**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWIN DICKINSON, R. | ) | |
| RUTHERFORD, STANKUS, NAUJOKAS, | ) | |
| J. KARALOW, MARK HARVEY, DANIEL | ) | |
| TREVINO, EDWARD MINGEY, BIEBEL, | ) | |
| F.J. CAPPITELLI, KARIN WEHRLE, | ) | |
| DAVID NAVARRO, HEATHER BRUALDI, | ) | |
| ANDREW VARGA, THOMAS O'MALLEY, | ) | |
| the CITY OF CHICAGO, and COOK | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, ARTURO DeLEON-REYES, by his attorneys LOEVY &

LOEVY, and complaining of Defendants REYNALDO GUEVARA, ERNEST HALVORSEN,

EDWIN DICKINSON, R. RUTHERFORD, STANKUS, NAUJOKAS, J. KARALOW, MARK

HARVEY, DANIEL TREVINO, EDWARD MINGEY, BIEBEL, F.J. CAPPITELLI, KARIN

WEHRLE, DAVID NAVARRO, HEATHER BRUALDI, ANDREW VARGA, THOMAS

O'MALLEY, the CITY OF CHICAGO, and COOK COUNTY, states as follows:

### INTRODUCTION

1.     Plaintiff Arturo DeLeon-Reyes was wrongfully convicted of the 1998 double

murder of Mariano and Jacinta Soto, and the abduction of their infant daughter and 3-year old

son. The crime occurred in Chicago, Illinois.

2.     Plaintiff had nothing to do with the murders or abductions.

3.  Indeed, despite a crime scene full of blood and other physical evidence, not one piece of that evidence has ever connected Plaintiff to the crime. None of the DNA and other forensic testing of physical evidence recovered from the crime scene has ever suggested that Plaintiff was a perpetrator.

4.  Instead, false evidence fabricated by Defendants caused Plaintiff's arrest, indictment, prosecution, and conviction.

5.  Included among that evidence was an involuntary and false confession attributed to Plaintiff, which was concocted and coerced by Defendants after 40 hours of abusive and illegal interrogation of a recently arrived Mexican immigrant who could not speak or understand English.

6.  Another man named Gabriel Solache was also wrongly convicted of these crimes. Solache had nothing to do with the Soto murders or abductions either.

7.  Defendants fabricated confessions and coerced statements they knew to be false from Solache and other witnesses, which falsely implicated Plaintiff in the crime.

8.  In order to secure Plaintiff's wrongful prosecution and conviction, Defendants also suppressed and destroyed evidence that would have shown Plaintiff was innocent, as well as evidence that could have been used to undermine the testimony of State's witnesses, including the testimony of Defendants themselves.

9.  As a result of Defendants' misconduct described in this Complaint, Plaintiff was wrongly convicted and was incarcerated for almost 20 years.

10.  He had come to the United States approximately three months before his ordeal began. Like so many other immigrants of all races and nationalities throughout American history, Plaintiff had come to work and to make a better future for his family. Plaintiff

immediately found a job in Chicago, earning what he could and sending money back to Mexico to provide for his pregnant wife, young daughter, and nine siblings. But Plaintiff's pursuit of the American dream ended with his wrongful conviction.

11.     At all times while he was imprisoned, Plaintiff maintained his innocence, and he fought for his freedom.

12.     During post-conviction hearings, in response to questions about whether he physically abused Plaintiff during his interrogation, Defendant Reynaldo Guevara invoked his Fifth Amendment right not to incriminate himself. Evaluating that testimony, Cook County Judge James Obbish said that Defendant Guevara had told "bald face lies" and further stated that Guevara had "eliminated any possibility of [] being considered a credible witness in any proceeding."

13.     In December 2017, the Cook County State's Attorney dropped all charges against Plaintiff and his co-defendant Solache. After almost 20 years of wrongful incarceration, Plaintiff finally received his vindication.

