IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTIRCT OF ILLINIOS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 1028 |
| | ) | |
| v. | ) | Hon. Andrea R. Wood |
| | ) | District Judge |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | Magistrate Sunil R. Harjani |
| Defendants. | ) | |
| | ) | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 2312 |
| | ) | |
| v. | ) | Hon. Andrea R. Wood |
| | ) | District Judge |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | Magistrate Sunil R. Harjani |
| Defendants. | ) | |
| | ) | |

**PARTIES' JOINT STATUS REPORT REGARDING *MONELL* DISCOVERY**

Pursuant to the Court's April 30, 2019 Order (Dkt. 101), the Court instructed the parties to meet and confer regarding the scope and phasing of *Monell* discovery, and to provide a joint status report by today's date. The parties have conferred, reached agreement on some issues and not others, and jointly submit the following update.

*Monell* **Discovery In Four Cases**

The parties have conferred about the scope of *Monell* discovery across four cases: these two cases consolidated for discovery, plus *Sierra v. City of Chicago*,

1

Case No. 18 Civ. 3029, and *Gomez v. City of Chicago*, Case No. 18 Civ. 3335. All four cases are alleged wrongful conviction cases alleging that Defendant Guevara and others violated their constitutional rights by, among other things, coercing their false convictions, manipulating witnesses and fabricating evidence, and suppressing exculpatory information.[1] In all four cases, Plaintiffs allege that the City maintained unconstitutional policies and practices that caused their wrongful convictions, the City's motion to bifurcate those claims were denied, and *Monell* discovery has been ordered to proceed. The underlying investigations in the four cases occurred in the following years: *Sierra* - 1995; *Gomez* - 1997; *Reyes & Solache* - 1998. The scope of *Monell* discovery discussed below applies to all four cases.[2]

The parties have discussed the production of two broad categories of documents: (1) other Area 5 homicide files, and (2) Complaint Register files ("CR files") reflecting the investigation and disposition of allegations of officer misconduct. With regard to the timeframe for production of these two categories of records, the parties have agreed on the period from 1992 through 1998.

### Category 1: Homicide Investigative Files

For homicide investigative files, the parties have agreed that the City will produce Area 5 homicide investigative files from 1992 through 1998. The parties disagree about one aspect of this production: whether the City will produce *all* Area

---

[1] *Sierra* does not have a coerced confession claim.
[2] [2] In the course of the Parties' discussions, the City did agree that if an agreement is reached between the Parties, the agreement would apply to all four of the cases. Agreement has not been reached. Accordingly, there is currently no agreement that applies to all of the cases other than the relevant time period.

2

5 homicide investigative files from that time period, or whether it will produce only those homicide investigative files for which a corresponding Cook County State's Attorney's Office ("CCSAO") file can be found.

Plaintiff's Position:

Plaintiffs intend to use the homicide files to prove that the City maintained a number of unconstitutional policies and practices. Among them, that the City concealed exculpatory information in secret "street files" (jury found *Monell* liability on this theory in *Fields v. City of Chicago* and *Rivera v. City of Chicago*), conducted unduly suggestive lineups, falsely reported the results of lineups in which the suspect was not selected, coerced confessions from suspects, and threatened and manipulated witnesses into implicating suspects.

As an initial matter, the City argues below that Plaintiffs have not demonstrated evidence suppression in these cases so as to warrant discovery of homicide investigative files. First, the City has already agreed to the production of Area 5 homicide investigative files from 1992-1998; the issue is simply whether the production should be limited to such files for which there is a corresponding CCSAO file. Second, the City has already made this argument and lost it in its motion to bifurcate; the City is indirectly asking this Court to overrule the finding of the District Judge, which it should decline to do. Plaintiffs' street files theory is alive and well in all four cases, the City did not seek to dismiss it in any of the four cases, and instead the District Court in all four cases has ordered discovery on that theory to proceed.

