*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                    Phone: 360-301-4465
Port Ludlow, WA 98365                   E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

## Jacques Rivera v. Guevara, et al.
No. 12 CV 4428

**Report of Plaintiff's Expert – Michael D. Brasfield**

**December 30, 2016**

## INTRODUCTION

Anand Swaminathan with the law firm of Loevy & Loevy, representing the plaintiff in this matter, contacted and retained me more than a year ago to assess whether there were any deviations from generally accepted police practices in the actions of numerous employees of the Chicago Police Department ("CPD"), specifically as they relate to matters stemming from the arrest and eventual incarceration of Jacques Rivera for his alleged murder of Felix Valentin. These events occurred over more than a 20 year period – beginning in 1988 and ending in 2011. Jacques Rivera spent more than 20 years in a maximum security prison as the result of the actions of the defendants. As a result of my review of the materials provided to me, I have concluded to a reasonable degree of professional certainty that the defendants and the CPD failed to conduct even a cursory investigation of the facts and that they intentionally and willfully manufactured and falsified evidence, manipulated witnesses, and withheld critically relevant information from the defendant and his attorneys. I have also concluded that the defendants and the CPD had a widespread practice or custom of acting in the same manner in similar cases for many years. In my opinion, there were numerous departures from generally accepted police practices in the Felix Valentin homicide investigation; and, the CPD, through its policies, practices, commissions and omissions created an environment where officers could routinely ignore city policies and the law with impunity and that such behavior was not only tolerated, but encouraged. Despite the City's formal written policies related to investigations and accountability, the evidence demonstrates that as a matter of unofficial policy or widespread practice, police officers routinely violated common and accepted police investigative practices.

I have also reviewed the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as concerning the *Rivera v. City of Chicago* case discussed below, and more broadly. To that end, I reviewed documents regarding CPD's policies and practices governing homicide investigative files. I also reviewed numerous files created by CPD detectives during homicide investigations and compared those files to defense attorneys' files to assess whether relevant investigative material was disclosed or withheld. I have also relied upon the substantial

knowledge and experience I have gained from reviewing hundreds of CPD homicide investigation files and tens of thousands of pages of material in other cases involving the withholding of exculpatory information in so-called street files, including *Fields v. City of Chicago* and *Kluppelberg v. City of Chicago*. Through those cases and this one, I have reviewed hundreds of homicide files across different detective areas of the city, and maintained and stored in different locations. Based on my review, I have concluded to a reasonable degree of professional certainty that the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices and resulted in the routine failure to disclose important investigative materials to criminal defendants.

My opinions and the facts upon which I base my opinions are discussed in greater detail below.

I have been an active-duty municipal and/or county law enforcement official for approximately 39 years. I retired from active governmental service in 2009. I have served as the Chief of Police of the Fort Lauderdale Police Department, the Assistant Chief of the Seattle Police Department, and the elected Sheriff of Jefferson County, Washington. Over the last 20 years I have also been actively engaged as a consultant, trainer, case reviewer and expert witness in law enforcement related matters. An overview of my qualifications follows in Section I.A. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants.

A list of cases will be found in Attachment A; material reviewed for this case is in Attachment B; my rate of compensation in Attachment C; and a complete and detailed resume in Attachment D; a list of reference materials in Attachment E; summary of my file-by-file comparisons in Attachment F; a spreadsheet of my data analysis in Attachment G; a copy of my expert report in *Fields v. City of Chicago* in Attachment H; and a copy of my expert report in *Kluppelberg v. City of Chicago* in Attachment I.

I reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

## **TABLE OF CONTENTS**

I.      Background

      A.  Expert Witness Qualifications

      B.  Materials and Other Information Reviewed and Used in Forming Opinions

II.     Summary of Relevant Facts

III.    Deviations from professional homicide investigation standards in Felix Valentin homicide investigation

IV.     Failures in CPD's internal investigation and disciplinary processes allowed Defendant Reynaldo Guevara to engage in the sort of investigative misconduct alleged here

V.      The CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices

      A.  Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

      B.  *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

      C.  CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

            1.  Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

            2.  The CPD's *ad hoc* response to subpoenas exacerbates the problem

      D.  Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

            1.  Background on the Area North investigative files and my file review in this case

            2.  Criminal defense files are missing pages from the police investigative files

            3.  Issuing a subpoena does little to ensure disclosure of all relevant materials

            4.  The missing pages contain important and relevant information that should have been disclosed to criminal defendants

E. CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

    1. The policies are insufficient to remedy the "street files" problem

    2. The City failed to provide proper training and oversight to ensure compliance with the special orders

F. The police investigative files show that the directives were not properly implemented

    1. The police files from the 1985 to 1989 time period show that CPD's policies were not followed

        a. Handwritten notes, not on general progress reports, are still routinely used

        b. To-from memos are still being used

        c. Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports

        d. Inventories are missing or incomplete

    2. The investigative files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

G. There is strong evidence in the police investigative files, the Valentin investigation itself, and other CPD street file cases that there are yet other investigative files and documents that are unaccounted for by CPD and inaccessible to the prosecutors and criminal defendants

    1. My analysis of hundreds of files indicates that investigative information is being kept in other repositories or being destroyed

    2. The documents and testimony from this case provide further evidence of the existence of additional files and the failure to preserve investigative information.

    3. Kluppelberg and Fields are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials

        a. Fields v. City of Chicago

        b. Kluppelberg v. City of Chicago

H.  The failure to turn over files in Jacques Rivera's case was a direct result of these practices and inadequate policies

I.  **Background**

### A.  Expert Witness Qualifications

I began my 41-year law enforcement career in 1968 as a patrol officer with the City of Mercer Island, Washington.  In 1969, I joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief.  In addition to uniformed patrol, my investigative assignments as a detective included traffic homicide investigation, burglary and theft, and vice (gambling and prostitution).  As a sergeant, I served in patrol, the tactical squad, and internal investigations.  As a lieutenant, I served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years.  This academy was responsible for developing and providing the initial law enforcement training for all commissioned law enforcement officers in Washington State.  As a captain, I served as commander at both the downtown and north precincts, with responsibility for over 125 officers at each location.  I also served as the commander of the Internal Investigations section of the Seattle Police Department for 2 years.  I was the major in command of the inspectional services division for 4 years.  This division was responsible for developing, implementing, and monitoring departmental policies and procedures.  This division was also responsible for developing and administering a budget in excess of $120 million.  My last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau.  I was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel, intelligence; crime prevention; communications; records & evidence, which included the maintenance and control of homicide files; data processing; and fiscal, property, & fleet management.  In this capacity I routinely served as the acting Chief of Police.  I retired from the agency in 1995.

I was selected by the City of Fort Lauderdale as their Police Chief in 1995.  The 33 square mile city has a full time resident population of 165,000.  An estimated additional 60,000 "snow bird" residents return to second homes in the city during the 6-month winter season.  Fort Lauderdale serves as the seat of government for the county of 1.5 million and is in the heart of a diverse tri-county (Dade, Broward, and the Palm Beach) population of 4 million.  As one of the premier tourist destinations in South Florida, over 12 million passengers come through the airport each year.  The ocean port handles the second largest number of cruise ship sailings in the world.  Fort Lauderdale serves as the governmental and business hub of the County.  The Fort Lauderdale Police Department had a budget of $60 million and consisted of 500 sworn positions and 300 civilian positions.  In 2000, the department received 600,000 calls for service, dispatched over 200,000 of those calls, made over 20,000 arrests, and issued 65,000 traffic citations.  The Department is now nationally recognized as an innovative leader in the field of community policing and was one of only a handful of cities nationwide to be selected as a Community Policing Demonstration Site by the Department of Justice.  I oversaw the operation of the only municipal jail in the state of Florida.  Under my tenure, Fort Lauderdale became the first major agency to obtain accreditation.  After over 6 years as the police chief of Fort Lauderdale, I retired from law enforcement a second time and returned to the Seattle area in the fall of 2001.

After retiring as Chief of the Fort Lauderdale Police Department I returned to my retirement home in Washington State. After a year and a half, I chose to run for, and was elected to, the office of Jefferson County Sheriff. I served in that capacity for over 6 years, and retired for the third (and final) time in the spring of 2009.

As both a Police Chief (6 years) and Sheriff (6 years), I have reviewed and approved policy and procedures of every kind. These included (but not limited to) criminal investigations, maintenance of police records, complaints against police officers, training, supervision and discipline.

Of specific relevance to this case - During my 4 years as a supervisor and commander of the Internal Investigation Section of the Seattle Police Department I was directly involved with thousands of investigations of allegations of employee misconduct, including failure to adhere to rules and regulations. These included criminal investigations, up to and including evidence and witness tampering, burglary, robbery, sexual assault, and homicide investigations in officer involved shootings.

Of specific relevance to this case - During my 31 years in a supervisory and management capacity as a Sergeant, Lieutenant, Captain, Major, Assistant Chief, Chief of Police, and Sheriff, I have been responsible for the review and processing of hundreds of disciplinary actions up to and including termination.

Of specific relevance to this case - I am the past chair of the Washington State Board on Law Enforcement Training, Standards, and Education. As such we regularly examined and reviewed issues and criteria that define standards and norms related to the practice and administration of law enforcement practices and operations.

Of specific relevance to this case - Since the enactment of legislation establishing the Washington Peace Officer Certification Revocation Hearing process, I participated as a member of that panel in more Revocation Hearings than any other sworn law enforcement officer to date.

Of specific relevance to this case – During my 2 years as Commander of the Washington State Basic Law Enforcement Academy in Burien, I was responsible for the administration of the training program provided to all Washington State Law Enforcement Officers. This was also my role as the Assistant Chief of the Seattle Police Department responsible for in-service and advanced training at the Academy over a subsequent 5 year period.

Of specific relevance to this case - I have been responsible for the development, formulation and updating of police policy and procedures as the Commander (6 years) of the Seattle Police Department's Inspectional Services Division.

As an independent consultant and sub-contractor, I have completed on-site visits to analyze 6 major U.S. City (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle) police agencies to evaluate community policing in public housing. I have also served as a visiting management assessor for the cities of New Orleans (LA), Columbus (OH), Portland, (OR), San Francisco (CA), Bremerton (WA). Upon my return to Seattle in 2001, I provided contract

professional services as a consultant and program director for the non-profit South Downtown Foundation. I had responsibility for administering several million dollars for improving public safety in the International District, SoDo, and Pioneer Square neighborhoods of Seattle. In this capacity I coordinated efforts with the City of Seattle, the Seattle Police Department and various interest and civic groups in the area.

In 2002, I became a candidate for the Sheriff of Jefferson County, Washington. I was successful and assumed that office on January 1, 2003. I successfully ran for re-election in 2006 and was returned to office with 80% of the popular vote. I held a gubernatorial appointment to the Washington State Sentencing Guidelines Commission, serving as the only law enforcement official on this body of judicial, legislative and governmental representatives. I chaired the Washington State Criminal Justice Training Commission's Board on Law Enforcement Training, Standards, and Education. Members of this board monitor and evaluate the training of police officers and participate in law enforcement decertification hearings.

Over the last 40 years I have received extensive, specialized professional training in nearly all areas of law enforcement. There has been particular emphasis in the areas of training, internal investigations, accident investigation, use of force, ethics and police liability. I was awarded "life member" status with the International Association of Chiefs of Police in 2005. I was also awarded "life member" status with the Washington Association of Sheriffs and Police Chiefs in 2009. I am also a "life member" of the National Sheriffs Association. I have also been a member of the Washington State Sheriff's Association and served on the executive board of that organization.

During my career, I have been required to investigate and/or review hundreds of internal investigations. I have supervised hundreds of officers, and have had to review their compliance with standards of behavior and truthfulness. As both a supervisor, and later a commander of internal investigations with the Seattle Police Department, I have reviewed and evaluated the thoroughness of well over hundreds of such investigations. As a police chief and as a sheriff, I have had the ultimate responsibility of passing judgment on such actions by law enforcement officers in situations ranging from traffic stops to fatal shootings.

I received a Bachelor of Arts degree in Criminal Justice from the University of Washington in Seattle. I also am a graduate of the Senior Management Institute for Police (SMIP) of the Police Executive Research Forum. A copy of my Curriculum Vitae is attached as Appendix A.

### B.  Materials and Other Information Reviewed and Used in Forming Opinions

The following opinions are based upon my four decades of knowledge, education, training, and experience as a police officer, detective, police supervisor, commander, police chief, and sheriff. In particular, they are based on my lengthy experience with the law enforcement specialties of inspections, training, policy development, accreditation, jail operations and police internal investigations. My opinions are also based on the extensive materials I have been provided by counsel. I have attached a list of those documents as Attachment B. I have formed the following opinions based on a reasonable degree of certainty within the field of law enforcement practices and procedures. It is my practice to evaluate the reasonableness of police policies, practices, and

8

procedures on a case-by-case basis from the perspective of a police reviewing authority. My experience and qualifications are briefly outlined above and documented in my complete resume in Attachment D of this document.

## II.    **Summary of Relevant Facts**

On Saturday afternoon, the 27th of August 1988, Israel Valentin (age 22) and his younger brother Felix Valentin (age 16) drove to an apartment building located at 3324 West Cortland Street in the City of Chicago, Illinois. Israel exited their car and went inside the building to pick up his girlfriend, Marilyn Lopez, to attend a wedding. While Israel was in the building, Felix waited in the driver's seat of their car. An individual approached the car and shot Felix multiple times, then jumped into a waiting car driven by another individual and fled the scene. Shortly thereafter, Israel returned to the vehicle and discovered his younger brother seriously wounded. Police communications received the call at 3:39 pm. Israel took Felix to Norwegian Hospital and he was eventually transferred to Cook County Hospital.

Felix succumbed to his wounds nearly 3 weeks later on 9/14/1988. Felix's hospital treatment is related in the deposition of Dr. Arthur Sharkey. Felix suffered from multiple gunshot wounds and was treated in the intensive care unit over a period of nearly 3 weeks. Police reports document his poor condition and inability to interact with officers (Wron 00031- 00036). As of 9/9/1988, Valentin was not responsive to painful or verbal stimuli, his pupils did not react to light, he was on a ventilator and a moving bed, he was not breathing on his own, he was on medication to paralyze him, and he was suffering from a major infection. According to Dr. Sharkey, there is no indication in the medical records that Valentin regained responsiveness between 9/9/1988 and his death on 9/14/1988.

On 8/27/1988, responding police units who arrived at Norwegian Hospital were furnished with descriptions of the suspect and his "getaway" driver. The victim Felix described both subjects as Hispanic males between the ages of 16-18 driving an older brown vehicle – possibly a Toyota hatchback (Hickey 00002). Responding police units reported also that Felix related that the suspect had been wearing a yellow baseball hat and was of light to medium complexion (Hickey 00004).

Detectives McLaughlin and Leonard responded to the hospital at 5:15 p.m. 8/27/1988 to interview Felix and Israel. Detectives created a general progress report and police report reflecting the interview. The general progress report relates Israel's description of the events surrounding the shooting. It does not contain a description of the suspect and getaway driver. In addition, the general progress report contains information that Marilyn Lopez's younger brother, Orlando "Macho" Lopez (age 12) may have observed some portion of the shooting but had not been interviewed (Wron 00069). The police report (Wron 00031-Wrong 00033) contains a description of the suspect – Hispanic male between the ages of 18-22 with brown eyes, dark hair, a black jean jacket, dark pants, and gym shoes – and getaway driver – Hispanic male between the ages of 18-22. The description is not attributed to any person and the report does not describe the origin of the description. In addition, the description does not appear in the general progress report and is different than the description reported by responding police units. The police report omits any reference to Orlando Lopez.

Additional detectives Letrich and Moriarty interviewed Felix Valentin at the hospital on 8/30/1988 (Wron 00039). Felix stated that the two suspects were members of the "Imperial Gangsters". Detectives presented an Imperial Gangster photo album ("gang book") to Felix. Felix identified the shooter as Jose Antonio "Chequin" Rodriguez, and the driver of the getaway car as Phillip Nieves. Based on the identification provided by the shooting victim, Rodriguez was arrested just 3 blocks from the scene of the shooting at 1 a.m. on 8/31/1988 by Officers Moriarity, Vergara and Wojcik (at the request of Letrich) as the suspect in the shooting (Wron 00058). A hold dated 8/31/1988 was placed on Rodriguez that stated that officers expected to charge him with aggravated assault on Felix Valentin by 1 a.m. on 9/2/1988 (Wron 00059). The hold also stated that a line-up was to be viewed by the witness in the case. A release form dated 8/31/1988 states that the victim was unable to identify the defendant, due to being heavily sedated for pain (Wron 0063).

A photograph of Rodriguez was provided to me during my review of the case (RFC 1420) as part of a set of six photographs (RFC 1415-1420). These photographs are not part of the police, prosecutor, or criminal defense files provided to me. The numbered photographs appear to correspond to detective Leonard's general progress report dated 8/31/1988 (Wron 0064), and to the photograph evidence form dated 8/31/1988 11:45 p.m. (Wron 0062).

Gang Specialists Guevara and Gawrys reported on 9/16/1988 that they showed photographs of Rodriguez and Nieves to Orlando Lopez following a physical lineup on 9/15/1988. The report states that Lopez denied that Rodriguez and Nieves were involved in the shooting of Felix Valentin (Wron 00010). There is no photo of Nieves in the file.

With the exception of the above, there is no further reference to Rodriguez or to Nieves in the material.

Detectives McLaughlin and Leonard reported that on 8/29/1988 they interviewed Orlando Lopez. The report states (Wron 00030):

LOPEZ was coming from the store at corner of Kimball and Cortland. LOPEZ observed a copper colored GM-type car coming out of the alley, traveling northbound at approximately 3319 W. Cortland. LOPEZ indicated that said vehicle contained 2 M/WH's one of whom exited from the passenger's side of the vehicle and began to walk toward 3320 W. Cortland where the victim was seated behind the wheel of his vehicle. Suddenly, the M/WH began to run toward vehicle and LOPEZ noticed a gun in M/WH's hand. LOPEZ believed he heard three (3) shots but indicated that they were not very loud. LOPEZ indicated that LOPEZ saw the victim lean forward and to the right in the vehicle which victim had been seated.

LOPEZ informed R/D's that LOPEZ could identify the shooter because LOPEZ recognized the shooter as a M/WH who played baseball at Humboldt Park and LOPEZ had observed him there on a few occasions. LOPEZ did not know shooters name but was aware that shooter was affiliated with the Latin Kings. LOPEZ then viewed books and made an identification of one RIOS, Jose (16-D LATIN KING Page 40D) as the M/WH

who exited the copper car and shot the victim. At this time there is no identification of the driver.

On 9/16/1988, Gang Specialists Guevara and Gawrys also reported that Orlando Lopez was located and brought to Gang Crimes North on 8/29/1988, at which point he looked at photo books and selected a picture of Rivera (Wron 00009-00010). No photo albums were preserved or inventoried as evidence.

A police report of Detectives McLaughlin and Leonard dated 9/1/1988 (Wron 00035) states that attempts were made to have Lopez view a physical lineup including Rivera and Rodriguez on 8/31/1988 or 9/1/1988 but Lopez's parents would not allow him to participate at night and Lopez could not be located.

On 8/30/1988, Gang Specialist Reynaldo Guevara and other defendants arrested 22 year old Jacques Rivera (Wron 00056). Guevara claims to have based the arrest solely on an alleged identification of Rivera by 12 year old Orlando Lopez on 8/29/1988. However, a rap sheet of Rivera was requested on the day of the shooting on 8/27/1988 (Wron 00055). The arrest report states that hold papers were submitted "due to the fact that the witness is not available to view a physical line-up which will be held on 31 Aug. 88" (Wron 00056). A hold dated 8/30/1988 was placed on Rivera that stated that officers expected to charge him with aggravated battery on Felix Valentin by 7 p.m. on 8/31/1988 (Wron 00057). The hold also stated "the witness to this case will not be available until tomorrows date, and Felony review will not approve charges until they can interview the witness." On 8/31/1988 or 9/1/1988, Rivera was released without charges.

Rivera was steadily employed at the Humboldt Park Institute. He was living with his spouse and children; was 4 to 6 years older than the descriptions of the suspects; had no known connection to the victim; and lacked identifying physical characteristics contained in the description of the suspects. Guevara had no physical evidence to support the arrest of Rivera.

