**<u>TRANSCRIBED FROM DIGITAL RECORDING</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DE LEON REYES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 CV 1028 |
| | ) | |
| -vs- | ) | Chicago, Illinois |
| | ) | July 11, 2019 |
| REYNALDO GUEVARA, et al., | ) | 9:38 AM |
| | ) | |
| Defendants. | ) | |
| ------------------------------ | ) | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUNIL R. HARJANI, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        LOEVY & LOEVY
                        BY: MR. SEAN STARR
                        311 North Aberdeen Street
                        Third Floor
                        Chicago, Illinois 60607

**PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
PORTIONS UNINTELLIGIBLE AND INAUDIBLE

Transcriber:

SANDRA M. MULLIN, CSR, RPR, RMR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 2260
Chicago, Illinois  60604
Telephone:  (312) 554-8244
Sandra_Mullin@ilnd.uscourts.gov

APPEARANCES:    (Continued)

For Plaintiff Solache:          PEOPLE'S LAW OFFICE
                                BY:  MR. JOHN L. STAINTHORP
                                1180 North Milwaukee Avenue
                                Chicago, Illinois 60642

For Defendant Guevara:          LEINENWEBER, BARONI & DAFFADA, LLC
                                BY:  MR. THOMAS M. LEINENWEBER
                                120 North LaSalle Street
                                Suite 2000
                                Chicago, Illinois 60602

For Defendants Varga
Brualdi, Wehrle,
O'Malley and Cook Co.:          COOK COUNTY STATE'S ATTORNEY
                                BY: MR. EDWARD M. BRENER
                                Civil Litigation Bureau
                                50 West Washington Boulevard
                                Fifth Floor
                                Chicago, Illinois 60602

For Defendants Biebel,
Naujokas, Stankus,
Trevino, Dickinson,
Harvey, Rutherford,
Mingey and Halvorsen:           THE SOTOS LAW FIRM, PC
                                BY:  MR. JOSH M. ENGQUIST
                                141 West Jackson Boulevard
                                Suite 1240A
                                Chicago, Illinois 60604

For Defendant Navarro:          REITER BURNS LLP
                                BY: MR. DANIEL M. NOLAND
                                311 South Wacker Drive
                                Suite 5200
                                Chicago, Illinois 60606

For Defendant City of
Chicago:                        ROCK FUSCO & CONNELLY, LLC
                                BY: MS. CATHERINE M. BARBER
                                321 North Clark Street
                                Suite 2200
                                Chicago, Illinois 60654

(Proceedings heard in open court:)

THE CLERK:  Case No. 18 CV 1028, Reyes versus Guevara.  And that's related to 18 CV 2312, Solache versus City of Chicago.

MR. STAINTHORP:  Good morning, Judge.  John Stainthorp on behalf of Plaintiff Gabriel Solache.

MR. STARR: Good morning, your Honor.  Sean Starr on behalf of Plaintiff Reyes.

MR. ENGQUIST:  Good morning, your Honor.  Josh Engquist on behalf of Defendants Halvorsen, Dickinson, Rutherford, Stankus, Naujokas, Harvey, Trevino, Mingey and Biebel.

MS. BARBER:  Good morning, your Honor.  Catherine Barber for Defendant City of Chicago.

MR. NOLAND:  Good morning, Judge.  Dan Noland on behalf of the former ASA David Navarro.

MR. BRENER:  Good morning, your Honor.  Edward Brener, B-r-e-n-e-r, on behalf of Defendants Brualdi, Wehrle, O'Malley, Varga and Cook County.

MR. LEINENWEBER:  Good morning, Judge.  Tom Leinenweber on behalf of Reynaldo Guevara.

THE COURT:  Okay.  Good morning to all of you.  So I have reviewed your status report with respect to depositions, and it looks good.  And obviously you've got a lot on the plate, so I encourage you to continue to meet

those dates and continue through those depositions and get them done. What I'd like to do, we've took care of the Adriana Mejia issue. What I wanted to see about was your pending briefing on the Monell discovery issues. And it's something I'm working on, but as a result of reading the briefs, I have some questions. And so I'll ask those questions. If you don't have answers, you can always get back to me. I don't want to put people on the spot for some of these things. You can let me know later, if you need to give me a more accurate answer.

