**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | No. 18 C 1028 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | Hon. Sunil R. Harjani, |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | |
| GABRIEL SOLACHE, | ) | |
| | ) | No. 18 C 2312 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood, |
| v. | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Hon. Sunil R. Harjani, |
| | ) | Magistrate Judge |
| Defendants. | ) | |

**PLAINTIFFS' SECOND SUPPLEMENTAL BRIEF IN
SUPPORT OF THEIR REQUESTS FOR *MONELL* DISCOVERY**

Pursuant to the Court's order (Dkt. 179), and in support of Plaintiffs' position set out in their Supplemental Brief In Support of Their Requests for *Monell* Discovery (Dkt. 195), and the joint status report of May 24, 2019 (Dkt. 178), Plaintiffs respectfully submit the following second supplemental brief in support of their requested *Monell* discovery, stating in support as follows:

## INTRODUCTION

This supplemental brief addresses the Court's questions raised at the hearing of July 11, 2019. It is divided into two sections: (1) a discussion of the burden of producing and the relevance of Chicago Police Department Area Five homicide files to these cases and related litigation; and (2) a discussion of the reasons to order production of all Area Five detective Complaint Register files (CR files) for the period from 1992 through 1998, and past litigation supporting that position.

**A.  Area Five Homicide Files Are Relevant to Multiple of Plaintiffs' *Monell* Theories in This and Related Litigation, and the Burden of Producing Those Files Is Limited**

**1.  The Limited Burden of the Requested Discovery**

It is important to reiterate that the current dispute about the appropriate scope of *Monell* discovery is not limited to the *Reyes* and *Solache* cases. The same *Monell* theories and the same *Monell* discovery are being pursued by the plaintiffs in *Sierra v. Guevara, et al.*, No. 18 C 3029 (N.D. Ill.) (Lee & Weisman, JJ.), and *Gomez v. Guevara, et al.*, No. 18 C 3335 (N.D. Ill.) (Kocoras, J.), and in those related cases the City's motions to bifurcate and stay *Monell* discovery have been denied, *Sierra*, No. 18 C 3029, Dkt. 84; *Gomez*, No. 18 C 3335, Dkt. 65, as they were here, Dkt. 174. These four cases are followed by at least four additional civil suits against Guevara and the City, each of which will also present the same *Monell* theories and discovery disputes. *Rodriguez v. Guevara, et al.*, No. 18 C 7951 (N.D. Ill.) (Tharp, J.); *Bouto v. Guevara, et al.*, No. 19 C 2441 N.D. Ill.) (Dow, J.); *Almodovar v.*

1

*Guevara, et al.*, No. 18 C 2341 (N.D. Ill.) (Gottschall, J.); *Negron v. Guevara, et al.*, No. 18 C 2701 (N.D. Ill.) (Gottschall, J.).

The underlying criminal investigations at issue in each of these Guevara cases occurred in the following years (the cases in which *Monell* discovery is underway are in bold):

- *Bouto*—1993

- *Almodovar & Negron*—1994

- ***Sierra*—1995**

- *Rodriguez*—1995

- ***Gomez*—1997**

- ***Reyes & Solache*—1998**

In *Rivera v. Guevara, et al.*, No. 12 C 4428 (N.D. Ill.), which concerned an investigation in 1988, the City produced seven years of Area Five homicide files for the years 1985 through 1991, and those files will be used in each of the Guevara cases above by agreement. The additional seven years of Area Five homicide files sought here, for the years 1992 through 1998, will be used in all of the above Guevara cases as well.

Properly analyzed, the burden of producing Area Five homicide files is extremely minimal when one considers that the plaintiffs in these cases are requesting seven years of homicide files total in eight separate wrongful conviction cases. As the production ordered in *Rivera* shows, the Court would be well within the bounds of Rule 26 to order the production of the seven years of homicide files sought here in *Reyes* and *Solache* without considering other cases. But when those other cases are considered, the burden argument falls away—the City will be producing less than a year's worth of homicide files per case.

