**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARTURO DeLEON-REYES,<br><br>    Plaintiff,<br><br> v.<br><br>REYNALDO GUEVARA, et al.,<br><br>    Defendants. | Case No. 18 C 1028<br><br>Magistrate Judge Sunil R. Harjani |
| GABRIEL SOLACHE,<br><br>    Plaintiff,<br><br> v.<br><br>CITY OF CHICAGO, et al.,<br><br>    Defendants. | Case No. 18 C 2312<br><br>Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Arturo DeLeon-Reyes and Gabriel Solache filed these wrongful conviction cases against the City of Chicago, several members of the Chicago Police Department, and certain Cook County Assistant State's Attorneys under 42 U.S.C. § 1983 alleging that Defendant Reynaldo Guevara and others violated their constitutional rights by, among other things, coercing their false confessions, manipulating witnesses and fabricating evidence, and suppressing exculpatory information. Plaintiffs also bring claims against the City under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), alleging that the City maintained unconstitutional policies and practices that caused their wrongful convictions. The City's motion to bifurcate discovery related to Plaintiffs' *Monell* claims was denied by the district court. The parties have been proceeding with fact discovery and now dispute the appropriate scope of *Monell*

discovery. For the reasons set forth below, the Court rejects the City's contention that it should only have to produce Area Five homicide investigative files for which there exists a corresponding Cook County State's Attorney's Office (CCSAO) file and the complaint register files (CR files) for every fifth detective at Area Five for the period from 1992 to 1998. The Court also rejects the Plaintiffs' request for the full seven years of discovery of these two categories of files with no limitations. The Court orders that the City's production is limited to the years 1995 through 1998 for all Area Five homicide investigative files and CR files for detectives.

## BACKGROUND

In these lawsuits brought pursuant to 42 U.S.C. § 1983, Reyes and Solache contend that they were wrongfully convicted and served almost 20 years in prison for the 1998 double murder of Mariano and Jacinta Soto and the abduction of their infant daughter and 3-year old son. On December 21, 2017, following post-conviction hearings, Cook County Circuit Court Judge James Obbish vacated Reyes's and Solache's convictions and ordered them released from prison. The Cook County State's Attorney voluntarily dismissed all charges against Reyes and Solache.

On February 9, 2018, Reyes filed his complaint in Case No. 18 C 1028 for injuries arising out of his alleged wrongful conviction. Reyes's complaint contains twelve claims against the City of Chicago, eleven Chicago Police Department officers and/or detectives, five Cook County Assistant State's Attorneys, and Cook County: Section 1983 claims for violations of Due Process and the Fourth, Fifth and Fourteenth Amendments, failure to intervene, conspiracy, policy and practice against the City, and state law claims for intentional infliction of emotional distress, malicious prosecution, civil conspiracy, indemnification, and respondeat superior. Reyes alleges that "false evidence fabricated by Defendants caused [his] arrest, indictment, prosecution, and conviction," including an involuntary and false confession attributed to Reyes. *Reyes*, No. 18 C

1028, Doc. 1 at ¶¶ 4, 5.  Reyes further alleges that Defendants "coerced statements they knew to be false from Solache and other witnesses, which falsely implicated [Reyes] in the crime" and "also suppressed and destroyed evidence that would have shown [Reyes] was innocent, as well as evidence that could have been used to undermine the testimony of State's witnesses, including the testimony of Defendants themselves." *Id*. at ¶¶ 7, 8.

Solache filed his complaint on March 30, 2018 in Case No. 18 C 2312.  Solache's complaint includes nine claims against the City and nine police officer defendants:  Section 1983 claims for violations of Due Process and the Fifth and Fourteenth Amendments, failure to intervene, *Monell* policy claims, and state law claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, respondeat superior, and indemnification. Solache's complaint alleges that "Defendant Guevara prepared fraudulent police reports memorializing the fabricated, false inculpatory statements he coerced from [Solache] and Reyes, and never disclosed to prosecutors, the court, [Solache] or his attorney the fact that he beat, threatened and otherwise coerced [Solache] and witnesses to give the fabricated, false statement implicating [Solache] in the Soto crimes, resulting in [Solache's] wrongful imprisonment for two decades." *Solache*, Case No. 18 C 2312, Doc. 1 at ¶ 54.  Solache's complaint also alleges that "before and after [his] convictions, the Defendants further conspired to fabricate inculpatory evidence and also deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration." *Id*. at ¶ 55.  Defendants deny Reyes and Solache were wrongfully convicted and deny there exists any basis for Reyes's and Solache's claims against them.

On April 24, 2018, these cases were consolidated for purposes of coordinated discovery before District Judge Andrea R. Wood. *Reyes*, No. 18 C 1028, Doc. 49.[1] The question of whether the cases will be consolidated for trial will be determined by the district court at a later date. *Id.* On August 16, 2018, the district court referred discovery supervision in these cases to Magistrate Judge Gilbert, the predecessor magistrate judge. *Id.*, at Doc. 80. These cases were reassigned to the undersigned magistrate judge on January 10, 2019. *Id.*, at Doc. 133. On April 24, 2019, Judge Wood denied the City's Motion to Bifurcate *Monell* Claim for purposes of discovery and trial. *Id.*, at Doc. 174.

