**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| | ) | Case No. 1:18-cv-01028 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 1:18-cv-02312 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants City of Chicago, Cook County and the individual defendant officers and prosecutors in this case have brought a joint motion to quash four third-party subpoenas issued by Plaintiffs Arturo DeLeon-Reyes and Gabriel Solache. [*DeLeon-Reyes* 320; *Solache* 215].[1] For the reasons stated below, the Court construes the Defendants' motion to quash as a motion for a protective order, and grants the motion.

---

[1] The remainder of this Memorandum Opinion and Order cites to documents from the *DeLeon-Reyes* docket, Case No. 1:18-cv-01028, unless otherwise noted.

**Background**

In these separate lawsuits, consolidated for purposes of discovery, *see* Doc. [49], Plaintiffs Arturo DeLeon-Reyes and Gabriel Solache claim that they were wrongfully convicted and that they served almost 20 years in prison for the 1998 double murder of Mariano and Jacinta Soto. *Solache* Doc. [171] at 4. Plaintiffs assert that their convictions were the result of constitutional violations committed by Chicago police officers during the investigation of the Soto homicide. *Id.* Specifically, Plaintiffs bring claims under 42 U.S.C. § 1983 for coerced confession, fabrication of false witness statements, deprivation of liberty without probable cause, violations of due process, failure to intervene, and conspiracy. *Id.* Plaintiff DeLeon-Reyes additionally asserts 42 U.S.C. § 1983 claims against certain state prosecutors for coerced confession and fabrication of false witness statements. *Id.* Both Plaintiffs allege *Monell* policy and practice claims, as well as state law claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification. *Id.*

Defendants deny Plaintiffs were wrongfully convicted, deny the claims against them, and assert various affirmative defenses, such as qualified immunity, absolute immunity, a bar under *Heck v. Humphrey*, estoppel, statute of limitations, Illinois Tort Immunity Act, and failure to mitigate damages. *Solache* Doc. [171] at 4.

**Discussion**

I.     **The Court Construes Defendant's Motion to Quash as a Motion for a Protective Order**

       A.     **The Subpoenas**

On December 12, 2019, Plaintiffs notified Defendants of their intent to subpoena: (1) the Cook County State's Attorney's Office ("CCSAO"); (2) the Federal Bureau of Investigation, Chicago Division ("FBI"); (3) the United States Attorney's Office for the Northern District of

Illinois ("USAO"); and (4) the United States Department of Justice, Civil Rights Division, Special Litigation Section ("DOJ"). Doc. [320] at 2.

Taking the subpoenas in turn, the CCSAO subpoena seeks "[a]ll Communications between any agents or employees of the City of Chicago and any agents or employees of the Cook County State's Attorney's Office during the time periods of 2013 to the present and 2001 to 2013 that refer or relate to former Chicago Police officers Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Joseph Miedzianowski, and/or John Galligan[.]" Doc. [320-1] at 5. Two of these police officers— Joseph Miedzianowski and John Galligan—are not defendants in this case, but rather convicted felons who engaged in wide-scale corruption and narcotics trafficking during their time as police officers. More specifically, Miedzianowski and his former partner, Galligan, were involved in a Chicago-to-Miami drug conspiracy. In 2001, Miedzianowski was convicted for racketeering and drug conspiracy in connection with several crimes he committed while acting as a rogue cop, including revealing the identity of undercover police officers to gang members, distributing crack cocaine, and supplying gang members with ammunition. "Rogue cop gets life," *Chicago Tribune*, January 25, 2003, www.chicagotribune.com/news/ct-xpm-2003-01-25-0301250139-story.html. Later in 2002, Galligan was convicted for fabricating a search warrant and giving false court testimony in the 1990s to cover up one of Miedzianowski's numerous crimes. "Cop who aided corrupt partner gets 57 months," *Chicago Tribune*, April 13, 2002, www.chicagotribune.com/news/ct-xpm-2002-04-13-0204130276-story,amp.html.

The next two subpoenas, to the FBI and USAO, seek all documents relating to any investigation or inquiries conducted by the FBI or USAO on Miedzianowski. Doc. [320-1] at 11, 16.

Finally, the subpoena directed to the DOJ seeks information gathered during a pattern or practice investigation conducted from 2015 to 2017 on the Chicago Police Department, which examined information relating to police misconduct. Doc. [320] at 3; Doc. [320-1] at 21-22.

In the joint motion before the Court, Defendants have moved to quash each of the third-party subpoenas. Defendants claim deliberative process privilege and common interest privilege over the information and documents sought by the CCSAO subpoena. Doc. [320] at 5-8. Defendants additionally assert that the CCSAO subpoena seeks irrelevant information and is unduly burdensome. *Id.* at 8-12. With respect to the FBI, USAO, and DOJ subpoenas, the Defendants argue that the documents sought are irrelevant to resolving the issues of this case. *Id.* at 12-15.

