IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18-CV-1028 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | Magistrate Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18-CV-2312 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | Magistrate Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MOTION TO COMPEL WITNESS ADRIANA MEJIA TO TESTIFY**

Defendants Edwin Dickinson, Robert Rutherford, Dennis Stankus, John Naujokas, Daniel Trevino, Mark Harvey, Robert Biebel, Edward Mingey, the estates of Ernest Halvorsen, John Karalow, and J. Cappitelli, Reynaldo Guevara, City of Chicago, David Navarro, Karin Wehrle, Heather Brualdi, Andrew Varga, Thomas O'Malley, and Cook County (collectively "Defendants"), by and through their respective counsel, respectfully move this Court for an order compelling witness Adriana Mejia to testify. In support, Defendants state as follows:

**BACKGROUND**

This case stems from horrific crimes that Arturo Deleon-Reyes, Gabriel Solache and Adrianna Mejia were convicted of committing together. It started with Mejia faking a pregnancy

and ended with the savage and fatal stabbing of an innocent young couple (Mariano and Jacinta Soto) so that Mejia could kidnap their infant and pretend the baby was the product of her "pregnancy." Mariano was stabbed 35 times and Jacinta was stabbed 20 times. The evidence that Mejia, Solache and Reyes murdered the couple before kidnapping their baby, Maria, and toddler, Santiago, was and is overwhelming. Not only were both shell-shocked children recovered from the home that Mejia, Solache and Reyes shared, [1] but Mariano Soto's blood was found on Mejia's clothes and shoes, and she, Solache and Reyes all described to several police officers and Cook County assistant state's attorneys (ASAs) how they committed the unimaginable crimes together.

In 2017, the circuit court suppressed Solache and Reyes' confessions after finding that Defendant Guevera gave incredible testimony denying recollection of the 1998 events at their post-conviction evidentiary hearing. The Cook County First Assistant State's Attorney then reluctantly *nolle prossed* the charges, but not without publicly stating "[t]here is no doubt in my mind, or the mind of anyone who has worked on this case, that Mr. Solache and Mr. Reyes are guilty of these crimes" and that "[i]t is a tragic day for Justice in Cook County." (Ex. 1, A. Grimm, *Prosecutors Believe 2 Men committed double murder but drop charges*, Chicago Sun-Times, Dec. 21, 2017). The Cook County State's Attorney's office (CCSAO) is opposing Solache and Reyes' pending petitions for Certificates of Innocence (COI) and have argued that Reyes' petition "invites this court to distort an Illinois statute so as to provide a financial windfall to a man who participated in a gruesome and violent double murder and the kidnapping of the murder victims' young children". (Ex. 2, *People v. Reyes*, #98 cr-12440-02, People's Request to Dismiss Reyes' Petition for a COI, p. 1).

---

[1] The three lived in a small 1-bathroom bungalow at 6234 South Mozart with Mejia's husband and other relatives.

2

By far the most important eye-witness in this lawsuit, Adriana Mejia, remains incarcerated in Illinois. She pled guilty in 2001 to two counts of first-degree murder, two counts of aggravated kidnapping, and one count of home invasion in exchange for life-imprisonment without possibility of parole. (*See* Ex. 3, 2/8/01 Guilty Plea Hearing, pp. 10-29). She also wrote letters expressing remorse, and in 20 years, has never contested the validity of her guilty plea or challenged her sentence. The evidence against Mejia is so damning and conclusive that even Solache and Reyes do not attempt to contest her guilt. *Id.* at p. 23-28 (outlining State's evidence); Dkt., 139 in *Reyes v. Guevara, et.al*, No. 18 C 1028, Pl's Response to Motion to Depose Mejia, at ¶ 2 (acknowledging Mejia's role in the murders/kidnappings).

