**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| | ) | Case No. 1:18-cv-01028 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 1:18-cv-02312 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Third-party Marilyn Mulero has brought a motion to quash the subpoena issued by the individual defendant officers to the Illinois Department of Corrections (IDOC). [*DeLeon-Reyes* 371; *Solache* 261].[1]  For the reasons stated below, the Court grants the motion.

---

[1] The remainder of this Memorandum Opinion and Order cites to documents from the *DeLeon-Reyes* docket, Case No. 1:18-cv-01028, unless otherwise noted.

**Background**

In these separate lawsuits, consolidated for purposes of discovery, *see* Doc. [49], Plaintiffs Arturo DeLeon-Reyes and Gabriel Solache claim that they were wrongfully convicted and that they served almost 20 years in prison for the 1998 double murder of Mariano and Jacinta Soto. *Solache* Doc. [171] at 4. Plaintiffs assert that their convictions were the result of constitutional violations committed by Chicago police officers during the investigation of the Soto homicide. *Id.* Specifically, Plaintiffs bring claims under 42 U.S.C. § 1983 for coerced confession, fabrication of false witness statements, deprivation of liberty without probable cause, violations of due process, failure to intervene, and conspiracy. *Id.* Plaintiff DeLeon-Reyes additionally asserts 42 U.S.C. § 1983 claims against certain state prosecutors for coerced confession and fabrication of false witness statements. *Id.* Both Plaintiffs allege *Monell* policy and practice claims, as well as state law claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification. *Id.*

Defendants deny Plaintiffs were wrongfully convicted, deny the claims against them, and assert various affirmative defenses, such as qualified immunity, absolute immunity, a bar under *Heck v. Humphrey*, estoppel, statute of limitations, Illinois Tort Immunity Act, and failure to mitigate damages. *Solache* Doc. [171] at 4.

**Discussion**

On October 22, 2019, counsel for Plaintiffs and Defendants traveled to Logan Correctional Center to depose Adriana Mejia, who is currently serving time for her involvement in the Soto homicides. Doc. [354] at 3-4. In 2001, she pled guilty to two counts of first-degree murder, two counts of aggravated kidnapping, and one count of home invasion in exchange for life-imprisonment without possibility of parole. Doc. [354-1] at 22-23. According to her confession

at the time of arrest, Mejia wanted to have a baby so desperately, that she faked a pregnancy and worked with Plaintiffs to murder Mr. and Mrs. Soto and kidnap the couple's two children. *Id.* at 42-44. At her October 22, 2019 deposition, Mejia repeatedly invoked the Fifth Amendment and refused to answer the majority of questions posed to her. *See, e.g.*, Doc. [354-1] at 88, 89. However, Mejia did testify about some of the circumstances surrounding her confession. *See id.* at 80-83. Mejia additionally testified to knowing Mulero, a fellow inmate, and stated that she talked to Mulero a little bit about Defendant Guevara. Doc. [381-2] at 3.

Nearly a year later, on August 31, 2020, the individual officer defendants served a subpoena on the IDOC Intel Center for "[a]ny and all telephone calls for Marilyn Mulero, Inmate No. B21346, from January 2019 to present." Doc. [371-2] at 1. The subpoena clarified that the individual defendant officers were not seeking any calls designated as attorney-client communications. *Id.* In the present motion, Mulero has moved to quash the subpoena. Doc. [371]. Mulero argues that Defendants[2] are pursuing a "broad fishing expedition," for which they have not provided a sufficient relevancy basis to warrant the invasion of her privacy.[3] *Id.* at 10-15. Defendants counter that they have a clear and directly relevant interest in seeking Mulero's phone calls for the fifteen months that Mulero and Mejia were housed together at Logan Correctional Center—which outweighs Mulero's privacy interests—in light of their close friendship, Mejia's

---

[2] Only Defendants Rutherford, Dickinson, Trevino, Mingey, Biebel, Harvey, Stankus, and the estates of Halvorsen, Karalow, and Cappitelli participated in the briefing for the present motion. For the sake of simplicity, this Memorandum Opinion and Order hereinafter refers to those parties as "Defendants."

