1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,                         )    No. 18 C 1028
                                             )
                Plaintiff,                   )
                                             )
           vs.                               )
                                             )
REYNALDO RIVERA, et al.,                     )
                                             )
                Defendants.                  )
-----------------------------------          )
GABRIEL SOLACHE,                             )    No. 18 C 2312
                                             )
                Plaintiff,                   )
                                             )
           vs.                               )
                                             )
CITY OF CHICAGO, et al.,                     )    Chicago, Illinois
                                             )    April 30, 2021
                Defendants.                  )    9:00 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HON. SUNIL R. HARJANI, MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff
DeLeon-Reyes:            MR. STEVEN E. ART
                        MR. SEAN C. STARR
                        Loevy & Loevy,
                        311 North Aberdeen Street, 3rd Floor,
                        Chicago, Illinois  60607

For Plaintiff
Solache:                MS. JANIS M. SUSLER
                        People's Law Office,
                        1180 North Milwaukee Avenue,
                        Chicago, Illinois  60642


                        PATRICK J. MULLEN
                        Official Court Reporter
                        United States District Court
                215 South Dearborn Street, Room 1412
                        Chicago, Illinois  60604
                        (312) 435-556

APPEARANCES:  (Continued.)

For Defendant
City of Chicago:      MS. EILEEN E. ROSEN
                     Rock, Fusco & Connelly, LLC,
                     321 North Clark Street, Suite 2200,
                     Chicago, Illinois  60654

For Defendant
Rivera:              MS. MEGAN K. McGRATH
                     Leinenweber, Baroni & Daffada LLC,
                     120 North LaSalle Street, Suite 2000,
                     Chicago, Illinois  60602

For Defendants Biebel,
Halverson, Dickinson,
Rutherford, Stankus,
Naujokas, Harvey,
Trevino, and Mingey:  MR. JAMES G. SOTOS
                      MR. JOSH M. ENGQUIST
                      Sotos Law Firm,
                      141 West Jackson Boulevard, Suite 1240A,
                      Chicago, Illinois  60604

For Defendants Varga,
Brualdi, Wehrle,
O'Malley, and
Cook County:          MR. EDWARD M. BRENER
                      MR. DAVID A. ADELMAN
                      Cook County State's Attorney's Office,
                      Complex Litigation Unit,
                      500 Richard J. Daley Center,
                      Chicago, Illinois  60602

For Defendant
Navarro:              MR. DANIEL M. NOLAND
                      MR. DANIEL J. BURNS
                      Reiter, Burns LLP,
                      311 South Wacker Drive, Suite 5200,
                      Chicago, Illinois  60606

(Proceedings via video teleconference on the record.)

THE CLERK:  18 C 1028, DeLeon-Reyes v. Guevara, and 18 C 2312, Solache v. City of Chicago.

THE COURT:  Okay.  Good morning, everyone.  Can I have appearances, please, starting with plaintiff Reyes, and keep going after that?

MR. ART:  Good morning, Your Honor.  Steve Art and Sean Starr for plaintiff Reyes.

MS. SUSLER:  Good morning, Judge Harjani.  Jan Susler on behalf of Gabriel Solache.

MR. ENGQUIST:  Good morning, Your Honor.  Josh Engquist and James Sotos on behalf of all the individual defendant officers with the exception of (inaudible) and Guevara.

MS. McGRATH:  Good morning, Your Honor.  Megan McGrath on behalf of defendant Guevara.

MS. ROSEN:  Good morning, Your Honor.  Eileen Rosen on behalf of defendant City of Chicago.

MR. BRENER:  Good morning, Your Honor.  Edward Brener and Dave Edelman in the Reyes matter only on behalf of prosecutor defendants O'Malley, Brualdi, Varga, and Wehrle as well as Cook County.

MR. NOLAND:  Good morning, Judge.  Daniel Noland and Daniel Burns in the Reyes case only on behalf of former assistant state's attorney David Navarro.

THE COURT: All right. Anyone else? Going once?

(No response.)

THE COURT: Okay. Good morning to all of you. Good to see you. I hope that all of you and your families have been well and healthy. It's been some time since we've appeared in person together, at least for this part virtually. What I'd like to do today is to recap a few things that have been on my mind in this case.

The first is, as you know, non-Monell discovery will close on June 3rd. I said that a number of times, and that is a firm date. So what I'd like to know from you is your thoughts about what will happen to get to Monell discovery because I'd like to put some schedules together, a plan of action to be able to manage the process starting July 1st.

So what I'll do is let me hear from you. I'm not going to make any rulings today, you know, so please don't -- I'm not going to decide whether things should be done or shouldn't be done. What I really want to do is have a conversation about what your plans are and then where the disputes lie, and then we can figure how we're going to resolve those disputes.

So with that, I'll hear from the plaintiffs first as to your thoughts of what you will be doing in Monell discovery, and either Reyes or Solache can go first. Go ahead.

