```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

ARTURO DeLEON-REYES,              )  Docket No. 18 C 1028
                                  )
              Plaintiff,          )  Chicago, Illinois
                                  )  June 23, 2021
         v.                       )  9:19 a.m.
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
              Defendants.         )
_____  )
                                  )
GABRIEL SOLACHE,                  )  Docket No. 18 C 2312
                                  )
              Plaintiff,          )
                                  )
         v.                       )
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
              Defendants.         )
```

     TRANSCRIPT OF PROCEEDINGS - Video Status/Motion Hearing
           BEFORE THE HONORABLE SUNIL R. HARJANI

APPEARANCES:

```
For Plaintiff        MR. STEVEN E. ART
DeLeon-Reyes:        MR. JOHN T. HAZINSKI
                     MR. SEAN C. STARR
                     Loevy & Loevy
                     311 N. Aberdeen Street, 3rd Floor
                     Chicago, IL 60607


For Plaintiff        MS. JANIS M. SUSLER
Solache:             People's Law Offices
                     1180 N. Milwaukee Avenue
                     Chicago, IL 60642
```

APPEARANCES (Cont'd.):

For Defendant          MS. EILEEN E. ROSEN
City of Chicago:       Rock Fusco & Connelly LLC
                       321 N. Clark Street, Suite 2200
                       Chicago, IL 60654


For the Individual     MR. JOSH M. ENGQUIST
Officer Defendants     The Sotos Law Firm PC
Except Guevara:        141 W. Jackson Boulevard, Suite 1240A
                       Chicago, IL 60604


For Defendant          MS. MEGAN K. McGRATH
Guevara:               Leinenweber Baroni & Daffada LLC
                       120 N. LaSalle Street, Suite 2000
                       Chicago, IL 60602


For the Individual     MR. DAVID A. ADELMAN
Prosecutor and Cook    Assistant State's Attorney
County Defendants      Honorable Kimberly M. Foxx
Except Navarro:        Cook County State's Attorney
                       500 Richard J. Daley Center
                       Chicago, IL 60602


For Defendant          MR. DANIEL M. NOLAND
Navarro:               MR. DANIEL J. BURNS
                       Reiter Burns LLP
                       311 S. Wacker Drive, Suite 5200
                       Chicago, IL 60606


For Respondent         MS. KAREN J. DIMOND
Cook County            Cook County Public Defender's Office
Public Defender:       69 W. Washington Street, 16th Floor
                       Chicago, IL 60602


Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1224
                       Chicago, IL 60604
                       312.435.6053
                       laura_renke@ilnd.uscourts.gov

(In open court via videoconference.)

THE COURT:  Good morning.  You can call the case.

THE CLERK:  18 C 1028, DeLeon-Reyes v. Guevara, *et al.*, and 18 C 2312, Solache v. City of Chicago, *et al.*

THE COURT:  Good morning, everyone.  Can I have appearances, please, starting with plaintiffs' counsel.

MR. ART:  Good morning, your Honor.  Steve Art, John Hazinski, and Sean Starr for plaintiff Reyes.

MS. SUSLER:  Good morning, Judge Harjani.  Jan Susler for plaintiff Gabriel Solache.

MS. ROSEN:  Good morning, your Honor.  Eileen Rosen for defendant City of Chicago.

MR. ENGQUIST:  Good morning, your Honor.  Josh Engquist on behalf of defendants Halvorsen, Dickinson, Rutherford, Stankus, Naujokas, Karalow, Harvey, Trevino, Mingey, Biebel, and Cappitelli.

MS. McGRATH:  Good morning, your Honor.  Megan McGrath on behalf of defendant Guevara.

MR. ADELMAN:  Good morning, your Honor.  David Adelman on behalf of defendants Cook County, Andrew Varga, Heather Brualdi, Karin Dooley, and Thomas O'Malley.

MR. NOLAND:  Good morning, your Honor.  Daniel Noland and Daniel Burns for David Navarro.

MS. DIMOND:  Good morning, your Honor.  Karen Dimond on behalf of the subpoena respondent, the Cook County Public

Defender's Office.

THE COURT: Okay. Anyone else?

(No response.)

THE COURT: Okay. Very good. Thank you.

Excuse me. So we're here to discuss a couple matters today, most importantly, the motion to quash the subpoena issued to the Cook County public defenders.

I've had an opportunity to review it, both the motion and the response. And I certainly have some questions that I would like to talk to all of you about.

Before I jump into it, though, is there anything anybody wants to say with respect to recent developments that may or may not have occurred?

(No response.)

THE COURT: Okay. Hearing nothing, let's jump into it.

So I want to start with the Cook County Public Defender.

So I understand that in our particular case, the Reyes/Solache case, you were able to identify 150 -- approximately 150 cases, if you will, out of the 250 or so that were subpoenaed.

My numbers are off a little bit. I think it's 145 out of the 263. If I ballpark numbers in this proceeding, just know that's what I'm doing.

Tell me, first off, what do you think happened to the other files?

MS. DIMOND: Your Honor, I don't know.

What we have found is the box numbers for about three-fifths of the files that have been requested. You're right. It's 145 out of the 263 that were requested.

We don't have box numbers for them. It's possible that some of those defendants were represented by private attorneys. I can't say exactly where the other files are. It's -- it's not unusual, I will say, for us to only be able to find a limited number of the files that have been requested.

THE COURT: Okay.

MS. DIMOND: It's not unique to this case.

THE COURT: Okay. So I want to drill down on that a little bit. Is it that the cases are listed on some spreadsheet and the boxes are not there, or is there just no record of it at all being in your office?

MS. DIMOND: Sometimes there's no record at all.

The spreadsheets that we've compiled list all the cases for which we have found a box number. So that was the very first stage of locating the files.

We're in the second stage right now. That is our warehouse employee is walking around the warehouse and making sure he can find all the boxes with those box numbers on them.

So that's what's taking place right now.

THE COURT: Okay.

MS. DIMOND: Then --

THE COURT: No problem.

Go ahead.

MS. DIMOND: Then the third thing that happens is -- and that won't happen until the day when we actually pull the boxes -- is we pull the box lid off and make sure the file is in that box. Sometimes it's not because sometimes someone else has pulled that file and not returned it to the box.

THE COURT: Okay. All right.

When you say 150 files, what does that mean? Does that mean a file is one box? Three boxes? Five boxes? Or one folder?

MS. DIMOND: It really could depend on how long the public defender had the case. Sometimes we withdraw fairly early in the case and we might just have a small file. The size of the files can really vary, from a very small file to -- I think the largest case I had was 80 boxes.

Now, I don't think any of the cases that were -- the files we're pulling here are that large, but certainly one case can take up more than one box. But I think most of the ones that we've located so far are contained within one box.

THE COURT: Mm-hmm. Okay. All right. That's helpful.

Most of the files you've located are contained within

one box. Do you have a ballpark percentage of what that could look like? Is it 70 percent? 80 percent?

MS. DIMOND: I think it's -- your Honor, I -- I would be guessing, but I think probably at least 70 percent.

THE COURT: Okay. Okay.

There was an offer made -- I went through and read what happened last time in Judge Kennelly's transcript in the *Fields* case. And I understand that there were people on site. There was a process by which I think you, Ms. Dimond, were reviewing privileged materials, pulling them out, and then handing them over for copying and scanning on site.

