**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DE LEON-REYES,        )
                 Plaintiff,  )
                             )
-vs-                         )   Case No. 18-cv-01029
                             )
REYNALDO GUEVARA, et al.,    )   Chicago, Illinois
                 Defendants. )   July 12, 2021
-----------------------------)   1:32 p.m.
GABRIEL SOLACHE,             )
                 Plaintiff,  )
                             )
-vs-                         )   Case No. 18-cv-02312
                             )
CITY OF CHICAGO, et al.,     )
                 Defendants. )

TRANSCRIPT OF TELEPHONIC PROCEEDINGS
BEFORE THE HONORABLE SUNIL R. HARJANI, MAGISTRATE JUDGE

TELEPHONIC APPEARANCES:

For the Plaintiff
DeLeon-Reyes:            MR. STEVEN E. ART
                        MR. JOHN T. HAZINSKI
                        Loevy & Loevy
                        311 N. Aberdeen St., 3rd Floor
                        Chicago, IL  60607
                        (312) 243-5900
                        E-mail:  Steve@loevy.com
                                 Hazinski@loevy.com

For the Plaintiff
Solache:                MS. JANIS M. SUSLER
                        People's Law Offices
                        1180 North Milwaukee Avenue
                        Chicago, IL 60642
                        (773) 235-0070
                        E-mail: Jsusler@peopleslawoffice.com

**PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
NOTE:   USE OF A SPEAKERPHONE MAY MAKE PORTIONS
UNINTELLIGIBLE AND INAUDIBLE

APPEARANCES:   (Continued)

For the Defendant
Guevara:                    MS. MEGAN KELLY McGRATH
                            Leinenweber Barone & Daffada, Ltd.
                            120 North LaSalle Street
                            Suite 2000
                            Chicago, IL  60602
                            (886) 786-3705
                            E-mail: Mkm@ilesq.com

For Defendants Halvorsen,
Dickenson, Rutherford,
Stankus, Naujokas, Karalow,
Harvey, Trevino, Mingey,
Biebel and Cappitelli:
                            MR. JOSH M. ENGQUIST
                            The Sotos Law Firm, P.C.
                            141 W. Jackson Boulevard
                            Suite 1240A
                            Chicago, IL  60604
                            (630) 735-3303
                            E-mail: Jengquist@jsotoslaw.com

For Defendants Wehrle,
Brualdi, Varga,
O'Malley:                   MR. EDWARD M. BRENER
                            MR. DAVID A. ADELMAN
                            Cook County State's Attorney's Office
                            50 W. Washington Street
                            5th Floor
                            Chicago, IL  60602
                            (312) 603-5971
                            E-mail: Edward.brener@cookcountyil.gov
                                    David.adelman@cookcountyil.gov

For the Defendant
Navarro:                    MR. DANIEL M. NOLAND
                            MR. DANIEL J. BURNS
                            Reiter Burns LLP
                            311 S. Wacker Drive
                            Suite 5200
                            Chicago, IL  60606
                            (312) 982-0090
                            E-mail: Dnoland@reiterburns.com
                                    Dburns@reiterburns.com

3

APPEARANCES:   (Continued)

For Defendant City
Of Chicago:                MS. EILEEN E. ROSEN
                           Rock Fusco & Connelly, LLC
                           321 North Clark Street
                           Suite 2200
                           Chicago, IL   60654
                           (312) 474-1000
                           E-mail: Erosen@rfclaw.com

For Respondent Cook
County State's
Attorney's Office:         MR. PATRICK D. MORRIS
                           MS. JESSICA SCHELLER
                           Cook County State's Attorney's Office
                           50 W. Washington Street
                           Suite 2760
                           Chicago, IL   60602
                           (312) 603-1426
                           E-mail: Patrick.morris@cookcountyil.gov
                                   Jessica.Scheller@cookcountyil.gov

For Respondent Law
Offices of Cook County
Public Defender:           MS. KAREN J. DIMOND
                           Law Office of the Cook County Public
                           Defender
                           69 West Washington Street
                           16th Floor
                           Chicago, IL   60602
                           (312) 603-0712
                           E-mail: Karen.dimond@cookcountyil.gov

Transcriber:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                    Official Court Reporter
                 United States District Court
             219 South Dearborn Street, Suite 1426
                   Chicago, Illinois  60604
                 Telephone:   (312) 435-5569
               Kathleen_Fennell@ilnd.uscourts.gov

(Proceedings heard via teleconference:)

THE COURTROOM DEPUTY:  18 C 1028, DeLeon-Reyes v. Guevara, and 18 C 2312, Solache v. City of Chicago.

THE COURT:  Good afternoon, everybody.

(Audio echo issues.)

THE COURT:  Counsel, give me a second while I switch computers.

(Pause.)

THE COURT:  That should be better.

THE COURTROOM DEPUTY:  That's better.

THE COURT:  Lynette, go ahead.

THE COURTROOM DEPUTY:  Okay.

18 C 1028, DeLeon-Reyes v. Guevara; 18 C 2312, Solache v. City of Chicago.

THE COURT:  Can I have appearances, please, starting with plaintiffs' counsel?

MR. ART:  Good afternoon, your Honor.  Steve Art and John Hazinski for Plaintiff Reyes.

MS. SUSLER:  Good afternoon, Judge Harjani.  Jan Susler on behalf of Plaintiff Gabriel Solache.

MR. ENGQUIST:  Good morning, your Honor.  Josh Engquist on behalf of Defendants Halvorsen, Dickenson, Rutherford, Stankus, Naujokas, Karalow, Harvey, Trevino, Mingey, Biebel and Cappitelli.

THE COURT:  Ms. Rosen, you're still on mute.

MS. ROSEN: Sorry, Judge.

Good morning, your Honor. Eileen Rosen on behalf of Defendant City of Chicago.

MR. BRENER: Good afternoon, your Honor. Ed Brener and David Adelman on behalf of Defendants O'Malley, Brualdi, Varga, Wehrle and Cook County.

MR. NOLAND: Good afternoon, your Honor, James -- Daniel Noland on behalf of David Navarro, and Daniel Burns.

MS. McGRATH: Good afternoon, your Honor. Megan McGrath on behalf of --

THE COURT: Ms. McGrath, your volume is pretty low. We barely caught that.

MS. McGRATH: Sorry.

Megan McGrath on behalf of Defendant Guevara.

THE COURTROOM DEPUTY: Still can't hear.

