1

## TRANSCRIBED FROM DIGITAL RECORDING

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
ARTURO DE LEON-REYES,            )
                  Plaintiff,    )
                                 )
-vs-                             )  Case No. 18-cv-01028
                                 )
REYNALDO GUEVARA, et al.,        )  Chicago, Illinois
                  Defendants.    )  September 20, 2021
------------------------------   )  10:35 a.m.
GABRIEL SOLACHE,                 )
                  Plaintiff,    )
                                 )
-vs-                             )  Case No. 18-cv-02312
                                 )
CITY OF CHICAGO, et al.,         )
                  Defendants.    )
```

TRANSCRIPT OF TELEPHONIC PROCEEDINGS
BEFORE THE HONORABLE SUNIL R. HARJANI, MAGISTRATE JUDGE

TELEPHONIC APPEARANCES:

```
For the Plaintiff
DeLeon-Reyes:               MR. STEVEN E. ART
                            Loevy & Loevy
                            311 N. Aberdeen St., 3rd Floor
                            Chicago, IL  60607
                            (312) 243-5900
                            E-mail:  Steve@loevy.com

For the Plaintiff
Solache:                    MS. JANIS M. SUSLER
                            People's Law Offices
                            1180 North Milwaukee Avenue
                            Chicago, IL 60642
                            (773) 235-0070
                            E-mail: Jsusler@peopleslawoffice.com
```

**PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
NOTE:   USE OF A SPEAKERPHONE MAY MAKE PORTIONS
UNINTELLIGIBLE AND INAUDIBLE

2

APPEARANCES:   (Continued)

For Defendants Halvorsen,
Dickenson, Rutherford,
Stankus, Naujokas, Karalow,
Harvey, Trevino, Mingey,
Biebel and Cappitelli:
                        MR. JOSH M. ENGQUIST
                        The Sotos Law Firm, P.C.
                        141 W. Jackson Boulevard
                        Suite 1240A
                        Chicago, IL   60604
                        (630) 735-3303
                        E-mail: Jengquist@jsotoslaw.com

For Defendants Wehrle,
Brualdi, Varga,
O'Malley:               MR. EDWARD M. BRENER
                        Cook County State's Attorney's Office
                        50 W. Washington Street
                        5th Floor
                        Chicago, IL   60602
                        (312) 603-5971
                        E-mail: Edward.brener@cookcountyil.gov

                        MS. C. ESTHER CHOI
                        Hinshaw & Culbertson, LLP
                        151 North Franklin Street
                        Suite 2500
                        Chicago, IL   60606
                        (312) 704-3221
                        E-mail: Echoi@hinshawlaw.com

For the Defendant
Navarro:                MR. DANIEL J. BURNS
                        Reiter Burns LLP
                        311 S. Wacker Drive
                        Suite 5200
                        Chicago, IL   60606
                        (312) 982-0090
                        E-mail: Dburns@reiterburns.com

APPEARANCES:   (Continued)

For Defendant City
Of Chicago:                    MS. EILEEN E. ROSEN
                               MS. THERESA BEROUSEK CARNEY
                               Rock Fusco & Connelly, LLC
                               321 North Clark Street
                               Suite 2200
                               Chicago, IL  60654
                               (312) 474-1000
                               E-mail: Erosen@rfclaw.com
                                       Tcarney@rfclaw.com

For Respondent Law
Offices of Cook County
Public Defender:               MS. KAREN J. DIMOND
                               Law Office of the Cook County Public
                               Defender
                               69 West Washington Street
                               16th Floor
                               Chicago, IL  60602
                               (312) 603-0712
                               E-mail: Karen.dimond@cookcountyil.gov

Transcriber:

                  KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                          Official Court Reporter
                        United States District Court
                  219 South Dearborn Street, Suite 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5569
                     Kathleen_Fennell@ilnd.uscourts.gov

(Proceedings heard via teleconference:)

THE COURTROOM DEPUTY: Court is now in session. We are calling Case 18-cv-1028, DeLeon-Reyes versus Guevara, and 18-cv-2312, Solache versus City of Chicago, motion hearing.

THE COURT: Good morning, everyone. Can I get your appearances, please, starting with plaintiffs' counsel.

MR. ART: Good morning. This is Steve Art for Plaintiff Reyes.

MS. SUSLER: Good morning, Judge Harjani. This is Jan Susler on behalf of Gabriel Solache.

MS. CARNEY: Good morning, your Honor. Theresa Carney on behalf of the City of Chicago. And I just wanted to let you know, there are Eileen Rosen for the City and Josh Engquist for Sotos law firm, the individual defendants, are currently in front of Judge Weisman on a status hearing on a similar issue to what's being heard today.

And Ms. Karen Dimond from the Public Defender's Office, I believe, is also on the call for status, so I don't know if we could pass for a couple minutes until they can get on to this call, and Judge Weisman sounds like he's finishing up just now.

THE COURT: I imagine that's the Sierra case?

MS. CARNEY: Yes.

THE COURT: Okay. Why don't we do that. I imagine that many of the questions I'll be asking (inaudible).

I don't have anything else on this morning, so I'm happy to pass it.

(Case passed and recalled at 10:54 a.m.)

THE COURT: Good morning. Lisa, you may call the case again.

THE COURTROOM DEPUTY: Thank you, Judge.

Thank you, Judge. We are recalling case 18 C 1028, DeLeon-Reyes versus Guevara, and 18 C 2312, Solache versus City of Chicago, motion hearing.

THE COURT: Lisa, you've got a lot of feedback, but I imagine if you go on mute after calling the case, we should be okay.

And with that, can I get appearances, please, starting with plaintiffs.

MR. ART: Good morning, your Honor. Steve Art for Plaintiff Reyes.

MS. SUSLER: Good morning, Judge Harjani. Jan Susler on behalf of Plaintiff Gabriel Solache.

MS. ROSEN: Good morning, your Honor. Eileen Rosen on behalf of Defendant City of Chicago.

MR. ENGQUIST: Good morning, your Honor. Josh Engquist on behalf of defendants Halvorsen, Rutherford, Trevino, Biebel, Harvey, Dickinson, Stankus, Naujokas and Mingey.

