```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   ARTURO DeLEON-REYES,              )
                                       )
 4                   Plaintiff,        )
                                       )
 5   -vs-                              )   Case No. 18 CV 1028
                                       )
 6   REYNALDO GUEVARA, et al.,         )
                                       )
 7                   Defendants.       )   Chicago, Illinois
     _____ )   June 28, 2023
 8   GABRIEL SOLACHE,                  )   11:27 a.m.
                                       )
 9                   Plaintiff,        )
                                       )
10   -vs-                              )   Case No. 18 CV 2312
                                       )
11   CITY OF CHICAGO, et al.,          )
                                       )
12                   Defendants.       )

13               TRANSCRIPT OF PROCEEDINGS - Status
               BEFORE THE HONORABLE STEVEN C. SEEGER
14
     APPEARANCES:
15
     For Plaintiff            LOEVY & LOEVY
16   DeLeon-Reyes:            BY:  MR. STEVEN E. ART
                              311 North Aberdeen Street
17                            3rd Floor
                              Chicago, IL  60607
18

19   For Plaintiff           PEOPLE'S LAW OFFICES
     Solache:                 BY:  MS. JANIS M. SUSLER
20                                 MS. NORA SNYDER
                              1180 North Milwaukee Avenue
21                            Chicago, IL  60642

22   Court Reporter:          AMY M. SPEE, CSR, RPR, CRR
                              Federal Official Court Reporter
23                            United States District Court
                              219 South Dearborn Street, Room 2318A
24                            Chicago, IL  60604
                              Telephone:  (312) 818-6531
25                            amyofficialtranscripts@gmail.com
```

```
 1   APPEARANCES (CONT'D):

 2   For Defendant City      ROCK FUSCO & CONNELLY LLC
     of Chicago:             BY:  MS. EILEEN E. ROSEN
 3                           321 North Clark Street
                             Suite 2200
 4                           Chicago, IL  60654

 5   For various            THE SOTOS LAW FIRM, P.C.
     individual officer     BY:  MR. JOSH M. ENGQUIST
 6   defendants:                 MS. ALLISON ROMELFANGER
                            141 West Jackson Boulevard
 7                          Suite 1240 A
                            Chicago, IL  60604
 8
     For Defendant          LEINENWEBER BARONI & DAFFADA LLC
 9   Guevara:               BY:  MR. THOMAS M. LEINENWEBER
                                 MS. MEGAN McGRATH
10                          120 North LaSalle Street
                            Suite 2000
11                          Chicago, IL  60602

12   For Defendant Cook
     County Attorney's      BY:  MR. LYLE K. HENRETTY
13   Office:                50 West Washington Street
                            20th Floor
14                          Chicago, IL  60602

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2          THE CLERK:  18 CV 1028, DeLeon-Reyes versus Guevara,

3    *et al.*, and 18 CV 2312, Solache versus City of Chicago, *et al.*

4          THE COURT:  Good morning, everyone.

5          Welcome.  Welcome.  Come on up.

6          All right.  Let's go ahead and get everyone's

7    appearances on the record, if you would, please.

8          Let's start with counsel for Plaintiff DeLeon-Reyes.

9          MR. ART:  Good morning, Your Honor.

10         Steve Art for Mr. Reyes.

11         THE COURT:  All right.  Good morning.

12         As long as everybody speaks in the microphone, my

13   court reporter will be happy.

14         So Mr. Art, is that right?

15         MR. ART:  Yes, Your Honor.

16         THE COURT:  All right.  Good morning.

17         MR. ART:  Good morning.

18         MS. SUSLER:  Good morning, Judge.

19         Jan Susler on behalf of the plaintiff, Gabriel

20   Solache.

21         THE COURT:  Okay.  Good morning.

22         MS. SNYDER:  Good morning, Your Honor.

23         Nora Snyder, also for Plaintiff Solache.

24         THE COURT:  Okay.  Good morning.

25         MR. HENRETTY:  Good morning, Your Honor.

1    Lyle Henretty on behalf of the Cook County State's
2  Attorney's Office.
3        THE COURT:  Okay.  Good.  All right.  Good morning.
4        Henretty?
5        MR. HENRETTY:  Henretty, H-e-n-r-e-t-t-y.
6        THE COURT:  All right.  Good morning.
7        And --
8        MS. ROSEN:  Good morning, Your Honor.
9        THE COURT:  -- anybody else from the plaintiffs'
10 team?  I assume not.
11        MR. ART:  That's it, Your Honor.
12        THE COURT:  I figured out from microphone placement
13 who is who.
14        Go ahead, defense team.
15        MS. ROSEN:  Good morning, Your Honor.
16        Eileen Rosen on behalf of the City of Chicago in both
17 cases.
18        THE COURT:  Okay.  Good.  Good morning.
19        MR. ENGQUIST:  Good morning, Your Honor.
20        Josh Engquist and Allison Romelfanger --
21        THE COURT:  A little slower, and I'll be happy.
22        Go ahead.
23        MR. ENGQUIST:  Sure.
24        Josh Engquist and Allison Romelfanger --
25        THE COURT:  Okay.

```
 1           MR. ENGQUIST:  -- on behalf of Defendants -- let me
 2    see if I can get them all right here -- Mingey, Biebel,
 3    Dickinson, Harvey, Yanow, Rutherford, Dickinson, Karalow, and
 4    Rogers and Stankus and Trevino.
 5           THE COURT:  Good morning.
 6           MR. LEINENWEBER:  Good morning, Judge.
 7           Tom Leinenweber and Megan McGrath on behalf of
 8    Defendant Reynaldo Guevara in both cases.
 9           THE COURT:  Good morning to you.
10           I fed your father a bagel this morning.  He's well
11    fed.  Good morning to you.
12           MR. LEINENWEBER:  I have lunch with him today.
13           THE COURT:  All right.  There you go.  Well, I can
14    put for the record he is well fed this morning.
15           So good morning, folks.  You know, it's been a while.
16    I was thinking of you folks this morning.
17           Let me actually -- let me back up.
18           I'm sorry that I'm late.  I adjusted the hearing, and
19    then you folks showed up for 11:00 o'clock and you were
20    sitting on those hard benches wondering what on earth is
21    happening behind that door.  I know, because I used to sit on
22    those hard benches wondering what on earth is happening.
23           I remember before I was a district court judge
24    sitting in those hard benches here in the Dirksen Federal
25    Building and saying, "Why can't the judge be on time?  Why
```

1    can't the judge -- the judge is the one who set the hearing.

2    I didn't set the hearing.  The judge set the hearing.  Why

3    can't the judge be on time for his own hearing?"

4            So I am sensitive to that perspective.  If any of you

5    felt sensitive to the hard benches back there, I get it, and

6    I'm sorry.

7            I will tell you, a lot of things happen behind the

8    scenes.  I have a sentencing this afternoon.  I'll just simply

9    say, there is a lot going on.

10           So I acknowledge that it was a later hearing than you

11   expected when you woke up this morning, and then when you

12   arrived in my courtroom, you had to sit and wait on a hard

13   bench.  So I apologize for that.  I do actually respect your

14   time.  So thank you for indulging me.

15           I also wanted to say, it's been a while since I've

16   seen you folks, needless to say.  This case was reassigned to

17   me when I took the bench.  It came over from Judge Wood back

18   in 2019.  There was a song called *It's Been a While* by the

19   band Staind back in the '90s.  There's a line in there:  "It's

20   been a while since I first saw you."  That's what I thought

21   when I prepared for the hearing today.  I do actually remember

22   when you folks rolled back into my courtroom in 2019.  I've

23   been monitoring you folks from afar, seeing a lot of activity

24   on the docket.  We're up to almost 700 docket entries.

25           You've been taken care of by Judge Harjani in the

1   meantime.  I know that you folks have worked incredibly hard.

2   I acknowledge that.  I've seen the entries.  I have not read

3   each and every submission in detail, but I have been reading

4   things, trying to keep up to speed.

5          So I know how hard and how long you folks have worked

6   on the case.  So I appreciate everything you folks have done

7   to get the case in the shape that it's in.

8          My understanding of the case posture is this:  We

9   closed fact discovery back in June of 2021, obviously.  In

10  March of this year, I authorized a limited reopening of

11  discovery for the limited purpose of getting discovery on the

12  certificate of innocence.  The plaintiffs here obtained the

13  certificate of innocence I think in November of 2022.  So it

14  was after the close of discovery.  So nobody had a chance to

15  take discovery on that.  So I thought it was fair game to get

16  to ask some questions.

17         I expressly said in my ruling that I was not making a

18  ruling on any privilege issues.  I acknowledge that there

19  could be all sorts of thorny privilege issues out there that

20  had not emerged, but I let you do a couple of months of

21  discovery on that.

22         I also issued a couple of orders in addition to my

23  initial order on March 7th, 2023, Docket No. 633.  I issued an

24  order on May 12th, 2023, Docket No. 665, and -- as well as

25  another order on May 5th, 2023, Docket No. 652.

1          In there I posed a number of questions to you folks,

2    in particular to the Cook County State's Attorney's Office to

3    try to figure out what the story was.  My understanding was

4    that the Cook County State's Attorney's Office opposed the

5    certificate of innocence for quite a while and then rather

6    unexpectedly dropped the opposition toward the end of last

7    year, I think the night before the hearing, give or take,

8    before the state court judge.

9          I put in my order that it looked abrupt and

10   unexplained.  I think there was a little pushback on that from

11   the Cook County State's Attorney's Office in your filing.  I

12   don't want to get into wordsmithing, but it looked abrupt and

13   it looked unexplained to me.  I don't think anybody, at least

14   as far as I can tell, knows what the reason was.  It's a

15   mystery.  It's a sphinx-like reaction from the Cook County

16   State's Attorney's Office that they opposed it, and then they

17   announced that they weren't opposing it, as I understand the

18   lay of the land.  So I authorized some limited discovery to

19   try to get to the bottom of it.

20         You folks have done some discovery.  I saw that one

21   of the prosecutors was deposed.  You've had quite an extensive

22   document production.  I'm surprised, by the way, about the

23   number of e-mails in question that were scooped up.  I don't

24   know if there were really 20,000 e-mails in question.  I

25   assumed, frankly, that there would be a lot of false hits on

1   that.  I just can't imagine that the Cook County State's

2   Attorney's Office is sending tens of thousands of external

3   e-mails.

