# Exhibit A

**THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARTURO DeLEON-REYES, | |
| Plaintiff, | Case No. 18-CV-01028 |
| v. | Hon. Steven C. Seeger |
| REYNALDO GUEVARA, *et al*. | |
| Defendants. | |

------------------------------------------------------------------------

| | |
|---|---|
| GABRIEL SOLACHE, | |
| Plaintiff, | Case No. 18-CV-02312 |
| v. | Hon. Steven C. Seeger |
| REYNALDO GUEVARA, *et al*. | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

LEGAL STANDARD............................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.    IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF INDIVIDUAL
      DEFENDANTS, IT SHOULD ALSO BE GRANTED IN FAVOR OF THE CITY ON
      PLAINTIFFS' *MONELL* CLAIMS............................................................................... 7

II.   THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' "STREET
      FILES" AND *BRADY* VIOLATION *MONELL* THEORIES. .......................................... 10

      A.   History of "street files" in the *Jones* and *Palmer* litigation. ....................................... 11

      B.   CPD's written policies regarding recordkeeping. ....................................................... 14

      C.   There is no evidence any Defendant suppressed or withheld exculpatory evidence in
           this case. ................................................................................................................ 16

      D.   There is no evidence of a widespread practice of failing to document investigative
           information or suppressing or withholding exculpatory evidence. ............................... 18

           1.   Tiderington's reliance on a spreadsheet that he had no hand in preparing and
                which he cannot manipulate render his opinions without foundation and
                unreliable................................................................................................ 20

           2.   Tiderington concedes it would not be "humanly possible" to become familiar with
                each of the investigations and, therefore, he cannot establish the City had a policy
                and practice of maintaining and concealing exculpatory evidence in clandestine
                "street files." ........................................................................................... 22

           3.   Tiderington's concession that he never reviewed any CCSAO files renders his
                opinion irrelevant to any theory that CPD had a policy and practice of maintaining
                and concealing exculpatory evidence in clandestine "street files." ...................... 25

           4.   If CPD disclosed all of its investigative documents for a case to the CCSAO, and
                the CCSAO did not, in turn, disclose those documents to the criminal defense
                attorney, the fault would be with the CCSAO not CPD. Yet Tiderington has no
                idea whether any of the documents he claims were not turned over, were in fact
                given to the prosecutor by CPD, so his opinion that documents were
                systematically withheld lacks a valid basis. Tiderington's haphazard statistically
                insignificant review of 64 CCPDO files does not establish that any material was
                withheld................................................................................................... 26

           5.   Tiderington's "failure to document" opinions are not supported by any data in his
                Report...................................................................................................... 28

III.  THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE
      TO DISCIPLINE *MONELL* THEORY. .......................................................................... 30

      A.   Plaintiffs' police oversight expert failed to identify any CR file that was not
           appropriately investigated. ...................................................................................... 31

B.  It is undisputed that CPD's "sustained rate" cannot form the basis of a *Monell* claim based on a failure to discipline theory. ........................................................................ 34

C.  The "historical context" of CPD's disciplinary system cannot form the basis of a *Monell* claim based on a failure to discipline in 1998. .............................................. 37

D.  Any reference to the CR histories of Individual Defendants cannot amount to a citywide practice. ......................................................................................................... 39

E.  Any reference to prior lawsuits involving Individual Defendants cannot amount to a citywide practice. ......................................................................................................... 42

IV.  THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COERCED CONFESSION *MONELL* THEORY. ............................................................................... 42

V.  PLAINTIFFS FAILED TO IDENTIFY ANY EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE THAT A CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITUTIONAL INJURY OR THAT ANY CITY POLICY WAS THE MOVING FORCE BEHIND A CONSTITUTIONAL INJURY. ........................................................................................... 59

VI.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFFS' DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION. ................................................................................................... 61

CONCLUSION ................................................................................................................... 62

# CASES

*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) .................................................... 10

*Andersen v. City of Chicago,* No. 16 C 1963, 2016 WL 7240765 (N.D. Ill. Dec. 14, 2016) ......... 9

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) ......................................................... 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................... 4

*Baldonado v. Wyeth*, No. 04 C 4312, 2012 U.S. Dist. LEXIS 68691 (N.D. Ill. May 17, 2012) . 52, 53

*Barnes v. Wexford Health Sources, Inc.*, No. 17-cv-8959, 2022 U.S. Dist. LEXIS 243607 (N.D. Ill. Nov. 23, 2022) .............................................................................................................. 56, 57

*Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994) ................................ 5

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997) ..................................................... passim

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015).................................................................. 25

*Black v. City of Chi.*, No. 18-cv-6518, 2022 U.S. Dist. LEXIS 24845 (N.D. Ill. Feb. 11, 2022). 57

*Bohanon v. City of Indianapolis*, No. 20-3125, 2022 WL 3585003 (7th Cir. Aug. 22, 2022) ..... 60

*Bouto v. Guevara*, No. 19-cv-2441, 2021 WL 5415151 (N.D. Ill. Nov. 19, 2021)...................... 10

*Bridges v. Dart*, 950 F.3d 476 (7th Cir. 2020)........................................................................ 57, 59

*Bryant v. Whalen*, 759 F. Supp. 410 (N.D. Ill. 1991) .................................................................. 39

*Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 U.S. Dist. LEXIS 234359 (E.D. Wis. Aug. 31, 2018) ......................................................................................................................................... 49

*C.W. v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015) .................................................................... 48

*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016)........................................................................ 56

*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) ........................................................... 17, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 4

*Chen v. Mnuchin*, No. 14 C 50164, 2020 U.S. Dist. LEXIS 180574 (N.D. Ill. Sep. 30, 2020) ... 54

*Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008)......................................................... 48

*City of Canton v. Harris*, 489 U.S. 378 (1989)......................................................... 6, 7, 18, 61

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) ................................................................. 54

*Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017) ........................................................... 60

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019)........................................................... 17

*Connick v. Thompson* 563 U.S. 51 (2011) ............................................................................. 41, 59

*Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) ............... 29

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016)...................................................................... 56

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) ...................................................... 47

iv

*Dixon v. Cty. of Cook*, 819 F.3d 343 (7th Cir. 2016) ........................................................ 37, 59, 61

*Edwards v. Jolliff-Blake*, 907 F.3d 1052 (7th Cir. 2018) ................................................................. 10

*Est. of Loury v. City of Chicago*, No. 16-cv-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019) 37

*First Midwest Bank v. City of Chi.*, 337 F.Supp.3d 749 (N.D. Ill. 2018) ..................................... 37

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ..................................................................... 26

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) ............................................................. 3, 6

*Godinez v. City of Chicago*, No. 16-cv-7344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) ........ 37

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017) ..................................... 47, 48

*Green v. Whiteco Indus.*, 17 F.3d 199 (7th Cir. 1994) ..................................................................... 4

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ..................................................................... 6

*Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014) ................................................................................. 7

*Harris v. City of Chicago*, No. 14-CV-4391, 2016 WL 3261522 (N.D. Ill. June 14, 2016) .......... 9

*Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D. Ill. 2009) ............................... 17

*Hostetler v. Johnson Controls*, No. 3:15-cv-226 JD, 2020 U.S. Dist. LEXIS 151437 (N.D. Ind. Aug. 21, 2020) ........................................................................................................ 49, 54

*Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002) ................................................................. 5

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 U.S. Dist. LEXIS 48792 (N.D. Ill. Mar. 31, 2017) ................................................................. 54

*Jackson v. Marion County,* 66 F.3d 15 (7th Cir. 1995) ............................................................... 3, 6

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ........................................................................ 10

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ................................................................. 6

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ..................................................... 11, 12, 14

*JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270 (7th Cir. 1996) ..................................... 4

*Kirk v. Clark Equip.* Co., 991 F.3d 865 (7th Cir. 2021) ............................................................... 47

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) ............................................... 33

*McTigue v. City of Chicago*, 60 F.3d 381 (7th Cir. 1995) ........................................................... 5, 6

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) ..................................... 48

*Milan v. Schulz*, No. 21-CV-765, 2022 WL 1804157 (N.D. Ill. June 2, 2022) ........................... 38

*Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152 (N.D. Ill. Mar. 12, 2024) .......... 25

*Minasian v. Standard Chartered Bank*, PLC, 109 F.3d 1212 (7th Cir. 1997) ....................... 48, 52

*Mitchell v. City of Chicago*, No. 18 C 7357, 2019 U.S. Dist. LEXIS 231746 (N.D. Ill. Sept. 18, 2019) ................................................................................................................................ 9

*Monell v. New York City Dep't. of Soc. Servs.,* 436 U.S. 658 (1978) ............................................. 1

*Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008).......................................................... 7, 60

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ....................................................................... 17

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ....................................................................... 61

*Myers v. Illinois Cent. R. Co.,* 629 F.3d 639 (7th Cir. 2010).......................................................... 47

*Obrycka v. City of Chi.*, 792 F. Supp. 2d 1013 (N.D. Ill. 2011) ...................................................... 53

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .................................................................................. 5

*Ortiz v. John O. Butler, Co.*, 94 F.3d 1121 (7th Cir. 1996) ............................................................. 4

*Othman v. City of Chicago*, No. 11 C 05777, 2014 WL 6566357 (N.D. Ill. Nov. 20, 2014)......... 7

*Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005) ..................................................... 5, 60, 61

*Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985)................................................... 11, 12, 13

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987).................................................. 11, 13, 14

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)......................................................................... 6

*Phelan v. Cook County*, 463 F.3d 773 (7th Cir. 2006) ..................................................................... 59

*Porter v. Whitehall Labs., Inc.*, 9 F.3d 607 (7th Cir. 1993)............................................................ 24

*Richards v. Combined Ins. Co. of America*, 55 F.3d 247 (7th Cir. 1995)....................................... 4

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018)................................................. 33, 39, 60

*Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194 (7th Cir. 1985)............................................. 6

*Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659 (7th Cir. 2005) ...................... 4

*Rossi v. City of Chi.*, 790 F.3d 729 (7th Cir. 2015) .................................................................... 5, 56

*Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) ................................................................................ 26

*Ruiz-Cortez v. City of Chi.*, 931 F.3d 592 (7th Cir. 2019)............................................................. 60

*Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768 (N.D. Ill. Oct. 26, 2016)........... 24

*Salgado by Salgado v. GMC*, 150 F.3d 735 (7th Cir. 1998).......................................................... 48

*Sallenger v. City of Springfield, Ill.*, 630 F.3d 499 (7th Cir. 2010) ......................................... 6, 10

*Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417 (N.D. Ill. June 11, 2015)..... 7, 39

*Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)..................................................................... 23

*Simmons v. City of Chicago*, No. 14-cv-9042, 2017 WL 3704844 (N.D. Ill. Aug. 28, 2017)...... 37

*Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) ................................................................................ 6

*Soller v. Moore*, 84 F.3d 964 (7th Cir. 1996) ................................................................................. 23

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .................................................................................. 6

*Teran v. Coloplast Corp.*, 633 F. Supp. 3d 1103 (N.D. Ill. 2022)................................................. 54

*Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2009).......................... 9, 29

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006)......................................................... 23

vi

*U.S. v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999) ........................................................................ 24

*U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003) ........................................................................... 24

*U.S. v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979) ...................................................................... 17

*U.S. v. Morris*, 957 F.2d 1391 (7th Cir. 1992) .......................................................................... 17

*U.S. v. Parks,* 100 F.3d 1300 (7th Cir.1996) ............................................................................. 17

*U.S. v. Roberts*, 534 F.3d 560 (7th Cir. 2008) ........................................................................... 17

*U.S. v. Warren,* 454 F.3d 752 (7th Cir. 2006) ............................................................................ 17

*United States SEC v. ITT Educ. Servs.*, 311 F. Supp. 3d 977 (S.D. Ind. 2018) ............................. 52

*United States v. Benson*, 941 F.2d 598 (7th Cir. 1991) ............................................................ 54

*United States v. Brownlee,* 744 F.3d 479 (7th Cir. 2014) ......................................................... 49

*Varlen Corp. v. Liberty Mut. Ins.* Co., 924 F.3d 456 (7th Cir. 2019) ......................................... 47

*Williams v. City of Chicago*, 315 F. Supp. 3d 1060 (N.D. Ill. 2018) ........................................... 9

*Wragg v. Vill. of Thornton*, 604 F.3d 464 (7th Cir. 2010) ......................................................... 6

# RULES

Fed. R. Civ. P. 56(1)(a) ................................................................................................................ 3

Fed. R. Evid. 403 ....................................................................................................................... 38

Fed. R. Evid. 407 ....................................................................................................................... 38

Fed. R. Evid. 801 ....................................................................................................................... 37

Fed. R. Evid. 803(8)(c ............................................................................................................... 38

Defendant City of Chicago (the "City"), by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, submits the following Memorandum of Law in support of its Motion for Summary Judgment on Plaintiff Solache's *Monell* claim (Count IV) and Plaintiff Reyes's *Monell* claim (Count VII).

## INTRODUCTION

This case arises out of Plaintiffs' alleged wrongful convictions for the 1998 double murder of Mariano and Jacinta Soto and the kidnapping of their two children. (Dkt. 224, Solache's First Am. Compl., ¶ 1; Dkt. 396, Reyes's Second Am. Compl., ¶ 1[1]). Plaintiffs allege that the City is liable, pursuant to *Monell v. New York City Dep't. of Soc. Servs.,* 436 U.S. 658 (1978), for the violation of Plaintiffs' constitutional rights because Plaintiffs' injuries were directly and proximately caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago. (Dkt. 396, Reyes's Second Am. Compl., at ¶¶ 174, 184). Specifically, Plaintiff Reyes' *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers (1) "systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information" (*id.* at ¶ 102); (2) "routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person" (*id.* at ¶ 109); (3) "operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct" (*id.*); (4) "condoned and facilitated a code of silence within the

---

[1] Hereinafter, for purposes of this brief, when citing to the Court record, the City will refer to the *Reyes v. Guevara, et al.*, 18-cv-1028, docket, unless there are material distinctions in the record cites, in which case, the City will refer to both dockets. Furthermore, while the allegations in Plaintiffs Reyes's and Solache's complaints are not identical in every respect, their causes of action arise out of the same occurrence and the gravamen of their complaints are the same. Additionally, Plaintiffs have responded to discovery related to their *Monell* claim jointly, (SOF ¶¶ 3-9) and rely on the same experts' opinions to support their *Monell* theories.

