*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTIRCT OF ILLINIOS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 1028 |
| | ) | |
| v. | ) | Hon. Steven Seeger |
| | ) | District Judge |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 2312 |
| | ) | |
| v. | ) | Hon. Steven Seeger |
| | ) | District Judge |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: April _, 2024                    Respectfully submitted,

/s/ Josh M. Engquist
JOSH M. ENGQUIST, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Defendants Halvorsen,
Dickinson, Rutherford, Trevino, Mingey, Biebel,
and Cappitelli*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
Allison L. Romelfanger
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
jengquist@jsotoslaw.com

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................................1

SUMMARY OF UNDISPUTED MATERIAL FACTS............................................................3

      1.  The murders of Mariano and Jacinta Soto and kidnapping of Maria and Santiago....3

      2.  April 1, 1998: The initial police investigation .............................................................5

      3.  April 2-3, 1998: Investigation continues and Adriana and Plaintiffs surface.............6

      4.  April 3-5, 1998: Area 5 Investigation of Adriana and Plaintiffs ...............................8

      5.  Plaintiffs' pretrial proceedings....................................................................................13

      6.  Plaintiffs' criminal trials and post-conviction proceedings .......................................14

      7.  Plaintiffs' Petitions for Certificate of Innocence("COIs").........................................17

      8.  Additional Facts Relevant to Plaintiffs' Fabrication of Evidence ..............................17

LEGAL STANDARD............................................................................................................18

ARGUMENT.........................................................................................................................19

I.     With the Exception of Reye's Fabricated Confession Claim against Trevino, Plaintiffs cannot Meet their Burden of Proof for their Coerced and/or Fabricated Confession Claims ................................................................................................19

      A.  Solache lacks any evidence establishing the involvement of any Defendant Officer in his claims for coerced and/or fabricated confession ............................20

      B.  Reyes does not have a viable Fifth Amendment claim of coerced confession......21

      C.  Reyes cannot Sustain his Fabrication Claim against Dickinson and Rutherford...22

      D.  Reyes lacks any evidence establishing personal involvement of Halvorsen in his claims for coerced and/or fabricated confession..................................................23

II.    Plaintiffs Lack Sufficient Evidence to Support their *Brady* and Fabrication of Witness Statements Claims...........................................................................................24

      A.  Plaintiffs have nothing to support the allegation that Defendant Officer withheld and/or destroyed evidence..................................................................................24

ii

**TABLE OF CONTENTS**
**-Continued-**

                                                                                    **PAGE**

    i. Alleged destruction of crime-scene photos.................................…..25

    ii. Witness interview notes .........................................................26

    iii. Miscellaneous documents reflecting alternate suspects................................26

    iv. Large bags of evidence .......................................................29

  B. Plaintiff lack sufficient evidence to support their fabrication of evidence claims.30

III. The Defendant Officers are Entitled to Summary Judgment on Plaintiffs' Failure to Intervene Claim.............................................................................................32

  A. Where Plaintiffs' constitutional claims fail, so do their claims for failure to intervene..................................................................................................32

  B. Solache cannot show any Defendant Officer had an opportunity to intervene in his coerced/false confession claim (Count I)................................................33

  C. Reyes cannot show Halvorsen, Dickinson or Rutherford had an opportunity to intervene to prevent his alleged false confession; or that Trevino had an opportunity to intervene in his alleged coerced confession(Count I) ....................33

  D. Failure to intervene is not cognizable as a federal tort because it violates Section 1983's prohibition against vicarious liability .........................................34

IV. Reye's Fourth Amendment Unlawful Pretrial Detention and Plaintiffs' State Law Malicious Prosecution Claims Fail as a Matter of Law.......................................35

  A. Rutherford did not play a significant role in Plaintiffs' criminal proceedings ......36

  B. Probable Cause bars Plaintiffs' claims .................................................37

  C. Alternatively, arguable probable cause entitles Defendant Officers to summary judgement on Reyes's Fourt Amendment unlawful pretrial detention claim........40

  D. Plaintiffs' criminal cases were not dismissed in a manner indicative of innocence .........................................................................................40

V. Plaintiffs' Conspiracy Claims Fail.....................................................................41

iii

A.    Reyes cannot show a meeting of the minds in his conspiracy claims against Halvorsen, Dickinson and Rutherford ......................................................................42

B.    Defendant Officers are entitled to qualified immunity based on the intra-corporate conspiracy doctrine ........................................................................................43

VI.   Halvorsen, Dickinson and Rutherford are Entitled to Summary Judgment on Plaintiffs' Intentional Infliction of Emotional Distress("IIED") Claim ............................................44

A.    Where Plaintiffs' underlying claims fail against Halvorsen, Dickinson and Rutherford, so do their IIED claims...........................................................................44

CONCLUSION.......................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................................19

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir.2005) ..........................................32

*Apostal v. City of Crystal Lake,* No. 94 C 50068, 1995 WL 692680 (N.D. Ill. Nov. 22, 1995)....19

*Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) ...........................................................34

*Beaman v. Freesmeyer,* 2017 Il App (4th) 160527, 82 N.E.3d 241
(Ill. App. Ct. 4th Dist., 2017)....................................................................................... 35-36

*Blackmon v. City of Chi.*, 2023 WL 7160639, at *8 (N.D. Ill. Oct. 31, 2023) .........................37, 39

*Boyd v. City of Chi*, 225 F. Supp. 3d 708, 721, 723 (N.D. Ill. 2016)............................................28

*Brady v. Maryland,* 373 U.S. 83 (1963) ................................................................. *passim*

*Brown v. City of Chi.*, 633 F. Supp.3d 1122, 1169 (N.D. Ill. Sept. 30, 2022).........................40, 41

*Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)..........................................................31

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)..............................................................................35

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) ..................................................24

*Colbert v. City of Chi.,* 851 F.3d 649 (7th Cir. 2017)........................................................... *passim*

*Coleman v. City of Peoria,* 925 F.3d 336 (7th Cir. 2019) ...................................................... *passim*

*Cooney v. Casaday,* 746 F.Supp.2d 973 (N.D. Ill. 2010) ...........................................................44

*Cusick v. Gualandri*, 573 F. Supp. 3d 1256, *1271 (N.D. Ill. Nov. 22, 2021)..............................36

*Drager v. Village of Bellwood*, 969 F.Supp. 2d 971, 983 (N.D. Ill. 2013).............................42, 44

*Edwards v. Joliff-Blake*, 2017 WL 1134473 (N.D. Ill. Mar. 27, 2017)........................................32

*Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ..........................................................30, 31

*Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022)..............................................................37

*Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651 (7th Cir. 2010) ............................................19

**TABLE OF AUTHORITIES**
**-Continued-**

<u>CASES</u>                                                                                          <u>PAGE</u>

*Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019 ......................................................29

*Haliw v. City of South Elgin*, 2020 WL 1304697, at *4 (N.D. Ill. March 3, 2020).......................43

*Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015)....................................................37

*Hill v. Cook County,* 463 F. Supp. 3d 820 (N.D. Ill. May 31, 2020) ..........................26, 28, 29, 36

*Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)..............................................40

*Jackson v. City of Cleveland*, 925 F.3d 793, 819–20 (6th Cir. 2019)...........................................43

*Johnson v. Dossey*, 878 F.Supp. 2d 905, 918 (N.D. Ill. Mar. 30, 2012).......................................42

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022).......................................................25

*Kidwell v. Eisenhauer,* 679 F.3d 957 (7th Cir. 2012) ...................................................19

*Kuri v. City of Chi.*, 2014 WL 114283, * 8..............................................................42

*Lane v. Utchman*, 2009 WL 4788780, * 15 (N.D. Ill. Dec. 9, 2009)..............................................39

*Mack v. City of Chi.,* No. 19 CV 4001, 2023 WL 4744791 (N.D. Ill. July 25, 2023).............20, 21

*Manuel v. City of Joliet, Ill.,* 137 S.Ct. 911 (2017))  ...................................................37

*McDonald v. Village of Winnetka,* 371 F.3d 992 (7th Cir. 2004)..................................................19

*Mims v. City of Chi.*, 18-CV-7192, 2024 WL 1075152, * 9, 18-19 (N.D. Ill., Mar. 12, 2024)

.....................................................................................................27, 29, 39

*Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ......................................................34

*Mosley v. City of Chi.*, 2009 WL 3097211, * 9 (N.D. Ill., Sept. 22, 2009)..................................39

*Moran v. Calumet City,* 54 F.4th 483 (7th Cir. 2022) ......................................................24, 26, 39

*Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) ............................................................34

*Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020). ............................................. 20-22, 30

## TABLE OF AUTHORITIES
### -Continued-

**CASES**                                                         **PAGE**

*Rasho v. Elyea,* 856 F.3d 469 (7th Cir. 2017) ..................................................................19

*REXA, Inc. v. Chester,* 42 F.4th 652 (7th Cir. 2022) .....................................................21

*Roberts v. Broski,* 186 F.3d 990 (7th Cir. 1999) ...........................................................19

*Ruiz v. City of Chi.*, 931 F.3d 592 (7th Cir. 2019)..........................................................25

*Sang Ken Kim v. City of Chicago,* 368 Ill. App. 3d 648 (1st Dist. 2006)......................35

*Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, * 19 (N.D. Ill. June 4, 2020)...........29

*Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010)..........................................................26

*Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ........................................................42

*Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) ...................................................40

*Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022).................................................33

*Swearnigen–El v. Cook County Sheriff's Dept.,* 602 F.3d 852 (7th Cir. 2010)............44

*Swetlik v. Crawford,* 738 F.3d 818 (7th Cir. 2013) .......................................................19

*Swick, et. al. v. Liautaud, et. al.,* 169 Ill. 2d 504 (1996).....................................35, 40, 41

*Tebbens v. Mushol*, 692 F.3d 807, 820 (7th Cir. 2012) ..................................................40

*Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012) ..............................................37

*Thompson v. Clark,* 596 U.S. 36 (2022) .........................................................................35

*Trout v. Frega,* 926 F. Supp. 117 (N.D. Ill. 1996).................................................... 19-21

*U.S. v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003)........................................................37

*U.S. v. Parks,* 100 F.3d 1300, 1307 (7th Cir.1996). .......................................................24

*U.S. ex. rel. Porter v. Rednour*, 2012 WL 3101710, * 3 (N.D. Ill. July 30, 2012) .......39

*U.S. v. 13138 South School Street, Riverdale, Ill.*, 774 F.Supp. 475, 478 (N.D. Ill. 1991)...........39

vii

**TABLE OF AUTHORITIES**
**-Continued-**

**CASES**                                                          **PAGE**

*U.S. v 120 South Wareham Lane, Schaumburg, Ill.*, 1996 WL 507244, * 3
(N.D. Ill. Sept. 4, 1996) ...................................................................................................39

*Vance v. Peters,* 97 F.3d 987 (7th Cir. 1996) .................................................................36

*Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). ..................................................37

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) .....................19

*Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).....................................41

*Wheeler v. Piazza,* 364 F. Supp.3d 870 (N.D. Ill., Mar. 5, 2019)............................. 42-43

*Williams v. Martinez*, 22-cv-06602, 2023 WL 6141494, at *4 (N.D. Ill. Sept. 20, 2023))............37

*Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) ...................................................23

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012) ................................................31

*Zambrano v. City of Joliet*, 2024 WL 532175, *9 (N.D. Ill. Feb. 9, 2024) ....................31

**STATUTES**                                                          **PAGE**

42 U.S.C. § 1983............................................................................................... *passim*

Fed. R. Civ. P. 12(f).........................................................................................................23

Fed. R. Civ. P. 56(a) ........................................................................................................18

Local Rule 56.1(a)(2) and 56.1(d) ....................................................................................3

Defendants, JoAnn Halvorsen as Special Representative of defendant Ernest Halvorsen (deceased), Edwin Dickinson, Robert Rutherford, and Daniel Trevino, (collectively "Defendant Officers"),[1] by and through their attorneys, The Sotos Law Firm, P.C., submit this Memorandum of Law in Support of their Motion for Partial Summary Judgment.

