# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | Case No. 18 C 1028 |
| *Plaintiff*, | ) | |
| | ) | Hon. Steven C. Seeger, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 18 C 2312 |
| *Plaintiff*, | ) | |
| | ) | Hon. Steven C. Seeger, |
| v. | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' STATEMENT OF THE CASE AT SUMMARY JUDGMENT**

## INTRODUCTION

Defendants have moved for summary judgment on all of Plaintiffs' claims and theories, with the exception of Plaintiffs' claims that Defendant Guevara and Defendant Trevino each coerced confessions from Reyes and Solache. As to all other claims and theories, Defendants move for summary judgment, through different motions brought by (1) Defendant Guevara; (2) the non-Guevara Detectives involved in the homicide investigation (Defendants Halvorsen, Rutherford, Dickinson, and Trevino); (3) the Sergeants supervising the detectives on the homicide investigation (Defendants Mingey, Biebel, and Cappitelli); and (4) Defendant City of Chicago, seeking to dismiss all of Plaintiff's *Monell* claims.

For their part, Plaintiffs have filed a partial motion for summary judgment motion concerning a single *Monell* theory that the City maintained an unconstitutional policy and practice of suppressing exculpatory evidence. Plaintiffs raise two arguments: (1) that the City is precluded from denying it had such a policy and practice, based on two prior jury findings on this issue, and (2) that the express policy theory of file suppression is unrebutted by any defense expert or any other evidence that would create a dispute of fact.

Because Defendants have not moved for summary judgment on all claims, there is going to be a trial no matter how these motions are decided. But even for the claims on which Defendants have moved, all turn on disputed facts, rending summary judgment unavailable.

### Basic Facts

Arturo De Leon-Reyes and Gabriel Solache were convicted of the 1998 double murder of Mariano and Jacinta Soto, and the kidnapping of their two young children, a baby girl and a young boy. The Sotos were both stabbed to death in their home, with dozens of stab wounds on

1

their bodies. Despite a gruesome, bloody crime scene, no physical evidence has ever connected Reyes or Solache to the crime.

There is no dispute by any party that Adriana Mejia committed the crime. She had pretended to be pregnant, and when it was time to go to the hospital to deliver, she instead went to the Soto home and killed the Sotos and kidnapped the children, pretending the baby was her own, and that she was watching the boy for a woman she met at the hospital. Her DNA was found at the crime scene, and the two Soto children were in her custody.

Several days later, Mejia family members and others renting rooms in the Mejia house saw news reports about the missing children and recognized the boy as the one in their home. Plaintiffs Reyes and Solache (who knew nothing about the murder and the true circumstances by which these children actually came to be in the Mejia home) volunteered to accompany Adriana's husband to take the boy to the police station. Based on that fateful decision, they became suspects, were questioned, and were not free again for 22 years.

The Defendants eventually broke Reyes and Solache during the resulting interrogation. They were particularly vulnerable: they were young, spoke little English, and had only recently immigrated to this country. They were convicted based primarily on confessions extracted from each of them in police custody, as well as the confession of Adriana Mejia, in which she pointed the finger at Reyes and Solache.

Reyes and Solache testified during their criminal proceedings, and consistently ever since, that they were beaten and coerced into falsely confessing. The true perpetrator, Adriana Mejia, has testified that she, too, was beaten into giving her confession implicating herself and Reyes and Solache.

Reyes and Solache have steadfastly maintained their innocence for decades. They are excluded from all DNA and other physical evidence. They have Certificates of Innocence from the State of Illinois. The City hired the law firm Sidley Austin to conduct a thorough investigation into Reyes and Solache's allegations; *and the City's own investigation concluded that both men had been physically abused by Defendant Guevara.*

### The Claims Against the Defendants

<u>Detective Reynaldo Guevara</u> does not deny having violated the Plaintiffs' rights in the manner alleged. When given the opportunity to defend himself during discovery, he instead elected to avail himself of the Fifth Amendment privilege against self-incrimination, which can only be asserted based on a well-founded belief that truthful answers could incriminate him.

Despite pleading the Fifth in response to every question about his conduct in the Soto investigation, including whether he abused and coerced Reyes and Solache into false confessions, falsified evidence, and concealed exculpatory evidence, Guevara has turned around and sought summary judgment in this case. This is despite the fact that he was involved in fabricating nearly every aspect of the evidence against Reyes and Solache in this case, including the following:

- He interrogated Reyes and Solache, during which (they both have testified) they were abused, threatened, and fed facts of the crime to obtain their false confessions.
- He interrogated Adriana Mejia, in which she testified she was abused and threatened, resulting in her confession falsely implicating Reyes and Solache.
- He interviewed multiple witnesses, including members of the Soto family, who were treated as suspects and subject to interrogation. He signed reports about the interviews of those witnesses that omitted and concealed that they had been suspects.
- He signed the cleared and closed report documenting the false confessions of Reyes and Solache, the fabricated confession of Adriana Mejia, and much of the rest of the fabricated evidence used to implicate Reyes and Solache.
- He was present and involved in getting Solache and Guadalupe Mejia to sign false handwritten statements written by felony review prosecutors, based on the coercive tactics he had used during his earlier interrogations.

