IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-01028 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-02312 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUBMISSION ON SUMMARY JUDGMENT**

**Introduction:** Plaintiff Reyes's counsel advised the Court last week that "this is a case where there's an alleged coerced confession. It's binary; either they're guilty, and they confessed, or in fact, they were abused and falsely confessed." (Ex. A, May 24, 2024 Hrg. Tr. at 23.) Defendants ***completely agree***. And to that point, Defendant Guevara is not seeking summary judgment on either Plaintiff's coerced/fabricated confession claim, Defendant Trevino is not seeking summary judgment on Plaintiff Reyes's fabricated confession claim, and that is what the trial of this case should concern. And if that were the case, there would be no summary judgment proceedings at all and we could have a two-week trial as soon as the Court could schedule it.

Notably, Plaintiff Reyes's counsel advised the Court that in the first Guevara lawsuit to reach trial in 2009, *Johnson v. Guevara*, 05 C 1042, no summary judgment motion was brought. That fact perfectly illustrates Defendants' point. Johnson sued one Defendant, Guevara, on one federal claim (due process fabrication/withholding of evidence) and there was no *Monell* claim. The case was tried without any summary judgment proceedings over the course of two weeks and Johnson obtained a $21 million dollar verdict for eleven years in prison (later settled for $14.75 million pending appeal). (Ex. B, *Johnson*, Dkt. 284.) Flash forward almost a decade, to *Rivera v. Guevara,* 12 C 4428, where Plaintiff brought a wide-ranging *Monell* claim, in addition to suing twelve other individuals, which led to expansive summary judgment proceedings, which saw many claims dismissed against various defendants (Ex. C, *Rivera*, Dkt. 373). By the time the case went to verdict only four individual defendants remained because Rivera dismissed six of them on the first day of trial and 2 more during trial. (Ex. D, *Rivera*, Dkt. 651.) The verdict in that case was for $17 million for 21 years in prison, *or less than half o*f what Johnson received per year in custody.

Here, Plaintiffs have twelve (*Reyes*) and nine (*Solache)* counts against nine other Defendants which Defendants believe are insufficient to withstand trial.

1

**The confession-related claims (*Reyes* Count I, *Solache* Count I):** Dets. Dickinson, Rutherford, Halvorsen and Youth Officer Trevino are entitled to summary judgment on Solache's claims because there is no evidence that they participated in *any* of his interrogations or were aware of any misconduct allegedly perpetrated by Guevara during his interrogations. As to Reyes, Halvorsen did not participate in his interrogations, and there is no evidence that Halvorsen, Dickinson or Rutherford were made aware of any misconduct that Guevara allegedly perpetrated during Reyes's interrogations. While Dickinson and Rutherford were present when Trevino translated Reyes's statements to English during an interview, neither Dickinson nor Rutherford spoke Spanish and there is no evidence that they had any reason to doubt the accuracy of Trevino's translations. Thus, there is no evidence against any Defendant other than Guevara or Trevino.

***Brady* Claims (*Reyes*, Count IV, *Solache* Count II):** This is not a *Brady* case. Plaintiffs have no evidence that (1) crime scene photographs, (2) witness interview notes, (3) polaroid photos of the victims' family members or (4) contents of a "large bag of evidence" were suppressed, exculpatory, or material to the defense, or that any Defendant intentionally or recklessly concealed any allegedly suppressed evidence. Summary judgment is appropriate on the claim in its entirety.

**Fabrication of Witness Statements (*Reyes*, Counts II & IV; *Solache* Count II):** Plaintiffs allege that "Defendants", without specifying which, manufactured the trial testimony of witnesses Guadalupe Mejia, Alfredo Aranda or Rosauro Mejia. However, these claims fail against all Defendants because each witness has consistently confirmed, through civil depositions, that the testimony they provided at Plaintiffs' criminal trials was truthful. And any differences between the witnesses' current recollections and the police reports of their interviews are inconsequential for purposes of a fabrication claim because the statements reflected in the reports were not introduced at Plaintiffs' trials.

Further, while Plaintiffs broadly allege that "Defendants" fabricated police reports, Dickinson, Rutherford, and Trevino are entitled to summary judgment because none of their reports were used against Plaintiffs at their trials. While Halvorsen's report was used to refresh Guevara's recollection of statements that Reyes made to Guevara during his interrogation, Halvorsen was not present at Reyes' interrogation and there is no evidence that Halvorsen had any reason to know that Guevara misreported any aspect of the interrogation to Halvorsen which he included in his report. As a result, Reyes cannot demonstrate that Halvorsen knowingly fabricated any information about his interrogation.

