**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-01028 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-02312 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S *DAUBERT* MOTION TO BAR**
**OPINIONS OF THOMAS J. TIDERINGTON**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 1

*DAUBERT* STANDARD ........................................................................................... 3

ARGUMENT .............................................................................................................. 5

    I.    TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY LACK PROPER FOUNDATION. ....................................................................................... 5

        a.    Tiderington has no foundation to discuss the *Jones* and *Palmer* litigation from the early 1980s.................................................................................................................. 5

        b.    Tiderington has no foundation to discuss the civil trials in *Fields, Rivera* or *Kluppelberg*. ........................................................................................................ 7

        c.    Tiderington lacked a basic understanding of the opinions contained within his own report............................................................................................................................ 8

        d.    There is no foundation for the statistical analysis in Tiderington's Report. .................. 9

        e.    Tiderington did not bill enough time to complete the analysis in his report. ...............11

    II.    TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE HIS METHODOLOGY IS NON-EXISTENT.................................................................... 13

        a.    Tiderington's opinions on "missing pages" from criminal defense files are not based on sound methodology and therefore unreliable. ...................................................... 14

        b.    Tiderington's opinions that CPD's policies were not being followed are not based on any articulated methodology and should be barred. ............................................. 17

    III.    TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT HELPFUL TO THE JURY. ......................................................................... 20

CONCLUSION................................................................................................................ 24

## <u>CASES</u>

*Agnew v. Cater*, No. 3:18-CV-50035, 2022 WL 313756 (N.D. Ill. Feb. 2, 2022) ................ 18, 19

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997) ...................................... 20, 22

*Beaman v. Freesmyer,* 776 F.3d 500 (7th Cir. 2015) ............................................ 17

*Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406 (N.D. Ill. Jan. 24, 2020) 15

*Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484 (N.D. Ind. June 21, 2010) ........11

*Carroll v. Otis Elevator Co.,* 896 F.3d 210 (7th Cir. 1990).......................................... 6

*City of Canton, OH v. Harri* TA \s "City of Canton, OH v. Harris, 489 U.S. 378 (1989) ...... 20, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ............................. 4

*Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870 (E.D. Wis. 2010) ................................11

*Gayton v. McCoy,* 593 F.3d 610 (7th Cir. 2010) ...................................................... 6

*General Electric Co. v. Joiner,* 522 U.S. 136 (1977) .............................................. 14

*Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771 (7th Cir. 2017) ........................... 2, 5

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)......................................... 22, 23

*Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919 (7th Cir. 2000).................................... 20

*Lapsley v. Xtek, Inc.,* 689 F.3d 802 (7th Cir. 2012)............................................. 5

*Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009) ...................... 4, 15

*Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004 (N.D. Ill. 2005 ................... 6

*Lurry v. City of Joliet*, No. 20 C 4545, 2023 WL 2138763 (N.D. Ill. Feb. 21, 2023)................... 24

*Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152 (N.D. Ill. Mar. 12, 2024) 18, 25, 26

*Myers v. Illinois Cent. R. Co.,* 629 F.3d 639 (7th Cir. 2010) ................................... 1, 5

*Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971 (7th Cir. 2018) ........................... 20

*Palmer v. City of Chicago,* 755 F. 2d 560 (7th Cir. 1985) ...................................... 7

*Palmer v. City of Chicago,* 806 F.2d 1316 (7th Cir. 1986) ....................................... 8

*Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) .................................................. 17

*Ruiz-Cortez v. City of Chicago,* 2016 WL 6270768 (N.D. Ill. Oct. 26, 2016)............................. 18

*Smith v. Ford Motor Co.,* 215 F.3d 713 (7th Cir. 2000).......................................... 19

*Sommerfield v. City of Chicago,* 254 F.R.D 317 (N.D. Ill. 2008) ................................. 7

*State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031 (N.D. Ind. 2012) 11

*Thompson v. City of Chicago,* 472 F.3d 444 (7th Cir. 2006)...................................... 24

*United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003) ........................................ 18

## RULES

Fed. R. Evid. 702……………………………………………………………………………….4, 5, 22

## INTRODUCTION

Plaintiffs disclosed Thomas J. Tiderington as a police procedures expert to opine on the Chicago Police Department's ("CPD") policies and practices concerning documentation and disclosure of documents and information learned during homicide investigations. (*See,* Tiderington's Expert Report, attached hereto as Exhibit A). Specifically, Tiderington claims to have been asked to assess "(1) whether there were deviations from generally accepted police practices in the investigation into the murder of Mariano Soto (and related kidnapping of their children) that was conducted by various Chicago Police officers; and (2) whether Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, are adequate and consistent with practices around the country." (Ex. A at p. 3). Tiderington opines that CPD had a systematic policy of (1) routinely failing to document information and (2) a routine failure to disclosure exculpatory documents and information learned during homicide investigations. (Ex. A at p. 4; Tiderington's October 6, 2022, Deposition, attached hereto as Ex. B at 415:10-416:7).

Tiderington's opinions should be barred entirely as they are 1) nothing more than inferences that lack a foundation, and when tested, do not withstand scrutiny; 2) lack a reliable methodology, or any methodology for that matter, and instead are based on assumptions as well as data and information curated and provided to him by Plaintiffs' counsel; and 3) are not relevant. *See generally, Myers v. Illinois Cent. R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017).

