# Exhibit A

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

DeLeon-Reyes & Solache, Plaintiffs

v.

Guevara, City of Chicago, et al.

**Case No. 1:18-cv-1028, 1:18-cv-2312**

**EXPERT REPORT OF**

**THOMAS J. TIDERINGTON**
(Thomas J. Tiderington & Associates-LLC)

1

**SUMMARY OF QUALIFICATIONS**

For the past forty-three years, twenty years as Chief of Police, I have served as a full-time law enforcement officer with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. For over 30 years, I have been an instructor at numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last five years I have been engaged as a criminal justice consultant, trainer, case reviewer and expert witness in law enforcement related matters. As a currently serving Police Chief (20 plus years), I have reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. I am currently an active life-member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life-member of the Michigan Association of Chiefs of Police (MACP).

Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshalls Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA). I have also worked cooperatively with numerous state and local police agencies including the Chicago Police Department. As a result of my many decades of working extensively with many federal, state and local agencies, I am familiar with the many similarities of investigative methods and strategies, as well as nationally acceptable best practices and protocols. I also have many years of extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations.

During my 43 plus year law enforcement career I have been responsible for the review and processing of hundreds of disciplinary actions up to and including suspensions and terminations. I also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments. The accreditation process furthers an agency's professional development and ensures that their methods, policies, procedures and daily operations follow the best practices or "professional standards" in the law enforcement arena.

As a Police Chief for over twenty years I have reviewed and approved policy and procedures of

every kind, including (but not limited to) criminal investigations, retention and maintenance of police records, complaints against police officers, training, supervision and discipline.

Further details of my training, experience, knowledge, and qualifications are contained in my Curriculum Vitae, which is attached as Attachment D of this report.

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. Any and all opinions expressed herein are held to a reasonable degree of professional certainty. The information that I relied on consists of the type of information that is reasonably relied upon in my field of expertise.

Opinions that I present in this report may use terminology that resemble legal terms or standards. Use of specific/similar legal terminology is not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers-of the-fact. The use of certain terms such as "reasonable", "reckless", "negligent", "unreasonable", "foreseeable", and "deliberate indifference" are commonly used in my field of expertise, and I use them often as a Police Chief, and when I train or communicate with law enforcement officers. These terms and others form the basis of my understanding of the subject matter and are commonly used by law enforcement officials in the field.

## INTRODUCTION

I have been retained by attorneys representing Plaintiffs Arturo DeLeon-Reyes and Gabriel Solache. I was asked to assess two things:

(1) whether there were deviations from generally accepted police practices in the investigation into the murder of Jacinta and Mariano Soto (and related kidnapping of their children) that was conducted by various Chicago Police officers; and

(2) whether Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, are adequate and consistent with practices around the country. I have reached conclusions on both of these issues.

First, as a result of my review of the materials provided to me related to the Soto homicide investigation, I conclude to a reasonable degree of professional certainty that the homicide investigation conducted in this case grossly deviated from generally accepted police practices. Consistent with that opinion, I have found that the defendants in this case applied tunnel vision to obtain the evidence they needed to implicate their pre-chosen suspects, rather than follow the evidence and leads wherever they took them; conducted guilt-presumptive interrogations of

DeLeon-Reyes and Solache contrary to accepted interrogation techniques; failed to consider evidence that undermined the confessions they obtained from DeLeon-Reyes and Solache; and conducted a shoddy investigation in which they failed to properly document investigative steps, pursue all possible leads, and engage in the sort of basic crime scene processing efforts that are critical to collecting and preserving potentially critical physical evidence. The investigation reflected a primary goal of closing the case with charges, rather than finding the truth about who participated in the murder and kidnapping of the Soto family. In addition, there is substantial evidence in the record that Detective Reynaldo Guevara and other defendants used physical and psychological abuse to coerce confessions from DeLeon-Reyes and Solache, and intentionally and willfully manufactured and falsified evidence, manipulated witnesses, and withheld critically relevant information from DeLeon-Reyes and Solache, and their attorneys. If the jury finds that such conduct in fact occurred—conduct that Detective Guevara, at least, does not deny—that would constitute further, dramatic deviations from generally accepted police practices. Finally, the Defendants in this case withheld documents and information they learned during the investigation from DeLeon-Reyes and Solache, all of which should have been disclosed.

Second, based on my review of Chicago Police Department's (CPD) policies and practices governing how information learned during homicide investigations was to be documented, stored and disclosed, as well as my review of numerous other documents and depositions and many dozens of homicide files and comparator criminal defense attorney files, it is my opinion to a reasonable degree of professional certainty that CPD's policies and practices related to homicide file documentation, storage/preservation and disclosure were woefully inadequate, deviated substantially from accepted practices in other departments, and resulted in the routine failure to disclose documents and information to criminal defendants. The policies themselves were inadequate, they were routinely not followed, the practices that instead were followed did not result in the thorough and accurate documentation of homicide investigations and the investigative information learned, and ultimately resulted in the routine failure to disclose potentially exculpatory or impeaching documents and information to criminal defendants.

My opinions and the facts upon which I base my opinions are discussed in greater detail below. Attachments to this report include the following:

Attachment A - Litigation support experience-Listing of cases and publications.
Attachment B - List of material reviewed.
Attachment C - My rate of compensation.
Attachment D - Complete and detailed curriculum vitae.
Attachment E - List of reference materials considered.
Attachment F - Spreadsheet of my data analysis.
Attachment G - Michael Brasfield's expert report in *Fields v. City of Chicago*
Attachment H - Michael Brasfield's expert report in *Rivera v. City of Chicago*

Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I therefore reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

### SUMMARY OF FACTS RELATED TO SOTO HOMICIDE INVESTIGATION

Without attempting a comprehensive recitation, but rather to give a brief summary of the matter sufficient to allow the reader to place the rest of this report in context, the following is provided:

In the early morning hours of March 28, 1998, 43-year-old Mariano Soto and his 35-year-old wife, Jacinta, were stabbed to death in their home in the Bucktown neighborhood on the Near North Side of Chicago, Illinois. Mariano was stabbed 39 times. Jacinta was stabbed 20 times. Their two children, two-month-old Maria Guadalupe and three-year-old Santiago, were abducted.

Adriana Mejia told her husband that she was in labor and ready to give birth. She left and returned the following day to their home on Chicago's South Side with a baby girl. She also brought along a young boy, who she said was the son of a woman at the hospital who had gone into labor and had no one to watch the child.

At the time, at least nine other people lived in their home. Among the residents were Rosauro's brother, Jorge, and his wife, Guadalupe, who lived in a basement apartment. Other residents included 23-year-old Gabriel Solache and 25-year-old Arturo DeLeon-Reyes.

Days later, on April 1, 1998, the bodies of Jacinta and Mariano Soto were discovered. Police sent photographs of the children to the media and the following night, Guadalupe Mejia saw a television news report about the murders and the disappearance of the children. She recognized a photograph of Santiago as the boy that Adriana brought home from the hospital. She told Adriana and theorized that the woman at the hospital who allowed Adriana to take the boy home was actually involved in the crime.

Rosauro came home from work at 1:30 a.m. He and Adriana began to argue about what to do with the boy. Adriana argued vociferously that they should just abandon him in an alley. At some point, DeLeon-Reyes and Solache heard the argument and joined the discussion. There is conflicting testimony about whether the person who first proposed taking the child to the police station was DeLeon-Reyes, Solache, or Rosauro, but ultimately it was the three of them who voluntarily took the boy to the police station.

At the 8th District Police station, after waiting approximately two hours for a Spanish-speaking officer, Rosauro explained why they were there. Police brought a member of the Soto family who had been in custody at CPD's Area 5 Police District to the 8th District station and identified

the boy as three-year-old Santiago Soto. Rosauro, Solache, and DeLeon-Reyes were transported to Area 5 where they were handcuffed and isolated in separate interrogation rooms.

Police went to Rosauro's home. They found Adriana with the baby, who they identified as Maria Soto by a birthmark on her neck. Adriana was arrested and taken to the station, where she was put in an interrogation room.

Two days later, following interrogations that lasted more than 40 hours, police announced that Adriana, Solache, and DeLeon-Reyes had each confessed to the murders. Chicago police announced that Adriana had wanted a child so badly that she was willing to kill to get one. After Adriana paid DeLeon-Reyes $600, police said, the three of them murdered Mariano and Jacinta Soto, and then abducted their two children.

Police said that Adriana admitted that she had faked being pregnant for nine months. As her due date approached, she spotted Jacinta and the two children at a medical facility and followed them home. Two days later, police said, Adriana Mejia had been left at the hospital by Rosauro to give birth. That night, Solache and DeLeon-Reyes picked her up in Rosauro's car and the three of them went to the Soto home. Police said they confessed to stabbing Jacinta when she answered the door, and that Mariano was stabbed to death in his bed. They abducted the Soto children. They dropped Adriana and the children off at the hospital, and then DeLeon-Reyes and Solache drove Rosauro's car home to the Mejia residence.

According to her confession, Adriana had called Rosauro the night before the crime and told him that she had given birth but they should not come get her until the morning. On the morning of March 29th, Rosauro and Guadalupe picked up Adriana at the hospital and brought her to the Mejia home with Jacinta Soto's children.

Adriana's husband, Rosauro, was released without being charged after police investigators concluded he knew nothing about the murders. Solache and DeLeon-Reyes—both of whom had no prior criminal records—went to trial before separate juries in Cook County Circuit Court in June 2000 on charges of first-degree murder, aggravated kidnapping, and home invasion.

Barbara Wilson, an Illinois State Police DNA analyst, testified that she performed DNA tests on Adriana's shoes and pants, as well as on a towel recovered from Rosauro's vehicle. She also conducted tests on two knives, a towel, a baby blanket, and baby clothing recovered from the Soto home. Wilson testified that Adriana's blood was found on one of the knives at the Soto home, as well as on the towel found in the car. In addition, Mariano Soto's blood was found on Adriana's pants and shoes.

However, none of the evidence could be connected to Solache or DeLeon-Reyes—neither man's DNA was found on any of the crime scene evidence. A male DNA profile was also found on the towel from Adriana's car, but that profile was not linked to Solache or DeLeon-Reyes. The prosecution's case against Solache and DeLeon-Reyes primarily rested on their confessions.

Police detective Reynaldo Guevara testified that DeLeon-Reyes and Solache confessed, and denied that either man was mistreated.

Solache and DeLeon-Reyes both testified that they only spoke Spanish. Solache said that he was physically abused by Guevara, and that he was so fearful of being beaten again that he answered affirmatively in Spanish to questions posed in Spanish by Guevara. Solache said Guevara then provided an account in English to a prosecutor who wrote down what Guevara said. Solache said he signed the statement although he could not read English and no one had read it to him in Spanish. The defense pointed out that the confession did not match the facts of the case.

Solache said Guevara punched him in the stomach multiple times and that he had lost hearing in his left ear because of the repeated head slaps from Guevara. A physician at the Cook County Jail testified that Solache complained of being unable to hear out of his left ear because police had hit him. An audiologist at the jail testified that she tested Solache in July and August 1998, and the tests showed a profound hearing loss in the left ear. In addition, the prosecutor's contemporaneous notes indicate that Solache complained of physical abuse: on April 6, the day after the handwritten statements were signed, Solache's defense counsel asked for a court order allowing his investigator to photograph Solache's injuries.

DeLeon-Reyes testified that Guevara slapped him in the head multiple times and threatened him with the electric chair unless he confessed. DeLeon-Reyes said that ultimately, he was asked questions in Spanish, some of them unrelated to the crime, and that the statement he signed did not contain his own words but rather the story Guevara had fed to him over the course of his interrogations, which a non-Spanish-speaking prosecutor wrote up as his confession.

Both DeLeon-Reyes and Solache have testified repeatedly, beginning before their criminal trials, that their confessions were false, and that they signed the false confessions because of Guevara's physical abuse and the threats and promises that were used during their interrogations.

Rosauro testified that he, too, was subjected to an interrogation in which he was falsely accused of committing the murder, and physically abused by Guevara. He testified for the defense that Guevara questioned him and asked him how much he had paid for the little girl. Rosauro said that when he said he did not pay anything for her, Guevara hit him. "He kept hitting me because he did not believe me," Rosauro testified.

On June 20, 2000, the separate juries convicted Solache and DeLeon-Reyes of two counts of first-degree murder, two counts of aggravated kidnapping, and home invasion. Solache was sentenced to death and DeLeon-Reyes was sentenced to life in prison without parole.

In January 2003, Illinois Governor George Ryan commuted the sentences of all inmates on death row, including Solache's sentence, to life in prison without parole.

The Illinois Appellate Court subsequently upheld Solache's and DeLeon-Reyes's convictions later that year. Both men filed post-conviction petitions alleging that Guevara had coerced numerous false confessions in other murder cases and had been accused in several other cases of police brutality—some of which the prosecution had known about, but failed to disclose at the time of their trial. The petitions were dismissed in 2004 and consolidated on appeal.

In December 2006, the Illinois Appellate Court reversed the dismissal of the petitions and ordered an evidentiary hearing. Subsequently, attorneys Jane Raley and Karen Daniel from the Center on Wrongful Convictions at Northwestern University School of Law filed an amended petition seeking a new trial. The petition outlined numerous cases in which Guevara had been accused of physically abusing suspects and coercing false confessions in murder cases.

The petition further claimed that Solache's attorney had provided an inadequate legal defense by failing to call an expert witness to testify that Solache's hearing loss was caused by the beating inflicted by Guevara. The petition was accompanied by an affidavit from Dr. Urjeet Patel, a physician, who said the blows delivered to Solache could have caused his hearing loss, particularly because the 1997 auto accident likely left him predisposed to future hearing loss due to further trauma.

At an evidentiary hearing in 2013, Guevara invoked his Fifth Amendment right against self-incrimination when called to the witness stand. In 2016, Cook County Circuit Court Judge James Obbish ruled that Solache and DeLeon-Reyes were entitled to a hearing to determine whether their confessions should have been suppressed.

"It is abundantly clear that the un-contradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Detective Guevara's assertion of 5th amendment privilege against self-incrimination lend credence to petitioners' allegations of abuse and coercion," Judge Obbish ruled.

"The accounts of the unrelated incidents…are sufficiently similar to the accounts testified to by (Solache and DeLeon-Reyes) in that they all include threats, abuse and coercion to secure statements and occurred within a range of time so as to constitute a pattern and practice," Obbish ruled. "Altogether, these incidents include details implying that Detective Guevara would employ methods to secure a confession or witness statement by whatever means they could."

By the time Guevara was called as a witness at the hearing in October 2017, six men—Juan Johnson, Jacques Rivera, Armando Serrano, Jose Montanez, William Negron, and Roberto Almodovar—had been exonerated of murder convictions that were based on false confessions or false testimony from witnesses that resulted from physical abuse, coercion or manipulation of suspects and witnesses by Guevara.

In October 2017, Cook County prosecutors called Guevara to the witness stand after granting him immunity from prosecution. After again pleading the Fifth, Guevara was granted immunity and then denied he physically abused Solache and DeLeon-Reyes.

The following month, in November 2017, the murder prosecution against Jose Maysonet was dismissed. Maysonet had long contended he falsely confessed as a result of Guevara's physical violence and ultimately was granted a new trial on other grounds. When Guevara and four other police officers refused to testify at Maysonet's second trial, the prosecution dismissed the case.

On December 13, 2017, Judge Obbish suppressed Solache's and DeLeon-Reyes's confessions, concluding that Guevara's denials that he physically abused them were "bald-faced lies." Judge Obbish declared, "I can't give an ounce of credibility to something he did 20 years ago. If he would lie after being given immunity under oath, why would this court . . . believe that he was telling the truth when he first testified?"

On December 21, 2017, the prosecution dismissed the charges.

In 2014 the City of Chicago retained the law firm Sidley Austin LLP to investigate allegations of misconduct made against former Police Detective Reynaldo Guevara and to evaluate whether the alleged misconduct resulted in convictions of innocent people currently serving prison sentences.

 In the course of their investigation they conducted 10 interviews, including of Solache and DeLeon-Reyes and their counsel, Adriana Mejia, Rosauro Mejia, Horatio Mejia,  Ernest Halvorsen, and counsel for the City; reviewed transcripts and court filings of pre-trial, trial, and post-conviction proceedings; and reviewed police and forensic reports relating to this matter. Their findings included the following:

1. That Solache and DeLeon-Reyes were physically abused by Detective Guevara and were otherwise subjected to unreasonable treatment during the course of their interrogations. That the allegations that Guevara physically abused Solache and DeLeon-Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and DeLeon-Reyes were, in fact, physically abused during the course of their interrogations. In this regard, they gave substantial weight to their interviews of Rosauro Mejia and Horatio Mejia, neither of whom have any apparent reason to lie in this matter and both of whom appeared credible. Although less compelling, they also credited Adriana Mejia's statement of having witnessed Solache being struck by Guevara, given that she had no apparent motivation to assist Solache in this regard.

