# Exhibit 84

Richard A. Leo, PhD, JD, 9/29/2022

260

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ARTURO DELEON-REYES vs. REYNALDO GUEVARA, et al.


No. 18 CV 01028

_____


GABRIEL SOLACHE vs. REYNALDO GUEVARA, et al.


No. 18 CV 02312

_____


VOLUME II

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF RICHARD A. LEO, Ph.D., J.D.


ON BEHALF OF DEFENDANT CITY OF CHICAGO


SEPTEMBER 29, 2022

Richard A. Leo, PhD, JD, 9/29/2022

---

261

1                I N D E X
2                              PAGE
3   WITNESS
4   For the Defendant City of Chicago:
5   RICHARD A. LEO, Ph.D., J.D.
6       Examination by Ms. Rosen ................ 265
7       Examination by Ms. Golden ............... 524
8
9            E X H I B I T S
10
11  NUMBER     DESCRIPTION      MARKED/REFERENCED
12  Exhibit 4   University of San Francisco Law
13              Research Paper No. 2013-19,
14              Predicting Erroneous Convictions . 279
15  Exhibit 5   Leo/Ofshe Article, Consequences
16              of False Confessions ............. 286
17  Exhibit 6   Torture Victims Chart ............ 368
18  Exhibit 7   Invoices, Leo 000001-000009 ...... 510
19  Exhibit 8   Invoices, Leo 000931-000983 ...... 513
20
21
22
23
24

---

263

1   APPEARANCES:
       FOR THE PLAINTIFF ARTURO DELEON-REYES
2      and WITNESS RICHARD LEO:
       LOEVY & LOEVY
3      311 North Aberdeen Street, 3rd Floor
       Chicago, IL 60607
4      By: Steven Art    (via Zoom)
           Sean C. Starr  (via Zoom)
5      (312) 243-5900
       steve@loevy.com
6
       FOR THE PLAINTIFF GABRIEL SOLACHE:
7      PEOPLE'S LAW OFFICE
       1180 North Milwaukee Avenue
8      Chicago, IL 60622
       By: Ben H. Elson  (via Zoom)
9      (773) 235-0070
       ben.elson79@gmail.com
10
       FOR THE DEFENDANT CITY OF CHICAGO:
11     ROCK FUSCO & CONNELLY, LLC
       333 West Wacker Drive, 19th Floor
12     Chicago, IL 60606
       By: Eileen E. Rosen   (via Zoom)
13         Catherine M. Barber  (via Zoom)
           Jessica Zehner   (via Zoom)
14     (312) 494-1000
       erosen@rfclaw.com
15
       FOR THE INDIVIDUAL POLICE OFFICER DEFENDANTS:
16     THE SOTOS LAW FIRM
       141 West Jackson Boulevard, Suite 1240A
17     Chicago, IL 60604
       By: Caroline Jamieson Golden  (via Zoom)
18     (630) 735-3300
       cgolden@jsotoslaw.com
19
       FOR THE DEFENDANT GUEVARA:
20     LEINENWEBER BARONI & DAFFADA, LLC:
       120 North LaSalle Street, Suite 2000
21     Chicago, IL 60602
       By: Megan McGrath   (via Zoom)
22     (312) 663-3003
       mkm@ilesq.com
23
       ALSO PRESENT:
24     Rachel Welling, Certified Legal Videographer

---

262

1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4   ARTURO DELEON-REYES,          )
5                                 )
6           Plaintiff,            )
7   vs.                           ) No. 18-CV-01028
8                                 )
9   REYNALDO GUEVARA, et al.,     )
10                                )
11          Defendants.           )
12  _____  )
13  GABRIEL SOLACHE,              )
14                                )
15          Plaintiff,            )
16  vs.                           ) No. 18-CV-2312
17                                )
18  REYNALDO GUEVARA, et al.      )
19          Defendants.           )
20
21       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
22  RICHARD A. LEO, Ph.D., J.D., sworn and examined on
23  behalf of the Defendant City of Chicago on September
24  29, 2022, before RUTH S. MORRIS, Illinois CSR 2322.

---

264

1           THE VIDEOGRAPHER:  This is the beginning
2   of Media Unit 1, and we are now on the video
3   record at 9:04 a.m.  This is the videotaped
4   videoconference deposition of Richard Leo
5   being taken on September 29th, 2022.
6           This deposition is being taken on behalf
7   of the Defendant in the matter of Arturo
8   Deleon-Reyes versus Reynaldo Guevara, et al.
9           The case number is 18 CV 1028,
10  consolidated with 18 CV 2312 filed in the
11  United States District Court for the Northern
12  District of Illinois, Eastern Division.
13          My name is Rachel Welling, certified legal
14  videographer representing Urlaub Bowen &
15  Associates with offices at 20 North North Clark
16  Street, Suite 600, Chicago, Illinois.  The
17  court reporter today is Ruthie Morris also of
18  Urlaub Bowen & Associates.
19          Counsel, please identify yourselves for
20  the video record and the parties which you
21  represent.
22          MR. ART:  Steve Art and Sean Starr for
23  Plaintiff Reyes.  Ben Elson for Plaintiff
24  Solache.

Richard A. Leo, PhD, JD, 9/29/2022

265

1      MS. ROSEN:  Eileen Rosen and Katie Barber
2  on behalf of Defendant City of Chicago, and I
3  believe we have Jessica Zehner watching from
4  our office.
5      MS. GOLDEN:  Caroline Golden for the
6  Individual Officer Defendants.
7      MS. McGRATH:  Megan McGrath on behalf of
8  Defendant Guevara.
9      THE VIDEOGRAPHER:  Will the court reporter
10  please swear in the witness.
11      RICHARD A. LEO, Ph.D., J.D.,
12  of lawful age, being sworn and examined on behalf of
13  the Defendant City of Chicago, testified as follows:
14          EXAMINATION
15  QUESTIONS BY MS. ROSEN:
16      THE WITNESS:  I couldn't tell yesterday or
17  today who Megan McGrath represents just because
18  she spoke so fast.  Could she repeat that?
19      MR. ART:  It's --
20      MS. McGRATH:  It's Defendant Guevara.
21      THE WITNESS:  Okay, thank you.
22      Q   (By Ms. Rosen) Good morning, Dr. Leo, how
23  are you today?
24      A   Waking up.  Good morning.

266

1      Q   Did you have an opportunity after the
2  deposition was over yesterday to take a look at your
3  documents to determine the Bates number of the
4  General Progress Report that you referenced in your
5  report that are not listed in the materials reviewed?
6      A   I did not.  I apologize, I forgot about
7  that.
8      Q   Okay.  And I don't think I asked you
9  yesterday but what, if anything, did you do to prepare
10  for your deposition before it began yesterday?
11      A   Well, I reviewed materials and I consulted
12  with counsel, and I prepared notes from my report
13  and from materials that I reviewed in this case on
14  some of the issues.
15      Q   What materials did you review?
16      MR. ART:  Eileen, I apologize.  Are we
17  talking about before we started yesterday?
18      MS. ROSEN:  Yes.
19      Q   (By Ms. Rosen) What materials did you
20  review before we started yesterday?
21      A   Okay.  So, I reviewed my report.  I
22  reviewed the confession statements of Mr. Reyes and
23  Mr. Solache.  I reviewed the Lassar Report.  I
24  reviewed Judge Cook's opinion in the Jackie Wilson

267

1  case.  And I reviewed materials in some of the cases,
2  not Mr. Reyes and Solache, but some of the other cases
3  that are later in the report.
4      I'm trying to think if there is anything
5  else I reviewed.  Give me just a second to look over
6  the -- the materials listed in the report.  Yes,
7  these are the materials that I reviewed.
8      Now, I would have to tell you the names of
9  the cases in which I reviewed some materials if
10  you'd like me to go through all of them that are
11  named.
12      Q   The names of the cases that you recently
13  reviewed, meaning in advance of the dep on today --
14      A   Would you like me to do that or not?
15      Q   When you say many, how many?  More or less
16  than ten?
17      A   More than ten.  I would say -- hold on
18  just a second, I can tell you exactly -- 38 cases I
19  reviewed materials from.
20      Q   Okay.  And what are you -- when I asked
21  you the question about what materials you reviewed,
22  it looked like you were reading from something.
23  What were you reading from?
24      A   Just my report which is Exhibit 1.  And

268

1  the reason I was reading from that was because it
2  lists, as you know, all the materials in the case.
3  And I just wanted to make sure that I had not missed
4  anything in Reyes and Solache that I reviewed.
5      Q   Okay.  And what did you look at to tell me
6  that you reviewed materials from 38 other cases?
7      A   Okay.  Well, I looked at my report, and
8  then I also looked at some of the materials in
9  the -- in the cases.  Again, do you want me to go
10  through this specifically?
11      Q   No.  My question is when I asked you how
12  many other cases -- when you told me you could list
13  the names, you told me to tell me how many, and then
14  you gave me the number 38, and then you looked over to
15  your side to tell me that you reviewed 38 cases.  So,
16  I want to know what you looked at to determine that
17  you looked at 38 cases.
18      A   Okay.  Sorry, I misunderstood the question.
19      Q   Okay.
20      A   So, I -- so I, I -- so, I have notes on each
21  of these cases that I took from materials that I
22  reviewed for the report, including my summaries from
23  the report, as memory aids on these cases.
24      And what I was looking at was the index

Richard A. Leo, PhD, JD, 9/29/2022

269

1  that I had prepared for each of the three areas,
2  Area 3, Area 4, and Area 5, of these cases. And so
3  I have notes on 25 cases from Area 3, on ten cases
4  from Area 4, and on three cases from Area 5.
5      And because I prepared an index listing
6  the names and enumerating them, I just needed to add
7  up those three numbers to tell you the exact number.
8  And that's what I was looking at after I was looking
9  at my report.
10     And then I also -- I forgot to mention,
11 but I mentioned this yesterday -- I also reviewed
12 the opinion of Clayborn Smith prior to the deposition,
13 the recent opinion.
14     Q   Okay.
15     A   And that's the only new document as I
16 mentioned yesterday that I reviewed post the
17 preparation of the report on January 15th of 2022.
18     Q   Okay.
19     MS. ROSEN:  And it's still our position
20 that the notes that he's reading from are --
21 we're entitled to them and they should be
22 produced.  But we don't have to rehash all of
23 that now, but at a later time.
24     MR. ART:  And I'll just state for the

270

1      record that our position remains the same as it
2      did during the first part of this deposition
3      yesterday.
4      Q   (By Ms. Rosen) And what, if anything, did
5  you do between the conclusion of your deposition
6  yesterday and this morning to prepare for your
7  deposition today?
8      A   I consulted with counsel and I reviewed --
9  I reviewed my report.  And I think that's it.  I
10 reviewed Mr. Solache's confession -- written
11 confession statement, and I reviewed my notes.
12     Q   How long was your consultation with
13 counsel?
14     A   After the deposition?
15     Q   Yes.
16     A   I think fifteen to twenty minutes maybe.
17     Q   And how much time did you spend last night
18 reviewing your report or yesterday afternoon for
19 you?
20     A   Yeah.  So, my report and the other things
21 I mentioned, probably about two, two and a half
22 hours.
23     Q   And how many times did you meet with
24 counsel before you began -- before we began the

271

1  deposition yesterday?
2      A   I --
3      MR. ART:  Objection to the form.  Do you
4  mean since his report?
5      MS. ROSEN:  In preparation for the
6  deposition.  Let me start over.
7      Q   (By Ms. Rosen) Before your deposition
8  yesterday, you indicated that to prepare you had
9  meetings with counsel.  How many meetings with
10 counsel did you have?
11     A   Either four or five.
12     Q   Over the course of what period of time?
13     A   The month of September.
14     Q   And who specifically did you meet with?
15     A   Mr. Art and Mr. Elson, and some of those
16 also were with Miss Susler and Mr. Starr.  And I
17 think that's it.
18     Q   And how much time total do you believe you
19 spent meeting with counsel over these four or five
20 meetings during the month of September?
21     A   I would have to look at my time sheets.  I
22 would estimate maybe three to five hours.
23     Q   What type of time sheets do you keep when
24 you do work like the work you're doing in Solache

272

1  and Reyes?
2      A   I write down start and stop times, and
3  then when I compute a bill I throw away the papers
4  on which the start and stop times were written.
5      Q   So, the start and stop times are noted
6  on a piece of paper that you throw away once you
7  prepare your bill?
8      A   Correct.
9      Q   And do you prepare your bills monthly?
10     A   I wish.  No, I do not prepare bills
11 monthly.
12     Q   Do you have a regular period of time that
13 you prepare your bills?
14     A   No, just when I can get to them and
15 sometimes that takes months.
16     Q   Okay.  In the materials reviewed, we
17 already talked about this yesterday, you identify
18 deposition transcripts of various people, correct?
19     A   Yes.
20     Q   When you were provided the deposition
21 transcripts, were you also provided the various
22 exhibits that went to the depositions?
23     A   I don't remember.  I don't think so
24 because I -- because I already had those materials.

Richard A. Leo, PhD, JD, 9/29/2022

273

1    But in order to accurately answer that question I
2  would have to go back into the electronic files and
3  see if they contained the exhibits.
4    Q   Before we start talking about Mr. Solache
5  and your opinions of him -- related to him and his
6  confession, I just have some clarifying questions
7  about some of the terminology that you used yesterday.
8  So, if I understand you correctly, you categorized a
9  confession statement as a proven false confession if
10  it meets one of four criteria that we discussed
11  yesterday, correct?
12    A  Yes.
13    Q  And how do you define a false confession?
14    A  A false confession would be a confession
15  that's factually false.  It could be a hundred
16  percent false or it could be less than a
17  hundred percent factually false, so that's partially
18  false.
19    So, sometimes we talk about pure false
20  confessions or partial false confessions.  Of
21  course, a partial false confession could also be a
22  partial true confession.  But just the definition
23  of a false confession would be a factually false
24  confession in whole or in part.

274

1    I do want to say that the term confession
2  sometimes has a dual meaning or can have more than one
3  meaning.
4    So, a confession can refer to an
5  incriminating statement, an admission, or a full
6  narrative confession in one sense.  Sometimes when
7  people talk about false confessions, it may be
8  they're using that term, people in my field, they're
9  using that term to refer to what might not be a full
10  narrative confession and might just be a series of
11  incriminating statements or ambiguous incriminating
12  statements or just an admission but no narrative.
13    And sometimes the word confession refers
14  to only -- excuse me, only an admission plus a
15  narrative.  So, false confession could have those
16  dual or multiple meanings.
17    Q  When you say admission plus a narrative,
18  what do you mean?
19    A  Okay.  So, taking a step back, when we
20  talk about confession -- let's just start with
21  that -- that term can be an umbrella term for either
22  an incriminating statement or an admission, "I did
23  X," or an admission plus the narrative, "I did X and
24  here's how and why I did it."

275

1    So, one meaning of confession is kind of
2  along -- any term along that spectrum from an
3  incriminating statement to "I did it" or admission, to
4  "I did it" plus the narrative.  Or a confession
5  might just refer to the "I did it" plus the
6  narrative.  Is that clear?
7    Q  Is a full narrative confession the same
8  thing as an admission plus narrative?
9    A  Yes, that -- I'm using that interchangeably.
10    Q  Okay.  All right.  And when you say --
11  when you use the term a false -- when you use the
12  term false confession, it could be a hundred percent
13  factually false or something less than a hundred
14  percent factually false, you mean there could be
15  details in the narrative of the confession that are
16  false, but there could be details in the confession
17  that are not factually false?
18    A  Correct.  And even in the proven false
19  confession you often see details that are accurate.
20  And often times those details, as we mentioned
21  yesterday, are believed to be the product of
22  contamination, or demonstrated to be.
23    Q  Okay.  And we also talked yesterday -- so,
24  do you equate a false confession, whether it's a

276

1  hundred percent factually false or something less
2  than a hundred percent factually false, as being
3  unreliable?
4    MR. ELSON:  Objection to the form.
5    THE WITNESS:  The term reliable is a
6  broader concept which means it could be
7  partially or wholly unreliable.  So, I guess I
8  need clarification.  Maybe if you just repeat
9  the question, do I -- go ahead.
10    Q  (By Ms. Rosen) Do you equate a false
11  confession, whether it's a hundred percent factually
12  untrue or something less than that, as unreliable?
13  Are those the same or are they different?
14    A  No, they're different.  Reliability refers
15  to degree -- unreliability, that is.  And false
16  confessions, even though they may contain factually
17  accurate details, often refer to or typically refer
18  to whole false confessions.
19    So, if I were to say a confession is
20  unreliable, that might mean -- in my opinion, that
21  might mean that the confession is partially or
22  wholly unreliable.  If I say in my research I think
23  a confession is false, what I typically mean is
24  entirely false, not just partially false.

Richard A. Leo, PhD, JD, 9/29/2022

277

1    So, the concept unreliable is broader
2  than false confession.
3    Q   Okay.  And we talked yesterday about the
4  two studies that you were a part of, the Ofshe/Leo
5  Study and the Drizen/Leo Study, and those -- both of
6  those studies examined proven false confessions,
7  correct?
8    A   Correct.
9    Q   Are there any other studies that you are
10  aware of that examine proven false confessions?
11    A   Well, the other studies that I mentioned,
12  the study that I did with Jon Gould in 2013-2014,
13  the work in progress that I mentioned.
14    There is a very prominent researcher in
15  England, Gisli Gudjonsson, spelled -- his first name
16  is spelled G-i-s-l-i.  His last name is
17  G-u-d-j-o-n-s-s-o-n. He's published hundreds of
18  papers.  They tend to be on the smaller side, and so
19  it's sometimes hard to keep track of them all.
20    I believe he's also written about proven
21  false confessions.  I don't -- I don't think he's
22  aggregated cases quite in the same way I have.  He
23  may have in a couple of those papers, but not in the
24  same detail.  And he's also written about proven

278

1  false confessions in books.  But, other than that, I
2  don't think there are studies just on proven false
3  confessions.
4    Q   And the Gould Study does not utilize your
5  -- the four criteria that you identified in the
6  Drizen/Leo Study, right?  That looked at -- that had
7  a different standard for classifying a confession as
8  factually false, right?
9    A   Yes and no.  So, the Gould Study was the
10  study of wrongful convictions and funded by the
11  Department of Justice.  And so we gathered data on
12  460 cases.  Actually, it was a study of error in the
13  criminal justice system, so 460 cases.
14    The standard was that we believed that the
15  evidence was indisputable that the person did not
16  commit the crime.
17    In the subset of confession cases, I made
18  sure that they met one of the four criteria.  So, we
19  didn't write about that in the body of the paper
20  because the standard was not proven wrongful
21  conviction but it was indisputable evidence of
22  innocence whether the person was convicted or not.
23    Q   Why don't we mark as Exhibit Number --
24  what are we on, 4, Robyn?  Yeah, okay.

279

1    Exhibit Number 4, Predicting Erroneous
2  Convictions which is the Gould Study -- if you can
3  shrink the document so we can see the title.  And
4  that's the study you were just discussing, correct,
5  Dr. Leo?
6    A   Correct, yeah.  And if you scroll down we
7  can see if this is a published version or a
8  pre-published version.
9    Q   Okay.  Let's scroll down.
10    A   Yes, it looks like a published version.
11    Q   Okay.  And if we go to Page 483 of the
12  document the way it's paginated, okay.  And can
13  you scroll up that way so we can see the whole page?
14  Good.
15    So, this section here describes the data
16  collection and case coding, correct?
17    A   Correct.
18    Q   Okay.  And in this study that -- what the
19  study indicates was involved was -- and I'm just
20  reading from the -- from that first paragraph is,
21  "Every case in our study involved a factually
22  innocent Defendant who was indicted post-1980 by a
23  state for a violent felony against a person and was
24  subsequently relieved of all legal responsibility

280

1  for the crime," right?
2    A   Yes.
3    Q   Okay.  And the cases that you analyzed and
4  described in the 1998 study with Dr. Ofshe and the
5  2004 study with Mr. Drizen included individuals who
6  had not been relieved of all legal responsibility
7  for the crime, correct?
8    A   Correct.
9    Q   In fact, some of them remained in prison
10  and were in prison at the time that you published
11  each of those studies, correct?
12    A   Correct.
13    Q   Okay.  And then it indicates here, "We
14  created two categories:  (1), quote, erroneous
15  convictions, end quote, for those defendants who were
16  factually exonerated after conviction, and (2),
17  quote, near misses, end quote, for those who had
18  charges dismissed before conviction or were
19  acquitted on the basis of factual innocence," right?
20    A   Correct.
21    Q   Okay  so, the study was -- this study was
22  focused on individuals with respect to the
23  convictions who were factually exonerated, right?
24    A   Or factually innocent, yes.

Richard A. Leo, PhD, JD, 9/29/2022

281

1    Q    And the determination of whether or not
2    they were factually innocent was by looking at
3    whether or not they were factually exonerated, or
4    the charges were dismissed before conviction, or
5    were acquitted on the basis of factual innocence,
6    right?
7    A    Yeah, but -- but, you're showing me -- it
8    says, "We established."  I haven't looked at this
9    article in a long time, but you're showing -- so I'm
10   going on memory, but you're showing me the bottom of
11   this and it says there's two separate components
12   but I only see one of them.  So, I don't know if you
13   want to scroll to the next page --
14   Q    Well, we'll get there.  And then it
15   says -- the next paragraph says, "The project
16   employed a conservative definition of factual
17   innocence that clearly distinguishes factual
18   innocence, (i.e., the defendant did not commit the
19   crime) from innocence based on procedural error or
20   other purely legal criteria (so-called legal
21   innocence)."  Do you see that there?
22   A    Yes.
23   Q    So, in this study the choice was to use
24   this conservative definition as explained in this

282

1    sentence, correct?
2    A    Yes.
3    Q    And when you -- when you determine that a
4    confession is a proven false confession because it
5    meets one of the four criteria that you have
6    established with first Dr. Ofshe and then
7    Mr. Drizen, are you equating a proven false
8    confession with factual innocence?
9    A    Not explicitly in the sense that we're
10   just going through and saying did the -- did the --
11   did the evidence meet one of these four criteria.
12   But if the evidence does meet one of the four
13   criteria, then our working assumption or belief is
14   that the person is factually innocent.
15   Q    So, if a person meets criteria for a
16   proven false confession under your analysis, then
17   that is the equivalent of factual innocence, right?
18   A    Yes.  When I'm doing research if I believe
19   that a case meets one of the four criteria, then I
20   believe the person is factually innocent.  I
21   haven't -- I can't think of a case in which there's
22   a proven false confession where I did not think the
23   person was factually innocent.
24   Q    And then if we read further it says, "In

283

1    each case analyzed in this study, we established
2    factual innocence based on two separate components:
3    (1), a judicial, executive, or legislative
4    acknowledgment that the individual did not commit
5    the crime for which he was erroneously indicted
6    (including a statement of innocence by a prosecutor,
7    governor, judge, state compensation board, or a
8    juror after an acquittal," right?
9    A    Yes.
10   Q    That's the first component.  And then the
11   second component is, "And evidence that we believe
12   would convince a reasonable person that the
13   individual did not commit the crime (such as post-
14   conviction DNA testing, the prosecution and
15   conviction of another individual for the crime, or a
16   new diagnosis of the victim's condition)."  Do you
17   see that there?
18   A    Yes.
19   Q    And so those are the two separate
20   components that were relied upon by you and your
21   fellow researchers in this study to define factual
22   innocence, right?
23   A    Generally, yes.
24   Q    Okay.  And so in this particular study the

284

1    evidence that you and your fellow researchers relied
2    upon to determine that individuals were factually
3    innocent did not include physical impossibility,
4    which is a criteria that you utilized to determine
5    that a particular confession is a proven false
6    confession, correct?
7    A    I believe -- I believe there were cases of
8    physical impossibility.  Number 2, "evidence that we
9    believe would convince a reasonable person that the
10   individual did not commit the crime," and then it
11   lists essentially three of -- three examples from
12   three of the four criteria such as post conviction
13   DNA testing, that's the scientific exculpation;
14   the prosecution of another individual, that's true
15   perpetrator identified; or a new diagnosis of the
16   victim's condition is no crime occurred.
17       It didn't list all the examples.  We could
18   have also listed, and that it was physically
19   impossible.
20       So, I believe there were cases in there,
21   I'd have to look at the dataset, where it was
22   physically impossible and that met criteria two
23   here.  So, this is really different language but
24   the same idea.

Richard A. Leo, PhD, JD, 9/29/2022

285

1    Q    But three of the four criteria that you
2   rely on are specifically identified in the
3   parenthetical, right?
4    A    As examples, yes.
5    Q    And the dataset, like we discussed
6   yesterday, is -- because of the grant involved, is
7   private, right, like we can't get access to it,
8   correct?
9    A    Correct. It's illegal and there is no way
10  to get access to that, yeah, to the -- to the data
11  because of the Department of Justice's rules as a
12  condition of the grant.
13   Q    Okay. And this study did not analyze or
14  list out -- let me start over.
15       This study did not provide a list of the
16  individuals that met the researchers' definition of
17  factual innocence like the 1998 study or the 2004
18  study, correct?
19   A    Correct. I would have liked to have done
20  that, but unfortunately because of the grant and the
21  condition of confidentiality required by it, legally
22  we could not do that.
23   Q    Okay. We can take down Exhibit Number 4,
24  and then let's take a look at what we'll mark as

286

1   Exhibit Number 5 which is the -- it's called
2   "Predicting Erroneous" -- no, that's not the right
3   one, hold on a second. It's "Consequences of False
4   Confessions" which is the Leo/Ofshe article.
5        Okay. So, this is the 1989 publication
6   that memorialized the research that you and Dr.
7   Ofshe did where you first coined the phrase
8   "proven false confession," correct?
9    A    Yes.
10   Q    So, this is ground zero, so to speak,
11  of the proven false confession analysis and study?
12       MR. ART:  Objection to form.
13   Q    (By Ms. Rosen) You can answer.
14   A    There were other studies that looked at
15  false confessions prior to this. But, yes, this is
16  the study where we defined the concept of proven
17  false confession.
18   Q    Okay. And previous to this nobody
19  utilized the four criteria that you and Dr. Ofshe
20  utilized to determine that any given confession
21  constituted a proven false confession, correct?
22   A    Correct. But, they might have used the
23  criteria without the terminology, you know, one of
24  the four criteria or more, but yes, nobody

287

1   systematized it or named it that the way we did in
2   1998.
3    Q    Okay. So, let's take a look at Page
4   34, 35 as the document is paginated. No, it's
5   got to be Page 435, sorry -- of the document, the
6   way the document is paginated, not the PDF. So,
7   it's early -- very early, there we go.
8        Okay. So, this section details the
9   method -- the methodology that you and Dr. Ofshe
10  utilized to select and classify the cases, correct?
11   A    Yes.
12   Q    Okay. And if we look at the methodology
13  section under A, it says, "Cases of disputed
14  confessions were identified through multiple
15  sources, electronic media, database searches
16  directly from case files, and from secondary
17  sources." Do you see that there?
18   A    Yes.
19   Q    And so in some of the cases that you
20  utilized, the 68 cases I believe total that you end
21  up discussing, am I correct that for some of the
22  cases the sole source of the information that you
23  obtained was from electronic media databases?
24   A    I'm sure there were some cases where that

288

1   was all we could obtain, yes.
2    Q    Okay.
3    A    I don't think there were many, but there
4   were some.
5    Q    Okay. And then when you say directly from
6   case files, when you say case files, can you tell me
7   what you're referring to?
8    A    Yes. So, in some of these cases Dr.
9   Ofshe had been a consultant or an expert witness, so
10  he had access to files that he had worked on.
11       In other cases we received materials from
12  attorneys working on the cases, even if we weren't
13  involved, and we may have received case file
14  materials also from researchers and journalists who
15  had access to those.
16       So, the case files would have -- I don't
17  know if these case files were the entirety. I
18  suspect in many cases they were not, if not all of
19  the cases, but they would have included some
20  combination of police reports, pre-trial
21  transcripts, trial transcripts, DNA reports or
22  ballistics reports. They might have included other
23  records on the individual or from the file, witness
24  statements. So, the typical kinds of things you

Richard A. Leo, PhD, JD, 9/29/2022

289

1  would find in a criminal case file.
2     Q   Okay. But I think you said that you were
3  pretty certain that for each of the cases you
4  didn't have all of the materials --
5     A  Yes --
6     Q  -- you had a subset of the materials?
7     A  Correct.
8     Q   Okay. And then it says --
9     MR. ART: Objection to the form. Give
10  me a chance to object, Dr. Leo.
11     THE WITNESS: Sorry.
12     Q   (By Ms. Rosen) And then it says, "The 60
13  cases discussed below do not constitute a
14  statistically adequate sample of false confession
15  cases. Rather they were selected because they share
16  a single characteristic, an individual was arrested
17  primarily because the police obtained an inculpatory
18  statement that later turned out to be a proven or
19  highly likely false confession." Do you see that
20  there?
21     A  Yes.
22     Q   Okay. And when you say later -- when you
23  and Dr. Ofshe say that later turned out to be a
24  proven or highly likely false confession, you mean

290

1  that in the way that you and Dr. Ofshe used that
2  terminology as later described in this article,
3  correct?
4     A  Yes.
5     Q   Okay. And then if we go to the last
6  paragraph on that same page, Page 436, and we're
7  just going to focus on the proven false confessions
8  for purposes of my questions. You indicate in
9  the -- in the article here, you and Dr. Ofshe, "For
10  the 34 cases classified as proven false confessions
11  the confessor's innocence was established by at
12  least one dispositive piece of independent evidence.
13  For example, a defendant's confession was classified
14  as proven false if the murder victim turned up alive."
15     So, that's one, correct?
16     A  Yes.
17     Q   "The true perpetrator was caught and
18  proven guilty," that's two, correct?
19     A  Yes.
20     Q   And then "Or scientific evidence
21  exonerated the defendant," that's three, correct?
22     A  Correct.
23     Q   And then let's go to the bottom of this
24  page, the last paragraph reads, "We recognize for

291

1  any case that could not be classified as a proven
2  false confession there is a possibility that our
3  classification of the case might be in error." Do
4  you see that?
5     A  Yes.
6     Q   Okay. But that qualification only
7  applies to the lessor standards, right, the highly
8  probable or the probable, correct?
9     A  Correct.
10     Q   And so with respect to a proven false
11  confession you and Dr. Ofshe do not concede that
12  there could be any error in your classification,
13  correct?
14     A  Not in that paragraph, correct.
15     Q   Well, do you concede that any circumstance
16  where you classify a case as a proven false
17  confession, that your classification might be in
18  error?
19     MR. ART: Objection to form.
20     THE WITNESS: I concede the possibility,
21  yes.
22     Q   (By Ms. Rosen) Okay. With respect to any
23  case in your career that you have classified as a
24  proven false confession, have you conceded that any

292

1  one of those cases where you have so classified the
2  confession was done in error?
3     MR. ART: Objection to form.
4     THE WITNESS: I cannot think of a case
5  where there was evidence that the confession --
6  in proven false confession cases -- there was
7  evidence that our classification was incorrect.
8     Q   (By Ms. Rosen) Okay. And if we go now to
9  Page 444 of the article, so six more pages, okay,
10  this is -- this table here is a table that lists the
11  cases that you and Dr. Ofshe classified as proven
12  false confessions, correct?
13     A  Correct.
14     Q   Okay. And so Number 1 is an individual by
15  the name -- the professor has identified an
16  individual by the name of Anthony Atkinson, do
17  you see that there?
18     A  Yes.
19     Q   Can you tell me what criteria was met in
20  Mr. Atkinson's case that allowed you and Dr. Ofshe
21  to classify his confession as a proven false
22  confession?
23     A  I do not recall. I haven't thought about
24  that case in twenty plus years, so I just don't

Richard A. Leo, PhD, JD, 9/29/2022

293

1  remember.  I would have to refresh my recollection
2  on that case, I would have to look at some documents.
3      Q    What kind of documents -- what kind of
4  documents would you look at?
5      A    Well, any document that -- with that --
6  that described why it fit into one of our four
7  categories showing either the crime didn't occur or
8  that it was physically impossible for Mr. Atkinson
9  to have committed it, or there was dispositive
10  scientific evidence, or the true perpetrator was
11  identified, so I just don't recall.
12       Some of these cases I do recall more of
13  than others, but that's not one that I recall
14  anything about now twenty-four, twenty-five years
15  later.
16      Q    And nowhere in the -- in this article that
17  you and Dr. Ofshe wrote regarding your analysis and
18  your findings do you specifically identify the
19  criteria that any of these particular individuals
20  met, correct?
21      A    Well, we may have described it in the
22  text.  Some of the cases are discussed more than
23  others, and so in our case discussions I believe we
24  described some of them, but we don't list out in a

294

1  table to the best of my recollection which criteria
2  was met for each individual case.
3       The case -- the case including Mr.
4  Atkinson, you know, they come with citations.  So,
5  the two citations, one to Caldwell and one to
6  Denver Registy, in Footnotes 34 and 35 presumably
7  would contain the information of which category or
8  categories those two -- that case fits into.
9      Q    Do you have this particular article in
10  front of you that you're referring to as you're
11  answering questions?
12      A    Yes, I do.  I have a copy of the document
13  that you put up in front of me.
14      Q    Okay.  What other documents do you have in
15  front of you?
16      A    Well, I have the other exhibits that you
17  put out that you -- the "Inside the Interrogation
18  Room" article, the North Carolina article.  I have
19  the report -- I happen to have, I think, the Lassar
20  Report in front of me, the Clayborn Smith opinion,
21  Judge Hooks' Opinion in Jackie Wilson, and then I have
22  notes.  And I have a big table of things spread out.
23  I see confession statements as well.
24      Q    Whose confession statements?

295

1      A    I have a binder of confession statements.
2  The binder includes Guadalupe Mejia, Rosauro Mejia,
3  Arturo Deleon-Reyes, Gabriel Solache, and Adriana
4  Mejia.
5       And not in front of me but immediately to
6  my right, maybe four feet away, I have a floor to
7  ceiling bookshelf that contains numerous binders of
8  case materials in this case.
9      Q    Okay.  All right.  Looking at the
10  individual that's identified in Line 2, Richard
11  Bingham, are you able to tell us what criteria
12  Mr. Bingham met that allowed you to conclude that
13  his confession qualified as a proven false
14  confession?
15      A    My recollection is that Professor Ofshe
16  worked on that case, and my recollection is that it
17  was a DNA exculpation.  But this is not a case I've
18  thought about for a long time.  So, that's my best
19  recollection as I sit here today.
20      Q    And do you recall anything more about the
21  DNA exculpation as you sit here today?
22      A    I do not.
23      Q    Okay.  And then Number 3, Leo Bruce, can you
24  tell us what criteria he met?

296

1      A    Yeah, so Leo Bruce was part of a case
2  called The Phoenix Temple Four, and he was one of
3  four people who falsely confessed, and the true
4  perpetrators were eventually identified and
5  successfully prosecuted.
6       So, there was a murder of nine Buddhist
7  monks and their assistants at a temple in Phoenix,
8  and the police had extracted or coerced confessions
9  from Leo Bruce and three other people, and
10  eventually they found -- after they had done this,
11  they found the murder weapon which led them to two
12  high school students who had left evidence at the
13  crime scene, and who I believe confessed to
14  committing the crime and then were successfully
15  prosecuted.  And the prosecutors acknowledged that
16  Leo Bruce and his three co-defendants were innocent
17  and falsely confessed.  And they settled the civil
18  case shortly after that if I'm recalling correctly.
19      Q    Okay.  And with respect to Individual
20  Number 4, Lavale Burt, do you recall what criteria he
21  met?
22      A    I do not.  I know that that is an Illinois
23  or Chicago case, but I don't recall the specific
24  criteria in that case.

Richard A. Leo, PhD, JD, 9/29/2022

297

1     Q   Okay.  And if we go to the next page for
2  Christopher Cole listed in Line 5, do you recall
3  what criteria he met?
4     A   I do not.
5     Q   How about Bradley Cox?
6     A   Mr. Cox, no, I do not.
7     Q   Do you recall the criteria that you and
8  Dr. Ofshe found with respect to Billy Gene Davis?
9     A   I would have to review materials.  I think
10  Billy Gene Davis was one of those rare cases where
11  the murder victim showed up alive, but I would have
12  to review materials to double-check that.  So, if my
13  memory is correct, he would have confessed to a
14  murder that didn't happen.
15     Q   Okay.  And how about Pedro Delvillar?
16     A   I do not recall without reviewing
17  additional documents.
18     Q   And how about Ralph Jacobs?
19     A   I do not recall without reviewing
20  additional documents.
21     Q   How about William Kelley?
22     A   Same answer, I do not recall without
23  reviewing additional documents.
24     Q   How about Guy Lewis?

298

1     A   I do not recall without reviewing
2  additional documents.
3     Q   Steven Linscott?
4     A   Yes, I do recall Steven Linscott's case.
5  He was -- I believe there was DNA that definitely
6  exculpated him.
7     Q   When you say definitely exculpated him,
8  what do you mean?
9     A   I believe his conviction was reversed.
10  And he wasn't prosecuted again, and the DNA
11  indicated that he did not commit the crime.
12     Q   Yeah.  So, you use the descriptive
13  definitively as opposed to you didn't just say the
14  DNA exculpated him.  So, I'm just wondering, did you
15  use definitively purposefully to mean something in
16  particular?
17     A   Yeah, I meant to say that it removed doubt
18  about his guilt.
19     Q   So, not all DNA evidence removes doubt
20  about guilt?
21     A   Well, not necessarily.  One would have to
22  analyze the DNA at the scene and the case facts and
23  make a judgment about that.
24     Q   Do you -- sorry, were you done?

