Exhibit 123

Richard Leo, 4/24/2023

1

```
                  IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

ARTURO DELEON-REYES,             )
                Plaintiff,       )
                                 )
                -vs-             )Case Number 18 CV 01028
                                 )
REYNALDO GUEVARA, et al.,        )
                Defendants.      )
*****************************
GABRIEL SOLACHE,                 )
                Plaintiff,       )
                                 )
                -vs-             )Case Number 18 CV 02312
                                 )
REYNALDO GUEVARA, et al.,        )
                Defendants.      )
```

VIDEOTAPED

AUDIO-VIDEOCONFERENCE DEPOSITION

RICHARD LEO

a witness herein, called for examination pursuant to Notice

and the Federal Rules of Civil Procedure as they pertain to

the taking of depositions before Lea Ruth Cohen, CSR, and a

Notary Public in and for the County of Peoria, State of

Illinois, on Monday, April 24, 2023, commencing at the hour

of 11:04 a.m., via Zoom platform.

Richard Leo, 4/24/2023

## 2

```
1
2     ALL APPEARANCES VIA ZOOM:
         SEAN C. STARR, ESQUIRE
3            a n d
         RACHEL BRADY, ESQUIRE
4         Loevy & Loevy
       311 North Aberdeen Street, Third Floor
5         Chicago, Illinois 60607
            (312)243-5900
6           sean@loevy.com
           rachel@loevy.com
7     on behalf of Plaintiff Arturo Deleon-Reyes;

8        BEN ELSON, ESQUIRE
         People's Law Office
9      1180 North Milwaukee Avenue, Third Floor
         Chicago, Illinois 60622
10          (773)235-0070
          ben.elson79@gmail.com
11    on behalf of Plaintiff Gabriel Solache;

12       MICHAEL SHALKA, ESQUIRE
             a n d
13       NORA SNYDER, ESQUIRE
       Leinenweber Baroni & Daffada, LLC
14     120 North LaSalle Street, Suite 2000
         Chicago, Illinois 60603
15          (866)786-3705
            mjs@ilesq.com
16    on behalf of Defendant Reynaldo Guevara;

17       CAROLINE GOLDEN, ESQUIRE
         The Sotos Law Firm, P.C.
18     141 West Jackson Boulevard, Suite 1240A
         Chicago, Illinois 60604
19          (630)735-3300
           CGolden@jsotoslaw.com
20    on behalf of individual police officer Defendants;

21       EILEEN E. ROSEN, ESQUIRE
         Rock Fusco & Connelly, LLC
22     321 North Clark Street, Suite 2200
         Chicago, Illinois 60654
23          (312)494-1000
            erosen@rfclaw.com
24    on behalf of Defendant City of Chicago;
```

## 3

```
1          ALSO PRESENT VIA ZOOM:
2     NICK TROTTA, Certified Legal Videographer
         ROBYN FALASZ, Exhibit Technician
3          Urlaub Bowen & Associates
          20 North Clark Street, Suite 600
4       Chicago, Illinois 60602(312)781-9586
            ntrotta@urlaubbowen.com
5            robin@urlaubbowen.com.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## 4

```
1                  I N D E X
2
      Called on behalf of Defendant City of Chicago:
3
      RICHARD LEO
4
      Direct Examination by Ms. Rosen        6
5
      Cross-Examination by Ms. Golden      153
6
7
8
9
10    Exhibit       Page      Description
11
      Exhibit 01 . . . 15   4/11/2019 Invoice No. 1
12
      Exhibit 02 . . . 17   2/1/2022 Invoice No. 2
13
      Exhibit 03 . . . 21   4/7/2023 Invoice
14
      Exhibit 04 . . . 24   1/31/2023 Leo report
15
      *Exhibit 06  . . 39   Monell opinion
16
      *Exhibit 08  . . 121    LEO2268-2358
17
18
19
20
21
22
23              *(Indicates skip in sequence.)
24
```

## 5

