*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 29



**Planet Depos**®
We Make It *Happen*™

# Transcript of David Valentin, Jr.

**Date:** July 23, 2019
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

Planet Depos
Phone: 888.433.3767
Email: transcripts@planetdepos.com
planetdepos.com

Worldwide Court Reporting & Litigation Technology

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4  ---------------------------x

5  ARTURO DeLEON-REYES,      :

6             Plaintiff,    :

7    v.                :  No. 1:18-cv-01028

8  REYNALDO GUEVARA, et al,   :

9             Defendants.   :

10  ---------------------------x

11  GABRIEL SOLACHE,        :

12             Plaintiff,    :

13    v.                :  No. 1:18-cv-2312

14  CITY OF CHICAGO, et al.,   :

15             Defendants.   :

16

17        Deposition of DAVID VALENTIN, JR.

18            Chicago, Illinois

19          Tuesday, July 23, 2019

20              10:01 a.m.

21

22  Job No.:  253110

23  Pages: 1 - 176

24  Reported by: Joanne E. Ely, CSR, RPR

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    2

```
1        Deposition of DAVID VALENTIN, JR., held at the

2    location of:

3

4            LOEVY & LOEVY

5            311 North Aberdeen Street

6            Chicago, Illinois 60607

7            312.243.5900

8

9

10

11

12

13       Pursuant to notice, before Joanne E. Ely, a

14   Certified Shorthand Reporter, and a Notary Public

15   in and for the State of Illinois.

16

17

18

19

20

21

22

23

24
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                3

```
 1                  A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF DeLEON-REYES:

 4        MR. SEAN STARR, ESQUIRE

 5        LOEVY & LOEVY

 6        311 North Aberdeen Street

 7        3rd Floor

 8        Chicago, Illinois 60607

 9        312.243.5900

10

11   ON BEHALF OF PLAINTIFF SOLACHE:

12        MS. JAN SUSLER, ESQUIRE

13        PEOPLE'S LAW OFFICE

14        1180 North Milwaukee Avenue

15        3rd Floor

16        Chicago, Illinois 60642

17        773.235.0070

18

19

20

21

22

23

24
```

```
 1    A P P E A R A N C E S  C O N T I N U E D

 2

 3   ON BEHALF OF DEFENDANT GUEVARA:

 4        KEVIN E. ZIBOLSKI, ESQUIRE

 5        LEINENWEBER BARONI & DAFFADA

 6        120 West LaSalle

 7        Suite 2000

 8        Chicago, Illinois 60602

 9        866.786.3705

10

11   ON BEHALF OF DEFENDANTS DICKINSON, RUTHERFORD,

12   STANKUS, NAUJOKAS, HARVEY, TREVINO, MINGEY,

13   BIEBEL:

14        CAROLINE JAMIESON GOLDEN, ESQUIRE

15        SOTOS LAW FIRM, PC

16        141 West Jackson

17        Suite 1240A

18        Chicago, Illinois 60604

19        630.735.3314

20

21

22

23

24
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    5

```
1      A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF DEFENDANTS WEHRLE, BRUALDI, VARGA,

4    O'MALLEY and COOK COUNTY:

5         EDWARD M. BRENER, ESQUIRE

6         COOK COUNTY STATE'S ATTORNEY'S OFFICE

7         500 Richard J. Daley Center

8         Chicago, Illinois 60602

9         312.603.5971

10

11   ON BEHALF OF DEFENDANT NAVARRO:

12        DANIEL J. BURNS, ESQUIRE

13        REITER BURNS LLP

14        311 South Wacker Drive

15        Suite 5200

16        Chicago, Illinois 60606

17        312.889.9123

18

19

20

21

22

23

24
```

```
1     A P P E A R A N C E S   C O N T I N U E D

2

3   ON BEHALF OF DEFENDANT CITY OF CHICAGO:

4         CATHERINE M. BARBER, ESQUIRE

5         ROCK FUSCO & CONNELLY, LLC

6         321 North Clark Street

7         Suite 2200

8         Chicago, Illinois 60654

9         312.494.1000

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              7

```
1                    C O N T E N T S

2  EXAMINATION OF DAVID VALENTIN, JR.         PAGE

3       By Ms. Susler                          8

4       By Mr. Starr                          129

5

6                    E X H I B I T S

7              (Attached to transcript.)

8

9  VALENTIN DEPOSITION EXHIBITS               PAGE

10

11  Exhibit 1  Reyes 276, 278, 280             60

12  Exhibit 2  RFC-Solache/Reyes 12            61

13  Exhibit 3  RFC-Solache/Reyes 500           62

14  Exhibit 4  RFC-Solache/Reyes 418-419       63

15  Exhibit 5  RFC-Solache/Reyes 416          105

16  Exhibit 6  RFC-Solache/Reyes 388-389      107

17  Exhibit 7  RFC-Solache/Reyes 386-387      110

18  Exhibit 8  RFC-Solache/Reyes 482          114

19  Exhibit 9  RFC-Solache/Reyes 484          116

20  Exhibit 10 RFC-Solache/Reyes 468-476      118

21  Exhibit 11 RFC-Solache/Reyes 605-608,     169

22             613 and 614

23

24
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    8

```
 1                    P R O C E E D I N G S
 2                    DAVID VALENTIN, JR.,
 3    having been duly sworn, testified as follows:
 4       EXAMINATION BY COUNSEL FOR PLAINTIFF SOLACHE
 5    BY MS. SUSLER:
 6       Q  Good morning.  My name is Jan Susler.  I'm
 7    one of the lawyers for Gabriel Solache.
 8          Would you state your name for the record,
 9    please.
10       A  My name is David Valentin, last name
11    V-a-l-e-n-t-i-n, Jr.
12       Q  Officer, have you ever had a deposition
13    taken before?
14       A  Yes.
15       Q  How many times?
16       A  I don't remember the exact count but
17    several times.
18       Q  Like more than five?
19       A  I don't remember.  I got 25 years on the
20    job, so I don't remember.  Many cases, traffic
21    related, criminal cases related, so I can't tell
22    you anymore.
23       Q  Well, I'm not talking about testifying in
24    court.  I'm talking about a situation like this.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    9

```
1        A   Depositions, yeah.

2        Q   Okay.

3        A   A lot of the traffic cases where

4    depositions were similar.

5        Q   Okay.  So you think more than 25 times?

6        A   Not that many.  I want to say over a

7    dozen.

8        Q   Okay.  Just a couple ground rules, you may

9    be familiar with them already, but everybody does

10   it differently.

11       I want to make sure that we have a clean

12   record, and the court reporter can only take down

13   one person talking at a time.  So even if you know

14   what I'm going to ask, can you please let me

15   finish my question before you answer, and that way

16   we're sure that you're answering the question I

17   ask.

18       A   Sure.

19       Q   And I will try very hard to let you

20   complete your answer before I interrupt.  All

21   right?

22       A   Uh-huh.

23       Q   And that's another thing.  You said

24   "uh-huh."
```

```
 1        A  Yes.
 2        Q  Yes.  The court reporter can only write
 3   down words.
 4        A  That's a natural habit.
 5        Q  I'm not trying to discourage you from
 6   doing that or from gesturing, but I'm going to
 7   need a verbal answer, and I'll try to remind you
 8   if you don't do that.
 9        A  Okay.
10        Q  If you don't understand something I'm
11   asking you, I need you to let me know; otherwise,
12   I will assume that you did understand and answered
13   accordingly.  All right?
14        A  Yes.
15        Q  Okay.  And if you need a break for
16   anything, just let me know.
17        A  Yes.
18        Q  Now, during the course of a deposition,
19   there are often objections.  It could be from
20   really anybody sitting at the table.  There's no
21   Judge here.  So what we do, unless if you're
22   represented by an attorney, your attorney
23   instructs you not to answer, you'll go ahead and
24   answer the question.  All right?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              11

```
 1        A  Yes.

 2        Q  Are you represented by an attorney today?

 3        A  Yes, I am.

 4        Q  Who is your attorney?

 5        A  Katie.

 6        Q  What did you do to prepare for your

 7   deposition today?

 8        A  I had to refresh my memory as this case is

 9   over 20 years old, so I looked over previous

10   reports and previous testimony.

11        Q  Did you meet with anybody?

12        A  Katie.

13        Q  How many times?

14        A  Twice.

15        Q  When?

16        A  Yesterday and, what was it, a couple

17   weeks?  A few weeks back?

18           MS. BARBER:  Whatever you remember.

19        A  A few weeks back.

20        Q  Was anybody else present when you met

21   with her?

22        A  Her partner.  I can't remember her name,

23   her assistant.

24        Q  Okay.  You said you looked at some
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    12

1    reports.

2            What did you look at?

3        A   The reports we generated on April 1st of

4    1998, a general offense case report, and a couple

5    of missing case reports that we generated for a

6    crime scene.

7        Q   Anything else you looked at?

8        A   I looked at photos.

9        Q   Photos of what?

10       A   Of victims of the case.

11       Q   Anything else you looked at?

12       A   That was it.

13       Q   Okay.  When you were informed that you

14   were going to have to sit for a deposition, did

15   you have any memories about this case and your

16   participation in it?

17       A   Yes.

18       Q   What did you remember?

19       A   We were there --

20       Q   I'm talking about -- I'm sorry to

21   interrupt, but I'm talking about before you had

22   any meetings and before you looked at any reports.

23           Can you separate that out in your mind?

24       A   Yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          13

```
1        Q   What did you remember before you were
2    notified about the deposition?
3        A   I remember this as being a double homicide
4    case that we were responding to at that time.
5        Q   Is there anything else you remembered?
6        A   That's probably --
7            MS. GOLDEN:  Object to form.
8        Q   That was an example.  She made an
9    objection, and you're going to go ahead and answer
10   because Katie didn't tell you not to.
11       A   Okay.  Just -- I just remember it being
12   one of the most heinous cases of my career.
13   That's all.
14       Q   Is there anything else that you remember?
15           MS. GOLDEN:  Same objection.
16       Q   I don't need to tell you each time that
17   that you can go ahead and answer.
18       A   Just the -- the grotesque of the case, the
19   situation involved that we responded to.
20       Q   Can you say what you mean?
21       A   We found two dead bodies in an apartment.
22   That's pretty grotesque.  We were there responding
23   to a -- actually, it came out as a call to check
24   the well-being, dispatch.  At the time, I was
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    14

1    working the 14th District, third watch.  Third

2    watch is roughly from 1600 hours, 4:00 p.m., to

3    midnight.

4        Q  Anything else you remembered before you

5    were notified about the deposition?

6            MS. GOLDEN:  Object to form.

7        A  Just to respond to check the well-being

8    from dispatch, and no further information other

9    than meet with relatives who called 911.

10       Q  Anything else?

11           MS. GOLDEN:  Same objection.

12       A  Not at that point, no.

13       Q  What languages do you speak, sir?

14       A  English and Spanish.

15       Q  How did you come to know Spanish?

16       A  Family growing up, my grandmother,

17   relatives.  It was the primary language actually

18   before I went to grammar school in my household.

19       Q  Okay.  Where is your family from?

20       A  Puerto Rico.

21       Q  Where in Puerto Rico?

22       A  My dad is from Caguas.  My mom is from San

23   Lorenzo.  I got a grandfather in San Sabastian.

24   I've got an uncle in Coamo, all over the islands.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    15

```
 1        Q   Okay.  Do you read and write Spanish
 2    as well as speak it?
 3        A   I read.  I don't write it as well, but I
 4    understand it, and I speak it.
 5        Q   I'm going to ask you a little about your
 6    employment history.
 7        A   Sure.
 8        Q   When did you start with the Chicago Police
 9    Department?
10        A   31 May 1994.
11        Q   How old were you at the time?
12        A   I was 29-and-a-half years old.
13        Q   What employment did you have before that?
14        A   I drove an 18-wheeler, semi driver.
15        Q   How long?
16        A   About eight years before I got on with the
17    police department.
18        Q   I take it the first thing you did in the
19    police department was go to the academy for
20    training?
21        A   That's correct.
22        Q   And then what did you do after that?
23        A   Completed my training, and I went to a
24    training district afterwards.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    16

1       Q   To a training district?

2       A   Right.

3       Q   What was that?

4       A   I went straight to the 14th District and

5   met with my field training officer.

6       Q   How long were you in the training

7   district?

8       A   Well, I was there for six months as a

9   trainee, as a PPO, as we call it.

10      Q   And then?

11      A   Once I became a full-fledged police

12  officer, then I was officially assigned to the

13  14th District.

14      Q   How long were you at the 14th District?

15      A   I was assigned to the 14th from December

16  of 1994 to May of 2002.

17      Q   Were you a patrol officer that whole time?

18      A   Yes.

19      Q   And what happened in May of 2002?

20      A   I transferred to a citywide specialized

21  unit.

22      Q   Which was what?

23      A   It's called information services division,

24  unit 125.  I was a computer programmer.

1      Q   How long were you there?

2      A   Approximately six years.

3      Q   So that would take us to 2008?

4      A   Yes.

5      Q   And then what?

6      A   In August of 2008, I needed a change, and

7   I transferred to the 19th District.

8      Q   In what capacity?

9      A   Patrol officer, beat car.

10      Q   How long were you in the 19th?

11      A   10 years.

12      Q   That takes us to 2018?

13      A   Yes.

14      Q   Then what?

15      A   In May of 2018, I transferred to O'Hare

16   Airport.

17      Q   And what do you do at O'Hare?

18      A   Similar capacity as a beat car.

19      Q   And is that your current assignment?

20      A   Yes, it is.  I work a traffic car at

21   O'Hare Airport.

22      Q   While you were in the 14th District as a

23   patrol officer --

24      A   Patrol officer, yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    18

```
 1        Q  -- did you have a regular partner?

 2        A  Yes.

 3        Q  Who was that?

 4        A  Corrie Bergadon.

 5        Q  How long were you and Corrie Bergadon

 6   partners?

 7        A  I want to say close to five years.

 8        Q  During which period between December of

 9   '94 and May of 2002?

10        A  I think we were assigned together about

11   late 1995 actually, all the way up to probably

12   around 1999 or so, and then he transferred out.

13        Q  Do you know where he is now?

14        A  The last I heard, he's at 16th District,

15   third watch, which is approximately 1430 hours to

16   2300 hours, 11:00 o'clock at night.

17        Q  Did you stay in touch after you were not

18   partners?

19        A  We'll talk occasionally if we see each

20   other at various police functions or we go to

21   court.  I probably last talked to Corrie about a

22   year ago or so, hi, bye, what's going on kind of

23   thing.  That's the last I talked to him.

24        Q  What contact did you have with him after
```

1    you were notified about this deposition?

2         A  I haven't.

3         Q  Do you have family in the Chicago Police

4    Department?

5         A  No.

6         Q  Are you aware of other Valentins in the

7    police department?

8         A  Yes.

9         Q  But you're not related.

10        A  Not related.

11        Q  Okay.  In 1998, do you know how many

12   Puerto Ricans there were in the Chicago Police

13   Department?

14        MR. BRENER:  Objection; form and

15   foundation.

16        MS. BARBER:  Object to foundation.

17        A  I have no knowledge of a statistic like

18   that.  I don't know.

19        Q  Okay.  Do you know how many Latinos there

20   were in the police department in 1998?

21        MR. BRENER:  Same objections.

22        MS. BARBER:  Same objection.

23        A  No.

24        Q  I'm going to be asking you some questions

1   about your participation in the investigation of

2   the Soto murders; and if you don't remember at the

3   time that I'm asking you a question, feel free to

4   say you don't remember.

5         But if it should happen -- because

6   sometimes this happens when you're delving into

7   something you haven't thought about for a long

8   time.  If you do remember something that you

9   thought you didn't remember, I'd like you to let

10   me know at any time during the deposition.  All

11   right?

12     A  Okay.

13     MS. BARBER:  I'm just going to object to

14   that.  I think that it's fair to answer your

15   questions as they go along.  It depends on what --

16   I mean, he'll answer the question.  It just

17   depends on what your questions are.

18     MS. GOLDEN:  Right.  He has no duty to --

19     MS. BARBER:  Jump in in any respect.

20     Q  All right.  Well, I'm going to repeat my

21   request to you, sir, that if you do remember an

22   answer at any time during the deposition that you

23   didn't remember when I asked you, I would

24   appreciate it if you let me know what your memory

1   is.

2       A   Okay.

3       Q   Now, did you write any reports about your

4   participation in the investigation?

5       A   Yes.

6       Q   What reports did you write?

7       A   Reports for the missing of the children

8   that we were trying to locate.  There were two

9   children missing from the crime scene.

10      Q   Okay.  Did you write any other reports?

11          MS. BARBER:  Objection; form.

12      A   Not that I can recall.

13      Q   Okay.  How did you happen to be assigned

14  to the case?

15      A   We were working that shift.  We started

16  our shift, and we were assigned by dispatch on the

17  radio of a check the well-being, and 2071 North

18  Leavitt was the address given to us.

19      Q   All right.  I noticed that you were kind

20  of gesturing to your shoulder when you said "we

21  were assigned by dispatch."

22      A   That's the radio I normally use.  Should I

23  put my vest on?

24      Q   No.  That's all right.  I just wanted to

1    make sure I understood.  Yeah.

2         A  It would normally be over here.

3         Q  All right.  The officer is demonstrating

4    with his radio that his --

5         A  That's how we get our dispatch.

6         Q  Okay.  And it's normally clipped to your

7    left shoulder.

8         A  Right.  It's just a habit of mine --

9         Q  Okay.

10        A  -- of answering it.

11        Q  Thank you for explaining.

12           So what were you told by dispatch?

13        A  A caller relayed that they were trying to

14   get in contact with relatives, and no further

15   information that I can recall from that, other

16   than go to the location and speak with the

17   callers.

18        Q  Where were you when you got that dispatch?

19        A  I was inside the 14th District coming out

20   of the roll call room.

21        Q  And who were you with?

22        A  Corrie Bergadon on that day.

23        Q  So it was right at the beginning of your

24   shift?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    23

1      A   Right.

2      Q   And you said that would have been around

3  4:00 o'clock?

4      A   4:00 o'clock is roll call.  We were

5  exiting roll call.  After the watch commander

6  gives out the assignments, talks about what's

7  going on, and we walked out of roll call about

8  4:30 or so, give or take.

9      Q   What did you do after you got that

10 dispatch?

11     A   Got in our police car in the parking lot,

12 and we drove to the location right away.  Usually

13 check the well-being is a high priority call.

14     Q   Can you tell me a little about check the

15 well-being, what that is in the police department?

16     A   Well, in our jargon, there is a distress

17 of some kind, no further information other than go

18 see the complainant about what's going on.  That's

19 all it is.

20     Q   Where did you go?

21     A   We went to 2071 North Leavitt.

22     Q   Do you remember that independently, or do

23 you remember that because of something you were --

24     A   I remember that independently, yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    24

```
 1        Q   What happened when you got there?
 2        A   When we got there, we saw a group of
 3   people standing in the gangway of the property.
 4   It is a big apartment building with a coach house
 5   in the back, and there's, like, a little small
 6   gangway, courtyard area where people were
 7   gathered.
 8        Q   How many people?
 9            MS. BARBER:  Objection; foundation.
10        A   Several.  I can't remember how many.
11        Q   Three?
12        A   At least three.
13        Q   Okay.  Six?
14        A   Not that many.  So let's say it was
15   between that.
16            MS. GOLDEN:  I'm sorry.  I didn't hear the
17   answer.
18            (The answer was read by the Reporter.)
19        Q   Did you talk with anyone other than the
20   dispatcher before you arrived at that address
21   about this call?
22        A   No.
23        Q   So basically, you knew that somebody
24   had -- I don't remember how you called it, for a
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              25

1    well-being --

2         A  A dispatch of a check the well-being with

3    the location, go over there, and meet the caller.

4         Q  So you didn't know anything else?

5         A  Nothing else.

6         Q  Okay.

7         A  I didn't even get a chance to get my

8    coffee.  I even know that.

9         Q  All right.  So there were between three

10   and six people in the gangway.

11        What happened when you got there?

12        A  We observed them in the gangway.  We

13   exited our vehicle, and we walked towards that

14   group of people.

15        Q  And then what happened?

16        A  I talked to a lady.

17        Q  What did she say?

18        A  She stated that -- in Spanish that she is

19   trying to get ahold of her relatives, and there

20   has been no contact for several days.  Apparently,

21   they are a close-knit group, in which she told me

22   they talked together every day.  But in this time

23   span, there was no contact.

24        So she went over to where they lived and

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    26

```
 1   tried to make contact; and when there was no
 2   contact available, that's when she called for
 3   police assistance.
 4       Q  Do you know that lady's name?
 5       A  I can't remember offhand.  It was a
 6   Hispanic lady.  That's all I remember.
 7       Q  What language was she speaking in?
 8       A  Spanish.
 9       Q  Does Corrie Bergadon speak Spanish?
10       A  No.
11       Q  Or understand Spanish?
12       A  No.
13       Q  Who was present when you spoke to this
14   woman or when she spoke to you?
15       A  It was her relatives, myself, and my
16   partner.
17       Q  Can you tell me anything about the people
18   who were present other than that they were her
19   relatives?  Male?  Female?  How old?
20       A  I can't remember all that.
21          MS. BARBER:  Object to the form of that
22   question.
23       Q  Did you speak with anybody else in the
24   group?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    27

```
1        A   No.

2            MS. GOLDEN:   Foundation.

3    BY MS. SUSLER:

4        Q   And they were all present when you were

5    speaking with the woman?

6        A   Yes.

7        Q   And what did you do after she told you

8    that?

9        A   We went to the rear basement apartment

10   where she pointed where her relatives lived,

11   knocked on the back door, no answer.

12           There were small windows on the side of

13   the building, knocked on that door -- I mean,

14   those windows, I should say.  Knocked on the

15   windows, tried to peek in the windows, could not

16   see into the apartment.

17       Q   When you said we went back to the

18   apartment, who were you referring to?

19       A   Me and my partner, Corrie Bergadon,

20   because I just told him that we got to try and get

21   in the apartment, make contact with the apartment.

22       Q   Where was the group of people that the

23   woman was with when you went back to the

24   apartment?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    28

```
1        A   They were standing outside in the

2    courtyard, gangway.

3        Q   So they didn't go with you when you went

4    back to the apartment.

5        A   No.

6        Q   Do you know whether the people who were

7    with her were also Spanish speakers?

8        A   I would assume so.

9        Q   Why would you assume so?

10       A   Because she stated that's her relatives.

11       Q   Okay.  How far from the door you knocked

12   on and the windows you looked in was the woman and

13   her family?

14          MS. BARBER:  Objection; foundation.

15       A   Several feet, probably from here to the

16   door, so let's say over 15 feet away.

17       Q   And if you know -- well, could you see

18   them from where you were knocking at the door and

19   looking in the windows?

20       A   Yes.

21       Q   What, if anything, did anyone say to you

22   about whether there were children in the family --

23          MS. BARBER:  Objection; foundation.

24       Q   -- when you first arrived?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    29

1      A   That they were concerned for the family,

2   and the family just had a newborn, and they have a

3   three-year-old autistic boy.

4      Q   So you knew that when you went to go knock

5   on the door?

6      A   Yes.

7      Q   Did you make any notes in a GPR of your

8   conversation with this woman?

9      A   At the patrol level, we don't use GPRs.

10  We're just responding officers to a call.  A GPR

11  is a form of what detectives will use.  So no.

12     Q   Did you make any notes on any other piece

13  of paper other than a GPR?

14     A   No.

15     Q   After you knocked on the door and the

16  windows, what happened?

17     A   We got no contact from the apartment.  At

18  which point, we notified our supervisor to come to

19  the scene.

20     Q   Who was your supervisor?

21     A   My supervisor that night was Sergeant Lupe

22  Pena.

23     Q   And why did you contact the sergeant?

24     A   For notification purposes, and if we had

1  to enter an apartment with forced entry, we need a

2  supervisor's permission to do it.  We just can't

3  just arbitrarily go in ourselves without making

4  notification to a supervisor.

5      Q  What time did you call Sergeant Pena?

6      A  I don't remember the time frame, shortly

7  after that.

8      Q  And what happened next?

9      A  Sergeant Pena shows up.  We talk to

10 Sergeant Pena about the situation.  Sergeant Pena

11 also talked with the people because he speaks

12 Spanish, and Sergeant Pena also noticed a phone

13 number on the side of the building.  Usually, a

14 lot of apartment buildings will have a phone

15 number on the side for contact emergency -- for

16 emergency contact, and he called it.

17     Q  Were you present when Sergeant Pena spoke

18 with the family?

19     A  Yes.

20     Q  What did Sergeant Pena say, and what did

21 the family say?

22     A  It was basically the same thing.  What the

23 family told me, they told the sergeant.  They told

24 to Sergeant Pena.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    31

1       Q   And when you say "they," who are you

2   referring to?

3       A   I'm referring to the lady and the group of

4   people that she was with.

5       Q   So it was more than just the lady talking

6   to the sergeant?

7       A   Yes.

8       Q   What was the next thing that happened?

9       A   Sergeant Pena made contact with a building

10  maintenance man; and about 45 minutes later, the

11  maintenance man of the property showed up with a

12  bunch of keys.

13      Q   Did Sergeant Pena leave the scene?

14      A   No.  He was there the whole time.

15      Q   And did any of the family members leave?

16      A   No.  Everybody was there.

17      Q   So you were standing around waiting for

18  the person with the keys to come and let you in?

19      A   Yes.

20      Q   And what was said -- who said what to whom

21  during the time you were waiting that 45 minutes

22  for the person from the building?

23      A   I don't remember any conversations like

24  that.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    32

1      Q   When you say that the building maintenance

2   man showed up 45 minutes later, do you know what

3   his name was?

4      A   No, I don't.

5      Q   Can you describe what he looked like?

6      A   I remember him being a Hispanic gentleman.

7      Q   About how old?

8      A   I can't remember.

9      Q   And his relationship to the apartment

10  building was that he was the maintenance man?

11        MS. BARBER:   Objection; foundation.

12     A   Yes.

13     Q   When he arrived, what happened?

14     A   The sergeant told the maintenance man to

15  go ahead and open the apartment.

16     Q   Who was present when that happened?

17     A   Myself and my partner.

18     Q   And the family was where?

19     A   Standing behind the sergeant.

20     Q   What happened next?

21     A   The maintenance man goes on to the door.

22  He's got 50 keys on a big key ring.  He can't find

23  which key opens the door, and he's a little

24  nervous too.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019          33

1     Q   How do you know that?

2     A   Because he was shaking and looking around

3  for the keys, and he's, like, trying different

4  keys.  You could tell he was getting frustrated.

5  He don't know which key it was.

6     Q   Do you know why he was nervous?

7     A   I don't know why.

8     Q   Where were you when the maintenance man

9  was trying to find the right key?

10    A   I was standing behind him.

11    Q   What happened next?

12    A   We told the sergeant he don't know which

13 key opens the door, and the maintenance man said,

14 "If you need to get in, go ahead and break a

15 window."

16    Q   And then what happened?

17    A   The sergeant gave us the order to break a

18 little small windowpane which will allow us to

19 reach in and unlock the door.

20    Q   Did you do that?

21    A   My partner did.

22    Q   So it was Officer Bergadon who --

23    A   Officer Bergadon, he had a tool to break

24 the glass.

1     Q   What kind of tool?

2     A   It was a blunt instrument.

3     Q   I'm not sure what that means.

4     A   A heavy object that he was carrying.

5     Q   Like a baton?

6     A   It was a tool, like a little -- let's say

7 like a Swiss army knife kind of thing, and it had

8 a section where it would pop out, and he used it

9 to pop windows and stuff.

10    Q   Okay.

11    A   Like the end of a screwdriver.

12    Q   So the glass that he broke was in the

13 door?

14    A   Yes.

15    Q   Was the glass of any color, or was it

16 clear?

17    A   It was clear.

18    Q   And what happened after Bergadon broke the

19 glass?

20    A   Once he broke the glass through, that's

21 when the smell of death hit us in the face,

22 decomposing bodies.

23    Q   How did you know that that's what the

24 smell was?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    35

1       A  I've been around enough dead bodies to
2   know that.  I've been in the morgue too.  So I
3   know what death smells like.
4       Q  On the job?
5       A  Yes.
6       Q  Where was the family when the window was
7   broken?
8       A  They were standing behind the sergeant in
9   the courtyard.
10      Q  Could they see inside the apartment from
11  where they were standing, if you know?
12      A  No.
13      Q  You don't know, or they couldn't see?
14      A  I would assume, no.
15      Q  All right.  As far as you know, could the
16  family see inside the apartment at the time the
17  window was broken?
18          MS. BARBER:  Objection; foundation.
19      A  No.
20      Q  Once the window was broken, you could
21  smell --
22      A  Oh, yeah.
23      Q  -- before the door was even open?
24      A  Yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    36

1      Q   All right.  What happened after the window
2  was broken?
3      A   Corrie opened the door wide open.
4      Q   Where was the sergeant at the time?
5      A   He was in the courtyard with the family.
6      Q   So who was with Corrie?
7      A   Me.
8      Q   And nobody else?
9      A   Nobody else.
10     Q   What did you or Corrie say when the window
11 was broken and you smelled this smell?
12     A   We made a spontaneous utterance of fuck,
13 as in, oh, shit.  We got a bad situation here.
14 That's what we yelled out to our sergeant.
15     Q   What did you yell to the sergeant?
16     A   Exactly what I stated.
17     Q   And then what happened?
18     A   The sergeant ordered us to go in the
19 apartment and look around, see what's going on
20 inside.
21     Q   All right.  Now, up to now, you've been
22 telling me these details.
23         Are these details that you remember just
24 independently?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    37

1        A   Yes.

2        Q   Before you were told there was a

3    deposition, these are things that you knew in your

4    memory?

5        A   Oh, yes.

6        Q   Okay.  You said the sergeant ordered you

7    to go in?

8        A   Yes.

9        Q   What did he say?

10       A   He said, "Go inside, see what's going on.

11   This family is talking about children.  See what

12   you can find in that apartment."

13       Q   Okay.  And what did you do?

14       A   Myself and Corrie Bergadon went into the

15   apartment.

16       Q   What did you see when the door opened?

17       A   We saw a male Hispanic man laying on the

18   kitchen floor with multiple stab wounds.  It

19   looked like he had been laying there for several

20   days.

21       Q   Where was he in relation to the door?

22       A   A few feet from the door.  As we opened

23   the door, he was laying on the kitchen floor.  It

24   was a very small apartment.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              38

```
1        Q   Where was his head in relation to the
2   door?
3        A   Pointed away.
4        Q   So his feet were closer to the door than
5   his head?
6        A   Yes.
7        Q   And can you describe the condition his
8   body was in?
9        A   Laying on his back.
10       Q   What else did you see when you first
11  opened the door?
12       A   Blood everywhere, knife wounds.
13       Q   When you say "blood everywhere," I'm sorry
14  because I know this is not a pleasant
15  conversation, but I need to know what you mean.
16       A   Well, it looked like there was a big
17  struggle, and the victim suffered multiple knife
18  wounds; and I guess during the stabbing process,
19  there was blood on the walls.  It looked to me,
20  like, a fight going on.  I even saw blood up on
21  the ceiling.
22       Q   Did you see any blood on the floor?
23       A   All over the floor.
24       Q   Did you see any footprints in the blood?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    39

```
1       A   I cannot recall because we did not turn on

2    the lights.

3       Q   Why didn't you turn on the lights?

4       A   We were trying to preserve the crime scene

5    as much as possible, and by me touching the

6    lights, it would leave fingerprints on the light

7    switch.

8       Q   What else did you see when you opened the

9    door?

10          MS. BARBER:  I'm just going to object to

11   the form of that question.

12      A   Nothing in the kitchen, other than there

13   was just stuff strewn about, like things were

14   knocked over.

15      Q   And you say you and your partner followed

16   the sergeant's instructions to enter the

17   apartment?

18      A   Yes.

19      Q   What did you do when you went in?

20      A   I went in.  I stepped over the body

21   towards a curtain door.

22      Q   Why did you step over the body?

23      A   That's the only way I could get to the

24   curtain door, the way he was laying, and I was
```

1   told that's a bedroom behind that curtain door.

2       Q   Who told you that?

3       A   The family.

4       Q   Where were they?

5       A   Behind the sergeant in the courtyard.

6       Q   Well, when did they tell you this?

7       A   They told the sergeant who relayed the

8   information to me in Spanish.

9       Q   So this is while you were in the apartment

10  or before you went in?  When did that happen?

11      A   While we were in the apartment.

12      Q   So when you entered the apartment -- I

13  think you said when you opened the door was when

14  you told the sergeant --

15      A   Right.

16      Q   -- the words you used and that it was a

17  serious situation.

18      A   Spontaneous reaction, sorry.

19      Q   And then the next thing that was said was

20  the sergeant told you and Corrie to go in?

21      A   To go in.

22      Q   And so while you're in, are you, like,

23  narrating to the sergeant in the courtyard what

24  you're seeing?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    41

```
 1      A   Yes.

 2      Q   Okay.  What did you say to the sergeant?

 3      A   The comments I made.

 4          The sergeant said, Hey, they stated go in

 5   the bedroom.  He said it's behind a curtain

 6   wall -- curtain door.  Like move the curtain, and

 7   there's a bedroom.

 8      Q   Okay.  So I'm not sure I'm understanding.

 9          What I want to know is the conversation

10   between you and the sergeant while you were in the

11   apartment, and he's outside with the family.

12      A   Yeah.  We kind of yelled at each other.

13   Hey, we got this.

14      Q   All right.

15      A   You know, it wasn't far.

16      Q   Okay.

17      A   We could hear each other.

18      Q   That's great.

19          I just want to know what you yelled, and

20   what he said back.

21      A   I yelled out this is the situation we have

22   in an expletive term.

23          And he yelled back, "Hey, go in the

24   bedroom behind the curtain."
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          42

1        Q   Okay.  And then what happened?

2        A   I moved the curtain and I saw an

3   individual -- well, I saw a pile of blankets at

4   first.

5        Q   Where was the pile of blankets?

6        A   In the middle of a queen-size bed.

7        Q   What happened next?

8        A   I went towards the blankets.  I moved the

9   blankets away, and I saw a female Hispanic, that

10  apparently was stabbed multiple times, in a fetal

11  position on the bed.

12       Q   Tell me what you mean by fetal position.

13       A   Like she was crouched over on her knees,

14  head on the bed, and I can see with my flashlight

15  multiple wounds on her back and torso, blood

16  everywhere.

17       Q   Let me just ask you about -- you said she

18  was on her knees.

19           So was her head facing -- her face was

20  facing down on the bed?

21       A   Like in a kneeling position, like in a

22  prayer kind of a position with -- on her knees and

23  head touching the mattress.

24       Q   So like her forehead was touching the

```
 1   mattress?
 2        A   Right.
 3        Q   Where were her hands?
 4        A   Off to her side.
 5        Q   Off to her side.  You're bending your
 6   elbows and --
 7        A   Like this.
 8        Q   All right.  So her --
 9        A   Off to her side.
10        Q   Okay.  You've got your elbows --
11        A   I didn't say my elbows.  You said her
12   hands.
13        Q   Okay.  But I'm just trying to explain the
14   gesture that you're making.
15        A   Right.
16        Q   So her hands were, like, under her chest?
17        A   No, off to the side.
18        Q   Off to the side.
19        A   Yeah.
20        Q   So it was sort of like if she were going
21   to be doing a pushup?
22        A   Similar.
23        Q   Where her hands were flat on the bed and
24   her elbows were bent --
```

1     A  Similar, yes.

2     Q  -- at her side.

3     A  Yes.

4     Q  Okay.  I'm not trying to put words in your

5  mouth.  I'm just trying to be accurate in the way

6  I describe what you're gesturing.

7     A  I'm just trying to describe how that is --

8     Q  Okay.

9     A  -- and granted this is over 20 years ago.

10    Q  Okay.  Can you describe the pile of

11  blankets before you lifted them off?

12        MS. BARBER:  Object to the form of the

13  question.

14    A  The blankets were covering her.

15    Q  How many were there?  Do you know?

16    A  I don't recall.

17    Q  What color were they?

18    A  The room was dark.  All I had was my

19  flashlight.

20    Q  But you had your flashlight on.

21    A  Yeah.  I couldn't tell if they were a dark

22  color.  I could not tell if they were blue, black.

23  They were similar.  You know, I can't really tell

24  what the color -- I wasn't concerned about the

1    color.  I was concerned about finding the

2    children.

3        Q  Was there any blood on the blanket?

4        A  I could not tell.

5        Q  Where did you put the blanket?

6        A  Off to the side of the body.

7        Q  What did you say as you were in the

8    bedroom and seeing the pile of blankets?  Were you

9    speaking to the sergeant?

10       A  I yelled out --

11          MS. BARBER:  Objection; form.

12          Go ahead.

13       A  I yelled out, We have another -- another

14   one in the room.

15       Q  What did the sergeant say?

16       A  Okay.  We're looking for two kids.

17       Q  Okay.

18       A  Keep searching.  He yelled out, Keep

19   searching.  He yelled out in English to not alarm

20   the family members.

21       Q  So the whole time that you were inside and

22   having this conversation with the sergeant

23   outside, that was going on in English?

24       A  Yeah.  He didn't want to come inside.  We

1    gave him a little razzing over that.

2        Q   Do you know what your partner was doing in

3    the apartment while you were doing what you were

4    doing?

5        A   He went straight.  There was a bathroom

6    behind the kitchen.

7        Q   He went into the bathroom?

8        A   He went straight towards the bathroom,

9    where I went to the bedroom.

10       Q   Were there any other rooms in the

11   apartment?

12           MS. BARBER:  Objection; foundation.

13       A   Not that I can recall.

14       Q   Do you know what he did in the bathroom?

15       A   No.

16       Q   Did you hear him say anything to the

17   sergeant?

18       A   Yes.

19       Q   What did you hear him say?

20       A   We got nothing in here.

21       Q   Do you know where he was when he said

22   that?

23       A   The bathroom.

24       Q   Okay.  While you and he were in the

```
1    apartment, did anyone else enter the apartment?
2         A  No.
3         Q  Was there anyone else near the door who
4    had a view into the apartment?
5         A  No.
6         Q  When did you hear your partner say "We got
7    nothing in here" in relation to when you were --
8    was that before or after you saw the pile of
9    blankets?
10           MS. BARBER:  Objection; form.
11        A  I can't remember before or after.
12        Q  What's the next thing you remember
13   happening while you and your partner were in the
14   apartment?
15        A  We were still searching for the children.
16        Q  Tell me what you did to search for
17   children.
18        A  Well, we saw like a baby crib, but it was
19   empty, saw toys strewn about the bedroom floor,
20   looked underneath the bed.  It would have been
21   wide enough for a child to get underneath, so we
22   looked underneath the bed, nothing, and we checked
23   behind the dresser, even kind of, like, knocked it
24   over.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                48

1      Q   When you say "we," did he come into the

2   bedroom?

3      A   Yes, me and Corrie.

4      Q   Did he come into the bedroom before or

5   after you found the pile of blankets and the woman

6   underneath?

7      A   After.

8      Q   What else?

9          MS. BARBER:   Form.

10     Q   What else did you do to search for the

11   children?

12     A   Kept searching.

13     Q   Where?

14     A   In the bedroom.   That's the only place

15   left.   It's a small apartment, probably smaller

16   than this room.

17     Q   Okay.   Was there other furniture that you

18   saw in the apartment other than the dresser and

19   the bed and crib?

20     A   Like a small toddler bed off to the side.

21     Q   How about other than in the bedroom?

22     A   I can't remember.

23     Q   Did you search behind any other furniture?

24     A   Searched underneath the bed, searched

1   behind the dresser, searched underneath the bed --

2   the crib, and that was it.

3       Q  Did you ever make a report to document

4   what you did in the apartment?

5           MS. BARBER:  Objection; form.

6       A  No.

7       Q  Was there anything else you did in the

8   apartment that you haven't told me?

9           MS. BARBER:  Objection; form.

10      A  No, that's it.

11      Q  Was there anything else that your partner

12  did in the apartment that you haven't told me?

13          MS. BARBER:  Objection; form, foundation.

14      A  Not that I can recall.

15      Q  Did you step in blood while you were in

16  the apartment?

17      A  Yes.

18      Q  And did your partner step in blood in the

19  apartment?

20      A  Probably.  Blood was everywhere.

21      Q  How long were you in the apartment?

22          MS. BARBER:  Objection; foundation.

23      A  I can't remember how long.  We were in

24  there not too long because it smelled bad.  I

1   wasn't staying in there anymore than we had to

2   because we were gagging.  It stunk.  It really

3   did.

4       Q  Is there anything else that you said to

5   the sergeant while you were in the apartment that

6   you haven't told me?

7       A  Everything we told the sergeant, we yelled

8   it out what we got, and that was it.

9       Q  But you told me some things.  I just want

10  to make sure that I know everything that you said

11  to the sergeant.

12      A  Everything I told you, I told the

13  sergeant.

14      Q  Is there anything else you told the

15  sergeant while you were in the apartment?

16      A  Nothing.

17      Q  Is there anything else your partner told

18  the sergeant while you were in the apartment?

19          MS. BARBER:  Objection; foundation.

20      A  Nothing.

21      Q  Is there anything else the sergeant said

22  to you or your partner while you were in the

23  apartment that you haven't told me?

24      A  Nothing.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    51

1       Q  After you did the searching that you
2   described, what was the next thing that happened?
3       A  Went outside and got some fresh air.
4       Q  And your partner went out too?
5       A  Oh, yeah.
6       Q  Did you say anything to the sergeant?
7       A  No.
8       Q  After you got some fresh air, what
9   happened?
10      A  We started making our documentation, and
11  we made our notifications.
12      Q  When you say "we started making our
13  documentation," what are you referring to?
14      A  Gathering information for our case report
15  and for our missing case reports of the two
16  missing children.
17      Q  And how did you do that?
18         MS. BARBER:  Objection; form.
19      A  By the information we had, talking to the
20  relatives, and the crime scene.
21      Q  Did you make the report right there at the
22  scene?
23      A  Yeah.  We documented a lot of things on
24  the scene.

1      Q   When you said we started making documents,

2   I guess I'm just trying to find out the timing.

3         MS. BARBER:  Objection; form.

4      A   Well, we got the police report number off

5   the radio, told dispatch give us the certain code

6   that we use, 0110, which stands for homicide.

7   That's the start of the paperwork process.

8      Q   Did you have any further conversation with

9   the relatives?

10     A   No.

11     Q   And do you know whether your partner did?

12     A   Definitely not.

13     Q   Because of the language problem?

14     A   He don't speak Spanish.

15     Q   Right.  And how about the sergeant?  Did

16  you hear the sergeant have any further

17  conversation with the relatives?

18     A   I know he was talking to them, but I don't

19  know what the conversation was about.

20     Q   And that's because you weren't near them?

21     A   I was not near them.

22     Q   Do you know how the relatives found out

23  what you found in the apartment?

24        MS. GOLDEN:  Foundation.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          53

```
 1          MS. BARBER:  And form.
 2      A  Probably through the sergeant.
 3  BY MS. SUSLER:
 4      Q  But do you know?
 5      A  I don't know.
 6      Q  You're guessing?
 7      A  I don't know.
 8      Q  Did you see the relatives crying?
 9      A  Yes.
10      Q  Were the relatives allowed to see the
11  apartment?
12      A  No.
13      Q  Or enter the apartment?
14      A  No.
15      Q  You said you made notifications.
16         Can you explain to me what you're
17  referring to?
18      A  In a situation like that, we make
19  notification to the detective division, downtown
20  operations command, news affairs.  Especially in a
21  case where it involves death or great bodily harm,
22  it's going to hit the news.  So they want to get
23  ahead of the process.
24      Q  Any other notifications?
```

1      A   One more to missings for the children.

2      Q   Can you just tell me what you mean by

3  making a notification?

4      A   That's the standard general order

5  procedure of notifying different levels of the

6  police department so that you can get the

7  resources necessary to investigate the crime

8  scene.

9      Q   How did you make the notifications?

10      A   Radio.

11      Q   Did you make them personally, or did

12  someone else?

13      A   I made one to missings for sure.  My

14  partner could have made notifications too because

15  he was helping with paperwork.

16      Q   What was the next thing that happened?

17      A   Shortly there afterwards, detectives

18  showed up.

19      Q   What detectives showed up?

20          MS. BARBER:  Objection; foundation.

21      A   I just know they're detectives.  I don't

22  know their names at that time.

23      Q   Did you find out later?

24      A   I found out later, yeah.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    55

```
 1        Q   What did you find out?
 2        A   Detectives were on scene, and the only
 3   reason we found out is we had to put in our case
 4   report that they were on scene.
 5        Q   Did you find out the names of the
 6   detectives that came?
 7        A   Yes.
 8        Q   What did you find out?
 9        A   I have to look at the case report to see
10   who we wrote down name wise.  I don't know these
11   guys personally.
12        Q   Okay.  So you don't have any memory
13   independent of your report of who the detectives
14   were?
15        A   There were several.
16        Q   How many?
17        A   I'd have to look at the case report on
18   that one.
19        Q   Do you know why the detectives showed up?
20            MS. BARBER:  Objection; foundation.
21        A   They're there to investigate a homicide.
22        Q   That's not your job?
23        A   No, it's not.
24        Q   What's your job -- not necessarily related
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          56

```
 1    to this particular scene, but what is your job as
 2    a patrol officer if you happen upon a homicide?
 3         MS. BARBER:  Objection; form.
 4      A  Our job is to make preliminary contact --
 5    we're preliminary investigating officers, find out
 6    what's going on, relay that information to the
 7    resources of the police department.  That's it.
 8    BY MS. SUSLER:
 9      Q  And is that what you did here?
10      A  That's correct.
11      Q  How long did you stay at that address?
12         MS. BARBER:  Objection; foundation.
13      A  I can't remember how long.  I wasn't
14    paying attention to time.
15      Q  Was it the bulk of your shift that day?
16         MS. BARBER:  Objection; form, foundation,
17    asked and answered.
18      A  Yes.
19      Q  So were you there until midnight?
20      A  Oh, no.
21      Q  How long do you think you were there?  Do
22    you know what time you left the scene?
23         MS. GOLDEN:  I'm going to object to form
24    to that.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    57

1          MS. BARBER:  And I object to foundation

2    as well.

3       A  I can't remember how long.  I didn't have

4    a watch on me.

5    BY MS. SUSLER:

6       Q  What was going on when you left?

7          MS. BARBER:  Objection; foundation.

8          MS. GOLDEN:  I don't know what you mean.

9    Where are we?  At the station or --

10         MS. SUSLER:  At the scene.  That's what

11   I'm asking about.

12      Q  What was going on at the scene at the time

13   that you left?

14         MS. BARBER:  Objection; form, foundation.

15      A  Detectives showed up, talked to the

16   sergeant, and I left for the -- we left, me and my

17   partner left for the 14th District station.

18      Q  Were you present when the detectives and

19   the sergeant were talking?

20      A  No.

21      Q  So you don't know what the detectives and

22   the sergeant said to each other?

23      A  No.

24      Q  Did you hear the sergeant say anything to

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                           58

```
1    the detectives?
2         A  No.
3         Q  Or the detectives say anything to the
4    sergeant?
5         A  No.
6         Q  Did you see -- did you know Reynaldo
7    Guevara before the date of this crime or the date
8    of your being present at the apartment?
9         A  I know of him, but I don't know him.
10        Q  What did you know of him?
11           MS. BARBER:  Objection; form.
12        A  He showed up at different crime scenes,
13   heinous crime scenes, like homicides or shootings,
14   gang-related shootings.
15        Q  Anything else you know about him?
16        A  That's it.
17        Q  How about Detective Halvorsen?  Did you
18   know anything about him before this day?
19        A  Only work related.
20        Q  What did you know about him?
21        A  He would show up at homicide scenes,
22   shooting scenes in the 14th District.
23        Q  Was there anything else that you did while
24   you were at 2071 North Leavitt that you haven't
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                     59

```
 1    told me?
 2         A   No.
 3             MS. BARBER:  Objection; form.
 4    BY MS. SUSLER:
 5         Q   Did you have any relationship to
 6    processing the crime scene?
 7         A   No.
 8             MS. BARBER:  Objection; form.
 9         Q   Do you know whether the missing children
10    were ever found?
11             MS. BARBER:  Objection -- well, I'll
12    withdraw.
13             Go ahead.
14         A   What was that question again?
15         Q   Do you know whether the missing children
16    were ever found?
17         A   Yeah.  They eventually were found.
18         Q   How did you find out?
19         A   News media.
20         Q   Did you learn what the circumstances of
21    finding the children were?
22             MS. BARBER:  Objection; form.
23         A   Only what was broadcast in the news media.
24         Q   What did you hear on the news?
```

1      A   I can't remember what I remember 20 years

2   ago on the news.

3      Q   All right.  Let me show you -- do you

4   think you would recognize -- if I showed you

5   photos of the apartment, do you think you would

6   recognize it?

7      A   Yes.

8          MS. SUSLER:  Why don't we mark this as

9   Valentin Deposition Exhibit No. 1.

10          (Valentin Deposition Exhibit 1 marked for

11   identification and attached to the transcript.)

12      Q   This is a group exhibit with three photos

13   that are marked Bates stamped Reyes 276, 278 and

14   280.  Let me ask you to look at the first page,

15   sir.

16          Do you recognize what you see there?

17      A   Yes.

18      Q   What do you see?

19      A   It's the rear entrance of the basement

20   apartment of 2071 North Leavitt.

21      Q   And is that the door the building

22   maintenance person tried to open with a key?

23      A   The inner door.

24      Q   The inner door.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          61

```
 1          The outer door didn't have a -- it wasn't
 2   locked?
 3       A  Right.  That's like a storm door.
 4       Q  Okay.  So can you point out the window
 5   that your partner broke in order to gain access?
 6       A  Not from this angle.
 7       Q  Okay.  Let's see if I have a better
 8   picture.
 9          MS. SUSLER:  I have another photo, but I
10   don't have copies of it.  It's RFC-Solache/Reyes
11   12, and why don't we mark this as Valentin Dep
12   Exhibit 2, and I'll make copies when we take a
13   break.
14          (Valentin Deposition Exhibit 2 marked for
15   identification and attached to the transcript.)
16       Q  Now, that the attorneys have seen
17   Exhibit 2, Officer, in the top portion of that
18   exhibit, do you recognize what's there?
19       A  It's the entrance to the rear basement
20   apartment of 2071 North Leavitt.
21       Q  Okay.  And can you tell me which window
22   was broken from that photo?
23       A  I can't tell because the door, the outer
24   door is closed.  It's the window to the inner
```

1    door.

2        Q   Okay.  So the outer door you said was like

3    a screen door?

4        A   Right.

5        Q   And the inner door -- can you tell me what

6    the inner door looked like?

7        A   It's a heavy wood door.  It had six

8    windowpanes, the closest windowpane to the door

9    locks that we broke open to reach inside and

10   unlatch it.

11       Q   Okay.  I'm going to show you what we'll

12   mark as Valentin Deposition Exhibit 3 which is

13   RFC-Solache/Reyes 500.

14           (Valentin Deposition Exhibit 3 marked for

15   identification and attached to the transcript.)

16   BY MS. SUSLER:

17       Q   Let's try one more time, Officer.

18           What do you see in Exhibit 3?

19       A   This is the door that -- the main door of

20   the apartment.  This has the window that my

21   partner broke out so we can get to that lock to

22   unlock the door and open it.

23       Q   All right.  And you're pointing to the

24   right-hand side of the photograph.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                        63

1        A   Right there is the lock.

2        Q   Okay.

3        A   And that's the window, and that's another

4    window right there.

5        Q   Can I see that for a minute.

6        A   Sure.  There you go.

7            MS. SUSLER:  Let's mark this as Exhibit 4,

8    please.

9            (Valentin Deposition Exhibit 4 marked for

10   identification and attached to the transcript.)

11       Q   Do you recognize what I've handed you,

12   sir?

13       A   It's a general offense case report.

14       Q   Okay.  Who made this general offense case

15   report, if you know?

16       A   My partner.

17       Q   Corrie Bergadon?

18       A   Yes.

19       Q   And the handwriting that you see in most

20   of the document is whose?

21       A   Corrie Bergadon.

22       Q   Do you see your signature?

23       A   Yes.

24       Q   Did you read this report before you signed

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    64

1    it?

2         A   Yes.

3         Q   Okay.  Just for the record, this is

4    RFC-Solache/Reyes 418 and 419.  It's a

5    double-sided document.  All right.  I have several

6    questions about this document.

7             Let me just ask you the Box No. 6 -- well,

8    let me ask you Box No. 5, what is that box?

9         A   I can't tell where you're at.

10        Q   At the top, right under where it says

11   first degree murder, like, between like degree and

12   murder, right underneath it.

13        A   That box right there?

14        Q   Yes.

15        A   Okay.

16        Q   What is checked?

17        A   It looks like no.

18        Q   What is the question for that box, if you

19   know?

20        A   Fire related.

21        Q   Okay.  Then Box No. 6 says date of

22   incident?  I'm sorry.  I can't read it.

23        A   Date of occurrence.

24        Q   Okay.  And it says 28 March '98 at

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    65

1    0700 hours.

2         Where did that information come from?

3    A  It came from the sergeant.

4    Q  What sergeant?

5    A  Pena.

6    Q  Do you know where he got that information?

7    A  I don't know where he got that information

8    from.

9    Q  Well, what information do you have about

10   what happened on March 28th of 1998 at 0700 hours?

11   A  None.

12   Q  Okay.  The next box to the right of that,

13   is that your beat number?

14   A  No.

15   Q  What is that box?

16   A  It's the beat of occurrence, of the

17   address, 1432.

18   Q  Okay.  And the box to the right of that?

19   A  That's beat 1455.

20   Q  And what's the significance of that?

21   A  That's the sector car.  We work an area,

22   whereas that is more localized as a beat.

23   Q  Which is more localized?

24   A  1432.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    66

```
 1      Q   So was 1455 the beat that you and Bergadon
 2   were on that night?
 3      A   Yes.
 4      Q   All right.  Then Box 10 where it says
 5   290 --
 6      A   Okay.
 7      Q   -- can you explain the significance of
 8   that?
 9      A   That's just a code used on reports to
10   describe the residence, a code.
11      Q   That means residence as opposed to
12   commercial, for example?
13      A   Parking lot, train station, bus.
14      Q   Okay.  And to the right of that, the box
15   says 1 April 1998 at 1645 hours.
16          What is that?
17      A   The time we arrived.
18      Q   Okay.  Then the box to the right of that
19   there's a check.
20          What is that box for, and what's the
21   significance of that check?
22      A   I can't tell.  It looks like it's -- if
23   you can make it out, you got better eyes than me.
24   I can't tell.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    67

1       Q   Well, I was hoping that because this is a

2    kind of report you probably filled out regularly,

3    you might be able to help me.

4       A   We haven't used this report in 20 years.

5       Q   Okay.

6       A   Everything is done on a computer now.

7       Q   Got it.

8           Okay.  The information under -- for the

9    section about victims, do you know where that

10   information came from?

11      A   Those are the deceased victims that we

12   found.

13      Q   And where did that information come from?

14      A   Through our identification of the family.

15      Q   And further to the right of that, there is

16   two Xs.

17          What is the significance of that?  What

18   does that mean?

19      A   This is a bad copy.

20      Q   I would give you a better one if I had it.

21      A   I mean --

22      Q   I apologize.

23      A   I can relate.  I'm not going to guess.

24      Q   All right.  How about the witness section?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    68

1    There's three names.
2          Where did that information come from?
3      A  From the people in the courtyard.
4      Q  Okay.  These were the family members who
5    you mentioned?
6      A  Yes.  Two of them were.
7      Q  Which two?
8      A  Rosa Aranda and Felicia Soto.
9      Q  Which of those women did you speak with?
10     A  Rosa.
11     Q  To the right of the Aranda Alfredo line,
12   there's three letters that say DNA.
13         Do you see where I'm?
14     A  That describes business phone, if there
15   are any other contact -- you have home phone and
16   business phone.  They didn't have cell phones back
17   then like they do today.
18     Q  And DNA means?
19     A  Does not apply.
20     Q  Then keep going down, there's a box that
21   says "Offender," and there's an X.
22         What does that mean?
23     A  Unknown.
24     Q  Okay.  Then the next section is

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          69

```
 1    Circumstances.
 2           Up at the top there's an X.
 3        A  Unknown.
 4        Q  Unknown what?
 5        A  Weapon used.
 6        Q  Okay.  Then -- okay.  The next box looks
 7    like 57 or 51, hard to read.
 8           It looks like it says unknown firearm
 9    features?
10        A  Yes.
11        Q  Okay.  Then the next is point/entry, also
12    unknown?
13        A  Yes.
14        Q  And point exit, also unknown?
15        A  Yes.
16        Q  Okay.  Then it looks like it might be
17    Box 58, unusual characteristics of offense.
18           You've written -- or he's written "See
19    narrative."
20        A  Yes.
21        Q  And then just to the right, there's a box
22    that's marked with an X with DNA written.
23           Do you know what that box is?
24        A  Gang affiliation.
```

1        Q   So does not apply.

2        A   Does not apply.

3        Q   Okay.  Then for property -- or the next

4   box down unknown?

5        A   Unknown.

6        Q   And what does that mean?

7        A   We don't know if items are missing.  So

8   we're not going to guess.

9        Q   Okay.  Then in the narrative section

10  something -- there's something written there.

11       Now, is that -- I'm not a handwriting

12  expert, but that looks like it's different

13  handwriting from the handwriting where the victims

14  and the witnesses appear.

15       Do you know if that's different

16  handwriting?

17       MS. BARBER:  I'm going to object to the

18  form of that question.

19       A   It looks pretty much the same to me.

20       Q   Okay.  But is that your partner Corrie

21  Bergadon's writing, if you know, in the narrative

22  section?

23       A   Yes.

24       Q   And on the other side as well, on

1    page 419, that's also Corrie's handwriting?

2        A   Right.  It looks like he's trying to write

3    smaller to get the information in.

4        Q   Okay.

5        A   There's a lot of information to get in

6    here.

7        Q   Do you know where Corrie got the

8    information that he wrote on the front side of

9    this case report and the narrative?

10       A   He was on the scene.

11       Q   Okay.  But he didn't speak Spanish or

12   understand Spanish --

13           MS. BARBER:  Objection.

14       Q   -- right?

15       A   Right.

16           MS. GOLDEN:  Objection; asked and

17   answered.

18           MS. BARBER:  Right.

19       Q   So he's relating here:  "At above

20   location, witness 1 related that she hadn't talked

21   to or seen victims since Friday"; right?

22       A   Yes.

23       Q   Did he get that information from you?

24       A   Yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    72

```
 1        Q   And then he wrote "R/O."

 2            That means reporting officers?

 3        A   Yes.  He was standing next to me.

 4        Q   Okay.  "Then talked to neighbor who lives

 5   in front of 2071 North Leavitt, who stated

 6   Saturday on the 28th of March '98 at 0700, he

 7   heard a male who stated, and not verbatim, 'I will

 8   not hurt you,' in Spanish out loud, and then a

 9   crash on the floor.  Then no noise at all."

10            Did I read that correctly?

11        A   Yes.

12        Q   Did he get that information from you?

13        A   From our conversation, standing there

14   talking to the witness Aranda.

15        Q   Alfredo Aranda?

16        A   Yes.

17        Q   Okay.  So you spoke with Alfredo Aranda

18   and had this conversation and then you

19   translated -- well, you spoke to Aranda and had

20   this conversation.

21        A   Yes.

22        Q   And then you translated --

23        A   To Corrie.

24        Q   Okay.  Do you know if he was taking notes?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                         73

1      A  I don't remember.

2      Q  Did you tell Corrie everything that

3  Mr. Aranda told you?

4      A  Yes.

5      Q  It says here, "Who lives in front of 2071

6  North Leavitt."

7         Do you know where Mr. Aranda lived?

8      A  An apartment.

9      Q  Oh, at that same address?

10      A  Yes.

11      Q  All right.  Then on the other side, it

12  says, "Beat 1440 went with witness 3 to try to

13  find the landlord."

14         Who was beat 1440?

15      A  Sergeant Pena.

16      Q  So Sergeant Pena left 2071 North Leavitt?

17      A  To try and find the landlord.  That's

18  where he got the phone number from the building.

19      Q  Okay.

20      A  He says he went to try and find the

21  landlord, saw a contact number, made contact,

22  maintenance man shows up.

23      Q  Okay.  Then the next line says, "Landlord

24  arrived at 1810 hours but could not find key to

1  open door."

2      A  Yes.

3      Q  So was it the landlord, or was it the

4  building maintenance man?

5      A  I can't remember who.  A representative of

6  the property.

7      Q  "At 1815 hours, R/Os, along with landlord,

8  Raul Delira, M-2-62 of 1252 West Berry and 1440

9  broke a small window on the left side of door by

10  locks to gain entry."

11      Did I read that correctly?

12      A  Yeah, he gave the order.

13      Q  Who gave the order?

14      A  The sergeant.

15      Q  All right.  If I understand this

16  correctly, it says that it was the landlord and

17  the sergeant who broke the small window.

18      A  The sergeant --

19      MS. GOLDEN:  Objection to form and

20  foundation.

21      Q  Go ahead.

22      A  The sergeant ordered us to break the

23  window.

24      Q  So the report doesn't really report what

1   happened?

2          MS. GOLDEN:  Object to form.

3          MS. BARBER:  Misstates the witness's

4   testimony and argumentative.

5      A  I don't know what you're trying to get at.

6   BY MS. SUSLER:

7      Q  I'm just trying to find out what happened.

8   Your testimony is that the sergeant ordered Corrie

9   to break the window, and Corrie broke the window;

10  right?

11     A  Yes.

12     Q  Okay.  "R/Os entered apartment and saw

13  victim 1 laying face up in the kitchen area and

14  victim 2 laying face down in the bedroom."

15         Did I read that correctly?

16     A  Yes.

17     Q  Now, you told me earlier that she was in a

18  fetal position, victim 2?

19     A  Yes.

20     Q  Okay.  So I'd like to know whether the

21  report has it accurate or whether your testimony

22  is accurate.

23         MS. BARBER:  I object to the form of that

24  question.  It misstates the evidence, misstates

1    the report, misstates the witness's testimony, and

2    it's argumentative.

3        MS. GOLDEN:  Yeah.  It's a when did you

4    stop beating your wife question.

5        MS. SUSLER:  That's an inappropriate

6    objection.

7        MS. GOLDEN:  Your question is

8    inappropriate.

9    BY MS. SUSLER:

10       Q  Can you answer, please, sir?

11       A  Face down means, yeah, her face was down.

12       Q  Did you tell -- well, Corrie, your

13   partner, saw the female victim in the fetal

14   position that you've described; is that correct?

15       MS. BARBER:  Objection; foundation.

16       A  I don't know what he saw.

17       Q  He came into the bedroom.

18       A  I don't remember.

19       MS. GOLDEN:  Asked and answered.

20       Q  He helped you move the dresser?

21       A  The dresser against the wall.

22       Q  In the bedroom?

23       A  Yeah.

24       Q  Okay.  So the body was still in the fetal

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    77

```
 1   position at the time that he came in to help you
 2   searching for the children behind the dresser?
 3       A   Yes.
 4       Q   Did he help you look under the bed
 5   as well?
 6       A   No.  I looked under the bed.  I was more
 7   into the bedroom than he was.
 8       Q   It goes on to say, "Both victims appeared
 9   to have multiple stab wounds on their bodies.
10   Witness 1 and 2 stated there was two children that
11   live with the parents."
12           I got that right so far?
13       A   Yes.
14       Q   Child 1 REDACTED, I can't read that, M/4/3
15   and      REDACTED      F/4/2 months; right?
16       A   Yes.
17       Q   Is 4 a police code for the race of the
18   children?
19       A   Yes.
20       Q   And what does the 4 stand for?
21       A   White Hispanic.
22       Q   Okay.  And then actually up here further
23   when we were talking about the landlord, Raul
24   Delira, when it said M-2-62, what does the 2 stand
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    78

1   for?

2        A   White.

3        Q   And the 62 for Delira?

4        A   That would be his age.

5        Q   So for REDACTED, then M, male; 4, white

6   Hispanic; 3, age.

7        A   Three years old.

8        Q   Okay.  And the baby then, REDACTED,

9   was a female white Hispanic, two months old.

10       A   Two months, yeah.

11       Q   Okay.  Then it says, "R/Os went into

12  apartment again to try to locate children."

13           Did I read that correctly?

14       A   Yes.

15       Q   Okay.  So did you go into the apartment

16  more than once?

17       A   Yes.  To get air -- we left to get air,

18  and then went back in looking for the children.

19       Q   At what point did you leave the apartment

20  to get air?

21       A   I don't remember.

22       Q   Well, you told me earlier that when you --

23  the sergeant told you to keep looking for the

24  children, you did, and then you were done, and you

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                      79

```
 1   left because it was --
 2        A  Smelling bad.
 3        Q  All right.  So is that the point at which
 4   you left for air?
 5           MS. BARBER:  Objection to the form of that
 6   question.  And objection; foundation, and asked
 7   and answered.
 8        A  Yeah.
 9        Q  How long were you out before you went back
10   in?
11           MS. BARBER:  Objection; form, foundation.
12        A  Several minutes.
13        Q  How many?
14        A  I don't remember.
15        Q  10?
16           MS. BARBER:  Objection; form, foundation.
17        A  I didn't have a watch on me.  I don't
18   remember.
19        Q  Was it half an hour?
20        A  No, it wasn't that long.
21        Q  What did you do while you were out
22   catching air?
23           MS. BARBER:  Objection; form, misstates
24   the witness's testimony.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019      80

1      Q   I don't need to tell you every time she

2   objects that you can answer the question.

3      A   I was waiting for someone to stop

4   speaking. That's why.

5      Q   Okay.

6      A   Breathing fresh air.

7      Q   Did you talk to anybody?

8      A   The sergeant.

9      Q   What did you say to him?

10      A   We didn't find nothing.

11      Q   And what did he say to you?

12      A   Go back inside and make sure. It's a

13   sensitive case.

14      Q   Did the report refresh your recollection

15   about going into the apartment two times and not

16   just one?

17      A   We made notations about that.

18      Q   No. I guess my question is did the report

19   refresh your recollection that you were in the

20   apartment twice and not just once?

21      A   Yes.

22      Q   What did you do when you went back into

23   the apartment?

24      A   We made sure there was no dead children in

```
 1    the apartment.
 2         Q   What did you do to do that?
 3         A   Looked around with our flashlights.
 4         Q   Is that what you had done the first time?
 5         A   Yes.
 6         Q   So you did the same thing you did the
 7    second time that you had already done the first
 8    time?
 9             MS. BARBER:  Objection; form.
10         A   Just to be sure.
11         Q   Did you look under the bed?
12             MS. BARBER:  Objection; form.
13         A   Yes.
14         Q   Did you look behind the dresser?
15         A   Yes.
16         Q   Did you look in the bathroom?
17         A   Yes.
18         Q   Did you look under any other furniture?
19         A   Tables, chairs.
20         Q   Did you look behind any furniture?
21         A   Couldn't get access to it.
22         Q   What do you mean?
23         A   It was so cluttered and crowded, we could
24    not move, just able to shine the flashlight back
```

1    there.

2         Q   Was there a couch?

3         A   I can't recall.

4         Q   Did you look behind the couch either time

5    you were in the apartment?

6              MS. BARBER:   Objection; form, foundation,

7    speculation.

8         Q   Is there anything you did the second time

9    you went in that you didn't do the first time?

10        A   No.

11             MS. BARBER:   Objection; form.

12        Q   What did you see Corrie do when you

13   returned into the apartment?

14        A   I wasn't watching him.

15        Q   Do you know what he did?

16        A   No, I don't.

17        Q   Is there anything you did in the apartment

18   either the first or the second time that you went

19   in that you haven't told me?

20             MS. GOLDEN:   Form.

21        A   No.

22        Q   The next line on Exhibit 4 is "R/Os at

23   this time could not find them."

24        A   Yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    83

1        Q   Is that correct?

2        A   Yes.

3        Q   How long were you in the apartment the

4    second time you went in?

5            MS. BARBER:  Objection; foundation.

6        A   Minutes.

7        Q   How many?

8        A   I don't remember.

9            MS. BARBER:  Objection; foundation.

10       Q   Five?

11           MS. BARBER:  Objection; foundation.

12       A   I don't know.

13       Q   30?

14       A   Uh-uh.  Not that long, I guarantee you

15   that.

16       Q   15?

17       A   I don't know.

18       Q   Somewhere between 5 and 15?

19       A   That's a safe answer, 5 and 15.

20       Q   Did you take any photographs while you

21   were in the apartment either time?

22       A   No.  That's not my job description.

23       Q   Did you have any conversation with your

24   partner while you were in the apartment the second

1    time?

2        A   Other than what we talked about earlier?

3        Q   Well, we didn't talk about the second time

4    you were in the apartment earlier, so that's why

5    I'm asking you now.

6            MS. BARBER:  Objection; argumentative,

7    misstates the entire last 15 minutes of this

8    deposition.

9        A   Nothing different than our first

10   conversation.

11       Q   I'm not sure I understand.

12           Which first conversation are you talking

13   about?

14           MS. BARBER:  Objection; form.

15       A   From the first time we went into the

16   apartment.

17       Q   Well, you'll have to forgive me.  I

18   remember you telling me conversations with the

19   sergeant but --

20           MS. BARBER:  Jan, can you ask a question

21   rather than having this conversation.

22           MS. SUSLER:  I'll conduct the deposition

23   in the way I see appropriate.

24           MS. BARBER:  Okay.

1          MS. SUSLER:  You make your objections.

2     That's fine.

3          MS. BARBER:  Okay.  But I'd like you to

4     ask a question, please.

5          MS. SUSLER:  That's what I was in the

6     process of doing when you interrupted me.

7          MS. BARBER:  Go ahead.

8     BY MS. SUSLER:

9        Q   I recall you telling me about

10    conversations with the sergeant while you were in

11    the first time; but forgive me, I don't recall

12    what you told me about conversations with your

13    partner while you were in the first time.  So I

14    need to ask you.

15         MS. BARBER:  Are you done with that

16    question?  Are you finished?

17         MS. SUSLER:  Yes.

18         MS. BARBER:  That's your question?

19         MS. SUSLER:  Yes.

20         MS. BARBER:  I'm going to object to you

21    testifying regarding whatever your memory is.  I'm

22    going to object to the form of that

23    question and --

24         MS. GOLDEN:  Asked and answered.

1          MS. BARBER:  -- asked and answered.

2      A  What was that question again?

3  BY MS. SUSLER:

4      Q  I'd like you tell me what conversation you

5  had with your partner while you were in the

6  apartment the first time.

7          MS. BARBER:  Objection; asked and

8  answered.

9      A  Do you see anything?  Did you find

10  anything?  That's it.

11     Q  That's what you said to him?

12     A  We were talking to each other.  Did you

13  find anything?  Did you see anything?

14     Q  What did he say to you?

15     A  Nothing, nothing in reference to the

16  children.

17     Q  Did you say anything else to each other

18  the first time you were in the apartment?

19          MS. BARBER:  Objection; form.

20     A  Do you see anything?  Did you find

21  anything?  That's it.

22     Q  Okay.  And the second time you were in the

23  apartment, what, if any, conversation did you have

24  with your partner?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    87

1        A    The same as I just stated.  Did you see
2    anything?  Did you find anything?
3        Q    The second time that you were in the
4    apartment, what, if any, conversation did you have
5    with the sergeant?
6        A    The only thing I told him was we don't
7    have nothing else.
8        Q    What did the sergeant say to you?
9        A    Come on out.
10       Q    What, if anything, did you hear your
11   partner say to the sergeant while you were in the
12   apartment the second time?
13       A    I don't remember what he said.
14       Q    And what, if anything, did you hear the
15   sergeant say to your partner while you were in the
16   apartment the second time?
17       A    I wasn't paying attention.
18       Q    Did he say anything?
19           MS. BARBER:  Objection; form, foundation,
20   asked and answered.
21       A    I don't know what the conversation was
22   between the sergeant and my partner.  I wasn't
23   close enough to hear.
24           MS. GOLDEN:  When you get to a good spot,

1    I need a break.

2          MS. SUSLER:  We can do that now.

3          (A recess was taken from 11:30 a.m. to

4    11:43 a.m.)

5          MS. SUSLER:  Go back on the record.

6    BY MS. SUSLER:

7      Q  When the building maintenance man came to

8    the apartment, which lock was he unable to find

9    the key for?

10         MS. BARBER:  Objection; form, foundation.

11     A  On the back door.

12     Q  How many locks were there on the back

13   door?

14         MS. BARBER:  Objection; foundation.

15     A  Two -- one, two.  That one and that one.

16     Q  Okay.  The bottom one is the doorknob?

17     A  The kind you stick the key in, yes.

18     Q  Okay.  And the top is a dead bolt?

19     A  Yeah.  Dead bolt.

20     Q  Which lock was the landlord or the

21   building maintenance man trying to open?

22     A  Both of them.  I don't recall which one he

23   was trying first.

24     Q  But he tried both?

1        A   I can't remember.

2        Q   And who was it who reached in through the

3    broken window and opened the door?

4        A   My partner.

5        Q   Okay.  What lock did he open or which

6    locks did he open for you all to get in?

7        A   I could not see because it was dark.

8        Q   When you got in, what did you see in terms

9    of the locks from the inside side of the door?

10       A   I wasn't paying attention to the locks.

11       Q   Well, whether you were paying attention

12   or not, what did you see?

13           MS. BARBER:  Objection; argumentative,

14   form, foundation.

15       A   I saw a dead person laying on the kitchen

16   floor.

17       Q   Did you look at the door from the inside

18   of the kitchen?

19       A   No.

20       Q   Can I ask you to look at exhibit -- the

21   case report.  This is 3?

22           THE REPORTER:  4.

23       Q   4.  Thank you.

24           Just to go back to where we left off on

1    the back side of the report, up at the top on the

2    right-hand side where it says "Notification" --

3        A   Yes.

4        Q   -- it has Sergeant Pena, beat 1440, who

5    you've already told us about.

6            Then desk watch car?

7        A   Watch commander.

8        Q   Oh, watch commander, P.O. Morley, 4611,

9    1845 hours?

10       A   Yeah.

11       Q   Does that mean that the desk watch

12   commander was P.O. Morley?

13       A   He's the secretary for the watch

14   commander.

15       Q   Okay.  And he was notified at 1845 hours?

16       A   Yes.

17       Q   And then it says "C.O.S. notified,

18   1830 hours"?

19       A   Yes.

20       Q   What's C.O.S.?

21       A   Dispatch, communication operations center,

22   dispatch.  It looks like a verification was going

23   on.

24       Q   Of what?

1        A   Of the homicide scene.

2        Q   So by 1830, you already knew that it was a

3    homicide scene; is that correct?

4        A   It was obvious, yes.

5        Q   Okay.  I'm just trying to fix times.

6            So the front side of the exhibit said that

7    you got there at 1645 hours?

8        A   Yeah.

9        Q   So 1830 hours is?

10       A   6:30.

11       Q   Okay.  The notification to dispatch, is

12   that generally the first notification that you

13   make if you come on a crime scene?

14       A   It's a series of notifications.  It

15   doesn't matter the order.

16       Q   Okay.  Then it says, "First Deputy Brown,

17   14489, 1840 hours"?

18       A   Yes.

19       Q   First deputy of the police department?

20       A   That reads first deputy's office, Officer

21   Brown answering the phone for the boss, and the

22   time we talked to him and his star number.

23       Q   Okay.  Thank you for breaking that down

24   for me.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              92

```
 1          Then next is -- does that say A/5/VC?
 2     A  Yes.
 3     Q  Area 5.
 4     A  Area 5, violent crimes.
 5     Q  Violent crime.
 6          Mantilla, 20778, 1856 hours?
 7     A  Yes.
 8     Q  Okay.  Is Mantilla a detective?
 9          MS. BARBER:  Objection; foundation.
10     A  Based on his star number, I would assume
11  so.
12     Q  What about the star number tells you that?
13     A  It starts with 20,000 series.
14     Q  And those are all detectives?
15          MS. BARBER:  Objection; foundation.
16     A  Yes.
17     Q  Okay.  I don't know, so that's why I'm
18  asking.
19          Then it says, "Crime lab, Sergeant Gray,
20  1127, 1852 hours"?
21     A  Yes.
22     Q  So the crime lab was notified.  Sergeant
23  Gray answered?
24     A  Yes.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    93

1      Q   And the notification was made at

2   1852 hours?

3      A   Yes.

4      Q   Okay.  Then it says "M.E."

5          That's the medical examiner?

6      A   Yes.

7      Q   Cantrell answered, No. 57, on scene?

8      A   Yes.

9      Q   Okay.  So Cantrell from the medical

10   examiner's office was on the scene?

11      A   Yes.

12      Q   Okay.  Of these notifications, which did

13   you make?

14      A   I can't remember who made what.

15      Q   Did you make any of them?

16      A   I made some notifications.  Corrie made

17   the other notifications.  We work together.

18      Q   The next piece of this report says, "Units

19   on scene," and by units you mean what?

20      A   Who is at the residence.

21      Q   Okay.  But units is a police term for

22   what?

23      A   For individual officers, detectives,

24   investigators, bosses showing up to the crime

1    scene.

2        Q   Okay.   So the first one says "Sergeant

3    Pena, 2095."   So --

4        A   That's our immediate sergeant.

5        Q   Okay.   Sergeant Doherty, 1462.

6        A   Yes.

7        Q   He's from the 14th District?

8        A   Yes.

9        Q   Do you know how or when Sergeant Doherty

10   arrived?

11       A   No.

12       Q   Then it says, Area 5, Detective Halvorsen,

13   20692.

14       A   Yes.

15       Q   Sergeant Mingey, 1731.

16       A   Sergeant, yes.

17       Q   Detective Guevara, 20861.

18       A   Yes.

19       Q   What time did Halvorsen arrive?

20           MS. BARBER:   Objection; foundation.

21       A   I don't remember.   I didn't have a watch

22   on.

23       Q   What about Sergeant Mingey?   When did he

24   arrive?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          95

1         MS. BARBER:  Same objection.

2     A  I can't answer that.  I don't know what

3  time.

4     Q  And how about Detective Guevara?  Do you

5  know what time he got there?

6     A  No, I don't.

7     Q  Okay.  Then it shows a Sergeant Stuart

8  from -- it says "2144 1410."

9         What do those numbers mean?

10     A  The sergeant's Star No. is 2144.  That's

11  the beat she was working on that day, 1410.

12     Q  Then Karalow, 13247 from beat 9603?

13     A  Yes.

14     Q  Do you know what function -- why was

15  Karalow there?

16         MS. BARBER:  Objection; form.

17     A  I don't remember what 9603 is.

18     Q  How about Harvey, 10582?

19         MS. BARBER:  Objection; form.

20     A  I don't know, ma'am.

21     Q  Lieutenant Riley?

22     A  That was our watch commander, our boss.

23     Q  And Barrett C.L., what is that?

24     A  I don't know.

1      Q   Do you know what C.L. means?

2      A   No, I don't.

3      Q   And Pusillo C.L., you don't know what that

4  means either?

5      A   I don't know what that is.

6      Q   Do you know what their function was at the

7  crime scene, if any?

8      A   I don't know.  That's not my pay grade.

9      Q   And then beat 50 -- maybe that's 554,

10  Boyle 20671.

11      A   Okay.

12          MS. BARBER:  What was the question there?

13  Are you asking -- if that's the question, if

14  you're asking if that's what it says, he can

15  answer that.  If you're asking if he knows that

16  person, he can answer that.  But it needs to be a

17  question.

18      Q   Do you know what function, if any, Boyle

19  had at the crime scene?

20      A   I don't know.

21      Q   How about Gutierrez?  Do you know what

22  function, if any, he or she had at the crime

23  scene?

24      A   Just based on their star numbers, they're

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    97

1    detectives.  That's all.

2        Q  And Forhnauer?

3        A  Frohnauer.

4        Q  Sorry?

5        A  Frohnauer.

6        Q  Who was that?

7        A  He was our relief.

8        Q  Meaning?

9        A  So we could go to the station and finish

10   up our paperwork, make notifications, and

11   everything else because we don't have access to

12   that at a crime scene.  I've got to be able to

13   make notifications at the police department.

14       Q  Oh, so the notifications that are noted

15   here were not made at the scene.

16       A  We don't ever mess with a crime scene, no.

17       Q  At what point did you leave 2071 North

18   Leavitt to go and do the notifications?

19       A  I don't remember.  I don't even have a

20   watch to this day.

21       Q  Well, if it says here that C.O.S. was

22   notified at 1830 hours --

23       A  That could be done on the radio.

24       Q  Okay.  So it doesn't necessarily refresh

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    98

```
1    your recollection that you were at the station by
2    1830 hours.
3        A  Right.
4        Q  Okay.  Is there anything that would
5    refresh your recollection about what time you left
6    the scene?
7        A  No.
8        Q  Is there anything that would refresh your
9    recollection about where you were when you made
10   these notifications that are indicated on
11   Exhibit 4?
12       A  No.
13       Q  The fact that this report notes units on
14   the scene, would that typically -- and in this
15   case, does it indicate that you were on the scene
16   when these people were on the scene?
17          MS. GOLDEN:  Compound.
18       A  No.
19       Q  How would you know they were on the scene
20   if you weren't there?
21       A  Sergeant Pena.
22       Q  Do you know if Sergeant Pena made a report
23   about his presence at 2071 North Leavitt on
24   April 1st or any other date?
```

1      A   I would not know that.  I'm not a

2   sergeant.

3      Q   The last person that's indicated units on

4   the scene is Riordan --

5      A   Riordan.

6      Q   -- 13696.

7          Who was Riordan?

8      A   Frohnauer's partner on 1432.

9      Q   And what, if any, purpose or function did

10  Riordan have at the scene, if you know?

11     A   None that I'm aware of.

12     Q   Was he relief with Frohnauer?

13     A   Yes.

14     Q   If you know, why did you need to be

15  relieved?

16         MS. GOLDEN:  Asked and answered.

17     A   So we can go to the police station, finish

18  our documentation, and use the phones.  We didn't

19  have cell phones back then.

20     Q   Okay.  If you know, what is the purpose of

21  having the beat officers who went on the

22  well-being check present through the investigation

23  at the scene?

24         MS. GOLDEN:  Object to form.

```
 1          MS. BARBER:  Same objection and misstates
 2    the testimony.
 3          MS. GOLDEN:  Assumes facts not in
 4    evidence.
 5       A  Crime scene protection.
 6    BY MS. SUSLER:
 7       Q  Can you say what you mean?
 8       A  Protecting the crime scene from anyone
 9    going in and out.
10       Q  Of the units on the scene that are listed
11    in Exhibit 4, were you there when Detectives
12    Guevara and Halvorsen arrived at the scene?
13       A  I don't remember.
14       Q  What did you see any detective do at the
15    scene?
16       A  I did not.
17       Q  You didn't see any detective do anything
18    at the scene?
19          MS. BARBER:  I'm just going to object to
20    the form of that question.
21       A  I wasn't watching them.
22       Q  How many detectives arrived at the scene
23    while you were still there?
24          MS. BARBER:  Objection; foundation.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    101

1        A  I don't know.

2        Q  More than one?

3        A  If they arrived at the crime scene, they

4   would talk to Sergeant Pena.  They wouldn't talk

5   to me.

6        Q  So you didn't talk to any of the

7   detectives at the scene?

8        A  Not me.

9        Q  Did you see Sergeant Pena talking to the

10  detectives?

11       A  He was talking to people.  I didn't know

12  who they were.

13       Q  What did you hear Sergeant Pena say to

14  people?

15       A  I was not privy to that conversation.

16       Q  How close were you to Sergeant Pena when

17  he was having these conversations?

18       A  I was a distance away.

19       Q  Where were you?

20       A  I don't remember, but I know I was not

21  involved in that group.  Once it gets to that

22  level, I mind my own business.

23       Q  Could you see Sergeant Pena having

24  conversations with the detectives?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    102

1       A  He was talking to people on the scene.  I
2   don't know what their function was.
3       Q  Did you see anyone enter the apartment?
4       A  No, not while I was there.
5       Q  Do you know if Sergeant Pena ever entered
6   the apartment?
7       A  No.
8       Q  You don't know, or he didn't?
9       A  Not while I was there.  I did not see him
10  get in the apartment.  He didn't even want to come
11  in with us.
12      Q  Is it fair to say, sir, that no one
13  entered the apartment while you were there after
14  you and your partner left the apartment?
15          MS. GOLDEN:  Objection to form.
16          MS. BARBER:  I'm sorry.  Can you read that
17  question back, please.
18          MS. SUSLER:  I'll ask it in a better way.
19      Q  When you and Bergadon left the
20  apartment -- before you left 2071 North Leavitt
21  and went back to the station to do your
22  notifications and reports, did you see anyone
23  enter the apartment?
24      A  No.  Absolutely not, it's a crime scene.

1      Q  As far as you know, are detectives allowed

2   to enter the crime scene?

3      A  I don't know what their job description

4   is.  I'm not a detective.

5      Q  Is there anything that would refresh your

6   recollection about how long you were at 2071 North

7   Leavitt on April 1st?

8         MS. BARBER:  Objection; asked and

9   answered.

10     A  Just the report here.  That's it.

11     Q  Exhibit 4 that we're looking at?

12     A  Yeah.  Whatever we wrote down, that's it.

13     Q  I'm looking at the front page of

14  Exhibit 4, and down at the bottom, it looks like

15  in the box for approval, Sergeant Mingey signed

16  it.

17        Do you see that?

18     A  No, that's not.

19     Q  What is that box where Sergeant Mingey's

20  name appears?

21     A  That's not Mingey.

22     Q  What does it say?

23     A  Sergeant Mike Ryan.

24     Q  Okay.  Down here it says Sergeant Mike

1   Ryan, 2188?

2        MS. BARBER:  I'm sorry.  Where are you

3   pointing?

4      A  2188, that's Sergeant Mike Ryan.

5   BY MS. SUSLER:

6      Q  Uh-huh.  And then up above where you see,

7   like, two boxes above where it says Sergeant

8   Mingey --

9      A  Okay.

10     Q  -- what is that box for, if you know?

11     A  It's the phone call notification to

12  Sergeant Mingey at Area 5, at Grand and Central.

13     Q  I see.  And Sergeant Ryan -- forgive if I

14  already asked you this.

15        Who is Sergeant Ryan, if you know?

16     A  That day he was the desk sergeant.

17     Q  At the 14th District?

18     A  Yes.

19     Q  And do you know why Sergeant Pena didn't

20  sign and approve the report?

21     A  The last I saw, he was still at the crime

22  scene.

23     Q  Do you know what, if any, relationship

24  Sergeant Mingey had to the investigation of the

1    crime scene that you discovered?

2        A  No.

3           (Valentin Deposition Exhibit 5 marked for

4    identification and attached to the transcript.)

5        Q  Let me show you what we have marked as

6    Valentin Deposition Exhibit 5.

7           Have you seen Exhibit 5 before?

8        A  This is my first time.

9        Q  Do you recognize whose handwriting that is

10   in the narrative portion of that exhibit?

11       A  I don't recognize the handwriting.

12       Q  Do you see at the bottom that it says

13   reporting Officer Frohnauer and Riordan?

14       A  Yes.

15       Q  Do you know whether Frohnauer and Riordan

16   made a report about their participation at 2071

17   North Leavitt?

18       A  I did not know.

19       Q  Did Frohnauer and Riordan arrive at the

20   scene while you were still at the scene?

21       A  Yes.

22       Q  What, if anything, did you say to them and

23   they say to you?

24       A  We needed to be relieved from the crime

```
 1    scene, and they were going to guard the crime
 2    scene so that we can go into the station, do our
 3    report, make notifications.  They were there to
 4    protect the crime scene from the people going in
 5    and out.
 6         Q  They were 14th District officers as well?
 7         A  At that time, yes.
 8         Q  And when they got there, what did you say
 9    to them?
10         A  We need to go into the station and finish
11    up.
12         Q  What did you hear your partner say to them?
13         A  Nothing.
14         Q  What did they say to you?
15         A  Okay.
16         Q  Did you tell them anything about the crime
17    scene?
18         A  Just double-homicide scene, and it's a
19    mess.
20         Q  Anything else you said to them?
21         A  That's it.
22         Q  When you said "it's a mess," what did you
23    mean?
24         A  A heinous crime scene.
```

1    Q   Is there a way to tell from looking at

2    Exhibit 5 what time Frohnauer and Riordan arrived

3    at the scene?

4        MS. BARBER:  Objection; foundation.

5        You can take your time in reviewing the

6    report.

7        THE WITNESS:  Okay.

8    A   I don't see where they would have written

9    that.

10   Q   I'll show you what I'll mark as Exhibit 6.

11       (Valentin Deposition Exhibit 6 marked for

12   identification and attached to the transcript.)

13       Do you recognize what I've shown you?

14   A   Yes.

15   Q   What is it?

16   A   It's the missing case report.

17   Q   Is this one of the documents your lawyer

18   showed you when you were preparing for your

19   deposition?

20   A   Yes.

21   Q   Your name appears as one of the reporting

22   officers?

23   A   Yes.

24   Q   Whose handwriting is this report?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    108

1      A   Mine.

2      Q   When did you make this report?

3      A   At the station.

4      Q   It says at the bottom right-hand corner,

5  date investigation completed, April 1, 2355 hours.

6      A   Yes.

7      Q   Does that mean the time this report was

8  submitted?

9      A   Yes.

10     Q   So you were -- where were you when you

11 made this report?

12         MS. GOLDEN:   Objection; asked and

13 answered.

14     A   14th District.

15     Q   So you were at the 14th District by at

16 least 2355 hours?

17     A   That's correct.

18     Q   Does this help you remember what time you

19 got to the station?

20     A   No, it don't.

21     Q   Do you know how long you were at the

22 station by the time you made this report?

23     A   I don't remember what time I got there or

24 how long I got there because I don't have a watch.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    109

```
 1   I don't pay attention to time.  I just wanted to
 2   get my report done and be out of there.
 3        Q   In military time, when did your shift end?
 4        A   Military time, 0030 hours of the next day.
 5        Q   So this is not too long -- this report was
 6   made not too long before the end of your shift.
 7        A   Correct.
 8        Q   Where did you get the information that you
 9   put on this report?
10        A   From the family member.
11        Q   Which family member?
12        A   Rosa Aranda.
13        Q   The part on the back page -- just for the
14   record, this is RFC-Solache/Reyes 388 and 389.
15            On the back part, the narrative, that's
16   your handwriting in the top part?
17        A   Yes.
18        Q   You wrote, "Missing was not found at 2071
19   North Leavitt when R/Os went to try to locate
20   them.  This is in relation with RD 198126.  At
21   location Area 5 detectives did not find missing
22   after their investigation."
23            Did I read that correctly?
24        A   Yes.
```

1       Q   So were you present at the scene when

2   Area 5 detectives looked for the missing children?

3       A   No.

4       Q   How did you know the information that you

5   wrote here, that the detectives didn't find them?

6       A   Sergeant Pena.

7       Q   How did he notify you?

8       A   He called the station.

9       Q   Do you know what, if any, investigation

10  the detectives did in order to try to find the

11  missing children at the scene?

12      A   No, I do not.

13      Q   What did Sergeant Pena tell you when he

14  called you at the station?

15      A   The information we wrote down.  That's it.

16      Q   When you say the information you wrote

17  down, are you referring to Exhibit 6?

18      A   Yes.

19      Q   I'm going to show you what we will mark as

20  Valentin Deposition Exhibit 7.

21          (Valentin Deposition Exhibit 7 marked for

22  identification and attached to the transcript.)

23      Q   Do you recognize that, sir?

24      A   Yes.

1       Q   What is that?

2       A   It's a missing case report made out for

3   the child in the double homicide.

4       Q   Okay.  Now, Exhibit 6 was for the infant

5   girl?

6       A   Yes.

7       Q   And Exhibit 7 is for the autistic

8   three-year-old?

9       A   Yes.

10      Q   And this one is RFC-Solache/Reyes 386 and

11  387.

12          Is that again your handwriting, sir?

13      A   Yes.

14      Q   And the information is again from Rosa

15  Aranda?

16      A   Yes.

17      Q   And on the back side, 387, you wrote the

18  same thing you had written in Exhibit 6?

19      A   Yes.

20      Q   That information came from when the

21  sergeant called you?

22      A   Yes, Sergeant Pena.

23      Q   When you were in the apartment at 2071

24  North Leavitt either time that you went in, did

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    112

```
 1   you see broken glass from a source other than the
 2   pane in the door that was broken to gain entry?
 3       A  I can't recall.  We didn't have the lights
 4   on.  We were trying to preserve the crime scene.
 5       Q  What specifically did you do to try to
 6   preserve the crime scene?
 7       A  Try not to disturb the crime scene.
 8       Q  You didn't touch either of the bodies, did
 9   you?
10       A  No.
11       Q  As far as you know, your partner didn't
12   either?
13       A  I don't know.
14       Q  Can you think of a reason why a patrol
15   officer doing a well-being check would touch a
16   crime victim's body?
17       A  To confirm they're deceased is the only
18   reason.
19       Q  Did either of you move the position of
20   either of the victims?
21       A  No.
22       Q  You wouldn't do that.
23       A  No.
24       Q  Nobody should do that.
```

```
1       A   No.

2           MS. BARBER:  Objection.

3           MS. GOLDEN:  Form, foundation, incomplete

4   hypothetical.

5   BY MS. SUSLER:

6       Q   What else did you do to preserve the

7   scene?

8           MS. BARBER:  Objection; foundation, asked

9   and answered.

10      A   We touch as little as possible.  We don't

11  want to touch the light switches.  We try and

12  delicately move things to look, try not to move

13  things around, not if we don't have to because we

14  don't want to upset the integrity of the crime

15  scene.

16      Q   Anything else you did to try to preserve

17  the crime scene that you haven't already told me?

18      A   Nothing.

19      Q   Once you left the scene to return to the

20  14th District, did you ever go back to that

21  address?

22      A   No.

23      Q   Did you do any other -- did you have any

24  other participation in the investigation of the
```

```
 1   murders --

 2        A   No.

 3        Q   -- or the kidnappings?

 4        A   Not in my pay grade, no.

 5        Q   Did you do any other work in any way on

 6   the case?

 7        A   No.

 8        Q   Were you present on April 1st when the

 9   crime scene technicians took photographs of the

10   scene?

11        A   No.

12        Q   Let me show what you we'll mark as

13   Valentin Exhibit No. 8.

14            (Valentin Deposition Exhibit 8 marked for

15   identification and attached to the transcript.)

16        Q   Is this something you've seen before?

17        A   Never.

18        Q   Okay.  If you look -- it's a crime scene

19   processing report.  If you look -- and it's

20   RFC-Solache/Reyes 482.

21            If you look at the bottom right-hand

22   corner where it says "beat officer's name," do you

23   see your name there, sir?

24        A   Yes.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              115

1      Q  Do you know why your name is on this
2  report?
3      A  Probably because of the general offense
4  case report.
5      Q  Exhibit 4?
6      A  Yeah.  The initial report.
7      Q  But do you know why your name would appear
8  on a crime scene processing report just because
9  you made a case report?
10     A  I don't know.
11        MS. GOLDEN:  Object to form.
12     Q  You don't know?
13     A  It's not in my pay grade.  It's not my job
14  description.
15     Q  All right.  Exhibit 8 indicates that the
16  investigating officer's name, on the same line as
17  yours but to the left, are Halvorsen and Guevara.
18        Do you see that?
19     A  Yes.
20     Q  Did you ever have any conversations with
21  either Halvorsen or Guevara about the offenses
22  that you discovered?
23     A  No.
24     Q  And let me show you what we'll mark as

1    Exhibit 9.

2         (Valentin Deposition Exhibit 9 marked for

3    identification and attached to the transcript.)

4    BY MS. SUSLER:

5        Q  Have you ever seen this piece of paper

6    before?

7        A  Never.

8        Q  Exhibit 8 was a crime scene processing

9    report from April 1st.  This one, Exhibit 9, is a

10   crime scene processing report from April 17th.

11        Were you present on April 17th when crime

12   scene photos were taken?

13       A  No.

14       Q  And, again, if you see your name at the

15   bottom right where it says beat officers --

16       A  Uh-huh.  Yes.

17       Q  -- do you know why your name appears on

18   this report?

19       A  Probably to tie in with the general

20   offense case report.

21       Q  The same as for Exhibit 8, as you

22   mentioned?

23       A  Yeah.  What's that 4, I think, it is?  The

24   case report.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    117

1       Q   Yeah.   Right.

2       A   To tie in with that is the only thing I

3   can -- the only reason I can think of.

4       Q   All right.   So on Exhibit 8, it says

5   reporting technicians are Karalow and Harvey.

6           Those are, if you look at Exhibit 4, two

7   of the names that appear where it says units on

8   the scene?

9       A   Uh-huh.   Yes.

10      Q   Were you present when the two reporting

11  technicians arrived at 2071 North Leavitt?

12      A   No.

13      Q   Did you see anybody take pictures that

14  day?

15      A   No.

16      Q   What do you know about photographs that

17  Karalow and Harvey took on April 1 of 1998?

18          MS. GOLDEN:   Objection.

19          MS. BARBER:   Objection; form, foundation,

20  speculation.

21      A   I have no knowledge about their job

22  description.

23      Q   Well, I'm not asking about their job

24  description.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              118

```
1        A   Or what they do.  I don't know what
2   they do.
3        Q   What information do you have about any
4   photographs that they took on April 1, 1998, at
5   2071 North Leavitt?
6            MS. BARBER:  Objection; form, foundation,
7   speculation.
8            MS. GOLDEN:  And potentially calls for
9   privileged communication.
10       A   None.
11       Q   And in terms of Exhibit 9, the reporting
12  technicians are Dennis Stankus and John Naujokas.
13           What information do you have about
14  photographs they took at 2071 North Leavitt on
15  April 17th of 1998?
16       A   Zero.
17       Q   Let me show you what we'll mark as
18  Deposition Exhibit 10.
19           (Valentin Deposition Exhibit 10 marked for
20  identification and attached to the transcript.)
21           MS. BARBER:  I assume you're going to ask
22  questions about this report; right?
23           MS. SUSLER:  Yes.
24           MS. BARBER:  Okay.  You have the
```

1    opportunity to review the report, and you can take

2    the time --

3          MS. SUSLER:  Of course.

4          MS. BARBER:  -- that you need to answer

5    any questions.  There's no rush at all.  If she is

6    going to be asking you questions from the report,

7    you can review it and take your time.

8    BY MS. SUSLER:

9      Q  Have you ever seen this before?

10     A  No, I have not.

11     Q  Okay.  I'm going -- you're certainly free

12   to read the entire report, but just to focus your

13   attention, I'm going to be asking you questions

14   about what's on page 5.

15         And just for the record, this is

16   RFC-Solache/Reyes 468 through 476.

17         You can let me know -- take your time, and

18   let me know when you're ready.

19     A  Okay.

20     Q  All right.  Directing your attention to

21   page 5 of Exhibit 10, the paragraph where it says

22   investigation.

23     A  Uh-huh.

24     Q  About five lines down.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    120

```
1        A   Uh-huh.
2        Q   Toward the end here, it says, "The
3    reporting detectives spoke with Sergeant Pena,
4    2095; and Officers C. Bergadon, 10931; and D.
5    Valentin, 4746."
6            Do you see where it says that?
7        A   Yeah.
8        Q   Did you speak with the reporting
9    detectives who were Halvorsen and Guevara?
10       A   No.
11           MS. GOLDEN:  Objection; asked and
12   answered.
13       Q   So this report is just wrong?
14       A   I didn't do this report.
15       Q   No, that's not my question.
16           I guess my question is if the person who
17   did the report said that Guevara and Halvorsen
18   spoke to you, that would not be true?
19       A   Yes.
20       Q   Yes, it's not true?
21           MS. GOLDEN:  I'm going to object --
22   belated objection to form and foundation.
23       Q   I just want to make sure that came out
24   right.
```

1          Is what this report says, that Detectives

2    Halvorsen and Guevara spoke with you true?

3          MS. GOLDEN:  Same objections.

4     A  No.

5     Q  On the next page, page 6, the reporting

6    detectives, Halvorsen and Guevara, wrote and I'm

7    pointing so that you can see it.  It's, like, six

8    or seven lines from the bottom of the first large

9    paragraph on page 6.

10    A  Yes.

11    Q  Where it says, "Reporting detectives

12    observed the body of a female, white Hispanic

13    adult laying on the floor in the bedroom just

14    inside this door."

15         Do you see where it says that?

16    A  Yes.

17    Q  That's not the position that you saw the

18    female victim, is it?

19         MS. BARBER:  Objection; form.

20    A  No.

21    Q  All right.  Because you saw her in a fetal

22    position in the middle of the bed.

23    A  Yes.

24    Q  So are you aware of whether anyone moved

```
 1   her body from the bed to the floor?

 2        A   No.

 3        Q   Do you know if, in fact, she was on the

 4   floor, how she got to the floor?

 5        A   No.

 6        Q   Did you testify at the trial of this case?

 7        A   Yes.

 8        Q   Okay.  Before I get to that, let me ask

 9   you, the blankets that you found on top of the

10   woman who died, do you know whatever happened with

11   them?

12        A   No.

13        Q   Do you know whether they were taken into

14   evidence?

15        A   I wasn't there, no.

16        Q   Do you know whether they were ever

17   analyzed for any kind of DNA?

18        A   That's not my job.

19        Q   But my question is do you know whether

20   they were ever analyzed?

21        A   No.

22        Q   Have you seen the transcript of your

23   testimony at the trial of this case?

24        A   Yes.
```

1      Q   Is that one of the things your lawyer

2   showed you?

3      A   Yes.

4      Q   Did you read the transcript?

5      A   Yes.

6      Q   And when your lawyer showed it, was that

7   the first time you had seen the transcript?

8      A   Yes.

9      Q   Did you see anything in that transcript

10  that you thought was incorrect?

11        MS. GOLDEN:  Object to form, foundation.

12     A   There was some misspellings.

13     Q   Other than misspellings?

14     A   I think I saw an address was incorrect.

15  Maybe they didn't hear the address correctly.

16     Q   That's fair.

17        Any other errors that you saw in the

18  testimony in terms of what you testified to?

19     A   No.

20     Q   What, if anything, do you know about what

21  happened to solve this crime?

22        MS. GOLDEN:  Object to form.

23     A   I know nothing.

24     Q   Do you know whether it was ever solved?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                      124

```
 1    Whether anybody was ever arrested for it?
 2           MS. GOLDEN:  Objection; asked and
 3    answered.  Withdrawn.
 4           MS. BARBER:  You can go ahead.
 5           THE WITNESS:  I was waiting.
 6       A  Only what I know of in the news media.
 7    BY MS. SUSLER:
 8       Q  What did you hear or see in the news
 9    media?
10           MS. BARBER:  Objection; asked and
11    answered.
12       A  The reports that everybody else got.  Two
13    persons are in custody for what happened over
14    there at 2071 North Leavitt.
15       Q  Was there anything else you ever learned
16    about the case?
17           MS. BARBER:  Objection; form.
18       A  All that was known in the public.
19       Q  Well, what did you learn?
20           MS. BARBER:  Objection; asked and
21    answered.
22       A  Persons in custody.
23       Q  Did you ever learn anything else about the
24    case?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              125

```
 1          MS. BARBER:  Objection; asked and
 2   answered.
 3        A  No.
 4   BY MS. SUSLER:
 5        Q  Did you ever learn anything about
 6   Detective Guevara and his relationship to the case
 7   and the investigation?
 8          MS. BARBER:  Objection; form, foundation.
 9        A  No.
10        Q  Have you ever learned anything about
11   Detective Guevara and the number of exonerations
12   of cases that he investigated?
13        A  I have no knowledge of that.
14        Q  Do you know that the people who were
15   convicted of the murders of the Sotos and the
16   abduction of their children were exonerated?
17          MS. GOLDEN:  Object to form.
18        A  I do not know that.
19        Q  Did you know they were exonerated after
20   they served 20 years in prison?
21          MS. GOLDEN:  Same objection, form.
22        A  No.
23        Q  After April 1st of 1998, when was the next
24   time you had any contact with Detective Guevara?
```

```
 1       A   None.

 2       Q   Is this the only case that you

 3   participated in where Detective Guevara was the

 4   detective?

 5          MS. GOLDEN:  Objection; form and

 6   foundation.

 7       A   Yes.

 8       Q   While you were in the 14th District from

 9   December of '94 to May of 2002, what was Detective

10   Guevara's reputation?

11          MS. BARBER:  Objection; form, foundation.

12       A   I don't know.  I never pay attention.

13   He's an officer that shows up to do his job.

14   That's it.

15       Q   What is his reputation in the police

16   community in which you circulate today?

17          MS. BARBER:  Objection; form, foundation.

18       A   I don't know the man.  I don't know his

19   character.

20       Q   And what do people say about him?

21          MS. BARBER:  Objection; form, foundation.

22       A   I never talk about the guy.

23       Q   Are you a member of the FOP?

24       A   Yes, I am.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                        127

```
 1        Q   How long have you been a member?
 2        A   25 years.
 3        Q   Do you know whether Detective Guevara is a
 4   member of the FOP?
 5        A   I can't answer that.
 6        Q   Why?
 7        A   I don't know.  I don't know the gentleman.
 8        Q   Are you aware of whether the FOP has ever
 9   issued a public statement about Detective Guevara?
10        A   No.
11        Q   Are you a member of the Puerto Rican
12   Police Association?
13        A   No.
14        Q   Have you ever been?
15        A   Yes.
16        Q   When?
17        A   In the '90s.
18        Q   Was Detective Guevara a member at the
19   time?
20            MS. BARBER:  Objection; foundation.
21        A   I don't know.
22        Q   How long were you a member?
23        A   A couple years.
24        Q   Are you aware if the Puerto Rican Police
```

1   Association has ever issued a public statement

2   about Detective Guevara?

3       A  No.

4       Q  Is there anything else you know about the

5   investigation of the Soto murders and abductions

6   that you haven't told me?

7           MS. BARBER:  Objection; form.

8       A  Nothing else.

9           MS. SUSLER:  I have no further questions

10  right now.  If you want to take a quick break.

11          MS. GOLDEN:  Yes.  And if you have

12  statements from either the FOP or the Puerto Rican

13  Police Association, we'd like them.

14          MS. SUSLER:  I have none.

15          MS. GOLDEN:  I'm just wondering.  It seems

16  like you do.

17          MS. SUSLER:  Why would you say that?

18          MS. GOLDEN:  Because your questions are so

19  specific, I thought you were talking about

20  something.

21          MR. STARR:  If you have statements from

22  the FOP or the Puerto Rican Police Association,

23  we'd like them as well.

24          MS. GOLDEN:  I got you.

```
1            MR. STARR:  Okay.

2            MS. SUSLER:  All right.  We'll be back in

3    a couple minutes.

4            (A recess was taken from 12:42 p.m. to

5    12:53 p.m.)

6            MR. STARR:  Go back on the record.

7     EXAMINATION BY COUNSEL FOR PLAINTIFF DeLEON-REYES

8    BY MR. STARR:

9        Q  Good afternoon, Mr. Valentin.

10       A  Good afternoon, sir.  How are you doing?

11       Q  Good.  My name is Sean Starr.  I represent

12   Plaintiff Reyes in this case.

13       A  Okay.

14       Q  I'm going to ask you a few questions.  I

15   will try to be brief so we can get you out of

16   here.

17          Have you ever been a plaintiff or a

18   defendant in another lawsuit?

19       A  Sure.

20       Q  Okay.  Have you been a plaintiff in a

21   lawsuit?

22       A  Not a plaintiff, a defendant.

23       Q  How many times have you been a defendant?

24       A  A couple times.
```

```
1        Q   Okay.  And have you been a defendant in a
2    lawsuit as part of -- stemming from your
3    employment with CPD?
4        A   Yes.
5        Q   Okay.  Could you give me a brief synopsis
6    of each case that you've been a defendant in?
7        A   One was a car chase that ended up badly.
8        Q   And you were a defendant in that one, sir?
9        A   Yes.
10       Q   And what was the outcome of that case?
11       A   The City settled.
12       Q   Do you remember any of the other ones?
13       A   The other one I was accused of excessive
14   force.
15       Q   Excessive force.
16           And you were a defendant again in that
17   one?
18       A   Yes.
19       Q   And what was the outcome or resolution of
20   that case?
21       A   Exonerated.
22       Q   Now, when you say "exonerated," did it go
23   to trial?
24       A   Yes.
```

1      Q   Okay.  It was a civil case?

2      A   It was a civil case in federal court.

3      Q   Okay.  Do you know the name of that case?

4      A   This was many years ago.  I can't remember

5   anymore.  I was just relieved.

6      Q   I'm sure.

7          And then were there any other ones?

8      A   Those are the two that I was involved in.

9      Q   Do you know the name for the car chase

10   case?

11      A   It happened in 1995 so I --

12      Q   What about the other one?  Do you have an

13   approximate time period for the other one?

14      A   Late '90s.

15      Q   And then as an employee of the Chicago

16   Police Department, have you ever been subject to

17   any discipline?

18      A   Yes.

19      Q   Do you have a ballpark figure on the

20   number of times you've been disciplined?

21      A   A couple times.

22      Q   And what form of discipline have you been

23   subjected to?

24      A   Days off.

1      Q   And are these -- this discipline -- strike

2   that.

3          Do you know if you have any CR numbers?

4      A   Right now?

5      Q   In your whole career.

6      A   Yes.

7      Q   Do you know how many?

8      A   I don't know what the exact number is.

9      Q   Would it be more than five?

10     A   Around five.

11     Q   And the discipline that you received, was

12  it a result of a CR number?

13     A   One was.

14     Q   One of them.

15         And what was that CR for?  Do you recall?

16     A   Violation of electronic communication

17  policy, bad texting.

18     Q   And what was the discipline you received

19  for that?

20     A   10-day suspension.

21     Q   Any other CRs that resulted in

22  suspension -- or I'm sorry -- yeah, suspension

23  that you can recall?

24     A   Yes.  A CR for a traffic crash.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                              133

```
 1        Q   What was the discipline imposed in that
 2   case?
 3        A   Three days.
 4        Q   Any other suspensions stemming from CRs?
 5        A   That's it.  That's all I can remember.
 6        Q   Any other forms of discipline stemming
 7   from a CR?
 8        A   No.
 9        Q   Could you explain what you meant when you
10   said "bad texting" earlier?  What did that entail?
11        A   Guys were sending jokes and texting, and
12   some people took offense to it.  That's all.
13        Q   Who took offense to it?
14        A   One of the recipients.
15        Q   Was it a male or a female?
16        A   Male.
17        Q   What was the nature of the text that they
18   took offense to?
19        A   It was a joke about -- racial in nature.
20        Q   Okay.
21        A   He didn't take too kindly to it.
22        Q   Okay.  All right.  Have you ever been
23   accused of falsifying evidence?
24        A   No.
```

```
1       Q  Have you ever been accused of suppressing
2   evidence?
3       A  No.
4       Q  Have you ever been accused of coercing a
5   witness or any kind of false confession?
6       A  No.
7       Q  Do you have any misconduct that we haven't
8   talked about that you've been accused of?
9       A  No, that's it.  Just looking to retire.
10      Q  Do you have a retirement date?
11      A  A couple years.
12      Q  Good for you.
13      A  That's why I'm at the airport.
14      Q  Fair enough.
15         Do you have any conditions, medical or
16   otherwise, that may affect your ability to
17   communicate truthfully today?
18      A  No.
19      Q  Do you take any medications that might
20   affect your ability to communicate truthfully?
21      A  No.
22      Q  Did you graduate from high school?
23      A  Yes.
24      Q  Where did you go to high school, sir?
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    135

1        A   Kelvyn Park High School.

2        Q   I live down the street.

3        A   Oh, I'm been in the neighborhood for a

4    long time.

5        Q   What about college?  Did you go to

6    college, sir?

7        A   Yes.

8        Q   Where did you go to college?

9        A   I graduated with an associate's degree

10   from Wright College, and I got a bachelor's degree

11   and a master's degree from Calumet College of

12   St. Joseph.

13       Q   I'm sorry.  You graduated with a

14   bachelor's degree from Wright College, and what

15   was the second part of that?

16       A   No.  Associate's degree from Wright

17   College, bachelor's degree from Calumet College of

18   St. Joseph, and also I got a master's degree from

19   Calumet College of St. Joseph, and they're out of

20   Indiana.

21       Q   And what was your undergrad degree and

22   your bachelor's degree in?

23       A   Law enforcement management.

24       Q   What about your master's degree?

```
 1        A   Law enforcement management.

 2        Q   Are you from the city?

 3        A   Yes.

 4        Q   What neighborhood are you from?

 5        A   Born and raised in Humboldt Park, and I

 6   live in Logan Square currently.

 7        Q   Are you married sir?

 8        A   No.

 9        Q   Divorced?

10        A   No.

11        Q   Any kids?

12        A   One.

13        Q   What size shoe do you wear?

14        A   Size shoe?

15        Q   Yeah.

16        A   11.

17        Q   And how tall are you?

18        A   5-5.

19        Q   Back in 1998, March, April of 1998, the

20   night that you went out to the incident --

21        A   Yes.

22        Q   -- were you wearing patrol blues like

23   you're wearing now or were you wearing

24   plainclothes?
```

1      A   Patrol blues, I remember it being an

2   inclement weather day.  So I had a jacket on.  I

3   had my hat on.  You know, it was impending bad

4   weather.

5      Q   Do you remember when you went to the

6   scene, was the sun still up?

7      A   It was gray, overcast, kind of crappy.

8          Pardon the French.

9      Q   I'm okay with that.

10         And by the time you left, do you recall if

11  the sun was still up?

12     A   Oh, it was dark.

13     Q   Did you have any particular type of shoes

14  that you wore when you wore your blue uniform?

15     A   Just my regular police boots.

16     Q   Are those department issue?

17     A   No.

18     Q   You buy them separate?

19     A   We buy them separate with our uniform

20  allowance.

21     Q   Is there any kind of requirements on what

22  kind of boots you can wear?

23     A   Only they have to be black.

24     Q   And you were wearing them the day that you

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    138

```
1    went to the scene of the crime?
2         A   Yes.
3         Q   Do you know if your partner was wearing
4    black boots the day of the crime?
5         A   I don't know.  I can't answer that.  I
6    don't look at him like that.
7         Q   Was he required to, though?
8         A   Yes.
9         Q   Did he usually wear black boots as well?
10        A   Either black boots or black gym shoes,
11   either/or.
12        Q   Do you know what size shoes he wears, by
13   any chance?
14            MS. BARBER:  Objection; foundation.
15        A   No.
16        Q   Okay.  Do you recall what brand name boots
17   you wore?
18        A   Whatever was on sale at Payless.
19        Q   Payless, is that where you would buy them?
20        A   Yeah.  And they're out of business now,
21   so.  They were good and cheap.
22        Q   During your time at the academy, did you
23   go through a training regimen?
24        A   Yes.
```

1    Q  Were you trained on a wide variety of

2  topics related to your police employment?

3    A  Yes.

4    Q  Did you receive any training after you

5  left the academy?

6    A  We only get, like, online training, maybe

7  in-service training.  That's about it.

8    Q  How frequently would you receive either of

9  those?

10   A  Probably once a year.

11   Q  Okay.  And in-service training, can you

12  explain what that means?

13   A  For example, I just had just recently

14  use-of-force training, two days.

15   Q  Like a seminar?

16   A  It's like a refresher on the use of force,

17  the law.  They discuss certain scenarios and

18  current events actually.  What should have been

19  done, what could have been avoided, kind of thing,

20  so that we don't wind up on your wall over here.

21   Q  Fair enough, sir.

22      Do you recall ever being trained on

23  preservation of a crime scene?

24   A  Yes.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    140

```
 1      Q   And when was that training?
 2      A   The academy.
 3      Q   Do you recall how extensive that training
 4  was?  Was it like a day of training on that or
 5  more than that?
 6          MS. BARBER:  Objection to form.
 7      A   I would have to look at the records.  I
 8  don't even know anymore.  It's been 25 years for
 9  me.  I ain't going to lie.
10      Q   Did you ever have any refreshers on the
11  preservation of a crime scene?
12      A   No.
13      Q   Did you ever have any training on evidence
14  inventory?
15      A   No.
16      Q   What about evidence handling?
17      A   In the academy, yes.
18      Q   Okay.  And did you have any follow-up
19  refresher training on evidence handling that you
20  can recall?
21      A   When they rolled out the
22  computer-generated evidence inventory.  It's a
23  computer program now, whereas prior when I got on,
24  we did it on paper.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                           141

1      Q   Okay.  So you were trained on the changes

2   and how to --

3      A   The updated, yeah.

4      Q   Okay.

5      A   How to inventory from the old system to

6   the new computer-generated system, and they gave

7   us training on evidence, inventory, tracking, and

8   all that stuff.

9          MS. BARBER:  Just wait until he's done

10  asking his question before you answer so that you

11  know exactly what --

12         THE WITNESS:  I'm sorry.

13         MS. BARBER:  -- the question is.

14         THE WITNESS:  Okay.

15     Q   Did you ever receive any training on

16  filling out police reports?

17     A   Yes.

18     Q   And was that training also training that

19  you had at the academy?

20     A   Yes.

21     Q   And have you had any subsequent refresher

22  courses on that?

23         MS. BARBER:  Objection; form.

24     A   Yes, updates.

```
 1    BY MR. STARR:

 2        Q   Updates meaning?

 3        A   It's all computerized now.

 4        Q   Just so we're clear, and forgive me if

 5    this was asked previously by my co-counsel, you

 6    never spoke to Ray Guevara about this case;

 7    correct?

 8            MS. BARBER:  Objection; asked and answered

 9    and foundation.

10        A   No.

11        Q   At any point in time; correct?

12        A   No.

13        Q   And you never spoke to Detective Halvorsen

14    about this case; correct?

15        A   No.

16            MS. BARBER:  Same objections.

17        Q   Do you know a police officer by the name

18    of Daniel Trevino?

19        A   The name sounds familiar.  I don't know

20    him personally.

21        Q   Do you have any recollection of ever

22    talking with a police officer by the name of

23    Daniel Trevino about this case?

24        A   Not about this case, no.
```

1      Q   What about a police officer named Robert

2   Rutherford?  Do you know him?

3      A   No.

4      Q   Do you have any recollection of talking to

5   a Robert Rutherford who works for the police

6   department about this case?

7      A   No.

8      Q   Do you have any recollection whatsoever of

9   anyone named Arturo Reyes?

10     A   I don't know who that is.

11     Q   Did you ever interview anyone named Arturo

12  Reyes?

13     A   No.

14     Q   Did you ever even see anyone named Arturo

15  Reyes?

16     A   No.

17     Q   You never participated in any police

18  investigation of Arturo Reyes, did you?

19     A   It's not my job description.

20     Q   I'm going to ask you the same questions

21  about someone named Gabriel Solache.

22         Does that name ring any bells?

23     A   Only recently here.  That's it.

24     Q   And did you ever interview Mr. Solache?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    144

```
1        A   No.

2        Q   Did you ever see Mr. Solache?

3        A   No.

4        Q   Did you ever participate in the police

5    investigation of Mr. Solache?

6        A   I'm not an investigator, no.

7        Q   The last line of questions about that,

8    about a woman named Adriana Mejia.

9            Does that name ring any bells?

10       A   No.

11       Q   Do you ever recall interviewing an Adriana

12   Mejia?

13       A   No.

14       Q   Do you recall seeing an Adriana Mejia?

15       A   No.

16       Q   Do you ever recall participating in a

17   police investigation of Adriana Mejia?

18       A   I'm just a beat cop, no.

19       Q   Fair enough.

20           Did anyone ever speak to you about any of

21   those three people?

22       A   No.

23       Q   Is there anything that would refresh your

24   recollection about any of those three people?  Any
```

1    documents that you can think of?

2        A  No.

3        Q  Do you recall my co-counsel asking you

4    about your testimony at the criminal trial?

5        A  Yes.

6        Q  Do you recall what you did in preparation

7    for that testimony?

8        A  I reviewed case reports, the general

9    offense case report.  That was about it.  I mean,

10   there was nothing more of my involvement other

11   than that.

12       Q  You never met with anyone from the Chicago

13   Police Department in preparation?

14       A  No.

15       Q  Did you ever meet with the state's

16   attorney in preparation?

17       A  Yes.

18       Q  Do you recall what state's attorney that

19   was?

20       A  I can't remember.

21       Q  Do you remember if it was a man or a

22   woman?

23       A  I can't remember that.

24       Q  Was it just one state's attorney?

1      A   Yes.

2      Q   And do you recall how many times you met

3   with that state's attorney?

4      A   Probably the day of the trial.  That's it.

5      Q   Did you have any communications with

6   anybody else about this case?

7      A   No.

8      Q   I'm going to refer your attention back to

9   Exhibit 4.  I think it's the general offense case

10  report; right?

11     A   Yes.

12     Q   And then in the witness box, there's three

13  individuals listed:  Rosa Aranda, Felicia Soto,

14  Alfredo Aranda; right?

15     A   Yes.  That's correct.

16     Q   You testified that you spoke to Rosa and

17  Alfredo; correct?

18     A   Yes.

19     Q   Do you remember speaking to Felicia Soto?

20     A   I don't remember if I did or not.  There

21  might have been a couple comments.  I don't

22  remember.

23     Q   Okay.  Do you recall the other family

24  members that were there?  Were they males or

```
 1   females?
 2        A  I can't remember.
 3        Q  Okay.  Do you remember speaking to anyone
 4   named Raul Aranda?
 5        A  No.
 6        Q  Do you recall speaking to anyone named
 7   Jorge Soto?
 8        A  If it's not on here, no.
 9        Q  If you had spoken to them, would you have
10   listed their names on here?
11        A  Yes.
12        Q  Let me ask you about the maintenance man
13   or the landlord that you testified about earlier.
14   I don't believe his name is listed on here.
15           Oh, is he?  At the back, sorry.  Okay.  My
16   apologies.  It is on the back there, Raul Delira.
17           You testified that his hands were shaking
18   and he seemed nervous; is that correct?
19        A  Yes.
20        Q  Did you consider him a suspect in this
21   incident?
22           MS. BARBER:  Objection; form, foundation.
23        A  That's not for me to say.
24        Q  I'm just asking.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    148

1           Did you consider him a suspect?

2      A  No.

3      Q  Was Sergeant Pena there when he was -- his

4  hands were shaking?

5      A  Yes.

6      Q  Did he observe that?  Do you know?

7           MS. GOLDEN:  Foundation.

8           MS. BARBER:  Objection.  Yes.  Join in

9  that objection.

10     A  I don't know what his vantage point was in

11  relation to the door.

12     Q  Did you consider any of these other people

13  suspects?

14     A  No.

15     Q  Okay.  Did anyone ever tell you that Raul

16  Delira was a suspect?

17     A  No.

18     Q  Did anyone ever tell you that Rosa Aranda

19  was a suspect?

20     A  No.

21     Q  What about Felicia Soto?

22     A  No.

23     Q  What about Alfredo Aranda?

24     A  No.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                        149

```
 1        Q   Any other family members that were there,
 2   did anyone ever tell you that they were suspects?
 3        A   No.
 4        Q   Okay.  Did anyone ever tell you anything
 5   about any suspects in this case?
 6        A   No.
 7        Q   You testified that you found a female in a
 8   fetal position in a bed; correct?
 9        A   Yes.
10        Q   What size bed was that?  Do you recall?
11        A   A queen-size bed.
12        Q   A queen-size bed.
13            And you testified that you took blankets
14   off of her and discovered her; is that correct?
15        A   Yes.
16        Q   When you took the blankets off her, did
17   you observe any wounds on the female?
18        A   When I shined my flashlight, I saw stab
19   wounds on her back.
20        Q   On her back?
21        A   Yeah.
22        Q   Okay.  Did she have clothes on?
23        A   I think she -- I can't remember if she had
24   clothes on or not.  She was in a bed.
```

1    Q  Okay.  Were you able to observe, like,

2  skin on this female victim?

3    A  Yes.

4    Q  Were you able to observe the skin on her

5  back at all?

6    A  Back and her arms.

7    Q  Okay.  And did she have wounds anywhere

8  else besides on her back?

9       MS. BARBER:  Objection; foundation.

10    A  Only what I saw.  I don't know how far

11  down the back went.

12    Q  Yeah.  I'm just trying to get what you

13  did see.

14       So you saw wounds on her back; correct?

15    A  I saw wounds on the back and blood.

16  That's it.

17    Q  Did you see any wounds on her arms?

18    A  I can't remember.

19    Q  Did you see any wounds on her neck?

20    A  I can't remember that one either.

21    Q  What about her head?

22    A  Couldn't tell because she had her hair

23  flopped over.

24    Q  And then any wounds down her legs or on

1    her feet or anything like that?

2         A  I can't remember.

3         Q  Do you remember there being more than one

4    stab wound?

5         A  Yes.

6         Q  How many, approximately, did you observe?

7            MS. BARBER:  Objection; foundation.

8         A  Multiple.  I didn't count, but I saw

9    multiple stab wounds.  I knew she was deceased at

10   that point and she smelled --

11        Q  Yeah.

12        A  -- of a dead body.

13        Q  You said it was pretty heinous.

14        A  Yeah, it was.

15        Q  And was there blood -- was there a pool of

16   blood around her in the bed?  Do you recall?

17        A  I don't remember.  She was on the bed.

18   The blood might have soaked into the mattress.  I

19   don't know.

20        Q  Do you recall there being any pools of

21   blood in the bedroom other than on the bed?

22        A  No.

23        Q  I know you said that there was blood kind

24   of everywhere sprayed and stuff, but I'm talking

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                          152

1    about actual pools of blood.

2         Do you recall that in the bedroom?

3    A  No.

4    Q  Do you recall any pools of blood in the

5    entryway by the male victim?

6    A  Yes.

7    Q  And where was the pool of blood by the

8    male victim?

9    A  Underneath and on the side, you know, like

10   on the floor and saw blood on the walls and even

11   on the ceiling.

12   Q  Yeah.  You said there was blood on the

13   ceiling.

14        Do you remember how much blood was on the

15   ceiling?

16   A  Splatter.

17   Q  And then you testified about when Sergeant

18   Pena went to go find somebody from the building,

19   that had responsibility to the building.

20   A  Yes.

21   Q  During that time when you were -- you

22   stayed at the crime scene that whole time;

23   correct?

24   A  Yes.

1      Q   And your partner stayed there as well?

2      A   Yes.

3      Q   Do you recall any further conversation you

4   had with the family members that were there?  Did

5   they give you any more information about the --

6          MS. BARBER:  I'm just going to object --

7      Q   -- family?

8          MS. BARBER:  -- asked and answered.  We

9   went over lots of anything else questions in the

10  first few hours of this deposition.

11         MR. STARR:  Great.  And I'd also

12  appreciate if you'd let me finish my question

13  before you object moving forward.

14         MS. BARBER:  Sure.

15     Q   Do you recall any further conversation or

16  any further details you learned from the family

17  during that time?

18         MS. BARBER:  Same objection.

19     A   No.

20     Q   What about physical details about the

21  woman you spoke to outside, the other family

22  member?  Do you remember -- she was Latino; is

23  that correct?

24     A   Latina, yes.

```
 1        Q   Do you remember what color hair she had?

 2        A   I don't remember her.

 3        Q   Do you remember approximately how tall she

 4   was?

 5            MS. BARBER:  Objection; foundation.

 6        A   No.  Because we never turned the lights

 7   on.  I had my flashlight.  So it's very difficult

 8   to tell how tall a person is when it's just based

 9   on a flashlight.

10        Q   But you were saying you were both standing

11   when you were talking.

12        A   Right.

13        Q   Was she taller than you?

14            I'm sorry.  Maybe my question is confusing

15   you.  I'm talking about the family members that

16   you were speaking to.

17        A   I thought you were talking about the lady

18   in the bedroom.

19        Q   Yeah.  Strike that.

20            MS. SUSLER:  So did I.

21        A   Okay.  I'm not the only one then.

22            MS. GOLDEN:  I knew what you meant.

23            MS. SUSLER:  Thanks.  Thanks.

24        A   Go back to that question about --
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    155

1      Q  So the woman you spoke to, the family
2  member that was alive who was outside of the crime
3  scene --
4      A  Okay.
5      Q  -- do you recall anything about her
6  physical description?
7      A  No.
8      Q  She was Latina?
9      A  She was definitely Latina because I spoke
10  to her in Spanish.
11      Q  And do you recall approximately how tall
12  she was?
13      A  About as tall as I am.
14      Q  Do you recall what color hair color she
15  had?
16      A  No, I don't.
17      Q  Okay.  Anything else you recall about her?
18  Was she heavy or thin or anything like that?
19      A  She was thin.
20      Q  Okay.
21      A  She wasn't overly obese or anything.
22      Q  What about her age?  Do you recall
23  approximately how old she was?
24      A  I want to say -- I can't tell -- remember

1    how old she was other than she was a young lady.

2    Definitely not elderly, nothing like that.

3        Q  She was, like, young in her 20s or young,

4    like, in her 40s?

5        A  30s.

6        Q  Okay.  What about Alfredo Aranda?  Do you

7    recall anything about what he looked like?

8        A  Other than him being a male Hispanic and

9    he spoke Spanish, that was it.

10        Q  Okay.

11        A  I don't remember how tall he was or --

12        Q  Do you remember his age?

13        A  No, I don't.

14        Q  Okay.  And the woman I was asking you

15    about that you spoke to outside, was that Rosa

16    Aranda?

17        A  Rosa Aranda.

18        Q  Okay.  Do recall what Felicia Soto looked

19    like?

20        A  No.

21        Q  And you don't recall Raul Aranda?

22        A  No, I don't.

23        Q  What do you recall about, other than the

24    injuries that they had suffered, the male and the

1  female victims in terms of their physical

2  description?

3      A  Going back to them now?

4      Q  Yeah.

5          MS. BARBER:  I'm sorry.  Can you read that

6  question back.

7          (The Reporter read the record as follows:

8  What do you recall about, other than the injuries

9  that they had suffered, the male and the female

10 victims in terms of their physical description?)

11         MS. BARBER:  I'm going to object to the

12 form of that question.  It's also compound.

13     A  Other than what I saw at the crime scene,

14 I don't remember much else.

15     Q  Do you remember their age?

16     A  I remember --

17         MS. BARBER:  Objection; foundation.

18     A  I remember them being a nice young couple

19 that didn't deserve this.

20     Q  As far as the male victim goes, how close

21 to the entryway was he?

22         MS. BARBER:  Objection; asked and

23 answered.

24     A  When we opened up the door, he was right

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    158

1   there laying on the floor.

2        Q   The door had clearance?

3        A   The door had clearance to open up wide,

4   and he was laying right on the floor.

5        Q   Okay.  And you testified you had to step

6   over him in order to get into the apartment?

7        A   Yeah.

8        MS. BARBER:  Yeah.  Sean, I'm going to

9   give you some leeway here.

10       MR. STARR:  Great.  I've got my own case.

11  I represent a separate plaintiff.  I can ask these

12  questions if I want.

13       MS. BARBER:  No.  That's absolutely

14  incorrect.  You cannot sit here for a deposition

15  and then ask him the same questions over and over

16  again.

17       MR. STARR:  I'm not asking the same

18  questions over and over again.

19       MS. BARBER:  Yes, you are.

20       MR. STARR:  Well, check the record, Katie.

21  I'm not.

22       MS. BARBER:  Like I said, I'm going to

23  give you some leeway; but at some point, there is

24  going to have to be a stopping point.

1         MR. STARR:  Let me know when you're ready

2    to tell me that.

3         MS. BARBER:  I will.

4         Go ahead.

5         THE WITNESS:  Okay.  What was the

6    question?

7         MR. STARR:  Can you read back the

8    question.

9         (The Reporter read the record as follows:

10   Okay.  And you testified you had to step over him

11   in order to get into the apartment?)

12        MS. GOLDEN:  That question begs for asked

13   and answered.  You say it in the form of your

14   question that you asked --

15        MR. STARR:  Is that an objection, or are

16   you testifying?

17        MS. GOLDEN:  Well, I'm not testifying.

18   I'm definitely commenting, though.

19        MR. STARR:  Okay.

20   BY MR. STARR:

21      Q  And your answer was yes?  I'm sorry.

22      A  Yes.

23      Q  I want to refer you to Exhibit 7.

24        MS. BARBER:  Is that REDACTED or REDACTED?

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    160

```
 1          MR. STARR:  REDACTED

 2   BY MR. STARR:

 3      Q  I just have a couple of quick questions

 4   about this.

 5          At the very top there, there's a date and

 6   a time, and it says from District 14 CPD.

 7      A  Yes.

 8      Q  Do you know what that is?

 9      A  It's the fax of when it was sent from the

10   district.

11      Q  Okay.

12      A  And this is a phone number, 312-744-2422.

13      Q  And that would be a fax number?

14      A  Fax number.  Fax number.

15      Q  Okay.  And it says 1 of 4; is that

16   correct?  Page 1 of 4 all the way to the right

17   there?

18      A  Yeah.

19      Q  Okay.  And then on the next page or the

20   back of it on your copy, the third line says,

21   "This is in relation with RD C198126."

22          Do you see that?

23      A  Yes.

24      Q  And then at the bottom of that same
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    161

```
 1    document, there's a different RD number there?
 2        A  Yes.
 3        Q  Do you know why there's more than one RD
 4    number?
 5        A  For each person in the case.
 6        Q  Okay.
 7        A  The RD number for the crime, and these are
 8    considered missings.  So they get a separate RD
 9    number for the missing, a separate RD number for
10    the missing.
11        Q  And is that standard procedure as far as
12    you understand it?
13        A  Yes.
14        Q  Okay.  And then the sentence -- same back
15    page there.  The sentence after the one I just
16    read, it says, "At location A/5 detective did not
17    find missing after their investigation."
18           Now, I believe you testified that your
19    sergeant, Pena, told you that.
20           My question is do you have any independent
21    recollection of him calling and telling you that?
22        A  Yes.
23        Q  So you remember being at the station?
24        A  He called the 14th District.
```

```
1        Q   He called the district.   Okay.
2            And does he call, like, a general line and
3   then someone asks for you?   How did you get the
4   phone on that occasion?
5            MS. BARBER:   Objection; form.
6        A   You call the district, and you say you
7   want to speak to Valentin, and they make a page,
8   and I pick up the line.   We have multiple phone
9   lines, and I talked to Sergeant Pena on the phone.
10       Q   So what did he tell you on that phone
11  call?
12           MS. BARBER:   Objection; asked and
13  answered.
14       A   The information that we wrote down.
15       Q   So the entire paragraph there or just that
16  the detectives didn't find the missing?
17       A   Yeah.
18           MS. BARBER:   Objection; asked and
19  answered.
20       A   Yes.
21       Q   Did he tell you anything else?
22           MS. BARBER:   Objection; asked and
23  answered.
24       A   No.
```

1    BY MR. STARR:

2        Q   Okay.  Does the separate RD mean there's a

3    separate investigation?

4            MS. BARBER:  Objection; foundation.

5        A   Yes.

6        Q   Do you have any recollection of someone

7    named Martin Soto being at the crime scene?

8        A   No.

9        Q   I want you to take a look at Exhibit 8

10   for me.

11       A   Okay.

12       Q   Under the top section, Photography, there,

13   the second -- in column B or box B, it says,

14   "Victim on kitchen floor, shoe impressions on

15   kitchen floor in blood."

16           Do you see that?

17       A   Okay.

18       Q   Did anyone ever come and ask you to take

19   an impression of your shoe after this incident?

20       A   No.

21       Q   Okay.  Did you ever have to do a to/from

22   about the crime scene?

23       A   No.

24           MS. BARBER:  Objection; form, foundation.

```
 1        Q   And then in the middle section with the
 2   physical evidence, there's a number of things
 3   listed there.
 4            Do you see those things?
 5        A   Yes.
 6        Q   Do you recall a multicolored pillowcase
 7   recovered on a couch?  Do you recall seeing a
 8   pillowcase on a couch?
 9            MS. BARBER:  Objection; asked and
10   answered.
11        A   No.
12        Q   Okay.  What about a paper napkin?
13            MS. BARBER:  Objection; form.
14        Q   Do you recall seeing any paper napkins at
15   the scene?
16        A   No.
17        Q   Do you recall seeing any knives at the
18   scene?
19        A   No.
20        Q   Do you recall seeing a box -- a knife box?
21        A   No.
22        Q   I asked you if anyone ever asked for your
23   shoe impression.
24            Did anyone ever ask you what your shoe
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    165

```
1    size was pertaining to this investigation?
2           MS. BARBER:  You can answer.
3       A  I was going to say no.
4    BY MR. STARR:
5       Q  Besides me; right?
6       A  That's the first time I ever heard that.
7       Q  All right.  I want to refer you to Exhibit
8    10, on page 5, sir, RFC 472.
9           We went over this paragraph to some
10   degree.  Halfway through that paragraph it says,
11   "The responding detectives were informed that a
12   person named Raul Aranda had called 911 requesting
13   the police check on the well-being of a victim."
14          Did you tell anyone that Raul Aranda
15   called 911?
16      A  No.
17      Q  Okay.  Do you remember Raul Aranda being
18   there?
19      A  I might have initially spoke to him about
20   what had happened.
21      Q  You might have or you recall?
22      A  Is he in the case report here?
23      Q  That's a different Aranda.
24      A  That's the reason why.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                            166

```
 1          No, I didn't speak to him.

 2     Q   Okay.

 3     A   I spoke to this gentleman right here.

 4     Q   Alfredo Aranda?

 5     A   Alfredo.

 6     Q   All right.

 7     A   I didn't know they were related.

 8     Q   And then a little bit farther down,

 9  there's a sentence that says, "He apparently used

10  the wrong key, and it got stuck in the lock and

11  would not turn."

12          Do you see that sentence?

13     A   Yes.

14     Q   Do you remember anyone getting a key stuck

15  and not being able to turn it?

16     A   It could have been the guy trying to open

17  the lock, when he was getting nervous, but not

18  open the door.

19     Q   But do you remember that?

20     A   No, I don't.

21          MS. GOLDEN:  Object to form and

22  foundation.

23     Q   If you could turn to page 6, sir.

24          Did you see anyone get a pair of keys --
```

1    or a key stuck in the lock?

2          MS. BARBER:  I'm going to object to the

3    foundation to that question and that also it's

4    speculative, given his answer to the previous

5    question.

6          MS. GOLDEN:  I'm going to object to form.

7       A  No.

8          MS. BARBER:  You can answer.

9       A  I'm just making sure everybody is done.

10      Q  Your answer is no?

11      A  No.

12      Q  Then back to page 6, that first paragraph,

13   several sentences down, it says that the

14   responding detectives opened the door and observed

15   the body of a male white Hispanic adult laying

16   face up on the kitchen floor approximately 5 feet

17   inside the door.

18      A  Yes.

19      Q  Do you recall the body being 5 feet

20   inside, or was it closer to the door?

21         MS. BARBER:  Objection; asked and

22   answered.  This has to be at least five or six

23   different questions about how far the body was

24   from the door.

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                    168

```
 1          You can answer.
 2      A  I'd say that's about right.  Seeing if the
 3  door swings open, that's 3 feet already, and then
 4  he was, like, laying right there.
 5  BY MR. STARR:
 6      Q  So it was 2 feet farther than the door; is
 7  that what you remember?
 8      A  Approximately.
 9      Q  Is that what you remember, or is that an
10  assumption?
11      A  It's an assumption.
12      Q  Can you take a look at page 8.
13          Before I have you look at anything in
14  particular, you wrote down in your case report
15  everything that Alfredo Aranda told you; correct?
16          MS. GOLDEN:  Object to form.
17      A  I wrote down what was given to me by all
18  the witnesses.
19      Q  Okay.  All right.  Sir, if any of those
20  witnesses had told you anything more about what
21  they observed or heard, you would have written
22  that in your case report; correct?
23          MS. GOLDEN:  Object to form.
24      A  Yes.
```

```
 1   BY MR. STARR:
 2      Q   Let me show you a couple of photographs,
 3   sir, to see if that provides any further
 4   recollection on your part.
 5          I have three copies of this.  I'm just
 6   going to mark this as a Group Exhibit, what are we
 7   on, 11.
 8          (Valentin Deposition Exhibit 11 marked for
 9   identification and attached to the transcript.)
10          MR. STARR:  Just take your time and maybe
11   peruse through these photographs, sir.
12          This is RFC 605 through RFC 608 and then
13   also RFC 613 and 614.
14          MS. GOLDEN:  I'm sorry.  Are we on 11?
15          MR. STARR:  Yes.
16      A   Okay.
17      Q   Do these photographs look familiar to you,
18   sir?
19          MS. BARBER:  Objection; form.
20      A   Yes.
21      Q   Do any of these photographs refresh your
22   recollection any further today than what you've
23   already testified to?
24          MS. BARBER:  Objection; form, foundation.
```

Transcript of David Valentin, Jr.
Conducted on July 23, 2019                                    170

```
 1       A  Yes.
 2   BY MR. STARR:
 3       Q  How do they refresh your recollection
 4   further, sir?
 5       A  I remember being at the crime scene.
 6       Q  Do you remember any other details that you
 7   haven't testified to today?
 8       A  No.
 9       Q  Can you take a look at No. 607?  Is that a
10   photograph facing the exit door of the apartment?
11   Do you know?
12       A  Yeah.  There's a door right there.
13          MS. BARBER:  I'm sorry.  Object to the
14   form of that question.
15       Q  Do you recall that couch that's in the
16   photograph, sir?
17       A  Again, we didn't have the lights on.  So I
18   didn't go in that section.
19       Q  Do you recall the couch?
20       A  No.
21          MS. BARBER:  I'm just going to object to
22   the asked and answered about do you remember the
23   couch.
24          MS. GOLDEN:  What was the answer?
```

1           MS. BARBER:  I believe it was the same as

2    it was this morning.

3           MS. GOLDEN:  Does not remember?

4           MS. BARBER:  Right.

5    BY MR. STARR:

6       Q  Do you recall that box being right there

7    in the middle of the room, sir?

8       A  No.

9       Q  Do you recall what appears to be a puddle

10   of blood on the floor beneath that box, sir?

11          MS. BARBER:  Objection; form, foundation.

12      A  Yes.

13      Q  Is that where the male victim was, sir?

14          MS. BARBER:  Objection; form, foundation.

15      A  Yes.

16      Q  Take a look at 608.

17          Do you know if the door in that photograph

18   is the entry door?

19      A  Right here, yes.

20      Q  And then approximately where was the male

21   victim located in this photograph when you entered

22   the premises?

23          MS. BARBER:  Objection; form, foundation.

24      A  Right over here.  The box was not there

1    when we got there.  Right over here.

2    BY MR. STARR:

3        Q  So are you indicating that he was where

4    the box currently is in this photograph?

5        A  Yes, and that pile of clothes right there.

6        Q  Okay.  And then take a look at 613, sir.

7    I think it's the next in your sequence.

8            Do you see that box again there?

9        A  Yes.

10       Q  There appears to be some sort of HVAC unit

11   next to the box.

12           Do you see that, sir?

13           MS. BARBER:  Objection; form, foundation.

14       A  Yes.  There appears to be some kind of

15   unit there.

16       Q  Do you recall seeing that when you were on

17   premises here, sir?

18       A  No.

19       Q  Take a look at 614.

20           Does that vantage point of the air vent,

21   HVAC unit refresh your recollection any further of

22   seeing that when you were there?

23       A  I don't remember seeing that, no.

24       Q  And then where again -- in this

1  photograph, in 614, approximately where was the

2  male victim located?

3      A   Right by this pile of trash and that box.

4      Q   Okay.  On the male victim, do you recall

5  where the stab wounds were?

6          MS. BARBER:  Objection; asked and

7  answered.

8      A   What I saw was on his upper torso, stomach

9  area, forearms when I shined the flashlight on

10  him.

11     Q   Anywhere else that you can recall?

12     A   That's what I can recall.

13     Q   You said you recall testifying at trial;

14  right?

15     A   Yes.

16     Q   Do you recall being asked about what your

17  partner used to break the window?

18     A   No.

19     Q   Let me show you what's going to be marked

20  as Exhibit No. 12, I believe.

21         MS. BARBER:  And again to the extent that

22  he's going to be asking questions from this

23  transcript, if you need to review the entire thing

24  in order to answer the questions, you should feel

1    free to do that and take your time as well.

2        A   I'm ready.

3            MR. STARR:  I'm going to withdraw this

4    exhibit.

5            I don't have any further questions.

6            MS. BARBER:  Let's just take a quick

7    five-minute break.

8            (A recess was taken from 1:44 p.m. to

9    1:52 p.m.)

10           MS. BARBER:  Do you have any questions

11   from that end of the table?

12           MR. ZIBOLSKI:  No questions.

13           MR. BRENER:  No questions.

14           MS. BARBER:  No questions for me.  We'll

15   reserve signature.

16           (Off the record at 1:52 p.m.)

17

18

19

20

21

22

23

24

1              ACKNOWLEDGMENT OF DEPONENT

2

3         I, DAVID VALENTIN, JR., do hereby

4    acknowledge that I have read and examined the

5    foregoing testimony, and the same is a true,

6    correct, and complete transcription of the

7    testimony given by me and any corrections appear

8    on the attached errata sheet signed by me.

9

10

11

12   _____          _____

13    (DATE)                    (SIGNATURE)

14

15

16

17

18

19

20

21

22

23

24

```
 1        CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

 2

 3           I, Joanne Ely, Certified Shorthand

 4    Reporter No. 84-4169, CSR, RPR, and a Notary

 5    Public in and for the County of Kane, State of

 6    Illinois, the officer before whom the foregoing

 7    deposition was taken, do hereby certify that the

 8    foregoing transcript is a true and correct record

 9    of the testimony given; that said testimony was

10    taken by me stenographically and thereafter

11    reduced to typewriting under my direction; that

12    review was requested; and that I am neither

13    counsel for, related to, nor employed by any of

14    the parties to this case and have no interest,

15    financial or otherwise, in its outcome.

16           IN WITNESS WHEREOF I have hereunto set my

17    hand and affixed my notarial seal this 31st day of

18    July, 2019.

19

20    My commission expires:  May 16, 2020

21

22

23    Notary Public in and for the

24    State of Illinois
```

OFFICIAL SEAL
JOANNE E. ELY
Notary Public - State of Illinois
My Commission Expires 5/16/2020

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

177

| A | | | |
|---|---|---|---|
| **abduction** 125:16 | 73:9, 113:21, 123:14, 123:15 | 60:2, 131:4 | 74:15, 79:3, 89:6, 92:14, |
| **abductions** 128:5 | **adriana** 144:8, 144:11, | **ahead** 10:23, 13:9, | 97:1, 115:15, 117:4, 119:5, |
| **aberdeen** 2:5, 3:6 | 144:14, 144:17 | 13:17, 32:15, 33:14, 45:12, | 119:20, 121:21, 124:18, 129:2, |
| **ability** 134:16, 134:20 | **adult** 121:13, 167:15 | 53:23, 59:13, 74:21, 85:7, | 133:5, 133:12, 133:22, 141:8, |
| **able** 67:3, 81:24, | **affairs** 53:20 | 124:4, 159:4 | 142:3, 150:5, 160:16, 165:7, |
| 97:12, 150:1, 150:4, 166:15 | **affect** 134:16, 134:20 | **ahold** 25:19 | 166:6, 168:17, 168:19 |
| **above** 71:19, 104:6, | **affiliation** 69:24 | **ain't** 140:9 | **allow** 33:18 |
| 104:7 | **affixed** 176:17 | **air** 51:3, 51:8, | **allowance** 137:20 |
| **absolutely** 102:24, 158:13 | **after** 15:22, 18:17, | 78:17, 78:20, 79:4, 79:22, | **allowed** 53:10, 103:1 |
| **academy** 15:19, 138:22, | 18:24, 23:5, 23:9, 27:7, | 80:6, 172:20 | **along** 20:15, 74:7 |
| 139:5, 140:2, 140:17, 141:19 | 29:15, 30:7, 34:18, 36:1, | **airport** 17:16, 17:21, | **already** 9:9, 81:7, |
| **access** 61:5, 81:21, | 47:8, 47:11, 48:5, 48:7, | 134:13 | 90:5, 91:2, 104:14, 113:17, |
| 97:11 | 51:1, 51:8, 102:13, 109:22, | **al** 1:8, 1:14 | 168:3, 169:23 |
| **accordingly** 10:13 | 125:19, 125:23, 139:4, 161:15, | **alarm** 45:19 | **also** 28:7, 30:11, |
| **accurate** 44:5, 75:21, | 161:17, 163:19 | **alfredo** 68:11, 72:15, | 30:12, 69:11, 69:14, 71:1, |
| 75:22 | **afternoon** 129:9, 129:10 | 72:17, 146:14, 146:17, 148:23, | 135:18, 141:18, 153:11, 157:12, |
| **accused** 130:13, 133:23, | **afterwards** 15:24, 54:17 | 156:6, 166:4, 166:5, 168:15 | 167:3, 169:13 |
| 134:1, 134:4, 134:8 | **again** 59:14, 78:12, | **alive** 155:2 | **analyzed** 122:17, 122:20 |
| **acknowledge** 175:4 | 86:2, 111:12, 111:14, 116:14, | **all** 9:20, 10:13, | **and-a-half** 15:12 |
| **acknowledgment** 175:1 | 130:16, 158:16, 158:18, 170:17, | 10:24, 13:13, 14:24, 18:11, | **angle** 61:6 |
| **actual** 152:1 | 172:8, 172:24, 173:21 | 20:10, 20:20, 21:19, 21:24, | **another** 9:23, 45:13, |
| **actually** 13:23, 14:17, | **against** 76:21 | 22:3, 23:19, 25:9, 26:6, | 61:9, 63:3, 129:18 |
| 18:11, 77:22, 139:18 | **age** 78:4, 78:6, | 26:20, 27:4, 35:15, 36:1, | **answer** 9:15, 9:20, |
| **address** 21:18, 24:20, | 155:22, 156:12, 157:15 | 36:21, 38:23, 41:14, 43:8, | 10:7, 10:23, 10:24, 13:9, |
| 56:11, 65:17, | **ago** 18:22, 44:9, | 44:18, 60:3, 62:23, 64:5, 66:4, 67:24, 72:9, 73:11, | 13:17, 20:14, 20:16, 20:22, |

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

24:17, 24:18,
27:11, 76:10,
80:2, 83:19,
95:2, 96:15,
96:16, 119:4,
127:5, 138:5,
141:10, 159:21,
165:2, 167:4,
167:8, 167:10,
168:1, 170:24,
173:24
**answered**
10:12, 56:17,
71:17, 76:19,
79:7, 85:24,
86:1, 86:8,
87:20, 92:23,
93:7, 99:16,
103:9, 108:13,
113:9, 120:12,
124:3, 124:11,
124:21, 125:2,
142:8, 153:8,
157:23, 159:13,
162:13, 162:19,
162:23, 164:10,
167:22, 170:22,
173:7
**answering**
9:16, 22:10,
91:21
**anybody**
10:20, 11:11,
11:20, 26:23,
80:7, 117:13,
124:1, 146:6
**anymore**
8:22, 50:1,
131:5, 140:8
**anyone**
24:19, 28:21,
47:1, 47:3,
100:8, 102:3,
102:22, 121:24,
143:9, 143:11,
143:14, 144:20,
145:12, 147:3,
147:6, 148:15,

148:18, 149:2,
149:4, 163:18,
164:22, 164:24,
165:14, 166:14,
166:24
**anything**
10:16, 12:7,
12:11, 13:5,
13:14, 14:4,
14:10, 25:4,
26:17, 28:21,
46:16, 49:7,
49:11, 50:4,
50:14, 50:17,
50:21, 51:6,
57:24, 58:3,
58:15, 58:18,
58:23, 82:8,
82:17, 86:9,
86:10, 86:13,
86:17, 86:20,
86:21, 87:2,
87:10, 87:14,
87:18, 98:4,
98:8, 100:17,
103:5, 105:22,
106:16, 106:20,
113:16, 123:9,
123:20, 124:15,
124:23, 125:5,
125:10, 128:4,
144:23, 149:4,
151:1, 153:9,
155:5, 155:17,
155:18, 155:21,
156:7, 162:21,
168:13, 168:20
**anywhere**
150:7, 173:11
**apartment**
13:21, 24:4,
27:9, 27:16,
27:18, 27:21,
27:24, 28:4,
29:17, 30:1,
30:14, 32:9,
32:15, 35:10,
35:16, 36:19,

37:12, 37:15,
37:24, 39:17,
40:9, 40:11,
40:12, 41:11,
46:3, 46:11,
47:1, 47:4,
47:14, 48:15,
48:18, 49:4,
49:8, 49:12,
49:16, 49:19,
49:21, 50:5,
50:15, 50:18,
50:23, 52:23,
53:11, 53:13,
58:8, 60:5,
60:20, 61:20,
62:20, 73:8,
75:12, 78:12,
78:15, 78:19,
80:15, 80:20,
80:23, 81:1,
82:5, 82:13,
82:17, 83:3,
83:21, 83:24,
84:4, 84:16,
86:6, 86:18,
86:23, 87:4,
87:12, 87:16,
88:8, 102:3,
102:6, 102:10,
102:13, 102:14,
102:20, 102:23,
111:23, 158:6,
159:11, 170:10
**apologies**
147:16
**apologize**
67:22
**apparently**
25:20, 42:10,
166:9
**appear**
70:14, 115:7,
117:7, 175:7
**appeared**
77:8
**appears**
103:20, 107:21,

116:17, 171:9,
172:10, 172:14
**apply**
68:19, 70:1,
70:2
**appreciate**
20:24, 153:12
**appropriate**
84:23
**approval**
103:15
**approve**
104:20
**approximate**
131:13
**approximately**
17:2, 18:15,
151:6, 154:3,
155:11, 155:23,
167:16, 168:8,
171:20, 173:1
**april**
12:3, 66:15,
98:24, 103:7,
108:5, 114:8,
116:9, 116:10,
116:11, 117:17,
118:4, 118:15,
125:23, 136:19
**aranda**
68:8, 68:11,
72:14, 72:15,
72:17, 72:19,
73:3, 73:7,
109:12, 111:15,
146:13, 146:14,
147:4, 148:18,
148:23, 156:6,
156:16, 156:17,
156:21, 165:12,
165:14, 165:17,
165:23, 166:4,
168:15
**arbitrarily**
30:3
**area**
24:6, 65:21,
75:13, 92:3,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

179

92:4, 94:12,
104:12, 109:21,
110:2, 173:9
**argumentative**
75:4, 76:2,
84:6, 89:13
**arms**
150:6, 150:17
**army**
34:7
**around**
18:12, 23:2,
31:17, 33:2,
35:1, 36:19,
81:3, 113:13,
132:10, 151:16
**arrested**
124:1
**arrive**
94:19, 94:24,
105:19
**arrived**
24:20, 28:24,
32:13, 66:17,
73:24, 94:10,
100:12, 100:22,
101:3, 107:2,
117:11
**arturo**
1:5, 143:9,
143:11, 143:14,
143:18
**ask**
9:14, 9:17,
15:5, 42:17,
60:14, 64:7,
64:8, 84:20,
85:4, 85:14,
89:20, 102:18,
118:21, 122:8,
129:14, 143:20,
147:12, 158:11,
158:15, 163:18,
164:24
**asked**
20:23, 56:17,
71:16, 76:19,
79:6, 85:24,

86:1, 86:7,
87:20, 99:16,
103:8, 104:14,
108:12, 113:8,
120:11, 124:2,
124:10, 124:20,
125:1, 142:5,
142:8, 153:8,
157:22, 159:12,
159:14, 162:12,
162:18, 162:22,
164:9, 164:22,
167:21, 170:22,
173:6, 173:16
**asking**
10:11, 19:24,
20:3, 57:11,
84:5, 92:18,
96:13, 96:14,
96:15, 117:23,
119:6, 119:13,
141:10, 145:3,
147:24, 156:14,
158:17, 173:22
**asks**
162:3
**assigned**
16:12, 16:15,
18:10, 21:13,
21:16, 21:21
**assignment**
17:19
**assignments**
23:6
**assistance**
26:3
**assistant**
11:23
**associate's**
135:9, 135:16
**association**
127:1, 128:1,
128:13, 128:22
**assume**
10:12, 28:8,
28:9, 35:14,
92:10, 118:21
**assumes**
100:3

**assumption**
168:10, 168:11
**attached**
7:7, 60:11,
61:15, 62:15,
63:10, 105:4,
107:12, 110:22,
114:15, 116:3,
118:20, 169:9,
175:8
**attention**
56:14, 87:17,
89:10, 89:11,
109:1, 119:13,
119:20, 126:12,
146:8
**attorney**
10:22, 11:2,
11:4, 145:16,
145:18, 145:24,
146:3
**attorney's**
5:6
**attorneys**
61:16
**august**
17:6
**autistic**
29:3, 111:7
**available**
26:2
**avenue**
3:14
**avoided**
139:19
**aware**
19:6, 99:11,
121:24, 127:8,
127:24
**away**
23:12, 28:16,
38:3, 42:9,
101:18

**B**
**baby**
47:18, 78:8
**bachelor's**
135:10, 135:14,

135:17, 135:22
**back**
11:17, 11:19,
24:5, 27:11,
27:17, 27:23,
28:4, 38:9,
41:20, 41:23,
42:15, 68:16,
78:18, 79:9,
80:12, 80:22,
81:24, 88:5,
88:11, 88:12,
89:24, 90:1,
99:19, 102:17,
102:21, 109:13,
109:15, 111:17,
113:20, 129:2,
129:6, 136:19,
146:8, 147:15,
147:16, 149:19,
149:20, 150:5,
150:6, 150:8,
150:11, 150:14,
150:15, 154:24,
157:3, 157:6,
159:7, 160:20,
161:14, 167:12
**bad**
36:13, 49:24,
67:19, 79:2,
132:17, 133:10,
137:3
**badly**
130:7
**ballpark**
131:19
**baroni**
4:5
**barrett**
95:23
**based**
92:10, 96:24,
154:8
**basement**
27:9, 60:19,
61:19
**basically**
24:23, 30:22

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

180

**bates**
60:13
**bathroom**
46:5, 46:7,
46:8, 46:14,
46:23, 81:16
**baton**
34:5
**beat**
17:9, 17:18,
65:13, 65:16,
65:19, 65:22,
66:1, 73:12,
73:14, 90:4,
95:11, 95:12,
96:9, 99:21,
114:22, 116:15,
144:18
**beating**
76:4
**became**
16:11
**because**
13:10, 20:5,
23:23, 27:20,
28:10, 30:11,
33:2, 38:14,
39:1, 49:24,
50:2, 52:13,
52:20, 54:14,
61:23, 67:1,
79:1, 89:7,
97:11, 108:24,
113:13, 115:3,
115:8, 121:21,
128:18, 150:22,
154:6, 155:9
**bed**
42:6, 42:11,
42:14, 42:20,
43:23, 47:20,
47:22, 48:19,
48:20, 48:24,
49:1, 77:4,
77:6, 81:11,
121:22, 122:1,
149:8, 149:10,
149:11, 149:12,

149:24, 151:16,
151:17, 151:21
**bedroom**
40:1, 41:5,
41:7, 41:24,
45:8, 46:9,
47:19, 48:2,
48:4, 48:14,
48:21, 75:14,
76:17, 76:22,
77:7, 121:13,
151:21, 152:2,
154:18
**been**
8:3, 23:2,
25:20, 35:1,
35:2, 36:21,
37:19, 47:20,
127:1, 127:14,
129:17, 129:20,
129:23, 130:1,
130:6, 131:16,
131:20, 131:22,
133:22, 134:1,
134:4, 134:8,
135:3, 139:18,
139:19, 140:8,
146:21, 166:16
**before**
2:13, 8:13,
9:15, 9:20,
12:21, 12:22,
13:1, 14:4,
14:18, 15:13,
15:16, 24:20,
35:23, 37:2,
40:10, 44:11,
47:8, 47:11,
48:4, 58:7,
58:18, 63:24,
79:9, 102:20,
105:7, 109:6,
114:16, 116:6,
119:9, 122:8,
141:10, 153:13,
168:13, 176:6
**beginning**
22:23

**begs**
159:12
**behalf**
3:3, 3:11, 4:3,
4:11, 5:3, 5:11,
6:3
**behind**
32:19, 33:10,
35:8, 40:1,
40:5, 41:5,
41:24, 46:6,
47:23, 48:23,
49:1, 77:2,
81:14, 81:20,
82:4
**being**
13:3, 13:11,
32:6, 58:8,
137:1, 139:22,
151:3, 151:20,
156:8, 157:18,
161:23, 163:7,
165:17, 166:15,
167:19, 170:5,
171:6, 173:16
**belated**
120:22
**believe**
147:14, 161:18,
171:1, 173:20
**bells**
143:22, 144:9
**bending**
43:5
**beneath**
171:10
**bent**
43:24
**bergadon**
18:4, 18:5,
22:22, 26:9,
27:19, 33:22,
33:23, 34:18,
37:14, 63:17,
63:21, 66:1,
102:19, 120:4
**bergadon's**
70:21

**berry**
74:8
**besides**
150:8, 165:5
**better**
61:7, 66:23,
67:20, 102:18
**between**
18:8, 24:15,
25:9, 41:10,
64:11, 83:18,
87:22
**biebel**
4:13
**big**
24:4, 32:22,
38:16
**bit**
166:8
**black**
44:22, 137:23,
138:4, 138:9,
138:10
**blanket**
45:3, 45:5
**blankets**
42:3, 42:5,
42:8, 42:9,
44:11, 44:14,
45:8, 47:9,
48:5, 122:9,
149:13, 149:16
**blood**
38:12, 38:13,
38:19, 38:20,
38:22, 38:24,
42:15, 45:3,
49:15, 49:18,
49:20, 150:15,
151:15, 151:16,
151:18, 151:21,
151:23, 152:1,
152:4, 152:7,
152:10, 152:12,
152:14, 163:15,
171:10
**blue**
44:22, 137:14

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

181

| | | | |
|---|---|---|---|
| **blues** | **building** | **callers** | |
| 136:22, 137:1 | 104:10, 146:12, | 24:4, 27:13, | 22:17 |
| **blunt** | 163:13, 164:20, | 30:13, 31:9, | **calling** |
| 34:2 | 171:6, 171:10, | 31:22, 32:1, | 161:21 |
| **bodies** | 171:24, 172:4, | 32:10, 60:21, | **calls** |
| 13:21, 34:22, | 172:8, 172:11, | 73:18, 74:4, | 118:8 |
| 35:1, 77:9, | 173:3 | 88:7, 88:21, | **calumet** |
| 112:8 | **boxes** | 152:18, 152:19 | 135:11, 135:17, |
| **bodily** | 104:7 | **buildings** | 135:19 |
| 53:21 | **boy** | 30:14 | **came** |
| **body** | 29:3 | **bulk** | 13:23, 55:6, |
| 38:8, 39:20, | **boyle** | 56:15 | 65:3, 67:10, |
| 39:22, 45:6, | 96:10, 96:18 | **bunch** | 76:17, 77:1, |
| 76:24, 112:16, | **brand** | 31:12 | 88:7, 111:20, |
| 121:12, 122:1, | 138:16 | **burns** | 120:23 |
| 151:12, 167:15, | **break** | 5:12, 5:13 | **can** |
| 167:19, 167:23 | 10:15, 33:14, | **bus** | 9:12, 9:14, |
| **bolt** | 33:17, 33:23, | 66:13 | 10:2, 12:23, |
| 88:18, 88:19 | 61:13, 74:22, | **business** | 13:17, 13:20, |
| **boots** | 75:9, 88:1, | 68:14, 68:16, | 21:12, 22:15, |
| 137:15, 137:22, | 128:10, 173:17, | 101:22, 138:20 | 23:14, 26:17, |
| 138:4, 138:9, | 174:7 | **buy** | 32:5, 37:12, |
| 138:10, 138:16 | **breaking** | 137:18, 137:19, | 38:7, 42:14, |
| **born** | 91:23 | 138:19 | 44:10, 46:13, |
| 136:5 | **breathing** | **bye** | 49:14, 53:16, |
| **boss** | 80:6 | 18:22 | 54:2, 54:6, |
| 91:21, 95:22 | **brener** | | 61:4, 61:21, |
| **bosses** | 5:5, 19:14, | **C** | 62:5, 62:21, |
| 93:24 | 19:21, 174:13 | | 63:5, 66:7, |
| **both** | **brief** | **c** | 66:23, 67:23, |
| 77:8, 88:22, | 129:15, 130:5 | 90:17 | 76:10, 80:2, |
| 88:24, 154:10 | **broadcast** | **caguas** | 84:20, 88:2, |
| **bottom** | 59:23 | 14:22 | 89:20, 96:14, |
| 88:16, 103:14, | **broke** | **call** | 96:16, 99:17, |
| 105:12, 108:4, | 34:12, 34:18, | 13:23, 16:9, | 100:7, 102:16, |
| 114:21, 116:15, | 34:20, 61:5, | 22:20, 23:4, | 106:2, 107:5, |
| 121:8, 160:24 | 62:9, 62:21, | 23:5, 23:7, | 112:14, 117:3, |
| **box** | 74:9, 74:17, | 23:13, 24:21, | 119:1, 119:7, |
| 64:7, 64:8, | 75:9 | 29:10, 30:5, | 119:17, 121:7, |
| 64:13, 64:18, | **broken** | 104:11, 162:2, | 124:4, 129:15, |
| 64:21, 65:12, | 35:7, 35:17, | 162:6, 162:11 | 132:23, 133:5, |
| 65:15, 65:18, | 35:20, 36:2, | **called** | 137:22, 139:11, |
| 66:4, 66:14, | 36:11, 61:22, | 14:9, 16:23, | 140:20, 145:1, |
| 66:18, 66:20, | 89:3, 112:1, | 24:24, 26:2, | 157:5, 158:11, |
| 68:20, 69:6, | 112:2 | 30:16, 110:8, | 159:7, 165:2, |
| 69:17, 69:21, | **brown** | 110:14, 111:21, | 167:8, 168:1, |
| 69:23, 70:4, | 91:16, 91:21 | 161:24, 162:1, | 168:12, 170:9, |
| 103:15, 103:19, | **brualdi** | 165:12, 165:15 | 173:11, 173:12 |
| | 5:3 | **caller** | |
| | | 22:13, 25:3 | |

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

182

can't
8:21, 11:22,
24:10, 26:5,
26:20, 30:2,
32:8, 32:22,
44:23, 47:11,
48:22, 49:23,
56:13, 57:3,
60:1, 61:23,
64:9, 64:22,
66:22, 66:24,
74:5, 77:14,
82:3, 89:1,
93:14, 95:2,
112:3, 127:5,
131:4, 138:5,
145:20, 145:23,
147:2, 149:23,
150:18, 150:20,
151:2, 155:24
cannot
39:1, 158:14
cantrell
93:7, 93:9
capacity
17:8, 17:18
car
17:9, 17:18,
17:20, 23:11,
65:21, 90:6,
130:7, 131:9
career
13:12, 132:5
caroline
4:14
carrying
34:4
case
11:8, 12:4,
12:5, 12:10,
12:15, 13:4,
13:18, 21:14,
51:14, 51:15,
53:21, 55:3,
55:9, 55:17,
63:13, 63:14,
71:9, 80:13,
89:21, 98:15,

107:16, 111:2,
114:6, 115:4,
115:9, 116:20,
116:24, 122:6,
122:23, 124:16,
124:24, 125:6,
126:2, 129:12,
130:6, 130:10,
130:20, 131:1,
131:2, 131:3,
131:10, 133:2,
142:6, 142:14,
142:23, 142:24,
143:6, 145:8,
145:9, 146:6,
146:9, 149:5,
158:10, 161:5,
165:22, 168:14,
168:22, 176:14
cases
8:20, 8:21,
9:3, 13:12,
125:12
catching
79:22
catherine
6:4
ceiling
38:21, 152:11,
152:13, 152:15
cell
68:16, 99:19
center
5:7, 90:21
central
104:12
certain
52:5, 139:17
certainly
119:11
certificate
176:1
certified
2:14, 176:3
certify
176:7
chairs
81:19

chance
25:7, 138:13
change
17:6
changes
141:1
character
126:19
characteristics
69:17
chase
130:7, 131:9
cheap
138:21
check
13:23, 14:7,
21:17, 23:13,
23:14, 25:2,
66:19, 66:21,
99:22, 112:15,
158:20, 165:13
checked
47:22, 64:16
chest
43:16
chicago
1:14, 1:18,
2:6, 3:8, 3:16,
4:8, 4:18, 5:8,
5:16, 6:3, 6:8,
15:8, 19:3,
19:12, 131:15,
145:12
child
47:21, 77:14,
111:3
children
21:7, 21:9,
28:22, 37:11,
45:2, 47:15,
47:17, 48:11,
51:16, 54:1,
59:9, 59:15,
59:21, 77:2,
77:10, 77:18,
78:12, 78:18,
78:24, 80:24,
86:16, 110:2,

110:11, 125:16
circulate
126:16
circumstances
59:20, 69:1
city
1:14, 6:3,
130:11, 136:2
citywide
16:20
civil
131:1, 131:2
clark
6:6
clean
9:11
clear
34:16, 34:17,
142:4
clearance
158:2, 158:3
clipped
22:6
close
18:7, 87:23,
101:16, 157:20
close-knit
25:21
closed
61:24
closer
38:4, 167:20
closest
62:8
clothes
149:22, 149:24,
172:5
cluttered
81:23
co-counsel
142:5, 145:3
coach
24:4
coamo
14:24
code
52:5, 66:9,
66:10, 77:17

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

183

coercing
134:4
coffee
25:8
college
135:5, 135:6,
135:8, 135:10,
135:11, 135:14,
135:17, 135:19
color
34:15, 44:17,
44:22, 44:24,
45:1, 154:1,
155:14
column
163:13
come
14:15, 29:18,
31:18, 45:24,
48:1, 48:4,
65:2, 67:13,
68:2, 87:9,
91:13, 102:10,
163:18
coming
22:19
command
53:20
commander
23:5, 90:7,
90:8, 90:12,
90:14, 95:22
commenting
159:18
comments
41:3, 146:21
commercial
66:12
commission
176:20
communicate
134:17, 134:20
communication
90:21, 118:9,
132:16
communications
146:5
community
126:16

complainant
23:18
complete
9:20, 175:6
completed
15:23, 108:5
compound
98:17, 157:12
computer
16:24, 67:6,
140:23
computer-generat-
ed
140:22, 141:6
computerized
142:3
concerned
29:1, 44:24,
45:1
condition
38:7
conditions
134:15
conduct
84:22
confession
134:5
confirm
112:17
confusing
154:14
connelly
6:5
consider
147:20, 148:1,
148:12
considered
161:8
contact
18:24, 22:14,
25:20, 25:23,
26:1, 26:2,
27:21, 29:17,
29:23, 30:15,
30:16, 31:9,
56:4, 68:15,
73:21, 125:24
conversation
29:8, 38:15,

41:9, 45:22,
52:8, 52:17,
52:19, 72:13,
72:18, 72:20,
83:23, 84:10,
84:12, 84:21,
86:4, 86:23,
87:4, 87:21,
101:15, 153:3,
153:15
conversations
31:23, 84:18,
85:10, 85:12,
101:17, 101:24,
115:20
convicted
125:15
cook
5:4, 5:6
cop
144:18
copies
61:10, 61:12,
169:5
copy
67:19, 160:20
corner
108:4, 114:22
correct
15:21, 56:10,
76:14, 83:1,
91:3, 108:17,
109:7, 142:7,
142:11, 142:14,
146:15, 146:17,
147:18, 149:8,
149:14, 150:14,
152:23, 153:23,
160:16, 168:15,
168:22, 175:6,
176:8
corrections
175:7
correctly
72:10, 74:11,
74:16, 75:15,
78:13, 109:23,
123:15

corrie
18:4, 18:5,
18:21, 22:22,
26:9, 27:19,
36:3, 36:6,
36:10, 37:14,
40:20, 48:3,
63:17, 63:21,
70:20, 71:7,
72:23, 73:2,
75:8, 75:9,
76:12, 82:12,
93:16
corrie's
71:1
couch
82:2, 82:4,
164:7, 164:8,
170:15, 170:19,
170:23
could
10:19, 27:15,
28:17, 33:4,
35:10, 35:15,
35:20, 39:23,
41:17, 44:22,
45:4, 54:14,
73:24, 81:23,
82:23, 89:7,
97:9, 97:23,
101:23, 130:5,
133:9, 139:19,
166:16, 166:23
couldn't
35:13, 44:21,
81:21, 150:22
counsel
8:4, 129:7,
176:13
count
8:16, 151:8
county
5:4, 5:6, 176:5
couple
9:8, 11:16,
12:4, 127:23,
129:3, 129:24,
131:21, 134:11,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

184

146:21, 157:18,
160:3, 169:2
**course**
10:18, 119:3
**courses**
141:22
**court**
1:1, 8:24,
9:12, 10:2,
18:21, 131:2,
176:1
**courtyard**
24:6, 28:2,
35:9, 36:5,
40:5, 40:23,
68:3
**covering**
44:14
**cpd**
130:3, 160:6
**cr**
132:3, 132:12,
132:15, 132:24,
133:7
**crappy**
137:7
**crash**
72:9, 132:24
**crib**
47:18, 48:19,
49:2
**crime**
12:6, 21:9,
39:4, 51:20,
54:7, 58:7,
58:12, 58:13,
59:6, 91:13,
92:5, 92:19,
92:22, 93:24,
96:7, 96:19,
96:22, 97:12,
97:16, 100:5,
100:8, 101:3,
102:24, 103:2,
104:21, 105:1,
105:24, 106:1,
106:4, 106:16,
106:24, 112:4,

112:6, 112:7,
112:16, 113:14,
113:17, 114:9,
114:18, 115:8,
116:8, 116:10,
116:11, 123:21,
138:1, 138:4,
139:23, 140:11,
152:22, 155:2,
157:13, 161:7,
163:7, 163:22,
170:5
**crimes**
92:4
**criminal**
8:21, 145:4
**crouched**
42:13
**crowded**
81:23
**crs**
132:21, 133:4
**crying**
53:8
**csr**
1:24, 176:4
**current**
17:19, 139:18
**currently**
136:6, 172:4
**curtain**
39:21, 39:24,
40:1, 41:5,
41:6, 41:24,
42:2
**custody**
124:13, 124:22

**D**

**dad**
14:22
**daffada**
4:5
**daley**
5:7
**daniel**
5:12, 142:18,
142:23

**dark**
44:18, 44:21,
89:7, 137:12
**date**
58:7, 64:21,
64:23, 98:24,
108:5, 134:10,
160:5, 175:13
**david**
1:17, 2:1, 7:2,
8:2, 8:10, 175:3
**day**
22:22, 25:22,
56:15, 58:18,
95:11, 97:20,
104:16, 109:4,
117:14, 132:20,
137:2, 137:24,
138:4, 140:4,
146:4, 176:17
**days**
25:20, 37:20,
131:24, 133:3,
139:14
**dead**
13:21, 35:1,
80:24, 88:18,
88:19, 89:15,
151:12
**death**
34:21, 35:3,
53:21
**deceased**
67:11, 112:17,
151:9
**december**
16:15, 18:8,
126:9
**decomposing**
34:22
**defendant**
4:3, 5:11, 6:3,
129:18, 129:22,
129:23, 130:1,
130:6, 130:8,
130:16
**defendants**
1:9, 1:15,

**4:11, 5:3**
**definitely**
52:12, 155:9,
156:2, 159:18
**degree**
64:11, 135:9,
135:10, 135:11,
135:14, 135:16,
135:17, 135:18,
135:21, 135:22,
135:24, 165:10
**deleon-reyes**
1:5, 3:3, 129:7
**delicately**
113:12
**delira**
74:8, 77:24,
78:3, 147:16,
148:16
**delving**
20:6
**demonstrating**
22:3
**dennis**
118:12
**dep**
61:11
**department**
15:9, 15:17,
15:19, 19:4,
19:7, 19:13,
19:20, 23:15,
54:6, 56:7,
91:19, 97:13,
131:16, 137:16,
143:6, 145:13
**depends**
20:15, 20:17
**deponent**
175:1
**deposition**
1:17, 2:1, 7:9,
8:12, 10:18,
11:7, 12:14,
13:2, 14:5,
19:1, 20:10,
20:22, 37:3,
60:9, 60:10,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

185

61:14, 62:12,
62:14, 63:9,
84:8, 84:22,
105:3, 105:6,
107:11, 107:19,
110:20, 110:21,
114:14, 116:2,
118:18, 118:19,
153:10, 158:14,
169:8, 176:7
**depositions**
9:1, 9:4
**deputy**
91:16, 91:19
**deputy's**
91:20
**describe**
32:5, 38:7,
44:6, 44:7,
44:10, 66:10
**described**
51:2, 76:14
**describes**
68:14
**description**
83:22, 103:3,
115:14, 117:22,
117:24, 143:19,
155:6, 157:2,
157:10
**deserve**
157:19
**desk**
90:6, 90:11,
104:16
**details**
36:22, 36:23,
153:16, 153:20,
170:6
**detective**
53:19, 58:17,
92:8, 94:12,
94:17, 95:4,
100:14, 100:17,
103:4, 125:6,
125:11, 125:24,
126:3, 126:4,
126:9, 127:3,

127:9, 127:18,
128:2, 142:13,
161:16
**detectives**
29:11, 54:17,
54:19, 54:21,
55:2, 55:6,
55:13, 55:19,
57:15, 57:18,
57:21, 58:1,
58:3, 92:14,
93:23, 97:1,
100:11, 100:22,
101:7, 101:10,
101:24, 103:1,
109:21, 110:2,
110:5, 110:10,
120:3, 120:9,
121:1, 121:6,
121:11, 162:16,
165:11, 167:14
**dickinson**
4:11
**didn't**
13:10, 20:9,
20:23, 24:16,
25:4, 25:7,
28:3, 39:3,
43:11, 45:24,
57:3, 61:1,
68:16, 71:11,
79:17, 80:10,
82:9, 84:3,
94:21, 99:18,
100:17, 101:6,
101:11, 102:8,
102:10, 104:19,
110:5, 112:3,
112:8, 112:11,
120:14, 123:15,
133:21, 151:8,
157:19, 162:16,
166:1, 166:7,
170:17, 170:18
**died**
122:10
**different**
33:3, 54:5,

58:12, 70:12,
70:15, 84:9,
161:1, 165:23,
167:23
**differently**
9:10
**difficult**
154:7
**directing**
119:20
**direction**
176:11
**discipline**
131:17, 131:22,
132:1, 132:11,
132:18, 133:1,
133:6
**disciplined**
131:20
**discourage**
10:5
**discovered**
105:1, 115:22,
149:14
**discuss**
139:17
**dispatch**
13:24, 14:8,
21:16, 21:21,
22:5, 22:12,
22:18, 23:10,
25:2, 52:5,
90:21, 90:22,
91:11
**dispatcher**
24:20
**distance**
101:18
**distress**
23:16
**district**
1:1, 1:2, 14:1,
15:24, 16:1,
16:4, 16:7,
16:13, 16:14,
17:7, 17:22,
18:14, 22:19,
57:17, 58:22,

94:7, 104:17,
106:6, 108:14,
108:15, 113:20,
126:8, 160:6,
160:10, 161:24,
162:1, 162:6
**disturb**
112:7
**division**
1:3, 16:23,
53:19
**divorced**
136:9
**dna**
68:12, 68:18,
69:22, 122:17
**document**
49:3, 63:20,
64:5, 64:6,
161:1
**documentation**
51:10, 51:13,
99:18
**documented**
51:23
**documents**
52:1, 107:17,
145:1
**does**
9:9, 26:9,
67:18, 68:19,
68:22, 70:1,
70:2, 70:6,
77:20, 77:24,
90:11, 92:1,
98:15, 103:22,
108:7, 108:18,
143:22, 144:9,
162:2, 163:2,
171:3, 172:20
**doesn't**
74:24, 91:15,
97:24
**doherty**
94:5, 94:9
**doing**
10:6, 43:21,
46:2, 46:3,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

186

46:4, 85:6,
112:15, 129:10
**done**
67:6, 78:24,
81:4, 81:7,
85:15, 97:23,
109:2, 139:19,
141:9, 167:9
**door**
27:11, 27:13,
28:11, 28:16,
28:18, 29:5,
29:15, 32:21,
32:23, 33:13,
33:19, 34:13,
35:23, 36:3,
37:16, 37:21,
37:22, 37:23,
38:2, 38:4,
38:11, 39:9,
39:21, 39:24,
40:1, 40:13,
41:6, 47:3,
60:21, 60:23,
60:24, 61:1,
61:3, 61:23,
61:24, 62:1,
62:2, 62:3,
62:5, 62:6,
62:7, 62:8,
62:19, 62:22,
74:1, 74:9,
88:11, 88:13,
89:3, 89:9,
89:17, 112:2,
121:14, 148:11,
157:24, 158:2,
158:3, 166:18,
167:14, 167:17,
167:20, 167:24,
168:3, 168:6,
170:10, 170:12,
171:17, 171:18
**doorknob**
88:16
**double**
13:3, 111:3
**double-homicide**
106:18

**double-sided**
64:5
**down**
9:12, 10:3,
42:20, 55:10,
68:20, 70:4,
75:14, 76:11,
91:23, 103:12,
103:14, 103:24,
110:15, 110:17,
119:24, 135:2,
150:11, 150:24,
162:14, 166:8,
167:13, 168:14,
168:17
**downtown**
53:19
**dozen**
9:7
**dresser**
47:23, 48:18,
49:1, 76:20,
76:21, 77:2,
81:14
**drive**
5:14
**driver**
15:14
**drove**
15:14, 23:12
**duly**
8:3
**during**
10:18, 18:8,
20:10, 20:22,
31:21, 38:18,
138:22, 152:21,
153:17
**duty**
20:18

**E**

**each**
13:16, 18:19,
41:12, 41:17,
57:22, 86:12,
86:17, 130:6,
161:5

**earlier**
75:17, 78:22,
84:2, 84:4,
133:10, 147:13
**eastern**
1:3
**edward**
5:5
**eight**
15:16
**either**
82:4, 82:18,
83:21, 96:4,
111:24, 112:8,
112:12, 112:19,
112:20, 115:21,
128:12, 138:10,
138:11, 139:8,
150:20
**elbows**
43:6, 43:10,
43:11, 43:24
**elderly**
156:2
**electronic**
132:16
**else**
11:20, 12:7,
12:11, 13:5,
13:14, 14:4,
14:10, 25:4,
25:5, 26:23,
36:8, 36:9,
38:10, 39:8,
47:1, 47:3,
48:8, 48:10,
49:7, 49:11,
50:4, 50:14,
50:17, 50:21,
54:12, 58:15,
58:23, 86:17,
87:7, 97:11,
106:20, 113:6,
113:16, 124:12,
124:15, 124:23,
128:4, 128:8,
146:6, 150:8,
153:9, 155:17,

157:14, 162:21,
173:11
**ely**
1:24, 2:13,
176:3
**emergency**
30:15, 30:16
**employed**
176:13
**employee**
131:15
**employment**
15:6, 15:13,
130:3, 139:2
**empty**
47:19
**end**
34:11, 109:3,
109:6, 120:2,
174:11
**ended**
130:7
**enforcement**
135:23, 136:1
**english**
14:14, 45:19,
45:23
**enough**
35:1, 47:21,
87:23, 134:14,
139:21, 144:19
**entail**
133:10
**enter**
30:1, 39:16,
47:1, 53:13,
102:3, 102:23,
103:2
**entered**
40:12, 75:12,
102:5, 102:13,
171:21
**entire**
84:7, 119:12,
162:15, 173:23
**entrance**
60:19, 61:19
**entry**
30:1, 69:11,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

187

74:10, 112:2,
171:18
**entryway**
152:5, 157:21
**errata**
175:8
**errors**
123:17
**especially**
53:20
**esquire**
3:4, 3:12, 4:4,
4:14, 5:5, 5:12,
6:4
**et**
1:8, 1:14
**even**
9:13, 25:7,
25:8, 35:23,
38:20, 47:23,
97:19, 102:10,
140:8, 143:14,
152:10
**events**
139:18
**eventually**
59:17
**ever**
8:12, 49:3,
59:10, 59:16,
97:16, 102:5,
113:20, 115:20,
116:5, 119:9,
122:16, 122:20,
123:24, 124:1,
124:15, 124:23,
125:5, 125:10,
127:8, 127:14,
128:1, 129:17,
131:16, 133:22,
134:1, 134:4,
139:22, 140:10,
140:13, 141:15,
142:21, 143:11,
143:14, 143:24,
144:2, 144:4,
144:11, 144:16,
144:20, 145:15,

148:15, 148:18,
149:2, 149:4,
163:18, 163:21,
164:22, 164:24,
165:6
**every**
25:22, 80:1
**everybody**
9:9, 31:16,
124:12, 167:9
**everything**
50:7, 50:10,
50:12, 67:6,
73:2, 97:11,
168:15
**everywhere**
38:12, 38:13,
42:16, 49:20,
151:24
**evidence**
75:24, 100:4,
122:14, 133:23,
134:2, 140:13,
140:16, 140:19,
140:22, 141:7,
164:2
**exact**
8:16, 132:8
**exactly**
36:16, 141:11
**examination**
7:2, 8:4, 129:7
**examined**
175:4
**examiner**
93:5
**examiner's**
93:10
**example**
13:8, 66:12,
139:13
**excessive**
130:13, 130:15
**exhibit**
7:11, 7:12,
7:13, 7:14,
7:15, 7:16,
7:17, 7:18,

7:19, 7:20,
7:21, 60:9,
60:10, 60:12,
61:12, 61:14,
61:17, 61:18,
62:12, 62:14,
62:18, 63:7,
63:9, 82:22,
89:20, 91:6,
98:11, 100:11,
103:11, 103:14,
105:3, 105:6,
105:7, 105:10,
107:2, 107:10,
107:11, 110:17,
110:20, 110:21,
111:4, 111:7,
111:18, 114:13,
114:14, 115:5,
115:15, 116:1,
116:2, 116:8,
116:9, 116:21,
117:4, 117:6,
118:11, 118:18,
118:19, 119:21,
146:9, 159:23,
163:9, 165:7,
169:6, 169:8,
173:20, 174:4
**exhibits**
7:9
**exit**
69:14, 170:10
**exited**
25:13
**exiting**
23:5
**exonerated**
125:16, 125:19,
130:21, 130:22
**exonerations**
125:11
**expert**
70:12
**expires**
176:20
**explain**
43:13, 53:16,

66:7, 133:9,
139:12
**explaining**
22:11
**expletive**
41:22
**extensive**
140:3
**extent**
173:21
**eyes**
66:23

**F**

**face**
34:21, 42:19,
75:13, 75:14,
76:11, 167:16
**facing**
42:19, 42:20,
170:10
**fact**
98:13, 122:3
**facts**
100:3
**fair**
20:14, 102:12,
123:16, 134:14,
139:21, 144:19
**false**
134:5
**falsifying**
133:23
**familiar**
9:9, 142:19,
169:17
**family**
14:16, 14:19,
19:3, 28:13,
28:22, 29:1,
29:2, 30:18,
30:21, 30:23,
31:15, 32:18,
35:6, 35:16,
36:5, 37:11,
40:3, 41:11,
45:20, 67:14,
68:4, 109:10,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

188

109:11, 146:23,
149:1, 153:4,
153:7, 153:16,
153:21, 154:15,
155:1
**far**
28:11, 35:15,
41:15, 77:12,
103:1, 112:11,
150:10, 157:20,
161:11, 167:23
**farther**
166:8, 168:6
**fax**
160:9, 160:13,
160:14
**features**
69:9
**federal**
131:2
**feel**
20:3, 173:24
**feet**
28:15, 28:16,
37:22, 38:4,
151:1, 167:16,
167:19, 168:3,
168:6
**felicia**
68:8, 146:13,
146:19, 148:21,
156:18
**female**
26:19, 42:9,
76:13, 78:9,
121:12, 121:18,
133:15, 149:7,
149:17, 150:2,
157:1, 157:9
**females**
147:1
**fetal**
42:10, 42:12,
75:18, 76:13,
76:24, 121:21,
149:8
**few**
11:17, 11:19,

37:22, 129:14,
153:10
**field**
16:5
**fight**
38:20
**figure**
131:19
**filled**
67:2
**filling**
141:16
**financial**
176:15
**find**
32:22, 33:9,
37:12, 52:2,
54:23, 55:1,
55:5, 55:8,
56:5, 59:18,
73:13, 73:17,
73:20, 73:24,
75:7, 80:10,
82:23, 86:9,
86:13, 86:20,
87:2, 88:8,
109:21, 110:5,
110:10, 152:18,
161:17, 162:16
**finding**
45:1, 59:21
**fine**
85:2
**fingerprints**
39:6
**finish**
9:15, 97:9,
99:17, 106:10,
153:12
**finished**
85:16
**fire**
64:20
**firearm**
69:8
**firm**
4:15
**first**
15:18, 28:24,

38:10, 42:4,
60:14, 64:11,
81:4, 81:7,
82:9, 82:18,
84:9, 84:12,
84:15, 85:11,
85:13, 86:6,
86:18, 88:23,
91:12, 91:16,
91:19, 91:20,
94:2, 105:8,
121:8, 123:7,
153:10, 165:6,
167:12
**five**
8:18, 18:7,
83:10, 119:24,
132:9, 132:10,
167:22
**five-minute**
174:7
**fix**
91:5
**flashlight**
42:14, 44:19,
44:20, 81:24,
149:18, 154:7,
154:9, 173:9
**flashlights**
81:3
**flat**
43:23
**floor**
3:7, 3:15,
37:18, 37:23,
38:22, 38:23,
47:19, 72:9,
89:16, 121:13,
122:1, 122:4,
152:10, 158:1,
158:4, 163:14,
163:15, 167:16,
171:10
**flopped**
150:23
**focus**
119:12
**follow-up**
140:18

**followed**
39:15
**follows**
8:3, 157:7,
159:9
**footprints**
38:24
**fop**
126:23, 127:4,
127:8, 128:12,
128:22
**force**
130:14, 130:15,
139:16
**forced**
30:1
**forearms**
173:9
**foregoing**
175:5, 176:6,
176:8
**forehead**
42:24
**forgive**
84:17, 85:11,
104:13, 142:4
**forhnauer**
97:2
**form**
13:7, 14:6,
19:14, 21:11,
26:21, 29:11,
39:11, 44:12,
45:11, 47:10,
48:9, 49:5,
49:9, 49:13,
51:18, 52:3,
53:1, 56:3,
56:16, 56:23,
57:14, 58:11,
59:3, 59:8,
59:22, 70:18,
74:19, 75:2,
75:23, 79:5,
79:11, 79:16,
79:23, 81:9,
81:12, 82:6,
82:11, 82:20,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

189

84:14, 85:22,
86:19, 87:19,
88:10, 89:14,
95:16, 95:19,
99:24, 100:20,
102:15, 113:3,
115:11, 117:19,
118:6, 120:22,
121:19, 123:11,
123:22, 124:17,
125:8, 125:17,
125:21, 126:5,
126:11, 126:17,
126:21, 128:7,
131:22, 140:6,
141:23, 147:22,
157:12, 159:13,
162:5, 163:24,
164:13, 166:21,
167:6, 168:16,
168:23, 169:19,
169:24, 170:14,
171:11, 171:14,
171:23, 172:13
**forms**
133:6
**forward**
153:13
**found**
13:21, 48:5,
52:22, 52:23,
54:24, 55:3,
59:10, 59:16,
59:17, 67:12,
109:18, 122:9,
149:7
**foundation**
19:15, 19:16,
24:9, 27:2,
28:14, 28:23,
32:11, 35:18,
46:12, 49:13,
49:22, 50:19,
52:24, 54:20,
55:20, 56:12,
56:16, 57:1,
57:7, 57:14,
74:20, 76:15,

79:6, 79:11,
79:16, 82:6,
83:5, 83:9,
83:11, 87:19,
88:10, 88:14,
89:14, 92:9,
92:15, 94:20,
100:24, 107:4,
113:3, 113:8,
117:19, 118:6,
120:22, 123:11,
125:8, 126:6,
126:11, 126:17,
126:21, 127:20,
138:14, 142:9,
147:22, 148:7,
150:9, 151:7,
154:5, 157:17,
163:4, 163:24,
166:22, 167:3,
169:24, 171:11,
171:14, 171:23,
172:13
**frame**
30:6
**free**
20:3, 119:11,
174:1
**french**
137:8
**frequently**
139:8
**fresh**
51:3, 51:8,
80:6
**friday"**
71:21
**frohnauer**
97:3, 97:5,
99:12, 105:13,
105:15, 105:19,
107:2
**frohnauer's**
99:8
**from**
10:5, 10:6,
10:19, 14:2,
14:8, 14:19,

14:22, 16:15,
21:9, 22:15,
28:11, 28:15,
28:18, 29:17,
31:22, 35:10,
37:22, 61:6,
61:22, 65:2,
65:3, 65:8,
67:10, 67:13,
68:2, 68:3,
70:13, 71:23,
72:12, 72:13,
73:18, 84:15,
88:3, 89:9,
89:17, 93:9,
94:7, 95:8,
95:12, 100:8,
105:24, 106:4,
107:1, 109:10,
111:14, 111:20,
112:1, 116:9,
116:10, 119:6,
121:8, 122:1,
126:8, 128:12,
128:21, 129:4,
130:2, 133:4,
133:7, 134:22,
135:10, 135:11,
135:14, 135:16,
135:17, 135:18,
136:2, 136:4,
141:5, 145:12,
152:18, 153:16,
160:6, 160:9,
163:21, 167:24,
173:22, 174:8,
174:11
**front**
71:8, 72:5,
73:5, 91:6,
103:13
**frustrated**
33:4
**fuck**
36:12
**full-fledged**
16:11
**function**
95:14, 96:6,

96:18, 96:22,
99:9, 102:2
**functions**
18:20
**furniture**
48:17, 48:23,
81:18, 81:20
**further**
14:8, 22:14,
23:17, 52:8,
52:16, 67:15,
77:22, 128:9,
153:3, 153:15,
153:16, 169:3,
169:22, 170:4,
172:21, 174:5
**fusco**
6:5

**G**

**gabriel**
1:11, 8:7,
143:21
**gagging**
50:2
**gain**
61:5, 74:10,
112:2
**gang**
69:24
**gang-related**
58:14
**gangway**
24:3, 24:6,
25:10, 25:12,
28:2
**gathered**
24:7
**gathering**
51:14
**gave**
33:17, 46:1,
74:12, 74:13,
141:6
**general**
12:4, 54:4,
63:13, 63:14,
115:3, 116:19,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

190

145:8, 146:9,
162:2
**generally**
91:12
**generated**
12:3, 12:5
**gentleman**
32:6, 127:7,
166:3
**gesture**
43:14
**gesturing**
10:6, 21:20,
44:6
**get**
22:5, 22:14,
25:7, 25:19,
27:20, 33:14,
39:23, 47:21,
53:22, 54:6,
62:21, 71:3,
71:5, 71:23,
72:12, 75:5,
78:17, 78:20,
81:21, 87:24,
89:6, 102:10,
109:2, 109:8,
122:8, 129:15,
139:6, 150:12,
158:6, 159:11,
161:8, 162:3,
166:24
**gets**
101:21
**getting**
33:4, 166:14,
166:17
**girl**
111:5
**give**
23:8, 52:5,
67:20, 130:5,
153:5, 158:9,
158:23
**given**
21:18, 167:4,
168:17, 175:7,
176:9

**gives**
23:6
**glass**
33:24, 34:12,
34:15, 34:19,
34:20, 112:1
**go**
10:23, 13:9,
13:17, 15:19,
18:20, 20:15,
22:16, 23:17,
23:20, 25:3,
28:3, 29:4,
30:3, 32:15,
33:14, 36:18,
37:7, 37:10,
40:20, 40:21,
41:4, 41:23,
45:12, 59:13,
63:6, 74:21,
78:15, 80:12,
85:7, 88:5,
89:24, 97:9,
97:18, 99:17,
106:2, 106:10,
113:20, 124:4,
129:6, 130:22,
134:24, 135:5,
135:8, 138:23,
152:18, 154:24,
159:4, 170:18
**goes**
32:21, 77:8,
157:20
**going**
9:14, 10:6,
12:14, 13:9,
15:5, 18:22,
19:24, 20:13,
20:20, 23:7,
23:18, 36:19,
37:10, 38:20,
39:10, 43:20,
45:23, 53:22,
56:6, 56:23,
57:6, 57:12,
62:11, 67:23,
68:20, 70:8,

70:17, 80:15,
85:20, 85:22,
90:22, 100:9,
100:19, 106:1,
106:4, 110:19,
118:21, 119:6,
119:11, 119:13,
120:21, 129:14,
140:9, 143:20,
146:8, 153:6,
157:3, 157:11,
158:8, 158:22,
158:24, 165:3,
167:2, 167:6,
169:6, 170:21,
173:19, 173:22,
174:3
**golden**
4:14, 13:7,
13:15, 14:6,
14:11, 20:18,
24:16, 27:2,
52:24, 56:23,
57:8, 71:16,
74:19, 75:2,
76:3, 76:7,
76:19, 82:20,
85:24, 87:24,
98:17, 99:16,
99:24, 100:3,
102:15, 108:12,
113:3, 115:11,
117:18, 118:8,
120:11, 120:21,
121:3, 123:11,
123:22, 124:2,
125:17, 125:21,
126:5, 128:11,
128:15, 128:18,
128:24, 148:7,
154:22, 159:12,
159:17, 166:21,
167:6, 168:16,
168:23, 169:14,
170:24, 171:3
**good**
8:6, 87:24,
129:9, 129:10,

129:11, 134:12,
138:21
**got**
8:19, 14:23,
14:24, 15:16,
22:18, 23:9,
23:11, 24:1,
24:2, 25:11,
27:20, 29:17,
32:22, 36:13,
41:13, 43:10,
46:20, 47:6,
50:8, 51:3,
51:8, 52:4,
65:6, 65:7,
66:23, 67:7,
71:7, 73:18,
77:12, 89:8,
91:7, 95:5,
97:12, 106:8,
108:19, 108:23,
108:24, 122:4,
124:12, 128:24,
135:10, 135:18,
140:23, 158:10,
166:10, 172:1
**gpr**
29:7, 29:10,
29:13
**gprs**
29:9
**grade**
96:8, 114:4,
115:13
**graduate**
134:22
**graduated**
135:9, 135:13
**grammar**
14:18
**grand**
104:12
**grandfather**
14:23
**grandmother**
14:16
**granted**
44:9

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

191

gray
92:19, 92:23,
137:7
great
41:18, 53:21,
153:11, 158:10
grotesque
13:18, 13:22
ground
9:8
group
24:2, 25:14,
25:21, 26:24,
27:22, 31:3,
60:12, 101:21,
169:6
growing
14:16
guadalupe
77:15, 78:8
guarantee
83:14
guard
106:1
guess
38:18, 52:2,
67:23, 70:8,
80:18, 120:16
guessing
53:6
guevara
1:8, 4:3, 58:7,
94:17, 95:4,
100:12, 115:17,
115:21, 120:9,
120:17, 121:2,
121:6, 125:6,
125:11, 125:24,
126:3, 127:3,
127:9, 127:18,
128:2, 142:6
guevara's
126:10
gutierrez
96:21
guy
126:22, 166:16
guys
55:11, 133:11

gym
138:10

**H**

habit
10:4, 22:8
had
8:12, 11:8,
12:21, 24:24,
29:2, 29:24,
33:23, 34:7,
37:19, 44:18,
44:20, 47:4,
50:1, 51:19,
55:3, 62:7,
67:20, 72:18,
72:19, 81:4,
81:7, 86:5,
96:19, 96:22,
104:24, 111:18,
123:7, 125:24,
137:2, 137:3,
139:13, 141:19,
141:21, 147:9,
149:23, 150:22,
152:19, 153:4,
154:1, 154:7,
155:15, 156:24,
157:9, 158:2,
158:3, 158:5,
159:10, 165:12,
165:20, 168:20
hadn't
71:20
hair
150:22, 154:1,
155:14
half
79:19
halfway
165:10
halvorsen
58:17, 94:12,
94:19, 100:12,
115:17, 115:21,
120:9, 120:17,
121:2, 121:6,
142:13

hand
176:17
handed
63:11
handling
140:16, 140:19
hands
43:3, 43:12,
43:16, 43:23,
147:17, 148:4
handwriting
63:19, 70:11,
70:13, 70:16,
71:1, 105:9,
105:11, 107:24,
109:16, 111:12
happen
20:5, 21:13,
40:10, 56:2
happened
16:19, 24:1,
25:11, 25:15,
29:16, 30:8,
31:8, 32:13,
32:16, 32:20,
33:11, 33:16,
34:18, 36:1,
36:17, 42:1,
42:7, 51:2,
51:9, 54:16,
65:10, 75:1,
75:7, 122:10,
123:21, 124:13,
131:11, 165:20
happening
47:13
happens
20:6
hard
9:19, 69:7
harm
53:21
harvey
4:12, 95:18,
117:5, 117:17
has
20:18, 25:20,
62:20, 75:21,

90:4, 127:8,
128:1, 167:22
hat
137:3
haven't
19:2, 20:7,
49:8, 49:12,
50:6, 50:23,
58:24, 67:4,
82:19, 113:17,
128:6, 134:7,
170:7
having
8:3, 45:22,
84:21, 99:21,
101:17, 101:23
he'll
20:16
he's
18:14, 32:22,
32:23, 33:3,
41:11, 69:18,
71:2, 71:19,
90:13, 94:7,
126:13, 141:9,
173:22
head
38:1, 38:5,
42:14, 42:19,
42:23, 150:21
hear
24:16, 41:17,
46:16, 46:19,
47:6, 52:16,
57:24, 59:24,
87:10, 87:14,
87:23, 101:13,
106:12, 123:15,
124:8
heard
18:14, 72:7,
165:6, 168:21
heavy
34:4, 62:7,
155:18
heinous
13:12, 58:13,
106:24, 151:13

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

192

**held**
2:1
**help**
67:3, 77:1,
77:4, 108:18
**helped**
76:20
**helping**
54:15
**her**
11:21, 11:22,
11:23, 25:19,
26:15, 26:18,
27:10, 28:7,
28:10, 28:13,
42:13, 42:15,
42:18, 42:19,
42:22, 42:24,
43:3, 43:4,
43:5, 43:8,
43:9, 43:11,
43:16, 43:23,
43:24, 44:2,
44:14, 76:11,
121:21, 122:1,
149:14, 149:16,
149:19, 149:20,
150:4, 150:6,
150:8, 150:14,
150:17, 150:19,
150:21, 150:22,
150:24, 151:1,
151:16, 154:2,
155:5, 155:10,
155:17, 155:22,
156:3, 156:4
**here**
10:21, 22:2,
28:15, 36:13,
46:20, 47:7,
56:9, 71:6,
71:19, 73:5,
77:22, 97:15,
97:21, 103:10,
103:24, 110:5,
120:2, 129:16,
139:20, 143:23,
147:8, 147:10,

147:14, 158:9,
158:14, 165:22,
166:3, 171:19,
171:24, 172:1,
172:17
**hereby**
175:3, 176:7
**hereunto**
176:16
**hey**
41:4, 41:13,
41:23
**hi**
18:22
**high**
23:13, 134:22,
134:24, 135:1
**him**
18:23, 18:24,
27:20, 32:6,
33:10, 46:1,
46:16, 46:19,
58:9, 58:10,
58:15, 58:18,
58:20, 80:9,
82:14, 86:11,
87:6, 91:22,
102:9, 126:20,
138:6, 142:20,
143:2, 147:20,
148:1, 156:8,
158:6, 158:15,
159:10, 161:21,
165:19, 166:1,
173:10
**his**
22:4, 32:3,
32:9, 38:1,
38:4, 38:5,
38:7, 38:9,
78:4, 91:22,
92:10, 98:23,
125:6, 126:13,
126:15, 126:18,
141:10, 147:14,
147:17, 148:3,
148:10, 156:12,
167:4, 173:8

**hispanic**
26:6, 32:6,
37:17, 42:9,
77:21, 78:6,
78:9, 121:12,
156:8, 167:15
**history**
15:6
**hit**
34:21, 53:22
**home**
68:15
**homicide**
13:3, 52:6,
55:21, 56:2,
58:21, 91:1,
91:3, 111:3
**homicides**
58:13
**hoping**
67:1
**hour**
79:19
**hours**
14:2, 18:15,
18:16, 65:1,
65:10, 66:15,
73:24, 74:7,
90:9, 90:15,
90:18, 91:7,
91:9, 91:17,
92:6, 92:20,
93:2, 97:22,
98:2, 108:5,
108:16, 109:4,
153:10
**house**
24:4
**household**
14:18
**how**
8:15, 11:13,
14:15, 15:11,
15:15, 16:6,
16:14, 17:1,
17:10, 18:5,
19:11, 19:19,
21:13, 22:5,

24:8, 24:10,
24:24, 26:19,
28:11, 32:7,
33:1, 34:23,
44:7, 44:15,
48:21, 49:21,
49:23, 51:17,
52:15, 52:22,
54:9, 55:16,
56:11, 56:13,
56:21, 57:3,
58:17, 59:18,
67:24, 79:9,
79:13, 83:3,
83:7, 88:12,
94:9, 95:4,
95:18, 96:21,
98:19, 100:22,
101:16, 103:6,
108:21, 108:24,
110:4, 110:7,
122:4, 127:1,
127:22, 129:10,
129:23, 132:7,
136:17, 139:8,
140:3, 141:2,
141:5, 146:2,
150:10, 151:6,
152:14, 154:3,
154:8, 155:11,
155:23, 156:1,
156:11, 157:20,
162:3, 167:23,
170:3
**humboldt**
136:5
**hurt**
72:8
**hvac**
172:10, 172:21
**hypothetical**
113:4

_____I_____
**i'll**
10:7, 59:11,
61:12, 84:22,
102:18, 107:10

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

193

i've
14:24, 35:1,
35:2, 63:11,
97:12, 107:13,
158:10
identification
60:11, 61:15,
62:15, 63:10,
67:14, 105:4,
107:12, 110:22,
114:15, 116:3,
118:20, 169:9
illinois
1:2, 1:18, 2:6,
2:15, 3:8, 3:16,
4:8, 4:18, 5:8,
5:16, 6:8,
176:6, 176:24
immediate
94:4
impending
137:3
imposed
133:1
impression
163:19, 164:23
impressions
163:14
in-service
139:7, 139:11
inappropriate
76:5, 76:8
incident
64:22, 136:20,
147:21, 163:19
inclement
137:2
incomplete
113:3
incorrect
123:10, 123:14,
158:14
independent
55:13, 161:20
independently
23:22, 23:24,
36:24
indiana
135:20

indicate
98:15
indicated
98:10, 99:3
indicates
115:15
indicating
172:3
individual
42:3, 93:23
individuals
146:13
infant
111:4
information
14:8, 16:23,
22:15, 23:17,
40:8, 51:14,
51:19, 56:6,
65:2, 65:6,
65:7, 65:9,
67:8, 67:10,
67:13, 68:2,
71:3, 71:5,
71:8, 71:23,
72:12, 109:8,
110:4, 110:15,
110:16, 111:14,
111:20, 118:3,
118:13, 153:5,
162:14
informed
12:13, 165:11
initial
115:6
initially
165:19
injuries
156:24, 157:8
inner
60:23, 60:24,
61:24, 62:5,
62:6
inside
22:19, 35:10,
35:16, 36:20,
37:10, 45:21,
45:24, 62:9,

80:12, 89:9,
89:17, 121:14,
167:17, 167:20
instructions
39:16
instructs
10:23
instrument
34:2
integrity
113:14
interest
176:14
interrupt
9:20, 12:21
interrupted
85:6
interview
143:11, 143:24
interviewing
144:11
into
20:6, 27:16,
37:14, 46:7,
47:4, 48:1,
48:4, 76:17,
77:7, 78:11,
78:15, 80:15,
80:22, 82:13,
84:15, 106:2,
106:10, 122:13,
151:18, 158:6,
159:11
inventory
140:14, 140:22,
141:5, 141:7
investigate
54:7, 55:21
investigated
125:12
investigating
56:5, 115:16
investigation
20:1, 21:4,
99:22, 104:24,
108:5, 109:22,
110:9, 113:24,
119:22, 125:7,

128:5, 143:18,
144:5, 144:17,
161:17, 163:3,
165:1
investigator
144:6
investigators
93:24
involved
13:19, 101:21,
131:8
involvement
145:10
involves
53:21
islands
14:24
issue
137:16
issued
127:9, 128:1
it's
16:23, 20:14,
22:6, 22:8,
41:5, 48:15,
53:22, 55:23,
60:19, 61:10,
61:19, 61:24,
62:7, 63:13,
64:4, 65:16,
66:22, 70:12,
76:2, 76:3,
80:12, 91:14,
102:24, 104:11,
106:18, 106:22,
107:16, 111:2,
114:18, 114:19,
115:13, 120:20,
121:7, 139:16,
140:8, 140:22,
142:3, 143:19,
146:9, 147:8,
154:7, 154:8,
157:12, 160:9,
167:3, 168:11,
172:7
items
70:7

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

194

its
176:15

**J**

jacket
137:2
jackson
4:16
jamieson
4:14
jan
3:12, 8:6,
84:20
jargon
23:16
joanne
1:24, 2:13,
176:3
job
1:22, 8:20,
35:4, 55:22,
55:24, 56:1,
56:4, 83:22,
103:3, 115:13,
117:21, 117:23,
122:18, 126:13,
143:19
john
118:12
join
148:8
joke
133:19
jokes
133:11
jorge
147:7
joseph
135:12, 135:18,
135:19
jr
1:17, 2:1, 7:2,
8:2, 8:11, 175:3
judge
10:21
july
1:19, 176:18
jump
20:19

just
9:8, 10:16,
13:11, 13:18,
14:7, 20:13,
20:16, 21:24,
22:8, 27:20,
29:2, 29:10,
30:2, 30:3,
31:5, 36:23,
39:10, 39:13,
41:19, 42:17,
43:13, 44:5,
44:7, 50:9,
52:2, 54:2,
54:21, 64:3,
64:7, 66:9,
69:21, 75:7,
80:16, 80:20,
81:10, 81:24,
87:1, 89:24,
91:5, 96:24,
100:19, 103:10,
106:18, 109:1,
109:13, 115:8,
119:12, 119:15,
120:13, 120:23,
121:13, 128:15,
131:5, 134:9,
137:15, 139:13,
141:9, 142:4,
144:18, 145:24,
147:24, 150:12,
153:6, 154:8,
160:3, 161:15,
162:15, 167:9,
169:5, 169:10,
170:21, 174:6

**K**

kane
176:5
karalow
95:12, 95:15,
117:5, 117:17
katie
11:5, 11:12,
13:10, 158:20
keep
45:18, 68:20,

78:23
kelvyn
135:1
kept
48:12
kevin
4:4
key
32:22, 32:23,
33:5, 33:9,
33:13, 60:22,
73:24, 88:9,
88:17, 166:10,
166:14, 167:1
keys
31:12, 31:18,
32:22, 33:3,
33:4, 166:24
kidnappings
114:3
kids
45:16, 136:11
kind
18:22, 21:19,
23:17, 34:1,
34:7, 41:12,
42:22, 47:23,
67:2, 88:17,
122:17, 134:5,
137:7, 137:21,
137:22, 139:19,
151:23, 172:14
kindly
133:21
kitchen
37:18, 37:23,
39:12, 46:6,
75:13, 89:15,
89:18, 163:14,
163:15, 167:16
kneeling
42:21
knees
42:13, 42:18,
42:22
knew
24:23, 29:4,
37:3, 91:2,

151:9, 154:22
knife
34:7, 38:12,
38:17, 164:20
knives
164:17
knock
29:4
knocked
27:11, 27:13,
27:14, 28:11,
29:15, 39:14,
47:23
knocking
28:18
knowledge
19:17, 117:21,
125:13
known
124:18
knows
96:15

**L**

lab
92:19, 92:22
lady
25:16, 26:6,
31:3, 31:5,
154:17, 156:1
lady's
26:4
landlord
73:13, 73:17,
73:21, 73:23,
74:3, 74:7,
74:16, 77:23,
88:20, 147:13
language
14:17, 26:7,
52:13
languages
14:13
large
121:8
lasalle
4:6
last
8:10, 18:14,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

195

18:21, 18:23,
84:7, 99:3,
104:21, 144:7
**late**
18:11, 131:14
**later**
31:10, 32:2,
54:23, 54:24
**latina**
153:24, 155:8,
155:9
**latino**
153:22
**latinos**
19:19
**law**
3:13, 4:15,
135:23, 136:1,
139:17
**lawsuit**
129:18, 129:21,
130:2
**lawyer**
107:17, 123:1,
123:6
**lawyers**
8:7
**laying**
37:17, 37:19,
37:23, 38:9,
39:24, 75:13,
75:14, 89:15,
121:13, 158:1,
158:4, 167:15,
168:4
**learn**
59:20, 124:19,
124:23, 125:5
**learned**
124:15, 125:10,
153:16
**least**
24:12, 108:16,
167:22
**leave**
31:13, 31:15,
39:6, 78:19,
97:17

**leavitt**
21:18, 23:21,
58:24, 60:20,
61:20, 72:5,
73:6, 73:16,
97:18, 98:23,
102:20, 103:7,
105:17, 109:19,
111:24, 117:11,
118:5, 118:14,
124:14
**leeway**
158:9, 158:23
**left**
22:7, 48:15,
56:22, 57:6,
57:13, 57:16,
57:17, 73:16,
74:9, 78:17,
79:1, 79:4,
89:24, 98:5,
102:14, 102:19,
102:20, 113:19,
115:17, 137:10,
139:5
**legs**
150:24
**leinenweber**
4:5
**let**
9:14, 9:19,
10:11, 10:16,
20:9, 20:24,
31:18, 42:17,
60:3, 60:14,
64:7, 64:8,
105:5, 114:12,
115:24, 118:17,
119:17, 119:18,
122:8, 147:12,
153:12, 159:1,
169:2, 173:19
**let's**
24:14, 28:16,
34:6, 61:7,
62:17, 63:7,
174:6
**letters**
68:12

**level**
29:9, 101:22
**levels**
54:5
**lie**
140:9
**lieutenant**
95:21
**lifted**
44:11
**light**
39:6, 113:11
**lights**
39:2, 39:3,
39:6, 112:3,
154:6, 170:17
**like**
8:18, 8:24,
19:17, 20:9,
24:5, 31:23,
32:5, 33:3,
34:5, 34:6,
34:7, 34:11,
35:3, 37:19,
38:16, 38:20,
39:13, 40:22,
41:6, 42:13,
42:21, 42:24,
43:7, 43:16,
43:20, 47:18,
47:23, 48:20,
53:18, 58:13,
61:3, 62:2,
62:6, 64:11,
64:17, 66:22,
68:17, 69:7,
69:8, 69:16,
70:12, 71:2,
75:20, 85:3,
86:4, 90:22,
103:14, 104:7,
121:7, 128:13,
128:16, 128:23,
136:22, 138:6,
139:6, 139:15,
139:16, 140:4,
150:1, 151:1,
152:9, 155:18,

**level**
156:2, 156:3,
156:4, 156:7,
156:19, 158:22,
162:2, 168:4
**line**
68:11, 73:23,
82:22, 115:16,
144:7, 160:20,
162:2, 162:8
**lines**
119:24, 121:8,
162:9
**listed**
100:10, 146:13,
147:10, 147:14,
164:3
**little**
15:5, 23:14,
24:5, 32:23,
33:18, 34:6,
46:1, 113:10,
166:8
**live**
77:11, 135:2,
136:6
**lived**
25:24, 27:10,
73:7
**lives**
72:4, 73:5
**llc**
6:5
**llp**
5:13
**localized**
65:22, 65:23
**locate**
21:8, 78:12,
109:19
**located**
171:21, 173:2
**location**
2:2, 22:16,
23:12, 25:3,
71:20, 109:21,
161:16
**lock**
62:21, 63:1,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

196

88:8, 88:20,
89:5, 166:10,
166:17, 167:1
**locked**
61:2
**locks**
62:9, 74:10,
88:12, 89:6,
89:9, 89:10
**loevy**
2:4, 3:5
**logan**
136:6
**long**
15:15, 16:6,
16:14, 17:1,
17:10, 18:5,
20:7, 49:21,
49:23, 49:24,
56:11, 56:13,
56:21, 57:3,
79:9, 79:20,
83:3, 83:14,
103:6, 108:21,
108:24, 109:5,
109:6, 127:1,
127:22, 135:4
**look**
12:2, 36:19,
55:9, 55:17,
60:14, 77:4,
81:11, 81:14,
81:16, 81:18,
81:20, 82:4,
89:17, 89:20,
113:12, 114:18,
114:19, 114:21,
117:6, 138:6,
140:7, 163:9,
168:12, 168:13,
169:17, 170:9,
171:16, 172:6,
172:19
**looked**
11:9, 11:24,
12:7, 12:8,
12:11, 12:22,
28:12, 32:5,

37:19, 38:16,
38:19, 47:20,
47:22, 62:6,
77:6, 81:3,
110:2, 156:7,
156:18
**looking**
28:19, 33:2,
45:16, 78:18,
78:23, 103:11,
103:13, 107:1,
134:9
**looks**
64:17, 66:22,
69:6, 69:8,
69:16, 70:12,
70:19, 71:2,
90:22, 103:14
**lorenzo**
14:23
**lot**
9:3, 23:11,
30:14, 51:23,
66:13, 71:5
**lots**
153:9
**loud**
72:8
**lupe**
29:21

**M**

**m**
93:4
**m-2**
74:8, 77:24
**ma'am**
95:20
**made**
13:8, 31:9,
36:12, 41:3,
51:11, 53:15,
54:13, 54:14,
63:14, 73:21,
80:17, 80:24,
93:1, 93:14,
93:16, 97:15,
98:9, 98:22,

105:16, 108:11,
108:22, 109:6,
111:2, 115:9
**main**
62:19
**maintenance**
31:10, 31:11,
32:1, 32:10,
32:14, 32:21,
33:8, 33:13,
60:22, 73:22,
74:4, 88:7,
88:21, 147:12
**make**
9:11, 22:1,
26:1, 27:21,
29:7, 29:12,
49:3, 50:10,
51:21, 53:18,
54:9, 54:11,
56:4, 61:12,
66:23, 80:12,
85:1, 91:13,
93:13, 93:15,
97:10, 97:13,
106:3, 108:2,
120:23, 162:7
**making**
30:3, 43:14,
51:10, 51:12,
52:1, 54:3,
167:9
**male**
26:19, 37:17,
72:7, 78:5,
133:15, 133:16,
152:5, 152:8,
156:8, 156:24,
157:9, 157:20,
167:15, 171:13,
171:20, 173:2,
173:4
**males**
146:24
**man**
31:10, 31:11,
32:2, 32:10,
32:14, 32:21,

33:8, 33:13,
37:17, 73:22,
74:4, 88:7,
88:21, 126:18,
145:21, 147:12
**management**
135:23, 136:1
**mantilla**
92:6, 92:8
**many**
8:15, 8:20,
9:6, 11:13,
19:11, 19:19,
24:8, 24:10,
24:14, 44:15,
55:16, 79:13,
83:7, 88:12,
100:22, 129:23,
131:4, 132:7,
146:2, 151:6
**march**
64:24, 65:10,
72:6, 136:19
**maria**
77:15, 78:8,
159:24
**mark**
60:8, 61:11,
62:12, 63:7,
107:10, 110:19,
114:12, 115:24,
118:17, 169:6
**marked**
60:10, 60:13,
61:14, 62:14,
63:9, 69:22,
105:3, 105:5,
107:11, 110:21,
114:14, 116:2,
118:19, 169:8,
173:19
**married**
136:7
**martin**
163:7
**master's**
135:11, 135:18,
135:24

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

197

matter
91:15
mattress
42:23, 43:1,
151:18
may
9:8, 15:10,
16:16, 16:19,
17:15, 18:9,
126:9, 134:16,
176:20
maybe
96:9, 123:15,
139:6, 154:14,
169:10
mean
13:20, 20:16,
27:13, 38:15,
42:12, 54:2,
57:8, 67:18,
67:21, 68:22,
70:6, 81:22,
90:11, 93:19,
95:9, 100:7,
106:23, 108:7,
145:9, 163:2
meaning
97:8, 142:2
means
34:3, 66:11,
68:18, 72:2,
76:11, 96:1,
96:4, 139:12
meant
133:9, 154:22
media
59:19, 59:23,
124:6, 124:9
medical
93:5, 93:9,
134:15
medications
134:19
meet
11:11, 14:9,
25:3, 145:15
meetings
12:22

mejia
144:8, 144:12,
144:14, 144:17
member
109:10, 109:11,
126:23, 127:1,
127:4, 127:11,
127:18, 127:22,
153:22, 155:2
members
31:15, 45:20,
68:4, 146:24,
149:1, 153:4,
154:15
memories
12:15
memory
11:8, 20:24,
37:4, 55:12,
85:21
mentioned
68:5, 116:22
mess
97:16, 106:19,
106:22
met
11:20, 16:5,
145:12, 146:2
middle
42:6, 121:22,
164:1, 171:7
midnight
14:3, 56:19
might
67:3, 69:16,
134:19, 146:21,
151:18, 165:19,
165:21
mike
103:23, 103:24,
104:4
military
109:3, 109:4
milwaukee
3:14
mind
12:23, 101:22
mine
22:8, 108:1

mingey
4:12, 94:15,
94:23, 103:15,
103:21, 104:8,
104:12, 104:24
mingey's
103:19
minute
63:5
minutes
31:10, 31:21,
32:2, 79:12,
83:6, 84:7,
129:3
misconduct
134:7
missing
12:5, 21:7,
21:9, 51:15,
51:16, 59:9,
59:15, 70:7,
107:16, 109:18,
109:21, 110:2,
110:11, 111:2,
161:9, 161:10,
161:17, 162:16
missings
54:1, 54:13,
161:8
misspellings
123:12, 123:13
misstates
75:3, 75:24,
76:1, 79:23,
84:7, 100:1
mom
14:22
months
16:8, 77:15,
78:9, 78:10
more
8:18, 9:5,
31:5, 54:1,
62:17, 65:22,
65:23, 77:6,
78:16, 101:2,
132:9, 140:5,
145:10, 151:3,

153:5, 161:3,
168:20
morgue
35:2
morley
90:8, 90:12
morning
8:6, 171:2
most
13:12, 63:19
mouth
44:5
move
41:6, 76:20,
81:24, 112:19,
113:12
moved
42:2, 42:8,
121:24
moving
153:13
much
39:5, 70:19,
152:14, 157:14
multicolored
164:6
multiple
37:18, 38:17,
42:10, 42:15,
77:9, 151:8,
151:9, 162:8
murder
64:11, 64:12
murders
20:2, 114:1,
125:15, 128:5
myself
26:15, 32:17,
37:14

**N**

name
8:6, 8:8, 8:10,
11:22, 26:4,
32:3, 55:10,
103:20, 107:21,
114:22, 114:23,
115:1, 115:7,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

198

115:16, 116:14,
116:17, 129:11,
131:3, 131:9,
138:16, 142:17,
142:19, 142:22,
143:22, 144:9,
147:14
**named**
143:1, 143:9,
143:11, 143:14,
143:21, 144:8,
147:4, 147:6,
163:7, 165:12
**names**
54:22, 55:5,
68:1, 117:7,
147:10
**napkin**
164:12
**napkins**
164:14
**narrating**
40:23
**narrative**
69:19, 70:9,
70:21, 71:9,
105:10, 109:15
**natural**
10:4
**nature**
133:17, 133:19
**naujokas**
4:12, 118:12
**navarro**
5:11
**near**
47:3, 52:20,
52:21
**necessarily**
55:24, 97:24
**necessary**
54:7
**neck**
150:19
**need**
10:7, 10:11,
10:15, 13:16,
30:1, 33:14,

38:15, 80:1,
85:14, 88:1,
99:14, 106:10,
119:4, 173:23
**needed**
17:6, 105:24
**needs**
96:16
**neighbor**
72:4
**neighborhood**
135:3, 136:4
**neither**
176:12
**nervous**
32:24, 33:6,
147:18, 166:17
**never**
114:17, 116:7,
126:12, 126:22,
142:6, 142:13,
143:17, 145:12,
154:6
**new**
141:6
**newborn**
29:2
**news**
53:20, 53:22,
59:19, 59:23,
59:24, 60:2,
124:6, 124:8
**next**
30:8, 31:8,
32:20, 33:11,
40:19, 42:7,
47:12, 51:2,
54:16, 65:12,
68:24, 69:6,
69:11, 70:3,
72:3, 73:23,
82:22, 92:1,
93:18, 109:4,
121:5, 125:23,
160:19, 172:7,
172:11
**nice**
157:18

**night**
18:16, 29:21,
66:2, 136:20
**nobody**
36:8, 36:9,
112:24
**noise**
72:9
**none**
65:11, 99:11,
118:10, 126:1,
128:14
**nor**
176:13
**normally**
21:22, 22:2,
22:6
**north**
2:5, 3:6, 3:14,
6:6, 21:17,
23:21, 58:24,
60:20, 61:20,
72:5, 73:6,
73:16, 97:17,
98:23, 102:20,
103:6, 105:17,
109:19, 111:24,
117:11, 118:5,
118:14, 124:14
**northern**
1:2
**not**
8:23, 9:6,
10:5, 10:23,
13:10, 14:12,
18:17, 19:9,
19:10, 21:12,
24:14, 27:15,
34:3, 38:14,
39:1, 41:8,
44:4, 44:22,
45:4, 45:19,
46:13, 49:14,
49:24, 52:12,
52:21, 55:22,
55:23, 55:24,
61:6, 67:23,
68:19, 70:1,

70:2, 70:8,
70:11, 72:7,
72:8, 73:24,
80:15, 80:20,
81:24, 82:23,
83:14, 83:22,
84:11, 89:7,
89:12, 96:8,
97:15, 99:1,
100:3, 100:16,
101:8, 101:15,
101:20, 102:4,
102:9, 102:24,
103:4, 103:18,
103:21, 105:18,
109:5, 109:6,
109:18, 109:21,
110:12, 112:7,
113:12, 113:13,
114:4, 115:13,
117:23, 119:10,
120:15, 120:18,
120:20, 121:17,
122:18, 125:18,
129:22, 142:24,
143:19, 144:6,
146:20, 147:8,
147:23, 149:24,
154:21, 156:2,
158:17, 158:21,
159:17, 161:16,
166:11, 166:15,
166:17, 171:3,
171:24
**notarial**
176:17
**notary**
2:14, 176:1,
176:4, 176:23
**notations**
80:17
**noted**
97:14
**notes**
29:7, 29:12,
72:24, 98:13
**nothing**
25:5, 39:12,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

199

46:20, 47:7,
47:22, 50:16,
50:20, 50:24,
80:10, 84:9,
86:15, 87:7,
106:13, 113:18,
123:23, 128:8,
145:10, 156:2
**notice**
2:13
**noticed**
21:19, 30:12
**notification**
29:24, 30:4,
53:19, 54:3,
90:2, 91:11,
91:12, 93:1,
104:11
**notifications**
51:11, 53:15,
53:24, 54:9,
54:14, 91:14,
93:12, 93:16,
93:17, 97:10,
97:13, 97:14,
97:18, 98:10,
102:22, 106:3
**notified**
13:2, 14:5,
19:1, 29:18,
90:15, 90:17,
92:22, 97:22
**notify**
110:7
**notifying**
54:5
**now**
10:18, 18:13,
21:3, 36:21,
61:16, 67:6,
70:11, 75:17,
84:5, 88:2,
111:4, 128:10,
130:22, 132:4,
136:23, 138:20,
140:23, 142:3,
157:3, 161:18
**number**
30:13, 30:15,

52:4, 65:13,
73:18, 73:21,
91:22, 92:10,
92:12, 125:11,
131:20, 132:8,
132:12, 160:12,
160:13, 160:14,
161:1, 161:4,
161:7, 161:9,
164:2
**numbers**
95:9, 96:24,
132:3

### O

**o'clock**
18:16, 23:3,
23:4
**o'hare**
17:15, 17:17,
17:21
**o'malley**
5:4
**obese**
155:21
**object**
13:7, 14:6,
19:16, 20:13,
26:21, 34:4,
39:10, 44:12,
56:23, 57:1,
70:17, 75:2,
75:23, 85:20,
85:22, 99:24,
100:19, 115:11,
120:21, 123:11,
123:22, 125:17,
153:6, 153:13,
157:11, 166:21,
167:2, 167:6,
168:16, 168:23,
170:13, 170:21
**objections**
10:19, 19:21,
85:1, 121:3,
142:16
**objects**
80:2

**observe**
148:6, 149:17,
150:1, 150:4,
151:6
**observed**
25:12, 121:12,
167:14, 168:21
**obvious**
91:4
**occasion**
162:4
**occasionally**
18:19
**occurrence**
64:23, 65:16
**off**
43:4, 43:5,
43:9, 43:17,
43:18, 44:11,
45:6, 48:20,
52:4, 89:24,
131:24, 149:14,
149:16, 174:16
**offender**
68:21
**offense**
12:4, 63:13,
63:14, 69:17,
115:3, 116:20,
133:12, 133:13,
133:18, 145:9,
146:9
**offenses**
115:21
**offhand**
26:5
**office**
3:13, 5:6,
91:20, 93:10
**officer**
8:12, 16:5,
16:12, 16:17,
17:9, 17:23,
17:24, 22:3,
33:22, 33:23,
56:2, 61:17,
62:17, 91:20,
105:13, 112:15,

126:13, 142:17,
142:22, 143:1,
176:6
**officer's**
114:22, 115:16
**officers**
29:10, 56:5,
72:2, 93:23,
99:21, 106:6,
107:22, 116:15,
120:4
**officially**
16:12
**often**
10:19
**oh**
35:22, 36:13,
37:5, 51:5,
56:20, 73:9,
90:8, 97:14,
135:3, 137:12,
147:15
**old**
11:9, 15:11,
15:12, 26:19,
32:7, 78:7,
78:9, 141:5,
155:23, 156:1
**once**
16:11, 34:20,
35:20, 78:16,
80:20, 101:21,
113:19, 139:10
**one**
8:7, 9:13,
13:12, 45:14,
54:1, 54:13,
55:18, 62:17,
67:20, 80:16,
88:15, 88:16,
88:22, 94:2,
101:2, 102:12,
107:17, 107:21,
111:10, 116:9,
123:1, 130:7,
130:8, 130:13,
130:17, 131:12,
131:13, 132:13,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

200

132:14, 133:14,
136:12, 145:24,
150:20, 151:3,
154:21, 161:3,
161:15
**ones**
130:12, 131:7
**online**
139:6
**only**
9:12, 10:2,
39:23, 48:14,
55:2, 58:19,
59:23, 87:6,
112:17, 117:2,
117:3, 124:6,
126:2, 137:23,
139:6, 143:23,
150:10, 154:21
**open**
32:15, 35:23,
36:3, 60:22,
62:9, 62:22,
74:1, 88:21,
89:5, 89:6,
158:3, 166:16,
166:18, 168:3
**opened**
36:3, 37:16,
37:22, 38:11,
39:8, 40:13,
89:3, 157:24,
167:14
**opens**
32:23, 33:13
**operations**
53:20, 90:21
**opportunity**
119:1
**opposed**
66:11
**order**
33:17, 54:4,
61:5, 74:12,
74:13, 91:15,
110:10, 158:6,
159:11, 173:24
**ordered**
36:18, 37:6,

74:22, 75:8
**os**
74:7, 75:12,
78:11, 82:22,
109:19
**other**
14:8, 18:20,
19:6, 21:10,
22:15, 23:17,
24:19, 26:18,
29:12, 29:13,
39:12, 41:12,
41:17, 46:10,
48:17, 48:18,
48:21, 48:23,
53:24, 57:22,
68:15, 70:24,
73:11, 81:18,
84:2, 86:12,
86:17, 93:17,
98:24, 112:1,
113:23, 113:24,
114:5, 123:13,
123:17, 130:12,
130:13, 131:7,
131:12, 131:13,
132:21, 133:4,
133:6, 145:10,
146:23, 148:12,
149:1, 151:21,
153:21, 156:1,
156:8, 156:23,
157:8, 157:13,
170:6
**otherwise**
10:11, 134:16,
176:15
**our**
21:16, 22:5,
23:11, 23:16,
25:13, 29:18,
36:14, 51:10,
51:11, 51:12,
51:14, 51:15,
55:3, 56:4,
67:14, 72:13,
81:3, 84:9,
94:4, 95:22,

97:7, 97:10,
99:18, 106:2,
137:19
**ourselves**
30:3
**out**
12:23, 13:23,
18:12, 22:19,
23:6, 23:7,
34:8, 36:14,
41:21, 45:10,
45:13, 45:18,
45:19, 50:8,
51:4, 52:2,
52:22, 54:23,
54:24, 55:1,
55:3, 55:5,
55:8, 56:5,
59:18, 61:4,
62:21, 66:23,
67:2, 72:8,
75:7, 79:9,
79:21, 87:9,
100:9, 106:5,
109:2, 111:2,
120:23, 129:15,
135:19, 136:20,
138:20, 140:21,
141:16
**outcome**
130:10, 130:19,
176:15
**outer**
61:1, 61:23,
62:2
**outside**
28:1, 41:11,
45:23, 51:3,
153:21, 155:2,
156:15
**over**
9:6, 11:9,
14:24, 22:2,
25:3, 25:24,
28:16, 38:23,
39:14, 39:20,
39:22, 42:13,
44:9, 46:1,

47:24, 124:13,
139:20, 150:23,
153:9, 158:6,
158:15, 158:18,
159:10, 165:9,
171:24, 172:1
**overcast**
137:7
**overly**
155:21
**own**
101:22, 158:10

**P**

**page**
7:2, 7:9,
60:14, 71:1,
103:13, 109:13,
119:14, 119:21,
121:5, 121:9,
160:16, 160:19,
161:15, 162:7,
165:8, 166:23,
167:12, 168:12
**pages**
1:23
**pair**
166:24
**pane**
112:2
**paper**
29:13, 116:5,
140:24, 164:12,
164:14
**paperwork**
52:7, 54:15,
97:10
**paragraph**
119:21, 121:9,
162:15, 165:9,
165:10, 167:12
**pardon**
137:8
**parents**
77:11
**park**
135:1, 136:5
**parking**
23:11, 66:13

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

201

part
109:13, 109:15,
109:16, 130:2,
135:15, 169:4
participate
144:4
participated
126:3, 143:17
participating
144:16
participation
12:16, 20:1,
21:4, 105:16,
113:24
particular
56:1, 137:13,
168:14
parties
176:14
partner
11:22, 18:1,
26:16, 27:19,
32:17, 33:21,
39:15, 46:2,
47:6, 47:13,
49:11, 49:18,
50:17, 50:22,
51:4, 52:11,
54:14, 57:17,
61:5, 62:21,
63:16, 70:20,
76:13, 83:24,
85:13, 86:5,
86:24, 87:11,
87:15, 87:22,
89:4, 99:8,
102:14, 106:12,
112:11, 138:3,
153:1, 173:17
partners
18:6, 18:18
patrol
16:17, 17:9,
17:23, 17:24,
29:9, 56:2,
112:14, 136:22,
137:1
pay
96:8, 109:1,

114:4, 115:13,
126:12
paying
56:14, 87:17,
89:10, 89:11
payless
138:18, 138:19
pc
4:15
peek
27:15
pena
29:22, 30:5,
30:9, 30:10,
30:12, 30:17,
30:20, 30:24,
31:9, 31:13,
65:5, 73:15,
73:16, 90:4,
94:3, 98:21,
98:22, 101:4,
101:9, 101:13,
101:16, 101:23,
102:5, 104:19,
110:6, 110:13,
111:22, 120:3,
148:3, 152:18,
161:19, 162:9
people
24:3, 24:6,
24:8, 25:10,
25:14, 26:17,
27:22, 28:6,
30:11, 31:4,
68:3, 98:16,
101:11, 101:14,
102:1, 106:4,
125:14, 126:20,
133:12, 144:21,
144:24, 148:12
people's
3:13
period
18:8, 131:13
permission
30:2
person
9:13, 31:18,

31:22, 60:22,
89:15, 96:16,
99:3, 120:16,
154:8, 161:5,
165:12
personally
54:11, 55:11,
142:20
persons
124:13, 124:22
pertaining
165:1
peruse
169:11
phone
30:12, 30:14,
68:14, 68:15,
68:16, 73:18,
91:21, 104:11,
160:12, 162:4,
162:8, 162:9,
162:10
phones
68:16, 99:18,
99:19
photo
61:9, 61:22
photograph
62:24, 170:10,
170:16, 171:17,
171:21, 172:4,
173:1
photographs
83:20, 114:9,
117:16, 118:4,
118:14, 169:2,
169:11, 169:17,
169:21
photography
163:12
photos
12:8, 12:9,
60:5, 60:12,
116:12
physical
153:20, 155:6,
157:1, 157:10,
164:2

pick
162:8
picture
61:8
pictures
117:13
piece
29:12, 93:18,
116:5
pile
42:3, 42:5,
44:10, 45:8,
47:8, 48:5,
172:5, 173:3
pillowcase
164:6, 164:8
place
48:14
plainclothes
136:24
plaintiff
1:6, 1:12, 3:3,
3:11, 8:4,
129:7, 129:12,
129:17, 129:20,
129:22, 158:11
pleasant
38:14
please
8:9, 9:14,
63:8, 76:10,
85:4, 102:17
point
14:12, 29:18,
61:4, 69:11,
69:14, 78:19,
79:3, 97:17,
142:11, 148:10,
151:10, 158:23,
158:24, 172:20
pointed
27:10, 38:3
pointing
62:23, 104:3,
121:7
police
15:8, 15:17,
15:19, 16:11,

18:20, 19:3,
19:7, 19:12,
19:20, 23:11,
23:15, 26:3,
52:4, 54:6,
56:7, 77:17,
91:19, 93:21,
97:13, 99:17,
126:15, 127:12,
127:24, 128:13,
128:22, 131:16,
137:15, 139:2,
141:16, 142:17,
142:22, 143:1,
143:5, 143:17,
144:4, 144:17,
145:13, 165:13
**policy**
132:17
**pool**
151:15, 152:7
**pools**
151:20, 152:1,
152:4
**pop**
34:8, 34:9
**portion**
61:17, 105:10
**position**
42:11, 42:12,
42:21, 42:22,
75:18, 76:14,
77:1, 112:19,
121:17, 121:22,
149:8
**possible**
39:5, 113:10
**potentially**
118:8
**ppo**
16:9
**prayer**
42:22
**preliminary**
56:4, 56:5
**premises**
171:22, 172:17
**preparation**
145:6, 145:13,

145:16
**prepare**
11:6
**preparing**
107:18
**presence**
98:23
**present**
11:20, 26:13,
26:18, 27:4,
30:17, 32:16,
57:18, 58:8,
99:22, 110:1,
114:8, 116:11,
117:10
**preservation**
139:23, 140:11
**preserve**
39:4, 112:4,
112:6, 113:6,
113:16
**pretty**
13:22, 70:19,
151:13
**previous**
11:9, 11:10,
167:4
**previously**
142:5
**primary**
14:17
**prior**
140:23
**priority**
23:13
**prison**
125:20
**privileged**
118:9
**privy**
101:15
**probably**
13:6, 18:11,
18:21, 28:15,
48:15, 49:20,
53:2, 67:2,
115:3, 116:19,
139:10, 146:4

**problem**
52:13
**procedure**
54:5, 161:11
**process**
38:18, 52:7,
53:23, 85:6
**processing**
59:6, 114:19,
115:8, 116:8,
116:10
**program**
140:23
**programmer**
16:24
**property**
24:3, 31:11,
70:3, 74:6
**protect**
106:4
**protecting**
100:8
**protection**
100:5
**provides**
169:3
**public**
2:14, 124:18,
127:9, 128:1,
176:1, 176:5,
176:23
**puddle**
171:9
**puerto**
14:20, 14:21,
19:12, 127:11,
127:24, 128:12,
128:22
**purpose**
99:9, 99:20
**purposes**
29:24
**pursuant**
2:13
**pushup**
43:21
**pusillo**
96:3

**put**
21:23, 44:4,
45:5, 55:3,
109:9

---
**Q**
---

**queen-size**
42:6, 149:11,
149:12
**question**
9:15, 9:16,
10:24, 20:3,
20:16, 26:22,
39:11, 44:13,
59:14, 64:18,
70:18, 75:24,
76:4, 76:7,
79:6, 80:2,
80:18, 84:20,
85:4, 85:16,
85:18, 85:23,
86:2, 96:12,
96:13, 96:17,
100:20, 102:17,
120:15, 120:16,
122:19, 141:10,
141:13, 153:12,
154:14, 154:24,
157:6, 157:12,
159:6, 159:8,
159:12, 159:14,
161:20, 167:3,
167:5, 170:14
**questions**
19:24, 20:15,
20:17, 64:6,
118:22, 119:5,
119:6, 119:13,
128:9, 128:18,
129:14, 143:20,
144:7, 153:9,
158:12, 158:15,
158:18, 160:3,
167:23, 173:22,
173:24, 174:5,
174:10, 174:12,
174:13, 174:14
**quick**
128:10, 160:3,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

203

174:6

**R**

r
72:1, 75:12,
78:11, 82:22
**race**
77:17
**racial**
133:19
**radio**
21:17, 21:22,
22:4, 52:5,
54:10, 97:23
**raised**
136:5
**rather**
84:21
**raul**
74:8, 77:23,
147:4, 147:16,
148:15, 156:21,
165:12, 165:14,
165:17
**ray**
142:6
**razzing**
46:1
**rd**
109:20, 160:21,
161:1, 161:3,
161:7, 161:8,
161:9, 163:2
**reach**
33:19, 62:9
**reached**
89:2
**reaction**
40:18
**read**
15:1, 15:3,
24:18, 63:24,
64:22, 69:7,
72:10, 74:11,
75:15, 77:14,
78:13, 102:16,
109:23, 119:12,
123:4, 157:5,

157:7, 159:7,
159:9, 161:16,
175:4
**reads**
91:20
**ready**
119:18, 159:1,
174:2
**really**
10:20, 44:23,
50:2, 74:24
**rear**
27:9, 60:19,
61:19
**reason**
55:3, 112:14,
112:18, 117:3,
165:24
**recall**
21:12, 22:15,
39:1, 44:16,
46:13, 49:14,
82:3, 85:9,
85:11, 88:22,
112:3, 132:15,
132:23, 137:10,
138:16, 139:22,
140:3, 140:20,
144:11, 144:14,
144:16, 145:3,
145:6, 145:18,
146:2, 146:23,
147:6, 149:10,
151:16, 151:20,
152:2, 152:4,
153:3, 153:15,
155:5, 155:11,
155:14, 155:17,
155:22, 156:7,
156:18, 156:21,
156:23, 157:8,
164:6, 164:7,
164:14, 164:17,
164:20, 165:21,
167:19, 170:15,
170:19, 171:6,
171:9, 172:16,
173:4, 173:11,

173:12, 173:13,
173:16
**receive**
139:4, 139:8,
141:15
**received**
132:11, 132:18
**recently**
139:13, 143:23
**recess**
88:3, 129:4,
174:8
**recipients**
133:14
**recognize**
60:4, 60:6,
60:16, 61:18,
63:11, 105:9,
105:11, 107:13,
110:23
**recollection**
80:14, 80:19,
98:1, 98:5,
98:9, 103:6,
142:21, 143:4,
143:8, 144:24,
161:21, 163:6,
169:4, 169:22,
170:3, 172:21
**record**
8:8, 9:12,
64:3, 88:5,
109:14, 119:15,
129:6, 157:7,
158:20, 159:9,
174:16, 176:8
**records**
140:7
**recovered**
164:7
**reduced**
176:11
**refer**
146:8, 159:23,
165:7
**reference**
86:15
**referring**
27:18, 31:2,

31:3, 51:13,
53:17, 110:17
**refresh**
11:8, 80:14,
80:19, 97:24,
98:5, 98:8,
103:5, 144:23,
169:21, 170:3,
172:21
**refresher**
139:16, 140:19,
141:21
**refreshers**
140:10
**regarding**
85:21
**regimen**
138:23
**regular**
18:1, 137:15
**regularly**
67:2
**reiter**
5:13
**relate**
67:23
**related**
8:21, 19:9,
19:10, 55:24,
58:19, 64:20,
71:20, 139:2,
166:7, 176:13
**relating**
71:19
**relation**
37:21, 38:1,
47:7, 109:20,
148:11, 160:21
**relationship**
32:9, 59:5,
104:23, 125:6
**relatives**
14:9, 14:17,
22:14, 25:19,
26:15, 26:19,
27:10, 28:10,
51:20, 52:9,
52:17, 52:22,

53:8, 53:10
**relay**
56:6
**relayed**
22:13, 40:7
**relief**
97:7, 99:12
**relieved**
99:15, 105:24,
131:5
**remember**
8:16, 8:19,
8:20, 11:18,
11:22, 12:18,
13:1, 13:3,
13:11, 13:14,
20:2, 20:4,
20:8, 20:9,
20:21, 20:23,
23:22, 23:23,
23:24, 24:10,
24:24, 26:5,
26:6, 26:20,
30:6, 31:23,
32:6, 32:8,
36:23, 47:11,
47:12, 48:22,
49:23, 56:13,
57:3, 60:1,
73:1, 74:5,
76:18, 78:21,
79:14, 79:18,
83:8, 84:18,
87:13, 89:1,
93:14, 94:21,
95:17, 97:19,
100:13, 101:20,
108:18, 108:23,
130:12, 131:4,
133:5, 137:1,
137:5, 145:20,
145:21, 145:23,
146:19, 146:20,
146:22, 147:2,
147:3, 149:23,
150:18, 150:20,
151:2, 151:3,
151:17, 152:14,

153:22, 154:1,
154:2, 154:3,
155:24, 156:11,
156:12, 157:14,
157:15, 157:16,
157:18, 161:23,
165:17, 166:14,
166:19, 168:7,
168:9, 170:5,
170:6, 170:22,
171:3, 172:23
**remembered**
13:5, 14:4
**remind**
10:7
**repeat**
20:20
**report**
12:4, 49:3,
51:14, 51:21,
52:4, 55:4,
55:9, 55:13,
55:17, 63:13,
63:15, 63:24,
67:2, 67:4,
71:9, 74:24,
75:21, 76:1,
80:14, 80:18,
89:21, 90:1,
93:18, 98:13,
98:22, 103:10,
104:20, 105:16,
106:3, 107:6,
107:16, 107:24,
108:2, 108:7,
108:11, 108:22,
109:2, 109:5,
109:9, 111:2,
114:19, 115:2,
115:4, 115:6,
115:8, 115:9,
116:9, 116:10,
116:18, 116:20,
116:24, 118:22,
119:1, 119:6,
119:12, 120:13,
120:14, 120:17,
121:1, 145:9,

146:10, 165:22,
168:14, 168:22
**reported**
1:24
**reporter**
2:14, 9:12,
10:2, 24:18,
89:22, 157:7,
159:9, 176:1,
176:4
**reporting**
72:2, 105:13,
107:21, 117:5,
117:10, 118:11,
120:3, 120:8,
121:5, 121:11
**reports**
11:10, 12:1,
12:3, 12:5,
12:22, 21:3,
21:6, 21:7,
21:10, 51:15,
66:9, 102:22,
124:12, 141:16,
145:8
**represent**
129:11, 158:11
**representative**
74:5
**represented**
10:22, 11:2
**reputation**
126:10, 126:15
**request**
20:21
**requested**
176:12
**requesting**
165:12
**required**
138:7
**requirements**
137:21
**reserve**
174:15
**residence**
66:10, 66:11,
93:20

**resolution**
130:19
**resources**
54:7, 56:7
**respect**
20:19
**respond**
14:7
**responded**
13:19
**responding**
13:4, 13:22,
29:10, 165:11,
167:14
**responsibility**
152:19
**result**
132:12
**resulted**
132:21
**retire**
134:9
**retirement**
134:10
**return**
113:19
**returned**
82:13
**review**
119:1, 119:7,
173:23, 176:12
**reviewed**
145:8
**reviewing**
107:5
**reyes**
7:11, 7:12,
7:13, 7:14,
7:15, 7:16,
7:17, 7:18,
7:19, 7:20,
7:21, 60:13,
61:10, 62:13,
64:4, 109:14,
111:10, 114:20,
119:16, 129:12,
143:9, 143:12,
143:15, 143:18

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

205

reynaldo
1:8, 58:6
rfc
165:8, 169:12,
169:13
rfc-solache
7:12, 7:13,
7:14, 7:15,
7:16, 7:17,
7:18, 7:19,
7:20, 7:21,
61:10, 62:13,
64:4, 109:14,
111:10, 114:20,
119:16
rican
127:11, 127:24,
128:12, 128:22
ricans
19:12
richard
5:7
rico
14:20, 14:21
right
9:21, 10:13,
10:24, 16:2,
20:11, 20:18,
20:20, 21:19,
21:24, 22:3,
22:8, 22:23,
23:1, 23:12,
25:9, 33:9,
35:15, 36:1,
36:21, 40:15,
41:14, 43:2,
43:8, 43:15,
51:21, 52:15,
60:3, 61:3,
62:4, 62:23,
63:1, 63:4,
64:5, 64:10,
64:12, 64:13,
65:12, 65:18,
66:4, 66:14,
66:18, 67:15,
67:24, 68:11,
69:21, 71:2,

71:14, 71:15,
71:18, 71:21,
73:11, 74:15,
75:10, 77:12,
77:15, 79:3,
98:3, 115:15,
116:15, 117:1,
117:4, 118:22,
119:20, 120:24,
121:21, 128:10,
129:2, 132:4,
133:22, 146:10,
146:14, 154:12,
157:24, 158:4,
160:16, 165:5,
165:7, 166:3,
166:6, 168:2,
168:4, 168:19,
170:12, 171:4,
171:6, 171:19,
171:24, 172:1,
172:5, 173:3,
173:14
right-hand
62:24, 90:2,
108:4, 114:21
riley
95:21
ring
32:22, 143:22,
144:9
riordan
99:4, 99:5,
99:7, 99:10,
105:13, 105:15,
105:19, 107:2
robert
143:1, 143:5
rock
6:5
roll
22:20, 23:4,
23:5, 23:7
rolled
140:21
room
22:20, 44:18,
45:14, 48:16,

171:7
rooms
46:10
rosa
68:8, 68:10,
109:12, 111:14,
146:13, 146:16,
148:18, 156:15,
156:17
roughly
14:2
rpr
1:24, 176:4
rules
9:8
rush
119:5
rutherford
4:11, 143:2,
143:5
ryan
103:23, 104:1,
104:4, 104:13,
104:15

**S**

s
127:17, 131:14
sabastian
14:23
safe
83:19
said
9:23, 11:24,
21:20, 23:2,
27:17, 31:20,
33:13, 37:6,
37:10, 40:13,
40:19, 41:4,
41:5, 41:20,
42:17, 43:11,
46:21, 50:4,
50:10, 50:21,
52:1, 53:15,
57:22, 62:2,
77:24, 86:11,
106:20, 106:22,

120:17, 133:10,
151:13, 151:23,
152:12, 158:22,
173:13, 176:9
sale
138:18
same
13:15, 14:11,
19:21, 19:22,
30:22, 70:19,
73:9, 81:6,
87:1, 95:1,
100:1, 111:18,
115:16, 116:21,
121:3, 125:21,
142:16, 143:20,
153:18, 158:15,
158:17, 160:24,
161:14, 171:1,
175:5
san
14:22, 14:23
santiago
77:14, 78:5,
159:24, 160:1
saturday
72:6
saw
24:2, 37:17,
38:20, 42:2,
42:3, 42:9,
47:8, 47:18,
47:19, 48:18,
73:21, 75:12,
76:13, 76:16,
89:15, 104:21,
121:17, 121:21,
123:14, 123:17,
149:18, 150:10,
150:14, 150:15,
151:8, 152:10,
157:13, 173:8
say
9:6, 13:20,
18:7, 20:4,
24:14, 25:17,
27:14, 28:16,
28:21, 30:20,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

206

30:21, 31:1,
32:1, 34:6,
36:10, 37:9,
38:13, 39:15,
41:2, 43:11,
45:7, 45:15,
46:16, 46:19,
47:6, 48:1,
51:6, 51:12,
57:24, 58:3,
68:12, 77:8,
80:9, 80:11,
86:14, 86:17,
87:8, 87:11,
87:15, 87:18,
92:1, 100:7,
101:13, 102:12,
103:22, 105:22,
105:23, 106:8,
106:12, 106:14,
110:16, 126:20,
128:17, 130:22,
147:23, 155:24,
159:13, 162:6,
165:3, 168:2
**saying**
154:10
**says**
64:10, 64:21,
64:24, 66:4,
66:15, 68:21,
69:8, 73:5,
73:12, 73:20,
73:23, 74:16,
78:11, 90:2,
90:17, 91:16,
92:19, 93:4,
93:18, 94:2,
94:12, 95:8,
96:14, 97:21,
103:24, 104:7,
105:12, 108:4,
114:22, 116:15,
117:4, 117:7,
119:21, 120:2,
120:6, 121:1,
121:11, 121:15,
160:6, 160:15,

160:20, 161:16,
163:13, 165:10,
166:9, 167:13
**scenarios**
139:17
**scene**
12:6, 21:9,
29:19, 31:13,
39:4, 51:20,
51:22, 51:24,
54:8, 55:2,
55:4, 56:1,
56:22, 57:10,
57:12, 59:6,
71:10, 91:1,
91:3, 91:13,
93:7, 93:10,
93:19, 94:1,
96:7, 96:19,
96:23, 97:12,
97:15, 97:16,
98:6, 98:14,
98:15, 98:16,
98:19, 99:4,
99:10, 99:23,
100:5, 100:8,
100:10, 100:12,
100:15, 100:18,
100:22, 101:3,
101:7, 102:1,
102:24, 103:2,
104:22, 105:1,
105:20, 106:1,
106:2, 106:4,
106:17, 106:18,
106:24, 107:3,
110:1, 110:11,
112:4, 112:6,
112:7, 113:7,
113:15, 113:17,
113:19, 114:9,
114:10, 114:18,
115:8, 116:8,
116:10, 116:12,
117:8, 137:6,
138:1, 139:23,
140:11, 152:22,
155:3, 157:13,

163:7, 163:22,
164:15, 164:18,
170:5
**scenes**
58:12, 58:13,
58:21, 58:22
**school**
14:18, 134:22,
134:24, 135:1
**screen**
62:3
**screwdriver**
34:11
**seal**
176:17
**sean**
3:4, 129:11,
158:8
**search**
47:16, 48:10,
48:23
**searched**
48:24, 49:1
**searching**
45:18, 45:19,
47:15, 48:12,
51:1, 77:2
**second**
81:7, 82:8,
82:18, 83:4,
83:24, 84:3,
86:22, 87:3,
87:12, 87:16,
135:15, 163:13
**secretary**
90:13
**section**
34:8, 67:9,
67:24, 68:24,
70:9, 70:22,
163:12, 164:1,
170:18
**sector**
65:21
**see**
18:19, 23:18,
27:16, 28:17,
35:10, 35:13,

35:16, 36:19,
37:10, 37:11,
37:16, 38:10,
38:22, 38:24,
39:8, 42:14,
53:8, 53:10,
55:9, 58:6,
60:16, 60:18,
61:7, 62:18,
63:5, 63:19,
63:22, 68:13,
69:18, 82:12,
84:23, 86:9,
86:13, 86:20,
87:1, 89:7,
89:8, 89:12,
100:14, 100:17,
101:9, 101:23,
102:3, 102:9,
102:22, 103:17,
104:6, 104:13,
105:12, 107:8,
112:1, 114:23,
115:18, 116:14,
117:13, 120:6,
121:7, 121:15,
123:9, 124:8,
143:14, 144:2,
150:13, 150:17,
150:19, 160:22,
163:16, 164:4,
166:12, 166:24,
169:3, 172:8,
172:12
**seeing**
40:24, 45:8,
144:14, 164:7,
164:14, 164:17,
164:20, 168:2,
172:16, 172:22,
172:23
**seemed**
147:18
**seems**
128:15
**seen**
61:16, 71:21,
105:7, 114:16,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

116:5, 119:9,
122:22, 123:7
**semi**
15:14
**seminar**
139:15
**sending**
133:11
**sensitive**
80:13
**sent**
160:9
**sentence**
161:14, 161:15,
166:9, 166:12
**sentences**
167:13
**separate**
12:23, 137:18,
137:19, 158:11,
161:8, 161:9,
163:2, 163:3
**sequence**
172:7
**sergeant's**
39:16, 95:10
**series**
91:14, 92:13
**serious**
40:17
**served**
125:20
**services**
16:23
**set**
176:16
**settled**
130:11
**seven**
121:8
**several**
8:17, 24:10,
25:20, 28:15,
37:19, 55:15,
64:5, 79:12,
167:13
**shaking**
33:2, 147:17,

148:4
**she**
13:8, 25:17,
25:18, 25:21,
25:24, 26:2,
26:7, 26:14,
27:7, 27:10,
28:10, 31:4,
42:13, 42:17,
43:20, 71:20,
75:17, 80:1,
95:11, 96:22,
119:5, 122:3,
122:4, 149:22,
149:23, 149:24,
150:7, 150:22,
151:9, 151:10,
151:17, 153:22,
154:1, 154:3,
154:13, 155:8,
155:9, 155:12,
155:14, 155:18,
155:19, 155:21,
155:23, 156:1,
156:3
**sheet**
175:8
**shift**
21:15, 21:16,
22:24, 56:15,
109:3, 109:6
**shine**
81:24
**shined**
149:18, 173:9
**shit**
36:13
**shoe**
136:13, 136:14,
163:14, 163:19,
164:23, 164:24
**shoes**
137:13, 138:10,
138:12
**shooting**
58:22
**shootings**
58:13, 58:14

**shorthand**
2:14, 176:3
**shortly**
30:6, 54:17
**should**
20:5, 21:22,
27:14, 112:24,
139:18, 173:24
**shoulder**
21:20, 22:7
**show**
58:21, 60:3,
62:11, 105:5,
107:10, 110:19,
114:12, 115:24,
118:17, 169:2,
173:19
**showed**
31:11, 32:2,
54:18, 54:19,
55:19, 57:15,
58:12, 60:4,
107:18, 123:2,
123:6
**showing**
93:24
**shown**
107:13
**shows**
30:9, 73:22,
95:7, 126:13
**side**
27:12, 30:13,
30:15, 43:4,
43:5, 43:9,
43:17, 43:18,
44:2, 45:6,
48:20, 62:24,
70:24, 71:8,
73:11, 74:9,
89:9, 90:1,
90:2, 91:6,
111:17, 152:9
**sign**
104:20
**signature**
63:22, 174:15,
175:13

**signature-rjgzs**
176:21
**signed**
63:24, 103:15,
175:8
**significance**
65:20, 66:7,
66:21, 67:17
**similar**
9:4, 17:18,
43:22, 44:1,
44:23
**since**
71:21
**sir**
14:13, 20:21,
60:15, 63:12,
76:10, 102:12,
110:23, 111:12,
114:23, 129:10,
130:8, 134:24,
135:6, 136:7,
139:21, 165:8,
166:23, 168:19,
169:3, 169:11,
169:18, 170:4,
170:16, 171:7,
171:10, 171:13,
172:6, 172:12,
172:17
**sit**
12:14, 158:14
**sitting**
10:20
**situation**
8:24, 13:19,
30:10, 36:13,
40:17, 41:21,
53:18
**six**
16:8, 17:2,
24:13, 25:10,
62:7, 121:7,
167:22
**size**
136:13, 136:14,
138:12, 149:10,
165:1

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

208

| | | | |
|---|---|---|---|
| **skin**<br>150:2, 150:4<br>**small**<br>24:5, 27:12,<br>33:18, 37:24,<br>48:15, 48:20,<br>74:9, 74:17<br>**smaller**<br>48:15, 71:3<br>**smell**<br>34:21, 34:24,<br>35:21, 36:11<br>**smelled**<br>36:11, 49:24,<br>151:10<br>**smelling**<br>79:2<br>**smells**<br>35:3<br>**soaked**<br>151:18<br>**solache**<br>1:11, 3:11,<br>8:4, 8:7,<br>143:21, 143:24,<br>144:2, 144:5<br>**solve**<br>123:21<br>**solved**<br>123:24<br>**some**<br>11:24, 19:24,<br>23:17, 50:9,<br>51:3, 51:8,<br>93:16, 123:12,<br>133:12, 158:9,<br>158:23, 165:9,<br>172:10, 172:14<br>**somebody**<br>24:23, 152:18<br>**someone**<br>54:12, 80:3,<br>143:21, 162:3,<br>163:6<br>**something**<br>10:10, 20:7,<br>20:8, 23:23,<br>70:10, 114:16, | 128:20<br>**sometimes**<br>20:6<br>**somewhere**<br>83:18<br>**sorry**<br>12:20, 24:16,<br>38:13, 40:18,<br>64:22, 97:4,<br>102:16, 104:2,<br>132:22, 135:13,<br>141:12, 147:15,<br>154:14, 157:5,<br>159:21, 169:14,<br>170:13<br>**sort**<br>43:20, 172:10<br>**soto**<br>20:2, 68:8,<br>77:15, 128:5,<br>146:13, 146:19,<br>147:7, 148:21,<br>156:18, 163:7<br>**sotos**<br>4:15, 125:15<br>**sounds**<br>142:19<br>**source**<br>112:1<br>**south**<br>5:14<br>**span**<br>25:23<br>**spanish**<br>14:14, 14:15,<br>15:1, 25:18,<br>26:8, 26:9,<br>26:11, 28:7,<br>30:12, 40:8,<br>52:14, 71:11,<br>71:12, 72:8,<br>155:10, 156:9<br>**speak**<br>14:13, 15:2,<br>15:4, 22:16,<br>26:9, 26:23,<br>52:14, 68:9,<br>71:11, 120:8, | 144:20, 162:7,<br>166:1<br>**speakers**<br>28:7<br>**speaking**<br>26:7, 27:5,<br>45:9, 80:4,<br>146:19, 147:3,<br>147:6, 154:16<br>**speaks**<br>30:11<br>**specialized**<br>16:20<br>**specific**<br>128:19<br>**specifically**<br>112:5<br>**speculation**<br>82:7, 117:20,<br>118:7<br>**speculative**<br>167:4<br>**splatter**<br>152:16<br>**spoke**<br>26:13, 26:14,<br>30:17, 72:17,<br>72:19, 120:3,<br>120:18, 121:2,<br>142:6, 142:13,<br>146:16, 153:21,<br>155:1, 155:9,<br>156:9, 156:15,<br>165:19, 166:3<br>**spoken**<br>147:9<br>**spontaneous**<br>36:12, 40:18<br>**spot**<br>87:24<br>**sprayed**<br>151:24<br>**square**<br>136:6<br>**st**<br>135:12, 135:18,<br>135:19, 176:17<br>**stab**<br>37:18, 77:9, | 149:18, 151:4,<br>151:9, 173:5<br>**stabbed**<br>42:10<br>**stabbing**<br>38:18<br>**stamped**<br>60:13<br>**stand**<br>77:20, 77:24<br>**standard**<br>54:4, 161:11<br>**standing**<br>24:3, 28:1,<br>31:17, 32:19,<br>33:10, 35:8,<br>35:11, 72:3,<br>72:13, 154:10<br>**stands**<br>52:6<br>**stankus**<br>4:12, 118:12<br>**star**<br>91:22, 92:10,<br>92:12, 95:10,<br>96:24<br>**starr**<br>3:4, 7:4,<br>128:21, 129:1,<br>129:6, 129:8,<br>129:11, 142:1,<br>153:11, 158:10,<br>158:17, 158:20,<br>159:1, 159:7,<br>159:15, 159:19,<br>159:20, 160:1,<br>160:2, 163:1,<br>165:4, 168:5,<br>169:1, 169:10,<br>169:15, 170:2,<br>171:5, 172:2,<br>174:3<br>**start**<br>15:8, 52:7<br>**started**<br>21:15, 51:10,<br>51:12, 52:1<br>**starts**<br>92:13 |

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

209

**state**
2:15, 8:8,
176:5, 176:24
**state's**
5:6, 145:15,
145:18, 145:24,
146:3
**stated**
25:18, 28:10,
36:16, 41:4,
72:5, 72:7,
77:10, 87:1
**statement**
127:9, 128:1
**statements**
128:12, 128:21
**states**
1:1
**station**
57:9, 57:17,
66:13, 97:9,
98:1, 99:17,
102:21, 106:2,
106:10, 108:3,
108:19, 108:22,
110:8, 110:14,
161:23
**statistic**
19:17
**stay**
18:17, 56:11
**stayed**
152:22, 153:1
**staying**
50:1
**stemming**
130:2, 133:4,
133:6
**stenographically**
176:10
**step**
39:22, 49:15,
49:18, 158:5,
159:10
**stepped**
39:20
**stick**
88:17

**still**
47:15, 76:24,
100:23, 104:21,
105:20, 137:6,
137:11
**stomach**
173:8
**stop**
76:4, 80:3
**stopping**
158:24
**storm**
61:3
**straight**
16:4, 46:5,
46:8
**street**
2:5, 3:6, 6:6,
135:2
**strewn**
39:13, 47:19
**strike**
132:1, 154:19
**struggle**
38:17
**stuart**
95:7
**stuck**
166:10, 166:14,
167:1
**stuff**
34:9, 39:13,
141:8, 151:24
**stunk**
50:2
**subject**
131:16
**subjected**
131:23
**submitted**
108:8
**subsequent**
141:21
**suffered**
38:17, 156:24,
157:9
**suite**
4:7, 4:17,

5:15, 6:7
**sun**
137:6, 137:11
**supervisor**
29:18, 29:20,
29:21, 30:4
**supervisor's**
30:2
**suppressing**
134:1
**sure**
9:11, 9:16,
9:18, 15:7,
22:1, 34:3,
41:8, 50:10,
54:13, 63:6,
80:12, 80:24,
81:10, 84:11,
120:23, 129:19,
131:6, 153:14,
167:9
**susler**
3:12, 7:3, 8:5,
8:6, 27:3, 53:3,
56:8, 57:5,
57:10, 59:4,
60:8, 61:9,
62:16, 63:7,
75:6, 76:5,
76:9, 84:22,
85:1, 85:5,
85:8, 85:17,
85:19, 86:3,
88:2, 88:5,
88:6, 100:6,
102:18, 104:5,
113:5, 116:4,
118:23, 119:3,
119:8, 124:7,
125:4, 128:9,
128:14, 128:17,
129:2, 154:20,
154:23
**suspect**
147:20, 148:1,
148:16, 148:19
**suspects**
148:13, 149:2,

149:5
**suspension**
132:20, 132:22
**suspensions**
133:4
**swings**
168:3
**swiss**
34:7
**switch**
39:7
**switches**
113:11
**sworn**
8:3
**synopsis**
130:5
**system**
141:5, 141:6

**T**

**table**
10:20, 174:11
**tables**
81:19
**take**
9:12, 15:18,
17:3, 23:8,
61:12, 83:20,
107:5, 117:13,
119:1, 119:7,
119:17, 128:10,
133:21, 134:19,
163:9, 163:18,
168:12, 169:10,
170:9, 171:16,
172:6, 172:19,
174:1, 174:6
**taken**
8:13, 88:3,
116:12, 122:13,
129:4, 174:8,
176:7, 176:10
**takes**
17:12
**taking**
72:24
**talk**
18:19, 24:19,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

210

30:9, 80:7,
84:3, 101:4,
101:6, 126:22
**talked**
18:21, 18:23,
25:16, 25:22,
30:11, 57:15,
71:20, 72:4,
84:2, 91:22,
134:8, 162:9
**talking**
8:23, 8:24,
9:13, 12:20,
12:21, 31:5,
37:11, 51:19,
52:18, 57:19,
72:14, 77:23,
84:12, 86:12,
101:9, 101:11,
102:1, 128:19,
142:22, 143:4,
151:24, 154:11,
154:15, 154:17
**talks**
23:6
**tall**
136:17, 154:3,
154:8, 155:11,
155:13, 156:11
**taller**
154:13
**technicians**
114:9, 117:5,
117:11, 118:12
**tell**
8:21, 13:10,
13:16, 23:14,
26:17, 33:4,
40:6, 42:12,
44:21, 44:22,
44:23, 45:4,
47:16, 54:2,
61:21, 61:23,
62:5, 64:9,
66:22, 66:24,
73:2, 76:12,
80:1, 86:4,
106:16, 107:1,

110:13, 148:15,
148:18, 149:2,
149:4, 150:22,
154:8, 155:24,
159:2, 162:10,
162:21, 165:14
**telling**
36:22, 84:18,
85:9, 161:21
**tells**
92:12
**term**
41:22, 93:21
**terms**
89:8, 118:11,
123:18, 157:1,
157:10
**testified**
8:3, 123:18,
146:16, 147:13,
147:17, 149:7,
149:13, 152:17,
158:5, 159:10,
161:18, 169:23,
170:7
**testify**
122:6
**testifying**
8:23, 85:21,
159:16, 159:17,
173:13
**testimony**
11:10, 75:4,
75:8, 75:21,
76:1, 79:24,
100:2, 122:23,
123:18, 145:4,
145:7, 175:5,
175:7, 176:9
**text**
133:17
**texting**
132:17, 133:10,
133:11
**th**
14:1, 16:4,
16:13, 16:14,
16:15, 17:7,

17:10, 17:22,
18:14, 22:19,
57:17, 58:22,
65:10, 72:6,
94:7, 104:17,
106:6, 108:14,
108:15, 113:20,
116:10, 116:11,
118:15, 126:8,
161:24
**than**
8:18, 9:5,
14:9, 22:16,
23:17, 24:19,
26:18, 29:13,
31:5, 38:4,
39:12, 48:16,
48:18, 48:21,
50:1, 66:23,
77:7, 78:16,
84:2, 84:9,
84:21, 101:2,
112:1, 123:13,
132:9, 140:5,
145:11, 151:3,
151:21, 154:13,
156:1, 156:8,
156:23, 157:8,
157:13, 161:3,
168:6, 169:22
**thank**
22:11, 89:23,
91:23
**thanks**
154:23
**that's**
9:23, 10:4,
13:6, 13:13,
13:22, 15:21,
18:23, 21:22,
21:24, 22:5,
23:18, 26:2,
26:6, 28:10,
34:20, 34:23,
36:14, 39:23,
40:1, 41:18,
48:14, 49:10,
52:7, 52:20,

54:4, 55:22,
56:7, 56:10,
57:10, 58:16,
61:3, 63:3,
65:19, 65:21,
66:9, 69:22,
70:15, 71:1,
73:17, 76:5,
80:4, 83:19,
83:22, 84:4,
85:2, 85:5,
85:18, 86:10,
86:11, 86:21,
92:17, 93:5,
94:4, 95:10,
96:8, 96:9,
96:13, 96:14,
97:1, 99:3,
103:10, 103:12,
103:18, 103:21,
104:4, 106:21,
108:17, 109:15,
110:15, 120:15,
121:17, 122:18,
123:16, 126:14,
133:5, 133:12,
134:9, 134:13,
139:7, 143:23,
146:4, 146:15,
147:23, 150:16,
158:13, 165:6,
165:23, 165:24,
168:2, 168:3,
170:15, 173:12
**their**
54:22, 77:9,
96:6, 96:24,
102:2, 103:3,
105:16, 109:22,
117:21, 117:23,
125:16, 147:10,
157:1, 157:10,
157:15, 161:17
**them**
9:9, 25:12,
28:18, 44:11,
52:18, 52:20,
52:21, 54:11,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

211

68:6, 82:23,
88:22, 93:15,
100:21, 105:22,
106:9, 106:12,
106:16, 106:20,
109:20, 110:5,
122:11, 128:13,
128:23, 132:14,
137:18, 137:19,
137:24, 138:19,
147:9, 157:3,
157:18
**then**
15:22, 16:10,
16:12, 17:5,
17:14, 18:12,
25:15, 33:16,
36:17, 40:19,
42:1, 64:21,
66:4, 66:18,
68:17, 68:20,
68:24, 69:6,
69:11, 69:16,
69:21, 70:3,
70:9, 72:1,
72:4, 72:8,
72:9, 72:18,
72:22, 73:11,
73:23, 77:22,
78:5, 78:8,
78:11, 78:18,
78:24, 90:6,
90:17, 91:16,
92:1, 92:19,
93:4, 94:12,
95:7, 95:12,
96:9, 99:19,
104:6, 131:7,
131:15, 146:12,
150:24, 152:17,
154:21, 158:15,
160:19, 160:24,
161:14, 162:3,
164:1, 166:8,
167:12, 168:3,
169:12, 171:20,
172:6, 172:24
**there's**
10:20, 24:5,

41:7, 66:19,
68:1, 68:12,
68:20, 68:21,
69:2, 69:21,
70:10, 71:5,
119:5, 146:12,
160:5, 161:1,
161:3, 163:2,
164:2, 166:9,
170:12
**thereafter**
176:10
**these**
36:22, 36:23,
37:3, 55:10,
68:4, 93:12,
98:10, 98:16,
101:17, 132:1,
148:12, 158:11,
161:7, 169:11,
169:17, 169:21
**they**
20:15, 22:13,
25:21, 25:22,
25:24, 26:18,
27:4, 28:1,
28:3, 29:1,
29:2, 30:23,
31:1, 35:8,
35:10, 35:11,
35:13, 40:4,
40:6, 40:7,
41:4, 44:17,
44:21, 44:22,
44:23, 53:22,
55:4, 59:17,
68:16, 68:17,
98:19, 101:3,
101:4, 101:12,
105:23, 106:1,
106:3, 106:6,
106:8, 106:14,
107:8, 118:1,
118:2, 118:4,
118:14, 122:13,
122:16, 122:20,
123:15, 125:19,
125:20, 133:17,

137:23, 138:21,
139:17, 140:21,
141:6, 146:24,
149:2, 153:5,
156:24, 157:9,
161:8, 162:7,
166:7, 168:21,
170:3
**they're**
54:21, 55:21,
96:24, 112:17,
135:19, 138:20
**thin**
155:18, 155:19
**thing**
9:23, 15:18,
18:23, 30:22,
31:8, 34:7,
40:19, 47:12,
51:2, 54:16,
81:6, 87:6,
111:18, 117:2,
139:19, 173:23
**things**
37:3, 39:13,
50:9, 51:23,
113:12, 113:13,
123:1, 164:2,
164:4
**think**
9:5, 18:10,
20:14, 40:13,
56:21, 60:4,
60:5, 112:14,
116:23, 117:3,
123:14, 145:1,
146:9, 149:23,
172:7
**third**
14:1, 18:15,
160:20
**those**
27:14, 67:11,
68:9, 92:14,
95:9, 117:6,
131:8, 137:16,
139:9, 144:21,
144:24, 164:4,

168:19
**though**
138:7, 159:18
**thought**
20:7, 20:9,
123:10, 128:19,
154:17
**three**
24:11, 24:12,
25:9, 60:12,
68:1, 68:12,
78:7, 133:3,
144:21, 144:24,
146:12, 169:5
**three-year-old**
29:3, 111:8
**through**
34:20, 53:2,
67:14, 89:2,
99:22, 119:16,
138:23, 165:10,
169:11, 169:12
**tie**
116:19, 117:2
**time**
9:13, 13:4,
13:16, 13:24,
15:11, 16:17,
20:3, 20:8,
20:10, 20:22,
25:22, 30:5,
30:6, 31:14,
31:21, 35:16,
36:4, 45:21,
54:22, 56:14,
56:22, 57:12,
62:17, 66:17,
77:1, 80:1,
81:4, 81:7,
81:8, 82:4,
82:8, 82:9,
82:18, 82:23,
83:4, 83:21,
84:1, 84:3,
84:15, 85:11,
85:13, 86:6,
86:18, 86:22,
87:3, 87:12,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

212

87:16, 91:22,
94:19, 95:3,
95:5, 98:5,
105:8, 106:7,
107:2, 107:5,
108:7, 108:18,
108:22, 108:23,
109:1, 109:3,
109:4, 111:24,
119:2, 119:7,
119:17, 123:7,
125:24, 127:19,
131:13, 135:4,
137:10, 138:22,
142:11, 152:21,
152:22, 153:17,
160:6, 165:6,
169:10, 174:1
**times**
8:15, 8:17,
9:5, 11:13,
42:10, 80:15,
91:5, 129:23,
129:24, 131:20,
131:21, 146:2
**timing**
52:2
**today**
11:2, 11:7,
68:17, 126:16,
134:17, 169:22,
170:7
**toddler**
48:20
**together**
18:10, 25:22,
93:17
**told**
22:12, 25:21,
27:7, 27:20,
30:23, 32:14,
33:12, 37:2,
40:1, 40:2,
40:7, 40:14,
40:20, 49:8,
49:12, 50:6,
50:7, 50:9,
50:12, 50:14,

50:17, 50:23,
52:5, 59:1,
73:3, 75:17,
78:22, 78:23,
82:19, 85:12,
87:6, 90:5,
113:17, 128:6,
161:19, 168:15,
168:20
**too**
32:24, 35:2,
49:24, 51:4,
54:14, 109:5,
109:6, 133:21
**took**
114:9, 117:17,
118:4, 118:14,
133:12, 133:13,
133:18, 149:13,
149:16
**tool**
33:23, 34:1,
34:6
**top**
61:17, 64:10,
69:2, 88:18,
90:1, 109:16,
122:9, 160:5,
163:12
**topics**
139:2
**torso**
42:15, 173:8
**touch**
18:17, 112:8,
112:15, 113:10,
113:11
**touching**
39:5, 42:23,
42:24
**toward**
120:2
**towards**
25:13, 39:21,
42:8, 46:8
**toys**
47:19
**tracking**
141:7

**traffic**
8:20, 9:3,
17:20, 132:24
**train**
66:13
**trained**
139:1, 139:22,
141:1
**trainee**
16:9
**training**
15:20, 15:23,
15:24, 16:1,
16:5, 16:6,
138:23, 139:4,
139:6, 139:7,
139:11, 139:14,
140:1, 140:3,
140:4, 140:13,
140:19, 141:7,
141:15, 141:18
**transcript**
7:7, 60:11,
61:15, 62:15,
63:10, 105:4,
107:12, 110:22,
114:15, 116:3,
118:20, 122:22,
123:4, 123:7,
123:9, 169:9,
173:23, 176:8
**transcription**
175:6
**transferred**
16:20, 17:7,
17:15, 18:12
**translated**
72:19, 72:22
**trash**
173:3
**trevino**
4:12, 142:18,
142:23
**trial**
122:6, 122:23,
130:23, 145:4,
146:4, 173:13
**tried**
26:1, 27:15,

60:22, 88:24
**true**
120:18, 120:20,
121:2, 175:5,
176:8
**truthfully**
134:17, 134:20
**try**
9:19, 10:7,
27:20, 62:17,
73:12, 73:17,
73:20, 78:12,
109:19, 110:10,
112:5, 112:7,
113:11, 113:12,
113:16, 129:15
**trying**
10:5, 21:8,
22:13, 25:19,
33:3, 33:9,
39:4, 43:13,
44:4, 44:5,
44:7, 52:2,
71:2, 75:5,
75:7, 88:21,
88:23, 91:5,
112:4, 150:12,
166:16
**tuesday**
1:19
**turn**
39:1, 39:3,
166:11, 166:15,
166:23
**turned**
154:6
**twice**
11:14, 80:20
**two**
13:21, 21:8,
45:16, 51:15,
67:16, 68:6,
68:7, 77:10,
78:9, 78:10,
80:15, 88:15,
104:7, 117:6,
117:10, 124:12,
131:8, 139:14

**type**
137:13
**typewriting**
176:11
**typically**
98:14

**U**

**uh-huh**
9:22, 9:24,
104:6, 116:16,
117:9, 119:23,
120:1
**uh-uh**
83:14
**unable**
88:8
**uncle**
14:24
**under**
43:16, 64:10,
67:8, 77:4,
77:6, 81:11,
81:18, 163:12,
176:11
**undergrad**
135:21
**underneath**
47:20, 47:21,
47:22, 48:6,
48:24, 49:1,
64:12, 152:9
**understand**
10:10, 10:12,
15:4, 26:11,
71:12, 74:15,
84:11, 161:12
**understanding**
41:8
**understood**
22:1
**uniform**
137:14, 137:19
**unit**
16:21, 16:24,
172:10, 172:15,
172:21
**united**
1:1

**units**
93:18, 93:19,
93:21, 98:13,
99:3, 100:10,
117:7
**unknown**
68:23, 69:3,
69:4, 69:8,
69:12, 69:14,
70:4, 70:5
**unlatch**
62:10
**unless**
10:21
**unlock**
33:19, 62:22
**until**
56:19, 141:9
**unusual**
69:17
**updated**
141:3
**updates**
141:24, 142:2
**upon**
56:2
**upper**
173:8
**upset**
113:14
**use**
21:22, 29:9,
29:11, 52:6,
99:18, 139:16
**use-of-force**
139:14
**used**
34:8, 40:16,
66:9, 67:4,
69:5, 166:9,
173:17
**usually**
23:12, 30:13,
138:9
**utterance**
36:12

**V**

**v-a-l-e-n-t-i-n**
8:11

**valentin**
1:17, 2:1, 7:2,
7:9, 8:2, 8:10,
60:9, 60:10,
61:11, 61:14,
62:12, 62:14,
63:9, 105:3,
105:6, 107:11,
110:20, 110:21,
114:13, 114:14,
116:2, 118:19,
120:5, 129:9,
162:7, 169:8,
175:3
**valentins**
19:6
**vantage**
148:10, 172:20
**varga**
5:3
**variety**
139:1
**various**
18:20
**vc**
92:1
**vehicle**
25:13
**vent**
172:20
**verbal**
10:7
**verbatim**
72:7
**verification**
90:22
**very**
9:19, 37:24,
154:7, 160:5
**vest**
21:23
**victim**
38:17, 75:13,
75:14, 75:18,
76:13, 121:18,
150:2, 152:5,
152:8, 157:20,
163:14, 165:13,

171:13, 171:21,
173:2, 173:4
**victim's**
112:16
**victims**
12:10, 67:9,
67:11, 70:13,
71:21, 77:8,
112:20, 157:1,
157:10
**view**
47:4
**violation**
132:16
**violent**
92:4, 92:5

**W**

**wacker**
5:14
**wait**
141:9
**waiting**
31:17, 31:21,
80:3, 124:5
**walked**
23:7, 25:13
**wall**
41:6, 76:21,
139:20
**walls**
38:19, 152:10
**want**
9:6, 9:11,
18:7, 41:9,
41:19, 45:24,
50:9, 53:22,
102:10, 113:11,
113:14, 120:23,
128:10, 155:24,
158:12, 159:23,
162:7, 163:9,
165:7
**wanted**
21:24, 109:1
**wasn't**
41:15, 44:24,
50:1, 56:13,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

214

61:1, 79:20,
82:14, 87:17,
87:22, 89:10,
100:21, 122:15,
155:21
**watch**
14:1, 14:2,
18:15, 23:5,
57:4, 79:17,
90:6, 90:7,
90:8, 90:11,
90:13, 94:21,
95:22, 97:20,
108:24
**watching**
82:14, 100:21
**way**
9:15, 18:11,
39:23, 39:24,
44:5, 84:23,
102:18, 107:1,
114:5, 160:16
**we'd**
128:13, 128:23
**we'll**
18:19, 62:11,
114:12, 115:24,
118:17, 129:2,
174:14
**we're**
9:16, 29:10,
45:16, 56:5,
70:8, 103:11,
142:4
**weapon**
69:5
**wear**
136:13, 137:22,
138:9
**wearing**
136:22, 136:23,
137:24, 138:3
**wears**
138:12
**weather**
137:2, 137:4
**weeks**
11:17, 11:19

**wehrle**
5:3
**well**
8:23, 15:2,
15:3, 16:8,
20:20, 23:16,
28:17, 38:16,
40:6, 42:3,
47:18, 52:4,
57:2, 59:11,
64:7, 65:9,
67:1, 70:24,
72:19, 76:12,
77:5, 78:22,
84:3, 84:17,
89:11, 97:21,
106:6, 117:23,
124:19, 128:23,
138:9, 153:1,
158:20, 159:17,
174:1
**well-being**
13:24, 14:7,
21:17, 23:13,
23:15, 25:1,
25:2, 99:22,
112:15, 165:13
**went**
14:18, 15:23,
16:4, 23:21,
25:24, 27:9,
27:17, 27:23,
28:3, 29:4,
37:14, 39:19,
39:20, 40:10,
42:8, 46:5,
46:7, 46:8,
46:9, 51:3,
51:4, 73:12,
73:20, 78:11,
78:18, 79:9,
80:22, 82:9,
82:18, 83:4,
84:15, 99:21,
102:21, 109:19,
111:24, 136:20,
137:5, 138:1,
150:11, 152:18,

153:9, 165:9
**weren't**
52:20, 98:20
**west**
4:6, 4:16, 74:8
**what's**
18:22, 23:6,
23:18, 36:19,
37:10, 47:12,
55:24, 56:6,
61:18, 65:20,
66:20, 90:20,
116:23, 119:14,
173:19
**whatever**
11:18, 85:21,
103:12, 122:10,
138:18
**whatsoever**
143:8
**wheeler**
15:14
**where**
9:3, 14:19,
14:21, 18:13,
22:18, 23:20,
24:6, 25:24,
27:10, 27:22,
28:18, 32:18,
33:8, 34:8,
35:6, 35:11,
36:4, 37:21,
38:1, 40:4,
42:5, 43:3,
43:23, 45:5,
46:9, 46:21,
48:13, 53:21,
57:9, 64:9,
64:10, 65:2,
65:6, 65:7,
66:4, 67:9,
67:13, 68:2,
68:13, 70:13,
71:7, 73:7,
73:18, 89:24,
90:2, 98:9,
101:19, 103:19,
104:2, 104:6,

104:7, 107:8,
108:10, 109:8,
114:22, 116:15,
117:7, 119:21,
120:6, 121:11,
121:15, 126:3,
134:24, 135:8,
138:19, 152:7,
171:13, 171:20,
172:3, 172:24,
173:1, 173:5
**whereas**
65:22, 140:23
**whereof**
176:16
**whether**
28:6, 28:22,
52:11, 59:9,
59:15, 75:20,
75:21, 89:11,
105:15, 121:24,
122:13, 122:16,
122:19, 123:24,
124:1, 127:3,
127:8
**which**
16:22, 18:8,
18:15, 25:21,
29:18, 32:23,
33:5, 33:12,
33:18, 52:6,
61:21, 62:12,
65:23, 68:7,
68:9, 79:3,
84:12, 88:8,
88:20, 88:22,
89:5, 93:12,
109:11, 126:16
**while**
17:22, 40:9,
40:11, 40:22,
41:10, 46:3,
46:24, 47:13,
49:15, 50:5,
50:15, 50:18,
50:22, 58:23,
79:21, 83:20,
83:24, 85:10,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

215

85:13, 86:5,
87:11, 87:15,
100:23, 102:4,
102:9, 102:13,
105:20, 126:8
**white**
77:21, 78:2,
78:5, 78:9,
121:12, 167:15
**who**
11:4, 14:9,
18:3, 22:21,
26:13, 26:18,
27:18, 28:6,
29:20, 31:1,
31:20, 32:16,
33:22, 36:6,
40:2, 40:7,
47:3, 55:10,
55:13, 63:14,
68:4, 72:4,
72:5, 72:7,
73:5, 73:14,
74:5, 74:13,
74:17, 89:2,
90:4, 93:14,
93:20, 97:6,
99:7, 99:21,
101:12, 104:15,
120:9, 120:16,
122:10, 125:14,
133:13, 143:5,
143:10, 155:2
**whole**
16:17, 31:14,
45:21, 132:5,
152:22
**whom**
31:20, 176:6
**whose**
63:20, 105:9,
107:24
**why**
28:9, 29:23,
33:6, 33:7,
39:3, 39:22,
55:19, 60:8,
61:11, 80:4,

84:4, 92:17,
95:14, 99:14,
104:19, 112:14,
115:1, 115:7,
116:17, 127:6,
128:17, 134:13,
161:3, 165:24
**wide**
36:3, 47:21,
139:1, 158:3
**wife**
76:4
**will**
9:19, 10:12,
29:11, 30:14,
33:18, 72:7,
110:19, 129:15,
159:3
**wind**
139:20
**window**
33:15, 35:6,
35:17, 35:20,
36:1, 36:10,
61:4, 61:21,
61:24, 62:20,
63:3, 63:4,
74:9, 74:17,
74:23, 75:9,
89:3, 173:17
**windowpane**
33:18, 62:8
**windowpanes**
62:8
**windows**
27:12, 27:14,
27:15, 28:12,
28:19, 29:16,
34:9
**wise**
55:10
**with**
9:9, 11:11,
11:21, 14:9,
15:8, 15:16,
16:5, 18:24,
22:4, 22:14,
22:16, 22:21,

24:4, 24:19,
25:2, 26:23,
27:5, 27:21,
27:23, 28:3,
28:7, 29:8,
30:1, 30:11,
30:18, 31:4,
31:9, 31:11,
31:18, 36:5,
36:6, 37:18,
41:11, 42:14,
42:22, 45:22,
52:8, 52:17,
54:15, 60:12,
60:22, 68:9,
69:22, 72:17,
73:12, 74:7,
77:11, 81:3,
83:23, 84:18,
85:10, 85:12,
85:15, 86:5,
86:24, 87:5,
92:13, 97:16,
99:12, 101:24,
102:11, 109:20,
115:20, 116:19,
117:2, 120:3,
120:8, 121:2,
122:10, 125:24,
130:3, 135:9,
135:13, 137:9,
137:19, 142:22,
145:12, 145:15,
146:3, 146:5,
153:4, 160:21,
164:1
**withdraw**
59:12, 174:3
**withdrawn**
124:3
**without**
30:3
**witness**
67:24, 71:20,
72:14, 73:12,
77:10, 107:7,
124:5, 134:5,
141:12, 141:14,

146:12, 159:5,
176:16
**witness's**
75:3, 76:1,
79:24
**witnesses**
70:14, 168:18,
168:20
**woman**
26:14, 27:5,
27:23, 28:12,
29:8, 48:5,
122:10, 144:8,
145:22, 153:21,
155:1, 156:14
**women**
68:9
**wondering**
128:15
**wood**
62:7
**words**
10:3, 40:16,
44:4
**wore**
137:14, 138:17
**work**
17:20, 58:19,
65:21, 93:17,
114:5
**working**
14:1, 21:15,
95:11
**works**
143:5
**would**
8:8, 17:3,
20:23, 22:2,
23:2, 28:8,
28:9, 34:8,
35:14, 39:6,
47:20, 58:21,
60:4, 60:5,
67:20, 78:4,
92:10, 98:4,
98:8, 98:14,
98:19, 99:1,
101:4, 103:5,

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

216

107:8, 112:15,
115:7, 120:18,
128:17, 132:9,
138:19, 139:8,
140:7, 144:23,
147:9, 160:13,
166:11, 168:21
**wouldn't**
101:4, 112:22
**wound**
151:4
**wounds**
37:18, 38:12,
38:18, 42:15,
77:9, 149:17,
149:19, 150:7,
150:14, 150:15,
150:17, 150:19,
150:24, 151:9,
173:5
**wright**
135:10, 135:14,
135:16
**write**
10:2, 15:1,
15:3, 21:3,
21:6, 21:10,
71:2
**writing**
70:21
**written**
69:18, 69:22,
70:10, 107:8,
111:18, 168:21
**wrong**
120:13, 166:10
**wrote**
55:10, 71:8,
72:1, 103:12,
109:18, 110:5,
110:15, 110:16,
111:17, 121:6,
162:14, 168:14,
168:17

**X**

**xs**
67:16

**Y**

**yeah**
9:1, 22:1,
35:22, 41:12,
43:19, 44:21,
45:24, 51:5,
51:23, 54:24,
59:17, 74:12,
76:3, 76:11,
76:23, 78:10,
79:8, 88:19,
90:10, 91:8,
103:12, 115:6,
116:23, 117:1,
120:7, 132:22,
136:15, 138:20,
141:3, 149:21,
150:12, 151:11,
151:14, 152:12,
154:19, 157:4,
158:7, 158:8,
160:18, 162:17,
170:12
**year**
18:22, 139:10
**years**
8:19, 11:9,
15:12, 15:16,
17:2, 17:11,
18:7, 44:9,
60:1, 67:4,
78:7, 125:20,
127:2, 127:23,
131:4, 134:11,
140:8
**yell**
36:15
**yelled**
36:14, 41:12,
41:19, 41:21,
41:23, 45:10,
45:13, 45:18,
45:19, 50:7
**yesterday**
11:16
**you'd**
153:12

**you'll**
10:23, 84:17
**you're**
9:16, 10:21,
13:9, 19:9,
20:6, 40:22,
40:24, 43:5,
43:14, 44:6,
53:6, 53:16,
62:23, 64:9,
75:5, 96:14,
96:15, 118:21,
119:11, 119:18,
136:23, 159:1
**you've**
36:21, 43:10,
69:18, 76:14,
90:5, 114:16,
130:6, 131:20,
134:8, 169:22
**young**
156:1, 156:3,
157:18
**yours**
115:17

**Z**

**zero**
118:16
**zibolski**
4:4, 174:12

**.**

**.0070**
3:17
**.1000**
6:9
**.3314**
4:19
**.3705**
4:9
**.5900**
2:7, 3:9
**.5971**
5:9
**.9123**
5:17

**0**

**00**
14:2, 18:16,

23:3, 23:4
**0030**
109:4
**01**
1:20
**01028**
1:7
**0110**
52:6
**0700**
65:1, 65:10,
72:6

**1**

**1**
174:8, 174:9,
174:16
**10**
1:20, 7:20,
17:11, 66:4,
79:15, 118:18,
118:19, 119:21,
132:20, 165:8
**105**
7:15
**10582**
95:18
**107**
7:16
**10931**
120:4
**11**
7:21, 18:16,
88:3, 88:4,
136:16, 169:7,
169:8, 169:14
**110**
7:17
**1127**
92:20
**114**
7:18
**116**
7:19
**118**
7:20
**1180**
3:14

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

217

**12**
7:12, 61:11,
129:4, 129:5,
173:20
**120**
4:6
**1240**
4:17
**125**
16:24
**1252**
74:8
**129**
7:4
**13247**
95:12
**13696**
99:6
**14**
14:1, 16:4,
16:13, 16:14,
16:15, 17:22,
22:19, 57:17,
58:22, 94:7,
104:17, 106:6,
108:14, 108:15,
113:20, 126:8,
160:6, 161:24
**141**
4:16
**1410**
95:8, 95:11
**1430**
18:15
**1432**
65:17, 65:24,
99:8
**1440**
73:12, 73:14,
74:8, 90:4
**14489**
91:17
**1455**
65:19, 66:1
**1462**
94:5
**15**
28:16, 83:16,

**83:18, 83:19,**
84:7
**16**
18:14, 176:20
**1600**
14:2
**1645**
66:15, 91:7
**169**
7:21
**17**
116:10, 116:11,
118:15
**1731**
94:15
**176**
1:23
**18**
1:7, 1:13,
15:14
**1810**
73:24
**1815**
74:7
**1830**
90:18, 91:2,
91:9, 97:22,
98:2
**1840**
91:17
**1845**
90:9, 90:15
**1852**
92:20, 93:2
**1856**
92:6
**19**
17:7, 17:10
**198126**
109:20, 160:21
**1994**
15:10, 16:16
**1995**
18:11, 131:11
**1998**
12:4, 19:11,
19:20, 65:10,
66:15, 117:17,

118:4, 118:15,
125:23, 136:19
**1999**
18:12
**1:-cv**
1:7, 1:13
**1st**
12:3, 98:24,
103:7, 114:8,
116:9, 125:23

**2**

**20**
11:9, 44:9,
60:1, 67:4,
125:20, 156:3
**20,000**
92:13
**2000**
4:7
**2002**
16:16, 16:19,
18:9, 126:9
**2008**
17:3, 17:6
**2018**
17:12, 17:15
**2019**
1:19, 176:18
**2020**
176:20
**20671**
96:10
**20692**
94:13
**2071**
21:17, 23:21,
58:24, 60:20,
61:20, 72:5,
73:5, 73:16,
97:17, 98:23,
102:20, 103:6,
105:16, 109:18,
111:23, 117:11,
118:5, 118:14,
124:14
**20778**
92:6

**20861**
94:17
**2095**
94:3, 120:4
**2144**
95:8, 95:10
**2188**
104:1, 104:4
**2200**
6:7
**23**
1:19
**2300**
18:16
**2312**
1:13
**2355**
108:5, 108:16
**2422**
160:12
**25**
8:19, 9:5,
127:2, 140:8
**253110**
1:22
**276**
7:11, 60:13
**278**
7:11, 60:13
**28**
64:24, 65:10,
72:6
**280**
7:11, 60:14
**29**
15:12
**290**
66:5

**3**

**30**
23:8, 83:13,
88:3, 91:10,
156:5
**31**
15:10, 176:17
**311**
2:5, 3:6, 5:14

Transcript of David Valentin, Jr.
Conducted on July 23, 2019

218

**312**
160:12
**312.243**
2:7, 3:9
**312.494**
6:9
**312.603**
5:9
**312.889**
5:17
**321**
6:6
**386**
7:17, 111:10
**387**
7:17, 111:11,
111:17
**388**
7:16, 109:14
**389**
7:16, 109:14
**3rd**
3:7, 3:15

---
**4**
---
**4**
14:2, 23:3,
23:4, 23:8,
160:15
**40**
156:4
**416**
7:15
**4169**
176:4
**418**
7:14, 64:4
**419**
7:14, 64:4,
71:1
**42**
129:4
**43**
88:4
**44**
174:8
**45**
31:10, 31:21,

32:2
**4611**
90:8
**468**
7:20, 119:16
**472**
165:8
**4746**
120:5
**476**
7:20, 119:16
**482**
7:18, 114:20
**484**
7:19

---
**5**
---
**5-5**
136:18
**50**
32:22, 96:9
**500**
5:7, 7:13,
62:13
**51**
69:7
**52**
174:9, 174:16
**5200**
5:15
**53**
129:5
**554**
96:9
**57**
69:7, 93:7
**58**
69:17

---
**6**
---
**6**
91:10
**60**
7:11
**605**
7:21, 169:12
**60602**
4:8, 5:8

**60604**
4:18
**60606**
5:16
**60607**
2:6, 3:8
**60642**
3:16
**60654**
6:8
**607**
170:9
**608**
7:21, 169:12,
171:16
**61**
7:12
**613**
7:22, 169:13,
172:6
**614**
7:22, 169:13,
172:19, 173:1
**62**
7:13, 74:8,
77:24, 78:3
**63**
7:14
**630.735**
4:19

---
**7**
---
**744**
160:12
**773.235**
3:17

---
**8**
---
**84**
176:4
**866.786**
4:9

---
**9**
---
**90**
127:17, 131:14
**911**
14:9, 165:12,

165:15
**94**
18:9, 126:9
**9603**
95:12, 95:17
**98**
64:24, 72:6

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 30

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4  - - - - - - - - - - - x

5  ARTURO DeLEON-REYES,   :

6        Plaintiff,   :

7   v.            :   Case No.

8  REYNALDO GUEVARA, et.  :  1:18- cv-01028

9  al,            :

10       Defendants.  :

11  - - - - - - - - - - - x

12

13         Deposition of MARK HARVEY

14          Chicago, Illinois

15        Tuesday, April 30, 2019

16           11:11 a.m.

17

18

19

20

21

22  Job No.: 241122

23  Pages: 1 - 148

24  Reported By: Juan Mares

Transcript of Mark Harvey
Conducted on April 30, 2019                                    2

1        Deposition of MARK HARVEY, held at the offices

2    of:

3

4

5             LOEVY & LOEVY

6             311 N. Aberdeen St.

7             3rd Floor

8             Chicago, Illinois 60607

9             (312) 243-5900

10

11

12

13

14        Pursuant to notice, before Juan Mares, Notary

15    Public in and for the State of Illinois.

16

17

18

19

20

21

22

23

24

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF REYES:

 3        SEAN STARR, ESQUIRE

 4        LOEVY & LOEVY

 5        311 N. Aberdeen St.

 6        3rd Floor

 7        Chicago, Illinois 60607

 8        (312) 243-5900

 9

10   ON BEHALF OF GABRIEL SOLACHE:

11        JOHN STAINTHORP, ESQUIRE

12        PEOPLE'S LAW OFFICE

13        1180 N. Milwaukee Ave.

14        Chicago, Illinois 60622

15        (773) 235-0070

16

17   ON BEHALF OF DEFENDANT BIEBEL:

18        CAROLINE GOLDEN, ESQUIRE

19        THE SOTOS LAW FIRM

20        141 W. Jackson Blvd.

21        Chicago Illinois 60604

22        (630) 735-3300

23

24
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          4

```
 1    A P P E A R A N C E S   C O N T I N U E D

 2

 3   ON BEHALF OF DEFENDANT CITY OF CHICAGO:

 4        THERESA BEROUSEK CARNEY, ESQUIRE

 5        ROCK FUSCO & CONNELLY, LLC

 6        321 N. Clark Street

 7        Chicago, Illinois 60654

 8        (312) 494-1000

 9

10   ON BEHALF OF DEFENDANT COOK COUNTY:

11        YULIA NIKOLAEVSKAYA

12        COOK COUNTY STATE'S ATTORNEY'S OFFICE

13        50 W. Washington

14        #500

15        Chicago, Illinois 60602

16        (312) 603-5440

17

18

19

20

21

22

23

24
```

```
 1                    C O N T E N T S

 2

 3    EXAMINATION OF MARK HARVEY                  PAGE

 4     By Mr. Starr                                 6

 5     By Ms. Golden                              146

 6

 7

 8                    E X H I B I T S

 9                (Attached to transcript.)

10    HARVEY DEPOSITION EXHIBITS                 PAGE

11     Exhibit 1   Photos                        121

12     Exhibit 2   Negatives                     129

13     Exhibit 3   Crime scene processing report 132

14     Exhibit 4   Inventory report              137

15     Exhibit 5   Inventory report              138

16     Exhibit 6   Inventory report              139

17     Exhibit 7   Inventory report              140

18     Exhibit 8   Inventory report              140

19     Exhibit 9   Inventory report              141

20     Exhibit 10  Inventory report              143

21

22

23

24
```

```
1                    P R O C E E D I N G S

2                       WHEREUPON,

3                      MARK HARVEY

4      of lawful age, being by me first duly sworn to

5      testify the truth, the whole truth, and nothing but

6      the truth, as herein certified, deposes and says as

7      follows:

8         EXAMINATION BY COUNSEL FOR PLAINTIFF REYES

9   BY MR. STARR:

10        Q   Good morning, Mr. Harvey.  My name is Sean

11     Starr.  Please excuse my being a little hoarse

12     today, but I'm one of the attorneys that represents

13     Plaintiff Reyes.  To my left here is John

14     Stainthorp, who represents Plaintiff Solache.  And

15     I'll be taking your deposition today.

16          For the record, could you please state and

17     spell your name?

18        A   Mark A. Harvey, H-A-R-V-E-Y.

19        Q   Mr. Harvey, where do you currently work?

20        A   I'm retired.

21        Q   Where was your last place of employment?

22        A   Chicago Police Department.

23        Q   Did you have a title when you worked for the

24     Chicago Police Department?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    7

1        A  Yes, I was a forensic investigator.

2        Q  Mr. Harvey, have you ever given a deposition

3   before?

4        A  Yes.

5        Q  How many times?

6        A  Maybe one or two.  I'm not sure.

7        Q  What were the circumstances that led to you

8   giving a deposition?

9        A  I don't remember.  It's a long time ago.

10       Q  Did you ever give one as a member of the

11  Chicago Police Department?

12       A  Yes.

13       Q  Did you ever give one in a non-police

14  department capacity, like a citizen?

15       A  No.

16       Q  I'm going to go over a couple ground rules

17  with you regarding the deposition.  To begin with, I

18  ask that you answer all my questions verbally and

19  not give any nods or any huh-uhs.  I'll promise to

20  try to ask clear questions.  However, if you don't

21  understand what I'm asking, you can please let me

22  know that; okay?

23       A  Okay.

24       Q  I'll also try not to interrupt you when

Transcript of Mark Harvey
Conducted on April 30, 2019                                    8

```
1   you're speaking, and I ask you to do the same for
2   me; okay?
3       A   Okay.
4       Q   Furthermore, if I ask you a question and you
5   don't tell me you don't understand it, I'm going to
6   assume you do.  Okay?
7       A   Okay.
8       Q   Are you on any medication today that would
9   inhibit your ability to remember things?
10      A   I took Benadryl.
11      Q   Any medication that would inhibit your
12  ability to testify truthfully?
13      A   No.
14      Q   Do you have any medical issues generally
15  that would inhibit your ability to remember or to
16  testify truthfully?
17      A   No.
18      Q   Is there any reason why you might not be
19  able to testify truthfully today?
20          Ms. Golden:  Object to form.
21      A   No.
22      Q   Mr. Harvey, what did you do today to prepare
23  for this deposition?
24      A   Today I looked over some of the reports that
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    9

1    the attorneys gave me.

2        Q   Do you know which reports you looked over?

3        A   My testimony from the trial.

4        Q   Any other reports you looked over?

5        A   No, not today.

6        Q   So the only document that you reviewed was

7    your testimony?

8            Ms. Golden:  Object to form.

9        A   Yes.

10       Q   Mr. Harvey, did you review any other

11   documents in anticipation of your deposition?

12       A   Yes.

13       Q   What did you review?

14       A   My crime scene report.

15       Q   Any other documents you reviewed in

16   anticipation of this deposition?

17       A   Photographs and inventory report.

18       Q   Which photographs did you review?

19       A   The photographs that I took the day of the

20   incident.

21       Q   Do you know how many photographs you took

22   the day of the incident?

23       A   I don't remember.

24       Q   Can you approximate how many photographs you

Transcript of Mark Harvey
Conducted on April 30, 2019                    10

```
1    took the day of the incident?
2         A  I believe, two rolls.
3         Q  Did you notice anything unusual in the
4    reports you did review?
5         A  No.
6         Q  Were there any other materials whatsoever
7    that you reviewed in anticipation of today's
8    deposition?
9         A  There were other reports in a packet,
10   detective reports and other crime scene reports, but
11   I didn't exactly review them.  I know they were
12   there, but I did not read them all.
13        Q  So is it correct to say that things, as far
14   as documents go, things that had your name on them?
15        A  Yes.
16        Q  And you didn't review documents that didn't
17   have your name on them?
18             Ms. Golden:  Objection.
19             Ms. Nikolaevskaya:  I'll join the objection.
20        Q  Did the reports that you reviewed reflect
21   that you followed the policies of the Chicago Police
22   Department?
23             Ms. Golden:  Objection.  Form and
24   foundation.
```

1          Ms. Berousek Carney:  Objection.

2      A  They reflected what I did on the incident

3  that day.

4      Q  Did what you did on the day of the incident

5  follow Chicago Police Department policies?

6          Ms. Golden:  Object to form and foundation.

7      A  Would you repeat the question?

8      Q  Yeah, sure.  Did your review of the

9  documents that your name was on reflect that you

10 followed Police Department policies?  And you said

11 they reflected what you did that day.  My question

12 is:  What you reviewed on those documents, did that

13 reflect the policies of the Chicago Police

14 Department?

15         Ms. Golden:  Same objection.

16     A  It reflected the procedures we followed at

17 that time.

18     Q  Do you know if it reflected policies that

19 the Chicago Police Department had in place at the

20 time?

21         Ms. Golden:  Same objection.  I think you

22 need to be more specific.

23         Mr. Starr:  I'm happy with my question.

24     Q  Did what you did on those days and what

Transcript of Mark Harvey
Conducted on April 30, 2019                                    12

```
1    those documents reflected follow Chicago Police
2    Department policies?
3         Ms. Golden:  Same objection.
4      A  They followed the procedures that we
5    normally followed.
6      Q  So just let me be a little bit more
7    specific.  I keep asking you about the policies, and
8    you keep saying they followed procedures.  Can you
9    answer yes or no whether they followed the policies
10   of the Chicago Police Department?
11        Ms. Golden:  Objection.  Asked and answered.
12   Form and foundation.  He's answered it four times
13   now.
14        Ms. Nikolaevskaya:  Objection.
15     Q  You can answer.
16        Ms. Golden:  For the last time you can
17   answer.
18     A  I followed the procedures that we performed
19   on an incident.
20     Q  Is it your understanding that the Chicago
21   Police Department policies means the same thing as
22   the Chicago Police Department procedures?
23        Ms. Golden:  Object to form, Sean.
24     Q  It's a yes or no question.
```

1        A   Will you restate?

2        Q   Sure.   Is it your understanding that the

3    Chicago Police Department policies mean the same

4    thing as Chicago Police Department procedures?

5            Ms. Golden:   Object to form.

6        A   Basically, yes.

7        Q   What's the difference between the two?

8            Ms. Golden:   Objection.   Misstates his

9    testimony.

10       A   Policy is something the City sets down, a

11   procedure that we follow when we process a scene.

12       Q   So there is no difference between those two,

13   or there is some difference between those two?

14           Ms. Golden:   Object to form and foundation.

15       A   I don't know.

16       Q   The materials that you reviewed today or in

17   anticipation of today's deposition, did they cause

18   you to remember anything about the investigation of

19   the Soto murder crime scene?

20       A   Nothing more than what I have a recollection

21   of.

22       Q   So no independent memories were triggered

23   from reviewing those documents?

24       A   No.

Transcript of Mark Harvey
Conducted on April 30, 2019                              14

1      Q  Does your recollection of the Soto homicide

2  investigation go beyond what the documents state or

3  demonstrate to you?

4          Ms. Golden:  Object to form.

5      A  No, they do not.

6      Q  Prior to reviewing the material, did you

7  have any independent recollection of the

8  investigation?

9      A  Just a couple of things.

10      Q  What did you remember?

11      A  I remembered two reporters being on the

12  scene, Andy Garcia and Anita Padilla.  I remember

13  that because there was so much difference in their

14  height.  And I remember the female victim on the

15  floor of the bedroom.

16      Q  Are those three things the sum total of your

17  independent recollection prior to reviewing the

18  documents?

19      A  Yes.

20      Q  Can you say anything about this

21  investigation that's not in your reports?

22          Ms. Golden:  Object to form.

23      A  No.

24      Q  What do you remember about the victim in the

1    bedroom?

2        A   I basically remember her lying on the floor.

3        Q   Anything else?

4        A   Independently, no.

5        Q   Do you recall anything about how she was

6    lying on the floor?

7        A   I believe she was lying face down.

8        Q   Anything else you remember about her lying

9    on the floor?

10       A   No.

11       Q   Do you remember what she was wearing?

12       A   No, I do not.

13       Q   Do you remember whether she was alive or was

14   she dead?

15       A   She was dead when we arrived.

16       Q   Are you able to remember anything about what

17   may have caused her death?

18       A   Remember independently, no; but from the

19   report, she was stabbed.

20       Q   Is there anything that would help you recall

21   anything further?

22       A   Not that I can think of.

23       Q   And other than the two reporters that you

24   recall and the fact that one of the victims was

Transcript of Mark Harvey
Conducted on April 30, 2019                    16

1    lying on the floor and was clearly deceased, is

2    there any other independent recollection you have of

3    anything about this investigation?

4        A  No.

5        Q  Do you know anything about this

6    investigation outside of your independent

7    recollection or the documents that you reviewed in

8    anticipation of this deposition?

9           Ms. Golden:  Nothing that you talked with

10   your lawyers about.

11       Q  I'm not asking about what conversation you

12   had with your lawyers; but other than your

13   independent recollection and what you recall based

14   on the documents or learned based on the documents,

15   is there anything else that you recall of this

16   investigation whatsoever?

17       A  No.

18       Q  So do you agree with me that any answers

19   that you might give today are either what you

20   learned from your reports that you reviewed in

21   anticipation of this deposition or those three

22   things that you independently recall?

23          Ms. Golden:  Object to form.

24       A  Yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                    17

```
1        Q  What's your understanding of why we're here
2   today?
3        Ms. Golden:  Objection.  Calls for
4   attorney-client communications to the extent we
5   discussed that.
6        Q  For the entirety of the deposition, I'm not
7   going to ask anything about what you and your
8   attorneys discussed; but my question that I just
9   posed is, what is your understanding of why we're
10  here today?
11       A  So you can get an understanding of what I
12  know about the incident.
13       Q  You understand you're also a defendant;
14  right?
15       A  Yes.
16       Q  When did you retire, Mr. Harvey?
17       A  November 2011.
18       Q  Are you currently receiving a Chicago Police
19  Department pension?
20       A  Yes.
21       Q  Have you ever testified in court?
22       A  Yes.
23       Q  Do you have an approximate number of times
24  you testified in court?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                                    18

1       A   I would guess some number over a hundred.

2       Q   And you testified in the criminal case

3   regarding the Soto murders; correct?

4       A   Yes.

5       Q   Were you ever trained by the Chicago Police

6   Department on how to testify?

7       A   I remember a small amount of training in the

8   Academy, but that's all I remember.

9       Q   And that small amount that you remember is

10  regarding how to testify; is that right?

11      A   Yes.

12      Q   Mr. Harvey, can you give me a rundown of

13  your educational background?

14      A   I graduated from high school, and I had some

15  credit hours to college.

16      Q   Where did you graduate from high school?

17      A   Quigley South.

18      Q   Did you go to Quigley South for your entire

19  high school education?

20      A   Yes.

21      Q   What year did you graduate from high school?

22      A   '74.

23      Q   You said you had some college.  How much

24  college did you have?

Transcript of Mark Harvey
Conducted on April 30, 2019                    19

```
1        A   I couldn't tell you what the hours were.  I
2   don't know.
3        Q   Was it more than a year or just part of a
4   year?
5        A   Probably a total, a little more than a year.
6        Q   A little more than a year.  Where did you go
7   to college?
8        A   DuPage County and the City Colleges.
9        Q   Which City Colleges?
10       A   Harold Washington.
11       Q   Did you go to DuPage College first?
12       A   No; that was after.
13       Q   After Harold Washington?
14       A   Yes.
15       Q   Okay.  In a similar way to the education
16   question, could you give me kind of a rundown of
17   your employment history?
18       A   After high school I was in the U.S. Army,
19   '74 to '78.  After getting out of the Army, I worked
20   for Krochs Bookstore.  I worked for the Art
21   Institute of Chicago.  And then I joined the Police
22   Department in June of '82.
23       Q   June of '82?
24       A   Yes.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                     20

1      Q  Do you know the approximate years for Krochs

2  and the Art Institute?

3      A  I don't remember.

4      Q  What did you do for Krochs; what was your

5  title?

6      A  At Krochs, I was in the warehouse.

7      Q  Okay.  And then what was your title at the

8  Art Institute?

9      A  Security officer.

10     Q  Do you know how many years you worked for

11  the Art Institute approximately?

12     A  Approximately a year and a half.

13     Q  And then you joined the Chicago Police

14  Department in 1982; correct?

15     A  Correct.

16     Q  And could you please tell me what different

17  districts you worked in and what positions you had

18  at those districts?

19     A  I was in Sixth after finishing the Academy

20  as a patrolman.  In '87 -- correct that; in '85, I

21  became a field training officer.  In '87 I became a

22  district evidence technician in Sixth.  And in '97,

23  I became a forensic investigator in the mobile crime

24  lab.

Transcript of Mark Harvey
Conducted on April 30, 2019                      21

```
 1        Q  Do you know what date in 1997 you became a
 2    forensic investigator?
 3        A  I don't remember the date.
 4        Q  Do you remember the month?
 5        A  No, I don't.
 6        Q  Was it -- do you remember if it was in the
 7    spring or winter or summer?
 8        A  Probably closer to fall.
 9        Q  Were you a forensic investigator in March,
10    April of 1998 when this murder investigation
11    occurred?
12        A  Yes.
13        Q  So it was before the fall that you became a
14    forensic investigator; correct?
15        Ms. Berousek Carney:  Objection.  Misstates
16    his testimony.
17        Mr. Starr:  Okay.  Okay.
18        Ms. Berousek:  The question is withdrawn?
19        Mr. Starr:  Yeah, the question is withdrawn.
20        Q  Are you sure you became a forensic
21    investigator in 1987?
22        Ms. Golden:  Object to form.
23        A  Yes.
24        Q  Is an evidence technician -- I'm going to
```

Transcript of Mark Harvey
Conducted on April 30, 2019                              22

```
 1    call it an ET -- is an ET a detail or an assignment?
 2         A  It was an assignment.
 3         Q  Is a forensic investigator a detail or an
 4    assignment?
 5         A  Assignment.
 6         Q  What kind of qualifications do you need, or
 7    do you know if you need any qualifications to become
 8    a evidence tech?
 9         A  At that time you had to have a certain
10    amount of time on the job, and then you had to take
11    a test.
12         Q  Was the test a written test or a practical
13    test?
14         A  I believe it was written and a practical.
15         Q  And by practical, do you mean like you had
16    to go out and do something?
17         A  Yes.  You were given a crime scene, and you
18    had to process it.
19         Q  Were there different qualifications to
20    become a forensic investigator?
21         A  Again, it was time on the job, and you had
22    to have been an evidence technician.
23         Q  So it was like a step position?
24         A  Yes.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    23

1      Q   Is there a different test for forensic
2    investigator?
3      A   I don't remember.
4      Q   Is becoming an ET considered a promotion?
5      A   Yes.
6      Q   Can you give me a summary of what the duties
7    of an evidence tech are?
8      A   Evidence techs were mostly assigned to
9    property crimes, burglaries, auto thefts, rapes;
10   but, of course, because of the busyness, we could
11   also be assigned to jobs that were meant for the
12   crime lab.
13     Q   So evidence techs didn't work out of the
14   crime lab?
15     A   Not at that time, no.
16     Q   And just for the record, unless I say
17   otherwise, I'm talking about '97-'98, in regards to
18   that time period.  I'll let you know if it's a
19   broader time period.
20        Ms. Golden:  Well, in '97 and '98, he was a
21   forensic investigator.  He was an evidence tech from
22   '87 to '97.
23     Q   Okay.  All the questions I'm asking about
24   are during the period I just explained; okay?  And

Transcript of Mark Harvey
Conducted on April 30, 2019                    24

1   if there's a difference that exists, you can tell me

2   that, but I'm primarily asking '97-'98; okay?

3       A   Okay.

4       Q   What were the duties and responsibilities of

5   a forensic investigator in '97-'98?

6       A   Forensic investigators mostly handled

7   violent crimes or crimes that entailed large amounts

8   of money, like a bank robbery or a robbery.

9       Q   So those are the types of crimes that

10  forensic investigators handled; correct?

11      A   Correct.

12      Q   What about their duties when they were on

13  the job?

14      A   To process a crime scene, and that could

15  entail many things.

16      Q   Could you give me a rundown of what that

17  does entail?

18      Ms. Golden:  Objection to form.  Go ahead

19  and answer if you can.

20      A   Crime scene processing, you get a layout of

21  the crime scene by talking to detectives and

22  officers on the scene.  You then document the scene

23  through photography.  You then collect evidence,

24  preserve it until you can take it into your station

Transcript of Mark Harvey
Conducted on April 30, 2019                          25

1    where it's inventoried and then sent on to members

2    of the crime lab who will analyze it.

3        Q  Can you repeat the last point?  I kind of

4    missed it.  The last response.

5            Ms. Golden:  Could you repeat the answer.

6    That might help me, too.

7            (Audio played back.)

8        Q  What was the training process for a forensic

9    investigator?

10       A  I believe we spent about a week learning the

11   tools that forensic investigators use that evidence

12   technicians don't.  The rest was on-the-job

13   training.

14       Q  Can you tell me what tools you're referring

15   to?

16       A  As an example, the gunshot residue kit, some

17   of the blood collection tools, the alternate light

18   source; and that's all I can remember.

19       Q  What was the blood collection tool?

20       A  There were things like a hemostat stick and

21   procedures for collecting blood, for taking a swab

22   and containing it so it wouldn't be contaminated.

23       Q  Was blood collection the sole responsibility

24   of a forensic investigator?

Transcript of Mark Harvey
Conducted on April 30, 2019                    26

```
1        A   No.

2        Q   Who else, if you know, collected blood?

3        A   Evidence technicians also collected blood.

4        Q   Any other positions within the Chicago

5    Police Department that you know collected blood?

6        A   Not that I know of.

7        Q   So is blood collection one of your primary

8    responsibilities?

9            Ms. Golden:  Object to form.

10       A   I wouldn't say primary, but it is part of

11   the possible responsibility for the crimes.

12       Q   And you said alternate light source?

13       A   Yes.

14       Q   What tool was that?

15       A   It's a machine that emits light at certain

16   frequencies, and at certain frequencies, different

17   bodily fluids can be discovered.

18       Q   Did you have a blood collection kit with you

19   during the investigation of the Soto murders?

20       A   Yes.

21       Q   Did you use it?

22       A   Not that I recall.

23       Q   Why didn't you use it?

24       A   Because the totality of the blood that we
```

Transcript of Mark Harvey
Conducted on April 30, 2019                27

1   saw was mostly around the victim.

2       Q   Could you explain what the answer means?

3       A   Well, what we saw was blood that was normal

4   in this incident and not something that looked out

5   of the norm.

6       Q   Do you have an independent recollection of

7   the amount of blood that was at the scene?

8       A   No.

9       Q   Do you have an independent recollection of

10  deciding there was a normal amount, and so therefore

11  a normal amount?

12      A   Independent, no.

13      Q   And do you have an independent recollection

14  of choosing not to take a blood collection sample?

15      A   No.

16      Q   And what basis do you have answering that

17  you chose not to take and collect blood based on the

18  amount of blood at the scene?

19      A   I don't quite understand what you're saying.

20      Q   Sure.  So I asked you earlier about your

21  independent recollection and then about what you

22  reviewed.  Is your knowledge of the previous answer,

23  the choice not to collect blood, based on some

24  documents you looked at?

Transcript of Mark Harvey
Conducted on April 30, 2019                    28

1      A   Yes.

2      Q   Do you know which document that is?

3      A   The crime scene report.

4      Q   And what is in the crime scene report that

5  tells you that you chose not to collect it because

6  of the amount of blood?

7      A   The fact that there was no blood inventory.

8      Q   So are there any other reasons why you

9  wouldn't inventory blood, other than the amount of

10  blood at the scene?

11         Ms. Golden:  Object to form.

12      A   As I stated, the amount of blood at the

13  scene and the location of the blood.

14      Q   Are there any additional reasons why you

15  wouldn't collect blood, other than those two?

16      A   Not that I can think of.

17      Q   Was there too little or too much blood to

18  collect blood?

19      A   In this case, I'm not going by independent

20  recollection, but by the fact that we didn't, I

21  would assume that there was a lot of blood.

22      Q   So you would generally not collect blood if

23  there was a significant amount of blood at the

24  scene?

Transcript of Mark Harvey
Conducted on April 30, 2019                                    29

```
1          Ms. Golden:  Object to form.
2      A  It would depend on the crime at the time.
3  Each incident is different.
4      Q  What sorts of crimes that involve a great
5  deal of blood would you not collect samples from?
6      A  I can't think of anything specific, but,
7  again, it would depend on the crime scene, what we
8  know about the crime scene, where blood is found,
9  where it's not found.
10     Q  What sort of crimes would you generally
11 collect blood samples from?
12     A  There was no generalization.  It depended on
13 the crime scene.
14     Q  Can you give me some examples of crime
15 scenes where you would not collect blood other than
16 this one?
17     A  If there was a small amount of blood around
18 the victim, for example, and nowhere else, then we
19 may or may not collect blood.
20     Q  Any other circumstances or examples you can
21 think of?
22     A  No, none that I can think of.
23     Q  Can you give me some examples of crime
24 scenes where you would collect blood generally?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                                    30

1       A   Again, I can't generalize because it depends

2    on the crime scene.

3       Q   Can you give me examples where you recall

4    collecting blood?

5           Ms. Berousek Carney:   Objection to form.

6       A   No, I cannot.

7       Q   Can you think of any other reasons why you

8    wouldn't collect blood besides the amount and the

9    location?

10          Ms. Berousek Carney:   Objection.   Asked and

11   answered.

12      A   No, I cannot.

13      Q   Did you have an FTO when you became a

14   forensic investigator?

15          Ms. Golden:   Object to form.

16      A   No.

17      Q   Did you receive any written materials when

18   you became a forensic investigator?

19      A   I don't remember.

20      Q   Is there anything that would help you

21   remember?

22      A   Not that I can think of.

23      Q   Is there a unit that the forensic

24   investigators are assigned to?

Transcript of Mark Harvey
Conducted on April 30, 2019                    31

```
 1        A   At that time Unit 177.

 2        Q   Is Unit 177 the mobile crime lab?

 3        A   Mobile crime lab, yes.

 4        Q   Could you explain what the mobile crime unit

 5   was?

 6        A   It's a group of forensic investigators who

 7   process crimes.

 8        Q   Is it the lab that was mobile, or is it just

 9   the moniker of the group, the unit?

10        A   It's a moniker.

11        Q   Okay.  What were your shifts when you were a

12   forensic investigator?

13        A   When I first went to the unit, I think we

14   rotated.  I don't remember exactly.  We worked days,

15   afternoons, and midnights.

16        Q   Does that mean there were three shifts

17   generally?

18        A   Yes.

19        Q   Do you know time periods for each shift?

20        A   I don't remember.

21        Q   Do you have a recollection whatsoever what

22   they might have been?

23            Ms. Golden:  Object to form.

24            Ms. Berousek Carney:  Asked and answered.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    32

```
 1        A   No, I do not remember the times.
 2        Q   How many hours a week did you work as a
 3    forensic investigator?
 4        A   We worked 10-hour shifts, 40 hours a week.
 5        Q   Does that mean you worked four days a week?
 6        A   Yes.
 7        Q   Did you make overtime as a forensic
 8    investigator?
 9        A   Yes.
10        Q   How many days a week would you estimate that
11    you made overtime?
12        A   There was no exact number.  It depended on
13    the job for one; and if you had to work overtime,
14    you had to work overtime.
15        Q   Do you recall there being any kind of
16    Chicago Police Department attempt to limit overtime
17    during that period?
18        A   No.
19            Ms. Berousek Carney:  Objection to form.
20        Q   Did you make overtime frequently?
21            Ms. Berousek Carney:  Objection to form.
22        A   I personally didn't frequently, but
23    everybody eventually did come up with overtime.
24        Q   Did you choose not to make overtime.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    33

1      A  No. It was just if your job took you over,
2  your job took you over.
3      Q  Do you recall ever turning down the
4  opportunity to make overtime?
5      A  It didn't work that way.  If you were on a
6  job and you had to work over, you had to work over.
7  You had to finish the job.
8      Q  Can you tell me what you mean by that, you
9  had to finish the job?
10     A  If you started processing a crime scene, you
11  had to process it and do all the paperwork before
12  you left.
13     Q  Do you recall any circumstances in your time
14  as a forensic investigator where you didn't finish a
15  job?
16     A  No.
17     Q  As a forensic investigator, did you have a
18  partner?
19     A  Most of the time.
20     Q  Was it the same person?
21     A  Normally, no.
22     Q  Did you have a partner the night of the
23  investigation in the Soto murders?
24     A  Yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                                    34

1        Q   Who was that person?

2        A   John Caralaw.

3        Q   Did you have a supervisor as a forensic

4    investigator?

5        A   Yes.

6        Q   More than one?

7        A   Yes.

8        Q   Who were your supervisors when you were a

9    forensic investigator?

10       A   We had several.  I know Sergeant Mino

11   (phonetic spelling) from the report.

12       Q   Can you spell that last name?

13       A   I'm not sure.  It's on the report.  I'm not

14   sure.

15       Q   And that's the only one that you recall?

16       A   From that time, yes.

17       Q   I see you're wearing glasses.  Did you wear

18   glasses in '97-'98?

19       A   Yes.

20       Q   As a Chicago police officer, were you

21   required to be generally familiar with the rules and

22   regulations of the Police Department?

23           Ms. Berousek Carney:  Objection to form.

24       A   Yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                    35

1     Q  Similar to the question on education and
2  employment history, can you tell me about your
3  disciplinary history as a member of the Chicago
4  Police Department?
5         Ms. Berousek Carney:  Objection to form.
6     A  I remember receiving CR numbers, but I don't
7  recall how many.
8     Q  Do you know how many CRs you received?
9     A  No.
10    Q  Is it less than ten?
11    A  I don't know.
12    Q  Could it be more than ten?
13    A  I don't know.
14    Q  Were you ever named as a defendant in any
15 other lawsuit besides this one?
16    A  I don't remember.
17    Q  Did you review your Interrogatory answers?
18    A  Yes.
19        Ms. Golden:  In preparation for this
20 deposition?
21        Mr. Starr:  Sure.
22    A  Yes.
23    Q  Do you recall answering a question about
24 being a defendant in a lawsuit on a prior occasion?

Transcript of Mark Harvey
Conducted on April 30, 2019                    36

```
 1        A  I don't remember.
 2        Q  Did you ever file any grievances as a member
 3   of the Chicago Police Department?
 4           Ms. Golden:  Object to form.
 5        A  No.
 6        Q  Were you a member of the FOP?
 7        A  Yes.
 8        Q  Were you an active member of the FOP?  Did
 9   you go to meetings for example?
10           Ms. Berousek Carney:  Objection to form.
11        A  No.
12        Q  Were there any written policies that applied
13   to forensic investigators?
14        A  Not that I can think of.
15        Q  Were there any special orders that applied
16   to forensic investigators specifically?
17        A  Not that I can remember.
18        Q  Were there any written guidelines or
19   protocols that applied to forensic investigators
20   specifically?
21        A  Again, I don't remember what they were.
22        Q  At the beginning of each shift that you
23   worked, is there a roll call?
24        A  Yes.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    37

1        Q   For all three shifts?

2        A   Yes.

3        Q   How are assignments given to forensic

4    investigators?

5        A   They do a schedule for a week or a month.  I

6    don't remember which it was, but you're just

7    assigned to a car for that day.

8        Q   Are you also assigned an area, or are you

9    citywide?

10       A   No.  Citywide.

11       Q   Who notifies you if there is a crime scene?

12       A   We normally would receive a call from the

13   desk.

14       Q   Do you recall receiving a call from the desk

15   the night of the Soto murders investigation?

16       A   Independently, no, but we obviously did

17   receive a call.

18       Q   So you said you generally receive a call

19   from the desk.  Who else might call you to come to

20   your crime scene?

21       A   It was 99 percent of the time the desk

22   assigned us a job.

23       Q   So in that 1 percent, who might call you?

24       A   If we were on the street, we might get a

Transcript of Mark Harvey
Conducted on April 30, 2019                     38

1   call from our sergeant or something.

2       Q   Would you ever get calls from a detective?

3       A   No. Our assignments always went through the

4   desk.

5       Q   Prior to receiving a call to go to a crime

6   scene, where would you be located?

7       A   Well, we could be at the office, or if we

8   were on the street, we could be involved in doing a

9   crime scene, or we could be finishing lunch and we

10  could get a call.

11      Q   What do you mean by on the street?

12      A   If we were sent out to do a crime scene, we

13  finished that crime scene, and sometimes it was

14  busy, so on the way back we'd get another call for

15  another job.

16      Q   And then I think you mentioned that you

17  might be at the end of your shift when you get a

18  call?

19          Ms. Golden:  Objection.  Misstates his

20  testimony.

21      A   Normally, if we had gotten to the time when

22  we were supposed to leave if we weren't on a job, we

23  wouldn't get a call.  But it did happen some nights

24  it was so busy.

Transcript of Mark Harvey
Conducted on April 30, 2019                    39

1      Q  So when you got a call at the end of your
2  shift, would you go to that job?
3          Ms. Berousek Carney:  Object to form.
4      A  When a job was assigned to us at that time,
5  yes.
6      Q  You understand when I say job, it means
7  going to a crime scene; correct?
8      A  Yes.
9      Q  Would there ever be a circumstance where you
10  were close to the end of your shift where you got a
11  call to go to a crime scene and you didn't go?
12     A  No.  We couldn't refuse.
13     Q  Were you at the end of your shift when you
14  got the call about the Soto murders and the Soto
15  crime scene?
16     A  No.
17     Q  Do you have an independent recollection of
18  that?
19     A  No.
20     Q  Where does your knowledge of that come from?
21     A  From my crime scene processing report.
22     Q  Do you know what time you got a call for the
23  Soto murders?
24     A  I believe it was 1910.

Transcript of Mark Harvey
Conducted on April 30, 2019                          40

1        Q   And do you know what time your shift ended

2    that night?

3        A   I don't remember the exact time that our

4    shift was closed in, but I think we finished

5    everything at 12-something.

6        Q   Twelve a.m.?

7        A   Yes.

8        Q   And when you say you finished everything, do

9    you mean you finished processing the crime scene?

10       Ms. Golden:  Object to form.

11       A   Processing the crime scene and finishing our

12   paperwork.

13       Q   If at any time you need a break, bathroom,

14   water or otherwise, just let me know, and we can

15   take a break.

16       What kind of equipment did you take to the

17   Soto crime scene?

18       A   It was the equipment we took to every crime

19   scene, what was in the truck or van at that time.

20       Q   In 1997-'98, what kind of vehicles did you

21   use?

22       A   They were vans, I believe Chevy vans.

23       Q   Did you ever use a squad car or an unmarked

24   car?

Transcript of Mark Harvey
Conducted on April 30, 2019                    41

1      A   We also had a squad car that could be used.

2      Q   But the Chevy vans were the primary vehicle?

3      A   Yes.

4      Q   Was it your responsibility as a forensic

5    investigator to check your equipment before you

6    started your shift?

7          Ms. Golden:  Object to form.

8      A   Yes, it was.

9      Q   What did that process of checking your

10   equipment involve?

11     A   Getting our radios, the radios working,

12   checking flashlights, checking cameras, making sure

13   we had supplies in the vans that we need or might

14   need, make sure we have envelopes, film, bags,

15   plastic bags.

16     Q   Was there any other equipment that you used

17   other than that list that you just gave me?

18     A   Oh, yes, we had a lot of other equipment.

19     Q   Could you give me an exhaustive list as best

20   you can?

21     A   Well, we had power tools.  We had ladders.

22   We had shovels.  We had axes.  We had crowbars.  We

23   had gunshot residue kits, blood sticks, Q tips with

24   long ends.  We had envelopes.  We had boxes.  We had

Transcript of Mark Harvey
Conducted on April 30, 2019                    42

```
1    boots.  That's about all I can think of right now.
2        Q   Did you check your equipment the night of
3    the Soto murder investigation?
4            Ms. Golden:  Object to form.
5        A   Yes.
6        Q   And was everything in working order?
7        A   It appeared to be at the time.
8        Q   And are those assumptions you're making, or
9    do you know that independently of the documents?
10           Ms. Golden:  Object to form.
11       A   It's an assumption.
12       Q   Can you explain the steps a forensic
13   investigator would take when responding to a crime
14   scene?
15       A   After receiving the call from the desk, we
16   would then, as I said, check our equipment.  We
17   would go to the crime scene.  We would speak with
18   police and/or detectives on the scene so we could
19   understand what was going on.  We would then do a
20   quick walk-through through the scene.  We would then
21   photograph the scene starting from the outside in.
22   After photographing, we would collect evidence.  We
23   would put that evidence in our truck after
24   completing the crime scene.  We'd head into the
```

Transcript of Mark Harvey
Conducted on April 30, 2019                              43

1    office where the evidence was inventoried, sealed

2    properly.  And once the report and inventories were

3    done, we would turn those in to the desk, and the

4    evidence would be placed in the evidence room, and

5    we were done.

6        Q  So is it correct that you checked your

7    equipment at the beginning of the shift and then

8    again when you got a call to the crime scene?

9        A  I don't think we do it twice.

10       Q  Would you check your equipment every time

11   you got a call to a crime scene?

12       A  No.  If it was working the first time, we

13   assumed it was working the second time.

14       Q  Did you check equipment when you got a call

15   the night of the Soto crime scene investigation?

16       A  Yes.

17       Q  And so you had not checked it prior to that

18   during that shift?

19       A  No.

20       Q  You didn't check your equipment at the

21   beginning of your shift?

22       A  Well, it's because the -- especially the

23   cameras; the cameras are just on a shelf, so you

24   grab one when you go out, so you wouldn't

1  necessarily check it at the beginning of the shift.

2     Q  So is your answer that you would check some

3  of the equipment at the beginning of the assignment

4  and then again when you got a call?

5        Ms. Golden:  Object to form.  You're

6  confusing assignment and shift.

7        Mr. Starr:  Okay.  Strike that.  You're

8  correct.

9     Q  Is your answer that you would check your

10  equipment at the beginning of the shift and then

11  check some more equipment or other parts of your

12  equipment when you got a call to the crime scene?

13        Ms. Golden:  Object to form.

14     A  No, because when we went down to the van, we

15  would have to check those to make sure all the

16  equipment was there.

17     Q  I'm sorry.  I don't understand your answer.

18  I apologize.  Let me ask it again.

19        So you previously testified that at the

20  beginning of your shift, you checked your equipment;

21  correct?

22     A  Yes.

23     Q  And one of the things you said you checked

24  was your cameras?

Transcript of Mark Harvey
Conducted on April 30, 2019                          45

1       A   Yes.

2       Q   Then you testified that you also checked

3    your equipment when you got a call to a crime scene;

4    correct?

5       A   Yes.

6       Q   So is it your testimony that you wouldn't

7    check your cameras if you had checked them

8    previously if you got a call to a crime scene, or am

9    I misunderstanding you?

10      A   Yeah.  So cameras would be kept upstairs in

11   our room, so that would be checked before we got

12   out; and then when we got down to the van, which was

13   downstairs parked, we would then check the equipment

14   in the van and then go to the crime scene.

15      Q   Right.  But you also testified that

16   sometimes you went to a crime scene from the street;

17   correct?

18      A   Again, if we were out on the street already

19   and we got an assignment, we would know that our

20   equipment because we had checked it prior to that.

21      Q   Do you recall whether or not you checked

22   your equipment the night of the Soto murder

23   investigation?

24          Ms. Golden:  Object to form.

Transcript of Mark Harvey
Conducted on April 30, 2019                                    46

1        Q  At the beginning of the shift?

2            Ms. Berousek Carney:  And I'm going to

3    object to form with respect to the meaning of the

4    word equipment.

5        Q  Okay.  I'll ask it again.  Do you recall

6    whether or not you checked your camera at the

7    beginning of your shift the night of the Soto crime

8    scene investigation?

9        A  Yes, I would have checked it.

10       Q  Do you recall specifically checking it?

11       A  I don't recall specifically checking it, no.

12       Q  Do you recall ever not checking your camera

13   at the beginning of a shift?

14       A  No.

15           Ms. Golden:  He's talking shift now, not

16   assignment.  Are you clear on that?

17           The Witness:  Yes.

18       A  At the beginning of the shift, no, we don't

19   always check them.

20       Q  You don't always check the cameras?

21       A  At the beginning of the shift.

22       Q  But sometimes you checked them at the

23   beginning of the shift?

24           Ms. Berousek Carney:  Objection to form.

Transcript of Mark Harvey
Conducted on April 30, 2019                    47

1        A   Sometimes.

2        Q   Do you recall checking your camera when you

3    got called to go out to the crime scene of the Soto

4    investigation?

5        A   I don't know when I exactly checked, whether

6    it was at the beginning of the shift or just before

7    we went on the call, but it would have been checked

8    before we went out.

9        Q   Is it possible you checked it both at the

10   beginning of your shift and again when you went out?

11       A   It's possible.

12       Q   Would that happen frequently where you would

13   check it more than once?

14       A   Sometimes you would.

15       Q   Is the camera one of your more important

16   tools as a forensic investigator?

17           Ms. Berousek Carney:  Objection to form.

18       A   It's an important tool, yes.

19       Q   Would you say it's the most important tool?

20       A   No.

21       Q   What tool is the most important tool?

22           Ms. Golden:  Object to form.

23       A   Everything you took out was important.

24       Q   All the tools were equally important; is

Transcript of Mark Harvey
Conducted on April 30, 2019                    48

1    that correct?

2         Ms. Golden:  Object to form.  Foundation.

3      A  All the tools that could be possibly used,

4    so yes.

5      Q  Right.  But as a forensic investigator, are

6    there ever crime scenes where you don't take

7    photographs?

8      A  None that I can think of.

9      Q  But as a forensic investigator, are there

10   crime scenes where you don't use every piece of your

11   equipment?

12     A  Yes.

13     Q  Do you know, do you have any recollection of

14   any other forensic investigator going out to a crime

15   scene and not taking photographs?

16     A  No.

17     Q  Who did you speak to when you arrived at the

18   crime scene of the Soto murder investigation?

19     A  I spoke to the police officers and

20   detectives that were on the scene.  Specifically

21   who, I can't remember that.

22     Q  Do you recall any people being at the crime

23   scene that you knew who they were?

24     A  Not that I recall, no.

Transcript of Mark Harvey
Conducted on April 30, 2019                    49

1       Q   Do you recall speaking to Ray Guevara?

2       A   No.

3       Q   Do you know who Mr. Guevara is?

4       A   He was one of the detectives on the case.

5       Q   Are you familiar with Mr. Guevara?

6       A   No.

7       Q   Were you familiar with him before this, the

8   night of the crime scene?

9       A   No.

10      Q   Was it ever the case that a specific

11  detective or police officer requests a specific

12  investigator, forensic investigator?

13          Ms. Golden:  Object to foundation.

14          Ms. Berousek Carney:  Form.

15      A   No.

16      Q   As a forensic investigator, did you ever

17  diagram a murder scene?

18          Ms. Berousek Carney:  Object to form.

19      A   I don't remember ever diagramming murder

20  scenes.

21      Q   And you understand when I say diagram, I

22  mean physically draw out a murder scene?

23      A   Yes.

24      Q   As a forensic investigator, is it your job

Transcript of Mark Harvey
Conducted on April 30, 2019                    50

1    to determine what is evidence?

2        A  Yes.

3        Ms. Golden:  I have a belated objection.

4        Q  As a forensic investigator, do you collect

5    evidence?

6        A  Yes.

7        Q  As a forensic investigator, is it your job

8    to preserve evidence?

9        A  Yes.

10       Q  If you determine that some piece of evidence

11   might help prove who committed a crime, is it your

12   job as a forensic investigator to collect the

13   evidence?

14       Ms. Golden:  Can you repeat the question?

15       Mr. Starr:  Can you play it back?

16       (Audio played back.)

17       Ms. Golden:  Object to form.

18       Q  As a forensic investigator, after you

19   determine that something is a piece of evidence, do

20   you photograph that evidence?

21       A  Yes.

22       Q  At a crime scene, what is the chain of

23   command?

24       Ms. Golden:  Object to form.

Transcript of Mark Harvey
Conducted on April 30, 2019                    51

1      A  It depends on who's there at the time.  If a

2   sergeant is there, he's probably considered in

3   charge.  If a lieutenant is there, he may be the one

4   that's considered in charge.  Otherwise, there's the

5   detectives, the (inaudible) was there.  They may be

6   in charge of the crime scene, but as of the

7   processing of the crime scene, I would say the

8   forensic investigators are in charge of that.

9      Q  And when I say chain of command as I

10  describe a police officer, do you understand what

11  that term refers to?

12     A  Yes.

13     Q  Can you tell me for the record what that

14  term refers to?

15     A  The chain going from the lowest police

16  officer there to the highest-ranking police officer

17  there.

18     Q  At a crime scene, do you have a direct

19  supervisor?

20     A  Sometimes our supervisors will be there, but

21  most of the time, no, we did not have a direct

22  supervisor on the scene.

23     Q  At a crime scene, did you ever take orders

24  from a detective?

Transcript of Mark Harvey
Conducted on April 30, 2019                     52

1          Ms. Berousek Carney:  Object to form.

2      A  No, we did not take orders from the

3  detectives.

4      Q  Do you recall ever taking orders from a

5  detective at a crime scene?

6      A  No, I do not.

7      Q  Are there any Chicago Police Department

8  forms or documents that you would use a forensic

9  investigator?

10     A  Yes; the crime scene processing report and

11 inventory report.

12     Q  Any other forms?

13     A  Specifically for crime scene processing?

14     Q  Correct.

15     A  No; those two.

16     Q  As a forensic investigator, did you ever

17 keep notes, take notes, keep notes?

18     A  Generally what we would do is we would

19 basically fill out the crime scene processing report

20 by hand and then transfer that to the typed form.

21     Q  Do you recall filling out a crime scene

22 processing report at the Soto murder scene?

23     A  My partner filled it out, yes.

24     Q  Do you recall typing a version of that

Transcript of Mark Harvey
Conducted on April 30, 2019                    53

```
 1    report?
 2         A   My partner would have typed it.
 3         Q   Do you know what a GPR form is?
 4         A   Yes, it's a form that the detectives use.
 5         Q   Did you ever fill out any GPR?
 6         A   No, never.
 7         Q   Is there any kind of protocol that you would
 8    follow at a crime scene?
 9             Ms. Golden:  Objection to form.
10         A   You have to explain protocol.
11         Q   You gave a description of what you do at a
12    crime scene; correct?
13         A   Yes.
14         Q   Is there any specific rule or regulation
15    that says you have to do certain things in a certain
16    order?
17         A   No, there was not.
18         Q   The steps that you went through at a crime
19    scene, are they any more than you described
20    previously?
21             Ms. Berousek Carney:  Form.
22         A   That was basically the normal order, but it
23    would change depending on the crime scene.
24         Q   Did you have any kind of checklist when you
```

Transcript of Mark Harvey
Conducted on April 30, 2019                                    54

1   were a forensic investigator regarding what to do at

2   a crime scene?

3       A  No.

4       Q  The order that you took and the steps that

5   you took, were those your own, or were you told to

6   do that when you were trained?

7       A  I don't remember if that was told to us in

8   training, but it was just a basically logical step

9   that was taken.

10      Q  Was it a generally recognized series of

11  steps that all the forensic investigators took as

12  far as you know?

13          Ms. Golden:  Objection to form and

14  foundation.

15      A  I can only speak for myself.  I don't know

16  what they did.

17      Q  Were you ever on a crime scene where your

18  partner said let's do it this way, and it differed

19  from the description of the steps you made?

20          Ms. Golden:  What steps are we talking

21  about?

22          Mr. Starr:  He said them twice.

23      Q  Okay.  What steps did you take when you went

24  to a crime scene?

Transcript of Mark Harvey
Conducted on April 30, 2019                55

1      A  Basically the steps I said.  We talked to

2   people.  You photograph.  You collect evidence.  You

3   preserve it and take it and inventory it.

4      Q  And did you testify you did a walk-through?

5      A  Yes.

6         Ms. Golden:  Right.  There was two different

7   steps we talked about, which is what I have.

8         Mr. Starr:  Can we go off the record for a

9   second.

10         ( Off the record.)

11      Q  Do you know if the steps you took at a crime

12   scene were the same or different steps that the

13   other forensic investigators took?

14         Ms. Golden:  Objection, form and foundation.

15      A  Again, I don't know what steps they took.

16      Q  Were you ever at a crime scene where your

17   partner wanted to take different steps and you took

18   different steps?

19         Ms. Golden:  Object to form.

20      A  Again, it would depend on the crime scene.

21   Things could come out in a different order.

22      Q  Do you ever recall a crime scene where you

23   took different steps?

24         Ms. Golden:  Object to form.

1     A  Yes.  As an example, if there were cartridge

2  cases in the street and we didn't want them to get

3  run over by a car, so we would collect them out of

4  order.

5     Q  Other than circumstances like that, were you

6  ever at a crime scene where a partner said, let's do

7  it in reverse order or let's do it in a jumbled

8  order or anything like that?

9        Ms. Golden:  Object to form.

10    A  No.

11    Q  Would you typically speak to the detectives

12  there on the scene first?

13       Ms. Golden:  Object to form.

14    A  Typically it just would depend on who was on

15  the scene.

16    Q  So in a circumstance where there's a

17  detective on the scene, would you talk to that

18  detective first?

19    A  If there was just detectives and there were

20  no police officers, yeah, then you would, of course,

21  talk to the detectives.

22    Q  If there were just police officers and

23  detectives, would you generally speak to the

24  detectives first?

Transcript of Mark Harvey
Conducted on April 30, 2019                          57

1      A   Not necessarily.
2      Q   You talked about the list of equipment you
3  would have on a crime scene.  Any of that equipment
4  would you bring backups for?
5      A   Well, we would have multiple, let's say,
6  bags, multiple envelopes; but the bigger equipment
7  we would just basically have one.
8      Q   Would you only have one camera when you went
9  to a crime scene?
10     A   Yes.
11     Q   Would that camera have a flash?
12     A   Yes.
13     Q   Would you have any backup flash with you
14  when you went to a crime scene?
15     A   No.
16     Q   Do you ever recall a circumstance where you
17  had a backup flash at a crime scene?
18     A   No.
19     Q   Do you know if other forensic investigators
20  would carry a backup flash when they would go to a
21  crime scene?
22         Ms. Berousek Carney:  Objection.
23  Foundation.
24     A   Not that I know of.

Transcript of Mark Harvey
Conducted on April 30, 2019                              58

1      Q  Were there any rules or regulations about

2   carrying a backup flash when you go to a crime

3   scene?

4           Ms. Berousek Carney:  Objection to form.

5      A  No.

6      Q  Is there any kind of procedure that existed

7   in circumstances where you had equipment failure?

8      A  Yes.

9      Q  What was that procedure?

10     A  If we were on a scene and something failed,

11  we would call to see if there was another unit

12  available so we could borrow their camera or

13  whatever equipment it was.

14     Q  Do you recall having equipment failure the

15  night of the Soto crime scene investigation?

16     A  Not that I know of.

17     Q  Do you know now that you had some sort of

18  equipment failure that night?

19     A  Yes.

20     Q  What do you know that what kind of equipment

21  failure you had?

22     A  There was something wrong with the camera.

23     Q  Do you know what was wrong with the camera?

24     A  It was either the flash was bad or the

Transcript of Mark Harvey
Conducted on April 30, 2019                    59

1   camera was bad.

2       Q  Do you know any reasons why a camera would

3   be bad?

4          Ms. Golden:  Object to form and foundation.

5       A  There could be multiple reasons, but I don't

6   know what was wrong with the camera that night.

7       Q  But you checked it before you went to the

8   scene; correct?

9       A  Yes.

10      Q  Was there any indication at the crime scene

11  that the camera was bad?

12      A  Not that I recall.

13      Q  Do you recall if the flash was going off

14  when you were taking photographs?

15      A  I know from seeing some of the pictures that

16  it did partially go off or the shutter partially

17  opened.

18      Q  We're going to look at the pictures in a

19  minute; however, do you have any independent

20  recollection of the flash not going off?

21      A  No, I don't.

22      Q  Do you have any independent recollection of

23  the flash going off?

24      A  No, I do not.

Transcript of Mark Harvey
Conducted on April 30, 2019                    60

```
 1      Q  If a flash wasn't going off, would you be
 2   aware of that?
 3        Ms. Golden:  At this particular time?
 4        Mr. Starr:  Just in general.
 5      A  Yes.
 6      Q  How would you be aware of it?
 7      A  I shoot with both eyes open.
 8      Q  Good answer.  Okay.  Do you ever recall
 9   having a problem where a flash didn't go off at a
10   crime scene?
11      A  Yes.
12      Q  And do you recall what you did about that?
13      A  One of the biggest problems we had was with
14   the cords, and they would come loose, and you would
15   have to hold the cord in while you took a picture.
16      Q  Was that a frequent problem?
17      A  It happened.  It happened.
18      Q  Any other problems with the flash that you
19   can recall?
20      A  Not that I recall.
21      Q  Was there a reason why you didn't carry a
22   second flash when you went to crime scenes?
23      A  The cameras came in a case, and there was a
24   camera and a flash and an extra cord and film in the
```

1  case, so you would just take that one case.

2      Q   Was there any reason why you wouldn't bring

3  a second flash to a crime scene?

4      A   No, not that I can think of.

5      Q   Do you know if any other forensic

6  investigators brought flashes, extra flashes, to the

7  crime scenes?

8          Ms. Golden:  Objection.  Foundation.

9      A   Not that I know of.

10     Q   Would it surprise you if an evidence tech

11 said they always brought a second flash to a crime

12 scene?

13         Ms. Berousek Carney:  Form, foundation.

14     A   Yes, that would be a surprise.

15     Q   Would it surprise you if an evidence tech

16 said that all the evidence techs and forensic

17 investigators brought a second flash to a crime

18 scene?

19         Ms. Golden:  Form, foundation.

20     A   That would be a surprise, yes.

21     Q   When you go to a crime scene that involves a

22 homicide, the bodies are there; correct?

23     A   Not always.

24     Q   What kind of circumstances would give rise

Transcript of Mark Harvey
Conducted on April 30, 2019                    62

1    to you as a forensic investigator going to a crime

2    scene where the bodies had already been removed?

3        A  If the person was still alive when the fire

4    department arrived, the fire department would take

5    them to the hospital.  They could either die en

6    route or in the hospital.

7        Q  Sure.  Good point.  Are there any crime

8    scenes that you went to where there was a dead body

9    but the body wasn't there?

10       A  Yes.

11       Q  What are those circumstances?

12       A  Sometimes crowds would gather, and to calm

13   the crowd down, the district officers would remove

14   the body to the hospital or the morgue before we got

15   there.

16       Q  Any other circumstances that you can think

17   of?

18       A  No, not that I can think of right now.

19       Q  Any crime scenes where the murder takes

20   place inside a residence where the people were dead

21   in advance of you getting there but they were still

22   removed?

23       A  Again, all I can think of is if the fire

24   department removed them before we got there.

Transcript of Mark Harvey
Conducted on April 30, 2019                              63

1      Q  Did that happen?

2      A  It has happened, yes.

3      Q  In circumstances where they were already

4  deceased when the fire department got to the scene?

5      A  That I don't know.  It would be normally if

6  the person was still alive and they tried to revive

7  them, they would take them.

8      Q  So you can't think of any circumstances

9  where an individual victim was deceased or removed

10  before you got there?

11      A  No.

12      Q  As a forensic investigator, would you stay

13  on the scene after a body is removed?

14      A  It would depend on the situation.

15      Q  Can you think of any specific examples where

16  you went to a crime scene, processed the scene, and

17  the bodies were removed, and you continued to

18  process the scene after that?

19      A  Yes.  Specifically I don't remember which

20  one, but it has happened.

21      Q  So there's no like rule or regulation

22  regarding that circumstance?

23      A  No.

24      Q  Do you recall whether or not you stayed on

Transcript of Mark Harvey
Conducted on April 30, 2019                    64

```
 1   the scene on the night of the Soto murder

 2   investigation after the bodies were removed?

 3       A  I don't remember.

 4       Q  Do you have any independent knowledge of who

 5   removed the bodies?

 6       A  No.

 7       Q  In any crime scene circumstance, is there

 8   someone who's in charge of making that decision as

 9   to when the bodies are removed from the scene?

10       A  Generally speaking, it would be the

11   supervisor on the scene or the maybe the detective

12   who would make that decision.

13       Q  Did you find a knife in the crime scene of

14   the Soto investigation?

15       A  Yes, there was a knife under the male

16   victim's arm.

17       Q  Do you recall independently finding that

18   knife?

19       A  That's from reading the reports.

20       Q  Do you know if that knife was found after

21   the body was removed or before?

22       A  According to the report, I believe it was

23   when he was rolled over.

24       Q  Do you recall whether or not you helped roll
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    65

1   him over?

2       A  I don't.

3       Q  Can you explain with a little more detail

4   what you did at the completion of the investigation,

5   generally speaking?

6       A  Do you mean at the scene?

7       Q  Yes.  Once you inventory all your evidence

8   and take all your photographs, could you give me

9   more detail as to what your job responsibilities

10  are?

11      A  As I stated, you put the evidence in your

12  truck and you go into your office, type the report,

13  package the evidence, fill out the inventory

14  reports.  Once that's all done, you turn it over to

15  the desk or put the evidence in the evidence room.

16      Q  Where was your office in '97-'98 when you

17  were a forensic investigator?

18      A  We were at 11th and State.

19      Q  The entire time?

20      A  The entire time I was a forensic

21  investigator, no.

22      Q  Where you were before that?

23      A  Well, I was at 11th and State, and then we

24  moved to Homan Square.

Transcript of Mark Harvey
Conducted on April 30, 2019                    66

```
1        Q   What date did you move to Homan Square?

2        A   I do not remember.

3        Q   Were you at Homan or 11th and State during

4    the time period of the Soto murder investigation?

5        A   We were at 11th and State.

6        Q   What do you do with the photographs you've

7    taken at the end of your investigation?

8        Ms. Golden:  (Inaudible.)

9        A   At that time we would remove the film from

10   the camera and drop it in the basket to be turned

11   over to inventory.

12       Q   Is that what you did for the Soto murder

13   investigation?

14       A   Yes.

15       Q   If you don't complete a roll, you don't take

16   whether it's 12 pictures or 24 pictures, would you

17   use that same roll at the next job you go to?

18       A   No.

19       Q   So you would remove that roll, and that

20   would just become part of the investigative evidence

21   for whatever scene you processed?

22       Ms. Berousek Carney:  Objection to form.

23       A   Yes.

24       Q   Did you have any involvement in the
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    67

1    processing of photographs?

2         A   No.

3         Q   Have you ever seen photographs developed?

4         A   Yes, I have.

5         Q   Have you seen photographs developed as a

6    Chicago police officer?

7         A   Not in the Chicago photo unit, no.

8         Q   Where did you see them developed?

9         A   I develop my own film.

10        Q   What kind of cameras would you use in

11   '97-'98 as a forensic investigator?

12        A   I believe it was the Canon AE1.

13        Q   And just so I'm clear, I think you testified

14   to this, but the flash would be on top of the

15   camera?

16        A   No. The flash was on the side of the camera,

17   and there was a bracket that the camera sat on.

18        Q   So would you hold the flash and push the

19   flash?

20        A   No. You held the flash because there was a

21   cord connected to sync it.

22        Q   Any other kinds of cameras you recall using

23   as a forensic investigator?

24        A   At that time, no.

Transcript of Mark Harvey
Conducted on April 30, 2019                    68

1      Q  Who decides which photos to take at a crime

2   scene?

3      A  Normally the person taking the pictures

4   decides.  There are suggestions from your partner,

5   and maybe the detectives would want something.

6      Q  And while you and your partner were at the

7   Soto crime scene, did you take all the photographs?

8      A  Yes, I did.

9      Q  Your partner didn't take any?

10      A  No.

11      Q  How do you know that?

12      A  Because that's the way it's done.  The

13   person writing the report writes the report, and the

14   photographer does all the photography.  That can

15   change, depending on the incident.

16      Q  But to your knowledge, you took the photos,

17   and your partner filled out the reports?

18      A  Yes.

19      Q  Who decides how to frame the photographs you

20   take?

21      A  The photographer.

22      Q  Does the photographer also decide how to

23   light the photographs to take?

24      A  Yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                    69

1      Q  Was there any kind of specific film you used
2  specifically?
3      A  Kodak 200.
4      Q  Did you use Kodak 200 at the Soto crime
5  scene?
6      A  Yes.
7      Q  How long did you stay at the crime scene?
8      A  I don't remember how long we were at the
9  crime scene.  I do not remember that.
10     Q  Is there anything that would help you
11  refresh your recollection?
12     A  No, not really.
13     Q  You can't think of anything that may help
14  your recollection of how long you were at the scene?
15     Ms. Berousek Carney:  Objection.  Asked and
16  answered.
17     A  No.
18     Q  Do forensic investigators ever go back to a
19  crime scene they've processed?
20     A  Yes, sometimes.
21     Q  What kind of circumstances would give rise
22  to that?
23     A  If something was found after we left, then
24  they might call us back, or they would send out

Transcript of Mark Harvey
Conducted on April 30, 2019                    70

1    another unit later to go back.
2        Q   Were you ever asked to return to the Soto
3    crime scene?
4        A   No.
5        Q   Are you certain of that?
6        A   From reading the reports, yes.
7        Q   Does the type of film you use and the type
8    of flash you use depend on whether it was daytime or
9    nighttime?
10       A   We were only given the Kodak film and the
11   flash.
12       Q   Would you ever do anything different if it
13   was daytime versus nighttime?
14           Ms. Golden:  Object to form.
15       A   Yes, of course, because light would be
16   different daytime to nighttime.
17       Q   What would you do differently?
18       A   On the daytime, you close the lens down more
19   and use less flash.  At the nighttime, you open up
20   the lens up and use a little more flash.
21       Q   Is that called a shutter?  And forgive me.
22   My knowledge of photography is not that great?
23       A   Yes.
24       Q   When you say you close the lens down, does

Transcript of Mark Harvey
Conducted on April 30, 2019                    71

1    that mean you close the shutter down?

2         A   You turn the ring on the lens that would

3    adjust the aperture, how far the shutter blades are

4    open.

5         Q   Do you still take photography?

6         A   Yes, I do.

7         Q   What kind of photos are you supposed to take

8    when you go to a crime scene?

9             Ms. Berousek Carney:   Objection to form.

10        A   You want to identify the place where the

11   incident occurred, so you would always take a photo

12   of the front of the building, house, or whatever the

13   location was.  You photograph the victims if they

14   were left on the scene.  You would photograph any

15   evidence that was left on the scene.

16        Q   Any other photos you were expected to take?

17            Ms. Golden:   Object to form.

18        A   There could be, but I can't think of what

19   else right now.

20        Q   Would you take photos of how the crime scene

21   was entered if they were obvious?

22        A   Yes, of course.

23        Q   Would you take photos of where the victims

24   were found?

Transcript of Mark Harvey
Conducted on April 30, 2019                          72

```
1            Ms. Golden:  Object to foundation.
2       A   Yes.
3       Q   Would you take photographs if there was any
4   evidence of a struggle?
5            Ms. Golden:  Object to foundation.
6       A   We would take overalls of the area where the
7   body was found if that would indicate a struggle,
8   yes.
9       Q   If there was something else indicated like
10  broken furniture or broken glass, would you take
11  photos of that?
12      A   Yes.
13      Q   Would you take photographs of any blood you
14  found?
15           Ms. Golden:  Objection to form.
16           Ms. Berousek Carney:  Foundation.
17  Hypothetical.
18      A   Yes.
19      Q   Would you take photographs of blood
20  splatter?
21           Ms. Golden:  Objection.  Incomplete
22  hypothetical.
23      A   Yes, we could.
24      Q   Is there a circumstance that you can recall
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    73

1   where there was blood splatter at a crime scene you

2   did not take photographs of?

3       A  Not that I recall.

4       Q  Would you take photographs of any possible

5   weapons that were at the crime scene?

6           Ms. Golden:  Incomplete hypothetical.

7           Ms. Berousek Carney:  Form.

8       A  If there was evidence that was used, yes.

9       Q  So can you ever recall a circumstance at a

10  crime scene where there was a weapon that you didn't

11  take a photograph of?

12      A  Well, it would depend on if a weapon was

13  used, if we knew that this weapon, for example,

14  knives, if there were other knives in the house but

15  they were in a drawer or whatever, of course we

16  would not take a picture of that.

17      Q  Do you recall a specific circumstance where

18  you chose not to take pictures of some knives?

19          Ms. Berousek Carney:  Objection.  Misstates

20  his testimony.

21      A  Specific, no.

22      Q  Do you take photographs of everything that

23  you inventory?

24      A  Yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                         74

1        Q   Is there anything else that you were trained
2    to take photographs of?
3        A   Specifically trained, no.
4        Q   Were you trained to take photographs of the
5    list you just gave me?
6        A   The list?
7        Q   Yeah, weapons, blood, blood splatter,
8    struggle, so on?
9        A   Yes.
10       Q   When was your training on those?
11       A   First training I got from the department was
12   in evidence technician school.
13       Q   Would you err on the side of taking more
14   photographs or less photographs?  Like if there was
15   something you were not sure if you would take a
16   photograph, would you still take a photograph?
17          Ms. Golden:  Object to form.
18       A   I would take as many photographs as I
19   thought was needed to document the scene.
20       Q   Can you recall any circumstance where there
21   was some item where you were not sure if it was
22   evidence or not where you didn't take a photograph
23   of it?
24       A   No, I do not recall an incident like that.

1      Q   Who makes a determination when the
2   photography is complete at a crime scene?
3      A   The photographer.
4      Q   What steps, if any, do you take to ensure
5   that the photographs depict what you're trying to
6   capture?
7          Ms. Golden:   Object to form.
8      A   You make that determination as you're taking
9   a photograph that you're covering as much as
10  possible.
11     Q   Do you ever take photographs, multiple
12  photographs, of the same thing?
13     A   You might take photographs that show
14  different angles, different elevations.
15     Q   When you were a forensic investigator, did
16  you specifically take more than one photograph of
17  whatever piece of evidence you were photographing?
18     A   Yes.
19     Q   Did you take multiple photographs of any of
20  the pieces of evidence at the Soto crime scene?
21     A   I don't recall.
22     Q   Would anything refresh your recollection?
23     A   Maybe looking at photographs, but that's
24  about it.

Transcript of Mark Harvey
Conducted on April 30, 2019                          76

```
 1      Q  Is there any chain of custody with the film
 2  once the photographs are done?
 3      A  Well, we drop it in a basket, and the photo
 4  unit picks it up to develop the film, so that is the
 5  part of the chain of custody.
 6      Q  So once you do that, your role and
 7  responsibility is ended?
 8      A  Correct.
 9      Q  Do you know how the film was processed?
10      Ms. Golden:  Objection.  Asked and answered.
11      A  Only from my own personal knowledge of
12  photography.  I never saw the film being processed.
13      Q  Do you know if there was ever any editing
14  done on the photographs in the Chicago Police
15  Department?
16      Ms. Berousek Carney:  Objection to form and
17  foundation.
18      A  I don't know.
19      Q  Where does the film roll end up; do you
20  know?
21      Ms. Golden:  Objection.  Foundation.
22      A  I know it goes to the photo unit, and I
23  don't know what they do with it.
24      Q  Do you know how film negatives are stored?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    77

1       A   No.

2       Q   As a forensic investigator at a crime scene,

3   did you wear gloves?

4       A   Yes.

5       Q   Why did you wear gloves?

6       A   So there would be no contamination of

7   evidence.

8       Q   Would you wear gloves the entirety of the

9   time you were at a crime scene?

10      A   No.

11      Q   When would you take your gloves off?

12      A   When you first start photographing, you

13  don't want to shoot the scene with your gloves on.

14  Then after you photograph, you put gloves on and

15  start collecting evidence.

16      Q   Why wouldn't you want to wear gloves when

17  you're taking photographs?

18      A   Because you need your hands free to handle

19  the camera.

20      Q   What kind of gloves did you wear?

21      A   Latex gloves.

22      Q   Besides wearing gloves, was there any other

23  steps you would take to ensure the evidence would

24  not be disturbed?

Transcript of Mark Harvey
Conducted on April 30, 2019                    78

```
 1          Ms. Carney:  Objection.  Incomplete
 2    hypothetical.
 3          Ms. Berousek Carney:  Form.
 4       A  Not that I can think of.
 5       Q  You understand all the questions I have been
 6    asking here have been about the crime scene?
 7          Ms. Golden:  That's not fair.
 8          Mr. Starr:  I said it at the beginning.
 9          Ms. Golden:  About this specific crime
10    scene.
11          Mr. Starr:  No, I'm talking about crime
12    scenes in general.
13          Ms. Golden:  I thought you were saying all
14    those questions were specific to this crime scene.
15          Mr. Starr:  No.
16       A  Can you ask the question again?
17          Mr. Starr:  Yeah.  Do you want to read it
18    back.
19          (Audio played back.)
20          Ms. Golden:  Just ask it.
21          Mr. Starr:  I'll ask it again.
22       Q  Do you understand that all the questions
23    I've been asking about are when you are at a crime
24    scene, with the exception of the ones when I
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          79

1    specifically say at the Soto crime scene?

2        A   Yes.

3        Q   Do you inventory anything that you deem

4    relevant to a crime scene?

5            Ms. Golden:   Objection to form.

6            Ms. Berousek Carney:   Objection to form.

7        A   Yes.

8        Q   What kind of evidence is relevant to a crime

9    scene?

10           Ms. Berousek Carney:   Objection to form,

11   foundation.

12       A   There are as many forms of evidence as is

13   relative to an investigation, possibly hair, blood,

14   weapons.   Anything can be a piece of evidence.

15       Q   Were you trained to identify certain pieces

16   of evidence?

17           Ms. Golden:   Object to form.

18       A   Not certain pieces of evidence.   Evidence in

19   general.

20       Q   When you are at a crime scene that's at a

21   residence, would any evidence of forced entry be

22   relevant?

23           Ms. Golden:   Objection.   Asked and answered.

24       A   It could be, yes.

Transcript of Mark Harvey
Conducted on April 30, 2019                                    80

1      Q   Would you inventory it?

2      A   Inventory what?

3      Q   Any evidence that you might get from a

4   forced entry?

5      A   Yes, generally, yes, we would.

6      Q   What about evidence of a struggle?

7          Ms. Golden:  Hypothetical.  Incomplete

8   hypothetical.

9          Ms. Berousek Carney:  Form.

10     A   Again, if it was obvious that there was a

11  struggle, we could photograph the area.  If there

12  was something that may have been present, we would

13  inventory that, yes.

14     Q   So physical evidence of a struggle, you

15  would inventory; correct?

16     A   Yes.

17     Q   Would you inventory evidence of potential

18  weapons?

19         Ms. Golden:  Incomplete hypothetical.

20         Ms. Berousek Carney:  Form.

21     A   It would depend on the circumstance.

22     Q   Can you explain what circumstance it would

23  depend on?

24     A   Well, a potential weapon is a very wide-open

Transcript of Mark Harvey
Conducted on April 30, 2019                           81

```
 1   subject.  It could be anything in the building.
 2   Anything can kill you.
 3       Q  Would you inventory something that you
 4   deemed as a forensic investigator potential weapons?
 5           Ms. Golden:  Objection to form.
 6       A  Again, it would depend on the circumstance,
 7   because a potential weapon is wide open.  If I
 8   thought it was used as a weapon, then yes.
 9       Q  If you thought it could have been used as a
10   weapon, would you inventory it?
11           Ms. Golden:  Object to form.
12       A  Again, it would depend on the circumstance.
13       Q  So if you saw something that was some
14   physical evidence and you thought that might have
15   been a weapon, would you inventory that?
16           Ms. Berousek Carney:  Objection.  Asked and
17   answered.
18       A  Yes.
19       Q  Anything that you could physically inventory
20   that you took a photograph of, would you inventory?
21           Ms. Golden:  Form.
22       A  Yes.
23       Q  Is there anything else that you can think of
24   that you would inventory?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                                82

1          Ms. Berousek Carney:  Objection to form.

2          Ms. Golden: (Inaudible.)

3      A  Again, it would depend on the crime scene,

4  the conditions of the incident.

5      Q  Anything specifically that you can think of

6  that you've inventoried in your career besides what

7  we've already talked about?

8          Ms. Golden:  Object to form.

9      A  Anything that I can think of that --

10     Q  Any examples that you can think of that we

11  haven't discussed?

12         Ms. Berousek Carney:  Objection to form.

13     A  That's hard to answer.  I've inventoried

14  thousands of things.  I don't know where you want me

15  to go with that.

16     Q  I just want some examples of things we

17  haven't discussed that you've inventoried.

18         Ms. Berousek Carney:  Objection to form.

19     A  I've inventoried contents of cars.  I've --

20     Q  It's limited to a residence.

21     A  I've inventoried glasses and bottles, tools.

22     Q  Are those examples of things that you deem

23  to be potential weapons?

24     A  I deem them to be possible evidence.

1      Q   Do you recall whether or not you've also
2   deemed them to be potential weapons?
3          Ms. Berousek Carney:   Objection to form.
4   Incomplete hypothetical.
5      A   Depends on the incident and the
6   circumstances surrounding the incident.
7          Mr. Starr:   Okay.   We can take a break.
8          (Off the record.)
9      Q   (By Mr. Starr) Mr. Harvey, is there a
10  difference between evidence gathered and inventory?
11     A   No, because evidence gathered is inventory.
12     Q   So is it correct that any evidence that's
13  collected or gathered gets inventoried?
14     A   Yes, that's correct.
15     Q   Are these two distinct steps however?
16     A   Generally speaking, yes, they are two
17  different steps.
18     Q   Because they're inventoried primarily back
19  at your office; is that correct?
20     A   Correct.
21     Q   And as a forensic investigator, both of
22  these steps are your responsibility; correct?
23     A   Correct.
24     Q   What steps are taken to maintain the

1    integrity of collected evidence?

2         Ms. Berousek Carney:  Object.  Incomplete

3    hypothetical.

4         Q  Do you understand what I'm asking?

5         A  Yes.  It's preserved by placing it in bags,

6    boxes, whatever, and keeping it in our trucks until

7    we get back to the unit to inventory them.

8         Q  Is it ever left alone in your trucks?

9         A  No.

10        Q  So is the chain of custody in terms of

11   evidence, once you identify something as evidence,

12   it's in your chain of custody until you turn it

13   over?

14        A  Yes, that's correct.

15        Q  So you're responsible for it that whole

16   time?

17        A  Yes.

18        Q  Do you know if the forensic crime unit

19   procedures met industry standards in 1998?

20        Ms. Berousek Carney:  Objection.

21   Foundation.

22        A  I do not know.

23        Q  Do you know if there was any internal audits

24   that were conducted in or around 1998 of the mobile

```
 1    crime lab?

 2          Ms. Berousek Carney:  Objection.

 3    Foundation.

 4       A  I do not know.

 5       Q  Do you know if there was any quality control

 6    mechanisms in place in 1998?

 7          Ms. Berousek Carney:  Objection.

 8    Foundation.

 9       A  I don't know.

10       Q  Do you know if there was anything at all in

11    place to verify the accuracy of investigative

12    procedures in the forensic unit?

13          Ms. Berousek Carney:  Objection.

14    Foundation.

15          Ms. Golden:  Form.

16       A  I do not know.

17       Q  Do you know if the forensic unit met State

18    Police standards?

19          Ms. Berousek Carney:  Objection.

20    Foundation.

21       A  I do not know.

22       Q  Do you know if it met FBI standards?

23          Ms. Berousek Carney:  Objection.

24    Foundation.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                              86

1        A   I do not know.
2        Q   Do you know if it was accredited in any way?
3            Ms. Berousek Carney:   Objection.
4    Foundation.
5        A   I do not know.
6        Q   Are there any documents that would refresh
7    your recollection of those questions I just asked?
8        A   No. I do not know what documents would
9    exist.
10       Q   Does the forensic unit or the crime lab or
11   both have an SOP, a standard operating procedure
12   handbook?
13       A   I don't remember.
14       Q   Did the forensic unit or the mobile crime
15   lab unit, either/or, have any written standards that
16   you were familiar with?
17       A   Not that I remember.
18       Q   Do you know of a Ray Guevara?
19       A   Just from being on the scene.
20       Q   So you recall him being there that night?
21           Ms. Berousek Carney:   Objection.  Misstates
22   his testimony.
23       A   Only from seeing on the report that he was
24   there listed as one of the detectives.

1       Q  You don't have any independent recollection

2  of him at the scene?

3       A  No, I don't.

4       Q  Do you have any independent recollection

5  about his work performance generally?

6       A  No, I do not.

7       Q  Do you have any opinion of his work

8  performance as a Chicago police officer?

9       A  No, I do not.

10      Q  Do you know anything about his reputation?

11      A  No, I do not.

12      Q  Did you ever hear from anyone that he was

13 involved in misconduct while he was with the Chicago

14 Police Department?

15      A  No.

16      Q  Have you seen any media coverage regarding

17 Ray Guevara?

18      A  Yes, I have.

19      Q  What media coverage have you seen?

20      A  Concerning this case.

21      Q  This specific case?

22      A  I believe so, yes.

23      Q  And what did you learn from that media

24 coverage?

Transcript of Mark Harvey
Conducted on April 30, 2019                    88

1        Ms. Golden:  Object to form.
2      A  It was mentioned, but what specifically was
3    mentioned, I don't remember.
4      Q  Did you ever have any communication, whether
5    written or oral, with anyone in the Chicago Police
6    Department about Guevara?
7      A  No.
8      Q  Did anyone in the Chicago Police Department
9    or otherwise ever ask you to review any
10   investigative work that you did with Ray Guevara?
11     A  No.
12     Q  Do you know Defendant Ernest Halvorsen?
13     A  He was on this assignment, and I believe I
14   had him on a couple of other assignments, but that's
15   all I know of him.
16     Q  Do you have any independent recollection of
17   him?
18     A  No.
19     Q  So how do you know that you had him on other
20   assignments?
21     A  The name's familiar.
22     Q  Do you recall talking to him at the Soto
23   crime scene?
24     A  No, I do not.

Transcript of Mark Harvey
Conducted on April 30, 2019                                    89

1        Q  I think I asked you this, but do you recall
2    talking to Ray Guevara at the Soto crime scene?
3        A  No, I do not.
4        Q  Would any documents refresh your
5    recollection of Defendant Halvorsen?
6        A  Other than him being on the crime scene, no.
7        Q  What about Defendant Edwin Dickinson, do you
8    know him?
9        A  No.
10       Q  Do you have any independent recollection of
11   him or who he is?
12       A  No, I do not.
13       Q  Do you recall seeing him on any documents?
14       A  I don't recall the name, no.
15       Q  Are there any documents that would help
16   refresh your recollection as to Edwin Dickinson?
17       A  If he's on my crime scene, yes, that would
18   help.
19       Q  What about Defendant Robert Rutherford; do
20   you know him?
21       A  No.
22       Q  Do you have any independent recollection
23   that has anything to do with Robert Rutherford?
24       A  No.

Transcript of Mark Harvey
Conducted on April 30, 2019                    90

1      Q  Any documents that would help you refresh
2  your recollection as to Robert Rutherford?
3      A  If it's on my crime scene report, yes, that
4  would.
5      Q  When you say crime scene report, you're
6  referring to the Soto crime scene report?
7      A  Yes.
8      Q  What about Defendant Dennis Stankus, do you
9  know who he is?
10     A  Yes.
11     Q  How do you know who he is?
12     A  He worked with me in the crime lab.
13     Q  Was he an evidence tech or forensic
14  investigator?
15     A  Forensic investigator.
16     Q  What do you know about him?
17     A  I've known him as a police officer.  We were
18  in the Sixth District together before the crime lab.
19     Q  Do you have any further independent
20  recollection of him?
21     A  Oh, I've seen him recently involving this,
22  yes.
23     Q  Did you discuss the case with him?
24     A  No.

Transcript of Mark Harvey
Conducted on April 30, 2019                                91

```
1       Q   There was no mention of you both defendants
2   in a lawsuit?
3           Ms. Golden:  Outside the presence of
4   attorneys.
5           Mr. Starr:  Yeah, of course.
6       A   No.
7       Q   When you saw him, did you see him with your
8   attorneys?
9       A   Yes.
10      Q   Have you seen him recently without your
11  attorneys?
12      A   No.
13      Q   Did you ever observe any misconduct on his
14  part?
15      A   No.
16      Q   Did you ever hear that he was involved in
17  misconduct?
18      A   No.
19      Q   Did you ever have any concerns about Mr.
20  Stankus's integrity?
21      A   No.
22      Q   Did anyone else ever express concerns about
23  his integrity to you?
24      A   No.  No one has ever talked about him that
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          92

```
1    way.
2        Q   Did you ever have any discussions with a
3    supervisor about Dennis Stankus?
4        A   No.
5        Q   Do you know defendant Daniel Trevino?
6        A   No, I do not.
7        Q   Do you have any independent recollection of
8    anything about Daniel Trevino?
9        A   No.
10       Q   Do you know if you ever worked with Daniel
11   Trevino?
12       A   No.
13       Q   Did you ever hear from anyone that Daniel
14   Trevino was involved in misconduct?
15       A   No.
16       Q   Any documents that would refresh your
17   recollection of Mr. Trevino?
18       A   Only if he's listed on the crime scene
19   report.
20       Q   What about Defendant Edward Mingey; do you
21   know him?
22       A   No, I do not.
23       Q   Do you have any independent recollection of
24   anything about Mr. Mingey?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                              93

```
 1       A   No.   Just that he was listed on the crime
 2   scene report.
 3       Q   So you know that he was on the crime scene
 4   report?
 5       A   Uh-huh.
 6       Q   Would any documents refresh your
 7   recollection regarding Defendant Mingey?
 8       A   Only from the crime scene report.
 9       Q   What about Defendant Robert Biebel; do you
10   know him?
11       A   No, I don't.
12       Q   Do you have any independent recollection of
13   anything to do with Defendant Biebel?
14       A   No, I don't.
15       Q   Are there any documents that would refresh
16   your recollection of Defendant Biebel?
17       A   If he was listed on the crime scene report.
18       Q   And then what about Defendant Cappitelli; I
19   believe his first and middle initial is F.J., F.J.
20   Cappitelli; do you know anything about him?
21       A   No.
22       Q   Do you have any independent recollection of
23   him?
24       A   No.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                        94

1      Q  Are there any documents that would help
2  refresh your recollection of Defendant Cappitelli?
3      A  Again, if it's listed on the crime scene
4  report.
5      Q  I believe you testified that your partner
6  was named John Caralaw; is that correct?
7      A  Yes.
8      Q  Did you frequently work with Mr. Caralaw?
9      A  No.  I think maybe one other time, and he
10  retired shortly after I got down to the crime lab.
11      Q  Did you ever observe any misconduct on the
12  part of Mr. Caralaw?
13      A  No.
14      Q  Did you ever hear that he was involved in
15  any kind of misconduct?
16      A  No.
17      Q  Did you ever have any concerns about Mr.
18  Caralaw's integrity?
19      A  No.
20      Q  Did anyone ever come to you with concerns
21  about his integrity?
22      A  No.
23      Q  Do you have any opinion about him as a
24  police officer?

Transcript of Mark Harvey
Conducted on April 30, 2019                              95

1        A   Only working with him.  He seemed to be a

2    fine police officer.  He was out there doing his

3    job.

4        Q   At this point do you recall anything about

5    the Soto murder investigation other than what you've

6    testified to, what's in the documents, and those

7    three pieces of independent knowledge?

8        A   Yes, that's all I remember.  Yes.

9        Q   Nothing we've talked about today has sparked

10   any further independent recollection?

11       A   No, it has not.

12       Q   Did you do a walk-through of the crime

13   scene?

14       A   I don't have an independent recollection of

15   doing it.

16       Q   But it's your general procedure that you

17   would have taken --

18       A   That's what I normally would do.

19       Q   Would you know of any documents that would

20   help refresh your recollection?

21       A   Only if it's listed on the crime scene

22   report.

23       Q   When you testify to only if it's listed on

24   the crime scene report, is that because that's the

Transcript of Mark Harvey
Conducted on April 30, 2019                          96

1    primary document where information about you is

2    contained?

3        A  Yes.

4        Q  Does that include the sum total of your

5    participation in this investigation?

6            Ms. Golden:  Object to form.

7        A  Yes.

8        Q  Do you know if it was night or day when you

9    got to the Soto crime scene?

10       A  From the crime scene report, we arrived at

11   1920.  I don't know if it was light or still light

12   out at that time or not.  I don't remember.

13       Q  But that understanding only comes from the

14   document?

15       A  Yes.

16       Q  Do you recall having any visibility problems

17   at the crime scene?

18       A  I don't recall any.

19       Q  Would there be anything that would refresh

20   your recollection as to that?

21       A  Only if it's listed in the crime scene

22   report.

23       Q  Do you know of any names of any of the CPD

24   personnel that were on the scene at any point while

Transcript of Mark Harvey
Conducted on April 30, 2019                          97

```
1    you were there?
2         A  I don't recall any.
3         Q  Any documents that would refresh your
4    recollection?
5         A  Again, what's listed on my crime scene
6    report.
7         Q  Do you know what time you were contacted to
8    go to the crime scene, the Soto crime scene?
9         A  I think it says 1910 on the report.
10        Q  Do you know who contacted you to go to the
11   Soto crime scene?
12            Ms. Golden:  Objection.  Asked and answered.
13        A  I believe it was the desk officer.
14        Q  Do you know if you were with your partner
15   when you were contacted to go to the Soto crime
16   scene?
17        A  I don't recall if we were in the same room
18   or not.
19        Q  Do you know how long it took you to get to
20   the Soto crime scene?
21        A  According to the report, about ten minutes.
22        Q  Do you know where the Soto residence was?
23        A  Listed on the report it was 2071 North
24   Leavitt.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          98

1      Q  So is it accurate to say that besides these

2   three pieces of independent recollection, the two

3   reporters, and seeing the woman at the crime scene,

4   the only basis of your understanding of what

5   happened comes from your crime scene report?

6      A  Yes.

7         Ms. Golden:  Objection.  Asked and answered,

8   and form.

9      Q  Are there any other documents besides your

10  specific crime scene report at the Soto residence,

11  the Soto crime scene, that could possibly refresh

12  your recollection to any of the line of questioning

13  that we just went through since we got back from the

14  break?

15        Ms. Golden:  Objection to form.  Asked and

16  answered.

17     A  My crime scene report that I filled out and

18  the pictures.

19     Q  What other reports did you fill out?

20     A  The inventory reports.

21     Q  The inventory reports, right.  For the Soto

22  crime scene, right?

23     A  Yes.

24     Q  What was the crime scene condition when you

Transcript of Mark Harvey
Conducted on April 30, 2019                                    99

1   arrived?

2           Ms. Golden:  Objection to form.

3       A  According to my report, it was disheveled,

4   and it was messy.

5       Q  Do you have any independent recollection of

6   that?

7       A  No, I do not.

8       Q  Would any other documents help you recall

9   the condition?

10      A  Again, the crime scene report and the

11  photos.

12      Q  Did you move anything at the crime scene?

13          Ms. Golden:  Object to form.

14      A  We turned over the bodies; but if we moved

15  anything else, I don't recall.

16      Q  And your recollection of moving the bodies

17  comes from your report?

18      A  Yes.

19      Q  You don't have any independent recollection

20  of that, right?

21      A  No.

22      Q  Would it be proper to move anything at a

23  crime scene generally?

24      A  Again, it would depend on the crime scene.

1    It would depend on the situation.

2        Q   Right.  Would it be proper to move anything

3    prior to taking photographs at a crime scene

4    generally?

5            Ms. Golden:  Objection to form.

6        A   Again, it would depend on the crime scene

7    and the situation, but, no; normally we would prefer

8    to photograph the scene before anything was touched.

9        Q   Can you think of a circumstance or an

10   example where it would be proper to move items at a

11   crime scene prior to photographing them?

12       A   Again, only if it was a possibility that

13   evidence was being damaged by staying there for a

14   certain length of time.

15       Q   And in any other circumstances, it would be

16   improper, right?

17           Ms. Golden:  Objection to form.  Foundation.

18           Ms. Berousek Carney:  Incomplete

19   hypothetical.  Misstates his testimony.

20       A   Again, it would depend on the crime scene

21   circumstances.

22       Q   Other than evidence being contaminated or

23   destroyed or however you necessarily define those

24   terms, is there any other example or circumstances

Transcript of Mark Harvey
Conducted on April 30, 2019                    101

1    that you can think of where moving evidence or

2    moving things at a crime scene would be proper

3    before taking photographs?

4        A   Again, it would depend on the crime scene

5    and the circumstance, but normally we would prefer

6    that the property stays where it's at until we're

7    finished photographing it.

8        Q   Can you think of any specific examples?

9            Ms. Golden:  Any other.

10       A   No, I can't.

11           Ms. Golden:  Any other.

12       Q   Are you generally supposed to leave the

13   scene as it is until you're done doing your job,

14   taking photographs and documenting evidence?

15           Ms. Golden:  Object to form.

16       A   I don't quite understand that question.

17       Q   Are you, as a forensic investigator at a

18   crime scene, supposed to leave the scene as-is

19   except in narrow circumstances so you can do your

20   work processing the scene as you found it?

21           Ms. Berousek Carney:  Objection to form.

22   Incomplete hypothetical.

23       A   Yes, we do prefer to have the scene

24   untouched so we can do our job.

Transcript of Mark Harvey
Conducted on April 30, 2019                    102

1      Q  Did the disheveled or messy residence as you

2   described it, indicate to you that there was some

3   sort of struggle at the crime scene?

4      A  I know from my report that it was messy, but

5   whether or not it indicated that there had been a

6   struggle before, I don't recall that.

7      Q  Are there any documents that help you

8   refresh your recollection on that?

9      A  Again, my crime scene report, but this is

10  all the crime scene report says, is that it was

11  messy.

12     Q  So there's nothing to indicate that the

13  crime scene was made disheveled by any of the

14  Chicago Police Department?

15        Ms. Golden:  Object to foundation and form.

16     A  No, not that I know of.

17     Q  But a disheveled crime scene at least

18  indicates the possibility that the perpetrators

19  caused the dishelevement; correct?

20        Ms. Golden:  Objection.  Foundation.

21        Ms. Berousek Carney:  Form.

22     A  That's not correct.  We don't know what

23  happened.  It could have been just a messy

24  apartment.  We don't know whether it was a struggle

Transcript of Mark Harvey
Conducted on April 30, 2019                    103

```
 1    or not.
 2        Q   Okay.  So when you arrive at a messy or
 3    disheveled crime scene, that's an indication that
 4    either there was a struggle and the perpetrator was
 5    involved, or it was just a messy home; correct?
 6            Ms. Berousek Carney:  Objection.  Misstates
 7    his testimony.  And to form.
 8        A   Until we get further knowledge, it's just a
 9    messy house.
10        Q   Do you recall anything about the messy house
11    indicating anything at all?
12            Ms. Golden:  Objection.  Foundation.
13        A   I don't recall, no.
14        Q   What do you recall about the layout of the
15    residence?
16        A   Nothing really except for the bedroom where
17    the female was found.  I think there was a back
18    bedroom where she was found.
19        Q   Do you recall anything else about that back
20    bedroom?
21        A   No.
22        Q   How certain are you that it was a back
23    bedroom?
24        A   I'm not 100 percent certain.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          104

1        Q   How many victims do you recall?

2        A   There were two victims on the scene, and

3    that's from reading the crime scene report.

4        Q   You recall that information by reading the

5    crime scene report?

6        A   Yes.

7        Q   What do you recall about the crime scene

8    other than the victims?

9        A   The female in the bedroom.

10       Q   And the fact that the female was in the

11   bedroom you independently recall; correct?

12           Ms. Golden:  Asked and answered.

13       A   Yes, I do.

14       Q   Was there any evidence of decay or bugs on

15   either of the victims that you know of?

16       A   Not that I recall, no; and I don't remember

17   reading it in the crime scene report.

18       Q   What did you observe regarding the entryway

19   of the home?

20       A   I don't recall anything specific about it.

21       Q   Anything that would help with your

22   recollection of the entry?

23       A   My crime scene report.

24       Q   Anything else?

Transcript of Mark Harvey
Conducted on April 30, 2019                    105

1      A   Some other report that was written by the
2   officers or the detectives.  I don't know.
3      Q   Do you recall there being any keys at the
4   crime scene?
5      A   Not that I recall, no.
6      Q   Would you have photographed keys?
7          Ms. Golden:  Objection.  Hypothetical.
8      A   Again, it would have depended on the
9   information that I received.
10     Q   But in this circumstance, in this crime
11  scene, if there were keys there, would you have
12  photographed the keys?
13         Ms. Golden:  Same objection.
14     A   Again, it would have depended on the
15  circumstances or if someone had knowledge that it
16  was involved.
17     Q   But if it had happened, you would have had
18  some knowledge at some point in time, right?
19         Ms. Berousek Carney:  Objection.
20         Ms. Carney:  Objection.
21     A   I don't independently recall.
22     Q   You don't independently recall what?
23     A   Keys and photographing keys.
24     Q   If there were keys at this crime scene,

Transcript of Mark Harvey
Conducted on April 30, 2019                    106

1  based on what you know from the reports and your

2  independent recollection, would you have

3  photographed the keys?

4        Ms. Golden:  Objection.

5        Ms. Berousek Carney:  Objection to form,

6  foundation.

7     A  Again, I don't recall photographing keys.

8  If it's in the report, that means the keys were

9  photographed.

10    Q  At this scene, based on the reports you

11 reviewed, do you have any independent recollection

12 if there was some sort of lock pick that was at the

13 scene that you found?  Do you recall finding a lock

14 pick?

15    A  No, I do not recall.

16    Q  If there was, would you have photographed

17 that?

18    A  Possibly, yes.

19    Q  What circumstances would you not have

20 photographed it?

21    A  Well, if it was found somewhere away from a

22 door or was out in the street somewhere, way down

23 the street, then I probably would have left it alone

24 because I would have come to the conclusion that it

Transcript of Mark Harvey
Conducted on April 30, 2019                    107

```
1    wasn't involved in the crime.
2        Q  So if there was some sort of lock pick that
3    was found in proximity to the entry way, would you
4    have photographed that?
5        A  Yeah, possibly, yeah.  I would have, yes.
6        Q  When you say possibly, what circumstances
7    would you have refrained from photographing a lock
8    pick that was close to a door on a place where there
9    was obviously forced entry and in particular this
10   crime scene?
11           Ms. Golden:  Objection.
12           Ms. Berousek Carney:  Assuming facts not in
13   evidence.
14       A  Again, it would have depended on our
15   knowledge about what happened at the scene, whatever
16   information we got from the detectives or the police
17   officers.
18       Q  So based on that knowledge and also the
19   documents you reviewed and also your independent
20   knowledge, did you photograph any lock picks?
21       A  Not that I recall.
22       Q  Do you recall finding any clothes hangers?
23       A  No, I do not recall any clothes hangers.
24       Q  Based on the documents you reviewed, your
```

1   independent recollection, if there had been a

2   clothes hanger in proximity to the door, would you

3   have photographed it?

4          Ms. Berousek Carney:  Objection.

5          Ms. Golden:  Objection.

6          Ms. Berousek Carney:  Form, foundation.

7     A  Again, if we had knowledge that it was

8   involved in some way, then, yes, we probably would

9   have photographed it.

10    Q  Would you have collected the evidence that

11  I've just listed based on the explanation of where

12  it was found in proximity to the door?

13         Ms. Golden:  Form.

14    A  Again, if it proved someone telling us that

15  it was possibly involved, we would have photographed

16  and collected it.

17    Q  Would it take someone telling you it was

18  possibly involved, or would you make that

19  determination on your own?

20    A  Again, it would depend on the scene.  And

21  with the apartment being in such a disarray, we

22  don't know what a hanger has to do with anything.

23    Q  So if there was a hanger external to the

24  home but in proximity to the door, would you have

Transcript of Mark Harvey
Conducted on April 30, 2019                     109

1   photographed it?

2          Ms. Golden:  Objection.

3          Ms. Berousek Carney:  Objection.

4     A   Again, I don't know.  It would depend on the

5   circumstances and if we got information that it was

6   possibly involved.

7     Q   Would you need to get that information or

8   could you make that determination on your own?

9          Ms. Golden:  Objection.  Incomplete

10  hypothetical.

11    A   If I determined it was involved, then, yes,

12  I would do it; but, again, the apartment was in such

13  a mess that we don't know how it was involved or if

14  it was at all involved.

15    Q   So if you determined that a hanger was

16  possibly involved, you would have photographed it

17  and inventoried it as evidence?

18    A   If we got that information, yes.

19         Ms. Golden:  Object to form.

20    Q   I'm saying if you determined?

21         Ms. Golden:  Object to form.

22    A   If I determined, and I would have determined

23  by the information that I had gotten.

24    Q   So you make, at crime scenes generally you

Transcript of Mark Harvey
Conducted on April 30, 2019                      110

```
1    don't make any determinations on what is evidence on
2    your own?
3         Ms. Golden:  Are you arguing with him now?
4         Mr. Starr:  I'm asking him a question.  I'm
5    just trying to be clear.
6         Ms. Berousek Carney:  Objection.
7      A  Of course, I make determinations of what
8    types of evidence I collect.
9      Q  So in this circumstance at the Soto crime
10   scene, if you saw a hanger on the ground in front of
11   the door, and you determined that it may have been
12   involved in the crime scene, would you have
13   photographed it and inventoried it as evidence?
14        Ms. Berousek Carney:  Objection.  Asked and
15   answered.  Argumentative.
16     A  Again, if I got knowledge that it was part
17   of the crime and it was used in the crime, then,
18   yes, I would have photographed it and collected it.
19     Q  What do you mean by got knowledge?
20     A  By talking to the detectives and police
21   officers.
22        Ms. Berousek Carney:  Objection.  Asked and
23   answered.
24     Q  So in this circumstance, you could not have
```

Transcript of Mark Harvey
Conducted on April 30, 2019                                    111

1    determined that on your own?

2          Ms. Berousek Carney:  Objection.  Asked and

3    answered. Argumentative.

4       A   Again, the apartment was in such disarray,

5    we don't know where that hanger came from, if it was

6    involved in that.

7       Q   So your answer is you could not make that

8    determination?

9          Ms. Golden:  Objection.

10      A   No, my answer was that the apartment was in

11   disarray.  Things were all over the place, and I

12   didn't know whether or not that hanger, if there was

13   a hanger, was used in the crime.

14      Q   Okay.  Was there any evidence that children

15   lived at the home?

16      A   I don't recall, no.

17      Q   Did you see a crib at the crime scene?

18      A   I don't recall.

19      Q   What was broken?

20      A   I don't remember.

21         Ms. Golden:  Objection.  Form and

22   foundation.

23      Q   Do you recall there being any broken

24   furniture?

Transcript of Mark Harvey
Conducted on April 30, 2019                              112

```
 1        A  I have no recall of any broken furniture,

 2   no.

 3        Q  Was there a broken jar?

 4        A  I don't remember a broken jar.

 5        Q  Was there a broken clock?

 6        A  I don't remember a broken clock.

 7        Q  If there were things that had been broken,

 8   would you have photographed them and collected them?

 9           Ms. Golden:  Object to the compound nature

10   of that question.

11           Mr. Starr:  Fair enough.

12        Q  If they were broken --

13           Ms. Golden:  Is that the only fair objection

14   I've had?

15           Mr. Starr:  Yeah.  Just kidding.

16        Q  If you identified items that were broken

17   like a clock, furniture, a jar, et cetera, would you

18   have photographed them?

19           Ms. Berousek Carney:  Hypothetical.

20        A  Again, it would depend on information that

21   we got about the scene, because there could be

22   broken anything in the scene.

23        Q  Right.  There could be broken anything, but

24   in this circumstance at the Soto residence, at the
```

Transcript of Mark Harvey
Conducted on April 30, 2019                          113

1    crime scene investigation as a forensic

2    investigator, if you identified something that was

3    broken, wouldn't you photograph it?

4         Ms. Berousek Carney:  Form and foundation.

5         A  Something being broken does not make it a

6    piece of evidence.

7         Q  Okay.  Let me ask this question.  If there

8    was shattered glass, any kind of shattered glass,

9    would you have photographed that at the crime scene?

10        Ms. Berousek Carney:  Objection.  Incomplete

11   hypothetical.

12        A  We did at this crime scene.  There was glass

13   on the floor.

14        Q  Did you photograph all the broken glass?

15        A  I remember from the report that we

16   photographed some green glass that was found on the

17   floor.

18        Q  Was there any other broken glass that you

19   did not photograph?

20        A  Not that I recall.

21        Q  If there was broken furniture at the crime

22   scene, would you have photographed that?

23        Ms. Berousek Carney:  Objection.  Asked and

24   answered.

Transcript of Mark Harvey
Conducted on April 30, 2019                    114

1      A   Again, it would depend on the circumstances.

2  We don't know if the furniture was broken before we

3  got there, before this incident occurred.

4      Q   How do you determine that?

5      A   By information that the detectives and/or

6  police officers give.

7      Q   So would you, hypothetically, at any crime

8  scene, not just the Soto one, would you refrain from

9  photographing broken furniture until you were told

10 to do so by a police officer or detective?

11     Ms. Berousek Carney:   Objection.   Misstates

12 his testimony.

13     A   No, that type of thing would be in the

14 overalls.   If we got information from the detectives

15 or police officers that there was a struggle and the

16 furniture was broken, then we would close in on it

17 and photograph it specifically.

18     Q   So absent that information from detectives

19 and police officers, you would refrain from taking

20 photographs of broken furniture?

21     Ms. Golden:   Form.

22     Ms. Berousek Carney:   Misstates his

23 testimony.

24     A   It depends.   It would depend on the scene.

Transcript of Mark Harvey
Conducted on April 30, 2019                    115

1    It would depend on the circumstances.  When we go

2    into a house, we don't know if the broken furniture

3    was done in conjunction with the incident or if it

4    was done before.

5        Q   Who makes that determination?

6        A   Sometimes no one because we can't get that

7    information, but that furniture would be in the

8    overalls of the scene.

9        Q   What do you mean by overalls?

10       A   Well, if you go into a room, you normally do

11   a four-corner shot.  You take pictures from all

12   corners showing an overall of the room.

13       Q   Did you take those overall photographs of

14   the Soto investigation?

15       A   According to my report, there were overalls

16   taken.

17       Q   As you sit here today, do you remember

18   seeing a coat hanger?

19       A   No, I do not.

20       Q   Based on all the documents you reviewed, is

21   there anything that indicates to you there was a

22   coat hanger at the scene?

23       A   I don't remember seeing that in any of the

24   reports.

1        Q   Do you know if the documents you reviewed
2    make any reference at all to a coat hanger at the
3    crime scene?
4        A   I don't remember seeing that in any of the
5    reports that I read.
6        Q   Do you have any reason to believe that there
7    was a coat hanger at the scene and that you just
8    didn't photograph or inventory it?
9            Ms. Berousek Carney:  Objection.  Asked and
10   answered.  Argumentative.
11           Ms. Golden:  Objection.
12       A   Again, I have no recollection of a coat
13   hanger being on the scene.
14       Q   Did you use a tripod to take the photographs
15   of the Soto crime scene?
16       A   I don't believe I did, no.
17       Q   Did you regularly use a tripod when you went
18   to crime scenes?
19       A   More often than not, we did not use a
20   tripod.
21       Q   Did you use a flash when you took the
22   photographs at the Soto residence?
23       A   Yes, I believe I did.
24       Q   Do you know how many photos you took of the

Transcript of Mark Harvey
Conducted on April 30, 2019                          117

1   crime scene?

2        Ms. Golden:  Objection.  Asked and answered.

3        Mr. Starr:  If I did, I apologize.

4   Q  Do you know how many photos you took?

5   A  It was two rolls.

6   Q  Do you know how many photographs that

7   equals?

8   A  That's 48 photographs.

9   Q  So there are two rolls of 24 frame?

10  A  Yes.

11  Q  Do you know if all the photographs you took

12  were accounted for in evidence?

13       Ms. Berousek Carney:  Objection.  Form,

14  foundation.

15       Ms. Golden:  Objection.

16  A  As far as I know, they are.

17  Q  What do you recall taking photographs of?

18  A  I have no independent recollection of taking

19  photographs, only what was listed on the crime scene

20  report.

21  Q  Did you -- and I may have asked this -- did

22  you review the photographs you took before today?

23  A  Yes.

24  Q  Did you review them in preparation for the

Transcript of Mark Harvey
Conducted on April 30, 2019                    118

1    deposition?

2         A   Yes.

3         Q   Do you know how many you took based on your

4    review?

5         A   Again, two rolls.

6         Q   And that means 48 frames?

7         A   Yes.

8         Q   When did you learn there was a problem with

9    the camera that you used at the Soto crime scene?

10        A   I believe it was a few days after it

11   occurred.

12        Q   How did you learn that information?

13        A   Someone from the photo lab must have told

14   me.  I can't say that that's how I learned

15   specifically, but that's the way it would usually

16   happen.

17        Q   Okay.  What did you learn?

18        A   That the photos were not printable.

19        Q   What do you mean by not printable?

20        A   The images were so dark and so light that

21   primarily they would show a dark background or a

22   white background.

23        Q   Did you ever see the printed version of

24   those photographs?

Transcript of Mark Harvey
Conducted on April 30, 2019                    119

1        A   Not until I went to court.

2        Q   Which court?

3        A   The trial for this.

4        Q   And so when you did see these photographs

5    printed, did you have any understanding of what the

6    problem was that caused the photographs to look the

7    way they did?

8        A   I thought of what the possible problems

9    could have been, but I didn't know for sure if that

10   was the problem.

11       Q   What possible problems do you believe may

12   have caused the photographs to look the way they do?

13       A   Either a problem with the flash or a problem

14   with the shutter in the camera.

15       Q   Are those two exclusive?  Is it possible to

16   have problems with both, or are you talking about

17   either/or?

18       A   Either/or.

19       Q   Do you have any photographs --

20           Ms. Golden:  I'm going to have a belated

21   objection to form.

22       Q   Do you have any professional photography

23   training?

24       A   My own training is from what I got through

Transcript of Mark Harvey
Conducted on April 30, 2019                    120

1    the Police Department.

2         Q   Have you ever taken any additional classes?

3         A   Yes, the department.  I did take a couple

4    other classes through the department, yes.

5         Q   Do you consider yourself an amateur

6    photographer?

7             Ms. Golden:  Objection to form.

8         A   Probably a step up from an amateur.

9         Q   Did you review the actual prints at any time

10   since the trial?  For instance, did you review them

11   in preparation for your deposition?

12        A   Yes.

13            Ms. Golden:  Asked and answered.

14        Q   Do you have any different beliefs about what

15   caused the problem today than you did back in 1998?

16        A   No.

17            Mr. Starr:  I have the photos, and I didn't

18   print multiple copies of every single photo, but I

19   did print multiple copies of his; so if I use other

20   ones, I might just show one photograph like we

21   talked about last time.

22            Let me amend what I just said.  I didn't

23   print four or five copies of every single one of

24   these photos except for a handful that I want to

Transcript of Mark Harvey
Conducted on April 30, 2019                    121

1    talk about specifically.  Okay?

2         Ms. Golden:  I brought the ones from

3    Stankus's deposition.

4         Mr. Starr:  Okay.

5     Q  So what I have here is RFC/AREYES-536-578.

6         I'm just going to show you these generally

7    because there's a lot of nothing; okay?

8     A  Uh-huh.

9         Mr. Starr:  Let's go off the record for a

10   second.

11        ( Off the record.)

12    Q  Mr. Harvey, I want to show you a number of

13   pictures and ask some questions about them.  This is

14   536.

15        Ms. Golden:  You're going to mark them,

16   right?

17        Mr. Starr:  I'm going to mark the whole

18   thing.  Is that okay?

19        Mr. Stainthorp:  Why don't you mark it as

20   one exhibit, but then you can identify each one by

21   the Bates.

22        Ms. Golden:  Harvey Group 1 or whatever.

23   Can you just read the Bates number for the record.

24        (HARVEY Deposition Exhibit 1 marked for

1    identification and attached to the deposition.)

2        Q   Okay.  Mr. Harvey, this is marked as Harvey

3    Group 1, RFC/REYES 536 through RFC/AREYES whatever I

4    said before.  What was it, Cary?

5            Ms. Golden:  I thought you said 578.

6        Q   That is what I said.  Thank you.  I want to

7    show you some of these.  This is 536.  Does that

8    photograph look familiar?

9        A   I've seen it as part of the prep for the

10   case, yes.

11       Q   Is it your understanding that that's one of

12   the photographs from the roll of photographs that

13   you took at the Soto crime scene?

14       A   Yes, I believe it is.

15       Q   Can you describe what that photo looks like?

16       A   It's black on the left side.  There's a

17   reddish glow.

18       Q   Based on your experience as a photographer,

19   do you have any idea why that would turn out that

20   way?

21       A   Again, a problem with the flash or shutter.

22       Q   For the record, I'm going to ask the same

23   line of questions for the ones I show you.  537, are

24   you familiar with that photograph?

Transcript of Mark Harvey
Conducted on April 30, 2019                    123

1        A   Just a black frame.

2        Q   Do you understand that to be one of the

3   photographs that you took at the Soto crime scene?

4        A   Yeah, it's probably one of them, yes.

5        Q   And do you have an understanding as a

6   photographer why the photo turned out that way?

7        A   Again, flash or shutter problem.

8        Q   This is a different one.  This is 539.  Does

9   that photo look familiar to you?

10       A   Yes, I have seen this photo.

11       Q   Do you understand that photo to be one of

12   photos you took at the Soto crime scene?

13           Ms. Golden:  Object to form.  We discussed

14   these photographs, so his understanding -- you can

15   ask him if he took the picture, but his

16   understanding, not based on anything I told you.

17           The Witness:  Okay.

18           Ms. Golden:  Based on just looking at the

19   picture.

20       A   I can't determine that this is the one that

21   I took.  There's nothing to identify it.

22       Q   What does that photograph look like?

23       A   A golden frame with a black edge.

24       Q   Based on your experience as a photographer,

Transcript of Mark Harvey
Conducted on April 30, 2019                          124

```
1    do you understand why that photograph turned out the
2    way it did?
3        A  Well, a possible explanation is shutter or
4    flash problem.
5        Q  Is the same true for 540?
6        A  Correct.
7        Q  Would the same be true for 544?
8        A  Yes.
9        Q  And the same for 545?
10       A  Yes.
11       Q  How about 556?
12       A  That's a photo of one of the victim's hand,
13   partially visible on the left side of the photo.
14           Ms. Golden:  Are these all the same?
15           Mr. Starr:  Uh-huh.
16       Q  Based on your experience as a photographer,
17   why did that frame --
18           Ms. Golden:  I'm sorry; what number are you
19   on, 556?  You gave me 556 and 557.  So we're just on
20   556?
21           Mr. Starr:  Yeah.
22       Q  Based on your experience as a photographer,
23   do you have any opinion about why this turned out
24   the way it did?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    125

1        A   Same issue, shutter or flash.

2        Q   What is the specific shutter problem that

3    may have caused these photographs to turn out this

4    way?

5            Ms. Golden:  Objection to form.  Foundation.

6        A   The shutter can get out of sync with the

7    flash.

8        Q   What causes that?

9            Ms. Berousek Carney:  Objection.  Form and

10   foundation.

11       A   I don't have enough knowledge of cameras to

12   tell you specifically why that happens.

13       Q   This is 565.  Is this photo familiar?

14       A   Again, photos are all the same.

15       Q   Can you describe what this photo looks like?

16       A   That looks like blood spots on the floor.

17       Q   Is there anything in the frame here that

18   indicates a problem with the camera?

19           Ms. Golden:  Objection.  Form and

20   foundation.

21       A   Again, the same problem with the shutter and

22   possible same problem with the shutter and the

23   flash.

24       Q   For the record, can you just describe what

Transcript of Mark Harvey
Conducted on April 30, 2019                    126

1    that looks like?

2        A  Again, same problem, the syncing problem

3    with the flash and the shutter.

4        Q  This is 576.  Are you familiar with this

5    photo?

6        A  Yes.

7        Q  Is this one of the photos you took at the

8    Soto crime scene?

9        A  Yes, I believe it is.

10       Q  And can you describe what this photo looks

11   like?

12       A  I believe this is the knife found under the

13   male victim's arm or under the male victim.

14       Q  Are there any problems that present in this

15   photograph?

16           Ms. Golden:  Objection to form.

17       Q  In terms of the film and the camera?

18           Ms. Golden:  Objection, compound.

19       A  Again, same problem with the flash and the

20   shutter.

21       Q  Do these photographs that I've given you, do

22   they look the same?

23           Ms. Golden:  Object to foundation.

24           Ms. Berousek Carney:  Form.

Transcript of Mark Harvey
Conducted on April 30, 2019                    127

1      A  Look the same as compared to?

2      Q  One of the photographs is completely black

3   that I gave you; correct?

4      A  Uh-huh.

5      Q  One of the photographs that I gave you is

6   partially black and partially light; correct?

7      A  Yes.

8      Q  One of the photos I gave you is a hue of

9   green; correct?

10     A  Yes.

11     Q  And in that photograph that's green, you can

12  see some imagery; right?

13     A  Yes.

14     Q  And another photograph I gave you is

15  predominantly black, but then there's a circle area

16  where you can see a bloody knife and what I believe

17  to be a bloody arm; correct?

18     A  Yes.

19     Q  Can you explain to me how the problem you

20  think existed with the camera caused these several

21  different outcomes?

22        Ms. Berousek Carney:  Objection to form and

23  foundation.

24     A  They look different, but it's all the same

Transcript of Mark Harvey
Conducted on April 30, 2019                    128

1   basic problem with the syncing of the flash and the

2   shutter.

3       Q  Could you explain how one problem could

4   cause these different outcomes?

5          Ms. Berousek Carney:  Objection to form and

6   foundation.

7       A  Again, as I say, I'm not an expert, but they

8   all look like that same basic problem.

9       Q  So that problem can present different

10  outcomes?  Is that what you're telling me?

11         Ms. Golden:  Objection.  Form, foundation.

12      A  Yes.

13      Q  So one frame could be all black, and one

14  frame could be all white, and then there are going

15  to be some middle ground; is that correct?

16         Ms. Golden:  We don't have an all white.

17         Mr. Starr:  I'm sorry.

18      Q  Overexposed.  Is that a correct analogy?

19      A  Yes; overexposed or underexposed.

20      Q  Can you explain how that happens?

21         Ms. Golden:  Objection to form, foundation.

22  Argumentative.

23      A  Again, I'm not an expert.  I just know when

24  sync problems occur between the shutter and the

Transcript of Mark Harvey
Conducted on April 30, 2019                     129

```
 1   flash, you can get pictures like this.
 2       Q  So is it a problem with the shutter and the
 3   flash or a problem with the shutter, in your
 4   understanding?
 5       A  It can be both.  It can be both having a
 6   problem, or it can be one having a problem.
 7       Q  So in this circumstance, does it appear to
 8   be one or the other or both?
 9       A  I don't know.
10       Q  I'm going to show you what's being marked as
11   Plaintiff's Exhibit 1 -- actually, make it Group 2.
12   And I don't have a copy of this, but they are
13   negatives of the photo that's presented.
14          (HARVEY Deposition Exhibit 2 marked for
15   identification and attached to the deposition.)
16          Mr. Starr:  So this is Harvey 2, Bates range
17   and these are REYES-007966 to REYES-007970.
18       Q  Do you want to review this, Mr. Harvey?  Are
19   you familiar with what those documents reflect and
20   represent?
21          Ms. Berousek Carney:  Objection to form and
22   foundation.
23       A  Yes.
24       Q  What are they?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    130

1      A   These are the strips of film that were
2   processed and came out this way.
3      Q   And when you say strips, do you mean in
4   layman's terms, negatives?
5      A   Yes.
6      Q   And does this exhibit represent some of the
7   photographs that I showed you earlier?
8         Ms. Golden:  Object to form and foundation.
9      A   Yes, on 797.
10     Q   Are those negatives of the photographs you
11  took of the Soto investigation?
12     A   Some of them, yes, I can say they are; but
13  the others, I'm not 100 percent sure they are mine.
14     Q   Do they represent the types of camera
15  problems we previously discussed?
16     A   Yes.
17     Q   Looking those over, do you have any
18  different opinions about what caused the photos to
19  have that outcome?
20     A   No.
21     Q   Do you know if there's any photos missing
22  that you took of the crime scene in that batch?
23        Ms. Golden:  Object to form.
24        Berousek Carney:  Objection.

Transcript of Mark Harvey
Conducted on April 30, 2019                    131

1      A  No, I do not.

2      Q  What evidence did you find at the Soto crime

3  scene?

4         Ms. Golden:  Objection to form.

5      A  I would have to look at my report to give

6  you a list of what was recovered.

7      Q  In any circumstance that you can recall, did

8  you ever gather evidence before photographing it?

9         Ms. Berousek Carney:  Objection.  Asked and

10  answered.

11     A  No.

12     Q  Did you find any knives in a box at the Soto

13  crime scene?

14     A  Not that I recall.

15     Q  Do you know if any knives were found in a

16  box at the crime scene?

17     A  I believe there were some later found.

18     Q  Do you know who discovered those knives?

19     A  No, I do not.

20        Mr. Starr:  I'm going to take a five minute

21  break.

22        (Off the record.)

23     Q  Mr. Harvey, I want to show you some

24  documents and ask you a couple questions.  This is

Transcript of Mark Harvey
Conducted on April 30, 2019                    132

1    going to be marked Plaintiff's Exhibit 3.

2         (HARVEY Deposition Exhibit 3 marked for

3    identification and attached to the deposition.)

4         Mr. Starr:  This is Bates 002499, but I'm

5    not certain who produced it.  There is not an

6    additional -- I know the State's attorney, I

7    believe, produced this to us, but I don't know why

8    there's not a more specific Bates on there.

9         Ms. Berousek Carney:  So this is his --

10   you're going to give one to me anyway?

11        Mr. Starr:  Yeah, I'll give one to everyone.

12        Ms. Golden:  There's just not a designation

13   up here.

14    Q  (By Mr. Starr) Mr. Harvey, take a minute to

15   review that, please.  Are you familiar with this

16   document?

17    A  Yes.

18    Q  Is it one of the documents you reviewed in

19   preparation for the deposition today?

20    A  Yes.

21    Q  Is this your crime scene processing report

22   that you have referred to a number of times today?

23    A  Yes, it is.

24    Q  What information have you gleaned from this

Transcript of Mark Harvey
Conducted on April 30, 2019                                133

1    document specifically?  What does this document tell

2    you?

3           Ms. Golden:  Objection to form.

4        A  The victim's name, the date and time, what

5    kind of crime it was, the pictures that were taken,

6    things that were inventoried, and the names of

7    detectives and myself and my partner.

8        Q  Does it include the entirety of the

9    inventory that you conducted?

10          Ms. Golden:  Object to form.

11       A  Yes, of what we collected.

12       Q  Can you tell us what items you inventoried?

13       A  First is one multi-colored pillowcase

14   recovered on couch on east wall.  One paper napkin

15   recovered on the sofa between cushion and arm on

16   east wall.  Thirteen pieces of greenish glass

17   recovered on kitchen floor.  One black-handled

18   knife, 12-1/2 inches overall length with a 7-3/4

19   inch blade recovered in a box behind the couch on

20   east wall.  One black-handled knife, 12-1/2 inches

21   overall length with a 7-3/4 inch blade recovered

22   under male victim on kitchen floor.

23       Q  Does that inventory represent the entirety

24   of things you determined to be evidence that should

Transcript of Mark Harvey
Conducted on April 30, 2019                              134

1   be inventoried?

2       A   Yes; that's a list of what we collected that

3   night.

4       Q   Was there anything that you identified but

5   failed to collect?

6       A   If it's not inventoried, we did not identify

7   it as evidence.

8       Q   Was there a bloody blanket at the scene that

9   you saw?

10          Ms. Berousek Carney:  Objection.

11  Foundation.

12      A   I don't recall.

13      Q   If there was a bloody blanket, would that

14  have been something that you would have normally

15  inventoried?

16          Ms. Berousek Carney:  Objection to form.

17      A   Again, it would depend on the circumstances

18  of the incident that we were at.

19      Q   What example or what circumstance would give

20  rise to you choosing not to inventory a bloody

21  blanket?

22          Ms. Berousek Carney:  Objection.

23          Ms. Golden:  Incomplete hypothetical.

24      A   If it was just a blanket that the victim

Transcript of Mark Harvey
Conducted on April 30, 2019                    135

1   fell on and bled on, there would probably be no

2   reason to collect it.

3       Q  If there was a bloody blanket that was found

4   close to the victim, would that be something that

5   you would normally photograph and inventory?

6          Ms. Berousek Carney:  Same objection.

7       A  Again, it would depend on the circumstance.

8       Q  Can you give an example of a circumstance or

9   example where there was a bloody blanket that's not

10  underneath the victim that you did not photograph

11  and did not inventory?

12         Ms. Golden:  Form.

13      A  Not that I recall.

14      Q  Two lines up from the bottom narrative,

15  there is a line that says the scene was photographed

16  as described and searched for physical evidence,

17  listed above; do you see that line?

18      A  Yes.

19      Q  Did you search the scene for physical

20  evidence?

21      A  Yes.

22      Q  And this is what you found; correct?

23      A  Yes.

24      Q  Does this document being in front of you

Transcript of Mark Harvey
Conducted on April 30, 2019                                    136

```
 1   provide any additional recollection of any of the

 2   questions I asked you?

 3        Ms. Golden:  Objection to form.

 4     A  Independent recollection, no.

 5     Q  Does it provide you any additional

 6   information about the crime scene and the events of

 7   your investigation?

 8        Ms. Golden:  Objection to form.

 9     A  No.

10     Q  Are there any other documents that you can

11   think of that would provide you any additional

12   information to any of the questions that you

13   referred to this document?

14        Ms. Golden:  Objection.  Asked and answered.

15   And you don't have to answer it.  You've answered it

16   four times.  He's told you his photographs.  He's

17   told you his property inventory reports, and he's

18   told you the crimes and processing report.  You keep

19   asking him the same question.

20     Q  My question is now that it's in front of

21   him, is there anything additional that you can

22   recall?

23        Ms. Berousek Carney:  Objection.  Form.

24        Ms. Golden:  Other than the property and the
```

Transcript of Mark Harvey
Conducted on April 30, 2019                         137

1    property inventory reports, which he's already

2    referred to multiple times?

3         Mr. Starr:  Yeah, any other documents.

4    A  No.

5         (HARVEY Deposition Exhibit 4 marked for

6    identification and attached to the deposition.)

7    Q  I'll show you what I'm going to mark as

8    Plaintiff's Exhibit 4.  Do you want to take a look

9    at it?

10   A  Yes.

11   Q  Can you tell me what this document is?

12   A  A copy of the inventory of the multi-colored

13   pillowcase.

14   Q  And this is in your inventory that you did;

15   correct?

16   A  Yes.

17   Q  Under the box that says found by, your name

18   and your partner's name are there; correct?

19   A  Yes.

20   Q  And at the bottom, the date, I believe, is

21   April 2, '98; and the time is 0030?

22   A  Yes.

23   Q  Is that the time that you recovered it or

24   that you inventoried it or that you arrived at the

Transcript of Mark Harvey
Conducted on April 30, 2019                    138

1    scene?

2          Ms. Golden:  Object to form.

3      A  That's the time that the desk sergeant would

4    approve it.

5      Q  So this form would have been submitted after

6    you left the crime scene?

7      A  And once we arrived at our office.

8      Q  So is it correct to assume you left sometime

9    before 12:30 then?

10     A  Yes.

11         (HARVEY Deposition Exhibit 5 marked for

12   identification and attached to the deposition.)

13     Q  All right.  I'm going to show you what's

14   marked as Exhibit 5.  Could you identify this

15   document for me, Mr. Harvey?

16     A  It's a copy of the inventory, an inventory

17   of the paper napkin found on the sofa between the

18   cushions.

19     Q  And then in the found by, your name and your

20   partner's name, indicated you submitted this report;

21   correct?

22     A  Yes.

23     Q  In the bottom, the date April 2, '98; time

24   12:30, or 0030, indicates that that's the time the

Transcript of Mark Harvey
Conducted on April 30, 2019                    139

1    desk sergeant received it?

2          Ms. Golden:   Received it?

3      A  Signed it.

4      Q  Is there anything else about this document

5    that gives you any recollection of anything to do

6    with this case?

7          Ms. Golden:   Objection to form.

8      A  No.

9          (HARVEY Deposition Exhibit 6 marked for

10   identification and attached to the deposition.)

11     Q  I'll give you what's going to be marked

12   Plaintiff's Exhibit 6.

13         Mr. Harvey, can you identify this document

14   for me?

15     A  It's a copy of the inventory on which I

16   inventoried 13 pieces of green-ish glass.

17     Q  And you and your partner are in the "found

18   by" box, so it indicates you recovered and submitted

19   this document?

20     A  Yes.

21     Q  Do you know what date you submitted this?

22     A  April 2.

23     Q  Again, at 12:30 a.m.?

24     A  Correct.

Transcript of Mark Harvey
Conducted on April 30, 2019                    140

```
1            (HARVEY Deposition Exhibits 7 and 8
2   marked for identification and attached to the
3   deposition.)
4       Q  I'm going to show you two exhibits now, 7
5   and 8.  Please review those documents.
6       A  The first one is a copy of the inventory of
7   the black-handled knife found in the box behind the
8   couch on the east wall.
9       Q  And the second one?
10      A  The second one is the knife found under the
11  victim's body in the kitchen.
12      Q  And these are both inventory reports that
13  you submitted?
14      A  Yes.
15      Q  And they were both submitted at 12:30 on
16  April 2?
17      A  Yes.
18          Ms. Golden:  Object to foundation.
19  Submitted.
20      Q  I'm sorry.  What I mean by submitted is
21  signed off on by your desk sergeant?
22      A  Yes.
23      Q  So these documents tell us that you have
24  found two knives; is that correct?
```

Transcript of Mark Harvey
Conducted on April 30, 2019                    141

1       A  Yes.

2       Q  One of those knives is under the male's

3   body; is that correct?

4       A  Yes.

5       Q  And one of them was found in a box behind

6   the couch on the east wall; is that correct?

7       A  Yes.

8       Q  Does that help refresh your recollection as

9   to whether you found the knife behind the couch?

10      A  Yes.

11      Q  Okay.  I'm going to show you what's going to

12  be marked as Plaintiff's Exhibit 9.

13         (HARVEY Deposition Exhibit 9 marked for

14  identification and attached to the deposition.)

15      Q  Here you are, sir.  Please take a minute to

16  review that.  Have you had a chance to review that?

17      A  Yes.

18      Q  Can you tell me what that document is?

19      A  It's a copy of an inventory.  What was

20  inventoried was a butcher block wooden knife holder,

21  apparently inventoried by Detective Halvorsen.

22      Q  What time were they inventoried?

23         Ms. Golden:  Object to foundation.

24      A  According to the report, at 0300 hours.

Transcript of Mark Harvey
Conducted on April 30, 2019                    142

1       Q   Why didn't you inventory this stuff?

2           Ms. Berousek Carney:  Objection to form.

3           Ms. Golden:  And foundation.

4       A   I don't remember why we did not inventory

5   it.

6       Q   Do you recall where the butcher block and

7   these knives were located?

8       A   No.

9       Q   Do you recall seeing a butcher block?

10      A   No, I do not recall.

11      Q   Is there any document that I could give you

12  that would help refresh your recollection as to

13  whether or not there was a butcher block?

14          Ms. Golden:  Objection to form.

15      A   It would have to be somebody else's report.

16      Q   Fair enough.  Do you recall there being

17  additional knives?

18          Ms. Berousek Carney:  Objection to form.

19      A   No, I don't.

20      Q   Is there any document I could show you that

21  would refresh your recollection as whether there

22  were other knives?

23      A   I would have to look at someone else's

24  report.

Transcript of Mark Harvey
Conducted on April 30, 2019                          143

```
1          Mr. Starr:  One more of these.
2          (HARVEY Deposition Exhibit 10 marked for
3     identification and attached to the deposition.)
4      Q  Please review that.  Could you tell me what
5     that document is?
6      A  It's a copy of an inventory listing an empty
7     cardboard box, inventoried by Detective Halvorsen.
8      Q  Why did you not inventory that item?
9          Ms. Berousek Carney:  Objection to form and
10    foundation.
11     A  I do not know.  I do not remember why we did
12    not inventory that.
13     Q  Do you recall there being an empty cardboard
14    box labeled something Sheffield?  My copy is not
15    dark enough.
16     A  No, I do not remember.
17     Q  Is there any documents that I could show you
18    that would help you remember an empty box labeled
19    Sheffield Cutlery?
20     A  The report tells me there was a box, but
21    beyond that, I don't know.
22     Q  Also on there is a seven-piece block set, I
23    believe it says; is that correct?
24     A  I think that's what it says.
```

Transcript of Mark Harvey
Conducted on April 30, 2019                               144

1      Q  And do you recall other than the block I
2  asked you about previously, there being specifically
3  a seven-piece block set?
4      A  No, I do not recall.
5      Q  Any document I could show you that would
6  help you remember that?
7      A  Someone else's report.
8      Q  I apologize if I asked you this already, but
9  do you recall what time you were called to go to the
10  crime scene?
11      A  I believe it was about 1910.
12      Q  In non-military time, what time is that?
13      A  7:10 p.m.
14      Q  You said it just took you ten minutes or so
15  to get there?
16      A  Yes.
17      Q  Why did you move the body of the male
18  victim?
19          Ms. Berousek Carney:  Objection to form.
20          Ms. Golden:  Foundation.  Did you say why?
21      A  The body was moved to check for other
22  wounds.
23      Q  Is that the only reason the body was moved?
24          Ms. Golden:  Foundation.

Transcript of Mark Harvey
Conducted on April 30, 2019                    145

```
1        A   Check for wounds and (inaudible) if there
2    are any.
3        Q   Is that all the reasons then?
4        A   Yes.
5        Q   Is the integrity of the crime scene
6    important to do a murder investigation?
7        A   Yes.
8        Q   Did you review those other inventory reports
9    that you did not create before today in preparation
10   for the deposition?
11       A   No. I saw them, but I didn't review them.
12       Q   After reviewing them, is there any other
13   information that you know about the Soto crime
14   scene?
15       A   No, there isn't.
16           Ms. Golden:  Objection.
17       Q   Were there any other reports that your name
18   is on that you reviewed than the ones I showed you
19   today?
20       A   No, I don't think so, no.
21       Q   Are there any other documents I could show
22   you that would refresh your recollection to anything
23   that happened at the crime scene?
24           Ms. Golden:  Objection.  Form.  Asked and
```

1    answered.

2          A   Not that I know of.

3              Mr. Starr:  I believe that's all I have.

4      Thanks.

5              Mr. Stainthorp:  I have no questions.

6      EXAMINATION BY COUNSEL FOR DEFENDANT BIEBEL

7    BY MS. GOLDEN:

8          Q   After you completed your shift on April 1

9      that rolled into April 2, did you have anything

10     further to do with the investigation of the Soto

11     murder investigation?

12         A   No, I didn't.

13             Ms. Golden:  I'm done.  Anyone else?

14             Mr. Starr:  Nothing else.

15             Ms. Berousek Carney:  Nothing.  Thank you.

16             Mr. Starr:  Thank you.

17

18

19

20

21

22

23

24

Transcript of Mark Harvey
Conducted on April 30, 2019                    147

1          CERTIFICATE OF REPORTER-NOTARY PUBLIC

2          I, Juan Mares, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that said proceedings were electronically recorded

5    by me; and that I am neither counsel for, related

6    to, nor employed by any of the parties to this case

7    and have no interest, financial or otherwise, in its

8    outcome.

9          IN WITNESS WHEREOF, I have hereunto set my

10   hand and affixed by notarial seal this 12th day of

11   May, 2019.

12

13

14   _____

15   Juan Mares, Notary Public for

16   the State of Illinois

17

18

19

20

21

22

23

24

```
 1                CERTIFICATE OF TRANSCRIBER

 2            I, Lisa C. Baker, do hereby certify that

 3    The foregoing transcript is a true and correct

 4    record of the recorded proceedings; that said

 5    proceedings were transcribed to the best of my

 6    ability from the audio recording and supported

 7    information; and that I am neither counsel for,

 8    related to, nor employed by any of the parties to

 9    this case and have no interest, financial or

10    otherwise, in its outcome.

11

12

13

14

15

16    _____

17    Lisa C. Baker

18    May 12, 2019

19

20

21

22

23

24
```

Transcript of Mark Harvey
Conducted on April 30, 2019

149

| A |
|---|
| **aberdeen** |
| 2:6, 3:5 |
| **ability** |
| 8:9, 8:12, |
| 8:15, 148:6 |
| **able** |
| 8:19, 15:16 |
| **about** |
| 12:7, 13:18, |
| 14:20, 14:24, |
| 15:5, 15:8, |
| 15:16, 16:3, |
| 16:5, 16:10, |
| 16:11, 17:7, |
| 17:12, 23:17, |
| 23:23, 24:12, |
| 25:10, 27:20, |
| 27:21, 29:8, |
| 35:2, 35:23, |
| 39:14, 42:1, |
| 54:21, 55:7, |
| 57:2, 58:1, |
| 60:12, 75:24, |
| 78:6, 78:9, |
| 78:11, 78:23, |
| 80:6, 82:7, |
| 87:5, 87:10, |
| 88:6, 89:7, |
| 89:19, 90:8, |
| 90:16, 91:19, |
| 91:22, 91:24, |
| 92:3, 92:8, |
| 92:20, 92:24, |
| 93:9, 93:18, |
| 93:20, 94:17, |
| 94:21, 94:23, |
| 95:4, 95:9, |
| 96:1, 97:21, |
| 103:10, 103:14, |
| 103:19, 104:7, |
| 104:20, 107:15, |
| 112:21, 119:16, |
| 120:14, 120:21, |
| 121:1, 121:13, |
| 124:11, 124:23, |
| 130:18, 136:6, |

139:4, 144:2,
144:11, 145:13
**above**
135:17
**absent**
114:18
**academy**
18:8, 20:19
**according**
64:22, 97:21,
99:3, 115:15,
141:24
**accounted**
117:12
**accredited**
86:2
**accuracy**
85:11
**accurate**
98:1
**active**
36:8
**actual**
120:9
**actually**
129:11
**additional**
28:14, 120:2,
132:6, 136:1,
136:5, 136:11,
136:21, 142:17
**adjust**
71:3
**advance**
62:21
**ae1**
67:12
**affixed**
147:10
**after**
19:12, 19:13,
19:18, 19:19,
20:19, 42:15,
42:22, 42:23,
50:18, 63:13,
63:18, 64:2,
64:20, 69:23,
77:14, 94:10,

118:10, 138:5,
145:12, 146:8
**afternoons**
31:15
**again**
22:21, 29:7,
30:1, 36:21,
43:8, 44:4,
44:18, 45:18,
46:5, 47:10,
55:15, 55:20,
62:23, 78:16,
78:21, 80:10,
81:6, 81:12,
82:3, 94:3,
97:5, 99:10,
99:24, 100:6,
100:12, 100:20,
101:4, 102:9,
105:8, 105:14,
106:7, 107:14,
108:7, 108:14,
108:20, 109:4,
109:12, 110:16,
111:4, 112:20,
114:1, 116:12,
118:5, 122:21,
123:7, 125:14,
125:21, 126:2,
126:19, 128:7,
128:23, 134:17,
135:7, 139:23
**age**
6:4
**ago**
7:9
**agree**
16:18
**ahead**
24:18
**al**
1:9
**alive**
15:13, 62:3,
63:6
**all**
7:18, 10:12,
18:8, 23:23,

25:18, 33:11,
37:1, 42:1,
44:15, 47:24,
48:3, 54:11,
61:16, 62:23,
65:7, 65:8,
65:14, 68:7,
68:14, 78:5,
78:13, 78:22,
85:10, 88:15,
95:8, 102:10,
103:11, 109:14,
111:11, 113:14,
115:11, 115:20,
116:2, 117:11,
124:14, 125:14,
127:24, 128:8,
128:13, 128:14,
128:16, 138:13,
145:3, 146:3
**alone**
84:8, 106:23
**already**
45:18, 62:2,
63:3, 82:7,
137:1, 144:8
**also**
7:24, 17:13,
23:11, 26:3,
37:8, 41:1,
45:2, 45:15,
68:22, 83:1,
107:18, 107:19,
143:22
**alternate**
25:17, 26:12
**always**
38:3, 46:19,
46:20, 61:11,
61:23, 71:11
**amateur**
120:5, 120:8
**amend**
120:22
**amount**
18:7, 18:9,
22:10, 27:7,
27:10, 27:11,

Transcript of Mark Harvey
Conducted on April 30, 2019

150

27:18, 28:6,
28:9, 28:12,
28:23, 29:17,
30:8
**amounts**
24:7
**analogy**
128:18
**analyze**
25:2
**andy**
14:12
**angles**
75:14
**anita**
14:12
**another**
38:14, 38:15,
58:11, 70:1,
127:14
**answer**
7:18, 12:9,
12:15, 12:17,
24:19, 25:5,
27:2, 27:22,
44:2, 44:9,
44:17, 60:8,
82:13, 111:7,
111:10, 136:15
**answered**
12:11, 12:12,
30:11, 31:24,
69:16, 76:10,
79:23, 81:17,
97:12, 98:7,
98:16, 104:12,
110:15, 110:23,
111:3, 113:24,
116:10, 117:2,
120:13, 131:10,
136:14, 136:15,
146:1
**answering**
27:16, 35:23
**answers**
16:18, 35:17
**anticipation**
9:11, 9:16,

10:7, 13:17,
16:8, 16:21
**anyone**
87:12, 88:5,
88:8, 91:22,
92:13, 94:20,
146:13
**anything**
10:3, 13:18,
14:20, 15:3,
15:5, 15:8,
15:16, 15:20,
15:21, 16:3,
16:5, 16:15,
17:7, 29:6,
30:20, 56:8,
69:10, 69:13,
70:12, 74:1,
75:22, 79:3,
79:14, 81:1,
81:2, 81:19,
81:23, 82:5,
82:9, 85:10,
87:10, 89:23,
92:8, 92:24,
93:13, 93:20,
95:4, 96:19,
99:12, 99:15,
99:22, 100:2,
100:8, 103:10,
103:11, 103:19,
104:20, 104:21,
104:24, 108:22,
112:22, 112:23,
115:21, 123:16,
125:17, 134:4,
136:21, 139:4,
139:5, 145:22,
146:9
**anyway**
132:10
**apartment**
102:24, 108:21,
109:12, 111:4,
111:10
**aperture**
71:3
**apologize**
44:18, 117:3,

144:8
**apparently**
141:21
**appear**
129:7
**appeared**
42:7
**applied**
36:12, 36:15,
36:19
**approve**
138:4
**approximate**
9:24, 17:23,
20:1
**approximately**
20:11, 20:12
**april**
1:15, 21:10,
137:21, 138:23,
139:22, 140:16,
146:8, 146:9
**area**
37:8, 72:6,
80:11, 127:15
**areyes**
122:3
**areyes-**
121:5
**arguing**
110:3
**argumentative**
110:15, 111:3,
116:10, 128:22
**arm**
64:16, 126:13,
127:17, 133:15
**army**
19:18, 19:19
**around**
27:1, 29:17,
84:24
**arrive**
103:2
**arrived**
15:15, 48:17,
62:4, 96:10,
99:1, 137:24,

138:7
**art**
19:20, 20:2,
20:8, 20:11
**arturo**
1:5
**as-is**
101:18
**ask**
7:18, 7:20,
8:1, 8:4, 17:7,
44:18, 46:5,
78:16, 78:20,
78:21, 88:9,
113:7, 121:13,
122:22, 123:15,
131:24
**asked**
12:11, 27:20,
30:10, 31:24,
69:15, 70:2,
76:10, 79:23,
81:16, 86:7,
89:1, 97:12,
98:7, 98:15,
104:12, 110:14,
110:22, 111:2,
113:23, 116:9,
117:2, 117:21,
120:13, 131:9,
136:2, 136:14,
144:2, 144:8,
145:24
**asking**
7:21, 12:7,
16:11, 23:23,
24:2, 78:6,
78:23, 84:4,
110:4, 136:19
**assigned**
23:8, 23:11,
30:24, 37:7,
37:8, 37:22,
39:4
**assignment**
22:1, 22:2,
22:4, 22:5,
44:3, 44:6,

Transcript of Mark Harvey
Conducted on April 30, 2019

151

45:19, 46:16,
88:13
**assignments**
37:3, 38:3,
88:14, 88:20
**assume**
8:6, 28:21,
138:8
**assumed**
43:13
**assuming**
107:12
**assumption**
42:11
**assumptions**
42:8
**attached**
5:9, 122:1,
129:15, 132:3,
137:6, 138:12,
139:10, 140:2,
141:14, 143:3
**attempt**
32:16
**attorney**
132:6
**attorney's**
4:12
**attorney-client**
17:4
**attorneys**
6:12, 9:1,
17:8, 91:4,
91:8, 91:11
**audio**
25:7, 50:16,
78:19, 148:6
**audits**
84:23
**auto**
23:9
**available**
58:12
**ave**
3:13
**aware**
60:2, 60:6
**away**
106:21

**axes**
41:22

**B**

**back**
25:7, 38:14,
50:15, 50:16,
69:18, 69:24,
70:1, 78:18,
78:19, 83:18,
84:7, 98:13,
103:17, 103:19,
103:22, 120:15
**background**
18:13, 118:21,
118:22
**backup**
57:13, 57:17,
57:20, 58:2
**backups**
57:4
**bad**
58:24, 59:1,
59:3, 59:11
**bags**
41:14, 41:15,
57:6, 84:5
**baker**
148:2, 148:17
**bank**
24:8
**based**
16:13, 16:14,
27:17, 27:23,
106:1, 106:10,
107:18, 107:24,
108:11, 115:20,
118:3, 122:18,
123:16, 123:18,
123:24, 124:16,
124:22
**basic**
128:1, 128:8
**basically**
13:6, 15:2,
52:19, 53:22,
54:8, 55:1, 57:7
**basis**
27:16, 98:4

**basket**
66:10, 76:3
**batch**
130:22
**bates**
121:21, 121:23,
129:16, 132:4,
132:8
**bathroom**
40:13
**became**
20:21, 20:23,
21:1, 21:13,
21:20, 30:13,
30:18
**because**
14:13, 23:10,
26:24, 28:5,
30:1, 43:22,
44:14, 45:20,
67:20, 68:12,
70:15, 77:18,
81:7, 83:11,
83:18, 95:24,
106:24, 112:21,
115:6, 121:7
**become**
22:7, 22:20,
66:20
**becoming**
23:4
**bedroom**
14:15, 15:1,
103:16, 103:18,
103:20, 103:23,
104:9, 104:11
**been**
22:22, 31:22,
47:7, 62:2,
78:5, 78:6,
78:23, 80:12,
81:9, 81:15,
102:5, 102:23,
108:1, 110:11,
112:7, 119:9,
134:14, 138:5
**before**
2:14, 7:3,

21:13, 33:11,
41:5, 45:11,
47:6, 47:8,
49:7, 59:7,
62:14, 62:24,
63:10, 64:21,
65:22, 90:18,
100:8, 101:3,
102:6, 114:2,
114:3, 115:4,
117:22, 122:4,
131:8, 138:9,
145:9, 147:2
**begin**
7:17
**beginning**
36:22, 43:7,
43:21, 44:1,
44:3, 44:10,
44:20, 46:1,
46:7, 46:13,
46:18, 46:21,
46:23, 47:6,
47:10, 78:8
**behalf**
3:2, 3:10,
3:17, 4:3, 4:10
**behind**
133:19, 140:7,
141:5, 141:9
**being**
6:4, 6:11,
14:11, 32:15,
35:24, 48:22,
76:12, 86:19,
86:20, 89:6,
100:13, 100:22,
105:3, 108:21,
111:23, 113:5,
116:13, 129:10,
135:24, 142:16,
143:13, 144:2
**belated**
50:3, 119:20
**beliefs**
120:14
**believe**
10:2, 15:7,

Transcript of Mark Harvey
Conducted on April 30, 2019                                              152

22:14, 25:10,
39:24, 40:22,
64:22, 67:12,
87:22, 88:13,
93:19, 94:5,
97:13, 116:6,
116:16, 116:23,
118:10, 119:11,
122:14, 126:9,
126:12, 127:16,
131:17, 132:7,
137:20, 143:23,
144:11, 146:3
**benadryl**
8:10
**berousek**
4:4, 11:1,
21:15, 21:18,
30:5, 30:10,
31:24, 32:19,
32:21, 34:23,
35:5, 36:10,
39:3, 46:2,
46:24, 47:17,
49:14, 49:18,
52:1, 53:21,
57:22, 58:4,
61:13, 66:22,
69:15, 71:9,
72:16, 73:7,
73:19, 76:16,
78:3, 79:6,
79:10, 80:9,
80:20, 81:16,
82:1, 82:12,
82:18, 83:3,
84:2, 84:20,
85:2, 85:7,
85:13, 85:19,
85:23, 86:3,
86:21, 100:18,
101:21, 102:21,
103:6, 105:19,
106:5, 107:12,
108:4, 108:6,
109:3, 110:6,
110:14, 110:22,
111:2, 112:19,

113:4, 113:10,
113:23, 114:11,
114:22, 116:9,
117:13, 125:9,
126:24, 127:22,
128:5, 129:21,
130:24, 131:9,
132:9, 134:10,
134:16, 134:22,
135:6, 136:23,
142:2, 142:18,
143:9, 144:19,
146:15
**besides**
30:8, 35:15,
77:22, 82:6,
98:1, 98:9
**best**
41:19, 148:5
**between**
13:7, 13:12,
13:13, 83:10,
128:24, 133:15,
138:17
**beyond**
14:2, 143:21
**biebel**
3:17, 93:9,
93:13, 93:16,
146:6
**bigger**
57:6
**biggest**
60:13
**bit**
12:6
**black**
122:16, 123:1,
123:23, 127:2,
127:6, 127:15,
128:13
**black-handled**
133:17, 133:20,
140:7
**blade**
133:19, 133:21
**blades**
71:3

**blanket**
134:8, 134:13,
134:21, 134:24,
135:3, 135:9
**bled**
135:1
**block**
141:20, 142:6,
142:9, 142:13,
143:22, 144:1,
144:3
**blood**
25:17, 25:19,
25:21, 25:23,
26:2, 26:3,
26:5, 26:7,
26:18, 26:24,
27:3, 27:7,
27:14, 27:17,
27:18, 27:23,
28:6, 28:7,
28:9, 28:10,
28:12, 28:13,
28:15, 28:17,
28:18, 28:21,
28:22, 28:23,
29:5, 29:8,
29:11, 29:15,
29:17, 29:19,
29:24, 30:4,
72:13, 72:19,
73:1, 74:7,
79:13, 125:16
**bloody**
127:16, 127:17,
134:8, 134:13,
134:20, 135:3,
135:9
**blvd**
3:20
**bodies**
61:22, 62:2,
63:17, 64:2,
64:5, 64:9,
99:14, 99:16
**bodily**
26:17

**body**
62:8, 62:9,
62:14, 63:13,
64:21, 72:7,
140:11, 141:3,
144:17, 144:21,
144:23
**bookstore**
19:20
**boots**
42:1
**borrow**
58:12
**both**
47:9, 60:7,
83:21, 86:11,
91:1, 119:16,
129:5, 129:8,
140:12, 140:15
**bottles**
82:21
**bottom**
135:14, 137:20,
138:23
**box**
131:12, 131:16,
133:19, 137:17,
139:18, 140:7,
141:5, 143:7,
143:14, 143:18,
143:20
**boxes**
41:24, 84:6
**bracket**
67:17
**break**
40:13, 40:15,
83:7, 98:14,
131:21
**bring**
57:4, 61:2
**broader**
23:19
**broken**
72:10, 111:19,
111:23, 112:1,
112:3, 112:4,
112:5, 112:6,

Transcript of Mark Harvey
Conducted on April 30, 2019

153

112:7, 112:12,
112:16, 112:22,
112:23, 113:3,
113:5, 113:14,
113:18, 113:21,
114:2, 114:9,
114:16, 114:20,
115:2
**brought**
61:6, 61:11,
61:17, 121:2
**bugs**
104:14
**building**
71:12, 81:1
**burglaries**
23:9
**busy**
38:14, 38:24
**busyness**
23:10
**butcher**
141:20, 142:6,
142:9, 142:13

**C**

**call**
22:1, 36:23,
37:12, 37:14,
37:17, 37:18,
37:19, 37:23,
38:1, 38:5,
38:10, 38:14,
38:18, 38:23,
39:1, 39:11,
39:14, 39:22,
42:15, 43:8,
43:11, 43:14,
44:4, 44:12,
45:3, 45:8,
47:7, 58:11,
69:24
**called**
47:3, 70:21,
144:9
**calls**
17:3, 38:2
**calm**
62:12

**came**
60:23, 111:5,
130:2
**camera**
46:6, 46:12,
47:2, 47:15,
57:8, 57:11,
58:12, 58:22,
58:23, 59:1,
59:2, 59:6,
59:11, 60:24,
66:10, 67:15,
67:16, 67:17,
77:19, 118:9,
119:14, 125:18,
126:17, 127:20,
130:14
**cameras**
41:12, 43:23,
44:24, 45:7,
45:10, 46:20,
60:23, 67:10,
67:22, 125:11
**can**
7:21, 9:24,
12:8, 12:15,
12:16, 14:20,
15:22, 17:11,
18:12, 23:6,
24:1, 24:19,
24:24, 25:3,
25:14, 25:18,
26:17, 28:16,
29:14, 29:20,
29:22, 29:23,
30:3, 30:7,
30:22, 33:8,
34:12, 35:2,
36:14, 36:17,
40:14, 41:20,
42:1, 42:12,
48:8, 50:14,
50:15, 51:13,
54:15, 55:8,
60:19, 61:4,
62:16, 62:18,
62:23, 63:15,
65:3, 68:14,

72:24, 73:9,
74:20, 78:4,
78:16, 79:14,
80:22, 81:2,
81:23, 82:5,
82:9, 82:10,
83:7, 100:9,
101:1, 101:8,
101:19, 101:24,
121:20, 121:23,
122:15, 123:14,
125:6, 125:15,
125:24, 126:10,
127:11, 127:16,
127:19, 128:9,
128:20, 129:1,
129:5, 129:6,
130:12, 131:7,
133:12, 135:8,
136:10, 136:21,
137:11, 139:13,
141:18
**can't**
29:6, 30:1,
48:21, 63:8,
69:13, 71:18,
101:10, 115:6,
118:14, 123:20
**cannot**
30:6, 30:12
**canon**
67:12
**capacity**
7:14
**cappitelli**
93:18, 93:20,
94:2
**capture**
75:6
**car**
37:7, 40:23,
40:24, 41:1,
56:3
**caralaw**
34:2, 94:6,
94:8, 94:12
**caralaw's**
94:18

**cardboard**
143:7, 143:13
**career**
82:6
**carney**
4:4, 11:1,
21:15, 30:5,
30:10, 31:24,
32:19, 32:21,
34:23, 35:5,
36:10, 39:3,
46:2, 46:24,
47:17, 49:14,
49:18, 52:1,
53:21, 57:22,
58:4, 61:13,
66:22, 69:15,
71:9, 72:16,
73:7, 73:19,
76:16, 78:1,
78:3, 79:6,
79:10, 80:9,
80:20, 81:16,
82:1, 82:12,
82:18, 83:3,
84:2, 84:20,
85:2, 85:7,
85:13, 85:19,
85:23, 86:3,
86:21, 100:18,
101:21, 102:21,
103:6, 105:19,
105:20, 106:5,
107:12, 108:4,
108:6, 109:3,
110:6, 110:14,
110:22, 111:2,
112:19, 113:4,
113:10, 113:23,
114:11, 114:22,
116:9, 117:13,
125:9, 126:24,
127:22, 128:5,
129:21, 130:24,
131:9, 132:9,
134:10, 134:16,
134:22, 135:6,
136:23, 142:2,

Transcript of Mark Harvey
Conducted on April 30, 2019

154

142:18, 143:9,
144:19, 146:15
**caroline**
3:18
**carry**
57:20, 60:21
**carrying**
58:2
**cars**
82:19
**cartridge**
56:1
**cary**
122:4
**case**
1:7, 18:2,
28:19, 49:4,
49:10, 60:23,
61:1, 87:20,
87:21, 90:23,
122:10, 139:6,
147:6, 148:9
**cases**
56:2
**cause**
13:17, 128:4
**caused**
15:17, 102:19,
119:6, 119:12,
120:15, 125:3,
127:20, 130:18
**causes**
125:8
**certain**
22:9, 26:15,
26:16, 53:15,
70:5, 79:15,
79:18, 100:14,
103:22, 103:24,
132:5
**certificate**
147:1, 148:1
**certified**
6:6
**certify**
147:3, 148:2
**cetera**
112:17

**chain**
50:22, 51:9,
51:15, 76:1,
76:5, 84:10,
84:12
**chance**
141:16
**change**
53:23, 68:15
**charge**
51:3, 51:4,
51:6, 51:8, 64:8
**check**
41:5, 42:2,
42:16, 43:10,
43:14, 43:20,
44:1, 44:2,
44:9, 44:11,
44:15, 45:7,
45:13, 46:19,
46:20, 47:13,
144:21, 145:1
**checked**
43:6, 43:17,
44:20, 44:23,
45:2, 45:7,
45:11, 45:20,
45:21, 46:6,
46:9, 46:22,
47:5, 47:7,
47:9, 59:7
**checking**
41:9, 41:12,
46:10, 46:11,
46:12, 47:2
**checklist**
53:24
**chevy**
40:22, 41:2
**chicago**
1:14, 2:8, 3:7,
3:14, 3:21, 4:3,
4:7, 4:15, 6:22,
6:24, 7:11,
10:21, 11:5,
11:13, 11:19,
12:1, 12:10,
12:20, 12:22,

13:3, 13:4,
17:18, 18:5,
19:21, 20:13,
26:4, 32:16,
34:20, 35:3,
36:3, 52:7,
67:6, 67:7,
76:14, 87:8,
87:13, 88:5,
88:8, 102:14
**children**
111:14
**choice**
27:23
**choose**
32:24
**choosing**
27:14, 134:20
**chose**
27:17, 28:5,
73:18
**circle**
127:15
**circumstance**
39:9, 56:16,
57:16, 63:22,
64:7, 72:24,
73:9, 73:17,
74:20, 80:21,
80:22, 81:6,
81:12, 100:9,
101:5, 105:10,
110:9, 110:24,
112:24, 129:7,
131:7, 134:19,
135:7, 135:8
**circumstances**
7:7, 29:20,
33:13, 56:5,
58:7, 61:24,
62:11, 62:16,
63:3, 63:8,
69:21, 83:6,
100:15, 100:21,
100:24, 101:19,
105:15, 106:19,
107:6, 109:5,
114:1, 115:1,

134:17
**citizen**
7:14
**city**
4:3, 13:10,
19:8, 19:9
**citywide**
37:9, 37:10
**clark**
4:6
**classes**
120:2, 120:4
**clear**
7:20, 46:16,
67:13, 110:5
**clearly**
16:1
**clock**
112:5, 112:6,
112:17
**close**
39:10, 70:18,
70:24, 71:1,
107:8, 114:16,
135:4
**closed**
40:4
**closer**
21:8
**clothes**
107:22, 107:23,
108:2
**coat**
115:18, 115:22,
116:2, 116:7,
116:12
**collect**
24:23, 27:17,
27:23, 28:5,
28:15, 28:18,
28:22, 29:5,
29:11, 29:15,
29:19, 29:24,
30:8, 42:22,
50:4, 50:12,
55:2, 56:3,
110:8, 134:5,
135:2

Transcript of Mark Harvey
Conducted on April 30, 2019

155

**collected**
26:2, 26:3,
26:5, 83:13,
84:1, 108:10,
108:16, 110:18,
112:8, 133:11,
134:2
**collecting**
25:21, 30:4,
77:15
**collection**
25:17, 25:19,
25:23, 26:7,
26:18, 27:14
**college**
18:15, 18:23,
18:24, 19:7,
19:11
**colleges**
19:8, 19:9
**come**
32:23, 37:19,
39:20, 55:21,
60:14, 94:20,
106:24
**comes**
96:13, 98:5,
99:17
**command**
50:23, 51:9
**committed**
50:11
**communication**
88:4
**communications**
17:4
**compared**
127:1
**complete**
66:15, 75:2
**completed**
146:8
**completely**
127:2
**completing**
42:24
**completion**
65:4

**compound**
112:9, 126:18
**concerning**
87:20
**concerns**
91:19, 91:22,
94:17, 94:20
**conclusion**
106:24
**condition**
98:24, 99:1
**conditions**
82:4
**conducted**
84:24, 133:9
**confusing**
44:6
**conjunction**
115:3
**connected**
67:21
**connelly**
4:5
**consider**
120:5
**considered**
23:4, 51:2,
51:4
**contacted**
97:7, 97:10,
97:15
**contained**
96:2
**containing**
25:22
**contaminated**
25:22, 100:22
**contamination**
77:6
**contents**
82:19
**continued**
63:17
**control**
85:5
**conversation**
16:11
**cook**
4:10, 4:12

**copies**
120:18, 120:19,
120:23
**copy**
129:12, 137:12,
138:16, 139:15,
140:6, 141:19,
143:6, 143:14
**cord**
60:15, 60:24,
67:21
**cords**
60:14
**corners**
115:12
**correct**
10:13, 18:3,
20:14, 20:15,
20:20, 21:14,
24:10, 24:11,
39:7, 43:6,
44:8, 44:21,
45:4, 45:17,
48:1, 52:14,
53:12, 59:8,
61:22, 76:8,
80:15, 83:12,
83:14, 83:19,
83:20, 83:22,
83:23, 84:14,
94:6, 102:19,
102:22, 103:5,
104:11, 124:6,
127:3, 127:6,
127:9, 127:17,
128:15, 128:18,
135:22, 137:15,
137:18, 138:8,
138:21, 139:24,
140:24, 141:3,
141:6, 143:23,
148:3
**couch**
133:14, 133:19,
140:8, 141:6,
141:9
**could**
6:16, 19:16,

20:16, 23:10,
24:14, 24:16,
25:5, 27:2,
31:4, 35:12,
38:7, 38:8,
38:9, 38:10,
41:1, 41:19,
42:18, 48:3,
55:21, 58:12,
59:5, 62:5,
65:8, 71:18,
72:23, 79:24,
80:11, 81:1,
81:9, 81:19,
98:11, 102:23,
109:8, 110:24,
111:7, 112:21,
112:23, 119:9,
128:3, 128:13,
128:14, 138:14,
142:11, 142:20,
143:4, 143:17,
144:5, 145:21
**couldn't**
19:1, 39:12
**counsel**
6:8, 146:6,
147:5, 148:7
**county**
4:10, 4:12,
19:8
**couple**
7:16, 14:9,
88:14, 120:3,
131:24
**course**
23:10, 56:20,
70:15, 71:22,
73:15, 91:5,
110:7
**court**
1:1, 17:21,
17:24, 119:1,
119:2
**coverage**
87:16, 87:19,
87:24
**covering**
75:9

Transcript of Mark Harvey
Conducted on April 30, 2019

156

| | | | |
|---|---|---|---|
| **cpd** | **date** | 88:12, 89:5, | 114:1, 114:24, |
| 96:23 | 21:1, 21:3, | 89:7, 89:19, | 115:1, 134:17, |
| **cr** | 66:1, 133:4, | 90:8, 92:5, | 135:7 |
| 35:6 | 137:20, 138:23, | 92:20, 93:7, | **depended** |
| **create** | 139:21 | 93:9, 93:13, | 29:12, 32:12, |
| 145:9 | **day** | 93:16, 93:18, | 105:8, 105:14, |
| **credit** | 9:19, 9:22, | 94:2, 146:6 | 107:14 |
| 18:15 | 10:1, 11:3, | **defendants** | **depending** |
| **crib** | 11:4, 11:11, | 1:10, 91:1 | 53:23, 68:15 |
| 111:17 | 37:7, 96:8, | **define** | **depends** |
| **crimes** | 147:10 | 100:23 | 30:1, 51:1, |
| 23:9, 24:7, | **days** | **deleon-reyes** | 83:5, 114:24 |
| 24:9, 26:11, | 11:24, 31:14, | 1:5 | **depict** |
| 29:4, 29:10, | 32:5, 32:10, | **demonstrate** | 75:5 |
| 31:7, 136:18 | 118:10 | 14:3 | **deposes** |
| **criminal** | **daytime** | **dennis** | 6:6 |
| 18:2 | 70:8, 70:13, | 90:8, 92:3 | **deposition** |
| **crowbars** | 70:16, 70:18 | **department** | 1:13, 2:1, |
| 41:22 | **dead** | 6:22, 6:24, | 5:10, 6:15, 7:2, |
| **crowd** | 15:14, 15:15, | 7:11, 7:14, | 7:8, 7:17, 8:23, |
| 62:13 | 62:8, 62:20 | 10:22, 11:5, | 9:11, 9:16, |
| **crowds** | **deal** | 11:10, 11:14, | 10:8, 13:17, |
| 62:12 | 29:5 | 11:19, 12:2, | 16:8, 16:21, |
| **crs** | **death** | 12:10, 12:21, | 17:6, 35:20, |
| 35:8 | 15:17 | 12:22, 13:3, | 118:1, 120:11, |
| **currently** | **decay** | 13:4, 17:19, | 121:3, 121:24, |
| 6:19, 17:18 | 104:14 | 18:6, 19:22, | 122:1, 129:14, |
| **cushion** | **deceased** | 20:14, 26:5, | 129:15, 132:2, |
| 133:15 | 16:1, 63:4, | 32:16, 34:22, | 132:3, 132:19, |
| **cushions** | 63:9 | 35:4, 36:3, | 137:5, 137:6, |
| 138:18 | **decide** | 52:7, 62:4, | 138:11, 138:12, |
| **custody** | 68:22 | 62:24, 63:4, | 139:9, 139:10, |
| 76:1, 76:5, | **decides** | 74:11, 76:15, | 140:1, 140:3, |
| 84:10, 84:12 | 68:1, 68:4, | 87:14, 88:6, | 141:13, 141:14, |
| **cutlery** | 68:19 | 88:8, 102:14, | 143:2, 143:3, |
| 143:19 | **deciding** | 120:1, 120:3, | 145:10, 147:3 |
| **cv** | 27:10 | 120:4 | **describe** |
| 1:8 | **decision** | **depend** | 51:10, 122:15, |
| | 64:8, 64:12 | 29:2, 29:7, | 125:15, 125:24, |
| **D** | **deem** | 55:20, 56:14, | 126:10 |
| **damaged** | 79:3, 82:22, | 63:14, 70:8, | **described** |
| 100:13 | 82:24 | 73:12, 80:21, | 53:19, 102:2, |
| **daniel** | **deemed** | 80:23, 81:6, | 135:16 |
| 92:5, 92:8, | 81:4, 83:2 | 81:12, 82:3, | **description** |
| 92:10, 92:13 | **defendant** | 99:24, 100:1, | 53:11, 54:19 |
| **dark** | 3:17, 4:3, | 100:6, 100:20, | **designation** |
| 118:20, 118:21, | 4:10, 17:13, | 101:4, 108:20, | 132:12 |
| 143:15 | 35:14, 35:24, | 109:4, 112:20, | **desk** |
| | | | 37:13, 37:14, |

Transcript of Mark Harvey
Conducted on April 30, 2019

157

37:19, 37:21,
38:4, 42:15,
43:3, 65:15,
97:13, 138:3,
139:1, 140:21
**destroyed**
100:23
**detail**
22:1, 22:3,
65:3, 65:9
**detective**
10:10, 38:2,
49:11, 51:24,
52:5, 56:17,
56:18, 64:11,
114:10, 141:21,
143:7
**detectives**
24:21, 42:18,
48:20, 49:4,
51:5, 52:3,
53:4, 56:11,
56:19, 56:21,
56:23, 56:24,
68:5, 86:24,
105:2, 107:16,
110:20, 114:5,
114:14, 114:18,
133:7
**determination**
75:1, 75:8,
108:19, 109:8,
111:8, 115:5
**determinations**
110:1, 110:7
**determine**
50:1, 50:10,
50:19, 114:4,
123:20
**determined**
109:11, 109:15,
109:20, 109:22,
110:11, 111:1,
133:24
**develop**
67:9, 76:4
**developed**
67:3, 67:5,

67:8
**diagram**
49:17, 49:21
**diagramming**
49:19
**dickinson**
89:7, 89:16
**didn't**
10:11, 10:16,
23:13, 26:23,
28:20, 32:22,
33:5, 33:14,
39:11, 43:20,
56:2, 60:9,
60:21, 68:9,
73:10, 74:22,
111:12, 116:8,
119:9, 120:17,
120:22, 142:1,
145:11, 146:12
**die**
62:5
**differed**
54:18
**difference**
13:7, 13:12,
13:13, 14:13,
24:1, 83:10
**different**
20:16, 22:19,
23:1, 26:16,
29:3, 55:6,
55:12, 55:17,
55:18, 55:21,
55:23, 70:12,
70:16, 75:14,
83:17, 120:14,
123:8, 127:21,
127:24, 128:4,
128:9, 130:18
**differently**
70:17
**direct**
51:18, 51:21
**disarray**
108:21, 111:4,
111:11
**disciplinary**
35:3

**discovered**
26:17, 131:18
**discuss**
90:23
**discussed**
17:5, 17:8,
82:11, 82:17,
123:13, 130:15
**discussions**
92:2
**dishelevement**
102:19
**disheveled**
99:3, 102:1,
102:13, 102:17,
103:3
**distinct**
83:15
**district**
1:1, 1:2,
20:22, 62:13,
90:18
**districts**
20:17, 20:18
**disturbed**
77:24
**division**
1:3
**document**
9:6, 24:22,
28:2, 74:19,
96:1, 96:14,
132:16, 133:1,
135:24, 136:13,
137:11, 138:15,
139:4, 139:13,
139:19, 141:18,
142:11, 142:20,
143:5, 144:5
**documenting**
101:14
**documents**
9:11, 9:15,
10:14, 10:16,
11:9, 11:12,
12:1, 13:23,
14:2, 14:18,
16:7, 16:14,

27:24, 42:9,
52:8, 86:6,
86:8, 89:4,
89:13, 89:15,
90:1, 92:16,
93:6, 93:15,
94:1, 95:6,
95:19, 97:3,
98:9, 99:8,
102:7, 107:19,
107:24, 115:20,
116:1, 129:19,
131:24, 132:18,
136:10, 137:3,
140:5, 140:23,
143:17, 145:21
**does**
14:1, 24:17,
31:16, 32:5,
39:20, 68:14,
68:22, 70:7,
70:24, 76:19,
86:10, 96:4,
113:5, 122:7,
123:8, 123:22,
129:7, 130:6,
133:1, 133:8,
133:23, 135:24,
136:5, 141:8
**doing**
38:8, 95:2,
95:15, 101:13
**done**
43:3, 43:5,
65:14, 68:12,
76:2, 76:14,
101:13, 115:3,
115:4, 146:13
**door**
106:22, 107:8,
108:2, 108:12,
108:24, 110:11
**down**
13:10, 15:7,
33:3, 44:14,
45:12, 62:13,
70:18, 70:24,
71:1, 94:10,

Transcript of Mark Harvey
Conducted on April 30, 2019

158

106:22
**downstairs**
45:13
**draw**
49:22
**drawer**
73:15
**drop**
66:10, 76:3
**duly**
6:4
**dupage**
19:8, 19:11
**during**
23:24, 26:19,
32:17, 43:18,
66:3
**duties**
23:6, 24:4,
24:12

**E**

**each**
29:3, 31:19,
36:22, 121:20
**earlier**
27:20, 130:7
**east**
133:14, 133:16,
133:20, 140:8,
141:6
**eastern**
1:3
**edge**
123:23
**editing**
76:13
**education**
18:19, 19:15,
35:1
**educational**
18:13
**edward**
92:20
**edwin**
89:7, 89:16
**either**
16:19, 58:24,

62:5, 86:15,
103:4, 104:15,
119:13, 119:17,
119:18
**electronically**
147:4
**elevations**
75:14
**else**
15:3, 15:8,
16:15, 26:2,
29:18, 37:19,
71:19, 72:9,
74:1, 81:23,
91:22, 99:15,
103:19, 104:24,
139:4, 146:13,
146:14
**else's**
142:15, 142:23,
144:7
**emits**
26:15
**employed**
147:6, 148:8
**employment**
6:21, 19:17,
35:2
**empty**
143:6, 143:13,
143:18
**en**
62:5
**end**
38:17, 39:1,
39:10, 39:13,
66:7, 76:19
**ended**
40:1, 76:7
**ends**
41:24
**enough**
112:11, 125:11,
142:16, 143:15
**ensure**
75:4, 77:23
**entail**
24:15, 24:17

**entailed**
24:7
**entered**
71:21
**entire**
18:18, 65:19,
65:20
**entirety**
17:6, 77:8,
133:8, 133:23
**entry**
79:21, 80:4,
104:22, 107:3,
107:9
**entryway**
104:18
**envelopes**
41:14, 41:24,
57:6
**equally**
47:24
**equals**
117:7
**equipment**
40:16, 40:18,
41:5, 41:10,
41:16, 41:18,
42:2, 42:16,
43:7, 43:10,
43:14, 43:20,
44:3, 44:10,
44:11, 44:12,
44:16, 44:20,
45:3, 45:13,
45:20, 45:22,
46:4, 48:11,
57:2, 57:3,
57:6, 58:7,
58:13, 58:14,
58:18, 58:20
**ernest**
88:12
**err**
74:13
**especially**
43:22
**esquire**
3:3, 3:11,

3:18, 4:4
**estimate**
32:10
**et**
1:8, 22:1,
23:4, 112:17
**events**
136:6
**eventually**
32:23
**ever**
7:2, 7:10,
7:13, 17:21,
18:5, 33:3,
35:14, 36:2,
38:2, 39:9,
40:23, 46:12,
48:6, 49:10,
49:16, 49:19,
51:23, 52:4,
52:16, 53:5,
54:17, 55:16,
55:22, 56:6,
57:16, 60:8,
67:3, 69:18,
70:2, 70:12,
73:9, 75:11,
76:13, 84:8,
87:12, 88:4,
88:9, 91:13,
91:16, 91:19,
91:22, 91:24,
92:2, 92:10,
92:13, 94:11,
94:14, 94:17,
94:20, 118:23,
120:2, 131:8
**every**
40:18, 43:10,
48:10, 120:18,
120:23
**everybody**
32:23
**everyone**
132:11
**everything**
40:5, 40:8,
42:6, 47:23,

Transcript of Mark Harvey
Conducted on April 30, 2019

159

73:22

**evidence**
20:22, 21:24,
22:8, 22:22,
23:7, 23:8,
23:13, 23:21,
24:23, 25:11,
26:3, 42:22,
42:23, 43:1,
43:4, 50:1,
50:5, 50:8,
50:10, 50:13,
50:19, 50:20,
55:2, 61:10,
61:15, 61:16,
65:7, 65:11,
65:13, 65:15,
66:20, 71:15,
72:4, 73:8,
74:12, 74:22,
75:17, 75:20,
77:7, 77:15,
77:23, 79:8,
79:12, 79:14,
79:16, 79:18,
79:21, 80:3,
80:6, 80:14,
80:17, 81:14,
82:24, 83:10,
83:11, 83:12,
84:1, 84:11,
90:13, 100:13,
100:22, 101:1,
101:14, 104:14,
107:13, 108:10,
109:17, 110:1,
110:8, 110:13,
111:14, 113:6,
117:12, 131:2,
131:8, 133:24,
134:7, 135:16,
135:20

**exact**
32:12, 40:3

**exactly**
10:11, 31:14,
47:5

**examination**
5:3, 6:8, 146:6

**example**
25:16, 29:18,
36:9, 56:1,
73:13, 100:10,
100:24, 134:19,
135:8, 135:9

**examples**
29:14, 29:20,
29:23, 30:3,
63:15, 82:10,
82:16, 82:22,
101:8

**except**
101:19, 103:16,
120:24

**exception**
78:24

**exclusive**
119:15

**excuse**
6:11

**exhaustive**
41:19

**exhibit**
5:11, 5:12,
5:13, 5:14,
5:15, 5:16,
5:17, 5:18,
5:19, 5:20,
121:20, 121:24,
129:11, 129:14,
130:6, 132:1,
132:2, 137:5,
137:8, 138:11,
138:14, 139:9,
139:12, 141:12,
141:13, 143:2

**exhibits**
5:10, 140:1,
140:4

**exist**
86:9

**existed**
58:6, 127:20

**exists**
24:1

**expected**
71:16

**experience**
122:18, 123:24,
124:16, 124:22

**expert**
128:7, 128:23

**explain**
27:2, 31:4,
42:12, 53:10,
65:3, 80:22,
127:19, 128:3,
128:20

**explained**
23:24

**explanation**
108:11, 124:3

**express**
91:22

**extent**
17:4

**external**
108:23

**extra**
60:24, 61:6

**eyes**
60:7

---
**F**
---

**face**
15:7

**fact**
15:24, 28:7,
28:20, 104:10

**facts**
107:12

**failed**
58:10, 134:5

**failure**
58:7, 58:14,
58:18, 58:21

**fair**
78:7, 112:11,
112:13, 142:16

**fall**
21:8, 21:13

**familiar**
34:21, 49:5,
49:7, 86:16,
88:21, 122:8,

122:24, 123:9,
125:13, 126:4,
129:19, 132:15

**far**
10:13, 54:12,
71:3, 117:16

**fbi**
85:22

**fell**
135:1

**female**
14:14, 103:17,
104:9, 104:10

**few**
118:10

**field**
20:21

**file**
36:2

**fill**
52:19, 53:5,
65:13, 98:19

**filled**
52:23, 68:17,
98:17

**filling**
52:21

**film**
41:14, 60:24,
66:9, 67:9,
69:1, 70:7,
70:10, 76:1,
76:4, 76:9,
76:12, 76:19,
76:24, 126:17,
130:1

**financial**
147:7, 148:9

**find**
64:13, 131:2,
131:12

**finding**
64:17, 106:13,
107:22

**fine**
95:2

**finish**
33:7, 33:9,

**finished**
38:13, 40:4,
40:8, 40:9,
101:7
**finishing**
20:19, 38:9,
40:11
**fire**
62:3, 62:4,
62:23, 63:4
**firm**
3:19
**first**
6:4, 19:11,
31:13, 43:12,
56:12, 56:18,
56:24, 74:11,
77:12, 93:19,
133:13, 140:6
**five**
120:23, 131:20
**flash**
57:11, 57:13,
57:17, 57:20,
58:2, 58:24,
59:13, 59:20,
59:23, 60:1,
60:9, 60:18,
60:22, 60:24,
61:3, 61:11,
61:17, 67:14,
67:16, 67:18,
67:19, 67:20,
70:8, 70:11,
70:19, 70:20,
116:21, 119:13,
122:21, 123:7,
124:4, 125:1,
125:7, 125:23,
126:3, 126:19,
128:1, 129:1,
129:3
**flashes**
61:6
**flashlights**
41:12
**floor**
2:7, 3:6,

33:14

14:15, 15:2,
15:6, 15:9,
16:1, 113:13,
113:17, 125:16,
133:17, 133:22
**fluids**
26:17
**follow**
11:5, 12:1,
13:11, 53:8
**followed**
10:21, 11:10,
11:16, 12:4,
12:5, 12:8,
12:9, 12:18
**follows**
6:7
**fop**
36:6, 36:8
**forced**
79:21, 80:4,
107:9
**foregoing**
147:3, 148:3
**forensic**
7:1, 20:23,
21:2, 21:9,
21:14, 21:20,
22:3, 22:20,
23:1, 23:21,
24:5, 24:6,
24:10, 25:8,
25:11, 25:24,
30:14, 30:18,
30:23, 31:6,
31:12, 32:3,
32:7, 33:14,
33:17, 34:3,
34:9, 36:13,
36:16, 36:19,
37:3, 41:4,
42:12, 47:16,
48:5, 48:9,
48:14, 49:12,
49:16, 49:24,
50:4, 50:7,
50:12, 50:18,
51:8, 52:8,

52:16, 54:1,
54:11, 55:13,
57:19, 61:5,
61:16, 62:1,
63:12, 65:17,
65:20, 67:11,
67:23, 69:18,
75:15, 77:2,
81:4, 83:21,
84:18, 85:12,
85:17, 86:10,
86:14, 90:13,
90:15, 101:17,
113:1
**forgive**
70:21
**forms**
52:8, 52:12,
79:12
**found**
29:8, 29:9,
64:20, 69:23,
71:24, 72:7,
72:14, 101:20,
103:17, 103:18,
106:13, 106:21,
107:3, 108:12,
113:16, 126:12,
131:15, 131:17,
135:3, 135:22,
137:17, 138:17,
138:19, 139:17,
140:7, 140:10,
140:24, 141:5,
141:9
**foundation**
10:24, 11:6,
12:12, 13:14,
48:2, 49:13,
54:14, 55:14,
57:23, 59:4,
61:8, 61:13,
61:19, 72:1,
72:5, 72:16,
76:17, 76:21,
79:11, 84:21,
85:3, 85:8,
85:14, 85:20,

85:24, 86:4,
100:17, 102:15,
102:20, 103:12,
106:6, 108:6,
111:22, 113:4,
117:14, 125:5,
125:10, 125:20,
126:23, 127:23,
128:6, 128:11,
128:21, 129:22,
130:8, 134:11,
140:18, 141:23,
142:3, 143:10,
144:20, 144:24
**four**
12:12, 32:5,
120:23, 136:16
**four-corner**
115:11
**frame**
68:19, 117:9,
123:1, 123:23,
124:17, 125:17,
128:13, 128:14
**frames**
118:6
**free**
77:18
**frequencies**
26:16
**frequent**
60:16
**frequently**
32:20, 32:22,
47:12, 94:8
**from**
9:3, 13:23,
15:18, 16:20,
18:14, 18:16,
18:21, 23:21,
29:5, 29:11,
34:11, 34:16,
37:12, 37:14,
37:19, 38:1,
38:2, 39:20,
39:21, 42:15,
42:21, 45:16,
51:15, 51:24,

Transcript of Mark Harvey
Conducted on April 30, 2019

161

52:2, 52:4,
54:19, 59:15,
64:9, 64:19,
66:9, 68:4,
70:6, 74:11,
76:11, 80:3,
86:19, 86:23,
87:12, 87:23,
92:13, 93:8,
96:10, 96:13,
98:5, 98:13,
99:17, 102:4,
104:3, 106:1,
106:21, 107:7,
107:16, 111:5,
113:15, 114:8,
114:14, 114:18,
114:19, 115:11,
118:13, 119:24,
120:8, 121:2,
122:12, 132:24,
135:14, 148:6

**front**
71:12, 110:10,
135:24, 136:20

**fto**
30:13

**furniture**
72:10, 111:24,
112:1, 112:17,
113:21, 114:2,
114:9, 114:16,
114:20, 115:2,
115:7

**further**
15:21, 90:19,
95:10, 103:8,
146:10

**furthermore**
8:4

**fusco**
4:5

**G**

**gabriel**
3:10

**garcia**
14:12

**gather**
62:12, 131:8

**gathered**
83:10, 83:11,
83:13

**gave**
9:1, 41:17,
53:11, 74:5,
124:19, 127:3,
127:5, 127:8,
127:14

**general**
60:4, 78:12,
79:19, 95:16

**generalization**
29:12

**generalize**
30:1

**generally**
8:14, 28:22,
29:10, 29:24,
31:17, 34:21,
37:18, 52:18,
54:10, 56:23,
64:10, 65:5,
80:5, 83:16,
87:5, 99:23,
100:4, 101:12,
109:24, 121:6

**get**
17:11, 24:20,
37:24, 38:2,
38:10, 38:14,
38:17, 38:23,
56:2, 80:3,
84:7, 97:19,
103:8, 109:7,
115:6, 125:6,
129:1, 144:15

**gets**
83:13

**getting**
19:19, 41:11,
62:21

**give**
7:10, 7:13,
7:19, 16:19,
18:12, 19:16,

23:6, 24:16,
29:14, 29:23,
30:3, 41:19,
61:24, 65:8,
69:21, 114:6,
131:5, 132:10,
132:11, 134:19,
135:8, 139:11,
142:11

**given**
7:2, 22:17,
37:3, 70:10,
126:21

**gives**
139:5

**giving**
7:8

**glass**
72:10, 113:8,
113:12, 113:14,
113:16, 113:18,
133:16, 139:16

**glasses**
34:17, 34:18,
82:21

**gleaned**
132:24

**gloves**
77:3, 77:5,
77:8, 77:11,
77:13, 77:14,
77:16, 77:20,
77:21, 77:22

**glow**
122:17

**go**
7:16, 10:14,
14:2, 18:18,
19:6, 19:11,
22:16, 24:18,
36:9, 38:5,
39:2, 39:11,
42:17, 43:24,
45:14, 47:3,
55:8, 57:20,
58:2, 59:16,
60:9, 61:21,
65:12, 66:17,

69:18, 70:1,
71:8, 82:15,
97:8, 97:10,
97:15, 115:1,
115:10, 121:9,
144:9

**goes**
76:22

**going**
7:16, 8:5,
17:7, 21:24,
28:19, 39:7,
42:19, 46:2,
48:14, 51:15,
59:13, 59:18,
59:20, 59:23,
60:1, 62:1,
119:20, 121:6,
121:15, 121:17,
122:22, 128:14,
129:10, 131:20,
132:1, 132:10,
137:7, 138:13,
139:11, 140:4,
141:11

**good**
6:10, 60:8,
62:7

**got**
39:1, 39:10,
39:14, 39:22,
43:8, 43:11,
43:14, 44:4,
44:12, 45:3,
45:8, 45:11,
45:12, 45:19,
47:3, 62:14,
62:24, 63:4,
63:10, 74:11,
94:10, 96:9,
98:13, 107:16,
109:5, 109:18,
110:16, 110:19,
112:21, 114:3,
114:14, 119:24

**gotten**
38:21, 109:23

**gpr**
53:3, 53:5

Transcript of Mark Harvey
Conducted on April 30, 2019

162

grab
43:24
graduate
18:16, 18:21
graduated
18:14
great
29:4, 70:22
green
113:16, 127:9,
127:11
green-ish
139:16
greenish
133:16
grievances
36:2
ground
7:16, 110:10,
128:15
group
31:6, 31:9,
121:22, 122:3,
129:11
guess
18:1
guevara
1:8, 49:1,
49:3, 49:5,
86:18, 87:17,
88:6, 88:10,
89:2
guidelines
36:18
gunshot
25:16, 41:23

**H**

h-a-r-v-e-y
6:18
had
10:14, 11:19,
16:12, 18:14,
18:23, 20:17,
22:9, 22:10,
22:15, 22:18,
22:21, 32:13,
32:14, 33:6,

33:7, 33:9,
33:11, 34:10,
38:21, 41:1,
41:13, 41:18,
41:21, 41:22,
41:23, 41:24,
43:17, 45:7,
45:20, 57:17,
58:7, 58:17,
58:21, 60:13,
62:2, 88:14,
88:19, 102:5,
105:15, 105:17,
108:1, 108:7,
109:23, 112:7,
112:14, 141:16
hair
79:13
half
20:12
halvorsen
88:12, 89:5,
141:21, 143:7
hand
52:20, 124:12,
147:10
handbook
86:12
handful
120:24
handle
77:18
handled
24:6, 24:10
hands
77:18
hanger
108:2, 108:22,
108:23, 109:15,
110:10, 111:5,
111:12, 111:13,
115:18, 115:22,
116:2, 116:7,
116:13
hangers
107:22, 107:23
happen
38:23, 47:12,

63:1, 118:16
happened
60:17, 63:2,
63:20, 98:5,
102:23, 105:17,
107:15, 145:23
happens
125:12, 128:20
happy
11:23
hard
82:13
harold
19:10, 19:13
harvey
1:13, 2:1, 5:3,
5:10, 6:3, 6:10,
6:18, 6:19, 7:2,
8:22, 9:10,
17:16, 18:12,
83:9, 121:12,
121:22, 121:24,
122:2, 129:14,
129:16, 129:18,
131:23, 132:2,
132:14, 137:5,
138:11, 138:15,
139:9, 139:13,
140:1, 141:13,
143:2
has
63:2, 63:20,
89:23, 91:24,
95:9, 95:11,
108:22
haven't
82:11, 82:17
having
58:14, 60:9,
96:16, 129:5,
129:6
he's
12:12, 46:15,
51:2, 89:17,
92:18, 136:16,
136:17, 137:1
head
42:24

hear
87:12, 91:16,
92:13, 94:14
height
14:14
held
2:1, 67:20
help
15:20, 25:6,
30:20, 50:11,
69:10, 69:13,
89:15, 89:18,
90:1, 94:1,
95:20, 99:8,
102:7, 104:21,
141:8, 142:12,
143:18, 144:6
helped
64:24
hemostat
25:20
her
15:2, 15:8,
15:17
here
6:13, 17:1,
17:10, 78:6,
115:17, 121:5,
125:17, 132:13,
141:15
hereby
147:3, 148:2
herein
6:6
hereunto
147:9
high
18:14, 18:16,
18:19, 18:21,
19:18
highest-ranking
51:16
him
49:7, 65:1,
86:20, 87:2,
88:14, 88:15,
88:17, 88:19,
88:22, 89:6,

Transcript of Mark Harvey
Conducted on April 30, 2019

163

89:8, 89:11,
89:13, 89:20,
90:16, 90:17,
90:20, 90:21,
90:23, 91:7,
91:10, 91:24,
92:21, 93:10,
93:20, 93:23,
94:23, 95:1,
110:3, 110:4,
123:15, 136:19,
136:21
**his**
13:8, 21:16,
38:19, 73:20,
86:22, 87:5,
87:7, 87:10,
91:13, 91:23,
93:19, 94:21,
95:2, 100:19,
103:7, 114:12,
114:22, 120:19,
123:14, 123:15,
132:9, 136:16,
136:17
**history**
19:17, 35:2,
35:3
**hoarse**
6:11
**hold**
60:15, 67:18
**holder**
141:20
**homan**
65:24, 66:1,
66:3
**home**
103:5, 104:19,
108:24, 111:15
**homicide**
14:1, 61:22
**hospital**
62:5, 62:6,
62:14
**hour**
32:4
**hours**
18:15, 19:1,

32:2, 32:4,
141:24
**house**
71:12, 73:14,
103:9, 103:10,
115:2
**how**
7:5, 9:21,
9:24, 15:5,
18:6, 18:10,
18:23, 20:10,
32:2, 32:10,
35:7, 35:8,
37:3, 60:6,
68:11, 68:19,
68:22, 69:7,
69:8, 69:14,
71:3, 71:20,
76:9, 76:24,
88:19, 90:11,
97:19, 103:22,
104:1, 109:13,
114:4, 116:24,
117:4, 117:6,
118:3, 118:12,
118:14, 124:11,
127:19, 128:3,
128:20
**however**
7:20, 59:19,
83:15, 100:23
**hue**
127:8
**huh-uhs**
7:19
**hundred**
18:1
**hypothetical**
72:17, 72:22,
73:6, 78:2,
80:7, 80:8,
80:19, 83:4,
84:3, 100:19,
101:22, 105:7,
109:10, 112:19,
113:11, 134:23
**hypothetically**
114:7

**I**

**i'll**
6:15, 7:19,
7:24, 10:19,
23:18, 46:5,
78:21, 132:11,
137:7, 139:11
**i've**
78:23, 82:13,
82:19, 82:21,
90:17, 90:21,
108:11, 112:14,
122:9, 126:21
**idea**
122:19
**identification**
122:1, 129:15,
132:3, 137:6,
138:12, 139:10,
140:2, 141:14,
143:3
**identified**
112:16, 113:2,
134:4
**identify**
71:10, 79:15,
84:11, 121:20,
123:21, 134:6,
138:14, 139:13
**illinois**
1:2, 1:14, 2:8,
2:15, 3:7, 3:14,
3:21, 4:7, 4:15,
147:16
**imagery**
127:12
**images**
118:20
**important**
47:15, 47:18,
47:19, 47:21,
47:23, 47:24,
145:6
**improper**
100:16
**inch**
133:19, 133:21

**inches**
133:18, 133:20
**incident**
9:20, 9:22,
10:1, 11:2,
11:4, 12:19,
17:12, 27:4,
29:3, 68:15,
71:11, 74:24,
82:4, 83:5,
83:6, 114:3,
115:3, 134:18
**include**
96:4, 133:8
**incomplete**
72:21, 73:6,
78:1, 80:7,
80:19, 83:4,
84:2, 100:18,
101:22, 109:9,
113:10, 134:23
**independent**
13:22, 14:7,
14:17, 16:2,
16:6, 16:13,
27:6, 27:9,
27:12, 27:13,
27:21, 28:19,
39:17, 59:19,
59:22, 64:4,
87:1, 87:4,
88:16, 89:10,
89:22, 90:19,
92:7, 92:23,
93:12, 93:22,
95:7, 95:10,
95:14, 98:2,
99:5, 99:19,
106:2, 106:11,
107:19, 108:1,
117:18, 136:4
**independently**
15:4, 15:18,
16:22, 37:16,
42:9, 64:17,
104:11, 105:21,
105:22
**indicate**
72:7, 102:2,

Transcript of Mark Harvey
Conducted on April 30, 2019

164

102:12
**indicated**
72:9, 102:5,
138:20
**indicates**
102:18, 115:21,
125:18, 138:24,
139:18
**indicating**
103:11
**indication**
59:10, 103:3
**individual**
63:9
**industry**
84:19
**information**
96:1, 104:4,
105:9, 107:16,
109:5, 109:7,
109:18, 109:23,
112:20, 114:5,
114:14, 114:18,
115:7, 118:12,
132:24, 136:6,
136:12, 145:13,
148:7
**inhibit**
8:9, 8:11, 8:15
**initial**
93:19
**inside**
62:20
**instance**
120:10
**institute**
19:21, 20:2,
20:8, 20:11
**integrity**
84:1, 91:20,
91:23, 94:18,
94:21, 145:5
**interest**
147:7, 148:9
**internal**
84:23
**interrogatory**
35:17

**interrupt**
7:24
**into**
24:24, 42:24,
65:12, 115:2,
115:10, 146:9
**inventoried**
25:1, 43:1,
82:6, 82:13,
82:17, 82:19,
82:21, 83:13,
83:18, 109:17,
110:13, 133:6,
133:12, 134:1,
134:6, 134:15,
137:24, 139:16,
141:20, 141:21,
141:22, 143:7
**inventories**
43:2
**inventory**
5:14, 5:15,
5:16, 5:17,
5:18, 5:19,
5:20, 9:17,
28:7, 28:9,
52:11, 55:3,
65:7, 65:13,
66:11, 73:23,
79:3, 80:1,
80:2, 80:13,
80:15, 80:17,
81:3, 81:10,
81:15, 81:19,
81:20, 81:24,
83:10, 83:11,
84:7, 98:20,
98:21, 116:8,
133:9, 133:23,
134:20, 135:5,
135:11, 136:17,
137:1, 137:12,
137:14, 138:16,
139:15, 140:6,
140:12, 141:19,
142:1, 142:4,
143:6, 143:8,
143:12, 145:8

**investigation**
13:18, 14:2,
14:8, 14:21,
16:3, 16:6,
16:16, 21:10,
26:19, 33:23,
37:15, 42:3,
43:15, 45:23,
46:8, 47:4,
48:18, 58:15,
64:2, 64:14,
65:4, 66:4,
66:7, 66:13,
79:13, 95:5,
96:5, 113:1,
115:14, 130:11,
136:7, 145:6,
146:10, 146:11
**investigative**
66:20, 85:11,
88:10
**investigator**
7:1, 20:23,
21:2, 21:9,
21:14, 21:21,
22:3, 22:20,
23:2, 23:21,
24:5, 25:9,
25:24, 30:14,
30:18, 31:12,
32:3, 32:8,
33:14, 33:17,
34:4, 34:9,
41:5, 42:13,
47:16, 48:5,
48:9, 48:14,
49:12, 49:16,
49:24, 50:4,
50:7, 50:12,
50:18, 52:9,
52:16, 54:1,
62:1, 63:12,
65:17, 65:21,
67:11, 67:23,
75:15, 77:2,
81:4, 83:21,
90:14, 90:15,
101:17, 113:2

**investigators**
24:6, 24:10,
25:11, 30:24,
31:6, 36:13,
36:16, 36:19,
37:4, 51:8,
54:11, 55:13,
57:19, 61:6,
61:17, 69:18
**involve**
29:4, 41:10
**involved**
38:8, 87:13,
91:16, 92:14,
94:14, 103:5,
105:16, 107:1,
108:8, 108:15,
108:18, 109:6,
109:11, 109:13,
109:14, 109:16,
110:12, 111:6
**involvement**
66:24
**involves**
61:21
**involving**
90:21
**isn't**
145:15
**issue**
125:1
**issues**
8:14
**it's**
7:9, 12:24,
23:18, 25:1,
26:15, 29:9,
31:6, 31:10,
34:13, 42:11,
43:22, 47:11,
47:18, 47:19,
53:4, 66:16,
68:12, 82:20,
90:3, 94:3,
95:16, 95:21,
95:23, 96:21,
101:6, 103:8,

Transcript of Mark Harvey
Conducted on April 30, 2019

165

106:8, 122:16,
123:4, 127:24,
134:6, 136:20,
138:16, 139:15,
141:19, 143:6
**item**
74:21, 143:8
**items**
100:10, 112:16,
133:12
**its**
147:7, 148:10

**J**

**jackson**
3:20
**jar**
112:3, 112:4,
112:17
**job**
1:22, 22:10,
22:21, 24:13,
32:13, 33:1,
33:2, 33:6,
33:7, 33:9,
33:15, 37:22,
38:15, 38:22,
39:2, 39:4,
39:6, 49:24,
50:7, 50:12,
65:9, 66:17,
95:3, 101:13,
101:24
**jobs**
23:11
**john**
3:11, 6:13,
34:2, 94:6
**join**
10:19
**joined**
19:21, 20:13
**juan**
1:24, 2:14,
147:2, 147:15
**jumbled**
56:7
**june**
19:22, 19:23

**just**
12:6, 14:9,
17:8, 19:3,
23:16, 23:24,
31:8, 33:1,
37:6, 40:14,
41:17, 43:23,
47:6, 54:8,
56:14, 56:19,
56:22, 57:7,
60:4, 61:1,
66:20, 67:13,
74:5, 78:20,
82:16, 86:7,
86:19, 93:1,
98:13, 102:23,
103:5, 103:8,
108:11, 110:5,
112:15, 114:8,
116:7, 120:20,
120:22, 121:6,
121:23, 123:1,
123:18, 124:19,
125:24, 128:23,
132:12, 134:24,
144:14

**K**

**keep**
12:7, 12:8,
52:17, 136:18
**keeping**
84:6
**kept**
45:10
**keys**
105:3, 105:6,
105:11, 105:12,
105:23, 105:24,
106:3, 106:7,
106:8
**kidding**
112:15
**kill**
81:2
**kind**
19:16, 22:6,
25:3, 32:15,

40:16, 40:20,
53:7, 53:24,
58:6, 58:20,
61:24, 67:10,
69:1, 69:21,
71:7, 77:20,
79:8, 94:15,
113:8, 133:5
**kinds**
67:22
**kit**
25:16, 26:18
**kitchen**
133:17, 133:22,
140:11
**kits**
41:23
**knew**
48:23, 73:13
**knife**
64:13, 64:15,
64:18, 64:20,
126:12, 127:16,
133:18, 133:20,
140:7, 140:10,
141:9, 141:20
**knives**
73:14, 73:18,
131:12, 131:15,
131:18, 140:24,
141:2, 142:7,
142:17, 142:22
**knowledge**
27:22, 39:20,
64:4, 68:16,
70:22, 76:11,
95:7, 103:8,
105:15, 105:18,
107:15, 107:18,
107:20, 108:7,
110:16, 110:19,
125:11
**known**
90:17
**kodak**
69:3, 69:4,
70:10
**krochs**
19:20, 20:1,

20:4, 20:6

**L**

**lab**
20:24, 23:12,
23:14, 25:2,
31:2, 31:3,
31:8, 85:1,
86:10, 86:15,
90:12, 90:18,
94:10, 118:13
**labeled**
143:14, 143:18
**ladders**
41:21
**large**
24:7
**last**
6:21, 12:16,
25:3, 25:4,
34:12, 120:21
**later**
70:1, 131:17
**latex**
77:21
**law**
3:12, 3:19
**lawful**
6:4
**lawsuit**
35:15, 35:24,
91:2
**lawyers**
16:10, 16:12
**layman's**
130:4
**layout**
24:20, 103:14
**learn**
87:23, 118:8,
118:12, 118:17
**learned**
16:14, 16:20,
118:14
**learning**
25:10
**least**
102:17

Transcript of Mark Harvey
Conducted on April 30, 2019

166

leave
38:22, 101:12,
101:18
leavitt
97:24
led
7:7
left
6:13, 33:12,
69:23, 71:14,
71:15, 84:8,
106:23, 122:16,
124:13, 138:6,
138:8
length
100:14, 133:18,
133:21
lens
70:18, 70:20,
70:24, 71:2
less
35:10, 70:19,
74:14
let
7:21, 12:6,
23:18, 40:14,
44:18, 113:7,
120:22
let's
54:18, 56:6,
56:7, 57:5,
121:9
lieutenant
51:3
light
25:17, 26:12,
26:15, 68:23,
70:15, 96:11,
118:20, 127:6
like
7:14, 22:15,
22:23, 24:8,
25:20, 56:5,
56:8, 63:21,
72:9, 74:14,
74:24, 112:17,
120:20, 122:15,
123:22, 125:15,

125:16, 126:1,
126:11, 128:8,
129:1
limit
32:16
limited
82:20
line
98:12, 122:23,
135:15, 135:17
lines
135:14
lisa
148:2, 148:17
list
41:17, 41:19,
57:2, 74:5,
74:6, 131:6,
134:2
listed
86:24, 92:18,
93:1, 93:17,
94:3, 95:21,
95:23, 96:21,
97:5, 97:23,
108:11, 117:19,
135:17
listing
143:6
little
6:11, 12:6,
19:5, 19:6,
28:17, 65:3,
70:20
lived
111:15
llc
4:5
located
38:6, 142:7
location
28:13, 30:9,
71:13
lock
106:12, 106:13,
107:2, 107:7,
107:20
loevy
2:5, 3:4

logical
54:8
long
7:9, 41:24,
69:7, 69:8,
69:14, 97:19
look
59:18, 119:6,
119:12, 122:8,
123:9, 123:22,
126:22, 127:1,
127:24, 128:8,
131:5, 137:8,
142:23
looked
8:24, 9:2, 9:4,
27:4, 27:24
looking
75:23, 123:18,
130:17
looks
122:15, 125:15,
125:16, 126:1,
126:10
loose
60:14
lot
28:21, 41:18,
121:7
lowest
51:15
lunch
38:9
lying
15:2, 15:6,
15:7, 15:8, 16:1

M

machine
26:15
made
32:11, 54:19,
102:13
maintain
83:24
make
32:7, 32:20,
32:24, 33:4,

41:14, 44:15,
64:12, 75:8,
108:18, 109:8,
109:24, 110:1,
110:7, 111:7,
113:5, 116:2,
129:11
makes
75:1, 115:5
making
41:12, 42:8,
64:8
male
64:15, 126:13,
133:22, 144:17
male's
141:2
many
7:5, 9:21,
9:24, 20:10,
24:15, 32:2,
32:10, 35:7,
35:8, 74:18,
79:12, 104:1,
116:24, 117:4,
117:6, 118:3
march
21:9
mares
1:24, 2:14,
147:2, 147:15
mark
1:13, 2:1, 5:3,
6:3, 6:18,
121:15, 121:17,
121:19, 137:7
marked
121:24, 122:2,
129:10, 129:14,
132:1, 132:2,
137:5, 138:11,
138:14, 139:9,
139:11, 140:2,
141:12, 141:13,
143:2
material
14:6
materials
10:6, 13:16,

30:17
**may**
15:17, 29:19,
51:3, 51:5,
69:13, 80:12,
110:11, 117:21,
119:11, 125:3,
147:11, 148:18
**maybe**
7:6, 64:11,
68:5, 75:23,
94:9
**mean**
13:3, 22:15,
31:16, 32:5,
33:8, 38:11,
40:9, 49:22,
65:6, 71:1,
110:19, 115:9,
118:19, 130:3,
140:20
**meaning**
46:3
**means**
12:21, 27:2,
39:6, 106:8,
118:6
**meant**
23:11
**mechanisms**
85:6
**media**
87:16, 87:19,
87:23
**medical**
8:14
**medication**
8:8, 8:11
**meetings**
36:9
**member**
7:10, 35:3,
36:2, 36:6, 36:8
**members**
25:1
**memories**
13:22
**mention**
91:1

**mentioned**
38:16, 88:2,
88:3
**mess**
109:13
**messy**
99:4, 102:1,
102:4, 102:11,
102:23, 103:2,
103:5, 103:9,
103:10
**met**
84:19, 85:17,
85:22
**middle**
93:19, 128:15
**midnights**
31:15
**might**
8:18, 16:19,
25:6, 31:22,
37:19, 37:23,
37:24, 38:17,
41:13, 50:11,
69:24, 75:13,
80:3, 81:14,
120:20
**milwaukee**
3:13
**mine**
130:13
**mingey**
92:20, 92:24,
93:7
**mino**
34:10
**minute**
59:19, 131:20,
132:14, 141:15
**minutes**
97:21, 144:14
**misconduct**
87:13, 91:13,
91:17, 92:14,
94:11, 94:15
**missed**
25:4
**missing**
130:21

**misstates**
13:8, 21:15,
38:19, 73:19,
86:21, 100:19,
103:6, 114:11,
114:22
**misunderstanding**
45:9
**mobile**
20:23, 31:2,
31:3, 31:4,
31:8, 84:24,
86:14
**money**
24:8
**moniker**
31:9, 31:10
**month**
21:4, 37:5
**more**
11:22, 12:6,
13:20, 19:3,
19:5, 19:6,
34:6, 35:12,
44:11, 47:13,
47:15, 53:19,
65:3, 65:9,
70:18, 70:20,
74:13, 75:16,
116:19, 132:8,
143:1
**morgue**
62:14
**morning**
6:10
**most**
33:19, 47:19,
47:21, 51:21
**mostly**
23:8, 24:6,
27:1
**move**
66:1, 99:12,
99:22, 100:2,
100:10, 144:17
**moved**
65:24, 99:14,
144:21, 144:23

**moving**
99:16, 101:1,
101:2
**much**
14:13, 18:23,
28:17, 75:9
**multi-colored**
133:13, 137:12
**multiple**
57:5, 57:6,
59:5, 75:11,
75:19, 120:18,
120:19, 137:2
**murder**
13:19, 21:10,
42:3, 45:22,
48:18, 49:17,
49:19, 49:22,
52:22, 62:19,
64:1, 66:4,
66:12, 95:5,
145:6, 146:11
**murders**
18:3, 26:19,
33:23, 37:15,
39:14, 39:23
**must**
118:13
**myself**
54:15, 133:7

**N**

**name**
6:10, 6:17,
10:14, 10:17,
11:9, 34:12,
89:14, 133:4,
137:17, 137:18,
138:19, 138:20,
145:17
**name's**
88:21
**named**
35:14, 94:6
**names**
96:23, 133:6
**napkin**
133:14, 138:17

Transcript of Mark Harvey
Conducted on April 30, 2019

168

| | | | |
|---|---|---|---|
| **narrative** | **none** | 32:12, 121:12, | **occur** |
| 135:14 | 29:22, 48:8 | 121:23, 124:18, | 128:24 |
| **narrow** | **nor** | 132:22 | **occurred** |
| 101:19 | 147:6, 148:8 | **numbers** | 21:11, 71:11, |
| **nature** | **norm** | 35:6 | 114:3, 118:11 |
| 112:9 | 27:5 | | **off** |
| **necessarily** | **normal** | **O** | 55:8, 55:10, |
| 44:1, 57:1, | 27:3, 27:10, | **object** | 59:13, 59:16, |
| 100:23 | 27:11, 53:22 | 8:20, 9:8, | 59:20, 59:23, |
| **need** | **normally** | 11:6, 12:23, | 60:1, 60:9, |
| 11:22, 22:6, | 12:5, 33:21, | 13:5, 13:14, | 77:11, 83:8, |
| 22:7, 40:13, | 37:12, 38:21, | 14:4, 14:22, | 121:9, 121:11, |
| 41:13, 41:14, | 63:5, 68:3, | 16:23, 21:22, | 131:22, 140:21 |
| 77:18, 109:7 | 95:18, 100:7, | 26:9, 28:11, | **office** |
| **needed** | 101:5, 115:10, | 29:1, 30:15, | 3:12, 4:12, |
| 74:19 | 134:14, 135:5 | 31:23, 36:4, | 38:7, 43:1, |
| **negatives** | **north** | 39:3, 40:10, | 65:12, 65:16, |
| 5:12, 76:24, | 97:23 | 41:7, 42:4, | 83:19, 138:7 |
| 129:13, 130:4, | **northern** | 42:10, 44:5, | **officer** |
| 130:10 | 1:2 | 44:13, 45:24, | 20:9, 20:21, |
| **neither** | **notarial** | 46:3, 47:22, | 34:20, 49:11, |
| 147:5, 148:7 | 147:10 | 48:2, 49:13, | 51:10, 51:16, |
| **never** | **notary** | 49:18, 50:17, | 67:6, 87:8, |
| 53:6, 76:12 | 2:14, 147:15 | 50:24, 52:1, | 90:17, 94:24, |
| **next** | **notes** | 55:19, 55:24, | 95:2, 97:13, |
| 66:17 | 52:17 | 56:9, 56:13, | 114:10, 147:2 |
| **night** | **nothing** | 59:4, 70:14, | **officers** |
| 33:22, 37:15, | 6:5, 13:20, | 71:17, 72:1, | 24:22, 48:19, |
| 40:2, 42:2, | 16:9, 95:9, | 72:5, 74:17, | 56:20, 56:22, |
| 43:15, 45:22, | 102:12, 103:16, | 75:7, 79:17, | 62:13, 105:2, |
| 46:7, 49:8, | 121:7, 123:21, | 81:11, 82:8, | 107:17, 110:21, |
| 58:15, 58:18, | 146:14, 146:15 | 84:2, 88:1, | 114:6, 114:15, |
| 59:6, 64:1, | **notice** | 96:6, 99:13, | 114:19 |
| 86:20, 96:8, | 2:14, 10:3 | 101:15, 102:15, | **offices** |
| 134:3 | **notifies** | 109:19, 109:21, | 2:1 |
| **nights** | 37:11 | 112:9, 123:13, | **often** |
| 38:23 | **november** | 126:23, 130:8, | 116:19 |
| **nighttime** | 17:17 | 130:23, 133:10, | **oh** |
| 70:9, 70:13, | **now** | 138:2, 140:18, | 41:18, 90:21 |
| 70:16, 70:19 | 12:13, 42:1, | 141:23 | **okay** |
| **nikolaevskaya** | 46:15, 58:17, | **observe** | 7:22, 7:23, |
| 4:11, 10:19, | 62:18, 71:19, | 91:13, 94:11, | 8:2, 8:3, 8:6, |
| 12:14 | 110:3, 136:20, | 104:18 | 8:7, 19:15, |
| **nods** | 140:4 | **obvious** | 20:7, 21:17, |
| 7:19 | **nowhere** | 71:21, 80:10 | 23:23, 23:24, |
| **non-military** | 29:18 | **obviously** | 24:2, 24:3, |
| 144:12 | **number** | 37:16, 107:9 | 31:11, 44:7, |
| **non-police** | 17:23, 18:1, | **occasion** | 46:5, 54:23, |
| 7:13 | | 35:24 | |

Transcript of Mark Harvey
Conducted on April 30, 2019

169

60:8, 83:7,
103:2, 111:14,
113:7, 118:17,
121:1, 121:4,
121:7, 121:18,
122:2, 123:17,
141:11
**on-the-job**
25:12
**once**
43:2, 47:13,
65:7, 65:14,
76:2, 76:6,
84:11, 138:7
**one**
6:12, 7:6,
7:10, 7:13,
15:24, 26:7,
29:16, 32:13,
34:6, 34:15,
35:15, 43:24,
44:23, 47:15,
49:4, 51:3,
57:7, 57:8,
60:13, 61:1,
63:20, 75:16,
86:24, 91:24,
94:9, 114:8,
115:6, 120:20,
120:23, 121:20,
122:11, 123:2,
123:4, 123:8,
123:11, 123:20,
124:12, 126:7,
127:2, 127:5,
127:8, 128:3,
128:13, 129:6,
129:8, 132:10,
132:11, 132:18,
133:13, 133:14,
133:17, 133:20,
140:6, 140:9,
140:10, 141:2,
141:5, 143:1
**ones**
78:24, 120:20,
121:2, 122:23,
145:18

**only**
9:6, 34:15,
54:15, 57:8,
70:10, 76:11,
86:23, 92:18,
93:8, 95:1,
95:21, 95:23,
96:13, 96:21,
98:4, 100:12,
112:13, 117:19,
144:23
**open**
60:7, 70:19,
71:4, 81:7
**opened**
59:17
**operating**
86:11
**opinion**
87:7, 94:23,
124:23
**opinions**
130:18
**opportunity**
33:4
**oral**
88:5
**order**
42:6, 53:16,
53:22, 54:4,
55:21, 56:4,
56:7, 56:8
**orders**
36:15, 51:23,
52:2, 52:4
**other**
9:4, 9:10,
9:15, 10:6,
10:9, 10:10,
15:23, 16:2,
16:12, 26:4,
28:8, 28:9,
28:15, 29:15,
29:20, 30:7,
35:15, 41:16,
41:17, 41:18,
44:11, 48:14,
52:12, 55:13,

56:5, 57:19,
60:18, 61:5,
62:16, 67:22,
71:16, 73:14,
77:22, 88:14,
88:19, 89:6,
94:9, 95:5,
98:9, 98:19,
99:8, 100:15,
100:22, 100:24,
101:9, 101:11,
104:8, 105:1,
113:18, 120:4,
120:19, 129:8,
136:10, 136:24,
137:3, 142:22,
144:1, 144:21,
145:8, 145:12,
145:17, 145:21
**others**
130:13
**otherwise**
23:17, 40:14,
51:4, 88:9,
147:7, 148:10
**our**
38:1, 38:3,
40:3, 40:11,
41:11, 42:16,
42:23, 45:11,
45:19, 51:20,
84:6, 101:24,
107:14, 138:7
**out**
19:19, 22:16,
23:13, 27:4,
38:12, 43:24,
45:12, 45:18,
47:3, 47:8,
47:10, 47:23,
48:14, 49:22,
52:19, 52:21,
52:23, 53:5,
55:21, 56:3,
65:13, 68:17,
69:24, 95:2,
96:12, 98:17,
98:19, 106:22,

122:19, 123:6,
124:1, 124:23,
125:3, 125:6,
130:2
**outcome**
130:19, 147:8,
148:10
**outcomes**
127:21, 128:4,
128:10
**outside**
16:6, 42:21,
91:3
**over**
7:16, 8:24,
9:2, 9:4, 18:1,
33:1, 33:2,
33:6, 56:3,
64:23, 65:1,
65:14, 66:11,
84:13, 99:14,
111:11, 130:17
**overall**
115:12, 115:13,
133:18, 133:21
**overalls**
72:6, 114:14,
115:8, 115:9,
115:15
**overexposed**
128:18, 128:19
**overtime**
32:7, 32:11,
32:13, 32:14,
32:16, 32:20,
32:23, 32:24,
33:4
**own**
54:5, 67:9,
76:11, 108:19,
109:8, 110:2,
111:1, 119:24

---

**P**

---

**package**
65:13
**packet**
10:9

Transcript of Mark Harvey
Conducted on April 30, 2019                                    170

| | | | |
|---|---|---|---|
| padilla<br>14:12<br>page<br>5:3, 5:10<br>pages<br>1:23<br>paper<br>133:14, 138:17<br>paperwork<br>33:11, 40:12<br>parked<br>45:13<br>part<br>19:3, 26:10,<br>66:20, 76:5,<br>91:14, 94:12,<br>110:16, 122:9<br>partially<br>59:16, 124:13,<br>127:6<br>participation<br>96:5<br>particular<br>60:3, 107:9<br>parties<br>147:6, 148:8<br>partner<br>33:18, 33:22,<br>52:23, 53:2,<br>54:18, 55:17,<br>56:6, 68:4,<br>68:6, 68:9,<br>68:17, 94:5,<br>97:14, 133:7,<br>139:17<br>partner's<br>137:18, 138:20<br>parts<br>44:11<br>patrolman<br>20:20<br>pension<br>17:19<br>people<br>48:22, 55:2,<br>62:20<br>people's<br>3:12 | percent<br>37:21, 37:23,<br>103:24, 130:13<br>performance<br>87:5, 87:8<br>performed<br>12:18<br>period<br>23:18, 23:19,<br>23:24, 32:17,<br>66:4<br>periods<br>31:19<br>perpetrator<br>103:4<br>perpetrators<br>102:18<br>person<br>33:20, 34:1,<br>62:3, 63:6,<br>68:3, 68:13<br>personal<br>76:11<br>personally<br>32:22<br>personnel<br>96:24<br>phonetic<br>34:11<br>photo<br>67:7, 71:11,<br>76:3, 76:22,<br>118:13, 120:18,<br>122:15, 123:6,<br>123:9, 123:10,<br>123:11, 124:12,<br>124:13, 125:13,<br>125:15, 126:5,<br>126:10, 129:13<br>photograph<br>42:21, 50:20,<br>55:2, 71:13,<br>71:14, 73:11,<br>74:16, 74:22,<br>75:9, 75:16,<br>77:14, 80:11,<br>81:20, 100:8,<br>107:20, 113:3, | 113:14, 113:19,<br>114:17, 116:8,<br>120:20, 122:8,<br>122:24, 123:22,<br>124:1, 126:15,<br>127:11, 127:14,<br>135:5, 135:10<br>photographed<br>105:6, 105:12,<br>106:3, 106:9,<br>106:16, 106:20,<br>107:4, 108:3,<br>108:9, 108:15,<br>109:1, 109:16,<br>110:13, 110:18,<br>112:8, 112:18,<br>113:9, 113:16,<br>113:22, 135:15<br>photographer<br>68:14, 68:21,<br>68:22, 75:3,<br>120:6, 122:18,<br>123:6, 123:24,<br>124:16, 124:22<br>photographing<br>42:22, 75:17,<br>77:12, 100:11,<br>101:7, 105:23,<br>106:7, 107:7,<br>114:9, 131:8<br>photographs<br>9:17, 9:18,<br>9:19, 9:21,<br>9:24, 48:7,<br>48:15, 59:14,<br>65:8, 66:6,<br>67:1, 67:3,<br>67:5, 68:7,<br>68:19, 68:23,<br>72:3, 72:13,<br>72:19, 73:2,<br>73:4, 73:22,<br>74:2, 74:4,<br>74:14, 74:18,<br>75:5, 75:11,<br>75:12, 75:13,<br>75:19, 75:23,<br>76:2, 76:14, | 77:17, 100:3,<br>101:3, 101:14,<br>114:20, 115:13,<br>116:14, 116:22,<br>117:6, 117:8,<br>117:11, 117:17,<br>117:19, 117:22,<br>118:24, 119:4,<br>119:6, 119:12,<br>119:19, 122:12,<br>123:3, 123:14,<br>125:3, 126:21,<br>127:2, 127:5,<br>130:7, 130:10,<br>136:16<br>photography<br>24:23, 68:14,<br>70:22, 71:5,<br>75:2, 76:12,<br>119:22<br>photos<br>5:11, 68:1,<br>68:16, 71:7,<br>71:16, 71:20,<br>71:23, 72:11,<br>99:11, 116:24,<br>117:4, 118:18,<br>120:17, 120:24,<br>123:12, 125:14,<br>126:7, 127:8,<br>130:18, 130:21<br>physical<br>80:14, 81:14,<br>135:16, 135:19<br>physically<br>49:22, 81:19<br>pick<br>106:12, 106:14,<br>107:2, 107:8<br>picks<br>76:4, 107:20<br>picture<br>60:15, 73:16,<br>123:15, 123:19<br>pictures<br>59:15, 59:18,<br>66:16, 68:3,<br>73:18, 98:18, |

Transcript of Mark Harvey
Conducted on April 30, 2019

171

115:11, 121:13,
129:1, 133:5
**piece**
48:10, 50:10,
50:19, 75:17,
79:14, 113:6
**pieces**
75:20, 79:15,
79:18, 95:7,
98:2, 133:16,
139:16
**pillowcase**
133:13, 137:13
**place**
6:21, 11:19,
62:20, 71:10,
85:6, 85:11,
107:8, 111:11
**placed**
43:4
**placing**
84:5
**plaintiff**
1:6, 3:2, 6:8,
6:13, 6:14
**plaintiff's**
129:11, 132:1,
137:8, 139:12,
141:12
**plastic**
41:15
**play**
50:15
**played**
25:7, 50:16,
78:19
**please**
6:11, 6:16,
7:21, 20:16,
132:15, 140:5,
141:15, 143:4
**point**
25:3, 62:7,
95:4, 96:24,
105:18
**police**
6:22, 6:24,
7:11, 10:21,

11:5, 11:10,
11:13, 11:19,
12:1, 12:10,
12:21, 12:22,
13:3, 13:4,
17:18, 18:5,
19:21, 20:13,
26:5, 32:16,
34:20, 34:22,
35:4, 36:3,
42:18, 48:19,
49:11, 51:10,
51:15, 51:16,
52:7, 56:20,
56:22, 67:6,
76:14, 85:18,
87:8, 87:14,
88:5, 88:8,
90:17, 94:24,
95:2, 102:14,
107:16, 110:20,
114:6, 114:10,
114:15, 114:19,
120:1
**policies**
10:21, 11:5,
11:10, 11:13,
11:18, 12:2,
12:7, 12:9,
12:21, 13:3,
36:12
**policy**
13:10
**posed**
17:9
**position**
22:23
**positions**
20:17, 26:4
**possibility**
100:12, 102:18
**possible**
26:11, 47:9,
47:11, 73:4,
75:10, 82:24,
119:8, 119:11,
119:15, 124:3,
125:22

**possibly**
48:3, 79:13,
98:11, 106:18,
107:5, 107:6,
108:15, 108:18,
109:6, 109:16
**potential**
80:17, 80:24,
81:4, 81:7,
82:23, 83:2
**power**
41:21
**practical**
22:12, 22:14,
22:15
**predominantly**
127:15
**prefer**
100:7, 101:5,
101:23
**prep**
122:9
**preparation**
35:19, 117:24,
120:11, 132:19,
145:9
**prepare**
8:22
**presence**
91:3
**present**
80:12, 126:14,
128:9
**presented**
129:13
**preserve**
24:24, 50:8,
55:3
**preserved**
84:5
**previous**
27:22
**previously**
44:19, 45:8,
53:20, 130:15,
144:2
**primarily**
24:2, 83:18,

118:21
**primary**
26:7, 26:10,
41:2, 96:1
**print**
120:18, 120:19,
120:23
**printable**
118:18, 118:19
**printed**
118:23, 119:5
**prints**
120:9
**prior**
14:6, 14:17,
35:24, 38:5,
43:17, 45:20,
100:3, 100:11
**probably**
19:5, 21:8,
51:2, 106:23,
108:8, 120:8,
123:4, 135:1
**problem**
60:9, 60:16,
118:8, 119:6,
119:10, 119:13,
120:15, 122:21,
123:7, 124:4,
125:2, 125:18,
125:21, 125:22,
126:2, 126:19,
127:19, 128:1,
128:3, 128:8,
128:9, 129:2,
129:3, 129:6
**problems**
60:13, 60:18,
96:16, 119:8,
119:11, 119:16,
126:14, 128:24,
130:15
**procedure**
13:11, 58:6,
58:9, 86:11,
95:16
**procedures**
11:16, 12:4,

Transcript of Mark Harvey
Conducted on April 30, 2019

172

12:8, 12:18,
12:22, 13:4,
25:21, 84:19,
85:12
**proceedings**
147:4, 148:4,
148:5
**process**
13:11, 22:18,
24:14, 25:8,
31:7, 33:11,
41:9, 63:18
**processed**
63:16, 66:21,
69:19, 76:9,
76:12, 130:2
**processing**
5:13, 24:20,
33:10, 39:21,
40:9, 40:11,
51:7, 52:10,
52:13, 52:19,
52:22, 67:1,
101:20, 132:21,
136:18
**produced**
132:5, 132:7
**professional**
119:22
**promise**
7:19
**promotion**
23:4
**proper**
99:22, 100:2,
100:10, 101:2
**properly**
43:2
**property**
23:9, 101:6,
136:17, 136:24,
137:1
**protocol**
53:7, 53:10
**protocols**
36:19
**prove**
50:11

**proved**
108:14
**provide**
136:1, 136:5,
136:11
**proximity**
107:3, 108:2,
108:12, 108:24
**public**
2:15, 147:1,
147:15
**pursuant**
2:14
**push**
67:18
**put**
42:23, 65:11,
65:15, 77:14

**Q**

**qualifications**
22:6, 22:7,
22:19
**quality**
85:5
**question**
8:4, 11:7,
11:11, 11:23,
12:24, 17:8,
19:16, 21:18,
21:19, 35:1,
35:23, 50:14,
78:16, 101:16,
110:4, 112:10,
113:7, 136:19,
136:20
**questioning**
98:12
**questions**
7:18, 7:20,
23:23, 78:5,
78:14, 78:22,
86:7, 121:13,
122:23, 131:24,
136:2, 136:12,
146:5
**quick**
42:20

**quigley**
18:17, 18:18
**quite**
27:19, 101:16

**R**

**radios**
41:11
**range**
129:16
**rapes**
23:9
**ray**
49:1, 86:18,
87:17, 88:10,
89:2
**read**
10:12, 78:17,
116:5, 121:23
**reading**
64:19, 70:6,
104:3, 104:4,
104:17
**really**
69:12, 103:16
**reason**
8:18, 60:21,
61:2, 116:6,
135:2, 144:23
**reasons**
28:8, 28:14,
30:7, 59:2,
59:5, 145:3
**recall**
15:5, 15:20,
15:24, 16:13,
16:15, 16:22,
26:22, 30:3,
32:15, 33:3,
33:13, 34:15,
35:7, 35:23,
37:14, 45:21,
46:5, 46:10,
46:11, 46:12,
47:2, 48:22,
48:24, 49:1,
52:4, 52:21,
52:24, 55:22,

57:16, 58:14,
59:12, 59:13,
60:8, 60:12,
60:19, 60:20,
63:24, 64:17,
64:24, 67:22,
72:24, 73:3,
73:9, 73:17,
74:20, 74:24,
75:21, 83:1,
86:20, 88:22,
89:1, 89:13,
89:14, 95:4,
96:16, 96:18,
97:2, 97:17,
99:8, 99:15,
102:6, 103:10,
103:13, 103:14,
103:19, 104:1,
104:4, 104:7,
104:11, 104:16,
104:20, 105:3,
105:5, 105:21,
105:22, 106:7,
106:13, 106:15,
107:21, 107:22,
107:23, 111:16,
111:18, 111:23,
112:1, 113:20,
117:17, 131:7,
131:14, 134:12,
135:13, 136:22,
142:6, 142:9,
142:10, 142:16,
143:13, 144:1,
144:4, 144:9
**receive**
30:17, 37:12,
37:17, 37:18
**received**
35:8, 105:9,
139:1, 139:2
**receiving**
17:18, 35:6,
37:14, 38:5,
42:15
**recently**
90:21, 91:10

Transcript of Mark Harvey
Conducted on April 30, 2019

173

**recognized**
54:10
**recollection**
13:20, 14:1,
14:7, 14:17,
16:2, 16:7,
16:13, 27:6,
27:9, 27:13,
27:21, 28:20,
31:21, 39:17,
48:13, 59:20,
59:22, 69:11,
69:14, 75:22,
86:7, 87:1,
87:4, 88:16,
89:5, 89:10,
89:16, 89:22,
90:2, 90:20,
92:7, 92:17,
92:23, 93:7,
93:12, 93:16,
93:22, 94:2,
95:10, 95:14,
95:20, 96:20,
97:4, 98:2,
98:12, 99:5,
99:16, 99:19,
102:8, 104:22,
106:2, 106:11,
108:1, 116:12,
117:18, 136:1,
136:4, 139:5,
141:8, 142:12,
142:21, 145:22
**record**
6:16, 23:16,
51:13, 55:8,
55:10, 83:8,
121:9, 121:11,
121:23, 122:22,
125:24, 131:22,
148:4
**recorded**
147:4, 148:4
**recording**
148:6
**recovered**
131:6, 133:14,

133:15, 133:17,
133:19, 133:21,
137:23, 139:18
**reddish**
122:17
**reference**
116:2
**referred**
132:22, 136:13,
137:2
**referring**
25:14, 90:6
**refers**
51:11, 51:14
**reflect**
10:20, 11:9,
11:13, 129:19
**reflected**
11:2, 11:11,
11:16, 11:18,
12:1
**refrain**
114:8, 114:19
**refrained**
107:7
**refresh**
69:11, 75:22,
86:6, 89:4,
89:16, 90:1,
92:16, 93:6,
93:15, 94:2,
95:20, 96:19,
97:3, 98:11,
102:8, 141:8,
142:12, 142:21,
145:22
**refuse**
39:12
**regarding**
7:17, 18:3,
18:10, 54:1,
63:22, 87:16,
93:7, 104:18
**regards**
23:17
**regularly**
116:17
**regulation**
53:14, 63:21

**regulations**
34:22, 58:1
**related**
147:5, 148:8
**relative**
79:13
**relevant**
79:4, 79:8,
79:22
**remember**
7:9, 8:9, 8:15,
9:23, 13:18,
14:10, 14:12,
14:14, 14:24,
15:2, 15:8,
15:11, 15:13,
15:16, 15:18,
18:7, 18:8,
18:9, 20:3,
21:3, 21:4,
21:6, 23:3,
25:18, 30:19,
30:21, 31:14,
31:20, 32:1,
35:6, 35:16,
36:1, 36:17,
36:21, 37:6,
40:3, 48:21,
49:19, 54:7,
63:19, 64:3,
66:2, 69:8,
69:9, 86:13,
86:17, 88:3,
95:8, 96:12,
104:16, 111:20,
112:4, 112:6,
113:15, 115:17,
115:23, 116:4,
142:4, 143:11,
143:16, 143:18,
144:6
**remembered**
14:11
**remove**
62:13, 66:9,
66:19
**removed**
62:2, 62:22,

62:24, 63:9,
63:13, 63:17,
64:2, 64:5,
64:9, 64:21
**repeat**
11:7, 25:3,
25:5, 50:14
**report**
5:13, 5:14,
5:15, 5:16,
5:17, 5:18,
5:19, 5:20,
9:14, 9:17,
15:19, 28:3,
28:4, 34:11,
34:13, 39:21,
43:2, 52:10,
52:11, 52:19,
52:22, 53:1,
64:22, 65:12,
68:13, 86:23,
90:3, 90:5,
90:6, 92:19,
93:2, 93:4,
93:8, 93:17,
94:4, 95:22,
95:24, 96:10,
96:22, 97:6,
97:9, 97:21,
97:23, 98:5,
98:10, 98:17,
99:3, 99:10,
99:17, 102:4,
102:9, 102:10,
104:3, 104:5,
104:17, 104:23,
105:1, 106:8,
113:15, 115:15,
117:20, 131:5,
132:21, 136:18,
138:20, 141:24,
142:15, 142:24,
143:20, 144:7
**reported**
1:24
**reporter-notary**
147:1
**reporters**
14:11, 15:23,

98:3
**reports**
8:24, 9:2, 9:4,
10:4, 10:9,
10:10, 10:20,
14:21, 16:20,
64:19, 65:14,
68:17, 70:6,
98:19, 98:20,
98:21, 106:1,
106:10, 115:24,
116:5, 136:17,
137:1, 140:12,
145:8, 145:17
**represent**
129:20, 130:6,
130:14, 133:23
**represents**
6:12, 6:14
**reputation**
87:10
**requests**
49:11
**required**
34:21
**residence**
62:20, 79:21,
82:20, 97:22,
98:10, 102:1,
103:15, 112:24,
116:22
**residue**
25:16, 41:23
**respect**
46:3
**responding**
42:13
**response**
25:4
**responsibilities**
24:4, 26:8,
65:9
**responsibility**
25:23, 26:11,
41:4, 76:7,
83:22
**responsible**
84:15

**rest**
25:12
**restate**
13:1
**retire**
17:16
**retired**
6:20, 94:10
**return**
70:2
**reverse**
56:7
**review**
9:10, 9:13,
9:18, 10:4,
10:11, 10:16,
11:8, 35:17,
88:9, 117:22,
117:24, 118:4,
120:9, 120:10,
129:18, 132:15,
140:5, 141:16,
143:4, 145:8,
145:11
**reviewed**
9:6, 9:15,
10:7, 10:20,
11:12, 13:16,
16:7, 16:20,
27:22, 106:11,
107:19, 107:24,
115:20, 116:1,
132:18, 145:18
**reviewing**
13:23, 14:6,
14:17, 145:12
**revive**
63:6
**reyes**
3:2, 6:8, 6:13,
122:3, 129:17
**reynaldo**
1:8
**rfc**
121:5, 122:3
**right**
17:14, 18:10,
42:1, 45:15,

48:5, 55:6,
62:18, 71:19,
98:21, 98:22,
99:20, 100:2,
100:16, 105:18,
112:23, 121:16,
127:12, 138:13
**ring**
71:2
**rise**
61:24, 69:21,
134:20
**robbery**
24:8
**robert**
89:19, 89:23,
90:2, 93:9
**rock**
4:5
**role**
76:6
**roll**
36:23, 64:24,
66:15, 66:17,
66:19, 76:19,
122:12
**rolled**
64:23, 146:9
**rolls**
10:2, 117:5,
117:9, 118:5
**room**
43:4, 45:11,
65:15, 97:17,
115:10, 115:12
**rotated**
31:14
**route**
62:6
**rule**
53:14, 63:21
**rules**
7:16, 34:21,
58:1
**run**
56:3
**rundown**
18:12, 19:16,

24:16
**rutherford**
89:19, 89:23,
90:2

**S**

**said**
11:10, 18:23,
26:12, 37:18,
42:16, 44:23,
54:18, 54:22,
55:1, 56:6,
61:11, 61:16,
78:8, 120:22,
122:4, 122:5,
122:6, 144:14,
147:4, 148:4
**same**
8:1, 11:15,
11:21, 12:3,
12:21, 13:3,
33:20, 55:12,
66:17, 75:12,
97:17, 105:13,
122:22, 124:5,
124:7, 124:9,
124:14, 125:1,
125:14, 125:21,
125:22, 126:2,
126:19, 126:22,
127:1, 127:24,
128:8, 135:6,
136:19
**sample**
27:14
**samples**
29:5, 29:11
**sat**
67:17
**saw**
27:1, 27:3,
76:12, 81:13,
91:7, 110:10,
134:9, 145:11
**say**
10:13, 14:20,
23:16, 26:10,
39:6, 40:8,

Transcript of Mark Harvey
Conducted on April 30, 2019

175

47:19, 49:21,
51:7, 51:9,
57:5, 70:24,
79:1, 90:5,
98:1, 107:6,
118:14, 128:7,
130:3, 130:12,
144:20
**saying**
12:8, 27:19,
78:13, 109:20
**says**
6:6, 53:15,
97:9, 102:10,
135:15, 137:17,
143:23, 143:24
**scenes**
29:15, 29:24,
48:6, 48:10,
49:20, 60:22,
61:7, 62:8,
62:19, 78:12,
109:24, 116:18
**schedule**
37:5
**school**
18:14, 18:16,
18:19, 18:21,
19:18, 74:12
**seal**
147:10
**sealed**
43:1
**sean**
3:3, 6:10,
12:23
**search**
135:19
**searched**
135:16
**second**
43:13, 55:9,
60:22, 61:3,
61:11, 61:17,
121:10, 140:9,
140:10
**security**
20:9

**see**
34:17, 58:11,
67:8, 91:7,
111:17, 118:23,
119:4, 127:12,
127:16, 135:17
**seeing**
59:15, 86:23,
89:13, 98:3,
115:18, 115:23,
116:4, 142:9
**seemed**
95:1
**seen**
67:3, 67:5,
87:16, 87:19,
90:21, 91:10,
122:9, 123:10
**send**
69:24
**sent**
25:1, 38:12
**sergeant**
34:10, 38:1,
51:2, 138:3,
139:1, 140:21
**series**
54:10
**set**
143:22, 144:3,
147:9
**sets**
13:10
**seven-piece**
143:22, 144:3
**several**
34:10, 127:20
**shattered**
113:8
**she**
15:5, 15:7,
15:11, 15:13,
15:14, 15:15,
15:19, 103:18
**sheffield**
143:14, 143:19
**shelf**
43:23

**shift**
31:19, 36:22,
38:17, 39:2,
39:10, 39:13,
40:1, 40:4,
41:6, 43:7,
43:18, 43:21,
44:1, 44:6,
44:10, 44:20,
46:1, 46:7,
46:13, 46:15,
46:18, 46:21,
46:23, 47:6,
47:10, 146:8
**shifts**
31:11, 31:16,
32:4, 37:1
**shoot**
60:7, 77:13
**shortly**
94:10
**shot**
115:11
**should**
133:24
**shovels**
41:22
**show**
75:13, 118:21,
120:20, 121:6,
121:12, 122:7,
122:23, 129:10,
131:23, 137:7,
138:13, 140:4,
141:11, 142:20,
143:17, 144:5,
145:21
**showed**
130:7, 145:18
**showing**
115:12
**shutter**
59:16, 70:21,
71:1, 71:3,
119:14, 122:21,
123:7, 124:3,
125:1, 125:2,
125:6, 125:21,

125:22, 126:3,
126:20, 128:2,
128:24, 129:2,
129:3
**side**
67:16, 74:13,
122:16, 124:13
**signature-e9nqm**
147:13
**signature-zxz**
148:15
**signed**
139:3, 140:21
**significant**
28:23
**similar**
19:15, 35:1
**since**
98:13, 120:10
**single**
120:18, 120:23
**sir**
141:15
**sit**
115:17
**situation**
63:14, 100:1,
100:7
**sixth**
20:19, 20:22,
90:18
**small**
18:7, 18:9,
29:17
**sofa**
133:15, 138:17
**solache**
3:10, 6:14
**sole**
25:23
**some**
8:24, 13:13,
18:1, 18:14,
18:23, 25:16,
27:23, 29:14,
29:23, 38:23,
44:2, 44:11,
50:10, 58:17,

Transcript of Mark Harvey
Conducted on April 30, 2019

176

| | | | |
|---|---|---|---|
| 59:15, 73:18, 74:21, 81:13, 82:16, 102:2, 105:1, 105:18, 106:12, 107:2, 108:8, 113:16, 121:13, 122:7, 127:12, 128:15, 130:6, 130:12, 131:17, 131:23 | **sorts** 29:4 **soto** 13:19, 14:1, 18:3, 26:19, 33:23, 37:15, 39:14, 39:23, 40:17, 42:3, 43:15, 45:22, 46:7, 47:3, | **specific** 11:22, 12:7, 29:6, 49:10, 49:11, 53:14, 63:15, 69:1, 73:17, 73:21, 78:9, 78:14, 87:21, 98:10, 101:8, 104:20, 125:2, 132:8 | **standards** 84:19, 85:18, 85:22, 86:15 **stankus** 90:8, 92:3 **stankus's** 91:20, 121:3 **starr** 3:3, 5:4, 6:9, 6:11, 11:23, |
| **somebody** 142:15 **someone** 64:8, 105:15, 108:14, 108:17, 118:13, 142:23, 144:7 | 48:18, 52:22, 58:15, 64:1, 64:14, 66:4, 66:12, 68:7, 69:4, 70:2, 75:20, 79:1, 88:22, 89:2, | **specifically** 36:16, 36:20, 46:10, 46:11, 48:20, 52:13, 63:19, 69:2, 74:3, 75:16, 79:1, 82:5, | 21:17, 21:19, 35:21, 44:7, 50:15, 54:22, 55:8, 60:4, 78:8, 78:11, 78:15, 78:17, 78:21, 83:7, |
| **something** 13:10, 22:16, 27:4, 38:1, 40:5, 50:19, 58:10, 58:22, 68:5, 69:23, 72:9, 74:15, 80:12, 81:3, 81:13, 84:11, 113:2, 113:5, 134:14, 135:4, 143:14 | 90:6, 95:5, 96:9, 97:8, 97:11, 97:15, 97:20, 97:22, 98:10, 98:11, 98:21, 110:9, 112:24, 114:8, 115:14, 116:15, 116:22, 118:9, 122:13, 123:3, 123:12, 126:8, 130:11, 131:2, | 88:2, 114:17, 118:15, 121:1, 125:12, 133:1, 144:2 **spell** 6:17, 34:12 **spelling** 34:11 **spent** 25:10 **splatter** 72:20, 73:1, 74:7 | 83:9, 91:5, 110:4, 112:11, 112:15, 117:3, 120:17, 121:4, 121:9, 121:17, 124:15, 124:21, 128:17, 129:16, 131:20, 132:4, 132:11, 132:14, 137:3, 143:1, 146:3, 146:14, 146:16 |
| **sometime** 138:8 **sometimes** 38:13, 45:16, 46:22, 47:1, 47:14, 51:20, 62:12, 69:20, 115:6 | 131:12, 145:13, 146:10 **sotos** 3:19 **source** 25:18, 26:12 **south** 18:17, 18:18 | **spoke** 48:19 **spots** 125:16 **spring** 21:7 **squad** 40:23, 41:1 | **start** 77:12, 77:15 **started** 33:10, 41:6 **starting** 42:21 **state** 2:15, 6:16, |
| **somewhere** 106:21, 106:22 **sop** 86:11 **sorry** 44:17, 124:18, 128:17, 140:20 | **sparked** 95:9 **speak** 42:17, 48:17, 54:15, 56:11, 56:23 | **square** 65:24, 66:1 **st** 2:6, 3:5 **stabbed** 15:19 | 14:2, 65:18, 65:23, 66:3, 66:5, 85:17, 147:16 **state's** 4:12, 132:6 |
| **sort** 29:10, 58:17, 102:3, 106:12, 107:2 | **speaking** 8:1, 49:1, 64:10, 65:5, 83:16 **special** 36:15 | **stainthorp** 3:11, 6:14, 121:19, 146:5 **standard** 86:11 | **stated** 28:12, 65:11 **states** 1:1 **station** 24:24 |

Transcript of Mark Harvey
Conducted on April 30, 2019

177

stay
63:12, 69:7
stayed
63:24
staying
100:13
stays
101:6
step
22:23, 54:8,
120:8
steps
42:12, 53:18,
54:4, 54:11,
54:19, 54:20,
54:23, 55:1,
55:7, 55:11,
55:12, 55:15,
55:17, 55:18,
55:23, 75:4,
77:23, 83:15,
83:17, 83:22,
83:24
stick
25:20
sticks
41:23
still
62:3, 62:21,
63:6, 71:5,
74:16, 96:11
stored
76:24
street
4:6, 37:24,
38:8, 38:11,
45:16, 45:18,
56:2, 106:22,
106:23
strike
44:7
strips
130:1, 130:3
struggle
72:4, 72:7,
74:8, 80:6,
80:11, 80:14,
102:3, 102:6,

102:24, 103:4,
114:15
stuff
142:1
subject
81:1
submitted
138:5, 138:20,
139:18, 139:21,
140:13, 140:15,
140:19, 140:20
such
108:21, 109:12,
111:4
suggestions
68:4
sum
14:16, 96:4
summary
23:6
summer
21:7
supervisor
34:3, 51:19,
51:22, 64:11,
92:3
supervisors
34:8, 51:20
supplies
41:13
supported
148:6
supposed
38:22, 71:7,
101:12, 101:18
sure
7:6, 11:8,
13:2, 21:20,
27:20, 34:13,
34:14, 35:21,
41:12, 41:14,
44:15, 62:7,
74:15, 74:21,
119:9, 130:13
surprise
61:10, 61:14,
61:15, 61:20
surrounding
83:6

swab
25:21
sworn
6:4
sync
67:21, 125:6,
128:24
syncing
126:2, 128:1

**T**

take
22:10, 24:24,
27:14, 27:17,
40:15, 40:16,
42:13, 48:6,
51:23, 52:2,
52:17, 54:23,
55:3, 55:17,
61:1, 62:4,
63:7, 65:8,
66:15, 68:1,
68:7, 68:9,
68:20, 68:23,
71:5, 71:7,
71:11, 71:16,
71:20, 71:23,
72:3, 72:6,
72:10, 72:13,
72:19, 73:2,
73:4, 73:11,
73:16, 73:18,
73:22, 74:2,
74:4, 74:15,
74:16, 74:18,
74:22, 75:4,
75:11, 75:13,
75:16, 75:19,
77:11, 77:23,
83:7, 108:17,
115:11, 115:13,
116:14, 120:3,
131:20, 132:14,
137:8, 141:15
taken
54:9, 66:7,
83:24, 95:17,
115:16, 120:2,

133:5, 147:3
takes
62:19
taking
6:15, 25:21,
48:15, 52:4,
59:14, 68:3,
74:13, 75:8,
77:17, 100:3,
101:3, 101:14,
114:19, 117:17,
117:18
talk
56:17, 56:21,
121:1
talked
16:9, 55:1,
55:7, 57:2,
82:7, 91:24,
95:9, 120:21
talking
23:17, 24:21,
46:15, 54:20,
78:11, 88:22,
89:2, 110:20,
119:16
tech
22:8, 23:7,
23:21, 61:10,
61:15, 90:13
technician
20:22, 21:24,
22:22, 74:12
technicians
25:12, 26:3
techs
23:8, 23:13,
61:16
tell
8:5, 19:1,
20:16, 24:1,
25:14, 33:8,
35:2, 51:13,
125:12, 133:1,
133:12, 137:11,
140:23, 141:18,
143:4
telling
108:14, 108:17,

Transcript of Mark Harvey
Conducted on April 30, 2019

178

128:10
**tells**
28:5, 143:20
**ten**
35:10, 35:12,
97:21, 144:14
**term**
51:11, 51:14
**terms**
84:10, 100:24,
126:17, 130:4
**test**
22:11, 22:12,
22:13, 23:1
**testified**
17:21, 17:24,
18:2, 44:19,
45:2, 45:15,
67:13, 94:5,
95:6
**testify**
6:5, 8:12,
8:16, 8:19,
18:6, 18:10,
55:4, 95:23
**testimony**
9:3, 9:7, 13:9,
21:16, 38:20,
45:6, 73:20,
86:22, 100:19,
103:7, 114:12,
114:23
**th**
65:18, 65:23,
66:3, 66:5,
147:10
**than**
13:20, 15:23,
16:12, 19:3,
19:5, 19:6,
28:9, 28:15,
29:15, 34:6,
35:10, 35:12,
41:17, 47:13,
53:19, 56:5,
75:16, 89:6,
95:5, 100:22,
104:8, 116:19,

120:15, 136:24,
144:1, 145:18
**thank**
122:6, 146:15,
146:16
**thanks**
146:4
**that's**
14:21, 18:8,
25:18, 34:15,
42:1, 51:4,
64:19, 65:14,
68:12, 75:23,
78:7, 79:20,
82:13, 83:12,
83:14, 84:14,
88:14, 95:8,
95:18, 95:24,
102:22, 103:3,
104:3, 117:8,
118:14, 118:15,
122:11, 124:12,
127:11, 129:13,
134:2, 135:9,
138:3, 138:24,
143:24, 146:3
**thefts**
23:9
**their**
14:13, 24:12,
58:12
**them**
10:11, 10:12,
10:14, 10:17,
45:7, 46:19,
46:22, 54:22,
56:2, 56:3,
62:5, 62:24,
63:7, 67:8,
82:24, 83:2,
84:7, 100:11,
112:8, 112:18,
117:24, 120:10,
121:13, 121:15,
123:4, 130:12,
141:5, 145:11,
145:12
**then**
19:21, 20:7,

20:13, 22:10,
24:22, 24:23,
25:1, 27:21,
29:18, 38:16,
42:16, 42:19,
42:20, 43:7,
44:4, 44:10,
45:2, 45:12,
45:13, 45:14,
52:20, 56:20,
65:23, 69:23,
77:14, 81:8,
93:18, 106:23,
108:8, 109:11,
110:17, 114:16,
121:20, 127:15,
128:14, 138:9,
138:19, 145:3
**there's**
24:1, 51:4,
56:16, 63:21,
102:12, 121:7,
122:16, 123:21,
127:15, 130:21,
132:8, 132:12
**therefore**
27:10
**theresa**
4:4
**these**
83:15, 83:22,
98:1, 119:4,
120:24, 121:6,
122:7, 123:14,
124:14, 125:3,
126:21, 127:20,
128:4, 129:17,
130:1, 140:12,
140:23, 142:7,
143:1
**they**
10:11, 11:2,
11:11, 12:4,
12:8, 12:9,
13:17, 14:5,
24:12, 31:22,
36:21, 37:5,
40:22, 48:23,

51:5, 53:19,
54:16, 55:15,
57:20, 60:14,
61:11, 62:5,
62:21, 63:3,
63:6, 63:7,
69:24, 71:13,
71:21, 73:15,
76:23, 83:16,
112:12, 117:16,
118:21, 119:7,
119:12, 126:22,
127:24, 128:7,
129:12, 129:24,
130:12, 130:13,
130:14, 140:15,
141:22
**they're**
83:18
**they've**
69:19
**thing**
12:21, 13:4,
75:12, 114:13,
121:18
**things**
8:9, 10:13,
10:14, 14:9,
14:16, 16:22,
24:15, 25:20,
44:23, 53:15,
55:21, 82:14,
82:16, 82:22,
101:2, 111:11,
112:7, 133:6,
133:24
**think**
11:21, 15:22,
28:16, 29:6,
29:21, 29:22,
30:7, 30:22,
31:13, 36:14,
38:16, 40:4,
42:1, 43:9,
48:8, 61:4,
62:16, 62:18,
62:23, 63:8,
63:15, 67:13,

Transcript of Mark Harvey
Conducted on April 30, 2019

69:13, 71:18,
78:4, 81:23,
82:5, 82:9,
82:10, 89:1,
94:9, 97:9,
100:9, 101:1,
101:8, 103:17,
127:20, 136:11,
143:24, 145:20

**thirteen**
133:16

**this**
8:23, 9:16,
14:20, 16:3,
16:5, 16:8,
16:15, 16:21,
21:10, 27:4,
28:19, 29:16,
35:15, 35:19,
49:7, 54:18,
60:3, 67:14,
73:13, 78:9,
78:14, 87:20,
87:21, 88:13,
89:1, 90:21,
95:4, 96:5,
102:9, 105:10,
105:24, 106:10,
107:9, 110:9,
110:24, 112:24,
113:7, 113:12,
114:3, 117:21,
119:3, 121:13,
122:2, 122:7,
123:8, 123:10,
123:20, 124:23,
125:3, 125:13,
125:15, 126:4,
126:7, 126:10,
126:12, 126:14,
129:1, 129:7,
129:12, 129:16,
129:18, 130:2,
130:6, 131:24,
132:4, 132:7,
132:9, 132:15,
132:21, 132:24,
133:1, 135:22,

135:24, 136:13,
137:11, 137:14,
138:5, 138:14,
138:20, 139:4,
139:6, 139:13,
139:19, 139:21,
142:1, 144:8,
147:6, 147:10,
148:9

**those**
11:12, 11:24,
12:1, 13:12,
13:13, 13:23,
14:16, 16:21,
20:18, 24:9,
28:15, 42:8,
43:3, 44:15,
52:15, 54:5,
62:11, 74:10,
78:14, 82:22,
86:7, 95:6,
100:23, 115:13,
118:24, 119:15,
129:19, 130:10,
130:17, 131:18,
140:5, 141:2,
145:8

**thought**
74:19, 78:13,
81:8, 81:9,
81:14, 119:8,
122:5

**thousands**
82:14

**three**
14:16, 16:21,
31:16, 37:1,
95:7, 98:2

**through**
24:23, 38:3,
42:20, 53:18,
98:13, 119:24,
120:4, 122:3

**time**
7:9, 11:17,
11:20, 12:16,
22:9, 22:10,
22:21, 23:15,

23:18, 23:19,
29:2, 31:1,
31:19, 33:13,
33:19, 34:16,
37:21, 38:21,
39:4, 39:22,
40:1, 40:3,
40:13, 40:19,
42:7, 43:10,
43:12, 43:13,
51:1, 51:21,
60:3, 65:19,
65:20, 66:4,
66:9, 67:24,
77:9, 84:16,
94:9, 96:12,
97:7, 100:14,
105:18, 120:9,
120:21, 133:4,
137:21, 137:23,
138:3, 138:23,
138:24, 141:22,
144:9, 144:12

**times**
7:5, 12:12,
17:23, 32:1,
132:22, 136:16,
137:2

**tips**
41:23

**title**
6:23, 20:5,
20:7

**today**
6:12, 6:15,
8:8, 8:19, 8:22,
8:24, 9:5,
13:16, 16:19,
17:2, 17:10,
95:9, 115:17,
117:22, 120:15,
132:19, 132:22,
145:9, 145:19

**today's**
10:7, 13:17

**together**
90:18

**told**
54:5, 54:7,

114:9, 118:13,
123:16, 136:16,
136:17, 136:18

**too**
25:6, 28:17

**took**
8:10, 9:19,
9:21, 10:1,
33:1, 33:2,
40:18, 47:23,
54:4, 54:5,
54:11, 55:11,
55:13, 55:15,
55:17, 55:23,
60:15, 68:16,
81:20, 97:19,
116:21, 116:24,
117:4, 117:11,
117:22, 118:3,
122:13, 123:3,
123:12, 123:15,
123:21, 126:7,
130:11, 130:22,
144:14

**tool**
25:19, 26:14,
47:18, 47:19,
47:21

**tools**
25:11, 25:14,
25:17, 41:21,
47:16, 47:24,
48:3, 82:21

**top**
67:14

**total**
14:16, 19:5,
96:4

**totality**
26:24

**touched**
100:8

**trained**
18:5, 54:6,
74:1, 74:3,
74:4, 79:15

**training**
18:7, 20:21,

Transcript of Mark Harvey
Conducted on April 30, 2019

180

25:8, 25:13,
54:8, 74:10,
74:11, 119:23,
119:24
**transcribed**
148:5
**transcriber**
148:1
**transcript**
5:9, 148:3
**transfer**
52:20
**trevino**
92:5, 92:8,
92:11, 92:14,
92:17
**trial**
9:3, 119:3,
120:10
**tried**
63:6
**triggered**
13:22
**tripod**
116:14, 116:17,
116:20
**truck**
40:19, 42:23,
65:12
**trucks**
84:6, 84:8
**true**
124:5, 124:7,
148:3
**truth**
6:5, 6:6
**truthfully**
8:12, 8:16,
8:19
**try**
7:20, 7:24
**trying**
75:5, 110:5
**tuesday**
1:15
**turn**
43:3, 65:14,
71:2, 84:12,

122:19, 125:3
**turned**
66:10, 99:14,
123:6, 124:1,
124:23
**turning**
33:3
**twelve**
40:6
**twice**
43:9, 54:22
**two**
7:6, 10:2,
13:7, 13:12,
13:13, 14:11,
15:23, 28:15,
52:15, 55:6,
83:15, 83:16,
98:2, 104:2,
117:5, 117:9,
118:5, 119:15,
135:14, 140:4,
140:24
**type**
65:12, 70:7,
114:13
**typed**
52:20, 53:2
**types**
24:9, 110:8,
130:14
**typically**
56:11, 56:14
**typing**
52:24

---
U
---

**uh-huh**
93:5, 121:8,
124:15, 127:4
**under**
64:15, 126:12,
126:13, 133:22,
137:17, 140:10,
141:2
**underexposed**
128:19
**underneath**
135:10

**understand**
7:21, 8:5,
17:13, 27:19,
39:6, 42:19,
44:17, 49:21,
51:10, 78:5,
78:22, 84:4,
101:16, 123:2,
123:11, 124:1
**understanding**
12:20, 13:2,
17:1, 17:9,
17:11, 96:13,
98:4, 119:5,
122:11, 123:5,
123:14, 123:16,
129:4
**unit**
30:23, 31:1,
31:2, 31:4,
31:9, 31:13,
58:11, 67:7,
70:1, 76:4,
76:22, 84:7,
84:18, 85:12,
85:17, 86:10,
86:14, 86:15
**united**
1:1
**unless**
23:16
**unmarked**
40:23
**until**
24:24, 84:6,
84:12, 101:6,
101:13, 103:8,
114:9, 119:1
**untouched**
101:24
**unusual**
10:3
**upstairs**
45:10
**use**
25:11, 26:21,
26:23, 40:21,
40:23, 48:10,

52:8, 53:4,
66:17, 67:10,
69:4, 70:7,
70:8, 70:19,
70:20, 116:14,
116:17, 116:19,
116:21, 120:19
**used**
41:1, 41:16,
48:3, 69:1,
73:8, 73:13,
81:8, 81:9,
110:17, 111:13,
118:9
**using**
67:22
**usually**
118:15

---
V
---

**van**
40:19, 44:14,
45:12, 45:14
**vans**
40:22, 41:2,
41:13
**vehicle**
41:2
**vehicles**
40:20
**verbally**
7:18
**verify**
85:11
**version**
52:24, 118:23
**versus**
70:13
**very**
80:24
**victim**
14:14, 14:24,
27:1, 29:18,
63:9, 126:13,
133:22, 134:24,
135:4, 135:10,
144:18
**victim's**
64:16, 124:12,

Transcript of Mark Harvey
Conducted on April 30, 2019

181

126:13, 133:4,
140:11
**victims**
15:24, 71:13,
71:23, 104:1,
104:2, 104:8,
104:15
**violent**
24:7
**visibility**
96:16
**visible**
124:13

**W**

**walk-through**
42:20, 55:4,
95:12
**wall**
133:14, 133:16,
133:20, 140:8,
141:6
**want**
56:2, 68:5,
71:10, 77:13,
77:16, 78:17,
82:14, 82:16,
120:24, 121:12,
122:6, 129:18,
131:23, 137:8
**wanted**
55:17
**warehouse**
20:6
**washington**
4:13, 19:10,
19:13
**wasn't**
60:1, 62:9,
107:1
**water**
40:14
**way**
19:15, 33:5,
38:14, 54:18,
68:12, 86:2,
92:1, 106:22,
107:3, 108:8,

118:15, 119:7,
119:12, 122:20,
123:6, 124:2,
124:24, 125:4,
130:2
**we'd**
38:14, 42:24
**we're**
17:1, 17:9,
59:18, 101:6,
124:19
**we've**
82:7, 95:9
**weapon**
73:10, 73:12,
73:13, 80:24,
81:7, 81:8,
81:10, 81:15
**weapons**
73:5, 74:7,
79:14, 80:18,
81:4, 82:23,
83:2
**wear**
34:17, 77:3,
77:5, 77:8,
77:16, 77:20
**wearing**
15:11, 34:17,
77:22
**week**
25:10, 32:2,
32:4, 32:5,
32:10, 37:5
**well**
23:20, 27:3,
38:7, 41:21,
43:22, 57:5,
65:23, 73:12,
76:3, 80:24,
106:21, 115:10,
124:3
**went**
31:13, 38:3,
44:14, 45:16,
47:7, 47:8,
47:10, 53:18,
54:23, 57:8,

57:14, 59:7,
60:22, 62:8,
63:16, 98:13,
116:17, 119:1
**weren't**
38:22
**what's**
13:7, 17:1,
95:6, 97:5,
129:10, 138:13,
139:11, 141:11
**whatever**
58:13, 66:21,
71:12, 73:15,
75:17, 84:6,
107:15, 121:22,
122:3
**whatsoever**
10:6, 16:16,
31:21
**when**
6:23, 7:24,
13:11, 15:15,
17:16, 21:10,
24:12, 30:13,
30:17, 31:11,
31:13, 34:8,
38:17, 38:21,
39:1, 39:4,
39:6, 39:13,
40:8, 42:13,
43:8, 43:14,
43:24, 44:4,
44:12, 44:14,
45:3, 45:12,
47:2, 47:5,
47:10, 48:17,
49:21, 51:9,
53:24, 54:6,
54:23, 57:8,
57:14, 57:20,
58:2, 59:14,
60:22, 61:21,
62:3, 63:4,
64:9, 64:23,
65:16, 70:24,
71:8, 74:10,
75:1, 75:15,

77:11, 77:12,
77:16, 78:23,
78:24, 79:20,
90:5, 91:7,
95:23, 96:8,
97:15, 98:24,
103:2, 107:6,
115:1, 116:17,
116:21, 118:8,
119:4, 128:23,
130:3
**where**
6:19, 6:21,
18:16, 19:6,
25:1, 29:8,
29:9, 29:15,
29:24, 30:3,
33:14, 38:6,
39:9, 39:10,
39:20, 43:1,
47:12, 48:6,
48:10, 54:17,
55:16, 55:22,
56:6, 56:16,
57:16, 58:7,
60:9, 62:2,
62:8, 62:19,
62:20, 63:3,
63:9, 63:15,
65:16, 65:22,
67:8, 71:10,
71:23, 72:6,
73:1, 73:10,
73:17, 74:20,
74:21, 74:22,
76:19, 82:14,
96:1, 97:22,
100:10, 101:1,
101:6, 103:16,
103:18, 107:8,
108:11, 111:5,
127:16, 135:9,
142:6
**whereof**
147:9
**whereupon**
6:2
**whether**
12:9, 15:13,

Transcript of Mark Harvey
Conducted on April 30, 2019

182

45:21, 46:6,
47:5, 63:24,
64:24, 66:16,
70:8, 83:1,
88:4, 102:5,
102:24, 111:12,
141:9, 142:13,
142:21
**which**
9:2, 9:18,
19:9, 28:2,
37:6, 45:12,
55:7, 63:19,
68:1, 119:2,
137:1, 139:15
**while**
60:15, 68:6,
87:13, 96:24
**white**
118:22, 128:14,
128:16
**who**
6:14, 25:2,
26:2, 31:6,
34:1, 34:8,
37:11, 37:19,
37:23, 48:17,
48:21, 48:23,
49:3, 50:11,
56:14, 64:4,
64:12, 68:1,
68:19, 75:1,
89:11, 90:9,
90:11, 97:10,
115:5, 131:18,
132:5
**who's**
51:1, 64:8
**whole**
6:5, 84:15,
121:17
**whom**
147:2
**why**
8:18, 17:1,
17:9, 26:23,
28:8, 28:14,
30:7, 59:2,

60:21, 61:2,
77:5, 77:16,
121:19, 122:19,
123:6, 124:1,
124:17, 124:23,
125:12, 132:7,
142:1, 142:4,
143:8, 143:11,
144:17, 144:20
**wide**
81:7
**wide-open**
80:24
**will**
13:1, 25:2,
51:20
**winter**
21:7
**with**
7:17, 11:23,
16:9, 16:12,
16:18, 26:18,
32:23, 34:21,
41:23, 42:17,
46:3, 49:5,
49:7, 57:13,
58:22, 58:23,
59:6, 60:7,
60:13, 60:18,
65:3, 66:6,
76:1, 76:23,
77:13, 78:24,
82:15, 86:16,
87:13, 88:5,
88:10, 89:23,
90:12, 90:23,
91:7, 92:2,
92:10, 93:13,
94:8, 94:20,
95:1, 97:14,
104:21, 108:21,
108:22, 110:3,
115:3, 118:8,
119:13, 119:14,
119:16, 122:21,
122:24, 123:23,
125:6, 125:18,
125:21, 125:22,

126:3, 126:4,
126:19, 127:20,
128:1, 129:2,
129:3, 129:19,
132:15, 133:18,
133:21, 139:6,
146:10
**withdrawn**
21:18, 21:19
**within**
26:4
**without**
91:10
**witness**
46:17, 123:17,
147:9
**woman**
98:3
**wooden**
141:20
**word**
46:4
**work**
6:19, 23:13,
32:2, 32:13,
32:14, 33:5,
33:6, 87:5,
87:7, 88:10,
94:8, 101:20
**worked**
6:23, 19:19,
19:20, 20:10,
20:17, 31:14,
32:4, 32:5,
36:23, 90:12,
92:10
**working**
41:11, 42:6,
43:12, 43:13,
95:1
**wouldn't**
25:22, 26:10,
28:9, 28:15,
30:8, 38:23,
43:24, 45:6,
61:2, 77:16,
113:3
**wounds**
144:22, 145:1

**writes**
68:13
**writing**
68:13
**written**
22:12, 22:14,
30:17, 36:12,
36:18, 86:15,
88:5, 105:1
**wrong**
58:22, 58:23,
59:6

**Y**

**yeah**
11:8, 21:19,
45:10, 56:20,
74:7, 78:17,
91:5, 107:5,
112:15, 123:4,
124:21, 132:11,
137:3
**year**
18:21, 19:3,
19:4, 19:5,
19:6, 20:12
**years**
20:1, 20:10
**you're**
8:1, 17:13,
25:14, 27:19,
34:17, 37:6,
42:8, 44:5,
44:7, 75:5,
75:8, 75:9,
77:17, 84:15,
90:5, 101:13,
121:15, 128:10,
132:10
**you've**
66:6, 82:6,
82:17, 83:1,
95:5, 136:15
**yourself**
120:5
**yulia**
4:11

**'**

**'**
24:2

Transcript of Mark Harvey
Conducted on April 30, 2019

183

**0**

**00**
138:24
**002499**
132:4
**0030**
137:21, 138:24
**0070**
3:15
**007966**
129:17
**007970**
129:17
**01028**
1:8
**0300**
141:24

**1**

**1**
133:18, 133:20
**10**
5:20, 32:4,
143:2, 144:13
**100**
103:24, 130:13
**1000**
4:8
**11**
1:16, 65:18,
65:23, 66:3,
66:5
**1180**
3:13
**12**
40:5, 66:16,
133:18, 133:20,
138:9, 138:24,
139:23, 140:15,
147:10, 148:18
**121**
5:11
**129**
5:12
**13**
139:16
**132**
5:13

**137**
5:14
**138**
5:15
**139**
5:16
**140**
5:17, 5:18
**141**
3:20, 5:19
**143**
5:20
**146**
5:5
**148**
1:23
**177**
31:1, 31:2
**18**
1:8
**1910**
39:24, 97:9,
144:11
**1920**
96:11
**1982**
20:14
**1987**
21:21
**1997**
21:1, 40:20
**1998**
21:10, 84:19,
84:24, 85:6,
120:15
**1:**
1:8

**2**

**200**
69:3, 69:4
**2011**
17:17
**2019**
1:15, 147:11,
148:18
**2071**
97:23

**235**
3:15
**24**
66:16, 117:9
**241122**
1:22
**243**
2:9, 3:8

**3**

**30**
1:15, 138:9,
138:24, 139:23,
140:15
**311**
2:6, 3:5
**312**
2:9, 3:8, 4:8,
4:16
**321**
4:6
**3300**
3:22
**3rd**
2:7, 3:6

**4**

**40**
32:4
**48**
117:8, 118:6
**494**
4:8

**5**

**50**
4:13
**500**
4:14
**536**
121:5, 121:14,
122:3, 122:7
**537**
122:23
**539**
123:8
**540**
124:5

**544**
124:7
**5440**
4:16
**545**
124:9
**556**
124:11, 124:19,
124:20
**557**
124:19
**565**
125:13
**576**
126:4
**578**
121:5, 122:5
**5900**
2:9, 3:8

**6**

**603**
4:16
**60602**
4:15
**60604**
3:21
**60607**
2:8, 3:7
**60622**
3:14
**60654**
4:7
**630**
3:22

**7**

**7**
144:13
**7-3**
133:18, 133:21
**71**
148:15
**735**
3:22
**74**
18:22, 19:19
**773**
3:15

Transcript of Mark Harvey
Conducted on April 30, 2019

184

**78**
19:19
**797**
130:9

---
**8**
---

**82**
19:22, 19:23
**85**
20:20
**87**
20:20, 20:21,
23:22

---
**9**
---

**97**
20:22, 23:17,
23:20, 23:22,
24:2, 24:5,
34:18, 65:16,
67:11
**98**
23:17, 23:20,
24:2, 24:5,
34:18, 40:20,
65:16, 67:11,
137:21, 138:23
**99**
37:21

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 31



Reyes 001440

PEOPLE V.
ARTURO DELEON REYES
INDICTMENT NO. 98CR-12440
PEOPLE'S EXHIBIT NO._____
40

PEOPLE V. GABRIEL SOLACHE
INDICTMENT NO. 98CR-12440
PEOPLE'S EXHIBIT NO.
40

Reyes 001443