**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-01028 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-02312 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO BAR PLAINTIFFS' EXPERT**
**DR. RICHARD LEO**

Defendant City of Chicago ("the City), through its undersigned attorneys, and for its

motion to bar Plaintiffs' expert Dr. Richard Leo, and, in support, states:

**INTRODUCTION**

Plaintiffs seek to hold the City liable pursuant to *Monell* for an alleged municipal policy of

coercing confessions. Plaintiffs claim the City had a widespread practice of coercing confessions,

to which it was deliberately different, and that such policy was the direct cause of their own alleged

coerced confessions for murdering Mariano and Jacinta Soto and kidnapping their two young

children. As alleged support for this claim, Plaintiffs rely on the expert testimony of Dr. Richard

Leo, a lawyer and social scientist, who opined that that City had a widespread practice of coercing

confessions.  To reach this conclusion, Dr. Leo collected and repeated a series of allegations where criminal defendants alleged their confessions were coerced.  For the following reasons, Dr. Leo's testimony is inadmissible.

## BACKGROUND

Dr. Leo is a professor of psychology and criminology, and his area of expertise is social psychology, criminology, the law on policy interrogation practices, the psychology of interrogation and confessions and erroneous convictions.  He received his Ph. D in Jurisprudence and Social Policy.  (Ex. 1, Leo Report, p. 1; Ex. 2, Leo CV, p. 1-2, Ex. 3, Leo Dep (9/28/22), 9:9-17).

Dr. Leo's January 15, 2022 expert report is divided into three parts.[1]  (Ex. 1).  Pages 12-29 of his report provide the social science background that informs his opinions related to Plaintiffs' claims against Individual Defendants.  Pages 29-65 of his report provide his opinions in support of Plaintiffs' claims against Individual Defendants and includes his opinion that Plaintiffs' confessions meet the criteria for what is referred to as a proven false confession in the social scientific research literature.  The remaining 30 pages of his report include his opinions in support of Plaintiffs' *Monell* claim against the City.  As for *Monell*, Dr. Leo's opinion is that the CPD had a "widespread and systemic pattern and practice of physically and psychologically coercive interrogations, especially of African-American and Latino men from 1972 to at least 2000." (*Id.*, p. 65-66; Ex. 4, Leo Dep. (9/29/22), p. 359:3-360:1).

As explained more fully below, Dr. Leo's opinion is inadmissible because it contains no explanation of his methodology or application of his expertise.  Rather, it begins with a narrative

---

[1] Dr. Leo also authored a rebuttal expert report on January 31, 2023 in response to Defendants' confession expert's report.  The opinions in his rebuttal expert report are limited to addressing the criticisms in Defendants' expert's report.

summary of allegations pertaining to Jon Burge, a former supervisor in CPD's Detective Division Area 2 who was suspended in 1991 until his ultimate termination from the police department in the 1993 and has no connection to the Soto murder investigation, and then includes "case summaries" on the coercion allegations of 62 murder suspects, where the summaries merely report what the suspect alleged in terms of purported coercion. (Ex. 1, p. 66-71). Of those 62 case summaries, 30 refer to allegations against former detectives Micheal Kill, Kenneth Boudreau, and John Halloran. (*Id.*, p. 77-82). Nineteen case summaries refer to allegations against former detectives Kato, Summerville, Lewis, Roberts, and Cirone. (*Id.*, p. 82-88). And the final thirteen case summaries pertain to allegations against Defendant Guevara and Halvorsen. (*Id.*, 88-92).

What's more, each of the 62 case summaries are not more than a few lines in his report, and some summaries are only one sentence long. (*See e.g.*, Ex. 1, p. 77-82). Following each summary, Dr. Leo's report includes citations to records Plaintiffs accumulated from unidentified sources. But the "case summaries" are merely derived from reading the documents, nothing more.

Further, the *Monell* portion of Leo's report makes no reference to the principles and publications he used to support his opinions for the underlying case set forth at pages 12-29. In particular, the *Monell* portion of his report fails to reference (1) the relevant social science research on the psychology of police interrogation practices and techniques, (2) police-induced false confessions, (3) risk factors for false confessions, (4) psychological coercion, (5) police interrogation contamination and scripting, and (6) indicia of unreliability. (*See* Ex. 1, p. 12-29, 29-65).

