**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | Case No. 18 C 1028 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 18 C 2312 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF ARTURO REYES' STATEMENT OF ADDITIONAL FACT IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Annie Prossnitz
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Jan Susler
Ben H. Elson
Nora Snyder
**People's Law Office**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
jsusler@peopleslawoffice.com

## Arturo Reyes and Gabriel Solache's Innocence

### *Arturo Reyes and Gabriel Solache did not kill Mariano and Jacinta Soto.*

1.      Plaintiffs Arturo Reyes and Gabriel Solache did not kill Mariano and Jacinta Soto, did not kidnap the Soto children, had no involvement in the crime, and have no knowledge of who killed Mariano and Jacinta Soto or kidnapped their children, beyond the convicted Adriana Mejia. In November 2022, the Circuit Court of Cook County granted the Certificate of Innocence petitions of Reyes and Solache, and the Illinois Court of Claims, expressing regret for the conduct that befell them and acknowledging that the justice system failed them, awarded them the maximum amount allowed by statute. Ex. A; Ex. B; Ex. C; Ex. D; Ex. E at 109:18-110:10; Ex. F at 340:1-21 (AR told Guevara he had not participated in the crimes, that he was unjustly accused); Ex. G at 172:1-12; Ex. H at 669-670; Ex. I at 477:24-484:18.

2.      Aside from the evidence fabricated by Defendants that purportedly tied Reyes and Solache to the alleged crimes, there was no other evidence connecting either of them to Mariano and Jacinta Sotos' deaths or the kidnappings of their children. For example, Defendants did not connect Reyes or Solache to the weapons used in the murders in any way, Ex. J (absence of such evidence in entire Sotos police files); there was not a shred of physical evidence—such as a fingerprint, a fiber, a shred of DNA evidence, or any other forensic evidence—that connected Reyes or Solache to the murders or kidnappings, Ex. J (absence of such evidence in entire Sotos police files); in fact, they were both excluded as the source for many of the items of physical evidence tested from the crime scene, Ex. K at 1588-1631; and no evidence was ever developed that Reyes or Solache knew or had any connection to the victims, and thus any motive to harm them or kidnap their children, Ex. J (absence of such evidence in entire Soto police files).

1

3.      Reyes and Solache testified at their motion to suppress hearings that they were innocent and the only reason they ever signed any statement implicating themselves was because they were physically abused by Defendant Guevara. They repeatedly reaffirmed this testimony about their innocence, and the abuse that caused them to falsely confess, including at their criminal trial, post-conviction hearing, and certificate of innocence proceedings, and this civil case. Ex. L at 635:6-636:15; Ex. M at 17:2-24 (JR-L 097699); Ex. M at 25:18-26:16 (JR-L 097707- JR-L 097708); Ex. N at 13:17-17:24; Ex. O at 718:1-723:22 (CCSAO 55639-55645); 725:8-10 (CCSAO 55647); 745:10-20 (CCSAO 55667); Ex. P at 2053:23-2056:2 (CCSAO 56976-56979); 2059:3-2060:7 (CCSAO 56981-56983); Ex. Q at 8018-8020; Ex. R at 40-57; Ex. S at 1-49; Ex. T at 1-2.

## I.      The Soto Murders and Kidnappings

4.      In March 1998, Mariano and Jacinta Soto were living at 2071 N. Leavitt on Chicago's North Side, with their two young children, two-month old Maria Guadalupe and three-year old Santiago. In the early morning hours of March 28, 1998, Mariano and Jacinta were stabbed to death in their home. Their two children were kidnapped. The bodies of Mariano and Jacinta were discovered when police forcibly entered their home on April 1, 1998 following a well-being check. The Soto children were missing. Ex. T at RFC-Solache/Reyes Ex. T at RFC-Solache/Reyes 377-381.

## II.      Initial Investigation by the Responding Officers

5.      The first responding police officers, Valentin and Bergadon, had initially been called for a wellness check on the Soto family, because neighbor Raul Aranda and members of the Soto family were concerned that the Sotos had not been seen or heard from for several days. When Officers Valentin and Bergadon arrived at the Soto home, the front door was locked from

the inside. The responding officers had to break a window and reach in to unlock the door.

Guevara and Halvorsen reported they found a set of keys in the deadbolt lock inside of the

exterior door which opened into the kitchen. Ex. V; Ex. W at 15:6-24, 16:12-17:7. Ex. X at 470-

476; Ex. Y at 33:2-21; Ex. T at 382.

6.    Upon entering the apartment, the responding officers discovered Mariano Soto's

body laying on the kitchen floor a few feet from the entrance door. The officers saw "blood

everywhere" and noticed that Mariano Soto had multiple knife wounds about the body. He had

been stabbed 39 times. The officers then found Jacinta Soto face down in the bed in a fetal

position covered in blankets with multiple knife wounds on her back. She had been stabbed

twenty times. The officers searched the apartment for the Soto children but they were not in the

apartment. Ex. J at 381-382; Ex. Y at 13:21-14:9, 37:16-38:23, 41:23-44:3.

7.    Evidence technicians and other officers at the scene collected a number of items

of physical evidence from the scene, including: a knife that was in a box behind the couch in the

Soto residence; a knife that was on the ground underneath Mariano Soto; physical specimens

from both victims including a vial of blood; oral, rectal, and vaginal swabs; clothing; hair

samples; and fingernail clippings; blood-stained baby blanket and baby pants. Ex. J at 96-113,

378-379; 390-395, 406-409.

**III.    Detectives Guevara and Halvorsen are assigned**

8.    On April 1, 1998, shortly after the bodies were found, Defendants Guevara and

Halvorsen were assigned to the Soto investigation by Defendant Mingey. They went to the crime

scene and spoke to the responding officers about how they had entered the apartment and found

the bodies. Guevara and Halvorsen then walked through the apartment themselves and observed

the bodies, and then after the bodies were removed conducted an additional, extensive search of

3

the apartment. Ex. Z at RFC-Solache/Reyes 482; Ex. AA at RFC-Solache/Reyes 483; Ex. BB at RFC-Solache/Reyes 484; Ex. T at RFC 381-83; Ex. CC at RFC-Solache/Reyes 425; Ex. DD at 1424:5-1430:10, 1436:9-1437:9, 1671:6-1672:20; Ex. Y at 53:15-55:23; Ex. EE at 24:4-25:2, 56:16-26, 132:4-135:23.

### IV. Defendants interrogate members of the Soto family

9. Defendants' investigation initially focused on several members of the Soto family. Guevara and Halvorsen brought Rosa Aranda, Jose Aranda and Felicia Soto into Area 5. Rosa and Felicia Soto were nieces of Mariano and Jacinta Soto. Defendants held them for three days and interrogated them as suspects in the Soto murders and kidnapping. Defendants repeatedly accused them of killing the Soto parents and kidnapping the Soto children, and told each one of them that the others had confessed and were implicating them in the crimes. Defendants took photos of Rosa, Jose and Felicia as part of their interrogations of each of them. Defendants also took several of Mariano Soto's siblings into custody, interrogated them at Area 5, and told them they were guilty of the crimes. Defendant Guevara told one brother, Jorge Soto, that all of Mariano's brothers were suspects. Ex. FF at 17:9-23:19, 33:4-35:23, 45:23-46:24, 47:20-48:3, 50:6-9, 51:11-15, 52:1-5, 63:19-64:7, 72:21-73:8; Ex. J at RFC-Solache/Reyes 78-81. Ex. GG at 18:10-15, 52:2-4, 53:3-60:9, 73:1-75:15; Ex. HH at 26:3-15, 30:2-32:15, 36:13-37:8, 38:19-39:5.

### V. Reyes and Solache Rent Rooms at the Mejia Family Home

10. In and around 1998, Rosauro and Adriana Mejia lived in an apartment at 6234 S. Mozart in Chicago, owned by Rosauro's brother, Horacio Mejia. Rosauro and Adriana rented rooms in their apartment to other people. Ex. II., Ex. JJ at 12:6-13:5, 14:5-8; Ex. KK at 24:20-25:14, Ex. E at 77:8- 78:9; Ex. LL at 252:1-8; Ex. MM at 57:7-12, 117:4-6; Ex. G at 137:12-

4

138:21; Ex. E at 84:8-85:7 (Reyes testified that he paid rent to live on the first floor of the Mozart residence with Rosauro and Adriana Mejia, Solache, and a man named Carlos).

### Reyes

11.     In or around December of 1997, Reyes moved to Chicago from Mexico. Reyes had come to the United States in hopes of finding work and making money to support his family. He first stayed with his sister-in-law's family while he got a job and looked for his own place. He could not read or speak English. Reyes quickly found a job through Kelly Temporary Services and began working full-time at Ed Miniat, Inc., a meat plant located in South Holland. Reyes spent almost all of his time working. Any free time he had he spent writing letters to his family, calling his wife, or spending time with his sister-in-law's family. He hardly ever interacted with Adriana or other members of the Mejia family. Ex. E at 33:20-34:3, 49:8-50:14, 52:2-17, 76:2-78:9, 86:7-87:6, 89:7-18, 89:5-90:4, 90:9-11, 109:1-6, 126:19-127:11; Ex. NN at JR-L 102125 - JR-L 102131.

12.     Reyes did not know anyone in the Mejia family and was not related to any of them. He learned that Adriana and Rosauro had a room available in their apartment through Manuel Mejia, who lived down the block at 6228 S Mozart. Reyes moved into the Mejias' apartment shortly before his arrest. When Reyes was arrested in early April 1998, he had been living in the Mejia home for a short time, and had only been in the United States for about four months. Ex. E at 86:7-87:6, Ex. F at 240:14-22; Ex. M at 54:23-55:8 (JR-L 097736 - JR-L 097737); Ex. E at 77:17-22, 86:7-87:6; Ex. F at 185:10-12.

