# EXHIBIT 4

```
 1   APPEARANCES:  (REMOTELY)

 2        THE SOTOS LAW FIRM, P.C.  by
          MS. CAROLINE JAMIESON GOLDEN
 3        141 West Jackson Boulevard
          Suite 1240A
 4        Chicago, Illinois  60604
          (630) 735-3300
 5        cgolden@jsotoslaw.com

 6             Appeared on behalf of
               the Individual Defendants except
 7             Guevara;

 8        ROCK FUSCO & CONNELLY, LLC, by
          MS. EILEEN E. ROSEN
 9        MS. ERICA FATIMA
          MS. THERESA CARNEY
10        MS. JESSICA ZEHNER
          333 West Wacker Drive
11        19th Floor
          Chicago, Illinois  60606
12        (312) 494-1000
          erosen@rfclaw.com
13        efatima@rfclaw.com
          tcarney@rfclaw.com
14        jzehner@rfclaw.com

15             Appeared on behalf of Defendant
               City of Chicago.
16
     ALSO PRESENT:
17
          MS. RACHEL WELLING,
18        Certified Legal Videographer;

19        MS. ROBYN FALASZ,
          Exhibit Technician;
20
          MS. MARIBETH REILLY,
21        Certified Shorthand Reporter;

22        MS. ISABELLA AGUILAR,
          Loevy & Loevy;
23
          MS. JANICE WILLIER,
24        Court reporter student.
```

1                    I N D E X

2    WITNESS                        EXAMINATION

3    THOMAS TIDERINGTON

4      By Ms. Golden                      358

5      By Ms. Rosen                       361

6      By Mr. Swaminathan                 697

7

8                  E X H I B I T S

9    NUMBER                         SCREEN-SHARED/
                                    REFERENCED
10
     TIDERINGTON
11   DEPOSITION EXHIBIT

12   Deposition No. 4                     392

13   Deposition No. 6                     415

14   Deposition No. 9                     460

15   Deposition No. 10                    450

16   Deposition No. 12                    680

17   Deposition No. 13                    525

18   Deposition No. 14                    528

19   Deposition No. 15                    540

20   Deposition No. 16                    541

21   Deposition No. 17                    545

22   Deposition No. 18                    545

23   Deposition No. 19                    553

24   Deposition No. 20                    568

```
 1               E X H I B I T S

 2   NUMBER                        SCREEN-SHARED/
                                   REFERENCED
 3
     TIDERINGTON
 4   DEPOSITION EXHIBIT

 5   Deposition No. 21                    584

 6   Deposition No. 23                    615

 7   Deposition No. 24                    641

 8   Deposition No. 25                    636

 9   Deposition No. 26                    654

10   Deposition No. 27                    657

11   Deposition No. 29                    668

12   Deposition No. 30                    669

13   Deposition No. 31                    674

14   Deposition No. 33                    684

15

16           (EXHIBITS SCANNED/ATTACHED.)

17                * * * * * * * *

18

19

20

21

22

23

24
```

Urlaub Bowen & Associates, Inc.   312-781-9586

1          THE VIDEOGRAPHER:  We are back on

2   the video record at 10:10 a.m. for Day 2 of

3   the deposition of Thomas Tiderington.

4               THOMAS J. TIDERINGTON,

5   called as a witness herein, having been

6   previously duly sworn, was examined and

7   testified further as follows:

8               CONTINUED EXAMINATION

9   BY MS. GOLDEN:

10       Q.  Good morning, Mr. Tiderington.

11       A.  Good morning.

12       Q.  How are you doing?

13       A.  I'm fine.  Thank you.

14       Q.  Did you have an evening of rest?

15       A.  I did.

16       Q.  I will remind you that -- I'm

17   sorry.

18       A.  For a few hours, yes.

19       Q.  You are well enough to proceed?

20       A.  I am.

21       Q.  I will remind you that you are

22   still under oath.

23       A.  Yes, ma'am.

24       Q.  You understand that?

```
 1        A.  I do.
 2        Q.  What, if anything, did you do to
 3  prepare for the balance of this deposition
 4  in between the time that we finished last
 5  evening and began this morning?
 6        A.  Well, one of the things I did, I
 7  went back because you had asked me what
 8  other cases I testified in.  So if you'd
 9  like to give me -- if you'd like me to give
10  you that information, I would be happy to do
11  so at this point.
12        Q.  Did you do anything else other
13  than go back and look at whatever cases you
14  had testified in?
15        A.  I --
16        Q.  Did you meet with Mr. Swaminathan?
17        A.  No, no.  We both went our separate
18  ways as soon as we got finished last night
19  at 8:30, 9:00, whatever it was.
20        Q.  Did you talk to anyone about the
21  deposition last night or this morning?
22        A.  No.
23        Q.  Have you spoken to Mr. Brasfield
24  about this case?
```

 1      A.  I don't think I spoke to him.  I
 2  don't think I talked with him, no.  I may
 3  have -- there might have been a text
 4  message, but, no, I don't know.  No, I
 5  didn't have any conversation about him -- or
 6  with him about this case at all.
 7      Q.  From the time you started working
 8  on it until the current time?
 9      A.  That's correct.
10      Q.  Did you review any records other
11  than the ones you mentioned about the other
12  cases you worked on?
13      A.  I went through my report again
14  last night.
15      Q.  Did you review anything other than
16  your report?
17      A.  Perhaps the -- when I say
18  "perhaps," some of the case files, some of
19  the record.  Nothing in great detail, but
20  just kind of skimmed through it.
21      Q.  And when you say "case files,"
22  what are you referring to?
23      A.  The police reports, the witness
24  statements, those types of things.

1      Q.  And all of those items are in the

2  material -- on the list of materials you

3  reviewed?

4      A.  Yes.

5      Q.  Those are all materials that you

6  reviewed before, right?

7      A.  They were, yes.

8      Q.  And those were all materials that

9  you reviewed and considered before you

10  issued your report, which is Exhibit 6 in

11  the deposition?

12      A.  That's correct, with the exception

13  of the documents that we identified

14  yesterday.

15          MS. GOLDEN:  I don't have any

16  other questions.

17          THE WITNESS:  Thank you.

18                  EXAMINATION

19  BY MS. ROSEN:

20      Q.  Good morning, Mr. Tiderington.

21  It's my turn.

22      A.  Good morning.

23      Q.  How are you?

24      A.  I'm fine.  Thank you.

```
 1      Q.  My name is Eileen Rosen, and I
 2  represent the City of Chicago, and I am
 3  going to be asking you some questions about
 4  your report.
 5      A.  Okay.
 6          MS. ROSEN:  Anand, you know, your
 7  video is not on.
 8          MR. ANAND:  Sorry, sorry.
 9          MS. ROSEN:  No worries.
10  BY MS. ROSEN:
11      Q.  So first, I have just some
12  follow-up from your testimony yesterday.
13  Based on your invoice we -- I think you
14  testified yesterday that you billed 78 hours
15  approximately in connection with the work
16  you did in preparation of your report,
17  correct?
18      A.  That's correct.
19      Q.  And then I think you told us that
20  there was unbilled time as well, and my
21  recollection is you estimated that at
22  something like 20 to 40 hours.  Did I get
23  that right?
24      A.  I may have -- I may have said
```

1   that.  I thought I said 40 or 50 hours.  In

2   reality, I don't know the exact number.

3        Q.  Because you didn't keep track?

4        A.  That's correct.

5        Q.  And you spent, I think you said,

6   another 15 or 20 hours in the last couple of

7   weeks preparing for the deposition, correct?

8        A.  That would be correct.

9        Q.  So if you spent approximately 80

10  hours that you billed for, and approximately

11  50 hours that you didn't bill for, and then

12  approximately 20 hours in the last couple of

13  weeks, that would be the total amount of

14  time that you spent reviewing materials in

15  connection with this case, correct?

16       A.  That is correct.

17       Q.  And the Brasfield dep that you

18  recently received, I think you said that was

19  the Rivera case; is that right?

20       A.  That's correct.

21       Q.  Did you see Mr. Brasfield's trial

22  testimony in Rivera?

23       A.  I don't think so, no.

24       Q.  I want to talk a little bit about

1  your experiences in Fort Lauderdale and when

2  you were at the DEA.  Were the types of

3  investigations that you worked on with the

4  DEA similar to the types of investigations

5  you did when you were with OCB?

6        A.  There were some cases that were

7  very similar when I was in the organized

8  crime division, and there would be many

9  cases that we worked with the DEA, so yes.

10       Q.  And are those investigations that

11  you worked on both with OCB and with when

12  you were assigned to the DEA, were those

13  long-term investigations?

14       A.  Some were.  Some were one-day

15  investigations.  Some were five-year

16  investigations.

17       Q.  And the five-year investigations,

18  what types of cases were those?

19       A.  Well, with the DEA, it involved

20  international money laundering

21  investigation.

22       Q.  And with OCB, the longer-term

23  investigations, what types of cases were

24  those?

 1      A.  Well, again, a wide variety of
 2  cases, but for the most part, it would have
 3  been cases involving drug cartels, and their
 4  criminal behavior, their criminal
 5  activities.
 6      Q.  And the goal was to dismantle the
 7  cartels, correct?
 8      A.  The overall goal, yes.
 9      Q.  And then the cases that were the
10  shorter term, the one-day ones, what types
11  of cases were those?
12      A.  They could be drug raids.  They
13  could have been prostitution-related cases.
14  They could have been anything crime -- you
15  know, anything crime-related in the City of
16  Fort Lauderdale involving any type of
17  organized crime, whether it was the Mafia,
18  whether it was the Colombia cartels.  So
19  there is really no -- it doesn't really fit
20  into any one box, I should say.
21      Q.  When you were assisting the DEA,
22  you told us that some of the things that you
23  did when you were assisting the DEA was to
24  obtain information and in furtherance of

 1  whatever the investigation was that they

 2  were working on, correct?  Is that one of

 3  the things that you would do, you and your

 4  team, I guess?

 5       A.  Certainly, yes.

 6       Q.  What other types of things did you

 7  do when you were in the role of assisting

 8  the DEA?

 9       A.  I'm sorry, I just want to make

10  sure we are talking about the same thing.

11  Are you talking about when I was assigned

12  full-time to the DEA as a supervisor, or

13  when I worked with the organized crime

14  division in Fort Lauderdale and worked joint

15  cases with the DEA?

16       Q.  I meant the latter, sorry.  I was

17  not clear, the joint cases.  When you were

18  -- I think you said yesterday that you

19  worked joint cases with the DEA while you

20  were assigned to the Fort Lauderdale Police

21  Department, and I am just trying to get a

22  sense of like what type of assistance you

23  would provide to the DEA in those

24  circumstances?

```
 1        A.  Well, again it would be, you know,
 2   kind of a wide spectrum of assistance, or
 3   perhaps joint investigations.  There were
 4   many cases where we would at some point make
 5   a determination of whether we would charge
 6   somebody federally or whether we would
 7   charge them in a state investigation.  You
 8   know, as I'm sure you know, there's federal
 9   charges -- you know, that there are state
10   charges that, you know, that federal agents
11   cannot necessarily bring forward and vice
12   versa.
13             So we would analyze what type
14   of case it was and whether we were better
15   suited to bring the case to a -- to a state
16   attorney or whether we take it to a federal
17   prosecutor, so it was essentially a
18   give-and-take.
19        Q.  And when it was a case that it was
20   going to be federally charged -- well, let
21   me back up for a second.
22             Who made the decision about
23   whether to pursue federal charges or state
24   charges?
```

1       A.  Well, again, we are just generally

2  speaking.

3       Q.  Yes.

4       A.  It would have been a collective

5  decision made between the case agents, who

6  in that role, I would have been a case

7  agent.  There would have been another

8  special agent in the DEA, who's referred to

9  perhaps as a GS-13, and then there would be

10 supervisors involved in the decision.  So it

11 would be kind of a collective decision by,

12 if you will, you know, the frontline guys,

13 if you will.

14      Q.  And there would be consultation

15 with either State prosecutors and/or U.S.

16 Attorneys?

17      A.  Oftentimes, yes.

18      Q.  And so they were involved in the

19 decision-making about what types of charges,

20 whether it be federal charges or --

21      A.  Well, they would be involved in

22 the discussions about whether we would

23 charge them federally or whether it met the

24 federal threshold.  There are certain

 1  thresholds of quantities of drugs and types

 2  of cases that the Feds would take versus a

 3  case that we would take through the state

 4  court.

 5       Q.  I see.  And when you were in the

 6  role of assisting, so you are assigned to

 7  Fort Lauderdale Police Department, you are

 8  assisting in a case that's going to be

 9  federally charged, what types of things

10  would you do to assist in that type of a

11  case?

12       A.  Well, I guess it depends on which

13  case.  I mean, again generally speaking, if

14  I was the undercover operative, my role

15  would be just that.  I would be the

16  undercover officer.  I would prepare reports

17  or, you know, there were different methods

18  that we used to collect evidence from wire

19  tap investigations to covert listening

20  devices and so on.

21       Q.  And when you prepared reports,

22  what types of reports would you prepare?

23  Would they be Fort Lauderdale Police

24  Department reports, or would they be DEA

 1   reports?

 2        A.  Well, for the most part, when we

 3   were -- when I was assisting -- when I say

 4   -- and again, maybe assisting is not the

 5   right word.  When we were working joint

 6   investigations, I would prepare Fort

 7   Lauderdale documents, and the DEA agent

 8   would prepare DEA documents.

 9        Q.  And would you maintain those

10   reports in the Fort Lauderdale Police

11   Department?

12        A.  They would have been, yes.

13        Q.  And the DEA would maintain their

14   reports in the DEA records place, wherever

15   they keep their records, right?

16        A.  That is correct.

17        Q.  You testified yesterday about

18   note-taking and in the context of the

19   interview of witnesses, and I think you said

20   that you kept notes a lot of the time in the

21   more critical cases, but not in the more

22   minor cases.  Do I have that right?

23             MR. SWAMINATHAN:  Objection to

24   form and foundation.

```
 1              Go ahead.
 2              THE WITNESS:  I may have said
 3   that, but I don't know.  And again, perhaps
 4   I should clarify that.  If I was a patrol
 5   officer, and I went to the scene of an
 6   accident and the witness came and told me,
 7   you know, what occurred there, those were
 8   notes that I probably would not have kept or
 9   expected an officer to keep.
10              As a detective -- let me turn
11   this off here so we don't have that buzzing
12   here.
13              As a detective working
14   criminal investigations, I would keep my
15   notes, yes.
16   BY MS. ROSEN:
17       Q.  And you would keep your notes for
18   any type of case as a detective?
19       A.  Any case that I -- yes, any case
20   that I was involved in that I took notes on.
21       Q.  Yes.  And what did you take your
22   notes on?
23       A.  I'm sorry?
24       Q.  What type of vehicle did you take
```

 1  your notes on?  What did you write on?

 2          MR. SWAMINATHAN:  Objection to

 3  form.

 4              Go ahead.

 5          THE WITNESS:  Again, in Fort

 6  Lauderdale, we didn't have a specialized

 7  form that we used.  It would have been legal

 8  pads primarily.

 9  BY MS. ROSEN:

10      Q.  So just a regular old legal pad,

11  right?

12      A.  For the most part.  I'm sure there

13  were other types of paper that I used.  It's

14  been quite a while.

15      Q.  And then the notes, what would you

16  do with the information that was contained

17  in the notes?

18      A.  They would be kept in the case

19  file.

20      Q.  And would you -- what would you do

21  with the actual substance of the

22  information?  Would it just remain on the

23  notes, or would you do something with the

24  information that's on your notes?

```
 1              MR. SWAMINATHAN:  Objection to
 2    form.
 3                   Go ahead.
 4              THE WITNESS:  I guess it depended
 5    on what type of case it was or, you know,
 6    you know, there were times that it would be
 7    included in the police report.
 8    BY MS. ROSEN:
 9         Q.  And sometimes not?
10         A.  And again, it -- you know, we are
11    not really talking about a specific case,
12    and you are asking me to think back 30 or 40
13    years, so I'm sure there were times that
14    they would not be, yes.
15         Q.  And then you said the notes would
16    be kept in the case file.  What are you
17    referring to when you say the case file?
18         A.  Well, at the time in Fort
19    Lauderdale, the case agent, I believe they
20    are still operating that way today, is the
21    case agent would create a file, and he would
22    be responsible or she would be responsible
23    for the contents of that file, and that
24    would be the official file for the
```

```
 1  investigation.
 2       Q.  And where would that file be
 3  maintained?
 4       A.  It would have been kept within the
 5  detective bureau.
 6       Q.  In a particular place?
 7       A.  In the file cabinet.
 8       Q.  Was there a file room?
 9       A.  There were.  We moved a couple of
10  times, the detective bureau did.  So, yes,
11  there was always a location where the
12  records were kept.
13       Q.  And did detectives that were
14  assigned to that particular unit have access
15  to the file cabinets?
16       A.  They would have, yes.
17       Q.  And, obviously, you would have
18  access to your own case files, right?
19       A.  That's correct.
20       Q.  And would you take those case
21  files out on the street if you felt it was
22  necessary and in furtherance of your
23  investigation?
24       A.  Probably not.  Probably not.  I
```

```
 1  don't think a case file would go out on the
 2  street.  If there was -- if there were
 3  certain documents that were needed, of
 4  course, you could make copies of them and
 5  take those with you.
 6      Q.  So the documents that you felt
 7  were relevant for whatever investigative
 8  task you were about to do, you would make
 9  copies from the case file, and take the
10  copies out with you out on the street,
11  right?
12      A.  Yeah, but I don't -- if you are
13  asking me -- I can't remember ever doing
14  that, but I don't know that it would be that
15  unreasonable, yes.
16      Q.  And then once you completed
17  whatever the investigative task was, what
18  would you do with the copies of those -- of
19  those reports or notes or whatever it was
20  that you photocopied?
21      A.  Again, as I just testified, I
22  don't recall doing that specifically.  I can
23  hypothetically tell you what, you know --
24  you know, if there is already the same copy
```

1  in the case file, I would not expect the

2  detective to put those notes or those

3  reports back in there unless there were

4  notes contained on them or additional

5  information added to them.

6       Q.  And what types of police reports

7  did you and your fellow officers prepare

8  when you worked in the Fort Lauderdale

9  Police Department as a detective?

10      A.  I'm sorry, what do you mean by

11 what kind of reports?

12      Q.  Yeah.  Did they have names?  The

13 forms that you would utilize to prepare your

14 reports, did they have names?

15      A.  Yeah, there were reports where you

16 would have the standardized case number

17 based on like 82- and, you know, then there

18 would be sequential numbers to them.  We had

19 supplemental reports.

20           Was the police report itself

21 called by anything special?  Not that I can

22 recall.

23           I know in the time I spent

24 with the DEA, their reports were called

 1   DEA-6s.

 2        Q.  And when you were in the Fort

 3   Lauderdale Police Department and you were

 4   investigating a particular case, what types

 5   of documents or information would you put in

 6   the case file?

 7        A.  Anything related to the case.

 8        Q.  And did the case file contain all

 9   original documents?

10        A.  Or copies of the original

11   documents, yes.

12        Q.  For the case -- for the documents

13   where there were copies of original

14   documents, where were the original

15   documents?

16        A.  Well, I guess again -- again, we

17   are -- we are kind of talking about

18   hypotheticals here, so I am trying to think

19   back of where -- you know, if a detective

20   went to a doctor's office and said I need a

21   copy of, you know, this report and somebody

22   made a copy of the report for him, then that

23   copy would have been placed into the case

24   file and, you know, not the original.

 1        Q.  How about police reports, with

 2   respect to any police report that was

 3   prepared in connection with whatever the

 4   investigation was, were the original reports

 5   maintained in the case file?

 6        A.  The original reports were then

 7   maintained in the case file.  There may have

 8   been copies of them.  But, yes, the

 9   originals would have been contained in the

10   case file.

11        Q.  Were there directives from the

12   Fort Lauderdale Police Department regarding

13   the creation of police reports and notes in

14   case file?

15        A.  I'm sure there were.

16        Q.  As you sit here today, do you

17   recall what the requirements were of the

18   directives regarding the creation of police

19   reports and notes in the case file?

20        A.  I don't.  I don't recall the

21   specific policy.  And, of course, the 22, 23

22   years that I spent there, I'm sure, they

23   changed and evolved over time.

24        Q.  And then with respect to when you

 1  were in the detective bureau at the

 2  Fort Lauderdale Police Department, I

 3  understood your testimony yesterday to be

 4  that the detective bureau had within it four

 5  different units; the violent crimes unit,

 6  OCB that eventually became special

 7  investigations, the homicide unit, and

 8  property crimes.

 9              Did I get that right?

10      A.  For the most part.  And what I

11  mean by "the most part," I mean, you know,

12  over 22 years, it evolved and changed.  But

13  for the most part, yes, that was the make-up

14  of our detective division.

15      Q.  Was there somebody at the head of

16  the detective division?

17      A.  There was.

18      Q.  And what was that person's title?

19      A.  Well, obviously, the chief of

20  police was in charge of everything.  There

21  was a deputy chief that had -- one deputy

22  chief had control or responsibilities over

23  the patrol division.  There was another

24  deputy chief that would have had control

 1  over the investigative services division,

 2  and then I think it was three deputy chiefs

 3  at one point, and another admin deputy

 4  chief.

 5      Q.  When you say investigative

 6  services, is that the same, synonymous with

 7  the detective bureau, or was the detective

 8  bureau within investigative -- you've got to

 9  let my finish my question.

10      A.  I'm sorry.  I'm sorry.

11      Q.  -- or was the detective bureau

12  within the investigative services?

13      A.  Yes, and that's a good point.  I

14  am referring to it from different names.

15  So, I mean, at one point in time, it was

16  called investigative services.  Other times

17  it was called the detective bureau, but what

18  I am speaking of is all the same.  It is all

19  the same.

20      Q.  Okay, great.  And then when you

21  were the -- you were the captain, right?

22  You were the commanding officer?  You were a

23  captain, that was your rank, and then your

24  title was commander.  Do I have that right?

1       A.  Right, that's correct.

2       Q.  When you were the commander, did

3  you report directly to the deputy chief of

4  the detective bureau?

5       A.  I did.

6       Q.  And does the deputy chief report

7  directly to the chief of police?

8       A.  That's correct.

9       Q.  And Mr. Brasfield was the chief of

10  police at a point in time while you were at

11  the Fort Lauderdale Police Department,

12  correct?

13      A.  Towards the end of my career, yes.

14      Q.  And what was your rank at the time

15  that Mr. Brasfield became chief of police in

16  Fort Lauderdale?

17      A.  I think it was a sergeant at that

18  point.

19      Q.  And before Mr. Brasfield became

20  the chief of police in Fort Lauderdale, did

21  you know him?

22      A.  I did not.

23      Q.  Was he the one that promoted you

24  to captain?

1      A.  I believe he was, yes.

2      Q.  And was that a -- did you have to

3  test into that position, or was that a

4  meritorious promotion?

5      A.  No.  It was a testing process.

6      Q.  And earlier today, Ms. Golden

7  asked you if you had any conversations with

8  Mr. Brasfield about this case, and you said,

9  no, but you mentioned something about you

10  might have texted with him.

11              Do you think you texted about

12  this case?

13      A.  Not anything about this case other

14  than to say that I am -- that I was retained

15  and that -- and that he was involved in some

16  of the older cases, and I do recall that he

17  either texted me back and he said, yes, I'm

18  done.  I don't want to have any

19  conversations because I don't want to ever

20  get dragged back into these cases, so that's

21  why I recall that I did not have any

22  conversation with him.

23      Q.  And did he explain to you why he

24  did not want to be dragged back into these

 1  cases?

 2      A.  No.  It was a very short, maybe

 3  one sentence, and I kind of understood what

 4  he meant, and that's why I never had any

 5  conversation with him about his work or

 6  about any of the work that he did on any of

 7  the cases.

 8      Q.  What did you understand him to

 9  mean?

10      A.  I don't want to get dragged back

11  in, don't mention my name.  I am not -- I

12  mean, it was more of a -- I hadn't talked

13  with Chief Brasfield for a long time, so it

14  was -- and again, I have to express how

15  brief the conversation was.  I mean, it was

16  just like a text message and, you know, hope

17  you are doing well.  I'm working on some of

18  your old cases.

19             Great, great.  You know, glad

20  to hear you are doing this work and

21  congratulations.  But I do recall he said

22  something to the effect that -- you know,

23  that he's done, that he is no longer doing

24  expert witness cases, and he would prefer

```
 1  not to -- I don't know if he said have a
 2  conversation, but I took it to mean that
 3  he -- you know, he didn't open the door for
 4  me to call and us have a conference or any
 5  discussion at all about the cases is kind of
 6  my take-away from that short message.
 7       Q.  Okay.  So the information that you
 8  know about the work that Mr. Brasfield did
 9  on the Fields case, the Rivera case, and the
10  Kluppelberg case comes solely from the
11  reports that he prepared in those cases,
12  correct?
13       A.  That's correct.  It certainly was
14  not from him in any way, shape, or form.
15       Q.  And I guess to be complete, and
16  the deposition testimony that you were
17  recently provided from the Rivera case,
18  right?
19       A.  Yes.
20       Q.  All right.  And with respect to
21  the information in Mr. Brasfield's report in
22  Rivera, did you read that report?
23       A.  I did.
24       Q.  And did you look at the
```

 1  spreadsheet that was attached to that

 2  report?

 3       A.  I did look at a spreadsheet, yes.

 4       Q.  Did you analyze the spreadsheet in

 5  any way, or did you just simply note that

 6  there was a spreadsheet that had lots of

 7  colors and lots of numbers and lots of

 8  lines?

 9       A.  No.  I took some time to

10  understand it, and I wanted to -- I wanted

11  to really understand what it meant, and so I

12  spent a great deal of time trying to

13  understand it and analyze.  I don't want to

14  say I analyzed all of the information, but

15  certainly various spot-checking of the data

16  that was contained or attributed to the

17  spreadsheet.

18       Q.  And how did you spot-check?  What

19  do you mean?

20       A.  Can I -- can we pull the chart up,

21  and I can kind of go over it with you?

22       Q.  Actually, I don't have -- I am

23  talking about the Brasfield one, not yours.

24  Right?  I am talking about the one that was

 1  attached to Rivera.

 2        A.  I don't -- can you pull that up?

 3  I don't recall if I ever saw a specific

 4  spreadsheet attached to his report.

 5        Q.  Well, I will -- I will do that

 6  later if we have the time.

 7        A.  Okay.

 8        Q.  It's not a huge point for me.

 9               As you sit here today, you

10  don't recall whether or not Rivera, right,

11  so I am talking -- I am not talking about

12  your report right now, so I just want to be

13  clear.

14        A.  Right.

15        Q.  The report that you reviewed that

16  was prepared by Mr. Brasfield, as you sit

17  here today, you don't recall whether or not

18  there was a spreadsheet similar to the one

19  in this case attached to that report that

20  you reviewed?

21        A.  I don't recall if it was attached

22  to the report, no.

23        Q.  Do you recall if you ever saw a

24  spreadsheet from Rivera?

```
 1        A.  From specifically -- I believe we
 2   are talking about the same spreadsheet.  I
 3   think the spreadsheet that I have attached
 4   to my report, I am assuming it was the same
 5   spreadsheet that was used by Mike Brasfield.
 6        Q.  So is it your understanding that
 7   Mr. Brasfield analyzed the same files that
 8   you analyzed?
 9            MR. SWAMINATHAN:  Objection to
10   form.
11            Go ahead.
12            THE WITNESS:  I don't -- I can't
13   really say exactly what Mike did, and I
14   don't recall in enough detail in his report,
15   you know, really to answer that question.
16   BY MS. ROSEN:
17        Q.  How about his report in Fields,
18   right -- Mr. Brasfield -- hold on.
19   Mr. Brasfield prepared a report in Fields.
20   Did you review that report in connection
21   with the work that you did in this case?
22        A.  I believe I did.
23        Q.  And did you note that there was a
24   spreadsheet in the Fields report that was
```

1  utilized by Mr. Brasfield?

2       A.  Again, you know, it's been several

3  months, so I don't recall.  You have asked

4  me about two reports from Mike Brasfield.  I

5  don't recall if the spreadsheet was attached

6  to his reports or not.

7            I have been provided a

8  spreadsheet.  I don't know if it's the same

9  spreadsheet, exact same spreadsheet that

10  Mike Brasfield used or not.  But if I did

11  look at his report, I probably could answer

12  that pretty quickly.

13       Q.  As you sit here today, you don't

14  know if Mr. Brasfield reviewed in connection

15  with the work he did in Rivera and Fields

16  the same files that you reviewed; is that

17  correct?

18       A.  I believe he did, but I don't know

19  for sure.

20       Q.  And with respect to the files that

21  are referenced in the spreadsheet that is

22  attached to your report, who prepared that

23  spreadsheet?

24       A.  Mr. Anand's office.

1       Q.   And do you know who at

2   Mr. Swaminathan's office prepared the

3   spreadsheet?

4       A.   I don't.

5       Q.   Do you know if it was one person

6   or many people?

7       A.   I know Anand -- well, I guess I

8   can't get into the conversations, but I

9   don't know how many people worked on that

10  spreadsheet.  I am assuming, and I could be

11  wrong with an assumption, but I am assuming

12  more than one person, but I don't know.

13      Q.   Were you involved in the

14  decision-making regarding what information

15  to memorialize on the spreadsheet?

16      A.   No.  The spreadsheet was just

17  provided.  I didn't alter or edit the

18  spreadsheet at all.

19      Q.   And you were not involved in the

20  creation of the spreadsheet, right?  You had

21  no input into the creation of the

22  spreadsheet, correct?

23      A.   That is correct.

24      Q.   And were you provided the files

1  that -- from which the data that is noted in

2  the spreadsheet was taken?

3       A.  Yes, I was.

4       Q.  What files were you provided by

5  category?

6       A.  Can I -- again, can I pull -- can

7  I open up the report or not?

8       Q.  If you don't -- if you don't

9  remember, we can -- we will get to it in the

10  report.  I am just wondering, do you have

11  a -- as you sit here today, do you know what

12  categories of files were reviewed --

13       A.  Yeah.

14       Q.  -- to prepare the spreadsheet?

15       A.  Yeah.  I mean they were the Public

16  Defender -- files from the Public Defenders.

17  They were permanent retention files, and

18  they were investigative files.

19       Q.  You said Public Defender files,

20  investigative files, and what was the third?

21       A.  Permanent retention files.

22       Q.  Were you provided any Cook County

23  State's Attorney office files?

24       A.  I don't think so.

 1      Q.  Are you aware that the parties in

 2   this case obtained files from the Cook

 3   County State's Attorney's Office, companion

 4   files to the files that you reviewed?

 5           MR. SWAMINATHAN:  Objection to

 6   form and foundation, especially based on the

 7   timing of when his report was compared to

 8   those disclosures, but go ahead.

 9           THE WITNESS:  I would have to look

10   at my list of materials that were provided

11   to me, but I don't recall as we sit here

12   today that I was provided with any State

13   Attorney files.

14   BY MS. ROSEN:

15      Q.  And they are not referenced.  I

16   can tell you they are not referenced.  In

17   your materials reviewed, they were not

18   provided to you.

19           My question is a little bit

20   different.  Do you know that we have them?

21      A.  Are you telling me that you have

22   them now?

23      Q.  I am telling you that the parties

24   in this case had them at the time that --

```
 1        A.  Okay.

 2        Q.  -- at the time -- during discovery

 3   in this case.  So my question is:  Are you

 4   aware that the parties have the Cook County

 5   State's Attorney's Office files?

 6        A.  I guess I am now.  I don't know

 7   that I was before.

 8        Q.  Pardon me.

 9        A.  I am sorry, I am making that

10   difficult.

11        Q.  No, no, no. I am just trying to

12   understand what you had and what you know of

13   and, you know, you are the expert, so I need

14   to know what data points you rely on.

15                  (Whereupon, Tiderington

16                   Deposition Exhibit No. 4 was

17                   screen-shared/referenced.)

18   BY MS. ROSEN:

19        Q.  If we can take a look at Exhibit

20   4, which is the materials that you reviewed.

21        A.  I'm sorry?

22        Q.  Yes.  We are going to put it up on

23   the screen.  It's Attachment B if you have

24   the hard copy in front of you.
```

```
 1           MR. SWAMINATHAN:  You want to grab
 2   the hard copy?
 3           THE WITNESS:  Yes.  Exhibit 4.
 4   BY MS. ROSEN:
 5      Q.  Do you have it?
 6      A.  Yes.  Okay.
 7      Q.  Are we good?
 8      A.  Yes.
 9      Q.  And if we take a look at the
10   materials reviewed.  With respect to
11   information related to the case, there are
12   146 -- no, wait a second.  I'm sorry -- 116
13   items listed; is that correct?
14      A.  That is correct.
15      Q.  Have you reviewed -- actually, let
16   me take that back.  Hold on one second.
17              With respect to Items 1
18   through 96, did you review all of those
19   materials?
20      A.  I am going to go through and look
21   if you don't mind.
22      Q.  Yeah, sure.
23      A.  I believe I did, yes.
24      Q.  And when -- does that mean that
```

 1  you read all of them cover to cover, or does

 2  that mean that you did something less than

 3  that?

 4          MR. SWAMINATHAN:  Objection to

 5  form.

 6              Go ahead.

 7          THE WITNESS:  Probably something

 8  less than that, depending on what the

 9  document was.

10  BY MS. ROSEN:

11      Q.  So can you tell me -- if you look

12  at Item 38, it's the deposition transcript

13  of Heather Brualdi.  Do you see that?

14      A.  I do.

15      Q.  Did you read the entirety of

16  Ms. Brualdi's deposition?

17      A.  In that particular depo, I think I

18  did read her deposition, yes.

19      Q.  Do you have an understanding of

20  who she is and what her role is in this --

21  in the Soto homicide?

22      A.  I believe she is with the State's

23  Attorney's Office.

24      Q.  And do you have an understanding

 1  of what assignment she was in in 1998 at the

 2  time of the Soto homicide investigation?

 3          MR. SWAMINATHAN:  Objection to

 4  form.

 5              Go ahead.

 6          THE WITNESS:  I don't know

 7  specifically what her assignment was.  It

 8  may have been in the depo, but I don't know

 9  exactly what it was as we sit here today.

10  BY MS. ROSEN:

11      Q.  How about the deposition

12  transcript of David Navarro, is that one

13  that you read thoroughly?

14      A.  I would have to pull that up to

15  see if it would refresh my memory.  For some

16  reason, Ms. Brualdi's depo sticks out in my

17  mind.

18              David Navarro, I would have to

19  again confirm and refresh my memory to

20  determine whether or not I read the entire

21  depo or whether I just read parts of it.

22      Q.  As you sit here today, do you have

23  an understanding of or a memory of what

24  Mr. Navarro's role was in the Soto homicide

 1  investigation?

 2       A.  You know, I don't.  But if you

 3  gave me a trigger word or two, I probably

 4  would but ...

 5       Q.  Do you have a recollection of him

 6  being at the Cook County State's Attorney's

 7  Office at the time of the investigation?

 8       A.  That sounds about right.

 9       Q.  And do you know what his

10  assignment was during the Soto -- you got to

11  let me finish my question, sorry -- the Soto

12  homicide investigation?

13            MR. SWAMINATHAN:  Objection to

14  form.

15            Go ahead.

16            THE WITNESS:  I don't.

17  BY MS. ROSEN:

18       Q.  Did you read thoroughly the

19  deposition transcript of Thomas O'Malley?

20  That's Item Number 42.

21       A.  I do believe I read his depo.  I

22  believe he is a State's Attorney.  He worked

23  in the State's Attorney's Office as well.

24       Q.  Do you recall what his assignment

1  was in 1998 at the time of the Soto homicide

2  investigation?

3      A.  Not specifically as to what their

4  assignments were, no.

5      Q.  Does the phrase "felony review"

6  mean anything to you?

7           MR. SWAMINATHAN:  Objection to

8  form.

9           Go ahead.

10          THE WITNESS:  That sounds perhaps

11  where they may have been assigned to.

12  BY MS. ROSEN:

13      Q.  And do you have an understanding

14  of what being assigned to felony review at

15  the Cook County State's Attorney's Office

16  meant back in 1998?

17      A.  Not in any great detail without

18  again reviewing the deposition statements,

19  testimony.

20      Q.  And then Item Number 58 is the

21  deposition of Kathleen Loughran.  Do you see

22  that?

23      A.  I do.

24      Q.  Do you know what case that

 1  deposition transcript came from?

 2       A.  I don't as we sit here today.

 3       Q.  Do you know what Ms. Loughran

 4  testified about in her deposition in

 5  whatever case the deposition transcript

 6  belongs to?

 7       A.  I do not, not as we sit here today

 8  without having the ability to refresh my

 9  memory.

10       Q.  I would pull it up for you, but I

11  don't know what dep transcript it is.

12            All right.  Moving down to

13  Item Number 94, Richard Brzeczek testimony.

14  Do you see that there?

15       A.  I do.

16       Q.  What type of testimony was that?

17       A.  Again, I was -- there's so many

18  documents, I would have to pull it up and

19  refresh my memory.

20       Q.  Does the fact that you wrote

21  "testimony" instead of "deposition

22  testimony" mean it was something other than

23  deposition?

24       A.  It probably means that, yes.

```
 1        Q.  How about with respect -- do you
 2   know who Richard Brzeczek is?
 3        A.  Again, I would -- I could easily
 4   refresh my memory.  But as far as the memory
 5   test goes, right now, I don't recall exactly
 6   who -- what role he played in this
 7   investigation.
 8        Q.  And then with respect to Milton
 9   Deas, that also just says testimony.  So is
10   it safe to assume it's something other than
11   deposition testimony?
12        A.  That's correct.
13        Q.  Do you recall who he is?
14        A.  I don't.
15        Q.  How about John Stibich, the same
16   testimony again.  Does that mean it's fair
17   to assume not deposition testimony?
18        A.  That's correct.
19        Q.  And as you sit here today, do you
20   recall who Mr. Stibich is?
21        A.  If you give me two words, I will
22   remember, but, no, I would have to refresh
23   it.
24        Q.  Okay.  And then when we go to Item
```

1    Number 97, that says 1995 to 1998, Area 5

2    investigative files.  Do you see that there?

3         A.  Yes, I do.

4         Q.  And so you were -- you were

5    provided all of the investigative files that

6    are within that Bates range; is that

7    correct?

8         A.  I believe so, yes.

9         Q.  And it's your understanding, I

10   think, based on what you testified to

11   earlier, that those investigative files were

12   utilized in preparing the spreadsheet that

13   is attached to your report in this case,

14   correct?

15        A.  I believe so, yes.

16        Q.  Did you review each and every one

17   of those investigative files?

18        A.  No.

19        Q.  How many investigative files are

20   represented in Item No. 97, do you know?

21        A.  300-and-some.  I don't know the

22   exact number, maybe 340 or some -- somewhere

23   around -- around 300.

24        Q.  I think in your report -- and we

1  will get there in a second -- you state 344.

2  Does that sound about right?

3      A.  It sounds about right.

4      Q.  How many of those 344

5  investigative files did you review?

6      A.  I am sorry.  For some -- I have to

7  get back.  Oh, I lost the Zoom meeting.

8  Okay, I'm back here now.  I am sorry, could

9  you please ask that again?

10     Q.  Sure.  Of the 344 investigative

11 files that you were provided, how many did

12 you actually review?

13     A.  Well, I spot-checked several of

14 them.  I don't know if I have an exact

15 number.  I would say somewhere around --

16 well, I went through a lot of the files.  I

17 don't know that I -- on some, I spent more

18 time than others, but I certainly went

19 through a good number of the files.

20     Q.  Can you estimate for me how many

21 files you reviewed of the 344?

22     A.  I probably looked at every one of

23 the files, but some in greater detail than

24 the others.

1     Q.  How did you -- when you say you

2  looked at every one of the files, what do

3  you mean?

4     A.  I skimmed through each of the

5  files that I have, and some were -- I would

6  stop, and I would look at them in more

7  detail than others.

8     Q.  What would -- why would you stop?

9  Like what would cause you to stop?

10          MR. SWAMINATHAN:  Objection to

11  form.

12              Go ahead.

13          THE WITNESS:  What would cause me

14  to stop?  I guess I don't understand that

15  question, whether --

16  BY MS. ROSEN:

17     Q.  Okay, let me try it this way.  You

18  believe you skimmed every file, all 344

19  files, correct?

20     A.  I do.

21     Q.  And you said, sometimes you spent

22  more time with some files than others,

23  right?

24     A.  That's correct.

```
 1        Q.  And what methodology were you
 2   utilizing to decide which files to spend
 3   more time with?
 4        A.  I don't know if there was any
 5   great methodology.  I would look at if
 6   something caught my interest, or I was -- if
 7   it was something unusual, I spent more time
 8   on that.
 9        Q.  What types of things would catch
10   your interest?
11        A.  I guess, could I refer back to my
12   report, and I can give you some examples?
13        Q.  Yeah.  We are going to get to --
14   you do discuss in some detail some of these
15   files?
16        A.  Right.
17        Q.  I am just trying to get a sense
18   of, you know, your process.
19        A.  Yeah.
20        Q.  So we will -- I will definitely
21   give you an opportunity to look at that part
22   of the report, and I even have some of the
23   files marked as exhibits, and we can talk
24   about them.  I am just trying to get a sense
```

1  of what types of things caught your interest

2  or you found unusual.

3              Was there something in

4  particular you were looking for, or was it

5  more haphazard than that?

6       A.  I would say that -- I mean, my --

7  the goal was to verify the information that

8  was contained in the chart.  And so I would

9  -- when you say haphazardly, I don't know if

10 I would agree to that.  But I would go

11 through the files and, you know, some of the

12 files, I would look at more closely than

13 others.

14             I don't know if there was any

15 specific reason or rhyme or methodology in

16 determining whether I am going to look at

17 one file in greater detail than the other,

18 but my goal was not to become familiar with

19 each of the 300 files.

20      Q.  So it was not your goal to become

21 familiar with each of the investigations

22 that underlie the 344 files you reviewed,

23 correct?

24      A.  I don't think it would have been

 1  humanly possible to do that.

 2       Q.  And why not?

 3       A.  Because there is 340 files, and

 4  each file contains many, many pages.

 5       Q.  Sometimes hundreds of pages,

 6  right?

 7       A.  That's correct.

 8       Q.  And you said -- you used the

 9  phrase "spot-check."  What were you

10  spot-checking?  What were you looking --

11  what were you checking?

12       A.  Well, I was -- again, initially, I

13  was trying to understand what the chart

14  meant, and then I would go through, and I'd

15  look in a file and see, you know, if GPRs

16  were contained in a particular file, or if

17  there were to-and-from memos contained in a

18  file.  So that's kind of the things I was

19  looking for are the categories that are

20  outlined and listed in the chart.

21       Q.  And then you also received --

22  listed here at Item 98, the 1995 to 1998

23  Cook County Public Defender files, right?

24       A.  Yes.

1      Q.  Did you review -- do you know how

2   many files total were provided to you?

3      A.  I think I have the number.  I

4   think the chart indicates how many files

5   there were, but I don't recall specifically.

6      Q.  I think it's somewhere in the --

7   you do have it in your report.  It's

8   somewhere in the 60-something range, I

9   believe?

10      A.  Yes.

11      Q.  But regardless, did you review

12   each of those files?

13      A.  Again, I think I went through each

14   of the files, but I don't want to say that I

15   -- and I don't want to lead you to believe

16   that I did it with -- that I reviewed in

17   detail every document that was contained.

18   That was not the case.

19      Q.  Other than with respect to the

20   1995 to 1998 RD files, do you see that

21   there?

22      A.  Yes.

23      Q.  And you were provided those as

24   well, right?

```
 1        A.   That's correct.
 2        Q.   And as you sit here right now, do
 3   you recall how many of those files you got?
 4        A.   I don't.
 5        Q.   And what is a RD file, do you
 6   know?
 7        A.   Record division file.
 8        Q.   And you used the phrase earlier
 9   "permanent retention file"?
10        A.   Correct.
11        Q.   Is there a distinction between the
12   permanent retention file and the records
13   division file?
14        A.   Again, to be sure, I'd have to
15   pull those up to refresh my memory.
16        Q.   Pull what up?
17        A.   Both the permanent retention files
18   and the record files.
19        Q.   Well, I don't see permanent
20   retention files listed here.  I only see
21   record division files.
22        A.   I think those are -- those are one
23   in the same.
24        Q.   Okay.  All right.  And then if we
```

 1  look at Items 117 to 146, Ms. Golden asked

 2  you some questions about those yesterday,

 3  and I just want to make sure I understand

 4  what their purpose here is in listing them

 5  here in this report.

 6       A.   Okay.

 7       Q.   Am I correct that you did not

 8  review all of these materials in connection

 9  with the preparation of your report?

10       A.   Well, the material -- I guess what

11  I explained yesterday, and I will try to

12  explain again today, is that at some point

13  in my career, I would have looked at all of

14  these documents to some degree.

15            Did I use all of the listed

16  documents here specifically to prepare that

17  report?  No.

18            You know, there's -- many of

19  these documents or books, I don't footnote

20  or I don't reference at all in the report.

21  It was intended to demonstrate the types of

22  material that I've had or that I have

23  reviewed throughout my career, which, you

24  know, over 44 years in some capacity.

```
 1        Q.  Are we to assume that the
 2   materials listed here at Items 117 through
 3   146 are relevant in some way to the opinions
 4   you were asked to evaluate -- let me start
 5   that over.
 6               Are we to assume that Items
 7   117 through 146 contain relevant information
 8   related to the -- your report?
 9               MR. SWAMINATHAN:  Objection to
10   form.  Foundation.
11               Go ahead.
12               THE WITNESS:  Probably not
13   necessarily to my report, specifically.  But
14   to my universe of knowledge, I guess, is
15   maybe a way to describe it of teaching and
16   training officers and going through various
17   seminars and training exercises.  I think I,
18   you know, am certainly not going to suggest
19   that every one of these documents was
20   specifically used in order to prepare my
21   report.
22               The intent was to demonstrate
23   the types of material that I have been
24   exposed to throughout my career.
```

```
 1   BY MS. ROSEN:

 2        Q.  You talked yesterday about the

 3   French books that are on here, and I think

 4   you said the reason you added them is

 5   because Mr. Brasfield had them on his

 6   report.  Did I get that right?

 7        A.  That's correct.

 8        Q.  And you don't speak French, right?

 9        A.  I don't.

10        Q.  And so you don't really know what

11   the contents of those French materials are,

12   correct?

13        A.  That's correct.

14        Q.  Yesterday when Ms. Golden was

15   asking you questions, she was specifically

16   asking you about your opinions related to

17   the gross deviation of acceptable standard

18   police practices.  Do you recall generally

19   that testimony from yesterday?

20        A.  I do recall, yes.

21        Q.  And in the list of items that you

22   identified as being a gross deviation, you

23   mentioned police reports being withheld.  Do

24   you recall that?
```

```
 1        A.  I would have to review my
 2 transcript or if you could read the question
 3 back to me.  I vaguely recall, but if you
 4 are going to ask me specific questions about
 5 my testimony yesterday, I would have to --
 6 or if you are going to ask me again about
 7 things I have already testified to, I think
 8 I would have to -- or I would want to hear
 9 the questions and hear my answers.
10        Q.  Yeah.  I am not like trying to
11 impeach you or anything.  I am just trying
12 to direct you to this topic.
13             I guess I can ask it this way:
14 Is it your opinion that police reports were
15 withheld by the police officers that were
16 involved in the homicide -- the Soto
17 homicide investigation?
18        A.  That is my opinion, yes.
19        Q.  What specific police reports were
20 withheld?
21        A.  Well, again, I'd like to -- I'd
22 have to go through the case file, and we can
23 get specific.
24        Q.  Have you detailed the police
```

 1  reports that you believe were withheld in

 2  your report?

 3           MR. SWAMINATHAN:  Objection to

 4  form.

 5              Go ahead.

 6           THE WITNESS:  Can we turn to those

 7  pages at this point, or are we going to

 8  just --

 9  BY MS. ROSEN:

10      Q.  No, I am just asking -- I am

11  simply asking you will we find the answer to

12  my question somewhere within the four

13  corners of your report?

14      A.  I'm sure we will.

15      Q.  Okay.  You said yesterday

16  something about the Polaroids and that

17  Polaroids are only taken of possible

18  suspects.  Do you recall testimony along

19  those lines?

20      A.  I do recall that we had that

21  discussion, yes.

22      Q.  What is the basis for your

23  conclusion that the police department only

24  takes Polaroids of possible suspects?

 1            MR. SWAMINATHAN:  Objection to
 2   form and foundation.
 3            THE WITNESS:  Yeah, that's not
 4   what I -- I don't think that's what I
 5   testified to.
 6   BY MS. ROSEN:
 7       Q.  Well, explain to me what you
 8   believe the importance of a Polaroid photo
 9   is in a Chicago Police Department homicide
10   investigation?
11            MR. SWAMINATHAN:  Objection to
12   form and foundation.
13               Go ahead.
14            THE WITNESS:  Well, I don't
15   know -- I think my testimony related to
16   specifically to the Soto investigation, and
17   that's what I was testifying to yesterday.
18   BY MS. ROSEN:
19       Q.  So explain to me with respect to
20   the Soto investigation the importance or
21   relevance of Polaroid photographs?
22       A.  Well, obviously, the importance is
23   the officers had to take photographs of
24   these individuals for a reason.  And

 1  everybody that was identified, everybody

 2  that was a witness, I did not see evidence

 3  that there was photographs taken of each

 4  witness.

 5            There were photographs taken

 6  of specific individuals that had

 7  subsequently claimed that they were

 8  interrogated and treated as mistreated and

 9  treated as suspects in the case.

10            And I noted that in addition

11  to Solache, Reyes, Mejia, that the only

12  other photos were of those that also claim

13  to have been mistreated by the police

14  detectives.

15  BY MS. ROSEN:

16      Q.  And what conclusion do you draw

17  from those inferences?

18            MR. SWAMINATHAN:  Objection to

19  form.

20            Go ahead.

21            THE WITNESS:  Perhaps that they

22  were suspects in this investigation.

23  BY MS. ROSEN:

24      Q.  Okay.

```
 1        A.  And again, if you would allow me,
 2   I did offer some analysis in my report, and
 3   it would be helpful if I was able to refresh
 4   my memory in terms of the Polaroid pictures.
 5        Q.  Yeah, we will get to that.
 6                  (Whereupon, Tiderington
 7                   Deposition Exhibit No. 6 was
 8                   screen-shared/referenced.)
 9   BY MS. ROSEN:
10        Q.  Let's take a look at Exhibit 6,
11   which is your report, and we will go to page
12   33.  So we are at Opinion 2 of your report,
13   and the heading is "CPD's Policies and
14   Practices Concerning Documentation and
15   Disclosures in Homicide Investigations are
16   Woefully Inadequate and Result in the
17   Routine Failure to Document and Disclose the
18   Documents and Information Learned during the
19   Homicide Investigation to Criminal
20   Defendants."
21                  Did I read that correctly?
22        A.  You did.
23        Q.  So as I understand it, you have
24   two main global criticisms.  One is what you
```

1  describe as a routine failure to document

2  information, right?

3        A.  That's correct.

4        Q.  And the second is a routine

5  failure to disclose the documents and

6  information learned.  Do I have that right?

7        A.  You do.

8        Q.  Now, with respect to your

9  conclusion about a routine failure to

10  document information learned in homicide

11  investigations, other than your review of

12  the information that you were provided in

13  connection with the Soto homicide

14  investigation, what else are you relying on

15  to support that main point, number 1?

16        A.  All right.  And we can go through

17  my report at this point?

18        Q.  Yeah.  I mean, if you feel like

19  there is somewhere in your report that

20  answers that question.  You have it in front

21  of you, correct?

22        A.  I do.

23        Q.  Yeah, sure.

24             Just so we are clear, I am

```
 1  uninterested in information related to the

 2  Soto homicide, right?  I am looking for

 3  other evidence or data that you are relying

 4  on for the conclusion that there is a

 5  routine failure to document?

 6       A.  So not specific to the Soto case

 7  at all?

 8       Q.  Correct.

 9       A.  And then we can -- I can utilize

10  the chart here to discuss the analysis there

11  or not?

12       Q.  Do you believe that that

13  information is contained in the chart?

14       A.  Well, certainly.  Under -- there

15  is information that the Chicago Police

16  Department attempted to policies -- enacting

17  policies that would require their officers

18  to submit certain information into certain

19  files, and the policy was not being followed

20  globally within the department.  I think

21  there was testimony from the PD

22  representatives that indicates that the

23  policies were ineffective, and they did not

24  ensure that documents were being forwarded
```

1   as required by department policy.

2       Q.   That's a different point, though,

3   right?  The failure to disclose is a

4   different point than the failure to

5   document, isn't it?

6       A.   Well, no.  Well, I think it's --

7   there is multiple issues within that

8   question, and there is the street file issue

9   where there is evidence that the officers

10  were maintaining parallel files and that

11  they had files that contained certain

12  information that was never -- that never got

13  to the permanent retention file or the

14  investigative file.

15          There was significant

16  exculpatory information that was found in

17  street files, and this is again, in my view,

18  all part of the problem within the Chicago

19  Police Department in terms of creating the

20  investigative files, properly creating the

21  investigative files, holding the officers

22  responsible for submitting the relevant

23  documents, and then disclosing these

24  documents as they are required to by law.

1        Q.   Okay.  So let me try this again,

2   because I thought we had agreed that there

3   were two main points to be taken from the

4   heading that I read that is accompanying

5   Opinion Number 2, and that one was a failure

6   to document, and the other was a failure to

7   disclose?

8        A.   Correct.

9        Q.   Are those two separate points in

10  your mind?

11            MR. SWAMINATHAN:   Objection to

12  form.

13            Go ahead.

14            THE WITNESS:  Well, I think they

15  are two points, but they are all tied into

16  the same issue.  I think there is evidence

17  in the record that witnesses were

18  interviewed and that the proper GPRs were

19  not being used to document the information,

20  that there was investigative steps that were

21  taken that were failed -- that there was a

22  failure to document those investigative

23  steps.  I think that's what I saw throughout

24  the investigations, and specifically in more

1  detail, the Soto investigation.

2  BY MS. ROSEN:

3      Q.  Yeah, so I am interested in what

4  other investigations you observed a failure

5  to document?

6      A.  Right.  If you want to look at the

7  Jones investigation.

8      Q.  Okay, so Jones, fine.  That's one

9  example.  Tell me about any other example --

10  well, Jones, what was not documented in

11  Jones?

12      A.  Well, there was documentation --

13  well, false or misleading documentation of a

14  photo lineup -- well, I'm sorry, of

15  information that was used to convict a young

16  man that was contrary to the reports that

17  were found in a street file at some point

18  later.

19      Q.  That's an example of a failure to

20  document, not a failure to disclose, a

21  failure to document?

22          MR. SWAMINATHAN:  Objection to

23  form and foundation.

24              Go ahead.

1            THE WITNESS:  Well, I would say it

2    was an overall failure to document the

3    investigative stuff that the officers took

4    in the Jones matter.

5    BY MS. ROSEN:

6        Q.  What is the evidence that the

7    officers in Jones failed to document?

8        A.  All right.  If you give me a

9    second just to review that portion.

10       Q.  Sure.  What page are you

11   reviewing?

12       A.  Page 36 and 37.

13       Q.  Okay.

14       A.  Maybe it would be a good time to

15   take a break as well after -- whenever you

16   think it's appropriate.  We have been going

17   an hour and a half now.

18       Q.  Yeah, sure.  Why don't you just --

19   let's answer my question, and take a look at

20   36 and 37, and then tell me what was not

21   documented in Jones?

22       A.  Well, yeah, okay so in the Jones

23   case, obviously, Officer Laverty documented

24   his portion of the investigation in which he

```
 1  concluded that Jones could not have possibly
 2  been the suspect.  There was a separate
 3  street file that failed to document how they
 4  concluded that Jones was a suspect
 5  adequately to document how they concluded
 6  that Jones committed this crime.
 7          MR. SWAMINATHAN:  Are you good to
 8  keep going, or do you want to take a break?
 9          MS. ROSEN:  You can take a break
10  if you are ready to take a break.
11          MR. SWAMINATHAN:  It's up to you.
12          THE WITNESS:  Yeah, I could take
13  five minutes.  Five minutes, would that be
14  fine?
15          MS. ROSEN:  Sure.
16          THE VIDEOGRAPHER:  We are off the
17  video record at 11:25 a.m.
18              (Whereupon, a break was taken
19               at 11:25 a.m. to 11:34 a.m.)
20          THE VIDEOGRAPHER:  We are back on
21  the video record at 11:34 a.m.
22  BY MS. ROSEN:
23      Q.  In the George Jones case that we
24  were just talking about happened in 1981,
```

1    correct?

2        A.   I believe so, yes.

3        Q.   What other examples are in your

4    report that support the notion that the

5    Chicago Police Department's policies and

6    practices resulted in a routine failure to

7    document information learned during a

8    homicide investigation?

9        A.   Well again, before the break, I

10   mean, we were talking about -- you had said,

11   you know, you are really not talking about

12   the Soto case, but, obviously, I did a deep

13   dive into the Soto case versus a --

14   something lesser on the other 300 cases.

15             And what I saw in the Soto

16   case, all right, in terms of, you know, not

17   documenting, you know, what a witness said

18   or didn't say, contemporaneous notes, the

19   officer would interview a witness, and then

20   a month later write a police report, and

21   there were no responding notes with that.

22             These are things that I --

23   that were consistent when I was

24   spot-checking the other cases that I would

1  also find as an example.

2      Q.  How were you able to determine

3  when you were spot-checking the other cases

4  that information was not being documented?

5          MR. SWAMINATHAN:  Objection to

6  form.

7              Go ahead.

8          THE WITNESS:  Well, there would be

9  -- there would be cases where the police

10  report would attribute statements to a

11  witness, but then there were no notes.  Some

12  of the -- some of the cases in a homicide

13  investigation, there were no notes

14  whatsoever.  Nothing on GPRs.  Nothing on

15  legal pads.  Nothing in to-from memos.

16              So it's hard for me to

17  believe or understand that a homicide

18  investigation can be conducted without any

19  type of written notes taken by a police

20  officer.

21  BY MS. ROSEN:

22      Q.  Do you list those examples in your

23  report somewhere?

24      A.  I don't think I listed them

 1  specifically, no.

 2      Q.  Can you identify them for us

 3  today, the case files that you are talking

 4  about?

 5      A.  I'm sure I could if we pull them

 6  up and go through them, yes, we could do

 7  that.

 8      Q.  We can go through all 344, is that

 9  the way that you propose that we figure out

10  which case you are thinking about?

11          MR. SWAMINATHAN:  Objection to

12  form.  Argumentative.

13          THE WITNESS:  Well, I guess it's

14  your decision how you want me to do it.

15  BY MS. ROSEN:

16      Q.  I am asking you how can you answer

17  the question?  Is the only way for you to

18  tell us which cases that you are thinking of

19  is to go through all 344 files?  Is that the

20  only way to get an answer to the question?

21      A.  Well, I don't think we have to --

22          MR. SWAMINATHAN:  Go ahead.

23          THE WITNESS:  I'm sorry.  I don't

24  think we have to go through 344.  We could

 1  randomly pick a case, we could go through it

 2  together, and I can explain what I would

 3  expect to see in a case and what perhaps is

 4  missing.

 5  BY MS. ROSEN:

 6      Q.  Why didn't you identify those

 7  cases in your report in support of your

 8  opinion?

 9          MR. SWAMINATHAN:  Objection to

10  form and foundation.

11              Go ahead.

12          THE WITNESS:  Well, I think I did,

13  and I did identify several instances, and I

14  think the Soto is probably the best example,

15  and I think it's detailed pretty

16  comprehensively.

17  BY MS. ROSEN:

18      Q.  Can you direct me to your report

19  where you list other cases other than the

20  Soto homicide that are examples of

21  detectives failing to document information,

22  and other than Jones?

23      A.  If you want to turn to page 50.

24      Q.  Okay.

 1        A.  We can go through those cases.  I

 2  think that illustrates some of the examples

 3  that I could provide for you.

 4        Q.  When you say "those cases," are

 5  you referring to the list of RD numbers that

 6  appear about midway through the -- through

 7  the report?

 8        A.  That's correct.

 9        Q.  And you believe in those cases,

10  there are examples of police officers

11  failing to document information they learned

12  in a homicide investigation; is that

13  correct?

14        A.  I do.

15        Q.  And explain to me if the

16  information was not documented how you know

17  that the information existed?

18            MR. SWAMINATHAN:  Objection to

19  form.

20            Go ahead.

21            THE WITNESS:  So I think your

22  question is:  If something is missing, how

23  do you know it's missing?

24

1    BY MS. ROSEN:

2         Q.   Exactly.

3         A.   Well -- and that's a good

4    question, but I have reviewed and conducted

5    enough criminal investigations to understand

6    what you would typically see in a homicide

7    file or any type of a criminal investigation

8    file, and what I am seeing in many of the

9    Chicago Police Department files is unlike

10   what I would typically see in other police

11   departments that I am familiar with.

12        Q.   Other than this list of RD

13   numbers, there is five of them, on page 50,

14   anyplace else where you have identified

15   files that support your conclusion that

16   there was a routine failure to document

17   information learned in a homicide

18   investigation?

19        A.   Well, I think we would also

20   reference the chart in Attachment F, which

21   also confirms my opinion there, I believe.

22        Q.   Is there a column that says

23   failure to document in the chart?

24        A.   I don't think it says a failure to

1    document, but it certainly says what's

2    missing or what's contained within there.

3    GPRs as an example.  I think there is a

4    column that lists that, and the numbers of

5    cases that do not have GPRs in them.

6         Q.  So if an investigative file

7    doesn't have a GPR, that fact supports your

8    conclusion of a failure to document; is that

9    correct?

10        A.  Well, it may.  I don't want to say

11   in every case, but it would be something

12   that I would be concerned about.  If I was a

13   supervisor looking over a file, I would be

14   concerned about that, yes.  It would be -- I

15   would expect in the vast majority of

16   homicide cases that there would be some type

17   of notes by the investigator.

18        Q.  And did you look at the cases that

19   are listed in the chart?  Well, let me back

20   up for a second, just so I am clear.

21             The point you are making is

22   that when we look at the chart, we will find

23   noted that there are investigative files

24   without any GPRs in those files?  Is that

1  what you are saying?

2       A.  Yes.  Could I -- you don't mind if

3  I look at the chart at this point, right?

4       Q.  No, go ahead.

5       A.  Okay.

6       Q.  So is that the point you were

7  making?

8       A.  I think that's accurate, yes.

9       Q.  Can you tell me what column you

10  are looking at that establishes that?

11       A.  There is a column that says, "Are

12  there handwritten notes in the file not on

13  GPRs?" is one file.  "Are there any

14  handwritten notes?" is another column.

15       Q.  Is there a column that says, Are

16  there GPRs in the investigative file?

17          MR. SWAMINATHAN:  Objection to

18  form and foundation.

19             Go ahead.

20          THE WITNESS:  I am sorry, can you

21  ask that again?

22  BY MS. ROSEN:

23       Q.  Sure.  Is there a column that

24  notes whether or not there are GPRs in an

```
 1   investigative file?
 2        A.   There is a column that says, "Are
 3   there handwritten notes in a file that are
 4   not on GPRs?" is one of the files -- one of
 5   the columns.
 6        Q.   That's a different point?
 7        A.   Right.
 8        Q.   Right?  That point is notes are in
 9   the file, they are just not on a GPR form?
10             MR. SWAMINATHAN:  Are you asking
11   -- go ahead.
12   BY MS. ROSEN:
13        Q.   I am asking -- it's my
14   understanding of the chart.  Isn't that your
15   understanding of the chart?
16        A.   All right, yes.
17        Q.   I thought the point you were
18   making was that there are investigative
19   files that contain no GPRs?
20        A.   There are.
21        Q.   Correct?
22        A.   There are.
23        Q.   And so I am asking you, when we
24   look at this chart, what columns should I be
```

1  looking for for that information?

2      A.  "Are significant documents missing

3  from the investigative file inventory?" is

4  another column in there.  And "Are there any

5  handwritten notes?"  All right, whether they

6  are on GPRs or whether or not are they on

7  legal pads.  Are there any handwritten

8  notes?

9      Q.  That's your interpretation of that

10  column?

11      A.  That's my understanding, yes.

12      Q.  What's your understanding based

13  on?

14          MR. SWAMINATHAN:  Objection to

15  form.  Foundation.

16              Go ahead.

17          THE WITNESS:  It says, "Are there

18  any handwritten notes in the investigative

19  file?"  And then there is a column that goes

20  through and says, yes, yes, yes, and then

21  there are some that say, no, no, no.

22  BY MS. ROSEN:

23      Q.  But that point is the point about

24  there's handwritten notes that aren't being

 1  written on a GPR?

 2            MR. SWAMINATHAN:  No.  Objection

 3  to form and foundation.

 4             MS. ROSEN:  Are you testifying,

 5  Anand?

 6            MR. SWAMINATHAN:  You are putting

 7  words in his mouth.

 8            MS. ROSEN:  Because you prepared

 9  the report, you want to explain it?  I am

10  asking him.

11            MR. SWAMINATHAN:  You are putting

12  words in his mouth.

13            MS. ROSEN:  No.  He can explain

14  it.  He can explain it.

15            MR. SWAMINATHAN:  He just showed

16  you the column, and you asked him a question

17  about the next column.  That's totally

18  unfair.

19             MS. ROSEN:  You know what, he

20  utilized this column to do this report,

21  these attachments for his opinion.  He can

22  be tasked with explaining it; not you.

23            MR. SWAMINATHAN:  He is

24  explaining, which what he -- he talked to

```
 1  you about one column, and you asked him a
 2  question that makes a premise about the next
 3  column.  That's not fair.
 4             MS. ROSEN:  No more speaking
 5  objections, please.
 6             MS. GOLDEN:  Anand, I would just
 7  respectfully ask that you not shake your
 8  head yes or shake your head no.
 9             MR. SWAMINATHAN:  No, please.
10             MS. GOLDEN:  Ms. Rosen has asked a
11  question and before the witness has answered
12  it.  I just saw that a couple of times and
13  nobody else is in the room.  I know that
14  it's -- it doesn't mean anything
15  necessarily, however, I would just ask that
16  you not -- try to refrain from doing that,
17  please.
18             MR. SWAMINATHAN:  Ask your next
19  question.
20  BY MS. ROSEN:
21      Q.  Any other columns that you believe
22  support your opinion that there was a
23  routine failure to document information
24  learned from a homicide investigation?
```

 1        A.  Okay, the fourth column from

 2   the -- from the left "Are significant

 3   documents missing from investigative file

 4   inventory?"

 5        Q.  What is investigative file

 6   inventory?

 7        A.  Well, the inventory sheet is where

 8   all of the documents that are contained

 9   within a case file should be on the

10   inventory, and the way the Chicago Police

11   Department, at least their policy, which I

12   believe was deficient, they used that as the

13   document to provide to the defense and

14   others apparently, as an index of what is

15   contained within the file.

16        Q.  Okay.  So this column that you are

17   pointing to, which is Column I, right?

18        A.  I don't have a -- what I am

19   looking at doesn't have a letter on it.

20        Q.  Well, that's too bad.

21            So the header is "Are

22   significant documents missing from

23   investigative file inventory?  List report,

24   type and dates."  Correct?

1        A.   That's correct.

2        Q.   So that means that the document is

3   in the file, it's not listed on the

4   investigative file inventory, correct?

5        A.   That was one of the problems

6   identified, yes.

7        Q.   So that means that the information

8   actually was documented -- the information

9   learned in the homicide investigation was

10  documented because it's in the file.  The

11  problem being identified there is that the

12  investigative file inventory is incomplete,

13  correct?

14       A.   Again, that's one of the issues.

15  And there is also another column that says,

16  "Are there any handwritten notes?"

17       Q.   Right.  That's the one that you

18  just told me about.

19       A.   Right.  But then you asked on

20  whether or not I meant GPRs or whether or

21  not I meant -- and what the column and what

22  was contained in the file.  There are some

23  files -- my recollection when I went through

24  some of these files that there were no

 1  handwritten notes whatsoever in the files

 2  about a homicide case.

 3       Q.  So your understanding of that

 4  particular column, which is -- reads, "Are

 5  there any handwritten notes?" is to capture

 6  whether or not there is any piece of paper

 7  in the file that contains handwriting?  Do I

 8  have that correct?

 9       A.  That's my understanding.

10       Q.  And what's the basis of your

11  understanding for drawing that conclusion?

12            MR. SWAMINATHAN:  Objection to

13  form and foundation.

14                 Go ahead.

15            THE WITNESS:  Well, I did note --

16  I did go -- I did -- some of the files that

17  I went through, there were -- there was a

18  file that -- or there were files that I did

19  not believe were consistent with what I

20  normally see in a homicide investigation.

21  And as I testified to, there were files that

22  did not have any type of handwritten notes

23  by the officer whatsoever.

24

1   BY MS. ROSEN:

2        Q.  By any officer?

3        A.  By any officers.

4        Q.  And did you compare -- how did you

5   identify those files?  From the chart or on

6   your own?

7        A.  Through my spot-checking of the

8   cases.

9        Q.  How many files are there in that

10  column that say "no"?

11       A.  I --

12       Q.  Do you know?

13       A.  I don't know offhand.

14       Q.  Did you tabulate that?

15       A.  I don't think I did, no.

16       Q.  Okay.  Any other data contained

17  within your report to support the conclusion

18  that there was a routine failure to

19  document?

20       A.  I think we discussed it.

21       Q.  What is your understanding of what

22  is meant by the use of the phrase "street

23  file"?

24       A.  My understanding is street files

 1  were files that were used that perhaps the

 2  detectives kept in their desk.  I think they

 3  were also referred to perhaps as working

 4  files, and that they were not considered a

 5  formal file that would have been turned

 6  over.

 7      Q.  The investigative file -- are the

 8  investigative files that you reviewed formal

 9  files that are turned over?

10      A.  Well, I mean, all of these files

11  should be formal files within a police

12  department, regardless of what they are

13  called.  These are -- any -- any

14  documentation relating to a criminal case

15  should be considered a formal file.  And as

16  you have pointed out, there's a number of

17  different files within the Chicago Police

18  Department, parallel files, and I believe

19  that contributed to some of the problems

20  that I see, that I see that I saw in

21  conducting my analysis.

22      Q.  But my question is a little bit

23  different.  You reviewed investigative files

24  from 1995 to 1998, correct, 344 of them?

 1      A.  That's correct.

 2      Q.  Were those considered formal files

 3  by the Chicago Police Department?

 4          MR. SWAMINATHAN:  Objection to

 5  form.

 6              Go ahead.

 7          THE WITNESS:  I believe those were

 8  considered standard, or we are using the

 9  word "formal."  Yeah, I guess you have to

10  define what "formal" means, I guess.

11  BY MS. ROSEN:

12      Q.  Well, when I asked you your

13  understanding of street file, you said files

14  that were sometimes kept in desks that were

15  not considered a formal file that would be

16  turned over to the criminal process or to

17  the prosecutors or to the defense attorneys.

18  So then I am using that definition, your

19  word, to ask you about investigative files.

20      A.  Right.

21      Q.  So you reviewed 344 investigative

22  files from 1995 to 1998.  Is it your

23  understanding that those files were

24  considered formal files to be turned over by

1  the Chicago Police Department?

2      A.  Yes.

3      Q.  And did you see any evidence in

4  your review of the materials -- let me start

5  over.

6            Did you see any evidence in

7  your review of the 344 investigative files

8  that entire files were not turned over to

9  criminal defendants or prosecutors?

10          MR. SWAMINATHAN:  Objection to

11  form and foundation.

12           Go ahead.

13          THE WITNESS:  I think there were

14  files missing from the Public Defender's

15  Office, yes.

16  BY MS. ROSEN:

17      Q.  Entire investigative files were

18  missing from the Public Defender's Office?

19          MR. SWAMINATHAN:  Objection to

20  form.

21           Go ahead.

22          THE WITNESS:  I believe so, yes.

23  BY MS. ROSEN:

24      Q.  Can you identify which RD numbers

1  you are referencing?

2      A.  You know what, I can't, not as we

3  sit here.  It's my recollection.  I could be

4  wrong.  And if I am wrong and if you can

5  point out that I am mistaken, I certainly

6  would not argue about that.

7      Q.  Do you in your report identify any

8  files, any investigative files, that were

9  completely missing from a criminal defense

10 file?

11     A.  From the Public Defender's file?

12     Q.  Yes.

13     A.  I don't think I identified any of

14 those, no.

15     Q.  On page 35 of your report, you

16 state -- if we could put the exhibit back

17 up, Exhibit 6.  You state, "Standard police

18 practice in 1998 was to maintain a

19 centralized repository often referred to as

20 a single 'murder book' or 'homicide file' to

21 collect and store all investigative

22 information learned during the course of a

23 homicide investigation."

24               Do you see that there?

```
 1        A.  I do.

 2        Q.  What is your basis for concluding

 3   it was standard police practice in 1998 to

 4   maintain a centralized repository?

 5        A.  Based on my experience.

 6        Q.  Anything else?

 7        A.  That's primarily my experience in

 8   working with several different police

 9   departments, yes.

10        Q.  Well, Detroit, right?

11        A.  That's correct.

12        Q.  And Fort Lauderdale, right?

13        A.  Correct.

14        Q.  What other police department?

15        A.  Well, the DEA and other

16   departments that we worked joint

17   investigations with.  The Broward Sheriff's

18   Office would be an example.  You know, we

19   worked many cooperative investigations.

20        Q.  And it's your opinion based on

21   that experience that the DEA maintained a

22   centralized repository for its murder

23   investigations?

24        A.  No, not for homicide
```

1  investigations.  For their investigations.

2      Q.  The DEA doesn't do homicide

3  investigations, right?

4      A.  That's correct.  Well, they might

5  participate in a homicide investigation, but

6  typically what I am suggesting is the DEA

7  has a central depository and a case agent

8  that's responsible for that case file, which

9  is consistent with how criminal

10  investigations should be conducted.

11      Q.  Do you know back in 1998 how New

12  York handled its record keeping with respect

13  to homicide investigations?

14      A.  I do not.

15      Q.  How about Los Angeles, do you know

16  what -- how Los Angeles handled its record

17  keeping or file maintenance with respect to

18  homicide investigations back in 1998?

19      A.  I think L.A. -- I think L.A. was

20  the -- somewhat of the leader on the murder

21  book of where there is one central

22  depository for information.

23      Q.  When did that come about?

24      A.  I don't know exactly the date, but

1   I know that that was what they taught, and I

2   know that that's what they recommended.

3        Q.  Is there any -- is there any

4   police practice manual or national standards

5   that you are relying on in support of your

6   conclusion that it was standard police

7   practice in 1998 to maintain a centralized

8   repository for homicide investigations?

9        A.  Well, I think IACP had information

10  on it.  I don't know if it dated back into

11  1998.  That, I am unclear of, and I would

12  probably have to look back and see what the

13  dates were on that.

14       Q.  The materials that you reference

15  in your attachment?

16       A.  No.  You had asked whether IACP or

17  any other -- well, any other -- you had

18  asked any other department, but I had

19  mentioned IACP often provides model policies

20  to agencies, and I know they have spoken on

21  this topic.  I don't know if it was prior to

22  1998 or after 1998 is what I would have to

23  go do additional research on.

24       Q.  And you did not do that research

1  before now?

2      A.  You know what --

3      Q.  You have got to let me finish my

4  question.

5      A.  I am sorry.  I'm sorry.

6      Q.  You did not do that research

7  before you prepared your report, correct?

8          MR. SWAMINATHAN:  Objection to

9  form.  Foundation.

10             Go ahead.

11          THE WITNESS:  I would have to

12  again look back at the IACP information that

13  I have listed to see exactly what the dates

14  are on it.

15  BY MS. ROSEN:

16      Q.  Listed on the attachments to your

17  report you mean, right?

18      A.  The material provided by IACP,

19  yes.

20      Q.  Right.  You have some of that

21  listed on your -- two of your attachments,

22  right?

23      A.  Right.

24      Q.  So if it's not there, you didn't

 1  look at it, right?

 2      A.  That would be a fair assessment,

 3  yes.

 4      Q.  How did you learn about the George

 5  Jones case?

 6      A.  What do you mean how did I learn

 7  about it?  The information was provided to

 8  me by plaintiff's counsel.

 9      Q.  And you also reference the Palmer

10  litigation in your report, correct?

11      A.  That's correct.

12      Q.  How did you learn about the Palmer

13  litigation?

14      A.  That was information that was

15  provided.

16      Q.  And if we take a look at page 38

17  of your report, the last line above the

18  paragraph with the heading "George Jones

19  Appeal," it says, "The Seventh Circuit did

20  not revisit or revise Judge Shadur's factual

21  findings."

22          Do you see that?

23      A.  I do.

24      Q.  There is a citation to the Palmer

 1  case.  Do you see that?

 2       A.  Yes.

 3       Q.  Did you read the Palmer case that

 4  you cite there?

 5       A.  Not in -- not in specific detail.

 6       Q.  So then how did you know that the

 7  Seventh Circuit did not revisit or revise

 8  Judge Shadur's factual finding?

 9       A.  I think I cut and pasted it from

10  that ruling.

11       Q.  From the Seventh Circuit ruling?

12       A.  From the document that I reviewed.

13  I don't know exactly if it was the Seventh

14  Circuit or if it was some other document.

15       Q.  So you cite to that Palmer case,

16  right there, right?  That's what that

17  footnote means?

18       A.  That's correct.

19       Q.  So do you think that you cut and

20  pasted from that particular decision that

21  you cite there?

22       A.  I very well may have.

23       Q.  But you are not sure?

24       A.  I can't tell you for sure at this

1  point.

2       Q.  Did you read any other opinions

3  that were issue -- well, let me back up for

4  a second.  It says -- the citation says,

5  Palmer versus City of Chicago, 755F.2d 560,

6  (7th Cir. 1985).  Do you see that there?

7       A.  I do.

8       Q.  Do you know what the F.2d is a

9  reference to?

10      A.  I don't.

11      Q.  Do you know what the Cir. is a

12  reference to?

13      A.  Circuit, I believe.

14      Q.  Do you have an understanding of

15 what the Seventh Circuit is?

16      A.  Probably not to the extent that

17 you do.

18      Q.  Do you have any understanding of

19 what the Seventh Circuit is?

20      A.  Not -- no, I don't.  I know it's

21 part of the judicial system in Chicago.

22      Q.  Have you been provided any other

23 opinions issued by the Seventh Circuit

24 regarding the Palmer litigation after 1985?

```
 1        A.  I don't think so.
 2               (Whereupon, Tiderington
 3                Deposition Exhibit No. 10 was
 4                screen-shared/referenced.)
 5   BY MS. ROSEN:
 6        Q.  Let's take a look at Exhibit
 7   No. 10?
 8            MR. SWAMINATHAN:  Which exhibit?
 9            MS. ROSEN:  10.
10            THE WITNESS:  Which is what?
11            MS. ROSEN:  It is the Seventh
12   Circuit's opinion issued November 26, 1986,
13   and if we go to page --
14            MR. SWAMINATHAN:  You are showing
15   him a different document that you are
16   referring to than the footnote one you are
17   talking about?
18            MS. ROSEN:  That's correct, page
19   4.  But you don't need to clue him in in
20   that way, Anand.
21            MR. SWAMINATHAN:  I am not clueing
22   him in.  I don't want there to be any
23   confusion.
24            MS. ROSEN:  Well, if he is
```

```
 1  confused, he is a big boy, and he can tell
 2  me.
 3          MR. SWAMINATHAN:  It wasn't your
 4  intention, obviously, to have him mistakenly
 5  think you were showing him a document other
 6  than the one you showed him, right?  I
 7  didn't cause you any -- unless your
 8  intention was to mislead them.
 9          MS. ROSEN:  Of course not, but you
10  don't need to be coaching your way through
11  this.
12          MR. SWAMINATHAN:  I'm not coaching
13  my way through anything.  I am just trying
14  to confirm -- unless your purpose was to
15  mislead him, what did I say to coach him?
16          MS. ROSEN:  Oh, my god, just stop.
17  BY MS. ROSEN:
18      Q.  Let's go to page 4 of the opinion,
19  and you will see -- why is yours looking
20  different than mine?  Keep going.
21              So the pagination is a little
22  bit different.  I am going to ask you to
23  take a look at the highlighted language
24  here, and it's describing the lawsuit that
```

1  you discuss in your report, the class action

2  lawsuit.  And the Seventh Circuit notes in

3  that first highlighted paragraph:

4                    "...it challenges the

5               constitutionality of the Chicago

6               Police Department's alleged

7               practice of concealing exculpatory

8               material collected in criminal

9               investigations and lodged in the

10              department's informal 'street

11              files.'  The District Court issued

12              a temporary restraining order

13              directing the City preserve such

14              material pending decision on the

15              plaintiff's motion for a

16              preliminary injunction.  In

17              compliance with this order, the

18              City adopted retention procedures

19              that in 1993 the District Court by

20              a preliminary injunction required

21              the City to continue and in

22              certain respects amplify."

23          Do you see that there?

24     A.  I do.

```
 1        Q.  And I take it, you have never read
 2   this opinion before I am showing it to you
 3   today, correct?
 4        A.  Well, can I look at the beginning
 5   of it?
 6        Q.  Sure.  That's the beginning.  It
 7   begins right there.  That's where the
 8   language starts.
 9        A.  The beginning of the document,
10   though?
11        Q.  Sure.
12        A.  I don't know how I could scroll.
13   I can't scroll up and see.
14        Q.  She will scroll.  Robyn will
15   scroll up for you.
16        A.  All right.  So I am just going to
17   read it.  Do you want me to read the
18   document or just rely on the highlighted
19   area?
20        Q.  Yeah, I just want you to rely on
21   the highlighted area, and I am asking you --
22   my question is:  Have you read that language
23   -- have you seen that language or read that
24   language that I just read to you before I am
```

1  showing it to you today?

2           MR. SWAMINATHAN:  Objection to

3  form and foundation.

4                Go ahead.

5           THE WITNESS:  I have seen it.  I

6  don't know verbatim, but I have seen similar

7  language to what you read to me.

8  BY MS. ROSEN:

9      Q.  And then if we can go back to the

10 page I was on, and then below more

11 highlighted language, it says, "Meanwhile,

12 the City had appealed from the grant of the

13 preliminary injunction and in 1985, this

14 Court reversed."

15                Do you see that?

16     A.  I do.

17     Q.  And then the citation there is to

18 755 F.2d 560 (7th Cir. 1985), which is the

19 citation you have in footnote 61 of your

20 report, right?

21     A.  That's correct.

22     Q.  And then reading on to the next

23 highlighted section, it says:

24                "We also held, however, that

```
 1              the convicted defendants were

 2              entitled to a preliminary

 3              injunction (patterned on the

 4              temporary restraining order)

 5              directing the City to preserve the

 6              defendants' files until the

 7              defendants could discover whether

 8              they had any basis either for

 9              mounting a collateral attack on

10              their convictions or for obtaining

11              damages under Section 1983 for

12              violation of their constitutional

13              rights.  We remanded the case for

14              the entry of a suitable

15              injunction."

16          Do you see that there?

17      A.  I do see that.

18      Q.  Did you understand that after the

19  Seventh Circuit reversed Judge Shadur that

20  they sent the case back under the conditions

21  that I just read to you so that plaintiffs

22  would have an opportunity to review the

23  files?

24      A.  Did I understand that from based
```

 1  on what you just read to me?

 2      Q.  No.  Well, did you understand that

 3  as you were preparing your report that

 4  that's what happened?

 5          MR. SWAMINATHAN:  Objection to

 6  form.

 7              Go ahead.

 8          THE WITNESS:  That's apparently

 9  what happened.  I don't know if I knew that

10  while I was doing my report or not.

11  BY MS. ROSEN:

12      Q.  And then the next highlighted

13  language reads:

14              "With the case back in the

15              District Court, the plaintiffs'

16              lawyers inspected the files but

17              found nothing on which they could

18              base a claim that any member of

19              the class had been convicted in

20              violation of the constitution."

21              Do you see that there?

22      A.  I do.

23      Q.  Were you aware that none of the

24  files contained any material that indicated

```
 1  that any of the plaintiffs had had their
 2  constitutional rights violated?
 3          MR. SWAMINATHAN:  Objection to
 4  form and foundation.  Misstates the
 5  testimony -- or the exhibit, rather.
 6          THE WITNESS:  I don't know if I
 7  was aware of that or not.
 8  BY MS. ROSEN:
 9      Q.  Okay.  If we can now go to the
10  next highlighted portion, which shows up as
11  page 7 for me.  There we go.
12              All right.  If we look to the
13  highlighted middle of the page that begins,
14  "The plaintiffs, we now know have lost this
15  case."  Do you see that?
16      A.  I do see that.
17      Q.  And then it goes on to say:
18              "The plaintiffs asked for a
19              preliminary injunction.  They got
20              it, but this Court threw it out.
21              The only relief we allowed was an
22              order (never actually entered by
23              the District Court so far as we
24              can determine) directing the City
```

```
 1                    to retain its 'street files' and

 2                    allow convicted members of the

 3                    plaintiff class to inspect them

 4                    for information which they might

 5                    use either to get their

 6                    convictions overturned or to get

 7                    damages for wrongful conviction."

 8               And then it goes on, "Such an

 9                    order is worthless if discovery

10                    turns up nothing; indeed, it's

11                    worse than worthless because then

12                    the party has incurred an expense

13                    without obtaining any benefit from

14                    it.  That is what happened here.

15                    Upon reviewing the files, the

16                    plaintiffs' counsel were unable to

17                    find anything worthwhile.  They

18                    went on a fishing expedition and

19                    the pond was empty."

20               Do you see that there?

21      A.  I do see that.

22      Q.  Were you aware that when you were

23  preparing your report that the files that

24  were at issue in the Palmer case, which were
```

```
 1  street files, which is as you described the

 2  informal files that weren't being turned

 3  over, that after plaintiffs' counsel in the

 4  Palmer litigation reviewed those files, they

 5  found nothing in those files that would

 6  allow them to either overturn their

 7  conviction or obtain money damages for a

 8  wrongful conviction?  Is that something you

 9  were aware of when you prepared your report?

10          MR. SWAMINATHAN:  Objection to

11  form and foundation.

12          THE WITNESS:  I don't know if I

13  was aware of it at that time, no.

14          MS. ROSEN:  We can take Exhibit 10

15  down.

16  BY MS. ROSEN:

17      Q.  If we go to page 39 of your

18  report, so back to Exhibit No. 6, at the

19  bottom of page 39, it begins your discussion

20  of the steps the Chicago Police Department

21  took after Jones and Palmer, correct?

22      A.  That's correct.

23      Q.  Okay.  And then in your opinion,

24  those steps are inadequate to ensure that
```

 1  all relevant investigative materials are

 2  disclosed, correct?

 3      A.  That was my opinion or is my

 4  opinion, yes.

 5      Q.  If we go to page 40 of your

 6  report, you have a discussion of Special

 7  Order 83-1 at the bottom of the page.  Do

 8  you see that there?

 9      A.  Yes.

10      Q.  And this is one of the directives

11  that in your view is inadequate, correct?

12      A.  That's correct.

13      Q.  And we already discussed it, but

14  you are aware that Mike Brasfield provided

15  opinions and testimony in a case called

16  Fields, correct?

17      A.  That's my understanding.

18      Q.  And, in fact, you have some

19  discussion of the Fields case in your

20  report, correct?

21      A.  That is correct.

22              (Whereupon, Tiderington

23               Deposition Exhibit No. 9 was

24               screen-shared/referenced.)

 1  BY MS. ROSEN:

 2       Q.  If we could take a look at Exhibit

 3  9.

 4            And you were provided some

 5  Fields materials other than Mr. Brasfield's

 6  report, correct?

 7       A.  I believe I was, yes.

 8       Q.  Item 85 and Item 86 are the -- in

 9  your attachment are Fields documents, Fields

10  PRF and Fields area file, right?

11       A.  I am looking at that at this

12  point, yes.

13       Q.  And there might be other Fields

14  materials on here.  I don't want to take the

15  time to look, but in any event, you were

16  provided some Fields material.

17            Were you provided any Fields

18  trial testimony from the civil case?

19       A.  I am going back to that

20  attachment, so if you can bear with me for a

21  second.

22       Q.  Sure.

23       A.  Okay.  I found it.  What -- I am

24  sorry, if you could please reask your

 1  question.

 2      Q.  There are Fields documents noted.

 3  I located quickly, as I am just looking at

 4  this, Items 85 and 86 are related to the

 5  Fields case, correct?

 6      A.  Yes.

 7      Q.  And 84, actually, right?  84, 85,

 8  and 86?

 9      A.  Yes.

10      Q.  And then you also had

11  Mr. Brasfield's report?

12      A.  That's correct.

13      Q.  So my question is:  Were you

14  provided any of the trial testimony from the

15  Fields civil trial?

16      A.  I don't recall seeing that.  It's

17  possible, but I don't recall as we sit here

18  today that I reviewed it.

19      Q.  So I am showing -- we have up here

20  marked as Exhibit No. 9 testimony from March

21  13th of 2014 in Mr. Fields' civil case.  If

22  we can go to page 36 of the PDF, this is the

23  -- wait, sorry.

24              If we could go to the next

 1  page, you will see that there is the direct
 2  examination of plaintiff's witness Lou
 3  Reiter.  Do you know who Lou Reiter is?
 4       A.  I don't recall that name.
 5       Q.  As you can see here from Line 13
 6  and 14 of the transcript, Mr. Reiter was a
 7  police consultant, and since this is the
 8  direct examination by plaintiff, he is
 9  plaintiff's expert --
10       A.  Correct.
11       Q.  -- in the Fields case that he is
12  testifying in this transcript, okay?
13            MR. SWAMINATHAN:  You want to
14  explain to him what -- are you explaining
15  what this transcript is, or what trial this
16  is, or which trial this is?  He's never seen
17  this document.
18            MS. ROSEN:  I've explained to him
19  that it was testimony from Mr. Fields'
20  trial.  That's what I explained to him, and
21  that is accurate.
22            MR. SWAMINATHAN:  There are
23  multiple trials.  You haven't explained --
24            MS. ROSEN:  I don't have to --

 1  Anand, if you want to ask him questions,

 2  then you can ask him question at the end.

 3              (Nonreportable cross-talk.)

 4          MR. SWAMINATHAN:  You are asking

 5  him --

 6          MS. ROSEN:  This is my exam.

 7  Don't talk over me.  I am going to conduct

 8  my exam as I see appropriate.

 9          MR. SWAMINATHAN:  No.  But if you

10  are going to -- you are showing him a

11  document he has never seen before.  If you

12  are going to ask him about that document,

13  you should give him the relevant context for

14  the document, otherwise you are just trying

15  to mislead him.

16          MS. ROSEN:  I am not.

17          MR. SWAMINATHAN:  So why are

18  you --

19          MS. ROSEN:  Anand, no, I am not.

20  We are not going to -- we are not going to

21  waste time on my record doing this.

22          MR. SWAMINATHAN:  No, it's not a

23  matter of wasting time.  You said this is

24  the trial transcript.  Why are you making

 1  that ambiguous statement?  You know what the

 2  real facts are.  Why would you -- why don't

 3  you explain the circumstances?  Why is it

 4  deliberately the case that you want to

 5  mislead him and not let him know the

 6  context?

 7          MS. ROSEN:  That is so

 8  inappropriate for you to be saying that.

 9  You have not even let me finish asking my

10  questions.

11              Is it not true that this is

12  trial testimony from Fields?  It absolutely

13  is true.  Is it not true that Mr. Reiter was

14  plaintiffs' expert?  It is true.  I am not

15  misleading him at all, and you can stop

16  talking now.

17          MR. SWAMINATHAN:  Okay.  Let the

18  record reflect counsel is showing this

19  witness a document that he has never seen

20  before.

21          MS. ROSEN:  You are making a

22  speaking objection to try to coach the

23  witness.

24          MR. SWAMINATHAN:  And counsel is

```
 1  making representations about what the
 2  document is that plaintiff's counsel, I
 3  believe, are misleading representations
 4  about what this is, given that the witness
 5  has not seen this document before and
 6  doesn't have a relevant context about
 7  trials, and what trial this is referring to.
 8  Go ahead.
 9  BY MS. ROSEN:
10      Q.  Okay.  Can we go to page 36 of the
11  PDF, please.  And as you can see at the top
12  of this page here, it says, Reiter, cross,
13  right?  So it's the cross-examination by the
14  defendant -- one of the defense counsel in
15  this case.  And the question that is being
16  asked and the answers are highlighted, but I
17  would like to ask you some questions about,
18  and I will read them.
19              "And actually it was -- it
20              sounds like it was about -- it was
21              implemented January of '83, and
22              then the late '90s some other
23              department started to get around
24              to implementing written policies
```

```
 1              like this; is that true?
 2                  "Yes."
 3                  And then the question is:
 4                  "So Chicago was ahead of
 5              its time with respect to this
 6              written policy, isn't that true?"
 7                  And the answer is:  "Yes."
 8                  Do you see that there?
 9      A.  I do see that.
10      Q.  Have you ever heard from any
11   source that the directives that were
12   implemented by the Chicago Police Department
13   after Jones and Palmer in 1983 were ahead of
14   their time with respect to the written
15   policy on documentation of information
16   learned in homicide investigations?
17              MR. SWAMINATHAN:  Objection to
18   form and foundation and to any questions
19   showing the witness -- taking a witness to
20   page 36 of a 54-page document that he hasn't
21   seen before and simply asking him out of
22   context about one question and answer.
23              Go ahead.
24              THE WITNESS:  I am sorry, could
```

 1  you please ask the question again just so I

 2  am clear?

 3         MR. SWAMINATHAN:  And I will just

 4  say same objection.  Go ahead so you can get

 5  question and answer.

 6         MS. ROSEN:  Can you just read back

 7  my question, Maribeth.

 8              (Whereupon, record read, as

 9               requested.)

10         MR. SWAMINATHAN:  Same objection.

11         THE WITNESS:  So I guess before I

12  can answer that question, could I read a

13  couple of pages back because they are

14  discussing 83-1?  So for context, I think it

15  would be important for me to understand what

16  was being discussed there.

17         MS. ROSEN:  Sure.  We can go back

18  a couple of pages.  Let's go back two pages.

19         THE WITNESS:  I mean, I am trying

20  to understand in context.  This was an

21  expert for the plaintiff or -- I don't know

22  exactly who he is, I don't think.

23  BY MS. ROSEN:

24      Q.  Okay, and that's fair.  I am

 1   representing to you that he was the expert,

 2   one of plaintiff's experts in the Fields

 3   trial that took place in 2014 and --

 4        A.  In 2014?

 5        Q.  The civil trial that took place in

 6   2014, yes.  Not his criminal case, the civil

 7   case that took place.

 8             MR. SWAMINATHAN:  Not civil.  You

 9   said the civil trial.  This was not the

10   civil trial.

11             MS. ROSEN:  Oh, my god, Anand,

12   honestly.

13             MR. SWAMINATHAN:  You are

14   misrepresenting the record to him.

15             MS. ROSEN:  The civil trial that

16   took place in 2014 is factually accurate.

17             MR. SWAMINATHAN:  Why are you

18   deliberating going out of your way to make

19   it seem like there is only one civil trial?

20             MS. ROSEN:  What difference does

21   it make if there were one or seven?  I am

22   not going to keep engaging in this

23   conversation with you.

24             MR. SWAMINATHAN:  No, you are

 1  deliberately saying things to him to make it

 2  appear as though -- to create a sense of --

 3  a set of facts that is not the case, and

 4  that bothers me.

 5          MS. ROSEN:  It is sworn testimony

 6  by a witness.  Irrespective of when it was

 7  given or at what time period, it is sworn

 8  testimony.

 9          MR. SWAMINATHAN:  It is sworn

10  testimony, but you are deliberately going

11  out of your way to use phrases to make it

12  seem as though there is one instance of a

13  civil trial and --

14          MS. ROSEN:  I am pretty sure he

15  got the point now that there was a second

16  civil trial.  You have made that point, and

17  I think it's irrelevant.

18  BY MS. ROSEN:

19      Q.  Okay.  So my question is really

20  pretty simple.  Had you heard from any

21  source that Special Order 83-1 was ahead of

22  its time?

23          MR. SWAMINATHAN:  You can answer

24  that question if you ever heard of it.  You

 1  can answer that.

 2          THE WITNESS:  No, I haven't heard

 3  that.

 4          MS. ROSEN:  We are done with

 5  Exhibit No. 9.  Thank you.

 6          THE WITNESS:  I'm sorry.  Can I

 7  just for one clarification?  Because I did

 8  answer but now I am reflecting on my answer.

 9  Ahead of their time in what respect?

10  BY MS. ROSEN:

11      Q.  In terms of the policy being ahead

12  of its time with respect to the requirements

13  regarding documenting information related to

14  homicide investigations?

15          MR. SWAMINATHAN:  Objection to

16  form and foundation.

17              You can go ahead.

18  BY MS. ROSEN:

19      Q.  Did you answer?

20      A.  Well, I guess I didn't answer

21  because I -- then my next question would be:

22  Which policy are you speaking of?  And then

23  I would have to look at that.  So I don't

24  know if you wanted me to get into that

 1  detail, and I don't know if my answer

 2  reflected a suggestion that I knew which

 3  policy that they were referring to.  But

 4  nevertheless, I've never heard that Chicago

 5  PD was ahead of their time in the record

 6  keeping in any respect.

 7  BY MS. ROSEN:

 8      Q.  It's with respect to the Special

 9  Order 83-1?

10          MR. SWAMINATHAN:  Objection to

11  form.  Asked and answered.

12          THE WITNESS:  So --

13  BY MS. ROSEN:

14      Q.  That was on the page.

15      A.  It was only -- it was only with

16  respect to Special Order 83-1?

17      Q.  Correct.

18      A.  No, I would never have heard that

19  from anybody.

20              I'm sorry, would this be a

21  good time to take a quick break?

22          MS. ROSEN:  Sure.  I am going to

23  need to break again in an hour.  So if you

24  want to take like a ten-minute break now,

1  and then break for lunch at 1:30?  It's up

2  to you.

3          MR. SWAMINATHAN:  That's a good

4  question.  Tom, can you -- I guess what she

5  is saying in one hour she has to break.  So

6  we can do a lunch then if you can make it

7  another hour.  Or if you want to get lunch,

8  we should do it now.

9          THE WITNESS:  Are you only going

10  to be gone for an hour, or is this going to

11  maybe drag on into all day?

12          MS. ROSEN:  No, no, no.  I don't

13  expect to be longer than 30 minutes, if

14  that, so.

15          THE WITNESS:  Yeah, why don't we

16  take a quick break now and then if we can go

17  to lunch while you have to do whatever you

18  have to do.

19          MS. ROSEN:  Perfect.

20          THE WITNESS:  All right.  Thank

21  you.

22          MS. ROSEN:  Yes.

23          THE VIDEOGRAPHER:  We are off the

24  video record at 12:32 p.m.

```
 1                 (Whereupon, a break was taken
 2                  at 12:32 p.m. to 12:44 p.m.)
 3             THE VIDEOGRAPHER:  We are back on
 4   the video record at 12:44 p.m.
 5   BY MS. ROSEN:
 6        Q.  If we can go back to Exhibit 6,
 7   the report, and go to page 45.  This section
 8   of your report discusses what in your
 9   opinion amount to the insufficient remedies
10   to the street file problem.  Do you see
11   that?
12        A.  I do.
13        Q.  And so the first point is the
14   continued use of parallel files, correct?
15        A.  I'm sorry, where are you -- where
16   are you at?
17        Q.  Point 1 on page --
18        A.  I was on page 45, I apologize.
19        Q.  We are on page 45, right?  "The
20   policies described above are insufficient to
21   remedy the street file problem."
22        A.  I'm sorry.  I was on the wrong
23   page.  I have it now.
24        Q.  And one of your criticisms is
```

1   about the continued use of parallel files,

2   correct?

3        A.  That's correct.

4        Q.  And then if we go to the next

5   page, another criticism is the discretion

6   that is allowed to the detectives to

7   determine what's relevant and needs to be

8   documented and disclosed.  Do you see that,

9   that's the line there on paragraph 2 -- I

10  mean, Point 2?

11       A.  I do see that, yes.

12       Q.  Okay.  So is it your view that the

13  detectives should not be allowed to utilize

14  their discretion to determine what

15  information is relevant to an investigation

16  that needs to be memorialized?

17       A.  That needs to be memorialized, you

18  mean turned over?

19       Q.  No.  Memorialized, written down?

20       A.  And again, I am thinking about

21  your question and make sure I understand it

22  completely.  Should an officer have

23  discretion about what they document in some

24  type of a report?

```
 1        Q.  Correct.
 2        A.  I think it would be somewhat
 3   discretionary with guidance from their
 4   department, but anything that is related to
 5   a criminal investigation, related to a
 6   homicide should be documented, and I think
 7   that's what law enforcement officers are
 8   taught from the academy on.
 9        Q.  And as I understand your criticism
10   of the directives that were put in place
11   after Jones and Palmer is that the directive
12   did not specifically instruct the detectives
13   regarding what needs to be documented.
14             Do I have that right?
15        A.  Which directive?  I think I know,
16   but I just want to clarify which directive
17   or all of the directives?
18        Q.  Well, let's go back to page 45 for
19   a second.  The heading is "The policies
20   described above are insufficient to remedy
21   the street files problem."  Correct?
22        A.  That's correct.
23        Q.  What is that referencing?  What
24   policies is that referencing?
```

 1      A.  The memos that came out, and
 2  eventually, the special order.
 3      Q.  So in your view, those policies
 4  are insufficient, right?
 5      A.  That's correct.
 6      Q.  And then if we go to the next
 7  page, page 46, one reason they are deficient
 8  is because they allow the detectives
 9  discretion to determine what is relevant and
10  needs to be documented and disclosed.  So I
11  am focusing on the documented part of it
12  so --
13      A.  Right.
14      Q.  -- as I understand it, you believe
15  that despite the fact that you just told me
16  that detectives have discretion that the CPD
17  policies were insufficient because they
18  allowed detectives to exercise their
19  discretion in determining what's relevant
20  and needs to be documented, right?
21          MR. SWAMINATHAN:  Objection to
22  form and foundation.
23              Go ahead.
24          THE WITNESS:  Yeah, that's kind of

```
 1  a long question.  I -- you would have to

 2  look at other CPD policies, and their

 3  policies would mandate what the officers

 4  should include in police reports.  So in

 5  that respect, I don't think there is a lot

 6  of discretion.  I think that the officers

 7  should follow whatever their policies are,

 8  and I think the policies would tell the

 9  officer that anything related to the

10  investigation should be documented, and then

11  we would move on to the next step of what

12  should be disclosed.

13  BY MS. ROSEN:

14       Q.  Okay, and we will get to the

15  disclosure part of it as we talk about the

16  problems that you identify further down in

17  your report about disclosures.

18            The item number 3 is "No

19  procedures or written instructions to

20  subpoena responders to make sure

21  investigative material from all location is

22  disclosed."  Do you see that?

23       A.  I do.

24       Q.  So is your criticism here simply
```

 1  that there is no written policy directing

 2  the subpoena response unit, specifically

 3  regarding units within the Chicago Police

 4  Department from which they can obtain

 5  records?

 6       A.  Well, that's certainly part of my

 7  criticism.

 8       Q.  What's the rest of your criticism

 9  with respect to the subpoena response unit?

10       A.  Well, as the department

11  spokesperson, there were problems, there was

12  no way for the subpoena service unit, the

13  records division, to know what units that

14  they would need to query, and if they ever

15  get a subpoena in order to get all the

16  documents on a particular case.

17            MS. ROSEN:  Can you read back his

18  answer.

19            (Whereupon, the record was

20             read as requested.)

21  BY MS. ROSEN:

22       Q.  So your recollection is that the

23  City of Chicago spokesperson said that there

24  was no way for the subpoena service unit to

1  know from where to get the documents?  Is

2  that what you just said?

3       A.  Well, Hickey described that it was

4  a -- I think it was an art, I think is the

5  word that he used, and that it was possible

6  in a case with multiple units working on the

7  same investigation for the subpoena to go

8  to only one of these units.  So certainly, I

9  am summarizing what his statements were, but

10  that was my take-away from reading his

11  testimony.

12       Q.  Do you know how many subpoenas the

13  subpoena service response unit processed in

14  any given year in, say, 1998?

15       A.  How many?

16       Q.  Yes.  How many subpoenas they

17  processed?

18       A.  I thought you were asking me to

19  guess.

20       Q.  No.  Do you know?  Do you have any

21  idea?

22       A.  No, I don't.

23       Q.  And what is your understanding of

24  how subpoenas work in the criminal court in

 1  Cook County?
 2       A.  I don't have an understanding of
 3  how they work.
 4       Q.  In your review of the materials in
 5  connection with the Soto homicide
 6  investigation, did you find a deficiency in
 7  any CPD response to any subpoena issued
 8  either by the state or any of the criminal
 9  defendants?
10            MR. SWAMINATHAN:  Objection to
11  form.
12                 Go ahead.
13            THE WITNESS:  I don't recall
14  seeing that.
15  BY MS. ROSEN:
16       Q.  All right.  If we move to page 48,
17  the fourth point is:  "There was inadequate
18  training, and monitoring/auditing to ensure
19  compliance with the special orders."  Do you
20  see that?
21       A.  I am sorry, what page?  You are on
22  48?
23       Q.  Yes, Point 4.
24       A.  Yes.

 1      Q.  So the fourth point you make here

 2  in this section is that there -- there was

 3  inadequate training and monitoring/auditing

 4  to ensure compliance with the special

 5  orders.  Do you see that?

 6      A.  That's correct.

 7      Q.  And you reference the training

 8  that was done after Special Order 83-1 was

 9  issued, right?

10      A.  Yes, that is correct.

11      Q.  And I don't see anything in here

12  about training that was done after the 86

13  directive was issued, or training that was

14  done after the 1988 SOP was issued.

15          Do you have any information

16  about training that was conducted within the

17  detective division in connection with the

18  issuance of those directives?

19      A.  Well, I guess you'd have to look

20  at Hickey's testimony that he believed that

21  the detectives were reverting back to their

22  own record keeping system.  He was not aware

23  of the policy being followed.  There was no

24  monitoring.  There was no auditing of the

```
 1  system.  If I understand your question

 2  correctly.

 3          MS. ROSEN:  Can you read back his

 4  answer again, please, sorry.

 5              (Whereupon, record read, as

 6               requested.)

 7  BY MS. ROSEN:

 8      Q.  And that's your memory of

 9  Mr. Hickey's testimony; is that correct?

10      A.  It is.

11      Q.  Back to my question, with respect

12  to 19 -- let's go with 1988 when the SOP was

13  issued, right, that's the standard operating

14  procedure manual for the detective division,

15  correct?

16      A.  Yes, it is.

17      Q.  And do you know, for example, when

18  a new detective -- when a police officer

19  made detective, say, in 1989 or 1990, do you

20  know what the process was with respect to

21  training for that new detective within the

22  Chicago Police Department?

23      A.  I don't.

24      Q.  Do you know whether or not they
```

1  went to specific detective training?

2      A.  Well, in most police agencies,

3  they do have that type of a system set up

4  for new detectives, but I don't know.  I

5  don't believe I saw anything that would tell

6  me about the training for the new detective.

7      Q.  And so you don't know what was

8  being trained with respect to the new

9  directives related to general progress

10  reports and investigative files, correct?

11     A.  Well, only based on what Hickey

12  and Winstrom testified to that it was

13  inadequate, and it was deficient.

14     Q.  They both testified that it was

15  inadequate and it was deficient?

16     A.  Well, those -- in summary, that's

17  the take-away I got from their testimony,

18  yes.

19     Q.  Okay.

20     A.  They also mentioned they weren't

21  aware of any type of -- any officer ever

22  being disciplined for violating any of these

23  policies or procedures as well, which is

24  somewhat -- well, not somewhat.  It's highly

1   unusual that officers -- somebody had to

2   have violated a policy, and there should

3   have been disciplinary action.

4        Q.  What is the basis for your

5   conclusion that somebody must have violated

6   these policies, and there should have been a

7   disciplinary action?

8        A.  Because I have been a police

9   officer for 44 years, and I know officers

10  violate policies.

11       Q.  Okay.  All right.  Let's go to

12  page 49.  At the top of page 49, you say, "A

13  review of investigative files shows the

14  special orders were not being followed."  Do

15  you see that?

16       A.  I do.

17       Q.  And when you say, "a review of the

18  investigative files," you are referencing

19  the investigative files that are referenced

20  in the spreadsheet, correct?

21       A.  That's correct.

22       Q.  And you indicated here, "I

23  received investigative files for 344

24  different homicide investigations conducted

1   by Area 5 detectives for the period from

2   1995-1998."  Do you see that?

3       A.  That's correct.

4       Q.  And that's the number we talked

5   about earlier, right?

6       A.  Yes, it is.

7       Q.  And then you footnote, "For two

8   homicide investigations, a permanent

9   retention file was produced but no

10  investigative file," and then you identify

11  the two RD numbers.  "Those two files are

12  still listed in Attachment F.  And as a

13  result, the spreadsheet contains 346 rows,

14  despite only 344 investigative files."

15              Do you see that?

16      A.  I do.

17      Q.  Is that something you figured out

18  by comparing those 344 files you received to

19  the spreadsheet?

20      A.  I think that came about because

21  I -- it wasn't adding up, so I asked

22  counsel, plaintiff's counsel, to clarify

23  that for me.

24      Q.  Got it.  All right.  And then if

1  we start looking at your findings midway

2  through the page, you say, "Handwritten

3  notes, not on general progress reports, are

4  still routinely used."  Do you see that?

5       A.  I do.

6       Q.  And then you say, "As discussed

7  above, the special orders directed officers

8  to use GPRs to take notes and were intended

9  to eliminate the use of handwritten notes,

10 which detectives had been treating as their

11 own property and something they were not

12 inclined to place in the CPD's file."

13           Do you see that?

14      A.  I do.

15      Q.  So, first of all, is it your

16 interpretation of the directives that the

17 directives mandate that any note must be

18 taken on a GPR?

19           MR. SWAMINATHAN:  Objection to

20 form.

21           THE WITNESS:  That's my

22 understanding of their policy, yes.

23 BY MS. ROSEN:

24      Q.  In a circumstance where a

```
 1  detective needed to take a note but didn't
 2  for whatever reason have a GPR or general
 3  progress report available to him, what is
 4  your opinion regarding what that particular
 5  detective should do in that circumstance?
 6       A.  I guess in what type of a setting?
 7  In an interview with a suspect?  On the
 8  street?  In a grocery store?  I'm not sure I
 9  follow your question.
10       Q.  Well, can you envision a
11  circumstance where a detective is
12  investigating a case, let's say out on the
13  street, and he -- he or she does not have
14  the GPR forms available for whatever reason.
15  He's run out, they fell in a puddle, his
16  coffee got spilled all over them, but the
17  investigation is progressing, and the police
18  officer is doing something that would
19  require a note --
20       A.  Right.
21       Q.  -- to be taken.  What should the
22  police officer do in that circumstance?
23            MR. SWAMINATHAN:  Objection to
24  form.  Foundation.
```

 1          Go ahead.

 2          THE WITNESS:  All right.  Again, I

 3 would have to -- I would have to look at

 4 Chicago's GPR policy to see what guidance

 5 they gave in that with respect to their

 6 officers.

 7               I think I mentioned my

 8 department did not require GPRs.  I was

 9 looking at it from a policy perspective.  If

10 Chicago is requiring their officers to --

11 and perhaps had good reason because the

12 problems they had in previous cases, if they

13 -- and as pointed out yesterday that the

14 sheer number of homicides that were

15 occurring in Chicago, I believe required

16 that the Chicago Police Department implement

17 perhaps a more robust policy than maybe

18 other departments.  So Chicago Police

19 Department implemented a GPR program, and it

20 was apparently routinely being violated.

21 BY MS. ROSEN:

22     Q.  That really wasn't my question.

23 My question was:  --

24     A.  I am sorry, but I thought that was

1  your question.

2        Q.  Yeah.  So my question was:  What

3  is a police officer to do in a scenario

4  where there is this policy, and yet they

5  don't have a GPR available to them, and they

6  need to take --

7             MR. SWAMINATHAN:  Objection to

8  form.

9  BY MS. ROSEN:

10       Q.  -- and they need to take a note?

11            MR. SWAMINATHAN:  Objection to

12  form and foundation.  Sorry.

13            THE WITNESS:  Again, I don't know

14  if you have the policy that we can pull up,

15  and we can look at it.  I think from a

16  practical matter, there would be exceptions

17  for officers to provide notes on something

18  other than a GPR.

19            But if I am reviewing this

20  case, or in my review of many cases, it

21  didn't seem like it was the exception.  It

22  seemed to be the rule for most of -- for

23  many of the cases that I looked at.

24

1  BY MS. ROSEN:

2      Q.  And if the handwritten notes that

3  aren't written on GPRs are included in the

4  investigative file, does that constitute a

5  violation of a criminal defendant's

6  constitutional rights?

7          MR. SWAMINATHAN:  Sorry, I missed

8  the first part.  Can you read back that

9  question, please.  Sorry.

10             (Whereupon, the record was

11              read as requested.)

12          MR. SWAMINATHAN:  Objection to

13  form and foundation.

14             Go ahead.

15          THE WITNESS:  No, I don't think it

16  would constitute a violation of their

17  constitutional rights.  What I would -- what

18  I was offering an opinion on is whether or

19  not the officers were following the Chicago

20  Police Department's policies on -- and their

21  apparent attempt to have their officers

22  understand that these notes that they were

23  taking were not their personal property, and

24  that they had to be maintained.  They had to

 1 | be disclosed, and they had to be turned
 2 | over.  So in my view, that is the apparent
 3 | reason why because they were having so many
 4 | problems that they implemented the GPR
 5 | program.
 6 |              If you are asking me is it
 7 | okay for the officer to just typically
 8 | ignore the policy, but it's okay because it
 9 | doesn't really violate anybody's rights?
10 | Well, that's not how police departments
11 | operate.
12 | BY MS. ROSEN:
13 |     Q.  Did you see any evidence in the
14 | files you reviewed from -- the investigative
15 | files you reviewed from 1995 to 1998 that
16 | police officers were treating handwritten
17 | notes as their personal property?
18 |     A.  Yes.
19 |     Q.  Can you explain that to me?
20 |     A.  Well, I mean, I reviewed testimony
21 | from the police spokesman that said that
22 | there was a -- it was a difficult process to
23 | get the officers to understand that these
24 | weren't personal -- that these personal

1  notes had to be disclosed and documented.

2       Q.  And he was talking about shortly

3  after the institution of the policy in 1983,

4  right?

5            MR. SWAMINATHAN:  Object to form

6  and foundation.

7               Go ahead.

8            THE WITNESS:  Well, I think he

9  said that the problem continues.  And also I

10 do recall seeing an OIG report that

11 identified the problems that, I guess, we

12 are talking about in '83 and '84, and they

13 have identified the fact that the problems

14 still exist today, and that was in, I

15 believe, a 2020 OIG report without looking

16 at it closer.

17 BY MS. ROSEN:

18      Q.  The OIG -- the problem identified

19 in the OIG report is the problem that the

20 detectives were treating their notes as

21 personal property?  Is that what you are

22 saying?

23            MR. SWAMINATHAN:  Objection to

24 form.

1              Go ahead.

2              THE WITNESS:  I would have to

3    look, and perhaps I am confusing it with

4    Hickey and -- Hickey's and Winstrom's

5    testimony, but I know that the OIG conducted

6    an audit and found many of the same problems

7    occurring in 2020 as were occurring back in

8    the '80s and '90s.

9    BY MS. ROSEN:

10       Q.  Right.  But my question is very

11   specific about whether or not you found

12   evidence in your review of the 1995 to 1998

13   investigative files that police officers

14   were treating notes as their personal

15   property?

16              MR. SWAMINATHAN:  Objection to

17   form.

18              Go ahead.

19              THE WITNESS:  I saw evidence that

20   the notes were not routinely being either --

21   either unexplainably there were no notes on

22   investigations that you would reasonably

23   expect to see notes and that many files were

24   void of notes as well.

```
 1              MS. ROSEN:  Can you read back his
 2   answer, please.  Sorry
 3                 (Whereupon, record read, as
 4                  requested.)
 5   BY MS. ROSEN:
 6        Q.  Okay.  The next point is --
 7   actually, the last line of this paragraph
 8   is --
 9              MR. SWAMINATHAN:  I'm sorry, which
10   line of which paragraph?
11              MS. ROSEN:  The handwritten notes.
12              MR. SWAMINATHAN:  Yeah, okay,
13   sorry.
14   BY MS. ROSEN:
15        Q.  It's the last two lines.  "Of
16   those, 154 of the 334 or approximately 46
17   percent contained handwritten notes not on
18   GPRs."  Do you see that?
19        A.  I do.
20        Q.  And then it says, "This is
21   consistent with Brasfield's findings in
22   Rivera, 61 percent, and Fields, 82 percent."
23   Do you see that there?
24        A.  I do.
```

 1       Q.  In your review, 46 percent is

 2  consistent with 61 percent is consistent

 3  with the 82 percent; is that right?

 4       A.  I think it's consistent that the

 5  policy is not being followed.

 6       Q.  Is that what you mean by that?

 7       A.  It would be, yes.

 8       Q.  The next paragraph is to-from

 9  memos are still being used.  And it says,

10  "Special orders directed officers to stop

11  using to-from memos."  Do you see that?

12       A.  I do.

13       Q.  And you believe that's explicit in

14  the directives?

15       A.  I -- yes.

16            Well, I'm sorry, let's clarify

17  what directive you are speaking of.

18       Q.  Well, you say, "As discussed

19  above, the special orders," plural, "also

20  directed officers to stop using to-from

21  memos."

22       A.  Right.  Can I review those real

23  quick?  I mean, if you are going to ask me

24  questions about them, let me just have them

 1  in front of me.

 2       Q.  Well, I am not going to have you

 3  spend 20 minutes reviewing pages and pages

 4  and pages of directives.

 5       A.  Well, then there's not that many

 6  pages.

 7       Q.  Yeah, there are.

 8       A.  Okay.

 9       Q.  There's five different directives.

10  So you put it in -- you reviewed the

11  directives before you wrote your report,

12  right?

13       A.  I did.

14       Q.  So are you -- you must be

15  confident that when you reviewed the

16  directive that they specifically mandated

17  that officers stop using to-from memos,

18  right?

19            MR. SWAMINATHAN:  Objection to

20  form and foundation.  And objection, the

21  witness has indicated that he would like to

22  be able to review the order before answering

23  the question.  Counsel is refusing to let

24  him do so.

```
 1              You can answer to the extent

 2   you can, Mr. Tiderington.

 3           THE WITNESS:  I'm sorry, if you

 4   can read that question back.

 5            MS. ROSEN:  Yeah, I will just

 6   rephrase it.

 7   BY MS. ROSEN:

 8       Q.  When you wrote, "The special

 9   orders also directed officers to stop using

10   to-from memos to communicate investigative

11   information, you did that after reviewing

12   the directives, correct?

13           MR. SWAMINATHAN:  Same objection.

14              Go ahead.

15           THE WITNESS:  That's correct.

16   BY MS. ROSEN:

17       Q.  And then the next point is Missing

18   or Incomplete Inventory Sheets.  Do you see

19   that?

20       A.  I do.

21       Q.  And then if we go to the next

22   page, page 50, you indicate -- you identify

23   that 17 percent of the total investigative

24   files contained no inventory sheet.  Do you
```

 1  see that?

 2      A.  I do.

 3      Q.  Let me ask you this:  With respect

 4  to the 1995 to 1998 investigative files, is

 5  it your understanding that each and every

 6  one of those investigative files is in the

 7  same condition, meaning it has the same

 8  information contained within them as they

 9  did at the time they were created during the

10  respective homicide investigations?

11      A.  That would have been my

12  assumption, yes.

13      Q.  And what's that assumption based

14  on?

15      A.  That was the information that was

16  provided to me.  There was no indication

17  that it was only a partial file.

18              Certainly, if you have other

19  information that is better information than

20  I had to review, I would certainly consider

21  it and would like to see it.

22      Q.  Have you had any experience in

23  responding to either a subpoena request or

24  discovery request for police files during

1  the course of your career as a police

2  officer?

3      A.  Yes.

4      Q.  In what circumstance?

5      A.  Throughout my career, I have had

6  subpoenas issued for files, for documents.

7  I for a short period of time, I was in

8  charge of the Fort Lauderdale's Police

9  Department's records division.

10     Q.  And can you tell me --

11     A.  I am not through answering.

12         MR. SWAMINATHAN:  Sorry, let him

13  finish.

14         THE WITNESS:  And as a Plymouth

15  Township police chief for 20 years, I

16  certainly had a more intimate knowledge of

17  the subpoena process in a small agency.

18  BY MS. ROSEN:

19     Q.  But admittedly a small -- the

20  records that are maintained in a small

21  agency like Plymouth Township is very

22  different than, say, Fort Lauderdale, right?

23     A.  You know, I thought so when I

24  first got hired as the police chief, but it

1   surprisingly -- a small agency, you still

2   have every aspect of policing to do.  You

3   have the same policies.  You still have to

4   buy vehicles.  You have to do budgeting.

5              It's the scale.  In larger

6   agencies such as Chicago or Detroit, the

7   larger agencies are broken down into

8   precincts, and really -- or areas, and what

9   a precinct or an area is in many respects is

10  a small police department.

11             So I would not say, well, it's

12  a small department, so you never really did

13  any of this stuff.  And in a small agency, I

14  learned as the police chief, you are

15  intimately involved in all of these things

16  versus a larger department where you have a

17  records department, and you have a subpoena

18  department.

19             So anyways, hopefully, I

20  explained that to you clearly.

21      Q.  Have you ever had to locate police

22  files that were 20 or 30 years old?

23      A.  Yes.

24      Q.  How often did you have to do that?

1      A.  Well, again, I am looking back or

2  thinking back, you know, as a detective,

3  there would be cases where they were 20 or

4  30 -- maybe not 30.  I would say probably

5  maybe 15 or 20 years old, and what typically

6  happens and what I feel is what the industry

7  standard is or a reasonable way to do it, is

8  a memorandum is sent to each unit within the

9  police department detailing what information

10  is being sought.  And a commander of that

11  particular unit is required to sign off that

12  he searched his files, his records, and that

13  there was a -- there were items either

14  responsive or not responsive, and whether

15  they had documents or did not have documents

16  related to the subpoena.

17      Q.  Okay.  All right.  Then the next

18  point you make here is that the inventory

19  sheets were incomplete.  Do you see that,

20  the second paragraph?

21          MR. SWAMINATHAN:  Here at the

22  bottom of page 49?

23          MS. ROSEN:  I am at the top of

24  page 50.  "Even where there was an inventory

 1  sheet in many cases, the inventory sheet was

 2  incomplete.  I found that 277 investigative

 3  files contained inventory sheets that were

 4  incomplete."

 5          THE WITNESS:  I do.

 6  BY MS. ROSEN:

 7      Q.  How did you determine that the

 8  inventory sheets were incomplete?

 9      A.  Well, in some of the files I

10  looked, and I saw certain items in the

11  police report that were not reflected on the

12  inventory sheet.

13      Q.  Did you look at 277 investigative

14  files and determine that the inventory

15  sheets were incomplete, or was that

16  something you got from the spreadsheet?

17      A.  Well, I looked at some of them.

18  Certainly I didn't look at 277, but that's

19  something that was spot-checked and is

20  reflected in the spreadsheet.

21      Q.  Do you know how it was that the

22  coders that created the spreadsheet

23  determined that the inventory sheet was

24  incomplete?

1      A.  No.

2      Q.  And when you say "incomplete," do

3  you mean that there were documents in the

4  file that were not listed on the inventory

5  sheet?

6      A.  Yes.  And again, just, I mean, if

7  we discounted the chart, the analysis or the

8  cases that I looked at or spot-checked,

9  there were items in the file that were not

10  contained on the inventory sheet.  Some

11  files didn't even have an inventory sheet.

12      Q.  Right.  That's a different point,

13  but I am just trying to get an understanding

14  of the definition of incomplete.

15      A.  All right.

16      Q.  So what you mean is there were

17  documents in the file that were not listed

18  on the inventory sheet?  Is that what you

19  mean?

20      A.  That is correct.

21      Q.  All right.  And then the next

22  paragraph is, "In addition, the inventory

23  sheets do not appear to be contemporaneously

24  updated as each new document is added."

1              What exactly -- what problem

2   exactly are you identifying there?

3        A.  Well, it tells me that documents

4   are routinely being kept someplace, and then

5   perhaps added to the case file at some point

6   in time, and then that's when the inventory

7   sheet is completed.  As you see on some of

8   the cases, where all of these items are

9   placed in the case file all on the same date

10  by the same person.

11       Q.  Do you have an understanding back

12  in 1995 to 1998 who was responsible for

13  maintaining the investigative file and

14  completing the inventory sheet?

15       A.  I think it speaks -- in the

16  policy, I think it speaks to what -- I don't

17  recall.  I would have to look at it again.

18  I don't recall specifically as we sit here

19  today.

20       Q.  And your concern is that the

21  documents were being kept somewhere else

22  before they were put in the investigative

23  file?  Is that what you thought?

24       A.  Well, that's certainly a

1  possibility.

2      Q.  And what's your basis for that

3  assumption?

4          MR. SWAMINATHAN:  Objection to

5  form.

6          THE WITNESS:  Well, I guess from a

7  practical matter, I -- the assumption I made

8  is that the documents would be inventoried

9  as they are placed in the file.

10 BY MS. ROSEN:

11     Q.  Do you know the process by which,

12 for example, GPRs make their way into an

13 investigative file back in 1995 to 1998?

14     A.  Well, they often did not,

15 obviously, but I don't know the specific --

16 I am sorry?

17     Q.  Go ahead.

18     A.  Again, I would have to look at the

19 policy that I had asked to review to see

20 specifically as to what the Chicago Police

21 Department's policy was.

22     Q.  Do you have -- when you said they

23 didn't make their way into the file, do you

24 mean ever or belatedly?

 1      A.  Well, both, I think.

 2      Q.  What evidence do you have that

 3   documents didn't make their way into the

 4   investigative file?

 5            MR. SWAMINATHAN:  Objection.

 6   Asked and answered.

 7            MS. ROSEN:  You can answer.

 8            THE WITNESS:  Well, I think we

 9   discussed that there is evidence that there

10   is documents that never made it into the

11   investigative file that were kept in

12   detective drawers.  They were kept in street

13   files.  I don't think anybody is disputing

14   that.

15   BY MS. ROSEN:

16      Q.  From 1995 to 1998?

17      A.  I -- I do believe that, yes.

18      Q.  What's the evidence to support

19   your conclusion that during the time period

20   of 1995 to 1998, there were documents that

21   were -- that never made their way into the

22   investigative files?

23            MR. SWAMINATHAN:  Objection.

24   Asked and answered.

```
 1            THE WITNESS:  Again, I mean, I can
 2   pull out the chart.  We can go through the
 3   same exercise that we already did.
 4   BY MS. ROSEN:
 5      Q.  The document -- you mean, not
 6   documenting things, right?  That's the
 7   exercise we did is you pointing out to me
 8   from the chart evidence that detectives were
 9   not documenting things.  This is a different
10   point.
11            The point we were just talking
12   about, I thought, was whether or not
13   documents that existed did not make their
14   way ever into an investigative file.  That's
15   a different point.
16            MR. SWAMINATHAN:  Your question?
17   Sorry, go ahead.
18   BY MS. ROSEN:
19      Q.  So that's what I thought we were
20   talking about.  Are we not talking about
21   different things?
22            MR. SWAMINATHAN:  Objection to
23   form and foundation.
24            THE WITNESS:  Well, I think we are
```

 1  talking -- well, I guess we are talking

 2  about two different things, or maybe I am

 3  confused by your questions.

 4           MS. ROSEN:  Okay.  Well, that

 5  could be.  It's 1:28, and I have to jump

 6  off, so this is a good place to take a

 7  break, and maybe I will have better

 8  questions.

 9           THE WITNESS:  Okay.

10           MR. SWAMINATHAN:  Eileen, it's

11  going to take us probably at least 45

12  minutes for lunch.  It's up the street, so

13  let's resume at about 45.

14           MS. ROSEN:  So 2:15?

15           MR. SWAMINATHAN:  Yes.

16           THE VIDEOGRAPHER:  We are off the

17  video record at 1:28.

18              (Whereupon, a break was taken

19               at 1:28 p.m. to 2:25 p.m.)

20           THE VIDEOGRAPHER:  We are back on

21  the video record at 2:25 p.m.

22  BY MS. ROSEN:

23      Q.  If we can put Exhibit 6 back up on

24  the screen, and we are still on page 50.  I

1  want to direct your attention to the bolded

2  portion of the report near the bottom of the

3  page where it says, Review of Permanent

4  Retention Files.  Do you see that there?

5       A.  I do.

6       Q.  And we said earlier that the

7  permanent retention files are the records

8  division files, correct?

9       A.  That's my understanding, yes.

10      Q.  Why do you use the phrase

11  "permanent retention files" instead of

12  record division files in this portion of

13  your report?

14           MR. SWAMINATHAN:  Objection to

15  form.

16               Go ahead.

17           THE WITNESS:  I think that's what

18  they were referred -- I saw reference to

19  them.  I think that's how Chicago refers to

20  them as well.

21  BY MS. ROSEN:

22      Q.  And then it says, "All relevant

23  information in unofficial documents is not

24  transcribed in official reports."  Do you

1  see that there?

2      A.  I do.

3      Q.  What is your definition of

4  unofficial documents?

5      A.  Well, I think we discussed it

6  earlier, and perhaps the street files or

7  documents that officers believed are

8  personal information versus and information

9  that perhaps they keep in their desk and not

10  in either the investigative file or the

11  permanent file.

12      Q.  When you are referencing

13  unofficial documents, you are referring to

14  street files?  Is that what you said?

15          MR. SWAMINATHAN:  Objection to

16  form.

17              Go ahead.

18          THE WITNESS:  I would -- I would

19  consider any documents created by a law

20  enforcement officer in the performance of

21  their duties are official reports.

22  BY MS. ROSEN:

23      Q.  So when you say, "unofficial

24  documents not transcribed in official

1  reports," I am trying to understand what you

2  mean by unofficial documents, so?

3      A.  Well, what I am -- I guess what I

4  am explaining there is I think it's

5  indisputable that the officers have taken

6  notes.  There is no other possible way for

7  them to be able to create police reports a

8  month later without the virtue of having

9  taken some notes.  And if you see a case

10 file that does not have any notes but it has

11 a very lengthy report with names and

12 addresses and so on, you have to conclude

13 the only way they could have done that is by

14 taking notes that were not disclosed or --

15 I'm sorry, not placed into one of the --

16 either the retention file or in the

17 investigative file.

18     Q.  Okay.  So this is based on your --

19 your reference to unofficial documents are

20 documents that you have inferred exist

21 because in your review of the files, there

22 are files that contain no notes, and you

23 believe those files should contain notes.

24 Do I have that right?

1      A.  I think you do, yes.

2      Q.  Okay.  So the unofficial documents

3  that you are referencing were not produced

4  in the 344 investigative files that you

5  reviewed, right?

6      A.  That's correct.

7      Q.  So you have never seen those

8  files?  It's just an inference -- I mean,

9  you have never seen those, quote, unquote,

10  unofficial documents?  It's just an

11  inference you are drawing based on your

12  belief that in the cases where there are

13  files where there are no notes, there should

14  be notes?

15          MR. SWAMINATHAN:  Objection to

16  form.  Foundation.

17              Go ahead.

18  BY MS. ROSEN:

19      Q.  Correct?

20      A.  That would be accurate.

21      Q.  So then you go on to say, "I was

22  provided with permanent retention files for

23  341 homicide investigations for the time

24  period 1995 to 1998."  Do you see that?

 1        A.   I do.

 2        Q.   Okay.  Did you review all 341

 3   permanent retention or records division

 4   files?

 5        A.   I skimmed through all of them, and

 6   some of them I took a closer look at than

 7   others.

 8        Q.   How many did you take a closer

 9   look at?

10        A.   Oh, it's hard to estimate, but I

11   don't know, maybe 20, 15, 20.

12        Q.   And then if we go to page 51 of

13   your report, it says, "First, I examined the

14   permanent retention files standing alone to

15   assess whether they communicated a complete

16   picture of the investigation."  Do you see

17   that?

18        A.   I do.

19        Q.   Why was that your first step?

20             MR. SWAMINATHAN:  Objection to

21   form.

22                 Go ahead.

23             THE WITNESS:  Well, I guess you

24   have to take a first step in anything, but I

1  wanted to get an understanding of the case,

2  and I -- the best way to do that would be to

3  look at what was contained in the permanent

4  retention file.

5  BY MS. ROSEN:

6       Q.  Why didn't you first look to the

7  344 investigative files you were provided?

8       A.  I guess I could have.

9       Q.  Is there a particular reason you

10  didn't?

11      A.  I don't think so.

12      Q.  In your review of the permanent

13  retention files, I assume you noticed that

14  there were no GPRs contained in any

15  permanent retention file, correct?

16      A.  I think that's accurate, yes.

17      Q.  And I assume you know from reading

18  the depositions of the City of Chicago

19  spokespeople, Mr. Hickey, Mr. Winstrom, that

20  that's by design, right?  That's intended?

21      A.  That would be -- that was the

22  intent.  Apparently that was the intent of

23  the policy, yes.

24      Q.  So if you were interested in

 1   looking at notes in connection with a

 2   homicide investigation, you know that the

 3   only place to look is in the investigative

 4   file, correct?

 5        A.  Well, the notes were supposed to

 6   be transcribed into the official police

 7   reports as well.

 8        Q.  That was not my question.  So let

 9   me try again.  My question is:  If you were

10   interested in looking at the notes, then you

11   knew that you had to look in the

12   investigative file, right?

13        A.  That's accurate, yes.

14        Q.  And, in fact, yesterday, you

15   repeatedly made the point when Ms. Golden

16   was questioning you that in connection with

17   the Soto homicide investigation, you were

18   critical of the fact that there were not

19   contemporaneous notes with the various

20   interviews and interrogations that were

21   being conducted, correct?

22        A.  That's correct.

23        Q.  And the reason you were critical

24   of that is because you thought that without

 1  those notes, you couldn't follow the story

 2  precisely of the investigation, correct, and

 3  how it developed?

 4        A.  I don't think I testified.  I

 5  don't think that was my testimony.

 6        Q.  Well, why are you concerned about

 7  the notes in the Soto homicide

 8  investigation?

 9        A.  Well, I am concerned about the

10  notes because there were several interviews

11  with the suspects, and there was no

12  explanation as to what they said.  The

13  detective -- and I have interviewed many,

14  many suspects in my career that you would

15  expect that an officer, a detective, would

16  be taking notes as to what was being told to

17  them.

18             I think one of the witnesses

19  even testified that she recalled -- and I

20  don't recall which one -- but that Guevara

21  was taking notes and that the notes -- there

22  were no notes that would have corresponded

23  with that interview.

24        Q.  Okay.  Then if we go to the second

 1  paragraph, you note that Mr. Brasfield also

 2  reviewed the permanent retention files in

 3  connection with his report, correct?

 4       A.  That's my understanding, yes.

 5       Q.  And you actually quote him here,

 6  correct?

 7       A.  I do.

 8       Q.  And he in this paragraph uses the

 9  phrase "official file."  Do you see that?

10       A.  Yes.

11       Q.  It's referenced in the third line?

12       A.  Yes.

13       Q.  And then it's referenced again?

14       A.  Yes.

15       Q.  And he is using that phrase in

16  connection with current retention file or

17  the records division file, correct?

18       A.  I think so, yes.

19       Q.  But the investigative file is also

20  an official file, correct?

21            MR. SWAMINATHAN:  Objection to

22  form.

23            Go ahead.

24            THE WITNESS:  It would be.

 1  BY MS. ROSEN:
 2      Q.  And as you said, you could just as
 3  easily have begun your review of the files
 4  by looking at the investigative files first
 5  instead of the records division files,
 6  correct?
 7           MR. SWAMINATHAN:  Objection to
 8  form and foundation.  Mischaracterizes his
 9  testimony.
10           Go ahead.
11           THE WITNESS:  That's correct.
12  BY MS. ROSEN:
13      Q.  Then you go through an analysis
14  that begins at the second half of the page
15  where you compare permanent retention files
16  to investigative files.  Do you see that?
17      A.  I do.
18      Q.  Why did you -- what was the -- let
19  me strike that.
20           Why did you compare the
21  permanent retention or records division
22  files to the investigative files?
23      A.  Well, I wanted to see if the --
24  what was -- if the information in the

1  investigative files was being transferred

2  over to the retention files.

3       Q.  In the investigative files, there

4  are, in addition to the GPRs and handwritten

5  notes, there are also the supplementary

6  reports that are typed reports, correct?

7       A.  Yes, there are.

8       Q.  And those are the same typed

9  reports that appear in the records division

10  or permanent retention files, correct?

11            MR. SWAMINATHAN:  Objection to

12  form.  Foundation.

13                Go ahead.

14            THE WITNESS:  I believe they are,

15  yes.

16  BY MS. ROSEN:

17       Q.  So when you compared the

18  investigative file to the permanent

19  retention file, you were -- you, obviously,

20  were not finding the notes, right, or the

21  GPRs, right?

22       A.  That's correct.

23       Q.  But you were finding supplementary

24  reports, right?

 1      A.  I believe there were supplementary

 2  reports in there, yes.

 3      Q.  Then you say, "Like Brasfield, I

 4  found many examples where information on

 5  handwritten notes was not transferred into

 6  official reports."  Do you see that?

 7      A.  I do.

 8      Q.  When you say "official reports"

 9  right there, what precisely do you mean?

10      A.  Police reports, supplemental

11  reports.

12      Q.  And when you reference handwritten

13  notes, are you referencing handwritten notes

14  and general progress reports and to-from

15  memorandum that are all written in

16  handwriting; or are you simply referencing

17  -- let me start over.

18           When you reference handwritten

19  notes, are you including GPRs and to-from

20  memoranda in that reference?

21      A.  I did, yes.

22      Q.  So you were comparing the notes

23  and the GPRs to the police reports, the

24  supplementary reports and the permanent

 1  retention file, but not the report -- the

 2  same reports that were already contained in

 3  the investigative file?

 4        A.  I am sorry.  I am not sure I

 5  followed that.

 6        Q.  I am just trying to understand why

 7  you were comparing the investigative file to

 8  the permanent retention file and what

 9  information you believed you were learning

10  by that exercise?

11        A.  Right.  No, I understand your

12  question now.  And again, I think I

13  testified earlier that I am familiar, you

14  know, with one file containing all of the

15  investigative reports, a single file, a

16  single master file, and I was trying to

17  understand how the Chicago PD operated with

18  parallel files.

19             So part of it was a learning

20  curve on my part to understand what was

21  going into the retention files or records

22  files, records division files, and how it

23  was different than what was in the

24  investigative file, and why there was two

 1  files.
 2       Q.  So then you say, "In many cases,
 3  the information," meaning the information
 4  that was not transferred from the notes to
 5  the supp reports, "is potentially
 6  exculpatory."  Do you see that there?
 7       A.  It could be, yes.
 8       Q.  And then, "In addition to other
 9  instances discussed below, where such notes
10  were not disclosed to criminal defendants,
11  examples include," and then you list a
12  series of Bates numbers.  Do you see that
13  there?
14       A.  I do.
15       Q.  So that -- those Bates numbers
16  that you list right there, what are they
17  precisely an example of?
18       A.  Where notes were not disclosed to
19  criminal defendants.  So the notes would be
20  contained in a certain file, and they were
21  not in the Public Defender file.
22       Q.  But you don't reference the Public
23  Defender -- the companion Public Defender
24  files there, correct?

```
 1        A.   That's correct.

 2        Q.   Why not?

 3        A.   I perhaps should have.

 4        Q.   Okay.  But in any event, this is

 5   -- these examples are examples of

 6   information you located in the investigative

 7   file that you did not find in the criminal

 8   defense file, correct?

 9             MR. SWAMINATHAN:  Objection to

10   form.  Foundation.

11                  Go ahead.

12   BY MS. ROSEN:

13        Q.   The Public Defender file?

14             MR. SWAMINATHAN:  Same objection.

15                  Go ahead.

16             THE WITNESS:  That's correct, yes.

17   BY MS. ROSEN:

18        Q.   So let's take a look at some of

19   these files.  Let's look at -- and I think

20   it will be easier for you, Mr. Tiderington,

21   if you keep that page of your report in

22   front of you because there's a lot of

23   different numbers.

24        A.   Okay.
```

1       Q.  These are the Bates number, but,

2   obviously, the files are RD numbers.  And if

3   we are comparing, it's easier to compare the

4   RD numbers, but this way we are all on the

5   same page.

6       A.  Okay.

7               (Whereupon, Tiderington

8                Deposition Exhibit No. 13 was

9                screen-shared/referenced.)

10  BY MS. ROSEN:

11      Q.  So let's take a look at Exhibit

12  No. 13.  Okay, and if we can shrink that so

13  it's 100 percent on the page on the screen

14  so we can see the Bates number.

15          Okay.  So at the bottom there,

16  the Bates number is RFC-Solache/Reyes 76011.

17  Do you see that?

18      A.  I do.

19      Q.  And I will represent to you -- and

20  we will go through them, but just so you

21  have an understanding, I have combined into

22  one exhibit 76011 through 16, which is

23  referenced in your report, okay?

24      A.  Okay.

 1      Q.  And that corresponds to RD number

 2  A596534, which we will see on the reports as

 3  we scroll through them.

 4              So do you recall identifying

 5  these GPRs as GPRs that didn't exist in the

 6  Public Defender file?

 7              MR. SWAMINATHAN:  Objection to

 8  form.  Foundation.

 9              And I am just going to note

10  for the record, I think there is a -- I

11  think, Eileen, you are going to be spending

12  time on this point probably significantly,

13  and I think there is a misunderstanding.  I

14  am going to -- you can go ahead -- I

15  can't -- you can go ahead and ask your

16  questions, but I think it would be probably

17  worthwhile to clarify this because I will

18  end up trying to -- I will end up clearing

19  this up later, but you will have wasted a

20  bunch of time so I want to just note that.

21              MS. ROSEN:  Thanks.

22  BY MS. ROSEN:

23      Q.  Okay.  So how did you conclude

24  that these notes Bates-stamped 76011 through

1  16 were not contained in the Public Defender

2  file?  What did you do?  What was your

3  methodology in discovering that?

4      A.  Can I look at the other documents

5  that you have?

6      Q.  Sure, yeah, you can scroll through

7  the pages.

8      A.  I don't think I can scroll

9  through.

10         MS. ROSEN:  Robyn, can you just

11  flip through the pages so he can look at

12  them.

13         THE WITNESS:  You know, I -- I

14  don't remember this one specifically.  The

15  take-away, if you will, on this is this

16  information that's contained here, you know,

17  should have -- and if you are telling me it

18  was turned over, it should have been turned

19  over because it could be exculpatory.

20  BY MS. ROSEN:

21      Q.  First of all, what's your basis

22  for saying it could be exculpatory?

23      A.  Well, I believe anything in an

24  investigative file could be exculpatory.

```
 1      Q.  So you haven't done any particular
 2  analysis that there is actually information
 3  in here that when you compare it to the
 4  investigation that was done leads you to
 5  believe that it's exculpatory?  It's simply
 6  based on your belief that everything should
 7  get turned over because it's potentially
 8  exculpatory, right?
 9      A.  That's correct.
10              (Whereupon, Tiderington
11               Deposition Exhibit No. 14 was
12               screen-shared/referenced.)
13  BY MS. ROSEN:
14      Q.  Okay.  All right.  Let's take a
15  look at Exhibit 14, which also comes from
16  the investigative file for A596534.
17              MR. SWAMINATHAN:  Was that the RD
18  number you just said?
19              MS. ROSEN:  Yes.  A59 -- hold on
20  A596534.
21  BY MS. ROSEN:
22      Q.  So this is a Chicago Police
23  Department Detective Division Supplementary
24  Report.  Do you see that?
```

 1        A.  I do.

 2        Q.  And these are documents you are

 3   familiar with from reviewing 344

 4   investigative files and the 341 RD files,

 5   right?

 6        A.  That's correct.

 7        Q.  And you will see at the top here

 8   it says, offense classification homicide.

 9   It says, IUCR code:  Homicide, first degree

10   murder/0110.  Do you see that?

11        A.  I do.

12        Q.  You know what a IUCR code is,

13   right?

14        A.  I don't know if I know what that

15   code is, no.

16        Q.  Oh, you don't?

17        A.  No.

18        Q.  So you don't know what the number

19   0110 denotes?

20        A.  I don't.

21        Q.  And then it says, "Status/Code

22   (this report):  Exceptionally cleared

23   closed."  Do you see that?

24        A.  I do.

```
 1        Q.  Do you know what that means to
 2   be -- when an investigation is exceptionally
 3   cleared and closed?
 4        A.  I don't understand or I don't know
 5   what the -- what the Chicago Police
 6   Department codes are or what they mean as
 7   far as exceptionally cleared cases.
 8        Q.  Let's go to page 8 of the exhibit,
 9   and it says on the second full paragraph:
10                "On the 31st of December,
11                1996, at the conclusion of her
12                investigation and after conferring
13                with her supervisor, ASA Kazaglis
14                rejected the lodging of murder
15                charges against Lamon Weathers.
16                ASA Kazaglis and her supervisor
17                stated that the testimony of the
18                witness Eric Camp would be
19                required to buttress the lineup
20                identification made by Vincent
21                Accuros, and only then would
22                charges be lodged.  Without Camp's
23                assistance in this investigation,
24                the Cook County State's Attorney's
```

```
 1              Office stated that charges against

 2              Weathers could not be filed."

 3          Do you see that there?

 4     A.  I do.

 5     Q.  And let's go to the last page of

 6  the report.  Then if we go to the last three

 7  paragraphs, it says:

 8              "In addition, the RDs feel

 9              they have exhausted all

10              investigative leads, and they have

11              made every reasonable attempt at

12              gaining the cooperation of the

13              decidedly uncooperative witness

14              Eric Camp.  Attempts at locating

15              (recanvassing) any additional

16              witnesses whose assistance would

17              be helpful in this investigation

18              also proved negative.

19              "Therefore, due to the above

20              facts, the undersigned detectives

21              respectfully request this case be

22              considered exceptionally cleared

23              and closed."

24          Do you see that?
```

```
 1      A.  I do.
 2      Q.  And I will represent to you that
 3  exceptionally cleared/closed means that
 4  nobody was charged in this particular
 5  homicide investigation, and I searched the
 6  spreadsheet and there is no PD file.
 7           So can you explain to me the
 8  point that you were trying to make with the
 9  notes that were Exhibit No. 13?
10      A.  I'm sorry, could you go back to
11  Exhibit 13?
12      Q.  Absolutely.
13      A.  And again, I don't remember this
14  specifically, but generally speaking, I
15  would find notes in the investigative file
16  that were not, by policy, transcribed or
17  explained in the police report is one of the
18  things that I discovered.
19      Q.  When you say "by policy," what do
20  you mean?
21      A.  Well, the police department had a
22  policy that the detectives would transcribe
23  their notes if it was, quote, relevant into
24  the police department -- into the police
```

1  report explaining the details of their

2  notes.

3       Q.  And is that in one of the

4  directives that you analyzed, either 83 or

5  86 or the SOP?  Is that where you are

6  getting that the policy was that the notes

7  had to be transcribed into the supplementary

8  reports?

9       A.  Yeah.  I can't point as we sit

10 here today exactly where I read that, but it

11 certainly is a good practice, and something

12 that I am familiar with that if there's some

13 cryptic notes on a GPR, it would be only

14 logical that you would expect the police

15 report to reflect the meaning of those

16 notes.

17      Q.  So is the point of the examples in

18 paragraph 51 -- on page 51 of your report

19 that notes should be transcribed into --

20 into police reports?  Or is it that notes

21 should be produced so that we can find them

22 in the PD file?

23           MR. SWAMINATHAN:  Objection to

24 form and foundation.

```
 1            THE WITNESS:  I guess the answer
 2   to that would be both, wouldn't it?  It's my
 3   contention that detectives should be
 4   explaining the notes that they are taking if
 5   they are cryptic.  And if it's seemingly
 6   important to the investigation to the point
 7   where they wrote the phone numbers down or
 8   addresses down or, you know, the victim said
 9   this or victim said that, I think it's
10   important to have -- and I believe it's
11   Chicago's policy that that would be included
12   and explained in the police report.  And
13   then, of course, you know my position if
14   it's in the police report, it certainly
15   should be disclosed.
16   BY MS. ROSEN:
17        Q.  And the notes should be disclosed,
18   too, right?
19        A.  They should be, yes.
20        Q.  So we are in agreement that the
21   notes should be disclosed and the police
22   report should be disclosed, right?
23        A.  If --
24        Q.  The supplementary reports, right?
```

```
 1        A.  If you are telling me that you
 2   agree with that, yes.
 3        Q.  So I guess I am back to -- and we
 4   can go back to page 51 of your report,
 5   Exhibit 6.  So these examples that you have
 6   listed here, you told me were examples of
 7   reports that were not located -- that you
 8   could not locate in the Public Defender
 9   file, correct?
10        A.  I think I told you a couple
11   different things about those notes, and if
12   you allow me to read from my police report,
13   I found examples where the information on
14   handwritten notes was not transferred into
15   or transcribed or transferred into official
16   reports.  Brasfield made that same
17   observation.  In many cases, the information
18   was perhaps exculpatory, and in other
19   instances, it was my review -- and I
20   certainly may have missed it -- but they
21   oftentimes, I did not see them in the Public
22   Defender's file.
23        Q.  So these -- the Bates stamps that
24   this paragraph -- I just need to understand
```

1   what you are saying they are examples of.

2   You are an expert.  You are disclosed as

3   having reviewed materials.  These are the

4   materials you reviewed, and you believe they

5   support your opinions and that they are

6   examples of something.  I do not have a

7   clear understanding of what that something

8   is, so let's try it again.  I'm sure it's

9   me.

10              What these Bates stamps that

11  are here on this page, what are they

12  examples of?

13      A.  Again, I will answer it, and

14  pretty much I am going to answer it the same

15  way I did the last time you asked the

16  question, and probably the most concise way

17  is to explain in my report.  Many examples

18  were information on handwritten notes was

19  not transferred into official police

20  reports.  Okay, so I guess we can take it

21  step-by-step, and I am not -- and again, you

22  understand that portion of my opinion?

23      Q.  Yes.

24      A.  Okay.  And in many cases, I

 1  believe that the information could be

 2  potentially exculpatory.

 3       Q.  Yes.

 4       A.  In other instances, there were

 5  notes that I assumed would have been in the

 6  Public Defender's file that I did not find

 7  in there.

 8            And to take it one step

 9  further, I believe it's reasonable if

10  there's notes, that the investigative

11  detective took notes and that I would

12  somehow see an explanation of those notes in

13  their police reports explaining the

14  importance or lack of importance of the

15  notes that they took.  If there is an

16  address or phone number or description of a

17  vehicle with no explanation in the police

18  report, then I think it would be

19  troublesome.  Because in most cases, the

20  police report, you know, perhaps is a short

21  story where it takes you in different

22  directions, and that's what I would expect

23  to see in a police report.

24       Q.  So let's go back to Exhibit 13.

 1   What are these notes an example of?

 2            MR. SWAMINATHAN:  Objection.

 3   Asked and answered.

 4                 Go ahead.

 5            THE WITNESS:  I'd have to look at

 6   the police report, and I don't know, maybe

 7   this is the reason.  Maybe this was included

 8   in the police report, but as we sit here, I

 9   don't think it was.  Here is a phone number.

10   All right.  There is a reference "idiot."  I

11   don't know if he is speaking about his

12   supervisor or if he is talking about a

13   street name of somebody that's identified as

14   a suspect.

15                 So I am looking at this, and

16   there is a lot of questions.  Obviously, the

17   detective felt it was important enough to

18   write this down.  And as I testified

19   earlier, oftentimes they did not, so it's

20   really shocking when they do write something

21   down.  It tells me that they thought it was

22   pretty significant.  And if it's

23   significant, it should have been explained

24   in the police report.

```
 1        Q.  So this is a -- these pages, the
 2   six pages in exhibit 13 are not -- are
 3   examples of information that you say was not
 4   transferred to a supplementary report,
 5   right?
 6        A.  That's my understanding, yes.
 7        Q.  And did you --
 8        A.  I mean, to confirm that, I would
 9   have to go back, and I would have to look at
10   the supplemental report and the police
11   report, but that's my understanding, yes.
12        Q.  Well, you did the work, right?
13        A.  Well, but again, you know, there
14   is 6,000 documents in this case, and if we
15   are going to be concise, which I'm sure you
16   want me to be, I would take the opportunity
17   to go back and confirm what I am telling
18   you.
19        Q.  Right.  But you chose these
20   examples, so presumably when you --
21        A.  Yes.
22        Q.  -- chose the examples --
23        A.  Right.
24        Q.  -- you looked at the reports, and
```

 1  so you're confident in your work, are you

 2  not?

 3      A.  Well, yeah.  But I'm also

 4  confident enough to understand that I have

 5  the ability to go back and refresh my memory

 6  and confirm what I am telling you because

 7  it's a complicated case.  There is over 100

 8  pages of my report, and there is 6,000

 9  documents.  I don't think this is supposed

10  to be just a memory test.  I think you are

11  probably looking for the most precise and

12  concise information that I can provide for

13  you.

14      Q.  Well, we are not going to spend

15  hours for you to compare your examples to

16  the reports when you are the one that

17  created the examples.  So if you are telling

18  me that that's what this example is, then

19  that's what we will go with.

20                  (Whereupon, Tiderington

21                   Deposition Exhibit No. 15 was

22                   screen-shared/referenced.)

23  BY MS. ROSEN:

24      Q.  All right.  Let's take a look at

 1  Exhibit 15.  So this is Bates-stamped 34554,

 2  which is the first Bates stamp in your list?

 3       A.  Can you make that -- I am sorry,

 4  can you make that a little bit larger?

 5       Q.  Yes.

 6       A.  We might have to -- there you go.

 7       Q.  Can you probably scroll so you can

 8  see the top of the document.

 9       A.  Exactly.  If you can scroll down a

10  little bit, please.  Okay.

11       Q.  What is this an example of?

12       A.  Again, this is an example of

13  perhaps the officer doing the right thing,

14  taking notes on the GPR, and I think I

15  referenced this because I don't believe that

16  the information in the GPR is explained or

17  contained in any way in the police report.

18              (Whereupon, Tiderington

19                Deposition Exhibit No. 16

20                was screen-shared/referenced.)

21  BY MS. ROSEN:

22       Q.  Let's take a look at Exhibit No.

23  16, and if you scroll to the bottom of this

24  page, the Bates number is AR-PD-041276.  Do

 1  you see that?

 2       A.  I do.

 3       Q.  And you know from the work you

 4  have done in this case that AR-PD is the

 5  Bates range that was used by the Public

 6  Defender's Office, right?

 7       A.  That's my understanding, yes.

 8       Q.  And while this is a terrible copy,

 9  I think if you scroll to the top and scroll

10  to the bottom, you will see that this is

11  exactly a copy of Exhibit 15 that we were

12  just looking at, right?

13       A.  Yes.

14       Q.  So that tells us that this GPR was

15  produced and is contained in the Public

16  Defender file, right?

17       A.  I wasn't disputing that.

18       Q.  But your point still is that this

19  information should have been typed into a

20  supp report of some sort, right?

21       A.  That would be logical.  That would

22  be what I would expect in a professional

23  investigation, yes.

24       Q.  So it's your expectation that

1   every bit of information that is written

2   down on a note should be then transferred to

3   some sort of supplementary report?

4               MR. SWAMINATHAN:  Objection to

5   form.  Foundation.

6               Go ahead.

7               THE WITNESS:  That's not what I

8   said at all.  I said if a detective is

9   taking notes and if the notes are important

10  to the case, if the notes are, you know --

11  and if you go back to the last example,

12  there is phone numbers, there is addresses,

13  there is quotes of perhaps street names of

14  individuals, there are times, and I would

15  think that it would happen more often than

16  not that if the officer, detective, took

17  notes that there would be some type of a

18  mention or trans -- and when I say

19  transcribed, I don't necessarily mean

20  verbatim, but I think that looking at this,

21  there should be some explanation, although I

22  can't make out on my computer screen exactly

23  what this says, but I would have expected to

24  see some notation in the police report.

```
 1   BY MS. ROSEN:
 2       Q.  And what is your basis for your
 3   opinion that there should have been
 4   information from this note in some other
 5   police report, despite the fact that the
 6   note was produced to the criminal defendant?
 7               MR. SWAMINATHAN:  Objection.
 8   Asked and answered.
 9               Go ahead.
10               THE WITNESS:  Well, an
11   investigator's job is to collect evidence.
12   And in order for items to be useful, the
13   notes, I believe, are taken as part of his
14   initial -- whether it's initial interview
15   with somebody, but then I think there has to
16   be some type of explanation as to the
17   importance of what the notes are.
18                    And I am not saying that each
19   chicken scratch on a note would have to be
20   transcribed, but I saw many instances in
21   which notes were taken on GPRs and other
22   forms where there is just no explanation
23   whatsoever about what the notes meant, and I
24   think that's highly unusual.
```

```
 1                   (Whereupon, Tiderington

 2                    Deposition Exhibit No. 17 was

 3                    screen-shared/referenced.)

 4   BY MS. ROSEN:

 5        Q.  Let's take a look at Exhibit 17.

 6        A.  I'm sorry, can you scroll back

 7   down.  Okay.

 8        Q.  So this is 77368 and 77452, which

 9   are from your list, okay?

10        A.  I see that.

11        Q.  All right.  And then I will

12   represent to you that they are both out of

13   the same investigative file.  Let's take a

14   look at Exhibit 18.

15                   (Whereupon, Tiderington

16                    Deposition Exhibit No. 18 was

17                    screen-shared/referenced.)

18   BY MS. ROSEN:

19        Q.  And this is also taken --

20   actually, this is the investigative file, so

21   this is from RD number A744094.  And those

22   two notes that were in Exhibit 17 that are

23   part of your list on page 51 come from this

24   investigative file.  In fact, there is the
```

1  first note, and it says, Daniela Crosoli.

2  Do you see that?

3       A.  I do.

4       Q.  Then it says, sister of Adriana,

5  and then there is an address, and I think it

6  says, gave diaries to somebody on 10 October

7  96.  Do you see that?

8       A.  Yes.

9            MR. SWAMINATHAN:  Eileen, what's

10  the Bates page for that one?

11            MS. ROSEN:  77368.

12            MR. SWAMINATHAN:  Thank you.

13  BY MS. ROSEN:

14       Q.  And if we go to the next page,

15  that's the resident alien card of Daniela.

16  If we keep going, and there is an ID card --

17  keep going to the next page, sorry.  There

18  is an ID card for Adriana.  You see that

19  that was referenced in that note?

20       A.  Okay.

21       Q.  Then if we go to the next page,

22  it's the back of that ID, and then if we go

23  to the next page, that's the investigative

24  file inventory sheet, right?

```
 1        A.  Apparently, it is, yes.  Well, I
 2   take that back, it's, obviously, incomplete
 3   obviously, right?
 4        Q.  Well, is it?
 5        A.  Well, where does it list the GPRs?
 6        Q.  Well, do we know if there is GPRs
 7   in this file yet?
 8        A.  You just showed them to me, didn't
 9   you?
10        Q.  Okay, wait, those are just notes.
11   Those are not GPRs.  You distinguished
12   between the notes and the GPRs, right?
13             MR. SWAMINATHAN:  Objection to
14   form.  Foundation.  Argumentative.
15                Go ahead.
16             THE WITNESS:  Weren't the notes
17   written on the GPRs?
18   BY MS. ROSEN:
19        Q.  Were they?
20        A.  Well, and you have identified part
21   of the problem here because we can't figure
22   it out.
23        Q.  Well, I can figure it out.  You
24   can't figure it out.
```

```
 1        A.  Perhaps you can tell me.  Then we
 2   don't have to --
 3        Q.  I can represent to you that it
 4   doesn't appear to be that these notes are
 5   written on a GPR.
 6              Do you know what a GPR form
 7   looks like?
 8        A.  I do.
 9        Q.  Can you describe it to me?
10        A.  If you can go back and you can
11   show me, and I can tell you that that's what
12   it looks like.
13        Q.  Where do you want us to go back
14   to?  The Daniela Crosoli reference?
15        A.  No.  I am sorry.  And again, I am
16   trying to save time for you as well.  I
17   don't want to waste time, but if you are --
18   if you are representing that this was not on
19   the GPR, I will concede that.
20              Obviously, there is
21   photocopies so sometimes you can't see all
22   of the lines and so on.  I don't see any
23   indication on the file inventory of these
24   notes.
```

1      Q.  Can we go back to the third, the

2  third page of the PDF.  This note right

3  here?

4      A.  Yes.

5      Q.  Does this appear to you to be

6  taken on a GPR?

7      A.  No.

8      Q.  All right.  Let's go to page --

9      A.  But again, to my point, what is

10  it?  What does it mean?  Why are --

11      Q.  I think we are going to get there.

12      A.  Oh, okay.

13      Q.  Page 10 of the PDF.  Okay.  So

14  this is a supplementary report, right?

15      A.  Yes, it is.

16      Q.  And can you shrink it so that we

17  have 100 percent of the page on the screen.

18          At the top of the page, you

19  can see there Adriana Peptenar, the victim's

20  name?

21      A.  It's actually shrunk.  I can't see

22  it.

23      Q.  We can make it bigger.

24      A.  That's okay.  I believe that's

1    what her name is.  I saw it when it was

2    larger.

3         Q.  And the note was the name and

4    address of the sister of Adriana, right?

5         A.  I believe so, yes.

6         Q.  So that would be the significance

7    of the note, right?  It was identifying the

8    sister of the victim?

9         A.  Apparently, yes.

10        Q.  And then if we scroll down a

11   little bit, and you can maybe make it bigger

12   so Mr. Tiderington can read it.  At the

13   bottom it says, offender now deceased,

14   Stefan Peptenar, and then it provides

15   descriptives of the offender, now deceased.

16   Do you see that?

17        A.  I do.

18        Q.  And then you will also note above

19   the narrative, there is some boxes that say,

20   status continued.  Do you see that on the --

21   and it says, closed cleared, cleared open,

22   and then exceptionally cleared closed.  Do

23   you see that there?

24        A.  I do.

1      Q.   And exceptionally cleared closed

2    for the Chicago Police Department means that

3    they have determined who the offender is,

4    but there will be no charges lodged, which

5    was the example from earlier when the state

6    would not approve charges.  Do you remember

7    that other example of exceptionally cleared

8    closed?

9      A.   I do.

10     Q.   And, obviously, in this particular

11   case, the offender is now deceased; so, of

12   course, there would be no charges being

13   lodged, right?

14     A.   That's logical, yes.

15     Q.   And then if we go to page 13 of

16   that same report, at the end of the report,

17   it says, "With the suicidal death of the

18   offender in this investigation, Stefan

19   Peptenar, it is requested that this case be

20   filed exceptionally/cleared/closed/death of

21   the offender."  Do you see that there?

22     A.   I do.

23     Q.   Obviously, in that particular

24   case, there would be no charges and no

1  criminal defense file to be produced, right?

2  I mean to -- there would be no criminal

3  defense file for us to review, right?

4       A.  That makes perfect sense, right.

5       Q.  So now let's go back to Exhibit

6  17.  Now, that's the second note that you

7  flagged in your report, right, from this

8  same case?

9       A.  That's correct.

10      Q.  And it says, there is a phone

11 number, right?

12      A.  There is a phone number, yes.

13      Q.  And then there is the numeral one,

14 and it says large pan pizza.  Do you see

15 that?

16      A.  Yep, yes.

17      Q.  And then numeral 2, it says, crazy

18 bread with sauce.  Do you see that there?

19      A.  I do see that there.

20      Q.  And that's another -- then there

21 is another phone number, right?

22      A.  Right.

23      Q.  So is it possible that what this

24 is is that on the back of some report, the

1  police officers that were working wrote down

2  people's orders for dinner?

3      A.  That's possible.

4      Q.  All right.

5      A.  And, by the way, I would not

6  expect that to be transcribed into a police

7  report.

8              (Whereupon, Tiderington

9               Deposition Exhibit No. 19 was

10              screen-shared/referenced.)

11  BY MS. ROSEN:

12      Q.  Then let's take a look at Exhibit

13  19, and this -- the RD number on this

14  particular example is B447609, and the Bates

15  numbers are the series of Bates numbers in

16  your report that begin with 94055 and go all

17  the way through 94096 to 99, so that whole

18  line.

19      A.  Okay.

20      Q.  Are you following me?  So these,

21  we can go through them one page at a time so

22  you can see them.  These are other examples

23  that are in this paragraph.

24              MR. SWAMINATHAN:  I'm sorry, can

 1  you go back to the first one?

 2          MS. ROSEN:  Sure, yes.

 3  BY MS. ROSEN:

 4      Q.  So the first one are typed notes,

 5  right?

 6          MR. SWAMINATHAN:  And this is

 7  94055?

 8          MS. ROSEN:  Yes.

 9          MR. SWAMINATHAN:  Yes.

10  BY MS. ROSEN:

11      Q.  Let's talk about the first page.

12  These are typed notes, right?

13      A.  Yes, they are.

14      Q.  On a general progress report?

15      A.  That's what it looks like exactly.

16      Q.  Do you see?

17          And there is boxes.  It's a

18  form, right, and so you just fill in the

19  form?

20      A.  Yes.

21      Q.  And these particular detectives

22  typed their general progress report or notes

23  in the general progress report, right?

24      A.  That appears what they did, yes.

1      Q.  So in this particular -- what are

2  these notes an example of?  Is this another

3  example of information not being transcribed

4  into the supplementary reports?

5      A.  I would have to compare it to the

6  police report and supplemental report.

7      Q.  And you can't tell me if that's

8  what this is an example of unless you

9  compare it to the supplementary reports,

10 right?

11          MR. SWAMINATHAN:  Objection to

12 form.  Foundation.

13              Go ahead.

14          THE WITNESS:  I mean, if you give

15 me a minute or so to read this, maybe I can

16 jog my memory as to why, the importance of

17 it anyways.

18 BY MS. ROSEN:

19     Q.  Okay.

20     A.  Okay.

21     Q.  Okay.  So having reviewed the

22 first page of this exhibit, does that

23 refresh your recollection?

24     A.  I'd have to look at the rest of

 1  the --

 2      Q.   Okay.

 3      A.   Because there's parts of these

 4  files, the officers did everything right.

 5  I'm not saying that 100 percent of the time

 6  they didn't do things correctly.

 7      Q.   In this particular -- with this

 8  particular GPR, having just read it as we

 9  are sitting here, is it your position that

10  this information needed to be transferred to

11  a supplementary report?

12      A.   It should have been, yes.  And

13  more importantly, it sounds as though this

14  occurred -- they were out in the field when

15  all this happened.  So I guess it would be

16  my expectation that there would have been

17  notes, and they would have used those notes

18  to type this GPR but the notes still should

19  have been in the case file.

20      Q.   The notes are in the case file.

21  They are in the investigative file.  That's

22  where you found them.

23      A.   No, I understand that.  But the

24  corresponding notes that they used to type

 1  this GPR up.

 2       Q.  So you are assuming that there

 3  were notes?

 4            MR. SWAMINATHAN:  Objection to

 5  form.

 6                 Go ahead.

 7  BY MS. ROSEN:

 8       Q.  Handwritten notes, that's what you

 9  are assuming because these are typed notes?

10       A.  I -- and again, I didn't -- I

11  don't know if I am making that assumption,

12  but I said, it's sometimes logical for the

13  detectives to take notes, and they may come

14  back and because their handwriting is

15  terrible, they may type it up, but they

16  would still have the handwritten notes, and

17  those handwritten notes still should have

18  been included.

19       Q.  So is that what this is an example

20  of, your --

21       A.  No, no, I don't know if that's

22  what this is an example of because you only

23  showed me one page of maybe 100 pages in

24  this file, so I would have to go through the

 1  entire file, and perhaps refresh my memory,

 2  and maybe I would find some handwritten

 3  notes that would correspond with this GPR.

 4              I would -- I mean, quite

 5  frankly, I think if they were going to type

 6  up a GPR that it would have been probably

 7  closer to policy if they would have typed up

 8  a supplemental report related to this.

 9      Q.  So now you are critical of the

10  fact that they typed their notes so that

11  they could be legible, is that what you are

12  saying?

13              MR. SWAMINATHAN:  Objection to

14  form.  Foundation.  Misstates his testimony

15  and argumentative.

16              Go ahead.

17              THE WITNESS:  That's -- you know

18  that's not what I said.  We are sitting here

19  talking about various hypothetical

20  situations because I don't have the complete

21  file in front of me, and I am suggesting

22  that there is many possibilities that would

23  perhaps demonstrate that they did everything

24  correctly.

```
 1                I think you would agree or the

 2   command officers in Chicago would agree that

 3   if the officers went in the field, and they

 4   took handwritten notes, and then they came

 5   back and they typed their handwritten notes

 6   into a GPR -- and I am not saying that's

 7   what they did here, but I am just saying if

 8   this is what they did, the notes still would

 9   have been required to be placed into the

10   investigative file.

11   BY MS. ROSEN:

12       Q.  Right.  But these are examples

13   that you isolated and put in your report.

14   So I am trying to figure out why these,

15   these particular documents are important to

16   you for purposes of your opinion.

17                And what I understood you to

18   be saying is, first, you said this paragraph

19   is examples of information that was not

20   found in the PD file.  Then you said this is

21   information that is not transferred to the

22   police reports, which is the supplementary

23   reports, as I understand you.

24                So I am just trying to
```

 1  understand what these are supposed to be

 2  examples of.

 3      A.  Right.  But, I'm sorry, but you

 4  also told me it wasn't important enough for

 5  us to go back and allow me to review the

 6  entire file.  You are showing me one page of

 7  hundreds of documents, and you are asking me

 8  -- and I am -- again, I am giving you some

 9  possibilities of things that I thought of

10  when I may have reviewed this that may have

11  been answered if I had the ability to scroll

12  through this file, instead of looking at one

13  page and one sentence.

14      Q.  Well, it's your report, and they

15  are your examples.

16      A.  Right.  But I'm sorry, that's

17  true, but I had the ability to look at the

18  entire file, and now you are asking me to

19  opine on one single piece of paper.  And I

20  am telling you or I am asking you, if we are

21  going to have this discussion, it would be

22  -- I could be more precise if I was allowed

23  the opportunity to go through these files

24  and further explain them to you.

 1      Q.   Okay.  Let's go to the next page.
 2  This is Bates 94058.  What is this an
 3  example of?
 4      A.   Just for the record, so you have
 5  taken this one page out of the -- out of
 6  that case file, is that my understanding of
 7  what this exercise is?
 8      Q.   No.  The exercise is is I have
 9  pulled all of the pages that you cited in
10  your report as examples of something.
11      A.   Right, right.
12      Q.   So I am giving you the documents
13  that you have identified in your report and
14  asking you what they are examples of.  I am
15  not self-selecting pages.  They are the
16  pages you selected.
17      A.   No, I understand.  I just wanted
18  to make sure I understood from your
19  perspective what this is.
20           Again, for me to be able to
21  refresh my memory, I would have to go back
22  to the case file and reference that.  And
23  looking at it, I can't, as we sit here,
24  recall exactly why I referenced this without

 1  having the ability to go back and look at

 2  that case file.

 3      Q.  Okay.  Let's go to the next page,

 4  and this is Bates-stamped 94059, also from

 5  your report in that same sequence.  What is

 6  this an example of?

 7      A.  Of course, it would be the GPR

 8  report, and this would be an example of

 9  notes that would have been produced by the

10  investigative officer, the detective.  And I

11  believe these notes, if I remember

12  correctly, they were not explained in the

13  police report or any supplemental report.

14      Q.  Let's go to the next page.  This

15  is 94060.  What's this an example of?

16          MR. SWAMINATHAN:  Objection to

17  form and foundation for the reasons already

18  stated, but go ahead.

19          THE WITNESS:  Again, same answer.

20  This is a document that I would have

21  expected to be explained in a police report

22  or supplement.

23  BY MS. ROSEN:

24      Q.  Let's go to the next page, Bates

 1  stamp 94089.  What's this one an example of?

 2      A.  I'm sorry, can you -- can you

 3  scroll back to the other -- can you go back?

 4      Q.  The previous page?

 5      A.  Yes.

 6          MR. SWAMINATHAN:  While he's doing

 7  that, Eileen, this 11-page exhibit, are

 8  these -- what makes up the 11 pages of this

 9  exhibit?

10          MS. ROSEN:  The pages that he

11  references, beginning at 94055 through 94096

12  through 99 on page 51 of his report.

13          MR. SWAMINATHAN:  So this is

14  94055, 94058, 59, 60, 94089, 94092, 94094,

15  and then 94906 through 99?  That's all that

16  this exhibit is?

17          MS. ROSEN:  Correct.  And they are

18  all from the same investigative file.

19          MR. SWAMINATHAN:  Yes.

20          THE WITNESS:  And again, I would

21  have to compare it to the rest of the file.

22  There was a reason that I identified this.

23  BY MS. ROSEN:

24      Q.  Okay.  Let's go to the next page.

 1      A.  At some point in the near future,
 2  can we plan for a five-minute break?
 3      Q.  Sure, as soon as we finish with
 4  this exhibit.
 5              Let's go to the next page.
 6  94092, what is this an example of?
 7              MR. SWAMINATHAN:  Can you go down
 8  a little bit.
 9              THE WITNESS:  So that's an example
10  of information that should have been
11  transcribed into a police report.
12  BY MS. ROSEN:
13      Q.  Okay.  Let's go to the next page.
14  94094, what's this an example of?
15      A.  Again, I think it's relevant
16  information that should have been explained
17  in a police report.
18      Q.  And let's go to the next page,
19  94096.
20      A.  Same thing, it describes four
21  hooded males, dark clothing, should have
22  been contained in the police report.
23      Q.  Let's go to the next page, 94097.
24  What's this an example of?

 1      A.  Same answer.

 2      Q.  Okay.  Let's go to the next page,

 3  94098.  What's this an example of?

 4      A.  It appears to be suspect

 5  information, and it should have been

 6  contained in a police report or supplemental

 7  report.

 8      Q.  Okay.  And then the next page,

 9  94099?

10      A.  Same answer.

11      Q.  And then I think that's the end of

12  this exhibit.  And your answer -- your

13  opinion that this information -- all of this

14  information in these GPRs should have been

15  transferred to a police report is

16  irrespective of whether or not every single

17  one of these documents is in the Public

18  Defender file, correct?

19          MR. SWAMINATHAN:  Objection to

20  form.

21              Go ahead.

22          THE WITNESS:  Well, yes, my first

23  opinion would be that it should have been

24  transcribed into a police report.  And then

 1  if that was the case, then it should been

 2  found in the Public Defender's file.

 3  BY MS. ROSEN:

 4       Q.  I am saying --

 5           MR. SWAMINATHAN:  Sorry, go ahead.

 6  BY MS. ROSEN:

 7       Q.  I am saying if these GPRs are all

 8  in the Public Defender file, is it still

 9  your position or your opinion that the

10  information needed to have been transcribed

11  into a supplemental report as well?

12       A.  Certainly.

13                (Ms. Isabella Aguilar

14                 entered the deposition

15                 proceedings.)

16           MR. SWAMINATHAN:  That was Exhibit

17  16, right?

18           MS. ROSEN:  No.  That was Exhibit

19  19, I believe.

20           MR. SWAMINATHAN:  Is that right,

21  19?  Yeah, 19.

22           MS. ROSEN:  Yes.

23           THE WITNESS:  Before we take a

24  break, earlier when we first started, I

 1  talked about some housekeeping matters that

 2  we were going to take care of as far as

 3  other cases that I have had listed from the

 4  other attorney yesterday.

 5  BY MS. ROSEN:

 6      Q.  Oh.

 7      A.  Is that something that we want to

 8  discuss now, or is it not important at this

 9  point or --

10      Q.  We can get to it at the end if we

11  have time for it.  I'd rather get done with

12  what we need from your report.

13      A.  Okay.

14      Q.  Thank you.

15      A.  Five minutes?  Ten minutes?

16      Q.  Let's do ten minutes.

17      A.  All right, thanks.

18          THE VIDEOGRAPHER:  We are off the

19  video record at 3:35 p.m.

20              (Ms. Janice Willier, court

21               reporter intern, exited the

22              deposition proceedings.)

23              (Whereupon, a break was taken

24               at 3:35 p.m. to 3:47 p.m.)

 1              THE VIDEOGRAPHER:  We are back on

 2    the video record at 3:47 p.m.

 3                    (Whereupon, Tiderington

 4                     Deposition Exhibit No. 20 was

 5                     screen-shared/referenced.)

 6    BY MS. ROSEN:

 7         Q.  Let's take a look at Exhibit 20,

 8    and this is -- Exhibit 20 is the

 9    investigative file for RD number C687989.

10    And if we go to the second page, we have the

11    investigative file inventory.  Do you see

12    that?

13         A.  Yes.  I'm sorry, what's -- is

14    there a Bates stamp number on that?

15         Q.  On which?  The whole file?

16         A.  Yes.

17         Q.  Yes.  It is -- it starts at 110109

18    and it goes to 110189.  Contained within

19    this investigative file are 110176 and

20    110180, which are examples listed on page 51

21    of your report.

22         A.  Right, yes, okay.

23         Q.  And this one, we have the whole

24    investigative file is marked as an exhibit.

1          MR. SWAMINATHAN:  Exhibit 20, you

2    said?

3          MS. ROSEN:  Yes.

4    BY MS. ROSEN:

5       Q.  And this is the investigative file

6    inventory.  Do you see that?

7       A.  I do.

8       Q.  And you see here under "Entering

9    Member," it says Haas, H-a-a-s, over and

10   over and over again?

11      A.  Yes.

12      Q.  Did you notice Detective Haas's

13   name on multiple investigative file

14   inventory sheets?

15      A.  I did, yes.

16      Q.  And, in fact, his name is all over

17   the investigative file inventory sheet for

18   the Soto homicide investigation, right?

19      A.  His name and others, I believe,

20   but Haas I do recall, yes.

21      Q.  And do you have any understanding

22   of what Detective Haas's function was back

23   in 1998 with respect to the investigative

24   file?

1      A.   It's my understanding that Chicago

2  policy is that they would designate a

3  detective within the area or within the --

4  within the area to be the records person.

5      Q.   Okay.

6      A.   That's my understanding.

7      Q.   And what's that understanding

8  based on?

9      A.   I thought I read it in a policy or

10  a directive that this is a process that they

11  are going to use.

12      Q.   Let's see, so the first one that

13  you have as an example here is 110176, which

14  I thought I had a PDF number on, but I

15  don't.  Give me one second.  I'll find it.

16           It is page 68 of the PDF,

17  okay, and this says, "Sat, Terry was there

18  when Kim spanked Cedric."  Do you see that?

19      A.   I do.

20      Q.   And what is this an example of?

21      A.   I am sorry, can you scroll down

22  to -- I just want to look at the Bates

23  number.  Okay.  And again, I know we are on

24  page 68, but if you can go back a few pages

 1 | so I can kind of orientate myself with this
 2 | file.
 3 |      Q.  Sure.
 4 |      A.  It's 81 pages.
 5 |      Q.  Why don't we go to page --
 6 |      A.  Why don't we go to the beginning?
 7 |      Q.  No, we are not going to the
 8 | beginning.  We can go to page 66.
 9 |      A.  What's on page 65, though, is
10 | going to be my question, of course.
11 |      Q.  Well, let's take a look at page
12 | 66.  And, it says, 1 of 2.  Do you see that
13 | at the top of the page?
14 |      A.  I do.
15 |      Q.  And --
16 |         MR. SWAMINATHAN:  What's the Bates
17 | of this page?  Sorry, before you ask the
18 | question, sorry.
19 |         MS. ROSEN:  110174.
20 |         MR. SWAMINATHAN:  Okay.
21 | BY MS. ROSEN:
22 |      Q.  Do you recall reviewing this GPR
23 | when you were conducting your analysis?
24 |      A.  Not specifically.

 1        Q.  Do you recall a case where

 2   reviewing a case where a mother was accused

 3   of child abuse of her son that you

 4   highlighted in your report?

 5        A.  I do, yes.

 6        Q.  And, in fact, take a look at page

 7   57 of your report.  Are you looking at page

 8   57 of your report?

 9        A.  I am.

10        Q.  And you see that's Kim Mathis?

11        A.  Yes.

12        Q.  Same RD number C687989?

13        A.  Yes.

14        Q.  So you have a, you know, a couple

15   of paragraph discussion about that case?

16        A.  I do.

17        Q.  So is that helping refresh your

18   recollection about the circumstances of this

19   particular case?

20        A.  Yeah.  Just if you don't mind,

21   just give me one minute to read the -- kind

22   of the summary that I included.  Would that

23   be all right?

24        Q.  Yes, that's fine.

 1        A.  Okay.

 2        Q.  So is your recollection refreshed

 3   about the circumstances of that particular

 4   homicide investigation?

 5        A.  Yes.

 6        Q.  Is that a case that you spent a

 7   little more time on than the others in

 8   reviewing?

 9        A.  I would say so, yes.

10        Q.  Let's go to this first page of

11   this general progress report.  You see at

12   the top it says Kimberly Mathis?

13        A.  I do.

14        Q.  And it has the date at the top of

15   the report, right?

16        A.  Correct.

17        Q.  And then if you -- if we can

18   scroll down, you can see, "This morning

19   4:50, victim was awake, said that his

20   stomach hurt," and it goes on, and you see

21   that?

22        A.  I do.

23        Q.  Is it your understanding based on

24   your review of this file and this particular

 1  GPR that this is memorializing an interview

 2  with Kimberly Mathis?

 3       A.  It appears to be, yes.

 4       Q.  And then a couple of lines down,

 5  it says, "Friday victim spent day at sister

 6  Terry Mathis house."  Do you see that?

 7       A.  Yes.

 8       Q.  So based on that, is it your

 9  understanding that Terry Mathis is Kimberly

10  Mathis's sister?

11       A.  I believe that the report

12  indicated that was the sister, yes.

13       Q.  And let's go to the next page now

14  of this general progress report, it says, 2

15  of 2, and it looks like -- it says at the

16  top there, "K. Mathis continued."  Do you

17  see that?

18       A.  I'm sorry.  Yes, I do.

19       Q.  So this is a continuation of the

20  interview of Ms. Mathis, right?

21       A.  It appears to be, yes.

22       Q.  And if we scroll down, it says,

23  "Got off work today at 4:00 a.m., went home,

24  Sebastian was there.  Victim was lying on

1   laundry bag in bedroom, had neighbor call

2   police/ambulance."  Do you see that there?

3        A.  Yes.

4        Q.  And then if we go to the next

5   page, "Saturday, Terry was there when Kim

6   spanked Cedric."  Do you see that.

7        A.  Yes.

8        Q.  And that's the page, the Bates

9   number on that one is 110176 that appears in

10  your list on page 51?

11       A.  Right.

12       Q.  And it's my understanding based on

13  our earlier discussion about the other

14  examples in this paragraph is this is

15  information that you would expect to be

16  transcribed into a supplemental report,

17  right?

18       A.  Well, I guess first, I would have

19  expected to see that perhaps on the GPR.  I

20  don't know what kind of document this was

21  written on.

22       Q.  Does it appear to you that perhaps

23  that was the back side of the last page of

24  the GPR that was her note -- the note of her

1   interview?

2        A.  Can you scroll up and maybe right

3   on that?

4        Q.  Can we go back to the preceding

5   page.  If you go back to the top of that

6   page and keep going.

7        A.  Yes, yes.

8        Q.  See the two holes at the top

9   there, the hole punch?

10       A.  Yes.

11       Q.  And scroll down, the next appears

12  to be the back side, right, of that report,

13  he ran out of space?

14       A.  I think your conclusion is

15  correct.

16       Q.  Okay, great.  All right.  So the

17  point of that particular page being noted on

18  page 51 is that the information should have

19  been transcribed into a supplemental report,

20  right?

21       A.  It should have been.

22       Q.  And then if we scroll to 1180,

23  just a couple more pages down, one more.

24  That's 110180, also referenced in that

1  paragraph on page 51, right?

2      A.  Yes.

3      Q.  And it says, "Kim paged Terry

4  today around 5:00 p.m., said something like

5  Terry come here now.  I think Cedric is

6  dead."  Do you see that?

7      A.  I do.

8      Q.  And then does this appear to be

9  the back side of a GPR?

10     A.  It looks like that, yes.

11     Q.  Why don't we scroll up a page.

12 See there it says, Terry Mathis on the side?

13     A.  Yes, I do.

14     Q.  So does that appear to you to be

15 an interview with Kim's sister, Terry?

16     A.  It appears to be, yes.

17     Q.  And then actually if we scroll up

18 one more page, that says 2 of 2.  Let's go

19 up one more.  And that's 1 of 2, and then

20 for sure, it says, Terry Mathis across the

21 top, and gives her identifiers, and starts

22 memorializing the interview that was

23 conducted, right?

24     A.  Yes, it does.

1    Q.  And again, your point in including

2  the Bates Number 110180, which was the back

3  side of this set of GPRs was because it is

4  an example of information that should be

5  memorialized in a supplementary report,

6  right?

7    A.  Well, I guess before I answer

8  that, could I review the police report and

9  the supplement?

10    Q.  Well, I am just trying to

11  understand why it's in that paragraph, and I

12  thought that was what we had established

13  earlier is that these are examples of

14  information that you determined should have

15  been transcribed to a supplemental report?

16           MR. SWAMINATHAN:  Objection to

17  form and foundation.  The witness has asked

18  to be shown some single pages.  He's asked

19  to be able to see some other pages to answer

20  the question, and counsel has not done that,

21  so that's my objection.

22           Go ahead.  You can answer.

23           THE WITNESS:  And again, I am

24  trying to be as accurate as possible, and

```
 1  I'd like to -- and I'd like to look at the

 2  police reports, and perhaps it would refresh

 3  my memory.

 4  BY MS. ROSEN:

 5      Q.  So without reviewing the police

 6  reports, you can't tell me why you included

 7  110176 and 110180 on page 51 of your report?

 8  Is that what you are saying?

 9      A.  I believe it would be helpful if I

10  was allowed to refresh my memory is what I

11  am suggesting.

12      Q.  Unfortunately, I don't believe we

13  have time for you to scroll through an

14  81-page file at this moment.  Maybe at the

15  end of the dep if there is time, we can do

16  that.

17      A.  Okay.

18      Q.  But as we noted, Kim Mathis is

19  discussed on page 57 of your report as well,

20  correct?

21      A.  That's correct.

22      Q.  And if we go to page 56 of your

23  report at the top of page 56 -- or it should

24  be 57, yeah.  Back one.  There you go.
```

```
 1              It says, examples of relevant
 2   information in police files that was
 3   withheld from criminal defendants but should
 4   have been disclosed, correct?
 5        A.  That's correct.
 6        Q.  So am I correct in assuming that
 7   in this portion of the report, what you are
 8   illustrating are examples where relevant
 9   information, as memorialized in the police
10   reports, was not in the PD file; is that
11   right?
12        A.  Well, no.  I think -- well, I
13   think there would be several components to
14   that question.  It would have been whether
15   or not the GPR -- I am sorry, are you
16   raising your hand?
17        Q.  No.
18        A.  I thought you wanted me to stop.
19   It's whether or not the notes or the GPRs
20   were provided.
21              The other component or the
22   other part of that question in my mind was
23   was the relevant information in the GPRs
24   translated into a police report or explained
```

1   in the police report?

2              So all of these examples may

3   not contain all of those issues, and that's

4   why I had asked to be allowed to refresh my

5   memory by looking at the entire file, so I

6   could give you a better answer.

7      Q.  Okay.  Let's take a look at your

8   discussion of the Kim Mathis file at page

9   57.

10             You wrote: "This case involves

11             the beating death of a child.  The

12             investigation revealed that Kim

13             Mathis, the child's mother,

14             admitted hitting the child on the

15             back with a belt four or five

16             times, and then he died two days

17             later.  The child died from blunt

18             trauma to the abdomen.  Detectives

19             pursued Mathis and according to

20             her testimony, beat, threatened

21             and intimidated her into signing a

22             statement that she had not read."

23             And the citation there is to

24   the Public Defender file, right?

```
 1        A.  It is, yes.

 2        Q.  And then:

 3               "The handwritten statement and

 4            corresponding supplemental report

 5            says that Mathis admitted hitting

 6            the child in the back with a belt,

 7            and also stomping on his abdomen

 8            with her heel."

 9               And then you cite to -- do you

10   know what you are citing to there?  Is that

11   the RD file, or is that the investigative

12   file, do you know?

13        A.  I believe it's the investigative

14   file.

15        Q.  And then you say, "Mathis denied

16   to the CCSAO that she kicked or stomped on

17   her son," and you cite to the PD file.  Do

18   you see that there?

19        A.  I do.

20        Q.  Then you go on to say, "The

21   investigative file includes handwritten

22   notes with a potential beating -- witness to

23   the beating.  The handwritten note states

24   that Mathis's sister had been at the
```

1  apartment when the beating occurred."  And

2  that's a cite to 110176?

3      A.  Right.

4      Q.  Right?  Which was the back side of

5  the continuation of the interview of Kim

6  Mathis, right?

7      A.  That's correct.

8      Q.  "But the clear/closed report says

9  that Mathis's sister was not at the

10 apartment during the beating and did not see

11 the child at that time of the report."  And

12 then you cite to -- do you know if that is

13 the investigative file or RD file?

14     A.  I believe it's the investigative

15 file.

16     Q.  Okay.  And then you say, "Given

17 that Mathis disputed that she had stomped on

18 her son's abdomen and testified that she was

19 coerced into giving her statement, it would

20 have been critical for the defense attorney

21 to know of all witnesses who were at the

22 house when the beating occurred."  Do you

23 see that?

24     A.  I do.

```
 1              (Whereupon, Tiderington
 2               Deposition Exhibit No. 21 was
 3               screen-shared/referenced.)
 4  BY MS. ROSEN:
 5       Q.  Let's take a look at the PD file,
 6  Exhibit 21.  Now, did you notice in your
 7  review of the files that a percentage of the
 8  files that were produced by the PD were
 9  redacted?
10       A.  I did notice that, yes.
11       Q.  Did you determine in any way
12  approximately what percentage of the files
13  were redacted?
14       A.  I did not figure out a percentage,
15  but I would agree that there were several
16  files and several pages within the files
17  that were redacted.
18       Q.  So in this particular file, the
19  first seven pages are redacted.  So let's go
20  to page 8, and this is Bates stamped 29833,
21  which is the citation you provide in your
22  report for the proposition that Mathis
23  denied to the CCSAO that she kicked or
24  stomped on her son.  Do you see that?
```

```
 1        A.  I do.

 2        Q.  So this is the document that you

 3  relied on to support your statement that

 4  Mathis denied to the Cook County State's

 5  Attorney's Office that she kicked or stomped

 6  on her son, right?

 7        A.  Well, I have to read it.

 8        Q.  Well, it's your citation, right?

 9        A.  It's my citation, but I want to

10  read the report to make sure it's the same

11  document.

12        Q.  You want to read the whole

13  document in order to determine whether or

14  not this is the document that you cited in

15  your report?

16        A.  Well, if you are going to ask me

17  questions.

18            MR. SWAMINATHAN:  He wants to just

19  look at this page that you have put in front

20  of him.

21            MS. ROSEN:  Go ahead, read it.

22            THE WITNESS:  Can you -- again, if

23  you can make it larger, please?  Or I could

24  -- well, I was going to say I could pull it
```

 1  up on my computer but ...
 2              And can we go to the page just
 3  before that as well?
 4         MS. ROSEN:  Sure.  Why don't you
 5  scroll up a page.
 6         THE WITNESS:  All right.  So then
 7  that's redacted, right?
 8         MS. ROSEN:  Yes.  Everything is
 9  redacted up until this page.
10         THE WITNESS:  Okay.
11         MR. SWAMINATHAN:  I have it up on
12  my computer and can make it bigger.  Is that
13  easier for you?
14         THE WITNESS:  I am good on this
15  one right now.  If we are going to read many
16  more, I will have to do that, though.
17              Can you scroll up just so I
18  can see the bottom of the page, please?
19  Thank you.
20              Next page, please.
21              And can you scroll up just a
22  little bit more, please.
23              Okay.
24

 1  BY MS. ROSEN:

 2      Q.  So this is the document that you

 3  cite to to support the proposition in your

 4  report that Mathis denied to the CCSAO that

 5  she kicked or stomped on her son, right?

 6      A.  Well, you are on page 834.  Are

 7  you talking about 833, or the whole

 8  document?

 9      Q.  I don't know.  It's your citation.

10  Let's go to 29833.  That's the page I asked

11  you to look at.  You asked to read the next

12  page.

13      A.  Right.

14      Q.  So you cited to this page.  Is

15  this the page that you are relying on to

16  support the proposition that the CCSAO --

17  that Mathis denied to the CCSAO that she

18  kicked or stomped on her son?

19      A.  That's my understanding, yes.

20      Q.  So it's your understanding that

21  this memorializes an interview between a

22  member of the Cook County State's Attorney's

23  Office and the criminal defendant?

24      A.  I believe that's what this

 1  document is.

 2       Q.  So it says, "I went to interview

 3  D," meaning Defendant "at CCJ today."  Do

 4  you know what CCJ is an acronym for?

 5       A.  I don't.  Cook County Jail.  I'm

 6  sorry, Cook County Jail.

 7       Q.  Correct, yes, Cook County Jail.

 8            Okay, let's go to the very

 9  last page of this report, which is -- hold

10  on, and I will give it to you, 21 of the

11  PDF.  If you read the last paragraph:

12            "After much discussion with

13            D's family and with D, I arranged

14            for them all to meet together in

15            the jury room.  The State wasn't

16            being unreasonable about the case

17            at all.  The State offered the

18            defendant 20 years if defendant

19            wanted to plead guilty.

20            Eventually defendant decided to

21            conference the case and Judge Egan

22            went along with that offer.

23            Defendant entered her plea of

24            guilty and got 20 years with 967

1              days' credit."

2                   Do you see that there?

3       A.  I do.

4       Q.  Does that indicate to you that, in

5   fact, this document represents the

6   memorialization of interviews and other work

7   done by Ms. Mathis's attorney and the Cook

8   County State's Attorney?

9       A.  Again, I am not an attorney.  I

10  don't know exactly, you know, if it was her

11  attorney, if it was the State Attorney.  I

12  don't think I can answer that.

13      Q.  Let's go to page 10 of the PDF.

14  All right, and if we go to the bottom of the

15  page at the entry that says 62599.

16              "The state informed me today

17              that the reason we don't have the

18              ME's report yet is because they

19              send their reports out for typing

20              and believe that the report was

21              finished.  In other words, they

22              screwed up and don't know why.  D

23              told me that her sister doesn't

24              want to talk to us without a

```
 1                    lawyer.  The sister won't even
 2                    talk to her own mother about what
 3                    happened.  The sister, however,
 4                    has dumped her kids at her
 5                    mother's house and left.
 6                    Defendant gave me mom's name and
 7                    number, Ali Matisck, Texas with a
 8                    phone number because I want to
 9                    talk to the kids if mom won't
10                    talk.  Terry is acting like
11                    somebody with something to hide.
12                    I passed this on to Mary Clements
13                    and told her to get to the kids
14                    ASAP.  The kids might be more
15                    honest than Terry, especially if
16                    Terry isn't around to influence
17                    them."
18                Do you see that there?
19       A.  I do.
20       Q.  Did you review this entire file
21  when you were reviewing the PD file in
22  connection with the opinions that you
23  provided in this case?
24       A.  In the Kim Mathis case or that
```

 1  portion?

 2      Q.  Yes.

 3      A.  I did.  I can't say I remember

 4  every word of the document, but I did, and

 5  certainly there are things that I understood

 6  and didn't understand.

 7      Q.  As you are looking at it now, does

 8  it seem to make more sense that this is

 9  actually the PD that is writing this

10  document and not the Assistant State's

11  Attorney?

12      A.  It's quite possible, now that you

13  point that out, yes.

14      Q.  Then if we look at the entry

15  below:

16              "6:28 this morning, Terry

17           Mathis, defendant's sister called

18           me.  She wanted to make an

19           appointment to see me with her

20           9-year-old daughter.  She was

21           certainly upset."

22              Do you see that?

23      A.  I do.

24      Q.  As I understood the point in your

 1  report, if we go back to your report, which

 2  is Exhibit No. 6, your criticism was that

 3  the notes about Terry Mathis being a

 4  potential witness to the meeting should have

 5  been disclosed to the defense attorney.  But

 6  quite clearly, from our review of the PD

 7  file, the defense attorney was in contact

 8  with the criminal defendant's sister, right?

 9       A.  It appears to be that way, yes.

10       Q.  All right.

11           THE VIDEOGRAPHER:

12  Mr. Tiderington.

13           THE WITNESS:  Yes, ma'am.

14           THE VIDEOGRAPHER:  Can you tip

15  your screen down just a touch.

16           THE WITNESS:  Sorry about that.  I

17  tipped it back to read.  My eyes aren't what

18  they used to be, and it's dark in here.

19           THE VIDEOGRAPHER:  Thank you.

20  BY MS. ROSEN:

21       Q.  Let's go -- you can take this

22  exhibit down, and put the -- oh, this is the

23  report, sorry.

24               Let's go to page 52 of the

 1  report, and this is the section that begins

 2  with the heading "Criminal defense files

 3  show that important investigative materials

 4  are regularly withheld from criminal

 5  defendants."  Do you see that there?

 6       A.  I do.

 7       Q.  When you say "withheld," what do

 8  you mean?

 9       A.  Generally speaking, that they

10  didn't receive them.

11       Q.  Are you -- when you use the word

12  "withheld," are you intending to convey some

13  kind of intent?  Meaning, are you intending

14  to convey that police officers were

15  deliberately withholding information, or is

16  it recklessness or negligence?  Can you give

17  me an idea of your opinion on that?

18           MR. SWAMINATHAN:  Objection to

19  form and foundation.

20           THE WITNESS:  Yeah.  I am just --

21  since we are kind of shifting gears, I just

22  want to kind of orientate myself to where we

23  are at with this, so if you can just bear

24  with me for one second.

```
 1            MS. ROSEN:  Yes.
 2   BY MS. ROSEN:
 3        Q.  Are you reading your report?
 4        A.  I am just refreshing my memory.
 5        Q.  About your report?
 6        A.  Yes.
 7        Q.  Let me know when you have finished
 8   refreshing your memory about your report.
 9        A.  Okay.
10        Q.  So back to my question about your
11   use of the word "withheld."  Are you
12   intending to convey intentional conduct by
13   police officers or reckless conduct or
14   negligence or none of the above?
15        A.  Well, I am making an observation
16   of what the evidence is, and what was
17   produced, what wasn't produced.  I use the
18   word "withheld" in the sense that it wasn't
19   provided.
20            Can I -- can I go to what the
21   individual intent of the officer was?  No, I
22   don't think I am doing that.  I do think
23   that there is a pattern of documents and
24   information that is typically or routinely
```

```
 1  being withheld, and I guess you could
 2  conclude that if it's the responsibility of
 3  the police department to provide all of this
 4  information and it's not being done, it's
 5  being withheld.
 6       Q.  Let's talk about -- let's go to
 7  page 53.  You say here, "Background on the
 8  Area North investigative files and my file
 9  review."  Do you see that there?
10       A.  Yes.
11       Q.  What's Area North?
12       A.  It's -- my understanding is it's
13  like what I call a precinct.  It's a
14  division within the Chicago Police
15  Department.
16       Q.  And is it your understanding that
17  in 1995 through 1998, the City of Chicago
18  had a precinct that was designated Area
19  North?
20       A.  Well, you are using -- I know I
21  use the word "precinct."  Maybe that wasn't
22  a good description.  Area where detectives
23  worked out of that was different than from
24  the headquarters, I guess, is my
```

 1  understanding.

 2       Q.  I am not fixating on the word

 3  "precinct."  I understood what you meant.  I

 4  am fixating on Area North.  Was there an

 5  Area North designation in the detective

 6  division in the time period of 1995 to 1998?

 7       A.  Yeah.  I'm sorry.  Yes, I believe

 8  there was.

 9       Q.  And then if we go to the last

10  paragraph on that page, it says:

11                 "For file comparison purposes,

12             there were 105 criminal defense

13             files provided corresponding to 72

14             investigative files.  There were

15             some cases with multiple

16             defendants, so multiple criminal

17             defense files for a single

18             investigative file, or where the

19             PD file produced did not have a

20             corresponding investigative file,

21             or where the PD file either

22             contained no police documents or

23             so few that it was treated as

24             incomplete and not counted?"

```
 1              Do you see that there?

 2       A.  I do.

 3       Q.  So my understanding from that

 4  sentence is you were provided, we said, 344

 5  investigative files, right?

 6       A.  That's correct.

 7       Q.  And then from that, you received

 8  corresponding criminal defense files of 105

 9  but those matched to only 72 investigative

10  files, right?

11       A.  That's correct.

12       Q.  So that 344 number was reduced

13  down to 72, right?

14       A.  Yes.

15       Q.  For comparison purposes?

16       A.  For comparison, yes.

17       Q.  Then you have in Footnote 3, you

18  identify RD numbers that were files produced

19  by the Public Defender where there was no

20  corresponding investigative file, right?

21       A.  That's correct.

22       Q.  Was there a corresponding RD file?

23       A.  I don't know that answer as we sit

24  here today.
```

```
 1        Q.  And then there were also files
 2   eliminated because they contained no police
 3   documents or so few that they were treated
 4   as incomplete?
 5        A.  That's correct.
 6        Q.  Right?
 7        A.  Yes.  I'm sorry, I said --
 8        Q.  I think we stepped over each
 9   other.
10        A.  Okay, yes.
11        Q.  And those files are listed in
12   paragraph -- in Footnote 114, right?
13        A.  That's correct.
14        Q.  And then if we go to the next
15   page, it says:
16             "Finally I gave the City the
17          benefit of the doubt for purposes
18          of my analysis of criminal defense
19          files as compared to investigative
20          files.  To that end, I excluded
21          from my analysis criminal defense
22          files in which it appears that the
23          criminal defense file was
24          incomplete, as mentioned above in
```

```
 1                Footnote 114.  The files available
 2                came from the Public Defender's
 3                Office, so it is likely that in
 4                many of these instances, the case
 5                was transferred to private
 6                counsel, and so the criminal
 7                defense file may not be complete.
 8                Those files contain a
 9                strikethrough in Attachment F,
10                leaving 63 files for calculation
11                and analysis."
12                   Correct?
13        A.   That's correct.
14        Q.   Okay.  So from the total universe
15   of investigative files that were provided to
16   you, the 344 for comparison purposes, you
17   only utilized 63 files; is that right?
18        A.   In comparing them to the Public
19   Defender's files?
20        Q.   Yes.
21        A.   Yes.
22        Q.   And then we already talked about
23   the fact that there are redactions in those
24   files, right?
```

 1        A.  We did.

 2        Q.  And did you account for those in

 3   any way?

 4        A.  For the redaction of the files?

 5        Q.  Yes.

 6        A.  I assume that there was perhaps

 7   some information that would be relevant that

 8   was redacted.  I could only go based on the

 9   documents that were provided that were not

10   redacted.  I had no -- I had no way of

11   determining what was underneath them.

12        Q.  So with respect to the files that

13   were redacted, did you have any

14   understanding of why particular documents

15   were redacted?

16        A.  I believe they were redacted by

17   the Public Defender's Office, but I don't

18   know that if I -- I don't know if it was

19   ever explained to me as the reason why they

20   were redacted.  I don't know.

21        Q.  And you don't foreclose the

22   possibility that relevant information could

23   have been redacted, right?

24        A.  Right.  I am sure it could have

1  been, yes.

2      Q.  But despite the fact that many of

3  these files were redacted, the fact that

4  they were redacted did not cause you to

5  remove those files from your analysis, like

6  you did for some of these other -- under

7  these other circumstances that we just

8  discussed, right?

9      A.  That's -- that's a fair statement,

10 yes.

11     Q.  Okay.  Let's go to page 55 of your

12 report.  You say here, "My comparison of the

13 investigative files to corresponding defense

14 files revealed that every one of the

15 criminal defense files are missing documents

16 that were contained in the corresponding

17 police investigative files," correct?

18     A.  That's correct.

19     Q.  And how did you determine that?

20     A.  I looked at what was in the

21 investigative file and compared it to what

22 was in the Public Defender file.

23     Q.  You personally did that?  You

24 compared the pages of the files page by

1  page?

2      A.  Well, I did a spot-check of that.

3  I can't take credit for every one, but my

4  intent was to -- if I was going -- by trying

5  to understand what the chart meant, I

6  spot-checked several cases, and it was

7  consistent with what the analysis was.

8      Q.  So you did not personally compare

9  all 63 investigative files to all 63 PD

10  files, correct?

11     A.  That's correct.

12     Q.  And you relied on the analysis as

13  reflected in the spreadsheet, correct?

14     A.  That's correct.

15     Q.  And you spot-checked that

16  analysis, right?

17     A.  That is correct.

18     Q.  And can you tell us what type of

19  spot-checking you did?

20     A.  I essentially went into some of

21  the cases and looking at the chart, I looked

22  at what was in the investigative file,

23  compared it to what was compared to what was

24  in the Public Defender's file.

```
 1        Q.  And you found no errors in the

 2   chart?

 3        A.  I don't believe I did, no.

 4        Q.  Can you estimate how many

 5   investigative files you compared to criminal

 6   defense files personally?

 7        A.  Not many.  I would say it was

 8   under ten.

 9        Q.  All right.  And then you say:

10             "The documents missing from

11              the defense attorney's files are

12              important investigative materials.

13              For example, the following

14              significant discoverable items

15              wereroutinely absent, and are

16              precisely the kind of documents

17              that should be routinely disclosed

18              to a criminal defendant under

19              normal police practices."

20             And then you identify

21   handwritten notes and general progress

22   reports, right?

23        A.  That's correct.

24        Q.  And that -- did you do that
```

1  analysis in that paragraph yourself, or did

2  you take it from the spreadsheet attached?

3      A.  I took it from the spreadsheet.

4      Q.  And then with respect to

5  investigative file inventories, did you do

6  that analysis yourself, or did you take it

7  from the spreadsheet?

8      A.  That one was pretty easy to look

9  at.  I don't want to take credit for it.  I

10  know I looked closer at that, but I would

11  say I would still have to defer to the

12  spreadsheet.

13      Q.  And then you have this point about

14  issuing a subpoena.  And it says, "In many

15  of cases I reviewed, the defense attorney

16  issued a subpoena specifically for street

17  files, and that subpoena appears in the

18  investigative file, but not all of the

19  documents in the investigative file were

20  disclosed in response to the subpoena."

21          Do you see that?

22      A.  I do.

23      Q.  What was your understanding of --

24  do you have an understanding of why the

1  subpoenas issued from the defense attorneys

2  used the phrase "street files"?

3      A.  I don't.  I guess I don't want to

4  opine on what they wrote in the subpoena.

5      Q.  How are you able to conclude that

6  there are documents missing from every

7  criminal defense file when a majority, if

8  not all, of the criminal defense files have

9  redacted pages in them?

10     A.  Well, again, you can only go on

11 the information that was provided.  If you

12 have better information that I can use for

13 comparison, I would certainly consider that.

14     Q.  When you reviewed the PD files and

15 saw the number of pages redacted, did it

16 cause you any concern?

17          MR. SWAMINATHAN:  Objection to

18 form.

19          THE WITNESS:  Well, the fact they

20 were redacted was not, I don't think, a

21 secret to anyone.  I think anyone involved

22 in this case knows that if they reviewed it

23 that they would know that those pages were

24 redacted.  So no particular concern, I

 1  guess.

 2              I certainly wish I would have

 3  had all of that unredacted information.  I

 4  think it would have precluded this

 5  discussion we are having today.

 6  BY MS. ROSEN:

 7      Q.  What do you mean it would have

 8  precluded the discussion we are having

 9  today?

10              THE VIDEOGRAPHER:  Eileen, I am

11  sorry, we are going to have to stop for just

12  a second.  I lost the last answer.

13              MS. ROSEN:  Yes.  We can go off

14  the record.

15              THE VIDEOGRAPHER:  Thank you.  We

16  are off the record at 4:40 p.m.

17              (Whereupon, a break was taken

18              at 4:40 p.m. to 4:52 p.m.)

19              THE VIDEOGRAPHER:  We are back on

20  the video record at 4:52 p.m.

21              MS. ROSEN:  And, Maribeth, can you

22  read back that last question that we didn't

23  get an answer to.

24

```
 1              (Whereupon, the record was
 2               read as requested.)
 3          THE WITNESS:  I guess I -- what I
 4  meant was that I think we all would have
 5  liked to have seen what the redacted
 6  information was.  If we knew what it was, we
 7  wouldn't be debating whether it was
 8  important, or whether it was a police
 9  report, or whether it was a work product
10  from the State Attorney -- from Public
11  Defender's Office.
12  BY MS. ROSEN:
13      Q.  Okay.
14      A.  But it is my understanding that
15  police reports were not redacted from these
16  files.
17      Q.  What is the basis of your
18  understanding that no police reports were
19  redacted from this file?
20      A.  I recall being told that by
21  plaintiff's counsel.
22      Q.  Which of plaintiffs' counsel told
23  you that no police reports were redacted
24  from the PD file?
```

```
 1      A.  Anand.
 2      Q.  When did Anand tell you that no
 3 police reports were redacted from the PD
 4 file?
 5           MR. SWAMINATHAN:  Hold on.  For
 6 purposes -- just so you know, our
 7 communications back and forth are
 8 privileged.  However, to the extent there
 9 were certain assumptions that you were asked
10 to make for purposes of your analysis, you
11 can identify those assumptions.  I think you
12 have already done that, but you can identify
13 the assumptions that you made.
14 BY MS. ROSEN:
15      Q.  When did Anand tell you that no
16 police reports were redacted from the PD
17 file?
18           MR. SWAMINATHAN:  Objection to
19 form and mischaracterizes testimony.
20                Again, you can identify what
21 assumptions, if any, you were told to make
22 by counsel.
23           THE WITNESS:  I think I did that.
24
```

 1  BY MS. ROSEN:

 2       Q.  You think you did what?

 3       A.  I made the assumption that police

 4  reports were not redacted.

 5       Q.  But you just told me Anand told

 6  you that?

 7            MR. SWAMINATHAN:  I didn't -- go

 8  ahead.

 9            THE WITNESS:  Well, I didn't say

10  that.  It was when I began looking at it.

11  BY MS. ROSEN:

12       Q.  So before you prepared your

13  report?

14       A.  Certainly.

15       Q.  And what exactly were you told

16  about whether or not police reports were

17  redacted from the PD file?

18            MR. SWAMINATHAN:  Well, once

19  again, you should not identify our

20  communications, but you can identify to the

21  extent I told you about any assumptions that

22  you were told to make by counsel, you can

23  identify them.

24            THE WITNESS:  Again, as I

```
 1  testified, I did not create this chart.  I
 2  spent a great deal of time trying to
 3  understand what the chart contained.  And I
 4  do recall -- I mean, it's obvious that I
 5  would be asked that question when I first
 6  began looking at the chart, and it wasn't
 7  today, and I was told that I could assume
 8  that the redacted areas contained work
 9  product from the Public Defender's Office:
10  BY MS. ROSEN:
11       Q.  And were you provided an
12  explanation for why it was safe to make the
13  assumption that the redactions represented
14  work product from the Public Defender's
15  Office?
16            MR. SWAMINATHAN:  You can answer
17  the question.  You are only to testify as to
18  the assumptions you were told to make.  So
19  to the extent you can answer that question
20  yes or no, you can do so.
21            THE WITNESS:  I am sorry, can you
22  read that question, please.
23            THE REPORTER:  Do you want me to
24  repeat it?
```

```
 1            THE WITNESS:  Please.
 2                 (Whereupon, record read, as
 3                  requested.)
 4            THE WITNESS:  Yes.
 5             MS. ROSEN:  Now I lost the
 6   question.  Can you read my question back
 7   again, sorry.
 8                 (Whereupon, record read, as
 9                  requested.)
10   BY MS. ROSEN:
11       Q.  What was the explanation you were
12   provided?
13            MR. SWAMINATHAN:  You can answer
14   as to whatever assumptions you were told to
15   make or explanation related to those
16   assumptions.
17            THE WITNESS:  I think I have
18   answered that the -- I was told that I could
19   assume that police reports were not redacted
20   and that any redaction was attorney work
21   product.
22   BY MS. ROSEN:
23       Q.  And you proceeded with your
24   analysis based on that assumption, correct?
```

```
 1      A.  That is correct.
 2      Q.  And if, in fact, there were police
 3  reports or other relevant information
 4  redacted in the PD files, would that change
 5  your conclusions that you reached in
 6  connection with your comparisons between the
 7  investigative file and the PD file?
 8          MR. SWAMINATHAN:  Objection to
 9  form.
10              I am sorry, could you read
11  that back.
12              (Whereupon, record read, as
13               requested.)
14          MR. SWAMINATHAN:  Objection to
15  form.
16              Go ahead.
17          THE WITNESS:  Certainly, I would
18  consider that.  I don't know if it would
19  change my opinion.  It might bolster my
20  opinion.
21  BY MS. ROSEN:
22      Q.  I mean, certainly, you'd have to
23  concede, right, that if the materials or the
24  majority of the materials that you have
```

 1   identified as being withheld because you

 2   didn't find them in the PD files, if they,

 3   in fact, are there and redacted for some

 4   reason, then, obviously, that would change

 5   your opinions, right?

 6        A.   Absolutely.

 7        Q.   Okay.  And do you have any

 8   understanding of where or how the PD

 9   maintained their files from 1995 to 1998?

10        A.   I do not.

11             I'm sorry, you said the PD.  I

12   am assuming you mean Public Defender, not

13   the police department, is that --

14        Q.   Thanks for checking that.  Yes, I

15   meant the Public Defender.

16        A.   No, I don't.

17        Q.   Let's take a look at page 56 of

18   your report.  Your discussion of Linox

19   Jackson and Tyrone Hammond.

20        A.   Right.

21        Q.   You say:

22             "Linox Jackson and Tyrone

23              Hammond were convicted of first

24              degree murder after allegedly

```
 1                 shooting Jerry Hall during on May

 2                 19, 1995."

 3                    There is a typo there.

 4                    "The defense attorney's file

 5                 is missing extensive information

 6                 inculpating two other suspects

 7                 named Richell Akins (Tree) and

 8                 Ralph Mahomes, including any

 9                 suggestion that detectives

10                 considered them suspects, such as

11                 their IR histories and criminal

12                 record search."

13                    Do you see that there?

14        A.   I do.

15        Q.   Which defense attorney's file are

16   you referring to?

17        A.   The Public Defender's Office.

18        Q.   Was that Mr. Jackson's criminal

19   defense file or Mr. Hammond's criminal

20   defense file?

21        A.   I wouldn't know that.  I mean,

22   I -- again, I know you don't want to go back

23   and let me go through the files, but I would

24   have to do that to answer that question.
```

 1        Q.  But you didn't note it, right,
 2   here in your report which file or files you
 3   looked at?
 4        A.  I did not.
 5                  (Whereupon, Tiderington
 6                   Deposition Exhibit No. 23 was
 7                   screen-shared/referenced.)
 8   BY MS. ROSEN:
 9        Q.  Let's take a look at Exhibit No.
10   23.  As you can see from the Bates stamp,
11   it's AR-PD, so the name on the first page
12   here is Linox Jackson.  Do you see that?
13        A.  I do.
14        Q.  Is this a file that you reviewed
15   in connection with your opinions in this
16   case, specifically the paragraph -- the
17   couple of paragraphs discussing
18   Mr. Jackson's case on page 56?
19        A.  I am just looking for the Bates
20   number in my report.
21        Q.  Well, you don't cite the PD file
22   in your report?
23        A.  Well, not there I don't, I guess
24   but ...

```
 1              That appears to be, yes.
 2  Again, I'd have to -- if we can scroll
 3  through there, I am certain something would
 4  jar my memory, but I believe that's it, yes.
 5       Q.  Well, obviously, it has his name
 6  on it, right?
 7       A.  Yes, it does.
 8       Q.  And it says, charge murder, right?
 9       A.  Yep, yes.
10       Q.  Let's go to the next page, that
11  says, M number.  Does that mean anything to
12  you?
13       A.  No.
14       Q.  And then the next page is
15  redacted, right?
16       A.  Correct.
17       Q.  And the next page, right?
18       A.  Yes.
19       Q.  Redacted?  And the next page is
20  redacted as well, correct?
21       A.  Correct.
22       Q.  As is the next page, right?
23       A.  Correct.
24       Q.  As is the next page, right?
```

```
 1        A.  Yes.

 2        Q.  As is the next page, right?

 3        A.  Yes.  All the pages that are --

 4   don't have any writing on them are redacted.

 5        Q.  Okay.  We can keep scrolling

 6   through.  Okay, here we go.

 7             So we are now on the eleventh

 8   page of the 51-page file, and this is a

 9   subpoena, right?

10        A.  Yes.

11        Q.  Issued, it looks like by the

12   Assistant Public Defender that was

13   representing Mr. Jackson, right?

14        A.  Yes.

15        Q.  But there's no stamps on it or a

16   date of the time served or anything like

17   that.  Do you see that?

18        A.  I don't see any timestamp on it.

19   I see a witness date of May 9th, but I don't

20   think that's what you are asking.

21        Q.  Where it says, clerk of the court,

22   that's not filled in?

23        A.  No, it's not.

24        Q.  And at the bottom, it says, "I
```

1  served this subpoena by handing a copy to,"

2  et cetera, et cetera, that's not filled in,

3  right?

4       A.  You are correct, it's not.

5       Q.  And in your review of all of these

6  files, you noticed subpoenas, right?  You

7  commented on it.  We just talked about that,

8  right?

9       A.  Yes.

10      Q.  And did you notice in those

11  subpoenas that when they were actually

12  issued and served that they had -- all that

13  information was filled out, right?

14      A.  Well, I would have to go back and

15  look at them and see if all that information

16  was filled out.

17      Q.  As you sit here today, you don't

18  recall that?

19      A.  Well, I do recall.  If you are

20  asking me if every one of them was filled

21  out, I can't say that they were.  But the

22  premise that some of them were filled out, I

23  would agree with you.

24      Q.  I know you are not a lawyer, but

1  the fact that this part of the subpoena is

2  not filled out, does that indicate to you

3  actually this subpoena was not served?

4       A.  That would not indicate that to

5  me.  I mean, if you are telling me that's

6  what it indicates from a lawyer's

7  perspective, I would not disagree with you,

8  but that's not what it would indicate to me.

9       Q.  Let's go to the next page.  It's

10  another subpoena, right?  This one to the

11  Illinois State Police, right?

12       A.  Yes.

13       Q.  For their forensic science

14  center -- to their forensic science center.

15  Do you see that?

16       A.  Yes.

17       Q.  Do you have any understanding of

18  what role in this time period, May of 2000,

19  that Illinois State Police, specifically its

20  forensic science center, had on homicides

21  that took place in Chicago?

22       A.  I can make an assumption, but I

23  don't know if I'm right.

24       Q.  You don't know, right?  You don't

 1  know?

 2        A.   I don't know for sure, yes.

 3        Q.   And what's your assumption?

 4        A.   My assumption is that they were

 5  the crime lab where evidence perhaps was

 6  sent to them for analysis.

 7        Q.   Let's go to the next page.

 8        A.   Was I right?

 9        Q.   You are.

10        A.   Thank you.

11        Q.   The next page is -- looks like an

12  appearance form.  You see that there?

13        A.   Yes.

14        Q.   But it's not signed, right?

15        A.   That doesn't appear to be signed,

16  yes, you are correct.

17        Q.   And the court number is blank.  It

18  just says OO, which denotes the year?

19        A.   Right, yes.

20        Q.   CR, but there is no court number

21  there, right?

22        A.   Yes, you're correct.

23        Q.   And when you were reviewing this

24  file, did you notice that?

 1        A.  Quite honestly, no.

 2        Q.  Let's go to the next page.  It's

 3   another copy of the same document, right?

 4        A.  Yes.

 5        Q.  And the next page, another copy of

 6   the same document, right?

 7        A.  Yes.

 8        Q.  And the next page, and this is

 9   something entitled, a motion for discovery,

10   right.

11        A.  That's what it says, yes, motion

12   for discovery.

13        Q.  And it's prepared on behalf of

14   Mr. Jackson, right, now comes the defendant,

15   Linox Jackson?

16        A.  Yes.

17        Q.  But once again, in the caption of

18   the case, that 00 CR, nothing is filled out,

19   right?

20        A.  It's not.

21        Q.  Let's go to the next.  That's the

22   continuation of the motion for discovery,

23   right?

24        A.  It is, yes.

1      Q.  And the next page.  And the next
2  page.  And the next page.  One more.
3              If we scroll to the bottom,
4  and then it says, so those few pages there
5  were the motion for discovery, right?
6      A.  Can I read them?  I'm kidding.  I
7  know it's late in the day, and I should not
8  be trying to be a comedian.  But, yes,
9  that's what it appears to be, yes.
10     Q.  And do you have any understanding
11 of what a motion for discovery is in the
12 context of a criminal case?
13     A.  As it pertains to Chicago,
14 probably not.
15     Q.  And then if we go one more page,
16 there is the signature page, but again, it's
17 not signed, right?
18     A.  Correct.
19     Q.  Let's go to page 23 of the PDF,
20 and this now appears to be a duplicate of
21 the document we just saw, right?
22     A.  Yes.
23     Q.  Let's go to 24, 25, 26, 27, and
24 that's a blank page, and then 28, and then

 1  29, and then 30.  And with the exception of

 2  the blank page that was inserted in the

 3  middle there, that seems to be a duplicate

 4  of the motion for discovery, right?

 5      A.  It appears that way.

 6      Q.  And let's go to page 31.  And what

 7  is that?  It looks like another copy of the

 8  motion for discovery, right?

 9      A.  Yes.

10      Q.  And there is still no court number

11  in the caption, right?

12      A.  Correct.

13      Q.  Let's go to page 32, 33, 34, 35,

14  36, 37.  And again, that's the signature

15  page without a signature.  So that would be

16  now the third copy in this file for motion

17  for discovery, right?

18      A.  It appears so, yes.

19      Q.  Then let's go to the next page.

20  This looks like a form that appears to be

21  utilized by the Public Defender's Office

22  with respect to client interviews, right?

23  It's a blank?  It's not filled in in this

24  case, right?

 1        A.   Yes.  Confidential, do not

 2   disclose, client interview is what it says.

 3        Q.   And then the next page is a

 4   continuation of that same form, right?

 5        A.   Yes.

 6        Q.   And the next page is another

 7   subpoena, right?  This one has a 00MC1

 8   number on it.  Do you see that at the top?

 9        A.   Yes.

10        Q.   Does that mean anything to you?

11        A.   No.  I am assuming it's a case

12   number, but I don't know what significance

13   it is.

14        Q.   Then let's -- you can see this

15   one, there is actually the stamp for the

16   clerk of the court?

17        A.   Yes.

18        Q.   If you keep scrolling, it's

19   actually stamped and served by.  Do you see

20   that?

21        A.   Correct, stamped by the Illinois

22   State Police.

23        Q.   I think it's probably stamped by

24   the person that served the subpoena, and

 1  then stamped -- the signature, and then

 2  stamped received by the Illinois State

 3  Police, right?

 4       A.  Yes.

 5       Q.  And let's go to the next page.

 6  This then is an appearance again in the

 7  00MC1 case, right?

 8       A.  For some reason, the name's

 9  crossed off, so I don't know if that's what

10  that means.  If you tell me that that's what

11  it means, I would not argue with you.

12       Q.  Well, I am referring to the court

13  number, it says case number and 00MC1, do

14  you see that?

15       A.  Right, yes.

16       Q.  Which is different than the ones

17  that weren't filled in were 00CR, right?

18       A.  I believe so.

19       Q.  If you don't --

20       A.  Right.

21       Q.  Sorry.  But you don't know the

22  distinction between those two?

23       A.  I don't.

24       Q.  Let's go to the next page.

 1        A.  The only thing I wanted to point

 2   out is the defendant's name was crossed off

 3   there.

 4        Q.  Yeah.  I don't have any idea why.

 5   Maybe because it says Johnson and his name

 6   is Jackson.

 7             Let's go to the next page,

 8   again, Johnson, same thing, but this time

 9   it's not crossed out, right?

10        A.  But it's still wrong, yeah.

11        Q.  It's still wrong but not crossed

12   out?

13        A.  Yes.

14        Q.  Let's go to page 53.  This is

15   another subpoena that was served on the

16   Chicago Police Department.  You see the

17   stamps on it, right?

18        A.  Yes.

19        Q.  But again, this is on the MC1

20   case, not the CR case?

21        A.  Okay, yes.

22        Q.  Let's go to page 44.  This would

23   be Mr. Jackson's IR history, correct?

24        A.  It is.

```
 1        Q.  Let's go to the next page, another
 2   subpoena, copy of the subpoena, I think, or
 3   maybe it's another subpoena to the Chicago
 4   Police Department, right?
 5        A.  Correct.
 6        Q.  Let's go to 46, an envelope,
 7   correct?
 8        A.  It appears to be an envelope.  I
 9   can't tell if it's 8 1/2 by 11 or 11 by 14,
10   but it appears to be an envelope, yes.
11        Q.  Let's go to page 47.  Another
12   subpoena to the Chicago Police Department,
13   and this time to the office of the
14   superintendent.  Do you see that?
15        A.  Yes.
16        Q.  Let's go to the next page.
17   Another subpoena, this time to the records
18   division of the Chicago Police Department.
19   Do you see that?
20        A.  I do.
21        Q.  Let's go to the next page.  This
22   is another subpoena.  This time to the
23   photography division of the Chicago Police
24   Department, right?
```

```
 1        A.  Yes.
 2        Q.  Let's go to the next page.  This
 3   is another subpoena to the Chicago Police
 4   Department.  This time to the bureau of
 5   identification, right?
 6        A.  Correct.
 7        Q.  Let's go to the next page.  This
 8   is another subpoena to the Chicago Police
 9   Department, and this time to the
10   communications division of the Chicago
11   Police Department, right?
12        A.  Yes.
13        Q.  Let's go to the next page.  Oh, I
14   guess that's the end of the file.
15             So there are no -- other than
16   the IR history, there are no police reports
17   in this particular file, correct?
18        A.  That's correct, yes.
19        Q.  So under the rules that you had
20   established on page 53 about your analysis
21   where the PD file contained no police
22   documents, or so few that it was completed
23   as incomplete, it was not counted, and that
24   was the RD numbers were in Footnote 114,
```

 1   correct?

 2        A.   I am sorry, the footnotes were in?

 3        Q.   Sorry.  The RD numbers for the

 4   cases that you did not analyze because the

 5   PD file produced did not have police

 6   documents, or so few that it was treated as

 7   incomplete and not counted, those RD numbers

 8   are listed in paragraph -- in Footnote 114

 9   on page 53 of your report, right?

10        A.   Yes.  Just let me confirm that,

11   but I think you are correct.

12        Q.   Let me know when you are there.

13        A.   Yes.

14        Q.   And this particular case has an RD

15   number of Z219872, and it's not listed in

16   Footnote 114, right?

17        A.   I think I believe you are correct,

18   yes.

19        Q.   And, in fact, you actually

20   analyzed it specifically at page 56 of your

21   report?  It being this particular RD file or

22   investigative file?

23        A.   I did.

24        Q.   And your conclusions were that

 1  certain documents that were in the

 2  investigative file weren't in the PD file,

 3  right?

 4       A.   That's correct.

 5       Q.   But under your own rules of

 6  engagement, this particular investigative

 7  file should not have been counted, correct?

 8       A.   I don't know that I -- how did you

 9  draw that conclusion?

10       Q.   Well, this particular file has no

11  police documents in it, and I thought --

12       A.   Should it not have had police

13  documents in it?

14       Q.   Well, it was my understanding that

15  based on what you said on page 53 of your

16  report --

17       A.   Right.

18       Q.   -- was that if a PD file didn't

19  have police documents in it, you weren't

20  counting it, and you weren't analyzing it?

21       A.   I think I said if there was so few

22  documents in there.  I don't know if I said

23  if all the police reports were not in there.

24  Maybe I did.  I'll have to look at that

 1  again.
 2       Q.  Well, we can read it again.  It's
 3  on the screen.  It says:
 4                "There were some cases where
 5            multiple defendants -- with
 6            multiple defendants, so multiple
 7            criminal defense files for a
 8            single investigative file, or
 9            where the PD file produced did not
10            have a corresponding investigative
11            file, or where the PD file either
12            contained no police documents or
13            so few that it was treated as
14            incomplete and not counted."
15       A.  And you could be correct there.
16  Again, I think I reviewed 6,000 pages of
17  documents.  If I -- if I should have listed
18  this in a footnote, I will take that
19  responsibility.  And if I go back and
20  research it and think about it differently,
21  I will let you know as well.
22       Q.  So but going back to the fact that
23  on page 56, you make the claim that
24  documents were withheld because they were

1  missing from the defense file, do you think

2  that's a fair claim to make in a case where

3  it's clear we have an incomplete file

4  because there are zero police reports in the

5  PD file?

6        A.  I am not going to argue that

7  point.  Like I said, I would have to go

8  back, and I know it's kind of late in the

9  day here, but I am not -- if what you are

10  saying is correct, and it appears that it

11  is, I should have used that, and I should

12  not have used that for the calculations.

13        Q.  Or as an example on page 56 of

14  your report, right?

15        A.  That's correct.  But like I said,

16  I would have to look at it, perhaps a fresh

17  look at it at some point.  But I don't know

18  what would have changed my opinion, and

19  perhaps that should have been -- perhaps

20  that was not the best example to use.

21        Q.  Let's go to your analysis of James

22  Edwards, Damaine Billups, Cornell Guthrie,

23  Alex Lane, N-Wata Mitchell, Willie Johnson.

24  In this particular case, you say that:

```
 1                    "James Bryant was beaten and

 2               stabbed to death by a group of

 3               people on June 19th.  CPD engaged

 4               in a sprawling investigation to

 5               figure out who and how many people

 6               had attacked him.  The

 7               investigation led them to a

 8               suspect named Tremaine Willis.

 9               Investigators requested Willis's

10               IR sheet and a photograph in early

11               July of 1995, and then

12               investigators canvassed the

13               neighborhood and asked witnesses

14               to look at photos to see if they

15               could identify any of the

16               assailants."

17               And there is a citation to --

18     do you know, that's got to be an

19     investigative file, you think, or RD file?

20          A.  I believe it's the investigative

21     file.

22          Q.  And then it says:

23                    "There is no reference to

24               Willis anywhere in the defense
```

```
 1              file.  Detective also pursued an

 2              alternative suspect named Paul

 3              Thomas, aka Johnson.  There is

 4              information on Thomas missing from

 5              the defense file, including, for

 6              instance, his arrest report."

 7         Do you see that there?

 8    A.  I do.

 9    Q.  Let's take a look and look at --

10  do you know when you say "defense file"

11  which of the six defendants you are

12  referring to?

13    A.  If we could pull up Z273605, I

14  might be able to figure it out.  As we sit

15  here, I don't think I can recall, or I don't

16  recall which suspects, or suspect, I guess.

17    Q.  When you say we could pull up

18  Z273605, what do you mean?  Which file

19  related Z273605?

20    A.  The investigative file.

21    Q.  All right.  And you think the

22  investigative file will help you to figure

23  out which defense file you looked at?

24    A.  Well, I am trying to -- you are
```

 1  asking me to answer questions about this
 2  file, and it would be helpful to look at it
 3  from the beginning and, you know, maybe I
 4  can walk you through the analysis, and how I
 5  concluded it and my conclusions to it.
 6       Q.  But I had a specific question,
 7  which was, do you know which defense file?
 8  There are six -- let me just finish my
 9  question.  There are six defendants that --
10       A.  Okay.
11       Q.  -- that apparently were charged in
12  this case, right?
13       A.  Correct.
14       Q.  And so my question is:  When you
15  draw conclusions about what's in the defense
16  file, I would like to know if you remember
17  which defense file you were reviewing to
18  draw those conclusions?
19       A.  All right.  I understand that, and
20  like I said, I would like to look at all six
21  of the files, and I could perhaps then
22  answer that question.
23       Q.  Well, see, we don't have six files
24  because they weren't produced.  So I am

 1  trying to figure out -- we only have a

 2  couple of the files, and I am trying to

 3  figure out --

 4       A.  Which ones -- I'm sorry, which

 5  ones do you have?

 6       Q.  Well, we have Willie Johnson.

 7  Would you like to take a look at Willie

 8  Johnson?

 9       A.  That might be the lucky number, so

10  let's take a look at that.

11       Q.  Okay.  Let's take a look at

12  Exhibit No. 25.

13              (Whereupon, Tiderington

14               Deposition Exhibit No. 25 was

15               screen-shared/referenced.)

16  BY MS. ROSEN:

17       Q.  Now, this is an over 1,000 page

18  criminal defense file for Mr. Johnson.

19       A.  Correct.

20       Q.  And if we were to try to flip

21  through every page of this file, we would be

22  here until tomorrow, so I am not going to do

23  that.  I am going to allow you to look at --

24  if we ever get to portions of the file that

 1  aren't redacted, let's see if I can get

 2  there.

 3              So if we go to page 34 of the

 4  PDF, so the first 33 pages are redacted of

 5  this file.  And then we have this

 6  supplementary report that describes who the

 7  victim is.  Do you see that?

 8      A.  Right.  And that's -- and it

 9  indicates it's page 1 of the supplemental

10  report.

11      Q.  Correct.  And we can go to the

12  next page of the supplemental report, and it

13  has some identifying information about where

14  the crime happened, and then it identifies

15  some witnesses and people that were

16  interviewed, right?

17      A.  Right.

18      Q.  And then you can, if you want to

19  read where it starts that investigation

20  part, that first couple of paragraphs, and

21  let me know if that refreshes your

22  recollection at all about which of the

23  criminal defense files you were analyzing?

24      A.  I mean, this will be helpful

```
 1  because the other question was, were the
 2  police reports redacted.  So my
 3  recollection, I believe the original report
 4  is in here as well, so right now we are
 5  looking at the supplemental report.  But if
 6  we continue through, I think you will find
 7  that the original report is also in here on
 8  this particular case.
 9       Q.  When you say the original report,
10  what do you mean, the original -- the
11  general defense case report?
12       A.  Yes.
13       Q.  That doesn't tell us whether other
14  reports were redacted, right?  Like GPRs
15  could have been redacted?
16            MR. SWAMINATHAN:  Objection to
17  form and foundation.
18            THE WITNESS:  I guess it could
19  have been, but I guess to -- I guess I
20  thought your previous question -- and when I
21  said that it was my understanding that
22  police reports were not redacted, this -- I
23  want to go through this file to confirm what
24  I told you.
```

1  BY MS. ROSEN:

2       Q.  Well, you don't know.  First of

3  all, that can't confirm it.  You have no

4  idea what's been redacted.  All you will

5  know is that there are police reports in

6  this file.

7            MR. SWAMINATHAN:  Objection to

8  form.

9  BY MS. ROSEN:

10      Q.  And we are certainly not going to

11  spend hours comparing the investigative file

12  to the thousand page PD file?

13      A.  Well, that's --

14            MR. SWAMINATHAN:  Objection to

15  form, foundation, and argumentative.

16  BY MS. ROSEN:

17      Q.  So you have testified that you

18  were operating under the assumption that all

19  of the redacted pages represented work

20  product, so that is the assumption you were

21  working under, and that is the assumption

22  that we will all work under with respect to

23  your analysis in the case.  We are certainly

24  not going to take hours at the twelfth hour

 1  of your deposition to have you try and

 2  figure out if that's true or not.  If you

 3  want to do that on your own time, then feel

 4  free.

 5          MR. SWAMINATHAN:  I don't know if

 6  there is a question pending, but I don't

 7  think that's what he asked for, but go

 8  ahead.

 9          MS. ROSEN:  Thanks.

10  BY MS. ROSEN:

11      Q.  So the question that started all

12  of this was there were six people charged in

13  this case, and you are making assertions

14  about information that was withheld, and so

15  you wanted to look at this particular file

16  to help answer that question.

17              Is this the file that you

18  reviewed, Mr. Johnson's file, in arriving at

19  your conclusions that certain materials were

20  missing from the criminal defense file?

21              (Ms. Aguilar exited the

22                deposition proceedings.)

23          THE WITNESS:  I believe I reviewed

24  all of the defendants' case files.

```
 1                    (Whereupon, Tiderington
 2                     Deposition Exhibit No. 24 was
 3                     screen-shared/referenced.)
 4    BY MS. ROSEN:
 5         Q.  Let's look at -- you indicate --
 6    well, let's also take a look at what we will
 7    mark as -- or what has been marked as
 8    Exhibit 24, which is the investigative file
 9    in connection with this case, and if we
10    could go to page 393 of the PDF.
11                    No, that's not right.  Can you
12    scroll down to 403.  Sorry, let me find it.
13                    Let's go to 293, sorry.
14                    Okay, so 293 is -- we are
15    looking at the investigative file.  If you
16    can scroll so you can see the Bates stamp.
17         A.  I'm sorry, just to clarify, which
18    investigative file are we looking at at this
19    point?
20         Q.  The one for Z273605.
21         A.  Okay.
22         Q.  You have an understanding that
23    when there is a murder that there is an
24    investigative file that's prepared, and
```

1  there is only one investigative file,

2  despite the fact that multiple people could

3  get charged, right?

4       A.  Well, there was not one.  I mean,

5  that's part of the problem.  There is not

6  one file.  There's parallel files and --

7       Q.  Have you seen more than one

8  investigative file?

9       A.  No, no, I am not -- no, if there's

10  multiple defendants like the Soto case,

11  there is one investigative file, and there

12  were multiple defendants.

13       Q.  Right, that was my question.

14       A.  Okay.

15       Q.  That was what I said,

16  investigative file.  I wasn't talking about

17  parallels files or anything else,

18  investigative file.

19       A.  Okay.

20       Q.  But the same isn't true on the

21  defense, right?  Every defendant has their

22  own criminal defense file, right?

23       A.  I believe that's the case, yes.

24       Q.  Okay.

1      A.  They would have a different

2  attorney assigned to them, yes.

3      Q.  Right.  So if we go to -- we are

4  in the investigative file.  If we scroll to

5  the bottom so you can see the Bates.  So the

6  Bates number is 40334, and that is one of

7  the documents that you indicate is missing

8  from the defense file, right?  This is an

9  arrest report for Mr. Thomas, somebody that

10 you believe is an alternative suspect,

11 right?

12     A.  I am sorry, pull that up or scroll

13 that up a little bit just so I can confirm,

14 if you can.

15     Q.  So that he can see the name.

16     A.  Yeah, I just want to make -- make

17 that a little larger.

18             I can't read that.  If you can

19 scroll up a little bit and a little bit more

20 to the left.

21     Q.  Do you see Thomas?

22     A.  I see Thomas.  I am trying to read

23 the narrative.

24     Q.  The narrative of what?

 1        A.   Well, the rest of the page.

 2        Q.   Okay.

 3        A.   I can't make that out after

 4   arrest.  And if you could perhaps make that

 5   just a little bit larger.

 6        Q.   Above arrested, after identified

 7   by RO's as a wanted person in CPD daily

 8   bulletin, wanted for murder, probable cause

 9   to arrest.

10        A.   Thank you.  I appreciate the help.

11        Q.   Sure.  So this is a document that

12   you say was not in the criminal defense

13   file, right?

14        A.   That's my understanding, yes.

15        Q.   Let's go back to Exhibit No. 25,

16   and let's go to page 393 of Exhibit No. 25.

17   Isn't that the same arrest report we were

18   just looking at?

19        A.   And, I'm sorry, the Bates number

20   at the bottom of the page there is what?

21   It's from the Public Defender's Office,

22   correct?

23        Q.   Yes.

24        A.   All right.  And for which

1  defendant is this relating to?

2      Q.  This is the Willie Johnson file.

3      A.  I agree with you, it is in Willie

4  Johnson, yes.

5      Q.  Let's go back to Exhibit 24, if we

6  could go to page 567 of the PDF.  If you

7  look at page 57 of your report, you say -- I

8  guess it starts at the bottom of 56, you

9  say:

10             "Finally, while the

11          supplementary report states that a

12          witness named Ms. Smith saw three

13          or four suspects chasing the

14          victim, there is a handwritten

15          note stating that Ms. Smith said

16          that it might have been only two

17          people who were chasing the

18          victim."

19             And the citation for that is

20  RFC-Solache/Reyes 40609.  And as you will

21  see, this is the Bates number at the bottom

22  matches the cite in your report, right?

23      A.  Correct.

24      Q.  Can you tell me where in this note

 1   it says that Ms. Smith said it might have

 2   been only two people who were chasing the

 3   victim?

 4        A.   Ms. Smith called the police in

 5   something two, three, four suspects chasing

 6   him.

 7        Q.   So it says two, three, or four,

 8   right?

 9        A.   It does.

10        Q.   Which is consistent with the

11   supplementary report, right?

12        A.   I would have to look at the

13   supplemental report.

14        Q.   Well, look at what you say about

15   the supplemental report in your report.  It

16   says, while the supplemental report states

17   that a witness named Ms. Smith saw three or

18   four suspects chasing the victim.

19             MR. SWAMINATHAN:  Objection to

20   form and foundation.

21             THE WITNESS:  Well, I guess maybe

22   I am not following the line of questioning,

23   but the note says -- and again that would

24   be, you know, was it two, was it three or

 1  was it four suspects chasing him?  Would be
 2  my -- I guess my question that the officer
 3  should have clarified in this police report.
 4  That's why I wanted to go back and look at
 5  the supplemental report.
 6  BY MS. ROSEN:
 7      Q.  Is your quarrel with the fact that
 8  the police report says three or four and the
 9  note says two, three, or four?
10      A.  No, it's not necessarily a
11  quarrel.  But if you are asking me to be
12  concise, I would like to go back and look at
13  that supplemental report to refresh my
14  memory to explain what I -- what I meant in
15  that paragraph or in that sentence.
16      Q.  Well, you don't cite the
17  supplemental report, so there is no way for
18  us to find it quickly.
19      A.  Do you want me to look for it?
20      Q.  No, I do not.
21          We can take those exhibits
22  down and go back to his report.
23          Exhibit No. 6, let's go to
24  page 57.  This is Jose Melendez, A315294.

 1              Actually, I'm sorry, can we go

 2   back to Exhibit No. 25.  In your report, you

 3   also indicate that there was -- the

 4   investigation led to a suspect by the name

 5   of Tremaine Willis, and that there is no

 6   reference to Willis anywhere in the defense

 7   file, right?  That's on page 56 of your

 8   report?  We talked about that a minute ago.

 9        A.  Yeah, but I am getting somewhat

10   confused because we are going forward and

11   then we are jumping back.  So now we are

12   back to the James Edwards case, is that what

13   you want me to --

14        Q.  Yes.  I am back to RD number

15   Z273605.

16        A.  Okay.

17        Q.  And we are now looking at

18   Mr. Johnson's Public Defender file again,

19   which was the file we were looking at

20   before.

21        A.  Okay.

22        Q.  And in your report, which I think

23   you also have in front of you, so we don't

24   have to pull it up on the screen if you need

 1  to refresh your recollection, you note that

 2  the investigation led to a suspect named

 3  Tremaine Willis, right?

 4       A.  That's correct.

 5       Q.  And then you reference at the

 6  bottom of that first paragraph, there is no

 7  reference to Willis anywhere in the defense

 8  file, right?

 9       A.  That's correct.

10       Q.  Let's go to page 461 of the PDF,

11  what is that?

12       A.  I believe it's a criminal history.

13       Q.  For who?

14       A.  Willie.

15       Q.  Is that the same person as

16  Tremaine Willis?

17       A.  It appears to be, yes.

18       Q.  So, in fact, there is a reference

19  to him in the defense file, right?

20       A.  Well, I guess you are still

21  looking at the Willie Johnson defense file,

22  correct?

23       Q.  Correct.

24       A.  Well, we are back to -- we are

 1  back to exactly where we were a few minutes

 2  ago.  We would have to look at the other

 3  files to see if he is referenced in all of

 4  those.

 5      Q.  We don't have all of the files, so

 6  we cannot look.

 7      A.  I think I have them, and I can

 8  find it if you'd --

 9      Q.  You think you have all six of

10  these defense files?

11      A.  I would look.  I would like to

12  look.  I don't know if I do or not.

13      Q.  Well, okay, if we have time at the

14  end, I will let you look.

15      A.  We may want to, if we could take

16  like a five-minute when you are done with

17  that before we move on to the --

18      Q.  A break, you mean?

19      A.  Yeah.  My wife is texting me, and

20  I don't know if there is an issue, or she

21  just wants me to bring bread home.

22          MS. ROSEN:  Sure, we can take a

23  break here.

24          THE VIDEOGRAPHER:  We are off the

 1  video record at 5:43 p.m.

 2              (Whereupon, a break was taken

 3              at 5:43 p.m. to 5:53 p.m.)

 4          THE VIDEOGRAPHER:  We are back on

 5  the video record at 5:53 p.m.

 6  BY MS. ROSEN:

 7      Q.  Let's go back to your report,

 8  Exhibit No. 6, page 57.  We have a

 9  discussion here about Jose Melendez.  It's

10  A315294.  Do you see that?

11      A.  I do.

12      Q.  And you say, "For this case, I

13  focused on comparing the investigative file

14  and permanent retention file, given the

15  redactions in the PD file."  Do you see

16  that?

17      A.  I do.

18      Q.  And so I take it, in this

19  particular case, there were so many

20  redactions in the PD file that you did not

21  believe that you could compare the

22  investigative file to the PD file for

23  purposes of your analysis; is that right?

24      A.  That's fair, yes.

1      Q.  So why did you go through the
2  exercise of comparing the investigative file
3  to the permanent retention file or RD file?
4      A.  I probably should not have.  I
5  mean, I -- it was probably not a great
6  example.  I am not arguing that point.
7      Q.  Okay.  And if you go to the last
8  -- the last sentence of the discussion about
9  Jose Melendez, it says, "Ms. Pantoja's
10  undisclosed handwritten statement, on the
11  other hand, states that she did not know how
12  Mr. Melendez got to her house."
13              Do you see that?
14      A.  I do.
15      Q.  But you have no basis to say the
16  handwritten statement was undisclosed,
17  right?  You didn't look at the PD file, or
18  you couldn't compare the PD file because of
19  the redactions, correct?
20      A.  That's a fair conclusion, yes.
21      Q.  And we already discussed Kim
22  Mathis.
23              Let's see, with respect to the
24  next witness -- I mean the next criminal

 1  defendant after Kim Mathis, so on page 58 of

 2  your report, Ardell Clemons.

 3       A.  Okay.

 4       Q.  So in this case you note that:

 5              "This case involves the

 6           stabbing death of a woman named

 7           Nyree Johnson.  The investigation

 8           revealed that Ardell Clemons, the

 9           victim's friend, had been living

10           with the victim at the time of the

11           murder.  Detectives pursued

12           Clemons who had fled to Florida.

13           Clemons was arrested just a few

14           days after the crime."

15           Do you see that?

16       A.  Yes.

17       Q.  And then you say, "The

18  investigative file includes several

19  documents that could have been relevant to

20  the defense but were not in the Public

21  Defender's file."  Do you see that?

22       A.  I do.

23       Q.  And you note -- you identify a

24  handwritten note about another potential

1    suspect who had previously worked with the

2    victim and was dating the victim, right?

3        A.  Yes.

4        Q.  And you cite the investigative

5    file, I think, for that?

6        A.  Correct.

7                    (Whereupon, Tiderington

8                     Deposition Exhibit No. 26 was

9                     screen-shared/referenced.)

10   BY MS. ROSEN:

11       Q.  If we could take a look at Exhibit

12   No. 26 and go to page 194 of the PDF, scroll

13   down.  So that's 44288, right?  So that's

14   your citation, right, in your report?

15       A.  Yes, yes, it is.

16       Q.  And so this is the note that you

17   are referencing when you say, "One

18   handwritten note not in the PD file about

19   another potential suspect who previously

20   worked with the victim and was dating the

21   victim."  Do you see that?

22       A.  I do.

23       Q.  What information is contained in

24   this report that leads you to conclude he is

 1  another potential suspect who previously

 2  worked with the victim and was dating the

 3  victim?

 4       A.  I would have to look at the -- I

 5  think that information is contained in the

 6  police report or the supplement.

 7       Q.  I see, okay.  Then if we go to

 8  page 166 of the investigative file.  This is

 9  the lease application that you reference,

10  right?

11       A.  Yes.

12       Q.  And you state, "Another document

13  in the investigative file but not in the PD

14  file is an apartment lease noting that the

15  victim left her former residence due to

16  domestic violence, what would have been a

17  lead into another potential alternative

18  suspect."

19            Do you see that there?

20       A.  I do.

21       Q.  And is that based on the fact that

22  -- well, why do you conclude -- who is the

23  potential alternative suspect that you are

24  inferring from this lease?

```
 1              MR. SWAMINATHAN:  Objection to
 2   form.
 3              THE WITNESS:  I believe it was a
 4   boyfriend or somebody that had leased the --
 5   that was listed on the lease with her.
 6   BY MS. ROSEN:
 7        Q.  How do you know?  What information
 8   do you have about that?
 9        A.  I think there's something, again,
10   in the police report that would tie in the
11   significance of the fact that there was a
12   domestic violence incident.  And, of course,
13   any time you have a young lady stabbed to
14   death, you would look at her relationships,
15   her acquaintances, and it certainly is
16   something that I'm sure a reasonable
17   investigator would have considered.
18        Q.  And when you are evaluating these
19   materials, the note that we just looked at
20   and this lease, are you evaluating it in the
21   context of the information that you learned
22   from reviewing the PD file?
23        A.  I don't know if I follow that
24   question.
```

```
 1        Q.  Sure.  When you were -- when you
 2   are evaluating those notes and concluding
 3   that these are potential suspects, and then
 4   you say that could have been relevant to the
 5   defense but were not in the Public
 6   Defender's file, right?
 7        A.  Correct.
 8        Q.  Are you evaluating the criminal
 9   defense file to evaluate what type of
10   defense they were offering in the particular
11   case?
12        A.  No.  My position is that any
13   reasonable officer would understand that
14   everything in a homicide file should be
15   turned over to the prosecutor.
16              (Whereupon, Tiderington
17               Deposition Exhibit No. 27 was
18               screen-shared/referenced.)
19   BY MS. ROSEN:
20        Q.  Let's take a look at Exhibit No.
21   27, which is Mr. Clemons.
22        A.  I'm sorry, and just to clarify
23   that point, just to make sure that I am
24   clear on that.  I can't think of anything in
```

```
 1  an investigative file, in a homicide
 2  investigative file that would not be
 3  relevant to an investigation; and,
 4  therefore, it would have been required to be
 5  turned over by virtue of a subpoena or work
 6  product to the -- for the State's Attorney.
 7       Q.  But you didn't -- you didn't look
 8  at any of the State's Attorney's files to
 9  see if any of these materials that you say
10  were not in the criminal defense file were
11  actually in the State's Attorney's files,
12  right?
13            MR. SWAMINATHAN:  Can you read
14  that question back.
15            THE WITNESS:  Yeah.
16               (Whereupon, the record was
17                read as requested.)
18            THE WITNESS:  That is correct.  I
19  did not have access to any State Attorney
20  files.
21  BY MS. ROSEN:
22       Q.  And were you ever told that we did
23  actually receive the State Attorney files?
24       A.  I think I was told that, yes.
```

```
 1        Q.  Did you ask to review them?
 2             MR. SWAMINATHAN:  Objection to
 3   form and foundation.  It was produced in
 4   February after disclosure.
 5             MS. ROSEN:  Okay.
 6   BY MS. ROSEN:
 7        Q.  Did you ask to review them?
 8             MS. ROSEN:  It didn't stop you
 9   from giving him more materials in the last
10   couple of weeks.
11   BY MS. ROSEN:
12        Q.  Did you ask to review the State's
13   Attorney's files?
14        A.  Your question is, did I ask?  I
15   think when I first began examining the case
16   and the chart, I was told what was available
17   and that files from the State Attorney's
18   Office, I was instructed or told that they
19   were not available.
20        Q.  But at some point, you knew they
21   became available, right?
22        A.  I think I found that out today.
23        Q.  Today?
24        A.  Yes.
```

 1      Q.  Okay.  If all of the

 2   information --

 3      A.  Maybe yesterday.  I'm sorry, maybe

 4   yesterday, or maybe within the last couple

 5   of days it would have been.  It's a late

 6   afternoon.

 7      Q.  If you found out that the

 8   materials you have identified in your report

 9   as being withheld are actually contained in

10   the Cook County State's Attorney's files,

11   would that change your conclusions that the

12   Chicago Police Department withheld those

13   materials?

14      A.  If all the materials in the police

15   department investigative files were turned

16   over to the State Attorney's Office, I think

17   that would have been proper and reasonable

18   conduct on the part of the investigators.

19      Q.  Going back to Mr. Clemon's case

20   for just a second, if we could take a look

21   at -- actually, let's -- yeah, let's take a

22   look at page 414 of the PDF.

23             Do you recall that Mr. Clemons

24   was picked up in Key West?

```
 1        A.  I recall that he was in Florida.
 2   I knew that he fled to Florida.  I don't
 3   know if I remember it was Key West, but yes.
 4            MR. SWAMINATHAN:   Smart man.
 5   BY MS. ROSEN:
 6        Q.  And do you recall when you were
 7   reviewing his PD file in connection with
 8   your analysis in this case that he was
 9   interviewed by police officers from Key West
10   and admitted that he called the Chicago
11   Police Department and confessed to the crime
12   and then confessed to the crime to the Key
13   West police officers?
14        A.  I am refreshing my memory.  I
15   vaguely recall that, yes.
16        Q.  And did that, the fact that
17   Mr. Clemons called the Chicago Police
18   Department from Florida and confessed to the
19   crime, and then confessed to the Key West
20   police officers that picked him up and
21   interviewed him impact your analysis in any
22   way?
23        A.  Again, I'd have to go back and
24   read the details.  I don't know exactly what
```

1  he told the investigators from Key West, and

2  if it comported with what he told the

3  Chicago investigators.

4       Q.  Did you notice as you were

5  reviewing this file, this PD file, how many

6  pages were redacted?

7       A.  I don't recall that as I sit here

8  today.

9       Q.  All right.  Let's -- we can take

10  this exhibit down.  Let's go back to the

11  report, Exhibit No. 6.  Exhibit No. 6 if we

12  look at the bottom of page 58, this is

13  Mr. Oscar Soto's case.  This is another one

14  that you reviewed, right?

15            Let me strike that.  This is

16  another case that you specifically analyzed

17  and compared the investigative file to the

18  Cook County Public Defender file, correct?

19       A.  That is correct.

20       Q.  How did you -- you have

21  identified, I believe it's eight.

22       A.  I am sorry.  I didn't hear that

23  question.

24       Q.  I'm sorry, I mumbled.

```
 1              In this section of your
 2   report, you identified eight examples of
 3   cases where you sort of did a deeper dive
 4   and did comparisons between the
 5   investigative file and the Public Defender
 6   file, correct?
 7        A.   That's correct.
 8        Q.   How did you choose these
 9   particular files?
10        A.   I think a combination of me
11   picking some of them and some of the cases I
12   was asked to look at by counsel.
13        Q.   Can you tell us which cases
14   counsel asked you to look at?
15             MR. SWAMINATHAN:  That would
16   require you to reveal our correspondence
17   communications, so I would tell you not to
18   answer that question.  I guess you can
19   answer the question yes or no, can you
20   identify which ones.  You can answer that
21   question.
22             THE WITNESS:  I don't recall which
23   cases specifically I was asked to look at.
24
```

 1   BY MS. ROSEN:

 2       Q.  When you were asked to look at the

 3   cases, were you provided any information

 4   about why the particular cases were

 5   selected?

 6            MR. SWAMINATHAN:  You can answer

 7   that question yes or no.

 8            THE WITNESS:  No.

 9   BY MS. ROSEN:

10       Q.  Did counsel, plaintiff's counsel

11   identify all of the cases for you?

12       A.  I'm sorry, all of -- all of the

13   eight or all of the cases in the chart?

14       Q.  Of the eight.

15       A.  No.

16       Q.  They, obviously, identified all

17   the cases in the chart.  They have created

18   the chart?

19       A.  No.

20       Q.  So, no, they didn't pick all of

21   them?

22       A.  No.

23       Q.  But as you sit here today, you

24   can't tell us if they picked one or seven,

1   or anything in between, right?

2        A.  I think I picked Melendez, and it

3   was a terrible pick on my part.  So beyond

4   that, I really don't have a recollection.

5        Q.  Let's take a look at Mr. Soto, who

6   was discussed at the bottom of page 58 on to

7   page 59.  And it says:

8                "This case involves a

9                gang-involved shooting from one

10               vehicle to another vehicle.  The

11               victim was a man named Miguel

12               Salas, who was shot on July 17,

13               1997, and died a few days later.

14               Detectives investigating an

15               unrelated aggravated battery

16               decided to show a photo array from

17               that case to the witnesses in the

18               Salas shooting.  Three witnesses

19               allegedly identified two

20               individuals as a passenger and the

21               shooter on July 20, 1997.  Later,

22               on July 23, 1997, after Detective

23               Guevara was apparently assigned to

24               the case, a different man, Oscar

```
 1              Soto was identified as the

 2              shooter."

 3                 Do you see that?

 4         A.  I do.

 5         Q.  And what is your basis for saying

 6  on July 23, 1997, after Detective Guevara

 7  was apparently assigned to the case?

 8         A.  It's an observation.

 9         Q.  Based on your review of the file?

10         A.  Yes.

11         Q.  And is it your -- was it your

12  observation that the first time that

13  Detective Guevara was assigned to the case

14  was on July 23, 1997?

15         A.  I believe so.  But I know you are

16  not going to want to hear this at the

17  twelfth hour, but I would definitely want to

18  review that to make sure that I am being

19  accurate and concise.

20         Q.  Do you have an understanding of

21  what specifically Detective Guevara was

22  assigned to do in connection with this

23  particular investigation?

24         A.  Yes.  I would certainly like to
```

1   refresh my memory by reviewing that file.

2        Q.  And without reviewing the file,

3   you can't my question, correct?

4        A.  I want to be accurate, so I would

5   prefer to review the file.

6        Q.  And then you say:

7             "While two supplementary

8             reports identifying the initial

9             two suspects and indicating

10            that" --

11            Let me start over.

12            It says, "While two

13            supplementary reports identifying

14            the initial two suspects and

15            indicating that witnesses could

16            not identify those suspects in a

17            lineup, are in the permanent

18            retention file, the arrest reports

19            for those suspects are not and

20            also do not appear to be in the PD

21            file."

22            Do you see that there?

23       A.  Yes.

24       Q.  When you say the arrest reports

1  for those suspects are not and also do not

2  appear to be in the PD file, what are you

3  saying?  The arrest reports are not where?

4      A.  In the Public Defender's file.

5      Q.  Okay.  But the supplementary

6  reports are, correct?

7      A.  I would have to look at that again

8  to confirm.

9      Q.  Okay.

10     A.  And again, I want to point out as

11  you did, some of these files are 700, 800,

12  900 pages long, so it is hard for me to

13  answer that without refreshing my memory.

14              (Whereupon, Tiderington

15               Deposition Exhibit No. 29 was

16               screen-shared/referenced.)

17  BY MS. ROSEN:

18     Q.  Let's take a look at Exhibit 29,

19  and let's go to page 5.  This is the RD file

20  that you referenced that contains the two

21  supplementary reports identifying the

22  initial two suspects.  So if we scroll down

23  on this page.

24     A.  We are still on the Soto case?

```
 1        Q.  Correct, 59529, that's the

 2   citation in your report, right?

 3        A.  Correct.

 4        Q.  So that's one supp report, right?

 5   It's two pages.  And then if we keep going,

 6   even though your citation seems incomplete,

 7   and we go to the next supp report that

 8   discusses a lineup, right, with another

 9   suspect, right?

10        A.  Well, I don't see where it

11   discusses a --

12        Q.  Sorry.  The next page.  Where it

13   discusses a lineup on the next page.

14        A.  Okay.

15        Q.  Right?  This is the supp report

16   that says the witnesses couldn't identify

17   the lineup -- I mean couldn't identify the

18   suspect?

19        A.  Yes.

20                (Whereupon, Tiderington

21                 Deposition Exhibit No. 30 was

22                 screen-shared/referenced.)

23   BY MS. ROSEN:

24        Q.  And then if we go to Exhibit 30,
```

1  which is the Public Defender file, if we go

2  to page 42 of that PDF.  That's the same

3  report, right, the first supplementary

4  report we looked at?  It talks about

5  offender Razo?

6        A.  I believe so, yes.

7        Q.  And then if we go to the next

8  page, it's blank, like it was in the other,

9  in the permanent retention file.  And then

10  if we go to the next page, we get to the

11  lineup report, and then the next page

12  indicates that they couldn't pick out the

13  witnesses, right?  So those are all the same

14  reports that were in the permanent retention

15  file?

16        A.  Yes.

17        Q.  But the criticism is that these

18  individuals' arrest reports aren't in the

19  Public Defender file, right?

20        A.  That's correct.

21        Q.  And --

22        A.  I'm sorry, and several handwritten

23  GPRs did not appear in the Public Defender's

24  file either.

1      Q.  Okay.  But you don't detail those,
2   do you?  Oh, you do, okay.
3               All right, let's go -- well,
4   let's look at page 68 of the Public
5   Defender's file, so Exhibit 30.  And if we
6   just scroll through that, you will see there
7   is a whole bunch of redacted pages in here,
8   right?  You don't know what the PD actually
9   redacted, you were just told to assume that
10  it's work product, right?
11     A.  That's correct, yes.
12     Q.  Let's go to page 59 of your
13  report, Exhibit No. 6, Mr. Rainey's case.
14  So you state here:
15               "Cedric Morris was shot to
16               death on June 10, 1996.  Witnesses
17               reported seeing one or two
18               assailants with dark hoodies
19               pulled over their faces.
20               Detectives requested over a dozen
21               IR photos sufficient to compile
22               multiple photo arrays."
23               And then you cite a bunch of
24  requests for photos and photos.

```
 1              And then you conclude, "This

 2                 indicates that there were multiple

 3                 potential suspects and potential

 4                 multiple photo identification

 5                 procedures performed, but the

 6                 defense file does not include any

 7                 information about these photos or

 8                 lineups."

 9            Do you see that?

10      A.   I do.

11      Q.   And are you certain -- well,

12  what's the basis for your conclusion that

13  the reason that all these photos were

14  compiled was to conduct photo identification

15  procedures?

16      A.   Well, I guess that's part of the

17  criticism that I have.  I don't think it was

18  detailed in the police report or in a

19  supplemental report the purpose for

20  requesting these.

21      Q.   Okay.  That -- sorry?

22      A.   So I am left with making

23  assumptions.

24      Q.   I see.  All right.  And then
```

```
 1   further, it says:
 2              "According to a lineup and
 3          supplementary report, Donnie
 4          Morris identified Guy Rainey out
 5          of a lineup.  Rainey was
 6          ultimately charged.  Morris's
 7          identification appears to be the
 8          only inculpatory evidence in the
 9          file.  But there is a handwritten
10          note in the investigative file
11          with Morris's name on it and the
12          statement 'Kevin Haas pull file to
13          see if he is still wanted."
14          Do you see that?
15   A.  I do.
16   Q.  And that says:
17              "Haas's name does not appear
18          in the defense file or in
19          supplementary reports explaining
20          his involvement.  The note
21          suggests Haas may have been an
22          alternative suspect and that
23          Morris could have been a suspect,
24          which would have weighed on his
```

```
 1                credibility in identifying Rainey.
 2                This information written by the
 3                detectives clearly investigative
 4                in nature should have been
 5                disclosed."
 6                     Do you see that?
 7       A.  I do.
 8       Q.  And does that name, Kevin Haas,
 9  seem familiar to you?
10       A.  It does.
11       Q.  And do you believe that Detective
12  Kevin Haas was a suspect, a viable suspect,
13  in this investigation?
14       A.  Probably not.
15       Q.  Okay.  Why did you write that in
16  your report?
17       A.  I think it was a mistake.
18                     (Whereupon, Tiderington
19                     Deposition Exhibit No. 31 was
20                     screen-shared/referenced.)
21  BY MS. ROSEN:
22       Q.  And if we pull Exhibit No. 31 and
23  go to page 106 of the PDF, this is the note
24  you are referencing, right?
```

```
 1      A.  It is.
 2      Q.  Now that you have realized that
 3  Kevin Haas is, in fact, Detective Haas and
 4  was the individual for some period of time
 5  charged with dealing with the investigative
 6  files at the area, do you still believe that
 7  Morris could have been a suspect, and it
 8  would have weighed on his credibility in
 9  identifying Rainey?
10      A.  Right.  I am sorry.  Can you go
11  back up a couple of pages.  I just kind of
12  try to want to figure out how I made that
13  mistake, and I think it was a GPR that was
14  prepared, and that would be on the back side
15  of the GPR if I remember correctly.  A
16  couple pages back.
17          And again, you know, clearly
18  there's so many documents, I am not
19  suggesting -- you don't have to go back that
20  far.  I just wanted to read the front of the
21  GPR to see how I made that mistake.  And
22  certainly, I can amend my report and correct
23  that.
24      Q.  And, in fact, Donnie Morris was
```

 1  with Mr. Rainey at the time with Mr. --

 2  sorry, let me start over.

 3              Donnie Morris was with Cedric

 4  Morris at the time he was shot, correct?

 5          MR. SWAMINATHAN:  Can you give me

 6  the Bates, the note that we are talking

 7  about?

 8          MS. ROSEN:  Sure.

 9          MR. SWAMINATHAN:  The page

10  reference.

11          MS. ROSEN:  It is Bates Number

12  72857.

13          MR. SWAMINATHAN:  Can you go back

14  up?  Yeah.

15          THE WITNESS:  Okay, I'm sorry,

16  your question again is?

17  BY MS. ROSEN:

18      Q.  It says across the top here,

19  Morris, Donnie, and then A403252.  That's

20  the RD number for this investigation

21  correct?

22      A.  That is correct, yes.

23      Q.  Yes, okay.  And Donnie Morris is

24  the uncle of Cedric Morris and was with him

 1  when he got shot, right, when Cedric got

 2  shot?

 3      A.  Again, I would have to review the

 4  file to confirm that.

 5      Q.  We can take this exhibit down.

 6          Was the Demetrius Johnson case

 7  that's listed at the bottom of page 59 of

 8  your report one of the files that

 9  plaintiff's counsel directed to your

10  attention?

11          MR. SWAMINATHAN:  Objection.  I am

12  instructing you not to answer.  That would

13  require you to reveal our correspondence and

14  communications.

15          Go ahead.

16          MS. ROSEN:  Did you say you

17  instructed not to answer?  Sorry.

18          MR. SWAMINATHAN:  Yes.

19          THE WITNESS:  I am sorry.  How

20  much longer do you think we will go, just

21  for planning purposes?

22          MR. SWAMINATHAN:  I think they've

23  got about, I think, either 25 or 24 minutes

24  left.

```
 1            THE WITNESS:  Okay.  That's fine.
 2    BY MS. ROSEN:
 3        Q.  All right.  Let's go to page 63 of
 4    your report.  There is a discussion here
 5    about the Polaroid photos in the Soto
 6    homicide investigation, a topic that we have
 7    touched upon throughout the last couple of
 8    days, right?
 9        A.  Yes.
10        Q.  And this is your analysis
11    regarding the Polaroid photos, right?  And
12    it rests, in part, on the fact that -- the
13    fact that Polaroid photos were taken of Rosa
14    Aranda, Jose Aranda, and Guadalupe Mejia led
15    you to conclude that they were treated as
16    alternative suspects and that would be
17    important exculpatory and impeachment
18    evidence, correct?
19        A.  That's correct.
20        Q.  Can you explain to me how it is
21    that the fact that Rosa Aranda and Jose
22    Aranda were treated as alternative suspects,
23    if, in fact, that was true, was exculpatory
24    evidence to Mr. Solache and Mr. Reyes?
```

```
 1        A.  Well, if the police department had
 2   and detectives, if they had other suspects,
 3   they never explained in the police reports
 4   how they cleared these other suspects.  If
 5   they believed that these other three
 6   individuals committed the crime and there is
 7   evidence in the record that suggests that
 8   they were held for a lengthy period of time,
 9   I think it was testimony that food was
10   thrown at one of them, and they claim -- and
11   I don't know if it actually happened, but
12   they claim they were physically abused.  If
13   they were all treated as suspects, in my
14   view, the detectives would have had some
15   reason to suspect that they committed this
16   crime; so, therefore, I believe the
17   information would have been exculpatory
18   towards Reyes and Solache.
19        Q.  And specifically, what you are
20   concluding here is that the Polaroid photos
21   were withheld, right?
22        A.  Well, I think they were withheld.
23   I don't know if that's in dispute.
24        Q.  Well, did you look at the
```

1  impounded evidence in this case?

2      A.  I did, yes.

3      Q.  Did you notice that there in the

4  impounded evidence, there is a Polaroid

5  photo of Guadalupe Mejia?

6      A.  Which Bates number are you

7  referring to?

8      Q.  Reyes 1 -- Reyes 000111.

9      A.  Can you pull that up or should I

10 find it?

11             (Whereupon, Tiderington

12              Deposition Exhibit No. 12 was

13              screen-shared/referenced.)

14 BY MS. ROSEN:

15     Q.  No, I can.  Let's mark Exhibit No.

16 12, or let's show him Exhibit No. 12.  It's

17 already marked.

18             So do you see that there is

19 People's Exhibit No. 1?  Do you recognize

20 who is depicted in that photograph?

21     A.  Yes.

22     Q.  Who is that?

23     A.  I'm sorry.  Guadalupe, I believe.

24     Q.  Do you think maybe it might be

 1  Adriana Mejia?

 2       A.  I am sorry.  Let me look at all

 3  the other photos.

 4       Q.  I mean, I can --

 5       A.  Yeah, I don't want to try to

 6  identify.

 7       Q.  That's fine.  So the photo in the

 8  top left, a woman in the teal sweatshirt is

 9  Adriana Mejia, and the other photograph in

10  the top row, that's Rosaura Mejia.

11       A.  Right.

12       Q.  And then below in the left when

13  you are facing the photograph is -- and it's

14  People's Exhibit No. 3, that's Mr. Reyes.

15  And then next to him is Mr. Solache, and

16  then next to him is Guadalupe Mejia, right?

17  So that's a Polaroid photograph that was

18  taken at the police station, and it's part

19  of the impounded evidence, right?

20       A.  That's correct.

21       Q.  And so --

22       A.  I don't know if it's part of the

23  impounded evidence.  But if you say it is, I

24  won't argue with you about that.

1      Q.  I will represent to you that the

2   parties in this case went and pulled all the

3   impounded evidence in connection with the

4   Soto homicide investigation, and these

5   photographs were in the impounded evidence,

6   and Mr. Reyes's counsel took photographs of

7   the impounded evidence, and this is one of

8   the photographs that was taken.

9             So that -- so the fact that it

10  was impounded, obviously, means that it was

11  produced in court and utilized at the trial,

12  and then impounded by the Circuit Court of

13  Cook County.  Do you understand that?

14     A.  I believe so, yes.

15     Q.  Okay.  So that means Guadalupe's

16  photograph, Polaroid photograph was actually

17  produced, despite the fact that when we are

18  reviewing the PD file today, we don't see it

19  in there for whatever reason, right?

20             MR. SWAMINATHAN:  Objection to

21  form and foundation.  Mischaracterizes the

22  evidence, but go ahead.

23             THE WITNESS:  It was not in -- it

24  was not in the PD file if that's what you

```
 1  are asking me.
 2  BY MS. ROSEN:
 3      Q.  Right.  We know it was not in the
 4  PD file --
 5      A.  Right.
 6      Q.  -- but we have it available to us
 7  today, right?
 8      A.  Yes.
 9      Q.  We don't know if the PD file that
10  is available to us today is a complete PD
11  file, do we?
12      A.  I don't have any way of knowing
13  that, that's correct.
14      Q.  And the fact that --
15      A.  I guess -- I am sorry.  I guess I
16  made the assumption that it was.
17      Q.  And why did you assume that?
18      A.  Well I -- well, maybe it's naive,
19  but why wouldn't it be a complete file?  If
20  they are asked to turn over the file, why
21  wouldn't they?  But I understand your point,
22  it may not be a complete file.
23      Q.  And certainly we know, regardless
24  of that point, that Guadalupe Mejia's
```

 1  Polaroid photograph was produced and

 2  impounded in court, right?

 3          MR. SWAMINATHAN:  Objection to

 4  form and foundation.  Mischaracterizes the

 5  evidence.

 6  BY MS. ROSEN:

 7      Q.  You can answer.

 8      A.  Well, I don't know what was

 9  produced in court.  I would have to refresh

10  my -- I don't know if I read all of the

11  trial testimony or looked at all of the

12  exhibits.

13              But once again, if you are

14  representing that that's what happened, I

15  would not argue with you.

16                  (Whereupon, Tiderington

17                   Deposition Exhibit No. 33 was

18                   screen-shared/referenced.)

19  BY MS. ROSEN:

20      Q.  Let's take a look at Exhibit No.

21  33.  Have you seen -- you can scroll through

22  these photographs.  Have you seen these

23  photographs before?

24      A.  I think I have seen.

1      Q.  Is it your understanding that

2   these are photographs that were taken by the

3   Cook County Public Defender's Office in this

4   case to explain to the parties and the Court

5   how they maintain their files from the

6   1990s?

7      A.  I don't have that information.

8      Q.  Does it seem to you based on a

9   review of these photographs that the files

10  are maintained in an orderly and pristine

11  fashion?

12            We can scroll back through

13  them actually so you can take a look at

14  them.

15     A.  But again, I don't know what --

16            MR. SWAMINATHAN:  Objection to

17  form.

18            Go ahead.

19            THE WITNESS:  I don't know if this

20  represents all homicide cases, felony cases,

21  all shoplifting cases, or all cases.  I

22  don't know that, and perhaps there is a more

23  centralized and organized area of their

24  records retention rooms that have more

 1  sensitive investigations contained in them.

 2  I don't know that.

 3          MS. ROSEN:  Okay.  Why don't we --

 4  I think we have got about ten minutes or so

 5  left.  Why don't we take a break so I can

 6  take a look at my notes, and we can finish

 7  up.

 8          MR. SWAMINATHAN:  Thank you.

 9          THE VIDEOGRAPHER:  We are off the

10  video record at 6:37 p.m.

11              (Whereupon, a break was taken

12               at 6:37 p.m. to 6:48 p.m.)

13          THE VIDEOGRAPHER:  We are back on

14  the video record at 6:48 p.m.

15  BY MS. ROSEN:

16      Q.  Other than the Polaroid

17  photographs that you say were withheld on

18  page 63 of your report, are there any other

19  documents that you saw in the investigative

20  file for the Soto homicide investigation

21  that was not in the Public Defender's file?

22      A.  As we sit here, I don't believe

23  there were, but I want to explain my answer

24  if I could.

1        Q.  Sure.

2        A.  So there is a number of documents

3   that it's more likely than not that the

4   detectives would have had to produce or

5   statements, handwritten notes -- I think I

6   have testified to this earlier.  It's

7   unreasonable to think that there were not

8   any types of notes of interviews with the

9   suspects prior to the State Attorney coming

10  in and taking the written statement.  And if

11  those documents, if they do exist, if those

12  were not produced, certainly, this would be,

13  I believe, a deviation of acceptable police

14  practices.

15       Q.  Okay.  So if the detectives

16  memorialized those things, and if those

17  documents were not produced, then it would

18  be a deviation, right?

19       A.  Well, and it's a Catch 22.  And if

20  they didn't document these things, I think

21  it's a deviation of police practices as

22  well.

23            So either they didn't do it,

24  which is inexcusable for a homicide

 1  detective, which is a deviation of normal

 2  police practices or reasonable police

 3  practices.  Or if they did take notes and

 4  they didn't produce it, likewise.  So either

 5  way, I think it's problematic.

 6       Q.  Different problem, but

 7  problematic, right?

 8       A.  Different problem from what?

 9       Q.  There are two different problems,

10  but both are problematic?

11       A.  No.  I think it's all the same

12  problem.

13       Q.  Well, if they existed, and they

14  were not produced, then that's one type of

15  problem?  If they weren't memorialized at

16  all, that's a different kind of problem,

17  right?

18       A.  That's correct.

19       Q.  You testified yesterday that it

20  was highly unusual and not acceptable to, I

21  think it was, detain somebody in an

22  interrogation room for 40 hours.  Is that

23  right?  Did I get that right?

24       A.  That's accurate, yes.

1      Q.  So it's your opinion that under no

2   circumstances is it permissible to detain

3   somebody for 40 hours in an interrogation

4   room?

5          MR. SWAMINATHAN:  Objection to

6   form.  Asked and answered.

7              Go ahead.

8          THE WITNESS:  You say under no

9   circumstances, such as -- I mean, I guess I

10  have to -- it's a hypothetical question,

11  obviously.  I would have to think about what

12  situations it -- it's not common.  It's not

13  normal.  I don't think it's reasonable.

14  BY MS. ROSEN:

15     Q.  What is your basis for concluding

16  that it's not common for an individual to be

17  detained in an interrogation room for 40

18  hours?

19     A.  Well, it's just not something that

20  law enforcement officers do.  We -- if we

21  are going to lock somebody up, we give them

22  the ability to use the restroom.  We give

23  the ability to sleep on a mattress.  We give

24  them some dignity.  We don't make

 1  individuals sleep in a chair in a closet, in

 2  an interrogation room.

 3              And I am also, oftentimes if

 4  people are left in an interrogation room,

 5  they are usually handcuffed because an

 6  interrogation room isn't the same as a jail

 7  cell.  So I think there is testimony that

 8  they were locked to the wall.  Whether that

 9  happened or not, I don't know.  But

10  certainly if that's what occurred, and if

11  the Jury decides that that's what occurred,

12  then certainly it would be inhumane

13  treatment of a prisoner.

14      Q.  So your position is that they

15  shouldn't be continuously held in an

16  interrogation room without allowing them to

17  use the bathroom or be fed or to sleep on a

18  cot, those types of things?  It's not the

19  40-hour detention that you are quarreling

20  with?

21      A.  I'm sorry, did you say there was a

22  cot, or is that a different scenario that we

23  are talking about?

24      Q.  I am trying to understand when you

1  said, holding somebody in an interrogation

2  room for 40 hours, whether you were being

3  specific to this case, meaning the

4  circumstances as you understood them in this

5  case, or in any circumstance?

6        A.  Again, from the departments that I

7  am familiar with and from the federal agency

8  I am familiar with, prisoners would only be

9  held for a short period of time in an

10 interrogation room.  After a period of time,

11 they would be put into a lockup facility

12 that had the ability to allow a prisoner to

13 be humanely -- treated humanely by allowing

14 them to sleep.  And so, no, I can't think of

15 any -- and I also believe it's a violation

16 of Chicago Police Department's policy of

17 holding a prisoner in this fashion for such

18 a long period of time in an interrogation

19 room.

20       Q.  Okay.  With respect to the

21 physical evidence that was collected in this

22 case, what is your understanding of when the

23 Chicago Police Department received results

24 of the analysis that was done in connection

 1   with the interrogations of Mr. Solache and

 2   Mr. Reyes?

 3           MR. SWAMINATHAN:  Can you read

 4   back the question?

 5            MS. ROSEN:  I can rephrase it

 6   because I --

 7           THE WITNESS:  I don't think I

 8   understand the question.

 9   BY MS. ROSEN:

10       Q.  You understand that there was

11   evidence that was collected, and it was

12   tested for DNA and other things, right?

13       A.  That's correct.

14       Q.  And you understand that at some

15   point, the Illinois State Police evaluated

16   the evidence and reported back on its

17   findings, right?

18       A.  That's correct.

19       Q.  Do you know when the ISP reported

20   back its findings to the Chicago Police

21   Department in relation to the days in which

22   Mr. Solache and Mr. Reyes were in police

23   custody?

24       A.  Can I refresh my memory by looking

 1  at the case file?

 2      Q.  Sure.  It's Exhibit No. 7.

 3      A.  I'm sorry.  Can you pull that up

 4  or --

 5      Q.  Yes, I am asking.  It's Exhibit

 6  No. 7.

 7      A.  I thought you were telling me to

 8  go get it.

 9          MS. ROSEN:  Robyn, can you get

10  Exhibit No. 7.  Got it?

11          EXHIBIT TECHNICIAN:  One second.

12  Technical difficulties here.  One second for

13  me to figure out what's wrong.

14          MR. SWAMINATHAN:  I have a copy of

15  the file in front of me.  Do you want me to

16  show it to him?

17          MS. ROSEN:  Sure, fine.  Yeah,

18  that's fine.  If he wants to just look at it

19  that way.  Flip through it, and then let me

20  know when the ISP results were reported

21  back.

22              It's probably quicker for you

23  to just flip through the pages of the file

24  you have in front of you.

1          THE WITNESS:  Yeah.  I think I am

2   looking at a report now, May 13, 1998.  Is

3   that the date that you --

4   BY MS. ROSEN:

5        Q.  Can you just -- I don't know it

6   off the top of my head, the precise date.

7   What's the Bates number of the page you are

8   looking at?

9        A.  097, 98, 99.

10       Q.  Yes.

11       A.  Okay.  And I think to answer the

12  question, the date was May 13th.

13       Q.  When were Mr. Solache and

14  Mr. Reyes in police custody?

15       A.  Well, turning to my report there,

16  just because I --

17       Q.  Sure.

18       A.  I'm sure you have the date, that I

19  can tell you whether or not I agree with you

20  on that.  Because I am having -- struggling

21  to find the date.

22       Q.  April 3rd, 4th, 5th, that time

23  frame?

24       A.  After refreshing my memory, that

1  sounds correct.

2      Q.  So the lab results didn't come

3  back until over a month after Mr. Solache

4  and Mr. Reyes and Ms. Mejia were charged,

5  right?

6      A.  That's correct.

7      Q.  And so at the time that the

8  detectives were collecting the evidence from

9  Mr. Solache's person, right, they collected

10  his shoes, and they took Ms. Mejia's

11  clothing, and whatever other items they took

12  from the searches from the house, they had

13  no idea whether or not, or what physical

14  evidence was going to show or already

15  showed, right?

16      A.  Correct, yes, I don't think they

17  had any physical evidence that showed that

18  Reyes or Solache were responsible for the

19  crime.

20      Q.  Right.  But what I am saying is

21  they had no -- they had no physical evidence

22  test results at the time that they were

23  interrogating Mr. Solache and Mr. Reyes and

24  Ms. Mejia?

1        A.   I would agree with you, yes.

2        Q.   And then you testified that for

3   some period of time you worked with -- I

4   think you said with the DEA in Chicago; is

5   that right?

6        A.   I worked cooperative cases with

7   the DEA in Chicago, yes.

8        Q.   What time frame was that

9   approximately?

10       A.   Well, a couple of cases probably

11  in the late '80s, and then some DEA cases

12  in -- before nineteen -- between 1990 and

13  1995.

14       Q.   Do you recall -- and you said you

15  worked with Chicago Police Department -- you

16  said you worked with Chicago police officers

17  in that time frame, right?

18       A.   Worked with the -- well, yeah,

19  there were Chicago police officers.  I

20  remember one in particular.  It was a

21  Chicago K-9 handler, a K-9 handler I think

22  that was assigned to the DEA task force that

23  we were working with.

24       Q.   Do you recall any of the names of

 1  any of the police officers that you worked

 2  with in those -- during that time frame?

 3       A.  I don't.

 4       Q.  Have you worked with any Chicago

 5  police officers after that 1990 and 1995

 6  time frame?

 7       A.  No.

 8            MS. ROSEN:  I do not have any more

 9  questions.

10            MR. SWAMINATHAN:  Megan, do you

11  have any questions?

12            MS. McGRATH:  I do not.  Thank

13  you.

14                    EXAMINATION

15  BY MR. SWAMINATHAN:

16       Q.  I just have a few questions,

17  Mr. Tiderington.  You had indicated several

18  times in this deposition that you wanted

19  to -- you wanted to clarify something based

20  on if I can look at some records, if I

21  understand correctly?

22       A.  That's correct.

23       Q.  What was the clarification you

24  wanted to provided?

```
 1        A.  I wanted to provide the

 2   information about what other cases I had

 3   testified in depositions.  And then I also

 4   wanted to clarify, I think I mentioned there

 5   was a trademark infringement case that I was

 6   retained on, and the question was:  How did

 7   this case get resolved, and did I testify or

 8   was I allowed to testify?

 9              I went back last night, and I

10   looked.  I looked at some emails, and my

11   understanding is that the case never went to

12   trial.  I received an email about two months

13   ago from the attorney thanking me for my

14   work and saying that my testimony

15   contributed to whatever prevailing or

16   whatever.  But I also after reading it

17   closely, I understood that the judge ruled

18   that my testimony would not be relevant if

19   it went to trial.

20              So I don't know -- again, I

21   don't know if there was a Daubert hearing or

22   if there wasn't.  But my understanding,

23   according to the attorney, was that he -- I

24   was retained to examine drug products such
```

```
 1  as rolling papers, pipes, scales.  And the
 2  attorney asked me to examine those to
 3  determine if they could be used with illegal
 4  drugs, with marijuana or cocaine.  So my
 5  analysis was whether or not the products
 6  could be used with drugs.
 7              Apparently, the judge -- and
 8  this is according to the attorney.  The
 9  judge said that it wasn't relevant on
10  whether or not the products could be used
11  with drugs.  What is relevant is whether or
12  not the products could be used with tobacco,
13  and I had testified that I was not a tobacco
14  industry expert, which I am not, and,
15  therefore, my testimony would not be
16  relevant.
17      Q.  I see, okay.  You were asked some
18  questions yesterday about whether there was
19  evidence to support the conclusion more
20  likely than not that Solache was abused.  Do
21  you recall that?
22      A.  I do.
23      Q.  Sir, your report does not actually
24  opine on the question of whether, in fact,
```

 1  Mr. Solache was abused; is that correct?

 2       A.  That's correct, it does not.

 3       Q.  If the Jury credits Mr. Solache's

 4  testimony that he was abused, would that be

 5  a deviation from police practices?

 6       A.  It would be, yes.

 7       Q.  But in this case, you were not

 8  tasked with assessing whether you believed

 9  Solache or Guevara or whoever else regarding

10  abuse, correct?

11       A.  That's correct.  I don't know if

12  they were abused.

13                 (Reporter clarification.)

14       Q.  Would you agree that that's the

15  Jury's role?

16       A.  I do.

17       Q.  But in this case, you were not

18  tasked with assessing whether to believe

19  Mr. Solache or Mr. Guevara or whoever else

20  about abuse; is that right?

21       A.  That's correct.

22       Q.  Would you agree that's the role of

23  the Jury?

24       A.  I do.

1      Q.  And ultimately if the Jury credits

2  Solache, that would be a deviation, correct?

3      A.  It would be, yes.

4      Q.  Putting aside of whether or not

5  Guevara actually abused Solache or not, did

6  you find other deviations from police

7  practices in this case?

8      A.  I did.

9      Q.  And so any -- sorry, strike that.

10          So your opinions about

11  deviations from police practices in this

12  case, do they depend on a conclusion or a

13  finding that Mr. Solache or Mr. Reyes was

14  abused?

15      A.  No, no, they would not.

16          MR. SWAMINATHAN:  I have no other

17  questions.

18          MS. ROSEN:  I don't have any

19  further questions based on that.

20              Carrie?  Ms. Golden?

21          MS. GOLDEN:  I am working on it.

22          MR. SWAMINATHAN:  It's seven

23  hours.  Carrie, if you want to ask one, you

24  can ask one, but we are at seven.

 1            MS. GOLDEN:  I was just going to

 2   say I don't have any questions, but thank

 3   you, Anand, for your gracious allowance of

 4   one question.

 5            MR. SWAMINATHAN:  Okay, thank you,

 6   everybody.

 7            MS. ROSEN:  Are you reserving?

 8            MR. SWAMINATHAN:  Yes, we are

 9   reserving.

10            MS. ROSEN:  Thanks, everyone.

11            THE WITNESS:  Thank you all.  I

12   appreciate it.

13            THE VIDEOGRAPHER:  We are off the

14   video record at 7:07 p.m. at the conclusion

15   of the deposition.

16                 (Deposition proceedings.

17                  concluded at 7:07 p.m.)

18

19

20            * * * * * * * *

21

22

23

24

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3
    ARTURO DeLEON-REYES,
 4            Plaintiff,
          vs.
 5   REYNALDO GUEVARA, ET AL.,
              Defendants.
 6   _____    No. 18 CV 01028
    GABRIEL SOLACHE,                 No. 18 CV 02312
 7            Plaintiff,
          vs.
 8   REYNALDO GUEVARA, ET AL.,

 9            Defendants.

10                  VOLUME II of II

11      I, THOMAS J. TIDERINGTON, being first

12   administered an oath, say that I am the

13   deponent in the aforesaid deposition taken

14   on October 6, 2022; that I have read the

15   foregoing transcript of my deposition, and

16   affix my signature to same.

17   __Number of errata sheets attached.

18   __No errata sheets.

19
                    THOMAS J. TIDERINGTON
20
    Subscribed and sworn to
21   before me this         day
    of                 , 2022.
22

23

24   Notary Public
```

```
 1 | STATE OF ILLINOIS  )
   |                    )   SS:
 2 | COUNTY OF DUPAGE   )
   |
 3 |
   |
 4 |      I, MARIBETH REILLY, a notary public
   |
 5 | within and for the County of DuPage and
   |
 6 | State of Illinois, do hereby certify that
   |
 7 | heretofore, to-wit, on October 6, 2022,
   |
 8 | remotely personally appeared before me,
   |
 9 | THOMAS TIDERINGTON, in a cause now pending
   |
10 | and undetermined in the United States
   |
11 | District Court, Northern District of
   |
12 | Illinois, Eastern Division, wherein ARTURO
   |
13 | DELEON-REYES and GABRIEL SOLACHE are the
   |
14 | Plaintiffs, and CITY OF CHICAGO, ET AL. are
   |
15 | the Defendants.
   |
16 |      I further certify that the said THOMAS
   |
17 | TIDERINGTON was first administered an oath
   |
18 | to testify the truth, the whole truth and
   |
19 | nothing but the truth in the cause
   |
20 | aforesaid; that the testimony then given by
   |
21 | said witness was reported stenographically
   |
22 | by me in the remote presence of the said
   |
23 | witness, and afterwards reduced to
   |
24 | typewriting by Computer-Aided Transcription,
```

1   and the foregoing is a true and correct

2   transcript of the testimony so given by said

3   witness as aforesaid.

4        I further certify that the signature

5   to the foregoing deposition was reserved by

6   counsel for the respective parties and that

7   there were present at the deposition the

8   attorneys hereinbefore mentioned.

9        I further certify that I am not

10  counsel for nor in any way related to the

11  parties to this suit, nor am I in any way

12  interested in the outcome thereof.

13       IN TESTIMONY WHEREOF:  I certify to

14  the above facts this 17th day of October,

15  2022.

16

17

18

19  _____

20  MARIBETH REILLY, CSR
    LICENSE NO.:  084-002306

21

22

23

24

1    Errata Sheet

2

3    NAME OF CASE: ARTURO DELEON-REYES vs REYNALDO GUEVARA

4    DATE OF DEPOSITION: 10/06/2022

5    NAME OF WITNESS: Thomas Tiderington

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                         _____

THOMAS TIDERINGTON, 10/06/2022

## Exhibits

**4** Tiderington 100522-4  392:16, 19,20 393:3

**6** Tiderington 100522-6  361:10 415:7,10 442:17 459:18 474:6 509:23 535:5 592:2 647:23 651:8 662:11 671:13

**9** Tiderington 100622-9  460:23 461:2,3 462:20 471:5

**10** Tiderington 100622-10  450:3,6,7 459:14

**12** Tiderington 100622-12  680:12,15,16

**13** Tiderington 100622-13  525:8,11,12 532:9,11 537:24 539:2

**14** Tiderington 100622-14  528:11,15

**15** Tiderington 100622-15  540:21 541:1 542:11

**16** Tiderington 100622-16  541:19,22,23 566:16,17

**17** Tiderington 100622-17  545:2,5,22 552:5,6

**18** Tiderington 100622-18  545:14,16

**19** Tiderington 100622-19  553:9,12,13 566:18,19

**20** Tiderington 100622-20  568:4,7,8 569:1

**21** Tiderington 100622-21  584:2,6

**23** Tiderington 100622-23  615:6,9,10

**24** Tiderington 100622-24  641:2,8 645:5

**25** Tiderington 100622-25  636:12,14 644:15,16 648:2

**26** Tiderington 100622-26  654:8,11,12

**27** Tiderington 100622-27  657:17,20,21

**29** Tiderington 100622-29  668:15,18

**30** Tiderington 100622-30  669:21,24 671:5

**31** Tiderington 100622-31  674:19,22

**33** Tiderington 100622-33  684:17,20,21

## 0

**00**  621:18

**000111**  680:8

**00CR**  625:17

**00MC1**  624:7 625:7,13

**0110**  529:19

**097**  694:9

## 1

**1**  393:17 416:15 474:17 571:12 577:19 637:9 680:8,19

**1,000**  636:17

**1/2**  627:9

**10**  450:3,7,9 459:14 546:6 549:13 589:13 671:16

**100**  525:13 540:7 549:17 556:5 557:23

**105**  596:12 597:8

**106**  674:23

**10:10**  358:2

**11**  563:8 627:9

**11-page**  563:7

**110109**  568:17

**110174**  571:19

**110176**  568:19 570:13 575:9 579:7 583:2

**110180**  568:20 576:24 578:2 579:7

**110189**  568:18

**114**  598:12 599:1 628:24 629:8,16

**116**  393:12

**117**  408:1 409:2,7

**1180**  576:22

**11:25**  422:17,19

**11:34**  422:19,21

**12**  680:12,16

**12:32**  473:24 474:2

**12:44**  474:2,4

**13**  463:5 525:8,12 532:9,11 537:24 539:2 551:15 694:2

**13th**  462:21 694:12

**14**  463:6 528:11,15 627:9

**146**  393:12 408:1 409:3,7

**15**  363:6 502:5 514:11 540:21 541:1 542:11

**154**  495:16

**16**  525:22 527:1 541:19,23 566:17

**166**  655:8

**17**  498:23 545:2,5,22 552:6 665:12

**18**  545:14,16

**19**  483:12 553:9,13 566:19,21 614:2

**194**  654:12

**1981**  422:24

**1983**  455:11 467:13 493:3

**1985**  449:6,24 454:13,18

**1986**  450:12

**1988**  482:14 483:12

**1989**  483:19

**1990**  483:19 696:12 697:5

**1990s**  685:6

**1993**  452:19

**1995**  400:1 405:22 406:20 439:24 440:22 492:15 494:12 499:4 505:12 506:13 507:16,20 513:24 595:17 596:6 613:9 614:2 633:11 696:13 697:5

**1995-1998**  486:2

**1996**  530:11 671:16

**1997**  665:13,21,22 666:6,14

**1998**  395:1 397:1,16 400:1 405:22 406:20 439:24 440:22 442:18 443:3 444:11,18 445:7,11,22 480:14 492:15 494:12 499:4 505:12 506:13 507:16,20 513:24 569:23 595:17 596:6 613:9 694:2

**19th**  633:3

**1:28**  509:5,17,19

**1:30** 473:1

---

**2**

**2** 358:2 415:12 419:5 475:9,10 552:17 571:12 574:14,15 577:18, 19

**20** 362:22 363:6,12 497:3 500:15 501:22 502:3,5 514:11 568:4,7,8 569:1 588:18,24 665:21

**2000** 619:18

**2014** 462:21 469:3,4,6,16

**2020** 493:15 494:7

**21** 584:2,6 588:10

**22** 378:21 379:12 687:19

**23** 378:21 615:6,10 622:19 665:22 666:6,14

**24** 622:23 641:2,8 645:5 677:23

**25** 622:23 636:12,14 644:15,16 648:2 677:23

**26** 450:12 622:23 654:8,12

**27** 622:23 657:17,21

**277** 503:2,13,18

**28** 622:24

**29** 623:1 668:15,18

**293** 641:13,14

**29833** 584:20 587:10

**2:15** 509:14

**2:25** 509:19,21

---

**3**

**3** 478:18 597:17 681:14

**30** 373:12 473:13 501:22 502:4 623:1 669:21,24 671:5

**300** 400:23 404:19 423:14

**300-and-some** 400:21

**31** 623:6 674:19,22

**31st** 530:10

**32** 623:13

**33** 415:12 623:13 637:4 684:17,21

**334** 495:16

**34** 623:13 637:3

**340** 400:22 405:3

**341** 513:23 514:2 529:4

**344** 401:1,4,10,21 402:18 404:22 425:8,19,24 439:24 440:21 441:7 485:23 486:14,18 513:4 515:7 529:3 597:4,12 599:16

**34554** 541:1

**346** 486:13

**35** 442:15 623:13

**36** 421:12,20 462:22 466:10 467:20 623:14

**37** 421:12,20 623:14

**38** 394:12 447:16

**39** 459:17,19

**393** 641:10 644:16

**3:35** 567:19,24

**3:47** 567:24 568:2

**3rd** 694:22

---

**4**

**4** 392:16,20 393:3 450:19 451:18 481:23

**40** 362:22 363:1 373:12 460:5 688:22 689:3,17 691:2

**40-hour** 690:19

**403** 641:12

**40334** 643:6

**40609** 645:20

**414** 660:22

**42** 396:20 670:2

**44** 408:24 485:9 626:22

**44288** 654:13

**45** 474:7,18,19 476:18 509:11,13

**46** 477:7 495:16 496:1 627:6

**461** 649:10

**47** 627:11

**48** 481:16,22

**49** 485:12 502:22

**4:00** 574:23

**4:40** 606:16,18

**4:50** 573:19

**4:52** 606:18,20

**4th** 694:22

---

**5**

**5** 400:1 486:1 668:19

**50** 363:1,11 426:23 428:13 498:22 502:24 509:24

**51** 514:12 533:18 535:4 545:23 563:12 568:20 575:10 576:18 577:1 579:7

**51-page** 617:8

**52** 592:24

**53** 595:7 626:14 628:20 629:9 630:15

**54-page** 467:20

**55** 601:11

**56** 579:22,23 613:17 615:18 629:20 631:23 632:13 645:8 648:7

**560** 449:5 454:18

**567** 645:6

**57** 572:7,8 579:19,24 581:9 645:7 647:24 651:8

**58** 397:20 653:1 662:12 665:6

**59** 563:14 665:7 671:12 677:7

**59529** 669:1

**5:00** 577:4

**5:43** 651:1,3

**5:53** 651:3,5

**5th** 694:22

---

**6**

**6** 361:10 415:7,10 442:17 459:18 474:6 509:23 535:5 592:2 647:23 651:8 662:11 671:13

**6,000** 539:14 540:8 631:16

**60** 563:14

**60-something** 406:8

**61** 454:19 495:22 496:2

**62599** 589:15

**63** 599:10,17 602:9 678:3 686:18

**65** 571:9

**66** 571:8,12

**68** 570:16,24 671:4

**6:28** 591:16

**6:37** 686:10,12

**6:48** 686:12,14

---

**7**

**7** 457:11 693:2,6,10

**700** 668:11

**72** 596:13 597:9,13

**72857** 676:12

**755** 454:18

**755f.2d** 449:5

**76011** 525:16,22 526:24

**77368** 545:8 546:11

**77452** 545:8

**78** 362:14

**7:07** 702:14,17

**7th** 449:6 454:18

---

**8**

**8** 530:8 584:20 627:9

**80** 363:9

**800** 668:11

**80s** 494:8 696:11

**81** 571:4

**81-page** 579:14

**82** 495:22 496:3

**82-** 376:17

**83** 466:21 493:12 533:4

**83-1** 460:7 468:14 470:21 472:9,16
482:8

**833** 587:7

**834** 587:6

**84** 462:7 493:12

**85** 461:8 462:4,7

**86** 461:8 462:4,8 482:12 533:5

**8:30** 359:19

---

**9**

**9** 460:23 461:3 462:20 471:5

**9-year-old** 591:20

**900** 668:12

**90s** 466:22 494:8

**94** 398:13

**94055** 553:16 554:7 563:11,14

**94058** 561:2 563:14

**94059** 562:4

**94060** 562:15

**94089** 563:1,14

**94092** 563:14 564:6

**94094** 563:14 564:14

**94096** 553:17 563:11 564:19

**94097** 564:23

**94098** 565:3

**94099** 565:9

**94906** 563:15

**96** 393:18 546:7

**967** 588:24

**97** 400:1,20

**98** 405:22 694:9

**99** 553:17 563:12,15 694:9

**9:00** 359:19

**9th** 617:19

---

**A**

**a.m.** 358:2 422:17,19,21 574:23

**A315294** 647:24 651:10

**A403252** 676:19

**A59** 528:19

**A596534** 526:2 528:16,20

**A744094** 545:21

**abdomen** 581:18 582:7 583:18

**ability** 398:8 540:5 560:11,17
562:1 689:22,23 691:12

**absent** 603:15

**absolutely** 465:12 532:12 613:6

**abuse** 572:3 700:10,20

**abused** 679:12 699:20 700:1,4,12
701:5,14

**academy** 476:8

**acceptable** 410:17 687:13 688:20

**access** 374:14,18 658:19

**accident** 371:6

**accompanying** 419:4

**account** 600:2

**accurate** 430:8 463:21 469:16
513:20 515:16 516:13 578:24
666:19 667:4 688:24

**Accuros** 530:21

**accused** 572:2

**acquaintances** 656:15

**acronym** 588:4

**acting** 590:10

**action** 452:1 485:3,7

**activities** 365:5

**actual** 372:21

**added** 376:5 410:4 504:24 505:5

**adding** 486:21

**addition** 414:10 504:22 520:4
523:8 531:8

**additional** 376:4 445:23 531:15

**address** 537:16 546:5 550:4

**addresses** 512:12 534:8 543:12

**adequately** 422:5

**admin** 380:3

**admitted** 581:14 582:5 661:10

**admittedly** 500:19

**adopted** 452:18

**Adriana** 546:4,18 549:19 550:4
681:1,9

**afternoon** 660:6

**agencies** 445:20 484:2 501:6,7

THOMAS TIDERINGTON, 10/06/2022

**agency** 500:17,21 501:1,13 691:7

**agent** 368:7,8 370:7 373:19,21 444:7

**agents** 367:10 368:5

**aggravated** 665:15

**agree** 404:10 535:2 559:1,2 584:15 618:23 645:3 694:19 696:1 700:14, 22

**agreed** 419:2

**agreement** 534:20

**Aguilar** 566:13 640:21

**ahead** 371:1 372:4 373:3 387:11 391:8 394:6 395:5 396:15 397:9 402:12 409:11 412:5 413:13 414:20 419:13 420:24 424:7 425:22 426:11 427:20 430:4,19 431:11 432:16 437:14 440:6 441:12,21 446:10 454:4 456:7 466:8 467:4,13,23 468:4 470:21 471:9,11,17 472:5 477:23 481:12 489:1 491:14 493:7 494:1,18 498:14 506:17 508:17 510:16 511:17 513:17 514:22 518:23 519:10 520:13 524:11,15 526:14, 15 538:4 543:6 544:9 547:15 555:13 557:6 558:16 562:18 565:21 566:5 578:22 585:21 609:8 612:16 640:8 677:15 682:22 685:18 689:7

**aka** 634:3

**Akins** 614:7

**Alex** 632:23

**Ali** 590:7

**alien** 546:15

**alleged** 452:6

**allegedly** 613:24 665:19

**allowance** 702:3

**allowed** 457:21 475:6,13 477:18 560:22 579:10 581:4 698:8

**allowing** 690:16 691:13

**alter** 389:17

**alternative** 634:2 643:10 655:17, 23 673:22 678:16,22

**ambiguous** 465:1

**amend** 675:22

**amount** 363:13 474:9

**amplify** 452:22

**analysis** 415:2 417:10 439:21 504:7 519:13 528:2 571:23 598:18, 21 599:11 601:5 602:7,12,16 604:1,6 608:10 611:24 620:6 628:20 632:21 635:4 639:23 651:23 661:8,21 678:10 691:24 699:5

**analyze** 367:13 385:4,13 629:4

**analyzed** 385:14 387:7,8 533:4 629:20 662:16

**analyzing** 630:20 637:23

**Anand** 362:6,8 389:7 433:5 434:6 450:20 464:1,19 469:11 608:1,2,15 609:5 702:3

**Anand's** 388:24

**and/or** 368:15

**Angeles** 444:15,16

**answering** 497:22 500:11

**answers** 411:9 416:20 466:16

**anybody's** 492:9

**anyplace** 428:14

**apartment** 583:1,10 655:14

**apologize** 474:18

**apparent** 491:21 492:2

**apparently** 435:14 456:8 489:20 515:22 547:1 550:9 635:11 665:23 666:7 699:7

**Appeal** 447:19

**appealed** 454:12

**appearance** 620:12 625:6

**appears** 554:24 565:4 574:3,21 575:9 576:11 577:16 592:9 598:22 604:17 616:1 622:9,20 623:5,18,20 627:8,10 632:10 649:17 673:7

**application** 655:9

**appointment** 591:19

**approve** 551:6

**approximately** 362:15 363:9,10, 12 495:16 584:12 696:9

**April** 694:22

**AR-PD** 542:4 615:11

**AR-PD-041276** 541:24

**Aranda** 678:14,21,22

**Ardell** 653:2,8

**area** 400:1 453:19,21 461:10 486:1 501:9 570:3,4 595:8,11,18,22 596:4,5 675:6 685:23

**areas** 501:8 610:8

**argue** 442:6 625:11 632:6 681:24 684:15

**arguing** 652:6

**argumentative** 425:12 547:14 558:15 639:15

**arranged** 588:13

**array** 665:16

**arrays** 671:22

**arrest** 634:6 643:9 644:4,9,17 667:18,24 668:3 670:18

**arrested** 644:6 653:13

**arriving** 640:18

**art** 480:4

**ASA** 530:13,16

**ASAP** 590:14

**aspect** 501:2

**assailants** 633:16 671:18

**assertions** 640:13

**assess** 514:15

**assessing** 700:8,18

**assessment** 447:2

**assigned** 364:12 366:11,20 369:6 374:14 397:11,14 643:2 665:23 666:7,13,22 696:22

**assignment** 395:1,7 396:10,24

**assignments** 397:4

**assist** 369:10

**assistance** 366:22 367:2 530:23 531:16

**Assistant** 591:10 617:12

**assisting** 365:21,23 366:7 369:6,8 370:3,4

**assume** 399:10,17 409:1,6 515:13,17 600:6 610:7 611:19 671:9 683:17

**assumed** 537:5

**assuming** 387:4 389:10,11 557:2, 9 580:6 613:12 624:11

**assumption** 389:11 499:12,13 506:3,7 557:11 609:3 610:13 611:24 619:22 620:3,4 639:18,20, 21 683:16

**assumptions** 608:9,11,13,21 609:21 610:18 611:14,16 672:23

**attached** 385:1 386:1,4,19,21 387:3 388:5,22 400:13 604:2

**attachment** 392:23 428:20 445:15 461:9,20 486:12 599:9

**attachments** 433:21 446:16,21

**attack** 455:9

**attacked** 633:6

**attempt** 491:21 531:11

**attempted** 417:16

**Attempts** 531:14

**attention** 510:1 677:10

**attorney** 367:16 390:23 391:13 396:22 567:4 583:20 589:7,8,9,11 591:11 592:5,7 604:15 607:10 611:20 643:2 658:6,19,23 687:9 698:13,23 699:2,8

**attorney's** 391:3 392:5 394:23 396:6,23 397:15 530:24 585:5 587:22 603:11 614:4,15 658:8,11 659:13,17 660:10,16

**attorneys** 368:16 440:17 605:1

**attribute** 424:10

**attributed** 385:16

**audit** 494:6

**auditing** 482:24

**awake** 573:19

**aware** 391:1 392:4 456:23 457:7 458:22 459:9,13 460:14 482:22 484:21

---

**B**

---

**B447609** 553:14

**back** 358:1 359:7,13 367:21 373:12 376:3 377:19 382:17,20,24 383:10 393:16 397:16 401:7,8 403:11 411:3 422:20 429:19

442:16 444:11,18 445:10,12 446:12 449:3 454:9 455:20 456:14 459:18 461:19 468:6,13,17,18 474:3,6 476:18 479:17 482:21 483:3,11 491:8 494:7 495:1 498:4 502:1,2 505:11 506:13 509:20,23 532:10 535:3,4 537:24 539:9,17 540:5 543:11 545:6 546:22 547:2 548:10,13 549:1 552:5,24 554:1 557:14 559:5 560:5 561:21 562:1 563:3 568:1 569:22 570:24 575:23 576:4,5,12 577:9 578:2 579:24 581:15 582:6 583:4 592:1,17 594:10 606:19,22 608:7 611:6 612:11 614:22 618:14 631:19,22 632:8 644:15 645:5 647:4,12,22 648:2,11,12,14 649:24 650:1 651:4,7 658:14 660:19 661:23 662:10 675:11,14,16,19 676:13 685:12 686:13 692:4,16,20 693:21 695:3 698:9

**Background** 595:7

**bad** 435:20

**bag** 575:1

**balance** 359:3

**base** 456:18

**based** 362:13 376:17 391:6 400:10 432:12 443:5,20 455:24 484:11 499:13 512:18 513:11 528:6 570:8 573:23 574:8 575:12 600:8 611:24 630:15 655:21 666:9 685:8 697:19 701:19

**basis** 412:22 437:10 443:2 455:8 485:4 506:2 527:21 544:2 607:17 652:15 666:5 672:12 689:15

**Bates** 400:6 523:12,15 525:1,14, 16 535:23 536:10 541:2,24 542:5 546:10 553:14,15 561:2 562:24 568:14 570:22 571:16 575:8 578:2 584:20 615:10,19 641:16 643:5,6 644:19 645:21 676:6,11 680:6 694:7

**Bates-stamped** 526:24 541:1 562:4

**bathroom** 690:17

**battery** 665:15

**bear** 461:20 593:23

**beat** 581:20

**beaten** 633:1

**beating** 581:11 582:22,23 583:1, 10,22

**bedroom** 575:1

**began** 359:5 609:10 610:6 659:15

**begin** 553:16

**beginning** 453:4,6,9 563:11 571:6,8 635:3

**begins** 453:7 457:13 459:19 519:14 593:1

**begun** 519:3

**behalf** 621:13

**behavior** 365:4

**belatedly** 506:24

**belief** 513:12 528:6

**believed** 482:20 511:7 522:9 679:5 700:8

**belongs** 398:6

**belt** 581:15 582:6

**benefit** 458:13 598:17

**big** 451:1

**bigger** 549:23 550:11 586:12

**bill** 363:11

**billed** 362:14 363:10

**Billups** 632:22

**bit** 363:24 391:19 439:22 451:22 541:4,10 543:1 550:11 564:8 586:22 643:13,19 644:5

**blank** 620:17 622:24 623:2,23 670:8

**blunt** 581:17

**bolded** 510:1

**bolster** 612:19

**book** 442:20 444:21

**books** 408:19 410:3

**bothers** 470:4

**bottom** 459:19 460:7 502:22 510:2 525:15 541:23 542:10 550:13 586:18 589:14 617:24 622:3 643:5 644:20 645:8,21 649:6 662:12 665:6 677:7

**box** 365:20

**boxes** 550:19 554:17

THOMAS TIDERINGTON, 10/06/2022

**boy** 451:1

**boyfriend** 656:4

**Brasfield** 359:23 363:17 381:9,15, 19 382:8 383:13 384:8 385:23 386:16 387:5,7,18,19 388:1,4,10, 14 410:5 460:14 518:1 521:3 535:16

**Brasfield's** 363:21 384:21 461:5 462:11 495:21

**bread** 552:18 650:21

**break** 421:15 422:8,9,10,18 423:9 472:21,23,24 473:1,5,16 474:1 509:7,18 564:2 566:24 567:23 606:17 650:18,23 651:2 686:5,11

**bring** 367:11,15 650:21

**broken** 501:7

**Broward** 443:17

**Brualdi** 394:13

**Brualdi's** 394:16 395:16

**Bryant** 633:1

**Brzeczek** 398:13 399:2

**budgeting** 501:4

**bulletin** 644:8

**bunch** 526:20 671:7,23

**bureau** 374:5,10 379:1,4 380:7,8, 11,17 381:4 628:4

**buttress** 530:19

**buy** 501:4

**buzzing** 371:11

---

**C**

**C687989** 568:9 572:12

**cabinet** 374:7

**cabinets** 374:15

**calculation** 599:10

**calculations** 632:12

**call** 384:4 575:1 595:13

**called** 358:5 376:21,24 380:16,17 439:14 460:15 591:17 646:4 661:10,17

**Camp** 530:18 531:14

**Camp's** 530:22

**canvassed** 633:12

**capacity** 408:24

**captain** 380:21,23 381:24

**caption** 621:17 623:11

**capture** 437:5

**card** 546:15,16,18

**care** 567:2

**career** 381:13 408:13,23 409:24 500:1,5 517:14

**Carrie** 701:20,23

**cartels** 365:3,7,18

**case** 359:24 360:6,18,21 363:15, 19 367:14,15,19 368:5,6 369:3,8, 11,13 371:18,19 372:18 373:5,11, 16,17,19,21 374:18,20 375:1,9 376:1,16 377:4,6,7,8,12,23 378:5, 7,10,14,19 382:8,12,13 384:9,10, 17 386:19 387:21 391:2,24 392:3 393:11 397:24 398:5 400:13 406:18 411:22 414:9 417:6 421:23 422:23 423:12,13,16 425:3,10 426:1,3 429:11 435:9 437:2 439:14 444:7,8 447:5 448:1,3,15 455:13, 20 456:14 457:15 458:24 460:15, 19 461:18 462:5,21 463:11 465:4 466:15 469:6,7 470:3 479:16 480:6 488:12 490:20 505:5,9 512:9 515:1 531:21 539:14 540:7 542:4 543:10 551:11,19,24 552:8 556:19,20 561:6,22 562:2 566:1 572:1,2,15, 19 573:6 581:10 588:16,21 590:23, 24 599:4 605:22 615:16,18 621:18 622:12 623:24 624:11 625:7,13 626:20 629:14 632:2,24 635:12 638:8,11 639:23 640:13,24 641:9 642:10,23 648:12 651:12,19 653:4, 5 657:11 659:15 660:19 661:8 662:13,16 665:8,17,24 666:7,13 668:24 671:13 677:6 680:1 682:2 685:4 691:3,5,22 693:1 698:5,7,11 700:7,17 701:7,12

**cases** 359:8,13 360:12 364:6,9,18, 23 365:2,3,9,11,13 366:15,17,19 367:4 369:2 370:21,22 382:16,20 383:1,7,18,24 384:5,11 423:14,24 424:3,9,12 425:18 426:7,19 427:1, 4,9 429:5,16,18 438:8 489:12 490:20,23 502:3 503:1 504:8 505:8 513:12 523:2 530:7 535:17 536:24 537:19 567:3 596:15 602:6,21 604:15 629:4 631:4 663:3,11,13,23

664:3,4,11,13,17 685:20,21 696:6, 10,11 698:2

**catch** 403:9 687:19

**categories** 390:12 405:19

**category** 390:5

**caught** 403:6 404:1

**CCJ** 588:3,4

**CCSAO** 582:16 584:23 587:4,16, 17

**Cedric** 570:18 575:6 577:5 671:15 676:3,24 677:1

**cell** 690:7

**center** 619:14,20

**central** 444:7,21

**centralized** 442:19 443:4,22 445:7 685:23

**cetera** 618:2

**chair** 690:1

**challenges** 452:4

**change** 612:4,19 613:4 660:11

**changed** 378:23 379:12 632:18

**charge** 367:5,7 368:23 379:20 500:8 616:8

**charged** 367:20 369:9 532:4 635:11 640:12 642:3 673:6 675:5 695:4

**charges** 367:9,10,23,24 368:19,20 530:15,22 531:1 551:4,6,12,24

**chart** 385:20 404:8 405:13,20 406:4 417:10,13 428:20,23 429:19, 22 430:3 431:14,15,24 438:5 504:7 508:2,8 602:5,21 603:2 610:1,3,6 659:16 664:13,17,18

**chasing** 645:13,17 646:2,5,18 647:1

**checking** 405:11 613:14

**Chicago** 362:2 413:9 417:15 418:18 423:5 428:9 435:10 439:17 440:3 441:1 449:5,21 452:5 459:20 467:4,12 472:4 479:3,23 483:22 489:10,15,16,18 491:19 501:6 506:20 510:19 515:18 522:17 528:22 530:5 551:2 559:2 570:1 595:14,17 619:21 622:13 626:16 627:3,12,18,23 628:3,8,10 660:12 661:10,17 662:3 691:16,23 692:20

696:4,7,15,16,19,21 697:4

**Chicago's** 489:4 534:11

**chicken** 544:19

**chief** 379:19,21,22,24 380:4 381:3,
6,7,9,15,20 383:13 500:15,24
501:14

**chiefs** 380:2

**child** 572:3 581:11,14,17 582:6
583:11

**child's** 581:13

**choose** 663:8

**chose** 539:19,22

**Cir** 449:6,11 454:18

**Circuit** 447:19 448:7,11,14 449:13,
15,19,23 452:2 455:19 682:12

**Circuit's** 450:12

**circumstance** 487:24 488:5,11,22
500:4 691:5

**circumstances** 366:24 465:3
572:18 573:3 601:7 689:2,9 691:4

**citation** 447:24 449:4 454:17,19
581:23 584:21 585:8,9 587:9
633:17 645:19 654:14 669:2,6

**cite** 448:4,15,21 582:9,17 583:2,12
587:3 615:21 645:22 647:16 654:4
671:23

**cited** 561:9 585:14 587:14

**citing** 582:10

**City** 362:2 365:15 449:5 452:13,18,
21 454:12 455:5 457:24 479:23
515:18 595:17 598:16

**civil** 461:18 462:15,21 469:5,6,8,9,
10,15,19 470:13,16

**claim** 414:12 456:18 631:23 632:2
679:10,12

**claimed** 414:7

**clarification** 471:7 697:23 700:13

**clarified** 647:3

**clarify** 371:4 476:16 486:22 496:16
526:17 641:17 657:22 697:19
698:4

**class** 452:1 456:19 458:3

**classification** 529:8

**clear** 366:17 386:13 416:24 429:20
468:2 536:7 632:3 657:24

**clear/closed** 583:8

**cleared** 529:22 530:3,7 531:22
550:21,22 551:1,7 679:4

**cleared/closed** 532:3

**clearing** 526:18

**Clements** 590:12

**Clemon's** 660:19

**Clemons** 653:2,8,12,13 657:21
660:23 661:17

**clerk** 617:21 624:16

**client** 623:22 624:2

**closed** 529:23 530:3 531:23
550:21,22 551:1,8

**closely** 404:12 698:17

**closer** 493:16 514:6,8 558:7
604:10

**closet** 690:1

**clothing** 564:21 695:11

**clue** 450:19

**clueing** 450:21

**coach** 451:15 465:22

**coaching** 451:10,12

**cocaine** 699:4

**code** 529:9,12,15

**coders** 503:22

**codes** 530:6

**coerced** 583:19

**coffee** 488:16

**collateral** 455:9

**collect** 369:18 442:21 544:11

**collected** 452:8 691:21 692:11
695:9

**collecting** 695:8

**collective** 368:4,11

**Colombia** 365:18

**colors** 385:7

**column** 428:22 429:4 430:9,11,14,
15,23 431:2 432:4,10,19 433:16,
17,20 434:1,3 435:1,16,17 436:15,

21 437:4 438:10

**columns** 431:5,24 434:21

**combination** 663:10

**combined** 525:21

**comedian** 622:8

**command** 559:2

**commander** 380:24 381:2 502:10

**commanding** 380:22

**commented** 618:7

**committed** 422:6 679:6,15

**common** 689:12,16

**communicate** 498:10

**communicated** 514:15

**communications** 608:7 609:20
628:10 663:17 677:14

**companion** 391:3 523:23

**compare** 438:4 519:15,20 525:3
528:3 540:15 555:5,9 563:21 602:8
651:21 652:18

**compared** 391:7 520:17 598:19
601:21,24 602:23 603:5 662:17

**comparing** 486:18 521:22 522:7
525:3 599:18 639:11 651:13 652:2

**comparison** 596:11 597:15,16
599:16 601:12 605:13

**comparisons** 612:6 663:4

**compile** 671:21

**compiled** 672:14

**complete** 384:15 514:15 558:20
599:7 683:10,19,22

**completed** 375:16 505:7 628:22

**completely** 442:9 475:22

**completing** 505:14

**compliance** 452:17 481:19 482:4

**complicated** 540:7

**component** 580:21

**components** 580:13

**comported** 662:2

**comprehensively** 426:16

**computer** 543:22 586:1,12

**concealing** 452:7

**concede** 548:19 612:23

**concern** 505:20 605:16,24

**concerned** 429:12,14 517:6,9

**concise** 536:16 539:15 540:12 647:12 666:19

**conclude** 512:12 526:23 595:2 605:5 654:24 655:22 672:1 678:15

**concluded** 422:1,4,5 635:5 702:17

**concluding** 443:2 657:2 679:20 689:15

**conclusion** 412:23 414:16 416:9 417:4 428:15 429:8 437:11 438:17 445:6 485:5 507:19 530:11 576:14 630:9 652:20 672:12 699:19 701:12 702:14

**conclusions** 612:5 629:24 635:5, 15,18 640:19 660:11

**condition** 499:7

**conditions** 455:20

**conduct** 464:7 594:12,13 660:18 672:14

**conducted** 424:18 428:4 444:10 482:16 485:24 494:5 516:21 577:23

**conducting** 439:21 571:23

**conference** 384:4 588:21

**conferring** 530:12

**confessed** 661:11,12,18,19

**confident** 497:15 540:1,4

**Confidential** 624:1

**confirm** 395:19 451:14 539:8,17 540:6 629:10 638:23 639:3 643:13 668:8 677:4

**confirms** 428:21

**confused** 451:1 509:3 648:10

**confusing** 494:3

**confusion** 450:23

**congratulations** 383:21

**connection** 362:15 363:15 378:3 387:20 388:14 408:8 416:13 481:5 482:17 516:1,16 518:3,16 590:22 612:6 615:15 641:9 661:7 666:22

682:3 691:24

**considered** 361:9 439:4,15 440:2, 8,15,24 531:22 614:10 656:17

**consistent** 423:23 437:19 444:9 495:21 496:2,4 602:7 646:10

**constitute** 491:4,16

**constitution** 456:20

**constitutional** 455:12 457:2 491:6,17

**constitutionality** 452:5

**consultant** 463:7

**consultation** 368:14

**contact** 592:7

**contained** 372:16 376:4 378:9 385:16 404:8 405:16,17 406:17 417:13 418:11 429:2 435:8,15 436:22 438:16 456:24 495:17 498:24 499:8 503:3 504:10 515:3, 14 522:2 523:20 527:1,16 541:17 542:15 564:22 565:6 568:18 596:22 598:2 601:16 610:3,8 628:21 631:12 654:23 655:5 660:9 686:1

**contemporaneous** 423:18 516:19

**contemporaneously** 504:23

**contention** 534:3

**contents** 373:23 410:11

**context** 370:18 464:13 465:6 466:6 467:22 468:14,20 622:12 656:21

**continuation** 574:19 583:5 621:22 624:4

**continue** 452:21 638:6

**continued** 358:8 474:14 475:1 550:20 574:16

**continues** 493:9

**continuously** 690:15

**contrary** 420:16

**contributed** 439:19 698:15

**control** 379:22,24

**conversation** 360:5 382:22 383:5, 15 384:2 469:23

**conversations** 382:7,19 389:8

**convey** 593:12,14 594:12

**convict** 420:15

**convicted** 455:1 456:19 458:2 613:23

**conviction** 458:7 459:7,8

**convictions** 455:10 458:6

**Cook** 390:22 391:2 392:4 396:6 397:15 405:23 481:1 530:24 585:4 587:22 588:5,6,7 589:7 660:10 662:18 682:13 685:3

**cooperation** 531:12

**cooperative** 443:19 696:6

**copies** 375:4,9,10,18 377:10,13 378:8

**copy** 375:24 377:21,22,23 392:24 393:2 542:8,11 618:1 621:3,5 623:7,16 627:2 693:14

**Cornell** 632:22

**corners** 412:13

**correct** 360:9 361:12 362:17,18 363:4,7,8,15,16,20 365:7 366:2 370:16 374:19 381:1,8,12 384:12, 13 388:17 389:22,23 393:13,14 399:12,18 400:7,14 402:19,24 404:23 405:7 407:1,10 408:7 410:7,12,13 416:3,21 417:8 419:8 423:1 427:8,13 429:9 431:21 435:24 436:1,4,13 437:8 439:24 440:1 443:11,13 444:4 446:7 447:10,11 448:18 450:18 453:3 454:21 459:21,22 460:2,11,12,16, 20,21 461:6 462:5,12 463:10 472:17 474:14 475:2,3 476:1,21,22 477:5 482:6,10 483:9,15 484:10 485:20,21 486:3 498:12,15 504:20 510:8 513:6,19 515:15 516:4,21,22 517:2 518:3,6,17,20 519:6,11 520:6,10,22 523:24 524:1,8,16 528:9 529:6 535:9 552:9 563:17 565:18 573:16 576:15 579:20,21 580:4,5,6 583:7 588:7 597:6,11,21 598:5,13 599:12,13 601:17,18 602:10,11,13,14,17 603:23 611:24 612:1 616:16,20,21,23 618:4 620:16,22 622:18 623:12 624:21 626:23 627:5,7 628:6,17,18 629:1, 11,17 630:4,7 631:15 632:10,15 635:13 636:19 637:11 644:22 645:23 649:4,9,22,23 652:19 654:6 657:7 658:18 662:18,19 663:6,7 667:3 668:6 669:1,3 670:20 671:11 675:22 676:4,21,22 678:18,19

THOMAS TIDERINGTON, 10/06/2022

681:20 683:13 688:18 692:13,18 695:1,6,16 697:22 700:1,2,10,11, 21 701:2

**correctly** 415:21 483:2 556:6 558:24 562:12 675:15 697:21

**correspond** 558:3

**corresponded** 517:22

**correspondence** 663:16 677:13

**corresponds** 526:1

**cot** 690:18,22

**counsel** 447:8 458:16 459:3 465:18,24 466:2,14 486:22 497:23 578:20 599:6 607:21,22 608:22 609:22 663:12,14 664:10 677:9 682:6

**counted** 596:24 628:23 629:7 630:7 631:14

**counting** 630:20

**County** 390:22 391:3 392:4 396:6 397:15 405:23 481:1 530:24 585:4 587:22 588:5,6,7 589:8 660:10 662:18 682:13 685:3

**couple** 363:6,12 374:9 434:12 468:13,18 535:10 572:14 574:4 576:23 615:17 636:2 637:20 659:10 660:4 675:11,16 678:7 696:10

**court** 369:4 452:11,19 454:14 456:15 457:20,23 480:24 567:20 617:21 620:17,20 623:10 624:16 625:12 682:11,12 684:2,9 685:4

**cover** 394:1

**covert** 369:19

**CPD** 477:16 478:2 481:7 633:3 644:7

**CPD's** 415:13 487:12

**CR** 620:20 621:18 626:20

**crazy** 552:17

**create** 373:21 470:2 512:7 610:1

**created** 499:9 503:22 511:19 540:17 664:17

**creating** 418:19,20

**creation** 378:13,18 389:20,21

**credibility** 674:1 675:8

**credit** 589:1 602:3 604:9

**credits** 700:3 701:1

**crime** 364:8 365:14,17 366:13 422:6 620:5 637:14 653:14 661:11, 12,19 679:6,16 695:19

**crime-related** 365:15

**crimes** 379:5,8

**criminal** 365:4 371:14 415:19 428:5,7 439:14 440:16 441:9 442:9 444:9 452:8 469:6 476:5 480:24 481:8 491:5 523:10,19 524:7 544:6 552:1,2 580:3 587:23 592:8 593:2, 4 596:12,16 597:8 598:18,21,23 599:6 601:15 603:5,18 605:7,8 614:11,18,19 622:12 631:7 636:18 637:23 640:20 642:22 644:12 649:12 652:24 657:8 658:10

**critical** 370:21 516:18,23 558:9 583:20

**criticism** 475:5 476:9 478:24 479:7,8 592:2 670:17 672:17

**criticisms** 415:24 474:24

**Crosoli** 546:1 548:14

**cross** 466:12

**cross-examination** 466:13

**cross-talk** 464:3

**crossed** 625:9 626:2,9,11

**cryptic** 533:13 534:5

**current** 360:8 518:16

**curve** 522:20

**custody** 692:23 694:14

**cut** 448:9,19

---

**D**

---

**D's** 588:13

**daily** 644:7

**damages** 455:11 458:7 459:7

**Damaine** 632:22

**Daniela** 546:1,15 548:14

**dark** 564:21 592:18 671:18

**data** 385:15 390:1 392:14 417:3 438:16

**date** 444:24 505:9 573:14 617:16, 19 694:3,6,12,18,21

**dated** 445:10

**dates** 435:24 445:13 446:13

**dating** 654:2,20 655:2

**Daubert** 698:21

**daughter** 591:20

**David** 395:12,18

**day** 358:2 473:11 574:5 622:7 632:9

**days** 581:16 653:14 660:5 665:13 678:8 692:21

**days'** 589:1

**DEA** 364:2,4,9,12,19 365:21,23 366:8,12,15,19,23 368:8 369:24 370:7,8,13,14 376:24 443:15,21 444:2,6 696:4,7,11,22

**DEA-6S** 377:1

**dead** 577:6

**deal** 385:12 610:2

**dealing** 675:5

**Deas** 399:9

**death** 551:17 581:11 633:2 653:6 656:14 671:16

**debating** 607:7

**deceased** 550:13,15 551:11

**December** 530:10

**decide** 403:2

**decided** 588:20 665:16

**decidedly** 531:13

**decides** 690:11

**decision** 367:22 368:5,10,11 425:14 448:20 452:14

**decision-making** 368:19 389:14

**deep** 423:12

**deeper** 663:3

**defendant** 466:14 544:6 587:23 588:3,18,20,23 590:6 603:18 621:14 642:21 645:1 653:1

**defendant's** 491:5 591:17 592:8 626:2

**defendants** 415:20 441:9 455:1,7 481:9 523:10,19 580:3 593:5 596:16 631:5,6 634:11 635:9 642:10,12

**defendants'** 455:6 640:24

**Defender** 390:16,19 405:23 523:21,23 524:13 526:6 527:1 535:8 542:16 565:18 566:8 581:24 597:19 601:22 613:12,15 617:12 648:18 662:18 663:5 670:1,19

**Defender's** 441:14,18 442:11 535:22 537:6 542:6 566:2 599:2,19 600:17 602:24 607:11 610:9,14 614:17 623:21 644:21 653:21 657:6 668:4 670:23 671:5 685:3 686:21

**Defenders** 390:16

**defense** 435:13 440:17 442:9 466:14 524:8 552:1,3 583:20 592:5,7 593:2 596:12,17 597:8 598:18,21,23 599:7 601:13,15 603:6,11 604:15 605:1,7,8 614:4, 15,19,20 631:7 632:1 633:24 634:5,10,23 635:7,15,17 636:18 637:23 638:11 640:20 642:21,22 643:8 644:12 648:6 649:7,19,21 650:10 653:20 657:5,9,10 658:10 672:6 673:18

**defer** 604:11

**deficiency** 481:6

**deficient** 435:12 477:7 484:13,15

**define** 440:10

**definition** 440:18 504:14 511:3

**degree** 408:14 529:9 613:24

**deliberately** 465:4 470:1,10 593:15

**deliberating** 469:18

**Demetrius** 677:6

**demonstrate** 408:21 409:22 558:23

**denied** 582:15 584:23 585:4 587:4,17

**denotes** 529:19 620:18

**dep** 363:17 398:11 579:15

**department** 366:21 369:7,24 370:11 376:9 377:3 378:12 379:2 381:11 412:23 413:9 417:16,20 418:1,19 428:9 435:11 439:12,18 440:3 441:1 443:14 445:18 459:20 466:23 467:12 476:4 479:4,10 483:22 489:8,16,19 501:10,12,16, 17,18 502:9 528:23 530:6 532:21, 24 551:2 595:3,15 613:13 626:16 627:4,12,18,24 628:4,9,11 660:12, 15 661:11,18 679:1 691:23 692:21 696:15

**department's** 423:5 452:6,10 491:20 500:9 506:21 691:16

**departments** 428:11 443:9,16 489:18 492:10 691:6

**depend** 701:12

**depended** 373:4

**depending** 394:8

**depends** 369:12

**depicted** 680:20

**depo** 394:17 395:8,16,21 396:21

**deposition** 358:3 359:3,21 361:11 363:7 384:16 392:16 394:12,16,18 395:11 396:19 397:18,21 398:1,4, 5,21,23 399:11,17 415:7 450:3 460:23 525:8 528:11 540:21 541:19 545:2,16 553:9 566:14 567:22 568:4 584:2 615:6 636:14 640:1,22 641:2 654:8 657:17 668:15 669:21 674:19 680:12 684:17 697:18 702:15,16

**depositions** 515:18 698:3

**depository** 444:7,22

**deputy** 379:21,24 380:2,3 381:3,6

**describe** 409:15 416:1 548:9

**describes** 564:20 637:6

**describing** 451:24

**description** 537:16 595:22

**descriptives** 550:15

**design** 515:20

**designate** 570:2

**designated** 595:18

**designation** 596:5

**desk** 439:2 511:9

**desks** 440:14

**detail** 360:19 387:14 397:17 401:23 402:7 403:14 404:17 406:17 420:1 448:5 472:1 671:1

**detailed** 411:24 426:15 672:18

**detailing** 502:9

**details** 533:1 661:24

**detain** 688:21 689:2

**detained** 689:17

**detective** 371:10,13,18 374:5,10 376:2,9 377:19 379:1,4,14,16 380:7,11,17 381:4 482:17 483:14, 18,19,21 484:1,6 488:1,5,11 502:2 507:12 517:13,15 528:23 537:11 538:17 543:8,16 562:10 569:12,22 570:3 596:5 634:1 665:22 666:6, 13,21 674:11 675:3 688:1

**detectives** 374:13 414:14 426:21 439:2 475:6,13 476:12 477:8,16,18 482:21 484:4 486:1 487:10 493:20 508:8 531:20 532:22 534:3 554:21 557:13 581:18 595:22 614:9 653:11 665:14 671:20 674:3 679:2, 14 687:4,15 695:8

**detention** 690:19

**determination** 367:5

**determine** 395:20 424:2 457:24 475:7,14 477:9 503:7,14 584:11 585:13 601:19 699:3

**determined** 503:23 551:3 578:14

**determining** 404:16 477:19 600:11

**Detroit** 443:10 501:6

**developed** 517:3

**deviation** 410:17,22 687:13,18,21 688:1 700:5 701:2

**deviations** 701:6,11

**devices** 369:20

**diaries** 546:6

**died** 581:16,17 665:13

**difference** 469:20

**differently** 631:20

**difficult** 392:10 492:22

**difficulties** 693:12

**dignity** 689:24

**dinner** 553:2

**direct** 411:12 426:18 463:1,8 510:1

**directed** 487:7 496:10,20 498:9 677:9

**directing** 452:13 455:5 457:24 479:1

**directions** 537:22

**directive** 476:11,15,16 482:13 496:17 497:16 570:10

**directives** 378:11,18 460:10 467:11 476:10,17 482:18 484:9 487:16,17 496:14 497:4,9,11 498:12 533:4

**directly** 381:3,7

**disagree** 619:7

**disciplinary** 485:3,7

**disciplined** 484:22

**disclose** 415:17 416:5 418:3 419:7 420:20 624:2

**disclosed** 460:2 475:8 477:10 478:12,22 492:1 493:1 512:14 523:10,18 534:15,17,21,22 536:2 580:4 592:5 603:17 604:20 674:5

**disclosing** 418:23

**disclosure** 478:15 659:4

**disclosures** 391:8 415:15 478:17

**discounted** 504:7

**discover** 455:7

**discoverable** 603:14

**discovered** 532:18

**discovering** 527:3

**discovery** 392:2 458:9 499:24 621:9,12,22 622:5,11 623:4,8,17

**discretion** 475:5,14,23 477:9,16, 19 478:6

**discretionary** 476:3

**discuss** 403:14 417:10 452:1 567:8

**discussed** 438:20 460:13 468:16 487:6 496:18 507:9 511:5 523:9 579:19 601:8 652:21 665:6

**discusses** 474:8 669:8,11,13

**discussing** 468:14 615:17

**discussion** 384:5 412:21 459:19 460:6,19 560:21 572:15 575:13 581:8 588:12 606:5,8 613:18 651:9 652:8 678:4

**discussions** 368:22

**dismantle** 365:6

**dispute** 679:23

**disputed** 583:17

**disputing** 507:13 542:17

**distinction** 407:11 625:22

**distinguished** 547:11

**District** 452:11,19 456:15 457:23

**dive** 423:13 663:3

**division** 364:8 366:14 379:14,16, 23 380:1 407:7,13,21 479:13 482:17 483:14 500:9 510:8,12 514:3 518:17 519:5,21 520:9 522:22 528:23 595:14 596:6 627:18,23 628:10

**DNA** 692:12

**doctor's** 377:20

**document** 394:9 406:17 415:17 416:1,10 417:5 418:5 419:6,19,22 420:5,20,21 421:2,7 422:3,5 423:7 426:21 427:11 428:16,23 429:1,8 434:23 435:13 436:2 438:19 448:12,14 450:15 451:5 453:9,18 463:17 464:11,12,14 465:19 466:2, 5 467:20 475:23 504:24 508:5 541:8 562:20 575:20 585:2,11,13, 14 587:2,8 588:1 589:5 591:4,10 621:3,6 622:21 644:11 655:12 687:20

**documentation** 415:14 420:12,13 439:14 467:15

**documented** 420:10 421:21,23 424:4 427:16 436:8,10 475:8 476:6,13 477:10,11,20 478:10 493:1

**documenting** 423:17 471:13 508:6,9

**documents** 361:13 370:7,8 375:3, 6 377:5,9,11,12,14,15 398:18 408:14,16,19 409:19 415:18 416:5 417:24 418:23,24 432:2 435:3,8,22 461:9 462:2 479:16 480:1 500:6 502:15 504:3,17 505:3,21 506:8 507:3,10,20 508:13 510:23 511:4, 7,13,19,24 512:2,19,20 513:2,10 527:4 529:2 539:14 540:9 559:15 560:7 561:12 565:17 594:23 596:22 598:3 600:9,14 601:15 603:10,16 604:19 605:6 628:22 629:6 630:1,11,13,19,22 631:12, 17,24 643:7 653:19 675:18 686:19

687:2,11,17

**domestic** 655:16 656:12

**Donnie** 673:3 675:24 676:3,19,23

**door** 384:3

**doubt** 598:17

**dozen** 671:20

**drag** 473:11

**dragged** 382:20,24 383:10

**draw** 414:16 630:9 635:15,18

**drawers** 507:12

**drawing** 437:11 513:11

**drug** 365:3,12 698:24

**drugs** 369:1 699:4,6,11

**due** 531:19 655:15

**duly** 358:6

**dumped** 590:4

**duplicate** 622:20 623:3

**duties** 511:21

**E**

**earlier** 382:6 400:11 407:8 486:5 510:6 511:6 522:13 538:19 551:5 566:24 575:13 578:13 687:6

**early** 633:10

**easier** 524:20 525:3 586:13

**easily** 399:3 519:3

**easy** 604:8

**edit** 389:17

**Edwards** 632:22 648:12

**effect** 383:22

**Egan** 588:21

**Eileen** 362:1 509:10 526:11 546:9 563:7 606:10

**eleventh** 617:7

**eliminate** 487:9

**eliminated** 598:2

**email** 698:12

**emails** 698:10

**empty** 458:19

Index: enacting-fact

THOMAS TIDERINGTON, 10/06/2022

enacting 417:16

end 381:13 464:2 526:18 551:16 565:11 567:10 579:15 598:20 628:14 650:14

enforcement 476:7 511:20 689:20

engaged 633:3

engagement 630:6

engaging 469:22

ensure 417:24 459:24 481:18 482:4

entered 457:22 566:14 588:23

Entering 569:8

entire 395:20 441:8,17 558:1 560:6,18 581:5 590:20

entirety 394:15

entitled 455:2 621:9

entry 455:14 589:15 591:14

envelope 627:6,8,10

envision 488:10

Eric 530:18 531:14

errors 603:1

essentially 367:17 602:20

established 578:12 628:20

establishes 430:10

estimate 401:20 514:10 603:4

estimated 362:21

evaluate 409:4 657:9

evaluated 692:15

evaluating 656:18,20 657:2,8

evening 358:14 359:5

event 461:15 524:4

eventually 379:6 477:2 588:20

evidence 369:18 414:2 417:3 418:9 419:16 421:6 441:3,6 492:13 494:12,19 507:2,9,18 508:8 544:11 594:16 620:5 673:8 678:18,24 679:7 680:1,4 681:19,23 682:3,5,7, 22 684:5 691:21 692:11,16 695:8, 14,17,21 699:19

evolved 378:23 379:12

exact 363:2 388:9 400:22 401:14

exam 464:6,8

examination 358:8 361:18 463:2, 8 697:14

examine 698:24 699:2

examined 358:6 514:13

examining 659:15

examples 403:12 423:3 424:22 426:20 427:2,10 521:4 523:11 524:5 533:17 535:5,6,13 536:1,6, 12,17 539:3,20,22 540:15,17 553:22 559:12,19 560:2,15 561:10, 14 568:20 575:14 578:13 580:1,8 581:2 663:2

exception 361:12 490:21 623:1

exceptionally 529:22 530:2,7 531:22 532:3 550:22 551:1,7

exceptionally/cleared/closed/ death 551:20

exceptions 490:16

excluded 598:20

exculpatory 418:16 452:7 523:6 527:19,22,24 528:5,8 535:18 537:2 678:17,23 679:17

exercise 477:18 508:3,7 522:10 561:7,8 652:2

exercises 409:17

exhausted 531:9

exhibit 361:10 392:16,19 393:3 415:7,10 442:16,17 450:3,6,8 457:5 459:14,18 460:23 461:2 462:20 471:5 474:6 509:23 525:8, 11,22 528:11,15 530:8 532:9,11 535:5 537:24 539:2 540:21 541:1, 19,22 542:11 545:2,5,14,16,22 552:5 553:9,12 555:22 563:7,9,16 564:4 565:12 566:16,18 568:4,7,8, 24 569:1 584:2,6 592:2,22 615:6,9 636:12,14 641:2,8 644:15,16 645:5 647:23 648:2 651:8 654:8,11 657:17,20 662:10,11 668:15,18 669:21,24 671:5,13 674:19,22 677:5 680:12,15,16,19 681:14 684:17,20 693:2,5,10,11

exhibits 403:23 647:21 684:12

exist 493:14 512:20 526:5 687:11

existed 427:17 508:13 688:13

exited 567:21 640:21

expect 376:1 426:3 429:15 473:13 494:23 517:15 533:14 537:22 542:22 553:6 575:15

expectation 542:24 556:16

expected 371:9 543:23 562:21 575:19

expedition 458:18

expense 458:12

experience 443:5,7,21 499:22

experiences 364:1

expert 383:24 392:13 463:9 465:14 468:21 469:1 536:2 699:14

experts 469:2

explain 382:23 408:12 413:7,19 426:2 427:15 433:9,13,14 463:14 465:3 492:19 532:7 536:17 560:24 647:14 678:20 685:4 686:23

explained 408:11 463:18,20,23 501:20 532:17 534:12 538:23 541:16 562:12,21 564:16 580:24 600:19 679:3

explaining 433:22,24 463:14 512:4 533:1 534:4 537:13 673:19

explanation 517:12 537:12,17 543:21 544:16,22 610:12 611:11, 15

explicit 496:13

exposed 409:24

express 383:14

extensive 614:5

extent 449:16 498:1 608:8 609:21 610:19

eyes 592:17

## F

F.2d 449:8 454:18

faces 671:19

facility 691:11

facing 681:13

fact 398:20 429:7 460:18 477:15 493:13 516:14,18 544:5 545:24 558:10 569:16 572:6 589:5 599:23 601:2,3 605:19 612:2 613:3 619:1 629:19 631:22 642:2 647:7 649:18 655:21 656:11 661:16 675:3,24

678:12,13,21,23 682:9,17 683:14
699:24

**facts** 465:2 470:3 531:20

**factual** 447:20 448:8

**factually** 469:16

**failed** 419:21 421:7 422:3

**failing** 426:21 427:11

**failure** 415:17 416:1,5,9 417:5
418:3,4 419:5,6,22 420:4,19,20,21
421:2 423:6 428:16,23,24 429:8
434:23 438:18

**fair** 399:16 434:3 447:2 468:24
601:9 632:2 651:24 652:20

**false** 420:13

**familiar** 404:18,21 428:11 522:13
529:3 533:12 674:9 691:7,8

**family** 588:13

**fashion** 685:11 691:17

**February** 659:4

**fed** 690:17

**federal** 367:8,10,16,23 368:20,24
691:7

**federally** 367:6,20 368:23 369:9

**Feds** 369:2

**feel** 416:18 502:6 531:8 640:3

**fell** 488:15

**fellow** 376:7

**felony** 397:5,14 685:20

**felt** 374:21 375:6 538:17

**field** 556:14 559:3

**Fields** 384:9 387:17,19,24 388:15
460:16,19 461:5,9,10,13,16,17
462:2,5,15 463:11 465:12 469:2
495:22

**Fields'** 462:21 463:19

**figure** 425:9 547:21,23,24 559:14
584:14 633:5 634:14,22 636:1,3
640:2 675:12 693:13

**figured** 486:17

**file** 372:19 373:16,17,21,23,24
374:2,7,8,15 375:1,9 376:1 377:6,
8,24 378:5,7,10,14,19 402:18
404:17 405:4,15,16,18 407:5,7,9,
12,13 411:22 418:8,13,14 420:17

422:3 428:7,8 429:6,13 430:12,13,
16 431:1,3,9 432:3,19 435:3,5,9,
15,23 436:3,4,10,12,22 437:7,18
438:23 439:5,7,15 440:13,15
442:10,11,20 444:8,17 461:10
474:10,21 486:9,10 487:12 491:4
499:17 504:4,9,17 505:5,9,13,23
506:9,13,23 507:4,11 508:14
511:10,11 512:10,16,17 515:4,15
516:4,12 518:9,16,17,19,20
520:18,19 522:1,3,7,8,14,15,16,24
523:20,21 524:7,8,13 526:6 527:2,
24 528:16 532:6,15 533:22 535:9,
22 537:6 542:16 545:13,20,24
546:24 547:7 548:23 552:1,3
556:19,20,21 557:24 558:1,21
559:10,20 560:6,12,18 561:6,22
562:2 563:18,21 565:18 566:2,8
568:9,11,15,19,24 569:5,13,17,24
571:2 573:24 579:14 580:10 581:5,
8,24 582:11,12,14,17,21 583:13,15
584:5,18 590:20,21 592:7 595:8
596:11,18,19,20,21 597:20,22
598:23 599:7 601:21,22 602:22,24
604:5,18,19 605:7 607:19,24
608:4,17 609:17 612:7 614:4,15,
19,20 615:2,14,21 617:8 620:24
623:16 628:14,17,21 629:5,21,22
630:2,7,10,18 631:8,9,11 632:1,3,5
633:19,21 634:1,5,10,18,20,22,23
635:2,7,16,17 636:18,21,24 637:5
638:23 639:6,11,12 640:15,17,18,
20 641:8,15,18,24 642:1,6,8,11,16,
18,22 643:4,8 644:13 645:2 648:7,
18,19 649:8,19,21 651:13,14,15,
20,22 652:2,3,17,18 653:18,21
654:5,18 655:8,13,14 656:22
657:6,9,14 658:1,2,10 661:7 662:5,
17,18 663:5,6 666:9 667:1,2,5,18,
21 668:2,4,19 670:1,9,15,19,24
671:5 672:6 673:9,10,12,18 677:4
682:18,24 683:4,9,11,19,20,22
686:20,21 693:1,15,23

**filed** 531:2 551:20

**files** 360:18,21 374:18,21 387:7
388:16,20 389:24 390:4,12,16,17,
18,19,20,21,23 391:2,4,13 392:5
400:2,5,11,17,19 401:5,11,16,19,
21,23 402:2,5,19,22 403:2,15,23
404:11,12,19,22 405:3,23 406:2,4,
12,14,20 407:3,17,18,20,21 417:19
418:10,11,17,20,21 425:3,19
428:9,15 429:23,24 431:4,19
436:23,24 437:1,16,18,21 438:5,9,
24 439:1,4,8,9,10,11,17,18,23
440:2,13,19,22,23,24 441:7,8,14,
17 442:8 455:6,23 456:16,24

458:1,15,23 459:1,2,4,5 474:14
475:1 476:21 484:10 485:13,18,19,
23 486:11,14,18 492:14,15 494:13,
23 498:24 499:4,6,24 500:6 501:22
502:12 503:3,9,14 504:11 507:13,
22 510:4,7,8,11,12 511:6,14
512:21,22,23 513:4,8,13,22 514:4,
14 515:7,13 518:2 519:3,4,5,15,16,
22 520:1,2,3,10 522:18,21,22
523:1,24 524:19 525:2 529:4 556:4
560:23 580:2 584:7,8,12,16 593:2
595:8 596:13,14,17 597:5,8,10,18
598:1,11,19,20,22 599:1,8,10,15,
17,19,24 600:4,12 601:3,5,13,14,
15,17,24 602:9,10 603:5,6,11
604:17 605:2,8,14 607:16 612:4
613:2,9 614:23 615:2 618:6 631:7
635:21,23 636:2 637:23 640:24
642:6,17 650:3,5,10 658:8,11,20,
23 659:13,17 660:10,15 663:9
668:11 675:6 677:8 685:5,9

**files.'** 452:11

**fill** 554:18

**filled** 617:22 618:2,13,16,20,22
619:2 621:18 623:23 625:17

**Finally** 598:16 645:10

**find** 412:11 424:1 429:22 458:17
481:6 524:7 532:15 533:21 537:6
558:2 570:15 613:2 638:6 641:12
647:18 650:8 680:10 694:21 701:6

**finding** 448:8 520:20,23 701:13

**findings** 447:21 487:1 495:21
692:17,20

**fine** 358:13 361:24 420:8 422:14
572:24 678:1 681:7 693:17,18

**finish** 380:9 396:11 446:3 465:9
500:13 564:3 635:8 686:6

**finished** 359:4,18 589:21 594:7

**fishing** 458:18

**fit** 365:19

**five-minute** 564:2 650:16

**five-year** 364:15,17

**fixating** 596:2,4

**flagged** 552:7

**fled** 653:12 661:2

**flip** 527:11 636:20 693:19,23

**Florida** 653:12 661:1,2,18

**focused** 651:13

**focusing** 477:11

**follow** 478:7 488:9 517:1 656:23

**follow-up** 362:12

**food** 679:9

**footnote** 408:19 448:17 450:16 454:19 486:7 597:17 598:12 599:1 628:24 629:8,16 631:18

**footnotes** 629:2

**force** 696:22

**foreclose** 600:21

**forensic** 619:13,14,20

**form** 370:24 372:3,7 373:2 384:14 387:10 391:6 394:5 395:4 396:14 397:8 402:11 409:10 412:4 413:2, 12 414:19 419:12 420:23 424:6 425:12 426:10 427:19 430:18 431:9 432:15 433:3 437:13 440:5 441:11,20 446:9 454:3 456:6 457:4 459:11 467:18 471:16 472:11 477:22 481:11 487:20 488:24 490:8,12 491:13 493:5,24 494:17 497:20 506:5 508:23 510:15 511:16 513:16 514:21 518:22 519:8 520:12 524:10 526:8 533:24 543:5 547:14 548:6 554:18,19 555:12 557:5 558:14 562:17 565:20 578:17 593:19 605:18 608:19 612:9,15 620:12 623:20 624:4 638:17 639:8,15 646:20 656:2 659:3 682:21 684:4 685:17 689:6

**formal** 439:5,8,11,15 440:2,9,10, 15,24

**forms** 376:13 488:14 544:22

**Fort** 364:1 365:16 366:14,20 369:7, 23 370:6,10 372:5 373:18 376:8 377:2 378:12 379:2 381:11,16,20 443:12 500:8,22

**forward** 367:11 648:10

**forwarded** 417:24

**found** 404:2 418:16 420:17 456:17 459:5 461:23 494:6,11 503:2 521:4 535:13 556:22 559:20 566:2 603:1 659:22 660:7

**foundation** 370:24 391:6 409:10 413:2,12 420:23 426:10 430:18 432:15 433:3 437:13 441:11 446:9 454:3 457:4 459:11 467:18 471:16

477:22 488:24 490:12 491:13 493:6 497:20 508:23 513:16 519:8 520:12 524:10 526:8 533:24 543:5 547:14 555:12 558:14 562:17 578:17 593:19 638:17 639:15 646:20 659:3 682:21 684:4

**fourth** 435:1 481:17 482:1

**frame** 694:23 696:8,17 697:2,6

**frankly** 558:5

**free** 640:4

**French** 410:3,8,11

**fresh** 632:16

**Friday** 574:5

**friend** 653:9

**front** 392:24 416:20 497:1 524:22 558:21 585:19 648:23 675:20 693:15,24

**frontline** 368:12

**full** 530:9

**full-time** 366:12

**function** 569:22

**furtherance** 365:24 374:22

**future** 564:1

---

## G

**gaining** 531:12

**gang-involved** 665:9

**gave** 396:3 489:5 546:6 590:6 598:16

**gears** 593:21

**general** 484:9 487:3 488:2 521:14 554:14,22,23 573:11 574:14 603:21 638:11

**generally** 368:1 369:13 410:18 532:14 593:9

**George** 422:23 447:4,18

**get all** 479:15

**give** 359:9 399:21 403:12,21 421:8 464:13 555:14 570:15 572:21 581:6 588:10 593:16 676:5 689:21, 22,23

**give-and-take** 367:18

**giving** 560:8 561:12 583:19 659:9

**glad** 383:19

**global** 415:24

**globally** 417:20

**goal** 365:6,8 404:7,18,20

**god** 451:16 469:11

**Golden** 358:9 361:15 382:6 408:1 410:14 434:6,10 516:15 701:20,21 702:1

**good** 358:10,11 361:20,22 380:13 393:7 401:19 421:14 422:7 428:3 472:21 473:3 489:11 509:6 533:11 586:14 595:22

**GPR** 429:7 431:9 433:1 487:18 488:2,14 489:4,19 490:5,18 492:4 533:13 541:14,16 542:14 548:5,6, 19 549:6 556:8,18 557:1 558:3,6 559:6 562:7 571:22 574:1 575:19, 24 577:9 580:15 675:13,15,21

**GPRS** 405:15 419:18 424:14 429:3,5,24 430:13,16,24 431:4,19 432:6 436:20 487:8 489:8 491:3 495:18 506:12 515:14 520:4,21 521:19,23 526:5 544:21 547:5,6, 11,12,17 565:14 566:7 578:3 580:19,23 638:14 670:23

**grab** 393:1

**gracious** 702:3

**grant** 454:12

**great** 360:19 380:20 383:19 385:12 397:17 403:5 576:16 610:2 652:5

**greater** 401:23 404:17

**grocery** 488:8

**gross** 410:17,22

**group** 633:2

**GS-13** 368:9

**Guadalupe** 678:14 680:5,23 681:16 683:24

**Guadalupe's** 682:15

**guess** 366:4 369:12 373:4 377:16 384:15 389:7 392:6 402:14 403:11 408:10 409:14 411:13 425:13 440:9,10 468:11 471:20 473:4 480:19 482:19 488:6 493:11 506:6 509:1 512:3 514:23 515:8 534:1 535:3 536:20 556:15 575:18 578:7 595:1,24 605:3 606:1 607:3 615:23

THOMAS TIDERINGTON, 10/06/2022

628:14 634:16 638:18,19 645:8
646:21 647:2 649:20 663:18
672:16 683:15 689:9

**Guevara** 517:20 665:23 666:6,13,
21 700:9,19 701:5

**guidance** 476:3 489:4

**guilty** 588:19,24

**Guthrie** 632:22

**Guy** 673:4

**guys** 368:12

**H**

**H-A-A-S** 569:9

**Haas** 569:9,20 673:12,21 674:8,12
675:3

**Haas's** 569:12,22 673:17

**half** 421:17 519:14

**Hall** 614:1

**Hammond** 613:19,23

**Hammond's** 614:19

**hand** 580:16 652:11

**handcuffed** 690:5

**handing** 618:1

**handled** 444:12,16

**handler** 696:21

**handwriting** 437:7 521:16 557:14

**handwritten** 430:12,14 431:3
432:5,7,18,24 436:16 437:1,5,22
487:2,9 491:2 492:16 495:11,17
520:4 521:5,12,13,18 535:14
536:18 557:8,16,17 558:2 559:4,5
582:3,21,23 603:21 645:14 652:10,
16 653:24 654:18 670:22 673:9
687:5

**haphazard** 404:5

**haphazardly** 404:9

**happen** 543:15

**happened** 422:24 456:4,9 458:14
556:15 590:3 637:14 679:11
684:14 690:9

**happy** 359:10

**hard** 392:24 393:2 424:16 514:10
668:12

**head** 379:15 434:8 694:6

**header** 435:21

**heading** 415:13 419:4 447:18
476:19 593:2

**headquarters** 595:24

**hear** 383:20 411:8,9 662:22 666:16

**heard** 467:10 470:20,24 471:2
472:4,18

**hearing** 698:21

**Heather** 394:13

**heel** 582:8

**held** 454:24 679:8 690:15 691:9

**helpful** 415:3 531:17 579:9 635:2
637:24

**helping** 572:17

**Hickey** 480:3 484:11 494:4 515:19

**Hickey's** 482:20 483:9 494:4

**hide** 590:11

**highlighted** 451:23 452:3 453:18,
21 454:11,23 456:12 457:10,13
466:16 572:4

**highly** 484:24 544:24 688:20

**hired** 500:24

**histories** 614:11

**history** 626:23 628:16 649:12

**hitting** 581:14 582:5

**hold** 387:18 393:16 528:19 588:9
608:5

**holding** 418:21 691:1,17

**hole** 576:9

**holes** 576:8

**home** 574:23 650:21

**homicide** 379:7 394:21 395:2,24
396:12 397:1 411:16,17 413:9
415:15,19 416:10,13 417:2 423:8
424:12,17 426:20 427:12 428:6,17
429:16 434:24 436:9 437:2,20
442:20,23 443:24 444:2,5,13,18
445:8 467:16 471:14 476:6 481:5
485:24 486:8 499:10 513:23 516:2,
17 517:7 529:8,9 532:5 569:18
573:4 657:14 658:1 678:6 682:4
685:20 686:20 687:24

**homicides** 489:14 619:20

**honest** 590:15

**honestly** 469:12 621:1

**hooded** 564:21

**hoodies** 671:18

**hope** 383:16

**hour** 421:17 472:23 473:5,7,10
639:24 666:17

**hours** 358:18 362:14,22 363:1,6,
10,11,12 540:15 639:11,24 688:22
689:3,18 691:2 701:23

**house** 574:6 583:22 590:5 652:12
695:12

**housekeeping** 567:1

**huge** 386:8

**humanely** 691:13

**humanly** 405:1

**hundreds** 405:5 560:7

**hurt** 573:20

**hypothetical** 558:19 689:10

**hypothetically** 375:23

**hypotheticals** 377:18

**I**

**IACP** 445:9,16,19 446:12,18

**ID** 546:16,18,22

**idea** 480:21 593:17 626:4 639:4
695:13

**identification** 530:20 628:5 672:4,
14 673:7

**identified** 361:13 410:22 414:1
428:14 436:6,11 442:13 493:11,13,
18 538:13 547:20 561:13 563:22
613:1 644:6 660:8 662:21 663:2
664:16 665:19 666:1 673:4

**identifiers** 577:21

**identifies** 637:14

**identify** 425:2 426:6,13 438:5
441:24 442:7 478:16 486:10
498:22 597:18 603:20 608:11,12,
20 609:19,20,23 633:15 653:23
663:20 664:11 667:16 669:16,17
681:6

**identifying** 505:2 526:4 550:7 637:13 667:8,13 668:21 674:1 675:9

**idiot** 538:10

**ignore** 492:8

**illegal** 699:3

**Illinois** 619:11,19 624:21 625:2 692:15

**illustrates** 427:2

**illustrating** 580:8

**impact** 661:21

**impeach** 411:11

**impeachment** 678:17

**implement** 489:16

**implemented** 466:21 467:12 489:19 492:4

**implementing** 466:24

**importance** 413:8,20,22 537:14 544:17 555:16

**important** 468:15 534:6,10 538:17 543:9 559:15 560:4 567:8 593:3 603:12 607:8 678:17

**importantly** 556:13

**impounded** 680:1,4 681:19,23 682:3,5,7,10,12 684:2

**inadequate** 415:16 459:24 460:11 481:17 482:3 484:13,15

**inappropriate** 465:8

**incident** 656:12

**inclined** 487:12

**include** 478:4 523:11 672:6

**included** 373:7 491:3 534:11 538:7 557:18 572:22 579:6

**includes** 582:21 653:18

**including** 521:19 578:1 614:8 634:5

**incomplete** 436:12 498:18 502:19 503:2,4,8,15,24 504:2,14 547:2 596:24 598:4,24 628:23 629:7 631:14 632:3 669:6

**inculpating** 614:6

**inculpatory** 673:8

**incurred** 458:12

**index** 435:14

**indicating** 667:9,15

**indication** 499:16 548:23

**indisputable** 512:5

**individual** 594:21 675:4 689:16

**individuals** 413:24 414:6 543:14 665:20 679:6 690:1

**individuals'** 670:18

**industry** 502:6 699:14

**ineffective** 417:23

**inexcusable** 687:24

**inference** 513:8,11

**inferences** 414:17

**inferred** 512:20

**inferring** 655:24

**influence** 590:16

**informal** 452:10 459:2

**information** 359:10 365:24 372:16,22,24 376:5 377:5 384:7,21 385:14 389:14 393:11 404:7 409:7 415:18 416:2,6,10,12 417:1,13,15, 18 418:12,16 419:19 420:15 423:7 424:4 426:21 427:11,16,17 428:17 432:1 434:23 436:7,8 442:22 444:22 445:9 446:12 447:7,14 458:4 467:15 471:13 475:15 482:15 498:11 499:8,15,19 502:9 510:23 511:8 519:24 521:4 522:9 523:3 524:6 527:16 528:2 535:13, 17 536:18 537:1 539:3 540:12 541:16 542:19 543:1 544:4 555:3 556:10 559:19,21 564:10,16 565:5, 13,14 566:10 575:15 576:18 578:4, 14 580:2,9,23 593:15 594:24 595:4 600:7,22 605:11,12 606:3 607:6 612:3 614:5 618:13,15 634:4 637:13 640:14 654:23 655:5 656:7, 21 660:2 664:3 672:7 674:2 679:17 685:7 698:2

**informed** 589:16

**infringement** 698:5

**inhumane** 690:12

**initial** 544:14 667:8,14 668:22

**initially** 405:12

**injunction** 452:16,20 454:13 455:3,15 457:19

**input** 389:21

**inserted** 623:2

**inspect** 458:3

**inspected** 456:16

**instance** 470:12 634:6

**instances** 426:13 523:9 535:19 537:4 544:20 599:4

**institution** 493:3

**instruct** 476:12

**instructed** 659:18 677:17

**instructing** 677:12

**instructions** 478:19

**insufficient** 474:9,20 476:20 477:4,17

**intended** 408:21 487:8 515:20

**intending** 593:12,13 594:12

**intent** 409:22 515:22 593:13 594:21 602:4

**intention** 451:4,8

**intentional** 594:12

**interest** 403:6,10 404:1

**interested** 420:3 515:24 516:10

**intern** 567:21

**international** 364:20

**interpretation** 432:9 487:16

**interrogated** 414:8

**interrogating** 695:23

**interrogation** 688:22 689:3,17 690:2,4,6,16 691:1,10,18

**interrogations** 516:20 692:1

**interview** 370:19 423:19 488:7 517:23 544:14 574:1,20 576:1 577:15,22 583:5 587:21 588:2 624:2

**interviewed** 419:18 517:13 637:16 661:9,21

**interviews** 516:20 517:10 589:6 623:22 687:8

**intimate** 500:16

**intimately** 501:15

**intimidated** 581:21

**inventoried** 506:8

**inventories** 604:5

**inventory** 432:3 435:4,6,7,10,23
436:4,12 498:18,24 502:18,24
503:1,3,8,12,14,23 504:4,10,11,18,
22 505:6,14 546:24 548:23 568:11
569:6,14,17

**investigating** 377:4 488:12
665:14

**investigation** 364:21 366:1 367:7
374:1,23 378:4 395:2 396:1,7,12
397:2 399:7 411:17 413:10,16,20
414:22 415:19 416:14 420:1,7
421:24 423:8 424:13,18 427:12
428:7,18 434:24 436:9 437:20
442:23 444:5 475:15 476:5 478:10
480:7 481:6 488:17 514:16 516:2,
17 517:2,8 528:4 530:2,12,23
531:17 532:5 534:6 542:23 551:18
569:18 573:4 581:12 633:4,7
637:19 648:4 649:2 653:7 658:3
666:23 674:13 676:20 678:6 682:4
686:20

**investigations** 364:3,4,10,13,15,
16,17,23 367:3 369:19 370:6
371:14 379:7 404:21 415:15
416:11 419:24 420:4 428:5 443:17,
19,23 444:1,3,10,13,18 445:8
452:9 467:16 471:14 485:24 486:8
494:22 499:10 513:23 686:1

**investigative** 375:7,17 380:1,5,8,
12,16 390:18,20 400:2,5,11,17,19
401:5,10 418:14,20,21 419:20,22
421:3 429:6,23 430:16 431:1,18
432:3,18 435:3,5,23 436:4,12
439:7,8,23 440:19,21 441:7,17
442:8,21 460:1 478:21 484:10
485:13,18,19,23 486:10,14 491:4
492:14 494:13 498:10,23 499:4,6
503:2,13 505:13,22 506:13 507:4,
11,22 508:14 511:10 512:17 513:4
515:7 516:3,12 518:19 519:4,16,22
520:1,3,18 522:3,7,15,24 524:6
527:24 528:16 529:4 531:10
532:15 537:10 545:13,20,24
546:23 556:21 559:10 562:10
563:18 568:9,11,19,24 569:5,13,
17,23 582:11,13,21 583:13,14
593:3 595:8 596:14,18,20 597:5,9,
20 598:19 599:15 601:13,17,21
602:9,22 603:5,12 604:5,18,19
612:7 629:22 630:2,6 631:8,10
633:19,20 634:20,22 639:11 641:8,
15,18,24 642:1,8,11,16,18 643:4
651:13,22 652:2 653:18 654:4

655:8,13 658:1,2 660:15 662:17
663:5 673:10 674:3 675:5 686:19

**investigator** 429:17 656:17

**investigator's** 544:11

**investigators** 633:9,12 660:18
662:1,3

**invoice** 362:13

**involved** 364:19 368:10,18,21
371:20 382:15 389:13,19 411:16
501:15 605:21

**involvement** 673:20

**involves** 581:10 653:5 665:8

**involving** 365:3,16

**IR** 614:11 626:23 628:16 633:10
671:21

**irrelevant** 470:17

**irrespective** 470:6 565:16

**Isabella** 566:13

**isolated** 559:13

**ISP** 692:19 693:20

**issuance** 482:18

**issue** 418:8 419:16 449:3 458:24
650:20

**issued** 361:10 449:23 450:12
452:11 481:7 482:9,13,14 483:13
500:6 604:16 605:1 617:11 618:12

**issues** 418:7 436:14 581:3

**issuing** 604:14

**item** 394:12 396:20 397:20 398:13
399:24 400:20 405:22 461:8
478:18

**items** 361:1 393:13,17 408:1
409:2,6 410:21 462:4 502:13
503:10 504:9 505:8 544:12 603:14
695:11

**IUCR** 529:9,12

**J**

**Jackson** 613:19,22 615:12 617:13
621:14,15 626:6

**Jackson's** 614:18 615:18 626:23

**jail** 588:5,6,7 690:6

**James** 632:21 633:1 648:12

**Janice** 567:20

**January** 466:21

**jar** 616:4

**Jerry** 614:1

**job** 544:11

**jog** 555:16

**John** 399:15

**Johnson** 626:5,8 632:23 634:3
636:6,8,18 645:2,4 649:21 653:7
677:6

**Johnson's** 640:18 648:18

**joint** 366:14,17,19 367:3 370:5
443:16

**Jones** 420:7,8,10,11 421:4,7,21,22
422:1,4,6,23 426:22 447:5,18
459:21 467:13 476:11

**Jose** 647:24 651:9 652:9 678:14,
21

**judge** 447:20 448:8 455:19 588:21
698:17 699:7,9

**judicial** 449:21

**July** 633:11 665:12,21,22 666:6,14

**jump** 509:5

**jumping** 648:11

**June** 633:3 671:16

**jury** 588:15 690:11 700:3,23 701:1

**Jury's** 700:15

**K**

**K-9** 696:21

**Kathleen** 397:21

**Kazaglis** 530:13,16

**keeping** 444:12,17 472:6 482:22

**Kevin** 673:12 674:8,12 675:3

**Key** 660:24 661:3,9,12,19 662:1

**kicked** 582:16 584:23 585:5 587:5,
18

**kidding** 622:6

**kids** 590:4,9,13,14

THOMAS TIDERINGTON, 10/06/2022

**Kim** 570:18 572:10 575:5 577:3 579:18 581:8,12 583:5 590:24 652:21 653:1

**Kim's** 577:15

**Kimberly** 573:12 574:2,9

**kind** 360:20 367:2 368:11 376:11 377:17 383:3 384:5 385:21 405:18 477:24 571:1 572:21 575:20 593:13,21,22 603:16 632:8 675:11 688:16

**Kluppelberg** 384:10

**knew** 456:9 472:2 516:11 607:6 659:20 661:2

**knowing** 683:12

**knowledge** 409:14 500:16

———————————————

**L**

**L.A.** 444:19

**lab** 620:5 695:2

**lack** 537:14

**lady** 656:13

**Lamon** 530:15

**Lane** 632:23

**language** 451:23 453:8,22,23,24 454:7,11 456:13

**large** 552:14

**larger** 501:5,7,16 541:4 550:2 585:23 643:17 644:5

**late** 466:22 622:7 632:8 660:5 696:11

**Lauderdale** 364:1 365:16 366:14, 20 369:7,23 370:7,10 372:6 373:19 376:8 377:3 378:12 379:2 381:11, 16,20 443:12 500:22

**Lauderdale's** 500:8

**laundering** 364:20

**laundry** 575:1

**Laverty** 421:23

**law** 418:24 476:7 511:19 689:20

**lawsuit** 451:24 452:2

**lawyer** 590:1 618:24

**lawyer's** 619:6

**lawyers** 456:16

**lead** 406:15 655:17

**leader** 444:20

**leads** 528:4 531:10 654:24

**learn** 447:4,6,12

**learned** 415:18 416:6,10 423:7 427:11 428:17 434:24 436:9 442:22 467:16 501:14 656:21

**learning** 522:9,19

**lease** 655:9,14,24 656:5,20

**leased** 656:4

**leaving** 599:10

**led** 633:7 648:4 649:2 678:14

**left** 435:2 590:5 643:20 655:15 672:22 677:24 681:8,12 686:5 690:4

**legal** 372:7,10 424:15 432:7

**legible** 558:11

**lengthy** 512:11 679:8

**lesser** 423:14

**letter** 435:19

**likewise** 688:4

**lines** 385:8 412:19 495:15 548:22 574:4

**lineup** 420:14 530:19 667:17 669:8,13,17 670:11 673:2,5

**lineups** 672:8

**Linox** 613:18,22 615:12 621:15

**list** 361:2 391:10 410:21 424:22 426:19 427:5 428:12 435:23 523:11,16 541:2 545:9,23 547:5 575:10

**listed** 393:13 405:20,22 407:20 408:15 409:2 424:24 429:19 436:3 446:13,16,21 486:12 504:4,17 535:6 567:3 568:20 598:11 629:8, 15 631:17 656:5 677:7

**listening** 369:19

**listing** 408:4

**lists** 429:4

**litigation** 447:10,13 449:24 459:4

**living** 653:9

**locate** 501:21 535:8

**located** 462:3 524:6 535:7

**locating** 531:14

**location** 374:11 478:21

**lock** 689:21

**locked** 690:8

**lockup** 691:11

**lodged** 452:9 530:22 551:4,13

**lodging** 530:14

**logical** 533:14 542:21 551:14 557:12

**long** 383:13 478:1 668:12 691:18

**long-term** 364:13

**longer** 383:23 473:13 677:20

**longer-term** 364:22

**looked** 401:22 402:2 408:13 490:23 503:10,17 504:8 539:24 601:20 602:21 604:10 615:3 634:23 656:19 670:4 684:11 698:10

**Los** 444:15,16

**lost** 401:7 457:14 606:12 611:5

**lot** 370:20 401:16 478:5 524:22 538:16

**lots** 385:6,7

**Lou** 463:2,3

**Loughran** 397:21 398:3

**lucky** 636:9

**lunch** 473:1,6,7,17 509:12

**lying** 574:24

———————————————

**M**

**made** 367:22 368:5 377:22 470:16 483:19 506:7 507:10,21 516:15 530:20 531:11 535:16 608:13 609:3 675:12,21 683:16

**Mafia** 365:17

**Mahomes** 614:8

**main** 415:24 416:15 419:3

**maintain** 370:9,13 442:18 443:4 445:7 685:5

**maintained** 374:3 378:5,7 443:21 491:24 500:20 613:9 685:10

**maintaining** 418:10 505:13

**maintenance** 444:17

**majority** 429:15 605:7 612:24

**make** 366:9 367:4 375:4,8 408:3 469:18,21 470:1,11 473:6 475:21 478:20 482:1 502:18 506:12,23 507:3 508:13 532:8 541:3,4 543:22 549:23 550:11 561:18 585:10,23 586:12 591:8,18 608:10,21 609:22 610:12,18 611:15 619:22 631:23 632:2 643:16 644:3,4 657:23 666:18 689:24

**make-up** 379:13

**makes** 434:2 552:4 563:8

**making** 392:9 429:21 430:7 431:18 464:24 465:21 466:1 557:11 594:15 640:13 672:22

**males** 564:21

**man** 420:16 661:4 665:11,24

**mandate** 478:3 487:17

**mandated** 497:16

**manual** 445:4 483:14

**March** 462:20

**Maribeth** 468:7 606:21

**marijuana** 699:4

**mark** 641:7 680:15

**marked** 403:23 462:20 568:24 641:7 680:17

**Mary** 590:12

**master** 522:16

**matched** 597:9

**matches** 645:22

**material** 361:2 408:10,22 409:23 446:18 452:8,14 456:24 461:16 478:21

**materials** 361:2,5,8 363:14 391:10,17 392:20 393:10,19 408:8 409:2 410:11 441:4 445:14 460:1 461:5,14 481:4 536:3,4 593:3 603:12 612:23,24 640:19 656:19 658:9 659:9 660:8,13,14

**Mathis** 572:10 573:12 574:2,6,9, 16,20 577:12,20 579:18 581:8,13,

19 582:5,15 583:6,17 584:22 585:4 587:4,17 590:24 591:17 592:3 652:22 653:1

**Mathis's** 574:10 582:24 583:9 589:7

**Matisck** 590:7

**matter** 421:4 464:23 490:16 506:7

**matters** 567:1

**mattress** 689:23

**MC1** 626:19

**Mcgrath** 697:12

**ME's** 589:18

**meaning** 499:7 523:3 533:15 588:3 593:13 691:3

**means** 398:24 436:2,7 440:10 448:17 530:1 532:3 551:2 625:10, 11 682:10,15

**meant** 366:16 383:4 385:11 397:16 405:14 436:20,21 438:22 544:23 596:3 602:5 607:4 613:15 647:14

**meet** 359:16 588:14

**meeting** 401:7 592:4

**Megan** 697:10

**Mejia** 414:11 678:14 680:5 681:1, 9,10,16 695:4,24

**Mejia's** 683:24 695:10

**Melendez** 647:24 651:9 652:9,12 665:2

**member** 456:18 569:9 587:22

**members** 458:2

**memoranda** 521:20

**memorandum** 502:8 521:15

**memorialization** 589:6

**memorialize** 389:15

**memorialized** 475:16,17,19 578:5 580:9 687:16 688:15

**memorializes** 587:21

**memorializing** 574:1 577:22

**memory** 395:15,19,23 398:9,19 399:4 407:15 415:4 483:8 540:5,10 555:16 558:1 561:21 579:3,10 581:5 594:4,8 616:4 647:14 661:14 667:1 668:13 692:24 694:24

**memos** 405:17 424:15 477:1 496:9,11,21 497:17 498:10

**mention** 383:11 543:18

**mentioned** 360:11 382:9 410:23 445:19 484:20 489:7 598:24 698:4

**meritorious** 382:4

**message** 360:4 383:16 384:6

**met** 368:23

**methodology** 403:1,5 404:15 527:3

**methods** 369:17

**middle** 457:13 623:3

**midway** 427:6 487:1

**Miguel** 665:11

**Mike** 387:5,13 388:4,10 460:14

**Milton** 399:8

**mind** 393:21 395:17 419:10 430:2 572:20 580:22

**mine** 451:20

**minor** 370:22

**minute** 555:15 572:21 648:8

**minutes** 422:13 473:13 497:3 509:12 567:15,16 650:1 677:23 686:4

**mischaracterizes** 519:8 608:19 682:21 684:4

**mislead** 451:8,15 464:15 465:5

**misleading** 420:13 465:15 466:3

**misrepresenting** 469:14

**missed** 491:7 535:20

**missing** 426:4 427:22,23 429:2 432:2 435:3,22 441:14,18 442:9 498:17 601:15 603:10 605:6 614:5 632:1 634:4 640:20 643:7

**Misstates** 457:4 558:14

**mistake** 674:17 675:13,21

**mistaken** 442:5

**mistakenly** 451:4

**mistreated** 414:8,13

**misunderstanding** 526:13

**Mitchell** 632:23

**model** 445:19

**mom** 590:9

**mom's** 590:6

**moment** 579:14

**money** 364:20 459:7

**monitoring** 482:24

**monitoring/auditing** 481:18 482:3

**month** 423:20 512:8 695:3

**months** 388:3 698:12

**morning** 358:10,11 359:5,21 361:20,22 573:18 591:16

**Morris** 671:15 673:4,23 675:7,24 676:3,4,19,23,24

**Morris's** 673:6,11

**mother** 572:2 581:13 590:2

**mother's** 590:5

**motion** 452:15 621:9,11,22 622:5, 11 623:4,8,16

**mounting** 455:9

**mouth** 433:7,12

**move** 478:11 481:16 650:17

**moved** 374:9

**Moving** 398:12

**multiple** 418:7 463:23 480:6 569:13 596:15,16 631:5,6 642:2, 10,12 671:22 672:2,4

**mumbled** 662:24

**murder** 442:20 443:22 444:20 530:14 613:24 616:8 641:23 644:8 653:11

**murder/0110** 529:10

---

**N**

**N-WATA** 632:23

**naive** 683:18

**name's** 625:8

**named** 614:7 633:8 634:2 645:12 646:17 649:2 653:6 665:11

**names** 376:12,14 380:14 512:11 543:13 696:24

**narrative** 550:19 643:23,24

**national** 445:4

**nature** 674:4

**Navarro** 395:12,18

**Navarro's** 395:24

**necessarily** 367:11 409:13 434:15 543:19 647:10

**needed** 375:3 488:1 556:10 566:10

**negative** 531:18

**negligence** 593:16 594:14

**neighbor** 575:1

**neighborhood** 633:13

**night** 359:18,21 360:14 698:9

**nineteen** 696:12

**nonreportable** 464:3

**normal** 603:19 688:1 689:13

**North** 595:8,11,19 596:4,5

**notation** 543:24

**note** 385:5 387:23 437:15 487:17 488:1,19 490:10 518:1 526:9,20 543:2 544:4,6,19 546:1,19 549:2 550:3,7,18 552:6 575:24 582:23 615:1 645:15,24 646:23 647:9 649:1 653:4,23,24 654:16,18 656:19 673:10,20 674:23 676:6

**note-taking** 370:18

**noted** 390:1 414:10 429:23 462:2 576:17 579:18

**notes** 370:20 371:8,15,17,20,22 372:1,15,17,23,24 373:15 375:19 376:2,4 378:13,19 423:18,21 424:11,13,19 429:17 430:12,14,24 431:3,8 432:5,8,18,24 436:16 437:1,5,22 452:2 487:3,8,9 490:17 491:2,22 492:17 493:1,20 494:14, 20,21,23,24 495:11,17 512:6,9,10, 14,22,23 513:13,14 516:1,5,10,19 517:1,7,10,16,21,22 520:5,20 521:5,13,19,22 523:4,9,18,19 526:24 532:9,15,23 533:2,6,13,16, 19,20 534:4,17,21 535:11,14 536:18 537:5,10,11,12,15 538:1 541:14 543:9,10,17 544:13,17,21, 23 545:22 547:10,12,16 548:4,24 554:4,12,22 555:2 556:17,18,20,24 557:3,8,9,13,16,17 558:3,10 559:4,

5,8 562:9,11 580:19 582:22 592:3 603:21 657:2 686:6 687:5,8 688:3

**notice** 569:12 584:6,10 618:10 620:24 662:4 680:3

**noticed** 515:13 618:6

**noting** 655:14

**notion** 423:4

**November** 450:12

**number** 363:2 376:16 396:20 397:20 398:13 400:1,22 401:15,19 406:3 416:15 419:5 439:16 478:18 486:4 489:14 525:1,14,16 526:1 528:18 529:18 537:16 538:9 541:24 545:21 552:11,12,21 553:13 568:9,14 570:14,23 572:12 575:9 578:2 590:7,8 597:12 605:15 615:20 616:11 620:17,20 623:10 624:8,12 625:13 629:15 636:9 643:6 644:19 645:21 648:14 676:11,20 680:6 687:2 694:7

**numbers** 376:18 385:7 427:5 428:13 429:4 441:24 486:11 523:12,15 524:23 525:2,4 534:7 543:12 553:15 597:18 628:24 629:3,7

**numeral** 552:13,17

**Nyree** 653:7

---

**O**

**O'MALLEY** 396:19

**oath** 358:22

**Object** 493:5

**objection** 370:23 372:2 373:1 387:9 391:5 394:4 395:3 396:13 397:7 402:10 409:9 412:3 413:1,11 414:18 419:11 420:22 424:5 425:11 426:9 427:18 430:17 432:14 433:2 437:12 440:4 441:10, 19 446:8 454:2 456:5 457:3 459:10 465:22 467:17 468:4,10 471:15 472:10 477:21 481:10 487:19 488:23 490:7,11 491:12 493:23 494:16 497:19,20 498:13 506:4 507:5,23 508:22 510:14 511:15 513:15 514:20 518:21 519:7 520:11 524:9,14 526:7 533:23 538:2 543:4 544:7 547:13 555:11 557:4 558:13 562:16 565:19 578:16,21 593:18 605:17 608:18 612:8,14 638:16 639:7,14 646:19

THOMAS TIDERINGTON, 10/06/2022

656:1 659:2 677:11 682:20 684:3 685:16 689:5

**objections** 434:5

**observation** 535:17 594:15 666:8, 12

**observed** 420:4

**obtain** 365:24 459:7 479:4

**obtained** 391:2

**obtaining** 455:10 458:13

**obvious** 610:4

**OCB** 364:5,11,22 379:6

**occurred** 371:7 556:14 583:1,22 690:10,11

**occurring** 489:15 494:7

**October** 546:6

**offender** 550:13,15 551:3,11,18, 21 670:5

**offense** 529:8

**offer** 415:2 588:22

**offered** 588:17

**offering** 491:18 657:10

**offhand** 438:13

**office** 377:20 388:24 389:2 390:23 391:3 392:5 394:23 396:7,23 397:15 441:15,18 443:18 531:1 542:6 585:5 587:23 599:3 600:17 607:11 610:9,15 614:17 623:21 627:13 644:21 659:18 660:16 685:3

**officer** 369:16 371:5,9 380:22 421:23 423:19 424:20 437:23 438:2 475:22 478:9 483:18 484:21 485:9 488:18,22 490:3 492:7 500:2 511:20 517:15 541:13 543:16 562:10 594:21 647:2 657:13

**officers** 376:7 409:16 411:15 413:23 417:17 418:9,21 421:3,7 427:10 438:3 476:7 478:3,6 485:1, 9 487:7 489:6,10 490:17 491:19,21 492:16,23 494:13 496:10,20 497:17 498:9 511:7 512:5 553:1 556:4 559:2,3 593:14 594:13 661:9,13,20 689:20 696:16,19 697:1,5

**official** 373:24 510:24 511:21,24 516:6 518:9,20 521:6,8 535:15 536:19

**oftentimes** 368:17 535:21 538:19 690:3

**OIG** 493:10,15,18,19 494:5

**older** 382:16

**one-day** 364:14 365:10

**OO** 620:18

**open** 384:3 390:7 550:21

**operate** 492:11

**operated** 522:17

**operating** 373:20 483:13 639:18

**operative** 369:14

**opine** 560:19 605:4 699:24

**opinion** 411:14,18 415:12 419:5 426:8 428:21 433:21 434:22 443:20 450:12 451:18 453:2 459:23 460:3,4 474:9 488:4 491:18 536:22 544:3 559:16 565:13,23 566:9 593:17 612:19,20 632:18 689:1

**opinions** 409:3 410:16 449:2,23 460:15 536:5 590:22 613:5 615:15 701:10

**opportunity** 403:21 455:22 539:16 560:23

**order** 409:20 452:12,17 455:4 457:22 458:9 460:7 470:21 472:9, 16 477:2 479:15 482:8 497:22 544:12 585:13

**orderly** 685:10

**orders** 481:19 482:5 485:14 487:7 496:10,19 498:9 553:2

**organized** 364:7 365:17 366:13 685:23

**orientate** 571:1 593:22

**original** 377:9,10,13,14,24 378:4,6 638:3,7,9,10

**originals** 378:9

**Oscar** 662:13 665:24

**outlined** 405:20

**overturn** 459:6

**overturned** 458:6

---

**P**

---

**p.m.** 473:24 474:2,4 509:19,21

567:19,24 568:2 577:4 606:16,18, 20 651:1,3,5 686:10,12,14 702:14, 17

**pad** 372:10

**pads** 372:8 424:15 432:7

**paged** 577:3

**pages** 405:4,5 412:7 468:13,18 497:3,4,6 527:7,11 539:1,2 540:8 557:23 561:9,15,16 563:8,10 570:24 571:4 576:23 578:18,19 584:16,19 601:24 605:9,15,23 617:3 622:4 631:16 637:4 639:19 662:6 668:12 669:5 671:7 675:11, 16 693:23

**pagination** 451:21

**Palmer** 447:9,12,24 448:3,15 449:5,24 458:24 459:4,21 467:13 476:11

**pan** 552:14

**Pantoja's** 652:9

**paper** 372:13 437:6 560:19

**papers** 699:1

**paragraph** 447:18 452:3 475:9 495:7,10 496:8 502:20 504:22 518:1,8 530:9 533:18 535:24 553:23 559:18 572:15 575:14 577:1 578:11 588:11 596:10 598:12 604:1 615:16 629:8 647:15 649:6

**paragraphs** 531:7 615:17 637:20

**parallel** 418:10 439:18 474:14 475:1 522:18 642:6

**parallels** 642:17

**Pardon** 392:8

**part** 365:2 370:2 372:12 379:10,11, 13 403:21 418:18 449:21 477:11 478:15 479:6 491:8 522:19,20 544:13 545:23 547:20 580:22 619:1 637:20 642:5 660:18 665:3 672:16 678:12 681:18,22

**partial** 499:17

**participate** 444:5

**parties** 391:1,23 392:4 682:2 685:4

**parts** 395:21 556:3

**party** 458:12

THOMAS TIDERINGTON, 10/06/2022

**passed** 590:12

**passenger** 665:20

**pasted** 448:9,20

**patrol** 371:4 379:23

**pattern** 594:23

**patterned** 455:3

**Paul** 634:2

**PD** 417:21 472:5 522:17 532:6 533:22 559:20 580:10 582:17 584:5,8 590:21 591:9 592:6 596:19,21 602:9 605:14 607:24 608:3,16 609:17 612:4,7 613:2,8, 11 615:21 628:21 629:5 630:2,18 631:9,11 632:5 639:12 651:15,20, 22 652:17,18 654:18 655:13 656:22 661:7 662:5 667:20 668:2 671:8 682:18,24 683:4,9,10

**PDF** 462:22 466:11 549:2,13 570:14,16 588:11 589:13 622:19 637:4 641:10 645:6 649:10 654:12 660:22 670:2 674:23

**pending** 452:14 640:6

**people** 389:6,9 633:3,5 637:15 640:12 642:2 645:17 646:2 690:4

**people's** 553:2 680:19 681:14

**Peptenar** 549:19 550:14 551:19

**percent** 495:17,22 496:1,2,3 498:23 525:13 549:17 556:5

**percentage** 584:7,12,14

**perfect** 473:19 552:4

**performance** 511:20

**performed** 672:5

**period** 470:7 486:1 500:7 507:19 513:24 596:6 619:18 675:4 679:8 691:9,10,18 696:3

**permanent** 390:17,21 407:9,12, 17,19 418:13 486:8 510:3,7,11 511:11 513:22 514:3,14 515:3,12, 15 518:2 519:15,21 520:10,18 521:24 522:8 651:14 652:3 667:17 670:9,14

**permissible** 689:2

**person** 389:5,12 505:10 570:4 624:24 644:7 649:15 695:9

**person's** 379:18

**personal** 491:23 492:17,24 493:21 494:14 511:8

**personally** 601:23 602:8 603:6

**perspective** 489:9 561:19 619:7

**pertains** 622:13

**phone** 534:7 537:16 538:9 543:12 552:10,12,21 590:8

**photo** 413:8 420:14 665:16 671:22 672:4,14 680:5 681:7

**photocopied** 375:20

**photocopies** 548:21

**photograph** 633:10 680:20 681:9, 13,17 682:16 684:1

**photographs** 413:21,23 414:3,5 682:5,6,8 684:22,23 685:2,9 686:17

**photography** 627:23

**photos** 414:12 633:14 671:21,24 672:7,13 678:5,11,13 679:20 681:3

**phrase** 397:5 405:9 407:8 438:22 510:10 518:9,15 605:2

**phrases** 470:11

**physical** 691:21 695:13,17,21

**physically** 679:12

**pick** 426:1 664:20 665:3 670:12

**picked** 660:24 661:20 664:24 665:2

**picking** 663:11

**picture** 514:16

**pictures** 415:4

**piece** 437:6 560:19

**pipes** 699:1

**pizza** 552:14

**place** 370:14 374:6 469:3,5,7,16 476:10 487:12 509:6 516:3 619:21

**plaintiff** 458:3 463:8 468:21

**plaintiff's** 447:8 452:15 463:2,9 466:2 469:2 486:22 607:21 664:10 677:9

**plaintiffs** 455:21 457:1,14,18

**plaintiffs'** 456:15 458:16 459:3 465:14 607:22

**plan** 564:2

**planning** 677:21

**played** 399:6

**plea** 588:23

**plead** 588:19

**plural** 496:19

**Plymouth** 500:14,21

**point** 359:11 367:4 380:3,13,15 381:10,18 386:8 408:12 412:7 416:15,17 418:2,4 420:17 429:21 430:3,6 431:6,8,17 432:23 442:5 449:1 461:12 470:15,16 474:13,17 475:10 481:17,23 482:1 495:6 498:17 502:18 504:12 505:5 508:10,11,15 516:15 526:12 532:8 533:9,17 534:6 542:18 549:9 564:1 567:9 576:17 578:1 591:13,24 604:13 626:1 632:7,17 641:19 652:6 657:23 659:20 668:10 683:21,24 692:15

**pointed** 439:16 489:13

**pointing** 435:17 508:7

**points** 392:14 419:3,9,15

**Polaroid** 413:8,21 415:4 678:5,11, 13 679:20 680:4 681:17 682:16 684:1 686:16

**Polaroids** 412:16,17,24

**police** 360:23 366:20 369:7,23 370:10 373:7 376:6,9,20 377:3 378:1,2,12,13,18 379:2,20 381:7, 10,11,15,20 410:18,23 411:14,15, 19,24 412:23 413:9 414:13 417:15 418:19 423:5,20 424:9,19 427:10 428:9,10 435:10 439:11,17 440:3 441:1 442:17 443:3,8,14 445:4,6 452:6 459:20 463:7 467:12 478:4 479:3 483:18,22 484:2 485:8 488:17,22 489:16,18 490:3 491:20 492:10,16,21 494:13 499:24 500:1, 8,15,24 501:10,14,21 502:9 503:11 506:20 512:7 516:6 521:10,23 528:22 530:5 532:17,21,24 533:14, 20 534:12,14,21 535:12 536:19 537:13,17,20,23 538:6,8,24 539:10 541:17 543:24 544:5 551:2 553:1,6 555:6 559:22 562:13,21 564:11,17, 22 565:6,15,24 578:8 579:2,5 580:2,9,24 581:1 593:14 594:13 595:3,14 596:22 598:2 601:17 603:19 607:8,15,18,23 608:3,16 609:3,16 611:19 612:2 613:13

619:11,19 624:22 625:3 626:16
627:4,12,18,23 628:3,8,11,16,21
629:5 630:11,12,19,23 631:12
632:4 638:2,22 639:5 646:4 647:3,
8 655:6 656:10 660:12,14 661:9,
11,13,17,20 672:18 679:1,3 681:18
687:13,21 688:2 691:16,23 692:15,
20,22 694:14 696:15,16,19 697:1,5
700:5 701:6,11

**police/ambulance** 575:2

**policies** 415:13 417:16,17,23
423:5 445:19 466:24 474:20
476:19,24 477:3,17 478:2,3,7,8
484:23 485:6,10 491:20 501:3

**policing** 501:2

**policy** 378:21 417:19 418:1 435:11
467:6,15 471:11,22 472:3 479:1
482:23 485:2 487:22 489:4,9,17
490:4,14 492:8 493:3 496:5 505:16
506:19,21 515:23 532:16,19,22
533:6 534:11 558:7 570:2,9 691:16

**pond** 458:19

**portion** 421:9,24 457:10 510:2,12
536:22 580:7 591:1

**portions** 636:24

**position** 382:3 534:13 556:9 566:9
657:12 690:14

**possibilities** 558:22 560:9

**possibility** 506:1 600:22

**possibly** 422:1

**potential** 582:22 592:4 653:24
654:19 655:1,17,23 657:3 672:3

**potentially** 523:5 528:7 537:2

**practical** 490:16 506:7

**practice** 442:18 443:3 445:4,7
452:7 533:11

**practices** 410:18 415:14 423:6
603:19 687:14,21 688:2,3 700:5
701:7,11

**preceding** 576:4

**precinct** 501:9 595:13,18,21 596:3

**precincts** 501:8

**precise** 540:11 560:22 694:6

**precisely** 517:2 521:9 523:17
603:16

**precluded** 606:4,8

**prefer** 383:24 667:5

**preliminary** 452:16,20 454:13
455:2 457:19

**premise** 434:2 618:22

**preparation** 362:16 408:9

**prepare** 359:3 369:16,22 370:6,8
376:7,13 390:14 408:16 409:20

**prepared** 369:21 378:3 384:11
386:16 387:19 388:22 389:2 433:8
446:7 459:9 609:12 621:13 641:24
675:14

**preparing** 363:7 400:12 456:3
458:23

**preserve** 452:13 455:5

**pretty** 388:12 426:15 470:14,20
536:14 538:22 604:8

**prevailing** 698:15

**previous** 489:12 563:4 638:20

**previously** 358:6 654:1,19 655:1

**PRF** 461:10

**primarily** 372:8 443:7

**prior** 445:21 687:9

**prisoner** 690:13 691:12,17

**prisoners** 691:8

**pristine** 685:10

**private** 599:5

**privileged** 608:8

**probable** 644:8

**problem** 418:18 436:11 474:10,21
476:21 493:9,18,19 505:1 547:21
642:5 688:6,8,12,15,16

**problematic** 688:5,7,10

**problems** 436:5 439:19 478:16
479:11 489:12 492:4 493:11,13
494:6 688:9

**procedure** 483:14

**procedures** 452:18 478:19 484:23
672:5,15

**proceed** 358:19

**proceeded** 611:23

**proceedings** 566:15 567:22
640:22 702:16

**process** 382:5 403:18 440:16
483:20 492:22 500:17 506:11
570:10

**processed** 480:13,17

**produce** 687:4 688:4

**produced** 486:9 513:3 533:21
542:15 544:6 552:1 562:9 584:8
594:17 596:19 597:18 629:5 631:9
635:24 659:3 682:11,17 684:1,9
687:12,17 688:14

**product** 607:9 610:9,14 611:21
639:20 658:6 671:10

**products** 698:24 699:5,10,12

**professional** 542:22

**program** 489:19 492:5

**progress** 484:9 487:3 488:3
521:14 554:14,22,23 573:11
574:14 603:21

**progressing** 488:17

**promoted** 381:23

**promotion** 382:4

**proper** 419:18 660:17

**properly** 418:20

**property** 379:8 487:11 491:23
492:17 493:21 494:15

**propose** 425:9

**proposition** 584:22 587:3,16

**prosecutor** 367:17 657:15

**prosecutors** 368:15 440:17 441:9

**prostitution-related** 365:13

**proved** 531:18

**provide** 366:23 427:3 435:13
490:17 540:12 584:21 595:3 698:1

**provided** 384:17 388:7 389:17,24
390:4,22 391:10,12,18 400:5
401:11 406:2,23 416:12 446:18
447:7,15 449:22 460:14 461:4,16,
17 462:14 499:16 513:22 515:7
580:20 590:23 594:19 596:13
597:4 599:15 600:9 605:11 610:11
611:12 664:3 697:24

**Public** 390:15,16,19 405:23
441:14,18 442:11 523:21,22,23
524:13 526:6 527:1 535:8,21 537:6
542:5,15 565:17 566:2,8 581:24
597:19 599:2,18 600:17 601:22

602:24 607:10 610:9,14 613:12,15
614:17 617:12 623:21 644:21
648:18 653:20 657:5 662:18 663:5
668:4 670:1,19,23 671:4 685:3
686:21

**puddle** 488:15

**pull** 385:20 386:2 390:6 395:14
398:10,18 407:15,16 425:5 490:14
508:2 585:24 634:13,17 643:12
648:24 673:12 674:22 680:9 693:3

**pulled** 561:9 671:19 682:2

**punch** 576:9

**purpose** 408:4 451:14 672:19

**purposes** 559:16 596:11 597:15
598:17 599:16 608:6,10 651:23
677:21

**pursue** 367:23

**pursued** 581:19 634:1 653:11

**put** 376:2 377:5 392:22 442:16
476:10 497:10 505:22 509:23
559:13 585:19 592:22 691:11

**putting** 433:6,11 701:4

---

**Q**

**quantities** 369:1

**quarrel** 647:7,11

**quarreling** 690:19

**query** 479:14

**question** 380:9 387:15 391:19
392:3 396:11 402:15 411:2 412:12
416:20 418:8 421:19 425:17,20
427:22 428:4 433:16 434:2,11,19
439:22 446:4 453:22 462:1,13
464:2 466:15 467:3,22 468:1,5,7,
12 470:19,24 471:21 473:4 475:21
478:1 483:1,11 488:9 489:22,23
490:1,2 491:9 494:10 497:23 498:4
508:16 516:8,9 522:12 536:16
571:10,18 578:20 580:14,22
594:10 606:22 610:5,17,19,22
611:6 614:24 635:6,9,14,22 638:1,
20 640:6,11,16 642:13 647:2
656:24 658:14 659:14 662:23
663:18,19,21 664:7 667:3 676:16
689:10 692:4,8 694:12 698:6
699:24 702:4

**questioning** 516:16 646:22

**questions** 361:16 362:3 408:2
410:15 411:4,9 464:1 465:10
466:17 467:18 496:24 509:3,8
526:16 538:16 585:17 635:1 697:9,
11,16 699:18 701:17,19 702:2

**quick** 472:21 473:16 496:23

**quicker** 693:22

**quickly** 388:12 462:3 647:18

**quote** 513:9 518:5 532:23

**quotes** 543:13

---

**R**

**raids** 365:12

**Rainey** 673:4,5 674:1 675:9 676:1

**Rainey's** 671:13

**raising** 580:16

**Ralph** 614:8

**ran** 576:13

**randomly** 426:1

**range** 400:6 406:8 542:5

**rank** 380:23 381:14

**Razo** 670:5

**RDS** 531:8

**reached** 612:5

**read** 384:22 394:1,15,18 395:13,
20,21 396:18,21 411:2 415:21
419:4 448:3 449:2 453:1,17,22,23,
24 454:7 455:21 456:1 466:18
468:6,8,12 479:17,20 483:3,5
491:8,11 495:1,3 498:4 533:10
535:12 550:12 555:15 556:8 570:9
572:21 581:22 585:7,10,12,21
586:15 587:11 588:11 592:17
606:22 607:2 610:22 611:2,6,8
612:10,12 622:6 631:2 637:19
643:18,22 658:13,17 661:24
675:20 684:10 692:3

**reading** 454:22 480:10 515:17
594:3 698:16

**reads** 437:4 456:13

**ready** 422:10

**real** 465:2 496:22

**reality** 363:2

**realized** 675:2

**reask** 461:24

**reason** 395:16 404:15 410:4
413:24 477:7 488:2,14 489:11
492:3 515:9 516:23 538:7 563:22
589:17 600:19 613:4 625:8 672:13
679:15 682:19

**reasonable** 502:7 531:11 537:9
656:16 657:13 660:17 688:2
689:13

**reasons** 562:17

**recall** 375:22 376:22 378:17,20
382:16,21 383:21 386:3,10,17,21,
23 387:14 388:3,5 391:11 396:24
399:5,13,20 406:5 407:3 410:18,
20,24 411:3 412:18,20 462:16,17
463:4 481:13 493:10 505:17,18
517:20 526:4 561:24 569:20
571:22 572:1 607:20 610:4 618:18,
19 634:15,16 660:23 661:1,6,15
662:7 663:22 696:14,24 699:21

**recalled** 517:19

**recanvassing** 531:15

**receive** 593:10 658:23

**received** 363:18 405:21 485:23
486:18 597:7 625:2 691:23 698:12

**recently** 363:18 384:17

**reckless** 594:13

**recklessness** 593:16

**recognize** 680:19

**recollection** 362:21 396:5 436:23
442:3 479:22 555:23 572:18 573:2
637:22 638:3 649:1 665:4

**recommended** 445:2

**record** 358:2 360:19 407:7,18,21
419:17 422:17,21 444:12,16
464:21 465:18 468:8 469:14 472:5
473:24 474:4 479:19 482:22 483:5
491:10 495:3 509:17,21 510:12
526:10 561:4 567:19 568:2 606:14,
16,20 607:1 611:2,8 612:12 614:12
651:1,5 658:16 679:7 686:10,14
702:14

**records** 360:10 370:14,15 374:12
407:12 479:5,13 500:9,20 501:17
502:12 510:7 514:3 518:17 519:5,
21 520:9 522:21,22 570:4 627:17
685:24 697:20

**redacted** 584:9,13,17,19 586:7,9
600:8,10,13,15,16,20,23 601:3,4

Index: redaction–representing

THOMAS TIDERINGTON, 10/06/2022

605:9,15,20,24 607:5,15,19,23
608:3,16 609:4,17 610:8 611:19
612:4 613:3 616:15,19,20 617:4
637:1,4 638:2,14,15,22 639:4,19
662:6 671:7,9

**redaction** 600:4 611:20

**redactions** 599:23 610:13 651:15,
20 652:19

**reduced** 597:12

**refer** 403:11

**reference** 408:20 428:20 445:14
447:9 449:9,12 482:7 510:18
512:19 521:12,18,20 523:22
538:10 548:14 561:22 633:23
648:6 649:5,7,18 655:9 676:10

**referenced** 388:21 391:15,16
485:19 518:11,13 525:23 541:15
546:19 561:24 576:24 650:3
668:20

**references** 563:11

**referencing** 442:1 476:23,24
485:18 511:12 513:3 521:13,16
654:17 674:24

**referred** 368:8 439:3 442:19
510:18

**referring** 360:22 373:17 380:14
427:5 450:16 466:7 472:3 511:13
614:16 625:12 634:12 680:7

**refers** 510:19

**reflect** 465:18 533:15

**reflected** 472:2 503:11,20 602:13

**reflecting** 471:8

**refrain** 434:16

**refresh** 395:15,19 398:8,19 399:4,
22 407:15 415:3 540:5 555:23
558:1 561:21 572:17 579:2,10
581:4 647:13 649:1 667:1 684:9
692:24

**refreshed** 573:2

**refreshes** 637:21

**refreshing** 594:4,8 661:14 668:13
694:24

**refusing** 497:23

**regular** 372:10

**regularly** 593:4

**Reiter** 463:3,6 465:13 466:12

**rejected** 530:14

**related** 377:7 393:11 409:8 410:16
413:15 417:1 462:4 471:13 476:4,5
478:9 484:9 502:16 558:8 611:15
634:19

**relating** 439:14 645:1

**relation** 692:21

**relationships** 656:14

**relevance** 413:21

**relevant** 375:7 409:3,7 418:22
460:1 464:13 466:6 475:7,15
477:9,19 510:22 532:23 564:15
580:1,8,23 600:7,22 612:3 653:19
657:4 658:3 698:18 699:9,11,16

**relied** 585:3 602:12

**relief** 457:21

**rely** 392:14 453:18,20

**relying** 416:14 417:3 445:5 587:15

**remain** 372:22

**remanded** 455:13

**remedies** 474:9

**remedy** 474:21 476:20

**remember** 375:13 390:9 399:22
527:14 532:13 551:6 562:11 591:3
635:16 661:3 675:15 696:20

**remind** 358:16,21

**remove** 601:5

**repeat** 610:24

**repeatedly** 516:15

**rephrase** 498:6 692:5

**report** 360:13,16 361:10 362:4,16
373:7 376:20 377:21,22 378:2
381:3,6 384:21,22 385:2 386:4,12,
15,19,22 387:4,14,17,19,20,24
388:11,22 390:7,10 391:7 400:13,
24 403:12,22 406:7 408:5,9,17,20
409:8,13,21 410:6 412:2,13 415:2,
11,12 416:17,19 423:4,20 424:10,
23 426:7,18 427:7 433:9,20 435:23
438:17 442:7,15 446:7,17 447:10,
17 452:1 454:20 456:3,10 458:23
459:9,18 460:6,20 461:6 462:11
474:7,8 475:24 478:17 488:3
493:10,15,19 497:11 503:11 510:2,
13 512:11 514:13 518:3 522:1

524:21 525:23 528:24 529:22
531:6 532:17 533:1,15,18 534:12,
14,22 535:4,12 536:17 537:18,20,
23 538:6,8,24 539:4,10,11 540:8
541:17 542:20 543:3,24 544:5
549:14 551:16 552:7,24 553:7,16
554:14,22,23 555:6 556:11 558:8
559:13 560:14 561:10,13 562:5,8,
13,21 563:12 564:11,17,22 565:6,
7,15,24 566:11 567:12 568:21
572:4,7,8 573:11,15 574:11,14
575:16 576:12,19 578:5,8,15
579:7,19,23 580:7,24 581:1 582:4
583:8,11 584:22 585:10,15 587:4
588:9 589:18,20 592:1,23 593:1
594:3,5,8 601:12 607:9 609:13
613:18 615:2,20,22 629:9,21
630:16 632:14 634:6 637:6,10,12
638:3,5,7,9,11 643:9 644:17 645:7,
11,22 646:11,13,15,16 647:3,5,8,
13,17,22 648:2,8,22 651:7 653:2
654:14,24 655:6 656:10 660:8
662:11 663:2 669:2,4,7,15 670:3,4,
11 671:13 672:18,19 673:3 674:16
675:22 677:8 678:4 686:18 694:2,
15 699:23

**reported** 671:17 692:16,19 693:20

**reporter** 567:21 610:23 700:13

**reports** 360:23 369:16,21,22,24
370:1,10,14 375:19 376:3,6,11,14,
15,19,24 378:1,4,6,13,19 384:11
388:4,6 410:23 411:14,19 412:1
420:16 478:4 484:10 487:3 510:24
511:21 512:1,7 516:7 520:6,9,24
521:2,6,8,10,11,14,23,24 522:2,15
523:5 526:2 533:8,20 534:24
535:7,16 536:20 537:13 539:24
540:16 555:4,9 559:22,23 579:2,6
580:10 589:19 603:22 607:15,18,
23 608:3,16 609:4,16 611:19 612:3
628:16 630:23 632:4 638:2,14,22
639:5 667:8,13,18,24 668:3,6,21
670:14,18 673:19 679:3

**repository** 442:19 443:4,22 445:8

**represent** 362:2 525:19 532:2
545:12 548:3 682:1

**representations** 466:1,3

**representatives** 417:22

**represented** 400:20 610:13
639:19

**representing** 469:1 548:18
617:13 684:14

THOMAS TIDERINGTON, 10/06/2022

**represents** 589:5 685:20

**request** 499:23,24 531:21

**requested** 468:9 479:20 483:6 491:11 495:4 551:19 607:2 611:3,9 612:13 633:9 658:17 671:20

**requesting** 672:20

**requests** 671:24

**require** 417:17 488:19 489:8 663:16 677:13

**required** 418:1,24 452:20 489:15 502:11 530:19 559:9 658:4

**requirements** 378:17 471:12

**requiring** 489:10

**research** 445:23,24 446:6 631:20

**reserving** 702:7,9

**residence** 655:15

**resident** 546:15

**resolved** 698:7

**respect** 378:2,24 384:20 388:20 393:10,17 399:1,8 406:19 413:19 416:8 444:12,17 467:5,14 471:9,12 472:6,8,16 478:5 479:23 483:11,20 484:8 489:5 493:3 569:23 600:12 604:4 623:22 639:22 652:23 691:20

**respectfully** 434:7 531:21

**respective** 499:10

**respects** 452:22 501:9

**responders** 478:20

**responding** 423:21 499:23

**response** 479:2,9 480:13 481:7 604:20

**responsibilities** 379:22

**responsibility** 595:2 631:19

**responsible** 373:22 418:2 444:8 505:12 695:18

**responsive** 502:14

**rest** 358:14 479:8 555:24 563:21 644:1

**restraining** 452:12 455:4

**restroom** 689:22

**rests** 678:12

**result** 415:16 486:13

**resulted** 423:6

**results** 691:23 693:20 695:2,22

**resume** 509:13

**retain** 458:1

**retained** 382:14 698:6,24

**retention** 390:17,21 407:9,12,17, 20 418:13 452:18 486:9 510:4,7,11 512:16 513:22 514:3,14 515:4,13, 15 518:2,16 519:15,21 520:2,10,19 522:1,8,21 651:14 652:3 667:18 670:9,14 685:24

**reveal** 663:16 677:13

**revealed** 581:12 601:14 653:8

**reversed** 454:14 455:19

**reverting** 482:21

**review** 360:10,15 387:20 393:18 397:5,14 400:16 401:5,12 406:1,11 408:8 411:1 416:11 421:9 441:4,7 455:22 481:4 485:13,17 490:20 494:12 496:1,22 497:22 499:20 506:19 510:3 512:21 514:2 515:12 519:3 535:19 552:3 560:5 573:24 578:8 584:7 590:20 592:6 595:9 618:5 659:1,7,12 666:9,18 667:5 677:3 685:9

**reviewed** 361:3,6,9 386:15,20 388:14,16 390:12 391:4,17 392:20 393:10,15 401:21 404:22 406:16 408:23 428:4 439:8,23 440:21 448:12 459:4 462:18 492:14,15,20 497:10,15 513:5 518:2 536:3,4 555:21 560:10 604:15 605:14,22 615:14 631:16 640:18,23 662:14

**reviewing** 363:14 397:18 421:11 458:15 490:19 497:3 498:11 529:3 571:22 572:2 573:8 579:5 590:21 620:23 635:17 656:22 661:7 662:5 667:1,2 682:18

**revise** 447:20 448:7

**revisit** 447:20 448:7

**Reyes** 414:11 678:24 679:18 680:8 681:14 692:2,22 694:14 695:4,18, 23 701:13

**Reyes's** 682:6

**RFC-SOLACHE/REYES** 525:16 645:20

**rhyme** 404:15

**Richard** 398:13 399:2

**Richell** 614:7

**rights** 455:13 457:2 491:6,17 492:9

**Rivera** 363:19,22 384:9,17,22 386:1,10,24 388:15 495:22

**RO's** 644:7

**robust** 489:17

**Robyn** 453:14 527:10 693:9

**role** 366:7 368:6 369:6,14 394:20 395:24 399:6 619:18 700:15,22

**rolling** 699:1

**room** 374:8 434:13 588:15 688:22 689:4,17 690:2,4,6,16 691:2,10,19

**rooms** 685:24

**Rosa** 678:13,21

**Rosaura** 681:10

**Rosen** 361:19 362:1,6,9,10 371:16 372:9 373:8 387:16 391:14 392:18 393:4 394:10 395:10 396:17 397:12 402:16 410:1 412:9 413:6, 18 414:15,23 415:9 420:2 421:5 422:9,15,22 424:21 425:15 426:5, 17 428:1 430:22 431:12 432:22 433:4,8,13,19 434:4,10,20 438:1 440:11 441:16,23 446:15 450:5,9, 11,18,24 451:9,16,17 454:8 456:11 457:8 459:14,16 461:1 463:18,24 464:6,16,19 465:7,21 466:9 468:6, 17,23 469:11,15,20 470:5,14,18 471:4,10,18 472:7,13,22 473:12, 19,22 474:5 478:13 479:17,21 481:15 483:3,7 487:23 489:21 490:9 491:1 492:12 493:17 494:9 495:1,5,11,14 498:5,7,16 500:18 502:23 503:6 506:10 507:7,15 508:4,18 509:4,14,22 510:21 511:22 513:18 515:5 519:1,12 520:16 524:12,17 525:10 526:21, 22 527:10,20 528:13,19,21 534:16 540:23 541:21 544:1 545:4,18 546:11,13 547:18 553:11 554:2,3, 8,10 555:18 557:7 559:11 562:23 563:10,17,23 564:12 566:3,6,18,22 567:5 568:6 569:3,4 571:19,21 579:4 584:4 585:21 586:4,8 587:1 592:20 594:1,2 606:6,13,21 607:12 608:14 609:1,11 610:10 611:5,10, 22 612:21 615:8 636:16 639:1,9,16 640:9,10 641:4 647:6 650:22 651:6

654:10 656:6 657:19 658:21 659:5,
6,8,11 661:5 664:1,9 668:17
669:23 674:21 676:8,11,17 677:16
678:2 680:14 683:2 684:6,19
686:3,15 689:14 692:5,9 693:9,17
694:4 697:8 701:18 702:7,10

**routine** 415:17 416:1,4,9 417:5
423:6 428:16 434:23 438:18

**routinely** 487:4 489:20 494:20
505:4 594:24 603:17

**row** 681:10

**rows** 486:13

**rule** 490:22

**ruled** 698:17

**rules** 628:19 630:5

**ruling** 448:10,11

**run** 488:15

────────────

**S**

────────────

**safe** 399:10 610:12

**Salas** 665:12,18

**Sat** 570:17

**Saturday** 575:5

**sauce** 552:18

**save** 548:16

**scale** 501:5

**scales** 699:1

**scenario** 490:3 690:22

**scene** 371:5

**science** 619:13,14,20

**scratch** 544:19

**screen** 392:23 509:24 525:13
543:22 549:17 592:15 631:3
648:24

**screen-shared/referenced**
392:17 415:8 450:4 460:24 525:9
528:12 540:22 541:20 545:3,17
553:10 568:5 584:3 615:7 636:15
641:3 654:9 657:18 668:16 669:22
674:20 680:13 684:18

**screwed** 589:22

**scroll** 453:12,13,14,15 526:3
527:6,8 541:7,9,23 542:9 545:6
550:10 560:11 563:3 570:21

573:18 574:22 576:2,11,22 577:11,
17 579:13 586:5,17,21 616:2 622:3
641:12,16 643:4,12,19 654:12
668:22 671:6 684:21 685:12

**scrolling** 617:5 624:18

**search** 614:12

**searched** 502:12 532:5

**searches** 695:12

**Sebastian** 574:24

**secret** 605:21

**section** 454:23 455:11 474:7
482:2 593:1 663:1

**seemingly** 534:5

**selected** 561:16 664:5

**self-selecting** 561:15

**seminars** 409:17

**send** 589:19

**sense** 366:22 403:17,24 470:2
552:4 591:8 594:18

**sensitive** 686:1

**sentence** 383:3 560:13 597:4
647:15 652:8

**separate** 359:17 419:9 422:2

**sequence** 562:5

**sequential** 376:18

**sergeant** 381:17

**series** 523:12 553:15

**served** 617:16 618:1,12 619:3
624:19,24 626:15

**service** 479:12,24 480:13

**services** 380:1,6,12,16

**set** 470:3 484:3 578:3

**setting** 488:6

**Seventh** 447:19 448:7,11,13
449:15,19,23 450:11 452:2 455:19

**Shadur** 455:19

**Shadur's** 447:20 448:8

**shake** 434:7,8

**shape** 384:14

**sheer** 489:14

**sheet** 435:7 498:24 503:1,12,23

504:5,10,11,18 505:7,14 546:24
569:17 633:10

**sheets** 498:18 502:19 503:3,8,15
504:23 569:14

**Sheriff's** 443:17

**shifting** 593:21

**shocking** 538:20

**shoes** 695:10

**shooter** 665:21 666:2

**shooting** 614:1 665:9,18

**shoplifting** 685:21

**short** 383:2 384:6 500:7 537:20
691:9

**shorter** 365:10

**shortly** 493:2

**shot** 665:12 671:15 676:4 677:1,2

**show** 548:11 593:3 665:16 680:16
693:16 695:14

**showed** 433:15 451:6 547:8
557:23 695:15,17

**showing** 450:14 451:5 453:2
454:1 462:19 464:10 465:18
467:19 560:6

**shown** 578:18

**shows** 457:10 485:13

**shrink** 525:12 549:16

**shrunk** 549:21

**side** 575:23 576:12 577:9,12 578:3
583:4 675:14

**sign** 502:11

**signature** 622:16 623:14,15 625:1

**signed** 620:14,15 622:17

**significance** 550:6 624:12 656:11

**significant** 418:15 432:2 435:2,22
538:22,23 603:14

**significantly** 526:12

**signing** 581:21

**similar** 364:4,7 386:18 454:6

**simple** 470:20

**simply** 385:5 412:11 467:21
478:24 521:16 528:5

THOMAS TIDERINGTON, 10/06/2022

**single** 442:20 522:15,16 560:19 565:16 578:18 596:17 631:8

**Sir** 699:23

**sister** 546:4 550:4,8 574:5,10,12 577:15 582:24 583:9 589:23 590:1, 3 591:17 592:8

**sit** 378:16 386:9,16 388:13 390:11 391:11 395:9,22 398:2,7 399:19 407:2 442:3 462:17 505:18 533:9 538:8 561:23 597:23 618:17 634:14 662:7 664:23 686:22

**sitting** 556:9 558:18

**situations** 558:20 689:12

**skimmed** 360:20 402:4,18 514:5

**sleep** 689:23 690:1,17 691:14

**small** 500:17,19,20 501:1,10,12,13

**Smart** 661:4

**Smith** 645:12,15 646:1,4,17

**Solache** 414:11 678:24 679:18 681:15 692:1,22 694:13 695:3,18, 23 699:20 700:1,9,19 701:2,5,13

**Solache's** 695:9 700:3

**solely** 384:10

**someplace** 505:4

**son** 572:3 582:17 584:24 585:6 587:5,18

**son's** 583:18

**SOP** 482:14 483:12 533:5

**sort** 542:20 543:3 663:3

**Soto** 394:21 395:2,24 396:10,11 397:1 411:16 413:16,20 416:13 417:2,6 420:1 423:12,13,15 426:14,20 481:5 516:17 517:7 569:18 642:10 665:5 666:1 668:24 678:5 682:4 686:20

**Soto's** 662:13

**sought** 502:10

**sound** 401:2

**sounds** 396:8 397:10 401:3 466:20 556:13 695:1

**source** 467:11 470:21

**space** 576:13

**spanked** 570:18 575:6

**speak** 410:8

**speaking** 368:2 369:13 380:18 434:4 465:22 471:22 496:17 532:14 538:11 593:9

**speaks** 505:15,16

**special** 368:8 376:21 379:6 460:6 470:21 472:8,16 477:2 481:19 482:4,8 485:14 487:7 496:10,19 498:8

**specialized** 372:6

**specific** 373:11 378:21 386:3 404:15 411:4,19,23 414:6 417:6 448:5 484:1 494:11 506:15 635:6 691:3

**specifically** 375:22 387:1 395:7 397:3 406:5 408:16 409:13,20 410:15 413:16 419:24 425:1 476:12 479:2 497:16 505:18 506:20 527:14 532:14 571:24 604:16 615:16 619:19 629:20 662:16 663:23 666:21 679:19

**spectrum** 367:2

**spend** 403:2 497:3 540:14 639:11

**spending** 526:11

**spent** 363:5,9,14 376:23 378:22 385:12 401:17 402:21 403:7 573:6 574:5 610:2

**spilled** 488:16

**spoke** 360:1

**spoken** 359:23 445:20

**spokesman** 492:21

**spokespeople** 515:19

**spokesperson** 479:11,23

**spot-check** 385:18 405:9 602:2

**spot-checked** 401:13 503:19 504:8 602:6,15

**spot-checking** 385:15 405:10 423:24 424:3 438:7 602:19

**sprawling** 633:4

**spreadsheet** 385:1,3,4,6,17 386:4,18,24 387:2,3,5,24 388:5,8, 9,21,23 389:3,10,15,16,18,20,22 390:2,14 400:12 485:20 486:13,19 503:16,20,22 532:6 602:13 604:2, 3,7,12

**stabbed** 633:2 656:13

**stabbing** 653:6

**stamp** 541:2 563:1 568:14 615:10 624:15 641:16

**stamped** 584:20 624:19,21,23 625:1,2

**stamps** 535:23 536:10 617:15 626:17

**standard** 410:17 440:8 442:17 443:3 445:6 483:13 502:7

**standardized** 376:16

**standards** 445:4

**standing** 514:14

**start** 409:4 441:4 487:1 521:17 667:11 676:2

**started** 360:7 466:23 566:24 640:11

**starts** 453:8 568:17 577:21 637:19 645:8

**state** 367:7,9,15,23 368:15 369:3 391:12 401:1 442:16,17 481:8 551:5 588:15,17 589:11,16 607:10 619:11,19 624:22 625:2 655:12 658:19,23 659:17 660:16 671:14 687:9 692:15

**State's** 390:23 391:3 392:5 394:22 396:6,22,23 397:15 530:24 585:4 587:22 589:8 591:10 658:6,8,11 659:12 660:10

**stated** 530:17 531:1 562:18

**statement** 465:1 581:22 582:3 583:19 585:3 601:9 652:10,16 673:12 687:10

**statements** 360:24 397:18 424:10 480:9 687:5

**states** 582:23 645:11 646:16 652:11

**stating** 645:15

**station** 681:18

**status** 550:20

**Status/code** 529:21

**Stefan** 550:14 551:18

**step** 478:11 514:19,24 537:8

**step-by-step** 536:21

**stepped** 598:8

**steps** 419:20,23 459:20,24

**Stibich** 399:15,20

**sticks** 395:16

**stomach** 573:20

**stomped** 582:16 583:17 584:24 585:5 587:5,18

**stomping** 582:7

**stop** 402:6,8,9,14 451:16 465:15 496:10,20 497:17 498:9 580:18 606:11 659:8

**store** 442:21 488:8

**story** 517:1 537:21

**street** 374:21 375:2,10 418:8,11 420:17 422:3 438:22,24 440:13 452:10 458:1 459:1 474:10,21 476:21 488:8,13 507:12 509:12 511:6,14 538:13 543:13 604:16 605:2

**strike** 519:19 662:15 701:9

**strikethrough** 599:9

**struggling** 694:20

**stuff** 421:3 501:13

**submit** 417:18

**submitting** 418:22

**subpoena** 478:20 479:2,9,12,15, 24 480:7,13 481:7 499:23 500:17 501:17 502:16 604:14,16,17,20 605:4 617:9 618:1 619:1,3,10 624:7,24 626:15 627:2,3,12,17,22 628:3,8 658:5

**subpoenas** 480:12,16,24 500:6 605:1 618:6,11

**subsequently** 414:7

**substance** 372:21

**sufficient** 671:21

**suggest** 409:18

**suggesting** 444:6 558:21 579:11 675:19

**suggestion** 472:2 614:9

**suggests** 673:21 679:7

**suicidal** 551:17

**suitable** 455:14

**suited** 367:15

**summarizing** 480:9

**summary** 484:16 572:22

**superintendent** 627:14

**supervisor** 366:12 429:13 530:13, 16 538:12

**supervisors** 368:10

**supp** 523:5 542:20 669:4,7,15

**supplement** 562:22 578:9 655:6

**supplemental** 376:19 521:10 539:10 555:6 558:8 562:13 565:6 566:11 575:16 576:19 578:15 582:4 637:9,12 638:5 646:13,15,16 647:5,13,17 672:19

**supplementary** 520:5,23 521:1, 24 528:23 533:7 534:24 539:4 543:3 549:14 555:4,9 556:11 559:22 578:5 637:6 645:11 646:11 667:7,13 668:5,21 670:3 673:3,19

**support** 416:15 423:4 426:7 428:15 434:22 438:17 445:5 507:18 536:5 585:3 587:3,16 699:19

**supports** 429:7

**supposed** 516:5 540:9 560:1

**surprisingly** 501:1

**suspect** 422:2,4 488:7 538:14 565:4 633:8 634:2,16 643:10 648:4 649:2 654:1,19 655:1,18,23 669:9, 18 673:22,23 674:12 675:7 679:15

**suspects** 412:18,24 414:9,22 517:11,14 614:6,10 634:16 645:13 646:5,18 647:1 657:3 667:9,14,16, 19 668:1,22 672:3 678:16,22 679:2,4,13 687:9

**Swaminathan** 359:16 370:23 372:2 373:1 387:9 391:5 393:1 394:4 395:3 396:13 397:7 402:10 409:9 412:3 413:1,11 414:18 419:11 420:22 422:7,11 424:5 425:11,22 426:9 427:18 430:17 431:10 432:14 433:2,6,11,15,23 434:9,18 437:12 440:4 441:10,19 446:8 450:8,14,21 451:3,12 454:2 456:5 457:3 459:10 463:13,22 464:4,9,17,22 465:17,24 467:17 468:3,10 469:8,13,17,24 470:9,23 471:15 472:10 473:3 477:21 481:10 487:19 488:23 490:7,11 491:7,12 493:5,23 494:16 495:9,12 497:19 498:13 500:12 502:21

506:4 507:5,23 508:16,22 509:10, 15 510:14 511:15 513:15 514:20 518:21 519:7 520:11 524:9,14 526:7 528:17 533:23 538:2 543:4 544:7 546:9,12 547:13 553:24 554:6,9 555:11 557:4 558:13 562:16 563:6,13,19 564:7 565:19 566:5,16,20 569:1 571:16,20 578:16 585:18 586:11 593:18 605:17 608:5,18 609:7,18 610:16 611:13 612:8,14 638:16 639:7,14 640:5 646:19 656:1 658:13 659:2 661:4 663:15 664:6 676:5,9,13 677:11,18,22 682:20 684:3 685:16 686:8 689:5 692:3 693:14 697:10, 15 701:16,22 702:5,8

**Swaminathan's** 389:2

**sweatshirt** 681:8

**sworn** 358:6 470:5,7,9

**synonymous** 380:6

**system** 449:21 482:22 483:1 484:3

---

**T**

**tabulate** 438:14

**take-away** 384:6 480:10 484:17 527:15

**takes** 412:24 537:21

**taking** 467:19 491:23 512:14 517:16,21 534:4 541:14 543:9 687:10

**talk** 359:20 363:24 403:23 464:7 478:15 554:11 589:24 590:2,9,10 595:6

**talked** 360:2 383:12 410:2 433:24 486:4 567:1 599:22 618:7 648:8

**talking** 366:10,11 373:11 377:17 385:23,24 386:11 387:2 422:24 423:10,11 425:3 450:17 465:16 493:2,12 508:11,20 509:1 538:12 558:19 587:7 642:16 676:6 690:23

**talks** 670:4

**tap** 369:19

**task** 375:8,17 696:22

**tasked** 433:22 700:8,18

**taught** 445:1 476:8

**teaching** 409:15

THOMAS TIDERINGTON, 10/06/2022

**teal** 681:8

**team** 366:4

**Technical** 693:12

**TECHNICIAN** 693:11

**telling** 391:21,23 527:17 535:1 539:17 540:6,17 560:20 619:5 693:7

**tells** 505:3 538:21 542:14

**temporary** 452:12 455:4

**ten** 567:15,16 603:8 686:4

**ten-minute** 472:24

**term** 365:10

**terms** 415:4 418:19 423:16 471:11

**terrible** 542:8 557:15 665:3

**Terry** 570:17 574:6,9 575:5 577:3, 5,12,15,20 590:10,15,16 591:16 592:3

**test** 382:3 399:5 540:10 695:22

**tested** 692:12

**testified** 358:7 359:8,14 362:14 370:17 375:21 398:4 400:10 411:7 413:5 437:21 484:12,14 517:4,19 522:13 538:18 583:18 610:1 639:17 687:6 688:19 696:2 698:3 699:13

**testify** 610:17 698:7,8

**testifying** 413:17 433:4 463:12

**testimony** 362:12 363:22 379:3 384:16 397:19 398:13,16,21,22 399:9,11,16,17 410:19 411:5 412:18 413:15 417:21 457:5 460:15 461:18 462:14,20 463:19 465:12 470:5,8,10 480:11 482:20 483:9 484:17 492:20 494:5 517:5 519:9 530:17 558:14 581:20 608:19 679:9 684:11 690:7 698:14, 18 699:15 700:4

**testing** 382:5

**Texas** 590:7

**text** 360:3 383:16

**texted** 382:10,11,17

**texting** 650:19

**thanking** 698:13

**thing** 366:10 541:13 564:20 626:1, 8

**things** 359:6 360:24 365:22 366:3, 6 369:9 403:9 404:1 405:18 411:7 423:22 470:1 501:15 508:6,9,21 509:2 532:18 535:11 556:6 560:9 591:5 687:16,20 690:18 692:12

**thinking** 425:10,18 475:20 502:2

**Thomas** 358:3,4 396:19 634:3,4 643:9,21,22

**thought** 363:1 419:2 431:17 480:18 489:24 500:23 505:23 508:12,19 516:24 538:21 560:9 570:9,14 578:12 580:18 630:11 638:20 693:7

**thousand** 639:12

**threatened** 581:20

**threshold** 368:24

**thresholds** 369:1

**threw** 457:20

**thrown** 679:10

**Tiderington** 358:3,4,10 361:20 392:15 415:6 450:2 460:22 498:2 524:20 525:7 528:10 540:20 541:18 545:1,15 550:12 553:8 568:3 584:1 592:12 615:5 636:13 641:1 654:7 657:16 668:14 669:20 674:18 680:11 684:16 697:17

**tie** 656:10

**tied** 419:15

**time** 359:4 360:7,8 362:20 363:14 370:20 373:18 376:23 378:23 380:15 381:10,14 383:13 385:9,12 386:6 391:24 392:2 395:2 396:7 397:1 401:18 402:22 403:3,7 421:14 459:13 461:15 464:21,23 467:5,14 470:7,22 471:9,12 472:5, 21 499:9 500:7 505:6 507:19 513:23 526:12,20 536:15 548:16, 17 553:21 556:5 567:11 573:7 579:13,15 583:11 596:6 610:2 617:16 619:18 626:8 627:13,17,22 628:4,9 640:3 650:13 653:10 656:13 666:12 675:4 676:1,4 679:8 691:9,10,18 694:22 695:7,22 696:3,8,17 697:2,6

**times** 373:6,13 374:10 380:16 434:12 543:14 581:16 697:18

**timestamp** 617:18

**timing** 391:7

**tip** 592:14

**tipped** 592:17

**title** 379:18 380:24

**to-and-from** 405:17

**to-from** 424:15 496:8,11,20 497:17 498:10 521:14,19

**tobacco** 699:12,13

**today** 373:20 378:16 382:6 386:9, 17 388:13 390:11 391:12 395:9,22 398:2,7 399:19 408:12 425:3 453:3 454:1 462:18 493:14 505:19 533:10 574:23 577:4 588:3 589:16 597:24 606:5,9 610:7 618:17 659:22,23 662:8 664:23 682:18 683:7,10

**told** 362:19 365:22 371:6 436:18 477:15 517:16 535:6,10 560:4 589:23 590:13 607:20,22 608:21 609:5,15,21,22 610:7,18 611:14,18 638:24 658:22,24 659:16,18 662:1, 2 671:9

**Tom** 473:4

**tomorrow** 636:22

**top** 466:11 485:12 502:23 529:7 541:8 542:9 549:18 571:13 573:12, 14 574:16 576:5,8 577:21 579:23 624:8 676:18 681:8,10 694:6

**topic** 411:12 445:21 678:6

**total** 363:13 406:2 498:23 599:14

**totally** 433:17

**touch** 592:15

**touched** 678:7

**Township** 500:15,21

**track** 363:3

**trademark** 698:5

**trained** 484:8

**training** 409:16,17 481:18 482:3,7, 12,13,16 483:21 484:1,6

**trans** 543:18

**transcribe** 532:22

**transcribed** 510:24 511:24 516:6 532:16 533:7,19 535:15 543:19 544:20 553:6 555:3 564:11 565:24 566:10 575:16 576:19 578:15

**transcript** 394:12 395:12 396:19

398:1,5,11 411:2 463:6,12,15
464:24

**transferred** 520:1 521:5 523:4
535:14,15 536:19 539:4 543:2
556:10 559:21 565:15 599:5

**translated** 580:24

**trauma** 581:18

**treated** 414:8,9 596:23 598:3
629:6 631:13 678:15,22 679:13
691:13

**treating** 487:10 492:16 493:20
494:14

**treatment** 690:13

**Tree** 614:7

**Tremaine** 633:8 648:5 649:3,16

**trial** 363:21 461:18 462:14,15
463:15,16,20 464:24 465:12 466:7
469:3,5,9,10,15,19 470:13,16
682:11 684:11 698:12,19

**trials** 463:23 466:7

**trigger** 396:3

**troublesome** 537:19

**true** 465:11,13,14 467:1,6 560:17
640:2 642:20 678:23

**turn** 361:21 371:10 412:6 426:23
683:20

**turned** 439:5,9 440:16,24 441:8
459:2 475:18 492:1 527:18 528:7
657:15 658:5 660:15

**turning** 694:15

**turns** 458:10

**twelfth** 639:24 666:17

**type** 365:16 366:22 367:13 369:10
371:18,24 373:5 398:16 424:19
428:7 429:16 435:24 437:22
475:24 484:3,21 488:6 543:17
544:16 556:18,24 557:15 558:5
602:18 657:9 688:14

**typed** 520:6,8 542:19 554:4,12,22
557:9 558:7,10 559:5

**types** 360:24 364:2,4,18,23 365:10
366:6 368:19 369:1,9,22 372:13
376:6 377:4 403:9 404:1 408:21
409:23 687:8 690:18

**typically** 428:6,10 444:6 492:7
502:5 594:24

**typing** 589:19

**typo** 614:3

**Tyrone** 613:19,22

————————————

**U**

**U.S.** 368:15

**ultimately** 673:6 701:1

**unable** 458:16

**unbilled** 362:20

**uncle** 676:24

**unclear** 445:11

**uncooperative** 531:13

**undercover** 369:14,16

**underlie** 404:22

**underneath** 600:11

**undersigned** 531:20

**understand** 358:24 383:8 385:10,
11,13 392:12 402:14 405:13 408:3
415:23 424:17 428:5 455:18,24
456:2 468:15,20 475:21 476:9
477:14 483:1 491:22 492:23 512:1
522:6,11,17,20 530:4 535:24
536:22 540:4 556:23 559:23 560:1
561:17 578:11 591:6 602:5 610:3
635:19 657:13 682:13 683:21
690:24 692:8,10,14 697:21

**understanding** 387:6 394:19,24
395:23 397:13 400:9 431:14,15
432:11,12 437:3,9,11 438:21,24
440:13,23 449:14,18 460:17
480:23 481:2 487:22 499:5 504:13
505:11 510:9 515:1 518:4 525:21
536:7 539:6,11 542:7 561:6 569:21
570:1,6,7 573:23 574:9 575:12
587:19,20 595:12,16 596:1 597:3
600:14 604:23,24 607:14,18 613:8
619:17 622:10 630:14 638:21
641:22 644:14 666:20 685:1
691:22 698:11,22

**understood** 379:3 383:3 559:17
561:18 591:5,24 596:3 691:4
698:17

**undisclosed** 652:10,16

**unexplainably** 494:21

**unfair** 433:18

**uninterested** 417:1

**unit** 374:14 379:5,7 479:2,9,12,24
480:13 502:8,11

**units** 379:5 479:3,13 480:6,8

**universe** 409:14 599:14

**unlike** 428:9

**unofficial** 510:23 511:4,13,23
512:2,19 513:2,10

**unquote** 513:9

**unreasonable** 375:15 588:16
687:7

**unredacted** 606:3

**unrelated** 665:15

**unusual** 403:7 404:2 485:1 544:24
688:20

**updated** 504:24

**upset** 591:21

**utilize** 376:13 417:9 475:13

**utilized** 388:1 400:12 433:20
599:17 623:21 682:11

**utilizing** 403:2

————————————

**V**

**vaguely** 411:3 661:15

**variety** 365:1

**vast** 429:15

**vehicle** 371:24 537:17 665:10

**vehicles** 501:4

**verbatim** 454:6 543:20

**verify** 404:7

**versa** 367:12

**versus** 369:2 423:13 449:5 501:16
511:8

**viable** 674:12

**vice** 367:11

**victim** 534:8,9 550:8 573:19 574:5,
24 637:7 645:14,18 646:3,18
653:10 654:2,20,21 655:2,3,15
665:11

**victim's** 549:19 653:9

**video** 358:2 362:7 422:17,21
473:24 474:4 509:17,21 567:19
568:2 606:20 651:1,5 686:10,14

THOMAS TIDERINGTON, 10/06/2022

702:14

**view** 418:17 460:11 475:12 477:3 492:2 679:14

**Vincent** 530:20

**violate** 485:10 492:9

**violated** 457:2 485:2,5 489:20

**violating** 484:22

**violation** 455:12 456:20 491:5,16 691:15

**violence** 655:16 656:12

**violent** 379:5

**virtue** 512:8 658:5

**void** 494:24

---

**W**

**wait** 393:12 462:23 547:10

**walk** 635:4

**wall** 690:8

**wanted** 385:10 471:24 515:1 519:23 561:17 580:18 588:19 591:18 626:1 640:15 644:7,8 647:4 673:13 675:20 697:18,19,24 698:1, 4

**waste** 464:21 548:17

**wasted** 526:19

**wasting** 464:23

**ways** 359:18

**Weathers** 530:15 531:2

**weeks** 363:7,13 659:10

**weighed** 673:24 675:8

**wereroutinely** 603:15

**West** 660:24 661:3,9,13,19 662:1

**whatsoever** 424:14 437:1,23 544:23

**wide** 365:1 367:2

**wife** 650:19

**Willie** 632:23 636:6,7 645:2,3 649:14,21

**Willier** 567:20

**Willis** 633:8,24 648:5,6 649:3,7,16

**Willis's** 633:9

**Winstrom** 484:12 515:19

**Winstrom's** 494:4

**wire** 369:18

**withheld** 410:23 411:15,20 412:1 580:3 593:4,7,12 594:11,18 595:1, 5 613:1 631:24 640:14 660:9,12 679:21,22 686:17

**withholding** 593:15

**witnesses** 370:19 419:17 517:18 531:16 583:21 633:13 637:15 665:17,18 667:15 669:16 670:13 671:16

**Woefully** 415:16

**woman** 653:6 681:8

**wondering** 390:10

**word** 370:5 396:3 440:9,19 480:5 591:4 593:11 594:11,18 595:21 596:2

**words** 399:21 433:7,12 589:21

**work** 362:15 383:5,6,20 384:8 387:21 388:15 480:24 481:3 539:12 540:1 542:3 574:23 589:6 607:9 610:8,14 611:20 639:19,22 658:5 671:10 698:14

**worked** 360:12 364:3,9,11 366:13, 14,19 376:8 389:9 396:22 443:16, 19 595:23 654:1,20 655:2 696:3,6, 15,16,18 697:1,4

**working** 360:7 366:2 370:5 371:13 383:17 439:3 443:8 480:6 553:1 639:21 696:23 701:21

**worries** 362:9

**worse** 458:11

**worthless** 458:9,11

**worthwhile** 458:17 526:17

**write** 372:1 423:20 538:18,20 674:15

**writing** 591:9 617:4

**written** 424:19 433:1 466:24 467:6,14 475:19 478:19 479:1 491:3 521:15 543:1 547:17 548:5 575:21 674:2 687:10

**wrong** 389:11 442:4 474:22 626:10,11 693:13

**wrongful** 458:7 459:8

**wrote** 398:20 497:11 498:8 534:7 553:1 581:10 605:4

---

**Y**

**year** 480:14 620:18

**years** 373:13 378:22 379:12 408:24 485:9 500:15 501:22 502:5 588:18,24

**yesterday** 361:14 362:12,14 366:18 370:17 379:3 408:2,11 410:2,14,19 411:5 412:15 413:17 489:13 516:14 567:4 660:3,4 688:19 699:18

**York** 444:12

**young** 420:15 656:13

---

**Z**

**Z219872** 629:15

**Z273605** 634:13,18,19 641:20 648:15

**Zoom** 401:7