# EXHIBIT 6

October 31, 2022

TO: Josh M. Engquist
The Sotos Law Firm, P.C.
141 w. Jackson Blvd, Suite 1240A
Chicago, IL 60604

RE: Arturo DeLeon-Reyes v. Guevara, et al.
18 CV 1028
Gabriel Solache v. Guevara, et al.
181 CV 2312

**INTRODUCTION**
I have been retained by the Sotos Law Firm in Chicago, Illinois, who is representing some of the individual defendants, as an expert witness in the aforementioned civil matter. After reading the information provided to me by the defendants' attorneys, I am submitting this report with my expert opinions in this matter. I base my opinions on careful analysis of the information which I was provided and my professional experience and training, and I make them to a reasonable degree of professional certainty. I have relied on my 40 plus years of law enforcement experience, training, and education to reach the opinions listed below in this report. During my tenure in the Homicide Unit with the Miami Police Department, I actively participated in hundreds of murder investigations as either the "Lead Investigator," "Co-Lead Investigator" for another detective who was assigned as the lead investigator, or as a Detective Sergeant supervising the detectives assigned murder cases. In addition to murder investigations, I participated in thousands of death investigations for deaths caused by suicide, accidental deaths, natural deaths, etc. During my professional career, I have also reached out to known experts in crime scene and homicide investigations when questions arose in order to verify certain aspects of my cases. I utilized both personal knowledge and personal experience in reaching my conclusions and opinions, which are generally accepted in the law enforcement community.

**FORMAL EDUCATION**
Bachelor's degree in PUBLIC ADMINISTRATION
    Barry University – Miami, FLA
    Magna Cum Laude
Bachelor's degree in CRIMINAL JUSTICE
    Grantham University – Lenexa, KS
    Summa Cum Laude
Master's degree in PUBLIC ADMINISTRATION
    Barry University – Miami, FLA
Doctoral degree in EDUCATION & ORGANIZATIONAL LEADERSHIP
    Barry University – Miami, FLA

**LAW ENFORCEMENT EXPERIENCE**
Graduated from the Miami-Dade College of Criminal Justice - 1980
    I) Florida certified law enforcement officer

Began working as a uniformed police officer in the Patrol Division with the City of Miami Police Department (MPD) – 1980 to 1981

Transferred to the Homicide Unit in the Criminal Investigations Division of the City of Miami Police Department as a Homicide Detective – 1981 to 1995

Promoted to the rank of Detective Sergeant and remained in the Homicide Unit supervising two teams of detectives. 1995-2002
    a) Regular homicide team consisting of four detectives
    b) Cold Case Squad consisting of two senior detectives

Detached to the Drug Enforcement Administration (DEA) as part of a team of Federal, State and Local law enforcement personnel investigating a Columbian drug syndicate responsible for dozens of murders throughout the world; the main target was Griselda Blanco.

Detached to the Federal Bureau of Investigations (FBI) as part of a team of Federal, State and Local law enforcement personnel investigating a Miami based drug syndicate responsible for approximately eight murders in South Florida; the main targets were Willie Falcon and Sal Maglutta.

Served as the Acting Commander of the entire homicide unit on several occasions; for weeks or months at a time.

Honorably retired at the rank of Lieutenant from the City of Miami Police Department; remaining on as a reserve police officer assisting then current homicide detectives in their cases until 2005.

2005 - Hired by the City of West Miami Police Department (WMPD) as the second in command, with the rank of Police Captain.

2012 – Promoted to the rank of Chief of Police with the City of West Miami Police Department.

2020 – Honorably retired as the Chief of Police from the City of West Miami Police Department. Remaining on in a reserve officer capacity with the rank of Executive Assistant to the Chief of Police; this is my current position.

**LAW ENFORCEMENT TRAINING**
During my tenures with both MPD and WMPD, I attended countless In-Service training classes both within the respective police departments, as well those offered by other local, state, and federal law enforcement agencies. These classes included, but were not limited to: Medicolegal

Death Investigations, Interviews and Interrogation, Criminal Investigation, Homicide Investigation, Internal Affairs Investigations, Firearms, and Evidence.

In 1998, I graduated as a Polygraph Examiner from the International Academy of Polygraph and as Truth Verification Expert from the National Institute of Truth Verification.

**TEACHING EXPERIENCE:**
As an adjunct professor, I have taught courses at the below universities in the respective subjects, both over the past five years and continue to teach criminal justice classes at Florida International University, and last semester at Carolina University. Additionally, I have instructed many In-Service courses to police officers, including but not limited to: Criminal Investigations, Interview and Interrogations, Crime Scene, Homicide Investigation, First Line Supervision and others, for the Miami Police Department, Miami-Dade Police Department, and others.

