LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

**CASE NO. 1:18-CV-1028**

**CASE NO. 1:18-CV-2312**

**ARTURO DELEON-REYES**

**V.**

**REYNALDO GUEVARA, ET AL.**

**AND**

**GABRIEL SOLACHE**

**V.**

**CITY OF CHICAGO, ET AL.**

**DEPONENT: BERNARD MURRAY, VOLUME I**

**DATE: FEBRUARY 7, 2023**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CASE NO. 1:18-CV-1028
CASE NO. 1:18-CV-2312


ARTURO DELEON-REYES,
Plaintiff


v.


REYNALDO GUEVARA, ET AL.,
Defendants


AND


GABRIEL SOLACHE,
Plaintiff


v.


CITY OF CHICAGO, ET AL.,
Defendants


DEPONENT:  BERNARD MURRAY, VOLUME I

DATE:      FEBRUARY 7, 2023

REPORTER:  EMILIA LOPEZ



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 3 of 71 PageID #:85702
The Deposition of BERNARD MURRAY, VOLUME 1, taken on February 07, 2023

2..5

Page 2

```
1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ARTURO DELEON-REYES:
4      Anand Swaminathan, Esquire
5      Annie Prossnitz, Esquire
6      Loevy & Loevy
7      311 North Aberdeen Street
8      Third Floor
9      Chicago, Illinois 60607
10     Telephone No.: (312) 243-5900
11     E-mail: anand@loevy.com
12     (Appeared via Videoconference)
13
14   ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:
15     Jan Susler, Esquire
16     People's Law Office
17     1180 North Milwaukee Avenue
18     Chicago, Illinois 60642
19     Telephone No.: (773) 235-0070
20     E-mail: jsusler@peopleslawoffice.com
21     (Appeared via Videoconference)
22
23
24
25
```

Page 4

```
1
2                 APPEARANCES (CONTINUED)
3
4    ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
5      Michael J. Schalka, Esquire
6      Leinenweber Baroni & Daffada LLC
7      120 North La Salle Street
8      Suite 2000
9      Chicago, Illinois 60602
10     Telephone No.: (866) 786-3705
11     E-mail: mjs@ilesq.com
12     (Appeared via Videoconference
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1               APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO AND THE
4    DEPONENT, BERNARD MURRAY:
5      Theresa Berousek Carney, Esquire
6      Rock Fusco & Connelly, LLC
7      333 West Wacker
8      Floor 19
9      Chicago, Illinois 60606
10     Telephone No.: (312) 494-1000
11     E-mail: tcarney@rfclaw.com
12     (Appeared via Videoconference)
13
14   ON BEHALF OF THE DEFENDANTS, ERNEST HALVORSEN, EDWIN
15   DICKINSON, R. RUTHERFORD, STANKUS, NAUJOKAS, J.
16   KARALOW, MARK HARVEY, DANIEL TREVINO, EDWARD MINGEY,
17   BIEBEL, AND FRANK J. CAPPITELLI:
18     Caroline Golden, Esquire
19     The Sotos Law Firm, P.C.
20     141 West Jackson Boulevard
21     Suite 1240A
22     Chicago, Illinois 60604
23     Telephone No.: (630) 735-3300
24     E-mail: cgolden@jsotoslaw.com
25     (Appeared via Videoconference)
```

Page 5

```
1                     INDEX
2                                            Page
3    PROCEEDINGS                               7
4    DIRECT EXAMINATION BY MR. SWAMINATHAN     9
5
6
7                    EXHIBITS
8    Exhibit                                  Page
9    1 - Expert Report                         35
10   2 - Mr. Brasfield's Report                67
11   3 - Materials Reviewed                    71
12   4 - Special Order 83-1                   121
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
 1              STIPULATION

 2

 3   The VIDEO deposition of BERNARD MURRAY, VOLUME I was

 4   taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN

 5   STREET, SUITE 101, LOUISVILLE, KENTUCKY 40220, via

 6   videoconference in which all participants attended

 7   remotely, on TUESDAY, the 7th day of FEBRUARY, 2023 at

 8   10:08 a.m. CENTRAL TIME; said VIDEO deposition was taken

 9   pursuant to the FEDERAL Rules of Civil Procedure. The

10   oath in this matter was sworn remotely pursuant to

11   FRCP 30.

12

13   It is agreed that EMILIA LOPEZ, being a Notary Public

14   and Court Reporter for the State of ILLINOIS, may swear

15   the witness and that the reading and signing of the

16   completed transcript by the witness is not waived.

17

18

19

20

21

22

23

24

25
```

Page 7

```
 1              PROCEEDINGS

 2

 3        THE REPORTER:  Okay.  We're now on the record.

 4   My name is Emilia Lopez.  I'm the online video

 5   technician and court reporter today representing

 6   Kentuckiana Court Reporters, located at 730 West

 7   Main Street, Suite 101, Louisville, Kentucky,

 8   40202.  Today is the 7th day of February 2023 and

 9   the time is 10:08 a.m. Central Time.  We're

10   convened by videoconference to take the deposition

11   of Bernard Murray in the matter of Arturo DeLeon-

12   Reyes v. Reynaldo Guevara, et al., case number

13   1:18-CV-1028, and Gabriel Solache v. City of

14   Chicago, et al, case number 1:18-CV-2312 pending in

15   the U.S. District Court for the Northern District

16   of Illinois Eastern Division.  Will everyone but

17   the witness please state your appearance, how

18   you're attending, and your location, starting with

19   the plaintiff's counsel?

20        MR. SWAMINATHAN:  Hi, good morning.  Anand

21   Swaminathan for Plaintiff Arturo DeLeon-Reyes,

22   appearing by Zoom from Chicago.

23        MS. SUSLER:  Jan Susler on behalf of the

24   plaintiff Gabriel Solache also on Zoom in Chicago.

25        MS. CARNEY:  Theresa Carney on behalf --
```

Page 8

```
 1        MR. SWAMINATHAN:  I'm sorry, Theresa, we have

 2   my colleague Annie's on --

 3        MS. CARNEY:  Oh, sorry.  Go ahead.

 4        MR. SWAMINATHAN:  So I decided to let her join

 5   in.  Sorry.

 6        MS. PROSSNITZ:  Annie Prossnitz appearing on

 7   behalf of Mr. Reyes, appearing from Washington D.C.

 8        MR. SCHALKA:  Michael Schalka on behalf of

 9   Defendant Guevara, appearing from -- remotely from

10   Chicago.

11        MS. GOLDEN:  Caroline Golden for the

12   individual officer defendants Halvorsen, Dickinson,

13   Rutherford, Stankus, Naujokas, Karalow, Harvey,

14   Trevino, Mingey, Biebel, and Cappitelli.

15        MS. CARNEY:  Theresa Carney on behalf of the

16   City of Chicago, as well as the department.

17        THE REPORTER:  Thank you.  And Mr. Murray,

18   will you please state your full name for the

19   record?

20        THE WITNESS:  Yes.  Bernard Murray.

21        THE REPORTER:  Murray.  Okay.  Do all parties

22   stipulate that the witness is in fact Bernardo

23   [sic] Murray?

24        MR. SWAMINATHAN:  So stipulated for Plaintiff

25   Reyes.
```

