# EXHIBIT 9

## CASE NO. 1:18-CV-1028

## ARTURO DeLEON-REYES V. REYNALDO GUEVARA, ET AL.

-----------------------------------------------------------------

## CASE NO. 1:18-CV-2312

## GABRIEL SOLACHE V. CITY OF CHICAGO, ET AL.

## DEPONENT:

## LT. JOSEPH BIRD

## DATE:

## DECEMBER 22, 2021

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS

3    EASTERN DIVISION

4

5 ARTURO DeLEON-REYES,

6 Plaintiff    Case No. 1:18-cv-01028

7

8 V.    Hon. Steven C. Seeger

9    District Judge

10 REYNALDO GUEVARA, et al.,

11 Defendants    Magistrate Sunil R. Harjani

12 --------------------------------------------------------

13

14 GABRIEL SOLACHE,

15 Plaintiff    Case No. 1:18-cv-2312

16

17 V.    Hon. Steven C. Seeger

18    District Judge

19 CITY OF CHICAGO, et al.,

20 Defendants    Magistrate Sunil R. Harjani

21

22

23 DEPONENT:  LT. JOSEPH BIRD

24 DATE:    DECEMBER 22, 2021

25 REPORTER:  CHLOE GILBERT

Page 2

APPEARANCES

1
2
3  ON BEHALF OF THE PLAINTIFF, ARTURO DeLEON-REYES:
4  Danielle Hamilton
5  Loevy & Loevy
6  311 North Aberdeen Street
7  Third Floor
8  Chicago, Illinois 60607
9  Telephone No.: (312) 243-5900
10  E-mail: hamilton@loevy.com
11  (Appeared via videoconference)
12
13  ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:
14  Jan Susler
15  People's Law Office
16  1180 North Milwaukee Avenue
17  Third Floor
18  Chicago, Illinois 60642
19  Telephone No.: (773) 235-0070
20  E-mail: jsusler@peopleslawoffice.com
21  (Appeared via videoconference)
22
23
24
25

Page 3

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
4  Eileen Rosen
5  Catherine Barber
6  Theresa Carney
7  Rock Fusco & Connelly, LLC
8  321 North Clark Street
9  Suite 2200
10  Chicago, Illinois 60654
11  Telephone No.: (312) 494-1000
12  E-mail:  tcarney@rfclaw.com
13  (Appeared via videoconference)
14
15  ON BEHALF OF THE DEFENDANT, DAVID NAVARRO:
16  Dan Burns
17  Reiter Burns LLP
18  311 South Wacker Drive
19  Suite 5200
20  Chicago, Illinois 60606
21  Telephone No: (312) 889-9123
22  E-mail: dburns@reiterburns.com
23  (Appeared via videoconference)
24
25

Page 4

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANTS, DICKINSON, BIEBEL,
4  HALVORSEN, MINGEY, HARVEY, STANKUS, RUTHERFORD, AND
5  TREVINO
6  Josh Engquist
7  The Sotos Law Firm, P.C.
8  141 West Jackson Boulevard
9  Suite 1240A
10  Chicago, Illinois 60604
11  Telephone No.: (630) 735-3308
12  (Appeared via videoconference)
13
14  ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
15  Megan McGrath
16  Megan K. McGrath
17  Leinenweber Baroni & Daffada, LLC
18  120 North LaSalle Street
19  Suite 2000
20  Chicago, Illinois 60091
21  Telephone No.: (866) 786-3705
22  E-mail: megan@ilesq.com
23  (Appeared via videoconference)
24
25

Page 5

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANTS, ANDREW VARGA, THOMAS
4  O'MALLEY, HEATHER BRUALDI, KARIN WHERLE DOOLEY:
5  Michael Stephenson
6  Hinshaw Law
7  151 North Franklin Street
8  Suite 2500
9  Chicago, Illinois 60606
10  Telephone No.: (312) 704-3000
11  (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 6**

INDEX

| | | Page |
|---|---|---|
| PROCEEDINGS | | 8 |
| DIRECT EXAMINATION BY MS. HAMILTON | | 10 |
| CROSS EXAMINATION BY MS. ROSEN | | 188 |

PLAINTIFF'S EXHIBITS

| Exhibit | | | Page |
|---|---|---|---|
| 1 | Amended Notice | | 13 |
| 2 | General Order - 118463-118500 | | 88 |
| 3 | General Order - 118619-118622 | | 122 |
| 4 | General Order - RFC 118623-118630 | | 127 |
| 5 | Complaint Categories - ARL 155269-155270 | | 159 |
| 6 | Pre 2000 Mainframe Complaint Register History - RCF 000789-791 | | 163 |
| 7 | Letter to Assistant Deputy Superintendent Internal Affairs Division - RCF 3926-32949 | | 168 |

DEFENDANT'S EXHIBITS

| Exhibit | | | Page |
|---|---|---|---|
| 8 | Complaint Register Investigation - 2293928 | | 187 |

**Page 7**

STIPULATION

The deposition of LT. JOSEPH BIRD was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, LOUISVILLE, KENTUCKY, 40202, via videoconference in which all participants attended remotely, on WEDNESDAY the 22ND day of DECEMBER 2021 at 11:03 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that CHLOE GILBERT, being a Notary Public and Court Reporte, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

**Page 8**

PROCEEDINGS

COURT REPORTER: Okay. We are now on the record. Will all parties, except for the witness, please state your appearance, how you are attending and your location, starting with Plaintiff's counsel?

MS. HAMILTON: This is Danielle Hamilton on behalf of the plaintiff, and I'm attending via Zoom from my home in Chicago.

MR. ENGQUIST: Josh Engquist on behalf of the individual police defendant officers with the exception of Reynaldo Guevara, attending remotely in Chicago.

MS. MCGRATH: Megan McGrath on behalf of defendant Guevara, attending remotely from Chicago.

MS. ROSEN: Eileen Rosen on behalf of defendant, City of Chicago, attending remotely from Chicago.

MS. CARNEY: Theresa Carney, also on behalf of the City of Chicago, attending remotely from Chicago.

MS. BARBER: Catherine Barber on behalf of the City, also attending remotely from Chicago.

MR. STEPHENSON: Michael Stephenson on behalf of defendants, Burwaldi, Varga, O'Malley, and

**Page 9**

Worley, attending remotely in Chicago from his house.

MR. BURNS: Dan Burns on behalf of defendant David Navarro, attending remotely from Chicago.

COURT REPORTER: Lieutenant Bird, will you please state your full name for the record?

THE WITNESS: Yes. Joseph, J-O-S-E-P-H, John Bird, B-I-R-D.

COURT REPORTER: And Lieutenant Bird, will you please hold your ID to the camera? Perfect. Thank you. Do all parties agree that the witness is in fact Joseph Bird?

MS. HAMILTON: Yes. Plaintiff agrees.

MS. MCGRATH: Agreed.

MR. STEPHENSON: Agreed.

MR. ENGQUIST: Agreed.

MR. BURNS: Agreed.

COURT REPORTER: Mr. Bird, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you. You may begin.

DIRECT EXAMINATION

Page 10

```
1   BY MS. HAMILTON:
2       Q   Good morning, Lieutenant Bird.  My name is
3   Danielle Hamilton as I mentioned before.  And first, I
4   wanted to ask you, are you currently employed with the
5   Chicago Police Department?
6       A   Yes, I am.
7       Q   And what is your title there?
8       A   I'm a lieutenant of police.
9       Q   Okay.  Are you in a particular division?
10      A   Yes, I work for the bureau -- I'm assigned
11  currently -- should I say I'm detailed to the Bureau of
12  Internal Affairs assigned to the 22nd District.  My
13  current title, position is I'm the department advocate.
14      Q   And can you explain what a department advocate
15  is?
16      A   Yes.  All closed investigations, either
17  completed by COPA or the Internal Affairs Division or
18  the office of an inspector general is sent to the
19  advocate section.  We administer the process of like
20  command channel review.  We review the investigation,
21  you know, to make sure the attachments are there before
22  we send it out for command channel review.  After that's
23  completed, we also handle separation cases.  We
24  coordinate with the department of law, with the police
25  board.  Like I file the charges at the police board
```

Page 11

```
1   against officers.  And then we just go through the
2   process until the officer actually gets suspended, or if
3   the case is not sustained, unfounded, or exonerated,
4   that case is filed properly.
5       Q   Okay.
6       A   And the main thing with the department
7   advocate is to ensure that there's fair, just,
8   consistent discipline within the department.
9       Q   Okay.  Have you ever been deposed before?
10      A   I have.
11      Q   How many occasions?
12      A   I've been the 30(b)(6) in two cases prior to
13  this, probably within the last year.  I've also
14  testified in many arbitration hearings for -- as the
15  department advocate.
16      Q   Okay.  I know you've been opposed recently,
17  but I just want to go over some ground rules to make
18  sure that we're on the same page before continuing
19  questioning.  So first I just ask that you give verbal
20  responses to my questions, so the court reporter can
21  take those answers down.  Do you understand that?
22      A   Yes.
23      Q   Okay.  And second, I'd ask that you do your
24  best to wait until I finish asking my question before
25  you begin your answer, and I'll give you the chance to
```

Page 12

```
1   finish your answer before I begin my next question.  Do
2   you understand that?
3       A   Yes.
4       Q   If you do need to take a break, just let me
5   know.  I would just ask that you answer any pending
6   questions before you take the break.  Do you understand
7   that?
8       A   Yes.
9       Q   And if at any time you don't understand one of
10  my questions or you need me to repeat it, just let, and
11  I'm happy to do that.  Do you understand that?
12      A   Yes.
13      Q   And do you understand if you answer my
14  question, that I will assume you understood it?
15      A   Yes.
16      Q   Okay.  And if at any time you remember
17  information that's responsive to one of my answers and
18  we've already moved on, please let me know and I'll give
19  you a chance to supplement your answer.  Okay?
20      A   Yes.
21      Q   If you don't do so, I'll understand the
22  answers that you've previously given were complete to
23  the best of your ability.  Do you understand that?
24      MS. ROSEN:  Objection.  Form.
25      A   Yes.
```

Page 13

```
1       Q   Okay.  So Lieutenant Bird, you understand that
2   you're going to be giving sworn testimony under oath
3   today, correct?
4       A   Yes, I do.
5       Q   Okay.  Is there any reason that you can't
6   testify truthfully and accurately today?
7       A   There's no reason I can't.  I can testify
8   accurately today.
9       Q   Great.  Sorry.  That was double negative.  Are
10  you on any medications that would impact your ability to
11  testify truthfully or accurately today?
12      A   No, I'm not.
13      Q   Okay.  Do you have any medical condition that
14  will impact your ability to testify truthfully and
15  accurately today?
16      A   I have none.  No.
17      MS. HAMILTON:  I'd like to mark the first
18  exhibit.  It'll be the amended 30(b)(6) rule
19  notice.  Is it possible for the court reporter -- I
20  have some Zoom issues with my shared screen.
21  Chloe, would you be able to pull that up?
22  (PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)
23      COURT REPORTER:  Yep.  Give me one moment.
24  BY MS. HAMILTON:
25      Q   Do you have that in front of you as well?
```

A Yes, I do.
MS. HAMILTON: Okay.
COURT REPORTER: So if you want, I can give you the ability to control the screen. If not, that's okay.
MS. HAMILTON: In the past, shared screen is like totally – my Zoom is completely shut down, so –
COURT REPORTER: That's fine.
MS. HAMILTON: I'll have you do it if that's okay. Thanks.
COURT REPORTER: Can you see that on the screen?
MS. HAMILTON: Yes. And he has it in front of him as well, so –
COURT REPORTER: Okay.
BY MS. HAMILTON:
Q We should be good. Okay. So you are here to give binding testimony as to a number of these topics in this amended rule 30(b)(6) notice, starting with topic 3. Is that your understanding?
A Yes.
Q Okay. So can you please review topic 3 and let me know when you've finished?
A I've reviewed it.

Q Okay. So topic 3 reads, "For the period from 1986 to 1998, the policies, practices, and procedures of the Chicago Police Department relating to investigations regarding misconduct, including, but not limited to the discipline of Chicago police officers who were found to have engaged in misconduct contrary to City of Chicago policies." Are you prepared to give binding testimony on behalf of the city regarding topic 3?
A Yes, I am.
Q Okay. Please review topic 4 and let me know when you finish doing that.
MS. SUSLER: Okay. Nicely done.
A Yes. I've reviewed it.
MS. HAMILTON: Okay. And just to make sure the record's clear, I'm going to read it. I know it's a long one.
MS. SUSLER: I know. It's fine. It's fine.
MS. ROSEN: Are you really going to read all four with all the subparts?
MS. HAMILTON: I'll read the paragraph. Just – I just want to make sure we're have the record clear. I'm also getting – someone's not on mute, I think. I don't know if anyone else can hear that or is it just me?
MS. CARNEY: Yeah, I think it's Jan on the

phone.
MS. HAMILTON: Oh.
COURT REPORTER: I'm sorry. Who just said that? I can't see
MS. ROSEN: Theresa Carney just said that.
COURT REPORTER: Thank you.
MS. HAMILTON: Is it possible, Jan, for you to mute yourself? I don't know if she can hear us. Chloe, can you mute Jan from your end?
COURT REPORTER: While I'm screen sharing, I'm not sure. I can try to stop screen sharing and see if I can.
MS. HAMILTON: Okay. That'd be great. I don't think she knows that she can hear us, but –
COURT REPORTER: Okay. I muted her. Let me screen again.
MS. HAMILTON: Great.
COURT REPORTER: Can you see that okay?
MS. HAMILTON: Yes.
COURT REPORTER: Okay. And if you want me to scroll up or down, just let me know.
BY MS. HAMILTON:
Q Okay. So Lieutenant Bird, topic 4 reads – and I'm not going to read the subparts, I'm just going to read the main section here. "Other than the

policies, practices, and procedures identified in response to request number three for the period from 1986 through 1998, any investigations or audits by the City of Chicago, including, but not limited to investigations by Internal Affairs, the Office of Professional Standards, the Independent Police Review Authority, or any other agency, firm, or organization retained by the City of Chicago to identify, investigate, prevent, or impose discipline related to any of the types of misconduct set forth below."
And then there are a number of categories delineated, which I won't read. "This request assumes that the city's response to request number three will include the city's policies, practices, and procedures related to civilian complaints and CR investigations. And accordingly, this requests exclude CR investigations and does not request that the city count up CR investigations related to the categories below. Instead, this request seeks to identify any other investigations or audits the city conducted related to the categories above." Are you prepared to give binding testimony on behalf of the City of Chicago regarding topic 4?
A Yes, I am.
Q Okay. Now please review topic 5 and let me know when you finished.

Page 18

1    A  I've reviewed it.
2    Q  Okay.  And topic 5 reads, "For the period from
3  1986 through 1998, all efforts by the City of Chicago to
4  identify, investigate or prevent, including through
5  investigations by Internal Affairs, the Office of
6  Professional Standards, the Independent Police Review
7  Authority, any other agency, firm or organization
8  retained by the City of Chicago or any other federal
9  state or local law enforcement agency, wrongful acts by
10  Reynaldo Guevara."  Are you prepared to give binding
11  testimony on behalf of the state of Chicago regarding
12  topic 5?
13    A  Yes, I am.
14    Q  Okay.  Please review topic 6 and let me know
15  when you've finished.
16    A  I've reviewed it.
17    Q  Okay.  Topic 6 reads, "The cities unwritten
18  and written policies" -- sorry.  My screen is --
19  "practices and customs in effect from 1986 through 1998,
20  relating to the method and manner by which supervisors
21  monitor report and or discipline subordinate Chicago
22  police officers for potential violations of departmental
23  rules or state federal laws."  Are you prepared to give
24  abiding testimony on behalf of the City of Chicago
25  regarding topic 6?

Page 19

1    A  Yes, I am.
2    Q  Okay.  And then finally, can you read topic 8
3  and let know when you've finished?
4    A  I've read it.
5    Q  Topic 8 reads, "For the period from 1986 to
6  1988, the policies, practices and procedures of the
7  Chicago police department regarding evaluations of its
8  police officers, including but not limited to any annual
9  or periodic performance review or evaluations, standards
10  were evaluating the work performed by Chicago police
11  officers, how those standards are communicated to
12  Chicago police officers, how the evaluations are used to
13  improve officer performance and/or correct efficient
14  performance."  Are you prepared to give binding
15  testimony on behalf of the City of Chicago regarding
16  topic 8?
17    A  Yes, I am.
18    Q  Okay.  And you said before, when you were a
19  30(b)(6) witness for the City of Chicago, you testified
20  as a 30(b)(6) witness in two prior occasions in the last
21  year; is that correct?
22    A  It was right about a year.  Yes, that is
23  correct.  It might have been a year and a couple months.
24    Q  Okay.  And were you testifying about the City
25  of Chicago's disciplinary policies?

Page 20

1    A  Yes.
2    Q  Okay.
3    A  In one case it was about the procedures at
4  BIA.  And in the other case, it was about the testimony
5  about rule 14.
6    Q  Okay.  What is rule 14?
7    A  Rule 14 is making a false report, whether
8  written or oral, and that's one of the rules and
9  regulations of the department in rule 14.
10    Q  Okay.  Do you remember the names of the
11  plaintiffs in those two cases in which you served as a
12  30(b)(6) witness?
13    A  I don't.  And my counsel asked me.  I don't.  I
14  apologize.  I could get that information to my counsel.
15    Q  Okay.  Thanks.  It's okay.  It's not a memory
16  test.  Did you prepare for your deposition today,
17  Lieutenant bird?
18    A  Yes, I did.
19    Q  Okay.  And what did you do to prepare?
20    A  I received -- let me go back.  So for like
21  number 3, you know, the question that you asked me
22  earlier?
23    Q  Yes.
24    A  I reviewed department directives, general
25  orders, special orders to understand the process that we

Page 21

1  had from 1986 to 1998.  The same I did for number 4.
2  Number 5, I had an opportunity to review approximately
3  16 to 18 CR files for the individual named in number
4  five.  For number 6, I also reviewed general and special
5  orders.  Number 8, again, I reviewed department
6  directives, general orders, and special orders within
7  this time period.  In addition to all these questions, I
8  had an opportunity to review deposition testimony that
9  was done by one Tina Skahill.  I'm drawing a blank on
10  the first name, but the second person was the name of
11  Doody.  The third person was Robert Klimas.  Then the
12  fourth deposition was Bruce Deen.
13    Q  And those individuals, Skahill, Doody, Klimas
14  and Dean, they had given prior 30(b)(6) testimony?
15    A  Yes.
16    Q  Okay.  And you review their depositions of
17  their 30(b)(6) testimony to prepare for today?
18    A  Yes.
19    Q  Okay.  Did you do anything else to prepare
20  other than what you testified to?
21    A  Yeah, I -- yes.  In addition to -- last night,
22  in addition to preparing for number 8, I reviewed three
23  arbitration decisions.  I had an opportunity just today
24  when I showed up, I notified my counsel.  I reviewed
25  three arbitration decisions from the time period --

Page 22

1 right around the time period of 1986 to 1998.
2 Q. Okay. Can you explain what arbitration
3 decisions are?
4 A. Yes. Officers – you know, officers will
5 grieve a contractual violation. You know, they'll
6 allege that there's a contractual violation. And
7 they'll say the department improperly enforced the
8 contract. And it could be many things. It could be
9 working secondary employment, or it could be working
10 overtime, and a less senior officer received the
11 overtime opportunity than a more senior officer. In
12 these particular cases, because your question that you
13 asked me was about evaluating police officers, the
14 performance of police officers, and then in number 6,
15 the way that we monitor and report subordinates, these
16 arbitration decisions discussed like the personal
17 concerns program from this time period, and officers
18 grieved that maybe the personal concerns program
19 violated their contractual rights. So I reviewed those
20 decisions, you know, to get a good understanding of the
21 policies from 1986 to 1998.
22 Q. Okay. And so who was making – who was giving
23 the arbitration decision? Was that the police board or
24 another entity?
25 A. It's an arbitrator. So it's generally the

Page 23

1 City and the Union will agree on arbitrators. So
2 they'll create a poll of arbitrators. And then the case
3 is randomly assigned when they go to arbitration. I
4 don't – I mean, I tendered them. I can't – I can't
5 remember. One arbitrator stuck out, George Roumell
6 (phonetic), because he's still writing arbitration
7 decisions today. So I don't remember the other two
8 arbitrators though.
9 Q. And you said you gave that to your counsel,
10 the decisions?
11 A. Just today after 9:00. I showed it up today
12 and tendered it to my client – my counsel.
13 MS. HAMILTON: Sure. And Eileen, if we could
14 just have that, if you could produce that at some
15 other point, we'd appreciate that.
16 MS. ROSEN: Sure.
17 BY MS. HAMILTON:
18 Q. Okay. Did you do anything else to prepare for
19 your deposition today, other than what you testified to?
20 A. I mean, the review of documents, I want to be
21 as thorough as possible. So I was tendered – you know,
22 as I mentioned for number 5, I was tendered CR files.
23 And Saturday while I was working, I did review, I just
24 wanted to confirm, I went into the CLEAR system, which
25 is one of our older systems that stores CR files. CLEAR

Page 24

1 came around in the early 2000s, and I wanted to see that
2 if I was missing any files that were tendered to me,
3 because it was asking for in this, including the
4 investigations, I just wanted to make sure what was
5 given to me that there wasn't an investigation that
6 might have been in the CLEAR system. However, the CLEAR
7 system only really contained three or four for this
8 individual, because the timeframe is before the CLEAR
9 system existed.
10 Q. And when you reviewed, you said for topic 5,
11 you reviewed 16 to 18 CR files for Detective Guevara; is
12 that correct?
13 A. Give or take, yes. It might have been a
14 little bit more. Yes, yes.
15 Q. Did you – you reviewed the underlying CR
16 files, not a summary or a description, but the actual
17 files?
18 A. Yes. I would say it was the summary report,
19 several attachments. I didn't line up the attachment
20 lists and confirm that I had every document, you know,
21 part of that CR file, but it was more than just the
22 summary report and most of the ones that I received. The
23 earlier ones from like the 1982 to 1984 and 1986, they
24 contained bits and pieces of the files that were given
25 to me from my counsel.

Page 25

1 Q. Okay. And what about the files from 1986 to
2 1998? Were those, to the best of your knowledge,
3 complete files?
4 A. I would – I would say a complete file is –
5 from being the department advocate, I would say a
6 complete file is you get the summary digest, you get
7 like the actual suspension notice if someone's
8 sustained, and then you get the finance description of
9 when that person was suspended. You know, finance at
10 the end of the process will say, Officer X is suspended
11 from January 1st to January 5th. To me, that is a
12 complete file. I would say, I didn't get all of the
13 documents, but I have enough information to be able, I
14 believe, to testify for you on number 5.
15 Q. Okay.
16 MS. HAMILTON: And Chloe, you can take down
17 the shared screen. Thank you.
18 Q. Good. Did you do anything else to prepare
19 today other than what you testified to?
20 A. I don't believe so. No. I mean, I think I
21 covered all of it.
22 Q. Did you meet with your counsel in preparation
23 for today's deposition?
24 A. I did.
25 Q. And how many times did you meet with your

**Page 26**

1 counsel to prepare for the deposition?
2    A  Last week, I met with one of my counsel for
3 approximately about an hour and a half. And then this
4 Monday I met with both of counsel today – on Monday for
5 about the same time, about an hour and a half.
6    Q  Did you bring any documents with you to the
7 deposition other than the arbitration decisions you
8 testified to?
9    A  No. I have a blank sheet of paper and my pen
10 just to write notes in case you need anything.
11    Q  Sure. And did you speak to any CPD employees
12 to prepare for your deposition?
13    A  No, I didn't. I – I mean, I spoke – my
14 supervisors know that I'm here today testifying, but I
15 did not get any information from anybody on the
16 department regarding this – what I'd be testifying
17 today.
18    Q  So you mentioned your position is with the
19 advocate section of the BIA. How long have you been in
20 that position?
21    A  About 16 months.
22    Q  And can you take me through your employment
23 with CPD? Well, first let me ask, when did you join the
24 Chicago Police Department?
25    A  Sure. May 5, 1997.

**Page 27**

1    Q  Okay. So between 1997 and, you know, sometime
2 in 20 – I'm really bad at math, 2020, can you take me
3 through your employment history with the Chicago Police
4 Department?
5    A  Sure. First I – yeah. Obviously, on
6 May 5th, I started to train in the academy. I was there
7 for about approximately six months. And then my
8 training cycles were in the 23rd District. After I
9 completed my probationary period, I was assigned to the
10 Eighth District. I worked in the Eighth District for
11 approximately two and a half, three years. I then bid
12 to the 22nd District. And in those assignments I worked
13 on watch. And then I worked on a tag team for a couple
14 years. Then in 2003, I went to the, it was called the
15 Internal Affairs Division at the time and I was an
16 Assistant Department Advocate. I was there for about
17 six months and then I was transferred, it was a
18 promotion, considered a promotion, to the Office of
19 Legal Affairs as a legal officer one. I stayed for
20 about two and a half years. I resigned from the
21 position, the promotion. I went back to the Ninth
22 District, transferred to the Eighth District again. And
23 then I was management transferred to the 22nd District.
24 And then I was promoted to Sergeant July 1st, 2008.
25 After pre-service training for sergeants, I was assigned

**Page 28**

1 to the Fourth District. Shortly thereafter, I became a
2 Sergeant of the Mobile Strike Force. So that was
3 November of 2008. Stated with the Mobile Strike Force
4 until January 2010. I successfully tried out and made
5 the SWAT team. I was a Sergeant of the SWAT team. In
6 2010 to 2013, I remained assigned to the SWAT team, but
7 they detailed me to the Management and Labor Affairs
8 Division. There, I handled arbitrations and contract
9 negotiations. I remained there for about 18 months.
10 Upon my request, I went back to the SWAT team. I was
11 elevated to Assistant SWAT Coordinator. Then about two
12 years after that, I was requested to go work for the
13 Office of Reform Management. The department had faced,
14 you know, some criticism. I was asked to be part of the
15 reform measures in training officers. I accepted that.
16 I was elevated to a legal officer two in the Office of
17 Legal Affairs. It was a promotion. And then I was
18 promoted to Lieutenant. And I know you're probably
19 going to ask what date I was promoted to Lieutenant, but
20 because of COVID, we started, we stopped, we were
21 promoted, we went back. It's about 16 months ago. I
22 was promoted from up to Lieutenant. I was assigned to
23 the 22nd District, but I didn't make it out of the door
24 of the graduation, and I was assigned to the Bureau of
25 Internal Affairs.

**Page 29**

1    Q  Okay. Thank you. Thank you for recounting
2 all of that. So is the Office of Legal Affairs in the
3 Bureau of Internal Affairs or is it in a separate
4 entity?
5    A  It's a separate entity. That's in the
6 superintendent's bureau or office.
7    Q  And –
8    A  When I was a legal officer One, yes, the
9 Bureau of Internal Affairs wasn't the Bureau of Internal
10 Affairs. It was Internal Affairs Division. And that
11 was also under the superintendent. So legal affairs,
12 management labor affairs, and IAD were all under the
13 superintendent. At some point in time over the last 15
14 years, IAD became its own bureau and it's the Bureau of
15 Internal Affairs.
16    Q  Okay. So in 1986 to 1998, the IAD was under
17 the superintendent; is that correct?
18    A  It was, yes.
19    Q  Okay. And then the Office of Reform
20 Management, is that under the superintendent?
21    A  It is. Yes.
22    Q  And do you know approximately –
23    A  Now it might have – they might have – you
24 know, we've had a lot of reorganization.
25    Q  Sure.

Page 30

1    A   Right now, that might be under a new bureau,
2   but when I went there, yes, it was under the office of
3   the superintendent.
4    Q   Okay.  And do you know when that office was
5   formed?
6    A   When I started there, there was only two of us
7   in there.  So I would say whatever date I gave you,
8   maybe 2017.  It was right after -- like maybe a year
9   after the DOJ report, there was also a couple reports
10  that came out, the police task force accountability
11  report.  It was a response that, you know, what was the
12  department going to do to reform, you know, our policies
13  in response to those reports.
14   Q   Have you held any positions aside from those
15  in CPD or the IAD/BIA with the City of Chicago?
16   A   No.  Every -- no.  I mentioned all of them.
17   Q   Okay.  Have you ever worked for any other
18  municipality?
19   A   Not a municipality.  No.
20   Q   Okay.  Have you ever worked for any other law
21  enforcement departments?
22   A   No.
23   Q   Okay.  So I want to draw your attention back
24  to the timeframe we're talking about, 1986 to 1998.  And
25  so what were the entities that investigated misconduct

Page 31

1   by CPD officers in that timeframe?
2    A   The Office of Professional Standards and the
3   Internal Affairs Division.
4    Q   And so that's OPS and IAD.  Were those both
5   part of the Chicago Police Department?
6    A   They were, yes.
7    Q   Okay.  And they were both -- were they both
8   under the superintendent's office?
9    A   Yes, they were.
10   Q   Okay.  And you mentioned at some point there
11  was a name change to IAD and it became the Bureau of
12  Internal Affairs.  Is that right?
13   A   That's correct.
14   Q   And do you know approximately when that name
15  change happened?
16   A   Over -- I left there in 2005.  So sometime
17  after 2005.
18   Q   And then you mentioned the Office of
19  Professional Standards, OPS.  Do you know when that
20  office was created?
21   A   I read it in a deposition.  I don't.  That
22  then subsequently became IRA, Independent Review
23  Authority, which then subsequently became COPA, which is
24  the Civilian Office of Police Accountability.  I don't
25  know when they changed though.

Page 32

1    Q   Do you know why IRA replaced OPS?
2        MS. ROSEN:  I'm going to object and say that's
3    beyond the scope of the 30(b)(6) notice.  OPS
4    became IRA long after 1998.  So if you know the
5    answer, you can tell her, if you know why IRA was
6    created, but it's beyond the scope and we're going
7    to move to strike it.
8   BY MS. HAMILTON:
9    Q   You can answer.
10   A   I would say that if I recall correctly, back
11  in those days that, you know, maybe the appearance that,
12  you know, an agency investigating police officers under
13  the superintendent maybe gave the wrong appearance.  And
14  I remember there was a lot of talk that they wanted to
15  separate it from the department, you know, at least to
16  give the parents and the thought that they're
17  independent, they make their own decisions, they
18  investigate their own cases without the influence of the
19  department.
20       MS. HAMILTON:  Okay.
21       MS. ROSEN:  I also have a retroactive
22   foundation objection, and I'll point out that since
23   it wasn't part of the 30(b)(6) notice.  He didn't
24   prepare to answer that question.
25       MS. HAMILTON:  Got you.  Just for the record,

Page 33

1   he just said he didn't know when it happened, so I
2   didn't know if we were talking about the relevant
3   time frame or not, but objection's noted.
4   BY MS. HAMILTON:
5    Q   So, besides IAD and OPS, were there any other
6   entities of the city that would investigate an
7   allegation of police misconduct as an administrative
8   matter?
9    A   Of all the reports that I see, I do not see
10  any as of administrative manner.
11   Q   Okay.  What about as any other kind of matter?
12   A   I'm sorry to interrupt you.
13   Q   That's okay.
14   A   I would say that, like our confidential
15  investigations back then, there would be joint
16  investigations with the Cook County State's Attorney in
17  case there was going to be potential charges against
18  officers.  So, even if there's federal investigations,
19  the internal affairs division obviously, Doody, who gave
20  that 30(b)(6) witness, he was detailed to the FBI task
21  force.  So they were investigating police officers for
22  misconduct corruption.  So, I would say the Cook County
23  State's Attorney's office, the federal, the FBI, and
24  potentially the U.S. Attorney's Office were involved in
25  investigations.

Page 34

1    Q   To your knowledge, was there a city inspector
2  general in 1986 to 1998 that investigated police
3  misconduct allegations?
4    A   I do not recall reading any investigations
5  that included the Inspector General's office.
6    Q   Okay.  Does the city have an Inspector
7  General's office?
8    A   They do, yes.
9    Q   Okay.
10   A   Yes.
11   Q   Do you know when that office was created?
12   A   No, I don't, but I remember one of the first
13 investigations.  I was at the Office of Management and
14 Labor Affairs, and the Inspector General's office sought
15 to interview members of the department, sergeant
16 detectives, and I recall was an arbitration that these
17 members objected to the authority that the Office of
18 Inspector General had.  It was resolved in the favor of
19 the city.  The officers had to go give their testimony
20 to the Inspector General's office.  So I don't know if
21 that was the first case, but I knew it was a first
22 issue, and I was at Management and Labor Affairs, 2012
23 and a half, 2013 to 2015.
24   Q   Okay.  So, I want to talk to you a little bit
25 about OPS and IAD and what they investigated.  What was

Page 35

1  the jurisdiction of OPS between 1986 and 1998?
2    A   Okay.  During this time period, the general
3  orders, now we truly have a jurisdiction under COPA
4  there is an actual ordinance, but back then it was the
5  general orders that controlled it.  The general orders
6  said that, I mean, as what I reviewed was OPS
7  investigated excessive force, and then there was a
8  sentence after that, other things that were deemed
9  either necessary by the superintendent.  I think if you
10 look at the cases, the past practice, I believe that at
11 OPS also had the authority to investigate domestic
12 incidents, police-involved shootings, excessive force
13 obviously, death in custody.  But I don't believe it was
14 limited to a jurisdiction, that I think it was just
15 maybe the past practice, because the only thing that I
16 came across in those general orders were excessive force
17 and anything the superintendent deemed necessary.  Then
18 anything else would go to the Bureau of Internal
19 Affairs.
20   Q   Okay.  So if a complaint of police misconduct
21 was initially lodged, what entity would it need to be
22 lodged with?
23   A   COPA was the intake.  So, COPA would receive
24 – I'm sorry, I apologize.  Back then, OPS.  OPS was the
25 intake agency.  OPS would take the complaint.  Now,

Page 36

1  there's several methods.  People back then in '86 would
2  walk into OPS, they would telephone, even if it was
3  started in a district, OPS was notified.  OPS would do
4  the intake.  OPS then would review it.  If it was under
5  their authority, they would retain it.  If they felt
6  that it was something that should go to IAD, then they
7  would transfer it to IAD.
8    Q   Okay.  What categories of allegations would be
9  transferred to IAD by OPS back in 1986 to 1998?
10   A   I would say anything other than the ones that
11 I mentioned.  Excessive force, domestic incidents, death
12 in custody.
13   Q   So is it fair to say that OPS – oh, I'm
14 sorry.  Were you finished with your answer?
15   A   I think I might have missed one, but yes, no,
16 go ahead.
17   Q   So is it fair to say that OPS acted as the
18 gatekeeper and that it would receive the complaints and
19 it would keep those that fell within OPS's limited
20 jurisdiction and then it would send the rest to IAD?
21       MS. ROSEN:  Objection to form.  You can
22       answer.
23   A   Yes, I agree.
24   Q   Okay.  So if there were an allegation that a
25 police officer had withheld exculpatory evidence in

Page 37

1  violation of Brady v. Maryland, would that matter be
2  investigated by OPS or IAD?
3       MS. ROSEN:  Objection.  Form.  You can answer.
4    A   If that alone came in, I would say that COPA
5  – gosh, I apologize, I just work with them every day.
6    Q   No problem.
7    A   OPS would transfer that to the Bureau of
8  Internal Affairs if that was how the allegation came in.
9    Q   What do you mean by "if that was how the
10 allegation came in"?
11   A   If the allegation came in that during my
12 arrest, I was beat up and something else, like the
13 officer used excessive force against me, then the more,
14 not saying more serious, but the one that stands out is
15 the excessive force, COPA is going to retain that, and
16 they would investigate it.  But the way that you
17 presented that question, say an attorney files a
18 complaint saying that this department member withheld
19 exculpatory evidence against my client, that case would
20 go to the Bureau of Internal Affairs – the Internal
21 Affairs Division.
22   Q   Okay, so if there was an allegation that an
23 officer withheld exculpatory evidence, if that was
24 solely the allegation, it would go to IAD?
25   A   Yes.

Page 38

1  Q. Okay. If there was that allegation as well as
2  an excessive force allegation, then because excessive
3  force is handled by OPS, then the whole thing would go
4  to OPS?
5  A. Yes.
6  Q. Okay. Is there any other – oh, sure. Go
7  ahead.
8  A. I just wanted to add that nothing precluded,
9  though. I'm saying my reviews, but if you read that
10 first sentence of that order, it really says anything
11 else deemed necessary by the superintendent. So the
12 superintendent could have kept the authority with OPS,
13 but what you said, yes, is correct.
14 Q. Okay. So, the superintendent could override
15 or could make the decision about matters that would stay
16 within OPS?
17 A. I believe so after reading those orders, yes.
18 Q. Okay. Is there any other investigative arm of
19 the city that would investigate a Brady violation?
20    MS. ROSEN: Objection to form. You can
21 answer.
22 A. In terms of like if that came in, no –
23 Q. Other than IAD, who you've already –
24 A. IAD would do that, yes. The IAD would handle
25 that. Now, when a case comes in the IAD, there could be

Page 39

1  three different units to investigate it. IAD, they
2  could send it out to the district, or it could be a
3  confidential investigation. A serious allegation like
4  that would most likely be sent to the confidential
5  investigation.
6  Q. Okay. If there were an allegation that a
7  police officer knowingly fabricated eyewitness
8  testimony, would that matter be investigated by OPS or
9  IAD?
10 A. I'd like to give the same answer. That alone
11 comes in, it would've probably been investigated by IAD.
12 If there was another allegation, then it could be
13 retained by OPS.
14 Q. Okay. Other than IAD, would there be any
15 other investigative arm of the city that would
16 investigate such an allegation?
17 A. No.
18 Q. In the circumstances where there's an overlap
19 between the category of what IPS would cover and the
20 category of what IAD would cover, who was responsible
21 for that investigation?
22    MS. ROSEN: Object to the form.
23 A. I think there was very limited cases where you
24 would have both organizations investigating a case. I'm
25 thinking of my reviews and history of reviewing cases.

Page 40

1  It doesn't happen often. Today it happens more, but
2  back then, very rarely. I think COPA, because they're
3  the gatekeeper, as you mentioned correctly, they were
4  the gatekeeper, that they would make the ultimate
5  determination whether or not they're going to keep it,
6  so I don't think there was many cases that would come
7  across – you would see both organizations or both units
8  investigating. It was COPA. If COPA keeps it,
9  they keep it. We wouldn't even know about the
10 investigation.
11 Q. Okay, and by COPA, you mean OPS in this?
12 A. Yes, yes, yes. Apologize.
13 Q. Okay. Back in that timeframe, could
14 investigations ever be bifurcated, where OPS would keep
15 part of it and IAD would keep part of it?
16 A. Nothing prevented it, yes.
17 Q. That could happen?
18 A. Yes.
19 Q. Are you aware of any instances where
20 investigations were bifurcated between IAD and OPS?
21 A. During my review preparing for this, no, I did
22 not come across any that I recall.
23 Q. We talked about this a little bit, but I just
24 want to be clear, from the relevant time period, what
25 were the ways a complaint could be initiated with OPS?

Page 41

1  A. I mean, someone can make the complaint
2  directly with OPS. The several that I reviewed, and
3  over my time, a lot of times it was a phone call to OPS.
4  People would go directly to OPS. I don't think anything
5  would preclude someone faxing a complaint to OPS. So
6  telephone, in person, fax would be the ones that you –
7  OPS would get.
8  Q. Could any person call OPS or fax them a
9  complaint?
10 A. Any – yes, anybody.
11 Q. Citizens as well as members of the police
12 department?
13 A. Correct. Now, they could do that. It might
14 be improper, though.
15 Q. What do you mean by that? Why would it be
16 improper?
17 A. It would be improper because if an officer
18 observes misconduct by another member, even during this
19 time period, that officer was required to notify a
20 supervisor, complete a two-form report before the end of
21 their tour of duty, and then the supervisor would've
22 initiated a CR, a complaint register. But an officer
23 could easily fax an anonymous complaint against any
24 officer, yes, but the proper method would've been to
25 notify a supervisor.

Page 42

1    Q   Then a supervisor -- was the supervisor then
2   obligated to file a complaint with OPS?
3    A   Yes, within one hour of receiving notice of
4   the misconduct.
5    Q   Okay.  Was there a mechanism to track the
6   number of complaints being initiated by fellow officers
7   reporting other officer's misconduct?
8    A   I didn't come across any of that.  I do not
9   know.  I mean, obviously, if you're saying that the
10  officer calls and makes a complaint, or that a tracking
11  mechanism, I don't -- because obviously that officer
12  would be listed as the complainant, so it's tracked in
13  the summary digest.  Whether or not someone kept a tally
14  of that, I don't know, but there is a tracking system in
15  terms of that individual would be listed as the
16  complainant in the summary digest.
17   Q   Okay.  So if I wanted to look up back in 1986
18  to 1998 how many complaints were initiated by fellow
19  officers about other officers, there would be a
20  mechanism to do that?
21      MS. ROSEN:  Objection.  Form, foundation, and
22      vague.  But if you understand what she's asking
23      you, you can answer.
24   A   I don't know.  I mean, I don't know.  I don't.
25  Obviously the officer's star number would be in there,

Page 43

1   so if you wanted to -- there's not a system like we have
2   today, I don't believe, back then.  But they wouldn't
3   list the officer's home address, when you see the
4   complainant's address.  So, if you did a query search of
5   complainants with no home address, I think you'd pull up
6   police officers.  There is not a mechanism, though.  I'm
7   just thinking you're asking me how I would probably do
8   it.  I don't believe there is a method to do that.
9   BY MS. HAMILTON:
10   Q   Okay.  Were there any policies or procedures
11  that required department members to self-report their
12  own misconduct?
13   A   Yes.  We always have a duty report.  The rules
14  and regulation -- I might get the numbers wrong, but 20,
15  21 and 22.  One is you have to report when you're under
16  investigation from another jurisdiction.  22 requires
17  the reporting of any 21, any unlawful act.  22 is when
18  you observe misconduct of another, and even the orders
19  would require that, yes.
20   Q   Was there any mechanism to track the number of
21  complaints being initiated officers reporting their own
22  misconduct?
23      MS. ROSEN:  Objection.  Form.
24   A   I don't know if you'd be able to track it, no.
25  I don't have that information.

Page 44

1    Q   Just to be clear, I'm talking about between
2   1986 and 1998.
3    A   Right.
4    Q   So there was no formal mechanism to track
5   that?
6       MS. ROSEN:  I'm going to object to the form.
7       Are you asking him whether or not you could figure
8       out how many rule 21 violations there were in the
9       time period, like some kind of report that would
10      tell us how many?
11      MS. HAMILTON:  I think the question that I
12      asked he was able to answer, so if you have an
13      objection to form, then that's an objection, but --
14      MS. ROSEN:  Okay, but I don't want you to --
15      so, when we negotiated this 30(b)(6) notice, it was
16      with the idea that we made clear that we weren't
17      going to require the witness to go tally up the
18      information.  If you are interested in how many
19      rule 21 or how many rule 22 or any types of those
20      complaints could be made, then you can ask the city
21      for that information.  But this witness isn't the
22      witness that can provide you that information.
23      MS. HAMILTON:  Okay.  I definitely understand
24      -- oh, sorry, go ahead.
25      MS. ROSEN:  Yeah, so I just want to make it --

Page 45

1   because I don't want it to come out in some odd way
2   simply because you're asking questions of a witness
3   that may not be the witness that can answer those
4   questions about what kind of reports the city can
5   generate today that would tally up the numbers that
6   you're seeking.
7       MS. HAMILTON:  Okay.  My understanding from
8       the negotiations about the scope of the 30(b)(6)
9       was that we're not going to ask this witness -- and
10      we read it in topic 3.  We're not going to ask this
11      witness to tally up any number of complaints from a
12      number of different ways.  What I'm asking, was it
13      possible to tally at all?  I'm not asking what the
14      tally is, I'm not asking this witness to give
15      statistics or numbers.  I'm asking him were there
16      procedures or mechanisms back in the relevant time
17      period to track, to tally how complaints came in,
18      and by what party.  Does that make --
19      MS. ROSEN:  Okay, so that was not my
20      understanding based on the communications, so he is
21      not prepared to answer those questions, and my own
22      personal knowledge tells me that there may be a way
23      to get at that information.  So, if that's
24      something that you're interested in, then you could
25      ask the city for that in a discovery request if

## Page 46

1  that's data you're looking for.

2     MS. HAMILTON: Okay, again, I'm not looking

3  for data. My question to this witness was, was it

4  possible to calculate data? I'm not asking him

5  what the data was. I'm asking him, was there a

6  system in place to calculate it?

7     MS. ROSEN: And I'm telling you this witness

8  did not look into that. So he is not the

9  appropriate person to answer that question based on

10  my communications with Mr. Swaminathan about the

11  scope of the 30(b)(6) notice.

12     MS. HAMILTON: Okay.

13     MS. ROSEN: Maybe there was a miscommunication

14  there, but I'm just telling you that this witness

15  is not prepared to answer that question.

16     MS. HAMILTON: Okay. I understand your

17  objection, and we'll take that up later.

18     MS. ROSEN: Yep.

19  BY MS. HAMILTON:

20    Q  So, could a citizen initiate an investigation

21  or make a complaint if they wanted to remain anonymous?

22    A  OPS would take that complaint, yes.

23    Q  Yes. Were there any restrictions back in the

24  relevant time period of investigating complaints if the

25  complainant wanted to remain anonymous?

## Page 47

1    A  One, it would deal with, yes. I mean, if it's

2  something, and anonymous complaint involving criminal

3  activity, it could be to potentially investigate it.

4  Same thing with residency and medical use. The depart

5  – the department would review that.

6    Q  Okay. If it wasn't of a criminal nature,

7  would the department investigate an anonymous complaint?

8    A  Yes. I mean, yes. We didn't have the

9  affidavit until much later. Yes.

10    Q  Okay. In the relevant timeframe, did OPS open

11  complaints when civil lawsuits were filed alleging

12  misconduct by police department officers?

13    A  Yes. Yes, if it alleged misconduct.

14    Q  Would IAD or OPS investigate those in those

15  instances?

16     MS. ROSEN: Objection. Form.

17    A  I think it would be the same if it was a

18  lawsuit, civil lawsuit filed against a police officer

19  for excessive force, OPS would review that. If it was

20  potentially maybe revolving around arrest, it could be

21  then sent to the IAD to investigate.

22    Q  Would they be prohibited from investigating

23  until the conclusion of the litigation, or could they

24  investigate while the litigation was pending?

25    A  They could do both, yes. They could do it

## Page 48

1  while it's pending.

2    Q  Okay. Are you aware of any officer that's

3  been disciplined at the conclusion of litigation in the

4  '86 to '98 timeframe?

5     MS. ROSEN: Objection. Form.

6    A  So after you're saying after the civil

7  litigation ended, an investigation was initiated, and

8  then some discipline occurred?

9    Q  Yes.

10     MS. ROSEN: I'm going to object and lodge an

11  objection that's beyond the scope of the 30(b)(6)

12  notice. If you know the answer, you can answer.

13    A  I don't have any of those. I don't recall any

14  of reading any of those. No, I do not.

15  BY MS. HAMILTON:

16    Q  Okay. Did OPS keep track of the complaints

17  that it received when it was – that it then referred

18  elsewhere?

19    A  Yes.

20    Q  Did they keep track of complaints that it

21  received even when they were referred out to other

22  entities like the SAO or the USAO or the IAD?

23    A  I mean, every complaint, they would complete

24  an intake form, a face sheet, so everyone is recorded.

25  Then yes, I would say if you went back – apologize, I

## Page 49

1  also looked at a couple annual reports. I forgot to say

2  that earlier. The annual reports I looked at. But if

3  you look at the annual reports – the annual reports, I

4  think that's what you're referring to. It would say

5  complaints invest by OPS, and then the next category

6  down below would say complaints referred to. If you

7  look at the '86, '87, '88, they changed over the time

8  the way that they were reported on the annual reports,

9  but the early ones said number of complaints take by

10  OPS, the number of cases referred out, and then the next

11  second paragraph or the BIA ones.

12    Q  Okay. Can you describe the numbering system

13  that OPS would use to keep track of incoming complaints?

14     MS. ROSEN: Objection. Form.

15    A  They would assign a log number to it, a

16  complaint register log number.

17    Q  Okay, and so all complaints that were

18  investigated by – that came in through OPS would get a

19  CR number; is that correct?

20    A  Yes.

21    Q  If those complaints were sent on to IAD, did

22  IAD have a separate numbering system?

23    A  No.

24    Q  Okay. Then in this time period after OPS

25  would give a complaint a CR number, would they also

Page 50

1  assign a code to the CR?
2    A.  Yes.  So, a category code would be assigned if
3  that's what you're referring to, and the last one I want
4  to say, there might have been some cases where it's
5  assigned to BIA.  The CR number is how you track any
6  complaint.
7    Q.  Okay.
8    A.  But now if it came over to IAD, and it was
9  assigned to the confidential section.  The confidential
10  -- I remember seeing one of these investigations that
11  had a slash like a confidential number.  But if you're
12  tracking, every single case would have a CR number.  Then
13  with this, yes, you would be assigned a category code.
14    Q.  Okay.  Then, could more than one category code
15  be assigned?
16    A.  It's usually there was one assigned.  One
17  assigned on the summary digest.
18    Q.  If there's more than one type of misconduct
19  included in the allegation, how did OPS decide what code
20  to assign?
21    A.  I believe after reading Bruce Dean's
22  deposition was just that excessive force was considered
23  a very serious matter, so generally they looked, sounded
24  as if they had a hierarchy where excessive force would
25  be a high -- that they would, if it came in that someone

Page 51

1  used excessive force on them, that would be the category
2  code, but now they would list all the allegations, and
3  these investigations could have multiple allegations
4  listed.
5    Q.  Were there any other category codes that
6  trumped the other category codes such as excessive
7  force?
8      MS. ROSEN:  Object to the form.
9    A.  I mean, I think excessive force is a very
10  serious matter.  We're violating someone's civil rights
11  by using excessive force.  But I mean, many things, but
12  I think if it involves the allegation of excessive
13  force, I think that usually would trump death in custody
14  might be another issue.  Officer-involved shooting could
15  be one.  But that would all be centered around
16  potentially excessive force.  They're all very serious
17  though, allegations.
18    Q.  Right.  So other than -- so excessive force,
19  police shootings, and death in custody.  If those
20  allegations were in a complaint, the OPS would assign
21  that category code to the whole round of group of
22  allegations; is that correct?
23    A.  Yes.
24    Q.  I want to talk about the structure of both
25  entities.  What was the staff chain of command at OPS

Page 52

1  and in the relevant timeframe?
2    A.  They had administrator or chief administrator.
3  But if you're asking for the structure, the complaint
4  would come into the intake section, the intake would
5  draw up the intake form, the face sheet would be part of
6  every investigation, a supervisor would review that to
7  confirm whether or not probably the category code and
8  what agency would ultimately handle the investigation,
9  and then that would be sent out then.  But when the case
10  completed at OPS, now I'm talking about investigations.
11  Okay, that was intake.  Now investigations --
12    Q.  Sure.  I wanted to let you finish your answer,
13  but my question was about just what are the staff
14  positions in OPS?  Could you tell me who's at the top
15  and then followed by who, or going the other -- who's
16  the most junior person and then up to the top?
17      MS. ROSEN:  Objection.  Form.
18    A.  The chief was the highest, they had
19  supervisors, and then they had investigators, probably
20  intake personnel as well.  So intake personnel to
21  investigators to supervisors to the chief.
22    Q.  Okay.  Was there also a position of
23  coordinator in OPS in this timeframe?
24    A.  I don't recall.
25    Q.  Is there a difference between a chief

Page 53

1  administrator and an administrator in OPS in this
2  timeframe?
3    A.  No.  The chief or administrator was the
4  leader, the command of that organization.
5    Q.  Okay.  Then, same regarding the staff and the
6  chain of command in IAD in this timeframe?
7    A.  Sure.
8    Q.  What was the order of staff?
9    A.  During this timeframe, it was assistant deputy
10  superintendent that led IAD.  Underneath, there were
11  then lieutenants, supervisors, which rank of sergeants.
12  They had, at the time, police agents, police officers,
13  and then civilian personnel.
14    Q.  What is a police agent?
15    A.  Police agent is an officer who is elevated to
16  a new title code.  It's very similar to when I was a
17  police officer and I became a legal officer one.  It's
18  considered a promotion, there's an increase in pay, but
19  you ultimately don't change your civil service rank.  So,
20  a police agent is still a police officer with a
21  different title code, and has different
22  responsibilities.  So a police agent was an investigator
23  at IAD.  Very similar if you think of Marine Unit
24  officers, they have a different title code.  Mounted
25  officers have a different title code.  Evidence

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 17 of 77 PageID #:85787

Page 54

1 technicians. They're all police officers. They're
2 still police officers, they picked the furloughs with
3 police officers, but it's just that they got a different
4 title code, and different rules and, I mean,
5 responsibility -- duties and responsibilities.
6    Q  What were the duties of responsibilities of
7 the police officers who were below police agents in the
8 IAD in this timeframe?
9    A  One would be system department advocates. So,
10 cases would close, they'd go to the advocate section,
11 and they would process the case. They would review,
12 make sure the attachments are there before we send it
13 out to CCR, they would facilitate the CCR. Back then it
14 was all paper copies, so they'd put the paper copies
15 together, and they would send it to the commander for
16 the commander review. They did more administrative work
17 there. Police agents could conduct investigations, and
18 even during this timeframe, you had sergeants that also
19 conducted investigations.
20    Q  Okay. When you said the department advocates
21 would do the administrative task of the CCR, what does
22 CCR stand for there?
23    A  Command channel review.
24    Q  Okay. So, you started to talk about this a
25 little bit before, but let's get into what were the

Page 55

1 steps that OPS would take once an investigation was
2 opened to investigate a complaint?
3    A  Oh, they complete an intake form. The face
4 sheet would be completed. They would talk to the
5 supervisor and the supervisor would make a determination
6 whether OPS would investigate it or would it be
7 transferred to IAD.
8    Q  And if OPS kept the complaint, what would be
9 the next step in the investigation?
10    A  They would assign it to an investigator.
11    Q  Okay. And what would be the next step after
12 assigning to an investigator?
13    A  Well, investigator would conduct an
14 investigation. They would first -- I mean, the first
15 step is to reach out to the complainant, try to make
16 contact in a very short period of time, introduce
17 yourself, explain that you're investigating the
18 misconduct of the officer, maybe schedule a time where
19 you could interview the complainant. You would attempt
20 to gather evidence. You know, they would start probably
21 right away trying to get the documentation, police
22 reports, inventories. Then they would eventually get to
23 the point where they would bring the officers, they'd
24 notify the officers of the investigation, bring the
25 officer -- serve the officers with allegations, but the

Page 56

1 officers have the opportunity if they want to request to
2 retain counsel, schedule a meeting with the officer.
3 After the interview with the -- interrogation, that's
4 what it's referred to in the contract, an interrogation
5 of the officer. Then they would weigh the evidence.
6 They would look to see the evidence and make a
7 determination whether the allegation should be sustained
8 or one of the other categories. And then they would
9 complete their investigation and send it up to the
10 supervisor for approval.
11    Q  In terms of the interrogation of the accused
12 officer, would that interrogation be a live
13 interrogation?
14    A  You could have taken two forms. Okay. So you
15 could do one, a live in-person interview of the officer
16 and back then, and even today, too, it was permissible
17 to do a -- you would send the officer questions and then
18 the officers would have to respond in a to-from subject
19 report answering the questions that the investigator
20 asked.
21    Q  Okay. So it could be a live interview and it
22 could be a to-from memorandum. Were there any other
23 ways in order to interrogate the accused in an OPS
24 investigation?
25    A  No.

Page 57

1    Q  Could the investigator take a statement of the
2 accused in lieu of interviewing them?
3    MS. ROSEN: Objection. Form. What's the
4 difference?
5    A  That was going to be my question. That's what
6 I was referring to. The statement is the interview, I
7 thought. I would say both are statements, you know,
8 like the interview would be the officer's statement,
9 verbal statement, but we would take -- if the officer
10 did a to-from subject report, that's an official
11 document report in the Chicago Police Department. And
12 if there was any misleading or false information in
13 those reports, the officer could be subject to an
14 additional allegation of providing a false report. So I
15 would consider both of those statements.
16    Q  Okay. So a to-from memorandum has questions
17 and answers on it; is that correct?
18    A  Just questions. The officer responds with the
19 answers.
20    Q  Okay. Could an investigator take a statement
21 from the accused that didn't have any questions, was
22 just a statement from the accused about their responding
23 to the allegations?
24    MS. ROSEN: Objection. Form.
25    A  Yeah. I'm not sure. I'm not sure like the

Page 58

1  question – sorry.
2      MS. ROSEN: If you don't understand the
3   question –
4      A  I don't understand the question. The officer
5   would have to be served with allegations to provide a
6   response.
7      Q  Sure. So the only written response that an
8   officer would give would be a to-from memorandum; is
9   that correct?
10     A  A written response, yes.
11     Q  So there's only to-from memorandums or live
12  interviews?
13     A  Yes.
14     Q  Okay. Was there any type of allegation of
15  misconduct that required a verbal in-person interview
16  during this time period?
17     A  I would say most – many were verbal. I would
18  say the more serious ones, absolutely. Excessive force,
19  I mean, from my review, from my experience in the
20  department, the CRs that were sent out to the district,
21  so this is not OPS. This is investigations that were
22  ultimately sent to IAD. IAD then sent to the district.
23  Those were handled with to-from responses, but most of
24  – the more serious allegations would be brought in with
25  – would've in-person verbal interview. I don't recall

Page 59

1   remind – I don't recall reading if there's a list of,
2   yes, these are absolutes.
3      Q  Okay. In this timeframe, were there any
4   investigations that didn't require either an interview
5   or a to-from memorandum by the accused officer?
6      A  I don't believe so, unless the allegation on
7   itself is – if COPA took an allegation that police
8   officers X did this, but when it was COPA investigated
9   it, they determined it was the FBI. Their initial step,
10  there would be no interviews of police officers. There'd
11  be no response to police officers. So I think that if
12  the determination was Chicago police officers weren't
13  involved in this incident, then there would be no
14  interviews.
15     Q  Okay. But if it was determined that Chicago
16  police officers were of the incident, then the accused
17  would either have to give an interview or submit a
18  to-from memorandum; is that correct?
19     A  That is correct.
20     Q  And in this timeframe, was there an affidavit
21  requirement mandating that OPS get an affidavit from a
22  complainant before it could pursue an investigation?
23     A  There was not.
24     Q  What about IAD? Was there an affidavit
25  requirement there?

Page 60

1      A  There was not.
2      MS. HAMILTON: Okay. Can we take a short
3   break?
4      MS. ROSEN: Sure.
5      MS. HAMILTON: Let's do ten minutes. So come
6   back at 11:27.
7      COURT REPORTER: We are going off the record.
8      (OFF THE RECORD)
9      COURT REPORTER: We are back on record at
10  11:29.
11  BY MS. HAMILTON:
12     Q  Okay. Lieutenant Bird, we were talking about
13  steps in an OPS investigation. So can you go through
14  again, what the steps are for an OPS investigation?
15     A  Sure. I –
16     MS. ROSEN: Objection. Form. You can answer.
17     A  They – obviously it would be the intake, the
18  gatekeeper, the complaint, they take the complaint. They
19  determine that they're going to keep it. Then it's
20  assigned to an investigator. Investigator conducts that
21  investigation, the many steps of an investigation, you
22  know, reach out to the complainant, obtaining evidence.
23  If there's evidence out there, then serving the
24  officers, they serve the officers with allegations, then
25  review the evidence, make a determination of the

Page 61

1   investigative findings. And if they make a
2   determination that is sustained, the next step would be
3   what is a fair and equitable penalty, discipline.
4      Q  Are there any other steps that an OPS
5   investigator would take when investigating a complaint
6   of misconduct in this time period, other than what you
7   testified to?
8      MS. ROSEN: Objection. Form.
9      A  I don't believe so. I can't think of any
10  right now.
11     Q  And so what were the possible outcomes of OPS
12  investigation back in this time period?
13     A  It could be classified as sustained, which is
14  that the evidence that has been obtained and reviewed by
15  the investigator, it is determined that it was more
16  likely than not that the events occurred. The officer
17  committed the misconduct. It could be not sustained and
18  not sustained, would simply be that the evidence didn't
19  prove or disprove the allegations. It could be
20  exonerated, which the events occurred, but the officers
21  were lawful in their actions, lawful and proper. The
22  last one could be unfounded, simply the events did not
23  occur.
24     Q  Okay. And then once OPS reached one of the
25  four outcomes that you just identified and selected one

Page 62

1  of them, what was the next step in the OPS investigation
2  process?
3      A  Well, the investigator would review it and –
4  there was a little bit different process.  Obviously the
5  invest – the supervisor would review it.  If it's
6  number one, the sustained one that I discussed, they
7  would have to come up with a penalty and then it would
8  be reviewed by their administrator.
9      Q  Okay.  Is there any other process that happens
10  in between if – strike all that.  If OPS determined
11  that the allegations were sustained, is there anything
12  else that would happen in between them making their
13  finding and recommending a penalty?
14      A  Well, they got to recommend a penalty.  So in
15  order to recommend a penalty, they would request the
16  disciplinary sustained history from the IAD, and then
17  they would request the complimentary history of the
18  accused officer from the personnel division.  And those
19  would be taken into account when you're determining the
20  appropriate penalty.
21      Q  Okay.  And so what is listed on an officer's
22  disciplinary history?
23          MS. ROSEN:  Objection.  Form.
24      A  Well, the sustained – in this case, what OPS
25  investigators would look for would be sustained history.

Page 63

1  They would receive the sustained history in the last
2  five years.
3      Q  Okay.  Would they receive any sustained
4  history beyond five years?
5      A  They shouldn't, according to the contracts.
6  They may have in some incidents, there has been
7  mentioned, like in those arbitration decisions that some
8  stale – the arbitrator referred to it as stale history,
9  which would be outside the five year period remained on
10  the five year period.  So I would say that they
11  shouldn't, it should be five years, and that's it.
12      Q  And when you say that – when you – you just
13  referenced a contract, what contract were you referring
14  to?
15      A  The Fraternal Order of Police and the City of
16  Chicago.
17      Q  Okay.  So the FOP contract had restrictions
18  regarding how many years of sustained history would
19  appear on an officer's disciplinary history?
20      A  Yes.
21      Q  And what was the length of time that would
22  stay on the sustained history pursuant to the FPO
23  contract?
24      A  Five years.
25          MS. ROSEN:  In the relevant timeframe you're

Page 64

1  talking about, right?
2          MS. HAMILTON:  Yes.  All my questions are in
3      the relevant timeframe unless otherwise specified.
4      A  Five years.
5  BY MS. HAMILTON:
6      Q  And so what is the complimentary history?
7      A  It has the number of awards that the police
8  officer has received, so honorable mentions would be
9  listed, department accommodations, whether or not the
10  officer received officer of the month.  There's also
11  like department wide accommodations, such as like the
12  president, if it was an election year, sometimes it's a
13  presidential award of excellence.  So anything positive
14  that the police officer received.  Complimentary letters
15  are also listed.  Members of the community will write
16  letters, praising officers.  And that is also included
17  in the complimentary history.
18      Q  Okay.  So once the complimentary history and
19  disciplinary history is obtained for sustained findings,
20  what's the next step in the investigator's process?
21      A  Determine the penalty.
22      Q  And what are the possible penalties that an
23  OPS investigator could determine?
24      A  I mean, it could be reprimand to, all the way
25  up to discharge from the police department.

Page 65

1      Q  And when you – we'll strike all that.  So
2  when they – the OPS investigator recommends a penalty,
3  what's the next step in the investigatory process for
4  OPS?
5      A  It would be reviewed by the supervisor.
6      Q  And then what would be the – how does the
7  supervisor conduct a review of the investigator's
8  initial findings?
9          MS. ROSEN:  Objection.  Form.
10      A  He would review the summary digest, the file,
11  the CR.
12      Q  Okay.  And then were there any other levels of
13  review after that?
14      A  It would go to the chief administrator.
15      Q  And then how does the chief administrator
16  conduct a review of the sustained finding by an OPS
17  investigator?
18      A  In the orders talked about very similar, you
19  would, when you review it, you would review it for the
20  timeliness of the investigation, adequacy of the
21  investigation, and number two, the sound soundness of
22  the investigation.  Was it sound?  Did whatever
23  determination the investigator came up with, was it
24  supported by evidence and if it was sustained, is the
25  penalty a fair and just penalty?  Penalty being fair and

Page 66

1 just would be something that we want to make sure the
2 officer realizes what they did was incorrect. They feel
3 sting and we hopefully deter them from doing it again.
4 Corrective action.
5    Q   So the supervisor who's reviewing the
6 investigators investigation, could the supervisor
7 disagree with the sustained finding and override it?
8    A   I mean, in reading through Stein's deposition,
9 yes. There was disagreements at times. And then they
10 would consult one another about the penalty. It seemed
11 like they would come to an agreement on that. Agree on
12 that in terms of -- it seemed like by reading that, yes.
13 In terms of they come to an agreement more so than if it
14 went to the chief administrator. The chief
15 administrator's decision was the ultimate decision, but
16 seemed like the investigator and the supervisor really
17 tried to hammer out the appropriate penalty based on
18 their investigation.
19    Q   Okay. But the supervisor had overriding
20 authority over the investigator?
21    A   Yes.
22    Q   Okay. And then the chief administrator had
23 overriding authority over both the supervisor and the
24 investigator?
25    A   Yes.

Page 67

1    Q   Okay. So for findings that were not
2 sustained, unfounded or exonerated, would those findings
3 also trigger these same levels of review?
4    A   Yes.
5    Q   Okay. And could the supervisor and the chief
6 administrator override the findings if they were not
7 sustained, unfounded or exonerated?
8    A   Yes.
9    Q   It was still the chief administrator who had
10 the ultimate authority to override the finding; is that
11 correct?
12    A   That is correct.
13    Q   So you said that OPS recommended a discipline
14 -- or recommended a penalty. Is that right?
15    A   Yes.
16    Q   Did OPS actually impose that penalty?
17    A   No.
18    Q   Okay. So OPS would make a -- recommend a
19 penalty to the superintendent?
20    A   Yes, it would. Yes.
21    Q   And could the superintendent decline to follow
22 that recommendation?
23    A   Yes, he could.
24    Q   Were there any procedural limitations on the
25 superintendent's decision to decline to follow OPS's

Page 68

1 disciplinary recommendation?
2    A   No.
3    Q   Were there any procedural limitations on the
4 superintendent's decision to decline to accept OPS's
5 sustained finding?
6    A   No.
7    Q   Okay. So if an investigator, supervisor and
8 the chief administrator all recommend a sustained
9 finding and discipline, but the superintendent says no,
10 would the complaint end up in the officer's disciplinary
11 history?
12    MS. ROSEN: Objection. Form.
13    A   It would not end up in the sustained history,
14 no.
15    Q   So is there a difference to you between a
16 disciplinary history and a sustained history?
17    MS. ROSEN: Objection. Form.
18    A   There is a history like of -- there was a list
19 of -- that I saw, like the history of discipline, the
20 number of like CRs that an individual has, an officer
21 has, I should say, sorry. But now when OPS is making a
22 request, I want to see their -- or even an IAD
23 investigator, I want to see their discipline history
24 while they're assessing concluding of a investigation,
25 then they would not receive that. They would receive

Page 69

1 the sustained history.
2    Q   Okay. So if OPS makes a sustained finding,
3 they would then receive an officer sustained history.
4    A   Yes.
5    Q   Okay. They would not receive the officer's
6 full disciplinary history that listed all CRs,
7 regardless of the finding.
8    A   No.
9    Q   Okay. So you mentioned earlier there was a
10 command channel review process. Can you take me through
11 the steps of command channel review?
12    A   Yes. So the closed case from OPS, and if you
13 want me to add BIA, it's a closed investigation. So
14 closed investigations from IAD, closed investigations
15 from OPS go to the advocate section. You know, I
16 couldn't find in the orders, the number of reviews, but
17 by looking at several of those CRs, it seemed like it
18 was -- so the advocate section gets it. And there's say
19 a sustained finding, not sustained finding on an
20 officer. And they would send that out, the paper copy,
21 to the officer's commanding officer. So, whoever's a
22 commanding officer's exempt rank would review the case.
23 Then that case would come back to the advocate section.
24 The advocate section then would send it to the deputy
25 chief. The deputy chief would review the case. When I

Page 70

1  was reviewing the CRs for today, some CRs had a four-
2  level review.  I actually noticed a five-level review.
3  That was five different command staffs reviewing the
4  case.  So it would go commander, deputy chief, chief
5  first deputy, superintendent.
6      Q    Okay.
7      A    They would review – same thing.  They review
8  it for the timeliness of the investigation.  They would
9  look at it, see if the evidence met the threshold and
10  then they would look at it like the penalty, whether or
11  not they know the officer, whether or not the penalty,
12  if sustained is an adequate penalty to correct behavior.
13      Q    You said for closed investigations, this
14  command channel review would occur, correct?
15      A    Yes.
16      Q    Well, what do you mean by closed
17  investigations?
18      A    Well, it's once the investigation was closed
19  by these – or we – command channel review does not
20  review open investigations.  So COPA has completed their
21  investigation.  IAD has completed their investigation.
22  They have made a recommendation and that's what I meant
23  by closed.  Then it goes out for command channel review.
24      Q    Do all OPS or IAD investigations, once they're
25  closed, then go on to command channel review?

Page 71

1      A    I believe so.  I know the answer today.  I'm
2  pretty sure that has not changed.  So it would go out,
3  not sustained, unfounded and exonerated would get, I
4  believe, a two level review back then.  Sustain one
5  would go up to chain.  Yeah.  So both would go out.
6  Yeah.  All of them would go out.
7      Q    Okay.  So, sustained could get a four or five
8  level review?
9      A    Yes.
10      Q    But any other finding would get a two level
11  review; is that correct?
12      A    That's my understanding.  It's definitely the
13  policy today.  I believe it was still the policy back
14  then.
15      Q    And so what are the possible outcomes of the
16  command channel review?
17      A    They could concur, not concur with the
18  investigation, just saying that the evidence either
19  supports or does not prove – or prove or disprove the
20  allegation.  So they could concur saying, yes, it should
21  be a sustained finding.  And then they could say that
22  the penalty is excessive or not enough.  And then they
23  could write on the command channel review form why they
24  do not concur with it and then what do they believe is
25  an alternative penalty.

Page 72

1      Q    Could they also send the file back for
2  additional investigation?
3      A    Yes.
4      Q    And they would be sending it back for the
5  investigating entity, either OPS or IAD, to do further
6  investigation; is that correct?
7      A    Yes.
8      Q    Okay.  So for two level reviews, what would
9  happen if both levels of those reviewers issued
10  non-concurrences?
11      A    In terms of what type of case?  Sustained, not
12  sustained?  Because if it's a not sustained, unfounded
13  exonerated, and they write non-concurrences saying it
14  should be sustained, then it – well, we would have to
15  serve the officer with a sustained finding.  Now we have
16  to serve the officer – we could – it would go to the
17  superintendent.  Superintendent would determine, yes,
18  command channel review is correct, that they believe it
19  should be sustained.  COPA said it should be not
20  sustained.  I'm changing the finding.  Now we have to
21  send it to the officer to accept or reject the penalty.
22      Q    Okay.  What if it was a sustained finding and
23  there are two levels of command channel review, and both
24  of those reviewers issued non-concurrences.  What would
25  happen next?

Page 73

1          MS. ROSEN:  Objection.  Form.
2      A    Sorry, Marty just mentioned, too.  It's
3  sustained?
4      Q    Yes.
5      A    And they not sustained them, right?
6      Q    Right.  They say – there's two levels of
7  review and they both say non – we do not concur.  What
8  happens next?
9          MS. ROSEN:  Objection.  Form.
10      A    It's just simply a – their review is advisory
11  in nature.  So it still goes to the superintendent.  So
12  if COPA says sustain, they say not sustain, it
13  ultimately goes to the superintendent.  The
14  superintendent does not have to go with command channel
15  review.  Superintendent could side with the
16  administrator of COPA.  And then that penalty would –
17  that case would be sustained.  And then we would send it
18  out the process of serving the officers with the
19  sustained finding.
20          MS. ROSEN:  OPS.
21      A    Yeah.  OPS, sorry.
22      Q    So did the superintendent have to approve all
23  categories of discipline?
24          MS. ROSEN:  Objection.  Form.
25      A    I would say that superintendent has to approve

Page 74

1   – when you're reviewing it for CCR, you're reviewing
2   each allegation to ensure that each allegation was
3   either proved or disproved.  So yeah, it's not
4   necessarily like the category, because there would only
5   be one category code on the investigation, but all
6   allegations are reviewed by command channel review and
7   the superintendent.
8       Q    And then does the superintendent have to
9   approve every recommended penalty?
10      A    No, they could – allegation two, they could
11  say COPA sustained it.  Based on the superintendent's
12  review, he believes that it should be not sustained,
13  unfounded or exonerated.  And he could change that.  So,
14  some of the allegations could be – there could be a
15  non-concurrence for that.  And even command channel
16  review could do the same thing.
17      Q    Okay.  If the superintendent agreed with
18  recommending a penalty, does the superintendent then
19  have to approve what penalty is imposed?
20      A    No.  No.  The superintendent could change that
21  too, after reviewing the case.
22      Q    Okay.  So if a superintendent agreed with a
23  recommended penalty and agreed that a reprimand should
24  be imposed – well, does the superintendent have to
25  agree with every like form – every level of discipline

Page 75

1   from reprimands all the way to separation?
2       A    No, that –
3           MS. ROSEN:  Objection.  Form.
4       A    The superintendent doesn't have to agree with
5   any of it – the penalties.  If COPA says, let's say –
6           MS. ROSEN:  OPS.
7       A    Oh yeah, I'm sorry.  God.  OPS says reprimand.
8   Superintendent could say I disagree with that in
9   investigation A.  Investigation B, OPS says separation.
10  Superintendent does not have to agree with separation.
11  He cannot concur with that.
12      Q    But the superintendent would be reviewing
13  every level of recommended penalty from reprimand all
14  the way up to separation.
15      A    Yes.
16      Q    Okay.  So it wasn't the case of superintendent
17  would only review, you know, more serious levels of
18  discipline such as separation.  They would review all
19  the way down to a reprimand.
20      A    Yes.
21      Q    Okay.  So I want to discuss the IAD
22  investigation process, now.  We've been talking about
23  OPS.  What's the first step of an IAD investigation?
24      A    It would go to the intake section of IAD, even
25  though it's – they're not intaking the complaint from

Page 76

1   the citizen, but it would go to the intake – the ADS
2   administration people.  They would determine like, would
3   it go to like IAD general investigations?  Would it be
4   something that could potentially be handled in the
5   district or the unit of assignment or B, is it a – or
6   C, is it a confidential investigation?
7       Q    Okay.  What kinds of allegations would be put
8   in that first category of just staying within IAD?
9       A    A little bit more involved cases.  It could be
10  – an example, if officers from let's say, an
11  investigation involved officers from a citywide unit and
12  officers from the district of occurring.  So, you know,
13  officers from a citywide and officers from the district
14  occurred, I mean, responded to a call and then there's a
15  subsequent CR about, you know, their response.  That
16  would stay with BIA because it involves like two
17  different units.  And just the opposite, take out one
18  unit if it was just the unit that responded, and there
19  was nothing more to that, that would be sent to that
20  unit.  So, that would be one example.  Usually more
21  complex cases.  Maybe if the witnesses live on the other
22  side of the city or out in the suburbs and someone's
23  going to have to go out and interview them or bring them
24  in, that would be something that IAD would put in the
25  first category and they would retain that.

Page 77

1       Q    Okay.  And for the second category, which
2   types of allegations would be sent to a unit to
3   investigate?
4       A    You know, the types that are – like generally
5   that occurred in that district of occurrence, you know,
6   it just – well, one, I think it's a convenience factor
7   for the complainant.  They just have to go to that
8   district.  They do the interview.  If they want the
9   Sergeant or investigator just goes to their house.  It
10  only involves people from that district or unit.  There's
11  no other issues that would be complex during the
12  investigation.
13      Q    And what about for confidential
14  investigations?  What types of allegations would be sent
15  to the confidential unit?
16      A    Ones that you don't want the officers know –
17  one, you know, you want to keep it confidential.  You
18  don't want the officers knowing that they're potentially
19  being investigated for misconduct.  Two, they generally
20  had a liaison with the Federal Bureau of Investigation.
21  So if it was something potentially with corruption that
22  could lead to arrest, maybe something you want to get
23  involved the Cook County State's Attorney's office with.
24  Those would be ones that the confidential section would
25  have.  They would also have residency.  If there was an

Page 78

1 allegation that someone didn't live in the city,
2 someone's violating the medical role policies, and that
3 they needed to a confidential investigation, you know,
4 do stakeouts on police officers. Those would be the
5 confidential investigations.
6    Q   Okay. What's a medical role violation?
7    A   The department has always had a very strict
8 medical role policy, even in this timeframe. If you
9 went on the medical role, unless you're going to a
10 doctor's office, a place to get medication, or food, you
11 are not permitted to leave your residence. There could
12 be a medical check on you from a supervisor in that --
13 the district where you live. Then they're a little --
14 that would just be a simple, "Hey, send us, you know" --
15 "Joe Bird called in sick today." My unit has to put me
16 on the medical role and they say, "We want a medical
17 check." They would notify the district that I live in,
18 and they would send a supervisor to my house to see if I
19 was home. If I was not home, then they -- there would
20 be a report, they would initiate a CR, or it could be a
21 potential SPAR. More complex ones is that if a medical
22 role -- someone's on the medical role, and now they went
23 to the medical section, the medical section, they're
24 having surgery or they hurt themselves, and they're
25 going to be on the medical for an extended period of

Page 79

1 time, then they can leave their houses, but you cannot
2 work secondary employment. So there might have been an
3 anonymous complaint that the officer is -- actually, I
4 think one of those arbitration decisions or something
5 was they were selling real estate while they're on the
6 medical role. Confidential investigations conducted an
7 investigation, determined whether or not they are
8 working secondary employment while in the medical, which
9 is prohibited.
10    Q   Okay. So after of the IAD gets the case and
11 decides which of these three areas it's going to be sent
12 to, what's the next step in the IAD investigation
13 process?
14    A   Very similar to OPS, conduct the
15 investigation, reach out to the complainant, schedule a
16 time when you could interview the complainant, and at
17 the same time, you're trying to obtain evidence. You
18 know, '86 to '97, there wasn't as, you know, many
19 videos, third party videos, but there still could have
20 been cameras at places of business. So the investigator
21 would go out, try to obtain evidence, secure any video,
22 interview witnesses, canvas the area of the alleged
23 occurrence, and then they would interview the
24 complainant. And then after they would review it, they
25 would then -- very similar, if there is -- notify the

Page 80

1 officer of their allegations and charges, serve the
2 officers with the allegations, give the officers the
3 opportunity to secure counsel, and then interview the
4 officers.
5    Q   And could the interview of the officer be the
6 same as we discussed with OPS, where it could be a
7 to-from memorandum?
8    A   Yes.
9    Q   And then what would be the next step after the
10 IAD investigator concluded their investigation?
11    A   Sent to, I believe the commanding officer of
12 that section, they confirmed that the investigation was
13 completed, and then it's forwarded to -- back to the
14 internal affairs division.
15    Q   And in terms of the findings that an
16 investigator could make at IAD, were those the same as
17 the OPS categories of unfounded, exonerated, sustained,
18 and not sustained?
19    A   Yes.
20    Q   Okay. And then when they send -- if an IAD
21 investigator made a sustained finding, would IAD have to
22 pull the complimentary history and sustained history?
23    A   Yes.
24    Q   Okay. Would they pull the complimentary
25 history and sustained history for any other findings

Page 81

1 other than sustained?
2    A   No.
3    Q   And then what would be the next step after
4 making a finding and pulling the histories, you know,
5 depending on what the finding was?
6    A   It really -- very similar process. It would
7 go -- if it's a police station investigation, it would
8 go into the supervisor, they would confer on the
9 investigation, then it would go to the ADS of internal
10 affairs for approval.
11    Q   And could the ADS override the finding of the
12 investigator and the supervisor?
13    A   Yes.
14    Q   And then was there -- there's -- was there any
15 other review after the ADS reviewed an investigator's
16 finding?
17    A   It goes out to command channel review. Same
18 process.
19    Q   And then, ultimately, it is reviewed by the
20 superintendent; is that correct?
21    A   That is correct.
22    Q   Okay. And if a case was sustained, could an
23 officer appeal that finding to a complaint review panel?
24    A   Yes.
25    Q   Okay. Can you explain what the complaint

Page 82

1 review panel is?
2      A.  Yes.  So the officer – the complaint review
3 panel was dependent on the officer's rank.  It was a
4 hearing.  So the officer would request a complaint
5 review panel, and if it's a police officer, detective,
6 or rank of that, it would be some of their same rank.  It
7 would be a sergeant and a lieutenant.  None of the
8 members could be from their unit.  And then there would
9 be assistant department advocate.  Although the
10 timeframe is before I arrived at IAD, I actually handled
11 a couple complaint review panels.  I think it was a very
12 similar process.  I would go inside, the assistant
13 advocate would go inside, they would present the
14 department's case to the three people on the panel, then
15 the officer would be able to offer maybe an explanation
16 of why it occurred, what happened, and they could be –
17 bring a representative.  It was generally – I can't
18 believe it changed, it was usually a representative from
19 the collective bargaining agreement.  It's not
20 restricted to that.  They get to bring someone, it could
21 be another officer if they wanted to.  Then they would
22 present maybe mitigating circumstances.  The complaint
23 review panel then would make a determination.  Once
24 again, that's only advisory.  And then it would be sent
25 to the superintendent for his review.

Page 83

1      Q.  And in terms of the three individuals who made
2 up the complaint review panel, who were those
3 individuals?
4      A.  We would just send out notifications from the
5 different districts.  If we had an officer from 8, we
6 knew we couldn't ask to get three people from 8.  So we
7 would send out a notification to like 14, "We need a
8 lieutenant complaint review panel on this date," the
9 unit would be notified, and then they would come down.  A
10 sergeant, the same way.  We handled it for, the same for
11 the sergeant and the PO.  We would just ensure that the
12 panel was not from the same unit that the officer was
13 from.
14      Q.  And in terms of the outcomes of the complaint
15 review panel, what were the possible outcomes?
16      A.  They could concur, not concur, and they would
17 recommend an alternative penalty or finding.
18      Q.  Could they recommend a – could they impose a
19 higher level of discipline?
20          MS. ROSEN:  Objection.  Form.
21      A.  I do not believe so.  I don't recall reading
22 it, but I – from my experience, I do not believe that.
23      Q.  They could only reduce the findings or
24 disciplines; is that correct?
25      A.  Well, not just reduce it.  They could also

Page 84

1 concur with it, what the recommended penalty is.
2      Q.  Okay, so they could concur or they could
3 reduce, but they couldn't increase the level of penalty.
4      A.  I'm almost positive that is correct.  Yes.
5      Q.  And then, is there any other review of a
6 finding by OPS or IAD after the complaint review panel?
7      A.  Then it would go to the superintendent.
8      Q.  Okay.  Is there any review after the
9 superintendent?
10      A.  Yes.  Ultimately 30 or more could go to the
11 police board –
12      Q.  When you say 30 or more, what do you mean?
13      A.  30 days or more suspension.
14      Q.  Okay.
15      A.  And then also, an arbitrator could review
16 discipline.
17      Q.  And was the arbitration process in place in
18 the relevant timeframe?
19      A.  Yes.
20      Q.  Okay.  And can you explain to me the steps of
21 the arbitration process?
22      A.  After just reading them through last night,
23 yes.  That – the officer would say, according to my
24 contract, okay, we say – superintendent says,
25 "Discipline this officer X amount of days."  Officer

Page 85

1 files a grievance and says that, "You're violating
2 section 8.1 of the contract just cause, that you did not
3 – I'm being suspended without pay, without cause."  Then
4 the arbitrator would hear that case.  The arbitrator,
5 you know – the city would be represented by department
6 of law.  The grieve officer would be represented by
7 their – or, I mean, the accused officer, the grievant,
8 would be represented by their collective bargaining
9 agreement attorney.  They would put on the case, and it
10 could be that the penalty is excessive. And the
11 arbitrator cannot increase the penalty – cannot
12 increase.  Could maintain it, concur with it, or
13 decrease it.  And then that is the final, that's the
14 final disposition of the case.  Then we would serve the
15 officer with the suspension.
16      Q.  Could the officer request – in lieu of
17 arbitration, could the officer request a review by the
18 police board?
19      A.  Yes.
20      Q.  Okay.  And what was the process for an accused
21 officer to get reviewed by the police board?
22      A.  It would go to the police board for review,
23 same, very similar.  It'd be a binding decision by the
24 police board.  Now I'm almost positive, based on my
25 experiences, the police board can increase the penalty.

Page 86

1   Q.  Okay.  So the police board, is it a hearing
2   that the police board conducts when an officer requests
3   a review?
4   A.  Yes.
5   Q.  And is the accused officer represented by an
6   attorney?
7   A.  Yes.
8   Q.  Okay.  Is there anyone on the other side in
9   that process?
10  A.  It's so infrequent, I don't -- I mean, even
11  back then, I would -- I mean, from what I was reading --
12  in my history of legal affairs and BIA, it might have
13  occurred one time.  I'm not talking about separation
14  case.  I'm talking about an officer electing to take a
15  non-separation case to the police board, and it does not
16  happen often.  I think it's because the police board
17  could ultimately potentially raise that penalty, and
18  they did it in one case.  So I forgot what you're
19  asking, but that's the -- yes, the city's represented by
20  attorneys, department of law.  The officer is
21  represented by his attorneys from its collective
22  bargaining agreement.
23  Q.  Okay.  And then the police board's
24  determination, was that final?
25  A.  Yes.

Page 87

1   Q.  Okay.  Could that --
2   A.  It's final in terms of the department.  Officer
3   could always then proceed to, you know, district court,
4   and try to, you know, overturn the judgment of the
5   police board.
6       MS. HAMILTON:  Okay.  I wanted to show you an
7   exhibit.  Chloe, is it possible to put on the
8   screen RFC 118463 through 118500?  If you can
9   just --
10      MR. BURNS:  Can you tell us what that is just
11  so we can -- we've printed them, so --
12      MS. HAMILTON:  Oh, sure.  That's general order
13  82-14, Complaint and Disciplinary Procedures.
14      MR. BURNS:  Thank you.
15      MS. HAMILTON:  Let me know if you need that
16  number again, Chloe.  It's -- I didn't get a chance
17  to mark them.  So it, it starts with RFC 118463.
18  It's blue.
19      COURT REPORTER:  To 118500, or 118630?  I
20  think it --
21      MS. HAMILTON:  To 118500.
22      COURT REPORTER:  Okay.  I can get it pulled
23  up.  Let me pull it up for you.  It should -- can
24  you see that okay?
25      MS. HAMILTON:  Yep.

Page 88

1       COURT REPORTER:  Okay.
2   BY MS. HAMILTON:
3   Q.  Thank you.  Okay.  So this is Exhibit 2.  This
4   is general order 82-14, Complaint and Disciplinary
5   Procedures.  And what was the effective date of this
6   general order?
7       (PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
8   A.  You're asking me, right?
9   Q.  Yes.
10  A.  Okay.  The 15 October 1982.
11  Q.  Okay.  And then this is -- this is outlining
12  the complaint register process.  I just -- I wanted to
13  ask you a question about page 2, section D.  So if you
14  go to the second page, Chloe.
15      MR. BURNS:  Did you say B like boy?
16      MS. HAMILTON:  D like dog.
17      MR. BURNS:  Okay.  Thank you.
18  BY MS. HAMILTON:
19  Q.  Sorry.  It's actually the third page, because
20  the second page is just blank.  So the third page is
21  purpose, and section D says, "No anonymous complaint
22  made against a department member shall be made the
23  subject of a complaint register investigation unless the
24  allegation is of a criminal nature."  Do you see that?
25  A.  Yes.

Page 89

1   Q.  So how does that square with your earlier
2   testimony that all anonymous complaints are
3   investigated?
4       MS. ROSEN:  Objection.  Form, mischaracterizes
5   his testimony, but you can answer.
6   A.  That we still -- there was -- I see that, but
7   there were still investigations.  One, definitely for
8   residency medical role, and when the department was on
9   notice the department investigated complaints -- were
10  made aware of a complaint.  So that's the best of my
11  ability.  Yes.  I mean, I don't have the contract in
12  front of me, but I thought definitely medical residency
13  were investigated.
14  Q.  Okay.  Other than medical and residency cases,
15  if the complainant was anonymous, would that
16  investigation proceed?
17      MS. ROSEN:  Objection.  Form.  And you're
18  excluding what you just read, which is criminal
19  matters.  So --
20      MS. HAMILTON:  Okay.  You could just make your
21  objection, you know, no speaking objections please.
22  A.  I'm not sure then.  I'm not sure.  I -- if
23  you're suggesting like officer X shows up late,
24  anonymous, would we investigate it?  But reading this,
25  we would not, but -- we would not.

Page 90

1 BY MS. HAMILTON:
2    Q   But you're aware in practice that there were
3 some complaints that had anonymous complainants that
4 were investigated?
5    A   Yes.
6    Q   Okay.  But it was – okay.  You can put that
7 down for a second.  Do you have any knowledge of any
8 policies or practices related to the length of time an
9 OPS or IAD investigation could take?
10      MS. ROSEN:  Objection.  Form.
11   A   They could – I mean, they could, no.  I mean,
12 they could take, you know, depending on the complexity
13 of that investigation, the allegations against the
14 police officer, you know, some confidential
15 investigations went on for years.  So it's just really
16 the nature of the allegation.
17   Q   So there was no policy that investigations
18 needed to be concluded within 30 days of the incident –
19 or 30 days, excuse me, of opening the investigation.
20   A   Oh.
21      MS. ROSEN:  Objection.  Form.
22   A   The investigation.  Yes.  Wow.  I actually
23 think though it was – in here, it mentioned that the
24 investigator would ask for an extension after ten –
25 after ten days, I think the earlier orders, and then it

Page 91

1 went up to 30 days.  So there was a timeframe I recall,
2 with asking for extensions and giving update on your
3 investigation.  But I didn't know if the conclusion – I
4 don't recall that the conclusion had to be closed at a
5 certain amount of time.
6    Q   Okay.  So there was a certain amount of time
7 in which an officer – or an investigator needed to ask
8 for an extension during an investigation.
9    A   Yes, and then prove why the extension is
10 necessary.
11   Q   Okay.  But there was no limit on how long the
12 entire investigation needed to be concluded.
13   A   I do not recall reading back then an absolute
14 – I mean, reading an absolute back then.
15   Q   Was there any tracking of how long it would
16 take OPS or IAD to complete its investigations?
17   A   Other than a supervisor's review, maintaining,
18 you know, supervisor control of their subordinates, I
19 don't know anything else.
20   Q   So there was no audit about how long IAD or
21 OPS investigations would take, in this time period?
22   A   I'm not aware of –
23      MS. ROSEN:  Objection.  Objection.  Form.
24   Q   You can answer.
25   A   I'm not aware of an audit.

Page 92

1    Q   Okay.  So in the relevant time period, as a
2 matter of procedure, would IAD consider past complaints
3 of misconduct in connection with the investigation of a
4 current complaint of misconduct?
5      MS. ROSEN:  Objection.  Form.
6    A   No.  No.
7    Q   Okay.  And as a matter of procedure, did OPS
8 consider past complaints of misconduct in connection
9 with the investigation of a current complaint of
10 misconduct?
11      MS. ROSEN:  Objection.  Form.
12   A   No.
13   Q   Past complaints were only considered if there
14 was a sustained finding, correct?
15      MS. ROSEN:  Objection.  Form.  Mischaracterizes
16 prior testimony.
17   A   It would be sustained finding, and
18 investigation has concluded with a sustained finding.
19   Q   Okay.  So when the investigation has concluded
20 with a sustained finding, then an investigator could
21 consider past complaints of misconduct; is that correct?
22   A   That is correct.
23   Q   So if there was a history of past complaints
24 of similar misconduct that were unsustainable,
25 unfounded, or exonerated, those would never be

Page 93

1 considered, correct?
2      MS. ROSEN:  Objection.  Form.
3    A   They would be not considered in that
4 investigation, but they would be considered in other
5 factors.
6    Q   What – in what other factors would they be
7 considered?
8    A   For example, the – it goes maybe more towards
9 one of your – the later questions in this 30(b)(6)
10 notice about like the personal concerns program, like
11 evaluating and monitoring police officers.  So if you
12 read that order, number one is all excessive force
13 complaints.  It's not just sustained.  So the evaluation
14 of – I mean, for that one, that would be one.  And then
15 two, the evaluation officers were evaluated every six
16 months, January 1st to June 30th, July 1st to December
17 31st.  And when you evaluate an officer, you take into
18 consideration their complimentary, but also the order
19 required that you consider any discipline.  So those two
20 personal concerns and evaluation of police officers, you
21 could consider complaints.
22   Q   Okay.  But if an OPS or IAD was doing an
23 investigation of a current complaint of misconduct, they
24 would not consider a history of past complaints of
25 similar misconduct that were unsustained, unfounded, or

Page 94

1  exonerated.
2      A  That is correct.
3      Q  It was not a part of the OPS investigator's
4  job to assess whether there was a history of similar
5  past complaints.  Correct?
6      A  That's correct.
7      Q  So unsustained complaints, or unfounded or
8  exonerated, would not come to the OPS or IAD
9  investigator's attention, correct?
10     A  That's correct.
11     Q  So for a sustained finding, an OPS or IAD
12  investigator would look at the sustained disciplinary
13  history, correct?
14     A  Yes.
15     Q  But that would not include complaints in which
16  no discipline had been imposed.  Correct?
17     A  That's correct.
18     And it would not include complaints in which
19  discipline had been formally recommended, but not
20  adopted.  Correct?
21        MS. ROSEN:  Objection.  Form.
22     A  That's correct.
23     Q  And the disciplinary history that the
24  investigators would review would not include complaints
25  in which there was a finding on misconduct, but no

Page 95

1  discipline was imposed.  Correct?
2        MS. ROSEN:  Objection.  Form.
3      A  Could you just read that question again,
4  please?
5      Q  Sure.  The OPS or IAD investigators would look
6  at disciplinary history, and when they we're looking at
7  the disciplinary history, that disciplinary history
8  would not include complaints in which there was a
9  finding of misconduct, but no discipline was imposed.
10     A  Well –
11        MS. ROSEN:  Objection.  Form.
12     A  Right, because I would say, how could it have
13  a finding of misconduct but not a sustained finding?  I
14  mean, I would say they – all sustained findings, if
15  that was what the end results were, they would be
16  reviewed.  But if you're suggesting like an investigator
17  suggests a sustained finding, but the final disciplinary
18  disposition is not a sustained finding, then those
19  wouldn't be used.
20     Q  Okay.  I understand.  And could officers
21  expunge sustained findings off their disciplinary
22  history after a certain number of years?
23        MS. ROSEN:  Objection.  Form.
24     A  I think the contract and the order says five
25  year sustained history, and then it shouldn't be used

Page 96

1  after that.  But as I testified earlier, I believe the
2  department didn't expunge many of those that they were
3  supposed to expunge, and some appeared on officers five
4  years history that they shouldn't appeared on, or you
5  know, they gave more than the five year history.
6      Q  Okay.  So in this time period, would the
7  officer have to request to expunge findings off of
8  their, sustained findings off of their disciplinary
9  history?
10        MS. ROSEN:  Objection.  Form.  You can answer.
11     A  I believe 8.4, the FOP contract, said after
12  the destruction of files would occur after a five year
13  period, so they wouldn't have to request it.
14     Q  Okay.  And during the relevant time period,
15  did that destruction order change at all?
16        MS. ROSEN:  Objection.  Form.
17     A  I don't believe it changed in terms of what
18  the contract language was, but I think the practice of
19  the department changed and they weren't destroyed.
20     Q  Okay.  So pursuant to the FOP contract, the
21  police department was destroying CRs after five years.
22        MS. ROSEN:  Objection.  Form.
23     A  They were supposed to.
24     Q  Okay.  And how long was that policy in place?
25        MS. ROSEN:  Objection.  Form.

Page 97

1      A  I'm not sure.  I mean the first contract was
2  signed I believe in 1983.  I'm not sure if it was part
3  of that '83 contract.
4      Q  To your knowledge, did that policy ever end?
5        MS. ROSEN:  Objection.  Form.
6      A  Yes, we don't destroy files.
7      Q  Okay.  Do you know when the policy changed
8  from destruction of files after five years to not
9  destroying files after five years?
10        MS. ROSEN:  Objection.  Form.
11     A  I don't.  It was a lawsuit.
12     Q  Do you know if it was in the 1986 to 1998 time
13  period?
14        MS. ROSEN:  Objection.  Form.
15     A  I believe it was after.
16     Q  Okay.  Okay.  So earlier you testified about
17  face sheets.  Can you tell me what a face sheet is?
18     A  The face sheet is – gives the complainant's
19  name, the allegations, you know, complainant contact
20  information, date of occurrence.  it's kind of like what
21  the intake person takes, lays out at the beginning.  It
22  gives the investigator a starting point for the
23  investigation.  Here's your complainant, and here's a
24  number, here's the contact information.
25     Q  And were copies of the face sheets kept

Page 98

1  anywhere?
2      A   Yeah.  OPS kept a copy.  And then a copy of
3  OPS kept it, a copy of the face sheet would go to the
4  investigator.  And same thing if the case was
5  transferred to IAD, the face sheet would -- a copy of
6  the face sheet would be sent to IAD with the file.
7      Q   Okay.  Did investigators have access to copies
8  of the face sheets?
9      A   They would get a copy.  Yes.  That would be
10  the -- how to contact the person.
11      Q   Okay.  Would they get copies of, or could they
12  access copies of face sheets of other investigations?
13        MS. ROSEN:  Objection.  Form.
14      A   I don't -- I mean, I don't believe they -- I
15  don't believe so.
16      Q   So an OPS investigator couldn't go into a room
17  and look through copies of face sheets --
18        MS. ROSEN:  Objection.  Form.
19      Q   -- other than the face sheet for their
20  investigation.
21        MS. ROSEN:  Objection.  Form.
22      A   They, I'm not saying they couldn't do that if
23  they kept them in a room, but I don't think the way that
24  they should have been investigating cases, they
25  shouldn't have done that because, you know, you're

Page 99

1  assigned this investigation.  So going into a room and
2  looking at other investigations, I'm not sure what the
3  point of -- that would be for the investigator.
4      Q   Okay.  And are you familiar with the term card
5  catalog?
6      A   After reading the deposition of, I believe his
7  name was Bruce Dean, I recall reading about the card
8  catalog.
9      Q   Okay.  What is a card catalog?
10      A   It was -- this is my point of view, is that it
11  was tracking.  They would have the card catalog, kind of
12  like if you went to the library, you wanted to check out
13  a book, that they would have all the officers that had
14  cases, they would fill it out, the officer's name, the
15  complaint number, and they would keep it in a room and,
16  you know, it'd be a record of the CR.
17      Q   Okay.  And when you say they kept it in a
18  room, would that be a room at OPS or at IAD or some
19  other place?
20      A   OPS.
21      Q   And did OPS investigators have access
22  to the room where all the card catalogs were kept?
23      A   Based on reading the testimony, yes.
24      Q   Okay.  And could they go through the card
25  catalogs as a part of their investigation?

Page 100

1      A   They could, yes.
2      Q   There was nothing prohibiting them from going
3  through the card catalog and looking through the various
4  cards; is that correct?
5        MS. ROSEN:  Objection.  Form.
6      A   You know, I don't -- would you say you would
7  prohibit, I would say that, you know, the -- this order
8  -- the -- you know, we conduct the investigations, like,
9  you know, it says that they -- my -- they could do it.
10  What would prohibit them?  I think the sense of like,
11  due process.  Like this is saying, you know, an officer
12  receives an allegation for today, and going through that
13  card catalog would offer no evidence of whether or not
14  that officer did what is being alleged today.  So I'm
15  not, I'm not aware of an SOP out of OPS that prohibited
16  it, but I'd be surprised if it was a common practice.
17      Q   Back in the, in '86 to '98, it was not a
18  common practice for an investigator to look through the
19  card catalog as a part of their investigation.  Correct?
20      A   Correct.
21      Q   Okay.  So other than the copies of the face
22  sheets and the card catalog, were there other physical
23  files that an investigator could use to look up past
24  complaints?
25        MS. ROSEN:  Objection.  Form.

Page 101

1      A   Nothing that I came across, no.  Not of my --
2  not to my knowledge.
3      Q   Okay.  And was there a time when OPS or IAD
4  began using electronic records of complaints?
5      A   Yes.
6      Q   And was that after the relevant time period
7  for this case?
8      A   Yeah, I mean, in terms of processing and
9  investigation, I believe so.  We -- well, I believe
10  CLEAR, the auto-CR system, started in 2000.  I know
11  there was a system like a mainframe where I think people
12  -- I meant people, files were stored, but I don't know
13  if it was a function that investigators could use.  So I
14  believe it's after this time.
15      Q   Right.  Was auto-CR a function that
16  investigators could use?
17      A   Not during this time.
18      Q   What about after this time period?
19      A   Yes.
20      Q   Okay.  Auto-CR did -- auto-CR did not exist in
21  the time period, '86 to '98, correct?
22      A   That's correct.
23        MS. HAMILTON:  Okay.  I'm going to need to
24  take a break.  Eileen, are you okay if we take a
25  half hour?  I have a court call that I need to do.

Page 102

1      MS. ROSEN:  Okay.
2      MS. HAMILTON:  Okay.  Thanks.  So we'll come
3   back on at 1:00.
4      MS. ROSEN:  Yeah.  So I didn't anticipate you
5   taking a break at this point.  So we're going to
6   use this time though, to eat lunch.  So we need –
7      MS. HAMILTON:  Yeah, that's fine.
8      MS. ROSEN:  – an extra few minutes though
9   because the lunch just got ordered.  So I just –
10   you know, I'll come back on at 1:00, but we may
11   need a few minutes later than that.
12      MS. HAMILTON:  Yeah.  We can come back later
13   at 1:15, 1:30.  Sorry, I didn't – I should have
14   said earlier about my court call.
15      MS. ROSEN:  Yeah.  It just – it may be fine.
16   So let's plan for 1:00, but if it doesn't work,
17   I'll let you know.
18      MS. HAMILTON:  Okay.  Thanks.
19      MS. ROSEN:  Okay.
20      (OFF THE RECORD)
21      COURT REPORTER:  We are back on the record at
22   1:21.
23   BY MS. HAMILTON:
24   Q   Okay.  Lieutenant Bird, I wanted to ask you
25   some questions about OPS investigators.  What was the

Page 103

1   criteria for becoming an OPS investigator back in this
2   timeframe?
3   A   I don't know.  I apologize.  I didn't come
4   across that in my review.
5   Q   Do you know the qualifications for becoming an
6   OPS investigator?
7   A   I do not.
8   Q   Were OPS – do you know if OPS investigators
9   were police officers?
10   A   There was not OPS investigators.  We did have
11   officers – I know from when my at the first time at IAD
12   that we did have officers assigned to like the records
13   division at OPS.  They did something there.  There were
14   limited duty officers.  But I believe, I am almost
15   positive, none of them were investigators.  They were
16   limited duty officers.  Minimum roles.  But I don't know
17   what the qualifications were.
18   Q   Okay.  Do you know what the qualifications
19   were for IAD police agents?
20   A   You had to have so much time – some time on
21   the job.  Usually it's a minimum requirement of three
22   years as a police officer and then good, you know,
23   complimentary and minimal disciplinary history, none.
24   There's a review process for any officer.  But in terms
25   of like degrees or that, at the time, the department

Page 104

1   didn't require people to have like bachelor's degrees,
2   during this timeframe.
3      MS. ROSEN:  And I just have a belated
4      objection to both of those lines of inquiry about
5      the qualifications for either OPS or IAD
6      investigators as beyond the scope of the 30(b)(6)
7      notice.
8   BY MS. HAMILTON:
9   Q   Okay.  Do you have any knowledge about whether
10   OPS investigators were generally people who wanted to
11   become police officers after being investigators?
12      MS. ROSEN:  Same objection.  Beyond the scope
13      of the 30(b)(6) notice.
14   A   I wouldn't know.
15   Q   Okay.
16   A   Sorry.
17   Q   It's okay.  So then another question about
18   investigations for either OPS or IAD, for the interviews
19   of the accused or the to-from memos of the accused.  Were
20   those the only two instances – or were there ever any
21   other instances which an accused officer was not
22   provided questions in advance other than the interviews
23   or the to-from memos?
24      MS. ROSEN:  Danielle, can you either have the
25      court reporter read back the question or read it

Page 105

1   back, because I didn't understand – I missed it.
2      COURT REPORTER:  I can read it back.
3      MS. HAMILTON:  Yeah.  Why don't you read it
4      back?  I – probably was a bad question but go
5      ahead.
6   (REPORTER PLAYS BACK REQUESTED TESTIMONY)
7      MS. ROSEN:  Objection.  Form.  And misstates
8      his prior testimony.
9   BY MS. HAMILTON:
10   Q   Do you understand the question or do you want
11   me to rephrase?
12   A   I understand the question and I would say that
13   the, no.  The answer would be no to that because the
14   packet that, you know, the exhibit you had me looking at
15   earlier, the officers' bill rights states that the
16   officer will be served with the allegations prior to the
17   interview.
18   Q   Okay.  So there was never an instance in which
19   the officers didn't have the allegation or questions in
20   front of them before having to give the interview or
21   write the to-from memos; is that correct?
22      MS. ROSEN:  Objection.  Form with respect to
23      allegations or questions.
24   Q   You can answer.
25   A   Yeah, I do not have – I just want to just

Page 106

1  clarify. You're talking about an accused officer. An
2  accused officer would not be required to answer
3  questions or do the to-from answer unless they've been
4  served with allegations. The fact – now, if you're
5  asking about officers, maybe they were potential
6  witnesses, now that could be different, that they're not
7  being served with allegations and that would take a
8  different, they would be just be given a witness
9  to-from. So they wouldn't be – they probably wouldn't
10  be served with allegations.
11      Q  Okay, got it. We were also talking about the
12  sustained histories being destroyed after five years
13  pursuant to the FOP contract. And I wanted to ask five
14  years from what date? Was it the date of the incident,
15  the date of the conclusion of the investigation, or some
16  other five year mark?
17      MS. ROSEN: Objection. Form.
18      A  If I recall in the readings, it was five years
19  from the date of the incident, unless there was a
20  arbitration and/or court case, then it would be five
21  years from that date.
22      Q  Okay. And then in the timeframe we've been
23  talking about '86 to '98, there was no investigation of
24  anonymous complaints by civilians that was related to
25  officer misconduct, correct?

Page 107

1      MS. ROSEN: Objection. Form, mischaracterizes
2  his testimony.
3      A  Yeah. And I'm not – I can't – I'm not – I
4  can't answer that question absolute, I don't know at
5  this time.
6      Q  Okay. So it's possible that in this
7  timeframe, there were investigations of anonymous
8  complaints by civilians related to officer misconduct?
9      A  Yes.
10      Q  Okay. But the policy was that there would be
11  no investigation of anonymous complaints unless they
12  were of a criminal nature, correct?
13      A  According to that order, 82-14.
14      Q  And then skipping to – so disciplinary
15  histories of officers was kept at IAD. Is that right?
16      A  That's correct.
17      Q  Okay. And do you know where within IAD the
18  disciplinary history of an individual officer was
19  maintained, in this time period?
20      A  I don't. We have a records division. They
21  had a records division. But the actual physical file,
22  I'm not sure – or should I just say a record section.
23      Q  Okay.
24      MS. ROSEN: Sorry, belated objection to beyond
25  the scope for the 30(b)(6) notice.

Page 108

1      Q  Okay. So I wanted to talk about performance
2  reviews. What were the city's policies and practices
3  with respect to performance reviews of Chicago police
4  officers?
5      A  Reviewed in order that officers were evaluated
6  twice a year. And it was January 1st, July, I mean,
7  June 30th, July 1st to December 31st. The commanding
8  officer of each district or unit was responsible for the
9  evaluation of the officers. Officers had to be in that
10  unit or that district for 30 days prior to the review
11  period, then it would be trickled down to the officer's
12  watch, and then the watch commander would assign a
13  supervisor – the order recommended a team of
14  supervisors to evaluate the performance of the officer.
15      Q  And were the evaluations of the officers kept
16  – were paper records kept of the evaluations?
17      A  Yes, there was a card, a performance
18  evaluation rating card or card. And then the officers
19  would be scored on that card. And interesting and it
20  was still the same policy when I became a police officer
21  in '97. The order provides that step raises – you
22  know, every five years a department member will receive
23  a step raise, but back then step raises weren't
24  guaranteed. An officer would have to be rated higher
25  than a 76 to receive a step raise. Below 70, the

Page 109

1  officer would be delinquent in their performance. And
2  they were kept. They were sent back to the personnel
3  division from the unit commanding officer.
4      Q  Okay. Were they kept – the evaluation cards
5  were kept in the personnel division?
6      A  Yes.
7      Q  And did IAD or OPS investigators have access
8  to the evaluation cards when they were conducting a CR
9  investigation?
10      A  There's no indication that they did, no.
11      Q  What about any supervisors in the command
12  channel review or complaint panel review, did those
13  investigators or reviewers have access to these
14  evaluation cards?
15      A  I would say that not necessarily the actual
16  card, but command channel review was a method to inform
17  commanders that there's complaints against a member of
18  their command. So you just say, "I'm the commander of
19  the first to district. I just did the CCR for Officer
20  X." Now two months later, I'm getting the Officer's X
21  performance rating card. So I would know that the
22  discipline have occurred because I just reviewed it. So
23  they didn't ask for necessarily that – like, I would
24  say in sense, yes, the commanders knew it during the
25  rating process of their disciplinary history.

Page 110

1    Q.  Okay.  Sorry, go ahead.
2    A.  In order to say that a supervisor would
3  consult with DIA or IAD for the disciplinary history.
4  And then also what the personnel division received a
5  complimentary history, and those factors were supposed
6  to be taken into account during the performance rating.
7    Q.  Would performance ratings appear on an
8  officer's complimentary history or disciplinary history?
9    A.  I don't know.
10    Q.  Okay.  In this time period, or do you know
11  after this time?
12    A.  Even in this time period, even now, we still
13  do a performance evaluation.  It's always been because
14  of pursuant to municipal code that employees of the City
15  of Chicago should be evaluated on a bi-annual basis.  And
16  even that order sites that, and that's still the
17  practice.  But if you pull a complimentary history
18  today, it does not have their performance rating.
19    Q.  Were there any consequences for supervisors --
20  or, excuse me, for officers who received low performance
21  evaluations?
22    A.  Yes.
23    Q.  What were the consequences?
24    A.  One consequence, they may not receive the step
25  raise.  Their next upcoming step raise, if they didn't

Page 111

1  score higher than a 76.
2    Q.  Are there any other consequences?
3    A.  I didn't see it in this order -- the orders
4  that I was reviewing.  I came on in '97 and this goes
5  until '98.  And when I came on the job, if you did not
6  receive an acceptable performance rating, you could not
7  do an overtime initiative with the city.  So I couldn't
8  sign up for overtime initiatives, and this is 1997,
9  unless I had a acceptable performance rating.
10    Q.  If you had a -- if you didn't have an
11  acceptable performance rating, could you be disciplined?
12    A.  No.  It was -- one, you had the opportunity to
13  appeal it, but you weren't necessarily disciplined other
14  than -- now, we're going back to the '80s, that order
15  generally talks about that if it continued, negative or
16  poor performance, it talks about then that could be used
17  in a case against you to discharge you in front of the
18  police board.  So yes, repeated bad performance would be
19  used against the officers.
20    Q.  Okay.  And you said that officers could appeal
21  a low performance rating?
22    A.  Yes.
23    Q.  Can you explain what that appeal process is?
24    A.  They would go to their commander.  And they
25  may present, you know, just very similar to SPARs, that

Page 112

1  SPARs, you know, type of discipline.  That you have an
2  opportunity to go to your commander and basically defend
3  your position and, you know, provide maybe potential
4  mitigating circumstances why your performance ratings
5  were low during this time.
6    Q.  Okay.  And then is there anybody who could
7  override the commander's performance evaluation score?
8    A.  I don't believe so.  No.
9    Q.  Was the superintendent made aware of
10  performance evaluation scores?
11    A.  My speculation would be only if we're going to
12  the police board to separate the officer.  And on all
13  the 13,000 officers, I don't -- I would be surprised.
14    Q.  Do you know pursuant to the policy that you've
15  been mentioning if the supervisor is required to be
16  notified about performance evaluations?
17    A.  Yes.
18       MS. ROSEN:  Objection.  Form.
19    A.  The supervisors were notified about them
20  because they're the ones that had to conduct them.  So
21  that order, and I recall when I came out in '97, it's
22  only one year, but, so being a police officer, my
23  performance rating would be conducted by a sergeant.  The
24  sergeant's performance ratings were conducted by the
25  lieutenants and the captains of the watches.  And then

Page 113

1  the lieutenants by the captain.  So sergeants were made
2  aware because you would be assigned these five officers
3  on your watch.  You have to, you know, complete the
4  performance ratings.
5    Q.  Okay.  And so, if a command channel reviewer
6  or another investigator wanted to access the performance
7  evaluation scores of an accused officer, how would they
8  do that?
9    A.  Yeah, I'm not sure.  I'm sorry if my last
10  statement maybe -- I don't believe what you just said.  I
11  don't believe an investigator could access them.  So I'm
12  investigating officer for discipline investigation --
13  IAD investigation.
14    Q.  Uh-huh.
15    A.  I don't know why they would request the
16  performance evaluation while they're conducting an
17  investigation of misconduct.
18    Q.  Okay.  If a supervisor wanted to see the
19  performance evaluation of a particular officer's -- past
20  performance evaluations of a particular officer, how
21  would they go about doing that?
22    A.  They would contact the personnel division.
23    Q.  And they would just make a request with the
24  personnel division to send them the prior performance
25  evaluations?

Page 114

1    A  Yes.  Like the order even mentions that you
2  have an officer transferred to your unit 35 days.  So
3  now they're in the period, but you've only supervised
4  them for 35 days.  You may even reach out to the other
5  unit of assignment and ask them about the performance
6  ratings, but maybe review a previous one.  But I don't
7  think there was a common practice that you would request
8  previous years of performance evaluations.  The officers
9  should only be evaluated on the last six months.
10    Q  And were performance evaluation reviewed for
11  the imposition of discipline during an OPS or an IAD
12  investigation?
13    A  No.
14    Q  Okay.  Are you familiar with the term early
15  warning system?
16    A  In some shape or form, I might have came -- I
17  thought I came across behavioral alert system, but early
18  warning system, I maybe -- explain it to me please.
19    Q  Well, let me just ask you.  What's your
20  understanding of an early warning system, if you have
21  one?
22      MS. ROSEN:  Objection.  Form.  Beyond the
23      scope of the 30(b)(6) notice.
24    A  So in one of the questions, you know, four or
25  five or six, maybe I was looking at, like early warning

Page 115

1  systems, potentially for a pattern or practice or
2  something.
3    Q  Uh-huh.
4    A  And in the personal concerns order, it talked
5  about factors that would be reviewed.  And like one of
6  those arbitration decisions talks about it that I
7  tendered.  An officer had 11 excessive force complaints
8  from 1980 to 1983 -- end of '83.  And based on that,
9  because if you read the personal concerns order, the
10  lieutenant had a counseling session with that officer.
11  And then that officer -- and the purpose, they say the
12  purpose of that early warning or that counseling session
13  is to say, "Hey, this is unacceptable, the excessive
14  force complaints."  And in that arbitration decision,
15  the lieutenant was very thorough and he followed the
16  guidelines.  Explained to the officer what's wrong.  You
17  have too many excessive force complaints.  All 11 were
18  not sustained.  And then we would identify what could be
19  potentially changed.  So this early warning system, he
20  said, "I recommend" the lieutenant said, "you might want
21  to change your demeanor.  Because when I look at your 11
22  complaints, your synopsis, your 11 discipline
23  complaints, it happens during an arrest and either
24  you're verbally abusive to maybe the arrestee or the
25  family."  And then another highlight, he said, "Your

Page 116

1  partner doesn't have any.  And it was the same partner
2  for most of the events."  So the early warning system
3  was like the behavioral intervention system.  And then
4  also, if you notice officers calling in sick often.  You
5  just want to sit down and talk to the officer and see if
6  everything's okay.  There might be a reason why the
7  officer is using the medical role more often than past.
8    Q  Okay.  You've mentioned the personnel concern
9  program and the behavioral alert system as systems that
10  were used as early warning systems.  Are you aware of
11  any other systems besides those two?
12      MS. ROSEN:  Objection.  Form.  Beyond the
13      scope of the 30(b)(6) notice.
14    A  I would just say daily supervision of
15  officers.  The, you know, sergeants, they supervise
16  these officers every day.  We would jokingly say we
17  spend more time with our partners and our supervisors
18  than our spouses and so you know, changes.  So a
19  supervisor could admonish an officer on the log -- the
20  supervisor's log.  That could be something, an early
21  warning.  I see the officer note, acting differently,
22  something happened, I'm going to admonish him on the
23  log.  This is prior to any discipline -- or I could
24  counsel the officer.  Counseling forms have been around
25  since, I want to say '83, and I could counsel the

Page 117

1  officer just to see what's going on.  So I would say
2  counseling and maybe potentially admonishments on the
3  supervisor's log.
4    Q  Okay.  Any other informal or formal mechanisms
5  of early warning systems in this time period, other than
6  the ones you've mentioned?
7      MS. ROSEN:  Objection.  Form.  Beyond the
8      scope of the 30(b)(6) notice.  You can answer.
9    A  I don't know anymore.
10    Q  So let's talk about the behavioral alert
11  system.  What is your understanding of what that is?
12    A  It was a method to help maybe officers to
13  correct -- prevent them from maybe going down the wrong
14  path, you know.  You know, if you saw like number one
15  was, if there were factors and the factors were all
16  excessive force complaints.  And number two was
17  complimentary and disciplinary history.  Number three
18  was medical role.  And these were factors that sergeants
19  and supervisors were supposed to take into effect.  If
20  we see a change in the officer's behavior, and this
21  could -- these are alerts, these are telling you, you
22  know.  And then it gave you a format to what to do.  To
23  sit down with the officer, have a counseling session,
24  identify what you're noticing, give the officer an
25  opportunity to explain themselves.  They would say in

Page 118

1  that order, it says, you know, construct – first start
2  off with positiveness with that officer.  And then it
3  would say use constructive discipline, or discipline, or
4  conversation, but give the officer the opportunity.  But
5  then clearly address what would be appropriate going
6  forward.  And that the officer would be supervisor
7  monitored more closely during this period.
8      Q   Could an officer be disciplined as a result of
9  being in the behavioral alert system?
10     A   No.
11     Q   So it was not considered a disciplinary
12 measure?
13     A   No.
14     Q   And how was an officer alerted or, you know,
15 triggered to be a part of the behavioral alert system?
16     MS. ROSEN:  Objection.  Form.
17     A   The supervisor would schedule a meeting.  The
18 sergeant would schedule a meeting with the officer –
19 the counseling session.
20     Q   Is there any other person who could schedule a
21 meeting or trigger an officer's participation in the
22 behavioral alert system?
23     MS. ROSEN:  Objection.  Form.
24     A   Not the behavioral – I don't believe so, no.
25     Q   Could OPS or IAD investigators request that an

Page 119

1  officer be put in the behavioral alert system?
2      A   Yes.  It was a standard where if you had like
3  two sustained CRs in a certain period.  I'm forgetting
4  the actual criteria, but yes, after you concluded your
5  investigation, you looked at the – you know, you
6  request the complimentary disciplinary history and you
7  notice now.  You're already sustaining this allegation.
8  And you now notice that the officer had another
9  sustained allegation.  You could refer that person to
10 the behavioral concerns program.
11     Q   Pursuant to the policy, did OPS or
12 investigative officers have to refer officers with two
13 or more sustained CRs to the behavioral alert system?
14     MS. ROSEN:  Objection.  Form.
15     A   I would say if an officer meets the threshold
16 that's in that order, the answer is yes, or I believe it
17 might potentially be a violation of a direct order.
18     Q   And were there any other thresholds that would
19 trigger referral into the behavior alert system?
20     A   Another one that I'm remembering is excessive
21 medical use.  There are a couple factors.  It's even –
22 I'm just drawing a blank on the other factors but
23 medical use is another one.
24     MS. HAMILTON:  Okay.  We could actually look
25     at that policy.  Chloe, if you wouldn't mind

Page 120

1  pulling up – let me find it.  Eileen, it's
2  GO-83-3, which is – starts with RFC 118619,
3  personnel concerns.
4      MS. ROSEN:  Well, are you asking – are you –
5  so you're not talking about behavioral intervention
6  now you're talking about personnel concerns?  It's
7  only because you prefaced it with let's look at
8  that policy and there's two different policies.
9      MS. HAMILTON:  Yeah.  My understanding was
10 that there was a few different policies and in
11 fact, so I'll go through both of them.  I think
12 83-3 was enacted in '83 and then received it in
13 1997.  And it included some behavioral, behavioral
14 alert system policies.
15     COURT REPORTER:  Is this the correct document?
16     MS. ROSEN:  So I was just – go ahead.
17 Whoever's talking can say something.
18     COURT REPORTER:  Nope.  I was just wondering
19 if this was the correct document.  You can go
20 ahead. I'm sorry.
21     MS. ROSEN:  Sure.  I just want to be clear for
22 the record.  You were talking to the lieutenant
23 about the BIS program and now – and you said let's
24 take a look at that policy and you're pulling up
25 the personnel concerns policies.  So I just want to

Page 121

1  be clear that there are two different policies.
2  Similar, but two different policies.
3      MS. HAMILTON:  Sure.  Understood.
4      MS. ROSEN:  Okay.
5  BY MS. HAMILTON:
6      Q   So we're looking at personnel concerns,
7  general order 83-3.  Do you see that or do you have that
8  in front of you, Lieutenant Bird?
9      A   I do.  Oh, hang on.  Sorry.  False alarm.  I
10 got 97.11.
11     MS. ROSEN:  Oh, hold on one second.  What's
12 the Bates did you say?  Sorry.
13     THE WITNESS:  83.3.
14     MS. ROSEN:  What's the base number, Danielle?
15     MS. HAMILTON:  The Bates is – sorry one
16 second.
17     COURT REPORTER:  I got it.
18     MS. HAMILTON:  118619.
19     MS. ROSEN:  Thank you.  Got it.
20 BY MS. HAMILTON:
21     Q   Okay.  So this policy was effective beginning
22 of 1983, correct?
23     A   That is correct.  Yes.
24     Q   And it was rescinded in by general order,
25 97-10 in 1997?

Page 122

1    A   Yes.  According to the handwriting on top,
2   yes.
3    Q   Oh, sorry.  Let's mark this as Exhibit 3.  I
4   think we're on Exhibit 3.  Is that right?
5       (PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
6       COURT REPORTER:  That's correct.
7   BY MS. HAMILTON:
8    Q   Yep.  So this is RFC 118619 to 118622.  So on
9   this document, there is a definition of a behavioral
10  alert system.  Do you see that into definitions?
11   A   Yes.
12   Q   Okay.  And you were just describing an
13  interview process where a supervisor counsels an
14  individual based on their behavioral pattern.  Is that
15  testimony about the behavioral alert system?
16   A   Yes.  Yes.
17   Q   Okay.  So under general responsibilities on
18  the first page there, Section 4-B, it says, "The
19  administrators of the office of professional standards
20  will review an investigations conducted by their office
21  for patterns of behavior, which would warrant concern."
22  Do you see that?
23   A   Yes.
24   Q   Are you aware of any policies or directors
25  about how the administrators of OPS would go about

Page 123

1   reviewing investigation conducted by their office for
2   patterns of behavior, which would warrant concern?
3    A   I would just say when they conclude an
4   investigation, they review the complimentary and
5   disciplinary history of the officer.  And at that moment
6   they'll be able to see the officer's five year sustained
7   history and then they could see if there's a potential
8   pattern of behavior that warrants concern.
9    Q   Are there any other policies or special orders
10  or directives spelling out for administrators of OPS,
11  how to conduct their review?
12      MS. ROSEN:  Objection.  Form.
13   A   No, I don't believe so.  I did not come across
14  any.
15   Q   Okay.  Do you know whether OPS was – the OPS
16  administrator was limited to review of paper files only
17  in conducting their review pursuant to Section 4-B-1?
18      MS. ROSEN:  Objection.  Form.
19   A   I want to say too, that during this timeframe
20  there was only paper review, so yes.
21   Q   Okay.  And then on the second page, Roman
22  numeral C, or excuse me, letter C that says, "The
23  internal affairs division review disciplinary records to
24  identify those members who display a pattern of behavior
25  that requires further evaluation by the personnel

Page 124

1   concerns program manager."  Do you see that?
2    A   Yes.
3    Q   And are you aware of any policies or
4   directives or general orders that would dictate how the
5   IAD would conduct their review of disciplinary records?
6    A   I would just respond the same way, that if the
7   IAD investigator closes a case which sustain finding and
8   request the disciplinary history and he or she notices a
9   pattern of behavior that requires evaluation to the
10  program.
11   Q   Was the – I'm sorry.  Go ahead.
12   A   That would be the only way I believe an
13  investigator would.
14   Q   And that investigator when doing their review
15  would be limited to a review of paper files as well,
16  correct?
17   A   Yes.
18   Q   And then let's look at then the – so the
19  behavioral system is listed in Roman numeral V, correct?
20   A   Yes.
21   Q   And we were talking about the thresholds that
22  would warrant referral to the behavior alert system.  Are
23  those thresholds listed in letter B?
24   A   Yes.
25   Q   Okay.  And where in that does it say that if

Page 125

1   there are two sustained findings that that would trigger
2   a referral?
3    A   That doesn't say that.  Yeah, when I thought
4   the next, more serious program was the one that we moved
5   to the personnel concerns, but the behavioral
6   intervention system – I mean, I'm sorry.  The
7   behavioral alert system did not require sustained
8   findings.
9    Q   Okay.  Did the personnel concerns program
10  require sustained findings in order to trigger a
11  referral?
12   A   If there's a later order after this, I thought
13  it did require a sustained finding, but here looking at
14  Roman numeral VI, I do not see that it requires a
15  sustained finding.
16   Q   Okay.  Are you aware of any other thresholds
17  that would trigger a referral into the behavioral alert
18  system or the personnel concerns program, other than the
19  threshold items that are listed in letter B?
20   A   Just read that again.  Read that again.  I see
21  letter B, because there's – under personnel concerns
22  program, there's A, B, C, D, E, F.
23   Q   Sure.  Well, let me just ask you, to your
24  knowledge the indicators of whether or not you are
25  triggering a referral into the behavioral alert system

Page 126

1   or the personnel concerns, are they all captured in B1
2   through 7, or 6A through F?
3       A   Yes.  Yes.
4       Q   okay.  And then, so we've talked about, I
5   believe, how the process for the behavioral alert system
6   works in terms of meeting with the officer and
7   counseling them.  Can you explain how the personnel
8   concerns program works?
9       A   Now, my understanding was the personnel
10  concerns program, and it is even talked about in one of
11  the arbitration decisions, was that that was the next
12  step.  First, we tried to alert the officers, come up
13  with a plan and then after it didn't happen, if you look
14  somewhere on here, it talks about that the officer would
15  be given an opportunity to correct it within a 12 month
16  period.  And then if it reoccurred, you redo the steps
17  like interviewing, but after that, you would now move
18  into the more, I want to say robust or serious program,
19  the personnel concerns program.  And I'm not exactly
20  sure of everything that's laid out in the personnel
21  concern program.
22      Q   Okay.  So the personnel concerns program was a
23  more robust program or kind of the next level after the
24  behavioral alert system; is that correct?
25      A   That is my understanding.  Yes.

Page 127

1       Q   And then was the superintendent ever notified
2   of someone's participation – an officer's participation
3   in either the behavioral alert system or the personnel
4   concerns program?
5       A   I didn't see that requirement in this order,
6   so no.
7       Q   Is the behavioral alert system the same as the
8   behavioral intervention system?
9           MS. ROSEN:  Objection.  Form.
10      A   I take it as it is, but I'm not sure if
11  there's other orders out there, but yes.  It's an early
12  warning system.  Yes.
13          MS. HAMILTON:  Okay.  Well, I just – let's
14      look at the current policy, which I believe is called
15      behavioral intervention system, which is 97-10.
16      And that's – the Bates starts with 118623.  Chloe,
17      would you mind pulling that up and marking that as
18      Exhibit 4?
19      (PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
20          COURT REPORTER:  Yes, pulling that up now.
21      Should be it right there in the screen.
22  BY MS. HAMILTON:
23      Q   Great.  Thank you.  And so, Lieutenant Bird,
24  this is the – this is general order 97-10, Exhibit 4,
25  and this is effective November 30, 1997; is that

Page 128

1   correct?
2       A   Yes.
3       Q   And this rescinded – the prior order we were
4   just looking at, Exhibit 3, 83-3; is that correct?
5       A   Yes.
6       Q   And what is your understanding of the
7   behavioral intervention system?
8           MS. ROSEN:  Objection.  Form.
9       Q   How does it work, if you know?
10      A   I was going to say, I don't want to cheat, but
11  it says it's a systematic review of the department's
12  member behavioral pattern to alert supervisors.  I think
13  it's very – I just think it was a new step of – they
14  redid the behavioral alert system from the '83 order and
15  then they revised it in this order.
16      Q   Okay.  And do you know, have they revised the
17  behavioral alert system in this order?
18          MS. ROSEN:  Did you say how?
19          MS. HAMILTON:  Yes.
20          MS. ROSEN:  You broke up.
21          MS. HAMILTON:  Yes, I said how.
22      A   I want to say this might have been what I was
23  referring to.  I knew I came across – yes.  This is the
24  one that I was referring to earlier where it mentions
25  sustained CRs.  It's the same type of program where

Page 129

1   these are the behavioral intervention indicators, and
2   that if an officer has 1 through 8, pages 2 and 3, then
3   they would be put in this program.  And then now I see
4   number 6 is a more sustained and registers within a
5   12-month period.
6   BY MS. HAMILTON:
7       Q   Okay.  So it looks like the – so it's your
8   testimony that the behavioral intervention system
9   codified threshold requirements for this behavioral
10  intervention system?
11          MS. ROSEN:  Objection.  Form.
12      A   Yes.  I would say this order rescinded that
13  one and yes, it's codified it.
14      Q   Okay.  And pursuant to this order, 97-10, was
15  a superintendent made aware of an officer's
16  participation or referral into the behavioral
17  intervention system?
18      A   I did not see it, when I reviewed it, that the
19  superintendent was required to be notified with this.
20  No.
21      Q   Could an officer refuse to participate in the
22  behavioral intervention system?
23      A   No.
24      Q   It was mandatory that they participate if they
25  were referred into it?

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 36 of 77 PageID #:85806

Page 130

1    A   Yes.  And there is cases, arbitration
2   decisions, because -- like if the process is they're in
3   this program and let's say there has to be maybe greater
4   intervention with the officer, maybe they want to review
5   the officer's mental healthiness -- sorry, mental
6   health, that they could give a direct order and the
7   officer would have to comply with it.  I'm almost
8   positive -- I mean, I -- yes.  I would say yes, they had
9   to comply with this.
10    Q   Okay.  And you know, before this order was in,
11  effect in the old order, 83-3, did they have to comply
12  with the behavioral alert system or the personnel
13  concerns program if they were referred into it?
14    A   I would say yes, because if I'm the
15  supervisor, you have the factors, the alerts that
16  trigger it.  I'm giving you a direct order to sit down
17  and talk to me.  So I would say yes, they have to comply
18  with it.
19    Q   If an officer refused to comply with the
20  personnel concerns program or behavioral alert system,
21  or after '97, the behavioral intervention system, would
22  there be any consequences for that?
23    A   Yes.  A supervisor should initiate a CR within
24  one hour of that refusal or a violation of a direct
25  order.

Page 131

1    Q   Right.  Okay.  And then going to Exhibit 4,
2   the second page, Roman numeral V, says, "Placement in
3   the behavioral intervention system."  Do you see that?
4    A   Yes.
5    Q   And then it says in the second paragraph,
6   after the underlined writing, "No sustained complaint
7   register investigation over five years old or department
8   traffic crash would be the basis for any such
9   recommendation.  Nor, will any unfounded or exonerated
10  complaint register investigation be the basis for any
11  BIS program recommendation."  Do you see that?
12    A   I do.
13    Q   So when the BIA or IAD or OPS is recommending
14  someone for this program, they cannot use, as a basis,
15  anything other than sustained findings; is that correct?
16       MS. ROSEN:  Objection.  Form.
17    A   It could be after this time, okay, because I
18  mean, obviously what that reads is saying you can't do
19  it.  But now, from '86 to '97, I'm not sure if that's
20  the case because the case that I mentioned -- the
21  arbitration decision I mentioned, it was the behavioral
22  alert interview or counseling session with the sergeant
23  involved 11 not sustained CRs.
24    Q   Okay.  So it's your understanding that at some
25  point this policy changed and you could consider other

Page 132

1   CRs other than ones with a sustained finding?
2    A   Yeah.  Just for this program, yes.  Yes,
3   because that line just says -- if you see the last line
4   that you read, it says, "Nor, will any unfounded or
5   exonerated to complaint register investigation be the
6   basis for the BIS program."  So we couldn't use it for
7   this program at this time in '97.
8    Q   Okay.  And are you familiar with the summary
9   punishment action request or SPARs?
10    A   Yes.
11    Q   Okay.  And what is SPARs?
12    A   SPARs is a very --
13       MS. HAMILTON:  I'm sorry.  Chloe, you can take
14    the exhibit down.  Sorry to interrupt you,
15    Lieutenant.
16       That's okay.  I would say SPARs are a very
17  effective discipline mechanism that supervisors have.
18  The SPAR is immediate correction of less serious
19  transgressions.  The supervisor takes action immediately
20  and notifies the officer that the conduct that occurred
21  is unacceptable.
22  BY MS. HAMILTON:
23    Q   And the SPARs program was in effect from '86
24  to '98?
25    A   Yes.

Page 133

1    Q   And was the SPARs program conducted by the CPD
2   unit itself?
3    A   The supervisor that observes the misconduct.
4    Q   And for SPARs, would a CR number be generated?
5    A   No.
6    Q   And could supervisors impose discipline as a
7   result of issuing a summary punishment to officers?
8    A   Yes.
9    Q   And what were the discipline options that they
10  could impose?
11    A   God, I'm not sure if it -- I believe it's a
12  reprimand of three days.  I'm not sure if that
13  increased, but it's currently a reprimand of three days,
14  and I do not believe that's changed in any contract.
15    Q   And for SPARs, would a supervisor have access
16  to an officer's past disciplinary history?
17    A   SPAR history.
18    Q   Excuse me, SPAR history.
19    A   That was answering.  Yeah, just the SPAR
20  history that they would -- so if I was going to SPAR an
21  officer, I would request the SPAR history for the last
22  12 months.
23    Q   Could you request the disciplinary history if
24  you were to SPAR in this time period an officer?
25    A   The order read just 12-month SPAR history.

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 37 of 77 PageID #:85807
Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/21/25 Page 37 of 77 PageID #...
134..137

Page 134

1    Q   So no, you couldn't also request the
2  disciplinary history?
3    A   That's correct.
4    Q   And if OPS or IAD investigator was seeking the
5  disciplinary history of an accused member sustained
6  findings, would they also receive the SPAR history?
7    A   I'm not sure.
8    Q   And where are the SPAR history – where were
9  the SPAR history records kept during this time period?
10   A   DIA.
11   Q   Or it would've been IAD at that point?
12   A   IAD.  I'm sorry.  Yes.
13   Q   And did IAD investigators and OPS
14  investigators have access to the SPAR history of
15  individual officers?
16   A   I'm not sure during this time period.
17   Q   Are you aware whether they have access to it
18  after this time period?
19   A   Yes.  I mean, I know when we file a case with
20  the police board, the police board will ask for the full
21  disciplinary history and we give them the SPAR history.
22  I don't believe investigators still currently get the
23  SPAR history.  They would get the sustained history.
24   Q   Can an officer appeal a SPAR imposition of
25  discipline?

Page 135

1    A   Yes.  They could request a hearing to their
2  commander.
3    Q   And then is the commander's decision reviewed
4  by anyone?
5    A   Yes.  I believe the deputy.
6    Q   And then is the deputy's review – is the
7  deputy's decision reviewed by anyone?
8    A   No.  And then it's final.  And I want to say,
9  unless there's more than three SPARs in a year – I'm
10  almost positive I came across this.  I know it's the
11  current practice.  You cannot grieve it.  So it would
12  have to be the fourth SPAR in a 12-month period before
13  an officer had opportunity to take it to arbitration.
14   Q   okay.  Does the superintendent have to review
15  SPAR discipline?
16   A   No.
17   Q   So if an officer is going to grieve his SPAR
18  discipline, does he have the options of either going to
19  the arbitration or to the police board?
20   A   Just an arbitrator, but it's the fourth SPAR
21  in a 12-month period.
22   Q   Okay.  They cannot grieve a SPAR with the
23  police board; is that correct?
24   A   That's correct.
25   Q   Are you familiar with the Brain Maker program?

Page 136

1       MS. ROSEN:  Objection.  Form.  Beyond the
2   scope of the 30(b)(6) notice.  You can answer if
3   you know.
4    A   I don't know it.  I mean, maybe something I
5   came across, maybe one of the depositions, either Klimas
6   or Dean's deposition talked about it.  It was the first
7   time I ever heard of it.
8  BY MS. HAMILTON:
9    Q   Okay.  Do you know how the Brain Maker program
10  operates?
11      MS. ROSEN:  Objection.  Form.  Foundation.
12   Beyond the scope of the 30(b)(6) notice.
13   A   Based on just reading the testimony and the
14  questions that were being asked, it seems like it was a
15  program that if you provide this program with data of
16  the officer, then maybe discipline or SPARs or behaviors
17  alerts, that you could predict what this officer would
18  do.  That's based on my readings.
19   Q   Do you know if the Chicago Police Department
20  was ever using the Brain Maker program?
21      MS. ROSEN:  Objection.  Form.  Foundation.
22   Beyond the scope of the 30(b)(6) notice.
23   A   From my review of the documents, it does not
24  seem that we ever used it.  And nor from 1997, when I
25  came on the job, I never heard of it.

Page 137

1    Q   Okay.  I want to move on to state's attorney
2  referrals.  So we talked earlier about OPS could refer
3  allegations or a complaint to the state's attorney's
4  office; is that correct?
5    A   Yes.
6    Q   And what type of allegations would trigger OPS
7  referring an investigation to the state's attorney's
8  office?
9    A   So probably something that's facing potential
10  criminal charge of the officer, the accused officer.
11   Q   Are there any other types of allegations that
12  would warrant a referral to the state's attorney's
13  office?
14   A   The order reads that – there's two different
15  lines.  One line was, OPS will maintain a liaison
16  contact with the state attorney's office, the US
17  attorney's office, and then one update at once at the
18  department of law, same thing applied.  Then you go down
19  a couple paragraphs and it says that about IAD.  So in
20  addition to making that referral of criminal charges,
21  they couldn't have made, I think, any referral.  And
22  what I would say now is I don't know why it would be any
23  different back then.  I don't know a referral, but like
24  a rule 14 violation.  If we sustain a rule 14, that
25  officer falsified a police report, and it's a final

Page 138

1  disciplinary disposition, we notify the state's
2  attorney's office.
3      Q   And that was the procedure and practice back
4  in 1986 to 1998?
5      A   I mean, it's what the order reads, that they
6  would maintain this relationship, so I would say yes.
7      Q   Would a complaint allegation of perjury
8  trigger a referral to the state's attorney's office by
9  OPS or IAD?
10     A   I don't think the complaint alone.  No.  It
11  would probably – not until the sustained findings.
12     Q   Would a sustained –
13     A   And also an investigation, because perjury
14  would require probably potential criminal charges, so
15  the complaint alone wouldn't, but now if there's
16  evidence that suggests perjury occurred, then the
17  state's attorney's office obviously would be involved
18  with maybe potentially charging the officer criminally.
19     Q   Okay.  So if there was an allegation of
20  perjury and a sustained finding of perjury, that would
21  trigger referral to the state's attorney's office.
22     A   Yes.  And I believe they would be part of the
23  investigation, because I don't know how we'd prove
24  perjury without getting the court documents, using the
25  state's attorney's office to receive these documents.

Page 139

1      Q   Okay.  What about an officer's use of lethal
2  force?  If that was the complaint – the nature of the
3  allegations in the complaint, would that trigger a
4  referral to the state's attorney's office?
5      A   I'm not sure.  I mean, OPS would be
6  investigating the excessive force.  Yeah.  I mean, I
7  would say – I didn't come across the complaint alone
8  triggering that notification.
9      Q   And I asked you about use of lethal force, but
10  what about just use of force?  Would that trigger
11  referral to the state's attorney's office?
12         MS. ROSEN:  And you're focusing your questions
13      simply on the complaint, correct?
14         MS. HAMILTON:  Correct.
15         MS. ROSEN:  Yeah, the form.
16     A   Yeah, again, the complaint, no.  The complaint
17  for excessive force alone would not trigger a
18  notification to the state's attorney's office.
19  BY MS. HAMILTON:
20     Q   So in the '86 to '98 timeframe, did OPS and
21  IAD keep statistics concerning the number of
22  investigations and outcomes?
23     A   Yes.
24     Q   And do they keep them in reports, or how do
25  they keep the number of investigations and outcomes?

Page 140

1      A   It's by reviewing the annual reports.  It
2  looks – obviously it's they would keep reports of the
3  number of complaints and then the annual reports would
4  have it broken down.  If it wasn't precisely the
5  category codes, it was very similar, like excessive
6  force, and they would say number of complaints, number
7  of sustained, and then they would have a list of the
8  different types of – unbecoming was other one I
9  remember reading in the excessive force.  So somehow or
10  another, yes.  They tallied them throughout the year and
11  then they had these numbers to present for the annual
12  report.
13     Q   Okay.  And who would they present the annual
14  report to?
15         MS. ROSEN:  Objection.  Form.  Misstates his
16      testimony.
17     A   I think the annual report would just be
18  distributed to everyone.  I don't know who actually put
19  the annual report together, but it's a document for the
20  public.
21     Q   Okay.  Is it a document that is shared with
22  the superintendent?
23     A   Yes.
24     Q   Do you have any knowledge of any internal or
25  external audits that were conducted at OPS during the

Page 141

1  '86 to '98 timeframe?
2         MS. ROSEN:  Objection.  Form.
3      A   I do not.
4      Q   Do you know if any internal or external audits
5  were conducted by IAD during the '86 to '98 timeframe?
6         MS. ROSEN:  Objection.  Form.
7      A   I do not.
8      Q   Have you reviewed any documentation of any
9  audits of OPS or IAD?
10         MS. ROSEN:  Objection.  Form.
11     A   I haven't.  The one arbitration decision talks
12  about the issue of officer absenteeism and that there
13  was some type of – because you mentioned IAD and OPS.  I
14  just want to say this audit might have been done by the
15  personnel division, but they came across – we had a
16  high number of people calling in sick.  And in one of
17  these arbitration decisions, they talked about how the
18  national average was like 1.3, but CPD was 7.9.  And it
19  was based on – this is kind of why that initial
20  personnel concern order was developed.  So that type of
21  audit, yes, but I don't know of the IA and BIA and OPS
22  other than keeping the statistics for the annual
23  reports.
24     Q   Okay.  In this timeframe, did the city through
25  OPR – excuse me, OPS or OAD attempt to track the number

Page 142

1   of allegations of misconduct relating to lineups?
2        MS. ROSEN: Objection. Form.
3        A  In terms of tracking, I don't know. No, I
4   don't know an audit for that.
5        Q  Would it be accurate to say that the Chicago
6   police weren't able to track allegations of lineup
7   misconduct prior to auto CR?
8        A  No.
9        MS. ROSEN: Objection. Form.
10       A  No, I don't believe so.
11       Q  So it's inaccurate to say that the Chicago
12   police couldn't track allegations before auto CR?
13       A  Yes. I think we could track -- I mean, the
14   category codes have been around. If we look at the
15   complaints that I looked at, there's all these category
16   codes, and then the category code for that could either
17   be arrest procedures -- arrest procedures is one. I
18   might be misstating it, but under procedures could be
19   then miscellaneous. So nothing prevented them from
20   doing a search of the CRs for arrest procedures and
21   seeing what it encompasses.
22       Q  So is there a particular category code for the
23   CRs for lineup misconduct?
24       MS. ROSEN: Objection. Form.
25       A  I think it would come under either that

Page 143

1   miscellaneous -- under that category or arrest
2   procedures.
3        Q  So if it were under miscellaneous, how would
4   someone be able to track lineup procedures specifically?
5        A  You would just get the documents. Even now
6   with auto CR, when I do it, I'm just saying the process.
7   There's like a -- I got to look for insubordination and
8   there's facts and circumstances. What is
9   insubordination or just rule A verbal abuse. I have to
10   go and search that category code. So I go through CRs.
11   Is this an insubordination that someone was
12   insubordinate to a commanding officer? So I read the
13   summary digest of the CRs, and then I pull out the ones
14   that I believe are relevant to what I'm looking for. So
15   I think the same thing can be done. I could pull those
16   CRs -- give me the CRs for arrest and miscellaneous, I
17   could read the summary reports, and see if there's a
18   pattern of, as you mentioned, lineup procedures.
19       Q  And could you -- the process that you just
20   outlined, could that -- was that possible to do in '86
21   to '98?
22       A  I see why not. Yes.
23       Q  But short of pulling all the CRs under those
24   two codes and then reviewing CRs one by one, was there
25   any other way to track allegations of lineup misconduct

Page 144

1   in '86 to '98?
2        A  I'm not aware.
3        MS. ROSEN: Form.
4        A  Sorry. I apologize. I'm not aware. I'm not
5   aware of it.
6        Q  Okay. So in this timeframe, did the city
7   attempt to track the number of allegations of Brady
8   misconduct by police officers?
9        MS. ROSEN: Objection. Form.
10       A  I mean, I think it would come under the same
11   procedure. If you're saying Brady misconduct where
12   maybe a department member failed to provide evidence, --
13       Q  Uh-huh.
14       A  -- then that would've been triggered by, I
15   would say maybe the person who's arrested. The
16   defendant's attorney would make an allegation that,
17   "Hey, during the process of this trial, evidence wasn't
18   turned over and therefore making a complaint against the
19   police officer." And we could track that. I mean, not
20   necessarily track it, but we could -- we could pull that
21   out of the CRs and review it.
22       Q  Were you aware of the city -- whether or not
23   the city did track the number of allegations of Brady
24   misconduct in the '86 to '98 time period?
25       MS. ROSEN: Objection. Form.

Page 145

1        A  I'm not aware. No.
2        Q  Okay. And so was there a category code on the
3   CRs specifically for evidence that was withheld in
4   violation of Brady?
5        MS. ROSEN: Objection. Form.
6        A  There was not.
7        Q  Okay. And in this time period, '86 to '98,
8   did the city attempt to track the number of allegations
9   of street file misconduct by police officers?
10       MS. ROSEN: Objection. Form.
11       A  There was not.
12       Q  Okay. Would it be accurate to say that the
13   Chicago Police couldn't track allegations of street file
14   misconduct prior to auto CR?
15       MS. ROSEN: Objection. Form. What do you
16   mean by "street file misconduct"?
17       Q  Okay. Looking at the notice -- if we could
18   just pull up Exhibit 1, street file misconduct. Well,
19   first of all, Lieutenant, do you know what I mean when I
20   say "street file misconduct"?
21       A  I do now. First time I came across that term
22   is when I read your -- this notice.
23       Q  Okay. So street file misconduct is violating
24   the city's 1986 special orders and any other orders or
25   directives in place during the time period of this

Page 146

1  request, '86 to '98, related to the street files
2  practice set forth in Jones vs. City of Chicago and
3  Palmer vs. City of Chicago.
4       MS. ROSEN: Just so that we're clear on what
5   you're talking about, Danielle, when you say
6   "street file misconduct," you're talking about
7   subparagraph G?
8       MS. HAMILTON: Yes.
9       MS. ROSEN: No. Actually, you're not. You're
10  talking E, right, under paragraph 4? Is that
11  right?
12      MS. HAMILTON: Yeah. Sorry. I was looking at
13  the wrong page.
14      MS. ROSEN: Got it.
15      MS. HAMILTON: Paragraph 4? Yep. E.
16      MS. ROSEN: Four E. Okay.
17      MS. HAMILTON: Yes.
18      MS. ROSEN: Just so that we know what you're
19  talking about when you say "street" -- I mean,
20  you're using that as shorthand, I assume.
21  BY MS. HAMILTON:
22      Q   Sure. Yes. So, were CR's categorized in any
23  way that the city could identify a pattern of
24  allegations of street file misconduct?
25      A   Not then what I already discussed, using the

Page 147

1  miscellaneous code.
2       Q   Okay. And so, if they were coded as
3   miscellaneous, then the only way to track the number of
4   allegations would be to go through, one by one, each
5   miscellaneous code and go through it and see if there
6   was street file misconduct in the CR; is that correct?
7       A   Yes.
8       Q   Okay. In this timeframe, did OPS or IAD have
9   any ability to track instances of alleged or actual
10  failures to document and preserve exculpatory
11  information learned during a homicide investigation?
12      MS. ROSEN: Objection. Form.
13      A   Yeah, I don't know. No, I'm not aware of any.
14      Q   Was there a category code for instances of
15  alleged or actual failures to document and preserve
16  exculpatory information learned during a homicide
17  investigation?
18      MS. ROSEN: Objection. Form.
19      A   No, it would just be the miscellaneous.
20      Q   Okay. And so, in terms of fabrication of
21  witness statements, and I'll define that for you as
22  police officers knowingly getting witnesses to make
23  false statements and inculpating a criminal suspect in a
24  case, whether by coercion, or feeding facts, or
25  manipulation, or otherwise. In this timeframe, did the

Page 148

1  city attempt to track the number of allegations of
2  fabrication of witness statements by police officers?
3       MS. ROSEN: Can you show me where that is in
4   the 30(b)(6) notice?
5       MS. HAMILTON: I think we have a fabrication
6   -- C -- 4C, fabrication of inculpatory evidence.
7       MS. ROSEN: Oh, so you're -- I see. So you're
8   further defining it, right, by whatever you just
9   read?
10      MS. HAMILTON: Yes.
11      MS. ROSEN: Okay. Objection. Beyond the
12  scope of the 30(b)(6) notice. But you can answer,
13  if you know.
14      A   I don't know. And it's just saying -- the
15  term I'm saying when I'm answering these, too, is just
16  to track.
17  BY MS. HAMILTON:
18      Q   Sure.
19      A   I don't want to be misunderstood that, if what
20  you just said -- let's say the Cook County state's
21  attorney or a defense attorney or, let's say, a
22  plaintiff's attorney who's suing the city calls OPS and
23  says, "Hey, there's a fabrication allegation." We would
24  take that complaint, and we would investigate it. The
25  fact that -- could we track it and say how many numbers,

Page 149

1  immediately? Would be no. I don't know of a tracking
2  system.
3       Q   Okay. And to be clear, yes, I'm not -- your
4   understanding is OPS or IAD would investigate
5   allegations of this kind, correct?
6       A   Yes.
7       Q   But there was no way to aggregate and track
8   how many of these complaints were happening in this '86
9   to '98 timeframe?
10      MS. ROSEN: Objection. Form.
11      A   That's correct. Unless, you know, during the
12  review of a sustained finding, the investigator
13  requested the five-year history, a sustain history, and
14  there's previous sustain, then there would be -- I would
15  say that's a tracking system. But that would be the
16  only one that I know of. Yes.
17      Q   Okay. And in terms of the CR category codes,
18  was there a category code for allegations of fabrication
19  of inculpatory evidence?
20      A   It would -- no. Those terms alone? No.
21      Q   And then, in the 1986 to '98 timeframe, did
22  the city attempt to track the number of allegations of
23  the use of force, coercion, or other prohibited
24  techniques to obtain incriminating statements from
25  witnesses or suspects?

Page 150

1     A   I'm not aware of the tracking.
2     Q   Okay.  Would it be accurate to say that the
3   Chicago Police was not able to track those kinds of
4   allegations prior to auto CR?
5         MS. ROSEN:  Objection.  Form.  Misstates his
6     prior testimony.
7     Q   You can answer.
8     A   I believe – the same thing I testified
9   earlier, that, if you did a request and asked, back in
10   the '80s, like 1986, I think we would be able to track
11   how many complaints we had for A, B, D, E, and F of
12   number 4.
13     Q   And your testimony is that the –
14     A   It would be –
15     Q   Oh, I'm sorry.  Go ahead.
16     A   It would be going through the files how I
17   mentioned earlier.
18     Q   Okay.  It would be going through the files.
19   The only way that the city could track A, C, D, E, and F
20   in number 4 is by a individual, one-on-one review of the
21   CRs; is that correct?
22     A   Yes.
23     Q   Okay.  Was there a systematic way for OPS or
24   IAD to track which officers were drawing a large number
25   of complaints?

Page 151

1         MS. ROSEN:  Object to the form, with respect
2     to "large."
3     A   Not that I – I mean, when I was at the Office
4   of Legal Affairs, it was after this time.  We did have
5   requests like number CRs per officer.  You know, we
6   objected to releasing some of this under the FOIA
7   grounds, but we were able to create this list.  So I do
8   not know of one, to your question.  I don't know – to
9   say that it was never done, I don't – I'd probably be
10   overstating.
11     Q   So there was a later program, when you were in
12   the Office of Legal Affairs, where there was a
13   systematic way to track the number of CRs an officer had
14   made against him; is that correct?
15         MS. ROSEN:  Objection.  Form.  Are you asking
16     whether or not OPS or IAD could do it?  Or whether
17     there was a mechanism by which to do it?
18   BY MS. HAMILTON:
19     Q   I'm asking, was there any mechanism by anyone
20   in the City of Chicago, OPS, IAD, other entities, to
21   track the number of complaints made against an officer
22   in '86 to 1998?
23         MS. ROSEN:  Okay.  I'm going to object.  It's
24     beyond the scope of the 30(b)(6) notice.
25     A   But as I mentioned, see, the one CR, the one

Page 152

1   arbitration I discussed yesterday – I mean, I read it
2   yesterday and earlier.  That officer had 11 not-
3   sustained CRs, that the Lieutenant did his counseling
4   for him.  Somehow or another, those 11 were tracked and
5   were then given to that Lieutenant to sit down and
6   discuss with that officer.  So I would say there was a
7   method, and I think that arbitration decision just goes
8   to show that a method existed.  How that actual method
9   occurred, I do not know.
10     Q   Okay.  Can you think of any other examples of
11   tracking, other than the arbitration decision that
12   you've testified about?
13     A   No.
14     Q   And the tracking that took place in the
15   arbitration decision – was that tracking done by the
16   OPS or IAD office?
17         MS. ROSEN:  Objection.  Form.
18     A   It was part of the behavioral alert system.  So
19   I would assume, based on reading, that it was the
20   lieutenant requested from BIA.
21     Q   Okay.  In '86 to '98, did the city have a
22   database that could identify all CRs against a
23   particular police officer?
24     A   I'm not sure.  I do not know.
25         MS. ROSEN:  Objection.  Beyond the scope of

Page 153

1   the 30(b)(6) notice.
2     Q   Were there any written policies, in this time
3   period, regarding the number of complaints that would
4   trigger an analysis of an officer's past complaints?
5         MS. ROSEN:  Objection.  Form.  Beyond the
6     scope of the 30(b)(6) notice.
7     A   I mean, we went over it earlier, that order
8   where it talks about all excessive force complaints
9   would probably trigger a review to the officer.
10   Potentially, the behavioral alert system.  I don't know
11   if I answered your question.
12     Q   Well, you've mentioned that the behavioral
13   alert system –
14     A   So there was a way to track it.  How did we
15   know then – if I was going to put an officer in the
16   behavioral alert system, how did I know, as lieutenant
17   in the second district?
18     Q   Right.  Other than the behavioral alert
19   system, was there any other system or policy that
20   tracked the number of complaints that would trigger an
21   analysis of an officer's past complaints?
22         MS. ROSEN:  Objection.  Form.  Beyond the
23     scope of the 30(b)(6) notice.
24     A   I'm not aware of any.
25     Q   Are you aware if there was a certain threshold

Page 154

1    of CR files that would trigger an alert to look at an
2    officer's past complaints?
3          MS. ROSEN: Objection. Form.
4    A    I'm not aware of any.
5          MS. HAMILTON: Okay. Can we take another
6    short break, just ten minutes?
7          MS. ROSEN: Sure. Danielle, do you have any
8    idea how long you're going to go?
9          MS. HAMILTON: I don't think I'll be more than
10   another 30 to 40 minutes.
11         MS. ROSEN: Oh, okay. Cool.
12            (OFF THE RECORD)
13         COURT REPORTER: We're back on the record at
14   2:51.
15   BY MS. HAMILTON:
16   Q    Lieutenant Bird, did IAD, OPS, or any city
17   agency maintain a list of officers who had been referred
18   to the state's attorney's office for rule 14 violations?
19   A    During this time period, I'm not sure. I
20   mean, the time period of '86 to '98.
21   Q    Do you know if they maintained a list of
22   officers after this time period?
23   A    We do. We notify the state's attorney's
24   office. And rule 14 has been – and I've testified on
25   this – but is treated differently now. Rule 14 – when

Page 155

1    there's evidence that an officer has provided any type
2    of false, misleading information, the recommended
3    penalty is separation. We do have officers on the
4    department that have sustained rule 14s prior to that,
5    prior to, really, 2008, but the cases ended in 2012. But
6    from that point forward, if there is a sustained
7    finding, the recommended penalty is separation.
8    Q    Okay. But there was no – this process that
9    you just outlined was not in place during '86 to '98; is
10   that correct?
11   A    Correct, because rule 14 was treated
12   differently.
13   Q    Okay. How was rule 14 treated in the relevant
14   timeframe?
15   A    It was explained, when I went to BIA that,
16   potentially, if there was evidence that sustained
17   finding and then, you know, the scales of justice really
18   tips in front of the complainant. And maybe you came
19   across evidence that, if the officer said, "I didn't go
20   down that street," but he went down that street. Today,
21   we would say, "Oh, that's a rule 14," in some incidents,
22   because it has to be material and intentional. But back
23   then, it was an aggravating circumstance. They might
24   say, "Hey, we're going to do a rule 14 for that," but it
25   would be an aggravated circumstance to the all – the

Page 156

1    finding of the penalty. Now, if it's material and
2    intentional, the officer's recommended to be fired.
3    Q    Okay. And then there's – is there a list of
4    officers with sustained rule 14 violations that is
5    passed on to the state's attorney's office?
6          MS. ROSEN: During what timeframe? Today?
7    Q    I'll ask you first about today then ask you
8    about the time period of the '86 to '98.
9    A    I am aware of it today. I'm not aware of it,
10   '86 '98.
11   Q    Okay. And is it the –
12         MS. ROSEN: I have scope objection. Sorry,
13   just a scope objection to the "after 1998."
14   Q    Does the BIA maintain the list of officers
15   that are referred to the SAO for rule 14 violations
16   today?
17         MS. ROSEN: Beyond the scope, but you can
18   answer.
19   A    I've testified, yes, we have a list. There's
20   no new officers added to that list because it would be
21   separation.
22   Q    Right. Where's that list maintained within
23   the BIA?
24         MS. ROSEN: Objection. Beyond the scope of
25   the rule 30(b)(6) notice. I'm going to let him

Page 157

1    answer a couple more on this contemporaneous, but
2    then I'm going to shut it down.
3    BY MS. HAMILTON:
4    Q    Okay. You can answer.
5    A    You know, it was a request, before – I want
6    to say with the records division. You know, it was a
7    request. Prior to my testimony for the rule 14, I
8    reviewed that list, the BIA records.
9    Q    So your testimony is it's maintained in the
10   BIA records division?
11   A    The rule 14 list.
12   Q    Yes.
13   A    Like when I was going to get the 30(b)(6), I
14   requested, "Hey, do we have current officers that have
15   rule 14?" And they produced that for me.
16   Q    Okay. So, back in '86 to '98, did the city
17   attempt to track the number of allegations of rule 14
18   violations by police officers?
19   A    I'm not aware of that.
20         MS. ROSEN: Objection. Form.
21   Q    Okay. Were the CRs categorized with a
22   category code that would allow for tracking of
23   allegations of rule 14 violations in '86 to '98?
24         MS. ROSEN: So, I'm going to object to form.
25   And I have a belated objection to the prior

Page 158

1   question because your question is, "Does the city".
2   So, "Does the city" generally is beyond the scope
3   of the 30(b)(6) notice, but he can answer if he
4   knows.
5     A  The tracking -- because now -- just keep in
6   mind that that is a rule violation. We generally don't
7   mean -- you know, the category codes are not rule
8   violations. And if I -- there might be one in there,
9   something about test trial or something like that. But
10  we're talking, now, rule -- I mean, department rules.
11  And we don't track -- we can, now, pull up rules, but we
12  still don't track by that. We have category codes.
13  BY MS. HAMILTON:
14    Q  Okay. So none of the category codes in '86 to
15  '98 specifically tracked rule 14 violations.
16    A  Could I -- I thought there was one, maybe,
17  potentially on that list, the category codes.
18    Q  Okay.
19    A  Do you want me to get that or look at it?
20    Q  Yeah, we have that. So why don't we pull that
21  up and mark that as an exhibit? Could you, Chloe, pull
22  up ARL 155269?
23     MS. ROSEN: And this is now Exhibit 5, right?
24     MS. HAMILTON: I believe so. I lost count,
25  though.

Page 159

1     COURT REPORTER: It's Exhibit 5.
2     MS. HAMILTON: Okay. Thank you.
3     COURT REPORTER: You said that was ARL 155269?
4     MS. HAMILTON: Yes.
5     COURT REPORTER: Okay.
6     MS. HAMILTON: I believe it's the only one
7  that starts with that ARL.
8     COURT REPORTER: Let me pull it up.
9  BY MS. HAMILTON:
10    Q  Okay. So I'm marking this as Exhibit 5, and
11  it's Bates stamped ARL 15269 to 15270. And this is the
12  complaint category tables for the Internal Affairs
13  Division/Chicago Police. Do you see that at the top?
14  (PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
15    A  Yes. Yes.
16    Q  And are these the list of the complaint
17  category codes that the IAD used in '86 to '98?
18    A  Yes, it is.
19    Q  Okay. And the question that I had asked you
20  before was, is there a category code for a rule 14
21  violation?
22    A  And what I'm looking -- it's probably -- if I
23  -- category codes would be right here. You could --
24  depending on when it came in. Like, let's say there's
25  proof of testimony in a deposition or a trial that was

Page 160

1   false. We could do group three, civil rights
2   violations, 3G. If it was -- at the time of the arrest,
3   the arrestee contacted OPS and said, "The officer, in
4   addition to using excessive force on me, lied on the
5   arrest report," we could do a group 4, Arrest/Lockup
6   Procedures, Miscellaneous.
7    Q  So would there be a way to aggregate all of
8   the rule 14 violations by using a CR category code?
9     MS. ROSEN: Objection. Form.
10    A  Just by searching how I said, the same
11  procedure as earlier.
12    Q  Which is searching one by one, reading the
13  content of the allegations, and then making a
14  determination whether it fit under the category code?
15    A  Correct.
16    Q  Okay. So I want to move on to another topic
17  of the notice. Between '86 and '98, do you know how
18  many complaints -- registers were filed against
19  Detective Ronaldo Guevara?
20     MS. ROSEN: Objection. Form.
21    A  I believe it was between 15 and 18, somewhere
22  in that range. I reviewed them.
23    Q  Okay. Sorry, just to go back -- sorry -- to
24  Exhibit 5 for just a moment. This is for IAD. Are
25  there different complaint category codes for OPS?

Page 161

1    A  I don't believe so. They were the same
2  category codes that we used on the top of the summary
3  report.
4    Q  Okay. And you can put that down now, Chloe.
5  Thank you. So you reviewed approximately 15 CRs of
6  Detective Guevarra, correct?
7    A  Yes. It might have been a little bit more,
8  yes. But right around there.
9    Q  And did you review the full CR files?
10     MS. ROSEN: Objection. Asked and answered.
11    But, yes, you can tell her again.
12    A  All the documents that were given to me, they
13  were a lot of the file. I don't know if it included
14  everything, but, yes, they were -- a substantial amount
15  of work for each file.
16    Q  And between '86 and '98, would it have been
17  possible to aggregate all of the CRs against Detective
18  Guevarra?
19     MS. ROSEN: Objection. Form.
20    A  It's just kind of -- I mean, I don't know how
21  to answer that question because we got them today. So,
22  somehow or another, yes, we could have got them back
23  then, I would assume. But I don't know.
24    Q  You don't know how the collection of CRs
25  against Guevarra were collected in order to give them to

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 44 of 77 PageID #:85814
Pedro Guevarra, et al. v. Reynaldo Guevarra, et al. December 22, 2021
162..165

Page 162

1  you today?
2      A   That's correct.
3      Q   And do you know the process by which IAD or
4  OPS could collect all the CRs against Guevarra back in
5  '86 to '98?
6          MS. ROSEN:  Objection.  Form.  Beyond the
7      scope of the 30(b)(6) notice.
8      A   I mean, one, you'd just do a background check
9  of the officer.  I mean, other than the sustained,
10  there's the disciplinary history with list stuff.  And
11  then, you would probably do a request with our records
12  division, saying, "I want all of these CRs."
13     Q   Okay.  Was there one place that an OPS
14  investigator or IAD investigator would go to get all the
15  CRs against Guevarra between '86 and '98?
16         MS. ROSEN:  Objection.  Form.
17     A   I don't know why they would be requesting that
18  because they would only -- you know, during an open
19  investigation, you should just review the evidence
20  that's in front of you.  But if they needed, for
21  whatever reason, they would go to the BIA records
22  division.
23     Q   Okay.  And the BIA records division would have
24  all CRs against Guevarra between '86 and '98 in one
25  place?

Page 163

1      A   Yes.
2          MS. HAMILTON:  Okay.  So then I wanted to look
3      at -- Chloe, if you wouldn't mind pulling up RFC
4      789 to 791, Guevarra mainframe.
5          COURT REPORTER:  Sorry.
6      A   No, that's okay.
7  BY MS. HAMILTON:
8      Q   And then, looking at the first page, this is
9  the pre-2000 mainframe complaint register history that
10  is Bates stamped RFC 789 to -- this page is 789.  So
11  have you seen this document before?
12     A   I don't believe so.
13     Q   Are you familiar with the mainframe document,
14  what that is?
15     A   Yeah.  Yeah.  I'm familiar with what this is.
16  I can tell you what this is.
17         MS. HAMILTON:  Okay.  And I believe this is
18  Exhibit 7, now?
19         COURT REPORTER:  Exhibit 6.
20  BY MS. HAMILTON:
21     Q   Sorry, Exhibit 6.  And so, what is this
22  document?
23     (PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)
24     A   This was -- someone did a check, pulled the
25  history for this officer from January 1, 1997, to

Page 164

1  December 31, 1999.  And then, this will list the
2  complaints against this officer.  It will list the
3  category codes.  First, it gives you the CR numbers.
4  Then it gives you the category codes.  Then it kind of
5  gives what the category code is, the date of the
6  incident, the date of the complaint, when it was closed,
7  and the final finding.
8      Q   Okay.  And the possibility to generate this
9  document, did this -- did that possibility exist between
10  '86 and 1998?
11         MS. ROSEN:  Objection.  Form.
12     A   I'm not sure when the mainframe started.  I
13  don't know.
14         MS. ROSEN:  And beyond the scope of the
15     30(b)(6) notice.  And I'm just going to say,
16     generally, to the extent that you guys are
17     interested in data compilation and how this police
18     department does that, that's a question that can be
19     answered.  And so, this 30(b)(6) notice does not
20     embrace that or encompass that. But you can go
21     ahead and answer her question.
22  BY MS. HAMILTON:
23     Q   Okay.  So you're not aware when the mainframe
24  program was implemented at the Chicago Police
25  Department; is that correct?

Page 165

1          MS. ROSEN:  Objection.  Form.
2      A   That's correct.
3      Q   I'm sorry.  What was your answer?
4      A   That's correct.
5      Q   Okay.
6      A   I'm not aware.
7      Q   And so, from the time period of this case, '86
8  to '98, there are seven CR files listed; is that
9  correct?  Based on incident date?
10     A   Oh, okay.  Let me -- the document I have says
11  11, but, oh, I see what you -- cut out the bottom four?
12     Q   Well, based on the incident date, actually,
13  there are eight listed there that have a date before
14  1998 -- or before the end of 1998; is that correct?
15         MS. ROSEN:  Objection.  Form.
16     A   I have eight.
17     Q   Okay.  And so, of the eight CRs before
18  December 31, 1998, how many of those were sustained?
19     A   Two.
20     Q   And of the eight until December 31, 1998, how
21  many of them were not sustained or unfounded?
22         MS. ROSEN:  Objection.  Form.
23     A   Four not sustained.
24     Q   Right.  The 1995 allegations -- the May, 1995,
25  allegations have a category code of 5D.  Do you see

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 45 of 77 PageID #:85815

Reynaldo Guevara, et al. v. City of Chicago, et al. Lt. Richard Bird - September 22, 2021

166..169

Page 166

1 that?

2      MS. ROSEN:  Can you use the CR number?

3   Q   Yes.  CR 217624?

4   A   Yes.

5   Q   That has a category code of 5D?

6   A   Yes.

7   Q   And the category code of number five is

8   excessive force allegations, correct?

9   A   Yes.

10   Q   Okay.  And then, for 1996 – sorry.  For the

11  CR code 236739, there's a category code of 4H.  Do you

12  see that?

13   A   Yes.

14   Q   And the terminology is proper care injury,

15  death.  Do you see that?

16   A   Yes.

17   Q   And what does that category code mean?

18   A   4H.  So this would be, when the person's under

19  arrest or lockup, that they receive proper care.  Proper

20  care could mean, like, if the person needs medical

21  attention just while they're in custody, the treatment

22  while they're in custody.

23   Q   Okay.  And you said that you – so there are

24  eight CRs here listed before December 31, 1998.  And you

25  said you reviewed twice as many for Detective Guevara

Page 167

1   during this time period.  Is that right?

2      MS. ROSEN:  Objection.  Misstates his

3      testimony, but you can answer.

4   A   Yes.  I mean, I reviewed more than eight.  I

5   could tell you that.

6   Q   Okay.  Is there any other way to aggregate all

7   of the complaints against Detective Guevarra from '86 to

8   '98, other than through this mainframe program?

9      MS. ROSEN:  Objection.  Form.  Do you mean –

10     what do you mean, "to aggregate"?  We obviously

11     have all the files.  So what are you asking?

12     MS. HAMILTON:  I'm asking if there's another

13     way to aggregate all the files, other than by using

14     the mainframe.  Is there some other system to

15     aggregate other than mainframe?

16     MS. ROSEN:  So, can CPD do it, is what you're

17     saying?

18     MS. HAMILTON:  Can any agency, OPS, IAD, or

19     CPD, aggregate the number of complaints, other than

20     what we're looking at, this mainframe?

21     MS. ROSEN:  Objection.  Form.  You can answer.

22   A   It was my understanding that the mainframe

23  would capture – you know, there was migration when we

24  switched systems, that files were migrated.  But I

25  believe the mainframe is the main source of this, yes.

Page 168

1   Mainframe was supposed to capture, I believe, before

2   auto CR and then with CR.  But I believe there was

3   migration issues.

4   BY MS. HAMILTON:

5   Q   Okay.  After 1998?

6   A   Yes.  And, well – yes.

7      MS. ROSEN:  Object to the form.

8   Q   Okay.  So then, we can put that down.  And

9   then, I'd like to show you another exhibit, which has a

10  Bates of – this will be Exhibit 8 [sic] – RFC 32936 to

11  32949.  This is CR 270916.

12     (PLAINTIFF'S EXHIBIT 7 MARKED FOR IDENTIFICATION)

13   A   Thank you.

14   Q   And Lieutenant Bird, is this one of the CRs

15  that you reviewed in preparation for your deposition

16  today?

17   A   I did read this.  Yes.

18   Q   All right.

19   A   Yes.

20   Q   Okay.  And on the second page in the

21  allegations component, it says, "It is alleged that the

22  accused gave false testimony during various 17 homicide

23  trials."  Do you see that?

24   A   I did see that.

25   Q   And this was an allegation made by state

Page 169

1   representative William Delgado, correct?

2   A   Yes.

3   Q   And the accused here is Reynaldo Guevara and

4   Ernest Halverson.  Do you see that?

5   A   Yes.

6   Q   So this is alleging that these two officers

7   gave false testimony during various 17 homicide trials,

8   correct?

9   A   Yes.

10   Q   And in '86 to '98, would this complaint have

11  triggered an investigation by OPS?

12     MS. ROSEN:  Object to the form.  You mean,

13     had this complaint been made in that timeframe?

14   Q   That's correct.  Had this complaint been made

15  in that time period, would it have triggered an

16  investigation by OPS?

17     MS. ROSEN:  Objection.  Form.

18   A   Yes.

19   Q   And had it been made in the relevant

20  timeframe, would it have triggered a referral to the

21  state attorney's office?

22   A   Yes.  I would say pursuant to those, yes, it

23  would.

24   Q   Okay.  And had it been made – in '86 to '98,

25  would it have resulted in being put on a list of rule 14

Page 170

1  violations?
2  A   Oh yeah.  We have to investigate the
3  allegations.  You know, officers, just like anyone else,
4  are innocent until the allegations are proven.  So this
5  would require an investigation.  And once the
6  investigation concluded -- this seems to be very serious
7  allegations of rule 14.  So not only would the state's
8  attorney be involved, but the department probably
9  would've sought separation if the allegations were
10  proven.
11  Q   Okay.  And would these allegations have been
12  taken into account when OPS investigators were weighing
13  whether a subsequent complaint should have been
14  sustained or not?
15  MS. ROSEN:  Objection.  Form.  Do you mean had
16  the complaint been made at '86 to '98 --
17  MS. HAMILTON:  Yes.
18  MS. ROSEN:  Without being sustained?  Without
19  being sustained?
20  BY MS. HAMILTON:
21  Q   Let's do without being sustained and then I'll
22  ask you the same question with being sustained.  So if
23  this was an unsustained finding and it had been made in
24  the relevant time period, would it have been considered
25  or taken into account if there was a subsequent

Page 171

1  investigation of a subsequent complaint?
2  A   No.
3  Q   Okay.  And what if it had been sustained?  What
4  if there had been sustained findings?  Would it have
5  then been taken into account in a subsequent
6  investigation?
7  A   Yeah, I would be surprised if it was a
8  sustained finding back then that the department would
9  not have sought discharge of the employee.  So, and then
10  it might be irrelevant whether or not it'd be used,
11  because I don't know if the person would still be an
12  employee, but if for some reason there was allegations
13  sustained that did not -- was not -- did not involve the
14  false testimony at 17 homicide trials, then yes, it
15  would be used if it was sustained.
16  Q   Okay.  And your -- if these allegations had
17  been found to be sustained, the recommended penalty
18  would've been separation?
19  A   Yes.  I mean, yes.
20  Q   Are you aware if Detective Rivera was
21  disciplined for the allegations in this complaint
22  register?
23  A   Yeah.  These -- the findings was sustained.  I
24  mean, not sustained.  I'm sorry.  Not sustained.
25  Q   Okay.  So he didn't receive any discipline for

Page 172

1  the allegations of this complaint, correct?
2  A   That's correct.
3  Q   When the referrals are made to the SAO to do
4  an investigation, is the superintendent made aware of
5  that referral?
6  A   I mean, you know, today, yes.  I would say
7  back then, yes.  You know, referral of potential charges
8  against officers, I think it's a very serious allegation
9  of misconduct.  And I think the superintendent wants to
10  know that.  Yes.
11  Q   Okay.  We can put that exhibit down.
12  Thank you, Chloe.  So between '86 and '98, did OPS take
13  any steps to investigate Guevara's patterns of
14  misconduct?
15  MS. ROSEN:  Objection.  Form.
16  Q   You can answer.
17  A   Yeah.  I do not see any.
18  Q   Did anyone at OPS ever attempt to alert anyone
19  at IAD or anywhere in the Chicago Police Department that
20  Guevara had repeated complaint registers against him?
21  MS. ROSEN:  Objection.  Form.
22  A   There's no indication.
23  Q   Did OPS ever attempt to alert anyone in IAD or
24  the CPD about the fact that Guevara had numerous
25  sustained complaints against him?

Page 173

1  MS. ROSEN:  Objection.  Form.
2  A   No.  In -- if my review was correct, we just
3  looked at two.  There was only two sustained over, I
4  thought that was like a ten year period.  So I would
5  just say it was a couple sustained, instead of numerous.
6  Q   Okay.  But you're aware of other CRs that are
7  not reflected on this form, correct?
8  A   Yes.
9  Q   Okay.  So there could have been more sustained
10  complaints between '86 and '98 that are not reflected on
11  Exhibit 7, I think -- or excuse me, 6, I think it was.
12  MS. ROSEN:  Objection.  Form.
13  A   Of the ones I reviewed, I thought there might
14  have been only one more sustained during this time
15  period.  So it would've been three sustained CRs.
16  Q   Okay.  And are you aware of OPS attempting to
17  alert anyone in IAD or the CPD that the Guevara had
18  three sustained CRs?
19  A   No.
20  Q   Did OPS ever take any steps to recommend
21  discipline based on Guevara's pattern of misconduct?
22  MS. ROSEN:  Objection.  Form.
23  A   There -- you know, there was -- as you pointed
24  out, there was two that were sustained.  And so when the
25  second one that one is sustained, then the

Page 174

1 investigator, either if it was OPS or BIA would then
2 have requested the disciplinary sustain history, but had
3 an opportunity to review that and then potentially could
4 have increased the next penalty if it was relevant to
5 increase it. So there could have been a process, yes.
6 There should have been a process with the second
7 sustained allegation.
8     Q   Are you aware of whether or not that process
9 actually occurred with respect to the second sustained
10 allegation?
11     A   I --
12         MS. ROSEN: Objection. Form.
13     A   I would say it occurred because that was the
14 process. When you sustain an allegation, you request a
15 complimentary and a disciplinary history, sustained
16 disciplinary history, and you take it into account.
17     Q   Okay. Do you have any knowledge of whether
18 Detective Guevara was identified for the behavioral
19 alert system or the behavioral intervention system from
20 '86 to '98?
21     A   I'm not aware. No.
22     Q   Okay. Do you have a knowledge of whether
23 Detective Guevara was identified for the personnel
24 concerns program sometime prior to the end of 1998?
25     A   No. I'm not aware of that.

Page 175

1     Q   If he had been referred to either of those
2 programs, would that be documented anywhere?
3     A   If you remember, the behavioral alert system
4 was -- the file was kept for one year, and then after
5 one year, the behavior changed then it would be
6 destroyed. So I don't know if it would've been more
7 than that one year -- if it would've been stored
8 anywhere.
9     Q   And the behavioral alert system being
10 destroyed after one year, was that policy pursuant to
11 the FOP contract?
12         MS. ROSEN: Objection. Form.
13     A   I mean, the one arbitration I discussed, the
14 arbitrator said it was destroyed, was supposed to be, he
15 even made a reference at the following year after that
16 one officer, there was no discipline. So the department
17 complied with their requirement.
18     Q   Yes. And I'm wondering where did the
19 requirement come from, if you know?
20     A   I don't. I -- could we pop open that order
21 again? Do you want to, or --
22     Q   Sure. This is the behavioral alert?
23     A   Yeah.
24     Q   Let me find that. I'll tell you, Chloe, which
25 Bates it is. Well, I'm in the wrong place. That was an

Page 176

1 earlier exhibit. Eileen, do you know the number for
2 that? The number exhibit that is?
3         MS. ROSEN: Yeah, I'm looking. Hold on.
4         MS. HAMILTON: Thanks.
5         COURT REPORTER: I'm going to share something
6 that I think might be it.
7         MS. ROSEN: Exhibit 3 and Exhibit 4. One is
8 the '83 order. The other is the '97 order.
9         MS. HAMILTON: Okay. So can you pull up
10 Exhibit 3 and Exhibit 4?
11         COURT REPORTER: Yes. This is Exhibit 3.
12 BY MS. HAMILTON:
13     Q   Okay. And so you look through Exhibit 3 and
14 do you understand the --
15     A   You --
16     Q   I'm sorry, what?
17     A   I -- I -- just you want me to go? I didn't
18 know if you want me to talk or not.
19         MS. ROSEN: Can you just rephrase your
20 question? Like repeat the question so we know what
21 we're asking again.
22         MS. HAMILTON: Sure. I actually do not
23 remember what the question was. So if -- Chloe, if
24 you wouldn't mind repeating it.
25         COURT REPORTER: Let me pull it up for you. I

Page 177

1 can play back the verbatim record. It kind of got
2 messy when I was screen sharing, but here it is.
3     (REPORTER PLAYS BACK REQUESTED TESTIMONY)
4         COURT REPORTER: And that's when he asked for
5 the order.
6 BY MS. HAMILTON:
7     Q   Okay. So the question then was, the
8 requirement that after a year, any participation in the
9 behavioral alert system was destroyed. Where did that
10 requirement come from?
11         MS. ROSEN: The file was destroyed.
12         MS. HAMILTON: The file was destroyed?
13         MS. ROSEN: The file was destroyed, not the
14 referral, right? That's the question?
15         MS. HAMILTON: Yes. That's the question.
16         MS. ROSEN: Okay.
17     A   If you -- if you go to page 3 in number 6, and
18 this is just laying the groundwork, it says, "If there's
19 a recurrence of the behavioral alert system indicator
20 within the 12 months, repeat the steps, you know, 1
21 through 4 of this order." And then now if we go to the
22 last page -- sorry, do you want me to wait until that
23 comes up or are you okay?
24 BY MS. HAMILTON:
25     Q   I'm okay. I have it -- I have it up. Chloe,

Page 178

1  would you mind going to the last page?
2      A   And if you go like the personnel concerns
3  manager, if you look at number 7, it says, "Maintains a
4  file for each member designated a personal concern for a
5  period of 12 months from the date of the last entry." So
6  I'm saying maybe from there, that's where it came from,
7  that we wouldn't maintain it past the last incident of
8  12 months.
9      Q   Okay.  You don't know if it was because of the
10  FOP contract that, that requirement number 7 made it
11  into this policy?
12      A   I don't know.  No.
13      Q   Okay.  Okay.  You can put that down, Chloe.
14  Thank you.  Okay.  Was Detective Guevara identified for
15  SPARs program between 1986 and 1998?
16          MS. ROSEN:  The SPARs program?
17  BY MS. HAMILTON:
18      Q   Or was he sparred between 1986 and 1998?
19      A   The one exhibit that you gave me, I'm just
20  looking at it.  No, there's no indication of SPARs.
21      Q   Okay.  And was Detective Guevara given any
22  performance reviews?
23      A   I mean, according to the order that every
24  member of the department was supposed to be reviewed
25  twice a year during those time periods.

Page 179

1      Q   Okay.  Have you ever seen any performance
2  reviews of Detective Guevara between '86 and '98?
3      A   I have not, no.
4      Q   Okay.  If there were performance reviews for
5  Detective Guevara in that time period, where would they
6  have been kept?
7      A   Once they're completed, they would be
8  forwarded to the personnel division.  So stored at the
9  personnel division.
10      Q   And are those files kept forever, or do they
11  also have a destruction – are they destroyed pursuant
12  to any policies?
13          MS. ROSEN:  Objection.  Form.  Beyond the
14      scope of the 30(b)(6) notice, but you can answer if
15      you know.
16      A   I – I don't know.
17  BY MS. HAMILTON:
18      Q   Okay.  Did OPS or IAD ever take any
19  preventative measures to address Detective Guevara's
20  pattern of misconduct?
21          MS. ROSEN:  Objection.  Form.
22      A   You know, I only saw the eight complaints and
23  I'm not trying to get into the weeds, but I don't know
24  if I necessarily notice a pattern of misconduct.  It's
25  hard to answer that question.  There was no steps that I

Page 180

1  have come across regarding these eight complaints.
2      Q   Okay.  Do you know if any civil lawsuits were
3  filed against Detective Guevara between '86 and '98?
4      A   I do not.
5      Q   If lawsuits had been filed in that time
6  period, would that have triggered a POS or an IAD
7  investigation?
8      A   It should, because the civil lawsuits
9  generally alleged misconduct, but potentially if it was
10  a traffic accident where there's no misconduct, I don't
11  know if that would trigger necessarily a CR number.  I'm
12  just trying to quickly think of a circumstance that it
13  wouldn't.
14          MS. HAMILTON:  Okay.  And then I want to show
15      you the RFC – the Guevara mainframe again, which I
16      believe is exhibit –
17          MS. ROSEN:  6.
18  BY MS. HAMILTON:
19      Q   6.  Thank you.  You can pull that up again.  So
20  the second page of Exhibit 6 has the CR 270916 in the
21  second entry.  Do you see that?
22      A   Yes.
23      Q   And that CR is the next exhibit alleging that
24  Guevara gave false testimony during 17 homicide trials,
25  right?

Page 181

1          MS. ROSEN:  Objection.  Form.
2      A   Yes.  That's it.
3      Q   And these allegations, what was the finding of
4  this CR?
5      A   Not sustained.
6      Q   I'm going to – hold on for one second.  Okay.
7  Was the source of the or the content of the allegations
8  in this CR 270916 only the lying – giving false
9  testimony during 17 homicide trials?
10      A   I mean, that's how the complaint came in.  Yes.
11      Q   Okay.  If there were other allegations of
12  misconduct in addition to the giving false testimony
13  during the 17 homicide trials, would there be a finding
14  as to each allegation?
15      A   Yes.
16      Q   Okay.  And would there be separate – so there
17  could be additional punishment if, in this CR, there was
18  sustained allegations of lying and of some other
19  misconduct; is that correct?
20          MS. ROSEN:  Objection.  Form.
21      A   Yes.  If, for example, you're now using your
22  hypothetical saying that this is a sustained finding, so
23  if we say just one of the cases that it was proven that
24  he gave false testimony during one homicide trial –
25      Q   Uh-huh.

Page 182

1    A    – we can add several violations, rule 1
2    violation, a rule 2, rule 3, probably a rule 14.
3    Q    And one will receive separate punishments or
4    separate recommended penalties for each sustained
5    finding?
6    A    They really don't do it like that for
7    punishment.  They do a finding, yes.  So each allegation
8    would have its own individual finding.  There's always
9    just one bottom penalty.
10    Q    And in terms of what discipline would be
11    imposed if there was numerous sustained findings as to
12    numerous allegations, could the recommendation be more
13    severe because there's numerous sustained findings?
14    A    It's really still – I mean, yes.  Obviously
15    that could be yes, but it's also the misconduct.
16    MS. HAMILTON:  Okay.  Okay.  We could just
17    take another short break.  I think I'm done, but I
18    just want to make sure.
19    MS. ROSEN:  Okey doke.
20    MS. HAMILTON:  Let's do ten minutes.
21    MS. ROSEN:  Okay.
22    (OFF THE RECORD)
23    COURT REPORTER:  We are back on record at
24    3:47.
25    BY MS. HAMILTON:

Page 183

1    Q    Okay, Lieutenant Bird, you testified that
2    earlier that after a second sustained CR finding,
3    Guevara's past complaint history would've been taken
4    into count in recommending discipline for a third
5    sustained finding.  Do you remember giving that
6    testimony?
7    MS. ROSEN:  Objection.  Form.  Misstates his
8    testimony.
9    A    If I could grab the form, like we had the one,
10    I believe it was in '84 that was sustained, and then
11    another one in '86.  I hope I'm not – here, let me grab
12    this.
13    Q    Sure.  Yeah.  Go ahead and look.
14    A    Okay.  So he had a sustained finding according
15    to this document in 1995.  And then there was a second
16    investigation that concluded in 1996.  So in the 1996
17    finding, when it gets to the investigator has determined
18    it's going to be a sustained finding, investigator then
19    requested the complimentary and disciplinary history –
20    you know, personnel complementary DIA or IAD discipline.
21    That history would've had one before it, the one
22    from '95, and that could have been taken into account in
23    assessing the discipline on the second one.
24    Q    Right.  So you're assuming that that practice
25    or policy was followed, correct?

Page 184

1    A    Yes.
2    Q    But have you ever seen any documentation that
3    that practice or policy was followed?
4    MS. ROSEN:  Objection.  Form.
5    A    That is why I was saying earlier, when you
6    said, "Hey, did you get the complete file?"  And I was
7    like saying, "I didn't get the suspension notification."
8    It – that would've been part of it.  Like I can only
9    say now the investigator requests very similar to this
10    document right here.  They will get this document.  This
11    is uploaded – I'm sorry, this is that sustained
12    finding.  This is part of the – they will upload this
13    in the file.  So this is what they reviewed in assessing
14    the penalty.
15    Q    Okay.
16    A    So I'm assuming that that was included in the
17    files back then as well.  And I would believe that
18    there's no reason why it wasn't.
19    Q    So do you know for a fact of whether or not it
20    would've been included in the file?
21    MS. ROSEN:  Objection.  Form.
22    A    If following the order, it's included.
23    Q    Okay.  Have you ever seen documentation that
24    the order was followed?
25    MS. ROSEN:  Objection.  Form.

Page 185

1    A    I didn't see it in the orders that were given
2    to me from this time period.
3    Q    Okay.  Another question.  Are you aware of any
4    of Guevara's supervisors in this timeframe being made
5    aware of the number of CRs against him or the type of
6    allegations in the CRs?
7    A    I'm not aware.
8    Q    Okay.  Have you seen any documentation of the
9    supervisors being made aware of the number of CRs or the
10    types allegations in the CRs?
11    A    I did not see anything.  No.
12    Q    And then regarding the CR related to giving
13    false testimony in 17 homicide trials, what would you
14    expect the OPS or IAD investigation to be for an
15    investigation with those kinds of allegations?
16    MS. ROSEN:  I'm going to object.  Beyond the
17    scope of the 30(b)(6) notice.  That's a 2001
18    allegation and the 30(b)(6) notice cuts off at
19    1998.
20    MS. HAMILTON:  Sure.  So let me –
21    MS. ROSEN:  But you can –
22    MS. HAMILTON:  Sorry.
23    MS. ROSEN:  You can go ahead and answer the
24    question.
25    BY MS. HAMILTON:

Page 186

1    Q   I can just add to the question, you know, if
2   that complaint had been made in the relevant timeframe,
3   what would you expect the investigation to have been?
4    A   I mean, this investigator and the supervisor
5   signed off on this investigation.  And this was – they
6   looked at – they each really relied on the state's
7   attorney's office.  And the state's attorney's office –
8   one of the state's attorneys indicated that he reviewed
9   these 17 files and he found that there was no
10  irregularities regarding the testimony in these trials.
11  And, you know, obviously the state attorney's office
12  would be more equipped to say, "Hey, you know, hey,
13  there was a motion here or there, or this was raised,"
14  but when say attorney's office is saying, "Hey, we
15  didn't see anything in these trials that would lead us
16  to believe that it should be sustained," then the
17  investigator relied on that information and he then not
18  sustained it.
19   Q   So is your position that a thorough
20  investigation was conducted with respect to the CR?
21      MS. ROSEN:  Objection.  Form.  Foundation.
22   A   You know, we're all different.  I – I would
23  say professionally, me, I may have done a little bit
24  more.  I think I would've tried – and he talks to the
25  sister.  You know, the sister makes the allegation to

Page 187

1   the state rep.  I would've found out who the sister is
2   of, and I probably would've went and interviewed the
3   brother who was incarcerated in prison.  I would've
4   known – I wanted to know what the actual allegation is.
5   I would've went a little bit more.
6       MS. HAMILTON:  Okay.  I have no further
7   questions.
8       MS. ROSEN:  Just give me one second.  Okay.  So
9   we're going to need to mark that then as an
10  exhibit.  So I have just a couple follow up
11  questions, but we need to send an exhibit.  So if
12  we can just – sure.  You can just send it.  We're
13  going to add a CR number.  So just give us one
14  second.
15      MS. HAMILTON:  No, that's fine.
16      MS. ROSEN:  Teresa's forwarding it right now.
17  Why don't we just take one – why don't you give me
18  five minutes so we can get this together and then
19  we'll come back?
20      MS. HAMILTON:  Sure.
21      MS. ROSEN:  Thanks.
22          (OFF THE RECORD)
23      COURT REPORTER:   And then this is Exhibit 8
24  pulled up?
25  (DEFENDANTS' EXHIBIT 8 MARKED FOR IDENTIFICATION)

Page 188

1           CROSS EXAMINATION
2   BY MS. ROSEN:
3    Q   Correct.  Okay.  So Lieutenant Bird, what is
4   Exhibit number 8?
5    A   This is the complaint register for log number
6   223928.
7    Q   And is log number 223928 the second sustained
8   CR that you were referencing off of Detective Guevara's
9   complaint history earlier in your testimony?
10   A   Yes.
11   Q   Okay.  And asking you to look at what is Bates
12  stamped 31944, which is the second to last page of the
13  PDF.
14   A   Okay.
15   Q   Can you tell us what that form is?
16   A   This is the form that the investigator
17  requested – the disciplinary – the previous discipline
18  hearing rec – discipline record of the officer – the
19  accused officer regarding this complaint number.
20   Q   And when would the investigator have made this
21  request?
22   A   After they have concluded that there was a
23  sustained finding.
24   Q   Okay.  And in your review – is this one of
25  the files that you reviewed in preparation for your

Page 189

1   deposition?
2    A   Yes.
3    Q   And in your review of this file in preparation
4   for the deposition, did you actually see in the file
5   Detective Guevara's previous disciplinary record?
6    A   I do not.
7    Q   And do you have an explanation for why that
8   disciplinary record does not appear in this version of
9   the CR file?
10   A   I don't.
11      MS. SUSLER:  Objection.  Form and foundation.
12  It's Jan Susler.
13      MS. HAMILTON:  Same objections.
14  BY MS. ROSEN:
15   Q   Is – upon review of the file, do you believe
16  this file is complete?
17   A   No, I don't.
18      MS. HAMILTON:  Same objections.
19   Q   Why don't you believe the file is complete?
20   A   When I'm looking at the summary report, it
21  kind of cuts off, like, number 3.  If I go to summary
22  report digest, then the fourth page, like after that
23  starts talking about the investigation, but then it's
24  like cut off.
25   Q   Can you give us the Bates number that you're

Page 190

1  referring to where you see that it cuts off?  So the
2  number at the bottom of the page that starts RFC?
3      A   Yes, 031827.
4          MS. ROSEN:  Okay.  I don't have any further
5  questions.
6          MS. HAMILTON:  Let's just take -- sorry for
7  these serial breaks, but can we just take another
8  five minutes to make sure I don't have any
9  follow-up?
10         MS. ROSEN:  Sure.
11         MS. HAMILTON:  Thanks.
12         (OFF THE RECORD)
13         COURT REPORTER:  We are back on the record at
14  4:10.
15         MS. HAMILTON:  Okay.  I don't have any further
16  questions for the lieutenant.
17         MS. ROSEN:  Anybody else?
18         MS. SUSLER:  No.  On behalf of Solache, we
19  have no questions.
20         MR. STEPHENSON:  Nothing on behalf of
21  defendants Varga, O'Malley, Wherle and Brualdi.
22         MS. ROSEN:  Josh?
23         MS. MCGRATH:  Nothing on behalf of Defendant
24  Guevara.
25         MR. ENGQUIST:  I'm sorry guys, I've been

Page 191

1  cutting off.  Yeah.  Nothing from me.
2          MS. ROSEN:  Okey doke.  We reserve signature.
3  (DEPOSITION CONCLUDED AT 5:11 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1   CERTIFICATE OF REPORTER
2
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page hereof by me after first
7   being duly sworn to testify the truth, the whole truth,
8   and nothing but the truth; and that the said matter was
9   recorded by me and then reduced to typewritten form
10  under my direction, and constitutes a true record of the
11  transcript as taken, all to the best of my skills and
12  ability. I certify that I am not a relative or employee
13  of either counsel, and that I am in no way interested
14  financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22  CHLOE GILBERT,
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 07/20/2029
25  SUBMITTED ON:  01/05/2022

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 52 of 77 PageID #:85822
The Deposition of LUTHER JOSEPH BIRD, taken on December 22, 2021
193

**Exhibits**

**Plaintiff's Exhibit 1_Bird** 13:22 145:18

**Plaintiff's Exhibit 2_Bird** 88:3,7

**Plaintiff's Exhibit 3_Bird** 122:3,4,5 128:4 176:7,10, 11,13

**Plaintiff's Exhibit 4_Bird** 127:18,19, 24 131:1 176:7, 10

**Plaintiff's Exhibit 5_Bird** 158:23 159:1,10,14 160:24

**Plaintiff's Exhibit 6_Bird** 163:19,21, 23 180:20

**Plaintiff's Exhibit 7_Bird** 163:18 168:12 173:11

**Defense Exhibit 8_Bird** 168:10 187:23, 25 188:4

**0**

**031827** 190:3

**1**

**1** 13:22 129:2 145:18 163:25 177:20 182:1

**1.3** 141:18

**11** 115:7,17,21, 22 131:23 152:2,4 165:11

**118463** 87:8,17

**118500** 87:8, 19,21

**118619** 120:2 121:18 122:8

**118622** 122:8

**118623** 127:16

**118630** 87:19

**11:27** 60:6

**11:29** 60:10

**12** 126:15 133:22 177:20 178:5,8

**12-month** 129:5 133:25 135:12,21

**13,000** 112:13

**14** 20:5,6,7,9 83:7 137:24 154:18,24,25 155:11,13,21, 24 156:4,15 157:7,11,15,17, 23 158:15 159:20 160:8 169:25 170:7 182:2

**14s** 155:4

**15** 29:13 88:10 160:21 161:5

**15269** 159:11

**15270** 159:11

**155269** 158:22 159:3

**16** 21:3 24:11 26:21 28:21

**17** 168:22 169:7 171:14 180:24 181:9,13 185:13 186:9

**18** 21:3 24:11 28:9 160:21

**1980** 115:8

**1982** 24:23 88:10

**1983** 97:2 115:8 121:22

**1984** 24:23

**1986** 15:2 17:3 18:3,19 19:5 21:1 22:1,21 24:23 25:1 29:16 30:24 34:2 35:1 36:9 42:17 44:2 97:12 138:4 145:24 149:21 150:10 178:15, 18

**1988** 19:6

**1995** 165:24 183:15

**1996** 166:10 183:16

**1997** 26:25 27:1 111:8 120:13 121:25 127:25 136:24 163:25

**1998** 15:2 17:3 18:3,19 21:1 22:1,21 25:2 29:16 30:24 32:4 34:2 35:1 36:9 42:18 44:2 97:12 138:4 151:22 156:13 164:10 165:14, 18,20 166:24 168:5 174:24 178:15,18 185:19

**1999** 164:1

**1:00** 102:3,10, 16

**1:15** 102:13

**1:21** 102:22

**1:30** 102:13

**1st** 25:11 27:24 93:16 108:6,7

**2**

**2** 88:3,7,13 129:2 182:2

**20** 27:2 43:14

**2000** 101:10

**2000s** 24:1

**2001** 185:17

**2003** 27:14

**2005** 31:16,17

**2008** 27:24 28:3 155:5

**2010** 28:4,6

**2012** 34:22 155:5

**2013** 28:6 34:23

**2015** 34:23

**2017** 30:8

**2020** 27:2

**21** 43:15,17 44:8,19

**217624** 166:3

**22** 43:15,16,17 44:19

**223928** 188:6,7

**22nd** 10:12 27:12,23 28:23

**236739** 166:11

**23rd** 27:8

**270916** 168:11 180:20 181:8

**2:51** 154:14

**3**

**3** 14:21,23 15:1, 8 20:21 45:10 122:3,4,5 128:4 129:2 176:7,10, 11,13 177:17 182:2 189:21

**30** 84:10,12,13 90:18,19 91:1 108:10 127:25 154:10

**30(b)(6)** 11:12 13:18 14:20 19:19,20 20:12 21:14,17 32:3 33:20 44:15 45:8 46:11 48:11 93:9 104:6,13 107:25 114:23 116:13 117:8 136:2,12,22 148:4,12 151:24 153:1,6, 23 156:25 157:13 158:3 162:7 164:15, 19 179:14 185:17,18

**30(b)(6)notice** 32:23

**30th** 93:16 108:7

**31** 164:1 165:18,20 166:24

**31944** 188:12

**31st** 93:17 108:7

**32936** 168:10

**32949** 168:11

**35** 114:2,4

**3:47** 182:24

**3G** 160:2

**4**

**4** 15:10 16:23 17:22 21:1 127:18,19,24 131:1 146:10, 15 150:12,20 160:5 176:7,10 177:21

**4-B** 122:18

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 53 of 77 PageID #:85823
The Deposition of JOSEPH BIRD, taken on December 22, 2021
194

**4-B-1** 123:17

**40** 154:10

**4:10** 190:14

**4C** 148:6

**4H** 166:11,18

---

**5**

**5** 17:24 18:2,12
21:2 23:22
24:10 25:14
26:25 158:23
159:1,10,14
160:24

**5:11** 191:3

**5D** 165:25
166:5

**5th** 25:11 27:6

---

**6**

**6** 18:14,17,25
21:4 22:14
129:4 163:19,
21,23 173:11
177:17 180:17,
19,20

**6A** 126:2

---

**7**

**7** 126:2 163:18
168:12 173:11
178:3,10

**7.9** 141:18

**70** 108:25

**76** 108:25 111:1

**789** 163:4,10

**791** 163:4

---

**8**

**8** 19:2,5,16
21:5,22 83:5,6
129:2 168:10
187:23,25

**188:4**

**8.1** 85:2

**8.4** 96:11

**80s** 111:14
150:10

**82-14** 87:13
88:4 107:13

**83** 97:3 115:8
116:25 120:12
128:14 176:8

**83-3** 120:12
121:7 128:4
130:11

**83.3** 121:13

**84** 183:10

**86** 36:1 48:4
49:7 79:18
100:17 101:21
106:23 131:19
132:23 139:20
141:1,5 143:20
144:1,24 145:7
146:1 149:8
151:22 152:21
154:20 155:9
156:8,10
157:16,23
158:14 159:17
160:17 161:16
162:5,15,24
164:10 165:7
167:7 169:10,
24 170:16
172:12 173:10
174:20 179:2
180:3 183:11

**87** 49:7

**88** 49:7

---

**9**

**95** 183:22

**97** 79:18 108:21
111:4 112:21
130:21 131:19
132:7 176:8

**97-10** 121:25
127:15,24

**129:14**

**97.11** 121:10

**98** 48:4 100:17
101:21 106:23
111:5 132:24
139:20 141:1,5
143:21 144:1,
24 145:7 146:1
149:9,21
152:21 154:20
155:9 156:8,10
157:16,23
158:15 159:17
160:17 161:16
162:5,15,24
165:8 167:8
169:10,24
170:16 172:12
173:10 174:20
179:2 180:3

**9:00** 23:11

---

**A**

**abiding** 18:24

**ability** 12:23
13:10,14 14:4
89:11 147:9

**absenteeism**
141:12

**absolute**
91:13,14 107:4

**absolutely**
58:18

**absolutes** 59:2

**abuse** 143:9

**abusive**
115:24

**academy** 27:6

**accept** 68:4
72:21

**acceptable**
111:6,9,11

**accepted**
28:15

**access** 98:7,12
99:21 109:7,13

**113:6,11**
**133:15 134:14,**
**17**

**accident**
180:10

**accommodati**
**ons** 64:9,11

**account** 62:19
110:6 170:12,
25 171:5
174:16 183:22

**accountability**
30:10 31:24

**accurate** 142:5
145:12 150:2

**accurately**
13:6,8,11,15

**accused**
56:11,23 57:2,
21,22 59:5,16
62:18 85:7,20
86:5 104:19,21
106:1,2 113:7
134:5 137:10
168:22 169:3
188:19

**act** 43:17

**acted** 36:17

**acting** 116:21

**action** 66:4
132:9,19

**actions** 61:21

**activity** 47:3

**acts** 18:9

**actual** 24:16
25:7 35:4
107:21 109:15
119:4 147:9,15
152:8 187:4

**add** 38:8 69:13
182:1 186:1
187:13

**added** 156:20

**addition** 21:7,
21,22 137:20
160:4 181:12

**additional**
57:14 72:2
181:17

**address** 43:3,
4,5 118:5
179:19

**adequacy**
65:20

**adequate**
70:12

**administer**
10:19

**administration**
76:2

**administrative**
33:7,10 54:16,
21

**administrator**
52:2 53:1,3
62:8 65:14,15
66:14,22 67:6,9
68:8 73:16
123:16

**administrator'**
**s** 66:15

**administrators**
122:19,25
123:10

**admonish**
116:19,22

**admonishmen**
**ts** 117:2

**adopted** 94:20

**ADS** 76:1 81:9,
11,15

**advance**
104:22

**advisory** 73:10
82:24

**advocate**
10:13,14,19
11:7,15 25:5
26:19 27:16
54:10 69:15,18,
23,24 82:9,13

**advocates**
54:9,20

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 54 of 77 PageID #:85824
The Deposition of LT. JOSEPH BIRD, taken on December 22, 2021

195

**affairs** 10:12, 17 17:5 18:5 27:15,19 28:7, 17,25 29:2,3,9, 10,11,12,15 31:3,12 33:19 34:14,22 35:19 37:8,20,21 80:14 81:10 86:12 123:23 151:4,12 159:12

**affidavit** 47:9 59:20,21,24

**affirm** 9:20

**agency** 17:7 18:7,9 32:12 35:25 52:8 154:17 167:18

**agent** 53:14, 15,20,22

**agents** 53:12 54:7,17 103:19

**aggravated** 155:25

**aggravating** 155:23

**aggregate** 149:7 160:7 161:17 167:6, 10,13,15,19

**agree** 9:11 23:1 36:23 66:11 74:25 75:4,10

**agreed** 9:14, 15,16,17 74:17, 22,23

**agreement** 66:11,13 82:19 85:9 86:22

**agrees** 9:13

**ahead** 36:16 38:7 44:24 105:5 110:1 120:16,20 124:11 150:15 164:21 183:13 185:23

**alarm** 121:9

**alert** 114:17 116:9 117:10 118:9,15,22 119:1,13,19 120:14 122:10, 15 124:22 125:7,17,25 126:5,12,24 127:3,7 128:12, 14,17 130:12, 20 131:22 152:18 153:10, 13,16,18 154:1 172:18,23 173:17 174:19 175:3,9,22 177:9,19

**alerted** 118:14

**alerts** 117:21 130:15 136:17

**allegation** 33:7 36:24 37:8,10, 11,22,24 38:1,2 39:3,6,12,16 50:19 51:12 56:7 57:14 58:14 59:6,7 71:20 74:2,10 78:1 88:24 90:16 100:12 105:19 119:7,9 138:7,19 144:16 148:23 168:25 172:8 174:7,10,14 181:14 182:7 185:18 186:25 187:4

**allegations** 34:3 36:8 51:2, 3,17,20,22 55:25 57:23 58:5,24 60:24 61:19 62:11 74:6,14 76:7 77:2,14 80:1,2 90:13 97:19 105:16,23 106:4,7,10 137:3,6,11 139:3 142:1,6, 12 143:25

144:7,23 145:8, 13 146:24 147:4 148:1 149:5,18,22 150:4 157:17, 23 160:13 165:24,25 166:8 168:21 170:3,4,7,9,11 171:12,16,21 172:1 181:3,7, 11,18 182:12 185:6,10,15

**allege** 22:6

**alleged** 47:13 79:22 100:14 147:9,15 168:21 180:9

**alleging** 47:11 169:6 180:23

**alternative** 71:25 83:17

**amended** 13:18 14:20

**amount** 84:25 91:5,6 161:14

**analysis** 153:4,21

**and/or** 19:13 106:20

**annual** 19:8 49:1,2,3,8 140:1,3,11,13, 17,19 141:22

**anonymous** 41:23 46:21,25 47:2,7 79:3 88:21 89:2,15, 24 90:3 106:24 107:7,11

**answering** 56:19 133:19 148:15

**answers** 11:21 12:17,22 57:17, 19

**anticipate** 102:4

**anymore** 117:9

**apologize** 20:14 35:24 37:5 40:12 48:25 103:3 144:4

**appeal** 81:23 111:13,20,23 134:24

**appearance** 8:4 32:11,13

**appeared** 96:3,4

**applied** 137:18

**approval** 56:10 81:10

**approve** 73:22, 25 74:9,19

**approximately** 21:2 26:3 27:7, 11 29:22 31:14 161:5

**arbitration** 11:14 21:23,25 22:2,16,23 23:3,6 26:7 34:16 63:7 79:4 84:17,21 85:17 106:20 115:6, 14 126:11 130:1 131:21 135:13,19 141:11,17 152:1,7,11,15 175:13

**arbitrations** 28:8

**arbitrator** 22:25 23:5 63:8 84:15 85:4,11 135:20 175:14

**arbitrators** 23:1,2,8

**area** 79:22

**areas** 79:11

**ARL** 158:22 159:3,7,11

**arm** 38:18 39:15

**arrest** 37:12 47:20 77:22 115:23 142:17, 20 143:1,16 160:2,5 166:19

**Arrest/lockup** 160:5

**arrested** 144:15

**arrestee** 115:24 160:3

**arrived** 82:10

**assess** 94:4

**assessing** 68:24 183:23 184:13

**assign** 49:15 50:1,20 51:20 55:10 108:12

**assigned** 10:10,12 23:3 27:9,25 28:6, 22,24 50:2,5,9, 13,15,16,17 60:20 99:1 103:12 113:2

**assigning** 55:12

**assignment** 76:5 114:5

**assignments** 27:12

**assistant** 27:16 28:11 53:9 82:9,12

**assume** 12:14 146:20 152:19 161:23

**assumes** 17:12

**assuming** 183:24 184:16

**attachment** 24:19

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 55 of 77 PageID #:85825
The Deposition of JOSEPH BIRD, taken on December 22, 2021

196

**attachments**
10:21 24:19
54:12

**attempt** 55:19
141:25 144:7
145:8 148:1
149:22 157:17
172:18,23

**attempting**
173:16

**attending** 8:5,
8,12,15,17,20,
23 9:1,4

**attention**
30:23 94:9
166:21

**attorney** 33:16
37:17 85:9 86:6
137:1 144:16
148:21,22
170:8

**attorney's**
33:23,24 77:23
137:3,7,12,16,
17 138:2,8,17,
21,25 139:4,11,
18 154:18,23
156:5 169:21
186:7,11,14

**attorneys**
86:20,21 186:8

**audit** 91:20,25
141:14,21
142:4

**audits** 17:3,20
140:25 141:4,9

**authority** 17:7
18:7 31:23
34:17 35:11
36:5 38:12
66:20,23 67:10

**auto** 142:7,12
143:6 145:14
150:4 168:2

**auto-cr** 101:10,
15,20

**average**
141:18

**award** 64:13

**awards** 64:7

**aware** 40:19
48:2 89:10 90:2
91:22,25
100:15 112:9
113:2 116:10
122:24 124:3
125:16 129:15
134:17 144:2,4,
5,22 145:1
147:13 150:1
153:24,25
154:4 156:9
157:19 164:23
165:6 171:20
172:4 173:6,16
174:8,21,25
185:3,5,7,9

------

**B**

------

**B-I-R-D** 9:8

**B1** 126:1

**bachelor's**
104:1

**back** 20:20
27:21 28:10,21
30:23 32:10
33:15 35:4,24
36:1,9 40:2,13
42:17 43:2
45:16 46:23
48:25 54:13
56:16 60:6,9
61:12 69:23
71:4,13 72:1,4
80:13 86:11
91:13,14
100:17 102:3,
10,12,21 103:1
104:25 105:1,2,
4,6 108:23
109:2 111:14
137:23 138:3
150:9 154:13
155:22 157:16
160:23 161:22
162:4 171:8
172:7 177:1,3
182:23 184:17
187:19 190:13

**background**
162:8

**bad** 27:2 105:4
111:18

**Barber** 8:22

**bargaining**
82:19 85:8
86:22

**base** 121:14

**based** 45:20
46:9 66:17
74:11 85:24
99:23 115:8
122:14 136:13,
18 141:19
152:19 165:9,
12 173:21

**basically**
112:2

**basis** 110:15
131:8,10,14
132:6

**Bates** 121:12,
15 127:16
159:11 163:10
168:10 175:25
188:11 189:25

**beat** 37:12

**began** 101:4

**begin** 9:24
11:25 12:1

**beginning**
97:21 121:21

**behalf** 8:8,10,
14,16,19,22,24
9:3 15:8 17:22
18:11,24 19:15
190:18,20,23

**behavior**
70:12 117:20
119:19 122:21
123:2,8,24
124:9,22 175:5

**behavioral**
114:17 116:3,9
117:10 118:9,
15,22,24 119:1,
10,13 120:5,13

**122**:9,14,15
124:19 125:5,7,
17,25 126:5,24
127:3,7,8,15
128:7,12,14,17
129:1,8,9,16,22
130:12,20,21
131:3,21
152:18 153:10,
12,16,18
174:18,19
175:3,9,22
177:9,19

**behaviors**
136:16

**belated** 104:3
107:24 157:25

**believes** 74:12

**bi-annual**
110:15

**BIA** 20:4 26:19
49:11 50:5
69:13 76:16
86:12 131:13
141:21 152:20
155:15 156:14,
23 157:8,10
162:21,23
174:1

**bid** 27:11

**bifurcated**
40:14,20

**bill** 105:15

**binding** 14:19
15:7 17:21
18:10 19:14
85:23

**bird** 9:5,8,9,12,
18 10:2 13:1
16:23 20:17
60:12 78:15
102:24 121:8
127:23 154:16
168:14 183:1
188:3

**BIS** 120:23
131:11 132:6

**bit** 24:14 34:24
40:23 54:25

**62**:4 76:9 161:7
186:23 187:5

**bits** 24:24

**blank** 21:9 26:9
88:20 119:22

**blue** 87:18

**board** 10:25
22:23 84:11
85:18,21,22,24,
25 86:1,2,15,16
87:5 111:18
112:12 134:20
135:19,23

**board's** 86:23

**book** 99:13

**bottom** 165:11
182:9 190:2

**boy** 88:15

**Brady** 37:1
38:19 144:7,11,
23 145:4

**Brain** 135:25
136:9,20

**break** 12:4,6
60:3 101:24
102:5 154:6
182:17

**breaks** 190:7

**bring** 26:6
55:23,24 76:23
82:17,20

**broke** 128:20

**broken** 140:4

**brother** 187:3

**brought** 58:24

**Brualdi** 190:21

**Bruce** 21:12
50:21 99:7

**bureau** 10:10,
11 28:24 29:3,
6,9,14 30:1
31:11 35:18
37:7,20 77:20

**Burns** 9:3,17
87:10,14 88:15,

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 56 of 77 PageID #:85826
The Deposition of LT. JOSEPH BIRD, taken on December 22, 2021
197

17

**Burwaldi** 8:25

**business**
79:20

---

**C**

**calculate** 46:4, 6

**call** 41:3,8 76:14 101:25 102:14

**called** 27:14 78:15 127:14

**calling** 116:4 141:16

**calls** 42:10 148:22

**camera** 9:10

**cameras** 79:20

**canvas** 79:22

**captain** 113:1

**captains** 112:25

**capture** 167:23 168:1

**captured** 126:1

**card** 99:4,7,9, 11,22,24 100:3, 13,19,22 108:17,18,19 109:16,21

**cards** 100:4 109:4,8,14

**care** 166:14,19, 20

**Carney** 8:19 15:25 16:5

**case** 11:3,4 20:3,4 23:2 26:10 33:17 34:21 37:19 38:25 39:24 50:12 52:9 54:11 62:24

69:12,22,23,25 70:4 72:11 73:17 74:21 75:16 79:10 81:22 82:14 85:4,9,14 86:14,15,18 98:4 101:7 106:20 111:17 124:7 131:20 134:19 147:24 165:7

**cases** 10:23 11:12 20:11 22:12 32:18 35:10 39:23,25 40:6 49:10 50:4 54:10 76:9,21 89:14 98:24 99:14 130:1 155:5 181:23

**catalog** 99:5,8, 9,11 100:3,13, 19,22

**catalogs** 99:22,25

**categories** 17:11,18,20 36:8 56:8 73:23 80:17

**categorized** 146:22 157:21

**category** 39:19,20 49:5 50:2,13,14 51:1,5,6,21 52:7 74:4,5 76:8,25 77:1 140:5 142:14, 15,16,22 143:1, 10 145:2 147:14 149:17, 18 157:22 158:7,12,14,17 159:12,17,20, 23 160:8,14,25 161:2 164:3,4,5 165:25 166:5,7, 11,17

**Catherine** 8:22

**CCR** 54:13,21, 22 74:1 109:19

**centered** 51:15

**chain** 51:25 53:6 71:5

**chance** 11:25 12:19 87:16

**change** 31:11, 15 53:19 74:13, 20 96:15 115:21 117:20

**changed** 31:25 49:7 71:2 82:18 96:17,19 97:7 115:19 131:25 133:14 175:5

**changing** 72:20

**channel** 10:20, 22 54:23 69:10, 11 70:14,19,23, 25 71:16,23 72:18,23 73:14 74:6,15 81:17 109:12,16 113:5

**charge** 137:10

**charges** 10:25 33:17 80:1 137:20 138:14 172:7

**charging** 138:18

**cheat** 128:10

**check** 78:12,17 99:12 162:8 163:24

**Chicago** 8:9, 13,15,17,18,20, 21,23 9:1,4 10:5 15:3,5,6 17:4,8,22 18:3, 8,11,21,24 19:7,10,12,15, 19 26:24 27:3 30:15 31:5 57:11 59:12,15 63:16 108:3 110:15 136:19 142:5,11

145:13 146:2,3 150:3 151:20 164:24 172:19

**Chicago's** 19:25

**chief** 52:2,18, 21,25 53:3 65:14,15 66:14, 22 67:5,9 68:8 69:25 70:4

**Chloe** 13:21 16:9 25:16 87:7,16 88:14 119:25 127:16 132:13 158:21 161:4 163:3 172:12 175:24 176:23 177:25 178:13

**circumstance** 155:23,25 180:12

**circumstances** 39:18 82:22 112:4 143:8

**cities** 18:17

**citizen** 46:20 76:1

**Citizens** 41:11

**city** 8:17,20,23 15:6,8 17:4,8, 17,20,22 18:3, 8,24 19:15,19, 24 23:1 30:15 33:6 34:1,6,19 38:19 39:15 44:20 45:4,25 63:15 76:22 78:1 85:5 110:14 111:7 141:24 144:6, 22,23 145:8 146:2,3,23 148:1,22 149:22 150:19 151:20 152:21 154:16 157:16 158:1,2

**city's** 17:13,14 86:19 108:2

145:24

**citywide** 76:11,13

**civil** 47:11,18 48:6 51:10 53:19 160:1 180:2,8

**civilian** 17:15 31:24 53:13

**civilians** 106:24 107:8

**clarify** 106:1

**classified** 61:13

**clear** 15:15,22 23:24,25 24:6,8 40:24 44:1,16 101:10 120:21 121:1 146:4 149:3

**client** 23:12 37:19

**close** 54:10

**closed** 10:16 69:12,13,14 70:13,16,18,23, 25 91:4 164:6

**closely** 118:7

**closes** 124:7

**code** 50:1,2,13, 14,19 51:2,21 52:7 53:16,21, 24,25 54:4 74:5 110:14 142:16, 22 143:10 145:2 147:1,5, 14 149:18 157:22 159:20 160:8,14 164:5 165:25 166:5,7, 11,17

**coded** 147:2

**codes** 51:5,6 140:5 142:14, 16 143:24 149:17 158:7, 12,14,17 159:17,23

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 57 of 77 PageID #:85827
The Deposition of LT. JOSEPH BIRD, taken on December 29, 2022
198

160:25 161:2
164:3,4

**codified** 129:9,
13

**coercion**
147:24 149:23

**collect** 162:4

**collected**
161:25

**collection**
161:24

**collective**
82:19 85:8
86:21

**command**
10:20,22 51:25
53:4,6 54:23
69:10,11 70:3,
14,19,23,25
71:16,23 72:18,
23 73:14 74:6,
15 81:17
109:11,16,18
113:5

**commander**
54:15,16 70:4
108:12 109:18
111:24 112:2
135:2

**commander's**
112:7 135:3

**commanders**
109:17,24

**commanding**
69:21,22 80:11
108:7 109:3
143:12

**committed**
61:17

**common**
100:16,18
114:7

**communicate
d** 19:11

**communicatio
ns** 45:20 46:10

**community**

64:15

**compilation**
164:17

**complainant**
42:12,16 46:25
55:15,19 59:22
60:22 77:7
79:15,16,24
89:15 97:19,23
155:18

**complainant's**
43:4 97:18

**complainants**
43:5 90:3

**complaint**
35:20,25 37:18
40:25 41:1,5,9,
22,23 42:2,10
46:21,22 47:2,7
48:23 49:16,25
50:6 51:20 52:3
55:2,8 60:18
61:5 68:10
75:25 79:3
81:23,25 82:2,
4,11,22 83:2,8,
14 84:6 87:13
88:4,12,21,23
89:10 92:4,9
93:23 99:15
109:12 131:6,
10 132:5 137:3
138:7,10,15
139:2,3,7,13,16
144:18 148:24
159:12,16
160:25 163:9
164:6 169:10,
13,14 170:13,
16 171:1,21
172:1,20
181:10 183:3
186:2 188:5,9,
19

**complaints**
17:15 36:18
42:6,18 43:21
44:20 45:11,17
46:24 47:11
48:16,20 49:5,
6,9,13,17,21
89:2,9 90:3
92:2,8,13,21,23

93:13,21,24
94:5,7,15,18,24
95:8 100:24
101:4 106:24
107:8,11
109:17 115:7,
14,17,22,23
117:16 140:3,6
142:15 149:8
150:11,25
151:21 153:3,4,
8,20,21 154:2
160:18 164:2
167:7,19
172:25 173:10
179:22 180:1

**complementar
y** 183:20

**complete**
12:22 25:3,4,6,
12 41:20 48:23
55:3 56:9 91:16
113:3 184:6
189:16,19

**completed**
10:17,23 27:9
52:10 55:4
70:20,21 80:13
179:7

**completely**
14:7

**complex** 76:21
77:11 78:21

**complexity**
90:12

**compliant**
60:18

**complied**
175:17

**complimentar
y** 62:17 64:6,14,
17,18 80:22,24
93:18 103:23
110:5,8,17
117:17 119:6
123:4 174:15
183:19

**comply** 130:7,
9,11,17,19

**component**
168:21

**concern** 116:8
122:21 123:2,8
126:21 141:20
178:4

**concerns**
22:17,18 93:10,
20 115:4,9
119:10 120:3,6,
25 121:6 124:1
125:5,9,18,21
126:1,8,10,19,
22 127:4
130:13,20
174:24 178:2

**conclude**
123:3

**concluded**
80:10 90:18
91:12 92:18,19
119:4 170:6
183:16 188:22
191:3

**concluding**
68:24

**conclusion**
47:23 48:3
91:3,4 106:15

**concur** 71:17,
20,24 73:7
75:11 83:16
84:1,2 85:12

**condition**
13:13

**conduct** 54:17
55:13 65:7,16
79:14 100:8
112:20 123:11
124:5 132:20

**conducted**
17:20 54:19
79:6 112:23,24
122:20 123:1
133:1 140:25
141:5 186:20

**conducting**
109:8 113:16
123:17

**conducts**
60:20 86:2

**confer** 81:8

**confidential**
33:14 39:3,4
50:9,11 76:6
77:13,15,17,24
78:3,5 79:6
90:14

**confirm** 23:24
24:20 52:7

**confirmed**
80:12

**connection**
92:3,8

**consequence**
110:24

**consequences**
110:19,23
111:2 130:22

**consideration**
93:18

**considered**
27:18 50:22
53:18 92:13
93:1,3,4,7
118:11 170:24

**consistent**
11:8

**construct**
118:1

**constructive**
118:3

**consult** 66:10
110:3

**contact** 55:16
97:19,24 98:10
113:22 137:16

**contacted**
160:3

**contained**
24:7,24

**contemporane
ous** 157:1

**content** 160:13
181:7

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 58 of 77 PageID #:85828
The Deposition of JOSEPH BIRD, taken on December 22, 2023
199

**continued** 111:15

**continuing** 11:18

**contract** 22:8 28:8 56:4 63:13,17,23 84:24 85:2 89:11 95:24 96:11,18,20 97:1,3 106:13 133:14 175:11 178:10

**contracts** 63:5

**contractual** 22:5,6,19

**contrary** 15:6

**control** 14:4 91:18

**controlled** 35:5

**convenience** 77:6

**conversation** 118:4

**Cook** 33:16,22 77:23 148:20

**Cool** 154:11

**coordinate** 10:24

**coordinator** 28:11 52:23

**COPA** 10:17 31:23 35:3,23 37:4,15 40:2,8, 11 59:7,8 70:20 72:19 73:12,16 74:11 75:5

**copies** 54:14 97:25 98:7,11, 12,17 100:21

**copy** 69:20 98:2,3,5,9

**correct** 13:3 19:13,21,23 24:12 29:17 31:13 38:13

41:13 49:19 51:22 57:17 58:9 59:18,19 67:11,12 70:12, 14 71:11 72:6, 18 81:20,21 83:24 84:4 92:14,21,22 93:1 94:2,5,6,9, 10,13,16,17,20, 22 95:1 100:4, 19,20 101:21, 22 105:21 106:25 107:12, 16 117:13 120:15,19 121:22,23 122:6 124:16, 19 126:15,24 128:1,4 131:15 134:3 135:23, 24 137:4 139:13,14 147:6 149:5,11 150:21 151:14 155:10,11 160:15 161:6 162:2 164:25 165:2,4,9,14 166:8 169:1,8, 14 172:1,2 173:2,7 181:19 183:25 188:3

**correction** 132:18

**Corrective** 66:4

**correctly** 32:10 40:3

**corruption** 33:22 77:21

**counsel** 8:6 20:13,14 21:24 23:9,12 24:25 25:22 26:1,2,4 56:2 80:3 116:24,25

**counseling** 115:10,12 116:24 117:2, 23 118:19 126:7 131:22 152:3

**counsels** 122:13

**count** 17:17 158:24 183:4

**County** 33:16, 22 77:23 148:20

**couple** 19:23 27:13 30:9 49:1 82:11 119:21 137:19 157:1 173:5 187:10

**court** 8:2 9:5,9, 18,24 11:20 13:19,23 14:3, 9,12,16 16:3,6, 10,15,18,20 60:7,9 87:3,19, 22 88:1 101:25 102:14,21 104:25 105:2 106:20 120:15, 18 121:17 122:6 127:20 138:24 154:13 159:1,3,5,8 163:5,19 176:5, 11,25 177:4 182:23 187:23 190:13

**cover** 39:19,20

**covered** 25:21

**COVID** 28:20

**CPD** 26:11,23 30:15 31:1 133:1 141:18 167:16,19 172:24 173:17

**CR** 17:15,16,17 21:3 23:22,25 24:11,15,21 41:22 49:19,25 50:1,5,12 65:11 76:15 78:20 99:16 109:8 130:23 133:4 142:7,12 143:6 145:14 147:6 149:17 150:4 151:25 154:1 160:8 161:9

164:3 165:8 166:2,3,11 168:2,11 180:11,20,23 181:4,8,17 183:2 185:12 186:20 187:13 188:8 189:9

**CR's** 146:22

**crash** 131:8

**create** 23:2 151:7

**created** 31:20 32:6 34:11

**criminal** 47:2,6 88:24 89:18 107:12 137:10, 20 138:14 147:23

**criminally** 138:18

**criteria** 103:1 119:4

**criticism** 28:14

**CROSS** 188:1

**CRS** 58:20 68:20 69:6,17 70:1 96:21 119:3,13 128:25 131:23 132:1 142:20, 23 143:10,13, 16,23,24 144:21 145:3 150:21 151:5, 13 152:3,22 157:21 161:5, 17,24 162:4,12, 15,24 165:17 166:24 168:14 173:6,15,18 185:5,6,9,10

**current** 10:13 92:4,9 93:23 135:11 157:14

**custody** 35:13 36:12 51:13,19 166:21,22

**customs** 18:19

**cut** 165:11 189:24

**cuts** 185:18 189:21 190:1

**cutting** 191:1

**cycles** 27:8

—————

**D**

**daily** 116:14

**Dan** 9:3

**Danielle** 8:7 10:3 104:24 121:14 146:5 154:7

**data** 46:1,3,4,5 136:15 164:17

**database** 152:22

**date** 28:19 30:7 83:8 88:5 97:20 106:14,15,19, 21 164:5,6 165:9,12,13 178:5

**David** 9:4

**day** 37:5 116:16

**days** 32:11 84:13,25 90:18, 19,25 91:1 108:10 114:2,4 133:12,13

**deal** 47:1

**Dean** 21:14 99:7

**Dean's** 50:21 136:6

**death** 35:13 36:11 51:13,19 166:15

**December** 93:16 108:7 164:1 165:18, 20 166:24

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 59 of 77 PageID #:85829
The Deposition of JOSEPH STRUD, taken on December 22, 2022
200

**decide** 50:19

**decides** 79:11

**decision** 22:23 38:15 66:15 67:25 68:4 85:23 115:14 131:21 135:3,7 141:11 152:7, 11,15

**decisions** 21:23,25 22:3, 16,20 23:7,10 26:7 32:17 63:7 79:4 115:6 126:11 130:2 141:17

**decline** 67:21, 25 68:4

**decrease** 85:13

**deemed** 35:8, 17 38:11

**Deen** 21:12

**defend** 112:2

**defendant** 8:11,15,17 9:3 190:23

**defendant's** 144:16

**defendants** 8:25 190:21

**DEFENDANTS** ' 187:25

**defense** 148:21

**define** 147:21

**defining** 148:8

**definition** 122:9

**definitions** 122:10

**degrees** 103:25 104:1

**Delgado** 169:1

**delineated**

**17:12**

**delinquent** 109:1

**demeanor** 115:21

**depart** 47:4

**department** 10:5,13,14,24 11:6,8,15 15:3 19:7 20:9,24 21:5 22:7 25:5 26:16,24 27:4, 16 28:13 30:12 31:5 32:15,19 34:15 37:18 41:12 43:11 47:5,7,12 54:9, 20 57:11 58:20 64:9,11,25 78:7 82:9 85:5 86:20 87:2 88:22 89:8,9 96:2,19, 21 103:25 108:22 131:7 136:19 137:18 144:12 155:4 158:10 164:18, 25 170:8 171:8 172:19 175:16 178:24

**department's** 82:14 128:11

**departmental** 18:22

**departments** 30:21

**dependent** 82:3

**depending** 81:5 90:12 159:24

**deposed** 11:9

**deposition** 20:16 21:8,12 23:19 25:23 26:1,7,12 31:21 50:22 66:8 99:6 136:6 159:25 168:15 189:1,4 191:3

**depositions** 21:16 136:5

**deputy** 53:9 69:24,25 70:4,5 135:5

**deputy's** 135:6,7

**describe** 49:12

**describing** 122:12

**description** 24:16 25:8

**designated** 178:4

**destroy** 97:6

**destroyed** 96:19 106:12 175:6,10,14 177:9,11,12,13 179:11

**destroying** 96:21 97:9

**destruction** 96:12,15 97:8 179:11

**detailed** 10:11 28:7 33:20

**detective** 24:11 82:5 160:19 161:6, 17 166:25 167:7 171:20 174:18,23 178:14,21 179:2,5,19 180:3 188:8 189:5

**detectives** 34:16

**deter** 66:3

**determination** 40:5 55:5 56:7 59:12 60:25 61:2 65:23 82:23 86:24 160:14

**determine**

**60:19 64:21,23 72:17 76:2**

**determined** 59:9,15 61:15 62:10 79:7 183:17

**determining** 62:19

**developed** 141:20

**DIA** 110:3 134:10 183:20

**dictate** 124:4

**difference** 52:25 57:4 68:15

**differently** 116:21 154:25 155:12

**digest** 25:6 42:13,16 50:17 65:10 143:13 189:22

**direct** 9:25 119:17 130:6, 16,24

**directives** 20:24 21:6 123:10 124:4 145:25

**directly** 41:2,4

**directors** 122:24

**disagree** 66:7 75:8

**disagreements** 66:9

**discharge** 64:25 111:17 171:9

**disciplinary** 19:25 62:16,22 63:19 64:19 68:1,10,16 69:6 87:13 88:4 94:12,23 95:6, 7,17,21 96:8

**103:23 107:14, 18 109:25 110:3,8 117:17 118:11 119:6 123:5,23 124:5, 8 133:16,23 134:2,5,21 138:1 162:10 174:2,15,16 183:19 188:17 189:5,8

**discipline** 11:8 15:5 17:9 18:21 48:8 61:3 67:13 68:9,19,23 73:23 74:25 75:18 83:19 84:16,25 93:19 94:16,19 95:1,9 109:22 112:1 113:12 114:11 115:22 116:23 118:3 132:17 133:6,9 134:25 136:16 171:25 173:21 175:16 182:10 183:4, 20,23 188:17, 18

**disciplined** 48:3 111:11,13 118:8 171:21

**disciplines** 83:24

**discovery** 45:25

**discuss** 75:21 152:6

**discussed** 22:16 62:6 80:6 146:25 152:1 175:13

**display** 123:24

**disposition** 85:14 95:18 138:1

**disprove** 61:19 71:19

**disproved**

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 60 of 77 PageID #:85830
The Deposition of JOSEPH BIRD, taken on December 2, 2022
201

74:3

**distributed**
140:18

**district** 10:12
27:8,10,12,22,
23 28:1,23 36:3
39:2 58:20,22
76:5,12,13
77:5,8,10
78:13,17 87:3
108:8,10
109:19 153:17

**districts** 83:5

**division** 10:9,
17 27:15 28:8
29:10 31:3
33:19 37:21
62:18 80:14
103:13 107:20,
21 109:3,5
110:4 113:22,
24 123:23
141:15 157:6,
10 162:12,22,
23 179:8,9

**Division/
chicago**
159:13

**doctor's** 78:10

**document**
24:20 57:11
120:15,19
122:9 140:19,
21 147:10,15
163:11,13,22
164:9 165:10
183:15 184:10

**documentatio
n** 55:21 141:8
184:2,23 185:8

**documented**
175:2

**documents**
23:20 25:13
26:6 136:23
138:24,25
143:5 161:12

**dog** 88:16

**DOJ** 30:9

**doke** 182:19
191:2

**domestic**
35:11 36:11

**Doody** 21:11,
13 33:19

**door** 28:23

**double** 13:9

**draw** 30:23
52:5

**drawing** 21:9
119:22 150:24

**due** 100:11

**duties** 54:5,6

**duty** 41:21
43:13 103:14,
16

———————

**E**

———————

**earlier** 20:22
24:23 49:2 69:9
89:1 90:25 96:1
97:16 102:14
105:15 128:24
137:2 150:9,17
152:2 153:7
160:11 176:1
183:2 184:5
188:9

**early** 24:1 49:9
114:14,17,20,
25 115:12,19
116:2,10,20
117:5 127:11

**easily** 41:23

**eat** 102:6

**effect** 18:19
117:19 130:11
132:23

**effective** 88:5
121:21 127:25
132:17

**efficient** 19:13

**efforts** 18:3

**Eighth** 27:10,

22

**Eileen** 8:16
23:13 101:24
120:1 176:1

**electing** 86:14

**election** 64:12

**electronic**
101:4

**elevated**
28:11,16 53:15

**embrace**
164:20

**employed** 10:4

**employee**
171:9,12

**employees**
26:11 110:14

**employment**
22:9 26:22 27:3
79:2,8

**enacted**
120:12

**encompass**
164:20

**encompasses**
142:21

**end** 16:9 25:10
41:20 68:10,13
95:15 97:4
115:8 165:14
174:24

**ended** 48:7
155:5

**enforced** 22:7

**enforcement**
18:9 30:21

**engaged** 15:6

**Engquist** 8:10
9:16 190:25

**ensure** 11:7
74:2 83:11

**entire** 91:12

**entities** 30:25
33:6 48:22

51:25 151:20

**entity** 22:24
29:4,5 35:21
72:5

**entry** 178:5
180:21

**equipped**
186:12

**equitable** 61:3

**Ernest** 169:4

**estate** 79:5

**evaluate** 93:17
108:14

**evaluated**
93:15 108:5
110:15 114:9

**evaluating**
19:10 22:13
93:11

**evaluation**
93:13,15,20
108:9,18 109:4,
8,14 110:13
112:7,10 113:7,
16,19 114:10
123:25 124:9

**evaluations**
19:7,9,12
108:15,16
110:21 112:16
113:20,25
114:8

**events** 61:16,
20,22 116:2

**eventually**
55:22

**everything's**
116:6

**evidence**
36:25 37:19,23
53:25 55:20
56:5,6 60:22,
23,25 61:14,18
65:24 70:9
71:18 79:17,21
100:13 138:16
144:12,17
145:3 148:6

149:19 155:1,
16,19 162:19

**EXAMINATIO
N** 9:25 188:1

**examples**
152:10

**excellence**
64:13

**exception** 8:12

**excessive**
35:7,12,16
36:11 37:13,15
38:2 47:19
50:22,24 51:1,
6,9,11,12,16,18
58:18 71:22
85:10 93:12
115:7,13,17
117:16 119:20
139:6,17 140:5,
9 153:8 160:4
166:8

**exclude** 17:16

**excluding**
89:18

**exculpatory**
36:25 37:19,23
147:10,16

**excuse** 90:19
110:20 123:22
133:18 141:25
173:11

**exempt** 69:22

**exhibit** 13:18,
22 87:7 88:3,7
105:14 122:3,4,
5 127:18,19,24
128:4 131:1
132:14 145:18
158:21,23
159:1,10,14
160:24 163:18,
19,21,23 168:9,
10,12 172:11
173:11 176:1,2,
7,10,11,13
178:19 180:16,
20,23 187:10,
11,23,25 188:4

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 61 of 77 PageID #:85831
The Deposition of LT. JOSEPH STRUD, taken on December 22, 2021
202

**exist** 101:20
164:9

**existed** 24:9
152:8

**exonerated**
11:3 61:20
67:2,7 71:3
72:13 74:13
80:17 92:25
94:1,8 131:9
132:5

**expect** 185:14
186:3

**experience**
58:19 83:22

**experiences**
85:25

**explain** 10:14
22:2 55:17
81:25 84:20
111:23 114:18
117:25 126:7

**explained**
115:16 155:15

**explanation**
82:15 189:7

**expunge** 95:21
96:2,3,7

**extended**
78:25

**extension**
90:24 91:8,9

**extensions**
91:2

**extent** 164:16

**external**
140:25 141:4

**extra** 102:8

**eyewitness**
39:7

———

**F**

———

**fabricated**
39:7

**fabrication**

147:20 148:2,5,
6,23 149:18

**face** 48:24 52:5
55:3 97:17,18,
25 98:3,5,6,8,
12,17,19
100:21

**faced** 28:13

**facilitate** 54:13

**facing** 137:9

**fact** 9:12 106:4
120:11 148:25
172:24 184:19

**factor** 77:6

**factors** 93:5,6
110:5 115:5
117:15,18
119:21,22
130:15

**facts** 143:8
147:24

**failed** 144:12

**failures**
147:10,15

**fair** 11:7 36:13,
17 61:3 65:25

**false** 20:7
57:12,14 121:9
147:23 155:2
160:1 168:22
169:7 171:14
180:24 181:8,
12,24 185:13

**falsified**
137:25

**familiar** 99:4
114:14 132:8
135:25 163:13,
15

**family** 115:25

**favor** 34:18

**fax** 41:6,8,23

**faxing** 41:5

**FBI** 33:20,23
59:9

**federal** 18:8,23
33:18,23 77:20

**feeding** 147:24

**feel** 66:2

**fell** 36:19

**fellow** 42:6,18

**felt** 36:5

**figure** 44:7

**file** 10:25 24:21
25:4,6,12 42:2
65:10 72:1 98:6
107:21 134:19
145:9,13,16,18,
20,23 146:6,24
147:6 161:13,
15 175:4
177:11,12,13
178:4 184:6,13,
20 189:3,4,9,
15,16,19

**filed** 11:4
47:11,18
160:18 180:3,5

**files** 21:3
23:22,25 24:2,
11,16,17,24
25:1,3 37:17
85:1 96:12
97:6,8,9 100:23
101:12 123:16
124:15 146:1
150:16,18
154:1 161:9
165:8 167:11,
13,24 179:10
184:17 186:9
188:25

**fill** 99:14

**final** 85:13,14
86:24 87:2
95:17 135:8
137:25 164:7

**finally** 19:2

**finance** 25:8,9

**find** 69:16
120:1 175:24

**finding** 62:13
65:16 66:7

67:10 68:5,9
69:2,7,19
71:10,21 72:15,
20,22 73:19
80:21 81:4,5,
11,16,23 83:17
84:6 92:14,17,
18,20 94:11,25
95:9,13,17,18
124:7 125:13,
15 132:1
138:20 149:12
155:7,17 156:1
164:7 170:23
171:8 181:3,13,
22 182:5,7,8
183:2,5,14,17,
18 184:12
188:23

**findings** 61:1
64:19 65:8
67:1,2,6 80:15,
25 83:23 95:14,
21 96:7,8
125:1,8,10
131:15 134:6
138:11 171:4,
23 182:11,13

**fine** 14:9 15:17
102:7,15
187:15

**finish** 11:24
12:1 15:11
52:12

**finished** 14:24
17:25 18:15
19:3 36:14

**fired** 156:2

**firm** 17:7 18:7

**fit** 160:14

**five-level** 70:2

**five-year**
149:13

**focusing**
139:12

**FOIA** 151:6

**follow** 67:21,25
187:10

**follow-up**
190:9

**food** 78:10

**FOP** 63:17
96:11,20
106:13 175:11
178:10

**force** 28:2,3
30:10 33:21
35:7,12,16
36:11 37:13,15
38:2,3 47:19
50:22,24 51:1,
7,9,11,13,16,18
58:18 93:12
115:7,14,17
117:16 139:2,6,
9,10,17 140:6,9
149:23 153:8
160:4 166:8

**forever** 179:10

**forgetting**
119:3

**forgot** 49:1
86:18

**form** 12:24
36:21 37:3
38:20 39:22
42:21 43:23
44:6,13 47:16
48:5,24 49:14
51:8 52:5,17
55:3 57:3,24
60:16 61:8
62:23 65:9
68:12,17 71:23
73:1,9,24 74:25
75:3 83:20
89:4,17 90:10,
21 91:23 92:5,
11,15 93:2
94:21 95:2,11,
23 96:10,16,22,
25 97:5,10,14
98:13,18,21
100:5,25 105:7,
22 106:17
107:1 112:18
114:16,22
116:12 117:7
118:16,23
119:14 123:12,

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 62 of 77 PageID #:85832
The Deposition of JOSEPH BIRD, taken on December 22, 2021

203

18 127:9 128:8
129:11 131:16
136:1,11,21
139:15 140:15
141:2,6,10
142:2,9,24
144:3,9,25
145:5,10,15
147:12,18
149:10 150:5
151:1,15
152:17 153:5,
22 154:3
157:20,24
160:9,20
161:19 162:6,
16 164:11
165:1,15,22
167:9,21 168:7
169:12,17
170:15 172:15,
21 173:1,7,12,
22 174:12
175:12 179:13,
21 181:1,20
183:7,9 184:4,
21,25 186:21
188:15,16
189:11

**formal** 44:4
117:4

**formally** 94:19

**format** 117:22

**formed** 30:5

**forms** 56:14
116:24

**forward** 118:6
155:6

**forwarded**
80:13 179:8

**forwarding**
187:16

**found** 15:5
171:17 186:9
187:1

**foundation**
32:22 42:21
136:11,21
186:21 189:11

**four-** 70:1

**fourth** 21:12
28:1 135:12,20
189:22

**FPO** 63:22

**frame** 33:3

**Fraternal**
63:15

**front** 13:25
14:14 89:12
105:20 111:17
121:8 155:18
162:20

**full** 9:6 69:6
134:20 161:9

**function**
101:13,15

**furloughs** 54:2

———————

**G**

**gatekeeper**
36:18 40:3,4
60:18

**gather** 55:20

**gave** 23:9 30:7
32:13 33:19
96:5 117:22
168:22 169:7
178:19 180:24
181:24

**general** 10:18
20:24 21:4,6
34:2,18 35:2,5,
16 76:3 87:12
88:4,6 121:7,24
122:17 124:4
127:24

**General's**
34:5,7,14,20

**generally**
22:25 50:23
77:4,19 82:17
104:10 111:15
158:2,6 164:16
180:9

**generate** 45:5
164:8

**generated**
133:4

**George** 23:5

**get all** 25:12
162:14

**give** 9:20
11:19,25 12:18
13:23 14:3,19
15:7 17:21
18:10,23 19:14
24:13 32:16
34:19 39:10
45:14 49:25
58:8 59:17 80:2
105:20 117:24
118:4 130:6
134:21 143:16
161:25 187:8,
13,17 189:25

**giving** 13:2
22:22 91:2
130:16 181:8,
12 183:5
185:12

**GO-83-3** 120:2

**God** 75:7
133:11

**good** 10:2
14:18 22:20
25:18 103:22

**gosh** 37:5

**grab** 183:9,11

**graduation**
28:24

**great** 13:9
16:13,17
127:23

**greater** 130:3

**grievance**
85:1

**grievant** 85:7

**grieve** 22:5
85:6 135:11,17,
22

**grieved** 22:18

**ground** 11:17

**grounds** 151:7

**groundwork**
177:18

**group** 51:21
160:1,5

**guaranteed**
108:24

**Guevara** 8:12,
15 18:10 24:11
160:19 169:3
172:20,24
173:17 174:18,
23 178:14,21
179:2,5 180:3,
15,24 190:24

**Guevara's**
172:13 173:21
179:19 183:3
185:4 188:8
189:5

**Guevarra**
161:6,18,25
162:4,15,24
163:4 166:25
167:7

**guidelines**
115:16

**guys** 164:16
190:25

———————

**H**

**half** 26:3,5
27:11,20 34:23
101:25

**Halverson**
169:4

**Hamilton** 8:7
9:13 10:1,3
13:17,24 14:2,
6,10,14,17
15:14,20 16:2,
7,13,17,19,22
23:13,17 25:16
32:8,20,25 33:4
43:9 44:11,23
45:7 46:2,12,
16,19 48:15
60:2,5,11 64:2,
5 87:6,12,15,

21,25 88:2,16,
18 89:20 90:1
101:23 102:2,7,
12,18,23 104:8
105:3,9 119:24
120:9 121:3,5,
15,18,20 122:7
127:13,22
128:19,21
129:6 132:13,
22 136:8
139:14,19
146:8,12,15,17,
21 148:5,10,17
151:18 154:5,9,
15 157:3
158:13,24
159:2,4,6,9
163:2,7,17,20
164:22 167:12,
18 168:4
170:17,20
176:4,9,12,22
177:6,12,15,24
178:17 179:17
180:14,18
182:16,20,25
185:20,22,25
187:6,15,20
189:13,18
190:6,11,15

**hammer** 66:17

**hand** 9:19

**handle** 10:23
38:24 52:8

**handled** 28:8
38:3 58:23 76:4
82:10 83:10

**handwriting**
122:1

**hang** 121:9

**happen** 40:1,
17 62:12 72:9,
25 86:16
126:13

**happened**
31:15 33:1
82:16 116:22

**happening**
149:8

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 63 of 77 PageID #:85833
The Deposition of JOSEPH BIRD, taken on December 12, 2017
204

**happy** 12:11

**hard** 179:25

**health** 130:6

**healthiness**
130:5

**hear** 15:23
16:8,14 85:4

**heard** 136:7,25

**hearing** 82:4
86:1 135:1
188:18

**hearings**
11:14

**held** 30:14

**hey** 78:14
115:13 144:17
148:23 155:24
157:14 184:6
186:12,14

**hierarchy**
50:24

**high** 50:25
141:16

**higher** 83:19
108:24 111:1

**highest** 52:18

**highlight**
115:25

**histories** 81:4
106:12 107:15

**history** 27:3
39:25 62:16,17,
22,25 63:1,4,8,
18,19,22 64:6,
17,18,19 68:11,
13,16,18,19,23
69:1,3,6 80:22,
25 86:12 92:23
93:24 94:4,13,
23 95:6,7,22,25
96:4,5,9 103:23
107:18 109:25
110:3,5,8,17
117:17 119:6
123:5,7 124:8
133:16,17,18,
20,21,23,25

134:2,5,6,8,9,
14,21,23
149:13 162:10
163:9,25 174:2,
15,16 183:3,19,
21 188:9

**hold** 9:10
121:11 176:3
181:6

**home** 8:9 43:3,
5 78:19

**homicide**
147:11,16
168:22 169:7
171:14 180:24
181:9,13,24
185:13

**honorable**
64:8

**hope** 183:11

**hour** 26:3,5
42:3 101:25
130:24

**house** 9:2 77:9
78:18

**houses** 79:1

**hurt** 78:24

**hypothetical**
181:22

———————

**I**

**IA** 141:21

**IAD** 29:12,14,
16 31:4,11 33:5
34:25 36:6,7,9,
20 37:2,24
38:23,24,25
39:1,9,11,14,20
40:15,20 47:14,
21 48:22 49:21,
22 50:8 53:6,
10,23 54:8 55:7
58:22 59:24
62:16 68:22
69:14 70:21,24
72:5 75:21,23,
24 76:3,8,24
79:10,12 80:10,

16,20,21 82:10
84:6 90:9
91:16,20 92:2
93:22 94:8,11
95:5 98:5,6
99:18 101:3
103:11,19
104:5,18
107:15,17
109:7 110:3
113:13 114:11
118:25 124:5,7
131:13 134:4,
11,12,13
137:19 138:9
139:21 141:5,9,
13 147:8 149:4
150:24 151:16,
20 152:16
154:16 159:17
160:24 162:3,
14 167:18
172:19,23
173:17 179:18
180:6 183:20
185:14

**IAD/BIA** 30:15

**ID** 9:10

**idea** 44:16
154:8

**IDENTIFICATI
ON** 13:22 88:7
122:5 127:19
159:14 163:23
168:12 187:25

**identified** 17:1
61:25 174:18,
23 178:14

**identify** 17:8,
19 18:4 115:18
117:24 123:24
146:23 152:22

**immediately**
132:19 149:1

**impact** 13:10,
14

**implemented**
164:24

**impose** 17:9
67:16 83:18

133:6,10

**imposed**
74:19,24 94:16
95:1,9 182:11

**imposition**
114:11 134:24

**improper**
41:14,16,17

**improperly**
22:7

**improve** 19:13

**in-person**
56:15 58:15,25

**inaccurate**
142:11

**incarcerated**
187:3

**incident** 59:13,
16 90:18
106:14,19
164:6 165:9,12
178:7

**incidents**
35:12 36:11
63:6 155:21

**include** 17:14
94:15,18,24
95:8

**included** 34:5
50:19 64:16
120:13 161:13
184:16,20,22

**including** 15:4
17:4 18:4 19:8
24:3

**incoming**
49:13

**incorrect** 66:2

**increase** 53:18
84:3 85:11,12,
25 174:5

**increased**
133:13 174:4

**incriminating**
149:24

**inculpating**
147:23

**inculpatory**
148:6 149:19

**independent**
17:6 18:6 31:22
32:17

**indication**
109:10 172:22
178:20

**indicator**
177:19

**indicators**
125:24 129:1

**individual** 8:11
21:3 24:8 42:15
68:20 107:18
122:14 134:15
150:20 182:8

**individuals**
21:13 83:1,3

**influence**
32:18

**inform** 109:16

**informal** 117:4

**information**
12:17 20:14
25:13 26:15
43:25 44:18,21,
22 45:23 57:12
97:20,24
147:11,16
155:2 186:17

**infrequent**
86:10

**initial** 59:9 65:8
141:19

**initially** 35:21

**initiate** 46:20
78:20 130:23

**initiated** 40:25
41:22 42:6,18
43:21 48:7

**initiative** 111:7

**initiatives**
111:8

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 64 of 77 PageID #:85834
The Deposition Of: JOSEPH RIVERA taken on December 22, 2021
205

**injury** 166:14

**innocent** 170:4

**inquiry** 104:4

**inside** 82:12,13

**inspector** 10:18 34:1,5,6, 14,18,20

**instance** 105:18

**instances** 40:19 47:15 104:20,21 147:9,14

**insubordinate** 143:12

**insubordination** 143:7,9,11

**intake** 35:23,25 36:4 48:24 52:4,5,11,20 55:3 60:17 75:24 76:1 97:21

**intaking** 75:25

**intentional** 155:22 156:2

**interested** 44:18 45:24 164:17

**interesting** 108:19

**internal** 10:12, 17 17:5 18:5 27:15 28:25 29:3,9,10,15 31:3,12 33:19 35:18 37:8,20 80:14 81:9 123:23 140:24 141:4 159:12

**interrogate** 56:23

**interrogation** 56:3,4,11,12,13

**interrupt** 33:12 132:14

**intervention** 116:3 120:5 125:6 127:8,15 128:7 129:1,8, 10,17,22 130:4, 21 131:3 174:19

**interview** 34:15 55:19 56:3,15,21 57:6,8 58:15,25 59:4,17 76:23 77:8 79:16,22, 23 80:3,5 105:17,20 122:13 131:22

**interviewed** 187:2

**interviewing** 57:2 126:17

**interviews** 58:12 59:10,14 104:18,22

**introduce** 55:16

**inventories** 55:22

**invest** 49:5 62:5

**investigate** 17:9 18:4 32:18 33:6 35:11 37:16 38:19 39:1,16 47:3,7, 14,21,24 55:2,6 77:3 89:24 148:24 149:4 170:2 172:13

**investigated** 30:25 34:2,25 35:7 37:2 39:8, 11 49:18 59:8 77:19 89:3,9,13 90:4

**investigating** 32:12 33:21 39:24 40:8 46:24 47:22 55:17 61:5 72:5 98:24 113:12

139:6

**investigation** 10:20 24:5 39:3,5,21 40:10 43:16 46:20 48:7 52:6,8 55:1,9,14,24 56:9,24 59:22 60:13,14,21 61:12 62:1 65:20,21,22 66:6,18 68:24 69:13 70:8,18, 21 71:18 72:2,6 74:5 75:9,22,23 76:6,11 77:12, 20 78:3 79:7, 12,15 80:10,12 81:7,9 88:23 89:16 90:9,13, 19,22 91:3,8,12 92:3,9,18,19 93:4,23 97:23 98:20 99:1,25 100:19 101:9 106:15,23 107:11 109:9 113:12,13,17 114:12 119:5 123:1,4 131:7, 10 132:5 137:7 138:13,23 147:11,17 162:19 169:11, 16 170:5,6 171:1,6 172:4 180:7 183:16 185:14,15 186:3,5,20 189:23

**investigations** 10:16 15:3 17:3,5,15,16, 18,19 18:5 24:4 33:15,16,18,25 34:4,13 40:14, 20 50:10 51:3 52:10,11 54:17, 19 58:21 59:4 69:14 70:13,17, 20,24 76:3 77:14 78:5 79:6 89:7 90:15,17 91:16,21 98:12 99:2 100:8

104:18 107:7 122:20 139:22, 25

**investigative** 38:18 39:15 61:1 119:12

**investigator** 53:22 55:10,12, 13 56:19 57:1, 20 60:20 61:5, 15 62:3 64:23 65:2,17,23 66:16,20,24 68:7,23 77:9 79:20 80:10,16, 21 81:12 90:24 91:7 92:20 94:12 95:16 97:22 98:4,16 99:3 100:18,23 103:1,6 113:6, 11 124:7,13,14 134:4 149:12 162:14 174:1 183:17,18 184:9 186:4,17 188:16,20

**investigator's** 64:20 65:7 81:15 94:3,9

**investigators** 52:19,21 62:25 66:6 94:24 95:5 98:7 99:21 101:13,16 102:25 103:8, 10,15 104:6,10, 11 109:7,13 118:25 134:13, 14,22 170:12

**investigatory** 65:3

**involve** 171:13

**involved** 33:24 59:13 76:9,11 77:23 131:23 138:17 170:8

**involves** 51:12 76:16 77:10

**involving** 47:2

**IPS** 39:19

**IRA** 31:22 32:1, 4,5

**irregularities** 186:10

**irrelevant** 171:10

**issue** 34:22 51:14 141:12

**issued** 72:9,24

**issues** 13:20 77:11 168:3

**issuing** 133:7

**items** 125:19

———

**J**

**J-O-S-E-P-H** 9:7

**Jan** 15:25 16:7, 9 189:12

**January** 25:11 28:4 93:16 108:6 163:25

**job** 94:4 103:21 111:5 136:25

**Joe** 78:15

**John** 9:8

**join** 26:23

**joint** 33:15

**jokingly** 116:16

**Jones** 146:2

**Joseph** 9:7,12

**Josh** 8:10 190:22

**judgment** 87:4

**July** 27:24 93:16 108:6,7

**June** 93:16 108:7

**junior** 52:16

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 65 of 77 PageID #:85835
The Deposition of JOSEPH BIRD, taken on December 22, 2023
206

**jurisdiction**
35:1,3,14 36:20
43:16

**justice** 155:17

———————

**K**

**keeping**
141:22

**kind** 33:11 44:9
45:4 97:20
99:11 126:23
141:19 149:5
161:20 164:4
177:1 189:21

**kinds** 76:7
150:3 185:15

**Klimas** 21:11,
13 136:5

**knew** 34:21
83:6 109:24
128:23

**knowing** 77:18

**knowingly**
39:7 147:22

**knowledge**
25:2 34:1 45:22
90:7 97:4 101:2
104:9 125:24
140:24 174:17,
22

———————

**L**

**labor** 28:7
29:12 34:14,22

**laid** 126:20

**language**
96:18

**large** 150:24
151:2

**late** 89:23

**law** 10:24 18:9
30:20 85:6
86:20 137:18

**lawful** 61:21

**laws** 18:23

**lawsuit** 47:18
97:11

**lawsuits** 47:11
180:2,5,8

**laying** 177:18

**lays** 97:21

**lead** 77:22
186:15

**leader** 53:4

**learned**
147:11,16

**leave** 78:11
79:1

**led** 53:10

**left** 31:16

**legal** 27:19
28:16,17 29:2,
8,11 53:17
86:12 151:4,12

**length** 63:21
90:8

**lethal** 139:1,9

**letter** 123:22
124:23 125:19,
21

**letters** 64:14,
16

**level** 70:2 71:4,
8,10 72:8 74:25
75:13 83:19
84:3 126:23

**levels** 65:12
67:3 72:9,23
73:6 75:17

**liaison** 77:20
137:15

**library** 99:12

**lied** 160:4

**lieu** 57:2 85:16

**lieutenant** 9:5,
9 10:2,8 13:1
16:23 20:17
28:18,19,22

60:12 82:7 83:8
102:24 115:10,
15,20 120:22
121:8 127:23
132:15 145:19
152:3,5,20
153:16 154:16
168:14 183:1
188:3 190:16

**lieutenants**
53:11 112:25
113:1

**limit** 91:11

**limitations**
67:24 68:3

**limited** 15:4
17:4 19:8 35:14
36:19 39:23
103:14,16
123:16 124:15

**lines** 104:4
137:15

**lineup** 142:6,
23 143:4,18,25

**lineups** 142:1

**list** 43:3 51:2
59:1 68:18
140:7 151:7
154:17,21
156:3,14,19,20,
22 157:8,11
158:17 159:16
162:10 164:1,2
169:25

**listed** 42:12,15
51:4 62:21
64:9,15 69:6
124:19,23
125:19 165:8,
13 166:24

**lists** 24:20

**litigation**
47:23,24 48:3,7

**live** 56:12,15,
21 58:11 76:21
78:1,13,17

**local** 18:9

**location** 8:5

**lockup** 166:19

**lodge** 48:10

**lodged** 35:21,
22

**log** 49:15,16
116:19,20,23
117:3 188:5,7

**long** 15:16
26:19 32:4
91:11,15,20
96:24 154:8

**looked** 49:1,2
50:23 119:5
142:15 173:3
186:6

**lost** 158:24

**lot** 29:24 32:14
41:3 161:13

**low** 110:20
111:21 112:5

**lunch** 102:6,9

**lying** 181:8,18

———————

**M**

**made** 28:4
44:16,20 70:22
80:21 83:1
88:22 89:10
112:9 113:1
129:15 137:21
151:14,21
168:25 169:13,
14,19,24
170:16,23
172:3,4 175:15
178:10 185:4,9
186:2 188:20

**main** 11:6
16:25 167:25

**mainframe**
101:11 163:4,9,
13 164:12,23
167:8,14,15,20,
22,25 168:1
180:15

**maintain** 85:12
137:15 138:6

154:17 156:14
178:7

**maintained**
107:19 154:21
156:22 157:9

**maintaining**
91:17

**Maintains**
178:3

**make** 10:21
11:17 15:14,21
24:4 28:23
32:17 38:15
40:4 41:1 44:25
45:18 46:21
54:12 55:5,15
56:6 60:25 61:1
66:1 67:18
80:16 82:23
89:20 113:23
144:16 147:22
182:18 190:8

**Maker** 135:25
136:9,20

**makes** 42:10
69:2 186:25

**making** 20:7
22:22 62:12
68:21 81:4
137:20 144:18
160:13

**management**
27:23 28:7,13
29:12,20 34:13,
22

**manager**
124:1 178:3

**mandating**
59:21

**mandatory**
129:24

**manipulation**
147:25

**manner** 18:20
33:10

**Marine** 53:23

**mark** 13:17
87:17 106:16

122:3 158:21
187:9

**MARKED**
13:22 88:7
122:5 127:19
159:14 163:23
168:12 187:25

**marking**
127:17 159:10

**Marty** 73:2

**Maryland** 37:1

**material**
155:22 156:1

**math** 27:2

**matter** 33:8,11
37:1 39:8 50:23
51:10 92:2,7

**matters** 38:15
89:19

**Mcgrath** 8:14
9:14 190:23

**meant** 70:22
101:12

**measure**
118:12

**measures**
28:15 179:19

**mechanism**
42:5,11,20
43:6,20 44:4
132:17 151:17,
19

**mechanisms**
45:16 117:4

**medical** 13:13
47:4 78:2,6,8,9,
12,16,21,22,23,
25 79:6,8 89:8,
12,14 116:7
117:18 119:21,
23 166:20

**medication**
78:10

**medications**
13:10

**meet** 25:22,25

**meeting** 56:2
118:17,18,21
126:6

**meets** 119:15

**Megan** 8:14

**member** 37:18
41:18 88:22
108:22 109:17
128:12 134:5
144:12 178:4,
24

**members**
34:15,17 41:11
43:11 64:15
82:8 123:24

**memorandum**
56:22 57:16
58:8 59:5,18
80:7

**memorandum
s** 58:11

**memory** 20:15

**memos**
104:19,23
105:21

**mental** 130:5

**mentioned**
10:3 23:22
26:18 30:16
31:10,18 36:11
40:3 63:7 69:9
73:2 90:23
116:8 117:6
131:20,21
141:13 143:18
150:17 151:25
153:12

**mentioning**
112:15

**mentions** 64:8
114:1 128:24

**messy** 177:2

**met** 26:2,4 70:9

**method** 18:20
41:24 43:8
109:16 117:12
152:7,8

**methods** 36:1

**Michael** 8:24

**migrated**
167:24

**migration**
167:23 168:3

**mind** 119:25
127:17 158:6
163:3 176:24
178:1

**minimal**
103:23

**minimum**
103:16,21

**minutes** 60:5
102:8,11 154:6,
10 182:20
187:18 190:8

**miscellaneous**
142:19 143:1,3,
16 147:1,3,5,19
160:6

**mischaracteri
zes** 89:4 92:15
107:1

**miscommunic
ation** 46:13

**misconduct**
15:4,6 17:10
30:25 33:7,22
34:3 35:20
41:18 42:4,7
43:12,18,22
47:12,13 50:18
55:18 58:15
61:6,17 77:19
92:3,4,8,10,21,
24 93:23,25
94:25 95:9,13
106:25 107:8
113:17 133:3
142:1,7,23
143:25 144:8,
11,24 145:9,14,
16,18,20,23
146:6,24 147:6
172:9,14
173:21 179:20,
24 180:9,10
181:12,19

182:15

**misleading**
57:12 155:2

**missed** 36:15
105:1

**missing** 24:2

**misstates**
105:7 140:15
150:5 167:2
183:7

**misstating**
142:18

**misunderstoo
d** 148:19

**mitigating**
82:22 112:4

**Mobile** 28:2,3

**moment** 13:23
123:5 160:24

**Monday** 26:4

**monitor** 18:21
22:15

**monitored**
118:7

**monitoring**
93:11

**month** 64:10
126:15

**months** 19:23
26:21 27:7,17
28:9,21 93:16
109:20 114:9
133:22 177:20
178:5,8

**morning** 10:2

**motion** 186:13

**Mounted** 53:24

**move** 32:7
126:17 137:1
160:16

**moved** 12:18
125:4

**multiple** 51:3

**municipal**

110:14

**municipality**
30:18,19

**mute** 15:22
16:8,9

**muted** 16:15

---

**N**

**named** 21:3

**names** 20:10

**national**
141:18

**nature** 47:6
73:11 88:24
90:16 107:12
139:2

**Navarro** 9:4

**necessarily**
74:4 109:15,23
111:13 144:20
179:24 180:11

**needed** 78:3
90:18 91:7,12
162:20

**negative** 13:9
111:15

**negotiated**
44:15

**negotiations**
28:9 45:8

**Nicely** 15:12

**night** 21:21
84:22

**Ninth** 27:21

**non-
concurrence**
74:15

**non-
concurrences**
72:10,13,24

**non-
separation**
86:15

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 67 of 77 PageID #:85837
The Deposition Of Timothy Joseph Rivard, taken on December 29, 2021
208

not- 152:2

note 116:21

noted 33:3

notes 26:10

notice 13:19
14:20 25:7 32:3
42:3 44:15
46:11 48:12
89:9 93:10
104:7,13
107:25 114:23
116:4,13 117:8
119:7,8 136:2,
12,22 145:17,
22 148:4,12
151:24 153:1,6,
23 156:25
158:3 160:17
162:7 164:15,
19 179:14,24
185:17,18

noticed 70:2

notices 124:8

noticing
117:24

notification
83:7 139:8,18
184:7

notifications
83:4

notified 21:24
36:3 83:9
112:16,19
127:1 129:19

notifies 132:20

notify 41:19,25
55:24 78:17
79:25 138:1
154:23

November
28:3 127:25

number 14:19
17:2,11,13
20:21 21:1,2,3,
4,5,22 22:14
23:22 25:14
42:6,25 43:20
45:11,12 49:9,

10,15,16,19,25
50:5,11,12 62:6
64:7 65:21
68:20 69:16
87:16 93:12
95:22 97:24
99:15 117:14,
16,17 121:14
129:4 133:4
139:21,25
140:3,6 141:16,
25 144:7,23
145:8 147:3
148:1 149:22
150:12,20,24
151:5,13,21
153:3,20
157:17 166:2,7
167:19 176:1,2
177:17 178:3,
10 180:11
185:5,9 187:13
188:4,5,7,19
189:21,25
190:2

numbering
49:12,22

numbers
43:14 45:5,15
140:11 148:25
164:3

numeral
123:22 124:19
125:14 131:2

numerous
172:24 173:5
182:11,12,13

───────

O

O'MALLEY
8:25 190:21

OAD 141:25

oath 13:2

object 32:2
39:22 44:6
48:10 51:8
151:1,23
157:24 168:7
169:12 185:16

objected 34:17
151:6

objection
12:24 32:22
36:21 37:3
38:20 42:21
43:23 44:13
46:17 47:16
48:5,11 49:14
52:17 57:3,24
60:16 61:8
62:23 65:9
68:12,17 73:1,
9,24 75:3 83:20
89:4,17,21
90:10,21 91:23
92:5,11,15 93:2
94:21 95:2,11,
23 96:10,16,22,
25 97:5,10,14
98:13,18,21
100:5,25 104:4,
12 105:7,22
106:17 107:1,
24 112:18
114:22 116:12
117:7 118:16,
23 119:14
123:12,18
127:9 128:8
129:11 131:16
136:1,11,21
140:15 141:2,6,
10 142:2,9,24
144:9,25 145:5,
10,15 147:12,
18 148:11
149:10 150:5
151:15 152:17,
25 153:5,22
154:3 156:12,
13,24 157:20,
25 160:9,20
161:10,19
162:6,16
164:11 165:1,
15,22 167:2,9,
21 169:17
170:15 172:15,
21 173:1,12,22
174:12 175:12
179:13,21
181:1,20 183:7
184:4,21,25
186:21 189:11

objection's
33:3

objections
89:21 189:13,
18

obligated 42:2

observe 43:18

observes
41:18 133:3

obtain 79:17,
21 149:24

obtained 61:14
64:19

obtaining
60:22

occasions
11:11 19:20

occur 61:23
70:14 96:12

occurred 48:8
61:16,20 76:14
77:5 82:16
86:13 109:22
132:20 138:16
152:9 174:9,13

occurrence
77:5 79:23
97:20

occurring
76:12

October 88:10

odd 45:1

offer 82:15
100:13

office 10:18
17:5 18:5 27:18
28:13,16 29:2,
6,19 30:2,4
31:2,8,18,20,24
33:23,24 34:5,
7,11,13,14,17,
20 77:23 78:10
122:19,20
123:1 137:4,8,
13,16,17 138:2,
8,17,21,25
139:4,11,18

151:3,12
152:16 154:18,
24 156:5
169:21 186:7,
11,14

officer 11:2
19:13 22:10,11
25:10 27:19
28:16 29:8
36:25 37:13,23
39:7 41:17,19,
22,24 42:10,11
47:18 48:2
53:15,17,20
55:18,25 56:2,
5,12,15,17
57:9,13,18
58:4,8 59:5
61:16 62:18
64:8,10,14 66:2
68:20 69:3,20,
21 70:11 72:15,
16,21 79:3
80:1,5,11 81:23
82:2,4,5,15,21
83:5,12 84:23,
25 85:6,7,15,
16,17,21 86:2,
5,14,20 87:2
89:23 90:14
91:7 93:17 96:7
100:11,14
103:22,24
104:21 105:16
106:1,2,25
107:8,18 108:8,
14,20,24 109:1,
3,19 112:12,22
113:7,12,20
114:2 115:7,10,
11,16 116:5,7,
19,21,24 117:1,
23,24 118:2,4,
6,8,14,18
119:1,8,15
123:5 126:6,14
129:2,21 130:4,
7,19 132:20
133:21,24
134:24 135:13,
17 136:16,17
137:10,25
138:18 141:12
143:12 144:19
151:5,13,21

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 68 of 77 PageID #:85838
The Deposition of LORI COOPER, taken on December 22, 2021

209

152:2,6,23
153:9,15 155:1,
19 160:3 162:9
163:25 164:2
175:16 188:18,
19

**officer's** 42:7,
25 43:3 57:8
62:21 63:19
68:10 69:5,21,
22 82:3 99:14
108:11 109:20
110:8 113:19
117:20 118:21
123:6 127:2
129:15 130:5
133:16 139:1
153:4,21 154:2
156:2

**Officer-
involved** 51:14

**officers** 8:11
11:1 15:5 18:22
19:8,11,12
22:4,13,14,17
28:15 31:1
32:12 33:18,21
34:19 42:6,19
43:6,21 47:12
53:12,24,25
54:1,2,3,7
55:23,24,25
56:1,18 59:8,
10,11,12,16
60:24 61:20
64:16 73:18
76:10,11,12,13
77:16,18 78:4
80:2,4 93:11,
15,20 95:20
96:3 99:13
103:9,11,12,14,
16 104:11
105:19 106:5
107:15 108:4,5,
9,15,18 110:20
111:19,20
112:13 113:2
114:8 116:4,15,
16 117:12
119:12 126:12
133:7 134:15
144:8 145:9
147:22 148:2

150:24 154:17,
22 155:3 156:4,
14,20 157:14,
18 169:6 170:3
172:8

**officers'**
105:15

**official** 57:10

**Okey** 182:19
191:2

**older** 23:25

**one-on-one**
150:20

**open** 47:10
70:20 162:18
175:20

**opened** 55:2

**opening** 90:19

**operates**
136:10

**opportunity**
21:2,8,23 22:11
56:1 80:3
111:12 112:2
117:25 118:4
126:15 135:13
174:3

**opposed** 11:16

**opposite** 76:17

**OPR** 141:25

**OPS** 31:4,19
32:1,3 33:5
34:25 35:1,6,
11,24,25 36:2,
3,4,9,13,17
37:2,7 38:3,4,
12,16 39:8,13
40:11,14,20,25
41:2,3,4,5,7,8
42:2 46:22
47:10,14,19
48:16 49:5,10,
13,18,24 50:19
51:20,25 52:10,
14,23 53:1
55:1,6,8 56:23
58:21 59:21
60:13,14 61:4,

11,24 62:1,10,
24 64:23 65:2,
4,16 67:13,16,
18 68:21 69:2,
12,15 70:24
72:5 73:20,21
75:6,7,9,23
79:14 80:6,17
84:6 90:9
91:16,21 92:7
93:22 94:3,8,11
95:5 98:2,3,16
99:18,20,21
100:15 101:3
102:25 103:1,6,
8,10,13 104:5,
10,18 109:7
114:11 118:25
119:11 122:25
123:10,15
131:13 134:4,
13 137:2,6,15
138:9 139:5,20
140:25 141:9,
13,21,25 147:8
148:22 149:4
150:23 151:16,
20 152:16
154:16 160:3,
25 162:4,13
167:18 169:11,
16 170:12
172:12,18,23
173:16,20
174:1 179:18
185:14

**OPS's** 36:19
67:25 68:4

**options** 133:9
135:18

**oral** 20:8

**order** 38:10
53:8 56:23
62:15 63:15
87:12 88:4,6
93:12,18 95:24
96:15 100:7
107:13 108:5,
13,21 110:2,16
111:3,14
112:21 114:1
115:4,9 118:1
119:16,17
121:7,24

125:10,12
127:5,24 128:3,
14,15,17
129:12,14
130:6,10,11,16,
25 133:25
137:14 138:5
141:20 153:7
161:25 175:20
176:8 177:5,21
178:23 184:22,
24

**ordered** 102:9

**orders** 20:25
21:5,6 35:3,5,
16 38:17 43:18
65:18 69:16
90:25 111:3
123:9 124:4
127:11 145:24
185:1

**ordinance**
35:4

**organization**
17:7 18:7 53:4

**organizations**
39:24 40:7

**outcomes**
61:11,25 71:15
83:14,15
139:22,25

**outlined**
143:20 155:9

**outlining**
88:11

**overlap** 39:18

**override** 38:14
66:7 67:6,10
81:11 112:7

**overriding**
66:19,23

**overstating**
151:10

**overtime**
22:10,11 111:7,
8

**overturn** 87:4

|   |
|---|
| **P** |

**p.m.** 191:3

**packet** 105:14

**pages** 129:2

**Palmer** 146:3

**panel** 81:23
82:1,3,5,14,23
83:2,8,12,15
84:6 109:12

**panels** 82:11

**paper** 26:9
54:14 69:20
108:16 123:16,
20 124:15

**paragraph**
15:20 49:11
131:5 146:10,
15

**paragraphs**
137:19

**parents** 32:16

**part** 24:21
28:14 31:5
32:23 40:15
52:5 94:3 97:2
99:25 100:19
118:15 138:22
152:18 184:8,
12

**participate**
129:21,24

**participation**
118:21 127:2
129:16 177:8

**parties** 8:3
9:11

**partner** 116:1

**partners**
116:17

**party** 45:18
79:19

**passed** 156:5

**past** 14:6
35:10,15 92:2,

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 69 of 77 PageID #:85839
The Deposition of JOSEPH BYRD, taken on December 22, 2021

210

8,13,21,23
93:24 94:5
100:23 113:19
116:7 133:16
153:4,21 154:2
178:7 183:3

**path** 117:14

**pattern** 115:1
122:14 123:8,
24 124:9
128:12 143:18
146:23 173:21
179:20,24

**patterns**
122:21 123:2
172:13

**pay** 53:18 85:3

**PDF** 188:13

**pen** 26:9

**penalties**
64:22 75:5
182:4

**penalty** 61:3
62:7,13,14,15,
20 64:21 65:2,
25 66:10,17
67:14,16,19
70:10,11,12
71:22,25 72:21
73:16 74:9,18,
19,23 75:13
83:17 84:1,3
85:10,11,25
86:17 155:3,7
156:1 171:17
174:4 182:9
184:14

**pending** 12:5
47:24 48:1

**people** 36:1
41:4 76:2 77:10
82:14 83:6
101:11,12
104:1,10
141:16

**Perfect** 9:10

**performance**
19:9,13,14
22:14 108:1,3,

14,17 109:1,21
110:6,7,13,18,
20 111:6,9,11,
16,18,21 112:4,
7,10,16,23,24
113:4,6,16,19,
20,24 114:5,8,
10 178:22
179:1,4

**performed**
19:10

**period** 15:1
17:2 18:2 19:5
21:7,25 22:1,17
27:9 35:2 40:24
41:19 44:9
45:17 46:24
49:24 55:16
58:16 61:6,12
63:9,10 78:25
91:21 92:1
96:6,13,14
97:13 101:6,18,
21 107:19
108:11 110:10,
12 114:3 117:5
118:7 119:3
126:16 129:5
133:24 134:9,
16,18 135:12,
21 144:24
145:7,25 153:3
154:19,20,22
156:8 165:7
167:1 169:15
170:24 173:4,
15 178:5 179:5
180:6 185:2

**periodic** 19:9

**periods** 178:25

**perjury** 138:7,
13,16,20,24

**permissible**
56:16

**permitted**
78:11

**person** 21:10,
11 25:9 41:6,8
46:9 52:16
97:21 98:10
118:20 119:9
144:15 166:20

171:11

**person's**
166:18

**personal**
22:16,18 45:22
93:10,20 115:4,
9 178:4

**personnel**
52:20 53:13
62:18 109:2,5
110:4 113:22,
24 116:8 120:3,
6,25 121:6
123:25 125:5,9,
18,21 126:1,7,
9,19,20,22
127:3 130:12,
20 141:15,20
174:23 178:2
179:8,9 183:20

**phone** 16:1
41:3

**phonetic** 23:6

**physical**
100:22 107:21

**picked** 54:2

**pieces** 24:24

**place** 46:6
78:10 84:17
96:24 99:19
145:25 152:14
155:9 162:13,
25 175:25

**Placement**
131:2

**places** 79:20

**plaintiff** 8:8
9:13

**plaintiff's** 8:6
13:22 88:7
122:5 127:19
148:22 159:14
163:23 168:12

**plaintiffs** 20:11

**plan** 102:16
126:13

**play** 177:1

**PLAYS** 105:6
177:3

**PO** 83:11

**point** 23:15
29:13 31:10
32:22 55:23
97:22 99:3,10
102:5 131:25
134:11 155:6

**pointed** 173:23

**police** 8:11
10:5,8,24,25
15:3,5 17:6
18:6,22 19:7,8,
10,12 22:13,14,
23 26:24 27:3
30:10 31:5,24
32:12 33:7,21
34:2 35:20
36:25 39:7
41:11 43:6
47:12,18 51:19
53:12,14,15,17,
20,22 54:1,2,3,
7,17 55:21
57:11 59:7,10,
11,12,16 63:15
64:7,14,25 78:4
81:7 82:5 84:11
85:18,21,22,24,
25 86:1,2,15,
16,23 87:5
90:14 93:11,20
96:21 103:9,19,
22 104:11
108:3,20
111:18 112:12,
22 134:20
135:19,23
136:19 137:25
142:6,12 144:8,
19 145:9,13
147:22 148:2
150:3 152:23
157:18 159:13
164:17,24
172:19

**police-
involved** 35:12

**policies** 15:2,7
17:1,14 18:18
19:6,25 22:21

30:12 43:10
78:2 90:8 108:2
120:8,10,14,25
121:1,2 122:24
123:9 124:3
153:2 179:12

**policy** 71:13
78:8 90:17
96:24 97:4,7
107:10 108:20
112:14 119:11,
25 120:8,24
121:21 127:14
131:25 153:19
175:10 178:11
183:25 184:3

**poll** 23:2

**poor** 111:16

**pop** 175:20

**POS** 180:6

**position** 10:13
26:18,20 27:21
52:22 112:3
186:19

**positions**
30:14 52:14

**positive** 64:13
84:4 85:24
103:15 130:8
135:10

**positiveness**
118:2

**possibility**
164:8,9

**possible** 18:22
33:17 78:21
106:5 112:3
123:7 137:9
138:14 172:7

**potentially**
33:24 47:3,20
51:16 76:4
77:18,21 86:17
115:1,19 117:2
119:17 138:18
153:10 155:16
158:17 174:3
180:9

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 70 of 77 PageID #:85840
The Deposition of LIEUTENANT JOSEPH BIRD, taken on December 22, 2021
211

**practice** 35:10, 15 90:2 96:18 100:16,18 110:17 114:7 115:1 135:11 138:3 146:2 183:24 184:3

**practices** 15:2 17:1,14 18:19 19:6 90:8 108:2

**praising** 64:16

**pre-2000** 163:9

**pre-service** 27:25

**precisely** 140:4

**preclude** 41:5

**precluded** 38:8

**predict** 136:17

**prefaced** 120:7

**preparation** 25:22 168:15 188:25 189:3

**prepare** 20:16, 19 21:17,19 23:18 25:18 26:1,12 32:24

**prepared** 15:7 17:21 18:10,23 19:14 45:21 46:15

**preparing** 21:22 40:21

**present** 82:13, 22 111:25 140:11,13

**presented** 37:17

**preserve** 147:10,15

**president** 64:12

**presidential** 64:13

**pretty** 71:2

**prevent** 17:9 18:4 117:13

**preventative** 179:19

**prevented** 40:16 142:19

**previous** 114:6,8 149:14 188:17 189:5

**previously** 12:22

**printed** 87:11

**prior** 11:12 19:20 21:14 92:16 105:8,16 108:10 113:24 116:23 128:3 142:7 145:14 150:4,6 155:4,5 157:7,25 174:24

**prison** 187:3

**probationary** 27:9

**problem** 37:6

**procedural** 67:24 68:3

**procedure** 92:2,7 138:3 144:11 160:11

**procedures** 15:2 17:1,14 19:6 20:3 43:10 45:16 87:13 88:5 142:17,18, 20 143:2,4,18 160:6

**proceed** 87:3 89:16

**PROCEEDINGS** 8:1

**process** 10:19 11:2 20:25 25:10 54:11 62:2,4,9 64:20 65:3 69:10

73:18 75:22 79:13 81:6,18 82:12 84:17,21 85:20 86:9 88:12 100:11 103:24 109:25 111:23 122:13 126:5 130:2 143:6,19 144:17 155:8 162:3 174:5,6, 8,14

**processing** 101:8

**produce** 23:14

**produced** 157:15

**professional** 17:6 18:6 31:2, 19 122:19

**professionally** 186:23

**program** 22:17,18 93:10 116:9 119:10 120:23 124:1, 10 125:4,9,18, 22 126:8,10,18, 19,21,22,23 127:4 128:25 129:3 130:3,13, 20 131:11,14 132:2,6,7,23 133:1 135:25 136:9,15,20 151:11 164:24 167:8 174:24 178:15,16

**programs** 175:2

**prohibit** 100:7, 10

**prohibited** 47:22 79:9 100:15 149:23

**prohibiting** 100:2

**promoted** 27:24 28:18,19, 21,22

**promotion** 27:18,21 28:17 53:18

**proof** 159:25

**proper** 41:24 61:21 166:14, 19

**properly** 11:4

**prove** 61:19 71:19 91:9 138:23

**proved** 74:3

**proven** 170:4, 10 181:23

**provide** 44:22 58:5 112:3 136:15 144:12

**provided** 104:22 155:1

**providing** 57:14

**public** 140:20

**pull** 13:21 43:5 80:22,24 87:23 110:17 143:13, 15 144:20 145:18 158:11, 20,21 159:8 176:9,25 180:19

**pulled** 87:22 163:24 187:24

**pulling** 81:4 120:1,24 127:17,20 143:23 163:3

**punishment** 132:9 133:7 181:17 182:7

**punishments** 182:3

**purpose** 88:21 115:11,12

**pursuant** 63:22 96:20 106:13 110:14 112:14 119:11

123:17 129:14 169:22 175:10 179:11

**pursue** 59:22

**put** 54:14 76:7, 24 78:15 85:9 87:7 90:6 119:1 129:3 140:18 153:15 161:4 168:8 169:25 172:11 178:13

---

**Q**

---

**qualifications** 103:5,17,18 104:5

**query** 43:4

**question** 11:24 12:1,14 20:21 22:12 32:24 37:17 44:11 46:3,9,15 52:13 57:5 58:1,3,4 88:13 95:3 104:17,25 105:4,10,12 107:4 151:8 153:11 158:1 159:19 161:21 164:18,21 170:22 176:20, 23 177:7,14,15 179:25 185:3, 24 186:1

**questioning** 11:19

**questions** 11:20 12:6,10 21:7 45:2,4,21 56:17,19 57:16, 18,21 64:2 93:9 102:25 104:22 105:19,23 106:3 114:24 136:14 139:12 187:7,11 190:5, 16,19

**quickly** 180:12

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 71 of 77 PageID #:85841
The Deposition of DR. JOSEPH BIRD, taken on December 19, 2017
212

**R**

raise 9:19
86:17 108:23,
25 110:25

raised 186:13

raises 108:21,
23

randomly 23:3

range 160:22

rank 53:11,19
69:22 82:3,6

rarely 40:2

rated 108:24

rating 108:18
109:21,25
110:6,18 111:6,
9,11,21 112:23

ratings 110:7
112:4,24 113:4
114:6

reach 55:15
60:22 79:15
114:4

reached 61:24

read 15:15,18,
20 16:24,25
17:12 19:2,4
31:21 38:9
45:10 89:18
93:12 95:3
104:25 105:2,3
115:9 125:20
132:4 133:25
143:12,17
145:22 148:9
152:1 168:17

reading 34:4
38:17 48:14
50:21 59:1
66:8,12 83:21
84:22 86:11
89:24 91:13,14
99:6,7,23
136:13 140:9
152:19 160:12

readings

106:18 136:18

reads 15:1
16:23 18:2,17
19:5 131:18
137:14 138:5

real 79:5

realizes 66:2

reason 13:5,7
116:6 162:21
171:12 184:18

rec 188:18

recall 32:10
34:4,16 40:22
48:13 52:24
58:25 59:1
83:21 91:1,4,13
99:7 106:18
112:21

receive 35:23
36:18 63:1,3
68:25 69:3,5
108:22,25
110:24 111:6
134:6 138:25
166:19 171:25
182:3

received 20:20
22:10 24:22
48:17,21 64:8,
10,14 110:4,20
120:12

receives
100:12

receiving 42:3

recently 11:16

recommend
62:14,15 67:18
68:8 83:17,18
115:20 173:20

recommendati
on 67:22 68:1
70:22 131:9,11
182:12

recommended
67:13,14 74:9,
23 75:13 84:1
94:19 108:13
155:2,7 156:2

171:17 182:4

recommendin
g 62:13 74:18
131:13 183:4

recommends
65:2

record 8:3 9:6
15:21 32:25
60:7,8,9 99:16
102:20,21
107:22 120:22
154:12,13
177:1 182:22,
23 187:22
188:18 189:5,8
190:12,13

record's 15:15

recorded
48:24

records 101:4
103:12 107:20,
21 108:16
123:23 124:5
134:9 157:6,8,
10 162:11,21,
23

recounting
29:1

recurrence
177:19

redid 128:14

redo 126:16

reduce 83:23,
25 84:3

refer 119:9,12
137:2

reference
175:15

referenced
63:13

referencing
188:8

referral 119:19
124:22 125:2,
11,17,25
129:16 137:12,
20,21,23 138:8,

21 139:4,11
169:20 172:5,7
177:14

referrals 137:2
172:3

referred 48:17,
21 49:6,10 56:4
63:8 129:25
130:13 154:17
156:15 175:1

referring 49:4
50:3 57:6 63:13
128:23,24
137:7 190:1

reflected
173:7,10

reform 28:13,
15 29:19 30:12

refusal 130:24

refuse 129:21

refused 130:19

register 41:22
49:16 88:12,23
131:7,10 132:5
163:9 171:22
188:5

registers
129:4 160:18
172:20

regulation
43:14

regulations
20:9

reject 72:21

related 17:9,
15,18,20 90:8
106:24 107:8
146:1 185:12

relating 15:3
18:20 142:1

relationship
138:6

releasing
151:6

relevant 33:2
40:24 45:16

46:24 47:10
52:1 63:25 64:3
84:18 92:1
96:14 101:6
143:14 155:13
169:19 170:24
174:4 186:2

relied 186:6,17

remain 46:21,
25

remained
28:6,9 63:9

remember
12:16 20:10
23:5,7 32:14
34:12 50:10
140:9 175:3
176:23 183:5

remembering
119:20

remind 59:1

remotely 8:12,
15,17,20,23
9:1,4

reoccurred
126:16

reorganization
29:24

rep 187:1

repeat 12:10
176:20 177:20

repeated
111:18 172:20

repeating
176:24

rephrase
105:11 176:19

replaced 32:1

report 18:21
20:7 22:15
24:18,22 30:9,
11 41:20 43:13,
15 44:9 56:19
57:10,11,14
78:20 137:25
140:12,14,17,
19 160:5 161:3

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 72 of 77 PageID #:85842
The Deposition of Dr. GUY JOSEPH BIRD, taken on December 29, 2021
213

189:20,22

**reported** 49:8

**reporter** 8:2
9:5,9,18,24
11:20 13:19,23
14:3,9,12,16
16:3,6,10,15,
18,20 60:7,9
87:19,22 88:1
102:21 104:25
105:2,6 120:15,
18 121:17
122:6 127:20
154:13 159:1,3,
5,8 163:5,19
176:5,11,25
177:3,4 182:23
187:23 190:13

**reporting** 42:7
43:17,21

**reports** 30:9,
13 33:9 45:4
49:1,2,3,8
55:22 57:13
139:24 140:1,2,
3 141:23
143:17

**representative**
82:17,18 169:1

**represented**
85:5,6,8 86:5,
19,21

**reprimand**
64:24 74:23
75:7,13,19
133:12,13

**reprimands**
75:1

**request** 17:2,
12,13,17,19
28:10 45:25
56:1 62:15,17
68:22 82:4
85:16,17 96:7,
13 113:15,23
114:7 118:25
119:6 124:8
132:9 133:21,
23 134:1 135:1
146:1 150:9
157:5,7 162:11

**requested**
28:12 105:6
149:13 152:20
157:14 174:2
177:3 183:19
188:17

**requesting**
162:17

**requests**
17:16 86:2
151:5 184:9

**require** 43:19
44:17 59:4
104:1 125:7,10,
13 138:14
170:5

**required** 41:19
43:11 58:15
93:19 106:2
112:15 129:19

**requirement**
59:21,25
103:21 127:5
175:17,19
177:8,10
178:10

**requirements**
129:9

**requires** 43:16
123:25 124:9
125:14

**rescinded**
121:24 128:3
129:12

**reserve** 191:2

**residence**
78:11

**residency**
47:4 77:25
89:8,12,14

**resigned**
27:20

**resolved** 34:18

**respect** 105:22
108:3 151:1
174:9 186:20

**respond** 56:18
124:6

**responded**
76:14,18

**responding**
57:22

**responds**
57:18

**response**
17:2,13 30:11,
13 58:6,7,10
59:11 76:15

**responses**
11:20 58:23

**responsibilitie
s** 53:22 54:5,6
122:17

**responsibility**
54:5

**responsible**
39:20 108:8

**responsive**
12:17

**rest** 36:20

**restricted**
82:20

**restrictions**
46:23 63:17

**result** 118:8
133:7

**resulted**
169:25

**results** 95:15

**retain** 36:5
37:15 56:2
76:25

**retained** 17:8
18:8 39:13

**retroactive**
32:21

**review** 10:20,
22 14:23 15:10
17:6,24 18:6,14
19:9 21:2,8,16
23:20,23 31:22
36:4 40:21

47:5,19 52:6
54:11,16,23
58:19 60:25
62:3,5 65:7,10,
13,16,19 67:3
69:10,11,22,25
70:2,7,14,19,
20,23,25 71:4,
8,11,16,23
72:18,23 73:7,
10,15 74:6,12,
16 75:17,18
79:24 81:15,17,
23 82:1,2,5,11,
23,25 83:2,8,15
84:5,6,8,15
85:17,22 86:3
91:17 94:24
103:4,24
108:10 109:12,
16 114:6
122:20 123:4,
11,16,17,20,23
124:5,14,15
128:11 130:4
135:6,14
136:23 144:21
149:12 150:20
153:9 161:9
162:19 173:2
174:3 188:24
189:3,15

**reviewed**
14:25 15:13
18:1,16 20:24
21:4,5,22,24
22:19 24:10,11,
15 35:6 41:2
61:14 62:8 65:5
74:6 81:15,19
85:21 95:16
108:5 109:22
114:10 115:5
129:18 135:3,7
141:8 157:8
160:22 161:5
166:25 167:4
168:15 173:13
178:24 184:13
186:8 188:25

**reviewer** 113:5

**reviewers**
72:9,24 109:13

**reviewing**
39:25 66:5
70:1,3 74:1,21
75:12 111:4
123:1 140:1
143:24

**reviews** 38:9
39:25 69:16
72:8 108:2,3
178:22 179:2,4

**revised**
128:15,16

**revolving**
47:20

**Reynaldo** 8:12
18:10 169:3

**RFC** 87:8,17
120:2 122:8
163:3,10
168:10 180:15
190:2

**rights** 22:19
51:10 105:15
160:1

**Rivera** 171:20

**Robert** 21:11

**robust** 126:18,
23

**role** 78:2,6,8,9,
16,22 79:6 89:8
116:7 117:18

**roles** 103:16

**Roman** 123:21
124:19 125:14
131:2

**Ronaldo**
160:19

**room** 98:16,23
99:1,15,18,22

**Rosen** 8:16
12:24 15:18
16:5 23:16
32:2,21 36:21
37:3 38:20
39:22 42:21
43:23 44:6,14,
25 45:19 46:7,
13,18 47:16

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 73 of 77 PageID #:85843
The Deposition of JOSEPH BIRD, taken on December 22, 2021
214

48:5,10 49:14
51:8 52:17
57:3,24 58:2
60:4,16 61:8
62:23 63:25
65:9 68:12,17
73:1,9,20,24
75:3,6 83:20
89:4,17 90:10,
21 91:23 92:5,
11,15 93:2
94:21 95:2,11,
23 96:10,16,22,
25 97:5,10,14
98:13,18,21
100:5,25 102:1,
4,8,15,19
104:3,12,24
105:7,22
106:17 107:1,
24 112:18
114:22 116:12
117:7 118:16,
23 119:14
120:4,16,21
121:4,11,14,19
123:12,18
127:9 128:8,18,
20 129:11
131:16 136:1,
11,21 139:12,
15 140:15
141:2,6,10
142:2,9,24
144:3,9,25
145:5,10,15
146:4,9,14,16,
18 147:12,18
148:3,7,11
149:10 150:5
151:1,15,23
152:17,25
153:5,22 154:3,
7,11 156:6,12,
17,24 157:20,
24 158:23
160:9,20
161:10,19
162:6,16
164:11,14
165:1,15,22
166:2 167:2,9,
16,21 168:7
169:12,17
170:15,18
172:15,21

173:1,12,22
174:12 175:12
176:3,7,19
177:11,13,16
178:16 179:13,
21 180:17
181:1,20
182:19,21
183:7 184:4,21,
25 185:16,21,
23 186:21
187:8,16,21
188:2 189:14
190:4,10,17,22
191:2

Roumell 23:5

round 51:21

rule 13:18
14:20 20:5,6,7,
9 44:8,19
137:24 143:9
154:18,24,25
155:4,11,13,21,
24 156:4,15,25
157:7,11,15,17,
23 158:6,7,10,
15 159:20
160:8 169:25
170:7 182:1,2

rules 11:17
18:23 20:8
43:13 54:4
158:10,11

—————

**S**

SAO 48:22
156:15 172:3

Saturday
23:23

scales 155:17

schedule
55:18 56:2
79:15 118:17,
18,20

scope 32:3,6
45:8 46:11
48:11 104:6,12
107:25 114:23
116:13 117:8
136:2,12,22

148:12 151:24
152:25 153:6,
23 156:12,13,
17,24 158:2
162:7 164:14
179:14 185:17

score 111:1
112:7

scored 108:19

scores 112:10
113:7

screen 13:20
14:4,6,13
16:10,11,16
18:18 25:17
87:8 127:21
177:2

scroll 16:21

search 43:4
142:20 143:10

searching
160:10,12

secondary
22:9 79:2,8

section 10:19
16:25 26:19
50:9 52:4 54:10
69:15,18,23,24
75:24 77:24
78:23 80:12
85:2 88:13,21
107:22 122:18
123:17

secure 79:21
80:3

seeking 45:6
134:4

seeks 17:19

selected 61:25

self-report
43:11

selling 79:5

send 10:22
36:20 39:2
54:12,15 56:9,
17 69:20,24
72:1,21 73:17

78:14,18 80:20
83:4,7 113:24
187:11,12

sending 72:4

senior 22:10,
11

sense 100:10
109:24

sentence 35:8
38:10

separate 29:3,
5 32:15 49:22
112:12 181:16
182:3,4

separation
10:23 75:1,9,
10,14,18 86:13
155:3,7 156:21
170:9 171:18

sergeant
27:24 28:2,5
34:15 77:9 82:7
83:10,11
112:23 118:18
131:22

sergeant's
112:24

sergeants
27:25 53:11
54:18 113:1
116:15 117:18

serial 190:7

serve 55:25
60:24 72:15,16
80:1 85:14

served 20:11
58:5 105:16
106:4,7,10

service 53:19

serving 60:23
73:18

session
115:10,12
117:23 118:19
131:22

set 17:10 146:2

severe 182:13

shape 114:16

share 176:5

shared 13:20
14:6 25:17
140:21

sharing 16:10,
11 177:2

sheet 26:9
48:24 52:5 55:4
97:17,18 98:3,
5,6,19

sheets 97:17,
25 98:8,12,17
100:22

shooting
51:14

shootings
35:12 51:19

short 55:16
60:2 143:23
154:6 182:17

shorthand
146:20

Shortly 28:1

show 87:6
148:3 152:8
168:9 180:14

showed 21:24
23:11

shows 89:23

shut 14:7 157:2

sic 168:10

sick 78:15
116:4 141:16

side 73:15
76:22 86:8

sign 111:8

signature
191:2

signed 97:2
186:5

similar 53:16,
23 65:18 79:14,

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 74 of 77 PageID #:85844
The Deposition of LUTHER JOSEPH BIRD, taken on December 29, 2021
215

25 81:6 82:12
85:23 92:24
93:25 94:4
111:25 121:2
140:5 184:9

**simple** 78:14

**simply** 45:2
61:18,22 73:10
139:13

**single** 50:12

**sister** 186:25
187:1

**sit** 116:5
117:23 130:16
152:5

**sites** 110:16

**Skahill** 21:9,13

**skipping**
107:14

**slash** 50:11

**Solache**
190:18

**solely** 37:24

**solemnly** 9:19

**someone's**
15:22 25:7
51:10 76:22
78:2,22 127:2

**SOP** 100:15

**sought** 34:14
170:9 171:9

**sound** 65:21,
22

**sounded** 50:23

**soundness**
65:21

**source** 167:25
181:7

**SPAR** 78:21
132:18 133:17,
18,19,20,21,24,
25 134:6,8,9,
14,21,23,24
135:12,15,17,
20,22

**sparred**
178:18

**SPARS** 111:25
112:1 132:9,11,
12,16,23 133:1,
4,15 135:9
136:16 178:15,
16,20

**speak** 26:11

**speaking**
89:21

**special** 20:25
21:4,6 123:9
145:24

**specifically**
143:4 145:3
158:15

**speculation**
112:11

**spelling**
123:10

**spend** 116:17

**spoke** 26:13

**spouses**
116:18

**square** 89:1

**staff** 51:25
52:13 53:5,8

**staffs** 70:3

**stakeouts** 78:4

**stale** 63:8

**stamped**
159:11 163:10
188:12

**stand** 54:22

**standard**
119:2

**standards**
17:6 18:6 19:9,
11 31:2,19
122:19

**stands** 37:14

**star** 42:25

**start** 55:20

118:1

**started** 27:6
28:20 30:6 36:3
54:24 101:10
164:12

**starting** 8:5
14:20 97:22

**starts** 87:17
120:2 127:16
159:7 189:23
190:2

**state** 8:4 9:6
18:9,11,23
137:16 168:25
169:21 186:11
187:1

**state's** 33:16,
23 77:23 137:1,
3,7,12 138:1,8,
17,21,25 139:4,
11,18 148:20
154:18,23
156:5 170:7
186:6,7,8

**Stated** 28:3

**statement**
57:1,6,8,9,20,
22 113:10

**statements**
57:7,15 147:21,
23 148:2
149:24

**states** 105:15

**station** 81:7

**statistics**
45:15 139:21
141:22

**stay** 38:15
63:22 76:16

**stayed** 27:19

**staying** 76:8

**Stein's** 66:8

**step** 55:9,11,15
59:9 61:2 62:1
64:20 65:3
75:23 79:12
80:9 81:3

108:21,23,25
110:24,25
126:12 128:13

**Stephenson**
8:24 9:15
190:20

**steps** 55:1
60:13,14,21
61:4 69:11
84:20 126:16
172:13 173:20
177:20 179:25

**sting** 66:3

**stop** 16:11

**stopped** 28:20

**stored** 101:12
175:7 179:8

**stores** 23:25

**street** 145:9,
13,16,18,20,23
146:1,6,19,24
147:6 155:20

**strict** 78:7

**strike** 28:2,3
32:7 62:10 65:1

**structure**
51:24 52:3

**stuck** 23:5

**stuff** 162:10

**subject** 56:18
57:10,13 88:23

**submit** 59:17

**subordinate**
18:21

**subordinates**
22:15 91:18

**subparagraph**
146:7

**subparts**
15:19 16:24

**subsequent**
76:15 170:13,
25 171:1,5

**subsequently**
31:22,23

**substantial**
161:14

**suburbs** 76:22

**successfully**
28:4

**suggesting**
89:23 95:16

**suggests**
95:17 138:16

**suing** 148:22

**summary**
24:16,18,22
25:6 42:13,16
50:17 65:10
132:8 133:7
143:13,17
161:2 189:20,
21

**superintenden
t** 29:11,13,17,20
30:3 32:13
35:9,17 38:11,
12,14 53:10
67:19,21 68:9
70:5 72:17
73:11,13,14,15,
22,25 74:7,8,
17,18,20,22,24
75:4,8,10,12,16
81:20 82:25
84:7,9,24 112:9
127:1 129:15,
19 135:14
140:22 172:4,9

**superintenden
t's** 29:6 31:8
67:25 68:4
74:11

**supervise**
116:15

**supervised**
114:3

**supervision**
116:14

**supervisor**
41:20,21,25
42:1 52:6 55:5
56:10 62:5
65:5,7 66:5,6,

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 75 of 77 PageID #:85845
The Deposition of LT. JOSEPH BIRD, taken on December 29, 2021

216

16,19,23 67:5
68:7 78:12,18
81:8,12 91:18
108:13 110:2
112:15 113:18
116:19 118:6,
17 122:13
130:15,23
132:19 133:3,
15 186:4

**supervisor's**
91:17 116:20
117:3

**supervisors**
18:20 26:14
52:19,21 53:11
108:14 109:11
110:19 112:19
116:17 117:19
128:12 132:17
133:6 185:4,9

**supplement**
12:19

**supported**
65:24

**supports**
71:19

**supposed**
96:3,23 110:5
117:19 168:1
175:14 178:24

**surgery** 78:24

**surprised**
100:16 112:13
171:7

**Susler** 15:12,
17 189:11,12
190:18

**suspect**
147:23

**suspects**
149:25

**suspended**
11:2 25:9,10
85:3

**suspension**
25:7 84:13
85:15 184:7

**sustain** 71:4
73:12 124:7
137:24 149:13,
14 174:2,14

**sustained** 11:3
25:8 56:7 61:2,
13,17,18 62:6,
11,16,24,25
63:1,3,18,22
64:19 65:16,24
66:7 67:2,7
68:5,8,13,16
69:1,2,3,19
70:12 71:3,7,21
72:11,12,14,15,
19,20,22 73:3,
5,17,19 74:11,
12 80:17,18,21,
22,25 81:1,22
92:14,17,18,20
93:13 94:11,12
95:13,14,17,18,
21,25 96:8
106:12 115:18
119:3,9,13
123:6 125:1,7,
10,13,15
128:25 129:4
131:6,15,23
132:1 134:5,23
138:11,12,20
140:7 149:12
152:3 155:4,6,
16 156:4 162:9
165:18,21,23
170:14,18,19,
21,22 171:3,4,
8,13,15,17,23,
24 172:25
173:3,5,9,14,
15,18,24,25
174:7,9,15
181:5,18,22
182:4,11,13
183:2,5,10,14,
18 184:11
186:16,18
188:7,23

**sustaining**
119:7

**Swaminathan**
46:10

**SWAT** 28:5,6,
10,11

**swear** 9:19

**switched**
167:24

**sworn** 13:2

**synopsis**
115:22

**system** 23:24
24:6,7,9 42:14
43:1 46:6
49:12,22 54:9
101:10,11
114:15,17,18,
20 115:19
116:2,3,9
117:11 118:9,
15,22 119:1,13,
19 120:14
122:10,15
124:19,22
125:6,7,18,25
126:5,24 127:3,
7,8,12,15
128:7,14,17
129:8,10,17,22
130:12,20,21
131:3 149:2,15
152:18 153:10,
13,16,19
167:14 174:19
175:3,9 177:9,
19

**systematic**
128:11 150:23
151:13

**systems** 23:25
115:1 116:9,10,
11 117:5
167:24

———————

**T**

**tables** 159:12

**tag** 27:13

**takes** 97:21
132:19

**taking** 102:5

**talk** 32:14
34:24 51:24
54:24 55:4
108:1 116:5

117:10 130:17
176:18

**talked** 40:23
65:18 115:4
126:4,10 136:6
137:2 141:17

**talking** 30:24
33:2 44:1 52:10
60:12 64:1
75:22 86:13,14
106:1,11,23
120:5,6,17,22
124:21 146:5,6,
10,19 158:10
189:23

**talks** 111:15,16
115:6 126:14
141:11 153:8
186:24

**tallied** 140:10

**tally** 42:13
44:17 45:5,11,
13,14,17

**task** 30:10
33:20 54:21

**team** 27:13
28:5,6,10
108:13

**technicians**
54:1

**techniques**
149:24

**telephone**
36:2 41:6

**telling** 46:7,14
117:21

**tells** 45:22

**ten** 60:5 90:24,
25 154:6 173:4
182:20

**tendered** 23:4,
12,21,22 24:2
115:7

**Teresa's**
187:16

**term** 99:4
114:14 145:21

148:15

**terminology**
166:14

**terms** 38:22
42:15 56:11
66:12,13 72:11
80:15 83:1,14
87:2 96:17
101:8 103:24
126:6 142:3
147:20 149:17,
20 182:10

**test** 20:16
158:9

**testified** 11:14
19:19 21:20
23:19 25:19
26:8 61:7 96:1
97:16 150:8
152:12 154:24
156:19 183:1

**testify** 13:6,7,
11,14 25:14

**testifying**
19:24 26:14,16

**testimony**
9:20 13:2 14:19
15:7 17:21
18:11,24 19:15
20:4 21:8,14,17
34:19 39:8
89:2,5 92:16
99:23 105:6,8
107:2 122:15
129:8 136:13
140:16 150:6,
13 157:7,9
159:25 167:3
168:22 169:7
171:14 177:3
180:24 181:9,
12,24 183:6,8
185:13 186:10
188:9

**That'd** 16:13

**There'd** 59:10

**Theresa** 8:19
16:5

**thing** 11:6
35:15 38:3 47:4

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 76 of 77 PageID #:85846
The Deposition of LT. JOSEPH BIRD, taken on December 22, 2021
217

**70:7 74:16 98:4
137:18 143:15
150:8

things** 22:8
35:8 51:11

**thinking** 39:25
43:7

**thought** 32:16
57:7 89:12
114:17 125:3,
12 158:16
173:4,13

**threshold** 70:9
119:15 125:19
129:9 153:25

**thresholds**
119:18 124:21,
23 125:16

**time** 12:9,16
21:7,25 22:1,17
26:5 27:15
29:13 33:3 35:2
40:24 41:3,19
44:9 45:16
46:24 49:7,24
53:12 55:16,18
58:16 61:6,12
63:21 79:1,16,
17 86:13 90:8
91:5,6,21 92:1
96:6,14 97:12
101:3,6,14,17,
18,21 102:6
103:11,20,25
107:5,19
110:10,11,12
112:5 116:17
117:5 131:17
132:7 133:24
134:9,16,18
136:7 144:24
145:7,21,25
151:4 153:2
154:19,20,22
156:8 160:2
165:7 167:1
169:15 170:24
173:14 178:25
179:5 180:5
185:2

**timeframe**
24:8 30:24 31:1

**40:13 47:10
48:4 52:1,23
53:2,6,9 54:8,
18 59:3,20
63:25 64:3 78:8
82:10 84:18
91:1 103:2
104:2 106:22
107:7 123:19
139:20 141:1,5,
24 144:6 147:8,
25 149:9,21
155:14 156:6
169:13,20
185:4 186:2

timeliness**
65:20 70:8

**times** 25:25
41:3 66:9

**Tina** 21:9

**tips** 155:18

**title** 10:7,13
53:16,21,24,25
54:4

**to-from** 56:18,
22 57:10,16
58:8,11,23
59:5,18 80:7
104:19,23
105:21 106:3,9

**today** 13:3,6,
11,15 20:16
21:17,23 23:7,
11,19 25:19
26:4,14,17 40:1
43:2 45:5 56:16
70:1 71:1,13
78:15 100:12,
14 110:18
155:20 156:6,7,
9,16 161:21
162:1 168:16
172:6

**today's** 25:23

**top** 52:14,16
122:1 159:13
161:2

**topic** 14:20,23
15:1,8,10 16:23
17:22,24 18:2,

12,14,17,25
19:2,5,16 24:10
45:10 160:16

topics** 14:19

**totally** 14:7

**tour** 41:21

**track** 42:5
43:20,24 44:4
45:17 48:16,20
49:13 50:5
141:25 142:6,
12,13 143:4,25
144:7,19,20,23
145:8,13 147:3,
9 148:1,16,25
149:7,22 150:3,
10,19,24
151:13,21
153:14 157:17
158:11,12

**tracked** 42:12
152:4 153:20
158:15

**tracking** 42:10,
14 50:12 91:15
99:11 142:3
149:1,15 150:1
152:11,14,15
157:22 158:5

**traffic** 131:8
180:10

**train** 27:6

**training** 27:8,
25 28:15

**transfer** 36:7
37:7

**transferred**
27:17,22,23
36:9 55:7 98:5
114:2

**transgression
s** 132:19

**treated** 154:25
155:11,13

**treatment**
166:21

**trial** 144:17
158:9 159:25

181:24

trials** 168:23
169:7 171:14
180:24 181:9,
13 185:13
186:10,15

**trickled** 108:11

**trigger** 67:3
118:21 119:19
125:1,10,17
130:16 137:6
138:8,21 139:3,
10,17 153:4,9,
20 154:1
180:11

**triggered**
118:15 144:14
169:11,15,20
180:6

**triggering**
125:25 139:8

**trump** 51:13

**trumped** 51:6

**truth** 9:21,22

**truthfully** 13:6,
11,14

**turned** 144:18

**two-form**
41:20

**type** 50:18
58:14 72:11
112:1 128:25
137:6 141:13,
20 155:1 185:5

**types** 17:10
44:19 77:2,4,14
137:11 140:8
185:10

———————

**U**

**U.S.** 33:24

**Uh-huh** 113:14
115:3 144:13
181:25

**ultimate** 40:4
66:15 67:10

**ultimately** 52:8
53:19 58:22
73:13 81:19
84:10 86:17

**unacceptable**
115:13 132:21

**unbecoming**
140:8

**underlined**
131:6

**underlying**
24:15

**Underneath**
53:10

**understand**
11:21 12:2,6,9,
11,13,21,23
13:1 20:25
42:22 44:23
46:16 58:2,4
95:20 105:1,10,
12 176:14

**understanding**
14:21 22:20
45:7,20 71:12
114:20 117:11
120:9 126:9,25
128:6 131:24
149:4 167:22

**understood**
12:14 121:3

**unfounded**
11:3 61:22
67:2,7 71:3
72:12 74:13
80:17 92:25
93:25 94:7
131:9 132:4
165:21

**Union** 23:1

**unit** 53:23 76:5,
11,18,20 77:2,
10,15 78:15
82:8 83:9,12
108:8,10 109:3
114:2,5 133:2

**units** 39:1 40:7
76:17**

Case: 1:18-cv-01028 Document #: 765-9 Filed: 01/27/25 Page 77 of 77 PageID #:85847
The Deposition of LUTHER JOSEPH BIRD, taken on December 22, 2022

218

unlawful 43:17

unsustainable 92:24

unsustained 93:5 94:7 170:23

unwritten 18:17

upcoming 110:25

update 91:2 137:17

upload 184:12

uploaded 184:11

USAO 48:22

— V —

vague 42:22

Varga 8:25 190:21

verbal 11:19 57:9 58:15,17, 25 143:9

verbally 115:24

verbatim 177:1

version 189:8

VI 125:14

video 79:21

videos 79:19

view 99:10

violated 22:19

violating 51:10 78:2 85:1 145:23

violation 22:5, 6 37:1 38:19 78:6 119:17 130:24 137:24 145:4 158:6 159:21 182:2

violations 18:22 44:8 154:18 156:4, 15 157:18,23 158:8,15 160:2, 8 170:1 182:1

— W —

wait 11:24 177:22

walk 36:2

wanted 10:4 23:24 24:1,4 32:14 38:8 42:17 43:1 46:21,25 52:12 82:21 87:6 88:12 99:12 102:24 104:10 106:13 108:1 113:6,18 163:2 187:4

warning 114:15,18,20, 25 115:12,19 116:2,10,21 117:5 127:12

warrant 122:21 123:2 124:22 137:12

warrants 123:8

watch 27:13 108:12 113:3

watches 112:25

ways 40:25 45:12 56:23

weeds 179:23

week 26:2

weigh 56:5

weighing 170:12

Wherle 190:21

whoever's 69:21 120:17

wide 64:11

William 169:1

withheld 36:25 37:18,23 145:3

witnesses 76:21 79:22 106:6 147:22 149:25

wondering 120:18 175:18

work 10:10 19:10 28:12 37:5 54:16 79:2 102:16 128:9 161:15

worked 27:10, 12,13 30:17,20

working 22:9 23:23 79:8

works 126:6,8

Worley 9:1

would've 39:11 41:21,24 58:25 134:11 144:14 170:9 171:18 173:15 175:6,7 183:3, 21 184:8,20 186:24 187:1,2, 3,5

Wow 90:22

write 26:10 64:15 71:23 72:13 105:21

writing 23:6 131:6

written 18:18 20:8 58:7,10 153:2

wrong 32:13 43:14 115:16 117:13 146:13 175:25

wrongful 18:9

— Y —

year 11:13 19:21,22,23 30:8 63:9,10 64:12 95:25 96:5,12 106:16 108:6 112:22 123:6 135:9 140:10 173:4 175:4,5,7,10,15 177:8 178:25

years 27:11,14, 20 28:12 29:14 63:2,4,11,18,24 64:4 90:15 95:22 96:4,21 97:8,9 103:22 106:12,14,18, 21 108:22 114:8 131:7

yesterday 152:1,2

— Z —

Zoom 8:8 13:20 14:7