# EXHIBIT 10

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# KENTUCKIANA
## COURT REPORTERS

## CASE NO. 18-CV-8144

## JOHN VELEZ

## V.

## CITY OF CHICAGO, ET AL.

## DEPONENT:

## TIMOTHY MOORE

## DATE:

## August 26, 2021



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF ILLINOIS

3                 CASE NO. 18-CV-8144

4               HONORABLE EDMOND E. CHANG

5

6                     JOHN VELEZ,

7                      Plaintiff

8

9                         V.

10

11              CITY OF CHICAGO, ET AL,

12                    Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  TIMOTHY MOORE

24   DATE:       AUGUST 26, 2021

25   REPORTER:  ARIA EDWARDS



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, JOHN VELEZ:
4    Ruth Brown
5    Loevy & Loevy
6    311 North Aberdeen Street
7    Third Floor
8    Chicago, Illinois 60607
9    Telephone No.: (312) 243-5900
10   Facsimile No.: (312) 243-5902
11   E-mail: ruth@loevy.com
12    (Appeared via Videoconference)
13
14   ON BEHALF OF THE DEFENDANT, MEGAN GOLDISH:
15   Winnie Monu
16   O'Connor & Battle
17   20 North Clark Street
18   Suite 1600
19   Chicago, Illinois 60602
20   Telephone No.: (312) 786-4600
21   E-mail: wmonu@mokblaw.com
22    (Appeared via Videoconference)
23
24
25
```

Page 4

```
1                 APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, MICHAEL DYRA, MICHAEL
4    BOCARDO, KRISTON KATO, SAMUEL CIRONE, JOHN CRUZ, ALLEN
5    JAGLOWSKI, DONALD WOLVERTON, MICHAEL WALSH, VICTOR
6    PEREZ, DENIS WALSH, JOHN FARRELL, BRADUL ORTIZ:
7    Krista Stalf
8    Borkan & Scahill
9    Two First National Plaza
10   20 South Clark Street
11   Suite 1700
12   Chicago, Illinois 60603
13   Telephone No.: (312) 580-1030
14   Facsimile No.: (312) 263-0128
15   E-mail: kstalf@borkanscahill.com
16    (Appeared via Videoconference)
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                 APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
4    Robin Shoffner
5    Matthew McCarter
6    Nathan & Kamionski LLP
7    33 West Monroe
8    Suite 1830
9    Chicago, Illinois 60603
10   Telephone No.: (312) 612-2255
11   E-mail: robinshoffner@nklawll.com
12   E-mail: mmcarter@nklawllp.com
13    (Appeared via Videoconference)
14
15   ON BEHALF OF THE DEFENDANTS, JAMES DAVIS AND
16   JOHN SULLIVAN:
17   Jessica Zehner
18   Rock Fusco Connelly
19   321 North Clark Street
20   Chicago, Illinois 60654
21   Telephone No.: (312) 494-1000
22   Facsimile No.: (312) 494-1001
23   E-mail: jzehner@rfclaw.com
24    (Appeared via Videoconference)
25
```

Page 5

```
1                       INDEX
2                                              Page
3    PROCEEDINGS                                 7
4    DIRECT EXAMINATION BY MS. BROWN             8
5
6                      EXHIBITS
7    Exhibit                                    Page
8    A - 30b6 Notice                             16
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 5 of 57 PageID #:85852
The Deposition of TIMOTHY MOORE, taken on August 26, 2021

6..9

Page 6

```
 1                  STIPULATION
 2
 3
 4   The video deposition of TIMOTHY MOORE was taken at
 5   KENTUCKIANA REPORTERS, LLC, 730 WEST MAIN STREET, SUITE
 6   101, LOUISVILLE, KENTUCKY 40202, via videoconference in
 7   which all participants attended remotely, on THURSDAY
 8   the 26TH day of AUGUST, 2021 at approximately 11:00 a.m.
 9   CST; said video deposition was taken pursuant to the
10   FEDERAL Rules of Civil Procedure. The oath in this
11   matter was sworn remotely pursuant to FRCP 30.
12
13   It is agreed that ARIA EDWARDS, being a Notary Public
14   and Court Reporter for the State of INDIANA, may swear
15   the witness and that the reading and signing of the
16   completed transcript by the witness is not waived.
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1                  PROCEEDINGS
 2       COURT REPORTER:  We are on record.  My name is
 3   Aria Edwards.  I'm the video technician and court
 4   reporter today.  Today is the 26th day of August
 5   2021. The time is 11:00 a.m.  We're convened by
 6   videoconference to take the deposition of Timothy
 7   Moore in the matter of John Velez versus City of
 8   Chicago, et al, pending in the United States
 9   District Court for the Northern District of
10   Illinois, case number 18-CV-8144. Will everyone but
11   the witness please state your appearance, how you're
12   attending, and the location you're attending from
13   starting with the plaintiff's counsel?
14       MS. BROWN:  Good morning.  My name is Ms. Ruth
15   Brown, and I'm the attorney for the plaintiff, John
16   Velez, and I'm attending remotely from Illinois.
17       MS. SHOFFNER:  Good morning.  Robin Shoffner
18   and Mark McCarter -- Matthew McCarter, appearing on
19   behalf of the City of Chicago and representing
20   Commander Timothy Moore this morning.
21       MS. STALF:  Krista Stalf on behalf of the
22   individually named CPD officers, appearing remotely
23   from Cook County.
24       MS. MONU:  Winifred Monu on behalf of Defendant
25   Megan Goldish, appearing remotely from Chicago,
```

Page 8

```
 1   Illinois.
 2       MS. ZEHNER:  Jessica Zehner on behalf of
 3   Defendant Cook County Sheriff Officers Davis and
 4   Sullivan, appearing remotely and from Illinois.
 5       COURT REPORTER:  Mr. Moore, will you please
 6   state your name for the record?
 7       THE WITNESS:  Timothy Moore.
 8       COURT REPORTER:  Do all parties agree that the
 9   witness is in fact Mr. Moore?
10       MS. BROWN:  Yes.  The plaintiff agrees.
11       MS. STALF:  Yes.  CPD officers agree.
12       MS. ZEHNER:  Agreed.
13       MS. SHOFFNER:  City agreed.
14       COURT REPORTER:  Mr. Moore, will you please
15   raise your right hand?  Do you solemnly swear or
16   affirm that the testimony you are about to give will
17   be the truth, the whole truth, and nothing but the
18   truth?
19       THE WITNESS:  I do.
20       COURT REPORTER:  All right.  Thank you.  You
21   may begin.
22                  DIRECT EXAMINATION
23   BY MS. BROWN:
24       Q    Good morning.  As I said earlier, my name is
25   Ruth Brown and I'm an attorney for the plaintiff, John
```

Page 9

```
 1   Velez.  Have you ever sat for a deposition before,
 2   Commander Moore?
 3       A    I have.
 4       Q    Approximately how many times?
 5       A    I'm -- I'm sure once, maybe twice?
 6       Q    Okay.  I'd like to begin just that going over
 7   the ground rules for the deposition to make sure that
 8   everyone's on the same page, okay?
 9       A    Sure.
10       Q    So first of all, there's a court reporter on
11   the Zoom and she is taking down all the questions and
12   answers, and because she can't take down non-verbal
13   responses like uh-huh's, uh-uh's, head nods, I'd ask
14   that you do your best to give a verbal response to my
15   questions, okay?
16       A    Okay.
17       Q    If you and I were having a conversation, we
18   might naturally talk over one another a little bit
19   because we would anticipate where the other one was
20   going, but that makes life very difficult for the court
21   reporter and muddles up the record, so I'd ask that you
22   do your best to wait until I finish asking my question
23   before you begin your answer, okay?
24       A    Okay.
25       Q    And I will do the same and I'll give you a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 6 of 57 PageID #:85853
The Deposition of TIMOTHY MOORE, taken on August 5, 2021

10..13

Page 10

1 chance to finish your answer before I begin my next
2 question, okay?
3 A Okay.
4 Q If you need to take a break at any time,
5 that's fine. You know, we can definitely accommodate
6 that, just let me know and we can take a break, okay?
7 A Sure.
8 Q The only thing I ask, is that you finish
9 answering any pending question before we take the break,
10 fair?
11 A Fair.
12 Q If at any time you don't understand one of my
13 questions, or you need me to repeat it, or rephrase it,
14 please let me know and I'm happy to do that, okay?
15 A Okay.
16 Q If on the flip side you answer one of my
17 questions, I will assume that you've understood it as it
18 was posed, fair?
19 A Fair.
20 Q Okay. And you understand that you're going to
21 be giving sworn testimony under oath today, correct?
22 A I do understand.
23 Q Okay. Is there any reason that you cannot
24 testify truthfully and accurately today?
25 A There's no reason.

Page 11

1 Q Okay. You're not on any medications that
2 would impact your ability to testify truthfully or
3 accurately today, correct?
4 A I am not.
5 Q Okay. And you don't have any medical
6 conditions that would impact your ability to testify
7 truthfully and accurately today, correct?
8 A That's correct.
9 Q Okay. If at any time you remember information
10 that's responsive to one of my questions after we've
11 already moved on, please let me know and I'll give you a
12 chance to supplement your answers, okay?
13 A Okay.
14 Q So you can -- if other things come to mind,
15 just let me know and I'll give you a chance, you can
16 fill them in, okay?
17 A Okay.
18 Q If you don't -- if you don't do so, I will
19 understand that you -- the answers that you've
20 previously given were complete to the best of your
21 ability, fair?
22 A Fair.
23 Q Okay. What did you do to prepare for the
24 deposition today, Commander?
25 A I sat with the counsel and went over --

Page 12

1 MS. SHOFFNER: Objection. Hang on. Let me
2 just give an instruction. She doesn't want to know
3 about anything that we discussed during the course
4 of our meetings. Those conversations are protected
5 by the attorney-client privilege, but with respect
6 to what you did outside of our meeting, go right
7 ahead and --
8 THE WITNESS: Okay.
9 MS. SHOFFNER: -- answer the question.
10 A I reviewed certain department policies and
11 general orders and special orders as it relates to the
12 Bureau of Internal Affairs. And I've also reviewed
13 transcripts of former chief of BIA, Tina Skahill.
14 BY MS. BROWN:
15 Q Okay. Which policies did you review in
16 preparation for this deposition?
17 A I believe it was General Order 933, General
18 Order 8 -- 8101, and the -- and the addendums that --
19 that follow these department policies, but it -- it's so
20 many orders, but they're all related to the Bureau of
21 Internal Affairs.
22 Q Okay.
23 A There's a lot of them.
24 Q What's the topic of 933? What's the main
25 topic?

Page 13

1 A I think it's the conduct of investigation.
2 Q What's the main topic of 8101?
3 A I would have to look at it again. I'm not
4 exactly sure.
5 Q Okay. It relates to Bureau of Internal
6 Affairs' investigations?
7 A That is correct.
8 Q Okay. Are there any other general orders that
9 you reviewed in preparation for this deposition?
10 A Yeah. Well they're -- they're all related to
11 the Bureau of Internal Affairs, but I -- I -- I reviewed
12 a lot of them, but they are related to Bureau of
13 Internal Affairs' policies.
14 Q Got it. And what about the special orders?
15 Which special orders did you review in preparation for
16 this deposition?
17 A I don't have the -- I don't have the orders in
18 front of me, but I -- I reviewed all these special order
19 relates to the Bureau of Internal Affairs, so there's --
20 there's a lot of them.
21 Q Okay. And did you review any special orders
22 that related to topics other than the Bureau of
23 Investigative Affairs?
24 A Not in preparation for this, no.
25 Q Okay. And you said that you reviewed a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 7 of 57 PageID #:85854
The Deposition of TINA SKAHILL MOORE, taken on August 5, 2021

14..17

Page 14

1  transcript of Tina Skahill's testimony; is that correct?
2     A   That is correct.
3     Q   And what case was that in?
4     A   I don't recall.  I don't recall the -- the
5  case itself.
6     Q   Okay.  Was that a 30(b)(6) deposition by Tina
7  Skahill where she was giving testimony on the
8  investigations of the Bureau of Internal Affairs?
9     A   Yes.  It was.
10    Q   Okay.  Do you recall what year the deposition
11  transcript was found?
12    A   I do not.
13    Q   Other than the documents you've just
14  described, did you review any other documents in
15  preparation for this deposition?
16    A   I did not.
17    Q   Okay.  And did you meet with any employees of
18  the City of Chicago, or communicate with any employees
19  of the City of Chicago to prepare for this deposition?
20    A   Yes.  I -- I spoke to my chief, Karen Konow
21  regarding -- regarding this, but it wasn't in an effort
22  to prepare for it.  It was just more so letting her know
23  where I would be and what I would be doing.
24    Q   Got it.  Okay.  Did you review in preparation
25  for this deposition the transcript of Eric Winstrom?

Page 15

1     A   I did not.
2     Q   Did you talk to Eric Winstrom at all about the
3  -- your deposition prior to coming here this morning?
4     A   I saw him passing.  And we -- we -- yeah.  We
5  talked about both having to sit for a deposition for
6  this case.  Well, that was the extent of our
7  conversation.
8     Q   Did you talk about any of the substance of
9  either your deposition or Mr. Winstrom's deposition?
10    A   I did not.
11    Q   Besides Chief Karen, I think it was Konow; is
12  that right?
13    A   It's Konow, K-O-N-O-W.
14    Q   Okay.  Besides Chief Konow and Eric Winstrom,
15  did you speak with any other Chicago Police Department
16  employees in preparation for this deposition?
17        MS. SHOFFNER:  Objection to the form of
18  foundation of the question.  It mischaracterizes his
19  prior testimony.
20    Q   You can answer.  You can answer, sir.
21    A   I did not.  I did not.
22    Q   Okay.  And without telling me the contents of
23  any of your meetings with your counsel, can you please
24  let me know how many times you met with your counsel in
25  preparation for this deposition?

Page 16

1     A   Total of three times.
2     Q   Okay.  And in total, how long -- how many
3  hours did those meetings take up?
4     A   I would say a total of three hours
5  approximately.
6     Q   Okay.  Was anyone present during those
7  meetings besides you and your attorneys?
8     A   Just counsel.
9     Q   Okay.  I just like to show you an exhibit.  The
10  court reporter could just grab for us the 30(b)(6)
11  notice.  That's a single document.
12        COURT REPORTER:  Yes.  Give me one moment.
13        MS. BROWN:  Thank you.
14        COURT REPORTER:  Is this the one that you were
15  looking for?
16        MS. BROWN:  Yes.  That's correct.  And I'd like
17  to mark this Exhibit A and just for the record,
18  that's the amended notice of Rule 30(b)(6)
19  deposition on the City of Chicago.
20        (EXHIBIT A MARKED FOR IDENTIFICATION)
21  BY MS. BROWN:
22    Q   Have you seen this document before,
23  Commander Moore?
24    A   I have.
25    Q   Is that a "yes"?

Page 17

1     A   That's a yes.
2     Q   Okay.  Thank you.  I'm sorry.  I couldn't hear
3  you.
4        MS. BROWN:  Okay.  If you could scroll down to
5     number 1, I think it's on page 3.  Actually, sorry.
6     Actually pull back up to number 1 there.  Just go --
7     scroll up a little bit.  Thank you.  Keep going,
8     keep going.  Okay.
9  BY MS. BROWN:
10    Q   Do you see where it says number 1, the city's
11  written and unwritten policies, general orders,
12  practices, customs?
13    A   Yes.  I do.
14    Q   "Rules and techniques relating to the
15  following topics as they existed in March 2001"?
16    A   I see it.
17    Q   Okay.  Great.
18        MS. BROWN:  And let's go back down to F on the
19  next page.
20    Q   Okay.  And do you see where it says,
21  "Discipline of police officers, detectives, and gang
22  crime specialists who allegedly engage in misconduct or
23  received complaints of misconduct, supervision of police
24  officers, detectives, and gang crime specialists,
25  including how the department monitors their

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1  productivity." Did you see that, sir?
2      A   I do see that.
3      Q   Okay. And are you prepared to testify on
4  behalf of the City of Chicago regarding that topic?
5      A   I am.
6      Q   Okay.
7      MS. BROWN: And let's go down to number 2.
8      Q   Do you see where it says, "Any and all changes
9  made between March 1994 and March 2002 to the written
10 and unwritten policies, general orders, practices,
11 customs, rules, and techniques identified in response to
12 1A through 1H above. And for each such change, how
13 Chicago Police Department officers, detectives and/or
14 gang crime specialists were made aware of the changes
15 identified above, including but not limited to how they
16 were informed of the new policies and the dates on which
17 all steps were taken to inform the officers of the
18 policy change." Do you see that, sir?
19     A   I see that.
20     Q   Okay. And are you prepared to testify on
21 behalf of the City of Chicago regarding that topic?
22     A   I am.
23     Q   Okay. Commander Moore, you are currently
24 employed by the Chicago Police Department, correct?
25     A   I am.

Page 19

1      Q   Okay. And what is your title?
2      A   Commander.
3      Q   Okay. And what is your -- I guess your
4  assignment?
5      A   I am assigned to the Bureau of Internal
6  Affairs as the commander.
7      Q   Okay. Are you the top ranked officer in the
8  Bureau of Internal Affairs?
9      A   I am not.
10     Q   Okay. Who supervises you?
11     A   Chief Karen Konow.
12     Q   Okay. And Chief Konow, is she the top ranked
13 officer in the Bureau of Internal Affairs?
14     A   She is.
15     Q   Okay. And how many commander's does she
16 supervise?
17     A   She supervises one commander.
18     Q   And that's you, right?
19     A   That is me.
20     Q   Okay. And what I -- can you give us a general
21 description of your job responsibilities.
22     A   I oversee all investigations in the Bureau of
23 Internal Affairs, as well as anything else that the
24 chief assigns me to do.
25     Q   Okay. And how long have you served in this

Page 20

1  role as -- of a commander of the Bureau of Internal
2  Affairs?
3      A   Just a little over a year.
4      Q   Okay. And what were you doing prior to that
5  assignment?
6      A   I was lieutenant in the Bureau of Internal
7  Affairs.
8      Q   Okay. And what years did you serve as a
9  lieutenant in the Bureau of Internal Affairs.?
10     A   November 2017 until July of 2020.
11     Q   What were your responsibilities as a
12 lieutenant?
13     A   I was assigned to the FBI's anti-corruption
14 task force prior to making commander.
15     Q   Okay. And so you were working on this, you
16 know, certain category of investigations; is that
17 correct?
18     A   Sure. Well, I was actually working out of the
19 FBI space and we were working on any criminal misconduct
20 regarding law enforcement officers working in the
21 Northern District of Illinois.
22     Q   Okay. And when you say "Criminal misconduct,"
23 what kinds of criminal misconduct were you
24 investigating?
25     A   Theft cases, fraud cases. Yeah. Mostly

Page 21

1  theft, fraud -- yeah. I wou -- I mean, I would have to
2  go over my -- my -- my cases, but the majority that I
3  recall are theft and fraud related.
4      Q   Okay. Were there -- were you also
5  investigating perjury cases?
6      A   I -- no. I did not investigate perjury case.
7      Q   What about excessive force?
8      A   Yeah. I -- I assisted in investigating
9  excessive force cases, but it wasn't my case, but yeah,
10 I did assist in those cases.
11     Q   Okay. Got it. All right. And before working
12 as a lieutenant -- and if I say the BIA, will you
13 understand I'm talking about the Bureau of Internal
14 Affairs?
15     A   Yeah. I will, yes.
16     Q   Great. Prior to serving as a lieutenant in
17 the BIA, where were you assigned for the Chicago Police
18 Department?
19     A   I was a sergeant in internal affairs from 2006
20 until I made lieutenant.
21     Q   So that was 2006 through November 2017?
22     A   That's correct.
23     Q   Okay. And what were your responsibilities as
24 a sergeant in internal affairs?
25     A   Initially, I was assigned to the confidential

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 9 of 57 PageID #:85856
The Deposition of TIMOTHY MOORE, taken on August 5, 2021

22..25

Page 22

1  investigations section where we -- I handled criminal
2  cases and long-term investigative cases.  I was also
3  assigned to special investigations section, which
4  oversaw the EEOC complaints, ranked cases, that being
5  cases involving lieutenants and above, and any other
6  high profile media cases that came to the attention of
7  the Bureau of Internal Affairs.
8       Q    Okay.  All right.  Prior to 2006, were you
9  still working for the Chicago Police Department, and if
10 so, what was your assignment?
11      A    Prior to 2006, I was the assigned to the third
12 police district as a sergeant.
13      Q    Okay.  What were your responsibilities there?
14      A    Initially, I was assigned to the third watch
15 as a field supervisor, overseeing the daily operations
16 of the officers on the watch.  Approximately a month or
17 two later, I was assigned to the community policing
18 office, and that -- that lasted for about three years.
19      Q    Okay.  So when you were a field supervisor on
20 the third watch, you were supervising patrol officers;
21 is that right?
22      A    That is correct.  That is correct.
23      Q    Okay.  And how long were you a sergeant in --
24 I guess was this the third district?
25      A    That is correct.  I want to say four years.

Page 23

1       Q    Okay.  All right.  And when did you first join
2  the Chicago Police Department?
3       A    1992, December 7th.
4       Q    Okay.  So were you -- is it correct that you
5  were a sergeant in the third district from about 2002 to
6  about 2006?
7       A    No.  I -- I made sergeant in 1999 and I went
8  directly to the third district in 1999.
9       Q    Oh, okay.  And were you there through about
10 2006?
11      A    Yes.  Yes.  Yes.
12      Q    Okay.  And what positions were you assigned to
13 between 1992 and 1999?
14      A    I was assigned to -- well, when I first left
15 the academy in '92 or '93 actually, I was assigned to
16 the 24th police district and I worked midnight as a
17 patrol officer.  A year later, I was assigned to the --
18 a technical unit where I still worked within the 24th
19 district on a technical team until I made sergeant.
20      Q    Okay.  So you were with the tactical unit from
21 1994 to about 1999?
22      A    Correct.
23      Q    Okay.  Do you have any other -- have you
24 worked any other law enforcement entity?
25      A    Yes.  I was -- in 2003, I believe I was

Page 24

1  assigned to the FBI Joint Terrorism Task Force for two
2  years.
3       Q    And what were your responsibilities there?
4       A    I supervised eight police officers while I was
5  there.  Six CPD officers, one for county sheriff's
6  officer, and one state police officer, and I kind of
7  oversaw their cases along with assisting in their
8  investigations.
9       Q    Okay.
10           MS. SHOFFNER:  Excuse me.  Ruth, could you
11 might taking down the exhibit just so we can better
12 see the screen for me?  Thanks.
13           MS. BROWN:  Sure.  Of course.
14           MS. SHOFFNER:  Thank you.
15           MS. BROWN:  It is better, I agree.  Okay.
16 BY MS. BROWN:
17      Q    Okay.  I'm going to ask you a lot of questions
18 and the time frame from those quest -- for these
19 questions is from 1994 to the 2002 time frame, okay?
20      A    Okay.
21      Q    If there's a different time frame, I'll let
22 you know, okay?
23      A    Okay.
24      Q    All right.  Can you just describe the chain of
25 command for gangs specialists in the 1994 to 2002 time

Page 25

1  frame?
2           MS. SHOFFNER:  Objection as to form.
3  Foundation.
4       A    Gang specialist, at a time, I believe they
5  worked out of the protective division, if I'm not
6  mistaken.  And the -- there would have been a commander,
7  a lieutenant, sergeant, and the gang specialist
8  themselves.  And of course, above the rank of commander,
9  at a time there might have been a assistant deputy
10 director at the time or a deputy chief, and then an ADS,
11 assistant deputy superintendent, then superintendent.
12      Q    Okay.  And what about in the 1994 to 2000 time
13 frame, what was chain of command for detectives?
14           MS. SHOFFNER:  Objection as to form.
15 Foundation, but to the extent, go ahead.  You can
16 answer.
17      A    For that there was a chief of detectives,
18 deputy chief, commander, lieutenant, sergeant, and then
19 detectives.
20      Q    Okay.  And what about -- what was the chain of
21 command or supervision for patrol officers in the 1994
22 to 2002 time frame?
23      A    We had a chief patrol, and after chief patrol,
24 there were deputy chiefs, commanders, lieutenants,
25 sergeants, and patrol men.  Well, actually field

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

```
 1   training officer then patrol men.  They were also in --
 2   in there too.
 3        Q    Okay.  Thank you.  Okay.  Are you familiar
 4   with the term lead investigator for a homicide
 5   investigation?
 6        A    I am.
 7        Q    Okay.  Is the lead investigator on homicide
 8   investigation in charge of supervising the remaining
 9   detectives are gangs specialist that worked on that
10   particular investigation?
11        MS. STALF:  Objection.  Form.  Foundation.
12        MS. SHOFFNER:  I joined and just so we're
13        clear, as usual, the objection by one party can be
14        asserted by any other party in the future that
15        agreed upon?
16        MS. BROWN:  That's fine.  Yes, Robin.
17        MS. SHOFFNER:  To extend, you can --
18        THE WITNESS:  Okay.
19        A    Can you repeat the question again?  Sorry.
20   BY MS. BROWN:
21        Q    Sure.  So wha -- let's start -- let's go back
22   a step.  So when I say the term lead investigator for
23   homicide investigation, what does that mean to you?
24        A    Okay.  So say if you have a homicide
25   investigation and you have three detectives assigned to
```

Page 27

```
 1   the -- the investigation, there's one investigator --
 2   one detective that's going to be really responsible and
 3   in charge of the investigation and you're going to have
 4   two investigators that -- or detectives that are going
 5   to assist that one detective.  Because there is one
 6   that's actually in charge of the investigation and he
 7   has his counterparts to assist.
 8        Q    Okay.  So the leader investigator is the one
 9   who's responsible for submitting the clear closed
10   report, correct?
11        A    Yes.  Yes.
12        Q    Okay.  And is it the lead investigator who was
13   responsible for updating supervisors about the course of
14   the investigation?
15        MS. SHOFFNER:  Objection.  Form, foundation.
16        A    Well, at any time, any investigator has a
17   knowledge of the case can update the -- the -- their
18   higher-ups, you know, it's not necessarily like the
19   responsibility of a lead investigator, but they -- they
20   can all update the -- their higher-ups.
21        Q    Was the lead -- was the lead
22   investigator responsible for -- so was the lead -- would
23   the lead investigator be supervising the other
24   detectives on the team?
25        MS. SHOFFNER:  Objection.  Form.  Foundation.
```

Page 28

```
 1   These questions are outside the scope of the notice
 2   that was submitted, the 30(b) notice as to what this
 3   officer is qualified to test -- designated to talk
 4   to.  And objection as to the form, foundation, and
 5   outside the scope of his expertise.
 6        MS. BROWN:  Well, the scope of the 30(b)(6)
 7   notice covers supervision, so I'm just trying to
 8   understand the supervision of homicide
 9   investigations.  So I'm going to keep going with my
10   questions on this topic.
11   BY MS. BROWN:
12        Q    Was the lead investigator on a homicide
13   investigation considered a -- the s -- a supervisor of
14   other detectives or gang specialists that were assisting
15   with that investigation?
16        A    Not to my knowledge.
17        Q    Okay.  If a supervisor had concerns about the
18   progress of a particular homicide investigation in the
19   1994 to 2002 time frame, were they expected to
20   communicate those concerns to the lead investigator on
21   the homicide?  Is that the person on the investigative
22   team they would reach out to?
23        MS. SHOFFNER:  Objection to form, foundation.
24        A    See that, I'm not familiar with.  I've never
25   been a detective.
```

Page 29

```
 1        Q    In the 1994 to 2002 time frame under the
 2   policy of the Chicago Police Department, how were
 3   supervisors supposed to keep track of developments in a
 4   homicide investigation?
 5        MS. SHOFFNER:  Objection.  Form.  Foundation.
 6        Outside his scope of expertise.
 7        A    How are supervisors supposed to keep track of
 8   homicide investigations?
 9        Q    How are supervisors supposed to keep track of
10   the developments in a homicide investigation, yes.
11        MS. SHOFFNER:  Same objection.
12        A    I've never worked in the detective division,
13   so I just -- I don't know how that exchange went, you
14   know, I just --
15        MS. BROWN:  Okay.  Let -- can we pull up
16        Exhibit 1 again?
17        COURT REPORTER:  Yes.
18        MS. BROWN:  Thanks.  Okay.  If we go back up to
19        number F.  Okay.  Let's stop right there.  So,
20        Robin, do you see this topic where it says,
21        "Supervision of police officers, detectives, and
22        gang crime specialists, including how the department
23        monitors their productivity"?
24        MS. SHOFFNER:  The totality of it as discipline
25        of police -- discipline of police officers, et
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1 cetera, who are allegedly engaged in misconduct or
2 received complaints of misconduct, and then there is
3 a subdivision that says, "Supervision of police
4 officers, detectives, including how they monitored
5 the supervision of" -- how they monitored -- I can't
6 -- their pro -- how the department monitors
7 productivity. And so if you want to ask him about
8 how they monitor pro -- if they monitor productivity
9 or how they monitor productivity. Other than that,
10 it seems very vague to me. And this issue was
11 covered exhaustively in the deposition of Eric
12 Winstrom, Commander Eric Winstrom, regarding how to
13 -- how the detective division does things.
14     MS. BROWN: So, Robin, is this witness prepared
15 to talk about supervision of detectives and gang
16 crime specialists?
17     MS. SHOFNER: Yes.
18     MS. BROWN: Okay. So I'm going to --
19     MS. SHOFNER: The -- the -- the -- as it's
20 presented and to paragraph F, it's very vague.
21 Police officers, detective, the whole police
22 department as an entity and a structure, you can ask
23 them, but with respect to how things were done
24 independently within a particular area with a
25 particular group of people, you can ask him

