IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| **ARTURO REYES,** | No. 18 Civ. 1028 |
| *Plaintiff,* | |
| | Hon. Steven C. Seeger |
| v. | District Judge |
| **REYNALDO GUEVARA, et al.,** | |
| *Defendants.* | |
| | |
| **GABRIEL SOLACHE,** | No. 18 Civ. 2312 |
| *Plaintiff,* | |
| | Hon. Steven C. Seeger |
| v. | District Judge |
| **REYNALDO GUEVARA, et al.,** | |
| *Defendants.* | |

## DECLARATION OF ANTHONY FINNELL

I, Anthony Finnell, hereby declare as follows:

1.  I have been retained by Plaintiffs in this matter to give expert opinion testimony.

2.  Attached to this declaration as Exhibit A is a true and accurate copy of my report, which contains opinions that I offer in this case, as well as attachments incorporated as part of that report. The contents of this report and its attachments are true and accurate to the best of my knowledge and belief, and I hold the opinions stated within the report to a

reasonable degree of professional certainty.

3. Attached to this declaration as Exhibit B is a true and accurate copy of my rebuttal report disclosed in this case, which contains opinions that I offer in this case. The contents of this report are true and accurate to the best of my knowledge and belief, and I hold the opinions stated within the report to a reasonable degree of professional certainty.

4. My qualifications for rendering expert opinions in this case are summarized in my report and in my CV, which is attached to this declaration as Exhibit C. My CV is true and accurate as of the date of my report in this case to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:          November 14, 2024

Anthony Finnell

2

**<u>EXPERT DECLARATION AND REPORT OF A. W. FINNELL &
ASSOCIATES, LLC</u>**

## Education & qualifications

Anthony Finnell

My name is Anthony W. Finnell, and I have been actively involved in police practices and law enforcement since 1989. On March 15, 2013, I retired from the Indianapolis Metropolitan Police Department. Presently, I serve as the Strategic Initiatives Manager for Seattle's Office of Inspector General for Public Safety (OIG) and the Vice President of the National Association for Civilian Oversight of Law Enforcement (NACOLE)[1]. I also work as a consultant on police oversight, policing and investigations for municipal and corporate organizations and institutions.

Prior to my appointment to these positions, I served as the Executive Director for the Citizens' Police Review Board (CPRB) and as the Interim Executive Director for the Community Police Review Agency (CPRA), both for Oakland, CA. I also served as a Supervising Investigator for the Independent Police Review Authority (IPRA)[2].

During my tenure with the Indianapolis Police Department (IPD) and then, the Indianapolis Metropolitan Police Department (IMPD)[3] I held many roles. My last assignment was as a Unit Supervisor overseeing the School Liaison Officers as they provided youth service programs within the public and private schools in Marion County, IN. I developed strategic alliances between the schools, business community, and the police department. I also recruited, trained, and mentored officers within the IMPD Community Affairs Branch.

As a Field Supervisor, at the rank of Sergeant, I supervised the activities of the Late Tactical Shift and Neighborhood Resource Officers of the Southeast District. This was accomplished by directing, mentoring, and training officers in the tasks they were to complete. I also ensured the community policing efforts of the department were carried out. I responded to regular patrol, field investigations, and other law enforcement related duties as needed. I maintained effective staffing levels to support the patrol needs of the shift and took disciplinary action when necessary.

In October 2004 I introduced and implemented a law enforcement based mentoring program called the O.K. (Our Kids) Program of Indiana, through IPD by fostering strategic alliances between the Indianapolis Public School system, the business community, and IPD. Part of the implementation included establishing the organizational structure of the O. K. Program of Indiana as a 501(c)3 not for profit organization. I developed and implemented fundraising activities to support the operational expenses of the O. K. Program of Indiana.

---

[1] https://www.nacole.org.
[2] On October 5, 2016, the Chicago City Council passed an ordinance to establish the Civilian Office of Police Accountability (COPA), which replaced IPRA as the civilian oversight agency of the Chicago Police Department.
[3] It was created on January 1, 2007, by consolidating the Indianapolis Police Department and the road division of the Marion County Sheriff's Office.

I worked as a Homicide and Robbery Detective, conducting investigations into criminal and non-criminal deaths, officer involved shootings, and bank, business and street level robberies and carjackings. I was also tasked with conducting investigations into criminal allegations against sworn officers.

In my position as a Supervising Investigator at IPRA I reviewed complaints and allegations of excessive force or official misconduct against members of the Chicago Police Department, assigning cases to investigative staff. I monitored the progress of each investigation to ensure timeliness and compliance with established investigative procedures and standards. This was accomplished by reviewing and approving investigative reports prepared by staff. I conducted preliminary investigations immediately after officer-involved shooting incidents and assigned and oversaw follow-up investigations performed by staff. I provided training to staff in investigative techniques, reporting methods and departmental policies and procedures. I also provided testimony at criminal, administrative or arbitration proceedings against departmental personnel and oversaw the preparation and presentation of cases recommending suspension to the Complaint Review Panel. In my time at IPRA, I developed an intimate knowledge of CPD's disciplinary systems and processes. I also gained a historical understanding of CPD's disciplinary systems and practices going back to the late 1990s.

As the Executive Director of the Citizens' Police Review Board (CPRB) for the City of Oakland, I oversaw the administration and operations of the CPRB, reporting directly to the City Administrator. I worked closely with the appointed board to achieve the goals and objectives of the CPRB. I was responsible for planning, organizing, and coordinating CPRB support activities and operations consistent with the organization's mission; overseeing the process and review of citizen complaints of officer misconduct by sworn members of the Oakland Police Department; planning and developing program policies; and as assigned, performing other related work. Key priorities included expansion of community outreach efforts to increase awareness and to educate the public about CPRB services, while creating a more active environment for the community to provide ongoing input to the CPRB. Operationally, I strengthened investigative capabilities through staff development, and mentorship as well as increased staffing. Lastly, I provided technological improvements and ongoing training to staff and board members to better equip them as they worked to achieve the goals and objectives of the CPRB.

I facilitated the transition from the CPRB to the Community Police Review Agency (CPRA). This transition occurred because of an amendment to the Charter for the City of Oakland which created the Oakland Police Commission (Commission). As the Interim Executive Director, I was responsible for planning, developing and implementing all functions and activities of the CPRA, including effective responsiveness to the public and other client needs; implementing goals and objectives and ensuring the enforcement of applicable laws, ordinances and regulations; preparing and presenting reports to the Oakland Police Commission, the Mayor, the City Council, the Chief of Police and other boards and commissions regarding CPRA activities. The

CPRA was responsible for the prompt and impartial investigation of civilian complaints of police misconduct or failure to perform a duty, as well as a review of procedures and tactics used during incidents resulting in serious injury and/or death.

I have served on the NACOLE Board of Directors since 2016. I served as the Chair of the Strategic Planning Committee (2016-2017), the Treasurer and Chair of the Elections and Bylaws Committee (2018-2021) and currently as Vice President.

My education includes a Bachelor of Science from Oakland City University and a Master of Business Administration from Keller Graduate School of Management.

A list of cases will be found in Attachment A; material reviewed for this case is in Attachment B; and a complete and detailed resume in Attachment C; and a copy of my expert report in *Velez v. City of Chicago* is Attachment D.

My compensation for work related to this case is $350 per hour, with a four-hour minimum. Deposition and trial testimony is billed at a flat rate of $1,750 per calendar day. Time spent traveling and waiting to testify is considered billable time. Reasonable expenses may be charged with prior approval.


Dr. Timothy Knight


Dr. Timothy Knight possesses a Ph.D. in Human Services specializing in Social and Community Services. His post-graduate work focused on social ethics, community engagement, and social justice advocacy. Dr. Knight retired from IMPD in 2016. During his time with IMPD, he was assigned as a homicide investigator and earned certifications in homicide investigations; kinesic interviewing and interrogation techniques; and numerous other investigative disciplines.

Dr. Knight began teaching at the college/university level in 1986. In addition to serving as Chair of the faculty council, Dr. Knight served as lead professor (department chair) of three departments, one of which was the Criminal Justice Department at Martin University. While serving at the University of Indianapolis, Dr. Knight taught all the community leadership development content in Adult Learning. The focal point of the content was evidence-based community engagement, i.e., community-based research and data analysis, foundation and non-profit organizational development, and social entrepreneurship. That course of study was enhanced through his nine years of homicide investigation experience and work in the City of Oakland, California as a policy analyst at the Citizens Police Review Board.

Dr. Knight's current assignment is with the City of Carmel, Indiana, as the Professional Development and Equity Manager for all personnel, including the police and fire departments.

4

The work includes policy review and development, department and programs efficacy evaluations, and leadership development training for all department heads and would-be leaders.

Dr. Knight also worked and supervised in-custody death investigations and officer involved shootings. As a matter of routine, Dr. Knight worked multi-jurisdictional investigations with the aid of and while supporting ATF and FBI agents, U.S. Marshal Service, DNR, and municipal and state agencies.

Many of the awards Dr. Knight earned during his IMPD career, were in recognition of community service and engagement activities, advocacy of citizens - often in the face of unjust treatment by police and government officials - and standing in solidarity with officers who did the same.

After retiring from IMPD, Dr. Knight began working for the City of Oakland, California, first as a policy analyst and next as Chief of Staff for Oakland's elected City Auditor. Both assignments served to sharpen his analytical skills and increased his awareness and ease with which trusted public service employees could violate public trust when independence, internal controls, adequate redundancy, and conscientious oversight were low administrative priorities.

Dr. Knight's academic background and training prepared him to drive social science research, including professional communications; multiple qualitative, quantitative, and mixed-method approaches to data collection and analysis; and report writing. Each is an essential skill set for the work of investigating and reporting on behavioral trends, organizational culture, social systems, and group value formation and dynamics.

Miroslava Meza

Ms. Meza is a Claremont Graduate University Alumna - M. S. in Mathematics with sub-specialization in Operations Research and Statistics. Ms. Meza also holds bachelors and master's degrees in Industrial Engineering from Monterrey Technology and Science Institute.

Currently Ms. Meza leads the Policy and Statistics team at OIG. Her team's main projects are related to public safety and policing research and data analysis. In this position she has conducted a wide range of projects from mapping Seattle Police Department's (SPD) disciplinary process to managing a multi-agency team to improve processes and data availability for police oversight.

Previously, Ms. Meza was project manager and main data analyst for a team working on a joint project between Southern California Edison and Claremont Graduate University. Ms. Meza's

5

team developed genetic algorithms and managed to predict and minimize volatility in power outages within Southern California Edison's Los Angeles urban network.

Ms. Meza has more than 10 years of experience teaching applied statistics at university level - her latest teaching experience was at Monterrey Institute of Technology and Higher Education, which is ranked No.6 in the Top 10 Universities in Latin America by Forbes. Ms. Meza has conducted demographic and social research regarding public policies and its impact on inclusion and gender issues for Sinaloa's State Government (Mexico).

**Introduction**

I was retained by Plaintiffs' counsel in this matter to review testimony, policies, reports, complaint registers (CRs), and other documents, and to render an opinion as to the City of Chicago's policies, procedures, and practices as they related to the training, supervision and discipline of officers, and their relationship to the disciplinary histories and conduct of the Defendant Officers, as it relates to the 1998 wrongful convictions of Plaintiffs Reyes and Solache.

Based on my review of the materials, coupled with my specialized training, education, and experience in the field of law enforcement, I have formed my opinion to a reasonable degree of professional certainty that the Defendants' law enforcement careers were wrought with numerous allegations of misconduct, many similar in nature to Plaintiffs' allegations, and insufficient accountability for such actions. In addition, I have formulated opinions regarding the City of Chicago's policies, procedures and practices that departed from the generally accepted law enforcement practices at the time as they related to the city's investigation and discipline of officers accused of misconduct and tolerating a code of silence within the ranks of CPD that insulated wrongdoers and concealed misconduct.

All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration and discipline based upon my education, training and employment as a law enforcement officer, as well as my work as a law enforcement oversight practitioner, and my experience as a consultant in the field.

The opinions I have rendered here are based upon the materials reviewed regarding CPD's policies, procedures, and practices with respect to officer supervision, misconduct investigation and discipline; Defendant Officers' careers in law enforcement with CPD including CRs made against them; CRs from 1995 – 1998 made against Area 5 detectives; and hundreds of CR files from March 1996 – March 2001 made against Area 4 detectives and gang specialists in connection with my expert work in *Velez v. City of Chicago*, No. 18-CV-8144, which resulted in data and conclusions consistent with my opinions here. The opinions are based upon my education, specialized law enforcement experience including as a supervising investigator for Chicago's Independent Police Review Authority (IPRA), training and knowledge of generally accepted standards and practices in the field, my continued work within the field of police practices, oversight of law enforcement agencies, and my work with other law enforcement agencies and municipalities around the country.

I also recognize that additional documentation may be provided to me. I welcome the opportunity to review any additional relevant material as the case proceeds. If this material is provided to me, I will be prepared to supplement my report.

**Methodology**

The opinions in this report have been formulated to a reasonable degree of professional certainty in the field of law enforcement. I base these opinions on my specialized education, training, and vast experience as a police officer, supervisor, investigator, law enforcement oversight practitioner, and recognized police practices expert.

The method I used in reaching my conclusions included a review of materials provided by Plaintiffs' counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These practices originate from the United States Constitution which establishes the basis from which police policy, practices, and procedures derive. These standards have also been established in model policies promulgated by professional organizations such as the National Association for Civilian Oversight of Law Enforcement (NACOLE)[4], International Association of Chiefs of Police (IACP), the Commission on Accreditation for Law Enforcement (CALEA), and Council of Inspectors General on Integrity and Efficiency (CIGIE).[5] These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF). Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder, but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and day-to-day work assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the

---

[4] NACOLE Principles of Effective Oversight, Principles for Effective Oversight - National Association for Civilian Oversight of Law Enforcement (nacole.org).
[5] Council of Inspectors General on Integrity and Efficiency (CIGIE) investigations standards. Qualitative Assessment Review Guidelines (ignet.gov).

fundamentals that I employ in my professional examination of officer misconduct investigations and as a civilian law enforcement oversight practitioner. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder.

The quantitative analysis is based in part on a compiled dataset of 349 Complaint Register files ("CRs"), containing 1,983 individual investigations and 2,150 allegation counts, with incident dates between 1995 and 1998. In addition, the quantitative analysis considers a subset of 158 CRs for defendant officers from Area 5; CR histories for Defendant Officers; Chicago Police Department Annual Reports from 1995 - 1998; Chicago Police Board (CPB) Annual Reports from 1995; and Cook County data for exonerations between 1989 and 2021 from the National Registry of Exonerations.

My opinions and the tables in this report rely on the analysis of the dataset of 349 Complaint Register Files with an incident date of 1995-1998. The analysis of these file is set out in the tables in this report, as well as in Appendix A and Appendix B.

In addition, in this report, I relied upon the statistical analysis and tables generated by Ms. Meza in support of my opinions. In addition, I relied on Dr. Knight for the historical context and relevant cases to support my opinions. In my experience as an expert on policy disciplinary processes, I routinely collaborate with other experts and rely on similar analyses by other experts.

***Dataset limitations:*** The CR coding collected by the Plaintiffs' team considered all 1,983 CPD individual investigations during the four-year period of 1995-1998 against detectives who worked at Area 5.

Based on CPD annual report count of Complaint Register files received, the sample is at least 9.6% of all Complaint Register files for the years 1995 to 1998. For more details on the sample size and quantitative analyses, see Appendix A.

My findings from my review of Area 5 files from 1995-1998 is consistent with my findings from a review of Area 4 files from 1996 to 2001. The policies regarding the investigation of civilian complaints were uniform Citywide, and by the City's own admission through 30(b)(6) testimony, the processes and practices were the same across all Areas of the City.

**Factual background**

I have reviewed substantial records from the underlying case to understand the backdrop on which I am offering opinions and the relationship between my opinions about training, supervision, discipline, and the conduct at issue in this case.

Plaintiffs' lawsuit alleges that they were wrongfully convicted of two murders that they did not commit due to the misconduct of several police officers including Defendant Guevara and other Defendants. Plaintiffs allege that Defendants violated their constitutional rights by, among other things, coercing their false confessions, coercing false statements and fabricating evidence from witnesses, and suppressing exculpatory information.

In 2013, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar, now of Sidley Austin, to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that at least four different men who alleged misconduct by Guevara are "most likely innocent." These men are Roberto Almodovar, Armando Serrano, Jose Montanez, and Robert Bouto. Lassar also reached conclusions in the Reyes and Solache cases. After an investigation into the facts and evidence, Lassar's team found the allegations "that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations."[6]

In my experience, police departments understand that officers who are undisciplined and unsupervised are more likely to commit the types of transgressions that are alleged in Reyes and Solache's complaints. Therefore, police departments understand that they need a robust and supervisory system of discipline in place, and that the absence of such a system will result in exactly the types of abuses that befell Mr. Reyes and Mr. Solache.

**Opinions and Analysis**

**Opinion 1: The Chicago Police Department and the Defendant City of Chicago engaged in a widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices.**

To determine whether CPD and the City of Chicago had engaged in widespread disciplinary and supervisory practices that were in direct conflict with accepted law enforcement practices at the time of this incident required a thorough review of Chicago's accountability systems and the

---

[6] *See* Lassar Reported dated 12/12/2014, AR-L 517173-517192.

ways in which the City became aware of the potential departures from industry standards and law.

Our analysis begins with a discussion of the City's widespread practices relating to coerced and false confessions; fabrication of witness statements through tactics including coercion; fabrication of witness identifications and misconduct during identification procedures; and false testimony by officers. We discuss the City's accountability systems that include an evaluation of internal affairs' investigations pertaining to false witness statements and excessive force. This phase of my analysis will address the various elements related to the receipt and investigation of citizen complaints, the imposition of discipline, lack of any pattern analysis to identify officers who repeatedly are accused of misconduct, and the failure of the City to implement a meaningful early intervention system to root out misconduct.

To supplement this discussion, our analysis includes discussion of the City's policies and practices for the investigation and discipline of officers accused of misconduct, qualitative and statistical analysis of the Defendants' CRs and civil lawsuits, and qualitative and statistical analysis of the City of Chicago's 1995 to 1998 CR production that include allegations of fabricated evidence. Finally, our analysis concludes with a discussion of Rule 14 allegations and the existence of a Code of Silence within the CPD.

**A. Beginning in the 1970s and continuing through at least 1998, the City of Chicago Police Department routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, physically abusing and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false.**

Evidence of the City's widespread practice of coercing false confessions and fabricating witness identifications and statements, using tactics such as manipulation and coercion; and false testimony by officers can be found in the records from historical cases that continue to detract from the reputation of the City of Chicago and CPD.

## Historical Context

This case is not the first of its kind. Documents available to me reveal a long history of the City of Chicago facing litigants with claims of abuse in the form of fabrication of evidence including coerced confessions and witness statements leading to wrongful arrests and convictions. This history rife with a lack of transparency, permissive policies, and ineffectual efforts to correct its course of systemic abuse and harm to its citizens is insightful and predictive: because change did not occur within the City of Chicago and CPD, citizen abuse, violent and abusive interrogations, the code of silence, vigilante behavior, wrongful convictions, and irreparable harm to the public and public trust have persisted for decades without correction.

11

1. **Pre-Guevara: The Jon Burge Era, 1972 - 1991**

The City's widespread practice of fabricating evidence dates back to the 1970s. A voluminous body of evidence demonstrates that Jon Burge and other officers under his command routinely used torture tactics, including electrocution, cattle prods, putting plastic bags overs suspects' heads, and threatening with guns, to extract false statements from witnesses and suspects.[7] Despite complaints made to the City of Chicago and officers at the highest levels of the CPD's awareness of fabricated evidence procured by the use of torture, this corrupt practice went on for decades, as these complaints were ignored or failed to be investigated.

The United States Court of Appeals for the Seventh Circuit described Burge's coercion of false confessions through physical force in this way:

> Burge . . .. was not pursuing a frolic of his own. He was enforcing the criminal law of Illinois overzealously by *extracting confessions from criminal suspects by improper means*. He was, as it were, *too* loyal an employee. He was acting squarely within the scope of his employment.[8]

2. **The Goldston Report**

Sadly, there are many examples of the fabrication of evidence by abusing and torturing suspects and witnesses during this era. Many of these instances were high profile and collectively were evaluated by the CPD in what is known as the "Goldston Report."