14.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

16.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

## PARTIES

18.     Plaintiff Arturo DeLeon-Reyes is a Mexican citizen. At all times relevant to the events at issue in this Complaint, Plaintiff lived in Chicago and was imprisoned in various locations throughout Illinois for a crime he did not commit. At the time that this case was filed, Plaintiff resided in Illinois.

19.     At all times relevant to this case, Defendants Reynaldo Guevara, Ernest Halvorsen, Edwin Dickinson (Star No. 20682), R. Rutherford (Star No. 20720), Stankus (Star No. 15239), Naujokas (Star No. 3771), J. Karalow (Star No. 13247), Mark Harvey (Star No. 10582), Daniel Trevino, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

20.     At all relevant times, Defendants Edward Mingey, Biebel (Star No. 1545), F.J. Cappitelli and other unknown law enforcement officers supervised the officers in the preceding paragraph. Acting under color of law and within the scope of their employment for the City of Chicago, they facilitated, condoned, approved, and turned a blind eye to the constitutional violations committed by the officers in the preceding paragraph.

21.     Defendants Guevara, Halvorsen, Dickinson, Stankus, Naujokas, Karalow, Harvery, Trevino, Mingey, Biebel, and Cappitelli are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

22.     At all relevant times, Defendants Karin Wehrle, David Navarro, Heather Brualdi, Andrew Varga, and Thomas O'Malley were Assistant Cook County State's Attorneys. These Defendants are sued for actions they undertook, in conspiracy with the Police Officer Defendants, in their capacities as investigators and without probable cause to believe that Plaintiff had committed any crime. Defendants Wehrle, Navarro, Brualdi, Varga, and O'Malley are referred to collectively as the "Prosecutor Defendants" throughout this Complaint.

23.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Police Officer Defendants. The City of Chicago is liable based on *respondeat superior* for the acts of the Police Officer Defendants. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department

24.     Defendant Cook County is a governmental entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office and which is responsible for paying any judgment entered against the Prosecutor Defendants.

25.     All Defendants are sued in their individual capacities unless otherwise noted.

## FACTS

### The Crime and Defendants Initial Investigation

26.     In March of 1998, Mariano and Jacinta Soto lived in a basement apartment in Chicago, along with their three-year old son Santiago and infant daughter Maria.

27.     On the morning of April 1, 1998, police officers conducting a well-being check at their apartment found the bodies of Mariano and Jacinta. In total, they had been stabbed more than 50 times. Jacinta was found lying face down in the bedroom; Mariano was found lying face up in the kitchen, with a number of defensive wounds on the back of both hands. The children were nowhere to be found.

28.     Police suspected that the crime had occurred on or around March 28, 1998.

29.     The Police Officer Defendants investigated the crime scene.

30.     Along with other Chicago police officers, they secured the house and began to gather the physical evidence left at the scene. Among other things, the Police Officer Defendants found two bloody knives and a butcher block at the scene, as well as blood-stained clothing and bed coverings, fingerprints throughout the house, broken glass, shoeprints in dried blood on the kitchen floor, and blood spatter on the bedroom wall. A police photographer took photographs of the scene. All of the evidence was collected and inventoried.

31.     None of the physical evidence discovered at the scene connected Plaintiff to the crime.

### Adriana Mejia

32.     On March 28, 1998, around the time the crime occurred, a woman named Adriana Mejia was picked up from the University of Illinois Hospital by her husband and sister-in-law, Rosauro and Guadalupe Mejia.

33.     The day before, on March 27, Adriana had been dropped off there supposedly to deliver a baby. She had been pretending for nine months that she was pregnant, lying to her family members. But when her family picked her up on March 28, she was holding a baby that she claimed was hers, and she was with a three-year-old boy who she claimed she was watching temporarily for another woman who had gone into labor at the hospital.

34.     In reality, these children were Santiago and Maria Soto, who had been abducted from the crime scene after their parents were murdered.

35.     Adriana Mejia's DNA was found all over the crime scene. After admitting that she had committed the murder and abduction, Adriana was convicted.

36.     She is serving life in prison for the crimes to this day.

**Arturo DeLeon-Reyes**

37.     When Plaintiff came to the United States from Mexico three months before the Soto murders to work, he left behind his pregnant wife, young daughter, and nine siblings.