3

Third, Plaintiff has identified suppressed evidence in this case, and the City has never challenged Plaintiffs' interrogatory responses on that issue. Examples of suppressed evidence that Plaintiffs allege in this case include suppressed crime scene photos that undermine the fabricated confessions the Defendants coerced from Plaintiffs; suppressed notes of interviews with witnesses including Alfredo Aranda, Leobardo Mejia, and others; and information about vehicles that the police suspected may have been involved in the crime and pointed to alternate suspects. The City's position is no surprise—it also denied the suppression of evidence in *Fields* and *Rivera* despite overwhelming evidence to the contrary, and has consistently maintained that the street files claim is meritless despite denials of summary judgment and jury findings to the contrary. Discovery on this claim should proceed, and the focus should be on the actual dispute at issue: whether the production of homicide investigative files should be limited to those for which there is a corresponding CCSAO file.

On that issue, the City's desire to limit the production of homicide files to those for which there is a corresponding State's Attorney's Office file is premised on the assumption that the homicide files are relevant only to Plaintiff's "street files" claim. But as set forth above, that is not the case. And for that reason alone, the City's desire to limit the production of homicide files to those for which there is a CCSAO file should be rejected. Only some of the many homicide files will contain lineups; only some will contain coerced confessions; and only some will contain evidence of manipulated witnesses. Plaintiff needs the full set of homicide files in

4

order to obtain enough of the types of incidents of each type necessary to prove a widespread practice.[3] Even focusing on only the street files claim, the City's attempt to limit the homicide files should be denied. To provide a bit of context, *Fields* and *Rivera* involved nearly all of the same counsel in this case. In both cases, the production of homicide files was *not* limited in the way the City seeks here. The plaintiffs presented evidence at trial in both cases based on a set of homicide files that was not limited to files with corresponding CCSAO files. The plaintiffs presented evidence that the Chicago Police Department kept multiple, parallel files associated with a single homicide case, but lacked a cohesive system for ensuring that the information in all of those places was disclosed to criminal defendants; that information that should have been included in official police reports was instead buried in police notes; that many of those police notes were not shared with criminal defendants or their counsel; and that the policies CPD put in place to purportedly prevent the suppression of exculpatory information in its parallel files were consistently flouted, such that the policies were all but non-existent. None of

---

[3] The City claims it did not know Plaintiffs intended to use the homicide files to prove theories other than the street files claim, but Plaintiffs expressly identified these other theories in emails to Defendants regarding *Monell* discovery, stating as follows: "With regard to *Monell* discovery on Plaintiff's claims related to street files, and a pattern and practice of coercing confessions, fabricating evidence, including manipulating witnesses in lineup procedures, we request the production of other Area 5 homicide files in the period leading up to the 1997 homicide investigation in this case [Gomez]. In other words, the production of the same type of records produced in a case recently litigated by our firms, *Rivera v. City of Chicago*." This language was sent in *Sierra* and *Gomez*, and became part of the parties' consolidated conferral across all four cases. The City also claims it does not know how Plaintiff intends to use these documents to prove his other claims, but that is hard to believe. By way of example, Plaintiff used exactly such records to prove one of these theories in *Rivera*: that the City manipulated the results of lineups in which the suspect was not selected.e

5

these theories require the production of CCSAO files, and all of the theories were developed and proven without such files.