Following the death of Felix Valentin on 9/14/1988, reports indicate that Orlando Lopez viewed a physical lineup at Area Five on 9/15/1988 and identified Rivera. Photographs were taken of the lineup and inventoried.

Lopez has testified numerous times that during the 9/15/1988 lineup he told police that Jacques Rivera was not the person who shot Felix Valentin, and that the police responded that he should not be afraid to make an identification (Lopez Dep., Lopez Hearing and Trial Testimony). Lopez testified that this conversation occurred with a detective with an afro, a mustache, and glasses and a woman with blond or white hair. I have been provided with photographs of Reynaldo Guevara, which show him with an afro, mustache, and glasses.

Lopez has also testified numerous times that there were actually 2 separate physical lineups that he viewed. Lopez testified that the first lineup was conducted within a few days of the shooting of Valentin. The same detective with an afro, a mustache, and glasses accompanied Lopez to the first lineup. In Lopez's view, he (Lopez) selected Rivera from the first lineup as well. Following the first lineup, Lopez saw the person who had shot Felix Valentin on the street. The person was an Imperial Gangster and was not Jacques Rivera.

11

Jacques Rivera has also testified that there were actually 2 separate physical lineups. Rivera testified that Guevara asked him to be a filler in a lineup, after which he was held for a period of time and then placed in a lineup. Rivera testified that he was not told during the first lineup what crime he was standing in a lineup for or who was viewing the lineup. Rivera testified that he was released after the first lineup.

The testimony of Lopez and Rivera on this point directly contradicts the "official" record produced by the defendants. The police reports produced by the defendants do not contain any report of a physical lineup before 9/15/1988. A report of McLaughlin and Leonard describes a failed attempt to conduct a physical lineup with Lopez on 9/1/1988, after which they report they attempted to show photos to Felix Valentin at the hospital (Wron 00034-00035).

Documents in the investigative file support Lopez and Rivera's testimony that there were actually 2 physical lineups. As I discuss above, arrest reports, hold reports, and release reports state that on 8/31/1988 and/or 9/1/1988 both Rivera and Jose Rodriguez were being held to participate in a physical lineup with a witness. A general progress report written by Leonard on 8/31/1988 lists the names of Rivera and Rodriguez, along with four other individuals acting as fillers – Villafane, Olivero, Ruiz, Ramon Lopez. Photographs of all six individuals, apparently taken at the same time against the same backdrop, were submitted into evidence on 8/31/1988 (RFC 1415-1420, Wron 00062, 00064).

Testimony from Villafane, Olivero, and Ruiz also supports Orlando Lopez and Rivera's testimony that there were actually 2 physical lineups. Villafane testified that he only once participated in a lineup in his life in the summer of 1988 (Villafane Dep, pp. 13-14). Olivero also testified that he participated in a lineup for a shooting in the summer of 1988 (Olivero Dep, pp. 13-14). Ruiz testified that he had been in a lineup for the shooting of Felix Valentin, who was a friend of Ruiz (Ruiz Dep, pp. 26-27).

Taken together, there is strong evidence supporting Lopez and Rivera's testimony that there were 2 physical lineups.

Following the second physical lineup on 9/15/1988, Reynaldo Guevara and other defendants arrested Jacques Rivera for murder (Wron 00051). Later on the same night, Guevara and Gawrys submitted a supplementary report (Wron 00009), which states that Lopez identified Rivera in a photo album on 8/29/1988 and at a physical lineup on 9/15/1988. The report states further that Lopez was shown photos of Rodriguez and Nieves after the 9/15/1988 physical lineup and stated that they were not involved in shooting Felix Valentin (Wron 00010). Lopez testified that he was not shown photographs other than the photo albums (Lopez Dep, p. 177). Finally, the report states that on 9/10/1988, Guevara and Gawrys showed the victim Felix Valentin a photo album at the hospital and that Valentin identified Jacques Rivera as the person who had shot him (Wron 00010). Such an identification would have been impossible given the course of Felix Valentin's medical treatment described above. Dr. Sharkey testified on 9/10/1988, Valentin could not reasonably have spoken to another person, he could not have looked through a photo album, and he could not even have communicated with his eyes (Sharkey Dep., pp. 55-56).

In spite of numerous intentional malicious acts by Guevara and others of omission and/or commission; witness manipulation; false testimony and reporting; withholding of evidence; etc., murder charges were successfully filed against Jacques Rivera.

Rivera was convicted in July 1990 for the murder of Felix Valentin, based on the testimony and in-court identification of then 13-year-old juvenile, Orlando Lopez, and the testimony of Reynaldo Guevara. Lopez's testimony was the only evidence of Rivera's guilt presented at Rivera's criminal trial. Investigative materials in the possession of the Chicago Police Department were not provided to Mr. Rivera and his attorney, Judge Wadas, as described in detail below. Rivera was sentenced to 80 years in state prison and incarcerated for over 20 years.

Rivera represented himself *pro se* in parts of his post-conviction case and attempted to use FOIA to obtain documents from the Chicago Police Department relating to a physical lineup conducted on or about 8/31/1988. Later, Rivera was represented in his post-conviction case by the Center on Wrongful Convictions at Northwestern University.

In September 23, 2011, the Circuit Court of Cook County granted Rivera a new trial based on the conclusion that there was sufficient evidence of his innocence. Cook County prosecutors elected in October of 2011 not to retry Rivera and dropped the charges against him. In September 2012, the Circuit Court of Cook County granted Rivera a certificate of innocence.

III. **Deviations from professional homicide investigation standards in Felix Valentin homicide investigation**

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced, trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "murder books" in some jurisdictions. These investigative records provide a step by step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices. In fact, Det. Anthony Wronkowski ("Homicide Coordinator") stated that there should be 22 specific parts of an on-going and completed Chicago Police Department homicide investigation book.

Experienced homicide detectives are familiar with the difficulties posed by relying entirely on a single "eyewitness" as a basis for police presenting a charge of homicide and they were aware of these difficulties in 1988. According to the American Judicature Society, misidentification by eyewitnesses was the leading cause of wrongful conviction in more than 75 percent of the first 183 DNA exonerations in the United States. The presence of a weapon during an incident can draw visual attention away from other things, such as the perpetrator's

face, and thus affect an eyewitness's ability to identify the holder of the weapon. This is further aggravated when the lineup does not contain the offender. In that situation young children and the elderly commit mistaken identifications at a rate higher than young adults.

Professional investigation and documentation are critically important for a number of reasons, some of which include but are not limited to:

- Case integrity
- Continuity of investigation
- Supervisory oversight
- Facilitation of case management
- Inclusion of investigative notes and investigators actions
- Insuring thoroughness of the investigation
- Allowing other investigators to assist or replace initial investigators
- Providing a "paper trail" of what steps were taken (or not taken)
- Focusing on important aspects of the case
- Identifying what remains to be done and what has already been done and by whom
- Eliminating suspicion from some possible initial suspects
- Providing sufficient information to identify and arrest a suspect
- Providing insight for prosecutors considering charges
- Providing an objective basis for charging and trying the suspect
- Providing an objective basis for the court to determine challenges
- To have a single document for discovery and disclosure (Brady rule)

<u>Individual, Supervisory & Institutional Failures in Felix Valentin Homicide Investigation</u>

Officers' liabilities in this investigation include, but are not limited to:

- Problematic reports
- Intentional and willful actions
- Intentional and willful omissions
- Fabrication of evidence
- Destruction, suppression, failure to preserve evidence and investigative materials
- Bogus documentation and failure to provide documentation
- Improper and manipulative juvenile procedures
- Improper lineup and photo array identification procedures
- Criminal conspiracy

This so-called "investigation" into the homicide of Felix Valentin by the Chicago Police Department, Reynaldo Guevara, and various police officers and supervisors employed by the City was 1) intentionally and blatantly calculated to wrongfully focus on, arrest, charge and convict Jacques Rivera; and/or 2) was conducted in a manner as to be considered so sloppy and unprofessional as to insure the same outcomes.

Even by the most forgiving of standards, practice and criteria, the investigative documents of the Chicago Police Department in this matter were lacking any semblance of a professional and thorough investigation.

Before describing specific failures in the Valentin investigation, I must note that it is unusual that an investigating officer in a criminal investigation would refuse to answer questions about that investigation under oath. On the advice of his attorneys and apparently concerned about incriminating himself, Reynaldo Guevara refused in his deposition in this case to answer a single substantive question about the Valentin investigation or the prosecution of Mr. Rivera during his deposition in this case. This refusal extended to all aspects of the case, including the fabrication and suppression of evidence, manipulation of witnesses, including Orlando Lopez, physical and photo identification procedures used, exclusion of alternative perpetrators, testimony at Mr. Rivera's criminal trial, related misconduct in other cases, etc. It is a duty of a police officer to testify truthfully about investigations in which he is and was involved and a refusal to adhere faithfully to that duty is a departure from accepted police practices. I infer from Guevara's silence that there are no ready explanations for the serious holes in the Valentin homicide investigative, and that if Guevara were to testify, his statements would not exonerate him.

Some specific and important examples and issues of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

- **Maintenance of parallel investigative files some of which are not provided to the criminal justice system.** As explained in greater detail below, important investigative materials created during CPD investigation were not provided to Mr. Rivera, his criminal defense attorney, Judge Wadas, or the state prosecutors charged with approving charges and prosecuting the criminal case. Some of these investigative materials have gone missing or were destroyed. Other investigative materials were withheld and produced decades after Mr. Rivera's conviction. Those investigative materials recently produced have strong investigative value and should have been provided to participants so that they could conduct additional investigation to demonstrate Mr. Rivera's innocence, the unreliability of eyewitness Lopez, and to bring the perpetrator to justice. The multiple files in this case demonstrates a lack of file integrity and security, an insufficient or non-existent chain of evidence and/or custody, and willful failure to disclose and produced (Brady rule) all records to prosecutors, defense attorneys, and the court, not only in the initial process and trial, but also later in appeals and civil litigation.

- **Investigative "tunnel vision" by Reynaldo Guevara and the other defendants**. Responding officers investigating crimes have an obligation under accepted practices to follow all leads to bring the true perpetrator to justice. It is not an acceptable practice to focus on a suspect while developing evidence that implicates that suspect and excluding evidence that implicates other suspects ("tunnel vision" or confirmation bias). Tunnel vision is apparent in the investigative materials. The following four examples are the chief evidence of tunnel vision in the investigation of the Valentin homicide and the prosecution of Mr. Rivera for that crime:

o **A rap sheet of in the investigative file, which was not given to Mr. Rivera or his attorney Judge Wadas, shows an issued on inquiry date stamp of 8/27/1988.** Based on my experience in other cases involving the Chicago Police Department, that date stamp was placed on the rap sheet when it was requested by investigators working the Valentin investigation and was issued by the records division. The date stamp of 8/27/1988 is the same day as the Valentin shooting and is a full two days before 8/29/1988, the date on which police report the first mention of Mr. Rivera being implicated as having anything to do with this crime. Selecting a suspect without evidence and then pursuing evidence to connect that suspect to the crime in question is in serious conflict with accepted police practices. If Mr. Rivera was a suspect before the only evidence tying him to the crime was developed—the eyewitness identification of Lopez—that represents a gross violation of accepted police practices and egregious misconduct.

o **A physical lineup viewed by Lopez on 8/31/1988 or 9/1/1988 did not result in an identification of Mr. Rivera and was suppressed.** Evidence discussed above supports the conclusion that an initial physical lineup procedure was performed on 8/31/1988 or 9/1/1988 that included Orlando Lopez as the witness and Mr. Rivera as a suspect, during which Mr. Rivera was not identified and after which Mr. Rivera was released from custody. Investigative materials concerning that physical lineup procedure were not provided in advance of Mr. Rivera's criminal trial to Mr. Rivera or to his attorney as described in Section V.H below. A failure by the sole eyewitness Lopez to make an identification of Mr. Rivera is evidence that he did not commit the crime. In addition, it is evidence that critically undermines Lopez's 9/15/1988 supposed identification of Mr. Rivera, and it is evidence that prosecutors and criminal defense attorneys would have used to evaluate the prosecution and defense of the case. Failure to document Lopez's non-identification of Mr. Rivera during the 8/31/1988 or 9/1/1988 physical lineup is additional evidence of "tunnel vision" and another gross violation of accepted police practices.

o **Failure to pursue perpetrators Rodriguez and Nieves, identified by the victim, and failure to document investigation, exclusion, or alibis of alternative perpetrators.** Shortly after the crime, the victim Felix Valentin stated to investigators that the person who had shot him was a member of the gang called the Imperial Gangsters, after which investigators provided a photo album of know Imperial Gangsters, from which Felix Valentin selected a photograph of Jose Rodriguez as the shooting perpetrator and Felipe Nieves as the driver of the getaway car. Rodriguez was arrested in close proximity to the crime scene, held, and participated in a physical lineup, as described above, but he was released according to reporting on or about 9/1/1988 with the only stated reason being that the victim had not identified him. Lopez testified that shortly after the first physical lineup he saw the perpetrator of the Valentin shooting on the street and recognized that the perpetrator was a member of the Imperial Gangsters street gang. The investigative files do not document any investigation of Rodriguez or Nieves other than the above, even though these individuals were identified by the

16

victim of the crime, who was the person in closest proximity to the shooter. The investigative files do not reflect or document an effort to determine whether Rodriguez or Nieves had an alibi for the date and time of the shooting of Felix Valentin, and they do not reflect or document the process by which Rodriguez or Nieves were excluded as suspects in this crime. The only exception is the report by Guevara and Gawrys described above, which states, contrary to Lopez's testimony, that Lopez was shown photographs of Rodriguez and Nieves following his supposed identification of Mr. Rivera on 9/15/1988, at which point Lopez supposedly excluded Rodriguez and Nieves. Established police practices require investigation of perpetrators of crimes identified by the victims of those crimes, including careful documentation of the investigation of such individuals and the process by which such individuals are excluded as suspects.

o **False reporting of an identification of Mr. Rivera by the victim Felix Valentin**. Reporting detectives Guevara and Gawrys stated in a police report written on 9/16/1988, after Mr. Rivera's arrest, that the victim Felix Valentin a week before on 9/10/1988 had identified Mr. Rivera as the perpetrator in a photograph. The failure to contemporaneously document this purported identification and the physical impossibility of such an identification being made by a victim who on 9/10/1988 was unresponsive, could not breath, had unreactive pupils, was paralyzed with medication, and who could not have made an identification according to the doctors treating him, demonstrates that the information about an identification of Mr. Rivera by Valentin is false. This false information is likely included in the police report produced after Mr. Rivera's arrest by police officers suffering from "tunnel vision" in order to eliminate the significant obstacle to Mr. Rivera's arrest and prosecution that is caused by the fact that shortly after the crime the victim Felix Valentin identified individuals as perpetrators who were not Mr. Rivera. Inserting false information into a police report is an additional gross deviation from acceptable police practices during a homicide investigation, as is attributing to the victim of a crime an identification that did not occur.[1]

- **Improper conduct of and failure to document physical and photographic lineup and showup procedures**. In addition to the failure to document a filler identification and/or non-identification of Rivera taking place during an initial physical lineup on 8/31/1988 or

---

[1] Additional departures from accepted police practices concerning the supposed 9/10/1988 identification of Mr. Rivera by Felix Valentin include 1) the fact that information about the identification was first inserted into a report 6 days later on 9/16/1988, after Lopez had selected Mr. Rivera in a 9/15/1988 physical lineup, leaving no contemporaneous documentation of the identification in the investigative record, 2) the lack of documentation regarding how the identification procedure was employed, including any deviations from standard practice, such as using signals rather than speech to indicate identification, or any modifications to allow Felix to view the photographs while his bed was in constant motion from side to side, 3) the lack of any audio recording, video recording, or other documentation of the identification procedure, 4) failure to preserve the photograph identified, 5) failure to document the physical and mental condition of the witness, given his serious injuries, during the identification procedure and interaction with the witness apart from the identification procedure.

9/1/1988, discussed above, investigating defendants also departed from accepted police practices in their conduct and documentation of physical and photographic lineups conducted during the course of the Valentin investigation as follows:

- o **Failure to document the circumstances of Lopez's purported identification of Mr. Rivera in a photo album**. There are conflicting reports and testimony about where the identification occurred and who was present and procured said identification. There is no documentation of the number of photographs shown to Lopez, what photo albums were shown to Lopez, who was present (both civilian and police officers) what Lopez said/what was said to him before and after the identification procedure, Lopez's reaction to various pictures as he reviewed the photo books, how long the procedure lasted, or the contents of Lopez's statement when he supposedly picked Jacques Rivera's photograph, including his level of certainty. The photograph and the photo book were not preserved or inventoried as evidence. In related fashion, there is an absence of explanation in the police documents as to why investigators provided Lopez solely with a Latin Kings photo album, rather than showing him multiple albums, such as the Imperial Gangster albums.

- o **Failure to document the circumstances of other identifications from photo albums**. There are similarly no records documenting the identifications supposedly made by Felix Valentin from photo albums and those photographs and photo albums were not preserved or inventoried as evidence.

- o **Failure to use fillers independent of the investigation**. Individuals present in a physical or photographic lineup procedures as fillers must not be known to witnesses viewing those procedures. For obvious reasons, use of a filler known to the witness increases the possibility of mistaken/improper identification because the person is known by the witness and thus is not a filler. George Ruiz (or a photo of him, if the defendants are believed) was used in a lineup procedure on or about 8/31/1988 or 9/1/1988. Ruiz was a friend of Felix Valentin's and was known to him. He was likely known by Lopez (at least in appearance) as well. Using Ruiz and others known to witnesses undermines the reliability of those identification procedures.

- o **Failure to document use of photos**. The investigative materials reflect photos, including photos of Mr. Rivera, without documentation of individuals to whom those photos were shown or even whether those photos were used during the investigation.

- o **Failure to include Jose Rodriguez in 9/15/1988 lineup.** Without any explanation in the police record, Jose Rodriguez was not presented in a physical lineup to Lopez on 9/15/1988. Rodriguez had been identified by the victim himself and was arrested in close proximity to the crime scene. Not permitting Lopez to observe the potential actual perpetrator dramatically increases the chance of a mistaken identification of an innocent person. Relatedly, the chance

of a mistaken identification is increased when two lineups are shown to a witness that only have a single suspect in common.

o **Failure to accept and suppression of non-identification**. According to Lopez, at the 9/15/1988 physical lineup, he (Lopez) stated that Mr. Rivera was not the person who committed the shooting. Rather than accepting his statement, defendants had Lopez proceed with the identification of Rivera and then suppressed the true circumstances of the identification. In addition, defendants improperly suggested to Lopez that he should continue with his identification of a particular participant (Mr. Rivera). This is an obvious and knowing suppression of highly exculpatory evidence, and it represents a blatant manipulation of a child witness (see below). In addition, it runs contrary to accepted police practices, established in 1988, which required investigators not to suggest to witnesses anything about who should or should not be selected during a lineup procedure.

o **Improper photo lineup with unresponsive witness**. As discussed elsewhere, Valentin was not in physical shape to participate in any lineup procedure or to respond to officers as of 9/10/1988, nonetheless Guevara/Gawrys presented him a lineup on that date. A lineup should not be shown to witnesses who are in a comatose state. The condition or a witness and any changes to a lineup procedure as a result of the witness's condition must be carefully documented.

o **Improper photo lineup with Orlando Lopez following live lineup and failure to document photo lineup**. Though Lopez denies being shown photographs of Rodriguez and Nieves after his 9/15/1988 lineup with Mr. Rivera, even accepting Guevara/Gawrys's account that he was shown such photographs, that was not the proper procedure. Rodriguez and/or Nieves should have been included in a live or photographic lineup, including fillers, if they were to be excluded. In addition, the photos shown to Lopez should have been preserved and inventoried as evidence, and the procedure used to show those photos to Lopez should have been documented.

**The departures from standard police practices regarding lineup procedures discussed above were in part a result of the written policies of the Chicago Police Department governing lineups**. Hickey testified that GO 83-5, effective at all dates in the Valentin investigation, did not require a photographic record to be made of a lineup in which a filler was selected (Hickey Dep., pp. 260-267). The written policies did not provide guidance on what had to be reported in the event of a lineup procedure in which a filler was selected. In addition, police were permitted to confirm to a person viewing a lineup that they had picked the correct person during the lineup procedure. There appear to be no written policies in effect in 1988 that governed the conduct of photographic lineups. Photographic procedures appear in 2003 amendments to GO 88-18.