But I want to take the first issue, which is the issue with respect to the homicide investigation files and the argument about the scope of what is permitted, or at least what you're willing to do.

Here is what I want to ask first is: How many homicide investigation files do you estimate actually exist between '92 and '98, ballpark?

MS. BARBER: Oh, I know that -- I believe there is hundreds. But I don't know -- I don't have the number off the top of my head.

THE COURT: Okay. How many do you think have a corresponding CC -- I'll just call it state's attorney file, to make it easier?

MS. BARBER: So, again, I don't know the answer to that question. I believe -- I would just have to reference

what we did in the other case, which was --

THE COURT:  You're talking about Fields and Rivera.

MS. BARBER:  Right.  And I would really only be guessing.  But we did find, I would say, probably more than -- more than half.

THE COURT:  Uh-huh.  Okay.

MS. BARBER:  Maybe two-thirds.  But I, honestly, I don't -- I don't know.

THE COURT:  Okay.  So I understand the different reasons of why you suggest your approach is appropriate, and I fully understand the plaintiffs' reasons of why you suggest that approach is not appropriate.  I would like some more detail.  Are you able to get that detail without spending a thousand hours on that issue, just knowing how many total and how many have a corresponding?

MS. BARBER:  I can get the number for -- for what CPD has.  But the information from -- from the corresponding state's attorney's files would be with that office.  So I don't have that -- I don't have an easy access to that.  That would require figuring out the numbers, and the names and doing some sort of search --

THE COURT:  Yeah.

MS. BARBER:  -- with their cooperation.

THE COURT:  Okay.  And they're not represented in any way in this case, or are they?

MR. BRENER:  The Cook County State's Attorney, we have four individual defendants that my office represents, in addition to the county.  So we are involved.

THE COURT:  Okay.  All right.  So is there a way to -- to do that, to figure out how many?

MR. BRENER:  We can certainly collaborate with the City's counsel to start working on that.

THE COURT:  Yeah, because, you know, it -- you know, it's one thing -- putting aside the merits issue for a moment, right, it's one thing if there are 90 percent of the files correspond.  It's another thing if there is ten percent of the files corresponding.  And it would be helpful to know what the range is, if you will, and some ballpark.  So I guess, put that down as one thing to get back to me on.

MS. BARBER:  Sure.

THE COURT:  You can do it in the form of a status report or a supplemental memo, whatever might be.  That's one question I had.

MS. BARBER:  Okay.

THE COURT:  I'd certainly like to know the answer on before I make a ruling on that issue.

MS. BARBER:  Sure.

THE COURT:  Here is my other question, which is for plaintiff.  I understand the -- the theory with respect to the homicide investigation files.  As it relates to the

street files, the basement files, the whatever, Brady, alleged Brady, whatever you want to call it, tell me how they relate to -- and how they will advance your claim with respect to coerced confessions and fabricating evidence.

MR. STARR:  Your Honor, I'd ask that I defer to counsel and my team on that.  I did not work on the Monell part of this.

THE COURT:  Okay.

MR. STARR: I mean, I have an idea, but I'd rather not go on the record with it.  I'd rather talk to my team and get back to you, if that's okay with you.

THE COURT:  That's fine.  So you can put that down as a --

MR. STARR: Certainly.

THE COURT:  -- as a note.  And I'll tell you why I'm thinking about that.  Look, I understand how you can use the homicide investigation files to advance a theory of what was disclosed versus what was not disclosed and then argue whether it was Brady material, or not.  What I don't understand is how getting hundreds of homicide investigation files is going to help you advance a coerced confession on fabricating evidence claim.  Right?  You're going to get a bunch of files.  Nothing in there are going to say anything about coerced confessions.  They're probably not going to say anything about fabrication of evidence.  They are homicide

investigation files; right? The only way you're going to advance the claim to know if there is a policy, pattern and practice of this is by getting other source information, whether it's from the individuals themselves, whether it's from investigations or news media about particular police officers who may have engaged in coerced confessions. But what I don't understand is how any of those files, that is, if you get 300 homicide investigation files, I don't understand how that is possibly going to help your coerced confession or fabricating evidence, or the non-street-files claims, if you will. And so I certainly would like to know how you intend to use them because you've alleged that's part of your reason for wanting to get the Monell-related discovery. Okay?