The Court inquired about the quantity of Area Five homicide files in this time period. While the City will obviously have better access to this information, Plaintiffs provide the following chart of homicides in Area Five by year:

| YEAR | # HOMICIDES | CITATION |
|---|---|---|
| 1992 | 139 | Exhibit A (CPD Annual Report 1992) at 5[1] |
| 1993 | 131 | Exhibit B (CPD Annual Report 1993 & 1994) at 20 |
| 1994 | 137 | Exhibit B (CPD Annual Report 1993 & 1994) at 22-23 |
| 1995 | 131 | Exhibit C (CPD Annual Report 1995) at 28-29 |
| 1996 | 113 | Exhibit D (CPD Annual Report 1996) at 17 |
| 1997 | 128 | Exhibit E (CPD Annual Report 1997) at 16 |
| 1998 | 123 | Exhibit F (CPD Annual Report 1998) at 10 |
| **TOTAL** | **902** | |

The burden imposed by Plaintiffs' request for 900 homicide files in these cases is minimal when compared to other litigation in which much more substantial *Monell* discovery has been ordered. *See* Dkt. 195 at 8 (collecting cases). This is particularly so considering that the City is really being asked to produce just slightly more than 100 homicide files per pending Guevara case.

### 2.       The Relevance of the Homicide Files

At the July 11 hearing, the Court inquired about the relevance of Area Five homicide files to Plaintiffs' *Monell* theories. The homicide files are a fundamental foundation of all of the *Monell* theories asserted in these and the other Guevara cases. The *Monell* theories allege that the City's policies and customs corrupted murder investigations in Area Five and the resulting criminal prosecutions. The homicide files represent the majority of (or perhaps the only) documents that Defendants possess relating to the investigations at issue. Those files reflect the police version of each of those investigations, and so they are essential to assessing any *Monell* theory that alleges a

---

[1] The Chicago Police Department Annual Reports list murders by district. In the relevant time period, Area Five encompassed the 14th, 15th, 16th, 17th, and 25th Districts.

systematic defect in homicide investigations. That alone justifies the production of the homicide files under the liberal discovery standard set out in Rule 26. Put another way, if the Area Five homicide files were not produced, Plaintiffs would be deprived of all nearly all documents in the City's possession relevant to their *Monell* claims, and it would be impossible for them to proceed.

But production of the Area Five homicide files is also justified when the particular *Monell* theories at issue are examined. Again, it is critical to highlight that the Court's determinations about the appropriate scope of *Monell* discovery here will affect each of the Guevara cases that follow *Reyes* and *Solache*. As a result, Plaintiffs submit that it is appropriate to consider the *Monell* theories and the relevance of the Area Five homicide files to those theories with all of the Guevara cases in mind.

**A. Suppression of Evidence**. The Court noted that it understood Plaintiffs' *Monell* theories alleging systemic suppression of evidence. As a result, Plaintiffs will keep their comments on those theories brief. A few points are nonetheless important. First, it is important to be clear that there are multiple due process *Monell* theories that relate to suppression of evidence, and the Area Five homicide files are relevant to these theories in different respects. For example, there is the street files theory, tried in *Fields* and *Rivera*, which holds that City policy caused the routine suppression of investigative files in homicide cases—regardless of whether any individual defendant committed investigative misconduct—so that prosecutors and defense attorneys in the criminal justice system did not receive pertinent investigative information. But in addition, Plaintiffs advance a *Monell* theory that investigative information was routinely suppressed because it was not recorded in the homicide files, such that even if the complete file had been turned over, a due process violation would result. The Area Five homicide files are relevant to proving both theories.