The parties' present dispute involves the appropriate scope of discovery regarding Plaintiffs' *Monell* claims in these two cases. *Monell* discovery is also underway in two other similar cases in this district, *Sierra v. City of Chicago*, No. 18 C 3029 (N.D. Ill.) (Lee, J. & Weisman, MJ.), and *Gomez v. City of Chicago*, No. 18 C 3335 (N.D. Ill) (Kocoras, J.). All four cases allege that Defendant Guevara and others violated plaintiffs' constitutional rights by, among other things, coercing their false confessions, manipulating witnesses and fabricating evidence, and suppressing exculpatory information resulting in their wrongful convictions.[2] In all four cases, plaintiffs also allege that the City maintained unconstitutional policies and practices that caused their wrongful convictions, the City's motion to bifurcate those *Monell* claims was denied, and *Monell* discovery has been ordered to proceed. The underlying homicide investigations in these

---

[1] The relevant filings in *Reyes* and *Solache* are identical. Unless otherwise noted, the Court cites only to the docket in the *Reyes* case, No. 18 C 1028.

[2] *Sierra* does not involve a coerced confession claim.

four cases occurred during the following years:  *Sierra* – 1995; *Gomez* – 1997; and *Reyes &
Solache* – 1998.[3]

The parties conferred and tried to reach an agreement regarding the appropriate scope of
*Monell* discovery in all four cases.  The City agreed that if an agreement was reached between the
parties in this case, that agreement would apply to all four of the cases.  However, no agreement
was reached between the parties regarding the scope of *Monell* discovery in these two cases or in
the *Sierra* and *Gomez* cases.  Nor did the parties agree that a ruling in this case would
presumptively apply to the *Sierra* and *Gomez* cases.  While Plaintiffs encourage this Court to
consider the other two cases in evaluating the scope of *Monell* discovery, this Court declines to do
so. Although this Opinion may address issues common to *Sierra* and *Gomez* and other cases in
district, other judges may not agree with this ruling.  Nor does the Court have any basis to order
discovery that essentially determines the scope of discovery (and as a result, additional time frame
for discovery) in other cases that are being handled by other judges in this district.  Accordingly,
this ruling applies only to the *Reyes* and *Solache* cases and does not apply those cases assigned to
other judges in this district.

## DISCUSSION

Federal Rule of Civil Procedure 26 governs the scope of civil discovery and allows parties
to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or
defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  However, a court
"must limit the frequency or extent of discovery otherwise allowed by [the] rules" if "the discovery

---

[3]     Plaintiffs add that these four cases are being following by at least four additional civil suits against
Guevara and the City, each which will present the same *Monell* theories and potential *Monell* discovery
disputes. *See Rodriguez v. Guevara, et al.*, No. 18 C 7951 (N.D. Ill.) (Tharp, J.); *Bouto v. Guevara, et al.*,
No. 19 C 2441 (N.D. Ill.) (Dow, J.); *Almodovar v. Guevara, et al.*, No. 18 C 2341 (N.D. Ill.) (Gottschall,
J); *Negron v. Guevara, et al.*, No. 18 C 2701 (N.D. Ill.) (Gottschall, J).

sought is unreasonably cumulative or duplicative" or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).  Rule 1 likewise directs that the civil rules should be "construed, administered, and employed by the court to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  Finally, magistrate judges "enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013).  With these principles in mind, the Court considers and resolves the *Monell* discovery issues presented by the parties.

The parties' *Monell* discovery dispute involves two categories of documents: (1) homicide investigative files and (2) CR files reflecting the investigation and disposition of allegations of officer misconduct.  As a threshold matter, the City argues that discovery of other homicide investigative files is not warranted absent a showing by Plaintiffs that exculpatory evidence was in fact suppressed in these cases.  Should discovery of other Area Five homicide investigation files be allowed, the parties have agreed on a time frame for production of 1992-1998.  The City seeks to limit its production of Area Five homicide investigation files during this time period to homicide files for which there exists a corresponding CCSAO file.  Plaintiffs object to the City's proposed limitation on its production of other Area Five homicide investigation files.

As to the requested CR files, the parties have agreed that the City will identify officers who worked as Area Five homicide detectives during the period from 1992-1998.  The City proposes to produce the CR file from every fifth detective on this list.   Plaintiffs object to this limitation.

As explained below, the Court rejects the City's threshold objection to production of any other homicide investigative files at this time, and also finds that neither side's proposal as to the scope of *Monell* discovery strikes the appropriate balance between permitting relevant discovery with limiting the burden of discovery to what is proportional to these cases.

**A.      Homicide Investigative Files**

Plaintiffs seek to hold the City liable on the basis that a number of its official policies and customs were the moving force behind their wrongful convictions.  A municipality is liable under 42 U.S.C. § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.  A municipal policy can be shown in one of three ways:  "(1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 844 (7th Cir. 2004).  *Monell* therefore "requires a plaintiff suing a municipal or comparable entity to demonstrate that the entity's official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

As part of the *Monell* discovery sought in these cases, Plaintiffs requested other CPD Area Five homicide investigation files from 1992 through 1998.  Plaintiffs intend to use the homicide files to prove that the City maintained a number of unconstitutional policies and practices, including that the City suppressed evidence, fabricated evidence, including witness statements, used against them, and coerced confessions from suspects.[4] *Reyes*, 18 C 1028, Doc. 185-1 at 2.  In response to questions posed by the Court, Plaintiffs explained specifically how other investigative