**B.     Standing**

Because Defendants are moving to quash subpoenas directed to third parties, the Court first addresses the threshold issue of standing. A party generally does not have standing to quash a subpoena to a nonparty. *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 186 (N.D. Ill. 2013). A party may have standing, however, "if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982); *see also Kessel v. Cook County*, No. 00 C 3980, 2002 WL 398506, at *2 (N.D. Ill. Mar. 14, 2002). Examples of such legitimate interests have included the assertion of privilege, interference with business relationships, and the production of private information. *Allstate Ins. Co. v. Electrolux Home Prod., Inc*., No. 16-CV-4161, 2017 WL 5478297, at *3 (N.D. Ill. Nov. 15, 2017) (citation omitted).

Here, Defendants have invoked the deliberative process and common interest privileges with respect to the CCSAO subpoena, but their primary objections to the nonparty subpoenas involve issues of relevancy and proportionality under Federal Rule of Civil Procedure 26(b)(1).

As courts in this district have made clear, non-recipients do not have standing to quash subpoenas on relevance and proportionality grounds. *See, e.g.*, *Parker*, 291 F.R.D. at 187 (N.D. Ill 2013) (citations omitted) ("Relevance, burden or service objections fall to the subpoena's recipient to make[.]"); *Buonavolanto v. LG Chem, Ltd.*, No. 18 C 2802, 2019 WL 8301068, at *2 (N.D. Ill. Mar. 8, 2019) (internal quotation marks omitted) (defendants did not have standing to quash nonparty subpoena on basis that the subpoenas went "beyond the scope of discovery as outlined by Rule 26"). Defendants therefore do not have standing to quash the nonparty subpoenas with relevance or proportionality challenges.[2]

At the same time, Defendants do have standing to seek a protective order under Rule 26 to limit discovery from a third party, *see Buonavolanto*, 2019 WL 8301068, at *2, and the relevance and proportionality limits in Rule 26 that guide the proper scope of discovery apply with equal force to nonparty discovery under Rule 45. *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307-08 (S.D. Ind. 2016). Indeed, it is the "power—and *duty*—of the district courts [to] actively [] manage discovery and to limit discovery that exceeds its proportional and proper bounds." *Id.* at 306 (emphasis in original). In that same vein, the Court "must limit the frequency or extent of discovery otherwise allowed by [the] rules" if "the discovery sought is unreasonably cumulative or duplicative" or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). The Court, moreover, "enjoy[s] extremely broad discretion" in managing discovery. *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013). *See Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012) (citations omitted) ("District

---

[2] After Plaintiffs filed their response brief, the CCSAO adopted Defendants' motion in full and joined Defendants' reply brief. Doc. [329] at 3. Certainly, the CCSAO has standing to quash the subpoena directed to it on relevance, burden, or privilege grounds. Yet, as discussed further below, the Court is construing Defendants' motion as a motion for a protective order, so the CCSAO's recent joining to Defendants' motion is of no import to the Court.

courts have broad discretion in supervising discovery . . . for they are much closer to the management of the case and the host of intangible and equitable factors that may be relevant in exercising such discretion."). The Court could, of course, wait for the subpoenas to be served, and then address the parties and nonparties' relevancy and proportionality arguments. But that would result in judicial inefficiency, as the parties have extensively briefed the arguments relating to the alleged relevancy of the subpoenas. Moreover, the very reason Rule 45(a)(4) requires notice to the opposing party before serving the subpoena is to ensure that important issues to the discovery process can be addressed prior to the service. Fed. R. Civ. P. 45(a)(4). And Rule 45(d)(1) requires the Court to enforce the issuing party's duty to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Allowing service of the subpoena would merely result in the parties and nonparties coming back to this Court and raising the very same arguments. As the court did in *Buonavolanto*, this Court exercises its discretion and construes the current motion as a motion for a protective order to enforce the limits on discovery provided by Rule 26(b), and to effectuate the principles identified in Rule 1. 2019 WL 8301068, at *2; Fed. R. Civ. P. 1 ("[Federal Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")

## II.      The Proper Scope of Discovery under Fed. R. Civ. P. 26

The Court next considers whether the four nonparty subpoenas properly seek information falling within the bounds of Rule 26(b). That subdivision provides that parties "may obtain discovery regarding any *nonprivileged* matter that is *relevant* to any party's claim or defense and *proportional* to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis added). Simply put, Rule 26(b)(1) limits discovery to matters that are relevant, proportional, and nonprivileged.

### A. The Court Does Not Have Enough Information to Rule on Defendants' Proportionality and Privilege Arguments

In this case, Defendants argue that the four nonparty subpoenas exceed each of Rule 26(b)(1)'s limits. That is, they challenge the subpoenas on relevancy, proportionality, and privilege grounds. The latter two issues, proportionality and privilege, do not merit any significant discussion at this time. In terms of proportionality, while the subpoenas are broad in both scope and timeframe, the breadth of documents that will be responsive to the subpoenas is currently unknown; the third-parties have not been served with the subpoenas and therefore have not attested to the actual burdens and costs associated with the production of the documents.[3] Doc. [320] at 2. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment ("A party claiming undue burden or expense ordinarily has far better information -- perhaps the only information -- with respect to that part of the determination.").