During the pendency of their post-conviction proceedings, the City hired Sidley Austin LLP to investigate Solache's and Reyes' claims of official misconduct and innocence. When Sidley interviewed Mejia on October 9, 2014, she freely acknowledged that she, Solache and Reyes murdered the Soto parents and kidnapped baby Maria and Santiago. (*See* Ex. 4, Sidley Memo). She also described how Solache and Reyes tried to cover up their crimes and discussed her experiences with the police and prosecutor leading to her confession. *Id.*

After the circuit court vacated their convictions, Solache and Reyes filed petitions for COI's. Assistant State's Attorney Yulia Nikolaevskaya interviewed Mejia in the presence of Assistant State's Attorney Krista Peterson in 2018. During that interview, Mejia again confirmed her guilt as well as the participation of Solache and Reyes in the murders and kidnappings. (*See* Ex. 5, Declaration of Nikolaevskaya).

On June 18, 2019, counsel for all parties in this case traveled to Logan Correctional Center to depose Mejia. After a continuance to allow her to retain counsel,[2] the parties again deposed

---

[2] Mejia asked counsel to explain their purpose and "how would this harm me." (Ex. 6, Mejia Dep., 6/18/19, p. 5). Defense counsel explained they were present to find out what transpired in March, 1998 for purposes of Solache and

3

Mejia on October 22nd at Logan. Mejia asserted her Fifth Amendment rights to most questions but voluntarily chose to answer many questions directly relevant to the key issues in this litigation. Indeed, Mejia tried to exculpate herself by inventing, for the first time, new testimony about the circumstances surrounding her confession, and further, revealed her own intention to seek release from prison. (See *infra*, pp. 8-13). As shown below, black-letter law prohibits Mejia from manipulating the Fifth Amendment by answering some but not all questions about her confession and crimes.

Mejia's selective assertion of the Fifth Amendment was wholly improper. It was cynically designed to help Solache and Reyes recover millions of dollars in this case,[3] while laying the mattress for her own upcoming effort to escape prison for these monstrous crimes. This Court should grant a new deposition and order Mejia to answer all relevant questions.

## ARGUMENT

**I.     Mejia's Conviction Prohibits Her from Asserting the Fifth Amendment Privilege.**

"To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 663-64 (7th Cir. 2002) (emphasis in original). "If the court concludes, based

---

Reyes' lawsuit. When Mejia stated she desired legal advice, defense counsel told Mejia they would suspend the deposition so she could obtain counsel. (*Id.* at pp. 5-6). Defendants then moved this Court to appoint counsel for Mejia. (Dkt. 190, 199). Plaintiffs did not oppose that motion. (Dkt. 193, 200). After a hearing, this Court appointed attorney Dena Singer to represent Mejia. (Dkt. 201).

[3] Indeed, Reyes' counsel asked 33 times if Mejia was asserting the Fifth Amendment because truthful testimony would reveal that she falsely incriminated them, even though she has always acknowledged that she committed the murders and kidnappings with Solache and Reyes. (*See*, *Ex. 7,* Mejia dep. Oct. 19, 2019, at pp. 141-223). He also littered the record with far-flung alternate theories unsupported by any evidence, including that the diminutive Mejia acted alone in stabbing Mariano 35 times and Jacinta 20 times before absconding with both children, or acted in concert with some unidentified gang or cartel. (*See Id.* at 147:9-16; 159:17-22; 163:5-11).

on the circumstances of the case, that disclosure of the testimony would not lead to a conviction that violates the Self-incrimination Clause, then the Court may force the witness to speak." *Shakman v. Democratic Org. of Cook County*, 920 F.Supp.2d 881, 887-88 (N.D. Ill. 2013), *quoting, United States v. Gecas*, 120 F.3d 1419, 1429 (11th Cir. 11997). *See also, In re Folding Carton Antitrust Litig.,* 609 F.2d 867, 872 (7th Cir. 1979) (per curiam) (holding the right of a convicted person to claim a Fifth Amendment privilege depends on the existence of a "non-fanciful" possibility of prosecution). "The party attempting to invoke the privilege has the burden of establishing its foundation." *Shakman*, 920 F.Supp.2d at 888.

With that in mind, Mejia cannot establish a basis to assert the privilege concerning questions about the murders and kidnappings because she was long ago convicted of those crimes and cannot face further prosecution. Mejia's conviction was based on her acceptance of a life sentence without possibility of parole in return for her plea of guilty to having participated in the very same murders and kidnappings Defendants seek to question her about. Undoubtedly, the doctrine of double jeopardy is an absolute bar to prosecution for the crimes Mejia pleaded guilty to committing. *See, e.g., Brown v. Ohio*, 432 U.S. 161, 165 (1977).