[3] Defendants' brief indicates that Mulero's motion to quash is based in part on a claim of attorney-client privilege. *See* Doc. [381] at 10. However, Mulero appears to have dropped that argument after the parties' Rule 37.2 conference, *see* Docs. [371, 383], so the Court does not address attorney-client privilege in this Memorandum Opinion and Order.

new invocation of the Fifth Amendment and accompanying claim that she is pursuing postconviction relief, and Mulero's postconviction litigation efforts. Doc. [381].

Upon a timely motion, Rule 45(d) mandates that the court quash or modify a subpoena if the subpoena "subjects a person to undue burden" or "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii-iv). Rule 45(d) likewise permits a court to quash or modify a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information[.]" Fed. R. Civ. P. 45(d)(3)(B)(i).

It is up to the moving party to establish the impropriety of the subpoena, *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002); *Simon v. Nw. Univ.*, No. 1:15-CV-1433, 2017 WL 66818, at *2 (N.D. Ill. Jan. 6, 2017); *Hard Drive Prods. v. Does 1-48*, No. 11 CV 9062, 2012 WL 2196038, at *6 (N.D. Ill. June 14, 2012), and magistrate judges "enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013).

## I.  Standing

Because Mulero is moving to quash the subpoena directed to IDOC, and not Mulero, the Court first addresses the threshold issue of standing. Ordinarily, a non-recipient movant does not have standing to quash a subpoena unless "the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982) (citation omitted); *see also Kessel v. Cook County*, No. 00 C 3980, 2002 WL 398506, at *2 (N.D. Ill. Mar. 14, 2002). Examples of such legitimate interests have included the assertion of privilege, interference with business relationships, and the production of private information. *Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, No. 16-CV-4161, 2017 WL 5478297, at *3 (N.D. Ill. Nov. 15, 2017) (citation omitted). A movant only needs to show a minimal privacy interest to establish standing for a

motion to quash. *Malibu Media, LLC v. John Does 1-14*, 287 F.R.D. 513, 516-17 (N.D. Ind. 2012). In the prisoner phone call context, courts in this Circuit have held that an incarcerated individual possesses a sufficient privacy interest in the recordings of her phone calls, such that she has standing to quash a subpoena for those recordings. *See Bishop v. White*, No. 16 C 6040, 2020 WL 6149567, at *3 (N.D. Ill. Oct. 20, 2020); *Simon*, 2017 WL 66818, at *2; *Coleman v. City of Peoria*, No. 15-CV-1100, 2016 WL 3974005, at *3 (C.D. Ill. July 22, 2016); *Pursley v. City of Rockford*, No. 18 CV 50040, 2020 WL 1433827, at *2 (N.D. Ill. Mar. 24, 2020), *opinion adopted*, No. 18 CV 50040, 2020 WL 4815946 (N.D. Ill. Aug. 19, 2020).

Applying those principles here, Mulero has established standing to quash the IDOC subpoena for recordings of her phone calls. That is, she has at least a minimal privacy interest in the recordings of phone calls she made to friends, family members, and others while incarcerated. True, Mulero's phone calls to non-attorneys are recorded by the prison. It logically follows then that Mulero's expectation of privacy in those phone calls would be lesser than a person whose phone calls are not recorded. *See* Doc. [381] at 11. Yet, that does not mean her privacy interest in the phone calls is zero. As courts have acknowledged, an incarcerated individual may know that certain prison employees will have access to recordings of her telephone calls and still expect that those recordings will not fall into the hands of civil litigants. *See  Pursley v. City of Rockford*, 2020 WL 1433827, at *2 (N.D. Ill. 2020)*; Simon*, 2017 WL 66818, at *2; *Coleman*, 2016 WL 3974005, at *3. Those holdings ring particularly true here, where Mulero is not a party, or even a witness, in the case.[4]