MR. ART: Good morning again, Your Honor. This is

Steve Art for plaintiff Reyes, and I think I can speak for all of the plaintiffs because we're going to do coordinated Monell discovery obviously here. So we have already CR files produced by the City of Chicago, and we are going through those and analyzing those. So I guess it's easiest to talk about it in terms of Monell discovery that's sort of like fact discovery and Monell discovery that's expert discovery. So there's some analysis of the CR files that has been ongoing on our side and is nearly complete, and then that will be subject to expert analysis of some kind. So that project is going on.

The Court ordered homicide files produced I believe at the end of December of 2020 on a rolling basis. We have received homicide files from the one year that was produced in the Sierra matter already, and we're conducting analysis of those. We are awaiting production of all of the other homicide files from the other years. I believe the due date is May 30th. Obviously the sooner we get some of those, the sooner we can begin the analysis of those, and those, too, will be subject after they are reviewed to some expert analysis.

We have subpoenaed the Cook County Public Defender's office for files that correspond to homicide files produced by the City of Chicago in Guevara cases. We are coordinating with the public defender's office about the most efficient manner in which to have those files scanned and produced. Obviously because they're a third party, we are offering to take the

burden off of the public defender's office and send people in to scan. We are in ongoing discussions with the person who coordinates their responses to subpoenas there about that production of files.

There will be a comparison on the plaintiffs' side between those files at the public defender's office in the criminal defense of the various cases at issue and the homicide files that are produced by the City of Chicago. Our understanding is that the City of Chicago, as they've done in the Fields matter and the Rivera matter where there was similar litigation, is going to want to do a comparison between those files and what the Cook County State's Attorney has. Then all of those comparisons will be subject to the same expert analysis as the review of the homicide files and the CR files. So that is sort of our version of how the file review will work and the expert analysis of the file review.

In addition to that, I think there's likely a 30(b)(6) deposition or a 30(b)(6) notice that results in a number of different individuals being designated by the city. I think that there may be individual fact witnesses relating to the different, you know -- so one of the theories obviously is that the homicide files would show or, you know, one of the allegations on the plaintiffs' side is that homicide files would show the systemic suppression of police materials that never made it to prosecutors and criminal defendants.

There may be fact witnesses relating to some of those cases that are important to illustrate that the materials suppressed, for example, or the police files suppressed, for example, were material to the criminal cases or that they were, in fact, suppressed. Whether or not there are witnesses in that sort of Monell fact category depends on the analysis of those files. It's hard for me to say sitting here today, having not looked at all those files, but I can tell you that there were a limited number of witnesses in those categories in the Fields case, and I believe there were in the Rivera case as well.

So from our perspective, those are the tasks to complete. I think the 30(b)(6) testimony can be taken while all of these other things are going on. So I think there's a period of time to review files the city is producing and that the Cook County Public Defender will produce from plaintiffs' perspective, and then once that period of time is done, a period of essentially expert discovery relating to Monell, which presumably can go on at the same time as expert discovery relating to the individual case.

THE COURT: All right. I have some questions. I'm going to ask them first, and then I'll give defendants a chance to speak.

First, when you say a limited number of witnesses relating to the files, what are you talking about? What's your

ballpark thoughts on that?

MR. ART: So I think if I'm remembering right in the Fields case where there was a similar volume of files at issue, there were, for example, a handful, a few attorneys disclosed to talk about whether or not they had received materials in a criminal case and whether those materials were material and exculpatory and could have been used in the criminal case. So I expect less than a dozen witnesses like that.

Those witnesses are essentially witnesses that are called to foreclose the defense that, you know, from the city's perspective, in fact, these files were not suppressed or the materials suppressed would not have made a difference in the individual criminal cases that we're talking about.

THE COURT: Okay. Can these depositions that you're referring to, the 30(b)(6) and what we'll call the limited witnesses arising out of the files, can they occur at the same time that the expert discovery analysis is going on?

MR. ART: Yes, with one exception, which is that the 30(b)(6) witness is likely necessary for the experts to produce their reports. But I think there's probably -- other than us discussing with the city the appropriate scope of a 30(b)(6) deposition, I don't think there's anything stopping us from proceeding with that now.

THE COURT: So let's say by June 30th, as I expect, you will get all your homicide files and that you will have by

then all of your Sierra files, and I believe you subpoenaed already the public defender files so let's say you have that. Starting July 1st, what are the first things? That first months, let's say, what are the tasks that you're going to try to accomplish?

MR. ART: We are going to be attempting to analyze all of the files produced by the City of Chicago, one. Two, we're going to be comparing all those files produced by the Cook County Public Defender. Three, I think during that time period we can take at least the lion's share of the topics on our 30(b)(6) notice. We will be nearing or we will have completed the analysis of the CR files at that point. Then I think that's what we would do in that first month.

THE COURT: I'll stick with you for the moment. So at some point part of our time between July and December is going to be taken up with some expert disclosures, right? That's probably going to take some time. You have to disclose. They've go to disclose. You've got depos. There might be rebuttal reports. What period of time do you think we should attribute for that process in the subset of July through December?

MR. ART: Your Honor, just with respect to Monell discovery or with respect to both Monell and the individual case?

THE COURT: Well, you've got to finish everything by

December, so I think the answer is both --

MR. ART: Yeah.

THE COURT: -- the Monell and the individual case.