And if I got the details wrong, let me know. But I understand there's a lot more than what happened in the *Fields* case. But how long did that take you? So as I write the numbers out, in the *Fields* case, there were 35 files, as I understand it, that were produced and which I think you, Ms. Dimond, did the privilege review and then handed them over for copying and scanning. How long did the 35 take you?

MS. DIMOND: Well, your Honor, what I can't remember exactly is if we did the *Fields* and the *Rivera* cases together or if those were on separate days. I'm afraid this -- I think this was in 2016, and I can't recall exactly. Perhaps one of the other attorneys that were involved could remember that better.

I remember spending at least one day there, spending

the entire day there pulling files. But what I can't recall is if we were actually there for two days on the two different matters.

THE COURT: Okay. So I'll quickly jump to somebody who knows the answer, but I want to come back to you, Ms. Dimond. Anyone can help.

MS. ROSEN: I'm pretty sure that the -- this is Eileen Rosen -- the *Rivera* files were pulled on a separate day than the *Fields* files. And I think that the *Rivera* files were pulled, my recollection is, over two days, not just one because I had people at my -- from my office there, and my recollection is two days for the number of files that were pulled in *Rivera*, which was something like 50, maybe.

THE COURT: 54?

MS. ROSEN: That's right.

THE COURT: Okay. So we have -- to the best of your recollection, we have *Fields* for one day at 35 and *Rivera* at two days for 54.

Does that sound about right? Or somebody correct me.

MR. ART: Your Honor, that's correct.

THE COURT: Okay. So, Ms. Dimond, I do some basic math here. It sounds like six days for about 150 files is what we're working with. Am I wrong about that?

MS. DIMOND: I trust your math, your Honor. I didn't figure out exactly how long it took because, unfortunately, I

couldn't remember exactly how many days we were out there.

THE COURT: Okay. Right. So what I'm trying to do is actually get down to identifying what's the burden.

I understand your predicament, Ms. Dimond -- I do -- with respect to all these other cases that are coming. I'll note for the record that some of these cases overlap. So while you've listed maybe 15 cases, two or three cases have overlapping years, overlapping homicides, and so the 15 may not be the 15.

And I don't know what's going to happen with the other cases down the pike, particularly when there are larger box numbers, box files. So obviously the *Sierra* one is your most pressing concern, and that seems to be double or more than double what we're dealing with here.

As any judge does, I can't comment on the other cases or what is required in those cases with respect to Rule 45 standards of burdensome, Rule 26 standards of relevancy and proportionality. I can't. It's not my case. So I have to focus on the case that I have here, although I'm sympathetic to your predicament.

But if we just focus on our case here, if the plaintiffs are covering all the scanning and copying and all that is happening at the PD is a privilege review, as I understand it -- I'm narrowing it down and drilling down -- we're looking at six days of your time based on precedent for

privilege review. Did I get -- am I right about that, or do you want to say something else?

MS. DIMOND: Again, your Honor, I'm just going to have to trust your math here because I haven't really figured out exactly how long that took because, again, I couldn't remember how many days we were out at the warehouse during the last time.

THE COURT: I have *Fields* -- from the -- I know a lot of them were the same. I have *Fields* being one day and *Rivera* being two days. And that's because the *Rivera* files were not exactly double, but, you know, let's say 1.5 extra -- 1.5 times what was in *Fields*, right?

MS. DIMOND: So that sounds like that could be correct, your Honor.

And, again, I would have to say if the only subpoena we had received was the subpoena in this case, I probably would not have filed a motion to quash. We probably would have continued to work with the plaintiffs to try and work this out.

But it's the combined burden of the *Reyes* case, the *Sierra* case, and the subpoenas that I anticipate we will get in the many other cases that have been filed against defendant Guevara that gives us pause, that makes us very fearful that we will just be overwhelmed with a tsunami of subpoenas that will be something we just cannot handle.

THE COURT: Yeah, yeah.

And I certainly recognize that and recognize that those total number of files -- that combined subpoenas will far exceed what you do on an annual basis.

And, of course, whatever I say, I'm going to be very clear, is not going to be a precedent for other cases. And I think the reason is that the number of files here are much smaller, at least from what we know exist in *Sierra*. So it can't be. It's just a very different scenario.

I haven't made any ruling yet. I'm really just asking questions.

But, Ms. Dimond, there's also an offer for contract attorneys. And, of course, I -- you're probably going to tell me you're a public agency; you don't like the idea. But give me more than that. I mean, what if I oversee the process? What if we arrange a method by which contract attorneys could assist you under your supervision? Because if you were a firm, you probably wouldn't even be having your associates do this work. You'd probably even be getting contract attorneys, assuming a larger production, let's say.

What troubles you about the contract attorneys?

MS. DIMOND: Well, we've never done that before, so it would be entirely something new for us. We would still have to train them, monitor them, review their work.

Of course, they're not familiar with their files the way we are. I can go through a file relatively quickly because

I'm familiar with the types of documents that are commonly generated in our cases, and I can sort them out not terribly fast, but relatively quickly as opposed to someone who's never seen those files before.

We're just not at all comfortable with using outside attorneys who are not familiar with our office, who don't have the same knowledge of our office, perhaps the same deep sense of the importance of keeping our client files confidential.

We -- we also are concerned that, you know, were it to become known among our clients that we are outsourcing their files to people they don't know to go through documents that are very confidential, information they've disclosed to our attorneys in criminal cases, we think that would and could undermine our clients' confidence in our office and our ability to keep matters confidential going forward.

We don't know what type of conflicts the attorneys that would be contract attorneys might have. Have they worked for the state's attorneys in the past? Have they represented codefendants of our clients? I'm not sure how we would go about making sure there were no conflict problems either.

So those are some of the concerns that we have. Again, hiring movers is something we're comfortable with. You know, hiring a copying service, that's fine. But pulling privileged documents is something we prefer to do ourselves.

THE COURT: Yeah. Yeah, what I'm getting at is that

seems to be a choice you're making. I mean, I understand the comfort level, particularly in a public agency, that you'd rather handle your own documents versus contract attorneys.

But if you were not a public agency, this really wouldn't be a huge deal. Firms hire contract attorneys all the time who do doc review. They train them in privilege review, what to look for, who the lawyers are, what the docs look like. They're obviously supervised by attorneys on the case, and their work is checked and verified and vetted.

So I understand your predicament. But it does seem to me that this is more of a choice rather than an absolute bar.

MS. DIMOND: Well, your Honor, again, it is a choice that we feel we need to make in the best interests of our clients. That's, you know, the best way I can address it. We just think it's appropriate that we do our own pulling of privileged documents.

THE COURT: Okay. So another question, which is when you're pulling privileged documents -- I think I know -- I know what you're going to say, but hopefully you can give me something more.

Are there separate files? You know, is there an attorney notes file that you can just pull out and say, "This file"? Or is it scattered everywhere like a big jigsaw puzzle?

MS. DIMOND: Well, it depended on what attorney handled the case. Some of our public defenders are very neat

and tidy and keep their files in a pristine fashion. Many do not, and documents are scattered throughout the file.