THE COURT: Thank you.

MS. DIMOND: I'm not sure if all the parties have introduced themselves, but this is Karen Dimond representing the Cook County Public Defender's Office.

MR. MORRIS: Good afternoon, your Honor. This is Patrick Morris, representing the respondent, Cook County State's Attorney's Office.

MS. SCHELLER: And good afternoon, your Honor. Jessica Scheller also on behalf of the State's Attorney's Office.

THE COURT: Okay. That looks like everybody. Give me one more second if you can just to see if we can get the audio quality a little bit better.

(Pause.)

THE COURT: Okay. Let's get started.

I want to first tackle the issue with respect to the subpoena for the Cook County Public Defender, and here we're seeking to decipher and update me on where things stand.

I think, Ms. Dimond, would you like to go first, or do you want to defer to somebody else?

MS. ROSEN: Judge, this is Eileen Rosen.

Before we do that, I caught something that maybe we all didn't appreciate from the last hearing that I just want to put on the Court's radar and Ms. Dimond's radar.

Because the subpoenas that were issued in Sierra and Solache/Reyes overlap, the overlap year is 1995. The Solache/Reyes subpoena to the Cook County Public Defender's Office does not include the 1995 files.

So the numbers that we were talking about last time did not include the files from 1995 because those files are being sought in the Sierra case. So for purposes of this Court, the numbers are a little bit off.

Our rough calculations, looking at the information we've been provided by Ms. Dimond in Sierra, it looks like there are 42 overlap files from the year 1995, and the Cook

County Public Defender's Office has found 28 of those files with box numbers. So the numbers are slightly off from the numbers we talked about last time.

THE COURT: So we were talking about approximately 145 or so files.

Do we subtract 28 from that number?

MS. ROSEN: No, you add.

THE COURT: Add.

MS. ROSEN: Yeah, because 1995, this Court ordered the City to produce '95 to '98; but since the Loevy law firm had already subpoenaed the year 1995 in Sierra, they didn't duplicate that in the Solache/Reyes cases.

THE COURT: So for purposes of the Public Defender subpoena, what years does the subpoena include?

MS. ROSEN: The subpoena in this case is only '96 to '98, but -- and I guess I'll let Steve speak to this, Mr. Art speak to this, but I assume the reason that they didn't subpoena 1995 as well is because they'd already subpoenaed it in Sierra, and the practice of the parties has been that when there's overlap, we simply either redesignate or reproduce the files in the cases where there's overlap so that people aren't overly burdened with having to repeat that production.

THE COURT: Mr. Art?

MR. ART: So my understanding is that -- we saw this issue as well -- is that the '95 files weren't excluded in the

rider to the subpoena in Reyes and Solache, but our discussions with the Cook County Public Defender's Office have concerned the files for '96, '97, '98 in this case, and we have been discussing '95 in Sierra.

And so when we were discussing with your Honor the 145 files, we were talking about files from just '96, '97 and '98.

THE COURT: I see.

Okay. I understand now. Thank you for that clarification.

All right. We have some updates. Who'd like to go first? Really, whoever has the most information to provide me.

MR. ART: Your Honor, we're happy to go first from the plaintiffs' side with the information about experts. And I'm going to let Mr. Hazinski speak to the details of a lot of this, but the overview is we've retained an expert for purposes of consulting about the appropriate sample size in a case like this.

We have some information based on that 145-file figure that we have from the Cook County Public Defender's Office, and Mr. Hazinski is going to speak about our expert and about what our expert has to say about a sample size so that we have that information for purposes of this discussion.

THE COURT: Okay. Go ahead.

MR. HAZINSKI: Thank you.

So we spoke with our expert, Allison Harris, who's a professor and a Ph.D. at Yale University whose work focuses on quantitative methods of the (inaudible) of law doing this -- probably this type of analysis of, you know, sort of legal data sets (inaudible).

What we learned in that conversation is that as a general matter in social science as a practice and in statistical analysis more generally, as the absolute number of files gets lower, it becomes more difficult to generate a sample from a smaller proportion of the documents.

Specifically what that means is that in social sciences and in statistical analysis, there are metrics called confidence levels or confidence intervals or margins of error. And so as the number decreases, we learned as a sample of that total universe of documents gets lower, it becomes much harder to generate a robust sample for purposes of this scientific analysis.

So that's sort of the framework, and we were talking about 145 files. That was our understanding at that point. And according to sort of the established social scientific method, what we learned is that an appropriate sample with a 95 percent confidence interval and a 5 percent margin of error, which is sort of the outer bounds of what would be deemed acceptable, would require the production of 108 of

10

those 145 files.

MR. ART: And just to complete the thought, your Honor, I'm sorry to keep speaking first, but as the total number of files increase from which we were taking the sample, in order to maintain that acceptable confidence interval, the number as a proportion of the total files could go down, but because the 145 is so small to start, we would have to take a sample that is almost the entire set of files to get that confidence interval with this particular set of files.

THE COURT: Okay. And the 108 of the 145, how does that relate to the 95 percent confidence level? Is there some connection between those factors, i.e., how do you get to 108? What was the calculation?

MR. HAZINSKI: So I have to admit to a lack of my own expertise here, but what we learned is that statisticians and people who do sampling rely on tables of information that are basically like reference texts that are relied upon.

So, for example, we were provided with a table of kind of common reference that someone in this field would use that shows that for a sample of X size, if you want to obtain -- I'm sorry. For a total data set size, if you want to obtain a sample that meets the confidence interval of Y with a particular margin of error, you can look across the chart and find a corresponding number.

And there are formula -- formulae that I don't know

that produce that information, and that's sort of what's generally relied upon. That was what was relied upon here to reach that number.

THE COURT: Okay. Mr. Art, unless you have something else, I'll jump to somebody else.

MR. ART: Your Honor, separately from the sampling discussion, we've had ongoing discussions with Ms. Dimond in the Public Defender's Office about what vendors to use, about a confidentiality agreement that will satisfy the Cook County Public Defender's Office when these files are produced, or when vendors come in and handle the files.

You know, as with previous discussions, I think we have broad agreement that whatever the Public Defender's Office needs in terms of resources or confidentiality agreement, we are -- we will provide or agree to.

So I think that that discussion is moving forward, and we just need to know what set of files is being produced.

THE COURT: Okay.

Ms. Dimond, go ahead.

MS. DIMOND: Your Honor, I did have a question in response to that.