MS. CHOI: Good morning, your Honor. Esther Choi on

behalf of Defendants Brualdi, O'Malley, Varga and Wehrle.

MR. BURNS: Good morning, your Honor. Daniel Burns, on behalf of Defendant David Navarro.

MR. BRENER: Good morning. Edward Brener on behalf of Cook County in the Reyes matter only.

MS. DIMOND: Good morning, your Honor. Karen Dimond on behalf of the Cook County Public Defender's Office.

THE COURT: Okay. That looks like everybody. Good morning.

We are here on two motions. One is the motion for extension of time to complete production of files from the Office of the Cook County Public Defender. We'll get to that last because I don't foresee that to be much of a problem.

Just so you know, I have talked to Judge Seeger. We have coordinated our thoughts and plans for the case, and as a result, you did get an extension of the schedule, look at it as a newer schedule, if you will, for expert discovery that gives you through the end of June 2022 (phone interruption) disclosures, I don't see any issue with respect to the extension of time (inaudible.)

Having said that, there's a more pressing motion, of course, is the one that was filed entitled motion for protective order to prevent undue strain on resources of public entities for speculative *Monell* discovery.

And since it is primarily the City's motion,

Ms. Rosen, you can address it first.

MS. ROSEN: Sure, Judge.

So, as it is I think apparent from the pleading, this is the -- this meaning the Solache/Reyes cases are the first case or cases in a long line of what the parties refer to as the Guevara cases by way of shorthand, and this discovery is being sought and replicated in almost all of the cases except for the ones where bifurcation has been granted early on.

As a result, by the time we get through each of the cases, the City will in all likelihood have produced homicide files, which would include both the investigative file and the records division file, for the years 1987 through 1998. And if past experience is any guide, plaintiff will then issue subpoenas to the Cook County Public Defender's Office for its companion file, and then the City will issue a subpoena to the Cook County State's Attorney's Office for the companion file to the found files, meaning the found Cook County Public Defender files.

As we move forward in this process, we have learned that the burden to the Cook County Public Defender in simply producing the files in this case, and just to back it up a little bit, in this case for the years 1995 through 1998, the City produced 344 investigative files. Plaintiffs' counsel then issued a subpoena for the companion files.

From that subpoena, the Cook County Public Defender

located a little less than half of those files and then ultimately this Court, after multiple hearings, ordered a subset of the files of 132 found files to be produced.

It has taken the Cook County Public Defender three weeks to scan the files that have been found, and it's my understanding based on some email exchanges I saw last night and this morning that of the 132 ordered produced, only 105 were actually located in the boxes. And so it has taken the company that is doing the scanning three weeks with I think two people scanning full-time and three machines there three weeks to produce the files.

They now still have to be reviewed for privilege. There's now a new dispute over the privilege review because the Cook County Public Defender's Office, after being ordered in a non-Guevara case to produce something like 500 files, has now agreed to allow contract attorneys to do the review, and there's now a dispute over the hiring of the contract attorneys because while plaintiffs' counsel has agreed to pay for that, they have been running ads for contract lawyers.

I've asked to see the ads because I have a concern about what these ads look like. Plaintiff hasn't provided it yet, but they're being hired by plaintiffs' firm, and I know that the Cook County Public Defender's Office doesn't want any of the parties to be the ones hiring or overseeing the PD privilege review because it's the Cook County Public

Defender's privilege

So that's the background that led the City to file this motion in each of the Guevara cases. We were in front of Magistrate Judge Weisman this morning. He has indicated that we will be receiving an order on the motion either later today or tomorrow, and he is -- he's denied the City's motion, but he's going to be, for many of the reasons articulated in the City's motion, granting the Cook County Public Defender's motion to quash and suggesting that the parties have to come up with a different way to pursue this *Monell* discovery.

With respect to the other cases, we have a hearing I believe tomorrow and then on Wednesday in two of the others, and so we're sort of going to see how that all goes.

But the point of the City's motion is that we now know, because we've gotten far enough in discovery in each of these Guevara cases, where plaintiff has been unable to show that documents in plaintiffs' underlying case, *Brady* materials were withheld, and so if there's no *Brady* materials being withheld from the files, that's the tether to this *Monell* theory, and so embarking on what is clearly brewing to be a costly and incredibly time-consuming endeavor is not proportional to the needs of the case.

I'm sure we said other things in our motion, but that's the general framework for the City's motion.

THE COURT: Okay. I have questions for you,

Ms. Rosen, and then I'll let Mr. Art or anyone else with him, including Ms. Susler, respond if they so wish.

So, Ms. Rosen, first off, can you update me as to what's happened with the Cook County State's Attorney's subpoena production.

MS. ROSEN:  Sure.  So the Cook County State's Attorney's Office has obtained a quote from a service to do the scanning and the privilege review.  They're waiting on a final list from us of found files from the PD office since that's what the City has said all along is that despite the fact that the total universe, right, is 344, which is what the City produced, the City's only interested in companion files.

So we don't -- I don't have a current list.  I saw, like I said, an email this morning, a number of 105 files found.  I assume we'd get a list soon from Ms. Dimond, and then we forward that list to the State's Attorney's Office, at which point we'd have some idea of the cost and the timing.

Based on 132 files, the cost was a million dollars, and --

THE COURT:  So, Ms. Rosen --

MS. ROSEN:  -- 66 days.

THE COURT:  Ms. Rosen, I am skeptical of that number. I've got to imagine you're skeptical of that number of a million dollars as well, so tell me what you really think is going on?

MS. ROSEN: Quite frankly, I don't know. Ms. Scheller and I have been exchanging voice mails in the last week and a half or so or two weeks since I got the quote, and apparently -- and they may have other ideas about how to approach this. They were talking with their higher-ups, but I have no final information from her about how the cost was arrived at.

I was given a quote, but I don't know what was communicated to the vendor about the scope of the work.

I know what it costs the City to review the files and redact them for production, but, of course, those are just police files, and so they're much smaller, right?