4          I mean, what I had in mind, if anything, was any

5   external e-mails between the Cook County State's Attorney's

6   Office and anybody else about the certificate of innocence, if

7   any.  When I issued my order, I frankly didn't think there

8   would be a whole lot to be produced.  I didn't know, but I

9   don't think the Cook County State's Attorney's Office is

10  probably doing a lot of e-mailing on that topic, but if there

11  was any, I'd let you do it.

12         So I did see those filings, and I authorized a

13  limited extension of discovery because I thought that you

14  needed more time to get to the bottom of things.  There is one

15  issue that is pending.  That's why you're here today.  I

16  wanted to talk about it.  It's been a while since we were nose

17  to nose.  I thought we should get nose to nose and talk about

18  the future direction of the case.

19         But I understand that there is an issue about whether

20  Ms. Lanier, First Assistant Lanier should be deposed to get

21  her thoughts on what had transpired.

22         I've got a few preliminary thoughts.  I want to give

23  you folks a chance to say whatever you want to say.  I don't

24  know if there's anything any of you want to say at the outset

25  in terms of setting the table for our discussion today.

1    I say all of this as kind of a warmup, bring

2    everybody up to speed, set the table.  Let's talk about why

3    we're here today.

4         So any sort of -- without arguing the motion yet,

5    folks, is there anything anybody wants to say?  Any sort of

6    background?

7         I'm assuming -- let me start with this:  I assume

8    that all discovery is done on the certificate of innocence

9    except the Lanier hunk, if any, right?  She has not been

10   deposed, obviously, because it's been a -- is there any other

11   lingering issue or are you otherwise done?

12        I'll hear from the plaintiffs' team first.

13        MR. ART:  The only lingering issue --

14        THE COURT:  As long as you go into the microphone,

15   we'll both be happy.

16        MR. ART:  Sorry, Your Honor.

17        THE COURT:  Go ahead.

18        MR. ART:  The only lingering issue --

19        THE COURT:  You're Mr. Art?

20        MR. ART:  Yes.

21        THE COURT:  All right.  So everybody -- say your name

22   -- I'm one for one in remembering names.  Don't hold me to

23   that.  But if you could, everybody, say your name.  It just

24   makes it a whole lot easier for my court reporter.  We'll get

25   to know you, but we don't know you as well yet as we'll know

1    you down the road.

2         So go ahead, please.

3         MR. ART:  Very good, Your Honor.

4         So Steve Art for Plaintiff Reyes.

5         The only lingering issue other than the deposition

6    issue that the defendants have is, we have a request to the

7    City to search for communications with the State's Attorney's

8    Office regarding the COIs.  And we are having a discussion

9    about what custodians to search, but I don't think that that

10   is going to be a dispute that requires the -- or there is

11   going to be a dispute about that.  It's a limited number of

12   custodians and I think a limited search.

13        THE COURT:  Okay.  So these would be communications

14   between the City and the State's Attorney's Office?

15        MR. ART:  Yes, Your Honor.

16        THE COURT:  Okay.  And when do you expect that to be

17   done?

18        MR. ART:  I mean, I hope to have -- go ahead,

19   Ms. Rosen.

20        MS. ROSEN:  So --

21        THE COURT:  As long as you say your name, we'll both

22   be happy.  Into --

23        MS. ROSEN:  Yes.

24        THE COURT:  -- the microphone.

25        MS. ROSEN:  Eileen Rosen on behalf of the City of

1    Chicago.

2           So, Your Honor, the plaintiffs issued a request for

3    the City's communications with the State's Attorney's Office

4    with respect specifically to the COIs of Mr. Solache and

5    Mr. Reyes.  We did a preliminary search and indicated that, to

6    our knowledge, there was no such communication.  But if they

7    wanted specific custodians, both on the City side and the

8    State's Attorney's Office side, searched specifically with

9    search terms, we'd be happy to do that.

10          We offered up a couple names that we thought would be

11   the relevant names, both on the City side and the State's

12   Attorney's Office side, and then plaintiffs' counsel indicated

13   they were going to give us additional custodians.  This was I

14   think two status reports ago.

15          And so we're just waiting for plaintiff to provide

16   any additional custodian names to do that search.  And

17   assuming that it's just a couple more names, then we're happy

18   to run the search.

19          THE COURT:  And did I understand you to say you don't

20   expect there to be any documents to produce, but you're happy

21   to kick the tires on it?

22          MS. ROSEN:  Correct.

23          THE COURT:  All right.  Fair enough.

24          All right.  Anything else by way of bringing

25   everybody up to speed?  Anything?

1    MS. ROSEN:  There is -- sorry, Judge.  Eileen Rosen

2  again.

3    There is just one issue with the response, the

4  subpoena response from the Cook County State's Attorney's

5  Office with respect to e-mails that were produced.  There were

6  some e-mails that were -- part of the e-mails were redacted.

7  We had a Rule 37 conference with Mr. Henretty yesterday or the

8  day before, and Mr. Henretty confirmed that the redactions

9  were not based on privilege, they were based on relevance.

10    And it's the State's Attorney's Office's position

11  that because the topics addressed in that e-mail string, part

12  of which were responsive to the subpoena, part of which were

13  not, if I'm understanding them correctly, were not relevant,

14  and so, therefore, they redacted it.

15    We had 37.1 conference, asked for the topics and the

16  custodians so we could further assess whether or not this was

17  something we wanted to pursue.  The State's Attorney's Office

18  took a position that they don't need to provide that

19  information to us.  We're considering whether or not to leave

20  that alone or whether or not we're going to need court

21  assistance on that.

22    THE COURT:  Okay.  Let's drill down on that, just --

23  a very small drill bit.

24    MR. HENRETTY:  I can give some context, Your Honor.

25    This is Lyle Henretty for the State's Attorney's

1   Office.

2          The document -- the one e-mail chain that we're

3   talking about here was at least in part, the part that we

4   produced, about a meeting between the state's attorney herself

5   and a few other people and some representatives -- or a

6   lawyer, a couple of lawyers, some of which I believe are

7   involved in this case, although I'm not a hundred percent sure

8   about that, but generally involved in the Guevara cases.

9          THE COURT:  This is the June 12th -- or June 14th,

10  2022, meeting with Kim Foxx and Lanier?

11         MR. HENRETTY:  Yeah.

12         THE COURT:  Yeah, I've got it.

13         MR. HENRETTY:  Yeah, that's correct.

14         And --

15         THE COURT:  I'm with you.

16         MR. HENRETTY:  -- attached to that, the e-mail that

17  we produced was the presentation.  And you've looked at the

18  plaintiffs' -- excuse me -- yeah, the plaintiffs' filing

19  yesterday to sort of understand what that was about.

20         I turned it over out of an abundance of caution.  I

21  wasn't certain that it was responsive.  It didn't talk about

22  Solache or Reyes in any detail.  It mentioned them, though.

23  And because it mentioned them and because it mentioned COIs,

24  although not together, I turned it over.  Plus, I knew that

25  the defendants had known about it because they asked me about

1     that document --

2          THE COURT:  Yeah.

3          MR. HENRETTY:  -- before I started searching.

4          So I turned it over just so there wasn't going to be

5     a fight about it and then redacted the remainder of the e-mail

6     chain.  They involve other cases.  It does not involve COIs.

7     Specifically, my -- for one case that wasn't this one, mostly

8     it was about other pending criminal actions and whether -- you

9     know, how those were going to be addressed that involved

10    Guevara.

11         THE COURT:  Okay.  What was redacted by way of

12    concept?  You say it's not relevant, but, like, what's the

13    topic?

14         MR. HENRETTY:  That was -- the topics were about

15    the -- just basically the setup for the meeting and

16    specifically about the -- some other cases involving Guevara.

17         THE COURT:  What does that mean?  Does that mean

18    logistics?  When you say setup of the meeting, what does that

19    mean?

20         MR. HENRETTY:  There was --

21         THE COURT:  Come by and you'll have lunch and --

22         MR. HENRETTY:  It was a five-page e-mail.  It was a

23    bunch of different things.  But it was effectively, here are a

24    bunch of cases by a bunch of lawyers that are currently

25    pending in criminal court that we want to talk about, and that

1   was -- there was some description of what those cases were.

2   On our part, it was mostly practical stuff.

3            THE COURT:  Okay.  So we're not going to do a deep

4   dive into this little side issue today.

5            When you're done, talk it over.  I'd like you to

6   give a -- make a proffer to defense counsel about what's in

7   there --

8            MR. HENRETTY:  That's fine.

9            THE COURT:  -- without producing it yet.  You can

10  figure out if it satisfies you.  You can also figure out if

11  you care.  You know, if you care and you must, you may file a

12  motion.

13           I've often thought, by the way, for discovery

14  motions, I should make litigants post a bond, each side.  If

15  you lose, that's okay, you surrender the bond, you know.

16           I've often thought, too, for pretrial orders, say,

17  you can object as much as you want.  That's the good news, you

18  can object as much as you want.  You really can.  It's fine.

19  As soon as I rule against you three times, all other

20  objections are waived.  So go ahead.  Just make sure they're

21  good.  Because people go crazy on objections, frankly.  I

22  haven't done that, but it's something I've often toyed with.

23           So talk it over, see if it matters.  If it matters

24  and you really need me to tee it up -- you really need to tee

25  it up for me, I'll issue a decision, okay?  But see if it

 1    matters.

 2            MS. ROSEN:  Thank you.

 3            THE COURT:  Okay.  So the -- it's a long way of

 4    saying the Lanier issue is the issue, right?  That's why --

 5    that's the last lingering thing.

 6            So I've read the submissions on it.  I have some

 7    preliminary thoughts.

 8            Do you folks want to say anything at the outset?  I'm

 9    happy to have you folks argue it.  Do you want to give me your

10    best pitch?