Chicago Police Department (hereinafter, "CPD")" (*id.* at ¶ 110); (5) failed to "track[] and identify[] police officers who are repeatedly accused of…serious misconduct" (*id.* at ¶ 111); and (6) "failed…to provide adequate training to Chicago Police Detectives and other officers" (*id.* at ¶ 113). (SOF ¶ 1). Plaintiff Solache's *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers (1) used "physical[] and psychological[] coercive interrogation tactics in order to elicit statements from suspects in criminal cases" causing false confessions (Dkt. 224, Solache's First Am. Compl., at ¶ 65); (2) "systematically suppressed evidence" related to fabricated and coerced confessions (*id.* at ¶ 68); (3) "condoned and facilitated a code of silence within the CPD" (*id.* at ¶ 70); and (4) "fail[ed] to discipline officers accused of this unlawful conduct" (*id.* at ¶ 71). (SOF ¶ 2).

Additionally, in written discovery, the City asked Plaintiffs to identify all of their *Monell* theories of liability and state the factual basis and evidence upon which they will rely to establish the theories of liability that they contended amounted to a "policy" under *Monell.* (SOF ¶ 3). Plaintiffs responded by identifying *Monell* theories based only on (i) CPD's supervision and disciplinary system; (ii) CPD's widespread pattern and practice of *Brady* violations, a/k/a their "street file" theory; (iii) a widespread practice of physical abuse of suspects to obtain statements against their will; and (iv) a widespread practice of manipulating eyewitness identification procedures, including by failing to properly document those procedures. (*Id.*).

Plaintiffs, however, have developed evidence related to only their theories based on (i) CPD's supervision and disciplinary system; (ii) CPD's widespread pattern and practice of *Brady* violations, a/k/a their "street file" theory; and (iii) a widespread practice of physical abuse

2

of suspects to obtain statements against their will.[2] (SOF ¶ 4).

Plaintiffs were further asked in written discovery to "identify all evidence known to Plaintiffs that establishes why" the identified City's policies were unconstitutional. (SOF ¶ 8). Plaintiffs responded regarding the "street files" theory by incorporating the expert report of their disclosed expert, Thomas Tiderington; the supervision and discipline theory by incorporating the expert report of their disclosed expert, Anthony Finnell; and the widespread physical abuse theory by incorporating the expert report of their disclosed expert, Dr. Richard Leo. (*Id.*).[3] However, Plaintiffs' experts have adduced no evidence to prove any of these allegations, much less that any resulted in a violation of Plaintiffs' constitutional rights. Therefore, Defendant City of Chicago is entitled to summary judgment as a matter of law on Plaintiffs' *Monell* claims.

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(1)(a). By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty*

---

[2] For their *Monell* theory based on a widespread practice of manipulating eyewitness identification procedures, including by failing to properly document those procedures, Plaintiffs identified one example in their discovery responses: the circumstances surrounding the lineup conducted in the Soto homicide investigation with Norma Salazar. (SOF ¶ 4). However, Plaintiffs have not produced any experts or developed any evidence to support this theory and, as such, waive their arguments and summary judgment should be granted as a matter of course with respect to Plaintiffs' identification procedures theory. Furthermore, one incident, as alleged here, does not equal a "widespread practice" under *Monell*. *Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir. 1995); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (requiring "examples of other…police officers taking actions similar to those complained of here"). Additionally, the City's written policies regarding lineup procedures mandated that when a lineup was held, a supplementary report would be created documenting the lineup. (SOF ¶ 22).

[3] Plaintiffs did not identify any written policies that they maintained were unconstitutional or identify any person with final policymaking authority whose deliberate act caused Plaintiffs' alleged constitutional injury. Accordingly, the City analyzes only Plaintiffs' *Monell* claims that are under a "widespread practice" theory.

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the court in evaluating a summary judgment motion construes all facts and reasonable inferences in the light most favorable to the non-moving party, only factual disputes that might affect the outcome of the suit under the governing law will preclude summary judgment. *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 272 (7th Cir. 1996); *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, Plaintiffs must offer more than a mere scintilla of evidence. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Moreover, Plaintiffs cannot prevail by simply resting on the pleadings or simple speculation and conjecture. *Whitmore's Auto. Servs.*, 424 F.3d at 669; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To the contrary, as the party who bears the burden of proof, Plaintiffs must affirmatively demonstrate the presence of a genuine issue of material fact that requires a trial to resolve. *Id.* If the moving party does not have the ultimate burden of proof on a claim, it suffices for the movant to direct the Court to the lack of evidence as an element of that claim. *Green v. Whiteco Indus.*, 17 F.3d 199, 201 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler, Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996) (citing *Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir. 1995)).

## ARGUMENT

In Count IV of Solache's First Amended Complaint and Count VII of Reyes's Second Amended Complaint, Plaintiffs seek to hold the City liable for Plaintiffs' convictions pursuant to

*Monell.* (Dkt. 224, Solache's First Am. Compl., ¶¶ 93-97; Dkt. 396, Reyes's Second Am. Compl., ¶¶ 172-84). To establish § 1983 municipal liability, Plaintiffs must show that "'(1) [they] suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of [their] injur[ies].'" *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005) (quoting *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)).

As mentioned, there are three potential avenues through which municipal liability could theoretically attach: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) 'a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a [*de facto* policy by] custom or usage with the force of law'; or (3) the act of a person with final policy making authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (quoting *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)); s*ee also, e.g., Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Again, Plaintiffs do not identify any express unconstitutional policy and are not claiming that they were directly injured by a person with final policymaking authority. (SOF ¶ 9). Thus, the City analyzes Plaintiffs' *Monell* claims under a "widespread practice" theory only.

The Supreme Court has cautioned that *Monell* is concerned with situations where the municipal policy itself is the cause of a plaintiff's injury, and it is not to be used as a means to impose *respondeat superior* liability against a municipality. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). A municipality may not be held liable under § 1983 solely because it employs a tortfeasor, rather a plaintiff must identify a specific municipal "policy" or "custom" that caused the plaintiff's injury. *Id.; see also Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985) (plurality opinion); *Id.* at 828 (opinion of Brennan, J.); *Pembaur v. City of Cincinnati*, 475 U.S.

469, 478-79 (1986); *St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) (plurality opinion); *Id.* at 137 (opinion of Brennan, J.); *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

Where a plaintiff attempts to assert a *Monell* claim based on a "widespread practice" theory, as Plaintiffs do here, they must establish a pattern of similar deprivations that are so "permanent, well-settled, and widespread as to constitute custom or usage" with the force of law. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010); *McTigue*, 60 F.3d at 382. Put another way, a plaintiff proceeding under a "widespread practice" theory must establish that the specific violations relied upon as pattern evidence are genuinely attributable to a *de facto* policy rather than mere isolated incidents. *Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir. 1995); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (requiring "examples of other…police officers taking actions similar to those complained of here"). A custom "'implies a habitual practice of a course of action that characteristically is repeated under the circumstances.'" *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)). It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. *Id.* (citing *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 202 (7th Cir. 1985)). Plaintiffs must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision. *Id.* at 543; *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("what is needed is evidence that there is a true policy at issue, not a random event").

Only if the plaintiff can prove a constitutional violation, is he entitled to prove the City's policy caused it. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010) (jury's conclusive verdict on the underlying constitutional claim means no *Monell* liability). Furthermore,

even if a plaintiff establishes an injury, that, alone, would be insufficient to prove a *Monell* claim. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015); *Othman v. City of Chicago*, No. 11 C 05777, 2014 WL 6566357, at *5 (N.D. Ill. Nov. 20, 2014); *see also Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2014). Under any theory, the plaintiff must demonstrate that the City was "deliberately indifferent" to the "known or obvious consequences" of the alleged policy. *See, e.g., Brown*, 520 U.S. at 407 (citing *Harris*, 489 U.S. at 388); *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008). Additionally, the plaintiff must demonstrate the existence of a direct causal link between the municipal policy and the constitutional injury. *Harris*, 489 U.S. at 385; *Brown,* 520 U.S. at 400.

## I. IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF INDIVIDUAL DEFENDANTS[4][5], IT SHOULD ALSO BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFFS' *MONELL* CLAIMS.

Defendant Officers bring a Motion for Partial Summary Judgment (incorporated fully herein), seeking summary judgment on Plaintiffs' coerced and/or fabricated confessions claims and Plaintiffs' Due Process claims. (*See generally* Def. Officers' Mem. Law Supp. Mot. Partial Summ. J.). As it relates to Plaintiffs' *Monell* theory concerning coerced and/or fabricated confessions, Defendant Officers demonstrate that with the exception of Reyes's confession claim against Defendants Dickinson, Rutherford and Trevino, Plaintiffs cannot meet their burden of proof because Solache lacks any evidence establishing the involvement of Defendant Officers and

---

[4] For purposes of this brief, "Defendant Supervisors" shall refer to Edward Mingey, Robert Biebel, and Francis Cappitelli (deceased); "Defendant Officers" shall refer to Ernest Halvorsen (deceased), Edwin Dickinson, Robert Rutherford, and Daniel Trevino; "Defendant Guevara" shall refer to Reynaldo Guevara; and "Individual Defendants" shall refer to all named individual officers.

[5] In addition, Defendants Dennis Stankus, Geri Lynn Yanow as Special Representative for John Naujokas (deceased), Theresa Karalow as Special Representative for John Karalow (deceased), and Mark Harvey, originally named in Reyes's Second Amended Complaint, were previously dismissed by stipulation. (Dkt. 681, Stipulation of Dismissal; Dkt. 682, Minute Entry). Further, Defendants Karin Wehrle, David Navarro, Heather Brualdi, Andrew Varga, Thomas O'Malley, and Cook County, also originally named in Reyes's Second Amended Complaint, were previously dismissed by stipulation. (Dkt. 597, Agreed Stipulation to Dismiss; Dkt. 597, Minute Entry).

Reyes lacks any evidence establishing personal involvement of Defendant Halvorsen. (*Id.*). Additionally, Defendant Officers show that based on Reyes's own testimony, Reyes cannot meet his evidentiary burden that Defendant Officers coerced him into confessing and thus does not have a viable claim of coerced confession. (*Id.*). Finally, as it relates to Plaintiffs' *Monell* "street files" theory, Defendant Officers establish that Plaintiffs cannot show that any alleged *Brady* materials existed and were withheld and/or destroyed and/or that any such materials were exculpatory. (*Id.*).

Defendant Supervisors join Defendant Officers' Motion for Partial Summary Judgment with respect to the aforementioned claims, and additionally move for summary judgment on alternative grounds. (*See generally* Def. Supervisors' Mem. Law Supp. Mot. Summ. J.). Defendant Supervisors further establish that they are entitled to summary judgment on Plaintiffs' coerced and/or fabricated confessions claims and Plaintiffs' Due Process claims because Plaintiffs lack any evidence establishing the involvement of Defendant Supervisors in Plaintiffs' alleged constitutional violations. (*Id.*).

Defendant Guevara also brings a Motion for Partial Summary Judgment (incorporated fully herein), joining all Defendant Officers' arguments with the exception of Reyes's and Solache's confession claims against him. (*See generally* Def. Guevara's Mot. Join & Mot. Partial Summ. J.). With respect to this claim, Defendant Guevara demonstrates that he is entitled to partial summary judgment because a coerced confession claim, without more, does not satisfy a fabrication of evidence claim. (*Id.*).

Accordingly, the only federal claim(s) that will survive Individual Defendants summary judgment that could provide a basis for *Monell* liability against the City are Reyes's and Solache's confessions claims.

8

Without an underlying constitutional violation against Individual Defendants, Plaintiffs cannot proceed with *Monell* claims on the same basis because doing so would create an inconsistent verdict. *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2009) (ruling that a municipality cannot be held liable under *Monell* if such a finding would create an inconsistent verdict).

It is anticipated that Plaintiffs will argue that *Thomas* created an exception which permits Plaintiffs to proceed against the City even if the Court finds in favor of Individual Defendants. However, *Thomas* stressed the importance of looking to the nature of the alleged constitutional violations and the theory of municipal liability when determining whether a municipality's liability is dependent on its officers. *Id.* Unlike in *Thomas*, here, the *Monell* claims *are* dependent on individual liability. *See, e.g., Mitchell v. City of Chicago*, No. 18 C 7357, 2019 U.S. Dist. LEXIS 231746, at *4 (N.D. Ill. Sept. 18, 2019), attached as Ex. 1, (given the nature of the plaintiff's claims that officers fabricated his oral confession and coerced false statements from each of the witnesses, the plaintiff could not prevail on his *Monell* claim without first establishing individual liability against the officers); *Andersen v. City of Chicago,* No. 16 C 1963, 2016 WL 7240765, at *3-4 (N.D. Ill. Dec. 14, 2016) ("Addressing first the *Monell* claim premised on the coercion of a false statement, it is clear that 'fabricating a confession and coercing [p]laintiff into making that confession, depends on the individual officers' actions.'…The same conclusion applies to the street files allegation because any harm caused by an alleged street files policy or practice could only manifest itself through the [individual officers] actually maintaining such files, and therefore, a finding of municipal liability is predicated on a finding first that the [o]fficers themselves were liable.") (quoting *Harris v. City of Chicago*, No. 14-CV-4391, 2016 WL 3261522, at *3 (N.D. Ill. June 14, 2016); *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1081 (N.D. Ill. 2018) (finding

9

same with respect to exculpatory evidence and street files allegations); *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1062 (7th Cir. 2018) (affirming summary judgment on *Monell* claim without finding of liability against individual defendants); *Sallenger,* 630 F.3d at 504 (holding a municipality cannot be liable under *Monell* for a failure to train when there is no underlying constitutional violation by an employee); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("there can be no liability under *Monell* for failure to train where there has been no violation of the plaintiff's constitutional rights") (citing *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006)); *Bouto v. Guevara*, No. 19-cv-2441, 2021 WL 5415151, at *4 (N.D. Ill. Nov. 19, 2021) ("the *Monell* violation alleged would likely first require a finding that the individual [d]efendants committed a *Brady* violation").