## INTRODUCTION

On March 28, 1998, Mariano and Jacinta Soto were brutally murdered in their home — collectively stabbed over fifty times — and their children, 2-month-old Maria and 3-year-old Santiago, were abducted. It is undisputed that Adriana Mejia ("Adriana"), who had been faking a pregnancy, participated in the barbaric stabbings and kidnappings so that she could pass off little Maria as her own child. During the criminal investigation, Adriana and Plaintiffs, Arturo DeLeon Reyes ("Reyes") and Gabriel Solache ("Solache"), implicated themselves and one another in the murders and kidnappings. Subsequently, Plaintiffs were arrested, charged, and found guilty of two counts of first-degree murder, two counts of aggravated kidnapping, and home invasion. Adriana pleaded guilty and was sentenced to natural life imprisonment.

In 2017, Reyes and Solache obtained post-conviction relief after levying allegations against Defendant Detective Reynaldo Guevara concerning a pattern of investigative misconduct. Plaintiffs now bring their respective lawsuits against the City of Chicago and Guevara (who are separately represented and separately moving for summary judgment), three former Chicago Police Sergeants, (who have separately moved for summary judgment), and the

---

[1] Defendants Edward Mingey, Robert Biebel and Kevin Rogers as Special Representative of defendant Francis Cappitelli (deceased) (collectively, "Defendant Supervisors"), have moved separately for summary judgment in their capacity as supervisors. All arguments made herein with respect to the Defendant Officers, have been adopted and incorporated into the Defendants Supervisors' simultaneously filed motion for summary judgment. In addition, previously named defendants Dennis Stankus, Geri Lynn Yanow, as Special Representative for Defendant John Naujokas (deceased), Theresa Karalow, as Special Representative for Defendant John Karalow (deceased), and Mark Harvey have been dismissed by stipulation. (*Reyes* Dkt. 681, 682; *Solache* Dkt. 511, 513).

1

Defendant Officers for various claims arising out of their arrest and prosecution for the Soto murders and kidnappings.

Specifically, Reyes brings §1983 claims against the Defendant Officers for coerced and/or fabricated confession under the Fifth and Fourteenth Amendments (Count I); fabrication of false witness statements (Count II); Unlawful Detention under the Fourth Amendment (Count III); Due Process violations under the Fourteenth Amendment (Count IV); failure to intervene (Count V); and Conspiracy (Count VI); and state law claims for Intentional Infliction of Emotional Distress ("IIED") (Count VIII); Malicious Prosecution (Count IX); and (ix) common law conspiracy (Count X). (*Reyes*, Dkt. 396).

Similarly, Solache brings federal §1983 claims against the Defendant Officers for coerced/false confession under the Fifth and Fourteenth Amendments (Count I); Due Process violations under the Fourteenth Amendment (Count II); and failure to intervene (Count III); and state law claims for IIED (Count VI); Malicious Prosecution (Count V); and common law conspiracy (Count VII). Solache has not asserted a Fourth Amendment Unlawful Detention claim or a federal conspiracy claim. (*Solache*, Dkt. 224).

Plaintiffs' allegations against the Defendant Officers lack sufficient evidentiary support in the record, and the Defendant Officers are entitled to judgment as a matter of law. In particular, (i) no Defendant Officer was personally involved in obtaining Solache's confession; (ii) the Defendant Officers did not coerce Reyes into confessing; (iii) Defendant Halvorsen was not personally involved in Reyes's confession and the language barrier made it unfeasible for Dickinson or Rutherford to fabricate Reyes's confession; (iv) Plaintiffs' *Brady* claims are not viable; (v) any allegedly fabricated witness statements were not used against Plaintiffs in their criminal proceedings; (vi) Plaintiffs' derivative claims of failure to intervene, and conspiracy

2

cannot survive where their underlying claims do not survive; (vii) Reyes cannot meet the elements of his federal conspiracy claim against Halvorsen, Dickinson and Rutherford; (viii) Plaintiffs' cannot prove the elements of their malicious prosecution claims and Reyes's Fourth Amendment Unlawful Detention claim; (ix) Plaintiffs cannot show Defendants Halvorsen, Dickinson or Rutherford engaged in extreme and outrageous conduct; and (x) the Defendant Officers are entitled to qualified immunity on Reyes's Unlawful Detention claim.

**SUMMARY OF UNDISPUTED MATERIAL FACTS[2]**

**1. The murders of Mariano and Jacinta Soto and kidnappings of Maria and Santiago.**

In 1998, the Mejia family resided at 6234 S. Mozart, in the Chicago Lawn neighborhood. (Defendants' Local Rule 56.1 Statement of Uncontested Facts ("SOF") at ⁋⁋ 12, 13). Guadalupe Mejia ("Guadalupe"), and her husband Jorge Mejia ("Jorge"), lived in the basement apartment with their two young children and two other individuals. (SOF at ⁋ 13). Jorge's brother Rosauro Mejia ("Rosauro") lived with his wife, Adriana, on the first floor along with Reyes, Solache, and Adriana's brother, Carlos Martinez. (SOF at ⁋ 12). Reyes was the brother-in-law of another of Jorge and Rosauro's brothers, and Solache is Adriana's childhood friend from her hometown in Mexico. (SOF at ⁋⁋ 8, 9). Between the basement apartment and the first floor, the residents shared one telephone, which was located in the basement. (SOF at ⁋ 14). As of mid-1997, Adriana and Rosauro had been trying to conceive for several years, and in June of 1997, Adriana announced to her family that she was finally pregnant. (SOF at ⁋ 20).

However, Adriana was not pregnant, and she instead hoped she could obtain a baby to pass off as her own. (SOF at ⁋⁋ 20, 21). On March 27, 1998, after pretending for months that she was pregnant, Adriana had her husband Rosauro drive her to the University of Illinois Hospital

---

[2] Defendants have submitted a joint statement of material facts pursuant to Local Rule 56.1(a)(2) and 56.1(d) and incorporate it in full in support of their memorandum of law.

3

("UIC") on Friday, March 27, for what she said was her appointment to be induced. (SOF at ¶¶ 20-22). Jacinta Soto was also present at UIC with her children, Santiago and Maria, on March 27, around 10:00 a.m. for an appointment for Santiago. (SOF at ¶ 24). Later that evening, on Friday March 27, Adriana called her family to tell them she gave birth to a baby girl. (SOF at ¶ 23).

The next morning, between 6:30 a.m. and 7:30 a.m. on March 28, 1998, Adriana, who was approximately 5'0' and 164 lbs., went to the Sotos' basement apartment located in the rear of 2071 N. Leavitt. (SOF at ¶¶ 4, 5, 25, 27, 91-93, 97-98). After Adriana gained access to the apartment, Jacinta (approximately 5'0" and 175 lbs.) and her husband, Mariano (approximately 5'3" and 161 lbs.) were stabbed to death. (SOF at ¶¶ 3, 4, 6, 89, 91-93, 97-98). Jacinta was stabbed over twenty times. (SOF at ¶ 41). Mariano was stabbed over forty times. (*Id.*).

The Sotos' two children, 3-year-old Santiago and 2-month-old Maria, were taken by Adriana, who returned to the hospital to wait for Rosauro to pick her up. (SOF at ¶¶ 29, 89, 91-93, 97-98). Adriana planned to tell her family that she gave birth to little Maria and that the boy was the son of a woman she met at UIC named Norma Salazar, who had asked Adriana to watch her son while she was in labor. (SOF at ¶¶ 4, 29).

Later that same morning, Rosauro and Guadalupe picked Adriana up from UIC, where she was holding a baby girl and the hand of a young boy. (SOF at ¶ 29). Guadalupe noticed that Adriana had blood on her pants, which Adriana attributed to the delivery. (SOF at ¶ 30). After bringing Adriana home, Guadalupe noticed that Adriana was walking around easily, the baby was bigger than expected of a newborn, and there was no umbilical cord attached to the baby. (SOF at ¶ 32). When the family asked about Santiago, Adriana repeated the story that a woman named Norma Salazar had asked Adriana to watch him. (SOF at ¶¶ 29, 31).

4

2. **April 1, 1998: The initial police investigation.**

Four days later, on April 1, 1998, around 4:30 p.m., 14th District Chicago Police Officers conducted a well-being check at 2071 N. Leavitt after Soto family members became concerned by their inability to contact Mariano and Jacinta. (SOF at ¶¶ 31, 33, 34). After officers gained entry to the rear basement apartment, they found Mariano and Jacinta Soto deceased with multiple stab wounds. (SOF at ¶ 35). Jacinta was found in the bedroom with knife wounds to the chest, back and buttocks, and Mariano was found in the kitchen by the front door with knife wounds to his head, face, neck and chest. (*Id.*). The Sotos' relatives on scene told the officers that the couple also had two children — a little boy named Santiago and a baby named Maria. (SOF at ¶¶ 3, 36).

After the bodies were discovered, Area 5 Detectives Reynaldo Guevara ("Guevara") and Ernest Halvorsen ("Halvorsen") were assigned that same day by Sergeant Edward Mingey ("Mingey") to investigate and respond to the scene with the mobile crime lab. (SOF at ¶¶ 37, 38). Upon arrival, the mobile crime lab, including Forensic Investigator Mark Harvey, examined the Sotos' injuries, photographed the scene, and collected evidence, including a knife that was found under Mariano's arm and a loose knife with apparent blood stains located in a box under a couch in the kitchen. (SOF at ¶¶ 38-40). Mingey, Guevara and Halvorsen unsuccessfully searched the home for the missing children. (SOF at ¶ 37).

While detectives were on scene, the Sotos' neighbor, Alfredo Aranda, told them that between 6:30 a.m. and 7:30 a.m. on March 28 (the same time when Adriana was in the Sotos' apartment and the Sotos' were being stabbed to death), he heard moaning coming from the Sotos' apartment, where he knew Mariano to sleep. (SOF at ¶¶ 26, 27, 215, 216). He also heard loud sounds like something had fallen and something was dragging. (SOF at ¶¶ 27, 215, 216). Alfredo heard the little boy crying and shouting "papi!" and a man's voice say something along the lines of "shut

5

up, nothing is going to happen to you." (SOF at ¶¶ 27, 215, 216, 219). He never again saw or heard from the Soto family. (*Id.*).

3. **April 2-3, 1998: Investigation continues and Adriana and Plaintiffs surface.**

From April 2 through April 5, 1998, numerous detectives, including Defendants Guevara, Halvorsen, Edwin Dickinson, and Robert Rutherford, and non-Defendants William Kernan, Joseph Mohan, Neil Jack, Kevin McDonald, Harry Collins, John Boyle, Victor Gutierrez, Michael Stephens, Berscott Ruiz, and John Santopadre, with the assistance of Spanish speaking Officers Defendant Daniel Trevino and Officer Jorge Cerda, conducted a wide-ranging follow-up investigation. (SOF at ¶¶ 42, 43, 44). This investigation included issuing a special bulletin to raise public awareness of the missing children, interviewing the Sotos' family members, neighbors, and employers, collecting physical evidence and submitting it for testing, and obtaining numerous suspect and witness statements. (*Id.*).

The Sotos' family members, Rosa Aranda-Soto ("Rosa") (Jacinta & Mariano's niece who had reported the Soto children missing), Rosa's husband Jorge Soto, and Felicia Soto ("Felicia") (Jacinta & Mariano's niece), were interviewed by Guevara and Halvorsen. (SOF at ¶¶ 45, 46, 246). During these interviews, Rosa was not handcuffed, and during questioning by Guevara, was never asked any questions implying she committed the murders, was not asked any details about the murders, was not told to confess, was not fed any facts about the murders, and Guevara never put his hands on her. (SOF at ¶ 45).