3

- He testified against Reyes and Solache at their criminal trials.

There is much more, but no need to pile on for purposes of this position statement. Based on Guevara's assertion of the Fifth on every one of these subjects combined with other evidence of misconduct—not the least of which is Plaintiffs' express accounts under oath—there is a factual dispute that requires a trial and renders summary judgment unavailable. That factual dispute is further bolstered by ample additional evidence, including the criminal trial, post-conviction and deposition testimony of Reyes, Solache, Adriana Mejia, and the many other witnesses Guevara interviewed and interrogated who have provided direct evidence of his misconduct, mistreatment, and suppression of evidence.

<u>Detective Ernest Halvorsen</u> was Guevara's long-time partner, and is the person who drafted nearly every police report also signed by Defendant Guevara, including the cleared and closed report documenting Reyes and Solache's false confessions. He died before being deposed in this matter and has thus not denied Plaintiffs' allegations. The evidence of his involvement in the investigative misconduct in this case includes, but is not limited to:

- He was assigned to the investigation with Guevara and they went to the crime scene together and were the first detectives to walk through the apartment and learn information about how the crime had occurred.
- He participated in the interrogations of Adriana Mejia that resulted in her statement falsely implicating Reyes and Solache.
- He was present and involved in getting Adriana Mejia to sign a handwritten statement written by a felony review prosecutor that falsely implicated Reyes and Solache, based on the coercive tactics used during his earlier interrogations.
- He was at Area 5 participating in interrogations throughout the time Solache and Reyes were being subjected to physical abuse, threats, and other misconduct.
- He *wrote* and signed the cleared and closed report documenting the false confessions of Reyes and Solache, the fabricated confession of Adriana Mejia, and much of the rest of the fabricated evidence used to implicate Reyes and Solache.
- Like Guevara, he interviewed multiple witnesses, including members of the Soto family, who were treated as suspects and subject to interrogation. He wrote and signed reports about those interviews that omitted and concealed that they had been suspects.

4

- He wrote and signed additional police reports falsely documenting the interviews he and Guevara conducted of members of the Soto family, including Jose Aranda, Rosa Aranda, Alfredo Aranda, Jorge Soto, and Felicia Soto. Those reports omitted the fact that those family members were treated as suspects, concealed information the family members told the detectives that undermined the detectives' theory of the case, and instead contained false information disavowed by the family members at their depositions.
- Creating a reasonable inference that Halvorsen knew the confessions were false, after they obtained the false confessions of Reyes and Solache, Halvorsen inexplicably ordered DNA and other forensic testing to be stopped, including possible blood stains found on a box of knives at the crime scene and a vehicle suspected to have been used in the crime.

Detective Daniel Trevino participated in multiple interrogations resulting in false statements implicating Plaintiffs and created reports documenting his fabrications. The evidence of his involvement in the misconduct in this case includes, but is not limited to:

- Trevino was a Youth Officer and not a Detective in 1998 and in such a capacity should not have been independently investigating a homicide or interrogating suspects.
- He participated in the interrogation of Reyes, including a session in which Reyes was taken to a larger conference room with a chalkboard where Defendants provided information about the crime and how it had occurred. Trevino spoke Spanish and used the information on the chalkboard to feed Reyes facts about the crime to be used in a confession statement. Reyes repeatedly denied any knowledge of the facts being fed to him, but Trevino and the other detectives nevertheless claimed that Reyes confessed to the crime during that meeting. In that same interrogation session, in Trevino's presence, Guevara threatened Reyes with the electric chair.
- He came in and out of interrogations with Reyes, often playing the good cop role after Guevara had been in the room playing the bad cop role, and subjecting Reyes to abuse and threats. Trevino then came in and told him that if he would just sign a statement for the State's Attorney, Trevino could help him be released and return to his family.
- He fully participated in getting Reyes to sign a handwritten statement written by a felony review prosecutor that falsely implicated Reyes and Solache, based on the coercive tactics used during the interrogations Trevino participated in. Trevino translated for the English-speaking prosecutor, telling him Reyes had walked through his involvement in the crime, when in fact it was Trevino that was reciting the story, not Reyes.
- He participated in multiple interrogations of Adriana Mejia, using the same sorts of coercive tactics to convince her to sign a false statement implicating Reyes and Solache.
- He interviewed Guadalupe Mejia, Adriana's family member, after which Trevino falsely claimed that Guadalupe had given a statement about a phone call to the Mejia home in