**Reyes's Unlawful Detention and Plaintiffs' State Law Malicious Prosecution Claims:** All Defendants are entitled to summary judgment on Reyes's claim for unlawful pretrial detention (*Reyes*, Count III)[1] and both Plaintiffs' state law claims for malicious prosecution (*Reyes* Count IX; *Solache* Count V) because, independent of their confessions, probable cause for both Plaintiffs' prosecutions was clearly present based on: (1) the Sotos' were murdered and their children kidnapped between March 27 and April 1, 1998; (2) Reyes and Solache were living with Adriana and the kidnapped children from March 28 until April 3; (3) Reyes and Solache, along with Rosauro, turned in the missing boy, Santiago; (4) Adriana was pretending that Maria was her own child whom she told everyone she had birthed; (5) Adriana was 5'0", 164 lbs., and the two adult victims, Jacinta (5'0", 175 lbs.) and Mariano (5'3", 161 lbs.), were stabbed over 50 times; (6) a man's voice was heard by a neighbor at the time of the murders saying "don't scream, I'm not going to hurt you"; (7) detectives collected bloody shoes and pants from Adriana's apartment; (8) police discovered a note in Reyes' pocket that mentioned Norma Salazar, the same name Adriana supplied police when falsely explaining her possession of Santiago by claiming that she was

---

[1] Solache did not bring a Fourth Amendment Claim.

watching him for Salazar; (9) Guadalupe overheard Reyes tell Adriana on March 28, "[y]ou are the only one that knows. I hope you don't serve me up headfirst"; (10) when Guadalupe and Rosauro told Adriana the children had to be taken to the police, Solache and Reyes raised no concerns, and (11) Adriana told detectives that Solache stabbed both victims and Adriana, Reyes and Solache all kidnapped the children.

Alternatively, Halvorsen, Dickinson, Rutherford and Trevino are entitled to qualified immunity on Reyes's Fourth Amendment claim (*Reyes*, Count III) because Defendants had probable cause to charge them with the murders and kidnappings.

Defendants Halvorsen, Dickinson, Rutherford and Trevion are additionally entitled to summary judgment on Plaintiffs' state law claims for malicious prosecution (*Reyes* Count IX; *Solache* Count V) because Plaintiffs' criminal prosecutions were not dismissed in a manner indicative of innocence. Specifically, when the State dismissed the charges, First Assistant Cook County State's Attorney Eric Sussman told Judge Obbish that, "there is not a doubt in my mind or the mind of any prosecutor who has worked on this case that Mr. Solache and Mr. Reyes are guilty of these heinous crimes" and described the day as a "tragic day for justice…"

**Failure to Intervene Claim.** Failure to intervene claims are largely dependent on proof that a defendant had an opportunity to prevent a constitutional violation. Such opportunities rarely present themselves unless a Defendant was present for and aware of the alleged misconduct. Thus, Defendants' summary judgment motions on the derivative failure to intervene claims largely track their lack of personal involvement arguments. With respect to the confession-related claims, only Guevara, and as to Reyes, Trevino, had any involvement in the alleged misconduct. But both of those Defendants have conceded to a trial on those claims, and they cannot additionally be sued for failing to intervene in their own misconduct.

In addition, all Defendants are entitled to summary judgment on the failure to intervene claims premised on the *Brady*, fabricated witness testimony, and unlawful pretrial detention claims, as those underlying claims lack sufficient supporting evidence to set forth constitutional claims for trial. Since failure to intervene claims are derivative of the underlying constitutional claims there can be no liability for failing to intervene.

**Plaintiff's Conspiracy Claims:** Similarly, the lack of personal involvement arguments largely track Halvorsen, Dickinson, Rutherford and Trevino's claims to summary judgment on Plaintiffs' derivative conspiracy claims. And, as with the failure-to-intervene claims, the derivative conspiracy claims cannot survive the dismissal of the unconstitutional claims for fabricated witness testimony and police reports, unlawful detention, and malicious prosecution.

Further, all Defendants are entitled to qualified immunity on Reyes's federal conspiracy claim (*Reyes*, Count VI), based on the lack of a consensus as to whether the intra-corporate conspiracy doctrine—which holds that members of the same entity cannot be held liable for conspiring only with each other— applies to claims under 42 U.S.C. Section 1983 as it undoubtedly does to claims under 42 U.S.C. Section 1985.