## BACKGROUND

Tiderington's *Monell* opinions regarding the City of Chicago and CPD were first disclosed by Plaintiffs legal team in January 2022, in the underlying consolidated cases of *Solache v.*

*Guevara, et. al.,* and *Reyes v. Guevara, et. al.* (*See,* Ex. A). Since that time, he has provided nearly identical opinions regarding the City's policies and practices, relying upon the same materials, in four additional cases involving Defendant Guevara, *Iglesias*, *Gomez, Maysonet,* and *Sierra*.

Tiderington's report, and the opinions contained therein, was prepared largely based upon one spreadsheet (Attachments F his report) created by Plaintiffs' legal team and provided to him based upon information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files")(also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of the Chicago Police Department ("CPD") from 1995-1998, as well as certain Cook County Public Defender's Office ("CCPDO") files . (Ex. B at 388:20-24; 390:15-18). Despite relying almost exclusively on this spreadsheet to support his conclusions that the City had a policy of systemically failing to document and disclose exculpatory information, Tiderington was not involved in the decision making or creation of the spreadsheet and does not know who or how many people were involved in its preparation. (Ex. B at 389:1-23). Moreover, while he was provided with the homicide files from which the information contained in the spreadsheet was purportedly derived, he did not review all the files and only "spot-checked" them or "skimmed through" them. (Ex. B at 401:10-402:7).

The spreadsheet was based upon 344 investigative files and 341 RD files ranging from 1995-1998, (the "*Solache/Reyes*" spreadsheet) and was provided to him in "hard copy large pages." (*See, Solache/Reyes* Spreadsheet attached as Ex. C; Tiderington's September 20, 2023, Deposition in *Johnson v. Guevara, et. al.,* at 234:12-24, attached as Ex. D). If he received the spreadsheet electronically, it was only in PDF format, and not in excel. (Ex. C at 234:12-24). The *Solache/Reyes* spreadsheet is 53 pages long and contains 349 rows and 28 columns of data for a

total of 9772 separate cells of data. (Ex. C.). Tiderington billed only 78 hours in connection with the work he did to prepare his report in the *Solache/Reyes* matter, which was the first case he was retained in and included opinions related to Plaintiffs' *Monell* claim as well as opinions related to the police investigation in that case. (Ex. B at 362:11-18). Accordingly, this would have been when Tiderington was first provided with any spreadsheet based upon information gathered from the homicide files and would have been the first time he had access to CPD investigative files and RD files. The relevant investigative file, RD file, Cook County State's Attorney's ("CCSAO") file and defense attorney files for the underlying criminal investigation and prosecution of Reyes and Solache, which he relied upon, in part, to provide opinions about the underlying police investigation, totaled almost 20,000 pages of documents alone. There were also 19 depositions, and 20 criminal trial hearing transcripts that Tiderington claims to have reviewed for his opinions related to the underlying criminal investigation[1]. (*See* Tiderington's List of Materials Reviewed in *Solache/Reyes,* attached as Ex. E). Tiderington's report is 66 pages long, 33 pages of which address CPD's policies. (Ex. A).

### *DAUBERT* STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized

---

[1] Notably, Tiderington's "Materials Reviewed" list is 6 pages long and identifies 146 individual items.

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. As recently emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. The Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (internal quotations omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017). The proponent of the expert bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Gopalratnam,* 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

**ARGUMENT**

I. **TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY LACK PROPER FOUNDATION.**

Tiderington claims that CPD's policies and practices concerning the documentation and disclosures in homicide investigations are woefully inadequate *and* resulted in the *routine* failure to document and disclose exculpatory documents and information learned during the homicide investigation to criminal defendants.   (Ex. A at p. 33)(emphasis added).   In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question."  *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010), *quoting Carroll v. Otis Elevator Co.,* 896 F.3d 210, 212 (7th Cir. 1990).   And when an expert bases his opinion on information supplied by another, the Court must focus on the reliability of the expert's foundation.  *See Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004, 1119 (N.D. Ill. 2005)*.*   Contrary to *Daubert's* requirement that expert testimony "rest[] on a reliable foundation," Tiderington's opinions are entirely based upon data and information supplied to him by Plaintiffs' counsel.

> a. **Tiderington has no foundation to discuss the *Jones* and *Palmer* litigation from the early 1980s.**

Tiderington opines that CPD had a "historic practice" of permitting detectives to "maintain street files" based upon his purported review and analysis of what he calls the "George Jones Case and the *Palmer* class action."  However, it is clear from both the summaries contained in his report and his deposition testimony, that Tiderington does not have the requisite background or experience to analyze, let alone render opinions about, the *Jones* and *Palmer* cases and his purported knowledge of the cases does not stand up to scrutiny.  Accordingly, Tiderington has no foundation to opine on either of these cases, or their impact on the policies and practices of CPD.