2. That Adriana, Rosauro, Solache, and DeLeon-Reyes were held at Area 5 and interrogated about their involvement in the Soto murders during the period from the afternoon of Friday, April 3rd until the early morning hours of Sunday, April 5th, 1998.

3. Adriana eventually confessed to having participated in the murders after she was presented with a pair of her shoes seized from her residence that had blood stains on them. According to police reports, Adriana initially stated that she had paid Arturo DeLeon-Reyes $600 to kill the Sotos and take their children but did not mention Solache. One police report in fact reported that Adriana had expressly denied Solache was involved. Police reports further state that DeLeon-Reyes was the next to confess, on the afternoon of Saturday, April 4, 1998, while being interrogated by Detective Guevara, and in the course of doing so, he implicated Solache in the murders. The reports state that when the police went back to Adriana and told her DeLeon-Reyes had implicated Solache, then she too stated that Solache participated in the crimes. Police reports also state that later that evening, while Guevara interviewed him, Solache also confessed to participating in the murders.

4. By early Sunday morning, Adriana, Solache, and DeLeon-Reyes had each signed written statements admitting involvement in the Soto murders. Rosauro Mejia also signed a statement, in which he denied knowing that his wife was not in fact pregnant and recounted his interactions with his wife and the kidnapped children she brought home from the hospital. Each written statement was signed in the presence of an Assistant State's Attorney ("ASA").

5. The police investigation revealed that bodies of Mariano and Jacinta Soto were discovered by police on Wednesday, April 1, 1998 (four days after the murders) after family members of the Sotos reported them missing. According to police reports, Mariano was found laying face up, five feet from the front door with multiple stab wounds all over his body. A kitchen knife was found under his right arm. Another knife was found in a box behind the sofa. Jacinta Soto was found in the bedroom. She too had multiple knife wounds, mostly to the back and buttocks. Blood was splattered on the bedroom wall near her body.

6. Police collected a number of pieces of physical evidence from the scene, including: a knife that was in a box behind the couch in the Soto residence; a knife that was on the ground underneath Mariano Soto; physical specimens from both victims including a vial of blood; oral, rectal, and vaginal swabs; clothing; hair samples; and fingernail clippings; blood-stained baby blanket and baby pants.

7. Latent fingerprints taken from the crime scene were deemed not suitable for comparison.

8. The police later twice searched the Mejia residence at 6234 S. Mozart. During the first search, the police found a pair of Adriana's shoes which had blood stains on them (which later DNA tests confirmed was the blood of victim Mariano Soto). Adriana's shoes also tested positive for an "additional" DNA type, but the amounts of that profile were too small to be compared. During the second search, the police recovered a pair of Adriana's pants that also had blood on them (also later shown to be Mariano Soto's blood).

9. The police also recovered physical evidence from Rosauro Mejia's car, including: the floor mats; a black cloth scarf; a bag with a dirty rag that was stored in the trunk wheel

well; a cushion from the rear seat of the car; a blood-stained green towel from the rear window deck behind the seat.

10. The green towel seized from Rosauro Meija's car later tested positive for Adriana Mejia's DNA, and also tested positive for DNA belonging to another unidentified male. In addition, a knife seized at the Soto residence also tested positive for Adriana Mejia's DNA.

11. When Solache and DeLeon-Reyes were detained for questioning, the police collected Solache's shoes and DeLeon-Reyes's pants and shoes. No blood or any DNA from the Sotos was found on any of these items. Sidley also noted the unexplained presence of DNA belonging to an unidentified male on the blood-stained green towel recovered from Rosauro Mejia's car. Mariano Soto, Arturo DeLeon-Reyes, and Gabriel Solache were all affirmatively excluded as possible matches for this DNA. No other samples were tested against it.

12. The police tested the physical evidence seized for DNA comparisons against Mariano and Jacinta Soto, Adriana Mejia, Solache, and DeLeon-Reyes. No tests were conducted for comparisons against any of the other residents of 6234 S. Mozart, including Rosauro Mejia, Carlos Martinez, or Jorge and Guadalupe Mejia.

13. Adriana Mejia pled guilty while Solache and DeLeon-Reyes were tried together before separate juries and convicted in June 2000.

14. The central evidence presented against Solache and DeLeon-Reyes were their written confessions in which they admitted participating in the murders of Jacinta and Mariano Soto. Adriana Mejia did not testify; nor was her statement implicating Solache and DeLeon-Reyes otherwise presented to the jury. Both Solache and DeLeon-Reyes contended their confessions had been coerced. The State put on witnesses to rebut Solache's and DeLeon-Reyes's claims that their confessions were coerced, including the testimony of Detective Guevara. Beyond the confessions, no other evidence was introduced to establish their involvement in the Soto murders.

15. Rosauro Mejia testified in support of the defendants' claims of physical abuse. He testified that when he was being questioned by Guevara, Guevara asked him how much he paid for the little girl, and when Rosauro answered that he had not paid anything, Guevara hit him repeatedly. Trial Tr., June 19, 2000, in People v. Solache, et al., Case No. 98-12440, Circuit Court of Cook County, at Q - 22. Rosauro testified that he believed Guevara hit him because he did not believe him.

16. In Detective Guevara's trial testimony, he denied hitting, striking, or slapping anyone and said he never saw Solache or DeLeon-Reyes exhibiting any signs of having been beaten by anyone else. Id. at Q - 239-40. Detective Guevara further testified that, as far as he knew, neither defendant had complained of being struck by an officer. Id. at Q - 214-15.

17. In May 2013, Judge Obbish, Cook County Circuit Court, began hearing testimony in the Solache and DeLeon-Reyes post-conviction hearing. Solache and DeLeon-Reyes have both testified about their allegations of misconduct at these proceedings. The court has

also heard from other witnesses regarding Guevara's alleged pattern and practice of misconduct, including Annie Turner, Adrian Duta, Leshurn Hunt, David Velazquez, Adolfo Frias, Graciela Flores, Samuel Perez, and Bill Dorsch.

18. That despite the abusive conduct during the course of their interrogations, they did not accept Solache's and DeLeon-Reyes' claims of actual innocence, noting in particular that Adriana Mejia continues to identify both of them as involved with her in the murders.

## OPINION 1: DEFENDANTS' INVESTIGATION OF SOTO MURDERS AND KIDNAPPING DEVIATIONS FROM GENERALLY ACCEPTED POLICE PRACTICES

**INVESTIGATIVE "TUNNEL VISION" BY REYNALDO GUEVARA AND THE OTHER DEFENDANTS**

It evident that from the moment that Rosauro Mejia, DeLeon-Reyes and Solache appeared at the CPD's 8th District with three year old Santiago Soto, that Chicago Police Department investigators narrowly focused their efforts on building a criminal case against Adriana Mejia and the three men who had voluntarily brought the Soto boy to the police—Arturo DeLeon-Reyes and Gabriel Solache, and Rosauro Mejia, —and on doing so exclusively by extracting confessions from them. The case was solved not through diligent efforts to develop evidence and follow leads, but instead by applying physical and psychological abuse, and seeing which individuals would crack and give a confession. Investigators knowingly and intentionally disregarded any evidence that pointed away from DeLeon-Reyes and Solache.

Officers investigating crimes have an obligation under accepted police practices to focus their investigations on bringing the true perpetrator to justice, not just closing a case. Under generally accepted police practices, that requires following all leads wherever they take you, rather than where you want them to take you. It is not an acceptable practice to focus on developing evidence that implicates the investigator's chosen suspect and excluding evidence that implicates other suspects ("tunnel vision" or confirmation bias). Tunnel vision is apparent in the investigative materials relating to this matter.

The following examples are evidence of "tunnel vision" and/or deliberate and intentional police misconduct in the DeLeon-Reyes/Solache investigation:

A.  Reasonably trained police officers know and understand that they must have more than a subjective hunch to make an arrest or get an arrest warrant. They need to have objective evidence that indicates the suspect's responsibility for the crime. "Probable Cause exists when articulable facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense".[1]

According to arrest reports Plaintiffs were arrested by members of the Chicago Police Department on April 3, 1998 at 10:20am. It is evident that CPD officers did not have probable cause or even reasonable suspicion to arrest, detain or incarcerate DeLeon-Reyes or Solache at that time. According to the cleared closed report, Solache, DeLeon-Reyes, Adriana and Rosauro had not even been questioned yet, let alone provided any evidence incriminating DeLeon-Reyes and Solache, who at that point had done nothing

---

[1] E.g., The IACP Law Enforcement Policy Center -Arrests and Investigatory Stops (September 2019)

other than voluntarily bring in a missing child.

I also considered that at a motion to suppress hearing on March 3, 2000, the Honorable Stanley J. Sacks concluded the following: ….. *"The only evidence regarding Reyes and Solache up to this point, I heard is that they accompanied Mr. Mejia to the police station on April 3rd and they were arrested. They voluntarily walked in with Mejia, and 10:30 on the same morning they walked in with him. Approximately 5 hours later, maybe 5 or 6 hours overall that they were placed under arrest. As far as the Court is concerned, basically on everything I heard so far as of 10:30 in the morning on April 3, 1998, <u>the police did not have probable cause to arrest Arturo Reyes or Gabriel Solache.</u>"*[2]

B. The defendants failed to properly pursue other possible suspects and failed to fully document the investigation of those that were excluded as suspects. Early in the investigation detectives learned that a woman by the name of Norma Salazar allegedly was involved in the kidnapping of the Soto children. Not only did Adriana Mejia initially tell detectives that it was Norma Salazar that had provided the baby and the boy, but also DeLeon-Reyes and Rosauro Mejia were each telling detectives that Adriana Mejia had told them that the boy belonged to Norma Salazar. A photo of Norma Salazar was also obtained from CPD computer resources, and "*shown to Adriana Mejia, who identified her as being the women [sic] who gave her the children."* At that point, Norma Salazar was a critical lead, and likely a prime suspect in being involved in the crime. According to the police report: *"On 3 April 98 at 1500 hrs. Detectives H. Collins and K. McDonald located Norma Salazar and brought her into Area Five Detectives. Adriana Mejia viewed Norma Salazar in the line-up but did not identify her. Norma Salazar was questioned by Det. K. McDonald and denied any knowledge about what Adriana MEJIA was saying. Norma Salazar was eliminated as a suspect and permitted to leave Area Five Detectives.*"

There are a number of deviations from police practices in this cursory and highly unusual aspect of the investigation. First, it is contrary to acceptable police practices to have shown Adriana a single photograph of suspect Salazar, especially prior to conducting a police line-up. It is also unusual that after allegedly identifying Salazar from a photo, Adriana did not identify the same person from a lineup conducted shortly afterward. Second, there is no lineup report of the lineup that was allegedly conducted, which was required. Special Order GO 88-18, regarding the conduct of lineups, states in clear terms: "When a lineup is held, a Supplementary Report will be completed. . . . In no case will a lineup be conducted without a Supplementary Report being completed." The policy then identifies various categories of information that must be documented whenever a lineup is conducted, including the time of the lineup, who conducted it, the

---

[2] CCSAO 0055208

names, ages and other characteristics of the participants in the lineup, and so on. No lineup report was created, and none of this information was documented. Third, there are no notes or documentation of any interview of Norma Salazar, or any explanation of how she was eliminated as a suspect. This violates accepted police practices: witness interviews should be documented, in particular an interview of a prime suspect, and if that person is eliminated as a suspect there should be clear documentation on how that person was eliminated. In fact, detectives in this case have admitted at deposition that there is not appropriate documentation related to Norma Salazar.[3]

C.  Rosauro Mejia was never the subject of any type of meaningful investigation to determine whether there was evidence that might point to his potential involvement in the crime. It appears that the entirety of the investigation into Rosauro was to subject him and Adriana to abusive and accusatory investigations to see if they would cave in and implicate him; when they did not, he was eliminated as a suspect and released. That is not in any way how investigation into a person of interest or suspect is conducted under generally accepted police practices. Rosauro was the husband of Adriana, shared a bed with her for months while she faked a pregnancy, had been driving her to the clinic and hospital during the time period of the crime, had purportedly left her at the hospital to give birth to a child, had not provided an alibi documented anywhere in the file, and owned the car that was believed to be used in the crime (and which contained blood and other physical evidence). In addition, the police had concluded that Adriana had lied to them about the involvement of a Norma Salazar, and so they had to consider the possibility that she was also lying to them about who was involved, in order to protect accomplices or loved ones. Yet, despite such obvious considerations, there is no evidence that the defendants made any effort to eliminate Rosauro Mejia as a suspect (e.g., check his alibi), and conspicuously absent from the file is any documentation of the interrogations of Rosauro Mejia at Area 5, other than handwritten notes of an initial interview.[4]

Either the detectives failed to meaningfully question Rosauro Mejia, or they failed to document their interview of him. Either one would be contrary to accepted police practices. Of course, Rosauro Mejia's unrebutted testimony is that he was interrogated by Guevara, and that the interrogation did not include open-ended or probative questions designed to develop investigative leads (even if he was not involved, he could have lots of valuable information for investigators about his wife's conduct and whereabouts at various times, and about other potential perpetrators who might have conspired with Adriana), or efforts to identify and investigate alibis or other information that may eliminate him as a suspect. Instead, he describes a guilt presumptive interrogation in

---

[3]  Dickinson Deposition, 174-180. Rutherford Deposition, 163-165, 167.
[4]  RFC Solache-Reyes 367.

which he was repeatedly accused of committing the crime and subjected to prohibited tactics including physical and psychological abuse. Based on his unrebutted testimony, he was eliminated as a suspect based simply on his ability to withstand the abuse.

D.  Family members of the deceased likewise provided details of recent suspicious events that provided potential investigative leads, but these were not followed up on. This included the fire-bombing of Soto's car by gang members, causing the Soto's to move from their former residence to the location where they were murdered.  This was consistent with other initial information provided to detectives by Adriana Mejia that gang members had come to her home and threatened her regarding the boy (Guadalupe Mejia and Rosauro Mejia confirmed that this was information Adriana had told them as well).[5] This important information appears to have been totally disregarded by investigators and no documentation of any follow-up work appears in the case file.

In addition, detectives interviewed a relative of the victims, Rosa Aranda, who had a potentially highly valuable lead into what happened: the victim, Jacinta Soto, had recently made a new friend at a clinic, that woman sometimes went to Jacinta's house, and shortly before the murder Jacinta complained that her keys to the apartment had gone missing and that the new friend had been over around when it happened.[6] This was not only an important lead into who might have committed the murder, and how it might have been committed, but was also information that directly contradicted the version of events in the handwritten statements taken from DeLeon-Reyes and Solache (discussed below). This information was presumably known to detectives; Aranda testified that when she was interrogated by detectives, she did not hide any information she knew and told them everything.[7]  Yet, this information is not documented anywhere in the police file, nor is there any indication that the detectives did anything to act on this important lead.[8]

E.  Objective evidence of who committed the Soto murders was either not properly collected or was deliberately not tested by the crime laboratory.   According to the supplemental report CPD investigators apparently learned during interviews with Mejia, DeLeon-Reyes and Solache, that a grey four-door Toyota owned by Rosauro Mejia was allegedly used during the Soto murders and kidnapping of their children.  Instead of sending investigators out to locate and seize the vehicle, which logically would contain important physical evidence of the crimes, they simply contacted an individual identified as

---

[5]  E.g., RFC-Solache/Reyes 244, 367.
[6]  Rosa Aranda deposition (pg. 84-85, 91-92).
[7]  Rosa Aranda deposition (pg. 60).
[8]  By the way, it should also be noted that if the Defendants claim that Ms. Aranda's information was not something they ever learned, that would itself be notable evidence of the failures in their interrogation techniques, and in particular their use of accusatory, guilt-presumptive interrogation tactics rather than open-ended questions designed to discovery information that could lead them to the truth.

Leobardo Mejia and asked him to bring the car to Area Five Detectives.

The investigative file is void of any details concerning how Leobardo Mejia came to be in possession of the vehicle or who had access to it following the murders.  Suspecting that the vehicle was used to commit two brutal murders and kidnappings, reasonable officers would have made seizing, searching and forensically processing the vehicle a very high investigative priority.  Furthermore, it was objectively unreasonable and inconsistent with acceptable police training, protocols and procedures to not have secured a search warrant prior to searching the vehicle for evidence and to have instead invited a family member of the police suspects to bring it to the police, contaminating the vehicle and possibly tipping off potential suspects or family members of the police's suspects about the direction of the police investigation.