299

1     A   But my recollection is in this case it
2  did in our judgment.
3     Q   How about Jose Martinez?
4     A   I do not recall the basis for that.
5     Q   How about Christopher Mason?
6     A   So, I think that's Christina Mason --
7     Q   Oh, Christina, sorry.
8     A   Yeah, and my recollection is that her baby
9  died and they got her to confess to killing the baby
10  before the autopsy results, and she confessed to
11  killing it.  I don't know, giving the baby cocaine
12  is what I recall.  And it turned out when the
13  autopsy results came back, the cause of death was
14  not homicide, had nothing to do with cocaine, and
15  the prosecutors dismissed the charges and
16  acknowledged her innocence.
17     Q   How about Robert Moore?
18     A   I do not recall without reviewing
19  documents the basis for that classification.
20     Q   How about Rick Nieskins or Nieskins?
21     A   Yes.  I do not recall that one either
22  without reviewing the documents.
23     Q   And how about the Mr. Nunez, Mark Nunez?
24     A   Yes.  So, Mr. Nunez was one of the Phoenix

300

1  Temple Four Co-Defendants --
2     Q   Okay.
3     A   -- so the same situation as Leo Bruce,
4  Number 3.
5     Q   And what about Dante Parker?
6     A   He was also one of the Phoenix Temple Four
7  Co-Defendants.  So, he had also falsely confessed
8  like Mark Nunez in 17 and Leo Bruce in Number 3.
9     Q   And what about George Parker?
10     A   I do not recall without reviewing
11  additional documents which category George Parker
12  fits into.
13     Q   If we can go -- if I focus your attention
14  back on Mr. Dante Parker, the -- next to 1991, which
15  is the year, the source of -- it says under
16  "Source," Ofshe and Leo and then Kimball and
17  Greenberg.  Do you see that?
18     A   Yes.
19     Q   So, when -- source in this table, what
20  does that mean?
21     A   Well, the source is just the citations.
22  This was a Law Review Hybrid Social Science Journal
23  as I described yesterday, but they used the Law
24  Review format and so they wanted and we provided

Richard A. Leo, PhD, JD, 9/29/2022

301

1  citations for each of the cases where somebody
2  interested can read about the case and check our
3  reasons for classifying them or including the case
4  in our article.
5      Q   So, each of these sources, the footnotes,
6  if we were to review them, we would be able to
7  figure out the criteria that you and Dr. Ofshe
8  determined the particular circumstance fit that
9  allowed you to conclude that the confession was a
10  proven false confession, is that what you're --
11          MR. ART:  Objection, form -- sorry,
12  Eileen.  Objection, form.
13          THE WITNESS:  My best belief without
14  reviewing those documents is that in most or
15  all of those cases, if we reviewed the cited
16  documents we would be able to know why the
17  confession was classified as false.
18          It might not -- there might be a couple
19  of exceptions or a few exceptions, but I believe
20  most or virtually all, or all, that the
21  citations would tell us why.
22      Q   (By Ms. Rosen) And so for Dante Parker,
23  you cite to Ofshe and Leo, Social Psychology, supra
24  note 4, so what is that a citation to?

302

1      A   Well, it's a citation to an article we
2  published a year earlier that's referenced in
3  Footnote 4 which is a very long footnote but the
4  article is in the beginning of the second paragraph
5  on Footnote 4 at the bottom of Page 430, and that's
6  called the Social Psychology of Police Interrogation,
7  The Theory and Classification of True and False
8  Confessions, published in a journal called "Studies in
9  Law, Policy, and Society."
10          And that article describes the Phoenix
11  Temple Four case including Mr. Parker's case over five
12  pages, 230 -- 226 to 231, as mentioned in Footnote
13  59.
14      Q   And how did you become familiar with the
15  Phoenix Temple Four case?
16      A   It was a high profile case so it had been
17  covered in the media.  I think Nightline did a show
18  on it.
19          I believe, but I may be wrong, that Dr.
20  Ofshe had also been retained in the case.  The four
21  people, Mr. Parker, Mr. Nunez, Mr. Bruce that we
22  mentioned, as well as I believe one more that we
23  haven't, I think they were charged with capital
24  murder and were in jail for sixty days, somewhere

303

1  around that, for a couple of months, maybe more.
2          And in that time period, I believe Dr.
3  Ofshe was retained and had received case materials.
4  And I think that's how I found out about it, but it
5  was -- it was a big case where -- I mean a high
6  profile case, the kind of case unlike most of these
7  or many of them, that garnered national media
8  attention.
9      Q   Okay.  And then the next person on the
10  list, Laverne Pavlinac, do you recall what criteria
11  were met there?
12      A   I do not.
13      Q   How about George Peterson?
14      A   Yeah, I do -- without reviewing I think --
15  I think what happened, I think I do recall George
16  Peterson.  I think George Peterson had confessed to
17  killing somebody in Flagstaff, Arizona.  And I think
18  the Phoenix Temple Four investigation led them to the
19  true perpetrator of that.
20          I think it may have been the same kids who
21  committed the nine murders -- I would have to
22  refresh -- but I think that led then the Flagstaff
23  prosecutors to dismiss charges against George
24  Peterson in that case.  So, I think it was a true

304

1  perpetrator identifying case.
2      Q   Okay.  And if we go to the next page,
3  looking at the individuals named in Lines 22 through
4  34, do you recall any of the criteria on that for
5  any of those individuals?
6      A   Twenty-two through 34, John Purvis, I do
7  not recall without reviewing documents.  Paul
8  Reggetz, I do not recall without reviewing documents.
9          Peter Reilly I do recall.  He was convicted
10  of murdering his mother.  He was seventeen years old
11  at the time, and his conviction was reversed.  I
12  don't recall the exact reason.  And the prosecutor
13  who had initially prosecuted him had died of a heart
14  attack shortly after that.  And the new prosecutor
15  for the re-trial discovered documents in the file
16  that had not been turned over that demonstrated that
17  Peter Reilly was at an event that would have made it
18  physically impossible for him to make it back to the
19  crime scene -- or the murder at his house where his
20  mother was murdered -- in time.  And so it was a
21  physical impossibility classification.
22          Ivan Reliford, I don't recall without
23  reviewing more documents -- without reading the
24  documents.  Melvin Reynolds, I do not recall without

Richard A. Leo, PhD, JD, 9/29/2022

305

1   reviewing more documents.
2        James Reyos was the one case that I
3   mentioned had been challenged -- yesterday I
4   mentioned -- had been challenged by Professor
5   Cassell, where the appellate prosecutor said this
6   guy is innocent.  And my recollection without
7   reviewing the documents is that he was like seven
8   hours away by car, and he would have had to have
9   driven like eighty or a hundred miles an hour to get
10  to the crime scene in time.  And that drive in New
11  Mexico would have involved mountainous roads.
12       So we, like the appellate prosecutor
13  believed that that -- it was physically impossible
14  for Mr. Reyos to have committed that crime because
15  it was impossible for somebody to have driven that
16  fast in those conditions to get to the crime scene
17  in time to commit the bloody crime which was a
18  homicide.
19       I do not recall without reviewing further
20  the basis for the classification of Martin
21  Salazar, Number 28; Donald Shoup, Number 29;
22  Christopher Smith, Number 30; Ruben Trujillo, Number
23  31.
24       David Vasquez was, I believe, the first

306

1   DNA exoneration of an innocent criminal defendant.
2   There was a serial killer who was eventually
3   executed, and he had committed the rape and murder
4   that David Vasquez had been convicted of, had
5   falsely confessed to, had been convicted of and
6   actually had pled guilty to, I believe.
7        So, that was a DNA exoneration or
8   scientific evidence dispositively exculpated him.
9        Earl Washington was the same situation.
10  He had confessed to a rape and a murder, and the DNA
11  conclusively demonstrated that he did not commit the
12  crime.  And the Virginia authorities as in the David
13  Vasquez case acknowledged that.  So, that was the
14  basis for the classification there.
15       And Johnny Lee Wilson, I do not recall the
16  basis for that without reviewing more documents.
17  Q    Okay.  And so if I understood you
18  correctly, with respect to Mr. Reilly and Mr. Reyos,
19  the evidence that you analyzed and discovered made
20  it physically impossible for them to have committed
21  the crime because of where they were at the time the
22  crime was committed, correct?
23  A    Yes.
24  Q    Okay.  And then with respect to the two

307

1   DNA cases that we just talked about, Vasquez and
2   Earl Washington, those were circumstances where the
3   evidence was collected at the time of the murders
4   which would have been, I assume, 1984 and 1983, before
5   DNA testing was available, correct?
6   A    I believe so, yes.
7   Q    And then later the evidence was tested
8   because there was new technology and that's how the
9   DNA ended up exculpating both of those individuals,
10  correct?
11  A    Correct.
12  Q    Okay.  In our case in 1998 we know
13  obviously the DNA evidence -- when I say "our case,"
14  I mean Mr. Solache's and Mr. Reyes's case, DNA
15  evidence -- DNA testing was available, right?
16  A    In 1998, yes.
17  Q    And of course, we know that Adriana Mejia
18  -- her DNA was -- there was DNA from the crime scene
19  tested, and the DNA from the crime scene not only
20  matched Ms. Mejia but the crime victims in some
21  respect, correct, depending on which evidence we're
22  talking about?
23  A    Correct.
24  Q    And then also there was DNA -- there was

308

1   evidence taken from Ms. Mejia's clothing and DNA
2   evidence was found from the victims on her clothing,
3   correct?
4   A    Correct.
5   Q    Okay.  Do you know whether or not --
6   whether or not all of the materials that were
7   collected from the crime scene were tested for DNA?
8        MR. ART:  Objection, form.
9        THE WITNESS:  I do not know.
10  Q    (By Ms. Rosen) Do you know what evidence
11  was collected that to this day has remained untested?
12  A    I do not.
13       MR. ART:  Objection.
14       THE WITNESS:  Sorry.
15  Q    (By Ms. Rosen) You say you do not?
16  A    Yes.
17  Q    And did you notice as you were reviewing
18  the materials that there was evidence that was
19  collected that potentially could be DNA tested?
20  A    I do not recall if I did or not.
21  Q    We can take down Exhibit Number 5.
22  Let's go back to Exhibit Number 1 which is Dr. Leo's
23  Report, if we could start at Page 52.  Okay.  So, I
24  want to ask some questions about Mr. Solache's

Richard A. Leo, PhD, JD, 9/29/2022

309

1 confession.
2    And your discussion regarding Mr. Solache
3 begins at the bottom of Page 52, correct --
4    A   Yes.
5    Q   -- of your report?  And if we go to the next
6 page, Page 53, about the middle of the first
7 paragraph, you indicate that Mr. Solache was
8 subjected to a relentlessly brutal physically and
9 psychologically coercive incommunicado interrogation
10 lasting almost forty-eight hours in total.  Do you see
11 that there?
12    A   I think it says forty, and I heard you say
13 forty-eight.  Maybe I misheard you.
14    Q   It says forty-eight.
15    A   Oh, I'm sorry, I was looking -- I was
16 looking at a different sentence, sorry.
17    Q   Do you see it?
18    A   Yes.  Okay, now I see the sentence you're
19 at, yes.
20    Q   Okay.  And above you say, "More than forty
21 hours of custody" which is where your eye must have
22 gone initially, correct?
23    A   Yes.
24    Q   Was it forty or forty-eight?

310

1    A   My recollection is the total time in
2 custody over which the interrogation was taken was
3 closer to forty-eight.
4    Q   And the line about the description of the
5 circumstances surrounding the interrogation, the
6 relentlessly brutal physically and psychologically
7 coercive incommunicado interrogation, that comes
8 from your reading of Mr. Solache's account of what
9 occurred, correct?
10    A   Yes
11    MR. ART:  Objection, form.
12    THE WITNESS:  Sorry.
13    Q   (By Ms. Rosen) And can you identify
14 specifically what portions of Mr. Solache's
15 testimony you were relying on in that particular
16 portion of your report?
17    A   No.  It would be his testimony in
18 deposition and at pretrial, and trial, and in post
19 conviction proceedings, but I can't from memory tell
20 you what portions or pages in those transcripts that
21 I read where he describes these conditions.  But
22 that is where he describes them.
23    Q   And did you review Mr. Solache's motion to
24 suppress testimony, his trial testimony, his post

311

1 conviction testimony, and his deposition testimony?
2    A   That's my recollection, yes.
3    Q   And did you compare the -- the
4 different -- the different transcripts and analyze
5 whether or not the accounts that Mr. Solache was
6 providing were consistent?
7    A   My recollection is that they were
8 generally consistent.  Some were more detailed than
9 others.  There may have been a few minor
10 inconsistencies that were trivial.
11    I don't recall seeing anything that caused
12 me to doubt the overall strong consistency of his
13 descriptions and recollections.
14    Q   Okay.  And then if we go to Section B of
15 the report, you conclude that Mr. Solache's
16 confession statement meets the criteria of a proven
17 false confession because it was not physically
18 possible for Mr. Solache -- and then you say or
19 Mr. Reyes -- to have committed the Soto double
20 murder and double child abduction given the
21 documentation of his work records and given the DNA
22 testing of the crime scene evidence dispositively
23 excluded both Mr. Reyes and Mr. Solache as the
24 source of any physical evidence left by the

312

1 perpetrator while linking -- I'm summarizing --
2 Adriana Mejia.  Do you see that?
3    A   Yes.
4    Q   Okay.  So, you have concluded that
5 Mr. Solache's confession meets two criteria for a
6 proven false confession, not physically possible for
7 him to have committed the crime, and the DNA
8 exculpation, correct?
9    A   Yes.
10    Q   Okay.  And with respect to it not being
11 physically possible for Mr. Solache to have
12 committed the crime, can you explain to me how you
13 arrived at that conclusion?
14    A   Well, it was the same discussion that I
15 made yesterday about the work records contradicting
16 the descriptions in the two confessions, of the
17 timing.  I believe Mr. Solache was at work according
18 to his work records at the time Mr. Reyes said that
19 he picked up Mr. Solache and they committed the
20 crime in the confession statements.
21    Q   What time -- irrespective of what the
22 confession statements say about the time of the
23 murder, what time did the murder happen?
24    MR. ART:  Objection to the form.

Richard A. Leo, PhD, JD, 9/29/2022

313

1    THE WITNESS: I don't think we know
2 exactly what time the murder happened. I think
3 there is what the confessions say, and then
4 there is also what police reports say, which as
5 I mentioned yesterday, I believe there is an
6 inconsistency in the closing report with what
7 is said in an earlier report, if I remember
8 correctly. But I think we -- also we don't
9 know the exact time of death.
10   Q   (By Ms. Rosen) And since we don't know the
11 exact time of death, how can you conclude that it
12 was physically impossible for Mr. Solache or
13 Mr. Reyes to have committed the double murder and
14 double abduction?
15   MR. ART: Objection.
16   THE WITNESS: Again, my conclusion would
17 be that what is in the confession statement is
18 physically impossible given that it contradicts
19 the work records which place him in a different
20 location than at the time the confessions say
21 they killed -- they committed the double murder
22 and child abduction.
23   Q   (By Ms. Rosen) Can you identify any other
24 case where you have concluded that an individual --

314

1 that an individual confession statement met criteria
2 for a proven false confession based on physical
3 impossibility, based not on the time that the crime
4 actually occurred but based solely on a comparison
5 between the purported physical impossibility and the
6 time stated in a given particular confession?
7    MR. ART: Objection to the form.
8    THE WITNESS: Without reviewing other
9 physical impossibility cases, off the top of my
10 head, no, I cannot.
11   Q   (By Ms. Rosen) Is there any way for you, if
12 I asked you to do it, to review all of the physical
13 impossibility cases that you have reviewed where you
14 could get an answer to that question for me?
15   MR. ART: Objection to the form.
16   THE WITNESS: The -- the -- I no longer
17 have most of the materials for the 1998 study.
18 I believe I no longer have most of the
19 materials from the 2004 study.
20   The study with Professor Gould, obviously
21 I couldn't name any of the cases in that study,
22 and the study that I'm now doing again with
23 Professor Drizen, at least two hundred and
24 fifty new cases, we haven't finished the

315

1 coding.
2    So, for the cases that I have materials, I
3 can certainly go back and look at those
4 materials, but that could take an enormous
5 amount of time, and I wouldn't do it, you know,
6 pro bono. So, in theory, yes, I could do that.
7 I don't know how soon I could get to it. But,
8 if I did that, I would have to charge you for
9 my time and I have no idea how much time it
10 would take.
11   Q   (By Ms. Rosen) And just so that I'm clear
12 about what you said, you've concluded that Mr.
13 Solache -- it was physically impossible -- let me
14 start over.
15   You have concluded that it was physically
16 impossible for Mr. Solache to have committed the
17 crime because of what time Mr. Reyes said he picked
18 up Mr. Solache to go commit the crime, correct?
19   MR. ART: Objection to form.
20   THE WITNESS: In Mr. Reyes's confession
21 statement, correct.
22   Q   (By Ms. Rosen) So, you're not even
23 comparing Mr. Solache's work records to
24 Mr. Solache's own confession? You're comparing it

316

1 to Mr. Reyes's confession, right?
2    A   Correct. When I did the report, I was
3 treating these confession statements together since
4 they were confession statements to the same crime.
5    Q   What time did Mr. Solache say the crime
6 was committed?
7    A   I don't recall. I would have to look
8 through his confession statement for sure.
9    Q   Okay.
10   A   I don't recall whether it said.
11   Q   Okay. And then with respect to the second
12 criteria that you say were met, the DNA testing of
13 the crime scene you say dispositively excluded both
14 Mr. Reyes and Mr. Solache, correct?
15   A   Correct.
16   Q   And can you -- I assume that your analysis
17 regarding this purported DNA exclusion is the same
18 as it was for Mr. Reyes which we discussed
19 yesterday, correct?
20   A   Correct.
21   Q   And as I think you indicated earlier
22 today, you have no idea if every bit of evidence
23 that was collected from the crime scene was tested,
24 right?

Richard A. Leo, PhD, JD, 9/29/2022

317

1      MR. ART: Objection to the form.
2      THE WITNESS: I think you asked earlier if
3  it was tested for DNA. Yes, I have. I do not
4  know whether every single piece of evidence at
5  the crime scene that yielded DNA or could have
6  yielded DNA was tested for DNA.
7      Q   (By Ms. Rosen) And certainly if we were to
8  test that, any of that material today, and it came
9  back to Mr. Reyes or Mr. Solache, then you no longer
10 could conclude that the DNA evidence dispositively
11 excluded them from the crime, correct?
12     MR. ELSON: Objection to the form.
13     THE WITNESS: Your question is a
14 hypothetical question. There's obviously no
15 evidence to that, but yes, in that hypothetical
16 alternative universe if that were true, then I
17 would modify my conclusion.
18     Q   (By Ms. Rosen) And in that circumstance,
19 Mr. Solache's and Mr. Reyes's confession statements
20 would no longer meet criteria based on a DNA
21 exclusion, right.
22     A   I believe so. I believe that's right.
23     Q   And this is not the circumstance -- this
24 particular case, this particular crime scene, the

318

1  evidence collected, and the status of the DNA is not
2  the same as evidence that is collected at a time
3  when DNA technology was unavailable that later
4  became available that then was conclusive evidence
5  that the individual charged did not commit the
6  crime, right?
7      MR. ELSON: Objection to the form.
8      THE WITNESS: Not sure I understand your
9  question. Can you ask it slightly differently?
10     Q   (By Ms. Rosen) Sure. So, in the -- in the
11 typical DNA exoneration cases, the evidence is
12 collected at a time when DNA technology was
13 unavailable or was in its infancy, correct?
14     A   Yes.
15     Q   And it's the technology that becomes
16 available later that allows for us to go back and
17 test that evidence which then leads to the
18 reasonable conclusion that the individual that was
19 charged didn't commit the crime because the DNA came
20 back to somebody else, right?
21     A   In most of the DNA exonerations, yes,
22 their post conviction DNA exonerations. When --
23     Q   That's not -- sorry, I didn't mean to
24 interrupt you.

319

1      A   Right. When -- when the new technology is
2  applied to existing evidence, there are some cases
3  that have been DNA exonerations where there was DNA
4  collected and tested during the pendency of the
5  trial, but those are the exceptions of the DNA
6  exoneration cases.
7      Q   And this case is not one of the former,
8  right, where the DNA -- we didn't have DNA
9  technology at the time of the crime, right?
10     MR. ELSON: Objection to the form.
11     THE WITNESS: Sorry. Correct.
12     Q   (By Ms. Rosen) And your conclusion that
13 the DNA dispositively excluded both Mr. Reyes and
14 Mr. Solache is based solely on your assumption that
15 based on the crime scene, it is inconceivable to you
16 that they would not have left, "they" being Mr. Reyes
17 and Mr. Solache, would not have left DNA behind,
18 correct?
19     MR. ART: Objection to the form.
20     THE WITNESS: I would disagree with you in
21 the way you phrased the question. I would just
22 say again, you know, I've been analyzing false
23 confessions and proven false confessions,
24 dozens of which involve DNA and DNA evidence

320

1  in homicide cases, sometimes multiple homicide
2  cases, for a very long time, and so I guess I'm
3  taking issue with your use of the word
4  "assumption."
5      This is based on my expertise, my
6  experience, and my analysis of this case. And
7  when I say expertise and experience, I mean as
8  an expert on false confession cases who has
9  studied and analyzed hundreds of them.
10     And my analysis of this case -- and I
11 think analysis is very different than
12 assumption. So, that's the reason why I
13 disagree with your question as phrased.
14     Q   (By Ms. Rosen) What expertise allows you
15 to conclude that it is inconceivable that Mr. Reyes
16 and Mr. Solache participated in this crime without
17 leaving any DNA behind that was eventually collected
18 by police?
19     MR. ART: Objection to the form.
20     THE WITNESS: Again it's the expertise in
21 analyzing false confessions and proven false
22 confessions from an empirical social science
23 perspective, the training that goes into that
24 expertise, and the logical and analytical skills

Richard A. Leo, PhD, JD, 9/29/2022

321

1    that one's trained in in graduate school, and the
2    teaching and research and publication and
3    analysis and testimony, like the legislative
4    testimony.  That's all part of that area of
5    expertise.
6          There are numerous cases in which the DNA
7    has exonerated, convictions have been reversed,
8    and yet the police and sometimes the prosecutors
9    continue to maintain that the person is guilty
10   even though everybody else has said it's
11   inconceivable, it's ruled out as a
12   logical possibility.  This case is not unique
13   in that regard.
14    Q    (By Ms. Rosen) What is it about your
15   training and expertise that makes you believe you're
16   competent to testify regarding whether or not,
17   number one, DNA evidence would have been left behind
18   by Mr. Reyes and Mr. Solache based on this crime
19   scene?
20    A    The short answer is again research,
21   experience, training, history of analysis.  But I
22   just want to clarify that, of course, I can only
23   opine based on the materials I've reviewed.
24   And based on the materials I've reviewed, I stand by

322

1    these conclusions.
2          If I were provided with new materials, I
3    would be happy to review them.  And if they provided
4    information that was inconsistent with other
5    materials or altered my opinions, I would change my
6    opinions.  And I think I mentioned that at the end
7    of my report.
8     Q    What background and expertise allows you
9    to conclude that even if Mr. Reyes and Mr. Solache
10   had left DNA behind at the crime scene, that it
11   would necessarily have been collected by the police
12   based on the nature of that particular crime scene?
13        MR. ELSON:  Objection to the form.
14        THE WITNESS:  I can only go based on what
15   is described in the materials.
16        I've already explained that I don't know
17   for certain if the DNA was collected.  Usually
18   in crimes this serious all of the significant
19   DNA is collected.
20        And so my assumption is that this
21   investigation was -- the collection of the
22   physical evidence was competently done.  And I
23   think you're discussing a hypothetical that's
24   not in evidence, and then asking me how I could

323

1    be -- make an expert opinion about something
2    that is completely not in evidence.
3          And again I can only opine about what has
4    been put in front of me.  And again my
5    expertise is in the analysis of these cases of
6    false confession and proven false confession
7    that is the basis for my conclusions.
8          But again, I don't know if every single
9    piece of evidence was collected -- that was
10   possible for DNA testing was collected.
11    Q    (By Ms. Rosen) You saw the crime scene
12   photos, right, you've listed that in the materials
13   that you reviewed?
14    A    Yes.
15    Q    And I think you testified yesterday that
16   there was blood everywhere, right?
17    A    Correct.
18    Q    So, how exactly -- what is your
19   understanding of how exactly the DNA should be
20   collected in a circumstance where there is blood
21   everywhere?
22        MR. ELSON:  Objection to the form.
23        THE WITNESS:  I'm not an expert in how DNA
24   is collected.  What I said was I assume based

324

1    on the materials that I reviewed, that
2    extensive DNA from the crime scene was
3    collected and was tested.
4     Q    (By Ms. Rosen) So, you have no idea how --
5    how -- let's say there's blood all over the carpet.
6    Do you have any idea at all how the DNA from the
7    carpet would be collected?
8     A    No.  I'm -- I'm not aware of the specific
9    or technical methods of DNA collection in a scenario
10   like that.
11    Q    How about if there is blood all over the
12   walls?  How would crime scene investigators collect
13   any DNA evidence that would be available with blood
14   all over the walls?
15    A    I assume they would remove the DNA, but I
16   don't know -- or the blood, some or all of the
17   blood, but I don't know the specifics of or the
18   technicalities of how that DNA would be collected or
19   even processed --
20    Q    And do you believe that they would collect
21   all of the blood?
22    A    I do not know whether they would collect
23   all of it or just most of it or some of it in some
24   places and all of it in other places.

Richard A. Leo, PhD, JD, 9/29/2022

325

1    Q   And do you know how it is that they
2  collect -- how it is that crime scene investigators
3  collect blood off of carpet?
4    A   The actual method of doing that, no, I do
5  not know.
6    Q   How about blood off a couch?
7    A   The specific technical method of
8  collecting blood off a couch, I do not know.
9    Q   How about blood off of a wall?
10     MR. ELSON:  Objection to form.
11     THE WITNESS:  I thought you asked that.  I
12  do not know the specific method of collecting
13  blood off a wall either.
14    Q   (By Ms. Rosen) Do you know any specific
15  methods of collecting DNA evidence off of any
16  surface?
17     MR. ART:  Objection to the phrase
18  "specific methods."
19     THE WITNESS:  Well, I mean I know that in
20  a sexual assault case often a rape kit is done
21  and sometimes, you know, mouths are swabbed and
22  hairs are plucked.  But I don't actually know
23  if that's done that way, or if there is a more
24  technical method in that kind of a situation.

326

1  I don't know the specifics about that, and I
2  don't know the specifics about the method or
3  how DNA is taken off a carpet or a wall if
4  there is blood, other than that it is
5  collected.  Some or all of it is collected and
6  subjected to further analysis.
7    Q   (By Ms. Rosen) And you don't know about --
8  do you know of any collection methods for obtaining
9  DNA off of surfaces as opposed to DNA off of a
10  person?
11     MR. ELSON:  Objection to the form.
12     THE WITNESS:  Other than that it is
13  collected by crime scene analysts with training
14  in collecting DNA and other types of physical
15  evidence, no.
16     MS. ROSEN:  Okay.  Let's go to Page 54.
17  On the top of the page you describe Mr. Solache's
18  recitation of the -- of his interactions with
19  police.  And at the -- in the first line at the
20  top of Page 54 you indicate that Mr. Solache
21  indicated that he sat on a metal bench for what
22  he described as a lot of time.  Do you see that
23  there?
24    A   Yes.

327

1    Q   And I assume you took that from something
2  that Mr. Solache said, correct?
3    A   Correct.
4    Q   But you can't be any more definitive about
5  what Mr. Solache meant by a lot of time, correct?
6    A   Correct.
7    Q   And then Mr. Solache described that an
8  officer came into the room and took his shoes
9  without questioning him, correct?
10    A   Correct.
11    Q   And then he was moved into -- the next
12  time an officer interacted with him he was moved to
13  a larger room, correct?
14    A   Correct.
15    Q   And then a Spanish speaking officer came
16  in and questioned him for about ten to fifteen
17  minutes, right?
18    A   Correct.
19    Q   And by Mr. Solache's own account that's
20  the first time that he was interviewed or
21  interrogated by any police officer, correct?
22    A   Correct.
23    Q   And that lasted ten to fifteen minutes by
24  his own account, right?

328

1    A   In his estimation, yes.
2    Q   Well, that's all we have to go by with
3  respect to Mr. Solache's account, right, his own
4  estimation?
5    A   Correct, because there's no recording,
6  correct.
7    Q   Okay.  And then this officer told Mr.
8  Solache that he had been accused of two deaths, and
9  Mr. Solache said he was innocent.  And this police
10  officer told Mr. Solache he needed to tell the truth
11  or else he would, quote, get fucked, unquote,
12  correct?
13    A   Correct.
14    Q   And in that particular place, you actually
15  cite to the suppression hearing testimony, right?
16    A   Correct.
17    Q   And that's the first citation to any of
18  the factual record that we have so far in your
19  report, isn't that correct?
20    A   I believe so.  Obviously, I would have to
21  review the report.  But, we discussed this
22  yesterday, yes, in the descriptions by Mr. Reyes and
23  Mr. Solache, I was taking them from three, four, or
24  five of their accounts and various testimony, and I

Richard A. Leo, PhD, JD, 9/29/2022

329

1    did not provide specific citations and here I did
2    because I was quoting something that was said.
3        Q   Well, you quoted other places, too, right?
4        A   I might have quoted other places.  You're
5    going to have to direct me in the report, but that's
6    the reason why I think I provided the citation here.
7        Q   Okay.  And then the next paragraph
8    describes Mr. Solache's description of his
9    interaction with Detective Guevara, right?
10       A   Correct, the first full paragraph on Page
11   54.
12       Q   Which includes Mr. Solache's account that
13   Detective Guevara struck him on the left side of his
14   face, correct?
15       A   Correct.
16       Q   And then also that Adriana Mejia was
17   brought into the room and accused Mr. Solache of
18   assisting her in the double murder, double
19   abduction, right?
20       A   Correct.
21       Q   And then the next paragraph provides Mr.
22   Solache's recitation of what happened, what he
23   claims happened between him and Detective Guevara
24   once Ms. Mejia left the room, right?

330

1        A   Correct.
2        Q   And then you have Mr. Solache's account that
3    he signed the false confession statement because he
4    couldn't take the beating anymore, correct?
5        A   Correct.
6        Q   Okay.  And then you identify here that he
7    signed the confession statement that ASA Brualdi
8    prepared at 3:35 a.m., on April 5th, right?
9        A   Correct.
10       Q   All right.  And if we go to Page 55, under
11   Risk Factors if you look at the third line down,
12   you have written that he was subjected to a lengthy
13   custodial interrogation of over the more than forty
14   hours.  Do you see that?
15       A   I do.  At some point I'm going to need to
16   take a brief restroom break.
17       Q   Sure.  And here again, the reference is
18   forty hours and not forty-eight.  Is there a
19   particular reason why throughout this portion of
20   Mr -- your account -- I'll start over.
21           Is there a particular reason why in the
22   section addressing Mr. Solache's confession
23   statement you sometimes refer to a forty hour or
24   more than forty hour lengthy unrecorded custodial

331

1    interrogation, and other places you put forty-eight
2    hours on it?
3        A   No.  I mean forty-eight hours is more than
4    forty, but I don't recall why I put more than forty
5    as opposed to forty-eight.  I thought I would put
6    forty-eight in one place, but I might have put it in
7    more than one.  I thought I would more often use
8    more than forty for both.
9        Q   Okay.  All right.  This is it.  We can
10   take a break here if you need to use the restroom.
11          MR. ART:  Okay.  So, are we taking a five
12   minute break, a ten minute break --
13          MS. ROSEN:  Let's do ten minutes so
14   everybody has a chance to go to the restroom or
15   grab something to eat.
16          THE WITNESS:  So, 9:00 my time, 11:00 your
17   time.
18          MS. ROSEN:  Sure.
19          THE VIDEOGRAPHER:  We're off the video
20   record at 10:48 a.m.
21          (At this time, a short break was
22   taken off the record.)
23          THE VIDEOGRAPHER:  We're back on the video
24   record at 11:03 a.m.