```
1          THE VIDEOGRAPHER:  Good morning.  This is
2     the beginning of Media Unit 1.  We are now on the video
3     record at 11:04 a.m.
4          This is the videotaped video-conferenced
5     discovery deposition of Dr. Richard Leo being taken on
6     April 24th, 2023.  This deposition is being taken on the
7     behalf of the Defendant in the matter of Arturo
8     Deleon-Reyes versus Reynaldo Guevara, et al.  The case
9     numbers are 18 CV 1028 and 18 CV 2312, filed in the United
10    States District Court for the Northern District of
11    Illinois, Eastern Division.
12          My name is Nick Trotta, Legal Videographer,
13    representing Urlaub Bowen & Associates with offices at 20
14    North Clark Street, Suite 600, Chicago, Illinois.  The
15    court reporter today is Lea Cohen, also of Urlaub Bowen &
16    Associates.
17          Counsel, please identify yourselves for the video
18    record and the parties which you represent.
19          MR. ELSON:  Ben Elson and Nora Snyder for
20    Gabriel Solache.
21          MR. STARR:  Sean Starr on behalf of Arturo
22    Reyes.
23          MS. ROSEN:  Eileen Rosen on behalf of
24    Defendant City of Chicago.
```

Richard Leo, 4/24/2023

6

1    MS. GOLDEN:  Caroline Golden for the
2    individual officer Defendants.
3        MR. SHALKA:  And Michael Schalka on behalf
4    of Defendant Guevara.
5        THE VIDEOGRAPHER:  Will the court reporter
6    please swear in the witness?
7            (Witness sworn.)
8            RICHARD LEO,
9    having been called on behalf of Defendant City of Chicago,
10   being first duly sworn, was examined and testified
11   as follows:
12       DIRECT EXAMINATION
13   BY MS. ROSEN:
14       Q.  Good morning, Dr. Leo.  How are you doing today?
15       A.  Good morning.  Thank you.  Good.
16       Q.  Can you tell me, do you have anything in front of
17   you today as you're taking your deposition?
18       A.  I do, yeah, I have four things in front of me.  I
19   have my rebuttal report to Dr. Welner, I have the
20   Dr. Welner report, and I have Bates-stamps notes that were
21   produced to you from the last deposition, and then I have
22   my original report in Reyes and Solache.
23       Q.  And the notes that you have in front of you, the
24   ones that are Bates-stamped, are they Bates-stamped LEO2268

7

1    through LEO2358?
2        A.  Yes.
3        Q.  And the version of the notes that I have been
4    provided are typewritten but then they also have some
5    handwriting on them.  Is that the same version that you
6    have?
7        A.  Yes.
8        Q.  Generally speaking, the handwriting that's on the
9    notes that are Bates-stamped 2268 through 2358, is that
10   handwriting your handwriting?
11       A.  Yes.
12       Q.  Since these documents were produced to us, have
13   you added any additional handwriting to the notes?
14       A.  No.
15       Q.  The rebuttal report that you have in front of
16   you, does it have any handwritten notes added to it?
17       A.  No.
18       Q.  Dr. Welner's report that you have in front of
19   you, does it have handwriting on it?
20       A.  Yeah, this Dr. Welner's notes does have some
21   handwriting, not much, and some underlining.
22       Q.  So Dr. Welner's report?  Is that what you mean?
23       A.  Yeah.  My copy of Dr. Welner's report I did
24   underline and make some notes on, yes.

8

1        Q.  When did you underline and make the notes on the
2    hard copy of Dr. Welner's report that you have in front of
3    you?
4        A.  I don't recall.
5        Q.  Your original report that you have in front of
6    you, does it have any handwriting or notations on it?
7        A.  Yes, it does.
8        Q.  When did you make the notes and handwriting on
9    your report?
10       A.  I believe it was in preparation for my two
11   depositions by you in late September.
12       Q.  Is that the same copy of your report that you had
13   in front of you when you were answering questions back in
14   September?
15       A.  Yes.
16       Q.  Have you added any additional notes --
17       A.  No.
18       Q.  Let me just finish my question so it's clear for
19   the record.
20           Have you added any additional notes or
21   handwritings to the original report, the original report
22   that you have in front of you, since your two depositions
23   in September?
24       A.  No.

9

1        Q.  When you were answering questions in your
2    deposition in September, did you have the report with your
3    handwritten notes in front of you to assist you in
4    answering questions?
5            MR. ELSON:  Hold on, Dr. Leo.  I'm going to
6    insert an objection here.  I don't think -- I think this
7    material is covered by privilege which is consistent with
8    the objection we asserted during the last session of the
9    deposition.
10           Given the meet-and-confer that we had on this
11   issue prior to today's deposition, I'll allow him to answer
12   this question but subject to the same conditions that we
13   produced the notes under and allowed him to answer
14   questions on this topic before.  We are not waiving any
15   privilege here, but I'll allow him to answer this question.
16           Do you need it read back?
17           THE WITNESS:  Yeah, that would be helpful.
18   Thank you.
19           MR. STARR:  I would just like to join that
20   objection.  Eileen, if it's convenient for you, I would
21   have a standing joiner of any objections that Ben makes.
22           MS. ROSEN:  Yeah, that's fine.
23           MR. STARR:  Okay, thank you.
24           (Record read as follows:

Richard Leo, 4/24/2023

10

1      "Question: When you were answering
2      questions in your deposition in
3      September, did you have the report with
4      your handwritten notes in front of you
5      to assist you in answering questions?"
6      A. To the best of my recollection, I had the report
7   in front of me with the notations on the report. There is
8   no -- what I'm referring to is not any separate handwritten
9   notes as the question implies but notes that are written or
10  underlinings on the report itself.
11     Q. I did not mean to imply by my question that you
12  had additional separate notes. It's my understanding that
13  the notes that you have in front of you during the
14  September deposition comprise the notes that were produced
15  to us after the fact that are currently Bates-stamped
16  LEO2268 through 2358. Do I have that correct?
17     A. It's possible that I misunderstood your question.
18  I thought you were referring to notations that I made on my
19  January 15th, 2022 report.
20     Q. Okay, hold on one second, let me make it clear
21  because I think there might be some confusion. So just so
22  that we're clear about what we're talking about.
23         So we have -- you have in front of you today four
24  hard copy documents, correct?

11

1      A. Yes.
2      Q. And you have in front of you your Guevara report
3   that has no notations or handwritten notes on the actual
4   document itself, correct?
5      A. Correct.
6      Q. Okay. You also have Dr. Welner's report which
7   does have your handwritten notes and some underlining, I
8   believe is what you said, correct?
9      A. Yes, on the document itself.
10     Q. Correct. You have no separate notes related
11  specifically to your rebuttal report, correct?
12     A. Correct.
13     Q. You have no separate notes related specifically
14  to Dr. Welner's report, correct?
15     A. Correct.
16     Q. Okay.
17         MR. ELSON: Objection to the form of that
18  last question. Go ahead.
19     Q. And then you also have the notes that you had in
20  front of you when you were answering questions in your
21  September depositions to assist you in answering questions,
22  you have those in front of you, correct?
23     A. Correct.
24     Q. Okay. And there are handwritten notes and

12

1   underlining and other notations on the notes that are
2   Bates-stamped 2268 through 2358, but those notations and
3   the handwriting are the same as they were at the time of
4   your deposition and the same as what was produced to us
5   after your deposition, correct?
6      A. To the best of my memory, yes.
7      Q. Okay. Then you also now today have a copy of
8   your original report in front of you, correct?
9      A. Correct.
10     Q. And you also had -- strike that.
11         The copy of the original report that you have in
12  front of you today contain notes and handwriting on it,
13  correct?
14     A. Some, correct, yeah, underlining and notations,
15  yes.
16     Q. That's your underlining and your notations,
17  correct?
18     A. Correct.
19     Q. And the notations and the handwriting that you've
20  just described that is on the actual report, the hard copy
21  of the report, those are the same notes and handwriting
22  that were on the original report at the time of your
23  September depositions, correct?
24     A. To the best of my memory, yes.

13

1      Q. Okay. And did you use that report with the notes
2   and the handwriting on it to assist you in answering
3   questions during your two sessions of deposition in
4   September?
5      A. I don't recall.
6      Q. Did you have that same report in front of you as
7   you were answering questions in September?
8      A. Yeah, most likely, but I don't recall.
9      Q. What did you do to prepare for your deposition
10  today?
11     A. I reviewed the four documents that we just
12  discussed and I spoke to counsel on the phone.
13     Q. When did you review the documents?
14     A. I reviewed them over the weekend.
15     Q. How much time did you spend reviewing the
16  documents?
17     A. I would estimate maybe five hours total, maybe a
18  little bit more, maybe a little bit less.
19     Q. When did you speak to counsel?
20     A. I spoke to counsel this morning and one of the
21  days, I'd have to look at my notes, one of the days towards
22  the end of last week, probably Thursday.
23     Q. When you spoke to counsel last week, who
24  specifically did you speak with?

Richard Leo, 4/24/2023

14

1    A.   Ben Elson, Nora Snyder and Steve Art.
2    Q.   How long did that conversation with Ben, Nora and
3  Steve last?
4    A.   So Nora may not have been on the conversation
5  last week, I'd have to look at my notes.  My best
6  recollection is that conversation lasted a half-hour, give
7  or take.
8    Q.   And the conversation this morning that you had
9  with counsel, who specifically did you have that
10  conversation with?
11    A.   Again, Ben Elson, Steve Art and Nora Snyder.
12    Q.   And how long did that conversation this morning
13  last?
14    A.   Again, I'd have to look at my time sheet, but my
15  estimate would be around 20 minutes.
16    Q.   When you say you would have to look at your time
17  sheet, what are you referring to?
18    A.   I'd have to look at my notation about when the
19  conversation started and ended or I'd have to look at my
20  iPhone and see what it says about how long that
21  conversation was.
22    Q.   Do you typically track -- keep track of the
23  amount of time you spend speaking with counsel --
24    A.   Yes.

15

1    Q.   -- so that you can eventually invoice them,
2  correct?
3        MR. STARR:  Objection to form.
4    A.   Correct.  Sorry.
5        MS. ROSEN:  Did we get an answer?  Is that
6  correct?
7        THE REPORTER:  "Correct."
8  BY MS. ROSEN:
9    Q.   Other than reviewing the documents and the two
10  conversations you described, have you done anything else to
11  prepare for your deposition?
12    A.   Not specifically, no.
13    Q.   Let's take a look at what we've marked as
14  Exhibit Number 1 which will get put up on the screen.  This
15  is one of your invoices --
16        (Remote screen sharing.)
17    Q.   -- Dr. Leo, which I believe we looked at last
18  time, but I just want to make sure I have now all of your
19  invoices and that they're current for all of the work
20  you've done up until the last week or so.
21        This is an invoice dated April 11th, 2019, it
22  says Reyes/Solache Cases, says Invoice No. 1.  If we go to
23  the -- I believe it's the next page of the document we can
24  see that the time frame of the invoice is through

16

1  February 4th, 2019, and it looks like the total amount of
2  hours since October 11th, 2018, which is the first
3  entry on the first page of the document, and
4  February 4th, 2019, is 50.4 hours.  Do you see that
5  there?
6    A.   I do, yes.
7    Q.   And is that an accurate reflection of the amount
8  of time you spent between October 2018 and February 2019
9  working on the Solache/Reyes cases?
10    A.   It should be, yes.
11    Q.   And then on the second page of Exhibit Number 1
12  we see at the bottom there, Minus retainer check -- you
13  don't need to scroll, sorry -- of $7,500.  Is that just the
14  typical retainer that you request when you -- at the
15  inception of a case when you begin consulting?
16    A.   That number has changed over the years and it
17  sometimes changes in response to particular cases where I'm
18  privately retained.  So I don't know that that number is
19  typical.
20    Q.   Okay, fair enough.  So we know that through
21  February "14th," 2019, you billed 50.4 hours on this
22  matter, correct?
23    A.   I think you said February 14th.  It looks like
24  February 4th.

17

1    Q.   I did, you are correct.  I apologize.
2        So through February 4th, 2019, you billed 50.4
3  hours in total for the work you completed in connection
4  with these two cases, correct?
5    A.   I believe so.
6    Q.   Then, if we can look at Exhibit Number 2, this is
7  again an invoice that was provided to us in connection with
8  the Solache and Reyes cases, it says Invoice No. 2, and
9  then this invoice has the dates July 24th, 2019 through
10  January 15th, 2022.  Do you see that there?
11    A.   Yes.
12    Q.   I think we talked about it the last time at your
13  deposition that the form of this invoice is different in
14  that it's not itemized, it's just for a global period of
15  time, correct?
16    A.   I believe so.
17    Q.   Do you have separate records where you itemize
18  the hours that you spent so that when you prepare an
19  invoice like this one that spans six months or so --
20  actually, more than that, it's from 2019 to 2022 so 18
21  months or so, so that you can accurately invoice the
22  client?
23        MR. ELSON:  Objection to the form, and also
24  I'm objecting to the extent that this line of questioning

Richard Leo, 4/24/2023

18

1  implicates privilege under Rule 26(b)(4)(B) and (C). I'm
2  not going to instruct you not to answer this question. You
3  can answer this question, but I want to caution you that
4  any answer you give related to communications between
5  counsel or drafts of any type of disclosure is privileged
6  under the rule and we would not -- we would instruct you
7  not to answer those questions.
8      MR. STARR:  We again join.
9      MR. ELSON:  You can answer this question.
10  A.  Okay.  So can the question be read back?
11      (Record read as follows:
12      "Question:  Do you have separate
13      records where you itemize the hours
14      that you spent so that when you prepare
15      an invoice like this one that spans six
16      months or so -- actually, more than
17      that, it's from 2019 to 2022 so 18
18      months or so, so that you can
19      accurately invoice the client?"
20  A.  Yes.
21  Q.  And do you maintain those records until today or
22  do you destroy them after you send the invoice?
23  A.  No, I maintain them.
24  Q.  Is there a reason that you didn't produce

19

1  those -- the records that you keep that separately itemize
2  the work that you did in response to the subpoena that you
3  received in this case?
4      MR. ELSON:  Objection to the form of the
5  question.  That question calls for an answer that would
6  divulge information that is privileged under Rule 26(b)(4)
7  (B) and (C), and I instruct you not to answer.
8      MS. ROSEN:  Carrie, were you saying
9  something?
10      MS. GOLDEN:  I was just going to, you know,
11  correct, because the rule specifically excludes from
12  privilege communications that relate to compensation so.
13      MS. ROSEN:  So we obviously disagree with
14  your instruction but we don't have to get into the debate
15  here.
16  BY MS. ROSEN:
17  Q.  Dr. Leo, I take it you're going to take your
18  attorney's advice and not answer the question, correct?
19  A.  Correct.
20  Q.  We're going to ask that you maintain those
21  records to the extent that we intend to pursue them --
22  well, I'm putting you on notice that we're going to likely
23  pursue those records.  So please do not destroy them and
24  please maintain them in a place where they can be

20

1  accessible if and when the parties agree to their
2  production or the Court orders it.  Okay?
3  A.  Yes.
4  Q.  Thank you.
5      If we scroll down a little bit on this document,
6  for this 18-month period of time or 18-month-or-so period
7  of time from July 24th, 2019 through January 15th,
8  2022, it looks like you spent 175.7 hours doing work in
9  this case, correct?
10  A.  Correct.
11  Q.  From this invoice, generally speaking, the work
12  that you are invoicing for includes email correspondence --
13  email correspondence, telephone consultation, review
14  analysis and synthesis of case materials, preparation of
15  report and revision of report.  Do I have that correct?
16  A.  Yes.
17  Q.  And just for frame of reference, the original
18  report was dated January 15th, 2022, so it looks like
19  this invoice covered the period of time leading up to the
20  preparation of and disclosure of the original report,
21  right?
22  A.  Correct.
23  Q.  And so up until January 15th, 2022, which is
24  when the original report was tendered, you had spent, if we

21

1  add the two invoices together, approximately 225 hours in
2  the various tasks that you did to prepare the
3  January 15th, 2022 report; is that correct?
4  A.  Well, I wouldn't agree with the wording because a
5  lot of that was not in preparation for the report, but I
6  think I would agree with the spirit of the question which
7  is in that I believe four-year period or roughly four-year
8  period, if you add the hours of the two invoices together,
9  then, yes, that's the amount of time that I spent on the
10  case.
11  Q.  Okay.  That's a fair point.  I assume part of the
12  time that you were reviewing materials was not necessarily
13  in preparation of the report, correct, that's the
14  distinction you're drawing?
15      MR. ELSON:  Objection to the form.
16  A.  Correct.
17  Q.  Okay.  Then, if we can look at Exhibit Number 3,
18  this is the invoice we just received in connection with our
19  request that you supplement your subpoena response.  This
20  invoice is dated April 7th, 2023, it covers activities
21  from March 18th, 2022, to March 16th, 2023, so
22  approximately a one-year period of time, correct?
23  A.  Yes.
24  Q.  Then this invoice generally describes that the

Richard Leo, 4/24/2023

22

1  activity being invoiced for includes email correspondence
2  with counsel, telephone consultation with counsel,
3  downloading and printing case materials, review and
4  analysis of case materials, preparation or revision of
5  rebuttal report.  Do you see that there?
6      A.  Correct.
7      Q.  And then the total amount of time for those
8  activities that covered the last year is 47 hours?
9      A.  Correct.
10     Q.  So in total the amount of time you spent doing
11 work on this case, excluding the amount of time that you
12 billed the Defendants for in your depositions in this
13 matter, totals approximately 275 hours' worth of work.  Do
14 I have that approximately correct?
15     A.  If that number is the sum of the three -- hours
16 on the three invoices, then that would be correct through
17 the date of the most recent invoice which is April 7th,
18 2023.
19     Q.  Right.  So it excludes whatever work you've been
20 doing between April 7th and today?
21     A.  Correct.
22     Q.  Okay.  Then this invoice talks about downloading
23 and printing case materials.  Did you receive new case
24 materials after you tendered your original report

23

1  January 15th, 2022?
2      A.  I don't recall if I did or not, but I do list in
3  my rebuttal report a few materials, I just don't -- that I
4  reviewed in preparation with the -- in preparation for the
5  rebuttal report, and I just don't recall when, other than
6  Dr. Welner's original report, when -- if I received those
7  prior to or after the September depositions.
8      Q.  In order to answer my question you were looking
9  at a document.  What document were you looking at?
10     A.  My rebuttal report for Dr. Welner dated
11 January 31st, 2023.
12     Q.  Okay.  We'll talk about the materials that you're
13 talking about when we get to that report.
14         But beyond that, as you sit here today you can't
15 recall any other case materials that you were provided that
16 you reviewed and analyzed, correct?
17     A.  Correct.
18     Q.  Or downloaded and printed, correct?
19     A.  Correct.
20     Q.  This invoice said that you had a telephone
21 consultation with David Owens.  Do you see that there?
22     A.  Correct.
23     Q.  Who does David Owens represent in this case?
24         MR. ELSON:  Objection to the form.

24

1      A.  I think David Owens is an attorney for Loevy and
2  Loevy.
3      Q.  Is it your understanding that he represents
4  Mr. Reyes?
5          MR. ELSON:  Objection to the form.
6      A.  It was, no -- it's my -- yes, if Loevy is the
7  firm that's representing Reyes then, yes, he would be part
8  of the firm that represents Mr. Reyes.
9      Q.  Let's take a look at what we've previously marked
10 as Exhibit Number 4 -- actually, let me go back.  Sorry.
11 Can we go back to the invoice, the current invoice or the
12 most recent invoice, Number 3.
13             (Remote screen sharing.)
14     Q.  Can you tell me approximately how much time you
15 spent preparing and revising your rebuttal report?
16         MR. ELSON:  Objection to the form.
17     A.  No, I couldn't tell you off the top of my head.
18 I don't know.  I would just have to guess.
19     Q.  Can you approximate it in any way?  How much of
20 the 47 hours that you've billed on this invoice for the
21 work that you did from the period of time of March 18th,
22 2022, to March 16th, 2023, approximately how much of that
23 time was spent preparing and revising your rebuttal report?
24     A.  Again, this would be speculation, but if you want

25

1  me to speculate I would speculate between 10 and 20 hours.
2      Q.  And then how much time out of that 47 hours do
3  you think you spent reviewing Dr. Welner's report?
4      A.  Well, Dr. Welner's report probably a couple
5  hours.  Again, that's my best guess.
6      Q.  As with the other invoice, do you keep itemized
7  records -- do you keep a record that itemizes the amount of
8  time you spent doing different tasks so that when you
9  prepare this invoice -- an invoice like this one you can
10 accurately bill for the time you worked on the matter?
11         MR. ELSON:  Objection to the form.
12     A.  Yes.
13     Q.  And do you still have that record?
14     A.  Yes.
15     Q.  As with the other one, we ask that you maintain
16 the record -- well, let me do it this way.
17         Is there a reason why you didn't produce that
18 record in response to the subpoena that we tendered to you
19 in this case?
20         MR. ELSON:  Objection.  Same objection I
21 made before, we're asserting the privilege.
22 BY MS. ROSEN:
23     Q.  Dr. Leo, I assume you're going to take your
24 attorney's advice and not answer my question?

Richard Leo, 4/24/2023

---

26

1    A.  Correct.
2    Q.  I'm going to make the same request I did of your
3  itemized log, or whatever, is please maintain whatever
4  itemized records you have that are associated with this
5  particular invoice, Exhibit Number 3, for the reasons I
6  stated before.  Okay?
7    A.  Yes.
8    Q.  Thank you.
9        Let's go to Exhibit Number 4 which is your
10 rebuttal opinion.  Taking a look at the first page of the
11 document here it's dated January 31st, 2023.  Do you see
12 that?
13   A.  Yes.
14   Q.  And then do you recognize this to be the first
15 page or the first half of the page, what's on the screen
16 here, of the rebuttal report you prepared in this case?
17   A.  Yes.
18   Q.  And this is the same, if we just scroll to the
19 last page I guess of this document, it ends with a list of
20 depositions.  Is that the last page of the version of the
21 report you have in front of you?
22   A.  Yes.
23   Q.  Okay.  Then if we go to page 11 of the document,
24 that's actually the end of your report and your signature,

---

27

1  correct?
2    A.  Yes.
3    Q.  And that's the same report that you have in front
4  of you, right?
5    A.  Correct.
6    Q.  Let's go to the first page of the report again.
7  And this format follows fairly closely to the format that
8  you used for your original report dated January 15th,
9  2023, meaning that it is addressed to counsel, it has the
10 case caption, it has your title and contact information at
11 the top of the page, right?
12   A.  Correct.
13   Q.  And that's the normal way that you do your
14 reports, at least in the recent history, is that correct,
15 for these types of -- for civil cases?
16   A.  Correct, yeah.  The first third or half of the
17 first page, yes.
18   Q.  Then, if we look at the bottom of this page, it
19 identifies some additional materials that you reviewed in
20 connection with this report, correct?
21   A.  Correct.
22   Q.  Are you all right there, Dr. Leo?
23   A.  I am, yeah.  I have a small dog and contractors
24 may be showing up and I'm on the top floor of my house.  I

---

28

1  just wanted to make sure she wasn't going down the stairs.
2  Thank you.
3    Q.  If you need to take a break then, just let us
4  know and we'll do that.
5    A.  Okay.  Thank you.
6    Q.  So the first item, the first item you reviewed in
7  connection with your rebuttal report is Dr. Welner's
8  report, correct?
9    A.  Yes.
10   Q.  And you said you took maybe a couple hours to
11 review that, right?
12   A.  Right.  That was my best estimate.
13   Q.  But your itemized log or whatever it is, whatever
14 document you keep, would provide an accurate answer to the
15 question of how much time you spent reviewing Dr. Welner's
16 report, correct?
17       MR. ELSON:  Objection to the form.  Same
18 objection as before.  I think that questions about an
19 itemization of how he spent his time invades the privileges
20 set forth in 26(b)(4)(B), (C), and we're asserting that
21 privilege here.
22       We can meet and confer about this.  I know you
23 don't want to have this debate right now.  We can meet and
24 confer after the deposition about this, but as to that

---

29

1  specific question you can answer.
2    A.  I don't believe I would have that information.
3    Q.  So your -- you don't believe your itemized -- so
4  where do you keep your itemization of the time spent
5  working on the Solache/Reyes case so that you could send
6  the invoice dated -- let me strike that.
7        With respect to Exhibit Number 3 which is the
8  invoice dated April 7th, 2023, that encompasses work you
9  did over a one-year period of time, what document or
10 documents do you maintain where you itemize the work you
11 did so that you can send this global invoice as reflected
12 in Exhibit Number 3?
13   A.  So I maintain time sheets, and then when I
14 prepare a report I no longer keep those time sheets, but
15 you'll notice that one category on this document is review
16 and analysis of case materials which is a broader category
17 than one particular document in the case.
18   Q.  The time sheets, are those the things that you
19 still have?
20   A.  No, not after I prepare an invoice.
21   Q.  What document were you referring to earlier that
22 you said you still maintained that reflects the
23 itemization?
24   A.  An itemized invoice.

---

Richard Leo, 4/24/2023

30

1    Q.  Got it.  So let me just understand the process so
2  I understand exactly wherein the dispute might lie between
3  the parties.
4         As you're working on the case you create time
5  sheets contemporaneously with the work that you're doing?
6    A.  Correct for the categories that appear on my
7  invoices, yes.
8    Q.  And are those handwritten time sheets or
9  computerized time sheets?
10   A.  Handwritten.
11   Q.  And if you were spending time today working on a
12 particular matter, would you create the time sheet as you
13 went, worked throughout the day, or at the end of the day
14 or at some other time?
15   A.  No, it has to be contemporaneous.
16   Q.  And if you were reviewing materials in connection
17 with a case and you were keeping time sheets, would you
18 itemize the particular records you were reviewing?
19   A.  No.
20        MR. ELSON:  Objection to form.  Go ahead.
21        MS. ROSEN:  Was there an answer?  I'm sorry.
22        THE REPORTER:  Yes, the answer was "No."
23 BY MS. ROSEN:
24   Q.  How would you -- if you were reviewing materials

31

1  in connection with a case, how would your -- what would
2  your time sheets indicate in association with that task?
3    A.  That I reviewed case materials.
4    Q.  So you don't break it down by particular document
5  or material, you don't break it down in any way, it's just
6  review and analyze case materials?
7    A.  Correct.
8    Q.  Okay.  So is that why you said that if we looked
9  at your -- wait.  Let me back up.
10        So now once you do your time sheets then you
11 create an itemized invoice; is that correct?
12   A.  Correct.
13   Q.  If we could go back to Exhibit Number 1 for a
14 second?
15        (Remote screen sharing.)
16   Q.  Is that the type of itemized invoice you were
17 referring to?
18   A.  Yes.
19   Q.  Okay.  So let's go to the first page of this
20 document.  So, for example, October 11th, 2018, you did
21 some task that's been redacted from this invoice for a
22 total of .2 hours, correct?
23   A.  Correct.  I just need, I think, a 30-second break
24 to make sure that the dog is on this floor and to put up a

32

1  barrier to prevent her from going down the stairs.  This
2  does not even need to be a five-minute break.  Just give me
3  30 seconds to retrieve the dog and put the barrier up.
4  I'll be right back.
5    Q.  Okay.
6         THE VIDEOGRAPHER:  Do you want to stay on?
7         MS. ROSEN:  Yeah, if it's really 30 seconds
8  we can just stay on, unless people want to take a break?
9         THE WITNESS:  I'm back.  The dog never left
10 and I put the barrier up.
11        MS. ROSEN:  Sounds good, thank you.
12 BY MS. ROSEN:
13   Q.  So looking at Exhibit Number 1 --
14   A.  Sorry, I just need to close doors.  Just a
15 second.  Just for sound reasons I needed to close the
16 doors.
17        All right.  I'm back and looking at
18 Exhibit Number 1.
19   Q.  Okay.  Looking at Exhibit Number 1, and the first
20 entry there it looks like you did some task that we don't
21 know what it is because it's redacted out on
22 October 11th, 2018, for .2 hours, correct?
23   A.  Correct.
24   Q.  And the way you would have transferred the

33

1  information to this itemized invoice is you would have
2  taken it from a time sheet that would have reflected
3  whatever the activity was on October 11th, 2018, for
4  .2 hours, right?
5    A.  Correct.
6    Q.  And then you would have discarded -- you would
7  have thrown away the time sheet then after you had
8  completed the invoice; is that right?
9    A.  Correct.
10   Q.  Okay.  All right.  Then, with respect to
11 Exhibit Number 2.
12        (Remote screen sharing.)
13   Q.  Did you create the time sheets contemporaneously
14 with the work you did, create an itemized invoice and then
15 create this other version of the invoice to submit to
16 counsel?
17   A.  Yes.
18   Q.  Okay.  And it's the itemized version of
19 Exhibit Number 2 that you still have that we've asked you
20 to maintain, correct?
21   A.  Correct.
22   Q.  And then, going to Exhibit Number 3 again,
23 beginning in March of -- March 18th, 2022, through
24 March 16th, 2023, you created contemporaneous time sheets

Richard Leo, 4/24/2023

34

1    that reflected the work that you did on the case and then
2    from those time sheets created an itemized invoice which
3    you still have, but then from the itemized invoice you
4    created this summary version of the invoice to produce to
5    counsel to produce to us; is that correct?
6             MR. ELSON:  Objection to the form.
7        A.  Yes.
8        Q.  And you still have the itemized version of this
9    invoice in your possession and that's the thing that we've
10   asked you to maintain, correct?
11       A.  Correct.
12       Q.  But you no longer have the time sheets associated
13   with the itemized invoice for the work you did beginning
14   March 18th, 2022, through March 16th, 2023, correct?
15       A.  Correct.
16       Q.  Does this summary in this invoice reflect all of
17   the categories of work that you did from the period of time
18   March 18th, 2022, to March 16th, 2023?
19       A.  To the best of my knowledge, yes.
20       Q.  So from this invoice we have five categories of
21   activities:  Email correspondence, telephone consultation,
22   downloading and printing case materials, review and
23   analysis of case materials and preparation and revision of
24   rebuttal report.  Do I have that right?

35

1        A.  Yes.
2        Q.  I take it that if we were to look at either the
3    itemized bills or the -- the itemized invoice or the time
4    sheets if they still existed we would see a bunch of
5    entries that say -- no.  Let me strike that.
6             If we were to look at the itemized invoice or the
7    time sheets if they still existed we would see notations
8    that matched the categories, the five categories identified
9    in this invoice; is that right?
10            MR. ELSON:  Objection to the form.
11       A.  Correct.
12       Q.  So we would not, if we were looking at your
13   either itemized invoice or your time sheets if they still
14   existed where you -- where the work you were doing
15   constituted downloading and printing case material, we
16   would not learn from either the time sheet or the itemized
17   invoice specifically what materials you were downloading
18   and printing, correct?
19       A.  Correct.
20       Q.  And the same applies for review and analysis of
21   case materials?  If we looked at the itemized invoice or
22   the time sheets if they still existed we would not be able
23   to discern which case materials you were reviewing and
24   analyzing on any particular day for any particular amount

36

1    of time, correct?
2             MR. ELSON:  Objection to the form.
3        A.  Yes.
4             MR. ELSON:  Calls for speculation.
5        A.  Typically, I would just indicate that I spent X
6    amount of time reviewing and analyzing case materials.
7        Q.  Okay.  And then preparation and revision of
8    rebuttal report, if we were to look at your time sheets if
9    they still existed or the itemized version of your invoice
10   we would not see a separation or a distinction between the
11   time spent preparing the report and revising the report; is
12   that right?
13            MR. ELSON:  Objection to the form.
14       A.  I believe so.
15       Q.  Okay.  Let's go back to Exhibit Number 4.  So you
16   reviewed the report of Dr. Welner, you reviewed
17   Dr. Welner's deposition in a case called Taylor versus City
18   of Chicago that was taken May 17th, 2018.  Do you see
19   that there?
20       A.  Yes.
21       Q.  Can you tell us approximately how much time you
22   had spent reviewing that deposition transcript of
23   Dr. Welner's?
24       A.  I don't recall.

37

1        Q.  Do you recall how long that transcript, how many
2    pages the transcript was?
3        A.  I do not.
4        Q.  Had you ever read that dep transcript before?
5        A.  I don't remember previously reading it, no.
6        Q.  Were you involved in the Taylor versus City of
7    Chicago case?
8        A.  I was, yes.
9        Q.  And during your work in Taylor did you have
10   occasion to review Dr. Welner's deposition in that case?
11       A.  Not -- sorry.  Not that I recall, no.
12       Q.  Then, if we go to the next page, the third item
13   listed here is the deposition of Dr. Welner in Patrick
14   versus City of Chicago, deposition that was taken
15   July 22nd, 2015.  Do you see that there?
16       A.  Yes.
17       Q.  Do you recall how much time you spent reviewing
18   Dr. Welner's deposition testimony in the Patrick case?
19       A.  I do not.
20       Q.  Were you involved in the Patrick case?
21       A.  I was not.
22       Q.  Had you ever read Dr. Welner's deposition
23   testimony in Patrick before being provided -- before it
24   being provided to you in connection with your work in this

Richard Leo, 4/24/2023

38

1 case?
2     A.   Not that I recall, no.
3     Q.   Do you recall how many pages the transcript of
4 Dr. Welner's deposition in Patrick was or is?
5     A.   I don't recall.
6     Q.   Do you recall how much time you spent reviewing
7 that transcript?
8     A.   I do not.
9     Q.   Are these three items listed on pages one and two
10 of your report the only additional material that you
11 reviewed and analyzed in preparation of your rebuttal
12 report?
13     A.   Yes.
14     Q.   Going back to Exhibit Number 3 for a second.  Is
15 the Welner report, the Welner deposition in Taylor and the
16 Welner deposition in Patrick, are those the only case
17 materials that you downloaded, printed, reviewed and
18 analyzed as reflected in the invoice dated April 7th,
19 2023?
20         MR. ELSON:  Objection to the form.
21     A.   To the best of my memory, yes.
22     Q.   All right.  Let's go back to the report.  We look
23 at the first paragraph of the report under the heading
24 Rebuttal Opinions.  You indicate that it's not feasible to

39

1 address every aspect of the report for -- with which I
2 disagree, and my silence on any particular point should not
3 be taken as an agreement.  Do you see that -- or, as
4 agreement.  Do you see that there?
5     A.   Yes.
6     Q.   Why do you have that qualifier in your opening
7 paragraph of your report?
8     A.   Because Dr. Welner's report is lengthy and
9 because I want to make sure that if I don't address every
10 small detail in his report with which I disagree that
11 that's not misconstrued as agreement.