At his deposition, Dr. Leo could not answer most questions about whether the allegations in the 62 cases were substantiated in any way. (Ex. 4, Leo Dep. (9/29/22), p. 463:190-464:15, 465:16-21, 495:3-6, 484:7-16; 501:23-502:1; 505:17-507:8). Instead, he repeatedly answered that

he would have to look back at the material and, at times, he directly read from notes prepared for the deposition, which were not attached to his report or produced before his deposition.  (Ex. 4, Leo Dep. (9/29/22), p. 267:20-269:13; 451:11-452:23; 463:19-464:15; 467:17-468:4).  Dr. Leo testified that he created the notes after he prepared his report and solely in preparation for his deposition to aid his memory.  (Ex. 4, Leo Dep. (9/29/22), p. 268:11-269:9).  But the notes were not produced with Dr. Leo's report or before his deposition, such that Defendants were unaware of the existence of the notes until Dr. Leo began reading from them during his testimony.  (Ex. 4, Leo Dep. (9/29/22), p. 268:5-270:3; 381:22-390:15; 392:13-393:12; 427:15-21; 466:21-469:24; 476:21-477:6; Ex. 5, Leo Dep (4/24/23), p. 6:16-7:2; 10:11-19).  Dr. Leo also read from the notes to answer questions throughout his deposition despite Defendants' repeated requests that anything Dr. Leo was reading from to answer questions should be produced, yet Plaintiffs refused.  (*Id.*).

Plaintiffs eventually produced Dr. Leo's notes, totaling 91 pages, and Defendants re-deposed Dr. Leo about them.[2]  (Ex. 6, Leo notes, LEO 2268-2358).  Yet, during that deposition, Plaintiffs asserted a work-product objection to follow-up questions about the notes, including even basic questions, like how Leo created them.  (Ex. 5, Leo Dep. (4/24/23), p. 125:17-126:2, 127:9-128:6, 132:14-18; 136:9-13; 139:16-20; 142:24-143:3).

The 91 pages of notes include additional information and record citations for the summaries that are not included in the report for 38 of the 62 cases and, as explained below, are divided into the headings "evidence of coercion," "notice to the City," and "evidence of innocence," with bullet points under each heading that include detailed factual assertions like what the suspect alleged with respect to his interrogation, when and how the suspect made those allegations, and whether any of the documents provided evidence undermining the criminal defendant's guilt.  (Ex. 6, Leo

---

[2] Plaintiffs produced the notes on November 7, 2022, long after the expert disclosure date of January 15, 2022.

notes). The additional information and citations, as well as the above identified headings, appear only in the notes and are not addressed or discussed in Leo's report. The notes contain additional information for the cases, including citations to specific pages of documents, ostensibly so that Dr. Leo could provide greater information at his deposition in support of Plaintiffs' *Monell* theories that he failed to provide in his expert report. (Ex. 4, Leo Dep. (9/29/22), p. 467:5:20-469:17). Notably, however, just like his report, Dr. Leo's notes make no reference to the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, or risk factors addressed at pages 12-29 of his report. (Ex. 6, Leo notes).

In fact, Dr. Leo's notes do not describe any methodology he used in creating the notes or how he developed the information contained in the bullet point for each heading in the notes. (*Id.*, Ex. 5, Leo Dep. (4/24/23), p. 139:16-20). When defense counsel asked Dr. Leo what methodology he used to create the notes, Plaintiffs blocked him from answering by asserting a work-product objection. (Ex. 5, Leo Dep. (4/24/23), p. 139:16-20). This, of course, suggests the notes were either completed by, or in conjunction with, Plaintiffs' counsel. As explained more below, just like the rest of Leo's report pertaining to *Monell*, the notes contain nothing more than factual assertions *anyone* could glean by simply reading the documents, rather than any application of true expertise.

Additionally, even though Dr. Leo has 91 pages of notes derived from 18,000 pages of documents Plaintiffs produced,[3] his invoices do not reflect sufficient billed time to review those

---

[3] Plaintiffs produced these documents with the bates label "PTP," yet the City produced 344 investigative files and 341 Records Division Files for murder cases in discovery in this case. Despite the City's production of hundreds of homicide files, Dr. Leo only relied on documents compiled and produced by Plaintiffs. *See* Dkt. 384, where the Court recognized that it was not obvious how reviewing CPD investigative files could adduce a pattern of "coerced confessions," as Plaintiffs suggested they would, to obtain production of the investigative files in this case. Plaintiff eventually agreed they could not make use of the files for that purpose.