### Solache

13.     Solache left Mexico in 2016 to work to save enough money to build a house in Mexico and return home. Having come from the same small Mexican town as the Mejia family,

5

he came to Chicago in 2016 at the suggestion of Adriana Mejia's brother Carlos, and was renting a room from the Mejias at the time Reyes moved in. Solache could not converse in or read English at the time. During the time he lived in the Mejia home, Solache had some limited interactions with the Mejia family. Ex. MM at 27:24-28:10, 55:24-56:12, 105:2-106:3, 107:7-9, 233:24-234:3, 251:20-24; Ex. LL at 295:5-16.

### VI.        Adriana Mejia Pretends to Be Pregnant

14.        Reyes and Solache both noticed that Adriana Mejia appeared to be pregnant, which was consistent with what they overheard from the Mejia family members. However, Adriana Mejia was pretending to be pregnant. She told her family she was pregnant. She had her husband, Rosauro, and others take her to doctor appointments under the pretense that she was pregnant. Ex. F at 246:14-22; Ex. MM at 106:16-107:5; Ex. OO at 2-3; Ex. JJ at 19:19-23, 24:8-10, 114:12-18; Ex. KK at 43:2-6.

15.        Certain members of the Mejia family did not believe Adriana was pregnant. One member of the family, Jose Mejia, witnessed Adriana placing the pillow under her clothes and confronted Adriana about this. Adriana told him to keep his mouth closed about it, not to tell anyone. However, Jose Mejia told Rosauro what he witnessed. Rosauro told Jose Mejia he did not want to hear about it. Despite allegedly expecting a baby, Rosauro and Adriana did nothing to prepare for having a child.  Ex. OO at 2-3; Ex. PP at 51:12-52:10, 53:11-55:3; Ex. W at 186:2-187:22 (Rosauro testifying that the couple did not have a crib, diapers, formula, stroller, or car seat in advance of the birth).

16.        On March 28, Rosauro and Adriana Mejia came home from the hospital with what the couple claimed was their newborn baby girl. They also brought home a three year old boy that Adriana had claimed was the son of a woman named Norma Salazar who had gone into

labor at the hospital and had no one to watch the child. This was not true—the children were Maria Guadalupe and Santiago, the two Soto children who had been kidnapped the night before at the Soto residence. Ex. DD at 1966:7-1967:8, 1984:12-1985:9, 2048:22-2049:2, 786:18-787:5.

17.     Solache first learned of the baby and boy being at the home when he woke up in the apartment around noon on March 28 and heard a baby crying. Reyes first encountered the boy Santiago at the apartment on the morning of March 29, finding him asleep on the floor of the living room. On March 29, after Adriana had been picked up by Rosauro and come home with the baby, Reyes saw Rosauro in front of the apartment building washing his car with all the floor mats pulled out. Ex. DD at 56969:2-56971:5, Ex. F at 271:19-272:19, 277:12-20.

18.     Reyes and Solache had no idea that Adriana Mejia had been pretending to be pregnant, that her story about Norma Salazar was untrue, and that the children she had brought home were in fact the kidnapped Soto children. Ex. MM at 117:11-15; Ex. LL at 250:15-251:24, 261:17-24; Ex. G at 2148:3-8; Ex. N at 52:9-13; Ex. E at 116:7-17; Ex. F at 302:19-303:3, 305:14-17, 313:21-314:1.

## VII.     Reyes and Solache bring Santiago Soto to the police station

19.     Reyes soon became concerned for the boy's well-being. When Reyes first encountered the boy on Sunday morning, March 29, Santiago Soto was asleep on the floor of the living room with no blanket or pillow. The next day, Adriana Mejia insisted that Reyes watch the young boy for her. Reyes took the day off of work and watched him for part of the day. The boy was sad, crying, and asking for his mother and father. Reyes tried to cheer him up by buying him something at the store. Reyes noticed that the boy had red marks on his wrists like he had been tied up. Later, when Reyes spoke to Adriana, she told him the boy's mother was coming to pick the boy up. Ex. F at 279:11-281:15, 282:6-283:8, 283:12-285:11, 285:17-287:4.

7

20. At the time Adriana asked Reyes to babysit the boy, she told him that the boy's mother was Norma Salazar. Adriana provided Reyes with a handwritten note that contained Norma Salazar's name and phone number. Reyes then copied the information onto a piece of paper, which was merely the information Adriana had provided to him about the boy and his mother. Ex G at 2124:21-2125:21; Ex. E at 147:4-148:19; Ex. F at 189:7-190:3.

21. Overnight on Thursday April 2 into April 3, Reyes was woken up by an argument between members of the Mejia household about the boy outside his bedroom. After coming out of his room, Reyes discovered Adriana, Rosauro, Guadalupe, Carlos Martinez, and the boy, along with Solache, all awake in the living room. The boy appeared sad, dirty, and mistreated. Carlos Martinez was sitting on the couch crying. The Mejia family was arguing and yelling at each other about the boy. Reyes then heard that Rosauro had suggested that they should put the boy out on the street. Reyes came to the boy's defense. He stood physically next to him, held the boy's hand, and suggested that they take the boy to the police. Solache agreed. And so on April 3, 1998, Reyes and Solache, along with Rosauro Mejia, voluntarily brought the kidnapped boy, Santiago Soto, to the 8th District Chicago police station at approximately 2:00 a.m. Ex. F at 289:15-291:24, 292:24-294:18, 295:7-21, 296:18-19; Ex. QQ at 88:15-89:12; Ex. LL at 266:18-267:5; Ex. R at 45:21-46:6; Ex. P at 2049:11-20.

22. After getting to the 8th District on April 3, Reyes, Solache and Rosauro were told to wait for a Spanish-speaking officer to get there, and waited for over two hours. At approximately 4:15 a.m. a Spanish-speaking officer named Solis arrived. Rosauro told Solis that the boy was the child of a woman named "Norma Salazar" who had asked Rosauro's wife, Adriana, to watch her son "Leonardo" because Salazar was giving birth and had no one to watch her son. Reyes, Solache, and Rosauro were then transported in a police car to Area 5

8

headquarters, where they were eventually separated and each placed in locked interrogation rooms. Ex. MM at 263:15-264:3; 269:13-270:5; 274:24-275:12; 276:1-10; 278:19-279:1; 280:11-14; Ex. RR; Ex. SS.

23.     After Reyes and Solache were transported to Area 5 on April 3, 1998, they were placed in a room together with Rosauro Mejia. After a while, officers separated the men. Reyes and Solache then each sat in an interrogation room alone for another period of time. Ex. F at 305:23-307:14, 305:6-306:3, 307:11-20; Ex. LL at 278:19-22, 280:4-10.

## VIII.     Defendants Use Physical and Psychological Abuse to Get Adriana Mejia to Falsely Implicate Reyes and Solache

### Adriana Implicates Norma Salazar, but Defendants Fabricate Evidence to Eliminate Salazar and Target Reyes and Solache Instead

24.     After establishing that Adriana had the missing Soto baby in her custody, the police brought Adriana and the baby to Area 5. When she had previously spoken to Dickinson when officers first came to her home, she had already volunteered information about a woman named Norma Salazar. Once at Area 5, on April 3, 1998 at 11:30 am, Defendant Guevara interrogated Adriana for the first time, during which Adriana implicated herself and Norma Salazar in illegally obtaining the Soto children. Adriana explained that she had met Norma Salazar at the University of Illinois Clinic and agreed to pay her $600 for a baby girl. Adriana told Guevara that they met twice at the clinic after that—once for Salazar to give her the baby and another time at which point Norma Salazar asked Adriana to watch the three-year-old boy, claiming it was her son. She did not implicate Reyes or Solache at all. Detectives obtained a copy of Norma Salazar's photo through CPD resources and Adriana positively identified Salazar as the person who gave her the children. Ex. TT at RFC-Solache/Reyes 000450; Ex. J at 194-196; Ex. UU at 60:6-61:7, 67:15-69:14, 71:11-17); Ex. II at 432-433; Ex. YY at 6:15-8:4.

9

25.     Defendants made no effort to meaningfully investigate or pursue Norma Salazar as a suspect, and instead fabricated evidence to make it appear that she had been eliminated as a suspect when in fact she had not. Contrary to Guevara and Halvorsen's police report, no Norma Salazar was ever actually brought to Area 5, placed in a live lineup, or eliminated as a suspect. In fact, the Chicago Police Department requires all live lineups to be documented in a lineup report, but there is no lineup report in the entire Soto homicide file indicating that a live lineup occurred. Ex. II at 433 (police report stating Norma Salazar was not identified in Area 5 lineup; no documentation of interview or how she was eliminated); Ex. UU at 165:3-168:7 (required to document live lineups in lineup report); Exs. J & VV (absence of lineup report in entire Sotos homicide files); Ex. WW at 163:16-164:14 (if they had conducted live lineup, they would have documented it in a lineup report), 167:12-168:7 (if they had interviewed her and eliminated her as suspect, they would have documented the interview and how she had been eliminated in handwritten notes and/or a supplementary report).

26.     Instead, over the next 11 hours, Defendant Guevara subjected Adriana to physical abuse, hitting her in the back and slapping her until she bled, insulted her, threw food at her, and threatened that something bad would happen to her and her family if she did not cooperate and adopt the story falsely implicating Reyes and Solache in the crime. Up to this point, Adriana had not implicated Reyes or Solache in the crime whatsoever. Ex. XX at 842:12-845:5, 847:24-849:2; Ex. YY at 15:15-22:23; Ex. ZZ at 115:1-116:21, 122:18-22, 126:24-127:17; Ex. AAA at 65:21-66:9; Ex. II at RFC 432-434; Ex. BBB at 265:4-15.