    Florida International University
        1) Criminal Law
        2) Criminal Investigations
        3) Introduction to Criminal Justice
        4) Criminological Theory
        5) Criminal Evidence
        6) Criminal Justice System
        7) Security and Crime Scene Science
        8) Drugs and Crime
        9) Corrections
        10) Law Enforcement
    Carlos Albizu University
        1) Policing and Law Enforcement
        2) Crime Scene Investigations
        3) Interviews and Interrogations
        4) Introduction to Criminal Justice
        5) Criminal Investigations
    Florida National University
        1) Introduction to Criminal Justice
        2) Juvenile Justice
    Barry University
        1) Ethics in Public Administration
        2) Methods and Techniques in Public Administration
        3) Public Management and the Political Process
        4) Contemporary Issues in Public Safety

My resume contains additional information, including my publications. In the last four years, I have testified as an expert witness at two depositions: (1) in the matter of *McIntosh v. Bach*, 20 CV 324 (N.D. Ill.), where I was also retained by The Sotos Law Firm, P.C.; (2) in the matter of *Arthur Brown v. City of Chicago*, 18 CV 7064, where I was retained by Hale & Monico LLC. My compensation for my work is $350 per hour.

**MATERIALS REVIEWED**
- Documents
    - Reyes Second Amended Complaint
    - Solache First Amended Complaint
    - Investigative File (RFC-Solache-Reyes 1-484)[1]
    - Photos (Reyes_Jenner 4371-410)
    - Photos (RFC 485-626)
    - Lassar Memo (AR-Jenner 19812-43)
    - Staffing Networking declaration 4/1/2021
    - Solache Amended PC Petition 6/20/2008
    - Jose Mejia declaration (Reyes 8725-8729)
    - Apartment diagram (Reyes 1428-39)
    - ISP Documents (Reyes_Jenner 9582-3)
    - ISP Documents (Reyes_Jenner 9559-86, 10121-8)
    - ISP Documents (SDT-IDP 559-66)
    - ISP Documents (JR-L 101377-98)
    - Phone Record (Reyes 8918)
    - Victor Herrera declaration (Reyes 8908-16)
    - Jacinta Soto ME Report (SDT-CCME 53-80)
    - Gabriel Solache handwritten statement (RFC 4006-14)
    - Reyes Amended PC Petition 12/2/2008
    - Sidley Interview of Adriana (RFC 8010-5)
    - Joint PC Brief 8/13/2015 (Reyes_Jenner 3669-703)
    - Order Vacating Reyes Conviction 12/21/2017
    - Diana Gama affidavit (Reyes 8891-3)
    - Elisa Sanchez affidavit (Reyes 8894-8)
    - LocatePLUS (Reyes 8918)
- Depositions
    - Adriana Mejia (6/18/19, 10/22/19, 2/4/21, 2/5/21)
    - Edwin Dickinson (6/8/21, 6/9/21)
    - Reynaldo Guevara (10/21/20, 12/9/20)
    - Arturo DeLeon-Reyes (2/27/20, 2/28/20)
    - Rosauro Mejia (8/8/19, 9/16/19)
    - Robert Rutherford (12/17/19, 12/18/19)
    - Solache (12/6/21, 12/8/21, 12/9/21)
    - Robert Biebel (11/13/19)
    - Daniel Trevino (6/22/21)
    - Mark Harvey (2/30/19)
    - Dennis Stankus (3/14/19)
    - Guadalupe Mejia (1/20/20)
    - Viola Rouse (2/17/21)
    - Jose Aranda (2/19/20)

---

[1] Citations to this bates stamp will be shortened to "RFC" for easier reference.

- o Rosa Aranda (2/5/20)
- o Alfredo Aranda (6/5/19)
- o Heather Brualdi (7/9/19)
- o Jorge Mejia (1/21/21)
- o Leobardo Mejia (11/2/19)
- o David Navarro (7/23/20)
- o Thomas O'Malley (8/14/19)
- o Jorge Soto Cortez (6/12/19)
- Transcripts
    - o Bail 4/6/1998 (Solache 7808-17)
    - o Grand Jury 4/27/1998 (Reyes_Jenner 10092-99)
    - o Motion to Suppress 6/23/1999 (JR-L 93169-282)
    - o Motion Hearing 2/4/2000 (JR-L 93587-646)
    - o Motion Hearing 3/3/2000 (JR-L 93647-819)
    - o Motion Hearing 3/3/2000 (Solache 5275, 5394-441)
    - o Motion Hearing 3/30/2000 (JR-L 93831-929)
    - o PC Hearings (Reyes_Jenner 10526-729, 11080-125, 11866-2121)
    - o Combined (Reyes_Jenner 4411-6984)
    - o Adriana Sentencing (Reyes 8686-725)
- Policies
    - o Memo re SO 8-2 (RFC 19354-7)
    - o SO 06-02
    - o SO 83-1
    - o SO 84-7 + Addendum
    - o SO 86-3
    - o Standard Operating Procedures (RFC 117553-623)
    - o DN 82-2
    - o GO 06-02
    - o GO 87-7
    - o GO 88-18
    - o GO 89-3
    - o GO 97-4
    - o Interrogations (JR-L 6141-6155)
- Thomas J. Tiderington Report in this case

**BRIEF CASE SUMMARY**

1. In March 1998, Adriana Mejia ("Adriana"), her husband Rosauro Mejia ("Rosauro"), her brother Carlos Martinez, Rosauro's brother and sister-in-law Jorge and Guadalupe Mejia, Gabriel Solache ("Solache"), and Arturo DeLeon-Reyes ("Reyes"), were living together in a house located at 6234 S. Mozart in Chicago, Illinois.
2. All of them had immigrated to the United States from Mexico, and several of them knew each other from when they lived in Mexico.
3. Adriana had learned she was unable to conceive a child. Nevertheless, she began lying to

her husband by telling him that she was pregnant; this began in the fall of 1997.