Page 9

```
 1        MS. SUSLER:  So stipulated for Plaintiff

 2   Solache.

 3        MS. CARNEY:  For the record, it's Bernard not

 4   Bernard.

 5        THE REPORTER:  Bernard?  Okay.  Sir, will you

 6   please raise your hand?  Do you solemnly swear or

 7   affirm the testimony you're about to give will be

 8   the truth, the whole truth, and nothing but the

 9   truth?

10        THE WITNESS:  I do.

11        THE REPORTER:  Thank you.

12              DIRECT EXAMINATION

13   BY MR. SWAMINATHAN:

14        Q.   Good morning, Mr. Murray.  Could you please

15   state and spell your name for the record?

16        A.   It's Bernard Murray, B-E-R-N-A-R-D.  Murray,

17   M-U-R-R-A-Y.

18        Q.   Okay.  And we've met before in prior

19   instances.  Nice to see you again.  Let me start by

20   asking you, sir, you have given depositions before in

21   the past, correct?

22        A.   I have.

23        Q.   Okay.  In how many instances have you been

24   deposed?

25        A.   Twice.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 5 of 71 PageID #:85704
The Deposition of BERNARD MURRAY, VOLUME 1, taken on February 07, 2023

10..13

Page 10

1    Q.   Okay.  And were both -- those both in matters
2   in which you were serving as an expert consultant for
3   the City of Chicago?
4        A.   Yes.
5        Q.   Okay.  Have you ever taken depositions before?
6        A.   No.
7        Q.   Okay.  And obviously you have -- you -- you're
8   a longtime former prosecutor, correct?
9        A.   Current prosecutor.
10       Q.   Current prosecutor.  My apologies.  Where are
11  you currently a prosecutor?
12       A.   DuPage County State's Attorney's Office.
13       Q.   Okay.  All right.  You're still there at this
14  time?
15       A.   I am.
16       Q.   And when did you begin there?
17       A.   I started in DuPage County in January of 2009.
18       Q.   Okay.  And in that capacity, you are a trial
19  prosecutor, correct?
20       A.   I'm -- I'm -- I'm in supervisory roles though
21  I also conduct trials.
22       Q.   Okay.  Suffice to say you have a lot of
23  experience questioning witnesses under oath, correct?
24       A.   I have.
25       Q.   Okay.  All right.  Let me just go through the

Page 11

1   ground rules, although I know you know them, but let's
2   go through them quickly.  So this is obviously a
3   deposition.  Basically a question and answer session.
4   I'll ask my questions, you'll answer them to the best of
5   your ability.  And the court reporter is going to take
6   it all down, so during the deposition, please make sure
7   that I complete my question before you answer my
8   question so the court reporter is not trying to take
9   down two people at the same time, fair?
10       A.   Yes.
11       Q.   Okay.  If for some reason I have cut you off,
12  because I thought you finished your question, please let
13  me know and I'll let you continue, okay?
14       A.   Yes.
15       Q.   And likewise, there may be times when you know
16  where I'm going with my question and there'll be many
17  times where you know where I'm going with my question.
18  Please make sure I've completed my question before you
19  answer, fair?
20       A.   Yes.
21       Q.   Okay.  Again, because the court reporter is
22  trying to write it all down, no non-verbal
23  communication, no "uh-huhs" or nods of your head, okay?
24       A.   Yes.
25       Q.   If I ask you a question and you don't

Page 12

1   understand it, please tell me and I will rephrase the
2   question, okay?
3        A.   Yes.
4        Q.   And if you -- if I ask you a question and you
5   answer my question, I'll assume you understood my
6   question; is that fair?
7        A.   Yes.
8        Q.   Okay.  If at any time you need to take a
9   break, we can take a break.  Please just let me know and
10  we will do that.  The only requirement is that you
11  complete answering any pending question before we take a
12  break, okay?
13       A.   I understand.
14       Q.   Okay.  This is a yes or no question, so I'm
15  not looking to get into your medical history in any way.
16  Do you have any medical conditions that would prevent
17  you from being able to understand my questions and
18  answer them truthfully today?
19       A.   No.
20       Q.   And, sir, are you taking any medications that
21  would prevent you from being able to understand my
22  questions and answer them truthfully today?
23       A.   No.
24       Q.   Okay.  All right.  Can you tell me in how many
25  instances you have served as a -- as an expert in

Page 13

1   litigation?
2        A.   Two.
3        Q.   Two cases prior to this one; is that right?
4        A.   Yes.
5        Q.   Okay.  And are those two cases both completed
6   at this stage?
7        A.   Yes, they are.
8        Q.   Okay.  And I'm going to venture a guess that
9   the two prior cases in which you served as an expert are
10  the Jacques Rivera case and the Nathson Fields case; is
11  that correct?
12       A.   That's correct.
13       Q.   Okay.  And so since the -- since you're --
14  since -- strike that.  Since the conclusion of your
15  involvement in those cases, the next case in which
16  you have served as an expert is this case, the Reyes,
17  Solache case; is that correct?
18       A.   Yes, it is.
19       Q.   Okay.  And are you serving as a -- as an
20  expert in any other cases?
21       A.   No.
22       Q.   Okay.  Have you been retained to serve as an
23  expert in any other cases?
24       A.   No.
25            MS. GOLDEN:  Objection.  Calls for an invasion



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 6 of 71 PageID #:85705
The Deposition of BERNARD J. MURRAY, VOLUME 2, taken on February 27, 2023
14..17

Page 14

1    of the privilege.  Or potentially does, but I'll
2    withdraw it based on the answer.
3    BY MR. SWAMINATHAN:
4        Q.   All right.  And how much are you being paid
5    for your work in this case?
6        A.   I am not being compensated.
7        Q.   When you say you're not being compensated, are
8    you doing the case for free?
9            MS. CARNEY:  Objection.  Form.
10           THE WITNESS:  I'm -- I'm -- I'm not being
11    compensated.  Work -- work requirements and
12    (Inaudible).
13   BY MR. SWAMINATHAN:
14       Q.   Oh, sorry.  It -- the -- it -- the -- it's
15   cutting out as you're talking there, so I only got half
16   your answer.
17       A.   I'm not being compensated because my -- my
18   DuPage County State's Attorney's Office employment
19   precludes me from accepting monetary legal employment
20   outside of the office.
21           MR. SWAMINATHAN:  Okay.  It's kind of coming
22           in and out a little bit for me.  Madam Court
23           Reporter, is this -- are you getting the same
24           thing?
25           THE REPORTER:  Yeah, it is.

Page 15

1            MR. SWAMINATHAN:  Can we try to see, is there
2            a mic that we can move a little closer?  Maybe it's
3            just not catching him all the time.
4            MS. CARNEY:  It's in the ceiling, so I can't
5            move it.  So just to keep --
6            THE WITNESS:  I'll keep my voice up.
7    BY MR. SWAMINATHAN:
8        Q.   Okay.  Let's see if that works.  I'm going to
9    ask the question again, I apologize, and let you answer
10   again, just because it came in and out from what we
11   heard, okay?  So let me just ask it again.  Sir, are you
12   doing this case for free?
13       A.   My employment with DuPage County State's
14   Attorney's Office precludes me accepting compensation
15   for legal work outside of that office.  Not accepting
16   --
17       Q.   Okay.
18       A.   -- compensation for that reason.
19       Q.   Okay.  And is there anybody who's receiving
20   compensation for your work in this case?  DuPage County,
21   or anybody else?
22       A.   No.
23       Q.   Okay.  When you agreed to offer expert
24   opinions in this case, did you do so with an
25   understanding that you would not receive any

Page 16

1    compensation for your work?
2        A.   No.  I -- I thought I could be compensated
3    when I accepted expert in this case.
4        Q.   Okay.  Did you get -- you -- I think it cut
5    out a little bit there, but I think I got it --
6        A.   I -- I -- I expected to be compensated when I
7    was employed in this case.
8        Q.   Okay.  And how recently did you learn that you
9    could not be compensated?
10       A.   I believe it was August or September --
11       Q.   Okay.
12       A.   -- 2022.
13       Q.   And at that point, had you submitted any
14   invoices on the matter?
15       A.   No.
16       Q.   And at -- to date, have you submitted any
17   invoices on the matter?
18       A.   I have not.  I've totaled up my hours that I
19   worked on the case, but I -- obviously it's not for
20   received compensation.
21       Q.   Okay.  What is the hourly rate that you had
22   agreed upon prior to you -- to learning that you could
23   not be compensated?
24       A.   $200 an hour when I'm working on the file,
25   filing my report, and $300 an hour for deposition or

Page 17

1    court testimony.
2        Q.   Okay.  And if you had -- strike that.  If you
3    had known that you could not be compensated for your
4    work on this matter, would you agree to be retained and
5    offered disclosed opinions in this matter?
6            MS. CARNEY:  Form.
7            THE WITNESS:  I've -- I had already done -- I
8            already received the file and was ready to work on
9            it, so I don't know how I would answer that.  I
10           would have to say that I felt I'd already been
11           familiar with the case, I would've stayed on it.
12   BY MR. SWAMINATHAN:
13       Q.   If you are asked to perform -- strike that.  If
14   you're asked to perform expert work on behalf of the
15   City of Chicago in a future case, I assume the DuPage
16   County requirements would still apply to you, correct?
17       A.   Yes.
18       Q.   In other words, if you were asked to work on
19   future work, you would not be able to be compensated for
20   that work, correct?
21       A.   Yes.
22       Q.   And if you're asked for --
23           MS. GOLDEN:  Object to foundation.
24   BY MR. SWAMINATHAN:
25       Q.   And if you are asked to perform future work

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 7 of 71 PageID #:85706
The Deposition of BERNARD MURRAY, VOLUME 2, taken on February 07, 2023

18..21

Page 18

1  for the City of Chicago and offer disclosed opinions, do
2  you intend to agree to do such work if the facts are
3  right or at this point, knowing that you can't be
4  compensated, would you decline to perform expert work?
5       MS. GOLDEN:  Form.
6       MS. CARNEY:  Form.  Calls for speculation.
7  BY MR. SWAMINATHAN:
8       Q.  Go ahead.
9       A.  I don't know.
10      Q.  You know -- you're not sure what you would do
11  in that situation.
12      A.  I'm not sure what I would do in that
13  situation.
14      Q.  So it's possible that in --
15      MS. GOLDEN:  One second, Anand.  Anand.
16      MR. SWAMINATHAN:  Go ahead.
17      MS. GOLDEN:  Please, just one second.  I'm --
18  have a belated objection to form.  Thank you.
19  BY MR. SWAMINATHAN:
20      Q.  In future cases, you would consider --
21      MS. CARNEY:  One second.
22      MR. SWAMINATHAN:  Oh, I'm sorry.  Somebody's
23  saying something?
24      MS. CARNEY:  You need to listen and, like,
25  give a second for people to object.

Page 19

1       THE WITNESS:  I will.
2       MS. GOLDEN:  Yeah.  Mr. Murray, just with the
3  lag in the video feed, I don't want to interrupt
4  you.  So if you could just pause for a second before
5  answering, just so I can get a chance to object if
6  I need to.  Appreciate it.
7       THE WITNESS:  Yes, I will.
8       MS. GOLDEN:  Thank you.
9  BY MR. SWAMINATHAN:
10      Q.  So if you're asked to offer disclosure
11  opinions in future cases for the City of Chicago, you
12  would consider doing so even if you're not compensated;
13  is that fair?
14      MS. CARNEY:  Objection.  Form.  Calls for
15  speculation.
16      THE WITNESS:  I don't know.
17  BY MR. SWAMINATHAN:
18      Q.  I'm asking if you would consider it or if you
19  would preclude it.  Is the answer you would consider it
20  or the answer is you don't know if you would consider
21  it?
22      MS. GOLDEN:  Objection.  Asked and answered.
23      THE WITNESS:  I don't know if I would consider
24  it.
25  BY MR. SWAMINATHAN:

Page 20

1       Q.  Okay.  All right.  How many total hours have
2  you said you've -- strike that.  You said you've kept a
3  total of the number of hours you worked on this matter.
4  How many hours is that?
5       A.  Check the document I created, approximately 41
6  hours.
7       Q.  Okay.  And is that 41 hours up to and through
8  the time of your disclosed report, or at some point
9  before or after that?
10      A.  It's through my disclosed report.  No, I'm
11  sorry.  It's through this morning.
12      Q.  Through this morning, okay.  So if I
13  understand correctly, you've totaled up your hours in a
14  document up to this point and it's 41 hours; is that
15  right?
16      MS. CARNEY:  Objection.  Form.
17  BY MR. SWAMINATHAN:
18      Q.  Go ahead.
19      A.  It's -- I'm -- I'm approximating it, but I
20  think it's 41 hours through this morning.
21      Q.  Okay.  And how many hours did you spend
22  preparing for today's deposition?
23      A.  Maybe two hours last week.
24      Q.  And that two hours, was that reviewing
25  materials or was that in meeting with Counsel?

Page 21

1       A.  Both.
2       Q.  Okay.  So -- strike that.  Have you had any
3  meetings with Counsel in preparation for today's
4  deposition?
5       A.  Yes.
6       Q.  And how long was your meeting with Counsel?
7       A.  Approximately two, two and a half hours.
8       Q.  Okay.  Who was present at that meeting other
9  than yourself?
10      A.  Ms. Carney.
11      Q.  Anyone else?
12      A.  No.
13      Q.  And during that meeting, did you review your
14  expert report?
15      A.  Yes.
16      Q.  Did you review any other materials?
17      A.  I had the -- Mr. Tiderington's report as well.
18      Q.  Anything else that you reviewed in that
19  meeting?
20      A.  No.
21      Q.  Did you do anything else to prepare for
22  today's deposition other than that two to two and a half
23  hour meeting with Ms. Carney?
24      A.  I read over the same materials yesterday.
25      Q.  When you say same materials, you're referring



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 8 of 71 PageID #:85707
The Deposition of BERNARD MURRAY, VOLUME 2, taken on February 7, 2023

22..25

Page 22

1  to your report and the expert report of Mr. Tiderington,
2  correct?
3      A.   Yes.
4      Q.   Okay.  Anything else you did to prepare for
5  today's deposition?
6      A.   I also looked at a police order.  I think it's
7  8301.  And I looked at parts of my previous deposition
8  Rivera.
9      Q.   And you did that outside the presence of
10 Counsel, I take it?
11     A.   Yes.
12     Q.   Okay.  And how long did you spend reviewing --
13 strike that.  Anything else that you reviewed other than
14 the -- your expert report, expert report of Mr.
15 Tiderington, special order 83-1, and parts of your
16 Rivera deposition?
17     A.   Preparing for the deposition, that's all I
18 reviewed.
19     Q.   Okay.  And how long did you spend reviewing
20 the special order and the parts of the Rivera
21 deposition?
22     A.   Reviewing the deposition, maybe longer, maybe
23 three hours as well as the report.
24     Q.   You cut out there.  "Three hours as well as,"
25 and I didn't catch it.

Page 23

1      A.   Also included in that time was the deposition
2  and the police order.
3      Q.   Okay.  So in preparation for this deposition,
4  you've spent approximately five to five and a half hours
5  meeting with Counsel and reviewing certain documents; is
6  that fair?
7      A.   That sounds like a good approximation.
8      Q.   Okay.  Anything else you've done in the period
9  between the time that you completed your expert report
10 in this matter and this morning?
11     A.   No.
12     Q.   Okay.  So if we want to understand the total
13 hours that you've spent approximately in preparing your
14 report, it would be the 41 hours, up to this point,
15 minus the five to five and a half hours you spent in
16 preparation; is that fair?
17     A.   No, that -- actually that's not accurate.  I'd
18 say the five hours are in -- in addition to the 41.
19     Q.   Okay.  So 41 hours was up to the point that
20 you completed your disclosed report?
21     A.   That's correct.
22     Q.   And then you spent an additional five to five
23 and a half hours on -- in preparation for this
24 deposition.  Do I have that right?
25     A.   Yes.

Page 24

1      Q.   Okay.  When you reviewed your testimony, you
2  said it was the deposition that you gave in the Jacques
3  Rivera case; is that correct?
4      A.   Yes.
5      Q.   When you reviewed your testimony from the
6  Jacques Rivera deposition, did you find anything in that
7  deposition transcript that was incorrect?
8      MS. CARNEY:  Objection.  Form.
9      THE WITNESS:  No.
10 BY MR. SWAMINATHAN:
11     Q.   Let me strike that.  Let me ask a better
12 question.  When you reviewed your testimony from the
13 Rivera deposition, did you find that there were any
14 answers you had given that were inaccurate or incorrect?
15     A.   No.
16     Q.   When you reviewed that deposition transcript
17 from the Rivera matter, did you find that there were any
18 answers you were given -- you had given that were false?
19     A.   No.
20     Q.   Do you stand by the answers you gave in the
21 transcript of the Rivera deposition?
22     A.   Yes.
23     Q.   Okay.  Have you at any point reviewed the
24 testimony that you gave at the Rivera trial?
25     A.   No.

Page 25

1      Q.   At any point since you completed that
2  testimony at the Rivera trial, did you think to yourself
3  -- strike that.  At any point, have you come to believe
4  that there was any testimony you gave at the Rivera
5  trial that was false or inaccurate?
6      A.   No.
7      Q.   Do you have any reason to believe any of the
8  testimony you gave at the Rivera trial was false or
9  inaccurate?
10     A.   No.
11     Q.   And do you stand by the testimony you gave at
12 the Rivera trial?
13     A.   Yes.
14     Q.   Have you had an opportunity to review your
15 testimony from the Nathson Fields trial?
16     A.   No.
17     Q.   Did you review it in preparation -- strike
18 that.  Did you review your testimony at the Fields trial
19 in your work in preparing your expert report in the
20 Rivera case?
21     A.   I -- I may have reviewed my deposition in
22 preparing for the Rivera deposition, but frankly I -- I
23 don't recall right now if -- if I did that.  I think I
24 did that.  That's what I'm guessing.
25     Q.   In other words, you recall reviewing your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 9 of 71 PageID #:85708
The Deposition of BERNARD J. MURRAY, VOLUME 2, taken on February 07, 2023
26..29

Page 26

1  Fields deposition testimony during the course of your
2  involvement in the Rivera matter; is that fair?
3      A.   That's my best recollection.
4      Q.   Okay.  At any point when you reviewed your
5  testimony from the Fields deposition, did you find that
6  any of the answers you had given were false or
7  inaccurate?
8          MS. GOLDEN:  Object to foundation.
9          THE WITNESS:  No.
10 BY MR. SWAMINATHAN:
11     Q.   At any point after you completed -- strike
12 that.  At any point during or after the Fields
13 deposition, did you believe that you had provided any
14 information that was false or inaccurate?
15         MS. GOLDEN:  Same objection.
16         THE WITNESS:  No.
17         MS. GOLDEN:  Add form.
18         THE WITNESS:  No.
19 BY MR. SWAMINATHAN:
20     Q.   And do you stand by your deposition testimony
21 in Fields?
22         MS. GOLDEN:  Form.
23         THE WITNESS:  Yes.
24 BY MR. SWAMINATHAN:
25     Q.   And have you had an opportunity at any point

Page 27

1  to review your trial testimony in the Fields matter?
2      A.   No.
3      Q.   At any point during or after you gave that
4  testimony, did you come to believe any of that testimony
5  was false or inaccurate?
6      A.   I don't -- I don't think I understand the --
7  the form of that question.
8      Q.   Let me ask it again.
9      A.   During my testimony?
10     Q.   Say that again?  Sorry.
11     A.   During my testimony?
12     Q.   Yeah.  No, let me -- yeah.  So let me ask a
13 better question.  As you were giving the testimony at
14 the Fields trial, did you have any moment where you
15 thought to yourself ooh, I made a mistake.  I said
16 something I didn't mean to say?
17         MS. GOLDEN:  Foundation.
18         THE WITNESS:  No.
19 BY MR. SWAMINATHAN:
20     Q.   At any point after you gave your testimony at
21 the Fields trial you think to yourself oh, I gave
22 some testimony there that I didn't mean to give?
23         MS. CARNEY:  Objection.  Form.
24         THE WITNESS:  No.
25 BY MR. SWAMINATHAN:

Page 28

1      Q.   And so during -- strike that.  So either
2  during or after you gave testimony at the Fields trial,
3  did you ever come to believe that you'd provided any
4  information that was false or inaccurate at that trial?
5          MS. GOLDEN:  Foundation.
6          THE WITNESS:  No.
7  BY MR. SWAMINATHAN:
8      Q.   Go ahead.
9      A.   No.
10     Q.   And do you stand by your testimony from the
11 Fields trial?
12         MS. GOLDEN:  Form.
13         THE WITNESS:  Yes.
14 BY MR. SWAMINATHAN:
15     Q.   Okay.  And then last question in this line.
16 Apologies for sort of the tediousness of it.  You
17 testified in the Rivera trial, correct?
18     A.   Yes.
19     Q.   And have you had any opportunity to review
20 your trial testimony from Rivera?
21         MS. CARNEY:  Objection.  Asked and answered.
22         MR. SWAMINATHAN:  Did I do the Rivera trial?
23 I'm sorry.  You -- did you say yes, Theresa?
24         MS. CARNEY:  Yeah, you did, but that's okay.
25         MR. SWAMINATHAN:  I will take -- I will take

Page 29

1  you -- yeah, I trust you.  Thank you.  Let me move
2  on then.
3  BY MR. SWAMINATHAN:
4      Q.   In the Rivera matter, do you recall
5  approximately how many hours you spent in preparing your
6  report in that matter?
7      A.   I don't recall.
8      Q.   Okay.  In the Fields matter, do you recall how
9  many hours you spent preparing your report in that
10 matter?
11     A.   I don't recall.
12     Q.   Do you recall how much you were paid in the
13 Fields matter?
14     A.   An hourly rate?
15     Q.   No.  The total amount that you were paid in
16 Fields.
17     A.   I do not recall that amount.
18     Q.   Would it be accurate to say that the amount
19 you were paid in Fields was in the ballpark of
20 $100,000?
21     A.   I don't think it made it to $100,000, but it
22 was 90,000s for sure.
23     Q.   Okay.  So in the ballpark of 90,000 is what
24 you were paid for Fields; is that fair?
25     A.   That's my best recollection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    Q.   Okay.  And what's your best recollection of
2  the amount you were paid in the Rivera matter?
3    A.   Approximately 16,000, 17,000.  That's an
4  estimate.
5    Q.   Okay.  Okay.  In the Rivera matter, fair to
6  say you were paid in -- strike that.  In both the Rivera
7  matter and in the Fields matter, you gave depositions --
8  strike that.  In both the Rivera matter and in the
9  Fields matter, you gave disclosed opinions, gave
10  depositions, and testified at trial, correct?
11    A.   Yes.
12    Q.   All right.  And you were paid approximately
13  four times less in the Rivera matter than you were paid
14  in the Fields matter, correct?
15        MS. CARNEY:  Objection.
16  BY MR. SWAMINATHAN:
17    Q.   Go ahead.
18    A.   I'm not doing the math quickly, but sounds --
19  that sounds about accurate.
20    Q.   Okay.  And in both those cases, you charged
21  the same hourly rate, that is $200 per hour for your
22  review of materials and report writing, and then $300
23  per hour for testimony, correct?
24    A.   Yes.
25    Q.   Why were your total hours -- so in other

Page 31

1  words, not only were your -- was the total amount you
2  were paid approximately four times less, the total hours
3  you put into the case were approximately four times
4  less; is that fair?
5    A.   That's accurate.
6    Q.   Okay.  Why would -- why did you spend
7  approximately four times more in Fields than you did in
8  Rivera?
9        MS. GOLDEN:  Objection.  I think that goes
10    into the drafting process.
11  BY MR. SWAMINATHAN:
12    Q.   Go ahead.
13    A.   The --
14        MS. CARNEY:  Sorry.  I'm sorry.  I was just
15    trying to think of the question.  I'm going to
16    object to the extent that the answer is going to
17    impede on any of the attorney-client communications
18    you had with the attorney for Rivera.  Answer that
19    without going into drafting process or the --
20        THE REPORTER:  Last thing I heard was "or
21    the."
22        MS. CARNEY:  Or the communications with either
23    set of city attorneys on those cases.
24  BY MR. SWAMINATHAN:
25    Q.   Go ahead.

Page 32

1    A.   I -- I looked at fewer files -- Rivera.
2    Q.   When you say you looked at fewer files in
3  Rivera, you mean you -- there were fewer total files in
4  which you conducted a comparison of police files to
5  public defender files and prosecutor files; is that
6  right?
7    A.   Yes.
8    Q.   Okay.  In other words, there was a time-
9  consuming process of comparing files that you conducted
10  in the Fields case for many dozens of files, correct?
11    A.   Yes.
12    Q.   And then in Rivera, you didn't conduct that
13  same file comparison for nearly as many files, correct?
14    A.   Examined far fewer files.
15    Q.   Okay.  And then similarly in this case, you
16  examined far fewer files than you examined in Fields,
17  correct?
18    A.   Yes.
19    Q.   Okay.  And that's not because there were fewer
20  available files in the cases, it's because you decided
21  to review fewer files for purposes of your analysis in
22  this case, correct?
23        MS. GOLDEN:  Objection.  Privilege.
24        MS. CARNEY:  Objection.  Form.  Foundation.
25    And the extent that what you reviewed will --

Page 33

1  includes attorney-client communications.
2        THE REPORTER:  Last thing we heard was
3    attorney-client communications.
4        MS. CARNEY:  Sorry.  I'm objecting on the
5    grounds that to answer that question, it would
6    likely call for attorney-client communication.  So
7    if you can answer that question without revealing
8    our attorney- client communication work product,
9    you can, otherwise I'm going to instruct you not to
10    answer.
11        MS. GOLDEN:  And the decision-making process
12    in terms of drafting reports and formulating
13    opinions.
14  BY MR. SWAMINATHAN:
15    Q.   Go ahead, Mr. Murray.
16    A.   Forgot the question.
17        MR. SWAMINATHAN:  Let me ask again.  I -- I'm
18    having a little bit of struggle here with the sort
19    of sound coming in and out.  Is it -- Theresa, is
20    it possible to switch to your audio potentially?
21        MS. CARNEY:  Yeah, that won't -- it won't work
22    on mine.  I have a backup potentially coming in if
23    it's -- if it's continuing to be difficult, but
24    it's all -- it's the system in here.  So there's
25    not much I can do. So we can -- I can have a backup

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 11 of 71 PageID #:85710
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2020

34..37

Page 34

1  be brought in at some point.  It's going to take a
2  -- it'll take a minute to get it done.  So if we
3  just try to --
4      MR. SWAMINATHAN:  Do you have a sense of
5  generally how long that will take?
6      MS. CARNEY:  I don't because it's -- it -- the
7  system is supposed to be set up that it --
8      MR. SWAMINATHAN:  Let's go off the record for
9  a minute.  I think Theresa just stepped off.
10     THE REPORTER:  Okay.
11     MS. CARNEY:  No, I'm here.
12     MR. SWAMINATHAN:  Oh.
13     THE REPORTER:  Do you guys want to go off the
14  record?
15     MR. SWAMINATHAN:  Yeah.  Let's go off the
16  record.  I want to see if we can figure out --
17  because the in and out is a real challenge.
18     THE REPORTER:  Okay.
19     MR. SWAMINATHAN:  Especially when some of the
20  instructions are be given as the witness, and I
21  can't hear that.
22     THE REPORTER:  Going off the record.  The time
23  is 10:37 a.m.
24         (OFF THE RECORD)
25     THE REPORTER:  We're back on the record.  The

Page 35

1      time is 10:47 a.m.
2  BY MR. SWAMINATHAN:
3      Q.   All right.  Mr. Murray, I'm going to show you
4  a document we'll mark as Exhibit 1.  The copy of your
5  expert report in the case.  Do you have that in front of
6  you?
7         (EXHIBIT 1 MARKED FOR IDENTIFICATION)
8      A.   Yes, I do.
9  BY MR. SWAMINATHAN:
10     Q.   Okay.  And if you got it in front of you, I
11  don't think we need to put it up on the screen.  If at
12  any point it's useful for you -- if it's useful to you
13  for me to put it up on the screen, I will do that, okay?
14     A.   Okay.
15     Q.   All right.  Looking at Exhibit 1, that is a
16  copy of your expert report in this matter, correct?
17     A.   Yes.
18     Q.   Okay.  And you signed that expert report,
19  correct?
20     A.   Yes, I did.
21     Q.   And the expert report itself is --
22  let's see.  You signed it on the 23rd page, correct?
23     A.   Yes.
24     Q.   Okay.  And then in addition to that report,
25  you include your CV, correct?

Page 36

1      A.   Yes.
2      Q.   And then you also attached your materials
3  reviewed, right?  Two pages of materials reviewed?
4      A.   Yes.
5      Q.   And then subsequent to that, you have an
6  Attachment A, correct?
7      A.   Attachment A.
8         MS. CARNEY:  So you might have to put it up
9  because he --
10        THE WITNESS:  Yeah.
11        MS. CARNEY:  -- he does not have all the
12  attachments, hard copies.
13        MR. SWAMINATHAN:  Okay.  Let me -- yeah.  Let
14  me put it up.
15  BY MR. SWAMINATHAN:
16     Q.   All right.  So what I'm showing you now is
17  Exhibit 1, which I have identified as the -- as your
18  expert report.  Looking at -- let's just -- since I've
19  got it up on the screen here, looking at Page 23 of
20  Exhibit 1, that's your signature, correct, sir?
21     A.   Yes.
22     Q.   Okay.  And so Pages 1 through 23 constitute
23  the expert report that you disclosed in this matter,
24  correct?
25     A.   Yes.

Page 37

1      Q.   And you're not intending to offer any opinions
2  in this matter other than those disclosed on Pages 1
3  through 23 of your report; is that fair?
4      A.   That's my intention.
5      Q.   Okay.  And you're not intending to present to
6  the jury different opinions in those -- for additional
7  opinions other than those that are contained within your
8  report on Pages 1 through 23, correct?
9      A.   I don't intend to.
10     Q.   Okay.  And then after that -- strike that.
11  Exhibit 1 is a, in total, 167-page document.  Do you see
12  that?
13     A.   Show me that Exhibit -- Attachment A again.
14  I'm sorry.
15     Q.   Yes.  Let me get to that in one minute.
16  Exhibit 1 is a total of 167 pages.  And what I'm showing
17  you now is that on the next page, after you signed your
18  report, is a copy of your CV.  Do you see that?
19     A.   I do.
20     Q.   Okay.  And that is an accurate copy of the CV
21  that you disclosed in this matter, correct?
22     A.   It's where I disclosed, but it's not fully
23  accurate.
24     Q.   Okay.  And in what sense is it not accurate,
25  sir?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A.   Well, there's a further employment. After
2  2015, I actually worked for the Illinois State Appellate
3  Prosecutor's Office for less than one year, maybe nine
4  months. I also worked on a case for the Kane County
5  State's Attorney's Office. And then I returned to the
6  DuPage County State's Attorney's Office. I think that's
7  on there, returning to the State's Attorney's Office.
8    Q.   Okay. So in other words, there are a few
9  employment positions that you held that are not listed
10  in your professional experience here, correct?
11    A.   That's correct.
12    Q.   Okay. Any reason you omitted those from this
13  resume?
14    A.   The -- no, there isn't.
15    Q.   Okay. Did you consider those not to be
16  employment that was worthy of including on our resume?
17    A.   When I forwarded this resume for you using
18  this -- with this report, I thought it was my most up-
19  to-date resume. I realized over the weekend that it was
20  not.
21    Q.   Okay. And looking at your -- at this resume,
22  it indicates that your -- all of your professional
23  experience is in the role of a prosecutor; is that
24  correct?
25    A.   Yes, that is correct.

Page 39

1    Q.   Okay. And the two additional -- you
2  identified a couple of additional items of experience
3  that you have that were not listed on this report, but
4  those were also in a role as a prosecutor, correct?
5    A.   Yes.
6    Q.   It would be -- and when you graduated from law
7  school, you went directly into the prosecutor's office,
8  correct?
9    A.   Yes.
10    Q.   Okay. And so fair to say you've spent your
11  entire career working either in the Cook County State's
12  Attorney's Office or other prosecutor offices?
13    A.   Yes.
14    Q.   Okay. The position you currently have with
15  the DuPage County State's Attorney's Office, in that
16  role do you have any involvement in police
17  investigations?
18    MS. CARNEY:  Objection. Form.
19    THE WITNESS:  My position is that of the first
20  assistant, so I don't directly go out and work on
21  investigations. But from time to time, I'm called
22  to review files to determine whether charges should
23  be placed or not. That's fairly rare, but it does
24  happen.
25  BY MR. SWAMINATHAN:

Page 40

1    Q.   Okay. In your work at the DuPage County
2  State's Attorney's office, have you reviewed any police
3  department -- DuPage Sheriff's Department policies?
4    A.   No.
5    Q.   And in your work, you said you've also spent
6  some time working in the Kane County State's Attorney's
7  office?
8    A.   Yes.
9    Q.   And have you reviewed any policies of the Kane
10  County Sheriff's Department or any other law enforcement
11  agencies in that jurisdiction?
12    A.   No.
13    Q.   And was there any other prosecutor's office
14  that you said you worked for?
15    A.   In my role with the Illinois State Appellate
16  Prosecutors in --
17    Q.   Yes. I'm sorry. I didn't mean that. In your
18  work with the Illinois -- can you say it again?
19  Illinois?
20    A.   Illinois State's Attorney -- the State's
21  Attorney Appellate Prosecutor's office.
22    Q.   In that office did you review any policies of
23  any law enforcement agencies?
24    A.   No.
25    Q.   And during your time working in the Cook

Page 41

1  County State's Attorney's office, in your role as a
2  prosecutor in any one of the roles you held as a
3  prosecutor, did you ever review any Chicago Police
4  Department policies?
5    A.   I became aware of the general order we
6  referred to before, the 83-1, I became aware of that
7  during my career as a prosecutor, but I did not
8  specifically review their policies during my career with
9  the Cook County State's Attorney's Office.
10    Q.   Okay. And when you say you "became aware of
11  special order 83-1," you had not -- you did not see that
12  policy at any point while you were working in the Cook
13  County State's Attorney's Office, correct?
14    A.   Yeah, I knew it existed, but I don't recall
15  seeing it until after that time.
16    Q.   Okay. And when you say you saw it for the
17  first time after you worked at the Cook County State's
18  Attorney's Office, the first time was in the context of
19  your work in the Fields case as an expert, correct?
20    MS. GOLDEN:  Objection. Misstates his
21  testimony. He just did not say that.
22  BY MR. SWAMINATHAN:
23    Q.   Go ahead.
24    MS. GOLDEN:  You can answer.
25    THE WITNESS:  I did not -- I don't recall



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 13 of 71 PageID #:85712
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 07, 2023

42..45

Page 42

1    reading it or reviewing it while I was in the Cook
2    County State's Attorney's Office, but I knew of its
3    existence.
4    BY MR. SWAMINATHAN:
5         Q.   I'll ask the question again.  The first time
6    you saw that policy was while you were serving as an
7    expert in the Fields matter, correct?
8         A.   That sounds right.  I don't remember exactly
9    when I first saw it, but I think that sounds right to
10   me.
11        Q.   Okay.  And you don't recall any point at which
12   you saw that policy in the context of your work as a
13   Cook County State's attorney, correct?
14        A.   Well, I didn't see it, but I was aware of it.
15        Q.   Okay.  And when you say you were "aware of
16   it," how did you become aware of it?
17        A.   Well, I knew there were -- that we had
18   discovery obligations to defense attorneys, so I knew
19   all -- during my career we were doing everything
20   possible to comply with that.  I was also aware the --
21   probably primarily through news media of the original
22   Street Files case and how, as a result of that, an order
23   was placed -- you know, this order was created to make
24   sure Street Files notes and all those type of materials
25   were preserved and that we, as prosecutors, should

Page 43

1    obtain them and tender them to defense attorneys.
2         Q.   And when you say you had knowledge about the
3    -- of the original Street Files case, what are you
4    referring to?
5         A.   I don't remember the name of the offender, but
6    it was a case in federal court where a prior criminal
7    defendant said there were Street Files, or that was a
8    characterization that were withheld from him that would
9    have proved his innocence.
10        Q.   Okay.  And is there -- was -- and you learned
11   about the existence of that original Street Files case
12   through the news media; is that right?
13        A.   That's my recollection, yes.
14        Q.   Okay.  And did you learn any other information
15   about that case other than what you learned through the
16   news media?
17        A.   Well, in that -- growing out of that, the
18   general order was created 83-01 or one of those reports
19   was created for police officers to retain investigative
20   files, notes, GPRs, whatever they came to be called.
21        Q.   And that -- and you learned about the
22   existence of that general order coming out of the
23   original Street Files case through the news media?
24        A.   Primarily, yes.
25        Q.   Okay.  And then was there anything else that

Page 44

1    you looked at or reviewed that provided you with
2    information about that original Street Files case or the
3    creation of a special order in response?
4         A.   I don't --
5         MS. CARNEY:  Form.
6         A.   -- understand your question.
7    BY MR. SWAMINATHAN:
8         Q.   Yeah.  Other than news media, was there
9    anything else that you reviewed to learn more about that
10   original Street Files case?
11        MS. CARNEY:  Form.
12        THE WITNESS:  Just so I'm clear, you're
13        referring back when I was working for the Cook
14        County State's Attorney's Office?
15   BY MR. SWAMINATHAN:
16        Q.   Yes.
17        A.   I don't recall reviewing other materials.
18        Q.   And other than what you saw on the news media
19   was there anything else you reviewed while you were
20   working in the Cook County State's Attorney's Office
21   about the special orders or general orders that emanated
22   from that event?
23        MS. CARNEY:  Foundation.
24   BY MR. SWAMINATHAN:
25        Q.   Go ahead.

Page 45

1         A.   I -- not that I recall.
2         Q.   Okay.  And then the next time that you -- oh,
3    strike that.  And when you said you learned about the
4    general orders that came out of that situation, you
5    didn't review a copy of that general order or special
6    order, correct?
7         MS. CARNEY:  Objection.  Form.
8         THE WITNESS:  I don't recall reviewing it
9         during that time period.
10   BY MR. SWAMINATHAN:
11        Q.   Okay.  And did you -- were you ever provided
12   with any document or information that summarized what
13   the contents of that order were while you were still
14   working in the Cook County State Attorney's office?
15        A.   Not that I recall.
16        Q.   Okay.  So it would be fair to say you,
17   basically, knew generally of its existence, but you
18   didn't know exactly what the policy said; is that fair?
19        MS. GOLDEN:  Form.
20        MS. CARNEY:  Objection.  Form.  Foundation.
21        Misstates his testimony.  You can answer.
22        THE WITNESS:  No, I knew specifically that the
23        order referred to retaining notes, I think now
24        called general progress reports, and any other
25        investigative material that was collected by law



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 14 of 71 PageID #:85713
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
46..49

Page 46

1   enforcement officers with the Chicago Police
2   Department during the course of their investigation
3   so that they would be available for use by
4   prosecutors and available to defense attorneys
5   prior to and during trial.
6   BY MR. SWAMINATHAN:
7       Q.   And you were just testifying a moment ago when
8   I asked you a question about the idea that you were
9   doing "everything we could to make sure information was
10  being disclosed to criminal defendants." Do you recall
11  saying that?
12      A.   Yeah.
13          MS. CARNEY: Objection. Form. And it
14      misstates his testimony. You can answer.
15  BY MR. SWAMINATHAN:
16      Q.   All right. Yeah. Let me ask a different
17  question. Would it be fair to say that, during the time
18  you were a Cook County prosecutor, you were doing
19  everything you could to make sure that investigative
20  information was being disclosed to criminal defendants?
21      A.   Yes.
22      Q.   Okay. And what would you -- what were you
23  doing to make sure everything was being disclosed to
24  criminal defendant as a prosecutor?
25      A.   As early in my career as working in the

Page 47

1   juvenile court, we had seminars by more senior
2   prosecutors telling us either different sources of law
3   enforcement information and even outside agency
4   information, and telling us -- telling young prosecutors
5   to use both interoffice mail forms with Chicago Police
6   Department. And I think, pretty much, by the time I --
7   even when I was in juvenile court we were using
8   subpoenas to make sure we obtained those reports and,
9   you know, other related law enforcement reports that
10  were not necessarily Chicago Police Department.
11      Q.   And so you were taking steps to try to gather
12  the relevant materials you needed from the police
13  department; is that right?
14      A.   Yes. This is -- this was training that I
15  received back in my first courtroom assignment, but it
16  was things that prosecutors more senior to me were
17  doing.
18      Q.   And so you were learning from them based on
19  what their experiences were, right?
20      A.   Yes.
21      Q.   And so one of the things you're describing
22  that you would do to make, you know -- when you say you
23  did everything you could to try to make sure you were
24  disclosing material to the criminal defendants, one of
25  the thing you did was you got trained by others in the

Page 48

1   prosecutor's office about where to go to gather that
2   information, correct?
3       A.   Okay. I missed the end of your question. I'm
4   sorry. I didn't understand the end of it.
5       Q.   One of the things you did was learn or get
6   trained from other prosecutors about where to go to
7   gather the information, correct?
8       A.   And the use of forms or other documents to
9   obtain -- or subpoenas to obtain those items.
10      Q.   Okay. In other words, the ways in which to go
11  about making requests to the police department for those
12  -- for that information, fair?
13      A.   And also other agencies, yes.
14      Q.   Okay. Thank you. And what else were the
15  things you were doing as a prosecutor to do everything
16  you could to make sure you were turning everything over
17  to criminal defendants?
18      A.   Well, during my time throughout the office if
19  I had not received reports in a timely manner for court
20  -- for disclosure in court, I would reach out to law
21  enforcement officers and ask them to bring their files
22  by so we can expedite the discovery process.
23      Q.   Yeah. In other words, if you weren't getting
24  things -- if you weren't getting police reports when you
25  wanted them, you would ask officers to just bring them

Page 49

1   to you directly; is that right?
2       A.   Yes.
3       Q.   And why was that helpful?
4       A.   Well, there's different court dates, and
5   judges are expecting that the discovery is completed and
6   we can get the matter either to trial or resolved short
7   of trial, so there are certain just time restraints put
8   upon a prosecutor and a defense attorney in a courtroom.
9   So if I had asked for police reports and did not receive
10  all of them before the next court date, I didn't want to
11  get sanctioned or disciplined by the judge, frankly. I
12  wanted to try to get the reports for my own benefit for
13  preparing for trial, preparing my answer to discovery,
14  as well as for providing them to defense counsel.
15      Q.   Okay. And so what you're describing is one of
16  the things you could do to circumvent the subpoena
17  process in going through the subpoena unit was to just
18  ask the detective to directly bring the file to you,
19  correct?
20          MS. GOLDEN: Form.
21          MS. CARNEY: Form. Misstates his testimony.
22      You can answer.
23          THE WITNESS: Well, it's not just subpoenas
24      we're, you know, sending inter-office form
25      requests, too. So if those items were not



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 15 of 71 PageID #:85714
The Deposition of BERNARD B. MURRAY, Volume 1, Taken on February 7, 2019
50..53

Page 50

1      returned, it would be a different phone call to a
2      different person.  But, yes, it's the same idea to
3      get items in a quicker fashion.
4  BY MR. SWAMINATHAN:
5      Q.   And one of the ways you could get them in a
6  quicker fashion was to ask the detective to just bring
7  it to you directly, correct?
8      A.   Yes.
9      Q.   Okay.  And I think you indicated that one of
10 the kinds of -- strike that.  One of the circumstances
11 that would come up in your work as a prosecutor was that
12 sometimes you'd get some of the files from the police
13 department, but not all of the files, correct?
14         MS. CARNEY:  Objection.  Form.  Misstates his
15 testimony.
16         MS. GOLDEN:  Foundation.
17         MS. CARNEY:  You can answer.
18         THE WITNESS:  I would request, you know --
19 through different subpoenas or different forms, I
20 would request every police report I could conceive
21 of.  And maybe some of them came in a timely manner
22 and some were -- some requests had not made it to
23 my desk or made it to my office prior to the next
24 court date.
25 BY MR. SWAMINATHAN:

Page 51

1      Q.   And so sometimes you couldn't -- you would
2  make calls or requests to get information that hadn't
3  -- that -- for part of the police file that hadn't
4  gotten to you yet, fair?
5      A.   That's accurate.
6      Q.   Okay.  And one of the things you would do to
7  try to do that was sometimes reach out directly to the
8  detective involved in the investigation, fair?
9      A.   Yes.
10     Q.   Okay.
11     A.   Or other officers.
12     Q.   And sometimes others as well, right?
13     A.   Yes.
14     Q.   And sometimes directly with the officer who
15 was involved in the investigation, fair?
16     A.   Yes.
17     Q.   Okay.  And you've described to me some of the
18 things you would do to try to make sure you were turning
19 everything over to the criminal defendants, including
20 your efforts to try to get materials from the police
21 department to you, correct?
22     A.   Yes.
23     Q.   And then were there steps you would take to
24 try to ensure that you were doing everything you could
25 to get the materials to the criminal defendants once you

Page 52

1  had the materials from the police department?
2      A.   I'm not sure I quite understand that question.
3      Q.   Yeah.  Once you had materials from the police
4  department, what steps would you take to do everything
5  you could to get the materials to the criminal
6  defendant?
7      A.   I would provide them in court.  I would
8  include some of the information in my answer discovery.
9  And if there were bulk items, like physical evidence or
10 maybe whole sets of photographs, I would tell the
11 defense attorney that the -- if they want to review them
12 pre-motions or pre-trial, we would make all those items
13 available as well.
14     Q.   Would you disclose all of the documents and
15 reports that you received from the police department to
16 the criminal defense attorneys?
17     A.   Yes, I would.
18     Q.   Would you pick and choose which documents to
19 disclose to the criminal defendants from the police
20 records and documents you had?
21     A.   If you could explain to me what you mean by
22 "pick and choose," I think I'd be better able to answer
23 your question.
24     Q.   Yeah.  Would you go through the police reports
25 and records that were provided to you by the police

Page 53

1  department and decide to deliberately leave some of
2  those out in terms of what you gave to the criminal
3  defendant?
4      A.   No.
5      Q.   Okay.  And when you would receive files from
6  the police department -- strike that.  Would it be fair
7  to say that your practice was to err on the side of
8  disclosing the materials that you received from the
9  police department to criminal defendants?
10     A.   That was the whole purpose of obtaining the
11 police reports would be to tender them to defense
12 counsel.
13     Q.   Okay.  And that was your practice?
14     A.   Yes.
15     Q.   And that was the policy of your -- of the
16 state's attorney's office, correct?
17     A.   I don't know if the office had a written
18 policy, but we were told it was, for lack of a better
19 phrase, an open file office that we'd give over
20 everything we have in our file to the defense counsel.
21     Q.   Okay.
22     A.   Obviously, if there's work products, something
23 like that, or something with an informant that what --
24 would be by the rules, I would not have to tender those.
25     Q.   Okay.  But putting aside obviously work



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 16 of 71 PageID #:85715
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 27, 2019

54..57

Page 54

1  product -- by work product, you mean things that were
2  created within your office as part of your analysis and
3  strategy and so on, correct?
4      A.   Yes.
5      Q.   Okay.  But you're not -- when you talk about
6  work product you're not talking about documents that
7  come from the police department, correct?
8      A.   Well, there might be something that deals with
9  an informant.
10     Q.   That's separate and apart from the issue of
11 work product, correct?
12     A.   Yes.
13     Q.   Okay.  So --
14          MS. GOLDEN:  I'm not --
15     Q.   -- putting aside --
16          MR. SWAMINATHAN:  Oh, I'm sorry.
17          MS. GOLDEN:  No, just pace.  Like if you could
18     -- I think you cut him off.
19          MR. SWAMINATHAN:  Yeah.  Oh, I'm sorry.  Okay.
20 BY MR. SWAMINATHAN:
21     Q.   Sorry.  Let me just make the -- make sure the
22 record is clear.  When it comes to work product, you're
23 not referring to confidential informants, correct?
24     A.   No.
25     Q.   And when it comes to work product you're not

Page 55

1  referring to materials from the police department,
2  correct?
3      A.   No.
4      Q.   And when you say -- I should ask it
5  differently because I'm saying "Correct?"  And you're
6  saying "No."  So let me re-ask it so we're clear.  When
7  you're talking about work product, you're not referring
8  to -- strike that.  When you're talking about work
9  product, are you referring to documented materials that
10 come from the police department?
11     A.   I'm not referring to that.
12     Q.   Okay.  And then confidential informants is --
13 well, strike that.  I don't care about that right now.
14 Okay.  Were -- did you serve as a supervisor in the
15 State's Attorney's office?  Strike that.  Did you
16 supervise other state's attorneys in the State's
17 Attorney's office?
18     A.   Yes, I did.
19     Q.   And specifically at Cook County?
20     A.   Yes, I did.
21     Q.   Okay.  And as supervisor, was it your
22 expectation that others were following the same practice
23 that you did of disclosing everything in your file that
24 you got from the police department?
25     A.   Yes.

Page 56

1      Q.   Did -- was it your experience that prosecutors
2  in your office disclosed everything in their file to
3  criminal defense attorneys?
4      A.   That was my experience.
5      Q.   Okay.  Did you have any instances where you
6  had prosecutors working in your office that you felt
7  were picking and choosing what to give to the criminal
8  defendants?
9          MS. CARNEY:  Objection.  Form.  Foundation.
10     You can answer.
11          THE WITNESS:  I did not feel that.
12 BY MR. SWAMINATHAN:
13     Q.   Okay.  Was it your experience that prosecutors
14 in your office were erring on the side of disclosure of
15 criminal defendants?
16     A.   Well, like I've said before, when we get the
17 police reports, we're tendering them to defense counsel,
18 so it's not necessarily erring on the side of.  It's what
19 we do.
20     Q.   Okay.  And in terms of the actions you would
21 take as a prosecutor to ensure that you were doing
22 everything you could to turn everything over to criminal
23 defendants, would you make sure that you were putting
24 all the documents that you received from the police
25 department into your file?

Page 57

1          MS. CARNEY:  Objection.  Form.
2          THE WITNESS:  Yeah.  I missed -- I'm sorry.  I
3     don't understand that question.
4  BY MR. SWAMINATHAN:
5      Q.   Yeah.  In other words, part of making sure you
6  give everything over to the criminal defendants is
7  making sure that you keep a complete file of all the
8  materials that you're receiving from the police department,
9  correct?
10     A.   Well, as we're gathering the -- all the
11 reports from the police -- from Chicago Police
12 Department, we would have them in our file.
13     Q.   Okay.  And when you say "in our file," what
14 are you referring to?
15     A.   A manila folder where we put the police
16 reports that we received from the police department.
17     Q.   Okay.  And so was there a practice around what
18 was done in your office in terms of the materials that
19 are gathered from the police department that go into a
20 particular type of file?
21     A.   I don't know if it's a particular type of
22 file.  Some people may use manila, some people may use
23 brown folders.  I don't really know that, but obviously
24 we're collecting police reports from law enforcement
25 agencies and other people who may be involved in the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  investigation and we have to put them into a folder so
2  we can then copy them and tender them to defense
3  counsel.
4      Q.   Okay.  And then the documents that you -- oh,
5  I'm sorry.  I didn't want to cut you off.
6      A.   I didn't finish -- and compile our answer
7  discovery, for example.
8      Q.   Okay.  And then those documents that you
9  gathered and made copies of and provided to criminal
10  defense attorneys, what would you do with those copies
11  that you had received?
12     A.   Copies I had received from Chicago Police
13  Department?
14     Q.   Yes.
15     A.   I would keep them in preparation for motions
16  at trial.
17     Q.   Okay.  And would that go into a trial file?
18     A.   Well, the file --
19          MS. CARNEY:  Objection.  Form.  Foundation.
20  You can answer.
21          THE WITNESS:  Well, the file is a file.  If we
22          go to trial or we plea out or we go to motions,
23          that's the file.
24  BY MR. SWAMINATHAN:
25     Q.   Okay.  So there was one file that was kept for

Page 59

1  the prosecution in an individual case throughout the
2  process through trial or however far it went; is that
3  fair?
4      A.   Well, through trial or resolution of the case
5  in the trial court.
6      Q.   Okay.  And then what would happen if the case
7  went up on appeal?
8          MS. CARNEY:  Objection.  Form.  Foundation.
9          Calls for speculation.  You can answer if you know.
10          THE WITNESS:  Our file would be -- if all
11          defendants were resolved, our file would be packed
12          up and sent to a warehouse for storage.
13  BY MR. SWAMINATHAN:
14     Q.   Okay.  And so then -- okay.  Strike that.
15  Before the file was packed up and sent off to storage,
16  would you remove any of the police reports or other
17  documents from the police department from the file?
18          MS. CARNEY:  Objection.  Form.  Foundation.
19          Calls for speculation.
20          THE WITNESS:  If there were duplicate reports,
21          we would clean out the file, we would take manila
22          folders out of the file -- of the inside of the
23          file, but we would keep a complete set of all the
24          reports that we gathered during the investigation
25          and use at motions or trial.

Page 60

1  BY MR. SWAMINATHAN:
2      Q.   Okay.  Would you throw away any of the police
3  reports that you had -- that became part of the file you
4  received from the police department?
5      A.   If it was a duplicate, an exact duplicate,
6  that may be discarded in an effort to clean up the file
7  for storage, but we would not remove any reports.
8      Q.   And the -- and so the file that was packed up
9  and went to storage would include all of the police
10  reports and other materials received from the police
11  department; is that fair?
12     A.   And I would --
13          MS. CARNEY:  Objection.  Form.  Foundation.
14          Calls for speculation.  Go ahead.
15          THE WITNESS:  You receive all the reports and
16          other agency reports and photographs and jury
17          instructions and motions.
18  BY MR. SWAMINATHAN:
19     Q.   Okay.  And then you said once you -- so in
20  other words, you would take -- there would be some step
21  of making sure that everything you've got associated
22  with that case from all the various police departments
23  or agencies you've received, it is all in the file
24  before it gets packed up; is that right?
25     A.   Well, the prosecutor who handled the case

Page 61

1  would pack it up.
2      Q.   Okay.  And then it would go off to storage; is
3  that right?
4      A.   Yes.
5      Q.   Okay.  And then if the case was up on appeal,
6  there would be a separate appeal file that is created?
7  Is that how it worked?
8          MS. CARNEY:  Objection.  Form.  Foundation.
9          Calls for speculation.
10          THE WITNESS:  I worked in appeals at the
11          beginning of my career.  The appellate prosecutors
12          would receive -- if it were conviction obviously --
13          would receive the brief from the defense -- from
14          the defendant appellate attorney, and they would
15          file their briefs and they would examine the record
16          on appeal that was compiled by the defense attorney
17          filing the appeal. So that's a completely different
18          part of the office that doesn't necessarily rely
19          upon the trial file.
20  BY MR. SWAMINATHAN:
21     Q.   Okay.  And so during the time you were working
22  on appeals, it -- you, typically, were not requesting
23  copies of the trial file that had gone to storage, fair?
24     A.   Almost never.
25          MS. CARNEY:  Objection.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 18 of 71 PageID #:85717
The Deposition of BERNARD J. MORRAY, Volume 2, Taken on February 7, 2019
62..65

Page 62

1    MR. SWAMINATHAN:  Did you get the answer,
2  Madam Court Reporter?
3    THE REPORTER:  Yes.
4    MR. SWAMINATHAN:  Okay.  Sorry.  Okay.
5  BY MR. SWAMINATHAN:
6    Q.   All right.  In your practice, when you
7  completed a case and we're packing up the trial to --
8  file to go to storage, would you ever remove materials
9  that you had received from the police department other
10 than duplicates?
11   A.   I think I answered that.  No, I would not.
12   Q.   Okay.  And during your time supervising other
13 prosecutors, are you aware of any prosecutors that would
14 remove any of the police reports or other documents
15 released from police -- received from police agencies
16 other than duplicates?
17    MS. CARNEY:  Objection.  Form.  Foundation.
18 Calls for speculation.
19    THE WITNESS:  I'm not aware of anyone removing
20 police reports from the closed trial file.
21 BY MR. SWAMINATHAN:
22   Q.   Okay.  And was it your expectation, as a
23 supervisor, that other state's attorneys were -- when
24 they closed the case and were packing up the trial file,
25 that they were not taking out materials from that file

Page 63

1  other than any duplicates?
2    A.   They -- to my knowledge, they were not taking
3  out police reports from the file.
4    Q.   Okay.  Let's go back to your report.  And
5  let's see here.  This is Exhibit 1 that I'm putting back
6  up on the screen.  We've made it to Page 24 there before
7  my dalliance.  So let's take a look at -- Page 25 and 26
8  of this Report are your materials reviewed.  Do you see
9  that, sir?
10   A.   I do.
11   Q.   Okay.  And does that accurately reflect the
12 materials you reviewed in preparation for -- strike
13 that.  Does this -- do Pages 25 and 26 of Exhibit 1 list
14 the materials you reviewed in preparing your report in
15 this matter?
16   A.   Yes.
17   Q.   Okay.  And do -- does Pages 25 and 26
18 accurately reflect the documents that you reviewed and
19 relied on in preparing your report in this matter?
20   A.   Yes.
21   Q.   Okay.  And are there any other documents that
22 you reviewed while you were preparing your report in
23 this case?
24   A.   No.
25   Q.   Okay.  And then Attachment A begins on

Page 64

1  Page 27, and then, basically, Pages 28 through 167 of
2  your report disclosed in this matter are an Attachment
3  A.  And can you tell us what Attachment A consists of?
4    A.   I'm looking at in the screen right now.  I
5  don't have a paper copy in front of me, so it's kind of
6  hard to read.
7    Q.   Would it be fair to say that Attachment A
8  appears to be your report in the Fields matter?
9    A.   Yes.
10   Q.   And, in addition -- I'm sort of just leafing
11 through it here with you looking at it with me here.  I'm
12 going through it here little by little, and I just don't
13 want to waste your time, but I'm going through this page
14 by page, and this includes the discussion of case after
15 case from the Fields matter.  Does that look familiar to
16 you?
17   A.   It does look familiar to me.
18   Q.   Okay.  So in other words, as I'm going through
19 this, this basically contains the -- strike that.  The
20 Fields report that I'm showing you on the screen as part
21 of Attachment A to your report is your case by case
22 discussion of each of the police files and corresponding
23 prosecutor files and public defender files in the Fields
24 matter, correct?
25   A.   It appears to be my entire report.

Page 65

1    Q.   Okay.  And your report included a discussion
2  of each case for which you had a prosecutor file and
3  public defender file to go along with a police file,
4  correct?
5    A.   Yes, that's my recollection.
6    Q.   Okay.  And then I'm just continuing to leaf
7  through each of those case-by-case discussions in your
8  Field report.  Okay.  And you see that on Page 144 of
9  Exhibit 1 it includes your signature on a date of
10 June 24, 2016 reflecting the entirety of your Fields
11 expert report, correct?
12   A.   I see that, yes.
13   Q.   Okay.  And that was a 117-page report that you
14 submitted in the Fields case, correct?
15   A.   Yep.  Yes.
16   Q.   Okay.  And then if you look at the next page,
17 this is Page 145 of Exhibit 1, part of Attachment A also
18 includes a letter and subsequently an expert report that
19 you submitted in the Rivera matter, correct?
20   A.   That's what it looks like, yes.
21   Q.   Okay.  So Attachment A consists of your Field
22 expert report and your expert report in the Rivera
23 matter, correct?
24   A.   Yes.
25   Q.   Okay.  And in the Rivera matter, your expert



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 19 of 71 PageID #:85718
The Deposition of BERNARD MURRAY, Volume 2, taken on February 7, 2024
66..69

Page 66

1  report was -- strike that.  On Page 167 of Exhibit 1, it
2  indicates your signature on your report in the Jacques
3  Rivera case dated May 12, 2017, correct?
4      A.  Yes.
5      Q.  And your report in that case was 22 pages,
6  correct?
7      A.  Yes.
8      Q.  Okay.  And the reason your report was much
9  shorter in the Rivera case is because you didn't conduct
10 the same number of file comparisons between prosecutor
11 files and public defender files and police files,
12 correct?
13     A.  I focused on a smaller set of files.
14     Q.  Okay.  In the Rivera case, were you aware that
15 there were more prosecutor files and public defender
16 files that had been disclosed during the discovery in
17 the matter than the ones that you had reviewed?
18     MS. CARNEY:  Objection.  Form.  Foundation.
19 You can answer.
20     THE WITNESS:  There were more files examined
21     by the plaintiff's expert, but as I recall from
22     that case, he focused as -- I think the word he
23     used was examples, the cases that I focused my
24     examination on.
25 BY MR. SWAMINATHAN:

Page 67

1      Q.  Okay.  So you -- in the Rivera case, you chose
2  to review a subset of the total prosecutor files and
3  public defender files and public -- and police files
4  that were available, correct?
5      MS. CARNEY:  Objection.  Form.
6      MS. GOLDEN:  Privilege.
7      THE WITNESS:  I examined the files that he
8      listed as examples, I think is the word he used, or
9      maybe both experts used that phrase as examples of
10     discovery issues.
11 BY MR. SWAMINATHAN:
12     Q.  The expert for the plaintiff in that matter
13 also identified some examples that he highlighted in
14 that case, too, correct?
15     A.  Boy, I don't recall right now.
16     Q.  Oh.
17     A.  That sounds correct, but I just don't recall.
18     Q.  You said it sounds correct, but you don't
19 recall?
20     A.  Yeah.
21     Q.  Yeah.  We can go back to it.  In fact, let's
22 do that right now.  Let me pull this down.  Okay.
23 Showing you a document, marking as Exhibit 2.  This is
24 the Brassfield expert report in Fields.  And, in fact,
25 if we go to Page 1 here, you see this is the expert

Page 68

1  report of Michael Brassfield and Nathson Fields.  Do you
2  see that?
3      (EXHIBIT 2 MARKED FOR IDENTIFICATION)
4      A.  Yes.
5  BY MR. SWAMINATHAN:
6      Q.  Okay.  And that Michael Brassfield, you agree,
7  is the expert that had been hired by the plaintiff in
8  the Rivera matter, correct?  In the Fields matter,
9  correct?
10     A.  Yes.  Yes.
11     Q.  And then on Page 19 of his report --
12 Mr. Brassfield's report, he has a section discussing the
13 missing pages containing information and relevant --
14 containing important and relevant information that
15 should have been disclosed to criminal defendants.  Do
16 you see that?
17     A.  Right.  I see that.
18     Q.  Okay.  And then he has the discussion of
19 particular files and the examples of particular cases,
20 correct?
21     A.  As you're scrolling down, I can see that.
22     Q.  Okay.  So in the -- I'll -- we don't need to
23 spend more time on that.  But in the Fields case, you
24 recall that Mr. Brassfield looked at some specific
25 examples from the set of files that were available,

Page 69

1  correct?
2      A.  Yes.  I don't remember the number that he used
3  as examples, but I remember that he did that.
4      Q.  Okay.  And in that case, you looked at all of
5  the examples that he highlighted in his report in your
6  own analysis, correct?
7      A.  Yes.
8      Q.  And then you also looked at additional files
9  other than the ones that were just highlighted on Pages
10 19 and ensuing pages of his report, correct?
11     A.  Yes.
12     Q.  Okay.  In the Rivera matter, you looked only
13 at the ones that were highlighted in the report, right?
14     A.  Yes.
15     Q.  Okay.  You didn't look at all of the other
16 prosecutor files and public defender files that had been
17 disclosed during the discovery process, correct?
18     A.  I did not.
19     Q.  And in this case, you looked only at the
20 examples that had been provided by Mr. Tiderington,
21 correct?
22     A.  Well, I went beyond the examples by
23 Mr. Tiderington because it was a -- a number of pages --
24 or I'm sorry, documents on Page 51 that he included as
25 examples, so I looked at those as well.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 20 of 71 PageID #:85719
The Deposition of BERNARD MORRAY, Volume 2, taken on February 07, 2024

70..73

Page 70

1    Q.   In this --
2    A.   Those pages -- necessarily pages -- not
3 necessarily -- each page wasn't necessarily its own
4 file.
5    Q.   Explain what you mean by that.  I'm not sure I
6 understand.
7    A.   Like there might've been two or three or four
8 or five pages which were one file.  So it wasn't one --
9 it wasn't one page that he cited equaled one file.
10   Q.   When -- for -- so some of the files that you
11 have listed in your materials reviewed in this case, are
12 you saying that you looked at the entire files that were
13 provided to you or just pages from those files?
14   A.   I looked at the documents that he claimed --
15 well, excuse me.  I looked at the documents that he
16 claimed were not in the defense file, and I looked in
17 other places to see if they were included in the
18 prosecutor file, if they were in the defense file, or if
19 the file that he was relying upon was sufficient.
20   Q.   Okay.  And let me take a step back and maybe
21 try to try to do it in order.  In this matter, the total
22 number of files for which you look at the police file
23 and the public defender file and the prosecutor file was
24 approximately how many?
25   A.   Well, if I can examine my report, I believe --

Page 71

1    Q.   Please.
2    A.   -- it's -- so I'm starting at Page 13 in my
3 report.  There was a comparison of eight defense
4 attorney files to investigative files.  Those -- I think
5 he called them examples or something like that.  But
6 prior to that, in my report, starting on Page 10, there
7 were reports of investigatory notes from other files
8 that he claimed were not provided to defense counsel as
9 well.  So that could be -- let's see.  One -- that could
10 be another eight cases because I'd -- I'd have to go
11 back and review it again, but it's another -- another
12 number of cases and one case overlapped from the eight
13 cases and the cases I examined from Page 50 -- the pages
14 I examined from Page 51.
15   Q.   Okay.  Let's look at --
16   A.   Page 51 of his report.
17   Q.   I'm just opening a document here.  Sorry.  All
18 right.  And just for maybe ease, I'm going to put your
19 materials reviewed on the screen here as Exhibit C.
20 Sorry, Exhibit 3.  So Exhibit 3 is just a two-page
21 document consisting of your materials reviewed in this
22 matter.  Do you see that, sir?
23            (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24   A.   I do.
25 BY MR. SWAMINATHAN:

Page 72

1    Q.   Okay.  And looking at your list of materials
2 reviewed, you discuss -- you identify a series of RD
3 numbers for which you looked at the public defender file
4 and the state's attorney file in addition to the police
5 file, correct?
6    A.   Well, they're not -- they're not all files,
7 but yes, I did examine those documents listed on those
8 two pages.
9    Q.   Okay.  And if you look at this list here of
10 your materials reviewed, if we want to identify the
11 instances in which you reviewed the police file as well
12 as the corresponding public defender file and state's
13 attorney file, we can identify those files from your
14 materials reviewed, correct?
15   A.   I'm -- I'm examining it right now.  Yes, I see
16 the names of some of the offenders listed on this -- on
17 the two-page summary that are also the names of the
18 offenders in Section 5 of my report.
19   Q.   Okay.  And so, for example, entry number five
20 on your materials reviewed is the first instance in this
21 list where you reviewed the police file as well as the
22 public defender file and prosecutor file, correct?
23   A.   Yes.  Well --
24   Q.   Okay.  And then you looked at the police file
25 in addition to the --

Page 73

1            MS. GOLDEN:  Well --
2    Q.   -- prosecutor file.
3            MS. GOLDEN:  I think -- Anand, you interrupted
4 him.
5            THE WITNESS:  Yeah, I -- I -- I see the RD
6       listed in number -- not -- RD listed number three
7       and number four.  And off the top of my head, I
8       don't know what cases they associate with, but
9       regarding the list of the materials reviewed, yes,
10      number five appears to be the first case where I
11      looked at the public defender file and the state's
12      attorney file.
13 BY MR. SWAMINATHAN:
14   Q.   Okay.  And then -- and focusing again on
15 instances where you looked at the police file, in
16 addition to the public defender file, in state's
17 attorney file, that's also the case in number -- for
18 number six, right?
19   A.   Yes.
20   Q.   And number seven, correct?
21   A.   Yes.
22   Q.   So that's three, correct?
23   A.   Yes.
24   Q.   And we get to number 13 as well, right?
25   A.   Well, there was number eight.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 21 of 71 PageID #:85720
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2022

74..77

Page 74

1    Q.   I'm sorry, number -- yeah.  I'm sorry.  What I
2  did -- so five, six, seven, and number eight, right?
3    A.   Yes.
4    Q.   So five, six, seven, and eight are instances
5  in which you reviewed the police file in addition to the
6  public defender file and state's attorney file, correct?
7    A.   Right.
8    Q.   And then 13, 14, 15, 16, and 18 are instances
9  in which you reviewed the public defender file and
10 state's attorney file, correct?
11   A.   Yes.  Number nine, I attempted to look at more
12 than just the investigative file, but I think that was
13 all I had at the time.  But yes, the other ones are
14 where I looked at public defender file and state's
15 attorney file.
16   Q.   And then number 19 as well is one where you
17 looked at the investigative file and -- strike that.
18 Number 19 is another one where you reviewed the police
19 files as well as the public defender file and state's
20 attorney file, correct?
21   A.   Yes.  See -- just one second, please.
22   Q.   Yes.
23   A.   Yes, I did.
24   Q.   Okay.  And number nine is the Soto homicide,
25 is the reference to the file in this particular case,

Page 75

1  correct?
2    A.   I think it is, but the RD is different.
3    Q.   Yeah.  Let's see.
4    MS. GOLDEN:  Could you repeat the question?
5    MR. SWAMINATHAN:  Yeah.  One second.
6    MS. CARNEY:  The court reporter could do it.
7    MR. SWAMINATHAN:  Okay.
8    MS. CARNEY:  Well, could I have the last
9  question read back, please?
10   THE REPORTER:  Yes.  One second.
11      (REPORTER PLAYS BACK REQUESTED QUESTION)
12   MS. GOLDEN:  Thanks.
13 BY MR. SWAMINATHAN:
14   Q.   Okay.  And just to clarify, Mr. Murray, I'll
15 just represent to you C198126 is the RD number for the
16 Reyes-Solache investigative file related to the double
17 murder of the Soto mother and father, you understand?
18   A.   I do understand.
19   Q.   Okay.  So number nine is a reference to the
20 investigative file from the police department in the
21 underlying homicide investigation that's a subject of
22 this litigation, correct?
23   A.   Yeah.  Yes.
24   Q.   Okay.  And then number 19 is an investigative
25 file for a different case involving a criminal defendant

Page 76

1  named Oscar Soto, correct?
2    A.   Yes.  And I -- I believe that's one of the
3  cases I discussed under Section 5 in my report.
4    Q.   That's correct.  Okay.  And so in this case --
5  strike that.  For purpose -- for the Reyes-Solache
6  matter with RD number C198126, you reviewed the police
7  investigative file from this litigation, correct?
8    A.   Yes.  Not -- not to any great extent, but it
9  was available for me to review.
10   Q.   Okay.  And then did you -- when you say not to
11 any great extent, what do you mean?
12   A.   I can't hear you.
13   Q.   Oh, you cut out there for a second.  For the -
14 - when you say you only reviewed the investigative file
15 from this case, "not to any great extent," what do you
16 mean?
17   A.   I -- I did not go through what was or was not
18 tendered to -- in the manner that I did on the other
19 files.  I think I had a discussion at the end of my
20 report regarding photos.  I think that's the -- the part
21 of the file I was focusing on.
22   Q.   Okay.  So when you -- when you looked at the
23 investigative file for the Soto homicide, fair to say
24 you weren't going through that file in significant
25 detail to understand the entire investigation, correct?

Page 77

1    A.   No.  Referring to the photographs, I did that.
2    MS. CARNEY:  Object to the form.
3  BY MR. SWAMINATHAN:
4    Q.   So you focused on the photographs in the file?
5    A.   The -- the Polaroid photographs that were used
6  during the trial.
7    Q.   Okay.  I think I asked a poor question right
8  -- one question before this, so let me re-ask it
9  properly.  You did not spend time going through the file
10 -- investigative file for the Soto homicide in detail to
11 understand the entire investigation?
12   A.   I -- I --
13   MS. CARNEY:  Object to form.
14   THE WITNESS:  I did not.
15 BY MR. SWAMINATHAN:
16   Q.   Okay.  And so the body of evidence that made
17 up the incriminating evidence and any exculpatory
18 evidence and witness interviews and so on, you didn't go
19 through that in any detail?
20   A.   I did not.
21   MS. CARNEY:  Object to form.
22   THE WITNESS:  I did not.
23 BY MR. SWAMINATHAN:
24   Q.   Okay.  And you didn't review the public
25 defender file that was produced related to the Soto



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  homicide?
2      A.  I did not.
3      Q.  And you didn't review the prosecutor file
4  disclosed in this litigation associated with the Soto
5  homicide, correct?
6      A.  Only as pertains to the Polaroid photographs.
7  Other than that, I did not.
8      Q.  Now, when you say you reviewed the prosecutor
9  file only as it pertains to the Polaroid photos, what do
10 you mean?
11     A.  Well, there was an exhibit and I'm trying to
12 remember if it was in the state's attorney's file or I
13 think it might even have been impounded with the Court.
14 So I knew that came from the prosecutors during the
15 trial.  So to the extent that that exhibit was either
16 copied into the prosecutor's file or was found
17 elsewhere, that's an example of something that I
18 would've reviewed potentially coming from the
19 prosecutor's file.
20     Q.  But you didn't have a copy of the entire
21 prosecutor file for the Soto homicide, correct?
22     A.  I did not review that file.
23     Q.  Okay.  And so we -- we've identified the list
24 from your materials reviewed of the instances in which
25 you -- let me put it back up.  Sorry.  We've identified

Page 79

1  the instances from your materials reviewed in which you
2  conducted a comparison of the police file to the public
3  defender file and state's attorney file, and it appears
4  to be approximately -- four, five, six, seven, eight,
5  nine, ten, ten cases where you had the prosecutor file,
6  public defender file, and police file, correct?
7      A.  That's what's listed there, but I -- I'm --
8  looking at my reports, there's eight files I
9  specifically looked at.  And then there's, in that
10 Section 5, I think it's it's six files in there.  May
11 -- well, maybe one of -- math has overlapped.  So five
12 additional files in there.  So that would be 13 files I
13 looked at anything that I had at my fingertips.
14     Q.  Thirteen files through which you viewed
15 anything and for some of those cases, it was just the
16 underlying police file, not the all the comparator
17 prosecutor file and PD file, correct?
18     MS. GOLDEN:  Form.
19     THE WITNESS:  I -- I looked at whatever I had.
20 BY MR. SWAMINATHAN:
21     Q.  Understood.  And I want to make sure I just
22 understand when we look at your materials reviewed, I
23 think we went through the items on your materials
24 reviewed, which are the items where you actually had a
25 police file as well as the corresponding PD file and

Page 80

1  state's attorney file, correct?
2      A.  That's -- that's in the listing.  That's what
3  it lists -- lists first, the investigative and RD file,
4  then it lists a public defender and then the -- in the
5  prosecutor's file third.
6      Q.  Okay.
7      A.  So --
8      Q.  And those are number five?  Six?
9      MS. GOLDEN:  And Anand --
10     MR. SWAMINATHAN:  Oh, I'm sorry.
11     MS. GOLDEN:  You're flying and he is trying to
12 answer questions and his cadence is much slower
13 than --
14     MR. SWAMINATHAN:  Okay.  Yeah.  Let me slow
15 down.  Let me slow down.
16     MS. GOLDEN:  He was still answering that
17 question.
18 BY MR. SWAMINATHAN:
19     Q.  Go ahead.
20     A.  No.  So I was saying that in the materials
21 reviewed, you can see that those are examples of where I
22 -- I had an investigative file, a public defender file,
23 and a prosecutor file to look at to compare other
24 examples would be just an investigative file and an RD
25 file.  Other examples, I -- another example, I think --

Page 81

1  well, other examples where -- where the public defender
2  file was wholly inadequate, I guess.  So though I tried
3  to examine them, there was either nothing or maybe just
4  a couple pages of reports in there.
5      Q.  Okay.  So looking at this list of materials
6  reviewed, the instances in which you had a police file,
7  in addition to a prosecutor file and public defender
8  file, were numbers five, six, seven, eight, 13, 14, 15,
9  16, 18, and 19, correct?
10     A.  As the way they're listed, yes.
11     Q.  Okay.  So that's ten files for which you had
12 the police file and public defender file and state's
13 attorney file, correct?
14     A.  That's what's listed here, yes.
15     Q.  Okay.  And when you say that's what's listed
16 here, you're not saying that you believe there's a bunch
17 of other cases in which you had the police file,
18 prosecutor file, and state's attorney -- and defense
19 file, correct?
20     A.  No.  But as I said to you a few minutes ago, I
21 -- I know in the Section 5 of my report, I know there's
22 five cases in there.  There's six cases, but math has
23 overlapped.  So I know there's five cases in there and
24 off the top of my head, I don't recall what I examined.
25 I -- I -- I might -- I might not have had all three of



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 23 of 71 PageID #:85722
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
82..85

Page 82

1 those things to compare and contrast to, but the -- the
2 Section material, it -- it -- it -- from -- in my report
3 is gleaned from Page 51 of the expert's report. And in
4 that part, he is claiming that he's comparing
5 investigative file to RD only.
6    Q.   Understood.
7    A.   So he -- he's not stating that he examined a
8 public defender file, even though, like I said the one
9 case, math has overlapped, there was a public defender
10 file. So --
11    Q.   Understood. In this -- you indicated that in
12 the Rivera case, you were aware that there were more
13 prosecutor files, public defender files that
14 corresponded to investigative files that had been
15 tendered in discovery in that litigation than the number
16 that you actually reviewed for purposes of your
17 disclosure, correct?
18    A.   In Rivera?
19    Q.   Yes.
20    A.   Yes.
21    Q.   And in this case, do you understand that there
22 were more prosecutor files and public defender files
23 corresponding police files than you reviewed in this
24 matter?
25         MS. CARNEY: Objection. Form. Foundation.

Page 83

1 You can answer.
2         THE WITNESS: I -- I believe I answered that
3 yes.
4 BY MR. SWAMINATHAN:
5    Q.   Okay. And ultimately, you reviewed only the
6 portion of the public defender files and prosecutor
7 files for the instances in which there Mr. Tiderington
8 had provided an example, instance -- strike that. Strike
9 that. In this case, you looked at a subset of the total
10 prosecutor files and public defender files that had been
11 tendered in discovery; is that fair?
12    A.   Not -- not completely accurate. I -- I looked
13 at the eight cases that he used examples, but then I
14 went into the Page 51 cases, which were number of pages
15 like one -- one case might've been, you know, four or
16 five pages. So not -- it's not a one-to-one
17 relationship between pages of cases. And then, also, I
18 looked at -- at the very conclusion, the photos -- the
19 Polaroid photographs from the Solache-Reyes case.
20    Q.   Okay. And you understood that that was only a
21 portion of the police files, prosecutor files, and
22 public defender files that had been tendered in
23 discovery in this case, correct?
24    A.   That's my understanding.
25    Q.   Okay. And so in that way, your analysis in

Page 84

1 this case was different than the analysis you conducted
2 in Fields, correct?
3    A.   I believe I've answered that, yes.
4    Q.   Okay. And in this case, your analysis
5 involved a review of many fewer files than you view --
6 than you reviewed in Fields, correct?
7         MS. CARNEY: Objection. Form. You can
8 answer.
9         THE WITNESS: As I said before, yes.
10 BY MR. SWAMINATHAN:
11    Q.   Okay. And then you had started to say
12 something a little while ago about the documents that
13 you actually reviewed in conducting your comparisons. I
14 want to ask you a little bit more about that. So let me
15 just sort of preface that and then get into my
16 questions. So when you -- strike that. In your
17 materials review, you indicate that you received each of
18 these, you know, investigative files, public defender
19 files and CCSAO files in their entirety, did you review
20 each of those files in their entirety or did you focus
21 on portions of those files?
22    A.   I -- I focused on what Mr. Tiderington's --
23 tiderington said was missing or not disclosed. That was
24 the -- the focus of the examination.
25    Q.   Okay. Did you -- were you -- other than the

Page 85

1 files themselves in their entirety, were you also
2 provided with packets that contain just portions of
3 those -- of the document from the file?
4         MS. CARNEY: Objection. Form. You can
5 answer.
6         THE WITNESS: I'm -- I'm sorry, sir. I don't
7 understand that question.
8 BY MR. SWAMINATHAN:
9    Q.   Yeah. In other words, you could be provided
10 with the entire files, right? Or you could be provided
11 with the relevant portions of the file as identified by
12 Mr. Tiderington?
13    A.   Oh, no. I had the entire files.
14    Q.   Okay. And then in terms of -- did Counsel
15 ever -- for each of these file for any -- strike that.
16 For any of the files listed in your materials reviewed,
17 did Counsel provide you with any specific documents from
18 those files separate from the entire file?
19    A.   No. I mean, he -- I -- I -- I was provided
20 the entire file, so there was not a separate part of the
21 file that was provided. I was given the file.
22    Q.   Okay. And you weren't given subsets of the
23 file to focus on?
24    A.   No. I mean, the -- the -- my focus came out
25 of the plaintiff's expert's report, what he said was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 24 of 71 PageID #:85723
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 7, 2023

86..89

Page 86

1  missing.
2      Q.   Okay.  Did you perform any work -- strike
3  that.  In Mr. Tiderington's report in this matter, he
4  has a number of attachments to his report.  You saw
5  those, correct?
6      A.   Yes, I did see that.
7      Q.   Okay.  And one of his attachments is an
8  attachment that's a huge spreadsheet that lists out all
9  the documents for which he conducted an analysis of
10 whether it was in the public defender file and so on.  Do
11 you recall that attachment?
12         MS. CARNEY:  Objection.  Misstates the
13     evidence.  You can answer.
14         THE WITNESS:  I -- I -- the attachments with
15     the -- with the different charts with the -- that
16     were created, I would refer to them as I needed to.
17     I didn't spend time reading every one of the
18     entries and whether they're accurate or not.
19 BY MR. SWAMINATHAN:
20     Q.   And that was going to be my question.  I know
21 you obviously looked at the examples Mr. Tiderington
22 disclosed in his report itself, right?  He basically
23 wrote out a paragraph or two about each of those example
24 cases, correct?
25     A.   Yeah.  I was -- he would say in this report,

Page 87

1  this -- the -- in a certain case, certain pages are
2  missing or -- he believed not tendered at all.  So
3  those would be the pages I'd look at.  And to the degree
4  that a case was either lined out in one of the
5  attachments where he considered he would not examine it,
6  I would point that out.
7      Q.   In the -- did you spend time going through
8  each of the rows that were in his Attachment G that
9  listed out for each specific investigation, what
10 documents were not contained in the public defender
11 file?
12     A.   I did not.
13     Q.   Okay.  Did you conduct any analysis of the
14 blue columns in his attachment that laid out his
15 analysis of whether the general orders and special
16 orders were being followed?
17         MS. CARNEY:  Objection.  Misstates the
18     evidence.  You can answer.
19         THE WITNESS:  I did not.
20 BY MR. SWAMINATHAN:
21     Q.   And did you conduct any analysis of his work
22 in the purple columns about the permanent retention
23 files?
24         MS. CARNEY:  Objection.  Misstates the
25     evidence.  You can answer.

Page 88

1         THE WITNESS:  I did not.
2         MR. SWAMINATHAN:  Okay.  We've been going for
3  another good chunk.  Should we take a quick five-
4  minute break?
5         MS. CARNEY:  Yeah, that'd be great.
6         MR. SWAMINATHAN:  Okay.
7         THE REPORTER:  Okay.  Going off the record.
8  The time is 11:48 a.m.
9             (OFF THE RECORD)
10        THE REPORTER:  We're back on the record.  The
11     time is 12:06 p.m.
12 BY MR. SWAMINATHAN:
13     Q.   Sir, would you agree with me that your
14 opinions in this case are very similar to your opinions
15 in the Fields and Rivera cases?
16         MS. CARNEY:  Objection.  Form.  You can
17     answer.
18         THE WITNESS:  Regarding a process of -- yes.
19 BY MR. SWAMINATHAN:
20     Q.   Okay.  And in the Fields case, you basically
21 opined that you saw no evidence of any systemic failure
22 to disclose Brady evidence; is that correct?
23     A.   That's correct.
24     Q.   And in the Rivera case, you reached the same
25 conclusion that there was no evidence of systemic

Page 89

1  failure to disclose information to criminal defendants,
2  correct?
3      A.   Yes.
4      Q.   And in this case, you reached that same
5  conclusion that there's no evidence of a systemic
6  problem with failing to disclose information from police
7  reports to criminal defendants, correct?
8      A.   Yes.
9      Q.   Okay.  And you've never opined in any other
10 cases other than these three cases, correct?
11     A.   I've only been expert on three cases.
12     Q.   Okay.  And all three cases were for the
13 Chicago Police Department, correct?
14     A.   Yes.
15     Q.   Okay.  Your opinions in this case, did you cut
16 and paste any portions of your opinions in this case
17 from your prior reports?
18     A.   Yes.
19         MS. CARNEY:  Oh, hold on.  Obviously, the
20     answer can now stand because he answered, but to
21     the extent you're going to ask him any more
22     questions about the drafting of his report, I'm
23     going to object and instruct him not to answer
24     based on the --
25 BY MR. SWAMINATHAN:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 25 of 71 PageID #:85724
The Deposition of BERNARD MORRAY, Volume 2 - taken on February 07, 2023
90..93

Page 90