Page 31

1 questions -- I mean, he's not -- no one's going to
2 be able to -- no one person can answer that -- those
3 questions. That particular -- it's --
4     MS. BROWN: So, Robin, that's why we have a
5 notice and, you know, you guys did not raise a
6 single objection and response to notice and you
7 designated Commander Moore for topic 1F, which
8 includes supervision of police officers, detectives,
9 and gang crime specialists. So I'm going to ask my
10 questions, if it turns out that this witness does
11 not have knowledge and can't give testimony, then
12 we're going to have to discuss whether another
13 witness needs to be provided, okay?
14     MS. SHOFNER: Well, you can ask the questions
15 that you want to ask, but given the totality of
16 paragraph F, he is qualified to answer. Those are
17 two different as it's structured. It's -- we're
18 looking at F related to the discipline of police
19 officers, and the supervision related to the
20 discipline of police officers, but with respect to
21 every minute detail about how police officers or
22 detective within a particular type of investigation,
23 there's never going to be one witness who can
24 testify to each -- to all of -- to each of these.
25 And this is the most qualified person to do that

Page 32

1 with respect to this paragraph. So you can ask your
2 questions and, you know, if you going to talk about
3 a particular type of thing, then you're going to
4 have to talk to the detective, or the crime
5 specialists, or gang specialist. I'm not even sure
6 what -- you going to have to talk to the individual
7 crime specialists or detectives who were involved in
8 the respective investigation that you're referring
9 to because everything -- everyone does things
10 differently and --
11     MS. BROWN: I mean, you just said so many
12 things, but my -- the bottom line here is that the
13 City of Chicago is the one who did not object to any
14 language, and then designated Commander Moore for
15 this particular paragraph. And now he's telling me
16 that Commander Moore does not have knowledge of how
17 detectives and gang crime specialists were
18 supervised because he was not a detective or a gang
19 crime specialist, so that's an issue. And, you
20 know, you can't get around that by saying that I'm
21 asking about minutia or that nobody else could have
22 testified about this or that, you know, you have the
23 opportunity to designate whoever you wanted. So
24 again, I'm going to go through my questions, but if
25 you keep objecting that Commander Moore does not

Page 33

1 have expertise on this issue, then we're going to
2 need another person to be designated, okay?
3     MS. SHOFNER: Well, questions -- I would -- I
4 just want to say just for the record that this
5 particular -- this paragraph, when you talk about
6 supervision, if you want to talk about the setup of
7 the police department and how people -- police
8 officers are trained or supervised, ask away, but
9 your questions make certain assumptions that -- are
10 just incorrect.
11     MS. STALF: Just to be clear the way that I
12 read this paragraph was that this witness was
13 testifying about supervision from a disciplinary
14 standpoint, not from the day-to-day operations
15 within a specific detective division. That's the
16 way that I read it. But, you know, if you're
17 telling me that I'm incorrect, Ruth, I mean, I guess
18 we're learning that now.
19     MS. SHOFNER: And, Ruth, I don't know if
20 you've had an opportunity --
21     MS. BROWN: If there was -- if there were -- if
22 there were concerns about this notice, it should
23 have been raised earlier, but I'm going to be asking
24 questions about supervision of detectives and gang
25 crime specialists in homicide investigations. If



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

```
 1  this witness can't testify to that, then I'm going
 2  to -- you know, I'm going to ask you for another
 3  witness who can testify, okay?
 4       MS. SHOFFNER:  Ruth, I don't know if you read
 5  the deposition of Commando Eric Winstrom, but we
 6  exhausted this issue extensively during his
 7  deposition.
 8       MS. BROWN:  He was not --
 9       MS. SHOFFNER:  He testified about --
10       MS. BROWN:  -- this topic -- no.  He did not.
11  He did not testify about supervision of detectives
12  and gangs for crime specialist and he was not asked
13  of this topic and he was not designated on this
14  topic.  So he doesn't --
15       MS. SHOFFNER:  He was and in fact --
16       MS. BROWN:  No --
17       MS. SHOFFNER:  -- and in fact, the other
18  paragraph of this notice, which are exhaustive,
19  there are a total of -- paragraph 1 alone covers 1,
20  2, 3, 4, 5, 6, 7, 8 different things.  They are
21  repetitive.  They are redundant --
22       MS. BROWN:  The ship has sailed --
23       MS. SHOFFNER:  No.  No.  No.  I'm not going to
24  interrupt you.  I will allow you to say what you
25  want to say for the record, but I'm going to finish.
```

Page 35

```
 1  And if you look at these other paragraphs, they are
 2  duplicative and they are redundant, and put --
 3  Commander Winstrom who was over detectives testify
 4  about how detective conduct investigations, who they
 5  report to, and who they are accountable to.  Having
 6  said that, you can go right ahead and ask all the
 7  questions you want.
 8  BY MS. BROWN:
 9       Q    Okay.  In the time period of 1994 to 2002
10  under the policy of Chicago Police Department, how were
11  supervisors expected to keep track of developments and a
12  homicide investigation by their subordinates?
13       MS. SHOFFNER:  Objection.  Form.  Foundation.
14       MS. STALF:  Objection, form and foundation.
15       COURT REPORTER:  I'm sorry, I missed whoever
16  that -- whoever said that objection.  I can't see on
17  my screen.
18       MS. STALF:  It was both Krista Stalf and Robin
19  Shoffner the same objection, simultaneously in sync.
20  I'll try to stay quiet, Robin.  I don't mean to
21  speak over you.
22       MS. BROWN:  You can take off the exhibit as
23  well.  The court rep -- if the court reporter can
24  take off the exhibit, that would be great, thank
25  you.
```

Page 36

```
 1  BY MS. BROWN:
 2       Q    Okay.  Commander Moore, did you understand my
 3  question?
 4       A    Can you repeat the question, please?
 5       Q    Sure.  I'd be happy to.  In the time period of
 6  1994 to 2002 under the policy of the Chicago Police
 7  Department, how were supervisors expected to keep track
 8  of developments in a homicide investigation that they
 9  were overseeing?
10       A    I'm not sure.  I don't know.
11       Q    In the 1994 to 2002 time frame, reports were -
12  - had to be submitted -- reports that were completed by
13  detectives and gang specialists had to be submitted to
14  supervisors to be signed, correct?
15       MS. SHOFFNER:  Objection.  Form.
16       A    I would -- yes.  I would think so, yes.
17       Q    Okay.  When a supervisor signed off on a
18  detective or gang specialist's report in a homicide
19  investigation, what was that supervisor's signature
20  supposed to indicate?
21       MS. SHOFFNER:  Objection.  Form.  Foundation.
22       A    I'm not sure.
23       Q    Under the policy of the Chicago Police
24  Department, what -- was there a requirement that
25  supervisors had to sign off on reports of their
```