On January 25, 1990, a publication known as the "Chicago Reader" published an article titled *The House of Screams* by John Conroy. The article discussed the conduct of Jon Burge and others at the Area 2 police station, and the case of Andrew Wilson, an individual who had been abused by Burge and wrongfully convicted based on fabricated evidence.[9] Shortly after, in March 1990, two OPS investigators were tasked with re-investigating Wilson's CR (CR No. 12543) as well as to "determine if there was systematic abuse at Area 2 during that period [1982] and if so, to determine the culpability, if any, of Area 2 Command Personnel."[10] OPS investigator Francine Sanders reinvestigated Andrew Wilson's CR and ultimately sustained the allegations against Burge and the two other officers.

The broader investigation into the conduct of Burge and his associates was conducted by an OPS investigator by the name of Michael Goldston. Goldston concluded that misconduct levied by Burge and others, including fabrication of evidence and witness and suspect abuse, was both systematic and that command level officers knew about it and failed to report it:

---

[7] G. Flint Taylor, The Chicago Police Torture Scandal: A Legal and Political History, 17 CUNY L. Rev. 329, 330 (2014).
[8] *Wilson v. City of Chicago*, 120 F.3d 681, 685 (7th Cir. 1997).
[9] John Conroy, *House of Screams*, CHI. READER (Jan. 25, 1990), http:// www.chicagoreader.com/chicago/house-of-screams/Content?oid=875107.
[10] Special Project Conclusion Report dated Nov. 2, 1990. AR-L 150959-150983.

>In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beatings but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.
>
>The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Command members were aware of the systematic abuse and perpetuated it either by actively participating in the same or failing to take any action to bring it to an end. This conclusion is supported by the number of incidents in which the Area 2 offices are named as the location of the abuse.[11]

In my opinion, Goldston's conclusions provided notice of a departure from generally accepted law enforcement standards in place at the time and signaled a systemic failure in the CPD's system of accountability. Further, it evidenced behavior within the ranks of the CPD for which supervisory and command personnel had turned a blind-eye and consciously ignored.

During his investigation, Goldston identified fifty (50) alleged victims of misconduct by officers at Area 2 from May 1973 through October 1985 and reported a statistical analysis, which included the following summary of the CR investigations that were initiated as a resulted of the alleged incidents of abuse/torture. The allegations included beatings (27 instances), electric shock (9 instances), a plastic bag or typewriter cover being put over the victim's head (13 instances), use of a firearm to threaten or strike the victim (11 instances), hangings (2), and more than one type of abuse was alleged in some instances.[12]

Goldston identified twenty-six (26) CR Files.[13] Of those seventeen (17) were assigned to OPS and nine (9) were assigned to the CPD's Internal Affairs Division (IAD). Not even one of those CRs resulted in a sustained finding. As of the time of his report, Goldston noted that all but one CR investigation was closed with no sustained findings and one CR investigation remained open.[14] Goldson also reported that nine (9) civil suits had been filed, of which five involved serious injuries. Of the lawsuits, five (5) had resulted in the City agreeing to settle, one ended in a mistrial, one was dismissed, in one, the defendants were granted summary judgment and one was pending at the time of his report.[15]

In February 1992, United States District Court Judge Milton Shadur ordered the Goldston

---

[11] Goldston Report, Sept. 28, 1990, AR-L 150959-150983.
[12] Goldston Report, Sept. 28, 1990, Appendix F (Statistical Analysis), AR-L 150959-150983, at 1.
[13] Id.
[14] Id.
[15] Id.

Report be publicly released.[16]

It has been my experience that police departments and the municipal governments who are ultimately responsible for the delivery of police services in their community receive notice of a potential departure from established standards and law when a complaint is made and/or a civil suit is filed that alleges an act of misconduct. In that regard, I believe the CRs and lawsuits noted within the Goldston Report provided a basis for action by the City of Chicago and CPD. In my opinion, such action would have included a re-examination of those previous complaints and the administration of appropriate remediation and affirmative action to ensure that such behavior stopped and that a clear message was sent throughout the ranks of the embattled department. I am not aware of any information that would cause me to conclude that the City or its police department re-examined any of the 26 CR investigations after the Goldston Report was issued in November 1990. Despite an OPS investigation that concluded that there was systematic misconduct that had resulted in at least 50 recognized incidents, including 26 that were reported and assigned to OPS or IAD for investigation, not even one was re-opened and reinvestigated considering Goldston's conclusions.

Notwithstanding the notice provided by the Goldston Report, it appears to me that the City did not take any steps to address or remedy the systematic misconduct uncovered by Goldston's investigation, particularly considering the number of detectives accused of misconduct and the pervasive nature of the misconduct. I have not been made aware of any evidence that the City implemented any training or enacted any policies that specifically addressed the gross departures set out in Goldston's findings. In my opinion, turning a blind eye to these findings is especially egregious given the fact that Burge was in a supervisory role in the CPD's Area 2, and presumably other (and perhaps younger) detectives learned how to interrogate suspects and witnesses by watching how Burge went about the work of fabricating evidence through abusing suspects and witnesses that were entrusted to his care.

### 3. Wilson v. City of Chicago[17]

On February 14, 1982, Chicago Police officers arrested Andrew Wilson for the murder of two police officers. Investigating officers coerced Wilson into confessing to committing the murders by punching him, kicking him, smothering him with a plastic bag, electrocuting him, and pressing him against a hot radiator throughout the day of his arrest. Extensive contemporaneous medical and photographic evidence confirmed the horrific treatment detectives meted out on Wilson.

---

[16] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 339 (2014) (citing David Jackson, 13 Years of Cop Torture Alleged, Daley, Martin, Rip Internal Police Reports, Chi. Trib. (Feb. 8, 1992), http://articles.chicagotribune.com/1992-02- 08/news/9201120603_1_jon-burge-torture-chicago-police-board).
[17] *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993).

Wilson underwent two trials. The first ended in a conviction of first-degree murder and the death sentence. The Illinois Supreme Court reversed Wilson's conviction on the grounds that his confession, part of the evidence against him, was forced. Wilson was retried, sentenced, and convicted to life without possibility of parole. In addition to appealing the second conviction, Wilson sued for damages under 42 U.S.C. § 1983. He claimed that his confession was fabricated due to being physically tortured. The defendants included lieutenant Burge, several officers, and the City of Chicago. The first trial ended in a hung jury. The second trial resulted in a verdict affirming that Wilson's rights were violated but exonerated all the officers who participated in his torture.

The jury also found that the City of Chicago had a *de facto* policy authorizing its police officers to physically abuse persons suspected of having killed or injured a police officer. The jury also found the policy to abuse suspects was not the proximate cause of the physical abuse Wilson underwent. The court ruled in favor of the officers who abused Wilson. The Police Board, however, found three of the officers guilty of misconduct, suspending two of them and firing Burge. The Fraternal Order of Police hailed Burge a hero and unsuccessfully attempted to enter a float in the St. Patrick's Day parade in his honor.

### 4. The Employment Termination of Jon Burge

The City eventually sought to impose formal discipline on the 3 officers that were involved in torturing Andrew Wilson. In February and March of 1992, the Police Board heard the case and took testimony from Wilson and several other Burge torture survivors. In 1993, the Board issued its order stating that Burge had physically abused Wilson, terminating Burge and recommending 15 months suspension of the other two.[18]

As previously stated in my report, the conduct of Jon Burge and the officers serving under his supervision during the time of this egregious conduct resulted in resounding notice to the City and the CPD. In fact, the improper and unlawful practices that occurred on Burge's watch as a CPD supervisor was reported and considered "common knowledge" according to a federal court:

> It was also common knowledge that in the early to mid–1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.[19]

---

[18] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 358 (2014).
[19] *U.S. ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999).

### 5. Special Prosecutor's Investigation and Report

In addition to the work of Investigator Goldston, the Office of the Special Prosecutor convened an investigation into Burge's improper and unlawful conduct. Their investigation spanned some four years and concluded in 2006. No criminal indictments resulted, but they did conclude that Burge had committed aggravated battery, obstruction of justice and perjury related to his abuse of Andrew Wilson and his later testimony about it.[20] They also concluded that several other officers had abused other individuals. The Report further found that because Jon Burge was the Commander of Area 2 and Area 3 and it was known he could abuse suspects and witnesses and fabricate evidence with impunity, those who served under his command recognized that they, too, could engage in the same abusive conduct without consequence.[21] It has been my experience that when an organization fails to establish and sustain effective systems of accountability and consciously turns a blind eye to misconduct, it sends a message throughout the organization that those who engage in misconduct may do so with impunity. I believe this to have been the case in the City of Chicago and throughout the CPD during the Burge Era.

In addition to the work of Goldston and the Office of the Special Prosecutor, the Illinois Legislature sought to remedy the illicit work of Burge and his confederates. In 2009, the legislature enacted the Illinois Torture and Inquiry Commission to address claims of abuse by police officers in the City of Chicago.[22] Eventually the City of Chicago acknowledged this stain on its history. In 2015, the City Council enacted the Reparations Ordinance for the Burge torture survivors. The ordinance included a formal apology from the Mayor and City Council for police abuse. Nevertheless, many of the torture survivors remain incarcerated for crimes they did not commit.

### 6. People v. Wrice[23]

On September 9, 1982, in the early morning hours, several men allegedly sexually assaulted, beat, and burned thirty-three-year-old K.B. The attack occurred in the attic of Wrice's Chicago home. Wrice was charged with rape, deviate sexual assault, and numerous other offenses. Prior to trial, Wrice moved to suppress inculpatory evidence he gave investigators because Detective Peter Dignan and Sergeant John Byrne, acolytes of Jon Burge, fabricated a confession from Wrice by physically abusing him.

Wrice testified that police took him to Area 2 Headquarters and placed him in a second-story room. Officers handcuffed him to a ring on the wall and questioned him. Unsatisfied with Wrice's responses, Detective Dignan freed him from the wall ring and told him that he (Dignan)

---

[20] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 358 (2014).
[21] *Id.* at 359. *See* Special Prosecutor's Report. AR-L 150667-150958.
[22] 775 ILCS 40, et. seq.
[23] People v. Wrice, 357 Ill. Dec. 33, 962 N.E.2d 934, 2012 IL 111860 (Ill. 2012).

"was fixing to do some police brutality." Dignan and Byrne took Wrice to a barred room located on the lower floor of the building, where they beat him with a 12- to 13-inch-long rubber hose, taped at each end, and a flashlight. Wrice sustained abuse to his groin, chest, and legs and eventually gave detectives a statement of admission.

A jury found Wrice guilty of armed violence, two counts of aggravated battery, deviate sexual assault, unlawful restraint, and rape. Wrice's first appeal was rejected. In 2000, Wrice filed a successive *pro se* post-conviction petition alleging violations of his due process rights. Wrice cited the report from the Chicago Police Department's Office of Professional Standards (OPS), establishing that abuse of prisoners and fabricated confessions at Area 2 were widespread and systematic. In October of 2007, Wrice filed a petition for leave to file another successive petition for post-conviction relief. In the petition, Wrice cited Special Prosecutor Edward J. Egan's findings of widespread and systematic mistreatment of suspects and witnesses by Chicago police officers, many of whom reported to Jon Burge. The court denied Wrice leave to file his second successive post-conviction. The appellate court reversed and remanded for a third-stage evidentiary hearing. Prosecutors appealed the Appellate Court decision to the U. S. Supreme Court, which agreed to hear the case. On February 2, 2012, the Supreme Court, with a unanimous opinion, affirmed the Appellate Court decision ordering a hearing on Wrice's claims. The ensuring hearing culminated in Wrice's exoneration and release.[24]

Wrice's case put the City of Chicago on notice that Burge's illegal tactics and torture of suspects and witnesses had spread throughout the Department to Burge's acolytes, including Dignan, Bryne, and others, as discussed in more detail below.

### 7. A Pattern of Lawsuits and Exonerations in the 1980s and 1990s That Further Put the City on Notice of Fabrications and Misconduct Specifically During Identification Procedures

A series of lawsuits, judicial decisions, and media coverage put the City on notice of a widespread pattern of fabrication of eyewitness identifications and misconduct during identification procedures conducted by CPD officers. As one example, James Newsome was wrongfully convicted of the murder of a grocer following a Chicago Police Department investigation. After Newsome was exonerated and pardoned based on forensic evidence tying the murderer's fingerprints left at the murder scene to a convicted murderer on death row, he brought a federal civil rights suit in 1996. During the litigation, Anthony Rounds, a key eyewitness, stated in an affidavit in 1999 that that he told the police that he did not get a good look at the murderer, but was asked to view a line-up nonetheless; that at the line-up, he could not make an identification of either a face or a voice; and that at the line-up, he repeatedly told that to the police who "constantly" told him that "number 3 [plaintiff] looked and sounded like the gunman." Rounds

---

[24] Stanley Wrice - National Registry of Exonerations (umich.edu).

swore that his fabricated testimony at Newsome's trial "was the creation of the plain clothes police officers" and "was based on what the police told [him] they knew, and not based on what [he] recalled."[25] In 2000, the district court denied the motion of two Chicago Police Department officers for summary judgment, detailing the plaintiff's evidence that they fabricated eyewitness identifications and conspired to wrongfully convict Newsome.[26] (A jury later awarded Newsome $15 million following a 2001 trial.[27])

The City also received notice of the wrongful conviction of Xavier Catron for murder following an investigation and line-ups with youth witnesses conducted by Chicago Police Department officer John Halloran. After Catron's trial, three key witnesses recanted their identifications of Catron, stating that they identified him only at the urging of the police.[28] (For his part, Halloran was subsequently named in three misconduct lawsuits that cost Chicago a total of $7,050,000.)[29]

In 1987, the Illinois Appellate Court reversed the 1982 murder conviction of Melvin Jones following evidence that the Chicago Police Department had no grounds to arrest Jones in the first place. Police had claimed that an eyewitness, Deneen Murray, had identified Jones in a line-up as the perpetrator of a triple murder to Chicago Police Department Officer Robert Flood. Yet Murray later swore in an affidavit that, during Flood's questioning of her concerning the triple murder, she did not tell Flood that Jones was involved in the triple murder; (2) she did not know Jones in November 1982, when Flood questioned her; (3) she first saw Jones in a police station a month or so later; (4) she viewed a lineup (apparently to determine if any person therein was a person that she had seen involved in the triple murder); (5) Jones was in the lineup viewed by Murray; (6) Murray recognized Jones as being one of the persons in the lineup; (7) Murray did not pick out Jones as being involved in the triple murder.[30]

Numerous DNA exonerations in the 1990s calling into question eyewitness identifications procured during Chicago Police Department investigations further put the City on notice of its faulty identification procedures and outcomes. As a few examples, Donald Reynolds and Billy Wardell were wrongfully convicted in 1988 of crimes related to the rape and attempted rape of two University of Chicago students in part based on victim identifications made during the Chicago Police Department investigation of the crime. Yet their convictions were subsequently vacated and the charges dismissed after DNA testing excluded Reynolds and Wardell as

---

[25] *See Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000).

[26] *Id.* at *16; *see also Newsome v. James*, No. 96 C 7680, Dkt. 150, at 3-9 (N.D. Ill. May 16, 2000).

[27] *See* Chicago Tribune, Lineup suit nets $15 million, 2001 WLNR 10747375; *see also Newsome*, Case No. 96 C 7680 (N.D. Ill.) (docket); National Registry of Exonerations entry on James Newsome, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3504.).

[28] *See, e.g.*, Chicago Tribune, Man Leaves Prison, Forgives Accuser Who Recanted Story, 2000 WLNR 8294420.

[29] Case No. 07-cv-3994 (Robert Wilson); Case 06-L-9648 (Emmanual Lopez Lopez); Case No. 06-cv-6772 (Harold Hill).

[30] *See* People v. Jones, 157 Ill. App. 3d 1006, 1025-27 (1987); *see also, e.g.*, Chicago Sun Times, Burge tortured me, too, ex-suspect says, 1992 WLNR 5316085; National Registry of Exonerations entry on Melvin Jones, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4176.

18

potential sources of the semen in the case. The case was widely reported in the media and the men sued the City of Chicago.[31]

Likewise, Robert Brown was wrongfully convicted of murder in 1984 after having been identified in a Chicago Police Department lineup as the man who shot victim Ronnie Bell. Subsequently, the true killers confessed to the murder, and Brown and his codefendant were released.[32]

And John Willis was likewise exonerated of a rape conviction by DNA evidence after false eyewitness identifications had been procured during a Chicago Police Department investigation. Willis brought a lawsuit widely covered in the media against Chicago Police Department officers and others.[33]

In another police investigation involving grocery store robberies in Chicago and nearby suburbs, Chicago police claimed that a string of witnesses had positively identified their suspect, Vincent Goldstein, as the perpetrator of four Chicago robberies that took place on September 11, September 25, November 5, and December 13 of 1993. Yet the robberies continued after Goldstein's arrest. Charges were dropped after Goldstein's employer provided a firm alibi for the December 13 robbery, and another person, Anthony Coker, confessed to Evanston police that he had committed the September 25 and November 5 robberies. The case was widely reported in the press, which directly raised the obvious question of how so many different witness misidentifications could have happened given Goldstein's innocence.[34]

The large body of information put the City on notice of widespread fabrication of eyewitness identifications and misconduct during identification procedures, and of the foreseeable risk of harm from wrongful convictions that resulted to the citizens of Chicago. In my opinion, the failure of the City to implement any meaningful changes considering the documented evidence of fabricated evidence by CPD officers is unconscionable and evidence of knowing disregard of the risk that investigators would continue to violate the rights of criminal suspects during investigations.

---

[31] *See, e.g.*, Chicago Sun Times, DNA tests free 2 men jailed for rape since '86, 1997 WLNR 7140007; Chicago Tribune, Section: 2 Found Guilty of Raping U. of C. Student in 1986, 1988 WLNR 1734965; National Registry of Exonerations entry on Donald Reynolds, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3574.

[32] Chicago Tribune, After 6 Years in Prison, 2 Men Cleared, 1989 WLNR 2542748; National Registry of Exonerations entry on Robert Brown, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3063.

[33] *See, e.g.*, Chicago Tribune, Ex-Inmate Exonerated Of Rapes Tries To Get His Life In Order, 2000 WLNR 8240260; Chicago Tribune, Prisoner To Go Free As DNA Clears Him In Beauty Shop Rape, 1999 WLNR 6721651; National Registry of Exonerations entry on John Willis, available at
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3756.

[34] Chicago Tribune, Wrong Guy Looked Right in Lineups, 1994 WLNR 4312248.

8. **The City's Practice of Fabricated Statements and Coerced Confessions Spread to Burge's Acolytes**

It's important to note that during Burge's tenure in Area 3, he served in a supervisory capacity. In my professional experience, I have come to recognize that the role of a supervisor is to provide guidance and oversight to those personnel who are assigned to their watch. In so doing, they also set the tone and establish the acceptable standards of conduct. Given Burge's history of misconduct and the shortcuts that he took to "solve" the cases assigned to him, I question how effective he may have been in his supervisory role and the troubling influence he may have had on those within his span of control. The notion that his practices were not only acceptable, but also helped him to rise to the level of Commander, is especially disturbing and demonstrates to me the City and CPD's willful blindness to the widespread pattern of behavior that was evident in the cases in which Burge had been previously assigned.

During his assignment to CPD Area 3, Burge overlapped with Detectives Kenneth Boudreau and Jack Halloran. In total, over the course of their careers, Detectives Boudreau and Halloran were accused of at least 50 allegations of misconduct, including allegations of excessive force, allegations of false or fabricated statements or coerced confessions.

Burge's history of misconduct spread to other parts of the Department. Area 4 Detective Kriston Kato had 42 CRs over the course of his career in which he was accused of engaging in the similar types of egregious misconduct that the Plaintiffs have alleged in the context of the Soto homicide investigation including physical abuse of witnesses and suspects. Twenty-six different individuals accused Kato of abusing suspects and witnesses inside the police station, and yet none of the allegations were sustained.

Finally, as set forth in more detail below, the City's failures to stop the rampant misconduct is exemplified in the numerous allegations against Area 5 Detective Defendant Guevara. He has been accused of fabricating evidence by dozens of people, including Plaintiffs, and has been called a "bald face[d]" liar by the Cook County judge who presided in Plaintiffs' post-conviction cases, and has refused to testify about his conduct as a CPD detective on grounds that a truthful response may incriminate him.