38.     His wife's aunt lived in Chicago, and so Plaintiff came to live first with her and her family.

39.     Plaintiff quickly found work, and he worked long hours six or seven days a week. He used some of the money that he had saved to rent a single room in a nearby apartment.

40.     The apartment in which he happened to rent a room belonged to Adriana and Rosauro Mejia.

41.     Plaintiff did not know the Mejias.

42.     Outside of his long work days, Plaintiff spent all of his free time with his wife's family.

43.     He had very little contact with the Mejias other than seeing them in passing on his way to or from work.

44.     Another Mexican immigrant named Gabriel Solache also had rented a room in the Mejias' apartment. Plaintiff had no prior relationship with Solache either.

**Plaintiff Does the Right Thing**

45.     In the early morning hours of April 3, 1998, Plaintiff woke up and came out of his room when he overheard Rosauro and Adriana Mejia arguing in another room.

46.     Plaintiff could hear that the argument was about the three-year old boy that Mejia had said she was watching.

47.     Plaintiff told the Mejias that if there was a problem with the boy, they should take the boy to the police station. Plaintiff offered to go with them.

48.     Plaintiff and Solache escorted Rosauro Mejia and the boy to the 8th District Chicago police station.

49.     It would be the last time Plaintiff or Solache set foot outside as free men for nearly 20 years.

### Defendants Interrogate Plaintiff and Fabricate a False Confession

50.     Although Plaintiff and Solache had ensured that a missing boy was safely returned to the police, as any responsible citizen would, the Defendants immediately treated them both as suspects.

51.     There was no reason to suspect either of them of any crime. But instead of interviewing them and learning those facts, Defendants began an unrelenting interrogation of both men.

52.     Defendants' interrogation of Plaintiff, which began in the morning hours of April 3, 1998 and continued over the next 40 hours, was an extreme and alarming abuse of police power. It was a wholly illegal effort to secure a false confession from Plaintiff in violation of his constitutional rights, by means of physical violence and psychological abuse and coercion.

53.     Defendants knew at all points during their interrogation that Plaintiff was a Mexican immigrant who did not speak or understand English.

54.     Throughout the interrogation, Plaintiff was in a setting and circumstances that were completely foreign to him. He was deprived of sleep and food. He was interrogated in multiple locations by different teams of interrogators. He was isolated and disoriented.

55.     During their interactions with Plaintiff, Defendants observed that Plaintiff did not understand English and they saw his other deficits created by their interrogation.

56.     But Defendants took no steps to limit or to adapt their questioning of Plaintiff in response to these known vulnerabilities.

57.     Instead, they did the opposite: they agreed among themselves and acted to exploit Plaintiff's vulnerabilities to secure a confession, regardless of whether it was true or false, and knowing that there was no evidence to suggest that Plaintiff was involved in the crime.

58.     At points during the interrogation, Defendant Guevara took the lead in interrogating Plaintiff. At other points, Plaintiff's interrogation was conducted by Defendants Rutherford, Dickinson and Trevino.

59.     Among other things, Defendants committed the following misconduct during their interrogation of Plaintiff:

      a.     The interrogation began with physical violence and aggression. After remaining in an interrogation room with no windows—just a glass slit in the door—for an unknown amount of time, Defendant Guevara came into the room, immediately slapped Plaintiff across the face, and yelled at him about why he "did it."

      b.     Plaintiff had no idea what was going on, and indicated as much to Defendant Guevara. He knew that the three-year old had been reported missing, but he knew nothing else about the boy, he did not know the boy had been abducted, he did not know that an infant had also been abducted, and he knew nothing of the Soto murders.

      c.     Guevara handcuffed Plaintiff to the wall before leaving the room.

      d.     Defendant Guevara's use of violence immediately put Plaintiff in a state of immense fear and confusion.

      e.     Defendants' physically violent and psychologically coercive tactics continued as the interrogation proceeded.