In stating its position below, the City spends much time re-litigating *Fields* and *Rivera*, two cases that unequivocally resulted in *Monell* verdicts on Plaintiffs' street files claim. And contrary to the City's revisionist framing below of those cases, the claim in both of those cases was based on much more than a comparison of police files to public defender or CCSAO files. The police practices expert in those cases, Michael Brasfield, explained the history of CPD's street files problem dating back to 1981, the policies put in place to purportedly fix the problem, the deficiencies in those policies on their face, and then as a practical matter reviewed hundreds of CPD homicide investigative files to see how those policies operated in practice. He found that nearly 100% of CPD homicide investigative files contained evidence that the policies put in place to fix the problem were not being followed, for example by failing to use CPD-mandated forms to take notes and share information on case developments, by failing to put all pertinent information into official police reports, by failing to contemporaneously log all investigative documents created in inventories required to be shared with criminal defendants, etc. *See* Exhibit A (Brasfield Expert Report in *Rivera*, at 30-72). None of these conclusions required a comparison of the homicide investigative files to any other files; what they required was a sufficient quantity of files to conduct the comparison. Plaintiffs do not intend to re-litigate the street files claims in *Fields* and *Rivera* here, but merely to clarify that the City's position that the claims were based on only a comparison of street

6

files to public defender and CCSAO files is flat wrong.

What is true is that the City's defense of the street files claim in both cases was to focus instead on whether material in the police files could be found in the CCSAO's files, arguing that if the material turned up in the CCSAO files, it could not constitute a *Brady* violation. To prove that defense, the City requested CCSAO files corresponding to the homicide files in *Rivera* and *Fields*—there were corresponding files in some cases but not all—and focused on those. Ultimately, it did not prevail by relying on those files.

The City's request, then, is to limit the production of homicide files to comport with its *defense* of just one of Plaintiff's *Monell* theories. But discovery should not be tailored to the City's defense, and to do so would be unfair to plaintiffs, who should be given the opportunity to both address the City's defense and also prove their claims in the additional ways they seek. For this reason, the City's limitation to homicide files for which a corresponding CCSAO file can be found should be rejected.

Defendants' Position:

As an initial matter, the City understood this Court's request for a joint status report as a request by the Court for the Parties to confer and propose a discovery plan detailing the scope and timing of *Monell* discovery. When Plaintiffs provided the City with their first draft (at approximately 2:30 p.m. on the date of this filing) it became apparent to the City that Plaintiffs intended to include legal arguments in the filing necessitating the City to respond in kind. Upon receipt of

7

the City's draft, Plaintiffs then incorporated additional arguments to respond to the City's rebuttal points. The City did not receive Plaintiffs revisions until 8:30 p.m. leaving the City with no time to address Plaintiffs' revisions in a concise and reasonable matter for the Court. Accordingly, the City will address only a few of Plaintiffs just added arguments and reserve the rest for the scheduled status on May 28.[4] First, the City's agreement to the production of Investigative homicide files for the agreed upon time frame does not in any way change the City's position that the most efficient way to handle the discovery, and consistent with Judge's Wood's ruling when she denied bifurcation, is to stagger it so that the *Monell* discovery can be tethered to the underlying claims. Plaintiffs have not identified a single document *in this case* that they claim were withheld from them. By contrast, in both *Fields* and *Rivera*, plaintiffs identified specific documents that they claimed were withheld. To be sure, Defendants denied that the documents were withheld and/or that they constituted *Brady* material but, at least, in those cases, plaintiffs identified specific documents that they claimed constituted withheld *Brady* material. Moreover, there has been no agreement reached on any of the other cases. Finally, Plaintiffs' footnote 3 is an inaccurate and, in any event, still does not explain how unrelated investigative homicide files will support any of the articulated *Monell* claims. The City's response to Plaintiffs' first draft is set forth

---

[4] Plaintiffs are disappointed in the City's decision to include this one-sided timeline. Plaintiffs will not waste additional space arguing over side issues; but needless to say Plaintiffs could air grievances over the City's conduct during the parties' conferral, but will instead focus on the issues in dispute.

8

below. While City and Plaintiffs' counsel have conferred on all four cases listed above, in the City's view, the discovery issues are not identical because the *Monell* claims are dependent on the facts of each case. Further, based on past experience, the City expects these claims to morph and change as discovery progresses. This makes agreeing to certain parameters in discovery particularly difficult. Nevertheless, based on Plaintiffs' reference to the *Fields* and *Rivera* cases, the City assumes Plaintiffs, at least, intend to pursue the same "street files" claim that the plaintiffs did in those cases did.[5] Not surprisingly, there are hundreds of pages of briefing on the issue in those cases, which would be impossible to synthesize here. Yet, the following provides some background that may be helpful in analyzing the issues.