• **Failure to document and transmit investigative information**. The investigative file reflects a pronounced failure by defendants to document investigative information. Oral communication of information during a homicide investigation is insufficient. A written

record is necessary to communicate relevant information among investigating personnel in order to identify suspects and develop evidence leading to the apprehension of the true perpetrator of the crime. All potentially pertinent information must be recorded because the investigator will not know at the time information is received that it is or is not important to the ultimate case. Contemporaneous documentation is critical to ensure that information is accurately recorded and communicated. Finally, the requirement of disclosure of investigative materials to the criminal defendant and criminal defense attorney (Brady rule) requires documentation of investigative information. A lack of documentation suggests a departure from standard police practices, a failure to investigate, a suppression of evidence, or a combination of these things. The following were not produced in the investigative files I have reviewed:

- o **Withheld notes, GPRs, investigative reports and activity forms of Gang Crimes Officers involved in the investigation**. As explained below, any investigative materials in the investigative file produced by the Gang Crimes Specialists involved in the Valentin investigation were never produced, with the exception of a couple of reports by Guevara. Investigative activities of gang crimes officers should have been reported to superiors and the criminal justice system.

- o **Withheld documentation of investigation between 9/2/1988 and 9/14/1988**. Virtually no chronological documentation of investigative steps taken between 9/2/1988 and 9/14/1988 was produced as part of the investigative file. Based upon the material made available by the defendants, the investigation was "shut down" on or about 8/31/1988 when it appeared that Felix Valentin would survive. Only after his death on 9/14/1988 were events and documents generated to belatedly make it appear that officers had actually been conducting a real investigation. There is no documentation of investigative steps taken during the 2 weeks that the investigation was dormant. There is no explanation or justification for the lack of continuity in this homicide investigation. Detectives McLaughlin and Leonard began the investigation, but it was soon taken over by gang specialists who should have only been providing assistance regardless of whether Valentin survived. There is no record of any meaningful supervisory oversight apparent from my review of the materials, other than signing documents.

- o **Withheld documentation of steps to locate Orlando Lopez**. The defendants state in various police reports that they were having trouble locating Orlando Lopez, but no documents were produced to reflect investigative steps undertaken by defendant investigators to locate Lopez between 8/30/1988 and 9/15/1988. In an investigation such as this one, investigators would have been making efforts to contact Lopez, and the results of that search are relevant to the investigation as a whole (for example, if Lopez was actively evading contact with the police, his status as a reluctant witness may be pertinent to the prosecutor or criminal defendant).

o **Withheld documentation of the reasons that Rodriguez and Nieves were excluded as suspects**. As discussed, no investigative materials were produced that reflect any reason that Rodriguez and Nieves were excluded as suspects. There are similarly no materials in the investigative files showing that either individual's alibi was checked or confirmed. There are no materials reflecting any interview or police interaction with Rodriguez or Nieves, with the exception of Rodriguez's 8/31/1988 arrest. A decision to stop pursing a suspected perpetrator must be documented in the homicide file. In fact, there is very little documentation anywhere in the file about the apparent parallel investigation into Rodriguez and Nieves. Based on my experience, I would expect that investigators would have documented the reasons that Rodriguez and Nieves were excluded as suspects.

o **Withheld documentation or recordings of interviews with or statements of witnesses and the victim**. No documents or recordings of interviews or statements of individuals relevant to the investigation have been produced as part of the investigative file, including Mr. Rivera's family, employer, and co-workers (regarding his alibi, work schedule, relationship with the victim and witnesses), individuals frequenting the Humboldt Park baseball fields, Marilyn Lopez (Israel Valentin's girlfriend), Orlando Lopez's friends, family, teachers, or others who might have shed light on his reliability as a child witness (see below), interviews with Israel Valentin or Felix Valentin after 9/1/1988 (with the exception of Guevara/Gawrys's purported 9/10/1988 photo identification), the corner store clerk to whom Lopez ran during the shooting, the driver who took Felix and Israel to the hospital, hospital staff, and family and friends of Felix Valentin. These interviews would be a starting point in a homicide investigation and I expect that they would have both occurred and been documented by the assigned personnel.

o **Withheld reports of tips and leads**. A typical homicide investigation will contain numerous tips that should be investigated. There are notably few tips documented in the investigative files in this case.

- **Improper use, interaction, and influence of juvenile witness**. The sole eyewitness and only evidence connecting Mr. Rivera to the murder of Felix Valentin was 12-13 year old Orlando Lopez. As discussed, relying on a single child eyewitness in support of a homicide charge, under the circumstances presented here, is unprofessional absent corroborating evidence. Established police practices dictate that juvenile witnesses should be treated with extreme care. There is no evidence that such steps were undertaken in the Valentin investigation regarding Lopez.

o **Vulnerability/susceptibility of juvenile witness**. Lopez was 12 years old at the time of the investigation and 13 years old at the time of trial, making him less reliable, and also susceptible to manipulation and suggestion. As discussed, mistaken identifications occur at a higher rate with juvenile witnesses. All interviews and identification procedures performed with juvenile witnesses must occur in a non-leading format with results carefully documented. As discussed, in

21

this case, Lopez testified that he stated to police at a physical lineup that Mr. Rivera was not the perpetrator after identifying Mr. Rivera in a photograph. That information should have been documented and Lopez should not have been compelled to make an identification following that statement.

o **Presence of parent/guardian**. There is no documentation of the presence or absence of a parent at any of the police interactions with Lopez. Absent such documentation, we must assume that there was no parent present at any of his numerous interactions with police.

o **Initial statement and subsequent statements of juvenile witness**. Lopez's statements and testimony about his observation of Felix Valentin's shooting have changed over time. It is especially important in the case of a juvenile witness to document carefully, preferably by recording audio/visual, all statements of a juvenile witness about the nature of a crime, particularly the initial statement. For example, 11 shots were fired at Valentin in rapid succession, but Lopez has testified that he was able to observe the beginning and the end of the shooting, while running to a corner store to tell a clerk to call the police as the shooting was occurring. This is an unreliable account on its face. It also contradicts the police record described above. In a case where an eyewitness is the only evidence connecting a perpetrator to a crime, all descriptive statements given by that eyewitness of the perpetrator must be completely and accurately reported, particular in the case of a juvenile witness. Inconsistencies in child statements should not be ignored; rather, discrepancies must be explored with witnesses, and the results of that follow-up investigation carefully documented.

Additional examples and issues of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

- Street nomenclature (North vs. West)
- Family relationships (Israel referred to as father rather than brother at one point)
- Orlando Lopez identified at one point as Orlando Rivera
- Corruption of physical evidence (shell casings (5) co-mingled and placed in single bag, bullets recovered at autopsy co-mingled and placed in single bag)
- Ballistic analysis missing or not done (no comparison of ballistic evidence with known weapons, no comparison with open or closed Chicago cases, no comparison with regional, state, or federal data bases)
- Failure to process and document crime scene, vehicle, and clothing (no documentation of Rivera's, Rodriguez's, or Nieves's owned or accessible vehicles, although autopsy found 11 wounds, only 5 shells recovered from scene, failure to examine, document, and photograph "line of sight" positions and angles)
- No attempt to locate suspect vehicle (stolen/missing vehicles, impounded vehicles, similar vehicle description in other similar or nearby crimes, area accident reports, investigation of incorrect vehicle, failure to include traffic accident/collision report #K875-233)

- No review or retention of incoming 911 call recording(s) or dispatch or responding unit call recordings
- Utilization of silencer suggested, but no follow-up
- Reason for Felix and Israel Valentin's visit was supposed to be to pick up Israel's girlfriend. Why didn't she come downstairs with Israel since no shots were heard? If she did, what did she see?
- Missing and merging of investigative dialogue often precludes ability to actually know which officer (who) did what, when, where, how and why
- Partial documents (blank "Inventory of Things Seized in Search" (warrant return), no "Search Warrant" in files)
- No attempt to address the classic "motive-means-opportunity" criteria.
  - Did the suspect have any animosity towards, or confrontational history (motive) with, Felix Valentin?
  - Did the suspect own or have easy access (means) to the murder weapon, or own or have access to the type of vehicle used in the shooting?
  - Did the suspect have a witness, or witnesses that would place him elsewhere (lack of opportunity) at the time of the shooting?

Nowhere in the investigation did officers inquire into, or establish and/or address any of these basic items.

The defendants in this lawsuit will undoubtedly claim that any "minor" oversights, inconsistencies, or mistakes were unimportant. The record does not support any of those conclusions and instead demonstrates ample departures from standard and accepted police practices. Any reviewing supervisor should have immediately noted the telltale signs of such.

As initially stated, there exists a broad range of literature, accepted policies and practices, and professional references that accentuate many of these shortcomings.

IV.  **Failures in CPD's internal investigation and disciplinary processes allowed Defendant Reynaldo Guevara to engage in the sort of investigative misconduct alleged here**

As described in detail below, Defendant Guevara's misconduct in the Jacques Rivera case and all other cases is a direct result of the CPD's failure to meaningfully investigate, supervise, or discipline him.

The community policing philosophy depends on the integrity of the police department. If the public lacks confidence in the agency's ability and commitment to investigate and prosecute officer misconduct, there is little hope for successful partnerships and problem-solving.

Police departments must walk a delicate balance when supervising their officers. On the one hand, police officers must employ great authority and a fair amount of autonomy to effectively carry out their duties. On the other hand, every police department understands that autonomy plus authority, absent sufficient supervision, will generate abuse of that power,

ultimately leading to violations of civilians' constitutional rights. This is a fundamental concept of policing – that a healthy police department will always deploy resources to supervising police officers to prevent abuse of police powers.

That supervision can be carried out in a variety of ways, including an active and efficient internal affairs department, direct supervision by superiors, and reviews of both of these systems by the department and/or municipal authorities and/or agencies to ensure that the supervision is effective. A breakdown in the oversight by the department not only fails to deter the unsupervised officer from committing misconduct, it also sends a message to all other officers and detectives that they will be provided similarly lax oversight, emboldening those officers to believe if they abuse citizens they will not face meaningful discipline from the department.

How police officers are disciplined for acts of misconduct affects the culture of policing within the police department and among police officers. An agency that implements or in practice demonstrates substandard mechanisms for police supervision and/or discipline invites a culture in the department where officers know that they cannot or will not be held to accepted standards in the event of oversights or misconduct in investigation and the performance of other job duties. That culture in turn may lead to circumstances where there is little incentive for sworn officers in the department to report or to attempt to address problems with police officers within the department. Once a culture of relative lawlessness or non-reporting is established and entrenched within a police department, a concerted effort will be necessary to reform that culture.

Moreover, how police officers are disciplined for acts of misconduct affects how the community views the police and how the police view their job. An agency or individual that routinely fails to take proper action when discovering that its officers have committed acts of misconduct will eventually lose its credibility in the community. Intuitively we can see why. If officers feel that the discipline system gives them no reason to obey the rules, some of them will not obey the rules. The public may see the results in more acts of police misconduct. Likewise, if officers view the agency's discipline as capricious or oppressive, they will often avoid the work that generates the most complaints: citizen contacts. (Community Policing Dispatch – August 2008)

In the case of Detective Guevara, both the Department's dedicated internal affairs system and his direct supervisors failed for decades to meaningfully investigate or discipline Guevara's pattern of gross misconduct in violating numerous citizens' constitutional rights, including Jacques Rivera's. Any worthwhile investigation would have uncovered widespread abuses, particularly given that Detective Guevara is refusing to testify about any of the over one hundred documented allegations of misconduct, for fear that truthful responses would implicate him criminally. While invoking silence may not be admissible at a criminal proceeding (and I offer no opinion on that), silence certainly can be an indicator of wrongdoing during internal investigations.

As far back as April 1986, Detective Guevara was accused of punching a civilian, threatening him, and using racial slurs in front of two witnesses. CR # C150473. After conducting an investigation, the complaint against Guevara was sustained, but inexplicably, the

Superintendent altered the result to "not sustained" for no apparent reason. If an investigation yields evidence that misconduct occurred, as in this case, discipline must be imposed. If new evidence comes to light that warrants reversing the initial decision to impose discipline, then the new evidence, or at least the reason for departing from the decision to impose discipline, must be documented. It almost goes without saying that when a police officer is caught committing misconduct but suffers no consequences, the effect on the officer is even worse than if the officer had not been apprehended in the first place – the officer learns that the internal affairs system has no teeth, and the system fails to serve as a deterrent regarding future misconduct.

Again in 1986, Guevara arrested a man for narcotics possession, released him for some unknown reason, and was accused of striking him in the head several times. CR #C152902. Guevara received a 2 day suspension for failing to fill out a battery report and releasing someone who had committed a crime. (These circumstances are similar to reports about Guevara in the FBI 302, discussed in detail below). Although this internal investigation occurred weeks after Guevara was accused of striking a different arrestee and of improper use of a weapon, very serious allegations themselves, and months after the April 1986 allegations, the internal investigation does not reference the repeated allegations against Guevara. CR #C152612. The failure to take into account prior similar incidents of misconduct when conducting an internal affairs investigation is a recipe for disaster. One of the initial steps any qualified detective takes when conducting a criminal investigation is to check the criminal history of a suspect, including not only convictions but also arrests as well, to determine whether a pattern of behavior is indicated. The same is true for any competent internal affairs investigation. But the CPD's internal affairs department, as a matter of policy (Klimas Dep, pp. 90-91, 93), did not consider other complaints when determining if a particular citizen's complaint of misconduct had merit.

Also in the early 1980s, Annie and Bernard Turner alleged that Guevara used excessive force against them for smoking on a city bus (CR #124631). Although medical evidence supported the Turners' allegations, the officers present denied misconduct, claiming that Annie Turner resisted arrest and was injured as a result. According to the records, however, Annie Turner was never charged with resisting arrest or anything other than smoking on a city bus. This discrepancy is not noted by the internal affairs investigators. Despite credible evidence supporting the Turners' claim, the complaint was not sustained.[2] The message that is sent by not disciplining police officers caught violating citizens' rights is that they are free to offend again without fear of reprisal.[3]

Similarly, in 1982, complainant Almarie Lloyd stated that Guevara and two other officers entered her home without a warrant (CR #125360). Although three witnesses apparently corroborated this version of events, there is no record that I have been provided that Guevara received any discipline whatsoever for his conduct.

---

[2] Investigators treated allegations brought by a police officer against Guevara differently than complaints by civilians, so long as the complaint did not criticize Guevara's on-duty actions. In CR # C251502, Guevara was suspended 20 days for threatening to harm a police sergeant who ticketed Guevara's car.

[3] CPD's internal affairs sustained rate of 2-3% is extremely low (Klimas Dep., p. 64), and supports the conclusion that Guevara was emboldened to commit misconduct by CPD's refusal to provide supervision and discipline.

Further, Guevara was the subject of two complaints of domestic violence, both in 1996 and 1998. CR #C223928 and #C248946. The way the CPD handled these complaints is instructive. In both incidents, Guevara was accused of physically striking members of his household. One of the allegations was sustained, the other was not. These are criminal acts, and should have been referred to the prosecutor for potential prosecution. Instead, Guevara simply received a 3 day suspension. Favorable treatment by the CPD of criminal acts committed by Guevara furthers the impression that Guevara was led to believe that he could break the law and not face consequences for his actions.

I find further support for the lack of investigation and/or supervision/discipline of Guevara in the FBI 302 report of Mohammed Omar produced by the FBI during the investigation of CPD Gang Crimes Specialist Joseph Miedzianowski (JR-L 44169-41183). In that report, witnessed by a member of the CPD's internal affairs division, Omar reported that he knew Guevara, and that Guevara's "policy" was to catch a person with drugs or guns, but let them buy their way out of trouble. Further, Omar reported that Guevara "accepted bribes to change positive or negative identifications during line-ups for murder cases." Omar provided a specific example of two cases where Guevara was implicated in fixing the cases in conjunction with an attorney Boyke, whom Omar said was a friend of Guevara's. Omar's information about Boyke's relationship to Guevara appears to be accurate, and his detailing of the criminal enterprise run by himself and Miedzianowski is supported by their federal convictions for the same (Beuke Dep., pp. 44, 66-67, 68-69, 69, 73-74) (Complaint, *Maysonet v. Beuke*, Bates No. JR-L 040987-040999, ¶ 3-4, 6, 28, 30, 46). Nonetheless, the record presented to me is devoid of any follow-up investigation of Omar's report (Klimas Dep., pp. 6, 12-13). There is no indication that Guevara was questioned, that IAD tried to question Boyke or find the two people specifically mentioned as having cases that were fixed by Guevara. These are the most fundamental steps that must be taken in any internal investigation, let alone one where the accusations are so serious. If true, what Omar is alleging is not only a terminable offense, it is also criminal. Nevertheless, it is not acceptable for a department to abdicate investigative authority to a prosecuting agency. Prosecutors seeking criminal charges have an entirely different standard of proof and purpose than a police agency looking to ensure that its police officers are not victimizing its citizenry. Regarding the suggestion that no follow-up was conducted because Omar was deemed not credible (Klimas Dep, pp. 6, 12-13), I find that suggestion contraindicated by the 16-page detailed report created by the FBI as a result of the interview with Omar, in which Omar freely details his own criminal involvement as well as those of Miedzianowski, Guevara, other civilians and other Chicago police officers. To discount wholesale a witness's account of such extreme police misconduct without conducting any follow-up investigation is wholly unacceptable by reference to accepted police practices and administration standards. Furthermore, if an investigation was not conducted because the complainant was not credible, that determination itself should be documented so that there is a record for any future inquiry as to why no investigation was undertaken. The lack of a documented explanation for why no investigation was conducted into these serious allegations suggests that no explanation exists to justify not investigating Omar's allegations.

The CPD's refusal to investigate, supervise, and/or investigate Guevara is apparent in relation to State Representative Delgado's April 2001 formal complaint with CPD regarding seventeen cases in which Guevara was alleged to have provided false testimony in court (CR

26

#C270916). The CPD conducted no investigation. The CPD did not even bother to record the names or case numbers of the seventeen cases. CPD's only response to Representative Delgado's complaint was to wait for the State's Attorney's Office to conduct its own review of the seventeen cases. A single ASA claimed to have reviewed fourteen of the seventeen cases less than two months later and reported finding no improprieties. There is no record of what that assistant state's attorney did to determine whether any improprieties occurred. Further, there is no record that the remaining three cases were ever reviewed; the only reference to those cases is that the assistant state's attorney could not find the records for those cases. No record of the state's attorney's investigation was ever obtained by the CPD. Guevara was never questioned about the seventeen cases by the CPD, which is a departure from accepted practices. As stated above, it is wholly unacceptable to abdicate responsibility for investigating misconduct by a Chicago police officer to another agency.

The CPD's lack of response to Representative Delgado's complaint is troubling in a number of respects, not the least of which is that the complaint was pending at the very same time that Omar provided his similar allegations of gross misconduct by Guevara. The fact that CPD refused to even so much as begin an investigation into contemporaneous serious complaints against Guevara coming from such diverse sources as a State Representative and a cooperating federal informant, indicates that the CPD was actively avoiding any investigation that might reveal misconduct by Guevara. Coupled with the CPD's refusal to investigate Hunt's allegations (see below), Dorsch's allegations (see below), and overturning a sustained finding against Guevara for no apparent reason, I find that the CPD evinced a long-standing refusal to investigate or discipline Guevara in any meaningful respect, that began in the mid-1980s and continued until his retirement in 2005.

The systemic lack of investigation and/or supervision/discipline is also present in the City's failure to investigate Leshurn Hunt's civil lawsuit against Guevara, filed in 1985. Hunt claimed he suffered excessive force and other civil rights violations committed by Guevara and other officers during his arrest and interrogation. Hunt sustained injuries and his confession was suppressed by the criminal court. In that lawsuit, according to the court, Hunt "identifies five recent occasions on which the police defendants in this case were accused of undertaking warrantless home searches, and nine recent occasions on which they were accused of using excessive force during arrests and interrogations." *Hunt v. Jaglowski*, 85 C 1976, 665 F.Supp. 681 (July 21, 1987). I see no indication that the CPD conducted investigation of the allegations raised, despite a lawsuit being filed against Guevara and a number of court opinions regarding the case being published. This is unacceptable under any standard of internal affairs investigations.