The other issue relating to that is yet a -- a Monell claim you have that's non-street-file includes this manipulation of live and photographic lineup procedures. As I understand, there were no lineups in plaintiffs' arrest or prosecution of this case. So, again, I don't see how that relates.

MR. STARR: Um, there was a lineup, your Honor, that involved a third-party witness. Norma Salazar was originally alleged to be the woman that Adriana Mejia got the baby from. And they brought her in, and they supposedly did a lineup with Norma Salazar. So that's the one lineup that I

know actually took place in this case. We don't have any record of it.

THE COURT: Okay. Did it relate to plaintiff? Was it plaintiffs' lineup?

MR. STARR: No, it wasn't plaintiff -- it was -- it was the -- the third-party that's not a plaintiff in this case, the woman who claims our plaintiffs helped her commit the crime.

THE COURT: Okay. And she was brought to a lineup to identify who?

MR. STARR: Allegedly this third-party that she was saying was responsible for giving her the child.

MR. STAINTHORP: Okay. It's Norma Salazar.

MR. STARR: Yeah.

MR. STAINTHORP: Is the person who was in the lineup.

MR. STARR: Yeah, is the name. Yeah, I said that.

THE COURT: But not plaintiff.

MR. STARR: Not plaintiff.

MR. STAINTHORP: Correct.

THE COURT: Okay.

MR. ENGQUIST: Your Honor, Adriana Mejia, initially, one of her stories was that a woman there, Norma Salazar, was the one who gave her the boy, and she had a story going with that. So they went to find a Norma Salazar

that was at the hospital and had nothing to do with the case, and that was the end of that. They just basically -- checking up on --

THE COURT: Yeah, you know, I know a little bit about that. Maybe you want to address that to me. Again, I don't find that convincing, to be quite honest. And if you're going to allege a policy, practice, pattern of creating lineups that are designed to implicate people that are innocent, it has got to be related to the plaintiff in that respect. And some random third-party lineup that doesn't go to the crux of plaintiffs' prosecution doesn't sound that convincing to me. But I'll hear your argument. I'm just giving you my thoughts as to -- and questions, really, that I'm thinking about.

Another question. So in the memorandums, and, again, if you know the answer, let me know. The memorandums, you talk about how the city cannot be held responsible under Monell for failing to produce evidence that the individual defendants concealed or destroyed. Can you tell me what your underlying theory is, why -- why do you say that?

MS. BARBER: Well, meaning, if some detective wrote, you know, this guy is innocent on a piece of paper and then threw it away, that it wouldn't be in any file for it to be produced later. So this whole notion of, like, well, if we just compare this file to this file, we can see what

documents were withheld, doesn't really work if some officer threw it away or destroyed it.

THE COURT: Right. But what if an officer had a piece of information and it was kept in a file and it wasn't produced by that officer to the state's attorney's office?

MS. BARBER: So that could be a theory. I don't know that that works in this case. But that's -- I'm not sure exactly which portion of the brief you're talking about, but I don't believe that that's -- that's what we were thinking. We were thinking in terms of evidence that the officers may have collected and destroyed and it wasn't put in a file.

THE COURT: Okay. If it wasn't put in a file, it would not have made it to the state's attorney. So, really, you would not even know, nobody would know what happened, unless someone was going to testify to that fact; right?

MS. BARBER: Right. Certainly the city wouldn't.

THE COURT: Okay. So, yeah, so what I understand was, there was some blanket statements in the memo that were -- were suggesting that the city couldn't be held under -- liable under Monell for failure to produce evidence. I think I understand your clarification now because I -- because I -- under the theory of, it was in the file but didn't make it to the state's attorney's office, there is a theory by way the city could be held liable. But you're

referring to a different situation.