With respect to the street files theory, the Area Five homicide files can be (1) examined themselves, and also (2) compared to other files concerning the same investigation and prosecution

in order to show what evidence was suppressed. Contrary to the City's suggestion, it is not only a comparison between the Area Five homicide files and a corresponding Cook County State's Attorney's Office (CCSAO) file that matters. As stated, a homicide file on its face will contain evidence probative of whether investigative materials were disclosed to the criminal justice system. By way of illustration, in *Rivera* the homicide file contained a number of General Progress Reports (GPRs) (on which Chicago Police Officers were required by policy to take notes), but the Investigative File Inventory included with the file reflected that multiple GPRs created on key dates and logged into the file shortly thereafter had gone missing. In addition, the City's view of the relevant file comparisons is too limited. In addition to the CCSAO files, the homicide file can be compared to the Permanent Retention File maintained by the City, which reports the official account of a criminal defendant's guilt in a homicide case. Again, in *Rivera* the jury saw that the materials suppressed in the homicide file told a much different story about alternative suspects and the sole eyewitness who identified Mr. Rivera than the official account contained in the Permanent Retention File. In addition, the homicide files can be compared to those in corresponding criminal defense files, and those comparisons can also demonstrate whether investigative materials were suppressed. The Court can see all of these comparisons in the reports submitted in *Rivera* (Dkt. 186-12) and *Fields* (Dkt. 186-13), and each comparison yields probative evidence.

There certainly is no basis to arbitrarily limit this evidence to those files for which a corresponding CCSAO file exists, as the City suggests. Such a limitation would merely deprive the jury of relevant evidence supporting Plaintiffs' file-suppression theory, and without an articulable basis for doing so. Moreover, the project of identifying which Area Five homicide files have a corresponding CCSAO file and then producing only those Area Five files is cumbersome, and imposes a greater burden on the parties than simply producing all of the Area Five homicide files in

the first place. Finally, as discussed in Plaintiffs' opening brief, the City's proposal to limit discovery to those cases with a corresponding CCSAO file is an attempt to gain an evidentiary advantage that both Judge Kennelly and Judge Gottschall rejected at the trials in *Fields* and *Rivera*, respectively. Imposing that limitation at the start of *Monell* discovery would make little sense.

In sum, the Area Five homicide files are plainly relevant to Plaintiffs' evidence suppression *Monell* theories, and this Court should order the production of those files for that reason alone. The City has contended that Plaintiffs must prove what items of evidence were suppressed by the Defendants before they can proceed with *Monell* discovery on these theories. But that contention represents the City helping itself to the relief that it sought from the Court in its motion for bifurcation, which the Court rejected. There is no requirement that Plaintiffs prove anything about particular items of evidence suppressed to engage in discovery. That said, Plaintiffs have identified numerous items of evidence suppressed, including: (1) Norma Salazar, who was implicated by the killer Adriana Mejia, was placed in a lineup during the Soto homicide investigation, and the Plaintiffs received no documentation of the lineup; (2) parts of Adriana Mejia's confession were excluded from handwritten statements and police reports; (3) members of the Soto and Mejia families were treated as alternative suspects by police, unbeknownst to Plaintiffs; and (4) GPRs reflecting interviews with witnesses and suspects are missing. While Plaintiffs are not required to prove anything about what evidence was suppressed to justify *Monell* discovery, given the procedural posture of the case, the Court can rest assured that the suppression of investigative materials will be a major component of the trials in these cases.

**B. Manipulation of Identification Procedures**. In Plaintiffs' view, the Court is quite right, as it stated at the July 11 hearing, that the validity of identification procedures involving third-party Norma Salazar would not justify *Monell* discovery on a manipulated identification theory in

6

these cases. However, as discussed already, it is important to assess these *Monell* theories in the context of the other Guevara cases in which the resolution of the present discovery dispute will have an effect. Manipulated identification procedures—including in photo arrays and live lineups—and the failure to report those procedures is an issue in *Sierra, Rodriguez, Gomez, Almodovar, Negron*, and *Bouto*—i.e., in all of the other Guevara cases. Plaintiffs and the City have also exhausted negotiations about the scope of the Area Five homicide file production in *Gomez* and *Sierra*, and so the manipulated identification theory should be part of the Court's consideration.