---

[4]      In all of the other Guevara cases, *Sierra*, *Rodriguez*, *Gomez*, *Almodovar*, *Negro*, and *Bouto*, the plaintiffs also allege a *Monell* theory based on manipulated identification procedures—including in photo array and live lineups—and the failure to report those procedures.  Plaintiffs acknowledge that the validity of identification procedures would not justify *Monell* discovery on a manipulated identification theory in these cases. *Reyes*, No. 18 C 1028, Doc. 212 at 6-7.

homicide files may support these *Monell* claims. *Id.*, Doc. 212 at 4-5, 8-10. For example, with respect to their suppressed evidence theory, Plaintiffs state that the Area Five homicide investigative files can be: (1) examined themselves and (2) compared to other files concerning the same investigation and prosecution. By way of illustration, Plaintiffs explain that in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), the homicide file contained a number of General Progress Reports (GPRs) on which CPD officers were required to take notes, but the Investigative File Inventory included with the file reflected that multiple GPRs created on key dates and logged into the file shortly thereafter were missing. In addition to the corresponding CCSAO files, the homicide investigative files can be compared to the Permanent Retention File maintained by the City, which reports the official account of a criminal defendant's guilt in a homicide case, and to the corresponding criminal defense files. Homicide investigative files could also contain evidence supporting allegations of coercion. For example, the homicide files will contain arrest reports indicating when the individual was arrested, and when the individual gave a statement, information about the length of an interrogation, the participants in the interrogation, and a copy of the handwritten confessions. Finally, Plaintiffs state that homicide investigative files can reveal evidence of fabricated police reports. With this explanation, the Court has no trouble concluding that the Area Five homicide files in question are relevant to Plaintiffs' stated *Monell* claims.

The City argues, however, that at this point in the litigation, the production of other homicide investigative files is irrelevant, unduly burdensome, and disproportionate to the needs of the cases because discovery has not yet shown that Plaintiffs' homicide investigative file based *Monell* theories have any viability in the context of the facts of these cases. The City objects to production of any other Area Five homicide investigation files, arguing that Plaintiffs must first make a threshold showing that some evidence was withheld from them. As to Plaintiffs'

suppression of evidence claims, the City claims that despite being in possession of the Soto investigative file since September of 2018, Plaintiffs have not identified a single document that was not produced to them. Without such a showing that a specific document or piece of evidence was withheld from them, the City claims that the production of hundreds of other homicide investigative files is unduly burdensome and not proportional to the needs of the case. The City contends that if Plaintiffs cannot identify what documents were allegedly withheld from them, then production of other investigative files "seems purposeless." *Reyes*, Case No. 18 C 1028, Doc. 178, at 11; *see Elizarri v. Sheriff of Cook County*, 901 F.3d 787, 791 (7th Cir. 2018) (*citing Los Angeles v. Heller*, 475 U.S. 796 (1986)) ("[I]t is established that a municipality cannot be held liable [under *Monell*] without an underlying violation of the Constitution by a municipal employee.").[5] According to the City, Plaintiffs should be obligated to identify some document that existed at the time of the Soto homicide investigation that was not produced to them in violation of *Brady* before beginning *Monell* discovery related to Plaintiffs' underproduction theory.

The Court rejects the City's contention that Plaintiffs are required to make some kind of threshold evidentiary showing that certain items of exculpatory evidence were withheld from them to justify proceeding with discovery of other Area Five homicide investigation files. First, the district judge rejected the City's motion for bifurcation of the individual constitutional claims from the *Monell* claims. As a result, discovery on Plaintiffs' individual constitutional claims and the *Monell* claims are occurring simultaneously. The Court cannot require a threshold showing when discovery is not complete on the individual claims – such a process would essentially be a *de facto*

---

[5]     The Court notes that the Seventh Circuit has held that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010) (emphasis in original). To determine whether a municipality's liability is dependent on its officers, courts consider "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

bifurcation and would also not be appropriate because the Court cannot be sure that all discovery has been uncovered yet as to the individual claims. The Court has worked to phase discovery in this case, so that the individual constitutional claims could proceed while the parties debated and decided the scope of the *Monell* discovery. However, the Court has not mandated that discovery on the individual claims be completed first, and indeed, the parties continue to locate witnesses and take their depositions on the individual claims.[6] While the Court has some sympathy for the City's argument, because it may turn out to be true that without a basis in the individual claims, the burdensome *Monell* discovery is unnecessary, the City lost that battle with a denial of its motion for bifurcation. The City must now live with those consequences.

Thus, under that analysis, Plaintiffs are only required to plausibly allege a suppression of evidence based *Monell* claim to engage in discovery to explore their claims. Plaintiffs have satisfied their pleading burden with respect to their claims that the City had a policy, among other policies, of failing to produce exculpatory and/or impeaching material to the criminal justice system, and the City did not move to dismiss those claims. *Reyes*, No. 18 C 1028, Doc. 1 at ¶¶ 95-122, 170-182; *Solache*, No. 18 C 2312, Doc. 1 at ¶¶ 62-73, 91-95. Nothing more is required to justify *Monell* discovery at this time.

Second, and contrary to the City's contention, Plaintiffs have identified some evidence that they believe was suppressed in the complaint in *Reyes*, their interrogatory responses, and their Joint Status Report. *Reyes*, No. 18 C 1028, Doc. 1 at ¶¶ 73, 74 & Doc. 178 at 4. The suppressed evidence Plaintiffs allege in these cases includes photos of the crime scene that undermine Plaintiffs' confessions, Defendants' notes of interviews with witnesses including Alfredo Aranda,

---

[6] Although the Court has phased discovery in this case, it directed the parties to inquire at depositions as to subjects that pertain to both Plaintiffs' individual claims as well as their *Monell* claims to eliminate the need to re-take depositions.