The claims of privilege are also premature. Defendants cannot just assert that all documents responsive to the subpoena are privileged without providing more particularized information from the agencies invoking the privilege, such as a declaration about the nature of the documents and why the privilege applies. Rule 26 mandates that a withholding party make a claim of privilege expressly and "describe the nature of the documents, communications, or tangible things not produced or disclosed . . . in a manner that, without revealing information itself

---

[3] The exception here is the CCSAO, which could have, but did not, elaborate on the burdens and costs associated with the subpoena directed to it, as discussed further below.

privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). In the same way, it is well-accepted that a party seeking to withhold material from discovery based on the attorney/client or work-product privileges carries the burden "to demonstrate by competent evidence and with particularity" that a privilege applies to each document that is claimed to be privileged. *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 796 (N.D. Ill. 2015) (collecting cases). In general, "blanket claim[s]" of privilege are "unacceptable." *Acosta v. Target Corp.*, 281 F.R.D. 314, 320 (N.D. Ill. 2012) (internal quotation marks and citation omitted).

Generic privilege claims are inadequate in part because of the fact-intensive nature of privilege claims. *See In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("The inquiry into whether documents are subject to a privilege is a highly fact-specific one."). That is why, in the attorney-client relationship context, it is "[o]nly when the district court has been exposed to the contested documents and the specific facts which support a finding of privilege," that a court can "make a principled determination" as to privilege. *Holifield v. United States*, 909 F.2d 201, 204 (7th Cir.1990).

Parties can provide the necessary facts for their privilege claims through affidavits or other sufficiently clear and detailed submissions. *See Mader v. Motorola Inc.*, 1995 WL 678507 (N.D. Ill. 1995) (inviting submission of affidavits in support of privilege claims). *Cf. Leybold-Heraeus Techs., Inc. v. Midwest Instrument Co.*, 118 F.R.D. 609, 612-13 (E.D. Wis. 1987) (parties claiming privilege need not submit documents under affidavit but attorney claiming privilege "must make submissions with clarity, buttressed by argument and citation sufficient for the court to make a decision as to each submission for which the privilege is claimed"). Regardless of form, the Court has to be provided with enough information about the privilege claims and the documents at issue to make the privilege determination.

At this stage, equipped only with Defendants' blanket privilege assertions, the Court does not have enough information to make the privilege call. It is impossible to know now whether all of the documents in the nonparty recipients' possession are privileged, or if there are documents that would not be subject to the privileges. As Defendants concede, the CCSAO has not prepared an affidavit in support of its claim of deliberative process privilege, and that before it could do so, it would need to know "exactly what documents are responsive to the subpoena." Doc. [329] at 6-7.

Significantly, the asserted privileges in this case are rebuttable, meaning more detail would be needed about Plaintiffs' need for the documents, as well as the CCSAO's need for secrecy. For instance, once a *prima facie* case for deliberative process privilege is made, a court has to balance the discovering party's need for disclosure against the government's need for secrecy, considering such factors as: "(1) the relevance of the documents to the litigation; (2) the availability of other evidence that would serve the same purpose as the documents sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which disclosure of the documents sought would tend to chill future deliberations within government agencies." *Evans v. City of Chicago*, 231 F.R.D. 302, 316 (N.D. Ill. 2005). In a similar fashion, Defendants' common interest privilege assertion is based on the work product privilege, which can be rebutted with a showing that the discovering party has a substantial need for the materials and an inability to, without undue hardship, obtain the substantial equivalent by other means. Doc. [320] at 8; Fed. R. Civ. P. 26(b)(3)(A)(ii). Thus, the information necessary to decide whether the asserted privileges have been rebutted has also not been addressed by the parties in any detail sufficient to issue a ruling on this matter. As a result, the Court does not have the

requisite facts at this time to grant or deny a protective order based on the privilege issues raised by Defendants.

While the CCSAO joined in this dispute at the reply brief stage, the information they have provided is barebones and insufficient to make a firm determination that all documents are privileged, or that production is not proportional to the needs of the case. In particular, the CCSAO failed to provide a declaration or affidavit about the nature of the privilege or why the documents would be privileged. Doc. [329] at 6-7. The CCSAO moreover ambiguously concedes that the subpoena could call for some factual information—not protected by the deliberative process privilege[4]—as well, which leads the Court to wonder why the *entire* subpoena must be quashed on privilege grounds. *Id.* at 5-6. *See* Fed. R. Civ. P. 45(d)(3) (allowing court to modify subpoena as alternative to quashing). The CCSAO's unsupported assertions of the deliberative process and common interest privileges, coupled with a concession that some of the documents may fall outside the scope of the deliberative process privilege, fail to invoke a privilege. *See* Fed. R. Civ. P. 26(b)(5)(A); *Evans v. City of Chicago*, 231 F.R.D. 302 (N.D. Ill. 2005) (motion to quash by Illinois Prisoner Review Board which did not include affidavit establishing prima facie case of deliberative process privilege failed to invoke privilege). *See also Rodriguez v. City of Chicago*, 329 F.R.D. 182, 186 (N.D. Ill. 2019) (government asserting deliberative process privilege must demonstrate "typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question," and must "specifically identify and describe the documents").