Further, Mejia cannot fear prosecution for some other crime because the events giving rise to her prosecution are over 20 years old, so any related crime for which she could otherwise be prosecuted would be time-barred. *See* 720 ILCS 5/3-5 (mandating only a small subset of crimes for which there is no statute of limitations). Because Mejia has already been convicted of the crimes against the Soto family and has no present fear of prosecution, she should be compelled to answer all questions related to her commission of the heinous crimes at the heart of this lawsuit, in which Solache and Reyes—Mejia's co-murderers according to her own statements—are seeking tens of millions of dollars in damages. *See In re Pansier*, 417 Fed. Appx. 565, 568–69 (7th Cir.

2011) (upholding sanction of dismissal for complainants who asserted Fifth Amendment privilege without establishing reasonable fear of prosecution); *United States v. Pardo*, 636 F.2d 535, 543-46 (D.C. Cir. 1980) (finding reversible error in refusal to compel testimony of witness concerning matters which were the subject of his guilty plea agreement); *Colon v. Town of Cicero*, 12 CV 5481, 2015 WL 4625003, at *3 (N.D. Ill. Aug. 3, 2015) (compelling witness to testify where answers to questions would not support the elements of criminal statute for which he could be convicted).

**II.    Mejia Waived any Privilege by Pleading Guilty, Twice Discussing the Crimes with Government Investigators, and Testifying at her Deposition in this case.**

**A.    Mejia Waived any Fifth Amendment Privilege by Pleading Guilty.**

Once an individual pleads guilty, she waives her Fifth Amendment privilege and can be compelled to testify about the criminal conduct supporting the conviction. *United States v. Fleming*, 504 F.2d 1045, 1050 (7th Cir.1974); *United States v. Hoffman*, 385 F.2d 501, 504 (7th Cir.1967). "[A] guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination." *Parke v. Raley*, 506 U.S. 20, 29, (1992); *see United States v. Berlin*, 437 F.2d 901, 906 (7th Cir. 1971) ("It has been held many times that a defendant who enters a valid plea of guilty 'simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, . . . .'"); *Murcio v. Perez*, 97 C 3339, 1999 WL 58546, at *2 (N.D. Ill. Feb. 3, 1999) ("A defendant who enters a valid guilty plea waives, among other constitutional rights, his Fifth Amendment privilege with regard as to the relevant criminal charge.")

In the face of overwhelming evidence, including Mariano Soto's blood on her clothes and shoes, her faked pregnancy, and her possession of the two children that she has always acknowledged orphaning with Solache and Reyes, Mejia waived her Fifth Amendment rights and

6

pleaded guilty to the murders and kidnappings she committed with Solache and Reyes. And, she never appealed or collaterally attacked her conviction over the ensuing twenty years. Accordingly, Mejia waived her right to assert her Fifth Amendment privilege.

### B. Mejia Waived the Privilege by Speaking to Sidley in 2014 and CCSAO in 2018.

A witness who testifies voluntarily, even in part, about a subject, waives the privilege against self-incrimination as to all details relating to that subject. *Mitchell v. United States*, 526 U.S. 314, 321 (1999); *Rogers v. United States*, 340 U.S. 367, 373 (1951) ("[F]ederal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details"). Because the privilege is personal in nature, a witness's choice to disclose some incriminating information requires a full disclosure. *Rogers*, 340 U.S. at 373. Voluntary disclosures to government investigators need not be under oath to constitute a waiver. *See Shakman*, 920 F.Supp.2d at 893-94.

Mejia voluntarily spoke both to lawyers hired by the City to investigate Solache and Reyes' claims of innocence and the ASA who was then representing Cook County and several former ASAs in Reyes' lawsuit[4] and was representing the State in both Plaintiffs' COI petitions. In October 2014, Mejia told Sidley that she committed the murders and kidnappings with Solache and Reyes. (*See* Ex. 4). Less than two years ago, Mejia said the same thing to ASA Nikolaevskaya. (*See* Ex. 5). Since her conviction, Mejia has twice voluntarily disclosed incriminating information about the crimes against the Soto family to Government investigators, and thus, now must be compelled to disclose the details of those same subjects in her deposition.