---

[4] For this reason, the Defendants' contention that this case's Protective Order "would have alleviated any concern that Mulero would have concerning the privacy of these telephone calls and their availability to parties outside of this litigation" falls short. *See* Doc. [381] at 11. Mulero is not a party to the case and reasonably could have expected her phone calls to remain private, excepting the review done by prison officials. Furthermore, Fed. R. Civ. P. 45(d) empowers—and under some circumstances requires—a court to quash a subpoena that infringes on protected or confidential matters, regardless of whether there is a

Having found that Mulero has standing to quash the IDOC subpoena, the Court turns next to weighing the relevance of the information sought against the strength of Mulero's privacy interest. *See Pursley*, 2020 WL 1433827, at *2 (collecting cases).

## II.    Relevancy

Defendants assert that the subpoena seeks relevant information that surmounts Mulero's privilege and privacy interest assertions, while Mulero contends that Defendants have not shown a relevancy basis meriting the discovery of more than a year of her phone calls.  Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if it "has any tendency" to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a)-(b).  In determining the scope of discovery under Rule 26, relevance is construed broadly and is "not limited to issues raised by the pleadings[.]" *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Even so, the discovering party must offer more than speculation to trump an incarcerated person's privacy right in recordings of her telephone calls. *See Simon*, 2017 WL 66818, at *4; *Pursley*, 2020 WL 1433827, at *4.

Three cases from this Circuit are instructional in assessing the relevancy of the IDOC subpoena for recordings of Mulero's phone calls.  The first is *Coleman*.  In *Coleman*, a wrongful conviction case against the City of Peoria and other named law enforcement individuals, the defendants served subpoenas to IDOC facilities to produce recordings of telephone calls relating to the plaintiff and a handful of individuals that the plaintiff named as witnesses in the civil litigation. 2016 WL 3974005, at *2.  The subpoenas also sought phone calls relating to the plaintiff's cell mate during the time they were incarcerated together. *Id.*  Plaintiff and his cell mate

---

protective order in place.  So while the Court acknowledges the *Coleman* Court's discussion of the protective order in that case, *see* 2016 WL 3974005, at *4,  this Court does not find that the protective order impacts the Rule 45(d) analysis here.

moved to quash the subpoenas. *Id.* at *3. However, because prior discovery showed that the plaintiff had called the named witnesses while incarcerated and had used his cell mate's phone account while they were housed together, the *Coleman* Court determined that the privacy interest in the phone calls did not outweigh the relevance of the calls. *Id.* at *2, *4. In weighing the relevance of the phone call recordings against the privacy interest, the court considered both the lesser privacy expectation for an incarcerated individual who knows his calls are being recorded, as well as the difficulty in identifying which phone calls were relevant without listening to the recordings.[5] *Id.* at *4. In sum, the *Coleman* Court found that "[i]n light of the relevance of the calls sought by the Defendants, and the difficulty in identifying the relevant calls, Coleman and Holland's lessened privacy interests is insufficient to quash the subpoenas." *Id.* The *Coleman* Court also found that the plaintiff's privacy interests could be protected by making the recordings subject to the protective order in the case. *Id.* The Court accordingly denied the motion to quash.

Conversely in *Simon*, the second helpful case, the court held that the broad discovery request did not outweigh the incarcerated individual's privacy interest in phone call recordings. There, a defendant in a wrongful conviction case served a subpoena to IDOC for all non-privileged audio tapes of recorded phone calls between the plaintiff and non-incarcerated individuals during the time the plaintiff was incarcerated, a span of around fifteen years. 2017 WL 66818, at *2. The court characterized the subpoena as allowing a "broad fishing expedition," and contrasted it with