MR. ART: Yeah. I suppose that our preference is to move along on an individual case track and a Monell track that are going on at the same time. To start expert discovery that relates solely to the individual case, to the extent there's that kind of expert discovery on July 1st, make some disclosures, and then have Monell expert discovery follow the analysis of the files and the 30(b)(6) deposition on that Monell track.

So if July and August are the time to do the fact discovery relating to Monell claims with the goal of -- assuming we have everything at the end of June and with the goal of having conducted all analysis of that by the end of August, then I believe in September, October, November, December, we can do all of the Monell expert discovery and any depositions of those Monell fact witnesses that we discussed earlier.

THE COURT: Okay.

MR. ART: So that -- and the overlap that I see relating to the individual experts and the Monell experts is pretty narrow, I think. I think it's just potentially police practices experts on each side who have something to say about the individual case and something to say about the Monell case.

THE COURT: Okay. So my next question was going to be: What individual expert topics are you imagining? Medical? Psychological? What do you have in mind?

MR. ART: So obviously I can't speak for defendants. I think we will have experts that discuss coerced confessions, or an expert. I'm not sure if there will be one in each of the plaintiffs' cases. To be frank, we haven't discussed that issue yet.

THE COURT: I see.

MR. ART: I think that there will be experts that discuss the DNA evidence in the case, you know, so those for sure. Sometimes there are experts in these cases that discuss damages and are damages experts, but I think from plaintiffs' perspective those are the -- and then a police practices expert who will discuss the investigation of the individual case. But usually that expert also discusses issues relating to the Monell claims in a single report.

THE COURT: Okay. Let me put a pause on plaintiffs at this moment, unless counsel for Mr. Solache has anything to add. Feel free to do that now.

MR. ENGQUIST: No, Judge. We adopt what Mr. Art, counsel for plaintiff Reyes, says. We'll be (inaudible).

THE COURT: So I'll come back to plaintiffs at some point, but let me hear from the defendants first. Why don't I start, just to make it manageable, why don't I start with the

City of Chicago and then go on to more of the individual defendants after that. Go ahead.

MS. ROSEN: Sure. So from the city's perspective obviously in the context of Monell discovery we play defense in the truest sense of the word. So everything we do is responsive to however plaintiff decides to pursue his Monell claims. So in this particular case, obviously the file review both on the CR side and the homicide file side are the focus at this point of the Monell claims and theories.

With respect to the CR files, plaintiff has had them since we were ordered to produce them, I believe, at the end of last year or early this year, and I don't know obviously what type of analysis they're doing or how they intend to utilize the CR files to pursue their Monell theories other than in the most general of ways to support some type of failure to discipline or failure to supervise claim.

It sounds like, based on what Mr. Art said this morning, that it's going to be focused mostly on expert disclosures. So once the city sees the expert disclosures, the city could at that point simply respond with its own expert, or depending on (inaudible) at that point disclose fact witnesses usually from the Chicago Police Department who are individuals that have knowledge of supervision and discipline to provide the city with facts to rebut the opinions of the expert and then an expert to also rebut whatever else is in those reports.

So that's typically how I would -- typically how it works and how I would envision it based on what Mr. Art said this morning.

With respect to the homicide files, Mr. Art is correct that typically what happens is the plaintiffs subpoena the criminal defense files. That has already been done. That subpoena went out in March, mid-March, for all of the files that the city was able to identify within the timeframe that the Court ordered us to produce the files. We've created that list so they could get that subpoena out.

Then once the PD files have been located, historically what we know is that both the Cook County Public Defender's office and the Cook County State's Attorney's office are unable usually to find all of the files. In the Rivera case, I believe they found less than 50 percent of the files that the city found, you know, or had within the relevant time period.

So once the city knows how many PD files are found, then the city will subpoena the Cook County State's Attorney's office for those companion files, because historically the way the plaintiffs argue it is that certain documents that are in the police files aren't in the PD files and, therefore, they were withheld.

So the city's response to that typically is, well, if they're in the CCSAO files, the city discharged its Brady obligations, and if there was an inconsistency, it falls to the

State's Attorney's office or it just means that some of these files are incomplete because they're 30 years old. So we are waiting before we issue our subpoenas to see what the Cook County Public Defender's office finds and produces.

I will note that in the other case that's going on almost on the same track as this one, Sierra, that's being managed by Magistrate Judge Weisman, the plaintiff subpoenaed the PD files, one year of overlap with this case, in December of 2020. We don't have them yet.

Plaintiff is working or has told us they're working with the PD's office, the Cook County Public Defender's office and we were given the same explanation that Mr. Art gave this morning. They're trying to figure a way to do it expeditiously because they're a third party, but we have no timetable. I asked as recently as last week if we have a timetable for when we're getting those files, and we don't have one.

THE COURT: That's public defender files?

MS. ROSEN: Correct. So we can't move forward. From the city's perspective, we don't want to waste the resources of the Cook County State's Attorney's office to order files that are not in play because there's no PD file.

THE COURT: The question, of course, is when we get the PD files.

MS. ROSEN: Correct.

THE COURT: We can't wait forever.