THE COURT: Mm-hmm. Okay. And the things you're looking for -- and I'm going based off your experience in *Fields* and *Rivera*. Tell me the types of things, ballpark, that you pulled last time.

MS. DIMOND: Well, I mean, I think we typically pull medical records because we don't have any consents from any of the clients or the victims in the cases.

We generally pull grand jury transcripts unless we have a court order directing us -- allowing us to release those grand jury transcripts.

We pull all types of notes written by our attorneys that reflect their work product.

We pull --

THE COURT: Grand jury transcripts.

MS. DIMOND: I'm sorry?

THE COURT: Why would you pull that? You got them from the State's Attorney's Office in discovery, I imagine.

MS. DIMOND: Right. And, again, we don't object to pulling those, but -- or to producing those, but we do ask a Court to enter an order allowing us to produce them, just to be careful about the confidentiality of those reports.

There are state statutes which direct the State's Attorney's Office not to release them. They typically will not

release them -- well, I can't really speak for the State's Attorney's Office, but it's my understanding they generally will not produce grand jury transcripts.

We -- it's a little less clear whether or not the public defender can readily produce those. If a Court directs us to produce them, we will, and we will not object. But we do want the Court's permission to release any grand jury transcripts that would be in our file.

In this case, I'm not sure if the parties are interested in those grand jury transcripts. Maybe they are; maybe they're not. I don't know.

THE COURT: Mm-hmm. Okay. When you say Court permission, which Court permission do you seek?

MS. DIMOND: That could be you, your Honor.

THE COURT: Okay. Go ahead. You were making a list for me. I interrupted you.

MS. DIMOND: Attorney notes. Investigator reports and notes. You know, notes that our attorneys will take during trials, their opening statements, their closing statement notes, anything that they're clearly working on.

You know, one thing that I think may be an issue in this case is police reports. So, of course, I believe police reports will be of great interest to the parties in this case, whether or not they're contained in our file. And that is something we will normally turn over. Those are not considered

privileged by our office.

However, what I do find is oftentimes our attorneys write notes all over the police reports, and then that becomes problematic. Sometimes they're copies; sometimes they're not. Sometimes I'm not sure if they're copies.

So what that means is it can be very time-consuming redacting those notes if I'm going to carefully remove any type of work product --

THE COURT: Right.

MS. DIMOND: -- theories and impressions of our attorneys.

THE COURT: Okay. And did you do that last time in terms of redacting some scribble?

MS. DIMOND: Your Honor, I didn't. I don't think I -- I did that at the time. You know, I will say that the last time we did this, I was doing it in a hurried fashion and it wasn't done under ideal conditions.

THE COURT: Mm-hmm. Yes.

Yeah, I did see you had certainly a time crunch over there. You know, we have time crunches too. But having reserved July to December for *Monell* discovery, we may have more wiggle room than you did last time.

The -- okay. Okay. Are you -- if you do a privilege review, are you going to have anyone help you?

MS. DIMOND: I have an assistant who will often

organize documents for me. She is a support staff member here. So she is good at organizing types of documents together if that's not already done in the file.

THE COURT: Okay.

MS. DIMOND: And then highlighting for my attention any documents that she has questions about.

THE COURT: Okay. So she's organizing documents -- is she -- is your assistant actually doing a privilege review?

MS. DIMOND: She pulls documents, and she creates -- yeah, she creates a draft for me, and then I go through it and finalize it. Normally that's what we would be doing.

THE COURT: Okay. So is it fair to say that there would be two people doing a privilege review if -- in this case no matter what I order?

MS. DIMOND: Well, yeah. It would be me and my assistant as of right now.

THE COURT: She's a lawyer?

MS. DIMOND: No.

THE COURT: Okay. Okay. Got it.

MS. DIMOND: No.

THE COURT: Got it. Okay.

MS. DIMOND: Your Honor, I have one other thing I should mention is we hope to do one thing different this time than we did in 2016, and that is do a digital review of the privilege documents, which means that they would not have to be

done -- this pulling of privilege documents would not have to be done on site at the warehouse.

I have not yet done this with other cases, but I understand other agencies do do this, and that is they have the entire file scanned on site, and then at a later time, we can digitally remove pages or redact pages.

Again, we have not done this yet. I don't know how well this will work. But this is something we are considering doing.

THE COURT: Okay. So my experience is that it works really well. Frankly, it's a lot easier and faster than looking at paper files because by the time you pull them and open them and shuffle paper, you've clicked through a lot of things on a computer and moved through stuff much faster. But that's just my opinion.

Okay. Thank you, Ms. Dimond.

I have some questions for the plaintiffs. But before I jump in, you know, if there's anything you want to respond to add to based on what has been said, let me know.

MS. DIMOND: No, I don't think there's anything further.

THE COURT: Okay. And for plaintiffs -- sorry. I meant plaintiffs, if there's anything you want to add before I jump to my questions, let me know.

MR. ART: No, your Honor.

THE COURT: Okay. All right. So I -- here's what my questions are, which is that the last part of your brief focuses on the lack of stipulation by the City.

The problem I have with that is that we are past that stage. The lack of stipulation was relevant for purposes of deciding what the structure of the file production was going to be from the City and CPD.

Now we're dealing with a third party. And we really can't dump this on a third party just because the City hasn't stipulated.

And, quite frankly, in other cases, non-wrongful conviction cases, there is no stipulation. Right? There's got to be some estimate of what a sample size is that's relevant. It's not like every case where there's an expert and there's a lot of document production you get everything or you get a stipulation. Those are not the only options.

But those are the only options you're giving me.

So my question to you is, why can't we treat this like any other case, which is you ask your expert how much you need and they come back to the judge, whoever it is, and say, "This is what we expect our sample size -- the necessary sample size is."

MR. ART: So, your Honor, I think from our perspective, our position is that the burden is not significant enough to require a reduction. We're talking about --

especially once we offload all of the logistical burden and all of the costs of this to the greatest extent possible, I think that we could be talking about a scenario where it's one or two days of time of a lot of different folks involved in pulling and scanning and then contract attorneys digitally reviewing these files for privilege. I think it would be a relatively modest burden.

So our position is that the production in this case -- and then, obviously, we're discussing different cases in the future to some extent -- is insubstantial enough that it should occur given the issues at stake in this case.

And so then the question is, well, how could we further reduce the burden beyond offloading all of the administrative, logistical, document scanning, and review costs? And I think the answer to that, your Honor, is we could agree to sample them.

But we can't represent our clients in this case and say, you know, we'll absorb what's potentially a massive expert battle cost at the end of the case about -- you know, between us and the City about whether that sample does accurately represent, you know, the policies and practices governing whether information in City files went to the PD. Right?

The City can defend that by saying, "You don't have a good sample of our files," or it can defend it by saying, "You don't have a good sample of what the public defender had." And

so --

THE COURT: No, I understand that, Mr. Art. And you've made that point.

But let me give you a hypothetical. What if the files that exist at the PD's Office was 1,000 files? What would you do then?

MR. ART: We -- I -- we would probably have to open up a sample.

But in that situation, I think that the difference would be that the burden -- we couldn't sit here with a straight face and argue that the burden was insubstantial enough to require production of the whole set of files. So I think that --

THE COURT: Right. No, I think that that's the point, which is that, yes, in this particular case, we are discussing burden as the primary issue.