Mr. Hazinski has just explained that their expert, Allison Harris, looked at the total as being 145 and said if the total is 145, we would have to produce 108.

But from our vantage point, and again I understand

your Honor just has the Reyes case, but right now, we are looking concurrently at being required to produce 145 files we find in the Reyes case plus 300 in the Sierra case, which means about 445 files.

So I'm wondering if Ms. Harris opined if the total is 445, how many would have to be produced to be statistically -- a statistically accurate sample.

THE COURT: Do you know the answer?

MR. ART: Your Honor, I don't know the precise answer to the question, but I know that the answer to that question is the proportion would be less than for 145 files. It would be more than 108 files, but it would not be the same percentage, if you will, because as the number of the total data set goes up, the number that you need for a confidence interval of 95 percent goes down as a proportion of the total.

So it would be -- you know, if we were taking all of the files that the Cook County Public Defender is being required to produce in all of these different cases and we took a sample of those files, it is I think -- Mr. Hazinski will correct me if it's incorrect -- it is correct to say that that would be the least burden on the Cook County Public Defender's Office if you could do it across all of the cases, if that makes sense.

MR. HAZINSKI: That's my understanding as well, your Honor.

I would add just one parameter to that consideration, which is another thing we learned from Dr. Harris, which is that when you take a sample across a set of years, and Mr. Art is exactly right, that the number as a proportion of the total files will go down.  So rather than being a majority of the files, it will be a minority of the files now that would have to be produced.

If I'm looking, if my estimates are right, probably in the range of about 200 to 215 of a sample -- or a set of 450.

The countervailing factor there is that when that sample is generated, it has to be considered as a representative sample for all of the files rather than for some slice of the total.  So that sample wouldn't be legitimately considered a representative sample, for instance, of one particular year within all of the years or, rather, across the gamut, so to speak.

THE COURT:  So a question on that.

If hypothetically I was to consider the 108 over the course of three years, how would you structure which files get produced to ensure you get a randomized set, if you will, that is representative of the entire set?

MR. HAZINSKI:  There are randomization methods that statisticians use, tools that are freely available or that experts rely on.  It can be as simple as generating a list,

you know, sort of correlating each number, records division number to an integer and then randomizing, you know, a percentage of the results of the sample. Computers have found a very tricky thing to do.

THE COURT: Yeah. I -- right, but you'd also want a random sample over the course of three years, and it gets randomized in integers and you might get a larger percentage from 1997 and smaller numbers from 1998, so you'd probably want to randomize by year to get a more accurate sample? Am I right about that?

MR. HAZINSKI: To be honest, I don't -- I don't know whether that's necessary or whether that's the general method, although if that were the case, I think that, too, if we talk to the expert and review if that would be necessary. I think that is fairly straightforward as well.

THE COURT: Okay.

Okay. Ms. Dimond, the floor is yours. You asked a question. You may continue on other things you want to inform me about.

MS. DIMOND: I don't think I have any other questions regarding that, your Honor.

THE COURT: Thank you.

Ms. Dimond -- excuse me, Ms. Rosen?

MS. ROSEN: Judge, obviously this is the first that we are learning of whatever their consulting expert told them,

so I'm obviously taking that in as I'm hearing it today.

I guess the question I might have, since we have Ms. Scheller here from the State's Attorney's Office and in keeping with the order last week or last time, we issued subpoenas to the State's Attorney's Office for the companion files.

Now, we issued that subpoena for the '95 through '98 years, looking at what Ms. Dimond was able to tentatively locate from the Sierra subpoena so we get a full gamut as it relates to Solache/Reyes.

I know she has some strong feelings about responding to that subpoena, but if -- if the numbers are -- there's no guarantee that the State's Attorney's Office is going to find the same number of files or the same files that the Cook County Public Defender's Office has located.

And so I guess what I wonder is what plaintiffs' expert would have to say about that, if they have anything to say about that, or if they haven't even considered it?

THE COURT: Well, let me hear from Ms. Scheller.

Thank you for appearing today. I know you've only received a subpoena. There's no motion pending with respect to that subpoena. I'm certainly not going to make any decisions about that today, but as I'm sure you can agree, the trickle-down effect on the motion to the Public Defender has implications for the state's attorney subpoena.

And so I'll let you speak first to apprise me on the things we've been talking about.

Go ahead.

MS. SCHELLER: Thank you, your Honor. Good afternoon.

I have been slightly briefed, so I will confess to feeling a little bit like Alice in Wonderland at this particular moment, and we're talking about the sample size and everything else related to this project.

I would just briefly go back to where the State's Attorney's Office's starting point is, which is we are not a file room to be used for the benefit of the City of Chicago in its litigation, and certainly they should have copies of whatever files they have tendered to us.

So in a given year, for example, we receive about 450 subpoenas for files and testimony; and of that, 60 to 65 percent originate from the City of Chicago or its outside counsel related to its litigation to try to harvest their documents.

And I think that this particular subpoena feels to our office like one step too far. It increases by 33 percent the amount of subpoenas we have to process in a given year. It does not serve our interests, it does not serve our office, and it's an incredibly expensive and time-consuming process.

So I enter the fray with some concern and with a

mind's eye toward a motion to quash or, in the alternative, to seek some relief from this Court with regard to shifting the cost and expense of obtaining, scanning, and reviewing the files to the City of Chicago for whose benefit it is, if you will.

We have reached out to an outside vendor to start getting our arms around what the scope of a third-party contract attorney review would look like managed by our office, but I have not yet given up hope that we might ultimately be successful in a motion to quash because ultimately what I believe is being sought from us is documents from the City related to what they gave to us, and there must be some boundary or barrier with regard to how a third party must engage in the City's litigation.

THE COURT: Okay. One of the questions we had, I don't know if you've had a chance to do this, but of the 145 files or so, even the '96 to '98 number, how many of those files does the State's Attorney's Office have?

Do you have any sense of that?

MS. SCHELLER: Well, your Honor, I believe the subpoena issued to me factors into account the 28 files that counsel were speaking about at the beginning of the hearing because it was for 173. So the sample set I was working with was slightly different, so I'm not sure which of the 28 were outside of the scope of the original 145.

But after having three different administrators work for five business days trying to locate files, I can represent that we've located about 88. Are there more? Perhaps. But that should suggest to the Court the level of burden imposed upon the State's Attorney's Office.