The CCSAO files are attorney files, so while the investigative file might be a hundred pages, that doesn't translate equally to a lawyer's file either on the PD side or the State's Attorney's side.

THE COURT: Ms. Rosen, what do you expect the cost to look like? What do you --

MS. ROSEN: You know, I -- I don't know exactly because I don't know how much privileged material is in the file, so I don't know how quickly they can go through.

I don't know the page count, and I don't know the volume of privilege. The more privileged material in the files, so, like, if there's handwriting on police reports or things like that or -- that aren't easily segregated,

obviously that takes more time.

THE COURT: I understand that. And I will find a way of costing the CCPD production for comparison, if you will, because they are (inaudible) but (inaudible) privilege material, and they allegedly contain many of the same pieces of information. I'm going to come back to that.

So, Ms. Rosen, I am -- I saw the motion. I guess I was puzzled. I'll tell you why I was puzzled.

I understand why you would file this for the other cases, but including this case puzzled me and that's because there were motions to quash both subpoenas, which I denied, which everybody who wanted to weigh in got to weigh in, and, in fact, your motion for protective order also includes the State's Attorney's subpoena, which, when issued by you, that's the City, which files you wanted, so effectively part of what you asked me to do is to issue a protective order for your own subpoena, which was puzzling.

I know why you're doing it and you're going to tell me you had no choice, but nevertheless procedurally that's what you're asking me to do. There's no objection to Judge Seeger on either of my decisions, and the time to object has passed.

So you lost the bifurcation motion, and I also addressed the issue two years ago on the homicide files, and you've obviously made a sweeping suggestion that there's no

*Brady* material in the individual plaintiff's files, however, I recall that we addressed this issue prior, and I found that the plaintiff did put sufficient information about alleged suppression of *Brady* material to warrant the production of homicide files.

All that's to say that it seems that both procedurally and substantively, we've addressed all these things in this case. Maybe not the other cases, I understand, but in this case. And so I was puzzled.

So you want to respond to that?

MS. ROSEN: Sure, Judge. It just became very clear to the City that this case is the first simply because we were furthest along in the discovery process, both on the fact discovery and on the *Monell* discovery, that it is both illustrative of what is to come and the burden that is involved.

And with respect to the comment that the Court just made about that you addressed the issue on the City's motion a couple years ago to bar the files, my recollection is, and I could be wrong because I haven't looked at that order in a bit, but my recollection is that that was based on the allegations plaintiff made in the complaint, and we've now --

THE COURT: That was only one basis, right? The other bases were an actual showing by plaintiff, and I've reviewed that in a memorandum opinion again.

MS. ROSEN: Okay.

THE COURT: There was also assertions made about evidence that were in the files that -- assertions made about evidence that were missing and examples provided. I know you disagreed with them and you didn't think they were *Brady* or that they were even missing, but nevertheless there was examples given to me.

I'm going to get on to this with the plaintiff in a moment, but that's where things stood at that time.

MS. ROSEN: Sure. And I guess the City's point with respect to this case in particular is that we -- other than completing Mr. Solache's deposition, which is going to happen in two weeks, the case is postured that the parties could, the City defendants could file summary judgment.

And so in the City's view, that would put the evidence to the test, right? And either plaintiff will prove that he has sufficient evidence that there was *Brady* material withheld from him from the file, separate and apart from sort of the allegation that a particular police officer withheld information they had in their brain, but actually documented evidence that was in the files.

And so the City -- because the City was taking a wide view of the strategy here for all the cases, that it made sense for the City to include Solache/Reyes because we could get to summary judgment soon and then maybe obviate the need

entirely for any of this *Monell* discovery.

So that's the answer to the question of why we included Solache/Reyes in the mix.

THE COURT: Okay. I understand that point, but, frankly, isn't that a point on bifurcation?

I mean, look, I respect that you believe this should go in a different way, but you lost that motion. And generally speaking, if you got -- if you won bifurcation, that's exactly what you'd be doing, right? You'd be filing a motion for summary judgment now at the end of non-*Monell* discovery and doing exactly what you're telling me to do.

But you lost it. It wasn't my decision. It was the prior district judge's position. It didn't work out for you. It worked out for your opponents, it hasn't worked for you here, and so what I'm getting at here is hasn't that shipped sailed?

MS. ROSEN: Well, actually, Judge, no, because in the City's view with respect to bifurcation, as the case moves along, there are circumstances where we move further along in discovery and now the burden of the *Monell* discovery becomes much more apparent, and it's less speculative because we often hear on the front end when we file bifurcation in the early stages of the case that what the City is arguing about what's to come is speculative and the City crying, you know, wolf, and so there are other circumstances where discovery has moved

along, circumstances have changed, we've gotten to a point in discovery where it becomes apparent, at least in the City's view, that the proportionality weighs differently --

THE COURT: So I understand that. I understand that. I think, you know, I'm pretty deep into the cases, so I get all the points you're making, but isn't that really more a motion to reconsider bifurcation? Because I'm wondering why you filed it the way you did, where it's just a motion to reconsider bifurcation and try to meet the standard for reconsideration under Rule 54 because that's what you're really getting at.

When you get to the second part of your motion, that's really what I see you getting at.

MS. ROSEN: Perhaps it's a motion to reconsider, although quite frankly, the City doesn't often -- doesn't often style the issue on bifurcation as a motion to reconsider. Maybe it should, and I think it's just the caption for the case and the motion was being brought because it was being brought sort of across the board in all of the cases and, quite frankly, you know, oftentimes in bifurcation, the City's position is we should bifurcate, you know, through trial, and that's not what we're asking for here.

We're saying get us to summary judgment so we can get to a point where we know exactly what potential *Monell* claims survive summary judgment, which is a little bit different than

17

the typical bifurcation motion that seeks bifurcation through trial.

THE COURT: Okay. So I'll raise my final question, and I'll let plaintiffs go, who I'm sure are champing at the bit to jump in here.

You know, Ms. Rosen, I guess, you know, my question to you is while you have sort of informed me, yes, we're the first, and, Judge, see what's happening as a result of the rulings that you issued, I guess I could say the same thing to you, Ms. Rosen, which is, Ms. Rosen, see what's happened as a result of the City not stipulating.