11            I mean, you -- is it Henrietta?

12            MR. HENRETTY:  Henretty.

13            THE COURT:  Henretty.  Henretty, okay.

14            MR. HENRETTY:  Henretty.

15            THE COURT:  Henretty.

16            So, Mr. Henretty, it's your motion.  Why don't you

17    just -- I mean, I've read everything, but go ahead and give me

18    your best take on --

19            MR. HENRETTY:  Sure, Your Honor.

20            And when I -- we didn't get an opportunity obviously

21    to reply because -- I shouldn't say that.  I didn't file a

22    reply based on what I read and maybe through the lines in what

23    was filed earlier this week that you didn't want us to file a

24    reply, but I would have been -- I'm happy to do it.

25            THE COURT:  As a general matter, attorneys always

1    want to say more and judges always want lawyers to say less.

2          MR. HENRETTY:  Understood.

3          So I would really just like to hit a few points that

4    are raised and give some clarification, I think, to what's

5    going on here.

6          We did disclose Ms. Lanier as the final

7    decision-maker.  I think it's --

8          THE COURT:  That can't be privileged, by the way.

9    And I have not researched this, and I issued a minute order on

10   this.  But the identity of a decision-maker can't possibly be

11   privileged, right?  I mean, I'm not --

12         MR. HENRETTY:  Our office --

13         THE COURT:  I thought the line about the buck stops

14   here actually was kind of on point.  Like, if you say

15   so-and-so makes a decision, you have not waived privilege.

16         I mean, identifying the speaker isn't privileged,

17   right?  So identifying the decision-maker, I just don't see

18   how that's privileged.

19         But go ahead.

20         MR. HENRETTY:  Yeah, and I just -- you know, we've --

21   obviously we're way past that.  My office has --

22         THE COURT:  I understand, but, you know --

23         MR. HENRETTY:  -- always taken the position just that

24   it's -- the office makes the decision, not the individual who

25   makes the decision.  But I understand, Your Honor.

1          THE COURT:  I mean, technically Kim Foxx makes every

2    decision, right?  I mean, technically, I suppose.

3          MR. HENRETTY:  There is an argument --

4          THE COURT:  It's all delegated authority.

5          MR. HENRETTY:  There is an argument to that.

6          THE COURT:  Yeah.  Go ahead.

7          MR. HENRETTY:  So -- but in this case --

8          THE COURT:  The secret is out.  Ms. Lanier made the

9    decision.

10         MR. HENRETTY:  Ms. Lanier made the decision.

11         I -- again -- and the reason we filed this was, I

12   don't know what question they could ask Ms. Lanier that isn't

13   either privileged or something we can give them through some

14   other means; meaning, you know, when they talk about the --

15   what documents were reviewed, I think -- and then this is -- I

16   don't know how deep we want to get into this.  But the issue

17   that -- in the Brown case in front of Judge Pallmeyer, I

18   disagree wholeheartedly with counsel.  It was decided in that

19   case and ordered in that case that the parties were not

20   allowed to ask who reviewed what in your office.  They were

21   allowed to ask very generally what documents were reviewed in

22   coming to this decision.

23         And we, I believe, have already started providing

24   that through Christa Bowden's deposition.  And I would agree

25   to provide a list of that or however the best way for that to

1    come across.  But who reviewed what we do believe is

2    privileged.

3              And obviously --

4              THE COURT:  All right.  Can I stop you there?  You

5    say, "I believe we've already starting producing that through

6    Christa Bowden's deposition."  So drill down on that.  What

7    exactly have you started producing and have you -- have you

8    made a proffer about what was reviewed generally?

9              MR. HENRETTY:  No, but Christa Bowden talked about

10   what she reviewed.  And that's the other -- that was sort of

11   leading to my next point, which is, you know, Ms. Lanier is

12   very close to the top of this pile.  So without going into

13   specifics on this case, it stands to reason, and it's the

14   typical practice I think in most places with a lot of people

15   in a sort of pyramid of employment, the people that are lower

16   do a lot of work, they pass it up to the next person who does

17   their own work but often doesn't review every single document

18   that was reviewed by the people underneath them.

19             THE COURT:  Mm-hmm.

20             MR. HENRETTY:  So --

21             THE COURT:  Not in this little operation I have here,

22   by the way.  But go ahead.

23             MR. HENRETTY:  That's -- that's fair, Your Honor.

24             But, you know, to the extent that we're talking

25   about, you know, who was making recommendations, who was

1    making -- who was reviewing what as it went up the chain,

2    that's a very different thing than what Ms. Lanier may or may

3    not have looked at in this particular case.

4          And so I think to say anything beyond, you know, she

5    is the final decision-maker, I don't think they can ask too

6    much beyond that that would be -- that would be privileged.

7          And for the first time in their response they did say

8    that they believe that even if it is privileged, that they --

9    that the privilege outweighs the -- or -- excuse me -- that

10    the privilege is outweighed by their need for this information

11    in this case.  And that is, again -- and something I've -- you

12    know, I would respond, I would have said that other cases have

13    already -- other judges in this courthouse have said no to

14    that, including the Brown case.

15          Those are, I would say, the main ones.  I don't want

16    to sort of nitpick through this, but I have -- any questions

17    Your Honor has, I'd be happy to talk about or answer.

18          THE COURT:  Did Ms. Lanier communicate with anyone

19    outside of the Cook County State's Attorney's Office about the

20    certificate of innocence in this case?

21          MR. HENRETTY:  No.

22          THE COURT:  Did anyone make a presentation to her,

23    for example?  Anybody outside her organization?

24          MR. HENRETTY:  No.

25          THE COURT:  Okay.  And she's not made any public

1   statements about it --

2             MR. HENRETTY:  No.

3             THE COURT:  -- right?

4             Okay.  And I understand from the plaintiff team, you,

5   I assume, are going to want to present evidence of the

6   certificate of innocence at trial.  And you said in your

7   filing that you would not seek to present evidence to the jury

8   that the Cook County State's Attorney's Office formally

9   opposed the certificate of innocence and then retracted its

10  opposition, right?

11            MR. ART:  Steve Art for Plaintiff Reyes.

12            And I can speak for both plaintiffs.  That's correct,

13  Your Honor.

14            THE COURT:  Okay.  Okay.  So the fact that the Cook

15  County State's Attorney's Office formally opposed it but then

16  no longer opposed it won't be tendered by the plaintiff.  So I

17  think that affects the relevance of the information.  If it's

18  not going to come out that they did a bait-and-switch, why

19  does it matter -- not a bait-and-switch.  Maybe flip-flop.  I

20  don't mean that in a pejorative sense.

21            But like, if the fact that they flip-flopped isn't

22  going to come out, why does it matter the reasons for the

23  flip-flop, is a thought that I had.

24            MR. HENRETTY:  I would agree.

25            THE COURT:  I see heads nodding on the right and

1   heads staying still on the left.

2        So why don't I hear from the defense team.  Go ahead.

3        MS. ROSEN:  Sure, Judge.

4        So it's our expectation that what's going to happen

5   at trial is going to be very similar to what's happened at

6   trials in this building in other cases.  And in fact,

7   recently, just a couple weeks ago, there was another reverse

8   conviction case where the plaintiff in that case had a COI,

9   and Mr. Reyes's counsel argued in rebuttal to the defense

10  closing argument specifically:  "Ms. Ekl," who was the defense

11  attorney, "has eloquently and carefully explained to you all

12  the evidence that in 1996 got Adam Gray convicted.  That

13  evidence has been vacated.  The Cook County State's Attorney's

14  Office decided that the conviction, based on everything she

15  just talked about for the last hour and a half, could not

16  stand because it would be contrary to the interests of justice

17  because science has intervened and we now know the confession

18  is false."

19       So we fully expect a similar argument to be made to

20  the jury in this case if we get to a jury, that the

21  confessions in this case are false in part because the State's

22  Attorney's Office took the position that they were innocent.

23       In this particular case, we have sworn testimony from

24  the former first assistant corporation counsel, Eric Sussman,

25  who was -- Sussman.

1        MR. ENGQUIST:  State's attorney.

2        MS. ROSEN:  Oh, sorry, state's attorney.  I

3   apologize.  First Assistant State's Attorney Eric Sussman, who

4   was involved in the post-conviction proceedings in the case.

5   So after the case came back from the appellate court, there

6   was a new hearing on the motions to suppress.  Mr. Sussman was

7   involved.

8        During that hearing, the judge suppressed the

9   confessions, and then it was up to the State's Attorney's

10  Office whether or not to proceed to trial.

11       And after some deliberation, they made the decision

12  that they could not, without the confessions, proceed to

13  trial, and so then the convictions were vacated.  At that

14  point in time, the petitions for certificate of innocence were

15  filed and they were litigated for years and years and years,

16  as the Court knows.

17       Mr. Sussman in a deposition in this case testified

18  that the decision not to proceed to trial after the

19  confessions were suppressed had nothing at all to do with

20  innocence and that there wasn't anybody in the Cook County

21  State's Attorney's Office that made that decision based on

22  innocence and that had to do with whether or not they could

23  prove the case beyond a reasonable doubt, which is what their

24  obligation is as prosecutors, and that that was the decision

25  at that time.

1          Now, fast-forward that, and then the COI is litigated

2    and litigated and litigated.  Obviously the pandemic impacted

3    the speed with which things got accomplished.  But in large

4    part, evidence that was developed in the civil case here was

5    utilized in the post-conviction proceeding.  And the

6    depositions that were taken here were provided to the State's

7    Attorney's Office.  The lawyers that are involved and

8    represent Mr. Solache and Mr. Reyes here represented them in

9    COI petitions.

10          And at one -- at some point in time late last year, I

11   believe -- or early last year, if I have my timeline correct,

12   Mr. Reyes filed a motion for summary judgment on his -- on the

13   petition.