## II. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' "STREET FILES" AND *BRADY* VIOLATION *MONELL* THEORIES.

Plaintiff Reyes alleges that the City had notice of widespread practices by officers of not recording investigative information in police reports, not maintaining proper investigative files, and not disclosing investigative materials to prosecutors and criminal defendants resulting in *Brady* violations – the so-called "street files" theory. (Dkt. 396, Reyes's Second Am. Compl., ¶ 179). Plaintiff Solache also alleges that the City had a widespread practice of failing to produce and withholding exculpatory evidence from the courts, prosecutors, criminal defendants, and their attorneys, but he fails to allege the City had notice of this purported policy. (Dkt. 224, Solache's First Am. Compl., ¶¶ 3, 95).

Although Plaintiffs have retained an expert to support these theories, Plaintiffs have failed to identify sufficient evidence for a reasonable jury to find that the City had a *de facto* policy of failing to document investigative information or withholding exculpatory evidence from criminal defendants in violation of *Brady*.

Plaintiff Reyes further alleges that the City had notice of widespread practices by officers of falsifying statements and testimony of witnesses, fabricating false evidence implicating criminal defendants, failing to maintain or preserve evidence or destroying evidence, and pursuing wrongful convictions through profoundly flawed investigations. (Dkt. 396, Reyes's Second Am. Compl., ¶ 179). Plaintiff Solache also further alleges that the City had a widespread practice of fabricating false inculpatory evidence and pursuing wrongful convictions through reliance on profoundly flawed investigations, but again fails to allege that the City had notice of such a policy. (Dkt. 224, Solache's First Am. Compl., ¶¶ 3, 95).

However, Plaintiffs have not offered a shred of evidence, through a retained expert or otherwise, to support these *Monell* theories.

Therefore, the City is entitled to summary judgment on Plaintiffs' *Monell* theories based on "street files" and *Brady* violations.

### A.      History of "street files" in the *Jones* and *Palmer* litigation.

Plaintiffs purport to draw a similarity between speculative claims that they did not receive documents and information in this case and the file that was subject to the litigation in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). Accordingly, *Jones*, as well as Seventh Circuit's subsequent decisions in *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*") and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ("*Palmer II*") provide necessary background for Plaintiffs' claims.

In *Jones*, a case about a 1981 prosecution, the plaintiff alleged that CPD and the individual officers withheld exculpatory evidence from him in a "street file." *Jones*, 865 F.2d at 995. He discovered that during the investigation, a detective, Frank Laverty, uncovered problems with the victim's identification of Jones. *Id.* at 990. Laverty documented that information in a memorandum

11

and placed it into the file that contained the detectives' notes. *Id.* at 989-90. In *Jones*, that file was termed a "street file."[6] In 1981, at the time of Jones's prosecution, notes were not labeled, as they are now, with a Record Division ("RD") number unique to each investigation. *Palmer I*, 755 F.2d at 566. Instead, CPD required detectives to document all pertinent information for an investigation in case or supplementary reports. *Id.* In accordance with that policy, Det. Laverty also memorialized the exculpatory information in a supplementary report. *Jones*, 856 F.2d at 991. Det. Laverty's supplementary report, however, was rewritten by another detective, excluding the exculpatory information Det. Laverty discovered. *Id.* Therefore, because of the wrongdoing of the other detective, the documentation of the evidence only existed in the "street file," which was not disclosed to Jones. *Id.* at 996.

In analyzing the City's liability in *Jones*, the Seventh Circuit found that the policy at issue was the maintenance of "street files." *Id.* at 995. The Court found that because CPD maintained detective notes and memoranda without an RD number, and Det. Laverty's supplementary report was destroyed, CPD's record keeping practices left a source of exculpatory information unavailable to Jones. *Id.* The Court held that there was sufficient evidence for the jury to conclude that the policy of maintaining "street files" created the *opportunity* for the constitutional violation in *Jones* to occur. *Id.* at 995-96. Critically, and contrary to Plaintiffs' assertions in this case, the Court did not find that CPD's practice of maintaining "street files" was designed to secrete exculpatory information. To the contrary, Det. Laverty intended the exculpatory evidence to be known – that is why he documented it, both in his memorandum and in a supplementary report. *Jones*, 856 F.2d at 991.

---

[6] The label at the time for the file sometimes maintained at a particular Area by detectives conducting a violent crime field investigation differed from Area to Area. *See Palmer I*, 755 F. 2d at 566. Such files were variously referred to as a street file, a working file, a running file, etc. *Id.* For purposes of this motion, the City will refer to the file in *Jones* as a "street file."

As a direct result of the *Jones* criminal prosecution, the plaintiffs in *Palmer* brought a class action lawsuit against the City in 1982 challenging the constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal "street files." *Palmer I*, 755 F.2d at 564-65. Specifically, the plaintiffs sought a preliminary injunction to "(a) prevent the defendants from continuing their alleged practice of withholding exculpatory evidence contained in 'street files;' and (b) preserve all existing 'street files.'" *Id.* at 566. While the District Court granted the preliminary injunction, the Seventh Circuit overruled it in *Palmer I. Id.* at 562.

The *Palmer I* Court warned that "the Federal courts have no business whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's Office, absent a clear and defined constitutional violation." *Id.* at 578. The Court further found that neither of the two classes of plaintiffs, those convicted of a felony ("subclass A") or those awaiting trial for felony charges in Cook County Circuit Court ("subclass B"), presented any evidence of an actual constitutional violation. *Id.* at 571.

Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Palmer I*, 755 F.2d, at 572.[7] Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d, at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any").

---

[7] This preservation order was characterized by the Court in *Palmer II* as "in the nature of a discovery order." *Palmer II*, 806 F.2d at 1321.

Nevertheless, after failing to uncover any exculpatory evidence, the class counsel filed a petition for attorneys' fees pursuant to Section 1988. *Palmer II*, 806 F.2d at 1316. The District Court granted the petition, but the Seventh Circuit in *Palmer II* again reversed. *Id.* at 1324. In doing so, the *Palmer II* Court emphasized that the class-plaintiffs did not prevail. *Id.* at 1321. While recognizing that the preliminary injunction was initially granted in the District Court, the Seventh Circuit explained that "this court threw it out." *Id.* at 1320. Plaintiffs' only success, the Court clarified, was in obtaining a discovery order directing the City to retain its "street files" such that convicted members of the class could inspect them for exculpatory information. *Id.* at 1321. The Court observed, however, that such an order "is worthless if discovery turns up nothing; indeed, it is worse than worthless because then the party has incurred an expense without obtaining any benefit from it." *Id.* The Seventh Circuit made clear that despite being afforded the opportunity to review each file, the plaintiffs were unable to find anything to substantiate their allegations, stating "they went on a fishing expedition, and the pond was empty." *Id.*

Plaintiffs' unabashed persistence in labeling certain documents that were purportedly not disclosed a "street file" was designed to align their case with *Jones* and *Palmer*. However, as discussed in more detail below, and despite all Plaintiffs' distortions, the documents and information in this case is nothing like the *Jones* "street file."

**B.** **CPD's written policies regarding recordkeeping.**

Even though the street files practice was never found to be *per se* unconstitutional and no individual other than Jones was found to have suffered a constitutional violation as a result, in the early 1980s, CPD reviewed its recordkeeping practices. (SOF ¶¶ 10-20); *Jones*, 856 F.2d at 991, 995-96; *Palmer II*, 806 F.2d at 1316, 1324. Among other things, CPD issued in 1983 Detective Division Special Order 83-1 ("S.O. 83-1"), which made clear that CPD's policy is to "conduct all

14

criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised...." (SOF ¶ 15). S.O. 83-1 expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." (SOF ¶ 16).

To effectuate these policies, S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation." (SOF ¶ 17). S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." (*Id.*).

To further standardize the procedure, S.O. 83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as an 8 $^1/_2$" x 11" inch case folder with two (2) two-hole punch fasteners designed to secure all documents relating to the subject criminal case." (SOF ¶ 18). The Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file. (*Id.*).

To standardize note taking, CPD created General Progress Reports ("GPRs") at the same time, which are preprinted forms that detectives use to take notes. (*Id.*). Detectives use GPRs to document "handwritten notes and memoranda including inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course

15

of a violent crime field investigation." (*Id.*). To address the specific problem identified in *Jones*, each preprinted GPR has a designated place for the RD number, such that all handwritten notes for any investigation are tracked together. (*Id.*). In accordance with S.O. 83-1, GPRs are not maintained in CPDs RD File but are maintained in the Investigative File. (SOF ¶¶ 12, 18, 70).

An RD File, often referred to as a "permanent retention file," contains the original case report, as well as all supplementary reports. (SOF ¶ 11). For homicide cases, CPD maintains both the Investigative File and the RD file permanently. (SOF ¶ 11, 15-20). By design, the RD files do not contain detectives' notes. (SOF ¶ 12).

Therefore, according to CPD's express policies, the Investigative File should provide all parties to the criminal proceeding a comprehensive account of the investigation, including exculpatory information. (SOF ¶ 17).

### C. There is no evidence any Defendant suppressed or withheld exculpatory evidence in this case.

Plaintiffs allege that Individual Defendants withheld numerous items in violation of *Brady*, including (1) original criminal scene photos of the Soto murders; (2) notes from witness interviews; (3) documents that reflected that "Defendants had multiple theories of the case and alternate suspects," including polaroid photographs; and (4) "[l]arge bags of evidence containing potentially exculpatory evidence that were removed from the scene and not inventoried or produced." (*See* Def. Officers' Mem. Law Supp. Mot. Summ. J.). As Individual Defendants make clear, Plaintiffs cannot show that all these materials existed and were withheld or destroyed or, for those materials that did exist, that they were withheld or destroyed or that any materials were exculpatory. (*Id.*).

To establish a civil claim under *Brady v. Maryland*, 373 U.S. 83 (1963), "a plaintiff must prove: (1) the evidence at issue is favorable to his defense; (2) the officer concealed the evidence

16

intentionally or at least recklessly; and (3) the concealment prejudiced him." *Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019); *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022); *see also Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019). Plaintiffs' *Brady* claim cannot be based on speculation alone. *U.S. v. Parks,* 100 F.3d 1300, 1307 (7th Cir.1996) ("speculation is not enough to establish that the Government has hidden evidence."). "[A] denial of Due Process cannot be premised on the defendant's mere conjecture that there might have been favorable evidence which was undisclosed. The existence of the evidence must be established…" *U.S. v. McPartlin*, 595 F.2d 1321, 1346, n. 32 (7th Cir. 1979); *see also Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994, *3 (N.D. Ill. 2009) (no *Brady* violation based on plaintiff's mere speculation that a report may have existed); *U.S. v. Warren,* 454 F.3d 752, 759 (7th Cir. 2006) (finding no *Brady* violation because defendant was "unable to point to any specific evidence, exculpatory or otherwise, withheld by the government."); *U.S. v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008) (The defendant must provide some evidence other than mere speculation or conjecture that evidence was exculpatory and suppressed by the government) (citing *U.S. v. Morris*, 957 F.2d 1391, 1402–03 (7th Cir. 1992)). Evidence is material under *Brady* if there is a reasonable probability the proceeding would have resolved differently if it had been disclosed. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). Finally, in a civil suit premised on *Brady*, a plaintiff must show that a defendant who was responsible for the suppression "acted intentionally or at least recklessly in failing to turn…over" the evidence. *Moran*, 54 F.3d at 493.

For these reasons and those explained in Individual Defendants' Motions for Summary Judgment, Plaintiffs lack sufficient evidence to support their *Brady* theories. As such, Plaintiffs cannot prove that they suffered constitutional violations as a result. As a fundamental principle, if no constitutional violation occurred, the alleged City policies are "quite beside the point." *Heller*,

17

475 U.S. at 799; *see also Matthews,* 675 F.3d at 709 (finding no constitutional violation, so therefore no municipal liability).

**D.     There is no evidence of a widespread practice of failing to document investigative information or suppressing or withholding exculpatory evidence.**

Even if Plaintiffs were to meet their burden on the first prong of their *Monell* claims by showing that there is a genuine issue of material fact as to the violation of their constitutional rights by any Individual Defendant concerning *Brady*, Plaintiffs cannot demonstrate that the City had notice of a widespread practice of failing to document investigative information or suppressing or withholding exculpatory evidence, or that the City's practices, whatever they were, caused Plaintiffs constitutional injuries.

Plaintiffs' *Monell* theory related to the City's recordkeeping practices and report writing rests entirely on Plaintiffs' retained police practices expert, Thomas Tiderington, who the City argues should barred from testifying for the reasons stated in Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington ("Tiderington *Daubert* Motion"), incorporated herein. (*See generally* Def. City's Mot. Bar Tiderington). However, should the Court permit Tiderington to testify, Plaintiffs' *Monell* claims still fall woefully short. Tiderington does not establish a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files." His opinions regarding the City's report writing are thin and rely exclusively on speculation. His opinions regarding recordkeeping practices are equally weak. Additionally, Plaintiffs' theory suffers from a failure to establish a causal link between Plaintiffs' alleged constitutional violations and this particular *Monell* theory. *Harris*, 489 U.S. at 385; *Brown,* 520 U.S. at 400.

Plaintiff retained Thomas Tiderington to provide opinion testimony on Plaintiffs' *Monell* claim, as well as the police investigation in this case. (SOF ¶ 39). He was also retained to provide

18

opinion testimony in five other cases involving Defendant Guevara: *Sierra v. Guevara*, 18 CV 3029 (N.D. Ill.), *Iglesias v. Guevara*, 19 CV 6508 (N.D. Ill.)*, Maysonet v. Guevara*, 18 CV 2342 (N.D. Ill.)*, Johnson v. Guevara.*, 20 CV 4156 (N.D. Ill.), and *Gomez v. Guevara*, 18 CV 3335 (N.D. Ill.). His reports in all the cases are nearly identical. (SOF ¶ 40).[8] As it relates to Plaintiffs' *Monell* claims, Tiderington states that he was asked to assess "whether CPD's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, **are** adequate and consistent with practices around the country." (SOF ¶ 47). Accordingly, Tiderington did not assess whether CPD's policies **were** adequate and consistent with practices around the country during the relevant time period – 1998. Additionally, Tiderington's Report does not assess CPD's policies and practices related to photo arrays/lineups at all, and as such, Plaintiffs forfeit this argument. (SOF ¶ 48).