In the afternoon on April 2, 1998, the day after the Sotos' bodies were discovered, Reyes called the landline in Guadalupe's apartment and asked Guadalupe to speak to Adriana. (SOF at ¶ 70). Because Guadalupe was suspicious of Reyes and Adriana, she picked up the receiver in her bedroom to listen to the conversation. (*Id.*). Guadalupe heard Reyes ask, "what did they say?" and

6

she heard Adriana reply "9:00 at their house." (*Id.*). Reyes replied to Adriana that he did not know the address, and Adriana informed him that "they" would call back with the address. (*Id.*). Guadalupe then heard Reyes tell Adriana, "You are the only one that knows. I hope you don't serve me up headfirst," to which Adriana replied "no." (*Id.*).

That same evening, at approximately 10:00 p.m., Guadalupe saw an evening news report about the murders of Mariano and Jacinta and how their children were missing. (SOF at ℙ 47). Guadalupe recognized the photograph of the boy in the news story as the three-year old boy Adriana had previously claimed she was babysitting. (*Id.*). Guadalupe confronted Adriana and told her that the boy needed to be taken to the police, but Adriana resisted. (SOF at ℙℙ 47, 49). When Rosauro got home around 1:30 a.m. on April 3, and found out about the news story, he too, insisted that the boy be taken to the police. (SOF at ℙ 48). Guadalupe heard Adriana screaming at Rosauro not to take the boy. (SOF at ℙℙ 48, 49).

Rosauro, Reyes and Solache took Santiago to the 8th District Chicago police station together around 3:30 a.m. on April 3. (SOF at ℙ 49). Rosauro, Reyes, and Solache and were Spanish speakers and did not speak or understand English. (SOF at ℙℙ 10, 50, 51, 74, 77). Rosauro informed 8th District Officers Wade Golab and Juan Solis[3] that on March 28, 1998, when his wife was at UIC Hospital, she was approached by a woman named Norma Salazar, who asked her to watch the young boy who she called Leonardo. (SOF at ℙℙ 51-53). Sergeant Hanlon, Officer Solis's supervisor, responded to the 8th District, recognized the boy as "Santiago" from the CPD Bulletin, and noted that the boy responded to "Santiago" when called. (SOF at ℙ 55). Due to the resemblance between "Leonardo" and Santiago, Sergeant Hanlon called Area 5. (SOF at ℙℙ 55, 56). Area 5 Detectives William Kernan ("Kernan") and Joesph Mohan ("Mohan") responded to

---

[3] Officer Solis spoke Spanish fluently. (SOF at ℙ 51).

7

the 8th District with Jose Aranda, Santiagos' uncle, who identified "Leonardo" as Santiago, and the investigation was turned over to Area 5 detectives. (SOF at ⁋⁋ 56).

**4. April 3-5, 1998: Area 5 Investigation of Adriana and Plaintiffs.**

Around 8:30 a.m. on April 3, Detectives Kernan and Mohan took Santiago, and 8th District Officers Reiff and Brown transported Rosauro, Reyes and Solache to Area 5 headquarters at Grand and Central (SOF at ⁋⁋ 57, 58). At the Area, Kernan interviewed Rosauro with the assistance of Spanish-speaking Officer Jorge Cerda ("Cerda"). (SOF at ⁋ 59). Rosauro again relayed that his wife was released from UIC Hospital on March 28, after giving birth to their daughter the day before, and repeated the story he told Officers Golab and Solis about Salazar. (SOF at ⁋ 59).

Based on this information, later that same morning, Detectives Edwin Dickinson ("Dickinson") and Kevin McDonald ("McDonald"),[4] along with Spanish-speaking Officer Lilia Flores ("Flores"), went to 6234 S. Mozart between 10:00 a.m. and 11:00 a.m. to interview Adriana. (SOF at ⁋ 61). Adriana allowed the officers into her home. (SOF at ⁋ 62). During the ensuing interview, Dickinson and McDonald grew suspicious that Adriana was falsely claiming that the baby was hers because the baby was much larger than an average newborn, she had a distinctive birth mark on the left side of her neck that mirrored a birth mark of the missing child, she had pierced ears that were not typical of a newborn, she no longer had an umbilical cord and her naval appeared completely healed. (*Id*.). Adriana stuck to her story that the baby was hers and she was watching the boy for a woman named Norma Salazar. (*Id*.).

Due to their suspicions, Detectives Dickinson and McDonald asked Adriana to accompany them to Area 5. (SOF at ⁋⁋ 63, 66). One of the detectives also called Detective Mohan

---

[4] Detectives Dickinson and McDonald did not speak Spanish, and Adriana did not speak or understand English. (SOF at ⁋⁋ 11, 18, 61).

to inform him they had found Maria, and Rosauro, Reyes and Solache were placed under arrest. (SOF at ℙℙ 63, 64). The baby was taken to a doctor where she was examined. (SOF at ℙ 65). The baby was then taken to Area 5 where she was identified by Soto family members as the missing baby, Maria. (*Id*.).

On April 3, around 11:30 a.m., Guevara interviewed Adriana at which time she implicated Norma Salazar. (SOF at ℙ 82). However, detectives found Salazar and placed her in a lineup for Adriana to view, but Adriana was unable to identify Salazar. (SOF at ℙ 83). Salazar was released when it was determined she had no knowledge regarding the murders or kidnappings. (*Id*.). Afterwards, Adriana agreed to submit to a polygraph examination, and she was transported by Guevara downtown for the test around 5:00 p.m. (SOF at ℙ 84).

At approximately 6:30 p.m. on April 3, Detectives Michael Stephens ("Stephens"), Berscott Ruiz ("Ruiz") and John Santopadre ("Santopadre") obtained a signed consent to search form from Rosauro and went to 6234 S. Mozart in search of evidence. (SOF at ℙ 85). There, detectives recovered a pair of Adriana's shoes with apparent blood stains on them. (SOF at ℙℙ 85, 86). The shoes were taken back to Area 5, where the mobile crime lab responded and tested the shoes. (SOF at ℙ 87). Their preliminary findings indicated the presence of blood. (SOF at ℙ 87).

Guevara and Adriana came back to Area 5 after the polygraph around 9:00 p.m., and Guevara confronted her with the fact that her shoes had blood on them. (SOF at ℙℙ 86, 88). At that time, Adriana admitted to faking her pregnancy, that one of the Plaintiffs[5] found her upset and

---

[5] Adriana has told different stories about the specifics of Solache's and Reyes's actions at the Soto home but has been consistent in the fact that they were involved in the Soto murders and kidnappings. (SOF at ℙℙ 4, 7, 91-93, 97-98, 158, 223). While it is not disputed that Adriana explained to Guevara what happened there is some dispute over the details of what Adriana said. (*See id*). As a result, Defendants only discuss the details of Adriana's interview that are not disputed for purposes of summary judgment.

offered to help her get a baby for $600.00 and implicated herself and at least one of the Plaintiffs in the kidnappings of Santiago and Maria. (SOF at ¶ 89).

Guevara also interviewed Reyes at Area 5 at approximately 11:30 p.m. on April 3, but what was said in that interview is disputed. (SOF at ¶ 99). After interviewing Reyes, Guevara asked him to empty his pockets, at which point two pieces of paper fell onto the floor. (SOF at ¶¶ 99, 100). The papers had Norma Salazar's name written on them, as well as the words, "hospital," and "Leonardo." (*Id.*). Reyes also had a calendar that contained Salazar's name. (SOF at ¶ 100).

The next day, April 4, Guevara interviewed Solache around 12:15 a.m., although what was said in this interview is disputed. (SOF at ¶ 119).

Meanwhile, attorneys from the Cook County State's Attorney Felony Review Unit were called to assist at Area 5. (SOF at ¶¶ 69, 77, 79, 92, 108, 119, 120). Assistant State's Attorney ("ASA") Karin Wehrle responded and interviewed Guadalupe. (SOF at ¶ 69). Guadalupe[6] described Adriana and Rosauro's struggles to have a baby and Adriana's announcement in June 1997 that she was pregnant. (*Id.*). Guadalupe further confirmed that Rosauro dropped Adriana off at UIC on March 27, and that Guadalupe and Rosauro picked her up the following day, at which time Adriana had a baby and a little boy with her. (*Id.*). Guadalupe noticed blood on Adriana's pants, which Adriana attributed to the delivery. (SOF at ¶¶ 67-69, 71). Guadalupe added that she noticed the baby was big for a newborn, there was no umbilical cord, only a small piece of gauze covered her bellybutton, and Adriana did not appear to be in pain. (SOF at ¶¶ 32, 69, 71). Guadalupe said that when saw the news story on the boy, she confronted Adriana about taking him to the police. (SOF at ¶ 69). She then signed a handwritten statement at approximately 1:35

---

[6] Guadalupe is a Spanish-speaker who did not speak or understand English. (SOF at ¶ 71).

a.m. in the presence of ASA Wehrle, Guevara and Trevino, which reflected that same version of events (SOF at ¶ 71).

At approximately 6:30 a.m. on April 4, Halvorsen and Guevara reinterviewed Rosauro,[7] who said he did not have any more information to provide and signed another consent to search so officers could locate the bloody pants Guadalupe told detectives she saw Adriana wearing on the 28th. (SOF at ¶ 76). Guevara, accompanied by Guadalupe, went to the Mozart address, where Guadalupe directed him to Adriana's closet, where Guevara recovered and inventoried a pair of black bloody pants. (SOF at ¶ 68).

Rosauro was also interviewed by ASA David Navarro (who spoke Spanish) and ASA O'Malley on April 4, at which time he relayed the same story he told detectives earlier. (SOF at ¶ 77). Also on April 4, the following interviews occurred:

| Time | Detective Conducting Interview | Interviewee |
|------|-------------------------------|-------------|
| 10:35 a.m. | Dickinson, Rutherford & Trevino | Adriana |
| 3:00 p.m. | Guevara | Reyes |
| 6:00 p.m. | Dickinson, Rutherford,[8] & Trevino | Reyes |
| 8:00 p.m. | Guevara | Adriana |
| 9:00 p.m. | Guevara | Solache |

(SOF at ¶¶ 90, 91, 104, 106, 119).

Between 11:00 p.m. and midnight, Reyes was reinterviewed by ASA O'Malley and Trevino, Adriana was reinterviewed by ASA Navarro and Halvorsen, and Solache was

---

[7] Halvorsen did not speak Spanish, but Guevara did speak Spanish. (SOF at ¶¶ 18, 92, 95).
[8] Neither Dickinson nor Rutherford spoke Spanish and Reyes did not speak or understand English. (SOF at ¶¶ 10, 18).

reinterviewed by ASA Brualdi and Guevara. (SOF at ¶¶ 92, 108, 120). Exactly what was said in these interviews is disputed, but it is undisputed that Adriana told detectives and ASAs that she, Reyes and Solache, were all present at the Soto residence when Jacinta and Mariano were murdered, that Solache stabbed Mariano and Jacinta, and that all three had kidnapped the children. (SOF at ¶¶ 4, 91-93, 97-98).

In the early morning hours of April 5, Reyes signed a handwritten statement to ASA O'Malley and Trevino (written by ASA O'Malley) at 2:00 a.m. implicating himself, Solache and Adriana in the Soto murders and kidnappings; Solache signed a handwritten statement to ASA Brualdi and Guevara (written by ASA Brualdi) at 3:35 a.m. implicating himself, Reyes and Adriana in the Soto murders and kidnappings;[9] and Rosauro gave a signed handwritten statement to ASA Varga and Officer Cerda (written by ASA Varga) at 4:00 a.m. (SOF at ¶¶ 79, 80, 110, 121). In connection with their statements, polaroid photographs were taken of Adriana, Reyes, Solache, Rosauro, Guadalupe, Jorge Mejia,[10] Felicia, and Rosa. (SOF at ¶¶ 114, 124, 246). Between 8:00 a.m. and 8:15 a.m., charges were approved by the Cook County State's Attorney's Office (CCSAO) against Adriana, Solache and Reyes for two counts of First-Degree Murder and two counts of Aggravated Kidnapping and Home Invasion, and all three were booked into lockup by 9:00 a.m. (SOF at ¶¶ 96, 116, 125, 126).