5

- which Reyes incriminated himself. This was then memorialized in the cleared and closed report. No such incriminating statement was ever made.
- The closing report and handwritten statement documenting the interviews of Guadalupe Mejia omitted that she had been treated as a suspect and accused of the crime, a concealment that would explain why she eventually signed a false statement that Reyes implicated himself on a phone call.
- Before trial, more than a year and a half after the homicide investigation had concluded, Trevino wrote a police report claiming that back when he interrogated Adriana Mejia, she had acted out her involvement in stabbing one of the victims during an interrogation by Trevino. That report was fabricated: Other police reports, plus other Defendants' testimony, indicate that it was made-up, providing additional evidence of Trevino's involvement in an orchestrated set of interrogations and misconduct to frame Plaintiffs.

Detectives Robert Rutherford and Edwin Dickinson participated in two of the key interrogations resulting in false and fabricated confessions implicating Plaintiffs. The evidence of their involvement in the investigative misconduct in this case includes, but is not limited to:

- Rutherford and Dickinson participated in the interrogation of Reyes, including a session in which Reyes was taken to a larger conference room with a chalkboard providing information about the crime and how it had occurred. In the presence of Rutherford and Dickinson, Reyes was asked about the information on the chalkboard, and he repeatedly denied any knowledge of the facts being fed to him. In that same interrogation session, in Rutherford and Dickinson's presence, Guevara threatened Reyes with the electric chair.
- Nevertheless, Rutherford and Dickinson wrote handwritten notes falsely claiming that Reyes had confessed to his involvement in the murders and kidnapping during that interrogation.
- Rutherford and Dickinson also participated in the interrogation of Adriana Mejia, in which they falsely claimed that Adriana was implicating Reyes as participating in the crime with her.
- Rutherford and Dickinson wrote handwritten notes falsely claiming that Adriana had implicated Reyes during that interrogation.
- The false information contained in Rutherford and Dickinson's fabricated GPRs was then further memorialized in Defendants Guevara and Halvorsen's cleared closed report summarizing the fabricated evidence used to frame Reyes and Solache.[1]

---

[1] Rutherford and Dickson allege that they do not speak Spanish and because Plaintiffs did not speak English, these Defendants claim they were relying on and relaying the tainted information provided by Guevara and Trevino. It remains to be seen at trial whether the latter Detectives will try to point the finger back at Rutherford and Dickson.

<u>Sergeants Ed Mingey, Robert Biebel, and Frank Cappitelli</u> were the supervisors overseeing this investigation. They were responsible for monitoring the investigation, and ensuring that proper procedures were being followed during the interrogations, and that the information learned during interviews and interrogations was being documented. Evidence of their investigative misconduct includes, but is not limited to:

- This was a "heater case," given the kidnapping of two children, and so all supervisors, from sergeants to commanders, were paying careful attention to the progress of the investigation.
- Sergeants such as Biebel, Mingey, and Cappitelli are responsible for the suspects and witnesses that are brought to Area 5, and expect to be kept abreast of who is there, in what rooms, and any updates on what is happening in the interrogation rooms.
- The interrogation rooms where Reyes, Solache, and other witnesses were interrogated looked out into the open area where the detectives sat, and were in very close proximity to the sergeants' office. As multiple defendants admit, if there was physical abuse and threats occurring as Reyes and Solache described it and as the City's investigators from Sidley Austin concluded had occurred–and as this Court must accept at summary judgment—the supervisors would have known about it.
- Rosauro Mejia, Adriana Mejia's husband, was also interrogated and eventually released and never charged. He testified that he was also subjected to physical abuse and threats throughout his interrogations. He testified that he was beaten by Defendant Guevara, while being held down by other detectives, and that this all occurred in the open area outside the sergeants' office where everyone could see. The City's investigators from Sidley Austin found Rosauro Mejia's claims of physical abuse to be credible.
- Defendant Cappitelli signed and approved numerous fabricated reports, including the cleared and closed report, and the Rutherford and Dickinson GPRs.
- Defendant Biebel signed and approved Guevara and Halvorsen's police reports falsely documenting the interviews of numerous witnesses including members of the Soto family such as Felicia Soto, Raul Aranda, Rosa Aranda, Alfredo Aranda, and Jose Aranda.
- Defendant Mingey was the regular supervisor of Guevara and Halvorsen on the third watch (evenings), and originally assigned them to the investigation and was overseeing the investigation through the earliest hours in which the Soto family members were being interrogated and treated as suspects, but not documented accurately as such.[2]

---

[2] At least some of these Defendants have been found liable on this same theory at other similar Guevera wrongful conviction trials, such as Mingey in the *Jacques Rivera* case.