**Intentional Infliction of Emotional Distress:** Halvorsen, Dickinson and Rutherford are entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claims (*Reyes* Count VIII; *Solache* Count VI) because Plaintiffs cannot demonstrate that Halvorsen, Dickinson or Rutherford engaged in the "extreme and outrageous" conduct necessary to support their claims, specifically because they are unable to meet their burden of proof against those Defendants on their underlying constitutional claims.

**Supervisory Defendants:** Defendants Mingey, Biebel and Cappitelli were sergeants at Area 5 at the time of the Soto homicide investigation. They are entitled to summary judgment on

5

each of Plaintiffs claims against them because they had little to no involvement in the investigation and no participation in or awareness of any of the misconduct Plaintiffs allege. As a result, Plaintiffs cannot meet the high burden to show supervisor liability on the part of any them.

**The *Monell* claim (*Reyes*, Count VII; *Solache* Count IV):** This Court addressed the *Monell* claim in these cases when deciding the appropriate scope of only one piece of *Monell* discovery,[2] and noted that "the breadth of the requests [for the homicide files] is sweeping, both in the number of other cases (343) and in the volume of pages (50,000)." (*Reyes*, Dkt. 384.) It is the sheer breadth of Plaintiffs' *Monell* claims, that extend well beyond the homicide files referred to in the order, that has dictated the breadth of both the City's motion for summary judgment and its *Daubert* motions. In that same order, this Court explained that the *Monell* claim must have a "firm and definable connection to the case at hand," and a "concrete link" between the alleged misconduct and the other criminal investigations. This Court further identified additional potential issues with the discovery sought "such as the need to identify the perceived deficiencies in the City's policies and practices at an appropriate level of generality, so they are sufficiently tailored to inform this case." This Court also raised questions about 1) Plaintiffs' arguments regarding "missing" documents which assumes that the defense counsel's files are complete (which discovery has shown is an incorrect assumption); 2) their arguments about failing to create the documents in the first place (their expert was unable to identify any "data" from the files to support this theory); 3) how the files would show "evidence of coerced confessions" in other cases (which they did not and their expert did not rely on a single one and instead Plaintiffs produced thousands of pages of documents representing cherry-picked information from hundreds of other cases after fact discovery closed and during the expert phase, a subset of which was relied upon by their expert

---

[2] As this Court noted, there are many docket entries in these cases due in large part to the scope and breadth of the *Monell* claims its accompanying discovery. *See e.g.*, Reyes, Dkt. 424, 446, 455, 503, 562, 576.

instead). And while this Court overruled the City's Rule 72 objection, the Court expressly reserved its decision on the admissibility of Plaintiffs' Monell evidence for "another day." That day has come and none of the "evidence" developed in this case supports a finding against the City on Plaintiffs' *Monell* claims. Accordingly, the City of Chicago moved for summary judgment.

The *Monell* claim rests on three pattern and practice theories of liability:[3] 1) withholding *Brady* evidence, also referred to as their "street file" theory; 2) failing to discipline and supervise; and 3) coercing confessions. Additionally, because each of Plaintiffs' *Monell* theories depends nearly exclusively on Plaintiffs' three disclosed experts, the City brought *Daubert* motions seeking to bar each of them: 1) Thomas Tiderington, who opines on Plaintiffs' "street files" theory; 2) Anthony Finnell, who opines on CPD's oversight systems; and 3) Dr. Richard Leo, who opines on CPD's purported policy of coercing confessions from mostly minority suspects.

Plaintiffs' "street files" theory is rooted in a dramatic mischaracterization of the file keeping systems in place over forty years ago (and sixteen years before Plaintiffs' arrests and prosecutions) that changed dramatically after two lawsuits were filed, *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) and *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*") and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ("*Palmer II*"). Relying on an inaccurate reading of both cases, Plaintiffs claim that the policy changes that began in 1982 were woefully inadequate in light of the pre-1982 practices and that the "street files" practice persisted post-1982. Specifically, Plaintiffs allege that CPD systematically suppressed exculpatory and/or impeaching

---

[3] Based on Plaintiff Reyes's counsel's response to the City's arguments on behalf of other plaintiffs who have brought similar *Monell* claims in Guevara-related cases, *see Sierra v. Guevara,* 18 C 3029 and *Iglesias v. Guevara*. 19 C 6508, the City anticipates, despite Plaintiffs' responses to the City's interrogatories limiting his *Monell* claim to the theories discussed herein, that Plaintiffs will likely claim that they pursue additional theories. Regardless, to the extent these theories are not subsumed by the ones Plaintiffs did identify, Plaintiffs have adduced no evidence to defeat the City's motion pursuant to those theories as well.

7

material by intentionally secreting discoverable reports, memos and other information in what their expert characterizes as "clandestine files" and/or "street files."