Rather, based upon his utter lack of ability to answer the simplest of questions regarding his "analysis" of those cases, and his concession that he learned the information about the cases from Plaintiffs' counsel, the only conclusion to be drawn is that this section of his report, and the opinions that stem from it, rely on summaries of the cases prepared by someone else within Plaintiffs' legal team and should be barred. *Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013, 1026 (N.D. Ill. 2011) *citing Sommerfield v. City of Chicago,* 254 F.R.D 317 (N.D. Ill. 2008). When asked about both the *George Jones* case and the *Palmer* litigation during his deposition, Tiderington admitted that he learned the information regarding both cases from Plaintiffs' counsel, and that he did not read the *Palmer* case he cites to in any "specific detail." (Ex. B at 447:4-15). In fact, when asked specifically about a quote in his report pertaining to the Seventh Circuit's decision in *Palmer,* he admits that he "copied and pasted" that language from "some other document," that he could not identify. (Ex. B at 447:24:448:14). Tiderington did not even have a basic understanding of the court from which he purported to be citing from.[2] (Ex. B at 449:18-21).

Such uncritical reliance on summaries of information provided by Plaintiffs' counsel was found to be impermissible in *Obrycka v. City of Chicago,* wherein the Court observed, an attorney's "single-minded devotion to a client's interests – which 'follows from the nature of our adversarial system of justice-is incompatible with the neutrality and evenhandedness that are necessary if a summarization of deposition testimony is to have the reliability of *Daubert* demands." 492 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011) *citing Sommerfield,* 254 F.R.D. at 322 ("Acceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony prepared by a party's lawyer would effectively eliminate *Daubert's* instance that an expert's

---

[2] Unbeknownst to him, Tiderington was relying on *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*"). (Ex. B at 454:17-21)

opinion be grounded on reliable information.")  The same can be said for Tiderington's blind reliance on the information provided to him by Plaintiffs' counsel regarding the history of the *Jones* and *Palmer* litigation.  While Plaintiffs' counsel appears to have produced to Tiderington the primary source documents for these cases that they summarized, based upon his inability to discuss the cases at his deposition, he did not review the source documents himself nor did he have an understanding of the procedural history, relevance or ultimate findings of the cases.  In fact, Tiderington was strikingly unaware of the critical finding in *Palmer* that after the Seventh Circuit reversed the district court's temporary injunction, and the case was remanded, the class plaintiffs were provided an opportunity to review the "street files" and found nothing on which they could base a claim that "any member of the class had been convicted in violation of the constitution," meaning no exculpatory information was discovered in the "street files."  *Palmer v. City of Chicago,* 806 F.2d 1316, 1317 (7th Cir. 1986) ("*Palmer* II") (Ex. B at 455:18-459:13).

Accordingly, Tiderington's seemingly uncritical reliance solely on the information provided to him by Plaintiffs' counsel, which was without a doubt Plaintiffs' roadmap of their case and evidence their counsel identified as supporting their claims does not provide a reliable foundation upon which Tiderington can state his opinions and must be barred.  *Obrycka,* 492 F. Supp. 2d at 1026.

### b. Tiderington has no foundation to discuss the civil trials in *Fields, Rivera* or *Kluppelberg.*

Similarly, Tiderington lacks the foundation to opine on the civil cases and trials in *Fields, Rivera* or *Kluppelberg,* including any purported comparisons drawn between his opinions and the expert opinions in those cases.  Tiderington testified that the only information he had regarding

7

these cases came from reviewing Brasfield's reports in each case[3]. (Ex. B at 384:7-14). And while he knew that Brasfield reviewed certain information and spreadsheets, he was unable to answer any questions regarding *what* Brasfield reviewed with any specificity. In fact, at one point, Tiderington testified that he believed he and Brasfield worked off the same spreadsheet. (Ex. B at 387:1-15).

> **c. Tiderington lacked a basic understanding of the opinions contained within his own report.**

This is not the only portion of the report that Tiderington's testimony shows a complete lack of familiarity with the subject matters discussed. As another example, to support one of his two global opinions that CPD had a practice of routinely failing to document information learned during homicide investigations, Tiderington was asked to identify examples in his report of cases where detectives failed to document information they learned during the course of a homicide investigation. (Ex. B at 426:18-427:14). He identified the RD numbers listed at page 50 of his report. (*Id.*) He also identified the spreadsheet, (Ex. B at 428:12-21), but acknowledged that the spreadsheet does not have a "failure to document" column. (Ex. B at 428:22-429:5). More significantly, however, contrary to Tiderington's deposition testimony, the RD numbers listed at page 50 of his report are not examples of a failure to document information learned during a homicide investigation. Rather, the RD numbers listed at those pages purport to be examples of:

> [I]nventory sheets [that] do not appear to be contemporaneously updated as each new document is added to the file. Instead, documents were routinely added in bunches, with significant time delays from when the document was created. In addition, there are other ways in which they were simply not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.).

---

[3] Notably, the review of each of these reports in any detail would have been a time-consuming task. Brasfield's reports in each of those cases totaled almost 300 pages, not including the spreadsheets created for each separate set of files produced in each of those cases.

Obviously, this report does not mention a failure to document.

Additionally, this section of the report also provides an example of the methodological flaw that permeates Tiderington's report and opinions. In this section of the report, Tiderington notes that, "I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete." (Ex. A at p. 50). Yet, Tiderington conceded that he, "Certainly [] didn't look at 277, but that's something that was spot-checked and is reflected in the spreadsheet." (Ex. B at 503:13-20). But, as will be further discussed *infra* at p. 17-20, the spreadsheet provides no column tallies, so it is impossible for Tiderington to have looked at the column of the spreadsheet that identified files that contained incomplete inventory sheets to determine that there were 277 of them. And, significantly, Tiderington did not know how the coders who created the spreadsheet determined that any given inventory sheet was "incomplete." (Ex. B at 503:21-504:1).