F.  According to documents from the Illinois State Police-Bureau of Forensic Sciences items recovered from the scene and from Rosauro Mejia's vehicle were submitted to the laboratory for analysis.  An item identified as exhibit #22 was submitted to the laboratory for processing. The item was an empty cardboard box labeled "Regent Sheffield Laser Cutlery 7 Piece Block Set," recovered by Det. D. Engel from behind the couch in the kitchen of the Soto home.[9] The item was initially submitted to ISP for testing to "examine reddish stain on top of empty cardboard box for the presence of human blood."[10] So, this was a box containing a possible murder weapon, found at the scene of the crime, with potentially blockbuster DNA evidence. Yet, according to the laboratory telephone conversation log dated 4-18-1998, Detective Halvorsen reportedly called the lab and instructed technicians not to analyze item #22.   The handwritten report states:  "about exhibit #22, originally thought had something to w/something. Now, they think it has nothing to do with anything.  Will not analyze.  Do not feel it is necessary to bring in car. Finish report & send it out."[11]   To stop the laboratory from processing and analyzing an item containing possible blood associated with a double murder crime scene is objectively unreasonable and inconsistent with acceptable police investigative standards.  Additionally, the investigative file is void of any mention as to why investigators determined that it *"was unnecessary to bring in the car"* or to forensically process it for physical evidence of the crime.[12]

According to lab records, on 4-9-1998, Detective Dickinson called the lab and the following was documented by lab technicians based on the phone conversation with Dickinson:  ….  "None of the suspects were bleeding, can hold off examinations of items

---

[9]  RFC Solace-Reyes 109, 373, 380.
[10] RFC Solache-Reyes 95.
[11]  RFC Solache-Reyes 499.
[12] Crime lab telephone conversation log dated 4-18-1998

collected from original scene. (all suspects have confessed)."[13]

Reasonably trained Officers know and understand the importance of conducting a thorough and systematic examination of any and all physical evidence obtained from crime scenes. To arbitrarily and selectively decide to test certain items of evidence and not others is highly unusual and inconsistent with acceptable police standards and training. The fundamental reason that physical evidence is carefully collected and analyzed is to assist investigators in identifying what occurred and who was involved. This process must be conducted carefully and thoroughly to ensure that crucial evidence is collected and properly analyzed. The fact that a suspect may have confessed should not have any bearing or impact on the processing of crime scene evidence or on the collection, testing and preservation of physical evidence. Instead, continuing the investigation to complete thorough testing of physical evidence is the objectively reasonable and necessary step to ensure that charges are being brought against the true perpetrators. The failure to do so is further evidence of tunnel vision, and a focus on closing cases rather than identifying the true perpetrators of the crime.

G. Similarly, under accepted police practices a reasonable officer's investigation is not over once a confession is obtained. By 1998 the concept of false confessions was well known within police practice, and investigators were trained that people can falsely confess to crimes for all sorts of reasons (e.g., protecting the real perpetrator, mental health issues or other forms of susceptibility to suggestion, attention seeking, etc.). For this reason, the generally accepted police practice was for investigators to test the veracity of a confession, to determine if it contains indicators of truthfulness (e.g., verifiable information that was not known or shared with the suspect) or falsity (e.g., assertions that are contradicted by physical evidence or other information learned by investigators). The evidence in the record indicates this did not occur in the Soto homicide investigation. The alleged written confessions of the Plaintiffs significantly conflict with crime scene evidence. This includes the following:

- The alleged statements prepared by the police of Mejia, DeLeon-Reyes and Solache all claim that Jacinta Soto was stabbed after answering the door and Mariano Soto was stabbed multiple times as he laid in his bed. But according to the crime scene processing report submitted by M. Harvey and approved by his supervisors, *"Mariano SOTO was found dead and laying face-up on the kitchen floor with multiple stab wounds to head, chest and arms. Jacinta SOTO was found dead and laying face-down on the bedroom floor with multiple stab wounds to the shoulders, back and buttocks."*

---

[13] RFC Solache-Reyes 501.

- In addition, if Mariano Soto had really been stabbed multiple times while lying in bed, there would have been bloody blankets/sheets and stains on the mattress, but there wasn't - there is no documentation of that in the file, and no sheets/mattress were inventoried. If indeed there had been blood on blankets, sheets or mattress, that would have been of evidentiary importance (and could have even contained DNA of the perpetrator), and evidence technicians that processed the crime scene then should have inventoried it, as would have been standard practice.

- The confessions also state that when Jacinta was confronted at the door by Adriana, DeLeon-Reyes and Solache, DeLeon-Reyes stabbed her in the chest. However, the stab wounds to her body were on the shoulders, back and buttocks; there is no documentation of any stab wounds to her chest.[14]

- In addition, the confessions state that the suspects were only able to enter the home when Jacinta Soto opened the door. However, when police arrived at the Soto apartment to look for the missing Soto family, the door to the home was locked.[15]

- Finally, the information in the call logs to and from the Mejia home contradict the statements in the confessions.[16] According to Adriana's written statement, she called home at 5:15 pm and told a Martin Vaca that she had the baby, and again at 7pm and spoke to Rosauro and told him to pick her up the next morning.[17] However, the call logs police obtained do not comport with these statements. There are only three calls to the Mejia home in the period from 3pm to 7pm. Two of those calls come from what appears to be the restaurant where Carlos Martinez worked, Jalisco Birrieria (a third call out to the restaurant is made in the same period). And the third is from a number, 773-523-9856, for which the caller is unclear. In other words, there are not multiple calls that can be attributed to coming from the hospital in that period. And importantly, the detectives do not appear to have made any efforts to investigate the calls to and from the Mejia household, which could have been another rich source of leads in an open-minded investigation. In fact, there are a series of interesting calls to and from the Mejia household on the evening of March 27, 1998 and morning of March 28, 1998, including calls at 10:05 pm, 10:38pm and at 12:31 am, and again at 10:50 and 11:41 am the next morning.[18] In particular, there are a series of particularly interesting calls to and from the Mejia house between 6-7 pm on March 27, a time when Adriana is purportedly calling home to inform Rosauro

---

[14] SDT-CCME 65.

[15] RFC Solache/Reyes 418-419.

[16] RFC Solache/Reyes 155-193.

[17] RFC Solache-Reyes 287. Notably, this is contradicted in part by the statement of Rosuaro Mejia, which indicates that after 5 pm Guadalupe Mejia informed him that Adriana had called home several times but had *not* indicated that she had the baby yet. RFC Solache-Reyes 317.

[18] RFC Solache/Reyes 161, 164-65.

that she has had the baby, that appear to be from a number associated with Jalisco Birrieria.[19] According to deposition testimony, that is where Carlos Martinez, Adriana'a brother, worked. In addition, there are a series of late night calls to and from a number, 773-434-8643, that Jose Mejia (nephew of Rosauro Mejia) testified belonged to him.[20] Those calls are at 10:38 pm and 12:31 am in the hours just before the perpetrators are believed to be gathering to commit the crime, and again at 10:50 am and 11:41 am in the hours when Adriana is purportedly being picked up at the hospital in possession of a baby and a boy. Again, there are no efforts to investigate these calls. But if Ms. Mejia was really calling the home that night, where she was calling from or whose phone she was calling from would have been potentially critical leads.

None of these important discrepancies were ever considered, explained or even mentioned in any of the case file documents. The failure to engage in post-admission investigation to test the veracity of the confessions is another indicator of tunnel vision and an investigation focused on closing cases rather than finding.

H. In addition to these obvious conflicts between the crime scene evidence and the confessions, the timing of events related to the crime call into question the written confessions of DeLeon-Reyes and Solache. There is no documentation indicating that the detectives made any efforts before seeking charges to check Solache's and DeLeon-Reyes' work records to see if they had an alibi. These records were later obtained in the period prior to trial, and the records strongly undermine the timing of events in the purported confessions. According to the written confession of Arturo DeLeon-Reyes, he was picked up by Solache at 1:30 am on the night of the crime. However, Solache's work records indicate that he started work on March 27, 1998 at 4:30 p.m. and did not get off work until 3:00 am, and so could not have possibly returned home and picked up DeLeon-Reyes until much later.[21] When the police questioned Solache and told him when the murders took place, he told them he couldn't possibly have been involved, as he was working, and provided the name of the company he worked for.[22] So, detectives could have easily confirmed this information; if they had, they would have had strong evidence that the confessions of DeLeon-Reyes and Solache were false, and that they likely were not the perpetrators.

DeLeon-Reyes and Solache's work records would have undermined their confessions and Adriana's statement implicating them in multiple additional ways, if detectives had bothered to follow up. According to the confessions, DeLeon-Reyes met Adriana Mejia

---

[19] Reyes 8918.
[20] Reyes 8726.
[21] Solache 7322.
[22] Deposition of Gabriel Solache (pg. 297).

at 10:00 am at the hospital on March 26. However, DeLeon-Reyes began work on the 26th at 12:30 pm, in South Holland, Illinois, and was picked up approximately an hour before work each day by a co-worker because he did not drive.[23] It is highly unlikely he could have met Adriana at UIC Hospital at 10:00 am, then find his way home in time to be picked up for work around 11:30 am.

Likewise, on March 27, 1998, DeLeon-Reyes worked a ten-hour shift, and clocked out at 11:15 pm; evidence in the record states that he did not leave the jobsite that night until 12:30 am, and did not get home until at least 1:30 am on the morning of March 28, 1998.[24] In fact, records indicate that he went right back to work the next day, leaving at 10:00 am and working an 11 hour and 15 minute shift.[25] His supervisor indicated that he did not seem tired and his work was no different than normal,[26] undermining the claim that he had managed to commit a double murder and double kidnapping in the eight and a half hours between when he got home and when he went back to work.

Ultimately, the work records of DeLeon-Reyes and Solache severely undermine their confessions, and the likelihood that they were involved in the crimes—first and foremost, Solache was at work until 3:00 a.m. and could not have possible been home in time to pick up DeLeon-Reyes and Adriana on any sort of timeframe that comports with the handwritten statements. Detectives failed to conduct the investigation necessary to adduce these critical facts.

**DELEON-REYES AND SOLACHE WERE UNREASONABLY DETAINED:**

Reasonably trained officers know and understand that the Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures. Arrests and detentions are considered "seizures" under the law. Traditionally, courts held that any seizure required probable cause to believe that the person being seized had committed a crime. However, in 1968, the U.S. Supreme Court created an exception to the probable cause rule. It held that the police could temporarily detain suspects as long as they had reasonable suspicion (a lower standard than probable cause) to believe the person being detained was involved in criminal conduct.

Although the defendants lacked any physical evidence that DeLeon-Reyes or Solache were involved in the Soto murders they were unreasonably arrested, and investigators began an unrelenting interrogation of the men that lasted over the next 40 hours. Many of the CPD Police reports use the word "interviews" when describing the interactions between the officers and the Plaintiffs. In reality, from the moment the Plaintiffs were placed under arrest on April 3, the

---

[23] JR-L 104367; REYES 008911-12; Arturo Reyes 2/25/2020 Deposition (p. 58); Reyes-Jenner 6521; Salvador Olivares Deposition (pg. 23); Declaration of Salvador Olivares, Reyes 8905-8907.
[24] JR-L 104367; REYES 8912; CCSAO 6234; 6237; Reyes-Jenner 6522, 6527.
[25] Reyes-Jenner 6523; JR-L 104367.
[26] Reyes-Jenner 6523; CCSAO 57103; 6234; 6237.

discussions became "custodial interrogations."  CPD General Order 87-07 states:   *"Custodial interrogation has been interpreted by the United States Supreme Court as questioning initiated by law enforcement officers after a person has been taken into, custody or has otherwise been deprived of his freedom of action by the authorities in any significant way.  NOTE: Interrogation encompasses not only questioning, but also any remarks, psychological tactics or patient maneuvering designed to elicit a response or to undermine a suspect's will to resist further questioning".*[27]

During this time DeLeon-Reyes and Solache were handcuffed and confined in separate interrogation rooms where the only way they could sleep was on the floor, the metal bench, or seated in a chair. As evidence of such conditions I considered the following:   Supplementary Report C-198126 (pg. 13) – *"the statement of Guadalupe MEJIA was completed at 0300 hrs.* (April 4, 1998). *At that time Adriana MEJIA, Arturo DeLEON, and Gabriel SOLACHE were all sleeping on chairs in their respective interview rooms.  It was decided to let the prisoners sleep and resume questioning in the morning."*

Nearly two days after first arriving at the Chicago Police department to turn over a young kidnaping victim the Plaintiffs remained handcuffed and locked in interrogation rooms without being criminally charged, and without the opportunity to consult with an attorney.

As discussed above, the decision to place DeLeon-Reyes and Solache under arrest on the morning of April 3, 1998 and subject them to interrogation, when at that point they had voluntarily brought in the kidnapped Soto boy and there was no evidence that supported probable cause for their arrest and interrogation, is further evidence of the tunnel vision that undermined the detectives' investigation from start to finish.

**THE INTERROGATIONS OF DELEON-REYES AND SOLACHE WERE UNREASONABLE AND INCONSISTENT WITH ACCEPTABLE POLICE PRACTICES.**

Police officers know and are trained to understand that they must hold themselves to high standards in conducting interviews and interrogations, and must use practices that focus on the rights of the accused person, and minimize any physical or mental anguish that might cause a false confession. As of 1998, the phenomenon of false confessions was well known in policing, and officers were trained on the sorts of tactics that were prohibited (e.g., physical abuse, threats and promises), and tactics that increased the risk of false confessions (e.g., feeding facts). CPD Captain Eric Winstrom acknowledged this on behalf of CPD in his deposition.[28]

[27] CPD G.O. 87-07 – Interrogations:  Field and Custodial.  Issue date:  30 October 1987.
[28]  CPD Commander Eric Winstrom deposition on December 21, 2021 (pg.  230-231, and generally pg. 211-270).

Custodial interrogations of suspects and the statements and confessions that are elicited are vitally important in the preparation of criminal cases. However, to be admissible as evidence, statements and confessions must be given freely and voluntarily and with due consideration for the suspect's right to silence and right to counsel. Therefore, police departments throughout the nation develop policies and train their officers to understand and observe due process rights of suspects and to guard against any charges of police coercion or intimidation during interrogation.[29]

Unfortunately, the evidence here indicates that generally accepted police practices related to the interrogation of suspects were violated in numerous ways during the course of the guilt-presumptive and accusatory interviews and interrogations conducted in this case, and likewise the types of safeguards detectives were trained on to avoid false confessions were also ignored.

First and foremost, the use of physical abuse is strictly prohibited. The Plaintiffs allege that while being interrogated over several days about the Soto murders they were handcuffed to a wall while Guevara repeatedly struck and beat them. They describe a course of events in which they repeatedly denied involvement, and their denials were repeatedly met with disbelief and physical force. Plaintiffs were deprived of sleep and urinated into bottles while being held captive at CPD Area 5. Additionally, Plaintiffs allege that Detective Guevara threatened them that they would get "the electric chair." CPD Commander Winstrom testified that such a statement would be in "improper".[30] This physical and psychological abuse of the Plaintiffs lasted for over forty hours and only stopped once the Plaintiffs agreed to falsely incriminate themselves and confess to murdering the Sotos.

Rosauro and Adriana Mejia's testimony both support the Plaintiffs' claims of physical abuse. Rosauro testified that when he was being questioned by Guevara, Guevara asked him how much he paid for the little girl, and when Rosauro answered that he had not paid anything, Guevara hit him repeatedly. Trial Tr., June 19, 2000, in People v. Solache, et al., Case No. 98-12440, Circuit Court of Cook County, at Q - 22.[31] Rosauro testified that he believed Guevara hit him because he did not believe him.

Likewise, the City of Chicago determined that Guevara used physical force and unreasonable practices to coerce Arturo DeLeon-Reyes and Gabriel Solache to involuntary confess to murder (Lassar Report on Reyes and Solache, Bates No. CCSAO 43655-43673).[32] And of course, Detective Guevara has repeatedly asserted his Fifth Amendment right against self-incrimination

---

[29] IACP Model Policy – Interrogations and Confessions – January 2004.
[30] CPD Commander Eric Winstrom deposition on December 21, 2021 (pg. 228).
[31] Reyes-Jenner 6312.
[32] Lassar Report - Lassar reached this conclusion despite drawing no inference from Guevara and another officer's refusal to speak about their activities as Chicago police officers and their interrogations of Reyes and Solache.

when questioned about whether he physically abused DeLeon-Reyes and Solache (and Adriana and others), and about whether he framed DeLeon-Reyes and Solache for the Soto crime.