332

1        Q   (By Ms. Rosen) Okay.  Returning to Page 55
2    of your report, I take it with respect to the
3    calculation of more than forty hours, particularly
4    based on what we just reviewed based on Mr. Solache's
5    own account you are, as you did with Mr. Reyes,
6    combining the length of time Mr. Solache was in
7    custody as well as the length of time that he
8    was interrogated?
9        A   The length of time that he was in police
10   custody for purposes of interrogation over which the
11   confession was eventually taken.
12       Q   Okay.  So, it is not simply interrogation
13   time, correct?
14       A   It's not simply talking time, yes.
15       Q   Okay.  If we could go back to the Leo
16   Drizen article, the problem of false confessions
17   that we marked yesterday, Exhibit 2, North Carolina
18   Law Review, is that right?
19          THE EXHIBITS COORDINATOR:  Yes, Eileen,
20   that's correct.
21          MS. ROSEN:  Thank you.
22       Q   (By Ms. Rosen) If we take a look at Page
23   948 when you were discussing the length of
24   interrogation for purposes of this article that you

Richard A. Leo, PhD, JD, 9/29/2022

333

1  wrote with Mr. Drizen, the way you describe the
2  interrogation time is -- if we take a look at the
3  second paragraph you state, "Of the cases in which
4  the length of interrogation was either reported or
5  could be determined, 16 percent lasted less than six
6  hours, 34 percent between six and twelve hours,
7  39 percent between twelve and twenty-four hours, 7
8  percent between twenty-four to forty-eight hours, 2
9  percent between forty-eight and seventy-two hours,
10 and 2 percent between seventy-two hours and
11 ninety-six hours."
12      You then go on to say these numbers are
13 staggering. "More than 80 percent of the false
14 confessors were interrogated for more than six
15 hours, and 50 percent of false confessors were
16 interrogated for more than twelve hours. The
17 average length of interrogation was 16.3 hours, and
18 and the median length of interrogation was twelve
19 hours." Do you see that there?
20      A   Yes.
21      Q   And nowhere in any of that do you use the
22 word custody or custodial, correct?
23      A   Not in the part that you've read, correct.
24      Q   So, isn't it a fair reading of this

334

1  article that when you and Mr. Drizen were analyzing
2  the length of interrogation, you were actually
3  analyzing talking time?
4       MR. ELSON:  Objection to the form.
5       THE WITNESS:  That's not my recollection
6  of how we came up with the time, and I don't
7  recall if there is somewhere else in the
8  article where we describe this as being the
9  custodial period during which the
10 interrogations occurred.
11      Q   (By Ms. Rosen) So, you think perhaps
12 somewhere else in the article that might be
13 discussed, the custodial period?
14      A   It might be or it might not be.
15      Q   And as you sit here today, you don't
16 recall how you and Mr. Drizen tallied interrogation
17 time?
18      A   No.  My recollection is we did it the same
19 way that I do it in this case.  The period of time the
20 person is in the interrogation room or interrogation
21 rooms, if it's multiple sessions or multiple rooms,
22 during which they are questioned even if there are
23 long periods of time or short periods of time --
24 excuse me, where they are left alone and not

335

1  questioned.
2       Q   And if you don't explicitly say that
3  somewhere in this article, which I don't believe you
4  do, is there a particular reason why?
5       A   I don't recall that there was any particular
6  reason why we did not say that.  It's obviously a long
7  article and it may have -- it may have just been
8  something that we didn't think to say if we don't say
9  it explicitly in the article.
10      Q   Okay.  Let's go back to Exhibit Number 1.
11 We go to the paragraph that discusses Mr. Solache's
12 allegations regarding physical abuse.  In the middle
13 of the paragraph, you write that "Because
14 Mr. Solache was chained to the wall with a right
15 handcuff, Detective Guevara repeatedly hit Mr.
16 Solache on the left side of his head causing Mr.
17 Solache extreme pain in his left ear and, Mr. Solache
18 believes, permanent hearing loss in his left ear."
19 Do you see that there?
20      A   Yes.
21      Q   And did you review in any of the materials
22 any documentation related to Mr. Solache's medical
23 history or any medical records related to Mr. Solache?
24      A   I don't recall if I reviewed any medical

336

1  records.  It would be -- if I did, they would be
2  listed in the materials reviewed.
3       I do recall reviewing documents that
4  described Mr. Solache's perception that this caused
5  permanent hearing loss, and my recollection is that
6  there was some medical testimony or reference to a
7  medical opinion that that was not the case because
8  he had a prior accident -- I don't recall if it was
9  a car accident or someone through a brick at him.
10      And then in a subsequent document that I
11 read, I think there was testimony or a description
12 of testimony by a doctor that said despite the prior
13 injury, he still could have had permanent hearing
14 loss caused if he was injured in the way he says by
15 Detective Guevara because the prior injury would
16 have made the ear that much more vulnerable to
17 losing hearing in the event of physical assault or
18 serious physical injury to the ear in the future.
19 That's my best recollection.
20      Q   Okay.  If we go to Page 56 in section --
21 or under the heading Paragraph 2, "Lengthy
22 (Incommunicado) Interrogation and Sleep Deprivation,"
23 with respect to your statement that the more than
24 forty hours of custody and interrogation of Gabriel

Richard A. Leo, PhD, JD, 9/29/2022

337

1    Solache on April 3rd through 5th was extraordinarily
2    lengthy by traditional police standards existing
3    both then and now, what police standards are you
4    referring to?
5        A    Again, the Reid Manual as we discussed
6    yesterday.  The 1986 edition, which was the current
7    issue at the time, said don't go over four hours
8    unless it's extraordinary.  And as I mentioned
9    yesterday, the Reid Manual is considered the Bible
10   of interrogation.  It sets national interrogation
11   standards.  And earlier editions of the Reid Manual
12   had said the same thing as does the current and
13   subsequent editions of the Reid Manual.
14       Q    And in the Reid Manual, the four hours is
15   a reference to talking time, right, not -- not
16   custodial time?
17       MR. ELSON:  Objection to the form.
18       THE WITNESS:  I'd have to review that
19       section.  My best recollection without reviewing
20       it is that they don't distinguish between
21       talking and custodial time.  They just describe
22       interrogation.
23       Q    (By Ms. Rosen) And you just infer that to
24   mean -- to be defined in the same way that you've

338

1    chosen to define it, right?
2        A    Yes.  I mean I haven't spoken to the Reid
3    people about this, but if somebody is in a room for
4    eight hours, 9:00 to 5:00, and they're not
5    interrogated the first two, they're interrogated for
6    two, they get a two hour break, they're interrogated
7    for two more, I would think that Reid would count
8    that as eight and not four, but I could be wrong.  I
9    don't know how they account for long delays between
10   multiple interrogation sessions in the same
11   interrogation room, for example.
12       Q    And you said that the Reid Manual or the
13   Reid method is considered the Bible.  What is your
14   basis for saying that?
15       MR. ELSON:  Objection, asked and answered.
16       THE WITNESS:  That's the scholarly
17       consensus.  They were one of the first manuals
18       in 1942.  I believe they were the first
19       national training firm, and it is represented
20       and believed -- represented by them and
21       believed by everyone I'm aware of that they've
22       trained hundreds of thousands and more than
23       anybody else, and I'm not the only scholar who
24       has referred to that as the Bible of

339

1    interrogation, American interrogation within
2    American policing.
3        So, the basis would be representations
4    inside the policing community by Reid and
5    others and representation by scholars, not
6    just me, that it's a common understanding.
7        And I think I mentioned yesterday that in my
8    2008 book, "Police Interrogation and American
9    Justice," I had a whole chapter on the rise of
10   Reid and the Reid Manual and that approach in
11   American interrogation which is often treated
12   as synonymous with American interrogation.
13       Q    (By Ms. Rosen) Who treats it as
14   synonymous?  What community treats it as synonymous?
15       A    I would say the scholarly community.  And
16   what I mean by that is that I have reviewed dozens
17   of unpublished and dozens of published interrogation
18   training manuals, and a lot of them are completely
19   or almost completely derivative of the Reid method.
20   They've even sued people, sued firms for copyright
21   infringement.
22       Now, I have heard in public settings
23   interrogators, police, say sometimes I don't use the
24   Reid method and then go on to describe the methods

340

1    they use or used that are exactly from the Reid
2    Manual that I would describe and I believe anybody
3    familiar with the Reid Manual or method would
4    describe as the Reid method.
5        So, it's my belief based on the materials
6    I've reviewed in the last three plus decades, and I
7    do not believe I'm alone in the scholarly community
8    that many other interrogation training materials
9    that do not explicitly describe themselves as using
10   the Reid method or the Reid Manual are using Reid
11   techniques nevertheless similar to or derivative to
12   what Reid teaches and advocates and has for decades.
13       Q    Have you compared the Reid method to the
14   training that was provided to police officers in the
15   mid to late nineties in the Chicago Police Department?
16       A    Have I explicitly compared that?  No.
17   However, in another civil case that doesn't involve
18   any of the litigants here, my recollection -- and
19   that's subject to a confidentiality order as well --
20   my recollection is that when I reviewed the Chicago
21   Police Department Manual that was provided to me in
22   discovery in that case, and it was either in the
23   late -- my recollection, I'd have to double-check
24   this, is that it was sometime between the late

Richard A. Leo, PhD, JD, 9/29/2022

341

1  eighties and the late nineties, I could be wrong,
2  that there were similarities.
3       But I probably reviewed that manual a
4  year and a half ago, maybe two years ago, I don't
5  recall the specific date.  So, that would be I think
6  the only time that I had looked at a Chicago
7  unpublished manual.
8       I think in this case, there may have been
9  some unpublished training materials provided as
10  well, but it wasn't the same as what appeared in
11  that other case to be a substantial unpublished
12  manual.
13     Q  And did you say that this other case that
14  you're describing where you compared or you reviewed
15  an unpublished CPD manual from an unknown time
16  period is in a case that is under a confidentiality
17  order so you can't tell us the name of the case?
18     A  Correct.  With respect to the first
19  question, rarely have I been involved in a case
20  that has a confidentiality order where I've been
21  reminded so many times about that confidentiality
22  order.  And the report that I wrote in that case, as
23  an example, has in the heading where, you know, the
24  page headings, every page where I list the name of

342

1  the attorney and the date and the page number, it
2  has "Confidential/Subject to Confidentiality Order,"
3  that I put in at the request of the attorney.
4       So, with respect to your second question,
5  I don't know if I can tell you the name of that
6  case.  I would be happy to -- to inquire with the
7  attorney and say, "Is this confidential information
8  for me to reveal this," and if she said, "No," I
9  would be happy to provide that, the name of that
10  case.
11       But I'm a little bit nervous about saying
12  anything about that case without first consulting
13  with the attorney because of the extraordinary
14  lengths -- extraordinary lengths that she has gone
15  to to remind me that that case is subject to a
16  confidentiality order.
17     Q  Okay.  If we go to Page 57 of your report
18  with respect to "Rush to Judgment," you say in the
19  middle of the report, "Detective Guevara did not
20  seek to evaluate Mr. Solache's possible guilt or
21  innocence, but instead single-mindedly sought to
22  elicit a confession from him that confirmed
23  Detective Guevara's lazy pre-existing conjectures
24  and speculations."  Do you see that there?

343

1     A  Yes.
2     Q  And are you opining that Detective Guevara
3  was lazy?
4     MR. ART:  Objection to the form.
5     THE WITNESS:  Right, I think we discussed
6  something similar yesterday where I said based
7  on the materials I reviewed which, of course,
8  include Mr. Reyes's account, it was my
9  interpretation that because Mr. Reyes and
10  Mr. Solache and Rosauro, Mr. Mejia, showed up
11  with the baby, there was an immediate -- child
12  rather -- there was an immediate presumption
13  that they were involved in the crime, and they
14  all describe being accused upon interrogation
15  or shortly after they met with -- they were
16  interrogated by Detective Guevara, and of
17  course, being assaulted as well.
18     If I reviewed or were presented with
19  materials, additional materials that
20  contradicted this opinion, then I would
21  certainly be happy to modify it.  But based on
22  the materials that I did review in this case,
23  and of course, in this section I'm basing the
24  analysis on Mr. Reyes's and Mr. Solache's

344

1  descriptions, that's my conclusion, that this
2  was an immediate presumption of guilt without
3  significant prior investigation.  That was lazy.
4     Q  (By Ms. Rosen) Okay.  Let's go to 59 of
5  your report.  If we go to the bottom of the page,
6  the last sentence reads, "Put differently, Mr.
7  Solache came to perceive that the only way to put an
8  end to Detective Guevara's torture was to do as
9  Detective Guevara demanded and sign the statement.
10  Mr. Solache perceived he had no choice to do
11  otherwise."  Do you see that there?
12     A  Yes.
13     Q  Is your use of the word "torture"
14  deliberate?
15     A  Well, it wasn't accidental.  Punching
16  somebody in the stomach and slapping them across the
17  face with an open fist hard many times, I think
18  would qualify as torture of one -- you know, one
19  form of torture when torture is explicitly defined
20  and analyzed, for example, in other contexts like
21  international interrogations as physical assault.  I
22  think any physical assault meets the definition of
23  torture.  So, I don't think this is erroneous, and
24  I'm sure when I wrote it it wasn't accidental.

Richard A. Leo, PhD, JD, 9/29/2022

345

1    Q   Okay.  Let's go to Page 60.  In the top
2  paragraph you describe Mr. Solache's personal
3  background, and conclude that it is likely that he
4  was more vulnerable to the physical and psychological
5  coercion he describes because of his personal
6  background.
7        I don't recall if I asked you yesterday
8  when I asked you about Mr. Reyes, but did you
9  interview Mr. Solache about his personal background?
10   A   I did not.
11   Q   Did you ask to?
12   A   I did not.
13   Q   And why not?
14   A   Because as I described yesterday, given my
15  area of expertise, I typically do not interview
16  people who have been interrogated unless there is no
17  recording of the interrogation and I'm seeking to
18  get their best recollection of what occurred during
19  the interrogation.  And when I do that, it's
20  typically in criminal cases that are going to trial
21  for the first time and the interrogation did not
22  occur that long ago and the interrogation was not
23  recorded.
24        And I think I mentioned yesterday that

346

1  circumstance has changed a lot in the last fifteen
2  years because most departments these days record
3  their interrogations.
4        In civil cases where it wasn't recorded
5  and the interrogation occurred decades ago and there
6  is a record, an imperfect record, by lawyers
7  questioning the interrogated person -- the person
8  who had been interrogated in pretrial or trial or
9  post conviction, I wouldn't typically interview them
10  about what occurred during the interrogation because
11  so much time had passed and they had already given
12  an account or a contemporaneous -- relatively
13  contemporaneous account.
14        I don't interview people to test them
15  because I'm not a clinical psychologist.  So, the
16  purpose of my interviewing is different than
17  a clinical psychologist.
18   Q   Okay.  And then you say, "Mr. Deleon-Reyes
19  did not speak or understand English and had only
20  been in the United States for a few months."  Do you
21  see that there?
22   A   Yes.
23   Q   But in this section we're talking about
24  Mr. Solache, right?

347

1    A   Yes, that's a typo.
2    Q   In fact, isn't this paragraph other than
3  changing the first two words from Mr. Deleon-Reyes
4  to Mr. Solache, isn't that complete paragraph a cut
5  and paste from what you said about Mr. Deleon-Reyes
6  regarding his personal background?
7        MR. ART:  Objection to the form.
8        THE WITNESS:  Give me just a second here.
9        MR. ART:  Dr. Leo, I guess I would add to
10  the objection that we've instructed you not to
11  answer any questions with information about
12  your report drafting process.  So, you can
13  answer the question whether those paragraphs
14  are the same, but not about how you drafted the
15  report.
16        THE WITNESS:  That paragraph is similar to
17  the paragraph at the bottom of Page 44 that
18  you're referencing.  And I believe it's just as
19  accurate as that, that both Mr. Reyes and
20  Mr. Solache had not -- did not speak English or
21  understand English, at least that's what
22  they've represented, and others have, and
23  because of the language barriers and because
24  they were relatively new to the United States.

348

1    Q   (By Ms. Rosen) Well, but the -- the
2  paragraphs are more than just similar, they're
3  identical except for in the paragraph on Page 60, it
4  says, "Mr. Solache" in the first -- at the beginning
5  of the paragraph.  And on Page 44, it says
6  Mr. Deleon-Reyes.  Every other word is the same,
7  correct?
8        MR. ART:  Objection, form, asked and
9  answered.
10        THE WITNESS:  Yes, that is correct.
11   Q   (By Ms. Rosen) Okay.  If we go to the
12  paragraph that begins, "7), Police Interrogation
13  Contamination and Scripting," the second line, it
14  says, "Mr. Solache did not know that Mariano and
15  Jacinta Soto had been murdered or that their
16  children had been abducted prior to his
17  interrogations by Detective Guevara."  Do you see
18  that there?
19   A   Yes.
20   Q   But Mr. Solache knew, right, when he took
21  the little boy to the police station that he had
22  been abducted, so that's not accurate.
23        MR. ART:  Objection to the form.
24   Q   (By Ms. Rosen) That was the reason for

Richard A. Leo, PhD, JD, 9/29/2022

349

1    taking the boy to the police station, right, because
2    somebody saw on TV that the boy had been abducted?
3        MR. ART:  Objection to the form.
4        THE WITNESS:  I thought that -- without
5    reviewing materials that describe it, I thought
6    that the boy was missing is what he knew, not
7    necessarily that the boy had been abducted.
8        Q    (By Ms. Rosen) Okay.  Let's go to Page 61,
9    the portion of your report under the heading
10   "Violation of National Police Interrogation Training
11   Standards, Protocols, and Best Practices."  That
12   section that runs through the top of Page 63 is
13   nearly verbatim the same as what you wrote with
14   respect to Mr. Reyes other than adjusting for
15   Mr. Solache's particular circumstances, correct?
16       MR. ART:  Objection, form.
17       THE WITNESS:  They may be similar based on
18   their descriptions of what Detective Guevara and
19   others did to them.  That is similar, but they're
20   not verbatim, if by verbatim you mean every word
21   is identical.
22       Q    (By Ms. Rosen) I don't believe I used the
23   word verbatim.  I think I said they're similar.
24       MR. ART:  You said verbatim.

350

1        MS. ROSEN:  Okay.  I'll withdraw the word
2    verbatim.
3        Q    (By Ms. Rosen) They're similar with
4    respect to other than where you substitute out
5    Mr. Solache's experiences for Mr. Reyes's
6    experiences, correct?
7        MR. ART:  Objection, form.
8        THE WITNESS:  They're very similar because
9    both individuals described the same patterns of
10   physical and psychological abuse and the same
11   violations of national standards.  And so, yes,
12   there is a similarity in the enumeration and
13   identification and description of those
14   violations of national training standards and
15   commonly accepted best practices because the --
16       Q    (By Ms. Rosen) Sorry, go ahead.
17       A    No, I was finished.
18       Q    So, the answers that you gave yesterday
19   with respect to national standards and best
20   practices apply equally to this section, correct?
21       A    Correct, that -- that they're the same
22   violations, the same abuses, the same bad practices,
23   with slight variations.  I believe that Mr. Reyes
24   does not describe being punched in the stomach, but

351

1    Mr. Solache does.  There are some minor differences,
2    but the same -- the same violations overall.
3        Q    Okay.  And then on Page 63, that's where
4    you discussed Detective Guevara and Assistant State's
5    Attorney Brualdi's account of the interrogation of
6    Mr. Solache, and you note that according to
7    Detective Guevara, he first came into contact with
8    Mr. Solache on April 3rd at 11:45 p.m., correct?
9        A    Correct.
10       Q    And then according to Detective Guevara,
11   he introduced himself to Mr. Solache, told him he'd
12   be talking to him later, inspected Mr. Solache's
13   clothes and shoes and then removed a pair of gym
14   shoes that Mr. Solache was wearing and left the
15   room, right?
16       A    Correct.
17       Q    And then, according to Detective Guevara,
18   he returned to the same interview room at 12:15 a.m.
19   on April 4th, correct?
20       A    Correct.
21       Q    And at that time according to Detective
22   Guevara he advised Mr. Solache of his Miranda Rights
23   in Spanish, confirmed that Mr. Solache understood
24   his Miranda Rights, and then interviewed Mr. Solache

352

1    for ten to fifteen minutes, right?
2        A    Correct.
3        Q    And then according to Detective Guevara,
4    he observed Mr. Solache sleeping later in the
5    morning and did not interview him again until
6    9:00 p.m., on April 4th, correct?
7        A    Correct.
8        Q    And according to Detective Guevara he
9    reminded Mr. Solache of his Miranda warnings to
10   which Mr. Solache responded that he understood, and
11   then he discussed the case with Mr. Solache, and
12   Mr. Solache initially denied any involvement,
13   correct?
14       A    Correct.
15       Q    And then according to Detective Guevara,
16   it was during this interview that he told Mr.
17   Solache that both Mr. Reyes and Ms. Mejia were
18   implicating him in the double homicide and double
19   child abduction, correct?
20       A    I'm sorry, I kind of lost where you were
21   reading from, but I see it now.  Yes.
22       Q    Okay.  So if, in fact, by the time
23   Detective Guevara spoke to Mr. Solache at 9:00 p.m.,
24   on April 4th, he had interviewed Mr. Reyes and Ms.

Richard A. Leo, PhD, JD, 9/29/2022

353

1    Mejia, and both of them were implicating him in the
2    double homicide and double child abduction, would
3    you still characterize Mr. Reyes -- I mean Mr.
4    Guevara's approach as a rush to judgment?
5        MR. ART:  Object to the form.
6        THE WITNESS:  Yes, I would still
7    characterize it that way because there was no
8    evidence implicating Mr. Solache at that point
9    other than Miss Mejia's accusation of Mr. --
10   Mr. Solache's involvement with her.  And she
11   describes being physically abused during that
12   interrogation, and we don't have a record of
13   what occurred during that interrogation, an
14   objective record, and of course, Detective
15   Guevara has a pattern and practice as I detail
16   elsewhere of allegations of abuse.
17       So, I would still say it was a premature
18   rush to judgment because there is no objective
19   evidence of guilt at that point, and to my mind
20   Andriana Mejia's accusation is tainted by her
21   description of being physically abused and by
22   Detective Guevara's record of allegations of
23   physical abuse which in this case also involved
24   Rosauro Mejia.

354

1        Q    (By Ms. Rosen) When you say there was no
2    objective evidence implicating Mr. Solache, what do
3    you mean by objective evidence?
4        A    Non-testimonial evidence that is not the
5    product of a Guevara interrogation linking Mr.
6    Solache to the double murder and double child
7    abduction.
8        Q    And so your conclusions and opinions about
9    circumstances of these interrogations necessarily
10   conclude that Mr. Guevara did the things that he's
11   accused of doing, right?
12       MR. ART:  Objection to form.
13       THE WITNESS:  I'm not concluding that he
14   did the things that he's accused of doing as a
15   factual matter in my testimony.  I'm
16   relying on-- in the opinion that you referred
17   to, I thought you were referring to the opinion
18   earlier where I said there was a premature rush
19   to judgment, and Detective Guevara was lazy in
20   his conclusion that Mr. Solache was involved in
21   the crime prior to interrogating him.
22       So, in this section of the report, I'm not
23   making a factual determination.  I'm not making
24   any factual determinations.  I'm saying based

355

1    on the materials that I reviewed, and based on
2    Mr. Solache's and Mr. Reyes's description,
3    that's my opinion.  Lazy investigation,
4    premature conclusion of guilt.
5        Elsewhere in the report which we haven't
6    got to, I describe, as you know, a pattern and
7    practice of documented abuses across the
8    Chicago Police Department from Area 2 to Area
9    5, and in Area 5 obviously you know that there
10   are numerous documented allegations of abuse
11   against Mr. Guevara going back many years
12   predating the Reyes and Solache interrogations
13   and prosecutor written confession statements in
14   1998.
15       Q    (By Ms. Rosen) But, my question had to do
16   with what you meant by objective -- in order for you
17   to conclude that there wasn't a rush to judgment
18   with respect to Mr. Solache, you said you needed
19   objective evidence.  And when I asked you to
20   describe what that was, you said non-testimonial
21   evidence that indicated that Mr. Solache was
22   involved that wasn't tainted -- I believe was the
23   word you used but I could be wrong -- by Mr. Guevara's
24   pattern and practice or something like that.  Did I

356

1    get that wrong?
2        MR. ART:  Objection to form.  Did you get
3    your summary of his last answer wrong?
4        MS. ROSEN:  Did I -- did I understand him
5    incorrectly?
6        MR. ART:  Objection to form.  You can
7    answer if you understand the question, Dr. Leo.
8        THE WITNESS:  I think you're correctly
9    recalling the beginning portion of that answer
10   but not the whole answer itself.
11       Q    (By Ms. Rosen) So, tell me again what you
12   mean by objective evidence.
13       A    Evidence that would directly link
14   Mr. Solache to the double abduction and double
15   murder that is not testimonial evidence produced by
16   an unrecorded interrogation, but is objective in the
17   sense that it's objectively verifiable like
18   fingerprints, DNA, records -- work records that
19   place somebody at -- or other records if there were
20   GPS location records, for example, something that
21   can be verified independent of one person's
22   perception or recollection.
23       Q    And is that something that you -- that you
24   believe would be necessary in every case so that in

Richard A. Leo, PhD, JD, 9/29/2022

357

1    order to find that there wasn't a rush to judgment,
2    or is that simply an opinion you have in this case
3    based on the circumstances of this case because it
4    involves Detective Guevara?
5            MR. ART:  Objection to form.
6            THE WITNESS:  What I would say is that the
7        Reid people say there needs to be a thorough,
8        factual investigation and factual basis
9        preceding an interrogation, and if there isn't
10       a factual basis preceding an interrogation,
11       then there -- there typically is in my
12       experience, a rush to judgment, a premature
13       conclusion.
14           And that appears to be a striking pattern
15       in the Detective Guevara cases that I've
16       reviewed, especially here.
17       Q   (By Ms. Rosen) Okay.  So absent objective
18   physical evidence, then your interpretation of the
19   Reid Manual is that interrogations should not occur?
20           MR. ART:  Objection to the form.
21           THE WITNESS:  I didn't really say that.  I
22       said a thorough investigation based on facts, I
23       think they say a factual basis.  They also say
24       there should be -- somebody should only be

358

1        subjected to an interrogation if the
2        interrogating detective or detectives have
3        reasonably concluded that the person is guilty
4        of the crime that they're about to be
5        interrogated for.
6        Q   (By Ms. Rosen) And can testimonial
7    evidence provide a factual basis?
8        A   Testimonial evidence could provide a
9    factual basis, yes.
10       Q   And in this case, the testimonial evidence
11   that was provided according to Detective Guevara by
12   Mr. Reyes and Miss Mejia is insufficient, correct?
13       A   The reason I'm skeptical of that is
14   because everybody, by which I mean Mr. Mejia, Miss
15   Mejia, Mr. Reyes, and Mr. Solache, all allege
16   physical abuse, physical coercion during their
17   interrogations.
18           And then we have all the other allegations
19   against Detective Guevara and how he conducts
20   interrogations prior to 1998.
21           And so again, I think any unrecorded
22   interrogation by Detective Guevara is highly
23   problematic, and we have no objective record of the
24   interrogations to compare the accounts and see who's

359

1    telling the truth and who is not, or who is
2    accurately recalling and who is not.
3        Q   Okay.  Let's turn to Page 65 of your
4    report, and at the bottom of the page, Section XII,
5    the heading reads, "The Chicago Police Department's
6    Widespread and Systemic Pattern and Practice of
7    physically and psychologically coercive
8    interrogations (Especially of African-American and
9    Latino men) from 1972 to at least 2000; and the City
10   of Chicago's continuing notice of systemic physical
11   coercion and abuse to extract and fabricate
12   confessions to high ranking officials in the Chicago
13   -- in the City of Chicago, high ranking officials in
14   the Chicago Police Department and police command
15   personnel."  Do you see that?
16       A   I do, yes.
17       Q   And so based on that heading, is it fair
18   to conclude that you are opining that the City of
19   Chicago in fact had a widespread and systemic
20   pattern and practice of physically and
21   psychologically coercive interrogations, especially
22   of African-American and Latino men, from 1972 to at
23   least 2000?
24       A   Yes.  And of course that opinion is

360

1    fleshed out in the pages that follow.
2        Q   And so you are concluding as a matter of
3    fact that multiple individuals were subjected to
4    physical and psychologically coercive
5    interrogations, correct?
6            MR. ART:  Objection to form.
7            THE WITNESS:  I'm not making factual
8        determinations.  I'm saying that in my -- in
9        the materials that I reviewed, I noticed a
10       pattern and practice that was undeniable,
11       systemic, and widespread based on -- based on
12       the allegations across departments -- I'm
13       sorry, Areas 2, 3, 4, and 5 spanning this
14       almost thirty year period.
15       Q   (By Ms. Rosen) So, in order to conclude
16   that there was a widespread and systemic pattern of
17   physically and psychologically coercive
18   interrogations, that means that you have determined
19   that the individual cases that you have reviewed to
20   reach this conclusion established that factually
21   physical and psychological coercion occurred during
22   interrogations, right?
23           MR. ART:  Objection to form, asked and
24       answered.

Richard A. Leo, PhD, JD, 9/29/2022

361

1       THE WITNESS: I'm not sitting here in the
2   role of a juror. I'm sitting here in the role
3   of an expert witness. And I'm saying that
4   based on my expertise, my training, my
5   knowledge, there's a clear pattern here through
6   the -- through the allegations. And one sees
7   it over and over, and the officials -- through
8   multiple documents and data sources, and
9   officials were on notice of that for many
10  years.
11      I'm not trying to make a factual
12  determination that a jury would make. I'm
13  saying based on the materials I reviewed, this
14  is the pattern and practice that is clearly
15  present there. And this is also the evidence
16  of notice of this allegation of pattern and
17  practice.
18  Q   (By Ms. Rosen) Okay. Well, I want to
19  separate out notice for a second and focus on
20  widespread and systemic pattern and practice.
21      Do you know what a Monell claim is?
22      MR. ART: Objection to form, foundation.
23      THE WITNESS: I do generally. I don't
24  know specifically. I haven't read that case in

362

1   at least two decades, so I don't remember the
2   details.
3   Q   (By Ms. Rosen) Do you know what it is that
4   Mr. Solache and Mr. Reyes have to prove in order to
5   prove that the City of Chicago itself is directly
6   responsible for any alleged constitutional violation
7   they might prove?
8       MR. ART: Objection, form, foundation,
9   calls for a legal conclusion. Go ahead.
10      THE WITNESS: I think if a Monell claim is
11  being pled, I think a pattern and practice has
12  to be established. But I don't know again the
13  details of the law there or the legal
14  requirement. And of course, my -- you know, my
15  observations are as a social scientist.
16  Q   (By Ms. Rosen) So, you know that Mr.
17  Solache and Mr. Reyes, to prevail on their Monell
18  claim, need to prove a pattern and practice against
19  the City of Chicago, right?
20      MR. ART: Objection, misstates the law.
21  Objection to form, foundation, asked and
22  answered.
23  Q   (By Ms. Rosen) You can answer.
24  A   Again, I don't know the details, and I

363

1   think that's part of the requirement, but I'm not
2   sure that's the entire requirement or exactly how
3   it's phrased in Monell or in Monell's progeny.
4   Q   And -- and you are, or essentially if
5   you're allowed to provide this opinion before the
6   jury in this case, going to be informing the jury
7   that the City of Chicago through its police
8   department had a widespread and systemic pattern and
9   practice of physically and psychologically coercive
10  interrogations, especially of African-American and
11  Latino men, from 1972 to at least 2000, right?
12      MR. ART: Objection to form and to the
13  phrase "informing the jury."
14      THE WITNESS: I would -- well, you know,
15  of course, I don't ask myself questions and I
16  don't know whether limitations would be placed
17  on my testimony, but yes, I would presume that
18  if this case goes to trial, and if asked about
19  my opinions, I would offer the same opinions
20  that I've provided in the report and tried to
21  illustrate in the report.
22  Q   (By Ms. Rosen) Okay. With respect to the
23  cases that you analyzed in support of the opinions
24  that begin at the bottom of Page 65 of your report,

364

1   you detail obviously specific cases. And am I
2   correct that with respect to the cases that you have
3   detailed in your report that all of the materials
4   you rely upon are cited in the report?
5   A   The materials I rely upon, yes, all of the
6   materials are cited in the report unless there's a
7   mistake like with those general progress reports and
8   I inadvertently did not include them.
9       However, I have been teaching and writing
10  about this or at least mentioning it in my writings
11  for many years. So, I'm familiar -- though I didn't
12  rely on it in this report directly -- I am familiar
13  with scholarly and other research on torture
14  scandals and allegations of torture in the Chicago
15  Police Department both in the Burge era and
16  subsequent to Burge's firing in 1993.
17      But the materials I directly relied on
18  are all cited in the report unless I inadvertently
19  left out a material that I was provided and did not
20  cite.
21  Q   What have you written about related to the
22  Burge era?
23  A   I don't think I've written anything
24  specific on the Burge era. I think I mentioned it

Richard A. Leo, PhD, JD, 9/29/2022

---

365

1  in a 2004 book chapter in an edited volume where I
2  write about the History of the Third Degree in
3  America as well as in my 2008 book, "Police
4  Interrogation and Criminal Justice."
5          And usually for the point that -- those
6  two -- that -- those two chapters, the 19 -- the
7  2004 book chapter in an edited volume that I can
8  identify on my CV if you like, and the 2008 book
9  chapter, what they are about is the History of the
10  Third Degree which in the United States pretty much
11  ended in the 1930's and 40's, the third degree being
12  a synonym for physical abuse, physical torture,
13  psychological abuse, psychological torture to
14  extract confessions.
15          And the reference to Chicago would be that
16  everywhere else in the United States the third degree
17  ended.  And even where there were allegations or a
18  scandal involving physical abuse in the interrogation
19  room, they were one offs.
20          Whereas, in Chicago the third degree
21  persisted in this era, 1972 to 2000 roughly and
22  appeared to be systemic with hundreds, or dozens if
23  not hundreds, of allegations of physical abuse and
24  torture during interrogation.

---

366

1          So, it's not that I wrote something
2  specifically on this, but that I mentioned it in the
3  context of something very historically similar where
4  I had done substantial detailed research analyzing
5  patterns and practices of third degree interrogation
6  abuse earlier in American history.
7      Q    And in the two book chapters -- well, the
8  book chapter in the book that you just mentioned,
9  the 2004 and the 2008 publications, do you discuss
10  anything post Burge's firing in 1993?
11      A    I don't recall specifically without
12  referring to those whether I mentioned any
13  allegations of physical abuse or coercion post 1993.
14      Q    Okay.  And if we look at the top paragraph
15  on Page 66, in the middle of the paragraph you
16  reference "in-court admissions of city lawyers."  Do
17  you see that there?
18      A    We're on Page 66 in the first paragraph?
19      Q    Yes, it's like five lines, six lines from
20  the bottom.
21      A    I don't see it.  Maybe our pagination is
22  different.  What --
23      Q    If you look up at the screen --
24      A    Page 66 -- oh, I'm sorry.

---

367

1      Q    Five lines -- six lines from the bottom on
2  the left side "from in-court admissions of city
3  lawyers" --
4      A    Oh, okay, okay.  I was looking at the
5  bottom of the page, I'm sorry.  Yeah, okay.  Yes, I
6  see that.
7      Q    What are you referencing there?
8      A    I would have to go through and find it in
9  the report.  It's there, I just don't know where it
10  is.  I thought there were attorneys who acknowledged
11  -- Cook County's attorneys, either City attorneys or
12  Attorney Generals -- who acknowledged in court that
13  there had been some physical abuse by Burge or his
14  acolytes.  And so I just have to go through this
15  long chronology and find the specific place where
16  that is.
17      Q    Okay.  If we go down to the first
18  paragraph under B, and you say, "It has been well
19  documented that Jon Burge and those under his
20  command, first at Area 2 and later at Area 3,
21  collectively tortured at least one hundred and
22  twenty-five suspects from 1972 to 1991," do you see
23  that there?
24      A    Yes.

---

368

1      Q    And then you cite to the "Torture Victims
2  Chart"?
3      A    Correct.
4      Q    And I take it you received the Torture
5  Victims Chart from Plaintiff's counsel, right?
6      A    Correct.
7      Q    And if we could mark the Torture Victims
8  Chart as exhibit -- whatever one we're on now.
9          THE EXHIBITS COORDINATOR:  It would be 6,
10  yes.
11          THE WITNESS:  Also, I just want to flag
12  that we should be mindful of lunch at some
13  point soon.  I ended up eating breakfast at
14  5:00 in the morning to be on Chicago time.  So,
15  whenever people think a lunch break would be
16  appropriate, that would be nice.
17      Q    (By Ms. Rosen) Okay.  Let's go -- let's go
18  a little bit more and then we can take the lunch
19  break.
20          Okay.  Is this the Torture Chart that you
21  were referencing?
22      A    I believe so, yes.
23      Q    Who prepared this chart?
24          MR. ART:  Objection to form.

---

Richard A. Leo, PhD, JD, 9/29/2022

369

1      THE WITNESS: I'm not a hundred percent
2  sure, but I believe it would have been prepared
3  by Flint Taylor in Mr. Taylor's office.
4      Q    (By Ms. Rosen) And Mr. Taylor, right,
5  is the founding member of -- or one of the founding
6  members of the People's Law Office, correct?
7      MR. ART: Objection to form.
8      THE WITNESS: That's my belief and
9  understanding, yes.
10     Q    (By Ms. Rosen) And the People's Law Office
11 represents Mr. Solache in this case, correct?
12     A    Correct.
13     Q    And so you are relying on in part for some
14 of your opinions in this case on a document prepared
15 by Mr. Solache's lawyers, right?
16     MR. ART: Objection to form, go ahead.
17     THE WITNESS: In part, but I think
18 that's -- I want to be careful to emphasize
19 that I'm relying on a lot of materials and a
20 lot of other materials, and this is just one
21 very small piece of the materials that I'm
22 relying on.
23     And in that paragraph that you've cited on
24 Page 66, I list, you know, the categories of

370

1  these materials. So, it's not that I'm relying
2  on this document for any conclusions, or this
3  document alone. This is merely one small part
4  of the bigger picture and the substantial
5  amount of documents that I reviewed and relied
6  on.
7      Q    (By Ms. Rosen) But, you rely solely on the
8  Torture Victims Chart in support of the proposition
9  that Burge and those under his command, first at
10 Area 2 and later at Area 3, collectively tortured at
11 least one hundred and twenty-five suspects from 1972
12 to 1991? That's the sole cite there, right, is this
13 Torture Victims Chart?
14     MR. ELSON: Objection, form --
15     MR. ART: Objection, asked and answered.
16 Objection, mischaracterizes his report.
17     Q    (By Ms. Rosen) You can answer.
18     A    Sorry. it's the sole citation, but that is
19 not the sole document that I relied on. And it's
20 just the sole citation for that sentence.
21     Q    If we go to Page 68 of your report, the
22 sentence -- the paragraph that begins, "During his
23 tenure as Cook County State's Attorney more than
24 fifty additional cases of torture and abuse by

371

1  Lieutenant Burge and his fellow detectives came out
2  of Area 2." See, it says torture but I think it
3  means Torture Victims Chart because the Bates number
4  is the same. Do you see that there?
5      A    Yes.
6      Q    So again, you're relying on the Torture
7  Victims Chart for that proposition, correct?
8      MR. ART: Objection to the form.
9      THE WITNESS: In part, yes. That is the
10 sole cite there, but there were other materials
11 that I reviewed that support that proposition.
12     Q    (By Ms. Rosen) What other materials that
13 you reviewed support the proposition that during his
14 tenure as Cook County State's Attorney more than
15 fifty additional cases of torture and abuse by
16 Lieutenant Jon Burge and his fellow detectives came
17 out of Area 2?
18     A    I'd have to go through this list, but I
19 believe there were other materials that I reviewed
20 that established that point.
21     Q    And then if we go down to the paragraph
22 that begins, "In 1982," the last sentence says, "As
23 former Police Chief Richard Rosenthal has opined the
24 loss of this many police reports has to have" --

372

1  sorry, let me start over. "As former Police Chief
2  Richard Rosenthal has opined, the loss of this many
3  police reports had to have been a deliberate act."
4  Do you see that there?
5      A    Yes.
6      Q    And that opinion was rendered in connection
7  with a civil case where Mr. Rosenthal was paid to
8  provide those opinions, right?
9      MR. ART: Objection to form.
10     THE WITNESS: He may have received
11 compensation as an expert witness, I don't
12 recall.
13     Q    (By Ms. Rosen) And was it a report that he
14 prepared in connection with a case that he was doing
15 for and hired by the Peoples Law Office to -- let me
16 start over.
17     The report he prepared was for the
18 People's Law Office, correct?
19     MR. ART: Objection to form.
20     THE WITNESS: Without reviewing it, I
21 don't recall.
22     Q    (By Ms. Rosen) Let's go to Page 69 of your
23 report at the top of the page it says, "In 1986, the
24 CPD promoted Jon Burge to Commander, transferred him

Richard A. Leo, PhD, JD, 9/29/2022

373

1  to the Bomb and Arson Unit, and replaced him in Area
2  2 with Lieutenant Phil Cline.  Cline, while Lieutenant
3  at Area 2, did no investigations nor made any inquiry
4  concerning alleged torture at Area 2 under his
5  predecessors there."  Do you see that?
6      A   Yes.
7      Q   And you don't have any citation there.
8  What is the basis of your conclusion that Lieutenant
9  Phil Cline did no investigations nor made any
10  inquiry regarding alleged torture at Area 2?
11          MR. ART:  Objection to form.
12          THE WITNESS:  I don't recall specifically
13      which documents I gleaned this information
14      from.
15          MS. ROSEN:  Can you guys hear me?  I lost
16      my microphone for a second.
17      Q   (By Ms. Rosen) Let's go to Page 70 of the
18  report.  If we scroll down a little bit more, the
19  paragraph that says, "Also similar was the way in
20  which several victims were threatened with
21  consequences if they refused to make a statement."  Do
22  you see that there?
23      A   Yes.
24      Q   And then you -- a couple of lines down you

374

1  begin, "The most striking similarities, however, are
2  found in the methods of torture used on the suspects.
3  Wilson was electroshocked by Yucaitis using the
4  black box and by Burge who used the black box and a
5  curling iron looking device, was "bagged" and beaten
6  and was threatened with a gun placed in his mouth."
7          With respect to those methods of torture
8  that you detailed there that were alleged by Andrew
9  Wilson, did you see in any of the Area 3 cases
10  similar allegations of the precise methods of
11  torture?
12          MR. ART:  Object to form, and misrepresents
13      what you're reading from in the report.
14          MS. ROSEN:  Okay.
15      Q   (By Ms. Rosen) You can answer.
16      A   Okay.  So -- so, you were quoting
17  something that I didn't write but that I excerpted,
18  right?  And I just want to be clear, you're asking
19  me if I saw any examples of bagging, beating, gun
20  play, electrocution?  Can you just tell me what
21  specific category of the many categories of torture
22  and abuse you're asking about with respect to Area
23  3?
24      Q   The particular ones that are detailed

375

1  right there in the report, that I just read.
2      A   I lost you when you were reading.  I think
3  you were reading the paragraph that said, "Also
4  similar -- "
5      Q   No, okay, let's start over then if you're
6  confused.
7          In the report -- in the section of the
8  report it is noted that the most striking
9  similarities, however -- similarities between the
10  allegations made by the individuals that are discussed
11  above -- are found in the methods of torture used on
12  the suspects.  Are you with me so far?
13      A   Yes.
14          MR. ART:  Object to the form of the
15      question, and then I just want to note that
16      you're reading a block quotation from the
17      document.
18          MS. ROSEN:  Thank you for that.  I didn't
19      know what I was reading from, Steve.
20          MR. ART:  You're attributing in your
21      question this text that is a block
22      quotation to Dr. Leo.
23          MS. ROSEN:  No, I was not at all.
24          MR. ART:  Okay --

376

1          MS. ROSEN:  I quoted it -- I am -- I am
2      directing him -- I'm not going to fight with
3      you.  Make your objection and we can move on.
4          MR. ART:  I would just ask that you don't
5      misrepresent what's in the report as his
6      opinions.  It is a block quotation from a
7      source --
8          MS. ROSEN:  I never said this was his
9      opinion.  I am reading from something he put in
10      his report.  That's all I'm doing.
11          MR. ART:  Okay.
12      Q   (By Ms. Rosen) It indicates here, "The
13  most striking similarities, however, are found in
14  the methods of torture used on the suspects," right?
15      A   Yes.
16      Q   And it goes on to say here in this block
17  quote, "Wilson was electroshocked by Yucaitis using
18  the black box and by Burge who used the black box
19  and a curling iron looking device, was "bagged" and
20  beaten and was threatened with a gun placed in his
21  mouth."  Do you see that?
22      A   Yes.
23      Q   I am asking you if you saw in any of the
24  cases you reviewed relating to Area 3 any allegations

Richard A. Leo, PhD, JD, 9/29/2022

377

1   that described these particular methods of torture as
2   described in this paragraph?
3           MR. ART:  Objection to the form.
4           THE WITNESS:  Okay.  Thank you.  I'm just
5   going to have to review these materials.  Yes,
6   I did, I was looking at Page 77 of my report,
7   Damari Clemon described being electroshocked
8   and threatened with a pistol by Detective
9   Boudreau and other detectives.
10          So, that would be one similarity between
11  the block quote that you read and allegations
12  of torture occurring in Area 3.
13          Essentially, you described four or five
14  categories in your reading of that quote,
15  electroshock, torture, bagging, beating, gun
16  playing, or threatening with a gun.  And that
17  one, just that third one that I list describes
18  two of those three categories -- two of those
19  four categories.
20      Q   (By Ms. Rosen) Any others from Area 3?
21      A   I'm just going to keep going.  But rather
22  than stating them all up, I'm just going to do them
23  one at a time and then pause and then answer, and
24  then pause and continue my answer.