12     Q.   Okay.  Under the heading, Dr. Welner is not
13 qualified to opine about the study of police interrogation
14 and false confessions.  Do you see that there?
15     A.   Yes.
16     Q.   The first sentence is, Dr. Welner's report is
17 fatally flawed because he's not qualified to opine on the
18 social science research of police interrogation and false
19 confessions.  Do you see that?
20     A.   Yes.
21     Q.   Are you saying that only individuals -- well,
22 what are you saying there?  Why is Dr. Welner not
23 qualified?
24         MR. ELSON:  Objection to the form.

40

1     A.   Well, he's not qualified for multiple reasons.
2 One reason is that there is no field of forensic psychiatry
3 that does research or studies empirically police
4 interrogations or false confessions.
5         So he went to medical school and he's presumably
6 qualified to be a medical doctor, but in his medical
7 education he never would have studied this field.  And
8 there is several aspects to this.  So he would not have
9 studied the substance of this science.  He would not have
10 been trained by professors in this area substantively.  He
11 also would not have received any methodological training in
12 social science or empirical research as part of his medical
13 training to become a doctor, and so, you know, we -- I
14 don't mean in any way to put down his accomplishment as
15 achieving an M.D. degree, but it's not a degree that trains
16 you to do research, to understand research in the social
17 sciences or any substantive research in this field.
18         Since receiving his medical degree, he hasn't
19 done any research or at least any published research in
20 this field.  He says he's interviewed people who have
21 confessed, but we have no record of his interviews of
22 people who he says have confessed.  He's never collected
23 data and published that data.  We have no way of assessing
24 his verbal assertions that he has any expertise in actually

41

1 studying interrogations or confessions.
2         It appears that he's read a few articles, but
3 that's not enough to be an expert.
4     Q.   According to who it's not enough to be an expert?
5     A.   According to me.
6     Q.   And what expertise do you have that allows you to
7 determine who is and who isn't an appropriate expert in
8 this field as you've described it?
9         MR. ELSON:  Objection to the form.
10     A.   My training, research, experience, publication in
11 this field, and also more generally as a social scientist.
12     Q.   Where can somebody go to get trained in the
13 social science research of police interrogation involving
14 confessions?
15     A.   Well, anyplace where courses are being offered --
16 graduate level courses are being offered in social
17 psychology or cognitive psychology or criminology or any
18 other relevant social science field where there is training
19 both substantively and methodologically in empirical social
20 science research.
21     Q.   When you say methodologically, what do you mean?
22     A.   So when one gets a PhD degree which is a research
23 degree one goes to a graduate PhD program, and part of that
24 program involves training somebody on social science

Richard Leo, 4/24/2023

42

1   research methods and data analysis.
2       Typically, a part or most of the first year would
3   be the basics and then there would be advanced courses as
4   well.  And the purpose of that training is to train
5   somebody, the future researcher who is in the PhD program,
6   to train that person on different empirical methods of
7   research, what they are and what the expectations are in
8   the social scientific field, how to do those various types
9   of research and how to evaluate research that is done using
10  those methodologies.
11      Q.  That doesn't need to be strictly in the area of
12  police interrogation and false confessions, right?
13      A.  When you say "it," I assume you mean the graduate
14  training?
15      Q.  Correct.
16      A.  Well, there is the methodological training and
17  then there are substantive courses.  For example, on social
18  psychology or on police investigation and in those
19  substantive courses there may or may not be coverage of
20  police interrogation and confessions, but one would be able
21  based on one's training both methodologically and
22  substantively to do independent research studies or
23  literature reviews that would then be supervised by
24  professors in those fields, criminology, psychology, et

43

1   cetera.
2       Q.  Let's go to page three of your rebuttal report.
3   This is under the heading, Dr. Welner's critique of the
4   concept of proven false confession is unsupported.
5       About the middle of the paragraph it says, Since
6   its introduction into the research literature in 1998, the
7   concept of proven false confessions has been generally
8   accepted.  No one has challenged it in the literature and
9   it has repeatedly been referenced, cited to and applied
10  and/or used by others.  Do you see that sentence there?
11      A.  Yes.
12      Q.  When you say since its introduction into the
13  research literature in 1998, what are you referring to?
14      A.  Well, I'm referring to an article in 1998 that
15  coined the term and the concept.
16      Q.  What article specifically?
17      A.  It was an article that I wrote with Richard
18  Ofshe.  I think it's called the Consequences of False
19  Confessions.  It was published in the Journal of Criminal
20  Law and Criminology.
21      Q.  And that's when the concept and phrase proven
22  false confession was first introduced into the research
23  literature, correct?
24      A.  Correct.

44

1       Q.  Then you say, No one has challenged it in the
2   literature.  Do you see that phrase?
3       A.  Yes.
4       Q.  What do you mean by that, No one has challenged
5   it in the literature?
6       A.  That, to my knowledge, no one has criticized or
7   critiqued it and said it's problematic the term.
8       Q.  When you say in the literature, what are you
9   referring to?
10      A.  The social science research literature on police
11  interrogation and confessions and specifically false
12  confessions, as well as the research literature on wrongful
13  convictions of the innocent which also encompasses false
14  confessions.
15      Q.  Then you say, It is a straightforward set of
16  criteria that is well established.  Do you see that?
17      A.  Yes.
18      Q.  And that straightforward set of criteria, are you
19  referring to the four criteria that you discussed in your
20  report?
21      A.  Correct.
22      Q.  And those four criteria were first introduced in
23  1998 as well?
24      A.  Correct.

45

1       Q.  In the next paragraph you say, Dr. Welner posits
2   that only confessions whose falseness is undisputed should
3   qualify as proven false confessions, but that view is
4   wholly unsupported.  Do you see that?
5       A.  Correct.
6       Q.  When you say wholly unsupported, what do you
7   mean?  Wholly unsupported by whom?
8       A.  Well, wholly unsupported by logic that in many
9   cases where confessions are provably false the original
10  police and/or prosecutors and sometimes experts
11  representing them in litigation will continue to maintain
12  that the confession is true and reliable.
13      So just because a confession's accuracy is
14  disputed doesn't mean that -- I should put it differently.
15  Just because it's disputed doesn't mean it's not a proven
16  false confession.  There are people who might dispute that
17  the world is round and believe that the world is flat.
18  That doesn't mean that the world is flat, right.  There are
19  things in the world that you can prove to a near absolute
20  certainty regardless of whether somebody disputes that.
21      Q.  So you're equating the circumstance where it has
22  been determined by you or others like you that a confession
23  meets criteria for a proven false confession -- let me
24  strike that.

Richard Leo, 4/24/2023

46

1    You're equating a dispute over whether a
2 confession is false when you or others like you have
3 determined it meets criteria for a proven false confession
4 to individuals holding the opinion that the world is flat?
5    MR. ELSON:  Objection to the form.
6 Mischaracterizes his testimony.
7    A.  I wouldn't agree with the word equate.  I was
8 comparing it.  I was just giving an example of something
9 that you could prove is wrong even though some people
10 continue to dispute it.  So it was a comparison.  It wasn't
11 an equation.
12    We can take the Central Park Five case as a good
13 example.  There is dispositive DNA that proves that all
14 five of those individuals were not involved in the crime.
15 Who did the crime, there is substantial other evidence.
16 There are many other cases like that.  And in that case the
17 prosecutors who wrote books about the case before the DNA
18 came out and the police continue to maintain that those
19 individuals were guilty.  And there is many others -- and
20 that the confessions are right.  There are many other cases
21 like that.  So I'm not equating it.  I'm just making a
22 comparison.  I could have chosen other things which we know
23 are false but people nevertheless dispute.  The criteria
24 for whether it's false is independent of whether or not

47

1 it's disputed.  We can't equate those.
2    Q.  Did you say in the Central Park Five case that
3 the prosecutors maintained that the confessions were true
4 before the DNA came out?
5    A.  To my knowledge, some of them have maintained it
6 afterwards as well.
7    Q.  What's your basis for saying that?
8    A.  Op-eds written by prosecutors or interviews given
9 by them.  I haven't looked at that case recently, but
10 that's my understanding, as well as comments after the
11 $41 million settlement that occurred some years ago in that
12 case.
13    Q.  Okay.  And then in the next sentence in that same
14 paragraph you write, His view has not been adopted in the
15 field, for good reason.  Many false confessions are still
16 disputed by police, prosecutors and civil defense attorneys
17 despite substantial evidence dispositively proving the
18 confession false.  Do you see that there?
19    A.  Yes.
20    Q.  That's the point you were just getting at, right?
21    A.  Correct.
22    Q.  When you say dispositively proving the confession
23 false, what do you mean?
24    A.  What I mean is conclusively.  It's just saying

48

1 the same thing that to a certainty, an absolute certainty
2 or a near absolute certainty the evidence establishes that
3 the confession was false.
4    MS. ROSEN:  Why don't we take a short break
5 here and then we'll come back for the hour, a little bit
6 more than an hour, and then we'll take the hour lunch
7 break.
8    MR. ELSON:  How long do you want to take?
9    MS. ROSEN:  Just ten minutes.
10    THE VIDEOGRAPHER:  All right.  We are off
11 the video record at 12:16 p.m.
12    (Whereupon a recess was taken.)
13    THE VIDEOGRAPHER:  We are back on the video
14 record, and this is the beginning of Media Unit 2 at
15 12:30 p.m.
16    MS. ROSEN:  I just want to note for the
17 record that I think that Reyes' counsel has switched out
18 because I see that Rachel Brady is now here for Mr. Reyes
19 and Mr. Starr is gone.  So we note that for the record.
20 BY MS. ROSEN:
21    Q.  Okay.  Let's put Exhibit 4 back up on the screen
22 which is the rebuttal report and we're on page three.
23    (Remote screen sharing.)
24    Q.  Then you go on to note that Dr. Welner's

49

1 deposition testimony in Taylor -- actually, in Patrick, I
2 guess, he identifies -- he offered certain criteria that
3 you note are remarkably similar to the ones he rejects
4 here.  Do you see that?
5    A.  Yes.
6    Q.  Then you identify three criteria that Dr. Welner
7 testified about in the Patrick case, 1. When physical
8 evidence proves conclusively that the individual could not
9 have committed the crime.  Do you see that?
10    A.  Yes.
11    Q.  Then, 2. When the true perpetrator emerges
12 through identification, and then 3. When alibi evidence
13 conclusively establishes that the confessor could not have
14 been present?
15    A.  Correct.
16    Q.  Okay.  And when the alibi evidence conclusively
17 establishes that the confessor could not have been present
18 meaning could not have been present at the time the crime
19 was committed, right?
20    A.  Correct.
21    Q.  Okay.
22    A.  I mean it's not that I mean this because this is
23 from Dr. Welner's deposition, but that's what I understand
24 him to mean.

Richard Leo, 4/24/2023

50

1    Q.   Correct.  And you're noting here that the
2    criteria Dr. Welner is describing is remarkably similar to
3    the ones you claim he rejects in the Solache and Reyes
4    case, right?
5    A.   Correct.
6    Q.   So -- I withdraw that.
7         With respect to, if we go to the bottom of the
8    page under, The empirical social scientific study of police
9    interrogation, psychological coercion and false confessions
10   is well established in social science and generally
11   accepted.  Do you see that there?
12   A.   Yes.
13   Q.   When you say empirical social scientific study,
14   what do you mean?
15   A.   I mean the body of research that empirically goes
16   out and studies any issue related to police interrogation,
17   psychological coercion or confessions including false
18   confessions.  So one of the reasons why I criticize about
19   Dr. Welner as not being qualified is he -- and as I
20   describe in this report is he simply doesn't understand
21   what the word empirical means.
22        Empirical doesn't refer to one's clinical
23   experience as a doctor or as a psychologist as he
24   mistakenly states in his report.  It refers to gathering

51

1    data about how something works in the real world, and there
2    are a number of possible ways one can do that through real
3    world case analysis, sometimes referred to as archival or
4    documentary case analysis, through experimental
5    re-creations, through interviewing, through field
6    observation, through surveys, et cetera.  So it's that body
7    of social science research knowledge based on empirical
8    data that I'm referring to here.
9         THE VIDEOGRAPHER:  Counsel, just really
10   quick, just by chance, sorry to interrupt, but, Doctor, is
11   there a printer maybe in the background?
12        THE WITNESS:  Yeah, there is a printer going
13   in the background and I can't stop it but it will stop
14   soon.
15        THE VIDEOGRAPHER:  Okay.  I just wanted to
16   make sure that we were getting -- if it will stop soon, we
17   can continue.  Sorry.  I just wanted to make sure because
18   it was coming through.  Sorry, counsel.
19        THE WITNESS:  Sorry.
20        MS. ROSEN:  No, I could hear it, too.  It
21   seems like it might be done now.
22        THE WITNESS:  I don't know when it's going
23   to be done but it's printing very quickly.  I would guess
24   within a minute or two but I don't know.  I can try to stop

52

1    it but then I'm going to get a paper jam that's going to
2    emit a loud beep and cause me a headache.  I'm pretty sure
3    it's going to stop very soon.
4         MS. ROSEN:  We can try and plow forward, but
5    if it becomes too distracting then maybe we need to break.
6         THE VIDEOGRAPHER:  Thanks, counsel.  I
7    apologize about that.
8         MS. ROSEN:  Yeah, no worries.  It was
9    distracting to me as well.
10   BY MS. ROSEN:
11   Q.   You talked about that empirical refers to the
12   gathering of data in a sort of general way, right?
13   A.   Correct.
14   Q.   And then you provided categories of data.  Can
15   you run that list by me one more time?
16   A.   Yeah.  One would be experimental re-creations,
17   right, where there are laboratories and experiments are
18   done under controlled conditions with randomized
19   assignment.
20        Okay, so the printer just stopped.
21        Another would be field observation going to the
22   natural environment and observing the phenomena under
23   study.  Another would be interviews with the relevant
24   community or group that one is studying for the phenomena

53

1    under study.  Another would be surveys, surveys of a group
2    under study for the research question.  And another would
3    be what's sometimes called archival or documentary analysis
4    where one analyzes real world documents and materials
5    either historical or contemporary.
6    Q.   The experimental re-creation, that's -- I think
7    what you're talking about there is things like the Kassin,
8    the 1996 Kassin alt key study, right?
9    A.   Correct, that would be one example.
10   Q.   Can you tell me in those last, say, I don't know,
11   ten years what experimental re-creations have been done
12   with respect to police interrogations, psychological
13   coercion and false confession?
14   A.   Well, there is a vast literature.  I can point
15   you to bibliographies, but if you want me to cite off the
16   top of my head every experiment, no, I couldn't do that.
17   And oftentimes when I am writing papers and I'm citing to
18   experiments or other studies, I don't remember the exact
19   year, I have to look it up and write the citation.  But
20   there have been a number of experimental studies on various
21   aspects of interrogation and confession in the last ten
22   years.
23   Q.   Can you name one?
24   A.   Yeah, I mean, I could name some, sure, but I

Richard Leo, 4/24/2023

54

1  would sort of have to have a bibliography in front of me to
2  really name them.  But Allison Redlich has done some
3  studies, her last name is spelled R-E-D-L-I-C-H.  Stephanie
4  Madon has done some studies.  Kyle Scherr.  I'm sorry,
5  Madon is M-A-D-O-N.  Scherr is S-C-H-E-R-R.  I mean there
6  is a number of researchers who have regularly -- those are
7  only three.  I could keep going.  Saul Kassin, K-A-S-S-I-N.
8  But to name the study and describe the study, I just have
9  to look at a bibliography, refresh my recollection, and I
10  can say there is this study, there is that study, here is
11  what this study is about, here is what that study is about,
12  but there is numerous experimental studies in this field in
13  the last ten years.
14      Q.  Then with respect to field observation, can you
15  put a little more meat on that?  Is that like the
16  observational study you did to get your PhD?  Is that what
17  you're describing there?
18      A.  Well, it could be.  My PhD study in the early
19  1990s involved more than just observation but that was the
20  centerpiece of the empirical methods.
21          There have been others who have observed
22  interrogations, but in the early 1990s there has been a
23  profusion of departments -- proliferation of departments
24  that electronically record.  So one could also analyze

55

1  actual interrogations based on electronic recordings,
2  not -- of the full interrogation, not just sitting in on
3  and observing interrogations which is much harder to do for
4  research purposes.
5      Q.  So you would include in this category of field
6  observation the ability to obtain and analyze recorded
7  interviews and confessions, correct?
8      A.  In a systematic way, yeah.  If one were to set
9  out to do a study of recorded interrogations and then
10  gather and systematically analyze them, that would be a
11  source of data, yes.
12      Q.  Has that been done?
13      A.  I believe it has been done, but I would have to
14  look back at some of the studies I'm thinking of to see
15  whether they were in person or electronically recorded.
16      Q.  Have you done any field observations -- have you
17  done any field observation study other than the one that
18  you did in connection with your PhD?
19      A.  Not in person where I sit in and observe
20  interrogations.  I have done studies where I've collected
21  cases and part of the analysis has been based on partial or
22  complete interrogation transcripts and recordings.
23      Q.  Have you published on your field observation
24  studies the cases that you've collected?

56

1          (Technical interruption.)
2      A.  I'm sorry, there is some noise in the background.
3  I can't do anything about this.  I don't think it's going
4  to be long.
5      Q.  Well, I can't hear you.
6      A.  Can you hear me now?  I need to somehow get back
7  to my volume which doesn't seem like I can do with the
8  share screen.
9          But the answer to the question is I have not done
10  any more field -- in-person field observation studies of
11  interrogations, and I have done studies where I
12  collected -- I've done studies where I have collected cases
13  and analyzed those cases which involved in part recordings
14  of interrogations or partial recordings of interrogations.
15      Q.  A lot of your words are being covered up by the
16  noise so it's hard to follow your answers because I'm
17  missing words.
18          MR. ELSON:  I wasn't missing any of the
19  words.  I hear the noise but I don't think it covered up
20  his words.
21          MS. ROSEN:  Well, it did for me.
22          THE VIDEOGRAPHER:  Yeah, I'm sorry, counsel.
23  It's just not coming through as clean as we would like it
24  to on my end.  I don't know if that's going to be something

57

1  that we can stop or is it going to be for a little bit?  I
2  don't know if we need to take a recess early.
3          THE WITNESS:  I would take a five-minute
4  break.  It's not something I can stop but I don't think
5  it's going to last very long.
6          MS. ROSEN:  Dr. Leo, are these people doing
7  the work that you were referencing earlier?  Is that what
8  that noise is?
9          THE WITNESS:  Yeah, there are some people
10  that are cutting out a small part of the ceiling just to
11  see -- in a room on this floor just to see which way the
12  joists run.  It should be very brief.  I can confer with
13  them over the break, but for scheduling reasons I don't
14  think I can get rid of them, but -- I can find out more
15  information, but my understanding is it would be very
16  brief.
17          MS. ROSEN:  Okay.  It seems like it's quiet
18  now.  If it happens again, then we're going to have to take
19  a break and you're going to have to find out how much --
20  how long this disruption is going to happen, you know, if
21  it's in short bursts then we can break around the bursts or
22  whatever.  I'm having difficulty following your answers.
23          THE VIDEOGRAPHER:  Thank you.
24          MS. ROSEN:  Yep.

Richard Leo, 4/24/2023

58

1    BY MS. ROSEN:
2        Q.  With respect to your in-person field observation
3    studies, other than the one that you did in connection with
4    your PhD, did you do any others?
5        A.  No.  I didn't sit in and observe interrogations
6    and gather after that dataset that I collected during my
7    dissertation.
8        Q.  Then with respect to the circumstance where you
9    collected cases which involved in part recorded or
10   partially recorded confessions, what were you referring to
11   there?
12       A.  Well, off the top of my head, my 1998 article,
13   the Consequences of False Confession.  My 2004 article with
14   Steve Drizin in the North Carolina Law Review.  Two
15   articles I did in 1997 with Richard Ofshe.  I would have to
16   review my CV to refresh my recollection on other studies
17   since then.
18       Q.  Have you done any other studies since 2004 where
19   you have collected -- where you have collected recordings
20   either in whole or in part of interviews and confessions?
21       A.  Yes.
22       Q.  But, as you sit here today, without reviewing
23   your CV you can't identify those for us, right?
24       A.  Well, I mean if I give it some more thought I

60

1        Q.  What was your role in those cases?
2        A.  In those studies my role was to help with the
3    conceptual aspect of the study and to write up parts of the
4    study and to analyze part or all of the data.
5        Q.  And will we find those studies that you were
6    involved in on your CV?
7        A.  Yes.
8        Q.  And same with the field observation, either the
9    in-person or the recorded ones that were implicated in the
10   collected cases, will we find all of that in your CV?
11       A.  Yes, all the ones that are published.  I have
12   studies in progress that are not listed on the CV that
13   involve some of these methods as well, but the ones that
14   have been published, yes, you would find on my curriculum
15   vitae.
16       Q.  How many studies do you have in progress?
17       A.  At least two, I just have to give -- well, there
18   is studies that are completed but have not yet been
19   published that are in the publication process, and then
20   there are studies that are still in progress that have not
21   been written up or if they've been partially written they
22   have not been submitted for publication.
23           So I would say around half a dozen studies or
24   articles, I'd have to give it a little bit more thought,

59

1    could identify some of them.
2            There was a 2013 or '14 study I published with
3    John Gould, G-O-U-L-D, which would fall into that category.
4    I believe there is some work I've done with Professor
5    Deborah Davis that would fall into that category.
6            Sorry, I know you can't hear.  We can take a
7    five-minute break if you want and I can try to find more
8    information out.
9            MS. ROSEN:  Why don't we do that.
10           THE VIDEOGRAPHER:  Going off the video
11   record at 12:47 p.m.
12           (Pause in Proceedings.)
13           THE VIDEOGRAPHER:  We're back on the video
14   record at 12:55 p.m.
15           DIRECT EXAMINATION (cont.)
16   BY MS. ROSEN:
17       Q.  From -- we were talking about empirical data and
18   how it's defined by you and others in your field.  With
19   respect to any experimental re-creation, have you yourself
20   been personally involved in any experimental re-creations?
21       A.  Yes, I've been on a few studies where there has
22   been experimental re-creations but I have not been the ones
23   doing the -- running the actual experimental, the actual
24   experiments.

61

1    but that's around the number that I've got that are not
2    listed on the CV that are either in the publication process
3    or in the data gathering and analysis and write-up process.
4        Q.  You had talked about at the last deposition a
5    study that you were working on with Mr. Drizin that had
6    been going on for, I don't remember precisely what you
7    said, but something like a decade.  Is that one of the ones
8    you're referring to as being a study in progress?
9        A.  Yes.  There are two studies involving
10   Professor Drizin.  One of them has not been going on that
11   long, and the one I think you're referring to has been
12   going on probably longer than that.
13       Q.  The one that's been going on longer than a
14   decade, I think what you said at your last deposition was
15   that there had not been much work being done on it in the
16   last couple of years because of a variety of reasons that
17   you provided in your deposition.  Is that still true?
18       A.  Yes.
19       Q.  Okay.  And what's the second one involving
20   Mr. Drizin that you just referenced?
21       A.  We have around 25 cases of proven false
22   confession in cases in which the person has falsely
23   confessed to harming, I believe they're all murder cases,
24   or killing a loved one defined as a child or a parent or

Richard Leo, 4/24/2023

62

1  immediate relative, and we're analyzing those cases.
2      Q.  When did you start that work?
3      A.  I don't recall specifically.  I guess maybe four
4  or five years ago.
5      Q.  Is that one in the data-gathering phase or in the
6  publication process?
7      A.  It's kind of in between the two.  We've gathered
8  the data and we're in the drafting process.  We haven't
9  submitted it for publication.
10     Q.  What's the purpose of this particular study with
11 respect to the fact that you're focusing in on the murder
12 of loved ones?
13     A.  The purpose is to analyze whether people who are
14 interrogated in the immediate aftermath of the murder of
15 their close relatives may be more vulnerable to making or
16 agreeing to false confessions, what patterns or insights we
17 get from looking at that, a subset of that kind of case.
18     Q.  How many are in the -- of the half dozen or so
19 studies that you said are in some form of progress, how
20 many are in the publication process?
21     A.  Yeah, I just want to clarify.  Some of them are
22 not -- are more analytical pieces, not necessarily
23 data-gathering pieces.  I think there are -- you said in
24 the publication process, right?

63

1      Q.  Uh-huh.  Yes.
2      A.  Right.  That would mean that they've been
3  submitted for publication.  I can think of at least two
4  that are in the publication process -- three.  I think
5  three are in the publication process.
6      Q.  And what are the general topics of those three
7  pieces?
8      A.  One of them is a -- is a reflection on the 1997
9  Decision to confess article -- Falsely Confess article that
10 Richard Ofshe and I published in 1997.  And so in that
11 publication journal they apparently contacted authors whose
12 work had been cited in the last 25 years most frequently
13 and invited us to write a reflection and analysis of what
14 had transpired in the last 25 years.  So that's one.
15         Another is an article called Interrogation by
16 Proxy which is an empirical study that involves different
17 types of interrogations that police do that they
18 essentially direct third parties to do to help them gather
19 confession evidence.
20         And then the third of the three I mentioned is on
21 the issue of sleep depravation and how and why that can
22 compromise testimonial evidence gathered during
23 interrogations.
24     Q.  Did you say the second one was an empirical data

64

1  analysis?
2      A.  Yes.
3      Q.  Okay.  What about the sleep depravation one?
4      A.  The sleep depravation one discusses some cases
5  but is more a review and synthesis type article.
6      Q.  You also mentioned another method is
7  interviewing -- interviews with the relevant community?
8      A.  Correct.
9      Q.  And what types of things are you talking about
10 there?  Who would be the relevant community, what types of
11 interviews?  Can you just put a little more descriptive on
12 that?
13     A.  Well, it depends on the purpose of the study, and
14 that would determine who the relevant community was and one
15 would do structured interviews of that community.  It could
16 be interrogated suspects, it could be police interrogators,
17 it could be police trainers, it could be police leaders, it
18 could be prosecutors, it could be criminal defense
19 attorneys, it could be judges.  It just depends on what the
20 research question is in the study.  And, of course, in
21 different fields, different areas of study, social science
22 researchers would interview different subject populations
23 that were relevant to answering the research question in
24 structured ways.

65

1      Q.  Have you conducted any of that type of research
2  or data analysis?
3      A.  I have, yes.
4      Q.  And who was the -- who was the relevant community
5  or what was the relevant community for the studies you did?
6      A.  So this was part of my doctoral dissertation
7  research, and I interviewed police interrogators, I
8  interviewed police interrogation trainers, I interviewed
9  police managers and I interviewed prosecutors and defense
10 attorneys.
11     Q.  Is that the only time that you utilized that
12 technique?
13     A.  It's the only time -- I mean that dataset was
14 part of a number of publications in the 1990s, but, yes, to
15 the best of my recollection.  It might be if I looked over
16 my CV I might jog my memory, but I'm not thinking of any
17 others as I sit here right now.
18     Q.  Then you also discussed surveys.  Tell me a
19 little bit about that.
20     A.  Well, surveys are a very standard method of
21 empirical data gathering.  Again, social scientists are
22 trained on survey construction and systematic analysis of
23 survey data, and I think some of the exhibits for this
24 deposition involve some of my published surveys.

Richard Leo, 4/24/2023

66

1   There was a 2007 one that I refer to, I believe,
2   in this report with Saul Kassin, other researchers, that
3   was a survey of police themselves. I believe I did some
4   surveys early in my graduate career of police and
5   churchgoers or community members. So there is a few
6   studies I've done, published studies, that involve surveys
7   and survey methodology. This is a very, I think a lot of
8   people know this is a very standard methodology, political
9   scientists use it, other social scientists use it.
10      Q.  Okay. And then the fifth method of empirical
11  data gathering you talked about was archival document
12  analysis, I think is how you put it, either historical
13  or contemporary. That's the type of thing that you and
14  Mr. Drizin did, right, for purposes of the 2004 article?
15      A.  Yeah. I mean some of these articles involve more
16  than one method of data analysis but that would be an
17  example of it.
18      Q.  Okay. Let's go to page four of your rebuttal
19  opinion -- actually, sorry, let's go back to page three,
20  bottom of the page, so we have some context.
21      At the bottom of page three you indicate under
22  the heading, The empirical social scientific study of
23  police interrogation, psychological coercion and false
24  confessions is well established in social science and

67

1   generally accepted. Then you say, Throughout his report,
2   Dr. Welner paints a distorted picture of the empirical
3   social scientific study of police interrogation,
4   psychological coercion and false confessions. He suggests
5   that the field is a boutique area comprised of a few
6   researchers who repeatedly cite to one another and whose
7   work therefore has no wider validity. Then you go on to
8   say, In fact, the field is well established in social
9   science and generally accepted, and then, It dates back to
10  at least 1908. Do you see that?
11      A.  Yes.
12      Q.  What's the 1908 reference to?
13      A.  I think it's a book by Hugo Munsterberg,
14  M-U-N-S-T-E-R-B-E-R-G, I think is the spelling of his last
15  name. He was in 1908 a professor, a distinguished
16  professor of psychology at Harvard University, and he
17  published a book that was based on analysis of cases and
18  other materials, and in that book he described false
19  confessions growing out of police interrogations.
20      Q.  Okay. So what you're pointing to is not the
21  criteria -- the four criteria that you developed and coined
22  to establish proven false confessions; you're talking
23  simply about the study of false confessions goes back to
24  1908, right?

68

1       MR. ELSON:  Objection to the form.
2       A.  Yeah, I'm talking about the empirical social
3   scientific study of police interviewing and interrogation,
4   psychological methods of interrogation including
5   psychologically coercive techniques and true and false
6   confessions.
7       Q.  Okay. Then you say in that same sentence, The
8   field started to really develop in the early 1980s and then
9   to explode in the quantity and variety of empirical social
10  science research. When you're referencing the early 1980s,
11  are you referencing something specific or just generally?
12      A.  No, I'm referencing generally that's when the
13  methodology became more sophisticated and the studies
14  started to take off.
15      Q.  Then you go on to say there have been hundreds if
16  not thousands of peer-reviewed studies on the subject and
17  dozens of books. Do you see that?
18      A.  Yes.
19      Q.  I'm curious in terms of your phraseology there,
20  there is a difference to me between saying there is
21  hundreds of things versus saying there is thousands of
22  things. So I'm trying to pin it down a little bit in terms
23  of when you say hundreds if not thousands, why do you use
24  that phrase?

69

1       A.  Because I don't know the exact number. I don't
2   know if it's 973 or 2,973. As you know, on page five I
3   cite a table of published research on the topic and it
4   ranges from hundreds to thousands. I haven't gone through
5   and collected these studies and verified the numbers, but I
6   was just trying to be a little bit on the cautious side in
7   case I was wrong that it wasn't thousands and it was merely
8   hundreds though I believe it to be thousands.
9       Q.  Then, if we go to the table on page five,
10  Table 2.1, Advancement in Interrogation Research, you've
11  taken a table from which -- this table comes from the
12  article at footnote six, right?
13      A.  That's actually a book, but, yeah, it comes from
14  the book that is cited published by New York University
15  Press in 2020 referenced in footnote six.
16      Q.  Got it, okay. And then -- but with respect to
17  that table, do you know how many of those publications talk
18  about criteria for meeting proven false confessions as
19  you've coined the term?
20      A.  I do not, no. That's not what I'm referring to
21  in this section, but I have no idea how many of them refer
22  to that criteria.
23      Q.  This is just a reference to the more general
24  topic of the field of study that we're talking about here,

Richard Leo, 4/24/2023

70

1    right?
2         A.   Correct.
3              MR. ELSON:  Objection to form.
4         Q.   Then you below the table you indicate in the last
5    sentence of the paragraph, There is no dispute, none, in
6    the social science research community, which is the
7    relevant community, that the psychological and empirical
8    study of police interrogation, psychological coercion and
9    false confessions is generally accepted and has been for
10   decades.  Do you see that there?
11        A.   Yes.
12        Q.   When you say the social science research
13   community, which is the relevant community, why do you say
14   that the social science research community is the relevant
15   community?
16        A.   Because this is the community of researchers,
17   psychologists, criminologists, sociologists and other PhD
18   social scientists that have generated this body, the
19   substantial body of peer-reviewed empirical knowledge on
20   these subjects.
21        Q.   When you say "these subjects," you mean the