18,000 pages to create those notes. In fact, the invoice he provided to cover the time he would have spent preparing the notes in advance of his deposition is only 47.2 hours total. Ex. 7, Leo invoice (LEO 2425-27). Yet, the 47 hours also includes the time he spent subsequently to (1) review and analyze Defendants' expert report, (2) draft his own 16-page rebuttal report in opposition to Defendants' expert, and (3) meet with Plaintiffs' counsel. (*Id.*; Ex. 4, Leo Dep (9/29/22), p. 387:8-16; 390:9-15). Even if the 47 hours encompassed *only* reviewing the documents, given the size of the production, that averages to about six seconds a page, which then leaves <u>no</u> time to create a typewritten annotation of the documents, including categorizing the information from the documents and referencing to specific page numbers. This further suggests that Dr. Leo did not create the notes independently and that he does not have a command over the material.

Because Dr. Leo included no methodology or expert analysis in support of his *Monell* opinion, including in his notes, his conclusion that CPD had a pattern and practice of physically and psychologically coercing confessions inadmissible.[4] Having developed no other evidence to support it, Plaintiff's confession theory cannot survive summary judgment.

## ARGUMENT

### I. *Daubert* Standard.

Pursuant to Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" only if the following conditions are satisfied by a preponderance of the evidence: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

---

[4] Leo's notes do not constitute a supplement to his opinion since they were produced long after Plaintiffs' deadline to disclose their expert reports and were only produced after Defendants threatened motion practice since Dr. Leo was reading from the notes to answer questions at his deposition.

a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial judge is the gatekeeper so that unreliable expert testimony does not carry too much weight with the jury. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993); *Kirk v. Clark Equip*. Co., 991 F.3d 865, 877 (7th Cir. 2021). Expert testimony that is not relevant and reliable should be excluded. *Id.*

In deciding admissibility, the Court should consider (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017). The Court must ensure that a proposed expert's methodology is "scientifically valid" (*Daubert*, 509 U.S. at 592-93), and the proponent of the expert bears the burden of showing the testimony meets each of the elements for admission. *Varlen Corp. v. Liberty Mut. Ins.* Co., 924 F.3d 456, 459 (7th Cir. 2019).

Further, Rule 26(a)(2) requires that a party who intends to rely upon an expert witness's testimony provide a report containing "a complete statement of all opinions" the retained expert will provide, "and the basis and reasons for them." *Ciomber v. Coop. Plus, Inc*., 527 F.3d 635, 641 (7th Cir. 2008); *Salgado by Salgado v. GMC*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (holding expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions."). Parties are not permitted to cure deficient expert reports by supplementing them with later deposition testimony. *Ciomber*, 527 F.3d at 641.

**II.      Dr. Leo did not employ any methodology or expertise to reach his conclusions.**

It is well-settled that an expert who provides nothing but a bottom line, provides nothing to the judicial process. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Where an expert fails to apply his or her expertise to the facts and data in the case through reliable principles and methodology, the opinion is based merely on the expert's *ipse dixit*, and, therefore, inadmissible. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered;" an opinion connected to existing data "only by the *ipse dixit* of the expert" is properly excluded under Rule 702.). The Court should exclude expert testimony where there is too great an analytical gap between the data and the opinion proffered. *C.W. v. Textron, Inc*., 807 F.3d 827, 837 (7th Cir. 2015).

In *Minasian v. Standard Chartered Bank*, PLC, the Seventh Circuit explained that an expert cannot "offer credentials rather an analysis." 109 F.3d 1212, 1216 (7th Cir. 1997). There, the plaintiffs proffered a banking expert in support of their claim that the defendant bank had defrauded them. The Court found the expert's affidavit amounted to mere legal analysis disguised as banking expertise and, while carefully tailored to support plaintiffs' position, failed to include any analysis, specifically omitting any identification or test of any hypothesis or suggestion of any way the expert's views could be falsified. *Id.* at 1216. The Court reasoned that an expert report that "does nothing to substantiate [the] opinion is worthless, and therefore inadmissible." *Id.*

To be admissible, the expert's report must show some application of his expertise; merely reciting documents without bringing expertise to bear is insufficient. *See Hostetler v. Johnson Controls,* No. 3:15-cv-226 JD, 2020 (excluding testimony of witness trained in aerial photographic analysis who merely offered observations of pictures without including any photographic

analysis).  An expert must draw on his expertise in some meaningful way to contribute to the fact-finding process.  *See Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 U.S. Dist. LEXIS 234359, at *17-18 (E.D. Wis. Aug. 31, 2018) (excluding testimony where expert did not apply expertise as a psychologist to illuminate the documents reviewed).