27.     After subjecting Adriana to this abuse, Guevara took steps to make her falsely implicate Reyes and Solache in the crime. Guevara dragged Adriana into the interrogation room where Solache was handcuffed to the wall and placed Adriana in front of him. Guevara insulted

Solache and questioned whether he had committed the crime; when Solache did not answer, Guevara said he was tired of him and slapped him across the face. Standing between Adriana and Solache, Guevara asked Adriana if Solache was the one who had committed the murders and told them to discuss what they had planned. Ex. XX at 849:8-850:24, 851:11-852:10, 868:1-24, 869:1-14; Ex. CCC at CCSAO 45545.

28.     Guevara also dragged Adriana by the elbow to Reyes's interrogation room, where Reyes was seated and handcuffed to the wall. Guevara ordered Adriana to sit down in a chair facing Reyes, two or three feet away from him. As Adriana faced Reyes, Guevara asked her if he was the other person who had committed the murders. When she and Reyes stayed silent, Guevara yelled at Adriana and told her to go fuck herself. Ex. XX at 853:21-24; Ex. YY at 38:2-39:11, 38:9-24, 39:1-4, 39:15-24.  Ex. CCC at CCSAO 45545.

29.     At the point Guevara took Adriana into Reyes's and Solache's respective interrogation rooms to pressure her to falsely implicate them in the crime, both Reyes and Solache had denied any involvement in the crime. They had not made any confession whatsoever. It was only after Guevara had physically abused Adriana, threatened her, and dragged her to Solache's and Reyes's interrogation rooms–after coaching her on the story he wanted her to adopt–that Adriana falsely implicated Solache and Reyes in the crime. In the presence of Defendant Halvorsen, a statement was taken from Adriana documenting her confession, and implicating Reyes and Solache in the crime. Ex. LL at 305:23-306:17; 312:11-21; 314:13-315:3; Ex. F at 340:1-21; 344:4-345:7; Ex. ZZ at 126:2-127:17; Ex. DDD.

30.     Defendants Rutherford, Dickinson and Trevino also took a turn interrogating Adriana. Trevino served as a translator for Rutherford and Dickinson during the interview allowing all of them to communicate with Adriana, and afterward they relayed the information

11

they learned back to Guevara. Rutherford and Dickinson then generated a handwritten Chicago Police Department general progress report ("GPR") that contained part of the script Defendants wanted Adriana to adopt, falsely claiming that Adriana had made a confession statement implicating Reyes in the crime. The GPR documents a version of the crime similar to the one Defendants fed to Reyes and Solache and documented in their confession statements, and was false. Ex. UU at 57:7-58:7, 73:19-74:9, 79:12-81:20, Ex. WW at 35:12-19, 38:12-39:1, 39:4-24, Ex. YYY at 119:9-120:12, 127:6-13, 129:9-5, 211:14-213:14. Ex. EEE at RFC 260-265; Compare Ex. EEE with Exs. FFF, GGG (implicating Reyes in crime and scheme to steal baby); Ex. UU at 66:22-67:14, 73:19-23; *see supra* at Paragraphs 1-3 (Reyes and Solache's innocence, establishing falsity of implicating statements); *see infra* at 48-53, 58-61, 63 (Reyes and Soalche's confessions based on story that came from police, not Reyes and Solache).

### *Adriana Disavows the False Confession She Signed*

31. In October 2019, Adriana asserted her Fifth Amendment rights when asked whether she falsely implicated Reyes and Solache in the crime; whether every aspect of her handwritten statement implicating Reyes and Solache was false; and whether Guevara had invented the story that Reyes and Solache were involved for her to adopt. Ex. AAA at 150:5-10; 165:13-21; 213:17-24, 1-5; 223:5-13.

32. Most recently, she disavowed any claim that Reyes had any knowledge of, or role in planning, the crime, as well as any claim that he participated in killing anyone. Adriana admitted she never spoke to Reyes in the Mejia residence; Reyes never knew she was faking her pregnancy; Reyes did not know about the plan to kill the Sotos couple; and Reyes did not participate in their killings. Ex. ZZ at 26:9-27:10; 32:20-22; 96:1-4; 98:10-20; Ex. HHH at 9:14-22; 120:23-124:9; 220:3-10.

12

33. Adriana has also wholly changed her account of Solache's involvement in the crime, indicating that it was also false from the start. At her 2001 sentencing hearing, Adriana blamed Reyes for helping plan the kidnappings and committing the killings, while Solache stood by. At her most recent deposition, however, Adriana provided a new account, claiming Solache agreed to get a baby from Norma Salazar and committed the killings out of his romantic feelings for her, while implicating herself in the kidnappings only. And yet, Adriana wrote a letter to Solache in July 1999, accepting fault and seeking his forgiveness for making him suffer. She admitted "I know I don't deserve anything from you," that if he helped her go to Mexico to bid farewell to her parents and seek their forgiveness, she would return to jail "because this is what I deserve," and help free him. Ex. III at 1-40; Ex. ZZ at 11:23-12:3, 14:2-7; 23:18-22, 24:17-25:6; Ex. HHH at 82:20-83; Ex. JJJ; Ex. MM at 121:6-122; Ex. AAA at 129:7-13, 130:13-131:16, 131:21-133:23, 135:3-136:18.

34. Adriana Mejia was responsible for the killing and kidnapping of the Soto family. Her DNA was found on evidence found at the crime scene; she brought the children home to her house and pretended the baby was hers; and she had been pretending she was pregnant and that the baby girl was her own daughter. Ex. III at 10:8-36:13; Ex. K at 1604:12-16, 1605:1-1606:5, 1611:7-11, 1611:24-1613:8, 1615:22-1617:4; Ex. DD at 1964:12-20, 1966:13-22, 1987:9-17.

### *Defendant Guevara does not deny that he abused Adriana Mejia*

35. When Defendant Guevara was asked under oath about whether he physically abused Adriana Mejia–including by slapping and hitting her, pulling her hair, and slamming her head into a table–and whether he knowingly forced Adriana to falsely implicate Reyes and Solache—including by feeding her facts—Guevara invoked his Fifth Amendment right against

self-incrimination. Ex. BBB at 230:23-232:14, 261:18-21, 262:4-20, 263:8-264:18, 265:4-21, 267:4-268:5, 269:4-270:9, 336:13-23, 433:17-22, 443:15-445.

IX. **Adriana's Handwritten Statement Implicating Reyes and Solache Was Demonstrably False**

*The call logs from the Mejia residence contradict Adriana's statements implicating Reyes and Solache*

36. According to the handwritten statement signed by Adriana, on March 27th, she called the Mejia home at about 5:15 p.m. to tell everyone she had a baby and would call back to speak to Rosauro. Her statement then says she called back at about 7:00 p.m. However, Defendants obtained phone records for the Mejia residence, which were entered into the police file by April 13, 1998 at the latest. The Mejia residence only had one phone: 773-925-5124. There are no calls coming in to that number at 5:15. The only incoming call from that timeframe was a 42 second call that came in at 5:22 p.m. from 773-476-5061. There is also no call coming into the Mejia residence at 7:00 p.m. Ex. KKK at RFC 161; Ex. DDD at RFC 287; Ex. V at RFC 153, 155 (demonstrating telephone records requested on April 8, 1998); Ex. LLL at RFC 72 (stating telephone records entered into the investigative file on April 13, 1998).

37. Instead, the calls to and from the Mejia residence that evening, overnight, and into the next morning, refute the confession story obtained from Adriana; and in particular, undermine any claim that Reyes and Solache had been involved in perpetrating the crime, and instead implicate members of Mejia's family, Carlos Rodriguez and Jose Mejia. For example, between 6:15 and 6:25 p.m. on March 27, around the time Adriana was supposedly calling the house to inform them that she had the baby, there are two calls coming in and one call going out to 773-927-1345, which is the phone number for a restaurant called Jalisco Birrieria, where Adriana's brother, Carlos Martinez, worked. The next morning, Saturday March 28th, Adriana

14

called Guadalupe's phone and told the family she was ready to be picked up. But the only two incoming calls to the Mejia residence that morning did not come from any number associated with the hospital; rather, they came from Jose Mejia's cell phone number of 773-434-8643. In fact, there are four different calls to and from 773-434-8643, the cell phone of Jose Mejia: a 1 minute and 34 second call from the Mejia residence to Jose Mejia at 10:38 p.m; a 1 minute and 29 second call from Jose Mejia to the Mejia residence on the 28th at 12:31 a.m.; a 27 second call from Jose Mejia to the Mejia residence on the 28th morning at 10:50 a.m; and a 5 minute and 25 second call from Jose Mejia to the Mejia residence at 11:41 a.m. Ex. MMM; Ex. KKK at RFC 161, 168; Ex. NNN at 171:11-172:14, 187:23-188:9; Ex. OOO at 12:14-24; Ex. PPP at 69:5-19, 112:9-19; Ex. OO at 2; Ex. PP at 88:17-89:5, 131:21-133:20, 164:22-165:10.

***The medical records contradict Adriana's handwritten statement and implicate Rosauro Mejia***

38.     According to her handwritten statement, in June of 1997 Adriana told everyone she was pregnant because she really believed she was, that she did not discover she was not pregnant until September of 1997, and that she did not tell anyone that she was not pregnant. This is contradicted by her medical records. Those records show that (1) she was given a test to determine if she was pregnant on June 18, 1997, the results of which were negative; (2) the medical records show that by December 1996, Adriana had been told by her doctors that she was infertile, and she went to various appointments with her fertility doctors between 1996 and 1998; and (3) Rosauro also went to fertility doctors, even during the period in which–according to Adriana's statement, and Rosauro's–he was under the mistaken belief that she was pregnant: he had at least one sperm analysis test on February 18, 1998 and another sperm analysis appointment scheduled for March 20, 1998. *Compare* Ex. DDD at RFC 282-283, Ex. QQQ at RFC  315 *with* Ex. RRR at JR-L 099726, JR-L 099717, JR-L 099713-099740, 099711-12, 099734.