Friday, March 27, 1998

4. In the morning, Adriana had Rosauro take her to the clinic to be induced. She told him not to stay, so Rosauro went to work.
5. Later in the day, Adriana informed Rosauro that she gave birth to a baby girl and could return from the hospital the following day.

Saturday, March 28, 1998

6. In the morning, Rosauro went to pick up Adriana from the hospital, along with her sister-in-law Guadalupe.
7. When they arrived, Adriana had with her a baby girl and a toddler boy. Adriana explained the boy was the child of a woman she met, Norma Salazar, and that Adriana had agreed to watch for the boy for a few days while the woman underwent a caesarian section.
8. Also, at some point during the day, a family member of Jacinta and Mariano Soto visited the Soto home to knock on the door. No one answered, despite their car being parked out front.

Wednesday, April 1, 1998

9. Raul Aranda, neighbor of Jacinta and Mariano, contacted the Chicago Police Department ("CPD") to do a wellness check, as he had not talked to or seen Mariano since Friday, March 27, 1998, and Mariano had not reported to work for three days.
10. CPD Officers Corrie Bergadon and David Valentin responded to the Soto residence—a rear basement apartment located at 2071 N. Leavitt, Chicago, Illinois—and met up with the landlord. The landlord could not open the door, so with the landlord's permission, the officers broke a small window near the lock to gain entry to the apartment. Upon entry, they discovered the deceased bodies of Jacinta and Mariano.
11. Mariano was face up, approximately five feet from the door, with 35 stab wounds to his head, chest, arms, back, and legs. Jacinta was on the floor in the bedroom with 1 stab wound to her left chest and 19 to her back and neck. RFC 340. Mariano's cause of death was "multiple stab and incised wounds," and Jacinta's cause of death was "multiple stab wounds." RFC 340. Both were ruled homicides. RFC 340.
12. While there, officers were informed that Jacinta and Mariano had two children that lived with them—3-year-old Santiago and 2-month-old Maria. The children were not found in the home.
13. Thus, while the investigation into the stabbing deaths was underway, CPD also put out a missing person's bulletin containing photographs and physical descriptions of the Soto children, distributing it to the media for publication.

Thursday, April 2, 1998

14. While watching the 10:00 p.m. news on TV, Guadalupe saw a photograph of a boy whose parents had been killed and was missing. Guadalupe informed the others in the home, and Adriana was confronted with the information.
15. When Adriana's husband Rosauro got home from work, around 1:30am on April 3rd, it was

decided that Rosauro, Solache, and Reyes would take the boy to the police station.

Friday, April 3, 1998

16. In the early morning hours, the three Spanish-speaking men entered the 8th Police District with a male toddler believed to be one of the missing children, Santiago Soto. Rosauro then offered a narrative about how Adriana came into possession of the boy via a woman named Norma Salazar. Police summoned a family member to CPD, at which point the boy was positively identified as Santiago Soto.
17. Subsequently, CPD officers responded to the Mejia/shared home at 6234 S. Mozart to speak with Adriana. A baby was observed in the home and believed to be the other missing child, Maria Soto. Adriana was then brought to CPD, and the baby girl was positively identified as Maria Soto by family of the decedents.
18. Around 11:30 a.m., Adriana was Mirandized and interviewed CPD Det. Guevara. RFC 239. Adriana told him that:
    a. On March 26, 1998, she met a woman named Norma Salazar at the clinic who told Adriana she could get Adriana a baby. RFC 239.
    b. They agreed to meet the following day, at which point Norma gave Adriana a baby girl and the two agreed to meet again the next morning. RFC 239-240.
    c. When they met the next morning, Norma brought a toddler boy with her and asked Adriana to take care of him for her while she was in the hospital, and Adriana agreed. RFC 240.
    d. For the days that followed, Norma never picked up the little boy, and on April 1, 1998, Norma told Adriana she did not want the boy anymore. RFC 240.
19. Officers subsequently searched the ICAM database for a Norma Salazar, found a photo of a Norma Salazar, showed it to Adriana, and Adriana positively identified that Norma Salazar as the Norma Salazar she had met at the hospital. RFC 240.
20. Around 3:00 p.m., the Norma Salazar from the photo was located and brought to CPD. Adriana viewed a live lineup containing that woman, but Adriana did not identify her. RFC 240. CPD Detectives Collins and McDonald interviewed Norma Salazar and she denied any knowledge of the murders. RFC 240.
21. Around 5:00 p.m., after discrepancies were identified in Adriana's story, Detective Guevara asked Adriana to submit to a polygraph, and she agreed to do so. RFC 240-241.
22. Around 6:30 p.m., Adriana's husband Rosauro was asked to sign a consent to search form for his and Adriana's residence at 6234 S. Mozart, which he agreed to. RFC 241. Thus, the search at the shared home and the polygraph of Adriana were conducted. RFC 241.
23. Around 9:00 p.m., Adriana returned from a failed polygraph. Subsequently, she positively identified a pair of black shoes with red stains, recovered during the search of the residence, as her own. RFC 241.
24. Around 10:30 p.m., Adriana was interviewed for a second time by Detective Guevara. RFC 241. She provided a different narrative this time and stated:
    a. She concealed a fake pregnancy by putting on weight. RFC 241.
    b. After nine months of lying, she would have to reveal her lie soon. RFC 241.
    c. She confided in Reyes that she had lied, and he told her he would get her a baby for $600. RFC 242.