```
 1        Q.   Yeah.  And I don't want to go into the details
 2   of your drafting process and back and forth with
 3   Counsel, which it is -- Counsel's correctly identifying
 4   as subject to a -- to a privilege.  I'm really just
 5   asking you about the content of the report itself as
 6   disclosed, okay?  So with that caveat, is it fair to say
 7   that there are portions of your report in this case that
 8   are basically paragraphs that are basically identical to
 9   paragraphs in your prior reports in Fields and Rivera?
10        MS. CARNEY:  Object to the form.  And I'm
11   going to instruct him not to answer on the basis of
12   work product in keeping with the previous
13   objections that you have lodged in depositions of
14   your experts.  I'm not going to let him talk about
15   any of the portions in the drafting of his report.
16        MR. SWAMINATHAN:  But I'm not -- okay.
17   Understood.  I'm not going to ask him about the
18   drafting process at all.  I'm just asking him about
19   the final disclosed opinion in each case.  Do they
20   contain -- you know, that -- I could put them all
21   up on the three one by one next to each other and
22   say, do these paragraphs match these paragraphs one
23   by one?  I don't want to spend an hour doing that
24   and I -- but I could. I mean, we can do that if we
25   need to do that.  So let me ask the question.  And
```

Page 91

```
 1   then, Theresa, you can object if you think you need
 2   to.
 3   BY MR. SWAMINATHAN:
 4        Q.   So let me clarify my question.  Your final
 5   version of your report -- I'm not asking the process
 6   that resulted in a final version of the Fields report or
 7   the Rivera report or this report, okay?  So with that
 8   caveat, the final version that you disclosed of your
 9   report in this matter, would you agree that it contains
10   paragraphs that are identical to paragraphs contained in
11   your final disclosed reports in Rivera and Fields?
12        MS. CARNEY:  Okay.  That's fine.  You can
13   answer.
14        THE WITNESS:  There are paragraphs, yes, that
15   are similar to or nearly identical to paragraphs
16   regarding the legal standards from the other
17   report.
18   BY MR. SWAMINATHAN:
19        Q.   Okay.  And you looked at different comparator
20   files in this case than you looked at in Fields and
21   Rivera, correct?
22        A.   I'm sorry, I don't understand the question.
23        Q.   You looked at a different set of underlying
24   police report -- police files and prosecutor files and
25   PD files in case -- in this case than you looked at in
```

Page 92

```
 1   Rivera and Fields, correct?
 2        A.   I think almost all of them are -- are -- are
 3   new.
 4        Q.   Okay.  But -- okay.  But then the overall
 5   opinions that you reached are the same in each of the
 6   cases, correct?
 7        A.   That there's not a systemic failure to
 8   disclose documents, yeah.  That -- that opinion is
 9   consistent.
10        Q.   Okay.  And you have some opinions about the
11   disclosure obligations of the prosecutor's office in all
12   three of your opinions, correct?
13        A.   Disclosure to defense -- defense attorneys?
14        Q.   Correct.
15        A.   Yes.
16        Q.   And you have some opinions in all three cases
17   about the files that were provided by the public
18   defender's office and the veracity of those files,
19   correct?
20        MS. GOLDEN:  Form.
21        MS. CARNEY:  You can answer.
22        THE WITNESS:  I don't -- I don't know the
23   veracity is the word I'd use.  I definitely use
24   completeness.
25   BY MR. SWAMINATHAN:
```

Page 93

```
 1        Q.   Okay.  And ultimately, the overall opinions
 2   you're offering in this case are consistent with the
 3   opinions you offered in Rivera and Fields, correct?
 4        MS. GOLDEN:  Objection.  Asked and answered.
 5        MS. CARNEY:  You can answer it again.
 6        THE WITNESS:  Yes.
 7   BY MR. SWAMINATHAN:
 8        Q.   And in other words, you looked at different
 9   sets of underlying files, but you reached the same
10   conclusions in this case as you did in Rivera and
11   Fields, correct?
12        MS. GOLDEN:  Same objections.
13        THE WITNESS:  Yes.
14   BY MR. SWAMINATHAN:
15        Q.   And are there any opinions that you're
16   offering in this case that are new, something you didn't
17   offer in Fields or Rivera?
18        MS. CARNEY:  Form.  You can answer.
19        THE WITNESS:  I -- I don't think so.
20   BY MR. SWAMINATHAN:
21        Q.   Okay.  You -- well, strike that.  In terms of
22   the -- strike that.  All right.  I want to ask you about
23   a little bit about your experience.  You indicated
24   previously that you have spent your entire career
25   working in prosecutors' offices, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 26 of 71 PageID #:85725
The Deposition of BERNARD J. MURRAY, Volume 1, taken on February 7, 2023

94..97

Page 94

1    A.   Yes.
2    Q.   And you're not holding yourself out as an
3    expert in this case in police practices, are you?
4    A.   The what?  How they conduct investigation? No.
5    Q.   Okay.  Are you holding yourself out as an
6    expert in this case on police procedures?
7    A.   What do you mean by -- can you explain what
8    you mean by procedure?
9    Q.   Yeah.  In other words, how police officers are
10   taught to go about conducting the day-to-day work of
11   conducting investigations?
12   A.   I don't know how they're -- how or -- how
13   they're taught, no.
14   Q.   Okay.  And are you holding yourself out as an
15   expert in this case on the generally accepted police
16   practices around the country?
17   A.   No.
18   Q.   Are you holding yourself out as an expert in
19   this case on the national standards for police practices
20   in this country?
21   A.   I think that's the same question.  No.
22   Q.   Are you holding yourself out as an
23   expert in this case on police policy writing?
24   A.   No.
25   Q.   Are you holding yourself out as an expert in

Page 95

1    this case on police training?
2    A.   I think you just asked that, but no, I'm not.
3    Q.   The last question was policy writing and this
4    one was training, but I appreciate you answering the
5    question.  Before you were retained in this case, you
6    had never reviewed -- actually seen any Chicago Police
7    Department policies; is that correct?
8         MS. CARNEY:  Objection.  Form.  Misstates his
9    testimony.
10        THE WITNESS:  Prior to this case, no.  I had
11   reviewed the special order prior to Fields.
12   BY MR. SWAMINATHAN:
13   Q.   Sorry.  Yeah.  That -- I've asked the question
14   before.  Let me ask again.  Before you consulted in the
15   Fields matter, you had never reviewed any Chicago Police
16   Department general orders or special orders, correct?
17        MS. CARNEY:  Objection.  Form.
18        THE WITNESS:  You'd have to narrow that down
19   because I -- I -- I know I've looked at other
20   general orders over the years, but not -- not the
21   general orders regarding the keeping of notes and
22   the keeping of investigative materials.
23   BY MR. SWAMINATHAN:
24   Q.   Okay.  And so the -- you have -- before you
25   were retained in the Fields matter, you'd never reviewed

Page 96

1    the Chicago Police Department's special orders regarding
2    the documentation and file retention associated with
3    investigations, correct?
4         A.   I was aware of them, but I had not reviewed
5    them.
6         Q.   Okay.  And so during your time working in the
7    Cook County State's Attorney's Office, you did not --
8    well, I'll strike that.  I've already asked you that.
9    Prior to your retention by the by the City of Chicago to
10   work in the Fields matter, did you have any knowledge
11   about whether any of the of the police department,
12   general orders or special orders regarding documentation
13   and file retention were amended at any point?
14        MS. CARNEY:  Objection.  Form.  You can answer
15   if you understand.
16        THE WITNESS:  I don't think I understand your
17   question.
18   BY MR. SWAMINATHAN:
19   Q.   So for example, you said you were aware of
20   Special Order 83-1, but you hadn't actually read it,
21   correct?
22   A.   That's correct.
23   Q.   Were you aware of any amendments or changes to
24   Special Order 83-1 during your time working in the Cook
25   County State's Attorney's Office?

Page 97

1    A.   I -- I don't think I was aware of amendments
2    to it, but I obviously filed -- investigative file
3    retention was a topic during that time period.  So to
4    the extent that there were amendments to it, it was up
5    to us to obtain police reports.  So I know we were
6    continuing our practices on that front.
7    Q.   And were there changes to your practices
8    around getting access to police reports as there were
9    amendments or changes to police department policies on
10   that issue?
11        MS. GOLDEN:  Foundation.
12        THE WITNESS:  No.  I -- we would pursue police
13   reports through all the -- all the manners I've
14   described earlier.
15   BY MR. SWAMINATHAN:
16   Q.   During your time working in the Cook County
17   State's Attorney's Office, did you ever review or see
18   any written policies of the subpoena service unit?
19   A.   No.
20   Q.   At any point while you were working in the
21   Cook County State's Attorney's Office, did you become
22   aware of any written policies in the subpoena service
23   unit?
24   A.   I'm not sure if I was aware of their policies
25   other than for -- for a period of time, we would send



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 27 of 71 PageID #:85726
The Deposition of BERNARD MURRAY, Volume 1, taken on February 07, 2023

98..101

Page 98

1  subpoenas and document requests and -- and inter-office
2  forms to the area as well as to 11th and State or 35th
3  and Michigan. And at some point during that time
4  period, they stressed that we should just send all our
5  requests to 11th and State or 35th and Michigan to
6  obtain the reports. So to the degree, that's the
7  subpoena service or whatever you refer to it as that's
8  something I was aware of.
9      Q.  Okay. And so you were aware of an instruction
10 to you as a prosecutor about where to submit your
11 requests to for subpoenas, correct?
12     A.  That's correct.
13     Q.  Okay. But in terms of the process within the
14 police department, once those subpoena requests were
15 received, you are not aware of any policies associated
16 with how the police department then responded to those
17 subpoena requests, correct?
18     A.  Policies, no.
19     Q.  And you're not aware of any procedure manuals
20 that provided guidance to police staff about how to
21 respond to those subpoena requests, correct?
22     A.  I'm not familiar with their policy manuals on
23 subpoena requests.
24     Q.  Have you ever -- strike that. Are you aware
25 of any training that was provided to individuals within

Page 99

1  the police department about how to respond to subpoena
2  requests?
3      A.  No.
4      Q.  Are you aware of any training ever received to
5  anybody who staffed the subpoena service unit?
6      A.  I -- I -- I don't know what training, if any,
7  they received. So I -- I can't -- I don't know that to
8  answer that, whether it was extensive or minimal or
9  whether those was a manual on it or a general order or
10 special order. I don't know those things.
11     Q.  In the -- in your work as an expert on this
12 case and Fields and Rivera, did you review any documents
13 that provided you with guidance on what the policies
14 were within the Chicago Police Department for responding
15 to subpoena requests?
16     A.  Documents regarding policy, no.
17     Q.  During your course of your expert work in this
18 case and Fields and Rivera, did you review any documents
19 that constituted checklists or guidelines or procedure
20 manuals to guide individuals within the police
21 department on collecting materials as requested in
22 subpoenas?
23     A.  Well, checklists is kind of a broad term. I
24 did not review their policy manuals, but it was obvious
25 in the subpoenas that we sent to 11th and State or 35th

Page 100

1  and Michigan that they were circling items in the
2  subpoena request form and sending them to different
3  areas. We'd get the same Xeroxed subpoena from
4  different areas with different things circled or checked
5  off on it. So that's not a policy manual examined, but
6  I think it was evidence of their practice possibly.
7      Q.  Did you review anything in the course of your
8  expert work across these three cases that constituted
9  some kind of internal guidance about where to go and how
10 to go about collecting material and response to
11 subpoena?
12     MS. CARNEY:  Objection. Form. You can
13 answer.
14     THE WITNESS:  Is that -- you're saying police
15 department forms? I'm sorry. Police department
16 documents? No.
17 BY MR. SWAMINATHAN:
18     Q.  Yes. Okay. In the course of your expert work
19 in this case or Rivera or Fields, did you go out and
20 review any documents associated with police practices in
21 any other jurisdictions?
22     A.  No.
23     Q.  Did you review any policy police department
24 policies within in any other jurisdictions?
25     A.  No.

Page 101

1      Q.  In the course of your extra work in this
2  matter, did you review any research or studies regarding
3  Brady disclosures in jurisdictions across the country?
4      A.  Can you rephrase that?
5      Q.  Yeah. During your course of your expert work
6  in these three cases, did you go out and look at any
7  research or studies regarding Brady disclosures?
8      A.  I did not look at research or studies.
9      Q.  Okay. And did you, in the course of your work
10 on this matter, investigate what the police -- what the
11 what the generally accepted police practices were around
12 the country with regard to the disclosure of information
13 in police files?
14     MS. CARNEY:  Object to form. Go ahead.
15     THE WITNESS:  You -- can you rephrase that? I
16 -- I didn't quite -- quite get the -- the -- the --
17 the middle part, I think, actually.
18 BY MR. SWAMINATHAN:
19     Q.  Yeah. In the course of your expert work on
20 these three matters, did you go out and review any of
21 the generally accepted police practices on the
22 disclosure of information in police files to prosecutors
23 and criminal defendants?
24     A.  You mean generated by police agencies?
25     Q.  Sure.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1    A.   I have not.

2    Q.   Okay.  And do you consider yourself to be an
3 expert on how police departments should set up their
4 policies to address their Brady disclosure obligations?

5    A.   No.

6    Q.   And do you claim to be an expert on how police
7 departments should set up their practices with regard to
8 the documentation and disclosure of information from
9 their police files?

10    A.   No.

11    Q.   Do you claim to be an expert in how police
12 departments should go about training officers in their
13 documentation and disclosure obligations?

14    A.   No.

15    Q.   And you claim to be an expert in how police
16 departments should go about monitoring and auditing
17 their policies related to disclosure and documentation?

18    A.   How they should monitor their own -- I'm
19 sorry, their own procedures?

20    Q.   Yeah.  Yeah, let -- yeah, exactly.  But let me
21 ask it again.  So it's may -- maybe I was a little
22 unclear.  And do you claim to be an expert in how police
23 departments should set up their policies or practices --
24 strike that.  Do you claim to be an expert in how police
25 departments should conduct monitoring or auditing to

Page 103

1 ensure that their policies are followed with regard to
2 documentation and disclosure of police files?

3    A.   No.

4    Q.   And I may have asked you this, so I apologize
5 if so, but you've never reviewed any Brady related
6 policies of any other police department other than the
7 Chicago Police Department, correct?

8         MS. CARNEY:  Objection.  Form.  You can answer
9    if you understand.

10         THE WITNESS:  Other agencies' Brady policies?

11 BY MR. SWAMINATHAN:

12    Q.   Yes.

13    A.   I have not.

14    Q.   And you have not reviewed any other police
15 agency other than the Chicago Police Department's
16 policies regarding the documentation and disclosure of
17 police files, correct?

18    A.   I have not looked at other agencies, no.

19    Q.   Okay.  And if we look at your materials
20 reviewed in this matter, this is Exhibit 3, your list of
21 materials reviewed does not include the Chicago Police
22 Department policies associated with disclosure -- with
23 documentation and disclosure, correct?

24    A.   No, they do not.

25    Q.   Okay.  And you didn't review those documents

Page 104

1 in preparing your report in this case, correct?

2    A.   No, I did not.

3    Q.   Okay.  You didn't rely on those documents --
4 strike that.  And you didn't rely on the Chicago Police
5 Department policies regarding documentation and
6 disclosure in preparing your report in this case,
7 correct?

8    A.   Well, I -- I did examine the -- the Special
9 Order 83-1 and what was included in there.  But any
10 other policy manuals, no, I did not.

11    Q.   Okay.  And when you say you looked at Special
12 Order 83-1, you had previously looked at 83-1 in the
13 context of your work in Fields and Rivera, correct?

14    A.   That is correct.

15    Q.   Okay.  But you didn't receive it again and
16 review it again in preparing your report in this case,
17 correct?

18         MS. CARNEY:  Objection.  Form.  Misstates his
19    testimony.

20         THE WITNESS:  I -- I definitely reviewed it
21    again.

22 BY MR. SWAMINATHAN:

23    Q.   In preparing your report in this case?

24    A.   Yes.

25    Q.   Okay.  And so you -- so your materials

Page 105

1 reviewed listed here should actually include an
2 additional item, which is Special Order 83-1; is that
3 right?

4    A.   It should.

5    Q.   Okay.  Any other documents that you reviewed
6 in preparation in preparing your report that are not
7 disclosed here on your materials reviewed?

8    A.   None that I'm aware of.

9    Q.   Okay.  Are there any other special orders that
10 you reviewed in preparing your report in this case,
11 other than Special Order 83-1?

12    A.   No.

13    Q.   Okay.  And are there any other special orders
14 that you relied on in preparing in your -- preparing
15 your opinions in this case, other than Special Order
16 83-1?