Page 37

```
 1  subordinates?
 2       MS. SHOFFNER:  Objection.  Form.  Foundation.
 3       A    Are we -- in general?
 4       Q    Actually --
 5       A    Or any?
 6       Q    Let's say homicide investigations.
 7       A    I don't know.
 8       Q    Okay.  Do you know what the -- whether --
 9  well, I guess is it fair to say you don't know what the
10  purpose of having supervisors sign off on homicide
11  reports was?
12       A    That's fair to say.
13       Q    Okay.  Do you have any knowledge as to whether
14  supervisors were expected to look for investigative
15  leads that detectives and gang specialists had failed to
16  follow up on?
17       MS. SHOFFNER:  I'm going to make a standing
18  objection to this line of questioning as duplicative
19  of the issues covered by Commander Winstrom.  It's
20  harassing of the witness at this point.  You had the
21  opportunity to ask Commander Winstrom these
22  questions who heads up the detective division, and
23  he answered them.  And so I'm going to make a
24  standing objection to this line of questioning.
25       MS. BROWN:  Well, I -- you know, I don't want
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  to ask Commander Moore questions that are outside of
2  his areas of -- area of expertise.  So, you know,
3  I'm happy to streamline it, but, you know, we're
4  going to have to figure out a way to move forward
5  because we are -- we have noticed the topic of
6  supervision of detectives and gang specialists, that
7  is in section F.  You did not object.  You designated
8  Commander Moore.  So what is your proposal for how we
9  go forward?
10     MS. SHOFFNER:  I suggest that you take a look
11  at the -- deposition of Commander Winstrom and see
12  that these -- all of these questions have been
13  answered by the chief of detectives.  How -- who
14  reports to who, how detectives are supervised.  So
15  with respect to that particular entity of the police
16  department, I suggest you move on.
17     MS. BROWN:  You did not designate Eric Winstrom
18  for section 1F; is that correct?  Can we agree on
19  that?
20     MS. SHOFFNER:  Counsel, at this point, what
21  we're saying is duplicative.  The content of the
22  subpoena is exhaustive, with respect to the topics
23  that Commander Winstrom testified to.  He was asked
24  this line of questioning.  This witness -- 30(b)(6)
25  witness on police mis -- investigation of

Page 39

1  misconduct, training in the areas of 1994 to 2001,
2  the general orders, the policy and customs.  It's
3  duplicative and I've -- you - - what you're saying
4  is repetitive and what I'm saying is repetitive at
5  this point, but he did not have expertise with how
6  the detective division operate.  I can see that,
7  that's why we had two 30(b)(6) witnesses testify.
8  One on the part of the policies and procedures of
9  investigating misconduct within the police
10  department, another who testified exhaustively on
11  how the detective division operates and all aspects
12  of it.
13     MS. BROWN:  You will agree with me, though,
14  Robin, that you did not designate Eric Winstrom on
15  topic 1F; is that correct?
16     MS. SHOFFNER:  I identified -- this witness was
17  identified on topic 1F which, for the record, deals
18  primarily with the discipline of police officers.
19  And that's what this officer is -- that's what this
20  witness is designed to address.  Now, in the scope
21  of disciplining, the issues for how they're
22  supervised is also relevant, but within the context
23  of disciplining - - the way this is written -- with
24  all the other issues that are raised in the
25  subpoena, the way this paragraph is written, is that

Page 40

1  in the scope of disciplining police officers, how
2  they deal with their superiors, but to add this,
3  like lined at the end of the paragraph dealing with
4  discipline of police officers is misleading, quite
5  frankly.  This paragraph is dealing with the
6  discipline of police officers, and then in the
7  context of investigating discipline of police
8  officers.  Do they talk to supervisors, do they learn
9  that -- do they learn who is responsible for who.
10  But generally, to assume that he's going to know how
11  every division operates when there are many of them,
12  it's not just -- like when you said police officers,
13  you're talking about the entire police division.
14  Wh -- you're ta -- so that would've mean every
15  division.  We could go to - - we could go to
16  organized crime, we could go to, you know, sex
17  assault cases, your -- no -- sex assault cases.  You
18  have all of these different divisions, and they
19  operate differently based on the nature of the
20  division.  So to say categorically, all police
21  officers, all detectives, all gang crime specialist,
22  and think that one person can testify to all of that
23  is not reasonable, but when it comes to the context
24  of discipline of police officers, this witness is
25  prepared to testify about the supervision and the

Page 41

1  context of a discipline investigation.  But just to
2  categorically say, oh, how does the detective
3  division operate this, how does the, you know,
4  crimes -- the way it's written, it's so extensive,
5  it covers every division within the entire police
6  department.  And it's overly broad, completely
7  broad, you know, if you want to submit a written
8  interrogatory on what you think Winstrom didn't
9  cover.  I'm prepared to address that.  He was the
10  person who was designated to talk about the
11  detective division.  He talked about it for hours
12  extensively and he talked about the operations of it
13  in addition to talking about the supervision of it.
14  So to the extent that the questions are directed to
15  minute issues within one division of the police
16  department, which are the detectives, went from what
17  the person, but collectively with respect to the
18  whole police department, every police officer, every
19  detective, there is also a process and that's the
20  process that this witness is designed to talk about.
21  But am I minute?  No.  No. This paragraph it says
22  what it says and there's eight or nine different
23  paragraphs that address different issues.  And this
24  one to simply starts off with the discipline of
25  police officers.  And there's nothing about how they



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1  investigate.  There's nothing in this paragraph
2  related to a special -- specific type of
3  investigation like a homicide investigation.  Other
4  paragraphs in this numeral 1 talk about homicide
5  investigation.  You see, expected to know homicide
6  investigations, sexual assault, juveniles there's a
7  whole another department.  This question covers
8  every police officer, not just officers involved in
9  a homicide investigation.
10      MS. BROWN:  I'm just going to make a few points
11  in response.  Again, you just -- you did not raise
12  any objections to this notice.  You designated
13  Commander Moore for this notice.  The language of 1F
14  has two clauses, one about discipline, one about
15  supervision, it specifically says, "Supervision of
16  Gang Specialists and Detectives," okay?  So I know -
17  - I don't want to --
18      MS. SHOFFNER:  Police officer and police
19  officers --
20      MS. BROWN:  And --
21      MS. SHOFFNER:  Once again, entire police
22  department.  There's nothing in this paragraph that
23  deals with the police's common part of investigation
24  --
25      MS. BROWN:  Robin, I thought that we're not

Page 43

1  going to interrupt --
2      MS. SHOFFNER:  Every single thing --
3      MS. BROWN:  Robin, I thought we were not going
4  to interrupt each other.
5      MS. SHOFFNER:  Okay.  Fine.  I apologize.
6      MS. BROWN:  You just spoke for, like, five
7  minutes.  So I'd like to finish what I was saying.
8  There's two clauses, one about discipline, one about
9  supervision.  Commander -- I don't want to waste
10  Commander Moore's time, but I do want my questions
11  answered.  So I'm going to try to figure out what he
12  does understand -- what he does -- what knowledge he
13  does have about supervision of gang specialists and
14  detectives.  And at the end of this deposition, if
15  there's a lot of I don't knows, I'm not sure's,
16  which, you know, all due respect to Commander Moore,
17  you know, then we're going to have to work out
18  another witness.  I'm going to keep going now.
19      MS. SHOFFNER:  I just want to say one more
20  thing.  I think in the interest of making this
21  beneficial and efficient.  Because he was not a
22  detective, he doesn't know about homicide
23  investigations and your questions are directed
24  toward homicide investigations.  So that's like
25  asking him questions about the juvenile division, or

Page 44

1  the sex crimes division.  He's not a homicide
2  investigator.  And there's nothing in that paragraph
3  that references - - there's nothing in that
4  paragraph that references homicide investigations,
5  and that's what you're asking him about, and that's
6  what's inappropriate.
7      MS. BROWN:  I'm asking him about supervision of
8  detectives.  Does he know -- is he prepared to speak
9  about supervision of detectives?
10      MS. SHOFFNER:  In the context of what?
11      MS. BROWN:  How there's --
12      MS. SHOFFNER:  In the context of what?
13      MS. BROWN:  We can make in the context --
14      MS. SHOFFNER:  He is --
15      MS. BROWN:  Please let me --
16      MS. SHOFFNER:  In the context of police
17  misconduct, yes, he is.  In the context of police
18  misconduct and discipline of detectives, yes.  With
19  respect to discipline, yes.  But with respect to the
20  minutia of a homicide investigation, no, he's not.
21  And I would ask that you move on.
22      MS. BROWN:  So you know what would be helpful
23  is, if you can tell me the categories of information
24  that he's not prepared to speak on.  Would that
25  include supervision of detectives as detectives?

Page 45

1  And supervision of gang specialists as gang
2  specialists?  But he is qualified to talk about
3  supervision of sworn members as a whole?
4      MS. SHOFFNER:  Objection.  Form.
5      MS. BROWN:  You're objecting to my comment.  All
6  right.  Let's keep going.
7      MS. SHOFFNER:  I thought it was a question, I'm
8  sorry.
9      MS. BROWN:  It was a question to you.  Okay.
10      MS. SHOFFNER:  Oh, was not my deposition, so
11  whatever.
12      MS. BROWN:  All right.
13  BY MS. BROWN:
14      Q   Okay.  Commander Moore, do you have any
15  specific knowledge about how detectives were supervised
16  in criminal investigations by their supervisors in the
17  detective division?
18      MS. SHOFFNER:  Objection.  Form.  Foundation.
19      A   How they were -- just in general, how they
20  were supervised?  Is that what you're asking?
21      Q   Let me ask again.  Are you prepared to give
22  testimony on behalf of the Chicago Police Department
23  regarding how detectives were supervised on criminal
24  investigations by their supervisors in the detective
25  division?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  MS. SHOFFNER: Objection. Form. Foundation.
2  Outside the scope of paragraph F.
3  A  Yeah.  In -- in a -- in a limited capacity,
4  you know. I mean, I've been a supervisor for over 20
5  years. So yes, I'm -- I'm able to speak to, you know,
6  supervising a fellow -- an officer, but I mean, when we
7  get into the weeds of -- a homicide investigation, I
8  cannot speak to how that's carried out, but I -- I've
9  been a supervisor for a long time. I'm familiar with
10 supervising people, but it's just -- I just cannot get
11 into the weeds of anything related to specific dealings
12 of any particular unit. If you understand what I'm
13 saying.
14 Q  So in the period of 1994 to 2000 under the
15 policy of this -- the police department, the City of
16 Chicago, in what ways were supervisors supposed to
17 supervise detectives and criminal investigations?
18 MS. SHOFFNER: Objection. Form.
19 A  I don't -- I don't know if the detective
20 division has a play book to go by, you know, as far as
21 with their -- the expected from their detectives. I
22 just -- I just think, well, I don't mean, it's hard to
23 answer that question because I've never been in that --
24 that area, you know what I mean? That's detective area.
25 So I just don't know how they carry out their day-to-day

Page 47

1  operations of supervising their detectives in order to
2  move along a case. You know, supervisor's -- supervisor
3  -- I've been a supervisor for a long time and we
4  supervise, but with -- with respect to supervisor or
5  supervising a detective, if there's wrong doing, I could
6  speak to that because I know how that would be carried
7  out, you know, in the disciplinary world. I would know
8  if they do something wrong, but as far as moving along a
9  case, I would not be able to speak to that. I can only
10 speak to the shortcomings the witness brought to the
11 attention of the Bureau of Internal Affairs having been
12 there for the last 15 years, you know. So I just -- you
13 know, it's hard for me to answer those questions. When
14 I -- it's not that what I do.
15 Q  Sure. I understand that. And I appreciate
16 you clarifying what you do and do not, you know, have
17 knowledge of. So is it fair to say that you don't have
18 knowledge of the day-to-day ways in which supervisors
19 were monitoring the activities of detectives and gang
20 specialists in 1994 to 2002??
21 A  Day-to-day operations, I would say -- I would
22 say no.
23 Q  Okay. Do you have knowledge of how
24 supervisors in the detective division were monitoring to
25 prevent misconduct by detectives and gang specialists in

Page 48

1  the 1994 to 2002 framework -- or time frame?
2  A  Yes. I can speak to discipline.
3  Q  Okay. I'm talking not about discipline, but
4  what about prevention?
5  A  Well, here's the thing, it's -- it's only --
6  it's brought to my attention once, once we get to the
7  point of, you know, wrongdoing, you know, or something
8  that needs to be corrected. As far as monitoring their
9  -- their activities prior to discipline or I just don't
10 -- you know, I would need any more information as to
11 with what you're getting at because I'm not exactly sure
12 had addressed that question.
13 Q  I wan -- I guess I have a lot of questions
14 about how supervisors were expected to monitor their
15 detectives and gang specialists in order to ensure that
16 they were carrying out their specific job duties. Is
17 that something that you have knowledge of?
18 MS. SHOFFNER: Objection as to the form.
19 Foundation and it's outside the scope of paragraph
20 F.
21 A  No.
22 Q  Let's spend some time on discipline. Let's
23 see if we can turn this around a little. So in the 1994
24 to 2002 time frame, was there a process for keeping
25 supervisors apprised of all complaint register

Page 49

1  investigations against their subordinates?
2  A  No. CV -- the information that you speak of,
3  that was all housed in the -- at the time of the
4  Internal Affairs Division.
5  Q  Okay. So there was no formal process by which
6  supervisors were kept updated on complaint register
7  investigations against their subordinates; is that
8  correct?
9  MS. SHOFFNER: Object. Objection as to form.
10 Foundation. You can answer.
11 A  Yeah. That is correct.
12 Q  Okay. In the 1994 to 2002 time frame, were
13 supervisors notified at the time that a complaint was
14 made against an officer?
15 A  I'm trying to think back. Yeah. Some
16 complaints were -- yeah. Be with -- it would have been
17 the immediate supervisor, it would have been the
18 commander of that district or unit that was made aware,
19 depending on the nature of the complaint. Let's put it
20 that way.
21 Q  Sure. And what kinds of complaints would
22 result in notification to the commander?
23 A  Excessive force like BY complaints. Any --
24 any kind of complaint where an officer had to submit to
25 random drug testing that resulted in a positive reading,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1  the commander must be aware of.
2      Q    Okay.  Anything else come to mind?
3      A    Not offhand, but of course, most -- most
4  criminal-related cases, the commander was made aware of,
5  if not all, and -- yeah -- and any other -- most
6  criminal cases, and like any other case, I would have to
7  -- I'm not exactly sure, but there were cases that were
8  brought to the attention of the command staff.
9      Q    Okay.  When you say criminal-related cases are
10 talking about theft, fraud, that kind of case?
11     A    Sexual assault, yeah.
12     Q    Okay.  What about things like fabrication of
13 statements by a witness?
14     A    I'm not --
15         MS. STALF:  Objection to form and foundation of
16 that question.
17         MS. BROWN:  Sure.  Let me ask it more clearly.
18 BY MS. BROWN:
19     Q    So in 1994 to 2002 time frame, I'd like to
20 know -- I'm going to give you some different kinds of
21 complaints and I'd like to know whether it was the kind
22 that triggered an automatic notification to the
23 commander or not.  Does that make sense?
24     A    Sure.
25     Q    Okay.  So let's say mistreatment of a witness

Page 51

1  that's non-physical?
2         MS. SHOFFNER:  Objection.  Form.  Foundation.
3         MS. STALF:  I join you.
4      A    No.  I would say no to that one.
5      Q    Okay.  A violation of lineup procedure?
6         MS. SHOFFNER:  Objection.  Form.  Foundation.
7      A    No.
8      Q    Fabrication of a witness statement?
9         MS. SHOFFNER:  Objection.  Form.  Foundation.
10     A    No.
11     Q    Okay.  And what about a Brady violation?  If I
12 use the term Brady violation are you familiar with that
13 term?
14     A    No.  Yes.
15     Q    Okay.  And do you understand it --
16     A    I know.
17     Q    You understand it to mean, you know,
18 withholding of information -- exculpatory information
19 from a criminal defendant or prosecutor?
20     A    Yes.
21     Q    Okay.  So what about if there was an
22 allegation of a Brady violation, is that something that
23 would trigger an automatic notification to the
24 commander?
25     A    Obv -- see -- possibly.  So if I want to --

Page 52

1  let me elaborate on this subject.  So the cases that
2  would normally trigger a notification to a command staff
3  member are the cases which would result in that member
4  being relieved of their police powers.  Do you
5  understand what I'm saying?  So that's why I -- I speak
6  of criminal cases, and there are certain cases that
7  would rise to the level.  If sustained, the member would
8  be relieved of their police powers and separated from
9  the police department.  So those are the type of cases
10 that will be brought to the attention of the command
11 staff member.  Are the ones where, potentially -- well,
12 that -- that member would be relieved of their police
13 powers.  So you have to let the commander know that,
14 hey, listen, Officer Johnson will not becoming in
15 tomorrow, he's been relieved of his police powers.  So
16 those are the type of cases, of situations where the
17 command staff member would be notified of.
18     Q    Got it.  So is it fair to say it's a small
19 proportion of the complaints, the most serious ones in
20 which, you know, the question is not suspension, but
21 complete termination?
22         MS. STALF:  Object to the form.  Foundation of
23 that question.
24     Q    You can answer.
25     A    Suspension -- suspension leading to

Page 53

1  termination.  So any case where the member would give a
2  30-day suspension and beyond up until super --
3  suspension are the ones that the command staff member
4  will be notified of.
5      Q    Okay.  And then am I correct to understand
6  that that's -- that would be a rare complaint that would
7  satisfy that criterion?
8      A    When you're looking at the totality of
9  complaints that come in, those are few and far between,
10 yes.
11     Q    Okay.  In the 1994 to 2002 time frame, were
12 supervisors notified when a complaint register file -- a
13 complaint register was resolved with a finding of
14 sustained?
15         MS. SHOFFNER:  Objection.  Form.  Go ahead.
16     A    The member will be notified, not the
17 supervisor.
18     Q    Okay.  So fair to say that the supervisor
19 would not be notified when a CR was resolved with the
20 finding that was other than sustained?
21     A    No.  It's -- the findings go to the member,
22 not supervisor.
23     Q    Okay.  In the 1994 to 2002 time frame, --
24     A    Can I -- Can I clarify that?
25     Q    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1    A    So what -- what happens is, back in that time
2  frame, the finding of a CR number was put on, like, a
3  almost, like, an index card, right?  It -- it would
4  compliment the Bureau of Internal Affairs.  It would be
5  on an index card.  It would make its way to the district
6  or unit of assignment, and then that will be put in the
7  officer's mailbox.  And that's how they would know or
8  learn the results of the investigation.  So whether or
9  not the supervisor, like the watch commander, would have
10  a stack of them and can just put them in the mailbox,
11  except claims.  Of course, he will be made aware because
12  he would have a stack of them, but those -- the results
13  of the investigation and the findings of the
14  investigation were sent back to the district, and then
15  they were put in the officer's mailbox and then they
16  would learn of their penalty recommendation.
17    Q    Okay.  In the 1994 to 2002 time-frame, did
18  supervisors have access to complaint register histories
19  for their subordinates?
20    A    No.
21    Q    Okay.  And the 1994 to 2002 time frame, did
22  supervisors have access to disciplinary histories for
23  their subordinates?
24    A    No.
25    Q    The 1994 to -- yes?  All right.

Page 55

1    A    Can I clarify that?  When you say access, I
2  mean, they could -- well, by request, if you requested
3  it, you'll be able to get it.  You'll be able to know,
4  like, how many CR numbers are out there, which they
5  would have to make a -- a request for that information
6  through the Bureau of -- or the Internal Affairs
7  Division's record section, but a lot of requests, it
8  didn't come in, but, you know, you would have to make a
9  request for that.  So it was available, but they
10  couldn't access it themselves.
11    Q    Okay.  Thank you very much for that
12  clarification.  Okay.  And in the 1994 to 2002 time
13  frame, was there any requirement that supervisors to
14  take any action when their subordinates we're generating
15  a high number of misconduct complaints?
16    A    I'm sorry, I'm -- I'm trying to think in the -
17  - in the -- the time frame.  So yes, yes.  If they -- if
18  they were keeping track and they were made aware, you
19  know, I mean, because it's something that these avenues
20  -- for the Bureau of Internal Affairs to keep track of,
21  but as far as a supervisor having knowledge that their
22  member has generally the -- X number of complaints
23  within a time period?  Yes.  Now that they should --
24  yeah.  They have a responsibility to bring it to the
25  attention of the Internal Affairs Division.

Page 56

1    Q    Okay.  So only if they were made aware of a
2  high number of complaints were they required to take
3  action; is that correct?
4    A    Correct.  So it's a little different than them
5  being responsible for tracking it.  If they're made
6  aware, if somehow this one particular member stands out
7  for a certain type of complaint multiple times, and did
8  they bring it to the attention of BI -- they should
9  bring that to the attention of BIA, they're not
10  responsible for tracking it, but if they're made aware
11  of it, they should do something about it.
12    Q    Okay.  And not only were they not responsible
13  for tracking it, but they also weren't -- there wasn't
14  an organized way to give them information about the
15  number of complaints that officers were receiving in the
16  1994 to 2002 time frame, right?
17    MS. SHOFFNER:  Objection as to form.
18  Foundation.  Not -- strike that.  Just as form.
19    A    To answer that question, the answer is, there
20  was a way, but the average investigator or sergeant in
21  any unit would not know that there was a way because
22  that information was housed in a certain database within
23  the Internal Affairs Division.  So they would have to
24  have knowledge that that database existed that would be
25  able to track and pull the number of complaints that

Page 57

1  invidi -- individual officer would have that would not
2  be contained in -- in fact the actual unit of assignment
3  and it wouldn't be available to that supervisor.
4    Q    Okay.  Thank you.  And what's the name of that
5  database that you're referring to?
6    A    It's the -- well, I know the acrym -- acronym,
7  it's the CRM system.  So that -- that's just to spin
8  around for a very long time.
9    Q    Okay.  And so back in the 1994 to 2002 time
10  frame, what information about an officer's complaint
11  history was available through the CRM database?
12    A    That's where it house all numbers.  All -- so
13  you will be able to query an officer's complaint history
14  by their employee number, by their name, by their star
15  number.  And you'll be able to see how many numbers they
16  had, what type of numbers, and you would - - yeah.  And
17  then you will be able to do from there, pull the hard
18  copy file that was housed in the Bureau of internal
19  Affairs' records' division.  So it just in that -- that
20  database still to my knowledge used today.
21    Q    Okay.  And would that list all complete
22  registers or just the ones that were sustained against
23  an officer?
24    A    All.
25    Q    Okay.  As you sit here today, are you aware of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  any instance in which a supervisor reported a
2  subordinate for potential investigation because that
3  subordinate was generating a high number of misconduct
4  complaints?
5        MS. SHOFFNER: Objection as to form. Go ahead.
6    A   As I sit here today, yes.
7    Q   Okay. And what comes to mind?
8    A   Well, there's one particular case where a
9  supervisor was harassing officers at roll call and
10 officers would do a -- a number on -- a CR number on the
11 supervisor for the use of profanity, and discipline,
12 maltreatment. And that continued -- that happened,
13 like, several times within a short period of time, and
14 that was -- that's one instance that I -- I can recall.
15   Q   Okay. Can you think of any instance in which
16 a subordinate report -- a supervisor reported a
17 subordinate for potential investigation for discipline
18 because the subordinate was generating a high number of
19 misconduct complaints against members of the community?
20   A   Yes. Definitely.
21   Q   Okay. And what do you recall?
22   A   I mean, I recall an instance where the -- an
23 officer would -- while -- while working with -- would
24 make their way into people's homes after, you know, the
25 -- complaint was -- I don't want to use the term home

Page 59

1  invasion, but they were entering homes without proper
2  documentation or a warrant. And that was happening --
3  those complaints are coming in on this particular
4  officer and the supervisor somehow was made aware of it,
5  and then that complaint did come in to BIA and that
6  particular member was searching homes without a warrant
7  for probable cause.
8    Q   Okay. Got that. And what was the name of the
9  officer and the supervisor?
10   A   I don't know, I don't recall.
11   Q   Okay. Was that in the 1994 to 2002 time frame
12 or some other time frame?
13   A   You know what, I think that was -- that might
14 have been beyond 2002. Yeah. There was -- there was
15 more -- more reason recent -- not, like, real recent,
16 but that was outside of that time frame that you're
17 speaking of.
18   Q   Got it. Okay. Thanks. Is there any instance
19 that you're aware of in the 1994 to 2002 time frame in
20 which a supervisor reported a subordinate for potential
21 investigation because that's subordinate was generating
22 a high number of misconduct complaints against members
23 of the Chicago community?
24        MS. SHOFFNER: Objection as to form and
25   foundation for that time period.

Page 60

1    A   No. I don't -- I don't recall any.
2    Q   Okay. We've talked about -- a little bit
3  about this already, but what were the entities that were
4  investigating misconduct by sworn members of the Chicago
5  Police Department in the 1994 to 2002 time frame?
6    A   Did you say by foreign members?
7    Q   By sworn. Sworn members.
8    A   Would you re -- hey, I'm not -- I'm not
9  understanding that question.
10   Q   Sure. I'm sorry. Where were the entities
11 that were investigating police officer misconduct for
12 the Chicago Police Department in the 1994 to 2002 time
13 frame?
14   A   Oh, I -- I get you. So that -- that would've
15 been the Internal Affairs Division. And that would have
16 been -- there -- there was a change over, but that would
17 have been the Independent Police Review Authority, IPRA.
18 So prior to IPRA, there was a officer -- professional
19 standards and I just -- I don't know the -- the date
20 exactly when that changed over, but I'm believing in
21 that time frame was speaking of it should've been IPRA.
22   Q   You know, if I tell you that, you know, IPRA
23 came into being in about 2007, does that sound right to
24 you with OPS being prior to 2007?
25   A   It could've been -- it -- it could've been. I

Page 61

1  wasn't sure of the date, but I know we went from OPS to
2  IPRA to COPA, so yes, it very well could have been
3  OPS.
4    Q   Okay. So if I use the term OPS, will you
5  understand that I'm talking about whichever entity, you
6  know, whether it was OPS or IPRA at the time. And I'll
7  just use the word OPS, does that work?
8    A   That works.
9    Q   Okay. And then -- so the IAD stands for
10 Internal Affairs Division, correct?
11   A   That is correct.
12   Q   Okay. And the IAD later became the Bureau of
13 Investigative Affairs; is that correct?
14   A   It's the Bureau of Internal Affairs.
15   Q   And that was just a name change, right?
16   A   That's correct.
17   Q   Okay. And the 1994 to 2002 time frame,
18 besides IAD and OPS, were there any other entities of
19 the City of Chicago that were involved in investigating
20 allegations of police misconduct as a non-criminal
21 matter?
22   A   I -- you know, -- I'm not -- it could have
23 been the Inspector General's Office. They might have
24 -- because I know right now they're very active in
25 inv -- investigating some of our non-criminal matters,



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  but I just don't know at the time if they were involved
2  in our non-criminal matters, but the only other agency
3  would have been -- or department would have been the
4  Inspector General's Office.
5      Q   Okay.  And would that -- is that the City
6  Inspector General or inspector general of the police
7  department?
8      A   It's the City's Inspector General's Office.
9      Q   Okay.  Is it fair to say that IAD and OPS were
10 doing the lion's share of police misconduct
11 investigations in the 1994 to 2002 time frame?
12     A   That is fair.
13         MS. STALF:  Objection.  Form.  Foundation.
14     Q   Okay.  So the City Inspector General, if they
15 were doing investigations in that time frame, is it fair
16 to say that they were doing a very small proportion of
17 the misconduct complaint investigations against Chicago
18 Police Department officers?
19         MS. SHOFFNER:  Objection.  Form.  Foundation.
20     A   Yes.
21     Q   Okay.  And is it fair to say in the 1994 to
22 2002 time frame, that some allegations of police
23 misconduct were handled by OPS, and some were handled by
24 IAD?
25         MS. SHOFFNER:  Objection to form.

Page 63

1      A   Yes.  That is correct.
2      Q   Okay.  Who -- which was the entity that
3  determined which complaints of police misconduct would
4  be investigated by OPS versus IAD?
5      A   Most -- well, all cases were filtered through
6  OPS.  They handled the -- they took the cases that fell
7  under your purview and the rest of the cases were sent
8  over to BIA or Internal Affairs Division to handle.  So
9  was based on category codes, if you will.
10     Q   And which categories did OPS investigate
11 during that 1994 to 2002 time frame?
12     A   Definitely excessive force complaints.  I'm
13 not sure if they handled the shooting incident at the
14 time, but excessive force complaints, they -- they did
15 handle.
16     Q   Did they also handle domestic violence?
17     A   I think they -- I'm pretty sure they did, yes.
18     Q   Okay.  What about deaths in custody?
19     A   Still the same.  Deaths in custody, at the
20 time, I'm not sure if they handled those, but they --
21 they very well could have.
22     Q   Okay.  When you say excessive force, you know,
23 excessive force complaints went to OPS.  Did that
24 inclu -- was that limited to fis -- you know, the use of
25 physical force?  But did that also include things like

Page 64

1  witness coercion or keeping a witness against their will
2  at a police station?
3      A   No --
4          MS. SHOFFNER:  Objection to form.  Foundation.
5      A   Excessive force would have been the --
6  excessive force would have been, like, the civil rights
7  violations -- well, excessive force would have been
8  strictly excessive force, which is the physical force.
9  There was other -- there was a different category code
10 for coercion and -- and that's still more so under the
11 criminal, well, it's kind of a criminal too, but they
12 fell under the criminal categories.
13     Q   Okay.  What was the code -- what was the name
14 of the, you know, coercion, or the -- when you just
15 described?
16     A   I don't -- so I don't -- I don't have a list
17 of the category codes in front of me, but there -- there
18 is a list, that lists different categories and their
19 code associated with the categories.
20     Q   Got it.  Okay.  So mistreatment of a witness
21 that was not using physical force, would that be
22 investigated by IAD?
23     A   Currently, no.
24     Q   I'm talking when the --
25     A   At the time -- there was a time, it -- it

Page 65

1  might have been investigated by IAD at the time, yes.
2      Q   Okay.  What categories of allegations m -- of
3  police misconduct did IAD investigate during the 1994 to
4  2002 time frame?
5      A   I hate to say it this way, but I -- it's all -
6  - really all categories not handled by COPA because I
7  mean, there's -- is a laundry list of category codes.
8  There are a lot of them, and COPA only -- or IPRA only
9  handles of -- of a small portion of all those category
10 codes.
11     Q   Okay.  So fair to say that in the 1994 to 2002
12 time frame, IAD would handle everything that was not
13 within OPS' specific jurisdiction?
14     A   That is correct.
15     Q   Okay.  And OPS' jurisdiction included
16 excessive force, correct?
17     A   Correct.
18     Q   And most non-excessive force related
19 complaints were handled by IAD?
20     A   That's correct.  Most.
21     Q   Okay.  And as you sit here today, you're not
22 sure exactly what other categories were handled by OPS
23 other than excessive force; is that correct?
24     A   That's correct.
25     Q   Okay.  Did the jurisdiction of OPS change at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1   all between 1994 and 2002?
2       A    During that time frame, I wou -- I would say
3   no.  No.
4       Q    Okay.  So is it fair to say that OPS would act
5   as kind of a gatekeeper where it would receive all the
6   complaints, it would keep those that fell within OPS'
7   specific jurisdiction, and then it would send the rest
8   to IAD?
9           MS. SHOFFNER:  Objection to form.
10      A    Yes.  That is fair to say.
11      Q    Okay.  So if there was an allegation that a
12  police officer manipulated an eyewitness identification
13  during a lineup.  That would -- that's something that
14  would be investigated by IAD, correct?
15      A    Correct.
16      Q    Okay.  And if there was an allegation that a
17  police officer withheld exculpatory evidence.  That's
18  something that would be handled by IAD, correct?
19      A    Right.
20      Q    Okay.  And if there was an allegation that a
21  police officer knowingly fabricated a witness'
22  testimony, that would be investigated by IAD, correct?
23      A    That's correct.
24      Q    Okay.  And an allegation that a police officer
25  held a -- mistreated a witness by holding her against

Page 67

1   her will, at a police station overnight, that's the kind
2   of complaint that would be handled by IAD?
3       A    That's correct.
4       Q    Okay.  And if there was an allegation that a
5   police officer mistreated a witness by threatening harm
6   to that witness if they didn't provide a statement,
7   that's the kind of complaint that would be handled by
8   IAD, correct?
9       A    That's correct.
10      Q    Okay.  What about if there was an allegation
11  that a police officer was maintaining a personal file,
12  street file, of police reports in violation of rules
13  requiring the maintenance of official files, is that
14  something that would be investigated by IAD?
15          MS. SHOFFNER:  Objection.  Form.
16      A    Yes.
17      Q    Okay.  What were the methods by which
18  complaints of misconduct by police officers came into
19  OPS in the 1994 to 2002 time frame?
20      A    A citizen could have contacted or an officer
21  could have contacted OPS directly.  An officer or
22  citizen could have -- could have informed a supervisor
23  of an allegation of misconduct and that would have been
24  sent to OPS.  It's mainly by -- or a citizen could have
25  come into the district or station to file a complaint,

Page 68

1   citizen could have called 311 and had an officer come
2   out to their house to file a complaint.  All these
3   complaints will be channeled -- oh, I'm sorry.  Go
4   ahead.
5       Q    I'm sorry.  I did not mean to cut you off,
6   please continue.
7       A    Yeah.  But all the complaints that come in
8   would have been funneled through OPS for assignment.
9       Q    Okay.  Did OPS have the ability to initiate
10  its own complaints if it wanted to launch an
11  investigation?
12      A    Yes.
13      Q    And did IAD have the ability to initiate its
14  own complaints of itself in an investigation of a police
15  officer was warranted?
16      A    Yes.
17      Q    Could you describe the numbering system that
18  OPS used to keep track of complaints?
19      A    At the time, it was a six-digit -- six-digit
20  numbering system.  I believe it started with the phone -
21  - as far back as I can tell with a two I don't -- I
22  don't remember having a number with a one, but I have
23  seen cases starting with a six-digit case was started
24  with a two, for example, 206353.
25      Q    Okay.  And so would OPS number, that's called

Page 69

1   the complaint register number, correct?
2       A    That is correct.
3       Q    Okay.  And would OPS give all complaints a
4   complaint register number regardless of whether they
5   were going to be investigated by OPS or IAD?
6           MS. SHOFFNER:  Objection as to form.
7       A    All right.  Yes.
8       Q    Okay.  What about if there was a lawsuit filed
9   -- a civil lawsuit filed against a member of the police
10  department, would a complaint register file be
11  initiated?
12      A    And looking back in that time period, I don't
13  -- I don't -- I'm not really familiar of whether or not
14  they did it that way, but currently that is -- that is
15  how it's done.  There is a log number that's pulled --
16  that's -- that follows the -- the civil suit.
17      Q    Okay.  And as you sit here today, you don't
18  know one way or another whether in the 1994 to 2002 time
19  frame lawsuits were generated complaint register files?
20      A    That is correct.
21      Q    Okay.  What if there was a referral of
22  misconduct from the state's attorney's office, would
23  that generate a complaint register number?
24      A    It would.
25      Q    Okay.  And same with the United States



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  Attorneys Office?
2      A    That is correct.
3      Q    Okay.  And if there was an internal complaint
4  by a, you know, a police officer against another police
5  officer, that would generate a CR number too, correct?
6      A    That is correct.
7      Q    Okay.  In the 1994 to 2002 time frame, besides
8  IAD and OPS, and the City Inspector General, was there
9  any other entity that was involved in investigating
10 misconduct by Chicago Police Department officers?
11     A    Not that I'm aware of.
12     Q    Okay.  In circumstances in which there was an
13 overlap between complaints that were within OPS'
14 jurisdiction and complaints that were outside of OPS'
15 jurisdiction, which entity, OPS or IAD, would
16 investigate that complaint?
17         MS. SHOFFNER:  Objection to form.
18     A    I -- it depends on the nature of the
19 investigation.  Say for instance, if there was --
20 looking at one log number, one complaint number -- I'm
21 sorry, one CR number, and if Internal Affairs Division
22 had a criminal component for that as there was handled
23 in -- in the confidential section and OPS had another
24 type of complaint, that case would be handled by
25 Internal Affairs.  It all depends on the nature of the

Page 71

1  complaint.
2      Q    In the 1994 to 2002 time frame, did OPS keep
3  track of the outcome of complaints that it referred out
4  to IAD?
5      A    No.  Because that, once IAD's complaints, we
6  just -- we handle it.
7      Q    Okay.  Did IAD have a separate numbering
8  system for complaints?
9      A    No.  Same numbering.
10     Q    Okay.  Can you describe the chain of command
11 in the Internal Affairs Division in the 1994 to 2002
12 time frame for investigations with misconduct?
13     A    Starting at the top, we had an assistant
14 deputy superintendent, followed by -- I believe there
15 was a -- kind of think -- yeah.  Follow up -- okay.  We
16 have the ADS and then we had -- there was, I guess, two
17 or three lieutenants working there, several sergeants,
18 police agents.  We had those.  And then we had police
19 officers.
20     Q    Okay.  And who was doing the investigation?
21 What -- was it the police agent or the police officer?
22     A    Both.  Police officers, police agents, and --
23 and sergeants, actually.
24     Q    Okay.  And what was the difference in
25 responsibility between the police officers, the police

Page 72

1  agents, and the sergeants?
2      A    There was -- there's no difference.  At the
3  time, they were all kind of scattered about to handle
4  the investigations.
5      Q    Were the sergeants --
6      A    I mean, wasn't scattered about, sorry.
7      Q    No.  Please continue.
8      A    No.  I said -- I said scattered about, you
9  know, there were different sections within Bureau of
10 Internal Affairs.  We had confidential, we had general,
11 we had special, there -- there was those are all
12 investigative sections.  And of course we had sergeants,
13 police agents, and police officers assigned to each
14 section to handle investigative work.
15     Q    Okay.  And were the sergeants overseeing the
16 police officers?
17     A    That's correct.
18     Q    Where did the police agents fit in the
19 hierarchy?
20     A    They -- it's kind of hard to say because
21 they're -- they kind of fit right above police officers,
22 right below sergeants.  But of course, the police agents
23 then oversee the police officers.  There's just -- there
24 was only six police agents in the whole City of Chicago
25 and they -- there was a sort of testing process to -- to

Page 73

1  get there.
2      Q    Okay.  And what were their responsibilities
3  relative to that as compared to the police officers?
4      A    Both -- so both police officers and -- and
5  police agents, they both handle investigative work.  But
6  of course, the -- the more complex of investigations,
7  they would -- they would be given to more experienced
8  officers or supervisors.  And it became a time where
9  sergeants would handle any investigations above -- I
10 mean, involving a lieutenant and above.  If you
11 understand what I'm saying.  We -- they didn't have
12 police officers investigating, like say commanders.
13 They needed -- they wanted a role of a supervisor to
14 investigate commander staff members or lieutenants and
15 above.
16     Q    Okay.  So was a police agent kind of like a
17 promotion from being a police officer?  It was just a
18 small number that -- of police officers that were
19 promoted, they get -- we're given a title of police
20 agent to do more complex investigations?
21     A    Yeah.  So at one point there was a -- it was a
22 -- I won't say -- it was a test.  It was a test, and
23 people -- investigators, officers that were already MBIA
24 to -- took the test and they were promoted to police
25 agents.  And -- but that was -- but then after they are

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 promoted, they never gave that exam again. So we were
2 left with just -- they were just left with five or six
3 police agents and, I think, at this point we have one
4 left.
5     Q    I see. Okay. What about an OPS? Can you
6 describe the chain of command for officers that were
7 working on investigations? And this is again in the
8 1994 to 2002 time frame.
9     A    No. I'm not familiar.
10     Q    If I tell you that there was investigators,
11 investigator 1, investigator 2, investigator 3, then
12 supervisors, coordinators, and the chief administrator.
13 Does that ring any bells or no?
14     A    None. It doesn't ring a bell.
15     Q    In the 1994 to 2002 time frame, was there an
16 affidavit requirement or mandating the OPS get an
17 affidavit from the complainant before it would
18 investigate misconduct complaint?
19     A    I believe it was.
20     Q    Okay. In the 1994 to 2002 time frame, was
21 there also an affidavit requirement demanding that IAD
22 get an affidavit from the complainant before it could
23 pursue an investigation?
24     A    Yes.
25     Q    Okay. Is it correct that roughly half for the

Page 75

1 cases that came into OPS were not investigated because
2 of the lack of an affidavit?
3         MS. SHOFFNER: Objection to form.
4     A    I'm not certain of the percentage. I'm not
5 sure.
6     Q    Okay. Do you have any sense of the proportion
7 of complaints that were not investigated because of the
8 lack of an affidavit in the 1994- to 2002 time frame?
9     A    I do not.
10     MR. MCCARTER: Ruth, do you think we can take a
11 break in a few minutes, just a snack break?
12     MS. BROWN: Sure. Yeah. Let's -- do you want
13 just five minutes, or do you want a longer break?
14     MR. MCCARTER: Five minutes works.
15     MS. BROWN: Okay. Sure. Let's go off the
16 record for five minutes.
17         (OFF THE RECORD)
18     COURT REPORTER: Right. We are back on record
19 at 12:48 p.m.
20 BY MS. BROWN:
21     Q    Okay. Commander Moore, in the 1994 to 2002
22 time frame, did OPS have any formal mechanism to search
23 for a particular category of complaint across the police
24 department?
25     MS. SHOFFNER: Objection as to form.

Page 76

1     A    I'm not sure.
2     Q    What kind -- OPS have done a search for, for
3 example, false recording complaints across the police
4 department in that time frame?
5     MS. SHOFFNER: Same objection.
6     A    I'm not sure. I -- I don't believe OPS had
7 access to the CRM's system.
8     Q    Okay. Did IAD have any mechanism in the 1994
9 to 2002 time frame to search for a particular category
10 of complaint across records of complaints for the police
11 department?
12     A    That would have been housed in the CRM system.
13     Q    Okay. And what was the -- what was IAD able
14 to search for in the CRM system in terms of categories
15 of complaints?
16     A    They would have been able to search for the
17 -- the type of misconduct case. Be it -- they -- they
18 could type in sexual assault case, or theft, or -- yeah.
19 They would be able to do a word search within a system.
20     Q    Okay. And this was in the 1994 to 2002 time
21 frame?
22     A    Correct. The same system as it is today.
23     Q    Okay. Was there -- what were the categories
24 of different kinds of complaints that could be searched
25 in that manner? You mentioned sexual assault, theft,

Page 77

1 what else?
2     A    It -- it's a long list. I mean, it -- it runs
3 a gambit depending on what you were looking for, it
4 would be housed in the CRM system, but there's really
5 too many to just start rattling off all the different
6 types of category codes and cases, but any situation or
7 -- you can come up with specific to a work search, you
8 just search for it.
9     Q    Okay. And what search -- what word, you know,
10 what would consistent searching words for, you know,
11 any words that were in the criminal -- the complaint
12 register file or just particular coding for how
13 complaints had been entered into the system?
14     A    No. Like, for an example, any complaint
15 dealing with an officer's weapon, type in weapon, and
16 you would see a -- a list of complaints related to
17 weapons like you -- you wanted the query up particular
18 officer and if they continue to lose their weapon, you
19 type in the officer's information, you put in "weapon,"
20 and you'd get a list of that officers complaints related
21 to the officer's weapon.
22     Q    Okay. Would that include lineup procedure
23 violations? Could you search for those?
24     MS. SHOFFNER: Objection as to form.
25     A    Yes. It's a word search, so I mean, there's -



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  - let's say if there's -- but it would have to be --
2  like when I said weapons, I -- I know that weapon is
3  part of a category code. You know, that -- that is
4  category code something with the weapons. Lineup would
5  have to be part of an established category code in order
6  for it to show up. You know what I mean? So --
7      Q   So was there --
8      A   And I just said I don't know -- yeah. That's
9  -- I'm not sure if there's a category code for lineup.
10     Q   So there would have to be a category code in
11 order to search for the particular kind of misconduct?
12     A   Yes. It will be easier -- it will be easier.
13 Either a category code or you can search by the officer
14 themselves. You know, if you have the name of a
15 particular officer, you can run that officer's complaint
16 history within that system.
17     Q   Okay. What if you wanted to search for
18 particular kinds of misconduct and there was not a
19 category code for it? For example, lineup procedure
20 violations, could those be searched for in the CRM
21 system and identified in that way?
22     A   Well, -- yeah. I guess -- yes. You could
23 search for it, but you have to be creative in -- in how
24 to search for it. If you can't use the word lineup,
25 you'd have to find out -- you'd have to find some other

Page 79

1  title or some other words in order to identify what
2  you're looking for if lineup's not in there.
3      Q   So you would have to find the category code
4  that you thought was closest to lineup violations?
5      A   Yeah. Something that would encompass lineup
6  misconduct. You would have to find a category code and
7  then run that, and then hopefully, that would result in
8  a -- a finding for what you're looking for.
9      Q   Okay. All right. And based on your
10 experience working on investigations for the City of
11 Chicago, was there a category code in 1994 to 2002 that
12 could reliably identify lineup procedure violations?
13     A   I'm not certain of that.
14     Q   Okay. And in the 1994 to 2002 time frame, did
15 the City of Chicago have any mechanism to search for
16 complaints alleging Brady violations?
17         MS. SHOFFNER: Objection as to form.
18     A   Once again, that -- that will be specific upon
19 a specific category code. And we would have to look
20 within the list of category codes for any type of
21 language that would encompass the Brady rule violation.
22     Q   Okay. And as you sit here today --
23     A   But the only re -- I don't re -- I --
24     Q   I'm sorry, go ahead.
25     A   I've -- I've never seen any list of the

Page 80

1  category codes that -- that just said Brady rule
2  violation or Brady rule itself. You have to find
3  something else that -- like that's close to it and
4  search for that.
5      Q   Okay. And as you sit here today, are you
6  aware of any category code that was available in 1994 to
7  2002 that would allow for a search -- a reliable search
8  that would yield complaints involving Brady violations?
9      A   Yes. I -- I would have to -- I would search -
10 - there -- there were category codes that spoke to --
11 that speak to the courts -- court procedures -- court
12 proceedings and -- yeah. Court infractions, yeah.
13         that -- it would be under the category of
14 court.
15     Q   I see. So if there was, like, a motion filed
16 in criminal court or something like that that resulted
17 in an investigation, then you could access a complaint -
18 - scratch that, terrible question, I'll just skip it.
19         MS. SHOFFNER: Thank you.
20     Q   Okay. All right. So in the 1994 to 2002 time
21 frame, are you aware of the city doing any analysis of
22 complaints across the police department by complaint
23 category type?
24     A   Are you talking about, like, currently or back
25 then if we were doing analysis?

Page 81

1      Q   1994 to 2002.
2      A   So I mean, we -- we -- we -- they did have,
3  like, reporting, like, annual reports that were put out,
4  even at that time. Yeah. That would have been an
5  avenue through the annual reporting system.
6      Q   Okay. Other than the information that IAD
7  collected for the annual reports, are you aware of any
8  search by IAD staff of particular categories of
9  misconduct across the police department?
10         MS. SHOFFNER: Objection. Form.
11     A   Well, yes. So BIA internal affairs, we --
12 we've always had analysts that -- that work within our
13 unit and they will be able to access, like, information
14 cases through the CRM system and -- and put together
15 reports for the -- the chief of internal affairs or the
16 -- the ADS at the time. But yes, there was -- there was
17 a way of doing it and it was really through the CRM
18 system and through the -- the well, I think, I would
19 say server, but it was -- it was all attached to the CRM
20 system. So we did have analysis for that and we still
21 do.
22     Q   Okay. And I'm talking just about the past
23 from 1994 to 2002. You know, is it your testimony today
24 on behalf of the City of Chicago that IAD was doing --
25 was creating reports that were analyzing different kinds

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  of misconduct across the city in complaints?
2      A   No.  Please, no.  If we had access to it we
3  would -- we would not generating reports from, you know.
4      Q   To your knowledge in the -- scratch that.  In
5  the 1994 to 2002 time frame, did the city attempt to
6  track the number of allegations of misconduct relating
7  to lineups?
8          MS. SHOFFNER:  Objection as to form.
9      A   No.  Not that I'm -- I'm aware of.
10     Q   Okay.  Would it be accurate to say that the
11  city was not able to track allegations of lineup
12  misconduct across the department in the 1994 to 2002
13  time frame?
14         MS. SHOFFNER:  Objection to form.
15     A   I'm -- I'm not certain of that.
16     Q   So you're not certain of whether or not the
17  Chicago Police Department was able to track misconduct -
18  - lineup misconduct allegations across the department;
19  is that right?
20     A   That's -- that's correct.
21     Q   Okay.  Can you think of any time at which IAD
22  found that misconduct had occurred and an eyewitness
23  identification procedure in the 1994 to 2002 time frame?
24     A   I'm sorry.  Can -- can you repeat that one?
25     Q   Sure.  Can you think of any instance in which

Page 83

1  IAD found that misconduct had occurred and an eyewitness
2  identification procedure in the 1994 to 2002 time frame?
3      A   I'm not sure.  I'm not familiar.
4      Q   Can you think of any time between 1994 and
5  2002 that in which IAD found that misconduct had
6  occurred during a lineup procedure?
7      A   I don't know.
8      Q   Can you think of any time between 1994 and
9  2002 in which IAD disciplined an officer for misconduct
10  relating to an eyewitness identification procedure?
11     A   Not offhand, no.
12     Q   If you wanted to answer that question by
13  referring to records, how could you go about figuring
14  out which complaints between 1994 and 2002 had IAD
15  disciplined an officer fro misconduct relating to a
16  lineup?
17     A   It's -- I just don't know, I don't think I
18  wouldn't know how to do that.
19     Q   Okay.
20     A   I'm not even -- really not even certain if
21  that could be done, honestly.
22     Q   Okay.  As an experienced law enforcement
23  officer, you're aware that sometimes motions are filed
24  in criminal court to suppress eyewitness identifications
25  because of alleged misconduct during the identification

Page 84

1  procedure, right?
2          MS. SHOFFNER:  Objection to form.
3      A   Yes.  I am.
4      Q   Okay.  And if I call those motions motions to
5  suppress, you understand what I'm talking about?
6      A   Yes.
7      Q   Okay.  In the 1994 to 2002 time frame, was IAD
8  taking any corrective steps to monitor motions to
9  suppress witness identifications?  Stop there.  Let me
10  ask it again.
11     A   Absolutely.
12     Q   And then -- in the 1994 to 2002 time frame,
13  was IAD taking any corrective steps to measure -- to
14  monitor motions to suppress witness identifications?
15     A   Not that I'm aware of.
16     Q   Okay.  If a motion to suppress a witness
17  identification that was made by a Chicago Police that
18  was -- sorry.  In a case in which Chicago Police
19  Department officer conducted an identification procedure
20  and the motion to suppress that identification procedure
21  was granted because there were improprieties in the
22  identification procedure, would IAD get notice of that
23  kind of a complaint?
24         MS. SHOFFNER:  Objection as to form.
25     A   Can you -- just one more time, will you repeat

Page 85

1  that one?
2      Q   Sure.  Yeah.  In the 1994 to 2002 time frame,
3  when an motion to suppress a witness identification was
4  granted on the basis of misconduct during the
5  identification by a Chicago Police Department officer,
6  did IAD receive notice?
7      A   Not that I'm aware of.
8      Q   Okay.  And did IAD do any -- take any
9  affirmative steps to find out when motions to suppress
10  witness identifications were granted in cases where
11  there -- the Chicago Police Department officers were
12  found to have done something improper in the
13  identification procedure?
14         MS. SHOFFNER:  Objection to the form.
15     A   Not that I'm aware of.
16     Q   Okay.  In the 1994 to 2002 time frame, did the
17  City of Chicago ever request that the states attorney's
18  office provide notice when a motion to suppress an
19  identification procedure had been granted?
20         MS. SHOFFNER:  I'm sorry, could you restate the
21  question, I'm --
22         MS. BROWN:  I can repeat it.  Yeah.
23  BY MS. BROWN:
24     Q   In the 1994 to 2002 time frame, did the City
25  of Chicago ever request that the states attorney's



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