In addition, I have reviewed the report of Professor Richard Leo. Dr. Leo's report reveals a systemic pattern of misconduct for decades, across all Areas of the CPD, involving numerous officers, and the torture and abuse of hundreds of innocent people. Specifically, Dr. Leo details that at least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the CPD and numerous police command personnel received continuing notice of a systemic practice of physical abuse and coercion of suspects in order to coerce and fabricate confessions. The physical abuse and coercion of custodial suspects to obtain

confessions was systemic and widespread at Area 2 and perpetrated by Burge and those under his command; at Area 3 and perpetrated by Detectives Michael Kill, Boudreau, Halloran and several other CPD detectives; at Area 4 and perpetrated by Detective Kriston Kato and the Area 4 detectives with whom he worked cases; and at Area 5 and perpetrated by Detective Guevara, Detective Halvorson, and other Area 5 Chicago police detectives.

These examples are indicative of a pattern of conduct exacerbated by failed supervision, a fractured accountability system, and widespread ignorance of gross departures from generally accepted industry standards and established laws that govern the way police departments are supposed to operate. My belief in this regard is evident by innumerable historical records that include the indelible work of Jon Burge and the many reports that have been authored since his abhorrent behavior surfaced and signaled systemic failures in the CPD.

### 9. The City's Practice of Fabricating False Statements Was Further Revealed in FBI 302s

The City's widespread practice of fabricating evidence was again revealed in a Federal Bureau of Investigation (FBI) form 302 by former Assistant State's Attorney Terrence Johnson, who worked as a felony review attorney at CPD Area 1 in the mid-1990s. Johnson reported how detectives at Area 1 fabricated evidence from four Black teenagers: Terrill Swift, Harold Richardson, Michael Sanders, and Vincent Thames. The case in which these young men were involved was known at the time as the case of the "Englewood Four."[35] All four were eventually exonerated based on DNA evidence, which also linked to the real serial killer. The City eventually settled these four cases for over $31 million.

In the FBI form 302, former ASA Johnson described how detectives would feed witnesses facts about the murder, how they made promises of leniency by promising that whoever spoke first would be a "witness" and that witnesses would go home (i.e., be released from police custody). Johnson further reported that the detectives worked to coordinate all the statements to line up with one another and falsely corroborate each other, and then practiced and rehearsed statements with the suspects prior to their giving their false statements.[36] In addition, Johnson described how the detectives coordinated their testimony at the suppression hearings, including using a "cheat sheet" of the timeline of their investigation/statements.[37]

In my opinion, the improper and unlawful tactics described by Johnson were wholly inconsistent with proper policing standards at the time. Furthermore, it reveals to me a highly coordinated and well-orchestrated strategy by detectives to fabricate evidence. These deeply dysfunctional and improper tactics utilized by detectives to fabricate not just one, but four interlocking confessions from teenagers signals a widespread pattern of fabrication that has

---

[35] Johnson 302 & Timeline, PTP-H Richardson 000301-306, and Johnson Dep.
[36] *Id.*
[37] *Id.*

much relevance to the way Reyes and Solache were charged and prosecuted for the Soto murders. It is important to note that the Englewood case was investigated at Area 1 in 1995, years before Reyes and Solache's criminal trials. Moreover, the fabrication of evidence in the Englewood case is consistent with Plaintiffs' allegations in this case.

Additionally, as documented in the June 2001 FBI 302 report of an interview with Mohammed Omar, CPD received information that its officers were engaging in criminal conduct, including providing protection to drug dealers, fabricating evidence, and taking bribes, but did no further investigation of its own into the allegations.[38] Omar's FBI 302 report was created during the investigation of CPD Gang Crimes Specialist Joseph Miedzianowski. In that report, witnessed by a member of the CPD's internal affairs division, Omar reported that he knew Defendant Guevara, and that Guevara's "policy" was to catch a person with drugs or guns, but let them buy their way out of trouble. Further, Omar reported that Guevara "accepted bribes to change positive or negative identifications during line-ups for murder cases." Omar provided a specific example of two cases where Guevara was implicated in fixing the cases in conjunction with an attorney Beuke, whom Omar said was a friend of Guevara's. Omar's information about Beuke's relationship to Guevara appears to be accurate, and his detailing of the criminal enterprise run by himself and Miedzianowski is supported by their federal convictions for the same.[39] Nonetheless, the record presented to me is devoid of any follow-up investigation of Omar's report (Klimas Dep., pp. 6, 12-13). There is no indication that Guevara was questioned, that IAD tried to question Beuke or find the two people specifically mentioned as having cases that were fixed by Guevara. These are the most fundamental steps that must be taken in any internal investigation, let alone one where the accusations are so serious. If true, what Omar is alleging is not only a terminable offense, but also criminal. Nevertheless, it is not acceptable for a department to abdicate investigative authority to ensure that its police officers are not victimizing its citizenry.

Omar's FBI 302 report is just further corroboration of the broken disciplinary process that permits the misconduct described above with near-impunity, and the code of silence in which officers look other way, and know not to blow whistle or face retaliation, both of which continued well after Plaintiffs' criminal cases and continues today.

---

[38] FBI 302 Report by Mohammed Omar, AR-L 101776-101791, at 14-15.
[39] Beuke Dep., AR-L 571205-571377, at 44, 66-67, 68-69, 69, 73-74, Complaint, *Maysonet v. Beuke*, AR-L 537371-537383, at ¶ 3-4, 6, 28, 30, 46.

10. **The City of Chicago's Broken Accountability System Has Been Demonstrated Repeatedly and Over Decades**

    *a.  Jones and Palmer*

Two federal court cases highlighted the fact that well before Plaintiffs' criminal cases, CPD had a pattern of keeping the code of silence within the Department intact rather than ensuring there were systems in place to guarantee that investigative materials were collected centrally and disclosed during criminal cases. These cases are yet another example CPD's broken accountability system.

*The George Jones Prosecution*

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death; and her 10-year-old brother Purvey was beaten unconscious in their home.[40] George Jones was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[41]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvey, who told Laverty that there were two assailants, and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator. That information was also placed in the street file.[42] Laverty was told that, considering these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[43] Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[44]

---

[40] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Cir. 1988).
[41] *Id.* at 988-991.
[42] *Id.* at 990-91
[43] *Id.* at 991.
[44] *Id.* at 995-96.

*Palmer v. City of Chicago*

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[45] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[46]The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[47]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the exclusion of relevant information from official reports "was not random or infrequent."[48] In fact, by the City's admission, there were hundreds street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[49] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

*The Jones Appeal*

After the *Palmer* litigation concluded, the Seventh Circuit issued an opinion in *Jones v. City of Chicago*,[50] in which Judge Posner affirmed liability against Chicago police officers for the withholding of evidence from Mr. Jones and affirmed liability against the City of Chicago for maintaining a street files practice.

Of note in the appellate court's decision is its finding that (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the

---

[45] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985).
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id*; CPD Special Order 83-2A.
[50] *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988).

monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[51]

The Seventh Circuit's decision highlighted the failure of CPD's leadership, which allowed Detective Laverty to be punished for coming forward while allowing those who actively attempted to thwart Laverty's efforts to reveal the truth to go without discipline or reprimand. Indeed, the United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events, writing that "the CPD should consider entering a commendation in Detective Laverty's personnel file for his adherence to the principles of honesty, decency, and justice." Instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.

These actions in effect condoned the misconduct and sent an unmistakable message to CPD personnel that the priority was not solving the street file problem, but instead was dissuading whistleblowers from coming forward.

### b. Klipfel lawsuit and the Miedzianowski scandal

The Mohammed Omar FBI 302, discussed above, came in the wake of ample additional information about Miedzianowski's rampant criminality, much of which was exposed by two whistleblowing agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The story of their whistleblowing, and their treatment for blowing the whistle, is as serious and grave a scandal as the underlying criminality of Joe Miedzianowski. who was eventually prosecuted federally and is serving a life sentence.

In 1994, Plaintiffs Diane Klipfel and Michael Casali, husband and wife ATF agents in Chicago, filed a lawsuit alleging that they were retaliated against for blowing the whistle on Miedzianowski's criminality. Ms. Klipfel was an ATF supervisor overseeing a joint task force with the Chicago Police Department focusing on crimes committed by Latino street gangs, and

---

[51] Id. at 988, 991-92, 993, 995-996.

Chicago police officers Joseph Miedzianowski and John Galligan were assigned to the taskforce. Mr. Casali, meanwhile, was part of an ATF undercover investigation.

In February 1992, ATF agent Klipfel learned that in the course of executing a search warrant, Miedzianowski got the key to a safe deposit box, from which he and CPD officer Michael Byrne stole thousands of dollars. In April 1992, ATF agent Casali learned from an informant that Miedzianowski was supplying gangs with guns and drugs, and was involved in covering up a homicide. Ms. Klipfel and Mr. Casali made repeated disclosures to higher-ups in the ATF about the criminal conduct of Miedzianowski, Galligan, and other CPD officers. Klipfel even confronted Miedzianowski, and his response was a perfect example of the impunity he felt: "Your husband and you both work in the City. Remember that, always remember that. And you better watch your darling kids. Your house could get lit up."

CPD's response to the serious allegations of two ATF agents was to protect Miedzianowski. CPD opened an Internal Affairs Investigation into Miedzianowski, but the investigation appears to have been a sham, and a perfect example of how CPD's broken disciplinary system creates a sense of impunity in officers like Miedzianowski. The record indicates that Internal Affairs shared information from its investigation with Miedzianowski, and permitted him to essentially participate in the investigation. A federal pleading in Miedzianowski's criminal case summarized the CPD investigation as follows:

> The search of Miedzianowski's residence revealed evidence that before the prior investigation [the CPD IAD investigation of plaintiffs' allegations] was completed, Miedzianowski received copies of witness statements and other reports generated in the course of that investigation. . . . he was not authorized to have these documents. This and other evidence obtained during the instant investigation indicates that, at best, the prior investigation was compromised in that Miedzianowski was kept informed of the progress of the prior investigation as it occurred.

Richard Risley, the head of CPD's Internal Affairs, knew about the allegations about Miedzianowski's criminality by 1993 at the latest. Records indicate that Risley not only failed to meaningfully investigate Miedzianowski, but was personally involved in trying to protect him. According to news reports related to the Klipfel's trial, Risley was caught on wiretaps communicating with Miedzianowski about the investigation, and actively scheming with him to discredit the accuser, and stating that he had concealed information that would have implicated Miedzianowski, including a recorded conversations between Miedzianowski and a co-conspirator who was in prison. This is unfathomable misconduct by the head of CPD's primary internal disciplinary unit.

Finally, news reports indicate that at the Klipfel trial, Philip Cline, then-Superintendent of the Chicago Police Department, testified that when he was a supervisor overseeing homicide investigations he suspected Miedzianowski of interfering in homicide investigations on two different occasions. In one case, Miedzianowski removed documents from the homicide files gave them members of an involved street gang. Cline reported both incidents to Internal Affairs, but neither incident resulted in a sustained finding or discipline against Miedzianowski. In fact, publicly available data from the Invisible Institute, tracking allegations of misconduct against CPD officers, it appears that Miedzianowksi was the subject of at least twenty civilian complaints, but none of those Complaint Register Files resulted in any discipline from the CPD.

All of this is corroborated by former Chicago Police officer Juan Juarez, who apparently provided an affidavit during discovery in the Klipfel lawsuit. Juarez, who worked in the 14th District (within Area 5) from 1992 until he resigned in 1997, stated as follows:

> During my time as an officer with the Chicago Police Department, it was my experience that Chicago Police Officers did not fear discipline from OPS or IAD because they knew that they would be shielded by the code of silence. In my experience as a Chicago Police Officer, the CPD had an unwritten policy of protecting police officers and shielding them from discipline or prosecution. . . . Other officers would not come forward with information they may have had or would even lie and falsify reports to corroborate the accused officer's version of facts.

Klipfel and Casali ultimately prevailed at trial. The jury found the City liable under Monell for maintaining a code of silence, and awarded the former ATF agents $9.75 million.

The records related to the Klipfel lawsuit and Miedzianowski's misconduct are a stunning example of CPD's broken disciplinary system, and the type of egregious officer misconduct that results. Not only did Miedzianowski get away with misconduct for decades despite numerous civilian complaints, even complaints from then-Commander Cline and from two ATF agents in good standing failed to cause CPD's disciplinary system to take any action to meaningfully investigate and discipline corrupt officers. The impact of this culture of impunity cannot be underestimated. In my opinion, it is no coincidence that Reynaldo Guevara previously worked with Miedzianowski out of the same gang crimes unit before becoming a detective with his own scandalous history of misconduct.

      c.   *Obrycka v. City of Chicago*[52]

On February 19, 2007, Obrycka was working at Jesse's Shortstop Inn, a neighborhood bar in Chicago. Obrycka's shift started at 6:00 pm and ended at 2:00 a.m. Abbate, an off-duty Chicago police officer, was a patron at Jesse's Shortstop Inn on February 19, 2007. At or around 9:30 p.m., Obrycka and Abbate had a physical altercation with each other in which Abbate punched and kicked Obrycka multiple times. Abbate, at or around 3:00 p.m. the same day, started a fight with another patron at Jesse's Shortstop Inn. The bartender at the time of the 3:00 p.m. incident was Patti Chiriboga, a friend of Abbate. Patti told Abbate that she would serve him no more alcohol and he left the bar but returned at or around 8:00 p.m. and consumed several mixed drinks and shots of brandy, before making his way behind the bar. Obrycka asked Abbate to leave the bar area and he complied. As the night progressed, Abbate became increasingly physically and verbally aggressive. Abbate flexed his biceps and yelled, "Chicago Police Department " repeatedly before making his way behind the bar and attacking Obrycka. Abbate told Obrycka, "nobody tells me what to do," while kicking and punching her repeatedly.

After the beating, Abbate left the bar and Obrycka dialed 911. Obrycka did not know Abbate was a police officer. A bar patron told Obrycka that Abbate was a Chicago Police Officer and Obrycka passed that information on to the 911 operator. The beating of Obrycka was captured on the bar's video recorder. Obrycka and other witnesses told responding officers that the person who assaulted Obrycka was a Chicago Police Officer, and that the incident was captured on video tape.

The supervisor in charge waited four days before signing the final police report. First responding officers omitted from their reports to the police department's Office of Professional Standards information about the assailant being a Chicago Police Officer. Officers shared information about the ongoing investigation including that of video evidence with Abbate, who, in turn, made numerous attempts to acquire the tape from the bar. Abbate offered - through other officers acting on his behalf - to pay medical bills and lost wages to Obrycka if she would not pursue the case with the police and prosecutors. She refused to cooperate with Abbate. Abbate then threatened Obrycka and others to prevent them from disclosing video recordings of his beating Obrycka. Obrycka left her employment after receiving word of Abbate's threats. Abbate went as far as having his sister call the bar to ascertain Obrycka's last name. Investigators knew of Abbate's threats but did not disclose that information to the Office of Professional Standards.

On February 22, 2007, the Office of Professional Standards and Chief Investigator with other OPS personnel viewed the videotape of the incident and, as a result, invited SAO and IAD to

---

[52] *Obrycka v. City of Chicago*, Case No. 07 C 2372 (N.D. Ill. Feb. 23, 2012).

investigate. After viewing the recordings, IAD and CPD took the reductionist approach characterizing the incident as a "bar fight" and recommended Abbate be charged with misdemeanor battery. In mid-March 2007, after signing the misdemeanor complaint and suffering CPD's inaction, Obrycka released the video of Abbate beating her. SAO, following the release of the recording, approved felony charges for aggravated battery on June 2, 2009. The trial judge sentenced Abbate to two years of probation on June 23, 2009.

The failure of police supervision and discipline in the City of Chicago is not only demonstrated by the many examples above, it is also a fact admitted by City policymakers and Chicago Police officers. Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within CPD.[53] In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in CPD.[54] And in 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."[55]

## B.     The City of Chicago had a Pattern and Practice of Fabricating Evidence

It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in fabricating evidence by extracting false statements from suspects and witnesses. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such misconduct substantiate that the misconduct occurred as an established practice, not just on an isolated basis. This allowed Chicago Police Department officers, including the Defendants, the widespread custom and practice of contriving false witness narratives for vulnerable witnesses for the purpose of wrongly convicting an innocent person.

The National Exoneration Registry has identified 294 exonerations between 1961 and 2017 in Cook County, Illinois. Chicago is part of this County.[56] This database indicates that 260 exonerations out of the total 294 had some type of police misconduct, with a higher concentration in Murder and Drug-Related convictions. The registry identifies in Cook County that 79 out of 260 exonerations found police misconduct related to false confession/fabricated evidence, mistaken witness identification, or false or misleading forensic evidence.

The CPD data analyzed by Ms. Meza shows that between 1995 and 1998, about 53% of all the allegations (1,136 out of 2,150 allegation counts) CPD received were classified as coerced confession, excessive force, fabricated statement or fabricated evidence, false arrest, forced to sign consent to search, improper inventory procedure, planted evidence, suggestive lineup,

---

[53] Mayor Emanuel's Address to City Council Stresses Trust, Respect - WTTW.
[54] Chicago Police Union President Appears to Acknowledge Code of Silence – ABC7 Chicago.
[55] *See* DOJ Findings Report (2017) (AR-L 150084-AR-L 150247) at 19.
[56] The National Registry of Exonerations - Exoneration Registry (umich.edu). The National Registry of Exonerations is an ongoing online archive that includes all known exonerations in the United States since 1989. There have been 2,663 exonerations as of February of 2019. University of Michigan, Law School, and University of California Irvine, Law School.

threats, verbal abuse, and racial/ethnic slurs—all allegations like those brought by Mr. Reyes and Mr. Solache. *See* Table 1.

A federal survey found that 8 percent of the use of force complaints received by large state and local law enforcement agencies in 2002 were sustained.[57] In the June 10, 2020, Washington Post article, *Police unions and police misconduct: What the research says about the connection,* about 7 percent of complaints of officer misconduct for unionized police agencies were sustained.[58]

By comparison, while the 1995 - 1998 dataset revealed similar rates of sustained allegations for CPD officers after investigation for all types of complaints (8% percent, or 167/1,983 individual investigations), the sustainment rate after investigation for excessive force complaints was just 4.7% (21/451). The sustained rates after final review are even further below the national average: 3% (51/1,983 individual investigations) for all complaints, and 0.9% (4/451) for excessive force complaints. *See* Tables 2 and 3. These figures are indicative of CPD's deeply flawed investigation and disciplinary systems.

There is no standardization of data collection for agencies and units tasked with investigating officer misconduct across the country. This creates a challenge when analyzing sustain rates and disciplinary process efficacy. For instance, the San Francisco Department of Police Accountability (DPA), Oakland's Community Police Review Agency (CPRA), and Portland's (Oregon) Independent Police Review Division (IPR) investigate all allegations that are submitted; however only certain types of investigations are included when determining their sustain rates.[59] Seattle's Office of Police Accountability (OPA) issued findings for 1042 allegations in 369 investigations in 2020. Eighteen percent of completed investigations contained one or more sustained findings.[60]

---

[57] Here's What Happens When You Complain To Cops About Cops | HuffPost Latest News.
[58] Police unions and police misconduct: What the research says about the connection - The Washington Post.
[59] San Francisco Department of Police Accountability, 2018 Third Quarter Report.
[60] Office of Police Accountability 2020 Annual Report, April 2021, pg. 23.

**TABLE 1**: Allegations in Chicago of coerced confession, excessive force, fabricated statement or fabricated evidence, false arrest, forced to sign consent to search, improper inventory procedure, planted evidence, suggestive lineup, threats, verbal abuse, racial/ethnic slurs. Dataset 1995-1998.

| Origin of Complaint | Sum of Allegation Count | Allegation count: Coerced confession, excessive force, fabricated statement or fabricated evidence, false arrest, forced to sign consent to search, improper inventory procedure, planted evidence, suggestive lineup, threats, verbal abuse, racial/ethnic slurs. | Percentage |
|---|---|---|---|
| EXTERNAL | 1921 | 1107 | 58% |
| INTERNAL | 199 | 28 | 14% |
| UNKNOWN | 30 | 1 | 3% |
| **Grand Total** | **2150** | **1136** | **53%** |

**TABLE 2**. Individual Investigations and Allegations of Use of Force in Chicago by their findings after investigation (before review).

| Row Labels | EXTERNAL | INTERNAL | Grand Total |
|---|---|---|---|
| Exonerated | 6 | | 6 |
| Not Sustained | 351 | | 351 |
| **Sustained** | **18** | **3** | **21 (4.7%, 21/451)** |
| Unfounded | 73 | | 73 |
| **Grand Total of Use of force allegations** | **448** | **3** | **451** |

**TABLE 3**. Individual Investigations and Allegations of Use of Force in Chicago by their findings after full review.

| Finding after full review | EXTERNAL | INTERNAL | Grand Total | % |
|---|---|---|---|---|
| N/A | 430 | 2 | 432 | 95.8% |
| Not Sustained | 15 | | 15 | 3.3% |
| Sustained | 3 | 1 | 4 | 0.9% (4/451) |
| **Grand Total** | **448** | **3** | **451** | |

The following table shows the number of allegations and the percentage of the total allegations filed between 1995 - 1998, where the allegation types are coerced confession, excessive force, fabricated statement or fabricated evidence, false arrest, forced to sign consent to search, improper inventory procedure, planted evidence, suggestive lineup, threats, verbal abuse, and racial/ethnic slurs.