f.   At one point, Plaintiff was taken to a different room with Defendants Guevara and Trevino. Defendants Rutherford, Dickinson and others were in that room as well. Defendant Guevara got very close to Plaintiff's face and told Plaintiff that he was not cooperating and threatened that if Plaintiff did not start talking about his role in the crimes he would get the electric chair and would be put to death.

g.   Plaintiff continued to deny any involvement in a crime.

h.   Defendant Guevara then grabbed Plaintiff by the arm forcefully and took him back to the interview room he had been in and again handcuffed him to the wall.

i.   Later, Defendant Guevara entered the interrogation room again and continued to interrogate Plaintiff about the crimes. Every time that Plaintiff denied involvement or responded that he did not know anything, Guevara slapped him across the face, each time harder than the last. This continued for an extended period. Plaintiff remained handcuffed throughout this beating.

j.   In addition to the extreme physical abuse and threats that Plaintiff would be executed if he did not cooperate, Defendants forced Plaintiff to take off his clothes during the interrogation, reinforcing their total control and authority over him.

k.   They also intentionally deprived Plaintiff of sleep throughout the interrogation. Plaintiff went to the police station around 4 a.m. on April 3, after a long day of work and less than a couple of hours of sleep. Defendants knew that Plaintiff had initially arrived at the police station in the middle of the night, and they kept him awake and handcuffed to the wall in a windowless interview room during his days-long interrogation. By the time Plaintiff's interrogation came to an end on April 5, Plaintiff had not slept more than a few hours since

waking up on the morning of April 2. The enforced sleep deprivation heightened the already impermissibly coercive nature of the interrogation.

l.   Defendants repeatedly and strenuously accused Plaintiff of the Soto murders and abductions over the course of the interrogation. Defendant Guevara, for example, screamed at Plaintiff repeatedly that he was guilty, often within inches of his face, in order to deliberately intimidate and frighten Plaintiff.

m.   The rooms in which the interrogation took place were closed and locked, and, before the physical abuse began, the glass slit in the door to the interrogation room was covered up with paper so that Plaintiff could not see out and others could not see in.

n.   Defendants also failed to give Plaintiff any effective Miranda warnings. At no point did Plaintiff knowingly or voluntarily waive his right to remain silent or his right to have counsel present at the interrogation.

60.   In the face of the extreme physical and psychological abuse and coercion described above, Plaintiff steadfastly maintained his innocence. Plaintiff told the Police Officer Defendants over and over that he did not know anything about the crime and that he was not involved in any way in the Soto murder and abduction. The Defendants ignored Plaintiff and brushed to the side evidence that corroborated Plaintiff's claims of innocence.

61.   For example, at one point the Defendants came in and insisted that Plaintiff sign a form consenting to a search of his room in the apartment. Plaintiff signed the form, and the Defendants then searched his room and found nothing that implicated or connected Plaintiff to the crime in any way.

62.   In the middle of the night of April 5, 1998, after 40 hours of abusive interrogation involving all of the events described above and more, Defendants finally broke Plaintiff's will

11

and forced him to sign a statement that they had written implicating Plaintiff in the Soto murders and abductions.

63.     Plaintiff was not the source of any of the details in the false confession Defendants obtained from him. In fact, Plaintiff did not know any of the details of the crimes. All of the facts related to the crime were fed to Plaintiff in his written statement by Defendants.

64.     In addition, Defendants Trevino and O'Malley wrote details of the crime into a false confession written in English (which Plaintiff could not read). Once Defendants had done this, they did not read the statement to Plaintiff in Spanish, or even give him a chance to review it. Instead, they told Plaintiff that they wanted to help him, and that to do so they needed Plaintiff to sign the document.

65.     After more than 40 hours of physical and psychological abuse, with his will broken and fearing further abuse, Plaintiff complied.

66.     The Prosecutor Defendants were all present at the Area 5 Detective Division during Plaintiff's interrogation. Defendant O'Malley participated personally in the interrogation and drafting of the false statement.