First, contrary to Plaintiffs' assertion the *Fields* and *Rivera* plaintiffs did not pursue a theory that the City concealed information in "secret street files". Much different, the plaintiffs in those cases pursued a theory of underproduction of police reports. They attempted to do this by comparing the police reports and records in CPD investigative files to the police reports and records in the corresponding criminal defense attorneys' files. The plaintiffs made no effort to determine or establish that the thirty-year old criminal defense attorneys' files were intact or included all the records they once did at the time of trial, but, instead, argued that if a single piece of paper existed in the CPD investigative file, but not the defense attorney's file, that was evidence that the City's *Brady*-compliance policies were

---

[5] The plaintiffs in *Fields* and *Rivera* were also represented by Loevy & Loevy.

deficient. In both cases, the plaintiffs' evidence to support this claim consisted of the testimony of one expert, who simply compared the set of investigative files to defense attorneys' files to determine what was "missing" and therefore, alleged to be withheld in violation of *Brady*. In his review, however, the expert found that documents from the investigative file were produced to the criminal defendants, necessarily eviscerating the allegation that the investigative files were "secret". Further, the expert did not conduct an analysis of the exculpatory value any particular document or record in a particular case. In fact, in many of the cases, the alleged "missing" report were often either meaningless, records created by the Cook County State's Attorney's Office (CCSAO), or were redundant of other information in the files. Even more, despite the fact that the *Brady* obligations of police officers are discharged once the alleged exculpatory evidence is provided to the prosecutor, *see Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (police duty to disclose exculpatory evidence discharged if evidence disclosed to prosecution), the plaintiffs in *Fields* and *Rivera* did not analyze whether the alleged "missing" documents could be found in the CCSAO files.

Naturally, the City's *Brady*-compliance policies with respect to police reports and records are not relevant unless and until Plaintiffs can prove that at least some document was withheld from them, and that the information contained in that document amounted to material exculpatory or impeaching evidence. To that end, Defendant Officers issued written discovery to Plaintiffs asking what material, exculpatory evidence they allegedly withheld from Plaintiffs. Plaintiffs objected to

10

that request on the grounds that the request was (1) premature, (2) Plaintiffs could not answer until all police records were produced, (3) referred Defendants to the allegations in their complaint, and then stated that Defendant Officers (1) destroyed crime scene photos, and (2) suppressed notes, memo, and other evidence in secret files. The City is unaware of any "secret file" in which Defendant Officers allegedly suppressed exculpatory evidence, and, as to the scene photos, it is not possible for the City to produce evidence Defendant Officers allegedly destroyed. Despite being in possession of the Soto homicide investigative file since September of last year, Plaintiffs have not identified a single document that was not produced to them. Added to that, both Plaintiffs were represented by the Cook County Public Defender, and that office cannot find its file for Plaintiff Reyes, making it particularly difficult for him to prove *any* specific document or record was withheld from him.

If Plaintiffs cannot even identify what documents were allegedly withheld from them, then a massive production of other investigative files seems purposeless. At a minimum, and consistent with Judge Wood's suggestions to stagger *Monell* discovery, the parties should conduct discovery on what documents were allegedly withheld from Plaintiffs in *this* case before endeavoring to conduct a labor-intensive file comparison in unrelated cases.