I find further support for the lack of investigation and/or supervision/discipline in both the sheer number of similar allegations lodged against Guevara as well as the confirmed acts of misconduct he committed. For a police detective to have one confirmed case of framing an innocent man is abhorrent; for it to occur repeatedly, it is evidence of a complete failure of supervision and that fellow officers turned a blind eye or condoned the misconduct.

Specifically, in 1989, Guevara framed Juan and Henry Johnson for murder by inducing one man to get other men to falsely implicate the Johnson brothers in the murder. The circuit

court eventually overturned Juan Johnson's conviction and he sued (Complaint, *Johnson v. Guevara*, case no. 05 C 1042). Guevara was found liable for framing Juan Johnson and ordered to pay $21,000,000 as compensation to Johnson. (Verdict Form, *Johnson v. Guevara*, case no. 05 C 1042)

In or around 1988-1990, CPD detective William Dorsch alleges that he witnessed Guevara tell a juvenile witness whom to select from a photo array (Dorsch Dep., pp. 320-360). Recognizing the obvious impropriety in Guevara's misconduct, Dorsch brought the incident to his supervisors' attention. Instead of disciplining Guevara (intentionally interfering in an identification procedure in a murder case could justify termination), the supervisors covered up the wrongdoing by instructing Dorsch to classify the case as cleared/closed, so that no further investigation would be conducted. There is no record of any follow-up investigation conducted by any supervisor or member of the internal affairs division to determine if Guevara in fact interfered in an identification procedure conducted during a homicide investigation.

The City of Chicago has also determined that, in 1993, Guevara was responsible for obtaining the convictions of Jose Montanez and Armando Serrano for murder, despite their innocence. According to the report issued by former Federal Prosecutor Scott Lassar of the law firm Sidley Austin, which was retained by the City of Chicago after the filing of this lawsuit to conduct an investigation of Guevara in order to examine its liability, among other things,[4] Guevara induced a man facing several serious felony crimes to falsely implicate Montanez and Serrano, causing them to spend over twenty years incarcerated for crimes they did not commit (Lassar Report regarding Montanez and Serrano, Bates No. CCSAO 46099-46156).[5] Subsequently, the appellate court reinstated Montanez and Serrano's case, and then both Montanez and Serrano were granted certificates of innocence (*People v. Montanez*, Ill. App. 2d. (1st Dist. 2016); Orders Granting Certificates of Innocence, *People v. Serrano* and *People v. Montanez*).

The City of Chicago has determined that in 1994 Guevara also caused Roberto Almodovar to be wrongfully convicted of murder as an innocent man. In the Almodovar case, Guevara was again accused of inducing witnesses to falsely implicate Almodovar and his co-defendant, William Negron. Guevara's explanation for how he came to suspect Almodovar– that Guevara thought Almodovar's photograph appeared similar to a description of the shooter that was not provided until *after* Guevara made Almodovar a suspect defies common sense. I am not making a credibility determination here; rather, I note that a police officer cannot claim that a photograph matches a description that does not exist at the time the photograph was selected as the suspect. I further note that, when questioned about this case at his deposition, Guevara took the Fifth rather than respond to questions about his alleged misconduct, lending further support for the opinion that Guevara's conduct in that investigation contradicted accepted police practices (Lassar Report on Almodovar, Bates No. CCSAO 43718-43732).

---

[4] The City's efforts to investigate Guevara, through Scott Lassar, did not come until long after Guevara retired and had no effect on preventing Guevara from victimizing other people.

[5] In a similarity to the Rivera case, detectives in the Montanez/Serrano case, investigated by Guevara, pulled the rap sheets for all three of the men eventually charged in the murder – Montanez, Serrano, and Pacheco – on May 25, 1993, although no one implicated them in the murder (or any other crime) until June 2, 1993. Like the Rivera case, this is shown by issued on inquiry date stamps on the rap sheets.

The City of Chicago determined that in May 1993 Guevara caused Robert Bouto to be wrongfully convicted of murder. In that case, Guevara is alleged to have induced several witnesses to falsely identify Bouto as the shooter. Although Bouto's alibi witnesses have consistently maintained that he was not present at the shooting, from the time of his trial to the present, all of the witnesses selected Bouto at line-ups conducted by Guevara. Those witnesses maintain that Guevara allowed them to see Bouto at the police station before the line-up was conducted, negating the neutrality of the line-up (Lassar Report on Robert Bouto, Bates No. CCSAO 30301-30344).

The City of Chicago also determined that in April 1998 Guevara used physical force to coerce Arturo Reyes and Gabriel Solache to involuntary confess to murder (Lassar Report on Reyes and Solache, Bates No. CCSAO 43655-43673).[6] Based on evidence of Guevara's misconduct, Solache and Reyes have been granted a new suppression hearing by the criminal court (Order in *People v. Reyes* dated June 29, 2016).

In 1996, the appellate court overturned the conviction of Xavier Arcos in a published opinion. That opinion reported that, in 1991, a witness was induced to falsely implicate Arcos by Guevara, who was alleged to have fed him details about the crime in order to frame Arcos. *People v. Arcos*, 282 Ill. App. 3d 870, 873-74 (1st Dist. 1996). I see no record that Guevara was ever questioned or investigated despite the courts overturning a murder conviction on grounds that he fed false information to the witness, which is a grave departure from accepted practices.

The fact that Guevara committed so many repeated serious transgressions during homicide investigations, resulting in the wrongful prosecution and conviction of innocence individuals, indicates to me that his supervising and fellow officers turned a blind eye to his misconduct. This evidence is consistent with the existence of a code of silence within the Chicago police department, dating back to the Jacques Rivera investigation in 1988, and continuing at least until 2007, when a federal jury determined that the CPD had a code of silence, wherein police officers would not report misconduct committed by fellow police officers. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). In addition, these repeated serious transgressions – discovered apparently without much investigative effort during an investigation performed recently by Lassar at the City of Chicago's request – demonstrate that the City of Chicago and the Chicago Police Department, including its IAD and other supervisory agencies, failed to adequately investigate, supervise, and/or discipline Guevara over the course of his career.

Conversely, I find no support for the proposition that Guevara was receiving appropriate supervision or discipline. The failure to even question Guevara about the allegations listed above, including allegations from Omar, Hunt, and Representative Delgado, but also the various other cases where citizens accused Guevara of misconduct, is even more pronounced given Guevara's refusal to testify about these incidents on grounds that truthful responses might subject him to criminal liability (Guevara Dep.). When he was a police officer, the CPD could

---

[6] Lassar reached this conclusion despite drawing no inference from Guevara and another officer's refusal to speak about their activities as Chicago police officers and their interrogations of Reyes and Solache (Lassar report on Reyes and Solache, footnote 1).

have forced him to provide truthful responses under Garrity, and, given his invocation of the Fifth Amendment, it is likely those responses would have uncovered Guevara's misconduct. But by not even questioning Guevara in so many of these cases, the CPD failed to even begin the process of ferreting out Guevara's wrongdoing and, by extension, allowed it to perpetuate for decades.

Supervision of Guevara was hampered by the CPD's refusal to implement any type of early warning system (Klimas Dep., p. 76). The need for an early warning system to alert a police department to problem officers before they violate citizens' rights was well-established in policing long before 1988. An effective early warning system would have tracked Guevara's serious allegations of misconduct lodged against him prior to 1988, and would have required supervisors to consider the allegations against him in conjunction with each other, rather than as separate and discreet acts. An effective early warning system in place prior to 1988 would have communicated to Guevara, and all other police officers in Area 5, that transgressions would be exposed and responded to harshly, in effect deterring Guevara from committing the misconduct that marked his career from 1988 onward. Indeed, a federal jury found that the CPD had a widespread practice of not supervising or disciplining police officers as late as 2007. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). The record before me is consistent with that verdict, and I have seen nothing to suggest that CPD maintained an effective disciplinary or supervisory system from 1982 onwards.

## V.   **The CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices**

Police departments have long recognized the need to ensure that information and evidence collected during a criminal investigation is properly documented, stored, and ultimately disclosed for use in the criminal trials. The standard practice is relatively straightforward, and consists of a few key components: (a) requiring investigating officers to document the information they learn during the course of an investigation; (b) collecting, inventorying, and maintaining all of the investigative materials and information, in one central location; (c) applying policies or guidelines to ensure that the investigative material in the central file is disclosed to prosecutors and criminal defendants in response to formal requests for information; and (d) administering training and monitoring around all of these issues to ensure the policies are followed.

CPD did not comply with these standards, instead allowing detectives and other investigating officers like gang crimes officers to utilize multiple, parallel files for each investigation. The use of parallel files itself creates a significant risk that important investigative materials will not be disclosed, but that risk was exacerbated by the CPD's failure to provide any training or policies regarding proper response to subpoenas and discovery requests. The result is predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

CPD's problem of failing to turn over all relevant materials was brought to light by two federal cases in the early 1980s, but despite being acutely aware of the problem, CPD did little to

address the practice. The policies it issued were a superficial attempt to resolve the problem and were deficient on their face – as they still allowed, and even required, multiple, parallel files to be created for each investigation. Moreover, CPD took almost no steps to train, supervise, or implement those policies. Finally, the policies did nothing to ensure that there was a system in place to properly respond to subpoenas and discovery requests.

I have reviewed numerous Chicago homicide files, including police investigative files and corresponding criminal defense files and permanent retention files. This includes such files produced in this case, as well as other cases against the City of Chicago (*e.g.*, *Fields v. City of Chicago*, *Kluppelberg v. City of Chicago*).[7] My review has confirmed that because of the deficient policies and widespread practices described above, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases, and that the written policies did little to alter the ingrained practice of keeping clandestine, parallel files.

Finally, I reviewed the material that was withheld from Mr. Rivera during his criminal trial and concluded that the information was withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

### A. Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

Every police department in the country must address how to properly document their criminal investigations. All information and evidence from an investigation must be properly collected, documented and preserved so that it can be disclosed to prosecutors and criminal defendants for use in criminal trials.

The standard police practice, across the country, is relatively straightforward: a lead detective is assigned to every major investigation, and that lead detective is in charge of compiling all investigative materials in a single centralized location. This includes investigative material generated by investigators in specialized units like gang crimes, bomb and arson and others. Although multiple detectives and specialized investigators may work on an investigation, all information must be centralized and organized. These standards are in place to help police officers effectively solve crimes: they ensure that, during the investigation, information is not lost because it is dispersed among various investigators and that the information is organized and stored so that a supervisor or other investigators can locate and understand the evidence collected by their colleagues. This standard police practice also ensures that once charges are filed, everything that does exist from the investigation is complete, identifiable, inventoried, and

---

[7] In both *Fields* and *Kluppelberg*, I examined investigative files maintained in the Chicago police department to evaluate the written policies and practices of the Chicago of Chicago, and in *Fields* I compared those investigative files to criminal defense attorney files to evaluate what materials were disclosed by the Chicago Police Department in the course of criminal investigations and prosecutions. I rely on those file examinations and comparisons in this report, and I intend to opine in this case about my findings in both *Fields* and *Kluppelberg*. The expert reports submitted in both cases are included as Attachment H and I, along with their respective attachments setting out the results of my examination and comparison.

maintained in its entirety in a central location. Whether it is referred to as an investigative file, a "murder book," a completed investigation, an open investigation, or something else, everything should be in one package that can be located and produced – for whatever reason it is needed.

Standard police practices also require the disclosure of all investigative material in the police file, whether centralized (standard, and preferable) or not. There should not be picking and choosing. Performing these disclosure requirements is not an informal practice; it is done pursuant to written policies and procedures, in conjunction with training on those policies and procedures, to ensure compliance to this crucial step in ensuring fair trials. As a practical matter, this disclosure for use in a criminal case usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly. In response to the subpoena, all investigative materials should be disclosed.

It is also standard police practice to keep and catalogue every document or piece of information pertaining to an investigation. The police investigative role is to search for and document facts – all facts regardless of where those facts fit into some pre-conceived theory of the investigation. Not all facts, information, or individuals will necessarily enhance the prosecution of an identified suspect. Nonetheless, those facts have to be included in the investigation– to help prevent tendencies like tunnel vision, and also in fairness to the victims, the prosecutor, the defense, the court, and the jury. The judge will eventually rule on what is relevant and admissible. And investigators routinely offer explanatory information that puts that information in perspective, or explains why the detectives gave it little weight. But based on my experience, police officers are expected to, and are specifically trained on the importance of preserving all investigative materials and including those materials in a centralized location. Police departments typically emphasize this point because, in order to meet the needs of police agencies and the courts, case files must be maintained in a manner that make them secure but accessible, and the case contents should be arranged in an orderly and consistent manner.

As a corollary, all of the information must be inventoried, indexed, or documented in such a manner as to be easily located and so that the content of the inventory is clearly understood. To that end, a copy of the investigative file inventory will typically be placed in an official police department file so that the department can maintain a single, accurate list of all available material, and that inventory is typically disclosed to prosecutors and criminal defendants so that they can ensure that they have everything. In this way, it serves not as a solution to the problem of ensuring that all investigative material is disclosed, but as a necessary backstop to try to prevent the possibility of non-disclosure despite the existence of other policies and procedures.

My knowledge of these standards is based on my extensive experience with police practices. This includes my own experience as a detective and supervisor in multiple police agencies; my familiarity with the policies used by police departments nationwide, developed in the course of my own efforts to improve policies in police agencies in which I worked, as well as in the course of my work as an independent consultant and auditor reviewing policies and

practices of police departments around the country; and my knowledge of industry standards established by organization like the International Association of Chiefs of Police. These standards have also been documented in homicide guides and reference materials for decades. In addition to my own extensive experience, for a summary of some relevant texts please see **Attachment E**.

### B. *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

In the early 1980s, two federal court cases highlighted the fact that the Chicago Police Department had no systems in place to ensure that investigative materials were collected centrally and disclosed during criminal cases, and in fact important materials were consistently withheld from criminal defendants.

### 1. The George Jones Prosecution

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death; and her 10-year-old brother Purvy was beaten unconscious in their home.[8] George Jones – a senior at a nearby high school, who edited the school newspaper and was nicknamed "Bookworm" – was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[9]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvy, who told Laverty that there were two assailants and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator. That information was also placed in the street file.[10] Laverty was told that, in light of these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[11] Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[12]

After the charges against him were dismissed, Jones filed a civil lawsuit. He was awarded a substantial amount in damages for the violation of his rights. Notably, among other things, the jury found that the City was liable to Jones for its custom of maintaining "street files" that were withheld from the State's Attorney and therefore unavailable to Jones and the rest of the criminal justice system.[13] The Seventh Circuit explained that the practice of "retaining records in

---

[8] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Circuit 1988)
[9] Ibid (at 988-991)
[10] Ibid (at 990-91)
[11] Ibid (at 991)
[12] Ibid. (at 991)
[13] Ibid. (at 995-96)

clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[14]

### 2. The Palmer Litigation

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[15] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[16] The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[17]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the following (among other things):

- The CPD does not provide its detectives or other personnel with guidelines as to the extent to which "official reports" (which Judge Shadur defined as case reports, supplementary reports, closing reports, etc.) have to embody information in "unofficial reports" (defined as notes, witness interviews, worksheets, memoranda, etc.) In particular, Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[18]
- The existence and use of unofficial reports is well known throughout CPD. Parallel files containing these reports are referred to as "street files," "running files," "office files" or "working files."
- Potentially relevant information contained among the CPD's various investigative files and materials for a particular crime is not necessarily included in official reports. There has been and is no police rule, regulation, procedure, or practice that requires all relevant information to be placed in official reports or to be transmitted to the CPD's Records Division for permanent retention.[19]
- the CPD responds to requests for documents as follows:
  - ° In response to a subpoena, CPD produces only official reports maintained at Records Division along with photographs and lab reports. CPD does not produce unofficial reports maintained at the Area or unofficial reports in the possession of individual detectives.[20]
  - ° In response to a defendant's discovery motion, Assistant State's Attorneys

---

[14] Ibid. (at 995).
[15] *Palmer v. City of Chicago*, No. 82 C 2349
[16] Ibid (at NF-L 005606-07)
[17] Ibid (NF-L 005607)
[18] Ibid (NF-L 005609-10)
[19] Ibid (NF-L 005612)
[20] Ibid (NF-L 005614)

(ASAs) order official reports by phone. CPD Records Division employees respond to these requests by producing official reports and do not contact individual Areas or other units or divisions of the CPD for unofficial documents.[21]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[22] In fact, by the City's admission, there were hundreds street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[23] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

### 3. The 1988 *Jones* Appeal

After the *Palmer* litigation concluded, the Seventh Circuit issued an opinion in 1988, *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), in which Judge Posner affirmed liability against Chicago police officers for the withholding of evidence from Mr. Jones and affirmed liability against the City of Chicago for maintaining a street files practice.

Among other things, the appellate decision noted as follows: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[24]

The Seventh Circuit's decision also specifically highlighted the failure of CPD's leadership, which allowed Detective Laverty to be punished for coming forward while allowing those who actively attempted to thwart Laverty's efforts to reveal the truth to go without discipline or reprimand. Indeed, the United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events as follows:

Laverty should have been commended for his adherence to the principles of

---

[21] Ibid (NF-L 005614)
[22] Ibid (NF-L 005615)
[23] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.
[24] *Id.* at 988, 991-92, 993, 995-996.

honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[25]

These actions in effect condoned the misconduct, and sent an unmistakable message to CPD personnel that the priority was not solving the street file problem, but instead was dissuading whistleblowers from coming forward.

Based on my experience, strong and unequivocal management commitment is needed to successfully achieve the sort of shift in culture that was necessary in the wake of the *Jones* and *Palmer* revelations; CPD leadership's response was the opposite. I would expect, therefore, that the improper street files practice would continue. As discussed below, my review of hundreds of homicide files in this case and others (*e.g.*, Fields and Kluppelberg) confirms exactly that: the street files practice continued unabated.

### C. CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

As the *Jones* and *Palmer* cases highlighted, the CPD has a long history of using multiple, parallel files during the course of a criminal investigation, which are frequently withheld from criminal defendants.

#### 1. Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

From at the latest in 1977[26] until at least 2009,[27] the Chicago Police Department has maintained multiple, parallel files relating to a single investigation and has had no system in place to ensure that all important investigative materials from these multiple files are collected and provided to the prosecutors and criminal defendants.

The only "centralized" repository of investigative information maintained by CPD is the "permanent retention file" maintained by the Records Division. But the CPD policy and practice

---

[25] *Jones*, at 991-92.

[26] The City's designated witness, in this and other cases involving the City's practice regarding maintenance and production of investigative files, James K. Hickey, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in Palmer v. City of Chicago, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[27] See Attachment H, Expert Report in Fields v. City of Chicago

is to only include the official reports in the permanent retention file.[28]  This practice of having an "official" file that does not include all of the investigative notes, documents, and materials deviates from standard police practice, which would have one single repository with all the information.

Instead of utilizing the permanent retention file as the central repository of information, CPD practice is to use multiple, parallel files while an investigation is ongoing.  These multiple, parallel files have been variously referred to at different times as "street files" "working files," "running files," "unit files," "Area files," or "investigative files," among other terms.  These files are used by detectives and other investigating officers, while an investigation was ongoing to gather relevant investigative materials; to communicate steps taken and steps to be taken in an investigation; and to record the personal opinions of the officers investigating a crime.  The files contained notes (sometimes handwritten on scraps of paper), memos, reports, photographs, and various other forms of information about the case that were developed as the investigation unfolded. Among other things, information in these various, parallel files included details about the crime and the physical evidence, information about the observations or statements of witnesses, identification of potential leads and suspects, and items obtained from victims or witnesses (*e.g.*, a victim's telephone book or a witness's telephone messages).  The files also contained other criminal history information and police reports pertaining to other cases, which were utilized in suspect identification and elimination.

Detectives working a case necessarily take notes during witness interviews and must communicate that information to other detectives.[29] The problem with the Chicago Police Department's practice is that these notes are stored across multiple files—both during and after an investigation—and are never consolidated into the official file which is permanently maintained by the CPD. Thus, even after an investigation concludes, there are still multiple files containing different sets of investigative materials scattered in various locations, and which are regularly withheld from criminal defendants.