MS. BARBER: Right. I believe -- yeah, right. So that theory was -- was -- we have lots of arguments against it, but that theory was -- was pursued in other cases.

THE COURT: Okay. Yeah, and I'm not necessarily opining the merits of it, I just wanted clarification as to what your -- what you meant by those statements.

With respect to the CR files, how many are there?

MS. BARBER: Um.

THE COURT: 30? 2,000? 9,000? I have no idea.

MS. BARBER: Unfortunately I don't either, I'm sorry. I will have to get back to you on --

THE COURT: Okay. That's fine. No, I -- that's why I prefaced at the very beginning, you're free to supplement a memo. I just wanted to get you my questions. Again, it's going to make a difference; right? You're asking to produce every fifth; is that right?

MS. BARBER: Right, something along those lines.

THE COURT: Yeah. And every fifth of, you know, 50 is very different than every fifth of 200,000. So I do want to know the -- the answer to that.

What was the scope of production for CR files in Fields and Rivera? How did you handle that?

MS. BARBER: In Rivera, they did not ask for CR files in other cases. They only pursued the CR -- the

claim -- they only pursued the claim for CRs related to one defendant. So that was not an issue in *Rivera*.

I was not the counsel in *Fields*, but I don't know that that was an issue either.

MR. NOLAND: Judge, so, Dan Noland. I was the lawyer for the city in the *Fields* case, and CRs was not really an issue in the case. We produced -- I believe the plaintiff requested we produce CR files relating to the individual defendant police officers sued in that case. But there was no request, to my recollection, of CRs related to anybody else, and it was not part of the Monell claim.

THE COURT: Okay. So, I mean -- so has anyone -- has this happened before, or are we the first one where we're asking for all CR files for an area between -- for a period of seven years?

MR. STARR: Your Honor, I'm not certain. And I worked on the *Rivera* trial, but I didn't work on any of the discovery phases and I didn't work on *Fields*. So I'd like to get back to you on this as well.

THE COURT: Yeah, that's fine. Let me know if there is a particular case -- what I want to do is, I want to make sure I don't miss any precedent or review another judge's analysis, and it might not be a published analysis, it might be a transcript, for example, and I want to be able to review that analysis to see what another judge has done in

this situation before I make a decision.

MS. BARBER:  Just so your Honor is aware, we did, I believe attached as an exhibit, Judge Gilbert -- a hearing before Judge Gilbert where the issue arose.

THE COURT:  Yeah, I saw that.  Although, my memory of that is that he didn't fully resolve it.

MS. BARBER:  Correct.

THE COURT:  Is that right?

MS. BARBER:  Yes.

THE COURT: Okay.  Yeah, so I saw that.  It was somewhat helpful, but it didn't get to the finish line, for my purposes.

MR. NOLAND:  Judge, I could just -- all I could add is that, on behalf of the city in another case called *McIntosh*, we were negotiating with the plaintiff on a similar thing.  Right now it hasn't -- it is at a standstill on other reasons.  In that case, I learned about another matter called *Hood/Washington*, two plaintiffs as well, where I think there were some CRs produced.  I don't know the details of that in particular, not about the case, but I believe there was some debate about it.

THE COURT:  Okay.  You can look at it, put it in your supplemental memo, and I'll take a look at it.

Okay.  The other question I had is there was a statement in the joint status report that the CR files, and

for the list of Area 5 detectives, may not include every detective so assigned. Do you remember that at all? There was a statement along those lines. I didn't understand what that meant.

MS. BARBER: And I did not --

THE COURT: Okay.

MS. BARBER: I did not --

THE COURT: So add it to your notes. On Page 14 there is a statement that says it may not include every detective so assigned. And so you can get back to me on that one.

MS. BARBER: Right. Just so, your Honor, I think what that was referring to is the fact that, you know, people aren't assigned in one -- one -- people move around is I think sort of -- sort of where that came into play.