In these other cases, the Area Five homicide files will reveal evidence that City policies and customs led to unduly suggestive identifications, and also the suppression of identifications, in violation of due process. For example, the Area Five homicide files will contain evidence of the use of improper photo and live "show-up" procedures (where only one picture or person is shown to a witness to obtain an identification). They will show that identifications were obtained through suggestive photo and live lineups. They will demonstrate, as Dr. Wells' report in *Rivera* makes clear, that the City failed to accurately document identification procedures, suppressing evidence that would have shown that eyewitnesses were unreliable. Dkt. 186-14. And, perhaps most importantly, the homicide files will reveal facts that demonstrate conclusively that an eyewitness identification was the result of officer manipulation or suggestion. This may take the form—as it did in *Rivera* and *Fields*—of crime scene reports and evidence revealing that a witness who later testified during criminal proceedings could not have observed the crime at issue and could not have identified the perpetrator. It may also take the form of indicia of unreliability—*e.g.*, a stranger identification, many months after the crime, which is inconsistent with initial descriptions, and which is based on suspect viewing opportunities—that reveal the manipulation of eyewitnesses once investigated. These *Monell*

7

theories, which will be prosecuted in other Guevara cases, are another reason for this Court to compel production of the Area Five homicide files.

**C. Fabrication of Evidence**. The manipulated identification theories tie into fabrication of evidence theories. When a witness is told who to pick out of a lineup, or is shown that person's photo several times before viewing the lineup, a police report is typically created afterward that omits such information and instead falsely states that the witness viewed the lineup and without prompting make a confident identification of the suspect. Such reports are fabricated evidence.

The homicide files can reveal evidence of fabrication in many other ways as well. Homicide files standing alone can reveal evidence of fabricated police reports, for example. This can occur when the "official" version of events told in typed police reports is contradicted by other documents in the file. This occurred in *Rivera*, where police reports told a version of events in which Mr. Rivera became a suspect only after the eyewitness identified his photo from a mugbook on a particular day, but the homicide file contained a rap sheet for Mr. Rivera that revealed that the defendants had considered him a suspect days earlier. Fabricated evidence is also revealed through examination of homicide files when witness statements documented in police reports are contradicted by other typed police reports, or by officer notes. This occurred in one of the homicide files produced as part of *Monell* discovery in *Rivera*; in that case, the homicide file contained two versions of the same lineup report, each one reaching a different conclusion about what had happened in the lineup. Dkt. 186-10 at 48-49 (discussing the case of Demetrius Johnson).

Homicide files can also reveal evidence of fabrication through targeted investigation. Plaintiffs' counsel have reviewed enough homicide files to know that some homicide investigations are open and shut; others reflect good police work or a good break; and others reek. For those latter cases, a few key witnesses often stand out. Talking to those witnesses as part of an investigation can

8

reveal the suppression of alternate suspects and other investigative leads, the manipulation of identification procedures, and fabricated police reports omitting the information above and telling a different story about the witness's knowledge. It is worth noting that is exactly what happened with the investigation conducted in this case. After getting the homicide file, Plaintiffs talked to certain witnesses identified in the police reports, some of whom revealed that undisclosed witnesses had been treated as suspects, and that the police reports documenting police interactions were false.

**D. Coerced Confessions**. Finally, homicide files can be important to developing evidence of a City-wide policy or custom of coercing confessions. There are a number of suspects and witnesses who, over the years, have alleged that they were beaten or coerced into confessing by Guevara and other Area Five personnel. Many of them are identified in Plaintiffs' Complaints, and in their discovery requests. The City, of course, has not conceded the merit of those claims, and in most of those cases the underlying homicide files are not available to Plaintiffs. But those homicide files could contain evidence supporting the allegations of coercion. For example, the homicide files will contain arrest reports indicating when the individual was arrested, and when they gave a statement, corroborating allegations about the length of an interrogation, the participants in the interrogation, and so on. They will also contain copies of handwritten confessions. A facial review of those documents can reveal forged signatures, and information that was fed to the suspect. Comparing the confessions against other documents in the file can reveal that certain information contained in the confession had been learned by police earlier in the investigation, or that non-public information learned later contradicts information in the confession. Plaintiffs' attorneys have come across many of these scenarios in other cases. And finally, as discussed above, targeted investigation based on the homicide files may lead to evidence of additional coerced confessions. Some

9

confessions stand out; in those cases, a conversation with the suspect could reveal evidence of abuse and other coercion.