Leobardo Mejia, and others, and information about vehicles that the police suspected may have been involved in the crime and pointed to alternate suspects. *Id.* The City acknowledges that in response to written discovery requests, Plaintiffs stated that "Defendant Officers (1) destroyed crime scene photos, and (2) suppressed notes, memos, and other evidence in secret files." *Id.*, Doc. 178 at 11. According to Plaintiffs, additional items of evidence were allegedly suppressed, including: (1) Norma Salazar, who was implicated by Plaintiffs' co-defendant Adriana Mejia, was placed in a lineup during the investigation, and Plaintiffs received no documentation of the lineup; (2) parts of Adriana Mejia's confession was excluded from handwritten statements and police reports; (3) members of the Soto and Mejia families were treated as alternative suspects by police, unbeknownst to Plaintiffs; and (4) GPRs reflecting interviews with witnesses and suspects are missing. *Id.*, Doc. 212 at 6. By filing Reyes's complaint and submitting their Joint Status Report and Second Supplemental Brief, Plaintiffs' counsel has certified that "the factual contentions [regarding the suppressed evidence] have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). In addition, by signing interrogatory responses, Plaintiffs certified that their discovery responses are not interposed "for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 26(g)(1). The Court has no reason to question counsel's and Plaintiffs' representations, and no further showing is required from Plaintiffs at this time to proceed with discovery on their suppression of evidence based *Monell* claim. *Brotherhood of Locomotive Engineers and Trainmen v. Union Pacific Railroad Co.*, 905 F.3d 537, 543 (7th Cir. 2018) (courts "are entitled to assume that the parties present their positions in good faith and with sufficient support.").

As to the other homicide investigation files Plaintiffs seek, the parties next disagree on whether the City should produce all Area Five homicide investigative files from 1992-1998 as Plaintiffs seek or whether it should produce only homicide investigative files for which a corresponding CCSAO file can be found as the City proposes. As support for its proposal to limit production of homicide investigative files to those with corresponding CCSAO files, the City emphasizes that a police officer's duty to disclose exculpatory evidence is discharged if that evidence is provided to the prosecutor. Thus, the City contends that if the CCSAO file cannot be found in a particular case, then Plaintiffs cannot prove that CPD, as opposed to the prosecutors, failed to produce some document.

Plaintiffs object to the City's proposed limitation of its production of homicide investigative files to those that correspond to a CCSAO file because their expert's analyses of homicide files will not rely on any CCSAO file. Plaintiffs explain that in two recent wrongful conviction cases in which the City was held liable for its policies and practices, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.) and *Fields v. Chicago*, No. 10 C 1168 (N.D. Ill.), the plaintiffs' expert's analyses of homicide files "had nothing to do with any CCSAO file." *Reyes*, No. 18 C 1028, Doc. 185-1 at 8.[7] Instead, Plaintiffs assert that the City's practices in *Rivera* and *Fields* were shown based on: (1) an examination of the homicide files, based on their own contents, to demonstrate non-compliance with policy and the absence of investigative materials; (2) a comparison of the homicide files to the CPD's permanent retention files, to demonstrate that the official version of

---

[7] Reyes's counsel, Loevy & Loevy, represented the plaintiffs in both *Fields* and *Rivera*. In *Fields* and *Rivera*, plaintiffs showed that the City's policies and practices regarding investigative file keeping and the production of homicide files to the criminal justice system were the moving force behind the violation of due process they suffered. The plaintiff in *Rivera* also used the homicide files to show that between 1985 and 1991, the City had a policy of failing to document live and photographic identification procedures in which a filler was selected. *Fields* is currently pending on appeal in the Seventh Circuit, and Defendants' post-trial motions are pending before Judge Gottschall in *Rivera*.

an investigation included in the latter files was different than that included in the former; and (3) a comparison of the homicide files to the materials that criminal defendants actually received in criminal cases.

In *Rivera* and *Fields*, the City made a similar argument at the summary judgment, *in limine*, and directed verdict stages of the proceedings that it was only relevant to compare CPD homicide files to CCSAO files and that argument was repeatedly rejected. The City argued at summary judgment that the *Rivera* plaintiff could not prove a *Brady* violation without comparing CPD homicide files to CCSAO files. *Rivera*, No. 12 C 4428, Doc. 306 at 18. According to the City, without the corresponding CCSAO file, a "[p]laintiff can only speculate that CPD failed to disclose all the relevant documents to the prosecutors" because "[p]laintiff must prove that CPD withheld the Investigative File from both [p]laintiff and the prosecutor." *Id*. Judge Gottschall rejected the City's argument that a reasonable jury could not find that a *Brady* violation occurred because, among other things, the prosecutorial file was lost in that case. *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1044-46, 1061 n.16 (2018). More relevant to this case, however, the City also asserted a *Daubert* challenge to the opinion of plaintiff's police practices expert, Michael Brasfield, on deficiencies in police practices which left the risk of nondisclosure of investigative materials unacceptably high. *Id*. at 1065-66. When analyzing Brasfield's methodology, Judge Gottschall recognized that Brasfield's methodology was broader than the City suggests. Specifically, that the gaps of information and documents in certain files, such as the criminal defense files, allowed an inference that the information was not turned over by CPD to the CCSAO. She certainly acknowledged that the fault for the gaps could lie in the hands of the CCSAO, and not the CPD. She held, however, that this possibility should be addressed through cross-examination of

Brasfield rather than exclusion of his testimony. *Id.* ("Those possibilities provide ammunition on cross-examination.").