Even if the CCSAO is correct that an affidavit is not *per se* required for the invocation of the deliberative process privilege, the information sought and the CCSAO's reasons for asserting

---

[4] *See Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 374-75 (7th Cir. 2004) (citations omitted) ("Consistent with its purpose, the deliberative process privilege typically does not justify the withholding of purely factual material, nor of documents reflecting an agency's final policy decisions, but it does apply to predecisional policy discussions, and to factual matters inextricably intertwined with such discussions.").

privilege are not "readily apparent to the Court." Doc. [329] at 6 (citing *Tumas v. Bd. of Educ. of Lyons Twp. High Sch. Dist. No. 204, Cook Cty. Ill.*, No. 06 C 1943, 2007 WL 2228695, at *3 (N.D. Ill. July 31, 2007)).  Thus, the Court cannot find that the CCSAO has successfully invoked the deliberative process or common interest privileges simply by joining in Defendants' reply brief.

Along those same lines, the CCSAO failed to provide detailed information regarding the burdens it would suffer in responding to the subpoena.  Instead, the CCSAO merely describes the burden as "astronomical," and guesses that the process of responding to the CCSAO subpoena would "likely take years to complete." Doc. [329] at 7.  That is not the way to address proportionality concerns.  Instead, "[a]n objecting party must specifically establish the nature of any alleged burden, usually by affidavit or other reliable evidence." *Burton Mech. Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 233 (N.D. Ind. 1992). *See Boyer v. Gildea*, No. 1:05-CV-129, 2008 WL 4911267, at *4-*5 (N.D. Ind. Nov. 13, 2008).  Beyond that, the burden of responding to a discovery request is just one of the many proportionality factors to be considered in Rule 26(b)(1).  The CCSAO has said nothing regarding the importance of the issues at stake in the action, the parties' relative access to relevant information, or the other proportionality factors. Fed. R. Civ. P. 26(b)(1).  In sum, the issues of burden and privilege have not been sufficiently addressed by Defendants or the CCSAO for this Court to make a determination.

**B.**     **The Court Finds that the Four Nonparty Subpoenas Seek Irrelevant Information**

In any event, the four nonparty subpoenas can be decided solely on relevance, which is properly before the Court now.  Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if it "has any tendency" to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a)-(b).  In determining the scope of discovery

under Rule 26, relevance is construed broadly. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Nevertheless, the requests in these particular subpoenas far exceed the bounds of relevancy under Rule 26(b)(1), making it appropriate for this Court to prevent Plaintiffs from serving the four nonparty subpoenas. *See, e.g.*, *United States v. Hamdan*, 910 F.3d 351, 358 (7th Cir. 2018) (holding district court did not err in quashing subpoenas of Wisconsin state troopers where proposed testimony was irrelevant and could have caused confusion and prejudice); *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811 (N.D. Ill. 2015) (granting motion to quash subpoena calling for testimony of hospital director who was not likely to possess any relevant information).

### 1.    The CCSAO Subpoena

The CCSAO subpoena seeks "All Communications between any agents or employees of the City of Chicago and any agents or employees of the Cook County State's Attorney's Office during the time periods of 2013 to the present and 2001 to 2013 that refer or relate to former Chicago Police officers Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Joseph Miedzianowski, and/or John Galligan[.]" Doc. [320-1] at 5.  Plaintiffs have agreed to narrow the timeframe of the CCSAO subpoena to 2010 through the present. Doc. [323] at 14.

Defendants first take issue with the request for communications relating to former Chicago Police officers Miedzianowski and Galligan.  Defendants point out, persuasively, that Miedzianowski and Galligan: (1) are *not* defendants in this case; and (2) were *not* involved at all with the investigation of the Soto murders and kidnappings at the heart of this lawsuit. Doc. [320] at 10.  Beyond that, Defendant Guevara was *not* charged by the government as a result of its wide-ranging investigation and indictment of Miedzianowski's corrupt activities, *nor* does Plaintiff

provide any evidence of a connection to Guevara from Miedzianowski's three-month jury trial or from any of the other 23 defendants who were convicted with him. It is also important to recognize that these document requests are directed to third-parties through a Rule 45 subpoena, and thus imposing the burden of production on a nonparty to this lawsuit requires more careful consideration. *Uppal*, 124 F. Supp. 3d at 813-14. These are significant hurdles to overcome in order to demonstrate the relevancy of the information to this wrongful conviction case. Plaintiffs argue that Defendant Guevara was a fellow gang crimes officer and direct the Court to four pieces of evidence that Plaintiffs claim demonstrate that Guevara, Miedzianowski, and Galligan were essentially partners in crime.

First, Plaintiffs offer an FBI report regarding Mohammed Omar's 2001, post-conviction interview statements. Doc. [323] at 3. Omar, a former member of the Spanish Cobras street gang, told federal law enforcement that Miedzianowski and Galligan were involved in a drug conspiracy with the Spanish Cobras for over a decade beginning in 1987. *Id.* at 2. Apparently, Omar also discussed Defendant Guevara in his statement to law enforcement. *Id.* at 3. According to Plaintiffs, the Omar FBI report "revealed that Guevara, too, participated in that conspiracy, and accepted bribes to release suspects in murder cases." *Id.* Omar claimed that Guevara's policy was to "catch a person with drugs or guns, but let them buy their way out of trouble," and that he "was also said to have accepted bribes to change positive or negative identifications during line-ups for murder cases." *Id.* (internal quotation marks omitted).