### C. Mejia Waived the Privilege by Testifying Substantively in her Deposition.

#### 1. The Law Prohibits Self-Selective Use of the Fifth Amendment.

---

[4] Former ASA Nikolaevskaya recently left the CCSAO and is no longer counsel in this matter.

7

Separately, Mejia waived her Fifth Amendment rights a fourth time by voluntarily answering many substantive questions about her confession at her deposition in this case. "A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Mitchell*, 526 U.S. at 322. The *Mitchell* Court explained that "the illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness, so there is no unfairness in allowing cross-examination when testimony is given without invoking the privilege." *Id.* Thus, a witness who voluntarily testifies about a topic may be cross-examined on topics *reasonably related* to the testimony's subject matter and matters affecting credibility. *Neely v. Israel*, 715 F.2d 1261, 1264–65 (7th Cir. 1983) (*emphasis added*). This rule has been enforced time and again. *See United States v. Williams*, 858 F.2d 1218, 1222–23 (7th Cir. 1988) (affirming cross-examination of defendant on all counts of indictment, even though he only testified as to one count, because crimes were inextricably woven); *United States v. Harbour*, 809 F.2d 384, 389 (7th Cir. 1987) (concluding denial of selling commodities opened door to all questions related to Defendant's selling of commodities and the events of the day in question); *United States v. Green*, 757 F.2d 116, 120–21 (7th Cir. 1985) (cross-examination proper on topics voluntarily raised by defendant on direct).

### 2. Mejia Testified Substantively on Critical Aspects of the Case.

In her deposition, Mejia chose to answer many questions critically relevant to the key issues in this litigation. Specifically, Mejia's self-serving testimony about her confession created a distorted record of not only the confession but also of the underlying crimes, which her improper assertion of the Fifth Amendment prevented Defendants from probing. Specifically, when defense counsel asked about Mejia being taken to and asked questions at her polygraph examination, Mejia

8

volunteered that "[f]irst they took me into a room and they had me sign some blank papers." (Ex. 7 at pp. 58:16-59:21). Mejia explained "these were a lot of blank papers," and that Guevara "[a]nd another from Puerto Rico" told her "she needed to sign them so she could make phone calls before the polygraph test." (*Id.* at pp. 59:20-60:6). She confirmed the blank papers had no writing or lines, that she signed her name "many times," and that after signing she took the polygraph. (*Id.* at p. 60:7-18). When asked if she had to do anything else before taking the polygraph, Mejia reiterated that Guevara required her "to write on a lot of white paper or blank paper" so she would "have access to an attorney, get lunch, and make some phone calls." (*Id.* at pp. 60:20-61:3). Mejia then repeated those same answers in response to follow-up questions (*Id.* at p. 61:4-22), adding that Guevara told her that after "sign[ing] all this paperwork…he will assign an interpreter to help." (*Id.* at pp. 61:23-62:4). Mejia further testified that Guevara, who told her when he was being "nice" that he was from Puerto Rico, was speaking in "very different" Spanish. (*Id.* at p. 62:5-19). But beyond confirming that she thereafter took the polygraph, she refused to answer further questions from defense counsel about the polygraph or conversations with Guevara until defense counsel asked if Guevara mistreated her. (*Id.* at pp. 62:20-65:23). At that point, she testified Guevara hit her, would not let her use the restroom, called her a derogatory name, used cuss words, and told her she would rot in prison for the rest of her life. (*Id.* at pp. 65:24-66: 9). She then confirmed that Guevara did nothing else and that she blamed him for being in prison for the rest of her life. (*Id.* at p. 66:10-14).

Any doubt that Mejia was intentionally trying to distort the history of this matter to exculpate herself and/or Solache and Reyes through this wholly new, invented testimony, evaporated when Plaintiffs' counsel questioned her. After Mejia asserted the Fifth to most of his questions, counsel showed Mejia a copy of the handwritten statement drafted by the felony review

9

ASA, Defendant Navarro, which documented Mejia's confession to him, and fully implicated Mejia, Solache and Reyes in the slayings and kidnappings. (*Id.* at p. 209:8-210:5). At that point Mejia responded substantively to 14 questions by identifying her signature, confirming she could read the Spanish on the pages, and, despite the fact that the statement clearly contains pre-printed lines, insisting she signed only blank pages like she previously had for Guevara.[5] (*Id.* at p. 209:8-212:22). She also confirmed that the statement was written in English, which she was and is unable to read. *(Id.* at p. 212:23-213:11).