---

[5] Defendants highlight this discussion from *Coleman* to indicate that, as a general rule, relevant calls cannot be identified without listening to the recordings. Doc. [381] at 9. Yet, the *Coleman* case did not espouse such a broad proposition. In *Coleman*, there was a particular difficulty in identifying the relevant phone calls without listening to the recordings because discovery showed that the plaintiff communicated with others via third parties. For instance, the plaintiff was known to call his sister, who would set up a three-way call with the plaintiff and another individual. 2016 WL 3974005, at *2, *4. As a result, simply looking at the call recipients listed in the prison's phone logs would not illuminate whether the plaintiff was calling the individuals he later named as witnesses in his wrongful conviction litigation. *Id.* In a normal case, there are many ways to maximize the chance for getting relevant phone calls, including filtering by call recipient or by limiting time frames.

the "more focused and narrowed request that the *Coleman* court faced." *Id.* at *4. In particular, the *Simon* Court highlighted the *Coleman* subpoena's pursuit of conversations relating to "key witnesses and individuals specifically named in deposition testimony as persons who had phone conversations with the plaintiff while he was incarcerated," which the court found starkly different from the subpoena at hand that was based only on the defendant's "broad generalization that Simon's calls to his 'family members, friends, and other third parties contain relevant information on the question of whether he is, in fact, innocent as he claims.'" *Id.* (citation omitted). In short, the defendant's justification for the subpoena in *Simon* was "supported by zero evidence developed to date in [the] litigation," and the court had no "non-conjectured factual basis that the calls in fact contain relevant information." *Id.* As a result, the court found in *Simon* that the breadth of the subpoena was too broad to be enforced. *Id.*[6]

In the third applicable case, *Bishop*, the defendants in yet another wrongful conviction case issued a subpoena for recorded prisoner phone calls. 2020 WL 6149567, at *2. The plaintiff in *Bishop* had been charged with first-degree murder and attempted murder in connection with the October 2014 shooting of Tepete Davis, Isaiah Watkins, and Antwon Lee. *Id.* A key piece of evidence against the plaintiff had been the eyewitness testimony of Lee, who had survived the shooting and identified the plaintiff as the shooter to law enforcement. *Id.* Two years after the

---

[6] The *Simon* Court ultimately modified the subpoena to require the limited production of calls on IDOC recorded lines between the plaintiff and his counsel and plaintiff and the plaintiff's investigators on a waiver basis. 2017 WL 66818, at *6. The court found that because the plaintiff knew phone calls on the recorded lines were monitored, he waived his privilege with respect to any conversations he had with his investigators and counsel on those recorded lines. *Id.* Because the pursuit of Simon's recorded calls with counsel and investigators "[did] not suffer from the broad, non-particularized nature" of the subpoena, the court found that "a more narrowed request limited to Simon's counsel and the Investigators [was] appropriate, considering Simon's lack of privacy interest in these calls and the likely relevance and potential highly probative value of these calls." *Id.* The Court nevertheless maintained its position that the defendant lacked factual support to justify the production of other calls, *see id.*, so *Simon* still stands for the proposition that a subpoena needs a non-conjectured factual basis" to justify the invasion of an incarcerated individual's privacy rights. *Id.* at *4.

shooting, when the plaintiff was awaiting trial, Lee recanted his identification of the plaintiff as the shooter. *Id.* Defendants believed that the plaintiff convinced Lee to change his story, and that there would be evidence of that coercion in the plaintiff's recorded telephone calls from his time in pretrial custody in Cook County Jail. *Id.* More specifically, Defendants aver, based on the discovered telephone call recordings of Lee, that the plaintiff, while in pretrial custody, directed others to communicate with Lee and offer Lee a payment of $10,000 to sign an affidavit recanting his identification of the plaintiff as shooter. *Id.* Defendants accordingly subpoenaed the Cook County Department of Corrections for phone call records, logs, and recordings of inmate calls relating to the plaintiff for a 4-year period. *Id.* In weighing the relevance of the subpoena's request, the *Bishop* Court acknowledged that it was "possible that relevant information may be contained somewhere within Plaintiff's 8,000 recorded phone calls," but reasoned that there was "still [ ] no solid evidence before the Court that Plaintiff ever used the *telephone* to communicate directly or indirectly with Lee or any of his intermediaries to accomplish that purported goal." *Id.* at *4, *5 (emphasis in original). The "bottom line" for the *Bishop* Court was that there was not enough evidence that "convincingly supports any theory as to how Plaintiff may have communicated with Lee's people if such communications, in fact, occurred at all." *Id.* at *6. According to the Court, "[t]here must be some basis, beyond mere supposition, that Plaintiff used the telephone to communicate directly or indirectly with Lee or his intermediaries before Defendants can be given license to rummage through Plaintiff's 8,000 personal telephone calls." *Id.* The *Bishop* Court accordingly granted the plaintiff's motion to quash. *Id.* at *9.