MS. ROSEN: Correct. So I have no idea, and it sounds like plaintiff has no idea despite their efforts to work with them. And that's not a surprise. We're talking about something like 400 or 500 files, so that --

THE COURT: The question really is whether they actually have the file or not. To the extent they have it, am I right that you would then try to get the state's attorney's files or whatever they have?

MS. ROSEN: Correct.

THE COURT: Are these -- tell me. Are these typically hardcopy files?

MS. ROSEN: Yes.

THE COURT: These PD files?

MS. ROSEN: Yes, they have to be scanned. I assume they're doing a privilege review because obviously they're attorney files. Certainly in the Rivera case and in the Fields case, privilege reviews were done. I believe -- I wasn't involved in Fields, and I wasn't involved in Rivera. My recollection is that the parties agreed to waive the requirement for a privilege log to expedite the production unless something came up in a particular file that we needed to come back to them about for purposes of this type of discovery. So we haven't had a specific conversation, but I assume that will be the same.

THE COURT: Remind me again of the timeframe of the

request and the year that overlaps with Sierra.

MS. ROSEN: Our timeframe here is 1995 to 1998, and the year 1995 would be the overlap year. Sierra is earlier. It goes back further in time. So for this case we're talking about '95, '96, '97, and '98.

THE COURT: All right. So that covers the file review time.

MS. ROSEN: Then with respect to the witnesses, that was the other aspect of it, the limited disclosure of the witnesses. So Mr. Art is correct that in the Rivera case there was a limited disclosure of witnesses. I think ultimately none of them -- my recollection is none of them actually testified at the trial. I think in Fields they did. There were some witnesses that testified at the trial.

In the Sierra case, Magistrate Judge Weisman, when he ruled on the scope of Monell discovery, he indicated that those files could only be used to support expert opinions and specifically ordered plaintiffs not to conduct what he called investigations of these files to identify witnesses to disclose.

Obviously for purposes of the '95 year, you know, if plaintiffs were permitted in this case to do more than what Magistrate Judge Weisman allowed, that would cause some issues. I'm not entirely sure how far plaintiffs intend to go with the fact disclosures, but certainly if they start disclosing

witnesses, even if it's a handful, then the city would then look for, you know, what we would generally be calling rebuttal witnesses, right?

So, you know, just by way -- hypothetically speaking, say plaintiff called a criminal defense attorney to say: No, I didn't get this piece of paper that's in the homicide file.

We'd call or we'd identify and call the state's attorney to say: Yes, we did.

You know, that's sort of the most general way to think about it. So there's no way for the city to know how much of that is going to be done because I have no idea what they're thinking in terms of the disclosures, and certainly the city would want this Court to follow in line with Magistrate Judge Weisman and keep it to a file review only without the disclosure of any witnesses both for expediency purposes and because, you know, this could easily -- we can easily envision how this could mushroom when you're talking about 500 files or 400 files or whatever is supplied.

THE COURT: I agree, and that's always been one of the concerns that, you know, every judge that's looked at this has expressed with these file productions, the potential for somebody to want to reinvestigate all of these cases. That doesn't sound like what's happening here if we're talking about limited witnesses in the ballpark of ten or so. I see it more as a request for examples, if you will, rather than a full

reinvestigation.

I need to read Judge Weisman's opinion again. I certainly agree with his thoughts as expressed that we don't want a full reinvestigation. I'm not sure. Has he reconfirmed that he's barred all individual fact witnesses in Monell? Because I didn't read his opinion as being that strong. Again, I'm not making any rulings. I'm just telling you what I think. So I want to know. Has he made any comments about it again, Ms. Rosen?

MS. ROSEN: He has not, and we're not there yet. You know, the ruling was what the ruling was. We're waiting on files. I assume at some point -- well, I know plaintiffs have said they view what he said a little less strict than we view it, not a surprise. But we haven't -- we're not there yet with Magistrate Judge Weisman because we're still waiting on those files.

THE COURT: Okay. That's fine. So he'll tell you what he thinks.

MS. ROSEN: Yes.

THE COURT: I talk to him all the time. I'll call him and ask him what he thinks. That's kind of the easiest way to deal with this, I imagine. So let me put it kind of succinctly. Sticking with you, Ms. Rosen, if there's an area of litigation or dispute, I suspect in this scenario it's whether or not individual witnesses can be deposed for the

underlying Monell case. Did I phrase it right?

MS. ROSEN: Arising out of the files, yeah, I think that would be a potential area of dispute. Then if you're looking for other areas of dispute, historically it's in the area of 30(b)(6) disclosures and the scope of those. We have no 30(b)(6) notice yet. I obviously know what's been done in other cases, and we did litigate it in Rivera, but there have been other cases where we've reached agreement. So it's not clear to me what plaintiff is looking for in the 30(b)(6) realm yet, but that's another potential area of dispute.

THE COURT: Okay. I understand. I think the topics, Mr. Art has kind of given a preview, if you will. I imagine they'd be similar. I think they're all thinking about police practices regarding production of statements, confessions, taking of confessions, things like that, right?

MS. ROSEN: Sure. Right. I mean, if it sticks to -- sometimes in the city's perspective it goes beyond the specifics of a specific case and goes a little bit farther than that, and that's where we push back.