But point number two is we can't ignore the fact that a sample size is possible if it was 1,000, it was 2,000, it was 5,000, it's 7,000. Regardless of the issue of the City stipulating or not stipulating, we would still have to be talking about sample size.

What I didn't see, and I -- well, I guess my -- first, my question. Are you using the same expert as you did last time?

MR. ART: For the -- sort of the police practices

overview? No, it's going to be a different expert.

THE COURT: Okay. The last time it was a guy named -- was it Mark Burnstone?

MR. ART: It's Mike Brasfield.

THE COURT: Mike Brasfield. Okay. Close enough for -- before the copy sunk in.

But who are you using this time?

MR. ART: So we are -- it's a time -- you know, we haven't disclosed experts in this case, and so I say this --

THE COURT: Got it. Got it.

MR. ART: -- with the disclosure. It's a tiny bit up in the air. There is a possibility that we will have folks that talk about the statistical aspect of it separately from the police practices aspect of it anyway. And so, you know, I -- I guess -- I suppose we agree with everything your Honor is saying about it being possible to take a sample of files that, you know, our side believes is statistically significant. Right?

I -- I think that the concern is, having gone down this road in, you know, at least two other cases, that it will open up a new front in the battle between the parties that is not in this case justified by the burden on the third-party subpoena recipient. And so I guess --

THE COURT: When you fought over sample size, are you saying the last time there was a stipulation in *Fields* or

*Rivera*?

MR. ART: In *Rivera* there was a stipulation. I -- Mr. Noland will correct me if I'm wrong. But I don't think in *Fields* there was a stipulation.

MS. ROSEN: There wasn't a stipulation in *Rivera* as it related to the investigative files. It only related to the lineups.

MR. ART: Okay. Yeah.

MS. ROSEN: So the fight was without a stipulation.

THE COURT: So I guess my question then is, if there's no stipulation and you only got 35 last time and you won, why are you so worried about this?

MR. ART: I -- I think that we're always worried, your Honor, about putting ourself -- our clients in the best position to be able to prove up this policy-and-practice claim because we're in some sense doing it in a black box because we haven't gotten a lot of guidance from the Court of Appeals about what quantum of evidence is necessary in these cases.

You know, we have some cases from the Seventh Circuit where they say, you know, "You've essentially proved up a single incident or a single incident type of claim," and we've litigated a couple of those cases recently. And then we have others where the Seventh Circuit says, "You haven't come through with evidence of a citywide policy and practice."

And as I sit here today and I think about a situation

where, you know, we are asked to take 12 or 15 instead of 50 or 100 files, I get very concerned that that is not a record that will withstand on an appeal by this -- by the City of Chicago in a *Monell* case in the Seventh Circuit.

So that's -- that's our concern.

THE COURT: Yeah, I understand that.

But, you know, as you recognize, at some point there has to be something offered to a Court. You know, not every case can you come in and say, "We want everything," because of what you just said, Mr. Art. At some point the file is going to be 400, 500, 700, 1,000. So, again, it's not a -- it's not an either/or situation. There's another way.

I guess what I'm hearing from you is that your expert has not given you any idea yet of what is a potentially good sample size?

MR. ART: Correct. That's correct.

And if the Court tells us to do so, we can go talk to our experts about that information.

THE COURT: Okay. Okay.

The problem, of course, is that when you talk to experts about this stuff, you get the -- you get a lot of the "it depends" and, my experience, a lot of wishy-washy answers. So let me think about that.

The other thing I wanted to ask you about is you subpoenaed about 240-something files from the PD. You had

about 400 homicide files, plus, come in.  What's the delta?

MR. ART:  I'm going to let Mr. Hazinski address that one, your Honor.

MR. HAZINSKI:  Your Honor, I can speak to that briefly.  We originally received from the City in this case, as well as in *Sierra*, sort of comprehensive lists of the RD numbers for the permanent retention and investigative files that the City planned to produce to us.

Based on those lists, in an effort to try to kind of narrow them to only those RD numbers where we thought there was a reasonable likelihood that the PD's Office might have a file, we went to the Cook County records and looked for criminal case numbers because many -- for a variety of reasons, many RD numbers are assigned or created that don't actually result in criminal charges at the -- at the Cook County State's Attorney's Office level.  Perhaps municipal charges, perhaps, you know, the assistant state's attorneys declined to prosecute or so on and so forth.

And so that's, I think, to answer your question, the delta representing the difference.  It was sort of an effort to narrow the scope of our subpoena in the first instance.

THE COURT:  Mm-hmm.  Okay.

So if you try to figure out from the 400 or so what resulted in charges and then narrow it down to subpoena the PD's Office, did you -- were you able -- did you subpoena that

entire set, or was it the files that you believed were actually represented by the PD, meaning did you exclude retained counsel?

MR. HAZINSKI: So, unfortunately, that database we were accessing for this information that's maintained by Cook County didn't allow us to determine in a systematic way whether it was the Public Defender's Office representing the defendant or retained counsel. So we'd hoped we could narrow it in that fashion, but it turned out we weren't able to.

So that -- I think as a result of that, the Public Defender's Office, if I understand Ms. Dimond's characterizations correctly, she has gone through and -- through this sort of box number search has sort of further narrowed and has helped complete that aspect of the narrowing.

THE COURT: Okay. So tell me if I'm right about this. But the 150, is that kind of the universe of PD files you're going to use for comparison, or will there be more beyond that?

MR. HAZINSKI: That will be the universe of files for the comparison.

THE COURT: Okay. Give me a second here.

I looked at the post-trial briefing and the decision, post-trial memorandum opinion and order in *Fields*. I saw that there was a -- and the plaintiffs had pointed out a comment made in the City's brief about sample size and it not being enough. That was part of their memorandum.

However, I did see -- as I understand it, Judge Kennelly in very summary fashion rejected that argument, and it really wasn't raised on appeal.

Did I get that right, or somebody wants to add to that?

MR. ART:  It was -- it was raised on appeal in a kind of summary fashion as well, your Honor, and the Seventh Circuit dealt with it in a kind of summary fashion.

THE COURT:  Okay.  Got it.

MR. NOLAND:  Judge, this is Dan Noland.  I represent Mr. Navarro in this case, not the City.  But I was the City's lawyer in *Fields*.

And just to clarify, the issue of sample size -- I think, to my best recollection -- I haven't looked at our expert's report in a while, but I believe it was that the files were cherry-picked because there was no effort to make a statistically valid sample size.  They were ordered to be produced because they had been relocated to the basement of one of the detective division areas in 2012 after a relevant file in that case had been located.

THE COURT:  Mm-hmm.

MR. NOLAND:  And so it was a cherry-picked sample size I believe is what the gist of the opinion was.

THE COURT:  Okay.  So it was not an argument that a random selection process, like every second or every third or

every fifth file, that isn't sufficient. That wasn't the argument that was made, if I understand you correctly.

MR. NOLAND: To the best of my recollection, yes, your Honor.

THE COURT: Okay. All right.

So that's all the questions of Ms. Dimond and Mr. Art. But I know there are other interests here from other lawyers. So go ahead, whoever wants to address something.