We have already lost a week of three people's time just hunting down to see if we have all of these files within our office, and regrettably not everything is digitized. We still have a warehouse with dusty boxes and files, just like you would envision from a decades-old legal saga, as opposed to one in 2021.

But those are the realities of what we're looking at here.

THE COURT: Okay. So just to clarify, there were about 173 ballpark-ish files that were subpoenaed, and you were able to locate 88 of them. And was that by looking at indexes or actually looking for the actual boxes?

MS. SCHELLER: Pulling the actual boxes.

In certain circumstances, I believe they can use a database, and I don't have complete clarity on how the process works. I think they looked in the database, and then they have to go to the actual file room to see if it can be located.

There may be, and I regret saying this already, more files that we can locate; but we were able to locate 88 in

advance of this hearing. It would probably take a few people a few more days to exhaust the list and say with some certainty this is the final number of the 173 that we are able to locate.

THE COURT: Okay. Thank you for that.

So, Ms. Rosen, one question for you, which is what is the City's position at this time with respect to the cost of the vendor and the review process?

Plaintiff has made some recommendations with respect to the PD. I'd like to know what your position is with respect to the State's Attorney's Office.

MS. ROSEN: We're certainly happy to discuss burden shifting on the cost. I'd like to have -- we haven't had any discussions about that or what's envisioned, but certainly we would agree to cost shifting in terms of to help -- obviously to help get this done.

THE COURT: All right. Ms. Dimond, the last time we talked, there was an offer to have attorneys, contract attorneys, do the review, and I suggested I could help supervise that, and it could be a place where the contract attorneys hired by the PD that are trained, supervised by you, and do the review, and the only thing the plaintiffs would do would be to pay the bill essentially.

You'd obviously bring in a reputable vendor, but the plaintiff wouldn't have any involvement in the actual

procedures to ensure that your privilege is preserved.

Have you given any more thought to that potential process?

MS. DIMOND: Yes, your Honor. I know that was mentioned at our last status, but it is up to this point, my office is not comfortable with outsourcing the review of our files to pull privileged documents.

That is our position as of now. I can, of course, discuss this with upper management again, but that's where we stand now.

THE COURT: Okay.

And, Ms. Scheller, again, I know there's no motion pending, but do you have a viewpoint on that with respect to contract attorneys reviewing for privilege?

MS. SCHELLER: Well, your Honor, as I stated, our preference would be that a motion to quash would be granted. However, if we were to be ordered to comply, I do not see a path forward with compliance, given our current resources, that does not include outside contract attorneys doing the privilege review with some supervision from our office.

THE COURT: So you brought up -- I appreciate, I mean you'd be willing to consider contract attorneys doing the review with supervision by your office.

Did I get that right?

MS. SCHELLER: If ordered to do so, Judge, I would.

THE COURT: Okay. The reason why -- I understand what Ms. Dimond's position is. The reason I'm asking about the alternative position is, correct me if I'm wrong, but in prior wrongful conviction cases, the state's attorney has produced files, maybe not to the number that is being produced here, but productions have occurred.

Am I right about that?

MS. SCHELLER: Yes, but not to this extent.

So to illustrate for the Court about five years ago, we had one part-time attorney who managed all subpoena production. We now have on any given day 10 employees who are working full-time on subpoena production.

And we simply can't continue to engage at this level or, worse yet, at the level contemplated by this subpoena for the benefit of third parties. It's just beyond what we can manage with our resources and our current budgetary constraints.

THE COURT: Okay. Tell me -- let me get this straight -- again, there's no motion pending for you, but I want to understand the boundaries of what we're dealing with.

If you found 80 files and if I were to hypothetically order 80 files and a vendor who was paid by the City did everything and contract attorneys who were paid by the City did the privilege review, what burden would there be on the state's attorney at that point?

MS. SCHELLER: It would be much the same as, unfortunately, my current burdens, your Honor. We would still have to check that production. We would still have to train those attorneys. We would still have to review all of the 88 files.

So they would have to be pulled from the warehouse, shipped to our office. Our vendor, we typically use Array, would have to pick them up and scan them. We'd have to get the files back. We'd have to make sure they find their way back home.

We would also have to, at the City's expense, I believe, because we haven't discussed this, utilize some type of database or platform like Relativity, which we would then have to monitor and check all of the work of contract attorneys because, again, part of the -- part of the complexity here is that these aren't just ordinary business contracts. It does take someone with some skill to understand, you know, what certain notes are and what is, for example, an exhibit used in the grand jury but placed somewhere else in the file?

So there would still have to be for this some project management, as well as a secondary review by our office before we could ever allow the production of (inaudible) files or any files.

THE COURT: Okay.

All right. I appreciate that.

So, Mr. Art, the answer to my question here was 108 files with respect to AG. I understand the argument about the confidence level. What I'm wondering is how does that square with what happened in the prior wrongful conviction cases?

I think in one of those cases, maybe it was Fields or Rivera, where there's no stipulation, and there was something like 30 or 40 files that were reviewed and passed the confidence level of the court, admitted, it was used, and really summarily treated on post-conviction and appeal, post-trial and appeal, as really not even an issue.

So I'm wondering why the difference here between what happened there and what you're proposing here.

MR. ART: So, your Honor, I would take issue with the idea that it wasn't an issue at all in the lead-up to trial, post-trial or appeal. In Fields, there was no stipulation whatsoever. In Rivera, there was a stipulation that the City takes the position that it was a stipulation only as to particular points. We took a different position.

But putting that dispute to the side, there was in both cases a question of whether a Public Defender's file -- a set of Public Defender's files that we were using were complete enough to prove the point that we were trying to prove.

And so from our perspective, you know, ex ante here

in a case, what we were trying to do was take off the table arguments that the other side might have that our sample is not correct.

So they can argue the Public Defender's files are not complete, that the Public Defender is a poor file keeper, so that it's missing files, parts of its files are incomplete, and so the question did these materials that were in the CPD's possession make it to the Public Defender's Office can't be answered by reference to these files.

As your Honor has suggested, that is the principal argument that we faced in Fields and in Rivera, but that doesn't take off the table the argument, you know, even if you consider these files to be complete, the sample that has been taken does not rise to the level of the confidence intervals required to draw social science conclusions from it whatsoever.

If we drop below 108 out of 145, we open up that second argument, and I would expect the City and other defendants to take that position then, that, you know, the sample of files, even if you considered them complete, is too low to draw any social science conclusions, and so plaintiff's experts who are opining on whether these materials made it from CPD to the criminal defense in these cases don't even have a basis to start opining about that issue from a social science perspective and, therefore, should be excluded.