If you stipulated to 20 or 30 or 15, whatever the number is, we wouldn't be in this boat. And now, of course, I can't force you to stipulate, and I understand that you want to preserve your position and certain arguments you want to make at trial regarding a statistical sample or statistical basis, but you have other arguments, frankly, as I see, many other arguments to make about the *Monell* matter besides the issue of the sample steps.

So I guess my question to you, Ms. Rosen, is maybe the state should reconsider, given what's happened on the stipulation. You've done in the past. I expect you didn't want to do it here, but I have to make a decision without considering the stipulation, and I've never held it against you. I've always ruled based upon what the facts and the law

requires me to do in my view, so I guess let me throw that back to you and tell me what you think.

MS. ROSEN: Well, so the issue with the stipulation for the City has always been that the City does not have clarity on precisely what plaintiff at the end of the day will argue on the *Monell* side. It has, over the years, in these cases that the City has had with, quite frankly, this plaintiff counsel, Loevy and Loevy, they go into the *Monell* discovery with -- believing that the *Monell* theories are one thing, and then as the evidence develops, it shifts.

And so it's difficult for the City to stipulate to a sample size when we don't even know what question we're going to ultimately answer.

In the circumstances in the past --

THE COURT: I expected that was the situation in the past, but we are near the finish line quite frankly, and I have a very clear view what the *Monell* theories are and, frankly, if they were to shift, I'm sure you'd have a very good motion to strike or exclude or eliminate, however you want to style it.

So I guess my question is what about now? Have you thought about that as a way to solve this problem?

MS. ROSEN: In this -- this case -- this to be your case, Judge, right?

THE COURT: Yes.

MS. ROSEN: Well, I mean, we've already dwindled down now to just based on where we are, we're at 105 files from the total, and so I don't know what the stipulation would look like or how we'd arrive at it, particularly now that plaintiff has the full set of City files. I can certainly go back to my client and address that, but I --

THE COURT: So the full set of City files relate to all *Monell* theories as I've said, and the file comparison primarily relates to one. I understand there's various arguments about how it flows over to other ones, blah, blah, blah; but generally we all know in this room that it was the file comparison primarily related to the *Brady* allegation, okay?

I haven't made any statement about whether or not they've even raised the other stuff, I've just been really cautious about that, but it's the *Brady* stuff. And so putting aside that the homicide files are produced with consideration that it relates to all the other *Monell* theories, this was related to consideration that relates to the *Brady* theory, and while we're dwindling down to (inaudible) I guess my question, Ms. Rosen, and I understand you need to talk to your client, I respect that and I think you should, but that if you really are concerned with cost and time and burden to public entities, part of the burden you have placed, too, on the State's Attorney's Office, let's be clear, isn't the time now

20

to solve this instead of just saying stop everything, which I don't know, you may have some traction with some judges.  I don't think you're going to get any traction here, given everything you've done, why not think about going to saying 30 or 40 or whatever number you can agree to.

You've done a stipulation in the past.  You know how to word it.  It's not that complicated.  You know, isn't that -- while you may believe it's the right -- believe it's the right time to stop everything now, maybe there's another viewpoint, which is maybe it's the right time to start thinking about stipulating.

MS. ROSEN:  So with respect to the stipulation, obviously I have to talk to my client, but with respect to whether or not we've stipulated in the past, the City has never stipulated on this theory.  The only time the City ever stipulated had to do with lineups and files and cases involving lineups.  That was a very different evaluation from the City side of it, knowing what the plaintiff's theory was as it related to lineups and the City's sense of what was in its file.

So it was easier for the City in that circumstance to agree to a sample size.

In the Rivera case, that sample size ultimately simply led to the files being used for the quote/unquote *Brady* -- street files *Brady* claim.  That was by order of court

and not because the parties stipulated. The court simply said this is the universe you have. Just work with them.

So certainly I can obviously take the Court's comments back to the City and let the Court know the City's position on that.

THE COURT: Okay.

All right. So, and to be clear, I'll never order you to do anything on stipulation. I'll never hold it against you. My suggestion here is only as a way to potentially solve the issue that you are producing -- excuse me -- that you are raising and really another method to do so besides asking for a full halt, if you will, of all the file production.

All right. Thank you. I'll come back to you later, Ms. Rosen.

For plaintiffs, I'll let you, of course, address any issues you want, and then I'll ask questions after that.

MR. ART: Thank you, your Honor.

I guess I'll speak for both plaintiffs and say that picking up on the point of a stipulation with the City, we discussed in the past month with Ms. Rosen the idea of stipulating broadly across all of these Guevara cases to a set of files that would reduce the quantity of proof required in all of the cases, and instead of getting a response from Ms. Rosen, we got this motion in all of the cases.

And so we remain interested and engaged if the City

is willing to discuss a stipulation that will limit the amount of proof needed. We think that that makes a lot of sense, and we reached out to reinitiate those discussions and got this motion in response.

The motion is procedurally and substantively improper. We're going to file a consolidated response in all of the cases, but every single phase of the case the City has sought to avoid accountability for its policies of file suppression, policies that have been proven by this exact method of proof in two recent federal jury trials in this building, and the question really is can the City, by engaging in an extraordinarily protracted litigation about a limited set of files create such a burden on the court and the parties that ultimately the court throws its hands up and says, okay, we're going to grant a protective order and put a stop to it because the City has filed a motion to bifurcate. It has filed a motion to -- it's responded to a motion to compel the production of its files. It's filed Rule 72 objections to that. It has participated in the Public Defender's litigation about the scope of production of its files, and at every single stage, it's adding a tremendous litigation cost to a process of file production that should be relatively straightforward and that the plaintiffs have offered to bear the entire cost of at every step.

And so procedurally to come in at the end of the day

when bifurcation has been denied, the City has been compelled to produce its files, the district judge has rejected Rule 72 objections, there's been months of litigation around a Cook County Public Defender motion to quash, we've agreed to a sample even without a stipulation. We've sent movers in to produce -- to gather those files and scanners to work around the clock to produce them. The City is filing a motion that essentially is objecting to only at this point to discovery that it has asked for.