14          That's the -- the -- the procedural posture of the

15   case that was pending before the judge up until the moment in

16   time that the State's Attorney's Office did this about-face in

17   November of 2022.

18          Ms. Bowden testified that she was on vacation the

19   week before.  She was preparing to make her argument in front

20   of the Court on the Monday or the Tuesday that it was set for

21   hearing, and that she got an e-mail with no explanation

22   whatsoever that she was to go into court and let everybody

23   know that the State's Attorney's Office was withdrawing its

24   opposition.

25          And she told us at her deposition she never

1    communicated or made recommendations up the chain of command

2    to do anything and that she was proceeding under her previous

3    marching orders.

4         So obviously something occurred.  And in order for

5    the defendants to rebut what we expect to be the argument that

6    is made over and over and over in this building, that the

7    evidence that was developed at the time of the case can no

8    longer be trusted because the Cook County State's Attorney's

9    Office is now saying they were innocent, has to -- if there's

10   evidence to utilize to rebut that, we have to have that

11   evidence available to us.  And right now, it appears that the

12   only person with that information is the current first

13   assistant, Ms. Lanier.

14         THE COURT:  Okay.  I appreciate that.

15         So I want to hear from the plaintiff team again.  I'd

16   like -- and I read your submissions on this, but I want to

17   make sure we're all on the same page.

18         What exactly do the plaintiffs hope to say to the

19   jury about the Cook County State's Attorney's Office with

20   respect to the certificates of innocence?

21         MR. ART:  We expect to present no evidence or

22   argument at all about the Cook County State's Attorney's

23   position on the COI proceedings whatsoever.  So that's correct

24   what Ms. Rosen just said.

25         And I'm sorry, Your Honor.  This is Steve Art for

1  Plaintiff Reyes, but speaking for both plaintiffs.

2            That's correct in the Gray case that was just tried

3  before Judge Chang.  The state's attorney's position was

4  brought in as evidence on the COI and it was argued.  What

5  we're saying here is, we don't intend to present that evidence

6  chiefly because we don't know.

7            THE COURT:  Isn't that better for you?  That seems

8  like a win for you.  I mean, they're not going to say anything

9  about what position the State's -- the Cook County State's

10 Attorney's Office took.  In other words, they're not going to

11 say that the Cook County State's Attorney's Office put their

12 thumb on the scale and thinks that these people are innocent.

13 It just won't come in.

14           MR. ART:  And for the record, that's correct,

15 Your Honor.

16           THE COURT:  Okay.

17           MS. ROSEN:  Well -- but the COI is coming in, right?

18 So they're going to waive --

19           THE COURT:  Well, can we talk about that?

20           Is it?  Can I just tell you -- and this may be a

21 little judicial thunderbolt -- I'm not sure.  So everybody

22 should start thinking about that.  I let it in in Bolden.  You

23 all probably know that.  It's not a secret.  It's out there.

24 I wrote on it.  You all have had lots and lots of these cases.

25 I didn't have a lot of these 1983 cases at the SEC or at

1   Kirkland & Ellis, so I'm still getting up to speed on this.

2   I'm still learning the case law.  A lot of judges have allowed

3   them.  I'm not sure, candidly.  I have some 403 concerns about

4   whether they will get undo weight in front of a jury.

5        I mean, it looked to me like the judge entertained an

6   awfully short hearing here.  It was like three or four pages

7   where it looked like people rolled in and said, "I want a

8   certificate of innocence."  No opposition, granted.  That's

9   what it looked like here.  And if that's what happened, I have

10  questions in my mind about whether hearing about a certificate

11  of innocence would get an inflated sense of importance in

12  front of the jury.

13       I mean, it looks to me like there was no

14  evidence-gathering by the state court judge or any

15  investigatory body.  There was no testimony taken.  There was

16  no evidentiary hearing.  There was a short hearing that was

17  not opposed and it was granted.

18       I could be missing something.  I don't know what I

19  don't know.  But that's what it looks like to me.

20       And I will say, as a general matter, and I genuinely

21  mean this, I'm keeping an open mind.  So don't anybody get

22  concerned or excited.  Okay?  Don't anybody get concerned or

23  excited.  But I thought I should tell you that nobody should

24  bank on any ruling on this one way or the other, because I

25  have some uncomfort -- discomfort on whether it's going to

1   come in.  Maybe it ought to come in.  It looks like most

2   judges -- most, it looks like, let it in because it is

3   relevant to whether the case was disposed of in a manner that

4   is indicative of innocence.  That's what I did in Bolden.

5   That's what I said in the Bolden case.  I wrote on this.  I'm

6   sure you've seen it.  I had a nice little string cite on this.

7   I remember citing Judge St. Eve and company, so I thought I

8   was in good company with Judge St. Eve and company.  But I

9   have had some moments of quiet reflection since then about

10  whether that's the right thing to do.  Maybe it is the right

11  thing to do.

12          But I will tell you, nobody should take it as a given

13  that it's coming in.  Okay?  So people should be prepared to

14  entertain discussion on that.  Because I don't know.

15          I mean, I think, okay, you've got 12 bodies in the

16  chairs over there.  They're going to decide, you know, was

17  this case resolved in a manner that's indicative of innocence.

18  They hear that there's a certificate of innocence issued by a

19  state court judge, that's going to be impactful for your

20  average person.  That's going to mean a lot.

21          Is that actually all that it purports to be from a

22  probative value sense?  I mean, if somebody rolled into court

23  and said, look, I want a certificate of innocence, and it

24  wasn't opposed and the -- I don't want to say the judge rolled

25  over, because that sounds bad.  What if the judge said, "Okay,

1    it's not opposed.  There is a basis for it.  I'll grant it"?

2    I just wonder how much weight a decision like that should be

3    entitled to.

4              It's entitled to something.  I respect state judges.

5    You know, it's certainly not a nothing.  I have questions in

6    my mind, though, about whether it would have an inflated,

7    oversized importance in the minds of the jurors.  I'm not

8    saying it's not important.  I'm saying, I have questions about

9    whether it would be overstated by the jury.

10             I don't know if any of this is a surprise to people,

11   but I wanted to front it because, you know, when you think

12   about trial, people shouldn't bank on it coming in or not

13   coming in.  I don't know.  You know, these are hard questions

14   for me.  Maybe it's easy for you all.  Maybe you see it clear

15   as day.  I'm not a hundred percent sure, and I've wrestled

16   with it, you know.

17             So you've baked in a premise there in your statement.

18   You kind of launched me into a discussion here about whether

19   it's going to come in.  It may come in, okay?  I don't know.

20   It may not.

21             But the premise of your question was that I was going

22   to let it in.  So go ahead from there.

23             MS. ROSEN:  Okay.  So assuming that the COI comes in,

24   we believe that it does have that kind of weight that you were

25   just talking about to a jury and that we have to have an

1   explanation for it.

2          And if the explanation is that the State's Attorney's

3   Office made this decision based on X, then that -- whatever

4   that reason is --

5          THE COURT:  That premise doesn't seem correct to me.

6   And I'm sorry to interrupt you.  But I understood plaintiffs'

7   counsel to say they -- they aren't going to present that.  So

8   I assume the evidence would be, they sought a certificate of

9   innocence and it was granted by the judge.  And you're

10  not going to -- the state court judge.  And you're not going

11  to tell the jury anything about whether it was opposed one way

12  or the other?

13         MR. ART:  Correct.

14         THE COURT:  Okay.

15         MR. ART:  Your Honor, this is Steve Art for Plaintiff

16  Reyes but speaking for both plaintiffs.

17         That's correct.  The thing that could be introduced

18  as the evidence before the state court judge when the state

19  court judge made that decision and the state court judge's

20  reasoning potentially --

21         THE COURT:  Hm-hmm.

22         MR. ART:  -- we don't know why the Cook County

23  State's Attorney --

24         THE COURT:  Hm-hmm.

25         MR. ART:  -- did what it did --

1          THE COURT:  Hm-hmm.

2          MR. ART:  -- and so we have no evidence to present.

3          THE COURT:  Yeah.

4          MR. ART:  So we don't intend to present it, we don't

5     intend to argue it, and we also don't know.

6          THE COURT:  Okay.  If the jury hears that there was a

7     litigated certificate of innocence presented to a state court,

8     is the jury going to infer that it was opposed?  I just wonder

9     about that.  Because usually things in court are opposed.

10    That's the presumption.  It's an adversary system by

11    definition.

12          If they don't hear -- if you don't hear anything

13    about it, whether it was opposed or not, most people probably

14    think things in court are opposed.

15          MR. ART:  I --

16          THE COURT:  And so the jury might think, boy, it was

17    opposed and the Court still did it, so, therefore, that's

18    important.  Or if the Court -- if the jury hears it was not

19    opposed, then they're going to think, okay, well, that really

20    is -- has merit.

21          I mean, it seems like if they hear that a certificate

22    of innocence was issued by a judge, they're either going to

23    think it's really important because it was opposed and the

24    judge decided after going through some process that this was

25    the right outcome, or they went in front of a state court

1　judge and it wasn't imposed, and the fact that it wasn't

2　imposed really tells you something, there really wasn't --

3　these guys really must have been innocent.

4　　　　You know, I'm thinking out loud here, obviously.  But

5　go ahead.

6　　　　MR. ART:  I think from our perspective, we don't know

7　the reason.

8　　　　THE COURT:  Yep.

9　　　　MR. ART:  We don't intend to present that reason

10　as --

11　　　　THE COURT:  Right.

12　　　　MR. ART:  -- evidence, we don't intend to argue it,

13　and we don't oppose any of the relief the defendants are

14　seeking in terms of doing discovery about the certificate of

15　innocence --

16　　　　THE COURT:  Yeah, yeah.

17　　　　MR. ART:  -- because we understand the points that

18　they are making --

19　　　　THE COURT:  Yeah.

20　　　　MR. ART:  -- about needing to do that discovery --

21　　　　THE COURT:  Yep.

22　　　　MR. ART:  -- given that we do intend to try to offer

23　this as evidence.  And we will address the admissibility of

24　the COI and all of the --

25　　　　THE COURT:  Yeah.

1      MR. ART:  -- points Your Honor just raised at the

2  appropriate point in pretrial, but we understand their need

3  for --

4      THE COURT:  Yeah, let me drill down on that a little

5  bit.