Regarding CPD's policies and practices concerning the documentation and disclosure of documents and information learned during homicide investigations, Tiderington has two global criticisms: that CPD routinely failed (1) to document information, and (2) to disclose the documents and information learned. (SOF ¶ 49). To arrive at these conclusions, Tiderington stated that he relied on the accuracy of a spreadsheet (Attachment F to his report) created by Plaintiffs' legal team and provided to him based upon information gathered from investigative files and RD files (also collectively referred to as "homicide files") from homicides that were investigated by CPD Area 5 detectives from 1995-1998. (SOF ¶¶ 50-51). These opinions are unreliable to prove Plaintiffs' *Monell* claims.

---

[8] For purposes of this motion, because Tiderington's reports are nearly identical, any reference to "report" in this motion, refers to his *Solache/Reyes* report unless otherwise noted.

19

1. **Tiderington's reliance on a spreadsheet that he had no hand in preparing and which he cannot manipulate render his opinions without foundation and unreliable.**

At the outset, it is important to note that Tiderington's report relies on the accuracy of the spreadsheet created and provided to him by Plaintiffs' counsel. (*Id.*). The spreadsheet is Attachment F of his report. (*Id.*). The spreadsheet (Attachment F) covered the time period 1995-1998 and also included information purportedly gathered from a small subset of criminal defense files ("*Solache/Reyes* spreadsheet"). (SOF ¶¶ 51, 56). While Tiderington's report (at page 4) describes Attachments F (the *Solache/Reyes* spreadsheet) as "Spreadsheet of my data analysis," Tiderington admits he was not involved in the creation of the spreadsheet, including deciding how to categorize or code entries, thereby rendering any conclusions he draws from his so-called "data analysis" or the spreadsheet devoid of any evidentiary meaning. (SOF ¶ 52-53). For instance, Tiderington admitted that he did not know how the coders determined that the inventory sheets (discussed below) were incomplete. (SOF ¶ 53). And while he was also provided with the files from which the information set forth in the spreadsheet was purportedly derived, as explained *infra* at 29 and 32, he conceded that he only "spot-checked" the files. (SOF ¶¶ 53, 61).

"Where an expert based [his] opinion on information supplied by another, the [courts] must focus on the reliability of the expert's foundation." *Black & Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873 at *1 (N.D. Ill. Sept. 8, 2006) (citing *Loeffel Steel Prods. v. Delta Brands*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005)). Expert opinions based on facts and material prepared by the party's lawyer are not reliable. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. Nov. 3, 2008) ("This conclusion follows from a number of separate but related principles, perhaps the most critical of which is the partisan role lawyers play in our adversary system.").

Here, Tiderington was provided with the spreadsheet only in "hard copy large pages," and if he received it electronically, it was only in pdf format, which included nearly 10,000 separate cells of data. (SOF ¶¶ 54-55). Specifically, the *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9,772 separate cells of data. (SOF ¶ 55). This spreadsheet purports to gather data from the 1995-1998 homicide files. (SOF ¶¶ 51, 55). The columns claim to answer questions such as: "Are there handwritten notes in that file that are not GPRs"; "Are there significant documents missing from the investigative file inventory? List report, type and dates."; and "Are they any handwritten notes?" (SOF ¶ 87). There are also eleven columns that assert to gather information from the subset of criminal defense files obtained. (SOF ¶ 56). Those eleven columns purport to generally identify "items in the Investigative File Missing from the Criminal Defense Files." (*Id.*). The spreadsheet contains no statistical analysis, does not provide percentages or even a tally of the totals for each of the 9,772 separate cells of data for the *Solache/Reyes* spreadsheet. (*Id.*). Tiderington's report purports to draw statistical conclusions or to tally certain data, which he terms his "findings," on datapoints from the 1995-1998 spreadsheet. (*See* Def. City's Mot. Bar Tiderington). For example, in his report, he states "For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete." (SOF ¶ 53). Yet, he conceded that he, "Certainly [] didn't look at 277 [files], but that's something that was spot-checked and is reflected in the spreadsheet." (SOF ¶ 53). Without access to versions of the spreadsheet that permit manipulation, such as an excel spreadsheet where data can be sorted and filtered, Tiderington simply could not have determined **himself** that there were 277 files identified in the column that purported to tally the number of files with "incomplete inventory sheets," thus it is simply incredulous to believe that Tiderington conducted this analysis. Moreover,

21

if he did not review all the files himself, and does not know how the coders determined that the inventory sheet was incomplete, then how can he reliably "find" that the inventory sheets were in fact "incomplete," regardless of the tally. The same problems exist with respect to his other "findings" on the other datapoints. A more detailed discussion of this fatal flaw is addressed in the Tiderington *Daubert* Motion, incorporated herein. (*See* Def. City's Mot. Bar Tiderington).

> **2. Tiderington concedes it would not be "humanly possible" to become familiar with each of the investigations and, therefore, he cannot establish the City had a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files."**

Tiderington relied upon the spreadsheet, as well as his haphazard review of the files from which the data in the spreadsheets was purportedly derived, to conclude that the City's written policies did not adequately address the *Jones* and *Palmer* "street files" problem. (SOF ¶¶ 97, 100). However, as explained below, his analysis falls woefully short of establishing that a practice of maintaining "clandestine files" still existed in 1998 or that CPD had a practice of withholding exculpatory evidence of any sort or even that CPD had a practice of withholding any information whatsoever.

Tiderington understands the phrase "street file" to mean files that were used by detectives that were not considered a formal file that would have to be turned over to the prosecution and/or defense. (SOF ¶ 98). In his report, Tiderington uses the phrase "unofficial documents," which he defines as "perhaps the street files [referring to the *Jones* and *Palmer* cases] or documents that officers believe are personal information versus [sic] and information that perhaps they keep in their desk and not in either the investigative file or permanent file." (SOF ¶ 91). In contrast, Tiderington recognizes that investigative files are formal files that are to be turned over by CPD to the prosecution and/or defense. (SOF ¶ 99).

The spreadsheet Tiderington was provided and his opinions are based on 344 investigative files and 341 RD Files ranging from 1995-1998 produced in the case (all official files), which he was also provided with. (SOF ¶¶ 57-58, 100). Despite his concession that investigative files are formal files to be turned over (and therefore, by CPD's and his own definition, not street files), Tiderington concluded that the policies enacted by CPD did not adequately address the "street files problem." (SOF ¶ 97).

First, he maintains that CPD's policies were not being complied with. (SOF ¶ 101). This opinion is irrelevant because the violation of police policies is "immaterial" to the question of whether a federal constitutional violation has been established. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or [] departmental regulations and police practices.'") (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001); *Soller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996)). Even Tiderington concedes that, for example, handwritten notes that are not written on GPRs that are included in the investigative file does not constitute a violation of a criminal defendant's rights. (SOF ¶ 93). Regardless, all his conclusions regarding compliance with CPD's policies are drawn from the spreadsheet and, as set forth above, and in Tiderington's *Daubert* Motion, are without foundation and unreliable. (*See* Def. City's Mot. Bar Tiderington).

Second, Tiderington concludes that criminal defense files show that "important investigative materials" are regularly withheld. (SOF ¶ 102). However, he admits that he did not review every file and merely "spot-checked" some of them, nor did he utilize "any great methodology" in deciding which files to spend more time with. (SOF ¶¶ 61-62). Tiderington concedes it would not "have been humanly possible" to become familiar with each of the

23

investigations that underlie the hundreds of files he reviewed because each of the files contained "many, many pages." (SOF ¶ 65). Moreover, Tiderington only billed 78 hours in connection with this case and given that there were nearly 700 files, it is apparent that Tiderington did not conduct any sort of meaningful review. (SOF ¶ 41).

Tiderington's opinions cannot be used to support the *Monell* claim because of the lack of any substantial review and analysis of the files that he purportedly relies on to draw his conclusions. Tiderington's failure to properly evaluate the data prevents any reliable link between those files and his conclusions. *See Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768, at *26-27 (N.D. Ill. Oct. 26, 2016) (expert's misalignment of data makes link between fact and conclusions too tenuous to accept expert's opinion); *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (there must be "some link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support").

Any conclusions he draws from the spreadsheet or his cursory review of the files are pure speculation and, regardless, do not establish a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files." The Court should not admit "opinion evidence that is based on subjective belief or unsupported speculation." *U.S. v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999) (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir. 1993)).

Moreover, Tiderington's concession that investigative files are formal files that are turned over by CPD eliminates the possibility that the City's policies and practices regarding investigative files are the equivalent of the pre-1983 policies and practices regarding street files. (SOF ¶ 99). Tiderington does not identify any investigative files of the 344 files he had available to him for review that were completely missing from a criminal defense file (other than from files that he eliminated from his analysis because they were incomplete), further cementing the fact that

investigative files are not the equivalent of "street files". (SOF ¶ 103). Accordingly, Tiderington's analysis of the files and the spreadsheets created by Plaintiffs' counsel does not support Plaintiffs' *Monell* "street files" theory.

> **3. Tiderington's concession that he never reviewed any CCSAO files renders his opinion irrelevant to any theory that CPD had a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files."**

The purpose of Tiderington's opinion is to demonstrate that CPD had a policy and practice of withholding documents, leading to *Brady* violations. However, CPD's *Brady* duty is fulfilled when CPD provides exculpatory documents to the prosecutor or defense counsel. *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) ("police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the evidence over to defense counsel"); *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (*Brady* requires police to disclose exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation); *Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152, at *8 (N.D. Ill. Mar. 12, 2024) (The police must disclose exculpatory evidence to the prosecutor so that they, in turn, can disclose the evidence to the defendant).

Therefore, it is necessary to know what documents the defense and prosecutor had to evaluate whether CPD had actually withheld documents in violation of *Brady*. Tiderington concedes, however, that he *never* reviewed any of the files from the Cook County State's Attorney's Office (hereinafter, "CCSAO files") that corresponded to the CPD files he examined to determine if any of the materials that Tiderington claims were not in the Cook County Public Defender's Office (hereinafter, "CCPDO files") were contained within the CCSAO files. (SOF ¶ 73).

25

**4. If CPD disclosed all of its investigative documents for a case to the CCSAO, and the CCSAO did not, in turn, disclose those documents to the criminal defense attorney, the fault would be with the CCSAO not CPD. Yet Tiderington has no idea whether any of the documents he claims were not turned over, were in fact given to the prosecutor by CPD, so his opinion that documents were systematically withheld lacks a valid basis. Tiderington's haphazard statistically insignificant review of 64 CCPDO files does not establish that any material was withheld.**

Tiderington also bases his opinion on whether important investigative materials are regularly withheld from criminal defendants on 64 criminal defense files from the CCPDO files associated with the 1995-1998 investigative files and RD Files. (SOF ¶ 71). But his review is clearly insufficient to draw any reliable conclusions. Tiderington admitted that he only personally reviewed 10 out of the 64 sets of companion files. (SOF ¶ 111). Additionally, Tiderington admits that he did not determine if the information in the investigative file that he thought was withheld was exculpatory. (SOF ¶ 109). A conclusion without the requisite supporting analysis is worth nothing more than the paper it was written on. A court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Without that analysis, Tiderington's opinions are irrelevant.

More fundamentally, the total number of the CCPDO files, 64, associated with the 1995-1998 investigative files and RD files is less than half the number of files that Plaintiffs' own consulting expert, Dr. Allison Harris, opined would be necessary to draw statistically significant conclusions. (Dkt. 469, Aff. Dr. Harris). By way of background, to obtain CCPDO files from the 1995-1998 time period to compare to CPDs files, Plaintiffs were ordered to obtain from their consulting/pre-disclosed expert the number of CCPDO files in a sample set that would be sufficient for a statistical analysis and provide it to the court, (Dkt. 434, Minute Entry), so that Magistrate Judge Harjani could decide the Cook County Public Defender's Motion to Quash or Modify

26

Subpoena ("Motion to Quash") (Dkt. 424, CCPD's Mot. Quash Subpoena), issued by Plaintiffs. The court granted in part and denied in part the Motion to Quash based, in large part, on the opinions of Dr. Harris. (Dkt. 471, Mem. Op. & Order).

Dr. Harris opined that in ascertaining an appropriate sample size, the generally accepted method in quantitative analysis is to obtain a sample with a confidence level of at least 95% and a margin of error of no more than 5%. (Dkt. 469, Aff. Dr. Harris, at ¶ 10). Applying this information to the 191 files in the total population here, defined as the total number of companion CCPDO files located, Plaintiffs' consulting expert asserted that a random selection of 154 files was required to produce a statistically significant result at a 99% confidence level and a margin of error of 5%. (Dkt. 471, Mem. Op. & Order, at 14; Dkt. 469, Aff. Dr. Harris, at ¶ 12). At 132 files, the result would still be statistically significant at a confidence level of 95% and a margin of error of 5%, but anything less would not produce statistically significant results. (Dkt. 471, Mem. Op. & Order, at 14; Dkt. 469, Aff. Dr. Harris, at ¶ 13).

The court ordered the CCPDO to produce a representative sample of 69% of the 191 files, or 132 files, and concluded that the likely benefit of ensuring a statistically significant result substantially outweighed the marginal burden placed upon the CCPDO. (Dkt. 471, Mem. Op. & Order, at 15). The court further noted that "[t]here is nothing in the record to indicate that a much smaller sample of files would achieve a sufficiently reliable result to infer a widespread pattern or practice and withstand a potential *Daubert* challenge to Plaintiffs' expert's methodology." (*Id.*). Accordingly, based on the conclusions of Dr. Harris, the 64 CCPDO[9] files Tiderington relied on

---

[9] Moreover, the CCPDO acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later. (*Velez v. Dart*, 18 CV 8144, Dkt. 256, at 4, attached as Ex. 2).

for the sample size fall far short of the 132 files that would be sufficient to produce an acceptable level of certainty.

### 5. Tiderington's "failure to document" opinions are not supported by any data in his Report.

For his opinion that CPD had an alleged policy and practice of failing to document information learned in homicide investigations, Tiderington cites *Jones* and other examples he found while spot-checking the spreadsheet "where the police report would attribute statements to a witness but then there were no notes." (SOF ¶¶ 76, 79). As for *Jones*, that case is not an example of failure to document at all. *See Jones* discussion *supra* at 19. Regardless, *Jones*, a case based on a 1981 investigation, is too remote to establish a practice pursuant to *Monell*. *Velez,* 2023 WL 6388231, at *23; s*ee also Brown*, 633 F. Supp. 3d at 1148, 1150 (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis).