On April 17, 1998, it was determined that photographs originally taken at the scene by the mobile lab unit were not able to be properly developed–*i.e.* they were either too dark or too light–due to a malfunction of the flash and/or shutter of the camera. (SOF at ¶¶ 129-131). At the

---

[9] It is not disputed that Reyes and Solache signed these statements; however, it is disputed whether they knew what was contained in those statements and whether the statements were coerced and/or fabricated.

[10] Jorge Mejia testified he was asked questions by a Hispanic police officer in a car on the way to the police stations where his wife Guadalupe was held, but he was not handcuffed at any time and was not questioned at the police station. (SOF at ¶ 66).

12

request of Guevara and ASA Art Hill, Forensic Investigators Dennis Stankus and John Naujokas rephotographed the scene of the Soto murder. (SOF at ¶ 131). Halvorsen, Dickinson, Rutherford and Trevino were not involved in taking or developing any photographs. (SOF at ¶¶ 129-131).

### 5. Plaintiffs' pretrial proceedings.

On April 27, 1998, in *People v. Adriana Mejia, Gabriel Solache and Arturo DeLeon-Reyes*, 98 CR 12440, a Cook County grand jury returned a true bill indicting Adriana and Plaintiffs on forty separate counts relating to the Soto murders and kidnappings. (SOF at ¶ 128). In the interim, the Illinois State Police crime lab conducted a number of forensic tests on physical evidence recovered from the Sotos' home. (SOF at ¶¶ 132-135). On May 13, 1998, the knives found in the box behind the couch, and Adriana's shoes and pants, all tested positive for human blood. (SOF at ¶¶ 133-135). A DNA comparison later revealed that the blood on Adriana's pants and shoes matched Mariano Soto. (SOF at ¶¶ 134-135). And the loose knife in the box found under the Sotos' couch had DNA on it consistent with Adriana's. (SOF at ¶ 133).

Reyes first filed a Motion to Quash Arrest and Suppress Evidence on February 1, 1999, alleging only that he was arrested without probable cause. (SOF at ¶ 144). That same day, Solache also filed a Motion to Suppress Statements claiming his confession was coerced when a Puerto Rican detective slapped him and chipped his tooth. (SOF at ¶ 145). Over five months later, on July 26, 1999, Reyes filed a Supplemental Motion to Suppress Statements claiming his confession was also coerced. (SOF at ¶ 148). Then on July 28, 1999, Solache joined Reyes's Motion to Quash Arrest and Suppress Evidence based on a lack of probable cause. (SOF at ¶ 150).

On April 7, 2000, Judge Stanley Sacks denied the motions because Solache's and Reyes's alleged inculpatory statements were made after they were implicated in the murders by

13

their co-defendants (including Adriana), finding that at that point, they were in lawful custody and those statements were made voluntarily. (SOF at ¶¶ 164-167).

### 6. Plaintiffs' criminal trials and post-conviction proceedings.

Plaintiffs' separate but simultaneous criminal jury trials took place from June 14-20, 2000, before Judge Sacks. (SOF at ¶ 169). On June 14, the State called, among other witnesses, Alfredo and Detective Halvorsen, to testify in both cases. (SOF at ¶ 170). Alfredo testified consistent with his statement to detectives that around 6:45 a.m. on March 28, he heard moaning coming from the Soto's apartment where he knew Mariano to sleep, loud sounds like something had fallen and something was dragging, the little boy crying, and a man's voice say something along the lines of "don't scream, I'm not going to hurt you." (SOF at ¶ 171). Halvorsen testified about his response to the crime scene on April 1, 1998, and the evidence that was collected and inventoried, including the knives found under the couch. (SOF at ¶ 172). Halvorsen did not testify about Plaintiffs, or any part of the investigation that occurred after April 1, 1998. (*Id.*).

On June 15, the State called, among others, Guadalupe, and Defendant Detectives Dickinson and Guevara. (SOF at ¶ 175). Guevara testified to both juries that he interviewed Adriana, Solache, Reyes and Guadalupe, but he did not testify regarding any statements these witnesses made, except that he told *only* the *Reyes* jury about Reyes's inculpatory statements, and he told *only* the *Solache* jury about Solache's inculpatory statements. (SOF at ¶ 176, 185-188).

Guadalupe testified to both juries consistent with her prior statements to detectives, that on March 28, 1998, when she accompanied Rosauro to retrieve Adriana and her baby at the hospital, Adriana had a baby girl and a roughly 3-year-old boy with her. (SOF at ¶¶ 177-178). She also testified about her observations of Adriana and the baby, and how she recognized a

14

photo of the missing boy on a news story about the crimes as the boy Adriana was watching, confronted Adriana about it, and asked Adriana to call the police. (*Id.*). Guadalupe further testified that police came to the house, interviewed Adriana, and saw the baby's birthmark, and about how Guadalupe went to the police station. (*Id.*). Finally, Guadalupe testified that when detectives returned to her home on April 4, she directed them to Adriana's closet where Guevara recovered the black pants Adriana wore when she came home from the hospital. (*Id.*). Other than testifying that Solache and Reyes lived with Adriana in the apartment above hers, Guadalupe did not testify about Solache or Reyes. (SOF at ¶ 179).

Defendant Detective Dickinson testified about collecting evidence on April 2, 1998, and finding Maria at the Mozart address with Adriana. (SOF at ¶ 182). He did not testify as to specific statements made by Adriana to him, or any statements made by Plaintiffs. (*Id.*).

On June 16, the State called, among other witnesses, Defendant Detective Trevino to testify in only *Reyes's* case about inculpatory statements Reyes made to him and ASA O'Malley. (SOF at ¶¶ 189, 190). Defendant Detective Ruiz testified to both juries about the recovery of Adriana's shoes, and that he spoke to Rosauro, who executed a consent to search, but he did not testify as to the content of Rosauro's statements. (SOF at ¶ 192). On June 20, both juries convicted Reyes and Solache of first-degree double murder, aggravated kidnapping, and home invasion. (SOF at ¶ 221). Reyes was sentenced to life in prison. (*Id.*). Solache was sentenced to death**. (*Id.*).

On February 8, 2001, Adriana pleaded guilty to murdering Jacinta and Maria Soto, home invasion, and the aggravated kidnapping of Santiago and Maria Soto. (SOF at ¶ 222). As part of the factual basis for her plea, Adriana, through her attorney, stipulated that (1) she recruited Reyes in exchange for $600 to find her a baby, (2) she knew someone would have to die for her

to get a baby, (3) she and Reyes saw Jacinta Soto using the phone with Maria and Santiago while at UIC, (4) Adriana followed Jacinta home, and was picked up the following day by Solache and Reyes, (5) they went to the Sotos' residence where Reyes stabbed Jacinta, (6) Jacinta and Mariano were stabbed to death, and (7) she, Solache and Reyes fled the scene with Maria and Santiago. (SOF at ¶ 223). In exchange for her plea, Adriana was sentenced to life in prison. (SOF at ¶ 222). Adriana is still incarcerated for these crimes today. (SOF at ¶¶ 4, 223).

In December 2003, Solache and Reyes filed post-conviction petitions for new hearings on their motions to suppress their confessions based on alleged misconduct on the part of Guevara, in theirs and other cases. (SOF at ¶ 226). The trial court summarily dismissed the petitions, but in 2006, the Illinois Appellate Court reversed and directed the trial court to address the claims noting "[t]he issue here is not whether defendants are guilty. Rather, it is simply whether defendants have, by virtue of their new evidence, presented the gist of a constitutional claim that their confessions were coerced." (SOF at ¶¶ 227, 228). On remand, and over the State's objection, Judge James Obbish granted Plaintiffs new hearings on their motions to suppress their confessions on June 29, 2016. (SOF at ¶ 229). Again, over the State's objection, on December 13, 2017, Solache's and Reyes's motions to suppress were granted, and new trials were ordered. (SOF at ¶ 231).

Without the confessions, the CCSAO determined it could not meet its burden of proof beyond a reasonable doubt, decided not to retry Solache and Reyes, and instead moved to dismiss the charges via *nolle prosequi* on December 21, 2017. (SOF at ¶¶ 232, 233). At that time, First Assistant State's Attorney Eric Sussman, who had carefully reviewed all the evidence in the case, represented to Judge Obbish that, "there is not a doubt in my mind or the mind of any prosecutor who has worked on this case that Mr. Solache and Mr. Reyes are guilty of these

16

heinous crimes" and described the day as a "tragic day for justice in Cook County." (SOF at ¶ 233).

### 7. Plaintiffs' Petitions for Certificates of Innocence ("COIs").

Solache and Reyes subsequently filed petitions of innocence on April 18, 2018. (SOF at ¶ 236). For over four years the CCSAO vehemently opposed the petitions. (SOF at ¶¶ 236, 240). At one point, the CCSAO argued in response to Reyes's motion for summary judgment on his petition for a COI that Reyes had failed to demonstrate his innocence of the horrific murders and that "a full consideration of the record . . . sufficiently rebuts petitioner's assertion of innocence." (SOF at ¶ 236). The State further and pointedly refused to concede that the statements signed by Reyes, Solache and Mejia were false. (SOF at ¶ 236). Thereafter, on November 14, 2022, the CCSAO suddenly changed its position and declared to the trial court, with no explanation, that it was simply withdrawing its opposition to Solache's and Reyes's COI petitions. (SOF at ¶ 240). Christa Bowden, the ASA litigating the COIs, was not given an explanation of why the CCSAO was withdrawing its objection to the petitions. (SOF at ¶ 241). ASA Bowden intended to oppose the petitions, and in fact had filed motions opposing them, up until she received an email from her supervisor on November 11, 2022, instructing her to withdraw the CCSAO's objection. (SOF at ¶ 241). She testified that no new facts regarding the Soto murders were brought to her attention at the time she was instructed to withdraw the CCSAO's objection. (SOF at ¶ 241). The court allowed the State to withdraw its opposition and then immediately granted both COI petitions. (SOF at ¶ 242).

### 8. Additional Facts Relevant to Plaintiffs' Fabrication of Evidence Claims.

Guadalupe testified in these civil suits that her statements to detectives and testimony at Plaintiffs' criminal trials were true. (SOF at ¶¶ 72, 73). Alfredo denies telling detectives certain

17

details set forth in certain Defendants' police reports, however, none of those details were entered into evidence against Solache or Reyes, and Alfredo maintains to this day that the testimony he did offer at the criminal trials was all true. (SOF at ⁋⁋ 217-220).

Rosauro's statements to police were never used by the State in its case-in-chief against Solache or Reyes at their criminal trials. (SOF at ⁋⁋ 192, 195-200). Rather, Solache called Rosauro in his defense to testify regarding the fact that he was struck by Guevara, and it was Solache who marked Rosauro's statement as an exhibit. (SOF at ⁋ 198). Regardless, Rosauro testified his statements were all true. (SOF at ⁋ 81).

Adriana's inculpatory statements to police about Solache and Reyes were not introduced as evidence against either Solache or Reyes at trial. (SOF at ⁋⁋ 182, 185, 187, 195-197, 201). And Solache's statements were not entered into evidence in Reyes's criminal trial, and Reyes's statements were not entered into evidence in Solache's criminal trial. (SOF at ⁋⁋ 176, 185-191, 195-197, 199-203). In addition, no police reports drafted by Dickinson, Rutherford or Trevino were offered into evidence by the State against either Plaintiff. (SOF at ⁋⁋ 195-197, 206-214). The only police report used by the State in Reyes's criminal case was a report drafted by Halvorsen to refresh Guevara's recollection as to statements Reyes made to Guevara. (SOF at ⁋ 209). No police reports were published to the jury. (SOF at ⁋⁋ 210, 213). No police reports were used by the State in Solache's criminal case. (SOF at ⁋⁋ 195-197, 206-214). Detective Rutherford never testified against either Solache or Reyes. (SOF at ⁋ 204).