7

For these reasons, none of the individual Defendants will be entitled to summary judgment on Plaintiffs' clearly established claims for violations of their Fifth Amendment rights, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018); their right to due process and a fair trial caused by knowing fabrications and suppressions of evidence, *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988); their malicious prosecution and illegal detention without probable cause, *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017); or the other federal and state claims that flow from the same misconduct.

Nor can these Defendants make any purely legal defense to any of those claims: There is no qualified immunity for this misconduct occurring in 1998 and later, as the cases cited above hold, and supervisors cannot assert a lack of personal involvement (to the extent that is a legal, not factual, argument), *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007) (supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see'"); the fabricated evidence was used in criminal proceedings to deprive the Plaintiffs of due process, *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) ("We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*.") (emphasis added); and there is no colorable reasonable diligence argument, *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence."); *Anderson v. Rockford*, 932 F.3d 494, 507-09 (7th Cir. 2019) (reversing summary judgment grant where there was evidence of an

8

active effort to suppress third-party witness statements), certainly not at summary judgment, *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432 (N.D. Ill. 2011 ("What was available through reasonable diligence . . . is very much in dispute.").

Also misplaced is Defendants' attempts to parse out Plaintiffs' due process claims into constituent components. Because the inquiry turns on the totality of the evidence in the aggregate, the Seventh Circuit has made extremely clear that once a court decides there is enough evidence to surmount summary judgment on any fair-trial theory in a case, there is no need to analyze every item of withheld or fabricated evidence and every sub-theory of liability. *Goudy v. Cummings*, 922 F.3d 834, 844 (7th Cir. 2019) (once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); *Camm v. Faith*, 937 F.3d 1096, 1108-09 (7th Cir. 2019).

Finally, Defendant Guevara cannot even get off the starting block. He has asserted his Fifth Amendment rights on all material facts. *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992). A jury must be expressly instructed that they can draw adverse inferences against a party asserting the Fifth Amendment in civil litigation, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), and so where a Defendant asserts his Fifth Amendment rights to avoid answering questions about material facts, then moves for summary judgment, the Court must draw an inference against that Defendant on those material facts, *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) (inference based on an assertion of the privilege may be drawn against even the non-moving party at summary judgment). Guevara bears the initial burden at summary judgment of establishing the absence of genuine disputes of material fact for trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); 10A Wright & Miller, Federal Practice

9

& Procedure §2727.1, at 455-56 (4th ed. 2016). He cannot discharge that initial burden given his assertion of the Fifth, and so his motion for summary judgment should be summarily denied.

The City of Chicago: Turning to the City's liability, the City similarly cannot establish an entitlement to summary judgment on any of the *Monell* theories at issue. The City moves for summary judgment on *Monell* claims whose theories are supported by evidence that multiple courts in this District have already determined survive summary judgment, on which federal juries have already found the City liable, after which multiple judges have denied the City's post-trial motions, and the Seventh Circuit, in one case, has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), *Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D. Ill. 2018); *Washington*, 2022 WL 4599708, at *17.

On the evidence suppression theory, the City having lost repeatedly in such similar cases, not only is summary judgment inappropriate on a theory that no reasonable jury could disagree with the City, but the City should in fact be precluded from re-litigating whether it had an official policy of evidence suppression at the relevant time. *Reyes* Dkt. 687 at 4-17 (Plaintiffs' affirmative summary judgment motion explaining this preclusion argument). And with respect to the theory that the City had a custom of coercing confessions using physical and psychological coercion, Plaintiffs have offered a huge volume of evidence of the City's pattern and practice over an extended period of time—thousands of pages of records from more than 200 cases in which arrestees were subjected to physically abusive and coercive interrogations—most of which the City does not contest at all. Nor does the City offer a contrary expert with a different opinion. There is no good faith basis to move for summary judgment on these claims either.

                                     Respectfully submitted,

By: /s/ Jon Loevy                      By: /s/ Ben H. Elson
*One of DeLeon Reyes's Attorneys*       *One of Solache's Attorneys*

Jon Loevy                                     Jan Susler
Anand Swaminathan                   Ben H. Elson
Steve Art                                     Nora P. Snyder
Rachel Brady                           **PEOPLE'S LAW OFFICE**
Sean Starr                                  1180 N. Milwaukee Avenue
Annie Prossnitz                         3rd Floor
Meg Gould                                 Chicago, IL 60642
**LOEVY & LOEVY**                   (312) 235-0070
311 N. Aberdeen Street              jsusler@peopleslawoffice.com
Chicago, IL 60607
(312) 243-5900
jon@loevy.com