Plaintiffs mischaracterize the holdings in both cases and use that mischaracterization as the launching pad to argue that the significant changes the City made to the record keeping and disclosure policies were "woefully inadequate." In its motion, the City describes its post-1982 written policies up to and including those in place at the time of Plaintiffs' arrests and prosecutions. The City then explains that it is entitled to summary judgment on this theory by showing: 1) there is no evidence of a "street file" or any *Brady* violation resulting from withholding documentation in this case, therefore as this Court put it, there is no "concrete link" between the *Monell* theory and the underlying claim; and 2) there is no evidence of a widespread practice of either evidence suppression (through the failure to disclose documents that existed) or a failure to document. As Defendant Officers make clear, there is no evidence that resembles a "street file," therefore, the "perceived deficiencies in the City's policies and practices [are not] at an appropriate level of generality" to sustain *Monell* liability.

The City further argued that the widespread practice theory depends upon Tiderington and his opinions do not establish a pattern and practice of withholding exculpatory and impeachment evidence in "street" files **and** he should be excluded pursuant to *Daubert*. His reliance on a spreadsheet that he had no hand in preparing and that he could not manipulate to render any opinions he draws from the spreadsheet is without foundation and unreliable. With respect to the files that underlie the spreadsheet, Tiderington testified that it would not be "humanly possible" to become familiar with each of the investigations and therefore he cannot establish from the files that the City had a practice of maintaining and concealing exculpatory evidence in clandestine "street files." Additionally, it is well-settled that if CPD disclosed all its investigative documents

8

for a case to the CCSAO, and the CCSAO did not, in turn, disclose those documents to the criminal defense attorney, the fault would be with the CCSAO not CPD. Yet Tiderington has no idea whether any of the documents he claims were "missing," were in fact given to the prosecutor by CPD, because he did not review any of the CCSAO files obtained by subpoena in this case, so his opinion that documents were systematically withheld lacks a valid basis. Additionally, Tiderington's haphazard statistically insignificant review of 64 Cook County Public Defender's Office ("CCPDO") files does not establish that any material was withheld. And finally, Tiderington's "failure to document" opinions are not supported by any data in his report. Additionally, all of Tiderington's opinions should be excluded because Tiderington 1) has no foundation to discuss the *Jones* and *Palmer* litigation from the early 1980s (he could not answer the most basic questions about those cases), or the civil trials in *Fields*, *Rivera* or *Kluppelberg*; 2) in fact, lacked a basic understanding of any of the opinions in the report and no foundation for any of the statistical analysis and did not bill enough time to do the report's analysis; 3) did not use sound methodology to opine that "missing pages" from criminal defense files were withheld or that CPD's policies were not being followed; and 4) his opinions, are not helpful to the jury.

Plaintiffs' failure to discipline and supervise theory cannot survive summary judgment because it exclusively relies on Finnell who 1) failed to identify that any Complaint Register ("CR") file was not appropriately investigated; 2) cannot establish that CPD's purported "sustained rate" forms the basis of a *Monell* claim; 3) cannot connect the "historical context" he provides to a widespread practice in 1998; and 4) cannot establish that Defendant Officers' CR histories or prior lawsuits amount to a citywide practice. Additionally, Finnell's opinions should be excluded because 1) he lacks the qualifications to render any of the opinions in his report because he does not have the requisite knowledge, skill, experience, training or education that qualifies him to opine

9

on CPD's disciplinary policies and practices or the statistical or qualitative analysis upon which his opinions rely (his police oversight experience, as distinct from his experience as a police officer, is limited and he was fired from or left under a cloud in two of three oversight positions he has held during his career); 2) he has no foundation to render his "historical context" opinions; 3) his purported comparison of CPD's "sustained rates" is a futile exercise because he concedes there are no national standards; 4) opinions based upon undisclosed expert Meza's statistical analysis, including but not limited to the "outlier analysis" and the accompanying tables violate Rule 26; and 5) he does not use a reliable methodology in determining CPD's purported "sustained rate," the "outlier analysis; and his opinions are both quantitatively and qualitatively deficient.

Plaintiffs' coercion confession theory exclusively relies on their expert, Dr. Richard Leo, who opines that that the City had a widespread and systemic pattern and practice of physically and psychologically coercive interrogations (especially of African-American and Latino men). This theory cannot survive summary judgment because Dr. Leo must be excluded because these opinions lack any expert analysis or any application of his expertise because the report simply provides summaries of a handful of allegations. Even if he is permitted to testify, his opinions do not establish *Monell* liability because he exclusively relies on unproven allegations made in 62 cases against a handful of officers spanning thirty years. Dr. Leo conceded if the allegations are untrue, they would not support his conclusions regarding an alleged policy and practice.