### d. There is no foundation for the statistical analysis in Tiderington's Report.

As outlined above, Tiderington comes to his conclusions regarding CPD's file keeping practices through his purported review and analysis of a spreadsheet, containing almost 10,000 separate cells of data. Tiderington has no background or education in statistics, and although this spreadsheet contains no statistical analysis, percentages, or even tallies, Tiderington testified at his deposition in the *Sierra* case that any of the statistical analysis or numbers identified in his report in this case, as well as the *Sierra* case, came from the spreadsheets that were provided by Plaintiffs' counsel. (*See,* Tiderington's December 8, 2022, Deposition Ex. F at 367:13-368:1; Ex. I, Tiderington's CV). Specifically, Tiderington's report purports to draw statistical conclusions or tally certain data, which he terms his "findings" on at least 17 different datapoints from the spreadsheet. For example, Tiderington's report states that for the time period of 1995-1998, "Only

334 of the 344 investigative files contained handwritten notes; of those, 154 of the 344 files, or approximately 46%, contained handwritten notes not on GPRs." (Ex. A at p. 49). The report further states that for the period of 1995-1998: "95 of the files, or approximately 28%, contained to-from memos not on official police forms." (Ex. A at p. 49). These types of "findings," that analyze in some way the data that is recorded in the spreadsheet, permeate Tiderington's report. (*See,* Ex. A at p. 49, 50, 52, 55).

But, without access to the spreadsheets in their native format, it strains credulity to believe that Tiderington was able to draw any of the statistical conclusions that his report purports to make. Moreover, he admits that of the 475 investigative files he was provided, he "did spot checks on probably 30 or 40 cases[]" though he does not know which cases those were, and he "certainly didn't check every file[]". (Ex. F at 286:13-14). Moreover, Tiderington does not know anything about the coders. He does not know who they are, how many there were and he was not involved in any of the decision making related to the coding. (Ex. B at 389:19-23). This renders his statistical analysis unreliable and justifies excluding his opinions that rely on this information. *See, State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2012). *See also, Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010)(stating that the defendant's expert's reliance on the defendant's own data, which he did not independently verify, rendered his opinion unreliable); *Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484, at *7 (N.D. Ind. June 21, 2010)(recommending exclusion of the portions of the defendant's expert's opinion replying on a histogram prepared by the defendant where the expert used it without verifying or reviewing the underlying information), *report & recommendation adopted,* 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010).

**e.  Tiderington did not bill enough time to complete the analysis in his report.**

Likewise, the 78 hours that Tiderington billed in connection with this case is further support for the conclusion that Tiderington's opinions lack a proper foundation.  Quite simply, 78 hours is not enough time to have conducted a meaningful review and analysis of both the underlying police investigation *and* a meaningful review and analysis of the files and other source materials that purportedly form the basis of his opinions related to Plaintiff's *Monell* claim *and* draft a 66-page report.

For purposes of his opinions related to the underlying criminal investigation that led to Plaintiffs' arrest and prosecution, Tiderington claims to have "thoroughly reviewed thousands of pages of records and testimony."  (Ex. A at p. 73; Ex. E).  These documents include almost 20,000 pages from the investigative file, RD File, CCSAO file and defense attorney files for the underlying criminal investigation and prosecution of both Solache and Reyes.  Tiderington also claims to have reviewed 23 depositions, including those of Defendant Officers, occurrence witnesses and Plaintiffs (both depositions took place over the course of three days resulting in transcripts totaling over 1000 pages), in addition to 20 criminal trial transcripts.   (Ex. E).  Tiderington's claim that he conducted the extensive material review related to the underlying criminal investigation necessary to write his report *and* write a 33-page report on those findings in the hours that he has accounted for is simply implausible.

Yet, that is not all Tiderington claims to have done during those 78. hours.  He also purports to have reviewed the spreadsheet, as well as an unknown number of files that make up the information contained therein. (Ex. E; Ex. F at 285:11-286:6).  The 1995-1998 dataset contained 344 investigative files, totaling 55,474 pages and the RD files constitute another 24,422 pages.  (Ex.C; Ex. E).  Even considering Tiderington's admission that he only spot-checked 30-40 files,

he simply did not bill enough time to account for any meaningful review of those files or the spreadsheet or any of the other materials he purports to have reviewed. But there is even more that Tiderington claims to have reviewed. He lists 146 items in Attachment B of his report as materials he reviewed in conjunction with his preparation of his report. (Ex. E). In those materials, he identifies multiple CPD directives (items 100-116), multiple additional deposition transcripts that are unrelated to the underlying case (items 58-61;81-96), trial testimony (16-21), other testimony (24;31-36), the City's discovery responses from other cases (items 63-77), as well as French publications (139, 141), despite the fact that he does not speak French. (Ex. E; Ex. B at 410:2-13)