The fact that Guevara committed so many repeated serious transgressions during homicide investigations, resulting in the wrongful prosecution and conviction of innocence individuals, indicates to me that his supervising and fellow officers must have known and simply turned a blind eye to his misconduct. This evidence is consistent with the existence of a code of silence within the Chicago police department, dating back to the Jacques Rivera investigation in 1988, and continuing at least until 2007, when a federal jury determined that the CPD had a code of silence, wherein police officers would not report misconduct committed by fellow police officers. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). These repeated criminal assaults – affirmed as part of Lassar's investigation at the City of Chicago's request – demonstrate that the City of Chicago and the Chicago Police Department, including its Internal Affairs Division, failed to adequately investigate, supervise, and/or discipline Guevara over the course of his career.

CPD Policy specifically prohibits "any circumstances of lengthy incommunicado custody, deception, promises or suggestions of benefits, or other forms of psychological pressure will invalidate the acceptability of anything the person questioned states or writes."[33] It is evident that the Plaintiffs were held in violation of the CPD policy, and it is more likely than not that CPD supervisors and police managers were well aware of the violations. In my experience, detective supervisors are active participants in active homicide investigations, responsible for ensuring the progress of such serious investigations, and particularly so in a high-profile investigation such as this one (missing children, news coverage). Commander Winstrom even acknowledges that the detectives' sergeants would have been aware of what suspects were in interrogation rooms and subject to interrogation.[34]

I have also had the opportunity to review the expert report of Professor Leo, documenting a disturbing history of systemic physical abuse of criminal suspects spanning decades and Detective Areas (including 1998 and Area 5). His report corroborates and further bolster my opinions with regard to the deviations from police practices present in the interrogations in this case, and CPD's culpability for permitting Guevara to engage in the physical abuse it appears he did in this case.

Second, DeLeon-Reyes and Solache have testified about the use of a number of additional prohibited tactics. Both of them testified to the use of psychologically coercive tactics including threats of harsh treatment if they did not cooperate or confess, and the implicit promise that the physical abuse would cease if they complied and confessed, that they would be treated more leniently. DeLeon-Reyes testified that he was threatened with the death penalty, and that they would help him return home if he signed. Solache was threatened that he would "get fucked" and

---

[33] CPD General Order 87-7, dated October 31, 1987.

[34] CPD Commander Eric Winstrom deposition on December 21, 2021 (pg. 249-50).

that something bad would happen to him, and implicitly promised that if he complied and confessed, that "something bad" would not happen. And in lieu of open-ended questions to determine what information the suspects could provide, DeLeon-Reyes and Solache testified that they were fed the facts of the crime in rich detail, such that any statement they gave would not contain any non-public and non-shared facts that could be used to independently verify the veracity of their statements.[35] Again, for his part Guevara does not dispute any of Plaintiffs' claims; when questioned about his use of such tactics, he asserted the Fifth. If the jury credits the Plaintiffs' unrebutted testimony, the psychologically coercive tactics used deviate grossly from accepted police practices, and were the exact sort of tactics that detectives are trained can result in false confessions.

Third, it is well understood in police practice that an interrogation does not end with a confession or implicating statement. Instead, as discussed above, detectives are trained to assess whether the suspect's statement contains indicia of reliability. So, for example, if the suspect volunteers information about how the crime was conducted that is confirmed by the physical evidence and information only known to the perpetrator, that is strong evidence that the confession is truthful. Here, there does not appear to have been any effort to assess the reliability of the statements taken from DeLeon-Reyes and Solache, an especially egregious deviation from police practices given the physically and psychologically coercive tactics that were used to obtain the statements in the first place. None of the detectives documented, or testified to, taking any steps to assess whether the confessions were reliable. As discussed above, if they had they would have found ample evidence that the confessions were unreliable and contradicted by other objective evidence.

Fourth, Plaintiffs at the time of their arrest were Mexican immigrants who could not speak, read or understand English and had little or no understanding of the workings of the American legal system. On April 2, 1984, CPD issued a Department Special Order describing procedures to be followed when officers arrest or detain foreign nationals such as DeLeon-Reyes and Solache. The Special Order States:[36]

Arrests of Foreign Nationals

1.      When an arrest or detention for any reason involves a foreign national, arresting officers and/or their supervising officer will:

a.      determine immediately if the arrestee is, in fact, a foreign national.

b.      notify the concerned Consular Post immediately if the arrest is made during the hours and on the days that the agency is open for business (see addendum to this order),

c.      notify the Office of the First Deputy Superintendent if the concerned Consular Post is closed, or if the arrest is made after 1700 hours or on a Saturday, Sunday or holiday. The Office of the First Deputy Superintendent will telephone the office or

---

[35]  Solache dep 477-482.
[36]  RFC-Solache/Reyes 118450.

home of the arrestee's consul.

d.        inform the foreign national in custody without delay of the charge(s) and his rights.

e.        allow Consular Officers the right to visit and confer with their foreign nationals who are in custody or detention and to arrange for their legal representation.

CPD Commander Eric Winstrom testified in a deposition on December 21, 2021 that CPD had a foreign national policy in place during the time period in question and acknowledged that the policy of notifying Consular Officers of the arrest of foreign nationals was simply not followed or practiced, and instead the practice among detectives was to apply the policy only to "diplomatics(sic) or dignitaries."[37] The detectives, in other words, openly violated their own policies designed to safeguard the rights of foreign nationals because those rules were inconvenient to their investigative goals. This violates generally accepted police practices.

 Fifth, the documentation of the interrogations of DeLeon-Reyes and Solache, and others, deviated from accepted police practices. As discussed above, there is no documentation whatsoever of Guevara's interrogations of Rosauro Mejia. There are no notes whatsoever of any interrogations of Solache. And there is only one set of notes from one of the interrogation sessions with DeLeon-Reyes, but no notes of any of Guevara's interviews, DeLeon-Reyes' primary interrogator.[38] Each interrogation session should have been documented. And because CPD did not require interrogations to be audio or video recorded in 1998 (even though many other departments did by that point), it would have been critical to take notes of what the person was saying so that a complete and accurate report documenting the interview could be later created. None of that was done. Instead, Detectives Guevara and Halverson appear to have documented the interrogations of DeLeon-Reyes and the other suspects in a cleared closed report not completed until April 30, 1998. The notion that interviews could have been accurately documented completely from memory, without the aid of notes, almost a month later is simply not credible. It is particularly notable, then, that the narrative description of what DeLeon-Reyes and Solache said as documented in the April 30 report almost perfectly tracks what is in the handwritten statement, with slight wording changes. By way of example:

---

[37] CPD Commander Eric Winstrom deposition on December 21, 2021 (pg. 276).

[38]  RFC Solache-Reyes 257-259. According to Rutherford, their GPR is based on an interview they participated in where Guevara led the questioning, and Rutherford and Dickinson wrote down what was being translated back to them since they did not speak Spanish. Rutherford Dep. Vol. I (pg. 102-107). The notes appear to be incomplete and do not document a complete story, they contain words and slang that appear very unlikely to have come from Reyes and that suggest the notes do not reflect an accurate translation of what the witness was saying, as they should (e.g., "Bogart way in," "deed was done"). In addition, neither Rutherford or Dickinson could explain why the time of the interview ("HRS") was deliberately crossed out. Dickinson Dep Volume; pp 198-200; Rutherford Dep . Vol. II (pg. 238-241).

| Top of p15 of April 30 supplementary report, documenting Guevara's purported interview of Reyes: | P4 of Reyes Handwritten Statement: |
|---|---|
| "They parked about a half block away from where the lady lived.<br><br>They were all ready to do whatever they had to do, to get the baby.<br><br>Adriana MEJIA walked up to the basement apartment in the back, and began knocking on the door.<br><br>He and Gabriel SOLACHE were a few meters away, waiting for the signal.<br><br>A women [sic] answered the door, and Adriana said something like, "Please let me in, I have no place to go"<br><br>Adriana MEJIA was the first one into the apartment." | "Arturo states that they parked about half a block away from the apartment.<br><br>Arturo states they were all ready to do what they had to do to get the baby.<br><br>Arturo states that Adriana walked up to the door of the basement apartment, in the back, and started knocking.<br><br>Arturo states that he and Gabriel were a few meters away, waiting for the signal.<br><br>Arturo states that Adriana said to the lady that answered the door something like please let me in, I have no place to go.<br><br>Arturo states that Adriana was the first one to get into the apartment." |

The same is true for Solache:

| P18-19 of April 30 supplementary report, documenting Guevara's purported interview of Solache: | P5 of Solache Handwritten Statement: |
|---|---|
| Adriana MEJIA put one hand over the woman's shoulder as the woman fell to the floor.<br><br>As Adriana had her hand over the women's shoulder she began stabbing the women in the back with her other hand.<br><br>He grabbed a knife that was on the kitchen table. | Gabriel states that then Adriana put one hand over the woman's shoulder and the woman was started [sic] to fall front and sideways.<br><br>Gabriel states while Adriana had her hand over the woman's shoulder and started to stab the woman in the back,<br><br>Gabriel states that he, Gabriel, grabbed a knife from the kitchen table. |

27

| The knife was about eleven inches long. | Gabriel states the knife including the blade was about eleven inches. |
|---|---|

This near-perfect match between the supplementary report and handwritten statement continues throughout. The same is also true in comparing Guevara and Halverson's documentation of their interviews of Adriana Mejia and Guadalupe Mejia to their handwritten statements; they are nearly identical in order and wording. Of course, no two interviews of the same witness-- even one who is cooperative-- ever follow the exact same script. Based on experience, this is strong evidence that the information in the supplementary report is copied from the handwritten statement, or vice versa, or both are copied from some third undisclosed set of notes. Any one of the three would deviate from accepted police practices, especially where, as here, the reports and statements are held out as separate, independent interviews. This failure to document suspect interrogations contemporaneously, and then create misleading after-the-fact documentation, is a gross deviation from generally accepted police practices.

As was the case with DeLeon-Reyes and Solache, once detectives misclassify an innocent person as a guilty suspect, they often subject him to an accusatorial interrogation. Getting a confession becomes particularly important when there is no other evidence against the suspect, especially in high-profile cases in which there is great pressure on police detectives to solve the crime, there is no other source of potential evidence to be discovered, and typically there is no credible evidence against an innocent but misclassified suspect. It is perhaps not surprising that most documented false confessions occur in homicides and other high-profile cases.[39]

**ADDITIONAL SIGNIFICANT DEVIATIONS FROM PROFESSIONAL HOMICIDE INVESTIGATION STANDARDS IN SOTO HOMICIDE INVESTIGATION**

This so-called "investigation" into the homicide of Mariano and Jacinta Soto by the Chicago Police Department, Reynaldo Guevara, and various police officers and supervisors employed by the City was intentionally and blatantly calculated to wrongfully focus on, arrest, charge and convict Plaintiffs DeLeon-Reyes and Solache. The investigation was poorly conducted and in a manner that can only be classified as shoddy and unprofessional. Among the failures was a repeated failure to contemporaneously document investigative steps, a critical aspect of a homicide investigators' truth-seeking function. As discussed in Opinion 2 below, the documentation failures evident in the Soto homicide investigation are part of a systemic failure at a department level to ensure documentation of critical information—including exculpatory and impeaching information—learned during homicide investigations.

Examples of additional documentation failures and shoddy investigation are as follows:

---

[39] Drizin S, Leo R: The problem of false confessions in the post-DNA world. NC L Rev 82:891–1007, 2004

1. Crime scene photographs had to be retaken - According to case file documents, on April 17, 1998 at 1515 hours the R/Det., Guevara, met with ASA Art Hill at the scene of the Soto's homicide at 2071 N. Leavitt. While at the scene Guevara requested the crime lab for the purpose of re -photographing the scene. "Officers were asked to take new pictures of the scene because the previous photos that were taken of the crime scene were all damaged due to a faulty camera."[40] That the crime scene photos from a high-profile murder were damaged and unusable is highly unusual.  It is also highly unusual to "re-photograph" a crime scene several weeks after discovering the crime.  The investigative file does not contain any specific details as to what aspects of the crime scene were "re-photographed" nor what safeguards were in place to ensure that the scene had not been contaminated in anyway prior to the photographs being retaken.[41] In fact, the photographs from the "re-photographing" session appear to depict nothing more than a ransacked apartment that was thoroughly contaminated and could no longer be probed for any evidence of investigative value. No effort to explain what was being re-photographed, or why, is included in the police file.

2. Consent searches vs court approved search warrants- According to CPD reports on  April 3, 1998, at 1700 hrs. Det. R. Guevara and Det. B. Ruiz asked Rosauro Mejia if he would sign a consent to search form, for his residence, so that detectives could search for any evidence as to how his wife came to be in custody of the two Soto children.  Mejia signed a consent to search form and Dets. M. Stephens, B. Ruiz and J. Santopadre went to 6234 S. Mozart to search the residence of Rosauro and Adriana Mejia.  Additionally, consent searches were used several additional times by these investigators to obtain additional information from the home.  Although consent searches are sometimes used, experienced and well trained investigators, especially homicide detectives, know that obtaining a search warrant avoids the pitfalls of warrantless searches. Moreover, at the point that detectives sought consent searches to portions of the Mejia home, they knew that the baby had been found there and had been in Adriana's possession; a proper search warrant would have given them the ability to conduct a more comprehensive search of the home, and in turn to develop additional evidence that may point them in the right direction, even if not exclusively at their chosen suspects.

3. On November 18, 1999 Investigator Daniel Trevino submitted a supplemental report concerning the statements made by Adriana Mejia on April 4, 1998.   The report containing important and relevant information was submitted some 19 months after the interview purportedly took place (April 4, 1998) and nearly three months (August 25, 1999) after he purportedly discovered that the information was missing from the report.

---

[40] Area 5 Supplementary Report- dated April 18, 1998.
[41]  In fact, the apartment appears to have been turned over to Martin Soto, the brother of Mariano Soto, on April 1. RFC Solache-Reyes 416.

Det. Trevino wrote in his Nov. 18, 1999 report:

*"On the 25 of Aug. 1999, Reporting Investigator while reviewing the final Statement of the above Homicide case under the above R.D. number, discovered that a statement of confession of Mrs. MEJIA was not included in the report.*

*Mrs. MEJIA while being interviewed in Spanish by Reporting Investigator after she was given her Miranda rights, gave the following statement in that she stabbed Mrs. SOTO (victim) with a knife. When asked to be specific, Mrs. MEJIA by using a pen as a prop acted out the scenario by showing R/I how she used the knife to stabbed the victim. Mrs. MEJIA also stated that when the victim fell on the floor on all fours she straddle her and began to stabbed her back.*

*When asked to demonstrate, Mrs. MEJIA got on all fours and started to act out as the victim while she was being stabbed. R/I reminded Mrs. MEJIA if she was telling the truth. Mrs. MEJIA stated that she was. The above statement was taken at Area 5 in the Lieutenant's Office, on the 4ᵗʰ of April, at @ 1400 hours, 1998."*[42]

If what Trevino belatedly documented really occurred, it is another example of remarkably shoddy documentation that the detectives failed to initially document a highly relevant and memorable reenactment of a murder. That said, there are reasons to doubt the reliability of this report created by Trevino 19 months later, from memory: under questioning at his deposition, he admitted that the report contains false information, including that he did not in fact interview Mejia (nor was he permitted to, since he is not a detective), that the encounter did not occur in a lieutenant's office, and the time it occurred is merely a guess.[43] And of course, he did not take any contemporaneous notes of this purported encounter.[44] Significantly, Trevino testified that he immediately told the detectives about Ms. Mejia's acting out the stabbing of Mrs. Soto.[45] Yet, there is no report from any detective documenting this highly inculpatory event. This is yet another example of the failure in notetaking and documentation in the Soto homicide investigation.

4. Based on my forty-three years of investigative experience I find the method used to document the Plaintiffs' alleged confessions to be highly inappropriate and inconsistent with acceptable police practices. CPD Commander Winstrom testified that interrogations during the time period of 1986-1998 were not recorded, although he did acknowledge that the state attorney's office would occasionally use a court reporter to create a

---

[42] Area 5 Supplementary Report dated Nov. 18, 1999.
[43] Daniel Trevino Deposition (pg. 97-100).
[44] Daniel Trevino Deposition (pg. 104).
[45] Daniel Trevino Deposition (pg. 106).

recording. In this case the police and state attorneys had the ability to record the alleged confessions, yet they each made a conscious decision not to record the interrogations.