378

1           In the writeup in my report on Page 78 of
2   Nevest Coleman and Darrell Fulton, the allegation is
3   that Detectives Boudreau, Halloran, and another Area
4   3 detective punched both Coleman and Fulton in the
5   face, and that's similar to the beating described
6   here.  And a detective threatening Fulton that he
7   would put a bullet in his brain, which is similar to
8   being threatened with a gun in the block quote
9   portion that you read.
10          Detective -- in the James Coston case on
11  Page 78, Detective Kill is alleged to have struck
12  him in the jaw which is similar to the beating
13  described in the block quote.
14          There's also the block quote -- also, Mark
15  Craighead, Number 6 on Page 78, makes an allegation
16  in Area 3 of beating.
17          Arnold Day makes an allegation of physical
18  coercion and abuse, in other words, beating.
19          In Number 7 on Page 78 --
20      Q   Oh, the actual -- the method that was
21  described in that first paragraph was "bagged" and
22  beaten, so that's really what I was asking about,
23  but go ahead.
24          MR. ART:  I would state that the witness

379

1   should be allowed to finish answering the
2   question in any other Area 3 cases which he was
3   in the middle of.
4           THE WITNESS:  Yeah, I would like to
5   continue answering.
6       Q   (By Ms. Rosen) And you understand my
7   question to be focused on the particular methods
8   that I pointed out to you, right?
9           MR. ART:  I object to the interruption,
10  and the witness should be allowed to finish his
11  answer.
12          THE WITNESS:  Yes --
13          MS. ROSEN:  I want him answering my
14  question.
15          MR. ART:  Objection.
16          THE WITNESS:  I didn't mention Alnoraindus
17  Burton who was Number 2.  I understood your
18  question as I said before I started going
19  through these cases to include electroshock,
20  bagging, beating, and threatening with a gun.
21  So, I understood at least four categories in
22  your question.
23          Alnoraindus -- I'm not sure I'm pronouncing
24  his name right -- but he also alleges being

380

1   beaten.
2           Fred Ewing and Darnell Stokes allege
3   beating in Area 3.  Oscar Gomez alleges
4   beating.  He alleges being threatened with a
5   gun as well.  Harold Hill alleges beating in
6   Area 3.
7           Tyrone Hood alleges beating and being
8   threatened with a gun.  Wayne Washington
9   alleges also being hit or beat.
10      Q   (By Ms. Rosen) Where are you reading from,
11  Mr. Hood and Mr. Washington?
12          MR. ART:  I object.  Mr. Leo, you should
13  finish your response to the --
14          MS. ROSEN:  I'm entitled to know where
15  he's reading from.
16          MR. ART:  You can ask that question after
17  he completes his answer --
18          MS. ROSEN:  Well, he cannot just meander
19  through his whole report for forty-five minutes
20  and then not answer specific questions about
21  it.  He can go right back to reading and
22  identifying.  I want to know where he's reading
23  from in his report.
24      Q   (By Ms. Rosen) Doctor Leo, please tell me

Richard A. Leo, PhD, JD, 9/29/2022

381

1  where you're reading from in your report.
2      MR. ART:  Doctor Leo, I instruct you to
3  finish your answer to her question at which
4  point counsel can ask you follow-up questions.
5      MS. ROSEN:  Are you instructing him not to
6  answer my question?
7      MR. ART:  I'm instructing him to answer
8  the previous question which was --
9      MS. ROSEN:  This is absurd, Steve.
10  Q   (By Ms. Rosen) Doctor Leo, please answer
11  my question.
12      MR. ART:  You cannot ask him in a pattern
13  opinion, are there any other cases from Area 3
14  and then interrupt his answer to that question
15  about the pattern of other cases in Area 3 by
16  asking other questions.
17      MS. ROSEN:  I am not interrupting the
18  answer.  I'm asking him to direct me to where
19  he is reading from, and then I'm going to let
20  him keep identifying whatever cases he wants to
21  identify for his pattern.
22  Q   (By Ms. Rosen) Please tell me what page
23  you're reading from.
24      MR. ART:  Doctor Leo, you can tell counsel

382

1  what page you're reading from, but then please
2  continue your answer to the prior question.
3      THE WITNESS:  I am not reading from a page
4  in my report.  I'm reading from notes that I
5  prepared that are based in part on my report
6  and are based also on documents that I reviewed
7  in preparation for the report.
8  Q   (By Ms. Rosen) How many -- how many pages
9  of notes are you reading from today?
10      MR. ART:  I object to form.  Do you mean
11  how many has he read from so far, how many is
12  he reading from --
13      MS. ROSEN:  I will ask the question again.
14  Q   (By Ms. Rosen) How many pages are the
15  notes that you're reading from right now to answer
16  the question about Hood and Washington about what
17  they were specifically -- what they specifically
18  alleged?
19  A   Two pages.
20  Q   And are these different notes than the
21  notes you were reading yesterday?
22      MR. ART:  Objection to form.
23      THE WITNESS:  I eventually want to finish
24  my original answer, but yes, because the notes

383

1  that I prepared yesterday if I'm recalling
2  correctly had to do with the Reyes and Solache
3  case.  And that was separate notes that I
4  prepared.  Again, same thing, based on what I
5  had written in the report and based on
6  materials that I had reviewed in preparation
7  for the report which were voluminous.
8      So, these are different notes in that
9  they're stapled separately to different sheets
10  of paper, but they are similar in that they
11  were derived from my report and from materials
12  that I reviewed in preparation for my report.
13  Q   (By Ms. Rosen) And with respect to all of
14  the answers you've provided identifying the pattern
15  that I asked about initially, are you reading from
16  your -- to provide the answers that you've provided
17  up to this point in time, are you reading from your
18  report or reading from your notes?
19      MR. ART:  And just to clarify, Eileen, do
20  you mean the question are there any other Area
21  3 cases?
22      MS. ROSEN:  Yes.
23      THE WITNESS:  Okay.  So, when I started my
24  answer to your question in the very beginning,

384

1  I was reviewing my report and I was answering
2  the first case or maybe the first or second
3  case, I was answering based on the review from
4  my report.
5      But, then you -- you and I had an exchange
6  where you said I'm not asking about this, I'm
7  asking about that.  And so at that point I
8  shifted to the notes because the notes are a
9  little bit more detailed on some of these
10  cases.  And I think you were saying that your
11  question was about beatings during baggings,
12  but I had interpreted the quote to mean
13  baggings and beatings.
14      So, I wanted to go to the notes because
15  they're a little bit more thorough than what is
16  in the report on some of these many cases that
17  I reviewed the documents for.
18  Q   (By Ms. Rosen) When did you prepare the
19  notes?
20      MR. ART:  I think Dr. Leo should be given
21  -- we let you ask questions in the middle of
22  his answer about what he was reading from, and
23  you can ask questions about the notes at any
24  time.  But he should be permitted to complete

Richard A. Leo, PhD, JD, 9/29/2022

385

1    his answer about the Area 3 cases.
2        Q    (By Ms. Rosen) Can you -- when you're
3    answering -- as you go through and answer that
4    question and identify cases, please let me know if
5    you're reading from your notes or from you
6    report and then you may continue.
7        MR. ART:  Well, I object to the instruction
8    and the form, but Dr. Leo, please do so, and if
9    "both" is the answer, please let us know that as
10   well.
11       THE WITNESS:  Okay.  So, I believe we
12   finished with Tyrone Hood and Wayne Washington.
13   I'm looking at my report on Page 79.  Harold
14   Hill, Dan Young, Peter Williams all allege that
15   they were beaten.
16       With regard to Joseph Jackson, I'm looking
17   at both.  He describes being beaten.  He
18   describes bagging which is another category
19   in the block quote that you quoted from.
20       I'm moving on to Anthony Jakes, and he
21   describes being beaten, and I am looking at both.
22       Ronald Kitchen describes being beaten, and
23   I'm looking at both.  I'm just looking at my
24   report, Eric Wilson also describes being beaten.

386

1        Anthony Lash describes being beaten, I'm
2    looking at both.  I'm looking at both on Johnny
3    Plummer and he describes being beaten.  I'm
4    looking at my report, Tyrone Reyna describes
5    being beaten.  I'm also looking at my notes.
6        Mr. Escamilla, Nicholas Escamilla, also
7    describes being beaten.  Mr. Miguel Morales
8    also describes being beaten.  I was looking at
9    my notes.
10       Anthony Robinson describes being beaten,
11   I'm looking at my notes and the report.  Clayborn
12   Smith, just looking at my report, he describes
13   being beaten.  Looking in the notes he also
14   describes -- he describes being beaten in
15   multiple ways as do many of these individuals.
16       Johnny Walker describes being beaten, I'm
17   looking at my report and my notes.  Kilroy
18   Watkins, K-i-l-r-o-y, he describes being
19   beaten.
20       Demond Watson -- I'm sorry, Weston --
21   describes being beaten, I'm looking at -- I'm
22   looking just at my report, just at my report.
23       Emmett White describes being beaten,
24   looking just at my report.  Marcus Wiggins

387

1    describes both being electroshocked and being
2    beaten, I'm looking at my notes.
3        Anthony Williams describes being beaten,
4    I'm looking just at my report.  And then
5    finally looking at my notes and the report,
6    Robert Wilson listed as Number 30 under Area 3
7    describes being beaten.  So, that's my answer.
8        Q    (By Ms. Rosen) Okay.  Can you tell me when
9    you prepared the notes that you have been utilizing
10   to answer my questions about Area 3?
11       A    In the last couple of weeks or so, I don't
12   know, since the beginning of September.
13       Q    As you stated earlier, the notes are more
14   detailed in some places than your report on some of
15   the individuals and their allegations.
16       A    Yes.
17       MR. ART:  Object to the form.  It
18   mischaracterizes his prior testimony.
19       Q    (By Ms. Rosen) What documents did you
20   review that provided you with the greater detail
21   that's in the notes?
22       MR. ART:  So, I just want to, for the
23   record, restate our objections from yesterday.
24   In our view the notes that the witness has

388

1    made in order to prepare himself for the
2    deposition are not subject to discovery because
3    they are privileged and they are not subject to
4    disclosure under Rule 26(a)2.
5        We are going to allow Dr. Leo to answer
6    questions about the notes, when he prepared
7    them, whether he's looking at them as he
8    responds.  We don't think the substance of
9    those notes is subject to discovery under the
10   rules.
11       But with respect to that question that
12   Miss Rosen just asked, which is what is the
13   information that is more detailed in the notes
14   than the -- than what is in your report and the
15   materials that you reviewed, you can answer
16   that question.
17       In other words, if it's okay with you,
18   Eileen, is there information in your notes that
19   is not contained in the report or the materials
20   you reviewed.
21       MS. ROSEN:  That was actually a cute
22   answer to that question.  The follow-up
23   question was what materials did he rely on to
24   prepare the notes.

Richard A. Leo, PhD, JD, 9/29/2022

389

1      MR. ART:  I disagree, and that's the
2  confusion that I am trying to clear up.  But I
3  think it is worth asking whether there is any
4  information in his notes that does not appear
5  either in his report or in the materials he
6  reviewed.
7      MS. ROSEN:  Well, we know that it's true
8  because the answer he gave with respect to Hood
9  and Washington is more -- has information and
10  details that are not in the report.
11      His answer with respect to Hood and
12  Washington in the report, it simply says
13  Detective Boudreau coerced a false confession
14  from Washington.  Both men's convictions were
15  subsequently overturned.
16      Doctor Leo read from his notes and
17  provided detail about the allegations that
18  Mr. Hood and Mr. Washington were making, having
19  to do with beating and whatever else, I don't
20  recall specifically.
21      So, we know that the notes are more
22  detailed than the report and I --
23      MR. ART:  I agree with that proposition.
24  What I said on the record just a moment ago was

390

1  that the notes do not contain any information
2  that is not in his report or the materials that
3  he reviewed in preparing that report.
4      And so your next question, if I recall it
5  correctly, was what detail is in his notes that
6  is not in the report or the materials he
7  reviewed.  We're going to allow him to answer
8  that question despite our objection.
9      THE WITNESS:  Everything in the notes is
10  based on materials that I reviewed in preparation
11  of the report.  So, there is no new materials.
12      What I did was go back to -- what I did in
13  preparation for the deposition is review some
14  of the original materials that I had been
15  provided when I prepared the report.
16      Q    (By Ms. Rosen) Okay.  This is a good place
17  to take a lunch break.
18      THE VIDEOGRAPHER:  We're off the video
19  record at 12:47 p.m.
20          (At this time, a lunch break was
21      taken off the record.)
22      THE VIDEOGRAPHER:  We're back on the video
23  record at 1:32 p.m.
24      Q    (By Ms. Rosen) Okay, Dr. Leo.  If we could

391

1  get Exhibit Number 1 back up on the screen.  If you
2  could turn to Page 71 of your report.  And if you
3  look at the bottom of the page, you cite a case
4  called U.S. ex. rel. Maxwell versus Gilmore.  Do you
5  see that yet there?
6      A    Yes.
7      Q    And how did you locate that case?
8      A    That case was provided to me by counsel.
9  I believe it's in the materials reviewed.
10      Q    And that's a Northern District of Illinois
11  case from 1999, right?
12      A    Correct.
13      Q    And that's after the Solache and Reyes
14  arrests, correct?
15      MR. ART:  Objection to form.
16      THE WITNESS:  It's a 1999 case in
17      publication, but I think the facts occurred
18      before that.  But I would have to double-check
19      the published opinion to refresh my recollection
20      about when the facts in that case occurred.
21      Q    (By Ms. Rosen) Okay.  The published
22  opinion, though, was not published until 1999,
23  correct?
24      A    That published opinion, yes.

392

1      Q    Okay.  And the finding that's recited in
2  your report was not published until 1999, right?
3      MR. ART:  Objection to form.
4      THE WITNESS:  The quotation from that
5      opinion that you're referring to, yes.
6      Q    (By Ms. Rosen) Okay.  And it says -- part
7  of the quote indicates, "It is now common knowledge
8  that in the early to mid-1980s Chicago Police
9  Commander Jon Burge and many officers working under
10  him regularly engaged in physical abuse and torture,"
11  correct?
12      A    Yes.
13      Q    And to the extent, Dr. Leo, for the rest
14  of the afternoon, if you're answering a question by
15  reviewing notes that you have in front of you, I'm
16  going to ask you to alert us to the fact that you're
17  referring to notes while -- in answer to the
18  question, okay?
19      MR. ART:  And we state our previous
20      objection to those notes not being discoverable
21      and protected by privilege.  And it's fine with
22      us if Dr. Leo informs counsel that he is
23      looking at notes before or after the answer,
24      but we think that the notes themselves and the

Richard A. Leo, PhD, JD, 9/29/2022

393

1  substance of those notes are not discoverable
2  for the reasons previously stated.
3      MS. ROSEN:  Okay.  And we obviously think
4  they are discoverable, so I'm going to ask, Dr.
5  Leo, that you be sure to retain all of the
6  notes that you had in front of you for the last
7  couple of days so that if we end up having to
8  litigate this and you're ordered to produce the
9  notes, you have them, okay?
10      THE WITNESS:  Okay.
11      MR. ART:  We will preserve the notes.
12      MS. ROSEN:  Okay, thank you.
13      Q    (By Ms. Rosen) Going to Page 72 of your
14  report, the first full paragraph says, "From 2002 to
15  2006, retired Justice Edward Egan served as a Cook
16  County Special Prosecutor."  Do you see that there?
17      A    Yes.
18      Q    And obviously, 2002 is after 1998, right?
19      A    Correct.
20      Q    And then the next paragraph says, "On
21  January 10th, 2003, Illinois Governor George Ryan
22  pardoned Aaron Patterson, Madison Hobley, Leroy
23  Orange, and Stanley Howard based on innocence."
24  Obviously, 2003 is after 1998, correct?

394

1      MR. ART:  Objection to form.
2      THE WITNESS:  Correct.
3      Q    (By Ms. Rosen) And in the last paragraph
4  you cite to a 2007 Seventh Circuit opinion in a case
5  called Hinton.  Obviously, that opinion was published
6  in 2005 which would be after 1998, correct?
7      MR. ART:  Objection to form.
8      THE WITNESS:  Correct.
9      Q    (By Ms. Rosen) And then on the next page,
10  Page 73, the first full paragraph references
11  something that Chief Cook County Criminal Court
12  Judge Paul Biebel said in 2006, right?
13      A    Correct.
14      Q    And 2006 is obviously after 1998?
15      MR. ART:  Objection to form.
16      THE WITNESS:  Correct.
17      Q    (By Ms. Rosen) And then in July, 2006, the
18  Special Prosecutors that you referenced earlier
19  issued their report, and obviously 2006 is after
20  1998, correct?
21      A    Correct.
22      Q    And then if we go to Page 74, there's a
23  reference to Mayor Richard Daley regarding a
24  statement he made about the Special Prosecutor's

395

1  Report that came on July 21st, 2006.  That obviously
2  is after 1998, correct?
3      MR. ART:  Objection to form.
4      THE WITNESS:  Yes.
5      Q    (By Ms. Rosen) And then you reference the
6  enactment -- the enactment of the Illinois Torture
7  and Inquiry Commission in 2009.  And 2009 is after
8  1998, correct?
9      MR. ART:  Objection to form.
10      THE WITNESS:  Correct.
11      Q    (By Ms. Rosen) And then you cite to a
12  court opinion that came out May 22nd, 2009.  2009 is
13  obviously after 1998, correct?
14      MR. ART:  Objection to form.
15      THE WITNESS:  Yes.
16      Q    (By Ms. Rosen) And you cite to a 2010
17  opinion in the case called People versus Wrice.
18  2010 is after 1998, correct?
19      MR. ART:  Objection to the form.
20      THE WITNESS:  Correct.
21      Q    (By Ms. Rosen) And then you reference the
22  fact that Mr. Burge was convicted by a federal jury
23  June 28th, 2010.  And 2010 is obviously after 1998,
24  correct?

396

1      MR. ART:  Objection to form.
2      THE WITNESS:  Yes.
3      Q    (By Ms. Rosen) And then on Page 75 of your
4  report you cite to the Seventh Circuit opinion that
5  was issued in 2013 that affirmed Mr. Burge's
6  conviction, and obviously 2013 is after 1998.
7      MR. ART:  Objection to form.
8      Q    (By Ms. Rosen) Correct?
9      MR. ART:  Objection to the form.
10      THE WITNESS:  Correct.
11      Q    (By Ms. Rosen) And then on Page 76 you
12  reference the enactment of the Reparations Ordinance
13  and Resolution in May of 2015, and obviously 2015
14  is after 1998, correct?
15      MR. ART:  Objection to the form.
16      THE WITNESS:  Correct.
17      Q    (By Ms. Rosen) And then you referenced
18  Judge Hooks' opinion in June of 2018 in the case of
19  People versus Jackie Wilson, and quite obviously
20  2018 is twenty years after 1998, correct?
21      MR. ART:  Objection to form.
22      THE WITNESS:  Correct.
23      Q    (By Ms. Rosen) And then you quote Mayor
24  Lightfoot's statement in September of 2018

Richard A. Leo, PhD, JD, 9/29/2022

397

1    regarding the death of Jon Burge.  And obviously
2    again, 2018 is twenty years after 1998, correct?
3              MR. ART:  Objection to the form.
4              THE WITNESS:  Correct.
5         Q    (By Ms. Rosen) And then your conclusion --
6    concluding paragraph to this section of the report
7    is at the bottom of Page 76, right?
8              MR. ART:  Objection to the form.
9              THE WITNESS:  It's really a summary.
10        Q    (By Ms. Rosen) Okay.
11        A    And it's at the bottom of Page 76,
12   correct.
13        Q    Okay.  So, that's your summary of your
14   opinions that began at the bottom of Page 65, right?
15        A    Correct, with respect to Area 2, yes --
16   actually, you know, I would say, yeah, it's a
17   summary of the opinions there.
18        Q    And you spend approximately eleven pages
19   discussing Burge and the various cases related to
20   Burge and some of the individuals that worked under
21   him, correct?
22             MR. ELSON:  Objection to the form.
23             THE WITNESS:  That's part of what I
24   discussed.  Obviously, I discussed more, but

398

1         yes, that is accurate.  That is among the things
2         that I discussed in these eleven pages.
3         Q    (By Ms. Rosen) Well, as I understand the
4    opinions that begin under Section B of Page 66 of
5    your report and go all the way through to the bottom
6    of Page 76 of your report is that the information
7    and the analysis and the citations that you provide
8    are all in support of your opinion that is listed
9    under Subheading B, "Systemic and Widespread
10   Torture, Physical Abuse, and Coercive Interrogation
11   at Area 2 under Jon Burge, and Continuing Notice to
12   High Ranking Officials in the City of Chicago, High
13   Ranking Officials in the Chicago Police Department,
14   and Police Command Personnel," right?
15        A    Correct.
16        Q    And in any of the materials you reviewed,
17   did you find any connection between Jon Burge and
18   any of the Defendant Officers in this case?
19        A    It depends on what you mean by connection.
20   They're -- they're both employed by the Chicago
21   Police Department, they're both investigators.
22   They're part of a common investigative culture.  They
23   both were accused of acts of physical and
24   psychological abuse and torture.  There's overlap in

399

1    the types of acts that they were accused to.
2         So, I think it would be a mistake to say
3    there is no connection between them because they're
4    part of the same department, part of the same
5    culture, overlapping years, part of the same pattern
6    and practice, just in different parts of the Chicago
7    Police department.
8         So, I believe there is a connection.  It's
9    -- it's merely the -- the level of generalization with
10   which we discussed that connection.
11        Q    Did you find any evidence in any of the
12   materials that you reviewed that Detective Reynaldo
13   Guevara knew Jon Burge?
14             MR. ART:  Objection to form.
15             MS. GOLDEN:  I'm incredibly sorry to
16   interrupt.  Rachel, our videographer, is asking
17   if we can take just one pause really quick.
18   She's having technical issues and so the
19   exhibit is not being captured.
20             MR. ART:  Sure.
21             MS. GOLDEN:  Sorry about that.
22             MS. ROSEN:  No worries, let's go off the
23   record.
24             THE VIDEOGRAPHER:  Sorry, folks, we're

400

1    back.  Just so you know, I'm still recording on
2    one screen that entire time, it's just that the
3    exhibit was not up on the screen at the time
4    because I have two different versions.  So, how
5    do you want to proceed?  It's up to you.
6              MS. ROSEN:  Okay.  We can just -- as far
7    as I'm concerned, we can just proceed.  It
8    doesn't matter to me that we didn't capture the
9    exhibit for some period of time.  If anybody
10   else has an objection to that, let me know.
11             MR. ART:  No, we agree.
12             THE VIDEOGRAPHER:  Okay, thank you.
13        Q    (By Ms. Rosen) Okay.  All right.  I forgot
14   what my last question was, so I'm sorry if I asked
15   it but I need to run through the list.
16        So, of the materials you reviewed, did you
17   find any evidence that Detective Reynaldo Guevara
18   knew Jon Burge?
19        A    I don't recall if there was any document
20   reviewed that said they had met.
21        Q    In any of the documents and materials that
22   you reviewed, did you find any evidence that
23   Detective Reynaldo Guevara worked for Jon Burge?
24        A    I do not recall if I reviewed any of the

Richard A. Leo, PhD, JD, 9/29/2022

401

1  documents that established a working relationship
2  between the two.
3      Q    In all of the materials that you reviewed,
4  did you ever find any evidence that Reynaldo Guevara
5  worked at Area 2 at any point in time during his
6  career?
7      A    I don't recall reviewing any documents
8  that said that, or if I did.
9      Q    Do you know where Area 2 is located within
10  the City of Chicago?
11      A    I have a rough idea, but I couldn't tell
12  you the exact coordinates.
13      Q    Do you have any idea where Area 5 is
14  located in the City of Chicago, or was located in the
15  City of Chicago back in the nineties?
16      A    I do not recall.
17      Q    Do you know what the distance was between
18  Area 2 and Area 5 in the nineties?
19      A    I do not.
20      Q    In any of the materials that you reviewed,
21  did you find any evidence that Detective Ernest
22  Halvorsen worked for Jon Burge?
23      A    I don't recall if I did.
24      Q    In all of the materials that you reviewed

402

1  did you find any evidence that suggested that Ernest
2  Halvorsen ever worked for Jon Burge?
3      A    I don't recall if I did.
4      Q    In any of the materials you reviewed did
5  you find any evidence that Ernest Halvorsen worked
6  at Area 2 at any point in his career?
7      A    I don't recall if I did.
8      Q    In all of the materials you reviewed did
9  you find any evidence that Edwin Dickenson worked --
10  knew Jon Burge?
11      A    I don't recall if I did.
12      Q    In any of the materials you reviewed did
13  you find any evidence that Edwin Dickenson worked
14  for Jon Burge?
15      A    I don't recall if I did.
16      Q    In any of the materials you reviewed did
17  you review any evidence that Edwin Dickenson was
18  assigned to Area 2 at any point during his career?
19      A    I don't recall if I did.
20      Q    In any of the materials that you reviewed
21  did you find any evidence that Robert Rutherford
22  knew Jon Burge?
23      A    I don't recall if I did.
24      Q    In any of the materials that you reviewed

403

1  did you find any evidence that Robert Rutherford
2  worked for Jon Burge?
3      A    I don't recall if I did.
4      Q    In any of the materials you reviewed did
5  you find any evidence that Robert Rutherford worked
6  at Area 2 at any point in his career?
7      A    I don't recall if I did.
8      Q    In all of the materials you reviewed did
9  you find any evidence that Officer Stankus knew
10  Jon Burge?
11      A    I don't recall if I did.
12      Q    In all of the materials that you reviewed
13  did you find any evidence that Officer Stankus
14  worked at Area 2 at any point in his career?
15      A    I don't recall if I did.
16      Q    In any of the materials you reviewed did
17  you find any evidence that Officer Stankus worked at
18  Area 2 during his career?
19      A    I don't recall if I did.
20      Q    In any of the materials that you reviewed
21  did you find any evidence that Officer Nejovus
22  worked for Jon Burge at any point in his career?
23      A    I don't recall if I did.
24      Q    At any point -- in any of the materials

404

1  you reviewed did you review any -- let me start over.
2      In any of the materials you reviewed did
3  you review any evidence or find any evidence that
4  Officer Nejovus worked at Area 2 at any point in his
5  career?
6      A    I don't recall if I did.
7      Q    In any of the materials you reviewed did
8  you find any evidence that Officer Karalow,
9  K-a-r-a-l-o-w, worked for or knew Jon Burge?
10      A    I don't recall if I did.
11      Q    In any of the materials that you reviewed
12  did you find any evidence that Officer Karalow
13  worked for Jon Burge?
14      A    I don't recall if I did.
15      Q    In any of the materials you reviewed did
16  you find any evidence that Officer Karalow ever
17  worked at Area 2 during the course of his career?
18      A    I don't recall if I did.
19      Q    And the remaining Defendant Officers in
20  the case are Mark Harvey, Daniel Trevino, Edward
21  Mingey, Officer Biebel, Officer Cavatelli.  Did you
22  find any evidence in any of the materials that any
23  of those officers knew Jon Burge?
24      A    I don't recall if I did.

Richard A. Leo, PhD, JD, 9/29/2022

---

405

1     Q    Did you find any evidence in the materials
2 that any of those officers ever worked for Jon Burge?
3     A    I don't recall if I did.
4     Q    Did you find any evidence in all of the
5 materials that any of those officers worked at Area
6 2 at any point in their careers?
7     A    I don't recall if I did.
8     Q    And did you find any evidence that Jon Burge
9 ever worked at Area 5 during the course of his career?
10    A    I don't believe so.
11    Q    And you said something earlier about
12 overlapping careers -- overlapping time frames of
13 the officers that provided some kind of a
14 connection. Do you know when any of the officers
15 whose names I just asked you about, starting with
16 Reynaldo Guevara and ending with Officer Cavatelli,
17 do you know when any of those officers began working
18 for the Chicago Police Department?
19    MR. ART: Objection to the form.
20    THE WITNESS: Off the top of my head I do
21 not know in what year or month or day those --
22 any of those officers began their employment
23 with the City of Chicago Police Department.
24    Q    (By Ms. Rosen) Okay. And then with

---

406

1 respect to the summary that you provided at the
2 bottom of Page 76, you indicate that there is a
3 substantial body of extensive evidence clearly
4 establishing that, dating back to at least the early
5 1970s it was well known that the City of Chicago
6 Police Department had a systemic practice of
7 subjecting African-American and Latino suspects who
8 were interrogated by detectives and supervisors to
9 physically abusive -- let me start that over.
10    The sentence -- the first sentence in the
11 summary reads, "In sum, there is a substantial body
12 of extensive evidence clearly establishing that
13 dating back to at least the early 1970s it was
14 well known that the City of Chicago's Police
15 Department had a systemic practice of subjecting
16 African-American and Latino suspects who were
17 interrogated by detectives and supervisors to
18 physically abusive and coercive interrogations (e.g.
19 beating, suffocating, electroshocks, mock
20 executions, threatening physical violence, et
21 cetera) with the result of coercing and/or
22 fabricating false and/or unreliable inculpatory
23 evidence to be used against the interrogated
24 suspects without regard to their actual guilt or

---

407

1 innocence." Do you see that there?
2     A    Yes.
3     Q    Okay. With respect to any of the cases
4 that you evaluated for this section of your report,
5 did you conclude that any of the confessions that
6 were at issue met criteria for a proven false
7 confession?
8         MR. ART: Objection, form.
9         MR. ELSON: Objection, form.
10        THE WITNESS: Okay. I'm going to ask a
11 clarifying question and then I will, if I have
12 this right, answer your question.
13        You are referring to the cases that --
14 there are no case summaries of cases in Area 2
15 in the report. The case summaries are of cases
16 in Area 3, 4, and 5. So, when you say "these
17 cases," I guess I got a little thrown. Can you
18 tell me which cases you're referring to?
19    Q    (By Ms. Rosen) Well, while you don't
20 provide case summaries, you provide details about
21 certain cases, right? You go on to a discussion
22 about Andrew Wilson. You go on to a discussion
23 about Maxwell. There's cases that you cite. I
24 just want to know if you -- I guess if you evaluated

---

408

1 any of these cases to determine whether or not that
2 any of them met criteria for a proven false
3 confession.
4         MR. ART: Objection to the form.
5         THE WITNESS: I think the only way that I
6 could answer that question is if I was asked
7 specific questions about -- you know, I had a
8 list of cases that were the Area 2 cases.
9         Many years ago I studied the Ronald Jones
10 case which was an early Jon Burge torture case.
11 And if that's an Area 2 case, that was
12 definitely a proven false confession.
13        But I would have to see a list of cases
14 or at least be given case names and then I
15 could say whether I knew the case well enough
16 to determine whether for research purposes
17 based on what I know I would classify it as a
18 proven false confession.
19    Q    (By Ms. Rosen) With respect to the work
20 that you did in this case evaluating the practices
21 at Area 2, did you analyze any of the cases to
22 determine whether any of the Area 2 cases met
23 criteria for a proven false confession?
24        MR. ART: Objection to form, asked and

---

Richard A. Leo, PhD, JD, 9/29/2022

409

1    answered.
2         THE WITNESS:  Not with respect to this --
3    my preparation of this report, no.
4         Q    (By Ms. Rosen) Okay.  And so your
5    conclusion in the summary at the bottom of Page 76
6    that the result of the practice that you've
7    identified resulted in the coercing and/or
8    fabricating false and/or unreliable inculpatory
9    evidence to be used against the interrogated suspects
10   without regard to their actual guilt or innocence is
11   based on what?
12        MR. ART:  Objection to form.
13        THE WITNESS:  It's based on a wide
14   spectrum of evidence that I mentioned in the
15   report.  Accusations that were made against
16   supervisors and detectives in Area 2; the
17   testimony of criminal defendants who made
18   accusations at motions to suppress hearings and
19   at trial; findings of the Office of Professional
20   Standards Reports; cases and allegations in
21   federal and state court decisions, judicial
22   findings, media articles, reports, and at
23   trials; allegations in civil lawsuits.
24        The four people who were pardoned by

410

1    Governor Ryan in 2003 who were on death row.
2    You know, Governor -- I saw Governor Ryan give
3    a speech at Northwestern where he said they
4    were innocent, and I've read descriptions where
5    he genuinely believed that they were innocent,
6    that they had been coerced into falsely
7    confessing.
8         Admissions of City officials, including
9    the Governor, I guess, is under a state
10   official.  There was the Embassy International
11   Report, and I think there was a United Nation
12   report.
13        So, all of those materials are listed in
14   my report, and that's the basis for -- for my
15   opinions here.
16        Q    (By Ms. Rosen) And from those things that
17   you've just identified, that's how you're -- that's
18   the basis for concluding that certain confessions
19   were coerced, right?
20        A    Yes.
21        MR. ART:  Objection to the form.
22        THE WITNESS:  Sorry.  Those are the
23   materials that I drew on.
24        Q    (By Ms. Rosen) And that certain

411

1    confessions were fabricated and false, right?
2         MR. ART:  Objection to form.
3         THE WITNESS:  I just want to be clear
4    here.  This is a wide range of evidence which
5    ranges from allegations by criminal defendants
6    and in civil complaints all the way to
7    judicial findings, admissions by City
8    Officials, and commissioned -- government
9    commissioned reports.  And my opinions about
10   the pattern and practices of these allegations
11   and in these cases is based on my analysis of
12   these materials.
13        I did not go through and do an analysis of
14   whether any of these cases met a proven false
15   confession.  But I did rely on these materials
16   in this and other sections of the report as
17   part of my analysis and the basis for those
18   conclusions as well as other opinions in the
19   report.
20        Q    (By Ms. Rosen) Okay.  Let's move to Page
21   77 of your report and your discussion of Area 3.
22   This section is entitled, "Physical Abuse and
23   Coercive Interrogation at Area 3 Involving
24   Detectives Kill, Boudreau, Halloran, and others."