22   general subjects, right?  Not on the science of whether
23   meeting one of the four criteria that you've coined
24   establishes that a confession can be categorized as a

71

1    proven false confession, right?
2              MR. ELSON:  Objection to the form.
3         A.   Correct, as it refers to the psychological and
4    empirical study of police interrogations, psychological
5    coercion, false confessions.  In that last sentence that
6    you previously read, that's what I'm referring to.
7         Q.   Then if we go to the next sentence -- I mean the
8    next paragraph, the second sentence, There is no known
9    error rate as measurement error simply does not apply to
10   this scientific field.  Do you see that there?
11        A.   Yes.
12        Q.   Why doesn't a measurement of error -- a
13   measurement of error apply to this scientific field?
14        A.   It has to do with the nature of what we're
15   studying.
16        Q.   Can you explain that, please?
17        A.   Well, if you were studying other things then you
18   have to be concerned with measurement errors.  If you're
19   preparing, for example, a sample taken and run through some
20   medical test or compared to some preexisting piece of
21   information or data, then you would have -- you can talk
22   about measurement error, you can talk about measurement
23   error in the study of DNA, for example, or polygraphs, but
24   here you don't have that same issue.  There isn't -- it's

72

1    not like we're comparing something taken from somebody's
2    body to a crime scene or, you know, we're not -- we don't
3    have an instrument that has an error rate and we're trying
4    to figure out what that error rate is.  Some sciences have
5    that issue, other sciences don't.  There is no measurement
6    devised that generates a measurement error in this field.
7         Q.   Well, with respect to the four criteria that you
8    have developed -- or identified, I should say.  Let me
9    strike that.
10             With respect to the four criteria that you have
11   identified that establish a proven false confession, as you
12   coined the phrase and used the phrase, how can anybody
13   determine whether or not you're correct?
14        A.   Well, they could go through and analyze the cases
15   and then they could verify or attempt to falsify the
16   analysis and they could explain why they disagreed with
17   that.
18             In the 25 years since we published that article
19   and since we have -- that coined the term and done studies
20   on this, there is only one case that in the published
21   literature that the -- that somebody has criticized and
22   said we were wrong about.  That case is the James Harry
23   Reyos case, spelled R-E-Y-O-S, and that case is a proven
24   false confession, as prosecutors have acknowledged.  And so

73

1    the person who criticized us who wasn't a social scientist
2    is simply wrong about that.  But if one wanted to
3    systematically analyze cases of proven false confession in
4    the literature, gather the relevant data and publish a
5    study explaining why they thought we were wrong, they could
6    certainly do that.  There is nobody prevented from doing
7    that.
8         Q.   So that would be the only way in your view that
9    anyone could determine whether or not you are correct when
10   you say or conclude that if an individual meets one of the
11   four criteria then their confession constitutes a proven
12   false confession which, as you indicated earlier today,
13   dispositively establishes that the disputed confession was
14   false?
15             MR. ELSON:  Objection to the form.
16        A.   Correct.  Social scientists would do systematic
17   analysis.  They wouldn't refer to unnamed interviews of
18   people in prison or cases that they worked on where it was
19   their anecdotal opinion that the person was actually
20   guilty.
21             They would do a systematic analysis of the
22   available evidence and they would publish it in a process
23   presumably that went through some kind of peer review and
24   analysis and that simply hasn't been done.  One person, a

Richard Leo, 4/24/2023

74

1 former prosecutor and law professor, as I think you know,
2 published a study challenging one categorization of a
3 proven false confession and that person is wrong according
4 to the prosecutors in the case.
5     Q. Okay.
6     A. As well as the research that I and my colleague
7 did and published twice, both in peer-reviewed journals, on
8 that one case that I previously named.
9     Q. Further down in the same paragraph you say, This
10 is an explanatory science. Do you see that?
11     A. Yes.
12     Q. What is that? What's the definition of
13 explanatory science?
14     A. Well, a science that seeks to explain the
15 phenomena that it studies. Some sciences have measurement
16 instruments that register measurement error. We don't have
17 that. It's not that type of science.
18     We collect and analyze data based on the
19 protocols and our methodological training and we present
20 that in our articles. And our methodologies are not
21 perfect, they're not perfect in any science. Some have
22 certain strengths and weaknesses, others have compensating
23 strengths and weaknesses, but we don't have measurement
24 instruments with known measurement error rates. That's

75

1 what I'm getting at. But it doesn't make it any less of a
2 science.
3     Q. Okay. Let's go to page six of the report. The
4 middle of the page you say, In addition to being a
5 well-established, generally accepted social science, the
6 social science research literature that is the basis of my
7 expertise is relevant and will greatly assist the jury
8 because of the powerful nature of confession evidence. Do
9 you see that?
10     A. Yes.
11     Q. Relevant to what?
12     A. Well, I just want to make sure I understand which
13 part of the question you're asking about. Let me just
14 review this real quick.
15     So an explication of the social science research
16 literature as it's relevant to the issues in this case
17 could greatly assist the jury. I guess it would be
18 relevant to -- your question is relevant to what, right, or
19 compared to what did you ask?
20     Q. The sentence reads, In addition to being a
21 well-established, generally accepted social science based
22 on empirical peer-reviewed studies that are capable of
23 testing and have involved testing, the social science
24 literature -- social science research literature that is

76

1 the basis of my expertise is relevant.
2     So I think what you're saying is that the social
3 science research literature that is the basis of your
4 expertise is relevant to something. I want to know what
5 it's relevant to.
6     A. Well, it would be relevant to explaining how
7 police interrogation works, what the techniques are and how
8 and why those techniques can sometimes lead innocent people
9 to make or agree to false confessions and what the issues
10 and problems are with those techniques and practices based
11 on that social science research.
12     Q. Then you go on to say, And will greatly assist
13 the jury because of the powerful nature of confession
14 evidence. Do you see that?
15     A. Yes.
16     Q. When you say will greatly assist the jury, do you
17 mean the jury in this case?
18     A. No. I mean more generally a jury in a disputed
19 interrogation/disputed confession case that typically has
20 to make a judgment about confession evidence and its
21 veracity or lack of veracity.
22     Q. Okay. And in this particular case you would like
23 to tell the jury that you have concluded dispositively
24 because Mr. Solache and Mr. Reyes meet one, at least one of

77

1 the four criteria that their confession is a proven false
2 confession, correct?
3     MR. ELSON: Objection to the form.
4     A. I think I would agree with the wording that I put
5 in my report that they meet the criteria. Of course, I
6 don't get to tell the jury anything, I just -- proactively.
7 I respond to questions that I'm asked that are permitted.
8     So, yes, if asked do these cases in your opinion
9 meet the criteria of a proven false confession, as I
10 mention in the report I would say yes, and if asked why I
11 would explain why as I do in my original report.
12     Q. And then you would, if permitted or asked, go on
13 to explain that once you've determined, you or somebody
14 like you in your field has determined that an individual
15 meets criteria then that dispositively establishes that the
16 confession is a proven false confession, correct?
17     MR. ELSON: Objection to the form.
18     A. I mean I don't think I would use the word
19 dispositively in the way you're using it. I would say that
20 based on my expertise and the review of the documents I
21 believe it meets one or more of these four criteria.
22     And if somebody asked me, as you did earlier,
23 what do you mean by a proven false confession, I would say,
24 as I did earlier, that a confession that meets one of these

Richard Leo, 4/24/2023

78

1   four criterias to a near or absolute certainty.
2       Q.   Okay.  When you say the powerful nature of
3   confession evidence, what do you mean?
4       A.   That as research has indicated, empirical
5   research that the courts have recognized, that people are
6   biased by confession evidence.  That when people hear that
7   somebody has confessed they tend to assume the confession
8   is true and voluntary, that they are very skeptical of the
9   idea of a false confession, that they don't believe they
10  would confess falsely, they're skeptical that somebody who
11  was innocent would confess falsely.  That's what I mean
12  that it's preju -- it's a very biasing, from a social
13  science standpoint a very biasing and prejudicial form of
14  evidence because it's so counterintuitive.
15      Q.   But there is more recent research, right, that
16  you're aware of that I think we talked about at the last
17  deposition that lay opinions and lay people's views on this
18  over time have changed dramatically, right, and that the
19  power of confession evidence has diminished in recent
20  history based on a variety of things, right?
21           MR. ELSON:  Objection to the form.
22      A.   I don't think the power of confession evidence
23  has diminished, and if I'm recalling correctly I think you
24  might have asked me about a 2018 survey in the last

79

1   deposition, and I think -- my recollection, I haven't
2   reviewed that article in preparation for this deposition,
3   but my recollection is that more people were aware.
4            Sorry, this is my 11:30 alarm going off.  After I
5   finish answering this question, I'm going to have to go for
6   an hour for this hour lunch break.
7            That more people are aware of the phenomenon of
8   false confession in that survey than in prior surveys but
9   that doesn't support the idea that confession -- that false
10  confession evidence is any less prejudicial or powerful
11  especially when the assertion is that somebody falsely
12  confessed.
13           MS. ROSEN:  Okay.  Let's take a break.
14           THE WITNESS:  Thank you.
15           THE VIDEOGRAPHER:  All right.  We're off the
16  video record at 1:30 p.m.
17           (Whereupon a recess was taken.)
18           THE VIDEOGRAPHER:  We are back on the video
19  record at 2:31 p.m.
20           DIRECT EXAMINATION (cont.)
21  BY MS. ROSEN:
22      Q.   Okey-doke.  If we could get Exhibit 4 back up?
23           (Remote screen sharing.)
24      Q.   We are on page -- just finishing six so let's go

80

1   on to page seven.  The first full paragraph, a couple lines
2   down, you state in, in reference to Dr. Welner, Confused
3   the concept of empirical which you define as going out into
4   the world to gather and analyze data, with the concept of
5   practical experience.  Do you see that there?
6       A.   Yes.
7       Q.   And what do you mean when you say that he
8   confused, meaning Dr. Welner, the concept of empirical with
9   the concept of practical experience?
10      A.   I believe in his report he defines empirical as
11  practical experience, and I'm aware of other times in other
12  cases where he's made that equation.
13           So practical experience and empirical are not the
14  same thing.  So his definition is incorrect which is not
15  surprising because, again, he's not trained as an empirical
16  researcher.  He has to my knowledge no graduate level or
17  professional training as a researcher.  That's not what
18  medicine is about.
19           Secondly, he repeatedly says, as I say in this
20  report, that there is no empirical field or no empirical
21  study of false confessions and he's a thousand percent
22  wrong about that.  So it's clear to me that he doesn't
23  understand one of the most basic concepts about social
24  science, what it means to say something is empirical, what

81

1   constitutes empirical research.
2       Q.   How do you define practical experience?
3       A.   It doesn't matter how I define it.  It's how he
4   defines it, and he seems to define it, as best I can tell
5   in this and other materials in other cases where I've
6   encountered either his reports or affidavits, as I'm a
7   psychiatrist and I talk to people and I talked to people a
8   bunch of years ago when I worked in prison and sometimes I
9   give talks to lawyers and that's my practical experience.
10  I, Michael Welner, have studied cases and talked to people
11  and that's not only my practical experience as Michael
12  Welner but also what we do in psychiatry.
13           So I think he's just describing his practical
14  experience as anything he does in the course of his work as
15  a psychiatrist as empirical.
16      Q.   So how do you understand him to be using
17  practical experience?
18           MR. ELSON:  Objection to the form.
19      A.   Yeah, I understand him to be using the term
20  practical experience to be referring to his experience as a
21  forensic psychiatrist who once talked to some people in
22  prison who confessed and who has worked on some cases as a
23  rebuttal expert witness where he's studied some documents
24  and/or interviewed some people in an unsystematic,

Richard Leo, 4/24/2023

**82**

1 unstructured, nonresearch-based, non-falsifiable,
2 nonreviewable way.
3     Q. Non -- what did you say?
4     A. Nonreviewable. He says, for example, as part of
5 his practical experience --
6     Q. I just want to know what you said. I'm not
7 asking for more than what you said. So you said non
8 "something" and nonreviewable. What were the two words
9 that you said?
10     A. You're going to have to ask the court reporter to
11 read it back.
12     (Record read as follows:
13     "Question: Yeah, I understand him to
14     be using the term practical experience
15     to be referring to his experience as a
16     forensic psychiatrist who once talked
17     to some people in prison who confessed
18     and who has worked on some cases as a
19     rebuttal expert witness where he's
20     studied some documents and/or
21     interviewed some people in an
22     unsystematic, unstructured,
23     nonresearch-based, non-falsifiable,
24     nonreviewable way."

**83**

1     Q. Did you say non-falsifiable?
2     A. Yes.
3     Q. What does that mean?
4     A. It means that all his discussion about practical
5 experience, we don't have any data or information where we
6 can verify whether it's accurate.
7     Q. Do you still have the data from your 2004 article
8 with Mr. Drizin?
9     MR. ELSON: Objection, asked and answered.
10     Q. You can answer.
11     A. Yeah. I think we covered that in the last
12 deposition. I might somewhere but I don't know where it is
13 at the moment.
14     Q. I think you said you didn't have it at the last
15 deposition. So I'm just confirming that you still don't
16 have it?
17     A. I stand by whatever I said at the last
18 deposition.
19     Q. Okay. So when you say non-falsifiable you mean
20 that it can't be falsified? Is that what you mean?
21     A. I mean there is no way of knowing whether
22 anything he says about the number of people he has spoken
23 to who have confessed is accurate or any of his impressions
24 are accurate. There is no way to review. He's never

**84**

1 published anything on this topic. There is no way to
2 review whether or not anything he's saying is true or
3 accurate, or I should say the basis for what he's claiming
4 is true or accurate.
5     Q. If we go to the bottom paragraph on page seven it
6 says, Dr. Welner also asserts that the field lacked what is
7 known as ecological validity, and then you say, This is a
8 false statement and again just advocacy by Dr. Welner.
9     When you say just advocacy, what do you mean?
10     A. Again, this goes back to his not being trained as
11 a social scientist, not being trained in any research
12 methodology and appearing to know very little about
13 research methodologies if anything.
14     Ecological validity, the realism that an
15 experiment or a dataset embodies, is always a matter of
16 degree. And so he's asserting it as if it's a binary. It
17 exists for him in his world as a forensic psychologist he
18 will assert because of his practical experience which he
19 mis-equates with empirical research but it doesn't exist
20 for the scientific field that does experiments as well as
21 collects and analyzes data based on the other methods that
22 I mentioned.
23     So all I'm saying which is pretty clear in the
24 report is it's not a binary. It's not something that

**85**

1 exists or doesn't exist. It's a matter of degree. And
2 because of his apparent ignorance of basic social science
3 research concepts he doesn't know what he's talking about.
4     Q. Can you define ecological validity?
5     A. Yeah, I just did in my last answer. It's the
6 degree to which the data in the study captures or
7 represents how that data or phenomena works in the real
8 world. That's ecological validity.
9     Q. And your criticism of Dr. Welner's point
10 regarding whether or not your field lacks ecological
11 validity is because it's not binary when we're talking
12 about social science? Is that what you're saying?
13     MR. ELSON: Objection to the form,
14 mischaracterizes his testimony.
15     A. I'm saying that from his written report and other
16 things he's written it's very clear that he does not
17 understand what that concept means. It's not a binary,
18 something that exists or doesn't exist. And so he's --
19 like so many things in his rebuttal report, he's just
20 factually wrong and it's the kind of error that, you know,
21 a first-year graduate student would not make. Anybody
22 who's had a week or two in a basic methodology course would
23 not make.
24     So, first of all, you would talk about the degree

Richard Leo, 4/24/2023

86

1  to which a particular study has ecological validity. He's
2  trying to tar this entire field as lacking ecological
3  validity, and it doesn't make sense conceptually because we
4  talk about degrees and it doesn't make sense to tar an
5  entire field, and it doesn't make sense also because
6  different studies, different methodologies depending on the
7  phenomena, the data, would have different degrees of
8  ecological validity.
9      So to me it appears, like so much of what he
10 does, he's acting as an advocate, as somebody who doesn't
11 know something and is trying to make a rhetorical argument,
12 not somebody who understands what he's talking about
13 Q.  You've also discussed at the bottom of the
14 paragraph on the bottom of page seven the concept of
15 convergent validity.  Do you see that there?
16 A.  Yes.
17 Q.  The statement here is because there is convergent
18 validity that gives us greater confidence that the findings
19 established across different methodologies have validity,
20 right?
21 A.  Correct.
22 Q.  I'm summarizing.
23 A.  Are more likely to be valid, yes.
24 Q.  When you are talking about the concept of

87

1  convergent validity is when you're talking about combining
2  the different methodologies that have been used in this
3  field, correct, that we talked about a little bit earlier
4  and that you lay out a little more clearly and a little
5  differently, I guess, at page eight, at the top of page
6  eight?  We can go there, right?
7  A.  To the extent I understand your question, yes,
8  that there is --
9  Q.  If you didn't understand the question, then don't
10 answer it.
11     When you are talking about the concept of
12 convergent validity and that in this field, the field that
13 we're talking about, the field that you have expertise in
14 that when there is convergent validity it gives us greater
15 confidence in the finding established across different
16 methodologies, right, that's the point?
17 A.  Correct.
18 Q.  Okay.  When you're talking about convergent
19 validity you're talking about different methods of data
20 analysis, correct?
21 A.  Different methods of data gathering that may or
22 may not lead to different types of data analysis so like
23 experiments versus surveys versus field research.
24 Q.  Then, if we go to page eight of your report, at

88

1  the top of this page you indicate that this is what has
2  happened in this field and then reference experimental
3  study findings which converge with the field studies and
4  the studies from real world cases.  Do you see that?
5  A.  Yes, and I -- yes.
6  Q.  Then you say, In effect, the findings of
7  controlled laboratory studies have been supported by data
8  collected from real world settings, correct?
9  A.  Correct.
10 Q.  When you're referencing real world settings in
11 that sentence, what are you referring to specifically?
12 A.  The kinds of field research where people sit in
13 on and observe interrogations, the research that analyzes
14 electronically recorded interrogations, the research that
15 is archival or documentary, that other types of studies
16 with different methodologies whose methodologies contain
17 different strengths and weaknesses than experiments report
18 consistent results.
19 Q.  When you say report consistent results,
20 specifically what do you mean?
21 A.  I meant that as a general statement.  I didn't
22 mean it specifically.  What I mean is that we don't find
23 research about, for example, false confessions from the
24 archival, the documentary analysis contradicting what we

89

1  find from the experimental studies.
2  Q.  And is there convergent validity to your
3  determination that if an individual meets one of four
4  criteria then the confession can be characterized as a
5  proven false confession?
6      MR. ELSON:  Objection to the form.
7  A.  That's not something you would get at with an
8  experimental methodology whether or not something is a
9  proven false confession because in the experiment you would
10 know the ground truth, you would know what happened and
11 whether or not that was a false confession or not a false
12 confession.  There is nothing about an experiment that
13 would contradict that but it wouldn't really be applicable.
14 Q.  How about field observation?  Have there been any
15 field observation studies that converge with your study
16 that support the idea that if an individual meets one of
17 four criteria then the confession qualifies as a proven
18 false confession as you've coined the term?
19     MR. ELSON:  Objection to the form.
20 A.  Usually field studies are observing a phenomena
21 in practice like how police investigate or interview or
22 interrogate.  You typically couldn't know that a confession
23 was false if you were watching an interrogation live.  The
24 only way to know that it was false typically would be after

Richard Leo, 4/24/2023

90

1  you review evidence that demonstrates it's false or not and
2  so that too would not likely be applicable.
3          On the other hand, if you observed an
4  interrogation and then subsequently gathered all the
5  evidence there is no reason why if it were a false
6  confession, a proven false confession, you wouldn't be able
7  to categorize it.  It's just usually early -- as a proven
8  false confession.  It's just that you would be observing
9  the phenomena of interrogation earlier in the process.
10         Q.  What about interviews with relevant community?
11 Do any of the empirical data that's gathered in the
12 methodologies that are reliant on interviews with relevant
13 communities converge with your study that you claim
14 established that if an individual meets one of four
15 criteria then the confession constitutes a proven false
16 confession?
17         MR. ELSON:  Objection to the form.
18         A.  Interviews are typically about process, not about
19 outcome like whether something can be categorized as a
20 proven false confession.  There is no reason why if
21 somebody was -- if I was conducting an interview studying a
22 case and, again, eventually gathered additional information
23 I couldn't categorize it as a proven false confession if
24 one or more of the criteria were met.

91

1          If we are conducting interviews with police
2  interrogators they might describe a situation where there
3  was a proven false confession so there is no reason why
4  that couldn't occur, but it's not a methodology that
5  typically one uses to evaluate whether somebody --
6  something is a proven false confession or not.
7          Q.  Is there any methodology that can be utilized
8  other than the methodology you utilized in support of the
9  2004 study and article?
10         MR. ELSON:  Objection to the form.
11         A.  Okay.  So your question is I think too broad when
12 you say in support of that article.  Do you mean
13 specifically classifying cases as proven false confessions
14 or do you mean some other aspect of that article?
15         Q.  I mean specifically proving -- establishing
16 criteria for a proven false confession.  Any other
17 methodology that would converge -- that would provide
18 convergent validity for your conclusion that if an
19 individual meets criteria for one -- meets one of the four
20 criteria that you've laid out then the confession is a
21 proven false confession?
22         A.  The proven false confession conclusion that a
23 case -- a confession meets the criteria would have to be
24 based on documentary evidence establishing the confession

92

1  is false.  Laboratory generated false confessions are
2  provably false as well but you wouldn't call them proven
3  false confessions or use those criterias because you would
4  know that they were false based on the conditions of the
5  laboratory experiment.
6          Q.  Then in the next paragraph there is a discussion
7  about the Kassin/Kiechel, is that how you say her name,
8  study?
9          A.  I think so, yes.
10         Q.  And that's the study with the college students or
11 grad students who were told not to touch the alt key
12 otherwise the computer would crash, and then the computer
13 crashed and they were all told that they pressed the alt
14 key, and there was an analysis done about how many people
15 would falsely confess to having done that, right?  I'm
16 summarizing very generally.
17         A.  Correct.
18         Q.  And that's the type of experimental studies that
19 have been done in this area, right?
20         A.  That's one type of experimental study, yes.
21         Q.  What other types of experimental studies have
22 been done other than this -- the type originally done by
23 Kassin and Kiechel in 1996?
24         A.  Well, I guess if we use the word type, type would

93

1  refer to kind of any experimental study, right.  So there
2  have been lots of other experimental studies on other
3  issues that are not re-creating a false confession, you
4  know, generating a laboratory-based false confession.
5          The other type and kind of laboratory study that
6  generates a false confession is where people are induced in
7  a laboratory to cheat and some people do cheat, some people
8  don't, and then they are accused of cheating, and some
9  people confess truthfully that they did cheat and some
10 people that didn't cheat confess falsely.
11         Q.  Okay.  Any other general type of experimental
12 study designed at generating a false confession?
13         A.  Yeah, there was one study in 2009 that used some
14 type of video evidence or equipment -- I'd have to review
15 the study, it's been many years, that also generated
16 laboratory-based false confessions, and there may be others
17 I'm not thinking of at this moment.
18         Q.  Okay.  If we go to page nine, the first
19 paragraph, the last two sentences, Dr. Welner writes that,
20 quote, "There is no empirical social science research that
21 resolves whether the Reyes/Solache confessions were true or
22 false."  Do you see that?
23         A.  Yes.
24         Q.  Then you say, I never said that the social

Richard Leo, 4/24/2023

94

1  science research resolves whether the confessions are true
2  or false, only that they meet the research criteria of a
3  proven false confession and I explained why.
4      A.  Correct.
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  I'm still struggling with trying to understand
8  where you're drawing the line here because you told us
9  earlier that while people could dispute that the confession
10  was false that if a particular confession meets one of the
11  four criteria then it dispositively establishes that the
12  confession was proven false.
13      So I'm just trying to understand the distinction
14  you're drawing between whether or not the confession is
15  true or false or whether it's a proven false confession?
16      MR. ELSON:  Objection to the form.
17      A.  I understand what you're -- I think what you're
18  saying you're confused about but I don't think you asked a
19  question.
20      Q.  Okay.  Well, let me try it again.  So I am
21  confused about the distinction you're drawing in the
22  sentence that reads, I never said that social science
23  research resolves whether the confessions are true or
24  false, only that they meet the research criteria of a

95

1  proven false confession and I explained why.  That's the
2  sentence I'm focusing on, okay?
3      A.  Okay.
4      Q.  With that sentence in mind, you earlier said that
5  if a case meets criteria then that establishes
6  dispositively that the confession constitutes a proven
7  false confession, and dispositively you defined as a proven
8  false confession to an absolute certainty or to a near
9  absolute certainty.
10      So I guess the question is, based on what you've
11  testified to today and in your previous dep and what you've
12  said in your report, what distinction are you drawing in
13  this sentence when you say you never said that the social
14  science research resolves whether the confessions are true
15  or false?  Isn't that exactly what you're doing, you're
16  saying the social science research resolves the question
17  and the confessions are false?
18      MR. ELSON:  Objection to the form.
19      A.  No.  I'm saying there is this research construct
20  we call proven false confession.  There are four criteria
21  that are not mutually exclusive.  If the case facts allow
22  one to categorize a disputed confession case as being one
23  of those four criteria or more then we would classify those
24  for research purposes as what we call a proven false

96

1  confession.
2      I didn't say the social science research resolves
3  this, and obviously in a court of law it's for the jury to
4  decide or the trier of fact to decide whether or not a
5  piece of evidence is true or false.  But I'm saying in the
6  research community we have these criteria and when we apply
7  them and if one or more are met then we say it is a proven
8  false confession, and my analysis in the earlier report was
9  that one or more of the criteria in Mr. Reyes and
10  Mr. Solache's case were met and we discussed those in the
11  last two depositions.
12      Q.  Then at the -- towards the bottom of the page,
13  the last paragraph actually, you talk about a survey study
14  that you published with Professor Kassin and you're
15  criticizing his criticisms of you, but I just want to
16  understand the survey that you're referencing here.  What
17  was the survey question that was asked --
18      A.  I don't recall.
19      Q.  -- that elicited the response that got you to the
20  5% number?
21      A.  I would -- the survey was published in 2007.  I
22  would have to go back and look for it.  I don't recall off
23  the top of my head what the exact question was.
24      Q.  Is the survey instrument still publicly available

97

1  so that we could go find it and see what question was
2  asked?
3      A.  I don't know.  It might be appended to the end of
4  the article.  I'd have to look at the article.
5      Q.  Okay.  As you sit here today, you're not sure is
6  what you're saying?
7      A.  Correct.
8      Q.  Okay.  If we go to the next page, page 10,
9  Dr. Welner distorts my past remarks, you say at the top of
10  the page, when he states that I have only seen 5 to 15
11  proven false confessions in my career.  You testified in a
12  Michigan case that of the approximately 400 cases in which
13  I testified, I did not know how many were proven false
14  confessions, but I estimated at that time the number to be
15  5 to 15.  Do you see that?
16      A.  Yes.
17      Q.  So I just wanted to be clear on what your
18  clarification here is.  So in the Michigan case that
19  Dr. Welner was discussing, that's a case that you actually
20  testified in court, correct?
21      A.  Correct.
22      Q.  So it's not a research paper or anything like
23  that?  It's actually testimony.  And you were asked a
24  question about how many times you had testified that a case

Richard Leo, 4/24/2023

98

1   fit criteria for a proven false confession and your
2   estimate at that time was between 5 and 15?  Is that what
3   you're saying or do I have that wrong?
4       A.  I think you've got it right.  I was asked -- my
5   recollection is I was asked of these 400 cases in which
6   you've testified as an expert witness, what percentage of
7   these or what number of these do you think met the criteria
8   for proven false confession, and my recollection is I said
9   I don't know, and then I was asked to estimate it and I
10  made an estimate, and these cases -- this was just in
11  the -- first of all, I don't know the number but I just
12  guessed an estimate, but these are cases I've worked on.
13  These are not necessarily cases that I've studied or
14  written about in a research context.
15      Q.  Right.  That's a different category, right, is
16  the cases that you've researched or written about.  So
17  these are all cases where you were hired as an expert,
18  right, the 400 number, correct?
19      A.  Correct.  I mean I might have worked pro bono on
20  some of them.  So hired, I would say retained.
21      Q.  Retained, that's a better word.  You're retained
22  as an expert in these approximately 400 cases, and when
23  you're retained as an expert in these 400 or so cases
24  you're provided materials like you were provided materials

99

1   in this case, right, by the person that -- the individual
2   that hired you or retained you?
3       A.  Correct.
4       Q.  Okay.  So you have at your disposal in those
5   approximately 400 cases presumably a lot of case materials
6   from which you can analyze and draw conclusions and then
7   ultimately arrive at some opinions that obviously must vary
8   from case to case, right?
9       A.  Some of the cases you don't have a lot of
10  materials.  Most of the cases I work on, 90% or more are
11  criminal cases that are going to trial.  They're not civil
12  cases with boxes and boxes of materials.  So there are some
13  cases where there is a lot of materials, there are other
14  cases where there are not.
15      Q.  Okay.  In any event, in the particular cases
16  where you're retained you are provided access to whatever
17  materials the individual who has retained you believes are
18  relevant for you to opine on whatever the particular issue
19  is that's relevant to that person's case, right?
20      A.  Yes.
21      Q.  Okay.  So of those 400 or so cases, when you were
22  asked the question in the Michigan case you estimated that
23  while you did not know precisely how many of the 400 cases
24  fit criteria for proven false confession you estimated the

100

1   number to be about 5 to 15.  Do you see that there?
2       A.  Yes.  At that time, yes.
3       Q.  Okay.  And do you have a different number now?
4       A.  Well, I would give a different estimate, yeah, I
5   think the number is higher than that but I don't know how
6   much higher.  I don't know if it's 20, 25, 30, but I do
7   think that I was underestimating but I don't have the
8   precise number.
9       Q.  Why do you think you were underestimating?
10      A.  Because subsequent to that I was looking over the
11  list of cases in which I had testified and I believe that I
12  counted more than 15 that I would find as proven false
13  confessions.
14      Q.  Okay.  But you don't know the number now either,
15  right?
16      A.  Off the top of my head, no.
17      Q.  Well, could you look it up?
18      A.  Well, I mean, I could look at the number of cases
19  in which I've testified and I could go through them one by
20  one and some of them I wouldn't know or remember enough to
21  know whether I would classify it as proven false
22  confession, but of the ones that I do remember and know
23  well enough I could look that up and then I could say, yes,
24  here is 26 or 32 that I can tell from memory I would have

101

1   classified or have classified as a proven false confession.
2           So I could determine that number to a degree at
3   which I would say it's no longer an estimate.  It's based
4   on what I remember this is the number in the list.
5       Q.  And why isn't that a number -- you keep track of
6   a number of different things, the number of times you
7   testify, the number of times you've been retained, we went
8   through all of this at your last deposition, why are you
9   not interested in keeping a tally of how many cases where
10  you've been retained as distinct from cases that you've
11  reviewed for purposes of research or publication?  Why
12  aren't you interested in keeping a tally of that number?
13          MR. ELSON:  Objection to the form.
14      A.  It's usually something that comes up in research.
15  It doesn't usually come up in the cases.  So prior -- I