Dr. Leo's *Monell* opinion lacks any expert analysis or application of his expertise.  As explained, he merely provides case summaries for allegations made against a handful of detectives, none of whom are defendants here, including collecting allegations against Defendant Guevara, as well as providing a narrative about Jon Burge.

As for the case summaries, they generally describe the murder suspects' allegations and include purported record citations but offer nothing else.  Because they are just summaries, there is no demonstrated expert analysis leading him to conclude that CPD had any alleged pattern or practice of coercing confessions. *See United States v. Brownlee,* 744 F.3d 479, 482 (7th Cir. 2014) (stating "the entirety of [an expert's] testimony cannot be the mere repetition of 'the out-of-court statements of others").

To illustrate, the first case summary Dr. Leo lists in the *Monell* portion of his report is the Frank Bounds case.  The entirety of Dr. Leo's report addressing Frank Bounds is the following:

1.  **Frank Bounds (1987)**: Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1996). (PTP-F BOUNDS-000001-000030)

(Ex. 1, Leo Report, p. 77).  Dr. Leo includes no evaluation of the allegations beyond merely summarizing them.  (*Id.*). Dr. Leo does not even attempt any expert assessment of Bounds's allegations.  He does not address any principles or methodology or reference any research or any other source material from his field.  (*Id.*).  He also does not include reference to any interview of

Mr. Bounds or anything else substantiating Bounds' allegations. (*Id.*). Further, Dr. Leo describes the allegations of Frank Bounds in one sentence as if it were fact. (*Id.*). Yet the trial court *denied* Bounds's motion to suppress the confession, and the appellate court affirmed that ruling, as well as Bounds's conviction. (Ex. 8, *People v. Bounds* opinion, PTP-F BOUNDS 1-30).

As for the notes regarding the Bounds case, although including slightly more detail, they still offer essentially the same information about Frank Bounds as shown below.

| | |
|---|---|
| Case: | Frank Bounds |
| Year: | 1987 |
| Report Page: | 77 |
| Location: | Area 3 |

**Summary in Leo Report:**

Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder.

**Materials Provided Supporting Summary In Report:**

| Description | Bates Range |
|---|---|
| Supreme Court of Illinois Opinion - People v. Bounds, 171 Ill.2d 1, 29-30 (1995). | PTP-F BOUNDS-000001-000030 |

**Evidentiary Support for Summary:**

A. Evidence of Coercion and Abuse

- According to a 1995 Illinois Supreme Court opinion, Bounds stated at a suppression hearing in his criminal trial that Detectives William Foley and William Kelly denied his request to speak to an attorney following his arrest, and Kelly hit him on the forehead and tried to kick him in the groin when he denied knowing anything about the crimes. PTP-F BOUNDS-000013
- Per that opinion, Bounds also asserted that Detective Michael Kill threatened that Bounds's girlfriend would lose his job if he did not sign a statement, and all three detectives—Foley, Kelly, and Kill—promised that his girlfriend's name would not be released to the media if he signed a confession statement. PTP-F BOUNDS-000013
- Per that opinion, Bounds's girlfriend, Susan Mitchnick, testified that Detective Kill and another officer questioned her at her home about Bounds, and Kill threatened to run her name "through the mud" in the media. PTP-F BOUNDS-000013.

B. Evidence of Notice to the City of Chicago

- Per the above, the City was on notice of Frank Bounds's testimony regarding alleged physical abuse by William Kelly at the time of the suppression hearing in his criminal trial and prior to 1995.

C. Evidence of Innocence
- See evidence of coercion and abuse, above.

(Ex. 6, Leo Notes, p. LEO 2276). Again, just like the case summary in his report, the notes merely summarize Mr. Bounds's allegations. (*Id.*). There are no specialized terms of art or definitions. There are no psychological principles or factors. (*Id.*). There are no references to published sources or studies. (*Id.*). There are no measurements or ratings. (*Id.*). Nor is there any reference to any first-hand information or observation collected by Dr. Leo. (*Id.*). If anything, just like the expert in *Minasian*, the notes appear to be disguised legal analysis. Indeed, they are divided into headings that just so happen to track the elements necessary for Plaintiffs to prove their *Monell* claim, including "evidence of coercion and abuse," and "notice to the City of Chicago," not Dr. Leo's specific expertise. *See Minasian*, 109 F.3d 1212, 1216 (excluding expert who did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion).