15

39. According to her handwritten confession, Adriana had an appointment on Friday, March 27 that Rosauro took her to, and at which she was seen by nurses who took a blood sample and gave her another appointment for April 9. The medical records contradict this, demonstrating instead that on March 26, 1998, Adriana had an appointment at the UIC Women's Health Center located at 1801 W. Taylor Street. The Soto medical records demonstrate that on that next day, March 27, Jacinta Soto had an appointment one block away at the UIC Perinatal Center at 820 S. Wood Street. Ex. RRR at JR-L 099753-54; Ex. DDD at 285; Ex. SSS at AR-L 106438-106440, 106443, 106444 .

### *Adriana had befriended Jacinta Soto before the night of the crime*

40. Contrary to Adriana's confession statement, Adriana befriended Jacinta Soto before March 27. Jacinta met Adriana at the UIC medical clinic on Taylor Street and encountered her at various other hospitals. Adriana would visit Jacinta at her apartment, give Jacinta gifts, and pick Jacinta up and take her to medical appointments. When a Soto family member inquired about Adriana, Jacinta said Adriana did not want to be introduced to anyone in the Soto family. A week before the murders, Jacinta's apartment keys went missing following one of Adriana's visits. *Compare* Ex. DDD at 283-287 *with* Ex. GG at 81:1-83:19, 91:8-92:2 and Ex. W at 64:12-20, 65:17-21.

41. Jacinta Soto was not the only woman with a baby that Adriana targeted. Prior to the Sotos murders, Adriana had befriended at least two other pregnant women, Diana Gama and Elisa Sanchez. Adriana met Gama at Mt. Sinai Hospital. Adriana met Sanchez through Guadalupe Mejia. Adriana asked Sanchez a number of questions about when she would be alone and whether police or security were in proximity to her home. After the murders, Guadalupe Mejia told Sanchez that Adriana had planned the crimes for a long time, had met Jacinta Soto at

16

the clinic and made friends with her prior to murdering the Sotos and kidnapping the children. Ex. TTT; Ex. UUU; Ex. VVV at 19:5-21:11, 24:6-21, 33:1-12.

X. **Defendants Use Physical and Psychological Abuse to Extract a False Confession from Arturo Reyes**

*The physical and psychological abuse used during Reyes's interrogations*

42. Defendant Guevara eventually entered the interrogation room, took the hat off Reyes' head, and slapped him hard across the face. Speaking Spanish to Reyes, Guevara asked him why he did it. Reyes repeatedly denied that he had done anything wrong, and told Guevara that he had no idea what Guevara was talking about. Guevara then left the interrogation room, leaving Reyes handcuffed to the wall. Paper was then placed over the little window on the door to the interrogation room. Eventually, Guevara then came back into the interrogation room, bringing a consent-to-search form for Reyes to sign. Guevara screamed at Reyes and ordered him to sign it. Because Reyes had nothing to hide, he willingly signed the form. Reyes was then left chained to the wall for a period of time that felt like forever to Reyes. Ex. F at 299:19-300:1, 300:17-301:10, 305:23-307:14, 313:8-314:8, 314:9-19, 315:1-316:23, 318:23-319:16; Ex. L at CCSAO 55540:1-55541:0, Ex. G at 2103:9-17 (Q-151-Q152), 2104:2-9 (Q-152), 2107:3-2108:10, 2107:12-2108:7; Ex. WWW.

43. After Reyes had been held at the police station for more than a full day and had not had anything to eat or drink, Guevara returned and brought Reyes to a larger conference room, where Defendants Trevino, Dickinson, and Rutherford were also present. There was a chalkboard in the room with information about the crime written on it. Guevara and Trevino both spoke to Reyes in Spanish, and then they translated the answers into English for Dickinson and Rutherford. They wrote additional things on the chalkboard and asked Reyes if he recognized what was written on the chalkboard. Reyes did not recognize what Defendants had written on the

17

chalkboard. Guevara told Reyes that he was not helping himself, that he was letting other people blame him for a crime. Guevara then told Reyes that if he did not confess to his role in the murders and kidnappings, Reyes was going to get the electric chair. This caused Reyes to experience a great amount of fear and panic. He became afraid he would never see his family again. Ex. G at 2106:21-2107:2, 2110:1-24, Ex. DD at 621:19-623:14; Ex. F at 320:10-322:4, 323:14-325:23; Ex. XXX at 103:17-104:11; Ex. YYY at 227:1-228:22, 236:7-237:18, 262:18-265:3; Ex. DD at 547:15-548:13, 548:15-549:13, 567:3-14, 587:7-588:5; Ex. UU at 57:11-58:7, 77:1-7; Ex. WW at 51:9-20, 179:24-180:12, 198:6-17.

44. Defendant Guevara then left the room. Defendant Trevino then entered the room and offered to help Reyes, and got him a Coke. Reyes again told Trevino he was innocent. Trevino ignored Reyes and accused him of the crimes, telling him that Adriana Mejia was claiming that she paid Reyes money to participate in the double murder and kidnapping. Ex. DD at 624:1-625:24, 627:22-628:13.

45. Reyes was then taken back to the interrogation room and left alone for a very long time. When Guevara came back in, he took Reyes' pants, as well as his shoes and his jacket. Guevara then left him alone in the cold room. Guevara later returned and began yelling at Reyes and again accusing him of the crimes. Every time Reyes denied Guevara's accusations, Guevara slapped Reyes in the face. The slapping increased in force each time Guevara delivered a blow to Reyes' face. Reyes was seated and handcuffed and Guevara was standing over him slapping him over and over again. Guevara became enraged that Reyes continued to tell him the word "No," and that he was not involved in any crimes. The slapping went on for a long period of time before Guevara eventually left the room again. Guevara also threatened Reyes with the electric chair. Ex. F at 233:11-15 (Guevara threatened Reyes with the electric chair, before Reyes met

18

with ASA O'Malley and Officer Trevino), 325:4-23, 330:8-332:4, 333:11-334:15, 338:14-340:1, 340:14-341:15; Ex. DD at 628:19-629:12, 629:13-630:24.

46.     Later, Guevara returned with Adriana Mejia, who looked disheveled—her eyes were red and her hair was messed up. Guevara held Adriana by the arm and instructed her to speak. Adriana then said in Spanish that Reyes "did everything." Reyes did not understand what Adriana was talking about. Guevara then told Reyes that there were other witnesses accusing him of having committed the crimes. Guevara then forcibly took Adriana and left the room. Ex. F at 342:24-343:12, 344:4-345:10; Ex. DD at 631:1-19.

### *Defendants coerced Reyes by targeting several of Reyes's vulnerabilities*

47.     Reyes had never been previously arrested or charged with a crime, let alone been interrogated by police. This was compounded because he was dealing with police officers in a foreign legal system that he did not understand, making the physical abuse and threats of the electric chair particularly frightening. Defendants also subjected Reyes to an excessively long interrogation, sleep deprivation, exhaustion and fatigue. Reyes had worked on April 2, 1998 until midnight, and then awoken to take the boy to the District 8 police station at approximately 4:00 a.m. on April 3rd, and so he had barely slept that night. He then endured a lengthy interrogation from April 3 through April 5, lasting approximately 40 hours, during which he could not sleep because he was handcuffed to a ring next to a table. Ex. F at 311:1-14, 319:9-16, 341:11-15; Ex. NN at JR-L 102127; Ex. ZZZ at 34-47.

### *Based on the abuse he suffered, Reyes's will was overcome*

48.     Trevino returned to the room and spoke to Reyes. Trevino gave Reyes a sandwich, the first food Reyes had eaten during the many hours he was at Area 5. Trevino told him the only way Trevino could help Reyes was if he would sign some paperwork for the State's

Attorney. Based on the physical and psychological abuse to which he was subjected, Reyes was exhausted. He was in pain, and did not want to be beaten anymore. He was scared, and fearful from the threats of the electric chair. Reyes believed that the only way to prevent Guevara–who had become increasingly angry–from beating him more was to do whatever Guevara and Trevino told him to do. Trevino promised to help Reyes if he signed and initialed the paperwork. Trevino made Reyes believe that he was going to investigate everything and make certain that the truth was going to come out. Reyes believed that if he signed the papers, he was going to be released and able to go back to his family. Ex. F at 233:11-15, 252:15-253:13, 253:4-13, 258:6-261:18, 262:13-263:12, 325:4-23, 345:11-346:18, 347:21-348:4; Ex. N at 21:8-17; Ex. DD at 631:20-633:21; Ex. ZZZ at 34-47.

### *Defendants got Reyes to sign a confession based on a false story they knowingly fed to him*

49.     Around 2:00 a.m. on April 5, 1998, almost two full days after Reyes had gone to the police station and had been placed in rooms at Area 5, Trevino took Reyes to another room with Assistant State Attorney Thomas O'Malley. Reyes signed a handwritten statement, written in English, confessing to crimes he had nothing to do with. O'Malley did not speak Spanish, so he had no way of knowing what Trevino was actually asking, or what Reyes was actually answering. So, during the statement taking process, ASA O'Malley asked questions in English, which Reyes did not understand. Trevino, acting as a translator, would then ask Reyes a question in Spanish, and Reyes would answer in Spanish. Trevino would then say something to O'Malley in English, and O'Malley would write it down in English. Ex. G at 2116:11-2117:24; Ex. F at 216:18-218:6, 219:6-221:19, 222:9-223:7; Ex. YYY at 270:9-18; Ex. AAAA at 70:18-71:21, 181:16-184:19.