   d. She agreed to this, faked labor to get dropped off at the hospital, and then followed a woman home to get her address to give to Reyes. RFC 242.
   e. Reyes then brought her a baby girl and toddler boy, who he said she'd have to watch for a few days. RFC 242.
25. That evening, Guadalupe and Jorge Mejia were interviewed. RFC 242. Guadalupe relayed the lead-up to the alleged birth of Adriana's baby, and further relayed information about events after Adriana returned home with the baby and toddler boy. RFC 242-243. After Guadalupe had asked Adriana about various aspects that stood out to her—the lack of umbilical cord on the baby girl, the baby's large size, the baby's pierced ears, where the boy's mother was—Guadalupe said she finally saw the missing boy on TV on the evening of April 2, 1998. RFC 243-244. Jorge substantiated this information. RFC 244.
26. Around 11:30 p.m., Reyes was interviewed by Detective Guevara for the first time. RFC 244. He was Mirandized and advised of Adriana's statements against him. RFC 244. He denied involvement or knowledge of how the two children came into her custody. RFC 244. However, in his pocket was a piece of paper containing, amongst other things, a notation that stated: "hospital, Norma Salazar, 773-9-773-031." RFC 245.

Saturday, April 4, 1998
27. Around 12:15 a.m., Solache was interviewed for the first time by Detective Guevara. RFC 245. He also was Mirandized and denied involvement or knowledge of how the two children came into Adriana's custody. RFC 245.
28. Around 1:35 a.m., Guadalupe was interviewed and provided a statement to an assistant state's attorney. RFC 245.
29. Adriana, Reyes, and Solache were asleep on chairs in their respective interview rooms, so officers elected to let them sleep and resume questioning in the morning. Instructions were left to continue questioning later that day. RFC 245.
30. Around 6:30 a.m., Rosauro signed a second consent to search form to allow officers to search for bloody pants Adriana was purportedly wearing when she returned home from the hospital. RFC 245. Guadalupe and Jorge also returned home. RFC 245. The bloody pants were located in Adriana's closet and collected. RFC 246.
31. Around 11:00 a.m., Adriana was interviewed for a third time. RFC 246. Still Mirandized, Adriana implicated herself, also implicating Reyes but denying involvement by Solache. RFC 246.
32. Around 3:00 p.m., Reyes was interviewed a second time. RFC 246. Still Mirandized, Reyes admitted to his involvement, as well as the involvement of Solache. RFC 246.
33. Around 6:00 p.m., Reyes repeated his prior statements to additional officers, and his pants and shoes were collected as items of potential evidentiary value. RFC 247.
34. Around 6:30 p.m., Reyes signed a consent to search form for his bedroom, which was then searched. RFC 248.
35. Around 7:00 p.m., Rosauro was interviewed by an assistant state's attorneys. RFC 248.
36. Around 8:00 p.m., Adriana was interviewed again. During the interview, she implicated Reyes and Solache and said Reyes had provided the name Norma Salazar to her. RFC 248-250.
37. Around 9:00 p.m., Solache was interviewed for a second time. RFC 250. Still Mirandized,

Solache admitted to his involvement. RFC 250-251.
38. Around 11:15 p.m., Adriana was interviewed by an assistant state's attorney, providing her narrative. RFC 251.
39. Around 11:25 p.m., Solache was interviewed by an assistant state's attorney, providing his narrative. RFC 251.
40. Around 11:30 p.m., Reyes was interviewed by an assistant state's attorney, providing his narrative. RFC 252.

Sunday, April 5, 1998
41. Around 2:00 a.m., Reyes provided a written statement to an assistant state's attorney. RFC 252.
42. Around 2:10 a.m., Adriana provided a written statement to an assistant state's attorney. RFC 252.
43. Around 3:35 a.m., Solache provided a written statement to an assistant state's attorney. RFC 252.
44. Around 3:45 a.m., a car potentially used in the crimes was brought into the station and processed by the crime lab. RFC 235, 253.
45. Around 4:00 a.m., Rosauro provided a written statement to an assistant state's attorney. RFC 252.
46. Subsequently, Rosauro was released without charging, while Adriana, Solache, and Reyes were arrested on charges of first-degree murder and aggravated kidnapping. RFC 253.