17    A.   No.

18    Q.   Okay.  And so you did not review special Order
19 83-2 in preparing your opinions in this case, correct?

20    A.   I did not.

21    Q.   If I asked you what was contained in Special
22 Order 83-2, could you tell me?

23    A.   Not off the top of my head.  I -- I know I --
24 I -- I looked at it maybe prior to Fields, but I -- I
25 don't recall what's in it.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 29 of 71 PageID #:85728
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
106..109

Page 106

1    Q.  Okay.  And you didn't you -- and you don't --
2  you did not study -- strike that.  You did not study
3  Special Order 83-2 and offer opinions about it in your
4  report, correct?
5    A.  I did not.
6        MS. GOLDEN:  Foundation.
7  BY MR. SWAMINATHAN:
8    Q.  Go ahead.
9    A.  Prior to this case, I did -- I did not.
10   Q.  Okay.  And in your materials reviewed, you
11 didn't -- strike that.  You did not review Special Order
12 8-3 in preparing your report in this case, correct?
13       MS. GOLDEN:  Objection.  Foundation.
14       THE WITNESS:  Prior to this case, no.
15   Q.  And prior -- and I say prior to this case, you
16 mean in preparing your report in this case, you did not
17 review Special Order 86-3, correct?
18   A.  I did not.
19   Q.  And you didn't rely on Special Order 86-3 in
20 preparing this report, correct?
21   A.  I did not.
22   Q.  Okay.  And you don't reference Special Order
23 86-3 in your report?
24   A.  No, I -- I -- I think I say 83-1 and other
25 orders, but no, I did not specifically review it -- or

Page 107

1  prior to compiling this report.
2    Q.  And if I asked you what was in Special Order
3  86-3, could you tell me?
4    A.  Could not.
5    Q.  And fair to say you did not study Special
6  Order 86-3 and offer opinions about it in your report?
7        MS. GOLDEN:  Foundation.
8        MS. CARNEY:  Form.
9        THE WITNESS:  Well, as -- as -- as I said, I
10       did not review it prior to compiling this report,
11       but I did mention 83-1 and -- and later orders.  So
12       to the extent that I had reviewed it prior to
13       Fields, I knew there were other orders that were
14       regulated investigative files, compilation and
15       retention and -- and -- and providing them.  I -- I
16       did not specifically review them in that manner.
17 BY MR. SWAMINATHAN:
18   Q.  Okay.  And ultimately you didn't study 86-3
19 and offer opinions about that particular policy in your
20 report in this matter, correct?
21   A.  Did -- did not.
22   Q.  Okay.  When you say "I did not," that is
23 correct?
24   A.  That's correct.
25   Q.  Okay.  And that's my apologies for the

Page 108

1  questioning.  In preparing your report in this matter,
2  you did not review documents related to the George Jones
3  homicide investigation from in or around 1981, correct?
4        MS. CARNEY:  Objection.  Form.  You can
5        answer.
6        THE WITNESS:  In -- in preparing for this
7        report, I did not.
8  BY MR. SWAMINATHAN:
9    Q.  Did you review the court opinions related to
10 the Jones or Palmer cases from the early 1980s?
11   A.  I did not.
12   Q.  In preparing your report in this matter, did
13 you review any of the hearing transcripts related to
14 Jones and Palmer?
15   A.  I did not.
16   Q.  In preparing your report in this matter, did
17 you review any of the deposition testimony of James
18 Hickey about what happened in Jones and Palmer?
19   A.  I did not.
20   Q.  Have you ever reviewed the court opinions
21 related to the Jones and Palmer cases from the early
22 1980s?
23   A.  I -- I -- I may have read either or both of
24 them, but -- and if I did, it would've been prior to
25 Fields, but I -- I -- I don't recall.  Again, I don't

Page 109

1  recall if I read them or maybe just cut to the head
2  notes or something like that, frankly.
3    Q.  But fair to say you weren't -- you didn't
4  remember the contents of those court opinions related to
5  Jones and Palmer at the time you were writing your
6  report in this case, correct?
7    A.  That's correct.
8    Q.  Okay.  And so you didn't rely on -- I -- on
9  the Jones and Palmer court opinions in offering your
10 opinions in this case, correct?
11   A.  I did not.
12   Q.  And you didn't rely on any of the information
13 in the hearing transcripts related to Jones and Palmer
14 informing your opinions in this case, correct?
15   A.  I did not.
16   Q.  And you did not rely on any testimony of James
17 Hickey or any other Chicago police officers about what
18 happened in Jones and Palmer, correct?
19   A.  I did not.
20   Q.  Did you review any documents in preparing your
21 report in this case that talked about what the problems
22 within the Chicago Police Department were that were
23 being solved by the Special Order 83-1?
24       MS. CARNEY:  Objection.  Form.  You can
25       answer.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 30 of 71 PageID #:85729
The Deposition of BERNARD MORRAY, Volume 2, Taken on February 07, 2022
110..113

Page 110

1    THE WITNESS: Yeah. I'm sorry. Could you
2    restate that question?
3    BY MR. SWAMINATHAN:
4    Q.   Yeah. In preparing your report in this case,
5    did you review any documents that discussed what the
6    underlying problems were that resulted in Special order
7    83-1?
8         MS. CARNEY: Objection. Form.
9         THE WITNESS: I did not review documents that
10   described the underlying issues.
11   BY MR. SWAMINATHAN:
12   Q.   Okay. And so in preparing your report in this
13   case, you didn't review any documents that indicated to
14   you -- strike that. And if you didn't review documents
15   about what the problems were that Special Order 83-1 was
16   intended to solve, you're not intending to offer
17   opinions in this case about whether 83-1 was an
18   effective solution to those problems, correct?
19        MS. CARNEY: Objection. Form. Foundation.
20   You can answer.
21        THE WITNESS: Well, I knew from referring --
22   from -- from reading 83-1, that there was a direct
23   about to make sure that investigative materials
24   were retained. So I knew that before I examined
25   the -- the plaintiff's expert's report and made my

Page 111

1    analysis.
2    BY MR. SWAMINATHAN:
3    Q.   Are you claiming to have a complete
4    understanding of what the problems were that had been
5    identified within the Chicago Police Department that
6    resulted in Special Order 83-1?
7         MS. CARNEY: Objection. Form. Assumes facts
8    not in evidence. You can answer.
9         THE WITNESS: A -- a complete understanding. I
10   -- I think it's evident from the 83-1 that they
11   were emphasizing the retention of investigative
12   matters, which had been referred to as Street Files
13   before, and to retain them and make them available.
14   BY MR. SWAMINATHAN:
15   Q.   And you have that knowledge -- and you're
16   saying you have knowledge about what the problems were
17   that 83-1 was intended to solve based on reading 83-1-1
18   itself; is that right?
19        MS. CARNEY: Objection. Form. Misstates his
20   testimony. You can answer.
21        THE WITNESS: I know from reading 83-1 and --
22   and knowing that -- that there was a -- a change in
23   policy to make sure investigative materials, which
24   were referred to as Street Files, to make sure
25   those items were retained.

Page 112

1    BY MR. SWAMINATHAN:
2    Q.   You don't know what specific problems any
3    federal judges identified with CPD's policies before
4    Special Order 83-1, correct?
5    A.   I do not.
6    Q.   And so you don't know whether Special Order
7    83-1 sufficiently addressed the problems that had been
8    identified by any federal judges, correct?
9         MS. CARNEY: Objection. Form.
10        THE WITNESS: I -- I don't know what the
11   federal -- what the federal judge opined.
12   BY MR. SWAMINATHAN:
13   Q.   Okay. And so you can't say whether or not the
14   policy solved those problems that the federal judge
15   opined on; is that fair?
16        MS. CARNEY: Objection. Form.
17        THE WITNESS: I only know what the -- the
18   order tried to accomplish.
19   BY MR. SWAMINATHAN:
20   Q.   You know what the you know what the order
21   said, correct?
22   A.   Yeah, I can read. I can know what -- what it
23   says.
24   Q.   Well, understood. But you don't know what
25   specifically were the -- strike that. Do you know what

Page 113

1    problems were specifically identified by Chicago Police
2    officials that needed to be fixed leading to Special
3    Order 83-1?
4         MS. CARNEY: Objection. Form. Asked and
5    answered. Assumes facts not in evidence. You can
6    answer.
7         THE WITNESS: They were from the Street Files
8    allegations, which were in newspapers, what they
9    were trying to resolve was to create a retention of
10   investigative materials as part of -- part of the
11   police department investigations. So those
12   materials will be available later for motion for
13   defendants for trials for prosecutors.
14   BY MR. SWAMINATHAN:
15   Q.   And is that the only issue that the Chicago
16   Police Department identified that needed to be solved?
17        MS. CARNEY: Objection. Form. Foundation.
18        THE WITNESS: I don't claim that was the only
19   issue that they're trying to address, but that's
20   the one that jumps off the pages.
21   BY MR. SWAMINATHAN:
22   Q.   Okay. And to the extent there were other
23   problems -- strike that. Do you know what other
24   problems the Chicago Police Department identified that
25   needed to be solved?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 31 of 71 PageID #:85730
The Deposition of BERNARD MURRAY, Volume 1, taken on February 7, 2023

114..117

Page 114

1    MS. CARNEY: Objection. Form.
2    THE WITNESS: I do not know what, if any,
3  other problems they're trying to address.
4  BY MR. SWAMINATHAN:
5    Q.   Okay.  And so can you say whether the Special
6  Order 83-1 was a good solution to those other problems?
7    MS. CARNEY: Objection. Form.
8    THE WITNESS: Well, if I don't know if that --
9  what other problems are, if any, then I would not
10  know if it was a successful way of answering those
11  problems, if any.
12    Q.   Okay.  Thank you.  Did you -- sorry.  Sorry.
13  Okay.  And so in light of your testimony on these
14  points, are you offering an opinion in this case that
15  Special Order 83-1 comports with generally accepted
16  police practices?
17    A.   I don't know what generally accepted police
18  practices are.
19    Q.   Are you offering an opinion in this case that
20  Special Order 83-1 was consistent with national policing
21  standards for documentation and disclosure?
22    A.   Since I'm not aware of those standards, I
23  don't know what it -- if it's addressed or not.
24    Q.   And are you offering an opinion in this case
25  that Special Order 83-1 was an effective solution to all

Page 115

1  of the problems that had been identified during the
2  course of the George Jones case?
3    MS. CARNEY: Objection. Form.
4    THE WITNESS: Regarding the George -- no, I'm
5  not addressing that at all.
6  BY MR. SWAMINATHAN:
7    Q.   Okay.  And ultimately, sir, are you qualified
8  to opine about whether Special Order 83-1 is a good
9  policy from a police perspective?
10    MS. CARNEY: Objection. Form.
11    THE WITNESS: I -- I never said from a police
12  perspective, no.
13  BY MR. SWAMINATHAN:
14    Q.   Okay.  Okay.  I think you've previously
15  indicated that -- strike that.  You're aware of what a
16  Chicago Police Department inventory form is, correct?
17    MS. CARNEY: Objection. Oh, nevermind. Go
18  ahead.
19    THE WITNESS: Well, there's -- when a -- a
20  when a forensic investigator is on a crime scene or
21  maybe a detective and they recover evidence and
22  preserve that evidence for either testing by a lab
23  or use later on a trial, that is referred to as an
24  inventory report.
25  BY MR. SWAMINATHAN:

Page 116

1    Q.   Okay.  And are you aware of, sort of, a list
2  that's kept in typically in investigative files that
3  lists each of the documents that's added to the
4  investigative file?
5    A.   I'm aware of that form as well.
6    Q.   Okay.  And that form is referred to as an
7  inventory or investigative file inventory, correct?
8    A.   You know, I guess it is.  I'm not necessarily
9  familiar with the title of it.
10    Q.   Okay.  You're not sure what title it has, but
11  you are familiar with that document, correct?
12    A.   I am.
13    Q.   Okay.  And if I refer to that as an inventory
14  or investigative file inventory, you know what I'm
15  referring to, correct?
16    A.   As long as you don't wander into evidence
17  recovery, yes, I'm okay with this.
18    Q.   Okay.  So putting aside evidence reports,
19  crime scene processing reports, those types of things,
20  I'm -- when I say for at least for this line of
21  questioning, when I'm referring to an inventory report
22  or inventory, you understand that I'm referring to that list
23  of documents contained with the investigative -- within
24  the investigative file.  You with me?
25    A.   I -- I understand what you're saying.

Page 117

1    Q.   Okay.  When you were acting as a prosecutor in
2  the Cook County State's Attorney's Office, would you get
3  copies of the inventory forms from the police
4  department?
5    A.   During the course of subpoenaing materials
6  from the police department, yes, we'd receive that form.
7    Q.   And would you receive -- how often would you -
8  - strike that.  How often would you receive that form?
9    A.   You -- you know, I -- I'm -- I'm not sure with
10  -- with certainty if we received it on every case.  I
11  assume we did.  It wasn't necessarily a form that I was
12  looking for when I received investigative material.
13    Q.   Would it be fair to say you got it about half
14  the time?
15    A.   It -- probably --
16    MS. CARNEY: Objection. Form. You can
17  answer.
18    THE WITNESS: Probably half the time.  Maybe
19  -- maybe more.  It's just a form that I didn't
20  necessarily focus on when I was requesting
21  investigative material.
22  BY MR. SWAMINATHAN:
23    Q.   In your trial testimony in the Rivera matter
24  on page 3908, you were asked, "In your experience, it
25  was typical or atypical that this index would get

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 32 of 71 PageID #:85731
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 07, 2023

118..121

Page 118

1  produced to you as a prosecutor?"  Answer, "I think I
2  can recall receiving it about half the time, not all the
3  time."  Is that an accurate representation about your
4  observations and experience as a prosecutor?
5        MS. CARNEY:  Objection.  Form.  If you're -- I
6     mean, if you're going to ask him to look at
7     testimony, I would ask that you show it to him, but
8     if that's the one line you're going to do, then we
9     can go forward.
10 BY MR. SWAMINATHAN:
11    Q.  Yeah.  I was just going to show him that one
12 line, but we can also pull it up.  Would you prefer --
13 how however you prefer, Mr. Murray.
14    A.  You don't have to pull it up.  It -- it -- it
15 sounds like an accurate representation of my testimony,
16 but as I said a second ago, it wasn't necessarily a form
17 I was looking for.  So that's why I'm estimating that I
18 got it in 50 percent of the cases.
19    Q.  Okay.  But you -- you're not claiming that you
20 always got that inventory, correct?
21    A.  No, I'm not.
22    Q.  And you're acknowledging that there were -- it
23 was common for you to receive police files and not be
24 provided with a copy of that inventory, correct?
25        MS. CARNEY:  Objection.  Form.  Misstates his

Page 119

1     testimony.
2        THE WITNESS:  Well, it would be more common
3     that I received it.
4  BY MR. SWAMINATHAN:
5     Q.  Because you're saying it was definitely more
6  than 50 percent of the time that you got it?
7        MS. CARNEY:  Objection.  Form.  Misstates his
8     testimony.  You can answer.
9        THE WITNESS:  I would say again that I can
10    definitely recall receiving it at least 50 percent
11    of the cases.  But again, I was not always looking
12    for it.  It was not a form that was significant to
13    my -- for preparation for discovery or for trial.
14    That's why I'm saying that there's a -- I recall 50
15    percent of the time receiving it.  I could have
16    received it more than that.
17 BY MR. SWAMINATHAN:
18    Q.  Do you agree that under this -- strike that.
19 Under the Chicago Police Department policy, you should
20 have been getting the inventories every time, correct?
21    A.  I don't know if I received -- if I'm familiar
22 with that policy.
23    Q.  Do you know whether there were any Chicago
24 Police Department policies that discussed the inventory
25 form?

Page 120

1     A.  I'm not personally familiar with it.
2     Q.  Okay.  Are you -- do you know whether there
3  were any Chicago Police Department policies that
4  discussed the importance of those inventory forms?
5     A.  I'm not familiar with that.
6     Q.  Have you reviewed any Chicago Police
7  Department policies that discuss the inventory forms?
8     A.  Not to my recollection.
9     Q.  Okay.  And in any event in the -- strike that.
10 In the document -- strike that.  In the policies that
11 you've reviewed, you're not relying on any information
12 about the inventory forms for purposes of forming your
13 opinions; is that fair?
14    A.  Could you say that again?
15    Q.  Informing your opinions in this matter, are
16 you relying on any information about how inventory forms
17 were supposed to be kept within the police department?
18    A.  I'm not.
19    Q.  In any of your review of materials and
20 preparation for your opinion in this case, did you form
21 any conclusions based on any policies related to
22 inventories?
23    A.  I'm not familiar with the policies, so I don't
24 have a conclusion regarding them.
25    Q.  Sorry, one sec.  In the course of your --

Page 121

1  well, strike that.  You see this document on my screen
2  now?
3     A.  The materials reviewed?
4     Q.  Oh, let's see here.  I'm showing you the wrong
5  thing here.  All right.  All right.  I'm showing you a
6  document I've marked as Exhibit 4.  This is Special
7  Order 83-1.  Do you see that at the top?
8        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
9     A.  I do.
10 BY MR. SWAMINATHAN:
11    Q.  This is a document that you are familiar with,
12 correct?
13    A.  Yes, I am.
14    Q.  Okay.  And it's a total of a five-page
15 document.  And this is the document that you indicated
16 that you actually did review before -- during your
17 report in this matter, correct?
18    A.  Yes.
19    Q.  Okay.  If you look at this document, it
20 contains a Section 4 with definitions and it identifies
21 -- excuse me, in section D, Investigative File Inventory
22 Sheet.  Do you see that?
23    A.  I do see it.
24    Q.  Okay.  So the inventory is actually discussed
25 in the Special Order 83-1, correct?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 33 of 71 PageID #:85732
The Deposition of BERNARD MURRAY, Volume 2, taken on February 9, 2023
122..125

Page 122

1    A.  It is.
2    Q.  Okay.  You hadn't realized that before?
3    A.  I -- I might have realized in the past, but I
4  didn't realize it's today when I -- or over the weekend
5  when I reviewed again, this file sheet.
6    Q.  Okay.  The inventory sheet component of this
7  policy is -- it's just not all that important to you; is
8  that right?
9        MS. CARNEY:  Objection.  Form.  Misstates his
10  testimony.
11       THE WITNESS:  It's a -- a -- a form that it
12  was not significant to me from compiling the
13  investigative material and getting it to defense
14  counsel and for my own use at trial.  I was -- when
15  I reviewed 83-1, I was most focused on Section 3
16  policy.
17  BY MR. SWAMINATHAN:
18   Q.  Okay.  In any way, if you received a copy of
19  the inventory -- strike that.  In the instances when you
20  received a copy of the inventory sheet from the police
21  department, did you disclose that to the criminal
22  defense attorneys?
23   A.  If I received it, I did, yes.
24   Q.  Okay.  And looking at Section D there on the
25  inventory sheet, it explains that it's a multi-line

Page 123

1  eight and a half by 11 sheet of paper with columns to
2  identify each investigative document that is placed in
3  the investigative file case folder.  Do you see that?
4    A.  I do.
5    Q.  Okay.  And it's indicates that it -- "This
6  form functions as the case index for all documents
7  within the investigative file case folder," correct?
8    A.  That's what it says.
9    Q.  Okay.  And then it continues, and it says, "A
10  copy of the form will be forwarded to the Records
11  Division whenever felony charges are placed against a
12  person to ensure proper notice of all existing documents
13  pertaining to the subject investigation to be" -- I --
14  maybe I read that wrong.  I'll read it again.  Section
15  D.  This is the top of Page 3.  "A copy of the form will
16  be forwarded to the Records Division whenever felony
17  charges are placed against a person to ensure proper
18  notice of all existing documents pertaining to this
19  subject investigation, can be made to the State's
20  Attorney's Office, the courts, and defense C=counsel."
21  Do you see that?
22    A.  I do see that.
23    Q.  Okay.  And so pursuant to CPD's own policies,
24  the inventory sheet had a particular importance,
25  correct?

Page 124

1        MS. CARNEY:  Objection.  Form.  Foundation.
2  You can answer.
3        THE WITNESS:  In the order, they -- the -- the
4        -- it had a significance for identifying reports
5        that were included in the investigative file.
6  BY MR. SWAMINATHAN:
7    Q.  Okay.  And the -- in the -- in Chicago's --
8  sorry, strike that.  In the CPD policies, the inventory
9  sheet was the mechanism to ensure that the prosecution
10  and the defense knew if they got everything, correct?
11       MS. CARNEY:  Objection.  Form.  Foundation.
12       THE WITNESS:  Well, I don't know if it's a --
13       a mechanism.  If -- if we're following the overall
14       policy of retaining everything, then -- all
15       investigative material, that would be the way to
16       ensure that the material was retained by the -- by
17       the detective investigating the case.  This is a
18       list of what's -- what purports to be in the file.
19  BY MR. SWAMINATHAN:
20    Q.  Okay.  And what it -- what this policy says is
21  that you should create a list of everything in the file,
22  "To ensure proper notice of all existing documents to
23  the State's Attorney's Office, the courts, and the
24  defense counsel," correct?
25    A.  That's what it says, yes.

Page 125

1    Q.  Okay.  In other words, this is a mechanism
2  that is -- strike that.  The inventory sheet is supposed
3  to be shared with the prosecutors so that you can
4  confirm whether in fact you got everything in the
5  investigative file, correct?
6    A.  Well, that's one way.  Yes.
7    Q.  That's the way that's written in the policy,
8  correct?
9    A.  That's correct.
10    Q.  Okay.  Now there's -- you're referring to the
11  fact that there's another way for you as a prosecutor to
12  try to do that, correct?
13    A.  Yes.
14    Q.  And what are you saying is the way to do that?
15    A.  I'm -- as I receive all the reports, I'm
16  reading them and making sure that the -- the typical
17  reports from the -- from the Records Division are
18  included.  And when I have a Records Division report
19  that has a detailed interview, then I expect to see a
20  GPR related to that so I can read the file in context to
21  realize whether I've received everything.
22    Q.  Okay.  So for example, you -- if you reviewed
23  the file and you saw a detailed interview, then you'd
24  expect to see a GPR of that interview, correct?
25    A.  That's one example.  Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 34 of 71 PageID #:85733
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2020
126..129

Page 126

1    Q.   And if you didn't see a GPR of that interview,
2  then you would know that you're probably missing
3  something you've got to follow-up; is that right?
4        MS. CARNEY:  Incomplete hypothetical.
5        THE WITNESS:  If a -- if I'm reading a police
6  report and there's a detailed interview in there, I
7  would expect that there would be a GPR of some
8  length that was created at the time of the
9  interview.
10 BY MR. SWAMINATHAN:
11   Q.   And if that -- if you didn't find that in the
12 police file, what would you do?
13   A.   Well, I'd start off by calling the detectives
14 saying, I think I'm missing a GPR.
15   Q.   And is this a hypothetical that you're giving
16 me or is this something that you would -- a way that you
17 would address this --
18   A.   Both.
19   Q.   -- when you were serving as the prosecutor?
20   A.   It's both.
21   Q.   Okay.  And when you say it's both, what do you
22 mean by that?
23   A.   It's a hypothetical, but it's also what I did.
24   Q.   Okay.  So you're describing in -- what one of
25 your practices in terms of -- strike that.  So let me

Page 127

1  ask you this.  Was it your practice as you were
2  reviewing the police files that were coming in to assess
3  whether or not you were getting all the different types
4  of documents you typically expect to see?
5    A.   Yes.  From the investigative file, the RD
6  file, we're trying to read the -- the reports at the
7  same time to make sure we've got everything that we
8  normally would have, not just from the investigative
9  file, but also, you know, for example, there's always a
10 case report when a -- when a crime happens.  If I don't
11 have that, then I know I'm missing that report.
12   Q.   Okay.  And so your practice was to see if you
13 were getting all the different types of documents you
14 typically expect, for example, GPRs.  Well, let me break
15 it down.  Sorry.  I'm asking you a poor question.  One of
16 your practices was to see if you were getting all the
17 different types of documents you'd expect to see in a
18 police file; is that correct?
19   A.   Yes.
20   Q.   Okay.  And one of the types of document --
21 strike that.  Were GPRs or handwritten notes a type of
22 document you'd expect to see in the files?
23        MS. CARNEY:  Objection.  Form.  Incomplete
24 hypothetical.  You can answer.
25        THE WITNESS:  Well, again, depending upon the

Page 128

1  investigation, if the -- for the example you used
2  earlier, if there was a detailed interview, I'd
3  expect there'd be some sort of a GPR.
4  BY MR. SWAMINATHAN:
5    Q.   Okay.  But if there were -- you'd expect to
6  see some supplementary reports in the police file,
7  correct?
8        MS. GOLDEN:  Object to foundation.  Form.
9        THE WITNESS:  Supplemental reports would be in
10 the -- in the RD file as opposed to the
11 investigative file, right?
12 BY MR. SWAMINATHAN:
13   Q.   They would also be in the investigative file,
14 right?
15   A.   It could be.
16   Q.   Or not?  Go ahead.
17   A.   Yes, they could be.
18   Q.   Okay.  And when you looked at the
19 investigative file, would you expect to see there to be
20 some general progress reports or other handwritten
21 notes?
22   A.   Well, depending upon the course of the
23 investigation, the example we used earlier, a detailed
24 interview in a police report.  If it wasn't video
25 recorded or court reported or handwritten at the time,

Page 129

1  yeah, I would expect there to be some sort of a GPR of
2  whatever length associated with that.
3    Q.   Okay.  So the practice in your office was to
4  be paying attention to whether you were getting the
5  types of materials you typically expected so that you
6  could follow up if needed; is that right?
7    A.   Yes.  We read the entire file to determine
8  that.
9    Q.   And in other words, in addition to seeing if
10 you're getting all the types of documents you'd expect
11 to see, you were also assessing whether there was
12 specific information in the files that suggested to you
13 that there may be something else you hadn't received; is
14 that right?
15   A.   Yes.
16   Q.   In other words, you may have some GPRs, but if
17 you notice that you have a detailed interview for which
18 you don't have a GPR, you'd do a follow-up?
19        MS. GOLDEN:  Object to foundation.
20        MS. CARNEY:  And incomplete hypothetical.  You
21 can answer.
22        THE WITNESS:  It -- it would depend upon the
23 -- the scenario of how that detailed interview was
24 initially recorded.  But as I said previously, that
25 -- that would cause -- would make me ask, are there



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 35 of 71 PageID #:85734
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 17, 2023
130..133

Page 130

1    GPRs that I'm missing?
2    BY MR. SWAMINATHAN:
3        Q.   Okay.  And in those instances, what was your
4    practice?
5        A.   As I said earlier, I would probably start off
6    with calling the -- the police officer, the detective on
7    the case.  But that doesn't preclude that, you know,
8    investigative materials and the RD files and all sorts
9    of police reports do not land on my desk on the same
10   day.  So it might just be a timing thing where I
11   received something on one day and -- and then I'm still
12   waiting for the GPRs or some other report on another
13   day.
14       Q.   And so was it common for you get a copy of a
15   investigative file where you had to follow-up to get
16   access to the GPRs?
17            MS. CARNEY:  Objection.  Form.  Incomplete
18   hypothetical.
19   BY MR. SWAMINATHAN:
20       Q.   Let's strike that.  I'll ask a better
21   question.  I'm sorry.  When you received a copy of the
22   investigative file, you weren't given the entire
23   investigative file in drips and drabs, you were given the entire
24   investigative file, right?
25            MS. CARNEY:  Objection.

Page 131

1            MS. GOLDEN:  Form.
2            THE WITNESS:  Could you rephrase that?
3    BY MR. SWAMINATHAN:
4        Q.   Yeah.  And I'm sorry, I'm asking you poor
5    questions.  I understand that you're indicating that,
6    you know, sometimes your requests for documents related
7    to the police investigation may involve you getting
8    documents from different places within the police
9    department.  That's fair?
10       A.   Yes.
11       Q.   Okay.  And in fact, you said you were trained
12   on, you know, knowing what forms to submit and where to
13   go to get information from within the police department,
14   correct?
15       A.   Yes.
16       Q.   And that's because the Chicago Police
17   Department kept documents related to police
18   investigations in different repositories, correct?
19            MS. CARNEY:  Objection.  Form.  Foundation.
20            THE WITNESS:  Yes.
21   BY MR. SWAMINATHAN:
22       Q.   Okay.  And -- but once you were -- strike
23   that.  So one of the repositories of information that
24   you would request in your cases as a matter of practice
25   was the investigative file, correct?

Page 132

1        A.   Yes.
2        Q.   Okay.  And when you requested the
3    investigative file, would you request a portion or
4    pieces of the investigative file, or would you request
5    the entire investigative file?
6        A.   To be accurate, the -- the subpoenas that were
7    often sent out wouldn't -- wouldn't necessarily say
8    investigative file.  They would say GPRs, for example,
9    or what's called Street Files, or what's called RD
10   files.  So it would be -- I don't know if we'd use that
11   label that you used, but we would ask for any and all
12   investigative and other materials.
13       Q.   And when you submitted those requests, was it
14   your expectation that you would get the entire
15   investigative file or pieces of it?
16       A.   Well, we're always hoping to get the entire
17   reports that we're requesting, but sometimes we didn't
18   get all the RD reports at the same time.  Sometimes we
19   didn't get the case report at the same time, and
20   sometimes we didn't receive all of the GPRs at the same
21   time for whatever reason.
22       Q.   Okay.  And so some -- and so when you made the
23   request, though, your expectation was that they were
24   going to be giving you everything in their file that
25   they had at the time?  That they weren't going to be

Page 133

1    picking and choosing within the police department; is
2    that right?
3        A.   Our subpoenas and our other forms are requests
4    for any and all documents.
5        Q.   Okay.  And so when you made a request to the
6    Records Division for the RD file, you were -- your
7    expectation was that they were going to give you-all of
8    the documents in the RD file, correct?
9        A.   Any and all.
10       Q.   And when you made a request to the -- for the
11   investigative file from the police department, your
12   expectation was they were going to give you the entire
13   investigative file, correct?
14       A.   Any and all documents.
15       Q.   Okay.  And so when you'd received the
16   investigative files, if you found that there were --
17   strike that.  When you received investigative files,
18   what you've indicated is that there'd be occasions when
19   you'd find that you didn't have all of the GPRs,
20   correct?
21       A.   That -- yes, there could be.
22       Q.   Okay.  And in those instances, you would reach
23   out first to the detective to get those copies, correct?
24       A.   If -- if I couldn't -- if it was not an
25   obvious timing issue, you know, the -- the GPRs could be



Kentuckiana Reporters                                    502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                        502.584.0119 Fax
Chicago, Illinois 60606                                  schedule@kentuckianareporters.com
                                                         www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 36 of 71 PageID #:85735
The Deposition of BERNARD MONROE, Volume 2, taken on February 07, 2023

134..137

Page 134

1  submitted with the -- draft copy of the final closing
2  supplemental report.  So maybe those GPRs and that final
3  supplemental report wasn't ready because the sergeant
4  hadn't reviewed them yet.  So if it was not a timing
5  issue like that -- if it was a timing issue, I'd
6  probably just subpoena them again.  But if it was not a
7  timing issue where I thought all the materials had been
8  compiled, I would first then go to the detective and
9  say, what am I missing?
10    Q.  Okay.  And that would happen from time to
11  time, right?  Where you'd have to follow up with the
12  detective because some documents from the investigative
13  file didn't get to you?
14    MS. CARNEY:  Hold on.  He wasn't done
15  answering.
16    MR. SWAMINATHAN:  Oh.
17    THE WITNESS:  Yeah.  My last thing I said was,
18  if any materials were actually missing.  Like I
19  said before, the -- the -- the -- the manner in
20  which a -- the example we've been using is a
21  detailed interview.  If it was recorded, a court
22  reported statement, or nowadays a video statement
23  or even back then a handwritten statement, that
24  maybe the GPRs either wouldn't exist or wouldn't be
25  as detailed if it was recorded in a different

Page 135

1  manner.  So that's what I mean by if anything was
2  missing, but it would give me reason to call and
3  ask.
4  BY MR. SWAMINATHAN:
5    Q.  And you -- you've testified I know in an --
6  the -- previously in Rivera and Fields, you acknowledged
7  that there were times when you would get an
8  investigative file from the police department and it
9  would turn out that there were some additional documents
10  that hadn't been provided to you yet, right?  That you
11  had to follow-up and get?
12    A.  Yes.
13    Q.  And you acknowledged that there were times
14  when, you know, there were GPRs that you'd call and say,
15  "Hey, I didn't -- I don't see these."  And then they
16  would turn up when you made the call, correct?
17    MS. GOLDEN:  Object to form.
18    THE WITNESS:  And it -- it -- it -- and it
19  could be for many reasons.  Again, timing or,
20  again, as I mentioned a second ago, the -- the
21  sergeant hasn't signed off on the closing supp, so
22  the GPR hadn't been submitted into the
23  investigative file yet.  But the point is that I
24  would reach out and see if I was missing anything.
25  BY MR. SWAMINATHAN:

Page 136

1    Q.  Okay.  And -- okay.  And so there were
2  multiple reasons that you were often given for why --
3  strike that.  In the instance -- strike that.  In -- let
4  me start over.  When you didn't get GPRs that you were
5  expecting as part of the investigative files that had
6  been provided to you, there were multiple explanations
7  for why that would happen; is that fair?
8    A.  I -- if in fact that there was a GPR -- and
9  no, again, a GPR might not have been ever created.  But
10  if -- if I believe that there should be a -- a GPR, I
11  would ask.  And yes, then there would be multiple
12  reasons why maybe it wasn't originally submitted.
13    Q.  Okay.  And can you say, sitting here today,
14  how often that happened that you -- that a GPR just
15  hadn't been submitted to you, and when you followed up,
16  they provided it?
17    MS. GOLDEN:  Object to foundation.
18    THE WITNESS:  I -- I -- I can't say how often
19  as -- as I said numerous times today, when -- when
20  -- my issue with police reports and -- and GPRs
21  usually revolved around the timing of when I needed
22  to tender them in court and when they finally came
23  to me from the police department.
24  BY MR. SWAMINATHAN:
25    Q.  And so in terms of how often it was that you

Page 137

1  followed up about a GPR and then were -- after you
2  followed up, they provided you with a copy of a GPR
3  based on your follow-up, can -- you can't say how often
4  that is that that happened; is that right?
5    A.  I can't.
6    MS. GOLDEN:  Form.
7    MR. SWAMINATHAN:  Go ahead.
8    MS. GOLDEN:  Go ahead.
9    MR. SWAMINATHAN:  Did you get the answer,
10  Madam Court Reporter?
11    THE WITNESS:  I cannot say.
12  BY MR. SWAMINATHAN:
13    Q.  Okay.  Sorry.  All right.  Let me ask you
14  about -- and by the way, when the detectives would send
15  you their GPRs, as a prosecutor, do you have the ability
16  to say whether the GPRs that were submitted to you or
17  all of the GPRs on a case?
18    MS. CARNEY:  Objection.  Form.
19    THE WITNESS:  I -- I don't understand the
20  question.
21  BY MR. SWAMINATHAN:
22    Q.  Yeah.  As a prosecutor, can you say once
23  you've received some number of GPRs that, in fact, there
24  are no other GPRs that exist for that case?
25    MS. GOLDEN:  Same objection.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 37 of 71 PageID #:85736
The Deposition of BERNARD MURRAY, Volume 2, taken on February 7, 2023

138..141

Page 138

1        THE WITNESS:  Only from the context of my
2    reviewing of the file.
3 BY MR. SWAMINATHAN:
4        Q.   In other words, you may be able to -- if there
5    was a GPR that was created that's missing from the
6    investigative file you received, you may be able to
7    catch it in some instances, correct?
8        MS. CARNEY:  Objection.  Form.  Incomplete
9    hypothetical.  You can answer.
10       THE WITNESS:  Yeah.  If I believed one was
11   missing, I would reach out and try to find out if
12   one was actually missing.
13 BY MR. SWAMINATHAN:
14       Q.   But you wouldn't always be able to catch it if
15   there were GPRs that were missing, correct?
16       MS. GOLDEN:  Form.
17       THE WITNESS:  Well, I -- I can only estimate
18   from my examination of the total file.
19 BY MR. SWAMINATHAN:
20       Q.   So, for example, if you had GPRs documenting
21   interviews, but those interviews weren't documented in
22   the supplementary reports, you'd have no idea that there
23   were GPRs related to that interview, correct?
24       A.   Well, two things.  Usually if there was a -- a
25   -- some significant interview, I think that would be

Page 139

1  documented in -- in, even briefly, in a supplemental
2  report.  But if an interview with someone was made part
3  of a GPR and it was not referenced and I couldn't
4  discern that it must have happened where is -- where is
5  the GPR or where is the the -- RD report, then I would
6  not know in that scenario.
7        Q.   Okay.  Okay.  And so you're not claiming that,
8    as a prosecutor, you can always tell whether you've
9    received all of the GPRs?
10       A.   I think I can tell from, again, reviewing the
11   entire -- reading the GPRs and the RD files in tandem, I
12   can get a good handle on that I've got everything.  I'm
13   not claiming in the -- the scenario -- the hypothetical
14   you -- hypothetical you created, which seems very
15   speculative to me.  In that scenario, I would not know.
16   But I think from reading the RD and the investigative
17   files and in -- you know, in conjunction with my review
18   of all the materials, I'd have a safe predictor of that
19   I -- whether -- whether I had all the GPRs that were
20   probably created.
21       Q.   And that's because your assumption is that if
22   there were interviews that were taking place, they were
23   always being documented in a supplementary report,
24   right?
25       MS. CARNEY:  Objection.  Form.  Misstates his

Page 140

1  testimony.  You can answer.
2        THE WITNESS:  You -- you could have a
3    reference to we interviewed in a -- in a -- in a --
4    in a -- in an RD a supplementary report, we
5    interviewed these three people, they knew nothing.
6    And that would make me say, "well, what did they
7    say?  Is" - "is our GPR related to that?"  And the
8    officer might say, "no, that was it."  We didn't --
9    we didn't have a GPR because they -- they knew
10   nothing.  So that's an example of me trying to
11   discern whether a GPR existed on -- on a witness.
12   Also, the -- the -- the canvas report would be
13   another report where it could be a brief mention.
14   We conducted a canvas and knocked on ten doors and
15   here are the ten people and no one knew nothing.
16   There may not be a GPR report related to that.  But
17   nevertheless, it would cause me to ask, "was a GPR
18   created?"
19 BY MR. SWAMINATHAN:
20       Q.   Yeah.  And your expect -- in other words, part
21   of what you're identifying is your expectation was that
22   if the police officers were interviewing witnesses as
23   part of their investigation, they were creating some
24   documentation of the fact that they conducted those
25   interviews, correct?