```
1   office provide notice when a motion to suppress and
2   identific -- an eyewitness identification had been
3   granted by court?
4        A   No.
5        Q   Okay.  So I'm going to use the shorthand term,
6   Brady misconduct and what I mean by that is, you know,
7   as we all know, is the problem of failure to place
8   exculpatory information in a police file.  You know,
9   failure to document exculpatory information, and failure
10  to disclose potentially exculpatory material to a
11  criminal defendant.  Does that definition makes sense to
12  you?
13       MS. STALF:  I just want to object to the extent
14    that that mischaracterizes Brady.
15       MS. BROWN:  Okay.
16       MS. SHOFFNER:  I join.
17  BY MS. BROWN:
18       Q   In the 1994 to 2002 time frame, did the City
19  of Chicago attempt to track the number of allegations of
20  Brady misconduct by police officers?
21       MS. SHOFFNER:  Objection as to form.
22       A   No.  I don't know.
23       Q   Okay.  Would it be accurate to say that the
24  City of Chicago was not able to track allegations of
25  Brady misconduct across the department?
```

Page 87

```
1        MS. SHOFFNER:  Objection as to form.
2        A   Yeah.  I don't -- don't think they could, I
3   don't see -- I mean, if you're -- you're asking if
4   whether or not the Bureau of Internal Affairs would be
5   able to do that or the City of Chicago itself?
6        Q   Well, we can start with the Bureau of Internal
7   Affairs, which was IAD at the time, right?
8        A   Correct.  It would be no.
9        Q   Okay.  So IAD did not have that capacity,
10  correct?
11       A   Correct.
12       Q   Did OPS --
13       A   I'm sorry -- sorry.  So like once again, when
14  -- when you worked within the CRM system, if -- if it
15  was case related, and we're -- we're using Brady as a
16  search mechanism within the CRM system, that might
17  uncover some -- some casework, but as far as actively,
18  you know, clearing it, no.  It was not doing that.
19       Q   Okay.  And when you say "That," you mean IAD
20  was not doing that in the 1994 to 2002 time frame,
21  correct?
22       A   I'm sorry.  That is correct.  IAD.
23       Q   I mean, I get these acronyms wrong all the
24  time, so I -- and I know we're asking you to go back in
25  time to what it used to be so.  Okay.  Were complete
```

Page 88

```
1   registers categorized in any way -- well, scratch that.
2   Are you aware of any investigations that went by IAD or
3   OPS that went forward on an allegation of Brady
4   misconduct in the 1994 to 2002 time frame?
5        MS. SHOFFNER:  Objection as to form.
6        A   I am not aware.
7        Q   Are you aware of any instance in which IAD or
8   OPS disciplined an officer for a Brady violation in 1994
9   to 2002?
10       A   I'm not aware.
11       Q   Can you think of any instance in which IAD or
12  OPS found that exculpatory evidence had been withheld
13  from criminal defendants and prosecutors in the course
14  of a CR investigation?
15       A   Within that time frame?  No.  No.
16       Q   Okay.  Going back to the 1994 to 2002 time
17  frame, do you have any way of knowing whether IAD ever
18  investigated a complaint of Brady misconduct on the part
19  of a department member in that time frame?
20       A   No.
21       Q   Do you have any reason to believe one way or
22  another whether or not there ever was an investigation
23  by IAD of a department member for an allegation of Brady
24  violation?
25       MS. SHOFFNER:  Objection as to form.
```

Page 89

```
1        A   No.  I do not.
2        Q   Okay.  I'm going to use the shorthand street
3   file misconduct.  And I know that -- I'm not trying to
4   suggest that the City of Chicago, you know, agrees with
5   that terminology.  When I say street files misconduct,
6   what I'm referring to is the problem of officers
7   maintaining separate personal files apart from the
8   formal investigative file for an investigation in
9   contravention of policy.  Does that term make sense?
10       A   Yes.
11       Q   Okay.  Had you heard of the term street files
12  before?
13       MS. STALF:  I just want to object to the
14    definition as provided by counsel as it's
15    misleading.
16       Q   You can answer.
17       A   Yes.  I'm familiar.
18       Q   Okay.  In the 1994 to 2002 time frame, did the
19  city attempt to track the number of allegations of
20  street file misconduct by police officers?
21       MS. STALF:  Object to the form of the question.
22       A   No.
23       Q   Were complaint register files categorized in
24  any way in the 1994 to 2002 time frame so that the city
25  could identify a pattern of allegations of police
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  officers maintaining personal files, but that were not
2  incorporated into the formal investigative file for a
3  crime?
4      MS. SHOFFNER:  Objection as to form.
5      A   No.
6      Q   Okay.  Is it fair to say that there's no way
7  to determine whether or not there were any complaint
8  registers alleging street violations from 1994 to 2002,
9  other than going back and reviewing every single
10  complaint register file from that time period?
11      MS. SHOFFNER:  Objection as to form.
12  Foundation.
13      A   I'm not familiar when you say street
14  violations.  I don't know who you're speaking of.
15      Q   Street file violations, so I'm talking about
16  when --
17      A   Oh, street --
18      Q   Street file violations, yes.
19      A   Oh, okay, street file violations.  Oh, no, I
20  don't know.
21      Q   Fair to say that you're not aware of any
22  method to go back and figure out which complaint
23  registers from 1994 to 2002 alleged street file
24  violations; is that right?
25      A   That is correct.

Page 91

1      Q   Okay.  Are you aware of anyone in IAD making
2  any effort to track whether or not there was a problem
3  with the police officers maintaining separate personal
4  files that were not incorporated into the formal
5  investigative file for a criminal investigation in the
6  1994 to 2002 time frame?
7      MS. STALF:  Objection to form.  Foundation.
8      A   No.
9      Q   I'm sorry -- okay.  Thank you.  Are you aware
10  of any instances in which the department member was
11  investigated for improperly maintaining personal file,
12  personal street file, in the 1994 to 2002 time frame?
13      MS. SHOFFNER:  Objection as to form.
14      A   No.  I'm not aware.
15      Q   Okay.  So just to be clear, you don't have any
16  knowledge of IAD ever investigating between 1994 and
17  2002 any complaint register file relating to street
18  files misconduct?
19      A   That is correct.
20      Q   Can you think of any instance in which IAD or
21  OPS made a finding that Chicago Police Department
22  officer had improperly maintained a personal street
23  file?
24      MS. SHOFFNER:  Objection as to form.
25      A   No.  I'm not aware.

Page 92

1      Q   Okay.  So fair to say that you can't think of
2  any time between 1994 and 2000 in which a Chicago Police
3  Department officer was disciplined for improperly
4  maintaining a personal street file?
5      A   That is correct.
6      MS. STALF:  Objection.  Form.  Foundation to
7  that last question.
8      Q   Do you have any way of knowing going back to
9  1994 and to 2002, that time frame, whether the --
10  whether IAD ever investigated a complaint of improper
11  maintenance of a street file, other than going back and
12  reviewing all of the complaint registers from that time
13  period?
14      MS. STALF:  Objection.  Form.  Foundation.
15      A   That's -- that's no.
16      Q   In the 1994 to 2002 time frame, did IAD track
17  complaints of allegations of street file misconduct?
18      MS. STALF:  Same objections.
19      A   I'm not aware of.
20      MS. SHOFFNER:  Hang on.  Are you ready to take
21  a break?
22      MS. BROWN:  Sure.
23      MS. SHOFFNER:  All right.  We need to take a
24  break.  The commander has an -- a call that he has
25  to attend to.

Page 93

1      MS. BROWN:  Sure.  Okay.
2      MS. SHOFFNER:  It'll be short.  Five minutes?
3      THE WITNESS:  Yeah.
4      MS. BROWN:  Sounds good.
5      COURT REPORTER:  All right.  We are off record.
6      (OFF THE RECORD)
7      COURT REPORTER:  Okay.  We're on record at 1:21
8  p.m.
9  BY MS. BROWN:
10      Q   Commander Moore, --
11      MS. SHOFFNER:  Ruth before --
12      MS. BROWN:  Yes?
13      MS. SHOFFNER:  I'm sorry.  I was just curious
14  in terms of lunch, how much longer do we have?
15  Should we break a little bit later for lunch, or is
16  this something we can plow through?
17      MS. BROWN:  I would say, why don't we plow
18  through for a little bit, and then maybe take a
19  break for a later lunch.  Does that sound okay?
20      MS. SHOFFNER:  Sure.
21      MS. BROWN:  Oh, wait.  You know, it's hard to
22  know.  I'm not sure how much I have left.  So
23  there's a chance I can plow through, but -- how
24  about we do that.  I'll do my best, and then if
25  people get hungry and tired, we'll just stop and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1    take a break?
2         MS. SHOFFNER:  Sounds good.  Thanks.
3         MS. BROWN:  Okay.
4  BY MS. BROWN:
5    Q    And, Commander Moore, just let me know at any
6  time if you want to take a lunch break and we can do it,
7  okay?
8    A    Okay.  Sure.
9    Q    Okay.  And so again, this is a reminder.  My
10 questions are going to be about the 1994 to 2002 time
11 frame, okay?
12   A    Okay.
13   Q    Okay.  Did IAD keep any statistics on the
14 number of investigations of police misconduct and the
15 outcomes of police misconduct investigations?
16   A    Aside from annual reports, no.
17   Q    Okay.  So there were annual reports, and did
18 that include the outcome of investigations?
19   A    Yes.  They did.
20   Q    Were those -- were numbers kept separately for
21 OPS and IAD investigations, or were they considered
22 together?
23   A    They were -- they were separate.  They were
24 separated.
25   Q    So was there a separate report that IAD did

Page 95

1  for its investigations, and then OPS had a separate
2  annual report for OPS investigations?
3    A    From what I recall, there was one report, but
4  it delineated IAD as opposed to the IPRA case -- OPS
5  cases.
6    Q    Oh, okay.  Got it.  And between 1994 and 2002,
7  what were the possible outcomes of an IAD complaint
8  register investigation?
9    A    Back then, they were sustained, not sustain,
10 unfounded, and -- unfounded and exonerated.
11   Q    Okay.  And was that the same for OPS
12 investigations of complaint registers?
13   A    Yes.
14   Q    Okay.  In the 2001 time frame, using all CRs
15 that were opened, as the denominator, what was the
16 approximate sustained rate for inter -- for IAD CR
17 investigations?
18        MS. SHOFFNER:  Objection as to the form.
19 Foundation.
20   A    I'm -- I'm not sure.
21   Q    Let me ask it this way: In 2001, approximately
22 what percentage of IAD CRs were sustained?
23        MS. SHOFFNER:  Objection as to foundation.
24   A    I don't know.
25   Q    Do you have any idea of whether it's, you

Page 96

1  know, more than two or three percent?
2         MS. SHOFFNER:  Same objection.
3    A    I wouldn't want to give a percentage without
4  really knowing, but there were sustained cases, of
5  course.
6    Q    Okay.  But you're not able to quantify in any
7  way what percentage of cases were sustained?
8    A    That is correct.
9    Q    Do you know whether the rate of sustained
10 cases for IAD investigations has been fairly consistent
11 over the years?
12        MS. SHOFFNER:  Objection as to form and
13 foundation.
14   A    I'm -- I'm not certain.  I'm not certain.
15   Q    The annual reports that you described, did
16 they provide a sustained rate for OPS and IAD
17 investigations?
18   A    Yes.
19   Q    Were you ever involved in compiling the
20 information for those reports?
21   A    Not during that time period, no.
22   Q    Okay.  But you reviewed those reports during
23 that time period; is that right?
24        MS. SHOFFNER:  Objection as to form.
25   A    No.

Page 97

1    Q    So you didn't review them?
2    A    No.
3    Q    Do you know whether or not the sustained rate
4  in those annual re -- those annual reports from the 1994
5  to 2002 time frame includes all IAD investigations or
6  just those involving an affidavit?
7    A    It will be all.  Well, if -- well, it would
8  list the total number of cases that came into OPS, BIA,
9  or IAD, and then it would give the breakdown.  So every
10 case that had a number associated with it, a complaint
11 log number, and then the breakdown would be generated as
12 a result of this total number of cases that came in.
13   Q    Okay.  In the 1994 to 2002 time frame, did the
14 City of Chicago attempt to track the number of
15 allegations of fabrication of witness statements by
16 members of the department?
17        MS. SHOFFNER:  Objection as to form.
18   A    I don't -- I'm not sure.  I don't know.
19   Q    Would it be accurate to say that the City of
20 Chicago was not able to track allegations of fabrication
21 of witness statements across the department in that time
22 frame?
23        MS. SHOFFNER:  Objection as to form.
24   A    I'm not certain.
25   Q    Were complaint registered files categorized in



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  any way that would allow some of the city to identify a
2  pattern of allegations of fabrication of witness
3  statements?
4      MS. SHOFFNER:  Objection as to form.
5      A    Yes.  I'm not -- I'm not certain.  It would
6  all be -- it all depends on the category codes and if
7  there was a particular category codes that spoke to it,
8  but offhand, I'm certainly there was one at the time.
9      Q    Is there one now?
10     A    I would have to look to see.
11     Q    Okay.  Are you aware of any investigations by
12  IAD that went forward in the 1994 to 2002 time frame on
13  allegations of fabrication of witness statements?
14     A    I'm not certain, no.
15     Q    Can you think of any time in which, between
16  1994 and 2002, IAD or OPS found that a member of the
17  Chicago Police Department had fabricated a witness
18  statement?
19     MS. SHOFFNER:  Objection as to form.
20  Foundation.
21     A    No.
22     Q    Can you think of any instance between 1994 and
23  2002 in which a member of the Chicago Police Department
24  was disciplined for having fabricated a witness
25  statement?

Page 99

1      A    Not offhand, no.
2      Q    Okay.  You testified earlier that IAD and OPS
3  investigations what -- could have four possible
4  outcomes: Sustained, not sustained, exonerated, or
5  unfounded; is that correct?
6      A    That's correct.
7      Q    Okay.  And can you explain each of one of tho
8  -- each one of those for me?
9      A    Sustained, there's -- there's evidence to
10  support the allegation.  Not sustained, it's when the
11  investigators unable to prove or disprove the
12  allegation.  Be -- unfounded is if the allegation is
13  false, not factual.  And exonerated is when the
14  allegation as written, the officer did do as described,
15  but it was proper, it was in department guidelines.
16     Q    Okay.  Thanks.  In IAD between 1994 and 2002,
17  who was it that decided the outcome of a particular
18  complaint register investigation?
19     A    That would be the investigator.
20     Q    Okay.  And was that decision reviewed by
21  anyone at IAD?
22     A    The investigator's immediate supervisor.
23     Q    Okay.  Anyone else?
24     A    It was reviewed by the -- the investigator,
25  then the advocate section would review it.  Depending on

Page 100

1  the outcome of the case, they would review it.  Then
2  sometimes the assistant deputy superintendent -- I'm
3  sorry, the ADS of BIA would review it getting on the
4  case.
5      Q    Okay.  And I'm sorry, I didn't hear you.  You
6  said something -- some kind of section, what section?
7      A    The advocate section.
8      Q    Advocate section?  What was the advocate
9  section?
10     A    So the advocate section is a section within
11  the Bureau of Internal Affairs that reviews the cases
12  prior to sending it out to a command channel review.
13     Q    Okay.  And this was between 1994 and 2002; is
14  that right?
15     A    That's correct.  That is the --
16     Q    Okay.  And who -- it's called -- who is the
17  advocate section advocating on behalf of?
18     A    I don't know if they were advocating on behalf
19  of anyone, but they're just the division within the
20  internal affairs that prepare the cases for command
21  channel review.  And that case is reviewed by the
22  accused officer's chain of command.
23     Q    Oh, I see.  The advocate section prepares
24  cases for the command channel review?
25     A    That is correct.

Page 101

1      Q    Okay.  And the command channel review, can you
2  describe what that process is?
3      A    So once the -- the case is submitted for
4  closure and sent to the advocate sections for
5  preparation, the advocate section would send the case to
6  that member's command staff member.  So it would go from
7  BIA or Internal Affairs Division, to the commander of
8  that unit or district for review, and then they would
9  either concur or not -- not concur with the
10  investigation.  As in if -- and once they finish their
11  review of it, it will be sent to the deputy chief of
12  that unit or for the -- or division for review even
13  after that it's -- it's returned to Internal Affairs
14  Division.
15     Q    Okay.  Did the command channel review process
16  occur for complaints that were unsustained, unfounded,
17  or exonerated?
18     A    So at the time -- yeah.  See, I'm not -- I'm
19  not sure of the time, exactly what they got in the
20  command channel.  I don't know if it was -- yeah.  I'm
21  not sure.  I'm not sure if it's all the cases.  That's a
22  good -- a pretty good question.
23     Q    I guess another way -- let me rephrase the
24  question, see if that helps trigger anything for you.
25  And if you can't answer it, you know, I understand that,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  you know, is -- was the command channel review process
2  only for complaints that had been recommended as
3  sustained?
4      A    Yeah.  It could have been -- it could have
5  been because I just don't -- I don't recall even to this
6  day, sending cases out to a command channel review that
7  are exonerated, you know.  So it makes more sense that
8  the cases would be sustained cases because the command
9  channel, they're reviewing, for the most part, the
10  penalty recommendations of the case, not so much re-
11  investigating the case.  So it would -- it would have to
12  have been cases that were sustained and command channels
13  would go over penalty recommendation that were levied by
14  internal affairs or -- again, the Internal Affairs
15  Division.
16      Q    Okay.  So when an investor -- let's say an
17  investigator made a sustained finding on a complaint
18  reviewed an investigation by the IAD in the 1994 to 2002
19  time frame, their immediate supervisor could override
20  that sustained finding; is that right?
21      A    Yes.  Yes.  They could look at it and say, we
22  need further investigative work.
23      Q    Okay.  And if the investigator and their
24  immediate supervisor, you know, both agreed that it
25  should be a sustained finding, the command channel

Page 103

1  review process could then not concur with the sustained
2  finding; is that right?
3      A    That's correct.
4      Q    Okay.  And then FD supervisor, the
5  investigator and their supervisor concurred in a
6  sustained finding, that the command channel review
7  process did not concur, how would the outcome of the CR
8  be determined?
9      A    It was the -- that case will come back to the
10  Internal Affairs Division and it will be reviewed by the
11  chief then assistant deputy superintendent, and they
12  would make this final decision, penalty.
13      Q    Okay.  And let's say that the -- so the -- so
14  if the investigator and the supervisor both agreed it
15  should be a sustained finding, the deputy chief could
16  override that decision, correct?
17      MS. SHOFFNER:  Objection as to form.
18      A    The -- the deputy chief?  Or the assistant
19  deputy superintendent?
20      Q    Yes.  Sorry, the deputy superintendent.
21      A    Yes.  The ADS.  That is correct.  That is
22  correct.
23      Q    Okay.  So just so we have a clear record.  So
24  in the 1994 to 2002 time frame, if the investigator and
25  the supervisor believed a complaint should be sustained,

Page 104

1  the ADS could override that determination, correct?
2      A    Yes.
3      Q    Okay.  If the -- was the ADS the highest level
4  of review for the -- for IAD of a particular complaint
5  register file?
6      A    That's correct.
7      Q    Okay.  If the ADS found that a complaint
8  should be sustained and recommended discipline, what
9  would happen to that complaint next?
10      A    The complaint -- give me -- give me one
11  second.  At that point, the complaint would be -- if
12  you'll be closer to the records of that point, once the
13  -- it'll be -- it'll go back to the investigator, maybe
14  modification of the outcome, and then the case would go
15  to records.  It would not -- if the -- if the ADS
16  decided to change the -- the outcome after the case went
17  to command channel, she wouldn't change the outcome, and
18  then it goes through -- it won't go through command
19  channel again.  If that's what you're asking.  It would
20  be closed FBIA at that point with her recommend -- her
21  or his recommendation.
22      Q    Okay.  If the ADS believed that a complaint
23  should be sustained and recommended discipline, was it
24  always the case that a police officer would then be
25  disciplined?

Page 105

1      MS. SHOFFNER:  Objection as to form.
2  Foundation.
3      A    Yes.
4      Q    Did anyone else in the police department have
5  the ability to -- did the -- did IAD have the ability to
6  mete out discipline?
7      A    So well, --
8      MS. SHOFFNER:  Objection as to the form, but
9  you can go on.
10      A    Well, with discipline -- so we'll -- the case
11  will be closed with our -- just -- with our
12  recommendation for discipline, but of -- of course, if
13  we're going to suspend somebody for say, five days, the
14  -- there will be paperwork that will have to go to the
15  finance division in order to facilitate the disciplinary
16  process, because either the member could be suspended
17  for five days, if that's the outcome, or they could
18  actually, you know, submit paperwork to say take five
19  days worth of my compensatory time off my books, and
20  then that will satisfy the punishment.  So it's not
21  necessarily that they would stay home for five days.
22  They can actually take time they have accumulated over
23  the months or years they've done a job, and submit that
24  in lieu of staying home without pay.
25      Q    Okay.  When IAD made a recommendation of



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  discipline, would that recommendation have to be
2  accepted by the superintendent of the police department
3  in order to go through?
4      A    Typically no.  But when we're -- discipline
5  -- disciplining members and the -- penalty is, like,
6  30 days or greater, then that would have to be reviewed
7  by the superintendent's office.
8      Q    Okay.  If the penalty was less than 30 days,
9  was IAD the final word on discipline for that member?
10     A    Yes.
11     Q    Okay.  So if the penalty was greater than 30
12  days, there would be a superintendent review?
13     A    Correct.
14     Q    Okay.  So if IAD made a recommendation of
15  discipline, the superintendent could override that
16  recommendation, correct?
17     A    That's correct.
18     Q    Was there any procedure limitation on the
19  superintendents decision to decline to follow IAD's
20  disciplinary recommendation?
21     A    I'm sorry.  Can you repeat that one?
22     Q    Let me put it this way: Was it completely up
23  to the discretion of the superintendent's office to
24  determine -- to decide whether or not to follow IAD's
25  disciplinary recommendation?

Page 107

1      A    Yes.  That's correct.
2      Q    Okay.  Other than the levels of review that
3  we've already talked about, with the supervisor and then
4  the command channel review, the ADS' review and the
5  superintendent's office review, was there any other
6  procedural step that a complaint had to go through in
7  order for discipline to be imposed on a member of the
8  Chicago Police Department?
9      A    Depending on the nature of the allegation or
10  complaint.  Our criminal cases when completed by an
11  investigation would go through the -- our legal affairs
12  department for review.
13     Q    Okay.  Anything other than that?
14     A    No.
15     Q    Okay.  I'd like to ask you a similar series of
16  questions, but now we're going to be talking about OPS
17  instead of IAD, okay?
18     A    Okay.
19     Q    So in between 1994 and 2002, who decided the
20  outcome of a particular complaint register file that was
21  being investigated by OPS?
22     A    All right.  Are -- are you asking who decided
23  the outcome of the investigation penalty-wise?
24     Q    I guess at the initial stage.
25     A    In the initial stage, think it would be cases

Page 108

1  closed, the OPS investigator would make a
2  recommendation, and that case was -- was sent back to
3  BIA, and the ADS would make a -- final decision on
4  the penalty.
5      Q    Oh, so OPS investigations would -- when the
6  investigator made a recommendation, it would then be
7  reviewed by IAD?
8      A    The inves -- that's what I recall, yes.  That's
9  what I recall.
10     Q    Did it go up -- did the complaint that was
11  recommended to be sustained by an investigator at OPS,
12  did it go up the chain of command at OPS or IAD?
13         MS. SHOFFNER:  Objection as to form.
14     Foundation.
15     A    Yeah.  I'm not -- I'm not exactly sure how
16  that process works because -- yeah.  Because I -- I
17  wasn't there, but -- yeah.  I'm not sure.  I can't
18  answer that.
19     Q    Okay.  Do you know whether a complaint that
20  went through OPS had a similar number of levels of
21  review before a department member could be disciplined
22  as a complaint that went through the IAD process?
23     A    I'm -- I'm certain that the cases still went
24  through command channel review.
25     Q    Were they also reviewed by the investigator's

Page 109

1  supervisor?
2      A    That I'm not certain of.
3      Q    Okay.  Was the ultimate decision to discipline
4  in the hands of the superintendent?
5      A    Well, like I said before, all depends on the -
6  - the nature of the complaint and the penalty that's
7  being levied.  If it's 30 days and beyond, that's for
8  the superintendent.
9      Q    Okay.  And if it was less than 30 days, who
10  would be the final word on whether discipline could mete
11  it -- be meted out in an investigation that was carried
12  out by OPS?
13     A    I believe it would have been in an Internal
14  Affairs Division.
15     Q    Okay.  And who in the Internal Affairs
16  Division?
17     A    The ADS.
18     Q    Okay.  So the ADS could override a
19  recommendation of discipline by an investigator, and a
20  supervisor, and OPS?
21     A    I believe so.
22     Q    Okay.  And if the complaint -- the discipline
23  recommended was more than 30 days, then the
24  superintendent could override the recommendation of the
25  --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1    A    Yes.

2    Q    Was there also a level of review by the police
3 review board of complaints against Chicago Police
4 Department officers?

5    A    Yes.  Yes.  There is.

6    Q    Okay.  Can you describe how that layer of
7 review worked in the 1994 to 2002 time frame?

8    A    Well, basically, cases that have been
9 submitted to the police board for separation.  That's
10 when the case would go through the legal affairs and
11 then it would it would be to -- to police board review.

12    Q    Did the police review board could also
13 override a recommendation of discipline?

14    A    That is correct.

15    Q    Okay.  And so that's cases of termination, was
16 that also true in cases of lengthy suspensions?

17    A    That's correct.

18    Q    Okay.  In 1994 to 2002, in that time frame, as
19 a matter of procedure when carrying out an investigation
20 of a complaint register file, did IAD consider past
21 complaints of misconduct in connection with
22 investigating the current complaint of misconduct
23 against an officer?

24    A    No.  It did not.

25    Q    Okay.  In the 1994 to 2002 time frame, did OPS

Page 111

1 consider past complaints of misconduct against an
2 officer in the context of considering -- of
3 investigating a current complaint against that officer?

4    A    No.  The -- the only consideration was during
5 the penalty phase of the investigation.  That's only --
6 that's the only time where the consideration for past
7 conduct or misconduct will be weighed in.

8    Q    Okay.  So if there -- if an officer had a
9 history of similar complaints of misconduct that were
10 unsustained, those would not be considered by an
11 investigator doing a CR investigation, correct?

12    MS. SHOFFNER:  Objection as to form.

13    A    That is correct.

14    Q    Okay.  And it was not part of IAD or OPS
15 investigator's job to assess whether there was a history
16 of similar past complaints when carrying out a CR
17 investigation in the 1994 to 2002 time frame, right?

18    A    That's correct.

19    Q    Okay.  And when in evaluating what kind of
20 discipline to impose on a Chicago Police Department
21 officer, after there was a sustained finding, at that
22 point, is it correct that the City of Chicago would look
23 only at an officer's disciplinary history and not their
24 complaint history?

25    MS. SHOFFNER:  Objection as to form.

Page 112

1    A    They will look and see the disciplinary
2 history and the complementary history.

3    Q    Okay.  But the -- when deciding what kind of
4 discipline to impose an an officer, the City of Chicago
5 would not look at the history of complaints that did not
6 result in discipline; is that right?

7    A    That is correct.  That is correct.

8    Q    Okay.  So put another way.  When the City of
9 Chicago was making a decision on discipline for a member
10 of the Chicago Police Department from the 1994 to 2002
11 time frame, they would look only at previously sustained
12 complaints and they would not look at overall complaint
13 histories?

14    A    That's correct.

15    Q    Okay.  In the 1994 to 2002 time frame, was
16 there any systematic way for IAD or OPS to track which
17 officers were drawing in a especially concerning number
18 of complaints?

19    A    I -- I'm sorry.  One more time?

20    Q    Sure.  In the 1994 to 2002 time frame, was
21 there an organized way for the city to track which
22 officers responded, especially to a number of complaints?

23    MS. STALF:  Object to the form.  Foundation.

24    A    No.

25    Q    Okay.  So to your knowledge, IAD was not

Page 113

1 tracking -- scratch that.  Okay.  And in the 1994 to
2 2002 time frame, could an IAD investigator look up the
3 complaint history for a particular Chicago Police
4 Department officer?