**TABLE 4**: Allegations associated to the ones raised by Reyes and Solache, by the percentage of the total allegations filed

| Allegation Type | Origin of Complaint | | | | | | Grand Total | % |
|---|---|---|---|---|---|---|---|---|
| | External | % | Internal | % | (blank) | % | | |
| Coerced Confession | 20 | 1% | 0 | 0% | 0 | 0% | 20 | 1% |
| Excessive Force | 448 | 23% | 3 | 2% | 0 | 0% | 451 | 21% |
| Fabricated Statement or Fabricated Evidence | 30 | 2% | 7 | 4% | 0 | 0% | 37 | 2% |
| False Arrest | 141 | 7% | 4 | 2% | 0 | 0% | 145 | 7% |
| Forced to Sign Consent to Search Form | 1 | 0% | 0 | 0% | 0 | 0% | 1 | 0% |
| Improper Inventory Procedure | 183 | 10% | 5 | 3% | 1 | 3% | 189 | 9% |
| Planted Evidence | 14 | 1% | 0 | 0% | 0 | 0% | 14 | 1% |
| Suggestive Line Up | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Verbal Abuse | 179 | 9% | 8 | 4% | 0 | 0% | 187 | 9% |
| Threats | 62 | 3% | 1 | 1% | 0 | 0% | 63 | 3% |
| Racial/Ethnic Slurs | 29 | 2% | 0 | 0% | 0 | 0% | 29 | 1% |
| **Subtotal** | **1107** | **58%** | **28** | **14%** | **1** | **3%** | **1136** | **53%** |
| Total Allegation count | 1921 | 100% | 199 | 100% | 30 | 100% | **2150** | 100% |

CPD's low sustain rates for allegations of abuse is troubling. CPD had a history of torture of the most heinous form for decades. The Department had notice that the problem continued well after Burge, as it continued to receive CRs making similar allegations. Rather than see these similar allegations as a red flag that needed to be treated with the utmost seriousness, the CPD failed to meaningfully investigate and discipline officers. The following are a few examples of CRs that I reviewed that show the CPD's failure to meaningfully investigate allegations of abuse.

- CR No. 217821 is a complaint alleging that during the complainant's arrest on May 19, 1995, Officer Ted Pilafas grabbed the complainant by the thumb and bent it backwards causing injury. Afterwards, Complainant was placed in handcuffs by Ofc. Pilafas. Complainant provided an initial statement to an on-duty CPD Sergeant at the time of her arrest, photos were taken of the swelling to her left thumb and hand by a CPD Evidence Technician, and she was transported to a medical facility where her left thumb was placed in a brace. Ofc. Pilafas submitted a to/from report to the OPS investigator where he described Complainant as a passive resister and admitted grabbing her hand tightly as he attempted to place her in handcuffs. Ofc. Pilafas stated Complainant did not complain of pain or request medical treatment. OPS investigator made one attempt to contact Complainant with the information she provided without success. The OPS investigator stating in his conclusion "complainant/victim…did not cooperate with this investigation."[61] He further stated he was unable to ascertain additional facts for clarification and he was unable to obtain medical information to support the allegation.[62] Lastly, the investigator inaccurately stated there was only one account of how the injury occurred and that was provided by the accused officer in the to/from memorandum.[63] Complainant provided a more detailed account of how her thumb was injured to the Sergeant at the time of the injury, the Sergeant documented the injury with photographs and sent Complainant to the hospital for treatment and subsequent photos taken by the Evidence Technician show Complainant's thumb in a brace, yet the allegation of physical abuse was deemed to be not sustained.

- CR No. 218641 is a complaint alleging that during the complainant's arrest, Officer Barbara Healy physically and verbally abused her by slamming Complainant against a car and forcing Complainant to her knees after she was handcuffed, and also by using profanity. Lastly Complainant alleges that while inside the 25th District Station, following her arrest and inside a room, Ofc. Healy forced Complainant to drop her shorts (she was not wearing any underwear) and to lift up her shirt and bra. Complainant reported the inappropriate search by Ofc. Healy to Sergeant Christian Grogman and Officer Corilyn Howard and they failed to take any action. Witnesses to the arrest of Complainant

---

[61] CR 217821 Summary Report Digest, Conclusion.
[62] Id.
[63] Id.

corroborate her account of the arrest. Ofc. Healy and witness officers on the scene provided to/from memorandums to the OPS investigator that aligned with one another and the arrest reports. All denied the allegations made by Complainant. Ofc. Healy also denied conducting any type of search of Complainant while at the 25th District Station.[64] Sgt. Grogman and Ofc. Howard denied the allegations made against them in to/from memorandums submitted to the OPS investigator. Despite the Complainant's detailed allegations to multiple officers, the OPS investigator concluded all allegations should be not sustained "[g]iven the highly conflicting accounts of the complainant and the accused, and the lack of any other substantial evidence to support or refute the allegations."[65]

- CR No. 219269 is a complaint alleging officers struck Complainant in the testicles with a flashlight, forced him into a squad car and verbally abused him and other witnesses. A CPD Sergeant was originally called to the scene to take this complaint on July 13, 1995. Complainant and witnesses stated many CPD officers rushed into his sister's home after a man they were chasing. This account was corroborated by other witnesses on the scene. The witnesses said the officers also directed profanity towards them. The witnesses also provided the Sergeant with the license plate number of at least one police vehicle involved in the incident. OPS investigator identified several officers involved in the chase and arrest and received to/from memorandums from them. They all denied knowledge of Complainant and the allegations made. The initial OPS investigation lasted 15 days. It was re-opened on December 11, 1997 as a result of Civil Suit 97C4991 (CR 240978), with numerous additional allegations of inappropriate searching of a minor female by raising her blouse and making crude comments about her body; entering a house and searching it without a warrant; using excessive force on several of the Complainants and failing to provide them with medical treatment; filing false police reports about the incident; making one male complainant remove his clothing during a search of him; and falsely charging one complainant with a possession of handgun they in fact placed at the scene. Complainants did not respond to requests for additional statements on advice of their legal counsel. OPS investigator identified several officers involved in the chase and arrest and received to/from memorandums from them. They all denied knowledge of Complainant and the allegations made. This OPS investigation lasted 55 days. The allegations were deemed not sustained in both instances.

---

[64] *Id.*
[65] *Id.*

### C. CPD's Accountability System Routinely Failed to Thoroughly Investigate, Supervise, and Discipline Officers for Serious Misconduct in a Timely Manner

CPD's broken systems of accountability have had the effect of enabling the continuance of bad behavior that has infected the culture of the department negatively and allowed the Defendants' misconduct to go uninterrupted. I have identified several ways in which the City's investigations of officers' misconduct were lacking and failed to comport with generally accepted standards in the field of police practices and resulted in a widespread practice of deficient investigations. A review of the Defendants' disciplinary histories further reveals the inadequacy of the City's investigatory and disciplinary practices.

**The Historical Context**

The People's Law Office's investigation into the Chicago Police Department identified sixty-five suspects who were tortured by Burge or other officers and detectives between 1972 and 1991 in Areas 2 and 3.[66] A report by the Office of Professional Standards (OPS), found that physical abuse "did occur and that it was systematic....[T]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture."[67]

In 1993, Burge was dismissed, and two detectives involved in the Wilson case were suspended by the Police Board.[68] According to reports, as of 1997, no other individual on the force has been disciplined for any of the identified sixty-four cases where torture was alleged.[69]

At that time, OPS reopened twelve of the torture cases and recommended discipline for several officers; however, the OPS director overruled the recommendations. In the cases of two sergeants identified as abusers involved with Burge, OPS investigators sustained complaints and recommended discipline; instead, one sergeant was decorated for valor by the mayor while the other retired with full benefits.[70]

No criminal prosecutions were pursued against the officers involved in the torture incidents. The U.S. Attorney's office reportedly learned of the Area 2 torture cases after the five-year statute of

---

[66] Telephone interview with attorney G. Flint Taylor of the People's Law Office, October 23, 1997; list of sixty-four alleged victims in Affidavit of G. Flint Taylor, *Illinois v. Patterson*, No. 86-C-6091 (Cook County Cir. Ct. filed November 13, 1996); Statement of G. Flint Taylor, before the Congressional Black Caucus, September 12, 1997, p. 2. For a detailed description of many of the torture allegations, *see* Conroy, "Town without pity," *Chicago Reader*; and Conroy, "The shocking truth," *Chicago Reader*, January 10, 1997.

[67] Office of Professional Standards report by investigator Michael Goldston, September 28, 1990 (hereinafter "Goldston Report"), p. 3. Goldston's report listed the names of fifty alleged victims of torture and brutality, the names of detectives who had been involved, and stated: "Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end." Ibid.

[68] Human Rights Watch, Shielded from Justice: Police Brutality and Accountability in the United States: Chicago: Torture.

[69] Taylor, statement before Congressional Black Caucus, p. 3, and Conroy, "Town without pity," *Chicago Reader.*

[70] Human Rights Watch, Shielded from Justice: Police Brutality and Accountability in the United States: Chicago: Torture.

limitations for civil rights cases had passed; when it was suggested that conspiracy charges could still be brought against those involved who continued to cover up their involvement, there was still no action toward pursuing the cases.[71] When a re-investigation is conducted, misconduct is uncovered, and yet no discipline is meted out, the unmistakable message to the rank and file officers is that the department is not interested in deterring misconduct.

### 1.    Majority of Complaints, Which Originate From the Community, Fail to be Sustained

As the CPD data analyzed by Ms. Meza shows, most allegations from the 1995 - 1998 dataset provided by CPD were from the community and most of these complaints never led to a sustained finding – only 1% of all external allegations—those originating outside the CPD—were sustained. *See* Table 5. That figure is far below available national averages from that time period. According to figures from the United States Department of Justice's Bureau of Justice Statistics, in 2002 the overall sustain rate for external citizen complaints was 8% across all large state and local law enforcement agencies nationwide.[72] These results are for cases that reached final disposition.

Even comparing to the other largest cities in America, Chicago's rate are much worse. In New York City, of the more than 103,000 complaints against NYC police officers filed over past two decades, 7.5% were sustained.[73] In Los Angeles, 4% of complaints against LAPD Officers in 2019 were sustained.[74]

Moreover, the small number of complaints that were sustained rarely resulted in any meaningful discipline (see Table 7). The practical result of this is that a vast number of officers who commit misconduct go unscathed, misconduct goes without affirmative corrective action, and officers are permitted to act with impunity.

From the dataset reviewed, 90% (1,756/1,953)[75] of the individual investigations were external, or from the community, while 10% were internal, or from within CPD.

In the 1995 - 1998 dataset, only 1.2% of all allegations filed by the community were sustained after full internal review, while 14% of allegations filed by CPD personnel were sustained.[76] Even more troubling, CPD's low sustain rate for external allegations of 3.6% was cut by two-thirds after full internal review, sending CPD officers the message that the Department will not ultimately discipline them if they break the rules.

---

[71] Conroy, "Town without pity," *Chicago Reader.*

[72] https://bjs.ojp.gov/content/pub/pdf/ccpuf.pdf.

[73] Drauth, D. (2021). NYPD: thousands of complaints, small percentage of officers disciplined. abc7NY.

[74] Leonard, E. (2020, August 18). Complaints against LAPD officers increased in 2019. NBC4.

[75] Thirty of the individual investigations lacked identification as to whether the complaint source was external or internal.

[76] Sustainment rates need to be assessed in terms of allegations because a single complaint may allege more than one misconduct type and the final determination may be different for each allegation.

**TABLE 5**: Individual Investigations[77] with Sustained findings before and after full internal CPD review, by source of complaint.

|  | External | Internal | (blank) | Total |
|---|---|---|---|---|
| **Sustainment before review** | 3.6% (64/1756) | 52% (102/197) | 3% (1/30) | 8% (167/1983) |
| **Sustainment after full internal review** | 1.2% (22/1756) | 14% (28/197) | 3% (1/30) | 3% (51/1983) |
| Difference | -2.4% (-42/1756) | -38% (-74/197) | 0 | -6% (-116/1983) |
| Total count in sample | 100% (1756/1756) | 100% (197/197) | 100% (30/30) | 100% (1983/1983) |

---

[77] Number of individual investigations divided in the total investigations. In a complaint there may be one or more named CPD employee, each of them is individually investigated for the misconduct alleged against them, for the purposes of this analysis sustainment is calculated based on individual investigations and not unique CRs.

Figure 1, shows investigation outcomes based on final determination after full internal review and the breakdown of sustained versus not sustained findings, based on the complaint's origin.

Most CRs had a final finding of N/A regardless of their complaint origin; 97% and 86% for external and internal complaints. The final finding of "N/A" means no determination was made. The main reason for an "N/A" finding is the lack of an affidavit,[78] creating opportunities for an extremely high number of complaints to go uninvestigated and countless officers to commit misconduct without being detected. This is discussed in greater detail in Opinion 1, Section C.4 of this report.

*Figure 1, Investigation outcomes based on final determination, by internal and external complaints. Sample 1995 – 1998*



In police departments across the United States, the number of external complaints (larger or smaller) may reflect the level of confidence the community has in the disciplinary process.[79] Between 1995 to 1998, CPD documented more external complaints filed by community members per year than those filed by either Police Department peers or Chain of Command members.

---

[78] Office of Inspector General, City of Chicago, Evaluation of the Use of the Affidavit Override in Disciplinary Investigations of Chicago Police Department Members (2020), available at https://igchicago.org/wp-content/uploads/2020/12/OIG-Evaluation-of-the-Use-of-the-Affidavit-Override-in-Disciplinary-Investigations-of-CPD-Members.pdf.

[79] PERF, 2018. A Review on Minneapolis Police Department Internal Affairs. 2016.08 Oversight Commission - Complaint Filing Experience.pdf (mn.gov).

**2. CPD's Investigations that Did Lead to Sustained Findings Rarely Included Serious Allegations of Misconduct**

Ms. Meza's analysis revealed there are significant differences in the allegations that originate from internal versus external complaints. Seven allegation types (excessive force, warrantless search, improper inventory procedure, verbal abuse, false arrest, property damage, and other) concentrate 80% of complaints that originate externally from the community. Four allegation types concentrate 83% of the internal complaints (rule violation, inattention to duty, theft, and other). *See* Tables 6A and 6B.

**TABLE 6A**: Frequency of types of top external allegations (80th percentile) in Chicago, Dataset 1995-1998

| Allegation type | Allegation Count | % External | Accumulative |
|---|---|---|---|
| **Excessive Force** | **448** | **23%** | **23%** |
| **Warrantless Search** | **294** | **15%** | **39%** |
| **Improper Inventory Procedure** | **183** | **10%** | **48%** |
| **Verbal Abuse** | **179** | **9%** | **57%** |
| **Other** | **168** | **9%** | **66%** |
| **False Arrest** | **141** | **7%** | **74%** |
| **Property Damage** | **132** | **7%** | **80%** |
| **Total external complaints** | **1921** | **100%** | **-----** |

**TABLE 6B**: Frequency of types of top internal allegations (80th percentile) in Chicago, Dataset 1995-1998

| Allegation type | Allegation Count | % Internal | Accumulative |
|---|---|---|---|
| **Other** | **78** | **39%** | **39%** |
| **Rule Violation** | **47** | **24%** | **63%** |
| **Theft** | **21** | **11%** | **73%** |
| **Inattention to Duty** | **19** | **10%** | **83%** |
| **Total internal complaints** | **199** | **100%** | **-----** |

Table 6B shows that officers almost never complained about each other except for procedural misconduct such as inattention to duty. Despite the extensive history of CPD officers physically abusing and coercing witnesses and suspects as outlined in Opinion 1, Section A of this report, only 10 times in the entire CPD over 4 years did an officer complain of another officer using excessive force or fabricating evidence. In this four-year period, no officer ever complained about another officer coercing a confession, despite the history discussed in Opinion 1, Section A. This is a strong indicator of the code of silence with the CPD discussed above.

Excluding the "other" catch-all category, the most frequent external complaints were for excessive force and warrantless search, while the most frequent internal complaints were for rule violation and theft. Thus, the allegation types referred to by internal members of CPD are mostly related to procedural misconduct, while allegation types that were reported by community/citizens were often related to abuse against people interacting with the police.

As set forth in the following table, however, an important finding from review of the CPD-provided dataset is that there is a significant disconnect between the most frequent alleged officer misconduct as shown in Tables 6A and 6B, and the types of misconduct for which allegations were sustained after investigation and after final review.

**TABLE 7A**: Source & Category of Sustained Internal Complaints With Corresponding Sustain Rates, 1995 - 1998 Dataset

| Type of Allegations | Number of Allegations Sustained after Investigation | Number of Allegations Sustained after Final Review | Total Allegations | % of Allegations Sustained after Investigation |
|---|---|---|---|---|
| **Domestic Violence Internal** | 2 | 0 | 3 | 67% |
| **Excessive Force Internal** | 3 | 1 | 3 | 100% |
| **Fabricated Statement or Fabricated Evidence Internal** | 2 | 0 | 7 | 29% |
| **False Arrest Internal** | 2 | 1 | 4 | 50% |
| **Improper Inventory Procedure Internal** | 2 | 0 | 5 | 40% |
| **Inattention to Duty Internal** | 14 | 0 | 19 | 74% |
| **Mistreatment of Juvenile Internal** | 0 | 0 | 1 | 0% |
| **Other Internal** | 35 | 7 | 78 | 45% |
| **Rule Violation Internal** | 38 | 16 | 47 | 81% |
| **Unlawful Use/Display of Weapon Internal** | 1 | 1 | 2 | 50% |
| **Verbal Abuse Internal** | 3 | 2 | 8 | 38% |

**TABLE 7B**: Source & Category of Sustained External Complaints in Chicago With Corresponding Sustain Rates, 1995 - 1998 Dataset

| Type of Allegations | Number of Allegations Sustained after Investigation | Number of Allegations Sustained after Final Review | Total Allegations | % of Allegations Sustained after Investigation |
|---|---|---|---|---|
| Domestic Violence External | 7 | 7 | 29 | 24% |
| Excessive Force External | 18 | 3 | 448 | 4% |
| Fabricated Statement or Fabricated Evidence External | 2 | 0 | 30 | 7% |
| False Arrest External | 8 | 1 | 141 | 6% |
| Improper Inventory Procedure External | 4 | 1 | 183 | 2% |
| Inattention to Duty External | 0 | 0 | 49 | 0% |
| Mistreatment of Juvenile External | 4 | 1 | 60 | 7% |
| Other External | 2 | 1 | 168 | 1% |
| Property Damage External | 4 | 0 | 132 | 3% |
| Rule Violation External | 3 | 2 | 21 | 14% |
| Theft External | 1 | 0 | 12 | 8% |
| Threats External | 1 | 0 | 62 | 2% |
| Unlawful Use/Display of Weapon External | 3 | 3 | 48 | 6% |
| Verbal Abuse External | 2 | 0 | 179 | 1% |
| Warrantless Search External | 9 | 4 | 294 | 3% |

A review of the dataset shows that internal complaints were sustained at significantly higher rates than external complaints from the community. In addition, sustained complaints disproportionally reflected misconduct relating to procedural misconduct (e.g., inattention to duty, rule violations, improper inventory procedure) or domestic violence, as opposed to abuses against community members while on duty (e.g., fabricated statements, threats, excessive force, false arrest, warrantless search, verbal abuse). As the City's accountability system continually sustained internally originated complaints at higher rates, and as those complaints were more likely to be less severe in nature, this reinforced the environment in which officers, like the Defendants in this case, could engage in serious misconduct violations with little fear of consequence.