### Additional Fabricated Statements Falsely Implicating Plaintiff

67.     The same physically and psychologically abusive tactics were used on other individuals as well. These witnesses have testified on multiple occasions about being physically abused by the Police Officer Defendants during their interrogations. Those witnesses gave statements that Defendants knew to be false, and the Defendants suppressed information about their interactions with those witnesses.

12

68.     For example, in the aftermath of the crime, Defendants also interrogated Solache and used physically and psychologically abusive tactics as egregious as the ones used on Plaintiff in order to get him to implicate himself and Plaintiff falsely in the crime.

69.     The Police Officer Defendants, including Defendants Guevara, Halvorsen, Dickinson, Rutherford, and Trevino, planned, coordinated and conspired to obtain false statements from Solache and others.

70.     The Prosecutor Defendants were present at the Area 5 Detective Division during the interrogations of Solache and other witnesses as well. During those interrogations and the interrogation of Plaintiff, the Prosecutor Defendants advised, urged, and ordered the Police Officer Defendants to continue the abusive and coercive interrogations even though it was plain to all involved that the interrogations were highly improper.

### Additional Steps to Frame Plaintiff

71.     Independent of Defendants' misconduct discussed above, the Police Officer Defendants took additional steps to frame Plaintiff.

72.     The Police Officer Defendants deliberately withheld evidence that further demonstrated Plaintiff's innocence.

73.     For example, the Police Officer Defendants withheld evidence that witness statements implicating Plaintiff were false, including but not limited to Defendants' notes indicating that the witnesses implicating Plaintiff gave earlier statements that contradicted their statements implicating Plaintiff.

74.     Moreover, the Police Officer Defendants destroyed exculpatory evidence that could have been used to demonstrate Plaintiff's innocence. The Police Officer Defendants, including Defendants Karalow and Harvey, crime lab technicians who photographed and

inventoried evidence at the crime scene, suppressed or destroyed photographs of the crime scene because the photographs contradicted the facts of Plaintiff's false confession. To hide the fact that these crime scene photos existed, the Police Officer Defendants prepared police reports falsely claiming that the camera used at the crime scene had malfunctioned and the original crime scene photos were unusable. New crime scene photographs consistent with Plaintiff's false confession were taken weeks after the crime by Defendants Guevara, Stankus, and Naukokas.

75.     After Plaintiff was forced to implicate himself in the Soto murder, the Police Officer Defendants produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file. These documents, which were evidence used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that the Police Officer Defendants knew to be false. The Police Officer Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was entirely false.

76.     The Police Officer Defendants concealed this misconduct from Plaintiff, his criminal defense attorneys, and the prosecutors involved in his criminal case, including the Prosecutor Defendants. Indeed, the Police Officer Defendants continue to this day to conceal evidence in their possession demonstrating Plaintiff's innocence; and they continue to hide their own fabrication of evidence.

77.     In addition, on information and belief, the Police Officer Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

78.     Supervisors of the Police Officer Defendants were aware of their misconduct, their suppression of evidence, and their fabrication of a case against Plaintiff. These supervisors

14

nevertheless intentionally ignored the Police Officer Defendants' misconduct, and approved of arresting and prosecuting Plaintiff for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, the supervisors of the Police Officer Defendants explicitly authorized their investigative misconduct.

### Evidence of Plaintiff's Innocence Ignored

79.     In the midst of the misconduct described in this Complaint, Defendants willfully ignored and acted to undermine evidence that showed conclusively that Plaintiff had nothing to do with the Soto murders.

80.     Defendants disregarded the fact that crime scene investigators had collected numerous pieces of physical evidence from the scene of the crime, but none of it—not a single fingerprint, shoeprint, drop of blood, item of clothing, bedsheet, or hair—connected Plaintiff to the crime. In fact, the only conclusion that can possibly be drawn from the physical evidence discovered at the crime scene is that Plaintiff could not have had anything to do with the crime.

81.     They also disregarded employee timesheets showing Plaintiff's long workdays the day of the crime and the day before, which made it impossible for him to have committed a violent double murder and double child abduction.