Plaintiffs' position regarding the scope of production of investigative files is also ill-informed. As explained, CPD's duty to disclose exculpatory evidence is discharged if that evidence is provided to the prosecutor. The City's experience in

11

*Fields* and *Rivera* is that given the age of these files, the CCSAO will likely not be able to find many of its files from the time period the parties have chosen. If the CCSAO file cannot be found in a particular case, then there is no way Plaintiffs can prove that CPD is at fault for the failure to produce any document. Limiting the production to only those cases where there is a corresponding CCSAO file is not conforming to the City's defenses, as Plaintiff suggests. Rather, it is confining the discovery to the true issues in the case. And, Plaintiffs are misleading when they state that the production of investigative files in *Rivera* and *Fields* was not limited in the way the City suggests doing so here. That was not an option in either case. In both cases, the files were selected for production on a completely different basis; in *Rivera*, they were selected for a different discovery issue pertaining to lineups, and, in *Fields*, they were selected because the files were not stored in CPD's warehouse.

As to the other *Monell* claims Plaintiff intends to prove with a cache of investigative files, the City does not know what those claims are, and Plaintiff does not explain them here. It has been the City's understanding that Plaintiff intends to use the investigative files to prove their alleged "street file" claims. It appears from the above that Plaintiffs may attempt to prove that every act of alleged misconduct on the part of Defendant Officers was the result of a City policy, such as coercing confessions and manipulating witnesses. If that is the case, then Plaintiff has made no effort to explain how or why a set of random investigative files will provide evidence to establish any of those theories. If they are at all probative,

12

certainly they will not be less so if confined to cases where there is a corresponding CCSAO file.

## Category 2: Complaint Register Files

For CR files, the parties have agreed that the City will identify officers who worked as Area 5 homicide detectives in the period from 1992 through 1998, and then produce all of their CR files for that time period. The parties disagree on one point, however: the City's position is that it will only produce the CR files that meet this criteria for every fifth officer; Plaintiff is amenable to a limitation to every 2nd/3rd/4th/5th detective, so long as the City will stipulate that the resulting sample is representative for purposes of reaching conclusions in this case. The City has refused to enter into any stipulation.

Plaintiff's Position:

Plaintiffs' overall position is very simple: they are willing to agree to limitations on the production of CR files, so long as Plaintiff's agreement to limitations is not used against Plaintiff later on. So, for example, it would be unfair to limit Plaintiffs to every fifth officer, and then turn around at summary judgment or trial and argue that the total number of CR files Plaintiff reviewed was too small, or that the use of every 5th officer somehow renders unrepresentative the sample from which Plaintiffs reached conclusions. To be clear, Plaintiffs are willing to put in the work to review all of the CR files for the agreed time period. The City does not dispute the relevance of such records; it merely seeks to reduce its burden by producing less than the set of relevant records. The City should not be permitted to

13

reduce its burden by opening Plaintiffs up to a *Daubert* or other evidentiary challenge of their own making.

Plaintiff's position is that so long as the City will not agree to any stipulation, it should produce all CR files for the agreed time period. If it will agree to a stipulation—which it thus far has said it will not do—the determination of whether the limitations will be to every 2nd, 3rd, 4th or 5th, should be resolved once the universe of Area 5 homicide detectives is determined, so that a sufficient number of records can be ensured.

Finally, as to phasing, Plaintiffs' position is that all discovery should be completed in four months, and the discovery of the categories of documents discussed above should proceed immediately, while fact discovery on the underlying claims proceeds in parallel. Indeed, the production of *Monell* documents in *Sierra* and *Gomez*, covering the period through 1997, has already been ordered and is to proceed. There is no reason to artificially hold up the production of documents in *Reyes* and *Solache*. However, Plaintiffs propose that oral discovery such as 30(b)(6) depositions could be phased to occur toward the latter end of the discovery schedule.

<u>Defendants' Position</u>:

As to the production of CR files, to be clear, the list that the City will generate identifying detectives who passed through Area 5 during the agreed upon time frame may not include every detective so assigned. Additionally, Plaintiffs have not articulated why the City's proposal to identify every fifth detective from the list leaves them vulnerable to a *Daubert* challenge without a stipulation.