There are a variety of reasons that multiple, parallel files are created within the CPD environment:

- Multiple detectives working on the same case, each take notes, resulting in multiple sets of investigative materials, but there is no formal place for detectives to keep these notes, and as a result they are kept on tables, coat racks, in cars, in filing cabinets, or desk drawers in the Areas and are not collected in a central repository.[30]
- In 1980, the CPD was re-organized, and the Detective Division was split into six geographical areas (Areas One through Six) and two subject matters (Violent Crimes

---

[28] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96
[29] Hickey himself confirms this. Hickey April 2014 Fields Trial Testimony, at 2060:16-21 ("It is just common sense that you do write things down because you can't remember, you know, who said what, who said what when.") Hickey November 2016 Fields Trial Testimony, at 11/23/16 PM, at 14-15 ("Taking notes is terribly important.")
[30] *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1071 (N.D. Ill. 1983).

and Property Crimes).[31] Detectives from different divisions or units of CPD often investigate a case together, but report to different supervisors, and work out of different units or Areas, resulting in multiple files kept at the different geographical locations throughout the City.

- In addition to detectives, there are many others involved in investigating major crimes such as homicides, including patrol officers as well as specialized unit officers like Gang Crimes and Bomb & Arson. Indeed, Gang Crimes Officers were heavily involved in the investigation in this case. Yet, no set of policies or practices governed the investigative practices of these additional investigators or required them to coordinate with the Detective Division. As a result, those investigators had their own sets of notes and yet more files, unknown to and uncoordinated by CPD.

- There is no centralized log of the various parallel files created for each investigation, and thus no way to know how many files exist or where they are located.

- Files that are kept in an Area may be moved during CPD re-organization or are relocated to a storage warehouse. If multiple files for the same homicide are stored at an Area, they are not necessarily stored or moved together, and there is no system in place, or documentation, for tracking the movement of these files.[32]

- The documents in the files at the Area are never consolidated into the permanent, official files stored in CPD's centralized Records Division.

- Detectives also do not routinely transcribe all information obtained during an investigation into an official report, resulting in different information maintained in the official and unofficial documents.

- The permanent file, kept in the Records Division, therefore, does not contain all the relevant and important investigative materials.

This practice of using of multiple, parallel files creates an unacceptable risk that information will not be discoverable in response to a subpoena and will, therefore, be withheld from prosecutors and defendants. Where detectives keep their own files, or files are kept at multiple areas or units throughout the City, there is no way for any detective or supervisor to know how many parallel files have been created for a particular case, or whether they have all been collected. This is why standard police practice around the country is to have a lead investigator responsible for keeping a single, known repository of information.

### 2. The CPD's *ad hoc* response to subpoenas exacerbates the problem

In Chicago, the risks created by using multiple files are exacerbated by the fact that the CPD Subpoena Service Unit, which is responsible for responding to requests for records, is untrained and lacks any policies governing how it responds to subpoenas and requests for files.

According to Hickey, when a request for investigative documents is made to the Chicago Police Department, that request goes to the Records Division, Subpoena Service Unit.[33] A sergeant was in charge of the Subpoena Service Unit, and that sergeant reported to the assistant

---

[31] James K. Hickey Deposition in *Kluppelberg v. Burge* at 64 (NF-L 001004).
[32] Loughran Deposition 43-44.
[33] Hickey *Kluppelberg* Dep 358(NF-L 001299)

director and director of the Records Division.[34] It was the Record Division director's responsibility to set policy at the Subpoena Service Unit.[35]

The Chicago Police Department had no written policy that Hickey was aware of dictating how the Subpoena Service Unit should search for documents responsive to a subpoena or request for records.[36] In addition, there were no directives addressing "policies, safe checks, [or] procedures . . . to ensure that when a request came in either by a subpoena or by an informal request from and Assistant State's Attorney . . . that all of the necessary information including exculpatory information was provided by the subpoena services unit in response to that request."[37]

The subpoena service unit was staffed by non-sworn personnel with the title "clerk."[38] There was no formal training of personnel assigned to respond to subpoenas,[39] and there is no rule, policy, procedure, directive or any other document that guides the clerks in the subpoena unit to ensure that all documents are retrieved from all possible locations and disclosed, or any training to that effect.[40] Whether all of the different units that worked on a given investigation were searched for documents responsive to a subpoena depended in large part on the discretion and experience of the personnel searching for the documents, such that a subpoena for all documents under a certain records number[41] would not necessarily result in the production of all documents corresponding to that particular investigation.[42] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art."[43] He acknowledged that it is possible in a case with multiple units working on the same investigation that the subpoena could only go to one of those units.[44]

All of this was true as well with respect to requests for documents made by the Cook County State's Attorney's Office to the Chicago Police Department.[45] This system was in place before Mr. Rivera's conviction and well into the 2000s.[46] In fact, the City's expert on the CPD's policies in 2009 explained that, even if a subpoena is forwarded to an Area or unit, there is no system or procedure to follow up if the Area or unit fails to respond.[47]

---

[34] Hickey, *Rivera v. Guevara, et al.*, No. 12 C 4428, pages 146-47 (NF-L 000312-13)

[35] Ibid, pages 159-60 (NF-L 000316)

[36] Ibid, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3

[37] Ibid, page160 (NF-L 000316)

[38] Ibid, pages 147-48 (NF-L 000313)

[39] Ibid, page 39 (NF-L 000274)

[40] Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

[41] A Records Division number is a unique identifier assigned to a particular criminal investigation. The letters represent the year that the investigation began and investigations are assigned the numbers sequentially as they had.

[42] Ibid, pages 43-46 (NF-L 000275-76)

[43] Ibid, page 162 (NF-L 000316); Hickey *Kluppelberg* Deposition 362-63(NF-L 001303-04)

[44] Hickey *Kluppelberg* Deposition 362-63 (NF-L 001303-04)

[45] Hickey, *Rivera*, page 125(NF-L 000296); Loughran Deposition, page 50.

[46] Ibid, pages 151-53 (NF-L 000314); Loughran Deposition 14.

[47] Loughran Deposition 15.

This system, or lack thereof,[48] for responding to requests for documents and producing investigative materials, including important investigative information, is deficient. Because there are multiple files in multiple locations pursuant to the special orders and CPD's design, there is an acute need for policies, practices and training to ensure that all relevant information was produced to prosecutors and criminal defendants. The lack of such safeguards represents a significant departure from accepted police practices.

### D. Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

From a police practices perspective, criminal defense attorney files contain all of the documents disclosed and made available to the attorneys that provided counsel to defendant(s) in the homicide cases that I reviewed. By standard police policy and practice, criminal defendants should get everything that was available from the police investigation to aid the defendant in presenting his or her defense at trial. It would be a dangerous departure from standard police policies to permit a practice of picking through police files to select which investigative materials to turn over.

As a practical matter, this disclosure of information usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly, rather than relying exclusively on what was provided by the prosecutor. In response to the subpoena, all investigative materials should be disclosed.

The basic principle is that a criminal defendant is not supposed to be tried in the dark. He is entitled to understand the full breadth of the evidence against him; and he is entitled to any evidence that may help him prove his innocence. As a matter of police practices, a well-trained detective would understand that information should be disclosed even if it is only supportive – but not conclusive – proof of innocence. As long as information known to the police or prosecution might contribute to doubt about the defendant's guilt, it is relevant and must be disclosed.

Based on the criminal defense files reviewed in this case, and others, as explained below, it is clear that these standard police practices are not followed in the Chicago Police Department, and as a result investigative materials that should be disclosed under normal police procedures are routinely withheld from criminal defendants. Moreover, these documents were withheld even where defendants issued subpoenas specifically requesting those documents. And finally, the material withheld was often relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. I discuss each conclusion in turn below.

---

[48] Hickey, *Rivera*, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

### 1. Background on the Area North investigative files and my file review

For purposes of my analysis of Area North files, I reviewed investigative files for the period from 1985-1991 (the three years around the 1988 homicide investigation), collected from two locations.

1. In 2011, during post-conviction proceedings in Mr. Rivera's criminal case and decades after Mr. Rivera's criminal trial, the City of Chicago located an investigative file related to Mr. Rivera's case. Portions of that file appear to have been provided to the CCSAO during Mr. Rivera's post-conviction proceedings. That complete file was not turned over to Plaintiff when this civil lawsuit was filed in 2012, and instead documents Bates-stamped CPD 1-55 were produced and identified as the "Area File." In April 2014, during the deposition of Anthony Wronkowski, the City produced for the first time a copy of the so-called Investigative File for the Valentin homicide, Bates-stamped as Wron 1-69. As discussed below, in Section V.H, that file contained numerous pages of documents related to the police investigation into the Valentin homicide that had not been previously produced and were relevant evidence.

Based on further investigation, it was learned that the investigative file had been stored at some point in time in the 45 file cabinets at Area North, containing primarily open investigative files from 1961 to the present. Based on Court rulings, Plaintiff was then given limited access to a sample of two file cabinet drawers from the period of 1985-1991, and all investigative files in those two drawers were copied and produced. That set of 52 files, classified as the Area North Inspection Files, forms one of the two sets of investigative files I reviewed.

2. Pursuant to CPD policy, closed homicide investigative files are supposed to be sent to the CPD records warehouse for storage. For purposes of another aspect of Plaintiff's case, the parties reviewed 435 investigative files stored at the records warehouse that were represented to comprise all Area Five homicide investigations from 1985-1991. By agreement of the parties those files are a representative sample for purposes of assessing CPD's policies and practices. The parties then identified and copied 138 of the 435 files that contained any evidence of a lineup having been conducted, and that set of 138 homicide files was used for purposes of my analysis.

Mr. Rivera's attorneys provided me with a spreadsheet that served as an index of the 190 police investigative files pertaining to the two sets of investigative files for the time period from 1985-1991, as described above.[49] I reviewed and double-checked the spreadsheet extensively. That spreadsheet is attached to this report as **Attachment G.**[50]

Attachment G also contains additional information reflecting my comparison of the investigative files to criminal defense files and permanent retention files (discussed further

---

[49] The spreadsheet contains 194 rows, rather than 190, because there were several cases in which there were multiple criminal defendants, and so multiple criminal defense files corresponding to a single investigative file. Each criminal defense files is given its own row, but for purposes of calculating statistics related to the investigative files, the rows are considered as one file.

[50] I intend to rely on the spreadsheet included as Attachment G at trial to help explain the differences between the particular files to the jury.

below). For all of the investigative files found at the CPD warehouse, Plaintiff's counsel issued subpoenas for any corresponding criminal defense files, and was able to obtain 48 criminal defense files corresponding to 44 investigative files (there were several cases with multiple defendants, so multiple criminal defense files for a single investigative file). Plaintiff also obtained 132 permanent retention files, which included files for 43 of those 44 investigative files. In some cases, the City of Chicago redacted substantial information from the criminal defense files and the permanent retention files in a way that made it impossible to conduct a comparison, as noted in Attachment G.

Finally, I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the case was transferred to private counsel, and so the criminal defense file may or may not be complete (10 criminal defense files). Those files contain a strikethrough in Attachment G. I also gave the City the benefit of the doubt in my comparison to criminal defense files by assuming that all material in the criminal defense file had been there at the time of the original criminal trial (even if it might have been added subsequently, for example, as part of appeals or post-conviction proceedings).

## 2. Criminal defense files are missing pages from the police investigative files

I also had access to criminal defense attorney files that corresponded to certain of these investigative files. Mr. Rivera's attorneys attempted to locate defense attorney files for as many of these homicide investigations as possible. As discussed above, through their efforts they located 48 criminal defense files for 44 different homicide investigations. Each CPD homicide investigation is assigned a "Records Division" (RD) number that is used to identify materials corresponding to a particular investigation. I reviewed all of the criminal defense attorney files counsel was able to obtain; none were withheld from me.

I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. I did not make any inferences about what documents were turned over to criminal defendants – my comparison exercise was objective in nature rather than subjective. I then analyzed the types of documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could and would be important to disclose to prosecutors and criminal defendants. My observations and conclusions flow from this analysis, which is contained in **Attachments F and G.**

Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and not crucial evidence (although I note that administrative records like inventories can be important evidence to disclose); while other records were highly relevant investigative material. But any withheld pages, regardless of their importance, are evidence that there was not a policy of copying all police files in their entirety. Moreover, the inconsistent nature of what was withheld or disclosed is concerning, (i.e. the same category of document is sometimes disclosed and sometimes withheld). That variation suggests that individual officers are making ad hoc decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production of all material in all police investigation files, are both egregious departures from generally accepted police practices.

My comparison of the investigative files to corresponding defense attorney files revealed that well over 90 percent (37 of 38 criminal defense files[51]) of defense attorney files are missing documents that were contained in the corresponding police investigative files.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

**Handwritten Notes and General Progress Reports:** More than 20 out of 27 of the criminal defense files (or approximately 74%) reviewed above were missing unofficial handwritten notes that were present in the investigative files (see Row L of Attachment G). Another 10% of criminal defense files were missing GPRs that were present in the investigative files. The handwritten notes are often found on plain sheets of paper, on the margins of official forms, and on scraps of paper, none of which were the official GPRs on which such information was supposed to documented. There were hundreds of handwritten notes contained in the police files reviewed that were not in criminal defense files. They are often not inventoried, or the inventory lacks any type of specificity to assist in investigation and discovery. They are documents recording the type of information– from alternative suspects, to witnesses, to vehicle information, to alternative theories of the crime – that should be disclosed to defendants under normal police practices.

**To-From Memos:** Approximately 17% of the criminal defense files were missing to-from memos that were present in the investigative files: (see Row N of Attachment G) Handwritten and typed to-from memos, not on GPRs, are another classic type of document typically contained in "street files" that were supposed to be prohibited during the relevant time period from 1985-1991. Like handwritten notes, they contain a wide range of information – from alternative suspects, to witnesses, to vehicles, to alternative theories of the crime.[52]

**Investigative File inventories:** Only 3 of the criminal defense files that I reviewed had an inventory to serve as an index of documents in the police investigative files.

As discussed above, normal police practices and procedures require the creation and dissemination of an inventory that serves the purpose of providing a compilation of all of the investigative materials related to a criminal investigation. The inventory sheet was apparently designed to be used as an index of documents in an Investigative File. Even when an inventory sheet is available, they were often incomplete (i.e., missing entries that were listed on the investigative file inventory or not listing handwritten notes or other

---

[51] Again, 10 of the 48 were excluded to give CPD the benefit of the doubt.

[52] Notably, in only six of the more than 40 cases in which I conducted a comparison of criminal defense files to investigative files were there even to-from memos. This strongly suggests that there are additional investigative files in addition to the ones the City produced, as set forth in Section VII, below. Defendants in this case testified that they routinely used memos to communicate between shifts, which is consistent with my findings in reviewing investigative files in Fields and Kluppelberg.

documents) or were so generic as to be worthless (e.g., including overly generic entries, such as "GPR," with no date, number of pages, or author).

Other types of important investigative material often missing from the criminal defense files included photographs, lab reports, evidence reports, hold requests and release of person in custody reports, and arrest reports. See Attachment F.

As discussed below in Sections V.G and V.H, these same problems infected the Rivera files as well.

### 3. Issuing a subpoena does little to ensure disclosure of all relevant materials

Even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," my analysis reveals that there was no guarantee that a defense attorney would receive all the relevant investigative materials beyond the official reports in the permanent retention file. In many instances, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the investigative file, but not all the documents in the investigative file were disclosed in response to a subpoena. For example, subpoenas specifically for "street files" were issued by defense counsel in the following cases, but as described in Attachment F, not all the documents were turned over in response: G235351 (subpoena at RFC 2922); J052070 (subpoenas at RFC 5250-52); J080925 (subpoena at RFC 5987); J209456 (subpoenas at RFC 6333, 6335-36); J215119 (subpoena at 6498); K417078 (subpoena at RFC 8181-82); K455932 (subpoena at RFC 8393); K530917 (subpoena at RFC 8783-85); M184949 (subpoena at RFC 9653); M287641 (subpoena at RFC 10192); M579697 (subpoena at RFC 10784); N028256 (subpoena at RFC 11332); N262285 (subpoenas at RFC 12628-29, 12702-03); N475910 (subpoena at RFC 13121-22); N581836 (subpoena at RFC 13575-76); P049272 (subpoena at RFC 13944-45); P060434 (subpoena at RFC 14475-76); P128067 (subpoenas at RFC 14647-49); P526822 (subpoena at RFC 16315-16).

These problems with CPD's responses to subpoenas and file requests persisted regardless of who sent the request. In fact in one case that I reviewed, an Assistant State's Attorney described the difficulties obtaining the complete set of investigative materials from CPD. In 1987, Sherman Addison was and convicted of the 1985 murder of Helen Smith. The case was sent back for a retrial, and in 1994, during a court hearing about discovery an Assistant State's Attorney explained that "usually there is an investigative file. We never had that, never had it for the first trial." JR-L 214518. He also reported to the Court that even though the prosecutor met with Detective Jedlowski, the lead detective in the case, before the first trial:

> [a]ll he had was the typed police report which is the normal police report that is always issued in cases, the non-investigative type police report. No notes, no GPRs, and that is what she [the prosecutor] was shown by him. She noted that he didn't have a copy of the street file or the investigator file so that is why she then subpoenaed the investigative file but she was not tendered anything by Detective Jedlowski and, in fact, Detective Jedlowski happened to be in the building yesterday so I spoke with him also and he verified the fact that all he had was just the typed police reports, supplementary reports

JR-L 214520-21. In fact, the lead detective made multiple representations to the prosecutors that he had provided the "complete set" of police files.

These subpoena responses suggest deficiencies with regard to the two most basic requirements of a process to ensure complete disclosures to defendants: (1) the City did not know what files it had and where (not centrally located or indexed); and (2) it did not have policies or procedures to ensure that whatever investigative material was found was turned over in its entirety. The latter finding is particularly troubling: it suggests that CPD personnel were picking and choosing which investigative materials in the files to turn over.

### 4. The missing pages contain important and relevant information that should have been disclosed to criminal defendants

Finally, entirely consistent with the findings above, in the majority of cases I reviewed there were significant amounts of relevant information that would have aided the defendant and therefore should have been disclosed under standard police procedures. In my experience, given the volume of investigative material that was not disclosed, it was inevitable that relevant information helpful to a criminal defendant would be withheld. That is exactly what I found.

Below are some examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate this problem:

**J209456 – David Quinones, Bruce Andras, Marc Johnson**

Quinones, Andras and Johnson were charged with the May 19, 1987 murder of Eddie Mercado, and attempted murder of Nicky Lanzarin and Luis Rodriguez. Andras reportedly told police that he was shot at the week prior by members of a rival gang, and the drive-by shooting in this case was allegedly planned in retaliation.

Among the documents missing from the criminal defense files are a request for identification photos (RFC 6443) of three men: (a) criminal defendant Bruce Andras, (b) Santiago Chacon, and (c) a man named Mickey Harris, whose name does not appear elsewhere in the investigative materials and whose connection is otherwise unexplained. The fact that police were interested in obtaining identification photos for Mickey Harris suggests he may have been an alternate suspect, and information that led police to pursue this lead should have been disclosed. Moreover, the fact that there is no information on who Mickey Harris is, or how police obtained this name, or why detectives thought his photos would be relevant to the investigation, suggests that additional investigative materials created during this investigation, are missing from this file.

Handwritten notes elsewhere in the investigative files were also withheld. A handwritten note at RFC 6334 lists a criminal case number (94CR0105701), the significance of which is not explained. This page is missing from both Quinones and Johnson's defense attorneys' files. The number 87117788701 is likewise handwritten on a blank page at RFC 6332, and is not included

or otherwise explained in any official reports. RFC 6332 is missing from both Andras and Johnsons' defense attorneys' files.[53]

**P526822 - Miguel Borrotto**

Miguel Borrotto was charged with first degree murder and aggravated battery with a firearm after he allegedly shot Fulgencio Torres and Angel Sotos in a bar fight on October 26, 1991.

A supplementary report at RFC 16300 notes that an Illinois vehicle registration card was found in the pocket of the shooter's jacket, which he took off and left behind after fleeing the bar. The card from the shooter's jacket was for a Nissan with the license plate ZZ1384. However, two documents which are missing from the defense attorney's file (a vehicle search printout at RFC 16394 and a receipt for the purchase of the vehicle at RFC 16401) show that the defendant owned a Nissan with a license plate number YVK670, not ZZ1384.