MR. NOLAND: And, Judge, just, as I learned, I probably -- just -- I'll add, just based on knowledge from other cases that I've had with the city is that, they may be talking about where a -- there isn't a roster of detectives assigned at any given time at an area. So in this other case I was working on, they -- we intended to put together a list, to the best of the city's ability based on computer research, to try to create something of how many detectives were working in a particular area, or passed through at some time, they could have been there for a month between, say, Point X

and Point Y.  But there could be no guarantees from the city, the CPD, that every detective that did pass through would be captured in that list because, you know, it's going back in time to try to create something to the best of their ability. And I think is what that probably refers to.

MS. BARBER:  And that may have come up in the *Hood* and *Washington* case as well, so we could look into that.

THE COURT:  Okay.  Let me know.  If that's the case, so that's the answer, which is that, there may be some gaps in the information based upon just lack of recordkeeping or people moving in and out too fast of that area.

MR. ENGQUIST:  And also the recordkeeping back then was all paper.

THE COURT:  Paper.

MR. ENGQUIST:  And that paper is not around.  So if you wanted to go and compare, like, everything, you have to do a hand search if you actually had the paper --

THE COURT:  Right.

MR. ENGQUIST:  -- about who was assigned every day. Even if you could do that, it would be incredibly hard to do. But most of that paper doesn't even exist anymore.

THE COURT:  Yeah, okay.

All right.  So on the plaintiffs' side, so I understand this issue with respect to your objection with respect to every fifth, and that you want a stipulation that

would preclude the defendants from necessarily challenging your expert's analysis based upon a particular sample set, if you will, or universe set.

What does your expert tell you about how much is a statistically significant number, right? Because experts deal with this all the time. And they don't necessarily need everything. A lot of times they will -- they will say, you know, this percentage is a significantly statistical sample, such that you can extrapolate and say that this is sufficient. And the defendants often don't have to stipulate to that, and they just cross-examine your expert, and they put their own expert up, and they'll say it's insufficient.

But what I'd like to know is what your expert is going to say about that. Because if you think about it, in every case that involves an expert, you could argue, produce everything. Produce every, you know, physician record for the last ten years from all hospitals around the country. Well, we don't do that. We find a place that -- and we meet in the middle where it's enough. And so what I'd like to know is what does your expert say as to what's enough.

MR. STARR: Okay.

THE COURT: And it might be you might need to know exactly how many CR files there are first. Again, if there is -- you know, if there is, you know, 50 or 100, getting every fifth is a much smaller statistical set. If there are

300,000, getting every fifth might be an appropriate statistical set, so.

MR. STARR: Yeah, I will get -- I will give you an answer to that. And I think we do need to know the total universe in order to determine that, but.

THE COURT: I agree. And I think as soon as you know, pass that information along so I get something useful --

MS. BARBER: Sure.

THE COURT: -- in your responses.

Okay. So those were my questions. When do you think you can get me, I guess, a supplemental memo?

MS. BARBER: When? Well, is --

THE COURT: It's the summer, I know everyone has got vacations and family stuff, so I don't want to -- I'm willing to be flexible. You tell me.

MS. BARBER: Can we do, like, mid August?

THE COURT: How about three weeks. Sounds fair.

MR. STARR: Fine with plaintiff.

THE COURT: August 2nd?

MS. BARBER: Could I have just until the -- the following week? Just that is a -- I have vacation.

THE COURT: Okay. Let's do August 9th.

MS. BARBER: Thank you.

MR. STARR: And with the caveat that they'll get us

the information about the total universe so that we can give you a better idea about our expert?

THE COURT: Yeah. Do you have a sense of when you can turn that over so it's not August 7th, and then I don't get anything reasonable?

MS. BARBER: Yeah, we can prioritize that. I can try to get that as soon as I can.

THE COURT: Okay. So let's aim for maybe two weeks on that one.

MS. BARBER: Sure.

THE COURT: And then -- okay. So I'll take a look at your memos on August 9th, and then, anything you want to submit to me. And then I'll likely issue a written ruling on the issue.