In sum, the Area Five homicide files are unquestionably relevant to Plaintiffs' *Monell* theories. And they will be relevant in multiple other cases as well. Production of those files is not burdensome in the least, especially considering that the City's burden is divided among multiple major wrongful conviction cases. This Court should order a complete production of Area Five homicide files from 1992 to 1998.

**B.      Area Five Complaint Register Files Should Be Produced for the Entire Time Period, As Other Courts in This District Have Ordered**

Plaintiffs explained in detail in their original filings the relevance of CR files to their claims that the City failed to train, supervise, and discipline its police officers, including Defendant Guevara, and they set out their efforts to compromise on the issue with the City. Dkt. 195 at 4-5, 11-12. The City does not dispute that CR files are relevant, but it has argued that it should not be required to produce all Area Five detective CR files for the years 1992 to 1998. Dkt. 195 at 12-14. The City argues that production of all Area Five detective CR files is not a burden proportional to these cases, and it asserts that a subset of CR files should be sufficient to prove Plaintiff's claims. *Id.*

At the July 11 hearing, the Court inquired into the number of Area Five detective CR files, the number of detectives at Area Five in the 1992-1998 time period, what portion of CR files would constitute a statistically significant sample, and other cases in which the production of CR files has been ordered. Following the hearing, the Court entered an order clarifying that the City needed only identify the total number of officers assigned to Area Five during the relevant time period. Dkt. 205. This section discusses these issues.

**1.      The Number of Area Five CRs and Area Five Officers**

10

Defendants repeatedly represented during the July 11 hearing that it was burdensome to assemble a roster of Area Five detectives during the relevant time period and those officers' CRs. Plaintiffs would like to push back on that representation. With respect to personnel assigned to Area Five, Plaintiffs' sent a FOIA request to the City on May 24, 2019, asking for a roster of all officers working for the Chicago Police Department between the years 1990 and 2000, along with their assignments. Exhibit G (FOIA Request). On June 27, the City provided a PDF of a table in response that lists all officers and their assignments. Exhibit H (FOIA Response)[2]. Presumably the table could be limited by year, district and area. Regardless, searching the table Plaintiffs have identified 238 detectives assigned to Area Five between 1990 and 2000. Accordingly, the number of detectives assigned to Area Five between 1992 and 1998 is likely between 150 and 200.

It is more difficult for Plaintiffs to estimate the total number of CRs in Area Five in the relevant time frame, given that they lack access to the City's CR search tools. However, the Invisible Institute's Citizens Police Data Project provides at least some insight. *See* https://cpdp.co/. This dataset is constructed based on CR file information provided by the City in response to litigation and FOIA requests, and it contains CR data from approximately 2001 to 2008, and from 2011 to 2015. Looking at the year 2002, there were 795 CRs in all of the Districts within Area Five.[3] If the number of CRs was similar in the 1992-1998 timeframe, there would be approximately 5,500 total CRs for all police officers in all Districts within Area Five. Because Plaintiffs are seeking the CRs of detectives in Area Five only, the total number of CRs would be much smaller than 5,500. For example, in the *Hood* litigation, discussed below, the CRs of approximately 260 detectives were

---

[2] A paper copy of the full exhibit will be delivered to chambers. The pdf was too big to file with the CM/ECF system.