Before trial in *Rivera*, the City again moved to exclude Brasfield's analysis of the homicide files to prove Rivera's "street files" theory. *Rivera*, No. 12 C 4428, Doc. 424 at 9-11. The City criticized Brasfield's failure to review all the corresponding CCSAO files which were available. *Id.* at 9. The City noted that Brasfield did not explain why he reviewed the CCSAO files for only six other cases, "but it is reasonable to assume the others undercut his opinion that the 'missing' documents were 'withheld.'" *Id.* The City then stated that "[d]espite his failure to review each and every SAO file available to the parties (which totaled 33) files, Brasfield concluded that the same documents 'missing' from the criminal defense attorneys' files were also 'missing' from the SAO files." *Id.* Judge Gottschall rejected the City's arguments seeking to bar Brasfield's opinions relating to the existence of a widespread "street files" practice for the same reasons given in her summary judgment opinion. *Id.*, Doc. 552 at 8-9.

In *Fields*, the defendants attacked plaintiff's methodology for proving his *Monell* claim of systematic underproduction of relevant police investigatory records and the sufficiency of his evidence on that claim through a motion *in limine*. *Fields*, 10 C 1168, Doc. 1076 at 1-2. "Part of plaintiff's proof consist[ed] of comparisons between documents in police files and documents in criminal defense attorney files that plaintiff ha[d] obtained." *Id.* at 2. Defendants argued that what "matter[ed] for purposes of a claim against the City is what county prosecutors got from the police, not what was produced to defense counsel." *Id.* Specifically, they argued that it was "inappropriate or insufficient for purposes of plaintiff's *Monell* claim to compare documents in the possession of the police department with documents in the files of criminal defense counsel." *Id.* at 3. Judge Kennelly noted that "one problem with the argument (though not the only one) is that it assumes

that a claim may be provided only with direct evidence. The contrary is true; circumstantial evidence is equally admissible and may be equally sufficient." *Id*. at 2. He explained:

> There is nothing deficient about Brasfield's methodology; he has compared what the police had to what is found in criminal defense counsels' files and has identified what is missing from the latter. Brasfield's testimony does not purport to be, and does not need to be, the entirety of the evidence plaintiff is offering on his *Monell* claim.

*Id*. at 3. Judge Kennelly overruled defendants' objection, finding that they had not shown that "this is a legally deficient method of proof or that it results in an insufficient showing of a *Monell* claim." *Id*.

In its motion for directed verdict on plaintiff's *Monell* claim of systematic underproduction of records by the CPD in *Fields*, the City again argued that the plaintiff's *Monell* evidence had serious foundational and methodological flaws because, among other reasons, Brasfield's analysis was limited to reviewing the pages in the criminal defense attorneys' files and comparing them with the pages in the Area Central Basement files. *Fields*, No. 10 C 1168, Doc. 1145 at 7. The City contended that this comparison was legally insufficient in assessing the CPD's compliance with *Brady* because the "criminal defense files would not necessarily reflect what the CPD turned over to the prosecutors." *Id*. at 7-8. Judge Kennelly rejected the City's challenges to the sufficiency of the evidence supporting the jury's finding of liability on the *Monell* claim. *Fields v. City of Chicago*, 2017 WL 4553411, at *3-4 (Oct. 12 ,2017). In so ruling, he stated:

> The Court overrules, as it did before and during the trial, defendants' contention that Fields's comparison methodology was fatally flawed. Defendants' attack on the methodology involved its weight, not a fundamental deficiency that rendered it insufficient to support Field's claims. The jury reasonably was entitled to infer from this and other evidence that there was systematic underproduction of exculpatory materials to prosecutors and defense counsel.

*Id*. at *3 n.8.

In light of this precedent, the City has not shown that the variance between documents in the Area Five homicide investigative files and a corresponding CCSAO file is the only relevant comparison. Rather, the Court finds the reasoning in *Rivera* and *Fields* to be highly persuasive evidence that any challenge in these cases to Plaintiffs' expert's anticipated analyses without comparison of CPD files to CCSAO files will likely be overruled as going to the weight and not the admissibility of the expert's testimony. As Judge Kennelly correctly noted, there are numerous ways to prove the issue of whether all *Brady* materials were turned over to the defense – and inferences can be made based upon gaps that exist in other files, not just the CCSAO files. While the City may completely reject this inference, this is an issue of *weight* – not *admissibility* – and certainly and more importantly, not a decision that should be driven by an order on the scope of discovery. Even with the 2015 amendments to the Federal Rules of Civil Procedure, which were designed to tighten the reins on excessive and overly burdensome discovery, the Court cannot and should not bind the hands of Plaintiffs here (and the presiding district judge) on a theory that has been rejected by two judges in this district through this Court's rulings on discovery. The discovery rules continue to allow a party to explore and uncover evidence to support a well-pleaded claim, which is the case here. Accordingly, in defense of the *Monell* claims in these cases, the City remains free to challenge Plaintiffs' expert's comparison methodology at summary judgment or trial, and it is even more free to convince the presiding district judge of its position, but it is not entitled to limit the homicide investigative files discovery Plaintiffs seek on this ground.