The Omar FBI report fails to demonstrate the relevance of the CCSAO's communications regarding Miedzianowski and Galligan. As an initial matter, Omar's statements in the report do not actually connect Defendant Guevara to Miedzianowski, Galligan, or their drug conspiracy. Instead, the majority of the fifteen-plus page report details Miedzianowski's bad acts. Near the

end of that report, it is apparent that Omar was asked for his knowledge on other police officers and individuals. There, only three paragraphs discuss Guevara. *See* Doc. [320-1] at 37-38. Those three paragraphs indicate that Omar knew Guevara from the neighborhood where Omar was raised, and that Guevara accepted bribes to help drug dealers and murderers beat charges. *Id.* At no point in the interview, as detailed by the report, did Omar say or even hint that Guevara was working in concert with Miedzianowski or Galligan.

Plaintiffs' second and third pieces of evidence, the affidavits of Jondalyn Fields and Frederick Rock, similarly fall short in terms of showing the relevance of the CCSAO's communications referring to Miedzianowski or Galligan. In the Fields affidavit, Fields stated that her roommate in 1998, Rock, was working with Miedzianowski and other police officers in the drug business. Doc. [323-1] at 1. She also stated that in 1994, she encountered Guevara and Galligan when they, along with several other Chicago police officers, came to her home to arrest her then boyfriend, Peter Cotto. *Id.* Finally, Fields said that Guevara would call her residence to speak with Rock, and that she saw him at Omar's restaurant at the Mega Mall in approximately February 1998, a location in which she had also separately observed Miedzianowski. *Id.* at 2. In Rock's affidavit, he stated that he worked for Miedzianowski, who introduced Guevara as "a 'very close friend' of his [] in charge of homicides at Grand and Central." Doc. [323-2] at 2. According to Rock, Miedzianowski made comments about a drug dealer known as "Poochie" in front of Rock and Guevara, which led Rock to believe that Miedzianowski wanted Guevara to help arrest Poochie, and that Miedzianowski was going to frame Poochie. *Id.* at 2-3.

The Fields affidavit and Rock affidavit do not demonstrate what light the CCSAO's communications about Miedzianowski or Galligan could shed on this case. The Fields affidavit does not establish that Guevara engaged in any of the alleged bad acts in the Miedzianowski-

Galligan conspiracy. And, although Rock interpreted Miedzianowski's comments in front of Guevara to mean that Miedzianowski wanted to frame a drug dealer, Rock's interpretation of a threat made in Guevara's presence is insufficient to indicate a relevant "other act" by Guevara. Plaintiffs have not provided any evidence that Poochie was actually framed, or that Guevara played a role in any of those activities.

Plaintiffs' final piece of evidence to attempt to highlight the relevance of the CCSAO's communications regarding Miedzianowski and Galligan is the testimony of Sargent Mingey, a supervisor assigned to Gang Crimes. In short, Mingey testified that there was a period of time when Guevara, Galligan, and Miedzianowski overlapped at Area 6. *See* Doc. [323] at 3; Doc. [329] at 11. However, the fact that Miedzianowski, Galligan, and Guevara worked in the same police facility for a time does not make the CCSAO's communications regarding Miedzianowski and Galligan relevant. In fact, a closer look at Sargent Mingey's testimony shows Miedzianowski and Guevara were quite separate during their workplace overlap. Sargent Mingey testified that the two worked for different supervisors, that they did not really like each other, and that Miedzianowski was a loner who only worked with his partner, Galligan. *See* Doc. [329] at 11. Sargent Mingey's testimony accordingly does not establish a nexus between Guevara and Miedzianowski's criminal activity, or otherwise show that the CCSAO's communications about Miedzianowski and Galligan would have any tendency to make a fact in this case more or less likely.

In a last ditch effort, Plaintiffs argue that Sargent Mingey's testimony indicating that Guevara and Miedzianowski worked separately actually proves the relevance of discovery regarding Miedzianowski. To that end, Plaintiffs speculate: "If they were not working together as part of their official duties, it is a reasonable conclusion that Guevara was working with Miedzianowski in some other capacity—perhaps his illicit activity." Doc. [339] at 5. Yet, such

15

guesswork does not establish relevance, nor does it provide an example of why the requested information is relevant. Without more information from Plaintiffs, their speculation amounts to an impermissible fishing expedition in this case. *See, e.g.*, *Batchelor v. Merck & Co.*, No. 3:05-CV-791 JTM, 2007 WL 4179015, at *3 (N.D. Ind. Nov. 20, 2007) (denying motion to compel where requesting party appeared to be "merely 'fishing' for discovery and hoping that discovery does exist to support their speculative and possible theory"); *Jones v. Union Pac. R.R. Co.*, No. 12 C 771, 2014 WL 1715450, at *2 (N.D. Ill. May 1, 2014). While some amount of fishing is generally necessary in the pretrial discovery process, *see Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004), discovery is not "a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Vakharia v. Swedish Covenant Hosp.*, No. 90 C 6548, 1994 WL 75055, at *2 (N.D. Ill. Mar. 9, 1994). And while it is true that relevance in discovery is a low bar to meet—the requesting party still needs to clear the proverbial relevancy limbo bar. Here, Plaintiffs' conjectures about Sargent Mingey's testimony fail to persuade the Court that the CCSAO's communications about Miedzianowski or Galligan are relevant.