Mejia also testified that she did not know a woman named Norma Salazar but refused to testify whether she spoke to police about her (Ex. 7 at p. 45:5-16), although Mejia's initial explanation to police for possessing little Santiago was that "Norma Salazar" had asked her to watch the boy for a few days when Mejia met her at the hospital while supposedly giving birth to the stolen baby.[6] Mejia also testified that she did not recognize a piece of paper on which Norma Salazar's name was handwritten (*Id.* at pp. 44:14-45:4) which Reyes had in his pocket when he went to the police station, presumably to perpetrate the "Norma Salazar lie" to the police.[7]

### 3. Mejia's Testimony Waived any Fifth Amendment Privilege

Mejia's truncated testimony about her handwritten confession leaves the potential impression in the record that she did not confess to the crimes, but rather was forced or tricked into signing blank pieces of paper that were later filled out by Defendants. In fact, Plaintiffs have already tried to capitalize on that distortion. (Ex. 10, Plaintiff Reyes's Responses to Defendant

---

[5] By contrast, Mejia testified at her suppression hearing that Navarro wrote out the statement in front of her and Defendant Halvorsen, she saw him write out each page, he then read each page to her, she stated she understood what he read and she signed each page. (Ex. 8, Mejia Testimony, 3/31/00 pp. 82:20-88:14).

[6] Mejia testified at her suppression hearing that she initially told police about Salazar. (Ex. 8, Mejia Testimony, 3/31/00 pp. 47:8-48:13).

[7] Since Mejia's deposition, Reyes has been deposed and testified Mejia gave him the paper found in his pocket, and he believed Norma Salazar's name was in Mejia's handwriting. (Ex. 9, Reyes dep. at p. 149:5-150:11).

Navarro's Second Set of Interrogatories at pp. 3-4 ("handwritten statement Navarro took from Adriana Mejia was fabricated and contained false information implicating Plaintiff")). The Fifth Amendment does not permit Mejia to unilaterally distort the record in this way. *See Neely*, 715 F.2d at 1264–65 (finding that defendant's direct testimony which implied certain denials and lack of knowledge, required cross-examination on related subject matters probative of those issues). Indeed, the Fifth Amendment is not a "positive invitation to mutilate the truth a party offers to tell" (*Mitchell*, 526 U.S. at 322, citing (*Brown v. United States,* 356 U.S. 148, 154-155 (1958)) and a witness cannot inject self-serving accounts of events into the record, and then misuse the Fifth Amendment to shield that same testimony from scrutiny.

Mejia's self-serving testimony that she signed blank pages, rather than her confession, waived any right to avoid answering any and all questions about her confession and the underlying crimes, and all related questions concerning her credibility and motivation. And, her willingness to testify as to certain questions was not inadvertent. Mejia specifically chose to answer several questions first from defense counsel and hours later from Reyes' counsel, which allowed her to try to exculpate herself. Defense counsel obviously needs to explore the notion, asserted for the first time ever in Mejia's deposition over 20 years after the crimes, that she did not confess to the crimes, as well any related implication that Defendants made up the case against her and Solache and Reyes, all which conflicts with the evidence in the case, including that Mariano Soto's blood was found on Mejia's clothes and shoes, she and Solache and Reyes actually had the Soto's two little children with them, and she has always acknowledged orphaning and kidnapping those children with Solache and Reyes.

These facts, in conjunction with her more recent admissions to Sidley in 2014 and ASA Nikolaevskaya in 2018, fly in the face of Mejia's self-serving testimony and demand that

Defendants be permitted to confront her with the evidence in the case including her previous acknowledgements of guilt. Further, because plaintiffs are relying on her selective testimony to suggest that Defendants fabricated her confession, Defendants must be permitted to inquire about the details in her statement, including those that relate to how she and Solache and Reyes planned, perpetrated, and covered-up the crimes, as well as questions about her conversations with the detectives and Navarro.