Taken together, *Coleman*, *Simon*, and *Bishop* teach that in order to overcome a prisoner's privacy interest in the recordings of her telephone calls, the subpoenaing party must offer more than mere speculation that the recordings could house relevant evidence. Put another way, there

must be evidence already discovered indicating that the recordings would probably document something relevant. What separates the permissible subpoena for telephone call recordings in *Coleman* from the overbroad subpoenas in *Simon* and *Bishop* is the previously discovered evidence supporting the *Coleman* subpoena, as well as the narrow tailoring of the subpoena to reflect that discovered evidence. In *Coleman*, prior discovery showed that the plaintiff had used his telephone account and his cell mate's while incarcerated to contact individuals, sometimes through third parties via three-way calls, that he later named as witnesses in his wrongful conviction litigation; the subpoena was limited to phone calls related to the plaintiff, his cell mate, and those named witnesses. 2016 WL 3974005, at *2. By contrast, in *Simon* and *Bishop*, there was no evidence that the plaintiffs used their telephones while incarcerated for a relevant purpose. *Simon*, 2017 WL 66818, at *4; *Bishop*, 2020 WL 6149567, at *4, *5. Instead, the subpoenaing parties merely guessed that they would have used their phones for potentially relevant reasons and issued subpoenas not sufficiently limited in time or scope. *Id.*

Here, Defendants' subpoena is more akin to the rejected subpoenas in *Simon* and *Bishop*. Defendants subpoenaed IDOC for the telephone call recordings of Mulero, a non-party, for the months that Mulero was incarcerated in the same prison as Mejia, a witness in the case. Defendants substantiate the subpoena based on a slim showing. According to Defendants, Mejia is a key witness in this litigation who initially confessed to working with the plaintiffs to commit the Soto homicides. Then, after years of not proclaiming innocence or pursuing postconviction relief, Mejia invoked the Fifth Amendment repeatedly throughout her October 2019 deposition and stated she is working on being released from prison. From this, Defendants infer that Mejia has changed course, meaning that her story about the Soto homicides has changed, and that she is going to

pursue postconviction litigation like the Plaintiffs. At the October 2019 deposition, Mejia further

admitted to knowing Mulero in the following limited exchange:

> Q. Do you know an inmate named Marilyn Milaro (phonetic)?
> A. Yes.
> Q. Have you ever talked to her about Detective Guevara?
> A. Very little.
> Q. Did she tell you that Detective [Guevara] mistreated her too?
> A. Seems like it. I don't remember.

Doc. [381-2] at 3. Defendants also direct the Court's attention to a letter that Mejia wrote on behalf

of Mulero, "presumably for use in Mulero's post-conviction proceeding," in which Mejia

described respecting and caring for Mulero. Doc. [381] at 8. The Defendants are further aware

that Mulero has been actively pursuing postconviction remedies for years, and that Mulero testified

at a clemency hearing just two weeks before Mejia's October 2019 deposition. *Id.* Finally, Mulero

and Plaintiff Reyes are represented by counsel from the same office space, as one third of Mulero's

litigation team is made up of lawyers from the Illinois Innocence Project, who share office space

with Loevy & Loevy. Doc. [381] at 9; Doc. [383] at 3.