THE COURT: Okay. So I have another question on the Monell side. Tell me who leads the charge. Does the city do it?

MS. ROSEN: Yeah.

THE COURT: Does somebody else take care of it?

MS. ROSEN: It would be my office, yes. We'd be

leading the charge, yes.

THE COURT: Okay. Anything else you want to tell me, Ms. Rosen, before I move to another defendant?

MS. ROSEN: No. I mean, in terms of the experts, I guess I have some comments about the expert disclosures. Obviously, again, in the most general sense, we play defense. So the sooner we get either -- well, obviously the sooner we get expert disclosures, the sooner we can get moving. As I said on the Monell side of it, particularly in a case like this, it may be that the city would need to disclose additional fact witnesses to deal with the expert disclosures on the Monell side. So the sooner we have that, obviously the sooner we can do that and get those witnesses deposed and do our own expert disclosures.

I suppose it might be helpful in terms of coming up with a firm schedule on the experts to know exactly how many experts plaintiffs are disclosing and what topic areas, so if not the expert names necessarily, the specific topic areas so that we can get moving both on the underlying case and on the Monell side of it.

THE COURT: And when you say fact witnesses relating to Monell from the city's side, are you talking about police department people talking about what the practices were at that time?

MS. ROSEN: Correct. Yeah, so it would be --

theoretically it might get swallowed up by the 30(b)(6) notice, but it might miss the mark in the city's view. So if we need to disclose somebody from within the police department that knows how subpoenas are responded to when they're obtained from, you know, either a Cook County public defender or other criminal defense attorney or the Cook County State's Attorney's office, I guess that's the most tangible sort of example of somebody who would be a fact witness, right? They're not opining. They're just simply talking about what the city's practices were back in the mid to late 1990s. Like I said, it might be covered by the 30(b)(6) notice, but it might not.

THE COURT: Okay. I will -- any other defendants want to, you know, say anything, please, that has not been covered by Ms. Rosen?

MR. ENGQUIST: Your Honor, I'm sorry.

THE COURT: Go ahead.

MR. ENGQUIST: This is Josh Engquist for the individual police officers. As Ms. Rosen was saying, I'm not sure exactly what experts they're going to be coming up with that will affect the underlying case. I'm assuming based off that we have a deposition for Mr. Solache's treater in Mexico, we're very light on documents, so right now we can't really tell whether or not we're going to need someone to respond to that. So I would assume at least rebuttal experts on damages, if not more, but we'd have to wait until we see what we get

from plaintiffs really to decide how we're going to be responding.

THE COURT: Got it. Okay. Anyone else on the defendants' side?

(No response.)

THE COURT: Okay. So I appreciate those thoughts. So what I'm trying to do, as you can tell, there are two main objectives on this. One is to figure sort of where the bodies are buried, where the problems are going to come up that I need to be able to either work with you on or make a ruling, and the second is to put together a schedule.

So on the first one, I have down as sort of a firm area of potential dispute, although, of course, as always, I hope you will talk about it first and try to resolve it, is the area of individual witnesses arising out of files. So my question then is on the other area that I see here as potentially some scope of a 30(b)(6). Although that one seems to be dispute-like, if you will, it's usually not that hard to resolve among yourselves.

What else, though? Am I missing anything off the list of problems, if you will, that are coming down the pike?

MR. ART: Your Honor, I think for plaintiffs, this is Steve Art for the plaintiffs. I'll speak for both plaintiffs again. I think from our perspective the only other thing that might warrant more discussion is the timing of the production

of the Cook County State's Attorney's files.  At this point in time, given the litigation that the attorneys involved in this case have been involved in other cases, where these theories are going is relatively clear.

The theory from the plaintiffs' perspective is that the absence -- that information that's contained in the city's homicide files itself and a comparison of those files to information that criminal defendants had will show systemic suppression of information, along with the other theories that depend largely on just what's in the homicide files that were the subject of the briefing.

In each of these cases, the city has taken the position:  Well, we need to go get files from the state's attorney to show that, in fact, we do have a system that regularly turns over materials to the state's attorney.

From our view, the city's sort of defense to our theory that they do, in fact, turn over materials to the Cook County State's Attorney as a regular matter, everybody knows that's where this is going.  The idea of waiting to see what files the PD produces to get files from the state's attorney, that may be a waste of time.

Now, obviously the city is entitled to defend how the city wants to defend, but if the city's theory is they turn this stuff over regularly, it doesn't need to do that just in the files that the Cook County State's Attorney's office

produces. It can do it in all of the corresponding files that the Cook County State's Attorney had or the homicide files that it is producing, and that's what has happened in other cases. It hasn't been limited to those files that the public defender has produced. So in our view those productions could be taking place simultaneously, and that would save us time.

THE COURT: Here's the question. I see your point, and I understand where the dispute or the issue lies. Having a specific concern on that, if the public defender files don't get produced till July or August and then you start subpoenaing the state's attorney's office, we are not going to make the December date. So we need to figure a better plan to do that.

I guess my question, my first question is: The public defender, can we get them to give us a list of files that they actually do have and then use that list to subpoena the state's attorney's files?