MS. ROSEN: Sure, Judge. I'll just address some of the things that have come up this morning and the City's perspective on some of these things.

So as an initial matter, one of our concerns was that because we have agreed to forgo a privilege log in an effort to expedite this process, we had requested that any documents that were set aside as privileged would be either scanned separately so that as we review the files, if we believe that there's information from our review that might be relevant to this process, it would be easily accessible.

And I think I understand now from Ms. Dimond's comments about the office doing a digital review that that would be fairly easy to do. They could segregate the privileged documents per file so that if we had additional questions or if we felt like something that was withheld might be relevant to this issue of whether or not documents had been produced by the police department or whether there was *Brady*

material that was withheld and whether the criminal defense lawyers knew about it.

But I think that's been -- because the last time I talked to Ms. Dimond, they hadn't -- they hadn't decided to do that digital review, and it was going to be another process to re-pull those files. But I think that's been taken care of when we get back to Ms. Dimond. As long as she tells me that that's going to be an easy thing, then that takes care of that issue.

And then with respect to the grand jury transcripts, the City would definitely want -- want those because sometimes individuals -- obviously, witnesses to crimes testify during the grand jury, and some of these cases involve whether or not the information that was disclosed was -- relates to these witnesses. And if they've testified -- even if you can't find the police report, if they've testified to the substance, then from the City's perspective, that provides us with a defense.

And same with -- so the investigator -- I'm less concerned about attorney notes. But with respect to the investigator reports and notes, again, we have a concern that if those are withheld wholesale -- we know from experience in cases where we have obtained the investigator reports, the Cook County Public Defender's Office, like any other criminal defense attorney or, quite frankly, the prosecutor's office, use investigators to go interview witnesses.

And these cases sometimes turn on whether or not information these witnesses told police is accurate. And certainly if investigators out -- go out and talk to these witnesses and confirm it and then these witnesses later recant, that's some evidence the City would use in its defense regarding all of the *Monell* claims being made by plaintiffs in this case and all the other cases.

And same goes for the police reports. We definitely would need -- we understand the redactions. But if it's the only police report in the PD file and it's not produced, then plaintiff will argue that the City didn't produce it. And so we would need to know that those police reports were in the file. We're less concerned about what's redacted, but we need to know the reports are there.

And then the only other comment --

THE COURT: Ms. Rosen, on the police reports, it was more about just redacting some scribbles on the side, not -- not withholding the entire document.

MS. ROSEN: Correct. And we just want to make sure -- it's not clear to me with respect to what happened in *Rivera* whether or not police reports were withheld because they had notes on them because, again, in that -- we agreed at that point not to do a privilege log. So -- and I just don't remember how that played out.

But we certainly -- they can go ahead and redact it.

We don't have a problem with that. But we definitely want the report so that we can compare it to the CPD file so that we can say that the report itself was produced.

And then if there's something, you know, that comes up in the redactions that we think matters, then we can take it up singly. But -- as we would need to.

And then the only other comment I would make was with respect to the sampling and whether or not it's statistically significant or not. The City has argued from the get-go in all of these cases, both as it relates to the files and the CRs, that the plaintiff has it within their power to come to court and say what is a statistically significant sample.

The City has asked in this case and other cases for plaintiffs to do that; they have not. And to the City's view, it would have made sense early on for them to have done that so we could get to a place where we could all agree on what's a statistically significant sample.

The City's concern right now, although I haven't thought it all the way through, is that if we start simply sampling the universe that exists at the Cook County Public Defender's Office, it again then is no longer random because -- because the plaintiffs have a larger universe of police files where they've only located approximately -- whatever it is -- half, let's say, potentially because we don't even know if all of these files are in the boxes.

So that universe has now shrunk, and now we're talking about random sampling of, as I understand it, not the total universe of files that the Chicago Police Department produced, but the files that eventually are located by the PD. And that's a distortion. It's no longer random.

I don't know what difference it makes that the file has or hasn't been found or was lost by the Cook County Public Defender's Office or whether or not the cases were -- were handled by private attorneys. But it's no longer random I guess is my point.

THE COURT: Right. But that point doesn't change whether or not we do 80 files or 100 files or 120 or 40. You'll always have that argument because out of the 250, only 150 was found.

MS. ROSEN: Right.

And then the final thing I'll say is it's never been explained -- to the City's satisfaction, at least -- why plaintiffs insist when pursuing this type of claim in going in the first instance to the Cook County Public Defender's Office.

It is clear under the case law that the City's obligation is to produce the records to the Cook County State's Attorney's Office. And so now by doing it this way, we've now burdened not only the Cook County Public Defender's Office, but now the City is going to go to the Cook County State's Attorney's Office for the companion files of the located files

because plaintiffs will argue from the located files that 50 percent -- or whatever the numbers end up being -- of this type of document are missing or aren't produced or whatever they're going to argue.

And then we're going to go to the Cook County State's Attorney's Office and say, "Well, we don't know why it's not in the PD file, but it's in the Cook County State's Attorney's file." And at that point it's the State's Attorney's obligation. And that's just -- I don't know that that matters at all, but it's something that I've never understood.

And when we're talking about the burden in this case, as well as all the other cases -- I guess this is the final point I'll make. While I agree 100 percent, Judge, that your control is on the subpoena in this case, I will -- I will just let the Court know that based on the other -- the other -- simply the other *Guevara* cases, we are looking at producing files from approximately 1985 through 1998, and 1998 takes us through this case.

So we are talking about, you know -- whatever that is -- 13 years of files. And so the numbers are going to get very large very quickly. And so, you know, I understand Ms. Dimond's point about she's not looking at just as it relates to this case. She's looking at what's coming down the pike.

And I will say this is not happening only in *Guevara*

cases. The City has just been ordered to produce I think it's six years of files -- I could be off. It's not my case -- of Area 4 files, which there is zero overlap between Area 4 and Area 5. So that's going to be a whole new -- and it's not going to stop. You know, I mean, with every new reversed conviction case that has a *Monell* claim that comes out of different areas, the same type of *Monell* discovery is going to be embarked upon.

So, you know, I think that's all I have to say.

THE COURT: Okay. Thank you, Ms. Rosen.

So I want to pick up on one thing you said and get a response on that, which is why subpoena the PD files first? Why not subpoena the State's Attorney's files first?

MR. ART: So, your Honor, on that point we have a disagreement about the law principally with the City. We don't think that the law makes clear that the City's only obligation is to transmit files to the Cook County State's Attorney's Office.

But *Brady* and the cases that follow it, and *Kyles against Whitley* -- it's the last Supreme Court case discussing in the Supreme Court the contours of this obligation -- talk about the right of the criminal defendant to receive these files.

And the City might take a defensive position in the case that the law only requires them under *Kyles* to transmit it

to a prosecutor, but we are certainly not conceding that point as a legal matter.

And then as a factual matter in these case, files flow from the City of Chicago to criminal defendants in the era at issue, not just by the Cook County State's Attorney obtaining a file from the City of Chicago and then disclosing it in the criminal cases, but also through subpoenas.

Almost every single one of these files has subpoenas directly from the criminal defense attorney to the City of Chicago asking for area files, investigative files, street files, everything in the Evidence and Recovered Property Section. And there's sort of -- we in these cases prove that the City wasn't responding to those subpoenas as well.