We need to take that off the table. We need to either do that by reaching the confidence interval that social science experts tell us is required to put forth these opinions in a legal case, or we need some stipulation from the other side that the sample is sufficient to -- or so really that that issue is off the table.

So that's our perspective, sitting where we are in this case, and we can't simply agree to take less, as we think it opens that argument up, and vendors are experts subject to attack on just the basic is this a sample that has a confidence interval that allows us to draw any conclusion.

THE COURT: Okay.

Ms. Dimond, so I guess the final question for you, it was your motion that you brought. We've had two hearings on it to really flush the issue out.

So I see sort of two options before me. One is I can rule. I'm certainly not going to rule today. I'm going to take a little time to think about this, given that I just received some information.

I can rule on this, or the other is now that we've flushed out the issue, and obviously you understand I'm not going to opine anything about Sierra and the burdens of Sierra. That is for Judge Weisman to deal with and to flush out those issues.

And so my decision here will really be limited to the

Reyes case and the '96 to '98 and 145 files at issue, and they've asked -- they've suggested that 108 is the minimum number.

I guess my question to you is do you want to proceed by agreement with the other side without a ruling from me on the 108?

MS. ROSEN: Judge, but -- this is Eileen Rosen from the City.

But the production is '95 to '98. So the full scope of the files that this Court ordered was the relevant time period for plaintiffs' *Monell* claims was '95 to '98, so I think if we're talking about whatever the statistically significant sample is according to plaintiffs' consultant, then they need to go get the number, the accurate number, for the total, which is the 170 whatever the number is.

THE COURT: I'm sorry, I thought you were dealing with '95 in Sierra, and that wasn't before me.

MS. ROSEN: Well, they haven't -- well, but '95 is going to be part of the data set that's utilized in Solache and Reyes because the City was ordered to produce '95 to '98 in this case, so the fact that it's overlap -- I think the only reason that we started going down the road of the smaller number was simply because of the way the subpoenas went out, that Sierra went first and then Solache went second, and '95 was the overlap year.

So I think the real number, for purposes of this case, includes that, the year of '95 and the number of files there unless plaintiffs are not -- unless Mr. Solache and Mr. Reyes are no longer going to utilize 1995 as their *Monell* data set in this case.

THE COURT: So (inaudible) on Mr. Art. Go ahead.

MR. ART: No, I was just going to say, your Honor, I think the question is how the subpoenas are being enforced in the different cases. We have been talking about '96, '97, '98 thus far in this matter. The '95 year has been discussed in connection with Sierra.

I don't think that we are saying, you know, 1995 is now irrelevant to this case. I think what we're saying is if the question is of the '96, '7, '8 files how much of the 145 that the PD has located that we need for a 95 percent confidence interval sample, the answer to that is 108.

If the Court would like us to provide how many we will need of the '95 files, we're happy to do that. We'd have to go back to our certain provider --

THE COURT: I guess my question is the motion I have before me is a motion to quash or modify the subpoena in this case.

So the subpoena in this case, what does it ask for, which year?

MR. ART: It covers '95 as well, but we've been

discussing '95 with the PD's office in connection with Sierra, and the motion to quash in Sierra is going to be dealt with after this Court deals with the motion to quash in these cases.

THE COURT: Okay. So essentially the motion to quash here or to modify requires a ruling from me on the full '95 to '98?

MR. ART: Yes.

THE COURT: Okay.

All right. Then I need to know what that number is that you're proposing. Is it 173? Did I get that right?

MR. ART: Something like that, your Honor, but I think what we would propose is today, by noon tomorrow we can provide the denominator, so to speak, and the sample that would be needed for a 95 percent confidence interval. We'll consult with our expert today or tomorrow morning (inaudible) and provide that.

THE COURT: Okay. What I'm hoping though is that because the sample size has gotten larger, it's not going to proportionally increase the limited, more limited number.

MR. ART: That's necessarily correct, and I think the increase will be marginal.

THE COURT: Okay.

So, Ms. Dimond, I know you've got to wait to see what that number is, but do you have any thoughts to my question?

MS. DIMOND: Well, yes, your Honor. I do feel like I should mention one other thing, and that is at the time your Honor had asked me to appear or asked someone from my office to appear on this matter, we had completed the first stage of the work that we need to do pursuant to that subpoena, and that is we've completed finding the box numbers for the requested files in Reyes and Sierra. So that was the information that is in my motion to quash, those numbers.

But we are now in the second stage, and that is to see how many of the boxes for which we have numbers we can actually locate. So the spreadsheets that I've completed and shared with both the plaintiffs and Ms. Rosen is that they list the box numbers, but it is possible that our employee at the warehouse -- and we do have one employee -- the employee at the warehouse will not be able to find all those boxes.

So I just want to point out there's an additional step that we need to go through to see which boxes we will find. And so I just want to bring that to your attention now because I don't want us to have all these discussions and then have to come back and say we've only found a small percentage of the boxes after having found the box number.

THE COURT: Okay. So that's an issue obviously. It seems to make sense for you to figure out, before we either agree to something or I order something, to know exactly how many boxes you have. I mean, if I were to order 80 or 70 or

108 or 150, it's sort of meaningless if you only have 30 of them.

So is that something that you can accomplish in the near term?

MS. DIMOND: So I hope so, your Honor. I've been texting the employee who works at the warehouse. He is the only employee in our entire office who finds boxes, and, of course, he's doing that not just for me but for every other attorney in the office who is asking that an old file be found so that it can be used in connection with a currently pending case.

So, you know, I will ask him to concentrate on this, but he has a lot of duties, and he is the only person who knows how to find these boxes.

THE COURT: Okay.

All right. So let me get this straight. You found it on some kind of index of database, so the actual physical box you're not sure if it's there or not; is that right?

MS. DIMOND: Correct. It should be there, but I -- I can't tell you that it actually has been located yet.

THE COURT: Okay. Is there someone --

MS. DIMOND: And what happens, your Honor, is that sometimes someone will request a box, and it's sent to one of our various locations, and it's never sent back to the warehouse.

So the box, if there's a box number, it probably has gone to the warehouse, but it might have then been requested by an attorney sent to another perhaps suburban or other location, and not sent back again.  So sometimes that can happen.

THE COURT:  Okay.  So what I'm trying to figure out here is what -- what would be the margin of error, if you will, which is if the number is let's say -- let's just take a hypothetical number of a hundred, right?  Do you anticipate finding 95, or do you think it's going to be like 50?