We'll file a written response today or tomorrow in this case, your Honor, with your permission, but we don't think that there's any basis at this point for a protective order in this case or any of the other Guevara cases, given the litigation on these *Monell* issues that has already happened.

THE COURT: All right. Let me ask you some questions.

First off, can you tell me what the cost is that you are expending for the PD files?

MR. ART: So it looks like the scanning costs will be about $25,000 to $30,000. I can get you the exact figure of where we're at right now, but I don't have it in front of me. But that was the estimate.

THE COURT: Okay. What about all in with the privilege review?

MR. ART: I don't know -- well, there is this question of whether we can hire contract attorneys through our normal contract attorney process, these are our prices. You know, I think it's 30 to $50 an hour, whether we have to hire an outside agency that's going to cost more, but -- and how long it's going to take and what kind of oversight they're going to have.

So I think that that cost is much more variable, but I could submit something to the Court with a range of estimates after we have resolved who will be performing that review.

THE COURT: Yeah, you know, I'm just looking at ballparks here. A million dollars seems somewhat outrageous, but the question is: Is it 200,000? 500,000? 100,000? What do you think your ballpark -- I don't want to hold you to it, but tell me honestly what ballpark you think it is.

MR. ART: Yeah, in this case a hundred thousand maximum, that's my guess at this point in time, and if that turns out to be incorrect, I will file something tomorrow and let you know, your Honor.

THE COURT: Okay. So I want to come back to the issue of the contract attorneys because we need to solve that in order to get these files produced, at least the production ruling, so I'll come back to that.

If you had -- so per Judge Seeger's expert discovery

schedule which assumed an October 15th production, and I also believe that's sufficient time, I guess the question is how do you stand today? When do you think you'll be able to get it done?

MR. ART: Your Honor, I think we should be able to. I mean, that's our belief from the plaintiffs' perspective all along. My understanding is that we are missing about a dozen files from the sampled set that had not been located in the warehouse and we were waiting for some assistance from the warehouse manager to help locate the boxes in which those files might be filed.

So that is one set of missing files. We have asked Ms. Dimond repeatedly when the warehouse manager will be back to assist and repeatedly have gotten no clear guidance on that.

In addition, there were approximately 15 files missing from boxes that were found. Our scanners that are at the warehouse have asked Ms. Dimond to identify what files in those boxes were part of the sample set so that they can be scanned, but we were waiting on the Cook County Public Defender for both of those things.

Of course, the way the litigation unfolded, we were told repeatedly by the Public Defender that they would not have any contract attorneys assist in the privilege review and were going to do it themselves, and it was only at the end --

close to the end of the scanning process that we learned we would have to hire contract attorneys to participate in the privilege review.

And so even with those delays, I think if the motion is granted out to October 15th, and, frankly, we didn't think it was our motion really procedurally to bring; we asked the Public Defender if they were going to ask for more time, and they said no, but we think that with the Public Defender's cooperation on those points, we could easily get them by October 15th, but the question is whether there will be any cooperation.

THE COURT: Ms. Dimond, I'll come to you in a second.

I'm sure everyone disagrees with everything everybody says here. Sometimes I try to find agreement, and it tends to be 10 percent, and that's a good day.

So I'll come to you, Ms. Dimond, and talk about the issue in a moment. But let me stick with this.

Mr. Art, I know that you're going to file a consolidated response, and I'm going to look for that, but my question to you is there's certain sweeping assertions here that there is zero evidence of *Brady*. You know, you all are good lawyers and when you write something, I do tend to trust what you tell me, even though I know there's going to be another side of the story.

So I guess my question to you, Mr. Art, is your

response to that assertion that there's zero evidence of *Brady* suppression here.

MR. ART: I -- I guess my response, your Honor, is that we've litigated this issue repeatedly in this case at the different procedural postures of the case, citing evidence that's already in the record of not only things that were on paper and suppressed but information known to police officers that were suppressed.

We've described exactly how this theory was presented in the Rivera case and in the Fields case. The City's position in all of those cases is nothing was suppressed in the individual case. We've answered that to the best of our ability, citing evidence to the Court and to the district judge already in this litigation.

We obviously disagree with the City's standpoint that there is no constitutional violation here relating to the suppression of files, and we intend to prove that in the individual case and in the *Monell* case.

What the City is doing here is taking a third or perhaps fourth bite at the exact same apple where it says there's no evidence of suppression of materially exculpatory evidence in this case.

THE COURT: So I understand that, Mr. Art. What I'm getting at is am I going to see -- or you have your individual files here, and you believe there are documents that are or

were suppressed.

MR. ART: Yes.

THE COURT: Am I going to see copies of those documents in your response?

MR. ART: If you would like to, your Honor, we can submit the evidence that at this point we think is suppressed in the response, as we have in past responses.

THE COURT: Okay. I'd like to. I'd like to see it.

Look, I think -- I understand it has been litigated, and I understand that I have raised this issue already both on the nature of how you evaluate claims in discovery based on allegations and because of a lack of bifurcation, but also I have cited and said that there is (inaudible) a genuine dispute as to whether or not *Brady* materials were produced or not, but I think that after two years, the time is ripe for me to at least look at that and confirm that that is indeed the case based on the sweeping allegation made by the City that there's nothing here at all.

I think at a minimum, we should have a record of that now in 2021. So if I could see it and attach it and if you need to file it under seal one way or another, make a motion for that, but I think at this point, I'd like to see what it is.

I probably recognize that the City will disagree in some fashion as to, one, whether it is *Brady* or, two, maybe

another theory, but I'd just like to know what it is that you're asserting, you know, that you would use, let's say, at summary judgment to argue defendants' motion.

MR. ART: Your Honor, that is a slightly more case-specific response than the one I currently have drafted and ready to file in all of these cases today. I guess I would ask for a couple more days just to put that piece of it together and add it to --

THE COURT: That's fine.

MR. ART: -- our consolidated response.