6      What material was presented to the state court judge

7  when she made the decision?

8      MR. ART:  So --

9      THE COURT:  If you know.

10     MR. ART:  -- I can't tell you off the top of my head

11  exactly what the state court judge had, but sometimes these

12  rulings are on the papers, right?  So it's the petition with

13  exhibits, right?

14     THE COURT:  Right.

15     MR. ART:  And the judge makes a decision.

16     THE COURT:  Right.

17     MR. ART:  Sometimes there's a full summary judgment

18  record.  And I don't want to misrepresent what was in that

19  summary judgment record because I don't know standing here

20  right now.

21     But there was fully briefed summary judgment motions.

22  It could have just been on the issue -- we had just had a case

23  before the Illinois Supreme Court in the Palmer case about

24  changing positions --

25     THE COURT:  Mm-hmm.

1          MR. ART:  -- in COI proceedings.  And so it might

2   have just been a legal brief at summary judgment on that

3   issue.

4          And then in some cases, they're full-on hearings,

5   right, with evidence --

6          THE COURT:  Right.

7          MR. ART:  -- presented by witnesses, which there

8   weren't here.

9          So I don't think that it was just, you know, here's a

10  petition, no opposition, here's your COI.  I think there was

11  more of a robust evidentiary record, because the State

12  requires one.

13         THE COURT:  But not an evidentiary hearing?

14         MR. ART:  Correct, Your Honor.

15         THE COURT:  Okay.  So there is a written record of

16  some kind --

17         MR. ART:  Correct.

18         THE COURT:  -- and to be determined.  I mean, we

19  could figure out what it was.

20         Do you know off the top of your head?

21         MS. ROSEN:  So it's my understanding, based on just

22  reviewing the pleadings and the transcripts, that Plaintiff --

23  Plaintiff Reyes filed a motion for summary judgment and

24  attached certain depositions and certain things --

25         THE COURT:  Okay.

1          MS. ROSEN:  -- from the civil case.

2          THE COURT:  Okay.

3          MS. ROSEN:  And that the State filed a response also

4   attaching certain depositions and certain things, mostly from

5   the civil case.

6          THE COURT:  Okay.

7          MS. ROSEN:  And then there may have been a reply.  I

8   don't recall.  It was set for hearing on the summary judgment

9   for Reyes only because Reyes is the only one that filed

10  summary judgment.  And then it's my understanding that there

11  was supposed to be an evidentiary hearing.  So this was

12  November 2022, and I thought it was maybe February 2023 for

13  the remain- -- for whatever was left after the Court ruled on

14  summary judgment.

15         So if Reyes did not win summary judgment at that

16  point, then on the remainder of whatever issues were left for

17  his hearing and then Mr. Solache's hearing because he did not

18  file a summary judgment at all.

19         So the Court had whatever pleadings had been filed, I

20  suppose.  I don't know what else the Court would have had.

21  And certainly the Court had not heard any testimony at that

22  point in time because no hearing had been scheduled.

23         THE COURT:  Okay.  Well, not to repeat myself, but I

24  am wondering what, if anything, the jury could hear about

25  whether the application for a certificate of innocence was

1   opposed.  Because it seems like if you don't say anything, the

2   jury is going to think that it was opposed.  But if you tell

3   them it wasn't opposed, that gets tricky, too, for the reasons

4   we've just talked about.

5           Here's an issue I'm struggling with:  I don't know

6   what information the defense team could elicit from this

7   deposition that would be nonprivileged and relevant, those two

8   things.  That's what I'm struggling with.

9           Like, what -- what do you expect she could say that

10  would not spill the beans in terms of the basis for the

11  decision and divulge privilege and that would help you -- you

12  know, we're all thinking about how this is going to go at

13  trial, right?  So we've got witnesses at trial.  We have got

14  closing arguments at trial.  How is it actually going to

15  advance the ball at trial?  What could she say that you would

16  actually use?

17          MS. ROSEN:  Well, for -- it's the defendants'

18  position, which I think we lay out in our papers, that the

19  information that she reviewed in making her decision is not

20  privileged.

21          THE COURT:  Well, I saw that, but let's say it's --

22  let's say she testified -- you get her, and she says, "I

23  reviewed nothing," or she says, you know, "I reviewed every

24  last piece of evidence.  You know, we withdrew it -- we

25  withdrew our opposition because I read all of the depositions.

1   I talked to the scientists who did the lab tests.  I, you

2   know, talked to the parties themselves.  I did a thorough,

3   exhaustive" -- you know, I don't know how that helps you

4   either way.  Or somewhere in between.  You know, how -- the --

5   you may or may not be right that it's not privileged what she

6   reviewed.  I have questions about that.

7           But put that aside, I don't know how it advances the

8   ball for you.  Ms. Lanier, when she made the decision the

9   office would not oppose the certificate of innocence, looked

10  at X, Y, and Z.  How does that help you?

11          MS. ROSEN:  So, for example, Judge, if she were -- if

12  we were permitted to get her deposition and we were permitted

13  to ask questions around the meeting or meetings that were had

14  between Ms. Lanier or Ms. Foxx and plaintiffs' counsel in this

15  case about -- which the topic of Mr. Solache and Mr. Reyes's

16  case is part of the PowerPoint presentation.  I mean,

17  Solache's and Reyes' names appear.

18          Now, we appreciate, based on plaintiffs' filing, that

19  plaintiffs have said that they didn't specifically talk about

20  Solache and Reyes in the meeting in June.

21          But the purpose of the meeting, right, was to

22  persuade the State's Attorney's Office to change course with

23  respect to how they were handling the Guevara cases generally,

24  and Solache and Reyes were part of that discussion.

25          And so to the extent -- whatever plaintiffs' pitch

1    was -- plaintiffs' counsel pitch was --

2            THE COURT:  Well, they were part of the discussion in

3    concept or in particularity?

4            MS. ROSEN:  According to the PowerPoint.

5            THE COURT:  Okay.

6            MS. ROSEN:  I mean, you know, we could depose, I

7    suppose, plaintiffs' counsel, but that would probably --

8            THE COURT:  That's not happening.

9            MS. ROSEN:  Yeah, that's probably going to take us,

10   you know, into a whole different area, but -- so --

11           THE COURT:  That's where things go completely off the

12   rails.  You know that litigation has jumped a shark when

13   people have --

14           MS. ROSEN:  Yeah.

15           THE COURT:  -- started talking about -- and I have

16   actually seen that in a former life, where people try to

17   depose opposing counsel.  I never like it, but --

18           MS. ROSEN:  We so far have not jumped that shark,

19   but, you know, you never know.

20           Anyway, base- -- and this is simply based on the

21   pleading, right?  Like, so we have -- the only thing we knew

22   about the meeting --

23           THE COURT:  The losing party always wants to depose

24   the opposing lawyer.  It's a sign you're losing the case.

25           Anyway, go ahead.

1         MS. ROSEN:  So with respect to the meeting, to the

2   extent that the pitch was Guevara generally and that Solache

3   and Reyes were part of that discussion and the only thing

4   pending at that point in time was the COI and the State's

5   Attorney's Office had at that point settled out of the case so

6   that its liability was fixed and set in stone with respect to

7   that, did Ms. Lanier know that the case -- the civil case had

8   settled?  And did that factor into her decision?

9         You know, maybe we don't get to ask did that factor

10  into her decision if you say that the basis for her decision

11  is protected, but certainly did she know it.

12        THE COURT:  Can I -- is the jury going to hear that

13  that settlement exists?

14        MR. ART:  No, Your Honor.

15        THE COURT:  I mean, I'm thinking about how this is

16  going to play out in trial.  I mean, we can be curious about

17  all kinds of things, but what I care about is what those 12

18  people are going to hear.  And whether she knew about a

19  settlement won't advance the ball at trial unless the jury

20  knows that there was a settlement, and then there are a couple

21  other things.  But they're not going to know about the

22  settlement, are they?

23        All right.  So I can't -- right?

24        MR. ART:  Steve Art for Plaintiff Reyes speaking for

25  both plaintiffs.

1          No.

2          THE COURT: Right. So --

3          MR. ART: Settlements never come in.

4          THE COURT: So --

5          MS. ROSEN: Okay. So you -- I mean, if you take that

6 piece of --

7          THE COURT: You're winning little mini victories

8 here.

9          MS. ROSEN: I --

10          THE COURT: You're racking them up. You know, I'll

11 give them to you.

12          Go ahead.

13          MS. ROSEN: So -- but the point of the matter is,

14 Judge, you know, we have this fact pattern and this timeline

15 here where the State's Attorney's Office had consistently

16 taken the position that Mr. Solache -- that the prosecution of

17 Mr. Solache and Mr. Reyes did not end based on any decision by

18 that office that they were innocent. And then suddenly

19 they're given this COI that obviously impacts dramatically

20 this case if it's to come into evidence at trial and it

21 changes the dynamic.

22          So from the defendants' perspective, we need to

23 understand what she looked at. I mean, we believe based on

24 our papers that the basis, the -- not the deliberations,

25 right, not the communications leading up to the final

1    decision.  But at some point in time, Ms. Lanier made a

2    decision.  And the basis for that decision, we think, is not

3    protected.  She is -- if she is the final decision-maker for

4    that office, deliberative process only protects the

5    deliberations.  And once the decision is made, the basis for

6    decision is fair game.

7            THE COURT:  What if she were to say, "Well, look,

8    before I made the decision, I got a memo from my staff, and

9    the staff summarized, you know, the testimony of the people,

10   you know, the people involved," would that fact come out at

11   trial and would that advance the ball?