Tiderington gives only 5 RD numbers as so-called examples of where information was not documented that should have been. (SOF ¶ 82). He puts those examples in a section of his report titled "Missing or Incomplete Inventory Sheets." (*Id.*). But that section does not address missing documentation at all. (*Id.*). That section purports to identify files with inventory sheets that do not appear to be contemporaneously updated, or contain illegible dates or no dates at all, or are missing the identity of the person who entered the document on the sheet or has vague entries. (*Id.*).

Additionally, Tiderington claims that if an investigative file does not have a GPR it *may* support his conclusion of a failure to document, but he then concedes that handwritten notes in the investigative file that are not written on GPRs does not constitute a constitutional violation, and that his criticism in this regard was limited to whether CPD's policies that handwritten notes should be taken on the GPR were being followed. (SOF ¶¶ 85, 93).

28

Furthermore, Tiderington claims the spreadsheet confirms his opinion that officers were regularly failing to document information, but as pointed out above, he cannot possibly have done any analysis of the spreadsheet on his own. *See supra* at 28-29; (SOF ¶ 78-79). In addition, the spreadsheet does not even purport to tally those instances where there was found a "failure to document." *See* Attachments F; (SOF ¶ 84). In short, none of the data in his report actually supports Tiderington's conclusion that there was a routine failure to document. (SOF ¶ 96).

Lastly, Tiderington's opinions fall woefully short of establishing the requisite notice and causation for *Monell* liability to attach. Plaintiffs' burden is to present evidence that proves the City was deliberately indifferent to the constitutional rights of the criminal defendants. *See Brown*, 520 U.S. at 411 ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision"); *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (before municipal liability can attach, the municipality must be on notice of the deficiency and have a high degree of culpability). Quite obviously, if Plaintiffs cannot establish evidence of one constitutional violation, and Tiderington provides none from his analysis of the spreadsheets or his haphazard review of the files, they fall woefully short of proving a *pattern* of violations necessary to establish their widespread practice claims. *Thomas,* 604 F.3d at 303 (while there is "no clear consensus as to how frequently such conduct must occur to impose *Monell* liability," it is clear "it must be more than one instance, or even three").

Tiderington does not establish Plaintiffs' *Monell* theory based on an alleged widespread practice of failing to document investigative materials or withholding exculpatory evidence. Accordingly, Plaintiffs' claims cannot survive summary judgment.

### III. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO DISCIPLINE *MONELL* THEORY.

Plaintiffs also allege in their *Monell* claims that the aforementioned widespread practices were allowed to flourish because the City directly encouraged and was thereby the moving force behind the misconduct at issue by failing to adequately train, supervise, and control their officers on proper interrogation techniques and failing to adequately punish and discipline prior instances of similar misconduct. (Dkt. 244, Solache's First Am. Compl., ¶¶ 94-96; Dkt. 396, Reyes's Second Am. Compl., ¶ 180). This "dysfunctional disciplinary system" *Monell* theory includes Plaintiffs' allegations that the City "condoned and facilitated a code of silence" and failed to "track and identify police officers who are repeatedly accused of serious misconduct," because of "CPD's wholly inadequate disciplinary system—*i.e.,* related to the utter failure to appropriately investigate and act upon evidence of misconduct by Chicago Police officers, including through civilian complaint against officers." (SOF ¶¶ 1, 6). Plaintiff allegations "include express policy theories (*e.g.*, disciplinary policies that were obviously inadequate and incomplete), widespread practice theories (*e.g.*, a widespread practice of failing to meaningfully investigate allegations of officer misconduct, depriving investigators of access to officers' disciplinary histories), and failure to train, supervise and discipline theories (*e.g.*, the failure to train internal investigators to meaningfully investigate allegations of office (sic) misconduct, permitting supervisors to conduct disciplinary investigations of their own officers, etc.)." (SOF ¶ 6). However, these allegations remain unsupported by admissible evidence even though the City produced 349 CPD disciplinary investigations, commonly referred to as Complaint Register or CR files ("CRs"), that included allegations against Area 5 detectives for the relevant time period of 1995-1998. (SOF ¶ 153). Accordingly, the City cannot be held liable based on its internal investigation and disciplinary

system because Plaintiffs cannot establish any constitutionally deficient policy or practice of the City.

>    **A.** **Plaintiffs' police oversight expert failed to identify any CR file that was not appropriately investigated.**

Plaintiffs' "dysfunctional disciplinary system" *Monell* theory rests entirely on their disclosed disciplinary practices expert, Anthony Finnell. (SOF ¶ 127). The City argues that Finnell should be barred from testifying for the reasons stated in Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Anthony W. Finnell ("Finnell *Daubert* Motion"), incorporated herein. (*See generally* Def. City's Mot. Bar Finnell). However, should the Court permit Finnell to testify, Plaintiffs' claims still fail because Finnell does not establish that the City had a widespread practice of failing to discipline its officers or that its disciplinary system was otherwise deficient. Plaintiffs requested and obtained from the City 349 CR files that included allegations of misconduct against Area 5 detectives from 1995 through 1998 because they claimed these files would demonstrate a failure to discipline. (SOF ¶ 153). These CR files were produced in addition to the 416 CR files from the March 1996-March 2001 time period that the City produced in the *Velez* case (that does not involve Guevara). (SOF ¶ 154). This evidence decidedly disproved Plaintiffs' *Monell* claims.

Plaintiffs retained Finnell to provide opinion testimony about CPD's supervision and disciplinary practices in support of Plaintiffs' *Monell* claims, specifically "to render an opinion as to the City of Chicago's policies, procedures, and practices as they related to the training[10], supervision[11] and discipline of officers, and their relationship to the disciplinary histories and

---

[10] Finnell does not identify any training materials in his report (SOF ¶ 171), nor does he recall receiving any training guides, training manuals or training histories. (*Id.*). Moreover, his report is devoid of any analysis of the City's training. (SOF ¶ 172). Accordingly, Plaintiffs waive their *Monell* theory with respect to a failure to train and summary judgment should be granted for the City on this issue.

[11] While Finnell mentions supervisors and supervision throughout his report, his criticisms are limited to CPD's systems. (SOF ¶ 173).

conduct of the [Individual Defendants], as it relates to the 1998 wrongful convictions of Plaintiffs Reyes and Solache." (SOF ¶ 127). Finnell has two global opinions. First, Finnell opines that "[t]he Chicago Police Department and Defendant City of Chicago engaged in a widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices." (SOF ¶ 134). Finnell's second global opinion is that "[t]he Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses." (*Id.*).

Like Tiderington, Finnell was provided with a spreadsheet prepared by Plaintiffs' counsel in this case based on information gathered from the 349 CR files covering 1995 to 1998. (SOF ¶ 135). That spreadsheet included columns such as complainant, accused officers' name, allegation, date of incident, date CR was initiated, date investigation completed, finding and a host of other data points, many of which are not mentioned in Finnell's report. (SOF ¶ 139). Finnell was also provided with spreadsheets prepared by Plaintiff's counsel in *Velez* based on CRs from 1996-2001. (SOF ¶ 135). With respect to the *Solache/Reyes* spreadsheet, Finnell testified that he does not know who prepared the spreadsheet, the backgrounds or credentials of any of the individuals who prepared the spreadsheet, and did not have any input into the preparation of the spreadsheet. (SOF ¶ 137). "Where an expert based [his] opinion on information supplied by another, the [courts] must focus on the reliability of the expert's foundation." *Black & Decker*, 2006 WL 5156873 at *1 (citing *Loeffel*, 372 F. Supp. 2d at 1119). Expert opinions based on facts and material prepared by the party's lawyer are not reliable. *Sommerfield*, 254 F.R.D. at 321 ("This conclusion follows from a number of separate but related principles, perhaps the most critical of which is the partisan role lawyers play in our adversary system.").

32

Finnell spot-checked the CR files that were provided to him in *Velez* by pulling a CR and seeing if the information from the CR matched the spreadsheet, but he could not say with any certainty how many CRs he spot-checked. (SOF ¶ 142). Finnell also claims he *tried* to look at every CR that was produced in this case, at least through the Complaint page that identifies the complaint and the Summary Report that shows the steps the investigator took. (SOF ¶ 143). He therefore cannot reliably verify that the spreadsheets were accurate. In the end, despite the 349 CR files that were available to him for 1995-1998, and the 416 CR files he was provided in *Velez*, he only criticized, at most, 12 investigations. (SOF ¶ 209).

Even if Finnell's criticisms are credited, Finnell only quarreled with the quality of the investigations of 1.5% of the investigations (12 out of 765) that he reviewed and that does not include the hundreds of career CR files for Individual Defendants he had at his disposal in both cases (*Velez* and this case). Given that Finnell's report sets forth no standards to ensure that the sample size he was reviewing was statistically significant (SOF ¶ 190), and by the standards identified by Dr. Harris, Finnell's review is insufficient to establish the City's practices. (Dkt. 469, Aff. Dr. Harris, at ¶ 10). And although he criticized the *investigation* in those 12 CR files, he conceded in his Report that "[m]y analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains the province of the factfinder," and there is no analysis in his Report discussing his determination that misconduct occurred in any of the CR files he reviewed. (SOF ¶ 208). Given that Finnell could not say a single outcome was wrong, his opinion does not support that there was a dysfunctional disciplinary system.

"Typically, experts in this area offer an analysis of the CR files they have reviewed and why they think the investigator erred." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1070 (N.D. Ill.

2018); *see also LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 988 (N.D. Ill. 2017). Yet, Plaintiff's expert was unable to render such an opinion despite having a corpus of nearly 1,000 CR files that spanned 7 years. Accordingly, summary judgment should be granted in favor of the City on Plaintiffs' *Monell* claims based on an alleged widespread practice of failing to discipline CPD officers.

**B.      It is undisputed that CPD's "sustained rate" cannot form the basis of a *Monell* claim based on a failure to discipline theory.**

Because Finnell could not identify a sufficient number of CR files that failed to satisfy investigative standards in the police oversight community, he attempted another approach: a comparison of CPD's rate of police disciplinary investigations that were sustained ("sustained rate") with a supposed national standard. (SOF ¶¶ 191-205). He opined that CPD's rate of sustaining allegations in CR files was too low compared to the national average and therefore showed that CPD's disciplinary system was inadequate. (SOF ¶ 204). This conclusion unraveled, however, because Finnell conceded at his deposition that there is no such thing as a national sustained rate and the City's sustained rate fell within the margin of error. (SOF ¶¶ 196, 204).

In his report, Finell examined CPD's sustained rate for use of force from 1995 to 1998 and found it to be 9%. (SOF ¶ 197). Finnell opined that this fell too far below the national average, indicating a problem with CPD's discipline for excessive force. (SOF ¶ 204). But to establish the "national average," Finnell relied, in part, on a federal survey for the proposition that "8 percent of the use of force complaints received by large state and local law enforcement agencies in 2002 were sustained." (SOF ¶ 191). However, Finnell admitted that he relied on a news article about the 2002 federal survey and was not sure he read the survey itself. (SOF ¶ 192). Once Finnell reviewed the actual federal survey, he acknowledged that the survey breaks down sustained rates based on the size of the agency and that law enforcement agencies with 1,000 or more full-time sworn

officers have a sustained rate of 6% for excessive force complaints. (SOF ¶ 193). Finnell conceded at his deposition that he compared CPD's rates to the 8% rate identified in the survey, not the appropriate 6% rate for large law enforcement agencies. (*Id.*). Moreover, despite his report stating that CPD's sustained rate is "far below available *national averages* for that time period" (emphasis added), Finnell admitted at his deposition that his report does not cite any "national averages from the time period" of this case and he could not recall any specifics regarding what the national average was in 1998. (SOF ¶ 204).

Finnell also relied on a 2020 Washington Post article for the proposition that "about 7 percent of complaints of officer misconduct for unionized police agencies were sustained." (SOF ¶ 195). Finnell then compared the sustained rate of the 1995-1998 dataset and noted that the sustained rate for all types of allegations was 8% after investigation and 3% after full review, the sustained rate for excessive force was 4.7% and 9% after full review. (SOF ¶¶ 197). The force statistics are based upon individual investigations and allegations (not CRs). (*Id.*). This comparison alone is insignificant because Finnell cannot establish that the sustained rates are statistically significant (assuming that what is reported in the 2020 Washington Post article is reliable) and does not show that CPD had a *de facto* policy of encouraging its officers to frame innocent homicide suspects. Furthermore, of the 349 CRs that were analyzed in this case from the 1995-1998 Dataset, Finnell's report evidenced that 39 CRs were sustained for an 11% sustained rate, far above any of the averages he used for comparisons. (SOF ¶ 199). By way of background, for the 1995-1998 time period, Finnell's report contains both a sustained rate for CR files – which was 11%, or 39 out of the 349 CRs – and a sustained rate for the number of allegations comprising those 349 CR files – which was 8%, or 171 out of the 2,150 allegations. (SOF ¶ 201). As a result, Finnell's report is riddled with confusion regarding allegation counts vs. CR counts and he makes

no effort to determine how the "national averages" are determined – by CR count or by allegation count. (*See* Def. City's Mot. Bar Finnell).

Moreover, Finnell acknowledged in his report that even his attempted comparison had limited utility because "[t]here is no standardization of data collection for agencies and units tasked with investigating misconduct across the country." (SOF ¶ 196). Finnell did not even try to find data from other law enforcement agencies around the country for their sustained rates for the time period at issue in this case. (SOF ¶ 202). He further testified that he agreed citizen complaints data must be interpreted with caution due to the differences in how agencies receive, process and record complaints, as well as the various influences on the citizen's decision whether to file a complaint. (SOF ¶ 194). Finally, Finnell agreed that even the meaning of "complaint rate" is not entirely clear because a low force complaint rate could mean that police are performing well or that the complaint process is inaccessible; likewise, a high force complaint rate could mean that officers use force often or that the complaint process is more accessible. (*Id.*).