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

18

non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an element of his or her claim. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). While the court must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor, (*Anderson*, 477 U.S. at 255) "that duty does not extend to drawing inferences that are supported by only speculation or conjecture." *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013); *accord McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In the end, summary judgment is the "put up or shut up moment in litigation." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). As to any issue on which a Plaintiff bears the ultimate burden of proof, he is obligated to identify *evidence* that would permit a jury to find in his favor. *Roberts v. Broski*, 186 F.3d 990, 995 (7th Cir. 1999) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

## ARGUMENT

I.      **With the Exception of Reyes's Fabricated Confession Claim against Trevino, Plaintiffs cannot Meet their Burden of Proof for their Coerced and/or Fabricated Confession Claims.**

As a prerequisite as to Plaintiffs' federal claims, "[i]ndividual liability under § 1983 …requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (citation and internal quotation marks omitted). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citation omitted). The mere presence of officers on scene, without more, is *not* enough to establish liability. *Trout v. Frega*, 926 F. Supp. 117, 121 (N.D. Ill. 1996)(emphasis added)(citing *Apostal v. City of Crystal Lake*, No. 94 C 50068, 1995

19

WL 692680, at *6 (N.D. Ill. Nov. 22, 1995)).

> **A.** **Solache lacks any evidence establishing the involvement of any Defendant Officer in his claims for coerced and/or fabricated confession.**

Solache alleges that the Defendant Officers coerced and/or fabricated his confession on April 3, 4, and 5, 1998, which was used to secure his criminal conviction. (*Solache*, Dkt. 224, Count I). However, there is no evidence in this case that the Defendant Officers participated in *any* interrogation of Solache, nor that they otherwise knew or consented to the alleged unconstitutional conduct during Solache's questioning.

"The Fifth Amendment… prohibits the use of involuntary or coerced confessions." *Mack v. City of Chi.*, No. 19 CV 4001, 2023 WL 4744791, at *15 (N.D. Ill. July 25, 2023) (citation and internal quotation marks omitted). "To bring a successful Fifth Amendment claim, [Plaintiffs] must show (1) that [their] confession was involuntary and coerced, and (2) that [their] confession was used against [them] in a criminal case." *Id*. A fabricated confession claim, by contrast, sounds in principles of due process under the Fourteenth Amendment's right to a fair trial and is viable when manufactured evidence was admitted against a plaintiff at his criminal trial and caused his conviction. *Patrick v. City of Chi*., 974 F.3d 824, 835 (7th Cir. 2020).

Solache has no evidence that Halvorsen, Dickinson, Rutherford or Trevino were present when he was questioned or that they were otherwise aware of any allegedly improper conduct by any other Defendant during that questioning. (SOF at ⁋⁋ 117-121). To the contrary, Solache's *own* testimony is that the *only* detective involved in his questioning was Guevara. (SOF at ⁋⁋ 117-121). Therefore, there is no evidence any Defendant Officer coerced *or* fabricated Solache's confession, and the Defendant Officers' presence at Area 5, without more, fails to rise to the level necessary for Solache's claims against them to survive. *Trout*, 926 F. Supp. at 121. Any inference they were involved would be "manifestly unreasonable," and this Court should

"decline to draw [it]…for purposes of summary judgment." *REXA, Inc. v. Chester*, 42 F.4th 652, 666 (7th Cir. 2022). Accordingly, summary judgment should be granted in all Defendant Officers' favor on Solache's Fifth and Fourteenth claims for coerced and fabricated confession (*Solache*, Count I).

**B.      Reyes does not have a viable Fifth Amendment claim of coerced confession.**

Reyes similarly makes sweeping allegations that the Defendant Officers *both* forced Plaintiff to incriminate himself *and* fabricated his confession. He specifically alleges that they, "forced Plaintiff to make statements involuntarily against his will, which incriminated him," (*Reyes*, Dkt. 396, ¶ 126), "used physical violence and extreme psychological coercion" against him, and "fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings." (*Reyes*, Dkt. 396, ¶¶ 127, 128). However, based on Reyes's own testimony, Reyes's cannot meet his evidentiary burden necessary to demonstrate that any Defendant Officer coerced him into confessing and his Fifth Amendment claim fails.

A coerced confession claim requires a plaintiff to show that his confession was involuntary and coerced, *Mack*, 2023 WL 4744791, at *15, whereas a fabricated confession claim, sounds in principles of due process under the Fourteenth Amendment's right to a fair trial and requires that plaintiff show that defendants knowingly manufactured false evidence that was admitted against him at his criminal trial. *Patrick*, 974 F.3d at 835. Although Reyes conflates these issues by comingling his coercion and fabrication allegations under the umbrella of his false confession claim, the two claims must be analyzed separately. And in doing so, it is clear the only claim of Reyes's that can survive summary judgment is that his confession was *fabricated* rather than *coerced*.

To that point, Reyes never testified that *any* Defendant Officer used any type of physical

21

force against him, nor does he allege any Defendant Officer was present at the times he claims Guevara used physical force. (SOF at ¶¶ 99, 101-110, 113). Furthermore, Reyes does not allege that any Defendant Officer threatened him at any time. (*See id.*) To the contrary, he testified that he thought Trevino was going to help him. (*See id.*) With no evidence that any Defendant Officer threatened or abused Reyes, Reyes has failed to meet his burden to show that they coerced Reyes into confessing. As a result, to the extent Reyes's Count I alleges that the Defendant Officers coerced his confession, such claim must be dismissed.[11]

> **C.     Reyes cannot Sustain his Fabrication Claim against Dickinson and Rutherford.**

Just as Reyes's claim of coerced confession fails against Dickinson and Rutherford–so too does his claim for fabricated confession, and thus Dickinson and Rutherford are entitled to summary judgment on Reyes's Count I in its entirety.

As noted above, to sustain his claim that Dickinson and Rutherford fabricated his confession, he must show that they **knowingly manufactured false evidence**. *See Patrick*, 974 F.3d at 835.

Here, it would be impossible for Dickinson and Trevino to have knowingly created Reyes's confession. The only evidence in this case demonstrates that at the time of the investigation, Reyes did not speak or understand English. (SOF at ¶ 10). And in the converse, neither Dickinson nor Rutherford spoke or understood Spanish. (SOF at ¶ 18). Dickinson and Rutherford's only means of communicating with Reyes was through a Spanish interpreter (Trevino). (SOF at ¶¶ 18, 106). Thus, it would be impossible for Dickinson and Rutherford to know what Reyes said (or did not say) and thus impossible for them to knowingly manufacture

---

[11] As noted above, for purposes of summary judgment only, the Defendant Officers concede a question of fact exists with regards to Reyes's Count I, fabricated confession, against Defendant Trevino, and therefore do not move for summary judgment on this claim.

his false statement. As a result, Dickinson and Rutherford are entitled to summary judgment on Reyes' Count I.

>    **D.    Reyes lacks any evidence establishing personal involvement of Halvorsen in his claims for coerced and/or fabricated confession.**

Reyes cannot show Halvorsen participated in *any* interrogation of Reyes, nor that Halvorsen otherwise knew or consented to the alleged unconstitutional conduct during his questioning.

The evidence in this case is that Reyes was questioned only by Detectives Guevara, Trevino, Dickinson and Rutherford. (SOF at ℙℙ 99-110). The record is void of any evidence that Halvorsen participated in any questioning of Reyes or that he was otherwise aware of any alleged unconstitutional conduct on the part of any Defendant during his questioning. While Halvorsen drafted the police reports that summarized Reyes' confessions, that alone is insufficient to establish Halvorsen was aware, and approved, of any unconstitutional conduct during Reyes's questioning. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (finding plaintiff proffered no evidence that would allow factfinder to impute knowledge of incident to defendant). Because he was not involved in taking Reyes' statement, Halvorsen would have to rely on information conveyed to him regarding the confessions, and there is no evidence that he was told of any improper conduct. As a result, Halvorsen is entitled to summary judgment on Reyes's coerced and/or fabricated confession claims (*Reyes* Count I).

## II.    Plaintiffs Lack Sufficient Evidence to Support their *Brady* and Fabrication of Witness Statements Claims.[12]

---

[12]Reyes has brought a Due Process Claim which alleges, among other things, that Defendant Officers fabricated witness statements, *and* a separate "fabrication of false witness statements" claim also brought under the Fourteenth Amendment. (*Reyes*, Dkt. 396, at Count II, Count IV). Plaintiff's Count II is duplicative of his Due Process claim (Count IV) and should be stricken. *See* Fed. R. Civ. P. 12 (f) (pleading can be stricken if it is "redundant.")

In addition to their claims for coerced and/or fabrication confessions, Plaintiffs aver that the Defendant Officers withheld numerous items in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), including notes from witness interviews, documents that reflected that "Defendants had multiple theories of the case and alternate suspects," and that the Defendant Officers destroyed original crime scene photos and "[l]arge bags of evidence containing potentially exculpatory evidence that were removed from the scene and not inventoried or produced." (SOF at ¶ 248). Plaintiffs also allege that "Defendants" fabricated witness statements and police reports to fit Guevara's theory of the crime. (SOF at ¶¶ 247-248).

### A. Plaintiffs have nothing to support the allegation that Defendant Officers withheld and/or destroyed evidence.

To establish a civil claim under *Brady*, "a plaintiff must prove: (1) the evidence at issue is favorable to his defense; (2) the officer concealed the evidence intentionally or at least recklessly; and (3) the concealment prejudiced him." *Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019); *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022). A *Brady* claim cannot be based on speculation. *U.S. v. Parks,* 100 F.3d 1300, 1307 (7th Cir.1996). Evidence is material under *Brady* if there is a reasonable probability the proceeding would have resolved differently if the evidence had been disclosed. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). Finally, in a civil suit premised on *Brady*, a plaintiff must show that a defendant who was responsible for the suppression "acted intentionally or at least recklessly in failing to turn…over" the evidence. *Moran*, 54 F.3d at 493.

As described below, Plaintiffs cannot show that any of the materials he has identified existed and were withheld or destroyed, that any such materials were exculpatory, and/or that any of the Defendant Officers were personally involved in withholding or destroying any such materials.

24

i.      Alleged destruction of crime-scene photos

As noted above, Plaintiffs claim the Defendant Officers destroyed original crime-scene photographs. A "destruction of evidence" due process claim requires a showing that: "(1) the [Defendants] acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that [Plaintiffs were] unable to obtain comparable evidence by other reasonably available means." *Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022) (citation and internal quotation marks omitted).

Here, Plaintiffs cannot prove any element of this claim. First, there is no evidence any photographs were destroyed at all. Nor can Plaintiffs' show the issue with the development of the original photographs was suppressed. Both the unusable original photos and the second set of photos were produced in the criminal proceedings, as were the reports explaining the issues with the originals. (SOF at ⁋⁋ 129-131). Harvey further testified at Plaintiffs' criminal trial that the photos were not able to be properly developed because of an issue with the flash or shutter. (*Id*.). And there is no evidence that Harvey purposefully rendered the original photos unusable. Second, Plaintiffs cannot establish any Defendant Officer played any role in taking or developing any photos, or that they otherwise directed Harvey, Stankus, or Naujokas to take any action with respect to the photographs. *Colbert*, 851 F.3d at 657. Finally, Plaintiffs have no evidence that the original photographs would have been exculpatory or that any alleged exculpatory value would have been apparent to the Defendants Officers. *See Coleman*, 925 F.3d at 349 (suppressed evidence must be favorable to the defense); *Ruiz v. City of Chi*., 931 F.3d 592,600-01 (7th Cir. 2019) (plaintiff must show suppressed evidence was favorable to defense and material to guilt or punishment); *Jones*, 34 F.4th at 559  (exculpatory value of evidence must have been apparent.)