The City further established that Plaintiffs failed to identify evidence to establish that a City policy rather than isolated individual action caused their constitutional injury or was the "moving force" or that the City's final policy maker was on notice.

Finally, all the derivative claims also fail (*respondeat* and indemnification) to the extent the underlying claims fail.

**Length of trial:** Per the Court's directive, Defendants have evaluated the potential length of a trial in these matters. As discussed above, Defendants believe that if the sole issue was the alleged false confessions against Defendants Guevara and Trevino, then a trial on both of these matters, would take approximately two weeks to try to verdict. If all the claims and the defendants needed to tried, the trial on these two matters would take approximately four to five weeks.

**Streamlining Summary Judgment:** In November of 2023, the Individual Defendants did reach out to Plaintiffs in an effort to narrow the issues needing to resolve prior to trial. To Plaintiffs' credit, all forensic investigators were dismissed with prejudice. However, no further narrowing down was done (including a request by the Individual Defendants for Plaintiffs to clarify what *Brady* and fabrication claims Plaintiffs were still pursuing so Defendants could focus and limit summary judgment briefing). On April 4, 2024, Plaintiffs did make a proposal to drop some defendants in exchange for other defendants giving up their right to file any motion for summary judgment, even if they had a good faith to do so. Defendants could not and cannot negotiate one defendant's opportunity to defend themselves at summary judgment in order to get another defendant out of the case.

Accordingly, Defendants propose that the Court bifurcate the *Monell* claim, since it adds no additional value to the case, meaning Plaintiffs will not receive any additional damages if they prevail. *See Reyes* Dkt. 163 at 9-10. This would eliminate the City's Motion for Summary Judgment, three *Daubert* briefs and Plaintiffs' Cross-Motion for Summary Judgment entirely. Bifurcation would also eliminate at least one week from the trial. In the event that the Court is not inclined to bifurcate *Monell,* the Defendants propose:

- Defendants would be limited to 100 pages for their initial summary judgment memorandums – 50 pages for the Individual Defendants and 50 pages for the City;
- Plaintiffs would then be limited to 50 pages to respond to the City's motion and 50 pages to respond to the Individual Defendants' motion (with no overuse of single spaced bullet points);
- Each reply would be limited to 25 pages.

- The Individual Defendants would limit their Statement of Facts to 200 facts (the parties would also limit attachment of depositions to only the pages cited);
- The City would limit its Statement of Facts to 250 facts;
  - Plaintiffs would limit their Statement of Additional Facts to 100;
- Plaintiffs' Cross Motion for Summary Judgment would be limited to 15 pages (and they agree not to include single spaced bullet points);
  - Plaintiffs would limit their Statement of Facts in Support of their Cross-Motion to 80 facts;
  - The City's Response to Plaintiffs' Cross-Motion for Summary Judgment would be limited to 15 pages;
  - Plaintiffs' Reply would be limited to 15 pages.

| | |
|---|---|
| Dated: May 31, 2024 | Respectfully Submitted, |
| /s/ Josh M. Engquist | /s/ Eileen E. Rosen |
| *One of the Attorneys for Defendant Officers* | *One of the Attorneys for the City of Chicago* |
| James G. Sotos<br>Josh M. Engquist<br>Caroline Golden<br>Allison Romelfanger<br>*Special Assistant Corporation Counsel*<br>THE SOTOS LAW FIRM, P.C.<br>141 W. Jackson Blvd., #1240A<br>Chicago, Illinois 60604<br>(630) 735-3330<br>jengquist@jsotoslaw.com | Eileen E. Rosen<br>Theresa Berousek Carney<br>Catherine M. Barber<br>Lauren M. Ferrise<br>*Special Assistant Corporation Counsel*<br>ROCK FUSCO & CONNELLY, LLC<br>333 West Wacker Dr., 19th Floor<br>Chicago, Illinois 60606<br>(312) 494-1000<br>erosen@rfclaw.com |

/s/ Gabrielle R. Sansonetti

*One of the Attorneys for Defendant Guevara*

Thomas More Leinenweber
James Daffada
Michael J. Schalka
Gabrielle R. Sansonetti
*Special Assistant Corporation Counsel*

LEINWEBER, DAFFADA & SANSONETTI
120 N. LaSalle Suite 2000
Chicago, Illinois 60602
(773) 716-6117
gabrielle@ilesq.com