Finally, Tiderington's report includes a section titled "Examples of relevant information in police files that was withheld from criminal defendants but should have been disclosed" wherein he purports to have conducted a comparison of certain defense attorney files and corresponding police investigative files to demonstrate that information was withheld from criminal defendants. (Ex. A at p. 55-59). In this section of his report, Tiderington claims to have reviewed the investigative file, RD file and criminal defense file for eight separate criminal investigations to conduct a comparison and determine whether any documents were contained within an investigative file and *not* within a criminal defense file. Putting aside the fact that such an analysis is unreliable because it is fraught with other issues which will be addressed more fully *infra*, *i.e.,* Tiderington's flawed methodology, the condition of the criminal defense attorney files 30-40 years after the initial criminal prosecution, the numerous redactions contained within the files and the fact that Tiderington did not review *any* CCSAO Files, it is impractical to believe that Tiderington was able to conduct this review at all given the extremely limited amount of hours he billed for the preparation of this report. Moreover, for one purported "example," Tiderington admits that there

were so many redactions in the CCPDO file that he could not perform any reasonable comparison. (Ex. A at 57).

The analysis contemplated by Tiderington's report, comparing the information within the criminal defense file to the corresponding investigative files is time consuming. The total amount of documents that Tiderington would have needed to carefully review to provide the opinions in this specific section of his report alone, with this level of detail, is over 4,000 pages.

In fact, Tiderington concedes that it would not "have been humanly possible" to become familiar with each of the investigations that underlie the hundreds of files he reviewed because each of them contained "many, many pages." (Ex. B at 20-405:7). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013, 1025 (N.D. Ill. June 2, 2011), *citing General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1977). Any opinions or conclusions that Tiderington draws from either the spreadsheet or his cursory review of the files are based on pure speculation for which he has no foundation to provide, and his opinions should be barred in their entirety.

## II.    TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE HIS METHODOLOGY IS NON-EXISTENT.

Even if Tiderington's opinions were supported by the proper foundation, his methodology is not only unreliable, but also non-existent. The Court must ensure that a proposed expert's methodology is "scientifically valid" and that his conclusions are "based on sufficient facts or data." *Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406, at *4 (N.D. Ill. Jan. 24, 2020). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698,

705 (7th Cir. 2009). In light of Tiderington's own testimony, that he, in fact, did not utilize "any great methodology" when it came to the review of the hundreds of files he was tasked with reviewing, Plaintiff will be unable to satisfy that burden. (Ex. B at 403:1-8).

   **a. Tiderington's opinions on "missing pages" from criminal defense files are not based on sound methodology and therefore unreliable.**

In this case, Tiderington opined that his review of eight files identified at pages 55-59 of his report demonstrate that certain documents contained in CPD Investigative Files were "withheld" from criminal defendants. Tiderington claims to have done a "case by case" analysis of "what documents are included in the police investigative files but are *missing from criminal defense files[]"* by comparing the investigative files to the corresponding defense attorney files. (Ex. A at p. 54). As alluded to *supra* at p. 12-13, such a purported comparison is unreliable because it fraught with Tiderington's unsound methodology. At the outset, the CCPDO undermined the foundational assumption that underlies Tiderington's stated methodology: specifically, that by comparing the investigative files to the CCPDO files one could determine whether documents from the investigative file had been produced. The CCPDO acknowledged that "when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later." (*See,* CCPDO's Reply Brief in *Velez v. City of Chicago,* attached hereto as Ex. G). Tiderington himself acknowledged this phenomenon in his report, when he noted that several CCPDO files contained "no police documents," while others had some records, though appeared to be partial or incomplete."[4] (Ex. A at p. 61, fn. 114).

---

[4] Notably, despite recognizing certain files as being partial or incomplete, Tiderington continued to use those files as the basis for his opinion that information was withheld from the criminal defense attorneys. Specifically, Tiderington opines that a multitude of documents were "not disclosed" to the criminal defense team for Linox Jackson, yet, upon review of the CCPDO file, Tiderington admitted that the file had *no*

Tiderington's admission supports the CCPDO's concession and Tiderington cites to no evidence to establish that the files are in the same condition as they were during the time of the criminal proceedings, and therefore, renders any comparison devoid of any evidentiary meaning.

What's more, the CCPDO made significant redactions to the files before they were produced. Tiderington did not make any effort to determine what percentage of the files were redacted. (Ex. B at. 584:11-17). It was his assumption that the redactions were done by the CCPDO, but he testified that there was never an explanation given to him about why they were redacted. (Ex. B at 600:12-20). Moreover, Tiderington recognized that there was a possibility that information relevant to his analysis could have been redacted. (Ex. B at 600:21-601:1).

In fact, in one of the eight files identified in the report and specifically reviewed by Tiderington during his comparison, he admits that there were so many redactions in the defense file that he did not believe he could do any comparison to the investigative file. (Ex. B at 651:7-24). Rather, Tiderington had no way to determine what was and was not redacted, or why, making any purported comparison between the investigative files and CCPDO files impractical. As such, any conclusion Tiderington has drawn from his comparison as the basis for his conclusions that any document was "missing" or "withheld" is nothing more than "the *ipse dixit* of the expert." *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015).