Although the Plaintiffs could not speak or understand or read English, their confessions were handwritten out for them in English. They were directed to sign or initial each handwritten page certifying that the information had been read to them and was true and accurate. Plaintiffs allege that they had no idea what they were signing and since the state attorney participating in the interrogations did not speak or understand Spanish, he/she would have had no way of knowing if the translations were accurate. A far more logical approach would have been for the Plaintiffs to write their own statements, or at least for the Spanish speaking officers to write the statements/confessions out in Spanish for the Plaintiffs to read and sign.

I also considered that during the time period of 1998 many departments were routinely tape recording and even videotaping criminal interrogations and confessions. The CPD certainly had the ability to utilize recording equipment and they failed to do so. This failure by CPD certainly contributed to the criminal misconduct of Detective Guevara and others.

5. Information learned from witnesses was routinely ignored and undocumented. As discussed above, detectives failed to document and follow up on critical information known to Rosa Aranda about a woman who had befriended Jacinta Soto in recent weeks, been to her home, and had been there close in time to when Jacinta's keys went missing. A number of additional witnesses were deposed in this case who testified that they had been brought to the station and interviewed by detectives, including some treated as suspects, but there are no contemporaneous notes of any of those interviews, and in most cases no report documenting the substance of those interviews. This is true, for example, of police interviews of Leobardo Mejia (Rosauro's brother), Carlos Martinez (Adriana's brother), Norma Salazar (discussed above), and family members of the victims Felisa Soto, Jose Aranda, Jorge Soto, Martin Soto, and Pedro Soto. Some of these witnesses were deposed in this case; they describe being treated poorly, and in an accusatory fashion, while undoubtedly grieving and despite a complete lack of evidence of their involvement in the heinous murder and kidnapping of their family members.[46]

To the extent the defendants in this case claim that the failures discussed above are merely "minor" oversights, inconsistencies, or mistakes, that is exactly the problem: a culture of cutting corners, and failing to approach homicide investigations with an expectation to be thorough and accurate, knowing that homicide investigations are the most severe and serious

---

[46] E.g., Jorge Soto Deposition (pg. 31-32, 37, 44), Jose Aranda Deposition (pg. 43, 52-53), Leobardo Mejia Deposition (pg. 97).

types of law enforcement investigations. And the problem flows down the command chain, because the detectives' sergeants and other supervisors should have immediately noted the gaps, delays and other deviations in the investigation.

In addition, these same problems demonstrated in the Soto homicide investigation, including cutting corners and failing to be rigorous in how a homicide investigation is conducted and documented, can be seen over and over again in many other homicide files, as I discuss below regarding the detectives' documentation and disclosure practices.

**OPINION 2: CPD's POLICIES AND PRACTICES CONCERNING DOCUMENTATION AND DISCLOSURES IN HOMICIDE INVESTIGATIONS ARE WOEFULLY INADEQUATE AND RESULT IN THE ROUTINE FAILURE TO DOCUMENT AND DISCLOSE THE DOCUMENTS AND INFORMATION LEARNED DURING THE HOMICIDE INVESTIGATION TO CRIMINAL DEFENDANTS**

**The CPD's policies and practices related to the documentation, storage/preservation, and disclosure of documents and information learned during homicide investigations was contrary to generally accepted police practices**

To meet their constitutional obligation to turn over investigative information to the criminal justice system, police departments typically put in place policies and practices that require officers to document the information they learn during the course of an investigation, keep all of the investigative materials and information in a centralized file, and disclose all of the investigative information in the central file to prosecutors and others in the criminal justice system. In support of these steps, departments perform training and monitoring to ensure the policies are followed and the necessary steps above are taken.

Based on my review, CPD did not maintain policies and practices to ensure that these basic steps were being taken. First and foremost, under CPD policies there was not a centralized file, but instead information related to each investigation was kept in multiple files in multiple places. Then, CPD failed to provide any training or policies to ensure that formal or informal responses to discovery requests from the criminal justice system actually resulted in the collection of all investigative material from all locations. In other words, documents related to a single investigation were in multiple places, but there was no policy, directive, checklist, or other guide to tell the subpoena responders what all those places were or how to go about ensuring that they had obtained it all. The result was predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

My review indicates that these problems were known as early as 1981, as part of two federal cases at that time, discussed below. But the policies and practices the City put in place in response to these cases was plainly inadequate to solve the problem. The policies that were put in place continued—rather than prohibited—the use of multiple, parallel files for each investigation. The policies were also wholly missing any instruction or directive to ensure that there was a process to ensure that whatever investigative material was out there, in the various places it was housed, was all being produced in response to discovery requests from the criminal justice system. There was also limited training on these new policies, and more importantly, no supervision or auditing to ensure that the new policies were being followed.

In addition to the Soto homicide file and related criminal defense and prosecutor files, I have reviewed many more Chicago homicide files and corresponding criminal defense files, including

all available Area 5 homicide files for the period from 1995-1998. In addition, I have also reviewed the expert reports of Michael Brasfield in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files for different time periods (Rivera) or different Areas (Fields), as well as the police homicide files in *Rivera*, *Fields* and *Kluppelberg*. Each of those cases contain examples of investigative material suppressed in CPD homicide files that should have been turned over to the criminal justice system based on police training, and that would have clearly been considered *Brady* material under generally accepted police practices. Based on my review of all of this material together, it is my opinion to a reasonable degree of professional certainty that CPD's documentation and filekeeping policies were deficient, and that CPD maintained a widespread practice in which investigative documents and information learned during homicide investigations was routinely withheld from criminal defendants.

Remarkably, my findings appear to be true even to this day. The City of Chicago's own Office of Inspector General issued a report in June 2020 regarding CPD Record Management, stating that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations."[47] The OIG's findings included the following:

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, cannot ensure that they are identifying and locating all responsive records for production. The Department lacks the means to determine what records may exist for any case or incident, making it impossible to know whether it has identified and produced all relevant records."
- "When receiving a request for 'any and all' relevant records (i.e., requests with broad language) including but not limited to certain specific records, Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated, in order to satisfy the broader request."
- "When the Subpoena Unit receives subpoenas with broad language, members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records."[48]

The OIG issued a follow up report in September 2021 stating, "CPD's ability to meaningfully ensure that it is fulfilling all of its constitutional and legal obligations to produce all relevant records for criminal and civil litigation remains seriously impaired."[49] The OIG was plain as day about CPD's unwillingness to do anything to fix the problem: "OIG concludes that CPD has undertaken almost no corrective actions." As discussed below, the OIG's findings—to this day— are consistent with my findings for the period from 1995-1998.

---

[47] June 2020 OIG Report, at 4-5.
[48] *Id.* at 4.
[49] Sept. 2021 OIG Follow-Up Report, at 2.

My opinions are discussed in more detail below.

**Standard police practice in 1998 was to maintain a centralized repository, often referred to as a single "murder book" or "homicide file." to collect and store all investigative information learned during the course of a homicide investigation**

Necessary to every homicide investigation is not only the investigative steps taken to solve the case, but also the documentation and preservation of the information learned over the course of that investigation. By 1998, police departments as a matter of course trained their officers that they were required to thoroughly document their investigations and that they should disclose the entirety of their investigations to criminal defendants, as this was part of their constitutional Brady obligation to the prosecutors and criminal defendants.

Police departments around the country wrote policies and perpetuated practices designed to ensure these constitutional requirements related to documentation and disclosure were being net. The standard practice followed by police departments, in turn, was the obvious one: maintain a single homicide file in which all investigative material is placed and kept, and then disclose the entirety of that single, homicide file to the criminal justice system. This was typically done by having the lead detective(s) assigned to the investigation be responsible for ensuring that the investigative steps conducted (which they would have other done themselves, or been told about by assisting detectives) were documented, and for gathering and collecting all of the documents in a single homicide file. In this way, any work done by the lead detectives, assisting detectives, patrol officers or gang officers or other special units, and all the various traditional (reports, notes, etc.) and non-traditional investigative material (business cards, a photo received from a witness, etc.) was all in one place. Likewise, in this way, investigative steps documented in handwritten notes, or in typed reports, would also all be in one place. This approach not only aids the investigation—by ensuring that all investigative material is in one place and available to the lead investigators to review, and to supervisors to monitor the investigation's progress—but also provides a single, central repository from which the entire set of investigative materials can be collected and copied for production to the criminal justice system.

The standard practice I have described above is exactly the practice that was, and is, followed in each of the police departments in which I have worked. My knowledge of these standards is based on my extensive practical experience of supervising and managing criminal investigations; including my own experience as a detective and detective sergeant with multiple police agencies; and my familiarity with the policies used by departments nationwide.  As a law enforcement trainer I have for several decades provided investigative training to detectives from hundreds of agencies throughout the country. In the course of my work as an independent criminal justice consultant reviewing policies and practices of police departments around the country,  I am familiar with industry standards established by organizations like the International Association of

Chiefs of Police (IACP) and the Police Executive Research Forum (PERF). These standards have also been documented in homicide guides and reference materials for decades. In addition to my own extensive experience, for a summary of some relevant texts please see **Attachment E**.

In addition to the maintenance of a single, centralized file, there is also the question of what information should be documented and included in the centralized file. The answer is everything (within reason). The standard police practice is to document, in notes and/or reports, all of the information learned during the course of an investigation. Of course, homicide detectives were not expected to document if they stopped for coffee on their way to a crime scene, or a friendly greeting from a passerby on their way to see a witness. But putting aside the extreme, investigative steps taken to advance the investigation should be documented, even if they ultimately prove to be dead ends, or do not support the hunches or theories of the investigating officers. This is because an investigator does not know in advance which piece of information they learn will ultimately prove to be critical to solving the case, and something that seems like a bid lead today can fizzle; and something that seems like a small lead today can prove to provide the critical clue down the road. This is also one of the critical ways that detectives avoid tunnel vision, and becoming overly fixated on a single suspect or theory, a highly relevant issue in this case, as discussed above. Thorough documentation of an investigation—even those steps that might point to alternate suspects or undermine the case against the eventual suspect—is also necessary as a matter of meeting the police's constitutional obligations to criminal defendants and the criminal justice system. Put simply, in my experience detectives and other police officers are trained and expected to follow the policies and practices I've described above.

Finally, consistent with all of the above, under generally accepted police practices the complete homicide file, consisting of all of the documents and information gathered during the investigation, must be produced to the criminal justice system. This is true regardless of whether the request comes in the form of a formal subpoena, or an informal request from prosecutors, criminal defendants, or others. Investigators (or administrators, to the extent they are involved in disclosing files) must not sift through the file to decide which documents they want to produce. Pursuant to written policies and practices, direction is given that the entire file, including all investigative material, should be disclosed.

**"Street Files": the George Jones Case and the *Palmer* class action**

In the early 1980s, the City's historic practice of permitting detectives to maintain "street files" containing their own "personal" investigative notes, undisclosed to the criminal justice system, came to light. It began with the criminal prosecution of a young man named George Jones, and resulted in two federal lawsuits through which a federal judge concluded that CPD's policies and practices at the time were inadequate, and resulted in the routine withholding of investigative material from criminal defendants.

36

**George Jones:** In 1981, George Jones, a senior at a Chicago high school who edited the school newspaper and was nicknamed "Bookworm," was charged with the murder of Sheila Pointer. During the CPD investigation, Frank Laverty, one of the detectives investigating the case, interviewed the victim's brother, Purvy. Purvy told Laverty that there were two assailants and both were wearing stocking masks. Laverty documented this and other evidence that Jones was not the perpetrator and that Jones could have used to help defend himself. However, this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[50]

Detective Laverty later learned in the newspaper that George Jones was on trial for the Pointer murder. Laverty told his Commander that Jones was innocent and being wrongly prosecuted, but his Commander did nothing to stop the prosecution. Laverty then found Jones' criminal defense attorney and told him about the information in the street file. Laverty's earlier investigative efforts documenting information that was exculpatory for Jones had not been provided to the defense attorney. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[51]

Jones then filed a civil lawsuit. He won. The jury found that the City had a practice of using "street files" that were withheld from the criminal justice system. The Seventh Circuit explained that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[52]

**The Palmer Litigation:** In addition to Jones' personal lawsuit, a class action was filed in federal court to prevent the use of street files.[53] The plaintiffs sought an injunction, and one was granted requiring CPD to preserve all street files and documents formerly placed in street files.[54] The TRO was amended when it came to light that detectives were continuing to treat notes and other investigative materials as their own, for personal use as part of a personal street file but not available for inclusion in any CPD file.[55]

District Judge Milton Shadur conducted a preliminary injunction hearing, after which he reached the following conclusions:

- There were no guidelines about what information in "unofficial reports" (e.g., notes, witness interviews, worksheets, memoranda, etc.) had to go into "official reports"

---

[50] *Jones v. City of Chicago*, 856 F.2d 985, 988-991 (7th Circuit 1988)
[51] Ibid. (at 991)
[52] Ibid. (at 995).
[53] *Palmer v. City of Chicago*, No. 82 C 2349
[54] Ibid (at NF-L 005606-07)
[55] Ibid (NF-L 005607)

(e.g., supplementary reports, closing reports, etc.). Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[56]

- The use of parallel files containing unofficial reports, referred to as "street files," "running files," "office files" or "working files," was well known within CPD.

- There was no policy or practice to ensure that all relevant information was placed in official reports or transmitted to the CPD's Records Division for permanent retention, resulting in potentially relevant information not being included in official reports.[57]

- In response to subpoena requests, CPD produces the official reports maintained at the Records Division, and photographs and lab reports, but not the unofficial reports maintained at the Area or kept by the detectives.[58] CPD Records Division employees do not respond to subpoenas or defense motions for discovery by contacting individual Areas for unofficial documents.[59]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[60] He also found that the use of street files created a "grave risk" of non-disclosure of exculpatory and impeaching information (in other words, *Brady* material). On appeal, the Seventh Circuit reversed Judge Shadur in part. It ordered CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies, but otherwise vacated the preliminary injunction because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. The Seventh Circuit did not revisit or revise Judge Shadur's factual findings.[61]

*George Jones* **Appeal:** In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of permitting detectives to keep street files undisclosed to criminal defendants.

The appellate decision included the following: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for

---

[56] Ibid (NF-L 005609-10)
[57] Ibid (NF-L 005612)
[58] Ibid (NF-L 005614)
[59] Ibid (NF-L 005614)
[60] Ibid (NF-L 005615)
[61] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.

misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[62]

Notably, the decision included the following indictment of CPD leadership at the time:

> Laverty should have been commended for his adherence to the principles of honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[63]

Based on my review in this case, discussed further below, this commentary on the failure of CPD leadership proved to be foreshadowing. The Jones and Palmer rulings reveal a consistent theme: resistance to change from detectives who insisted on continuing to keep street files, and resistance to change from CPD leadership that was more concerned about punishing Laverty for blowing the whistle than abolishing unconstitutional practices that had almost resulted in the wrongful imprisonment of an innocent high school student.The lack of a strong institutional response, and a strong message from CPD leadership that a dramatic change in practice was needed and was going to be enforced at the risk of discipline, is deeply problematic. It is no surprise, then, to see substantial evidence in this case, and the many other cases I reviewed, that the street files practice continued on for decades.

**CPD's policies after *Jones* and *Palmer* do not solve the problem, and are inadequate to ensure disclosure of all relevant investigative materials**

Despite the revelations from the Jones and Palmer lawsuits, including specific guidance from Judge Shadur regarding the failures in CPD's policies, the department's leadership made only the most tepid policy changes. The new policies were inadequate on their face, and wholly insufficient to make the sort of institutional changes necessary to ensure the consistent and complete disclosure of investigative material. The new policies were defective in nearly every way: they did not require documenting all investigative steps, they applied only to detectives but

---

[62] *Jones* at 988, 991-92, 993, 995-996.
[63] *Jones*, at 991-92.

not other officers involved in investigations, they continued to permit a system of multiple files containing different information, they lacked any express directive to disclose all investigative material in the multiple police files, and they contained no processes or instructions to ensure subpoena responders gathered all investigative information from each of the multiple repositories that existed under CPD's parallel file system. In addition, there was very limited training on the new policies, and there was no auditing and monitoring to ensure that file disclosure problems had been resolved.[64] Put simply, the policies themselves were deficient, as were the efforts to ensure those deficient policies were even followed. Given this, the continuation of the street files problem—to this day, according to the City's OIG—is entirely predictable.