412

1    Do you see that?
2         A    Yes.
3         Q    Okay.  So, are you concluding that
4    Detectives Kill, Boudreau, Halloran, and others, in
5    fact, physically abused individuals?
6         MR. ART:  Objection to the form.
7         THE WITNESS:  Again I'm not positioning
8    myself as a finder of fact or as doing what a
9    jury would do at a trial.  But like any
10   expert, I've been provided materials.  I've been
11   asked to review those materials and to offer
12   expert opinions based on the materials I've
13   reviewed.
14        And there is a pattern of cases in
15   which in the same types of materials those
16   allegations or findings have been made ranging
17   from mere allegations to judicial findings and
18   admissions by City officials and in police and
19   government reports.
20        Q    (By Ms. Rosen) And are the materials that
21   you're referencing all listed in this section of the
22   report that discusses Area 3?
23        MR. ART:  Objection to form.
24        THE WITNESS:  No.  The materials I'm

413

1    referencing would be listed at the beginning of
2    the report.  There might be some that I relied
3    on in my analysis here that are in the
4    materials reviewed section of the report that
5    aren't explicitly summarized in these pages on
6    Area 3.
7        Q    (By Ms. Rosen) Well, I guess I'm
8    wondering, you said that there are judicial findings
9    related to Area 3, and maybe as we walk through each
10   of these cases you can identify for me the judicial
11   findings that you say you -- you rely upon to
12   support the conclusions related to Area 3.
13       MR. ART:  Is there a question?
14       MS. ROSEN:  Pardon me?
15       MR. ART:  Was there a question?
16       MS. ROSEN:  Yeah, I'm just signaling to
17   the witness that I'd like for him to point out
18   to me any time he sees a judicial finding as we
19   work through these opinions.
20       MR. ART:  In response to any questions you
21   ask?
22       MS. ROSEN:  In response to any portion of
23   the report that I'm going through in Area 3.
24       MR. ART:  Okay.  We object to that request

415

1    1995.
2        Q    Did you say 171 Ill.2d, 1995?
3        A    Correct.
4        Q    Your report says 1996.  So -- and it's the
5    same -- but it's the same 171 Ill.2d.
6        A    Correct.  So, it's either 1995 or 1996.
7        Q    But the 171 Ill.2d citing to Page 1, the
8    report says 1, 29-30, that's accurate, right?
9        A    Correct.
10       Q    And that's one of the federal or state
11   court decisions that supports your conclusions that
12   Detective Kill physically abused and coerced an
13   interrogation, right?
14       MR. ART:  Objection to form.
15       THE WITNESS:  That there was an allegation
16   that he did that.
17       Q    (By Ms. Rosen) Oh, that's -- that's not a
18   judicial finding that he did that, that's just
19   simply someplace where it's memorialized that he was
20   alleged to have done that?
21       A    I would have to review the opinion to see
22   whether it was written as a judicial finding of
23   fact or it was merely summarized as an allegation
24   in the statement of facts.

414

1    and instruction as unreasonable and not
2    something an expert would do.
3        If you want to ask him particular questions
4    about judicial findings that appear in the report
5    and the materials reviewed you, of course, can do
6    so.
7        Q    (By Ms. Rosen) Dr. Leo, if you look at the
8    opening paragraph of this section, about six lines
9    from the bottom of the paragraph it says -- well,
10   actually you can go up to the beginning of that
11   sentence.  "The evidence comes from the repeated
12   documented allegations that accumulated against
13   Detectives Kill, Boudreau, Halloran, and other Area 3
14   Chicago Police Detectives; from the testimony of
15   numerous criminal defendants at motion to suppress
16   hearings and trials in Area 3 cases; from federal and
17   state court decisions in Area 3 cases."  Do you see
18   that?
19       A    Yes.
20       Q    Can you identify for me the federal and
21   state court decisions you're referring to right
22   there?
23       A    Yes.  And I'm reviewing my notes.  In the
24   case of Frank Bounds, People v. Bounds, 171 Ill.2d,

416

1        Q    So, as you sit here today, you don't know
2    whether or not People versus Bounds -- if that court
3    decision determined that Detective kill, in fact,
4    did what he was alleged to have done?  Is that what
5    you're saying?
6        A    Without reviewing the document, correct.
7        MR. ART:  I would just lodge an objection
8    to form to the extent that you're asking him
9    about judicial findings.  I'm not -- I'm not
10   reading that in the paragraph that you're
11   referring to about that.
12       MS. ROSEN:  Yeah, I wasn't asking him
13   about the paragraph.  I was asking him to
14   provide to me federal and state court decisions
15   that supported what he said in the above
16   paragraph.  We're not there yet, so --
17       MR. ART:  No, let -- let me just make the
18   record clear.  You asked him a question about
19   whether he found judicial findings in People
20   against Bounds, and he said he would have to
21   review it.  But there's no discussion of
22   judicial findings in the paragraph above.  You
23   asked him initially for --
24       MS. ROSEN:  Steve, speaking objection,

Richard A. Leo, PhD, JD, 9/29/2022

417

1   this is a speaking objection and I'm not going
2   to have speaking objections. I know what
3   questions I've asked and he's answered my
4   questions. So, no speaking objections. If you
5   have an objection to the form of the question
6   or something else, please make it. Otherwise,
7   no speaking objections.
8       MR. ART: Okay. I have a record to make
9   about you misleading the witness --
10      MS. ROSEN: I am not misleading the
11  witness, and you are not -- you cannot pretend
12  like you're making a record and use it as a way
13  to make a speaking objection. That's improper.
14      MR. ART: Okay. I'm going to make a
15  record. Let me know when you're ready for me to
16  make it.
17      MS. ROSEN: I object to you making speaking
18  objections in an effort to coach the witness.
19      MR. ART: That's not what I'm doing. You
20  read from the paragraph above the Bounds case
21  and said to him, "What federal and state court
22  decisions are you asking about?" And he pointed
23  to Bounds to be one. And then you said, "Where
24  in that do you see a judicial finding?"

418

1       And what I'm asking you to clarify is when
2   you're asking about federal and state court
3   decisions as this report says, or judicial
4   findings, which we do not see in that paragraph.
5   And if we're missing it, let us know.
6       MS. ROSEN: Are you done?
7       MR. ART: Yes.
8       MS. ROSEN: Great.
9   Q   (By Ms. Rosen) With respect to the federal
10  and state court decisions that you cite in the
11  paragraph, in addition to the People versus Bounds,
12  what other federal and state court decisions are you
13  referring to?
14  A   In the Damari Clemon case, Number 3; the
15  Marcus -- I'm sorry, I'm misreading this, sorry.
16  I'm not referring to that, so I withdraw that.
17      There is a state court decision in the
18  State of Illinois versus Jerry Gillespie that is
19  referred to in Number 10.
20  Q   Is that PTP-J Gillespie-000001-000020?
21      MR. ART: Objection.
22  Q   (By Ms. Rosen) Is that what you're
23  referencing, Dr. Leo?
24  A   I think that's the Motion to Hold the

419

1   Appeal. What I'm referencing is -- if I heard you
2   right -- it's the first citation there, the
3   000001-000020.
4   Q   Okay.
5   A   In the Anthony Lash case on Page 18 there's
6   a case cite -- a published opinion cited there, 252
7   Ill.App.3d, in 1993 starting at Page 239.
8       There was an appellate opinion in the
9   Anthony Jakes case.
10  Q   Is that cited in the Paragraph 16 of
11  Anthony -- of Anthony Jakes?
12  A   It is not, no. The Bates range for that
13  is PTP-A JAKES 000205-219.
14  Q   How do you know that? Are you reading
15  from notes?
16  A   I was reviewing my notes, yes.
17  Q   Okay.
18  A   Also, the Anthony Jakes case is a case
19  that I've worked on and reviewed many documents for
20  prior to this.
21      The Johnny Plummer case, Number 20 on the
22  list, People v. Plummer, 306 Ill.App.3d from 1999.
23      I mentioned earlier in the Clayborn Smith
24  case that I reviewed a recent opinion by the

420

1   Appellate Court of Illinois. This is the only
2   document that I referred to that I've reviewed prior
3   to -- subsequent to preparing the report, a new
4   document. And I mentioned that, I think, very early
5   on yesterday. The working citation for this is 2022
6   Ill.App.1st 201256-U, Number 1-20-1256, Second
7   Division, June 21st, 2022.
8       In the Robinson case, the Anthony Robinson
9   case, Number 22 on Page 81, People v. Robinson, 238
10  Ill.App.3d -- Ill.App.3d from 1992.
11      In the Marcus Wiggins case, Number 28,
12  Page 82; People v. Clemon, C-l-e-m-o-n, 259 Ill.App.
13  3d, 1994.
14      In the Anthony Williams case right below
15  that, Number 29 on Page 282 -- I'm sorry, on Page
16  82, People v. Williams, 303 Ill.App.3d, 1999.
17      Those are the -- those are the cases here
18  in this section. Obviously, there are other cases
19  I've reviewed in connection with this report, and
20  other cases I've worked on, my teaching, and my
21  research as well.
22  Q   Okay. Let's talk about the individuals
23  that you identify in this section of the report.
24  There's thirty of them, right, thirty cases that you

Richard A. Leo, PhD, JD, 9/29/2022

421

1   summarized in some way here?
2       A    Correct.  And this isn't all the cases.
3   This is just a partial list of Area 3 cases.
4       Q    What do you mean this isn't all the cases?
5       A    This is not all of the cases in which
6   there have been accusations of physical abuse or
7   torture by Area 3 detectives or, to my knowledge,
8   Detective Kill, Halloran, and Boudreau.  There are
9   other cases in which those accusations have been
10  made that are not in this report or in this section.
11      Q    And how do you know that there are other
12  allegations that have been made against Detectives
13  Kill, Boudreau, Halloran, and others at Area 3?
14      MR. ART:  Objection, form.
15      THE WITNESS:  Because I've worked on some
16  of those cases.  I would have to review my
17  records, but I have worked on other cases that
18  are not mentioned in this report.  And also I
19  recall in some of the stuff I've read that was --
20  was not read for this report but I've read in
21  other contexts.
22      I should qualify my answer that I would
23  have to review those materials to confirm that
24  they involve Detective Kill, Detective

422

1   Halloran, or Detective Boudreau, but I know
2   there are more Area 3 cases.  And if my memory
3   serves, there are more Area 3 cases involving
4   accusations against Detective Kill, Detective
5   Boudreau, and/or Detective Halloran than these
6   thirty cases.
7       Q    (By Ms. Rosen) And are you relying on
8   those other -- well, let me back up.
9       Can you identify any other cases other
10  than those that are either listed here in your
11  report or anywhere else in your report to support
12  your opinions regarding the allegations against
13  Detectives from Area 3?
14      A    I would need to review materials that I
15  have to answer that question with specific case
16  names.
17      Q    So, without reviewing materials you
18  cannot answer my question about identifying any
19  other cases other than the thirty that are listed
20  here, right?
21      MR. ART:  Objection, form.
22      THE WITNESS:  Cases that I've worked on in
23  Area 3 that I believe -- I have to confirm --
24  in Area 3 that are not listed here I think

423

1   include Corinthian Bell, James -- and James
2   Andrews, and I think Eric Cane.  So, I would
3   just need to confirm if those cases were Area 3
4   cases.
5       Q    (By Ms. Rosen) Are you relying on
6   information that you obtained doing work on
7   Corinthian Bell, James Andrews, and Eric Cane in
8   support of the opinions that you're providing in
9   this case?
10      MR. ART:  Objection to form.  Go ahead and
11  answer.
12      THE WITNESS:  I did not rely on the work I
13  did in those cases in support -- or in the
14  preparation of this report.  But, if I'm --
15  obviously, if I'm testifying as an expert
16  witness about my knowledge of cases and
17  allegations and evidence about police torture
18  and physical abuse, coerced confessions and
19  false confession in the Chicago Police
20  Department, then I would be relying on my broad
21  expertise which would include my research on
22  the subject that was not done in connection
23  with this report as well as my teaching
24  lectures, legislative testimony, et^cetera.

424

1       Q    (By Ms. Rosen) What legislative testimony
2   have you provided related to allegations of abuse
3   related to Area 3 Detectives?
4       MR. ART:  Objection to form.
5       THE WITNESS:  I don't recall if I provided
6   any specific testimony about that.  I do know
7   that I testified, I believe it was in 1999, to a
8   subcommittee of the Illinois State Legislature
9   on the issue of electronically recording
10  interrogations.  And I believe there were some
11  discussions of allegations of physical abuse
12  that I referenced in that testimony.
13      Q    (By Ms. Rosen) But you're not certain if
14  it had anything to do with Area 3?
15      A    It would have had to do with Area 2 and
16  Area 3 at that time.
17      Q    And you discussed specific cases out of
18  Area 3?
19      A    No, I don't believe that I discussed
20  specific cases.
21      Q    Okay.  Let's talk about Frank Bounds, the
22  individual you list in Item Number 1.
23      A    Okay.
24      Q    You state in your report that Detective

Richard A. Leo, PhD, JD, 9/29/2022

425

1    Kill hit Bounds on the head, tried to kick him in
2    the groin, and threatened to bring Bounds' girlfriend
3    into the case if he did not confess, causing Bounds to
4    falsely confess to a murder.  Did I read that
5    correctly?
6        A    You did, but there's a mistake in the
7    report.  That's Detective Kelly and not Detective
8    Kill.  That was a mistake that I didn't catch in the
9    proofreading.
10       Q    Okay.  So, are you concluding that Mr.
11   Bounds falsely confessed to a murder?
12           MR. ART:  Objection to form.
13           THE WITNESS:  No, I'm not making a finding
14   of fact there.  He alleged that he falsely
15   confessed.
16       Q    (By Ms. Rosen) You don't say that, though,
17   in that paragraph, right?  You simply state that as
18   a conclusion that he falsely confessed?
19           MR. ART:  Objection to form,
20   mischaracterizes the report.
21       Q    (By Ms. Rosen) You state there that he --
22   do you say "alleged" or "alleges" that he falsely
23   confessed?
24       A    I do not.

426

1        Q    What you meant to say was that he alleged
2    he falsely confessed?
3            MR. ART:  Objection to form.
4            THE WITNESS:  Causing him to assert that
5    he falsely confessed to the murder.
6        Q    (By Ms. Rosen) And are you -- are you
7    crediting Mr. Bounds' allegations that Detective
8    Kelly hit him in the head, tried to kick him in the
9    groin, and threatened to bring his girlfriend into
10   the case?
11           MR. ART:  Objection to the form.
12           THE WITNESS:  Not crediting his opinion.
13   He made that assertion and this -- his -- he's
14   alleging that, and I'm saying that this is a
15   pattern and this is part of that pattern.  So,
16   I'm not trying to suggest that I'm making a
17   factual determination.  I'm merely saying
18   that -- I'm merely saying here that that was
19   his assertion.
20       Q    (By Ms. Rosen) Right, that's what you're
21   saying now.  It doesn't read that way, so I'm trying
22   to get clarity on what you're intending.
23           So, my question is, are you simply
24   reciting Mr. Bounds' allegations in this particular

427

1    paragraph, or are you drawing conclusions based on
2    his allegations regarding whether or not the
3    confession -- whether or not the physical abuse
4    occurred and whether or not that led to a false
5    confession?
6            MR. ART:  Objection, asked and answered.
7        Q    (By Ms. Rosen) You can answer.
8        A    I'm relying on his testimony and the
9    testimony of his girlfriend indirectly, Susan
10   Mitchnick.
11       Q    Where did you find the name of his
12   girlfriend, Susan Mitchnick?
13       A    It's in the opinion and I'm reviewing, as
14   I said earlier, my notes on this case.
15       Q    So once again, your notes have more
16   details than your report, correct?
17       A    Yes, but my notes are from the materials I
18   reviewed in the case in preparation of the report.
19       Q    But you prepared the notes after you
20   prepared the report, correct?
21       A    After the report, yes.
22       Q    And in preparation for this deposition
23   here today?
24       A    Yes.

428

1        Q    When you were reviewing the court opinion,
2    People versus Bounds, to create your notes so that
3    you could answer questions here today at your
4    deposition, did you happen to notice whether or not
5    Mr. Bounds' allegations were sustained by the court
6    or overruled by the court, or whether there were any
7    factual findings made about his allegations?
8            MR. ART:  Objection to form, compound,
9    calls for a legal conclusion.
10           THE WITNESS:  I don't recall.  I'd have to
11   review the document again.
12       Q    (By Ms. Rosen) Do you recall whether or
13   not his conviction was affirmed?
14           MR. ART:  Objection to form.  Are you
15   talking about in that judicial opinion?
16           MS. ROSEN:  Correct.
17           THE WITNESS:  I do not recall.
18       Q    (By Ms. Rosen) And you didn't write that
19   in your notes, right?
20       A    I did not note that.
21       Q    Does it matter to you whether or not -- for
22   purposes of your opinions in this case, whether or
23   not Mr. Bounds' conviction was affirmed?
24           MR. ART:  Again, you're asking about on

Richard A. Leo, PhD, JD, 9/29/2022

429

1  direct appeal?
2     MS. ROSEN:  I'm asking about the case
3  citation that we are discussing.
4     MR. ART:  Okay.  So, objection to form.
5  Go ahead.
6     THE WITNESS:  In this part of the report
7  I'm making a pattern and practice opinion.  And
8  so it's less relevant to me whether a court at
9  some stage in the process affirms or doesn't
10  affirm a conviction.
11     The important point is that that is one of
12  many data points of cases and allegations of
13  physical abuse in this case in Area 3, but in
14  Areas 2, 3, 4, and 5 together.
15     And so -- so, it's the allegations and the
16  evidence supporting those allegations that go
17  to the pattern and practice opinions, not
18  whether on a different issue or other issues or
19  among other issues a judicial opinion is
20  affirmed or reversed.  Those are typically more
21  complicated issues.  And there may be an
22  affirmation or reversal on other grounds, or it
23  might be on procedural grounds.
24     So, I would put less weight on the

430

1  affirmation of an opinion than I would if I --
2  if I were arriving at a different kind of
3  opinion.
4     Q  (By Ms. Rosen) So, in an effort -- in your
5  analysis when you are analyzing cases to determine
6  whether or not there's a pattern and practice, what
7  do you do with evidence that undermines the
8  allegations?
9     MR. ART:  Objection to form.
10     THE WITNESS:  I would look at the sum
11  total of the evidence in front of me, and I
12  would evaluate it.  And in all of these cases,
13  including all of the Jon Burge cases, they're
14  always disputed by the officers who are alleged
15  or have been found to engage in the acts of
16  physical and psychological coercion.
17     Even Jon Burge himself never admitted, at
18  least not in any legal setting, that he
19  committed any act of torture or abuse, and yet
20  there are -- there are judicial findings there
21  and City admissions and a mountain of evidence
22  as many courts have said, so I would consider
23  that evidence.
24     But in all of these cases, the alleged --

431

1  the officers who are alleged to have engaged in
2  these forms of psychological and physical abuse
3  always dispute and deny.
4     Q  (By Ms. Rosen) I'm not really focusing on
5  -- my question was not focused on whether or not the
6  officers denied it.  My focus was on what you did with
7  evidence that contradicted the allegations, separate
8  and apart -- well, maybe not separate and apart, but
9  there's other evidence, right, that could undermine
10  the allegations other than a police officer's denial,
11  right?
12     A  That is possible, yes.  And these cases
13  are disputed, and I would be happy to consider any
14  other evidence that I didn't review if you want to
15  put that in front of me.
16     And to swing back to your question, I
17  would consider any evidence that contradicted or
18  disputed the accusations.  Of course, I'm going to
19  evaluate all the evidence that's put in front of me
20  and analyze which evidence fits with patterns and
21  practices or adds up to -- accumulates to patterns
22  and practices and make my analysis.
23     Q  So, if you are confronted with a case
24  where there were allegations of physical abuse that

432

1  led to an alleged coerced or false confession, if
2  you had evidence that contradicted that, not from a
3  police officer but from some other source, what
4  would you do with that evidence in order to consider
5  it to determine whether or not the allegation fit
6  within whatever pattern and practice, what would be
7  your methodology to evaluate it?
8     MR. ART:  Objection to form.
9     THE WITNESS:  Well, the methodology is
10  first and foremost to look at all the cases and
11  all the evidence in all the cases and look for
12  patterns to connect dots and figure out whether
13  they're -- they are isolated events or whether
14  there is a widespread or pervasive not isolated
15  practice.
16     With respect to a particular piece of
17  evidence, I would analyze it within that case
18  in light of other evidence in that case and
19  make my best analysis about the weight of the
20  evidence in that case on both sides in light of
21  what we know about the case and how I evaluate
22  the strength of the evidence.
23     But I want to be clear that, you know,
24  even if we threw out the Frank Bounds case,

Richard A. Leo, PhD, JD, 9/29/2022

433

 1    there's still numerous cases of allegations of
 2    the physical and psychological abuse in Area 3
 3    as in the other areas that are more than
 4    sufficient to establish a pattern and practice
 5    in my opinion.
 6        Q    (By Ms. Rosen) Okay.  Let's take a look at
 7    Mr. Burton's case.  With respect to Mr. Burton, you
 8    write, "Detective Kill kicked Burton in the groin,
 9    slammed his head against the wall, slapped him
10    across the face, and told him he could kill him
11    causing Burton to falsely confess."  Do you see that
12    there?
13        A    Yes.
14        Q    Are you concluding that Mr. Burton falsely
15    confessed?
16        A    As a factual matter, no, I would -- I
17    would say today, causing him to assert that he
18    falsely confessed.
19        Q    And as a factual matter, have you
20    determined that Detective Kill, in fact, kicked Mr.
21    Burton in the groin, slammed his head against the
22    wall, slapped him across the face, and told him he
23    could kill him?
24        A    I'm not trying to make any factual

434

 1    determinations, that is Mr. Burton --
 2            (At this time, a short break was
 3            taken due to technical issues.)
 4        Q    (By Ms. Rosen) I think my question was,
 5    are you -- are you stating that those allegations
 6    are facts or not?
 7        A    I am not making a factual determination.
 8    I'm offering an opinion based on the materials I
 9    reviewed.
10        Q    Okay.  And the materials that you reviewed
11    that support what you state here in Paragraph 2 are
12    cited there, correct?
13        MR. ART:  Objection to form, asked and
14    answered.
15        Q    (By Ms. Rosen) Is that correct?
16        A    I believe so, yes.
17        Q    And then with respect to Mr. Clemon,
18    again, are you crediting his allegations or simply
19    recounting what he alleges?
20        MR. ART:  Objection to form.
21        THE WITNESS:  Again, I'm not making any
22    findings of fact.  I'm not making a factual
23    assertion.  I'm analyzing a pattern and relying
24    on his assertion that he was electroshocked and

435

 1    threatened.
 2        Q    (By Ms. Rosen) And is there any particular
 3    reason why you wrote these as if you were stating a
 4    fact as opposed to qualifying it in the way you are
 5    in your testimony here today?
 6        MR. ART:  Objection to form.
 7        THE WITNESS:  The amount of material that
 8    I reviewed in this case was voluminous.  I
 9    don't think I've ever reviewed more material in
10    any case for which I've written a report, and
11    this took an enormous amount of time.  You have
12    my records, I believe.  And when you write
13    something that is this long, sometimes you don't
14    have the opportunity to double and triple and
15    quadruple proof a report.
16        So, if I had to write things today, there
17    might be parts of the report that I would write
18    slightly different -- differently.  I stand by
19    the opinions that I've written in the report.
20        MR. ELSON:  Eileen, I need to take a ten
21    minute break.  Can we do that now?
22        MS. ROSEN:  Yeah, no problem.
23        THE VIDEOGRAPHER:  We're off the video
24    record at 2:44 p.m.

436

 1            (At this time, a short break was
 2            taken off the record.)
 3        THE VIDEOGRAPHER:  We're back on the video
 4    record at 2:57 p.m.
 5        THE WITNESS:  Miss Rosen, I keep
 6    forgetting to tell you this, but I have the
 7    Bates stamp numbers for the general progress
 8    reports that you asked about at the beginning
 9    of the deposition that I had forgotten to get
10    last night.
11        Q    (By Ms. Rosen) Sure.
12        A    Okay.  CCSAO 48905 to 49177.
13        Q    Okay.  Thank you.  All right.
14        Let's turn to Page 78 of your report.  At
15    the top of 78, Paragraph 4, you discuss Nevest
16    Coleman and Darrell Fulton.  Do you see that?
17        A    Yes.
18        Q    And the first sentence of that reads,
19    "Detective Boudreau, Detective Halloran, and another
20    Area 3 Detective punched Coleman in the face
21    repeatedly until he falsely confessed."  Do you see
22    that?
23        A    Yes.
24        Q    And in this particular paragraph, did you

Richard A. Leo, PhD, JD, 9/29/2022

437

1  also mean to say alleged or asserted or something
2  like that?
3        MR. ART:  Object to form, mischaracterizes
4    his prior testimony.
5    Q  (By Ms. Rosen) You can answer.
6    A  So, there's a range of evidence that I
7  reviewed and he is asserting that he falsely
8  confessed, but in these cases there's a range of
9  evidence that supports that.
10       I would have to review the materials in this
11  case, but I actually think this case meets the
12  definition or may meet the definition of a proven
13  false confession.  So, what I meant to communicate
14  or I mean to communicate, I shouldn't say meant, is
15  that this is one among many cases where I've
16  reviewed a body of evidence ranging in evidentiary
17  strength, and it's one data point in a pattern where
18  there's an assertion and there's evidence to support
19  that assertion, and in this particular case that it
20  may be a proven false -- or meet the criteria of a
21  proven false confession
22    Q  What's your basis for saying that this
23  case may meet criteria for a proven false confession?
24    A  That Coleman and Fulton were excluded from

438

1  the male DNA on the victim's underwear.  That's the
2  basis.
3    Q  And how do you know that, that Coleman and
4  Fulton's DNA was excluded from the victim's underwear?
5    A  Well, based on the materials I reviewed in
6  preparation of this report when I wrote the report
7  as mentioned in the report.  That's where that --
8  that's where I reviewed the materials and that's
9  what I reference in the report.
10       And this would be a good example of the
11  range of evidence in these cases to establish a
12  pattern.  This would be on the very strong end, at
13  least with respect to factual innocence.
14    Q  So, you cite two things in support of
15  Paragraph 4, PTP-D Fulton-0001 to 00086, and PTP-N
16  Coleman 0001 to 00010.  Do you see that?
17    A  I do.
18    Q  And is that what you're relying on
19  exclusively with respect to whatever your opinion is
20  with respect to Mr. Coleman and Mr. Fulton?
21        MR. ART:  Objection to form.
22        THE WITNESS:  That's what I relied on
23  directly when I prepared this report, yes.
24    Q  (By Ms. Rosen) Did you rely on something

439

1  indirectly?
2    A  Well, when you say exclusively, I want to
3  be clear that I rely on my expertise, my background
4  knowledge, on other materials.  This is merely what
5  I cited in this report in support of what I wrote in
6  this paragraph.
7    Q  With respect to the factual assertions
8  that you make in this paragraph, other than the two
9  documents cited at the conclusion of the paragraph,
10  are you relying on anything else?
11        MR. ART:  Objection to form and to factual
12  assertions.
13    Q  (By Ms. Rosen) What are you reading from?
14    A  I'm reviewing my notes.  There's also
15  PTP -- PTP-N Coleman-000042-0000105 that I also
16  relied on that I did not -- that I do not
17  believe are-- that are cited in the materials
18  reviewed but aren't in the report.  So, I did rely on
19  them in the preparation of the report but are not
20  cited in this paragraph.
21    Q  Why aren't they cited in this paragraph?
22    A  I don't recall.
23    Q  So far we've found two citations that you
24  have in your notes that we haven't found in your

440

1  report in the place where you are discussing the
2  particular case, right?
3        MR. ART:  Objection to form.
4    Q  (By Ms. Rosen) Hood and Washington I think
5  you had an additional cite, and now in Fulton and
6  Coleman you have an additional cite.  Is that
7  correct?
8        MR. ART:  Objection to form.  There's also
9  additional material provided in the Smith case
10  that he's testified at length on.
11        MS. ROSEN:  I'm sorry, I forgot.  And the
12  Smith opinion.
13        THE WITNESS:  I believe these materials
14  are in the report, they're just not cited in
15  that section.  Again, it was a massive
16  undertaking, and I didn't always cite
17  everything that I reviewed in a particular case
18  in a particular section of the report where I
19  reviewed it.
20       But I did cite everything that I reviewed
21  in preparation for the report in the materials
22  reviewed section except for anything I
23  inadvertently excluded like those general
24  progress report numbers that I just gave you.

Richard A. Leo, PhD, JD, 9/29/2022

441

1    Q    (By Ms. Rosen) Did you obtain the
2   information that Coleman and Fulton were excluded
3   from male DNA on the victim's underwear?
4         MR. ART: Objection, asked and answered.
5         THE WITNESS: I would have to go through the
6   documents I reviewed to tell you specifically,
7   and I have thousands of pages of documents
8   organized into probably two dozen binders on my
9   shelves. So, I could spend the time and look
10   for it, but without the ability to review my
11   massive file, I couldn't tell you off the top
12   of my head.
13    Q    (By Ms. Rosen) Other than the three
14   documents that we've talked about, the two that are
15   actually cited in Paragraph 4 and the one that you
16   brought from your notes, do you have any other
17   materials specifically related to Mr. Fulton and
18   Mr. Coleman?
19         MR. ART: Objection to form.
20         THE WITNESS: I would have to go through
21   all of my documents to see whether there's
22   anything in addition to what I've mentioned and
23   what is listed in this paragraph. If so, it
24   would be in the materials reviewed at the

442

1   beginning of the report.
2    Q    (By Ms. Rosen) Okay. Let's move to Number
3   5, Mr. Coston. Is says, "Detective Kill struck him
4   in the jaw, grabbed him around the neck, and pushed
5   him against the wall while questioning him about a
6   murder (Coston was a witness in a murder case)." Do
7   you see that?
8    A    Yes.
9    Q    And are you crediting -- crediting any of
10   Mr. Coston's allegations or are you simply reciting
11   the allegations?
12    A    Well, again, I reviewed a body of evidence.
13   There's evidentiary support for his allegations. This
14   is one data point in a larger pattern. I'm not a fact
15   witness. I'm not purporting to be a fact witness. I
16   am applying my analysis to the materials and evidence
17   that I reviewed in this as well as other cases.
18    Q    With respect to what you say about Mr.
19   Coston here in Paragraph 5, you cite to PTP-J
20   Coston-000001 to 3. Do you see that?
21    A    Yes.
22    Q    So, if I look at those three pages, I will
23   find the information that you have reported in this
24   paragraph of the report, right?

443

1    A    Yes.
2    Q    Okay. Let's move to Paragraph 6,
3   Mr. Craighead. It says, "Detective Kill and other
4   Area 3 Detectives beat Craighead and deprived him of
5   food and water until he falsely confessed.
6   Photographs of Craighead taken after his interrogation
7   depict his injuries." Do you see that?
8    A    Yes.
9    Q    So, are you opining that Mr. Craighead
10   falsely confessed?
11         MR. ART: Objection.
12         THE WITNESS: Again, I'm not making a
13   factual determination. I'm not acting as the
14   jury here. I reviewed a body of evidence
15   including in this case -- which includes this
16   case, and I'm offering an expert opinion. And
17   in this case there -- I've been saying that
18   there is a range of evidence from moderate to
19   strong in the record that I reviewed supporting
20   the assertions. And this is an example of a
21   case that had stronger evidence than some of
22   the others with the photographs of Mr. Craighead
23   depicting injuries. There are other cases
24   obviously that have that as well.

444

1         The important point is that this is evidence
2   of a pattern, and this is one case in a broader
3   pattern. And that's what the opinion in this
4   section is about.
5    Q    (By Ms. Rosen) Did you see the photographs
6   that documented his injury?
7    A    If they were in the materials I reviewed,
8   yes, I did. I don't have an independent memory as I
9   sit here nine, ten months after reviewing the
10   massive discovery that I did not re-review for
11   preparation of the deposition, but I believe I did.
12    Q    So, because of this line in Paragraph 6
13   that says, "Photographs of Craighead taken after his
14   interrogation depict his injuries," you would
15   categorize this on -- did you say on the stronger
16   side?
17         MR. ART: Objection to form.
18         THE WITNESS: Yeah. But I want to be
19   clear about the point that I was trying to
20   make. I'm an expert evaluating a body of
21   evidence. The evidence ranges in strength, and
22   the amount of evidence in each case also ranges.
23   And there's some evidence like allegations of
24   coercion or abuse or false confession that all I

Richard A. Leo, PhD, JD, 9/29/2022

445

1  have is the complaint that was filed in the civil
2  case.
3       And there are other cases where I have
4  testimony by the victim or the person who was
5  interrogated.  And then there are other cases
6  where I have judicial Findings, commission
7  reports, admissions by city officials.
8       So, the evidence that I relied on to make
9  my opinions, to arrive at my opinions
10 particularly in the pattern part of the report,
11 varies.  And that's one point I've been trying
12 to make.
13      And all I'm saying here is that photographic
14 evidence of abuse that corroborates the
15 accusations made by somebody who alleges they
16 were physically assaulted like in this case, like
17 in the Andrew Wilson case, and I believe like in
18 some of the other cases, is stronger than in some
19 other cases where the evidence might be at the
20 low end of that spectrum, like an allegation in a
21 complaint, and it's not as strong as evidence at
22 the other end like judicial findings of fact or
23 commission reports or admissions by City
24 officials.

446

1       Q   (By Ms. Rosen) Okay.  Let's move to Arnold
2  Day.  In this paragraph you say, "Detective Boudreau
3  and another Area 3 detective choked Day and
4  threatened to throw him out of a window until he
5  falsely confessed to a murder.  Day was acquitted
6  after presenting his allegations of physical abuse
7  and coercion."
8       You cite to Mr. Day's affidavit and his
9  complaint, correct?
10      A   Yeah, in the report I do, yes.
11      Q   In your notes do you have other cites?
12      MR. ART:  Objection to form.  I would
13 instruct him based on our previous objections
14 about content not to answer that question.
15      Q   (By Ms. Rosen) Are you reading from your
16 notes?
17      A   I'm not reading from my notes.  I was
18 reviewing my notes but I'm not reading from them.
19      Q   When you said that's all you have in the
20 report, what did you mean?
21      A   What I meant was cited here in this
22 section of the report.  There are other materials
23 about the Arnold Day case that are cited in the
24 beginning of the report where I have the

447

1  comprehensive list of all the materials that I've
2  reviewed.
3       Q   In the materials reviewed section?
4       A   Yes.
5       Q   That would be the January 29th, 1993
6  Report of Proceedings, correct?
7       A   I need to go to the materials reviewed
8  section of the report.  Can you tell me what page
9  you're on?
10      Q   Eight.
11      A   Okay.  Eight, sorry, 7th -- what number is
12 it?
13      Q   How did you know that you had additional
14 materials cited for the Day case in the materials
15 reviewed section?
16      MR. ART:  I object to the form and to the
17 premise of the question.
18      Q   (By Ms. Rosen) Okay.  You can answer.
19      A   I think I mentioned earlier that some
20 of -- some of these cases I only cited some of the
21 materials that -- in the actual writeup that I
22 relied on.
23      Q   So, when we were talking about Mr. Day I
24 asked you about the two -- I asked you about the two

448

1  citations in the paragraph which were the affidavit
2  and the complaint, and you said, "That's all I cite
3  there.  I have more materials cited in the materials
4  reviewed section."  Did you simply remember that?
5       MR. ART:  Object to the form of the
6  question and to the -- his complaint cites an
7  affidavit -- or sorry.  The page of the report
8  that you're reading from cites an affidavit,
9  complaint, and a Bates range.  And then you
10 were representing to him what's in that Bates
11 range, and it's not correct.
12      MS. ROSEN:  You're speaking objections are
13 becoming tedious and I --
14      MR. ART:  You cannot tell a witness --
15 here's what you --
16      MS. ROSEN:  This is his report, this is
17 his report.  If I'm mischaracterizing his
18 report, he's more than capable of correcting
19 me.  He doesn't need your help, Steve.  You're
20 --
21      MR. ART:  All you're -- you're trying to
22 trick the witness --
23      MS. ROSEN:  Oh, my gosh.  I can quick -- I
24 can trick Dr. Leo.

Richard A. Leo, PhD, JD, 9/29/2022

449

1     MR. ART:  You just said that all Paragraph
2  7 about Arnold Day cites as an Affidavit and a
3  Complaint.  And it actually cites a hundred and
4  five pages of Bates range which are then also
5  listed in the Materials Reviewed, and you're
6  trying to say to him why -- why did you know
7  that you've listed -- you reviewed other
8  materials --
9     MS. ROSEN:  You know what, this debate is
10  over.  Your speaking objections are over --
11     MR. ART:  If you want to ask --
12     MS. ROSEN:  Your speaking objections are
13  over.  He's more than capable of correcting me
14  if I'm misreading his report.  He wrote it.
15     MR. ART:  You are intentionally inserting
16  confusion about what he cited in an effort to
17  make it seem as though he hasn't supported his
18  opinions so you can later go to court and say
19  he didn't know what he had cited, but you're
20  misrepresenting what's written in the paragraph.
21     MS. ROSEN:  He is more than capable of
22  telling me that.  He doesn't need your help.
23     Q    (By Ms. Rosen) With respect to Arnold
24  Day's allegations, what materials did you rely on in

450

1  support of Paragraph 7 other than his affidavit and
2  other than his civil complaint?
3     A    The testimony that he gave at the Motion
4  to Suppress and the testimony that he gave to the
5  Torture -- the Torture Inquiry and Relief Commission
6  which are contained in the documents cited in the
7  Bates range from 01 -- 0001 to 000105, but are not
8  explicitly listed by name in that small paragraph in
9  Number 7.
10     Q    And with respect to the statement that he
11  falsely confessed, is that -- are you -- do you hold
12  an opinion that he falsely confessed?
13     MR. ART:  Objection to form, asked and
14  answered.
15     THE WITNESS:  Again, it's not for me to
16  say whether somebody falsely confessed or make
17  any other finding of fact.  What I'm saying is
18  I reviewed materials, evidence in this case,
19  and that supports the opinion that there was
20  the pattern and practice here, and that
21  evidence is -- is -- varies in range.
22     And in this case remember, I had
23  mentioned that at the lower end there would be
24  something like allegations made in a complaint.