16  think prior to that question on cross-examination, nobody
17  had asked me how many times of the cases I've worked on, or
18  if they had I didn't remember it, what number of the cases
19  I've worked on would I classify as a proven false
20  confession.  And this is not even the cases I've worked on.
21  This is just the number of cases I've testified in.
22      Q.  Right because you've worked on more -- you've
23  been retained to evaluate more cases than the ones where
24  you actually ended up testifying in, right?

Richard Leo, 4/24/2023

102

1    A.  Substantially, correct.
2    Q.  Yeah, okay.  You say the issue about a proven
3  false confession usually comes up in research, not in
4  cases?  Is that what you said, usually comes up in
5  research?
6    A.  Sorry, go ahead.
7    Q.  Yeah.  You said that the issue about whether a
8  confession meets criteria to be a proven false confession
9  usually comes up in research and not in cases where you're
10  testifying or being retained to evaluate.  Why do you say
11  that?  What do you mean?
12    A.  What I mean is that I might do articles involving
13  proven false confessions and assemble a dataset and analyze
14  it, so that would be in research and publication where I
15  might read other articles where the concept is referred to
16  or referenced, but in my expert witness testimony I'm
17  usually only asked general questions about proven false
18  confessions and nobody has ever asked me what number of
19  cases or what are the names of the cases that you've
20  testified in that you would classify as proven false
21  confessions.
22    Q.  How many cases where you've been retained have
23  you been asked to evaluate whether the confession met
24  criteria for a proven false confession?

103

1    A.  I couldn't give you a number.  I have no idea.
2    Q.  Because that's not a number you keep track of?
3    A.  Correct.
4    Q.  And I think you said -- I think -- actually, I
5  could probably look, but my recollection is you've
6  consulted, been retained in something like 2,000 cases,
7  right?
8    A.  Correct.
9    Q.  As of the report -- the January 15, 2022 report,
10  2,200 cases is what the report says and presumably that
11  number has gone up, right?
12    A.  Correct.
13    Q.  So of the 2,200 or so cases as of January 15th,
14  2022, as you sit here today you can't tell us in how many
15  of those cases you've been asked to assess whether or not
16  the confession met criteria to be a proven false
17  confession, right?
18    A.  Correct.
19    Q.  Are you always asked to evaluate the confession
20  to determine whether or not it meets criteria to be a
21  proven false confession?
22    A.  No.
23    Q.  How often are you asked to evaluate a confession
24  in these cases, this 2,200 or whatever the current number

104

1  is?  What percentage of the time are you asked to determine
2  whether or not the confession meets criteria to be a proven
3  false confession?
4    A.  It would be a pure speculative guess and the
5  problem with making speculative guesses is then they get
6  reified into subsequent questions as specific numbers as if
7  that's the number.  So I don't want to guess.  I have no
8  idea, as I said earlier.
9    Q.  At the bottom of the page, the same page, page
10  10, it says, Dr. Welner relies on an Alaska trial judge
11  from 1998 who falsely states that I had been excluded in
12  every forum where a pretrial admissibility hearing was
13  held.  Do you see that?
14    A.  Yes.
15    Q.  The Alaska trial judge who falsely stated you've
16  been excluded in every forum, do you know why the trial
17  judge made that mistake?
18    MR. ELSON:  Objection, form, calls for
19  speculation.
20    Q.  You can answer.
21    A.  Sorry.  I have no idea.
22    Q.  If we go to now Exhibit A to your report so it's
23  page I think 12 of this document.  This is a list of cases
24  in which you've qualified and testified from

105

1  January 2019 to January 2023?
2    A.  Correct.
3    Q.  Okay.  If we -- well, let's see.  Let's go
4  through the list.  State of California versus Manuel
5  Dominguez.  Do you know what the result of the suppression
6  hearing was?
7    A.  I don't recall.  I think the confession was
8  suppressed.
9    Q.  How about the next one, State of California
10  versus James Rickleffs, do you know what the result of the
11  suppression hearing was?
12    A.  I think the confession was not suppressed.
13    Q.  And the next one, is that a civil case?
14    A.  Correct.
15    Q.  Against the United States government?
16    A.  Correct.
17    Q.  And said that you were retained -- were you
18  retained to evaluate the confession to determine whether or
19  not it met criteria?
20    A.  I don't recall if it met the criteria of a false
21  confession.  I don't recall whether it was or not.  I'd
22  have to review it.
23    Q.  The next one is State of California versus
24  Regalado.  Do you know what the result of that suppression

Richard Leo, 4/24/2023

106

1  hearing was?
2      A.  I don't recall.  I think it was not suppressed
3  but I'm not sure.
4      Q.  Do you know how often you testified in a pretrial
5  hearing, a suppression hearing, what the percentage of
6  times are that the statement was suppressed versus not
7  suppressed?  Do you keep that stat?
8      A.  I don't know -- no, I don't keep the statistic
9  and I'm not always told either.
10     Q.  Do you ask?
11     A.  Sometimes I ask, yes, but I'm still not always
12  told.  It may be that the result doesn't occur for months
13  and then I say please let me know and I forget to follow up
14  and they don't tell me.
15     Q.  In this --
16     A.  Or it might be -- sorry.  Or it might be, you
17  know, they tell me two hours later.
18     Q.  Okay.  And then State of California versus Singh,
19  do you know whether or not the statement was suppressed?
20     A.  I do not recall whether it was suppressed or not.
21     Q.  And -- did I just ask you about Singh?  I'm
22  sorry.  In Singh -- State of California versus Singh, do
23  you know whether or not the statement was suppressed?
24     A.  I don't recall.

107

1      Q.  Then State of California versus Atwal, it says
2  trial.  Was that a criminal case or a civil case?
3      A.  No, it was a criminal case.
4      Q.  What did you testify to at the trial?  What was
5  the purpose of your testimony?
6      A.  The purpose was the use of interrogation
7  techniques to coerce false statements or create a risk of
8  coercing false statements from alleged witnesses and/or
9  co-conspirators.
10     Q.  And do you know what the result of the trial was?
11     A.  Yes.  All of the criminal defendants were
12  acquitted.
13     Q.  Were acquitted?
14     A.  Correct.
15     Q.  Were you testifying on behalf of a particular
16  defendant or multiple defendants?
17         MR. ELSON:  Objection to the form.
18     A.  Well, I was retained by one defendant but the
19  testimony was on behalf of more than one defendant, several
20  defendants.
21     Q.  Okay.  Do you know what the criminal defendants
22  were accused of in that case?
23     A.  Yes.  It was a homicide case.
24     Q.  Okay.  Then State of California versus Curtis

108

1  Leonard, that was a suppression hearing.  Do you know
2  whether or not the statement was or was not suppressed?
3      A.  I don't recall.
4      Q.  Then in the matter of Michael Wright,
5  administrative trial, what was that about?
6      A.  Michael Wright was a pharmacist in Utah and I
7  think it was a licensing hearing, whether or not his
8  license was going to get taken away, and I think he was
9  accused of improperly prescribing or improperly prescribing or
10  dispensing some medication, and so it was a multi-day
11  licensing board hearing and that's why it was an
12  administrative trial.
13     Q.  And what was your role?
14     A.  He was interrogated and he claimed that under
15  duress he gave false statements to put an end to the
16  interrogation, and my role was to explain based on the
17  social science how and why that could happen.
18     Q.  And what was the result of the administrative
19  trial?
20     A.  I don't remember the result exactly, but I think
21  it was kind of split like, you know, he didn't get his
22  license taken away but he was suspended for three months.
23  That's an example of what -- the kind of decision that was
24  made but I don't remember the details.  So I think he got a

109

1  lower level of punishment than revocation of his license.
2      Q.  Okay.  And then State of Montana versus Ryan
3  Lamb, is that a criminal trial?
4      A.  Yes, that was a criminal trial.
5      Q.  And what testimony did you offer in that case?
6      A.  I believe I offered testimony again about police
7  interrogation, psychological interrogation methods and
8  confessions, true and false confessions.  General
9  testimony.  There may have been case specific testimony
10  about the techniques used, I don't recall.
11     Q.  And do you know what the outcome of the trial
12  was?
13     A.  I think he was convicted.
14     Q.  Okay.  And then State of Arizona versus Gary
15  Worrell.  Was that another criminal case, criminal trial?
16     A.  It was, yes.
17     Q.  Did you testify similarly as you've been talking
18  about here about interrogation techniques, et cetera?
19     A.  Yes.
20     Q.  Do you know what the outcome of that criminal
21  trial was?
22     A.  Yes.  He was convicted.
23     Q.  U.S. versus Jumper, that was a suppression
24  hearing.  Do you know what the outcome of the suppression

Richard Leo, 4/24/2023

110

1  hearing was?
2      A. I think it was suppressed but I'm not 100% sure.
3      Q. State of California versus Cerna, another
4  suppression hearing. Do you know what the outcome of the
5  suppression hearing was?
6      A. I don't recall.
7      Q. State of California versus Benitez, another
8  suppression hearing. Do you know what the outcome of that
9  suppression hearing was?
10     A. I don't recall.
11     Q. The next page at the top, United States versus
12  MMJ -- I mean MMJ, another suppression hearing. Do you
13  know what the outcome of the suppression hearing was?
14     A. I think it was suppressed but I'm not 100% sure.
15     Q. Then State of Ohio versus Ferricci, another
16  trial. Is that a criminal case?
17     A. Yes.
18     Q. Then did you testify consistently with the way
19  you've testified in other cases?
20     A. Yes.
21     Q. Do you know what the outcome of the trial was?
22     A. I believe he was convicted.
23     Q. State of California versus Nicholas James, that's
24  another suppression hearing?

111

1      A. I believe that was suppressed, yes.
2      Q. Then how about State of California versus Garcia,
3  another suppression hearing?
4      A. I don't recall what the outcome was of that.
5      Q. The next one, U.S. versus KIW, another
6  suppression hearing. Do you know what the outcome of that
7  was?
8      A. I think it was suppressed but I don't know for
9  sure.
10     Q. State of California versus Garcia, it says trial.
11  Is that a criminal case?
12     A. Yes, and I think he was convicted.
13     Q. State of California versus Mendez, that's another
14  suppression hearing. Do you know what the outcome of the
15  suppression hearing was?
16     A. Yeah. Hold on a second. I think there was a
17  hung jury on the July 2020 Garcia trial. I don't think he
18  was convicted because I think he was convicted at a
19  subsequent trial.
20         On Mendez, I don't recall the outcome.
21     Q. The next one, Lavelle Jones and Carl Dukes,
22  that's a civil case?
23     A. Yeah. These were two joint civil cases in which
24  I testified and I don't know what the result was, whether

112

1  they've settled or not that particular case, the one in the
2  state court of claims.
3      Q. Okay. But it also says trial. Did you testify
4  at the trial?
5      A. I think it was a bench trial.
6      Q. Okay. In the court of claims?
7      A. Correct.
8      Q. And were you asked to evaluate whether or not, I
9  assume, Mr. Jones and Mr. Dukes gave a -- provided a
10  confession or an inculpatory statement; is that right?
11     A. Correct.
12     Q. Were you asked to evaluate whether or not they
13  met one of the four criteria to be a proven false
14  confession?
15     A. I don't recall. I'd have to go back and look at
16  my notes or report in that case.
17     Q. Okay. Then the Garcia case, that's the retrial
18  after the hung jury from July of 2020; is that right?
19     A. Correct.
20     Q. And do you know the outcome of that case then?
21     A. I think he was convicted.
22     Q. And then there is another civil case, McCollum
23  versus Robeson County; is that right?
24     A. Correct.

113

1      Q. And did you testify at the trial?
2      A. I did.
3      Q. Do you know what the verdict was?
4      A. Yes. It was in favor of the plaintiffs, and I
5  think it was an $85 million verdict, in that neighborhood
6  between 80 and $90 million.
7      Q. It was more than one plaintiff?
8      A. There were two plaintiffs, Henry McCollum and I
9  think his stepbrother Leon Brown.
10     Q. And in that particular case were you asked to
11  determine whether or not the confessions in that case met
12  one of the four criteria to be a proven false confession?
13     A. I think it was taken as given because it was a
14  D -- a clear DNA exoneration. So I think everybody agreed
15  that it was a proven false confession. I may be
16  misremembering. I would have to go back and look at my
17  report in that case.
18     Q. State of California versus Eastman. Was that a
19  criminal trial?
20     A. Yes.
21     Q. Do you know the result of the criminal trial?
22     A. I do not recall. I think he was convicted but I
23  do not recall.
24     Q. State of Nevada versus Rohr, that's a suppression

Richard Leo, 4/24/2023

114

1    hearing.  Do you know what the result of the suppression
2    hearing was?
3        A.   Yeah.  The statement was admitted.
4        Q.   And then Nevada, State of Nevada versus Anita
5    Rohr.  Is that a criminal trial?
6        A.   Yes, and she was convicted, and a few months ago
7    the conviction got reversed on appeal by an appellate
8    court.
9        Q.   Do you know what the basis for the appeal was?
10       A.   I reviewed the opinion.  It had -- I think it had
11   something to do with the confession, whether it was
12   improperly admitted or whether certain statements by law
13   enforcement were improperly allowed.  I think that was it
14   but I'd have to reread the opinion.
15       Q.   Okay.  State of Missouri versus Simmons, that's
16   another criminal trial; is that right?
17       A.   Correct.  It's a criminal trial, that's correct.
18       Q.   And was Mr. Simmons convicted or acquitted?
19       A.   I don't recall.
20       Q.   State of -- I'm sorry, were you done?
21       A.   Yes.
22       Q.   Okay.  State of California versus Ramey, that's
23   another criminal trial, right?
24       A.   Correct.

115

1        Q.   And was Mr. Ramey convicted or acquitted?
2        A.   I don't recall.
3        Q.   The next one is U.S. versus Bigda?
4        A.   Correct.
5        Q.   It says prosecution there.  What does that mean?
6        A.   I was -- I worked on behalf of the prosecution in
7    that case, not on behalf of the defense.
8        Q.   And what did the prosecution ask you to do in
9    that case?
10       A.   It was essentially a police interrogation
11   standards expert.  So Mr. Bigda was a police officer in a
12   county in Massachusetts and he had arrested somebody and
13   was interrogating them in a neighboring county and he may
14   not have realized that his interrogation was being recorded
15   and so he made a number of threats about physically
16   assaulting and beating up the person he was interrogating,
17   who was a minor, if that person didn't confess.  So the
18   Department of Justice was prosecuting him for violating
19   federal law in terrorizing and threatening that minor on
20   tape in an interrogation.
21            So they wanted an expert to testify, as I did at
22   the federal trial, about police interrogation training,
23   practices and standards with respect to threats of
24   violence, physical assault and other abusive interrogation

116

1    techniques.
2        Q.   And you were permitted to testify in that -- to
3    the topics that you just described, right?
4        A.   Correct.
5        Q.   Was Mr. Bigda convicted or acquitted?
6        A.   He was acquitted.
7        Q.   U.S. versus Kathleen Richard, that's a
8    suppression hearing.  Was the confession suppressed or not?
9        A.   No.  It was admitted.
10       Q.   Then you testified again at the trial?
11       A.   Correct.
12       Q.   And what happened at the trial?
13       A.   She was convicted.
14       Q.   State of California versus Gonzales.  That's
15   another criminal trial, right?
16       A.   Correct.
17       Q.   Was Mr. Gonzales acquitted or convicted?
18       A.   I don't recall whether he was convicted or
19   acquitted.
20       Q.   State of California versus Kourchenko, is that
21   another criminal trial?
22       A.   Correct.
23       Q.   Was Mr. Kourchenko acquitted or convicted?
24       A.   I believe he was convicted.

117

1        Q.   State of California versus Jimmy Rosales, is that
2    another criminal case?
3        A.   Yes.
4        Q.   Was he -- Mr. Rosales convicted or acquitted?
5        A.   I think he was acquitted but I'm not 100% sure.
6    I'd have to double check.
7        Q.   And then State of Illinois versus David Wright,
8    post-conviction hearing.  Do you see that?
9        A.   Yes.
10       Q.   And that's here in Cook County, right?
11       A.   Correct.
12       Q.   "Here" meaning where I am, not where you are.
13            Who retained you to represent Mr. Wright?
14       A.   The Exoneration Project at the University of
15   Chicago Law School, I believe.
16       Q.   What was the substance of your testimony?
17       A.   I believe it was the same as it usually is about
18   the social science on police interrogation, psychological
19   coercion and false confessions and some case specific
20   analysis.
21       Q.   Were you asked to analyze whether or not
22   Mr. Wright's confession met one of the four criteria for it
23   to be a proven false confession?
24       A.   I don't recall.

Richard Leo, 4/24/2023

118

1    Q.   And do you know what the status of the
2    post-conviction proceeding is for Mr. Wright?
3    A.   I think he was released but I could be wrong.
4    I'd have to double check.
5    Q.   State of Colorado versus Lyndarr, that's another
6    post-conviction --
7    A.   Correct.
8    Q.   -- hearing in Colorado.  Who retained you on
9    behalf of Mr. Lyndarr?
10   A.   It was the post-conviction attorney in Colorado.
11   I don't remember his name.
12   Q.   And what did you testify to in that particular
13   post-conviction hearing?
14   A.   About interrogation practices, psychological
15   coercion, false statements and false confessions.
16   Q.   Do you know what the outcome of that hearing was?
17   A.   I don't.  I think it was one of those situations
18   where he told me the outcome wouldn't be determined for
19   months, that after the hearing both sides would have to
20   brief it, there would be a written opinion and he would get
21   back to me, and I haven't heard since.
22   Q.   Okay.  The next one is State of California versus
23   Sidney Russell.  Is that another criminal trial?
24   A.   Correct.

119

1    Q.   What was the outcome of that criminal trial?
2    A.   Don't recall.  I think he was convicted but I'm
3    not 100% sure.
4    Q.   And then U.S. versus Ronald Jacobs, that's a
5    suppression hearing.  Was the statement suppressed?
6    A.   I think it was suppressed, but recently I heard
7    that an appellate court reversed the suppression.
8    Q.   Do you know the basis for the appellate court's
9    decision to reverse the suppression?
10   A.   I do not.
11   Q.   Then the next one is State of California versus
12   Robert Earl Davis.  That's another criminal trial; is that
13   right?
14   A.   Correct, and I don't recall the outcome.
15   Q.   And the next one is U.S. versus -- I don't know
16   how to say that name, Racion or Racion?
17   A.   Yeah, I pronounce it Racion but I don't know
18   either.  My recollection is he was convicted.
19   Q.   Okay.  Then the next one is the State of
20   Tennessee versus Lowe.  That's another post-conviction
21   hearing; is that right?
22   A.   Correct, and her conviction was reversed.
23   Q.   What were you asked to testify to in that
24   post-conviction hearing?

120

1    A.   About interrogations, confessions, the Reid
2    method, risk factors.
3    Q.   Were you allowed -- were you asked to evaluate
4    whether or not Miss Lowe's confession met one of the four
5    criteria for a proven false confession?
6    A.   I don't believe I was asked but I'd have to
7    double check to confirm for sure.
8    Q.   Okay.  Then the next one is State of California
9    versus Knowles, another post-conviction hearing.  Do you
10   know what the outcome of that hearing was?
11   A.   No.  I believe the attorney was going to get back
12   to me and never did or it might still be undecided.
13   Q.   Okay.  And then were you asked to evaluate
14   Mr. Knowles' confession to determine whether or not it met
15   criteria, one of the four criteria to be a proven false
16   confession?
17   A.   I don't believe so.
18   Q.   Then the last one, Commonwealth of Kentucky
19   versus McCullon, that's another suppression hearing.  Do
20   you know what the outcome of that hearing was?
21   A.   I don't believe they ever got back to me on that
22   so I don't recall.
23   Q.   Okay.  All right.  I think we're done with this
24   exhibit, and this is probably a good place to take a break

121

1    since I'm going to switch gears a little bit, and then we
2    can talk about your notes for a bit.  So I'm going to go
3    off the record.
4    A.   Can we take a 10-minute break, not a 5-minute
5    break or a 15-minute break, just longer than our usual
6    break, usual five-minute break?
7    Q.   Yeah, sure, we can do -- if you need 15, that's
8    fine.
9    A.   Either 10 or 15 is fine with me.
10        MS. ROSEN:  Nick, you're muted.
11        THE VIDEOGRAPHER:  Thank you.  Going off the
12   video record at 3:38 p.m.
13        (Whereupon a recess was taken.)
14        THE VIDEOGRAPHER:  This is the beginning of
15   Media Unit 4, and we are back on the video record at
16   3:53 p.m.
17        DIRECT EXAMINATION (cont.)
18   BY MS. ROSEN:
19   Q.   All right.  If we could switch gears a little bit
20   and take a look at Exhibit Number 8.
21        (Remote screen sharing.)
22   Q.   Dr. Leo, these are the notes that you were
23   utilizing to assist your memory during the September 2022
24   deposition in this case --

Richard Leo, 4/24/2023

122

1    A. Okay.
2    Q. -- that are Bates-stamped LEO2268 through
3  LEO2358. I think from this morning we talked -- we talked
4  about this and you testified that you have a hard copy of
5  these documents in front of you, correct?
6    A. Yes.
7    Q. Okay. And you testified in the September
8  deposition or depositions, I don't remember which day, that
9  you prepared these notes in the weeks leading up to your
10  deposition to assist you for the deposition answering
11  questions because the report you wrote in this case
12  contained a lot of information and was either the longest
13  or one of the longest reports you'd ever written. Do I
14  have that summarized accurately?
15    A. I believe so.
16    Q. Okay. And so these notes are not only summaries
17  of I believe it's 38 of the cases that you analyzed in the
18  Monell portion of your opinion but also have three
19  different indexes and then also has some notes typewritten
20  and handwritten related to the underlying case, meaning
21  Mr. Reyes and Mr. Solache's case. Is that right?
22    A. Yes.
23    Q. Okay. Why -- what made you decide to, let's
24  focus on the notes related to Mr. Solache and Mr. Reyes'

123

1  cases which begin at page -- at Bates-stamped 2353 which is
2  I think about eight pages from before the end of the
3  packet. So starting here, Indicia of Unreliability, the
4  confessions are riddled with factual errors and are
5  inconsistent with crime scene facts, physical evidence and
6  logic. Do you see that?
7    A. Yes.
8    Q. So the next few pages, six pages, address the
9  Solache and Reyes case itself. Why did you prepare notes
10  with respect to this aspect of your report?
11    MR. ELSON: Objection. You just summarized
12  his previous testimony from the 14-hour deposition as to
13  why and when these notes were prepared. So my objection
14  is, number one, based on asked and answered.
15    Number two, we asserted privilege objections
16  during the 14-hour deposition in relation to these notes
17  and, as you know, we had a meet-and-confer process about
18  this subsequently where we explained the basis of our
19  objections, but in an effort to reach a compromise we
20  produced these notes even though we believed they weren't
21  discoverable subject to our reservation of our privilege
22  right.
23    During our meet-and-confer process, we discussed
24  the timing of a potential redeposition related to these

124

1  notes. We never reached a resolution of that issue but we
2  agreed -- we offered some additional time for you to reask
3  questions if you wanted to reask them regarding when and
4  why the notes were created which have already been asked
5  and answered.
6    So I'm going to allow him to answer the question
7  you just asked, but I'm making this record because I'm
8  guessing we're going down a road where I'm going to have to
9  reassert our privilege objections and I want to caution the
10  witness about that, but we'll take it on a question by
11  question basis and you can answer this particular question.
12    And it probably needs to be read back and it
13  needs to be read back for my own sake. So I would ask the
14  court reporter to do that.
15    (Record read as follows:
16    "Question: So the next few pages, six
17    pages, address the Solache and Reyes
18    case itself. Why did you prepare notes
19    with respect to this aspect of your
20    report?"
21    A. So these are memory aids that Reyes and Solache
22  case, as I think was asked maybe in a previous question or
23  mentioned at least, is I think the longest report I've ever
24  prepared, certainly one of the longest. I reviewed a

125

1  voluminous amount of materials. It's the longest time I've
2  ever been deposed, right, you got an extra seven hours your
3  second day. So this was just an effort to be prepared for
4  the deposition and to have notes in front of me should my
5  mind go blank or should I not remember something buried in
6  the reports. So it was just to help me more adequately and
7  accurately answer your questions in the two-day, 14-hour
8  deposition.
9  BY MS. ROSEN:
10    Q. Okay. And when did you -- specifically when did
11  you prepare the notes as it relates to the Reyes and
12  Solache portion of your report?
13    A. I don't recall when I prepared, exactly when I
14  prepared those notes. It would have been around the time
15  of my deposition, prior to my deposition, but I don't
16  recall specifically.
17    Q. And with respect to this page of the notes, what
18  did you do to create the notes? Meaning what documents did
19  you review, if any, to prepare the six points that appear
20  at Bates stamp LEO2353?
21    MR. ELSON: Objection. We are asserting
22  privilege under Rule 26(b)(4)(B) and (C) with regard to
23  that question and instruct the witness not to answer.
24    Q. I assume you're going to take your attorney's

Richard Leo, 4/24/2023

126

1  advice and not answer my question, correct?
2      A.  Correct.
3          MS. ROSEN:  And, actually, I hate to do
4  this, but can you read back my question just so that I have
5  it in my head precisely?
6          THE REPORTER:  Yes.
7          (Record read as follows:
8          "Question:  And with respect to this
9          page of the notes, what did you do to
10         create the notes?  Meaning what
11         documents did you review, if any, to
12         prepare the six points that appear at
13         Bates stamp LEO2353?"
14 BY MS. ROSEN:
15     Q.  Let's go to the next page of the note.  Now, this
16 page is titled Evidence of Proven False Confession DNA
17 Exclusion, and it identifies information on the document,
18 items 1) through 6), beginning with the point about the
19 victims being stabbed more than 50 times, bullet point 2)
20 is items found by the police, item 3) is a statement that
21 the true perpetrator or perpetrators would have left DNA at
22 the crime scene and DNA from the crime scene would have
23 been left on them, item number 4) is that neither Reyes nor
24 Solache's DNA was found at the DNA-rich crime scene nor

127

1  were any of either murder victims' DNA found on Mr. Reyes
2  or Solache, number 5) not a single piece of forensic
3  evidence linked Reyes or Solache to the double murder, DNA
4  testing excluded both individuals as the source of any
5  evidence at the crime scene, and then by contrast
6  Miss Mejia's DNA was found at the scene and the victim's
7  blood was on her.  Do you see that?
8      A.  Yes.
9      Q.  And you -- what did you do to create the notes?
10 What documents did you review to create the typed portion
11 of the notes at page Bates-stamped LEO2354?
12         MR. ELSON:  Objection.  We assert the
13 privilege pursuant to Rule 26(b)(4)(B) and (C) in response
14 to this question, and I instruct the witness not to answer.
15 BY MS. ROSEN:
16     Q.  With respect to -- I assume you're going to take
17 your attorney's advice and not answer the question,
18 correct?
19     A.  Correct.
20     Q.  Did you prepare these notes independently of
21 anybody else?
22         MR. ELSON:  Objection.  Same objection as
23 before, same privilege asserted, same instruction not to
24 answer.

128

1  BY MS. ROSEN:
2      Q.  There is handwritten notes at the bottom -- I'm
3  going to assume, just so we're not wasting time, that every
4  time you're instructed not to answer you're going to take
5  your lawyer's advice.  Is that assumption correct?
6      A.  Correct.
7          MR. ELSON:  For the record, I'm not his
8  lawyer.  He is the expert.  I'm the party's attorney.  But
9  understood, and, yes, you can save us time by making that
10 clear.  I appreciate that.
11         MS. ROSEN:  You're representing him, aren't
12 you, for purposes of this deposition?
13         MR. ELSON:  I don't know if that's the
14 correct technical way to put it.  I mean he is an expert
15 witness and I represent the Plaintiff in the case and he
16 has been retained by the Plaintiff, but I don't know that
17 it's accurate to say that I'm his lawyer.
18         MS. ROSEN:  Okay.  Well, we don't need to
19 get into this debate, but I'm going to assume you're going
20 to take Mr. Elson's advice or Miss Brady's advice if she
21 decides to chime in and instructs you not to answer,
22 correct?
23         MS. BRADY:  I would like to put on the
24 record that, as we stated at the beginning of this

129

1  deposition, our objection in the Reyes case, we're joining
2  all the objections made by Mr. Elson and I've been
3  declining for efficiency that that rule still stands.
4          MS. ROSEN:  Yeah, I didn't assume that it
5  somehow evaporated because you appeared, but thanks for
6  clarifying.
7  BY MS. ROSEN:
8      Q.  At the bottom of LEO2354, there is some
9  handwritten notes, correct?
10     A.  Yes, correct.
11     Q.  That's your handwriting, right?
12     A.  Correct.
13     Q.  When did you add the handwriting in relation to
14 when the notes were typed?
15         MR. ELSON:  Objection.  Same objection, same
16 privilege asserted, same instruction not to answer.
17         MS. ROSEN:  The when?  You allowed him to
18 answer a when question earlier.  What's the difference?
19         MR. ELSON:  Because I allowed him to answer
20 the when question with regard to when these notes were
21 created in terms of after his report was issued and before
22 the deposition, but if you're getting into the details of
23 what specific writings contained in each document were
24 placed on the document, then I'm going to assert the

Richard Leo, 4/24/2023

130

1   privilege.
2           MS. ROSEN:  Okay.  I don't understand but
3   okay.
4   BY MS. ROSEN:
5       Q.   Why did you add the handwritten notes to the
6   typed version of the document at LEO2354?
7           MR. ELSON:  Objection, asserting the
8   privilege, and instructing the witness not to answer.
9       Q.   Let's look at page 2355.  Are these your
10  handwritten notes?
11      A.   Yes.
12      Q.   When did you write these notes in comparison to
13  the typed notes at page 2354 that we just looked at?
14          MR. ELSON:  You can answer that question if
15  you know the answer.
16      A.   I don't recall exactly when I wrote out these
17  notes.
18      Q.   Is it possible you wrote out the handwritten
19  notes before you did the typed notes?
20          MR. ELSON:  You can answer that.
21      A.   It's possible.
22      Q.   Go to the next page, Bates-stamped 2356.  This
23  says Sources of Pattern/Practice/Notice.  Do you see that?
24      A.   Yes.

131

1       Q.   This now goes to the Monell portion of your
2   report, right, your opinions related to the City of
3   Chicago's policies and practices; is that correct?
4       A.   Yes.
5           MR. ELSON:  Objection to the form.
6       Q.   And when did you prepare these notes?
7           MR. ELSON:  You can answer that.
8       A.   I don't recall.
9       Q.   Was it in the same time period in the weeks
10  leading up to the September deposition?
11          MR. ELSON:  You can answer that.
12      A.   It was after the report, prior to the deposition.
13  I don't know how much prior to the deposition, but closer
14  to the deposition than to the completion of the report.
15      Q.   And certainly your deposition occurred September
16  I believe it's 28th and 29th of 2022.  Do you recall
17  that?
18      A.   Yes.
19      Q.   And if you testified in September -- on
20  September 28th and/or September 29th that you prepared
21  the notes in the few weeks leading up to your deposition,
22  would that have been accurate testimony?
23      A.   I believe it would have been if that's what I
24  testified to during the deposition.

132

1       Q.   Okay.  So based on that testimony is it fair to
2   say that you prepared all of the notes that are in this
3   packet of materials that are marked as Exhibit 8 during the
4   month of September leading up to your September 28th and
5   September 29th deposition?
6       A.   If that's what I previously testified to then,
7   yes, I believe that would be accurate.
8       Q.   Okay.  Then turning to this page that we have up
9   on the screen right now, Bates-stamped 2356 of Exhibit 8,
10  it identifies the source -- the document is called Sources
11  of Pattern/Practice and Notice and then it has 10 bullet
12  points.  Do you see that there?
13      A.   Yes.
14      Q.   And what did you review in order to create those
15  notes?
16          MR. ELSON:  Objection, assert the privilege
17  under Rule 26(b)(4)(B) and (C) and instruct the witness not
18  to answer.
19  BY MS. ROSEN:
20      Q.   Did you prepare this page 2356 in one sitting?
21          MR. ELSON:  Object -- same objection, same
22  instruction.
23      Q.   Let's go to the next page, 2357.  This page now
24  says, Evidence of a Proven False Confession, Physical

133

1   Impossibility.  It has two bullet points, right?
2       A.   Correct.
3       Q.   This goes back to your opinion regarding
4   Mr. Solache and Mr. Reyes' underlying case, right?  It's
5   not the Monell claim anymore?
6       A.   Correct.
7       Q.   Where do you maintain these notes, the one's
8   we've been talking about, 2353, 2354, 2355, 2356, 2357?
9           MR. ELSON:  Objection to the form.  You can
10  answer if you understand the question.
11      A.   They should be in my file, my paper file for the
12  case, or three-hole punched into binders that are
13  essentially a paper file of the case.
14      Q.   Do you maintain an electronic file of your case,
15  of the case?
16      A.   If I've been sent documents electronically then
17  yes, I would maintain an electronic file.
18      Q.   Do you maintain an electronic version of your
19  original report that was prepared and tendered in January
20  of 2022?
21      A.   Yes, I have an electronic copy of that.
22      Q.   Do you have an electronic copy of the rebuttal
23  report that we were talking about this morning,
24  Exhibit Number 4?

Richard Leo, 4/24/2023

134

1    A.  Yes.
2    Q.  Do you have an electronic copy of these notes?
3    A.  I should, yes.
4    Q.  And when you prepared these notes, I assume you
5    prepared them on the same computer or word processor or
6    whatever it is that you prepared your reports on; is that
7    correct?
8              MR. ELSON:  Objection, assert the privilege
9    under Rule 26(b)(4)(B), (C), instruct the witness not to
10   answer.
11   BY MS. ROSEN:
12   Q.  In advance of your deposition, after you typed
13   the notes to assist you to answer the questions for your
14   two-day deposition, did you then print a copy of the note?
15             MR. ELSON:  Objection to the form of the
16   question.  You can answer whether you printed a copy of the
17   notes.
18   A.  Yes.
19   Q.  And then after you printed a copy of the notes
20   did you then add the handwritten additional notations that
21   we see throughout the note?
22             MR. ELSON:  You can answer that question.
23   A.  For the most part, yes.  Yeah, the handwritten
24   notations I believe on all the typewritten notes would have

135

1    been added after I printed out the typewritten notes.
2    Q.  Okay.  And if we go to the last page of this
3    exhibit, at the top it says Interrogation of Arturo Reyes,
4    it identifies certain police officers, it identifies the
5    victims, and then it says Interrogation of Gabriel Solache
6    and it identifies police officers.  Do you see that?
7    A.  Yes.
8    Q.  Under police officers it says ASA Heather
9    Brualdi.  Do you see that?
10   A.  Yes.
11   Q.  You know that ASA is not a police officer, right?
12   A.  Correct.
13   Q.  Okay.  And so in these particular notes, pages 23
14   to -- 2353 to 2358, all of the notes, the typed written