Added to that, there can be no doubt that the notes lack any expert analysis because Plaintiffs asserted a work product privilege to questions regarding the methodology about creating them. If the *methodology* is work-product, that means the *lawyers* provided input. If the *lawyers* provided input to the methodology – so much so that Leo did not even invoice any time for creating the notes – then preparing the notes did not require the analysis of an expert to complete.

In addition to the case summaries, Dr. Leo's report also includes a narrative regarding Jon Burge that is similarly inadmissible. Like the case summaries, Dr. Leo's opinion merely recounts allegations against Burge, how they came to light, as well as his characterization of the City's response to those allegations through the decades since, including the fact that Burge was terminated from CPD and sentenced to prison. (Ex. 1, p. 66-71). In fact, as one of his sources, Dr. Leo simply referred to a chart of so-called torture victims prepared by Plaintiff Solache's counsel, again, without any effort to substantiate the truth of the allegations or analyze them with

any methodology. (*Id.*, p. 66; Ex. 4, Leo Dep. (9/29/22), p. 367:17-368:6; 368:20-369:12; Ex. 9, Chart, (PTP-NOTICE 829-842).

Narrative testimony, based on the expert's review of documents, does not involve any scientific, technical, or other specialized knowledge. *Baldonado v. Wyeth*, No. 04 C 4312, 2012 U.S. Dist. LEXIS 68691, at \*15 (N.D. Ill. May 17, 2012). To be sure, just as with Plaintiffs' other expert, Anthony Finnell, "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology." *United States SEC v. ITT Educ. Servs.*, 311 F. Supp. 3d 977, 987 (S.D. Ind. 2018). Even if an expert uses his or her expertise to wade through the documents, merely providing a narrative of the records reviewed amounts to "advocacy-based interpretation of documents," not an admissible expert opinion. *Baldonado*, 2012 U.S. Dist. LEXIS 68691, at \*15.

While Dr. Leo's lack of expert analysis in support of his *Monell* opinion is plain on the face of the report, it also stands in stark contrast to his analysis of Plaintiffs' interrogations in the underlying case. On the underlying case, Dr. Leo's opinion is 50 pages long. (Ex. 1, p. 15-66). It includes the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. (*Id.*). Within those sections and others, there are citations to resources and numerous terms and factors and principles related to Dr. Leo's field. (*Id.*). Whereas the case summaries pertaining to his *Monell* opinion include none of that detail, proving he employed no expertise or methodology for that part of his report. Because experts are expected to provide the same level of rigor they would in their academic fields, such testimony should be excluded. *See Obrycka v. City of Chi.*, 792 F.

Supp. 2d 1013, 1026 (N.D. Ill. 2011) (excluding expert testimony given disparities between expert's professional standards and the ones he employed as an expert in the case).

On top of that, Dr. Leo's conclusion is that the CPD had a pattern and practice of coercing confessions from African-American and Latino men, yet he does not mention anywhere in his report (or his notes for that matter) the race of any of individual who made allegations of abuse. (Ex. 1, Leo Report, p. 77-82, 83-88, 88-92, 92-93, 93-94).

Ultimately, Dr. Leo claims his conclusion that CPD had a pattern and practice of coercing confessions from African-American and Latino men is supported by a "pattern" of cases but Dr. Leo's analysis of the 62 cases summarized and his Burge narrative suffer from the same fatal flaw: a complete lack of methodology or application of his expertise. Plaintiffs, therefore, cannot rely on his opinion to support their coercion policy theory. *See Chen v. Mnuchin*, No. 14 C 50164, 2020 U.S. Dist. LEXIS 180574, at *14-15 (N.D. Ill. Sep. 30, 2020) (excluding expert testimony where expert failed to explain the methodologies and principles that support his opinion); *Teran v. Coloplast Corp.*, 633 F. Supp. 3d 1103, 1112 (N.D. Ill. 2022) (excluding expert testimony where expert failed to conduct expert analysis to reach his conclusion); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 U.S. Dist. LEXIS 48792, at *82 (N.D. Ill. Mar. 31, 2017) (excluding expert testimony where expert offered no discernable methodology).