20

50.     In reality, Trevino coaxed Reyes to give a statement that was manufactured by Defendants Guevara, Trevino, and the other Defendants designed to falsely implicate Reyes and Solache in the murders and kidnapping of the Soto family. Some of the time, Trevino would ask Reyes questions about Reyes' employment or where he was from in Mexico and Reyes would answer. At other times, Trevino would ask questions or say things about the details of a murder and kidnapping. Trevino would say something about the crime and tell Reyes to repeat it; or, Trevino would say something and tell Reyes to acknowledge what Trevino said; or Trevino would talk about a crime and Reyes would not say anything at all in response. Trevino would then talk to O'Malley again in English, who would write things down. Ex. F at 219:6-220:24, 222:9-223:22, 237:3-8, 239:22-240:13, 241:22-244:1, 247:23-248:2, 258:14-259:17, 260:5-7, 262:4-263:12.

51.     The things Trevino was saying about the murder and kidnapping of the Soto family–those were all things that were said by Trevino, or had been said by Guevara, Trevino, Rutherford and Dickinson during the earlier interrogations by the police. Other than things about Reyes's background or employment, none of the information about the crime came from Reyes; it was all things told to him by Guevara and Trevino. Ex. F at 219:6-20, 237:13-238:23, 240:23-241:21, 261:9-18, 347:1-20.

52.     Reyes did not know what the statement actually said. The statement was never read to Reyes in Spanish, nor could Reyes read it in English. To make it seem more credible, Trevino directed Reyes to put his initials next to cross-outs in the confession statement. Trevino instructed Reyes to sign the statement, and he did. Reyes signed the statement because his will was overcome. And because he wrongly trusted Trevino that signing it would help him return to his family. He did not know it was a confession to a heinous crime, and he did not sign it because

21

it was the truth. To the contrary, the confession was entirely false—Reyes had nothing to do with the crime. Ex. F at 221:1-9, 225:3-226:7, 236:14-20, 252:12-23, 253:9-13, 261:9-18.

53.    Defendants Rutherford and Dickinson also prepared a handwritten Chicago Police Department general progress report ("GPR") of an interview of Reyes they conducted with Trevino, falsely claiming that Reyes had made a confession statement implicating himself, Solache and Adriana in the crime. The statements about the crime contained in the GPR did not come from Reyes; they were written by Dickinson, and was information that came from Guevara and Trevino. The information was false. Ex. EEE at RFC 257-65; Ex. UU at 61:8-13, 81:25-83:20, 83:21-24, Ex. QQ at 70:15-22, 243:17-245:8, 246:12-247:22; Ex. WW at 229:1-24, 237:1-4, 248:3-22; Ex. F 219:6-19, 235:19-236:13, 236:21-237:8, 237:13-24, 241:22-244:21, 245:14-246:10, 246:23-247:18; 249:1-9; 250:10-252:11, 253:20-254:20, 255:8-15, 261: 9-18; Ex. UU 193:22-194:5, 197:5-8, 200:18-201:4, 202:8-14, 203:7-11, 204:10-12, 205:13-16, 206:8-13, 21-15, 207:9-11; *see supra* at Paragraphs 1-3(Reyes' innocence, establishing falsity of implicating statements).

## XI.    Defendants Use Physical and Psychological Abuse to Extract a False Confession from Gabriel Solache

### *The physical and psychological abuse used during Solache's interrogations*

54.    After Solache sat alone in an Area 5 interrogation room, two officers entered and, without speaking to Solache, took his shoes and left him alone in the room. Next, a Spanish speaking officer took Solache to a bigger room, and told him he was accused of some murders and when they took place. When Solache told him it was impossible because he was working at the time, providing the name of the company where he worked, the officer told him he was lying, that he better tell the truth or he would be "fucked up," and then returned him to the same small

22

room, re-handcuffing his right hand to a ring on the wall. Ex. LL at 280:11-14, 292:19-295:1, 297:4-301:21; Ex. O at 716:19-717:1; Ex. II at 438.

55. Defendant Guevara then walked into the room, beating Solache who was cuffed to the ring, asking why he did it, slapping Solache hard on the left side of his face, more than once. When Solache asked what he'd done, Guevara told him he didn't want any more lies because something bad was going to happen to him. Solache told Defendant Guevara that he'd already explained to another officer where he was working when the murders took place. More slapping –and hurt–ensued, for what seemed like forever. Ex. LL at 302:4-13, 304:5-305:22, 306:2-5, 307:6-308:15, 311:21-312:3; Ex. R at 49:18-50:1, 68:22-69:1.

56. Defendant Guevara soon returned with Adriana Mejia, asking Solache if he was going to continue claiming he was innocent in front of Ms. Mejia. Guevara forced Adriana Mejia to claim that Solache helped her and that he stabbed the man. Solache said that was not true, that he hadn't done anything. Defendant Guevara slapped him again, in the same left side of his head, ultimately resulting in a complete loss of hearing in Solache's left ear. Defendant Guevara took Adriana Mejia away, leaving Solache in pain. Guevara then returned alone, and, while Solache was still handcuffed to the ring on the wall, Guevara used his fist to beat Solache several times in the stomach. Ex. LL at 311:15-315:12; 315:23-316:10, 339:7-10; Ex. XX at 868:1-870:24; SS7024 at 24:11-17; 47:2-48:6; Ex. O at 723:1-9, 750:6-9; Ex. P at 2055:18-2056:2; Ex. R at 51:7-52:3.

### *Defendants coerced Solache to sign a false statement by targeting several of Solache's vulnerabilities*

57. Solache was particularly vulnerable to the physical and psychological coercion because of his personal background. He had been in the United States for two years, but lived with Mexican people, isolated from U.S. society. Solache did not speak or understand English,

could not read English, and he had never been arrested before, was totally unfamiliar with police procedures, and generally did not know his rights. He was not able to comprehend what was going on during the interrogation, especially the physical abuse and psychological threats, which intimidated and frightened him, and heightened his feelings of hopelessness and helplessness. Defendants combined this with an excessively long interrogation, handcuffed to a wall, subject to sleep deprivation, exhaustion and fatigue to induce Solache to sign his confession. They knew Solache had worked a long day of labor on April 2, 1998, had only had little sleep prior to arriving at the District 8 police station. And Solache was offered food and drink only once by Defendants, after he signed a confession, and was taken to the bathroom only once. Ex. O at 716:2-18; 720:1-3, 728:17-729:23, 750:24-751:8; 758:3-5; Ex. LL at 237:3-6; 252:12-19, 295:5-18, 304:5-308:22, 311:21-312:3, 312:11-314:5, 316:6-10, 315:23-318:4, 322:9-21, 325:17-22; Ex. I at 475:4-16, 479:8-14, 483:17-484:18, 485:10-486:10, 486:21-487:19; Ex. ZZZ at 55-61; Ex. BBBB at RFC 4129-4140, 4144-4153; Ex. GGG at 1-9; Ex. R at 56:10-12.

### *Based on the abuse he suffered, Solache's will was overcome*

58.     Based on the physical and psychological abuse to which he was subjected, Solache was exhausted. He was in pain, and did not want to be beaten anymore. Solache believed that the only way to prevent Guevara, who had now beaten him on three separate occasions, from beating him more was to do whatever Guevara wanted, whatever Guevara indicated he was to do. Upon the third beating, Solache falsely confessed to Guevara—the only detective who interrogated him—that he had done it. Ex. LL at 304:5-308:22, 315:23-318:4; Ex. II; Ex. R at 51:22-52:3; Ex. O at 720:7-723:18; Ex. ZZZ at 55-61.

### *Defendants got Solache to sign a confession based on a false story they knowingly fed to him*

59.     On April 5, at 3:35 a.m., more than 40 hours after Solache had been placed in a room at Area 5, Defendant Guevara returned and brought Solache to a different big room where ASA Heather Brualdi was. He could not understand anything ASA Brualdi and Guevara said to each other; and Brualdi could not understand anything Guevara and Solache said to each other. Guevara, the detective who had slapped and beaten him, served as interpreter, speaking to Solache in Spanish, then purportedly translating into English, and then ASA Brualdi writing whatever Guevara told her. Ex. LL at 318:14-320:20, 322:11-325:1, 325:17-326:1, 326:5-11; Ex. QQ at 125:8-14; 195:6-18; Ex. GGG.

60.     Some of the time, Guevara would ask Solache questions about where Solache was from in Mexico, or about his address, and Solache would answer. At other times, Guevara would say something untrue, and Solache responded the way Guevara wanted him to, as he had already been beaten, was afraid, and needed to avoid being beaten again. Solache did not know what ASA Brualdi was writing in English, and Guevara never read him anything. Solache just signed the pages and placed his initials where Guevara instructed, because he felt intimidated, and because Guevara told him he had to sign. To make the statement seem more credible, Guevara directed Solache to initial cross-outs in the confession statement that Solache could neither read nor understand and that were not read to him. Defendant Guevara then took Solache back to the interrogation room. Ex. I at 475:10-477:13; 477:24-478:24; 479:2-483:5, 484:9-18; 486:21-487:8; 487:20-489:13; Ex. LL at 327:2-7.