47. In subsequent court appearances, Solache (RFC 91) and Reyes (RFC 94) were both found guilty at trial, and Adriana pled guilty.

**ANALYSIS**

48. After reviewing the materials listed above, it is my professional opinion that the CPD officers working the Soto family murder/kidnapping investigation (hereinafter, "Soto Investigation") conducted themselves professionally and in a manner consistent with generally accepted police principles and investigatory norms.

49. Furthermore, I opine that they followed the investigation into the murders in a direction based upon generally accepted police procedures and investigative protocols, namely—assessment of the crime scene, interviews of family, witnesses, and suspects, and other tasks that led them to Adriana, Solache, and Reyes—especially including the location of the two missing children in their possession.

50. No homicide investigation is ever perfect, nor is it ever the same. The benefit of hindsight, especially once you have knowledge of the outcome, will inevitably reveal investigative action(s) that could have been taken beyond those that were completed while the investigation was ongoing. This is the nature of homicide investigations: they are dynamic, they can evolve quickly, and they rarely develop in an identical manner to prior investigations handled.

51. In the Soto Investigation, the officers had two key fronts to cover: a kidnapping of two young children, and a brutal double murder of parents who were not discovered immediately.

### A. The Investigation into the Kidnappings

52. The possibility that two young children were still alive and in the hands of someone dangerous made searching for them priority number one, as time was of the essence. The officers acted swiftly in this matter: they immediately searched the crime scene for any signs of the children, they began interviews of family members, notified others of the missing children, and filed missing persons reports into the early morning hours. Additionally, alleys, abandoned buildings, garbage cans, and other areas nearby were checked to see if the missing children had been left anywhere.

53. Coupled with the aforementioned tasks, officers also interviewed the agency (Esperanza Early Intervention) providing services to Santiago Soto and obtained photos of the children. RFC 339. Public transportation methods were investigated, such as bus stations and O'Hare airport airlines (RFC 346-347, 349-350), additional relatives of the missing children were sought out, and LEADS messaging was sent to the states immediately surrounding Illinois. RFC 352-353. Additionally, a CPD Special Bulletin was issued, where photos and information on the missing children were publicized, and the FBI was contacted for assistance. RFC 351.

54. In less than 48 hours, and as a result of a news report showing the missing children, the first child—Santiago—was brought into the police station. The second child—Maria—was located shortly thereafter.

55. It is my professional opinion that the actions taken by officers in pursuit of finding the missing children were appropriate investigative steps based upon generally accepted police procedures and investigative protocols.

### B. The Early Investigation into the Murders

56. Along with the kidnapping investigation, officers had also kicked off a well-rounded homicide investigation. As an initial matter, detectives, the Crime Lab, and the medical examiner were notified to report to the scene. Other officers were also immediately assigned to canvas the neighborhood, at which point numerous neighbors were interviewed. E.g. RFC 338-339, 341. They also interviewed neighbors of a previous residence of the Soto family. E.g. RFC 348-349.

57. That evening, the brother of the decedent was called to the scene to identify the victims, which he did. Subsequently, several family members were interviewed to gain information about the decedents with regard to habits, work schedule, vehicle, and when any of the Soto family were last seen.

58. Early the following morning, multiple family members and friends were further interviewed both concerning the children and concerning information on the decedents with regard to habits, work schedule, vehicle, and last sighting. Coworkers of Mariano were also interviewed. RFC 355-356.

59. Samples were collected from the victims and their clothing, and numerous evidentiary items were processed and inventoried. Information was also gathered on Jacinta's medical history (RFC 342), and a LEADS response was obtained confirming the vehicle of Mariano.

60. It is my professional opinion that these were appropriate investigative steps to take, based upon generally accepted police procedures and investigative protocols, to initiate an investigation into the murders of Mariano and Jacinta.

### C. The Developing Investigation

61. Within 36 hours[2] of the discovery of the decedents, three Spanish-speaking men (Reyes, Solache, and Rosauro) walked into the police station with the missing toddler boy, Santiago. Translators were called in, and Rosauro was interviewed.

62. Rosauro told officers:
    a. His wife, Adriana, had brought the missing boy to their home on Saturday (3/28/1998)—she'd just given birth to their daughter, and while at the hospital, she was asked to babysit the boy by a woman she'd met. RFC 357, 365, 367.
    b. The woman, Norma Salazar, was unknown to him and only Adriana communicated with Norma. RFC 365-366.
    c. On Thursday evening (4/2/1998), a news report showed the boy to be a missing child. RFC 366-367.
    d. Rosauro brought the boy to CPD shortly thereafter, in the early morning hours of Friday (4/3/1998). RFC 366-367.