Page 141

1        A.   Yes.
2        Q.   And your assumption is that if they conducted
3    interviews with individuals as part of the
4    investigation, you'd see evidence of that in their
5    supplementary reports, even if it's just a brief note
6    about interviewing somebody, correct?
7        A.   I -- I would say that the majority of the
8    time, there would be some reference in the supplementary
9    report.  But there -- there may be -- there may be an
10   interview of someone who they thought was a pertinent
11   witness, but knew nothing.  That might be in a GPR and
12   not in a supplementary report.  So it'd be the converse
13   of what you're asking.  There might be a -- a one
14   paragraph or maybe a -- like, a document they received
15   where they thought they might have a lead and then they
16   quickly realized that it was insignificant, and then
17   maybe did not mention it in the RD, the typed report.
18       Q.   Okay.  And if they didn't mention it in the
19   typed RD report, you wouldn't know if they created a GPR
20   of that report, correct?  Related to that interview,
21   correct?
22       MS. CARNEY:  Objection.  Form.  Misstates his
23   testimony.
24       THE WITNESS:  Well, I -- I -- I -- I'm -- I
25   think even one of the cases we have here, there's a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 142

1  -- a lease and a name of somebody that was -- and -
2  - and a GPR report, and -- and it was quickly
3  dropped because the actual perpetrator confessed.
4  So that case, there was evidence in the GPRs of --
5  of that information, but certainly not detailed in
6  the supplemental report.
7  BY MR. SWAMINATHAN:
8      Q.   Okay.  So ultimately, is it your opinion that
9  if the police department failed to give you-all the
10  documents related to an investigation, you'd always be
11  able to catch that?
12     A.   I -- I think with the -- the -- reading the RD
13  and the supplement and the investigative file in tandem,
14  I -- I think I can discern whether I've received all the
15  reports or certainly lead me to ask, have I received all
16  the reports?  And --
17     Q.   Okay.  And even investigative steps --
18         MS. CARNEY:  Hold on.  Hold on.  Hold on. Hold
19  on. He was still talking.
20         THE WITNESS:  And -- and as I've said, the --
21  it -- it is possible that we -- even though I think
22  a GPR should have been created, and when I reach
23  out to the -- police officer, the detective,
24  he'll say, "no, we didn't do a GPR on that" because
25  of whatever reason.  Now, if -- if -- if -- if your

Page 143

1  hypothetical is an interview was conducted or notes
2  were made on a GPR and they were wholly irrelevant
3  to the case and they were not recorded, then, in
4  the RD or -- and then that sub -- that note was not
5  included in the investigative file, then I would've
6  no way of knowing about that.
7  BY MR. SWAMINATHAN:
8      Q.   And maybe just a related question is, when you
9  are reviewing the file, if the police -- if the --
10  strike that.  If the police detectives on the case don't
11  create a supplementary report for investigative steps
12  that they took during the course of the investigation,
13  you have no way of knowing if there were GPRs for that
14  work, correct?
15         MS. GOLDEN:  Object to foundation.
16         MS. CARNEY:  Incomplete hypothetical.  You can
17  answer.
18         THE WITNESS:  Well, if I -- if I've received
19  the investigative file and there's a GPR in there
20  and it's not referenced in the -- in a
21  supplementary report, the reason probably was that
22  it was a -- a dead end or a lead that they realized
23  quickly was a dead end.  And that's why there was
24  no supplemental report on that.  But obviously,
25  they would've preserved the -- the investigative

Page 144

1  material, the lease, or the whatever, or the note
2  they took, whatever it might be.
3  BY MR. SWAMINATHAN:
4      Q.   Okay.  And if they pursued a lead that proved
5  to ultimately be a dead end, in that instance, you
6  acknowledged they may not decide to write any
7  supplementary reports about that dead end, correct?
8         MS. GOLDEN:  Object to form and foundation.
9         MS. CARNEY:  And incomplete hypothetical.
10         THE WITNESS:  Well -- well, I think the point
11  is that they're making investigative GPRs regarding
12  that, what ultimately is a dead lead, there's a GPR
13  that refers to that.
14  BY MR. SWAMINATHAN:
15     Q.   Okay.  And if it isn't -- and you're
16  acknowledging in that scenario, it may not be documented
17  in any supplementary report, but there should be a GPR
18  for it, correct?
19     A.   Yeah.  And -- and in that situation, you know,
20  as I've said a few times, we read the investigative
21  file, the GPRs, and any material collected there, with
22  the same level of -- of significance placed on it as the
23  final typed up supplementary reports.
24     Q.   And if you had an instance where they pursued
25  a dead end and they didn't write up typed reports about

Page 145

1  it, unless you received the GPR, you would have no way
2  to know whether there were GPRs about that angle; is
3  that fair?
4         MS. GOLDEN:  Object to form and foundation.
5         THE WITNESS:  Well, I'd have to add on to your
6  hypothetical whether there was any other
7  indications in the supplementary reports that the -
8  - that was followed up on in some form,
9  whether they listed it as a dead end or not.  If --
10  but if -- if it's completely -- if it's -- I said
11  this earlier, if it's a -- if they took notes of an
12  interview with somebody and they realized
13  immediately it was a dead end and there's
14  absolutely no reference to it in the -- in the
15  supplementary reports and they did not put that GPR
16  in the investigative file, there's no way I would
17  know of it.
18  BY MR. SWAMINATHAN:
19     Q.   Okay.  If detectives conducted interviews and
20  investigation that they never documented at all, you
21  wouldn't have any way of catching that either, correct?
22         MS. GOLDEN:  Object to --
23         MS. CARNEY:  Form.  Foundation.  Incomplete
24  hypothetical.
25         THE WITNESS:  Well, I -- I think I answered a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 39 of 71 PageID #:85738
The Deposition of BERNARD C. MURRAY, Volume 2, taken on February 07, 2023

146..149

Page 146

1  few questions ago, but I'll -- I'll -- I'll -- I'll
2  -- I'll say what I'm trying to convey to you, that
3  if -- if detectives are conducting an investigation
4  on an open case and they're pursuing a -- a -- a
5  part of an investigation that leads nowhere, and
6  pretty quickly it leads nowhere, but they don't
7  submit that GPR into the file and it's not
8  referenced in any other way in their or other typed
9  supplementary reports, I would not know about it.
10 BY MR. SWAMINATHAN:
11     Q.   Okay.  That ultimately -- well, strike that.
12 If the detectives pursued investigative -- well, strike
13 that.  Strike that.  Ultimately the process required
14 prosecutors to trust the Chicago Police detectives to be
15 documenting everything into their investigative file or
16 typed reports, correct?
17         MS. CARNEY:  Objection.  Form.  Foundation.
18     Incomplete hypothetical.
19         THE WITNESS:  I -- I -- I think the special
20     order says, "Relevant information obtained by any
21     detective during the course of their
22     investigation."  But with that caveat, I think that
23     we are relying upon them to collect and preserve
24     relevant investigative material.
25 BY MR. SWAMINATHAN:

Page 147

1      Q.   Okay.  And the process requires prosecutors to
2  trust the Chicago Police detectives to disclose to them
3  all of that relevant and pertinent information, correct?
4          MS. GOLDEN:  Object to form.
5          THE WITNESS:  We --
6          MR. SWAMINATHAN:  Carrie, I -- let me -- let
7      me strike that question and re-ask it.  I think
8      Carrie's right.  That was a poorly formed question.
9  BY MR. SWAMINATHAN:
10     Q.   Ultimately, the process required prosecutors
11 to trust Chicago Police detectives to be disclosing
12 everything to them, correct?
13         MS. GOLDEN:  Object to form.
14         THE WITNESS:  We -- maybe the best way to word
15     it is we trust but verify.  We issue the subpoenas
16     and we trust that we'll receive everything.  But
17     for whatever reason where we can tell we're not
18     receiving everything, whether are timing issues,
19     whether -- whatever it is, you know, that's when we
20     verify.
21 BY MR. SWAMINATHAN:
22     Q.   Okay.  And -- but ultimately, even that
23 verification process, you can't guarantee that the
24 Chicago Police Department has given you everything. You
25 have to have some faith that they're following through

Page 148

1  in doing that for you, correct?
2          MS. GOLDEN:  Object to form and foundation.
3          THE WITNESS:  Well, again, I've -- I've gone
4      through how I've read all the reports and tried to
5      determine that -- from my knowledge that I've
6      received everything.  And then if I think something
7      missing, I will try to find if something's missing.
8      So to the level that I depend upon them to produce
9      what they've collected during the course of the
10     investigation, the relevant information in the
11     investigative file and the typed reports, yeah, I'm
12     trusting them to provide that material to me.
13 BY MR. SWAMINATHAN:
14     Q.   Does Cook County State's Attorney's office,
15 did it conduct any audits of Chicago Police Department
16 files to ensure that it was getting everything?
17         MS. CARNEY:  Objection.  Form.
18         MS. GOLDEN:  Foundation.
19         THE WITNESS:  I'm not sure I understand what
20     you mean by audit.
21 BY MR. SWAMINATHAN:
22     Q.   Yeah.  Did the Cook County State's Attorney's
23 Office ever review specific files from the Chicago
24 Police Department and say, all right, we're auditing to
25 make sure that when we make subpoena requests or

Page 149

1  informal requests, you actually provide us with all of
2  the police files?
3          MS. CARNEY:  Objection.  Foundation.
4          THE WITNESS:  I -- I'm not aware of -- that
5      sounds like some sort of formal audit.  I think
6      I've already described how an individual prosecutor
7      might say, "I don't think I've got everything.
8      Please give me what I need."
9  BY MR. SWAMINATHAN:
10     Q.   So are you aware of any formal audits in which
11 the CC -- with the Cook -- in which the Cook County
12 State's Attorney's Office audited the Chicago Police
13 Department's files, investigative files, to ensure that
14 they were getting everything?
15     A.   No.
16         MS. CARNEY:  Objection.  Form.  Foundation.
17     Asked and answered.  You can answer.
18         THE WITNESS:  Not that I'm aware of.
19 BY MR. SWAMINATHAN:
20     Q.   Did anyone in the state's attorney's office
21 ever go in and review homicide investigations to make
22 sure the investigations were being thoroughly documented
23 and disclosed?
24         MS. CARNEY:  Objection.
25         MS. GOLDEN:  Object to foundation.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 40 of 71 PageID #:85739
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2020
150..153

Page 150

1      THE WITNESS:  Well, no, I'm not aware of that.
2  BY MR. SWAMINATHAN:
3      Q.   Did anyone from the State's Attorney's Office
4  ever go in and review Chicago Police Department files to
5  make sure documents were being pulled from all of the
6  necessary repositories related to that case?
7      MS. CARNEY:  Objection.  Form.  Foundation.
8      THE WITNESS:  Is that a -- are you saying on a
9  case-by-case basis?
10  BY MR. SWAMINATHAN:
11     Q.   No, I'm saying as a matter -- strike that. Was
12  there any formal audit or monitoring done to ensure that
13  CPD files were being pulled from all of the necessary
14  repositories within the police department for a given
15  case?
16     MS. CARNEY:  Objection.  Foundation.
17     THE WITNESS:  It was not an office-wide audit
18     that I'm aware of.  As I've said before, each
19     prosecutor would look at what he's received and
20     where he should have received it from.  If they
21     didn't get the rap sheet, they knew the Bureau of
22     Identification didn't provide it, so they would
23     make phone calls and reach out to them on why they
24     didn't get it.  So not a formal office audit, but
25     each prosecutor would audit his own files.

Page 151

1  BY MR. SWAMINATHAN:
2      Q.   Other than individual prosecutors trying to
3  check and see if they think they got everything from the
4  police department, was there anything else that was done
5  within the prosecutor's office to ensure that they were
6  getting everything from the Chicago Police Department?
7      A.   And you -- again, you're -- you're referring
8  to, like, an office-wide audit?
9      Q.   Any office-wide audit or review or spot check,
10  any of those things?
11     A.   Well, the prosecutors would self-audit their
12  files.  That's why I was asking, do you mean office-
13  wide or -- or not?
14     Q.   That's what I said.  Any office-wide audit.
15     A.   No.
16     Q.   Or spot check or monitoring.
17     MS. GOLDEN:  Object to form.
18     THE WITNESS:  Not that I'm aware of.
19  BY MR. SWAMINATHAN:
20     Q.   Okay.  And did the state attorney's office
21  ever conduct any trainings for the Chicago Police
22  Department about what specific processes or expectations
23  they had about how Chicago Police Department was pulling
24  files in response to its subpoena request and informal
25  request?

Page 152

1      MS. CARNEY:  Object --
2      MS. GOLDEN:  Object to foundation.
3      THE WITNESS:  Well, I -- I'm not quite sure I
4  understand.  The -- did -- did the Cook County
5  State Attorney's office ever train the Chicago
6  Police Department on how they should gather up the
7  -- the discovery materials?  No, we did not do that
8  type of training.
9      MR. SWAMINATHAN:  Okay.
10     MS. GOLDEN:  So, Anand, when you're at a good
11  spot, I could use a break.
12     MR. SWAMINATHAN:  Yep, let's do it right now.
13     MS. GOLDEN:  Okay.
14     THE REPORTER:  Okay.
15     MR. SWAMINATHAN:  Should we -- why don't we --
16  can we do a lunch?  It's 1:20, so I -- I'm trying -
17  - I want to try to be done before he has to go at
18  5:00 p.m., and so we're not bringing him back.  I
19  think we've got a good chance of doing that, you
20  know?  Don't hold me to it, but I'm -- but I think
21  we're on -- in good shape.  But -- and I think we
22  can do that, even if we take a break until 2:00 for
23  lunch.  So -- but we are going to go long enough
24  that we can't -- I don't think we can just power
25  through without saying to the witness we should

Page 153

1  take a lunch break.
2      MS. GOLDEN:  Yeah, that's fine.  Do you want
3  to go off the record?
4      MR. SWAMINATHAN:  Yeah, let's go off the
5  record.  Thank you.
6      THE REPORTER:  Okay.  Going off the record.
7  The time is 1:21 p.m.
8      (OFF THE RECORD)
9      THE REPORTER:  We're back on the record.  The
10  time is 2:05 p.m.
11     MR. SWAMINATHAN:  Sorry.
12  BY MR. SWAMINATHAN:
13     Q.   All right.  Good afternoon, Mr. Murray.  Did
14  you get a chance to get some lunch?
15     A.   I did.
16     Q.   And are you prepared to keep going forward
17  here today?
18     A.   I am.
19     Q.   Okay.  You did not review any of the
20  depositions of the numerous witnesses in this case,
21  correct?
22     MS. CARNEY:  Objection.  Form.  You can
23  answer.
24     THE WITNESS:  The deposition of the expert,
25  that was it.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 41 of 71 PageID #:85740
The Deposition of BERNARD MURRAY, Volume 2, Taken on February 07, 2019
154..157

Page 154

BY MR. SWAMINATHAN:

Q. Did you review any depositions of any of the witnesses to the -- involved in the Soto homicide investigation?

A. I did not.

Q. Did you review the depositions of Mr. Reyes or Mr. Solache or anyone else who was a subject of the investigation?

A. I did not.

Q. Okay. You say you reviewed Mr. Tiderington's expert report, correct?

A. Yes.

Q. And you saw his materials reviewed, correct?

A. Yes.

Q. And Mr. Tiderington, you agree, did review numerous depositions related to the underlying Soto homicide investigation, correct?

A. Yes.

Q. One of the things he identified in his report is that the depositions revealed various investigative steps that were taken, but were not documented anywhere in the investigative file?

MS. CARNEY: Objection. Form. Foundation. You can answer.

THE WITNESS: Referring to the Solache-Reyes

Page 155

case?

BY MR. SWAMINATHAN:

Q. Yes.

A. Yes.

Q. Okay.

A. You said that.

Q. I'm sorry. Go ahead.

A. You said that.

Q. Yeah. And including interviews that were done as part of the Soto investigation that were not documented in any supplementary reports or GPRs, correct?

A. I don't know if I focused on that. That was not my concern. But if it's in his report, then it's true.

Q. Okay. And you're not offering any opinions about those issues, correct?

A. I'm not.

Q. Okay. With regard to the individual Soto homicide investigation that you focused on just those four Polaroid photos, correct?

A. Yeah. The collection of photograph Polaroids, yes.

Q. Okay. And you understood that there were four Polaroid photos that Mr. Tiderington focused on as being

Page 156

related to the Brady evidence and Brady obligations, correct?

A. Those four people, but maybe five photographs. Does that sound right?

Q. Okay. That sounds about right. And basically, we're talking about Felicia Soto, Rosa Aronda, Jorge Mejia, and Guadalupe Mejia, correct?

A. I'm just it up now. I am sorry, what -- so what did you say? I -- I -- I -- I have my report now.

Q. Yeah, I'll read the names. I'll say the names again. Mr. Tiderington focused on four Polaroid photos contained in the investigative file of Felicia Soto, Rosa Aronda, Jorge Mejia, and Guadalupe Mejia, correct?

A. Yes.

Q. And he identified that those Polaroid photos were contained in the investigative file; is that right?

A. I am looking at my -- I'm trying to look at my capture, but I think that's what he said, yes.

Q. Okay. And you had a copy of the investigative file from the Soto homicide investigation and you saw that those Polaroid photos were in the investigative file, correct?

A. Yes.

Q. Okay. And you agree that those Polaroid

Page 157

photos were not contained in the public defender file, correct, for those four individuals?

MS. CARNEY: Objection. Form. You can answer.

THE WITNESS: Well, it's -- it's -- it's hard for me to answer that because I think I testified earlier today that physical evidence may be, you know, clothing, a weapon, and even photographs that were collected during the investigation, the prosecutors, maybe instead of Xeroxing them or copying them, would say, we'll have them available to you for you to look at them, so --

BY MR. SWAMINATHAN:

Q. You have -- sorry, you -- let me break that up here. First of all, you are not claiming that you found copies of those four Polaroids in any public defender file; is that right?

A. I am not saying that.

Q. Okay. And are you saying that you found copies of those four Polaroid photos in the prosecutor file from the state's attorney's office produced in the -- in this case?

A. What I'm saying is that the photographs that are -- are maybe --

Q. Nope, you cut -- you --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 42 of 71 PageID #:8574
The Deposition of BERNARD MURRAY, Volume 2, taken on February 17, 2021
158..161

Page 158

1    A.   -- utilized during that investigation --
2    Q.   Sorry.  Sorry.  You cut out entirely there for
3  a second and froze in the middle.  Can we -- can you
4  start over again?  Or maybe I need -- can you read back
5  the question, sorry, and then let him answer again?
6         THE REPORTER:  Yeah.
7         THE WITNESS:  You froze.
8         MS. CARNEY:  Did you freeze?  We -- did we
9  lose somebody off of the -- no.  Okay.
10         MR. SWAMINATHAN:  I don't think so.  Your
11  screen just froze for, like, two seconds, then he
12  came back on.
13         THE WITNESS:  Okay.
14         THE REPORTER:  Give me one sec.
15            (REPORTER PLAYS BACK REQUESTED QUESTION)
16         THE WITNESS:  What I'm -- what I'm saying is
17  that when investigators use Polaroid photographs
18  during the course of investigation, it's common for
19  them to put them into a -- folder, like a -- a
20  mailing photograph -- not -- mailing folder, which
21  they then place into the investigative file, either
22  for use at trial or production later on to the
23  prosecutor.  Often, we -- we don't receive a Xerox
24  of the photographs, we tell the defense attorney,
25  hey, there was photographs that were used during

Page 159

1  the investigation, they're available for you to
2  review.  Much like we would save other pieces of
3  physical evidence, and -- and frankly other
4  photographs, too.
5  BY MR. SWAMINATHAN:
6    Q.   Did you see any evidence that any of those
7  four Polaroid photos were contained in the prosecutor
8  file?
9    A.   I -- I did not.
10    Q.   And you didn't find a copy of those four
11  Polaroid photos in the prosecutor file, correct?
12    A.   I'm just reviewing my notes.  I don't think I
13  did, though.  No.  I -- I discussed the other
14  photographs, which were impounded with the court.
15    Q.   Okay.  And so you agree that the four photos
16  that were contained in the investigative file that Mr.
17  Tiderington focused on, none of those were contained in
18  the state's attorney filed that you received for the
19  Soto homicide investigation, correct?
20    A.   They were not, but -- but then again, they
21  were -- we would not expect a Xerox copy of them in the
22  state's attorney file.  We would have them produced for
23  use at trial or motions, and we would tell defense
24  counsel, as we always did, that physical evidence,
25  including photographs, they can view them at any time

Page 160

1  they want prior to or during trial.  So I wouldn't
2  necessarily expect to find a Xerox of the photographs,
3  or even the original photographs, if they weren't used
4  at trial.
5    Q.   Okay.  So let me break that down.  So first
6  step, you did not find a copy of those four Polaroid
7  photos, either originals or copies, in the prosecutor
8  file for the Soto homicide, correct?
9         MS. GOLDEN:  Objection.  Asked and answered.
10  BY MR. SWAMINATHAN:
11    Q.   Go ahead.
12    A.   I said I did not, and -- and -- and -- and --
13  and nor would I necessarily expect to find them.
14    Q.   Okay.  And then did you find any notations or
15  documentation of any kind that indicated that those
16  Polaroid photos had been made available to the defense
17  attorney in the Soto homicide investigation?
18    A.   Those specifically, no, but only by
19  implication that there are other photographs, Polaroid
20  photographs, that were used during the investigation
21  were later on impounded and obviously therefore used at
22  trial.
23    Q.   There were other Polaroid photographs that
24  were impounded in evidence, but the -- not those four
25  Polaroid photographs, correct?

Page 161

1    A.   Not those four.
2    Q.   And then there were Polaroid photos that were
3  actually produced to the criminal defense attorney that
4  were in -- from the investigative file, but not those
5  four photos, correct?
6         MS. CARNEY:  Objection.  Form.  Foundation.
7         THE WITNESS:  I don't know that these
8  photographs were not made available to the criminal
9  defense attorneys.
10  BY MR. SWAMINATHAN:
11    Q.   I'm asking a different question.  There were
12  -- other than these four Polaroid photos, there were a
13  number of other Polaroid photos contained in the
14  investigative file, correct?
15    A.   Are you referring to the ones that were
16  eventually inventory -- I mean, in -- that were
17  impounded with the court?
18    Q.   Yes.  Some of the other Polaroid photos
19  contained in the investigative file, other than these
20  four, were impounded with the Court, correct?
21    A.   Yes.
22    Q.   And those were photos of four suspects in the
23  case, Arturo Reyes, Gabriel Solache, Adriana Mejia,
24  Rosauro Mejia, and then Guadalupe Mejia as well,
25  correct?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

```
1           MS. CARNEY:  Objection.  Form.  Foundation.
2           THE WITNESS:  Well, I don't know if all four
3    of them were suspects.
4    BY MR. SWAMINATHAN:
5       Q.   When you say you don't know that all four of
6    them were suspects, you're saying that because you just
7    don't know the investigation that well; is that fair?
8       A.   That's fair.  But also, I -- I mean, I know
9    who the three charged defendants were.
10      Q.   Okay.  So let's -- let me just try to do it a
11   little more clearly.
12          MS. GOLDEN:  Well, I have a belated objection
13   to form.
14   BY MR. SWAMINATHAN:
15      Q.   Okay.  You -- the Polaroid photos that were
16   contained in the investigative file, other than the four
17   photos that Mr. Tiderington is focused on, you found
18   some of those in the impounded exhibits, correct?
19          MS. GOLDEN:  Form.
20          THE WITNESS:  Excuse me.  Impounded with the
21   clerk of the court.
22   BY MR. SWAMINATHAN:
23      Q.   Yes.  And then you -- some of those photos,
24   other than the four Polaroid photos Mr. Tiderington
25   focused on, were found in the state's attorney's office
```

Page 163

```
1    file, correct?
2           MS. CARNEY:  Objection.  Form.  Foundation.
3           THE WITNESS:  I -- I -- I'm not absolutely
4    sure about that.
5    BY MR. SWAMINATHAN:
6       Q.   And some of those Polaroid photos, other than
7    the ones that Mr. Tiderington focused on, were found in
8    the public defender file from the Soto homicide
9    investigation, correct?
10          MS. CARNEY:  Objection.  Form.  Foundation.
11          THE WITNESS:  Well, I -- I'm focusing on the
12   four that Mr. -- that the plaintiff's expert was
13   discussing, the four people in the five
14   photographs.
15   BY MR. SWAMINATHAN:
16      Q.   And those four photos that Mr. Tiderington is
17   focusing on, were not contained -- that were in the
18   investigative file, were not contained in the public
19   defender file or the prosecutor file produced in this
20   litigation, correct?
21          MS. CARNEY:  Objection.  Form.  Foundation.
22   You can answer.
23          THE WITNESS:  As I've said before, photographs
24   that were used in this process would not
25   necessarily be tendered in formal discovery in
```

Page 164

```
1    court.  You would tell counsel that the -- in the
2    police investigative file, there's more Polaroid
3    photographs that are available for you to review at
4    any time.  So you wouldn't necessarily find Xeroxes
5    or -- or -- or -- or Xerox -- yeah, Xerox copies of
6    those photographs in either file.
7    BY MR. SWAMINATHAN:
8       Q.   I understand, but I would like you to start by
9    answering my question, which is whether those documents
10   were contained in the public defender or state's
11   attorney file, those four Polaroid photos?
12          MS. CARNEY:  Objection.  Form.  Foundation.
13   Asked and answered.
14          THE WITNESS:  I did not find them, nor would I
15   expect to find them.
16   BY MR. SWAMINATHAN:
17      Q.   Okay.  And then those -- in the public
18   defender file and prosecutor file, did you see any
19   notation anywhere in either of those files that
20   indicated that the criminal defense attorney or -- had
21   been given access to those pictures?  Or strike that.
22   Let me --
23          MS. CARNEY:  Objection.
24   BY MR. SWAMINATHAN:
25      Q.   Let me ask you a better question.  Sorry.  Did
```