5    A    No.  No.  We couldn't look it up.  We can
6 request it.

7    Q    Okay and where would it be requested from?

8    A    IAD records.

9    Q    Okay.  And did IAD records maintain at this
10 time a list of all past complaints against a particular
11 Chicago Police Department officer?

12    A    Yeah.  They -- they do maintain it, but, like,
13 when investigators are near completing their
14 investigation, they make a formal request to Internal
15 Affairs Division records section to get the disciplinary
16 history.  That needs to be included with their case
17 file.  That's, like, one of the last attachments in the
18 case file.  That's -- that's different from, like, say,
19 the complaint history that could be, you know, 40
20 complaints.  They're only asking and receiving the
21 disciplinary history of the member.

22    Q    Okay.  Thank you for that clarification.  And
23 what's the -- if they had wanted to get the complete
24 complaint history, would that be available to them from
25 IAD records?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    A    No.  They wouldn't -- they wouldn't provide it
2  whoever -- like, if they made a request for that, they
3  wouldn't receive that because it's not -- they don't
4  need it.  So they wouldn't get it.
5    Q    Okay.  So the disciplinary history, that was -
6  - would the disciplinary history be requested only in
7  the case of when the investigator recommended sustaining
8  the allegations?
9    A    Correct.
10    Q    Okay.  And was that true for IAD
11  investigations and OPS investigations?
12    A    That is correct.
13    Q    So in an IAD investigation, the disciplinary
14  history would only be requested after the investigator
15  had reached a conclusion about making a recommendation
16  of the outcome of the complaint?
17    A    That's correct.
18    Q    The disciplinary history for an officer in the
19  1994 to 2002 time frame, would that include only
20  complaints for which discipline had been imposed?
21    A    That would include the complaints that
22  resulted in a sustained finding.
23    Q    Okay.  So if there was a sustained finding
24  with no discipline, would that CR show up in an
25  officer's disciplinary history?

Page 115

1    A    It would.
2    Q    Would the disciplinary history include
3  complaint register files in which, you know, an
4  investigator or a supervisor had recommended sustaining
5  the allegations have been ultimately been overridden by
6  of the someone up the chain of command?
7    A    No.  I'm sorry, ca -- you know, let me -- I
8  just thought about what you're -- what you're asking.  So
9  whether or not -- okay.  So you have a sustained finding
10  and if the superintendent say comes back and says, okay,
11  if unfound it, that would not show up on the member's
12  disciplinary history upon request, only the same
13  findings would show up on the history.  Does that
14  clarify of anything?
15    Q    Yes.  That makes sense.  Thank you.  In the
16  1994 to 2002 time frame, did IAD have any alert system
17  to flag department members who accumulated
18  high-frequency number of complaint registers over a
19  particular time period?
20    A    No.
21    Q    Did OPS have any alert system to flag
22  department members who accumulated a high number of CR
23  investigations?
24         MS. STALF:  Objection.  Form.  Foundation.
25    Q    Did IAD at some point later develop any

Page 116

1  mechanism to -- for an alert to be raised when a
2  particular officer accumulated a large number of
3  complaint registers?
4         MS. STALF:  Same objections.
5    A    No.  No.  There's no formalized system for
6  that.
7    Q    Okay.  And that's true to the present day?
8    A    That's true to the present day, albeit --
9  present day we do have a system of intake that's within
10  the Bureau of Internal Affairs, and we have one sergeant
11  that -- that sees all incoming complaints.  And she
12  actually brings to my attention our frequent flyers of -
13  - of cases that come in.  So at that point, we're able
14  to act upon it because she's able to say, this officer
15  has gotten, you know, seven complaints within the last
16  three months because she sees every last complaint.  So
17  that's kind of right now our trigger for that.  It's
18  informal, but it works.
19    Q    Got it.  And what's the position of that
20  person who does that today?
21    A    She's a -- she's a sergeant assigned to
22  intake.
23    Q    Okay.  Was there any system of frequent
24  identification of frequent flyers back in 1994 to 2002?
25    A    There's no system to identify officers that

Page 117

1  are -- are frequent flyers, but once identified officers
2  are put into the behavioral alert system, which, you
3  know, they are kind of sidelined and provided treatment
4  to get them back on track, which is basically sending
5  them back to the academy for a refresher training on how
6  to interact with people.
7    Q    Okay.  And do you have any sense of how many
8  members annually were put in the behavioral alert
9  program, and then, you know, by the -- in the 1994 to
10  2002 time frame?
11    A    I do not.
12    Q    Have you heard of some thing called Brain
13  Makers Pro (phonetic)?
14    A    No.
15    Q    In the 1994 to 2002 time frame, if there was a
16  civil lawsuit filed alleging misconduct by a member of
17  the Chicago Police Department, would IAD investigate
18  that misconduct?
19    A    If there was a civil suit file, wh -- what
20  would happen even back then is the -- there will be a
21  complaint log number generated.  And it -- it would --
22  it would really serve as a placeholder, and we wou -- we
23  would -- well, the law department, legal affairs, will
24  monitor the civil case and provide us with information
25  to determine whether or not a full-fledged investigation



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  where these take place, but a number would be generated,
2  but it would serve as a placeholder as we develop more
3  information from the civil suit.
4      Q   Okay.  Am I correct to understand that no
5  investigation would begin until the lawsuit was
6  resolved?
7      A   That's correct.
8      Q   And then after the lawsuit was resolved, there
9  would be an -- a decision made whether or not to
10  investigate; is that right?
11     A   That's correct.
12     Q   Okay.  And what happened if the lawsuit -- by
13  the time the lawsuit was resolved, you know, more than
14  five years had passed from when the misconduct -- the
15  alleged misconduct had occurred?
16     A   Well, --
17         MS. SHOFFNER:  Objection to form.
18     A   If the Internal Affairs Division is going to -
19  - wants to move forward with an investigation, we would
20  have to seek the approval of the superintendent to move
21  forward with that case.  If the case is already beyond
22  the five-year mark.
23     Q   Okay.  And I'm sorry, you said you'd get the -
24  - you have to get the approval of the superintendent's
25  office?

Page 119

1      A   That is correct.
2      Q   Okay.  And what criteria were used to
3  determine whether or not there should be an
4  investigation of allegations that were raised in a civil
5  suit by IAD?
6      A   Well, that -- that would be on a case-by-case
7  basis, depending on the -- nature of the civil suit
8  and what misconduct resulted from the -- the suit itself
9  and, like, its transcript.  So what it -- we will get
10  materials and depending on who received, we move forward
11  an investigation, but that's all case-by- case basis.
12     Q   Okay.  So is it fair to say that the filing of
13  a civil lawsuit did not automatically trigger an
14  investigation by IAD into the allegations raised into
15  the -- in the law suit?
16     A   That's correct.
17     Q   Okay.  And if a lawsuit was ongoing and there
18  was a comp -- the allegations in the lawsuit were a
19  matter that would be investigated by OPS, would OPS wait
20  until the lawsuit was resolved before commencing
21  investigation?
22     A   I'm not sure.
23     Q   Did IAD in the 1994 to 2002 time frame have
24  the ability to refer a case to the states attorney's
25  office?

Page 120

1      A   Yes.
2      Q   Okay.  What circumstances would trigger a
3  referral to the states attorney's office?
4      A   If -- if -- if it's of course criminal in
5  nature, we -- over confidential we do have detectives
6  and sergeant that work our criminal cases, and we -- we
7  do consult with states attorney's office for state
8  charges and sometimes -- yeah.  Sometimes the cases are
9  just referred to the attorney's office, but it all
10  depends on the nature of the investigation.
11     Q   Okay.  Is it completely and up to the
12  discretion of IAD to decide whether or not a complaint
13  should be referred to the states attorney's office?
14     A   Well, -- well, yes, because I mean, there are
15  times where the states attorney's office would ask for
16  the case to be handled by -- by them.  So then a
17  determination will be made whether or not we'll allow
18  them to handle it or we'll just keep it, but we do work
19  hand-in-hand with states attorney's office on matter
20  involving our officers.
21     Q   If there was a violation -- excuse me, if
22  there's a sustained finding of lying under oath that was
23  made in a complaint register investigation by IAD in the
24  1994 to 2002 time frame, would that automatically be
25  referred to the states attorney's office for a potential

Page 121

1  perjury charge?
2         MS. SHOFFNER:  Objection as to form.
3      A   So that -- that case would already be -- at
4  the states attorney's office.  They would be -- they
5  would bring it to our attention.  You -- you know what I
6  mean?  Codes -- it's already a at the state attorney's
7  office.  It's in -- it's in the court system.  That's
8  where it was uncovered.  So they would bring it to our
9  attention.  So we generate -- generate the number.  And
10  then after that it will be determined who handles case.
11  Be it BIA confidential or something else.
12     Q   Okay.  So in the category of cases in which
13  there is a court determination of perjury --
14     A   No.
15     Q   -- they would be handled in the way you just
16  described; is that right?
17     A   That's -- that's correct.
18     Q   What if there's no court determination of
19  perjury, but when IAD investigated the complaint
20  register, they realized that there had been perjury in
21  the criminal prosecution of a defendant?  In that case,
22  would there be an automatic referral to the states
23  attorney's office for potential perjury charges?
24         MS. SHOFFNER:  Objection as to form.  Foundation
25         and incomplete hypothetical.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

```
 1      A    So in order for BIA to make -- to -- to even
 2  investigate, we would have to go by the transcripts from
 3  the court proceedings, so it's hard to answer that
 4  question.  I -- I really can't dive into that one.
 5      Q    Yeah.  So let's say that IAD was -- did its
 6  own investigation and it -- and considered court
 7  transcripts, you know, of testimony by one of its police
 8  officers, and the investigation determined that the
 9  police officer had actually been lying in court, is that
10  the kind of case that would trigger an automatic
11  referral to the state's attorney's office for potential
12  perjury not charge?
13      MS. SHOFFNER:  Objection to form.  Foundation
14   and incomplete hypothetical.
15      A    Potentially, yes.
16      Q    Okay.  Are you aware of any instance in which
17  the IAD in the 1994 to 2002 time frame referred the case
18  to the state's attorney's office for a potential perjury
19  charge when the perjury was something that the -- that
20  IAD discovered during its investigation?
21      A    I am not.
22      COURT REPORTER:  I'm sorry, Ms. Monu, did you
23   say something?
24      MS. MONU:  No.  I did not.  Go ahead.
25      MS. BROWN:  Winnie, if you have any tech
```

Page 123

```
 1  issues, just let us know.  Otherwise, we're going to
 2  barrel on forward here.
 3  BY MS. BROWN:
 4      Q    Okay.  When a civil -- in your experience
 5  working IAD and now the BIA, when a civil lawsuit was
 6  filed, triggering a CR number, has it been your
 7  experience that the plaintiff in the lawsuit typically
 8  does not want to provide an affidavit?
 9      MS. SHOFFNER:  Objection as to form.  And
10   foundation as it's during the time period of 1994 to
11   2002 to or --
12      MS. BROWN:  Better -- let me do better, hold
13   on.
14  BY MS. BROWN:
15      Q    In the 1994 to 2002 time frame, there was an
16  affidavit requirement for IAD and OPS investigations,
17  right?
18      A    Correct.
19      Q    Okay.  And when a civil lawsuit was filed, in
20  your experience, did civil lawsuit plaintiffs typically
21  decline to provide affidavits?
22      MS. SHOFFNER:  Objection as to form.
23      A    That's correct.
24      Q    Okay.  And would that be because their counsel
25  typically advised them not to submit an affidavit?
```

Page 124

```
 1      MS. SHOFFNER:  Objection as to form.
 2   Foundation.
 3      A    I -- I'm not sure why.
 4      Q    Okay.
 5      MS. BROWN:  All right.  I'm at a good stopping
 6   point.  I still have a little more to cover, but
 7   what I would propose is that we take, like, a
 8   half-an-hour break, and then come back and I'll do
 9   my last section.  Does that sound okay to everybody
10   because it's getting pretty late?
11      MS. SHOFFNER:  That's fine with us.
12      THE WITNESS:  Sure.
13      MS. SHOFFNER:  Okay.  All right.  Let's say
14   2:45.
15      MS. BROWN:  Sounds good.
16      MS. SHOFFNER:  All right.  Thank you.
17      COURT REPORTER:  We're off record.
18      (OFF THE RECORD)
19      COURT REPORTER:  All right.  We are back on
20   record at 2:48 p.m.
21  BY MS. BROWN:
22      Q    Okay.  Commander Moore, in the 1994 to 2002
23  time frame, were there particular categories of
24  complaints that had a particularly high sustain rate?
25      A    A high sustain rate?
```