**TABLE 8**: Frequency of Allegations Pertinent to Reyes & Solache Case, with Corresponding Sustain Rates, 1995 - 1998 Dataset

| | External | | | | | |
|---|---|---|---|---|---|---|
| | Allegation Count | Sustained After Full Internal Review | % | Allegation Count | Sustained After Full Internal Review | % |
| **Coerced Confession** | 20 | 0 | 0% | 0 | 0 | - |
| **Excessive Force** | 448 | 3 | 1% | 3 | 1 | 33% |
| **Fabricated Statement or Fabricated Evidence** | 30 | 0 | 0% | 7 | 0 | 0% |
| **False Arrest** | 141 | 1 | 1% | 4 | 1 | 25% |
| **Forced to Sign Consent to Search Form** | 1 | 0 | 0% | 0 | 0 | - |
| **Improper Inventory Procedure[80]** | 183 | 1 | 1% | 5 | 0 | 0% |
| **Planted Evidence** | 14 | 0 | 0% | 0 | 0 | - |
| **Suggestive Line Up** | 0 | 0 | - | 0 | 0 | - |
| **Verbal Abuse** | 179 | 0 | 0% | 8 | 2 | 25% |
| **Threats** | 62 | 0 | 0% | 1 | 0 | 0% |
| **Racial/Ethnic Slurs** | 29 | 0 | 0% | 0 | 0 | - |
| **Total of this subset of allegations** | 1107 | 5 | 0% | 28 | 4 | 14% |

The sustain rates for misconduct of the type alleged in the Reyes and Solache case, which generally concerns coerced confessions, fabrication and suppression of different kinds of evidence, threats, and verbal/mental abuse, reflect that there were only 48 allegations sustained after investigation in the 1995 to 1998 data, out of 1,107 total allegations. Moreover, as reflected in Tables 7A and 7B, only 10 allegations were sustained after final review, reflecting that officers who engaged in such misconduct faced almost no risk of accountability and were unlikely to face any discipline. It is well known in my field that the existence of a disciplinary process that rarely ever results in sustained findings for particular categories of misconduct signals to officers that they can engage in such serious misconduct with little fear of

---

[80] Exclusion, CR (218080) with unknown complaint origin, with sustained allegation of Improper Inventory Procedure after full review.

consequence, allowing them to perpetrate misconduct without fear of discipline and to understand in advance that their decisions take place within a system that will not seriously punish any misconduct they may choose to commit.

Further contributing to an officer's sense of impunity, even for those few allegations sustained after final review, officers were extremely unlikely to face any meaningful discipline, as shown in the following table:

**TABLE 9**: Frequency of Discipline Served for all Allegations Sustained after Final Review in Chicago, by Complaint Source/Type, 1995 - 1998 Dataset

| Types of Allegations Sustained | Domestic Violence External | Excessive Force External | Excessive Force Internal | False Arrest External | False Arrest Internal | Improper Inventory Procedure External | Mistreatment of Juvenile External | Other External | Other Internal | Rule Violation External | Rule Violation Internal | Unlawful Use/Display of Weapon External | Unlawful Use/Display of Weapon Internal | Verbal Abuse Internal | Warrantless Search External | Grand total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allegations Sustained after Final Review | 7 | 3 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 2 | 16 | 3 | 1 | 2 | 4 | 51 |
| Violation Noted, No Disciplinary Action | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1 | -- | 1 |
| N/A or blank | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1 | -- | -- | -- | -- | 2 | 2 |
| Reprimand | -- | -- | 1 | | 1 | | | -- | 1 | 2 | -- | -- | -- | | | 5 |
| Suspended 1 Day | 1 | 2 | | 1 | -- | -- | 1 | -- | -- | -- | 2 | -- | -- | 1 | 2 | 10 |
| Suspended 3 Days | 3 | | | | -- | 1 | | 1 | -- | -- | 7 | -- | -- | -- | | 12 |
| Suspended 5 Days | 3 | 1 | -- | -- | -- | -- | -- | -- | -- | -- | 10 | -- | -- | -- | | 14 |
| Suspended 10 Days | -- | -- | -- | -- | -- | -- | -- | -- | 10 | -- | -- | -- | -- | -- | | 10 |
| Suspended 30 Days | -- | -- | -- | -- | -- | -- | -- | -- | 3 | -- | -- | -- | -- | -- | | 3 |
| Suspension and separation of department | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 3 | 1 | -- | -- | 4 |

| Suspension, returned to active duty | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2 | -- | -- | -- | -- | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Options granted, i.e., forfeit furlough days | -- | 2 | -- | -- | -- | 1 | 1 | 1 | -- | -- | 1 | -- | -- | -- | -- | 6* |

\* Options are granted jointly with other types of discipline.

Of the CRs I reviewed, the following are a few examples of CRs where the allegations were sustained, but the discipline imposed was next to nothing.

- CR No. 216576 is a complaint where allegations of a Rule 8 violation[81] were sustained against Officer Wayne McClory. Ofc. McClory referred to another CPD officer as a "fuckin' asshole" in the presence of a CPD supervisor. Ofc. McClory received a two-day suspension. The original incident occurred March 28, 1995. The investigation was initiated April 4, 1995 and was completed on May 8, 1995. Command Channel Review and the Assistant Deputy Superintendent, Internal Affairs Division concurred with the sustained finding and recommended discipline. Ofc. McClory rejected the recommendation and requested a hearing before the Complaint Review Panel (CRP). On Oct. 2, 1996, Ofc. McClory appeared before the CRP and contested both the finding and recommended penalty. The CRP unanimously concurred with the sustained finding but recommended a one-day suspension as an alternate penalty. Ofc. McClory was given the option to forfeit accumulated comp time or vacation in lieu of taking a day without pay.

- CR No. 224495 is a complaint where allegations of a Rule 6 violation[82] and a Rule 14 violation[83] were sustained against Detective Kriston Kato and Detective Sam Cirone. The OPS investigator recommended three-day suspensions for both detectives; however the Complaint Review Panel did not concur with the findings or the recommended penalty. The findings were changed to not sustained and the Superintendent concurred.

- CR No. 218912 is a complaint where allegations of a Rule 6 violation and a Rule 8 violation were sustained against Lieutenant Vicki Zoch. The OPS investigator recommended a two-day suspension for Lt. Zoch. The original incident occurred June 28, 1995. The investigation was initiated the same day and was completed on November 6, 1995. Command Channel Review and the Assistant Deputy Superintendent, Internal Affairs Division concurred with the sustained finding and recommended discipline. Lt. Zoch rejected the recommendation and requested a hearing before the CRP. Lt. Zoch took a leave of absence for disability pension effective March 3, 1997. There was no record of her having served a penalty.

---

[81] Disrespect to or maltreatment of any person, while on or off duty.
[82] Disobedience of an order or directive, whether written or oral.
[83] Making a false report, written or oral.

### 3. CPD's Annual Reports

I have reviewed CPD's annual reports for the corresponding time period of the City of Chicago's CR production (1995 - 1998). CPD reported the IAD and OPS investigations in general figures, including the complaints filed, general categories of complaints, those investigated by IAD and OPS and the sustain rates. My understanding is that these figures overstate the actual sustain rate in two ways: first, they treat any CR that results in a sustained finding as "sustained" even if there may be allegations and/or accused officers that did not result in a sustained finding; and second, they treat CRs with excessive force allegations as sustained even if the only sustained allegations relate to other kinds of misconduct.

**TABLE 10**: OPS Investigations Reported in CPD Annual Reports for 1995 - 1998

| Year | Total CRs | Investigations Retained by OPS | OPS Completed Investigations | Number of Sustained CRs | Sustain Rate of Excessive Force CRs |
|------|-----------|-------------------------------|------------------------------|-------------------------|-------------------------------------|
| 1995[84] | 6,406 | 3,119 | 3,079 | 244 | 7.9% |
| 1996[85] | 7,151 | 3,138 | 3,216 | 269 | 8% |
| 1997[86] | 6,940 | 3,115 | 3,108 | 300 | 9.6% |
| 1998[87] | 5,778 | 2,857 | 2,799 | 203 | 7% |

---

[84] https://home.chicagopolice.org/wp-content/uploads/2014/12/1995-Annual-Report.pdf.
[85] https://home.chicagopolice.org/wp-content/uploads/2014/12/1996-Annual-Report.pdf.
[86] https://home.chicagopolice.org/wp-content/uploads/2014/12/1997-Annual-Report.pdf.
[87] https://home.chicagopolice.org/wp-content/uploads/2014/12/1998-Annual-Report.pdf.

**TABLE 11**: IAD Investigations in Chicago for 1995-1998

| Year | IAD Investigation Category | Number of CRs | Sustained | Sustain Rate |
|------|---------------------------|---------------|-----------|--------------|
| 1995 | Civil Rights violations | 540 | 3 | 0.6% |
|      | Verbal Abuse | 730 | 14 | 1.9% |
|      | Arrest/Lock-up Procedures | 276 | 60 | 22% |
|      | Bribery/corruption | 33 | 1 | 3% |
| 1996 | Civil Rights violations | 1,049 | 15 | 1.4% |
|      | Verbal Abuse | 591 | 26 | 4.3% |
|      | Arrest/Lock-up Procedures | 459 | 84 | 18% |
|      | Bribery/corruption | 21 | 3 | 14% |
| 1997 | Civil Rights violations | 1,233 | 8 | 6% |
|      | Verbal Abuse | 619 | 18 | 3% |
|      | Arrest/Lock-up Procedures | 530 | 89 | 17% |
|      | Bribery/corruption | 39 | 9 | 23% |
| 1998 | Civil Rights violations | 754 | 11 | 1.4% |
|      | Verbal Abuse | 651 | 20 | 3% |
|      | Arrest/Lock-up Procedures | 374 | 86 | 30% |
|      | Bribery/corruption | 39 | 3 | 7.6% |

Based on my professional experience in the field of police practices, police administration and accountability and the review of the evidence in this case, it is my opinion the City had a widespread practice resulting in a *de facto* policy of failing to properly investigate officers accused of misconduct, supervise officers, and administer meaningful discipline for officers found to have fabricated evidence.

This widespread practice included: (1) the failure to investigate allegations of false evidence; (2) the failure to supervise and discipline officers accused of creating false evidence; (3) the failure to identify repeat offender officers or implement an early intervention prevention program; and (4) the perpetuation of a code of silence such that officers who committed misconduct believed they could do so with impunity. Both the superintendent of police and City Council had notice of

this widespread practice and failed to remedy it. That was so although in the 1990s, it was well known that police departments had a responsibility to ensure that their officers were not fabricating evidence. If they did not provide that assurance, then, foreseeably, suspects' rights would invariably be violated.

*"Police accountability systems are vital to lawful policing. In combination with effective supervision, a robust accountability system can help identify, correct, and ultimately prevent unreasonable and unnecessary use of force."*[88]

Yet, for an accountability system of any kind to work, it must be real, and it must have consequences. "It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens."[89]

Internal Investigations are a form of administrative inquiries that have been in place for decades to maintain reasonable parameters of performance in the field and to hold officers accountable for their conduct. Historically, it has been a common practice for police agencies in the United States to have in place a mechanism for receiving and investigating allegations of misconduct by its membership. These investigations, and the policies that guide that process, typically impact four essential constituency groups: the person who has brought forth the allegation, the officer or officers on whom the allegation has been made, the involved agency and the municipality that employs them, and ultimately the community served by the officer and the agency they represent.

There have been a whole host of studies on police practices that have influenced the way law enforcement agencies in the U.S. go about establishing standards of conduct and investigations of misconduct within their ranks. The following serve as an example and have been widely known throughout the field of law enforcement: the 1931 Wickersham Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals. The Task Force Report provides particularly helpful guidance as it relates to discipline within a law enforcement agency.

"Discipline and accountability are essential to a police agency. The integrity of the police agency can be maintained by an effective and responsive discipline system. Certainly, public support will be strengthened by protecting them from police misconduct and corruption through the changing of inadequate police policies and procedures, and the correction or removal of employees guilty of misconduct. Police chief executives agree that discipline,

---

[88] DOJ Findings Report, AR-L 150084-AR-L 150247, at 7.
[89] *Id.*

positive and negative, is good for an organization; it assists in establishing the prestige of the organization in the specific occupational field and general community, in maintaining effective agency performance, and preserving employee morale. An inadequate discipline system many times will produce the opposite effect on an organization."[90]

The Task Force Report goes on to say that the police chief serves as the "ultimate police supervisor" and is tasked with monitoring the internal system frequently.[91] Moreover, they write:

> "The investigative procedures used, coupled with the subsequent adjudication process, are the most important elements in maintaining the confidence of the public and employees in the administration of discipline. The reason for investigating complaints of misconduct are: a. to maintain police agency integrity; b. to protect the public from police misconduct; c. to retrain and correct employees guilty of misconduct and remove those whose transgressions make them unacceptable for further police service; and d. to protect innocent police employees."[92]

In addition to those reasons set out above, I believe the following is critical to the mission of a robust, fair, and consistently enforced investigative, supervisory, and disciplinary process: the protection of the public from law enforcement officers who use their power and authority to corrupt the criminal justice process, impede the constitutional protections afforded to all who become suspects of crime and prosecution, physically abuse persons whom they have a duty to protect, and wholly disregard the sanctity of human life and dignity.

It has been my experience that law enforcement agencies demand high standards of discipline to ensure integrity within the ranks. Agencies simply cannot ignore or otherwise overlook the presence of misconduct. It is imperative that systems be in place to ensure fairness and be structured in a way that is reasonably calculated to remedy the behavior sought to be corrected. This has been a widely known and accepted principle for the duration of my law enforcement career.

At every critical stage of the CPD's systems there are enormous barriers that prevent accountability and create a culture where officers who choose to do wrong are allowed to do so without fear of punishment; barriers that discourage citizen complaints or prevent officers from reporting misconduct; barriers that prevent fair, thorough, and unbiased investigations; and even barriers to imposing discipline.

---

[90] POLICE TASK FORCE REPORT OF THE COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, at page 470.
[91] *Id.* at page 475.
[92] *Id.* at page 488.

One of the primary functions of a police agency is to investigate reports of police misconduct and to take affirmative steps to address such misconduct when its existence is evident. "When it fails to perform this function effectively, an obvious consequence is an increase of malfeasance since perpetrators will feel that their actions will go unpunished."[93]

In addition to creating a mechanism that sets up roadblocks for the department to promptly and thoroughly investigate complaints and correct wrongdoing, the City of Chicago has made a conscious and deliberate decision to allow a process to remain in place which presented a clearly foreseeable risk of harm to the citizens of Chicago by allowing a large population of officers to escape discipline and continue to engage in conduct that is contrary to their oath of office and amounts to a *de facto* policy that has resulted in widespread patterns, practices, and customs that threaten the Constitutional rights of citizens and resulted in the Plaintiffs' injuries.

Not only did the City tolerate impediments and obstructions to misconduct investigations, but it also allowed for the existence of a disciplinary process that rarely ever resulted in any meaningful discipline and, thus, signaled to officers that it was ok to engage in misconduct with impunity and without fear of discipline. In fact, multiple problems with CPD's disciplinary system during the relevant time made it unlikely that officers would ever be disciplined for misconduct.

It is widely known that for the most part police officers act with great autonomy. Many of them work alone or with a single partner, have minimal direct oversight as they move from call to call and location to location, make critical decisions that directly impact personal liberty, and carry immediate authority that is greater than most government officials. With such great and autonomous power, swift accountability must follow. The way that accountability is best administered in a police agency is through clear and consistently enforced policy, engaged supervision, rigorous and frequently reinforced training, and a strong process by which citizen complaints are received and investigated. It is clear to me from the discovery materials that the way the City investigated complaints of misconduct was highly ineffective and further frustrated the accountability systems in place at the time of this incident.

During the time frame during which this incident occurred, administrative investigations (typically referred to as Internal Affairs Investigations) fell within the purview of either the Internal Affairs Division (IAD), the Office of Professional Standards (OPS) or the Independent Police Review Authority (IPRA).[94] These were meant to be vital to maintaining reasonable

---

[93] *Clark v. City of Muskegon*, 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). Also, see, Internal Affairs Conference Manual, 2017, Public Agency Training Council.

[94] The internal process through which complaints of police misconduct is investigated has a rich history in American Policing and dates to studies on police practices including the 1931 Wickersham Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and

parameters that guide the performance by officers and the CPD as an organizational body within the City of Chicago.

During the more than 31 years in which I have been engaged in the profession of law enforcement and oversight of law enforcement agencies, a common police practice has been to investigate allegations of police misconduct which come to the attention of the police agency from any source, provided that the allegation, if later proven true, would amount to misconduct. This important and fundamental system of accountability not only helps to ferret our wrongdoers and hold them responsible for their actions, but when fairly and consistently applied it sends a resounding message to the entire organization that standards of conduct will be enforced. It also aids in identifying systemic issues, policy deficiencies and training needs.

These time-honored accountability systems and practices were in place then, and remain in place now, to properly inform and guide officers as to what they should or should not do, particularly when dealing with citizens during enforcement encounters. The supervisory practices, techniques, systems, and administrative investigations are the most critical aspect of controlling, monitoring and guiding field officer performance.

During the time of this incident, CPD's IAD investigated those allegations of police misconduct that were not within OPS's jurisdiction. OPS (and later IPRA) was tasked with investigating excessive force complaints. IAD investigated allegations such as coercion, mistreatment of witnesses, fabrication of witness/suspect statements, failure to disclose exculpatory evidence, holding a witness against their will and threatening to harm a witness if they did not provide a statement.[95] During this timeframe, OPS assigned a CR number to both IAD and OPS investigations and also assigned the initial complaint category.[96] All complaints that would come in, either from IAD, a direct citizen contact, or a from a CPD supervisor, were funneled through OPS for assignment.[97] Four outcomes were possible at the end of an IAD or OPS investigation:

---

Goals, and other similar studies since that time. These practices are embodied in model policies of nationally recognized police professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum. They have been continuously referenced in authoritative texts such as the O.W. Wilson's POLICE ADMINISTRATION, a former Chicago Police Superintendent, and its many successors and the International City Management Association's texts on municipal police practices. It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), Northwestern University Police Traffic Institute (IL), Southern Police Institute (KY), and Public Agency Training Council (IN).

[95] Timothy Moore Deposition, Case No. 18-CV-8144, *John Velez v. City of Chicago,* et al, August 26, 2021, at 66-67; Joseph Bird Deposition, Case No. 1:18-CV-1028, *Arturo DeLeon-Reyes v. Reynaldo Guevara*, et al and Case No. 1:18-CV-2312, *Gabriel Solache v. City of Chicago,* et al, December 22, 2021, at 35-36.

[96] Moore Dep. at 69; Bird Dep. at 36, 55.

[97] Moore Dep. at 67-68; Bird Dep. at 41.

- Unfounded – the allegation was found to have not occurred;
- Exonerated – the conduct occurred but was lawful;
- Not Sustained – the allegation is unable to be proved or disproved;
- Sustained – the allegation occurred.[98]

OPS was charged with the investigation of certain types of allegations that at this time largely consisted of excessive force complaints. OPS was nominally independent of the CPD but did fall within CPD's sphere of supervision and oversight. The lack of independence of the agency charged with investigating officers had significant adverse consequences, including that officers' accounts were believed over citizens and officers had multiple chances to contest the findings of the allegations made against them. Once a CR was assigned to OPS for investigation, the investigator would gather the documents and seek to interview the complainant and/or victim if the victim was not the complainant. The investigator was tasked with gathering evidence from witnesses or other physical evidence. Then the investigator would serve the accused officer with a notice of the allegations and waiver of counsel. The accused officers would have to respond by being interviewed, submitting a statement which was a question/answer format, or submitting a to/from memorandum. However, if the investigator could not contact the complainant or witnesses, the accused officer may not have to respond to the allegations. The investigator would then review the file and reach a finding. If the investigator reached a sustained finding, the investigator would then pull the accused officer's complimentary history such as award or commendations.[99] Pursuant to the FOP contract, the OPS investigator was only permitted to look at the accused officer's disciplinary history once a sustained finding was reached. If so, the OPS investigator could obtain a record of only prior sustained allegations from IAD.[100] It was not possible for the investigator to view the accused officer's prior CRs if they did not result in a sustained finding. Also, prior to 1991, the City destroyed most all CR files after five years.