82.     Defendants completely disregarded the simple fact that Plaintiff had voluntarily come to the police station with the missing three-year old boy.

83.     In addition, Defendants ignored that the false confession they had written for Plaintiff was riddled with obviously false information that could not be squared with the evidence at the crime scene.

84.     Finally, DNA testing performed after Plaintiff's convictions on the physical evidence that was recovered from the crime scene excluded Plaintiff (and Solache) as the source

of any of the physical evidence collected at the scene. Instead, DNA testing on the physical evidence revealed the presence of the victims' DNA, as well as the DNA of Adriana Mejia and the DNA profile of an unidentified person. Still Defendants took no action to undo the wrongful conviction of Plaintiff that their misconduct had caused.

**Plaintiff's Wrongful Conviction and Imprisonment**

85.     As a result of the Defendants' misconduct, Plaintiff was tried in the Circuit Court of Cook County. A jury convicted Plaintiff of first-degree double murder, aggravated kidnapping and home invasion. He was sentenced to life in prison without the possibility of parole.

86.     The State's case hinged upon Plaintiff's fabricated confession and statements that Defendants had fabricated from other witnesses. At trial, the State did not present any eyewitness testimony of any kind implicating Plaintiff in the crime, nor was there any physical evidence linking Plaintiff to the crime. Without Plaintiff's coerced statements, he would never have been convicted.

87.     Plaintiff was 23 years old when he was arrested and charged with the Soto murders and kidnapping. He would spend the next 19 years of his life behind bars, almost all of them in harsh and dangerous conditions in maximum-security facilities within the Illinois Department of Corrections.

88.     Plaintiff's whole life was turned upside down without any warning. Almost half of his life as of the date of this Complaint has been consumed by the horror of his wrongful imprisonment.

89.     Because of the Defendants' misconduct, Plaintiff's opportunity to be with and make a better life for his family was taken away, and his relationships with his wife, children, and the rest of his family were irreparably harmed.

16

90.     Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

91.     Because Plaintiff had been sentenced to life in prison without parole, he feared that he would die alone inside the prison walls, never to see his family again.

92.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**Plaintiff's Exoneration**

93.     On December 21, 2017, following post-conviction hearings, the Cook County State's Attorney moved to dismiss all charges against Plaintiff, and Judge James Obbish of the Cook County Circuit Court ordered him released from prison.

94.     On the same day, the Cook County State's Attorney's Office dismissed all charges against Solache.

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

95.     The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

96.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence and/or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they not commit.

17

97. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false confessions; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

98. At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

99. The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, inter alia, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case,

18

physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

100.    At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

101.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

102.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Fields v. City of Chicago*, 1:10 Civ. 1168 (N.D. Ill.) and *Jones v. City of Chicago*, 87 Civ. 2536, 88 Civ. 1127 (N.D. Ill.).

103.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Soto murders and investigation at issue here.

104.    In addition, a set of clandestine street files related to Area 5 homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. City of Chicago*, 12

Civ. 4428 (N.D. Ill.).Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

105.     Put simply, the policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Soto murder, including in the Area 5 Detective Division.

106.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

107.     Prior to and during the period in which Plaintiff was falsely charged and convicted with the Soto murders, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

108.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

109.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction,

failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

110.     This includes Defendants in this case. By way of example, Defendants Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen has engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

111.     The City of Chicago and its Police Department also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

21

b. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

c. The risks of wrongful conviction and the steps police officers should take to minimize risks.

d. The risks of engaging in tunnel vision during investigation.

e. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

112. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

113. The City's failure to train, supervise, and discipline its officers, including Defendants Guevara, Halvorsen and other Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

114. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

115.     The policies and practices described in the foregoing paragraphs were also
approved by the City of Chicago policymakers, who were deliberately indifferent to the
violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

116.     As a result of the policies and practices of the Chicago Police Department,
described above, Defendant Guevara has framed dozens of other innocent men over the span of
two decades. Like Plaintiff, these men have all lodged independent accusations of similar
misconduct against him.