14

Plaintiffs' counsel are extremely experienced civil rights litigators with many years of experience. They are certainly competent enough to identify a sample size sufficient for whatever it is they hope to prove. The City cannot be handcuffed into accepting a stipulation just to limit a discovery request that in the City's view is not proportional to the needs of the case. This is especially true considering the City does not know what Plaintiffs intend to prove or how Plaintiffs will use the evidence the City would be producing. Rather, Plaintiffs should know what they intend to prove, and if the CR files they request are sufficient to establish that claim, then there is no need for a stipulation.

Finally, as to the length of time the parties expect they will need to complete *Monell* discovery, Plaintiffs indicated to the City, that they expect all discovery, including *Monell*, can be completed in four months.[6] The City's position is that is impossible. As a simple matter, it will take considerable time to locate, produce, and review the hundreds of files Plaintiffs request. On top of that, the City is currently unsure of what the contours of Plaintiffs' *Monell* claims are. Regardless, considering Plaintiffs likely intend to proceed by way of an alleged widespread practice theory of constitutional violations of some sort, the City will likely need to conduct mini-discovery investigations into the allegations of each of those cases. The City anticipates that at least twelve months is needed to complete *Monell* discovery. If, however, the Court agrees to stagger the homicide files discovery, and

---

[6] All Defendants agree that fact discovery without *Monell* cannot be conducted in four months' time, let alone *Monell* discovery.

if Plaintiffs cannot establish that any document were withheld from them, the City intends to file a motion to explain why this Court should not allow the discovery at all, which would naturally shorten the amount of time necessary.  Finally, Plaintiffs representation that "the production of *Monell* documents in *Sierra* and *Gomez*, covering the period through 1997, has already been ordered and is to proceed" is flat out false. Magistrate Judge Weisman is managing the discovery in *Sierra* and the Parties are still litigating confidentiality order issues in that case and haven't even begun to discuss *Monell* discovery.  Similarly, in *Gomez*, Judge Kocoras has issued no orders related to *Monell*.

Dated: May 24, 2019

Respectfully submitted,

| | |
|---|---|
| /s/ Anand Swaminathan | s/ Jan Susler |
| Jon Loevy | Jan Susler |
| Anand Swaminathan | John L. Stainthorp |
| Steven Art | Ben H. Elson |
| Sean Starr | People's Law Office |
| Loevy & Loevy | 1180 N. Milwaukee, 3rd floor |
| 311 N. Aberdeen, 3rd floor | Chicago, IL 60642 |
| Chicago, IL 60607 | *Attorneys for Gabriel Solache* |
| *Attorneys for Arturo Reyes* | |
| | |
| s/ Eileen Rosen | s/ Thomas Leinenweber |
| Eileen E. Rosen | Thomas M. Leinenweber |
| Catherine M. Barber | James V. Daffada |
| Stacy Benjamin | Kevin E. Zibolski |
| Theresa Carney | Leinenweber Baroni & Daffada LLC |
| Rock Fusco & Connelly LLC | 120 N. LaSalle St., Suite 2000 |
| 321 N. Clark St., Suite 2200 | Chicago, IL 60602 |
| Chicago, IL 60654 | *Attorneys for Individual Chicago Police* |
| *Attorneys for Defendant City of Chicago* | *Defendant Guevara* |

| | |
|---|---|
| s/ Caroline Golden<br>James G. Sotos<br>Caroline P. Golden<br>Josh M. Engquist<br>Joseph M. Polick<br>Sotos Law Firm<br>550 E. Devon, Suite 150<br>Itasca, IL 60143<br>*Attorneys for Individual Chicago Police Defendants Halverson, Dickinson, Rutherford, Stankus, Naujokas, Harvey, Trevino, Mingey, and Biebel* | s/ Daniel Noland<br>Daniel M. Noland<br>Paul A. Michalick<br>311 S Wacker Drive, Suite 5200<br>Chicago IL 60606<br>*Attorney for Individual Prosecutor Defendant Navarro* |