Also missing from the defense attorney's file is a page of handwritten notes (RFC 16397) on which the names Eduardo Castro and Karl Lugo are written. These names are not included in supplementary reports or mentioned elsewhere in the investigative file. The presence of unexplained names in the file suggests that there are other investigative materials for this case (for instance, that explain the source of the names and their relevance) that are now missing from this particular file.

**J080925 – Samuel Slack**

Samuel Slack was charged in July 1987 with the February 1987 armed robbery and murder of Estella Winburn.

Two fingerprint comparison reports are missing from the defense attorney's file. The report at RFC 5984 notes that the victim's prints were compared for elimination purposes. The report at RFC 5982 requested that the defendant's prints be compared to "all unidentified latent prints," but no results are listed in the report.

Five photographs at RFC 6074-79 were also withheld from the defendant. These photos are labeled with the names Jeffery Johnson, Christopher Morrow, Fines Gerard Savage, Clarence Parker, and Carl Harrington. A supplementary report at RFC 6007 notes that five photographs were shown to eyewitness Alvin Robles, and Robles "tentatively identified" the photo of defendant Slack. In fact, Robles first identified Johnson as the shooter in a photo lineup in February 1987 (RFC 6017-19), but Johnson was released when Robles failed to identify him in a live lineup (RFC 6014). Slack was not identified in a live lineup by Robles until five months later, in July 1987 (supp report at RFC 6005-06). The arrest reports for two of the men in these photos, Savage and Johnson, were also withheld from the defense attorney (RFC 6042, 6056).

---

[53] An additional file for this case was found in the two drawers that Plaintiff was given access to from Area North, and that file contains information pointing to an alternate suspect that also was not produced to the criminal defendant. The existence of a separate file, with different documents and information, stored in another location, demonstrates the risks of maintaining a parallel file system.

Given the fact that the same eyewitness who implicated Slack in the shooting previously identified another suspect, exactly which photos were used in the lineup could have been an important part of Slack's defense.

## N028256 – Jesse Swanigan

Defendant Jesse Swanigan was charged with the January 1990 murder of Roy Stolle. Swanigan was ultimately found not guilty of the murder charge but was sentenced to 7 years on the theft and possession of a stolen motor vehicle. Swanigan claimed to have run across the real perpetrator of the burglary, saw him loading two TVs into his car, yelled "police" to scare him off, and drove off in the car. The TVs were later determined to have been stolen from the victim's home during the burglary and murder. Swanigan denied any involvement in the burglary and admitted only to stealing the car with the TVs inside, and to later attempting to sell the TVs to a friend named Benny Buford.

Several mug shot photographs from the investigative file (RFC 11300-09) were withheld. The men's names are written on the back of most of the photos along with the note "filler" on several. Two of the photos, however, also have a note stating, "unidentified…misidentified as Swanigan, Jessie." No names are listed on these two photos.

A handwritten phone message (RFC 11324) was also withheld from the criminal defendant. The phone message appears to be from a John Reed, and on the back are details regarding Reed's contact information and place of employment. Reed's name does not appear anywhere else in the file and there is no indication whether detectives ever followed up with Reed or what information he may have provided.

## M258570 – Curtis Kirkland

Curtis Kirkland was charged with first-degree murder in January 1991. Victim Stanley Moody was chased and beaten by several men in June 1989 and eventually died from his injuries. Kirkland and another man, Michael Sargent, were both charged with murder after eyewitnesses identified them in lineups. Sargent was found not guilty (RFC 9920), but Kirkland was convicted and sentenced to 38 years in prison (RFC 9919).

Several pages of handwritten notes (RFC 9984, 9987, 9989-90) contain names not included in supplementary reports – Carmen Tate, Eddie Richardson, Ernest Roberts, Carl Evans. These names are mentioned in the investigative file only in a GPR at 10081. A handwritten note at RFC 9989 contains potentially important information tying Ernest Roberts and Carmen Tate to the crime, apparently provided by an anonymous source: "Ernest …V with Joe…Michael has baseball bat…Carmen had rock[?]…all people in liquor store saw it…would you like to remain anonymous??...YES."

A memo in the defense attorney's file (JR-L 223955) indicates that a witness named Avory Moore volunteered these names to Kirkland's defense attorney nearly two years after the crime and several months after Kirkland was charged. Police interviewed a possibly related witness named Courtney Moore (see canvass report at RFC 9959), who owned a nearby

laundromat, but supposedly saw nothing and could provide no information. Avory Moore's memo reads "I was working at the Laundromat…across the street from where this guy was beat up and killed…Curtis was not 1 of the 8 guys that was involved in this incident. I know they (sic) guy who had the stone was called Carmen, and the man who had the 2x4 was called Ernest."

This highly exculpatory information was clearly known to detectives early on in the investigation, based on the notes at RFC 9989, but was only uncovered independently by the defense attorney, and then only partially – it is not clear that the defense attorney uncovered the names or significance of Eddie Richardson, or Carl Evans.

## N162782 – Tomas Nieves

Tomas Nieves was charged with the April 11, 1990 murder of Benedicta Gonzalez, who fell or was pushed out the window of an apartment building during an argument and died of her injuries.

The investigating detectives appear to have considered several male acquaintances of Gonzalez as potential suspects before eventually arresting and charging Nieves. Gonzalez was a known drug dealer, and had related dealings with these various men. Gonzalez's daughters told police that a man they knew as "Mike" was with their mother that day, and initially identified a John Lowden in a photo array (see supplementary report at 11924), but one of the girls later changed her identification (RFC 11932). Other witnesses identified Mike as Mike Amidei. Amidei had an alibi for his whereabouts that day, but cooperated with police and identified Jose Montero in a live lineup in May 1990 (RFC 11945). Amidei told police that he had seen Montero at Gonzalez's apartment when he himself went there to buy drugs on April 11, 1990.

It is not clear from the investigative file how police identified Nieves as a suspect. A supplementary report dated October 28, 1990 (RFC 11949), six months after the murder, notes that "the reporting detectives developed information that a male white Hispanic known as Tomas Nieves was involved with the deceased in a failed relationship." After Nieves was brought in for questioning, detectives had Mike Amidei (who previously gave a definitive identification of Jose Montero) view another lineup (see RFC 11943). Amidei changed his story and identified Nieves as the man he saw at Gonzalez's apartment the day of her murder.

A number of photos relevant to the investigation were withheld from Nieves's defense attorney, including polaroid photos (RFC 11956-66) of the various men who were considered as alternate suspects, and polaroid photos taken at the crime scene (RFC 11955). These crime scene photos included a photo of a pair of glasses found at the scene, which police used to track down Nieves and tie him to the crime. Moreover, the fact that there is no information about how Nieves was identified as a suspect suggests that there is additional investigative material that once existed but is no longer included in this file.

## P272087 – Demetrius Johnson

In connection with this investigation, Demetrius Johnson was charged with the murder of Fred Erwin and was convicted on June 12, 1991. The investigative file contains documentation of an in-person lineup, in which a witness positively identified an alternative suspect named Bryan Johns. See Bates No. RFC 15470-71. The report of this lineup and all references to this

lineup occurring are omitted from the permanent retention file and were not provided to Erwin or his criminal defense attorneys and are also missing from the CCSAO file. Instead, typed police reports included in the permanent retention file state that Bryan Johns appeared in a lineup that resulted in no positive identification (see supplementary report at RFC 15480).[54] I note, in relation to my other opinions in this case, that this is an investigation in which Defendant Guevara was actively involved.

*     *     *

I received copies of the Cook County State's Attorney's Office files for each of the examples above, and in each case the material identified as withheld from the criminal defendant was also withheld from the State's Attorney's Office.

In several of these cases, and many others identified in Attachment F and G, there are handwritten notes, or GPRs that list names and contact information of individuals without additional context or explanation of their relationship to the investigation. In my experience, it is likely that these were individuals whose names came up during the investigation as possible suspects or witnesses that a detective would want to remember and follow up on. That is exactly what I found in my review of the undisclosed street file in Fields; it contained handwritten notes listing names without any explanation, which were in fact referring to important alternate suspects.[55] These examples emphasize how important it is to disclose all investigative materials, because the importance or relevance of certain pieces is not always apparent looking at a document in isolation.

Moreover, the fact that the relationship of various names is not explained elsewhere in the investigative files produced in this case is indicative of the practice of using multiple, parallel files for an investigation: there is no evidence that explains where the names came from, or evidence of any follow up to investigate those names. That suggests that detectives continued to store that information in separate files, that were not ultimately stored with the investigative files produced in this case. One example of this are the photos, from what appear to be an August 31, 1988 lineup, that were produced from ERPS for the first time in this civil case in 2013 (see Section V.H, below).

### E. CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

All police officials are aware of the challenges of ensuring that, over the course of an evolving criminal investigation involving multiple investigators developing evidence at different locations and times, that investigating officers document their findings and that such investigative material is collected, preserved, compiled and disclosed. In the CPD's case, it was acutely aware of these challenges since 1982, at the time of the *Jones* case, and the problems created by using multiple, parallel files. Yet, it has made only superficial attempts to resolve its

---

[54] The withheld lineup information is also missing from the CCSAO file for this case. While there is some possibility that this criminal defense file was transferred and could be incomplete, that is unlikely to explain the omission since the information is also missing from the CCSAO file.

[55] See CITY-NF-001062; CITY-NF-001076; CITY-NF-001085, which list names of alternate suspects without any additional information.

"street files" problem. It issued written directives, but they were incomplete and insufficient in their scope, and beyond that they were not supplemented with the training, auditing and monitoring necessary to ensure that the necessary changes in practice occurred. Unsurprisingly, then, the street files problem continued.

1. A department-wide teletype issued during the *Palmer* litigation;
2. Detective Division Notice 82-2 (Detective Division Notice - File Control);
3. Special Order 83-1 (Detective Division Special Order – File Control);
4. Special Order 83-2 (Detective Division Special Order – Investigative Files);
5. Special Order 86-3 (Detective Division Special Order – Investigative Files); and
6. Standard Operating Procedures (SOP) 1988

Instead of using the *Jones* and *Palmer* litigation as an opportunity to reform its practices and implement standard police procedure of creating one single, centralized file for each investigations, those directives actually instructed detectives to create multiple, parallel files, each with different information and did nothing to address the fundamental problems regarding: (1) allowing officers discretion about what to document in the official reports; and (2) the absence of any system or training for responding to subpoenas and ensuring complete disclosures of investigative material. Moreover, the CPD provided only minimal training on these orders, and failed to conduct any audit, supervision, or oversight to ensure that detectives were following these new directives.[56]

## 1. The policies are insufficient to remedy the "street files" problem

### a. The Teletype and Detective Division Notice 82-2

In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued two documents: (1) Detective Division Notice 82-2[57] and (2) a 1-paragraph teletype to commanding officers alerting them to the TRO.[58] As Hickey explained, Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[59]

Notice 82-2 and the corresponding teletype were concerned only with preservation and were silent about procedures to collect or inventory their notes, memos, or other documents. Although it coined the term "Unit Investigative File," it did not require detectives to put notes or memos into Unit Investigative Files; and it did not specify whether detectives had to preserve notes or memos that were not in the file.[60]

Even with Notice 82-2's limited requirements and scope, the CPD showed little commitment to implementing that Notice. There is no evidence of training to implement the Notice, and six months after its implementation, Commander Stibich testified that it was still the

---

[56] Hickey *Fields* Dep. at 10, 43.
[57] NF-L 008751
[58] NF-L 008754; Hickey, *Kluppelberg* Deposition 201 (NF-L 001141)
[59] Hickey *Kluppelberg* Deposition 221-22, 224; (NF-L 001161-62, NF-L 001164); Brzeczek Test. NF-L 007517
[60] NF-L 008751-53; Hickey *Kluppelberg* Deposition 212-13 (NF-L 001152-53)

prevailing view that if a detective kept his own personal notes or memos – or considered those to be his personal property – then Notice 82-2 did not require the detective to put those notes or memos in the file and detectives felt they could do whatever they wanted with those notes or memos, including destroying them.[61]

Based on this and other testimony, Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[62] The comments of Commander Stibich and the findings of Judge Shadur make clear to me that the practice of keeping information in parallel files that were not shared with prosecutors or criminal defendants was an ingrained problem within the police department, and one that would require the sort of dramatic change in attitude and culture that could only be achieved through extensive training, monitoring, and discipline.

### b. Special Order 83-1

On January 3, 1983, Detective Division Notice 82-2 was replaced by Special Order 83-1. Special Order 83-1 applied only to the field investigations of detectives assigned to Violent Crimes.[63] Special Order 83-1 defined certain terms and created procedures for documenting and preserving investigative documents. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. According to the terms of Special Order 83-1, an Investigative File Case Folder was to be created either when certain categories of violent crimes occurred[64] or when a violent crime investigation resulted in an arrest and approval of felony charges.[65] Special Order 83-1 also created an "Investigative File inventory sheet," which was supposed to identify each document placed in the Investigative File.[66] The inventory sheet was to be forwarded to the Records Division anytime felony charges were lodged.[67] Finally, Special Order 83-1 created General Progress Reports ("GPRs").[68] The GPR forms were to be used by detectives whenever they were taking handwritten notes or writing memoranda to other detectives.

Unlike Notice 82-2, Special Order 83-1 created an affirmative obligation for detectives to submit handwritten GPRs or investigative materials for review and inclusion in the investigative file. It also mandated that detectives transcribe relevant information previously recorded on a

---

[61] Stibich Test. (NF-L 007468-70)

[62] NF-L 005615-16

[63] NF-L 007223-27

[64] Those categories of violent crimes were identified in Special Order 83-1, V(A)(1): Homicides/Medical Examiner Cases; Police-related shooting incidents; Batteries likely to result in death; Rapes and Deviate Sexual Assaults, and Any other major violent crime field investigation that the unit supervisor deems appropriate.

[65] Special Order 83-1, V(A)(1) & (2)

[66] Special Order 83-1 IV(D)

[67] Special Order 83-1, IV(D)

[68] Special Order IV(E); Hickey *Kluppelberg* Deposition 170 (NF-L 001110)

GPR or other miscellaneous documents on an official CPD case report form (general offense case reports, supplementary reports, etc.).[69]

In reviewing Special Order 83-1, Judge Shadur identified several deficiencies, including:

- Unless the crime being investigated fit one of the specified of violent crimes, there was no obligation to create an Investigative Case File Folder unless and until the offender was arrested and felony charges were approved. According to Judge Shadur, and in line with standard police practices, this continued to pose the same type of risk that information would not be retained and disclosed because there was nothing to prevent against selective retention while the case is investigated;[70]

- It only required detectives to include "relevant" information in the official reports and offered no guidance about what information a detective should deem "relevant," leaving discretion for detectives to withhold information based on their assessment that it was not relevant.[71]

- It did not include information to ensure that any detective who has or receives information relating to a violent crime field investigation not assigned to him will forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder;[72] and

- It omits any provision defining how the CPD responds to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding.[73]

Moreover, the training on 83-1 was inadequate. Hickey testified that he provided a one-time training to about 1,000 detectives.[74] He said each training session was done in groups of 30-40 people, and lasted approximately 3 hours.[75] During that three-hour training session, he went over Special Order 83-1. One training session was wholly insufficient to try to change a decades-long practice, especially one so ingrained in the culture of the police department.

### c. Special Order 83-2

On May 2, 1983, Special Order 83-2 was issued. Three of the changes in Special Order 83-2 were (1) a requirement that detectives create records reflecting all relevant information, V(B)(1); (2) a requirement that where a detective receives information about another crime, he or she pass that information along to the detective investigating that other crime, V(B)(6); and (3)

---

[69] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73
[70] NF-L 005620
[71] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20.
[72] NF-L 005621
[73] NF-L 005621
[74] Hickey *Kluppelberg* Deposition 308-309 (NF-L 001249-50); NF-L 008808
[75] Hickey *Kluppelberg* Deposition 309 (NF-L 001250); NF-L 008808

that a copy of the Investigative File Inventory Sheet will be transmitted to either the Office of Legal Affairs (in case of a subpoena from a criminal defendant) or the State's Attorney's Office (in case of a discovery motion) so that the inventory sheet is disclosed to defense counsel in a criminal case, V(B)(6).[76] Hickey also testified that Special Order 83-2 also created the Investigative File Control Card, IV(F).[77] This Control Card was supposed to act like a library card so that the Investigative File could be accounted for.

Despite these new requirements in 83-2, there is no evidence that CPD provided any additional training to update detectives on the differences between 83-1 and 83-2.

Moreover, even if detectives had been adequately trained on Special Order 83-2, it was still deficient. Here are some of the deficiencies that should have been apparent to CPD policymakers.

- **Special Order 83-2 still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **Special Order 83-2 applied only to detectives**, and it explicitly excluded from its directives all other officers involved in investigating major crimes, such as gang crimes officers, officers from bomb and arson, and officers from patrol, among others. The failure to include gang crimes officers is particularly egregious: it was well understood within CPD leadership that gang crimes officers participated in homicide investigations,[78] and the Valentin investigation at issue in this case is an obvious example of the intimate involvement of gang crimes officers in homicide investigations. Yet, there was no training or other effort to ensure that gang crimes officers were preserving their notes in the wake of *Jones* or otherwise.[79]

- **Special Order 83-2 provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."[80]** Relevance is of course subjective and, as Commander Stibich testified, what is relevant to one detective may not be relevant to another.[81] In fact, Hickey testified that a detective would only have to put information in a supplemental report if the detective deemed it pertinent at the time that the detective wrote the supplemental report, regardless of whether the detective considered the information relevant when he or she received it.[82] For example, Hickey testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[83] Based on my experience, this is inconsistent with standard

---

[76] NF-L 008746-50
[77] Hickey *Kluppelberg* Deposition 228-29 (NF-L 001168-69)
[78] Hickey *Rivera* Deposition 229-32.
[79] Hickey *Rivera* Deposition 55, 87-88.
[80] Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20
[81] Stibich Test. NF-L 007474
[82] Hickey *Kluppelberg* Deposition [2015] 24-25, 33
[83] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)

police practices. Alternate suspect information, for example, is highly relevant information and its documentation and disclosure to criminal defendants is critical.[84]

- **Special Order 83-2 provided no guidance about how information should be communicated or documented among detectives**, for example when one detective learned something about a crime being investigated by another detective; or when one unit learned something about a crime that is also being investigated by another unit. While section V(B)(6) of Special Order 83-2 codifies the obligation to "forward" information about a crime to the assigned detective, it does not require either detective – the detective passing along information or the receiving detective – to document that information.[85] Similarly, even where the detective passing along the information may have created a document memorializing that information – *e.g.*, a memorandum or GPR – there is no requirement in Special Order 83-2 that the resulting memorandum or GPR be distributed to other detectives or units investigating that crime.[86]

- **Nowhere does Special Order 83-2 state that the entire investigative file should must be disclosed in response to a discovery motion or subpoena, or provide procedures for doing so.** Despite the underlying circumstances of *Jones* and Judge Shadur's admonishment about the failure to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," Special Order 83-2 included absolutely no policy directive or procedure to ensure production of investigative files. Although the City claims in this litigation that its practice was to disclose the entire investigative file, such a directive is conspicuously absent from the Special Orders. Instead, the Special Order contains an instruction to forward a copy of the inventory to the Records division to be forwarded to the defense attorney. This might imply that in fact the policy was not to copy and disclose the entire investigative file, but just the inventory. In addition, there is no rule, policy, procedure, directive or any other document that guides the clerks in the subpoena unit to ensure that all documents are retrieved from all possible locations and disclosed, or any training to that effect.[87] The CPD's lack of clear policy guidance, as well as the lack of any guidelines or instructions to ensure retrieval and disclosure of all investigative material, are each egregious violations of generally accepted police practices. Indeed, these are both straightforward requirements of any policy regarding maintenance and disclosure of investigative materials, and, as explained above, standard practice is to keep a single investigative file and to have a clear policy requiring that the single investigative file be copied in its entirety and disclosed to the prosecutor or directly to the defense attorney. The result within CPD was entirely predictable: confusion among detectives

---

[84] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

[85] Hickey 236-37 *Kluppelberg* Deposition (NF-L 001176-77)

[86] Hickey *Kluppelberg* Deposition [2015] 39, 43, 46

[87] Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3 (no guidelines or instructions and no training).

and subpoena personnel about their disclosure obligations, as acknowledged by Hickey.[88]

- **Inventory sheets are an inadequate mechanism for ensuring disclosure of documents generated during the police investigation.** While the investigative file inventory sheet is designed to be used as an index of documents in the file, there is no guidance about what level of detail is needed in the inventory sheet to ensure that it serves its purpose. Indeed, my review of the records demonstrates that the inventories are largely useless because the entries are too general, often missing dates, descriptions and numbers of pages, such that one cannot tell whether they have the document referenced. In addition, that sheet is only distributed beyond the Area or investigating unit if felony charges are placed IV(D); V(B)(6).