MS. BARBER: Actually, your Honor, I'm getting some information that it might be a little bit more difficult to get the number of the CRs --

THE COURT: Yeah.

MS. BARBER: -- in two weeks. I have not done that before, so I don't know exactly how long it would take.

MR. NOLAND: And, Judge, I'm sorry, again, I'm probably speaking out of school a little bit, just I figured I'd share as an officer of the court the information I know from other matters. If we're talking about the CPD creating a list of detectives from Area 5 for a period of time, that

takes time. So that was not an easy process, just that list itself. And so, in the case I was working on, it was a list for five years, and there were 300 and some detectives. We didn't go to the next point to figure out how many CRs that each of those detectives had in that five-year period. To do that, it's going to be -- first you're going to have to figure that out going detective by detective how many CRs each of those detectives had, and then trying to figure out which CR allegations were made in that five-year period. So it is just not as easy as pushing a button. It's going to be I think a substantial amount of work to figure that number out.

Now, there are -- I do know that there is annual reports where total numbers of CRs are identified just CPD-wide, and so --

THE COURT: You can't break it up by area and years?

MR. NOLAND: It's by year. I don't know if it's by area. And even if it is, I would be surprised if it's by -- like through the detective division, it might be all officers. And so -- so -- so, you know.

THE COURT: So I'm going to tell you, I mean, as you can tell, you know, a logical analysis, you need to know how many before you start making determination about how much is enough. And without knowing that, I'm not going to be

able to make that determination.  I understand the challenges you have.  I mean, it's on paper, it's not computers, no database, I get it.  But I'm going to need you to tell me a solution.

MR. STARR: Your Honor, if I may?

THE COURT: Uh-huh.

MR. STARR:  It's my understanding that the CRs are electronic.  I don't know about the detective records and the rosters and the extent of which the recordkeeping is accessible in that regard.  I imagine that it can be done at some point.  I don't know how long it takes, but.

THE COURT:  It's '92 to '98; right?  That's the timeframe?

MR. STARR: Yes.

THE COURT:  So --

MS. BARBER:  Right.  So, your Honor, I haven't had experience trying to get that information before, so I cannot tell you exactly how long it will take.  I don't know.

THE COURT: Okay.

MS. BARBER:  But what I'm hearing is that it's not going to be easy.

THE COURT:  Okay.

MS. BARBER:  I can do my best, but I don't -- especially with the -- you know, the other depositions that we've got scheduled, and things like that.

THE COURT: Okay.

MR. ENGQUIST: Your Honor, if there is going to be a difficulty with it and in two weeks it's going to be much further out, then we'll notify them, and we'll notify the court, I would assume.

THE COURT: Yeah, I mean, you know, I can push things a little bit. I mean, you know, it's -- we need to get the Monell discovery going, and so we need to resolve this issue. But I'm mindful of that I want to make a decision that is reasoned and informed before I make a decision. So I'll need you to tell me how long you need to get them the info so that at least I can find out what's statistically appropriate, what's not. Because if I do find that there are, you know, 500,000 CRs, for example, I don't know how many there are, I'm just making up a number, you may find that a statistical sample every fifth is fine. I may grant your request. But I won't know that until I know the numbers.

MS. BARBER: Would it be okay if we just got back to you with an estimate of how -- of how long that we can -- we can -- it will take us to get that list? It's hard for me to put a deadline on it if I -- if I don't know exactly how long this will take.

THE COURT: Okay. So I guess all we can do then -- here is what I will do: I will keep the date August 9th for

supplemental memo.  I think you just have to meet-and-confer with the other side and talk to them about how long it's going to take on the total number of CRs.  And if I don't have an answer by August 9th, I don't have an answer, and then we'll have to continue that particular issue for some time.

MR. STARR: Can we ask the meet-and-confer take place within the next two weeks so we can have a week to --

THE COURT:  That sounds fair.  Just to talk about where you are and how long it's going to take.

MS. BARBER:  That should be fine.

THE COURT:  Okay.  So at least by August -- sorry, July 25th, you should meet-and-confer on the issue.  And then what I'll do is, let's have a status the following -- the week after July 9th to talk about the report.