[3] The data was searched by District, and data from Districts 14, 15, 16, 17, and 25, which make up Area 5, was downloaded. Sorting the data by year and adding the total CRs for each District revealed 795 CRs in 2002.

produced, and though the production is ongoing it is likely that the total will be approximately 1250. Plaintiffs expect that a similar number of CRs are in dispute here, though only the City knows.

### 2. The Problems Created by Sampling CR Files

The Court asked what sample of CR files Plaintiffs' expert might consider a statistically significant sample. Plaintiffs outline some of the issues raised by experts they have consulted here, before discussing reasons that the City's sampling proposal should be rejected outright.

***A. Sampling Issues***. As an initial matter, Plaintiff's experts have advised that before any representative sampling process is designed, it is necessary to know, at minimum, the total number of CRs files. Complicating matters, different samples may be needed to address different issues relevant to Plaintiffs' *Monell* theories. For instance, the production of one of every $x$ number of CRs (depending on the total number) might be sufficient to prove certain *Monell* theories—*e.g.*, the overall rate at which CRs are sustained or result in disciplinary action—but that same set would likely be insufficient to prove other *Monell* theories Plaintiffs are pursuing—*e.g.*, the rate at which CRs are sustained or result in disciplinary action specifically with regard to allegations of torture or physical abuse. Similarly, Plaintiffs hope to reach certain conclusions about the rate at which allegations are sustained against officers when they are in the position of homicide detective, as opposed to patrol officer, and a different number of CRs may be necessary to achieve a statistically valid sample on that issue. And yet another sample set would be necessary for Plaintiffs to show the failure to train and supervise specific repeat offender officers—some of whom are Defendants in these cases—who have disproportionately large numbers of CRs, only a small number of which would be represented if CRs are limited to one in every $x$ number of CRs.

Even putting to one side the fact that a sampling process cannot be designed without more information from the City about the number and types of CRs, the fact that different samples will be

12

necessary to develop evidence of different aspects of Plaintiffs' theories weighs in favor of simply producing the entire set of CRs, instead of presenting multiple samples from that complete set. The former production would be much less burdensome than the latter.

**B. Burden of Proof, Burden, and Proportionality**. But even if there were not these sampling issues to contend with, the City still would have no justification for its proposed limitation on the production of CR files. The City asserted in its last brief that Plaintiffs were "competent to assess what is needed to prove their claim." Dkt. 184 at 13. As the City correctly identifies, Plaintiffs bear the burden of proof to establish their *Monell* theories, and the Seventh Circuit has made clear repeatedly and recently that the burden of establishing pattern claims, including a failure to train or discipline, is no small task. Plaintiffs have to proffer a lot of evidence to prove *Monell* claims. *J.K.J. v. Polk County*, 928 F.3d 576, 594-98 (7th Cir. 2019); *see also Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1070 (N.D. Ill. May 11, 2018) (widespread practice of one officer—Guevara—insufficient to support *Monell* claim). Plaintiffs have assessed that they need at minimum all disciplinary documentation in the time frame 1992 to 1998 to sufficiently prove their *Monell* claim. In Plaintiffs' view, if that discovery is denied, it will likely lead to dismissal of their *Monell* theories.

The City at this point in the litigation downplays the issue, suggesting that of course Plaintiffs should be able to prove their *Monell* theories with a sample of CR files. But if the City actually felt that way, it would agree to a stipulation that a sample is statistically significant for purposes of litigation these cases. Instead, the City hopes to limit the production of CRs by proposing a sample, and then it will argue later that the sample is insufficient to prove a practice. Moreover, the City will respond to Plaintiffs' findings by saying that any findings Plaintiffs reach are not relevant or causally related to the claims in this case. For example, the City will challenge any conclusions about overall sustain rates and discipline rates as being too general to be applicable to

13

the specific allegations of misconduct in this case. In addition, the City will respond by saying that the conclusions Plaintiffs have reached based on the data are cherry-picked, and that the proper analysis is some other one they choose to extract from the data. Plaintiffs would then need to analyze subsets of the pool of CRs to challenge whatever arguments the City makes, and that subset will itself need to be a statistically valid sample. Plaintiffs' best way to convince a judge and jury that their position is right, and that the City's position is wrong, is to review the complete set of CR files.