Having determined that the City's proposed limitation on the production of homicide investigative files to those for which there is a corresponding CCSAO file lacks a relevancy justification, the Court turns to Rule 26(b)(1)'s proportionality requirement. Given the large size of the Chicago Police Department, courts in this district have recognized that the potential scale of

*Monell* discovery can be time-consuming and burdensome. "Due to the fact that that *Monell* claims implicate a potentially large number of events taking place in an organization over a period of time, they naturally, and necessarily require extensive and often burdensome discovery." *Awalt v. Marketti*, 2012 WL 6568242, at *7 (N.D. Ill. Dec. 17, 2012); *see also Medina v. City of Chicago*, 100 F.Supp.2d 893, 895 (N.D. Ill. 2000) ("[D]iscovery relating to the municipality's policies and practices . . . can add significant time, effort, and complications to the discovery process."); *Moore v. City of Chicago*, 2007 WL 3037121, at *9 (N.D. Ill. Oct. 15, 2007) ("[C]laims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them.").

Regarding burden, the City has determined that there were 600 Area Five homicides during the 1992 to 1998 timeframe where at least one individual was charged and prosecuted before or during 1998. *Reyes*, No. 18 C 1028, Doc. 211 at 4. Based upon its experience in other cases and through consultation with CPD personnel who are familiar with the documents being requested, the City estimates that it will take approximately eleven months to locate, review, and produce 600 homicide files. *Id.*, Doc. 220 at 3-7. Plaintiffs assert that a complete production of Area Five homicide files from 1992 to 1998 is proportional to the needs of the case. As a result of their experience litigating these *Monell* issues, Plaintiffs' counsel dispute the City's assertions about the burden of producing 600 Area Five homicide investigative files. *Id.*, Doc. 222 at 2-5.[8] The Court finds that the City's time frame for production is unnecessarily long and could be completed

---

[8]     In their latest filing, Plaintiffs offer to hire and pay a vendor to conduct the scanning of homicide investigative files if the City is required to make a complete production of the approximately 600 files. *Reyes*, No. 18 C 1028, Doc. 222 at 2. However, there is more to the burden issue than just the cost and time of the homicide file production. Rather, the burden includes the potential addition of time to the discovery schedule for any follow-up discovery, and the time and expense of the City's attorneys and its personnel to collect and review the files before the files even make it to the vendor.

sooner, but nevertheless recognizes that there is a substantial burden on producing 600 Area Five homicide investigative files.

The Court rejects Plaintiffs' request for all Area Five homicide files over the seven-year period prior to the Soto homicide investigation as unnecessarily broad and not proportional to the needs of these cases. The Court finds that a production of all Area Five homicide files from 1995 through 1998 strikes the proper balance between the value of the material sought and the burden and time that production would place on the parties and the Court.[9] Discovery of all homicide investigative files for a four-year time period preceding the Soto homicide investigation is roughly in line with other decisions in this district that have permitted *Monell*-related discovery. As Plaintiffs acknowledge, "courts evaluating *Monell* discovery requests routinely order the production of all files for a five-year period preceding the event at issue in a case. Plaintiffs' cases concern an investigation in 1998, which would justify the production of all files from 1994 to 1998." *Reyes*, No. 18 C 1028, Doc. 185-1 at 11-12 (*citing Awalt v. Marketti*, 2012 WL 6568242, at *6 (N.D. Ill. Dec. 17, 2012); *Padilla v. City of Chicago*, 2011 WL 3651273, at *4 (N.D. Ill. Aug. 18, 2011); *Johnson v. City of Joliet*, 2007 WL 495258, at *4 (N.D. Ill. Aug. 18, 2011)).

In the Court's view, discovery of the additional three years of Area Five homicide investigative files Plaintiffs seek (1992-1994) would lead to unnecessarily time-consuming and expensive document production and follow-up discovery but would be unlikely to yield much additional benefit. Plaintiffs claim that they need the full set of homicide investigative files they requested in order to obtain enough of each type of misconduct alleged to prove a widespread practice with regard to each of Plaintiffs' *Monell* theories, but the Court questions this position

---

[9]    Under the City's estimate of 600 homicides for the seven-year time period between 1992 to 1998, that would amount to approximately 85.7 homicides per year in Area Five or about 343 homicides for the 1995 to 1998 time period.

given Plaintiffs' counsel's success in proving *Monell* claims based on similar evidence in the *Fields* and *Rivera* cases. The Court finds it significant that in *Rivera*, the City produced only 138 investigative files, which were selected because they documented the results of lineups, and the jury found *Monell* liability on both the plaintiff's "street file" theory and identification procedures theory. *Reyes*, No. 18 C 1028, Doc. 220 at 4 & Doc. 222 at 4.[10]

Moreover, in two other wrongful conviction cases currently proceeding against the City stemming from the reversal of 1996 convictions for a 1993 murder, the plaintiffs recently offered to use the homicide investigative file discovery from the *Fields* and *Rivera* litigation to prove their street file *Monell* claim. *Washington v. Boudreau, et al.*, No. 16 C 1893 (N.D. Ill.), Doc. 148 at 11; *Hood v. City of Chicago*, No. 16 C 1970 (N.D. Ill.).[11] The homicide investigative file discovery from the *Rivera* and *Fields* cases was used to do "in depth analysis of street files claims from 1983-1991 and 1999-2006." *Washington*, No. 16 C 1893, Doc. 148 at 12. The plaintiffs in *Washington* and *Hood* took the position that the homicide investigative files discovery in *Rivera* and *Fields* was "sufficient to prove that the same practice existed during the intervening time frame 1991 to 1999" because there was no evidence that the City's policies and practices changed during the 1991-1999 time frame. *Id.* Similarly here, the City has agreed that the parties may rely on the