However, even if Plaintiffs' proffered evidence did connect Guevara's accepting bribes to Miedzianowski and Galligan, bribing criminals and/or involvement in a drug conspiracy is a far cry from the allegations of the complaints in this case.[5] In a nutshell, Plaintiffs here accuse the individual defendant officers of causing their wrongful convictions for the 1998 double murder of Mariano and Jacinta Soto. *See, e.g.*, Doc. [328]; *Solache* Doc. [224]. Within that overarching

---

[5] The Court acknowledges that Plaintiffs mention Guevara's alleged connection with Miedzianowski in their complaints. *See* Doc. [328] ¶ 122(b); *Solache* Doc. [224] ¶ 63. However, that mention is nestled within a 40+ paragraph list of Guevara's purported misdeeds preceding the counts and is never later specifically connected to any of the counts of the complaints. The mere mention of Miedzianowski in the complaints does not establish relevance in this case.

framing claim, Plaintiffs' complaint alleges various unconstitutional acts by the individual officers, including the use of physical violence, psychological abuse, and coercion to secure false confessions from Plaintiffs for the 1998 double murder of Mariano and Jacinta Soto. Doc. [328] ¶ 53; *Solache* Doc. [224] ¶ 62. Discovery into Guevara's accepting of bribes to help guilty drug dealers and murderers avoid conviction would not help Plaintiffs prove that Guevara and the other individual officers framed the purportedly innocent Plaintiffs to ensure their convictions. Put another way, the alleged acts are too dissimilar to the allegations of the Complaint and the elements of the asserted claims that Plaintiffs must prove to constitute relevant, discoverable evidence in this case.

Plaintiffs further argue that the Miedzianowski information is relevant as Rule 404(b) evidence. Doc. [323] at 11. Plaintiffs remind the Court of its previous holding that the past crimes, wrongs, or other acts of the defendant officers, if sufficiently similar to the acts described in Plaintiffs' complaints, may be relevant. *Id.* (citing Doc. [313] at 8). Plaintiffs also hark back the Court's finding that the mere possibility that the trial court will eventually limit Rule 404(b) evidence is not a reason to limit discovery into Rule 404(b) evidence. *Id.* (citing Doc. [313] at 6). All true. However, the Court issued those rulings in the context of Plaintiffs' previous motion for 404(b) evidence, which was reasonably grounded in "other acts" sufficiently similar to the bad acts pleaded in the complaints. Plaintiffs represented that the 404(b) evidence there would "show that Guevara and the other Defendants used physical abuse to extract false confessions, fabricated police reports, and suppressed exculpatory evidence in numerous other cases," for the relevant Rule 404(b)(2) purposes of "demonstrating their intent, opportunity, preparation, and plan." Doc. [308] at 7. Whereas here, Defendant Guevara's other acts, as described by Plaintiffs' proffered Miedzianowski evidence, are not sufficiently similar to the acts described in Plaintiffs' complaints

to establish a *modus operandi* in homicide interrogations. Nor would the Miedzianowski drug conspiracy evidence be relevant to the defendant officers' intent, opportunity, preparation, or plan to frame innocent people for murder. At most, the Miedzianowski evidence shows Guevara taking bribes to help drug dealers beat charges and being in the vicinity of Miedzianowski when he made threatening comments about a drug dealer named "Poochie." Those acts are unlike the alleged acts of Guevara in Plaintiffs' complaints, in which they claim he used violent interrogation tactics, falsified evidence, and took other steps to ensure that Plaintiffs were wrongfully prosecuted and convicted for the Soto homicides. The Court accordingly finds that the Miedzianowski evidence is irrelevant on a Rule 404(b) basis as well. *See Wofford v. Celani*, No. 11 C 3543, 2012 WL 2847549, at *4 (N.D. Ill. July 11, 2012) (denying plaintiff's motion to compel 404(b) evidence on relevance grounds where citizen complaints sought did not appear to involve claims of excessive force, unlawful arrest, malicious prosecution, or any of the other bad acts alleged by plaintiff).

Finally, Plaintiffs contend that the evidence is relevant to their *Monell* claims. However, Plaintiffs now frame their *Monell* claims broadly as the "failure to supervise and discipline rogue police officers," Doc. [323] at 4, but that is not what they pleaded in their complaints. Nor is it what Plaintiffs have represented to the Court. In fact, on numerous occasions, Plaintiffs have framed their *Monell* claims more narrowly as pertaining to the practice of physical violence and coercion to obtain false confessions; the fabrication and suppression of evidence; the failure to train, supervise, and discipline its officers leading to wrongful convictions, and the secrecy of "street files." See, e.g., Doc. [166] at 4-5; Doc. [173] at 8, Doc. [178] at 3; Doc. [212] at 3-11.