Mejia's testimony regarding her confession has also raised important questions about why she pleaded guilty and admitted to the crimes, and why she did not raise her allegations about signing a blank page in her motion to suppress, or at any time in the twenty years since. As explained above (*supra*, p. 10, n.5), Mejia's deposition testimony directly contradicted her motion to suppress testimony where she acknowledged watching Navarro write out each page of the statement in her presence, and that she signed each page after Navarro read the statement to her. (Ex. 8, 3/1/00, Mejia motion to suppress testimony, pp. 82:20-88:14). Reyes' counsel then aggressively exploited her deposition testimony by repeatedly asking whether her prior statements implicating Solache and Reyes were false, and when she declined to testify, asked her 33 times over 80 pages if she was doing so because truthful answers would reveal that she falsely incriminated Solache and Reyes. (*See generally,* Ex. 7, pp. 141-223).

Relatedly, Defendants must explore other motivations for Mejia's selective use of the Fifth Amendment privilege, which conveniently doubled at her deposition as a conduit for Solache and Reyes' preposterous theories about gangs and cartels, and Mejia's apparent superhuman ability to commit these brutal crimes alone. Indeed, counsel's aggressive exploitation of Mejia's use of the 5th Amendment necessarily raises related inquiries into Mejia's communications with Solache and Reyes and their counsel and agents, her knowledge of Solache's and Reyes' civil cases, and what,

12

if any, communications she has had with others involved with this case. Ultimately, without an ability to probe details and cross-examine her, the record is now distorted about the circumstances of Mejia's confession, which is precisely what the Fifth Amendment prohibits. *See, Mitchell*, 526 U.S. at 322 (explaining that self-selected testimony must be subjected to cross-examination).

And, Defendants' suspicions about Mejia's motivations do not arise in a vacuum and are not speculative. Mejia testified during her deposition that she had spoken to another inmate, Marilyn Mulero, about Detective Guevara and Mulero's claims against him. (*Id.* 65:9-65:20). Mulero is also represented by Reyes' counsel, and was recently granted clemency, though not on the basis of innocence, by Governor Pritzker after serving 28 years of a life sentence she received after pleading guilty to a brazen 1992 double murder.[8] Indeed, Mulero's highly publicized clemency hearing occurred on October 9, 2019, just two weeks prior to Mejia's assertion of the Fifth Amendment at her October 22, 2019 deposition. *See* Marie Fazio, *She spent more than half her life in prison. Now her lawyers say she should be freed because Chicago detectives coerced her confession*, CHI TRIB., Oct. 10, 2019, https://www.chicagotribune.com/news/breaking/ct-marilyn-mulero-clemency-hearing-20191009-tpguwm4czret7fyico5vnoxhui-story.html. Mejia then confirmed that, although she does not yet have a lawyer (and she's never filed anything in relation to her conviction or sentence), she too intends to file something with the courts so she can get out of prison. (Ex. 7, pp. 232:12-233:6). Accordingly, it is eminently logical to conclude that Mejia's eleventh-hour silence on the matter of Solache and Reyes' guilt occurred because she has been led to believe that, notwithstanding the gravity of her crimes, she too can receive a grant of clemency in her own case if she agrees not to testify against her accomplices. Given the number of civil cases against Defendant Guevara, their publicity, and the coordination between those

---

[8] Mulero's co-defendant Jacqueline Montanez, now claims she alone fatally shot both victims.

13

plaintiffs, their counsel, and others in developing claims against him, this certainly bears on her credibility in this case. *See, Neely v. Israel*, *supra*, 715 F.2d at 1264–65 (7th Cir. 1983) (finding that courts broadly interpret whether a witness's testimony has sufficiently put a matter in dispute to warrant cross-examination on credibility). And, given the extraordinary stakes in this litigation, it is even more important that Mejia be ordered to testify as to all of the circumstances surrounding the demonic crimes that destroyed the Soto family 22 years ago.