From these facts, Defendants make mountains out of molehills. Essentially, Defendants

speculate that because of Mejia and Mulero's close relationship, their shared connection to

Defendant Guevara, the timing of Mejia's deposition, and the fact that Mulero is represented by

counsel from the same office space as Plaintiff Reyes, that "Mejia likely shared details with Mulero

about this case and her desire to obtain relief." Doc. [381] at 9. Defendants further surmise that

Mulero could have pressured Mejia to invoke the Fifth Amendment at her deposition because that

deposition testimony was "tremendously beneficial to a client of Mulero's attorneys (Plaintiff

Reyes)." *Id.* Ultimately, Defendants suppose that Mulero could have spoken to others "about

incentivizing Mejia" to refuse to answer deposition questions and claim that they have a "clear and

directly relevant interest" in finding out whether she did so. *Id.*

11

However, Defendants' confusing conspiracy theory, like the speculative bases provided in *Simon* and *Bishop*, is insufficient to overcome Mulero's privacy interest in the recordings of her telephone calls, even though that interest is lessened by Mulero's knowledge that her calls were being recorded. *See Simon*, 2017 WL 66818, at *3-*4; *Bishop*, 2020 WL 6149567, at *3, *6.

First, Defendants' argument on timing falls flat. Defendants emphasize that although Mejia was not deposed until October 2019, her deposition was "percolating," as of June 2019, the original date of her deposition, which coincides with a time that "Mulero was actively involved in making her case against defendant Guevara to the governor[.]" Doc. [381] at 8. Yet, there is a much simpler and more reasonable explanation for Mejia's invocation of the Fifth Amendment as of October 2019: Mejia was appointed counsel in October 2019, and counsel may have advised Mejia to invoke the Fifth Amendment. Defendants do not acknowledge this possibility.

Second, the crux of the problem for Defendants here is that there is no evidence that Mulero talked to others on the phone about Mejia, let alone talked to others on the phone about a plot to pressure Mejia into changing her story about the Soto homicides. What's more is that there is no credible evidence at this point that Mejia's decision to invoke the Fifth Amendment is connected to Mulero in any way at all. Significantly, as Mulero points out, this lack of evidence exists after ample discovery opportunities, including Mejia's October 2019 deposition and Defendants' having listened to Mejia's recorded telephone calls. Doc. [383] at 6. In addition, Defendants had previously issued a broad document subpoena to the Exoneration Project, Mulero's counsel, seeking materials related to Plaintiffs' cases, including correspondence with Mejia, to which the Exoneration Project had no responsive documents (excluding public pleadings and transcripts) other than a single generic letter from Mejia attesting to Mulero's character. Doc. [371] at 4. Defendants will, moreover, have another opportunity to depose Mejia, at which time Mejia will

not be allowed to invoke the Fifth Amendment.[7]  Perhaps Mejia will offer testimony in that deposition indicating that Mulero talked to others on the phone about Mejia in a way relevant to this case.  Until then, Defendants are "throwing darts in the dark," and have not provided the Court with a "non-conjectured factual basis that the calls in fact contain relevant information." *Simon*, 2017 WL 66818, at *4.  The Court therefore finds that the subpoena is unenforceable at this time.

<u>Conclusion</u>

For the reasons discussed above, the Court grants Mulero's Motion to Quash Subpoena to the Illinois Department of Corrections Intel Center for IDOC Telephone Calls Of Third-Party Marilyn Mulero, [*DeLeon-Reyes* 371; *Solache* 261].

**SO ORDERED.**

Dated: December 2, 2020

Sunil R. Harjani
United States Magistrate Judge

---

[7] On September 29, 2020, the Court held that the Fifth Amendment no longer applies to Mejia's testimony about the crimes she pled guilty to and ordered that Mejia answer questions and testify about the crimes she was convicted of nearly twenty years ago. Docs. [369, 370].

13