MR. ART: I hope so, Your Honor, is the answer to that question. I am being told that they don't have a comprehensive list. They have a list of the files that they have and what boxes those files can be found in in their warehouse. Then the question when you go to the box is, you know, is what the list says going to be reflected in the box itself, right? There's some question about whether that is the case.

So I think what we could get is: Okay. The public defender has these indexes of where everything is stored. Of

those homicide files that the city has produced, here's the ones for which the public defender index lists the case.

I think that that -- I think we should talk to the public defender more about it and see how reliable that would be and see whether that is at least a point for negotiation to get these productions going at the same time.

On the question of the production itself, I have had five conversations with them. I'm hoping to be able to discuss it with their new leadership soon. They have this leadership transition at that office that just occurred. I am hopeful there.

So we have offered to hire movers to go and move the boxes that contain all of these files to a staging area. We have offered to hire, you know, temporary workers who will work for the PD and who we will pay for and who will go and pull all of the files. Then as Ms. Rosen said, what we've done in other cases is that the public defender then sits there and pulls the privileged part of the file, and then we hire a third-party document scanner to go in with scanners. Then the public defender hands the file to them, they scan it, and they put it back. That operation in I think the Rivera case took two days.

So my hope, if I can convince the public defender that, you know, we should move forward and do this as fast as possible, is that we can do all of this by the third week in May. That's my hope.

26

THE COURT: Okay. So, Ms. Rosen, you know, I understand the concern, which is, if the public defender only has 50 files it doesn't make sense to subpoena 400 from the state's attorney. What about the idea of getting a list? We've done it in other situations like with the CRs. What do you think?

MS. ROSEN: Sure, if they can get us that, right. Just, you know, from my perspective, maybe I'm obviously sensitized to public agencies and the burden that this type of production is on them. Right now, you know, the PD's office and eventually the Cook County State's Attorney's office in these cases is going to be asked for files from the years, I think, 1989 to 1998. So we're talking about thousands of files. So certainly, you know, if we can eliminate the burden, that's where I'm coming from on that decision.

But if we can certainly get a list, even if it's imperfect, so that at least we're narrowing the field, that's fine. My only concern -- and maybe Mr. Art can speak to this -- is that, you know, we're a little over a month into this discussion with the Cook County Public Defender's office in Solache and Reyes, but we're five months into it in the Sierra case with no end in sight.

The plaintiffs, I assume the same offers that Mr. Art discussed this morning with respect to this case are the same offers his office is making in the Sierra case, and we have no

list. I have said in that case as well as this case that that's what we're waiting on. We have no list, and we have no files. So I'm not the one talking to them. It's their subpoena. They're the ones talking to them. So that's, you know, my concern.

I'm happy to take a list that we reasonably believe is the list of the files that they have or are most likely to have and use that list to get a subpoena out to the state's attorney's office so that we're not burdening them with files. Because like I said, my experience in the Rivera case is we were dealing with a much smaller universe. I think we were only dealing with -- we were dealing with a subset of files for the time period, not the full boat. So it was something in the 150-to-170 range for that time period. So it was much more manageable both on the PD side and the Cook County State's Attorney's office side. But, yeah, I think the list would work.

THE COURT: Okay. So here's what I could do on that, which is, I'd like you to go back, Mr. Art primarily talking to them, and relay the issue of getting a list. I'd actually like a representative from the public defender's office to appear at our next status. Look, I'm not going to get mad at them. They're not in trouble. You can tell them that. They're a third-party, you know, public agency that has the burden now of producing a lot of docs. So I'm sensitive to their issues, and

they have much bigger concerns than a production in this case to deal with on a daily basis.

Nevertheless, you know, you can express to them that there's some concerns that if five or six months go by before we get a production, it's going to blow our discovery schedule up. So I certainly would like them to start working on the list and then at least to appear at the next status and tell me what, you know, they're doing to get the production going. Okay? I'll put this in my order as well.

MS. ROSEN: Judge, perhaps if we could coordinate the call with a representative from the city as well so that we're understanding what's going on and can have a discussion with them, too.

THE COURT: Right. I mean between plaintiff and defendant, I think that makes sense.

MS. ROSEN: And a representative from the PD.

THE COURT: Yes.

MS. ROSEN: Yes.

THE COURT: That makes sense. Okay. So I have -- you know, the big-ticket items list, I added the timing with respect to the subpoena to the state's attorney as issue number 3. Again, I'll ask if I'm missing anything with these three issues. I'm not asking because -- don't get me wrong. Silence is good, but I do like to know what's coming around the bend. So anything to add from anyone?

MR. ART: Nothing more from plaintiffs' perspective, Your Honor.

MS. ROSEN: Nothing on my side, Judge.

THE COURT: Okay. So here's what I'd also like you to do. I've mentioned, you know, there are two aspects. One is what's coming around the bend and then two is scheduling. I'd like to get a preliminary Monell discovery schedule from you both, and that's going to include essentially a timeline and deadlines for all the things that you've laid out, which is, you know, expert disclosures, expert depositions, rebuttal, the timing to get subpoenas out for individual fact witnesses, assuming they're granted, though I'm not making any suggestion they are at this time, and anything else that is going to happen in Monell discovery. Essentially we've got to schedule them out so that the dates line up so that we finish by December 31st.