And so as a matter of proof, from the plaintiffs' perspective, we can prove everything that we need to prove by having the Cook County Public Defender file and comparing it to the files that the City has produced in the case.

The City takes a defensive position and says, "We did everything we needed to do by providing this stuff to the prosecutors." We have all kinds of arguments about whether the prosecutors' files showed that the City did do that thing. But from our perspective, the correct analysis is not how does the City's file compare to the prosecutor's files. How does the City's file compare to what the criminal defendant had when the criminal defendant went to trial?

THE COURT: It's part of the argument that the CPD are really agents of prosecutors or part of the prosecution team and therefore they have *Brady* obligations? Or something else?

MR. ART: I mean, they certainly have *Brady* obligations. I mean, they certainly have *Brady* obligations because they have an obligation to ensure that all of the material exculpatory evidence in their files makes it into the criminal justice system, whether that is directly by providing it to prosecutors in response to subpoenas from criminal defense attorneys, in response to questioning by criminal defense attorneys and criminal defendants during the criminal proceedings.

There are all kinds of avenues by which that information gets from the City of Chicago, the principal investigative agency in all of these cases, to the criminal defendant. But our position is that's the City's obligation, constitutional obligation.

THE COURT: Mm-hmm. Okay.

Okay. So I understand the dueling positions. Obviously, none of that is going to get resolved today. But at least there are credible arguments on both sides as to what the issue is. And so I'm not going to wade into that any further. I just wanted to hear what the other side of the story was.

You know, what I would like to do in this case, what the -- let me kind of back up. The homicide file issue was a

little different for a number of reasons. It was different because it involved a party, and the parties have different obligations than a non-party.

Second, the homicide file issue -- let's be clear -- was not fully granted. It's not as if I said the plaintiff gets everything they want. I reduced it from seven years down to four years. So we did inherently do a more limited period. You can call it a sample. You can call it random. You can call it different things. But we did reduce it down from what plaintiff had originally asked for.

The homicide files issue was also different in that, as I understood it, there were many different *Monell* theories by which the homicide files would allegedly show evidence. The *Brady*/underproduction theory was only one way the homicide files would be used. There were other theories -- I understand the defendants disagree with them. But nevertheless, there are theories by which the homicide files could be used, which is why I see the homicide files and the level of production that I permitted for four years to be very different than the production here that I'm faced with.

I recognize that the issue of burden has been somewhat reduced by the copying and the contractors and the vendors. I certainly can't force a public agency to use contract attorneys. And I understand their trepidation. It's certainly a choice that they have made about maybe feeling more

comfortable to do it themselves than having outside people come in.

But nevertheless, I recognize they're not a private entity, and therefore they have much greater sensitivities about their files as a public agency than a private entity does. So I recognize the burdens as being somewhat reduced by what the plaintiff has offered.

Nevertheless, I think that what I need to hear from next is something about what the expert would consider a sufficient sample size because here's the thing. I mean, ultimately, yes, the defendants -- the subpoena recipient is moving to quash and has to show the burdensomeness and certainly has done so to a certain extent.

But at the same time, the docs are still subject to Rule 26(b)(1). And while relevance is not necessarily an issue here, proportionality is certainly an issue here. And within proportionality is really an assessment of the importance of the documents and how many of those documents are necessary. Right? It's 150 here. It could easily be 300, 500, 1,000.

My analysis should be the same, which is what can the plaintiff tell me about how many documents they need to do a sufficient analysis on the theory that they wish to advance. Right now that's a vacuum. I cannot answer that question. If I picked any other number, it would be pulling a rabbit out of a hat.

If I give you 150, that would simply be accepting your representation that "I want everything, and everything is what I want." And that's not good enough either. So I'd have to hear what the expert has to say about how much -- I understand there's going to be all sorts of caveats and -- you know, that the expert's going to give me about "It depends on this; it depends on that."

But at some point, if the expert's a good expert, they should be able to advise you, plaintiff, as to what is a sufficient sample size. If you went to him and said, "There are 3,000 documents. I need to know how much you need," if he gives you a bunch of caveats and "it depends," he's not a very good expert. The guy's not giving you a straight answer. So it shouldn't be different with 3,000 versus 150. He should be able to give you a good answer.

So my question is, how can I get this information? I know you haven't disclosed him yet. Normally I would get an affidavit that says how many -- how much this person needs.

But let me throw it back to you, Mr. Art. How can I get this information?

MR. ART: If it's all right with the Court, I would like to discuss that with my team just because of the disclosure issue and just to think out loud a little bit.

THE COURT: Okay.

MR. ART: I think we would want to assess whether

there's a consulting expert who comes in to talk about sample sizes and that kind of thing and might not necessarily end up being the disclosed testifying expert and then can provide information to the Court about getting beyond this discovery hurdle without necessarily being the expert who testifies.

But I don't know what the rest of the team is going to want to do. So if you could give me a short time period to discuss that, and we can report back.

THE COURT: That's fine.

Once we decide this issue, I gather then you will -- the defendants, the City, will seek the exact same number from the State's Attorney's Office, whether it's 150 or 80 or 70. Is that right?

MS. ROSEN: Right. We're interested in comparing the Cook County -- the files that are produced in this case from the Cook County Public Defender's Office to CCSAO files. So whatever tangible files we end up with, whatever that number is -- 30, 50, 100 -- that's what we're going to seek from the Cook County State's Attorney's Office.

THE COURT: Okay. So I guess it's possible that if -- let's say the number of files I order is 50, it's possible the State's Attorney's files may only have 25 of them or 20 of them?

MS. ROSEN: It is possible.

THE COURT: Okay. How can we get an answer to that

question?  Can we compare a list up to 150 of what the State's Attorney's Office have and at least know that it's not -- you know, it's not a 150 versus 20; it's 150 versus 135?

MS. ROSEN:  I guess I'll defer to maybe Mr. Adelman on that, who is -- represents the County, not the Cook County State's Attorney's Office.  But maybe he has an idea of how to go about assessing that information.

MR. ADELMAN:  Good morning, your Honor.

You know, as Ms. Rosen pointed out, you know, I'm not representing the State's Attorney's Office.  I'm only representing the County as indemnitor and the individual ASAs who are defendants.  So I really can't speak as to what the office would require for that.  And I believe -- and I'm -- since I'm not handling subpoenas, I could be wrong in this.  But I believe there has not been a subpoena yet to the office.  Is that correct?

MS. ROSEN:  That's correct.

THE COURT:  That's my understanding too.  But I think we need to get the answer.  I mean, the first part of getting an answer is what I asked Mr. Art to do.

But I think the second question is, what is going to be the overlap between the State's Attorney -- and I think we need to know that before we order anything in the case.

If I order 50 and there's only 10 of these State's Attorney's files, you guys are going to be in a big mess and

42

it's going to make it very -- we're going to have to go back, and I'm going to hear a lot of motions to reconsider because this is what will happen as we think down the road and around the corner.

So, Ms. Rosen, what can you do to help us resolve that issue?

MS. ROSEN: I can reach out to the subpoena unit, the people there, and find out -- well, we now know the list, right? We have the 145. So if we work off that number, even though that's not a definitive number yet because it's possible that Ms. Dimond's people will look in the box and the file won't be there. But I think that's a good -- I guess a good starting point for this.