That's what I'm trying to figure out, what do you think is the discrepancy between what's on the index and what's physically there?

MS. DIMOND:  I -- I just really don't know, your Honor.  I'd be reluctant to guess.  I don't know.  I really don't know.

THE COURT:  Okay.  All right.

MS. DIMOND:  But I, you know, suggest, perhaps in the meantime, the State's Attorney's Office might want to file their motion to quash, while we're -- if they're going to do that, while we continue to see if we actually can find all of the boxes.

MS. SCHELLER:  Your Honor, if I may --

THE COURT:  Please.

MS. SCHELLER:  -- we didn't file our motion to quash

in advance of this hearing given the way the minute order was worded inviting our participation, but we do intend to file a motion to quash if that in any way informs or guides the process.

THE COURT: Okay. So certainly are -- you can certainly file your motion to quash at any time. I do anticipate making a ruling fairly soon on the PD's motion to quash.

I'll obviously consider any argument the State's Attorney's Office wants to make to me in their motion, but I do anticipate not waiting and ruling on the PD's motion fairly quickly.

Ms. Dimond, I don't -- I still don't have a timeframe though for me, to let me know how many of these boxes are actually going to be there.

MS. DIMOND: Your Honor, I can ask our public defender to direct its employees to devote, to assign exclusively to looking for these boxes.

I mean, that's the only thing I could do, and presumably should be able to, you know, within a week go through the rest of the sheets and walk through the warehouse and try and find them.

THE COURT: Okay.

Just thinking this through, if I were to order a more limited number, let's say the full set is 173 and I ordered

the more limited number, out of the boxes that are actually there, not just boxes on this index, so regardless, it might be that the more limited sample size that's less than 170, you know, something or 160, my point is it might not matter because you're only producing what you can find, not what is on the index.

Okay. I'm going to give this some thought. Anybody else want to present anything else at this time?

MR. ART: Nothing from plaintiff.

THE COURT: Okay. I saw a motion that was filed -- let me back up before that.

Mr. Art, you were going to get me that number with respect -- I think tomorrow with respect to the full sample. Do you want to file it in the status report?

MR. ART: Yeah, we can file it by noon tomorrow in a status report.

THE COURT: Okay. If anybody has a comment on that, feel free to file your own status report by the next day, so by 7/14.

I saw a motion for leave to supplement a Rule 26(a) disclosure and to issue document subpoenas to the Cook County Public Defender Office. I see from the motion that there is likely an objection from the City on this, is that correct, Ms. Rosen?

MS. ROSEN: Yes. The City defendants object to the

three witnesses.  We didn't know anything about the subpoena actually, that wasn't brought to our attention in advance of the motion, but certainly the supplemental 26(a) disclosures from Mr. Sarley, Mr. Smith, I believe, and Mr. Ward.

THE COURT:  So I'll ask you to file a response brief because there's an assertion in the motion that I'd like some more detailed information that would probably be better in writing.

How about a response by -- you tell me if this works -- July 19th?

MS. ROSEN:  I think that should be fine, Judge.

THE COURT:  Okay.

Mr. Art, if you want to reply to that, I mean I think it's pretty short, how about by July 22nd?

MR. ART:  I think plaintiff Solache has taken the lead, so I will defer to (inaudible).

MS. SUSLER:  That's fine, Judge.

THE COURT:  All right.  You don't have to, of course, but I'll give you the option if there's something you want to say in response, but I'll give you until July 22nd to do that.

MS. SUSLER:  Thank you, Judge.

THE COURT:  Okay.  So I will likely issue a ruling on this -- let me back up.

I think my initial question to you, to Ms. Dimond, was do you want to proceed by agreement, or do you want me to

make a ruling on this? I know you can't agree to (inaudible) the full number, whether it's 110, 115 or 120, but do you have any initial thoughts on that?

And I'll ask a few questions on it.

MS. DIMOND: At this point, I don't know that I want to agree to produce 108 files. It is possible we would not even be able to find 108 boxes. We would hope that would be so, but I don't know that that would be the case.

So I don't think I can promise that our office would be able to produce that many.

THE COURT: Okay.

So I guess I'm a little confused here, right? The full number of boxes they're requesting is 173, right? Out of that, if I were to hypothetically order 110, 112, that still gives you a room, a margin of error, of about 60 or 70 that you may not be able to find.

So, to me, that gives you a lot of leeway in being able to produce the number that I order if I am to do that. Does that make sense?

MS. DIMOND: Yes. I just don't know how many we'll find. And also, there is the problem of sometimes a box is found but when you open up the box, the file is not actually in there.

So -- and there's a couple more steps that one has to take to actually get to the file, and I'm just reluctant to

say that we absolutely can produce a certain number because we only have gotten through the first step that we have to take in order to find the file.

THE COURT: Okay.

MR. ART: Your Honor, could I raise an issue?

So if -- let's stay with the 145 number for now, and we'll provide the other number tomorrow, but if to get a sample that is representative of the 145 we have to randomly select 108, that process perceives that all 145 are going to be available because the first step in that process is going to be randomly selecting 108 of the 145 and then being reliant on the idea they're going to go find those.

If we did that and said, okay, let's go look for the 108 and they can't find those 108, then we need to re-randomly sample from the 145 so that we can get 108. Worse yet if the case is that they're only going to find 80 of the 145 or 80 of the 108, or suppose there's only 80 or 90 of the 145, then we're in a position where the sampling process is an endeavor none of us -- we should not go down that road at all because we're just going to be sampling and resampling always to arrive at an insufficient sample to meet the confidence interval.

In that case, the best course of action for purposes of expedient resolution of this litigation is to order production of all the files, and then the Public Defender just

says we don't have all of them, and that is the reality that we're all dealing with.

But we can't -- shouldn't engage in serial sampling of the files and searching for them and then not arriving at a representative sample because that will be most burdensome on all the parties, and we'll have something that is not useful from a statistical perspective.

THE COURT: I agree. I mean, that's why I've raised the question a couple times. You know, if there is 170, it seems like -- and you'd be able to find 108 or 110, but I think, Ms. Dimond, we don't know and you don't know exactly how many boxes are actually there, so I could spend a lot time ordering the sample all for a big waste of time if in reality you only have 80 total out of everything that the plaintiff has requested.