THE COURT: That's fine. I need to talk to you about schedules before I turn to Ms. Dimond.

So the consolidated response, you know, that will be for all cases, when would you -- can you file that you said today, how about tomorrow?

MR. ART: Yes.

THE COURT: So that will be 9/21. And then with respect to the specific argument that there's no *Brady* material (inaudible), you tell me, 9/22 or 9/23?

MR. ART: 9/23 would be great, your Honor.

THE COURT: Okay. 9/23 you can do it in a supplement -- supplemental response for this case only, and I'll take a look at that.

Okay. I have some comments to make obviously, but I'll do that near the end. Let me turn to Ms. Dimond next for

your thoughts on a couple things which I know you raised your hand on.

Go ahead.

MS. DIMOND: Oh, thank you, your Honor. I appreciate it.

Your Honor, first of all, I'd like to say we very much support the motion for a protective order which has been filed by the City. While the Public Defender has already expended a great deal of time and energy in trying to comply with the subpoena, there's still quite a bit of work left to be done. And we very much are in need of the protective order which has been requested.

But let me go ahead and tell you what has happened fairly recently. The Public Defender has invited the plaintiff and their movers and scanners to come out to our warehouse as early as August 12th. They did not come out, would not tell us why they were not coming out that day, but, nevertheless, I told them they could come out within the next couple of weeks, which they eventually did.

On August 25th, I went out to the warehouse with one of our support staff members, one of the plaintiffs' attorneys, two of the defendants' attorneys, and three employees from a moving company. We spent the day out there, and I -- your Honor had agreed that 132 files could be produced. Of the 132 files that were identified in the

randomized list, we were only able to locate 120 of those files. So there were 12 we were not able to locate.

The -- the usual warehouse employee, however, was not the one who looked for all those files originally. It was a group of 11 supervisors who went out there on one day, trying to find them. The warehouse employee is now on an indefinite medical leave, so he will not be coming back any time soon.

I do not believe those 12 files can be located. Those of us who went out to the warehouse on August 25th searched very hard for those files, again, attorneys for both sides and myself and a support staff member. I do not think those 12 files will ever be located.

I went back to the warehouse on August 31st with my assistant and the scanners and began to go through those files, and when I went through -- that is, through the boxes. When I went through the boxes, I realized about 15 of the files were missing from the boxes.

Some of the boxes have pieces of paper in them saying someone had taken that file out 15 or 20 years ago, and apparently it was never put back in the box. So we are down to 105 files that were actually scanned by the scanning company. They spent three full weeks out there. They had anywhere between two, some days three scanners who were out there and who did scan those files.

But now we are at the point of having to pull

privileged documents from those files which are in digital format now.

Your Honor, as you may recall, I, on behalf of the Public Defender's Office, objected very much to having anyone do the privilege reviews other than people in my own office. Eventually, we had to reverse our position on that when we received a decision in the Velez case. The Velez case, the order entered in that case on September 2nd, ordered us to produce about 575 files.

THE COURT: I read the opinion.

MS. DIMOND: It would be just simply impossible for us to do that many privilege reviews. Therefore, the very next day, September 3rd, I notified the parties that outside reviewers, contract attorneys, would have to be hired to do those privilege reviews just at the end of last week, and it was always my understanding that the attorneys for the plaintiffs would be contracting with a company to hire contract attorneys for our privilege review.

However, at the end of last week, it became my understanding that they were planning to send us or assign to us attorneys that were already employed by their firm to do contract work. And these employees, be they regular employees or contract attorneys, are not acceptable to the Public Defender's Office. We want attorneys that --

THE COURT: I understand there was an advertisement

out for people who want to be contract attorneys, not people who are already employed by Loevy and Loevy.

MS. DIMOND: Well, I wasn't quite clear on that from their emails. It sounded like some of them were already working for Loevy and Loevy.

THE COURT: (Inaudible) be inappropriate, but that's not my understanding based on what Mr. Art said today.

Let me just pause on that. Mr. Art, is that right? None of them are employees at Loevy and Loevy?

MR. ART: Correct. We hire project attorneys to work on a project basis as contract attorneys for all kinds of different cases, and that's what we're talking about, drawing upon that pool of contract attorneys, as any other law firm would, to do a particular project. They are not employees.

THE COURT: People who have worked for you in the past on other projects that you would hire to work for you now possibly.

MR. ART: We could do either, but they will be contract -- they will be contract attorneys, not employees of the law firm.

THE COURT: Okay. So you could get people who have never worked on a Loevy and Loevy case.

MR. ART: If necessary, your Honor, yes.

THE COURT: Okay. Ms. Dimond.

MS. DIMOND: Again, your Honor, we would prefer that

they be attorneys hired by an outside agency. I feel that any attorneys who belong to a pool that's routinely hired by Loevy and Loevy, their loyalties are to Loevy and Loevy, and they're not to the Public Defender's Office. Therefore, even though they might not be technically employees, they are contract employees. And if they're routinely periodically repeatedly hired or hope to be repeatedly hired by Loevy in the future, again, their loyalties are not to the Public Defender's Office. They're to Loevy and Loevy.

THE COURT: Okay. Go on. I'll come back to that. Is that it, Ms. Dimond?

MS. DIMOND: Yes, your Honor.

THE COURT: Okay. So let me stop here for a moment.

So, Mr. Art, I'll tell you, I do have some concern -- it was my understanding that this would be an outside vendor that had no connection to Loevy, and even with a pool of people, there's the issue of people hoping to be retained in the future by the firm.

So I guess my question to you, Mr. Art, is there an objection to hiring an outside company?

MR. ART: We will do whatever the Court requires. We did not expect to be hiring anyone until the change of course by the Public Defender after the production was already supposed to be due, but we will do whatever the Court requires.

THE COURT: Okay. So let me be clear. Based on the arguments I've heard, I'm going to order an outside firm that is to conduct the privilege review (inaudible). They're not going to be people that are employed by Loevy and Loevy, nor are they going to be project assistants that are being retained for this project on an individual basis.

There are many contract firms out there. Find one that you can agree on and have them do the privilege review.