12           When the Cook County State's Attorney's Office made

13   the decision through Ms. Lanier, she received a memo that

14   summarized the applicable evidence.  Would that come in?  Does

15   that help?  I don't know --

16           MS. ROSEN:  Well, come in or help --

17           THE COURT:  I mean --

18           MS. ROSEN:  -- you know, I'm not sure if that's

19   correct.  But if she says, "I made the decision simply because

20   this was a Guevara case, and our office has made the decision

21   that we are no longer fighting Guevara cases," then that's not

22   based on innocence, right?  That's just based on a decision

23   made by the Cook County State's Attorney's Office --

24           THE COURT:  You could be able to figure -- you could

25   figure that out independently, couldn't you?

1              I mean, how many Guevara cases are there?

2              And I'm just -- couldn't you hypothetically -- and

3      this was a question that I frankly had for the Cook County

4      State's Attorney's Office.

5              I mean, are they opposing certificates of innocence

6      in these Guevara cases?

7              MR. HENRETTY:  I don't know the answer to that

8      generally.  I know about --

9              THE COURT:  Would you rather answer that question or

10     have Ms. Lanier raise her right hand?  You have to pick.

11             MR. HENRETTY:  No, no.  I'm certainly going to find

12     out --

13             THE COURT:  That's a --

14             MR. HENRETTY:  -- the answer to that --

15             THE COURT:  -- rhetorical question.

16             MR. HENRETTY:  -- question.  I mean, I could

17     generally find out the answer to that question.

18             THE COURT:  Yeah.

19             MR. HENRETTY:  I suspect -- my understanding is they

20     are.

21             THE COURT:  They are what?

22             MR. HENRETTY:  We are -- not all of them, but, you

23     know, on a case-by-case basis, they decide to oppose some and

24     not others, is my understanding.

25             But if I may, Your Honor, we did offer an affidavit

1      from Ms. Lanier -- or from our office, I think from

2      Ms. Lanier, saying that this decision was not -- no decision

3      was made on innocence in deciding to withdraw the objection,

4      and that was insufficient, which it sounds to me like that's

5      what they're asking --

6              THE COURT:  Say that one more time.

7              MR. HENRETTY:  Sure.

8              And I'll read it from -- because it was not me who

9      made the proffer.  It was somebody else.

10             They said:  "To declare that the withdrawal of the

11     CCSAO's opposition to the COIs did not reflect a final

12     determination that Solache or Reyes were innocent."

13             And I think all -- the -- I believe everybody agreed

14     to that except for the defendants.

15             THE COURT:  Why doesn't that help you?  That seems

16     pretty helpful to you.

17             MS. ROSEN:  Well, Judge, it was -- well, initially --

18     and I have to go back and look at the proffer because I think

19     originally when the proffer was offered, then plaintiffs'

20     counsel said that if that's the case, then they need to get

21     behind the decision.

22             So they -- plaintiff was not going to agree to that.

23     And I, quite frankly, have lost the thread on that original

24     proffer --

25             MR. HENRETTY:  And if I misspoke, I apologize.

1    MS. ROSEN:  -- and what is plaintiffs' changed course

2   on that.

3    MR. ART:  Your Honor, I can speak --

4    THE COURT:  Yeah.

5    MR. ART:  -- for -- this is Steve Art for Plaintiff

6   Reyes speaking for both plaintiffs.

7    There was the idea floated in Rule 37 conversations

8   about a proffer that would be put in place in lieu of a

9   deposition, and I believe Ms. Scheller from the Cook County

10  State's Attorney's Office proposed language similar to what

11  Mr. Henretty has just read in court.  And the parties

12  discussed that it could be problematic to have a -- have a

13  proffer or statement from the State's Attorney's Office that

14  favored one party over the other.

15   So I think what I said during that Rule 37 call is,

16  if it said it's not based on a determination about innocence,

17  we'd certainly need language along the lines of "or guilt."

18  And we'd probably need to know what the basis was so that we

19  don't just have a piece of evidence that says it's not X.

20   THE COURT:  Well, we're talking here not about the

21  meaning of the certificate of innocence but about why the Cook

22  County State's Attorney's Office did what it did.

23   MR. ART:  Right, Your Honor.

24   THE COURT:  So --

25   MR. ART:  I apologize.

1      THE COURT:  Do you want to read the language again
2  that you --
3      MR. HENRETTY:  And if I -- I may have stepped
4  earlier.
5      Ms. Scheller was the one on the phone, and she is
6  prepping for a Seventh Circuit argument tomorrow, which is why
7  she is not here with me --
8      THE COURT:  Okay.
9      MR. HENRETTY:  -- today.
10      It was something along the lines of -- my
11  understanding was that it was that the CCSAO had declared that
12  a withdrawal of its opposition to the COIs did not reflect a
13  final determination that Solache or Reyes were innocent or if
14  it was innocent or guilty.  I don't -- I thought it was
15  just -- that's what I had thought the proffer was.  And
16  maybe -- I didn't mean to suggest that the plaintiffs had
17  agreed to that.  I apologize.
18      THE COURT:  Yeah.  Well, they wouldn't have withdrawn
19  their opposition because they thought he was guilty, right?  I
20  mean, I don't understand the assertion of guilt there in the
21  language.  You don't withdraw an opposition to a certificate
22  of innocence because you think somebody was guilty.
23      MR. ART:  I think our more general point,
24  Your Honor --
25      THE COURT:  Yeah.

1          MR. ART:  -- this is Steve Art --

2          THE COURT:  Yeah.

3          MR. ART:  -- speaking for plaintiffs -- is, if there

4    is going to be a statement from the first assistant that says,

5    our reasons for changing our positions -- position in this

6    proceeding were not, whatever the statement is going to say,

7    X, then the statement should say what the reasons were.

8          I suspect that -- and this is speculation because we

9    do not know.  I suspect there is an institutional change in

10   position in Guevara cases because of the pattern of

11   misconduct, right?  The defense side doesn't want that

12   evidence in at trial, right?  And I don't even know if it

13   could come in.

14         But the idea that the COI would come in and the

15   defendants would have a statement tailored to their evidence

16   in the case from the first assistant saying it wasn't about

17   innocence and then there's nothing to respond to, no evidence

18   about what the reason was, what the basis for the decision was

19   seems to tip the scales the other way and make it unfair for

20   the plaintiffs.  So that's our position on the stipulation

21   that was proposed by the state's attorney.

22         THE COURT:  Okay.  Okay.  I interrupted.  You were

23   saying?

24         MR. HENRETTY:  I think that was the majority of it,

25   Your Honor.

```
 1            I did want to point out -- and I lost it earlier --
 2   the closing argument in the case from a few weeks ago that was
 3   read earlier didn't talk about COIs.  That was about the
 4   decision not to retry, which has been deposed in this case.  I
 5   don't think the word "COI" was anywhere in there.
 6            They were talking about the CCSAO decided not to
 7   retry these people.
 8            THE COURT:  Mm-hmm.
 9            MR. HENRETTY:  And that is -- that's already been --
10   you know, we had Mr. Sussman testify about that already.
11            THE COURT:  So -- you go ahead.
12            MS. ROSEN:  Yeah, no, I think that's a different case
13   that you're talking about.
14            MR. HENRETTY:  That you just read.
15            MS. ROSEN:  From Gray, no.
16            MR. HENRETTY:  That was about COI.
17            THE COURT:  Let's go into the microphone.
18            MS. ROSEN:  Yeah, sure.  Sorry.
19            I'm pretty sure that this argument had to do with the
20   COI.
21            MR. HENRETTY:  What you just read didn't.  That's
22   why --
23            MS. ROSEN:  Okay.  Well, I -- it was the argument
24   that was made in support of the COI.
25            THE COURT:  Okay.  So let's go back to the Cook
```

1   County State's Attorney's Office position with respect to

2   Guevara cases generally.

3        I mean, how many cases are there and what positions

4   are they taking in terms of the certificates of innocence?

5        MR. ART:  Steve Art for the plaintiffs, Your Honor.

6        In the submission that we had submitted a couple --

7   yesterday, probably --

8        THE COURT:  Yep.

9        MR. ART:  -- on the last page, I believe, I did my

10  best to outline the cases since August 2022.  In August 2022,

11  there were seven exonerations -- I believe August 8th or 9th,

12  2022 -- of folks who had pending post-conviction petitions in

13  Illinois state court who alleged that their wrongful

14  convictions were caused by Reynaldo Guevara.

15       Following that, I think there have been ten more

16  post-conviction proceedings resulting in convictions being

17  vacated.  It's something in that area of 15 to 20.

18       THE COURT:  And I'm wondering, in how many of those

19  cases was the -- did the Cook County State's Attorney's Office

20  withdraw their opposition or never oppose it?

21       MR. ART:  In all --

22       THE COURT:  We're talking about whether it's

23  impactful that they withdrew their opposition here.

24       MR. ART:  In all --

25       THE COURT:  Maybe there is a decision that they're

1     just not going to oppose it in Guevara cases.

2           MR. ART:  I'm sorry, Your Honor.

3           THE COURT:  Yeah, go ahead.  I keep interrupting you.

4           MR. ART:  No, no.  My understanding is, in all of

5     them, they have made a decision -- in -- sorry.  Let me start

6     that again.

7           In each of the cases, they have made a decision

8     either to withdraw an opposition that was in place or not to

9     oppose.  I do not think that they have said in those cases "we

10    are doing this in all cases as a blanket matter."

11          THE COURT:  Okay.

12          MR. ART:  In some of the cases where they have done

13    that, the state court judges have said, I'm still holding an

14    evidentiary hearing to determine in an evidentiary hearing if

15    the due process standard for a vacatur of a conviction has

16    been met.

17          So those are the post-conviction cases.

18          On the same page, we talk about the certificates of

19    innocence issued since August 2022.  And I think that it is

20    seven --

21          THE COURT:  Okay.

22          MR. ART:  -- have been issued, all without opposition

23    or with withdrawal of opposition.

24          In each of those certificate of innocence

25    proceedings, the decision has been presented to us as a

1    decision in the individual case --

2              THE COURT:  Okay.

3              MR. ART:  -- as happening on a case-by-case basis.

4              THE COURT:  How hard is that to figure out?  There's

5    got to be a warm body over there that's --

6              MR. HENRETTY:  I think I can figure it out.  Mr. Art

7    deals with these specific cases more than I do.  I'm just here

8    for this.  But --

9              THE COURT:  Yeah.

10             MR. HENRETTY:  -- I can -- I believe that is

11   something that I can get an answer to as far as numbers goes.