Even if Finnell could compare sustained rates between police departments, and he admitted that he cannot, the difference between the 7% national average sustained rate Mr. Finnell quoted from the Washington Post article and CPD's sustained rate of 3% for all types of allegations (or even if the 9% sustained rate for excessive force complaints) is within the margin of error that Mr. Finnell used for purposes of his analysis. (SOF ¶¶ 195, 197). In other words, even if Finnell's observations are insulated from his own fatal admissions, Finnell's observations demonstrate that any discrepancy between any purported national sustained rate and CPD's sustained rate is due to chance. In the end, Finnell admitted that one cannot look at a police department's sustained rate alone and use it to determine that it was deliberately indifferent to police misconduct. (SOF ¶ 205).

36

C.     **The "historical context" of CPD's disciplinary system cannot form the basis of a *Monell* claim based on a failure to discipline in 1998.**

Seeking to rely on platitudes instead of evidence, Plaintiffs also attempt to rely on what their expert refers to as "historical context" to prove that the City had a policy of failing to discipline its officers in 1998 and seek to introduce evidence starting from the "Burge Era" to show that City's police accountability system had allegedly been broken for decades. (SOF ¶ 215). Finnell spends 18 pages of his report discussing events from almost half a century ago having nothing to do with this case, such as the allegations against Jon Burge, who was suspended in 1991 and terminated in 1993, and prior civil rights litigation alleging unrelated claims. (SOF ¶¶ 215-17).

Regardless, these "historical" comments are not probative of CPD's 1995-1998 investigative and disciplinary practices and thus cannot amount to evidence of CPD's policies in 1998. This commentary cannot replace evidence and Plaintiffs' failure to discipline *Monell* theory should be dismissed on summary judgment. *See Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (*Monell* requires "official policy, widespread custom, or action...was the moving force behind [Plaintiff's] constitutional injury."). In fact, the actual CR files reviewed by Finnell establish that CPD was properly investigating complaints of police misconduct 1995-1998. (SOF ¶ 199).

Also, the Department of Justice ("DOJ") report cited in Finnell's report is irrelevant and inadmissible here. (SOF ¶ 217). To start, the report itself is inadmissible hearsay as it is out of court statements being offered for the truth. Fed. R. Evid. 801. Additionally, in instances where DOJ reports were ruled admissible, those prior cases did not have the same relevancy hurdles as are present here. For instance, those other cases centered around officers' use of force from 2010-2016, the same scope and time considered by the DOJ report. *See First Midwest Bank v. City of*

*Chi.*, 337 F.Supp.3d 749, 778 (N.D. Ill. 2018) (off-duty officer use of force in 2010); *Godinez v. City of Chicago*, No. 16-cv-7344, 2019 WL 5597190, at *3 (N.D. Ill. Oct. 30, 2019) (use of force in 2015); *Est. of Loury v. City of Chicago*, No. 16-cv-4452, 2019 WL 1112260, at *1 (N.D. Ill. Mar. 11, 2019) (use of force in 2016); *Simmons v. City of Chicago*, No. 14-cv-9042, 2017 WL 3704844, at *1, 8 (N.D. Ill. Aug. 28, 2017) (use of force in 2013). The timeframe at issue in this matter (1998 and the preceding years) is decades earlier than the time the DOJ report covers, 2010-2016. Because this report is irrelevant in terms of time, any attempt to draw inferences from it would thus yield unreliable and untrustworthy conclusions in violation of Fed. R. Evid. 803(8)(c).[12]

In fact, where a plaintiff has attempted to rely on the exact same DOJ report to support a *Monell* claim based on a failure to discipline theory, this Court has struck it down. *Velez*, 2023 WL 6388231, at *23 ("But these events are too remote in time from the underlying misconduct alleged here—mostly in 2001—to be relevant in establishing a pertinent practice or custom."); *see also Brown*, 633 F. Supp. 3d at 1148, 1150 (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis); *Milan*, 2022 WL 1804157, at *5 (explaining that the 2017 DOJ Report focused on police officer shootings and use of force was not relevant to *Monell* claim in case involving claims of fabrication and withholding of evidence).

The question relevant to Plaintiffs' *Monell* allegations here is whether the CPD policies relating to homicide investigation procedures directly caused Plaintiffs a constitutional injury.

---

[12] The DOJ report was "initiated [after] the release" of the video showing the fatal encounter between CPD and Laquan McDonald in October 2014 and reviewed a sample of "force reports and investigative files for incidents that occurred between January 2011 and April 2016...". (DOJ Report, at. 1-2); *see also Milan v. Schulz*, No. 21-CV-765, 2022 WL 1804157, at *5 (N.D. Ill. June 2, 2022) ("[T]he [DOJ] Report focused on police officer shootings and the City's oversight of officers' use of force, which are not at issue in this case."). Thus, it is not probative of any relevant police practices at issue here in 1998.

Thus, the consideration of subsequent remedial measures implemented in the context of police involved shootings about two decades after 1998 are irrelevant and inadmissible. Fed. R. Evid. 407 and 403.

> **D.      Any reference to the CR histories of Individual Defendants cannot amount to a citywide practice.**

Finnell opined that the Individual Defendants own CR history demonstrated that the City had a *de facto* policy of failing to discipline its officers and thereby encouraging unconstitutional conduct. (SOF ¶ 176). But he had no reliable basis to make that conclusion. Finnell's Report has no analysis discussing his determination that misconduct occurred in any of the CR files he reviewed, which included the Individual Defendants' CRs. (SOF ¶ 208). Finnell's speculative conclusion about the Individual Defendants' CR files does not create a genuine issue of fact that officer misconduct was so widespread across CPD that it amounted to a *de facto* policy of failing to discipline. *See Rivera*, 319 F. Supp. 3d at 1071 (granting summary judgment on a failure to discipline *Monell* theory where expert "offer[ed] no sufficient methodological basis for his opinion that [defendant officer] engaged in misconduct, that the City mishandled or failed to discipline him in response to complaints lodged against him, or misconduct about which City officials knew."); *Saucedo*, 2015 WL 3643417, at *4 (statistics on the numbers of CRs filed against a particular officer without any evidence that those investigations were faulty, flawed, or unfair is "insufficient to support a *Monell* claim."); *see also Bryant v. Whalen*, 759 F. Supp. 410, 424 (N.D. Ill. 1991) (evidence of unstained complaints, "without any evidence that those complaints had merit," insufficient to establish municipal liability under *Monell*).

Second, a review of the CR histories for Individual Defendants shows that the sustained rates for complaints made against the individual officers with this most CRs initiated against them in this case exceeds the average 7% sustained rate cited by Finnell for overall allegations of officer

39

misconduct. By the time of Plaintiffs' arrests in April 1998, Defendant Guevara had 13 CRs initiated against him; Defendant Biebel had 3 CRs; Defendant Cappitelli had 0 CRs; Defendant Halvorsen had 3 CRs; Defendant Mingey had 3 CRs; Defendant Dickinson had 1 CR; Defendant Rutherford had 8 CRs; and Defendant Trevino had 0 CRs. (SOF ¶ 157). Looking at Defendants Guevara and Rutherford since they had the most CRs against them: for Guevara, allegations were sustained in 4 out of 13 of his CRs, for a 30.7% sustained rate; and for Rutherford, allegations were sustained in 1 out of 8 of his CRs, for a 12.5% sustained rate. (SOF ¶¶ 159-63). The fact that these officers had multiple complaints sustained against them prior to Plaintiffs' arrests shows that they knew they could be punished and undermines Plaintiffs' argument that Individual Defendants thought they could act with impunity.

Third, Finnell concluded in his original report that Defendants Guevara, Halvorsen, Rutherford, Harvey, Mingey, and Biebel were outliers (SOF ¶ 148), meaning they received more complaints than their fellow Area 5 detectives, but his conclusions are seriously flawed based on the arguments set forth in the Finnell *Daubert* Motion. Additionally, Finnell concedes in a case that he was retained on subsequent to this one, *Sierra v. City of Chicago*, that he does not know if any police departments were conducting outlier analyses in 1990s and, more importantly, cannot identify any police department that has ever used an outlier analysis similar to the one Miroslava Meza, whom he enlisted the assistance of when preparing his report in that case, conducted for the purpose of discipline and oversight. (SOF ¶ 150). Moreover, Finnell conceded in his rebuttal report that his "outlier analysis" from his report was wrong, and that none of the Individual Defendants are outliers when compared to the 1995-1998 time period. (SOF ¶ 152). Thus, Finnell's opinions on his outlier analysis are not relevant to whether the City's policies were unconstitutional.

40

Finally, a myopic focus on the Individual Defendants' alleged conduct would impermissibly conflate the question of their conduct with the question of whether a genuine widespread practice existed within CPD during 1998. This would run afoul of the Supreme Court's admonition that courts should not convert *Monell* claims into *respondeat superior* liability. *Brown*, 520 U.S. at 403. As the Seventh Circuit commented, "[T]he gravamen [of a *Monell* claim] is not individual misconduct by police officers…but *widespread practice* that permeates a critical mass of an institutional body." *Rivera*, 319 F. Supp. 3d at 1071 (quoting *Rossi*, 790 F.3d at 737). "In other words, *Monell* claims focus on institutional behavior." *Rossi*, 790 F.3d at 737. A limited focus on CR files of Individual Defendants defeats Plaintiff's claim because "a practice may not be widespread if it took place two, three or four other times." *Black v. City of Chicago*, 18-cv-6518, 2022 WL 425586, at \*5 (N.D. Ill. Feb. 11, 2022) (citing *Palmer v. Marion County*, 327 F.3d 588, 595-96 (7th Cir. 2003)); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002); *Grieveson*, 538 F.3d at 773-75. Although "there is no clear consensus as to how frequently [conduct] must occur to impose *Monell* liability," a plaintiff still must demonstrate "that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. The alleged misconduct must go beyond "individual misconduct by police officers (that is covered elsewhere under § 1983) [to] a *widespread practice* that permeates a critical mass of an institutional body." *Rossi*, 790 F.3d at 737 (emphasis in original); *see also Bryant*, 759 F. Supp. at 412 ("Statistics of unsustained complaints of excessive force, without any evidence that those complaints had merit, will simply not suffice to establish municipal liability under § 1983"). Plaintiffs thus fall short of their burden to demonstrate a widespread practice by the City of failing to discipline its officers such that it amounts to a *de facto* policy. *Connick v. Thompson* 563 U.S. 51, 61 (2011).

**E.      Any reference to prior lawsuits involving Individual Defendants cannot amount to a citywide practice.**

Finnell also opines that the civil lawsuits filed against CPD officers provided additional notice to policymakers of their alleged misconduct. (SOF ¶ 211). However, he testified that the majority of the lawsuits identified in his report were filed after 2005, a decade after the events in this case. (SOF ¶ 212). In fact, of the 16 lawsuits listed in Finnell's report, only three of them were filed before Plaintiffs' arrests in 1998. (*Id.*). Finnell further concedes that he did not conduct an independent assessment of the claims in the lawsuits, nor did he have actual knowledge of the posture of the litigation. (SOF ¶ 214). *See Palmquist*, 111 F.3d at 1346 (stating that before liability can attach, the municipality must be on notice that their practices were so obviously deficient and so likely to result in constitutional injury). Lawsuits involving Individual Defendants that were filed after Plaintiffs' arrests cannot provide the notice to the City that is required in order for *Monell* liability to attach.

## IV.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COERCED CONFESSION *MONELL* THEORY.

Even though the City produced 344 investigative files and 341 RD Files in response to Plaintiffs' demand for discovery on this issue, Plaintiffs admitted they developed no evidence from any of those files to support their coerced confession theory. (SOF ¶ 286). Instead, Plaintiffs rely only on the inadmissible opinion of Richard Leo, Ph.D.

Dr. Leo is a professor of psychology and criminology and his area of expertise is social psychology, criminology, the law on policy interrogation practices, the psychology of interrogation and confessions and erroneous convictions. (SOF ¶ 232). He received his Ph.D in Jurisprudence and Social Policy. (SOF ¶ 231). Dr. Leo's January 15, 2022 expert report is divided

into three parts.[13] Pages 12-29 of his report provide the social science background that inform his opinions related to Plaintiffs' claims against Individual Defendants. (SOF ¶ 233). Pages 29-65 of his report provide his opinions in support of Plaintiffs' claims against Individual Defendants and includes his opinion that Plaintiffs' confessions meet the criteria for what is known as a proven false confession in the social scientific research literature. (SOF ¶ 236). The remaining 30 pages of his report include his opinions in support of Plaintiffs' *Monell* claim against the City. (SOF ¶ 256). As for *Monell*, Dr. Leo's opinion is that the CPD had a "widespread and systemic pattern and practice of physically and psychologically coercive interrogations, especially of African-American and Latino men from 1972 to at least 2000." (*Id.*). The *Monell* portion of his report makes no reference to the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability set forth at pages 12-29 of his report. (SOF ¶ 258).

To support this conclusion, Dr. Leo relies on allegations of 62 murder suspects (who were criminally charged) who claimed their confessions were coerced spanning from 1970s to 2000, plus references to a handful of CR files pertaining to allegations against Defendant Guevara. As explained more fully below, Dr. Leo's opinion is inadmissible because it contains no explanation of his methodology or application of his expertise. (SOF ¶ 294-308). Rather, it begins with a narrative summary of allegations pertaining to Jon Burge, the former commander of CPD Detective Division Area 2, who was suspended in 1991 until his ultimate termination from the police department in the 1993 and has no connection to the Soto murder investigation, and then

---

[13] Dr. Leo also authored a rebuttal expert report on January 31, 2023 in response to Defendants' confession expert's report. The opinions in his rebuttal expert report are limited to addressing the criticisms in Defendants' expert's report.

43

includes "case summaries" on the coercion allegations of those 62 murder suspects, where the summaries merely report what the suspect alleged. (SOF ¶¶ 270-72, 280, 282, 284, 287). Of those 62 case summaries, 30 refer to allegations against former detectives Micheal Kill, Kenneth Boudreau, and John Halloran. (SOF ¶ 270). Then, 19 case summaries refer to allegations against former detectives Kato, Summerville, Lewis, Roberts, and Cirone. (SOF ¶ 280). And the final 13 case summaries pertain to allegations against Defendant Guevara and Halvorsen. (SOF ¶ 284). Each of the 62 case summaries are not more than a few lines in his report, with some summaries only one sentence long. (SOF ¶ 268). Following each case summary, Dr. Leo's report includes citations to documents Plaintiffs produced to Defendants after the close of fact discovery, and to Dr. Leo, accumulated from unidentified sources, that provide the record support for the allegations included in each case summary, documents Plaintiffs' counsel cherry-picked and produced. (Dkt. 564 at pp. 11-12). And, as explained below, those citations fail to substantiate Leo's opinion, and are merely derived from reading the documents themselves, nothing more.