25

Instead, Plaintiffs' arguments are based solely on speculation and are at odds with well-established evidence. And this speculation is insufficient to overcome summary judgment. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (non-movant cannot rely on inferences supported by mere speculation or conjecture to overcome summary judgment).

  ii.  Witness interview notes

Plaintiffs claim that the Defendant Officers withheld notes from their interviews with various witnesses. This claim also fails for multiple reasons. First, Plaintiffs cannot show that any notes existed that were never turned over to the State or defense. *See Hill v. City of Chicago*, 2009 WL 174994, *4 (N.D. Ill. Jan. 26, 2009) ("Hill's mere speculation that a RAMIS report and report concerning Turner may have existed, however, cannot be the basis for his *Brady* claim."). Second, they cannot show that any Defendant Officer was personally involved in withholding any of these hypothetical notes. *Colbert*, 851 F.3d at 657. Third, Plaintiffs cannot show that any alleged notes were exculpatory; they have no evidence to show notes existed, much less what they stated. *See Coleman*, 925 F.3d at 349 (evidence must be favorable to the defense). Fourth, and finally, Defendant Officers' interviews of witnesses were memorialized into typed and/or handwritten reports, which were disclosed to the State and the defense. And there is no evidence that any notes would have reflected additional or different information than what is contained in those typed reports. *See Moran*, 54 F.4th at 496 (holding there was no *Brady* violation when allegedly suppressed evidence was not materially different than evidence produced in a different form). Plaintiffs' claims regarding hypothetical notes that were allegedly withheld thus fail.

  iii.  Miscellaneous documents reflecting alternate suspects

As noted above, in connection with their statements to detectives, polaroid photographs were taken of Guadalupe, Jorge Mejia, Rosa, and Felicia. (SOF at ¶¶ 114, 124, 246). Plaintiffs

26

now claim that these photos were suppressed and that they were exculpatory because they demonstrate detectives' belief that these four individuals were alternative suspects in the Soto murders and kidnappings. (SOF at ⁋ 248). However, this theory suffers the same fate as Plaintiffs' other *Brady* claims.

Initially, Plaintiffs cannot establish that any Defendant Officer took the polaroids, let alone that they failed to turn them over to the State or defense. *Colbert*, 851 F.3d at 657. Indeed, they cannot establish that this evidence was suppressed at all —the polaroid of Guadalupe, as well as those of Adriana and Plaintiffs, were all impounded by the State. (SOF at ⁋ 205). Minimally, that eliminates Plaintiffs' theory that polaroids of Guadalupe were withheld, and Plaintiffs lack any evidence that the State did not have access to the Polaroids of the other witnesses. *See Mims v. City of Chi.*, 18-CV-7192, 2024 WL 1075152, * 9, 18-19 (N.D. Ill., Mar. 12, 2024) (finding Mims could not establish *Brady* claim by averring that defense counsel did not receive the evidence; Mims needed affirmative evidence that the police withheld the information, and officers did not have an obligation to ensure court-impounded materials accessible by the prosecution "actually made it into the hands of defense counsel").

At bottom, Plaintiffs' allegations surrounding the polaroids are rooted in speculation and conjecture. First, they cannot point to a complete defense file for their criminal cases and therefore cannot show what documents their defense attorneys possessed prior to trial. *Mims*, 2024 WL 1075152, * 9. Second, Plaintiffs cannot show that the photographs of Guadalupe, Jorge Mejia, Felicia or Rosa, were exculpatory or impeachment evidence. These witnesses were all interviewed in the course of the investigation, and Plaintiffs' criminal defense counsel knew that. (SOF at ⁋ 168). Guadalupe, Jorge Mejia, Rosa and Felicia were all disclosed by the State as potential trial witnesses. (*Id.*). Plaintiffs' defense counsel, at a minimum, had police reports that

27

memorialized detectives' interviews with these witnesses and Guevara's participation in those interviews. (SOF at ⁋ 245). *See Boyd v. City of Chi*, 225 F. Supp. 3d 708, 721, 723 (N.D. Ill. 2016) (no suppression of statement related to a witness's role in crime where it was reasonable to expect defense counsel to interview the witness on that topic). But Plaintiffs apparently believe an interview of an individual is much less indicative of being a suspect than a polaroid. Rather Plaintiffs argue that somehow it is the polaroids that may have led defense counsel to believe these three individuals were suspects, which then would have somehow led to the admission of the photos as evidence to prove that theory, which would have had an impact on the jury's guilty verdicts. Those are quite speculative leaps.

Still more, Plaintiffs cannot identify a single piece of evidence indicating that any Defendant Officer ever believed that Guadalupe, Jorge Mejia, Felicia or Rosa were suspects in this case. *See Hill*, 2009 WL 174994, * 4 (speculation alone cannot establish *Brady* claim). Instead, Rosa testified that when she was at the police station she was not handcuffed and that, when questioned by Guevara, he never asked her any details about the murders, never touched her, never asked her about any knives, never told her he wanted her to confess, and never fed her any facts about the Soto murders. (SOF at ⁋ 45). Jorge Mejia testified he was asked questions by a Hispanic police officer in a car on the way to the police stations where his wife Guadalupe was held, but he was not handcuffed at any time and was not questioned at the police station. (SOF at ⁋ 66). And Guadulupe never testified about being treated as a suspect, and instead confirmed that what was in her handwritten statement is what she told detectives and ASAs. (SOF at ⁋ 72, 73).

The final nail in this theory's coffin is that Plaintiffs cannot show this evidence would have been material to their defense. Even if detectives had considered any of these individuals an

28

alternate suspect early in the investigation, that fact *alone* does not tend to establish Plaintiffs' innocence or "increase the probability that the trial judge would have reached a different verdict." *See Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, * 19 (N.D. Ill. June 4, 2020). And Plaintiffs cannot point to any evidence connecting Guadalupe, Jorge Mejia, Felicia, or Rosa to the Soto murders — because there simply is none. *Mims*, 2024 WL 1075152, *9 (evidence is material if there is a reasonable probability the verdict would have been different) (citing *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019)).

        iv.      <u>Large bags of evidence</u>

Plaintiffs' final *Brady* allegation is that the Defendant Officers removed large bags of physical evidence from the scene of the Soto murders containing "potentially exculpatory" evidence.

Plaintiffs have failed to establish personal involvement of any Defendant Officer. There is no evidence that Defendants Rutherford or Trevino were even at the crime scene. And while Defendants Halvorsen and Dickinson did respond to the scene, the record is void of any evidence that they were personally involved in removing any evidence from the crime scene, much less "large bags" of evidence. Consequently, Plaintiffs cannot establish personal involvement on the part of any Defendant Officer. *Colbert*, 851 F.3d at 657. Plaintiffs' theory that these "bags of evidence" contained exculpatory materials is also rooted solely in speculation; indeed Plaintiffs do not even claim to know what was in the alleged bags. This final *Brady* allegation falls well short of creating an issue of fact for any *Brady* claim to survive. *See Hill*, 2009 WL 174994, * 4 (speculation alone cannot establish *Brady* claim). As a result, Defendant Officers are entitled to summary judgment on Plaintiffs Due Process *Brady* claims (*Reyes*, Count IV, *Solache* Count II).

29

**B.** **Plaintiffs lack sufficient evidence to support their fabrication of evidence claims**.

Plaintiffs also allege that Defendant Officers fabricated the statements reflected in police reports and/or handwritten statements of (1) the Sotos' neighbor, Alfredo, (2) Guadalupe, (3) Adriana; (4) Rosauro, (5) Solache and Reyes, and (6) various related police reports. (SOF at ℙ 247).

To prove a due process claim based on fabrication of evidence, Plaintiffs must demonstrate that (1) a defendant knowingly manufactured false evidence, (2) the evidence was introduced at trial, and (3) it was material to the outcome of the trial. *Patrick*, 974 F.3d at 835; *see also Coleman*, 925 F.3d at 344. Manufactured testimony is testimony that is "made up" and "known to be untrue by the witness." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("*Fields II*"). False testimony is also different than coerced testimony—when a witness is "forced [to testify] by improper means"—which does equate to false testimony. *Fields*, 740 F.3d at 1110. Neither coerced nor unreliable testimony is the equivalent of false testimony, which is a necessary element to prove fabrication. *Coleman*, 925 F.3d at 346.

Guadalupe maintains that the information she provided to detectives and her testimony at the Plaintiffs' criminal trial is true. (SOF at ℙℙ 72, 73). Furthermore, while there is a dispute over *some* of the details reflected in the detectives' interview of Alfredo, Alfredo maintains that his testimony at Plaintiffs' criminal trials is true. (SOF at ℙℙ 215-220). And Rosauro maintains to this day that the information he provided to detectives is true. (SOF at ℙ 81). Not to mention Dickinson, Rutherford, and Halvorsen could not speak Spanish, and thus, could not communicate with these witnesses without the assistance of an interpreter. (SOF at ℙ 18). As such, Plaintiffs cannot show that the Defendant Officers knowingly manufactured *false* statements from Alfredo, Guadalupe and Rosauro, and their fabrication claims thus fail. *See Fields*, 740 F.3d at 1110.

30

To the extent there are statements reflected in police reports that Alfredo, Adriana, Rosauro, Reyes or Solache now allege were never made, those alleged fabricated statements were never used against Plaintiffs at their criminal trials and cannot sustain Plaintiffs' fabricated evidence claims. The content of Adriana's and Rosauro's statements were never admitted into evidence by the State at all, and Solache's statements were not used as evidence against Reyes, and Reyes's statements were not used as evidence against Solache. (SOF at ¶¶ 176, 182, 185-192, 195-203); *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994); *Fields II*, 740 F.3d at 1114 (if evidence is not used against a defendant, then there is no harm, "and without a harm there is . . .  no tort."); *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ("[I]f an officer []fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process[.]") And again, Alfredo's denial that he made certain statements contained in police reports is beside the point because those specific statements were also not introduced against Plaintiffs at their criminal trials. (SOF at ¶¶ 217-220).

The same is true for any police reports of the interviews of these witnesses that Plaintiffs allege were fabricated — Reyes cannot show that any reports drafted by Dickinson, Rutherford or Trevino were used by the State against him at trial; and Solache cannot show that any report drafted by any Defendant Officer was used by the State against him at trial. *See Zambrano v. City of Joliet*, 2024 WL 532175, *9 (N.D. Ill. Feb. 9, 2024) ("The fact that the report did not come into evidence dooms the Fourteenth Amendment claim.").

Furthermore, while a report drafted by Halvorsen was used to refresh Guevara's recollection as to statements made by Reyes (in Reyes's criminal trial only), Reyes cannot point to any evidence *Halvorsen* knowingly falsified this report. *Zambrano*, 2024 WL 532175, * 8 ("It

31

is not an accident, an oversight, a blunder, a goof or a gaffe. 'Deliberately' falsifying information means serving up a lie, on purpose."). Instead, the evidence establishes that Halvorsen was not involved in *any* questioning of Reyes, and thus, would have to rely on what other officers told him with respect to any statements made by Reyes in drafting his report. (SOF at ¶¶ 92, 99-110). Because Plaintiffs cannot prove essential elements of their claims, Defendant Officers are entitled to summary judgment on Plaintiffs' *Brady* and fabrication due process claims (*Reyes*, Count II & IV; *Solache* Count II).

### III. The Defendant Officers are Entitled to Summary Judgment on Plaintiffs' Failure to Intervene Claim.

In yet another effort to attempt to drag the Defendant Officers into their underlying claims, Plaintiffs bring separate standalone claims that allege that Defendant Officers (among others) knew about the unconstitutional actions of other Defendants, had an opportunity to intervene, and failed to do so. (*See Reyes*, Dkt. 396, Count V; *Solache*, Dkt. 224, Count III).

An officer "who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir.2005) (emphasis in original).

#### A. Where Plaintiffs' constitutional claims fail, so do their claims for failure to intervene.

"In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Edwards v. Joliff-Blake*, 2017 WL 1134473 (N.D. Ill. Mar. 27, 2017) (dismissing supervisor liability, failure to intervene, and indemnification claims for no

32

underlying constitutional violation). As demonstrated throughout this brief, Plaintiffs'

constitutional claims for Due Process (*Reyes* Count II, IV; *Solache* Count II) cannot survive

against *any* Defendant, and Reyes's claim for unlawful detention (*Reyes* Count III) cannot

survive against *any* Defendant because both Plaintiffs have failed to establish elements of those

claims, and thus Plaintiffs' derivative claims of failure to intervene cannot survive as to these

claims (*Reyes*, Count V; *Solache*, Count III).