Finally, and most critically, Tiderington failed to review *any* of the available CCSAO files for comparison. (Ex. B at 658:7-20). In fact, Tiderington was not even aware that the CCSAO Files were available for review until the day of his deposition in this case. (Ex. B at 659:12:22). And while he learned of the existence of the CCSAO files in October 2022, Tiderington made no effort to review the CCSAO files and supplement his report in this case. This is notable for two

---

police reports contained within it, and therefore, should not have been used for his assessment. (Ex. B at 631:22-632:22).

reasons. First, his report expressly states, "If additional information is presented to me, I am happy to consider it." (Ex. A at p. 66). Second, Tiderington concedes that if all the materials in the police department investigative files were turned over to the CCSAO, then "that would have been proper and reasonable conduct on the part of the investigators." (Ex. B at 660:7-18).

As such, any comparison to a defense file without also reviewing and comparing to the documents in the CCSAO is for naught, because if CPD disclosed all its investigative documents for a case to the CCSAO, and the CCSAO did not, in turn, disclose those documents to the criminal defense attorney, the fault would be with the CCSAO not CPD. *Beaman v. Freesmyer,* 776 F.3d 500, 512 (7th Cir. 2015) (police officer's *Brady* obligations are discharged by disclosing material, exculpatory evidence to the prosecutor, for it's the prosecutor's responsibility to turn the evidence over to defense counsel); *Mims v. City of Chicago,* No. 18-cv-7192, 2024 WL 1075152, at *8 (N.D. Ill. Mar. 12, 2024) (The police must disclose exculpatory evidence to the prosecutor so that they, in turn, can disclose the evidence to the defendant).

Tiderington's methodology is so flawed, that it is exactly the type of opinion that *Daubert* and its gatekeeping requirement is designed to keep from the jury. *Agnew v. Cater,* 2022 WL 313756, at *3 (N.D. Ill. Feb. 2, 2022). Specifically, these opinions are why "it's called 'gatekeeping' and not 'clean up.' The function keeps opinions from being introduced to the factfinder in the first place." *Id.* There is simply too great an analytical gap between the handful of files Tiderington reviewed and the conclusions he drew from that review. *See Ruiz-Cortez v. City of Chicago,* 2016 WL 6270768, at *26 (N.D. Ill. Oct. 26, 2016) (Leinenweber, J.) (expert's misalignment of data makes link between fact and conclusions too tenuous to accept expert's opinion); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (there must be "some link between the facts or data the expert has worked with and the conclusions the expert's testimony is

intended to support"). And as such, it is precisely the type of opinions the Court must bar in order to "prevent expert testimony from carrying more weight with the jury than it deserves." *Agnew v. Cater*, No. 3:18-CV-50035, 2022 WL 313756, at *5 (N.D. Ill. Feb. 2, 2022).

> **b. Tiderington's opinions that CPD's policies were not being followed are not based on any articulated methodology and should be barred.**

Tiderington also opined that his analysis revealed that the policies of the Chicago Police Department were "not being followed." (Ex. A at p. 49). Tiderington claims that through this review, he was able to arrive at certain statistical "findings" to support this conclusion. Specifically, he claims that 1) a certain percentage of files contained handwritten notes, showing that handwritten notes, not on general progress reports ("GPRs") were still routinely used; 2) a certain percentage of files contained to-from memos, showing that to-from memos were still being used; and 3) a certain percentage of files had missing or incomplete inventory sheets. (Ex. A at p. 56-57). However, Tiderington's only explanation for how he arrived at these tallies and percentages is that he "used the spreadsheets." (Ex. F at 286:22-288:4). And, there is simply no way he could have utilized the spreadsheet to do so if he only was provided a hard copy or pdf version. An expert cannot "waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

As outlined *supra* at Section I (d), Tiderington admits that all the statistical analysis and tallies that are identified in his report derive from the spreadsheets prepared and provided by Plaintiffs' counsel. The spreadsheet is 53 pages long and contains 349 rows and 28 columns of data for a total of 9,772 separate lines of data. (Ex. C). Tiderington testified that he received this spreadsheet in hardcopy large pages, and *if* he received it electronically, it was only in PDF format. (Ex. D at 234:12-24). It strains credibility to think that Tiderington physically flipped through

these "hard copy large pages" to manually count cells to calculate the 17 different data points contained within his report.  Not only would it have been an incredibly tedious and time-consuming task that Tiderington could not have accomplished in the time he spent preparing his report, but it would have been impossible to do so in a methodologically sound manner.  If Tiderington manually counted the cells to calculate the data points, there is simply no way for him to establish that the calculations are accurate.  He could not have implemented any quality control over a manual count of over 18,000 separate cells of data.  And if he didn't manually count the data to calculate the data points, who did?  An "expert's work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data.  Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology."  *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000).

Finally, Tiderington's methodology suffers from the same flaws as discussed in great detail in the City's Motion to Bar Plaintiff's Expert Dr. Nancy Steblay in that the coding contained in the two datasets is inconsistent and unverified.  This can clearly be seen in one of the later reports written by Tiderington in the matter of *Sierra v. Guevara,* wherein Tiderington was provided a second spreadsheet for the years 1991-1995, which is 69 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate cells of data, based upon 475 investigative files and 496 RD files.  (*See Sierra* spreadsheet attached as Ex. H).  Notably, the year 1995 overlaps between the two sets of data, a fact that went unnoticed by Tiderington until pointed out at his deposition in *Johnson  v. Guevara, et. al.,* in September 2023.  (Ex. D at 232:3-233:3).