**The Teletype and Detective Division Notice 82-2:** In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.[65] CPD designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[66]

Notice 82-2 and the corresponding teletype were only about preserving documents. It did not require detectives to put notes or memos into a central repository (or any repository), and it did not even affirmatively require detectives to preserve notes or memos that had not already been turned into a police file.[67]

Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them in to a department file, or even preserve them at all.[68] Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[69]

**Special Order 83-1:** On January 3, 1983, Special Order 83-1 replaced Detective Division Notice 82-2. Special Order 83-1 applied only to detectives assigned to Violent Crimes.[70] Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the

---

[64] Hickey *Fields* Dep. at 10, 43; Winstrom Deposition 208-210.
[65] NF-L 008751; NF-L 008754; Hickey, *Kluppelberg* Deposition 201
[66] Hickey *Kluppelberg* Deposition 221-22, 224; Brzezcek Test. NF-L 007517
[67] NF-L 008751-53; Hickey *Kluppelberg* Deposition 212-13
[68] Stibich Test. (NF-L 007468-70)
[69] NF-L 005615-16
[70] NF-L 007223-27

documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved.[71] Special Order 83-1 also created General Progress Reports ("GPRs").[72] The GPR forms were to be used by detectives for taking handwritten notes or writing so-called "to-from memos" to their colleagues.

Special Order 83-1 created an obligation for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents.[73]

Judge Shadur found Special Order 83-1 to still be lacking, including the following:

- There was no obligation to create an Investigative Case File Folder unless the crime fit certain violent crime categories and felony charges were approved. According to Judge Shadur, this was problematic because there was nothing to prevent against selective retention while the case was still being investigated;[74]

- It lacked direction to ensure that any assisting detective who received information relating to an investigation would forward the information to the lead/assigned detective to be included in the Investigative File Case Folder;[75]

- It required detectives to include "relevant" information in the official reports but offered no guidance as to what should be considered "relevant," permitting detectives to again choose what to include and exclude from their reports.[76]

- It lacks any guidance on how CPD should respond to a criminal subpoena or other request for disclosure of investigative material.[77]

**Special Order 83-2:** On May 2, 1983, Special Order 83-2 was issued. Under the updated policy, detectives were required to create records reflecting all relevant information, to pass along information they learn to detectives assigned to investigating that crime. In addition, under the updated policy the Investigative File Inventory Sheet was to be copied and disclosed to

---

[71] Special Order 83-1, IV(D)
[72] Special Order IV(E); Hickey *Kluppelberg* Deposition 170
[73] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73
[74] NF-L 005620
[75] NF-L 005621
[76] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20.
[77] NF-L 005621

prosecutors and criminal defendants.[78] Special Order 83-2 also created the Investigative File Control Card, which was supposed to allow for the Investigative File to be checked out by investigating detectives and accounted for.[79]

The updated policy, although a small improvement, was still plainly deficient:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

- it still applied only to detectives.[80]

- it fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

- it still fails to provide any definition of what is "relevant."[81]

- it relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- there is no provision in Special Order 83-2 requiring an audit or oversight to ensure the special order is actually being followed.

**Special Order 86-3:** On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 changes very little.[82] Where it does make changes, most of those changes actually weaken the overall policy rather than strengthen it. For example, it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received, and it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)."

---

[78] NF-L 008746-50
[79] Hickey *Kluppelberg* Deposition 228-29
[80] Hickey *Rivera* Deposition 55, 87-88.
[81] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20
[82] Winstrom Deposition 44-46.

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it. Overall, it remained deficient, for at least the following reasons:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

- it still applied only to detectives.

- it still fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it still lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

- it still fails to provide any definition of what is "relevant."[83]

- it still relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- it removed the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)," thus permitting detectives to keep handwritten notes on their person, at home, or in their locker for extended periods of time, as they did when the street file practice came to light.

- it still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."

- it removed the requirement of sending the inventory sheet to defense attorneys, albeit inadequate, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

---

[83] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20

So, Judge Shadur's express statement that CPD's policies were deficient because they failed to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," there was still absolutely no policy directive or procedure to ensure production of investigative files. Notably, the Special Order contains a single instruction about disclosure: to forward a copy of the inventory sheet to the Records Division, to be forwarded to the defense attorney. But what it does not say is to forward a copy of the entire file to the criminal defense attorney. This is an inexcusable omission.

Moreover, despite Judge Shadur's admonition, there was still no policy, procedure, or directive to ensure that subpoena unit staff, or other support staff at the Areas, were retrieving investigative material from all possible locations, or any training to that effect.[84] This, too, was an egregious violation of generally accepted police practices. Especially given that CPD chose to perpetuate a multiple, parallel file system. Indeed, as Hickey acknowledged, the lack of a centralized file, combined with lack of instruction, created confusion among detectives and subpoena personnel about their disclosure obligations.[85]

Finally, the failure to define relevance in a way to ensure the documentation of all information learned during an investigation deviates from generally accepted police practice, and is particularly egregious given Judge Shadur's concerns on this very issue. Commander Stibich admitted that what is relevant to one detective may not be relevant to another.[86] And CPD designees on this topic, Hickey and Winstrom, have testified to exactly the problems with CPD's lack of guidance. Detectives could decide what was pertinent not contemporaneously, but whenever they chose to write their supplemental report.[87] If this occurred once a suspect had been arrested and charged, a detective could freely decide that all other evidence—perhaps investigation into an alternate suspect—could be arguably "not relevant" since it did not implicate the person charged. Indeed, Hickey and Winstrom have admitted that this is exactly what could and would occur. For example, they both testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[88] This is contrary to accepted police practices, a recipe for violating Brady obligations, and exactly the problem Judge Shadur warned of and that CPD's deficient policies created. Alternate suspect

---

[84]  Hickey *Rivera* Deposition 36, 185-87. Winstrom Deposition 106-107, 189, 192-94.
[85]  Hickey Rivera Deposition at 253-54. He testified to remembering conversations when he was in charge of records division in which there were questions from subpoena clerks and detectives about what they were required to produce in response to subpoenas, including whether the entire investigative files had to be turned over.
[86] Stibich Test. NF-L 007474
[87] Hickey *Kluppelberg* Deposition [2015] 24-25, 33
[88] Hickey *Kluppelberg* Deposition 237-38 ; Winstrom Deposition 89-90.

information is exactly the type of highly relevant information for which documentation and disclosure is critical.[89]

Finally, Special Order 86-3 included a section requiring "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." This is an improvement on appear; auditing is critical. However, it appears to have been nothing more than words on paper; it was not done. Hickey and Winstrom, the City's designees on the topic, were not aware of a single instance in which such auditing occurred.[90]

**Standard Operating Procedures (SOP) 1988:** In 1988, standard operating procedures were created to govern the work of detectives. Chapter 18 deals with investigative files. The policy did not change. The relevant portion of the new SOPs, Chapter 18, contains "no substantive changes of any kind" from Special Order 86-3.[91]

In other words, the deficiencies described above with regard to Special Order 86-3 remained in the SOPs and was the governing set of policies (or lack thereof) through the Soto homicide investigation in 1998.

**The policies described above are insufficient to remedy the "street files" problem**

**1. Continued use of parallel files:** The use of street files as part of a parallel file system had been in place since at least the 1970s.[92] Despite the revelations in *Jones* of the failure with this system, the City continued to perpetuate a multiple, parallel file system. For a given investigation, there would be *at least* three files: a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number; a unit RD file, that Hickey testified was a slim file kept in the homicide drawer at the Area that would contain all the known official police reports (supplementary reports, etc.);[93] and an investigative file maintained by the detective area, containing documents that individual detectives assigned to investigate the case chose to include.[94] By design, the files had different information in them.[95]

---

[89] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

[90] Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.

[91] Hickey *Rivera* Deposition pages 250-51; Winstrom Deposition 44-46.

[92] Hickey, the City's designated witness on this topic, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in Palmer v. City of Chicago, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[93] Hickey *Kluppelberg* Deposition 115-16, 299-300; S.O. 86-3

[94] Hickey *Kluppelberg* Deposition 297-300

In addition to these files, investigative material could also be kept in the Evidence and Recovered Property Section, arrest reports could be kept at the Identification section, and individual detectives could each keep their own running/working files during an investigation.[96] And yet additional files could be created by other units of the Chicago Police Department, because the policies only applied to the Detective Division.  So, in addition to the multiple files above, patrol officers, gang crimes officers, and other special unit investigators could each have additional sets of files related to a homicide investigation. None of those files were subject to any documentation, storage and disclosure requirements.

Remarkably, Hickey himself raised some of these concerns. He informed CPD senior leaders that Special Order 83-1 was only addressed to the Detective Division,[97] and Hickey suggested that Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[98] CPD never acted on Hickey's concerns to look beyond the detective division, and allowed yet more parallel files to be created in other parts of the Department.

CPD's multiple, parallel files created unacceptable risk.  Investigative information was kept in multiple places, in multiple units, without any mechanism to even track how many parallel files had been created for a particular case, or whether they had all been collected.  This is why standard police practice around the country is to have a lead investigator responsible for keeping a single centralized file with everything in it. That the City kept in place a parallel file system after *Jones* and Judge Shadur's warnings, without any protections in place to make sure that all repositories were known and collected from, is an inexcusable police failure.

**2. Discretion to determine what is relevant and needs to be documented and disclosed.** As discussed above, the policies left detectives to choose what information to document in official reports and when to turn in investigative materials.  Given the street files problem and the history of resistance to change among detectives, CPD needed to provide strong, direct guidance; it did the opposite. The testimony of Hickey and Winstrom, discussed above, reveals the problem: they openly admit that it would be appropriate under CPD policy for detectives to determine that information about an alternate suspect was not relevant, if they so chose.[99]

**3. No procedures or written instructions to subpoena responders to make sure investigative material from all locations is disclosed.** Inexplicably, despite having a system of multiple, parallel files for a single investigation, CPD did provide any sort of formal training and

---

[95] Hickey *Kluppelberg* Deposition 100.
[96] Hickey *Kluppelberg* Deposition at 295-96; Hickey *Fields* April 2014 Trial Testimony at 2069.
[97] Hickey *Kluppelberg* Deposition 207-208
[98] Hickey *Kluppelberg* Deposition 208
[99] Hickey *Kluppelberg* Deposition 339; Hickey *Kluppelberg* Deposition [2015] at 66-67.

written procedures to subpoena responders on how to go about ensuring that they were gathering the documents from all repositories.

Based on the testimony of CPD's designees on the topic, Hickey and Winstrom, requests for investigative documents were handled by the Subpoena Service Unit in the Records Division.[100] But CPD had no written policy requiring, or explaining how, the staff in the Subpoena Service Unit were to go about searching for and gathering all responsive documents.[101] There were no checklists, procedures, "safe checks" or any other guidelines or guidance to assist subpoena responders in making sure they were requesting material from all the right repositories, or to check on the back end whether they got everything they should, or even formal training to set the proper expectations and practices.[102]

As a result, whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck, as in whether the subpoena responder happened to request the right documents from the right places, and the unit that received the request copied everything in their repository.[103] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art," and that it was possible in a case with multiple units working on the same investigation for the subpoena to go to only one of those units.[104] Winstrom admitted that subpoena clerks would simply ready the subpoena and send a request for documents to whichever units they thought might have documents, and that they were not provided with any policies, directives, checklists, guidelines or training materials to guide their decision about where to obtain documents, nor were they given any forms or lists that identified all the repositories in which documents related to a homicide investigation might be found.[105]

The woefully inadequate policy and practice I have described above was in place since the 1980s, through 1998, and well into the 2000s.[106]  In fact, the City's designee on the CPD's policies through 2009 testified that there is no system or procedure to follow up with the Area if it failed to respond to a request from the Records Division subpoena responder for documents.[107] The OIG Report discussed above demonstrates that all of the same, predictable problems continue to this day (June 2020 OIG Report, at 4):

---

[100] Hickey *Kluppelberg* Dep 358
[101] Hickey *Kluppelberg* Dep 36-37; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3
[102] Hickey *Kluppelberg* Dep 39, 147-48, 160; Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3; Winstrom Deposition 192-94.
[103] Hickey *Rivera* Deposition 43-46
[104] Hickey *Rivera* Deposition 162; Hickey *Kluppelberg* Deposition 362-63.
[105]  Winstrom Deposition 189, 192-94.
[106] Hickey, *Rivera*, 151-53; Loughran Deposition 14 Winstrom Deposition 197-201.
[107] Loughran Deposition 15.

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, **cannot ensure that they are identifying and locating all responsive records for production**. The Department **lacks the means to determine what records may exist for any case or incident**, making it impossible to know whether it has identified and produced all relevant records."
- "When receiving a request for "any and all" relevant records (i.e., requests with broad language) including but not limited to certain specific records, **Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated**, in order to satisfy the broader request."
- "When the Subpoena Unit receives subpoenas with broad language, **members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records**."

The lack of concrete written policies, procedures, training and safeguards, in the face of a multiple file system that created a greater need for exactly such things, was an egregious departure from generally accepted police practices.

**4. There was inadequate training and monitoring/auditing to ensure compliance with the special orders.** The only training provided to detectives was one three-hour session about Special Order 83-1. But one three-hour training session on just the first iteration of the policy change, where CPD senior leaders already knew detectives were opposed to the change, was wholly insufficient to overcome a decades-long practice. Hickey himself admitted that he learned that unit detectives were reverting back to keeping their own files to take out on investigations after Special Order 83-1.[108]

CPD did nothing to monitor and assess whether the policy was being followed, or to reprimand those detectives and supervisors who refused to comply. Hickey and Winstrom admit they are not aware of, and could not identify, any sampling or auditing that occurred after the Special Orders were put in place.[109] In addition, I am not aware of the City having produced a single document demonstrating that any audit or inspection ever occurred. Hickey and Winstrom also admit that there was no discipline of detectives that did not comply with the Special Orders.[110]

Put simply, policymakers failed to train, monitor or supervise detectives to ensure compliance with the Special Orders. The result is obvious and predictable: a failure to comply. As discussed below, that is exactly what I found in my review of homicide files.

---

[108] Hickey *Kluppelberg* Deposition 321, 327.
[109] Hickey *Kluppelberg* Deposition 160-61, 166, 167, 375-76; Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.
[110] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213; Winstrom Deposition 209-210.

**A review of investigative files shows that the Special Orders were not being followed**

I received investigative files for 344 different homicide investigations conducted by Area 5 detectives for the period from 1995-1998.[111] I reviewed the files to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs. As discussed above, I have opined that these policies were inadequate on their face to address the street files problem. But even if they were adequate on their face, they must also be implemented and followed. In my review, the files show that the special orders were not followed in a number of ways (which would have been obvious in any reasonable file audit). The analysis I conducted is the same one Michael Brasfield conducted in Rivera and Fields, and my findings are entirely consistent with his. In other words, my finding that the 1995-1998 Area 5 investigative files reveal that the policies were not being followed is the same conclusion that Brasfield reached with regard to 1985-1991 Area 5 investigative files, and 1984-1989 Area 1 (primarily) investigative files.

My findings are as follows:

**Handwritten notes, not on general progress reports, are still routinely used:** As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes, which detectives had been treating as their own property and something they were not inclined to place in the CPD's file. I found that detectives consistently used handwritten notes not on GPRs, despite the direction in the special orders. Only 334 of the 344 investigative files contained handwritten notes. Of those, 154 of the 334 files, or approximately 46%, contained handwritten notes not on GPRs. This is consistent with Brasfield's findings in Rivera (61%) and Fields (82%).

**To-from memos are still being used:** As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports. However, I found that detectives continued using to-from memos: 95 of the files, or approximately 28%, contained to-from memos not on official police forms. This is consistent with Brasfield's findings in Rivera (20%) and Fields (43%).

**Missing or Incomplete Inventory Sheets**: One of the new requirements under the policy, purportedly to ensure that prosecutors and criminal defendants could check to see if they had received all of the documents in the investigative file, was the creation of an inventory sheet to be included in the investigative file to track all the documents entered into the file. I have

---

[111] For two homicide investigations, a permanent retention file was produced, but no investigative file: Z101225, Z160497. Those two files are still listed in Attachment F, and as a result the spreadsheet contains 346 rows, despite only 344 investigative files.

already opined that the inclusion of an inventory sheet in the investigative file does little to ensure all investigative information is being documented and included in the investigative file, or to ensure that the entire file is disclosed. But in any event, my review shows that inventory sheets were not consistently included in the investigative files. I found that 57 files, almost 17% of total investigative files, contained no inventory sheet.

Even where there was an inventory sheet in the file, in many cases the inventory sheet was incomplete. I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete.

In total then, I found that in nearly all of the investigative files, inventory sheets were either missing or incomplete.

In addition, the inventory sheets do not appear to be contemporaneously updated as each new document is added to the file. Instead, documents were routinely added in bunches, with significant time delays from when the document was created. In addition, there are other ways in which they were simply not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.). Some examples include the following:

> A242406
>
> Z243035
>
> A276340
>
> A636514
>
> A744094

**Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports.** The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation. The special orders also require that inventories be sent to the permanent retention file for distribution to prosecutors and criminal defendants (as discussed above, an indication that CPD contemplated that it would only initially produce permanent retention files). These requirements were routinely flouted.