451

1  This is stronger than that because there is not
2  only allegations but there is also sworn
3  testimony.
4     So, that's what I relied on as part of the
5  evidence supporting my pattern opinion in this
6  section of the report.  And again, the evidence
7  of the pattern here is so strong that even if
8  we threw out the Arnold Day case, there's
9  scores and scores of other cases that support
10  that opinion.
11     Q    (By Ms. Rosen) Let's look at Paragraph 8,
12  Fred Ewing and Darnell Stokes.  You indicate there,
13  "Detective Boudreau coerced confessions from two
14  developmentally disabled juveniles, Fred Ewing
15  (IQ=56) and Darnell Stokes.  Both were acquitted."
16     What are you citing in support of that
17  proposition?
18     MR. ART:  Objection to form.
19     MS. ROSEN:  Well, there's what I cite
20  right here, and then there's the additional
21  materials I reviewed that are -- that are
22  listed earlier in the report.
23     So, as you can see here, a newspaper
24  article is cited, but there are -- there were

452

1  other materials as well.  There was the
2  complaint.  There were materials from a
3  complaint register that were also -- that I
4  also reviewed in this case.
5     Q    (By Ms. Rosen) And what are you looking at
6  that indicates to you that there were other materials
7  that you reviewed in addition to what you have cited
8  in that Paragraph 8?
9     MR. ART:  Objection to form.
10     THE WITNESS:  Again, I'm reviewing my
11  report and I'm reviewing my notes.
12     Q    (By Ms. Rosen) So, it's --
13     A    Again, in conjunction -- in preparation
14  for this deposition based on materials that I had
15  reviewed in the report, nothing new since the
16  preparation of the report.
17     Q    But you're relying on your notes to
18  answer that question in part, correct?
19     MR. ART:  Object to the form of the
20  question.
21     Q    (By Ms. Rosen) You can answer.
22     A    Reviewing my notes as a memory aid in
23  addition to what is written in the report.
24     Q    Okay.  Let's talk about Derrick

Richard A. Leo, PhD, JD, 9/29/2022

453

1    Flewellen -- well, let me go back to Ewing and
2    Stokes. Have you -- are you opining that Detective
3    Boudreau coerced the confessions?
4        MR. ART: Objection to form.
5        THE WITNESS: Again, I'm not making a
6    factual determination. I'm saying that there
7    is evidence in the record to support that, and
8    that this is evidence of a broader pattern of
9    coercion in Area 3 in this particular instance.
10       Q   (By Ms. Rosen) When you say you're not
11   making a factual determination about coercion, what
12   do you mean exactly?
13       MR. ART: Objection to form, asked and
14   answered.
15       THE WITNESS: That I'm here to offer an
16   expert opinion, not a factual opinion; that I
17   have been provided with thousands and thousands
18   of pages of materials and I've analyzed those
19   materials based on my expertise and my training,
20   and I've offered opinions based on those
21   materials.
22       That I am not making factual determinations
23   about what did or did not occur but like any
24   expert, I'm reviewing materials that contain

454

1    facts and evidence and assertions of varying
2    degrees of support, and I'm offering an opinion.
3        And I don't want my opinions to be
4    misconstrued as factual assertions. That's
5    what I mean.
6        Q   (By Ms. Rosen) Do you hold the opinion
7    that Detective Boudreau coerced confessions out of
8    Ewing and Stokes as an expert.
9        MR. ART: Objection to the form.
10       THE WITNESS: I hold the opinion that
11   based on the materials I reviewed there is
12   evidence supporting that assertion in the
13   materials I reviewed.
14       Q   (By Ms. Rosen) Okay.
15       A   And that is part of a larger pattern when
16   there is substantial evidence of widespread coercion
17   in Area 3 as well as other areas.
18       Q   Going back to Mr. Coston in Paragraph 5,
19   do you hold an expert opinion as you've been
20   describing it that Detective Kill struck him in the
21   jaw, grabbed him around the neck, and pushed him
22   against the wall while questioning him about a
23   murder?
24       A   Again, I don't hold a factual opinion

455

1    about that. That's one data point. I wasn't there.
2    Like all of the interrogations in all of the cases
3    I've worked on involving Detective Kill, there's
4    no -- there's no record of the interrogation, and
5    there's a disputed account where Detective Kill
6    denies and Mr. Coston -- and the suspect asserts he
7    was beaten or otherwise physically or psychologically
8    coerced.
9        So, I'm not offering the opinion that he
10   was coerced in this case. I'm offering the opinion
11   that there is evidence that I reviewed that supports
12   his assertion -- well, there's evidence that I
13   reviewed of his assertion in this case, and there
14   are other cases -- all these cases have evidence
15   ranging in strength, evidentiary strength, supporting
16   assertions in cases of coercion.
17       Q   Okay. I'm trying to zero in on Mr. Coston,
18   right, and you told me about there's a range of
19   evidence that supports the assertions.
20       So, let's focus singularly on Mr. Coston's
21   case. And I would like to know whether or not you
22   hold the expert opinion, not the factual opinion,
23   but the expert opinion as you define it that
24   Detective Kill struck him in the jaw, grabbed him

456

1    around the neck, and pushed him against the wall
2    while questioning him about a murder.
3        MR. ART: Objection to form, asked and
4    answered.
5        THE WITNESS: I don't hold the expert
6    opinion per^se that Detective Kill struck him
7    in the jaw, grabbed him around the neck, and
8    pushed him against the wall.
9        My opinion is that that assertion is
10   consistent with every other case I've studied
11   involving Detective Kill, and that there is an
12   abundance of evidence supporting the assertion
13   that Detective Kill engaged in the pattern and
14   practice of that kind of coercive activity,
15   even if it didn't involve the specifics of that
16   case.
17       But in that case, I do not hold an expert
18   opinion about what did or did not specifically
19   happen.
20       Q   (By Ms. Rosen) With respect to Mr.
21   Craighead's case, do you hold an expert opinion
22   regarding what did or did not happen?
23       MR. ART: I object to the form of that
24   question, did or did not happen.

Richard A. Leo, PhD, JD, 9/29/2022

457

1     MS. ROSEN:  I'm just using his words.
2     Q    (By Ms. Rosen) You can answer the
3  question.
4     A    I think you're asking me to -- whether I
5  hold factual opinions as an expert, and I'm trying
6  to distinguish between facts and expert opinions.
7         There is evidence that I reviewed that
8  supports that assertion but I'm not here to say
9  what did or did not happen.  And even though you
10  want to go through these cases individually, this
11  is -- this is a pattern evidence opinion.  And
12  that's what my opinion is about, and that's what I'm
13  here to do in this case.  I'm not here to make
14  factual opinions.
15         So, I'm not opining that this in this
16  particular case did or did not happen.  I'm saying
17  there is evidence.  I reviewed that evidence.  I
18  reviewed the evidence in other cases.  It's
19  consistent with what I've seen in other cases.
20     Q    And when you say it's consistent with what
21  you've seen in other cases, do you mean the
22  allegations are consistent, or do you mean there's
23  evidence to support the allegations?
24     MR. ART:  Objection to form.

458

1     THE WITNESS:  Both, that there is a range
2  of evidence in these cases.  Detective Kill is
3  one of the most notorious of the detectives who
4  have been accused of engaging in widespread
5  pervasive systemic torture and psychological
6  coercion in these cases.
7         His name comes up over and over and over
8  again in the materials that I've reviewed, both
9  in preparation of this report as well as in
10  cases I've worked on as well as in scholarly
11  books and articles that I've used in my
12  teaching and my research.
13         That's what I mean by consistent, and
14  that's one of the reasons that I opine in this
15  report that there's a pattern here, and this is
16  part of a pattern.  There's substantial evidence
17  of a pattern, whether or not it happened in this
18  particular case.
19     Q    (By Ms. Rosen) Right.  But the point of
20  your opinion is to say that since there's -- it's
21  irrelevant -- let me strike that.
22         The pattern and practice evidence is
23  irrelevant if every single one of these allegations
24  is false, right?

459

1     MR. ART:  Objection to form.
2     THE WITNESS:  When you say every single
3  one of these allegations is false, are you
4  referring to Area 3 only, or are you referring
5  to every one of these allegations of 2, 3, 4,
6  and 5?
7     Q    (By Ms. Rosen) I am referring to the
8  allegations in 1 through 30 in your report which is
9  what you have indicated provides the basis for your
10  opinions regarding Area 3.
11         So, if -- if allegations -- the
12  allegations that are made by each of these
13  individuals as set forth by you in your report in
14  Paragraphs 1 through 30 related to Area 3, if every
15  single one of these people are lying and the
16  allegations are not true, then the pattern and
17  practice evidence is irrelevant, correct?
18     MR. ART:  Objection to form, a gross
19  mischaracterization of his testimony.
20     THE WITNESS:  There is substantial
21  evidence of a pattern, but if we're going to --
22  if we're going to engage in that hypothetical,
23  if we imagined hypothetically as you've asked
24  that every single one of these individuals was

460

1  lying, and the abuse that they assert and is
2  supported by a wide range of evidence varying
3  in strength did not occur, then I would say
4  that these cases in that hypothetical -- which
5  I think is contradicted by a mountain of
6  evidence -- do not support my pattern and
7  practice opinion in Area 3.
8         But as I also indicated, I think there are
9  Area 3 cases that I've worked on and thus I've
10  studied more documents in great detail that
11  would support that opinion.
12         And I think there are also Area 3 cases
13  that are not mentioned here that are in the
14  public domain where there have been allegations
15  against Detective Kill and other Area 3
16  detectives.  But I would have to review
17  materials to confirm that.
18         So, I don't think, to circle back to the
19  language you used, that if hypothetically in an
20  alternative universe, all thirty of these
21  people were lying and none of this alleged
22  abuse occurred despite everything we know about
23  allegations of abuse in the Chicago Police
24  Department in this area and others, I still

Richard A. Leo, PhD, JD, 9/29/2022

461

1    think there might be other evidence out there
2    supporting the pattern and practice opinion.
3        Q    (By Ms. Rosen) Okay.  Let's talk about
4    Derrick Flewellen, Paragraph 9.  You indicate,
5    "Detective Boudreau and other Area 3 detectives
6    interrogated Derrick Flewellen for more than
7    thirty-six hours during which they slapped, kicked,
8    punched him until he signed a false confession.
9    Flewellen was exonerated based on DNA evidence after
10   serving close to five years in prison."
11       What do you rely on in support of the
12   assertions that you set forth in Paragraph 9?
13       A    Well, I'm relying specifically on the
14   materials I reviewed in this report which are the --
15   the materials cited here in the complaint and any
16   other materials that I cited in the materials
17   reviewed Section which I would have to go back into
18   that part of the report to tell you.
19       But I also want to point something out to
20   you which is that in the North -- which relates to
21   Derrick Flewellen.  In the North Carolina Law Review
22   article that I published in 2004, which is
23   one of the exhibits to this deposition which you've
24   asked me many questions about, Number 39 of the 125

462

1    proven false confessions, Page 936 of the article,
2    the 2004 article, lists Derrick Flewellen.  So, he
3    is a data point in the 125 proven false confession
4    article.  And this illustrates the point I've been
5    trying to make about the quantum and degree of
6    evidence across cases.
7        This would be an example of another proven
8    false confession.  This would be an example of a
9    case where there is much stronger evidence on the
10   evidence spectrum supporting the assertion by the
11   person who alleges that they were abused and has
12   evidence supporting their assertion of a coerced
13   false confession.
14       Q    What materials did you have when you were
15   reviewing Mr. Flewellen's case in preparation for
16   the 2004 article?
17       A    I do not recall what materials
18   specifically I had when preparing that article.
19       Q    Okay.  Let's go to the next page of your
20   report.  Paragraph 10 discusses Mr. Gillespie.  You
21   indicate here that "Detective Boudreau and other
22   Area 3 detectives beat, kicked, slapped, and choked
23   Mr. Gillespie, threatened him with further beating
24   including burning him with a cigarette if he did not

463

1    sign a written confession they prepared."  Do you
2    see that there?
3        A    Yes.
4        Q    And are you concluding that Mr. Gillespie's
5    confession was false?
6            MR. ART:  Objection to form.
7            THE WITNESS:  Again, I'm not concluding
8    that any of these individuals' confessions were
9    false.  I'm not offering a factual opinion
10   about that.
11       Again, I'm merely providing my opinion
12   about a pattern based on a range of evidence I
13   reviewed that supports it.
14       Q    (By Ms. Rosen) What evidence did you
15   review with respect to Mr. Gillespie?
16       A    Well, the evidence that's cited here as
17   well as any other materials that are cited in the
18   materials reviewed section.
19       Q    What about the individuals you're talking
20   about in Paragraph 11, Oscar Gomez, Abel Gomez, and
21   Abel Quinoles?  You indicate here, "Detective
22   Halloran and Detective Boudreau held all three men
23   for more than thirty hours and beat them while they
24   were shackled to a wall."  Did these individuals

464

1    confess?
2            MR. ART:  Objection to form.
3        Q    (By Ms. Rosen) What are you reviewing?
4        A    I'm reviewing the notes that I -- that I
5    made, that I -- the same notes I've referred to
6    earlier in preparation for this report -- I'm sorry,
7    in preparation for this deposition -- that are based
8    on materials that I reviewed in preparation for the
9    report as memory aids given the volume of materials
10   and the number of cases.
11       I do not recall that they confessed.  I
12   would have to review these materials to confirm
13   that, but that's my recollection, that they asserted
14   that they were beaten but that they did not confess.
15   But I would have to review the materials to confirm.
16       Q    And what materials did you rely on with
17   respect to what you have written in Paragraph 11?
18       A    The materials that are cited here and any
19   other materials that are mentioned in the materials
20   reviewed section.
21       Q    In Paragraph 12 you reviewed -- discussed
22   two individuals, Jason Gray and Manuel Bobe, I
23   think.  What materials did you rely on in support of
24   your discussion here about Mr. Gray and Mr. Bobe?

Richard A. Leo, PhD, JD, 9/29/2022

465

1    A    Again, the materials that are cited here
2  in this paragraph as well as any other materials in
3  the -- in the materials reviewed section of the
4  report.
5    Q    You note here, "The trial judge rejected
6  Detective Kill's trial testimony, and the appellate
7  court upheld that ruling, finding:  Detective Kill's
8  actions and the possibility that he may have testified
9  under oath falsely -- testified falsely under oath in
10  a deposition and in many other prosecutions, has much
11  bearing on the credibility of his testimony."  Do you
12  see that?
13    A    Yes.
14    Q    And then the case was remanded, right?
15    A    I believe so.
16    Q    And do you know what ultimately happened
17  with Mr. Gray's conviction and whether or not his
18  confession was ultimately allowed into evidence?
19    MR. ART:  Objection to form, compound.
20    THE WITNESS:  I do not recall without
21    reviewing more materials as I sit here today.
22    Q    (By Ms. Rosen) Okay.  And then Tyrone Hood
23  and Wayne Washington, Number 13, you indicate here,
24  "Detective Boudreau coerced a false confession from

466

1  Washington" and that "Both men's convictions were
2  subsequently overturned."  Do you see that?
3    A    Yes.
4    Q    Are you opining that the confession that
5  was taken from Mr. Washington was coerced?
6    MR. ART:  Objection to form.
7    THE WITNESS:  Again, I'm not opining
8    factually what did and did not happen.  I'm
9    offering an expert opinion about the evidence
10    that I reviewed and the patterns that I saw,
11    and this is one of many data points that
12    supports that.
13    Q    (By Ms. Rosen) And the materials that you
14  relied on for Paragraph 13 are cited here in this
15  paragraph -- at the end of this paragraph, right?
16    A    No, there's more materials in the
17  materials reviewed section.
18    Q    What are you reading from?
19    A    I'm not reading from anything.  I reviewed
20  notes that listed more materials.
21    Q    So, the notes that you have, how many
22  pages of notes do you have in front of you today?
23    MR. ART:  Are you talking about in total,
24    Eileen?

467

1    MS. ROSEN:  Yes.
2    MR. ART:  Actually, you can answer that
3    question if you know the answer.
4    THE WITNESS:  I would have to estimate the
5    number of pages.  I would estimate it to be
6    around fifty.  It might be a little lower, it
7    might be a little higher.  That would be my
8    estimate.
9    Q    (By Ms. Rosen) And this is a different set
10  of notes than the notes you were using yesterday, is
11  that correct?
12    MR. ART:  Objection to form, asked and
13    answered.
14    THE WITNESS:  I had all my notes in front
15    of me.  I don't recall which notes I was
16    relying on in the questioning yesterday.
17    Q    (By Ms. Rosen) So, when you say fifty
18  pages of notes, is that the total number of notes
19  that you've been using throughout the course of the
20  two days of this deposition?
21    MR. ART:  Objection to form.
22    MS. ROSEN:  Again, it's just an estimate
23    of the number of pages.  And yes, when
24    appropriate I've reviewed notes that are not

468

1    based on any new materials, that are just based
2    on materials that are mentioned in the report,
3    documented in the report, as memory aids to
4    assist me in answering these questions.
5    Q    (By Ms. Rosen) And you took the time when
6    you were preparing these notes with respect to the
7    pattern and practice evidence that we've been
8    discussing here related to Area 3 to add additional
9    citations that are not included in Pages 77 through
10    82 of your report, correct?
11    MR. ART:  Objection to form.  That calls
12    for information not subject to disclosure and
13    information that's privileged, and I instruct
14    him not to answer.
15    Q    (By Ms. Rosen) Why did you add additional
16    citation materials in your notes when you were
17    preparing your notes for this deposition?
18    MR. ART:  Same objection, same instruction
19    not to answer.
20    Q    (By Ms. Rosen) Why didn't you include all
21    of the citations that you relied on in support of
22    each of the individual paragraphs identified at Page
23    77 through 82 of your report?
24    MR. ART:  Is the question why didn't he

Richard A. Leo, PhD, JD, 9/29/2022

469

1  include them in his report?
2      MS. ROSEN: Yes.
3      MR. ART: You can answer that question
4  about whether you included those in your
5  report.
6      THE WITNESS: When preparing the report I
7  had an overwhelming amount of materials or a
8  massive amount of materials to review. As I
9  mentioned before, it's the longest report I've
10  ever written.
11      And it's not uncommon when writing a
12  report or even an academic article or anything
13  to list some but not all of the citations that
14  support a particular point. So, when I was
15  writing the report, I didn't feel a need to
16  list every single document on every single case
17  in the pattern and practice section.
18      Q   (By Ms. Rosen) But you felt the need to
19  add those cites into your notes, right?
20      MR. ART: Objection to form. Objection to
21  the extent that it calls for privileged
22  information and information not subject to
23  disclosure, and I instruct you not to answer
24  that question, Dr. Leo.

470

1      Q   (By Ms. Rosen) Let's go to Paragraph 14
2  with respect to Harold Hill, Dan Young, and Peter
3  Williams. Do you see that there?
4      A   I do.
5      Q   With respect to Paragraph 14, are the
6  materials that you relied on in preparing the
7  summary that's included in Paragraph 14 cited in
8  this paragraph, at the end of this paragraph?
9      MR. ART: Objection to form.
10      THE WITNESS: I don't know if all of them
11  are. This may be a subset of the materials
12  that I reviewed that are cited in the materials
13  reviewed section of my report.
14      Q   (By Ms. Rosen) Let's go to Page 80 of your
15  report, Mr. Joseph Jackson. You cite to Jackson
16  00001 to 00004 in support of the summary that you
17  provide on Mr. Jackson's case. Do you see that
18  there?
19      A   Yes.
20      Q   Are there any additional materials that
21  you relied on other than those materials?
22      A   Again, I would have to look at the
23  materials reviewed section to refresh my
24  recollection to see if there were additional

471

1  materials.
2      Q   In this particular paragraph are you
3  reaching any opinions regarding the allegations
4  Mr. Jackson made against Detective Boudreau?
5      MR. ART: Objection, form.
6      THE WITNESS: Again, I'm not offering any
7  factual opinions. I'm offering a pattern
8  opinion here. There's evidence that I reviewed
9  in Mr. Jackson's case that supports the
10  evidence of a widespread pattern and practice
11  of abuse, physical abuse, psychological abuse
12  in Area 3 as well, as well as elsewhere.
13      This specific case is about Area 3, but
14  my opinion here is part of a broader opinion
15  about Areas 2, 3, 4, and 5.
16      Q   (By Ms. Rosen) With respect to Paragraph
17  16 you had a discussion about Anthony Jakes,
18  correct?
19      A   Correct.
20      Q   And you indicate that "Detective Boudreau
21  slapped, punched, and kicked fifteen year old Jakes
22  until he falsely confessed to being the lookout
23  during a murder. Jakes was held incommunicado for
24  over sixteen hours and deprived of food and water

472

1  and denied access to his aunt." Do you see that
2  there?
3      A   Yes.
4      Q   And you cite PTP-A Jakes 00001 through
5  409, correct?
6      A   Yes.
7      Q   Are you relying on anything else in
8  support of the summary that you've provided here
9  with respect to Anthony Jakes?
10      A   I would have to double check to see what I
11  listed in the materials reviewed. This is one of
12  those cases where I've worked on separately from
13  this, and I've reviewed hundreds of pages of
14  documents in that case separate from the materials
15  I reviewed in this case, in this -- in this
16  litigation.
17      Q   And do you hold an opinion with respect to
18  Mr. Jakes regarding whether or not Detective
19  Boudreau slapped, punched, and kicked him until he
20  falsely confessed?
21      A   Again, I'm not offering a factual opinion
22  about Mr. -- about what did or did not happen in
23  Mr. Jakes' case because I reviewed extensive
24  materials in that case. When I reviewed that case

Richard A. Leo, PhD, JD, 9/29/2022

473

1    it was clear to me that -- and I opined and opine
2    now that the -- the accounts that the detectives in
3    Mr. Jakes' case give about what occurred during the
4    many hours of unrecorded interrogation do not fit
5    with the social science research evidence on how and
6    why false and unreliable confessions occur that
7    Mr. Jakes' account does, and that there were
8    substantial indicia of unreliability in that case or
9    evidence of substantial indicia of unreliability in
10   that case.
11        But again, that's an expert opinion as the
12   opinion here is an expert opinion. It's not a
13   factual opinion. I'm not making any -- offering any
14   factual opinions. This is for purposes here, one
15   data point, in a -- in a wider pattern that I've
16   reviewed evidence supporting.
17        Q    Did you opine in Mr. Jakes' case that he
18   met criteria for a proven false confession?
19        A    That was not part of my opinion in that --
20   in that -- in my work in that case.
21        Q    Are you relying on the sum total of the
22   work you did, including your expert opinion in the
23   Jakes' case, in support of your opinions in this
24   case as it relates to Mr. Jakes?

474

1        MR. ART:  Objection to form. Go ahead.
2        THE WITNESS:  When I prepared this report
3    I was only relying directly, or at the moment I
4    should say, on the materials that I reviewed for
5    this case.
6        But obviously, when I'm providing an expert
7    opinion I rely on my expertise and my background
8    knowledge of the subjects of my expertise. And
9    as I mentioned before, I've done research on
10   these -- on many Chicago cases. I've taught and
11   lectured about many Chicago cases, and I've
12   worked on and studied primary documents on many
13   of the Chicago cases, and this is one of those
14   cases.
15        So, this forms part of the basis of my
16   expertise and opinion, though when preparing
17   this report I was only relying immediately on
18   the documents I had reviewed.
19        Q    (By Ms. Rosen) Is there anything that you
20   you learned in connection with the work you did in
21   Anthony Jakes' case that leads you to conclude that
22   anything you've written here is inaccurate or
23   incorrect?
24        MR. ART:  Objection to form.

475

1        THE WITNESS:  Not that I recall.
2        Q    (By Ms. Rosen) Okay. Let's go to
3    Paragraph 17, Ronald Kitchen, Marvin Reeves, and
4    Eric Wilson. In this case you cite to PTP-0001 to
5    000208. Do you see that?
6        A    Yes.
7        Q    What's contained in those materials?
8        A    I believe there are excerpts from an
9    Amended Petition for Post Conviction Relief, and
10   there is a letter as mentioned here from Donald
11   Hubert to Edward Egan and Robert Boyler at -- I
12   would have to review those materials to see if there
13   is additional material contained in those pages.
14        Q    In answering my question, were you
15   reviewing your notes?
16        A    I did glance at my notes, yes, and review
17   them.
18        Q    And do you hold an opinion with respect to
19   whether or not any of the individuals mentioned in
20   Paragraph 17 falsely confessed or gave falsely
21   inculpatory statements?
22        MR. ART:  Objection to form.
23        THE WITNESS:  Again, I'm not offering a
24   factual opinion. Again, I reviewed -- in this

476

1    case like the others, I reviewed a range of
2    evidence varying in strength, and in this case
3    there were medical records that -- that
4    corroborate Mr. Kitchen's allegations or offer
5    corroboration.
6        So, this case had evidence, like many of
7    these cases, that was in addition to or there
8    was multiple -- there was multiple sources of
9    evidence. But again, I'm not making a factual
10   determination, and this is a pattern opinion
11   based on the evidence that I reviewed.
12        Q    (By Ms. Rosen) I don't see any reference
13   to medical records in Paragraph 17. How do you know
14   there were medical records?
15        A    I thought I reviewed part of the Special
16   Prosecutor Report or referenced to the Special
17   Prosecutor Report that contained documentation, or I
18   should say reference to, reference to him going to
19   a doctor or hospital about abuse he suffered during
20   the interrogation.
21        Q    And is that something that you're
22   recalling because you reviewed your notes or you
23   independently recall that?
24        MR. ART:  To the extent that that requires

Richard A. Leo, PhD, JD, 9/29/2022

477

1    you to testify about what's in the substance of
2    the notes that you took, we re-assert the
3    objection. Those notes are not subject to
4    disclosure and I instruct you not to answer.
5    To the extent that you can answer without
6    divulging that information, you may answer.
7         THE WITNESS: Mr. Kitchen wrote a book
8    about his abuse that I had read many years ago.
9    I recall that in that book, if my memory is
10   accurate, that he had mentioned his.
11        But, I believe this is the material that
12   I reviewed for the report. I did not look at
13   his book again or review that in conjunction
14   with the preparation -- in my preparation for
15   this report.
16        Q   (By Ms. Rosen) Let's talk about Mr. Lash,
17   Anthony Lash. Do you hold an opinion that Mr. Lash
18   falsely confessed?
19        A   Again, I'm not offering a factual opinion
20   that any individual did or did not falsely confess.
21        I'm offering an expert opinion about
22   evidence that I reviewed that supports a pattern and
23   practice of coercive -- physically and psychologically
24   coercive interrogation that resulted in some number of

478

1    unreliable or false confessions or increased the risk
2    of eliciting false and unreliable confessions.
3         Q   And the materials that you relied on in
4    support of Paragraph 18 are listed at the end of the
5    paragraph, correct?
6         A   Correct, unless I reviewed anything in
7    addition to this in the materials reviewed section.
8    I don't recall that I did, but I would have to
9    review that section to confirm.
10        Q   Okay. Let's move to Alfonzia Neal, this
11   is 19. "Detective Boudreau beat a murder confession
12   out of Alfonzia Neal who had an IQ in the 40's and
13   likely did not understand much, if anything, of the
14   confession." Do you see that there?
15        A   Yes.
16        Q   Are you concluding that Alfonzia Neal
17   likely did not understand much, if anything, of the
18   confession, or is that somebody else's conclusion
19   that you're simply reciting in this paragraph?
20        MR. ART: Objection to the form.
21        THE WITNESS: As part of my area of
22   expertise, I've studied what used to be called
23   mental retardation which is now called
24   intellectual disability. This is something

479

1    that's been involved in many of the proven
2    false confession cases. It is a risk factor
3    for false confession.
4         And somebody -- as you probably know,
5    there are gradations of what used to be called
6    mental retardation or intellectual disability.
7    Somebody with an IQ in the 40s would have a hard
8    time understanding much of what was going on in
9    an accusatory or adversarial interrogation that
10   is severely intellectually disabled.
11        And so this is -- this is -- this condition
12   -- this observation is stated probabilistically
13   likely, but I'm not repeating somebody else's
14   conclusion, this is my observation.
15        Anybody with an IQ in the 40s, not merely
16   Mr. Alfonzia Neal who was in an interrogation
17   that involved aggressive interrogation and
18   potential abuse, almost certainly would not have
19   understood any Miranda warnings and would have
20   had a hard time understanding anything that was
21   said to them in rapid succession.
22        Q   (By Ms. Rosen) So, the conclusion that he
23   likely did not understand much is your conclusion
24   based on the fact that his IQ was in the 40s?

480

1         A   If his IQ was in the 40s, like anybody
2    with an IQ at that level, yes.
3         Q   All right. Let's go Johnny Plummer,
4    Paragraph 20. It says, "Detective Boudreau and
5    other Area 3 detectives interrogated fifteen year
6    old Johnny Plummer for thirty-six hours, during
7    which they denied him food and hit him in the face,
8    stomach, and side (including with a flashlight) until
9    he falsely confessed to the murder." Do you see that?
10        A   I do.
11        Q   And are you opining that Mr. Plummer falsely
12   confessed?
13        MR. ART: Objection to the form.
14        THE WITNESS: Again, I'm not offering a
15   factual opinion here. Again, I'm offering an
16   expert opinion based on the evidence that I
17   reviewed in this -- other cases of a widespread
18   pattern and practice of psychologically and
19   physically coercive interrogation techniques
20   that increased the risk of eliciting false and
21   involuntary confessions in this and many, many
22   other cases in Area 2's -- 2, 3, 4, and 5.
23        Q   (By Ms. Rosen) With respect to Mr. Plummer's
24   case, what do you rely on in support of the

Richard A. Leo, PhD, JD, 9/29/2022

481

1   information that you provide in Paragraph 20?
2       A    The opinion, the published opinion that I
3   referred to here, as well as any other materials in
4   the materials reviewed section.
5       Q    And can you tell me where -- never mind.
6           Paragraph 21 is Tyrone Reyna and Nicholas
7   Escamilla and Miguel Morales.  It indicates,
8   "Detective Boudreau and other Area 3 Detectives beat
9   sixteen year old Reyna.  Detective Halloran slapped
10  him in the face and kicked him in the leg.  Detective
11  Boudreau and Detective Halloran spit on him, refused
12  to let him contact his family, and intimidated him
13  into confessing to a murder he did not commit.
14          Boudreau and other Area 3 Detectives also
15  beat and threatened Reyna's co-defendants, Nicholas
16  Escamilla and Miguel Morales, causing Escamilla to
17  falsely confess after hours of abuse."  Do you see
18  that?
19      A    Yes.
20      Q    And are you concluding that Mr. Escamilla
21  falsely confessed after hours of abuse?
22          MR. ART:  Objection to the form.
23          THE WITNESS:  Again, I'm not offering any
24  factual opinions.  I'm offering an expert

482

1   opinion based on a wide range of evidence
2   across numerous cases that I reviewed and
3   analyzed supporting the pattern opinion that
4   the Chicago Police Department in Areas 2, 3, 4,
5   and 5 engaged in a pervasive, widespread,
6   systemic pattern of physical and psychological
7   coercion during interrogations that increased
8   the risk of eliciting involuntary and false
9   confessions.  And this is one data point that I
10  evaluated for that opinion, one data point of
11  evidence.
12          And again, if we threw out this case
13  entirely there would still be strong evidence
14  of a pattern and practice of physical and
15  psychological abuse.
16      Q    (By Ms. Rosen) Are you aware of an opinion
17  issued by Judge Hooks in a case called George
18  Anderson that discusses many of the individuals that
19  are listed in your report?
20          MR. ART:  Objection to form.
21          THE WITNESS:  I'm not recalling it as I
22  sit here, and so I would have to look at my
23  materials reviewed section to see whether it
24  was among the voluminous materials that I

483

1   reviewed in preparation of this report almost a
2   year ago.
3           But I am happy to review it if you would
4   like me to answer any questions about it or
5   anything stated in it.
6       Q    (By Ms. Rosen) Let's take a look at
7   Paragraph 22, Anthony Robinson.  Are you concluding
8   with respect to Mr. Robinson that he falsely
9   confessed to a murder?
10          MR. ART:  Objection to the form.
11          THE WITNESS:  Again, I'm not making any
12  factual determinations or conclusions.  I'm
13  offering an expert opinion about the materials
14  that I reviewed that contained a wide range of
15  evidence supporting my opinion that there was a
16  pattern and practice of physical and
17  psychological coercion across Areas 2, 3, 4,
18  and 5 in numerous cases that increased the risk
19  of eliciting false, unreliable, and involuntary
20  confessions in numerous cases.
21      Q    (By Ms. Rosen) Can you tell me specifically
22  what materials you relied on in preparing Paragraph 22
23  of your report?
24      A    Well, I cite to those seven pages or six

484

1   pages that were among the materials that I reviewed.
2   Without looking at the materials reviewed section of
3   my report, I don't recall if that was -- those were
4   the only materials I reviewed when I prepared the
5   report in the Anthony Robinson case or if I reviewed
6   other materials as well.
7       Q    And with respect to the opinion that you
8   cite there in the Anthony Robinson case, is there a
9   judicial finding in that opinion that concludes
10  that, in fact, Detective Kill and other Area 3
11  detectives kicked and slapped Anthony Robinson until
12  he falsely confessed to a murder?
13          MR. ART:  Objection to the form.
14          THE WITNESS:  I would have to review the
15  opinion to refresh my recollection about what
16  the judge wrote in that case.
17      Q    (By Ms. Rosen) Okay.  Number 23 is
18  Mr. Clayborn Smith, and he's the individual that you
19  recently were provided a new opinion for, correct?
20      A    Correct.
21      Q    And with respect to Anthony -- and with
22  respect to Clayborn Smith, are you opining that he
23  falsely confessed to the murder?
24      A    Again, I am not making -- I'm not offering

Richard A. Leo, PhD, JD, 9/29/2022

485

1 a factual -- I'm not offering an opinion of fact or
2 a determination of fact. I'm offering an expert
3 opinion based on a wide range of evidence that I
4 reviewed about physical and psychological coercion
5 in Areas 2, 3, 4, and 5 that increased the risk of
6 of eliciting false and unreliable and involuntary
7 confessions, and that in my opinion established
8 evidence for a widespread, pervasive, systemic pattern
9 and practice of that physical and psychological
10 coercion.
11      Q    And the materials that you relied on with
12 respect to Clayborn Smith are the materials cited
13 here and the materials cited in the materials
14 reviewed section of your report, and the new opinion
15 that you were recently provided, correct?
16      A    That's what -- the materials that are
17 cited here and any additional materials in the
18 materials reviewed section, I relied on in my
19 analysis of this case for purposes of this
20 paragraph, and I supplemented that analysis, not in
21 the report, but in preparation for the deposition
22 with the updated Second Division Illinois Appellate
23 Court Opinion that I -- I provided the citation to
24 yesterday.

486

1      Q    And with respect to the individuals that
2 you've identified in Paragraphs 24, 25, 26, 27, 28,
3 29, 30, are you concluding that any of those
4 individuals falsely confessed as a result of the
5 physical abuse they alleged?
6           MR. ART:  Objection to form.
7      Q    (By Ms. Rosen) You can answer.
8      A    And again, I'm not making any factual
9 conclusions about what did or did not happen in the
10 interrogation room or whether their confession is
11 accurate or inaccurate, their confession statements.
12           I'm offering an expert opinion based on a
13 wide range of substantial evidence about a pattern
14 and practice of physical and psychological abuse
15 that increased the risk of eliciting involuntary and
16 unreliable confessions.
17           The one thing I will add to that is that
18 Mr. Weston, Number 26, and Mr. King, Number 30, I
19 worked on those civil cases both a number of years
20 ago. I did not review those materials when I was
21 preparing the report in this case, and I did not
22 review those materials from those civil cases in
23 preparation for my deposition.
24           But I did review a substantial number of

487

1 documents in both of those cases, particularly in
2 Mr. Weston's case, when working on those cases. And
3 so I have deep background knowledge of those cases
4 that is -- background knowledge of those cases
5 that's deeper than in many if not all of the cases
6 in this section of the report.
7      Q    When did you work on Mr. Weston's case?
8      A    If you let me access my records I can tell
9 you the exact year. If you do not, I can estimate
10 when that was. But I don't know -- I don't know if
11 the estimate would be accurate.
12      Q    Well, there's a citation here to a report
13 dated June 12th, 2010 --
14      A    Okay, thank you for -- thank you for
15 reminding me of that. I forgot that I cited the
16 report in these materials. I think that tells you
17 the answer. It would have been around 2010, most
18 likely I was retained in 2008 or 2009, and I
19 produced the report in 2010.
20           It's possible I was retained in 2010. I
21 recall -- obviously, this was twelve years ago. I
22 recall being provided a substantial amount of
23 information in those cases, thousands of pages of
24 documents.