15   notes relate to Mr. Solache and Mr. Reyes' underlying case
16   except for page 2356 which says Sources of
17   Pattern/Practice/Notice.  Do you see that there?
18   A.  Yes.
19   Q.  And then if we go to the first page of the packet
20   of notes, Exhibit Number 8, at this point now there is a
21   lengthier summary that begins with Mr. Flewellen's case,
22   right?
23   A.  Correct.
24   Q.  And let me ask you this:  Did you print these

136

1    notes, pages 2268 through 2352, off of your computer and
2    then write handwritten notes on them?
3              MR. ELSON:  You can answer that question.
4    A.  Yes.
5    Q.  Are these notes saved in the electronic version
6    of your file with your original report and your rebuttal
7    report?
8    A.  Yes.
9    Q.  And did you create these notes on the same
10   computer that you created your original report and your
11   rebuttal report using the same word processor?
12             MR. ELSON:  Objection, assert the privilege,
13   instruct the witness not to answer.
14   BY MS. ROSEN:
15   Q.  Taking a look at the first page here
16   Bates-stamped 2268, at the top it says, Case Derek
17   Flewellen, it says year 1995, and then it says Report
18   Page 78.  What is that a reference to the 78?
19   A.  I'm not sure.  It might be a report -- it's
20   prob -- I have to crosscheck it.  It's probably a reference
21   to page 78 of my report.
22   Q.  And then it says Area 3, what is that a reference
23   to?
24   A.  Well, as you know, my report discussed Areas 2,

137

1    3, 4 and 5 in the systematic widespread pattern and
2    practice discussion and so I tried to group these together
3    by area just to keep them straight in my mind.  And then,
4    as you pointed out, there were indexes that -- for the
5    cases in each of the areas as well.  There is so many cases
6    it was hard for me to just remember all the names and which
7    area they corresponded to.
8    Q.  Okay.  Then below Area 3 it says, Summary in Leo
9    Report.  Do you see that there?
10   A.  Yes.
11   Q.  And then below that, what is reflected there
12   under the heading Summary in Leo Report?
13   A.  It's just a very brief summary of the case.
14   Q.  Where did it come from?
15   A.  It came from --
16             MR. ELSON:  Objection to form.  You can
17   answer.  No, you can answer.
18   A.  These were memory aids to help me in the
19   deposition.  All the material came from the materials I
20   reviewed in the report.
21   Q.  Right.  I'm asking that particular paragraph.
22   Did you type that?  Is that new information that you typed
23   as you were typing the notes or did you get it from
24   somewhere else?

Richard Leo, 4/24/2023

---

138

1    MR. ELSON: Objection, assert the privilege,
2    instruct the witness not to answer.
3    Q.   Why does the heading say Summary in Leo Report?
4    Could it be a summary from somewhere else?
5        MR. ELSON: Same objection, same
6    instruction.
7    Q.   Below that paragraph it says Materials Provided
8    Supporting Summary in Report. Do you see that?
9    A.   Yes.
10   Q.   And then there is a sort of a two-cell table or
11   something that says Description and then it says, Complaint
12   in Derek Flewellen versus City of Chicago, and then Bates
13   range PTP-D-FLEWELLEN with the numbers. Do you see that?
14   A.   Yes.
15   Q.   And where did that information come from?
16       MR. ELSON: Object to the form of the
17   question. I think there is a way for you to ask this that
18   doesn't implicate the privilege but you would need to
19   phrase it differently. I'm not trying to be obstructionist
20   or to make a speaking objection, but the way you phrased
21   that question I'm going to assert the privilege and
22   instruct the witness not to answer.
23   BY MS. ROSEN:
24   Q.   Was there a particular reason that you used a

---

139

1    table in the notes, in these summaries of the different
2    cases?
3        MR. ELSON: Objection, assert the privilege,
4    instruct the witness not to answer.
5    Q.   Below the table it says Evidentiary Support for
6    Summary, and then it says, Evidence of Coercion and Abuse.
7    Do you see that?
8    A.   Yes.
9    Q.   And then it says, In a complaint filed in 2000
10   Derrick Flewellen alleged in November 1995 the Chicago
11   Police Department, including Detectives Boudreau and
12   Halloran, took him from the hospital where he was being
13   treated for a foot injury and was in severe pain. Then it
14   cites to PTP-FLEWELLEN pages 2 and 3. Do you see that?
15   A.   Yes.
16   Q.   What methodology were you utilizing to create the
17   bullet points under Evidence of Coercion and Abuse in
18   creating these notes?
19       MR. ELSON: Objection, assert the privilege,
20   instruct the witness not to answer.
21   Q.   Let's take a look at for a second
22   Exhibit Number 6 which is the Monell only opinion.
23       (Remote screen sharing.)
24   Q.   And go to page 78. You're just going to have to

---

140

1    scroll. It's 78 of the full report. Yeah, that's not
2    going to work. It's my page 13 try. Sorry, okay.
3        Let's go to the bottom of this page. That bullet
4    point number 9 is Mr. Flewellen, correct, Derek Flewellen?
5    A.   Correct.
6    Q.   And the extent of the discussion regarding
7    Mr. Flewellen's case comprises whatever that is, six lines,
8    right?
9    A.   Yes.
10   Q.   If we go to the next page you'll see that's now a
11   different discussion of Mr. Gillespie's case. So if we go
12   back to page 78, that's Mr. Flewellen's case, and yet the
13   notes, if we go back to Exhibit Number 8 for
14   Mr. Flewellen's case, are a page and a half, 2268 and 2269.
15       Why did you decide to add so much detail in the
16   notes that you prepared to aid your memory so that you
17   could answer questions at the deposition?
18       MR. ELSON: Objection, assert the privilege,
19   instruct the witness not to answer.
20   BY MS. ROSEN:
21   Q.   The notes -- well, let's actually go to
22   Bates-stamped 2274 of the notes. This is the index that
23   you created, right, for the Area 3 cases?
24   A.   Correct.

---

141

1    Q.   And there are 25 Area 3 cases listed on this
2    index, right?
3    A.   Correct. Although a number of them have multiple
4    criminal defendants/potential or real plaintiffs even
5    though they're grouped into a single case, but yes.
6    Q.   Correct. And how -- so, for example, take a look
7    at number 3) Nevest Coleman and Derrll/Darryl, spelled a
8    different way, Fulton. How do you summarize that in your
9    report, as one or two cases?
10   A.   I summarize it as one case.
11   Q.   Okay. All right. When did you create the index
12   in relation to creating the note?
13       MR. ELSON: Objection. Objection, assert
14   the privilege and instruct you not to answer that question.
15   BY MS. ROSEN:
16   Q.   Let's go back to the first page of the document,
17   2268. There is a note off to the side at the top there it
18   says, Proven DNA. Do you see that?
19   A.   Yes.
20   Q.   When did you add that note?
21       MR. ELSON: Objection, asked and answered.
22   A.   Yeah, I don't recall.
23   Q.   And then at the bottom of this page under section
24   B it says, Evidence of Notice to the City of Chicago,

---

Richard Leo, 4/24/2023

142

1  right?
2      A.  Yes.
3      Q.  And then, if we go to the next page, it says,
4  Evidence of Innocence, correct?
5      A.  Yes.
6      Q.  And then I guess we skipped -- let's go back to
7  the first page again.  Section A is Evidence of Coercion
8  and Abuse, correct?
9      A.  Correct.
10     Q.  So each of the notes follow the same format,
11  right, it's got the case name at the top, the year, the
12  page of the report, the particular area, and then each note
13  says Summary in Leo Report and then it says Materials
14  Provided Supporting Summary Report, and then it says
15  Evidentiary Support for Summary, A. Evidence of Coercion
16  Abuse, after that it says, B. Evidence of Notice to the
17  City of Chicago, and then after that it says, C. Evidence
18  of Innocence.  And all of the notes related to the Monell
19  portion of your report follow this same format, correct?
20     A.  Correct.
21     Q.  This is not the format that you used in your --
22  in the report that you tendered January 15, 2022, right?
23     A.  Correct.
24     Q.  How much time did it take you to create these

143

1  detailed, copious notes in preparation for your deposition?
2          MR. ELSON:  Objection to the form, objection
3  based on the privilege, instruct the witness not to answer.
4          MS. ROSEN:  Let's take a break.
5          THE WITNESS:  Ten minutes?
6          MS. ROSEN:  Yes, please.
7          THE VIDEOGRAPHER:  All right.  We're off the
8  video record at 4:29 p.m.
9          (Pause in Proceedings.)
10         THE VIDEOGRAPHER:  This is the beginning of
11  Media Unit 5.  We are back on the video record at 4:42 p.m.
12         (Remote screen sharing.)
13         DIRECT EXAMINATION (cont.)
14  BY MS. ROSEN:
15     Q.  Taking a look at what we've marked as
16  Exhibit Number 8, the first page of it still.  With respect
17  to section A. under Evidence of Coercion and Abuse, what
18  methodology did you utilize to identify the bullet points
19  that you have here to support evidence of coercion and
20  abuse?
21         MR. ELSON:  Objection, assert the privilege,
22  and instruct the witness not to answer.
23     Q.  Moving to section B. Evidence of Notice to the
24  City of Chicago.  What methodology did you utilize in

144

1  reviewing the materials or anything else to include the
2  three bullet points in your notes that support your claim
3  of evidence of notice to the City of Chicago?
4          MR. ELSON:  Objection to the form, objection
5  based on the privilege, instruct the witness not to answer.
6  BY MS. ROSEN:
7      Q.  And then if we go to the next page under section
8  C. Evidence of Innocence, what methodology did you use in
9  reviewing the materials you were provided to come up with
10  the three bullet points that you indicate in your notes as
11  evidence of innocence?
12         MR. ELSON:  Same objections, same
13  instruction.
14     Q.  The order in which these notes were produced, is
15  this the order that you have them saved on your computer?
16         MR. ELSON:  Objection, assert the privilege
17  and instruct him not to answer.
18     Q.  These notes are an appendix to your recent report
19  in the Gomez case; is that correct?
20         MR. ELSON:  You can answer that question.
21     A.  These notes are a subset of my notes that I
22  produced in the Gomez case.
23     Q.  Well, the Gomez case you produced a report,
24  right?

145

1      A.  Correct.
2      Q.  And these notes are in Appendix C of your
3  Gomez report, right?
4          MR. ELSON:  Objection to the form.  You can
5  answer.
6      A.  Correct.
7      Q.  And the notes in Exhibit C are produced in a
8  different order than they were produced here.  Why is that?
9          MR. ELSON:  Objection to the form, and I
10  will assert the privilege to that question and instruct you
11  not to answer.
12     Q.  Let's go to page 2282, Bates-stamped 2282.
13  Scroll up a little bit.
14         This is the summary that you provided with
15  respect to the Nevest Coleman and Derrell Fulton case,
16  correct?
17     A.  Yes.
18     Q.  And if you look in the table under Materials
19  Provided Supporting Summary Report, at the bottom right
20  corner it says PTP-N COLEMAN00001 to 00010, and then (typo
21  in Leo Report).  Do you see that there?
22     A.  Yes.
23     Q.  What's the typo?
24         MR. ELSON:  Objection to the form.  You can

Richard Leo, 4/24/2023

146

1    answer if you can.
2        Q.   What's the typo that you're referencing there?
3        A.   I don't recall.  I'd have to compare it to the
4    report.
5        Q.   Do you often refer to yourself in the third
6    person?
7            MR. ELSON:  Objection to the form.
8        A.   I wouldn't say often.  I would say sometimes.
9        Q.   Why did you note that there was a typo in your
10   original report on page 2282?
11           MR. ELSON:  Objection, assert the privilege,
12   instruct the witness not to answer.
13       Q.   Let's go to page 2335, Bates-stamped 2335.  Under
14   Summary in Leo Report it says in brackets and highlighted,
15   Note the error in the Bates reference in the report.  Do
16   you see that?
17       A.   Yes.
18       Q.   What error are you referring to?
19       A.   I don't recall.  I'd have to compare this to the
20   report to figure it out at this late date.
21       Q.   Why did you include that in the notes of the
22   Prince case?
23           MR. ELSON:  Objection, assert the privilege,
24   instruct the witness not to answer.

147

1        Q.   These summaries are for only 38 of the total
2    cases that are summarized in the Monell portion of your
3    report, right?
4        A.   I believe so.
5        Q.   Why did you summarize these cases and not the
6    others?
7            MR. ELSON:  Objection to the form,
8    foundation.
9        Q.   Let me rephrase it.  Why did you prepare detailed
10   notes for these 38 cases and not for the other cases that
11   are listed in your report?
12           MR. ELSON:  Objection to the form, and based
13   on how that question is phrased I'm asserting the privilege
14   and instructing him not to answer.  I understand where
15   you're going with this this, Eileen, and I could assist in
16   how you want to phrase this question if you'd like to get
17   the answer you're looking for.
18           MS. ROSEN:  No.  I'm going to ask my
19   questions.  I disagree with your assertion of the privilege
20   throughout so -- and I guess we'll have to take that up at
21   another time.
22   BY MS. ROSEN:
23       Q.   Is there a typical font that you utilize when
24   you're preparing reports, Dr. Leo?

148

1        A.   I typically use the Times New Roman 12 on reports
2    though I don't always use it on other documents.
3        Q.   What other font do you use on other documents?
4        A.   Whatever default font there is on the computer,
5    Word program.
6        Q.   Well, does your Word program have a standard
7    default font?
8        A.   It probably does, I just haven't paid attention
9    to what it's called.
10       Q.   If we look at page 2274 again, that's the index
11   for the Area 3 cases, that's in Times New Roman, right?
12       A.   Correct.
13       Q.   And then if we look at let's go to
14   Bates-stamped 2353, that and the following typed pages are
15   also all in Times New Roman, right?
16       A.   Correct.
17       Q.   If we go back to the first page of the report --
18   of these notes, the notes that are the detailed summaries
19   of the cases you discuss in the report are not in Times New
20   Roman, right?
21       A.   Correct.
22       Q.   Why is that?
23           MR. ELSON:  Objection, assert the privilege,
24   instruct the witness not to answer.

149

1    BY MS. ROSEN:
2        Q.   Dr. Leo, are you sure that you prepared all of
3    these summaries of the cases discussed in the Monell
4    portion of the report or did somebody else prepare them for
5    you?
6            MR. ELSON:  Objection to the form, assert
7    the privilege, instruct the witness not to answer.
8            MS. ROSEN:  Okay.  We are going to suspend
9    the deposition, we have approximately three hours left on
10   the record, so that we can take up this assertion of
11   privilege and litigate it if we need to, but we are
12   reserving the rest of the time.
13           MR. ELSON:  We don't agree to suspend the
14   deposition.  We met and conferred on this issue back in
15   January.  You had months and months to reach a resolution
16   about this prior to today's deposition and you decided not
17   to do that, you decided to move ahead today.  You've
18   already deposed this man for almost 20 hours.  The idea
19   that you're going to bring him back for a fourth session is
20   absolutely out of the question from our perspective.  So we
21   do not agree.
22           MS. ROSEN:  Okay.  Well, we are going to
23   suspend the deposition because you are asserting what we
24   believe is a privilege that is not applicable to these

Richard Leo, 4/24/2023

150

1  circumstances or these notes.  You produced the notes, we
2  had Rule 37 discussions, we had debates, and you suggested
3  we table the debates since you were going to be producing a
4  rebuttal report.  So that's what we did.
5        It is your choice to make these objections.  We
6  couldn't have possibly known the scope of the objections
7  until we got the notes produced to us because they weren't
8  produced to us during the first 14 hours of his deposition
9  when they should have been.
10       So that's our position.  We are reserving the
11 time.  We will have a Rule 37.  I hear what your position
12 is now, and if we have to take it to the judge, we'll take
13 it to the judge and the judge will decide.
14       MR. ELSON:  You knew what our position was
15 back in January.  We made our position crystal clear in our
16 email correspondence during our meet and confer.  Our
17 position remains the same as we've expressed it during this
18 deposition.  It hasn't changed.
19       So you certainly did have an opportunity to
20 resolve this issue prior to the deposition.  The issue that
21 we tabled was the issue of timing.  You asked for an
22 additional full day based on the notes.  We were willing to
23 give you as a compromise so that we didn't have to waste
24 the court's time an additional hour, and you turned down

151

1  that offer and we decided to table the issue of timing
2  because he was going to issue a rebuttal report and you
3  were going to have another opportunity to depose him
4  anyway.  It was your choice not to pursue the privilege
5  issue any further before the deposition today.
6        So we're not willing to suspend the deposition
7  and bring him back another time based on the privilege
8  issue.
9        MS. ROSEN:  Well, it's not going to be your
10 choice eventually.  It's going to be a judge's choice.  So
11 we are suspending the deposition.  We are reserving the
12 time.  We were entitled to seven hours today.  We are
13 reserving the time and we are going to have this resolved
14 by the court if we can't reach agreement.
15       MR. ELSON:  Just to be --
16       MS. ROSEN:  I understand what your position
17 is, and I'm not going to waste more time on the record
18 debating.  So we can go off the record, and if you want to
19 further debate it, we can further debate it, but I'm not
20 going to eat up deposition time debating it.
21       MR. ELSON:  Fine.  I don't want to further
22 debate it either, but I just want to make one point clear
23 since this deposition was supposed to be in relation to his
24 rebuttal report and you've gone through his rebuttal report

152

1  in exhausting detail, reading almost every sentence of the
2  report and asking him questions about each sentence, asking
3  him questions about each of the cases that he listed in the
4  appendix.  Are you finished with your questioning in
5  relation to the rebuttal report?
6        MS. ROSEN:  I am finished with my questions
7  in relation to the rebuttal report.
8        Miss Golden, do you have any questions with
9  respect to the rebuttal report?
10       MS. GOLDEN:  None at this time but I might
11 when we resume.
12       MR. ELSON:  No.  Well, we're not -- if you
13 have questions in relation to the rebuttal report, you
14 should ask them now, as should counsel for Defendant
15 Guevara, because we're not suspending the deposition --
16 we're not agreeing to suspend the deposition for any
17 reason, and we're absolutely not agreeing to allow you to
18 come back at a later date to ask questions about the
19 rebuttal report that you could have asked today.
20       MS. GOLDEN:  I think I'd have followup on
21 the notes when I think we get answers to the questions that
22 we're asking about the notes.  I don't know that I have any
23 questions about the body of the report but I'd have to take
24 a break and look at my notes to figure that out.  So we can

153

1  address that if it's an issue.
2        MR. ELSON:  Let's take a break, then, and
3  you can determine whether you have any questions related to
4  the rebuttal report before we end for the day.
5        MS. GOLDEN:  Okay.
6        THE VIDEOGRAPHER:  In agreeance to go on
7  break?
8        MR. ELSON:  I'm sorry?
9        MS. ROSEN:  Yes, we are in agreement to go
10 on a short break.
11       THE VIDEOGRAPHER:  All right.  We're off the
12 video record at 4:56 p.m.
13       (Whereupon a recess was taken.)
14       THE VIDEOGRAPHER:  We are back on the video
15 record at 5:01 p.m.
16       CROSS-EXAMINATION
17 BY MS. GOLDEN:
18     Q.  Okay.  Good afternoon or good evening, Dr. Leo.
19 I have just a few questions for you, not very many, I can
20 assure you, but I do want to put up Exhibit 4 which is your
21 report and ask the tech to go to Exhibit A which starts on
22 page 12 -- actually, go to page 13 which is the list of
23 cases in which you've been qualified and testified.
24       (Remote screen sharing.)

Richard Leo, 4/24/2023

---

154

1    Q.  Do you see that?
2    A.  Yes.
3    Q.  So does this list include cases in which you have
4  been determined not to be qualified to testify?
5    A.  I don't believe there are any in that time period
6  that I can recall in which a court said I wasn't legally
7  qualified to testify, but if such case existed it would not
8  be on this list because it wouldn't have been a testimony
9  at a suppression hearing, a trial or post-conviction
10  hearing.
11   Q.  And you don't keep track of the times in which
12  the court declines to allow your testimony, correct?
13   A.  Correct.
14   Q.  Do any of the cases that appear on your list of
15  cases in which you testified relate to cases in which you
16  gave in-court testimony about whether a confession was a
17  proven false confession as you define it in your reports?
18   A.  I don't recall.  I'd have to go through the
19  testimony on some of these cases, particularly the two
20  civil cases -- three civil cases.
21   Q.  So which ones are you referring to?
22   A.  Well, the Nieves case, Armando Nieves versus
23  United States on page one or what would be page 12.
24       And the Lavelle -- on the middle of page two or

---

155

1  what I think is 13, Lavelle Jones versus City of Albany and
2  Carl Dukes versus City of Albany.
3       And then a couple down from that, the Henry Lee
4  McCollum, et al., case.
5       It's possible it came up in a fourth case, the
6  one of State of Illinois v David Wright on page three or
7  page 14.  Again, I would have to review the transcript.
8       It's possible it came up on the very next one
9  after that, so that would be five, State of Colorado versus
10  Acacia Lyndarr.
11       It's possible it came up -- sorry, I'm just
12  looking at this more closely -- the State of Tennessee
13  versus Lindsey Lowe at the bottom of page three.
14       Those would be the ones in which if -- if I had
15  all the materials in front of me, transcripts of my
16  testimony, those would be the ones I would look for to see
17  if that was specifically discussed.
18   Q.  Have you ever been told by a court that you are
19  not allowed to testify that a confession is proven false?
20   A.  I don't recall if I've ever been told that.
21   Q.  Have you ever been told by an attorney before you
22  take the stand that you are not permitted to testify on a
23  particular topic?
24   A.  Yes.

---

156

1    Q.  And what topics have you not been allowed to
2  testify about?
3    A.  Well, it's usually case specific.  You know, it
4  might be, for example, that part of the interrogation
5  process involved a polygraph and the court did not want me
6  to mention the word polygraph or lie detector.
7    Q.  Aside from being advised that you should not
8  testify about a polygraph, can you think of any other topic
9  on which you've been advised prior to taking the stand that
10  you should not testify about?
11   A.  Yeah.  Again, it's case specific.  I think there
12  have been times when judges have not wanted me to testify
13  about the DNA exonerations or wrongful convictions say in a
14  suppression hearing, for example.  Yeah, that -- so those
15  are the examples that come to mind off the top of my head.
16   Q.  Can you think of any other particular topic
17  you've been advised not to testify about before you took
18  the stand other than a polygraph, a DNA exoneration or a
19  wrongful conviction?
20       MR. ELSON:  Objection, asked and answered.
21   A.  The -- sometimes particular cases, you know, we
22  don't want you to testify about the Central Park jogger
23  case.  But other than that, no, as I sit here today I can't
24  recall any other specific admonitions not to testify.

---

157

1    Q.  What other particular cases have you been --
2  received an admonition about not testifying other than
3  Central Park jogger case?
4    A.  That's the only one I recall.
5    Q.  And in terms of the wrongful conviction is it --
6  what exactly was the instruction, that you weren't supposed
7  to refer to a conviction as wrongful or was there some
8  other specific instruction you were given?
9    A.  I don't recall.
10   Q.  Okay.  I think aside from the cases that you
11  mentioned when I first started asking you questions,
12  Nieves, Jones, McCollum cases and the like, are there any
13  other cases in which you think you might have or possibly
14  testified that a confession was in fact a proven false
15  confession?
16       MR. ELSON:  Objection, asked and answered.
17   A.  Well, this is a list of four years of testimony.
18  I've been testifying since 1997 so there might be other
19  cases that predate this or even post-date it in which I was
20  asked whether or not a case met the criteria of a proven
21  false conviction.  I just don't recall.
22   Q.  You don't recall any other cases; that's correct?
23   A.  Off the top of my head, correct.
24   Q.  Okay.  And I think on the next page, page four of

---

Richard Leo, 4/24/2023

---

158

1  Exhibit A so if we go to the list of depositions.  Since
2  you were deposed in this case in September it looks like
3  you gave a deposition in the John Horton versus City of
4  Rockford case?
5      A.  Correct.
6      Q.  And for whom were you retained in that case?
7      A.  The plaintiff.
8      Q.  And what was the plaintiff's lawyer's name?
9      A.  I think it's Elliot Slosar.
10     Q.  At Loevy and Loevy?
11     A.  Correct.
12     Q.  Have you reviewed a copy of your deposition in
13  that case?
14     A.  I don't believe so.
15     Q.  And did you issue a report in that case opining
16  that the confession at issue was a proven false confession?
17     A.  I don't recall.  I'd have to look at the report.
18         MS. GOLDEN:  Okay.  That is it for me.
19  Thank you.
20         MS. ROSEN:  We can't hear you, Michael.
21  You're still muted.  Try now.
22             (Technical difficulties)
23         MR. SHALKA:  Can you hear me now?
24         MS. ROSEN:  Yes.

---

159

1          MR. SHALKA:  I have no further questions
2  based on the report.
3          MS. ROSEN:  Okay.  So we're suspending the
4  deposition.  We've completed our questions related to the
5  rebuttal report and we're reserving the remaining time to
6  ask questions about the notes to the extent that either we
7  persuade Plaintiff's counsel that they're wrong or a court
8  agrees with us.
9          Can we get the official time on the record now?
10         THE VIDEOGRAPHER:  Sure.  Just one second.
11  4 hours, 12 minutes.
12         MS. ROSEN:  Thank you.
13         Thanks, Dr. Leo.  Have a good evening.
14         THE VIDEOGRAPHER:  This concludes the video
15  deposition of Dr. Richard Leo.  We are off the video record
16  at 5:11 p.m.
17             (Record closed.)
18
19
20
21
22
23
24

---

160

1  STATE OF ILLINOIS :
2                     : SS
3  COUNTY OF PEORIA  :
4      I, Lea Ruth Cohen, CSR, and Notary Public in and
5  for the County of Peoria, State of Illinois, do hereby
6  certify that heretofore, to-wit, on Monday, April 24, 2023,
7  appeared before me via remote audiovisual means:
8
9      RICHARD LEO, a witness herein.
10
11     I further certify that the said witness was by me
12  first duly sworn to testify to the truth, the whole truth
13  and nothing but the truth in the cause aforesaid; that the
14  testimony then given by said witness was reported
15  stenographically by me via remote audiovisual means and
16  afterwards reduced to typewriting, and the foregoing is a
17  true and correct transcript of the testimony so given by
18  said witness as aforesaid.
19
20
21
22
23
24

---

161

1      I further certify that I am not counsel for nor
2  in any way related to any of the parties to this suit, nor
3  am I in any way interested in the outcome thereof.
4
5      In testimony whereof, I hereunto set my hand and
6  affix my notarial seal on this Thursday, April 27, 2023.
7
8
9
10  _____
11         Notary Public
12
13
14  Lea Ruth Cohen, Certified Shorthand Reporter
15     (State of Illinois License #084-002868)
16     My commission expires 4/12/2026
17
18
19
20
21
22
23
24

---

Richard Leo, 4/24/2023

**A**

**a.m** 1:21 5:3
**Aberdeen** 2:4
**ability** 55:6
**able** 35:22 42:20 90:6
**absolute** 45:19 48:1,2 78:1 95:8,9
**absolutely** 149:20 152:17
**abuse** 139:6,17 142:8,16 143:17,20
**abusive** 115:24
**Acacia** 155:10
**accepted** 43:8 50:11 67:1,9 70:9 75:5 75:21
**access** 99:16
**accessible** 20:1
**accomplishment** 40:14
**accuracy** 45:13
**accurate** 16:7 28:14 83:6,23,24 84:3,4 128:17 131:22 132:7
**accurately** 17:21 18:19 25:10 122:14 125:7
**accused** 93:8 107:22 108:9
**achieving** 40:15
**acknowledged** 72:24
**acquitted** 107:12,13 114:18 115:1 116:5,6,17,19,23 117:4,5
**acting** 86:10
**activities** 21:20 22:8 34:21
**activity** 22:1 33:3
**actual** 11:3 12:20 55:1 59:23,23
**add** 21:1,8 129:13 130:5 134:20 140:15 141:20
**added** 7:13,16 8:16,20 135:1
**addition** 75:4,20
**additional** 7:13 8:16,20 10:12 27:19 38:10 90:22 124:2 134:20 150:22,24
**address** 39:1,9 123:8 124:17 153:1
**addressed** 27:9
**adequately** 125:6
**administrative** 108:5,12,18
**admissibility** 104:12
**admitted** 114:3,12 116:9
**admonition** 157:2
**admonitions** 156:24
**adopted** 47:14
**advance** 134:12
**advanced** 42:3
**Advancement** 69:10
**advice** 19:18 25:24 126:1 127:17 128:5 128:20,20
**advised** 156:7,9,17
**advocacy** 84:8,9
**advocate** 86:10
**affidavits** 81:6
**affix** 161:6
**aforesaid** 160:12,17
**aftermath** 62:14
**afternoon** 153:18
**ago** 47:11 62:4 81:8 114:6
**agree** 20:1 21:4,6 46:7 76:9 77:4 149:13,21
**agreeance** 153:6
**agreed** 113:14 124:2
**agreeing** 62:16 152:16,17
**agreement** 39:3,4,11 151:14 153:9
**agrees** 159:8

**ahead** 11:18 30:20 102:6 149:17
**aid** 140:16
**aids** 124:21 137:18
**al** 1:5,9 5:8 155:4
**alarm** 79:4
**Alaska** 104:10,15
**Albany** 155:1,2
**alibi** 49:12,16
**alleged** 107:8 139:10
**Allison** 54:2
**allow** 9:11,15 95:21 124:6 152:17 154:12
**allowed** 9:13 114:13 120:3 129:17,19 155:19 156:1
**allows** 41:6
**alt** 53:8 92:11,13
**amount** 14:23 16:1,7 21:9 22:7,10,11 25:7 35:24 36:6 125:1
**analysis** 20:14 22:4 29:16 34:23 35:20 42:1 51:3,4 53:3 55:21 61:3 63:13 64:1 65:2,22 66:12,16 67:17 72:16 73:17,21,24 87:20,22 88:24 92:14 96:8 117:20
**analytical** 62:22
**analyze** 31:6 54:24 55:6,10 60:4 62:13 72:14 73:3 74:18 80:4 99:6 102:13 117:21
**analyzed** 23:16 38:11,18 56:13 122:17
**analyzes** 53:4 84:21 88:13
**analyzing** 35:24 36:6 62:1
**and/or** 43:10 45:10 81:24 82:20 107:8 131:20
**anecdotal** 73:19
**Anita** 114:4
**answer** 9:11,13,15 15:5 18:2,3,4,7,9 19:5,7,18 23:8 25:24 28:14 29:1 30:21,22 56:9 83:10 85:5 87:10 104:20 124:6,11 125:7,23 126:1 127:14,17,24 128:4,21 129:16,18,19 130:8,14,15,20 131:7,11 132:18 133:10 134:10,13,16,22 136:3,13 137:17,17 138:2,22 139:4,20 140:17 140:19 141:14 143:3,22 144:5,17,20 145:5,11 146:1,12,24 147:14,17 148:24 149:7
**answered** 83:9 123:14 124:5 141:21 156:20 157:16
**answering** 8:13 9:1,4 10:1,5 11:20,21 13:2,7 64:23 79:5 122:10
**answers** 56:16 57:22 152:21
**anybody** 72:12 85:21 127:21
**anymore** 133:5
**anyplace** 41:15
**anyway** 151:4
**apologize** 17:1 52:7
**apparent** 85:2
**apparently** 63:11
**appeal** 157:9
**appear** 30:6 125:19 126:12 154:14
**APPEARANCES** 2:1
**appeared** 129:5 160:6
**appearing** 84:12
**appears** 41:2 86:9
**appellate** 114:7 119:7,8
**appended** 97:3

**appendix** 144:18 145:2 152:4
**applicable** 89:13 90:2 149:24
**applied** 43:9
**applies** 35:20
**apply** 71:9,13 96:6
**appreciate** 128:10
**appropriate** 41:7
**approximate** 24:19
**approximately** 21:1,22 22:13,14 24:14 24:22 36:21 97:12 98:22 99:5 149:9
**April** 1:20 5:6 15:21 21:20 22:17,20 29:8 38:18 160:5 161:6
**archival** 51:3 53:3 66:11 88:15,24
**area** 40:10 42:11 67:5 92:19 136:22 137:3,7,8 140:23 141:1 142:12 148:11
**areas** 64:21 136:24 137:5
**argument** 86:11
**Arizona** 109:14
**Armando** 154:22
**arrested** 115:12
**arrive** 99:7
**Art** 14:1,11
**article** 43:14,16,17 58:12,13 63:9,9,15 64:5 66:14 69:12 72:18 79:2 83:7 91:9,12,14 97:4,4
**articles** 41:2 58:15 60:24 66:15 74:20 102:12,15
**Arturo** 1:3 2:6 5:7,21 135:3
**ASA** 135:8,11
**aside** 156:7 157:10
**asked** 33:19 34:10 77:7,8,10,12,22 78:24 83:9 94:18 96:17 97:2,23 98:4 98:5,9 99:22 101:17 102:17,18,23 103:15,19,23 104:1 112:8,12 113:10 117:21 119:23 120:3,6,13 123:14 124:4,7,22 141:21 150:21 152:19 156:20 157:16,20
**asking** 75:13 82:7 137:21 152:2,2,22 157:11
**aspect** 39:1 60:3 91:14 123:10 124:19
**aspects** 40:8 53:21
**assault** 115:24
**assaulting** 115:16
**assemble** 102:13
**assert** 84:18 127:12 129:24 132:16 134:8 136:12 138:1,21 139:3,19 140:18 141:13 143:21 144:16 145:10 146:11,23 148:23 149:6
**asserted** 9:8 123:15 127:23 129:16
**asserting** 25:21 28:20 84:16 125:21 130:7 147:13 149:23
**assertion** 79:11 147:19 149:10
**assertions** 40:24
**asserts** 84:6
**assess** 103:15
**assessing** 40:23
**assignment** 52:19
**assist** 9:3 10:5 11:21 13:2 75:7,17 76:12,16 121:23 122:10 134:13 147:15
**associated** 26:4 34:12
**Associates** 3:3 5:13,16
**association** 31:2
**assume** 21:11 25:23 42:13 78:7 112:9

125:24 127:16 128:3,19 129:4 134:4
**assumption** 128:5
**assure** 153:20
**attempt** 72:15
**attention** 148:8
**attorney** 24:1 118:10 120:11 128:8
155:21
**attorney's** 19:18 25:24 125:24 127:17
**attorneys** 47:16 64:19 65:10
**Atwal** 107:1
**AUDIO-VIDEOCONFERENCE** 1:13
**audiovisual** 160:6,14
**authors** 63:11
**available** 73:22 96:24
**Avenue** 2:8
**aware** 78:16 79:3,7 80:11

**B**

**B** 19:7 141:24 142:16 143:23
**back** 8:13 9:16 18:10 24:10,11 31:9,13
32:4,9,17 36:15 38:14,22 48:5,13,21
55:14 56:6 59:13 66:19 67:9,23
79:18,22 82:11 84:10 96:2 112:15
113:16 118:21 120:11,21 121:15
124:12,13 126:4 133:3 140:12,13
141:16 142:6 143:11 148:17 149:14
149:19 150:15 151:7 152:18 153:14
**background** 51:11,13 56:2
**Baroni** 2:13
**barrier** 32:1,3,10
**based** 42:21 51:7 55:1,21 67:17 74:18
75:21 76:10 77:20 78:20 84:21 91:24
92:4 95:10 101:3 108:16 123:14
132:1 143:3 144:5 147:12 150:22
151:7 159:2
**basic** 80:23 85:2,22
**basics** 42:3
**basis** 47:7 75:6 76:1,3 84:3 114:9
119:8 123:18 124:11
**Bates** 125:20 126:13 138:12 146:15
**Bates-stamped** 6:24,24 7:9 10:15 12:2
122:2 123:1 127:11 130:22 132:9
136:16 140:22 145:12 146:13 148:14
**Bates-stamps** 6:20
**beating** 115:16
**beep** 52:2
**beginning** 5:2 33:23 34:13 48:14
121:14 126:18 128:24 143:10
**begins** 135:21
**behalf** 2:6,10,15,19,23 4:2 5:7,21,23
6:3,9 107:15,19 115:6,7 118:9
**believe** 8:10 11:8 15:17,23 17:5,16
21:7 29:2,3 36:14 45:17 55:13 59:4
61:23 66:1,3 69:8 77:21 78:9 80:10
100:11 109:6 110:22 111:1 116:24
117:15,17 120:6,11,17,21 122:15,17
131:16,23 132:7 134:24 147:4 149:24
154:5 158:14
**believed** 123:20
**believes** 99:17
**Ben** 2:7 5:19 9:21 14:1,2,11
**ben.elson79@gmail.com** 2:10
**bench** 112:5
**Benitez** 110:7
**best** 10:6 12:6,24 14:5 25:5 28:12

34:19 38:21 65:15 81:4
**better** 98:21
**beyond** 23:14
**biased** 78:6
**biasing** 78:12,13
**bibliographies** 53:15
**bibliography** 54:1,9
**Bigda** 115:3,11 116:5
**bill** 25:10
**billed** 16:21 17:2 22:12 24:20
**bills** 35:3
**binary** 84:16,24 85:11,17
**binders** 133:12
**bit** 13:18,18 20:5 48:5 57:1 60:24 65:19
68:22 69:6 87:3 121:1,2,19 145:13
**blank** 125:5
**blood** 127:7
**board** 108:11
**body** 50:15 51:6 70:18,19 72:2 152:23
**bono** 98:19
**book** 67:13,17,18 69:13,14
**books** 46:17 68:17
**bottom** 16:12 27:18 50:7 66:20,21 84:5
86:13,14 96:12 104:9 128:2 129:8
140:3 141:23 145:19 155:13
**Boudreau** 139:11
**Boulevard** 2:17
**boutique** 67:5
**Bowen** 3:3 5:13,15
**boxes** 99:12,12
**brackets** 146:14
**Brady** 2:3 48:18 128:23
**Brady's** 128:20
**break** 28:3 31:4,5,23 32:2,8 48:4,7
52:5 57:4,13,19,21 59:7 79:6,13
120:24 121:4,5,5,6,6 143:4 152:24
153:2,7,10
**brief** 57:12,16 118:20 137:13
**bring** 149:19 151:7
**broad** 91:11
**broader** 29:16
**Brown** 113:9
**Brualdi** 135:9
**bullet** 126:19 132:11 133:1 139:17
140:3 143:18 144:2,10
**bunch** 35:4 81:8
**buried** 125:5
**bursts** 57:21,21

**C**

**C** 2:2 18:1 19:7 28:20 125:22 127:13
132:17 134:9 142:17 144:8 145:2,7
**California** 105:4,9,23 106:18,22 107:1
107:24 110:3,7,23 111:2,10,13
113:18 114:22 116:14,20 117:1
118:22 119:11 120:8
**call** 92:2 95:20,24
**called** 1:16 4:2 6:9 36:17 43:18 53:3
63:15 132:10 148:9
**calls** 19:5 36:4 104:18
**capable** 75:22
**caption** 27:10
**captures** 85:6
**career** 66:4 97:11
**Carl** 111:21 155:2

**Carolina** 58:14
**Caroline** 2:16 6:1
**Carrie** 19:8
**case** 1:4,8 5:8 16:15 19:3 20:9,14
21:10 22:3,4,11,23,23 23:15,23 25:19
26:16 27:10 29:5,16,17 30:4,17 31:1
31:3,6 34:1,22,23 35:15,21,23 36:6
36:17 37:7,10,18,20 38:1,16 46:12,16
46:17 47:2,9,12 49:7 50:4 51:3,4
62:17 69:7 72:20,22,23,23 74:4,8
75:16 76:17,19,22 90:22 91:23 95:5
95:21,22 96:10 97:12,18,19,24 99:1,5
99:8,8,19,22 105:13 107:2,2,3,22,23
109:5,9,15 110:16 111:11,22 112:1
112:16,17,20,22 113:10,11,17 115:7
115:9 117:2,19 121:24 122:11,20,21
123:9 124:18,22 128:15 129:1 133:4
133:12,13,14,15 135:15,21 136:16
137:13 140:7,11,12,14 141:5,10
142:11 144:19,22,23 145:15 146:22
154:7,22 155:4,5 156:3,11,23 157:3
157:20 158:2,4,6,13,15
**cases** 15:22 16:9,17 17:4,8 27:15 45:9
46:16,20 55:21,24 56:12,13 58:9 60:1
60:10 61:21,22,23 62:1 64:4 67:17
72:14 73:3,18 77:8 80:12 81:5,10,22
82:18 88:4 91:13 97:12 98:5,10,12,13
98:16,17,22,23 99:5,9,10,11,12,13,14
99:15,21,23 100:11,18 101:9,10,15
101:17,18,20,21,23 102:4,9,19,19,22
103:6,10,13,15,24 104:23 110:19
111:23 122:17 123:1 137:5,5 139:2
140:23 141:1,9 147:2,5,10,10 148:11