### III.    Dr. Leo's unsupported conclusions are not helpful to the jury.

To be admissible under Rule 702, an expert's opinion must aid the jury in determining an issue in the case. The point of the expert testimony is to help the jury understand some issue that requires some specialized knowledge, skill, or expertise. *Hostetler v. Johnson Controls*, No. 3:15-cv-226 JD, 2020 U.S. Dist. LEXIS 151437, at *16 (N.D. Ind. Aug. 21, 2020) (expert witnesses

13

must bring their expertise to bear in such a way that their expertise helps relate the evidence to the jury in a way that will assist the jury's understanding of the evidence) (citing *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)).  The jury does not need an expert to explain matters that are common knowledge.  *Id.* (rejecting expert's opinion that consisted mostly of drawing inferences from the evidence that he was no more qualified than the jury to draw).

Here, as explained, Dr. Leo offers nothing but a bottom line, so his testimony would not help the jury understand any fact or issue in the case.  *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). He provides only case summaries and a narrative about Jon Burge that merely describe the allegations of abuse.  A jury does not need an expert to explain that allegations that police detectives physically abused criminal suspects until they confessed amounts to an allegation of coercion.  It is well within common understanding that an officer inflicting significant physical harm on a suspect to obtain a confession is coercive and involuntary.

Further, Dr. Leo bases his *Monell* opinion merely on his review of the documents, not any witness testimony elicited in the case.  For instance, for several of the case summaries, Dr. Leo's cites only newspaper articles.  (*See e.g.*, Ex. 1, p. 78 (Ewing and Stoke case), 80 (Neal case), 83 (Cage case), 85 (Lucas case), 86 (Rogers case), 87 (Washington case).  In other words, Dr. Leo apparently read the newspaper article and then summarized it in his report.  Not only are newspaper articles insufficient to substantiate allegations, but certainly the jury does not need an expert to read the newspaper to them.

Additionally, several of the documents Leo cited to support his case summaries are incomplete.  The Coston case is an example.  (Ex. 1, p. 78; Ex. 10, p. Coston citation, PTP-J COSTON-1-3).  There, he cites a few pages of what appears to be a deposition transcript, but the

14

transcript does not include the name of the person testifying. (*Id.*). Contrary to Dr. Leo's reliance on the document, it appears to be an unnamed officer *denying* allegations of coercion. (*Id.*).

The record citation for the Emmett White case is also incomplete in that it refers to a portion of a transcript from an apparent criminal proceeding in Milwaukee and does not mention the officers for whom Leo claims White made accusations against. (Ex. 1, p. 82; Ex. 11, White citation, PTP-E WHITE 1-7).

Other case summaries cite court opinions, like the Bounds case, that affirm the criminal defendants' conviction, necessarily undermining any allegation of coercion.[5] And while some summaries refer to transcripts and affidavits, setting aside witnesses who may have been named as 404(b) witnesses against Defendant Guevara, none are identified as witnesses in this case.

In short, the most Dr. Leo can offer the jury is a summary of documents that Plaintiffs provided him that he read. Under no circumstance is that proper expert testimony. Dr. Leo cannot serve as a stand-in to deliver Plaintiffs' counsel's arguments for which they failed to develop the requisite evidence.

WHEREFORE, Defendant, City of Chicago, Respectfully Request This Honorable Court Grant Its *Daubert* Motion To Bar Plaintiffs' Expert Dr. Richard Leo. in its entirety, and for any other relief as this Court deems just and reasonable.

---

[5] In addition to Frank Bounds (Area 3, no.1 in Leo's Report), for the cases of Anthony Lash (Area 3, no. 18), Johnny Plummer (Area 3, no. 20), Anthony Robinson (Area 3, no. 22), Anthony Williams (Area 3, no. 29), Kevin Murray (Area 4, no. 10), Gregory Shelton (Area 4, no. 14), and Ronald West (Area 4, no. 18), Dr. Leo's report cites to court opinions affirming the defendant's conviction. (Ex. 1, p. 77, 80-82, 85-87; Ex. 12, PTP-A LASH-000001-000011; Ex. 13, PTP-J PLUMMER-000001-000010; Ex. 14, PTP-A ROBINSON 000001-000006; Ex. 15, PTP-A WILLIAMS-000001-000008; Ex. 16, PTP-K MURRAY 000001-000013; Ex. 17, PTP-G SHELTON-00001-000006; Ex. 18, PTP-R WEST-000001-000008). For the Derrick Harvey case (Area 4, no.5), Leo's report cites an appellate court opinion concluding Harvey's appeal was barred by procedural default. (Ex. 19, PTP-D HARVEY-000001-000023).

Dated: December 16, 2024

Respectfully Submitted,

by: /s/ *Eileen E. Rosen*
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Austin G. Rahe
Lauren M. Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com