61.     Guevara's physical abuse left visible effects. At Solache's initial appearance in court on April 6, 1998, the assistant state's attorney documented in the state's attorney's file that Solache had injuries, and, on the motion of Bernard Sarley, the assistant public defender assigned to Solache for only the initial appearance, the court entered an order allowing the public

25

defender investigator to go the courtroom lockup to photograph the injuries the public defender saw on Solache. Ex. CCCC at 18 (confidential); Ex. DDDD at 4-16; Ex. EEEE at 27:6-13, 53:15-54:5, 56:7-10, 83:12-84:1, 99:18-21, 102:5-13.

## XII. Defendants Knew Reyes's and Solache's Handwritten Statements Were False

### *Defendant Guevara does not deny that he abused Arturo Reyes and Gabriel Solache in order to get them to give confessions he knew were false*

62. When Defendant Guevara was asked under oath whether he used physical abuse, threats and other coercive tactics against Reyes and Solache, and fed them facts, to get them to falsely implicate themselves and each other in the Soto murder and kidnapping, Guevara invoked his Fifth Amendment right against self-incrimination. Ex. FFFF at 53:15-17, 53:21-54:1; Ex. BBB at 137:23-139:1, 139:15-21, 140:20-141:1, 200:23-201:6, 221:16-21, 270:20-271:3, 289:14-291:21, 331:13-23, 332:2-19, 337:15-338:-19, 339:5-10, 340:24-345:22, 348:19-349:18, 477:11-16, 478:23-479:6.

63. The Defendants knew the statements they were taking from Reyes and Solache were false, because they knew that all of the information about the crime and how it occurred came from them, not from Reyes and Solache. In other words, the Defendants had fed Reyes and Solache the facts, and the story they wanted them to repeat. None of the statements in the confessions came from Reyes or Solache. Ex. F at 219:6-19, 234:14-237:12, 241:22-244:1, 245:14-249:9, 250:10-252:11, 253:20-255:15, 258:6-262:18, 260:16-263:5, 263:17-264:1, 266:13-269:2; Ex. I at 477:24-478:24, 479:2-14, 480:12-482:12, 483:21-486:18. That Defendants knew the statements were false is further evidence by the following: (a) rather than pursue a lead pointing to Norma Salazar, they fabricated evidence to make it appear as though Salazar had been eliminated as a suspect, *see supra* at ¶¶24-25; (b) they then brought Adriana into the interrogation rooms Reyes and Solache were in to make clear that they wanted her to implicate

26

them in the crime, *see supra* at ¶¶27-29; (c) they then subjected Reyes and Solache to physical and psychological abuse in order to overcome their repeated denials of any involvement in the crime, *see supra* at ¶¶42-48, 54-58, 62; and (d) they fed Reyes and Solache facts of the crime and the story they wanted them to repeat as a purported confession.

### *Knowing the confessions were fabricated, Halvorsen orders cessation of further testing on potential DNA evidence*

64.     One of the items recovered at the Soto crime scene, lab exhibit #22, was an empty cardboard box labeled "Regent Sheffield Laser Cutlery 7 Piece Block Set," recovered by Det. D. Engel from behind the couch in the kitchen of the Soto home.  It was submitted to the Illinois State Police lab for testing to "examine reddish stain on top of empty cardboard box for the presence of human blood." But after obtaining statements from Reyes, Solache and Adriana, on April 18, 1998 Halvorsen called the lab and instructed technicians not to analyze the red stain on the box that could have been used to identify the true perpetrator of the crime. The handwritten report documenting Halvorsen's instructions states: "about exhibit #22, originally thought had something to w/something. Now, they think it has nothing to do with anything. Will not analyze." Ex. J at 95-96, 103-104, 109-110, 383, 499; Ex. GGGG at RFC 5429.

### XIII.     Reyes's and Solache's Handwritten Statements Are Demonstrably False

### *No physical evidence connects Reyes or Solache to the crime*

65.     Mariano and Jacinta Soto were stabbed more than 50 times, leaving a crime scene that was full of the victim's blood, DNA and other physical evidence, including bloody knives, blood-stained clothing and bed coverings, shoe prints in blood, and hairs and fingerprints throughout the house. Not a single piece of the substantial forensic evidence (hair, fingerprints, DNA, etc.) linked Plaintiffs to the Soto murders. Neither Plaintiffs' DNA was found at the crime scene, and no DNA from Plaintiffs was found on the Sotos. The DNA evidence and DNA testing

27

excluded both Plaintiffs as the source of any of the physical evidence left by the true perpetrators at the crime scene. There was no physical evidence—such as a fingerprint, a fiber, a shred of DNA evidence, or any other forensic evidence—that connected Reyes or Solache to the murders or kidnappings. Ex. VV at 479, 481-484; Ex. J at 406, 408, 420; Ex. T at 377-382; Ex. J (absence of such evidence in entire Sotos police files), Ex. K at 1615:3-1616:16; 1617:18-1620:17; 1621:1-1622:15; Ex. HHHH at 1577:19-1579:2; Ex. ZZZ at 30-31.

### Reyes' and Solache's work records contradict their false confession statements

66.     According to the confession statement Reyes signed, Solache picked up Reyes on March 28, 1998 at 1:30 a.m. from behind the Mejia home at 6234 S. Mozart, after which they went to commit the crime. According to the confession statement Solache signed, "he finished work at 3:00 in the early morning hours." Ex. FFF at 3; Ex. GGG at 2-3.

67.     Contrary to the confession statements, on March 28, 1998 at 1:30 a.m. Solache was at work at Ready Metal Manufacturing Company, located at 4500 W. 47th Street, Chicago, more than 4 miles from the Mejia residence. Solache did not get off of work that morning until 2:30 a.m., as confirmed by his time records from work. He did not get home from work that night until approximately 4:00 a.m. Ex. LL at 236:12-237:9, 242:1-18; Ex. IIII at Solache 7321-7322; Ex. JJJJ at 8:6-12, 29:13-30:13, 31:17-33:18, 65:14-68:16; Ex.ZZZ at 30-31.

68.     Reyes was also at work late on March 27, at the Miniat Meat Packing Plant located at 16250 Vincennes Ave, in South Holland, IL, more than 20 miles from the Mejia residence. He clocked in at 12:30 p.m. and got off work at 11:15 p.m. Reyes did not leave work that night until approximately 12:00 or 12:15 a.m., and did get home until approximately 1:00 a.m., when he was dropped off by his co-worker, Salvador Olivares. Olivares picked Reyes up the next morning, March 28, at 10:00 a.m. and Reyes worked for 12 hours and 15 minutes, from

28

11:00 a.m. to 11:45 p.m, that day. Reyes' coworkers and supervisors observed him on March 28 and did not notice any performance issues related to him. He appeared to be the same worker as he had been all days prior. Ex. DD at 2183:17-2185:4. Ex. NN; Ex. DD at 2184:22-2185:16, 2177:4-6, 2180:12-19; Ex. ZZZ at 30-31.

***Reyes's and Solache's false confessions are inconsistent with the crime scene evidence***

69.     According to the handwritten statements signed by Reyes and Solache, Adriana Mejia knocked on the door to the Soto home, and then Jacinta Soto opened the door, and Adriana asked if she could come in. With the door now open, Reyes and Solache then rushed into the Soto apartment and Reyes immediately stabbed Jacinta Soto by the front door upon entry, where she fell to the ground. According to the handwritten statements signed by Reyes and Solache, they then went into the bedroom, where Mariano Soto was lying in bed, and Solache went over and began stabbing Mariano to death in the bed. However, contrary to the statements, Jacinta's body was not found near the front door to the apartment; instead, her body was found in the bedroom. Likewise, Mariano's body was not found on or near the bed where he had supposedly been sleeping. Instead, Mariano's body was found lying face up by the front door to the apartment. Ex. GGG at 4-6; FFF at 4-5; Ex. T at 377-382; Ex. Y at 37:16-38:9, 42:2-23; Ex. DD at 1425:12-24; Ex. ZZZ at 31-32.

70.     According to the handwritten statements of Reyes and Solache, after the crime Reyes purportedly discarded his sweatshirt and the knife he used in a nearby garbage container, and Solache purportedly threw the knife he used in the stabbing just outside the bedroom door. However, contrary to the statements, police canvassed the area thoroughly and searched for weapons and other physical evidence, but never recovered a knife, sweatshirt or any other evidence connected to Reyes; and no knife was recovered from the scene next to the bedroom

29

door. *Compare* Exs. FFF & GGG *with* Ex. VV (absence of such evidence in police investigative file); Ex. at 337-38, 384 (canvass of apartment and garbage cans, other surrounding buildings); Ex. UUUU at 337; Ex. KKKK at 338; Ex. GGG at 6; Ex. Z; Ex. Y at 164:17-19.

### *Reyes and Solache's confessions contain additional contradictions that make them demonstrably false*

71.     The confession statements Reyes and Solache signed are also demonstrably false because they contradict one another: (a) the Reyes statement states that Solache picked him up at 1:30 a.m. on Saturday March 28 and that they then picked up Ms. Mejia at around 2:00 a.m.; but the Solache statement states that he finished work at 3:00 a.m. on March 28, *compare* Ex. FFF at 296 *with* Ex. GGG at 306-307; (b) the Reyes statement says they picked up Adriana in an alley; but the Solache statement says they picked up Ms. Mejia at the University of Illinois Hospital; *compare* Ex. FFF at 296 *with* Ex. GGG at 307; (c) the Reyes statement states that he took the baby and boy to the car; but the Solache statement states that Adriana took the baby and Reyes took the boy, *compare* Ex. FFF at 298 *with* Ex. GGG at 310; (d) the Reyes statement states that Solache and Adriana dropped him off at home and then went to the hospital; but the Solache statement states that he and Reyes dropped Adriana at the hospital and then went back home, *compare* Ex. FFF at 299 *with* Ex. GGG at 311.