63. Family of the decedents were later called in by officers and identified toddler Santiago as the missing boy.

64. Rosauro knew of two telephone numbers—one for Norma, and one to the hospital—and provided those to police. RFC 366-367. Officers called the numbers, but both appeared to be wrong numbers. RFC 366, 369. Notwithstanding, officers immediately followed up on the story of how Adriana came into possession of the boy by going to the Mejia/shared home. RFC 195.

65. Upon arriving to the home, a baby girl appearing to be the missing child, Maria Soto, was observed with Adriana. RFC 195. Thus, Adriana was brought into CPD, and the baby was taken to a hospital to ensure her health. RFC 195. Family of decedents identified baby Maria

---

[2] The bodies were discovered about 4:45pm on 4/1/98. Santiago was brought to station about 3:30am on 4/3/98.

as the missing girl. RFC 195.

66. Having found both missing children of the brutally stabbed parents in the possession of members from a single household, all four individuals—Adriana, Reyes, Solache, and Rosauro—were kept for questioning. Amidst this, other avenues of investigation were still being explored.

### D. Questioning and Further Investigation

67. Officers proceeded to Mirandize and interview Adriana, Reyes, Solache, and Rosauro. Having come into possession of both children, first interviewing Adriana made sense. The first narrative she provided, around 11:30am on 4/3/1998, differed from Rosauro's, in part. Adriana raised that she had kept secret her fertility issues, but she also raised the name Norma Salazar as someone who offered to help her get a baby. Supposedly Norma brought her the little girl, asked her to babysit the boy, but did not come back for him or want him. This would raise questions, which the officers then addressed.

68. Before conducting any further interviews, officers ran the name Norma Salazar through the ICAM database. They worked to obtain a criminal history report and photographs of a Norma Salazar who had been arrested in November of 1997. RFC 205-207. A CPD request was also sent for a telephone and computer study of the Norma Salazar number Rosauro had provided earlier, along with another number. RFC 213.

69. A Norma Salazar identified on ICAM was brought into CPD same day. Adriana was first shown the photograph and confirmed it to be the same woman. However, once Norma was put into a live lineup, Adriana did not pick her out. Officers nevertheless interviewed Norma, who denied involvement.

70. Meanwhile, officers obtained consent from Rosauro to search the shared residence, baby Maria was discharged from a hospital check where her blood type was confirmed (RFC 195), and the clothes and shoes of toddler Santiago were collected for testing. RFC 235. Additional interviews were also conducted that evening of neighbors and family.

71. After discrepancies were identified in Adriana's story, officers asked Adriana to submit to a polygraph, and she agreed. RFC 240-241. Her results indicated deception, so a second interview followed. RFC 241. During this second interview, she provided a different narrative from the first one she offered and implicated Reyes. She also identified a pair of black shoes with red stains on them as her own. Officers properly collected these.

72. Meanwhile, Rosauro and Adriana's family members—Guadalupe and Jorge—came to CPD to offer further information about the events surrounding the baby girl and toddler boy appearing at their home. RFC 242, 244. Their narratives further corroborated Rosauro's interview.

73. Having received new information from Adriana implicating Reyes, it made sense to interview him next. He was Mirandized, and during his interview, he denied involvement. RFC 244. Despite this, a note in his pocket contained the name Norma Salazar with some numbers and the word "hospital." This note was collected. RFC 135.

74. The last of the four original individuals to be interviewed was Solache. Officers spoke with him, but he denied involvement. Due to the late hour, officers elected to let them sleep and resume questioning in the morning. In the interim, Guadalupe was interviewed by and provided a statement to an assistant state's attorney. RFC 242-243.

75. Early the next morning, just over 24 hours since the toddler boy was brought in, Rosauro signed a second consent to search form. RFC 236. Guadalupe and Jorge were driven home, and with the consent to search signed, the bedroom of Adriana was searched. There, bloody pants were found in the closet and collected. RFC 236.

76. Armed with the additional aforementioned information, Adriana was interviewed for a third time. It was at that time that Adriana fully implicated herself in the murders and kidnappings, at which point she continued to implicate Reyes but denied the involvement of Solache. Meanwhile, the crime scene received additional processing, with attention paid to footwear impressions. E.g. RFC 62, 343, 345.

77. Having been implicated a second time, Reyes was interviewed again. During this interview, Reyes also implicated himself and Solache. He thereafter signed a consent to search form to have his bedroom searched. RFC 236.

78. While the search was ongoing, Rosauro was interviewed by assistant state's attorneys. Shortly thereafter, Adriana was informed of statements made by Reyes and then admitted to lying about the non-involvement of Solache. Accordingly, Solache was interviewed again, at which point he implicated himself. Items of potential evidentiary value were collected from both Reyes and Solache. RFC 236-237.

79. That evening, Adriana, Solache, and Reyes were all interviewed by assistant state's attorneys, after which time they provided written statements. Rosauro did as well. Meanwhile, a vehicle possibly involved in the commission of the crimes was located, brought in, and processed and photographed. RFC 235.