Page 165

```
1    you see any indication in the prosecutor file that the
2    prosecutor had been made aware of those four Polaroid
3    photos?
4           MS. CARNEY:  Objection.  Form.  Foundation.
5           THE WITNESS:  Well, I did not review the
6    prosecutor and the defense file in this case.
7    BY MR. SWAMINATHAN:
8       Q.   Okay.  And you did not find --
9           MS. CARNEY:  Hold on.  Hold on.  He was still
10   talking.
11          THE WITNESS:  I only --
12   BY MR. SWAMINATHAN:
13      Q.   I'm sorry.  Go ahead.
14      A.   I only focused on the allegations that
15   Plaintiff's expert made regarding the photographs.
16      Q.   Okay.  And did you find any notation anywhere
17   in the prosecutor file indicating that they were aware
18   of the existence of those four Polaroid photos?
19          MS. CARNEY:  Objection.  Form.  Foundation.
20          THE WITNESS:  As I said, I did not review the
21   prosecutor's file specifically for that.  I can
22   only discuss the fact that other Polaroid
23   photographs were presented in court and impounded
24   with the clerk, so it certainly seems logical to me
25   that all those photographs were available for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 44 of 71 PageID #:85743
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023

166..169

Page 166

1    review at trial or even before trial.
2    BY MR. SWAMINATHAN:
3        Q.   It would be logical to share them, but do you
4    know if that actually happened?
5            MS. CARNEY:  Objection.  Form.  Foundation.
6            THE WITNESS:  I -- I know that that was the --
7    what I've said a few times now, the common practice
8    was to say, there are photographs, there are
9    physical exhibits, that are available for you to
10   review prior to or during trial.  So in this case,
11   we've got evidence that -- that some of these
12   photographs were used, so I -- I do find it hard to
13   believe that the other photographs weren't made
14   available for defense counsel to review.
15   BY MR. SWAMINATHAN:
16       Q.   What -- you said that there were some Polaroid
17   photos, not these four, that were in the impounded
18   evidence in clerk's office, correct?
19       A.   Yes.
20       Q.   Were there -- were any of these four photos
21   found in any impounded evidence at the clerk's Office?
22       A.   They were not.
23       Q.   Okay.  And were any of the --
24       A.   Well, one --
25       Q.   Did you find any note -- go ahead.

Page 167

1        A.   Sorry.  One of the people, but a different
2    photograph.
3        Q.   Okay.  And so did you find any -- let's focus
4    on Rosa Aronda and Felicia Soto for a moment.  There
5    were Polaroid photos taken by detectives at Area 5 of
6    those two individuals found in the investigative file,
7    correct?
8        A.   Yes.
9        Q.   Okay.  You didn't find any copies of those
10   Polaroid photos of Rosa Aronda and Felicia Soto in any
11   impounded evidence at the -- in the court, correct?
12       A.   I did not.
13       Q.   And you didn't find any copies of those
14   Polaroid photos of Rosa Aronda and Felicia Soto in any
15   prosecutor file, correct?
16           MS. CARNEY:  Object to foundation.
17           THE WITNESS:  I did not examine -- I did not
18   find them in -- in the prosecutor file, but I did
19   not examine the prosecutor file at length, so I
20   presume they were not there based upon the
21   allegation of the plaintiff's expert.
22   BY MR. SWAMINATHAN:
23       Q.   Did you find any notation in the prosecutor
24   file that indicated that the Felicia Soto or Rosa Aronda
25   Polaroid photos had been provided or shared with the

Page 168

1    prosecutor's office?
2            MS. CARNEY:  Form.
3            THE WITNESS:  By -- specifically by name, no.
4    But as I've said a few times now, the investigative
5    file has a folder in there where all these -- where
6    Polaroid photographs and -- and other photographs
7    could be -- were contained in those envelopes, and
8    prosecutors would review them prior to going to
9    trial.  And the evidence of that is the other
10   photographs that were impounded.  They obviously
11   had access to them and used them.
12   BY MR. SWAMINATHAN:
13       Q.   Is it your testimony that these four photos
14   were contained in the same envelope as the other photos
15   of Mr. Reyes, Ms. Adriana Mejia, and Mr. Solache?
16           MS. CARNEY:  Objection.  Form.  Foundation.
17           THE WITNESS:  The -- there's -- for example,
18   the impounded photographs could have been in -- in
19   two places.  They could have been in that envelope
20   with -- as well as these other Polaroid
21   photographs, or if they were used in evidence
22   somehow, they could have been contained in an
23   inventory sheet with other evidence that's
24   inventoried.  So those are the two places that
25   Polaroid photographs I would expect to find.

Page 169

1    BY MR. SWAMINATHAN:
2        Q.   Okay.  And those are possibilities, but you
3    can't say either of those things is the case in this --
4    in the Soto homicide investigation, correct?
5            MS. CARNEY:  Objection.  Form.  You can
6    answer.
7            THE WITNESS:  I can't think of another
8    possibility.
9    BY MR. SWAMINATHAN:
10       Q.   Well, another possibility is they didn't get
11   turned over, correct?
12       A.   No.  The -- I mean, the possibility of where
13   they were stored, and then how they were uncovered
14   during the course of this litigation.
15       Q.   Are you claiming that you can say with
16   certainty that those four -- strike that.  Let's do it -
17   - let's focus on Aronda and Soto again.  Sir, are you
18   claiming that you can say with certainty that the Soto
19   and Aronda photos were disclosed to the prosecutor in
20   this case?
21           MS. GOLDEN:  Form.
22           MS. CARNEY:  Objection.  Form.  Foundation.
23           THE WITNESS:  Well, since I -- I've not talked
24   to the prosecutors in the case, I don't know that
25   to a certainty, but I'm telling you that the common

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 45 of 71 PageID #:85744
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023

170..173

Page 170

1    practice was for those photographs to be made
2    available to the prosecution from the investigatory
3    -- investigative file prior to trial.  And I'm
4    saying --
5    BY MR. SWAMINATHAN:
6        Q.   Well, the expectation of the prosecutors,
7    is --
8            MS. CARNEY:  Well --
9            MR. SWAMINATHAN:  -- that --
10           MS. CARNEY:  Well --
11           MS. GOLDEN:  Hold on.
12           MR. SWAMINATHAN:  Go ahead.
13           MS. CARNEY:  You interrupted him, Anand.
14           MR. SWAMINATHAN:  All right.
15           THE WITNESS:  Yeah.  And -- and -- and -- and
16   also -- the -- the -- then the sharing of that
17   information, which is done in every case with
18   defense counsels that there are photographs in the
19   investigative file, they're available for you to
20   review prior to trial or at trial.  And I'm saying
21   that the -- for lack of a better word, the
22   circumstantial evidence that these photos were made
23   available is the fact that other photos were used
24   at trial and impounded.
25   BY MR. SWAMINATHAN:

Page 171

1        Q.   And so the circumstantial evidence you're
2    aware of that these photos were shown to the prosecutors
3    is that other photos were shown to the prosecutors; is
4    that right?
5        A.   Other photos that in all likelihood were
6    contained in the investigative file in the envelope that
7    is commonly used for storing photographs.
8        Q.   Okay.  And are you aware -- strike that.  And
9    what evidence -- strike that.  Are you aware of any
10   evidence that proves that the Aronda and Soto Polaroid
11   photos were shared with the prosecutor?
12           MS. GOLDEN:  Objection.  Form.  And -- just
13   form.
14           THE WITNESS:  I -- I -- I don't have personal
15   knowledge that they were shared, but I'm -- I'm --
16   I'm opining on the common practice of how those
17   photographs would be stored and then shared with
18   the prosecution later on.
19   BY MR. SWAMINATHAN:
20       Q.   And if the common practice was followed, then
21   you would expect these photos to have been shared with
22   the prosecutor; is that right?
23       A.   Yes.
24       Q.   Okay.  And if the common practice was not
25   followed, then these photos would not have been shared

Page 172

1    with the prosecutors, correct?
2            MS. CARNEY:  Objection.  Form.  Foundation.
3    Misstates his testimony.
4            THE WITNESS:  I -- I -- what I'm telling you
5    is that all the -- all Polaroid photographs that
6    are stored in the investigative file are made
7    available to the prosecutor.
8    BY MR. SWAMINATHAN:
9        Q.   You know that for a fact that they're always
10   made available?
11       A.   I've never seen a case where they weren't.  How
12   about that?
13       Q.   Yeah, but you have no idea whether you got all
14   of them.  You can't say for sure, can you?
15           MS. GOLDEN:  Okay.  Now you're arguing with
16   the witness, so I object to the form.  And it's
17   becoming harassing.
18   BY MR. SWAMINATHAN:
19       Q.   Go ahead.
20           MS. CARNEY:  If you can answer his question,
21   you can.
22           THE WITNESS:  I can't answer your question.
23   BY MR. SWAMINATHAN:
24       Q.   Are you able, based on your experience, to
25   offer an opinion that all Polaroid photos are always

Page 173

1    shared with the defendants in all CPD cases?
2            MS. CARNEY:  Objection.  Form.
3            THE WITNESS:  All the photographs that -- that
4    are in the investigative file, the offer is made to
5    the defense attorney to view them and -- and -- and
6    -- and use them in any way they might want to use.
7    BY MR. SWAMINATHAN:
8        Q.   And you're able to say that you have the
9    ability to vouch for the fact that the Chicago Police
10   Department has always shared all Polaroid photos
11   contained in its investigative files?
12           MS. CARNEY:  Objection.
13           MS. GOLDEN:  Object to form.
14           MS. CARNEY:  Misstates his testimony.  You can
15   answer if you understand what he's saying.
16           THE WITNESS:  Well, I -- I -- the -- the the --
17   the photographs -- well, the example is this case
18   right here.  There was photographs in the envelope
19   that were used at trial and impounded.
20   BY MR. SWAMINATHAN:
21       Q.   But not the Rosa Aronda and Felicia Soto
22   photos, correct?
23           MS. GOLDEN:  Object to form and foundation.
24           MS. CARNEY:  Also asked and answered.
25           THE WITNESS:  They were -- they were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 46 of 71. PageID #:85745
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
174..177

Page 174

1    apparently not shared.
2  BY MR. SWAMINATHAN:
3      Q.   Okay.  And if the --
4      A.   Let -- let me -- let me -- let me put a caveat
5  to that.  They were not shared according to Plaintiff's
6  expert.  I -- I don't know, in fact, they were viewed by
7  the defense and decided not to use them at trial.
8      Q.   Did you see -- did you review any of the
9  depositions in this matter discussing those Polaroid
10  photos?
11     A.   I did not.
12     Q.   Okay.  Do you know what the prosecutor said --
13  strike that.  Do you know if the prosecutor said that
14  they had copies of those Polaroid photos of Felicia Soto
15  and Rosa Aronda?
16     A.   I don't know what they said.
17     Q.   Do you know what the public defender said
18  about whether they had those copies of those Polaroid
19  photos?
20     A.   I do not.
21     Q.   And you agree with me that if those Polaroid
22  photos had been available to the prosecution, you would
23  have shared those with the defense attorneys, correct?
24     A.   I would have made them available.
25     Q.   Okay.  And you agree that it -- your

Page 175

1  expectation was that if prosecutors in your office had
2  been made aware of those photos, you -- of Felicia Soto
3  and Rosa Aronda, you would have made the public
4  defenders aware of those photos, or criminal defense
5  attorneys?
6          MS. GOLDEN:  Object to form.
7          THE WITNESS:  I would have made them aware
8      that there are photographs that were collected
9      during the investigation.
10  BY MR. SWAMINATHAN:
11     Q.   Okay.  Okay.  And then in your report you talk
12  about -- you spent some time talking about the fact that
13  the individuals depicted in these Polaroid photos, like
14  Felicia Soto and Rosa Aronda, are mentioned in other
15  police reports in the case, correct?
16     A.   Soto and Aronda are on the very first page of
17  the general case report.
18     Q.   And is it the fact that these individual's
19  names are mentioned in other places in the police
20  reports, is that a reason why you would choose not to
21  disclose those photos to the extent you knew of them?
22          MS. GOLDEN:  Object to foundation.
23          MS. CARNEY:  Form.  Incomplete hypothetical.
24          THE WITNESS:  I -- I -- I -- you have to re-
25      ask that question.

Page 176

1  BY MR. SWAMINATHAN:
2      Q.   Yeah.  The fact that there were references to
3  these individuals in the police reports, Ms. Soto and
4  Ms. Aronda, is that a reason you would not have
5  disclosed to the defense the existence of these Polaroid
6  photos?
7          MS. GOLDEN:  Form and foundation.
8          THE WITNESS:  I -- I've -- I've already said
9      that I would tell counsel that photographs were
10      retained in the file for them to review.
11  BY MR. SWAMINATHAN:
12     Q.   And that's true even if their names appeared
13  in other police reports, correct?
14     A.   Yeah, that --
15          MS. GOLDEN:  Form.
16          THE WITNESS:  The -- the -- the point that I
17      think I -- made with the Soto and Aronda reports,
18      that I mentioned on the very first page of the
19      report, is, it -- it's not like the existence of
20      those two people were hidden from defense attorney.
21      They're mentioned throughout the reports.  Now, the
22      photograph I -- I say the common practice was to
23      make them available, but it wasn't like they -- the
24      two people's identities were hidden from defense
25      counsel.

Page 177

1  BY MR. SWAMINATHAN:
2      Q.   I -- I'm asking a different question.  The
3  fact that their names appear in the reports in other
4  places, are you saying on that basis you would have
5  chosen not to make that information available to the
6  defendants?  Strike that.
7          MS. GOLDEN:  Form and foundation.
8  BY MR. SWAMINATHAN:
9      Q.   Strike that.  Strike that.  Are you claiming
10  that you would not have informed the defendants about
11  the existence of those Polaroid photos if you knew that
12  their names appeared in other places in the reports?
13          MS. CARNEY:  Objection.
14          MS. GOLDEN:  Objection.  Go ahead, Theresa.
15          MS. CARNEY:  Incomplete hypothetical.
16          MS. GOLDEN:  Foundation.
17          THE WITNESS:  I think I said the exact
18      opposite, that I would make photographs available
19      that tell -- tell defense counsel early in
20      discovery that any photographs that are contained
21      in the investigative file, Polaroids, or scene
22      photographs, or any photographs, that will be made
23      available for inspection prior to or during trial.
24  BY MR. SWAMINATHAN:
25     Q.   Okay.  And that's even though their names

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 47 of 71 PageID #:85746
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023

178..181

Page 178

1  otherwise appear in the police report; is that correct?
2      A.   Their -- yeah.  Their names appearing in the
3  report doesn't -- doesn't have any bearing on making
4  photographs available.
5      Q.   Okay.  And then if we talk about these
6  specific reports -- these specific Polaroid photos of
7  Rosa Aronda and Felicia Soto, you say that the fact that
8  there are Polaroid photos of these people doesn't
9  necessarily mean that they were treated as suspects,
10 correct?
11     A.   That's correct.
12     Q.   And Mr. Tiderington doesn't argue that every
13 person for whom there is a Polaroid photo in a file is a
14 suspect, does he?
15     A.   He kind of argues a different variation on
16 that.  He says that if -- if -- if the defense --
17 defense counsel knew of the photographs, they would have
18 pursued them in a different manner.  So he -- he is
19 essentially saying that he would view them as
20 alternative suspects.
21     Q.   Did you review the depositions of -- the
22 deposition of Felicia Soto in this case?
23     A.   I did not.
24     Q.   Do you know what Felicia Soto said about how
25 she was treated during the course of this investigation?

Page 179

1      A.   I do not.  I -- I know what the plaintiff's
2  expert says about the -- the significance of the
3  photographs, though.
4      Q.   Okay.  And you're -- and you -- would you
5  agree that sometimes Polaroid photos are taken of people
6  who are suspects?
7      A.   They use -- yes, that -- that's true.
8      Q.   Okay.  And in fact, in this case, there are a
9  number of Polaroid photos of -- taken of people who we
10 definitely know to have been suspects, correct?
11     A.   They were charged.
12     Q.   Yes.  Is that a yes?
13     A.   Yes.
14     Q.   Okay.  And so, in this case, the existence of
15 Polaroid photos may be an indication that these four
16 people were suspects or not, correct?
17          MS. GOLDEN:  Foundation.
18          MS. CARNEY:  Form.  Foundation.
19          THE WITNESS:  Well, that -- that ignores what
20     the plaintiff's expert says in his report.  He says
21     that it -- they would have had additional reason to
22     contact these witness and learn why they had been
23     at the station and questioned and what information
24     they had revealed.  All that information, what they
25     revealed, was contained in all the reports, so

Page 180

1  irrespective of a photograph, they had reason they
2  could pursue how they were -- how they were
3  interviewed and the information contained in there.
4  He -- he's -- he -- he's equating the -- the
5  existence of a Polaroid photograph with the fact
6  that somebody must be a suspect.  And I -- I take
7  issue with that.
8  BY MR. SWAMINATHAN:
9      Q.   In this case, he relied on more than just the
10 fact that there was a Polaroid photo of these
11 individuals to conclude that there was -- that these
12 people were treated as suspects, correct?
13     A.   Well, his -- his -- his plain statement, I'm
14 reading from my report, is, "Had defense counsel had
15 these Polaroid photographs, he or she would have had
16 additional reason to contact these witnesses and learn
17 about what -- about why they had been at the station and
18 questioned and what information they had revealed."
19 Everything he says after the existence of the
20 photographs was detailed to a certain extent in the
21 police reports.  It didn't preclude him, defense
22 counsel, from going and -- and interviewing those
23 witnesses further.
24     Q.   And so --
25     A.   So what I'm trying to say is, he is equating

Page 181

1  Polaroid photographs with suspects.
2      Q.   Okay.  And when he offered his opinions, was
3  it that he did so having had an opportunity to review
4  Felicia Soto's deposition, correct?
5          MS. GOLDEN:  Objection.  Form.  Foundation.
6          THE WITNESS:  I -- I assume he did -- did.
7  BY MR. SWAMINATHAN:
8      Q.   I'm sorry.  Yeah.  And let me ask a better
9  question.  When you reviewed the files and -- strike
10 that.  When you reviewed the investigative file in this
11 case, did the police reports contain any indication that
12 Felicia Soto or Rosa Aronda had been treated as
13 suspects?
14          MS. GOLDEN:  Object to form.
15          THE WITNESS:  I -- I -- I did not review the
16     extent of their interviews other than the fact that
17     they were interviewed.  And that was the point of
18     my -- in my report that there was extensive
19     material about those two people in the police
20     reports.
21 BY MR. SWAMINATHAN:
22     Q.   You said there was very extensive material
23 about interviews with those two people?
24     A.   Well, the -- like I said in my report, they're
25 on the very first page of the general case report and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 48 of 71 PageID #:85747
The Deposition of BERNARD J. MURRAY, Volume II, taken on February 07, 2023
182..185

Page 182

1    their knowledge is discussed there and throughout the
2    file, and again in supplementary reports, starting on
3    Solache-Reyes 2363. So they're mentioned in the police
4    reports. They're certainly not -- their existence and
5    the fact that they're at a police station has certainly
6    not been concealed from defense counsel.
7        Q.   Did you view the -- did you -- were you aware
8    of any testimony from Rosa Aronda about being put in an
9    interrogation room for hours?
10       A.   I'm not.
11       Q.   Did you review any testimony from Rosa Aronda
12   about interrogating -- being interrogated harshly by
13   detectives?
14       A.   I think I said earlier I didn't review any of
15   the depositions, so I'm not -- I'm not aware of any of
16   that.
17       Q.   Did you see any indication in the police file
18   that she had been kept in an interrogation room for
19   hours and interrogated harshly by detectives?
20           MS. GOLDEN: Objection. Form.
21           THE WITNESS: I would submit the fact that she
22           is listed on the first page of the report and that
23           she was interviewed in some of those materials
24           included in supplemental report as well.
25   BY MR. SWAMINATHAN:

Page 183

1        Q.   Did you see any indication in the -- strike
2    that. Did you review any testimony about the fact that
3    she -- strike that. Did you review any testimony
4    indicating that she had been accused of having knowledge
5    about the crime by detectives?
6        A.   As I said to you before, I did not review any
7    of her depositions.
8        Q.   Did you see anything in the investigative file
9    that you reviewed that indicated that Rosa Aronda had
10   been accused of having knowledge about the crime during
11   the course of an interrogation?
12       A.   Well --
13           MS. CARNEY: Objection. Form.
14           THE WITNESS: In -- in -- in the -- in the way
15           you're paraphrasing it, I don't think it was worded
16           that way, but the fact that -- that they were
17           interviewed in -- and -- and there were interviews
18           referred to in the police reports, indicating the
19           investigators are trying to find out what happened.
20   BY MR. SWAMINATHAN:
21       Q.   As a prosecutor, would it matter to you if
22   somebody was simply interviewed or if that person was
23   subjected to an interrogation in which they were accused
24   of involvement or knowledge about a crime?
25           MS. CARNEY: Objection. Form. Incomplete

Page 184

1    hypothetical.
2            THE WITNESS: I -- I really have a hard time
3            understanding that question.
4    BY MR. SWAMINATHAN:
5        Q.   Yeah. As a prosecutor, if a person was simply
6    interviewed and provided information, as opposed to
7    being interrogated and accused of having knowledge or
8    involvement in the crime, would it matter to you the
9    difference between those two things, or are those just
10   one and the same to you?
11           MS. CARNEY: Form and foundation.
12           THE WITNESS: They're not one and the same,
13           but in the course of investigation, the officers
14           have to -- they don't know who the offenders are,
15           so they -- they may, to use your word, interrogate
16           rather than question. That may be a part of their
17           interviews that they're conducting to find out what
18           -- what they have in front of them, a suspect or a
19           -- a -- or defendant or a witness. They -- they --
20           I don't presume them to know on every single case,
21           the first time they meet someone, to know whether
22           they're an offender or not.
23   BY MR. SWAMINATHAN:
24       Q.   Do you say they are one and the same or not
25   one and the same?

Page 185

1        A.   I said they're not one and the same.
2        Q.   Okay. And then did you -- would you agree
3    with me that the investigative file in this case
4    contained interviews of many more people than the people
5    for whom there were Polaroid photos?
6            MS. CARNEY: Objection. Form. You can
7            answer.
8            THE WITNESS: I did not review the police
9            reports to that extent.
10   BY MR. SWAMINATHAN:
11       Q.   Okay. And would it be -- surprise you to hear
12   that there were interviews of many, many more people at
13   the police station than are -- than for whom there are
14   photos, Polaroid photos, in the investigative file?
15           MS. GOLDEN: Form.
16           THE WITNESS: Yeah, they -- all I know is the
17           photographs that we have in front of us.
18   BY MR. SWAMINATHAN:
19       Q.   Okay. And so you're not claiming that they
20   took Polaroid photos of everybody who was brought to the
21   police station and interviewed, are you?
22           MS. CARNEY: Objection. Form. Misstates his
23           testimony.
24           THE WITNESS: I don't know the -- the reason
25           for taking any photographs. I suggested some

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 49 of 71 PageID #:85748
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 10, 2021
186..189

Page 186

1  reasons why they might have taken Polaroid
2  photographs. Maybe one of the primary ones in
3  there is if you're handing an investigation off to
4  someone and you want to -- you want to verify who's
5  already been talked to and who's -- and the name
6  that the person provided. So for the detectives
7  from one shift to another shift to understand who's
8  been interviewed and what their photograph was.
9  Now, did -- did -- they did -- they didn't take
10 other photographs of other people. I -- I don't
11 know why they didn't. Or -- or, frankly, I don't
12 know why they necessarily did with these people,
13 other than that they were, again, Aronda and -- and
14 Soto were the very first people they met. Maybe
15 that's why they took those photographs. But I'm --
16 I'm speculating on why they took those photographs.
17 BY MR. SWAMINATHAN:
18     Q.   All right. You don't know why they took the
19 photos of Felicia Soto and Rosa Aronda?
20     A.   No. My point is just the mere fact of taking
21 a Polaroid photograph doesn't make you a suspect.
22     Q.   I -- I'm not asking you about that. I'm
23 simply asking you, did you find any indication in the
24 police file about why they took photos of Felicia Soto
25 and Rosa Aronda?

Page 187

1      A.   No.
2          MS. CARNEY: Objection.
3          MS. GOLDEN: Form.
4          MR. SWAMINATHAN: Go ahead.
5          MS. CARNEY: Form. Foundation. Asked and
6  answered. You can answer.
7          THE WITNESS: I -- I didn't review the police
8  reports to that extent to -- to look for that, but
9  from -- not from what I reviewed anyway.
10 BY MR. SWAMINATHAN:
11     Q.   Okay. And do you -- did you find anything in
12 the police file to help you understand why, of all the
13 people who they interviewed at the police station in
14 this case, they took photos of these particular people?
15     A.   I didn't review the police reports for that
16 information.
17     Q.   Okay. For Guadalupe Mejia and Jorge Mejia,
18 you didn't review their depositions either, correct?
19     A.   That's correct.
20     Q.   And do you know what they said about whether
21 Guadalupe Mejia had been treated as a suspect in this
22 case?
23          MS. GOLDEN: Object to form.
24          MS. CARNEY: Foundation.
25          THE WITNESS: I did not review their

Page 188

1  deposition, so I do not know what they said.
2  BY MR. SWAMINATHAN:
3      Q.   And do you have -- did you review any
4  information in the course of your work on this matter
5  about what they said about how Ms. Guadalupe Mejia had
6  been treated when she was in an interrogation room?
7          MS. CARNEY: Objection. Form. Foundation.
8          THE WITNESS: Excuse me. No.
9  BY MR. SWAMINATHAN:
10     Q.   And if -- Guadalupe Mejia, you understand that
11 she gave a statement incriminating Mr. Reyes and
12 Mr. Solache and Ms. Mejia in this case?
13     A.   My understanding is she gave a handwritten
14 statement. I assumed it was pertinent to the course of
15 the investigation. I don't know exactly what's
16 contained in it.
17     Q.   If a witness who gave a statement used against
18 the defendant had been themselves treated as a suspect
19 during the course of the investigation, is that
20 information you would've expected to be disclosed to
21 you?
22          MS. CARNEY: Objection. Form. Foundation.
23 Incomplete hypothetical.
24          THE WITNESS: I -- I don't know how to answer
25 the question. It -- it's -- it -- it -- during a

Page 189

1  course of investigation, as you're interviewing
2  somebody, you're gaining information about their
3  involvement. Does that mean they -- they -- they
4  were treated as a suspect or treated as a witness?
5  I don't think that's evident, even in the course of
6  an investigation. Any investigation.
7  BY MR. SWAMINATHAN:
8      Q.   Well, if an individual had been treated as a
9  suspect, would you expect to be informed of that
10 information as a prosecutor?
11         MS. CARNEY: Objection. Form. Incomplete
12 hypothetical.
13         THE WITNESS: Well, the problem I have with --
14 with -- with your hypothetical is that they're
15 interviewing people and they -- they may not know
16 their involvement either way. So as they're
17 interviewing them, they're trying to gather
18 information. That doesn't mean they necessarily
19 treated them, "as a suspect." They're interviewing
20 them and the people are providing information,
21 which later on turns into a handwritten statement.
22 That doesn't necessarily mean they were treated as
23 a suspect or not treated as a suspect.
24 BY MR. SWAMINATHAN:
25     Q.   Could it be important to the prosecution and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 50 of 71 PageID #:85749
The Deposition of BERNARD MURRAY, Volume 2, taken on February 7, 2023

190..193

Page 190

1  defense to understand the potential motivations of a
2  person who gives a statement, a handwritten statement,
3  in an investigation?
4       A.   I don't understand what you mean by their
5  motivation.
6       Q.   Let's try -- let's move on.  In the work you
7  performed in this case, did you conduct any review of
8  the history of Brady violations within the Chicago
9  Police Department?
10           MS. CARNEY:  Objection.  Form.  Foundation.
11           THE WITNESS:  I did not.
12  BY MR. SWAMINATHAN:
13      Q.   Your materials review don't list any historic
14  study of instances of Brady violations in the Chicago
15  Police Department; is that true?
16           MS. CARNEY:  Objection.  Form.
17           THE WITNESS:  I did -- I did not include any
18  reports referring to an investigation of Brady
19  violations in the Chicago Police Department.
20  BY MR. SWAMINATHAN:
21      Q.   Okay.  And putting aside investigations of
22  Brady violations, did you go out and look for
23  information in -- just in internet searches or in any
24  other form for information about prior Brady violations
25  in the Chicago Police Department?

Page 191

1       A.   I did not.
2       Q.   Did -- in performing your work in this case,
3  did you conduct any legal research to see how many
4  findings there are of Brady violations against Chicago
5  police officers?
6       A.   I did not.
7       Q.   And in the CC -- strike that.  In the State's
8  Attorney's Office, did you keep any database or
9  compilation of instances of Brady violations by the
10  Chicago Police Department?
11           MS. CARNEY:  Objection.  Form.  Foundation.
12      And I'm just going to add a belated objection to
13      the previous questions as to foundation as to the
14      history of Brady violations.  Sorry, you're going
15      too fast, so I can't get them in.
16           MR. SWAMINATHAN:  Fair.
17  BY MR. SWAMINATHAN:
18      Q.   Go ahead.
19      A.   So I'm sorry, I forgot the question.
20      Q.   I'll ask it again.  Did the State's Attorney's
21  Office keep any database or compilation of Chicago
22  Police Department Brady violations?
23           MS. CARNEY:  Objection.  Form.  Foundation.
24           MS. GOLDEN:  And can you make sure that you're
25      talking about the Cook County State's Attorney's

Page 192

1  Office?  We're talking about that throughout,
2  right?
3           MR. SWAMINATHAN:  Yes.
4           THE WITNESS:  Not that I'm aware of.
5  BY MR. SWAMINATHAN:
6       Q.   Are you aware of any instances in your time as
7  a prosecutor in which there was a Brady violation that
8  resulted from a failure for documents to be produced by
9  the police department?
10           MS. CARNEY:  Objection.  Form.  Foundation.
11      Incomplete hypothetical.  I'll take that one back.
12      Just form.
13           THE WITNESS:  Let me understand that again.
14      When I was working for the Cook County State's
15      Attorney's Office?
16  BY MR. SWAMINATHAN:
17      Q.   Correct.
18      A.   Well, there -- there could be cases reversed
19  on appeal where there's a determination that maybe not
20  all reports were tendered or -- or information of that
21  nature.  I'm not sure if it'd be Brady.  It might just
22  be discovery obligations.  So I'm aware --
23      Q.   You mean you -- I'm sorry.  Go ahead.
24      A.   I'm aware of maybe appellate reversals, but I
25  don't know of any studies by the State's Attorney's

Page 193

1  Office -- or -- or compilations by the State's
2  Attorney's office.
3       Q.   When you said there could be, I'm not asking
4  about a hypothetical.  You're aware of instances when
5  that did occur while you were in the Cook County State's
6  Attorney's Office, correct?
7           MS. GOLDEN:  Form.
8           THE WITNESS:  Well, I would say there's a
9      difference between a Brady reversal and maybe a
10      reversal for incomplete discovery, which is not
11      necessarily Brady.  It's, I don't know, another
12      report wasn't provided, which could cause a new
13      trial.  So I -- I -- I -- I don't know if I can
14      name one right now, but I'm -- I'm -- I'm sure
15      there are examples.
16  BY MR. SWAMINATHAN:
17      Q.   Okay.  And so you're aware, during the time
18  that you were in the State -- Cook County State's
19  Attorney's Office, that there were instances where the
20  appellate courts reversed convictions based on discovery
21  violation for the failure to disclose some police
22  document, fair?
23      A.   Yes.
24      Q.   Okay.  And how many instances like that are
25  you aware of?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 51 of 71 PageID #:8750
The Deposition of BERNARD MURRAY, Volume 1, taken on February 07, 2023
194..197

Page 194

1    A.   I can't name one specifically.  I'm just aware
2  of the reversal.
3    Q.   Okay.  And it happened.  In other words, it
4  happened.  You can't put a specific finger on exactly
5  how many times it happened, but it happened?
6    A.   Yeah.  I mean, frankly, I can't think of a
7  case right now, but I'm -- I know it's happened.
8    Q.   Okay.  And in those instances where it
9  happened, was it a result of a failure to tender
10  materials by a prosecutor or by a Chicago police
11  officer?
12        MS. GOLDEN:  Foundation.
13        THE WITNESS:  I don't have that specific
14    information for you.
15  BY MR. SWAMINATHAN:
16    Q.   In the instances where there were reversals
17  based on discovery violations, are you aware of any
18  attempts to follow-up and find out whether it was a
19  result of the prosecutor failing to tender the material
20  or the police department failing to tender the material?
21        MS. CARNEY:  Objection.  Foundation.
22        THE WITNESS:  I -- I -- I don't -- I'm not
23    privy to that information.
24  BY MR. SWAMINATHAN:
25    Q.   Okay.  And so is it fair to say that you're

Page 195

1  not claiming to have conducted a review to determine if
2  there was a systemic problem with Brady violations in
3  the Chicago Police Department?
4        MS. CARNEY:  Objection.  Form.  Misstates the
5    testimony.  You can answer.
6        THE WITNESS:  I did not -- I did not, during
7    my time at the Cook County State's Attorney's
8    Office, conduct an investigation into Brady
9    violations.
10  BY MR. SWAMINATHAN:
11    Q.   Okay.  And in your work in this case, you're
12  not claiming that you've conducted a review to determine
13  if there were systemic problems with Brady violations
14  within the Chicago Police Department, correct?
15    A.   I did not study the Chicago Police Department
16  for a determination of systemic Brady violations.  I did
17  not do that.
18    Q.   Okay.  And you aren't disclosing opinions
19  about whether there were systemic Brady violations
20  within the Chicago Police Department in the 1990s,
21  correct?
22    A.   I'm not opining on that.
23    Q.   Okay.  If you were going to opine on that,
24  there's a lot more that you would have reviewed, suffice
25  to say, fair?

Page 196

1        MS. CARNEY:  Objection.  Form.  Foundation.
2        THE WITNESS:  I'm not sure what I would
3    review, but since I'm not offering an opinion on
4    it, I don't know what I would've done.
5  BY MR. SWAMINATHAN:
6    Q.   Okay.  How many instances of Brady violations
7  by the Chicago Police Department would it take to start
8  to get you concerned about a systemic problem?
9        MS. CARNEY:  Objection.  Form.  Foundation.
10        THE WITNESS:  We -- as prosecutors, we never
11    want to provide incomplete information to a
12    defendant ever.  His liberty is at stake, so we
13    never want to have any violations of Brady.  We --
14    that's why we are so vigorous in trying to make
15    sure we've obtained every report possible and
16    provide them to a defense attorney.
17  BY MR. SWAMINATHAN:
18    Q.   And despite those vigorous efforts, there were
19  instances when Chicago Police Department failed to
20  tender all of the materials it should have to
21  prosecutors.  Is that fair to say?
22    A.   Well, you know --
23        MS. CARNEY:  Objection.  Form.
24        THE WITNESS:  -- since again --
25        MS. CARNEY:  But you -- I'm sorry.  Go ahead.

Page 197

1        THE WITNESS:  I apologize.  Since I did not do
2    a study of that, I don't know if the -- the Brady -
3    - how many Brady violations there are.  Are they by
4    the Chicago Police Department?  Are -- are they by
5    the prosecutor for not tendering a report that they
6    had received?  I don't know if it's a report from a
7    hospital that should have been provided by the
8    prosecutors and were not provided.  So I don't have
9    a good handle on the extent of -- of the number of
10    Brady violations and if they were created by the
11    Chicago Police Department.
12  BY MR. SWAMINATHAN:
13    Q.   Okay.  Did you have instances from your --
14  from cases that you were the prosecutor on where the
15  cases were later reversed based on a discovery
16  violation?
17    A.   I've had reversals, but not based upon Brady.
18    Q.   And what about reversals based on discovery
19  violations?
20    A.   I don't think I've ever had a reversal on --
21  on a discovery violation.
22    Q.   Okay.
23    A.   I'm pretty confident.
24    Q.   I'm sorry.  You can go ahead.
25    A.   I'm pretty confident that I didn't.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 52 of 71 PageID #:8751
The Deposition of BERNARD J. MURRAY, VOLUME 2, taken on February 07, 2022
198..201

Page 198

1    Q.   Okay.  And let me ask you specifically about
2  your work as an expert.  As part of your expert work for
3  the city in recent years, you did learn about some Brady
4  violations, correct?
5    A.   The -- yes.  Allegations made in the -- in the
6  -- in the lawsuits, yes.
7    Q.   Okay.  And ultimately, you agree that in --
8  some of the evidence you reviewed caused you to find
9  that in fact there had been Brady violations in -- at
10  least in some cases that you reviewed as part of your
11  expert work, correct?
12      MS. GOLDEN:  Form.
13      MS. CARNEY:  Objection.  Form.
14      THE WITNESS:  I -- I don't know if I agree
15    that I found Brady violations in the files I
16    reviewed. I don't know.  I don't think that's
17    accurate.
18  BY MR. SWAMINATHAN:
19    Q.   You offered opinions in the Nathson Fields
20  case, correct?
21    A.   Yes.
22    Q.   And in the Nathson Field [sic] case, the
23  Chicago Police Department admitted that it had an entire
24  file of investigative information that it did not
25  disclose to the prosecution or defense, correct?

Page 199

1    A.   Yeah.  I'm -- I'm aware of that, but in that
2  case, I was not reviewing the -- that file.  I'm aware
3  that that was part of that case.  But, again, I was
4  reviewing other files.
5    Q.   So in that case, you were aware that admission
6  -- that CPD had basically admitted that it failed to
7  turn over investigative information to the prosecution
8  and defense, correct?
9      MS. GOLDEN:  Object to form.
10      THE WITNESS:  And I -- I know there was
11    reports.  I -- I want to say the initial
12    supplemental reports were not turned over before
13    the first trial. So I know that to be true.  But I
14    don't know the circumstances surrounding how they
15    were -- why -- how and why they were not tendered.
16  BY MR. SWAMINATHAN:
17    Q.   The file that was not tendered in that case by
18  the police department included things like alternate
19  suspects and alternate motives, correct?
20      MS. CARNEY:  Objection.  Form.  Foundation.
21      THE WITNESS:  Yeah.  Which I -- yes, I think
22    that's true.  I -- I know they were discounted by
23    the time they went to trial.
24  BY MR. SWAMINATHAN:
25    Q.   And when you say they were discounted by the

Page 200

1  time they went to trial, what do you mean?
2    A.   Well, the statements of witnesses to the
3  actual two shooters.
4    Q.   Can you say what you mean?  I'm not sure I
5  understand.
6    A.   Well, the -- the two defendants who were
7  eventually charged, my -- my understanding of that case
8  is there was a year gap, or something like that,
9  before those two defendants were charged.  So yes, the
10  alternative suspects or other people -- I'm not sure if
11  I'd call them alternative suspects, but other people
12  were interviewed in the days following the murder. Those
13  -- I believe that was the report that was not provided
14  to defense attorneys.
15    Q.   And in that, you recall, you testified at the
16  trial in the Fields case, correct?
17    A.   Yes.
18    Q.   And you remember Mr. Loevy was showing you a
19  number of different documents contained in the Street
20  Files from the Fields case that had never been disclosed
21  to prosecutors or the defense?
22      MS. GOLDEN:  Objection.  Form.  Foundation.
23      And I -- if you're going to -- form and foundation
24      right now.  Let's see if you can answer the
25      question.

Page 201

1      THE WITNESS:  It -- it's been quite a long
2    time since that trial, so I -- I remember being
3    crossed on the -- those reports.  And I think my
4    answer is what I said to you earlier today.  I did
5    not specifically review those files for my expert
6    report in that case.
7  BY MR. SWAMINATHAN:
8    Q.   Okay.  And you didn't ultimately dispute in
9  that case that there were documents that had not been
10  disclosed to the defense in that case, correct?
11      MS. GOLDEN:  Object to form.
12      THE WITNESS:  That was, again, not what I
13    focused on from my report.
14  BY MR. SWAMINATHAN:
15    Q.   And in that case, you did something you didn't
16  do in this case.  You conducted a comprehensive review
17  of all the investigative files compared to the
18  corresponding prosecutor files that were available,
19  correct?
20      MS. CARNEY:  Objection.  Asked and answered.
21      You can answer again.
22      THE WITNESS:  I -- I believe the field was
23    narrowed down somewhat, but it was far more files
24    than I reviewed in Rivera.
25  BY MR. SWAMINATHAN:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 53 of 71 PageID #:8752
The Deposition of BERNARD MURRAY, Volume 1, taken on February 07, 2019
202..205

Page 202

1    Q.   Okay.  And in your review in the Fields case,
2  you found a number of instances in which documents that
3  were in the police file were not contained in the
4  prosecutor file, correct?
5           MS. CARNEY:  Objection.  Form.
6           THE WITNESS:  Well, the -- as is true with the
7     public defender's file, there was -- there was
8     never an -- there was never a claim that
9     prosecutor's files were complete either.  They were
10    pretty incomplete and there was plenty of missing
11    prosecutor files as well.  So there's a police
12    report in an investigative file or the RD file, and
13    it was not in the prosecutor's file.  It -- the --
14    there was -- was strong evidence in most of those
15    files, if not all of them, that the prosecutor's
16    file didn't exist or was incomplete in its own
17    right.
18 BY MR. SWAMINATHAN:
19    Q.   What evidence did you have that -- putting
20 aside instances when there was no prosecutor file
21 available, what evidence are you aware of that the
22 prosecutor files that were provided to you were
23 incomplete?
24    A.   Well, they didn't have all the supplemental
25 reports in them.  Didn't have basic case reports.  Didn't

Page 203

1  have -- you can go on and on.  Didn't have the closing
2  supps.  Didn't have GPRs.  So it's pretty obvious that
3  the prosecutor files were incomplete, too.
4     Q.   In that case, you agree that in the prosecutor
5  files that you had, in every instance, you found
6  documents that were in the police file that were not in
7  the prosecutor file, correct?
8           MS. GOLDEN:  Object to form.
9           THE WITNESS:  I'm sorry.  Could you say again?
10 BY MR. SWAMINATHAN:
11    Q.   Yeah.  You acknowledged that in every
12 investigative file that you looked at, there were
13 documents from that police file that were not in the
14 prosecutor files for those corresponding cases, correct?
15          MS. GOLDEN:  Same objection.
16          THE WITNESS:  Yeah, but I would put the caveat
17    on that that I -- I was not claiming that the
18    prosecutor files were complete.
19 BY MR. SWAMINATHAN:
20    Q.   Okay.  And in that case, you found numerous
21 files in which there were documents that were missing
22 from both the -- strike that.  In that case, you found
23 numerous instances in which documents that were missing
24 from the public defender file were also missing from the
25 prosecutor file, correct?

Page 204

1           MS. CARNEY:  Objection.  Form.
2           THE WITNESS:  And -- and it would be based on
3     the same flawed premise that the -- the public
4     defender's files were complete.  They -- they were
5     not complete.
6  BY MR. SWAMINATHAN:
7     Q.   In each given instance, it could be that the
8  reason the document is missing from both the public
9  defender file and the state's attorney file is that both
10 those files are incomplete.  And another reason could be
11 that the document wasn't disclosed to the prosecution
12 and the defense, correct?
13          MS. GOLDEN:  Form.
14          THE WITNESS:  I don't agree with that.
15 BY MR. SWAMINATHAN:
16    Q.   So you're saying that in instances where a
17 document is missing from both the public defender file
18 and the state's attorney file, it's not possible that
19 the explanation is that that -- the police failed to
20 turn over that document.  Is that your testimony?
21    A.   No.
22          MS. GOLDEN:  Form.
23          MS. CARNEY:  Hold on.  Hold on.  Form.
24 Foundation.  You can answer.
25          THE WITNESS:  No.  My contention is that the

Page 205

1  files are so obviously incomplete that you -- you
2  cannot say, "gee, this form, because it's missing
3  from both files, that it therefore was never
4  tendered by the police."  The fact is both files in
5  many cases were wholly inadequate as to what -- the
6  universe of files and reports that would've been
7  tendered.  So it's --
8  BY MR. SWAMINATHAN:
9     Q.   How many prosecutor files --
10          MS. CARNEY:  Hold on.  Hold on.
11          MR. SWAMINATHAN:  Oh, I'm sorry.
12          MS. CARNEY:  He was still talking.
13 BY MR. SWAMINATHAN:
14    Q.   I'm sorry.  You can go ahead.
15    A.   No, I'm saying to you that the -- the -- the
16 -- the basic flawed interpretation by Brassfield and by
17 this expert is that these files years and years, 25 and
18 30 years later are complete as they were on the eve of
19 trial.  Most of the examples are -- they're -- they're
20 wholly inadequate.  They're not even close to what
21 would've been tendered -- expected to be tendered during
22 the discovery process.
23    Q.   During the course of your time as a
24 prosecutor, how often did you go into the packaged-up
25 trial files and pull materials -- pull police reports

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 54 of 71 PageID #:85753
The Deposition of BERNARD MORRAY, Volume 2, Taken on February 07, 2023
206..209

Page 206

1  out of those files?
2       MS. GOLDEN:  Form.
3       THE WITNESS:  I don't understand what you mean
4  by packaged-up police files.
5  BY MR. SWAMINATHAN:
6  Q.   You said that when you completed a trial that
7  ended in a conviction, you would close up -- you --
8  you'd close up the file and you'd package it up and send
9  it to storage, right?
10      MS. CARNEY:  Objection.  Misstates his
11  testimony.  You can answer.
12      THE WITNESS:  The -- when I finished -- my
13  practice was when I finished a file was to try to
14  clean up duplicates and send the file to the
15  warehouse.
16  BY MR. SWAMINATHAN:
17  Q.   Okay.  And after --
18  A.   I'm not --
19  Q.   -- how -- oh, go ahead.  Go ahead.
20  A.   I'm not saying it's everybody's practice.  I
21  -- I know the files were closed out and sent to the
22  warehouse.  But my practice was to do that right after
23  trial was complete.
24  Q.   And how often as a prosecutor did you go back
25  and request those files out of storage that you'd

Page 207

1  previously worked on and pull documents and police
2  reports out of those files?
3       MS. CARNEY:  Objection.  Form.
4       THE WITNESS:  I don't -- really don't
5  understand the -- the premise of the question.  If
6  -- if the case was reversed and it was back on --
7  on -- on appeal to be tried again, obviously I'd
8  order up the -- the -- the original trial file.  Or
9  if a new suspect who had not been charged before
10  was then charged, then I would order that file
11  back.  Those would be the instances where I would
12  ask for my file to be returned to me.
13  BY MR. SWAMINATHAN:
14  Q.   Okay.  So for the most part, once you'd pack
15  the file up and it went to storage, you wouldn't request
16  to get that file back, correct?
17      MS. CARNEY:  Objection.  Misstates his
18  testimony.
19      THE WITNESS:  There were -- there are -- would
20  be occasions when I would ask for it to come back.
21  And I just described those to you.  There's -- you
22  know, my -- my file -- my practices of -- of
23  packaging up and sending back is -- I think most
24  prosecutors would send their files to the
25  warehouse.  I -- I'm not saying they were sent back

Page 208

1  to the warehouse in the same format that I sent
2  mine back, but that -- other than the reasons I
3  gave to you before of reordering a file, I don't
4  think I would reorder a file just to look at a
5  police report.
6  BY MR. SWAMINATHAN:
7  Q.   Okay.  So in how many instances did you
8  request a file from storage and then pull out police
9  reports from that file before putting it back?
10      MS. CARNEY:  Objection.
11      MS. GOLDEN:  Object to form.
12      MS. CARNEY:  Form.
13      THE WITNESS:  I -- I -- I don't have enough
14  information to answer that.  If -- if a case was
15  back for a retrial, I'd pull all the reports out.
16  Or all the pertinent ones.  If it was a -- a -- a
17  newly charged co-defendant, the same thing.  How
18  many times?  I -- I couldn't tell you how many times
19  that happened.  Not -- I mean, retrials, sadly, I've
20  had a few cases reversed that I had go to trial --
21  had -- had a retry.  But it wasn't like I just said,
22  "hey, I'd love to read the police report on the
23  Jones case.  It's been a couple of years now.  I'm
24  going to go down memory lane."  I wouldn't be -- I
25  -- I personally wouldn't be doing that.

Page 209

1  BY MR. SWAMINATHAN:
2  Q.   In cases that didn't involve somebody being
3  recharged or being retried, how many times did you pull
4  out -- did you call back the old file from storage?
5  A.   I'm -- I'm -- what I'm trying to say to you is
6  I don't have a reason to call back a file from storage.
7  Q.   So the answer is never.  You never called back
8  a file from storage unless it was going to be the
9  subject of a retrial or recharges, correct?
10      MS. CARNEY:  First of all, he wasn't done
11  answering.  I know.  I get it.  You're going fast,
12  but his cadence is significantly slower, so --
13  BY MR. SWAMINATHAN:
14  Q.   Go ahead.  Yeah.
15  A.   -- object to that extent he
16  wasn't done, but also objection.  Misstates his
17  testimony.  Go ahead.
18      THE WITNESS:  Well, you're -- you're -- you
19  know, I guess hypothetically trying to provide is a
20  -- a -- a situation where I would grab an old