Page 125

```
 1      Q    Yes.  In your experience?
 2      A    Not that I'm aware of.
 3      Q    Do you know were there some categories, like,
 4  for example, vehicle infractions or equipment
 5  infractions that, you know, had a higher sustain rate
 6  that other kinds of complaints?
 7      MS. SHOFFNER:  Objection as to form.
 8      A    Not that I'm aware of.
 9      Q    In the 1994 to 2002 time frame, did IAD keep
10  any statistics of sustain rates by different categories
11  in their reporting?
12      A    I'm not familiar with that, no.
13      Q    Okay.  With complaints initiated by --
14  internally within the police department, did they have a
15  higher sustain rate than complaints that were initiated
16  by members of the community?
17      A    I can't say for certain that that's true.
18      Q    Do you have any information on the complaint -
19  - the sustain rate for complaints that were generated
20  within the police department versus outside the police
21  department?
22      MS. SHOFFNER:  Objection as to form.
23      A    No.  I do not.
24      Q    Okay.  Are you aware of IAD ever doing any
25  analysis to see whether there was a different sustain
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1  rate based on whether the complaints were initiated
2  within the police department or by members of the
3  community?
4       A   I'm not aware of that.
5       Q   Okay.  Are you able to give binding testimony
6  for the City of Chicago here today on the ways in which
7  supervising sergeants monitored the productivity of gang
8  specialists and detectives?
9       MS. SHOFFNER:  Objection as to form,
10  foundation, and completeness.  He's designated to do
11  that with respect to criminal disciplinary
12  procedures, but with respect to the inner workings
13  of each respective police officers division or
14  detective per -- division, whether it's homicide,
15  whether it's, you know, -- let me finish.  Whether
16  it's some juvenile investigations, whether it's
17  sexual assault cases, sexual crimes, organized
18  crimes.  Each division has their own internal
19  operations and he's designated to address the
20  process related to supervisor's -- supervisory --
21  the supervisor's role in the context of disciplinary
22  procedures.
23       MS. BROWN:  Okay.  So then I'm assuming that
24  that was an objection to a question.  You know, in
25  general, I would ask you to refrain from speaking

Page 127

1  objections.  Can the Court Reporter please read back
2  the question, and then I'd like Commander Moore to
3  answer.
4       COURT REPORTER:  Yes.  Give me one moment.
5       (REPORTER PLAYS BACK REQUESTED TESTIMONY)
6  BY MS. BROWN:
7       Q   You can go ahead, sir.
8       MS. STALF:  Just want to object to that
9  question to the extent that it calls for a legal
10  conclusion.
11       Q   Commander Moore, are you there?  Can you hear
12  me?
13       MS. BROWN:  Robin, are we having a technical
14  issue?
15       COURT REPORTER:  I think they were calling
16  through using a cell phone and it looks like it's
17  not in the participant section anymore, so it might
18  have hung up.
19       MS. BROWN:  Yeah.  Robin and Commander Moore,
20  we can't hear you at all.  So I think there's a
21  technical issue.  Krista, I can't hear you.  Oh,
22  Krista, you're muted, if you're talking?
23       MS. STALF:  Yeah.  Okay.  Sorry.  Oh, yeah.
24  Somebody sent a chat.  I was just going to say we
25  should send a chat because I don't think they can

Page 128

1  hear us either.
2       MS. BROWN:  Okay.
3       MS. SHOFFNER:  Can you hear us now?
4       MS. BROWN:  Yeah.
5       MS. SHOFFNER:  All right.  We're waiting for a
6  read back.
7       COURT REPORTER:  Give me one moment.  I'll play
8  it again.
9       MS. BROWN:  Thanks very much.
10       (REPORTER PLAYS BACK REQUESTED TESTIMONY)
11       MS. SHOFFNER:  Did you hear the question?  Did
12  you hear the --
13       THE WITNESS:  I did --
14       MS. SHOFFNER:  All right.  I --
15       THE WITNESS:  -- clearly.
16       MS. SHOFFNER:  Okay.  I'm going to just go
17  renew my objections.  State that it's an incomplete
18  state.  It's an incomplete comment or reading.
19       MS. BROWN:  Robin, --
20       MS. SHOFFNER:  I'm just going to make a
21  complete record here.  It's an incomplete reading
22  paragraph.  Did you -- I'm sorry, what?
23       MS. BROWN:  I'm just asking you not to -- just
24  say form, foundation, whatever you want to say.  Keep
25  it short.  No speaking objections, please.

Page 129

1       MS. SHOFFNER:  I will say whatever I want to
2  say.  And what I want to say is that it's an
3  incomplete reading of paragraph F, and that I --
4  form, foundation, and particularly, with respect to
5  binding testimony.  Having said that, Officer
6  Commander Moore, you can answer the question.
7       A   What -- yes.  Yes.  But, you know, yes.  As it
8  relates to the discipline disciplinary world, you know,
9  I'm -- I'm able to say yes, but it -- it would all come
10  across in our disciplinary procedures.
11  BY MS. BROWN:
12       Q   So how did supervising sergeants monitor the
13  productivity of gang specialists in the 1994 to 2002
14  time frame?
15       MS. SHOFFNER:  Objection as to form.  Assumes
16  facts not in evidence.
17       A   As I said earlier, and I didn't work in the
18  detective division, I wasn't a detective, so I've just
19  don't -- I can't speak to their policies and procedures
20  related to supervising them.
21       Q   Okay.  How were supervising sergeants expected
22  to supervise detectives?
23       MS. SHOFFNER:  Objection as to form.  Outside
24  the scope of this witness' expertise and outside the
25  scope of paragraph F of the subpoena.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1    A   Yeah. the -- the question is pretty, pretty
2  broad and pretty vague.  I just wasn't there, so I don't
3  -- I can't speak to how they were able to supervise
4  their detectives at that time.
5  BY MS. BROWN:
6    Q   Okay.  And same is true for -- you can't speak
7  to how, in the 1994 to 2002 time frame, supervising
8  sergeants were able to supervise gang specialists?
9        MS. SHOFFNER:  Objection as to form,
10       incompleteness, and incomplete hypothetical.
11   A   That is correct.
12       MS. BROWN:  Okay.  And I just want to say on
13       the record that, you know, this is -- I'm not going
14       to rehash the dispute, but this is an instance in
15       which we believe that the City of Chicago should
16       have provided a witness who could speak to this
17       topic, which is 1F.
18  BY MS. BROWN:
19   Q   Okay.  Are you able to speak to -- okay. Let's
20  take a look at Exhibit 1 again, which was the
21  30(b)(6) notice.
22       MS. BROWN:  You can keep it off the screen for
23       just a second.  I'm sorry.
24   Q   Commander Moore, are you able to -- well, let
25  me scratch that.  What changes were made between 1994

Page 131

1  and 2002 in the policies that were applicable to the
2  discipline of police officers?
3        MS. SHOFFNER:  Objection as to form.
4        Foundation.
5    A   So within their -- within a time frame, it --
6  it's possible that some of our department general orders
7  and special orders related to internal affairs were
8  modified by way of an amendment, but I would have to
9  have those documents in -- in the front of me to -- to
10  actually fully answer the question, but there are times
11  where there -- there are -- there's modification of our
12  department orders related to discipline that are amended
13  and, yes, there's quite possibly that happened during
14  that time frame.
15   Q   Okay.  And as you sit here today, you know,
16  what changes are you aware of happening between 1994 and
17  2002 that relate to the Internal Affairs Department's
18  investigation of police officer misconduct?
19   A   Without looking at the orders themselves, I
20  -- I wouldn't be able to say for certain what changes
21  were made during that time frame.
22   Q   Okay.  Do you know if there were any policies
23  or procedure changes that impacted the City of Chicago's
24  ability to hold police officers accountable for
25  misconduct between 1994 to 2002?

Page 132

1        MS. SHOFFNER:  Objection as to form.
2    A   I don't -- I mean, I'm sure that -- that took
3  place, but I just don't have those documents in front of
4  me to -- to accurately speak to it.
5    Q   Okay.  Did the City of Chicago's ability to
6  discipline police officers improve after 2002 to the
7  present?
8        MS. SHOFFNER:  Objection.  Objection as to
9        form.  Foundation.
10   Q   Let me ask it better.  Do -- let me ask a
11  different questions.  Do you think the Chicago Police
12  Department is better today at holding police officers
13  accountable for misconduct than it was in the 1994 to
14  2002 time frame?
15       MS. SHOFFNER:  Objection as to form.
16   A   Yes.
17   Q   Okay.  And what ways?
18   A   Well, we -- well, if you compare today to
19  then, you know, with the advancement of technology, is -
20  - is a lot easier to hold officers accountable.  You
21  know, video, camera.  I mean, there's -- there's so much
22  technology out there.  At this point, we have body-worn
23  cameras.  So it -- it's easier to hold officers
24  accountable for their actions compared to how things
25  were back -- back then.

Page 133

1    Q   Has the sustained rate for IAD complaints
2  changed between 1994 to 2002, that time period and the
3  present?
4    A   The sustained rate.  I'm not sure.  I would
5  have to compare the two time frames.
6    Q   Okay.
7        MS. BROWN:  All right.  Let's put Exhibit 1
8        back on the screen.  Thank you.
9    Q   Okay.  Do you see where it says letter G?  "How
10  to conduct a homicide investigation, including but not
11  limited, how to identify witnesses, preserve evidence,
12  and determine reliability of witness or suspect
13  statements."  Do you see that, sir?
14   A   I -- I do see that.
15   Q   Okay.  And then if you go down to number 2.
16  Okay.  It says, "Any and all changes made between March
17  '94 to March 2002 to the written and unwritten policies,
18  general orders, practices, customs, rules, and
19  techniques identified in response to," and it includes
20  1G above.  Do you see that?
21   A   1H above?
22   Q   Yes.
23   A   Yes.  Yes.
24   Q   1A to 1H, but that includes 1G, which is the
25  one we were just looking at.  The one I'm saying

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1  investigations?
2      A    Yes.
3      Q    Are you able to give binding testimony for the
4  City of Chicago on changes made to policy about --
5  regarding how to conduct a homicide investigation?
6      MS. SHOFFNER:  Objection as to form.
7  Foundation.  Calls for a legal conclusion.
8      A    I am not.
9      Q    Okay.  Are you able to give testimony on
10 changes to policies and procedures that relate to -- in
11 1H, the use of -- as witnesses in criminal
12 investigations of incentivized accusers, facing
13 potential or pending a potential criminal charges?
14     A    No.  I'm not.
15     Q    Okay.  Aside from topic 1F, which include --
16 which is, you know, discipline and supervision of police
17 officers.  Are there any other topics in number 1 here,
18 whether it's A, B, C, D, E, or -- I guess A, B, C, D, or
19 E that you're able to give testimony on changes to
20 policy for?
21     A    Well, yes.  Well, when it comes to general
22 orders and special orders, you know, I -- I am familiar
23 with some changes in some of our department orders, but
24 it would be -- it all depends on what's presented to me,
25 actually.

Page 135

1      Q    Okay.  Well, let's start with -- let's see.
2  Let's start with number topic 1A.  So the documentation
3  of -- and preservation of interviews during a criminal
4  investigation.  Are you familiar with any -- with
5  whether there were changes in policy that relate to
6  report writing for detecting gang specialists during
7  this time fair -- time frame?
8      MS. SHOFFNER:  Objection as to form.
9  Foundation.  Are you asking him if there was a
10    general order on that?
11     MS. BROWN:  I'm going to leave my question as
12    is.
13 BY MS. BROWN:
14     Q    You can answer, Commander Moore, and if you
15 need it read back, just let me know.
16     A    No.  I -- I can't speak to that.
17     Q    Okay.  Can you speak to whether there were
18 changes in policy and procedure between 1994 and 2002 on
19 inventorying photos during a photo identification
20 procedure?
21     A    No.  I cannot.
22     Q    Okay.  Can you speak to whether or not there
23 were changes between 1994 and 2002 in policy relating to
24 documentation of eyewitness descriptions of
25 perpetrators?

Page 136

1      A    I can't answer.
2      Q    Okay.  Are you able to give -- sorry.  Are you
3  able to speak to do whether there had been any changes
4  in policy between 1994 and 2002 regarding the treatment
5  of eyewitnesses?
6      A    I cannot.
7      Q    Do you have knowledge of the changes in policy
8  and procedure relating to identification procedures like
9  lineups that were made during the 1994 to 2002 time
10 frame?
11     A    I cannot.
12     Q    Okay.  And am I correct to understand that you
13 can't give testimony about how supervisors monitored the
14 productivity of detectives?
15     MS. SHOFFNER:  My objections stand, we can --
16     A    That's the question you asked earlier.  I
17 think I responded that only as it relates to discipline
18 within that unit.
19     Q    Okay.  What is your no -- how does -- how is
20 productivity relating to discipline?  To me, they seem
21 like two different things.  How -- what's the knowledge
22 that you have about productivity?
23     MS. SHOFFNER:  Objection as to form.
24 Foundation.  It's your statement contained and
25    sentenced maybe you should explain it to him.

Page 137

1  BY MS. BROWN:
2      Q    You can answer, Commander Moore.
3      A    Okay.  Depending on the nature of a -- a BIA
4  investigation and the allegations that are presented to
5  us.  You know, sometimes we handle cases that -- that
6  come out of the detective divisions that related to --
7  to how investigations or conduct -- conducted, you know,
8  and they come out in -- in our administrative
9  investigation.  So aside from that, I can't speak to
10 what actually trans -- happens at the internal -- at
11 that particular division.
12     Q    Okay.  Are there -- were there instances in
13 which IAD investigated detectives for being, let's say,
14 suspiciously too productive in the way that they were
15 able to close investigations in the 1994 to 2002 time
16 frame?
17     MS. STALF:  Objection.  Form.  Foundation.
18     MS. SHOFFNER:  Objection as to form.
19     A    I'm not certain.
20     Q    Are you aware of IAD ever investigating a
21 police officer in the 1994 to 2002 time frame for having
22 a suspiciously high close rate for criminal
23 investigations?
24     MS. STALF:  Same objections.
25     A    No.  I am not.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 38 of 57 PageID #:85885
The Deposition of TIMOTHY MOORE, taken on August 26, 2021

138..141

Page 138

1    Q  Are you aware of IAD ever investigating
2  officers for having insufficient productivity in their
3  jobs?
4    A  I am not.
5    Q  Okay.
6      MS. BROWN:  All right.  So I just want to put
7  on the record, you know, just one last time, Robin,
8  I think that we're going to have to discuss bringing
9  back Commander Winstrom, or another possible witness
10  because some of the topics in which Commander Moore
11  was designated, in our opinion, he's not able to
12  speak to and I know you have a different opinion,
13  but I just want to put that on the record.
14      MS. SHOFFNER:  Okay.  Well, I do have a
15  different opinion.  And it's clear that the
16  deposition of Commander Winstrom was taken to
17  address all the issues related to how did the
18  detective division is operated, and he was the one
19  talked about all aspects of homicide investigation,
20  and he did talk about the role of supervisors and
21  that process.  Commander Moore is clearly the person
22  to talk about supervision as it relates to
23  discipline, which would seem to be with the
24  paragraph that he was designated for delineates,
25  making sure that the investment of seats that they

Page 139

1  investigation of CRS is notification to officers and
2  the fulfillment of -- of the penalties or
3  punishment. We can talk further about what -- I
4  mean, I would suggest that you -- to the extent that
5  you haven't read the deposition of Eric Winstrom,
6  that you do. And then perhaps, if there are issues
7  or questions that were unresolved or not addressed
8  in his deposition, then we can determine to what
9  extent, if any, in order to proceed.  I w --
10  strenuously -- I will strenuously oppose having to
11  reproduce another deponent, and particularly
12  Commander Winstrom again, that he would be the
13  person.  And if we can resolve your issue by some
14  sort of written questions, interrogatories, we can
15  address that -- we can -- we will consider that, but
16  that's where we stand at this point.
17      MS. BROWN:  Okay.  All right.  We can continue
18  to talk about it.  Okay.  The plaintiff has no more
19  questions for Commander Moore at this time.
20      MS. SHOFFNER:  All right.  Thank you. Anybody
21  else have questions?
22      MS. STALF:  No questions on behalf of the CPD
23  officer defendants.
24      MS. MONU:  No questions on behalf of Defendant
25  Megan Goldish.

Page 140

1      MS. ZEHNER:  No questions on behalf of County
2  defendant.
3      MS. SHOFFNER:  All right.  Thank you.  We do
4  want to -- we would like the deposition transcript
5  on this.  And we do waive signature.
6      COURT REPORTER:  You waive signature?  Okay. We
7  are off.
8      (DEPOSITION CONCLUDED AT 4:15 P.M.)

Page 141

1              CERTIFICATE OF REPORTER
2                STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page here of by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded stenographically and mechanically by
10  me and then reduced to typwritten form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability.  I certify that I am not a relative or employee
14  of either counsel, and that I am in no way interested
15  financially, directly or indirectly, in this action.
16
17
18
19
20     Aria Edwards
21
22  ARIA EDWARDS,
23  COURT REPORTER/NOTARY
24  COMMISSION EXPIRES:  03/23/2029
25  SUBMITTED ON: 09/07/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**Exhibits**

**Exhibit A_**
**Moore** 16:17, 20

---

**1**

---

**1** 17:5,6,10 29:16 34:19 42:4 74:11 130:20 133:7 134:17

**11:00** 7:5

**12:48** 75:19

**15** 47:12

**18-CV-8144** 7:10

**1992** 23:3,13

**1994** 18:9 23:21 24:19,25 25:12,21 28:19 29:1 35:9 36:6, 11 39:1 46:14 47:20 48:1,23 49:12 50:19 53:11,23 54:17, 21,25 55:12 56:16 57:9 59:11,19 60:5, 12 61:17 62:11, 21 63:11 65:3, 11 66:1 67:19 69:18 70:7 71:2,11 74:8, 15,20 75:21 76:8,20 79:11, 14 80:6,20 81:1,23 82:5, 12,23 83:2,4,8, 14 84:7,12 85:2,16,24 86:18 87:20 88:4,8,16 89:18,24 90:8, 23 91:6,12,16 92:2,9,16 94:10 95:6 97:4,13 98:12,16,22 99:16 100:13

102:18 103:24 107:19 110:7, 18,25 111:17 112:10,15,20 113:1 114:19 115:16 116:24 117:9,15 119:23 120:24 122:17 123:10, 15 124:22 125:9 129:13 130:7,25 131:16,25 132:13 133:2 135:18,23 136:4,9 137:15, 21

**1994-** 75:8

**1999** 23:7,8,13, 21

**1:21** 93:7

**1A** 18:12 133:24 135:2

**1F** 31:7 38:18 39:15,17 42:13 130:17 134:15

**1G** 133:20,24

**1H** 18:12 133:21,24 134:11

---

**2**

---

**2** 18:7 34:20 74:11 133:15

**20** 46:4

**2000** 25:12 46:14 92:2

**2001** 17:15 39:1 95:14,21

**2002** 18:9 23:5 24:19,25 25:22 28:19 29:1 35:9 36:6,11 47:20 48:1,24 49:12 50:19 53:11,23 54:17,21 55:12 56:16 57:9 59:11,14,19

60:5,12 61:17 62:11,22 63:11 65:4,11 66:1 67:19 69:18 70:7 71:2,11 74:8,15,20 75:8,21 76:9,20 79:11,14 80:7, 20 81:1,23 82:5,12,23 83:2,5,9,14 84:7,12 85:2, 16,24 86:18 87:20 88:4,9,16 89:18,24 90:8, 23 91:6,12,17 92:9,16 94:10 95:6 97:5,13 98:12,16,23 99:16 100:13 102:18 103:24 107:19 110:7, 18,25 111:17 112:10,15,20 113:2 114:19 115:16 116:24 117:10,15 119:23 120:24 122:17 123:11, 15 124:22 125:9 129:13 130:7 131:1,17, 25 132:6,14 133:2,17 135:18,23 136:4,9 137:15, 21

**2003** 23:25

**2006** 21:19,21 22:8,11 23:6,10

**2007** 60:23,24

**2017** 20:10 21:21

**2020** 20:10

**2021** 7:5

**206353** 68:24

**24th** 23:16,18

**26th** 7:4

**2:45** 124:14

---

**2:48** 124:20

---

**3**

---

**3** 17:5 34:20 74:11

**30** 106:6,8,11 109:7,9,23

**30(b)** 28:2

**30(b)(6)** 14:6 16:10,18 28:6 38:24 39:7 130:21

**30-day** 53:2

**311** 68:1

---

**4**

---

**4** 34:20

**40** 113:19

**4:15** 140:8

---

**5**

---

**5** 34:20

---

**6**

---

**6** 34:20

---

**7**

---

**7** 34:20

**7th** 23:3

---

**8**

---

**8** 12:18 34:20

**8101** 12:18 13:2

---

**9**

---

**92** 23:15

**93** 23:15

---

**933** 12:17,24

**94** 133:17

---

**A**

---

**a.m.** 7:5

**ability** 11:2,6, 21 68:9,13 105:5 119:24 131:24 132:5

**Absolutely** 84:11

**academy** 23:15 117:5

**accepted** 106:2

**access** 54:18, 22 55:1,10 76:7 80:17 81:13 82:2

**accommodate** 10:5

**accountable** 35:5 131:24 132:13,20,24

**accumulated** 105:22 115:17, 22 116:2

**accurate** 82:10 86:23 97:19

**accurately** 10:24 11:3,7 132:4

**accused** 100:22

**accusers** 134:12

**acronym** 57:6

**acronyms** 87:23

**acrym** 57:6

**act** 66:4 116:14

**action** 55:14 56:3

**actions** 132:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**active** 61:24

**actively** 87:17

**activities** 47:19 48:9

**actual** 57:2

**add** 40:2

**addendums** 12:18

**addition** 41:13

**address** 39:20 41:9,23 126:19 138:17 139:15

**addressed** 48:12 139:7

**administrative** 137:8

**administrator** 74:12

**ADS** 25:10 71:16 81:16 100:3 103:21 104:1,3,7,15,22 108:3 109:17, 18

**ADS'** 107:4

**advancement** 132:19

**advised** 123:25

**advocate** 99:25 100:7,8, 10,17,23 101:4, 5

**advocating** 100:17,18

**affairs** 12:12, 21 13:11,19,23 14:8 19:6,8,13, 23 20:2,7,9 21:14,19,24 22:7 47:11 49:4 54:4 55:6,20,25 56:23 60:15 61:10,13,14 63:8 70:21,25 71:11 72:10 81:11,15 87:4,7

100:11,20 101:7,13 102:14 103:10 107:11 109:14, 15 110:10 113:15 116:10 117:23 118:18 131:7,17

**Affairs'** 13:6, 13 57:19

**affidavit** 74:16, 17,21,22 75:2,8 97:6 123:8,16, 25

**affidavits** 123:21

**affirm** 8:16

**affirmative** 85:9

**agency** 62:2

**agent** 71:21 73:16,20

**agents** 71:18, 22 72:1,13,18, 22,24 73:5,25 74:3

**agree** 8:8,11 24:15 38:18 39:13

**agreed** 8:12,13 26:15 102:24 103:14

**agrees** 8:10 89:4

**ahead** 12:7 25:15 35:6 53:15 58:5 68:4 79:24 122:24 127:7

**albeit** 116:8

**alert** 115:16,21 116:1 117:2,8

**allegation** 51:22 66:11,16, 20,24 67:4,10, 23 88:3,23 99:10,12,14 107:9

**allegations** 61:20 62:22 65:2 82:6,11,18 86:19,24 89:19, 25 92:17 97:15, 20 98:2,13 114:8 115:5 119:4,14,18 137:4

**alleged** 83:25 90:23 118:15

**allegedly** 17:22 30:1

**alleging** 79:16 90:8 117:16

**amended** 16:18 131:12

**amendment** 131:8

**analysis** 80:21,25 81:20 125:25

**analysts** 81:12

**analyzing** 81:25

**and/or** 18:13

**annual** 81:3,5, 7 94:16,17 95:2 96:15 97:4

**annually** 117:8

**answering** 10:9

**answers** 9:12 11:12,19

**anti-corruption** 20:13

**anticipate** 9:19

**anymore** 127:17

**apologize** 43:5

**appearance** 7:11

**appearing** 7:18,22,25 8:4

**applicable** 131:1

**apprised** 48:25

**approval** 118:20,24

**approximate** 95:16

**approximately** 9:4 16:5 22:16 95:21

**area** 30:24 38:2 46:24

**areas** 38:2 39:1

**Aria** 7:3

**aspects** 39:11 138:19

**assault** 40:17 42:6 50:11 76:18,25 126:17

**asserted** 26:14

**assess** 111:15

**assigned** 19:5 20:13 21:17,25 22:3,11,14,17 23:12,14,15,17 24:1 26:25 72:13 116:21

**assignment** 19:4 20:5 22:10 54:6 57:2 68:8

**assigns** 19:24

**assist** 21:10 27:5,7

**assistant** 25:9, 11 71:13 100:2 103:11,18

**assisted** 21:8

**assisting** 24:7 28:14

**assume** 10:17 40:10

**Assumes** 129:15

**assuming** 126:23

**assumptions** 33:9

**attached** 81:19

**attachments** 113:17

**attempt** 82:5 86:19 89:19 97:14

**attend** 92:25

**attending** 7:12,16

**attention** 22:6 47:11 48:6 50:8 52:10 55:25 56:8,9 116:12 121:5,9

**attorney** 7:15 8:25

**attorney's** 69:22 85:17,25 119:24 120:3,7, 9,13,15,19,25 121:4,6,23 122:11,18

**attorney-client** 12:5

**attorneys** 16:7 70:1

**August** 7:4

**Authority** 60:17

**automatic** 50:22 51:23 121:22 122:10

**automatically** 119:13 120:24

**avenue** 81:5

**avenues** 55:19

**average** 56:20

**aware** 18:14 49:18 50:1,4 54:11 55:18 56:1,6,10 57:25 59:4,19 70:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

80:6,21 81:7
82:9 83:23
84:15 85:7,15
88:2,6,7,10
90:21 91:1,9,
14,25 92:19
98:11 122:16
125:2,8,24
126:4 131:16
137:20 138:1

**B**

back 17:6,18
26:21 29:18
49:15 54:1,14
57:9 68:21
69:12 75:18
80:24 87:24
88:16 90:9,22
92:8,11 95:9
103:9 104:13
108:2 115:10
116:24 117:4,5,
20 124:8,19
127:1,5 128:6,
10 132:25
133:8 135:15
138:9

barrel 123:2

based 40:19
63:9 79:9 126:1

basically
110:8 117:4

basis 85:4
119:7,11

begin 8:21 9:6,
23 10:1 118:5

behalf 7:19,21,
24 8:2 18:4,21
45:22 81:24
100:17,18
139:22,24
140:1

behavioral
117:2,8

believed
103:25 104:22

believing
60:20

bell 74:14

bells 74:13

beneficial
43:21

BI 56:8

BIA 12:13
21:12,17 56:9
59:5 63:8 81:11
97:8 100:3
101:7 108:3
121:11 122:1
123:5 137:3

binding 126:5
129:5 134:3

bit 9:18 17:7
60:2 93:15,18

board 110:3,9,
11,12

body-worn
132:22

book 46:20

books 105:19

bottom 32:12

Brady 51:11,
12,22 79:16,21
80:1,2,8 86:6,
14,20,25 87:15
88:3,8,18,23

Brain 117:12

break 10:4,6,9
75:11,13 92:21,
24 93:15,19
94:1,6 124:8

breakdown
97:9,11

bring 55:24
56:8,9 121:5,8

bringing 138:8

brings 116:12

broad 41:6,7
130:2

brought 47:10
48:6 50:8 52:10

Brown 7:14,15
8:10,23,25

12:14 16:13,16,
21 17:4,9,18
18:7 24:13,15,
16 26:16,20
28:6,11 29:15,
18 30:14,18
31:4 32:11
33:21 34:8,10,
16,22 35:8,22
36:1 37:25
38:17 39:13
42:10,20,25
43:3,6 44:7,11,
13,15,22 45:5,
9,12,13 50:17,
18 75:12,15,20