Many of the barriers to the City's ability to effectively supervise, investigate, and discipline officers were the result of terms that the City agreed to in its collective bargaining agreements with the FOP. These limitations were not only known to the City, but also agreed to. The City yielding to the FOP prevented the City from identifying, disciplining, and stopping repeat patterns of officer misconduct.

---

[98] Moore Dep. at 99; Bird Dep. at 61.
[99] Moore Dep. at 112; Bird Dep. at 62.
[100] Moore Dep. at 112; Bird Dep. at 63.

4.     **OPS Investigations Failed to Investigate Officer Misconduct in a Manner that Comported with Accepted Police Practices as of 1998**

a.   **The City Failed to Investigate Anonymous Complaints**

During this time frame the City's General Order on Complaint and Disciplinary Procedures, General Order 93-1, did not permit anonymous complaints to be investigated unless their allegations were criminal in nature.[101] In my opinion, such a policy and practice impedes the administration of discipline by creating obstacles that will ultimately preclude the investigation of police misconduct. Not only are these impediments problematic from the perspective of a misconduct investigation, but they also create the foreseeable and certain opportunity for countless complaints to go uninvestigated and countless officers who would otherwise need swift discipline or remediation to fall through the cracks only to surface in yet another tragic set of circumstances. One of the primary functions of a police agency is to investigate reports of police misconduct and to take affirmative steps to address such misconduct when its existence is evident:

*"When it fails to perform this function effectively, an obvious consequence is an increase of malfeasance since perpetrators will feel that their actions will go unpunished."[102]*

During this time frame, the City required a signed affidavit from each complainant. Several things happen when a complainant's signed affidavit is a prerequisite to an investigation. First, such a process can have a chilling effect on the complaint process generally and can serve to undermine the complainant's confidence in the department's willingness to examine the conduct of its own employees. Second, and equally as important, it can prevent a department from becoming fully cognizant of deviant behaviors that will likely evolve into a pattern of misconduct that will have a foreseeable risk of harm on constituents and threaten the public trust and confidence. Third, it incentivizes officers to falsely accuse people of crimes, as a complainant with a pending criminal case on the underlying incident will likely be reluctant to make a sworn statement. When a municipality and its policy makers consciously and deliberately adopt such restrictive and antiquated practices, there is disincentive for a complainant to come forward and report legitimate claims of misconduct. The unfortunate and foreseeable result is that serious police misconduct that should have been investigated in a timely and robust fashion goes undetected. Not only does the behavior itself become concealed, but those responsible for the behavior are emboldened and become incentivized by a broken accountability system.

In addition to creating a mechanism that sets up roadblocks for the department to promptly and thoroughly investigate complaints and correct wrongdoing, the City of Chicago made a

---

[101] General Order 93-3 (eff. 1/13/93), Department Member Bill of Rights No. D. at AR-L 150412.
[102] *Clark v. City of Muskegon,* 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). *See also*, Internal Affairs Conference Manual, 2017, Public Agency Training Council.

conscious and deliberate decision to allow a process to remain in place which presented a clearly foreseeable risk of harm to the citizens of Chicago by allowing a large population of officers to escape discipline and continue to engage in conduct that is contrary to their oath of office and amounts to a *de facto* policy that has resulted in widespread patterns, practices, and customs that threaten the Constitutional rights of citizens and resulted in the plaintiffs' injuries.

### b. To/From Memorandums Were Widely Used Instead of In-Person Interviews of Accused Officers

In my opinion, when investigators rely upon a written response to a small number of questions without any additional follow-up or the securing of a properly preserved audio statement, the risk of error and the omissions of information give way to a serious flaw in the investigative process.[103] While I recognize that written police reports are often the first historical record of an event and an officer's involvement in that fixed point in time, interviews are the starting point of the investigative process and serve as the means by which an investigator gathers all of the facts and can challenge a particular version of those facts, especially when that version is contradicted or is inconsistent with that which serves as the basis for a complaint.

> The *United States of America v. City of Pittsburg* case is instructive as to how such investigations are to be conducted: "*All interviews of complainants, involved officers, and witnesses shall be tape-recorded and transcribed*."[104]

> The Agreement further provides that investigators shall not accept a written statement from any officer in lieu of an interview: "*(I)nvestigators shall have the authority to answer all interviewees and to challenge their version of the facts*."[105]

While I recognize that the City of Chicago was not a party to that Agreement, I believe they have failed to follow the guiding principles that ensure fair, objective, and thorough investigations of police conduct.

In the CRs that were provided for my review, the rate of written to/from reports by accused officers is remarkably high. Even for serious allegations of misconduct like that which serves as the basis of this litigation, the investigator might accept a to/from memorandum in lieu of an interview, including those for fabrication and suppression of evidence and abuse of suspects and witness. The following are a few examples from my review of the CR files in this case:

- CR No. 217624 (5/8/95) is a complaint alleging Detective Ronald Koncz and Detective Reynaldo Guevara physically abused complainant's son at an unknown location, by beating and pushing him to make him give them information regarding a homicide that

---

[103] *See* Reiter, Lou, LAW ENFORCEMENT ADMINISTRATIVE INVESTIGATIONS, 3rd Edition, 2006, 11.2.
[104] *United States of America v. City of Pittsburg*, No. 97 C 354 (W.D. Pa. 1997), ¶56.
[105] *Id.*

took place approximately one year prior. The detectives were not subject to a live interview by the OPS investigator. Instead, they were permitted to submit a to/from memorandum in response to the allegations against them. The detectives provided nearly the same, but not verbatim, to/from reports in which they denied physically abusing or pushing the complainant's son. Ultimately, the allegation of physical abuse was not sustained.

- CR No. 152902 (9/18/86) is a complaint alleging that Officer Guevara: 1) grabbed complainant by the shirt and threw him against the bar; 2) handcuffed him and struck him the face several times; 3) threw him to the floor and kicked him; 4) threw him against a wall outside and hit him in the head; 5) failed to make the proper notification that he (Guevara) was the victim of a battery; and 6) that Officer Guevara released a prisoner without proper authorization. Allegations #5 and #6 were made by the responding supervisor upon learning the facts of the incident. A seventh allegation of making a false report, written or oral, when Guevara gave false information regarding the incident to the OPS investigator; also known as a Rule 14 violation. Officer Guevara denied striking the complainant and throwing him onto the floor, into the wall and handcuffing him to the bar. Allegations 1-4 were deemed to be not sustained. Allegations 5-7 were deemed to be sustained. Guevara received a 2-day suspension, without pay.

- CR No. 152612 (8/27/86) is a complaint alleging Officers John Guzman, Stephan Gawrys, and Reynaldo Guevara struck complainant's brother, and one of the accused officers placed a gun to his dog's head and threatened to shoot the dog. The investigator conducted a telephone interview with the complainant's brother and asked if he had any injuries. He replied that he had sore ribs. He also told the investigator that only one of the three officers hit him. The accused officers denied striking the brother as well as threatening to shoot his dog. The investigator's summary report digest of the incident and investigation indicated the brother said he sustained no injuries. The investigator failed to include the information provided by the brother that he had sore ribs and only one of the officers struck him. Both allegations were ultimately not sustained.

- CR 217423 (5/27/94) is a complaint as a result of a civil suit alleging Officers Joseph Del Pilar, Daniel Gillespie, Clark Mikes, Gail Pietrowski, Joseph Colon, Michael Lynch and Mamie Draper arrested the Complainant without probable cause, falsified a police report, and conducted an unlawful search. The investigator reviewed the case report of the original arrest, criminal history of the complainant, arrest report and property inventory report. Then the investigator contacted the accused officers and they each submitted to/from memorandums denying the allegations and/or knowledge of the incident. The investigator was unable to contact the complainant. The allegations were all deemed to be not sustained.

- CR 228656 (7/8/96) is a complaint alleging Officers Jose Lopez, Anthony Lopez, Susan Wolverton, and Michael Tantilla physically and verbally abused Complainant during his arrest—specifically pushing Complainant's face against the hood of a squad car, dragging him downstairs, choking him and striking him in the ribs with a baton and directing profanity at Complainant. Officers stated in the police reports and subsequent to/from memorandums submitted to OPS as part of their investigation that Complainant was a violent resister and minimal necessary force was used to affect the arrest. The allegations were deemed to be not sustained.

- CR 231492 (9/3/96) is a complaint alleging Detectives William Facchini and William Kernan were rude, unprofessional, and physically and verbally abused Complainant prior to and during his arrest. The officers slapped Complainant's face, pushed him and directed profanity at him. Investigators stated that the detectives denied the allegations made against them and provided in their to/from memorandum that Complainant was standing at the front desk engaging in a verbal altercation with the desk officer when they asked him to quiet down and leave the building. The allegations were deemed to be not sustained.

In June of 1997, the United States Department of Justice notified the City of Steubenville, Ohio, among other things, that: "*The City's practice is to discourage civilians from making complaints, and to fail to investigate adequately those that are made. Civilians who do make formal complaints are discouraged from seeking formal resolution. Instead, the Chief of Police encourages his shift commanders to resolve complaints "in-house" --without documentation or disciplinary results. Where there is formal resolution of a civilian complaint, the documentation leading to such resolution, and apparently the investigation that would otherwise be documented, is practically nonexistent. Only seldom are statements taken from police officers, and even more rarely from other witnesses. Equally rarely is physical evidence collected or evaluated*".[106]

In my opinion, the prevalent use of to/from submissions of accused officers is evidence of systematic bias in favor of the officer in the context of administrative investigations. Moreover, this complacent way to gather information in response to alleged misconduct creates opportunity for vague, ambiguous, non-responsive, and even false statements that inevitably lead to an inaccurate and unjust result. In addition, it gives officers the opportunity to confer and provide consistent accounts. The data demonstrates that notwithstanding the fact that the investigator cannot assess credibility or probe further from a mere written response, the investigator still systematically and in the extreme majority of cases takes the word of the accused officer as provided in a written submission over the victim's or complainant's version of what occurred.

---

[106] DOJ Findings Letter to City Law Director, Steubenville, Ohio, dated June 12, 1997.

### D. CPD's Accountability System Had No Mechanism to Detect and Respond to Officers with High Numbers of Complaints

During the timeframe leading up to Mr. Reyes and Mr. Solache's arrests in 1998, there was no formal process in place for CPD Command Staff and supervisors to track the number of CRs subordinates received. This information was held within the Bureau of Internal Affairs (BIA).[107] Command Staff or immediate supervisors might be notified of some complaints, such as excessive force, positive drug test results, or any related to criminal activity.[108] However, Command Staff or supervisors were not notified when the allegations involved such misconduct as *Brady* violations, mistreatment of witnesses, violation of a line-up or fabrication of witness statements.[109] Cases that would trigger notification to Command Staff members were cases that would result in the accused member being relieved of police powers, and these were few and far between.[110] Supervisors have a duty to take action when their subordinates generate a high number of CRs in a short amount of time. However, the supervisor must be aware of this, and there was no formal system in place to do so.[111]

CPD's broken systems of accountability has had the effect of enabling the continuance of bad behavior that has infected the culture of the department, negatively impacted its legitimacy in the community, and allowed the Defendants' conduct to go uninterrupted. A review of the Defendants' disciplinary histories further reveals the inadequacy of the City's investigatory and disciplinary practices.

From the 556 employees investigated from 1995 to 1998, 10.25% of all accused officers (57/556 officers) were responsible for 43% of all allegations (924/2,150 allegations). Officers who contributed to a significant number of cases fall into the statistical outlier classification. Those officers with 9 or more allegations fall into the category of statistical outlier, and they are in the third quartile plus 1.5 times the interquartile range.[112]

---

[107] Moore Dep. at 49.
[108] Moore Dep. at 49-50; Bird Dep. at 144-145, 148-150.
[109] Moore Dep. at 51; Bird Dep. at 144-45; 148-50.
[110] Moore Dep. at 52.
[111] Moore Dep. at 55-56; Bird Dep. at 152.
[112] These outliers were statistically determined using the interquartile rule (anything above the third quartile plus 1.5 times the interquartile range). The analyst calculated the quartiles using the quantile function rather than following Tukey's recommendations, i.e., $IQR(x) = quantile(x, 3/4) - quantile(x, 1/4)$. For normally $N(m,1)$ distributed X, the expected value of $IQR(X)$ is $2*qnorm(3/4) = 1.3490$, i.e., for a normal-consistent estimate of the standard deviation, use $IQR(x) / 1.349$. For more technical information refer to Tukey, J. W. (1977). Exploratory Data Analysis. Reading: Addison-Wesley.

**TABLE 12**: Officers in Chicago with nine or more allegations fall above the third quartile plus 1.5 range; those are considered Outliers based on their abnormally high allegation of misconduct count.

|  | Outlier | Not Outlier | Total |
|---|---|---|---|
| Officer Count | 57 | 499 | 556 |
| % | 10.25% | 89.75% | 100% |

Evidence of CPD's failure to properly and effectively supervise its officers can be found in CPD's failure to monitor and frequently audit the records they had at their disposal (complaint history, use of force history, training history, civil lawsuits, etc.) that could reasonably alert CPD to areas of misconduct that could lead to foreseeable risks of harm if left without intervention.

### E. The Structure of CPD's Review System Unduly Delayed Accountability

The City also had a complex and lengthy layer disciplinary review process. There were multiple layers of review before discipline is final and can be administered.

After a sustained finding was reached, the investigator's finding and recommended discipline would go through the Command Channel Review.[113] This consisted of two or three levels of review by rank supervisors for any sustained case other than those that involved a recommendation of separation. Separation cases bypassed the Command Channel Review and went straight to the superintendent.[114] The Command Channel reviewers could concur or not concur with the investigator's findings, or they could send the file back for additional investigation.[115] If the first two supervisors issued non-concurrences, the file would be reviewed by a third, higher ranking supervisor.[116] After the Command Channel Review was completed, the recommendation would be submitted to the Assistant Deputy Superintendent for presentation to the Superintendent.[117] During this time fame, the Superintendent had to approve all discipline, including reprimands.[118] If the case was sustained, an officer could appeal that finding. For recommendations of 6 to 30 days suspension, the officer could appeal to the Complaint Review Panel.[119] The Complaint Review Panel could only reduce findings and discipline. The Panel's findings would be reviewed by the Superintendent. An officer could also avail himself/herself of

---

[113] Bird Dep. at 70-71.
[114] Id.; Tina Skahill Deposition, Case No. 16-CV-1970, *Hood v. City of Chicago,* et al, July 2, 2019, at 82.
[115] Bird Dep. at 71-72.
[116] Bird Dep. at 72-73, 65; Skahill Dep. at 87.
[117] Bird Dep. at 69-70.
[118] Bird Dep. at 74-75; Skahill Dep. at 90-91.
[119] Bird Dep. at 81; Skahill Dep. at 135-137.

review by the Police Board.[120] The Police Board's determination was final and could only be appealed in court.[121]

Each of these layers of review created the opportunity for, and high probably of, interference in the effective administration of discipline and accountability. As shown in the next two tables, the evidence in the 1995 – 1998 dataset supports the problematic nature of the complex, multilayered review process for any sustained finding.

---

[120] Bird Dep. at 83-85; Skahill Dep. at 138-140.
[121] Bird Dep. at 86-87.

Table 13 shows that out of the 83 individual officers with sustained findings in the 1995 - 1998 dataset provided by CPD, 36 (43%) officers contested or requested to be reviewed by at least one procedure.

**TABLE 13**: Named Employees in Chicago Using Resources to Contest Discipline, Outlier vs. Not- Outlier

| Officer Requested Review from Complaint Review Panel | Not Outlier | Outlier | Grand Total |
|---|---|---|---|
| Yes | 20 (6% of all officers)<br><br>(43% of all sustained not outliers) | *16 (4% of all officers)*<br><br>*(32% of all outliers sustained)* | ***36 (6% of all officers)***<br><br>***(43% of all sustained)*** |
| Officers with sustained findings | 62 | 21 | **83** |
| All officers | 499 | 57 | **556** |

The officers with the highest frequency of serious allegations in the 1995 - 1998 dataset also tended to have accessed more than one option to contest or get a final discipline determination reversed.

Table 14 describes the number of allegations contested by review panel, grievance, and arbitration.

**TABLE 14**: Allegation Count Of Officers in Chicago Using Resources To Contest Discipline

| Allegations with sustained findings after investigation | | Requests for Complaint Review Panel, allegation count | Filed appeal of disciplinary decision to Police Board, allegation count | | Grievance filed, allegation count | Allegations arbitrated |
|---|---|---|---|---|---|---|
| 171 | | 81 | 11 | | 6 | 6 |
| Outcomes | | Count of allegations with sustained findings after full review | | | Arbitration Outcome | |
| | | 52 | | | Not Sustained | 2 |
| | | | | | Sustained | 4 |

CPD officers routinely used resources to dispute allegations against them. CPD's lengthy initial investigations and options to dispute findings caused delays in the application of appropriate discipline of its officers.

Defendant Guevara routinely took advantage of these broken systems while employed at CPD. The following salient examples show how Defendant Guevara utilized resources to substantially mitigate the discipline he received:

- CR No. 251502 is an internally generated complaint against Detective Reynaldo Guevara alleging that while off duty, he repeatedly demonstrated insubordination and disrespect toward a supervisory member of CPD by stating "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; failed to comply with a direct order to leave the 014 District station by Sergeant Oravetz. This incident occurred on February 6, 1999, and was witnessed by several on-duty members of CPD. The CR was initiated by the District Watch Commander, Lt. Perry Nigro when he left his office to investigate a loud disturbance coming from the front desk area. Throughout the OPS investigation and directly to Area 5 Commander Gerard Mahnke, Guevara denied all allegations made against him, despite having numerous sworn members who were present when the incident occurred and provided statements to support the allegations. OPS recommended a 30-day suspension without pay on March 4, 1999. On April 12, 1999, Commander Mahnke recommended to CPD Assistant Deputy Superintendent of

Internal Affairs Nathan Gibson, that the recommended discipline be reduced by 10 days, stating the following: *"I have reviewed the attached complaint register investigation regarding an off-duty incident involving Detective Reynaldo Guevara. I concur with the findings and recommendations of this investigation. However, considering the circumstances and his complementary and disciplinary history, I recommend that options be granted for ten (10) of the thirty days."* On April 27, 1999, Gibson recommended to CPD Superintendent Terry Hillard to follow the recommended 30-day suspension. Guevara filed a grievance to the Complaint Review Panel rejecting the recommended penalty, and the panel convened on August 31, 1999, to review the complaint. Guevara stated he had tried to apologize to the complainant and a 30-day suspension would be a hardship on his family. After hearing statements from Guevara, the Assistant Advocate, and reviewing all documents related to the investigation, the panel returned with the unanimous decision to concur with the sustained findings and the recommended 30-day suspension. The allegations were deemed to be sustained. Guevara received a 30-day suspension on November 15, 1999. The suspension was served from January 1 – 31, 2000. *On October 16, 2000, despite the seriousness of the actions of Guevara, and having gone through multiple channels of review, analysis, and consideration, the Bureau of Staff Services – Management and Labor Affairs Section reduced the discipline to 20-days and compensated Guevara with 10 days back pay for the actual suspension he had already served.*

- CR No. 223928 is a complaint where allegations of a Rule 6 violation were sustained against Sergeant Louis Vasquez, Officer Robert Stubitsch, and Officer Jenny Molda and allegations of a Rule 9 violation[122] were sustained against Detective Reynaldo Guevara.[123] Det. Guevara was accused of physically striking his stepdaughter about the face. The recommended discipline for Sgt. Vasquez and Ofcs. Stubitsch and Molda was reprimand. The OPS investigator recommended a three-day suspension for Det. Guevara. The original incident occurred January 10, 1996. The investigation was initiated January 11, 1996 and was completed on February 6, 1996. Command Channel Review and the Assistant Deputy Superintendent, Internal Affairs Division concurred with the sustained finding and recommended discipline. Sgt. Vasquez and Ofcs. Stubitsch and Molda rejected the recommendation and requested a hearing before the CRP. On September 25, 1997, they appeared before the CRP and contested both the finding and recommended penalty. The CRP unanimously concurred with the sustained finding and penalty recommendation. Although Det. Guevara denied all allegations against him in his to/from memorandums to the investigator, there was sufficient evidence to sustain the allegation of striking the stepdaughter about the face. This reviewer did not locate any documentation in the CR file to indicate justification for

---

[122] Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.
[123] The investigation against Det. Guevara was re-opened May 13, 1996 at the request of the Commander, Area 5 Detective Division when new information became available for consideration.

reducing the recommended three-day suspension to a suspension of one day. Det. Guevara served his one-day suspension on July 23, 1998.