117.     As of the filing of this complaint, fourteen men have had their convictions thrown
out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in
prison for crimes they did not commit. In addition to Plaintiff and Gabriel Solache, the other
twelve men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco,
Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry
Johnson, and Thomas Sierra.

118.     Defendant Guevara has a long history of engaging in precisely the kind of
investigative misconduct that occurred in this case, including abusive tactics, manipulation of
witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously
prosecuting innocent persons. In addition to the cases in which individuals have been exonerated,
there are dozens of other identified cases in which Defendant Guevara has engaged in serious
investigative misconduct.

119.     Given this extensive history of misconduct and the City of Chicago's failure to
meaningful disciplined Guevara and others, it is apparent that Guevara engaged in such

misconduct because he had every reason to believe that the City of Chicago and its Police
Department condoned his conduct.

120.    Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not
to answer any questions about allegations that he manipulated dozens of witnesses to provide
false identifications because truthful responses could subject him to criminal liability, including
every single instance of misconduct detailed below.

121.    Examples of Defendant Guevara's misconduct include:

    a.    Bill Dorsch is a former Chicago police detective.  While serving with the Chicago
police department, Dorsch was assigned to investigate a murder.  Several months after the
murder occurred, Defendant Guevara brought two juveniles to the police station that purported to
have witnessed a shooting and recorded the license place of the shooter. Based on the
information provided, Detective Dorsch created a photo array for the juveniles to attempt to
identify the shooter.  While the first juvenile was viewing the photo array, and before he
identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the
juvenile "that's him."  The juvenile then agreed with Guevara, saying that was the person who
committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the
other juvenile view the same photo array, and he was unable to make any identification. Based
on the first juvenile's identification, the suspect was charged with murder.  Subsequently, Dorsch
spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that
they had been paid to falsely claim that the suspect was the person responsible for the shooting.
After prosecutors spoke to the two juveniles, the suspect was released.

    b.    Defendant Guevara's activities have drawn the interest of federal law enforcement
officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago

24

Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

      c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

      d. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

      e. Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

      f. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

      g. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.   In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j.   In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.   After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.  In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.  In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

27

q.   In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

r.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

s.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.  Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

t.   In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key Brady material at his trial.

u.   In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

v.   Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

w.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses.  She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

x.   In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

y.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus.  Guevara called her a "bitch" and pushed her out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke.  He also hit her across the face with a metal bracelet he was wearing and called

her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of
Professional Standards.

z. In 1982, Defendant Guevara and three other officers broke through Almarie
Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked
who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two
children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional
Standards the next day.

aa. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt
from his home and handcuffed him to a ring in the wall at the police station where he was beaten
about the head, face, and body until he confessed to murder and robbery charges. Hunt was
detained for approximately 23 hours and deprived of food, water, and sleep until after he
confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office
of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a
beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned
a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against
the City of Chicago.

bb. In 1984, Defendant Guevara and other officers physically assaulted Graciela
Flores and her 13-year old sister Anna during a search of their home, during which the officers
did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch"
and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent
one week in the hospital.

cc. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo
Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied

30

knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

      dd. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

      ee. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

      ff. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

gg. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

hh. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

ii. In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

jj. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

kk. In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ll.   In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

mm.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by Guevara.

nn. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day.  Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

oo. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

pp. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

122. As the examples above demonstrate, the City of Chicago failed to meaningfully discipline Defendants Guevara or Halvorsen, or other officers engaged in similar misconduct. The Police Officer Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I – 42 U.S.C. § 1983
### False Confession
### (Fifth Amendment and Fourteenth Amendments)

123. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

124. In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

125.     In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

126.     In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

127.     Specifically, Police Officer Defendants and the Prosecutor Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional, multi-day interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murders of Mariano and Jacinta Soto.

128.     Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

129.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Soto murders.

130.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

131.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

132.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT II – 42 U.S.C. § 1983
### Fabrication of False Witness Statements
### (Fourteenth Amendment)

133.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

134.     In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and due process by fabricating witness statements implicating Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing their own misconduct and the circumstances in which these witness statements were obtained.