- **Finally, there is no provision in Special Order 83-2 requiring an audit or oversight to ensure compliance with the special orders.**

### d. Special Order 86-3

On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 largely replicates its predecessor with some minor adjustments, most of which actually limited, rather than expanded, to policies governing disclosure of investigative materials to prosecutors and defense attorneys. For example, Special Order 86-3 more explicitly limits the creation of Investigative File Case Folders to homicides or felony investigations where charges have been approved, or an arrest warrant issued; it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received; it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)" and instead only states that such notes must be "submitted."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it:

- **It still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **It permitted detectives to maintain their handwritten notes as personal files for longer periods of time,** by removing the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)." Thus, even if detectives retained their handwritten notes on their person, or in their locker for extended periods of time, it would not clearly violate the Order. In my experience, that level of discretion is a gross deviation from standard police practices, especially in light of the ingrained problem in CPD.

---

[88] Hickey Rivera Deposition at 253-54. He testified to remembering conversations when he was in charge of records division in which there were questions from subpoena clerks and detectives about what they were required to produce in response to subpoenas, including whether the entire investigative files had to be turned over.

- **It still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."**

- **Finally, it removed even the inadequate stop-gap measure of providing the inventory sheet to defense attorneys**, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

Special Order 86-3 included a section VI, titled "Inspection." That section requires "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." According to Stibich, however, he had no idea if, when, how often, or in what manner such inspections were conducted.[89] Hickey, too, does not know of any such auditing ever occurring.[90] Nor is there any evidence that detectives were trained on this new policy.

### e. Standard Operating Procedures (SOP) 1988

In 1988, Chief of Detectives John Townsend wrote standard operating procedures to govern the work of detectives. Chapter 18 deals with investigative files. Chapter 18 contains "no substantive changes of any kind" from Special Order 86-3.[91]

### f. Summary

The policies implemented by the CPD were inadequate to remedy the "street files problem" and deviated from standard police practices regarding documenting and disclosing investigative materials.

*Continued use of parallel files*. None of the policies required a single repository for all investigative information maintained by a lead detectives. In fact, in reviewing the materials provided, I identified *at least* three different files that would be created relating to any criminal investigation pursuant to the special orders. First, there would be a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number.[92] Second, there would be a unit RD file: Hickey testified that this was a slim file kept in the homicide drawer at the Area to identify that there is a case open.[93] Like the permanent retention file, it would contain all the known official police reports: original case offense report, supplementary reports, lab reports and other documents sent to the investigative unit from support units.[94] Third, there would be the investigative file maintained by the detective area.[95] This file would contain documents that

---

[90]  Hickey *Rivera* Deposition 244, 249.
[91] Hickey *Rivera* Deposition pages 250-51.
[92] Hickey *Kluppelberg* Deposition 22-23, 95-96.
[93] Hickey *Kluppelberg* Deposition 115-16, 299-300.
[94] Hickey *Kluppelberg* Deposition 115-16, 299-300; S.O. 86-3
[95] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)

individual detectives assigned to investigate the case have determined should be in there.[96] As noted above, none of the files had to have the same documents in them: In fact, by design, they did not.[97] Likewise, Hickey admitted that the files did not even necessarily have the same *information* in them.[98]

But in addition to these files, investigative material could also be kept in the Evidence and Recovered Property Section (like the photos produced in this case in 2013), arrest reports could be kept at the Identification section, and individual detectives could each keep their own running/working files during an investigation.[99] Defendant detectives in this case have also admitted to documenting investigative information in unofficial documents, like Serafini Reports, that never become part of the official file.[100]

Moreover, additional files were also created by other units of the Chicago Police Department, because the policies only applied to the Detective Division. So, in addition to the multiple files above, gang crimes officers, other special unit investigators, and patrol officers, could each have additional sets of files related to a homicide investigation, and the special orders are silent as to those additional files, if and how they are to be preserved and maintained, and whether they are to be disclosed to prosecutors and criminal defendants. This case is an example of the problem: despite intimate involvement of gang crimes officers in the homicide investigation, no gang crimes notes, memos or daily activity summaries have ever been produced. Yet, like any investigators, gang crimes officers would have had a need to take notes, and indeed many of them in this case admitted that they kept such notes and documentation.[101]

This was an obvious omission. In fact, Hickey testified that he raised the fact that Special Order 83-1 was only addressed to the Detective Division and that the Department might want to look beyond the detective division to see if the problem extended to other units.[102] And at some point, Hickey suggested that perhaps Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[103] But there was no response from the chain of command to Hickey's concerns and CPD never looked to see if the problem of street files went beyond the Detective Division. This failure to look beyond the detectives – notwithstanding the fact that they worked closely with other units in investigating crimes – was deficient and allowed yet more parallel files to be created in other parts of the Department.

[96] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)
[97] See for examples Hickey *Kluppelberg* Deposition [2015] describing documents that would go in the investigative file but not in the permanent retention file at 71-72, 81, 91, 94, 100, 103, 105, 108-110
[98] Hickey *Kluppelberg* Deposition at 100.
[99] Hickey *Kluppelberg* Deposition at 295-96; Hickey *Fields* April 2014 Trial Testimony at 2069.
[100] Rinaldi Deposition at 28, 34 (detectives prepared what he called "Serafini reports" for open cases, which comprised leads and investigative results that were passed from one shift of detectives to the next to update the investigation's progress; but these Serafini reports were never made part of the official file).
[101] Hickey April 2014 Fields Trial Testimony, at 2060:16-21); Hickey November 2016 Fields Trial Testimony, at 11/23/16 PM, at 14-15; Zacharias Deposition at 183-84, 193-96, 200, 203-06; Fallon Deposition at 60-62, 145; Gawrys Deposition at 187-88, 218.
[102] Hickey *Kluppelberg* Deposition 207-208 (NF-L 001147-48)
[103] Hickey *Kluppelberg* Deposition 208 (NF-L 001148)

The problems created by such an unwieldy system are obvious: It creates the potential for information and documents to go missing because they are not centrally controlled. Moreover, because the files are designed to be different and to be retained in different locations, there is no way to ensure that the complete investigative file is produced during any criminal prosecution.

*Discretion to determine what is relevant and needs to be documented and disclosed.* Second, the policies also left detectives with far too much discretion about what information to document in official reports and when to turn in investigative materials. This is particularly true because the status quo had previously been not to record or document information – at least not on official documents that would be maintained by CPD and disclosed to the prosecution and defense. As a result, to overcome this culture – and this citywide practice – CPD had to be explicit in its requirements and provide direct guidance about what did or did not have to be documented; it is not enough to leave it up to the individual officer.

An egregious example of the problems of officer discretion relate to the lack of a requirement to document elimination of suspect. Indeed, Hickey testified that it was not the policy of the CPD to require detectives to document suspects who were eliminated.[104] To the contrary, it was permissible and consistent with the special orders not to document the identity or investigative steps taken to eliminate a suspect if a detective did not think that information was relevant or if the detective discounted it for some reason.[105] This is a significant departure from standard police practice, which calls for officers to err on the side of documentation and disclosure of such information, which is often crucial to other investigators on a case and highly likely to contain exculpatory information.

### 2. The City failed to provide proper training and oversight to ensure compliance with the special orders

On a department-wide scale, there was no action taken whatsoever to ensure that the special orders were being followed. The only training provided was one three-hour session after 83-1 was issued. But some of the Defendant detectives in this case deny receiving any such training; Defendant Rinaldi, for example, testified that in the period around Plaintiff's prosecution in 1988 and 1989, Area 5 detectives had been given no instructions about whether they could keep their own files, or given requirements for doing so; and accordingly there was no effort to ensure that all exculpatory information in investigative notes were preserved or tendered for inclusion in the official file. In other words, training or no training, he was oblivious to the requirements of the special orders.[106]

This is because, even if it did occur, one three-hour training session on just the first iteration of the policy change was wholly insufficient to try to change a decades-long practice. In fact, Hickey testified that the years after Special Order 83-1, he learned that unit detectives were reverting back to carrying their own files on the street separate and apart from the file maintained by CPD.[107] Nothing, however, was done about this.

---

[104] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)
[105] Hickey *Kluppelberg* Deposition 339 (NF-L 001280); Hickey *Kluppelberg* Deposition [2015] at 66-67.
[106] Rinaldi Deposition at 50-54.
[107] Hickey *Kluppelberg* Deposition 321, 327 (NF-L 001262, NF-L 001268)

Hickey also explained that although he did a sampling prior to the special orders being issued, he did not do one at any time after Notice 82-2 and was not aware of anyone else conducting such an audit.[108] Hickey testified that members of the police department were supposed to conduct inspections pursuant to Special Order 83-2 and 86-3 but Hickey could not identify any instances of audits or investigations.[109] Likewise, the City has produced no documentation that any such inspections were ever conducted. Hickey also testified that detectives were not disciplined for failure to comply with the Special Orders.[110] Similarly, Commander Stibich testified that supervisors were supposed to review files but he had no idea how often, when or the manner in which that review was conducted.[111] Put simply, policymakers failed to train, review, or supervise subordinates to ensure that the Special Orders were followed.

In fact, it appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department-wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline when the new special orders were not followed. Based on my review of the record, almost none of this occurred. Accordingly, CPD leadership either knew or was deliberately ignorant of the fact that the street files problem continued unabated after issuance of the special orders

### F. The police investigative files show that the directives were not properly implemented

#### 1. The police files from the 1985 to 1989 time period show that CPD's policies were not followed

I reviewed 180 of the 190 total investigative files from 1985-1991,[112] excluding those that appeared to be incomplete. I reviewed them to evaluate whether the files, standing on their own (i.e. without comparing to a permanent retention file or defense file) demonstrated compliance with the 1982, 1983, and 1986 special orders, or if the practices that led to the wrongful prosecution of George Jones continued, like the use of informal street files and the failure to tell the complete story of the investigation in official reports (and instead typing up official reports for only the part of the investigation that led to the person charged). The files show that the special orders were not followed in a number of ways (which would have been obvious in any reasonable file audit):

---

[108] Hickey *Kluppelberg* Deposition 160-61, 166, 167 (NF-L 001100-01, NF-L 001106-07)

[109] Hickey *Kluppelberg* Deposition 375-76; Hickey *Rivera* Deposition 244, 249.

[110] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213.

[111] Stibich Testimony NF-L 007461-62

[112] As set forth earlier in my report, these 180 investigative files take up 184 rows, because several contain multiple criminal defense files. The multiple rows for a single investigative file are italicized, and counted only once toward the statistics below.

### a. Handwritten notes, not on general progress reports, are still routinely used

As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes on loose sheets of paper without any context of who wrote the note and when. I found that detectives consistently used handwritten notes despite the direction in the special orders. 110 of the 180 files I reviewed, or approximately 61%, contained handwritten notes not on GPRs.

### b. To-from memos are still being used

As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports. However, I found that detectives continued using to-from memos: 36 of the files, or approximately 20%, contained to-from memos not on official police forms.

### c. Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports

The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation. The special orders also require that inventories be sent to the permanent retention file for distribution to prosecutors and criminal defendants (as discussed above, an indication that CPD contemplated that it would only initially produce permanent retention files). These requirements were routinely flouted.

I was provided with copies of 138 permanent retention files, 43 of which corresponded to investigative files from the time period 1985 – 1991 (for one of the 44 investigative files, the permanent retention file was not located), and intend to rely on them to demonstrate the City's failure to train, follow, or implement its special orders. **See Attachments F and G**.

First, I examined the permanent retention files, standing alone, to assess whether they communicated a complete picture of the investigation. My finding is that the permanent retention files in CPD are different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged. Put another way, in most departments, in addition to the various strands of the investigation, there is a charging memo in the official file that explains the basis for charges; CPD's entire official file is a charging document (or file).[113]

Second, I compared and contrasted the 43 permanent retention files with their corresponding investigative files. **See Attachments F and G.**

---

[113] In my review of permanent retention files in Fields, which I also rely on here, I made the same observation and reached the same conclusion.

The case files I reviewed are replete with examples where information on handwritten pages (whether on scraps of paper or GPRs) and informal memos between investigators, is not transferred into official reports. In many cases, the information is potentially exculpatory. By not transcribing the information into an official report, it is less likely to get into the permanent retention file, and as observed above, to criminal defendants. I have provided a number of such examples in Section V.D.4. Other examples include RFC 4873-75,[114] RFC 11711-17,[115] RFC 10701,[116] RFC 6379, RFC 16395, RFC 8213, RFC 8388, RFC 8438, RFC 11324, RFC 14712, and RFC 14761.

In numerous cases, including some of the example pages cited in the paragraph above, I found handwritten notes containing cryptic notations on a page, without context: a name, a phone number, an address, a license plate number, etc. By not transcribing information into official reports, all of the context related to a given note is lost, both to other investigators on the case and to prosecutors and defense attorneys. Who said it? When? Why did the detective consider the particular notation important enough to jot down? Because the information is not typed into an official report, these questions cannot be answered. In my experience, it is typical to see notes like this in a file, and often it is critical information (a new witness previously unknown, contact information for someone who couldn't be located, a piece of information that credits or discredits a witness or suspect, etc.). An investigator cannot write down everything a witness is telling them, and so they jot down the key information so that they can remember it and accurately convey it later in an official report, with the full context of its relevance to the investigation. But in my review of hundreds of CPD files in this case (as well as Fields and Kluppelberg), this final step is too often not done. The result is a violation of the Special Orders, which require relevant information to be written down and transferred into official reports, as well as a failure to disclose important information to prosecutors and criminal defendants.

Finally, many of the investigative files produced in this case are lacking inventories (itself a violation of policy). In addition, more than 50% of the permanent retention files do not contain a copy of the inventory, also a violation of the special orders. And for the cases where inventory sheets were included in the permanent retention files, they were often incomplete or the description of the documents were so generic or general so as to be unusable

#### d. Inventories are missing or incomplete

I also noted that documents were often added to the inventory sheet long after they were initially created. In some instances, some inventory sheet entries were not created until after an offender had been charged. In other files, the dates are either illegible, or do not appear at all. In other instances, there are stamped dates, but nothing shown as entered. In other instances, an item is shown as entered, but not date or individual entering. In other instances, a large quantity

---

[114] An anonymous note in the investigative file provides the name and description of a single offender who allegedly committed the crime along with information about where he could be found.

[115] Notation that Arron Thomas was a purported eyewitness to the crime and that, on the day after the crime, Thomas was arrested in connection with an armed robbery and participated in a lineup.

[116] A GPR instructing someone to bring a blue knit hat for the lineup. The offender had worn a similar hat, and the defendant reports that he was made to wear this hat at the lineup, years after the crime.

of GPRs and supplemental reports were entered all on the same date. Some limited examples:

J-409858
M-079435
M-127008

The delay in creating an inventory sheet reveals three problems. One, it again demonstrates the amount of discretion that officers could exercise when deciding what to put into an Investigative File: if an inventory sheet is only created after an individual is charged, detectives can exercise discretion over what they deem relevant at the end of an investigation. Second, if the documents are not logged on the inventory sheet until after the charges are brought, that indicates that documents are being stored in other, undisclosed locations during the course of the investigations, which was precisely the problem the special orders should have addressed. Finally, if detectives obtain additional information after charges are brought, there is no mechanism in place to update the inventory sheet in the Records Division, or in the inventory sheet disclosed (albeit rarely) to criminal defendants.

### 2. The investigative files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

These consistent failures to follow the requirements of the special orders reveal that detectives were not properly trained on the special orders and that there was no proper supervision or oversight to ensure that these special orders were followed.

Had there been any systematic audit or review of these files, these trends would be immediately apparent. But my review of the files shows no signs of an audit or review. Though the CPD had forms designed to facilitate oversight and supervision, those forms were routinely missing or blank in the files I examined. This includes the following:

**Homicide File (Chain of Command) Review:** This form is designed to document that the chain of command responsible for overseeing the investigation and compliance with relevant departmental policies and procedures has actually done so. Many of the files that I reviewed either were missing the form, had only a single signature, or had no signatures as all. That is, there is essentially no documentation of supervisory review in the investigative files. This demonstrates a willful disregard among supervisors for ensuring that detectives were following the policies.

**Investigative Case File Control**: Many of these are missing. This form is designed to maintain case integrity and chain of custody of investigative files. It is common during an investigation for a file to be routinely removed for a multitude of legitimate reasons (crime lab, consultation with other units, review by prosecutor, court appearances, etc.) The case file control form documents the file's movements so that it is clear whether and when information may have been copied or removed. In most of the cases that I reviewed they are either missing, have so few entries as to be unbelievable, or have not entries at all – an impossibility. This is another important form for discovery purposes because it should reveal all the individuals that may have contributed to the file, including from

other divisions or units. The failure to systematically utilize them properly, and the concurrent institutional failure to enforce compliance, indicates a pattern and practice of indifference to the policies for maintaining investigative files.

**Detective Division Personnel Form**: This sheet is designed to quickly track and identify detective division employees, where they are assigned, working hours, and equipment. It does not necessarily account for officers from other units. Regardless, in the majority of the cases reviewed, this form is missing altogether.

**Case Assignment Slip**: The Case Assignment Slip is designed to document initial detective(s) assigned and conclusion status. These are key individuals to seek out in discovery for documents, depositions or testimony. Again, enough of these forms are missing to demonstrate a clear pattern and practice of disregard for the policy.

As discussed above, without ongoing monitoring through audits and other means to ensure that the new special orders were being followed and that prosecutors and criminal defendants were receiving complete disclosures, it was almost certain that the ingrained practice of using street files would continue.

My review of records in this case and others shows that the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. As discussed above, 100% of the Investigative Files I reviewed contained evidence that the special orders were not being followed – they were either lacking inventories, had incomplete inventories, had handwritten notes not on GPRs, or had to-from memos not on GPRs; and most often, some combination of these things – and more than 90% of defense attorney files were missing information from the Investigative File; even superficial audits of small samples of records would have revealed these problems.

The failure to audit or discipline for non-compliance with the policies (see Sections IV, V.E.2) signals that the old ways – the ways of "street files" that the CPD should have been trying to correct – are acceptable. It is not only that best practices require enforcement of special orders to give them teeth, but also, in my experience with Internal Affairs, given the circumstances here strict adherence was necessary to create a new culture and practice so that detectives would not continue with the ingrained practice of keeping undisclosed parallel files

**G. There is strong evidence in the police investigative files, the Valentin investigation itself, and other CPD street file cases that there are yet other investigative files and documents that are unaccounted for by CPD and inaccessible to the prosecutors and criminal defendants**

**1. My analysis of hundreds of files indicates that investigative information is being kept in other repositories or being destroyed**

The files I reviewed demonstrate that the investigative files were not the central repository for information. My review of the files revealed cases where information that should be included was absent from the investigative file, as well as instances when the investigative

files specifically reference a piece of information, but the corresponding information is not documented in the file. This suggests that the missing information was stored in separate files, or otherwise destroyed. Examples of such missing information include:

- No explanation on photographs, such as when or where the photo was taken, who/what is depicted in the photograph or why the detectives believe it is relevant to the investigation. The missing information suggests that the paperwork, notes, or other investigative materials that led to the photograph were maintained separately from the investigative files produced in this case.

- Missing forms, such as missing inventories, inventory control cards, property inventories, Major Crime Worksheets, Gang Crimes Daily Activity Summaries, etc.

- Other missing forms or documents including missing medical records, missing property inventory forms, or missing search warrant affidavits, and missing search warrant returns.

- No live lineup photos, where there are lineup reports.

- Reference to other units or outside agencies processing evidence, but no documentation in official reports, no results, and no chain of custody.