THE CLERK:  Are you talking July 9th or --

THE COURT:  After.  August 9th, sorry.

THE CLERK:  Tuesday, August 13th, at 9:30.

THE COURT:  Okay.  Anything else we need to talk about it?

MR. STAINTHORP:  Yes, Judge.  There was an issue that arose during the deposition that was just this last Tuesday, which actually precipitated a call to your office in an attempt to resolve the issue.  You were not available.  We were able to get through the deposition, but the issue is

this:  At that deposition, there were multiple counsel representing a single party, and both counsel were -- were making objections during the deposition.

THE COURT:  Which deposition again?

MR. STAINTHORP:  This was the deposition of Assistant State's Attorney Heather Brualdi, who was a defendant in Reyes, and who is represented by the Cook County State's Attorney's office.  At the deposition, repeatedly, both counsel would make objections, would make statements on the record.  We attempted to resolve it during the deposition by us pointing out that, certainly the practice, and my understanding is of the rule, is that, when there is multiple counsel representing a single witness or party, that only one counsel makes objections on the record and only one counsel makes statements on the record.  The Cook County State's Attorneys present were unwilling to accept that rule.  We did manage to complete the deposition, but it appears to me that that may be an issue going forward, and I have no interest in dealing with what happened on Tuesday, the dep was done.  But I thought that, going forward, that we should have an understanding that, when there is multiple counsel representing a single witness, or party, that only one of the counsel makes statements on the record at the deposition.

THE COURT:  Okay.  Any response?  Anybody here?

MR. BRENER:  I would just like to clarify what --

one thing that was said.  Yes, it's true that both myself and my colleague at certain points during the deposition registered objections.  In many cases, they were identical objections raised to objectionable questions, several questions that were asked again, again, again, again, and again because the answer being given was not the answer that counsel was looking for.  We never spoke at the same time, and it did not impact the record, it did not prevent counsel from asking his questions.  But, yes, I would agree that we did both object at certain points during the deposition.

MR. STAINTHORP:  Just --

THE COURT:  One question.  So both of you were representing the same individual?

MR. BRENER:  That's correct, Judge.

THE COURT:  And both of you were objecting?

MR. BRENER:  Uh, I was --

THE COURT:  At the same time?

MR. BRENER:  No, not --

THE COURT:  Not talking over each other, but there would be an objection and an objection?

MR. BRENER:  No.

THE COURT:  Did you take turns?

MR. BRENER:  No.  We did not make the same objection at the same question.  But, for instance, there was -- there were a number of questions asked about what I

would term a semantic issue, in which I raised an objection a number of times that the witness had answered the question, maybe the fourth or fifth time he was asked. And then my colleague raised the same objection, I did not. So, no, we did not object to the same question and were not speaking over each other.

MR. STAINTHORP: That's not entirely accurate, Judge. At times they made objections that were contradictory to each other. It made for a very confusing record. It was very disruptive of the deposition. Fortunately, I was the questioner, I was able to proceed, but it made it very, very difficult.

THE COURT: So, that's fine. I've heard enough. So I guess this is an easy one, and the answer is, one person makes the objections. Okay?

MR. STAINTHORP: Thank you.

THE COURT: Going forward.

MR. BRENER: Thank you, your Honor.

THE COURT: All right. Anything else?

MR. ENGQUIST: One other thing, your Honor. Just a housekeeping matter, just because I got information last night, just so -- because on our status report we have people that we're trying to serve. Rosauro Mejia was served. We're going to have to move the dep. Apparently he has some work issues, but we're going to figure out (unintelligible) for

him.  And Horacio Mejia, we didn't get service on, and he may not be in the state, so -- and we have another search for him, just to let people know.

THE COURT:  Yeah, okay.

MR. STARR: Thanks, counsel.

THE COURT:  Appreciate that.  Okay.  Let's do something else.  I will see you all August 13th.  Okay. Thank you all.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.

*/s/Sandra M. Mullin*                    July 22, 2019

_____          _____
Sandra M. Mullin                 Date
Official Court Reporter