Typically in litigation like this, a plaintiff's lawyer will decide to sample a large set of files because they lack the resources to conduct a complete review, knowing that by doing so they are opening themselves to a battle of experts about the size of their sample. But in these cases, Plaintiffs are willing to invest the time and effort to review the complete set of data that the City does not dispute is relevant, and they do not want to expose themselves to a battle of experts about sample sizes. The City should not be able to insist on smaller pool of CR files, without a stipulation, and by so doing expose Plaintiffs to a statistical challenge of the City's making.

Finally, the City's burden and proportionality arguments do not hold water. Plaintiffs have extremely meritorious claims that an abject failure to train and supervise detectives at Area Five in the relevant time period led to rampant abuses of the rights of citizens and dozens of wrongful convictions. Moreover, as discussed, the issue of burden must be assessed bearing in mind that the CR files are going to be used across all eight cases discussed above, meaning that the City is producing a minimal number of CR files per case.[4] Finally, it is highly likely that the City's proposed sampling of files will actually create a *greater* burden of production than producing all CR files.

---

[4] Both the type of claims at issue in these cases and the number of suits being litigated simultaneously distinguish this case from *Brent-Bell*, which was cited by the City and which is being litigated by the undersigned. *Brent*

### 3.        Precedent from this District Supports Production of All CR Files

Finally, the Court inquired what other courts in this District have done when faced with similar requests for CR files. In *Hood v. Chicago*, No. 16 C 1970 (N.D. Ill.) (Wood & Valdez, JJ.), and *Washington v. Chicago*, No. 16 C 1893 (N.D. Ill.) (Wood & Valdez, JJ.), the parties attempted to reach compromise, with the plaintiffs presenting many of the same proposals that the City has rejected here. *See Hood*, No. 16 C 1970, Dkt. 172. The City there rejected the plaintiffs' proposal as well, and it made the same arguments presented to the Court here to resist producing CR files. *Id.*, Dkt. 182. The parties filed supplemental position papers. *Id.*, Dkts. 189 & 190. The Court granted the motion to compel, ordering the City to produce all CR files for those detectives who had been at Area One between 1989 and 1996. *Id.*, Dkt. 191; *Hood*, No. 16 C 1970, Transcript of November 29, 2018 Hearing.[5] As discussed above, the CRs of approximately 260 detectives were ordered produced, and the total number of detective CRs will be approximately 1250. This decision supports ordering production of the complete set of Area Five detective CR files as well.

### CONCLUSION

For all of the foregoing reasons, and for those reasons outlined in Plaintiffs' prior filings, this Court should reject the City's proposed limitations on *Monell* discovery and order the City to produce all Area Five homicide and detective CR files for the years 1992 through 1998.

**DATED: AUGUST 9, 2019**

RESPECTFULLY SUBMITTED,
/s/ Steven Art
*One of Plaintiffs' Attorneys*

---

involves a false arrest and detention, not a multiple year wrongful conviction obtained by the misconduct of an officer responsible for wrongly convicting multiple innocent men.

[5] Plaintiffs regrettably do not have this transcript. If the Court would like them to order it and file it, they are of course happy to do so.

15

Jon Loevy
Anand Swaminathan
Steven Art
Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen, 3rd floor
Chicago, IL 60607
312.243.5900
steve@loevy.com
*Attorneys for Arturo Reyes*

Jan Susler
John L. Stainthorp
Ben H. Elson
People's Law Office
1180 N. Milwaukee, 3rd floor
Chicago, IL 60642
773.235.0070
*Attorneys for Gabriel Solache*

## CERTIFICATE OF SERVICE

I, Sean Starr, an attorney, certify that I filed the foregoing PLAINTIFFS' SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUESTS FOR *MONELL DISCOVERY* on August 9, 2019, using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sean Starr

*One of Plaintiffs' Attorneys*