---

[10]    *Rivera* concerned a homicide investigation in 1998. During discovery in *Rivera*, the parties reviewed 435 homicide investigative files which represented all the Area Five investigative files for homicides committed between January 1, 1985 and December 31, 1991. *Reyes*, No. 18 C 1028, Doc. 185-1, Ex. F at ¶ 3. Of the 435 homicide investigative files reviewed, 138 of the homicide investigations involved at least one live, in-person or photographic lineup. *Id.* at 4. The City entered a stipulation in *Rivera* agreeing that the 435 homicide investigative files was a sufficient sample for purposes of assessing the City's policies and practices about lineups. *Id.* at ¶ 5. In *Fields*, the City produced over 450 homicide investigative files. *Washington*, No. 16 C 1893, Doc. 142 at 5 n.2. & Doc. 148 at 13 n.7. Either way, the number of homicide files reviewed in those cases was still considerably less than the 600 files requested by the Plaintiffs here.

[11]    Reyes's counsel, Loevy & Loevy, represents the plaintiffs in *Washington* and *Hood*. *Washington* and *Hood* are consolidated for purposes of discovery.

seven years of Area Five homicide files that the City produced in *Rivera* which covers the years 1985 through 1991. *Reyes*, No. 18 C 1028, Doc. 185-1 at 6, 11, 4l.  Plaintiffs' expert's analysis of the homicide investigative file data in *Rivera* will therefore provide additional relevant data for Plaintiffs' *Monell* claims in these cases, and the Plaintiffs can similarly argue that the policies and practices did not change between 1992 and 1994.

The Court would reach this result even if it accepted Plaintiffs' assertion about the time and effort necessary to produce the homicide investigative files because producing an additional three years of Area Five homicide investigative files would provide little additional benefit. *See* Doc. 222.  In the Court's view, when comparing this case to production in other cases, production of four years strikes the right balance – it is sufficiently large that it provides a substantial sample set for expert analysis, but it reduces the burden to the City of producing seven years' worth of homicide files.  Further, it is not just the time and expense of the City's production of the Area Five homicide investigative files that is relevant to the proportionality analysis.  There is also a burden on the CCSAO and defense attorneys' to make their own productions of corresponding files.  Moreover, there may be follow-up discovery as a result of this production.  There is also a burden imposed on the Court system in allowing a case where substantial discovery has already been done to continue for another almost twelve months in fact discovery.

For these reasons, the Court is persuaded that approximately 343 homicide investigative files from 1995 through 1998 coupled with the 138 homicide investigative files from 1985 to 1991 in *Rivera* is a sufficient sample size from which a potential pattern of conduct could be demonstrated.  With this production, Plaintiffs will have what they reasonably need to prosecute their *Monell* claims and the absence of homicide investigative files from 1992-1994 will not unfairly prejudice Plaintiffs.  Under a proportionality analysis, any additional benefit of providing

Plaintiffs with the Area Five homicide investigative files from 1992 through 1994 does not outweigh the Court's concerns about the extra burden, time, and expense involved in their production, the additional time that would be required to keep fact discovery open, and any follow-up discovery into three additional years' worth of homicide investigations.

This Court must exercise its discretion to limit discovery based upon relevance and proportionality under Rule 26(b)(1) of the Federal Rules of Civil Procedure. Thus, the Court finds that production of Area Five homicide investigative files from 1992-1994 would be unreasonably cumulative and duplicative and disproportionate to the needs of these cases.

**B.     Complaint Register Files**

The parties' second category of disputed *Monell*-related documents concerns the CR files of other Area Five detectives during the period from 1992 through 1998. These CR files are relevant to Plaintiffs' theory that the City had a policy of not training, supervising, and disciplining officers who engaged in misconduct similar to the alleged misconduct in these cases. The City does not seriously dispute the relevance of the CR files to Plaintiffs' *Monell* claim concerning failure to train, supervise, and discipline officers.[12]

The City represents that approximately 212 detectives were assigned to Area Five between 1992 and 1998. *Reyes*, No. 18 C 1028, Doc 220 at 2. Using its production in *Washington* and *Hood* as a guide, the City states that 4.4 CR files per detective or 933 CR files can be expected during the time frame from 1992 to 1998. *Id*. at 3. As to burden, the City states that it will take two to three months to identify the CR file numbers and additional time to redact the CR files and

---

[12]     The City claims that Plaintiffs have not explained how they intend to prove their failure to discipline claim with the CR files, but Plaintiffs intend to use the CR files to show the rate at which CRs are sustained and/or result in discipline for the specific allegations of misconduct in these cases, and likely contend that the rate is unacceptably low. *Reyes*, No. 18 C 1028, Doc. 211 at 4.

then, approximately seven to eight months to produced 933 CR files. *Id.* To reduce its burden of production, the City proposes to limit its discovery production of CR files to every fifth detective who worked at Area Five during the period from 1992 through 1998. In light of Plaintiffs' counsel's experience litigating *Monell* cases, Plaintiffs contend that the City is exaggerating the burden and time necessary to produce the CR files at issue. *Id.*, Doc. 222 at 5-6.[13]