Moreover, construing their *Monell* claims with that breadth would open the door to any matter involving any Chicago police officer who acted outside of his or her authority. Before liability can be imposed under *Monell*, Plaintiffs will have to show that the Chicago Police

Department's policies and practices were the "*moving force* behind" any constitutional violations. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) (citation omitted) (emphasis in original). As the Seventh Circuit has observed, "the Supreme Court has been especially concerned with the broad application of causation principles in a way that would render municipalities vicariously liable for their officers' actions." *Id.* In *Wright v. City of Chicago*, the plaintiff alleged *Monell* claims in connection with numerous arrests and property seizures he was subjected to over a two-year span. No. 09 C 3489, 2010 WL 4875580, at *1 (N.D. Ill. Nov. 23, 2010). In discovery, the plaintiff served "very broad discovery requests," including a request for "all investigative files from 2004 to 2009 for all civilian abuse complaints against City of Chicago police officers." *Id.* at *2. When the defendants moved to limit the plaintiff's *Monell* discovery, the plaintiff argued that the evidence sought was relevant because his *Monell* claims "attack the 'widespread custom and practice of police misconduct and code of silence which has been allowed to continue despite numerous lawsuits.'" *Id.* The *Wright* Court rejected the plaintiff's broad reading of his *Monell* claims, holding: "Wright's claims against the City cannot be as broad as alleging failure to supervise or discipline police officers in general, because that would be, in effect, alleging a negligence claim against the City, which is unavailable under *Monell* . . . Instead, Wright's Monell claims must be limited to policies and practices that are the moving force behind the specific constitutional violations allegedly inflicted on Wright." *Id.* at *3.

Plaintiffs here, like the plaintiff in *Wright*, are attempting to grow their *Monell* claims into general claims regarding the City's failure to discipline or supervise police officers. However, the law requires that *Monell* claims be based on the policies and practices that were the "moving force" behind the specific constitutional violations alleged by Plaintiffs. The law does not allow vicarious liability cases. In this case, Plaintiffs allege that the individual defendant officers used various

tactics in order to secure Plaintiffs' wrongful prosecutions and convictions, including using physically and psychologically coercive tactics to obtain false confessions; fabricating witness statements; concealing exculpatory evidence; and manipulating witnesses to influence their testimony. *See, e.g.*, Doc. [328] ¶ 98, 177; *Solache* Doc. [224] ¶ 66. Plaintiffs' *Monell* claims are therefore limited to the policies, procedures, and practices of the City relating to those and the other actions allegedly taken by the police officers to secure Plaintiffs' wrongful convictions. They are not so broad as the City's failure to discipline officers for any bad conduct.

The final reasons to reject Plaintiffs' alleged relevancy basis are (1) the timeframe for the requested information and (2) the nature of the materials requested. Plaintiffs request communications between the City and the CCSAO about Miedzianowski and Galligan, but do not explain why communications *from 2010 through the present* will reveal Rule 404(b) "other acts" evidence or *Monell*-related information from an alleged wrongful conviction dating back to a *1998 incident*. Communications from over a decade later between two government bodies do not bear a temporal relationship to the allegations in the Complaint. What is more, Plaintiffs do not explain why *communications between the City and the CCSAO would* shed light about Guevara's other acts evidence, as opposed to the underlying source material about the alleged Guevara-Miedzianowski connection, such as documents from investigations into these individuals. These issues are further addressed below. For these plethora of reasons, CCSAO communications regarding Miedzianowski and Galligan are irrelevant and thus outside the proper scope of discovery.

That leaves only the CCSAO subpoena's request for communications with the Chicago Police Department involving Defendants Guevara, Halvorsen, and Mingey from the last ten years. Plaintiffs assert that the request with respect to Halvorsen, Mingey, and Guevara seeks information

directly related to Plaintiffs' *Monell* claims and Rule 404(b) discovery. Doc. [323] at 12. In support, Plaintiffs state, "these communications may lead to the discovery of evidence showing the City was aware that Defendants and their colleagues engaged in misconduct in other cases, which would help Plaintiffs satisfy the notice element of their *Monell* claims." *Id.* More specifically in terms of notice, Plaintiffs state that the communications could reveal the information shared between the City and the CCSAO during investigations into Guevara's criminal activity. *Id.* Plaintiffs also surmise that the communications regarding Guevara, Halvorsen and Mingey "may explain the reasons that various of the Defendants have and have not asserted their Fifth Amendment right to remain silent in response to questions in these and related cases." *Id.* Finally, Plaintiffs claim that the communications regarding the individual defendant officers could "show important information about Defendants' motivation and bias," such as "the closeness of the police and the prosecutors and pressure exerted from one entity to another[.]" *Id.* at 12-13. Plaintiffs' reasons for asserting relevance of the CCSAO's communications about Halvorsen, Mingey, and Guevara, too, lack merit.

First, there is a significant temporal problem. The investigation of the Soto murders took place in 1998. It is unclear how communications starting in 2010 between the City and the CCSAO could show that the City was on notice in 1998 for misconduct occurring then. Plaintiffs say that the 2010-present timeframe is appropriate because it covers the period in which Scott Lassar of Sidley Austin LLP was conducting an internal investigation on behalf of the City into the allegations of misconduct regarding Guevara, which included allegations regarding the 1998 Soto homicide investigation. Doc. [339] at 3. Even so, the Court is still at a loss as to how the CCSAO's *communications* with the City would be relevant to this case, and Plaintiffs have not met their burden in demonstrating the relevancy of such communications. The City's documents regarding

Lassar's investigation and findings, the non-privileged of which have already been produced, are the documents relevant to the case, not the CCSAO's communications to the City from the last ten years. Doc. [329] at 13.[6] At any rate, the CCSAO's communications with the City from 2010 to the present certainly do not have a tendency to make it more likely that the City was on notice of any 1998 misconduct. The Plaintiffs' notice reason therefore flops.