Finally, Mejia's substantive testimony about other topics discussed above further waived any Fifth Amendment right she might otherwise have claimed. Her denial of knowing Norma Salazar's name entitles Defendants to explore why she provided that name to police to explain her possession of little Santiago, why Reyes had that same name on a piece of paper in his pocket which he now claims Mejia gave to him, and whether that unusual coincidence was part of their failed cover story. Similarly, Mejia's discussion about some of her interactions with Defendant Navarro requires her to testify to all details of those interactions. And, her authentication of letters demonstrating remorse for her crimes (Ex. 7, at pp. 129:20-136:18) opened the door to their content as the law is clear that a witness cannot pick and choose which testimony to provide once she opens that door. Indeed, the Supreme Court instructs, the Fifth Amendment is not a "positive invitation to mutilate the truth a party offers to tell." *Mitchell*, 526 U.S. at 322, citing *Brown v. United States, supra,* 356 U.S. at 154-155.

## CONCLUSION

Mejia's testimony is at the heart of every critical issue in this lawsuit, specifically Solache and Reyes' commission of the savage murders and kidnappings, Mejia's confession and statements implicating both of them, and the truth of Solache and Reyes' own confessions. After freely admitting the truth for twenty years, Mejia's recent decision to assert the Fifth Amendment is not

14

only unsupported; it also offends fundamental notions of propriety. The Fifth Amendment's privilege against self-incrimination was and is intended to prevent the government from forcing criminal suspects to incriminate themselves in crimes, not as a ruse to facilitate an unseemly strategy to fuel a civil case seeking tens of millions of taxpayer dollars. Yet Mejia faces no risk of prosecution, she asserted her 5th Amendment rights after talking with another of Reyes' counsel's clients who was seeking and has since obtained clemency, and she confirmed that she too now intends on pursing her release despite over 20 years of inaction. And, Reyes' counsel promptly exploited Mejia's Fifth Amendment assertion by filling the record with preposterous theories including that Mejia actually stabbed both Soto parents 55 times by herself before kidnapping both children. To say that this strategy is a thinly veiled effort to disguise rather than discover the truth is an understatement. This Court should order Mejia to answer all questions concerning the details and circumstances surrounding her and Solache and Reyes' involvement in the Soto murders and kidnappings and her admissions to those horrific offenses.

WHEREFORE, Defendants seek an order from this Court compelling witness Adriana Mejia to testify and any other relief this Court deems just and equitable.

Dated: July 15, 2020                              Respectfully Submitted:

DEFENDANT CITY OF CHICAGO                         DEFENDANT REYNALDO GUEVARA

MARK A FLESSNER
Corporation Counsel for the City of Chicago       */s/ Thomas Leinenweber*
                                                  Thomas M. Leinenweber
*/s/ Eileen E. Rosen*                             James V. Daffada
Eileen E. Rosen                                   Kevin E. Zibolski
Catherine M. Barber                               Special Assistant Corporation Counsel
Theresa Berousek Carney                           Leinenweber Baroni & Daffada, LLC
Special Assistant Corporation Counsel             120 N. LaSalle Street, Suite 2000
Rock Fusco & Connelly, LLC                        Chicago, Illinois 60602
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654

15

| | |
|---|---|
| DEFENDANTS HALVORSEN, DICKINSON, RUTHERFORD, STANKUS, NAUJOKAS, HARVEY, TREVINO, MINGEY, CAPPITELLI, KARALOW & BIEBEL | DEFENDANTS WEHRLE, BRUALDI, VARGA, O'MALLEY & COOK COUNTY KIMBERLY M. FOXX State's Attorney of Cook County |
| */s/ Caroline Golden* James G. Sotos Caroline P. Golden Josh M. Engquist Special Assistant Corporation Counsel Sotos Law Firm 141 W. Jackson Blvd., Suite 1240A | */s/ Edward Brener* Edward M. Brener Ryan J. Gillespie Assistant State's Attorneys 500 Richard J. Daley Center Chicago, Illinois 60602 |

DEFENDANT NAVARRO

*/s/ Daniel Noland*
Terrence M. Burns
Daniel M. Noland
Paul A. Michalik
Daniel J. Burns
Reiter Burns LLP
311 S. Wacker Drive, Suite 5200
Chicago, Illinois 60606

16