So I'll ask you to get together, of course, and I'll give you some time. You have a lot going on. I understand. How about May 31st for that status report with that schedule forwarded to me?

MR. ART: That works from the plaintiff's perspective, Your Honor. I suppose a thing that might be useful prior to that time is a status where we discuss the production of documents from the public defender's office with a representative there.

THE COURT:  Yes.

MR. ART:  But I think it makes sense for Ms. Rosen and I to speak with her again and see, so take their temperature again early next week.  I feel like we have been negotiating to avoid motion practice about the scope of the subpoena from that office, and I feel like we're really close.  Maybe that's me being hopeful, but I think we could reach an agreement with them next week.  If for some reason we can't, it may be helpful for all of us to come in and discuss that issue with you before the rest of the Monell discovery is set.

THE COURT:  Yes.

MS. ROSEN:  So I guess, yes, I guess I'm just confused about what Mr. Art just said about resolving any issue about the scope, which I'm interpreting to mean that the Cook County Public Defender's office is offering some resistance to the scope of plaintiffs' subpoena.  Maybe I'm just misinterpreting the words, but that's certainly the first I'm hearing of it.

MR. ART:  No.  All I mean is I think that the view of that independent public agency is it's a third-party subpoena and they shouldn't have to bear the costs of it, and they could easily come into court and file a motion to quash that then we would have to litigate, and that would delay things further to start the process.  So I'm trying to avoid that pathway in favor of one where we remove as much of the burden as humanly possible through discussions with them without having to do

motion practice.  That's all I intended to say.

MS. ROSEN:  Okay.

THE COURT:  Okay.  So I agree.  I think, as you've told me, the schedule you propose is partly dependent on when you're getting all the files.  So you should certainly talk to the public defender, talk to them about the list that I've asked for, and I will hold a status where they can attend as well prior to that May 31st deadline on the discovery issues.

So if everyone gets their calendars out, we'll do it again by video conference.  How is May 24th, Monday?  It's pretty open.  So I'll say, you know, the same time, 9:15.  Does that work for everybody?

MR. ART:  Yes, Your Honor.

MS. ROSEN:  Yes, that's fine.  We have a deposition that's supposed to start at 10:00, but I think that's fine.

THE COURT:  Okay.  Why don't we start at 9:00 just to be safe so that you can get done in time.

MS. ROSEN:  Sure.

THE COURT:  When you're video conferencing, nothing starts on time.

MS. ROSEN:  Yeah.

THE COURT:  If you say 9:15, it means 9:30.  It's like coming late to a party with all the issues that sometimes come up.  So let's say 9:00 o'clock on May 24th for a status, and I'll put in the order that the public defender shall send a

representative to provide a status as to the subpoena that's outstanding.

Okay. I have another matter coming up fairly soon, so I want to move on. I've read your status report with respect to the non-Monell discovery. My question there is this. You know, there are various disputes that are listed, and they're not full-blown disputes yet. They're things that people are thinking about, and that's fine. I'll give you time to work on it.

What I don't want to happen is we have litigation, you know, on June 25th and then there's not enough time for me to rule or for me to resolve it and for you to follow whatever order I give. So the question for you is, as I sometimes do, I'd like to set a deadline by which any motions shall be filed relating to non-Monell disputes. So my question to you is: When should I set that schedule? Any proposals?

MS. ROSEN: So, Judge, with respect to those disputes, my recollection is there's a couple of discrete categories of disputes. So, for example, the defendants believe that certain damages witnesses disclosed by plaintiff Reyes were untimely because Mr. Reyes' deposition was a year ago and, you know, that's sort of general and we just got the disclosure. We are proceeding with those depositions. So our point at this point is to take the depositions and determine whether or not we really feel we were prejudiced based on whatever these

witnesses say in comparison to Mr. Reyes' deposition.

From our perspective, I don't know that that needs to be resolved before June 30th, right? Our strategy at that point would be to try and bar those witnesses.

THE COURT: Got it.

MS. ROSEN: So it doesn't -- there won't be -- I guess the other option would be to maybe redepose Mr. Reyes. That's probably unlikely. Depending on what these people have to say, I suppose we could do limited interrogatories to Mr. Reyes if some completely new topic comes up out of these damages witnesses. So I don't know that that really is something that we need to resolve before the June 30th deadline.

The issue about Dr. Valadez, who is Mr. Solache's treater, as Mr. Engquist indicated a few moments ago, we've gotten very -- he is identified as a 26(a)(2)(c), a non-retained expert, however that is or whichever category that is. I always forget. So he apparently has been treating Mr. Solache in Mexico for -- I think it was for 18 months. We have ten pages of records, and we've been told those are all the records that he has, which is obviously not something we're accustomed to in terms of a treating psychologist or psychiatrist for somebody who's seeing somebody weekly. But that's what plaintiffs have told us is the extent of his records. So we're sort of investigating what that means and that he's in Mexico, what all of that means.

THE COURT: You're traveling to Mexico.

MS. ROSEN: Apparently.

THE COURT: Which is probably what all American doctors would rather do.