So if we -- if we get that list together, send it to the State's Attorney's Office, we can either do an official subpoena or -- and ask them, or we can just informally ask them if they can tell us which of these files they actually have, short of subpoenaing the files.

THE COURT: It makes sense to do a subpoena now. I mean, you can certainly let them know that we are working on this issue.

It might be the 145. It might be less than that. That's no -- there's nothing new in subpoenas. You know, everything gets negotiated and reduced --

MS. ROSEN: Sure.

43

THE COURT: -- in connection most of the time. But that gives some certainty that they have something in their hand. And they can give you a list and say, "Out of the 145, we have 130," or "120," or "100."

MS. ROSEN: Yeah. We'll do that.

THE COURT: Okay.

So let's talk about a time for us to get back together and talk this through when we have time to address these two issues. I'm open to proposals. How long do you think you all need?

MR. ART: Probably two weeks on the expert, your Honor.

THE COURT: Mm-hmm.

MS. ROSEN: Yeah. I mean, I don't know how quickly -- you know, I'm hopeful in two weeks we might get -- you know, we can get the subpoena out today. We've already been working on it. So, you know, we -- hopefully we can get at least -- if we don't have the full numbers, they should be in a position to tell us how long it will take them to get us the numbers.

THE COURT: Yeah. I think somebody from the State's Attorney's Office appeared last time we talked?

MS. ROSEN: It was actually Mr. Brener, who was representing the -- the ASAs in this case, the defendants. But he indicated that he'd been told by people in the subpoena unit that they would also be objecting to the eventual subpoena from

the City.

So I can reach out to Mr. Brener and find out who the person is that's providing him that information and so we can go right to the source.

THE COURT: I think that's right. And I'd like that person to appear at our next status.

MS. ROSEN: Okay.

THE COURT: Because I would certainly -- you know, if the objection is coming down the pike, maybe a lot of that is the same objection and is going to have the same issues as it is here. Some will be different, but some will be the same.

I'd certainly like them to appear, but, more importantly, I'd like them to work on the list comparison; that is, the list that you have -- you know, I don't know what their systems are like, but it doesn't seem to me it should take too long to look at a list of 143 and figure out which of those 143 or 145 they have.

All right. Let's talk again -- I don't want too much time to go by, but I'm not available the week of the 5th. So we'd be looking at a little bit more than that.

How is July 12th? And I'm thinking the afternoon, 1:30 or 2:00.

MS. ROSEN: That's fine for the City.

MR. ART: Good for plaintiff Reyes, your Honor.

MR. ENGQUIST: I'm sure either me or my coworkers will

45

make that work.

MR. ADELMAN: I'm unavailable that afternoon, but I'm sure my co-counsel, Ed Brener, can be there.

MS. SUSLER: That's fine with plaintiff Solache, Judge.

THE COURT: Okay. Do --

MS. DIMOND: Karen Dimond on behalf --

THE COURT: Sorry, I -- oh, Ms. Dimond. I forgot. Go ahead.

MS. DIMOND: Yes, I can attend on behalf of the Public Defender's Office.

THE COURT: Okay. July 12th at 1:30, with all the main lawyers and then whoever else can send somebody to cover.

And then I'll put in the order that the State's Attorney's Office shall send a representative as well for subpoena purposes. Okay. And we'll see where things stand.

I think the point, of course, is that we only have six months to do *Monell* discovery, and so I'm going to make a decision pretty quickly after I get the information. So do everything in your power to get the answers by July 12th because I don't want to delay this any longer than, you know, it has to.

Ms. Dimond, I haven't given you a chance to regroup with you. But that's my plan. Anything you wanted to add?

MS. DIMOND: No, not really, your Honor.

46

THE COURT: Okay. All right.

I know we're here for a status as well, and your non-*Monell* fact discovery deadline of June 30 is approaching in seven days. I did get a motion for disclosure and to add certain witnesses. I've read it only briefly, and I certainly haven't heard a response yet.

So, Mr. Art, do you want to respond to that in writing?

MR. ART: We would like -- well, so I should say we don't have an objection to the relief that the defendants are seeking. We would like to -- if there is going to be additional time to tie up the things the defendants identify -- we have a limited number of things that we are currently talking about with defendants and still conferring about that we would like to bring to the Court's attention that we would intend to get done during the same period of time. But we don't have any objection.

THE COURT: Okay. So that was my fear is that if I give the defendant something, then plaintiff gets something in return.

Look. I'm not unreasonable. I realize that there's going to be a couple of witnesses who are going to be sick or have medical issues or work issues, that you just -- no matter -- whatever Herculean task you do that you're just not going to get them in by June 30. But recognizing that, I don't

also -- I also don't want to open the floodgates.

So what I'm going to do is I'm going to ask the plaintiffs file a motion. If there's certain things that you want done -- and I hope they're limited, and there has to be good cause -- file a motion, and I will take a look at that and I'll address both motions the next time we meet on July 12th.

And if anybody wants to respond to any of those motions that are filed, just do so before July 12th and I'll read it.

MS. ROSEN: Judge --

THE COURT: Ms. Rosen.

MS. ROSEN: Judge, can I just get a clarification? Some of these witnesses that there's -- I think there's three in our motion: Mr. Dorsch, Mr. Engel, and Ms. Crawford. It is possible that we could get some of these scheduled before we see you again.

THE COURT: Okay.

MS. ROSEN: So -- but if -- we don't have permission to do it post June 30th, so I don't know how you want to deal with that.

And as Mr. Art said, they don't object to these three. We have three. We have an additional 26(a) disclosure that we don't want to depose. But these three witnesses -- one the dep started but couldn't get concluded because of the time zone issue, and the other two had medical emergencies.

So I'm not -- I'm not guaranteeing we'll get them done by the 12th, but we may be able to get some of this wrapped up before the 12th, which we prefer to do so that we can focus on the *Monell*.

THE COURT: Yeah. I guess is there a reason why you can't get it done by the 12th? I mean, if I order it, then they have to show up, right? So what's the barrier there?

MS. ROSEN: Well, with respect to Mr. Engel, he's got a medical -- he had a medical condition. He was seeing a doctor I think this week to get medical clearance. So if he's still not clear, then that would prevent him.

Ms. Crawford, I think her issue -- we heard from her attorney -- she's a third-party witness -- that her mother was having some medical emergency that required her to leave the state. And I don't know what the time frame is on her return.

And then with respect to Mr. Dorsch, I -- we don't have contact with Mr. Dorsch directly. Plaintiffs do. And the issue for him was really just because of the time zone issue, we weren't aware that his deposition would be going if we proceeded, you know, till 11:00, 12:00 at night for him. So I don't know what his availability is generally. And there's some documents he was waiting for that were being shipped overseas to him that are relevant.

I'm hopeful we can, you know, get -- get certainly some of these done. I don't know if they'd all get done by the

12th, particularly with the Fourth of July holiday.

THE COURT: Mm-hmm. Mm-hmm. Okay.

Mr. Art, any comment on the last witness with the documents issue?