You know, it seems a very inefficient use of all our resources at this time with the timing efficiencies out. So I think, Ms. Dimond, I think I will probably want you to actually report back to me how many boxes you actually have.

And so I think plaintiffs will give you the number of boxes at issue, and if you were able to tell me, you know, today you could find 95 percent of them based on your experience, that would be good enough, but I don't think you're able to do that. And so I have to go with the assumption that it might only be 50 percent or 40 percent or

30 percent, in which case this whole discussion of sampling is just pointless.

So I will ask you to determine how many of these boxes you actually have before I make a decision because otherwise my decision is not going to be useful.

So, Ms. Dimond, you tell me how long you need. I know it's not easy, but can I -- can we get together on the 23rd of July? Will you be able to give me an answer by then?

MS. DIMOND: Yes. I will ask that this employee be directed to focus his time on finding those boxes.

THE COURT: Okay. And do you have the full number, the 170 or so, that has been discussed today?

MS. DIMOND: Well, I -- I don't know exactly because I think I mentioned we had found 145. The '95 -- the 1995 files were in the Sierra category, and so I can't tell. Perhaps someone else can.

THE COURT: No, I think you answered the question, which is you know the universe of boxes that you're looking for.

MS. DIMOND: Yes.

THE COURT: For this case. Okay. That's all I was getting at.

MR. ART: Sorry, your Honor. Sorry to interrupt.

On that point, part of what we'll file tomorrow will be identifying those files that in addition to the 145 that

we've been talking about already will be added to this set as part of the year 1995. So we will make that clear in our filing tomorrow, along with how much of the sample of that would need to be taken.

THE COURT: All right. So it sounds like to actually get any kind of decision here that makes sense, we should get it right the first time and know what is actually physically available rather than just something from an index.

So let's get together again on the 23rd. Get my calendar. How is 11:00 a.m. on the 23rd?

MR. ART: Works for plaintiff Reyes.

MS. ROSEN: Works for the City.

(Inaudible.)

MS. SCHELLER: Your Honor, I apologize.

Do you expect to have the State's Attorney's Office present at that hearing?

THE COURT: No, I don't. You know, you stated your position. I understand where you're going, and I appreciate the work you've put in to locate (inaudible) or at least to consider the issue.

Remind me again, just so I have my notes really clear, the work that you did to locate for the overlap (inaudible) you were able to identify?

MS. SCHELLER: I'm sorry, your Honor, the last part of your question cut out on my --

THE COURT: Provide me again the numbers that you gave me in the very beginning of the hearing so I have it clearly.

MS. SCHELLER: Sure.

So the subpoena rider that we received listed 173 files and as of today, I was told that we have been able to locate 88.

THE COURT: Okay.

All right. Is more work being done as we speak or this week or next week that will more firmly identify that number?

MS. SCHELLER: You know, your Honor, I hadn't really decided. I was going to take my leads from the Court. We, of course, plan to move to quash, but I wanted to participate in this case today.

My preference, of course, would be that we stop looking right now and file our motion to quash and seek relief, however --

THE COURT: I would suggest -- I mean, when we get into a hearing on your motion to quash, I'm going to ask these same questions, because part of my decision will be whether to quash or to modify.

So I think if you can appear next Friday to give me a more firm number of how many you will be able to identify, that would be actually helpful.

MS. SCHELLER: So, your Honor, that brings me back to July 23rd, and I apologize. I am not available to appear on that date.

THE COURT: Okay. That's fine.

MS. SCHELLER: I could appear the 22nd if --

THE COURT: Can we do the afternoon of the 22nd, maybe 2:00?

MS. SCHELLER: The State's Attorney's Office is available.

MS. ROSEN: The City's available.

(Inaudible.)

MR. BRENER: That goes for the prosecutor defendants, your Honor.

THE COURT: I imagine anyone else can get coverage if you cannot appear. So let's go with July 22nd at 2:00 p.m. and I'll get the answers from Ms. Dimond at that time and also from Ms. Scheller, and then we'll take it from there.

Okay. Anything else?

MS. DIMOND: Yes, your Honor.

There was also a motion (inaudible) to issue a subpoena, a document subpoena, to the Cook County Public Defender's Office for some photos. We just got this today, but I can actually address this already.

We do have a database of photos, but it only goes back to 2013. This is a digital database. I did doublecheck

it. It does not contain any photos of Mr. Solache or of Mr. Reyes.

I have checked with our chief -- our deputy chief of investigation, and he -- he tells me that is the place one would have to look. We do not have them there.

We're trying to find out who the individual investigator was at that time in 1998, but I'm not sure if we're going to be able to figure that out or, if we do identify that particular investigator, if that investigator will have that photo anywhere.

This file was already subpoenaed by the parties a couple of years ago and reviewed. I presume the photos were not in there. It was already produced to the parties a couple years ago.

THE COURT: Okay. So let me do this. I'm going to ask you, Ms. Dimond, to meet and confer with the plaintiffs on this issue. There's no document subpoena issued yet, (inaudible) before me, but the two of you should talk it out, see if you can come to a resolution without a ruling, go ahead and do that. Otherwise, I'll make the ruling when I see the responses.

But you can update me at the next hearing about this matter, and I'll ask you to meet and confer in the meantime, okay?

I haven't had a chance to really dig into this issue

just yet to weigh in anyway.

All right. Thank you all.

MS. ROSEN: Judge -- sorry, Judge, this is Eileen Rosen from the City.

There's one additional thing that you asked us to confer about Plaintiff Solache's deposition.

THE COURT: Yes, you're right.

Go ahead.

MS. ROSEN: And so the parties did confer, and the City defendants believe that Mr. Solache's deposition needs to get done before mid-September at the latest in order to in any way come close to meeting the end-of-the-year deadline. There's no way we could possibly deal with expert disclosures at a minimum as it relates to damages until we have his testimony, and we'd like a little bit of time to do any follow-up discovery that might arise from his deposition.

Ms. Susler, and I guess Mr. Reyes's counsel as well, would like to wait until mid-October. The City defendants' concern is that that, particularly with the holidays that come up in November and December, would make it very difficult for the City defendants to properly disclose any experts that are reliant upon Mr. Solache's testimony.

And there's going to be for sure one damages expert, maybe two, and there could be -- it could impact liability experts as well, although that's less clear.

So the City defendants propose that if the Court were going to allow plaintiff Solache to wait until mid-October to be deposed, the City defendants would want some time beyond the end of the year to finalize, to do the experts, or whatever else might come up out of the -- out of that deposition to the end of February.