Ms. Dimond, does that order take care of that issue for you?

MS. DIMOND: I think it does, your Honor.

I think there will be another issue that will come up, which I'd like to bring to your attention right now if I may, and perhaps it's not an issue, and that is the types of documents that will be withheld. We will, of course, be withholding attorney-client communications and work product. We will also be withholding medical records, which we typically withhold unless we have the consent of the individuals who these records belong to, and we typically withhold grand jury transcripts.

Now, if there's any objections to our practice, I am bringing this to everyone's attention right now.

THE COURT: All right. Mr. Art?

MR. ART: No objection from the plaintiffs, your Honor.

THE COURT: Ms. Susler?

MS. SUSLER: No objection, Judge.

THE COURT: Ms. Dimond, issue solved?

MS. DIMOND: Thank you.

MS. ROSEN: Judge, can I just raise an issue with the grand jury transcripts? Because sometimes obviously witnesses testify in front of the grand jury, and -- and that is a potential source of information about the witness's interactions, both with police and obviously the homicide victim.

And so we -- the City -- our preference would be to actually get the grand jury materials, but we could perhaps address it more individually and have the Public Defender's Office specifically inform us that it's withholding grand jury testimony of certain witnesses with the witnesses perhaps being identified that we could make a case-by-case assessment.

THE COURT: You mean for a specific defense file, you may decide you'd like to motion for the grand jury file?

MS. ROSEN: Correct, because that would be potentially another source, depending on, you know, what the file review comes up with.

So, for example, you know, completely hypothetically, if there's a report that's missing in a PD file that identifies a witness in a police report and that police report, for whatever reason, isn't in the PD file, but if that

individual actually testified in front of the grand jury, that's circumstantial evidence obviously that our people knew that that witness existed, and so maybe the report's missing because the report was misfiled in the PD file, but everybody knew about this witness and what the witness was going to say, that kind of a thing.

THE COURT: All right. Remind me again what is the process to get grand jury files? Do you need an order from the state court judge?

Maybe Ms. Dimond can weigh in here.

MS. DIMOND: Yes, I can.

And I also know that these files, the companion files, are being assessed by the Cook County State's Attorney's Office, and I know they have a position on this matter, too.

From past experience, their position will be that the state court judge needs to approve it. That would be (inaudible) at 26th and California.

So because they're involved, too, if any rulings are going to be made regarding grand jury transcripts, perhaps it would be advisable to allow the State's Attorney's Office to weigh in on this.

THE COURT: Okay. So I understand the issue at this time. Of course, you are free to (inaudible) this privilege and not produce the grand jury material. If there's a

specific request, file a motion, and then I will give every party a chance to weigh in before I decide that issue on a case-by-case basis.

Okay.

MS. ROSEN: So we just would need to know, because we are bypassing the need for a privilege log for these files. This is something we agreed to on the front end. So because of that, we might not know that they're withholding the grand jury materials. So we just need notice of some, you know, maybe we don't need a whole privilege log, but maybe if they could give us notice that grand jury materials are being withheld from a particular file so that we can evaluate it.

THE COURT: Wouldn't grand jury materials be withheld from almost every one of these files? I imagine if a homicide was indicted, it went to the grand jury, and you want to be able to look at the file itself when it's active, things that happened before the grand jury?

MS. ROSEN: Perhaps. I don't know that that's universal.

MS. DIMOND: I don't always find them in the file. Sometimes I do, sometimes I don't.

THE COURT: Okay.

All right. Well, I'll let you to your work. I'm not going to weigh in on something that's not really ripe yet for me to -- without having more information on what there is or

there isn't, but for the moment, it was plaintiffs' subpoena and they have no objection to the privilege withholding that you have questioned, and if it's a situation with a particular file, you can bring it to my attention, and you can talk further on that.

Okay. Let me -- anybody else want to weigh in on this, somebody that hasn't already said? Any of the other defendants?

MR. ENGQUIST: No, your Honor.

THE COURT: Okay.

All right. Let me give you some thoughts about this particular case, if I may.

And I'm not making any rulings. Of course, I will look at the response from the plaintiffs before making a decision, but I can tell you a couple things.

The first is is that it's not as if I'm operating in a vacuum and Judge Seeger is on a different planet, if you will, in this case. I can tell you that the two of us have coordinated, as you do with case management between any magistrate judge and district court judge, and we are on the same page. That is, there was a ruling of bifurcation by Judge Wood, and then there was a plan as to how this case would proceed. That is, it would proceed with both fact discovery on the individual claims and *Monell* discovery through the end of a period of time. And after that time,

there will likely be motions for dispositive rulings by the defendants.

That was the plan, and that's always been the plan. And I can tell you that Judge Seeger and I are on the same page as to that plan. And we don't see that plan changing. That is, this case isn't going to be bifurcated.

Beyond *Monell*, fact discovery should be done, and I'll confirm that with you in a second.

*Monell* fact discovery should be done by the end of this year, and expert discovery should be done by June 30th, 2022. And that's very much the plan that Judge Seeger and I (inaudible) and that we had discussed the various issues with respect to production. And, generally speaking, you know, calls that have to be made as to whether or not and how much documents be produced, we've made those calls, and now the parties need to comply with those orders and get things done.

There are things that happened here that I'm not quite sure how it got to this stage, if you will. You know, I set a timeline for certain things to happen. Nothing has happened.

And with respect to the PD, I didn't get a motion for an extension of time on my order. I'm not quite clear why, Ms. Dimond. It doesn't make sense to me after all our discussions that an order would just be not complied with and no extension -- or at least notice to me or at least a

courtesy discussion about what's happening.

Maybe you want to address that, Ms. Dimond, because that's been on my mind.

MS. DIMOND: Thank you, your Honor. I do -- you ordered, I think you gave us one week to comply with that, and I did during that week offer the plaintiffs an opportunity to come out to our warehouse with their movers and their scanners.

They did not do so. They did not give me any response. I didn't know what else to do. We complied with it in terms of doing as much as we could do.