12             If it's something that was a policy decision and

13   change, I do worry we might be right back in the same

14   position.

15             THE COURT:  Yeah, I'm not looking for whether there

16   is a policy.  I would -- I'm just curious --

17             MR. HENRETTY:  Yeah.

18             THE COURT:  -- and it may impact my decision

19   generally, I don't know, but --

20             MR. HENRETTY:  Yeah, I can certainly --

21             THE COURT:  -- I'm curious to know how many Guevara

22   cases there are where someone is seeking a certificate of

23   innocence.  And of those cases, how many of those cases

24   resulted in the Cook County State's Attorney's Office

25   withdrawing their opposition or not withdrawing -- or not

1  opposing it?

2       I assume they oppose it until their people are out of

3  the case, and then they probably don't care.  I don't know.

4  Maybe not.

5       MR. ART:  In a lot of these cases, there's --

6       THE COURT:  I don't mean that in a pejorative sense.

7       MR. ART:  No, no, no.

8       THE COURT:  I just mean, like, you know, there's no

9  skin in the game, so maybe they don't fight it as hard.

10      Go ahead.

11      MR. ART:  I don't -- from my perspective don't

12 understand it to be related to civil litigation at all.  A lot

13 of these are happening before civil litigation has gotten

14 going.

15      THE COURT:  Okay.

16      MR. ART:  And then a lot of them there are no Cook

17 County State's Attorney defendants in the civil case.

18      THE COURT:  Okay.

19      MR. HENRETTY:  Yeah, and I would push back on that,

20 too, Judge.  They actually split those into two different

21 parts of the office for that very reason.  So there wouldn't

22 be an ethical consideration of the civil lawyers are worried

23 about what happens with the COI and they're trying to -- so

24 those are totally separate decisions and they do not discuss

25 them.

1         THE COURT:  Okay.  Can we go back to the draft

2  affidavit that you had sketched out and paraphrased.

3         So the concept is, the Cook County State's Attorney's

4  Office was willing to offer a declaration along the lines that

5  they withdrew their opposition here for reasons that didn't

6  have anything to do with the guilt or innocence of the

7  individuals?

8         MR. HENRETTY:  I think the language that Ms. Scheller

9  apparently initially said was "reflect a final

10  determination" --

11         THE COURT:  On the --

12         MR. HENRETTY:  -- on the Solache --

13         THE COURT:  -- innocence or guilt.

14         MR. HENRETTY:  Yeah.

15         THE COURT:  I think -- I mean, I have questions about

16  that, but it's the opposite of innocent.

17         So, I mean, wouldn't that go a long way towards

18  satisfying people?

19         Is anybody objecting to that declaration?

20         So, in other words --

21         MR. HENRETTY:  I mean, I would have to --

22         THE COURT:  We're just talking here.

23         MR. HENRETTY:  Yeah, I --

24         THE COURT:  We're -- we're just -- it's just us

25  talking.

1          MR. HENRETTY:  I think that was what was originally

2  presented by someone with a higher title --

3          THE COURT:  This would be --

4          MR. HENRETTY:  -- than me, so that sounds okay.

5          THE COURT:  -- signed by who?

6          MR. HENRETTY:  That -- I don't know if they had

7  discussed it or not whether it would be somebody -- whether it

8  would be Ms. Lanier or whether it would be somebody who had

9  the authority --

10         THE COURT:  Yeah.

11         MR. HENRETTY:  -- to say that for the office.

12         THE COURT:  So the concept would be some sort of

13  confirmation by way of a declaration that the Cook County

14  State's Attorney's Office did not withdraw its opposition in

15  these two cases for reasons that had to do with the innocence

16  or guilt of these particular people.  That's the concept?

17         MR. HENRETTY:  Mm-hmm.  Yes, Your Honor.

18         THE COURT:  Okay.  Does anybody feel uncomfortable

19  with that concept?

20         MR. ART:  Yes, Your Honor, the plaintiffs do.

21         This is Steve Art for --

22         THE COURT:  Yeah.

23         MR. ART:  -- Plaintiff Reyes speaking for both

24  plaintiffs.

25         Having the jury in this civil trial presented with

1    the facts Solache and Reyes got certificates of innocence, and

2    then, you know -- I'm not sure that we concede that it's

3    relevant at all what the state's attorney's position leading

4    up to the issuance of that certificate by a state court is.

5           But suppose it comes in and the defendants get to

6    present evidence that says it didn't have to do with this

7    person's innocence, with the affidavit as currently proposed,

8    what we don't have is the reason that they did drop their

9    opposition, and we think that needs to be in there.

10          If there is going to be an affidavit that says it

11   wasn't for this reason, the affidavit should say it was for --

12   and explain the reason.

13          THE COURT:  But we're talking about why the Cook

14   County State's Attorney's Office removed their opposition.

15          Does it matter what the reason was if the reason was

16   something other than guilt or innocence?

17          Just -- you know, it's either something about guilt

18   or innocence or it's some other reason.  And if it's in the

19   "some other reason" bucket, it doesn't really matter what the

20   other reason was, it seems to me.  It just wasn't involving

21   guilt or innocence.

22          MR. ART:  I can't answer that question without

23   knowing what the reason is.

24          THE COURT:  Yeah.

25          MR. ART:  The reason could be, I looked at all of the

1    evidence, and, gosh, you know, it was clear to me that there

2    is no way we were going to win this hearing.  Right?  I didn't

3    make a determin- --

4            THE COURT:  But that's guilt or innocence.

5            MR. ART:  I mean --

6            THE COURT:  Yeah, I mean, I'm talking about, on the

7    one hand, they removed their opposition because it had

8    something to do with their assessment of guilt or innocence,

9    and then there's a bucket of everything else, every other

10   reason, you know, resources, it's a pain in the neck, who

11   knows what, they don't like something, who knows what.

12           But does it matter what the reason was for

13   withdrawing their opposition if their reason is something

14   other than guilt or innocence?

15           MR. ART:  Potentially, no.  Potentially it's not

16   relevant.  Potentially none of the reasoning is relevant.  But

17   I don't think I can make arguments about whether or not we

18   need to know the reason without having some idea of what the

19   reason is, right?

20           I could imagine a situa- -- if the defendants are

21   presenting a story to the jury, you know, the Cook County

22   State's Attorney decided these guys -- you know, didn't make

23   any decision about these guys being innocent, then we have

24   absolutely nothing to say.

25           THE COURT:  All right.  I'm going to ask you a loaded

1     question.

2                MR. ART:  Yeah.

3                THE COURT:  Imagine two universes.  One universe is,

4     the jury hears about the certificate of innocence, the jury

5     hears that the Cook County State's Attorney's Office initially

6     opposed it, the jury hears that the Cook County State's

7     Attorney later withdrew its opposition, and the jury hears

8     that the reason for withdrawing it had nothing to do with the

9     guilt or innocence of the people.

10               That's universe one.

11               Universe two is, the jury hears nothing.

12               Which universe would you like to reside in?

13               MR. ART:  Universe one, Your Honor, for both

14    plaintiffs.

15               I guess what our position on the discovery issue

16    about what evidence is going to be gathered here at this stage

17    of the case --

18               THE COURT:  Yeah.

19               MR. ART:  -- before we make arguments about relevance

20    and what's coming in and how it's coming in and how it shall

21    be limited is, we shouldn't be deprived of that information at

22    this stage without having the opportunity to know what the

23    basis is and make arguments or not based on that information.

24               In other words, it doesn't make a lot of sense to us

25    to gather a reason something didn't happen from a

1   decision-maker without also gathering as evidence the reason

2   that it did.

3           THE COURT:  Okay.  Anything else, anybody?

4           All right.  So the sentencing that I alluded to

5   before is looming.  So I'm going to go ahead and give you some

6   thoughts and give you a ruling.

7           I'm going to go ahead and quash the subpoena.  I'm

8   going to grant the motion to quash.

9           Let me give you some thoughts in no particular order.

10          We're talking about here about getting discovery from

11  the Cook County State's Attorney's Office.  That's a serious

12  thing.  They have a job to do.  They've got a really important

13  job to do.  Discovery is distracting and disruptive and

14  burdensome for anybody, let alone a public agency.

15          So anytime you're in the territory of getting

16  discovery from a public agency, it's -- it's serious business,

17  let alone a prosecutor's office.  I mean, there is a real

18  public interest in having them devoted to their mission.

19  That's not to say there aren't other interests at play.  There

20  obviously are.  But you start from the standpoint that they've

21  got a pretty important job to do, and distracting them and

22  burdening them is something you don't do lightly.  I think

23  everybody would probably agree with that.  Sometimes it's

24  important enough, you do it.

25          I thought here it was important enough to allow you

1    to do some discovery on it.  That's why I authorized it, I

2    green-lighted it to do some discovery.  It seems like there

3    was a deposition, obviously.  There was some document

4    production.

5             I appreciate you folks working cooperatively on that.

6             But the question is simply how much.  I do think, in

7    general, federal courts need to tread lightly when invading

8    the province of state prosecutors.  So it's not something I do

9    lightly.

10            This particular would-be deponent is the first

11   assistant.  I understand it's the number two person in the

12   Cook County State's Attorney's Office.  Sometimes high-ranking

13   people are deposed, but, again, you don't do it lightly.

14            I have some concern that once a high-ranking person

15   is deposed in one case, it could be a bursting of the damn and

16   everybody is going to want their piece of this person in every

17   other case.

18            You know, Governor Pritzker cannot be deposed left,

19   right, up, and down.  He wouldn't have time to do anything

20   else.  But he is named in lots and lots of lawsuits, right?