At his deposition, Dr. Leo could not answer most questions about whether the 62 cases were substantiated in any way. (SOF ¶ 306). Instead, he repeatedly answered that he would have to look back at the material or he directly read from notes prepared for the deposition, which were not attached to his report or produced before his deposition. (SOF ¶ 306). Dr. Leo testified that he created the notes after he prepared his report and solely in preparation for his deposition to aid his memory. (SOF ¶ 301). The notes were not only not produced with Dr. Leo's report, but they were also not produced before his deposition. (SOF ¶ 302). In fact, Defendants were unaware of the existence of the notes until Dr. Leo began reading from them at his deposition. (*Id.*). Dr. Leo read from the notes to answer questions throughout his deposition and despite Defendants' repeated requests during the deposition that the notes should be produced because Leo was reading

44

from them to answer questions, Plaintiffs refused.  (*Id.*).  Plaintiffs eventually produced the notes[14],

totaling 91 pages, and Dr. Leo was re-deposed about them.  (*Id.*).  During that deposition, Plaintiffs

asserted a work-product objection to follow-up questions about the notes' creation, including *how*

Leo created them.  (*Id.*).

The 91 pages of notes include additional information and record citations for the summaries

that are not included in the report for 38 of the 62 cases and, as explained below, are divided into

the headings "evidence of coercion," "notice to the City," and "evidence of innocence," with bullet

points under each heading that include detailed factual assertions like what the suspect alleged

with respect to his interrogation, when and how the suspect made those allegations, and whether

any of the documents provided evidence undermining the criminal defendant's guilt.  (SOF ¶ 301).

This additional information and citations, as well as the above identified headings, appear only in

the notes and are not addressed or discussed in Leo's report.  (*Id.*).  The notes contain additional

information for the cases, including citations to specific pages of documents, ostensibly so that Dr.

Leo could provide greater information at his deposition in support of Plaintiffs' *Monell* theories

that he failed to provide in his expert report.  Notably, just like his report, the notes make no

reference to the relevant social science research on the psychology of police interrogation practices

and techniques, police-induced false confessions, risk factors for false confessions, psychological

coercion, police interrogation contamination and scripting, and indicia of unreliability set forth at

pages 12-29 of his report.  (SOF ¶ 303).  Quite obviously, Dr. Leo does not, in his report, explain

the methodology he used to prepare the notes because they had not yet been prepared at the time

he tendered his report.  The notes themselves do not describe any methodology he used in creating

---

[14] Plaintiffs produced the notes on November 7, 2022, long after the expert disclosure date of January 15, 2022.  (SOF ¶ 302).

the notes or how he developed the information contained in the bullet point for each heading in the notes. (SOF ¶ 304). In fact, when defense counsel asked Dr. Leo what methodology he used to create the notes, Plaintiffs stopped him from answering questions about his methodology by asserting a work-product objection, suggesting the notes were either completed by, or in conjunction with, Plaintiffs' counsel, who quite obviously can read documents and summarize them just like Dr. Leo can. (SOF ¶¶ 302, 307). There is no way to determine the soundness of his opinion if Defendants are not allowed to know what methodology he invoked to arrive at his opinion. Nevertheless, as the City will explain, the notes contain nothing more than factual assertions *anyone* could glean by simply reading the documents, rather than any application of Dr. Leo's expertise.

What's more, even though Dr. Leo has 91 pages of notes derived from 18,000 pages of documents Plaintiffs produced, the so-called "PTP production" (as distinct from the 344 investigative files and 341 RD Files Plaintiffs requested from the City in discovery which Dr. Leo did not rely upon), his invoices do not reflect sufficient billed time to review those 18,000 pages to create those notes. In fact, the invoice he provided to cover the time he would have spent preparing the notes in advance of his deposition is for 47 hours total. (SOF ¶ 311). Yet, the 47 hours also includes the time he spent subsequently to review and analyze Defendants' expert report, draft his own 16-page rebuttal report in opposition to Defendants' expert, and meet with Plaintiffs' counsel. Even if the 47 hours encompassed *only* reviewing the documents, given the size of the production, that averages to about six seconds a page, which then leaves *no* time to create a typewritten annotation of the documents, including categorizing the information from the documents and referencing to specific page numbers. This further suggests that Dr. Leo did not

46

create the notes. Defendants have been provided no information as to who did and what parameters were followed in reading and analyzing those cases.

Because Dr. Leo included no methodology or expert analysis in support of his *Monell* opinion, including in his notes, which, of course do not constitute a supplement to his opinion since they were produced long after Plaintiffs' deadline to disclose their expert reports and were only produced after Defendants threatened motion practice since Dr. Leo was reading from the notes to answer questions at his deposition, his conclusion that CPD had a pattern and practice of physically and psychologically coercing confessions inadmissible. Having developed no other evidence to support it, Plaintiff's confession theory cannot survive summary judgment.

### A.     Dr. Leo's opinions do not satisfy the *Daubert* standard.

Pursuant to Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" only if the following conditions are satisfied by a preponderance of the evidence: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial judge is the gatekeeper so that unreliable expert testimony does not carry too much weight with the jury. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993); *Kirk v. Clark Equip.* Co., 991 F.3d 865, 877 (7th Cir. 2021). Expert testimony that is not relevant and reliable should be excluded. *Id.*

In deciding admissibility, the Court should consider (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v.*

*Illinois Cent. R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017). The Court must ensure that a proposed expert's methodology is "scientifically valid" (*Daubert*, 509 U.S. at 592-93) and the proponent of the expert bears the burden of demonstrating that the testimony meets each of the elements for admission. *Varlen Corp. v. Liberty Mut. Ins.* Co., 924 F.3d 456, 459 (7th Cir. 2019).

Further, Rule 26(a)(2) requires that a party who intends to rely upon an expert witness's testimony provide a report containing "a complete statement of all opinions" the retained expert will provide, "and the basis and reasons for them." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008); *Salgado by Salgado v. GMC*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (holding expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions."). Parties are not permitted to cure deficient expert reports by supplementing them with later deposition testimony. *Ciomber*, 527 F.3d at 641.

### 1. Dr. Leo did not employ any methodology or expertise to reach his conclusions.

It is well-settled that an expert who provides nothing but a bottom line, provides nothing to the judicial process. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Where an expert fails to apply his or her expertise to the facts and data in the case through reliable principles and methodology, the opinion is based merely on the expert's *ipse dixit*, and, therefore, inadmissible. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered;" an opinion connected to existing data "only by the *ipse dixit* of the expert" is properly excluded under Rule 702.). The Court should exclude expert testimony where there is too great

48

an analytical gap between the data and the opinion proffered. *C.W. v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015).

In *Minasian v. Standard Chartered Bank*, PLC, the Seventh Circuit explained that an expert cannot "offer credentials rather an analysis." 109 F.3d 1212, 1216 (7th Cir. 1997). There, the plaintiffs proffered a banking expert in support of their claim that the defendant bank had defrauded them. The Court found the expert's affidavit amounted to mere legal analysis disguised as banking expertise and, while carefully tailored to support plaintiffs' position, failed to include any analysis, specifically omitting any identification or test of any hypothesis or suggestion of any way the expert's views could be falsified. *Id.* at 1216. The Court reasoned that an expert report that "does nothing to substantiate [the] opinion is worthless, and therefore inadmissible." *Id.*

Further, to be admissible, the expert's report must show some application of his or expertise; merely reciting documents without bringing expertise to bear is insufficient. *See Hostetler v. Johnson Controls,* No. 3:15-cv-226 JD, 2020 (excluding testimony of witness trained in aerial photographic analysis who merely offered observations of pictures without including any photographic analysis). An expert must draw on his or expertise in some meaningful way to contribute to the fact-finding process. *See Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 U.S. Dist. LEXIS 234359, at *17-18 (E.D. Wis. Aug. 31, 2018) (excluding testimony where expert did not apply expertise as a psychologist to illuminate the documents reviewed).

Just like the cases above, Dr. Leo's *Monell* opinion lacks any expert analysis or application of his expertise. As explained, he merely provides case summaries for allegations made against a handful of detectives, none of whom are defendants here, as well as collecting allegations against Defendant Guevara. The case summaries generally describe the murder suspects' (who became criminal defendants) allegations and include purported record citations. (SOF ¶¶ 270-72, 280, 282,

49

284, 287). Nothing more. Because they are just summaries, there is no demonstrated expert analysis leading him to conclude that CPD had any alleged pattern or practice of coercing confessions. *See United States v. Brownlee,* 744 F.3d 479, 482 (7th Cir. 2014) (stating "the entirety of [an expert's] testimony cannot be the mere repetition of 'the out-of-court statements of others'").

To illustrate, the first case summary Dr. Leo lists in the *Monell* portion of his report is the Frank Bounds case. The entirety of Dr. Leo's report addressing Frank Bounds is the following:

1. **Frank Bounds (1987)**: Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1996). (PTP-F BOUNDS-000001-000030)

Here, Dr. Leo describes the allegations of Frank Bounds in one sentence as if it were fact. The criminal court opinion he cites in support, however, stated that these were Bounds's allegations—allegations that the trial court did not find persuasive when it denied Bounds's motion to suppress the confession. The appellate court affirmed that ruling and Bounds's conviction. (SOF ¶ 274). He does not include any expert assessment of the allegations. He does not address any principles or methodology. He does not include reference to any research or other source material from his field. Nor does he provide any reference to any interview of Mr. Bounds. Dr. Leo includes no evaluation of the allegations beyond merely summarizing them.

As for the notes, although including slightly more detail, they offer essentially the same information about Frank Bounds as shown below.

50

Case:           Frank Bounds
Year:           1987
Report Page:    77
Location:       Area 3

**Summary in Leo Report:**

Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Supreme Court of Illinois Opinion – People v. Bounds, 171 Ill.2d 1, 29-30 (1995). | PTP-F BOUNDS-000001-000030 |

**Evidentiary Support for Summary:**

A. Evidence of Coercion and Abuse

- According to a 1995 Illinois Supreme Court opinion, Bounds stated at a suppression hearing in his criminal trial that Detectives William Foley and William Kelly denied his request to speak to an attorney following his arrest, and Kelly hit him on the forehead and tried to kick him in the groin when he denied knowing anything about the crimes. PTP-F BOUNDS-000013
- Per that opinion, Bounds also asserted that Detective Michael Kill threatened that Bounds's girlfriend would lose his job if he did not sign a statement, and all three detectives—Foley, Kelly, and Kill—promised that his girlfriend's name would not be released to the media if he signed a confession statement. PTP-F BOUNDS-000013
- Per that opinion, Bounds's girlfriend, Susan Mitchnick, testified that Detective Kill and another officer questioned her at her home about Bounds, and Kill threatened to run her name "through the mud" in the media. PTP-F BOUNDS-000013.

B. Evidence of Notice to the City of Chicago

- Per the above, the City was on notice of Frank Bounds's testimony regarding alleged physical abuse by William Kelly at the time of the suppression hearing in his criminal trial and prior to 1995.

C. Evidence of Innocence
- See evidence of coercion and abuse, above.

Again, just like the case summary in his report, the notes merely summarize Mr. Bounds's allegations. (SOF ¶ 273). There are no specialized terms of art or definitions. There are no psychological principles or factors. There are no references to published sources or studies. There are no measurements or ratings. Nor is there any reference to any first-hand information or observation collected by Dr. Leo. If anything, just like the expert in *Minasian*, the notes appear to be disguised legal analysis because they are divided into headings that just so happen to track the

51

elements necessary for Plaintiffs to prove their *Monell* claim, including "evidence of coercion and abuse," and "notice to the City of Chicago." *See Minasian*, 109 F.3d 1212, 1216 (excluding expert who did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion).

Indeed, there can be no doubt that the notes lack any expert analysis because Plaintiffs asserted a work product privilege to questions regarding the methodology about creating them. (SOF ¶ 302). If the *methodology* is work product, that means the *lawyers* provided input. If the *lawyers* provided input to the methodology – so much so that Leo did not even invoice any time – then preparing the notes did not require the work of an expert to complete.

Apart from the case summaries, Dr. Leo's report begins with a narrative regarding allegations (separate from the 62 case summaries) pertaining to Jon Burge, which is similarly inadmissible. Indeed, his opinion merely recounts what the allegations were against Burge, how they came to light, and his characterization of the City's response to those allegations through the decades since, including the fact that Burge was terminated from CPD and sentenced to prison. In fact, as one of his sources, Dr. Leo simply referred to a chart of so-called torture victims prepared by Plaintiff Solache's counsel. Narrative testimony, based on the expert's review of documents, however, does not involve any scientific, technical, or other specialized knowledge. *Baldonado v. Wyeth*, No. 04 C 4312, 2012 U.S. Dist. LEXIS 68691, at *15 (N.D. Ill. May 17, 2012). To be sure, just as with Finnell's expert opinion, "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology." *United States SEC v. ITT Educ. Servs.*, 311 F. Supp. 3d 977, 987 (S.D. Ind. 2018). Even if an expert uses his or her expertise to wade through the documents, merely

52

providing a narrative of the records reviewed amounts to "advocacy-based interpretation of documents," not an admissible expert opinion. *Baldonado*, 2012 U.S. Dist. LEXIS 68691, at *15.

In fact, Dr. Leo's lack of expert analysis supporting his *Monell* opinion stands in stark contrast to his analysis of Plaintiffs' interrogations in the underlying case. On the underlying case, Dr. Leo's opinion is 50 pages long. (SOF ¶¶ 233, 236). It includes he relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. (SOF ¶ 233). Within those sections, and others, there are citations to resources and numerous terms and factors and principles related to Dr. Leo's field. (*Id.*). Whereas the case summaries pertaining to his *Monell* opinion include none of that detail. Because experts are expected to provide the same level of rigor they would in their academic fields, such testimony should be excluded. *See Obrycka v. City of Chi*., 792 F. Supp. 2d 1013, 1026 (N.D. Ill. 2011) (excluding expert testimony given disparities between expert's professional standards and the ones he employed as an expert in the case).