> **B.**     **Solache cannot show any Defendant Officer had an opportunity to intervene in his coerced/false confession claim (Count I).**

As argued above, the Defendant Officers were not present for Guevara's questioning of

Solache, and consequently there is no evidence they were aware of any alleged unconstitutional

conduct on the part of Guevara during this questioning. *Stewardson v. Biggs*, 43 F.4th 732, 736

(7th Cir. 2022) (officer can be found liable for failing to intervene where they are *present*).

Without knowledge of any alleged unconstitutional conduct, it only logically follows that the

Defendant Officers likewise did not have a realistic opportunity to intervene. *Id.* at 736 ("A

realistic opportunity to intervene may exist if an officer could have "called for backup, called for

help, or at least cautioned [the officer] to stop.") (citations omitted). As a result, Solache's claim

for failing to intervene (Count III) fails against the Defendant Officers in its entirety.

> **C.**     **Reyes cannot show Halvorsen, Dickinson or Rutherford had an opportunity to intervene to prevent his alleged false confession; or that Trevino had an opportunity to intervene in his alleged coerced confession. (Count I).**

As argued above, Halvorsen was not present for any of the detectives' questioning of

Reyes and consequently there is no evidence Halvorsen was aware of any alleged

unconstitutional conduct on the part of any Defendant during this questioning. *Stewardson*, 43

F.4th at 736 (officer can be found liable for failing to intervene where they are *present*). And

while Dickinson and Rutherford were present for Reyes's questioning, they do not speak or

33

understand Spanish, and would not know what was being said by Reyes to any detective. (SOF at

¶¶ 10, 18). And as noted above, there is no evidence Dickinson, Rutherford, or Trevino observed

any alleged physical abuse on the part of Guevara. Finally, there is no evidence Trevino

overheard Guevara make any threats to Reyes. Without knowledge of any alleged

unconstitutional conduct, it logically follows that Halvorsen, Dickinson and Rutherford likewise

had no ability to intervene in any alleged fabrication of Reyes's statement. And likewise, Trevino

had no ability to intervene in any alleged physical abuse or threats made by Guevara. *Id.* at 736.

("A realistic opportunity to intervene may exist if an officer could have "called for backup,

called for help, or at least cautioned [the officer] to stop.") (citations omitted).

As a result, Reyes's claim for failing to intervene (Count V) fails against Defendant

Halvorsen, Dickinson and Rutherford in its entirety. And this claim additionally fails against

Trevino  to the extent he alleges any failure to intervene in Guevara's coercion of Reyes's

statement.

## D.   Failure to intervene is not cognizable as a federal tort because it violates Section 1983's prohibition against vicarious liability.

The Defendant Officers are aware of how frequently failure to intervene claims are

raised, recognized, and litigated in Section 1983 litigation. Recently, however, the Seventh

Circuit called into question the viability of the failure to intervene theory of Section 1983

liability. In concurrence, Judge Easterbrook noted that "'[f]ailure to intervene' sounds like

vicarious liability," which would of course be untenable, as "[t]he Supreme Court has held many

times that § 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48

F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) (citing *Ashcroft v. Iqbal*, 556 U.S.

662, 676–77 (2009); *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). And

Defendant Officers recognize that this Court is bound to follow the Seventh Circuit's current

34

jurisprudence recognizing such a claim, (*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)) but raise the argument for the express purpose of preserving it for appeal and as such, request that it be dismissed for failure to state a viable claim.

## IV. Reyes's Fourth Amendment Unlawful Pretrial Detention and Plaintiffs' State Law Malicious Prosecution Claims Fail as a Matter of Law.[13]

Plaintiffs also allege that Defendant Officers "used false evidence" to "cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause," (*see Reyes*, Dkt. 408, at ¶ 142), and "exerted influence" to initiate and to continue judicial proceedings against them without any probable cause. (*See Reyes*, Dkt. 396, at ¶ 190; *Solache*, Dkt. 224, at ¶ 99). And that those criminal proceedings terminated in their favor. (*See Reyes*, Dkt. 396, at ¶ 193; *Solache*, Dkt. 224, at ¶ 104).

Under Illinois law, to succeed on a malicious prosecution claim, a plaintiff must prove: (1) the defendant commenced or continued a criminal proceeding against him, (2) the proceeding was terminated in his favor, (3) there was no probable cause, and (4) the defendant acted maliciously. *Swick, et. al. v. Liautaud, et. al.*, 169 Ill. 2d 504, 512, (1996); *see also Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 653-54, (1st Dist. 2006); *Beaman v. Freesmeyer*, 2017 Il App (4th) 160527, 82 N.E.3d 241 (Ill. App. Ct. 4th Dist., 2017). Recently, the Supreme Court held that a Fourth Amendment claim for deprivation of liberty without probable cause mirrors the elements of a malicious prosecution claim. *See Thompson v. Clark*, 596 U.S. 36 (2022). That is, for his Fourth Amendment claim, Reyes must show (among other elements) that the Defendant Officers commenced or continued criminal proceedings against him and that there was no probable cause. *See id*.

---

[13] As noted above, Solache does not bring a Fourth Amendment Unlawful Detention Claim.

35

### A.    Rutherford did not play a significant role in Plaintiffs' criminal proceedings.

The "commencement or continuance of a prosecution" element of Plaintiffs' malicious prosecution claims require a defendant to have played a "significant role" in the criminal prosecution. *Hill v. Cook County*, 463 F. Supp. 3d 820, 845 (N.D. Ill. May 31, 2020) (citations omitted). While at this juncture, it is unclear as to whether the "significant role" test applies to this same element in federal malicious prosecution claims, at a minimum, a plaintiff is required to show that the defendant played some role, *i.e.* was personally involved, in his or her prosecution. *See Thompson*, 596 U.S. 36; *Colbert*, 851 F.3d at 657.

Plaintiffs have no evidence that Rutherford played a "significant role" in their criminal prosecutions — there is no evidence that he was involved in the decision to charge Plaintiffs, that he signed criminal complaints, provided *any* information to prosecutors, or testified in any criminal proceedings. (SOF at ⁋ 204); *see Cusick v. Gualandri*, 573 F. Supp. 3d 1256, *1271 (N.D. Ill. Nov. 22, 2021) ("the significant role determination must include those persons who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct that was instrumental in the commencement or continuation of the criminal prosecution.") (citing *Beaman v. Freesmeyer*, 2021 IL 125617, ⁋ 79, 183 N.E.3d 767 (Sept. 27, 2021)). And without any involvement in initiating Plaintiffs' criminal proceedings, there can be no liability against him for Reyes's claim of Fourth Amendment unlawful detention or Plaintiffs' claims of state law malicious prosecution. *See Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996). Accordingly, Rutherford is entitled to summary judgment on Reyes' claim for Fourth Amendment Unlawful Detention (Count III), and both Plaintiffs' state law claims of malicious prosecution (*Reyes* Count IX; *Solache* Count V).

36

### B.    Probable cause bars Plaintiffs' claims.

The presence of probable cause is an absolute defense to claims under Section 1983 against police officers for pretrial detention, *Manuel v. City of Joliet, Ill.,* 137 S.Ct. 911, 918 (2017), and under state law for malicious prosecution. *See Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Probable cause exists where the facts and circumstances are such that a reasonably prudent person would believe that the arrestee has committed a crime. *Coleman*, 925 F.3d at 350; *Blackmon v. City of Chi.*, 2023 WL 7160639, at *8 (N.D. Ill. Oct. 31, 2023). That belief does not need to be "correct or even more likely true than false, so long as it is reasonable." *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022). "This is an objective inquiry; [the court] do[es] not consider the subjective motivations of the officer." *Wade*, 783 F.3d at 1087 (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012) (first brackets in original)). Probable cause does not require certainty. Rather, it is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015).

"[P]robable cause is evaluated at the time of the filing of charges on which [Plaintiffs were] held." *Williams v. Martinez*, 22-cv-06602, 2023 WL 6141494, at *4 (N.D. Ill. Sept. 20, 2023) (citing *Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017)). ASA O'Malley approved charges of First-Degree Murder, Aggravated Kidnapping, and Home Invasion on April 5, 1998; and Plaintiffs were subsequently indicted for those same charges by a grand jury on April 27, 1998, (SOF ¶¶ 116, 125, 128), so that is the date on which probable cause is assessed, effectively superseding any prior arrest or judicial hearing. *See U.S. v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003) (indictment supersedes prior proceedings when determining probable cause).

37

Whether this Court assesses probable cause at the time ASA O'Malley approved charges, or at the time of indictment, the Defendant Officers were collectively aware of the following evidence, (i) Mariano and Jacinto Soto were savagely murdered and their children taken from the scene between March 27 and April 1, 1998; (ii) Reyes and Solache were living with Adriana and the two kidnapped children from March 28 until April 3; (iii) Reyes and Solache turned in the missing child, Santiago, along with Rosauro; (iv) Adriana was pretending that Maria, a 2 month-old was her own child whom she told everyone she had given birth to immediately before she brought the children home; (v) Adriana was approximately 5'0' and 164 lbs., there were two adult victims, Jacinta (approximately 5'0" and 175 lbs.) and her husband, Mariano (approximately 5'3" and 161 lbs.), there were signs of a struggle, and Jacinta and Mariano were collectively stabbed over 50 times; (vi) at least one man's voice was heard by a neighbor at the time Jacinta and Mariano were murdered saying something to the effect of, "don't scream, I'm not going to hurt you;" (vii) detectives collected shoes and pants from Adriana's apartment that tested positive for blood; (viii) police discovered a note in Reyes' pocket that mentioned Norma Salazar, the same name Adriana supplied police when falsely explaining her possession of Santiago by claiming that she was watching him for Salazar; (ix) Guadalupe overheard a conversation between Adriana and Reyes after March 28, in which he stated something to the effect of, "[y]ou are the only one that knows. I hope you don't serve me up headfirst"; and most importantly; (x) while Guadalupe and Rosauro forced Adriana to bring the children to the police, Solache and Reyes never raised any concerns, and (xi) Adriana admitted to detectives, at a minimum, that she, Solache and Reyes were present inside the Sotos' home and witnessed the murders of Jacinta and Mariano, that Solache stabbed Jacinta and Mariano, and that she, Reyes and Solache all kidnapped Santiago and Maria. (SOF at ¶¶ 3-7, 12, 25, 27, 29, 35, 41, 70, 86, 87,

38

89, 92-93, 98- 99, 100, 134, 158, 223). To this day, Adriana maintains that this information is true. (SOF at ⁋ 7).

Against that backdrop, Adriana's statements *alone* were enough to establish probable cause—but the Defendant Officers had so much more as detailed above. *See e.g. Moran*, 54 F.4th at 500 (holding that "an eyewitness identification[], even if questionable, [is] enough to give [the police] probable cause to arrest . . . and here there were two witnesses who insisted that [the plaintiff] was the shooter.") (citing *Coleman*, 925 F.3d at 351 (internal quotation marks omitted)); *Blackmon*, 2023 WL 7160639, at *8 ("The Seventh Circuit has repeatedly held that eyewitness identification creates probable cause, even if the identification is questionable or the officers subjectively doubt its accuracy.") (citations omitted); *see also U.S. v 120 South Wareham Lane, Schaumburg, Ill.*, 1996 WL 507244, * 3 (N.D. Ill. Sept. 4, 1996) (finding hearsay statements of co-conspirator are admissible to establish probable cause) (citing *U.S. v. 13138 South School Street, Riverdale, Ill.*, 774 F.Supp. 475, 478 (N.D. Ill. 1991)); *U.S. ex. rel. Porter v. Rednour*, 2012 WL 3101710, * 3 (N.D. Ill. July 30, 2012) ("Hearsay is admissible to establish probable cause when it might not be admissible to prove guilt."); *Mosley v. City of Chi.*, 2009 WL 3097211, * 9 (N.D. Ill., Sept. 22, 2009) (taking into account co-defendants statements in finding probable cause existed for Mosley's arrest and prosecution); *Lane v. Utchman*, 2009 WL 4788780, * 15 (N.D. Ill. Dec. 9, 2009) (statements of three co-defendants implicating petitioner in crime was sufficient for probable cause).