A review of just the first overlapping file demonstrates such inconsistencies.  Specifically, when coding RD File Z000273, the members of Plaintiffs' legal team coding the *Solache/Reyes*

dataset indicated that there were "significant documents missing from the investigative file inventory," whereas the *Sierra* coding team indicated that column was "not applicable."

***Solache/Reyes* Dataset (Ex. E)[5]**

| Identifying Information | | | | Investigative File Information | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Records Division Number | Year | Victim(s) | Defendant(s) | Was an Investigative File produced? | Includes Investigative File Inventory? | Bates Number for Investigative File Inventory | Are significant documents missing from Investigative File Inventory? (list report type and Bates) | Are there any handwritten notes? | Are there Handwritten Notes in the file not on GPRs? | Bates numbers for Handwritten Notes not on GPRs | Are there To-From Memos in the file not on GPRs? | Bates ranges of To-From Memos |
| Z000273 | 1995 | Steven Jackson | Varren King; James Martin; Nakia Davis | Yes | Yes | 34479 | 34479 | Yes | Yes | 34492; 34547; 34651, 34653 | No | N/A |

***Sierra* Dataset (Ex. D)**

| Identifying Information | | | | Investigative File Information | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Records Division Number | Year | Victim(s) | Defendant(s) | Was an Investigative File produced? | Includes Investigative File Inventory? | Bates Number for Investigative File Inventory | Are significant documents missing from Investigative File Inventory? (list report type and Bates) | Are there any handwritten notes? | Are there Handwritten Notes in the file not on GPRs? | Bates numbers for Handwritten Notes not on GPRs |
| 399 | Z000273 | 1995 | Steven Jackson | Varren King; James Martin; Nakia Davis | Yes | Yes | 90664 | N/A | Yes | Yes | 090677; 090732; 090836, 38 |

---

[5] These images show a glimpse of the herculean task it would have been for Tiderington to flip through hard copies (or even PDFs) of these spreadsheets and manually count various columns of data in order to come to his various conclusions.

This is obviously inconsistent, and necessarily impacts Tiderington's ultimate conclusions and statistical analysis. While it would be impossible here to uncover the scope of the problem, the fact that there are even such inconsistencies shows that the data is unreliable.

### III. TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT HELPFUL TO THE JURY.

Expert testimony that is not helpful to the jury is excluded. Fed. R. Evid. 702. And Rule 403 excludes testimony where the potential prejudice of the evidence outweighs the probative value. In this case, Plaintiffs' claims are that the City had notice of a widespread practice by officers within the CPD of not recording investigative information in police reports, not maintaining proper investigative files and not disclosing investigative materials to prosecutors and criminal defendants.

Plaintiffs intend to argue that CPD maintained a "street file" practice during the time of the underlying criminal investigation which led to Plaintiffs' arrests and prosecutions because (1) of CPD's purported "history" of a "street files practice;" (2) because CPD policies were not being complied with; (3) and because his "review" of criminal defense files showed documents were "regularly withheld" from criminal defendants. Yet, Tiderington cannot identify any documents that were *created* and then *withheld* from Plaintiffs during their criminal prosecutions. Accordingly, Tiderington's opinions cannot establish a causal link between Plaintiff's alleged constitutional violations and this particular *Monell* theory. *See City of Canton, OH v. Harris*, 489 U.S. 378, 397 (1989); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). His opinions, therefore, are wholly disconnected from the claim at issue in the case. *See Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971, 973 (7th Cir. 2018) (expert opinion testimony does not help the jury understand the evidence or decide an issue in the case when it does not fit the facts of the case).

Starting with CPD's purported "history" of a street files practice, Tiderington attempts to draw a similarity between this case and polaroid photographs Tiderington opines were withheld, as well as "interview notes" that Tiderington claims were not documented with the file that was subject to the litigation in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). However, Tiderington's one sided and incomplete dissertation of the history of the *Jones* and *Palmer* litigation is irrelevant to whether Plaintiffs suffered a constitutional violation based on CPD's record keeping policies. Moreover, Tiderington provides no evidentiary support for his opinions regarding what policies *should* have been in place during the 1991-1995 time period. In fact, his report expressly states that he was asked to assess "whether Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, **are** adequate and consistent with practices around the country." (Ex. A at p. 3) (emphasis added). Tiderington provides no basis for comparing CPD's policies from 1998, the time of Plaintiffs' arrests, to the practices of law enforcement agencies today. (Ex. A, generally). Tiderington's opinions regarding what he has deemed to be "standard police practices" related to a "centralized repository" to collect and store investigative information, (Ex. A at 35), are generally *ipse dixit* in its purest form – assertions made but not substantiated – and are *per se* unreliable. *Obrycka,* 492 F. Supp. 2d at 1026.