I was provided with permanent retention files for 341 homicide investigations from the time period 1995 – 1998. **See Attachment F.**

First, I examined the permanent retention files, standing alone, to assess whether they communicated a complete picture of the investigation. I found that while they communicate a story about how the detectives got from arrest to charges of their suspect, they communicated little else in terms of investigation into other leads or suspects. Rarely was there ever documentation of investigation into avenues that led to a dead end, something that happens in homicide investigations all the time (even those that eventually result in catching the correct perpetrator).

Michael Brasfield conducted the same exercise and wrote in his report as follows: "the permanent retention files in CPD are different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged. Put another way, in most departments, in addition to the various strands of the investigation, there is a charging memo in the official file that explains the basis for charges; CPD's entire official file is a charging document (or file)." This is well said, and I observed the same thing in my review of files.

Second, I compared and contrasted a number of the permanent retention files with their corresponding investigative files. **See Attachment F.**

Like Brasfield, I found many examples where information on handwritten notes was not transferred into official reports. In many cases, the information is potentially exculpatory. In addition to other instances discussed below, where such notes were not disclosed to criminal defendants, examples include RFC 34554, 76011-14, 76015-16, 77368, 77452, 94055, 94058-60, 94089, 94092, 94094, 94096-99, 110176, 110180, and 104166-70.

These examples in the paragraph above include handwritten notes containing cryptic notations on a page, without context: a name, a phone number, an address, etc. In my experience, notes like these are often important information (a new witness or suspect previously unknown, contact information for a possible alibi witness, the license plate of the getaway car, etc.). By not transcribing information into official reports, the relevance of the information, and its potential inculpatory or exculpatory value, is lost. Obviously, a detective thought the information was important enough to take a note, and I acknowledge that often a note may only contain shorthand and abbreviations to keep up with a person as they are speaking. But then it is critical to write a report, using the note as a memory aid, to provide a more thorough explanation of the information learned and its relevance to the overall investigation. In my review, this final step is often not done. The result is a violation of the Special Orders, which require relevant information to be written down and transferred into official reports, as well as a failure to disclose important

information to prosecutors and criminal defendants.

Finally, in my review I found that 329, or 96%, of permanent retention files did not have an inventory sheet, which according to policy should have been in the investigative file and copied into the permanent retention file.

My review of records in this case and others shows that the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. In addition, as discussed below, virtually all of the defense attorney files were missing information from the investigative file. So, even superficial audits of small samples of records would have revealed these problems.

**Criminal defense files show that important investigative materials are regularly withheld from criminal defendants**

Under generally accepted police practices, CPD's policy and practice must be to require and ensure that prosecutors and criminal defendants get **everything** from the police investigation, including all documents and information about the crime that was learned during the investigation. As discussed above, the standard is not to invite detectives or other officers to make their own assessments of what is exculpatory or not, what is relevant or not, or to pick and choose what documents and information from their investigation to disclose. The standard is to instruct officers to disclose everything, and let the prosecutor and criminal defendant determine what they think is important to their prosecution or defense at trial.

This is true regardless of whether the request for the police files comes from the prosecution or defense, or in response to a formal subpoena or motion for discovery, or in response to an informal request for investigative documents. In my experience, requests can come in from any of these avenues, but the response must be the same: to disclose everything, not pick and choose.

By 1998, departments knew, and officers were trained, for decades that they were required to follow such policies and practices as part of their constitutional obligations under Brady v. Maryland. This means providing a defendant not just with evidence that might support his guilt, but also any evidence that might support his innocence, including evidence that might undermine or impeach the evidence against him.

Given the standards set forth above, any review of prosecutor and criminal defense files should reveal a simple finding: all of the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file.

Based on my review of the criminal defense files provided to me, as compared to the investigative files, that is not what I observed. Instead, I found that documents in the

investigative file were routinely missing from criminal defense files. In a number of cases, this included investigative material withheld from criminal defendants that was relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. This is not surprising, given the lack of any such express requirement or instruction in the CPD policies (discussed above). My findings across these files is consistent with my findings from reviewing the police files from the Soto homicide investigation, where detectives did not disclose investigative information and documents that was exculpatory and impeaching and should have been disclosed. I discuss these conclusions below.

*Background on the Area North investigative files and my file review*

I compared criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. It is my understanding that this is the set of files that were ordered to be produced in discovery in this matter, and so I was provided with all such documents (not a sample or selected portion).

The law firm of Loevy & Loevy provided me with a spreadsheet that served as an index of the investigative files, permanent retention files, and criminal defense files. I spot-checked, reviewed and double-checked the spreadsheet, and reviewed numerous files to make sure I was familiar with the information contained in the spreadsheet and how it was compiled. My intention and understanding is for the information contained in Attachment F to be objective – that is, it does not contain subjective determinations about how fields are to be coded, whether something is relevant, whether something it administrative, etc. In this way, anything that was contained in the investigative file but not in the criminal defense file was identified in the spreadsheet. That spreadsheet is attached to this report as **Attachment F.**[112]

For file comparison purposes, there were 105 criminal defense files provided corresponding to 72 investigative files (there were some cases with multiple defendants, so multiple criminal defense files for a single investigative file; or where the PD file produced did not have a corresponding investigative file;[113] or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted[114]). After excluding partial or incomplete PD files, there were a total of 64 criminal defense files included in my analysis.

---

[112] I intend to rely on the spreadsheet included as Attachment F at trial to help explain the differences between the particular files to the jury.

[113] Those cases are Y188817, C381983, C166557, K340833, X146756, A12723, B29657, B540081, C112684, X234861, and C166557.

[114] Where there was a PD file that contained no police documents in it (e.g., just court transcripts, pleadings or other documents), it was marked in Attachment F as being an investigation with no corresponding PD file. Those cases are as follows: A496779, A594174, A732463, C650817, C713913, C739679. Where there were *some* police records in the PD file but it appeared to partial or incomplete, in the interest of giving the City the benefit of the doubt and remaining objective in terms of what goes into Attachment F, the case was included in the spreadsheet and marked at being an investigation with a

Finally, I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the criminal defense file was incomplete, as mentioned above and in footnote 114. The files available came from the Public Defender's Office, so it is likely that in many of these instances the case was transferred to private counsel, and so the criminal defense file may not be complete. Those files contain a strikethrough in Attachment F (leaving 63 files for calculation and analysis). I also gave the City the benefit of the doubt in my comparison to criminal defense files by assuming that all material in the criminal defense file had been there at the time of the original criminal trial (even if it might have been added subsequently, for example, as part of appeals or post-conviction proceedings). And finally, I gave the City the benefit of the doubt by assuming that the only police documents related to an investigation were those in the investigative file and the permanent retention file the City produced in this case. But of course, as discussed above, the Special Orders regarding documentation and filekeeping applied only to detectives, and so patrol officers, gang crimes officers and others could keep their own notes and reports that were not required to be included in the investigative file.

*Criminal defense files are missing pages from the police investigative files*

I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. As discussed above, my comparison exercise was objective rather than subjective. I then analyzed the types of documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could be of importance to prosecutors or defense attorneys and should have been disclosed.

Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and unlikely to have been important to prosecutors or defense attorneys (although administrative records can be important, such as the inventory sheets discussed above, an inventory control card identifying detectives who may have checked out the file and participated in the investigation, and even a homicide file checklist noting investigative steps that were taken); while other records were clearly investigative in nature and highly relevant. Regardless, any withheld pages that had been created before trial and conviction, regardless of importance, are evidence that there was not a policy of copying **all** documents in the police files. Instead, what the files reveal is that individual officers or others are making *ad hoc* decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production

---

corresponding PD file ("Yes" in column S), but the row was stricken out and not counted for purposes of my calculations and analysis. Those files are: A103098, A325358, A440114, A482669, B662923, C037884, C250890, and C722335.

of all material in all police investigation files, are both egregious departures from generally accepted police practices.

My comparison of the investigative files to corresponding defense attorney files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

**Handwritten Notes and General Progress Reports:** 37 of the criminal defense files (or approximately 59% of the 63 files analyzed) were missing handwritten notes that were present in the investigative files (see Row Z of Attachment F). Likewise, 26 of the criminal defense files, or 41%, were missing GPRs that were present in the investigative files (see Row X of Attachment F). The handwritten notes are often found on what appear to be plain sheets of paper, scraps of paper, and so on, none of which were the official GPRs on which such information was supposed to be documented.

**Investigative File inventories:** 43 of the 63 criminal defense files did not have an inventory to serve as an index of documents in the police investigative files.

As discussed above, CPD created the requirement of an inventory sheet in the wake of *Jones/Palmer*, with the idea that prosecutors and criminal defendants could review the inventory to make sure they got all the documents. As discussed above, this is not an adequate safeguard, and the inventories were often missing, incomplete or too vague, and on top of that it appears that the inventory sheets were not getting to criminal defendants at all in most cases. In other words, the safeguard CPD purportedly built into its policy was useless.

**Issuing a subpoena**: In many of the cases I reviewed, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the investigative file. But not all the documents in the investigative file were disclosed in response to those subpoenas. So, even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," there was no guarantee that a defense attorney would receive the complete investigative file (even assuming that was all the documents in the file).

*Examples of relevant information in police files that was withheld from criminal defendants but should have been disclosed*

Below are some examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed.

**Z219872 - Linox Jackson and Tyrone Hammnond**

Linox Jackson and Tyrone Hammond were convicted of first degree murder after allegedly shooting Jerry Hall during on May 19, 1995. The defense attorney's file is missing extensive information inculpating two other suspects, named Richell Akins ("Tree") and Ralph Mahomes, including any suggestion that detectives considered them suspects, such as their IR Histories and a criminal records search. ((RFC-Solache/Reyes 38520 (Akins); (RFC-Solache/Reyes 38522-25 (Mahomes)). The inventory sheet listing the IR sheets for Akins and Mahomes also was not disclosed. RFC-Solache/Reyes 038474.

Also missing from the defense attorney's file are other documents inculpating Akins and Mahomes. For instance, the Supplementary Report including a detailed interview with Akins, which contains multiple demonstrable inaccuracies, was also not disclosed. (RFC-Solache/Reyes 38480-38491.) A handwritten routing slip with Mahomes's name circled with a note "Did they shoot him in his car?" is also missing from the defense file. (RFC Solache-Reyes 38528).

**Z273605 - James Edwards, Damaine Billups, Cornell Guthrie, Alex Lane, N-Wata Mitchell, Willie Johnson**

James Bryant was beaten and stabbed to death by a group of people on June 19, 1995. CPD engaged in a sprawling investigation to figure out who, and how many people, had attacked him. Their investigation led them to a suspect named Tremaine Willis. Investigators requested Willis's IR sheet and a photograph in early July 1995 (RFC-Solache/Reyes 40247, 40249) and then investigators canvassed the neighborhood and asked witnesses to look at photos to see if they could identify any of the assailants. RFC-Solache/Reyes 49618. There is no reference to Willis anywhere in the defense file. Detectives also pursued an alternate suspect named Paul Thomas (aka Johnson). There is information on Thomas missing from the defense file, including, for instance, his arrest report. (RFC-Solache/Reyes 40335).

There are also a number of handwritten notes missing from the defense file, including one containing a phone number that does not appear on any documents in the defense file, and a hand-drawn map with what appear to be descriptions of the assailants and their actions. (RFC-Solache/Reyes 40304, 40344.) Finally, while the supplementary report states that a witness named Miss Smith saw three or four suspects chasing the victim, there is a handwritten note

56

stating that Miss Smith said that it might have been only two people who were chasing the victim. (RFC-Solache/Reyes 40609). In this investigation, in which detectives did not know how many people were involved in the attack, witness's observations about the number of assailants would have been important. This note would have bolstered other witness's statements that they observed only two people beating the victim, and supported the defense of a number of the individuals charged.

### A315294 - Jose Melendez

For this case, I focused on comparing the investigative file and permanent retention file given redactions in the PD file. In the permanent retention file is a supplementary report describing interviews with witnesses Arturo Salgado and Manuel Oliver, who were together in the area when Mr. Villasenor was shot, states that the witnesses told detectives that they did not see anyone running from the shooting. (53512). The GPRs from an interviews with Mr. Salgado and Mr. Oliver, however, do not foreclose the possibility that they may have seen the shooter. (71246, 71247.) Without this information, a defense attorney would not have known to interview them to attempt to discover impeachment material against the only person who identified Mr. Melendez in a lineup. As another example, a supplementary report states that a witness named Pamay Bassey looked out the window across the street from the shooting and did not see anything (53506), but the GPR does not reflect that she told police she saw nothing (71243). Contrast this with GPRs for other witnesses who saw nothing, which state "didn't see anything" (71240) or "didn't see" (71239).

The permanent retention file is also missing a handwritten statement of Eleuteria Pantoja, Mr. Melendez's alibi witness. (71191-95.) According to the version of Ms. Pantoja's story that appears in the permanent retention file, Mr. Melendez got dropped off at her house (which was over 2 miles away from the shooting) after the shooting, which she thought was unusual because he typically drives to her house. (53540.) Ms. Pantoja's undisclosed handwritten statement, on the other hand, states that she did not know how Mr. Melendez got to her house. (71194.)

### C687989 - Kim Mathis

This case involves the beating death of a child. The investigation revealed that Kim Mathis, the child's mother, admitted hitting the child on the back with a belt four to five times, and that he died two days later. The child died from blunt trauma to the abdomen. (RFC-Solache/Reyes 65178.) Detectives pursued Mathis, and, according to her testimony, beat, threatened, and intimidated her into signing a statement that she had not read. (AR-PD 30237-60.) The handwritten statement and corresponding supplementary report say that Mathis admitted hitting the child in the back with a belt and also stomping on his abdomen with her heel. (RFC-

Solache/Reyes 65192, 110155-60.) Mathis denied to the CCSAO that she kicked or stomped on her son. (AR-PD 29833)

The investigative file includes handwritten notes with a potential witness to the beating. The handwritten note states that Mathis's sister had been at the apartment when the beating occurred (RFC-Solache/Reyes 110176), but the cleared/closed report says that Mathis's sister was not at the apartment during the beating and did not see the child at that time (RFC-Solache/Reyes 65212). Given that Mathis disputed that she had stomped on her son's abdomen and testified that she was coerced into giving her statement, it would have been critical for the defense attorney to know of all witnesses who were at the house when the beating occurred.

**Z475236 – Ardell Clemons**

This case involves the stabbing death of a woman named Nyree Johnson. The investigation revealed that Ardell Clemons, the victim's friend, had been living with the victim at the time of the murder. (RFC-Solache/Reyes 51121.) Detectives pursued Clemons, who had fled to Florida. Clemons was arrested just a few days after the crime.

The investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file. One handwritten note not in the PD file documents another potential suspect who had previously worked with the victim and was dating the victim. (RFC-Solache/Reyes 44288). While the police report lists this individual as a witness and states that he had briefly stayed with the victim, it also stated that they were "only friends. (RFC-Solache/Reyes 51121.). Another document in the investigative file but not in the PD file is an apartment lease noting that the victim left her former residence due to domestic violence, what would have been a lead into another potential alternate suspect (RFC-Solache/Reyes 044260).

**B442532 – Oscar Soto**

This case involves a gang-involved shooting from one vehicle to another vehicle. The victim was a man named Miguel Salas who was shot on July 17, 1997 and died a few days later. Detectives investigating an unrelated aggravated battery decided to show a photo array from that case to the witnesses to the Salas shooting. Three witnesses allegedly identified two individuals as a passenger and the shooter on July 20, 1997. (RFC-Solache/Reyes 093896-97). Later, on July 23, 1997, after Detective Guevara was apparently assigned to the case (RFC-Solache/Reyes 093922), a different man, Oscar Soto, was identified as shooter. (RFC-Solache/Reyes 093917).

While two supplementary reports identifying the initial two suspects (RFC-Solache/Reyes 059529) and indicating that witnesses could not identify those suspects in a lineup (RFC-

Solache/Reyes 059532) are in the permanent retention file, the arrest reports for those suspects are not and also do not appear to be in the PD file.

The investigative file contains several handwritten GPRs (RFC-Solache/Reyes 93888-93; 95; 93924-25) which do not appear to be in the public defender's file, along with other missing documents. These GPRs contain conflicting information regarding whether the witnesses were able to identify the initial suspects and vehicle used in the crime, as well as police notes documenting interviews with the witnesses.