488

1      Q    And were you -- did you provide those
2 opinions in connection with a civil case for
3 Mr. Weston?
4      A    My recollection is that it was a post
5 conviction case, it was not a civil proceeding.
6 But, you know, I would -- to be a hundred percent
7 sure, I would want to check my records, but that's
8 my recollection.
9      Q    Okay. And then all of the materials that
10 you relied upon in support of the summaries you
11 provide in Paragraphs 24 through 30 are either cited
12 at the end of those paragraphs or in the materials
13 reviewed section of your report, correct?
14      A    Yes. In preparation of the report and
15 then in preparation for the deposition. Of course,
16 the only additional material is the -- this
17 Appellate Court Opinion we've referred to multiple
18 times in the Clayborn Smith case.
19      Q    Okay. And then with respect to Page 83
20 through the top of 88, those are your opinions
21 regarding Area 4 cases, and the individual cases
22 identified in Paragraphs 1 through 19 are cases that
23 you specifically reviewed in support of your
24 opinions related to Area 4, correct?

Richard A. Leo, PhD, JD, 9/29/2022

489

1    MR. ART: Objection to form and the phrase
2    "opinions related to."
3    Q    (By Ms. Rosen) You can answer.
4    A    At some point I might need to take a
5    bathroom break. Yes, as in other parts of the
6    report, these are -- these -- I reviewed materials,
7    the materials listed in the materials reviewed
8    section of the report in these 18 cases as part of
9    my opinion, expert opinion about the pattern and
10   practice that was widespread in this and other areas
11   and the risks that that created. I did not review
12   any materials that are not listed in the materials
13   reviewed section in preparation of the report or in
14   preparation for the deposition in these cases.
15   Q    And to the extent in Paragraphs 1 through
16   8 -- 1 through 19 -- strike that.
17       With respect to your summaries as set
18   forth in Paragraphs 1 through 19 of the report, are
19   you rendering any opinions that any of these
20   individuals falsely confessed as a result of the
21   physical abuse they allegedly received in connection
22   with their interrogation?
23       MR. ART: Objection to form and to the
24       extent it's asking about more than a dozen

490

1    cases.
2        THE WITNESS: Again, I'm not offering any
3    factual opinion about whether a confession is
4    true or false, coerced or not coerced. I'm
5    offering an opinion about based on a wide range
6    of evidence as I've articulated before
7    supporting that there was a pattern and
8    practice of physical and psychological abuse in
9    these nineteen cases as well as in the other
10   cases that increased the risk of eliciting
11   false, unreliable, and/or involuntary
12   confessions.
13       MS. ROSEN: Okay, let's take a break.
14       THE WITNESS: So, can we come back at no
15   earlier than 4:30, so that would be a twelve
16   minute break, unless you want to take a longer
17   break.
18       MR. ART: Let's come back at 4:30.
19       THE VIDEOGRAPHER: We're off the video
20   record at 4:17 p.m.
21       (At this time, a short break was
22       taken off the record.)
23       THE VIDEOGRAPHER: We're back on the video
24   record at 4:32 p.m.

491

1    Q    (By Ms. Rosen) Okay. Doctor Leo, I want
2    to direct your attention to Page 88 of your report,
3    Section E is entitled, "Physical Abuse and Coercive
4    Interrogation at Area 5 Involving Detective Guevara,
5    Detective Halvorson, and Other Area 5 Chicago Police
6    Detectives." Do you see that?
7    A    Yes, I do see that.
8    Q    Okay. And in this section of the report
9    it's formatted similarly to the analysis you did in
10   your discussion about Area 3 and Area 4, correct?
11   A    It is correct that it's formatted in the
12   same way, but I do see all of these as part of one
13   overall pattern that's widespread across the Chicago
14   Police Department.
15   Q    Okay. And in this particular case -- I
16   mean in this particular section in the first
17   paragraph you identify other individuals who have
18   had their convictions overturned in cases
19   investigated by Detective Guevara. Do you see that?
20   A    Yes, and these -- this is based on
21   materials that I was provided and reviewed in
22   preparation for this report.
23   Q    What materials were you provided with --
24   in with -- what materials were you provided in

492

1    relation to Jacques Rivera?
2    A    The materials that are listed in the
3    materials reviewed section of the report. The
4    reason I mention this, if I mentioned that in my
5    prior answer, is because recently -- I don't know,
6    maybe three weeks ago -- I'm on -- I got an email
7    from The National Registry of Exonerations. I'm on
8    their email list saying that there were thirty some
9    odd exonerations related to Detective Guevara in
10   that online database.
11       I did not review The National Registry of
12   Exonerations in preparation for this deposition. I
13   only meant to communicate in my prior answer that I
14   only discussed the cases that I was provided
15   materials for based on that email from The National
16   Registry of Exonerations. There may be more cases
17   involving Detective Guevara that I did not review in
18   preparation for this report.
19   Q    Okay. So, let me -- I understand, thanks
20   for the clarification.
21       With respect to this particular paragraph,
22   you reference an individual by the name of Jacques
23   Rivera. Do you see that?
24   A    Yes.

Richard A. Leo, PhD, JD, 9/29/2022

493

1    Q    And I just looked at the Materials
2  Reviewed Section and I don't see anything related to
3  Jacques Rivera.
4    A    That should be --
5    Q    Can you point me -- can you point me to
6  the materials that you reviewed -- can you look at
7  your report and point me to the materials -- the
8  item number of the materials you reviewed related to
9  Jacques Rivera?
10      MR. ART:  I apologize. objection to form.
11      THE WITNESS:  Okay.  I'm looking and I'm
12  trying to find that right now.
13      I don't see in my materials reviewed any
14  documents with Jacques Rivera's name on it.  I
15  do see Number 244, an affidavit of David Rivera
16  who is mentioned in the subsequent cases.
17    Q    (By Ms. Rosen) Do you have a belief that
18  David Rivera is somehow connected to Jacques Rivera?
19      MR. ART:  Objection, form.
20      THE WITNESS:  I would have to review
21  materials to answer that question.  I don't
22  recall as I sit here.
23    Q    (By Ms. Rosen) If you were not provided
24  any materials related to Jacques Rivera, then how

494

1  did you become aware that Jacques Rivera's
2  conviction was overturned and that his case was
3  investigated by Detective Guevara?
4      MR. ART:  Objection, form.
5      THE WITNESS:  There are documents that
6  I've reviewed in the mass of documents that I
7  was provided that are listed at the beginning
8  of the report that sometimes refer to other
9  cases but aren't documents on those cases.
10      And so if I did not review anything in
11  Mr. Jacques Rivera's case, I would have learned
12  through other materials that I reviewed in
13  preparation for the report.  Though, I don't
14  recall specifically which material or materials
15  that I did review that mentioned Mr. Rivera's
16  name or case.
17    Q    (By Ms. Rosen) How about Juan Johnson,
18  what materials did you review related to Juan
19  Johnson?
20      MR. ART:  Objection to form.
21      THE WITNESS:  I do not see any specific
22  materials with Mr. Johnson's name on them in
23  the materials that I reviewed.
24    Q    (By Ms. Rosen) How about Roberto

495

1  Almodovar?
2      MR. ART:  Objection to form.
3    Q    (By Ms. Rosen) What materials did you
4  review in relation to Mr. Almodovar?
5    A    I do not recall which materials I reviewed
6  that mentioned or were about Mr. Almodovar's case.
7    Q    What about Mr. William Negron?
8      MR. ART:  Objection to form.
9    Q    (By Ms. Rosen) What materials did you
10  review in relation to Mr. Negron?
11    A    I do not recall which materials I reviewed
12  in relation to Mr. Negron.
13    Q    And there's nothing listed in the
14  materials reviewed section specifically related to
15  Mr. Negron, right?
16      MR. ART:  Objection to the form.
17    Q    (By Ms. Rosen) Is that correct?
18    A    There's no document that I saw in my
19  review just now that mentions Mr. Negron by name.
20  But, as I mentioned earlier, many of the documents
21  refer to individuals in other cases, and so some of
22  the documents may have described his case even
23  though I didn't see in my review just a moment ago
24  any documents that list his name.

496

1    Q    And then with respect to Angel Rodriguez,
2  Henry Johnson, Xavier Arcos, Ricardo Rodriguez,
3  Geraldo Iglesias, and Demetrius Johnson, I can
4  represent to you that I did a word search just now
5  of your report, and I don't see any documents
6  identified in the materials reviewed section related
7  to those individuals.  If, in fact, my word search
8  is correct and there is nothing listed in the
9  materials reviewed section of your report, is it
10  true that the information you have related to those
11  individuals come from some other materials you
12  reviewed in connection with the opinions you're
13  providing in this case?
14      MR. ART:  Objection to the form.
15  Objection to the representation that you did a
16  word search and found that none of the
17  documents related to those individuals.  I
18  don't think you can do a word search that does
19  that, but with those objections, you can answer
20  if you can, Dr. Leo.
21      THE WITNESS:  I would have to do a word
22  search, if that's possible, to verify what you're
23  saying, but I think you're asking a hypothetical
24  question.  And based on your hypothetical

Richard A. Leo, PhD, JD, 9/29/2022

497

1    question, if there are no documents in the
2    materials I reviewed bearing the names of the
3    individuals that you mentioned, then any
4    information that I -- any information that I --
5    any information that I analyzed about their cases
6    or learned about their cases would have been
7    contained in other documents among the voluminous
8    documents that I reviewed.
9        Q    (By Ms. Rosen) Okay.  And then if we look
10   down to the paragraphs -- the summary paragraphs
11   that followed in sequence in this report, they're
12   numbered Paragraphs 1 through 13, are you providing
13   any opinions with respect to any of those individuals
14   that there were confessions that were elicited that
15   were the result of physical abuse and resulted in a
16   either coerced or false confession?
17       MR. ART:  Objection to the form.
18       THE WITNESS:  Well, I would want to go
19   through the cases individually to answer a
20   question about each one.  But, more generally,
21   as I said before, no, I'm not providing any
22   factual opinions about what did or did not
23   occur.
24       My opinions are expert opinions about

498

1    evidence of a wide range and varying evidence
2    supporting the pattern of practice of physical
3    and psychological abuse in Area 5 as well as
4    across other areas in the Chicago Police
5    Department that increased the risk of eliciting
6    involuntary and/or false confessions.
7        As in other parts of the report, the cases
8    vary in the strength of evidence that supports
9    the assertions by the individuals who said they
10   were tortured.  And so if we went through these
11   cases individually, I would note that some have
12   a stronger evidentiary support than others or
13   have multiple sources, more sources than
14   others.
15       But even if we removed one or more of
16   these opinions, even if we removed an entire
17   section, there's still a substantial
18   evidentiary support for the widespread pattern
19   and practice across the Chicago Police
20   Department that I wrote about in this report
21   in my opinion.
22       Q    (By Ms. Rosen) With respect to -- actually
23   let me ask you.  You said if you were permitted to
24   go through them, you could identify, did you say, the

499

1    strength of the evidence?
2        A    Well, the point I was trying to make is
3    that in some cases there's more evidence than in
4    other cases.  And I was trying to build on an
5    earlier point I made which is that the documents
6    that I analyzed in these cases ranged -- and when
7    I'm talking about the cases, I mean all the cases.
8        They range from only having a complaint to
9    having reports and judicial findings and commission
10   and government reports, and some are in between.  So,
11   I was only meaning to suggest that if we went through
12   them individually, we might discuss that there is a
13   varying range of evidence, depending on the
14   individual case, supporting the pattern and practice
15   opinions in this section of my report.
16       Q    The varying range of evidence that you
17   relied on in support of your summaries in this section
18   and the other sections are either cited in the
19   individual summaries or in the materials reviewed
20   section of your report, correct?
21       A    Correct, across the various sections,
22   correct.
23       Q    I want to talk specifically about, if we go
24   to Page 90 of your report, Ariel Gomez at Paragraph

500

1    7. And in Paragraph 7 you write, "Ariel Gomez
2    alleges that Detective Guevara coerce from him a
3    false murder confession."  Do you see that?
4        A    Yes.
5        Q    And then it says, "In 2018, Mr. Gomez was
6    exonerated after three witnesses swore under oath
7    that Guevara repeatedly attempted to coerce them
8    into identifying Gomez as the shooter."  Do you see
9    that?
10       A    Yes.
11       Q    And in that particular sentence, you cite
12   to a BuzzFeed article by Melissa Segura, correct?
13       A    Yes.
14       Q    And is that your support for the statement
15   that in 2019 Mr. Gomez was exonerated after three
16   witnesses swore under oath that Guevara repeatedly
17   attempted to coerce them into identifying Gomez as
18   the shooter?
19       MR. ART:  Objection to the form.
20       THE WITNESS:  That is the citation in the
21   report for that point, but I also reviewed
22   other documents in his case, some or all of
23   which are listed in that paragraph, and there
24   may be others that I would have to review the

Richard A. Leo, PhD, JD, 9/29/2022

501

1    materials reviewed section to see if there is
2    more listed there.
3         Q    (By Ms. Rosen) Do any of those other
4    materials support the specific point that you -- the
5    specific point that Mr. Gomez was exonerated after
6    three witnesses swore under oath that Guevara
7    repeatedly attempted to coerce them into identifying
8    Gomez as the shooter in 2018?
9         MR. ART:  Objection to the form.
10        THE WITNESS:  I would have to review the
11   materials in the materials reviewed section on
12   Mr. Gomez's case to fresh my recollection in
13   order to answer that question.
14        Q    (By Ms. Rosen) If we look at Number 8,
15   Leshurn Hunt, you cite to a district court opinion
16   in this case.  Is that the district court opinion
17   that was issued after the trial where Detective
18   Guevara was found not liable with respect to the
19   allegations Mr. Hunt made against him in the civil
20   case?
21        MR. ART:  Objection to the form of the
22   question.
23        THE WITNESS:  I don't recall.  I would
24   need to review that document to answer your

502

1    question.
2         Q    (By Ms. Rosen) Would it matter to you in
3    your analysis if Mr. Hunt filed a civil case, went
4    to trial, and the jury found Detective Guevara not
5    liable with respect to the allegations Mr. Hunt was
6    making -- all the allegations Mr. Hunt was making
7    against him?
8         MR. ART:  I object to the characteristic
9    of a lawsuit.
10        Q    (By Ms. Rosen) You can answer.
11        A    If -- it would not matter to me in terms
12   of my pattern and practice opinions in this case
13   because even if we threw out Mr. Hunt's case or
14   threw out any case in these sections on pattern and
15   practice, there is still substantial and overwhelming
16   evidence of a widespread and pervasive practice, not
17   only across the Chicago Police Department but also by
18   Detective Guevara himself.
19        So, it would not matter to me.  It would
20   not in the sense that it would not change my
21   analysis or opinions in this case.
22        Q    If we go to Page 92 of your report,
23   there's a section that identifies some of the
24   civilian or numerous civilian -- let me start over.

503

1         At Page 92, there's a section that
2    identifies complaints that were received by the
3    Chicago Police Department regarding Detective
4    Guevara, correct?
5         A    Yes.
6         Q    And what is the point of you listing these
7    five cases where individuals made complaints to the
8    Chicago Police Department regarding Detective
9    Guevara's conduct?
10        MR. ART:  Objection to form.
11        THE WITNESS:  The point is among the
12   massive materials that I reviewed to illustrate
13   the basis for my opinions in this report, and
14   one of the important points to me that I tried
15   to emphasize in this deposition is that there
16   are numerous sources of evidence for my
17   analysis and expert witness opinion that there
18   was substantial evidence of a pattern and
19   practice of physical and psychological abuse in
20   interrogations leading to or creating the risk
21   of leading to involuntary or false confessions.
22        So, this is highlighting one source among
23   many of evidence.  Some of these cases have
24   multiple sources, but that's the reason I've

504

1    broken out into the sort of subsection of cases
2    involving civilian complaints.
3         Q    (By Ms. Rosen) And you identify five
4    complaints here, right?
5         A    Five examples, yes.
6         Q    And it's over the course of thirteen
7    years, right?
8         A    From 1982 to 1995, yes.
9         Q    And do you have any idea how many
10   complaints other police officers in the Chicago
11   Police Department on average obtained in a similar
12   time frame?
13        MR. ART:  Objection to form.
14        THE WITNESS:  I do not know what the
15   average rate of complaints by Chicago Police
16   Detectives from 1982 to 1985, who were
17   similarly situated to Detective Guevara.
18        Q    (By Ms. Rosen) And when you say similarly
19   situated, what do you mean?
20        A    Well, as you know, a police department is
21   a hierarchical organization, and so you have street
22   officers and desk sergeants and detectives and
23   lieutenants and captains and commanders and chiefs,
24   and so I just assumed -- and you can correct me if

Richard A. Leo, PhD, JD, 9/29/2022

505

1  this is a mistaken assumption in my answer -- that if
2  one wanted to compare Detective Guevara's complaint
3  rate to other Chicago Police employees and police
4  officers, you would want to take that section of the
5  department that performed comparable work, otherwise
6  you would be comparing apples to oranges.
7      Q   Okay.  And then if we go to the next, I
8  guess, section of your report, you say, "In other
9  cases" -- this is Page 93 -- "In other cases,
10 individuals allege they've been abused by Detective
11 Guevara in attempts to obtain confessions or to
12 provide false testimony against other suspects."
13      And the first one that you identify is
14 Mr. Rankins in relation to Mr. Serrano and
15 Mr. Montanez.  Do you see that there?
16      A   Yes.
17      Q   In the materials that you were provided in
18 this case with respect to Mr. Rankins and Mr. Serrano
19 and Mr. Montanez, did you see any materials or any
20 testimony from any of the individuals that discussed
21 the fact that Mr. Montanez's family, before the trial
22 against Mr. Serrano and Mr. Montanez, paid for Mr.
23 Rankins to go to Puerto Rico and stay with Mr.
24 Montanez's family members so that he would not be

506

1  around for the trial to testify against Mr. Serrano
2  and Mr. Montanez?
3      MR. ART:  Objection to the form of the
4  question.
5      Q   (By Ms. Rosen) You can answer.
6      A   I do not recall seeing that.  I would need
7  to review the materials to know whether it was
8  contained and that -- that assertion was contained
9  or if the fact was contained in the materials I
10 reviewed.
11      What I do recall, though, is that this was
12 one of the cases that had a higher quantum of
13 evidence supporting the accusations than some of the
14 other cases, and in particular that Mr. Montanez and
15 Mr. Serrano both received Certificates of --
16 Certificates of Innocence.
17      And though I did not work on these cases, I
18 have worked on and studied other cases where I've read
19 full blown transcripts of Certificate of Innocence
20 Hearings where there is a lot of questioning about any
21 adverse facts typically by the prosecution.
22      So -- but I don't know -- I don't recall I
23 should say -- whether any of the documents that I
24 reviewed included that what you're representing as

507

1  fact.
2      Q   Did you see -- did you see a transcript of
3  the Certificate of Innocence preceding -- for Mr.
4  Serrano and Mr. Montanez's case?
5      A   I do not recall reviewing that, and if --
6  -- if -- if it's not listed in the materials
7  reviewed, then I didn't.  And if it is, then I simply
8  do not recall.
9      Q   If we go to Page 94 of your report, you
10 discuss Scott Lassar and his investigation.
11      A   Correct.
12      Q   Were you provided materials related to
13 Mr. Lassar's investigation into Mr. Almodovar, Mr.
14 Serrano, Mr. Montanez, and Mr. Bouto's case?
15      MR. ART:  Objection to form.
16      THE WITNESS:  I would have to review the
17 list of materials reviewed to know whether I
18 was provided -- to recall, to refresh my
19 recollection about whether I was provided with
20 specific materials by Mr. Lassar and his firm
21 on those cases.
22      What I do recall being provided was a
23 memorandum that I referred to and I think
24 others referred to as the Lassar Report which

508

1  was one of the documents as I mentioned earlier
2  that I reviewed in preparation for this
3  deposition and have in front of me with the
4  Bates stamps numbers AR-Jenner 019812 to
5  019843.
6      Q   (By Ms. Rosen) And that's the report that
7  discusses Mr. Solache's and Mr. Reyes's case, right?
8      A   That's my recollection, correct.
9      Q   Well, you're looking at it.  You just said
10 you're looking at it, right?
11      A   Correct.  And it's titled "Guevara
12 Investigation, Gabriel Solache and Arturo Reyes,
13 dated December 12th, 2014."
14      Q   And so that particular memorandum that you
15 have in front of you simply discusses Mr. Solache's
16 and Mr. Reyes's case, not the other cases, okay.
17      And then if we look to the final paragraph
18 before the conclusion it says, "In sum, Chicago police
19 commanders and high ranking City of Chicago officials
20 (including police command personnel) were on
21 continuing notice since as early as 1982 that there
22 was a pattern and practice of police interrogation,
23 torture, and coercion to extract confessions in Area 5
24 involving Detective Guevara, Detective Halvorson, and

Richard A. Leo, PhD, JD, 9/29/2022

509

1  other Area 5 Chicago police detectives."  Do you see
2  that?
3      A   Yes.
4      Q   And what is your basis for your conclusion
5  specific to Area 5?  Because that's what this
6  paragraph says, that there were Chicago police
7  commanders and high ranking City of Chicago officials
8  that were on notice about Area 5 detectives.
9      MR. ART:  Objection to the form.
10     THE WITNESS:  The basis would be the
11  materials I reviewed that pertain to Area 5.
12  Although, as I said before, I think this pattern
13  and practice was widespread across the areas, and
14  it's artificial to separate the areas since there
15  are five -- since they're all part of the same
16  police department and police departmental
17  culture, even though I broke it down into areas
18  for simplicity of analysis in the report.
19     Q   (By Ms. Rosen) Okay.  We can take down
20  Exhibit Number 1.
21     Can we mark as an exhibit what's been
22  marked previously, the PDF that's called "Invoices
23  Number 1."
24     THE EXHIBITS COORDINATOR:  Eileen, I don't

510

1  think we marked this one previously, so should
2  we make this Number 7?
3      MS. ROSEN:  Yes, please.
4      Q   (By Ms. Rosen) So, Invoices Number 1, the
5  first six pages relate to the work you did in
6  Sanchez versus The Village of Wheeling case, right?
7  You can scroll through the pages so you can take a
8  look.
9      And then when we get to Page 7, that's
10  your invoices related to this case.  Do you see
11  that?
12     A   Yes.
13     Q   If we could just go back to Page 6 for a
14  second -- oh, actually, let's go back to Page 4,
15  sorry.  I think we talked about this a little bit
16  earlier yesterday, but it seems like a very long
17  time ago.  Here the hourly rate for the opinions
18  you've provided in the Sanchez matter was $375.00 an
19  hour?  Do you see that?
20     A   I do.
21     Q   And then underneath it, it says "Reduced
22  Rate."  Do you see that?
23     A   I do.
24     Q   So, does that mean that you -- that your

511

1  hourly rate for that time period was higher, but for
2  whatever reason you agreed to bill at a reduced rate
3  in that particular case?
4      A   Yes.
5      Q   Okay.  Is there a particular reason you
6  agreed to the reduced rate?
7      MR. ART:  Objection to the form.  And I
8  just want to caution you, Dr. Leo, to the
9  extent that your answer would divulge
10  conversations between your counsel in that
11  case, I would instruct you not to answer.  To
12  the extent you can answer it without divulging
13  that information, you can go ahead.
14     THE WITNESS:  There may have been a
15  reason.  I don't recall as I sit here today
16  what that reason is.
17     Q   (By Ms. Rosen) Okay.  And then if we go to
18  Page 7, this is an invoice for this case, Solache
19  and Reyes.  Here the billable rate is $400.00 an
20  hour, but again it says "Reduced Rate."  And it
21  appears to me that this invoice spans, based on the
22  dates, from July 24th, 2019, to January 5th, 2022.
23  Do you see that there?
24     MR. ART:  Objection to the form.  It's

512

1  January 15.
2      MS. ROSEN:  Oh, sorry.  Let me say that
3  again.
4      Q   (By Ms. Rosen) The dates on the invoice
5  appear to cover the time frame of July 24th, 2019,
6  through January 15th, 2022, correct?
7      A   Yes.
8      Q   So, in that time frame, which is over two
9  years, you billed a hundred and seventy-five
10  hours -- 175.7 hours in connection with the work
11  that you did in this case, is that right?
12     A   Correct.
13     Q   And then if we go back to the Sanchez
14  invoice, we go to Page 1, this invoice covers
15  July 20th, 2020, through March 24th, 2021, correct?
16     A   Yes.
17     Q   And that this invoice covers -- in that
18  time period you billed 39.6 hours, is that right?
19     MR. ART:  Objection to the form.
20     THE WITNESS:  Correct.
21     Q   (By Ms. Rosen) And then if we go to Page
22  4, that invoice has a date range of March 25th,
23  2021, through January 31st, 2022, and the total
24  amount of hours listed on that invoice was a hundred

Richard A. Leo, PhD, JD, 9/29/2022

513

1    and five hours, correct?
2        A    Correct.
3        Q    So, if I quickly do the math in the
4    Sanchez matter from the time period of July 20th,
5    2020, through January 31st, 2022, you billed
6    approximately a hundred and forty-five hours, right?
7        A    Correct.
8        Q    Okay.  All right.  If we can mark as
9    Exhibit Number 7, Invoice Number 2 --
10       MR. ART:  Is this 7 or 8?
11       MS. ROSEN:  Yes, this is 8, sorry.
12       Q    (By Ms. Rosen) Exhibit 8.  Okay.  So, the
13   first two pages -- three pages -- hold on, the first
14   six pages of this exhibit, so it's Bates stamped 931
15   through 936 and are related to a case called Amor
16   versus Naperville.  Do you see that?
17       A    I do.
18       Q    And in this particular case you bill at
19   $450.00 an hour, correct?
20       A    Correct.
21       Q    Okay.  And then if we go to Page 937, that
22   looks like your invoice for Anthony Jakes.  And in
23   that case you bill at $450.00 an hour and that says
24   2020 rate.  Do you see that?

514

1        A    Yes.
2        Q    And so does that mean that in 2020 -- let
3    me start over.
4        Does that mean if you were hired in 2020
5    to review a case, that your hourly -- your typical
6    hourly rate was $450.00 an hour?
7        A    Yes, for civil cases or privately retained
8    cases, not for public defender cases.  They were
9    prosecutor cases or appointed cases.
10       Q    Okay.  And then Page 945 is blank.  Page
11   946 is blank.  And then if we go to Bates stamped
12   had 947, this is for a case called Nickie Miller
13   versus Montgomery County.  And here it looks like
14   your hourly rate is $475.00, but it looks like this
15   is for work you did in 2021.
16       So, is it fair for me to assume that your
17   normal hourly rate for cases -- for private cases or
18   civil matters that were initiated in 2021, was
19   $475.00?
20       MR. ART:  Objection to form.
21       THE WITNESS:  That's my best recollection,
22   yes.
23       Q    (By Ms. Rosen) And then if we go to the
24   page Bates stamped 950, that's for a case called

515

1    Anderson versus Knox County, and that's a 2020 case,
2    and it looks like your hourly rate there is $450.00
3    which is consistent with what we saw earlier for one
4    of the other invoices, right?
5        MR. ART:  Object to the form of a 2020
6    date.
7        Q    (By Ms. Rosen) Cases initiated in --
8    initiated with you in 2020.
9        A    I think it's consistent with one of the
10   other bills.  I don't recall if my private hourly
11   rate in 2020 was $450.00 an hour.  I believe it
12   was.
13       Q    Okay.  And then if we go to Bates stamp
14   953, this is something -- a matter called Andrew
15   Royer.  It looks like you did work on this case --
16   looks like you were hired -- looks like the initial
17   work you did on this case was December 30th, 2018.
18   And here the hourly rate which you indicate is a
19   "Reduced Rate" is $350.00 per hour, correct?
20       A    Correct.
21       Q    And do you know why in this particular
22   case you provided a reduced rate?
23       A    This was not a civil case.  This was a
24   post conviction case, and although I don't remember

516

1    specifically why, that may be the reason.
2        Q    Do you remember -- do you know the result
3    of that post conviction case?
4        A    I believe he was released and exonerated.
5        Q    Okay.  And then if we go to Bates stamp
6    956, this is another invoice for the Amor case,
7    again at the $450.00 rate, correct?
8        A    Correct.
9        Q    Okay.  And then if we go to Bates stamp
10   959, this is another invoice in connection with the
11   Jakes matter, and the rate for this one is $450.00
12   an hour, right?
13       A    Correct.
14       Q    And then Page 963 and 964 are blanks.  And
15   then Page 965 appears to be a duplicate of the
16   invoice that we looked at that was marked in Exhibit
17   1.  The date is July 24th, 2019, to January 15th,
18   2022, correct?
19       A    Yes.
20       Q    And then 967 is another duplicate of the
21   same invoice for Solache and Reyes, correct?
22       A    Yes.
23       Q    And then beginning at 969, we have an
24   invoice in a case called Tobias versus Los Angeles

Richard A. Leo, PhD, JD, 9/29/2022

517

1 for work that it looks like it began February 23rd,
2 2018, and in that case your hourly rate was $400.00
3 an hour, correct?
4    A    Correct.
5    Q    And then if we go to 973, there's another
6 Toias invoice again at the $400.00 an hour hourly
7 rate, correct?
8    A    Correct.
9    Q    And then if we go to 976, we have another
10 Reyes invoice.  This one it looks like for work
11 spanning from October 11th, 2018, through
12 February 4th, 2019.  Do you see that there?
13   A    Yes.
14   Q    And the total amount of hours billed on
15 this invoice is 50.4, correct?
16   A    Yes.
17   Q    And this invoice is itemized by -- it
18 appears to be itemized, I can't tell because a lot
19 of it is redacted, but it appears to be itemized by
20 date that you did the work, October 11th, 2018, and
21 October 12, 2018, and so on.  Do you see that there?
22   A    Yes.
23   Q    And you break down the hours that you
24 worked on whatever the tasks were that have been

519

1 the number of hours, but not more than that.
2    MS. ROSEN:  Okay.  Well, there's no reason
3 to debate it at this point.
4    Q    (By Ms. Rosen) Okay.  My question really
5 is this 2018 -- late 2018, early 2019 invoice as
6 well as some of the other invoices that we looked at
7 provides a more detailed breakdown of the work you
8 did and the time you spent on a particular matter
9 per day.  But the invoice that spans July, 2019, to
10 January 15th, 2022, in the Reyes matter was not
11 created in that way.
12        And my question is why did you do that in
13 the other bill in the less detailed fashion?
14   A    I cannot answer that question in light of
15 Mr. Elson's admonition to me five or ten minutes
16 ago.
17   Q    Okay.  All right.  And then Page 979 is
18 for a case, Anderson versus Knox County, and this
19 particular hourly rate for this case that looks like
20 was for work being done in 2020, is $450.00 an hour,
21 correct?
22   A    Yes.
23   Q    And then finally if we get to 981, we have
24 this report, that is in a case called Rosario.  And

518

1 redacted from this report, from this invoice, right?
2    A    Correct.
3    Q    But the other invoice that we looked at
4 that was in Exhibit Number 7, spanned that two year
5 period and it didn't detail the dates in this way,
6 correct?
7    A    Correct.
8    MR. ART:  Well, I just want to lodge an
9 objection that I think we intended to redact
10 these bills further because we think that the
11 information that is redacted is not subject to
12 disclosure under the rules.  But, apparently in
13 this statement we did not, and so we'll permit
14 the questioning but we have objections to
15 questioning about line item bills from other
16 cases, and we should have redacted them.
17   MS. ROSEN:  Okay.  Are you saying that
18 what we're looking at right here on Page --
19 that is Bates stamped Leo 976, should be
20 further redacted?
21   MR. ART:  Yes, I think so.  I think -- I
22 mean I think you're entitled to know what the
23 expert's hourly rate is, what the expert charged
24 in total for work on a particular case including

520

1 your hourly rate for work being done in 2021, is
2 $475.00 an hour, correct?
3    MR. ART:  Objection to form, and I'll just
4 state for the record that this was produced
5 unredacted inadvertently by my office,
6 apparently.  We would assert the same privileges
7 and the same redactions would apply to these
8 pages.
9        So, I'm going to actually call these back.
10 You can ask about the hourly rate.  And you can
11 ask about the line items that were produced in
12 the redacted version, but we have objections to
13 questions about the privileged information that's
14 not subject to disclosure under Rule 26.
15   MS. ROSEN:  I'm in disagreement with you
16 about your reading, but in any event I don't
17 intend to ask questions about the line items on
18 this particular invoice.  And you're asking to
19 call it back.  You can call it back, but
20 we can have a discussion about your position
21 regarding line item redactions.
22   MR. ART:  Very good.
23   MS. ROSEN:  Okay.  Why don't we take a
24 break so I can review my notes.  And then

Richard A. Leo, PhD, JD, 9/29/2022

521

1    hopefully the next segment will be close to the
2    last segment.
3        THE VIDEOGRAPHER: We're off the video
4    record at 5:28 p.m.
5        (At this time, a short break was
6    taken off the record.)
7        THE VIDEOGRAPHER: We are back on the
8    video record at 5:41 p.m.
9    Q    (By Ms. Rosen) All righty, we're in the
10   home stretch. Dr. Leo, your report with respect
11   to your opinions related to pattern and practice
12   identify case summaries for cases that span the
13   period of approximately 1987 to 2002, correct?
14       MR. ART: Objection to the form.
15       THE WITNESS: I believe so. I would have
16   to go through the report to confirm that, but I
17   believe that's the approximate range. Although,
18   One of the headings indicated that some of the
19   Area 2 cases were from the 1970s.
20   Q    (By Ms. Rosen) Right. But as we discussed
21   earlier and you made the point of you didn't do case
22   summaries for the Area 2 cases, right?
23       MR. ART: Object to the form of the
24   question, mischaracterizes his testimony.

522

1        THE WITNESS: In the report, correct, I
2    did not do Area 2 case summaries.
3    Q    (By Ms. Rosen) Okay. So, focusing on the
4    case summaries, I am correct that the time period is
5    approximately 1987 to 2002, correct?
6    A    Correct.
7    Q    And do you know how often criminal
8    defendants in that time period brought motions To
9    suppress statements based on allegations of physical
10   abuse?
11   A    I do not know the number and I do not
12   believe -- I do not believe that number exists.
13   But there's a governmental body that tabulates that
14   number and that number would be accessible.
15   Q    Do you have any idea how often, meaning in
16   how many cases in any given year, during the 1995 to
17   1998 time frame criminal defendants bring or brought
18   motions to suppress based on allegations of physical
19   abuse?
20   A    I have to apologize, one of my kids is at
21   the door and apparently I locked it thinking I had
22   left it unlocked, so I just need to run down. If
23   you want to go off the record, it literally will
24   just be thirty seconds.

523

1    Q    I just need an answer to my question
2    before you run off, sorry.
3    A    Oh, I'm sorry, go ahead. Can you repeat
4    the question?
5    Q    Sure. Do you know how often criminal
6    defendants brought motions to suppress based on
7    allegations of physical abuse during the 1995 to
8    1998 time period?
9    A    I do not know that number. I don't think
10   anybody knows that number.
11   Q    Okay. Why don't you go let your child in.
12   A    I'll be right back. I promise it will be
13   very, very brief.
14   Q    Okay.
15   A    Back, sorry about that.
16   Q    No worries. Do you know in the 1995 to
17   1998 time period how many criminal defendants
18   brought motions to suppress alleging physical --
19   motions to suppress their statements alleging
20   physical abuse involving police officers employed by
21   the Chicago Police Department?
22       MR. ART: Objection to form.
23       THE WITNESS: I do not know that number.
24   I do not know the source that has tabulated

524

1    that number.
2        MS. ROSEN: I have no further questions at
3    this time, but I believe Miss Golden does.
4    QUESTIONS BY MS. GOLDEN:
5    Q    Good afternoon, Doctor. My name is
6    Caroline Golden and I represent some of the
7    individual officer defendants in this case. Thank
8    you for hanging in there.
9    Q    Does your -- I will try to be as brief as
10   I can but I'm going to be shuffling through papers,
11   so please bear with me.
12       Does your report contain any opinion about
13   or description of the role of Investigator Harvey in
14   the custodial interrogation of Mr. Solache or Mr.
15   Reyes?
16       MR. ART: Objection, form.
17   Q    (By Ms. Golden) Do you want me to break it
18   down? Does your report contain any opinion about
19   the role of Investigator Harvey in the custodial
20   interrogation of Mr. Solache?
21       MR. ART: Objection to form.
22       THE WITNESS: I'm just going to review my
23   report for a moment.
24   Q    (By Ms. Golden) Sure.