148:19 149:3 152:3 153:23 154:3,14
154:15,15,19,20,20 156:21 157:1,10
157:12,13,19,22
**categories** 30:6 34:17,20 35:8,8 52:14
**categorization** 74:2
**categorize** 90:7,23 95:22
**categorized** 70:24 90:19
**category** 29:15,16 55:5 59:3,5 98:15
**cause** 52:2 160:12
**caution** 18:3 124:9
**cautious** 69:6
**ceiling** 57:10
**centerpiece** 54:20
**Central** 46:12 47:2 156:22 157:3
**Cerna** 110:3
**certain** 49:2 74:22 114:12 135:4
**certainly** 73:6 124:24 131:15 150:19
**certainty** 45:20 48:1,1,2 78:1 95:8,9
**Certified** 3:2 161:14
**certify** 160:5,10 161:1
**cetera** 43:1 51:6 109:18
**CGolden@jsotoslaw.com** 2:19
**challenged** 43:8 44:1,4
**challenging** 74:2
**chance** 51:10
**changed** 16:16 78:18 150:18
**changes** 16:17
**characterized** 89:4
**cheat** 93:7,7,9,10
**cheating** 93:8
**check** 16:12 117:6 118:4 120:7
**Chicago** 2:4,9,14,18,22,23 3:4 4:2 5:14

Richard Leo, 4/24/2023

5:24 6:9 36:18 37:7,14 117:15
138:12 139:10 141:24 142:17 143:24
144:3
**Chicago's** 131:3
**child** 61:24
**chime** 128:21
**choice** 150:5 151:4,10,10
**chosen** 46:22
**churchgoers** 66:5
**circumstance** 45:21 58:8
**circumstances** 150:1
**citation** 53:19
**cite** 53:15 67:6 69:3
**cited** 43:9 63:12 69:14
**cites** 139:14
**citing** 53:17
**City** 2:23 4:2 5:24 6:9 36:17 37:6,14
131:2 138:12 141:24 142:17 143:24
144:3 155:1,2 158:3
**civil** 1:17 27:15 47:16 99:11 105:13
107:2 111:22,23 112:22 154:20,20
**claim** 50:3 90:13 133:5 144:2
**claimed** 108:14
**claiming** 84:3
**claims** 112:2,6
**clarification** 97:18
**clarify** 62:21
**clarifying** 129:6
**Clark** 2:21 3:3 5:14
**classified** 101:1,1
**classify** 95:23 100:21 101:19 102:20
**classifying** 91:13
**clean** 56:23
**clear** 8:18 10:20,22 80:22 84:23 85:16
97:17 113:14 128:10 150:15 151:22
**clearly** 87:4
**client** 17:22 18:19
**clinical** 50:22
**close** 32:14,15 62:15
**closed** 159:17
**closely** 27:7 155:12
**closer** 131:13
**co-conspirators** 107:9
**coerce** 107:7
**coercing** 107:8
**coercion** 50:9,17 53:13 66:23 67:4
70:8 71:5 117:19 118:15 139:6,17
142:7,15 143:17,19
**coercive** 68:5
**cognitive** 41:17
**Cohen** 1:18 5:15 160:3 161:14
**coined** 43:15 67:21 69:19 70:23 72:12
72:19 89:18
**Coleman** 141:7 145:15
**COLEMAN00001** 145:20
**colleague** 74:6
**collect** 74:18
**collected** 40:22 55:20,24 56:12,12 58:6
58:9,19,19 60:10 69:5 88:8
**collects** 84:21
**college** 92:10
**Colorado** 118:5,8,10 155:9
**combining** 87:1
**come** 48:5 101:15 137:14 138:15 144:9
152:18 156:15

**comes** 69:11,13 101:14 102:3,4,9
**coming** 51:18 56:23
**commencing** 1:20
**comments** 47:10
**commission** 161:15
**committed** 49:9,19
**Commonwealth** 120:18
**communications** 18:4 19:12
**communities** 90:13
**community** 52:24 64:7,10,14,15 65:4,5
66:5 70:6,7,13,13,14,15,16 90:10
96:6
**compare** 146:3,19
**compared** 71:20 75:19
**comparing** 46:8 72:1
**comparison** 46:10,22 130:12
**compensating** 74:22
**compensation** 19:12
**complaint** 138:11 139:9
**complete** 55:22
**completed** 17:3 33:8 60:18 159:4
**completion** 131:14
**comprise** 10:14
**comprised** 67:5
**comprises** 140:7
**compromise** 63:22 123:19 150:23
**computer** 92:12,12 134:5 136:1,10
144:15 148:4
**computerized** 30:9
**concept** 43:4,7,15,21 80:3,4,8,9 85:17
86:14,24 87:11 102:15
**concepts** 80:23 85:3
**conceptual** 60:3
**conceptually** 86:3
**concerned** 71:18
**conclude** 73:10
**concluded** 76:23
**concludes** 159:14
**conclusion** 91:18,22
**conclusions** 99:6
**conclusively** 47:24 49:8,13,16
**conditions** 9:12 52:18 92:4
**conducted** 65:1
**conducting** 90:21 91:1
**confer** 28:22,24 57:12 150:16
**conferred** 149:14
**confess** 63:9,9 78:10,11 92:15 93:9,10
115:17
**confessed** 40:21,22 61:23 78:7 79:12
81:22 82:17 83:23
**confession** 43:4,22 45:12,16,22,23
46:2,3 47:18,22 48:3 53:13,21 58:13
61:22 63:19 70:24 71:1 72:11,24
73:3,11,12,13 74:3 75:8 76:13,19,20
77:1,2,9,16,16,23,24 78:3,6,7,9,19,22
79:8,9,10 89:4,5,9,11,12,17,18,22
90:6,6,8,15,16,20,23 91:3,6,16,20,21
91:22,23,24 93:3,4,6,12 94:3,9,10,12
94:14,15 95:1,6,7,8,20,22 96:1,8 98:1
98:8 99:24 100:22 101:1,20 102:3,8,8
102:23,24 103:16,17,19,21,23 104:2
104:3 105:7,12,18,21 112:10,14
113:12,15 114:11 116:8 117:22,23
120:4,5,14,16 126:16 132:24 154:16
154:17 155:19 157:14,15,21 158:16

158:16
**confession's** 45:13
**confessions** 39:14,19 40:4 41:1,14
42:12,20 43:7,19 44:11,12,14 45:2,3
45:9 46:20 47:3,15 50:9,17,18 55:7
58:10,20 62:16 66:24 67:4,19,22,23
68:6 69:18 70:9 71:5 76:9 80:21
88:23 91:13 92:1,3 93:16,21 94:1,23
95:14,17 97:11,14 100:13 102:13,18
102:21 109:8,8 113:11 117:19 118:15
120:1 123:4
**confessor** 49:13,17
**confidence** 86:18 87:15
**confirm** 120:7
**confirming** 83:15
**confused** 80:2,8 94:18,21
**confusion** 10:21
**connection** 17:3,7 21:18 27:20 28:7
30:16 31:1 37:24 55:18 58:3
**Connelly** 2:21
**Consequences** 43:18 58:13
**consistent** 9:7 88:18,19
**consistently** 110:18
**constituted** 35:15
**constitutes** 73:11 81:1 90:15 95:6
**construct** 95:19
**construction** 65:22
**consultation** 20:13 22:2 23:21 34:21
**consulted** 103:6
**consulting** 16:15
**cont** 59:15 79:20 121:17 143:13
**contact** 27:10
**contacted** 63:11
**contain** 12:12 88:16
**contained** 122:12 129:23
**contemporaneous** 30:15 33:24
**contemporaneously** 30:5 33:13
**contemporary** 53:5 66:13
**context** 66:20 98:14
**continue** 45:11 46:10,18 51:17
**contractors** 27:23
**contradict** 89:13
**contradicting** 88:24
**contrast** 127:5
**controlled** 52:18 88:7
**convenient** 9:20
**converge** 88:3 89:15 90:13 91:17
**convergent** 86:15,17 87:1,12,14,18
89:2 91:18
**conversation** 14:2,4,6,8,10,12,19,21
**conversations** 15:10
**convicted** 109:13,22 110:22 111:12,18
111:18 112:21 113:22 114:6,18 115:1
116:5,13,17,18,23,24 117:4 119:2,18
**conviction** 114:7 119:22 156:19 157:5
157:7
**convictions** 44:13 156:13
**Cook** 117:10
**copious** 143:1
**copy** 7:23 8:2,12 10:24 12:7,11,20
122:4 133:21,22 134:2,14,16,19
158:12
**corner** 145:20
**correct** 10:16,24 11:4,5,8,10,11,12,14
11:15,22,23 12:5,8,9,13,14,17,18,23

Richard Leo, 4/24/2023

15:2,4,6,7 16:22 17:1,4,15 19:11,18
19:19 20:9,10,15,22 21:3,13,16,22
22:6,9,14,16,21 23:16,17,18,19,22
26:1 27:1,5,12,14,16,20,21 28:8,16
30:6 31:7,11,12,22,23 32:22,23 33:5
33:9,20,21 34:5,10,11,14,15 35:11,18
35:19 36:1 42:15 43:23,24 44:21,24
45:5 47:21 49:15,20 50:1,5 52:13
53:9 55:7 64:8 70:2 71:3 72:13 73:9
73:16 77:2,16 86:21 87:3,17,20 88:8
88:9 92:17 94:4 97:7,20,21 98:18,19
99:3 102:1 103:3,8,12,18 105:2,14,16
107:14 112:7,11,19,24 114:17,17,24
115:4 116:4,11,16,22 117:11 118:7
118:24 119:14,22 122:5 126:1,2
127:18,19 128:5,6,14,22 129:9,10,12
131:3 133:2,6 134:7 135:12,23 140:4
140:5,24 141:3,6 142:4,8,9,19,20,23
144:19 145:1,6,16 148:12,16,21
154:12,13 157:22,23 158:5,11 160:16

**correctly** 78:23
**corresponded** 137:7
**correspondence** 20:12,13 22:1 34:21
150:16
**counsel** 5:17 13:12,19,20,23 14:9,23
18:5 22:2,2 27:9 33:16 34:5 48:17
51:9,18 52:6 56:22 152:14 159:7
161:1
**counted** 100:12
**counterintuitive** 78:14
**county** 1:19 112:23 115:12,13 117:10
160:2,4
**couple** 25:4 28:10 61:16 80:1 155:3
**course** 64:20 77:5 81:14 85:22
**courses** 41:15,16 42:3,17,19
**court** 1:1 5:10,15 6:5 20:2 82:10 96:3
97:20 112:2,6 114:8 119:7 124:14
151:14 154:6,12 155:18 156:5 159:7
**court's** 119:8 150:24
**courts** 78:5
**coverage** 42:19
**covered** 9:7 20:19 22:8 56:15,19 83:11
**covers** 21:20
**crash** 92:12
**crashed** 92:13
**create** 30:4,12 31:11 33:13,14,15 107:7
125:18 126:10 127:9,10 132:14 136:9
139:16 141:11 142:24
**created** 33:24 34:2,4 124:4 129:21
136:10 140:23
**creating** 139:18 141:12
**crime** 46:14,15 49:9,18 72:2 123:5
126:22,22,24 127:5
**criminal** 43:19 64:18 99:11 107:2,3,11
107:21 109:3,4,15,15,20 110:16
111:11 113:19,21 114:5,16,17,23
116:15,21 117:2 118:23 119:1,12
141:4
**criminologists** 70:17
**criminology** 41:7 42:24 43:20
**criteria** 44:16,18,19,22 45:23 46:3,23
49:2,6 50:2 67:21,21 69:18,22 70:23
72:7,10 73:11 77:1,5,9,15,21 89:4,17
90:15,24 91:16,19,20,23 94:2,11,24
95:5,20,23 96:6,9 98:1,7 99:24 102:8

102:24 103:16,20 104:2 105:19,20
112:13 113:12 117:22 120:5,15,15
157:20
**criterias** 78:1 92:3
**criticism** 85:9
**criticisms** 96:15
**criticize** 50:18
**criticized** 44:6 72:21 73:1
**criticizing** 96:15
**critique** 43:3
**critiqued** 44:7
**cross-examination** 4:5 101:16 153:16
**crosscheck** 136:20
**crystal** 150:15
**CSR** 1:18 160:3
**curious** 68:19
**current** 15:19 24:11 103:24
**currently** 10:15
**curriculum** 60:14
**Curtis** 107:24
**cutting** 57:10
**CV** 1:4,8 5:9,9 58:16,23 60:6,10,12 61:2
65:16

---

**D**

**d** 2:2,12 4:1 113:14
**Daffada** 2:13
**data** 40:23,23 42:1 51:1,8 52:12,14
55:11 59:17 60:4 61:3 62:8 63:24
65:2,21,23 66:11,16 71:21 73:4 74:18
80:4 83:5,7 84:21 85:6,7 86:7 87:19
87:21,22 88:7 90:11
**data-gathering** 62:5,23
**dataset** 58:6 65:13 84:15 102:13
**date** 22:17 146:20 152:1
**dated** 15:21 20:18 21:20 23:10 26:11
27:8 29:6,8 38:18
**dates** 17:9 67:9
**David** 23:21,23 24:1 117:7 155:6
**Davis** 59:5 119:12
**day** 30:13,13 35:24 122:8 125:3 150:22
153:4
**days** 13:21,21
**debate** 19:14 28:23 128:19 151:19,19
151:22
**debates** 150:2,3
**debating** 151:18,20
**Deborah** 59:5
**decade** 61:7,14
**decades** 70:10
**decide** 96:4,4 122:23 140:15 150:13
**decided** 149:16,17 151:1
**decides** 128:21
**decision** 63:9 108:23 119:9
**declines** 154:12
**declining** 129:3
**default** 148:4,7
**defendant** 2:15,23 4:2 5:7,24 6:4,9
107:16,18,19 152:14
**defendants** 1:6,10 2:19 6:2 22:12
107:11,16,20,21
**defendants/potential** 141:4
**defense** 47:16 64:18 65:9 115:7
**define** 80:3 81:2,3,4 85:4 154:17
**defined** 59:18 61:24 95:7

**defines** 80:10 81:4
**definition** 74:12 80:14
**degree** 40:15,15,18 41:22,23 84:16
85:1,6,24 101:2
**degrees** 86:4,7
**Deleon-Reyes** 1:3 2:6 5:8
**demonstrates** 90:1
**dep** 37:4 95:11
**Department** 115:18 139:11
**departments** 54:23,23
**depending** 86:7
**depends** 64:13,19
**depose** 151:3
**deposed** 125:2 149:18 158:2
**deposition** 1:13 5:5,6 6:17,21 9:2,9,11
10:2,14 12:4,5 13:3,9 15:11 17:13
28:24 36:17,22 37:10,13,14,18,22
38:4,15,16 49:1,23 61:4,14,17 65:24
78:17 79:1,2 83:12,15,18 101:8
121:24 122:8,10,10 123:12,16 125:4
125:8,15,15 128:12 129:1,22 131:10
131:12,13,14,15,21,24 132:5 134:12
134:14 137:19 140:17 143:1 149:9,14
149:16,23 150:8,18,20 151:5,6,11,20
151:23 152:15,16 158:3,12 159:4,15
**depositions** 1:18 8:11,22 11:21 12:23
22:12 23:7 26:20 96:11 122:8 158:1
**depravation** 63:21 64:3,4
**Derek** 136:16 138:12 140:4
**Derrell** 145:15
**Derrick** 139:10
**Derrll/Darryl** 141:7
**describe** 50:20 54:8 91:2
**described** 12:20 15:10 41:8 67:18
116:3
**describes** 21:24
**describing** 50:2 54:17 81:13
**Description** 4:10 138:11
**descriptive** 64:11
**designed** 93:12
**despite** 47:17
**destroy** 18:22 19:23
**detail** 39:10 140:15 152:1
**detailed** 143:1 147:9 148:18
**details** 108:24 129:22
**Detectives** 139:11
**detector** 156:6
**determination** 89:3
**determine** 41:7 64:14 72:13 73:9
101:2 103:20 104:1 105:18 113:11
120:14 153:3
**determined** 45:22 46:3 77:13,14
118:18 154:4
**develop** 68:8
**developed** 67:21 72:8
**devised** 72:6
**difference** 68:20 129:18
**different** 17:13 25:8 42:6 63:16 64:21
64:21,22 86:6,6,7,19 87:2,15,19,21
87:22 88:16,17 98:15 100:3,4 101:6
122:19 139:1 140:11 141:8 145:8
**differently** 45:14 87:5 138:19
**difficulties** 158:22
**difficulty** 57:22
**diminished** 78:19,23

Richard Leo, 4/24/2023

**direct** 4:4 6:12 59:15 63:18 79:20 121:17 143:13
**disagree** 19:13 39:2,10 147:19
**disagreed** 72:16
**discarded** 33:6
**discern** 35:23
**disclosure** 18:5 20:20
**discoverable** 123:21
**discovery** 5:5
**discuss** 148:19
**discussed** 13:12 44:19 65:18 86:13 96:10 123:23 136:24 149:3 155:17
**discusses** 64:4
**discussing** 97:19
**discussion** 83:4 92:6 137:2 140:6,11
**discussions** 150:2
**dispensing** 108:10
**disposal** 99:4
**dispositive** 46:13
**dispositively** 47:17,22 73:13 76:23 77:15,19 94:11 95:6,7
**dispute** 30:2 45:16 46:1,10,23 70:5 94:9
**disputed** 45:14,15 47:1,16 73:13 76:18 95:22
**disputes** 45:20
**disruption** 57:20
**dissertation** 58:7 65:6
**distinct** 101:10
**distinction** 21:14 36:10 94:13,21 95:12
**distinguished** 67:15
**distorted** 67:2
**distorts** 97:9
**distracting** 52:5,9
**District** 1:1,1 5:10,10
**Division** 1:2 5:11
**divulge** 19:6
**DNA** 46:13,17 47:4 71:23 113:14 126:16,21,22,24 127:1,3,6 141:18 156:13,18
**DNA-rich** 126:24
**doctor** 40:6,13 50:23 51:10
**doctoral** 65:6
**document** 11:4,9 15:23 16:3 20:5 23:9 23:9 26:11,19,23 28:14 29:9,15,17,21 31:4,20 66:11 104:23 126:17 129:23 129:24 130:6 132:10 141:16
**documentary** 51:4 53:3 88:15,24 91:24
**documents** 7:12 10:24 13:11,13,16 15:9 29:10 53:4 77:20 81:23 82:20 122:5 125:18 126:11 127:10 133:16 148:2,3
**dog** 27:23 31:24 32:3,9
**doing** 6:14 20:8 22:10,20 25:8 30:5 35:14 57:6 59:23 73:6 95:15
**Dominguez** 105:5
**doors** 32:14,16
**double** 117:6 118:4 120:7 127:3
**downloaded** 23:18 38:17
**downloading** 22:3,22 34:22 35:15,17
**dozen** 60:23 62:18
**dozens** 68:17
**Dr** 5:5 6:14,19,20 7:18,20,22,23 8:2 9:5 11:6,14 15:17 19:17 23:6,10 25:3,4

25:23 27:22 28:7,15 36:16,17,23 37:10,13,18,22 38:4 39:8,12,16,22 43:3 45:1 48:24 49:6,23 50:2,19 57:6 67:2 80:2,8 84:6,8 85:9 93:19 97:9 97:19 104:10 121:22 147:24 149:2 153:18 159:13,15
**drafting** 62:8
**drafts** 18:5
**dramatically** 78:18
**draw** 99:6
**drawing** 21:14 94:8,14,21 95:12
**Drizin** 58:14 61:5,10,20 66:14 83:8
**Dukes** 111:21 112:9 155:2
**duly** 6:10 160:11
**duress** 108:15

**E**

**E** 2:20 4:1
**Earl** 119:12
**earlier** 29:21 57:7 73:12 77:22,24 87:3 90:9 94:9 95:4 96:8 104:8 129:18
**early** 54:18,22 57:2 66:4 68:8,10 90:7
**Eastern** 1:2 5:11
**Eastman** 113:18
**eat** 151:20
**ecological** 84:7,14 85:4,8,10 86:1,2,8
**education** 40:7
**effect** 88:6
**efficiency** 129:3
**effort** 123:19 125:3
**eight** 87:5,6,24 123:2
**Eileen** 2:20 5:23 9:20 147:15
**either** 35:2,13,16 53:5 58:20 60:8 61:2 66:12 81:6 100:14 106:9 119:18 121:9 122:12 127:1 151:22 159:6
**electronic** 55:1 133:14,17,18,21,22 134:2 136:5
**electronically** 54:24 55:15 88:14 133:16
**elicited** 96:19
**Elliot** 158:9
**Elson** 2:7 5:19,19 9:5 11:17 14:1,11 17:23 18:9 19:4 21:15 23:24 24:5,16 25:11,20 28:17 30:20 34:6 35:10 36:2,4,13 38:20 39:24 41:9 46:5 48:8 56:18 68:1 70:3 71:2 73:15 77:3,17 78:21 81:18 83:9 85:13 89:6,19 90:17 91:10 94:16 95:18 101:13 104:18 107:17 123:11 125:21 127:12 127:22 128:7,13 129:2,15,19 130:7 130:14,20 131:5,7,11 132:16,21 133:9 134:8,15,22 136:3,12 137:16 138:1,5,16 139:3,19 140:18 141:13 141:21 143:2,21 144:4,12,16,20 145:4,9,24 146:7,11,23 147:7,12 148:23 149:6,13 150:14 151:15,21 152:12 153:2,8 156:20 157:16
**Elson's** 128:20
**email** 20:12,13 22:1 34:21 150:16
**embodies** 84:15
**emerges** 49:11
**emit** 52:2
**empirical** 40:12 41:19 42:6 50:8,13,21 50:22 51:7 52:11 54:20 59:17 63:16 63:24 65:21 66:10,22 67:2 68:2,9

70:7,19 71:4 75:22 78:4 80:3,8,10,13 80:15,20,20,24 81:1,15 84:19 90:11 93:20
**empirically** 40:3 50:15
**encompasses** 29:8 44:13
**encountered** 81:6
**ended** 14:19 101:24
**ends** 26:19
**enforcement** 114:13
**entire** 86:2,5
**entitled** 151:12
**entries** 35:5
**entry** 16:3 32:20
**environment** 52:22
**equate** 46:7 47:1
**equating** 45:21 46:1,21
**equation** 46:11 80:12
**equipment** 93:14
**erosen@rfclaw.com** 2:23
**error** 71:9,9,12,13,22,23 72:3,4,6 74:16 74:24 85:20 146:15,18
**errors** 71:18 123:4
**especially** 79:11
**ESQUIRE** 2:2,3,7,11,12,16,20
**essentially** 63:18 115:10 133:13
**establish** 67:22 72:11
**established** 44:16 50:10 66:24 67:8 86:19 87:15 90:14
**establishes** 48:2 49:13,17 70:24 73:13 77:15 94:11 95:5
**establishing** 91:15,24
**estimate** 13:17 14:15 28:12 98:2,9,10 98:12 100:4 101:3
**estimated** 97:14 99:22,24
**et** 1:5,9 5:8 42:24 51:6 109:18 155:4
**evaluate** 42:9 91:5 101:23 102:10,23 103:19,23 105:18 112:8,12 120:3,13
**evaporated** 129:5
**evening** 153:18 159:13
**event** 99:15
**eventually** 15:1 90:22 151:10
**everybody** 113:14
**evidence** 46:15 47:17 48:2 49:8,12,16 63:19,22 73:22 75:8 76:14,20 78:3,6 78:14,19,22 79:10 90:1,5 91:24 93:14 96:5 123:5 126:16 127:3,5 132:24 139:6,17 141:24 142:4,7,15,16,17 143:17,19,23 144:3,8,11
**Evidentiary** 139:5 142:15
**exact** 53:18 69:1 96:23
**exactly** 30:2 95:15 108:20 125:13 130:16 157:6
**examination** 1:16 4:4 6:12 59:15 79:20 121:17 143:13
**examined** 6:10
**example** 31:20 42:17 46:8,13 53:9 66:17 71:19,23 82:4 88:23 108:23 141:6 156:4,14
**examples** 156:15
**excluded** 104:11,16 127:4
**excludes** 19:11 22:19
**excluding** 22:11
**Exclusion** 126:17
**exclusive** 95:21
**exhausting** 152:1

**exhibit** 3:2 4:10,11,12,13,14,15,16
15:14 16:11 17:6 21:17 24:10 26:5,9
29:7,12 31:13 32:13,18,19 33:11,19
33:22 36:15 38:14 48:21 79:22
104:22 120:24 121:20 132:3,9 133:24
135:3,20 139:22 140:13 143:16 145:7
153:20,21 158:1
**exhibits** 65:23
**exist** 84:19 85:1,18
**existed** 35:4,7,14,22 36:9 154:7
**exists** 84:17 85:1,18
**exoneration** 113:14 117:14 156:18
**exonerations** 156:13
**expectations** 42:7
**experience** 41:10 50:23 80:5,9,11,13
81:2,9,11,14,17,20,20 82:5,14,15
83:5 84:18
**experiment** 53:16 84:15 89:9,12 92:5
**experimental** 51:4 52:16 53:6,11,20
54:12 59:19,20,22,23 88:2 89:1,8
92:18,20,21 93:1,2,11
**experiments** 52:17 53:18 59:24 84:20
87:23 88:17
**expert** 41:3,4,7 81:23 82:19 98:6,17,22
98:23 102:16 115:11,21 128:8,14
**expertise** 40:24 41:6 75:7 76:1,4 77:20
87:13
**experts** 45:10
**expires** 161:15
**explain** 71:16 72:16 74:14 77:11,13
108:16
**explained** 94:3 95:1 123:18
**explaining** 73:5 76:6
**explanatory** 74:10,13
**explication** 75:15
**explode** 68:9
**expressed** 150:17
**extent** 17:24 19:21 87:7 140:6 159:6
**extra** 125:2

---
**F**

**fact** 10:15 62:11 67:8 96:4 157:14
**factors** 120:2
**facts** 95:21 123:5
**factual** 123:4
**factually** 85:20
**fair** 16:20 21:11 132:1
**fairly** 27:7
**FALASZ** 3:2
**fall** 59:3,5
**false** 39:14,18 40:4 42:12 43:4,7,18,22
44:11,13 45:3,9,16,23 46:2,3,23,24
47:15,18,23 48:3 50:9,17 53:13 58:13
61:21 62:16 66:23 67:4,18,22,23 68:5
69:18 70:9 71:1,5 72:11,24 73:3,12
73:14 74:3 76:9 77:1,9,16,23 78:9
79:8,9 80:21 84:8 88:23 89:5,9,11,11
89:18,23,24 90:1,5,6,8,15,20,23 91:3
91:6,13,16,21,22 92:1,1,2,3,4 93:3,4
93:6,12,16,22 94:2,3,10,12,15,15,24
95:1,7,8,15,17,20,24 96:5,8 97:11,13
98:1,8 99:24 100:12,21 101:1,19
102:3,8,13,17,20,24 103:16,21 104:3
105:20 107:7,8 108:15 109:8 112:13
113:12,15 117:19,23 118:15,15 120:5
120:15 126:16 132:24 154:17 155:19
157:14,21 158:16
**falsely** 61:22 63:9 78:10,11 79:11
92:15 93:10 104:11,15
**falseness** 45:2
**falsified** 83:20
**falsify** 72:15
**fatally** 39:17
**favor** 113:4
**feasible** 38:24
**February** 16:1,4,8,21,23,24 17:2
**federal** 1:17 115:19,22
**Ferricci** 110:15
**field** 40:2,7,17,20 41:8,11,18 42:8
47:15 51:5 52:21 54:12,14 55:5,16,17
55:23 56:10,10 58:2 59:18 60:8 67:5
67:8 68:8 69:24 71:10,13 72:6 77:14
80:20 84:6,20 85:10 86:2,5 87:3,12
87:12,13,23 88:2,3,12 89:14,15,20
**fields** 42:24 64:21
**fifth** 66:10
**figure** 72:4 146:20 152:24
**file** 133:11,11,13,14,17 136:6
**filed** 5:9 139:9
**find** 57:14,19 59:7 60:5,10,14 88:22
89:1 97:1 100:12
**finding** 87:15
**findings** 86:18 88:3,6
**fine** 9:22 121:8,9 151:21
**finish** 8:18 79:5
**finished** 152:4,6
**finishing** 79:24
**firm** 2:17 24:7,8
**first** 6:10 16:2,3 26:10,14,15 27:6,16
27:17 28:6,6 31:19 32:19 38:23
39:16 42:2 43:22 44:22 80:1 85:24
93:18 98:11 135:19 136:15 141:16
142:7 143:16 148:17 150:8 157:11
160:11
**first-year** 85:21
**fit** 98:1 99:24
**five** 13:17 34:20 35:8 46:12,14 47:2
62:4 69:2,9 155:9
**five-minute** 32:2 57:3 59:7 121:6
**flat** 45:17,18 46:4
**flawed** 39:17
**Flewellen** 136:17 138:12 139:10 140:4
140:4
**Flewellen's** 135:21 140:7,12,14
**floor** 2:4,8 27:24 31:24 57:11
**focus** 122:24
**focusing** 61:21 95:2
**follow** 56:16 106:13 142:10,19
**following** 57:22 148:14
**follows** 6:11 9:24 18:11 27:7 82:12
124:15 126:7
**followup** 152:20
**font** 147:23 148:3,4,7
**foot** 139:13
**footnote** 69:12,15
**foregoing** 160:15
**forensic** 40:2 81:21 82:16 84:17 127:2
**forget** 106:13
**form** 11:17 15:3 17:13,23 19:4 21:15
23:24 24:5,16 25:11 28:17 30:20
34:6 35:10 36:2,13 38:20 39:24 41:9
46:5 62:19 68:1 70:3 71:2 73:15 77:3
77:17 78:13,21 81:18 85:13 89:6,19
90:17 91:10 94:16 95:18 101:13
104:18 107:17 131:5 133:9 134:15
137:16 138:16 143:2 144:4 145:4,9
145:24 146:7 147:7,12 149:6
**format** 27:7,7 142:10,19,21
**former** 74:1
**forth** 28:20
**forum** 104:12,16
**forward** 52:4
**found** 126:20,24 127:1,6
**foundation** 147:8
**four** 6:18 10:23 13:11 44:19,22 62:3
66:18 67:21 70:23 72:7,10 73:11
77:1,21 78:1 89:3,17 90:14 91:19
94:11 95:20,23 112:13 113:12 117:22
120:4,15 157:17,24
**four-year** 21:7,7
**fourth** 149:19 155:5
**frame** 15:24 20:17
**frequently** 63:12
**front** 6:16,18,23 7:15,18 8:2,5,13,22
9:3 10:4,7,13,23 11:2,20,22 12:8,12
13:6 26:21 27:3 54:1 122:5 125:4
155:15
**full** 55:2 80:1 140:1 150:22
**Fulton** 141:8 145:15
**further** 74:9 151:5,19,19,21 159:1
160:10 161:1
**Fusco** 2:21
**future** 42:5

---
**G**

**G-O-U-L-D** 59:3
**Gabriel** 1:7 2:10 5:20 135:5
**Garcia** 111:2,10,17 112:17
**Gary** 109:14
**gather** 55:10 58:6 63:18 73:4 80:4
**gathered** 62:7 63:22 90:4,11,22
**gathering** 50:24 52:12 61:3 65:21
66:11 87:21
**gears** 121:1,19
**general** 52:12 63:6 69:23 70:22 88:21
93:11 102:17 109:8
**generally** 7:8 20:11 21:24 41:11 43:7
50:10 67:1,9 68:11,12 70:9 75:5,21
76:18 92:16
**generated** 70:18 92:1 93:15
**generates** 72:6 93:6
**generating** 93:4,12
**getting** 47:20 51:16 75:1 129:22
**Gillespie's** 140:11
**give** 14:6 18:4 32:2 58:24 60:17,24
81:9 100:4 103:1 150:23
**given** 9:10 47:8 113:13 157:8 160:13
160:16
**gives** 86:18 87:14
**giving** 46:8
**global** 17:14 29:11
**go** 11:18 15:22 24:10,11 26:9,23 27:6
30:20 31:13,19 36:15 37:12 38:22
41:12 43:2 48:24 50:7 66:18,19 67:7
68:15 69:9 71:7 72:14 75:3 76:12

Richard Leo, 4/24/2023

77:12 79:5,24 84:5 87:6,24 93:18
96:22 97:1,8 100:19 102:6 104:22
105:3 112:15 113:16 121:2 125:5
126:15 130:22 132:23 135:2,19
139:24 140:3,10,11,13,21 141:16
142:3,6 144:7 145:12 146:13 148:13
148:17 151:18 153:6,9,21,22 154:18
158:1
**goes** 41:23 50:15 67:23 84:10 131:1
133:3
**going** 9:5 18:2 19:10,17,20,22 25:23
26:2 28:1 32:1 33:22 38:14 51:12,22
52:1,1,3,21 54:7 56:3,24 57:1,5,18,19
57:20 59:10 61:6,10,12,13 79:4,5
80:3 82:10 99:11 108:8 120:11 121:1
121:2,11 124:6,8,8 125:24 127:16
128:3,4,19,19 129:24 138:21 139:24
140:2 147:15,18 149:8,19,22 150:3
151:2,3,9,10,13,17,20
**Golden** 2:16 4:5 6:1,1 19:10 152:8,10
152:20 153:5,17 158:18
**Gomez** 144:19,22,23 145:3
**Gonzales** 116:14,17
**good** 5:1 6:14,15,15 32:11 46:12 47:15
120:24 153:18,18 159:13
**Gould** 59:3
**government** 105:15
**grad** 92:11
**graduate** 41:16,23 42:13 66:4 80:16
85:21
**greater** 86:18 87:14
**greatly** 75:7,17 76:12,16
**ground** 89:10
**group** 52:24 53:1 137:2
**grouped** 141:5
**growing** 67:19
**guess** 24:18 25:5 26:19 49:2 51:23
62:3 75:17 87:5 92:24 95:10 104:4,7
142:6 147:20
**guessed** 98:12
**guesses** 104:5
**guessing** 124:8
**Guevara** 1:5,9 2:15 5:8 6:4 11:2
152:15
**guilty** 46:19 73:20

**H**

**half** 26:15 27:16 60:23 62:18 140:14
**half-hour** 14:6
**Halloran** 139:12
**hand** 90:3 161:5
**handwriting** 7:5,8,10,10,13,19,21 8:6
8:8 12:3,12,19,21 13:2 129:11,13
**handwritings** 8:21
**handwritten** 7:16 9:3 10:4,8 11:3,7,24
30:8,10 122:20 128:2 129:3 130:5,10
130:18 134:20,23 136:2
**happen** 57:20 108:17
**happened** 88:2 89:10 116:12
**happens** 57:18
**hard** 8:2 10:24 12:20 56:16 122:4
137:6
**harder** 55:3
**harming** 61:23
**Harry** 72:22

**Harvard** 67:16
**hate** 126:3
**head** 24:17 53:16 58:12 96:23 100:16
126:5 156:15 157:23
**headache** 52:2
**heading** 38:23 39:12 43:3 66:22
137:12 138:3
**hear** 51:20 56:5,6,19 59:6 78:6 150:11
158:20,23
**heard** 118:21 119:6
**hearing** 104:12 105:6,11 106:1,5,5
108:1,7,11 109:24 110:1,4,5,8,9,12
110:13,24 111:3,6,14,15 114:1,2
116:8 117:8 118:8,13,16,19 119:5,21
119:24 120:9,10,19,20 154:9,10
156:14
**Heather** 135:8
**held** 104:13
**help** 60:2 63:18 125:6 137:18
**helpful** 9:17
**Henry** 113:8 155:3
**heretofore** 160:5
**hereunto** 161:5
**higher** 100:5,6
**highlighted** 146:14
**hired** 98:17,20 99:2
**historical** 53:5 66:12
**history** 27:14 78:20
**hold** 9:5 10:20 111:16
**holding** 46:4
**homicide** 107:23
**Horton** 158:3
**hospital** 139:12
**hour** 1:20 48:5,6,6 79:6,6 150:24
**hours** 13:17 16:2,4,21 17:3,18 18:13
20:8 21:1,8 22:8,15 24:20 25:1,2,5
28:10 31:22 32:22 33:4 106:17 125:2
149:9,18 150:8 151:12 159:11
**hours'** 22:13
**house** 27:24
**Hugo** 67:13
**hundreds** 68:15,21,23 69:4,8
**hung** 111:17 112:18

**I**

**idea** 69:21 78:9 79:9 89:16 103:1 104:8
104:21 149:18
**identification** 49:12
**identified** 35:8 72:8,11
**identifies** 27:19 49:2 126:17 132:10
135:4,4,6
**identify** 5:17 49:6 58:23 59:1 143:18
**ignorance** 85:2
**Illinois** 1:1,20 2:4,9,14,18,22 3:4 5:11
5:14 117:7 155:6 160:1,4 161:14
**immediate** 62:1,14
**implicate** 138:18
**implicated** 60:9
**implicates** 18:1
**implies** 10:9
**imply** 10:11
**Impossibility** 133:1
**impressions** 83:23
**improperly** 108:9,9 114:12,13
**in-court** 154:16

**in-person** 56:10 58:2 60:9
**inception** 16:15
**include** 55:5 144:1 146:21 154:3
**includes** 20:12 22:1
**including** 50:17 68:4 139:11
**inconsistent** 123:5
**incorrect** 80:14
**inculpatory** 112:10
**independent** 42:22 46:24
**independently** 127:20
**index** 140:22 141:2,11 148:10
**indexes** 122:19 137:4
**indicate** 31:2 36:5 38:24 66:21 70:4
88:1 144:10
**indicated** 73:12 78:4
**Indicates** 4:23
**Indicia** 123:3
**individual** 2:19 6:2 49:8 73:10 77:14
89:3,16 90:14 91:19 99:1,17
**individuals** 39:21 46:4,14,19 127:4
**induced** 93:6
**information** 19:6 27:10 29:2 33:1
57:15 59:8 71:21 83:5 90:22 122:12
126:17 137:22 138:15
**injury** 139:13
**innocence** 142:4,18 144:8,11
**innocent** 44:13 76:8 78:11
**insert** 9:6
**insights** 62:16
**instruct** 18:2,6 19:7 125:23 127:14
132:17 134:9 136:13 138:2,22 139:4
139:20 140:19 141:14 143:3,22 144:5
144:17 145:10 146:12,24 148:24
149:7
**instructed** 128:4
**instructing** 130:8 147:14
**instruction** 19:14 127:23 129:16
132:22 138:6 144:13 157:6,8
**instructs** 128:21
**instrument** 72:3 96:24
**instruments** 74:16,24
**intend** 19:21
**interested** 101:9,12 161:3
**interrogate** 89:22
**interrogated** 62:14 64:16 108:14
**interrogating** 115:13,16
**interrogation** 39:13,18 41:13 42:12,20
44:11 50:9,16 53:21 55:2,22 63:15
65:8 66:23 67:3 68:3,4 69:10 70:8
76:7 89:23 90:4,9 107:6 108:16
109:7,7,18 115:10,14,20,22,24
117:18 118:14 135:3,5 156:4
**interrogation/disputed** 76:19
**interrogations** 40:4 41:1 53:12 54:22
55:1,3,9,20 56:11,14,14 58:5 63:17
63:23 67:19 71:4 88:13,14 120:1
**interrogators** 64:16 65:7 91:2
**interrupt** 51:10
**interruption** 56:1
**interview** 64:22 89:21 90:21
**interviewed** 40:20 65:7,8,8,9 81:24
82:21
**interviewing** 51:5 64:7 68:3
**interviews** 40:21 47:8 52:23 55:7
58:20 64:7,11,15 73:17 90:10,12,18

Richard Leo, 4/24/2023

91:1
**introduced** 43:22 44:22
**introduction** 43:6,12
**invades** 28:19
**investigate** 89:21
**investigation** 42:18
**invited** 63:13
**invoice** 4:11,12,13 15:1,21,22,24 17:7
 17:8,9,13,19,21 18:15,19,22 20:11,19
 21:18,20,24 22:17,22 23:20 24:11,11
 24:12,20 25:6,9,9 26:5 29:6,8,11,20
 29:24 31:11,16,21 33:1,8,14,15 34:2
 34:3,4,9,13,16,20 35:3,6,9,13,17,21
 36:9 38:18
**invoiced** 22:1
**invoices** 15:15,19 21:1,8 22:16 30:7
**invoicing** 20:12
**involve** 60:13 65:24 66:6,15
**involved** 37:6,20 46:14 54:19 56:13
 58:9 59:20 60:6 75:23 156:5
**involves** 41:24 63:16
**involving** 41:13 61:9,19 102:12
**iPhone** 14:20
**issue** 9:11 50:16 63:21 70:22 71:24
 72:5 99:18 102:2,7 124:1 149:14
 150:20,20,21 151:1,2,5,8 153:1
 158:15,16
**issued** 129:21
**issues** 75:16 76:9 93:3
**item** 28:6,6 37:12 126:20,23
**itemization** 28:19 29:4,23
**itemize** 17:17 18:13 19:1 29:10 30:18
**itemized** 17:14 25:6 26:3,4 28:13 29:3
 29:24 31:11,16 33:1,14,18 34:2,3,8
 34:13 35:3,3,6,13,16,21 36:9
**itemizes** 25:7
**items** 38:9 126:18,20

**J**
**Jackson** 2:17
**Jacobs** 119:4
**jam** 52:1
**James** 72:22 105:10 110:23
**January** 10:19 17:10 20:7,18,23 21:3
 23:1,11 26:11 27:8 103:9,13 105:1,1
 133:19 142:22 149:15 150:15
**Jimmy** 117:1
**jog** 65:16
**jogger** 156:22 157:3
**John** 59:3 158:3
**join** 9:19 18:8
**joiner** 9:21
**joining** 129:1
**joint** 111:23
**joists** 57:12
**Jones** 111:21 112:9 155:1 157:12
**journal** 43:19 63:11
**journals** 74:7
**judge** 104:10,15,17 150:12,13,13
**judge's** 151:10
**judges** 64:19 156:12
**judgment** 76:20
**July** 17:9 20:7 37:15 111:17 112:18
**Jumper** 109:23
**jury** 75:7,17 76:13,16,17,18,23 77:6

96:3 111:17 112:18
**Justice** 115:18

**K**
**K-A-S-S-I-N** 54:7
**Kassin** 53:7,8 54:7 66:2 92:23 96:14
**Kassin/Kiechel** 92:7
**Kathleen** 116:7
**keep** 14:22 19:1 25:6,7 28:14 29:4,14
 54:7 101:5 103:2 106:7,8 137:3
 154:11
**keeping** 30:17 101:9,12
**Kentucky** 120:18
**key** 53:8 92:11,14
**Kiechel** 92:23
**killing** 61:24
**kind** 62:7,17 73:23 85:20 93:1,5 108:21
 108:23
**kinds** 88:12
**KIW** 111:5
**knew** 150:14
**know** 16:18,20 19:10 24:18 28:4,22
 32:21 40:13 46:22 51:22,24 53:10
 56:24 57:2,20 59:6 66:8 69:1,2,2,17
 72:2 74:1 76:4 82:6 83:12 84:12 85:3
 85:20 86:11 89:10,10,22,24 92:4 93:4
 97:3,13 98:9,11 99:23 100:5,6,14,20
 100:21,22 104:16 105:5,10,24 106:4
 106:8,13,17,19,23 107:10,21 108:1
 108:21 109:11,20,24 110:4,8,13,21
 111:6,8,14,24 112:20 113:3,21 114:1
 114:9 118:1,16 119:8,15,17 120:10
 120:20 123:17 128:13,16 130:15
 131:13 135:11 136:24 152:22 156:3
 156:21
**knowing** 83:21
**knowledge** 34:19 44:6 47:5 51:7 70:19
 80:16
**Knowles** 120:9
**Knowles'** 120:14
**known** 71:8 74:24 84:7 150:6
**Kourchenko** 116:20,23
**Kyle** 54:4

**L**
**laboratories** 52:17
**laboratory** 88:7 92:1,5 93:5,7
**laboratory-based** 93:4,16
**lack** 76:21
**lacked** 84:6
**lacking** 86:2
**lacks** 85:10
**laid** 91:20
**Lamb** 109:3
**LaSalle** 2:13
**lasted** 14:6
**late** 8:11 146:20
**Lavelle** 111:21 154:24 155:1
**law** 2:8,17 43:20 58:14 74:1 96:3
 114:12 115:19 117:15
**lawyer** 128:8,17
**lawyer's** 128:5 158:8
**lawyers** 81:9
**lay** 78:17,17 87:4
**Lea** 1:18 5:15 160:3 161:14

**lead** 76:8 87:22
**leaders** 64:17
**leading** 20:19 122:9 131:10,21 132:4
**learn** 35:16
**Lee** 155:3
**left** 32:9 126:21,23 149:9
**Legal** 3:2 5:12
**legally** 154:6
**Leinenweber** 2:13
**lengthier** 135:21
**lengthy** 39:8
**Leo** 1:14 4:3,14 5:5 6:8,14 9:5 15:17
 19:17 25:23 27:22 57:6 121:22 137:8
 137:12 138:3 142:13 145:21 146:14
 147:24 149:2 153:18 159:13,15 160:8
**LEO2268** 6:24 10:16 122:2
**LEO2268-2358** 4:16
**LEO2353** 125:20 126:13
**LEO2354** 127:11 129:8 130:6
**LEO2358** 7:1 122:3
**Leon** 113:9
**Leonard** 108:1
**let's** 15:13 24:9 26:9 27:6 31:19 36:15
 38:22 43:2 48:21 66:18,19 75:3
 79:13,24 105:3,3 122:23 126:15
 130:9 132:23 139:21 140:3,21 141:16
 142:6 143:4 145:12 146:13 148:13
 153:2
**level** 41:16 80:16 109:1
**license** 108:8,22 109:1 161:14
**licensing** 108:7,11
**lie** 30:2 156:6
**Lindsey** 155:13
**line** 17:24 94:8
**lines** 80:1 140:7
**linked** 127:3
**list** 23:2 26:19 52:15 100:11 101:4
 104:23 105:4 153:22 154:3,8,14
 157:17 158:1
**listed** 37:13 38:9 60:12 61:2 141:1
 147:11 152:3
**literature** 42:23 43:6,8,13,23 44:2,5,8
 44:10,12 53:14 72:21 73:4 75:6,16,24
 75:24 76:3
**litigate** 149:11
**litigation** 45:11
**little** 13:18,18 20:5 48:5 54:15 57:1
 60:24 64:11 65:19 68:22 69:6 84:12
 87:3,4,4 121:1,19 145:13
**live** 89:23
**LLC** 2:13,21
**Loevy** 2:3,3 24:1,2,6 158:10,10
**log** 26:3 28:13
**logic** 45:8 123:6
**long** 14:2,12,20 37:1 48:8 56:4 57:5,20
 61:11
**longer** 29:14 34:12 61:12,13 101:3
 121:5
**longest** 122:12,13 124:23,24 125:1
**look** 13:21 14:5,14,16,18,19 15:13 17:6
 21:17 24:9 26:10 27:18 35:2,6 36:8
 38:22 53:19 54:9 55:14 96:22 97:4
 100:17,18,23 103:5 112:15 113:16
 121:20 130:9 136:15 139:21 141:6
 143:15 145:18 148:10,13 152:24

155:16 158:17
**looked** 15:17 31:8 35:21 47:9 65:15
130:13
**looking** 23:8,9 32:13,17,19 35:12 62:17
100:10 147:17 155:12
**looks** 16:1,23 20:8,18 32:20 158:2
**lot** 21:5 56:15 66:7 99:5,9,13 122:12
**lots** 93:2
**loud** 52:2
**loved** 61:24 62:12
**Lowe** 119:20 155:13
**Lowe's** 120:4
**lower** 109:1
**lunch** 48:6 79:6
**Lyndarr** 118:5,9 155:10

## M

**M-A-D-O-N** 54:5
**M-U-N-S-T-E-R-B-E-R-G** 67:14
**M.D** 40:15
**Madon** 54:4,5
**maintain** 18:21,23 19:20,24 25:15 26:3
29:10,13 33:20 34:10 45:11 46:18
133:7,14,17,18
**maintained** 29:22 47:3,5
**making** 46:21 62:15 104:5 124:7 128:9
**man** 149:18
**managers** 65:9
**Manuel** 105:4
**March** 21:21,21 24:21,22 33:23,23,24
34:14,14,18,18
**marked** 15:13 24:9 132:3 143:15
**Massachusetts** 115:12
**matched** 35:8
**material** 9:7 31:5 35:15 38:10 137:19
**materials** 20:14 21:12 22:3,4,23,24
23:3,12,15 27:19 29:16 30:16,24 31:3
31:6 34:22,23 35:17,21,23 36:6 38:17
53:4 67:18 81:5 98:24,24 99:5,10,12
99:13,17 125:1 132:3 137:19 138:7
142:13 144:1,9 145:18 155:15
**matter** 5:7 16:22 22:13 25:10 30:12
81:3 84:15 85:1 108:4
**McCollum** 112:22 113:8 155:4 157:12
**McCullon** 120:19
**mean** 7:22 10:11 40:14 41:21 42:13
44:4 45:7,14,15,18 47:23,24 49:22,22
49:24 50:14,15 53:24 54:5 58:24
63:2 65:13 66:15 70:21 71:7 76:17
76:18 77:18,23 78:3,11 80:7 83:3,19
83:20,21 84:9 88:20,22,22 91:12,14
91:15 98:19 100:18 102:11,12 110:12
115:5 128:14
**meaning** 27:9 49:18 80:8 117:12
122:20 125:18 126:10
**means** 50:21 80:24 83:4 85:17 160:6
160:14
**meant** 88:21
**measurement** 71:9,12,13,18,22,22
72:5,6 74:15,16,23,24
**meat** 54:15
**Media** 5:2 48:14 121:15 143:11
**medical** 40:5,6,6,12,18 71:20
**medication** 108:10
**medicine** 80:18

**meet** 28:22,23 76:24 77:5,9 94:2,24
150:16
**meet-and-confer** 9:10 123:17,23
**meeting** 69:18 70:23
**meets** 45:23 46:3 73:10 77:15,21,24
89:3,16 90:14 91:19,19,23 94:10 95:5
102:8 103:20 104:2
**Mejia's** 127:6
**members** 66:5
**memory** 12:6,24 38:21 65:16 100:24
121:23 124:21 137:18 140:16
**Mendez** 111:13,20
**mention** 77:10 156:6
**mentioned** 63:20 64:6 84:22 124:23
157:11
**merely** 69:7
**met** 90:24 96:7,10 98:7 102:23 103:16
105:19,20 112:13 113:11 117:22
120:4,14 149:14 157:20
**method** 64:6 65:20 66:10,16 120:2
**methodological** 40:11 42:16 74:19
**methodologically** 41:19,21 42:21
**methodologies** 42:10 74:20 84:13
86:6,19 87:2,16 88:16,16 90:12
**methodology** 66:7,8 68:13 84:12
85:22 89:8 91:4,7,8,17 139:16 143:18
143:24 144:8
**methods** 42:1,6 54:20 60:13 68:4
84:21 87:19,21 109:7
**Michael** 2:11 6:3 81:10,11 108:4,6
158:20
**Michigan** 97:12,18 99:22
**middle** 43:5 75:4 154:24
**million** 47:11 113:5,6
**Milwaukee** 2:8
**mind** 95:4 125:5 137:3 156:15
**minor** 115:17,19
**Minus** 16:12
**minute** 51:24
**minutes** 14:15 48:9 143:5 159:11
**mis-equates** 84:19
**mischaracterizes** 46:6 85:14
**misconstrued** 39:11
**misremembering** 113:16
**missing** 56:17,18
**Missouri** 114:15
**mistake** 104:17
**mistakenly** 50:24
**misunderstood** 10:17
**mjs@ilesq.com** 2:15
**MMG** 110:12
**MMJ** 110:12
**moment** 83:13 93:17
**Monday** 1:20 160:5
**Monell** 4:15 122:18 131:1 133:5 139:22
142:18 147:2 149:3
**Montana** 109:2
**month** 132:4
**months** 17:19,21 18:16,18 106:12
108:22 114:6 118:19 149:15,15
**morning** 5:1 6:14,15 13:20 14:8,12
122:3 133:23
**move** 149:17
**Moving** 143:23
**multi-day** 108:10

**multiple** 40:1 107:16 141:3
**Munsterberg** 67:13
**murder** 61:23 62:11,14 127:1,3
**muted** 121:10 158:21
**mutually** 95:21

## N

**n** 2:2,12 4:1
**name** 5:12 53:23,24 54:2,3,8 67:15
92:7 118:11 119:16 142:11 158:8
**named** 74:8
**names** 102:19 137:6
**natural** 52:22
**nature** 71:14 75:8 76:13 78:2
**near** 45:19 48:2 78:1 95:8
**necessarily** 21:12 62:22 98:13
**need** 9:16 16:13 28:3 31:23 32:2,14
42:11 52:5 56:6 57:2 121:7 128:18
138:18 149:11
**needed** 32:15
**needs** 124:12,13
**neighborhood** 113:5
**neighboring** 115:13
**neither** 126:23
**Nevada** 113:24 114:4,4
**never** 32:9 40:7,22 83:24 93:24 94:22
95:13 120:12 124:1
**nevertheless** 46:23
**Nevest** 141:7 145:15
**new** 22:23 69:14 137:22 148:1,11,15
148:19
**Nicholas** 110:23
**Nick** 3:2 5:12 121:10
**Nieves** 154:22,22 157:12
**nine** 93:18
**noise** 56:2,16,19 57:8
**non** 82:3,7
**non-falsifiable** 82:1,23 83:1,19
**nonresearch-based** 82:1,23
**nonreviewable** 82:2,4,8,24
**Nora** 2:12 5:19 14:1,2,4,11
**normal** 27:13
**North** 2:4,8,13,21 3:3 5:14 58:14
**Northern** 1:1 5:10
**notarial** 161:6
**Notary** 1:19 160:3 161:11
**notation** 14:18
**notations** 8:6 10:7,18 11:3 12:1,2,14
12:16,19 35:7 134:20,24
**note** 48:16,19,24 49:3 126:15 134:14
134:21 141:12,17,20 142:12 146:9,15
**notes** 6:20,23 7:3,9,13,16,20,24 8:1,8
8:16,20 9:3,13 10:4,9,9,12,13,14 11:3
11:7,10,13,19,24 12:1,1,22,21 13:1,21
14:5 112:16 121:2,22 122:9,16,19,24
123:9,13,16,20 124:1,4,18 125:4,11
125:14,17,18 126:9,10 127:9,11,20
128:2 129:9,14,20 130:5,10,12,13,17
130:19,19 131:6,21 132:2,15 133:7
134:2,4,13,17,19,24 135:1,13,14,15
135:20 136:1,2,5,9 137:23 139:1,18
140:13,16,21,22 142:10,18 143:1
144:2,10,14,18,21,21 145:2,7 146:21
147:10 148:18,18 150:1,1,7,22
152:21,22,24 159:6

Richard Leo, 4/24/2023

**notice** 1:16 19:22 29:15 132:11 141:24
  142:16 143:23 144:3
**noting** 50:1
**November** 139:10
**ntrotta@urlaubbowen.com** 3:4
**number** 1:4,8 15:14 16:11,16,18 17:6
  21:17 22:15 24:10,12 26:5,9 29:7,12
  31:13 32:13,18,19 33:11,19,22 36:15
  38:14 51:2 53:20 54:6 61:1 65:14
  69:1 83:22 96:20 97:14 98:7,11,18
  100:1,3,5,8,14,18 101:2,4,5,6,6,7,12
  101:18,21 102:18 103:1,2,11,24
  104:7 115:15 121:20 123:14,15
  126:23 127:2 133:24 135:20 139:22
  140:4,13 141:3,7 143:16
**numbers** 5:9 69:5 104:6 138:13
**numerous** 54:12

**O**

**Object** 132:21 138:16
**objecting** 17:24
**objection** 9:6,8,20 11:17 15:3 17:23
  19:4 21:15 23:24 24:5,16 25:11,20,20
  28:17,18 30:20 34:6 35:10 36:2,13
  38:20 39:24 41:9 46:5 68:1 70:3 71:2
  73:15 77:3,17 78:21 81:18 83:9
  85:13 89:6,19 90:17 91:10 94:16
  95:18 101:13 104:18 107:17 123:11
  123:13 125:21 127:12,22,22 129:1,15
  129:15 130:7 131:5 132:16,21 133:9
  134:8,15 136:12 137:16 138:1,5,20
  139:3,19 140:18 141:13,13,21 143:2
  143:2,21 144:4,4,16 145:4,9,24 146:7
  146:11,23 147:7,12 148:23 149:6
  156:20 157:16
**objections** 9:21 123:15,19 124:9 129:2
  144:12 150:5,6
**observation** 51:6 52:21 54:14,19 55:6
  55:17,23 56:10 58:2 60:8 89:14,15
**observational** 54:16
**observations** 55:16
**observe** 55:19 58:5 88:13
**observed** 54:21 90:3
**observing** 52:22 55:3 89:20 90:8
**obstructionist** 138:19
**obtain** 55:6
**obviously** 19:13 96:3 99:7
**occasion** 37:10
**occur** 91:4 106:12
**occurred** 47:11 131:15
**October** 16:2,8 31:20 32:22 33:3
**offer** 109:5 151:1
**offered** 41:15,16 49:2 109:6 124:2
**Office** 2:8
**officer** 2:19 6:2 115:11 135:11
**officers** 135:4,6,8
**offices** 5:13
**official** 159:9
**Ofshe** 43:18 58:15 63:10
**oftentimes** 53:17
**Ohio** 110:15
**okay** 9:23 10:20 11:6,16,24 12:7 13:1
  16:20 18:10 20:2 21:11,17 22:22
  23:12 26:6,23 28:5 31:8,19 32:5,19
  33:10,18 36:7,15 39:12 47:13 48:21

49:16,21 51:15 52:20 57:17 61:19