### XIV.     Police Recover Soto Baby from Mejia Home and Collect Evidence

72.     When Reyes, Solache, and Rosauro Mejia brought the boy to the police station, Defendants quickly realized that it was in fact the Soto boy, which they confirmed with the Soto family members they had detained at Area 5. Defendants then went to the Mejia home to speak to Adriana. They found Adriana in possession of a baby girl, who she was pretending was her own daughter. Police suspected it was the missing Soto baby girl. The police brought Adriana and the baby to Area 5, and confirmed that the baby was in fact the missing Soto baby girl,

30

Maria Guadalupe. Ex. JJ at 39:7-15; Ex. GG at 65:12-66:11; Ex. FF at 56:7-17; 98:14-18; 100:7-101:5; Ex. TT at 450; Ex. J at 194-196; Ex. UU at 60:6-61:7, 67:15-69:14, 71:11-17.

73.     At the Mejia home, police also recovered a number of items of evidence, including Adriana Mejia's pants and shoes. They later returned to the Mejia home to collect additional physical evidence. Having obtained consent from Reyes to search his rooms, the police went to his room and searched, concluding "nothing of evidentiary value was found." Ex. II at RFC 440-441; Ex. J at RFC 124, 332.

## XV.     Defendants Attempt to Obtain a False Statement from Rosauro Mejia Using Physical and Psychological Abuse

74.     Defendants Guevara and Halvorsen physically abused Rosauro Mejia in an effort to get him to implicate himself in the Soto murders and kidnappings. It was Guevara and Halvorsen who conducted the interrogations of Rosauro. Halvorsen held Rosauro down while Guevara openly beat him in the middle of the open area at Area 5. Guevara repeatedly asked Rosauro how much money he had paid for the Soto baby girl. When Rosauro told Guevara he did not know what he was talking about, Guevara struck Rosauro in the face and body. Over the course of two days of interrogating Rosauro, Defendants refused to let Rosauro use the bathroom and only gave him food and water once. Eventually, Rosauro signed a statement implicating Adriana but not Plaintiffs. Adriana called Rosauro several times after being arrested and admitted she was involved in the murders but she never once told Rosauro that Plaintiffs were involved. Ex. II at 438 (it was "reporting detectives," Guevara and Halvorsen, that conducted the interrogation of Rosauro); Ex. DD at 1974:7-1975:3; LLLL at 8-9 (AR-L 517181-517182) (Guevara beating while the other officer restrains Rosauro); Ex. JJ at 48:23-50:24, 60:19-61:21,

31

104:24-106:24; Ex. LLLL at 8-9 (AR-L 517181-517182); Ex. MMMM at 3 (JR-L 099330); Ex. KK at 59:5-60:23.

### *Defendant Guevara does not deny that he abused Rosauro Mejia*

75.     When Defendant Guevara was asked under oath about whether he physically abused Mejia, including by hitting him repeatedly until he became too exhausted to continue the beating, Guevara invoked his Fifth Amendment right against self-incrimination. Ex. BBB at 219:15-220:18, 221:16-222:5.

## XVI.     <u>Defendants Coerce Guadalupe Mejia to Give a False Statement Implicating Reyes</u>

76.     After the Soto baby had been recovered at the Mejia home, Guadalupe Mejia and her husband, Jorge Mejia, were also brought to Area 5 and questioned. They were treated as suspects and interrogated. Guadalupe Mejia was accused of the crime, which she repeatedly denied. They kept her at the station for many hours, holding her overnight, without the ability to leave. And they subjected her to insults and mistreatment, even throwing food at her. They also took Polaroid photos of Guadalupe and Jorge Mejia, as they had done with Reyes, Solache and Adriana Mejia. Ex. NNNN at 35:1-36:4, 38:3-5, 38:11-21, 65:18-24, 67:16-68:1, 69:22-25, 71:11-24; Ex. PPP at 42:19-43:6, 96:1-99:8; Ex. OOOO at 27:40-28:30; Ex. J at 76-77, 80-81.

77.     Defendants Guevara and Trevino then coerced Guadalupe to give a false statement implicating Reyes. According to the statement, Reyes called the Mejia residence between 3:15 and 3:20 p.m on April 2, and asked to speak to Adriana. Guadalupe listened in on the call between Reyes and Adriana, and according to the statement Reyes implicated himself in the crime, telling Adriana "You are the only one who knows. I hope you don't send me up head first." Ex. PPPP and Ex. II at 435-437.

78.     This phone call never occurred. Reyes never made a call to the house in which he implicated himself, said anything about Adriana being "the only one who knows," or otherwise implicating himself in the murder or kidnapping of the Sotos family. In addition, this statement is demonstrably false based on the phone records of all calls to the Mejia residence. Those records show that only one call came into the Mejia residence on April 2 and it was at 11:38 a.m., when Reyes was on his way to work, and not near 3 or 3:15 as claimed. Guadalupe herself does not recall ever hearing Reyes making the incriminating statement attributed to him, and admits that she did not really listen to the whole call she purports to have heard. Ex. KKK at JR-L 104104(Mejia phone records) *compare* Ex. NN at JR-L 102127(Reyes's employment records showing a 12:30 pm start time); Ex. HHH at 167:3-11 (Adriana denying that Reyes called the house to talk to her); Ex. QQQQ at 127:3-20 (did not listen to the whole call, no memory of Reyes saying any of the incriminating statements asserted in this paragraph, he said no such thing on the portion of the call she could hear); Ex. OOOO at 24:50 - 25:44.

### *Guevara does not deny that he coerced Guadalupe Mejia into Falsely Implicating Reyes*

79.     When Guevara was asked under oath about whether he threatened Guadalupe Mejia and accused her of being involved in the Soto murder and kidnapping, whether he threw food at her and screamed at her, and whether he manipulated and coerced Guadalupe into giving an incriminating statement against Reyes that was based on what Guevara wanted her to say, Guevara invoked his Fifth Amendment right against self-incrimination. Ex. BBB at 405:3-9, 404:11-408:1, 410:5-20.

## XVII.     Defendants Suppress Additional Evidence to Implicate Plaintiffs

80.     Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances, conduct, or tactics used to get Reyes and Solache to sign

false confessions implicating themselves in the Soto murder and kidnapping. This includes the omission of any information about the physical abuse, threats, and promises that were used against them, as well as the fact that Defendants fed Reyes and Solache all of the details about the crime and themselves provided all of the information contained in their purported confessions. None of this was disclosed in the police files related to the Soto homicide investigation or Solache's criminal defense file, and the prosecution file contains no records indicating that such information was disclosed to them by the police. *Compare* Paragraphs 42-62, *supra with* Exs. VV & J (omitted from police files), Ex. GGGG (no mention in Solache criminal defense file); Ex. RRRR (no mention in prosecution file).

81. Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances, conduct, or tactics used to get Adriana to sign a false statement implicating Reyes and Solache in the Soto murder and kidnapping. This includes the omission of any information about Defendants targeting Reyes and Solache–including by bringing her to the rooms they were in to make clear they were the targets–and feeding her facts conforming to their version of events, as well as the physical abuse, threats, promises and other coercive tactics that were used against Adriana. None of this was disclosed in the police files related to the Soto homicide investigation or Solache's criminal defense file, and the prosecution file contains no records indicating that such information was disclosed to them by the police. *Compare* Paragraphs 24-31, 35, *supra with* Exs. VV & J (omitted from police files), Ex. GGGG (no mention in Solache criminal defense file); Ex. RRRR (no mention in prosecution file).

82. Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances, conduct, or tactics used to get Guadalupe Mejia to sign a false statement implicating Reyes in the Soto murder and kidnapping. This includes the omission

34

of any information about the treatment of Guadalupe as a suspect, the long hours she was kept at the station, and the insults and other mistreatment to which she was subjected in order to get her to sign a false statement implicating Reyes. None of this was disclosed in the police files related to the Soto homicide investigation or Solache's criminal defense file, and the prosecution file contains no records indicating that such information was disclosed to them by the police. *Compare* Paragraphs 76-79 *with* Exs. VV & J (omitted from police files), Ex. GGGG (no mention in Solache criminal defense file); Ex. RRRR (no mention in prosecution file).

### *Defendants Fabricate and Suppress Evidence in Police Reports*

83.     The closing report was written and signed by Defendants Guevara and Halvorsen, the reporting detectives listed on the report. The report was not submitted until April 30, 1998, and was approved by Defendant Cappittelli. Defendants Halvorsen and Guevara wrote and reviewed the report. The report documents a series of interviews and interrogations of Reyes, Solache, Adriana and Gualdalupe, culminating in their statements implicating Reyes and Solache. The report makes it appear as though all of the statements were entirely voluntary, and makes no mention of any coercive tactics used to obtain the statements. The report also documents Adriana's initial statement implicating Norma Salazar, and then documents a purported live lineup and interview through which Salazar was eliminated as a suspect. Ex. II; Ex. DD at 1748:5-1750:13.

### *Trevino's Report More Than a Year After the Underlying Investigation*

84.     Defendant Trevino authored a supplementary report on November 18, 1999, asserting that when he reviewed the Soto homicide, he "discovered that a statement of confession of Mrs. Mejia was not included in report." He wrote that back on April 4, 1998–more than 19 months earlier–when he interviewed Adriana in the Area 5 Lieutenant's office at 1400 hours, and

35

asked her to describe how she stabbed Jacinta, Adriana told him that when Jacinta fell on the floor, Adriana stabbed her in the back; that Adriana then demonstrated by getting on all fours, using a pen as if it were a knife, and acted out the stabbing. Ex. SSSS.