80. Having found the two children in their possession, and with written statements from each of them (as well as other witnesses) taken by assistant state's attorneys, Adriana, Solache, and Reyes were all charged with the murders and kidnappings. Rosauro was released without charging.

### E. Post-Charging Investigation

81. Following their charging, each of them were booked.

82. At the behest of the Cook County State's Attorney's Office, officers interviewed additional family members to clarify news reports and get additional information. Items of potential evidentiary value were also collected and sent to the crime lab for processing.

83. In the days that followed, additional investigative actions were taken. Crime scene photos taken at the time the bodies were initially discovered were learned to have been damaged due to a faulty[3] camera and, thus, new photos were requested, taken, and provided. RFC 266. Additionally, blood was found on several items, including the clothing and shoes of Adriana, as well as on a towel found in the vehicle that had been examined.

### F. Tasks and Statements

84. Having assessed the aforementioned roll-out of various investigatory tasks in Sections A through E, it is my professional opinion that these were appropriate investigative steps to take to conduct a thorough investigation. It is also my opinion that, looking at these tasks as a whole and in the order in which it all came about, there was not tunnel vision employed.

85. On the contrary, officers did what any seasoned investigator would do: they took the next step, and then the next step, and then the next. In other words, officers made use of the information they had and actively worked to seek out more information. When officers found the decedents and missing children, they called in detectives, the crime lab, and started looking for the children. When one of the children was brought into the station, they questioned the people who brought him. When Adriana was trying to pass off one of the children as her newborn, she was questioned about her knowledge. Having known the amount of blood that was present at the scene, clothing and personal items of the possible suspects and of the children were collected for testing. And this list of tasks, of course, goes on. Officers took the information that they had, even something as simple as a possible phone number Rosauro had gotten on a woman named Norma, and put it into action—calling the number, getting a phone study, bringing her in for a lineup, and so on.

86. Any homicide investigator unequivocally knows that one first interviews those individuals who: (1) have been identified by witnesses; (2) have been found with items of evidentiary value; (3) have been found at/near the crime scene; (4) are associated with individuals covered by one of the three aforementioned categories and/or gleaned from those initially interviewed; and (5) are family members of the victims and/or suspects. Here, officers

---

[3] A faulty camera issue is not a surprise to me considering the 1998 timestamp. I can recall where crime scene photography was damaged due to issues such as this back in the 1990s. This was especially true when crime scenes were still being photographed using 35mm cameras and photographic film. With today's technology, a lab technician has immediate access to the photographs and would have noticed an issue with their equipment almost immediately. From my experience, lab techs would not have had that same advantage in 1998.

spoke with many people—family (in Chicago and in other states/locations), friends, neighbors, coworkers, housemates, and even a neighborhood canvas. They also spoke to the four people who held the most important evidence in their hands: the four people who had possession of the missing children.

87. As an initial matter, individual statements—especially in instances where more than one possible perpetrator is involved—are never 100% the same. Moreover, each homicide investigation has its own complexities and differences. For these reasons, when the aforementioned categories of individuals have been interviewed, a homicide detective will usually assess a variety of angles: the truthfulness of the statements provided; whether the statements are plausible when compared to the scene and/or known evidence and/or other witnesses' statements; and what, if any, other tasks and/or interviews need to be conducted. This list is not exhaustive, but it provides some of the more immediate reactions officers will have and look for in interviewing.

88. Mr. Tiderington raises that inappropriate tunnel vision was employed in this investigation—namely, officers wrongfully narrowed in on Adriana, Reyes, Solache, and Rosauro. However, to maintain this assertion would be to discount at least two noteworthy pieces of information: (1) that each of the four of them were in possession of at least one missing child of a couple who was brutally stabbed and murdered, and (2) that Rosauro was released without charges despite going through multiple interviews, having spent the same amount of time in custody as the others, and having brought one of the two children into the station as well. Thus, had there been actual tunnel vision, it is unclear to me how Rosauro would be released without charging. The simple answer is that the investigation showed he was not involved and could not be held, while—through evidence, statements of others, and their own confessions[4]—it showed Adriana, Reyes, and Solache were involved.

89. Had no confessions been obtained and credible information from other witnesses/physical evidence ruled out Adriana, Reyes, and/or Solache, then it would have been appropriate for the officers to continue to seek out more suspects. That did not occur, however, and releasing Rosauro without charges is an example of how investigators presented all they had to the assistant state's attorneys, who then determined what charges should come forth.