21  police report for -- for fun or something.  I don't
22  understand why I would -- why I --
23  BY MR. SWAMINATHAN:
24  Q.   Yeah.  Let me start over.  Yeah.  Let me --
25      MS. GOLDEN:  No.  No.  You're interrupting



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 55 of 71 PageID #:85754
The Deposition of BERNARD MURRAY, Volume 2, taken on February 27, 2020
210..213

Page 210

1    him.  You can't -- please don't interrupt him.
2         MR. SWAMINATHAN:  He just asked me.  That's
3    why I'm responding.
4         MS. GOLDEN:  No, he didn't ask you.  He said
5    he didn't understand why, and then you cut him off.
6         MR. SWAMINATHAN:  No, he said, "is that what
7    you're asking?"  He said --
8         MS. GOLDEN:  And then you went on and then you
9    cut him off.
10         MR. SWAMINATHAN:  -- not an answer.
11    BY MR. SWAMINATHAN:
12         Q.   All right.  Mr. Murray, you explained to me
13    that a scenario in which you would go back to get copies
14    of trial files that you've put into storage is where
15    there's going to be a retrial of that individual or
16    charges against another individual related to the same
17    case, correct?
18         A.   And I guess the more I think about it,
19    possibly if that defendant is -- there's a warrant out
20    and he's charged on a new case, then maybe I'd want that
21    file for background as well.  Those are possible
22    examples why I might reorder the file.  But if there's
23    not a legal process in court, a -- a motion with newly
24    discovered evidence perhaps, or -- I'm trying to think
25    of other reasons.  But that's -- I can't think of other

Page 211

1    reasons why I would reorder a file.
2         Q.   Okay.  And so how often was it the case
3    approximately that you were having -- and I'm talking
4    about as a percentage.  What percentage of the time
5    would you pack a case up for storage and then find that
6    you needed to request it back because there was some
7    retrial or new charges?
8         A.   Well, as I said, I've had a -- a few
9    reversals, so there'd be a handful of cases there.  A
10    -- some sort of newly discovered evidence or post-
11    conviction petition filed.  I've -- I've definitely had
12    a few of those.  Or a scenario where maybe the defendant
13    was implicated in another crime, I might order those up.
14    It's not a lot of times where I personally did that.
15         Q.   Something like -- so less than 10 percent; is
16    that fair?
17         MS. CARNEY:  Objection.  Form.
18         THE WITNESS:  I -- I -- I can't put a number
19    on it.
20    BY MR. SWAMINATHAN:
21         Q.   Is it possibly as much as 50 percent of the
22    time?
23         A.   I don't think it's that high.
24         Q.   Is it as high as 25 percent of the time?
25         A.   See, now -- now I'd have to go back and see

Page 212

1    how many cases I actually tried and then put the file
2    away.  And I -- and I -- I would have difficulty doing
3    that.
4         Q.   Do you think it could be less than 10 percent
5    of the time?
6         A.   I can't -- I can't answer your question.
7         Q.   Okay.  It could be more or less than
8    10 percent; is that fair?
9         A.   It could be more or less than 90 percent.  I
10    can't answer that question.
11         Q.   So you're saying it could be -- you know, from
12    your experience, it could be as much as 90 percent of
13    the time you had to reorder the file?
14         MS. GOLDEN:  Form.
15         MS. CARNEY:  Objection.  Form.  Misstates his
16    testimony.
17         THE WITNESS:  I guess I'm trying to impress
18    upon you that I don't know what the number would
19    be.
20    BY MR. SWAMINATHAN:
21         Q.   Okay.  Okay.  And you think it's possible
22    that, from your career, as often as -- strike that.  You
23    just told me -- the reason I'm confused is you told me a
24    moment ago you don't think it's as much as 50 percent of
25    the time, and then you just told me that it could be as

Page 213

1    much as 90 percent of the time.  That's why I'm
2    confused.
3         A.   Well, I was doing that to point out to you
4    that I don't have a number for you.
5         Q.   Okay.  So to be clear, you -- it's not
6    anywhere near 90 percent of the time, fair?
7         MS. CARNEY:  Objection.  Form.  Asked and
8    answered.
9         THE WITNESS:  I -- I don't think it's 90
10    percent.  But, again, I cannot put a percentage on
11    it for you.
12    BY MR. SWAMINATHAN:
13         Q.   Okay.  And in the cases where there is not
14    some retrial or new charges, you had -- you would not go
15    on your own to obtain copies of files from storage
16    unless there was some legal process that was going on in
17    that case, correct?
18         MS. GOLDEN:  Form.
19         THE WITNESS:  Going on with my prosecution of
20    the -- of the defendant in that case, those are the
21    reasons I stated to you.  But, you know, there's --
22    there's other reasons why a file could be
23    reordered. There could be other witnesses on that
24    case who may be implicated in other crimes.  There
25    could be witnesses in that case who are now

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 56 of 71 PageID #:8755
The Deposition of BERNARD MURRAY, Volume 2, taken on February 7, 2024
214..217

Page 214

1  involved in other crimes. There could be other
2  reasons why, not me but other prosecutors, might've
3  sought that file as well.
4        Q.   When you would reorder --
5             MS. CARNEY:  Hold on.  He wasn't done.
6  BY MR. SWAMINATHAN:
7        Q.   Oh, I'm sorry.  Go ahead.
8        A.   I was going to say I'm giving you examples
9  where -- discussing with you when the instances that I
10 can think of why I personally would reorder a file. But
11 there could be reasons why other prosecutors might be
12 seeking that original trial file for use in other -- you
13 know, unrelated to my defendant, unrelated to his case,
14 but possibly other people involved in the case.
15       Q.   When you would call a file back from storage
16 because there was some retrial or other legal
17 proceeding, would you pull police reports out of that
18 file so that there were no longer available as part of
19 that trial file?
20            MS. GOLDEN:  Objection.
21            MS. CARNEY:  Object to form.  Incomplete
22 hypothetical.
23            MS. GOLDEN:  Form.
24            THE WITNESS:  I would keep the file in my
25 office and use whatever reports from that file that

Page 215

1  I needed to use.
2  BY MR. SWAMINATHAN:
3        Q.   And would you tender -- if you tender
4  documents to the defense, would you make copies of those
5  police documents?
6             MS. CARNEY:  Objection.  Form.  Incomplete
7  hypothetical.
8             THE WITNESS:  If for some reason I called back
9  my file and had to make -- and had to provide new
10 discovery or old discovery to defense counsel, I
11 would make a copy for them.
12 BY MR. SWAMINATHAN:
13       Q.   And would you throw away or discard documents
14 from the police file that were not duplicates during
15 that retrial or retrial process?
16            MS. CARNEY:  Objection.  Form.  Incomplete
17 hypothetical.
18            THE WITNESS:  Well, I -- I'm trying to
19 maintain all the -- the -- the -- the reports that
20 I collected for use at trial or now in this new
21 legal proceeding.  Personally, I -- I try to keep my
22 files complete, but I know from personal experience
23 that that wasn't necessarily true when a file went
24 to the warehouse.
25 BY MR. SWAMINATHAN:

Page 216

1        Q.   In your practice, when you had a case that you
2  called back -- strike that.  When you had a file that
3  you called back, did you follow the same practices you
4  followed when it -- when you first worked on the case,
5  which was to make sure you kept a copy of all the police
6  reports before you packed it back up and sent it back to
7  storage again?
8        A.   I certainly tried to include everything that I
9  then used in the new proceedings when I sent it back.
10 But as I've said to you before, what happens at the
11 warehouse is a completely different matter.  And I'm
12 certainly not speaking for other prosecutors' practices.
13 I know they try to package up their files too, but I've
14 had too many examples of files getting lost or even
15 decimated in the warehouse.  And, frankly, I don't know
16 how that happens.  But that warehouse is - - warehouses,
17 plural, is almost like the closing scene in Indiana
18 Jones in Raiders of the Lost Ark.  It's not good.
19       Q.   Putting aside the question of files that are
20 getting decimated or completely lost, are you aware of
21 instances in which individuals in the warehouse were
22 pulling specific police reports out of the files to
23 remove them from those trial files?
24            MS. CARNEY:  Objection.
25            MS. GOLDEN:  Form.

Page 217

1            MS. CARNEY:  Foundation.
2            THE WITNESS:  If -- if I go back to the first
3  part of your question, these files are getting
4  decimated for reasons that I don't know.  So if
5  you're asking me, "did a" -- "did a warehouse
6  employee pull files out and trash them?"  I don't
7  know.  But I don't know why the files were so
8  trashed.
9  BY MR. SWAMINATHAN:
10       Q.   Are you aware of any instances in which anyone
11 in the warehouse was ever disciplined for pulling
12 specific police reports out of files?
13            MS. CARNEY:  Objection.  Form.  Foundation.
14            THE WITNESS:  Not -- not that I'm aware of.
15 But, again, I -- I -- I don't know.  And I don't
16 think other people know necessarily with certainty
17 why the files were so -- kept so poorly at the
18 warehouse as well.  Maybe we should have been
19 routinely firing people.
20       Q.   Are you aware of instances in which
21 prosecutors went over to the trial files at the
22 warehouse and would pull out individual police reports
23 or other police documents from those files?
24            MS. GOLDEN:  Form.
25            MS. CARNEY:  Foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 57 of 71 PageID #:85756
The Deposition of BERNARD MURRAY, Volume 2, taken on February 17, 2021

218..221

Page 218

1     THE WITNESS: I know when prosecutors, myself
2  included, go to the warehouse to look for files, we
3  couldn't find them, or we saw somewhat infamous
4  trials in three or four different locations.
5  BY MR. SWAMINATHAN:
6     Q.  I -- I'm asking a different question. Are you
7  aware of instances in which prosecutors went to the
8  warehouse and pulled documents, like police reports, out
9  of the trial files?
10     MS. GOLDEN: Form.
11     MS. CARNEY: Foundation.
12     THE WITNESS: I -- I don't know what other
13  prosecutors did when they went to the warehouse.
14  BY MR. SWAMINATHAN:
15     Q.  Did you ever go to the warehouse and pull
16  specific police reports out of a trial file?
17     MS. GOLDEN: Form.
18     THE WITNESS: On the occasions that I went to
19  the warehouse, I was looking for a file. And I was
20  looking for the complete file. And sometimes I was
21  successful, sometimes I was not. I was not looking
22  to take a document out of the file personally.
23  Personally, I was looking for a file for some other
24  reason.
25  BY MR. SWAMINATHAN:

Page 219

1     Q.  Okay. And did you have instances where you
2  would ever obtain a file back from the warehouse that
3  had been in storage and then pull specific police
4  reports or other documents from the police department
5  out of those files before sending them back to storage?
6     MS. GOLDEN: Form.
7     THE WITNESS: I would -- I -- when -- when I
8  would take a file back in the warehouse on those
9  occasions, I would utilize the entire file, so I
10  would take reports out of it. And to the best of
11  my ability, I would try to reconstitute the file
12  before I sent it back to the warehouse.
13  BY MR. SWAMINATHAN:
14     Q.  Okay. And -- oh. What percentage of the
15  files did you -- strike that. In Fields, did you opine
16  on the percentage of prosecutor files that you deemed to
17  be incomplete?
18     MS. CARNEY: Objection. No, sorry. Go ahead.
19     THE WITNESS: You know, I -- I -- I -- I don't
20  remember. I -- I know we were -- we were trying to
21  estimate that at one point, but I don't remember
22  what the number was.
23  BY MR. SWAMINATHAN:
24     Q.  You didn't disclose any opinion about a
25  percentage of prosecutor files you deemed incomplete in

Page 220

1  Fields, correct?
2     A.  No.
3     Q.  And you didn't offer any opinions in the
4  Rivera case about the percentage of prosecutor files you
5  deemed incomplete, correct?
6     A.  I don't think -- no, I did not.
7     Q.  And what -- and then did you disclose an
8  opinion in this case about the percentage of prosecutor
9  files you deemed incomplete?
10     A.  No.
11     Q.  And in fact, you didn't look at the majority
12  of prosecutor files in this case that were produced,
13  correct?
14     A.  As I said before, I focused on the eight cases
15  that the plaintiff's expert used, and then the Page 51
16  documents. Those are the files that I focused on.
17     Q.  In the -- well, I was asking you about any
18  instances of known Brady violations. In Fields, you
19  indicated that you were aware of what the Chicago Police
20  Department's position was about whether it had turned
21  over the documents in its street file to the prosecution
22  and defense, correct?
23     MS. CARNEY: Objection. Form.
24     THE WITNESS: I -- I was aware of -- of -- of
25  the allegations that those reports were not

Page 221

1  tendered.
2  BY MR. SWAMINATHAN:
3     Q.  Okay. And when you conducted your review --
4  strike that. And in that case, you were not opining on
5  that issue, correct?
6     A.  I was not.
7     Q.  Okay. And did it cause you any concern that
8  there had -- that, in fact, CPD was admitting that it
9  had a file in the Fields case that it had failed to
10  disclose?
11     MS. GOLDEN: Form and foundation.
12     THE WITNESS: My concern was not with that
13  file, it was with the other files, and to examine
14  those documents.
15  BY MR. SWAMINATHAN:
16     Q.  And do you know why it -- strike that. Did
17  you do any investigation to understand why it was that
18  that file in the Fields case had not been disclosed?
19     A.  I --
20     MS. CARNEY: Objection. Form, foundation.
21     THE WITNESS: I did not contain -- I did not
22  conduct an investigation into the Fields case.
23  BY MR. SWAMINATHAN:
24     Q.  And in the course of your work, did you
25  develop an understanding of how it came to be that CPD



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 58 of 71 PageID #:85757
The Deposition of BERNARD MURRAY, Volume 2, Taken on February 7, 2020

222..225

Page 222

1  failed to turn over a file in the Fields case?
2      A.  I did not come to that understanding.
3      Q.  Okay.
4          MS. GOLDEN:  Belated objection to foundation
5      and form.
6  BY MR. SWAMINATHAN:
7      Q.  Okay.  And then in that case, you looked at,
8  not the Fields case, but a number of other files that
9  had been found in the same location as the Fields file
10 that had not been disclosed, correct?
11         MS. CARNEY:  Foundation and form.
12         THE WITNESS:  I -- I don't know exactly where
13     they were found, but I was refuting the
14     allegations, whether the defense counsel on those
15     cases received the proper discovery.
16 BY MR. SWAMINATHAN:
17     Q.  And you didn't -- when you offered those
18 opinions, did you know one way or the other whether
19 those other files that you were opining on had been
20 found in the same place as the Fields file?
21         MS. GOLDEN:  Objection.  Form, foundation.
22         THE WITNESS:  As I -- as I sit here now, I
23     don't recall where they were stored.
24 BY MR. SWAMINATHAN:
25     Q.  Okay.  And as you did your review of the other

Page 223

1  files from that case, not the Fields file, you found a
2  number of instances in which there were documents that
3  were -- from the police file that were missing from both
4  the prosecution and the defense files, correct?
5      A.  I'd have to review the report, but there was
6  times where the reports not found in a wholly incomplete
7  prosecutor file or wholly incomplete defense file, so
8  yeah.
9      Q.  Yeah.  And there were some time -- oh, I'm
10 sorry.  Go ahead.
11     A.  So it would not surprise me that there --
12 there's investigative materials that were not found in
13 those two files.
14     Q.  Are you saying now that your testimony in the
15 Fields case was that every single prosecutor filed was
16 wholly incomplete?
17     A.  No.
18         MS. GOLDEN:  Objection.  Form.  Misstates his
19     testimony.
20         THE WITNESS:  No, I -- I'm -- I'm not saying
21     that every file was wholly incomplete.  There was -
22     - but many, many files, both prosecution and
23     defense files, were obviously missing significant
24     amounts of police reports.
25 BY MR. SWAMINATHAN:

Page 224

1      Q.  Are you testifying that every public defender
2  file in the Fields case was wholly incomplete?
3          MS. CARNEY:  Objection.  Form, foundation.
4      Asked and answered.  Misstates his testimony.  And
5      at this point, if you're going to keep going down
6      his testimony or his specific opinions from Fields,
7      I'm going to ask you to put up his report or
8      testimony that you're referring to.  Obviously that
9      report was done years ago and I was not counsel on
10     that case.  So if you're not going to show him the
11     report, I'm not going to let him keep answering
12     questions about it.
13 BY MR. SWAMINATHAN:
14     Q.  I can show you the report.  It's helpful, but
15 I don't think this is an issue that's covered in your
16 report.  I think it's more a matter of the terminology
17 you're using now, but I'm -- if you -- if the report's
18 helpful to you, I can put it up.
19     A.  What I said to you that many of the
20 prosecutor's files and many of the public defender's
21 files were inadequate to -- it wasn't just missing one
22 or two pieces of paper.  They were obviously incomplete
23 files.  I'm not saying every one of those files were
24 wholly incomplete, but there were some that were wholly
25 incomplete.  So it's very difficult to draw a -- a

Page 225

1  conclusion that somehow law enforcement, Chicago Police
2  Department, withheld documents from both the prosecution
3  and the defense when the files were in such disarray.
4      Q.  Okay.  And the reason we're going down this
5  road is because I -- you introduced the idea of the
6  files all being wholly incomplete in response to a
7  question of mine.  So I had a quest -- I had to follow-
8  up about that.  So let me go back to my question.  In
9  that case, you found instances when there were documents
10 that were missing from both the public defender file and
11 the prosecutor file and are you claiming now that in
12 every one of those instances, it was because both the
13 homic -- the public defender file and the prosecutor
14 files were wholly incomplete?
15         MS. CARNEY:  Objection.  Form.  And I'm -- at
16     this -- again, going to ask if you're going to ask
17     him questions about the specific opinions from his
18     report, that you put up the report and give him a
19     chance to review it or take a look at it because --
20 BY MR. SWAMINATHAN:
21     Q.  I'm happy to put it up.  Would that be helpful
22 to you, Mr. Murray?
23     A.  Well -- well, I -- if you're getting any more
24 questions on this topic, yes, but I -- I'm not saying
25 just because -- I'm not -- you -- I -- I'm let me back

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 59 of 71 PageID #:85758
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 7, 2020
226..229

Page 226

1  off on wholly incomplete.  There was definitely files
2  that were wholly incomplete, but as I said a minute ago,
3  there were many files that were inadequate to a nature
4  where you could not say that the prosecution and the
5  plaintiff -- prosecution and the, I'm sorry, the defense
6  attorney never had the Chicago Police Department
7  reports.
8       Q.    What -- do you know what the ultimate outcome
9  at trial was of the Fields case in which you offered an
10 opinion?
11      A.    He recovered money from the city and -- and
12 other defendants.
13      Q.    And do you know if the jury reached a finding
14 on whether or not -- strike that.  Do you know whether
15 the jury reached a finding on claims against the City of
16 Chicago for maintaining unconstitutional policy and
17 practices?
18      A.    I don't know.
19            MS. GOLDEN:  Objection.  Foundation.
20            THE WITNESS:  I don't know.
21 BY MR. SWAMINATHAN:
22      Q.    All right.  So sitting here today, you're --
23 you don't -- you do -- strike that.  Sitting here today,
24 you're not aware of whether the jury found that the City
25 of Chicago had an unconstitutional policy or practice of

Page 227

1  Brady non-disclosure?
2       A.    I know that they re -- re -- recovered a
3  significant amount of money.  That's all I focused on.
4       Q.    Okay.  And in the Jacques Rivera case, you
5  offered an opinion in that case, correct?
6       A.    Yes, sir.
7       Q.    And do you know what the outcome of that case
8  was?
9       A.    Mr. Rivera also recovered money from the city.
10      Q.    And do you know if the jury found that a Brady
11 violation had occurred in Mr. Rivera's case?
12      A.    I do not, no.
13      Q.    And do you know if the jury found that the
14 City of Chicago had maintained unconstitutional policy
15 or practice of withholding Brady information?
16      A.    I do not know.  Other than the substantial
17 amount of money they rewarded to Mr. Rivera.
18      Q.    Okay.  Would it surprise you to learn that in
19 both of those cases the jury disagreed with you about
20 whether or not the City of Chicago had a systemic
21 problem with failing to disclose information in police
22 files to prosecutors and criminal defendants?
23            MS. CARNEY:  Objection.  Form, foundation.
24            THE WITNESS:  Well, are they disagreeing
25        specifically with me or -- I mean, do they say we

Page 228

1  disagree with Mr. Murray or was there other
2  reasons?
3  BY MR. SWAMINATHAN:
4       Q.    You tell me.  Did you do any information --
5  did you do any work to figure out what the reason was
6  for the jury's determination?
7            MS. CARNEY:  Objection.  Form, foundation.
8            THE WITNESS:  I did -- I did not conduct a --
9        a study into the jurors or ask them if it was why
10       they vote -- both the verdicts they voted.
11 BY MR. SWAMINATHAN:
12      Q.    Were you curious about what the evidence was
13 that resulted in the jury reaching the conclusions that
14 it did in light of your testimony in the case?
15      A.    I provided my expert report for their
16 consideration, what -- what other evidence they
17 considered both from the plaintiff's attorneys and also
18 from defense attorneys to come to their decision, I
19 don't know all that information.  So I -- I'm not going
20 to opine on why they voted one way or the other.
21      Q.    Were you curious at any point during the --
22 during -- after you learned about the result in the
23 Rivera case or the Fields case about what all that
24 underlying evidence was that resulted in the verdicts in
25 those cases?

Page 229

1            MS. CARNEY:  Objection.  Form, foundation.
2            THE WITNESS:  My curiosity didn't go to that
3        level.
4  BY MR. SWAMINATHAN:
5       Q.    Okay.  And when you learned that there had --
6  strike that.  When you found out that the City of
7  Chicago was admitting that it had a file that it had
8  failed to disclose to prosecutors or to the defense in
9  Mr. Fields's case, did that bother you as a prosecutor
10 that that had happened?
11            MS. CARNEY:  Objection.  Form, foundation.
12            THE WITNESS:  I -- I -- I didn't know all the
13       circumstances on -- on how they came to not tender
14       the report or admit they didn't tender the report.
15       So obviously I want all investigative material
16       provided to defense counsel in every case.
17 BY MR. SWAMINATHAN:
18      Q.    Your opinions in this case, you understand,
19 involved the case in which one of the defendants is
20 Reynaldo Guevara, correct?
21      A.    One of the detectives, yes.
22      Q.    And do you have any knowledge or information
23 about Mr. Reynaldo Guevara's history in the Chicago
24 Police Department?
25            MS. CARNEY:  Objection.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 60 of 71 PageID #:85759
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 7, 2019
230..233

Page 230

1      THE WITNESS: I don't know what you mean by
2   knowledge or information about him.
3   BY MR. SWAMINATHAN:
4      Q.   In other words, are you -- do you have any
5   knowledge about allegations of misconduct against
6   Reynaldo Guevara?
7      A.   From what I've read in the in -- in news media
8   reports.
9      Q.   And what have you learned -- what do you know
10  about Mr. Guevara from news media reports?
11     A.   Well, I -- I know that there are now
12  situations where he's exercising his Fifth Amendment
13  right not to answer questions.  And in cases where this
14  -- in a number of cases, the Cook County State's
15  Attorney's Office has decided not to proceed further
16  with the case.
17     MS. GOLDEN:  I'm sorry.
18     THE WITNESS:  Oh, I'm sorry.  Go ahead.
19     MS. GOLDEN:  I'm sorry.  My microphone was off
20  and I have a belated -- I'm sorry, a belated
21  objection to form of the last question.
22  BY MR. SWAMINATHAN:
23     Q.   And do you have an opinion about the
24  prosecutor's office's decision not to challenge some of
25  those cases?

Page 231

1      A.   Do I have an opinion about that?  Well, as
2   always, I -- I'd like to know what other evidence was
3   remaining.  Could the prosecution still go forward with
4   the case?
5      Q.   Did you do some work to find out the answer to
6   that question?
7      A.   I did not.
8      MS. CARNEY:  Objection.  Form.
9   BY MR. SWAMINATHAN:
10     Q.   Do you know whether -- you indicated that you
11  had some information from media reports that Mr. Guevara
12  was pleading the Fifth.  Do you know if he plead -- he
13  was pleading the Fifth with regard to his actions in the
14  Soto homicide investigation that's a subject of this
15  litigation?
16     A.   I'm not aware of whether it is or isn't.
17     Q.   Okay.  And do you have any knowledge about
18  whether how many of the investigative files that were
19  produced in this case and are the subject of your expert
20  report involved Detective Guevara?
21     A.   I do not know.
22     Q.   Did you do any analysis of the files to see
23  how often Detective Guevara was part of these underlying
24  homicide investigations that you reviewed?
25     A.   I did not.

Page 232

1      Q.   Do you have any knowledge about allegations
2   that Detective Guevara was withholding evidence of
3   innocence from criminal defendants as part of his
4   conduct in his homicide investigations?
5      A.   I don't --
6      MS. GOLDEN:  Form.
7      THE WITNESS:  I don't have knowledge of that.
8   BY MR. SWAMINATHAN:
9      Q.   In other words, do you have any knowledge
10  about what the allegations are against Detective Guevara
11  in this case and others?
12     A.   No.
13     Q.   Okay.  And if Detective Guevara has pled the
14  Fifth about whether or not he withheld Brady information
15  from prosecutors and defendants in this case in many
16  other cases, would that matter to you?
17     MS. CARNEY:  Objection.  Form, foundation.
18     THE WITNESS:  It doesn't matter to my analysis
19  of whether material was provided from the
20  prosecution to defense attorneys.
21  BY MR. SWAMINATHAN:
22     Q.   Does it have any impact on your opinions about
23  whether information is getting from the police
24  department to the prosecutors?
25     MS. CARNEY:  Object to form.

Page 233

1      MS. GOLDEN:  Form and foundation.
2      THE WITNESS:  Well, I can -- part of my
3   examination was to look at reports that the
4   prosecutors had in their file also to look at the
5   investigative reports and the other RD reports and
6   to the extent that there's a public defender file
7   to see if those documents are included in there.
8   So I'm concerned about that.
9   BY MR. SWAMINATHAN:
10     Q.   And if Detective Guevara has pleaded the Fifth
11  about whether he withheld information from prosecutors
12  and criminal defendants in numerous cases, would that
13  have any bearing on your opinions?
14     MS. CARNEY:  Objection.  Form.
15     MS. GOLDEN:  Foundation.  You can answer it.
16     THE WITNESS:  My -- my analysis whether other
17  of the -- of the compliance with discovery would
18  remain the same.
19  BY MR. SWAMINATHAN:
20     Q.   If Detective Guevara has pleaded the Fifth
21  with regard to whether he failed to even document
22  important exculpatory information that he learned, could
23  that have some bearing on your opinions in this case?
24     MS. CARNEY:  Objection.  Form, foundation.
25     THE WITNESS:  I -- the -- I don't know why he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 61 of 71 PageID #:85760
The Deposition of BERNARD MURRAY, Volume 2, taken on February 7, 2023

234..237

Page 234

1     is taking the Fifth, so I don't know if it pertains
2     to that or not.  So it really would not have any
3     bearing on my case.
4     BY MR. SWAMINATHAN:
5         Q.   If Detective Guevara failed to document
6     exculpatory information that he learned during the
7     course of his investigation, that could result in Brady
8     violations that, as a prosecutor, you'd never know
9     about, correct?
10        MS. CARNEY:  Objection.  Form -- incomplete
11    hypothetical.  You can answer that.
12        THE WITNESS:  Well, I think I've said before
13    that, if -- if there's no way for me to discern
14    from the reports that part of invest -- an
15    interview was ever cur -- was ever conducted and
16    not submitted into the investigative file.  There's
17    no way I would know that that interview took place.
18    BY MR. SWAMINATHAN:
19        Q.   Michael Brassfield -- I'm changing topics
20    here.  Michael Brassfield looked at the investigative
21    file, standing alone to see whether the investigative
22    files complied with the Chicago Police Department's
23    special orders.  You recall that from his report,
24    correct?
25        A.   I do.

Page 235

1         Q.   Okay.  And in your work, you did not conduct
2     an audit or review of Mr. Tiderington -- strike that.
3     Mr. Tiderington did the same thing in this case,
4     correct?  I think it might've said Brassfield.  Mr. --
5     strike.  So let me ask it again.  Sorry.
6         MS. CARNEY:  Yeah.  You did say Brassfield.
7     BY MR. SWAMINATHAN:
8         Q.   Yeah.  Let me ask again.  Sorry.  Thanks for
9     that, Carrie.  Mr. Tiderington in this case is standing
10    alone to see if they --
11        THE REPORTER:  You're cutting out.  Everyone
12    cut out.
13        MS. CARNEY:  Yeah, I can hear you.
14        THE REPORTER:  Okay.
15        MR. SWAMINATHAN:  Oh, Emilia, can you hear me?
16        THE REPORTER:  Now I can hear you.  I didn't
17    hear your last question.
18    BY MR. SWAMINATHAN:
19        Q.   Okay.  No, I'll ask it again.  I think I was
20    asking a poor question.  You probably saved me from
21    myself.  Mr. Murray, in this case, Mr.
22    Tiderington reviewed the investigative file -- files
23    standing alone to see if they contained evidence of
24    whether there's -- the general orders and special orders
25    are being followed, correct?

Page 236

1         A.   I think he did that.  I'm -- I'm trying to
2     understand your question.
3         Q.   And it was he did something very similar to
4     Mr. Brassfield, which is he looked at the investigative
5     file, standing alone, to see if the special orders and
6     general orders about inventories and GPRs and to/from
7     memos were being followed, correct?
8         A.   I'm sure he did that.  I didn't focus on that.
9         Q.   Okay.  And when you say you didn't focus on
10    that, you didn't offer any opinions on that same issue;
11    is that fair?
12        A.   Yes, it is fair.
13        Q.   Okay.  And so ultimately you didn't audit his
14    numbers around his findings about the percentage of time
15    that particular types of documents were missing from
16    those investigative files, correct?
17        A.   I did not.
18        Q.   Okay.  And did you conduct any kind of
19    comparison between permanent retention files and
20    investigative files?
21        A.   No.
22        Q.   Okay.  Okay.  I want to ask you what some of
23    the file comparisons you did.  Let me pull up your
24    report here.  All right.  I'm showing you a document I
25    have marked as Exhibit 1.  This is your expert report,

Page 237

1     correct?
2         A.   I see it, yes.
3         Q.   Okay.  Let's turn to -- toward the back of
4     your report, you discussed a case called People v. Oscar
5     Soto.  Do you see that?
6         A.   Give me one second.  I'll get to it.  Yeah, I
7     have it in front of me now.
8         Q.   Okay.  And so for the Soto case, we looked at
9     your materials reviewed before, but for that case, you
10    were provided with a copy of not only the police
11    investigative file and RD file, but you're also provided
12    with the State's attorney file and the public defender
13    file, correct?
14        A.   I think that's accurate, yes.
15        Q.   Okay.  Do you want to take a minute to look at
16    your materials reviewed?
17        A.   I am -- I'm looking at the -- what I wrote in
18    the report.
19        Q.   Okay.  Just -- tell me when you're ready for
20    the next question.  You can go ahead and read that whole
21    section and then just tell me when you're done so that
22    before I ask you my next question.
23        A.   Okay.  I will.  Okay.  I -- I'm -- I've
24    reviewed the four points I made.
25        Q.   Okay.  So having had a chance to review your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 62 of 71 PageID #:85761
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2020
238..241

Page 238

1  report, do you agree with me you were provided with a
2  copy of the police investigative file and RD file as
3  well as the prosecutor file and defense file for the
4  People v. Oscar Soto case?
5     A.   Yes, sir.  And reviewed it.
6     Q.   Okay.  And you conducted an analysis and
7  comparison of those files, correct?
8     A.   Yes, I did.
9     Q.   Okay.  And did you review the public defender
10  file as part of that analysis?
11    A.   I did.
12    Q.   And did you review the state's attorney file
13  as part of that analysis?
14    A.   I'm sure I did.
15    Q.   Okay.
16    A.   My report, I'm more focused on the public
17  defender's file, but yes, I'm sure I looked at all of
18  them.
19    Q.   Okay.  And when you looked at the public
20  defender file, you looked at the entirety of the file,
21  correct?
22    A.   Yes.
23    Q.   And when you looked at the state's attorney
24  file, you looked at the entirety of that file too,
25  correct?

Page 239

1     A.   I'm sure I did, but again, my -- in the
2  report, I'm focusing on -- on the public defender's
3  file.
4     Q.   Okay.  And when you conducted the review of
5  the file, did you reach any conclusions about whether
6  the investigative file was complete or incomplete?
7     A.   No, my -- my focus was on how incomplete the
8  public defender's file is.  So it'd be very difficult to
9  claim that police reports were not provided to the
10  public defenders when -- with the state of their
11  existing file.
12    Q.   Did you conduct -- strike that.  Did you form
13  any opinions about whether the state's attorney file was
14  complete or incomplete?
15    A.   Not that I noted in my report.
16    Q.   Okay.  And so when you reviewed the state's
17  attorney file, you didn't look at the file and go, "This
18  is obviously an incomplete file," correct?
19    A.   I -- I may have, but I didn't note it in my
20  report.
21    Q.   Did you note it somewhere?
22    A.   I not -- no, if I didn't note it in my report,
23  I didn't note it anywhere.
24    Q.   Okay.  All right.  So it is when -- it's not
25  like when you reviewed that file, you said, "a-ha, this

Page 240

1  public" - "this prosecutor file is clearly incomplete;"
2  is that fair?
3     A.   No, I -- again, the allegation is that the
4  public defender didn't receive these materials.  So my
5  initial focus was on their file.
6     Q.   Okay.  And when you looked at the public
7  defender file, you concluded that file -- strike that.
8  So you reviewed the public defender file in its entirety
9  and concluded that that file was incomplete, correct?
10    A.   Yeah.  I believe when you whittle down
11  redacted pages and -- and -- and photos and all that,
12  you get the 33 pages.  I mean, included in the -- in the
13  remaining pages are defense counsel subpoenas.  So it
14  leaves -- leaves about basically 25 pages of police
15  reports whereas the Chicago Police Department files
16  contain 158 pages, including the nine pages of GPRs that
17  the plaintiff's expert claims were missing from the
18  public defender's file.
19    Q.   And so I think the answer to my question is
20  yes, right?  When you reviewed the public defender file
21  in its entirety, you concluded that it was incomplete,
22  correct?
23    A.   Yes, it is incomplete.
24    Q.   Okay.  And when you reviewed the state
25  attorney file in its entirety, you didn't reach any

Page 241

1  conclusion that file was incomplete, correct?
2     A.   No, I did not.
3     Q.   Okay.  No, I did not, meaning that's correct;
4  is that right?
5     A.   It means I didn't reach a conclusion whether
6  it was complete or not.
7     Q.   Okay.  And when you --
8     A.   Let me answer him further.  I may have
9  observed that it was complete or not complete, but when
10  -- when I got to the public defender's file being so
11  lacking, my analysis kind of ended there.
12    Q.   Okay.  Now, when you looked at those files,
13  what did you find in terms of whether the investigative
14  file materials were contained in the state's attorney
15  file?
16    A.   As I just said, when I saw how poorly
17  maintained the public defender's file was, I reached a
18  conclusion that it would be impossible for us to
19  determine whether they had received all the police
20  depart -- department reports based upon the allegation
21  of Plaintiff's expert.
22    Q.   So and --
23    A.   So my -- my point is that the -- the
24  plaintiff's expert is claiming that these are documents
25  that weren't pro -- example of documents not provided to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 63 of 71 PageID #:85762
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2020

242..245

Page 242

1    the defense counsel when we -- we can't tell that from
2    the 25 pages versus 158 pages of the police file.
3         Q.   Did you find that there was any
4    investigative --
5         A.   My focus --
6         Q.   Oh, I'm sorry, go ahead.
7         A.   I apologize.  My -- once I saw how incomplete
8    the public defender's file was, the -- the allegation
9    that the police or the prosecutors didn't provide
10   everything that was in the police file is -- is -- is
11   impossible to verify.  They've got 25 pages remaining
12   when the original -- I mean, the police reports are
13   158 pages.  It's impossible to determine whether the
14   prosecutor's file was complete back at the time of trial
15   and tendered everything or that the police tendered
16   everything when you can't verify what the public
17   defenders had during the time they're preparing for
18   trial.
19        Q.   Did you find that the investigative file
20   materials were all contained in the state's attorney
21   file?
22             MS. CARNEY:  Objection.  Asked and answered.
23             THE WITNESS:  Yeah.  And -- and again, I -- I
24   don't recall off the top of my head because I
25   stopped at point number one under Soto.

Page 243

1    BY MR. SWAMINATHAN:
2         Q.   Did you find any instances in which the
3    investigative file was information -- well, strike that.
4    Did you find any instances in which the investigative
5    file information was missing from the state's attorney
6    file in whatever level of review you did conduct of the
7    prosecutor file?
8              MS. CARNEY:  Objection.
9              THE WITNESS:  Yep.  You know --
10             MS. CARNEY:  Form.
11             THE WITNESS:  I -- the allegation here is that
12   the public defender was not provided these
13   documents either from the police or from the
14   prosecutor.  So when their file is so inadequate,
15   the analysis of -- of what was in a potentially
16   incomplete prosecutor's file is irrelevant.
17   BY MR. SWAMINATHAN:
18        Q.   Would it matter to you if the prosecution
19   didn't get a copy of a number of these documents in the
20   police file?
21             MS. CARNEY:  Objection.  Form, foundation,
22   incomplete hypothetical.
23             THE WITNESS:  Again, this is Plaintiff's
24   expert claiming that the public defender didn't get
25   these police reports.

Page 244

1    BY MR. SWAMINATHAN:
2         Q.   I'm asking you a different question, sir.
3         A.   But -- but --
4         Q.   Focus on my question, please.  Let me ask it
5    and then you can answer.
6              MS. CARNEY:  Hold on.  He wasn't done
7    answering so you can re-ask it, but just let him
8    finish answering what he was saying.  I know you
9    don't like -- I know you don't agree that he's
10   answering your question, but he --
11             MR. SWAMINATHAN:  Yeah.  Okay.  Go -- yeah.  Go
12   ahead.  Go ahead.
13             MS. CARNEY:  You can re-ask it.  Just let him
14   finish.  Were you done?
15             MR. SWAMINATHAN:  Go ahead.
16             MS. CARNEY:  After all that?
17             THE WITNESS:  No.  Go ahead and re-ask it.  Go
18   ahead.
19             MS. CARNEY:  Okay.  Try again, Anand.
20   BY MR. SWAMINATHAN:
21        Q.   Yeah.  If there were investigative file
22   documents that were not contained in the prosecutor
23   file, would you want to know that?
24        A.   If the prosecutor's file is incomplete today
25   as we look at it, I -- I don't know what they had back

Page 245

1    at the time that they received information from the
2    police.  But I think the focus is rightfully here is
3    what the plaintiff's expert is claiming.  He's saying
4    that the public defender did not receive these documents
5    from the police and we cannot make that determination
6    based upon the approximately 25 police page -- police
7    report pages in their file today.
8         Q.   Did you find -- did you disclose any findings
9    about what was contained in the prosecutor file?
10             MS. CARNEY:  Objection.  Asked and answered.
11   BY MR. SWAMINATHAN:
12        Q.   Sir?
13        A.   I -- I did not.
14        Q.   Did you disclose any findings about whether
15   the prosecutor file was complete or incomplete?
16        A.   As I just said, I did not.
17        Q.   Did you disclose that you had you had found
18   some evidence of any kind to indicate that the
19   prosecutor's file was incomplete?
20             MS. CARNEY:  Objection.  Form.  Asked and
21   answered.
22             THE WITNESS:  As I've said numerous times, I
23   stopped once I saw the public defender's was so
24   incomplete.
25   BY MR. SWAMINATHAN:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 64 of 71 PageID #:85763
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2024
246..249

Page 246

1    Q.   Okay.  And you had the entire prosecutor file,
2    so if you wanted to, you could have compared the entire
3    police file to the prosecutor file to see if the
4    documents also ended up in the prosecutor file, correct?
5    A.   I -- I -- I don't know if I have the entire
6    prosecutor's file.  As -- as I've stated through this
7    report, there are many times where the prosecutor's
8    file, today, as we look at it, is incomplete.  What I
9    was struck by the Soto case was how the -- the public
10   defender's file was so incomplete as to be impossible to
11   claim that the prosecutor or the police didn't provide
12   these documents at the time of trial.
13   Q.   Did you -- when you reviewed the prosecutor
14   file in this case, as you indicated, did you find that
15   there was anything unusual about the information
16   contained in the state's attorney file?
17        MS. CARNEY:  Objection.  Form.
18        THE WITNESS:  If I can say it again, I was
19        struck by the public defender's file being
20        incomplete.  So my analysis of the prosecutor's file
21        didn't need to be any more detailed than it was.
22   BY MR. SWAMINATHAN:
23   Q.   Okay.
24        MS. CARNEY:  Anand, now when you're at a good
25        spot, I need a break.

Page 247

1        MR. SWAMINATHAN:  Yeah, we can take a break
2        right now.
3        THE REPORTER:  Okay.  We're going off the
4        record.  The time is 3:39 p.m.
5             (OFF THE RECORD)
6        THE REPORTER:  We're back on the record.  The
7        time is 3:54 p.m.
8    BY MR. SWAMINATHAN:
9    Q.   Okay.  Mr. Murray, could you turn to Page 13
10   of your report?
11   A.   All right.
12   Q.   And this is the section where you begin to dis
13   -- at the very bottom is where you -- the section header
14   at the bottom says, "Comparison of eight attorney" -
15   "defense attorney files to investigative files."  Do you
16   see that?
17   A.   I see that.
18   Q.   Okay.  All right.  And I want to ask you what
19   a couple of these files here, and I'm going to -- I
20   think we're going to be wrapped up here pretty quickly
21   if I can stay on discipline here.  Let's go to Page 15.
22   A.   Hold on.  Okay.
23   Q.   Okay.  On Page 15, you talk about the People
24   v. Edwards case, correct?
25   A.   I see that.

Page 248

1    Q.   Okay.  And I just wanted to ask you about
2    entry number five in your -- in that list there we've
3    talked to about a hand-drawn map.  Do you see that?
4    A.   I do see that.
5    Q.   Okay.  Now the hand-drawn map that's
6    referenced there in numeral five of your par -- in your
7    paragraph, that document, you did not find in the
8    defense file or the prosecutor file, correct?
9    A.   That is correct.
10   Q.   Okay.  Now the document itself -- strike that.
11   You indicated that some of the information contained on
12   that hand-drawn map is contained in other places in the
13   file, correct?
14   A.   Yes.  On a -- a -- a series of pages in a -- a
15   supplementary report, I believe, or maybe it was --
16   yeah, I think it was a supplementary report.
17   Q.   Okay.  Now, if I understand your testimony
18   correctly, you agree that that hand-drawn map itself,
19   you would still expect the police to turn over to the
20   prosecutors to be tendered to the defense as well,
21   correct?
22   A.   I would.
23   Q.   Okay.  Now, let's take a look at People v. Kim
24   Mathis, number 17.
25   A.   Hold on.  Yes.

Page 249

1    Q.   Okay.  And in People v. Kim Mathis, there's a
2    note that appears to be on the back of a GPR, correct?
3    A.   No.
4    Q.   That Mr. Tiderington identified?
5    A.   Like one extra sentence or something like
6    that, yes.
7    Q.   Okay.  And you didn't find that information on
8    the back of a GPR in the prosecutor file or the defense
9    file, correct?
10   A.   Let me take a look.  I think that's correct,
11   but let me examine my notes.
12   Q.   Yep.  Yep.
13   A.   I -- I -- I -- I've not noted whether it was
14   in the prosecutor's file, so I assume I did not find it
15   in the prosecutor's file.
16   Q.   Okay.  And when you review and then the rest
17   of your analysis there in Paragraphs 3 through 4 talks
18   about some of the other evidence and documents in the
19   case that refer to these same individuals, Terry Mathis
20   and Kim Mathis, correct?
21   A.   And -- and specifically to the allegation that
22   the sister was present during the -- the whipping of the
23   victim.
24   Q.   Okay.  And ultimately, your testimony is that
25   regardless of what information is in the rest of the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 65 of 71 PageID #:85764
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2019
250..253

Page 250

1  file, to the extent there's information contained on
2  that GPR, you would expect it to have been tendered to
3  the prosecution and to the defense, correct?
4      A.   And -- but specifically that one sentence was
5  out of -- well, not out of context.  It was near the end
6  of that GPR.  What -- and it seemed to indicate that she
7  was -- that Terry, the sister, was present where that
8  the remainder of that GPR and all the other police
9  reports and all the conversations between defense
10  counsel and defendant as well as Terry, reveals that --
11  that Terry couldn't find parking and dropped Kim off in
12  front of the -- a building.  Then she went into the
13  building, whipped the victim.  So that one kind of
14  confusing statement that she was there, it -- it might
15  just refer to that she was there dropping her sister
16  off, but I'm -- I'm saying that -- that all the context
17  of the whole rest of the police report refutes that
18  Terry was up in the apartment.
19      Q.   Okay.  And so the information on that -- on
20  that one piece -- sorry.  The piece of information on
21  that report, that -- strike that.  The piece of
22  information on that GPR that you didn't find in the PD -
23  - in the public defender file or prosecution file is
24  different than the information that's contained in the
25  rest of the file; is that right?

Page 251

1      A.   Let -- let -- let me let me word that more --
2  more carefully.  The -- even that GPR, which I believe
3  was the interview of -- of Terry -- it could also be a
4  separate GPR, those interview of the defendant, Kim.  It
5  -- it's -- it's ambiguous about that one note that's --
6  that's not in the public defender's file.  It's, like,
7  one sentence at the end of that -- that -- that GPR, so
8  even the context of the GPR doesn't say that the sister
9  was in the apartment at the time of the assault.  And
10  then everything else in the -- in the file, including in
11  the public defender's file, indicates that she was not
12  upstairs, so what I'm trying to say is that one
13  sentence, which was a little -- not misleading, but a
14  little vague, could refer to being out in front of the
15  house as opposed to being in the apartment.
16      Q.   Okay.  And are you -- strike that.  Are you
17  saying that the information on that GPR that was not
18  found in the public defender file or the prosecutor
19  file, that because there are other references to the
20  interviews of that individual it's okay not -- for
21  police not to tender that to the prosecution and
22  defense?
23      A.   Well, I'm not --
24           MS. CARNEY:  Form.
25           THE WITNESS:  I -- I'm not saying that it's

Page 252

1  okay not to -- to tender it.  I'm saying that --
2  that -- is it really a sentence at the end of a --
3  of a full- page GPR or nearly full-page GPR?  That
4  was a little bit vague.  So yeah.  Did it not get
5  Xeroxed?  Was it -- was it likely on the backside
6  of a GPR and that's why it wasn't provided?  Yeah.
7  That should have been provided.  No doubt about
8  that.  But this is not a -- a denial of access to
9  information that -- that had any meaning in -- when
10  it's compared to the rest of the file interviews
11  with both Terry and with Kim.  That's what I'm
12  saying.
13  BY MR. SWAMINATHAN:
14      Q.   Okay.  And so when I read this section of your
15  report, you're -- you agree that the information,
16  whether it's on the back of the GPR or on the front of
17  the GPR, should be tendered to the prosecution, correct?
18      A.   Well, the front of the GPR was tendered.  It's
19  just that one sentence on the back of the GR that wasn't
20  tendered, and I agree that it's -- it's part of the
21  investigative file.  It should have been provided.  I'm
22  not disagreeing with that.
23      Q.   And that -- that's the only part that I wanted
24  to make sure.  I just want to make sure I'm
25  understanding that part of it.  And then --

Page 253

1           MS. GOLDEN:  Well, wait a second.  I know that
2      you want to understand that first part, but you cut
3      him off from what he was about to say.
4  BY MR. SWAMINATHAN:
5      Q.   Is there more you want to say about it,
6  Mr. Murray?
7      A.   Yes.  The -- the -- even -- even before that
8  one sentence, which I contend is kind of vague, even
9  before we get to that, even the context of the rest of
10  the GPR is that she was not up in the apartment.  She
11  was down in the street in the car.  And then the point
12  four is the public defender's file has extensive diary
13  of interviews by the public defender, who represented
14  Kim as well as Terry and other family members.  It was
15  open conversation regarding where she was, what she did,
16  and where she went, so I'm adding into that -- that if -
17  - if Terry was to say -- or Kim were to say, "no, Terry
18  was up in the apartment at the time of the attack,"
19  there was nothing precluding them from learning that
20  information from their client and their client's sister.
21      Q.   Okay.  And that's why I'm getting confused now
22  because now -- so is it your testimony that if a -- if
23  an attorney could ask the right questions to obtain the
24  same information, then the obligation to turn that over
25  from the police no longer exists?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 66 of 71 PageID #:85765
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
254..257

Page 254