85:22,23 86:15,
17 92:22 93:1,
4,9,12,17,21
94:3,4 122:25
123:3,12,14
124:5,15,21
126:23 127:6,
13,19 128:2,4,
9,19,23 129:11
130:5,12,18,22
133:7 135:11,
13 137:1 138:6
139:17

Bureau 12:12,
20 13:5,11,12,
19,22 14:8
19:5,8,13,22
20:1,6,9 21:13
22:7 47:11 54:4
55:6,20 57:18
61:12,14 72:9
87:4,6 100:11
116:10

**C**

ca 115:7

call 58:9 84:4
92:24

called 68:1,25
100:16 117:12

calling 127:15

calls 127:9
134:7

camera 132:21

cameras
132:23

capacity 46:3
87:9

card 54:3,5

carried 46:8
47:6 109:11

carry 46:25

carrying 48:16
110:19 111:16

case 7:10 14:3,
5 15:6 21:6,9
27:17 47:2,9
50:6,10 53:1
58:8 68:23
70:24 76:17,18
84:18 87:15
95:4 97:10
100:1,4,21
101:3,5 102:10,
11 103:9
104:14,16,24
105:10 108:2
110:10 113:16,
18 114:7
117:24 118:21
119:11,24
120:16 121:3,
10,21 122:10,
17

case-by-
119:11

case-by-case
119:6

cases 20:25
21:2,5,9,10
22:2,4,5,6 24:7
40:17 50:4,6,7,
9 52:1,3,6,9,16
63:5,6,7 68:23
75:1 77:6 81:14
85:10 95:5
96:4,7,10 97:8,
12 100:11,20,
24 101:21
102:6,8,12
107:10,25
108:23 110:8,
15,16 116:13
120:6,8 121:12
126:17 137:5

casework
87:17

categorically
40:20 41:2

categories
44:23 63:10
64:12,18,19
65:2,6,22
76:14,23 81:8
124:23 125:3,
10

categorized
88:1 89:23
97:25

category
20:16 63:9
64:9,17 65:7,9
75:23 76:9 77:6
78:3,4,5,9,10,
13,19 79:3,6,
11,19,20 80:1,
6,10,13,23
98:6,7 121:12

cell 127:16

cetera 30:1

chain 24:24
25:13,20 71:10
74:6 100:22
108:12 115:6

chance 10:1
11:12,15 93:23

change 18:12,
18 60:16 61:15
65:25 104:16,
17

changed 60:20
133:2

channel
100:12,21,24
101:1,15,20
102:1,6,9,25
103:6 104:17,
19 107:4
108:24

channeled
68:3

channels
102:12



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charge 26:8 27:3,6 121:1 122:12,19

charges 120:8 121:23 134:13

chat 127:24,25

Chicago 7:8, 19,25 14:18,19 15:15 16:19 18:4,13,21,24 21:17 22:9 23:2 29:2 32:13 35:10 36:6,23 45:22 46:16 59:23 60:4,12 61:19 62:17 70:10 72:24 79:11,15 81:24 82:17 84:17,18 85:5,11,17,25 86:19,24 87:5 89:4 91:21 92:2 97:14,20 98:17, 23 107:8 110:3 111:20,22 112:4,9,10 113:3,11 117:17 126:6 130:15 132:11 134:4

Chicago's 131:23 132:5

chief 12:13 14:20 15:11,14 19:11,12,24 25:10,17,18,23 38:13 74:12 81:15 101:11 103:11,15,18

chiefs 25:24

circumstances 70:12 120:2

citizen 67:20, 22,24 68:1

city 7:7,19 8:13 14:18,19 16:19 18:4,21 32:13 46:15 61:19 62:5,14 70:8 72:24 79:10,15 80:21 81:24

82:1,5,11 85:17,24 86:18, 24 87:5 89:4, 19,24 97:14,19 98:1 111:22 112:4,8,21 126:6 130:15 131:23 132:5 134:4

city's 17:10 62:8

civil 64:6 69:9, 16 117:16,19, 24 118:3 119:4, 7,13 123:4,5, 19,20

claims 54:11

clarification 55:12 113:22

clarify 53:24 55:1 115:14

clarifying 47:16

clauses 42:14 43:8

clear 26:13 27:9 33:11 91:15 103:23 138:15

clearing 87:18

close 80:3 137:15,22

closed 27:9 104:20 105:11 108:1

closer 104:12

closest 79:4

closure 101:4

code 64:9,13, 19 78:3,4,5,9, 10,13,19 79:3, 6,11,19 80:6

codes 63:9 64:17 65:7,10 77:6 79:20 80:1,10 98:6,7 121:6

coding 77:12

coercion 64:1, 10,14

collected 81:7

collectively 41:17

command 24:25 25:13,21 50:8 52:2,10,17 53:3 71:10 74:6 100:12,20,22, 24 101:1,6,15, 20 102:1,6,8, 12,25 103:6 104:17,18 107:4 108:12, 24 115:6

commander 7:20 9:2 11:24 16:23 18:23 19:2,6,17 20:1, 14 25:6,8,18 30:12 31:7 32:14,16,25 35:3 36:2 37:19,21 38:1, 8,11,23 42:13 43:9,10,16 45:14 49:18,22 50:1,4,23 51:24 52:13 54:9 73:14 75:21 92:24 93:10 94:5 101:7 124:22 127:2, 11,19 129:6 130:24 135:14 137:2 138:9,10, 16,21 139:12, 19

commander's 19:15

commanders 25:24 73:12

Commando 34:5

commencing 119:20

comment 45:5 128:18

common 42:23

communicate 14:18 28:20

community 22:17 58:19 59:23 125:16 126:3

comp 119:18

compare 132:18 133:5

compared 73:3 132:24

compensatory 105:19

compiling 96:19

complainant 74:17,22

complaint 48:25 49:6,13, 19,24 53:6,12, 13 54:18 56:7 57:10,13 58:25 59:5 62:17 67:2,7,25 68:2 69:1,4,10,19,23 70:3,16,20,24 71:1 74:18 75:23 76:10 77:11,14 78:15 80:17,22 84:23 88:18 89:23 90:7,10,22 91:17 92:10,12 95:7,12 97:10, 25 99:18 102:17 103:25 104:4,7,9,10, 11,22 107:6,10, 20 108:10,19, 22 109:6,22 110:20,22 111:3,24 112:12,22 113:3,19,24 114:16 115:3, 18 116:3,16 117:21 120:12, 23 121:19 125:18

complaints 17:23 22:4 30:2 49:16,21,23 50:21 52:19 53:9 55:15,22 56:2,15,25 58:4,19 59:3,22 63:3,12,14,23 65:19 66:6 67:18 68:3,7, 10,14,18 69:3 70:13,14 71:3, 5,8 75:7 76:3, 10,15,24 77:13, 16,20 79:16 80:8,22 82:1 83:14 92:17 101:16 102:2 110:3,21 111:1, 9,16 112:5,12, 18 113:10,20 114:20,21 116:11,15 124:24 125:6, 13,15,19 126:1 133:1

complementary 112:2

complete 11:20 52:21 57:21 87:25 113:23 128:21

completed 36:12 107:10

completely 41:6 106:22 120:11

completeness 126:10

completing 113:13

complex 73:6, 20

compliment 54:4

component 70:22

concerns 28:17,20 33:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**CONCLUDED** 140:8

**conclusion** 114:15 127:10 134:7

**concur** 101:9 103:1,7

**concurred** 103:5

**conditions** 11:6

**conduct** 13:1 35:4 111:7 133:10 134:5 137:7

**conducted** 84:19 137:7

**confidential** 21:25 70:23 72:10 120:5 121:11

**connection** 110:21

**consideration** 111:4,6

**considered** 28:13 94:21 111:10 122:6

**consistent** 77:10 96:10

**consult** 120:7

**contacted** 67:20,21

**contained** 57:2 136:24

**content** 38:21

**contents** 15:22

**context** 39:22 40:7,23 41:1 44:10,12,13,16, 17 111:2 126:21

**continue** 68:6 72:7 77:18 139:17

**continued** 58:12

**contravention** 89:9

**convened** 7:5

**conversation** 9:17 15:7

**conversations** 12:4

**Cook** 7:23 8:3

**coordinators** 74:12

**COPA** 61:2 65:6,8

**copy** 57:18

**correct** 10:21 11:3,7,8 13:7 14:1,2 16:16 18:24 20:17 21:22 22:22,25 23:4,22 27:10 36:14 38:18 39:15 49:8,11 53:5 56:3,4 61:10,11,13,16 63:1 65:14,16, 17,20,23,24 66:14,15,18,22, 23 67:3,8,9 69:1,2,20 70:2, 5,6 72:17 74:25 76:22 82:20 87:8,10,11,21, 22 90:25 91:19 92:5 96:8 99:5, 6 100:15,25 103:3,16,21,22 104:1,6 106:13, 16,17 107:1 110:14,17 111:11,13,18, 22 112:7,14 114:9,12,17 118:4,7,11 119:1,16 121:17 123:18, 23 130:11 136:12

**corrected** 48:8

**corrective** 84:8,13

**could've** 60:25

**counsel** 7:13 11:25 15:23,24 16:8 38:20 89:14 123:24

**counterparts** 27:7

**county** 7:23 8:3 24:5 140:1

**court** 7:2,3,9 8:5,8,14,20 9:10,20 16:10, 12,14 29:17 35:15,23 75:18 80:11,12,14,16 83:24 86:3 93:5,7 121:7, 13,18 122:3,6, 9,22 124:17,19 127:1,4,15 128:7 140:6

**courts** 80:11

**cover** 41:9 124:6

**covered** 30:11 37:19

**covers** 28:7 34:19 41:5 42:7

**CPD** 7:22 8:11 24:5 139:22

**CR** 53:19 54:2 55:4 58:10 70:5,21 88:14 95:16 103:7 111:11,16 114:24 115:22 123:6

**creating** 81:25

**creative** 78:23

**crime** 17:22,24 18:14 29:22 30:16 31:9 32:4,7,17,19 33:25 34:12 40:16,21 90:3

**crimes** 41:4 44:1 126:17,18

**criminal** 20:19, 22,23 22:1 45:16,23 46:17 50:6 51:19 52:6 64:11,12 70:22 77:11 80:16 83:24 86:11 88:13 91:5 107:10 120:4,6 121:21 126:11 134:11,13 135:3 137:22

**criminal- related** 50:4,9

**criteria** 119:2

**criterion** 53:7

**CRM** 57:7,11 76:12,14 77:4 78:20 81:14,17, 19 87:14,16

**CRM's** 76:7

**CRS** 95:14,22 139:1

**curious** 93:13

**current** 110:22 111:3

**custody** 63:18, 19

**customs** 17:12 18:11 39:2 133:18

**cut** 68:5

**CV** 49:2

**— D —**

**daily** 22:15

**database** 56:22,24 57:5, 11,20

**date** 60:19 61:1

**dates** 18:16

**Davis** 8:3

**day** 7:4 102:6 116:7,8,9

**day-to-day** 33:14 46:25 47:18,21

**days** 105:13, 17,19,21 106:6, 8,12 109:7,9,23

**deal** 40:2

**dealing** 40:3,5 77:15

**dealings** 46:11

**deals** 39:17 42:23

**deaths** 63:18, 19

**December** 23:3

**decide** 106:24 120:12

**decided** 99:17 104:16 107:19, 22

**deciding** 112:3

**decision** 99:20 103:12,16 106:19 108:3 109:3 112:9 118:9

**decline** 106:19 123:21

**defendant** 7:24 8:3 51:19 86:11 121:21 139:24 140:2

**defendants** 88:13 139:23

**definition** 86:11 89:14

**delineated** 95:4

**delineates** 138:24

**demanding** 74:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**denominator**
95:15

**department**
12:10,19 15:15
17:25 18:13,24
21:18 22:9 23:2
29:2,22 30:6,22
33:7 35:10
36:7,24 38:16
39:10 41:6,16,
18 42:7,22
45:22 46:15
52:9 60:5,12
62:3,7,18 69:10
70:10 75:24
76:4,11 80:22
81:9 82:12,17,
18 84:19 85:5,
11 86:25 88:19,
23 91:10,21
92:3 97:16,21
98:17,23 99:15
105:4 106:2
107:8,12
108:21 110:4
111:20 112:10
113:4,11
115:17,22
117:17,23
125:14,20,21
126:2 131:6,12
132:12 134:23

**Department's**
131:17

**depending**
49:19 77:3
99:25 107:9
119:7,10 137:3

**depends**
70:18,25 98:6
109:5 120:10
134:24

**deponent**
139:11

**deposition** 7:6
9:1,7 11:24
12:16 13:9,16
14:6,10,15,19,
25 15:3,5,9,16,
25 16:19 30:11
34:5,7 38:11
43:14 45:10
138:16 139:5,8

140:4,8

**deputy** 25:9,
10,11,18,24
71:14 100:2
101:11 103:11,
15,18,19,20

**describe** 24:24
68:17 71:10
74:6 101:2
110:6

**description**
19:21

**descriptions**
135:24

**designate**
32:23 38:17
39:14

**designated**
28:3 31:7 32:14
33:2 34:13 38:7
41:10 42:12
126:10,19
138:11,24

**designed**
39:20 41:20

**detail** 31:21

**detecting**
135:6

**detective** 27:2,
5 28:25 29:12
30:13,21 31:22
32:4,18 33:15
35:4 36:18
37:22 39:6,11
41:2,11,19
43:22 45:17,24
46:19,24 47:5,
24 126:14
129:18 137:6
138:18

**detectives**
17:21,24 18:13
25:13,17,19
26:9,25 27:4,24
28:14 29:21
30:4,15 31:8
32:7,17 33:24
34:11 35:3
36:13 37:15
38:6,13,14

40:21 41:16
42:16 43:14
44:8,9,18,25
45:15,23 46:17,
21 47:1,19,25
48:15 120:5
126:8 129:22
130:4 136:14
137:13

**determination**
104:1 120:17
121:13,18

**determine**
90:7 106:24
117:25 119:3
133:12 139:8

**determined**
63:3 103:8
121:10 122:8

**develop**
115:25 118:2

**developments**
29:3,10 35:11
36:8

**difference**
71:24 72:2

**differently**
32:10 40:19

**difficult** 9:20

**DIRECT** 8:22

**directed** 41:14
43:23

**directly** 23:8
67:21

**director** 25:10

**disciplinary**
33:13 47:7
54:22 105:15
106:20,25
111:23 112:1
113:15,21
114:5,6,13,18,
25 115:2,12
126:11,21
129:8,10

**discipline**
17:21 29:24,25
31:18,20 39:18

40:4,6,7,24
41:1,24 42:14
43:8 44:18,19
48:2,3,9,22
58:17 104:8,23
105:6,10,12
106:1,4,9,15
107:7 109:3,10,
19,22 110:13
111:20 112:4,6,
9 114:20,24
129:8 131:2,12
132:6 134:16
136:17,20
138:23

**disciplined**
83:9,15 88:8
92:3 98:24
104:25 108:21

**disciplining**
39:21,23 40:1
106:5

**disclose** 86:10

**discovered**
122:20

**discretion**
106:23 120:12

**discuss** 31:12
138:8

**discussed**
12:3

**disprove**
99:11

**dispute** 130:14

**disrespect**
58:11

**district** 7:9
20:21 22:12,24
23:5,8,16,19
49:18 54:5,14
67:25 101:8

**dive** 122:4

**division** 25:5
29:12 30:13
33:15 37:22
39:6,11 40:11,
13,15,20 41:3,
5,11,15 43:25
44:1 45:17,25

46:20 47:24
49:4 55:25
56:23 57:19
60:15 61:10
63:8 70:21
71:11 100:19
101:7,12,14
102:15 103:10
105:15 109:14,
16 113:15
118:18 126:13,
14,18 129:18
137:11 138:18

**Division's**
55:7

**divisions**
40:18 137:6

**document**
16:11,22 86:9

**documentatio
n** 59:2 135:2,24

**documents**
14:13,14 131:9
132:3

**domestic**
63:16

**drawing**
112:17

**drug** 49:25

**due** 43:16

**duplicative**
35:2 37:18
38:21 39:3

**duties** 48:16

_____

**E**

**earlier** 8:24
33:23 99:2
129:17 136:16

**easier** 78:12
132:20,23

**Edwards** 7:3

**EEOC** 22:4

**efficient** 43:21

**effort** 14:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

91:2

**elaborate** 52:1

**employed**
18:24

**employee**
57:14

**employees**
14:17,18 15:16

**encompass**
79:5,21

**end** 40:3 43:14

**enforcement**
20:20 23:24
83:22

**engage** 17:22

**engaged** 30:1

**ensure** 48:15

**entered** 77:13

**entering** 59:1

**entire** 40:13
41:5 42:21

**entities** 60:3,
10 61:18

**entity** 23:24
30:22 38:15
61:5 63:2 70:9,
15

**equipment**
125:4

**Eric** 14:25 15:2,
14 30:11,12
34:5 38:17
39:14 139:5

**established**
78:5

**et al** 7:8

**evaluating**
111:19

**everyone's**
9:8

**evidence**
66:17 88:12
99:9 129:16
133:11

**exam** 74:1

**EXAMINATIO
N** 8:22

**excessive**
21:7,9 49:23
63:12,14,22,23
64:5,6,7,8
65:16,23

**exchange**
29:13

**exculpatory**
51:18 66:17
86:8,9,10 88:12

**excuse** 24:10
120:21

**exhausted**
34:6

**exhaustive**
34:18 38:22

**exhaustively**
30:11 39:10

**exhibit** 16:9,
17,20 24:11
29:16 35:22,24
130:20 133:7

**existed** 17:15
56:24

**exonerated**
95:10 99:4,13
101:17 102:7

**expected**
28:19 35:11
36:7 37:14 42:5
46:21 48:14
129:21

**experience**
79:10 123:4,7,
20 125:1

**experienced**
73:7 83:22

**expertise** 28:5
29:6 33:1 38:2
39:5 129:24

**explain** 99:7
136:25

**extend** 26:17

**extensive** 41:4

**extensively**
34:6 41:12

**extent** 15:6
25:15 41:14
86:13 127:9
139:4,9

**eyewitness**
66:12 82:22
83:1,10,24 86:2
135:24

**eyewitnesses**
136:5

—————

**F**

**fabricated**
66:21 98:17,24

**fabrication**
50:12 51:8
97:15,20 98:2,
13

**facilitate**
105:15

**facing** 134:12

**fact** 8:9 34:15,
17 57:2

**facts** 129:16

**factual** 99:13

**failed** 37:15

**failure** 86:7,9

**fair** 10:10,11,
18,19 11:21,22
37:9,12 47:17
52:18 53:18
62:9,12,15,21
65:11 66:4,10
90:6,21 92:1
119:12 135:7

**fairly** 96:10

**false** 76:3
99:13

**familiar** 26:3
28:24 46:9
51:12 69:13
74:9 83:3 89:17
90:13 125:12

134:22 135:4

**FBI** 20:19 24:1

**FBI's** 20:13

**FBIA** 104:20

**FD** 103:4

**fell** 63:6 64:12
66:6

**fellow** 46:6

**field** 22:15,19
25:25

**figure** 38:4
43:11 90:22

**figuring** 83:13

**file** 53:12 57:18
67:11,12,25
68:2 69:10
77:12 86:8
89:3,8,20 90:2,
10,15,18,19,23
91:5,11,12,17,
23 92:4,11,17
104:5 107:20
110:20 113:17,
18 117:19

**filed** 69:8,9
80:15 83:23
117:16 123:6,
19

**files** 67:13
69:19 89:5,7,
11,23 90:1
91:4,18 97:25
115:3

**filing** 119:12

**fill** 11:16

**filtered** 63:5

**final** 103:12
106:9 108:3
109:10

**finance** 105:15

**find** 78:25 79:3,
6 80:2 85:9

**finding** 53:13,
20 54:2 79:8
91:21 102:17,
20,25 103:2,6,

15 111:21
114:22,23
115:9 120:22

**findings** 53:21
54:13 115:13

**fine** 10:5 26:16
43:5 124:11

**finish** 9:22
10:1,8 34:25
43:7 101:10
126:15

**fis** 63:24

**fit** 72:18,21

**five-year**
118:22

**flag** 115:17,21

**flip** 10:16

**flyers** 116:12,
24 117:1

**follow** 12:19
37:16 71:15
106:19,24

**force** 20:14
21:7,9 24:1
49:23 63:12,14,
22,23,25 64:5,
6,7,8,21 65:16,
18,23

**foreign** 60:6

**form** 15:17
25:2,14 26:11
27:15,25 28:4,
23 29:5 35:13,
14 36:15,21
37:2 45:4,18
46:1,18 48:18
49:9 50:15
51:2,6,9 52:22
53:15 56:17,18
58:5 59:24
62:13,19,25
64:4 66:9 67:15
69:6 70:17
75:3,25 77:24
79:17 81:10
82:8,14 84:2,24
85:14 86:21
87:1 88:5,25
89:21 90:4,11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

91:7,13,24
92:6,14 95:18
96:12,24 97:17,
23 98:4,19
103:17 105:1,8
108:13 111:12,
25 112:23
115:24 118:17
121:2,24
122:13 123:9,
22 124:1 125:7,
22 126:9
128:24 129:4,
15,23 130:9
131:3 132:1,9,
15 134:6 135:8
136:23 137:17,
18

**formal** 49:5
75:22 89:8 90:2
91:4 113:14

**formalized**
116:5

**forward** 38:4,9
88:3 98:12
118:19,21
119:10 123:2

**found** 14:11
82:22 83:1,5
85:12 88:12
98:16 104:7

**foundation**
15:18 25:3,15
26:11 27:15,25
28:4,23 29:5
35:13,14 36:21
37:2 45:18 46:1
48:19 49:10
50:15 51:2,6,9
52:22 56:18
59:25 62:13,19
64:4 90:12 91:7
92:6,14 95:19,
23 96:13 98:20
105:2 108:14
112:23 115:24
121:24 122:13
123:10 124:2
126:10 128:24
129:4 131:4
132:9 134:7
135:9 136:24
137:17

**frame** 24:18,
19,21 25:1,13,
22 28:19 29:1
36:11 48:1,24
49:12 50:19
53:11,23 54:2,
21 55:13,17
56:16 57:10
59:11,12,16,19
60:5,13,21
61:17 62:11,15,
22 63:11 65:4,
12 66:2 67:19
69:19 70:7
71:2,12 74:8,
15,20 75:8,22
76:4,9,21 79:14
80:21 82:5,13,
23 83:2 84:7,12
85:2,16,24
86:18 87:20
88:4,15,17,19
89:18,24 91:6,
12 92:9,16
94:11 95:14
97:5,13,22
98:12 102:19
103:24 110:7,
18,25 111:17
112:11,15,20
113:2 114:19
115:16 117:10,
15 119:23
120:24 122:17
123:15 124:23
125:9 129:14
130:7 131:5,14,
21 132:14
135:7 136:10
137:16,21

**frames** 133:5

**framework**
48:1

**frankly** 40:5

**fraud** 20:25
21:1,3 50:10

**frequent**
116:12,23,24
117:1

**fro** 83:15

**front** 13:18
64:17 131:9

132:3

**fulfillment**
139:2

**full-fledged**
117:25

**fully** 131:10

**funneled** 68:8

**future** 26:14

---

**G**

**gambit** 77:3

**gang** 17:21,24
18:14 25:4,7
28:14 29:22
30:15 31:9
32:5,17,18
33:24 36:13,18
37:15 38:6
40:21 42:16
43:13 45:1
47:19,25 48:15
126:7 129:13
130:8 135:6

**gangs** 24:25
26:9 34:12

**gatekeeper**
66:5

**gave** 74:1

**general** 12:11,
17 13:8 17:11
18:10 19:20
37:3 39:2 45:19
62:6,14 70:8
72:10 126:25
131:6 133:18
134:21 135:10

**General's**
61:23 62:4,8

**generally**
40:10 55:22

**generate**
69:23 70:5
121:9

**generated**
69:19 97:11
117:21 118:1
125:19

**generating**
55:14 58:3,18
59:21 82:3

**give** 8:16 9:14,
25 11:11,15
12:2 16:12
19:20 31:11
45:21 50:20
53:1 56:14 69:3
96:3 97:9
104:10 126:5
127:4 128:7
134:3,9,19
136:2,13

**giving** 10:21
14:7

**Goldish** 7:25
139:25

**good** 7:14,17
8:24 93:4 94:2
101:22 124:5,
15

**grab** 16:10

**granted** 84:21
85:4,10,19 86:3

**great** 17:17
21:16 35:24

**greater** 106:6,
11

**ground** 9:7

**group** 30:25

**guess** 19:3
22:24 33:17
37:9 48:13
71:16 78:22
101:23 107:24
134:18

**guidelines**
99:15

**guys** 31:5

---

**H**

**half** 74:25

**half-an-hour**
124:8

**hand** 8:15

**hand-in-hand**
120:19

**handle** 63:8,
15,16 65:12
71:6 72:3,14
73:5,9 120:18
137:5

**handled** 22:1
62:23 63:6,13,
20 65:6,19,22
66:18 67:2,7
70:22,24
120:16 121:15

**handles** 65:9
121:10

**hands** 109:4

**Hang** 12:1
92:20

**happen** 104:9
117:20

**happened**
58:12 118:12
131:13

**happening**
59:2 131:16

**happy** 10:14
36:5 38:3

**harassing**
37:20 58:9

**hard** 46:22
47:13 57:17
72:20 93:21
122:3

**harm** 67:5

**hate** 65:5

**head** 9:13

**heads** 37:22

**hear** 17:2 100:5
127:11,20,21
128:1,3,11,12

**heard** 89:11
117:12

**held** 66:25

**helpful** 44:22

**helps** 101:24



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hey 52:14 60:8

hierarchy 72:19

high 22:6 55:15 56:2 58:3,18 59:22 115:22 124:24,25 137:22

high-frequency 115:18

higher 125:5, 15

higher-ups 27:18,20

highest 104:3

histories 54:18,22 112:13

history 57:11, 13 78:16 111:9, 15,23,24 112:2, 5 113:3,16,19, 21,24 114:5,6, 14,18,25 115:2, 12,13

hold 123:12 131:24 132:20, 23

holding 66:25 132:12

home 58:25 105:21,24

homes 58:24 59:1,6

homicide 26:4, 7,23,24 28:8, 12,18,21 29:4, 8,10 33:25 35:12 36:8,18 37:6,10 42:3,4, 5,9 43:22,24 44:1,4,20 46:7 126:14 133:10 134:5 138:19

honestly 83:21

hours 16:3,4 41:11

house 57:12 68:2

housed 49:3 56:22 57:18 76:12 77:4

hung 127:18

hungry 93:25

hypothetical 121:25 122:14 130:10

I

IAD 61:9,12,18 62:9,24 63:4 64:22 65:1,3, 12,19 66:8,14, 18,22 67:2,8,14 68:13 69:5 70:8,15 71:4,7 74:21 76:8,13 81:6,8,24 82:21 83:1,5,9,14 84:7,13,22 85:6,8 87:7,9, 19,22 88:2,7, 11,17,23 91:1, 16,20 92:10,16 94:13,21,25 95:4,7,16,22 96:10,16 97:5,9 98:12,16 99:2, 16,21 102:18 104:4 105:5,25 106:9,14 107:17 108:7, 12,22 110:20 111:14 112:16, 25 113:2,8,9,25 114:10,13 115:16,25 117:17 119:5, 14,23 120:12, 23 121:19 122:5,17,20 123:5,16 125:9, 24 133:1 137:13,20 138:1

IAD's 71:5 106:19,24

idea 95:25

identific 86:2

identification 16:20 66:12 82:23 83:2,10, 25 84:17,19,20, 22 85:3,5,13,19 86:2 116:24 135:19 136:8

identifications 83:24 84:9,14 85:10

identified 18:11,15 39:16, 17 78:21 117:1 133:19

identify 79:1, 12 89:25 98:1 116:25 133:17

Illinois 7:10,16 8:1,4 20:21

impact 11:2,6

impacted 131:23

impose 111:20 112:4

imposed 107:7 114:20

improper 85:12 92:10

improperly 91:11,22 92:3

improprieties 84:21

improve 132:6

inappropriate 44:6

incentivized 134:12

incident 63:13

inclu 63:24

include 44:25 63:25 77:22 94:18 114:19, 21 115:2 134:15

included 65:15 113:16

includes 31:8 97:5 133:19,24

including 17:25 18:15 29:22 30:4 133:10

incoming 116:11

incomplete 121:25 122:14 128:17,18,21 129:3 130:10

incompleteness 130:10

incorporated 90:2 91:4

incorrect 33:10,17

Independent 60:17

independently 30:24

index 54:3,5

individual 32:6 57:1

individually 7:22

inform 18:17

informal 116:18

information 11:9 44:23 48:10 49:2 51:18 55:5 56:14,22 57:10 77:19 81:6,13 86:8,9 96:20 117:24 118:3 125:18

informed 18:16 67:22

infractions 80:12 125:4,5

initial 107:24,

25

Initially 21:25 22:14

initiate 68:9,13

initiated 69:11 125:13,15 126:1

inspector 61:23 62:4,6,8, 14 70:8

instance 58:1, 14,15,22 59:18 70:19 82:25 88:7,11 91:20 98:22 122:16 130:14

instances 91:10 137:12

instruction 12:2

insufficient 138:2

intake 116:9,22

inter 95:16

interact 117:6

interest 43:20

internal 12:12, 21 13:5,11,13, 19 14:8 19:5,8, 13,23 20:1,6,9 21:13,19,24 22:7 47:11 49:4 54:4 55:6,20,25 56:23 57:18 60:15 61:10,14 63:8 70:3,21,25 71:11 72:10 81:11,15 87:4,6 100:11,20 101:7,13 102:14 103:10 109:13,15 113:14 116:10 118:18 126:18 131:7,17 137:10

internally 125:14



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

interrogatories 139:14

interrogatory 41:8

interrupt 34:24 43:1,4

interviews 135:3

inv 61:25

invasion 59:1

inventorying 135:19

inves 108:8

investigate 21:6 42:1 63:10 65:3 70:16 73:14 74:18 117:17 118:10 122:2

investigated 63:4 64:22 65:1 66:14,22 67:14 69:5 75:1,7 88:18 91:11 92:10 107:21 119:19 121:19 137:13

investigating 20:24 21:5,8 39:9 40:7 60:4, 11 61:19,25 70:9 73:12 91:16 102:11 110:22 111:3 137:20 138:1

investigation 13:1 26:5,8,10, 23,25 27:1,3,6, 14 28:13,15,18 29:4,10 31:22 32:8 35:12 36:8,19 38:25 41:1 42:3,5,9, 23 44:20 46:7 54:8,13,14 58:2,17 59:21 68:11,14 70:19 71:20 74:23 80:17 88:14,22 89:8 91:5 95:8

99:18 101:10 102:18 107:11, 23 109:11 110:19 111:5, 11,17 113:14 114:13 117:25 118:5,19 119:4, 11,14,21 120:10,23 122:6,8,20 131:18 133:10 134:5 135:4 137:4,9 138:19 139:1

investigations 13:6 14:8 19:22 20:16 22:1,3 24:8 28:9 29:8 33:25 35:4 37:6 42:6 43:23,24 44:4 45:16,24 46:17 49:1,7 62:11,15,17 71:12 72:4 73:6,9,20 74:7 79:10 88:2 94:14,15,18,21 95:1,2,12,17 96:10,17 97:5 98:11 99:3 108:5 114:11 115:23 123:16 126:16 134:1, 12 137:7,15,23

investigative 13:23 22:2 28:21 37:14 61:13 72:12,14 73:5 89:8 90:2 91:5 102:22

investigator 26:4,7,22 27:1, 8,12,16,19,22, 23 28:12,20 44:2 56:20 74:11 99:19,24 102:17,23 103:5,14,24 104:13 108:1,6, 11 109:19 111:11 113:2 114:7,14 115:4

investigator's 99:22 108:25

111:15

investigators 27:4 73:23 74:10 99:11 113:13

investment 138:25

investor 102:16

invidi 57:1

involved 32:7 42:8 61:19 62:1 70:9 96:19

involving 22:5 73:10 80:8 97:6 120:20

IPRA 60:17,18, 21,22 61:2,6 65:8 95:4

issue 30:10 32:19 33:1 34:6 127:14,21 139:13

issues 37:19 39:21,24 41:15, 23 123:1 138:17 139:6

---

J

Jessica 8:2

job 19:21 48:16 105:23 111:15

jobs 138:3

John 7:7,15 8:25

Johnson 52:14

join 23:1 51:3 86:16

joined 26:12

Joint 24:1

July 20:10

jurisdiction 65:13,15,25 66:7 70:14,15

juvenile 43:25 126:16

juveniles 42:6

---

K

K-O-N-O-W 15:13

Karen 14:20 15:11 19:11

keeping 48:24 55:18 64:1

kind 24:6 49:24 50:10,21 64:11 66:5 67:1,7 71:15 72:3,20, 21 73:16 76:2 78:11 84:23 100:6 111:19 112:3 116:17 117:3 122:10

kinds 20:23 49:21 50:20 76:24 78:18 81:25 125:6

knowing 88:17 92:8 96:4

knowingly 66:21

knowledge 27:17 28:16 31:11 32:16 37:13 43:12 45:15 47:17,18, 23 48:17 55:21 56:24 57:20 82:4 91:16 112:25 136:7, 21

Konow 14:20 15:11,13,14 19:11,12

Krista 7:21 35:18 127:21, 22

---

L

lack 75:2,8

language 32:14 42:13 79:21

large 116:2

lasted 22:18

late 124:10

launch 68:10

laundry 65:7

law 20:20 23:24 83:22 117:23 119:15

lawsuit 69:8,9 117:16 118:5,8, 12,13 119:13, 17,18,20 123:5, 7,19,20

lawsuits 69:19

layer 110:6

lead 26:4,7,22 27:12,19,21,22, 23 28:12,20

leader 27:8

leading 52:25

leads 37:15

learn 40:8,9 54:8,16

learning 33:18

leave 135:11

left 23:14 74:2, 4 93:22

legal 107:11 110:10 117:23 127:9 134:7

lengthy 110:16

letter 133:9

letting 14:22

level 52:7 104:3 110:2

levels 107:2 108:20

levied 102:13 109:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

lieu 105:24

lieutenant 20:6,9,12 21:12,16,20 25:7,18 73:10

lieutenants 22:5 25:24 71:17 73:14

life 9:20

limitation 106:18

limited 18:15 46:3 63:24 133:11

lined 40:3

lineup 51:5 66:13 77:22 78:4,9,19,24 79:4,5,12 82:11,18 83:6, 16

lineup's 79:2

lineups 82:7 136:9

lion's 62:10

list 57:21 64:16,18 65:7 77:2,16,20 79:20,25 97:8 113:10

listen 52:14

lists 64:18

location 7:12

log 69:15 70:20 97:11 117:21

long 16:2 19:25 22:23 46:9 47:3 57:8 77:2

long-term 22:2

longer 75:13 93:14

lose 77:18

lot 12:23 13:12, 20 24:17 43:15 48:13 55:7 65:8

132:20

lunch 93:14, 15,19 94:6

lying 120:22 122:9

—— M ——

made 18:9,14 21:20 23:7,19 49:14,18 50:4 54:11 55:18 56:1,5,10 59:4 84:17 91:21 102:17 105:25 106:14 108:6 114:2 118:9 120:17,23 130:25 131:21 133:16 134:4 136:9

mailbox 54:7, 10,15

main 12:24 13:2

maintain 113:9,12

maintained 91:22

maintaining 67:11 89:7 90:1 91:3,11 92:4

maintenance 67:13 92:11

majority 21:2

make 9:7 33:9 37:17,23 42:10 44:13 50:23 54:5 55:5,8 58:24 89:9 103:12 108:1,3 113:14 122:1 128:20

Makers 117:13

makes 9:20 86:11 102:7 115:15

making 20:14

43:20 91:1 112:9 114:15 138:25

maltreatment 58:12

mandating 74:16

manipulated 66:12

manner 76:25

March 17:15 18:9 133:16,17

mark 7:18 16:17 118:22

MARKED 16:20

material 86:10

materials 119:10

matter 7:7 61:21 110:19 119:19 120:19

matters 61:25 62:2

Matthew 7:18

MBIA 73:23

Mccarter 7:18 75:10,14

measure 84:13

mechanism 75:22 76:8 79:15 87:16 116:1

media 22:6

medical 11:5

medications 11:1

meet 14:17

meeting 12:6

meetings 12:4 15:23 16:3,7

Megan 7:25 139:25

member 52:3, 7,11,12,17 53:1,3,16,21 55:22 56:6 59:6 69:9 88:19,23 91:10 98:16,23 101:6 105:16 106:9 107:7 108:21 112:9 113:21 117:16

member's 101:6 115:11

members 45:3 58:19 59:22 60:4,6,7 73:14 97:16 106:5 115:17,22 117:8 125:16 126:2

men 25:25 26:1

mentioned 76:25

met 15:24

mete 105:6 109:10

meted 109:11

method 90:22

methods 67:17

midnight 23:16

mind 11:14 50:2 58:7

minute 31:21 41:15,21

minutes 43:7 75:11,13,14,16 93:2

minutia 32:21 44:20

mis 38:25

mischaracteri zes 15:18 86:14

misconduct 17:22,23 20:19, 22,23 30:1,2 39:1,9 44:17,18 47:25 55:15

58:3,19 59:22 60:4,11 61:20 62:10,17,23 63:3 65:3 67:18,23 69:22 70:10 71:12 74:18 76:17 78:11,18 79:6 81:9 82:1,6,12, 17,18,22 83:1, 5,9,15,25 85:4 86:6,20,25 88:4,18 89:3,5, 20 91:18 92:17 94:14,15 110:21,22 111:1,7,9 117:16,18 118:14,15 119:8 131:18, 25 132:13

misleading 40:4 89:15

missed 35:15

mistaken 25:6

mistreated 66:25 67:5

mistreatment 50:25 64:20

modification 104:14 131:11

modified 131:8

moment 16:12 127:4 128:7

monitor 30:8,9 48:14 84:8,14 117:24 129:12

monitored 30:4,5 126:7 136:13

monitoring 47:19,24 48:8

monitors 17:25 29:23 30:6

month 22:16