The reality of the City's deeply flawed review process is that as soon as the investigator reached a sustained finding, there were many opportunities for that finding to be altered, and even if not altered the recommended discipline could be reduced.

The aforementioned data and cumulative evidence are indicative of a broken and ineffective disciplinary process that invites officers to conceal misconduct and fosters a culture of silence and complacency that allows wrongdoers to act without fear of punishment and with impunity.

Finally, CPD's deeply flawed review process is also unnecessarily lengthy. The 1995 – 1998 dataset was analyzed according to the following categories:

➢ Intake: the complaint is filed, data is collected, and the case is classified and assigned.
➢ Investigation: the investigation is planned and conducted.
➢ Deliberation of Finding: the type of finding is specified, and discipline (if any) is recommended.
➢ If Sustained Finding- Full Internal Review: another investigation is conducted, the command channel is reviewed, the Assistant Deputy Superintendent reviews the case, the Chief Administrator of Operations reviews the case, a Complaints Review panel is held, Officer can request review, and finally the Superintendent of Police reviews the case.
➢ After Full Internal Review: The finding is either changed or made final, the discipline could change, a grievance can be filed, which then leads to the arbitration process.
➢ External Review: the Chicago Police Board reviews the case and could make changes to the final finding as well as recommended discipline.
➢ Conclusion after Full External Review: the final complaint category is determined, discipline is recommended, however, at this point, the Superintendent of Police still could overrule discipline. This could then lead to a referral to CCSAO.

While the disciplinary process can include these multiple stages, not all of them are followed in each case. The 1995 - 1998 dataset's *median length* from incident date to complaint filed is 6 days from incident and the *median days* any given complaint takes from incident date to case review completion is 63 days.

For cases where findings were sustained, the *median length* from the time of the incident date and the disciplinary steps are as follows:

• 63 days from CR initiated to case review completed
• 531 days from CR initiated for discipline being imposed by the Superintendent of police if no review nor arbitration was requested

- 280 days from CR initiated to Complaint Review Panel Decision
- 725 days for final findings and discipline after full external review

It should be noted, there was only 1 arbitration case in the sample. Moreover, the sample showed that the *median length* in days for the final discipline to be imposed by the Superintendent of Police is statistically longer when officers contest the original disciplinary determination.

Based on the sample available, it takes approximately 662 more days than when it is not contested nor externally reviewed. The following table outlines the *median days* to advance throughout the disciplinary process.

TABLE 15: Disciplinary Stages Length

|  | Max | Min | Mean | Median | Count |
|---|---|---|---|---|---|
| (1) Case review initiated | 3822 | 1 | 150.9 | 6 | 1799 |
| (2) Case review completed | 3646 | 1 | 163.2 | 63 | 1940 |
| (3) Complaint Review Panel decision | 789 | 109 | 343.6 | 280 | 66 |
| (4) Superintendent of Police Discipline Imposed, no external review | 1439 | 87 | 534.6 | 531 | 47 |
| (5) Final finding after full external review | 1534 | 387 | 783.9 | 725 | 8 |
| (6) Decision from outside arbitration | 1559 | 1559 | 1559.0 | 1559 | 1 |

Lengthy delays within the disciplinary process allowed for officers to have multiple CRs open at a given time. The City of Chicago had established practices of not identifying police officers who were repeatedly accused of the same kinds of serious misconduct and failing to investigate cases in which the police are implicated in a wrongful charge or conviction.

Despite awareness of systemic issues between the 1970s and 1990s, the City of Chicago and CPD failed to implement proper reform to keep officers from engaging in improper and illegal actions.

## F. CPD's Accountability System Routinely Failed to Detect or Discipline Fabrication of Eyewitness Identifications and Misconduct during Eyewitness Identification Procedures

Since before the 1998 Soto murders investigation, it has been common knowledge in law enforcement that a large percentage of erroneous convictions are the result of incorrect or improper eyewitness identifications and manipulation of witnesses. As discussed above, the City of Chicago and CPD received clear notice of a disturbing pattern in the 1980s and 1990s of fabrication of eyewitness identifications and eyewitness misidentifications leading to wrongful

convictions. Nonetheless, the City did not put into place a system of accountability to root out and correct such misconduct, and its existing disciplinary system failed entirely to detect and discipline such misconduct.

While there are several reasons why witnesses may mistakenly select an innocent person from a line-up or photographic array, suggestion during the selection process is a frequent cause. In February of 1992, the International Association of Chiefs of Police (IACP) developed a Model Policy pertaining to Show-ups, Photographic Identifications, and Line-ups. This policy was supplemented with a Concepts and Issues Paper authored by the IACP National Law Enforcement Policy Center in 1993 and has since been updated several times over the years. The IACP Law Enforcement Policy Center Model Policy pertaining to Eyewitness Identification is the latest revision to the original model policy.[124] This publication, and others by IACP, set out several guiding principles aimed at reforming the way law enforcement officers utilize line-ups, showups, and photographic arrays when seeking to identify suspects in criminal investigations. These principles have been the foundation of law enforcement training on eyewitness identification for many years and have been expanded upon to include both blind-administration and sequential presentation of photo arrays. The IACP Model Policy and corresponding Concept Paper placed law enforcement agencies on notice that failure to adhere to the procedures and precautions outlined in the document could result in misidentifications and unjust accusations or even convictions of innocent persons, while the actual culprit remained free.[125]

The CPD data analyzed by Ms. Meza shows that between 1995 and 1998, out of 2,150 allegation counts, there were *zero allegations* categorized as addressing misconduct in line-ups or photo arrays. Not a single external or internal complaint relating to either a line-up or a photo array was reflected in the dataset, even though fellow police officers and supervisors are in the best position to witness or learn of coercive and manipulative line-up and photo array misconduct by their colleagues and to report improper tactics and fabrications. The nonexistence of *any* complaints, particularly internal, regarding line-up misconduct reflects a failure of accountability when considered alongside the evidence from other sources such as exonerations, lawsuits, and judicial decisions reflecting misconduct. When coupled with the problematically low sustain rate for documented complaints, the data indicates that the City's disciplinary system did not provide any meaningful deterrent against misconduct by police officers who sought to fabricate and manipulate live lineup or photo array identifications, signaling to officers that they could engage in such misconduct with impunity and emboldening future abuses. Likewise, Table 4 and Table 8 show that out of 20 coerced confession allegations made by civilians between 1995-1998, not a single one resulted in a sustained finding, despite the long and well documented history of coerced confessions by CPD, as discussed above.

---

[124] IACP Model Policy on Eyewitness Identification (eff. Feb. 1992); IACP Law Enforcement Policy Center, *Eyewitness Identification* Concepts and Issue Paper (May 1993).
[125] IACP Law Enforcement Policy Center, *Eyewitness Identification* Concepts and Issue Paper (May 1993), pg. 2.

As was generally known and accepted in law enforcement long before 1998, a police accountability system that does not root out and address misconduct and suggestive techniques during line-up and photo array identification procedures, and instead simply relies on the investigating officers to police themselves without any supervision or correction through the disciplinary system, leads to foreseeable abuses and fabrications of eyewitness identifications, as well as a foreseeable risk of harm to Chicago citizens from wrongful convictions.

### G. Failure to Address Rule 14 Allegations, the Chicago Police Department and the City of Chicago Condoned a Code of Silence

CPD operates with rules of conduct. Within these rules of conduct, prohibited acts include making a false report, written, or oral.[126] This standard applies whether an officer is testifying, preparing official records and documentation, and throughout the participation in an IAD Investigation. Failure to abide by or address Rule 14 allegations can lead to the deterioration of the public's trust and confidence in an individual officer as well as the department's ability to perform its official duties and responsibilities. Legal precedent has established that the effects of false reporting can impact an officer's ability to testify in the court of law.[127]

Defining the "*code of silence*" and providing historical context in American policing may be useful in determining its existence within a given set of facts, such as those before the court in this matter. In 1936, police administration expert August Vollmer wrote that *"It's unwritten law in police departments that police officers must never testify against their brother officer."[128]*

A *"code of silence"* refers to affirmative acts or omissions by an agency or its membership which insulate and protect its employees from accountability and criticism. The Code of Silence typically presents itself in various ways:

- ➢ Officers are comfortable engaging in misconduct, despite the presence of other officers, without the fear of reprisal or complaint.
- ➢ Repeated acts of misconduct go unreported or without any remedial action whatsoever.
- ➢ The lack of any complaints initiated or otherwise investigated by supervisors.
- ➢ Acts of retaliation within the ranks when someone defies the code of silence.
- ➢ Officers behave contrary to reasonable practices when the act of misconduct transpires.

---

[126] From the Rules and Regulations of the Chicago Police Department Adopted and Published by the Police Board.
[127] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995); and *State v. Laurie*, 139 N.H. 325, 653 A.2d 549 (1995).
[128] August Vollmer served on President Herbert Hoover's Wickersham Commission.

> ➤ When the situation should have alerted a reasonable officer and focused their attention on the wrong that was taking place, when asked, nobody saw or heard a thing.
> ➤ When the incident was so obvious that officers would have had to go to great lengths to not be aware that a wrong action was taking place.
> ➤ When officers respond with "I don't recall" and avoid, rather than deny, when asked about misconduct.[129]

In 1991, the Christopher Commission, which arose from the controversial incident involving Rodney King's interaction with members of the Los Angeles Police Department, stated that the "*code of silence*" was "…perhaps the greatest single barrier to the effective investigation and adjudication of complaints." The Christopher Commission also found that less than 2% of excessive force complaints were sustained; the process was skewed by the code of silence.[130]

It is notable that in the rare instances when allegations against Defendant Guevara, for example, were sustained, in each of those cases Guevara provided statements or reports denying that he had committed the misconduct for which findings were sustained. In other words, the investigators concluded based on their investigations that Guevara had lied to them. Yet, none of these cases resulted in additional discipline based on Rule 14 violations for lying. See, e.g., CR #s 152902, 223928, 251502. But such findings impugn Guevara's credibility, and should have raised questions about whether he should be permitted to testify in Court.

## Opinion 2: The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses.

Ineffective mechanisms for detecting police misconduct and weak systems of accountability provided the perfect ecosystem for Guevara, Halvorsen, and others so inclined to engage in misconduct unchecked.

The Independent Commission on the Los Angeles Police Department (1991) found 44 officers with extremely high rates of citizen complaints who could have been identified from department records. Journalists have noted departments in which 2 percent of the officers accounted for as much as 50 percent of the complaints.[131] Across the country, police disciplinary processes routinely fail to adequately deal with the small group of officers who represent a disproportionate share of complaints received and the number of use-of-force situations. It has become common knowledge that a few officers within a department often account for an inordinate number of complaints.[132]

---

[129] Internal Affairs Conference Manual, PATC, 2017.
[130] Independent Commission on the Los Angeles Police Department (Los Angeles, Calif.), & Christopher, W. (1991). *Report of the Independent Commission on the Los Angeles Police Department*. Los Angeles: The Commission.
[131] Walker, Alpert, and Kennedy, 2000.
[132] New Perspectives in Policing, Harvard Kennedy School, 2011.

There are dozens of known cases in which Defendants engaged in serious investigative misconduct, including many cases in which they were accused of using excessive force, threatening, manipulating, and coercing suspects and witnesses as well as fabricating statements and evidence. The Defendants engaged in such misconduct as they had no reason to fear that the City of Chicago or CPD would ever discipline them for doing so.

### A. Defendants Received Many CRs

As explained above, 10.25% of all accused officers (57/556 officers) were responsible for 43% of all allegations (924/2,150 allegations). Those officers with 9 or more allegations fall into the category of statistical outlier, and they are in the third quartile plus 1.5 times the interquartile range.[133] As shown in the table below, Defendants Guevara, Halvorsen, Rutherford, Harvey, Mingey, and Biebel were outliers.

**TABLE 16**: Defendants' Allegation History

| Accused Officer Name | Number of allegations | Statistical Outlier?    Yes/No |
|---|---|---|
| Reynaldo Guevara | 63 | Yes |
| Ernest Halvorsen | 15 | Yes |
| Edwin Dickinson | 3 | No |
| R. Rutherford | 22 | Yes |
| Lawrence Stankus | 2 | No |
| John Naujokas | 8 | No |
| John Karalow | 3 | No |
| Mark Harvey | 23 | Yes |
| Daniel Trevino | 2 | No |
| Edward Mingey | 13 | Yes |
| Biebel | 13 | Yes |
| F. J. Cappitelli | 4 | No |
|  | 158 |  |

---

[133] These outliers were statistically determined using the interquartile rule (anything above the third quartile plus 1.5 times the interquartile range). The analyst calculated the quartiles using the quantile function rather than following Tukey's recommendations, i.e., IQR(x) = quantile(x, 3/4) - quantile(x, 1/4). For normally N(m,1) distributed X, the expected value of IQR(X) is 2*qnorm(3/4) = 1.3490, i.e., for a normal-consistent estimate of the standard deviation, use IQR(x) / 1.349. For more technical information refer to Tukey, J. W. (1977). Exploratory Data Analysis. Reading: Addison-Wesley.

## B. Defendants Had Multiple Open Cases

As explained above, because of CPD's lengthy delays within the disciplinary process, these Defendants were allowed to have multiple CRs open at a given time. Defendant Guevara had 5 CRs (16 allegations) that were opened in parallel with at least one other CR, while Defendant Halvorsen had 2 CRs (15 allegations); Defendant Rutherford had 2 CRs (3 allegations); and Defendant Mingey had 2 CRs (6 allegations) open at the same time as another CR.

On account of the CPD's broke accountability system, these officers who were repeatedly accused of the same kinds of serious misconduct went undetected and were able to continue engaging in misconduct.

## C. Defendants Were Accused of Fabricating Evidence and Abuse of Citizens

What is particularly troubling and evident here is repeated allegations that Defendants Guevara and Halvorsen engaged in the similar types of egregious misconduct that the Plaintiffs have alleged in the context of the Soto homicide investigation. Many of these similar allegations of misconduct occurred prior to Plaintiffs' criminal trials and went undisciplined. Further, the misconduct appears to have continued even after Plaintiffs' trials as well. In addition, Guevara and Halverson repeatedly engaged in abusive conduct, in uniform and off duty, but there was no CPD intervention. Some examples are listed below.

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 124631 | 5/8/82 | Excessive Force; Verbal Abuse— Complainant submitted allegations on behalf of herself and her brother, Bernard Turner. Complainant alleged that Officers Guevera, McCarthy, Martinez, and Velez came up to her after she lit a cigarette on a bus and attempted to arrest her. Annie attempted to get off the bus by herself, but officers allegedly grabbed her, pushed her, struck her multiple times while pushing her off the bus and putting her in a squad car, and struck Bernard multiple times when he attempted to intervene. Throughout, officers allegedly cursed at Annie and Bernard repeatedly, including calling both racial slurs.<br><br>(This is an incomplete file. Defendants have not provided the complete file.) | Guevara | Not sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 125360 | Unknown | Warrantless Search – Complainant alleges that the accused officers entered her home, failed to identify themselves, and searched her home without a warrant.<br><br>(This is an incomplete file. Defendants have not provided the complete file.) | Guevara | Unknown | |
| 143475 | 1/25/85 | Warrantless Search – Complainant alleges that the accused officers came to his front door and ordered him to open it. Complainant refused, and the officers allegedly broke a pane of glass on the door, kicked doors open, and searched the premises for one hour. Accused officers allegedly did not show search or arrest warrants at any point despite requests from inhabitants of house.<br><br>(This is an incomplete file. Defendants have not provided the complete file.) | Guevara | Not sustained | N/A |
| 145129 | Unknown | False Arrest – Complainant Leshurn Hunt alleged false arrest<br><br>(File not located by Defendants) | Guevara | Unknown | |
| 150473 | 4/16/86 | Excessive Force; Verbal Abuse – Complainant alleges that the accused officer struck him, pushed him, and choked him after pulling him over. Complainant additionally alleges that Guevara verbally abused and threatened him, including calling him racial slurs.<br><br>(This is an incomplete file. Defendants have not provided the complete file.) | Guevara | Allegation 1: Sustained; Allegation 2: Sustained; Allegation 3: Sustained; Allegation 4: Sustained | Sustained findings later apparently changed to not sustained during. |
| 152612 | 8/27/86 | Excessive Force – Complainant submitted allegations on behalf of brother, Bill Buzzo. Victim alleged that accused officers struck him about the body, and that one accused officer put a gun to Buzzo's dog's head and threatened to shoot him. | Guevara | Not sustained | N/A |
| 152902 | 9/18/86 | Excessive Force; Failure to Notify; Release of Prisoner – Complainant alleged that Officer Guevara struck him and threw him multiple times.  Captain Bazarek alleged that on the same date and time Officer Guevara failed to provide notice that he (Guevara) had been a victim of battery at Garcia's hands, and that Guevara released a prisoner without proper authorization. | Guevara | Excessive Force allegation not sustained; Failure to notify and release of prisoner sustained | 2-day suspension |

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 157627 | 8/22/87 | Excessive Force – Complainant alleged that accused officers slammed the victim up against a car. | Halvorsen Dickerson | Not sustained | N/A |
| 168160 | 5/10/89 | Warrantless Search – Complainant lodged complaint on behalf of victim Petra Rodriguez. Complainant alleged that the accused searched the victim's basement apartment without a search warrant and the accused that failed to properly identify themselves as Chicago Police Officers. | Guevara | Not sustained | N/A |
| 177115 | 7/6/90 | Excessive Force - Complainant alleges that the accused officer has threatened the victim that he will kill her with his gun on more than one occasion in the past | Halvorsen | Unfounded | N/A |
| 182519 | 2/21/91 | Verbal Abuse – Complainant alleged that Guevara yelled "shut up you do not know what the fuck you are talking about" when searching her property. | Guevara | Not sustained | N/A |
| 195857 | 9/30/92 | Other - Complainant alleged that Guevara forced victims to stand next to Latin Kings "Wall of Honor" and flash gang signs while he took their picture without explanation. CR stated that the accused was exonerated because while Guevara did take these photos, he did for official police purposes. | Guevara | Exonerated | N/A |
| 205257 | 4/19/94 | Excessive Force – Complainant Javier Mejia alleged that Guevara rear-ended his car while drunk, and then verbally abused him, verbally threatened him, and threatened him with a gun. Complainant Adolfo Mejia alleged that Guevara kicked him, told him to "shut up" when he complained of being handcuffed too tightly, and took items from the car. | Guevara | Not sustained | N/A |
| 217624 | 5/8/95 | Excessive Force – Complainant alleged that the accused physically abused her son, Jossie Martinez, for information regarding a homicide. | Guevara | Not sustained | N/A |
| 220046 | 8/10/95 | Other – Complainant alleged that multiple CPD officers had suspended drivers' licenses, and the accused allegedly had not remedied their suspensions. | Guevara | Unknown | N/A |
| 223928 | 1/10/96 | Excessive Force – Complainant alleged that Guevara struck victim on the right side of her face. | Guevara | Sustained | 1- or 3-day suspension |
| 236739 | 9/14/96 | Other – Complainant alleged that the accused failed to treat complainant's injuries from being held in Abilene, TX while in TX to extradite him to Chicago. | Guevara | Not sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 240708 | 9/8/96 | Warrantless Search, False Arrest - Complainant alleged that the accused officer entered and searched the second-floor apartment of Mr. Pong without a search or arrest warrant and unlawfully detained him without probable cause and at gun point. | Halvorsen Mingey | Not sustained | N/A |
| 248946 | 10/4/98 | Excessive Force – Complainant is Guevara's wife. She alleged that Guevara physically abused her during a fight. | Guevara | Not sustained | N/A |
| 251502 | 2/6/99 | Verbal Abuse – Complainant alleged that Guevara was insubordinate and disrespectful toward him, attempted to start a physical and verbal altercation with him, and violated his direct verbal order. | Guevara | Sustained | 30-day suspension, served, and then later reduced to 20-day suspension, resulting in 10 days of back pay. |
| 255701 | 7/8/97 | False Arrest; Fabricated Evidence – Complainant alleged via civil lawsuit that the accused falsely arrested and incarcerated his client, Concepcion Santiago. | Guevara | Unfounded | N/A |
| 255984 | 3/23/97 | False Arrest; Fabricated Statement or Fabricated Evidence; Suggestive Lineup - Complainant alleges that Detective Halvorsen violated Mr. Angel Rodriguez's rights by (1) arresting him on a traffic warrant that was not in effect; (2) directed Rodriguez to participate in a line-up and failed to inform him of his rights nor that he was a suspect in a homicide investigation; and (3) prior to a formal lineup, showed a single photo of Rodriguez to a witness so that he could make a positive identification during the formal line-up. | Halvorsen | Allegation 1: Unfounded; Allegation 2: Not sustained; Allegation 3: Not sustained | N/A |
| 256148 | 8/24/99 | Excessive Force – Complainant alleged Halvorsen grabbed head and twisted it while trying to force him to participate in a lineup and failed to provide him safety and security resulting in injury in custody | Guevara Halvorsen | exonerated | N/A |