135.     Specifically, as set forth above, Defendants used physical violence and psychological abuse to obtain false witness statements from Solache and other witnesses implicating Plaintiff in the Soto murders.

136.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

137.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

138.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

139.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

140.     In the manner described more fully above, the Police Officer Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

141.     In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

142.     These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

143. The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

144. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

145. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

146. The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT IV – 42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

147. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148. As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

149. In the manner described more fully above, the Police Officer Defendants deliberately withheld exculpatory evidence from Plaintiff and from prosecutors (including the Prosecutor Defendants), among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

150. The Police Officer Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime,

obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

151.    In addition, the Police Officer Defendants also destroyed evidence that would have demonstrated Plaintiff's innocence. These Defendants destroyed this evidence knowing that it had exculpatory value. In the alternative, these Defendants destroyed this potentially exculpatory evidence in bad faith.

152.    In addition, based upon information and belief, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

153.    The Police Officer Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

154.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

155.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

156.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT V – 42 U.S.C. § 1983**
**Failure to Intervene**

157.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and Prosecutor Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

159.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

160.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

161.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

162.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VI – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

163.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164.    The Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

165.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

166.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

167.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

168.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

169.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

170.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

171.    As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

172.    Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

173.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of

criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

174.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

175.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

176.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by

42

various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

177.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

178.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to

adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

179.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

180.    As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

181.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

182.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress

183.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

184.     The actions, omissions, and conduct of the Police Officer Defendants and the

Prosecutor Defendants, acting as investigators and as set forth above, were extreme and

outrageous.

185.     These actions were rooted in an abuse of power and authority and were

undertaken with the intent to cause, or were in reckless disregard of the probability that their

conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

186.     As a result of the Defendants' actions, Plaintiff suffered and continues to suffer

emotional distress and other grievous and continuing injuries and damages as set forth above.

### Count IX – State Law Claim
### Malicious Prosecution

187.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

188.     In the manner described above, the Police Officer Defendants, individually,

jointly, or in conspiracy with one another, as well as within the scope of their employment,

accused Plaintiff of criminal activity and exerted influence to initiate and to continue and

perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in

spite of the fact that they knew Plaintiff was innocent.

189.     In so doing, these Defendants caused Plaintiff to be subjected improperly to

judicial proceedings for which there was no probable cause.

190.     These judicial proceedings were instituted and continued maliciously, resulting in

injury.

191.     The judicial proceedings against Plaintiff were terminated in his favor when the

Cook County State's Attorney dismissed all charges against him.

192.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

193.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT X – State Law Claim
### Civil Conspiracy

194.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

195.     As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

196.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

197.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

198.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

46

**Count XI – State Law Claim**
**Indemnification**

199.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

200.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

201.     The Police Officer Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

202.     The City is liable to indemnify any compensatory judgment awarded against the Police Officer Defendants.

203.     Defendant Cook County is responsible for any judgment entered against the Prosecutor Defendants.

**Count XII – State Law Claim**
*Respondeat Superior*

204.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

205.     In committing the acts alleged in the preceding paragraphs, the Police Officer Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

206.     Defendant City of Chicago is liable as principals for all torts committed by their agents.


WHEREFORE, Plaintiff, ARTURO DeLEON-REYES, respectfully requests that this Court enter judgment in his favor and against of Defendants REYNALDO GUEVARA,

ERNEST HALVORSEN, EDWIN DICKINSON, R. RUTHERFORD, STANKUS, NAUJOKAS, J. KARALOW, MARK HARVEY, DANIEL TREVINO, EDWARD MINGEY, BIEBEL, F.J. CAPPITELLI, KARIN WEHRLE, DAVID NAVARRO, HEATHER BRUALDI, ANDREW VARGA, THOMAS O'MALLEY, the CITY OF CHICAGO, and COOK COUNTY, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ARTURO DeLEON-REYES, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ARTURO DeLEON-REYES**

BY**:**    /s/ Anand Swaminathan
            *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steve Art
LOEVY & LOEVY
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900

48