- Cryptic handwritten notes with no explanations as to source, relevance, or why included.

- Numerous Xeroxed handwritten spacer/filler pages with A/4-VC; A/1-VC; A/3-VC which would indicate other sources for relevant documents that may, or may not, have been. Other examples include listing detective's names and unit numbers on Plain pages – or officers from other agencies - suggesting that information is coming from other, unidentified sources.

Using the example of missing inventories above, they are missing in approximately 37% of the investigative files the City disclosed. Likewise, I identified ten investigative files produced by the City that contain no GPRs or handwritten notes at all.[117] In my career, I am aware of no other instance in which a homicide investigation was conducted in which no notes were taken at all, and a number of the defendants in this case admit that they took notes as part of their investigative practices. The most likely explanation for each of the findings above is that there are yet other files for each of these ten homicides that contain additional investigative material and inventories.[118] Indeed, among the files I reviewed, there are nine cases in which two

---

[117] G-063126, G-129819 , G-256674, H-167635, J-423347, K-575912, M-020288, M-381429, M-538914, N-133637.

[118] This is true regardless of what terminology is used to describe the files: If the City contends that the files produced in this case are supposed to be Investigative Files as defined under the special orders, then, the files demonstrate that other, parallel files were maintained containing additional investigative material. If the City contends they are not Investigative Files as defined under the special orders, then the files produced are themselves examples showing that the parallel file system continued unabated after issuance of the special orders.

investigative files were produced – one that was found in the warehouse (where investigative files for closed cases and open cases older than ten years are supposed to go, pursuant to the special orders), and one that was found in the two drawers of file cabinets to which Plaintiff's counsel in this case was given access.[119] These cases, which suggest that there are many other examples among the other 45 file cabinets of drawers, are strong evidence of a continued street files practice in which multiple repositories are kept, each with different information; and in which some or all of these repositories exist outside of official channels, and are therefore unknown or unaccounted for by the subpoena service unit and unavailable to prosecutors and criminal defendants.

**2. The documents and testimony from this case provide further evidence of the existence of additional files and the failure to preserve investigative information.**

In addition to the evidence above, the evidence in this case provides strong evidence that additional repositories of investigative information exist in unofficial and undisclosed forms.

Detectives routinely prepared an investigative document called a Serafini report. Detectives prepared "Serafini reports" for open cases, which comprised leads and investigative developments that were passed from one shift of detectives to the next to update the investigation's progress.[120] The Serafini reports were not unique to Area 5; their use actually began in Area 4.[121] Hickey, the City's own designee, acknowledged the use of Serafini Reports.[122] *However, these Serafini reports – full of highly relevant and potentially exculpatory information - were never made part of the official file*.[123] Indeed, there are no Serafini reports in any of the Valentin homicide files produced in Mr. Rivera's criminal case or this civil case; and I did not see a single such document in the hundreds of investigative files I reviewed in this case, or other CPD cases like Fields and Kluppelberg.

Gang crimes investigators, too, had special investigative documents they created that were never made part of the official files, called daily activity reports or "humper" reports.[124] Defendant Fallon, a gang crimes investigator assigned to the Valentin homicide investigation, testified that gang crimes specialists filled out a daily activity report at the end of every shift. These daily reports listed investigative actions taken during the shift and leads that required follow-up by the next shift; this included highly relevant information like details of witness identifications of suspects from gangbooks, witness names and contact information, and so on.[125] The specialists paired each activity with a Record Division number, thus permitting the activity to be linked to a particular investigation.[126] The daily activity reports were stored at the gang

---

[119] G-235351, J-209456, J-215119, K-530917, K-466033, N-475910, M-541953, M-556260, P-129569.

[120] Rinaldi Deposition at 28-29, 34, 100-101.

[121] Rinaldi Deposition at 100-101.

[122] Hickey Rivera Deposition at 291-93.

[123] Rinaldi Deposition at 34. "[W]hen I'd read the official file, I wouldn't see those notes and stuff in there."

[124] Hickey *Rivera* Deposition at 134-35,138-39; Fallon Deposition at 50, 73-74.

[125] Fallon Deposition at 50, 73-74, 145.

[126] Fallon Deposition at 50-51.

crimes office.[127] Yet, no such documents were produced in any of the Valentin homicide files produced in Mr. Rivera's criminal case or this civil case; and I did not see a single such document in the hundreds of investigative files I reviewed in this case, or other CPD cases like Fields and Kluppelberg.

Also missing from the files produced before Mr. Rivera's criminal case, and the files produced more recently, are any gang crimes notes, either on official forms like GPRs or in unofficial forms. The files are completely devoid of such notes, despite the involvement of eight gang crimes investigators in the Valentin homicide investigation (Guevara, Gawrys, Noon, Guzman, Sparks, Zacharias, Fallon, and Sparks). And again, there is a dearth of such notes in the hundreds of other investigative files I also reviewed.

This is entirely consistent with the testimony of the Defendant gang crimes investigators in this case, who testified in effect that gang crimes officers operated entirely outside the system. As discussed at length above, they were not subject to the Special Orders, or any other set of requirements to ensure that they preserved and disclosed investigative material.[128] Accordingly, gang crimes specialists admitted that the gang crimes officers maintained their own parallel file, kept by individually and in the gang crimes offices.[129] Indeed, it was well known that gang crimes officers participated in homicide investigations, and like any other investigators created notes.[130] Yet, those documents were not subject to preservation and disclosure requirements.[131] Defendant Zacharias, for example, testified that he never recalled giving his notes to a detective for inclusion in an official file, or recalled seeing any of his fellow gang crimes officers do so; he does not know of any gang crimes officer that would produce street files in discovery; and prior to 1993, he cannot remember ever seeing an official file that contained gang crimes specialists' notes.[132] Defendant Gawrys, another gang crimes specialist, admitted that gang crimes notes and humper reports created to alert other detectives about what investigation needed to be completed were removed from the official file before the file was readied to go to storage.[133] At least some gang crimes officers destroyed those notes as a matter of practice, with the blessing of their supervisors.[134]

Notably, it appears that gang crimes files all went missing at some point after the gang crimes specialists were consolidated at offices on Maxwell street. File cabinets with their case files were moved from the various gang crimes offices to the consolidated office on Maxwell Street in 1993, but it is unknown where those files are currently.[135] The lack of tracking and

---

[127] Fallon Deposition at 68.

[128] Hickey Rivera Deposition at 87-88, 231-33; Fallon Deposition at 60-66; Gawrys Deposition at 37-38, 188, 190.

[129] Zacharias Deposition at 183-84; Fallon Deposition at 67-71; Gawrys Deposition at 37-38, 188; Spratte Deposition at 379.

[130] Hickey *Rivera* Deposition at 229, 275-76; Gawrys Deposition at 187-88, 190, 218; Fallon Deposition at 60-66.

[131] Spratte Deposition at 264-65, 379

[132] Zacharias Deposition at 193, 195-96, 200, 203-04, 206.

[133] Gawrys Deposition at 213-14.

[134] Fallon Deposition at 60-62, 63-66; Gawrys Deposition at 37-38, 188, 190, 209-210; Spratte Deposition at 379.

[135] Spratte Deposition at 37, 97-99, 339, 378.

accountability for large numbers of investigative files is an egregious departure from police standards.

As discussed above, the failure to put in place policies that covered gang crimes was an egregious omission, and one that was obvious and predictable. Indeed, as set forth in Section V.E.1 above (pp. 53, 56-58), the need for department-wide changes was raised with CPD top brass (rather than just detective division), but rejected.

In sum, the investigative files contain only a portion of the investigative materials that, based on my experience would typically be included in a comprehensive homicide investigation file.[136] This indicates that other parallel repositories of investigative information exist or that information that is supposed to be preserved is being destroyed

### 3. Kluppelberg and Fields are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials

This case has remarkable similarities to the facts and circumstances of other CPD cases that I've examined extensively. In particular, both Fields v. City of Chicago and Kluppelberg v. City of Chicago, two other wrongful conviction cases from the 1980s, present additional examples of what the City had already learned in Jones and Palmer: that the failure to effectively and properly maintain, track and disclose investigative material, there is a grave risk of withholding exculpatory information, and in turn, of wrongful prosecutions and convictions. After Jones and Palmer, Fields and Kluppelberg are additional examples of cases in which clearly exculpatory information was buried in a street file that was not disclosed until civil discovery in their civil rights lawsuits, decades too late. A brief summary of each of those cases is provided below, and further information is contained in **Attachments H and I**.

#### a. Fields v. City of Chicago

Nathson Fields was convicted in 1986 of the 1984 double murder of Jerome Smith and Talman Hickman. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders were located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors.

The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. Notably, it also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect

---

[136] **Attachment E** provides background materials regarding what kinds of investigative documents should appear in a homicide investigation, including examples of checklists used during criminal investigations.

in any of these documents.

In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of CPD, and awarded Mr. Fields compensatory damages of $22 million.

### b. Kluppelberg v. City of Chicago

James Kluppelberg was convicted for a 1984 fire that killed six people. In 1984 the fire was investigated by CPD's Bomb and Arson division and Area Three Violent Crimes. Bomb and Arson investigators could not determine the origin of the fire and Area Three detectives closed the case as accidental. But the case was re-opened in 1988. During the 1988 investigation, Area Three detectives found new fire investigators to rule the case an arson, and James Kluppelberg was coerced into confessing to the crime. At his 1988 criminal trial, Kluppelberg only had the documents from the 1988 Area Three investigation. The 1984 Area 3 and Bomb and Arson files were withheld.

Following his exoneration, Kluppelberg filed a civil case. In 2014, during the civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area Three investigation, and included critical exculpatory information. Specifically, it included handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes -- undermining the arson determination and supporting the evidence that the fire was accidental. It contained numerous references to individuals who had had arguments or fights with the victims. And the file also contained a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby and just hours before the fire for which Kluppelberg was convicted. Moreover, Ramos reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires.

The file was found on a pallet among other Area 3 files at the records warehouse, and it appears it was packed up in 1991 when Area 3 was relocated. Neither of the Bomb and Arson files (from 1984 or the reinvestigation in 1988) has been located, much like the gang crimes documents in this case.

In both of these cases, the undisclosed documents should have been produced to Mr. Fields and Mr. Kluppelberg before their original criminal trials in 1986 and 1988 (and at numerous points after that). These documents should have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

### H. The failure to turn over crucial documents in Jacques Rivera's criminal case was a direct result of these practices and inadequate policies

I have familiarized myself with the underlying facts in Mr. Rivera's case, including those facts set out above in Section II above, and have reviewed the various sets of police files produced to Mr. Rivera at the time of his criminal trial, at later dates during his criminal case, and during this civil litigation, including (a) the permanent retention file (Hickey 1-33); (b) the

investigative file produced to Mr. Rivera in April 2014 during this litigation (Wron 1-69); (c) the file produced by Mr. Rivera's criminal defense attorney, Judge Wadas (RFC 469-810); (d) a set of photos produced to Mr. Rivera in March 2013 during this litigation from the Evidence and Recovered Property Section (the "ERPS file"); (e) the file produced by the Cook County State's Attorney's Office ("CCSAO file") (SAO 1-820).

What is clear from my review is that the file Judge Wadas (Mr. Rivera's criminal attorney during his original criminal trial in 1990) received was nothing more than official police reports later designated as the permanent retention file. When official reports are received by the records division as an investigation is ongoing, those reports are stamped with a date and time of receipt.[137] A comparison of the Valentin permanent retention file and the police reports present in Judge Wadas's file reveal that both sets of pages have the exact same date and time stamps, in the exact same location on the page, each of which were placed on the police reports when they were received by the records division. In other words, the police reports in Judge Wadas's file came from the permanent retention file at records division.[138] It is also notable that, much like the permanent retention file, Judge Wadas's file contains no GPRs or handwritten notes of any kind. In addition, Judge Wadas testified that the file he produced in this case contained everything he ever received.[139]

The investigative file (Wron 1-69) was not produced to Judge Wadas before the criminal trial. It contains approximately 30 pages of investigative material that were not disclosed until decades later. At earliest, these pages of investigative materials we disclosed during Mr. Rivera's post-conviction proceedings, close in time to CCSAO ASA Darren O'Brien beginning to work on the case. For years, that file was unaccounted for: the City's employee responsible for investigative files at Area North, Mr. Wronkowski, has testified that he did not know where the investigative file had been between the time of Mr. Rivera's criminal trial in 1990 and Mr. Wronkowski's search in 2011.[140] There is no investigative file control card documenting chain of custody for the file.

It is also apparent that the investigative file (Wron 1-69) was not produced to the CCSAO at the time of Mr. Rivera's criminal trial. The CCSAO file from the time of trial is gone. The State's Attorney working on Mr. Rivera's post-conviction case, ASA O'Brien, sought to reconstruct the file when he started work on the post-conviction case. O'Brien had the CPD provide him missing police reports. The CCSAO file contains an inter-office mail from Gillian

---

[137] Later, after it is determined whether the particular investigation is one that must be permanently retained in the records division, the records division adds a second, "PERMANENT RETENTION" stamp.

[138] There are a few police reports in Judge Wadas's files that don't have the time and date stamps from the records division. The first report is the original case incident report (RFC 532-535), and it doesn't have time and date stamps in the permanent retention file either (HICKEY 3-6). The second is page 3 of a 27 August 1988 supp report (RFC 509), which like the original case report isn't stamped in the permanent retention file either (HICKEY 9). That leaves a single police report that is included in Judge Wadas's files without a time and date stamp: the September 15, 1988 Arrest Report for Jacques Rivera. That report is not in the permanent retention file at all.

[139] Wadas Deposition at 51.

[140] Wronkowski Deposition 86, 65-66.

McLaughlin to O'Brien's investigator McGreal; that inter-office mail envelope is in the CCSAO file right before the police reports produced from Area Five. In other words, it is likely that part of the investigative file (Wron 1-69) were produced to the CCSAO after ASA O'Brien began to work on the post-conviction proceedings in 2009 or later. Still later, the whole file was produced in the midst of this civil litigation. Further supporting this conclusion, Judge Wadas testified that he had everything in his file that the prosecutors had because they showed him their file at the time of Mr. Rivera's criminal trial.[141]

The documents newly produced in the investigative file include handwritten notes and other investigative material that undermine the prosecution's theory of the case, contain potential investigative leads, suggest investigative misconduct and demonstrate Mr. Rivera's innocence. For example, the investigative file contains the rap sheet for Mr. Rivera, discussed above, that shows an issued on inquiry date stamp of 8/27/1988. Based on my experience in other cases involving the Chicago Police Department, that date stamp was placed on the rap sheet when it was requested by investigators working the Valentin investigation and was issued by the records division. The date stamp of 8/27/1988 is the same day as the Valentin shooting and is a full two days before 8/29/1988, the date on which police report that Orlando Lopez identified Mr. Rivera in a photo album. This document is contained only the investigative file – it is excluded from the permanent retention file, the CCSAO file, and Judge Wadas's file. It is highly exculpatory because it establishes that the defendants deemed Mr. Rivera a suspect before the sole eyewitness supposedly identified him. This fact could have been used to impeach all of the State's witnesses at trial.

Other documents in the investigative file containing relevant investigative material not produced to Judge Wadas are WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. They include:

- As a general matter, all GPRs created and preserved in connection with the Valentin investigation are excluded from Judge Wadas's file. In addition:
- WRON 0002-0003: the investigative file inventory, which is supposed to list all of the investigative materials created during the course of the investigation. Without the investigative file inventory, it is impossible to know what documents should be contained in a police investigative file and when they were placed in that file.
- WRON 0012: a handwritten report documents that Felix Valentin died on September 14, 1988, after contracting a bacterial infection earlier in his hospital treatment.
- WRON 0037: a photograph of Jacques Rivera taken either after or before the second lineup.
- WRON 0045: an evidence report on the photographs taken of the second lineup.
- WRON 0047-0048: the criminal complaint.
- WRON 0056: an arrest report, showing that Mr. Rivera was arrested on 8/30/1988 at 11 p.m. in connection with the Valentin shooting and relating that hold papers were submitted "due to the fact that the witness is not available to view a physical lineup which will be held on August 31, 1988," which is evidence that Mr. Rivera was placed in

---

[141] Wadas Deposition at 86-87.

a physical lineup in this case prior to 9/15/1988.

- WRON 0057: a hold form, showing that Mr. Rivera needs to be held at the department because "the witness to this case [Lopez] will not be available until tomorrow's date," further evidence of a first physical lineup. The hold sheet notes that there is an expectation that Jacques will be charged with the Valentin shooting at 7 p.m. on 8/31/1988.
- WRON 0058: an arrest report, showing that Jose Rodriguez is arrested on 8/31/1988 at 1 a.m. for the Valentin shooting. The report states that Rodriguez was identified by the victim.
- WRON 0059: a hold form for Mr. Rodriguez, dated 8/31/1988, stating that "a lineup must be viewed by the witness in this case" and noting that there is an expectation that Rodriguez will be charged with the Valentin shooting at 1 a.m. on September 2, 1988. Again, this is further evidence of an earlier physical lineup.
- WRON 0064: a GPR listing the six participants in the earlier physical lineup, with their biographical information and addresses.
- WRON 0062: an evidence form, dated 8/31/1988, documenting the placement into evidence of 6 photographs corresponding to the six individuals participating in the 8/31/1988 or 9/1/1988 physical lineup. This is further evidence of a first physical lineup. The submission of this evidence form and accompanying photos late on the evening of 8/31/1988 contradicts the official police account that the photos were used in a photo array procedure with the victim Felix Valentin on 9/1/1988.
- WRON 0052: a form to release Mr. Rivera from custody after the first lineup.
- WRON 0063: the form to release Mr. Rodriguez from custody after the first lineup.
- WRON 0060-61, 0065: reports about the 5 cartridge cases recovered at the scene.
- WRON 0055, 0067: rap sheets for Mr. Rivera. Neither of the rap sheets in Judge Wadas's files matches these rap sheets in the investigative file.
- WRON 0053: McLaughlin GPR dated 8/27/1988, 8/28/1988, or 8/29/1988, containing the original description purportedly given by Orlando Lopez.
- WRON 0054: Leonard GPR containing the canvass of nearby buildings.
- WRON 0069: McLaughlin GPR dated 8/27/1988, the date of the shooting, reflecting the hospital interview of Israel Lopez. After Israel's description of what he saw and did, it states, "Girlfriend's brother – [Orlando] Macho Lopez – 13 yo saw incident – has not been interviewed – Kings."

In addition to all of this, the ERPS file, which was not produced to Mr. Rivera until 2013 during this lawsuit, contains six photographs that appear to be of individuals participating in the first physical lineup. Those photos also would have shown that Mr. Rivera was placed in an initial lineup on 8/31/1988 or 9/1/1988.

All evidence regarding the earlier physical lineup not produced to the CCSAO, to Mr. Wadas, or to Mr. Rivera would have permitted attorneys in the criminal justice system to conduct a contemporaneous investigation to determine if Mr. Rivera had stood in a physical lineup before the 9/15/1988 in which he was supposedly identified, who had viewed the lineup, and who had been selected in the lineup. There is no documentation of a first physical lineup in the police file. According to Lopez, he viewed such a lineup and picked Mr. Rivera. According to Mr. Rivera and others, they stood in such a lineup. Mr. Rivera was released following that

lineup, suggesting strongly that he was not identified and instead Lopez identified another participant in that lineup. The defendants' entire case against Mr. Rivera rested on Lopez, the sole eyewitness, and if he had failed to pick Mr. Rivera in an initial lineup, that would have been highly exculpatory evidence.

The investigative files in Valentin investigation suffer from the same systemic problems observed in the investigative files I reviewed as a whole, from this case and others such as Fields and Kluppelberg. In sum, the documents in the investigative files are highly relevant to the investigation, and should have been produced to Mr. Rivera before his original criminal trial in 1990 (and at every other point at which he engaged with the criminal justice system after that). These documents would have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

## CONCLUDING STATEMENT

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of the materials and circumstances in this matter. I utilized all of the facts and data known to me, and applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty in the law enforcement community, and based on longstanding and well-accepted law enforcement practices.

I reserve the right to supplement or modify this report and my opinions expressed in the report to the extent that additional information is presented to me and to the extent permitted by rules.

Pursuant to 28 U.S.C Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Michael D. Brasfield