The City cites no authority to support its assertion that Plaintiffs' request for Area Five CR files during the time period from 1992 through 1998 should be dramatically reduced to a random sample of 20% of those files, and the Court is not persuaded that this would represent a sufficient sample size from which to demonstrate a potential pattern. The concern is that every fifth CR file could result in producing a sample set that is sufficient for some of the *Monell* theories but not for others, in which case, it is likely that Plaintiffs will be back before the Court asking for more files. There is also no rational basis for the City's assertion to use this limitation, as opposed to every fourth CR file or third CR file. The City is also at fault because it has steadfastly refused to stipulate that it will not challenge the sample size of every fifth CR file used by the expert if the City's limitation is adopted. While the Court understands that the City does not want to stipulate because 20% of the requested production could result in a skewed result that favors the Plaintiffs, the City cannot have it both ways. In fact, the failure of the City to agree to a stipulation is illuminating – if it had sufficient confidence that 20% of the requested files was enough, one would think it would agree to the stipulation. In other words, its lack of willingness to stipulate diminishes the strength of its proposal.

Plaintiffs, on the other hand, seek all CR files from Area Five detectives from 1992 to 1998 and take the position that nothing short of production of all seven years of CR files will suffice.

---

[13] Plaintiffs have offered to hire and pay a vendor to complete the CR file production only if all of the requested CR files are produced. *Reyes*, No. 18 C 1028, Doc. 222 at 7.

This request suffers from the same overbreadth and proportionality concerns as Plaintiffs' request for all Area Five homicide investigative files for a seven-year period. Plaintiffs were also given an opportunity by this Court to consult with its expert and explain what sample size would be sufficient, and the Court received vague statements from Plaintiffs on this matter. Despite being given the opportunity to propose a narrower scope of production, after consultation with its expert, Plaintiffs have chosen to insist on the full production. No basis is provided for why seven years is better than six, five, or four years, and Plaintiffs' briefs and affidavits in support are silent on this matter.

As a result, the Court overrules the City's proposed CR file limitation and Plaintiffs' request for seven years of CR files. The Court exercises its substantial discovery discretion and limits the temporal scope of the CR files production to 1995 through 1998, which will reduce some of the burden and time involved in production. Under the City's estimate, this shortened four-year period from 1995 to 1998 or about 57% of requested time frame should yield approximately 533 CR files. Production of four years of CR files or approximately 533 CR files is either greater or generally in-line with the CR file production in other police misconduct cases with *Monell* claims in this district. *See*, e.g., *Gilfand v. Planey*, 2011 WL 4036110, at *10 (N.D. Ill. Sept. 9, 2011) (plaintiffs' police practices expert reviewed CPD CR files from 2003-2006); *Padilla v. City of Chicago*, 2009 WL 4891943, at *1 (N.D. Ill. Dec. 14, 2009) (City produced "over 200 CR files."); *Arias v. Allegretti*, 2008 WL 191185, at *3 (N.D. Ill. 2008) (plaintiffs' expert reviewed four years of CR files); *Talbert v. City of Chicago*, 236 F.R.D. 415, 416 (N.D. Ill. 2006) (City of Chicago produced "hundreds" of CR files for the two-year period prior to the shooting involved in the case); *Garcia v. City of Chicago*, 2003 WL 22175618, at *2 (N.D. Ill. Sept. 19, 2003) (CPD CR files for the period August 1, 1999 through June 2001 received into evidence).

The Court recognizes that in the cited cases, the parties may have agreed to the CR files production and the City may have stipulated not to challenge whether the number of CR files produced constituted a statistically representative sample. Nevertheless, the Court finds these cases relevant as a general benchmark for determining the appropriate time frame and number of CR files needed to establish the City's policies or customs. Even if there was an agreed production and stipulation in these other cases, the plaintiffs' attorneys and their experts obviously believed that the number of CR files produced was sufficient to prove a *Monell* pattern claim. Four years' worth of CR file data should serve as a sufficient sample size for Plaintiffs to rely on to draw meaningful conclusions and any challenge to the sample size will likely affect only the weight, not admissibility, of Plaintiffs' expert's opinions regarding the training, supervision, and discipline of police misconduct. *Arias*, 2008 WL 191185, at *3 n.1 ("The City's argument that Reiter's conclusions are unreliable because he relied on a *de minimus* sample [of 4 years of CR files] goes to the weight of his testimony, not its admissibility.").

## **CONCLUSION**

For the reasons set forth above, the Court rejects the City's proposed limitations on *Monell* discovery. The Court also rejects the Plaintiffs' request for the full seven years of *Monell* discovery with no limitations. The Court orders that the City's production is limited to the years 1995 through 1998 for all Area Five homicide investigative files and CR files for detectives.

The following discovery schedule is ordered by the Court:

(1) Fact discovery will now close on February 28, 2020. This provides the parties approximately six months from today to complete fact discovery. This is a firm deadline and no further extensions will be permitted.

(2)   The City's production of homicide investigative files and CR files shall begin immediately and shall be made on a rolling basis.

(3)   All *Monell*-related document production shall be completed by January 15, 2020.

(4)   Any oral discovery concerning the *Monell*-related discovery shall be phased so that it takes places after substantial document production is completed, but before the fact discovery cut-off.

(5)   The parties shall file a joint status report by September 20, 2019 that identifies the names of deponents and firm dates for their depositions from September 2019 through December 2019.

(6)   Finally, the status hearing previously set for September 17, 2019 at 9:15 a.m. is stricken and reset to October 15, 2019 for the parties to report on the status of all discovery.

**SO ORDERED.**

Dated:  September 10, 2019

_____

Sunil R. Harjani
United States Magistrate Judge