So too, does Plaintiffs' Fifth Amendment articulation. Plaintiffs hypothesize that the CCSAO's communications with the City may reveal the reasons various defendants have or have not taken the Fifth. Doc. [323] at 12. Yet Plaintiffs provide no explanation for why the CCSAO and the City would be discussing the officers' invocation or non-invocation of the Fifth amendment, nor why those discussions would be relevant to the case. Moreover, in the Court's view, the only plausible relevancy basis as to why certain officers would be invoking the Fifth Amendment would be to test whether the defendant officers truly believe their testimony may self-incriminate them, *see Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019) ("The only valid reason to invoke the Fifth Amendment is a reasonable fear that truthful answers may incriminate the witness"), but Plaintiffs have not offered any support for their conjecture that the communications between the CCSAO and the City of Chicago could contain information about the officers' beliefs. Plaintiffs' Fifth Amendment reason is consequently deficient.

Plaintiffs' final supporting basis for the relevance of the CCSAO communications, that they might portray the closeness between the CCSAO and the City and any pressures exerted between the entities, suffers from the same temporal problem as Plaintiffs' notice argument.

---

[6] For this same reason, Plaintiffs' speculation that communications relating to Guevara, Halvorsen, and Mingey "likely include relevant 404(b) evidence with respect to Lassar's investigations into other cases involving allegations of abuse or coerced confessions" fails. Doc. [339] at 3. Plaintiffs have received the non-privileged Lassar investigation documents, yet they point to none of those documents (nor anything else) to indicate that the CCSAO communications they seek would encompass relevant other-acts evidence.

Communications between the CCSAO and City, taking place more than ten years after the 1998 Soto investigation, do not make any fact in this case more or less likely. The alleged "closeness" and "pressure" from 2010 to the present are not relevant to conduct that was purported to have taken place prior to 1998.

In conclusion, for the reasons stated above, the Court, having construed Defendants' motion to quash as a motion for a protective order, grants the motion with respect to the CCSAO subpoena because the subpoena calls for irrelevant information, outside of the scope of Rule 26(b)(1).

### 2. The FBI and USAO Subpoenas

The FBI and USAO subpoenas contain identical document requests and can be dispensed with together and quickly for the reasons discussed above. The riders of the FBI and USAO subpoenas both call for:

> All Documents relating to any investigations or inquiries conducted by the Federal Bureau of Investigation or the United States Attorney's Office for the Northern District of Illinois *into former Chicago police officer Joseph Miedzianowski*, including but not limited to investigative notes, investigative reports, notes and records of witness interviews, and FBI forms FD-209, FD- 302, FD-472, FD-473, and FD-888 prepared as part of the investigation. This request seeks all Documents in your possession, custody, or control, including within the Federal Bureau of Investigation and the United States Attorney's Office for the Northern District of Illinois.

Doc. [320-1] at 11, 16 (emphasis added). Because the Court has already determined that information on Miedzianowski is irrelevant and therefore outside the scope of discovery permitted by Rule 26(b)(1), the Court has no trouble in granting Defendants' (construed) protective order with respect to the FBI and USAO subpoenas.

### 3. The DOJ Subpoena

Plaintiffs' final nonparty subpoena is to the DOJ and requests documents relating to the investigation of the Chicago Police Department undertaken by the DOJ in the years 2015 to 2017 in order to ascertain whether the Chicago Police Department was engaging in a pattern or practice of unlawful conduct. Doc. [320-1] at 21-22. Plaintiffs frame the DOJ subpoena as a request for complaint register ("CR files") and emphasize that the Court has already found such files to be relevant to Plaintiffs' *Monell* claims. Doc. [323] at 11-12. While it is true that the Court did previously order the City to produce all Area Five homicide CR files, that production was limited to the years 1995 through 1998. Doc. [224] at 24. In stark contrast, the DOJ subpoena calls for CR files and data collected from an investigation that took place from 2015 to 2017. Doc. [320] at 14. Importantly, in the 2015-2017 investigation, the DOJ reviewed Chicago Police Department data from the time period of January 2011 to March 2016. *Id.* Chicago Police Department data and CR files from more than ten years after the Soto investigation in 1998 have no bearing on this case. Plaintiffs must demonstrate that the failure to train and supervise the officers prior to 1998 was the motivating factor that led to the Plaintiff's alleged constitution violations. Recent data of alleged CPD misconduct is not relevant to the *Monell* claims as alleged in the Complaint. Thus, the DOJ subpoena, like the CCSAO, FBI, and USAO subpoenas, improperly calls for irrelevant information. The Court, having construed Defendants' motion to quash as a motion for a protective order, grants the motion with respect to the DOJ subpoena.

### Conclusion

For the reasons discussed above, the Court construes Defendants' motion to quash [*DeLeon-Reyes* 320; *Solache* 215] as a motion for protective order, and grants the motion.

Plaintiffs shall not serve any of the four nonparty subpoenas discussed in this Memorandum Opinion and Order.

**SO ORDERED.**

Dated: June 8, 2020

_____
Sunil R. Harjani
United States Magistrate Judge