MS. ROSEN: Yeah.

THE COURT: Take ten pages of notes and (inaudible) the patient.

MS. ROSEN: Correct.

THE COURT: But anyway.

MS. ROSEN: Correct. So that's sort of the issue, then that he's a Spanish speaker and so will that impact the amount of time. We're evaluating that, so that's obviously something we need to get resolved before his deposition is scheduled. So we would bring that to the Court's attention if there's a dispute there certainly in enough time for that dep to go forward because we don't want to delay the dep.

Off the top of my head -- oh, he's actually -- isn't he -- let me look at the status report. I think he is at the end of May, so we will make that decision in order to get it resolved if we can't reach agreement. I think right now we'd be in a position to do it fairly quickly if we think we need the Court's assistance there.

THE COURT: Okay.

MS. ROSEN: I don't know that there were any other -- I could be forgetting some, but I think that was the gist.

I guess the other witness that there might be an issue with is Mr. Sussman. He is or he was the First Assistant Cook County State's Attorney at the time that the cases, the underlying criminal cases, the convictions were overturned and the prosecutions dismissed. He is a witness that we've deposed in other cases.

In fact, in the Fulton/Coleman matter, there was litigation about that. The Cook County State's Attorney's office came in and tried to quash the subpoena, saying whatever their arguments were. I don't remember. We are in contact with the Cook County State's Attorney's office. Apparently he's now getting outside counsel, which is a new thing, so we're trying to work with that counsel.

So it is possible he might have something to say or his lawyers might have something to say about his deposition and the scope of it, but we're trying to work that out. Obviously, we have told them we have a hard fact discovery closure date at the end of June. So, you know, I suppose we could put a hard deadline in an order, and maybe that would force them to make some decisions about whether they're contesting the motion at all -- or the scope of the deposition, I mean.

I think those are the only issues that we flagged in the report, but I could have missed some. So anybody else? Feel free to jump in.

THE COURT: Mr. Art, anything?

MR. ART: Nothing from plaintiffs' perspective, Your Honor.

THE COURT: Okay. Any other defendants?

(No response.)

THE COURT: Okay. So I agree that we should set a hard deadline. I certainly want to give you time to work it out without motion practice and additional cost and time, but we can do that with them knowing that there's a hard deadline. So I'm going to set May 19th as a date for any motion practice associated with issues arising out of the non-Monell discovery.

So whatever comes up, if you can't resolve it, you've got to file a motion by May 19th. If you don't, I'm going to assume that you have resolved it and I'm going to push forward. Unless it's an emergency, generally I will not entertain motions after that date. So whatever you have, work it out before that date.

The reason is just time, right? If I give one side time to file a motion and the other one wants to file a response brief, then I need to spend time on it. I need to rule. Sometimes that puts us into, you know, mid-June, and then we've blown a bunch of potential depo dates that could have been swallowed up or could have been used for something else to move the case along. So May 19th.

MS. ROSEN: Judge, can we -- this is Eileen Rosen.

Can we exempt from that, though, the issue about the those damages witnesses for the reason that we don't have those depositions before May 19th?  So we won't be able to assess it fully.  Like I said, I think our recourse is going to be at some point to move to bar them, which would not lead -- it might not even be something that we would do, obviously, with you.  It might be with the trial judge, right?

THE COURT:  That's true.

MS. ROSEN:  So if we could just exempt the damages witnesses from that, other than Dr. Valadez which obviously has the issue of the -- he doesn't fall into the category of the defendants' view that he was untimely.

THE COURT:  Okay.  I will exempt that on the representation that the likely remedy you'll seek is not more discovery but, you know, some substantive ruling.

MS. SUSLER:  Judge, this is Jan Susler.  I would ask that Sharon Makowsky also be included in that exemption since she was timely disclosed as a damages witness for Mr. Solache.

MS. ROSEN:  We agree with that.

THE COURT:  Okay.  I have another matter at 10:30, so I have a little bit of time.  Does anyone -- as I said before, I appreciate the work that you've done.  Make no mistake, the Court always appreciates the hard work that you're doing.  I know it takes up a lot of your time and a lot of resources, and my orders are only designed to move this case along to a place

where we can finish and that's all.

So with that, anything you want to raise with me?

MR. ART:  Nothing from plaintiffs, Your Honor.  Thank you for your time.

MS. ROSEN:  Nothing from the city.

MR. ENGQUIST:  Nothing from the individual defendant officers.

MR. BRENER:  Nothing from the prosecutor defendants.

THE COURT:  Okay.  I will see you again May 24th, and we'll talk more particularly about the subpoena.  Then once I see the proposed Monell schedule, I'll probably get you back in again to talk about it.  Okay?  Everyone, have a good day.

MS. ROSEN:  Thank you, Judge.

MR. ART:  Thank you, Judge.

MR. ENGQUIST:  Thank you, Judge.

MS. McGRATH:  Thank you, Judge.

(Proceedings concluded.)

C E R T I F I C A T E

I, Patrick J. Mullen, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable SUNIL R. HARJANI, one of the magistrate judges of said court, at Chicago, Illinois, on April 30, 2021.

/s/ Patrick J. Mullen
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division