MR. ART: Yeah. I think that we agree with Ms. Rosen that I hope that we could get it done by the 12th, but I'm not positive that we'd be able to. I think that -- I think that I can say that all of us want to conclude the individual case discovery in this case, and we're working cooperatively to do it, and I think that we're going to be able to without a significant extension of time and without very many witnesses who need to be deposed.

Some of this involves, you know, witnesses who are not in our control but we can work with, and hopefully we can get Dorsch scheduled before the 12th. Other of the witnesses that we're talking about, I think we just have to confer a little further. I think from plaintiff's perspective, we're hoping some of these witnesses just get taken off the table entirely so there is nothing else to do, but we're not at a place where we can say that.

THE COURT: Okay. Given your representations and -- that there's no objection, I will grant the defendant's motion. So you have leave to disclose this 26(a) -- 26(a) disclosure fact witness, and you have leave to take these three depositions. But no further discovery from the defendants is

permitted at this time on individual non-*Monell* fact.

MS. ROSEN: I'll just remind the Court that we still have to do plaintiff Solache's deposition because he's back.

THE COURT: Yes. And I was going to get to that next.

MS. ROSEN: Okay.

THE COURT: Mr. Art, do you have something to say?

MR. ART: Yes, your Honor, if you don't mind.

I think that we could get a motion setting out the very limited set of things that from plaintiff's perspective need to be done by close of business tomorrow.

THE COURT: Okay. All right. I'll put that in the order too. June 24th for plaintiff's motion.

Okay. So next on my list was Mr. Solache. So here's my fear -- and I don't know if it's a legitimate fear or not. You can tell me -- but that this deposition takes too long and opens up a can of worms in some way that either affects expert discovery or affects some kind of individual discovery that you felt you didn't get to do because you delayed Mr. Solache's deposition. I hope not, that that's not the case. And if that's not the case, we can be a little bit more relaxed about Mr. Solache.

But if that is the case, what I just said, then I need a little bit more certainty as to when this is going to happen. So I'll hear from anyone first. Who would like to speak? Mr. Art? Ms. Rosen?

Ms. Susler, please.

MS. SUSLER: Well, Judge, I think -- I really don't anticipate any of the issues that you expressed concern about arising. And the latest reports from Mexico are that COVID is resurging and that it isn't going to be safe for any of us to go in the next short period of time.

I'm very grateful for your indulgence in, you know, erring on the side of safety for everybody involved. But, frankly, I don't -- I don't anticipate issues arising that would complicate other discovery.

THE COURT: Mm-hmm. Okay. So let me stick with you for a moment. What is your thoughts? What would we do with your client? Remote? Virtual? Wait?

MS. SUSLER: Remote is really not an option. I'm going to need to be there with him. And whether the defendants want to be there in person would obviously be up to them. But he doesn't have the technological capacity. And even if he did, I would need to be there with him. So that's going to require my physical presence at his side in person in Mexico.

THE COURT: Okay. Okay.

Mr. Art, why don't you go next. What do we do with Mr. Solache, to the extent you have a position?

MR. ART: I think that we have to defer to our co-plaintiff and co-counsel on all things with respect to Mr. Solache.

THE COURT: Ms. Rosen?

MS. ROSEN: With respect to whether or not there will be complications, assuming that the discovery responses we've received from Mr. Solache to date are complete and that there are no surprises that come out of his mouth at his deposition, which I have no way to foresee, I think we've done everything we can to get Mr. Solache to disclose to us all of the relevant witnesses who might have something to say about either his case or his damages, that there should not be a complication.

As far as the experts go, I don't know what Mr. Solache's plan is with respect to disclosing an expert with respect to damages. We are deposing a treater of his. That deposition is getting completed this week. And so I don't know if there's an additional one. I assume that falls to them, and then we'll get a rebuttal. So I don't -- I don't foresee any problem there.

My preference is to go to Mexico and -- and for us to depose him in person, strong preference. So -- and I -- but, you know, I mean, if that didn't -- at some point I guess we're going to have to draw a line in the sand. I don't know what that point is exactly, but --

THE COURT: Yeah. I think that's a problem is that I know that you want to be there with your client. But at some point we're going to reach the stage where we have to make a call -- it might be October. It might be November -- where I

might just have to say, "Sorry. We're just doing this all remote."

So unless you've got a -- I mean, I think for now we can wait and see what happens, also recognizing that we've been doing that since January, waiting and seeing what happens, and nothing's changed with respect to the situation in Mexico.

So I'm just going to point out that I think all of you need to sort of think about this, which is if it hits August or September and nothing is changing in Mexico, we're going to have to pull the trigger. And if you need me to order it, I'll order it if nobody wants to agree and volunteer to do this by remote. But I think that's the way we're headed. At some point we're going to have to make a call.

MS. SUSLER: I appreciate, Judge, your willingness to wait and see how it plays out. Hopefully -- hopefully the vaccines will be more available, and Mexico will be able to get a better grip on controlling the virus. But in the meantime, I do appreciate your patience in waiting to see what develops.

THE COURT: Yeah. Can you tell me -- I'll ask the question. You feel free to not answer. But can you tell me if he's vaccinated or not yet?

MS. SUSLER: I actually don't know the answer to that question. I'm glad to find out and glad to tell the Court. But I don't know at this point.

THE COURT: Okay. So if you can find out, that would

be great. And if he's willing to inform me of that status, he can do so. I'm obviously not going to make him.

And the only reason I ask that is while Mexico is not necessarily -- has some issues with respect to the virus, there are parts of Mexico that Americans are traveling to all the time that are -- the communities' vaccination rates and COVID rates -- vaccination rates are high, and COVID rates are low.

And so I guess the question is, can Mr. Solache travel to one of those parts for his deposition rather than all of you having -- going to the community where he's in, which may not be that safe?

MS. ROSEN: And just to that point, Judge, I will say when this -- when Mr. Reyes's dep was taken, we all actually went to Cabo to take his deposition. He traveled there. And Mr. Solache's dep actually was scheduled I believe it's March 12th of 2020. And we tried our best to get there before the world shut down.

So -- so yes. I think presumably if he's safe to travel, then it might be more workable if we pick a community that's safe.

THE COURT: So I'd like to hear about that more on July 12th when we meet again if he's willing to tell me his vaccination status. And also I'm going to ask you to at least confer on this issue, which is to talk about traveling to one of the safer communities.

But we all, I'm sure, have neighbors that are headed to Mexico, you know, every other week different neighbors going somewhere, whether it's Cancun or Cabo.  And so if somebody certainly doesn't feel safe, I understand that.  But really it's a matter of a community and if everyone's vaccinated.  If everyone feels okay, maybe we can work around those issues and get the deposition done sooner rather than later.

So I'm not sure -- we can wait till September.  We might be still in the same position we are now.  So I want to hear more about that on July 12th when we talk again.

Okay.  Anybody else want to raise anything?

(No response.)

THE COURT:  Okay.  Thank you all for your time.  We'll talk again.  And I'll issue a minute order with the various dates that I've set out.

Okay.  We're adjourned.

MULTIPLE COUNSEL:  Thank you, your Honor.

THE CLERK:  Court is in recess.

(Concluded at 10:38 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ LAURA R. RENKE*                          *July 12, 2021*
LAURA R. RENKE, CSR, RDR, CRR
Official Court Reporter