So I think I've pretty much stated everybody's position, but I'll let Ms. Susler speak.

THE COURT: So let's assume that the discovery deadline is not going to be moved. Judge Seeger has made it very clear that it's a hard deadline, and so have I. So let's assume that's not going to happen.

With that assumption then, Ms. Susler, go ahead.

MS. SUSLER: Yes, your Honor.

Mr. Solache has just gotten his first dose of the vaccine -- he's authorized me to disclose that publicly -- on July 7th after trying, and it's just not readily available in Mexico.

So he's got the AstraZeneca, which is 8 to 12 weeks until the second dose. I asked him to try to get an appointment as soon as he could. He's not able to do that apparently. Vaccine distribution where he lives is not quite as organized in the same way it is here.

And that's why we thought October would be a safer bet so that he would be fully vaccinated and that it would be

safer for everybody because we're talking about Mr. Solache, we're talking about me, we're talking about defense counsel because all of us want to be there in person, and, of course, the videographer, the court reporter, the interpreter.

And we've been -- I've circulated before our meet-and-confer some information that I was able to find about the status of COVID in Mexico. The place where we went for our previous deposition of plaintiff Reyes was down in Cabo in Baja, California.

Right now if you look at a map of California, the entire peninsula of Baja is in red. Apparently, they're using the resorts for hospitals for people who have COVID. So I'm just trying to err on the side of safety for everyone, and that's why I suggested early to mid-October. That way he will hopefully have had his second injection of the vaccine, and it will be safer for everybody.

We're only a month apart, and I just feel like at this point, since we've all been very careful in terms of scheduling his deposition, I just don't want to rush in and endanger ourselves or him or any of the other people who are going to be attending the deposition.

THE COURT: Okay. When -- so when -- if he's simply just simply trying every day to get a second vaccine appointment, there's no --

MS. SUSLER: (Inaudible) today. I texted him before

we went online, and he said he is not able to get an appointment.

I -- obviously, he'll keep trying, and I'm happy to inform the Court if he gets an appointment, he manages to schedule one. I don't know what the procedure is. I don't know if he's asking for something that's unusual.

My sense is that it is because he told me that at the first vaccine, they didn't even tell him he needed a second vaccine. He went on the World Health Organization page for AstraZeneca and discovered that that's what's recommended, 8 to 12 weeks.

Eight weeks is the end of the first week in September, and it takes supposedly another two weeks after your vaccine for it to be completely -- you to be completely vaccinated.

That's why I erred on the side of October.

THE COURT: Yeah, so Ms. Rosen, according to the timeframe for the vaccine would mean he would be fully vaccinated by the end of September, early October. Mid-September is sort of in the middle of the vaccination process. (Inaudible).

MS. ROSEN: Well, Judge, I just -- you know, at some point, we'll just have to get the dep done. So if that means that everybody participates by Zoom, then we participate by Zoom.

I mean, at some point, sure, I have a strong preference for being there in person, and I appreciate Ms. Susler has a strong preference for being there in person; but if the Court is telling us that the December 31st deadline is the deadline and there is no wiggle room, then, you know, we could get to October and be told he still hasn't been vaccinated, and then we've waited all this time.

So, you know, it's a difficult position, and I appreciate it, and that's why we've been patient. But at some point, the City defendants are going to be prejudiced and I assume the County defendants are going to be prejudiced.

So I don't know exactly where the line is on this, but it feels like we're getting close.

THE COURT: Yeah.

So I agree, we are getting close, and we need a firm date for Mr. Solache's deposition.

Look, I'm sensitive to the various issues at play. Certainly the pandemic, Mr. Solache's vaccination status, the desire of the lawyers to be there in person, it's an important deposition.

At the same time, I balance out the fact that Mr. Solache is a plaintiff. He's the one who brought this case. And, therefore, you know, he has to make all efforts possible to appear for his deposition one way or the other.

We're in the middle of a pandemic. Not everybody can

get everything they want, right? So, yes, you want to be vaccinated, you want to do it in person, you want to do it on your own timeframe.

Those are all things to desire, but may be not practical, given the fact that we're in a pandemic and the fact that Mr. Solache brought this case, he's got to be willing to be accommodating to be deposed by the defendants to repeat the allegations that he has made.

And so given Mr. Solache's vaccination status, I'm going to order that the deposition occur the week of October 4th, right? And this time, I will order it to be in person. However, if, for some reason, someone wants to bring a motion and ask that it be done by video conferencing, I will hear it out.

I think most of you would like it to be in person. You had Reyes in person, and Solache is an important deposition, and so I'm going to order in person. But, again, it's very dependent on if somebody feels uncomfortable, they could bring a motion.

Certainly there's some parties here that don't need to be there in person, and you could appear via Zoom, particularly if other people are handling the questioning and taking the lead; but we need a firm date to get this done, and I'm going to order it to happen that week. So everybody should start making their plans for that week.

I do believe at this time that gives three months to deal with any testimony that he has provided for the expert disclosures. I think that's sufficient time at this time, particularly only with respect to damages. It's not usually a heavy lift when it comes to damages, based on what Mr. Solache likely has to say.

So I do think that's sufficient time at the moment to get this all done by the end of December.

MS. SUSLER: I appreciate that, Judge.

I do need to emphasize that I am going to have to be there in person. There's no way that this can be accomplished without me being there physically, so I appreciate all the patience that you and the other parties have shown, and we'll work with the defendants to get it done October 4th in person.

THE COURT: All right. Thank you.

MS. SUSLER: Thank you.

THE COURT: Okay. Anything else from anybody?

All right. So, I'm looking at the docket. Tell me if I'm right about it, so we don't have a firm -- any firm date yet for expert disclosures and depositions.

We need to get on that, and I know that this particular subpoena issue has delayed a few things, but I'm hopeful that by the 23rd -- the 22nd, we'll have all the answers that we need.

So I'd also like you to meet and confer and propose

some dates for me, the schedule for expert discovery that you would like me to order, and let me know what that schedule is on the 22nd.

MS. ROSEN: Okay, Judge.

THE COURT: Okay. Thank you all. I'll speak to you next week.

Take care.

MR. ART: Thank you, your Honor.

MS. ROSEN: Thank you, Judge.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.

*/s/Kathleen M. Fennell*                    *July 16, 2021*
_____          _____
Kathleen M. Fennell                                Date
Official Court Reporter