THE COURT: Okay. Well, I would suggest that, you know, when you have a judge pretty deeply involved in a case like I am in this, just getting me on a phone on a status and letting me know what's going on would be helpful so I can keep track of it, rather than receive a motion embedded with it, I find out that a lot of things that I wanted to happen didn't happen.

So I just kind of put that out there for you to consider next time. There's a lot of cases which I'm not keeping track of as closely as this one, and I wouldn't notice if something was not happening. With this one, I am. And so next time, at least get me on a status if you don't want to file a motion.

Okay. But to continue, I know that Judge -- I'm not

going to speak with Judge Seeger, but I know he gave you some thoughts in a minute entry as to the relationship between the individual case and the *Monell* case. Those were just that, they were thoughts, things to think about as you move through discovery on how you make a determination about the extent of *Monell* discovery.

They won't mean to suggest that I am on a different page than Judge Seeger in our views on what's supposed to happen, okay? I will not -- you are free, you know, anything you want procedurally that allows you to do within the rules, including objections, appeals, what have you, to try to convince each judge of your position, I've got no problem with that.

I just want to let you know that it's not as if we're not coordinating it or we are not talking or we are not case managing this matter together because we are, okay?

And also, you shouldn't expect that anything will be stayed. If for some reason I make a ruling on this motion and I deny it and you choose to object to Judge Seeger, don't expect automatically everything to come to a grinding halt. The assumption is that everything will proceed towards the schedule that we have laid out, frankly that Judge Seeger has laid out and that I'm trying to enforce and impose -- excuse me -- that I'm trying to make sure that everyone complies with is probably the better words to use. And it was certainly my

recommendation, to be quite frank, to Judge Seeger that you be given the extra time for expert discovery to the end of June.

So that's a little bit of background on where things stand. But like I say, I'm not in any way trying to prejudice you in doing what you need to do. I just want to let you know a little bit about what our case management plan is.

Having said that, I will look for the defendants' response, and I will issue a written ruling. It may not be very long, but I will put something on paper.

Here's what I need to regroup with you all on. Nothing should slow down simply because this motion has been filed. There's no stay, and all schedules will continue, and that means the PD files, the contract attorneys that we talked about, privilege review that we've talked about should proceed and should finish by October 15th, okay?

And if you run into a problem, once again, file a motion or get me on a status call and let me help you solve it, but October 15th is the date, and that's the plan.

I am concerned about the State's Attorney's Office because that seems to be moving a lot slower. I understand you've got some time now with expert discovery, but -- so let me regroup with that, Ms. Rosen, because I know you're dealing with the state's attorneys primarily.

Given the schedule that you've been given, what is the date by which you're going to need the state's attorney's

files now?  Do you have that in mind?

MS. ROSEN:  Yeah, one second.

The plaintiff expert disclosures are due January 5th, do I have that correct, Judge?

Or, no, that's not right.  I know it's early January.

THE COURT:  I think it's -- it's sometime in January, and then you have a response.

MS. ROSEN:  90 days later, right?

THE COURT:  So I guess let me put it this way, I need to talk to you again --

MS. ROSEN:  Okay.

THE COURT:  -- on this state's attorney matter. There's two things I need to talk to you about.  One is the state's attorney matter.  I'm sure you're going to report to the state's attorney what happened and that we need to keep this moving and get those files produced.

The second thing, Ms. Rosen, I'd like you to talk to your client about stipulations.  And, you know, I know there are other cases out there.  I'm not telling you -- I can't speak to other cases, and you can obviously do it on a case-by-case basis.

My only request is that you talk to your client about this case and just see whether we can solve part of the problems that you are considering with a stipulation, and I'd like to hear back from you on that.

So it's Monday. Ideally, I'd like to talk to you again pretty soon. I know it's not always easy to get people from the City on the phone.

So then tell me if we can do it this -- can this happen this week?

MS. ROSEN: To report back on both the progress of the State's Attorney's Office and whether the City would agree to some sort of stipulation?

THE COURT: Yes.

MS. ROSEN: Sure. Friday?

Assuming I can get in touch with Ms. Scheller by Friday is fine. Maybe if we put it in an order or something so that she knows.

THE COURT: Ms. Shell being?

MS. ROSEN: Ms. Scheller is the individual at the Cook County State's Attorney's Office who has been at the previous hearings with respect to the Cook County State's Attorney files.

I can get in touch with my client by Friday.

THE COURT: Okay. Give me a second here. Let me look at my schedule.

Okay. My courtroom deputy is out this week, and so I will try to find one for Friday. So let's put it on the books for now.

If for some reason I can't, I will let you know by

46

middle of the week.  But for now, let's do Friday, how is around 10:00 a.m.?

MS. ROSEN:  That's fine for the City, Judge.

THE COURT:  Plaintiff?

MR. ART:  Fine for Plaintiff Reyes, your Honor.

MS. SUSLER:  Yes, fine for Plaintiff Solache as well, Judge.

THE COURT:  Defendants?

Okay.  Ms. Provine, who is Judge Valdez's courtroom deputy, is going to help us out.  So we'll meet on Friday at 10:00 a.m. with a hearing.

It's good on my end, and we'll send you a WebEx invitation for it so you can log on.  Talk to you then, and we'll get some answers at that point to the questions I've raised, and then you have your schedule for the responses to the current motion.

With respect to the motion for an extension of time for the production of files from the Office of Cook County Public Defender that's unopposed, that motion is granted, and has -- I will put in the order that files from the CCPD shall be produced by October 15, 2021, which is the current schedule, anchor date (inaudible) that all the other dates are based on.

Okay.  Anything else?

MR. ART:  Not from plaintiff, your Honor.

MS. ROSEN: Not from the City.

MS. DIMOND: Nothing.

THE COURT: Okay. Talk to you all on Friday. Thank you.

MS. ROSEN: Thank you.

MS. DIMOND: Thank you, Judge.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.


*/s/Kathleen M. Fennell*                    *September 22, 2021*
_____         _____
Kathleen M. Fennell                          Date
Official Court Reporter