21   So you've just got to be careful.  It's susceptible to abuse.

22   I'm not suggesting that any of you abused anything in this

23   case, so please don't take it that way.  But just for other

24   lawyers, it's susceptible to potential abuse and distraction,

25   even for people who are good-intentioned, as I know all of you

1   are.  It's just going to be burdensome on people who have

2   significant other duties.

3           I am concerned also about what the deposition would

4   accomplish here.  I'm not convinced that it would elicit

5   nonprivileged information that is relevant and likely

6   admissible.

7           I think it would be costly and burdensome and

8   distracting to depose this person, and I'm not sure what the

9   payout would be.  I don't envision a lot of scenarios in which

10  I would allow it to come into evidence.

11          I think all of us are at a disadvantage because we

12  don't know what we don't know.  It's hard to say, you know.

13  But when I think about the scenarios about what she could say,

14  maybe she'd say, "I looked at nothing.  I just did it on a

15  whim."  Or she could say, "I got a memo from my staff, and

16  they summarized the evidence.  And I learned about this, that,

17  and the other" or "I looked at the underlying documents" or "I

18  talked to the victim" or "I just talked to my staff, and we

19  made a policy decision.  In these Guevara cases, once our

20  people are out, we've got to cut bait.  We've got other stuff

21  going on.  We've just got to let them go.  We're not going to

22  oppose it because we don't have the resources.  We're

23  stretched too thin."

24          I mean, the Cook County State's Attorney's Office has

25  a lot of irons in the fire.  Maybe they decide if they have a

1　couple of their irons in the fire, they still have their hands
2　full of what is in the fire.

3　　　　I may not have said that right.  You get the
4　metaphor.  There are a lot of irons in the fire.

5　　　　I'm not necessarily convinced that what Ms. Lanier
6　knew and whether she reviewed X, Y, and Z would be relevant.
7　Maybe it would be, but I have my concerns about that.  It
8　seems pretty far afield from the issues that I envision
9　happening at trial.

10　　　　You know, I -- the ultimate issue is whether the
11　state court case was resolved in a way that's indicative of
12　innocence and whether Ms. Lanier reviewed X, Y, or Z before
13　she made her decision to not oppose the certificate of
14　innocence before the state court judge made the decision on
15　the certificate of innocence.  It just seems pretty far
16　afield.

17　　　　So it seems like -- it's not exactly a bird in the
18　hand and two in the bush concept, but you'd be banking a lot
19　of burden disruption cost and expense and distraction for her.
20　You'd incur that cost, and I'm not sure the payout long term
21　would outweigh that.  So I'm going to quash it.

22　　　　I do think, though, you folks should talk about that
23　declaration that I'm potentially amenable to.  That's not a
24　ruling.  I hesitate to say that because maybe people will get
25　excited and we'll be back here in a couple weeks.  And maybe

1    we will anyway.  I don't know.  It's at least worth talking

2    about separately.  I'm not sure if any of this is going to

3    come in.  You ought to talk about my universes, my two

4    universes.  I'm not saying that there are -- these are the

5    only two universes.  Maybe this is a multiverse where we've

6    got a lot of potential universes.  But that's two universes

7    that I have in my head.

8          One is, the certificate of innocence comes in, it

9    comes in that the Cook County State's Attorney's Office

10   opposed it, it comes in that they dropped it, it comes in that

11   they dropped their opposition for reasons unrelated to the

12   merits, the innocence or guilt of these people.  That's one

13   universe.

14         The other universe is, the jury hears nothing.  Maybe

15   there are other options out there.  I'm sure there are.  You

16   folks can brainstorm.  I think people ought to think about

17   that.

18         You know, I hear what Mr. Art is saying that if the

19   Cook County State's Attorney says that it wasn't about guilt

20   or innocence, he'd want to know what the reason was.  I get

21   that from a curiosity perspective.  But it seems to me if it's

22   some other reason unrelated to guilt or innocence, it really

23   doesn't matter what the reason was unless you don't believe

24   that the reason really was different from innocence or guilt.

25   In other words, you think it was a phony reason.

1          I don't know that I would allow discovery to see if

2   the Cook County State's Attorney's Office is offering a phony

3   reason behind its decision, certainly not a decision like --

4   excuse me -- certainly not a deposition like this one.

5          You know, all of this goes against the backdrop that

6   the Cook County State's Attorney's Office has never offered

7   any explanation for why it's changed course.

8          Is that right?

9          MR. HENRETTY:  Correct, Your Honor.

10          THE COURT:  All right.  So it's a mystery to all of

11  us, and I think it's going to remain entombed, at least as far

12  as I'm concerned.

13          So the motion to quash is denied.  I'm sorry.  The

14  motion to quash is granted.  The request to depose her is

15  denied.  You know what I mean.  Like I said, sometimes I say

16  things backwards, so that was an example.

17          I do think this discussion was helpful.  If there is

18  a discussion about the declaration and you folks butt heads

19  and you think it's really important to come back, you can.

20  Would I compel them to do a declaration or rethink this

21  deposition?  Maybe.  I hesitate to say this because I don't

22  want to precipitate more discovery fights.  But people just

23  ought to talk about how this is going to play out.

24          You got a sense of me and my thinking.  You know,

25  think about how this might play out for you at trial.  You

1    know, you might like what I do and you might be disappointed.

2    You've just got to think about the scenarios, okay?  It's the

3    best I can do with what I've got.  That's the ruling.

4         All right.  So with that ruling, you folks are -- I'm

5    going from memory here.  You're doing expert discovery, right?

6    That's not done?  Remind me, is it done?

7         MR. ART:  It's done.

8         THE COURT:  So are people filing for summary

9    judgment?

10        MR. ENGQUIST:  Yes, Your Honor.

11        THE COURT:  We don't have a schedule, right?  We

12   don't have a schedule.

13        MS. ROSEN:  And, Judge, we also are going to do

14   *Daubert* motions.

15        THE COURT:  Okay.

16        MS. ROSEN:  I don't know how the Court -- some judges

17   do --

18        THE COURT:  Yep.

19        MS. ROSEN:  -- it differently.

20        THE COURT:  So does anyone -- and you don't have to

21   tell me definitively now if you're still thinking about this,

22   but does anybody expect that a *Daubert* motion would be a

23   necessary step for summary judgment?

24        In other words, would a summary judgment motion by

25   you depend on whether I grant or deny a *Daubert* motion?

1  MS. ROSEN:  With respect to the *Monell* claims, the

2  *Monell* claims are almost entirely dependent on experts.  So if

3  we are successful in limiting or barring the experts in

4  support of the *Monell* theories, then that would impact the

5  *Monell*, at least the *Monell* part --

6  THE COURT:  Okay.

7  MS. ROSEN:  -- of the summary judgment.

8  THE COURT:  So here's what I would say:  If you are

9  filing for summary judgment and you need a *Daubert* ruling in

10  your favor for that, then you should file them both,

11  obviously.

12  If there is a *Daubert*-related motion that is not

13  relevant for summary judgment but is relevant for trial, you

14  can file that later.  Okay?

15  What I would like to do, folks, is, have you folks

16  talk together cooperatively.  See if you can iron out a

17  schedule.  File a joint motion for a proposed schedule.

18  Does anybody have a back-of-the-envelope sketched-out

19  plan about when you'd like to file for summary judgment?

20  MR. ENGQUIST:  No.  No, Your Honor.  We certainly

21  have other summary judgment schedules all lined up right now

22  in several case, so I'm -- I don't have it even clear in my

23  head.

24  THE COURT:  Yeah, okay.

25  MS. ROSEN:  Yeah, I would have to check the other

1  schedules because all of these cases seem to be following sort

2  of very close --

3          THE COURT:  Yeah.

4          MS. ROSEN:  -- to one another.

5          THE COURT:  It's a live fire exercise, I know, and

6  you've got a lot of planes to land.

7          MS. ROSEN:  Yeah.

8          THE COURT:  How about on the plaintiffs' team, are

9  you going to file for summary judgment?

10          MR. ART:  No, Your Honor.

11          THE COURT:  Okay.  Why don't you just talk

12  cooperatively.  Just -- you know, the cases were filed in

13  2018.  One of my professional goals is to have every case that

14  ends with a teen off my docket one way or the other soon.  So

15  the sooner you can file it, the better, without sitting on

16  you.  You know, I don't want it to be end of the year,

17  obviously.  I mean, I think in the next couple of months, I

18  would think, would be sufficient for you.  But I don't know.

19  I don't know the record.  I don't know how close you are to

20  being done.

21          Why don't you do that, file a joint motion.  I'll

22  grant it.  We'll enter it, and we'll go from there.  Is that

23  okay?  We'll get you off to the races.

24          Anything else, anybody?

25          MR. ART:  No from plaintiffs, Your Honor.  Thank you.

1        THE COURT:  All right.  So I started later than I

2   expected.  I kept you here longer than I expected, and I've

3   undoubtedly made Judge Leinenweber hungry.  He's wondering

4   what happened to his lunch companion.  So you can tell him

5   that you were in front of a long-winded judge, and he will get

6   it.  I'll just put it that way.  Okay?

7        MR. LEINENWEBER:  Justice takes time.

8        THE COURT:  Justice -- the wheels of justice grind

9   slow, as you've just seen.  All right.  So I apologize to him

10  for making you late.

11       Thank you, folks, for coming in.  I'm looking forward

12  to your submissions.  I always enjoy cases with high-caliber

13  lawyers.  So I appreciate everybody, all the work they've

14  done.  I'm going to enjoy working on this case.  So I'm

15  looking forward to it long term.

16       Anything else, anybody?

17       All right.  Thanks, everybody.

18       THE CLERK:  All rise.

19     (Which were all the proceedings heard.)

20

21

22

23

24

25

1                          *   *   *   *   *   *

2                              CERTIFICATE

3           I certify that the foregoing is a correct transcript from

4      the record of proceedings in the above-entitled matter.

5

6      /s/ *Amy Spee*                    *7/1/2023*

7      _____          _____
       Amy Spee, CSR, RPR, CRR          Date
8      Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25