On top of that, Dr. Leo's conclusion is that the CPD had a pattern and practice of coercing confessions from African-American and Latino men, yet he does not mention anywhere in his report (or his notes for that matter) the race of any of individual who made allegations of abuse. (SOF ¶¶ 230, 256).

Ultimately, Dr. Leo claims his conclusion that CPD had a pattern and practice of coercing confessions from African-American and Latino men is supported by a "pattern" of cases but Dr. Leo's analysis of the 62 cases summarized and his Burge narrative suffer from the same fatal flaws: a complete lack of methodology or application of his expertise. Plaintiffs, therefore, cannot rely on his opinion to support their coercion policy theory. *See Chen v. Mnuchin*, No. 14 C 50164,

53

2020 U.S. Dist. LEXIS 180574, at *14-15 (N.D. Ill. Sep. 30, 2020) (excluding expert testimony where expert failed to explain the methodologies and principles that support his opinion); *Teran v. Coloplast Corp.*, 633 F. Supp. 3d 1103, 1112 (N.D. Ill. 2022) (excluding expert testimony where expert failed to conduct expert analysis to reach his conclusion); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 U.S. Dist. LEXIS 48792, at *82 (N.D. Ill. Mar. 31, 2017) (excluding expert testimony where expert offered no discernable methodology).

## 2. Dr. Leo's unsupported conclusions are not helpful to the jury.

To be admissible under Rule 702, an expert's opinion must aid the jury in determining an issue in the case. The point of the expert testimony is to help the jury understand some issue that requires some specialized knowledge, skill, or expertise. *Hostetler v. Johnson Controls*, No. 3:15-cv-226 JD, 2020 U.S. Dist. LEXIS 151437, at *16 (N.D. Ind. Aug. 21, 2020) (expert witnesses must bring their expertise to bear in such a way that their expertise helps relate the evidence to the jury in a way that will assist the jury's understanding of the evidence) (citing *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). The jury does not need an expert to explain matters that are common knowledge. *Id.* (rejecting expert's opinion that consisted mostly of drawing inferences from the evidence that he was no more qualified than the jury to draw).

Here, as explained, Dr. Leo offers nothing but a bottom line, so his testimony would not help the jury understand any fact or issue in the case. *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). He provides only case summaries and a narrative about Jon Burge that merely describe the allegations of abuse. A jury does not need an expert to explain that allegations that police detectives physically abused criminal suspects until they confessed amounts to an allegation

54

of coercion. It is well within common understanding that an officer inflicting physical harm on a suspect to obtain a confession is coercive and involuntary.

Further, Dr. Leo bases his *Monell* opinion merely on his review of the documents, not any witness testimony elicited in the case. For instance, for several of the case summaries, Dr. Leo's cites only newspaper articles. (SOF ¶ 294). In other words, Dr. Leo apparently read the newspaper article and then summarized it in his report. Certainly, the jury does not need an expert to read the newspaper to them.

Additionally, several of the documents Leo cited to support his case summaries are incomplete. (SOF ¶¶ 295-297). The Coston case is an example. (SOF ¶ 295). There, he cites a few pages of what appears to be a deposition transcript, but the transcript does not include the name of the person testifying. It appears to be an unnamed officer *denying* allegations of coercion. (*Id.*). The record citation for the Emmett White case is also incomplete in that it refers to a portion of a transcript from an apparent criminal proceeding in Milwaukee and does not mention the officers for whom Leo claims White made accusations against. (SOF ¶ 297). Other case summaries cite court opinions, like the Bounds case, that affirm the criminal defendants' conviction, necessarily undermining any allegation of coercion. (SOF ¶ 274). And while some summaries refer to transcripts and affidavits, setting aside witnesses who may have been named as 404(b) witnesses against Defendant Guevara, none are identified as witnesses in this case. In short, the most Dr. Leo can offer the jury is a summary of documents that Plaintiffs provided him that he read. Under no circumstance is that proper expert testimony. Dr. Leo cannot serve as a stand-in to deliver Plaintiffs' counsel's arguments for which they failed to develop the requisite evidence.

**B.      Plaintiffs cannot establish a municipal policy of coercing confessions.**

Because Dr. Leo's opinions are inadmissible pursuant to Rule 702, Plaintiffs' coercion theory of *Monell* liability fails as a matter of law.  Plaintiffs cannot defeat summary judgment with their allegations of coercion in their own case.  *Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016) (plaintiff cannot establish *Monell* claim based on his own case or even a handful of others; [h]e must show systemic failings that reflect official deliberate indifference…").  Nor can Plaintiffs defeat summary judgment with the hearsay allegations in the records they supplied to Dr. Leo. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Barnes v. Wexford Health Sources, Inc.*, No. 17-cv-8959, 2022 U.S. Dist. LEXIS 243607, at *33-34 (N.D. Ill. Nov. 23, 2022).  Accordingly, Plaintiffs developed no evidence to support their theory that the City had an alleged policy to coerce confessions.

Even if the Court considered Dr. Leo's opinion as admissible evidence, it still fails to establish Plaintiffs' *Monell* theory.

Dr. Leo's report only includes allegations against a handful of officers, mainly Burge, Boudreau, Kill and Kato.  (SOF ¶¶ 262-263, 269-271, 280-281).  But the gravamen of a *Monell* claim is not individual misconduct on the part of certain employees, "but a widespread practice that permeates a critical mass of an institutional body."  *Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015).  "[M]isbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole."  *Id*.  Plaintiffs failed to make that connection here.  Nor did Plaintiffs develop any evidence that connects any of the Individual Defendants here to Jon Burge or former detectives Boudreau, Kill, or Kato.

Further, it is undisputed that Dr. Leo relies merely on a series of unproven allegations.  He testified repeatedly that he did not make any determinations as to whether any of the allegations

56

were true or not and he acknowledged they were only allegations. (SOF ¶ 287). He even admitted that if they were untrue, they would not support his conclusion regarding an alleged policy and practice. (SOF ¶ 293). His use of *allegations* over a span of thirty years to show a pattern lacks any reliable methodology to draw conclusions.

As such, Plaintiffs cannot rely on them to establish a widespread practice. *See Bridges v. Dart*, 950 F.3d 476, 480 n.4 (7th Cir. 2020) (concluding that, at most, the complaints demonstrate that the defendants were aware that detainees had made accusations, but "[w]ithout any evidence regarding the defendants' knowledge of the legitimacy of those complaints," the complaints do little to advance the plaintiff's argument).

And Dr. Leo conducted no analysis as to how often criminal defendants who confess later move to suppress their confessions. (SOF ¶ 305). Arguably, it is not unexpected for criminal defendants to make accusations against the police, regardless of the truth of the allegations, if that is the only available strategy to undermine the confession. *See Black v. City of Chi.*, No. 18-cv-6518, 2022 U.S. Dist. LEXIS 24845, at *13-14 (N.D. Ill. Feb. 11, 2022) (concluding a plaintiff cannot defeat summary judgment on a *Monell* claim "simply by showing that the City of Chicago gets sued a lot"); *Barnes v. Wexford Health Sources, Inc.*, No. 17-cv-8959, 2022 U.S. Dist. LEXIS 243607, at *33 (N.D. Ill. Nov. 23, 2022) (rejecting the plaintiff's reliance on a laundry list of lawsuits, finding no substantive evidence comparable to his case or establishing his alleged policy theory). He fails to provide a basis for his acceptance of allegations in motions to suppress as the truth. What studies are there to show how allegations in motions to suppress correlate to true incidence of coercion? In cases like Bounds where the motion was denied, how does he determine the court was wrong? What studies show that unproven allegations of coercive interrogations can be relied upon as evidence of innocence?

And, here, Leo's report includes allegations from a total of 62 criminal defendants over a thirty-year period. Reviewing the CPD annual reports published online, there were over 230,000 arrests made just for 1995 to 1998 *alone*, for crimes including murder, aggravated assault, robbery, sexual assault, and theft, where the police likely interrogated the suspects. *See* https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/. Accordingly, the allegations in Dr. Leo's complaint represent a mere fraction of a percentage, again, hardly evidence a pervasive widespread practice.

Similarly, Plaintiffs failed to develop evidence that the City's policymakers knew of an alleged widespread practice of coercing confessions and consciously disregarded it. Dr. Leo's report makes no effort to even identify when these individuals made the allegations. Several of Dr. Leo's record cites are cites to post-conviction materials or even current civil lawsuits filed decades after the fact. (SOF ¶ 261). And, as mentioned, Dr. Leo even cites numerous criminal court opinions *affirming* the criminal defendants' convictions. (SOF ¶ 298). Thus, far from putting the City on notice of alleged misconduct, such judicial findings could only have the *opposite* effect. That is that the allegations of coercion were incredible or otherwise insufficient to establish a constitutional violation.

While Leo does cite to eight CR files in support of his case summaries, of those eight, two were instances where the complainant failed to cooperate with the investigation; one where the complainant's conviction was affirmed on appeal; and another where Leo relies on an incomplete CR file, citing to only the four-page summary digest without considering the underlying investigative materials. (SOF ¶ 300). Considering the size of the City and the police department, such a smattering of allegations are so few and far between they cannot be described as "so

58

persistent and widespread as to practically have the force of law." *Bridges*, 950 F.3d at 480 (7th Cir. 2020) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

What's more, as addressed above, it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). Plaintiffs "must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* Nothing in Dr. Leo's report provides that evidence. He does not provide any analysis showing the City's policymakers were aware of any pervasive practice, much less that they consciously disregarded the potential resulting constitutional violations.

## V. PLAINTIFFS FAILED TO IDENTIFY ANY EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE THAT A CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITUTIONAL INJURY OR THAT ANY CITY POLICY WAS THE MOVING FORCE BEHIND A CONSTITUTIONAL INJURY.

An independent basis for the Court to grant summary judgment on Plaintiffs' *Monell* claims is that Plaintiffs have not developed evidence that it was a City policy, as opposed to individual action by Individual Defendants, which was the moving force behind any constitutional injury. This is true regardless of the *Monell* theory under which Plaintiffs may attempt to proceed. Any time a plaintiff brings a *Monell* claim based on an alleged widespread practice, he must meet rigorous causation standards by showing that the City was "deliberately indifferent" to the "known or obvious consequences" of the alleged widespread practice. *Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."); *Dixon*, 819 F.3d at

59

348-49; *Montano*, 535 F.3d at 570; *Bohanon v. City of Indianapolis*, No. 20-3125, 2022 WL 3585003, at *10-11 (7th Cir. Aug. 22, 2022) (reversing Plaintiff's jury verdict on *Monell* after finding no evidence of municipal fault or causation where written policy was constitutional).

Based on the above, Plaintiffs cannot establish that any injury they suffered from their alleged *Brady* claims was caused by the City's policy, and Plaintiffs cannot prove that any widespread practice of withholding *Brady* evidence "caused the [constitutional] violation, [nor that] the custom or policy must be 'the moving force behind it.'" *Rivera*, 319 F. Supp. 3d at 1056 (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 660 (7th Cir. 2017)). Furthermore, despite the nearly 349 CR files that were provided to Plaintiffs from the 1995-1998 dataset, Plaintiffs failed to show any statistically significant or meaningful deficiency in the City's disciplinary system. In fact, a review of the CR files for the Individual Officers demonstrates that the officers did not believe they could act with impunity or that the City condoned a "code of silence." Thus, Plaintiffs cannot establish that the City's disciplinary system caused their alleged injuries. *Ovadal*, 416 F.3d at 535.

Plaintiffs also failed to establish any causal nexus between their coerced confession claim and any alleged City policy. Plaintiffs fault Individual Defendants for coercing their confessions, but they did not develop any evidence that any of the officers were motivated by any alleged policy as Plaintiffs define it. Indeed, Plaintiffs developed no evidence of the officers' motivation at all, let alone that they acted in accordance with some practice apparently carried out by other detectives, where there is no evidence that any of the officers even knew each other. Accordingly, Plaintiffs cannot prove any municipal action caused their injuries. *See Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019) (finding no evidence alleged policy caused plaintiff's injury

60

where evidence indicated officer was motivated by his own decision to engage in a drug conspiracy).

This absence of a causal link prevents Plaintiffs from drawing an inference that the City's recordkeeping and disclosure policies, its policy on the interrogation of suspects, or its supervision and discipline policies "[were] the proximate cause of his injury." *Ovadal*, 416 F.3d at 535.

Likewise, Plaintiffs cannot establish that any lack of training or supervision was the "moving force" that caused a constitutional deprivation. *See Dixon*, 819 F.3d at 348. The facts do not show that City "policymakers were aware of, and acquiesced in, a pattern of constitutional violations" which is required to hold a municipality liable for failure to train. *See Harris*, 489 U.S. at 397. Here, as detailed above, there is no evidence of a widespread practice by CPD officers of failing to disclose exculpatory information or coercing confessions which policymakers could have been aware of and condoned. Therefore, there is no evidence of City policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct...." *Brown*, 520 U.S. at 40. Accordingly, the City is entitled to summary judgment on Plaintiffs' *Monell* claims.

## VI.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFFS' DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION.

Plaintiffs bring *respondeat superior* (Solache Count VIII, Reyes Count XII) and indemnification (Solache Count IX, Reyes Count XI) claims against the City, too. "[C]laims…for respondeat superior and indemnity" against a municipal entity "are derivative liability claims that depend on [Plaintiffs] prevailing against at least one of the individual defendants." *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). "Because the individual defendants are entitled to summary judgment in their favor, the claims against [the City] must fail as well." *Id*. *Respondeat*

61

*superior* liability is also limited to state-law claims, so to the extent the state law claims against the officers are dismissed, so is the *respondeat superior* claims.

## CONCLUSION

For the foregoing reasons, the City respectfully requests this Honorable Court grant its motion for summary judgment in its entirety and against the Plaintiffs.

Dated: April 8, 2024

Respectfully Submitted,

/s/ Eileen E. Rosen
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Lauren M. Ferrise
Jessica L. Zehner
ROCK FUSCO & CONNELLY, LLC
333 W. Wacker Dr., 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com