Not to mention the criminal court overseeing Plaintiffs' criminal proceedings found during Plaintiffs' motion to suppress hearings that probable cause existed the moment the co-defendants implicated one another in the crime. (SOF at ⁋ 166); *see Mims*, 2024 WL 1075152, * 16 (while not preclusive, criminal court's ruling was relevant to court's assessment). Thus, the

39

Defendant Officers are entitled to summary judgment on Reyes's unlawful detention claim (Count III) and Plaintiffs' malicious prosecution claims (*Reyes*, Count IX; *Solache*, Count V).

### C. Alternatively, arguable probable cause entitles Defendant Officers to summary judgment on Reyes's Fourth Amendment unlawful pretrial detention claim.

Alternatively, the Defendant Officers are entitled to qualified immunity because the facts set forth above (*supra* at 38-39) arguably created probable cause for Reyes's detention. Qualified immunity protects officers who reasonably but mistakenly conclude that probable cause exists. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999), *as amended* (Jan. 7, 2000); *Tebbens v. Mushol*, 692 F.3d 807, 820 (7th Cir. 2012) (citations omitted). "Arguable probable cause exists when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (emphasis in original). Here, and in light of the authorities already discussed in the preceding section, there was no clearly established law to inform the Defendant Officers that the evidence known to them at the time Reyes was indicted was insufficient to establish probable cause, and qualified immunity bars Reyes's unlawful detention claim (Count III).

### D. Plaintiffs' criminal cases were not dismissed in a manner indicative of innocence.

State law claims for malicious prosecution require a plaintiff to show that his or her criminal prosecution ended via a favorable termination. *Swick*, 662 N.E.2d at 1243. While abandonment of criminal proceedings can equate to a favorable termination under Illinois law, that presumption can be overcome where it can be shown that "the abandonment is for reasons not indicative of innocence of the accused." *Brown v. City of Chi.*, 633 F. Supp.3d 1122, 1169 (N.D. Ill. Sept. 30, 2022) (quoting *Swick*, 662 N.E.2d at 1243). "In determining whether a

plaintiff can establish this element of the claim, it is imperative to examine why prosecutors dropped the charges." *Brown*, 633 F.Supp.3d at 1169. A dismissal via *nolle prosequi* does not indicate innocence when it results from an "impossibility or impracticability of having the accused tried." *Id*. (quoting *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997)).

Here, there can be no doubt that Plaintiffs' criminal prosecutions were *not* dismissed in a manner indicative of their innocence.[14] The only evidence in this case is that ASA Sussman, who carefully reviewed all the evidence in this case, chose to dismiss the charges against Plaintiffs via *nolle prosequi* because their confessions were thrown out as evidence. (SOF at ¶¶ 232, 233). Without their confessions, the CCSAO determined that it could not meet its burden of proof beyond a reasonable doubt (*i.e*. it was impossible and/or impracticable to re-try them). (SOF at ¶ 232); *see also Washington*, 127 F.3d at 557.  In moving to dismiss the charges on December 21, ASA Sussman represented to Judge Obbish that, "there is not a doubt in my mind or the mind of any prosecutor who has worked on this case that Mr. Solache and Mr. Reyes are guilty of these heinous crimes" and described the day as a "tragic day for justice in Cook County."  (SOF at ¶ 233). Sussman's utterance of those words completely undermines Plaintiffs' claims that their criminal trials were dismissed in a manner indicative of their innocence, and thus, Plaintiffs' state law claims for malicious prosecution (*Reyes* Count IX; *Solache* Count V) must be dismissed. *Brown*, 633 F.Supp.3d at 1169.

## V.      Plaintiffs' Conspiracy Claims Fail.

Reyes (only) lodges a claim against the Defendant Officers for Section 1983 conspiracy (*Reyes* Count VI) and both Solache and Reyes bring state law conspiracy claims (*Reyes* Count X;

---

[14] While Plaintiffs later obtained COIs, those are entirely separate non-criminal proceedings. What is relevant here is how Plaintiffs' *criminal cases* were terminated. *Swick*, 662 N.E.2d at 1243 (plaintiff must show *criminal prosecution* ended via a favorable termination).

41

*Solache* Count VII).

Like the failure to intervene claims, a federal conspiracy claim is derivative of their constitutional claims, and similarly, a state law conspiracy claim is derivative of the state law malicious prosecution claims. As demonstrated throughout this brief, Plaintiffs' constitutional claims for Due Process cannot survive against *any* Defendant, Reyes's claim for unlawful detention cannot survive against *any* Defendant, and Plaintiffs' malicious prosecution claims cannot survive against *any* Defendant, and thus Reyes's derivative federal claim of conspiracy cannot survive as to those dismissed constitutional claims and both Plaintiffs' state law conspiracy claims fail entirely. *See, e.g.*, *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (stating conspiracy is not an independent basis of liability in Section 1983 actions); *Drager v. Village of Bellwood*, 969 F.Supp. 2d 971, 983 (N.D. Ill. 2013) (conspiracy is not an independent basis of liability under Section 1983); *see also Kuri v. City of Chi.*, 2014 WL 114283, * 8 (dismissing derivative federal and state-law conspiracy claims to extent underlying claims were dismissed); *Johnson v. Dossey*, 878 F.Supp. 2d 905, 918 (N.D. Ill. Mar. 30, 2012) (finding plaintiff needed to show a genuine issue of material fact exists as to one or more of the underlying state law torts for her state conspiracy claim to survive).

> **A.** **Reyes cannot show a meeting of the minds in his conspiracy claims against Halvorsen, Dickinson and Rutherford.[15]**

To meet his burden on conspiracy, Reyes must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Wheeler v. Piazza*, 364 F. Supp.3d 870, 880 (N.D. Ill., Mar. 5, 2019).

---

[15] As noted above, only Reyes brings a federal conspiracy claim, not Solache.

While Dickinson and Rutherford were in the room when Trevino was interpreting for Reyes, as argued above, there is no evidence Dickinson or Rutherford knew what Reyes was saying–they could not understand the conversation Trevino and Reyes were having because of the language barrier. And there is no evidence that at any point, they observed anyone threaten or physically abuse Reyes. Halvorsen on the other hand was not present for Reyes's interview *at any point*. As a result, Halvorsen, Dickinson and Rutherford would have to rely on information provided to them by the individuals interpreting Reyes's statement. Finally, the record is void of any evidence Trevino, Dickinson and Rutherford formed an "express or implied agreement" to coerce or fabricate Reyes's confession. *Wheeler*, 364 F. Supp.3d at 880. As a result, Reyes' conspiracy claim additionally fails as to his coerced and/or fabricated confession claim against Halvorsen, Dickinson and Rutherford.

Additionally, dismissal is warranted on the conspiracy claims because they are barred pursuant to the intra-corporate conspiracy doctrine.

**B. Defendant Officers are entitled to qualified immunity based on the intra-corporate conspiracy doctrine.**

Defendant Officers are entitled to qualified immunity on Reyes's Section 1983 conspiracy claims because "it cannot be said that the law [was] clearly established on this point…[t]hat is, reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)." *Haliw v. City of South Elgin*, 2020 WL 1304697, at *4 (N.D. Ill. March 3, 2020) (finding liability is not clearly established for conspiracies amongst police officers of a single municipality because the law was unsettled on whether the intracorporate conspiracy doctrine applies to Section 1983 claims) (*comparing Jackson v. City of Cleveland*, 925 F.3d 793, 819–20 (6th Cir. 2019) (the intracorporate conspiracy doctrine applies to Section

1983 just as it does to Section 1985 claims because both create "cause[s] of action against any 'person' who deprives a plaintiff of his rights[.]"), *with Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971, 985 (N.D. Ill. 2013) ("The Seventh Circuit has yet to decide whether the doctrine applies to § 1983 conspiracy claims, and district courts in this Circuit are split on whether it does.").

At issue in *Haliw* was an alleged conspiracy to frame the plaintiff in 2017. Here, the issue is an alleged conspiracy among Defendants in 1998. If the law was unsettled in 2017, it was certainly unsettled almost a quarter of a century prior in 1998, and the Defendant Officers are entitled to qualified immunity on Reyes's federal conspiracy claim (*Reyes* Count VI).

**VI.      Halvorsen, Dickinson and Rutherford are Entitled to Summary Judgment on Plaintiffs' Intentional Infliction of Emotional Distress ("IIED") Claim.**

Plaintiffs further allege that the Defendant Officers' wrongful acts caused them extreme emotional distress. (*See Reyes*, Dkt. 396, Count VIII, *Solache*, Dkt. 224, Count VI). However, Plaintiffs cannot meet the essential elements of this claim as to Halvorsen, Dickinson and Rutherford. To prove an IIED claim under Illinois law, a plaintiff must demonstrate that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe distress." *Swearnigen–El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 864 (7th Cir. 2010).

**A.      Where Plaintiffs' underlying claims fail against Halvorsen, Dickinson and Rutherford, so do their IIED claims.**

Here, Plaintiffs' IIED claims are based on the same conduct that allegedly violated their constitutional rights. Because Plaintiffs underlying claims fail against Halvorsen, Dickinson and Rutherford—so do Plaintiffs' IIED claims against them, as they cannot demonstrate the "extreme and outrageous" conduct necessary to support their IIED claims against them. *See Cooney v.*

44

*Casaday*, 746 F.Supp.2d 973, 977–78 (N.D. Ill. 2010) (plaintiff's IIED claim must fail when it is premised on alleged constitutional violations that fail). Accordingly, summary judgment is appropriate for Halvorsen, Dickinson and Rutherford on Plaintiffs' IIED claims (*Reyes* Count VIII; *Solache* Count VI)

## CONCLUSION

For the foregoing reasons, Defendants JoAnn Halvorsen as Special Representative of defendant Ernest Halvorsen (deceased), Edwin Dickinson, Robert Rutherford, and Daniel Trevino, are entitled to summary judgment on the above-mentioned claims against them, and respectively request this Court grant their motion against Plaintiffs and in favor of the Defendant Officers and for any further relief this Court deems just and proper.

Date: April ___, 2024

Respectfully submitted,

/s/ Josh M. Engquist
JOSH M. ENGQUIST, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Defendants Halvorsen,*
*Dickinson, Rutherford, Trevino, Mingey, Biebel,*
*and Cappitelli*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
Allison L. Romelfanger
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
jengquist@jsotoslaw.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on April _, 2024, I electronically filed the foregoing **Defendant Officers' Memorandum of Law in Support of Their Motion for Partial Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed on the below Service List:

***Attorneys for Plaintiff Arturo Reyes***
Jon Loevy
Steve Art
Anand Swaminathan
Rachel Brady
Sean Starr
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312)243-5900
jon@loevy.com
steve@loevy.com
anand@loevy.com
brady@loevy.com
sean@loevy.com

***Attorneys for Defendant City of Chicago***
Eileen E Rosen
Catherine M. Barber
Theresa B. Carney
Austin Rahe
Rock Fusco & Connelly, LLC
333 N. Wacker, 19th Floor
Chicago, IL 60654
(312)494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com
pmoran@rfclaw.com

***Attorneys for Plaintiff Gabriel Solache***
Jan Susler
Ben H. Elson
Nora Snyder
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773)235-0070
jsusler@peopleslawoffice.com
ben.elson79@gmail.com
norasnyder@peopleslawoffice.com

***Attorneys for Defendant Guevara***
James V. Daffada
Thomas M. Leinenweber
Michael J. Schalka
Gabrielle Rose Sansonetti
Leinenweber, Daffada & Sansonetti, LLC
120 N. LaSalle St, Suite 2000
Chicago, IL 60602
(312)663-3003
jim@ilesq.com
thomas@ilesq.com
gabrielle@ilesq.com

/s/Josh M. Engquist
JOSH M. ENGQUIST, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Defendants Halvorsen, Dickinson, Rutherford, Trevino, Mingey, Biebel, and Cappitelli*

46