Next, Tiderington opines that CPD policies were not being complied with, and as a result, there was a "failure to document" and thus a "failure to turn over" crucial documents in the underlying criminal investigation which was a direct result of the "failed policies and practices" related to the documentation of homicide investigations. However, these opinions are based on nothing more Tiderington's own say so and a series of speculative conclusions. Specifically, Tiderington opines that because there are no contemporaneous notes of various interviews during

the criminal investigation in the investigative file, that they must have withheld. Tiderington admits that he cannot opine on whether any specific defendant (or any other officer for that matter) created notes and then withheld them. (Ex. F at 119:4-9). And while he believes it is "highly unusual" for a homicide investigative file to not contain any notes, he offers no evidentiary support for his contention that Chicago Police Officers were required to take handwritten notes. Moreover, even if there was some requirement that notes be taken, violation of internal departmental policies are irrelevant to constitutional standards. *Thompson v. City of Chicago,* 472 F.3d 444, 455 (7th Cir. 2006). Accordingly, whether Tiderington believes that notes *should* have been taken is irrelevant and will not assist the fact finder in understanding the evidence. *Lurry v. City of Joliet*, No. 20 C 4545, 2023 WL 2138763, at *14 (N.D. Ill. Feb. 21, 2023).

Finally, Tiderington's opinions that his "review" of criminal defense files showed documents were "regularly withheld" from criminal defendants is likewise irrelevant because Tiderington cannot identify any exculpatory document that was "withheld" and Plaintiffs cannot establish that the City failed to produce documents to them in their underlying criminal prosecution. *Harris*, 489 U.S. at 385; *Brown,* 520 U.S. at 400. Tiderington opines that certain polaroid photographs taken of several witnesses, specifically, Guadalupe Mejia, Jorge Mejia, Rosa Aranda and Felicia Soto, were withheld from Plaintiffs *and* were exculpatory because they purport to demonstrate the detectives' belief that these four individuals were alternative suspects. (Ex. A at 63). This is a bold attempt to create evidence where evidence does not exist.

Tiderington's entire opinion is based upon speculation and conjecture. He was not provided a complete defense file for Plaintiffs' criminal cases, and therefore cannot establish what documents the criminal defense attorneys had in their possession prior to trial, which Tiderington acknowledges. (Ex. B at 683:9-13). *See Mims v. City of Chi.*, 18-CV-7192, 2024 WL 1075152, *

9, 18-19 (N.D. Ill., Mar. 12, 2024). Second, the basis for Tiderington's conclusion that these particular witnesses were *suspects* is based upon his own circular reasoning that *because* they took the photographs, they must have considered them suspects. (Ex. A at 63). Specifically, because Tiderington did not see evidence that there were photographs taken of each witness interviewed, and because these persons subsequently claimed they were "interrogated and … treated as suspects[]" that his conclusion was that "[p]erhaps that they were suspects in this investigation." (*Id.* at 415:16-22). (Ex. B at 413:22-414:9). But Tiderington cites to no evidence that it was CPD's policy to only take photographs of suspects. Rather, Tiderington testified that the basis for his conclusion that CPD had a policy to only take Polaroid photographs of suspects was his pure speculation that these witnesses were of some importance if officers had to take photographs of them. (Ex. B at 412:15-414:14). But even that speculation wasn't solid, as he went on to state that based upon several inferences, his conclusion was that "[p]erhaps that they were suspects in this investigation." (*Id.* at 415:16-22).

Moreover, Tiderington does not cite to any evidence that the photographs were withheld at all. In fact, his report ignores the fact that the polaroid of Guadalupe, as well as those of Adriana and Plaintiffs, were all impounded by the State. (Ex. A at 63). When asked about the impounded evidence during his deposition, Tiderington acknowledged that Guadalupe's photograph was produced and impounded. (Ex. B at 681:12-20; 683:23-684:15). Minimally, that eliminates Plaintiffs' theory that polaroid of Guadalupe was withheld, and Plaintiffs lack any evidence that the State did not have access to the Polaroids of the other witnesses. *See Mims v. City of Chi*., 18-CV-7192, 2024 WL 1075152, * 9, 18-19 (N.D. Ill., Mar. 12, 2024) (finding Mims could not establish *Brady* claim by averring that defense counsel did not receive the evidence; Mims needed affirmative evidence that the police withheld the information, and officers did not have an

obligation to ensure court-impounded materials accessible by the prosecution "actually made it into the hands of defense counsel").

Tiderington's opinions are also inadmissible pursuant to Rule 403 because of their potential to confuse the jury. Rather than establish any culpability on the part of the City for its record keeping policies, Tiderington's opinions fault the City for failing to meet what he has defined as "best practices" of **today** and without any support. Moreover, Tiderington's opinions offer more confusion than clarity because none of his criticism can establish a link between the policies and the alleged constitutional violations. As such, to allow for Tiderington to opine on what policies may or may not have been followed or what documents may or may not have been disclosed in other, unrelated criminal defense files would only muddy the waters and essentially create multiple mini trials within the trial.

## CONCLUSION

For the foregoing reasons, Defendant, City of Chicago, requests that Thomas J. Tiderington's expert opinions be barred in their entirety.

WHEREFORE, Defendant, City of Chicago, Respectfully Request This Honorable Court Grant Its *Daubert* Motion To Bar Opinions Of Thomas J. Tiderington in its entirety, and for any other relief as this Court deems just and reasonable.

Dated: April 8, 2024                    Respectfully Submitted,

by: */s/ Eileen E. Rosen*
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Austin G. Rahe
Lauren M. Ferrise

Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com