**A403252 - Guy Rainey**

Cedric Morris was shot to death on June 10, 1996. Witnesses reported seeing one or two assailants with dark hoodies pulled over their faces. RFC-Solache/Reyes 53995, 54002-03. Detectives requested over a dozen IR photos sufficient to compile multiple photo arrays. See RFC Solache-Reyes 72767, 72788, 72802, 72831, 72838, 72768-87, 72789-90, 72792-801, 72803-30, 72832-7, 72839-55. This indicates that there were multiple potential suspects and potentially multiple photo identification procedures performed, but the defense file does not include any information about these photos or lineups. Further, according to a lineup and supplementary report, Donnie Morris identified Guy Rainey out of a line-up. Rainey was ultimately charged. Morris's identification appears to be the only inculpatory evidence in the file. But there is a handwritten note in the investigative file, RFC-Solache/Reyes 72857, with Morris's name on it and the statement, "Kevin Haas pull file to see if he is still wanted." Haas's name does not appear in the defense file, or in supplementary reports explaining his involvement. The note suggests Haas may have been an alternative suspect, and that Morris could have been a suspect, which would have weighed on his credibility in identifying Rainey. This information written by the detectives, clearly investigative in nature, should have been disclosed.

**P272087 – Demetrius Johnson**

I was also provided with a copy of the investigative file and permanent retention file related to the investigation resulting in the arrest of Demetrius Johnson. This is a file that was part of the 1985-1991 files reviewed by Michael Brasfield. I reviewed this file as well, because it is a remarkable example of the misconduct that can occur when detectives are able to suppress documents contained in investigative files.

In connection with this investigation, Demetrius Johnson was charged with the murder of Fred Erwin and was convicted on June 12, 1991. The investigative file contains documentation of an in-person lineup, in which a witness positively identified an alternative suspect named Bryan Johns. See Bates No. RFC 15470-71. The report of this lineup and all references to this lineup occurring are omitted from the permanent retention file and were not provided to Erwin or his criminal defense attorneys and are also missing from the CCSAO file. Instead, typed police

reports included in the permanent retention file state that Bryan Johns appeared in a lineup that resulted in no positive identification (see supplementary report at RFC 15480).[115] This is an investigation in which Defendant Guevara was actively involved.

**Rivera, Fields and Kluppelberg are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials**

My findings above, and the Soto investigation itself (as discussed below), are consistent with the facts and circumstances of other wrongful conviction cases involving CPD in which exculpatory information was withheld, including *Fields v. City of Chicago*, *Kluppelberg v. City of Chicago, and Rivera v. City of Chicago*. These cases are, respectively, a 1984 homicide investigation in Area 1, a 1984 homicide investigation in Area 3, and a 1988 homicide investigation in Area 5. I reviewed the underlying police files and related records from these cases. Collectively, they are further evidence that the street files practices at issue in *Jones* and *Palmer* continued unabated for decades, and that the practice was Citywide. A brief summary of each of those cases is provided below, and further information is contained in **Attachments G and H**.

      **Fields v. City of Chicago:** Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman based on a homicide investigation conducted by Area 1 detectives. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders were located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors.

The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. Notably, it also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect in any of these documents.

In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of CPD, and awarded Mr. Fields compensatory damages of $22 million.

---

[115] The withheld lineup information is also missing from the CCSAO file for this case. While there is some possibility that this criminal defense file was transferred and could be incomplete, that is unlikely to explain the omission since the information is also missing from the CCSAO file.

**Kluppelberg v. City of Chicago:** James Kluppelberg was convicted for a 1984 fire that killed six people. In 1984 the fire was investigated by CPD's Bomb and Arson division and Area 3 detectives. Bomb and Arson investigators could not determine the origin of the fire and Area 3 detectives closed the case as accidental. But the case was re-opened in 1988. During the 1988 investigation, Area 3 detectives found new fire investigators to rule the case an arson, and James Kluppelberg was coerced into confessing to the crime. At his 1988 criminal trial, Kluppelberg only had the documents from the 1988 Area 3 investigation. The 1984 Area 3 and Bomb and Arson files were withheld.

Following his exoneration, Kluppelberg filed a civil case. In 2014, during the civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area 3 investigation, and included critical exculpatory information. Specifically, it included handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes -- undermining the arson determination and supporting the evidence that the fire was accidental. It contained numerous references to individuals who had had arguments or fights with the victims. And the file also contained a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby and just hours before the fire for which Kluppelberg was convicted. Moreover, Ramos reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires.

The file was found on a pallet among other Area 3 files at the records warehouse, and it appears it was packed up in 1991 when Area 3 was relocated. Neither of the Bomb and Arson files (from 1984 or the reinvestigation in 1988) has been located, much like the gang crimes documents in this case.

In both of these cases, the undisclosed documents should have been produced to Mr. Fields and Mr. Kluppelberg before their original criminal trials in 1986 and 1988 (and at numerous points after that). These documents should have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

**Rivera v. City of Chicago:** Jacques Rivera was convicted of a 1988 shooting that killed a young man named Felix Valentin. He was convicted based on the eyewitness identification of a single person, a 12-year old boy. The investigation was conducted by Area 5 violent crime detectives and officers from Gang Crimes North, including Reynaldo Guevara. Mr. Rivera was exonerated in 2011 after the sole eyewitness recanted his previous identification or Rivera.

During civil discovery, an investigative file was produced that contained a number of documents

not previously produced to Mr. Rivera or his criminal defense attorney, Ken Wadas. Based on a comparison to Wadas' file, the documents in the investigative file that were WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. These documents included all of the GPRs, the inventory sheet, arrest reports and hold reports, and a rap sheet for Mr. Rivera. These documents proved to be of critical importance.

The rap sheet for Mr. Rivera included an "issued on inquiry" date stamp of 8/27/1988, the same day as the Valentin shooting. But Mr. Rivera did not become a suspect in the investigation until he was purportedly selected from a book of gang photos by the sole eyewitness on 8/27/1988, two days later. This was highly exculpatory information because it established that Guevara and the other officers had made Mr. Rivera a suspect *before* the sole eyewitness supposedly identified him. This document is contained only the investigative file – it was excluded from the permanent retention file, the CCSAO file, and Judge Wadas's file.

There were other important exculpatory documents withheld from Mr. Rivera. The withheld GPRs included a handwritten note documenting an interview with the sole eyewitness. That GPR indicated that the witness had been "by the store," placing him much further from the shooting (and far less likely to be able to make an identification) than was otherwise known. The investigative file also contained hold reports and other documents indicating that Mr. Rivera had been placed in a lineup several days before the lineup documented in the official typed reports.

Mr. Rivera won a jury verdict against Guevara, his partner, and his Sergeant, as well as against the City of Chicago for the same policy and practice failures disclosed in this report. Mr. Rivera was awarded $17.175 million.

**The failure to turn over crucial documents in the Soto homicide investigation was a direct result of the failed policies and practices discussed above**

As discussed above, I have thoroughly reviewed thousands of pages of records and testimony from the Soto homicide investigation, including the complete police files from the case. I have also received the Solache criminal defense file and prosecutor's file.

Based on my review, what is apparent is that (1) there were important investigative steps taken that were not documented and included in the police file (and therefore not disclosed), and (2) there were materials contained in the police file that were not produced to the criminal defendants.

The following documents in the investigative file were not contained in the criminal defense file: RFC Solache-Reyes 000074; 76-83; 138; 197-203; 208-211.[116]

---

[116]  Of these, RFC-Solache-Reyes 000076-81 are not contained in the CCSAO file either.

**Polaroid photos**: the withheld documents include Polaroid photos taken of several witnesses: Guadalupe Mejia, Jorge Mejia, Rosa Aranda, and Felicia Soto.[117] Based on their deposition testimony, which included describing accusatory and threatening interrogation techniques, these individuals appear to have each been treated as alternate suspects. For example, Rosa Aranda, a family member of the victims, testified at her deposition that she had been treated as a suspect, accused of the crime, and interrogated by Guevara over three days.[118] Guadalupe Mejia testified that Guevara locked her up, and questioned her without letting her leave.[119] And Guadalupe's husband Jorge Mejia corroborated that Guadalupe Mejia had also been treated as a suspect, testifying that Guadalupe told him that she kept insisting that she was not involved in the crimes, they threw food at her, and kept her at the station for hours.[120]

The fact that Rosa Aranda, Jose Aranda, and Guadalupe Mejia were each questioned about the murder, subject to accusatory interrogations, and denied involvement is all information that should have been documented, along with the reasons they were detained and suspected. The fact that each of these individuals were treated as an alternate suspect is itself important exculpatory and impeachment evidence.

Next, the Polaroid photos were evidence that each of these individuals had been questioned by Detectives at Area 5, and that they had been treated as alternate suspects in the murder and kidnapping of the Soto family. In fact, the only other individuals that the detectives took Polaroid photos of were DeLeon-Reyes, Solache, Adriana Mejia, and Rosauro Mejia, all of whom had been treated as suspects and interrogated over days. The very fact that they were treated as alternate suspects is the type of quintessential Brady evidence that police are required to document and disclose to the criminal justice system. Had defense counsel had these Polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed. DeLeon-Reyes' or Solache's counsel may have wanted to call these witnesses to argue that they were alternate suspects, or to testify about their treatment by Guevara to corroborate their own claims of physically and psychologically abusive interrogation tactics.

In this case, such an inquiry would have yielded critical information. That Guadalupe Mejia was treated as a suspect is of particular importance for DeLeon-Reyes, because after being questioned by Guevara she signed a statement claiming that she heard DeLeon-Reyes make incriminating statements on a phone call with Adriana. DeLeon-Reyes claims that statement is false, and so evidence that Guadalupe Mejia had been treated as a suspect, accused of

---

[117]  RFC-Solache/Reyes 76-81.
[118]  Rosa Aranda deposition (pg. 40-41, 45-46).
[119]  Guadalupe Mejia deposition (pg. 41-42; 42-43).
[120]  Jorge Mejia deposition (pg. 38).

the crime and subjected to harassing behavior, could have been critical to the defense in explaining why she signed a false statement incriminating Reyes.

Likewise, the Polaroid photo indicating that Rosa Aranda was interrogated at Area 5 is also of critical importance. At her deposition, Rosa Aranda revealed that the victim, Jacinta Soto, had made a new friend at a clinic in the weeks before the crime; that the new friend sometimes went to Jacinta's house; and that in the days before the murder, Jacinta had complained that her keys to the apartment had gone missing, and that the friend was over at the same time the keys went missing.[121] She also testified that when the detectives interrogated her, she told them everything.[122] These facts severely undermine the version of events contained in DeLeon-Reyes and Solache's confessions, powerful evidence in a case where they were alleging that their confessions were false and the product of coercion. According to the confessions, Jacinta Soto was a random target that DeLeon-Reyes found at the hospital on the day of the crime; and when they then went to the home later that night they knocked on the door, Jacinta opened the door, at which point DeLeon-Reyes barged in and immediately began stabbing the victim. Rosa Aranda's information about Jacinta's new friend and lost keys would have been powerful evidence that Plaintiffs' confessions were in fact false. This information may have also permitted the defense to argue that Adriana Mejia could have acted alone, if she was able to gain entry while the family was sleeping (rather than needing to physically overwhelm an adult male and female).

Ultimately, the question of exactly how the defense would have used this evidence is besides the point: it is investigative information contained in the Soto investigative file, and there is no excuse for failing to disclose it. In fact, that Polaroid photos of DeLeon-Reyes, Solache and Adriana were all disclosed, but not these, suggests that these photos may have been deliberately withheld, for the reasons set out above. Regardless, the fact that these Polaroids were not disclosed is consistent with my findings about CPD's documentation and disclosure policies and practices discussed above.

**Additional investigative information not documented or disclosed**: In addition to all of this, there is ample additional investigative information that CPD detectives learned during their investigation that they simply failed to document. All of it was investigative information of exactly the type detectives are expected to document and disclose. This includes the following:

- *Interview Notes*. The Defendants conducted numerous interviews of the suspects and witnesses, but no notes of those interviews have been disclosed.
  - E.g., Adriana Mejia was interrogated at least three separate times by Guevara, according to his report, but there are no General Progress Reports (GPRs), or contemporaneous notes of any kind, documenting those interviews. Importantly,

---

[121] Rosa Aranda deposition (pg. 84-85, 91-92).
[122] Rosa Aranda deposition (pg. 60).

Adriana has testified that Guevara was taking notes during his interviews with her, including writing down the details that he wanted her to tell prosecutors.[123]

- o E.g., Guevara interrogated Reyes at least three times, according to his reports, but there are no GPRs reflecting the first two of these interviews conducted by Guevara.

- o E.g., Guevara interviewed Solache at least twice, but there are no GPRs or handwritten notes of any interview with Solache.

- o E.g., the Soto's next-door neighbor, Alfredo Aranda, testified that he was interviewed by a Puerto Rican detective who tried to convince him to lie about what he had heard next door on the morning the murders supposedly occurred. There are no handwritten notes of this interview, though Guevara later wrote a supplementary report that falsely attributed material facts to Aranda.[124]

- o E.g., police reports indicate that Guevara and Halvorsen interviewed Adriana Mejia's brother and roommate, Carlos Martinez, on April 3, 1998, but there are no GPRs or other handwritten notes of that interview.[125]

- o Police supplementary reports indicate that Leobardo Mejia, the brother of Adriana's husband, was interviewed. There are no notes of that interview. Furthermore, though the reports indicate that Guevara asked Leobardo to bring in Adriana Mejia's husband, Rosauro Mejia's car, Leobardo testified that he was actually asked to bring in his *own* car because police were pursuing the theory that his car had been used in the crime. This information is not documented in any of the police reports.[126]

- *Norma Salazar Lineup and Additional Investigation.* As discussed in Opinion 1 above, Adriana Mejia originally implicated Norma Salazar, however, contrary to CPD policies and practices, no lineup report was ever turned over, nor were any notes or reports about what she said during her interview (including what information she provided that eliminated her as a suspect).

- *Interrogations of Other Witnesses*: As discussed above, Guadalupe Mejia, Rosa Aranda, and Felisa Soto were all interrogated and treated as suspects, but that information is not contained in any documents in the police file or disclosed to the CCPD. In addition to them, others were subjected to accusatory interrogations as well.

- o *E*.g., Rosa Aranda's husband, Jose Aranda was also treated as a suspect. He testified that Guevara made him to come to the police station to give a statement, kept him there for about three days, physically grabbed him and told him that Rosa and Felicia Soto had already confessed to the crimes, and took

---

[123]  Adriana Mejia Feb. 4, 2021 Deposition (pg. 123-128).
[124]  Compare Alfredo Aranda Dep. (pg. 11-14, 31) with Supplementary Rpt., Apr. 2, 1998 at RFC Solache-Reyes 384.
[125]  RFC Solache-Reyes 279-280.
[126]  RFC Solache-Reyes 432, 446; Leobardo Mejia Deposition (pg. 97).

measurements of his shoes. None of this information was documented or disclosed. [127]

  o *E.g.,* the police questioned the brothers of victim Mariano Soto—Jorge Soto and his brothers Martin and Pedro—for hours about their involvement in the murders. No notes or reports of these interrogations exists anywhere in the record. [128]

- *Crime Scene Photographs.* As discussed in Opinion 1, original crime scene photos were taken, but were destroyed, purportedly as a result of a faulty camera. The original photographs could have been critical to Plaintiffs' defense in order to show that the crime scene evidence rendered their confessions impossible. As discussed above, the positioning of Mariano and Jacinta Soto in the home contradict the confessions; the photos could have provided evidence confirming that fact, or refuting any attempts to explain that critical contradiction (e.g., no trail of blood from the bedroom to the kitchen, or vice versa). As discussed above, Guevara wrote a report claiming that the original photos had been unusable due to a faulty camera, and so he returned to the crime scene to have alternate photos taken, but those photos of a ransacked apartment were useless.

The investigative files in the Soto homicide investigation suffers from the same systemic problems observed in the investigative files I reviewed as a whole, from this case, the hundreds of other investigative files I reviewed, and others cases such as Rivera, Fields and Kluppelberg. The photographs that were not disclosed, and the ample additional information learned during the investigation that was not documented or disclosed, should have been produced under generally accepted police practices but were not as a result of CPD's deficient policies and practices related to documentation and disclosure of investigative information learned in homicide investigations.

## <u>CONCLUDING STATEMENT</u>

I have provided my opinions based upon my training, experience, and my review of thousands of pages of records in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty, and based on longstanding and well-accepted law enforcement practices.

If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*

/s/Thomas J. Tiderington

---

[127] Jose Aranda deposition (pg. 43, 52-53, 61-62).
[128] Jorge Soto Deposition (pg. 31-32, 37, 44).