Richard A. Leo, PhD, JD, 9/29/2022

525

1    A   I don't mention Detective Harvey by name,
2  but I do not know if he was one of the detectives
3  that Mr. Solache described interrogating and in
4  Mr. Solache's description of the interrogation. And
5  if so, it would apply -- the opinions -- an opinion
6  or more in the report could apply to him.
7    Q   Do you have any criticism of the work that
8  -- of the forensic investigators that were assigned
9  to the Soto homicide investigation?
10     MR. ART:  Object to form.
11     THE WITNESS:  I don't believe in the
12  report I analyzed the work of the forensic
13  investigators.
14    Q   (By Ms. Golden) Do you in your report
15  analyze the work of Sergeant Biebel?
16     MR. ART:  I mean I guess I object to the
17  extent the report, what's in it, speaks for
18  itself.
19     THE WITNESS:  I don't recall if I
20  mentioned Sergeant Biebel in the report.
21    Q   (By Ms. Golden) Do you recall mentioning
22  Sergeant Mingey or Sergeant Cavatelli in the report?
23     MR. ART:  Same objection. Go ahead.
24     THE WITNESS:  Without going through the

526

1  report, I don't recall.
2    Q   (By Ms. Golden) Okay.  I expect that if
3  they had a significant role in the custodial
4  interrogation of Mr. Solache or Mr. Reyes you would
5  recall it, right?
6     MR. ART:  Objection to the form.
7     THE WITNESS:  Yes, I would be more likely
8  to recall it as I sit here today.
9    Q   (By Ms. Golden) Okay.  Do you agree that a
10  guilty person's confession can contain details that
11  are not accurate?
12    A   Yes, I agree that is possible.
13    Q   Do you agree that confessions -- truthful
14  confessions can be -- I'm sorry.
15     Do you agree that a guilty person's
16  confession can only be -- can be only partially
17  true?
18    A   Not necessarily.  You could have a
19  confession that is a hundred percent factually true
20  and the person could be guilty.  So, it's not only
21  the case that a guilty person's confession could
22  be partially true, it can also be entirely true.
23    Q   Some confessors, some guilty confessors
24  actually intentionally misstate the facts and

527

1  circumstances of the crime they have committed,
2  don't they?
3     MR. ART:  Objection to form.
4     THE WITNESS:  I'm sure that that occurs in
5  some cases.  It may -- but there are other
6  reasons as well.
7    Q   (By Ms. Golden) Are you done?
8    A   Yes.
9    Q   Would you expect to find victim DNA in the
10  car used to commit the Soto homicides?
11     MR. ART:  Objection to the form,
12  incomplete hypothetical.
13     THE WITNESS:  Possibly, yes.
14    Q   (By Ms. Golden) Do you think that Adriana
15  Mejia commited the Soto homicides and kidnapping
16  alone?
17    A   It's not for me to say who did or did not
18  commit the crime.  But I think there is strong
19  evidence that she did commit the crime.  I do not
20  know whether she committed the crime alone or in
21  concert with somebody else.  I think the unknown
22  male DNA at the crime scene and possibly left
23  elsewhere -- I'm not recalling everywhere it was --
24  would suggest that she had an -- potentially had an

528

1  accomplice.
2    Q   Do you think it's possible for a woman of
3  her -- by the way, did you review any videotaped
4  deposition testimony?
5    A   I reviewed deposition transcripts.
6    Q   Did you also review any videotaped
7  depositions?
8    A   I did not, just the transcripts.
9    Q   And you would -- I think we agree that
10  Adriana Mejia is, in fact, guilty of the Soto
11  homicides and kidnappings, right?  I think we can
12  agree to that.
13    A   What I said is that there is strong
14  evidence of her guilt.
15    Q   Okay.  But you would agree that her
16  confession is only partially true?
17     MR. ART:  Objection to the form.
18     THE WITNESS:  I would -- I believe the
19  evidence does not support her assertion that
20  Mr. Reyes or Mr. Solache were involved in the
21  crime with her.
22    Q   (By Ms. Golden) Are there any other facts
23  in her confession that you believe are unsupported
24  by the evidence in the case?

Richard A. Leo, PhD, JD, 9/29/2022

529

1      MR. ART: Objection to form.
2      THE WITNESS: I haven't looked at her
3  confession statement for at least nine months,
4  so in order to answer that question I would
5  have to be allowed to review it, and then I can
6  answer it for you.
7      Q   (By Ms. Golden) What is your degree of
8  confidence that the confession statement of
9  Mr. Reyes meets the criteria for a proven false
10 confession?
11     MR. ART: Objection to form and to the
12 statement "degree of confidence." You can go
13 ahead and answer. Objection to form and to the
14 phrase "degree of competence."
15     MS. GOLDEN: I said confidence.
16     MR. ART: Objection to form and to the
17 phrase "degree of confidence."
18     Q   (By Ms. Golden) You can answer.
19     A   I don't think I can put a number on it,
20 but I would say that I am confident that that
21 confession statement meets the criteria or at least
22 one of the criteria of the proven false confession.
23     Q   Do you draw any distinction between a
24 prosecutor acknowledging innocence and a prosecutor

530

1  making a statement that he or she declines to
2  prosecute?
3      MR. ART: Objection to form.
4      THE WITNESS: Well, a prosecutor might
5  decline to prosecute for reasons not related to
6  innocence. A prosecutor may also believe that
7  the person is innocent, but may not want to
8  state that publicly for -- for any number of
9  reasons.
10     Q   (By Ms. Golden) You agree, though, that a
11 prosecutor might decline to prosecute even if --
12 even though they believe a suspect or a person is
13 guilty if they just don't have the evidence for the
14 prosecution?
15     A   Yes, I believe that's possible.
16     Q   And there's a very high evidentiary burden
17 in a criminal case, right?
18     A   If -- if you mean beyond a reasonable
19 doubt, yes.
20     Q   Okay. Do you think or do you have an
21 opinion about whether or not -- what is your
22 understanding of the injuries -- I'm going to
23 withdraw that.
24     Would you agree that one reason a person

531

1  can agree to confess is because they're guilty?
2      A   Yes.
3      Q   Do you agree that one reason a person can
4  be moved from denying involvement in a crime to
5  admitting it is because they're guilty?
6      MR. ART: Objection to form.
7      THE WITNESS: I think that's an incomplete
8  answer because even guilty people typically
9  don't confess in a vacuum. And so unless a
10 guilty person spontaneously confessed, if the
11 confession is in response to police
12 interrogation practices or techniques, then
13 that would also -- or the police interrogation
14 situation, or other factors, that could also
15 influence the decision to confess of a guilty
16 person.
17     Q   (By Ms. Golden) Did you -- I think we
18 talked earlier about the Lassar Report. Do you
19 remember that?
20     MR. ART: Objection to form.
21     Q   (By Ms. Golden) Something that we --
22 something that you reviewed and considered in
23 connection with your work in this case?
24     A   Yes.

532

1      Q   Do you agree with the Lassar Report's
2  conclusion that more likely than not Solache --
3  Mr. Solache and Mr. Reyes were physically abused
4  during the course of the interrogation?
5      A   I don't think it's for me to make a
6  factual determination about what did or did not
7  happen, but I do believe that there is substantial
8  evidence supporting that, and that the evidence would
9  come from multiple sources.
10     One would be the assertions of Mr. Reyes and
11 Mr. Solache. Two would be that Miss Mejia and Rosauro
12 Mejia also assert that they, too, were physically
13 assaulted. Three would be that, as you know, I
14 believe it meets the criteria of a proven false
15 confession. And in addition, there's substantial
16 indicia of unreliability, and that their account
17 fits with why you would have that, whereas Detective
18 Guevara's account does not. And four, there is
19 substantial evidence of a pattern and practice, not
20 only across the areas in the Chicago Police Department
21 of physical and psychological abuse in interrogations,
22 but more specifically also by Detective Guevara, and
23 that would also be evidence.
24     And then I would add to that the Lassar

Richard A. Leo, PhD, JD, 9/29/2022

---

533

1  Report's opinion as evidence as well supporting Mr.
2  Reyes and Mr. Solache's repeated testimony under oath
3  over many, many years that they were physically and
4  psychologically assaulted and coerced by Mr. -- I'm
5  sorry, by Detective Guevara.
6      Q   Does the Lassar Report support the
7  conclusion that Mr. Solache and Mr. Reyes are not
8  innocent?
9          MR. ART:  Objection to form.
10         THE WITNESS:  My recollection is that they
11 declined to opine whether they are -- they
12 believe he's innocent -- Mr. Reyes or
13 Mr. Solache are innocent --
14     Q   (By Ms. Golden) Did you --
15     A   -- but I would have to review the report
16 which I could easily do if I'm misremembering
17 anything about that.
18     Q   Was it your -- was it your practice as you
19 were reviewing the record to pick and choose what
20 parts of what documents you intended to believe or
21 not believe?
22         MR. ELSON:  Objection to form.
23         THE WITNESS:  I would disagree with the
24 way you stated that question.  It implies a

---

534

1  kind of arbitrariness and selection bias.  I
2  would say that in any case, including this case,
3  an expert is presented with a range in documents,
4  and this is -- I have -- there's very few cases
5  in which I've been presented with the amount of
6  documents as I've been presented in this case.
7      But, even in cases where I've been
8  presented with far less, hundreds instead of
9  thousands or tens of thousands of pages, any
10 analyst, any expert has to analyze those, and
11 by necessity based on their expertise, based on
12 their analysis, put a different amount of
13 weight on different pieces of evidence depending
14 on what that evidence is.
15     So, it's not so much picking and choosing,
16 it's what weight one assigns in the analysis of
17 evidence in a particular case or with respect
18 to a particular opinion.  And I've tried in
19 this deposition to discuss some of that, that I
20 would put less weight on evidence of allegations
21 that were contained in one civilian complaint as
22 opposed to evidence that was from a complaint and
23 judicial findings and a police report -- or I'm
24 sorry, a government report or a DNA test.

---

535

1      So, I do think we put different weight and
2  I did put different weights on evidence in this
3  case that I analyzed, but I don't think it was
4  a matter of just picking and choosing in the
5  colloquial connotation of that phrase.
6      Q   (By Ms. Golden) All right.  You understand
7  that Rosauro Mejia was also a Spanish speaker,
8  correct?
9      A   Yes.
10     Q   Do you have any reason to believe that he
11 had any less or more difficulty with the language
12 than did Mr. Solache or Mr. Reyes?
13         MR. ELSON:  Objection to the form.
14         THE WITNESS:  I do not know what his level
15 of difficulty was or was not
16     Q   (By Ms. Golden) What is the purpose of
17 scripting as you've described it?
18     A   Pressuring a suspect to adopt a narrative
19 that is consistent with what the police believe
20 occurred in the crime and that will present a
21 plausible, if not persuasive, account to prosecutors,
22 judges, and juries.
23     Q   Okay.  I think in your report you pointed
24 out what you called factual errors in the confession

---

536

1  that were inconsistent with crime scene facts
2  including the location of the bodies, the absence of
3  blood on Mr. Solache, no blood on the shoes of
4  Mr. Solache, Mrs. Soto screaming while -- I'm sorry,
5  Mrs. Soto screaming while her husband was sleeping,
6  and the $600.00 motive.
7      And so is there anything that will prevent
8  the plaintiff's counsel from arguing to the jury
9  about these facts if you don't testify?
10         MR. ELSON:  Objection to the form,
11 mischaracterizes --
12         MS. GOLDEN:  Let me put it differently.
13     Q   (By Ms. Golden) If you're not allowed to
14 testify, the plaintiff's counsel can still argue
15 these facts to the jury, right?
16         MR. ELSON:  Same objections.
17         THE WITNESS:  I think that's beyond the
18 scope of my expertise because if there was a
19 challenge to the plaintiff's making those
20 arguments, a judge would rule on that
21 evidentiary challenge.  And we're talking about a
22 future event, so I don't know.
23     Q   (By Ms. Golden) You had -- got a law
24 degree and some other degree at the same time.  What

---

Richard A. Leo, PhD, JD, 9/29/2022

537

1  was the second degree in?
2      A   A Ph.D. in an interdisciplinary law and
3  social science field where I specialized in social
4  psychology, criminology, and sociology.
5      Q   So, you have a Juris Doctorate like the
6  other lawyers in the case, right?
7      MR. ART:  Object to form.
8      THE WITNESS:  I do have a Juris Doctorate
9  Degree --
10     Q   (By Ms. Golden) But you're not admitted
11 to practice law anywhere?
12     MR. ART:  Were you done with your answer,
13 Dr. Leo?  I think you cut him off.
14     THE WITNESS:  Yeah, I was going to say I
15 never sat for the bar exam, and I've, of course,
16 never litigated a case, and I've never worked
17 for a law firm in the capacity of a clerk or a
18 lawyer.  So, while I formally have a J.D.
19 Degree, my experience and -- and occupation is
20 very different from any of the lawyers in this
21 case.
22     Q   (By Ms. Golden) And you've never been a
23 police officer, right?
24     A   Correct.

538

1      Q   And you've never investigated a crime or
2  taken -- interrogated a suspect, right?
3      MR. ART:  Objection to form.
4      THE WITNESS:  Correct.
5      Q   (By Ms. Golden) I want to ask you a little
6  bit about the idea that physical abuse or torture
7  can cause someone to falsely confess.  That is
8  generally accepted, correct?
9      A   It's generally accepted in the scientific
10 community and the research literature that physical
11 coercion and torture can and does sometimes lead to
12 false confessions.
13     Q   And that's something that's generally
14 understood by the average American, right?
15     MR. ELSON:  Objection to the form.
16     MR. ART:  Objection to the form.
17     THE WITNESS:  I don't know if there's a
18 survey establishing that, but it certainly
19 would be less counterintuitive than that
20 psychological methods of interrogation --
21     Q   (By Ms. Golden) I'm sorry.
22     A   -- that lead to false confessions.
23     Q   Okay.  Are you aware of any studies that
24 support the idea that expert testimony is necessary

539

1  to explain to a jury that physical abuse can cause
2  someone to falsely confess?
3      MR. ART:  Objection, form.  Totally
4  irrelevant, calls for a legal conclusion.  Go
5  ahead.
6      THE WITNESS:  I'm not aware of any study
7  that makes that argument.  I don't think any
8  study would ever argue that expert testimony is
9  necessary.  A study might marshal evidence that
10 suggests expert testimony could be helpful
11 under certain circumstances or generally, but I
12 don't think any study would say that it's
13 necessary.
14     Q   (By Ms. Golden) Are you aware of any study
15 that says that expert testimony is helpful for
16 jurors to understand the concept that physical abuse
17 and torture can cause someone to falsely confess?
18     MR. ART:  Objection, form and relevance.
19 Go ahead.
20     THE WITNESS:  I'm not aware of any
21 specific study that argues that.
22     Q   (By Ms. Golden) You state in your report
23 that you said that the accounts of Officer Trevino,
24 Detective Guevara, Detective Dickenson, and

540

1  Detective Rutherford could not explain how Mr. Reyes
2  moved from a denial to an admission of guilt, is
3  that fair?
4      MR. ART:  Objection to form.
5      THE WITNESS:  It could explain how you
6  move from a denial to an admission, but it's a
7  stretch.  And what I thought I was getting at in
8  the report was that it isn't consistent with
9  what we know leads to proven false confessions.
10     Q   (By Ms. Golden) If you eliminate what
11 Mr. Reyes says about his custodial interrogation and
12 only credit the testimony of Mr. -- or ASA O'Malley,
13 Detective Guevara, Detective Dickenson, and
14 Detective Rutherford, their accounts of the
15 custodial interrogation are not inconsistent with
16 Mr. Reyes's guilt, correct?
17     MR. ART:  Objection, incomplete
18 hypothetical.  Is he disregarding Solache's
19 testimony as well or just Reyes's?
20     Q   (By Ms. Golden) Well, so you don't -- you
21 don't address Mr. Solache's testimony in the portion
22 of your report that addresses no, he doesn't need
23 to disregard Solache's testimony because Solache
24 wasn't there.

Richard A. Leo, PhD, JD, 9/29/2022

541

1    MR. ART: Okay. Same objection, and he's
2  disregarding all the evidence in the case
3  except for those officers you just testified
4  about?
5    Q  (By Ms. Golden) So, if Mr. -- if Mr. Reyes
6  is guilty and there is no other -- oh, forget it.
7    Mr. Reyes's guilt is enough to -- hold on,
8  let me just find the report. It's so hard without
9  the report.
10    I mean do you conceive of the possibility
11  that Mr. Reyes confessed because he's guilty.
12    MR. ELSON: Objection to the form.
13    THE WITNESS: I don't think, as I mentioned
14  earlier, generally somebody's guilt explains
15  specifically enough why they would confess even
16  if they are guilty unless it's a spontaneous
17  confession. They would still, even if they are
18  guilty hypothetically be responding to police
19  interrogation pressure or techniques or tactics
20  even if it was not a super long interrogation.
21    So, I resist the language generally that
22  somebody confesses because they're guilty. It's
23  too vague and ambiguous unless they spontaneously
24  confess in the absence of interrogation. And

542

1    even there I might rephrase it a little bit
2  differently.
3    So, if -- if you hypothesize that -- for a
4  hypothetical question, that Mr. Reyes or Mr.
5  Solache are guilty because they were
6  interrogated, it would still be something else
7  or something broader that led them to confess
8  in your hypothetical.
9    Q  (By Ms. Golden) How many interrogations
10  have you personally observed?
11    A  Just a clarification, when you say
12  personally observed, am I correct to interpret you
13  to mean that I sat in on as they were occurring or
14  --
15    Q  Yes.
16    A  So, you do not mean electronically
17  recorded interrogations?
18    Q  Correct.
19    A  Okay. A hundred and twenty-two live
20  interrogations inside the Oakland Police Department.
21  Felony Investigative Divisions, there were five.
22  There were --
23    Q  Are you -- are you actually intentionally
24  lengthening your answers so I don't get to ask as

543

1  many questions as I would like?
2    MR. ELSON: That's absurd. You need to let
3  him finish his answer --
4    MS. GOLDEN: I'm just looking -- I'm just
5  looking at a transcript --
6    MR. ELSON: You just asked him how many
7  times he had been in interrogation, and he's
8  answering that question and told you --
9    MS. GOLDEN: He's answered -- he's
10  answering --
11    MR. ART: -- the number of times he's
12  participated in a particular location, and as
13  soon as he said as the first response to your
14  question, after asking for clarification, you
15  stopped him from speaking and you said to him,
16  "Are you trying to lengthen your answers to my
17  questions so I don't get as many questions."
18    I mean he's answering literally the only
19  thing you asked about with directly responsive
20  information. And badgering the witness in
21  response by interrupting his answer --
22    MS. GOLDEN: You've --
23    MR. ART: -- is totally inappropriate.
24    Q  (By Ms. Golden) You've been asked that

544

1  question before, and I'm looking at it in a
2  transcript --
3    MR. ART: He did not finish his answer.
4  Please stop interrupting my witness. He is
5  going to finish his answer before you interrupt
6  him and ask another question. Go ahead,
7  Doctor.
8    Q  (By Ms. Golden) Do you remember the
9  question?
10    A  Yes. I was right at the end of my answer.
11  All I was saying was that it -- that those occurred
12  in 1992 to 1993.
13    Q  So, the last time you personally observed
14  an interrogation was 1992 or 1993?
15    A  Correct.
16    Q  And it's true, is it not, that you can't
17  infer that just because someone was physically
18  tortured that the confession is false?
19    A  By that fact alone, correct. But, it
20  substantially increases the risk of getting a false
21  confession.
22    Q  All right. You've been offering expert
23  services -- I'm sorry. You've been offering
24  services as an expert witness since 1996 or 1997,

Richard A. Leo, PhD, JD, 9/29/2022

545

1    does that sound about right?
2        A    Correct.
3        Q    And I think that about 95 percent of your
4    work is testifying or working with criminal defense --
5    in criminal -- in criminal cases, is that also
6    correct?
7        A    That's my estimate.  I haven't counted it
8    up, but that's what I would estimate.  It might be
9    90 percent, but in that range.
10       Q    And when a criminal defense attorney
11   consults with you, it's because they want to develop
12   a defense that a false confession has occurred, is
13   that true?
14       A    Not necessarily, no.  There might be a
15   range of reasons why a criminal defense attorney
16   would consult with me.
17       Q    Have you ever testified that when a
18   criminal defense attorney consults with you, they're
19   consulting with you because they want to develop the
20   defense that a false confession has occurred?
21       MR. ELSON:  Objection to the form.
22       THE WITNESS:  I might have testified to
23   that, but if I was allowed to give a fuller
24   answer, I would have given the answer that I

547

1    accusing her of misrepresenting the testimony.
2    That's wonderful.
3        MR. ART:  I am accusing her of not
4    providing the witness with a document and
5    characterizing the testimony in a way favorable
6    to the defense in this case in order to make a
7    point.
8        And I think if she wants to ask questions
9    about the reasons Dr. Leo gave testimony in a
10   past case that we are not identifying, she
11   should provide the transcript that she's
12   questioning based on.
13       MS. ROSEN:  Well, it's her -- as your
14   office has repeatedly told us when your people
15   are asking questions, it's her -- it's her time
16   to ask the questions in her way and you should
17   stop being offensive and accusing her of
18   misrepresenting the transcript.
19       MR. ART:  Okay --
20       MS. GOLDEN:  Steve, if I have -- if I have
21   impeachment evidence, I will provide it to you
22   but --
23       MR. ART:  If you're going to ask questions
24   --

546

1        just gave right now.
2        Q    (By Ms. Golden) You think when you gave
3    that testimony you were cut off?
4        MR. ART:  Objection to form.
5        MR. ELSON:  Objection to the form.
6        MR. ART:  Are you going to show us the
7    testimony?
8        MS. GOLDEN:  No.
9        MR. ART:  So, we're just taking your word
10   for it that he gave testimony?
11       Q    (By Ms. Golden) Do you think -- can you
12   answer the question?
13       MS. ROSEN:  You're accusing her of
14   misrepresenting a transcript?
15       MR. ART:  Yes, and I'm asking to see the
16   transcript.
17       MS. GOLDEN:  I will give it to you later.
18       Q    (By Ms. Golden) Doctor Leo, do you --
19       MS. ROSEN:  That is inappropriate.
20       MR. ART:  Provide us the document that
21   you're supposedly cross examining him about so
22   that we can see it and answer questions about
23   the testimony.
24       MS. ROSEN:  You are too much.  You're

548

1        MS. GOLDEN:  -- we need to move on.
2        MR. ART:  Okay.  So, if you're going to
3    ask questions about sworn testimony in other
4    cases, I'd like to see it so the witness can
5    read the testimony before he answers questions
6    about it.
7        MS. GOLDEN:  That's -- that's just not how
8    it works, but anyway --
9        Q    (By Ms. Golden) Does your report contain
10   any conclusion that Mr. Solache or Mr. Reyes has an
11   intellectual disability or disorder or are mentally
12   ill?
13       A    Not in my report.
14       Q    Does either Mr. Solache or Mr. Reyes --
15   were either of them juveniles at the time they
16   confessed?
17       A    No.
18       Q    Does your report contain any conclusion
19   that Mr. Solache or Mr. Reyes had a low IQ or low
20   level of cognitive functioning?
21       A    No.
22       Q    Okay.  Can we go to Exhibit 1, Page 164,
23   please.  And are you aware, Dr. Leo, of -- I'm
24   sorry.  First of all, when you -- when you testify

Richard A. Leo, PhD, JD, 9/29/2022

549

1   in a motion to suppress, generally what is the
2   purpose of your testimony?
3       A    Generally the purpose of the testimony
4   is to educate the judge about the psychological
5   research literature on police interrogation,
6   psychological coercion, and sometimes unreliable
7   confessions or statements, and then to provide an
8   analysis of which techniques were used in the
9   particular interrogation and what the research says
10  about those techniques or what the findings have
11  been that bears on the judge's decision about
12  whether to admit or exclude the confession statement
13  that was the product of the interrogation.
14          There are some cases, not a majority, but
15  some cases where the interrogation is of a witness,
16  and so it's -- it's the same reason, that it doesn't
17  apply to the suspect.
18      Q    And the decision being made in a motion to
19  suppress is whether or not typically to suppress a
20  confession, correct?
21          MR. ELSON:  Objection to form.
22          THE WITNESS:  Correct.
23      Q    (By Ms. Golden) Okay.  And then if the
24  motion to suppress is denied, does that necessarily

550

1   mean that the confession was not given involuntarily?
2           MR. ELSON:  Objection to form.  Answer if
3   you can.
4           THE WITNESS:  Well, if -- if the -- if the
5   defense attorney is arguing that it was
6   involuntary and the judge admits the confession,
7   doesn't exclude it and says it was voluntary,
8   then as a matter of law the confession has been
9   found to be voluntary.  It may be the case that I
10  have opined that as a matter of psychology it was
11  my opinion that psychologically coercive
12  techniques were used, but the judge has made the
13  legal decision, which is how I understand your
14  question.
15      Q    (By Ms. Golden) Okay.  I think so.  Do
16  you -- in the pages -- let's go to Page -- let's go
17  down 1, 2, 3, 4 -- go to the deposition section.  Do
18  you see the cases listed here on Page 167 of Exhibit
19  1?
20      A    I do.
21      Q    Okay.  Did you issue a report in any of
22  these cases -- I'm sorry, strike that.
23          Did you testify in any of these
24  depositions that the confession statement at issue

551

1   met the criteria for a proven false confession?
2       A    I do not recall whether I did.  I believe
3   -- I would have to look at the transcripts.  I
4   believe that in the Henry Lee McCollum case, that's
5   four up from the bottom, my recollection is that
6   that was not disputed.  I may be wrong, but I would
7   have to review the testimony.
8       Q    Have you testified at trial in any of
9   these cases that are listed here as those in which
10  you gave deposition testimony?
11      A    I testified in the Henry Lee McCollum case
12  at the civil trial.  I did not testify in any of
13  the -- I do not believe I testified in any of these
14  other cases.  I don't think any of the other cases
15  went to or have gone yet to trial.
16      Q    And sometimes when you testify -- well, do
17  you generally find out what happens in the case
18  after you testify?
19      A    Usually I inquire if I'm not told, and
20  usually I'm told but not always.
21      Q    Do you have any estimate as to the number
22  of times in which you've testified in a motion to
23  suppress and the suspect has pled guilty to the
24  crime?

552

1           MR. ELSON:  Objection to the form.
2           THE WITNESS:  I do not know and I don't
3   have an estimate that would be better than a
4   guess, and I don't want to guess.
5       Q    (By Ms. Golden) But it's happened, right?
6       A    Yes.
7       Q    And has it also happened that you testify
8   at a motion to suppress and the judge makes a
9   determination that the confession was not
10  involuntary?
11          MR. ELSON:  Objection to form.
12          THE WITNESS:  Yes.
13      Q    (By Ms. Golden) And do you have any
14  estimate as to the number of times that that's
15  happened?
16      A    I would say more than fifty percent, but I
17  don't know how much more than fifty percent.
18      Q    So, fifty percent of the times you've
19  testified at a motion to suppress the confession is
20  allowed to be used as evidence at trial?
21      A    I think that misstates my testimony.  I
22  would say more than fifty percent.  I just -- I'm
23  reluctant to provide an estimate above that because
24  I just don't know.

Richard A. Leo, PhD, JD, 9/29/2022

553

1    Q   Okay.  And sometimes when you testify at
2  trial the criminal defendant is found guilty,
3  correct?
4    A   Correct.
5    Q   And do you have any estimate as to the
6  number of times you testified at trial that the
7  criminal defendant is found guilty?
8    A   No.  I would just be guessing and I don't
9  want to guess.
10    Q   And it's my understanding from
11  correspondence with your counsel that you've never
12  testified in a criminal case that a particular
13  confession met the criteria for a proven false
14  confession, is that right?
15    A   I don't recall ever testifying in a
16  criminal case to that.
17    Q   Okay.  I apologize if we've covered this,
18  but the false evidence ploy is a perfectly legal
19  technique, correct?
20    MR. ELSON:  Objection to the form.
21    THE WITNESS:  I would say that it's --
22  it's legal, but "perfectly" might not be the
23  right word to attach to it because you could
24  and sometimes do have false evidence ploys that

554

1  imply leniency or threaten harsher punishment.
2  And in that case the false evidence ploy would
3  be suppressed by a judge as unlawful.
4    But usually false evidence ploys in our
5  system are considered lawful, and by themselves
6  don't result in involuntary confessions.
7    Q   (By Ms. Golden) Have you ever under oath
8  described the false evidence ploy as a perfectly
9  legal technique?
10    MR. ELSON:  Objection to the form.
11    THE WITNESS:  Without seeing the
12  transcript I don't know, but if I had, I would
13  say -- I would -- I would say that I overstated
14  that because there are some circumstances in
15  which false evidence ploys, as I just
16  mentioned, would not be perfectly lawful, and
17  that would be if they implied threat or promise
18  or otherwise caused an involuntary confession
19  or statement.
20    Q   (By Ms. Golden) It's true, is it not, that
21  a true evidence -- that convicting a guilty suspect
22  with evidence that is, in fact, true is very
23  powerful to persuade them to admit to their
24  involvement in a crime?

555

1    MR. ELSON:  Objection to form.
2    THE WITNESS:  I would say that it's a
3  powerful interrogation technique psychologically,
4  yes, whether it's a true evidence ploy or a false
5  evidence ploy.
6    Q   (By Ms. Golden) But confronting a guilty
7  suspect with evidence of his guilt that he knows to
8  be true is very persuasive, correct?
9    MR. ART:  Objection, form, asked and
10  answered.
11    THE WITNESS:  It can be persuasive, yes.
12    Q   (By Ms. Golden) I would think so.  And
13  those confessions are true or mostly true, is that
14  correct?
15    MR. ART:  Objection to the form.
16    THE WITNESS:  That is the conventional
17  wisdom.  We don't know what percentage of
18  confessions are true or partially true, or false
19  or partially false, but that is the conventional
20  wisdom.
21    Q   (By Ms. Golden) Okay.  So, as I understand
22  your opinion and -- your opinions in this case,
23  sometimes in order to terminate the stress of an
24  interrogation, the suspect might confess falsely

556

1  just to get out of there, right?
2    A   Correct.  The longer the interrogation
3  goes or the more risk factors are used or the more
4  psychologically or physically coercive the
5  interrogations.
6    Q   And they can also confess truthfully just
7  to get out of there, right?
8    MR. ELSON:  Objection, form.
9    THE WITNESS:  That's true.  That is a
10  possibility generally.
11    Q   (By Ms. Golden) Do you have a degree in
12  psychology?
13    A   I do not have a degree in psychology.  As I
14  mentioned earlier, it's an interdisciplinary social
15  science degree.  I have been a professor of psychology
16  and I am considered a social psychologist, but I don't
17  have a formal degree in psychology.
18    Q   What does it mean to objectively establish
19  something?
20    A   That it's -- it's verifiable.
21    Q   And it's -- it's pretty much common sense,
22  is it not, that if a crime -- that if a person
23  confesses to a crime that didn't happen, it's a false
24  confession?

Richard A. Leo, PhD, JD, 9/29/2022

557

1    MR. ART: Can you let me know what you
2  mean by "it is pretty much common sense"?
3    Q   (By Ms. Golden) Well, what do you think
4  common sense means?
5    MR. ART: Objection to the form.
6    Q   (By Ms. Golden) Let me -- I'll try to
7  phrase it differently.
8    Don't you think that the average person
9  can understand without the aid of expert testimony
10  that if a person confessed to a crime that they
11  didn't commit that their confession must be false?
12    MR. ELSON: Objection to the form.
13    THE WITNESS: No, I think that's a
14  tautological question. What the research
15  shows is that people don't by and large
16  understand why false confessions occur. It
17  doesn't make sense to them. They don't
18  understand why if they're told that somebody
19  falsely confessed why they would have falsely
20  confessed unless they were tortured or
21  mentally ill.
22    Q   (By Ms. Golden) You don't think that the
23  average person can understand that if there was no
24  crime that the confession can't be true?

558

1    MR. ELSON: Objection to form.
2    THE WITNESS: I do -- I think that's a
3  different question. I do think that if the
4  murder victim, for example, showed up alive
5  that people would understand, yeah, the
6  confession has to be false. But, I don't think
7  they would understand why somebody gave a false
8  confession, or how often false confessions have
9  been documented, why they happen in such
10  apparently large numbers.
11    Q   (By Ms. Golden) Isn't it also pretty
12  easy to understand -- isn't it also fair to say that
13  the average person could understand that if a person
14  was in Mexico at the time a crime was committed in
15  Chicago, that they couldn't have committed the
16  crime, and that's like the alibi defense that's
17  presented all the time, right?
18    MR. ART: Objection.
19    THE WITNESS: Yeah, you've asked a
20  compound question. So, on the second question,
21  I don't know if it's an alibi defense that is
22  presented all the time. I would certainly be
23  surprised if in Chicago it was presented all
24  the time that the defendant was in Mexico, but

559

1  I just don't know.
2    I think that if there was objective
3  evidence indicating that somebody in Chicago
4  was in Mexico, and then a case was dismissed
5  because of that, I think people would
6  understand that, yes, you can't be in two
7  places at the same time. But again, I don't
8  think they would understand why a person would
9  have falsely confessed to that, or likely
10  understand, unless that person was tortured or
11  mentally ill.
12    Q   (By Ms. Golden) On Page 53 of your report,
13  in Section B at the bottom there, in the middle of
14  the first paragraph, it says, "Physical evidence
15  left by the true perpetrators at the very bloody
16  crime scene." Do you see that reference there?
17    A   Yes.
18    Q   And by "the very bloody crime scene,"
19  you're referring to the Soto home, correct?
20    MR. ELSON: Objection, asked and answered.
21    THE WITNESS: Correct.
22    Q   (By Ms. Golden) And what evidence, what
23  physical evidence was left by the true perpetrator
24  at the very bloody crime scene?

560

1    MR. ART: Objection to the form.
2    MR. ELSON: Objection, asked and answered.
3    THE WITNESS: Well, presumably DNA
4  evidence at the very least because we have a
5  DNA match to two people at least.
6    Q   (By Ms. Golden) I misunderstood you then.
7  I thought you were saying that the true perpetrator --
8  and maybe this was somewhere else in your report and I
9  just have the wrong reference -- left DNA at the crime
10  scene that was discovered. Is that not your position?
11    A   No. It's my position that at a crime
12  scene that bloody, that blood soaked, where somebody
13  had been stabbed more than fifty times, or two people
14  rather, combined, that almost certainly the true
15  perpetrator would have left their DNA at that crime
16  scene. And in fact, that we have two people's DNA
17  at that crime scene and we do not have Mr. Reyes' or
18  Mr. Solache's DNA at that crime scene.
19    Q   Is it your belief that the unidentified
20  male DNA profile was found in the Soto home?
21    MR. ART: Objection to the form.
22    THE WITNESS: I don't recall specifically
23  if the unidentified male DNA was found in the
24  home or if it was found in the car. I would

Richard A. Leo, PhD, JD, 9/29/2022

561

1  have to review materials to refresh my
2  recollection, but I believe it was found in one
3  of those two places.
4       Q   (By Ms. Golden) Have you ever been allowed
5  to testify that one person's account of a custodial
6  interrogation fits with your research and another
7  person's does not?
8       MR. ART:  Objection to the form.
9       THE WITNESS:  In the way that you phrased
10  the question, I don't believe so because when I
11  testify I'm not testifying about my research
12  in particular.  I'm a small part of a very
13  large field and body of research on these
14  subjects.  But I do believe there have been
15  some cases where I have been allowed to testify
16  that a piece of evidence or an account is
17  consistent with findings or inconsistent with
18  findings from the research literature.
19       I don't recall a specific case on hand,
20  but I do believe in some cases I have been
21  allowed to discuss whether something is or is
22  not consistent with findings in the research
23  literature.
24       MR. ART:  We're at fourteen hours now.

562

1       MS. GOLDEN:  I don't -- are we quite
2  there?  I think we have a few minutes left, I
3  was just going to take a break and --
4       MR. ART:  Yeah, no, I think we're at
5  fourteen hours.  Let's -- if you want to take a
6  break and go off the record you can, and we'll
7  get the time.  But if we are at fourteen we
8  are done for the day.
9       THE VIDEOGRAPHER:  We are at fourteen
10  hours.
11       MR. ART:  That is the end of the time
12  allotted for Dr. Leo's deposition.  We will
13  reserve signature.
14       MS. GOLDEN:  Thank you, Dr. Leo.
15       MS. ROSEN:  Thank you, Dr. Leo.
16       THE WITNESS:  Thank you.
17       THE VIDEOGRAPHER:  We're off the video
18  record at 6:41 p.m.
19
20
21
22
23
24

563

1              CERTIFICATE OF REPORTER
2
3       I, RUTH S. MORRIS, an Illinois Certified
4  Shorthand Reporter, do hereby certify that the witness
5  whose testimony appears in the foregoing deposition
6  transcript was duly sworn by me; that the testimony of
7  said witness was taken by me to the best of my
8  ability, and thereafter reduced to typewriting under
9  my direction; that I am neither counsel for, related
10  to, nor employed by any of the parties to the action
11  in which this deposition was taken; and further, that
12  I am not a relative or employee of any attorney or
13  counsel employed by the parties hereto; nor am I
14  financially or otherwise interested in the outcome of
15  this action.
16       IN WITNESS WHEREOF I have hereunto set my
17  hand this 17th day of October, 2022.
18
19
20       _____
21              Ruth S. Morris
22              IL CSR 084.002322
23
24

564

1  STATE OF _____)
2  COUNTY OF _____)
3       I, RICHARD LEO, do hereby certify:
4  That I have read the foregoing deposition transcript;
5  That I have made such changes in form and/or substance
6  to the transcript as might be necessary to render the
7  same true and correct;
8       That having made such changes thereon, I
9  hereby subscribe my name to the transcript.
10       I declare under penalty of perjury that the
11  foregoing is true and correct.
12       Executed this _____ day of _____,
13  2022.
14
15       _____
16              Richard Leo
17
18
19  _____
20       Notary Public
21  My commission expires: _____.
22
23
24