64:3 66:10,18 67:20 68:7 69:16 74:5
75:3 76:22 78:2 79:13 83:19 87:18
91:11 93:11,18 94:20 95:2,3 97:5,8
99:4,15,21 100:3,14 102:2 105:3
106:18 107:21,24 109:2,14 112:3,6
112:17 114:15,22 118:22 119:19
120:8,13,23 122:1,7,16,23 125:10
128:18 130:2,3 132:1,8 135:2,13
137:8 140:2 141:11 149:8,22 153:5
153:18 157:10,24 158:18 159:3
**Okey-doke** 79:22
**once** 31:10 77:13 81:21 82:16
**one's** 42:21 50:22 133:7
**one-year** 21:22 29:9
**ones** 6:24 49:3 50:3 59:22 60:9,11,13
  61:7 62:12 100:22 101:23 154:21
  155:14,16
**Op-eds** 47:8
**opening** 39:6
**opine** 39:13,17 99:18
**opining** 158:15
**opinion** 4:15 26:10 46:4 66:19 73:19
  77:8 114:10,14 118:20 122:18 133:3
  139:22
**opinions** 38:24 78:17 99:7 131:2
**opportunity** 150:19 151:3
**order** 23:8 132:14 144:14,15 145:8
**orders** 20:2
**original** 6:22 8:5,21,21 12:8,11,22
  20:17,20,24 22:24 23:6 27:8 45:9
  77:11 133:19 136:6,10 146:10
**originally** 92:22
**outcome** 90:19 109:11,20,24 110:4,8
  110:13,21 111:4,6,14,20 112:20
  118:16,18 119:1,14 120:10,20 161:3
**Owens** 23:21,23 24:1

**P**

**P.C** 2:17
**p.m** 48:11,15 59:16,14 79:16,19 121:12
  121:16 143:8,11 153:12,15 159:16
**packet** 123:3 132:3 135:19
**page** 4:10 15:23 16:3,11 26:10,15,15
  26:19,20,23 27:6,11,17,18 31:19
  37:12 43:2 48:22 50:8 66:18,19,20,21
  69:2,9 75:3,4 79:24 80:1 84:5 86:14
  87:5,5,24 88:1 93:18 96:12 97:8,8,10
  104:9,9,9,23 110:11 123:1 125:17
  126:9,15,16 127:11 130:9,13,22
  132:8,20,23,23 135:2,16,19 136:15
  136:18,21 139:24 140:2,3,10,12,14
  141:16,23 142:3,7,12 143:16 144:7
  145:12 146:10,13 148:10,17 153:22
  153:22 154:23,23,24 155:6,7,13
  157:24,24
**pages** 37:2 38:3,9 123:2,8,8 124:16,17
  135:13 136:1 139:14 148:14
**paid** 148:8
**pain** 139:13
**paints** 67:2
**paper** 52:1 97:22 133:11,13
**papers** 53:17
**paragraph** 38:23 39:7 43:5 45:1 47:14
  70:5 71:8 74:9 80:1 84:5 86:14 92:6

93:19 96:13 137:21 138:7
**parent** 61:24
**Park** 46:12 47:2 156:22 157:3
**part** 21:11 24:7 40:12 41:23 42:2 55:21
  56:13 57:10 58:9,20 60:4 65:6,14
  75:13 82:4 134:23 156:4
**partial** 55:21 56:14
**partially** 58:10 60:21
**particular** 16:17 26:5 29:17 30:12,18
  31:4 35:24,24 39:2 62:10 76:22 86:1
  94:10 99:15,18 107:15 112:1 113:10
  118:12 124:11 135:13 137:21 138:24
  142:12 155:23 156:16,21 157:1
**particularly** 154:19
**parties** 5:18 20:1 30:3 63:18 161:2
**parts** 60:3
**party's** 128:8
**Patrick** 37:13,18,20,23 38:4,16 49:1,7
**pattern** 137:1
**Pattern/Practice** 132:11
**Pattern/Practice/Notice** 130:23
  135:17
**patterns** 62:16
**Pause** 59:12 143:9
**peer** 73:23
**peer-reviewed** 68:16 70:19 74:7 75:22
**people** 32:8 40:20,22 45:16 46:9,23
  57:6,9 62:13 66:8 73:18 76:8 78:5,6
  79:3,7 81:7,7,10,21,24 82:17,21
  83:22 88:12 92:14 93:6,7,7,9,10 94:9
**people's** 2:8 78:17
**Peoria** 1:19 160:2,4
**percent** 80:21
**percentage** 98:6 104:1 106:5
**perfect** 74:21,21
**period** 17:14 20:6,6,19 21:7,8,22 24:21
  29:9 34:17 131:9 154:5
**permitted** 77:7,12 116:2 155:22
**perpetrator** 49:11 126:21
**perpetrators** 126:21
**person** 42:6 55:15,19 61:22 73:1,19,24
  74:3 99:1 115:16,17 146:6
**person's** 99:19
**personally** 59:20
**perspective** 149:20
**persuade** 159:7
**pertain** 1:17
**pharmacist** 108:6
**phase** 62:5
**PhD** 41:22,23 42:5 54:16,18 55:18 58:4
  70:17
**phenomena** 52:22,24 74:15 85:7 86:7
  89:20 90:9
**phenomenon** 79:7
**phone** 13:12
**phrase** 43:21 44:2 68:24 72:12,12
  138:19 147:16
**phrased** 138:20 147:13
**phraseology** 68:19
**physical** 49:7 115:24 123:5 132:24
**physically** 115:15
**picture** 67:2
**piece** 71:20 96:5 127:2
**pieces** 62:22,23 63:7
**pin** 68:22

Richard Leo, 4/24/2023

place 19:24 120:24
placed 129:24
plaintiff 1:3,7 2:6,10 113:7 128:15,16
    158:7
plaintiff's 158:8 159:7
plaintiffs 113:4,8 141:4
platform 1:21
please 5:17 6:6 19:23,24 26:3 71:16
    106:13 143:6
plow 52:4
point 21:11 39:2 47:20 53:14 85:9
    87:16 126:18,19 135:20 140:4 151:22
pointed 137:4
pointing 67:20
points 125:19 126:12 132:12 133:1
    139:17 143:18 144:2,10
police 2:19 39:13,18 40:3 41:13 42:12
    42:18,20 44:10 45:10 46:18 47:16
    50:8,16 53:12 63:17 64:16,17,17 65:7
    65:8,9 66:3,4,23 67:3,19 68:3 70:8
    71:4 76:7 89:21 91:1 109:6 115:10
    115:11,22 117:18 126:20 135:4,6,8
    135:11 139:11
policies 131:3
political 66:8
polygraph 156:5,6,8,18
polygraphs 71:23
populations 64:22
portion 122:18 125:12 127:10 131:1
    142:19 147:2 149:4
position 150:10,11,14,15,17 151:16
posits 45:1
possession 34:9
possible 10:17 51:2 130:18,21 155:5,8
    155:11
possibly 150:6 157:13
post-conviction 117:8 118:2,6,10,13
    119:20,24 120:9 154:9
post-date 157:19
potential 123:24
power 78:19,22
powerful 75:8 76:13 78:2 79:10
practical 80:5,9,11,13 81:2,9,11,13,17
    81:20 82:5,14 83:4 84:18
practice 89:21 137:2
practices 76:10 115:23 118:14 131:3
precise 100:8
precisely 61:6 99:23 126:5
predate 157:19
preexisting 71:20
preju 78:12
prejudicial 78:13 79:10
preparation 8:10 20:14,20 21:5,13
    22:4 23:4,4 34:23 36:7 38:11 79:2
    143:1
prepare 13:9 15:11 17:18 18:14 21:2
    25:9 29:14,20 123:9 124:18 125:11
    125:19 126:12 127:20 131:6 132:20
    147:9 149:4
prepared 26:16 122:9 123:13 124:24
    125:3,13,14 131:20 132:2 133:19
    134:4,5,6 140:16 149:2
preparing 24:15,23 36:11 71:19
    147:24
prescribing 108:9

present 3:1 49:14,17,18 74:19
Press 69:15
pressed 92:13
presumably 40:5 73:23 99:5 103:10
pretrial 104:12 106:4
pretty 52:2 84:23
prevent 32:1
prevented 73:6
previous 95:11 123:12 124:22
previously 24:9 37:5 71:6 74:8 132:6
Prince 146:22
print 134:14 135:24
printed 23:18 38:17 134:16,19 135:1
printer 51:11,12 52:20
printing 22:3,23 34:22 35:15,18 51:23
prior 9:11 23:7 79:8 101:15,16 125:15
    131:12,13 149:16 150:20 156:9
prison 73:18 81:8,22 82:17
privately 16:18
privilege 9:7,15 18:1 19:12 25:21
    28:21 123:15,21 124:9 125:22 127:13
    127:23 129:16 130:1,8 132:16 134:8
    136:12 138:1,18,21 139:3,19 140:18
    141:14 143:3,21 144:5,16 145:10
    146:11,23 147:13,19 148:23 149:7,11
    149:24 151:4,7
privileged 18:5 19:6
privileges 28:19
pro 98:19
proactively 77:6
prob 136:20
probably 13:22 25:4 61:12 103:5
    120:24 124:12 136:20 148:8
problem 104:5
problematic 44:7
problems 76:10
Procedure 1:17
proceeding 118:2
Proceedings 59:12 143:9
process 30:1 60:19 61:2,3 62:6,8,20,24
    63:4,5 73:22 90:9,18 123:17,23 156:5
processor 134:5 136:11
produce 18:24 25:17 34:4,5
produced 6:21 7:12 9:13 10:14 12:4
    123:20 144:14,22,23 145:7,8 150:1,7
    150:8
producing 150:3
production 20:2
professional 80:17
professor 59:4 61:10 67:15,16 74:1
    96:14
professors 40:10 42:24
profusion 54:23
program 41:23,24 42:5 148:5,6
progress 60:12,16,20 61:8 62:19
Project 117:14
proliferation 54:23
pronounce 119:17
prosecuting 115:18
prosecution 115:5,6,8
prosecutor 74:1
prosecutors 45:10 46:17 47:3,8,16
    64:18 65:9 72:24 74:4
protocols 74:19
provably 45:9 92:2

prove 45:19 46:9
proven 43:4,7,21 45:3,15,23 46:3
    61:21 67:22 69:18 71:1 72:11,23
    73:3,11 74:3 77:1,9,16,23 89:5,9,17
    90:6,7,15,20,23 91:3,6,13,16,21,22
    92:2 94:3,12,15 95:1,6,7,20,24 96:7
    97:11,13 98:1,8 99:24 100:12,21
    101:1,19 102:2,8,13,17,20,24 103:16
    103:21 104:2 112:13 113:12,15
    117:23 120:5,15 126:16 132:24
    141:18 154:17 155:19 157:14,20
    158:16
proves 46:13 49:8
provide 28:14 91:17
provided 7:4 17:7 23:15 37:23,24
    52:14 61:17 98:24,24 99:16 112:9
    138:7 142:14 144:9 145:14,19
proving 47:17,22 91:15
Proxy 63:16
psychiatrist 81:7,15,21 82:16
psychiatry 40:2 81:12
psychological 50:9,17 53:12 66:23
    67:4 68:4 70:7,8 71:3,4 109:7 117:18
    118:14
psychologically 68:5
psychologist 50:23 84:17
psychologists 70:17
psychology 41:17,17 42:18,24 67:16
PTP-D-FLEWELLEN 138:13
PTP-FLEWELLEN 139:14
PTP-N 145:20
Public 1:19 160:3 161:11
publication 41:10 60:19,22 61:2 62:6,9
    62:20,24 63:3,4,5,11 101:11 102:14
publications 65:14 69:17
publicly 96:24
publish 73:4,22
published 40:19,23 43:19 55:23 59:2
    60:11,14,19 63:10 65:24 66:6 67:17
    69:3,14 72:18,20 74:2,7 84:1 96:14
    96:21
punched 133:12
punishment 109:1
pure 104:4
purpose 42:4 62:10,13 64:13 107:5,6
purposes 55:4 66:14 95:24 101:11
    128:12
pursuant 1:16 127:13
pursue 19:21,23 151:4
put 15:14 31:24 32:3,10 40:14 45:14
    48:21 54:15 64:11 66:12 77:4 108:15
    128:14,23 153:20
putting 19:22

Q
qualified 39:13,17,23 40:1,6 50:19
    104:24 153:23 154:4,7
qualifier 39:6
qualifies 89:17
qualify 45:3
quantity 68:9
question 8:18 9:12,15 10:1,9,11,17
    11:18 18:2,3,9,10,12 19:5,5,18 21:6
    23:8 25:24 28:15 29:1 53:2 56:9
    64:20,23 75:13,18 79:5 82:13 87:7,9

91:11 94:19 95:10,16 96:17,23 97:1
97:24 99:22 101:16 124:6,10,11,11
124:16,22 125:23 126:1,4,8 127:14
127:17 129:18,20 130:14 133:10
134:16,22 136:3 138:17,21 141:14
144:20 145:10 147:13,16 149:20
**questioning** 17:24 152:4
**questions** 8:13 9:1,4,14 10:2,5 11:20
11:21 13:3,7 18:7 28:18 77:7 102:17
104:6 122:11 124:3 125:7 134:13
140:17 147:19 152:2,3,6,8,13,18,21
152:23 153:3,19 157:11 159:1,4,6
**quick** 51:10 75:14
**quickly** 51:23
**quiet** 57:17
**quote** 93:20

**R**
**R-E-D-L-I-C-H** 54:3
**R-E-Y-O-S** 72:23
**Rachel** 2:3 48:18
**rachel@loevy.com** 2:6
**Racion** 119:16,16,17
**Ramey** 114:22 115:1
**randomized** 52:18
**range** 138:13
**ranges** 69:4
**rate** 71:9 72:3,4
**rates** 74:24
**re-creating** 93:3
**re-creation** 53:6 59:19
**re-creations** 51:5 52:16 53:11 59:20
59:22
**reach** 123:19 149:15 151:14
**reached** 124:1
**read** 9:16,24 18:10,11 37:4,22 41:2
71:6 82:11,12 102:15 124:12,13,15
126:4,7
**reading** 37:5 152:1
**reads** 75:20 94:22
**real** 51:1,2 53:4 75:14 85:7 88:4,8,10
141:4
**realism** 84:14
**realized** 115:14
**really** 32:7 51:9 54:2 68:8 89:13
**reask** 124:2,3
**reason** 18:24 25:17 40:2 47:15 90:5,20
91:3 138:24 152:17
**reasons** 26:5 32:15 40:1 50:18 57:13
61:16
**reassert** 124:9
**rebuttal** 6:19 7:15 11:11 22:5 23:3,5
23:10 24:15,23 26:10,16 28:7 34:24
36:8 38:11,24 43:2 48:22 66:18
81:23 82:19 85:19 133:22 136:6,11
150:4 151:2,24,24 152:5,7,9,13,19
153:4 159:5
**recall** 8:4 13:5,8 23:2,5,15 36:24 37:1
37:11,17 38:2,3,5,6 62:3 96:18,22
105:7,20,21 106:2,20,24 108:3
109:10 110:6,10 111:4,20 112:15
113:22,23 114:19 115:2 116:18
117:24 119:2,14 120:22 125:13,16
130:16 131:8,16 141:22 146:3,19
154:6,18 155:20 156:24 157:4,9,21

157:22 158:17
**recalling** 78:23
**receive** 22:23
**received** 19:3 21:18 23:6 40:11 157:2
**receiving** 40:18
**recess** 48:12 57:2 79:17 121:13 153:13
**recognize** 26:14
**recognized** 78:5
**recollection** 10:6 14:6 54:9 58:16
65:15 79:1,3 98:5,8 103:5 119:18
**record** 5:3,18 8:19 9:24 18:11 25:7,13
25:16,18 40:21 48:11,14,17,19 54:24
59:11,14 79:16,19 82:12 121:3,12,15
124:7,15 126:7 128:7,24 143:8,11
149:10 151:17,18 153:12,15 159:9,15
159:17
**recorded** 55:6,9,15 58:9,10 60:9 88:14
115:14
**recordings** 55:1,22 56:13,14 58:19
**records** 17:17 18:13,21 19:1,21,23
25:7 26:4 30:18
**redacted** 31:21 32:21
**redeposition** 123:24
**Redlich** 54:2
**reduced** 160:15
**refer** 50:22 66:1 69:21 73:17 93:1
146:5 157:7
**reference** 10:7 67:12 69:23 80:2 88:2
136:18,20,22 146:15
**referenced** 43:9 61:20 69:15 102:16
**referencing** 57:7 68:10,11,12 88:10
96:16 146:2
**referred** 51:3 102:15
**referring** 10:8,18 14:17 29:21 31:17
43:13,14 44:9,19 51:8 61:8,11
69:20 71:6 81:20 82:15 88:11 146:18
154:21
**refers** 50:24 52:11 71:3
**reflect** 34:16
**reflected** 29:11 33:2 34:1 38:18 137:11
**reflection** 16:7 63:8,13
**reflects** 29:22
**refresh** 54:9 58:16
**Regalado** 105:24
**regard** 125:22 129:20
**regarding** 85:10 124:3 133:3 140:6
**regardless** 45:20
**register** 74:16
**regularly** 54:6
**Reid** 120:1
**reified** 104:6
**rejects** 49:3 50:3
**relate** 19:12 135:15 154:15
**related** 11:10,13 18:4 50:16 122:20,24
123:24 131:2 142:18 153:3 159:4
161:2
**relates** 125:11
**relation** 123:16 129:13 141:12 151:23
152:5,7,13
**relative** 62:1
**relatives** 62:15
**released** 118:3
**relevant** 41:18 52:23 64:7,10,14,23
65:4,5 70:7,13,14 73:4 75:7,11,16,18
75:18 76:1,4,5,6 90:10,12 99:18,19

**reliable** 45:12
**reliant** 90:12
**relies** 104:10
**remaining** 159:5
**remains** 150:17,21
**remarkably** 49:3 50:2
**remarks** 97:9
**remember** 37:5 53:18 61:6 100:20,22
101:4,18 108:20,24 118:11 122:8
125:5 137:6
**remote** 15:16 24:13 31:15 33:12 48:23
79:23 121:21 139:23 143:12 153:24
160:6,14
**repeatedly** 43:9 67:6 80:19
**rephrase** 147:9
**report** 4:14 6:19,20,22 7:15,18,22,23
8:2,5,9,12,21,21 9:2 10:3,6,7,10,19
11:2,6,11,14 12:8,11,20,21,22 13:1,6
20:15,15,18,20,24 21:3,5,13 22:5,24
23:3,5,6,10,13 24:15,23 25:3,4 26:16
26:21,24 27:3,6,8,20 28:7,8,16 29:14
34:24 36:8,11,11,16 38:10,12,15,22
38:23 39:1,7,8,10,16 43:2 44:20
48:22 50:20,24 66:2 67:1 75:3 77:5
77:10,11 80:10,20 84:24 85:15,19
87:24 88:17,19 95:12 96:8 103:9,9,10
104:22 112:16 113:17 122:11 123:10
124:20,23 125:12 129:21 131:2,12,14
133:19,23 136:6,7,10,11,17,19,21,24
137:9,12,20 138:3,8 140:1 141:9
142:12,13,14,19,22 144:18,23 145:3
145:19,21 146:4,10,14,15,20 147:3
147:11 148:17,19 149:4 150:4 151:2
151:24,24 152:2,5,7,9,13,19,23 153:4
153:21 158:15,17 159:2,5
**reported** 160:13
**reporter** 5:15 6:5 15:7 30:22 82:10
124:14 126:6 161:14
**reports** 27:14 81:6 122:13 125:6 134:6
147:24 148:1 154:17
**represent** 5:18 23:23 117:13 128:15
**representing** 5:13 24:7 45:11 128:11
**represents** 24:3,8 85:7
**request** 16:14 21:19 26:2
**reread** 114:14
**research** 39:18 40:3,12,16,16,17,19,19
41:10,13,20,22 42:1,7,9,9,22 43:6,13
43:22 44:10,12 50:15 51:7 53:2 55:4
64:20,23 65:1,7 68:10 69:3,10 70:6
70:12,14 74:6 75:6,15,24 76:3,11
78:4,5,15 81:1 84:11,13,19 85:3
87:23 88:12,13,14,23 93:20 94:1,2,23
94:24 95:14,16,19,24 96:2,6 97:22
98:14 101:11,14 102:3,5,9,14
**researched** 98:16
**researcher** 42:5 80:16,17
**researchers** 54:6 64:22 66:2 67:6
70:16
**reservation** 123:21
**reserving** 149:12 150:10 151:11,13
159:5
**resolution** 124:1 149:15
**resolve** 150:20
**resolved** 151:13
**resolves** 93:21 94:1,23 95:14,16 96:2

Richard Leo, 4/24/2023

**respect** 29:7 33:10 50:7 53:12 54:14 58:2,8 59:19 62:11 69:16 72:7,10 115:23 123:10 124:19 125:17 126:8 127:16 143:16 145:15 152:9
**respond** 77:7
**response** 16:17 19:2 21:19 25:18 96:19 127:13
**rest** 149:12
**result** 105:5,10,24 106:12 107:10 108:18,20 111:24 113:21 114:1
**results** 88:18,19
**resume** 152:11
**retained** 16:18 98:20,21,21,23 99:2,16 99:17 101:7,10,23 102:10,22 103:6 105:17,18 107:18 117:13 118:8 128:16 158:6
**retainer** 16:12,14
**retrial** 112:17
**retrieve** 32:3
**reverse** 119:9
**reversed** 114:7 119:7,22
**review** 13:13 20:13 22:3 28:11 29:15 31:6 34:22 35:20 37:10 58:14,16 64:5 73:23 75:14 77:20 83:24 84:2 90:1 93:14 105:22 125:19 126:11 127:10 132:14 155:7
**reviewed** 13:11,14 23:4,16 27:19 28:6 31:3 36:16,16 38:11,17 79:2 101:11 114:10 124:24 137:20 158:12
**reviewing** 13:15 15:9 21:12 25:3 28:15 30:16,18,24 35:23 36:6,22 37:17 38:6 58:22 144:1,9
**reviews** 42:23
**revising** 24:15,23 36:11
**revision** 20:15 22:4 34:23 36:7
**revocation** 109:1
**Reyes** 5:22 6:22 17:8 24:4,7,8 48:18 50:3 76:24 96:9 122:21 123:9 124:17 124:21 125:11 126:23 127:1,3 129:1 135:3
**Reyes'** 48:17 122:24 133:4 135:15
**Reyes/Solache** 15:22 93:21
**Reynaldo** 1:5,9 2:15 5:8
**Reyos** 72:23
**rhetorical** 86:11
**Richard** 1:14 4:3 5:5 6:8 43:17 58:15 63:10 116:7 159:15 160:8
**Rickleffs** 105:10
**rid** 57:14
**riddled** 123:4
**right** 20:21 22:19 27:4,11,22 28:11,12 28:23 32:4,17 33:4,8,10 34:24 35:9 36:12 38:22 42:12 45:18 46:20 47:20 48:10 49:19 50:4 52:12,17 53:8 58:23 62:24 63:2 65:17 66:14 67:24 69:12 70:1,22 71:1 75:18 78:15,18,20 79:15 86:20 87:6,16 92:15,19 93:1 98:4,15,15,18 99:1,8,19 100:15 101:22,24 103:7,11,17 112:10,18,23 114:16,23 116:3,15 117:10 119:13,21 120:23 121:19 122:21 123:22 125:2 129:11 131:2 132:9 133:1,4 135:11 135:22 137:21 140:8,23 141:2,11 142:1,11,22 143:7 144:24 145:3,19 147:3 148:11,15,20 153:11
**risk** 107:7 120:2
**road** 124:8
**Robert** 119:12
**Robeson** 112:23
**robin@urlaubbowen.com** 3:5
**ROBYN** 3:2
**Rock** 2:21
**Rockford** 158:4
**Rohr** 113:24 114:5
**role** 60:1,2 108:13,16
**Roman** 148:1,11,15,20
**Ronald** 119:4
**room** 57:11
**Rosales** 117:1,4
**Rosen** 2:20 4:4 5:23,23 6:13 9:22 15:5 15:8 19:8,13,16 25:22 30:21,23 32:7 32:11,12 48:4,9,16,20 51:20 52:4,8 52:10 56:21 57:6,17,24 58:1 59:9,16 79:13,21 121:10,18 125:9 126:3,14 127:15 128:1,11,18 129:4,7,17 130:2 130:4 132:19 134:11 136:14 138:23 140:20 141:15 143:4,6,14 146:4 147:18,22 149:1,8,22 151:9,16 152:6 153:9 158:20,24 159:3,12
**roughly** 21:7
**round** 45:17
**rule** 18:1,6 19:6,11 125:22 127:13 129:3 132:17 134:9 150:2,11
**Rules** 1:17
**run** 52:15 57:12 71:19
**running** 59:23
**Russell** 118:23
**Ruth** 1:18 160:3 161:14
**Ryan** 109:2

---

**S**

**S-C-H-E-R-R** 54:5
**sake** 124:13
**sample** 71:19
**Saul** 54:7 66:2
**save** 128:9
**saved** 136:5 144:15
**saying** 19:8 39:21,22 47:7,24 68:20,21 76:2 84:2,23 85:12,15 94:18 95:16,19 96:5 97:6 98:3
**says** 14:20 15:22,22 17:8 40:20,22 43:5 80:19 82:4 83:22 84:6 103:10 104:10 107:1 111:10 112:3 115:5 130:23 132:24 135:3,5,8,16 136:16,17,17,22 137:8 138:7,11,11 139:5,6,9 141:18 141:24 142:3,13,13,14,16,17 145:20 146:14
**scene** 72:2 123:5 126:22,22,24 127:5,6
**Schalka** 6:3
**scheduling** 57:13
**Scherr** 54:4,5
**school** 40:5 117:15
**science** 39:18 40:9,12 41:13,18,20,24 44:10 50:10 51:7 64:21 66:24 67:9 68:10 70:6,12,14 74:10,13,14,17,21 75:2,5,6,15,21,23,24 76:3,11 78:13 80:24 85:2,12 93:20 94:1,22 95:14,16 96:2 108:17 117:18
**sciences** 40:17 72:4,5 74:15
**scientific** 42:8 50:8,13 66:22 67:3 68:3
71:10,13 84:20
**scientist** 41:11 73:1 84:11
**scientists** 65:21 66:9,9 70:18 73:16
**scope** 150:6
**screen** 15:14,16 24:13 26:15 31:15 33:12 48:21,23 56:8 79:23 121:21 132:9 139:23 143:12 153:24
**scroll** 16:13 20:5 26:18 140:1 145:13
**seal** 161:6
**Sean** 2:2 5:21
**sean@loevy.com** 2:5
**second** 10:20 16:11 31:14 32:15 38:14 61:19 63:24 71:8 111:16 125:3 139:21 159:10
**Secondly** 80:19
**seconds** 32:3,7
**section** 69:21 141:23 142:7 143:17,23 144:7
**see** 14:20 15:24 16:4,12 17:10 22:5 23:21 26:11 35:4,7 36:10,18 37:15 39:3,4,14,19 43:10 44:2,16 45:4 47:18 48:18 49:4,9 50:11 55:14 57:11,11 67:10 68:17 70:10 71:10 74:10 75:9 76:14 80:5 86:15 88:4 93:22 94:5 97:1,15 100:1 104:13 105:3 117:8 123:6 127:7 130:23 132:12 134:21 135:6,9,17 137:9 138:8,13 139:7,14 140:10 141:18 145:21 146:16 154:1 155:16
**seeks** 74:14
**seen** 97:10
**send** 18:22 29:5,11
**sense** 86:3,4,5
**sent** 133:16
**sentence** 39:16 43:10 47:13 68:7 70:5 71:5,7,8 75:20 88:11 94:22 95:2,4,13 152:1,2
**sentences** 93:19
**separate** 10:8,12 11:10,13 17:17 18:12
**separately** 19:1
**separation** 36:10
**September** 8:11,14,23 9:2 10:3,14 11:21 12:23 13:4,7 23:7 121:23 122:7 131:10,15,19,20,20 132:4,4,5 158:2
**sequence** 4:23
**session** 9:8 149:19
**sessions** 13:3
**set** 28:20 44:15,18 55:8 161:5
**settings** 88:8,10
**settled** 112:1
**settlement** 47:11
**seven** 80:1 84:5 86:14 125:2 151:12
**severe** 139:13
**SHALKA** 2:11 6:3 158:23 159:1
**share** 56:8
**sharing** 15:16 24:13 31:15 33:12 48:23 79:23 121:21 139:23 143:12 153:24
**sheet** 14:14,17 30:12 33:2,7 35:16
**sheets** 29:13,14,18 30:5,8,9,17 31:2,10 33:13,24 34:2,12 35:4,7,13,22 36:8
**short** 48:4 57:21 153:10
**Shorthand** 161:14
**showing** 27:24
**side** 69:6 141:17

Richard Leo, 4/24/2023

**sides** 118:19
**Sidney** 118:23
**signature** 26:24
**silence** 39:2
**similar** 49:3 50:2
**similarly** 109:17
**Simmons** 114:15,18
**simply** 50:20 67:23 71:9 73:2,24
**Singh** 106:18,21,22,22
**single** 127:2 141:5
**sit** 23:14 55:19 58:5,22 65:17 88:12 97:5 103:14 156:23
**sitting** 55:2 132:20
**situation** 91:2
**situations** 118:17
**six** 17:19 18:15 69:12,15 75:3 79:24 123:8 124:16 125:19 126:12 140:7
**skeptical** 78:8,10
**skip** 4:23
**skipped** 142:6
**sleep** 63:21 64:3,4
**Slosar** 158:9
**small** 27:23 39:10 57:10
**Snyder** 2:12 5:19 14:1,11
**social** 39:18 40:12,16 41:11,13,16,18 41:19,24 42:8,17 44:10 50:8,10,13 51:7 64:21 65:21 66:9,22,24 67:3,8 68:2,9 70:6,12,14,18 73:1,16 75:5,6 75:15,21,23,24 76:2,11 78:12 80:23 84:11 85:2,12 93:20,24 94:22 95:13 95:16 96:2 108:17 117:18
**sociologists** 70:17
**Solache** 1:7 2:10 5:20 6:22 17:8 50:3 76:24 122:24 123:9 124:17,21 125:12 127:2,3 133:4 135:5,15
**Solache's** 96:10 122:21 126:24
**Solache/Reyes** 16:9 29:5
**somebody** 41:12,24 42:5 45:20 72:21 77:13,22 78:7,10 79:11 86:10,12 90:21 91:5 115:12 149:4
**somebody's** 72:1
**soon** 51:14,16 52:3
**sophisticated** 68:13
**sorry** 15:4 16:13 24:10 30:21 32:14 37:11 51:10,17,18,19 54:4 56:2,22 59:6 66:19 79:4 102:6 104:21 106:16 106:22 114:20 140:2 153:8 155:11
**sort** 52:12 54:1 138:10
**Sotos** 2:17
**sound** 32:15
**Sounds** 32:11
**source** 55:11 127:4 132:10
**Sources** 130:23 132:10 135:16
**spans** 17:19 18:15
**speak** 13:19,24
**speaking** 7:8 14:23 20:11 138:20
**specific** 29:1 68:11 104:6 109:9 117:19 129:23 156:3,11,24 157:8
**specifically** 11:11,13 13:24 14:9 15:12 19:11 35:17 43:16 44:11 62:3 88:11 88:20,22 91:13,15 125:10,16 155:17
**speculate** 25:1,1
**speculation** 24:24 36:4 104:19
**speculative** 104:4,5
**spelled** 54:3 72:23 141:7

**spelling** 67:14
**spend** 13:15 14:23
**spending** 30:11
**spent** 16:8 17:18 18:14 20:8,24 21:9 22:10 24:15,23 25:3,8 28:15,19 29:4 36:5,11,22 37:17 38:6
**spirit** 21:6
**split** 108:21
**spoke** 13:12,20,23
**spoken** 83:22
**SS** 160:1
**stabbed** 126:19
**stairs** 28:1 32:1
**stamp** 125:20 126:13
**stand** 83:17 155:22 156:9,18
**standard** 65:20 66:8 148:6
**standards** 115:11,23
**standing** 9:21
**standpoint** 78:13
**stands** 129:3
**Starr** 2:2 5:21,21 9:19,23 15:3 18:8 48:19
**start** 62:2
**started** 14:19 68:8,14 157:11
**starting** 123:3
**starts** 153:21
**stat** 106:7
**state** 1:19 80:2 105:4,9,23 106:18,22 107:1,24 109:2,14 110:3,7,15,23 111:2,10,13 112:2 113:18,24 114:4 114:15,20,22 116:14,20 117:1,7 118:5,22 119:11,19 120:8 155:6,9,12 160:1,4 161:14
**stated** 26:6 104:15 128:24
**statement** 84:8 86:17 88:21 106:6,19 106:23 108:2 112:10 114:3 119:5 126:20
**statements** 107:7,8 108:15 114:12 118:15
**states** 1:1 5:10 50:24 97:10 104:11 105:15 110:11 154:23
**statistic** 106:8
**status** 118:1
**stay** 32:6,8
**stenographically** 160:14
**stepbrother** 113:9
**Stephanie** 54:3
**Steve** 14:1,3,11 58:14
**stop** 51:13,13,16,24 52:3 57:1,4
**stopped** 52:19
**straight** 137:3
**straightforward** 44:15,18
**Street** 2:4,13,21 3:3 5:14
**strengths** 74:22,23 88:17
**strictly** 42:11
**strike** 12:10 29:6 35:5 45:24 72:9
**structured** 64:15,24
**struggling** 94:7
**student** 85:21
**students** 92:10,11
**studied** 40:7,9 81:10,23 82:20 98:13
**studies** 40:3 42:22 50:16 53:18,20 54:3 54:4,12 55:14,20,24 56:10,11,12 58:3 58:16,18 59:21 60:2,5,12,16,18,20,23 61:9 62:19 65:5 66:6,6 68:13,16 69:5

72:19 74:15 75:22 86:6 88:3,4,7,15 89:1,15,20 92:18,21 93:2
**study** 39:13 50:8,13 52:23 53:1,2,8 54:8,8,10,10,11,11,16,18 55:9,17 59:2 60:3,4 61:5,8 62:10 63:16 64:13 64:20,21 66:22 67:3,23 68:3 69:24 70:8 71:4,23 73:5 74:2 80:21 85:6 86:1 88:3 89:15 90:13 91:9 92:8,10 92:20 93:1,5,12,13,15 96:13
**studying** 41:1 52:24 71:15,17 90:21
**subject** 9:12 64:22 68:16 123:21
**subjects** 70:20,21,22
**submit** 33:15
**submitted** 60:22 62:9 63:3
**subpoena** 19:2 21:19 25:18
**subsequent** 100:10 104:6 111:19
**subsequently** 90:4 123:18
**subset** 62:17 144:21
**substance** 40:9 117:16
**substantial** 46:15 47:17 70:19
**Substantially** 102:1
**substantive** 40:17 42:17,19
**substantively** 40:10 41:19 42:22
**suggested** 160:12
**suggests** 67:4
**suit** 161:2
**Suite** 2:13,17,21 3:3 5:14
**sum** 22:15
**summaries** 122:16 139:1 147:1 148:18 149:3
**summarize** 141:8,10 147:5
**summarized** 122:14 123:11 147:2
**summarizing** 86:22 92:16
**summary** 34:4,16 135:21 137:8,12,13 138:3,4,8 139:6 142:13,14,15 145:14 145:19 146:14
**supervised** 42:23
**supplement** 21:19
**support** 79:9 89:16 91:8,12 139:5 142:15 143:19 144:2
**supported** 88:7
**Supporting** 138:8 142:14 145:19
**supposed** 151:23 157:6
**suppressed** 105:8,12 106:2,6,7,19,20 106:23 108:2 110:2,14 111:1,8 116:8 119:5,6
**suppression** 105:5,11,24 106:5 108:1 109:23,24 110:4,5,8,9,12,13,24 111:3 111:6,14,15 113:24 114:1 116:8 119:5,7,9 120:19 154:9 156:14
**sure** 15:18 28:1 31:24 39:9 51:16,17 52:2 53:24 75:12 97:5 106:3 110:2 110:14 111:9 117:5 119:3 120:7 121:7 136:19 149:2 159:10
**surprising** 80:15
**survey** 65:22,23 66:3,7 78:24 79:8 96:13,16,17,21,24
**surveys** 51:6 53:1,1 65:18,20,24 66:4,6 79:8 87:23
**suspects** 64:16
**suspend** 149:8,13,23 151:6 152:16
**suspended** 108:22
**suspending** 151:11 152:15 159:3
**swear** 6:6
**switch** 121:1,19

Richard Leo, 4/24/2023

switched 48:17
sworn 6:7,10 160:11
synthesis 20:14 64:5
systematic 55:8 65:22 73:16,21 137:1
systematically 55:10 73:3

**T**

table 69:3,9,10,11,11,17 70:4 138:10
  139:1,5 145:18 150:3 151:1
tabled 150:21
take 14:7 15:13 19:17,17 24:9 25:23
  28:3 32:8 35:2 46:12 48:4,6,8 57:2,3
  57:18 59:6 68:14 79:13 120:24 121:4
  121:20 124:10 125:24 127:16 128:4
  128:20 139:21 141:6 142:24 143:4
  147:20 149:10 150:12,12 152:23
  153:2 155:22
taken 5:5,6 33:2 36:18 37:14 39:3
  48:12 69:11 71:19 72:1 79:17 108:8
  108:22 113:13 121:13 153:13
talk 23:12 69:17 71:21,22 81:7 85:24
  86:4 96:13 121:2
talked 17:12 52:11 61:4 66:11 78:16
  81:7,10,21 82:16 87:3 122:3,3
talking 10:22 23:13 53:7 59:17 64:9
  67:22 68:2 69:24 85:13 86:12,24
  87:1,11,13,18,19 109:17 133:8,23
talks 22:22 81:9
tally 101:9,12
tape 115:20
tar 86:2,4
task 31:2,21 32:20
tasks 21:2 25:8
Taylor 36:17 37:6,9 38:15 49:1
tech 153:21
technical 56:1 128:14 158:22
Technician 3:2
technique 65:12
techniques 68:5 76:7,8,10 107:7
  109:10,18 116:1
telephone 20:13 22:2 23:20 34:21
tell 6:16 24:14,17 36:21 53:10 65:18
  76:23 77:6 81:4 100:24 103:14
  106:14,17
ten 48:9 53:11,21 54:13 143:5
tend 78:7
tendered 20:24 22:24 25:18 133:19
  142:22
Tennessee 119:20 155:12
term 43:15 44:7 69:19 72:19 81:19
  82:14 89:18
terms 68:19,22 129:21 157:5
terrorizing 115:19
test 71:20
testified 6:10 49:7 95:11 97:11,13,20
  97:24 98:6 100:11,19 101:21 102:20
  104:24 106:4 110:19 111:24 116:10
  122:4,7 131:19,24 132:6 153:23
  154:15 157:14
testify 101:7 107:4 109:17 110:18
  112:3 113:1 115:21 116:2 118:12
  119:23 154:4,7 155:19,22 156:2,8,10
  156:12,17,22,24 160:11
testifying 101:24 102:10 107:15 157:2
  157:18

testimonial 63:22
testimony 37:18,23 46:6 49:1 85:14
  97:23 102:16 107:5,19 109:5,6,9,9
  117:16 123:12 131:22 132:1 154:8,12
  154:16,19 155:16 157:17 160:13,16
  161:5
testing 75:23,23 127:4
thank 6:15 9:18,23 20:4 26:8 28:2,5
  32:11 57:23 79:14 121:11 158:19
  159:12
thanks 52:6 129:5 159:13
thereof 161:3
thing 34:9 48:1 66:13 80:14
things 6:18 29:18 45:19 46:22 53:7
  64:9 68:21,22 71:17 78:20 85:16,19
  101:6
think 9:6,6 10:21 16:23 17:12 21:6
  24:1 25:3 28:18 31:23 43:18 48:17
  53:6 56:3,19 57:4,14 61:11,14 62:23
  63:3,4 65:23 66:7,12 67:13,14 74:1
  76:2 77:4,18 78:16,22,23 79:1 81:13
  83:11,14 91:11 92:9 94:17,18 98:4,7
  100:5,7,9 101:16 103:4,4 104:23
  105:7,12 106:2 108:7,8,20,24 109:13
  110:2,14 111:8,12,16,17,18 112:5,21
  113:5,9,13,14,22 114:10,13 117:5
  118:3,17 119:2,6 120:23 122:3 123:2
  124:22,23 138:17 152:20,21 155:1
  156:8,11,16 157:10,13,24 158:9
thinking 55:14 65:16 93:17
third 2:4,8 27:16 37:12 63:18,20 146:5
thought 10:18 58:24 60:24 73:5
thousand 80:21
thousands 68:16,21,23 69:4,7,8
threatening 115:19
threats 115:15,23
three 22:15,16 38:9 43:2 48:22 49:6
  54:7 63:4,5,6,20 66:19,21 108:22
  122:18 144:2,10 149:9 154:20 155:6
  155:13
three-hole 133:12
thrown 33:7
Thursday 13:22 161:6
time 12:3,22 13:15 14:14,16,23 15:18
  15:24 16:8 17:12,15 20:6,7,19 21:9
  21:12,22 22:7,10,11 24:14,21,23 25:2
  25:8,10 28:15,19 29:4,9,13,14,18
  30:4,8,9,11,12,14,17 31:2,10 33:2,7
  33:13,24 34:2,12,17 35:3,7,13,16,22
  36:1,6,8,11,21 37:17 38:6 49:18
  52:15 65:11,13 78:18 97:14 98:2
  100:2 104:1 124:2 125:1,14 128:3,4,9
  131:9 142:24 147:21 149:12 150:11
  150:24 151:7,12,13,17,20 152:10
  154:5 159:5,9
times 80:11 97:24 101:6,7,17 106:6
  126:19 148:1,11,15,19 154:11 156:12
timing 123:24 150:21 151:1
title 27:10
titled 126:16
to-wit 160:5
today 5:15 6:14,17 10:23 12:7,12
  13:10 18:21 22:20 23:14 30:11 58:22
  73:12 95:11 97:5 103:14 149:17
  151:5,12 152:19 156:23

today's 9:11 149:16
told 92:11,13 94:8 106:9,12 118:18
  155:18,20,21
top 24:17 27:11,24 53:16 58:12 87:5
  88:1 96:23 97:9 100:16 110:11 135:3
  136:16 141:17 142:11 156:15 157:23
topic 9:14 69:3,24 84:1 155:23 156:8
  156:16
topics 63:6 116:3 156:1
total 13:17 16:1 17:3 22:7,10 31:22
  147:1
totals 22:13
touch 92:11
track 14:22,22 101:5 103:2 154:11
train 42:4,6
trained 40:10 41:12 65:22 80:15 84:10
  84:11
trainers 64:17 65:8
training 40:11,13 41:10,18,24 42:4,14
  42:16,21 74:19 80:17 115:22
trains 40:15
transcript 36:22 37:1,2,4 38:3,7 155:7
  160:16
transcripts 52:22 155:15
transferred 32:24
transpired 63:14
treated 139:13
trial 99:11 104:10,15,16 107:2,4,10
  108:5,12,19 109:3,4,11,15,21 110:16
  110:21 111:10,17,19 112:3,4,5 113:1
  113:19,21 114:5,16,17,23 115:22
  116:10,12,15,21 118:23 119:1,12
  154:9
tried 137:2
trier 96:4
Trotta 3:2 5:12
true 45:12 47:3 49:11 61:17 68:5 78:8
  84:2,4 93:21 94:1,15,23 95:14 96:5
  109:8 126:21 160:16
truth 89:10 160:11,11,12
truthfully 93:9
try 51:24 52:4 59:7 94:20 140:2 158:21
  138:19
turned 150:24
turning 132:8
twice 74:7
two 8:10,22 13:3 15:9 17:4 21:1,8 38:9
  51:24 58:14 60:17 61:9 62:7 63:3
  82:8 85:22 93:19 96:11 106:17
  111:23 113:8 123:15 133:1 141:9
  154:19,24
two-cell 138:10
two-day 125:7 134:14
type 18:5 31:16 64:5 65:1 66:13 74:17
  92:18,20,22,24,24 93:5,11,14 137:22
typed 127:10 129:14 130:6,13,19
  134:12 135:14 137:22 148:14
types 27:15 42:8 63:17 64:9,10 87:22
  88:15 92:21
typewriting 160:15
typewritten 7:4 122:19 134:24 135:1
typical 16:14,19 147:23
typically 14:22 36:5 42:2 76:19 89:22
  89:24 90:18 91:5 148:1

Richard Leo, 4/24/2023

**typing** 137:23
**typo** 145:20,23 146:2,9

**U**

**U.S** 109:23 111:5 115:3 116:7 119:4,15
**Uh-huh** 63:1
**ultimately** 99:7
**undecided** 120:12
**underestimating** 100:7,9
**underline** 7:24 8:1
**underlining** 7:21 11:7 12:1,14,16
**underlinings** 10:10
**underlying** 122:20 133:4 135:15
**understand** 30:1,2 40:16 49:23 50:20
    75:12 80:23 81:16,19 82:13 85:17
    87:7,9 94:7,13,17 96:16 130:2 133:10
    147:14 151:16
**understanding** 10:12 24:3 47:10 57:15
**understands** 86:12
**understood** 128:9
**undisputed** 45:2
**Unit** 5:2 48:14 121:15 143:11
**United** 1:1 5:9 105:15 110:11 154:23
**University** 67:16 69:14 117:14
**unnamed** 73:17
**Unreliability** 123:3
**unstructured** 82:1,22
**unsupported** 43:4 45:4,6,7,8
**unsystematic** 81:24 82:22
**Urlaub** 3:3 5:13,15
**use** 13:1 66:9,9 68:23 77:18 92:3,24
    107:6 144:8 148:1,2,3
**uses** 91:5
**usual** 121:5,6
**usually** 89:20 90:7 101:14,15 102:3,4,9
    102:17 117:17 156:3
**Utah** 108:6
**utilize** 143:18,24 147:23
**utilized** 65:11 91:7,8
**utilizing** 121:23 139:16

**V**

**v** 155:6
**valid** 86:23
**validity** 67:7 84:7,14 85:4,8,11 86:1,3
    86:8,15,18,19 87:1,12,14,19 89:2
    91:18
**variety** 61:16 68:9 78:20
**various** 21:2 42:8 53:20
**vary** 99:7
**vast** 53:14
**veracity** 76:21,21
**verbal** 40:24
**verdict** 113:3,5
**verified** 69:5
**verify** 72:15 83:6
**version** 7:3,5 26:20 33:15,18 34:4,8
    36:9 130:6 133:18 136:5
**versus** 5:8 36:17 37:6,14 68:21 87:23
    87:23 105:4,10,23 106:6,18,22 107:1
    107:24 109:2,14,23 110:3,7,11,15,23
    111:2,5,10,13 112:23 113:18,24
    114:4,15,22 115:3 116:7,14,20 117:1
    117:7 118:5,22 119:4,11,15,20 120:9
    120:19 138:12 154:22 155:1,2,9,13

158:3
**victim's** 127:6
**victims** 126:19 135:5
**victims'** 127:1
**video** 5:2,17 48:11,13 59:10,13 79:16
    79:18 93:14 121:12,15 143:8,11
    153:12,14 159:14,15
**video-conferenced** 5:4
**Videographer** 3:2 5:1,12 6:5 32:6
    48:10,13 51:9,15 52:6 56:22 57:23
    59:10,13 79:15,18 121:11,14 143:7
    143:10 153:6,11,14 159:10,14
**videotaped** 1:12 5:4
**view** 45:3 47:14 73:8
**views** 78:17
**violating** 115:18
**violence** 115:24
**vitae** 60:15
**volume** 56:7
**voluminous** 125:1
**voluntary** 78:8
**vs-** 1:4,8
**vulnerable** 62:15

**W**

**wait** 31:9
**waiving** 9:14
**want** 15:18 18:3 24:24 28:23 32:6,8
    39:9 48:8,16 53:15 59:7 62:21 75:12
    76:4 82:6 96:15 104:7 124:9 147:16
    151:18,21,22 153:20 156:5,22
**wanted** 28:1 51:15,17 73:2 97:17
    115:21 124:3 156:12
**wasn't** 28:1 46:10 56:18 69:7 73:1
    154:6
**waste** 150:23 151:17
**wasting** 128:3
**watching** 89:23
**way** 24:19 25:16 27:13 31:5 32:24
    40:14,23 52:12 55:8 57:11 73:8
    77:19 82:2,24 83:21,24 84:1 89:24
    110:18 128:14 138:17,20 141:8 161:2
    161:3
**ways** 51:2 64:24
**we'll** 23:12 28:4 48:5,6 124:10 147:20
    150:12
**we're** 10:22,22 19:20,22 25:21 28:20
    48:22 57:18 59:13 62:1,8 69:24
    71:14 72:1,2,3 79:15 85:11 87:13
    120:23 124:8 128:3 129:1 143:7
    151:6 152:12,15,16,17,22 153:11
    159:3,5
**we've** 15:13 24:9 33:19 34:9 62:7
    133:8 143:15 150:17 159:4
**weaknesses** 74:22,23 88:17
**week** 13:22,23 14:5 15:20 85:22
**weekend** 13:14
**weeks** 122:9 131:9,21
**well-established** 75:5,21
**Welner** 6:19,20 23:10 36:16 37:13
    38:15,15,16 39:12,22 45:1 49:6 50:2
    50:19 67:2 80:2,8 81:10,12 84:6,8
    93:19 97:9,19 104:10
**Welner's** 7:18,20,22,23 8:2 11:6,14
    23:6 25:3,4 28:7,15 36:17,23 37:10

37:18,22 38:4 39:8,16 43:3 48:24
    49:23 85:9
**went** 30:13 40:5 73:23 101:7
**weren't** 123:20 150:7 157:6
**West** 2:17
**whereof** 161:5
**wholly** 45:4,6,7,8
**wider** 67:7
**widespread** 137:1
**willing** 150:22 151:6
**withdraw** 50:6
**witness** 1:16 6:6,7 9:17 32:9 51:12,19
    51:22 57:3,9 79:14 81:23 82:19 98:6
    102:16 124:10 125:23 127:14 128:15
    130:8 132:17 134:9 136:13 138:2,22
    139:4,20 140:19 143:3,5,22 144:5
    146:12,24 148:24 149:7 160:8,10,13
    160:17
**witnesses** 107:8
**word** 46:7 50:21 77:18 92:24 98:21
    134:5 136:11 148:5,6 156:6
**wording** 21:4 77:4
**words** 56:15,17,19,20 82:8
**work** 15:19 17:3 19:2 20:8,11 22:11,13
    22:19 24:21 29:8,10 30:5 33:14 34:1
    34:13,17 35:14 37:9,24 57:7 59:4
    61:15 62:2 63:12 67:7 81:14 99:10
    140:2
**worked** 25:10 30:13 73:18 81:8,22
    82:18 98:12,19 101:17,19,20,22
    115:6
**working** 16:9 29:5 30:4,11 61:5
**works** 51:1 76:7 85:7
**world** 45:17,17,18,19 46:4 51:1,3 53:4
    80:4 84:17 85:8 88:4,8,10
**Worrell** 109:15
**worries** 52:8
**worth** 22:13
**wouldn't** 21:4 46:7 73:17 89:13 90:6
    92:2 100:20 118:18 146:8 154:8
**Wright** 108:4,6 117:7,13 118:2 155:6
**Wright's** 117:22
**write** 47:14 53:19 60:3 63:13 130:12
    136:2
**write-up** 61:3
**writes** 93:19
**writing** 53:17
**writings** 129:23
**written** 10:9 47:8 60:21,21 85:15,16
    98:14,16 118:20 122:13 135:14
**wrong** 46:9 69:7 72:22 73:2,5 74:3
    80:22 85:20 98:3 118:3 159:7
**wrongful** 44:12 156:13,19 157:5,7
**wrote** 43:17 46:17 122:11 130:16,18

**X**

**X** 4:1 36:5

**Y**

**yeah** 6:18 7:20,23 9:17,22 12:14 13:8
    27:16,23 32:7 51:12 52:8,16 53:24
    55:8 56:22 57:9 62:21 66:15 68:2
    69:13 81:19 82:13 83:11 85:5 93:13
    100:4 102:2,7 111:16,23 114:3
    119:17 121:7 129:4 134:23 140:1

Richard Leo, 4/24/2023

141:22 156:11,14
**year** 22:8 42:2 53:19 136:17 142:11
**years** 16:16 47:11 53:11,22 54:13
61:16 62:4 63:12,14 72:18 81:8
93:15 157:17
**Yep** 57:24
**York** 69:14

**Z**
**Zoom** 1:21 2:1 3:1

**0**
**00010** 145:20
**01** 4:11
**01028** 1:4
**02** 4:12
**02312** 1:8
**03** 4:13
**04** 4:14
**06** 4:15
**08** 4:16
**084-002868** 161:14

**1**
**1** 4:11 5:2 15:14,22 16:11 31:13 32:13
32:18,19 49:7 126:18
**1/31/2023** 4:14
**1:30** 79:16
**10** 25:1 97:8 104:10 121:9 132:11
**10-minute** 121:4
**100%** 110:2,14 117:5 119:3
**1028** 5:9
**11** 26:23
**11:04** 1:21 5:3
**11:30** 79:4
**1180** 2:8
**11th** 15:21 16:2 31:20 32:22 33:3
**12** 104:23 148:1 153:22 154:23 159:11
**12:16** 48:11
**12:30** 48:15
**12:47** 59:11
**12:55** 59:14
**120** 2:13
**121** 4:16
**1240A** 2:17
**13** 140:2 153:22 155:1
**14** 59:2 150:8 155:7
**14-hour** 123:12,16 125:7
**141** 2:17
**14th** 16:21,23
**15** 4:11 97:10,15 98:2 100:1,12 103:9
121:7,9 142:22
**15-minute** 121:5
**153** 4:5
**15th** 10:19 17:10 20:7,18,23 21:3 23:1
27:8 103:13
**16th** 21:21 24:22 33:24 34:14,18
**17** 4:12
**175.7** 20:8
**17th** 36:18
**18** 1:4,8 5:9,9 17:20 18:17
**18-month** 20:6
**18-month-or-so** 20:6
**18th** 21:21 24:21 33:23 34:14,18

**1908** 67:10,12,15,24
**1980s** 68:8,10
**1990s** 54:19,22 65:14
**1995** 136:17 139:10
**1996** 53:8 92:23
**1997** 58:15 63:8,10 157:18
**1998** 43:6,13,14 44:23 58:12 104:11

**2**
**2** 4:12 17:6,8 31:22 32:22 33:4,11,19
48:14 49:11 126:19 136:24 139:14
**2,000** 103:6
**2,200** 103:10,13,24
**2,973** 69:2
**2.1** 69:10
**2/1/2022** 4:12
**2:31** 79:19
**20** 3:3 5:13 14:15 25:1 100:6 149:18
**2000** 2:13 139:9
**2004** 58:13,18 66:14 83:7 91:9
**2007** 66:1 96:21
**2009** 93:13
**2013** 59:2
**2015** 37:15
**2018** 16:2,8 31:20 32:22 33:3 36:18
78:24
**2019** 15:21 16:1,4,8,21 17:2,9,20 18:17
20:7 105:1
**2020** 69:15 111:17 112:18
**2022** 10:19 17:10,20 18:17 20:8,18,23
21:3,21 23:1 24:22 33:23 34:14,18
103:9,14 121:23 131:16 133:20
142:22
**2023** 1:20 5:6 21:20,21 22:18 23:11
24:22 26:11 27:9 29:8 33:24 34:14
34:18 38:19 105:1 160:5 161:6
**21** 4:13
**2200** 2:21
**225** 21:1
**2268** 7:9 12:2 136:1,16 140:14 141:17
**2269** 140:14
**2274** 140:22 148:10
**2282** 145:12,12 146:10
**22nd** 37:15
**23** 135:13
**2312** 5:9
**2335** 146:13,13
**2352** 136:1
**2353** 123:1 133:8 135:14 148:14
**2354** 130:13 133:8
**2355** 130:9 133:8
**2356** 130:22 132:9,20 133:8 135:16
**2357** 132:23 133:8
**2358** 7:9 10:16 12:2 135:14
**24** 1:20 4:14 160:5
**24th** 5:6 17:9 20:7
**25** 61:21 63:12,14 72:18 100:6 141:1
**26** 100:24
**26(b)(4)** 19:6
**26(b)(4)(B)** 18:1 28:20 125:22 127:13
132:17 134:9
**27** 161:6
**275** 22:13
**28th** 131:16,20 132:4
**29th** 131:16,20 132:5

**3**
**3** 21:17 24:12 26:5 29:7,12 33:22 38:14
49:12 126:20 136:22 137:1,8 139:14
140:23 141:1,7 148:11
**3:38** 121:12
**3:53** 121:16
**30** 32:3,7 100:6
**30-second** 31:23
**311** 2:4
**312)243-5900** 2:5
**312)494-1000** 2:22
**31st** 23:11 26:11
**32** 100:24
**321** 2:21
**37** 150:2,11
**38** 122:17 147:1,10
**39** 4:15

**4**
**4** 24:10 26:9 36:15 48:21 79:22 121:15
126:23 133:24 137:1 153:20 159:11
**4/11/2019** 4:11
**4/12/2026** 161:15
**4/7/2023** 4:13
**4:29** 143:8
**4:42** 143:11
**4:56** 153:12
**400** 97:12 98:5,18,22,23 99:5,21,23
**41** 47:11
**47** 22:8 24:20 25:2
**4th** 16:1,4,24 17:2

**5**
**5** 97:10,15 98:2 100:1 127:2 137:1
143:11
**5-minute** 121:4
**5%** 96:20
**5:01** 153:15
**5:11** 159:16
**50** 126:19
**50.4** 16:4,21 17:2

**6**
**6** 4:4 126:18 139:22
**600** 3:3 5:14
**60602(312)781-9586** 3:4
**60603** 2:14
**60604** 2:18
**60607** 2:4
**60622** 2:9
**60654** 2:22
**630)735-3300** 2:18

**7**
**7,500** 16:13
**773)235-0070** 2:9
**78** 136:18,18,21 139:24 140:1,12
**7th** 21:20 22:17,20 29:8 38:18

**8**
**8** 121:20 132:3,9 135:20 140:13 143:16
**80** 113:6
**85** 113:5
**866)786-3705** 2:14

Richard Leo, 4/24/2023



**9**

**9** 140:4
**90** 113:6
**90%** 99:10
**973** 69:2