85. Defendants suppressed that Trevino had created a false report claiming to have seen Adriana act out the crime in a way that bolstered the confession statement Defendants obtained from her implicating Reyes and Solache. The closing report itself indicates that there was no interview of Adriana at 1400 hours. In addition, Trevino, as a youth officer, should not have, and would not have, conducted an interview by himself of Adriana, a homicide suspect. And Adriana did not provide any kind of demonstration of how she stabbed Jacinta in the presence of detectives Dickinson and Rutherford. Defendant Mingey admitted that in his entire career he had never heard of a confession being documented so long after the fact. Ex. II (documenting each interview of Adriana; no interview at 1400 hours); Ex. UU at 51:21-52:1, 57:20-59:24; Ex. QQ at 198:7-19, 261:20-263:14, 263:15-19, 264:2-19; Ex. TTTT at 92:3-93:6.

***Defendants suppress that Jacinta Soto had met a new friend at the clinic shortly before her murder, evidence that undermined the false confessions they took from Reyes and Solache***

86. In the weeks before Jacinta Soto was killed, she had met a new friend at the clinic, and the new friend sometimes went over to Jacinta's house. In addition, Jacinta's keys to the apartment had gone missing, and the new friend had just been over when the keys had gone missing. This information was learned by Defendants Guevara and Halvorsen when they interrogated Rosa Aranda at Area 5. Ex. FF at 84:1-85:19, 91:5-92, 59:5-60:24 (Rosa Aranda told detectives everything she knew); Ex. T at RFC 384-85 (Guevara and Halvorsen interviewed Rosa Aranda at Area 5 on April 1, 1998); Ex. II at RFC 433. Nowhere in the police file did Defendants document any of this information. Likewise, this information is not contained anywhere in the criminal defense or prosecution file, which contains no records indicating that

36

such information was disclosed to them by the police. Exs. VV & J (omitted from police files),

Ex. GGGG (no mention in Solache criminal defense file); Ex. RRRR (no mention in prosecution

file).

***Defendants suppressed evidence that would have fatally undermined the timeline of the crime contained in the statements implicating Reyes and Solache***

87.     On April 2, 1998, officers Azara and Pulia interviewed Lourdes Rodriguez,

reporting that on Saturday March 28, she saw Mariano Soto and his son exit the Soto vehicle and

go into their home. But according to an April 3, 1998 GPR, Guevara later interviewed Lourdes

Rodriguez, reporting that Rodriguez saw Mariano Soto *around 2 or 3 p.m.* on *Thursday, March*

*26* instead of the *morning* of *Saturday, March 28* as she had previously told responding officers.

*Compare* Ex. UUUU *with* Ex. VVVV.

88.     Defendants suppressed the fact that Guevara never conducted a follow-up

interview with Lourdes, and that his report was fabricated in order to overcome a fatal problem

with the timeline contained in the confession statements they took from Reyes and Solache.

Rodriguez only spoke to officers on one occasion, and that was on April 2, the night the bodies

were recovered. Ex. WWWW at 15:16-16:8 (she said she'd seen the father & son on the street,

dad taking son out of car), 19:21-21:1 and 31:23-32:3 (saw the same cop some days later, but

didn't talk to him again; recalls speaking to only one officer), 26:6-24 (bodies found April 1, cop

knocked on her door April 2 at 3:00 a.m.), 30:13-22 (she's sure she saw father and child in street,

and that it was in the morning).

89.     Guevara and Halvorsen interviewed Alfredo Aranda and wrote a report stating

that on the morning of Saturday March 28, Alfredo Aranda heard through his bathroom wall the

sound of someone falling out of bed and hitting the floor and wall. He next heard the muffled

screams of a woman, as if someone had a hand over her mouth. He told Guevara and Halvorsen

37

that he could not understand what the woman was saying, but recognized the voice as being Jacinta Soto. He heard what sounded like someone being dragged on the floor. He then heard a male voice say, "Don't scream, I'm not going to hurt you." He next heard a loud disturbance take place in the victim's apartment. He heard metal banging and the sounds of glass breaking. He heard the victim's three year old son yelling, "Papi, Papi!" He told Defendants that this disturbance lasted 10-15 minutes. Ex. X at 475.

90. Defendants suppressed evidence that in fact Mr. Aranda had not provided these details of the disturbance described in Guevara and Halvorsen's report and used to corroborate the version of events used in the confession statements they obtained from Reyes and Solache. Instead, these details came from the detectives, who tried to get Aranda to say these things, but Aranda denied that they were true. In addition, although Guevara and Halvorsen's report is dated April 2 on the first page, it is dated April 9 on the next eight pages and was not approved by the Sergeant until April 11. Ex. XXXX at 11:24-12:6, 12:14-24, 27:6-13, 28:5-8, 13-15; Ex X.

### Defendants suppressed evidence of alternate suspects in the Mejia and Soto families

91. Defendants, including Guevara, picked up Jorge Soto at his home and took him to Area 5 and interrogated him the entire day as a suspect in the murders and kidnappings. Guevara told him he was a suspect. At the same time, they also interrogated his brothers Pedro Soto and Martin Soto, who Guevara brought in. This is not documented anywhere in the police file, or in the prosecution and criminal defense files. Ex. HH at 26:5-15, 29:10-30:13, 31:6-32:15, 36:13-20, 38:19-22, 67:18-68:1; Exs. VV, J, GGGG and RRRR (absence of such evidence in police files, criminal defense file and prosecution file).

92. Defendants Guevara and Halvorsen wrote a report stating that they brought Rosa and Jose Aranda, and Rosa Aranda's sister, Felicia Soto, to the station to interview them.

38

However, they suppressed the fact that they held them for three days as suspects in the crime, subjecting them to interrogations in which they repeatedly accused them of killing the Soto parents and kidnapping the Soto children, and used false evidence ploys to try to get them to implicate each other. Defendants also took Polaroid photos of Rosa, Jose and Felicia as part of their interrogations of each of them. Defendants also treated Mariano Soto's siblings as suspects, accusing them of the crime and subjecting them to interrogation. None of this alternative suspect information was disclosed to Reyes or Solache. *See supra* at Paragraphs 9, 91; Exs. VV, J, GGGG and RRRR (absence of such evidence in police files, criminal defense file and prosecution file)..

93. Defendants also suppressed Polaroid photos that they took of a number of their suspects: Guadalupe Mejia, Jorge Mejia, Rosa Aranda, and Felicia Soto. Defendants took Polaroid photos of each of these individuals at Area 5 and placed those photos in the investigative file for the Soto homicide. However, those Polaroid photos were not disclosed to the prosecution or defense. Ex. J at 76-81 (contained in Soto police investigative file); Exs. GGGG & RRRR (absence of these Polaroids from criminal defense and prosecution files).

***The felony review prosecutor and trial prosecutor adamantly deny having ever learned of any of the misconduct set forth above***

94. The Defendant Officers fabricated false evidence and hid evidence from prosecutors. Felony Review Assistant State's Attorneys Tom O'Malley, Heather Brualdi, Karen David Navarro and Andrew Varga relied on the police to investigate crimes and provide them with all pertinent information they learned in the course of the investigation, including whether they had discovered any exculpatory evidence. Defendants' investigation began before the Felony Review ASAs arrived at Area 5 or did anything on the case. The ASAs did not know what Defendants said or did to any of the witnesses prior to arriving at Area 5. If the ASAs had

39

learned of the coercive tactics Defendants had used on Reyes, Solache, and Adriana, such as physical or psychological abuse and the feeding of facts, they would have alerted their supervisors and documented the information, but no such notification or documentation occurred because Defendants did not inform them of such conduct. The same is true for the trial prosecutors, Art Hill and Mercedes Luque-Rosales–they never learned of any abusive, coercive or other misconduct by Defendants; and if they had, they would have disclosed it but did not because they never learned of such conduct. Ex. AAAA (O'Malley Dep) at 111:23-113:7, 110:23-111:13, 114:12-20, 299:15-16, 300:8-12, 152:13-21, 152:22-154:1, 106:8-107:3, 108:16-22; Ex. QQ (Brualdi Dep) at 117:19-118:17, 195:6-18, 203:21-204:8, 261:4-262:14, 263:16-264:15, 262:15-19, 249:6-250:4, 311:16-21, 314:14-20, 280:22-282:23, 285:20-286:11; Ex. YYYY (Navarro Dep) at 90:6-10, 50:22-51:9, 272:21-273:2, 297:4-19, 298:8-17, 158:22-159:17, 160:19-24; Ex. ZZZZ (Varga Dep) at 91:19-25, 70:13-20, 164:25-165:2, 113:6-25, 114:1-12; Ex. AAAAA (Wehrle Dep) at 129:20-130:6, 256:25-257:19, 155:14-17, 157:17-158:7, 158:8-15; Ex. BBBBB (Hill Dep) at 202:24-203:19, 309:4-310:2.

RESPECTFULLY SUBMITTED

**ARTURO DeLEON-REYES**

By:    /s/ Steve Art

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Annie Prossnitz
Meg Gould
Wallace Hilke
**LOEVY + LOEVY**
311 N. Aberdeen St
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**GABRIEL SOLACHE**

By:    /s/ Jan Susler

Jan Susler
Ben H. Elson
Nora Snyder
**People's Law Office**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
jsusler@peopleslawoffice.com

40

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on January 27, 2025, I filed the foregoing

PLAINTIFF ARTURO REYES' STATEMENT OF ADDITIONAL FACT IN OPPOSITION TO

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT using the Court's CM/ECF system, which

effected service on all counsel of record.

By: /s/ Steve Art
*One of Plaintiffs' Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Annie Prossnitz
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Jan Susler
Ben H. Elson
Nora Snyder
**People's Law Office**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
jsusler@peopleslawoffice.com

41