90. In that same vein, Mr. Tiderington's assertion that this was a "guilt-presumptive" investigation falls short. As an initial matter, the lack of a confession from and release of Rosauro cuts against that. But more importantly, investigators should question the people

---

[4] When interviewing a suspect or otherwise, an officer should not use physical force to beat up on their subject. It is my understanding from the Complaint that allegations made here by Plaintiffs assert that physical force was used to coerce statements from them. If a physical beating did factually take place, that would not be accepted police activity and would be of concern. Unfortunately, testimony provided in this case on that issue is at odds, and I cannot offer my opinion as to the credibility of that testimony. Thus, I can only speak to my review of the documents I was provided, and according to those documents, I did not see evidence of a physical beating.

who have the missing children about why they have them and what they knew about the murder. Indeed, investigators should question those individuals' motivations, whereabouts, and knowledge of the missing children's acquisition. Moreover, if one or more of them implicates another, investigators should question those implicated individuals further to ascertain additional information. This case is not a case where police targeted random individuals on the street and coerced them into confessing—this is a case where the missing children of two brutally murdered parents were found in the possession of four specific individuals, and police took their lead. Failing to investigate these four individuals would be the actual deviation from acceptable police practices.

91. Anyone who has ever been a homicide detective would know and understand that it would have been a neglect of their duties if officers would have simply taken Santiago Soto, thanked the men who brought him to CPD, and allowed them to go on their way with little to no questions. It was the prudent, sound decision-making of the investigators to question those who brought Santiago in. Similarly, it would have been a neglect of duty to do the same for Adriana, found with baby Maria.

92. As I have said before, hindsight is 20/20. In every investigation I participated in during my career—either as lead investigator, co-lead investigator, or as part of a team of investigators—there was undoubtedly always something that "could have" been done: that one extra question I should have asked the witness or suspect; that one extra photograph I should have requested the crime scene technician take; that extra 25 feet I should have extended the crime scene. All homicide detectives have had to live with these questions, especially after having an offender acquitted because of such issues. Not every investigation was flawless or free of all errors, but I do not see evidence here that officers failed to fulfill their investigative roles.

93. As to supervisory actors, there is a difference between being a detective investigating a case and being the commander/overseer of an investigative unit. Supervisors are not the boots-on-the ground individuals conducting the day-to-day investigatory tasks and, based on my 40 years of experience in Miami, are not usually overseeing just one homicide case at a time either. It is not wise to micromanage your investigators; rather, a supervisory actor should be keeping themselves updated on case developments and assist where necessary with logistics, tools, and manpower. He or she will not be an active participant in the direct evidentiary tasks themselves.

## G. Searches

94. Mr. Tiderington appears to opine that CPD detectives should have gotten search warrants instead of the consent to search forms they obtained at various points. Report, at p. 29. The courts, including the U. S. Supreme Court, have many times ruled on both the validity and lawfulness of "Consent Searches." In my 40+ years of experience, I often used, or saw another officer use, a consent to search form in lieu of obtaining a search warrant. Mr. Tiderington's assertion that a warrant should have been used instead discounts and/or

ignores issues of practicality, timeliness, and the fact that a consent to search is a valid procedure.

95. Here, the Soto Investigation on April 3rd and April 4th was a rapidly-developing one, simultaneously proceeding in many different stages. The more complex and time-consuming process of securing a search warrant would have caused an unnecessary delay when CPD was already well within its rights and legal obligations to request a consent to search form from Rosauro Mejia (and, subsequently, others). Moreover, if anyone had rejected consent, officers then could have obtained a search warrant.

### H. Report-writing

96. Mr. Tiderington opines at various points that individuals were either not "meaningfully question[ed]" or interviews of them were not documented. Report, at pp. 15, 31, 64. In my years of experience in one of the busiest homicide units in the country, there is a much simpler third option: an extremely busy homicide unit, with extremely busy homicide detectives, can occasionally make errors.

97. During my tenure in the homicide unit, there were times when I took weeks or months to complete my final reports due to the magnitude of murders and new cases occurring almost daily. Detectives were often assigned several murder cases in the span of just a few months, so we did not have the luxury of dedicating all our investigative time to just a single case. Even as a homicide detective sergeant, I would provide my subordinate detectives with the leeway to delay the completion of their final reports due to the number of other cases they were investigating. For a large metropolitan homicide unit, this would neither be unusual, nor surprising.

98. Certainly, officers should endeavor to be accurate, complete, and to compile reports as close-in-time as is possible to the events the report is intended to capture; however, the contemporaneous memorialization of events is not always feasible. While police investigative policies and best practices call for documentation of a detective's findings, nothing prohibits them from completing reports at a later date. Many investigations span several months and sometimes years; thus, it is their responsibility to utilize both their notes and their memories when completing the final or closing supplementary reports. In my review, I found no evidence that the officers excluded exculpatory evidence or statements in their reports.

## I. Conclusion[5]

99. Lastly, I note one final piece of information that cannot be discounted from consideration: that Adriana remains incarcerated for these crimes and that she maintains the involvement of Reyes and Solache to this day. Whether she is a credible witness is not for me to opine, but her commitment to their involvement remains a point of relevance and cannot be stricken from the conversation.

100. For all the reasons mentioned above, it is my professional opinion that the officers acted in accordance with generally accepted police practices and procedures during the course of the Soto Investigation.

Dr. Nelson Andreu

---

[5] I reserve the right to modify any portion of this Report if new and/or additional information is provided for my review.