```
1        MS. CARNEY:  Form.
2        MS. GOLDEN:  Misstates his testimony.
3        THE WITNESS:  I -- I still haven't said that.
4    I said that all investigative material --
5  BY MR. SWAMINATHAN:
6        Q.   Okay.  So that I just wanted to make sure I'm
7    understanding it.
8        A.   I'm sorry.  All investigative material should
9    be provided, even that one sentence on the back of the
10   report, but I'm just trying to put it into the context
11   of how that -- number one, how that might've happened.
12   Maybe the back page was not Xeroxed, so that's issue
13   number one, I suppose.  But then the other part of it is
14   that there was extensive access to those two people, and
15   the -- the -- the public defender's running diary, which
16   probably should have been subject to redaction, clearly
17   shows open conversations with those two women and that
18   not being an issue.
19       Q.   I think you've totally lost me now, so I
20   anything I need to -- let me break it into pieces to
21   make sure I'm understanding, okay?  You say that there's
22   a bunch of information in this file that could otherwise
23   explain the information that's otherwise on the back of
24   that GPR, correct?
25       A.   Generally -- primarily that she was -- she,
```

Page 255

```
1    Terry, was driving around at -- at the location, but
2    didn't go into the location.
3        Q.   Okay.  And I think we've established -- let me
4    make sure.  So we've established, one, you agree that
5    the information on the GPR should be disclosed to the
6    prosecutors and the defense, regardless of whether it's
7    on the front of the page of the back of the page.  Are
8    we on the same page there?
9        A.   All investigative materials should be provided
10   to the police and to the defendant.
11       Q.   Okay.  And then --
12       A.   All relevant material.
13       Q.   Are we on the same -- okay.  Go ahead.  Sorry.
14   Sorry.
15       A.   All -- I meant to say all relevant
16   investigative material.
17       Q.   And then are we on the same page that the
18   information on the GPR, regardless of whether one could
19   later learn that same information through counsel or
20   through other witnesses, that information should still
21   be tendered to the prosecution, regardless of whether
22   there are other ways of learning that information?  Do
23   you agree with that?
24       A.   I -- I guess I'm trying to say is the material
25   -- investigative materials should have been provided,
```

Page 256

```
1    and -- and -- and by the way, the -- I don't know if the
2    public defender's file was complete at the time that we
3    now have it.  That page may have been provided, but I'm
4    saying in the rest of the material that we do have in
5    the public defender's file, it certainly shows that it
6    was not an issue.
7        Q.   Okay.  Can we just go back to my question? Let
8    me ask it again.  I'm just asking you if what your -- is
9    it your opinion that if information that's contained in
10   a police report can then be subsequently learned by the
11   attorney through other means that it's no longer the
12   case that that police report should be tendered to the
13   prosecution and defense?
14       A.   And for the --
15       MS. GOLDEN:  Object to form.
16       THE WITNESS:  For the third time, I'm not
17   saying that.
18   BY MR. SWAMINATHAN:
19       Q.   Okay.  That's all that -- I just wanted to
20   make sure I understood that.  Okay.  And then -- all
21   right.  Let's look at Ardell -- let's see.  Okay. Let's
22   go back to the number -- Page 1 of your report, all the
23   way back to Page 1.
24       A.   Yes.
25       Q.   Nah.  I guess I don't really need to look at
```

Page 257

```
1    that.  Okay.  Let's look at Page -- actually, let's go
2    to Page 9 of your report.
3        A.   Yes.
4        Q.   On Page 9 at EI1, do you see that sort of near
5    the bottom of the page?
6        A.   I'm there now.
7        Q.   "If he is referring to the manner," do you see
8    that paragraph that begins there?
9        A.   I -- I see that.
10       Q.   Okay.  It says, "Prosecutors and criminal
11   defense attorneys are aware of the manner and location
12   of how those reports are created and where they are
13   stored."  Do you see that?
14       A.   Yes.
15       Q.   You can read that whole paragraph there?
16       A.   I do see it.  I see it.
17       Q.   Okay.  What is your basis for saying that
18   criminal defense attorneys are aware of the manner and
19   location of how reports are created and stored?
20       A.   Well, I look at all the subpoenas that are in
21   all the public defender's files.  So they -- they send
22   subpoenas to the areas as well as to 11th and State or
23   35th and Michigan, and they list off the laundry list of
24   items, just like prosecutors do, that they wanted to
25   recover.  And they use the street files language:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 67 of 71 PageID #:85766
The Deposition of BERNARD J. MURRAY, Volume 2, taken on February 07, 2023
258..261

Page 258

1  street files, running files, investigative files, area
2  files.  So they know that those -- that a possible
3  location for those reports or where they were created in
4  the area and they may be stored there as well as sending
5  those same subpoenas, like I said, to -- to what's
6  colloquially called headquarters to get whatever else
7  they want, the case report, the forensic reports.  And so
8  you see that in case after case that both prosecutors
9  and public defenders are issuing the same style of
10 subpoena.
11     Q.  Okay.  And that's an indication that they are
12 asking for lots of different things, but in -- to what
13 extent does that reveal that they know actually where
14 that information is stored and how it's created?
15     A.  Well, because they often send those subpoenas
16 to the areas and they call them area files, that would
17 be an example of knowing where -- where investigative
18 files are created and stored.
19     Q.  Okay.  And some of that information is
20 sometimes not stored at the areas.  It's stored in ERPS
21 or the identification section or other locations as
22 well, correct?
23     A.  Yes.  And -- and that's why the those other
24 subpoenas are sent to 11th and State or 35th and
25 Michigan for dispersal to those other areas.

Page 259

1      Q.  Okay.  And are you saying that you're aware
2  that all the public -- the defense attorneys all know
3  all of those different areas where the materials are
4  stored?
5      A.  Yes.  I -- I would say that from my practice
6  and in the homicide cases, when they were requesting the
7  area files, the investigative files, they knew what area
8  is this.  They put it on there on a -- in -- in the --
9  in previous days, I guess.  You know, 51st and -- and
10 Wentworth, for example, for Area 1, they would put that
11 right on there, so yes.  They knew if it was an Area 1
12 case that the investigative file was in all likelihood
13 there and -- and that the -- the RD file was stored
14 elsewhere.
15     Q.  Okay.  And do you recall when you reviewed
16 Mr. Tiderington's expert report he referred to the
17 Office of the Inspector General report for the City of
18 Chicago?  Do you recall his report discussing that OIG
19 report?
20     A.  No.  I -- actually, I don't.
21     Q.  Okay.  Let's go to his report.  Do you have a
22 copy of it with you?
23     A.  Hold on.
24     Q.  Let me see.  I can pull it up on the screen
25 here, too.

Page 260

1      A.  I do.
2      Q.  You said you do have it?
3      A.  I have his report.
4      Q.  Okay.  Can you go to Page 34 of his report?
5      A.  Just give me one second.  Okay.  I'm there.
6      Q.  And on Page 34 of his report, he discusses
7  some findings of the Office of Inspector General of the
8  City of Chicago.  Do you see that?
9      A.  I'm sorry.  Say it again.
10     Q.  Yeah.  Look in the middle of his report where
11 there's a section --
12     A.  Okay.
13     Q.  -- that begins, "Remarkably."
14     A.  Yeah.  I'm there.
15     Q.  Okay.  And in that section, he summarizes
16 various findings from an Office of Inspector General
17 report from the City of Chicago from June of 2020.  Do
18 you see that?
19     A.  I see that.
20     Q.  Okay.  And you reviewed this as part of your
21 review of his report in advance of preparing your own
22 report, correct?
23     A.  That's true, but as -- as I've said before, I
24 was more focused on the Page 51 reports and the eight
25 cases and all that.  So I was not necessarily opining on

Page 261

1  this part of his report.
2      Q.  Okay.  But in your report, you wrote that
3  prosecutors and defense attorneys are aware, basically,
4  of the locations of where reports are created and where
5  they can be obtained, correct?
6      A.  Yes.
7      Q.  Okay.  And if you look at this OIG report that
8  he's described here, he quotes the findings of the OIG
9  report, which say, "CPD Subpoena Unit and Office of
10 Legal Affairs, the units responsible for responding to
11 subpoenas and record requests, cannot ensure that
12 they're identifying and locating all responsive records
13 for production.  The department lacks the means to
14 determine what records may exist for any case or
15 incident, making it impossible to know whether it has
16 identified and produced all relevant records."  Do you
17 see that?
18     A.  I just read that.  I just --
19     Q.  Okay.  Basically, what the OIG's finding was
20 that the Chicago Police Department itself doesn't know
21 where all of its documents are, fair?
22         MS. CARNEY:  Objection.  Form.  Foundation.
23 Misstates testimony.  Go ahead.
24         THE WITNESS:  Well, that's what the -- the
25 2020 OIG report findings included, so it's just



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 68 of 71 PageID #:85767
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023
262..265

Page 262

```
 1    amazing that prosecutors and public defenders
 2    recovered all these reports back in the day.
 3    Amazing.
 4    BY MR. SWAMINATHAN:
 5        Q.   And the finding of the OIG in 2020 about the
 6    ability of seat of the Chicago Police Department itself
 7    to find records, does it cause you to have any doubts or
 8    concerns about your opinion that prosecutors and
 9    criminal defense attorneys knew exactly where everything
10    was and how to get it?
11            MS. CARNEY:  Objection.  Form.  Foundation.
12            THE WITNESS:  I -- I would --
13            MS. CARNEY:  Argumentative.
14            THE WITNESS:  I -- I would say to you that we
15    issued those subpoenas and we got the reports, so
16    we must've been doing something right.
17    BY MR. SWAMINATHAN:
18        Q.   Okay.  And your testimony is when you got the
19    reports, you can say with confidence that you got all of
20    the reports?
21            MS. CARNEY:  Objection.  Form.  Misstates his
22    testimony.
23            THE WITNESS:  As -- as -- as I said before, we
24    gather all the reports, read them in tandem, and
25    determine if we received everything.  If we haven't
```

Page 263

```
 1    received everything, we ask, where is other
 2    reports? If there's a timing issue, we keep looking
 3    for that. But we sent the subpoenas to those
 4    locations, both prosecutors, public defenders, and
 5    private attorneys, and by the time we got to being
 6    ready for trial, we were fairly confident that we
 7    had everything.
 8    BY MR. SWAMINATHAN:
 9        Q.   Okay.  And I think you acknowledged that the
10    process does require you ultimately to pay -- place some
11    trust that Chicago Police detectives and the department
12    are providing you with all of the documents that they
13    have in their files, correct?
14            MS. GOLDEN:  Object to the form of the
15    question.  Asked and answered --
16            THE WITNESS:  Yeah.  I -- I think I --
17            MS. GOLDEN:  -- about six hours ago.
18            THE WITNESS:  Thank you.  I think I did answer
19    that before, sir.
20    BY MR. SWAMINATHAN:
21        Q.   What's the answer?
22        A.   That the --
23            MS. GOLDEN:  Objection.  Form.
24            THE WITNESS:  The -- the answer is that we --
25    we examine all those documents to -- to -- to
```

Page 264

```
 1    determine whether we -- we believe we have
 2    everything.  If we think something is missing, we
 3    ask for them to turn in reports, but at the end of
 4    the day, there is a level of trust.
 5    BY MR. SWAMINATHAN:
 6        Q.   Okay.  And when you read the findings of the
 7    Office of Inspector General, does it cause you to have
 8    any concerns that maybe that trust was misplaced?
 9            MS. CARNEY:  Objection.
10            MS. GOLDEN:  Form and foundation.
11            MS. CARNEY:  Argumentative.
12            THE WITNESS:  As I said a minute ago, despite
13    those findings by OIG, we -- we, by being
14    prosecutors and defense attorneys, did acquire all
15    those reports with a certain level of certainty
16    back when we were getting ready for trial.  So it
17    doesn't cause me the concern that may -- it -- it
18    may exhibit to you.
19    BY MR. SWAMINATHAN:
20        Q.   Okay.  Did you -- when you saw that in
21    Mr. Tiderington's report, did you decide to review the
22    OIG report and understand why it -- the OIG had reached
23    those conclusions?
24            MS. CARNEY:  Objection.  Form.  Foundation.
25            MS. GOLDEN:  It also calls for privileged
```

Page 265

```
 1    information.
 2            MR. SWAMINATHAN:  No, it doesn't.
 3    BY MR. SWAMINATHAN:
 4        Q.   Go ahead.
 5            MS. GOLDEN:  Actually, it does because it goes
 6    to the drafting process.
 7            MR. SWAMINATHAN:  It doesn't.
 8    BY MR. SWAMINATHAN:
 9        Q.   Go ahead.
10            MS. GOLDEN:  Actually, it does.
11            MS. CARNEY:  Hold on.  What is your question,
12    Anand?
13            MR. SWAMINATHAN:  Did you decide to review the
14    OIG findings cited in Mr. Tiderington's Report that
15    you reviewed?
16            MS. CARNEY:  Okay.  So to the extent that you
17    need to disclose any attorney-client communications
18    in order to answer that question about what or what
19    you didn't review, I would advise you not to
20    answer.
21            THE WITNESS:  I personally did not review the
22    OIG report.
23    BY MR. SWAMINATHAN:
24        Q.   Okay.  Did you request a copy of the OIG
25    report so you could review it yourself to see what
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 69 of 71 PageID #:85768
The Deposition of BERNARD K. MURRAY, Volume 2, taken on February 7, 2019

266..269

Page 266

1  caused the OIG to reach those findings?
2      MS. CARNEY: Objection. Form.
3      THE WITNESS: I did not review that report. As
4  I said to you before, I was more focused on the
5  Page 51 material, the page -- the eight cases, and
6  the Polaroid photographs.
7  BY MR. SWAMINATHAN:
8      Q. Were you curious about why the OIG reached
9  those findings?
10      MS. GOLDEN: Form.
11      MS. CARNEY: Objection. Form. Calls for
12  speculation. Go ahead.
13      MS. GOLDEN: I think it's also asked and
14  answered, but --
15      THE WITNESS: Oh, I'm sorry. My -- my -- I
16  did not have any level of curiosity.
17  BY MR. SWAMINATHAN:
18      Q. Okay. And did you do any assessment to
19  understand how far back the OIG had looked at material
20  to understand how pervasive this problem was?
21      MS. CARNEY: Objection. Form. Foundation.
22  Asked and answered. And assumes -- misstates the
23  evidence. Go ahead.
24      THE WITNESS: I did not examine the report.
25  BY MR. SWAMINATHAN:

Page 267

1      Q. Okay. And to these -- going back to your --
2  we can put Tiderington's expert report to the side.
3  Going back to your report where you referenced defense
4  attorneys being aware of the manner and location of how
5  reports are created and so on, I just -- I want to ask
6  you a couple questions about the public defender's
7  policies. Did you have -- strike that. Did you ever
8  review any policies of the public defender's office with
9  regard to their process for obtaining records from the
10  police department?
11      A. Did I review policy manuals or something like
12  that?
13      Q. Any policies of the public defender's office.
14      A. I -- I did not -- well, again, do you mean,
15  like, a policy manual? What do you mean?
16      Q. Just policies. Just -- like, written
17  policies, just like the general orders or special orders
18  in a police department.
19      A. I did not look at written policies of the
20  public defender's office.
21      Q. Have you ever reviewed any written policies at
22  the public defender's office?
23      A. No.
24      Q. Do you know what the public defender's
25  office's policies were with regard to the maintenance of

Page 268

1  their homicide files or other files?
2      MS. GOLDEN: Object to form and foundation.
3      THE WITNESS: Could you ask the question
4  again, sir?
5  BY MR. SWAMINATHAN:
6      Q. Yes. Do you have any knowledge about what the
7  public defender's policies were with regard to the
8  maintenance of their -- the files from the prosecution
9  and defense?
10      MS. GOLDEN: Sorry. Form. Foundation.
11      THE WITNESS: Well, I -- I -- I know what
12  Public Defender Karen Diamond said in her Velez v.
13  Dart Motion to Quash. The --
14  BY MR. SWAMINATHAN:
15      Q. Did she provide the --
16      MS. GOLDEN: Well, excuse me. I think you
17  interrupted the witness, please.
18  BY MR. SWAMINATHAN:
19      Q. Go ahead.
20      A. She didn't believe that the files were
21  maintained in a manner that -- that they would be able
22  to be reviewed 30 years later for the benefit of civil
23  litigation. So I don't know if she's speaking to -- to
24  a policy that -- that was either had or -- or did not
25  -- did not exist, but she certainly weighs in on the --

Page 269

1  on -- on the fact that they were incomplete.
2      Q. Okay. And so did she attach to her --
3  whatever it is that you reviewed of hers a copy of any
4  police -- Cook County Public Defender's Office policy?
5      A. Did she -- she did not attach a policy
6  document to it.
7      Q. Did she cite to any policy document?
8      A. No, she did not.
9      Q. Okay. And so had -- and I think you answered
10  the question by referring to Karen Diamond, so I got
11  confused. Did you review any public defender policy
12  document about how they maintain their files?
13      MS. CARNEY: Objection. Form. Foundation.
14      THE WITNESS: I think I answered this, but I
15  did not look at public defender policies.
16  BY MR. SWAMINATHAN:
17      Q. Okay. And did you review any procedures
18  manuals for the public defender's office about how they
19  maintained their files?
20      A. Is there a difference between policy and
21  procedure?
22      Q. Yes. But you want me to ask a different
23  question or clarify?
24      A. Yeah, please.
25      Q. As opposed to written policies, did you review



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 70 of 71 PageID #:85769
The Deposition of BERNARD MURRAY, Volume 2, taken on February 07, 2023

270..273

Page 270

1  any documents setting forth the procedures for
2  implementing or following those policies of the public
3  defender's office?
4         MS. CARNEY:  Object to form.
5         THE WITNESS:  Not a -- a -- a document issued
6     by their office, but as I've spoken to already, the
7     -- the routine use of subpoenas, which were very
8     descriptive and very similar to the subpoenas the
9     prosecutor sent out.  I don't know if it was a
10    policy or a procedure in their office, but on every
11    murder case that I handled a public defender, they
12    issued those subpoenas.
13 BY MR. SWAMINATHAN:
14    Q.   And did you review any internal --
15        MS. GOLDEN:  Well, hold on, Anand.
16        MR. SWAMINATHAN:  Oh, I'm sorry.
17        MS. GOLDEN:  I'm know you're trying to wrap it
18    up, but you're starting to cut him off a little
19    more frequently.
20        THE WITNESS:  So I -- I -- I -- I don't know
21    if they had a policy circulating in the public
22    defender's office that if you're in the murder task
23    force you must issue that subpoena.  I don't know
24    if it was a policy or a procedure the -- that they
25    had there, but they did it in every case.

Page 271

1  BY MR. SWAMINATHAN:
2     Q.   Did you review any procedures manuals
3  implementing policies about how the public defender's
4  office would keep its files at the conclusion of trials?
5         MS. CARNEY:  Objection.
6         MS. GOLDEN:  Form.
7         MS. CARNEY:  Foundation.
8         THE WITNESS:  I did not review any of their
9     policy manuals.
10 BY MR. SWAMINATHAN:
11    Q.   Did you interview anyone from the public
12 defender's office about what their practices were with
13 regard to their files at the conclusion of a case?
14    A.   I did not.
15    Q.   Did you ever work in the Cook County Public
16 Defender's Office in any role?
17    A.   No.
18    Q.   Have you ever worked as a public defender or
19 criminal defense attorney?
20    A.   You already asked those questions early on.  I
21 was a prosecutor from the very beginning of my career.
22 I've only been a prosecutor.
23    Q.   Okay.
24    A.   I did not work in any public defender office.
25    Q.   And do you claim to be an expert on the Cook

Page 272

1  County Public Defender's Offices file-keeping practices?
2         MS. CARNEY:  Objection.  Form.  Foundation.
3     Argumentative.  And misstates his report and
4     testimony.
5         THE WITNESS:  I don't -- I don't claim to be
6     an expert.  I'm just quoting to you what
7     Ms. Diamond said in a Motion to Quash -- a
8     subpoena.  A -- a -- an assumption adopted in the
9     case is that the -- if the report is not found in
10    their file, it must not have been given to them.
11    She refutes that in her filing.
12 BY MR. SWAMINATHAN:
13    Q.   Do you know what Karen Diamond's role was in
14 the public defender's office?
15    A.   I believe it was a supervisory role, but I'm
16 not exactly positive.
17    Q.   Okay.  And do you know what role she had with
18 regard to the maintenance of files herself?
19    A.   I -- I only know what she filed.
20    Q.   Do you know what -- so do -- does that mean
21 you do or you don't know what she -- what her role was
22 with regard to the maintenance of files at the
23 completion of a trial?
24        MS. CARNEY:  Object to form.
25        THE WITNESS:  I -- I do not know what her role

Page 273

1  was.
2         MR. SWAMINATHAN:  Okay.  Let's take a quick
3     break.  I think I might be done, so let me just
4     quickly see if I got anything else.
5         THE WITNESS:  Okay.
6         MS. GOLDEN:  Okay.  About how many minutes,
7     how long?
8         MR. SWAMINATHAN:  Let's go over three minutes
9     as a goal.
10        MS. GOLDEN:  Yeah.  All right.  I won't leave.
11        THE REPORTER:  Okay.  Going off the record.
12 The time is 4:22.
13        (OFF THE RECORD)
14        THE REPORTER:  We're back on the record.  The
15    time is 4:26 p.m.
16        MR. SWAMINATHAN:  All right.  I have no
17 further questions.
18        MS. GOLDEN:  All right.
19        MS. CARNEY:  All right.  Any -- Jan, do you
20 have any?
21        MS. SUSLER:  I do not have any questions.
22 Thank you.
23        MS. CARNEY:  Anybody from the defense?
24        MR. SCHALKA:  Nothing from me.
25        MS. CARNEY:  No questions.  Thank you,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-8 Filed: 01/27/25 Page 71 of 71 PageID #:85770
The Deposition of BERNARD MURRAY, Volume 1/2, taken on February 07, 2023
274..276

Page 274

1  Mr. Murray.
2      THE REPORTER:  Yes.  Thank you.  Mr. Murray,
3  would you like to read or waive?
4      MS. CARNEY:  We're going to reserve.
5      THE REPORTER:  You're going to waive?
6      MS. CARNEY:  No.  We're going to read.
7      MR. SCHALKA:  Reserve.
8      THE REPORTER:  Oh, read?  Okay.  Can I send it
9  to you then, Ms. Carney?
10      MS. CARNEY:  Yes.  You can send it directly to
11  me.
12      THE REPORTER:  Perfect.  And then I'll just
13  get orders real quick before everyone signs off.
14  Mr. Swaminathan, did you -- how do you like your
15  transcript, or do you need one right now?
16      MR. SWAMINATHAN:  No.  Don't need one right
17  now.  Thank you.
18      THE REPORTER:  Okay.
19      MR. SWAMINATHAN:  I don't need video.
20      THE REPORTER:  Okay.  Ms. Susler, do you need
21  a transcript right now?
22      MS. SUSLER:  No.  Thank you very much.
23      THE REPORTER:  Okay.  Ms. Carney, do you need
24  a copy of the transcript right now?
25      MS. CARNEY:  Not right now.

Page 275

1      THE REPORTER:  Okay.  And then, Mr. Schalka,
2  do you need a copy of the --
3      MR. SCHALKA:  Yes.
4      THE REPORTER:  -- transcript?
5      MR. SCHALKA:  No, I don't.
6      THE REPORTER:  No?  Okay.  And then,
7  Ms. Golden, did you need a copy?
8      MS. GOLDEN:  No.  Thank you.
9      THE REPORTER:  Okay.  All righty.  And we're
10  off record --
11      MR. SWAMINATHAN:  Madam Court Reporter, can
12  you put your e-mail address in the -- typed in the
13  chat?  And then I'll e-mail you some exhibits.
14      THE REPORTER:  I will.  And then everyone stay
15  on.  I'm going to go off real quick.  The time is
16  4:28.
17          (DEPOSITION CONCLUDED AT 4:28 P.M.)
18
19
20
21
22
23
24
25

Page 276

1  CERTIFICATE OF DIGITAL REPORTER
2  STATE OF ILLINOIS
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded digitally by me and then reduced to typewritten
10  form under my direction, and constitutes a true record
11  of the transcript as taken, all to the best of my skills
12  and ability.  I certify that I am not a relative or
13  employee of either counsel, and that I am in no way
14  interested financially, directly or indirectly, in this
15  action.
16
17
18  
19
20
21
22  EMILIA LOPEZ,
23  DIGITAL REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 02/03/2024
25  SUBMITTED ON: 12/21/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com