months 105:23 116:16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 50 of 57 PageID #:85897
The Deposition of Memphis Moore, taken on August 20, 2021

153

**Monu** 7:24
122:22,24
139:24

**Moore** 7:7,20
8:5,7,9,14 9:2
16:23 18:23
31:7 32:14,16,
25 36:2 38:1,8
42:13 43:16
45:14 75:21
93:10 94:5
124:22 127:2,
11,19 129:6
130:24 135:14
137:2 138:10,
21 139:19

**Moore's** 43:10

**morning** 7:14,
17,20 8:24 15:3

**motion** 80:15
84:16,20 85:3,
18 86:1

**motions** 83:23
84:4,8,14 85:9

**move** 38:4,16
44:21 47:2
118:19,20
119:10

**moved** 11:11

**moving** 47:8

**muddles** 9:21

**multiple** 56:7

**muted** 127:22

**N**

**named** 7:22

**naturally** 9:18

**nature** 40:19
49:19 70:18,25
107:9 109:6
119:7 120:5,10
137:3

**necessarily**
27:18 105:21

**needed** 73:13

**nods** 9:13

**non-criminal**
61:20,25 62:2

**non-excessive**
65:18

**non-physical**
51:1

**non-verbal**
9:12

**Northern** 7:9
20:21

**notice** 16:11,
18 28:1,2,7
31:5,6 33:22
34:18 42:12,13
84:22 85:6,18
86:1 130:21

**noticed** 38:5

**notification**
49:22 50:22
51:23 52:2
139:1

**notified** 49:13
52:17 53:4,12,
16,19

**November**
20:10 21:21

**number** 7:10
17:5,6,10 18:7
29:19 54:2
55:15,22 56:2,
15,25 57:14,15
58:3,10,18
59:22 68:22,25
69:1,4,15,23
70:5,20,21
73:18 82:6
86:19 89:19
94:14 97:8,10,
11,12,14
108:20 112:17,
22 115:18,22
116:2 117:21
118:1 121:9
123:6 133:15
134:17 135:2

**numbering**
68:17,20 71:7,9

**numbers** 55:4
57:12,15,16
94:20

**numeral** 42:4

**O**

**oath** 10:21
120:22

**object** 32:13
38:7 49:9 52:22
86:13 89:13,21
112:23 127:8

**objecting**
32:25 45:5

**objection** 12:1
15:17 25:2,14
26:11,13 27:15,
25 28:4,23
29:5,11 31:6
35:13,14,16,19
36:15,21 37:2,
18,24 45:4,18
46:1,18 48:18
49:9 50:15
51:2,6,9 53:15
56:17 58:5
59:24 62:13,19,
25 64:4 66:9
67:15 69:6
70:17 75:3,25
76:5 77:24
79:17 81:10
82:8,14 84:2,24
85:14 86:21
87:1 88:5,25
90:4,11 91:7,
13,24 92:6,14
95:18,23 96:2,
12,24 97:17,23
98:4,19 103:17
105:1,8 108:13
111:12,25
115:24 118:17
121:2,24
122:13 123:9,
22 124:1 125:7,
22 126:9,24
129:15,23
130:9 131:3
132:1,8,15
134:6 135:8
136:23 137:17,
18

**objections**
42:12 92:18
116:4 127:1
128:17,25
136:15 137:24

**Obv** 51:25

**occur** 101:16

**occurred**
82:22 83:1,6
118:15

**offhand** 50:3
83:11 98:8 99:1

**office** 22:18
61:23 62:4,8
69:22 70:1
85:18 86:1
106:7,23 107:5
118:25 119:25
120:3,7,9,13,
15,19,25 121:4,
7,23 122:11,18

**officer** 19:7,13
23:17 24:6 26:1
28:3 39:19
41:18 42:8,18
46:6 49:14,24
52:14 57:1,23
58:23 59:4,9
60:11,18 66:12,
17,21,24 67:5,
11,20,21 68:1,
15 70:4,5 71:21
73:17 77:18
78:13,15 83:9,
15,23 84:19
85:5 88:8 91:22
92:3 99:14
104:24 110:23
111:2,3,8,21
112:4 113:4,11
114:18 116:2,
14 122:9 129:5
131:18 137:21
139:23

**officer's** 54:7,
15 57:10,13
77:15,19,21
78:15 100:22
111:23 114:25

**officers** 7:22

18

**objections**
42:12 92:18
116:4 127:1
128:17,25
136:15 137:24

**Obv** 51:25

**occur** 101:16

**occurred**
82:22 83:1,6
118:15

**offhand** 50:3
83:11 98:8 99:1

**office** 22:18
61:23 62:4,8
69:22 70:1
85:18 86:1
106:7,23 107:5
118:25 119:25
120:3,7,9,13,
15,19,25 121:4,
7,23 122:11,18

**officer** 19:7,13
23:17 24:6 26:1
28:3 39:19
41:18 42:8,18
46:6 49:14,24
52:14 57:1,23
58:23 59:4,9
60:11,18 66:12,
17,21,24 67:5,
11,20,21 68:1,
15 70:4,5 71:21
73:17 77:18
78:13,15 83:9,
15,23 84:19
85:5 88:8 91:22
92:3 99:14
104:24 110:23
111:2,3,8,21
112:4 113:4,11
114:18 116:2,
14 122:9 129:5
131:18 137:21
139:23

**officer's** 54:7,
15 57:10,13
77:15,19,21
78:15 100:22
111:23 114:25

**officers** 7:22

8:3,11 17:21,24
18:13,17 20:20
22:16,20 24:4,5
25:21 29:21,25
30:4,21 31:8,
19,20,21 33:8
39:18 40:1,4,6,
8,12,21,24
41:25 42:8,19
56:15 58:9,10
62:18 67:18
70:10 71:19,22,
25 72:13,16,21,
23 73:3,4,8,12,
18,23 74:6
77:20 85:11
86:20 89:6,20
90:1 91:3 110:4
112:17,22
116:25 117:1
120:20 122:8
126:13 131:2,
24 132:6,12,20,
23 134:17
138:2 139:1

**official** 67:13

**one's** 31:1

**ongoing**
119:17

**opened** 95:15

**operate** 39:6
40:19 41:3

**operated**
138:18

**operates**
39:11 40:11

**operations**
22:15 33:14
41:12 47:1,21
126:19

**opinion**
138:11,12,15

**opportunity**
32:23 33:20
37:21

**oppose** 139:10

**opposed** 95:4

**OPS** 60:24
61:1,3,4,6,7,18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

62:9,23 63:4,6,
10,23 65:22,25
66:4 67:19,21,
24 68:8,9,18,25
69:3,5 70:8,15,
23 71:2 74:5,16
75:1,22 76:2,6
87:12 88:3,8,12
91:21 94:21
95:1,2,4,11
96:16 97:8
98:16 99:2
107:16,21
108:1,5,11,12,
20 109:12,20
110:25 111:14
112:16 114:11
115:21 119:19
123:16

**OPS'** 65:13,15
66:6 70:13,14

**order** 12:17,18
13:18 47:1
48:15 78:5,11
79:1 105:15
106:3 107:7
122:1 135:10
139:9

**orders** 12:11,
20 13:8,14,15,
17,21 17:11
18:10 39:2
131:6,7,12,19
133:18 134:22,
23

**organized**
40:16 56:14
112:21 126:17

**outcome** 71:3
94:18 99:17
100:1 103:7
104:14,16,17
105:17 107:20,
23 114:16

**outcomes**
94:15 95:7 99:4

**overlap** 70:13

**overly** 41:6

**overnight** 67:1

**overridden**

115:5

**override**
102:19 103:16
104:1 106:15
109:18,24
110:13

**oversaw** 22:4
24:7

**oversee** 19:22
72:23

**overseeing**
22:15 36:9
72:15

---

**P**

**p.m.** 75:19 93:8
124:20 140:8

**paperwork**
105:14,18

**paragraph**
30:20 31:16
32:1,15 33:5,12
34:18,19 39:25
40:3,5 41:21
42:1,22 44:2,4
46:2 48:19
128:22 129:3,
25 138:24

**paragraphs**
35:1 41:23 42:4

**part** 39:8 42:23
78:3,5 88:18
102:9 111:14

**participant**
127:17

**parties** 8:8

**party** 26:13,14

**passed** 118:14

**passing** 15:4

**past** 81:22
110:20 111:1,6,
16 113:10

**patrol** 22:20
23:17 25:21,23,
25 26:1

**pattern** 89:25
98:2

**pay** 105:24

**penalties**
139:2

**penalty** 54:16
102:10,13
103:12 106:5,8,
11 108:4 109:6
111:5

**penalty-wise**
107:23

**pending** 7:8
10:9 134:13

**people** 30:25
33:7 46:10
73:23 93:25
117:6

**people's** 58:24

**percent** 96:1

**percentage**
75:4 95:22
96:3,7

**period** 35:9
36:5 46:14
55:23 58:13
59:25 69:12
90:10 92:13
96:21,23
115:19 123:10
133:2

**perjury** 21:5,6
121:1,13,19,20,
23 122:12,18,
19

**perpetrators**
135:25

**person** 28:21
31:2,25 33:2
40:22 41:10,17
116:20 138:21
139:13

**personal**
67:11 89:7 90:1
91:3,11,12,22
92:4

**phase** 111:5

**phone** 68:20
127:16

**phonetic**
117:13

**photo** 135:19

**photos** 135:19

**physical** 63:25
64:8,21

**place** 86:7
118:1 132:3

**placeholder**
117:22 118:2

**plaintiff** 7:15
8:10,25 123:7
139:18

**plaintiff's** 7:13

**plaintiffs**
123:20

**play** 46:20
128:7

**PLAYS** 127:5
128:10

**plow** 93:16,17,
23

**point** 37:20
38:20 39:5 48:7
73:21 74:3
104:11,12,20
111:22 115:25
116:13 124:6
132:22 139:16

**points** 42:10

**police** 15:15
17:21,23 18:13,
24 21:17 22:9,
12 23:2,16
24:4,6 29:2,21,
25 30:3,21
31:8,18,20,21
33:7 35:10
36:6,23 38:15,
25 39:9,18
40:1,4,6,7,12,
13,20,24 41:5,
15,18,25 42:8,
18,21 44:16,17
45:22 46:15
52:4,8,9,12,15

60:5,11,12,17
61:20 62:6,10,
18,22 63:3 64:2
65:3 66:12,17,
21,24 67:1,5,
11,12,18 68:14
69:9 70:4,10
71:18,21,22,25
72:13,16,18,21,
22,23,24 73:3,
4,5,12,16,17,
18,19,24 74:3
75:23 76:3,10
80:22 81:9
82:17 84:17,18
85:5,11 86:8,20
89:20,25 91:3,
21 92:2 94:14,
15 98:17,23
104:24 105:4
106:2 107:8
110:2,3,9,11,12
111:20 112:10
113:3,11
117:17 122:7,9
125:14,20
126:2,13 131:2,
18,24 132:6,11,
12 134:16
137:21

**police's** 42:23

**policies** 12:10,
15,19 13:13
17:11 18:10,16
39:8 129:19
131:1,22
133:17 134:10

**policing** 22:17

**policy** 18:18
29:2 35:10
36:6,23 39:2
46:15 89:9
134:4,20 135:5,
18,23 136:4,7

**portion** 65:9

**posed** 10:18

**position**
116:19

**positions**
23:12

**positive** 49:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**possibly** 51:25
131:13

**potential** 58:2,
17 59:20
120:25 121:23
122:11,18
134:13

**potentially**
52:11 86:10
122:15

**powers** 52:4,8,
13,15

**practices**
17:12 18:10
133:18

**preparation**
12:16 13:9,15,
24 14:15,24
15:16,25 101:5

**prepare** 11:23
14:19,22
100:20

**prepared** 18:3,
20 30:14 40:25
41:9 44:8,24
45:21

**prepares**
100:23

**present** 16:6
116:7,8,9 132:7
133:3

**presented**
30:20 134:24
137:4

**preservation**
135:3

**preserve**
133:11

**pretty** 63:17
101:22 124:10
130:1,2

**prevent** 47:25

**prevention**
48:4

**previously**
11:20 112:11

**primarily**
39:18

**prior** 15:3,19
20:4,14 21:16
22:8,11 48:9
60:18,24
100:12

**privilege** 12:5

**pro** 30:6,8
117:13

**probable** 59:7

**problem** 86:7
89:6 91:2

**procedural**
107:6

**procedure**
51:5 77:22
78:19 79:12
82:23 83:2,6,10
84:1,19,20,22
85:13,19
106:18 110:19
131:23 135:18,
20 136:8

**procedures**
39:8 80:11
126:12,22
129:10,19
134:10 136:8

**proceed** 139:9

**proceedings**
7:1 80:12 122:3

**process** 41:19,
20 48:24 49:5
72:25 101:2,15
102:1 103:1,7
105:16 108:16,
22 126:20
138:21

**productive**
137:14

**productivity**
18:1 29:23
30:7,8,9 126:7
129:13 136:14,
20,22 138:2

**profanity**
58:11

**professional**
60:18

**profile** 22:6

**program** 117:9

**progress**
28:18

**promoted**
73:19,24 74:1

**promotion**
73:17

**proper** 59:1
99:15

**proportion**
52:19 62:16
75:6

**proposal** 38:8

**propose** 124:7

**prosecution**
121:21

**prosecutor**
51:19

**prosecutors**
88:13

**protected** 12:4

**protective**
25:5

**prove** 99:11

**provide** 67:6
85:18 86:1
96:16 114:1
117:24 123:8,
21

**provided**
31:13 89:14
117:3 130:16

**pull** 17:6 29:15
56:25 57:17

**pulled** 69:15

**punishment**
105:20 139:3

**purpose** 37:10

**pursue** 74:23

**purview** 63:7

**put** 35:2 49:19
54:2,6,10,15
77:19 81:3,14
106:22 112:8
117:2,8 133:7
138:6,13

**Q**

**qualified** 28:3
31:16,25 45:2

**quantify** 96:6

**query** 57:13
77:17

**quest** 24:18

**question** 9:22
10:2,9 12:9
15:18 26:19
36:3,4 42:7
45:7,9 46:23
48:12 50:16
52:20,23 56:19
60:9 80:18
83:12 85:21
89:21 92:7
101:22,24
122:4 126:24
127:2,9 128:11
129:6 130:1
131:10 135:11
136:16

**questioning**
37:18,24 38:24

**questions**
9:11,15 10:13,
17 11:10 24:17,
19 28:1,10
31:1,3,10,14
32:2,24 33:3,9,
24 35:7 37:22
38:1,12 41:14
43:10,23,25
47:13 48:13
94:10 107:16
132:11 139:7,
14,19,21,22,24
140:1

**quiet** 35:20

**R**

**raise** 8:15 31:5
42:11

**raised** 33:23
39:24 116:1
119:4,14

**random** 49:25

**rank** 25:8

**ranked** 19:7,12
22:4

**rare** 53:6

**rate** 95:16 96:9,
16 97:3 124:24,
25 125:5,15,19
126:1 133:1,4
137:22

**rates** 125:10

**rattling** 77:5

**re-** 102:10

**reach** 28:22

**reached**
114:15

**read** 33:12,16
34:4 127:1
128:6 135:15
139:5

**reading** 49:25
128:18,21
129:3

**ready** 92:20

**real** 59:15

**realized**
121:20

**reason** 10:23,
25 59:15 88:21

**reasonable**
40:23

**recall** 14:4,10
21:3 58:14,21,
22 59:10 60:1
95:3 102:5
108:8,9

**receive** 66:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

85:6 114:3

**received** 17:23
30:2 119:10

**receiving**
56:15 113:20

**recent** 59:15

**recommend**
104:20

**recommendati
on** 54:16
102:13 104:21
105:12,25
106:1,14,16,20,
25 108:2,6
109:19,24
110:13 114:15

**recommendati
ons** 102:10

**recommended**
102:2 104:8,23
108:11 109:23
114:7 115:4

**record** 7:2 8:6
9:21 16:17 33:4
34:25 39:17
55:7 75:16,17,
18 93:5,6,7
103:23 124:17,
18,20 128:21
130:13 138:7,
13

**recording** 76:3

**records** 76:10
83:13 104:12,
15 113:8,9,15,
25

**records'** 57:19

**redundant**
34:21 35:2

**refer** 119:24

**references**
44:3,4

**referral** 69:21
120:3 121:22
122:11

**referred** 71:3
120:9,13,25

122:17

**referring** 32:8
57:5 83:13 89:6

**refrain** 126:25

**refresher**
117:5

**register** 48:25
49:6 53:12,13
54:18 69:1,4,
10,19,23 77:12
89:23 90:10
91:17 95:8
99:18 104:5
107:20 110:20
115:3 120:23
121:20

**registered**
97:25

**registers**
57:22 88:1
90:8,23 92:12
95:12 115:18
116:3

**rehash** 130:14

**relate** 131:17
134:10 135:5

**related** 12:20
13:10,12,22
21:3 31:18,19
42:2 46:11
65:18 77:16,20
87:15 126:20
129:20 131:7,
12 137:6
138:17

**relates** 12:11
13:5,19 129:8
136:17 138:22

**relating** 17:14
82:6 83:10,15
91:17 135:23
136:8,20

**relative** 73:3

**relevant** 39:22

**reliability**
133:12

**reliable** 80:7

**reliably** 79:12

**relieved** 52:4,
8,12,15

**remaining**
26:8

**remember**
11:9 68:22

**reminder** 94:9

**remotely** 7:16,
22,25 8:4

**renew** 128:17

**rep** 35:23

**repeat** 10:13
26:19 36:4
82:24 84:25
85:22 106:21

**repetitive**
34:21 39:4

**rephrase**
10:13 101:23

**report** 27:10
35:5 36:18
58:16 94:25
95:2,3 135:6

**reported** 58:1,
16 59:20

**reporter** 7:2,4
8:5,8,14,20
9:10,21 16:10,
12,14 29:17
35:15,23 75:18
93:5,7 122:22
124:17,19
127:1,4,5,15
128:7,10 140:6

**reporting** 81:3,
5 125:11

**reports** 36:11,
12,25 37:11
38:14 67:12
81:3,7,15,25
82:3 94:16,17
96:15,20,22
97:4

**representing**
7:19

**reliably** 79:12

**reproduce**
139:11

**request** 55:2,5,
9 85:17,25
113:6,14 114:2
115:12

**requested**
55:2 113:7
114:6,14 127:5
128:10

**requests** 55:7

**required** 56:2

**requirement**
36:24 55:13
74:16,21
123:16

**requiring**
67:13

**resolve** 139:13

**resolved**
53:13,19 118:6,
8,13 119:20

**respect** 12:5
30:23 31:20
32:1 38:15,22
41:17 43:16
44:19 47:4
126:11,12
129:4

**respective**
32:8 126:13

**responded**
112:22 136:17

**response** 9:14
18:11 31:6
42:11 133:19

**responses**
9:13

**responsibilitie
s** 19:21 20:11
21:23 22:13
24:3 73:2

**responsibility**
27:19 55:24
71:25

**responsible**
27:2,9,13,22

40:9 56:5,10,12

**responsive**
11:10

**rest** 63:7 66:7

**restate** 85:20

**result** 49:22
52:3 79:7 97:12
112:6

**resulted** 49:25
80:16 114:22
119:8

**results** 54:8,12

**returned**
101:13

**review** 12:15
13:15,21 14:14,
24 60:17 97:1
99:25 100:1,3,
12,21,24 101:1,
8,11,12,15
102:1,6 103:1,6
104:4 106:12
107:2,4,5,12
108:21,24
110:2,3,7,11,12

**reviewed**
12:10,12 13:9,
11,18,25 96:22
99:20,24
100:21 102:18
103:10 106:6
108:7,25

**reviewing** 90:9
92:12 102:9

**reviews**
100:11

**rights** 64:6

**ring** 74:13,14

**rise** 52:7

**Robin** 7:17
26:16 29:20
30:14 31:4
35:18,20 39:14
42:25 43:3
127:13,19
128:19 138:7

**role** 20:1 73:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

126:21 138:20

**roll** 58:9

**roughly** 74:25

**rule** 16:18
79:21 80:1,2

**rules** 9:7 17:14
18:11 67:12
133:18

**run** 78:15 79:7

**runs** 77:2

**Ruth** 7:14 8:25
24:10 33:17,19
34:4 75:10
93:11

——————

**S**

——————

**sailed** 34:22

**sat** 9:1 11:25

**satisfy** 53:7
105:20

**scattered**
72:3,6,8

**scope** 28:1,5,6
29:6 39:20 40:1
46:2 48:19
129:24,25

**scratch** 80:18
82:4 88:1 113:1
130:25

**screen** 24:12
35:17 130:22
133:8

**scroll** 17:4,7

**search** 75:22
76:2,9,14,16,19
77:7,8,9,23,25
78:11,13,17,23,
24 79:15 80:4,
7,9 81:8 87:16

**searched**
76:24 78:20

**searching**
59:6 77:10

**seats** 138:25

**section** 22:1,3
38:7,18 55:7
70:23 72:14
99:25 100:6,7,
8,9,10,17,23
101:5 113:15
124:9 127:17

**sections** 72:9,
12 101:4

**seek** 118:20

**sees** 116:11,16

**send** 66:7
101:5 127:25

**sending**
100:12 102:6
117:4

**sense** 50:23
75:6 86:11 89:9
102:7 115:15
117:7

**sentenced**
136:25

**separate** 71:7
89:7 91:3
94:23,25 95:1

**separated**
52:8 94:24

**separately**
94:20

**separation**
110:9

**sergeant**
21:19,24 22:12,
23 23:5,7,19
25:7,18 56:20
116:10,21
120:6

**sergeants**
25:25 71:17,23
72:1,5,12,15,22
73:9 126:7
129:12,21
130:8

**series** 107:15

**serve** 20:8
117:22 118:2

**served** 19:25

**server** 81:19

**serving** 21:16

**setup** 33:6

**sex** 40:16,17
44:1

**sexual** 42:6
50:11 76:18,25
126:17

**share** 62:10

**Sheriff** 8:3

**sheriff's** 24:5

**ship** 34:22

**Shoffner** 7:17
8:13 12:1,9
15:17 24:10,14
25:2,14 26:12,
17 27:15,25
28:23 29:5,11,
24 30:17,19
31:14 33:3,19
34:4,9,15,17,23
35:13,19 36:15,
21 37:2,17
38:10,20 39:16
42:18,21 43:2,
5,19 44:10,12,
14,16 45:4,7,
10,18 46:1,18
48:18 49:9
51:2,6,9 53:15
56:17 58:5
59:24 62:19,25
64:4 66:9 67:15
69:6 70:17
75:3,25 76:5
77:24 79:17
80:19 81:10
82:8,14 84:2,24
85:14,20 86:16,
21 87:1 88:5,25
90:4,11 91:13,
24 92:20,23
93:2,11,13,20
94:2 95:18,23
96:2,12,24
97:17,23 98:4,
19 103:17
105:1,8 108:13
111:12,25
118:17 121:2,
24 122:13

123:9,22 124:1,
11,13,16 125:7,
22 126:9 128:3,
5,11,14,16,20
129:1,15,23
130:9 131:3
132:1,8,15
134:6 135:8
136:15,23
137:18 138:14
139:20 140:3

**shooting**
63:13

**short** 58:13
93:2 128:25

**shortcomings**
47:10

**shorthand**
86:5 89:2

**should've**
60:21

**show** 16:9 78:6
114:24 115:11,
13

**side** 10:16

**sidelined**
117:3

**sign** 36:25
37:10

**signature**
36:19 140:5,6

**signed** 36:14,
17

**similar** 107:15
108:20 111:9,
16

**simply** 41:24

**simultaneousl
y** 35:19

**single** 16:11
31:6 43:2 90:9

**sir** 15:20 18:1,
18 127:7
133:13

**sit** 15:5 57:25
58:6 65:21
69:17 79:22

80:5 131:15

**situation** 77:6

**situations**
52:16

**six-digit** 68:19,
23

**Skahill** 12:13
14:7

**Skahill's** 14:1

**skip** 80:18

**small** 52:18
62:16 65:9
73:18

**snack** 75:11

**solemnly** 8:15

**sort** 72:25
139:14

**sound** 60:23
93:19 124:9

**Sounds** 93:4
94:2 124:15

**space** 20:19

**speak** 15:15
35:21 44:8,24
46:5,8 47:6,9,
10 48:2 49:2
52:5 80:11
129:19 130:3,6,
16,19 132:4
135:16,17,22
136:3 137:9
138:12

**speaking**
59:17 60:21
90:14 126:25
128:25

**special** 12:11
13:14,15,18,21
22:3 42:2 72:11
131:7 134:22

**specialist**
25:4,7 26:9
32:5,19 34:12
40:21

**specialist's**
36:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-01028 Document #: 765-10 Filed: 01/27/25 Page 55 of 57 PageID #:85902
The Deposition of Timothy Moore, taken on August 25, 2021

158

**specialists**
17:22,24 18:14
24:25 28:14
29:22 30:16
31:9 32:5,7,17
33:25 36:13
37:15 38:6
42:16 43:13
45:1,2 47:20,25
48:15 126:8
129:13 130:8
135:6

**specific** 33:15
42:2 45:15
46:11 48:16
65:13 66:7 77:7
79:18,19

**specifically**
42:15

**spend** 48:22

**spin** 57:7

**spoke** 14:20
43:6 80:10 98:7

**stack** 54:10,12

**staff** 50:8 52:2,
11,17 53:3
73:14 81:8
101:6

**stage** 107:24,
25

**Stalf** 7:21 8:11
26:11 33:11
35:14,18 50:15
51:3 52:22
62:13 86:13
89:13,21 91:7
92:6,14,18
112:23 115:24
116:4 127:8,23
137:17,24
139:22

**stand** 136:15
139:16

**standards**
60:19

**standing**
37:17,24

**standpoint**
33:14

**stands** 56:6
61:9

**star** 57:14

**start** 26:21
77:5 87:6
135:1,2

**started** 68:20,
23

**starting** 7:13
68:23 71:13

**starts** 41:24

**state** 7:11 8:6
24:6 120:7
121:6 128:17,
18

**state's** 69:22
122:11,18

**statement**
51:8 67:6
98:18,25
136:24

**statements**
50:13 97:15,21
98:3,13 133:13

**states** 7:8
69:25 85:17,25
119:24 120:3,7,
13,15,19,25
121:4,22

**station** 64:2
67:1,25

**statistics**
94:13 125:10

**stay** 35:20
105:21

**staying** 105:24

**step** 26:22
107:6

**steps** 18:17
84:8,13 85:9

**stop** 29:19 84:9
93:25

**stopping**
124:5

**streamline**
38:3

**street** 67:12
89:2,5,11,20
90:8,13,15,17,
18,19,23 91:12,
17,22 92:4,11,
17

**strenuously**
139:10

**strictly** 64:8

**strike** 56:18

**structure**
30:22

**structured**
31:17

**subdivision**
30:3

**subject** 52:1

**submit** 41:7
49:24 105:18,
23 123:25

**submitted**
28:2 36:12,13
101:3 110:9

**submitting**
27:9

**subordinate**
58:2,3,16,17,18
59:20,21

**subordinates**
35:12 37:1
49:1,7 54:19,23
55:14

**subpoena**
38:22 39:25
129:25

**substance**
15:8

**suggest** 38:10,
16 89:4 139:4

**suit** 69:16
117:19 118:3
119:5,7,8,15

**Sullivan** 8:4

**super** 53:2

**superintenden
t** 25:11 71:14
100:2 103:11,
19,20 106:2,12,
15 109:4,8,24
115:10 118:20

**superintenden
t's** 106:7,23
107:5 118:24

**superintenden
ts** 106:19

**superiors** 40:2

**supervise**
19:16 46:17
47:4 129:22
130:3,8

**supervised**
24:4 32:18 33:8
38:14 39:22
45:15,20,23

**supervises**
19:10,17

**supervising**
22:20 26:8
27:23 46:6,10
47:1,5 126:7
129:12,20,21
130:7

**supervision**
17:23 25:21
28:7,8 29:21
30:3,5,15 31:8,
19 33:6,13,24
34:11 38:6
40:25 41:13
42:15 43:9,13
44:7,9,25 45:1,
3 134:16
138:22

**supervisor**
22:15,19 28:13,
17 36:17 46:4,9
47:2,3,4 49:17
53:17,18,22
54:9 55:21 57:3
58:1,9,11,16
59:4,9,20 67:22
73:13 99:22
102:19,24
103:4,5,14,25
107:3 109:1,20

115:4

**supervisor's**
36:19 47:2
126:20,21

**supervisors**
27:13 29:3,7,9
35:11 36:7,14,
25 37:10,14
40:8 45:16,24
46:16 47:18,24
48:14,25 49:6,
13 53:12 54:18,
22 55:13 73:8
74:12 136:13
138:20

**supervisory**
126:20

**supplement**
11:12

**support** 99:10

**supposed**
29:3,7,9 36:20
46:16

**suppress**
83:24 84:5,9,
14,16,20 85:3,
9,18 86:1

**sure's** 43:15

**suspect**
133:12

**suspend**
105:13

**suspended**
105:16

**suspension**
52:20,25 53:2,3

**suspensions**
110:16

**suspiciously**
137:14,22

**sustain** 95:9
124:24,25
125:5,10,15,19,
25

**sustained** 52:7
53:14,20 57:22
95:9,16,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

96:4,7,9,16
97:3 99:4,9,10
102:3,8,12,17,
20,25 103:1,6,
15,25 104:8,23
108:11 111:21
112:11 114:22,
23 115:9
120:22 133:1,4

**sustaining**
114:7 115:4

**swear** 8:15

**sworn** 10:21
45:3 60:4,7

**sync** 35:19

**system** 57:7
68:17,20 71:8
76:7,12,14,19,
22 77:4,13
78:16,21 81:5,
14,18,20 87:14,
16 115:16,21
116:5,9,23,25
117:2 121:7

**systematic**
112:16

—————

T

**ta** 40:14

**tactical** 23:20

**taking** 9:11
24:11 84:8,13

**talk** 9:18 15:2,8
28:3 30:15
32:2,4,6 33:5,6
40:8 41:10,20
42:4 45:2
138:20,22
139:3,18

**talked** 15:5
41:11,12 60:2
107:3 138:19

**talking** 21:13
40:13 41:13
48:3 50:10 61:5
64:24 80:24
81:22 84:5
90:15 107:16

127:22

**task** 20:14 24:1

**team** 23:19
27:24 28:22

**tech** 122:25

**technical**
23:18,19
127:13,21

**technician** 7:3

**techniques**
17:14 18:11
133:19

**technology**
132:19,22

**telling** 15:22
32:15 33:17

**term** 26:4,22
51:12,13 58:25
61:4 86:5 89:9,
11

**termination**
52:21 53:1
110:15

**terminology**
89:5

**terms** 76:14
93:14

**terrible** 80:18

**Terrorism** 24:1

**test** 28:3 73:22,
24

**testified** 32:22
34:9 38:23
39:10 99:2

**testify** 10:24
11:2,6 18:3,20
31:24 34:1,3,11
35:3 39:7
40:22,25

**testifying**
33:13

**testimony**
8:16 10:21
14:1,7 15:19
31:11 45:22
66:22 81:23

122:7 126:5
127:5 128:10
129:5 134:3,9,
19 136:13

**testing** 49:25
72:25

**theft** 20:25
21:1,3 50:10
76:18,25

**thing** 10:8 32:3
43:2,20 48:5
117:12

**things** 11:14
30:13,23 32:9,
12 34:20 50:12
63:25 132:24
136:21

**tho** 99:7

**thought** 42:25
43:3 45:7 79:4
115:8

**threatening**
67:5

**time** 7:5 10:4,
12 11:9 24:18,
19,21,25 25:4,
9,10,12,22
27:16 28:19
29:1 35:9 36:5,
11 43:10 46:9
47:3 48:1,22,24
49:3,12,13
50:19 53:11,23
54:1,21 55:12,
17,23 56:16
57:8,9 58:13
59:11,12,16,19,
25 60:5,12,21
61:6,17 62:1,
11,15,22 63:11,
14,20 64:25
65:1,4,12 66:2
67:19 68:19
69:12,18 70:7
71:2,12 72:3
73:8 74:8,15,20
75:8,22 76:4,9,
20 79:14 80:20
81:4,16 82:5,
13,21,23 83:2,
4,8 84:7,12,25
85:2,16,24

86:18 87:7,20,
24,25 88:4,15,
16,19 89:18,24
90:10 91:6,12
92:2,9,12,16
94:6,10 95:14
96:21,23 97:5,
13,21 98:8,12,
15 101:18,19
102:19 103:24
105:19,22
110:7,18,25
111:6,17
112:11,15,19,
20 113:2,10
114:19 115:16,
19 117:10,15
118:13 119:23
120:24 122:17
123:10,15
124:23 125:9
129:14 130:4,7
131:5,14,21
132:14 133:2,5
135:7 136:9
137:15,21
138:7 139:19

**time-frame**
54:17

**times** 9:4 15:24
16:1 56:7 58:13
120:15 131:10

**Timothy** 7:6,20
8:7

**Tina** 12:13
14:1,6

**tired** 93:25

**title** 19:1 73:19
79:1

**today** 7:4
10:21,24 11:3,
7,24 57:20,25
58:6 65:21
69:17 76:22
79:22 80:5
81:23 116:20
126:6 131:15
132:12,18

**tomorrow**
52:15

**top** 19:7,12

71:13

**topic** 12:24,25
13:2 18:4,21
28:10 29:20
31:7 34:10,13,
14 38:5 39:15,
17 130:17
134:15 135:2

**topics** 13:22
17:15 38:22
134:17 138:10

**total** 16:1,2,4
34:19 97:8,12

**totality** 29:24
31:15 53:8

**track** 29:3,7,9
35:11 36:7
55:18,20 56:25
68:18 71:3
82:6,11,17
86:19,24 89:19
91:2 92:16
97:14,20
112:16,21
117:4

**tracking** 56:5,
10,13 113:1

**trained** 33:8

**training** 26:1
39:1 117:5

**trans** 137:10

**transcript**
14:1,11,25
119:9 140:4

**transcripts**
12:13 122:2,7

**treatment**
117:3 136:4

**trigger** 51:23
52:2 101:24
116:17 119:13
120:2 122:10

**triggered**
50:22

**triggering**
123:6

**true** 110:16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

114:10 116:7,8
125:17 130:6

**truth** 8:17,18

**truthfully**
10:24 11:2,7

**turn** 48:23

**turns** 31:10

**type** 31:22 32:3
42:2 52:9,16
56:7 57:16
70:24 76:17,18
77:15,19 79:20
80:23

**types** 77:6

**typically** 106:4
123:7,20,25

_____

**U**

**uh-huh's** 9:13

**uh-uh's** 9:13

**ultimate** 109:3

**ultimately**
115:5

**unable** 99:11

**uncover** 87:17

**uncovered**
121:8

**understand**
10:12,20,22
11:19 21:13
28:8 36:2 43:12
46:12 47:15
51:15,17 52:5
53:5 61:5 73:11
84:5 101:25
118:4 136:12

**understanding**
60:9

**understood**
10:17

**unfound**
115:11

**unfounded**
95:10 99:5,12
101:16

**unit** 23:18,20
46:12 49:18
54:6 56:21 57:2
81:13 101:8,12
136:18

**United** 7:8
69:25

**unresolved**
139:7

**unsustained**
101:16 111:10

**unwritten**
17:11 18:10
133:17

**update** 27:17,
20

**updated** 49:6

**updating**
27:13

**usual** 26:13

_____

**V**

**vague** 30:10,20
130:2

**vehicle** 125:4

**Velez** 7:7,16
9:1

**verbal** 9:14

**versus** 7:7
63:4 125:20

**video** 7:3
132:21

**videoconferen**
**ce** 7:6

**violation** 51:5,
11,12,22 67:12
79:21 80:2
88:8,24 120:21

**violations** 64:7
77:23 78:20
79:4,12,16 80:8
90:8,14,15,18,
19,24

**violence** 63:16

**W**

**wait** 9:22 93:21
119:19

**waiting** 128:5

**waive** 140:5,6

**wan** 48:13

**wanted** 32:23
68:10 73:13
77:17 78:17
83:12 113:23

**warrant** 59:2,6

**warranted**
68:15

**waste** 43:9

**watch** 22:14,
16,20 54:9

**ways** 46:16
47:18 126:6
132:17

**weapon** 77:15,
18,19,21 78:2

**weapons**
77:17 78:2,4

**weeds** 46:7,11

**weighed** 111:7

**wh** 40:14
117:19

**wha** 26:21

**whichever**
61:5

**Winifred** 7:24

**Winnie** 122:25

**Winstrom**
14:25 15:2,14
30:12 34:5 35:3
37:19,21 38:11,
17,23 39:14
41:8 138:9,16
139:5,12

**Winstrom's**
15:9

**withheld** 66:17

88:12

**withholding**
51:18

**witness'** 66:21
129:24

**witnesses**
39:7 133:11
134:11

**word** 61:7
76:19 77:9,25
78:24 106:9
109:10

**words** 77:10,
11 79:1

**work** 43:17
61:7 72:14 73:5
77:7 81:12
102:22 120:6,
18 129:17

**worked** 23:16,
18,24 25:5 26:9
29:12 87:14
110:7

**working** 20:15,
18,19,20 21:11
22:9 58:23
71:17 74:7
79:10 123:5

**workings**
126:12

**works** 61:8
75:14 108:16
116:18

**world** 47:7
129:8

**worth** 105:19

**wou** 21:1 66:2
117:22

**would've**
40:14 60:14

**writing** 135:6

**written** 17:11
18:9 39:23,25
41:4,7 99:14
133:17 139:14

**wrong** 47:5,8
87:23

**wrongdoing**
48:7

_____

**Y**

**year** 14:10 20:3
23:17

**years** 20:8
22:18,25 24:2
46:5 47:12
96:11 105:23
118:14

**yield** 80:8

_____

**Z**

**Zehner** 8:2,12
140:1

**Zoom** 9:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com