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 263553 | 7/29/95 | Fabricating Evidence – Complainant submitted CR on behalf of victim Edwin Davila. Complainant alleged that Guevara told the victim he planned to tell witnesses to identify him in a line-up, and that Guevara tainted the line-up by making him the only line-up participant to show a tattoo on his back. | Guevara | Unfounded | N/A |
| 266681 | 6/28/97 | Suggestive Lineup; Fabricated Evidence – The complainant alleged that Guevara forced several witnesses to falsely identify him as a murderer, leading to his being charged with a crime he did not commit. | Guevara | Not sustained | N/A |
| 270916 | N/A | Perjury - Investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Guevara and Halvorsen gave false testimony in 17 homicide cases. | Guevara Halvorsen | Not sustained | N/A |
| 283321 | 8/13/02 | False Arrest; Verbal Abuse; Other – Complainant alleged that Guevara failed to identify himself as a CPD officer, placed him in a holding cell, and threatened him. | Guevara | Allegation 1: Exonerated; Allegation 2: Unfounded; Allegation 3: Not sustained | N/A |
| 289081 | March 1999 | Suggestive Lineup; Fabricated Evidence – Complainant alleged he was only identified as offender by witness who was shown photo spreads by Halvorsen which always contained complainant's photo; complainant also alleged witness was pressured by Halvorsen and Woodall into making the identification by threatening to charge witness with the murder and pressuring him to pick someone out as the offender when shown the photos. | Halvorsen | Not Sustained | N/A |
| 297534 | 4/30/04 | Other – Complainant alleged that the accused had a different date of birth listed on his IL driver's license as compared to his alpha file. The accused would have been over the mandatory CPD retirement age if the alleged age listed on his driver's license was verified. | Guevara | Unfounded | N/A |
| 304802 | 9/11/89 | False Arrest – Complainant was attorney for victim Juan Johnson. Complainant alleged via civil suit that Guevara illegally arrested Johnson for murder. | Guevara | Not sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendant Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 1038461 | 9/20/94 | False Arrest – The reporting party alleges that the accused detective falsely arrested her son and charged him with murder. Investigation did not proceed because allegation was more than five years old. | Guevara | Administratively Close | N/A |
| 1067861 | 12/13/95 | Excessive Force – Complainant alleged that Guevara coerced a confession by physically abusing and threatening him and complainant's girlfriend. | Guevara | Administratively Close | N/A |
| 1079442 | 3/2/99 | Excessive Force – Complainant alleges that the accused detective framed him for a crime he did not commit, leading to his wrongful conviction. He further alleges misconduct, corruption, coercion, witness tampering, and physical abuse. | Guevara | Administratively Close | N/A |
| 1086233 | 2/5/93 | Fabricating Evidence – Complainant alleged that Guevara fabricated evidence and manipulated witnesses to prosecute him | Guevara Halvorsen | Administratively Close | N/A |
| 1089024 | 4/3/98 | Excessive Force – Complainant alleged in civil suit that the accused officers used physical abuse to coerce his murder confession, and that the accused officers fabricated evidence to implicate complainant for murder. | Guevara Halverson Other Defendants | Open | N/A |
| 1089631 | unknown | Excessive Force – accused officer used coercive and manipulative tactics to obtain false statements to implicate the victim | Halvorsen Biebel Cappitelli | Open | N/A |
| 1089749 | unknown | Excessive Force – Complainant alleges in civil suit that the accused officer subjected Gomez to physical and psychological abuse, and fabricated reports and evidence to obtain a false confession. | Guevara Halverson Other Defendants | Open | N/A |

As set out above, the Defendants' CRs illustrate several of the deficiencies of City's investigatory and disciplinary system, including its failure to conduct rigorous investigations, credit testimony of victims and non-CPD witnesses, evaluate corroborating evidence in an unbiased manner, and recommend or implement meaningful discipline. As I have repeatedly pointed out, the obvious consequence of a broken accountability system is that officers who engage in misconduct do so without fear that they face any risk of discipline or intervention.

### D. Civil Lawsuits Provided Additional Notice to Policymakers

Civil lawsuits are often an indicator and provide fair warning that an officer, unit, or group of officers may be engaged in conduct that runs afoul the law, violates directives and general orders. These suits often tarnish the reputations of law abiding officers and further deteriorate the reputation of the department and its standing with the community it serves.

Below are examples of civil lawsuits and the nature of those claims brought against just these Defendant officers accused of misconduct, some of which relate to the CR complaints discussed above. I have not conducted an independent assessment of these claims, nor do I have actual knowledge of the posture of the litigation. Nevertheless, it is my opinion that officers, including at the highest level in CPD, would take notice of such lawsuits:

| Caption | Complaint | Involved Members | Resolution |
|---|---|---|---|
| Hunt v. Jaglowski, et al., Case No. 85 C 1976 | 4th Amendment violations; False arrest; Illegal Interrogation | Guevara | Verdict for Hunt against Weingart and Chicago and for Defendants on other claims |
| Pong v. Halvorsen, Mingey, et al., Case 97 C 06268 | 4th Amendment violations | Halvorsen Mingey | Settled |
| Santiago v. Guevara, Case No. 99 C 4476 | Malicious prosecution; denial of constitutional rights | Guevara | Settled |
| Angel Rodriguez v. Halvorsen, et al., Case No. 03 C 3880 | Malicious prosecution; denial of constitutional rights | Halvorsen | Judgment in favor of defendants |
| Johnson v. Guevara, et al., Case No. 05 C 1042 | Wrongful conviction | Guevara | Verdict for Johnson and against Guevara |
| Rivera v. Guevara, et al., Case No. 12 C 4428 | Wrongful conviction | Guevara Mingey | Verdict for Rivera and against Guevara, Mingey |
| Serrano v. Guevara, et al., Case No. 17 C 2869 | Wrongful conviction | Guevara Halvorsen Mingey | Ongoing |
| Montanez v. Guevara, et al., Case No. 17 C 4560 | Wrongful conviction | Guevara Halvorsen Mingey | Ongoing |
| Almodovar & Negron v. Guevara, et al., Case Nos. 18 C 02341 & 18 C 02701 | Wrongful conviction | Guevara Halvorsen Mingey Rutherford | Ongoing |
| Maysonet v. Guevara, et al. Case No. 18 C 2342 | Wrongful conviction | Guevara | Ongoing |
| Sierra v. | Wrongful conviction | Guevara | Ongoing |

| Caption | Complaint | Involved Members | Resolution |
|---|---|---|---|
| Guevara, et al., Case No. 18 C 03029 | | Halvorsen Mingey Biebel Cappitelli | |
| Gomez v. Guevara, et al., Case No. 18 C 3335 | Wrongful conviction | Guevara Mingey Biebel | Ongoing |
| Ricardo Rodriguez v. City of Chicago, et al., Case No. 18 C 7951 | Wrongful conviction | Guevara Halvorsen Biebel | Ongoing |
| Bouto v. Guevara, et al., Case No. 19 C 02441 | Wrongful conviction | Guevara Halvorsen Mingey | Ongoing |
| Iglesias v. Guevara, et al., Case No. 19 C 6508 | Wrongful conviction | Guevara Halvorsen Rutherford Biebel | Ongoing |
| Johnson v. Guevara, et al., Case No. 20 C 4156 | Wrongful conviction | Guevara Halverson | Ongoing |

### E. Defendants Escaped Accountability

Defendants Guevara and Halvorsen each received multiple CRs containing similarly themed allegations and patterns throughout their career, and Guevara and Halvorsen were sued many times based on similarly themed allegations and patterns, yet none of their supervisors acted as if they noticed a pattern or showed concern for such behavior. This lack of supervisory oversight, as well as inadequate investigations, review, and discipline, in my opinion, is the reason Defendants were able to wreak havoc on the citizens of Chicago for so long. The lack of accountability continued after the Soto murders investigation.

### Conclusion

Defendants in this case inherited a long legacy of abusive *de facto* policies in the Chicago Police Department. Disciplinary processes lacked urgency, intentionality, and were void of meaningful sanctions to correct or dismiss officers who committed wrongdoing. What's worse is that the policing structure was without mechanisms for detecting wrongdoing officers and the political will to hold them responsible for misconduct. Case after case after case demonstrated the willingness of police administrators, supervisors, and peer officers to regard officers who committed wrongdoing as paragons of truth, high value members of the police agency, essential

to sustaining safety, and worthy of public leniency when under the *unjust* cloud of scrutiny, the cost of which was the invalidation and indignant treatment of the citizen, whose cries for justice went unheard and were awarded with beatings, stomping, burnings, mutilations, harsh sentencing, and dehumanization.

Slow justice breeds an impunity self-concept. Burge and other officers acted with abandonment with no fear of retribution. Burge was never disciplined for torture. He was not charged for that conduct. Instead, he was only sentenced in 2010 for lying about his conduct committed in the early 1980s. The incentive in this ecosystem of misconduct bends toward wrongdoing and invites villainy. Yet not every invitation needs to have an RSVP. Burge, like every law-abiding peace officer, possessed agency. With the same sense of abandonment and freedom to impose their will on citizens, Defendants could have courageously followed prescribed police practices, general orders, civil rights laws, and acted as a police-advocate for citizens. Instead, they chose to follow in the footsteps of Burge.

As a former law enforcement officer with over 31 years of experience working in a large metropolitan police department with experience in police supervision, homicide investigations, and with criminal and with experience leading organizations tasked with civilian oversight of law enforcement agencies, I bring the understanding that individual officers can and do operate as criminals for many years before being caught by the most intentional of supervisors and police commanders. The code of silence exists in layers and silos, meaning that criminal syndicates may thrive in isolation within closed and specialized police units and or within layers of the police rank structures. Street patrol officers of a particular district or beat may act as a closed unit and under the blanket of a complicit group of citizens who benefit from illicit relationships with sworn officers.

The City of Chicago is culpable: it failed to make meaningful investments in its ethical infrastructure. Each court ruling and every independent report written in response to Chicago officer and administration misdeeds is rife with recommendations for improving community engagement, monitoring, and responding to citizen abuse, eliminating racial mistreatment, and improving transparency, but progress toward those ends is slow and - in some cases - non-existent. Defendants exercised agency when they abused and mistreated citizens by manipulating and coercing witnesses and fabricating statements and evidence. The City of Chicago validated this abuse and mistreatment of citizens.

As described throughout this report, Defendants' misconduct—in particular that of Defendant Guevara--in the Reyes and Solache case and all other cases is a direct result of the CPD's failure to meaningfully investigate, supervise, or discipline its officers for decades. CPD has a dark history of a widespread practice of torture, coerced and false confessions and statements, and fabrication and suppression of evidence that was permitted to persist for decades, from the Burge

era to this case, where Guevara and others continued to engage in the same misconduct. The fact that Defendant Guevara and others committed so many repeated serious transgressions during homicide investigations, resulting in the wrongful prosecution and conviction of innocent people and others accused of crimes, indicates that their supervising and fellow officers turned a blind eye to misconduct. This evidence is consistent with the existence of a code of silence within CPD discussed throughout my report. These repeated serious transgressions—confirmed during the Lassar investigation—demonstrate that the City of Chicago and the Chicago Police Department, including its IAD and other supervisory agencies, failed to adequately investigate, supervise, and/or discipline its officers.

I declare pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct based upon the information I have been provided to date. I reserve the right to modify my opinions should I receive new or additional information.

_____
Anthony Finnell

**Appendix A**

Analysis of Dataset provided by Plaintiffs' legal team

1.    ***Description of statistical methods used***
2.    ***Support data and analysis for select tables***
3.    ***References***

## 1. Description of statistical methods used

Most of the dataset analysis is based on descriptive statistics such as mean, median, range, and proportions. Those descriptive statistics were assessed using 95% confidence intervals.

Hypothesis testing was used to compare two subgroups, Pearson Chi-Square was used for non-parametric tests and Chi-Square Goodness-of-fit was used to test the independence of some discrete variables (i.e., to prove the independence or lack of thereof of two variables such as source of the complaint -variable 1- and officer requested review of findings -variable 2-).

## 2. Support data and analysis for select tables

### 2.1. General information about the dataset

There are 349 Complaint Register files in the sample, from those 39 complaints had at least one of the allegations mentioned in them was sustained.

|           | Complaint Register files (CRs) | Individual Investigations | Allegations |
|-----------|-------------------------------|---------------------------|-------------|
| Sustained | 39                            | 167                       | 171         |
| Total     | 349                           | 1983                      | 2150        |
|           | 11%                           | 8%                        | 8%          |

### 2.2 Sample size information

Based on CPD annual report count of complaints received, the sample is at least 9.6% of all complaints for the years 1995 to 1998. Table C explains the sample size in more detail.

TABLE 17: Sample size, based on CPD complaints documented in its annual report (1995-1998).

| Year of | Sample available | CPD Annual report, complaint | Sample size |
|---------|------------------|------------------------------|-------------|

| incident | Individual Investigations | received count | % Of total complaints registered by CPD |
|---|---|---|---|
| 1995 | 643 | 9525[134] | 6.8% |
| 1996 | 556 | 7420[135] | 7.5% |
| 1997 | 448 | 7240[136] | 6.2% |
| 1998 | 336 | 5981[137] | 5.6% |
| *Total* | 1983 | 20641 | 9.6% |

Regarding complaint counts received through CPD, some notes on the available data are provided below:

**Chicago Police Department Annual Reports from 1995 to 1998**. CPD reports annually the number of police Complaint Register files received; CPD reports do not distinguish between those Complaint Register files handled by the Bureau of Internal Affairs (BIA), City of Chicago Independent Police Review Authority (IPRA), or Chicago Office of Police Accountability (COPA). *Note: IPRA ceased to exist in 2017 and COPA took the review and investigative authority from IPRA.*

**Chicago Police Board (CPB) Annual Reports, from 1995**. There are no published CPB Annual Reports for the years 1981-1988, 1996-2000 and from 2005-2020.

**National Registry of Exonerations**. Cook County data for exonerations between 1989 and 2021. University of Michigan Law School and University of California Irvine, Law School.

2.3 Identification of outliers in the sample based on their allegation count

Officers with 9 or more allegations are consider outliers, outlier officers requested review by the Complaint Review Panel at a higher rate than non-outlier officers. 12.12% for outliers and 2.332% for non-outliers. To ensure that the difference between groups is statistically significant, the data in the following table was used to run two different hypotheses tests.

Contingency table, Review Request by the Officer Status, by Complaint Origin Type

---

[134] https://home.chicagopolice.org/wp-content/uploads/2014/12/1995-Annual-Report.pdf.
[135] https://home.chicagopolice.org/wp-content/uploads/2014/12/1996-Annual-Report.pdf.
[136] https://home.chicagopolice.org/wp-content/uploads/2014/12/1997-Annual-Report.pdf.
[137] https://home.chicagopolice.org/wp-content/uploads/2014/12/1998-Annual-Report.pdf.

| Officer requested from Complaint Review Panel | Not Outlier | Outlier | Grand Total |
|---|---|---|---|
| Yes | 20 | 16 | 36 |
| All officers | 499 | 57 | 556 |
| % yes | 4% | 28% | 6% |

Chi Square Test for comparing two groups, categorical variables. The following tests proved that the rate in which outlier and non-outlier officers request review is different. Being the outliers' review rate higher than that of the non-outliers.

| P-value <.05 significance level.<br><br>We reject Ho: the request of review from the Complaint panel is independent of the origin of complaint.<br><br>Thus, the request of review is statistically different between Outlier and Non-Outlier officers. | Pearson's Chi-squared test<br><br>data: data\$`Officer Requests Review from Complaint Review Panel` and data\$`Internal or External CR`<br>X-squared = 230.11, df = 2, p-value < 2.2e-16<br>*Testing for independence between request of review and source of the complaint.<br><br>**They are not independent. |
|---|---|

83

| | |
|---|---|
| P-value <.05<br><br>We reject Ho: P1=P2, thus the proportion of requests for review are different between the two samples.<br><br>H. Alternative is P1<P2, where P1 are Internal Complaints and P2 are External Complaints. | prop.test(c(20, 16),c(499, 57), alternative = "less", conf.level = 0.95)<br><br>2-sample test for equality of proportions with continuity correction<br><br>data:  c(20, 16) out of c(499, 57)<br>X-squared = 45.019, df = 1, p-value = 9.757e-12<br>alternative hypothesis: less<br>95 percent confidence interval:<br> -1.0000000 -0.1318915<br>sample estimates:<br>   prop 1    prop 2<br>0.04008016 0.28070175 |

| |
|---|
| Code used:<br>O12.1$outlier<-ifelse(o12.1$total>8.5,o4.1$`Accused Officer Name`,NA)<br>O12.1$outlier2<-ifelse(o12.1$total>8.5,1,0)<br>Technical description:<br>IQR(x, na.rm = FALSE, type = 7)<br>type    an integer selecting one of the many quantile algorithms, see quantile.<br>Details<br>Note that this function computes the quartiles using the quantile function rather than following Tukey's recommendations, i.e., IQR(x) = quantile(x, 3/4) - quantile(x, 1/4).<br>For normally N(m,1) distributed X, the expected value of IQR(X) is 2*qnorm(3/4) = 1.3490, i.e., for a normal-consistent estimate of the standard deviation, use IQR(x) / 1.349.<br>**References**<br>Tukey, J. W. (1977). Exploratory Data Analysis. Reading: Addison-Wesley. |

| Description | Number |
|---|---|
| Total allegations | 2,150 |

| Statistical Outliers Individuals | Outlier officers/ all officers in the sample<br>57 /556 |
|---|---|
| % Statistical Outlier individuals | 10% |
| Total allegations Statistical Outliers | Outlier/all allegations<br>924 / 2150 |
| % Allegations Statistical Outliers | 43% |

## 3. References

National Registry of Exonerations 2017. University of Michigan Law School.  ExonerationsIn2017.pdf (umich.edu)

NATIONAL REGISTRY OF EXONERATIONS, UNIV. OF MICH. LAW SCH., EXONERATIONS IN 2015, at 1, 3-4, 7-8 (2016),
http://www.law.umich.edu/special/exoneration/documents/exonerations in 2015.pdf
Exonerations_in_2015.pdf (umich.edu)

Reichart, Brian (2016) "Tunnel Vision: Causes, Effects, and Mitigation Strategies," Hofstra Law Review: Vol. 45: Iss. 2, Article 7. Available at:
http://scholarlycommons.law.hofstra.edu/hlr/vol45/iss2/7

PERF, 2018. A Review on Minneapolis Police Department Internal Affairs. 2016.08 Oversight Commission - Complaint Filing Experience.pdf (mn.gov).

Sisca, Tracy. Arriazola, Sherrie (2009). The Chicago Police Board, a Ten-Year Analysis. The Chicago Justice Project, 2009. https://chicagojustice.org/wp-content/uploads/2016/08/cjp_cpb_report_2009.pdf


https://theintercept.com/2019/05/29/chicago-police-civilian-oversight-police-shooting-ricky-hayes/
Chicago Office of Police Accountability (COPA)
https://www.chicagocopa.org/data-cases/case-portal/
Microsoft Word - 2010 Citywide Public View.doc (chicagopolice.org)

Chicago Police Department, Annual Reports 1995-1998.
https://home.chicagopolice.org/wp-content/uploads/2014/12/1995-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1996-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1997-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1998-Annual-Report.pdf

Chicago Office of Inspector General. Allegations of Police Misconduct, A Guide to the
Complaint and Disciplinary Process, April 2021.
https://www.chicago.gov/content/dam/city/depts/cpb/PoliceDiscipline/AllegMiscond20210401.p
df
https://informationportal.igchicago.org/complaint-and-administrative-notification-trends-and-
statistics/

**Appendix B**

Dataset provided by Plaintiffs' legal team