# EXHIBIT 12



# Transcript of Tina M. Skahill, Corporate Designee

**Date:** July 2, 2019
**Case:** Hood, et al. -v- City of Chicago, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Tina M. Skahill, Corporate Designee  
Conducted on July 2, 2019

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
 5   TYRONE HOOD,                   :
 6              Plaintiff,          :
 7          vs.                     :   Case No. 16 CV 1970
 8   CITY OF CHICAGO,  et al.,      :
 9              Defendants.         :
10                                  :
11
12          The discovery deposition of TINA M.
13   SKAHILL, called by the Plaintiff for examination, taken
14   pursuant to notice, agreement and by the provisions of the
15   Rules of Civil Procedure for the United States District
16   Courts pertaining to the taking of depositions, taken
17   before PAMELA J. BREWER, CSR NO. 084-004362, a Certified
18   Shorthand Reporter within and for the State of Illinois,
19   at Loevy & Loevy, 311 North Aberdeen Street, Third Floor,
20   Chicago, Illinois 60607, on the 2nd day of July 2019, at
21   9:00 a.m.
22
23
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3
 4              LOEVY & LOEVY
 5          BY:  HEATHER LEWIS DONNELL, ESQ.
 6              311 North Aberdeen Street
 7              Third Floor
 8              Chicago, Illinois  60607
 9              (312) 243-5900
10              (312) 243-5902 Facsimile
11                  On behalf of the Plaintiff,
12
13
14          THE SOTOS LAW FIRM, P.C.
15          BY:  GEORGE J. YAMIN, JR., ESQ.
16              141 West Jackson Boulevard
17              Suite 1240A
18              Chicago, Illinois  60604
19              (630) 735-3377
20              (630) 773-0980 Facsimile
21                  On behalf of City of Chicago;
22                  and
23
24
```

**Page 3**

```
 1   APPEARANCES (continued):
 2
 3          ROCK, FUSCO & CONNELLY, LLC
 4          BY:  EILEEN ROSEN, ESQ.
 5              321 North Clark
 6              Suite 2200
 7              Chicago, Illinois  60654
 8              (312) 494-1000
 9              erosen@rfclaw.com
10                  On behalf of the Police Officers.
11
12   ALSO PRESENT:
13      Steven A. Greenberg, Esq.
14
15
16
17   REPORTED BY:  PAMELA J. BREWER, CSR NO. 084-004362
18
19
20
21
22
23
24
```

**Page 4**

```
 1                  I N D E X
 2   THE WITNESS
 3      TINA M. SKAHILL
 4      By Ms. Donnell        Page(s):  5
 5      By Mr. Yamin          Page(s):  --
 6      By Ms. Rosen          Page(s):  --
 7          AFTERNOON SESSION  Page 97
 8              E X H I B I T S
 9   SKAHILL EXHIBIT NO.        MARKED FOR IDENTIFICATION
10      1  Fourth Amended Notice of Rule ...   Page  5
11      2  Notice of Rule 30(b)(6) Deposition    Page  5
12      3  Gen. Order/Compl. ... B#30633-30712   Page 147
13      4  Gen. Order/Sum. Pun. ... B#30582-30594 Page 154
14      5  Gen. Order/Compl. ... B# 30595-30628  Page 164
15      6  Gen. Order/Pers. ... B# 30629-30632   Page 166
16      7  Complaint Category Tables        Page 215
17      8  Complaint Category Tables B# 31341    Page 215
18      9  Operational Proc. Man. B#31130-31274  Page 219
19     10  IAD Stan. Op. Proc. B# 31070-31127    Page 239
20     11  Police Complaints Guide B#31275-31282 Page 254
21     12  Employee Compl. Hist. B#021790-021816 Page 258
22     13  Summary Report Digest B#020837-020843 Page 295
23     14  C.R. No. 211020 Bates No. 021119     Page 304
24     15  Summary Report Digest B#021115-021118 Page 304
```

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

2 (5 to 8)

5

1        (WHEREUPON, Exhibit Nos. 1 and 2
2        were marked for identification.)
3        (Witness sworn.)
4        TINA M. SKAHILL,
5  called as a witness, having been duly sworn by the
6  Certified Shorthand Reporter, was examined and testified
7  as follows:
8        E X A M I N A T I O N
9  BY MS. DONNELL:
10    Q.  Good morning, Ms. Skahill, can you state your
11 name for the record, please.
12    **A.  Tina Skahill.**
13    Q.  And, Ms. Skahill, what is your current position
14 with the Chicago Police Department?
15    **A.  Deputy director in the bureau of investi- --- in**
16 **Internal Affairs.**
17    Q.  And you --
18        Is it your understanding that you have been
19 designated as the City's witness pursuant to Plaintiff's
20 Rule 30(b)(6) notice, which has been marked as Exhibit 1
21 to your deposition?
22    **A.  It is.**
23    MS. DONNELL:  And before we proceed, your counsel
24 would like to make an objection for the record, so I will

6

1  just go ahead and let him do that.
2    MR. YAMIN:  Thanks.
3        Yeah, I want to comment on -- for the
4  record, on the change in language in the Notice of
5  Deposition that's reflected in what's titled the Fourth
6  Amended Notice of Rule 30(b)(6) deposition.  It's -- has a
7  Certificate of Service date of June 4.  This is a
8  group -- sorry, referring to Group Exhibit No. 2.
9        The Certificate of Service indicates that
10 this notice was served June 4, 2019.  It also says -- it's
11 the third amended notice of deposition.
12        Actually it was not served on the City
13 until June 20, 2019.  And the last page of -- this is
14 confusing to read because there is no caption.  But at the
15 end right before the signature line, it says dated June
16 20, 2019, that's when the city received it by way of
17 email.
18        In the group exhibit are four versions of
19 the Notice of 30(b)(6) deposition, for which Ms. Skahill
20 is here to give testimony.  The first three are dated
21 respectively:  September 25, 2018; February 26, 2019, and
22 that has the title "Amended Notice of Rule 30(b)(6)
23 Deposition; the third version has the same title, but it's
24 dated May 7, 2019; and then Exhibit No. 1, Fourth Amended

7

1  Notice of -- um, so I can strike that; and then in
2  my -- in Group Exhibit 2, the fourth version as I said is
3  dated June 20, 2019.
4        Although we have notice, we got served with
5  the first version of this notice back in September 2018,
6  and subsequent versions since then.  It was not until the
7  version dated June 20, 2019 that the word
8  "training" appears in the Notice in any way.  And where it
9  appears is in what is numbered 4, I will call it "Subject
10 No. 4," on Page 2 of both the third amended notice as part
11 of Group Exhibit 2, and then also the notice that's
12 Exhibit 1.
13        Subject No. 4 states:  "The City's written
14 and unwritten policies, practices, customs, and training
15 in effect from 1989 to 1996 relating to the investigation
16 of discipline of alleged police officer misconduct."
17        The word "training," as I said, doesn't
18 appear at all in the previous versions of the notice.  And
19 going back to September 2018, which is close to a year
20 ago, and didn't appear in a notice as recently as when we
21 received in May.
22        The notice it does appear on -- dated June
23 20 is 12 days before this deposition.  So for the first
24 time with regard to this deposition, the City has been put

8

1  on notice that training is to be a topic on which the
2  30(b)(6) witness will be asked questions, and we are
3  objecting to the untimeliness of that -- of the notice
4  insofar as that it contains a reference to "training" at
5  this late date.
6    MS. DONNELL:  Okay.
7        Have you completed your objection, George?
8    MR. YAMIN:  Yes.
9    MS. DONNELL:  So, Ms. Skahill, I am going to proceed
10 with going over Exhibit 1 with you, but understanding
11 subject to your Counsel's objection to the insertion of
12 the word "training," into Topic 4.
13        I just want to go over the topics to
14 clarify that you are you prepared to testify in each of
15 these, okay?
16    THE WITNESS:  Yes.
17    MS. DONNELL:  So if you turn to Page 2 of Exhibit 1,
18 and Exhibit 1 is the Fourth Amended Notice of Rule
19 30(b)(6) Deposition in the Wayne Washington versus
20 Kenneth Boudreau and Tyrone Hood versus City of Chicago
21 civil actions in the Northern District of Illinois.
22 BY MS. DONNELL:
23    Q.  Have you had an opportunity to review Exhibit 1
24 in the topics listed herein prior to your deposition?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

9

1    A.  I saw a couple of versions, so I did get to see
2  one of them.  I need to review this one as well.
3    MS. DONNELL:  Okay, sure.
4         And as of anything you may take the
5  opportunity to look at Exhibit 1.  Why don't we start with
6  Topic 3, and review Topic 3, and then I will just ask you
7  some questions about it once you have had an opportunity
8  to review it.
9              (WHEREUPON, the witness is
10                 reviewing the document.)
11   THE WITNESS:  Okay.
12 BY MS. DONNELL:
13   Q.  Topic 3 --
14        So you've had an opportunity to review
15 Topic 3 in our Notice?
16   A.  Yes.
17   Q.  And Topic 3 is for the period of 1989 to 1996:
18 "Any efforts by the City of Chicago to identify,
19 investigate or prevent any of the following types of
20 misconduct including but not limited to investigations by
21 Internal Affairs, the Office of Professional Standards,
22 the Independent Police Review Authority, or any other
23 agent, firm or organization retained by the City of
24 Chicago and discipline imposed by the City as a result of

10

1  such investigations."  Are you prepared --
2         And then subtopic "a" is actual and/or
3  alleged wrongful acts and/or misconduct by Kenneth
4  Boudreau, John Halloran, James O'Brien, Bernard Ryan, and
5  Robert Lenihan that was reported from 1989 through 1996;
6  are you prepared to testify on behalf of the City as to
7  Topic 3a?
8    A.  I am prepared.
9    MS. DONNELL:  Okay.
10 BY MS. DONNELL:
11   Q.  And with respect to Topic 3b, which has the same
12 preface, but then sub "b" is in proper photographic
13 identification procedures, including misconduct related to
14 photographic identifications or lack of adequate
15 documentations regarding the same.
16        Ms. Skahill, are you prepared to testify as
17 to Topic 3b in Plaintiff's Rule 30(b)(6) Notice?
18   A.  I am prepared.
19   MS. DONNELL:  And I don't know if you have had an
20 opportunity to review Topic 4 yet, but if you would like
21 to do that, then I will ask you are you prepared to
22 testify as to Topic 4.
23              (WHEREUPON, the witness is
24                 reviewing the document.)

11

1  BY MS. DONNELL:
2    Q.  Have you had an opportunity to review Topic 4?
3    A.  I have.
4    Q.  And subject to your Counsel's objection
5  regarding "training," are you prepared to testify today as
6  to the City's written and unwritten policies, practices,
7  and customs in effect from 1989 through 1996 relating to
8  the investigation and discipline of alleged police officer
9  misconduct?
10   A.  Even though "training" was added later, I am
11 prepared to the best of my ability.
12   Q.  For all of --
13        For the policies, practices, customs, and
14 training as well?
15   A.  Yes.
16   MS. DONNELL:  Okay.  All right.
17        And then before we go into the substance of
18 your testimony, I want to ask you some questions on what
19 you did to prepare for this deposition today, but with the
20 instruction that you are not to disclose your
21 communications with your Counsel, Mr. Yamin or Ms. Rosen,
22 okay.
23   THE WITNESS:  Yes.
24 BY MS. DONNELL:

12

1    Q.  So other than your communications with your
2  Counsel, what did you do to prepare for your deposition
3  today?
4    A.  I reviewed Department directives; I looked at
5  Standard Operating Procedures of Internal Affairs, and the
6  Office of Professional Standards; I also looked at other
7  newspaper articles.
8    Q.  What kind of newspaper articles did you review?
9    A.  Tribune articles.
10   Q.  And what were the Tribune articles related to?
11   A.  Various Internal Affairs practices.
12   Q.  When were the newspaper articles published in
13 the Chicago --
14        Is this the Chicago Tribune you are
15 referring to?
16   A.  Yes.
17   Q.  So you looked at Chicago Tribune newspaper
18 articles that related to Internal Affairs investigations?
19   A.  Yes.
20   Q.  How many newspaper articles did you review to
21 prepare for your deposition today?
22   A.  I think it was about two.
23   Q.  And do you remember the date of those -- when
24 those newspaper articles were published?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

4 (13 to 16)

13

1    A.  It was sometime in the '90s.
2    Q.  And did they relate to any particular officers'
3  misconduct that was being investigated by Internal
4  Affairs?
5    A.  Just discussed in general that I can recall.
6    Q.  And other than the Department Directive, the
7  Standard Operating Procedures or SOPs for Internal
8  Affairs, and OPS, and the two Tribune articles you just
9  identified, is there any other documents that you reviewed
10 to prepare for your deposition today?
11   A.  Yes, I looked at the depositions of
12 Commander Klymus (phonetic) and Bruce Dean (phonetic).
13   Q.  And those were in the Rivera cases?
14   A.  Yes.
15   Q.  Other than the documents you have already
16 identified and testified to, are there any other documents
17 that you reviewed to prepare for your deposition today?
18   A.  I looked at the category codes.
19   Q.  And by "category codes" those are the complaint
20 registered category codes?
21   A.  Yes.
22   Q.  And, for the record, we can refer to those as
23 "CR codes"; is that right?
24   A.  That's fine.

14

1    MS. DONNELL:  Okay.
2  BY MS. DONNELL:
3    Q.  Anything else other than what you have testified
4  to already?
5    A.  I looked at provisions of the contracts -- of
6  the, um --
7    Q.  The Fraternal Order of Police --
8    A.  -- Fraternal Order of Police contracts.
9    MS. DONNELL:  Sorry.
10 BY MS. DONNELL:
11   Q.  You looked at provisions of the Fraternal Order
12 of Police contracts that were operative in 1989 to 1996?
13   A.  Yes.
14   Q.  And what particular provisions of the FOP, the
15 Fraternal Order of Police contracts did you review to
16 prepare for your deposition?
17   A.  Section 8.4.
18   Q.  And what does Section 8.4 relate to?
19   A.  The use of CR files.
20   Q.  Other than the documents you've already
21 testified to, anything else that you reviewed to prepare
22 for your deposition today?
23   A.  I spoke to Director Robert Landowski, and he is
24 our director of human resources.

15

1    Q.  And what did you --
2        Why did you seek out a meeting with
3  Robert Landowski to prepare for your deposition today?
4    MS. ROSEN:  Objection to the form.
5    THE WITNESS:  I spoke with Director Landowski about
6  any information, um, past programs such as Behavioral
7  Alert System and Personnel Concerns.
8    MS. DONNELL:  I'll come back to that meeting with
9  Director Landowski.
10 BY MS. DONNELL:
11   Q.  Any other meetings or documents you looked at
12 other than what you have already identified?
13   A.  I also spoke with personnel subordinates in the
14 Bureau of Internal Affairs for documents such as Advocate
15 newsletters from past years, and information about police
16 agents.
17   Q.  You said "police agents"?
18   A.  Yes.
19   Q.  And can you define, for the record, what an
20 "Advocate Newsletter" is?
21   A.  It was a newsletter created by the Advocate
22 section that was distributed throughout the Department
23 addressing disciplinary matters.
24   Q.  And the Advocate section is housed -- is a

16

1  subsection of what department?
2    A.  It's a section of Internal Affairs, and I have
3  also reviewed the Summary Digest Reports.
4    Q.  For what?
5    A.  Of, um, the officers named in the notice.
6    Q.  Would that be Officer Kenneth Boudreau,
7  Officer Halloran, Officer O'Brien, Officer Ryan, and
8  Officer Lenihan?
9    A.  Yes.
10   Q.  I'm sorry, Officer John Halloran, James O'Brien,
11 Bernard Ryan, and Robert Lenihan, right?
12   A.  Correct.
13   Q.  Other than looking at the Summary Digest Reports
14 for the five named officers in Topic 3a, did you review
15 any other CR files and disciplinary documents for those
16 five officers named in Topic 3a to prepare for today?
17   A.  I did see disciplinary histories for those
18 officers from 19 -- from the mainframe titled from 1967 to
19 2000.
20   Q.  And did you look at the disciplinary histories
21 actually on the mainframe or was the document printed from
22 the mainframe for you to review with respect to the
23 disciplinary histories?
24   A.  I don't know if the document was printed from

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

5 (17 to 20)

---

17

1  the mainframe. It was simply titled "mainframe," and it
2  was a paper document.
3      Q.  So you looked at a document which you would term
4  "a mainframe" which is a printout of disciplinary
5  histories saved on the mainframe for each of the five
6  officers; is that accurate when describing that one?
7      A.  It was a document that listed -- um, set from
8  the mainframe, and then it had the date from 1967 until
9  2000 for each officer, and the list of discipline -- files
10 (phonetic) of disciplines.
11     Q.  And was it a list of CR files?
12     A.  It was --
13     MS. ROSEN:  Objection to form.
14     MR. YAMIN:  Join.
15 BY MS. DONNELL:
16     Q.  Why don't you describe the document that you are
17 describing is from the mainframe for each of the different
18 (inaudible) officers that you looked at, what was
19 contained on the -- what information was contained on the
20 sheet?
21     A.  It was a list of CRs. A description of the
22 category.
23     Q.  When you are saying the "description of
24 category" is that the codes, the CR codes?

---

18

1      A.  Yes, and then on the finding, the column of the
2  date, um, the incident occurred. And then the date of the
3  complaint, I believe the date that it was closed.
4      Q.  And was there any narrative portion of that
5  document about the underlying allegations or facts of the
6  allegations?
7      A.  No, it did have a disclaimer on the bottom of
8  each page.
9      Q.  What was included in the disclaimer at the
10 bottom of each page on the mainframe document for each of
11 the officers named in Topic 3a?
12     A.  That it was --
13         The information was limited, and there
14 might -- I might -- there might be -- I don't know
15 exactly; I would have to see it to read it. But it was
16 a -- there was a disclaimer that seemed to qualify the
17 information contained on it.
18     MS. DONNELL:  Okay.
19 BY MS. DONNELL:
20     Q.  With respect to your preparation for Topic 3a,
21 and the actual alleged wrongful acts by Officer Boudreau,
22 Halloran, O'Brien, Ryan, and Lenihan, other than reviewing
23 Summary Digest Reports for each of the officers, and the
24 mainframe document for each of the officers, were there

---

19

1  any other documents you reviewed to prepare for your
2  testimony on Topic 3a?
3      A.  Well, when I received the late notice about
4  training, I reached out to the education and training
5  division yesterday.
6      Q.  Is that for Topic 4 then?
7      A.  Yes.
8      Q.  Okay, I did --
9         Before we move to Topic 4, I was just
10 asking -- because you had been testifying about the
11 documents you looked at to prepare for --
12     A.  Yes.
13     Q.  -- Topic 3a, other than the Summary Digest
14 Reports and mainframe documents for each of those five
15 officers, were there any other documents you reviewed to
16 prepare for Topic 3a?
17     MR. YAMIN:  Objection to the form.
18     THE WITNESS:  Let's see, not that I can recall.
19 BY MS. DONNELL:
20     Q.  Is it accurate to say that you didn't look at
21 any actual CR investigative files by OPS or IAD?
22     MR. YAMIN:  Objection, it mischaracterizes what the
23 witness testified to.
24     THE WITNESS:  I just looked at --

---

20

1      MR. YAMIN:  And form of the question, too.
2      MS. DONNELL:  You may answer.
3      THE WITNESS:  I just looked at the Summary Digest
4  Reports.
5      MS. DONNELL:  Okay.
6  BY MS. DONNELL:
7      Q.  So then is it accurate to say that you did not
8  review any CR investigatory files for any one of those
9  five officers?
10     MR. YAMIN:  Objection, same objections.
11     THE WITNESS:  That would be accurate in preparation
12 for this, yes.
13     MS. DONNELL:  Okay, thank you.
14         I should have stated this earlier, but if
15 you don't understand one of my questions, will you just
16 let me know; I am happy to rephrase it, okay.
17     THE WITNESS:  Yes.
18     MS. DONNELL:  And I will do my best not to talk over
19 you or interrupt you, and I'll have you do the same.
20         Okay, I think you were going to tell me
21 about some additional -- an additional meeting you had to
22 prepare for Topic 4 when the training piece got added.
23 BY MS. DONNELL:
24     Q.  But before we talk about that, are there any

---

Transcript of Tina M. Skahill, Corporate Designee

6 (21 to 24)

Conducted on July 2, 2019

---

21

1 other documents that you reviewed to prepare for your
2 deposition today?
3     THE WITNESS: For 3 or 4?
4     MS. DONNELL: For any of the topics.
5     THE WITNESS: Um, not that I can recall.
6     MS. DONNELL: Okay.
7 BY MS. DONNELL:
8     Q. You were also --
9         You were beginning to testify about a
10 meeting you had to prepare for training; is that right?
11     A. No, I didn't say "a meeting."
12     Q. Oh, I'm sorry, I misunderstood you.
13     A. I just contacted training division personnel.
14     Q. Do you remember who you spoke with in the
15 training division personnel?
16     A. No, I didn't speak with them. I asked someone
17 by email if they had any information concerning, um,
18 training of OPS investigators, police agents, and, um,
19 sergeants.
20         And I also did contact personnel at the
21 civilian office of police accountability, their training
22 coordinator, and asked her if she had any information from
23 that time period 1989 to 1996 of training of OPS
24 investigators.

---

22

1     Q. And did you receive any documents or information
2 on the training of OPS investigators or police agents or
3 sergeants from that time period?
4     A. Um, anything I received I gave directly to
5 Counsel.
6     MS. DONNELL: Okay.
7 BY MS. DONNELL:
8     Q. Ms. Skahill, anything other than what you have
9 already testified already in terms of documents you
10 reviewed or communications you had with other CPD
11 personnel to prepare for your deposition today?
12     MR. YAMIN: Objection, asked and answered.
13     THE WITNESS: Not that I can recall.
14     MS. DONNELL: Okay.
15 BY MS. DONNELL:
16     Q. And then without disclosing the contents of your
17 communications, did you also meet with your attorney,
18 Mr. Yamin or other attorneys at the Sotos Law Firm or
19 Ms. Rosen or other attorneys at the Rock Fusco Law Firm to
20 prepare for your deposition today?
21     MS. ROSEN: Objection to the form.
22     THE WITNESS: I met with Mr. Yamin and Mr. Givens,
23 Jeff Givens (phonetic).
24     MS. DONNELL: And Mr. Givens, okay.

---

23

1 BY MS. DONNELL:
2     Q. And how many meetings did you have with
3 Mr. Yamin and/or Mr. Givens?
4     A. Between 5 or 6.
5     Q. When did your meeting first begin to prepare for
6 your deposition with Mr. Yamin or Mr. Givens?
7     A. Um, I had contact with him verbally before, but
8 I -- I don't know if it started in May or June of this
9 year.
10     MS. DONNELL: Okay.
11 BY MS. DONNELL:
12     Q. And for each of the 5 or 6 meetings you have
13 had, have both Mr. Yamin and Mr. Givens been present?
14     A. I believe so.
15     Q. And you're -- and all of the --
16     A. Off and on.
17     MS. DONNELL: I'm sorry, I didn't mean to --
18 BY MS. DONNELL:
19     Q. And you said of these 5 or 6 meetings they began
20 some time in May or June of this year; is that right?
21     A. I believe so.
22     Q. Do you remember the length of the first meeting?
23     A. No, just been a few hours.
24     MS. DONNELL: Okay.

---

24

1 BY MS. DONNELL:
2     Q. How about the second meeting?
3     A. Each time was a few hours.
4     MS. DONNELL: Okay.
5 BY MS. DONNELL:
6     Q. So you had 5 or 6 meetings that were somewhere
7 between 2 and 3 hours each?
8     MR. YAMIN: Objection to the form of the question, it
9 mischaracterizes the testimony.
10     THE WITNESS: Yeah, it could be 3 to 4 hours.
11     MS. DONNELL: Okay.
12 BY MS. DONNELL:
13     Q. So you had 5 or 6 meetings that were each 3 or 4
14 hours?
15     A. Approximately, yeah.
16     MS. DONNELL: Before we proceed with the deposition,
17 I want to make clear that for all of my questions the
18 relevant time frame is the 1989 to 1996 time frame, unless
19 I specify a different time frame, okay.
20     THE WITNESS: Yes.
21 BY MS. DONNELL:
22     Q. For this particular time frame of 1989 to 1996,
23 is it accurate to say that the officer misconduct was
24 investigated by either the Office of Professional

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

---

25

1 Standards, OPS or the Internal Affairs Division?

2 **A. If there were CR investigations conducted**

3 **between 1989 and 1996 it would have been conducted by**

4 **either the Office of Professional Standards or Internal**

5 **Affairs.**

6 MS. DONNELL: Okay.

7 BY MS. DONNELL:

8 Q. In other words, at this time frame it was not

9 called the Bureau of Internal Affairs, correct, it was

10 Internal Affairs Division; is that right?

11 **A. That is correct.**

12 Q. And can you --

13 When did the Bureau of Internal Affairs get

14 renamed and replaced Internal Affairs Division?

15 **A. Many years past this time frame.**

16 MS. DONNELL: Okay.

17 BY MS. DONNELL:

18 Q. And the Office of Professional Standards was

19 replaced by IPRA in 2007; is that right?

20 **A. That's outside of this time frame, it's what you**

21 **said.**

22 MS. DONNELL: Okay.

23 BY MS. DONNELL:

24 Q. And when you use the term -- you reached out to

---

26

1 COPA, that's the organization that replaced IPRA, which

2 replaced OPS, right, when you were getting information

3 about training of investigators?

4 **A. I reached out to the civilian office of police**

5 **accountability that's in place now.**

6 MS. DONNELL: Okay.

7 BY MS. DONNELL:

8 Q. And that's commonly referred to as COPA or would

9 you prefer the longer?

10 **A. No, COPA is fine.**

11 Q. And if I use the term "OPS," you understand that

12 refers to the Office of Professional Standards?

13 **A. Yes, I will.**

14 Q. And Internal Affairs Division you use IAD or

15 what would you like to use for purposes of the deposition?

16 **A. Either is fine.**

17 MS. DONNELL: Okay.

18 BY MS. DONNELL:

19 Q. And you, Ms. Skahill, are currently the deputy

20 director of the Bureau of Internal Affairs; is that right?

21 **A. That's correct.**

22 Q. And you serve under Chieftain Alexander

23 currently?

24 **A. That is correct.**

---

27

1 Q. And you were appointed to that position in

2 August 2017; is that right?

3 **A. No.**

4 MS. DONNELL: No.

5 BY MS. DONNELL:

6 Q. When did you start the deputy director position

7 with the Bureau of Internal Affairs?

8 **A. About 2018.**

9 Q. In 2018?

10 **A. Yes.**

11 Q. And prior to 2018 when you began the

12 deputy -- as deputy director for Bureau of Internal

13 Affairs, were you retired from CPD for some period of

14 time?

15 **A. Yes.**

16 Q. Did you retire from the Department in 2015?

17 **A. Yes.**

18 Q. And prior to your retirement from the Department

19 in 2013 --

20 Well, let me just make clear: Between 2013

21 and 2018, did you serve in any capacity as consultant or

22 otherwise with CPD?

23 **A. Not as a consultant, no.**

24 Q. Did you serve in any capacity with the Chicago

---

28

1 Police Department between your retirement in 2013 and when

2 you became the deputy director of the Bureau of Internal

3 Affairs?

4 **A. Yes, I returned to the Department in December of**

5 **2016.**

6 Q. In what capacity did you return to the

7 Department in December of 2016?

8 **A. As deputy director in the Office of the General**

9 **Counsel.**

10 Q. And then did you hold the position as deputy

11 director in the Office of the General Counsel until you

12 were appointed the deputy director of the Bureau of

13 Internal Affairs?

14 **A. Yes.**

15 Q. And then prior to your retirement, what position

16 did you have just prior to your retirement in CPD in 2013?

17 **A. Chief of special functions.**

18 MS. DONNELL: Okay.

19 BY MS. DONNELL:

20 Q. And prior --

21 How long did you serve as chief of special

22 functions?

23 **A. From 2011 to 2013, my retirement.**

24 Q. What position did you have prior to chief of

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

29

1 special function?
2    **A.  Chief of the Office of Compliance.**
3    Q.  And how long did you serve as chief of the
4 Office of Compliance?
5    **A.  From, I believe, January 2011 until August of**
6 **2011.**
7    MS. DONNELL:  Okay.
8 BY MS. DONNELL:
9    Q.  And what position did you hold prior to chief of
10 the Office of Compliance -- chief of compliance?
11    **A.  Chief of, um, Chicago Alternative Policing**
12 **Strategy.**
13    Q.  Is that CAPS?
14    **A.  Yes.**
15    Q.  And how long did you serve as the chief of CAPS?
16    **A.  2009 to 2011.**
17    Q.  What position did you hold prior to being chief
18 of CAPS?
19    **A.  Chief of Internal Affairs.**
20    Q.  How long did you serve as the Chief of Internal
21 Affairs?
22    **A.  2008 to 2009.**
23    Q.  What position did you have prior to Chief of
24 Internal Affairs?

30

1    **A.  Deputy Chief and patrol in Area 2.**
2    Q.  And how long did you serve in that capacity?
3    **A.  And that was from end of 2006 to 2008.**
4    MS. DONNELL:  Okay.
5 BY MS. DONNELL:
6    Q.  I won't go over the history of CPD, but when did
7 you become a sworn officer?
8    **A.  November 1982.**
9    MS. DONNELL:  Okay.
10 BY MS. DONNELL:
11    Q.  Do you have any current plans to re-retire?
12    **A.  At some point, yes.**
13    Q.  But nothing directly on the horizon; is that
14 right?
15    **A.  Right.**
16    MS. DONNELL:  So I want us to begin by the process
17 back in '89 to '96 by which a complaint or CR file would
18 be initiated, and started, and investigated, okay.
19    THE WITNESS:  Yes.
20 BY MS. DONNELL:
21    Q.  And as you stated earlier the operative
22 organizations or jurisdiction over --
23       Well, is it accurate to say that the
24 entities that had jurisdiction to investigate officer

31

1 misconduct for this time period was either OPS or IAD?
2    **A.  Well, that would be correct. I'm not sure if**
3 **the Office of Inspector General also would have been able**
4 **to.**
5    MS. DONNELL:  I was going to ask that, too.
6 BY MS. DONNELL:
7    Q.  Is it also possible that investigations could be
8 conducted by outside agencies if it was referred out of
9 the Department, right?
10    MR. YAMIN:  Objection, form, foundation.
11    THE WITNESS:  Um, members of the Chicago Police
12 Department could have been investigated by any number of
13 agencies.
14    MS. DONNELL:  So let's focus now just on the
15 Department's agencies first, okay.
16    THE WITNESS:  Yes.
17 BY MS. DONNELL:
18    Q.  And for the Department's agencies that would be
19 OPS or IAD, correct?
20    **A.  At that time, yes.**
21    MS. DONNELL:  And, again, all of these questions will
22 be for the relevant time period.
23 BY MS. DONNELL:
24    Q.  What was the jurisdiction that OPS had to

32

1 investigate officer misconduct?
2    MR. YAMIN:  Objection, form.
3    THE WITNESS:  Excessive force. I believe, um,
4 domestic violence. I believe, um, lethal force, the use
5 of lethal force, I think those were -- in-custody deaths.
6 BY MS. DONNELL:
7    Q.  If allegations contain an allegation of
8 excessive force, domestic violence, lethal force or
9 in-custody death as well as other allegations or
10 misconduct, during this time frame would OPS handle all of
11 the allegations or would there be a bifurcation and some
12 of the allegations would be investigated by IAD?
13    MR. YAMIN:  Objection to the form of the question.
14    THE WITNESS:  It would depend upon the facts of each
15 investigation on whether or not -- what direction that
16 would take.
17    MS. DONNELL:  Okay.
18 BY MS. DONNELL:
19    Q.  And during this time period, which entity
20 determined whether OPS or IAD would investigate the
21 allegation?
22    **A.  OPS.**
23    Q.  And during this time frame was it possible that
24 OPS and IAD would both be investigating a particular

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

9 (33 to 36)

33

1  incident just -- some allegations would be investigated by
2  OPS and other allegations would be investigated by IAD; do
3  you know if that was possible?
4      **A. It's possible, but not as likely.**
5      Q. Was it the practice during this time period that
6  either OPS or IAD would conduct a full investigation,
7  whatever the allegations were?
8      **A. In most cases, yes.**
9      Q. And in which cases were both OPS and IAD
10 involved in an investigation?
11     MR. YAMIN: Objection, form.
12     THE WITNESS: It's possible that OPS might need
13 assistance from Internal Affairs on a complex
14 investigation or as mentioned before if the facts of the
15 investigation require a bifurcation.
16 BY MS. DONNELL:
17     Q. Do you have knowledge of how many CR complaints
18 were investigated by both during this time frame -- by
19 both OPS and IAD?
20     **A. No.**
21     MR. YAMIN: Are you talking about the total or --
22     Objection to the form of the question.
23     MS. DONNELL: Yeah.
24 BY MS. DONNELL:

34

1      Q. Do you know under -- during this time frame; I
2  will rephrase it.
3          From that 1989 to 1996, do you have any
4  knowledge of the number of CR investigations that were
5  investigated by both OPS and IAD, in other words the
6  allegations were bifurcated in both entities to some part
7  of the investigation?
8      **A. I do not.**
9      Q. And when you were saying that you are assuming
10 that some cases might have required both OPS and IAD, what
11 are you basing that on?
12     **A. Um, what the -- the annual reports for those**
13 **years.**
14     Q. And which annual reports are you referring to?
15     **A. Um, the annual reports that list the**
16 **investigations for each year conducted by Internal**
17 **Affairs, and those conducted by the Office of Professional**
18 **Standards.**
19     Q. And did those reports list any combined
20 investigation?
21     **A. I don't recall.**
22     Q. So you are just referring to the inner parts
23 listed OPS investigation separate from IAD investigations?
24     **A. Yes.**

35

1      Q. During this relevant time period, what
2  percentage of CR complaints were investigated by OPS
3  versus IAD?
4      **A. I don't --**
5      MR. YAMIN: Excuse me, this is outside the scope --
6          Objection, outside of the scope of the
7  notice; you can answer.
8      THE WITNESS: Yes, I don't know, that wasn't listed
9  for statistical (phonetic).
10 BY MS. DONNELL:
11     Q. Do you recall reviewing the deposition of
12 Mr. Dean in the Rivera matter?
13     **A. I recall viewing it.**
14     Q. And he testified that during the '83 to '93 time
15 period 45 to 55 percent were -- well, let me strike that;
16 I will come back to that.
17          As you sit here today, do you have any idea
18 about the percentage of CR investigations that OPS
19 investigated versus IAD during the '89 to '96 --
20     MR. YAMIN: Same objection, plus it calls for
21 speculation.
22     THE WITNESS: I'm not prepared to guess.
23 BY MS. DONNELL:
24     Q. So you don't know as you sit here today what

36

1  percentage is that, right?
2      **A. That's right.**
3      MS. ROSEN: Objection, asked and answered.
4  BY MS. DONNELL:
5      Q. What were the ways that a CR investigation could
6  be initiated from '89 to '96?
7      **A. A variety of ways, the complainant could bring**
8  **it to the attention of a supervisor within the Police**
9  **Department directly or they could also go directly to the**
10 **Office of Professional Standards.**
11     Q. In person you mean?
12     **A. Yes, in person.**
13     Q. Okay.
14     **A. In addition, they could telephone the Office of**
15 **Professional Standards, they could complain. They could**
16 **send a letter to either the Office of Professional**
17 **Standards or um, anyone within the Police Department as**
18 **well or um, Department members could report misconduct.**
19 **Supervisors could observe misconduct and initiate. Um,**
20 **and I'm not sure if fax machines are in place then, but**
21 **they could also -- people could fax information over**
22 **through a fax machine.**
23     Q. You identified that a complainant could bring
24 a complaint -- an allegation of misconduct to a supervisor

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

37

1  directly as well as any other member of the Department; is
2  that right?
3     **A. Yes.**
4     Q. And if the complainant made a verbal complaint
5  to a supervisor or other member of the Department, were
6  there obligations on the CPD member to then file a
7  complaint?
8     **A. Yes.**
9     Q. And that was pursuant to like, what, a general
10 order?
11    **A. It was pursuant to both the rules and**
12 **regulations of the Chicago Police Department and**
13 **directives.**
14    Q. And you also testified that a complainant could
15 go directly to the office of OPS in person to file a
16 complaint; is that right?
17    **A. Yes.**
18    Q. What was the office of operation -- hours of
19 operation from '89 to '96 that permitted in-person
20 complaints?
21    **A. I don't recall the exact hours, but it usually**
22 **would have been daylight hours or you know, 8:00 to 4:00.**
23    Q. And during this time frame, where was the Office
24 of Professional Standards located?

38

1     **A. I don't recall the exact address.**
2     Q. There was just one office, though, correct?
3     **A. I believe so, but I am not -- I'm not sure.**
4     Q. And you said that an individual could also
5  telephone a complaint to OPS, correct?
6     **A. Yes.**
7     Q. What were the office -- the hours of the
8  telephone -- I'm sorry, let me strike that.
9           What hours could an individual call the
10 Office of Professional Standards to file a verbal
11 complaint?
12    **A. I don't know the exact hours, whenever they were**
13 **open.**
14    Q. And then you had said that an individual
15 complainant could send a letter to OPS or anyone within
16 the Department; is that right?
17    **A. Yes.**
18    Q. And then their Department members could also
19 report misconduct by other fellow members, right?
20    **A. Yes.**
21    Q. And then you're not sure whether OPS had fax
22 capacities during this time period to receive a complaint
23 by fax?
24    **A. Yes, I'm not sure.**

39

1     Q. Other than the manner in which a complaint could
2  be initiated, are there any other ways in which a
3  complaint could be initiated during the time frame of '89
4  to '96?
5     **A. Well, Department members were also required to**
6  **inform the Department if they committed misconduct**
7  **themselves as well or if they were under investigation by**
8  **another law enforcement agency, so self-reporting was**
9  **required as well.**
10    Q. And what policies or procedures or what
11 directives required Department members to self-report
12 their own misconduct or whether they were under
13 investigation by another law enforcement agency?
14    **A. It was in regulations, the Police Department,**
15 **and also our Department directives complaint disciplinary**
16 **procedures.**
17    Q. During the '89 to '96 time frame, could a
18 citizen initiate a CR if they remained anonymous?
19    **A. Yes.**
20    MS. DONNELL: Okay.
21 BY MS. DONNELL:
22    Q. And during the '89 to '96 time frame, did OPS
23 track whether the CR file was initiated by an internal CPD
24 member versus an external member of the community?

40

1     MR. YAMIN: Objection, form of the question, and
2  outside of the scope of the Notice.
3     THE WITNESS: Could you define what you mean by
4  "track"?
5     MS. DONNELL: Sure.
6  BY MS. DONNELL:
7     Q. Did OPS keep any documentation, in any way, if
8  the CR was being initiated by another Department member
9  versus a private citizen?
10    MR. YAMIN: Objection, outside the scope of the
11 Notice.
12    MS. DONNELL: You can answer.
13    THE WITNESS: That information would be contained in
14 the CR file.
15 BY MS. DONNELL:
16    Q. Was that contained in the face sheet?
17    **A. The complaint -- how the complaint came in, yes,**
18 **it would be included in there as well.**
19    Q. So it's accurate to say that during this time
20 frame the CR file would indicate whether the complaint was
21 initiated by another CPD member or a private citizen,
22 true?
23    **A. That would be correct.**
24    MS. DONNELL: Okay.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

11 (41 to 44)

41

1 BY MS. DONNELL:
2     Q.  For --
3         Is it accurate to say that during the '89
4 to '96 time frame when an allegation of misconduct was
5 made, regardless of the type of misconduct that the
6 initial entity that created the CR file was OPS?  Sorry,
7 is that not clear?
8         Is it fair to say that OPS was the entity
9 that created, initiated the CR file even if it was for
10 allegations that wasn't within its jurisdiction?
11    MR. YAMIN:  Objection to the form.
12        You can answer, Ms. Skahill.
13    THE WITNESS:  Are you talking about the CR number
14 itself?
15    MS. DONNELL:  Sure.
16 BY MS. DONNELL:
17    Q.  Let's say who -- what entity creates -- gave the
18 CR number?
19    **A.  That number came from OPS.**
20    MS. DONNELL:  Okay.
21 BY MS. DONNELL:
22    Q.  So even if an allegation of misconduct came to
23 Internal Affairs Division, someone from Internal Affairs
24 would have to contact OPS to get a CR number; is that

42

1 true?
2     **A.  That's correct.**
3     Q.  And so -- okay.
4         And during this time frame, was it also OPS
5 that coded -- created the allegation codes that went along
6 with that particular CR file or CR complaint?
7     MR. YAMIN:  Objection to the form "created".
8     THE WITNESS:  They selected the code.
9 BY MS. DONNELL:
10    Q.  So OPS would -- sorry, if this is not clear.  I
11 am still catching up on my sleep.
12        During this time frame OPS would assign the
13 CR number; is that right?
14    **A.  That's correct.**
15    Q.  And OPS would also -- someone at OPS would also
16 select the codes that go along with the allegations?
17    **A.  They would assign --**
18    MR. YAMIN:  Objection to the form; you can answer.
19    THE WITNESS:  They would assign them under the code.
20    MS. DONNELL:  Okay, all right.
21 BY MS. DONNELL:
22    Q.  And then somebody at OPS would determine whether
23 OPS was going to have jurisdiction for the investigation
24 or it was going to be IAD; is that true?

43

1     MR. YAMIN:  Objection, form.
2     THE WITNESS:  Yes, that's true.
3 BY MS. DONNELL:
4     Q.  And who were the individuals at OPS that assigns
5 the CR numbers during this time period?  What rule --
6         Was it an investigator?
7     **A.  No, it would have been the intake personnel.**
8     Q.  Okay, the intake personnel would assign the CR
9 number, correct?
10    **A.  That's correct.**
11    Q.  And what individual or role would assign the
12 code for a particular CR?
13    MR. YAMIN:  Objection, you use the word plural in
14 code or codes.
15 BY MS. DONNELL:
16    Q.  But during this time frame, could more than one
17 code be assigned to an allegation of misconduct?
18    **A.  I don't believe so, you can only select one.**
19    Q.  So a single code would be selected, correct?
20    **A.  Yes.**
21    Q.  And what was the policy and procedure for
22 determining what single code should be selected for a
23 particular allegation of misconduct?
24    **A.  An intake, you know, would review all of the**

44

1 **available information based on the facts of each case**
2 **assigned a category code.**
3     Q.  And how was --
4         If there was more than one type of
5 misconduct included in an allegation, how did OPS select a
6 particular code to assign to that collection of
7 misconduct?
8     **A.  They would select the more serious, the code**
9 **that, um, more aligned with the most serious allegations.**
10    Q.  And, again, was that an intake personnel that
11 was assigning the codes -- assigning the code?
12    **A.  I believe so, yes.**
13    MS. DONNELL:  Okay.
14 BY MS. DONNELL:
15    Q.  And at this time period, was there any written
16 policy about what misconduct was considered the more
17 serious misconduct that should be determining the code
18 assignment?
19    **A.  OPS had their SOPs.  And, I believe, um,**
20 **Bruce Dean gave some description in his dep of what they**
21 **considered more serious allegations.**
22    Q.  And what were those --
23        Back in this time frame what did OPS
24 consider the more serious allegations of officer

Transcript of Tina M. Skahill, Corporate Designee

Conducted on July 2, 2019

---

45

1 misconduct?

2 **A.    He mentioned, um — given their — the type of**

3 **allegations they investigated, he gave examples of**

4 **excessive force where you might have, um, deep lacerations**

5 **or broken bones.  Obviously a death in-custody is more**

6 **serious, um, things of that nature.**

7 **        So physical — extended physical injuries**

8 **could be an indicator of seriousness of alleged physical**

9 **injuries.**

10    Q.    After excessive force, what was considered or

11 types of excessive force -- were there other allegations

12 during this time period that OPS designated as the more

13 serious allegations of officer misconduct?

14    MR. YAMIN:  Objection to the form.

15    MS. ROSEN:  Objection to form.

16    THE WITNESS:  No, I wouldn't know beyond what I've

17 already mentioned.

18 BY MS. DONNELL:

19    Q.    Since an OPS intake personnel assigned the CR

20 number, and assigned the single code for the CR, was there

21 any review process to review the -- how the CR was coded?

22    **A.    It's my understanding that everything had to be**

23 **reviewed by supervisor.**

24    Q.    And when you say "everything had to be reviewed

---

46

1 by supervisor," what are you referring to?

2    **A.    So on that —**

3 **        Once the CR number was initiated, review of**

4 **the allegation had to be made to determine whether or not**

5 **it would go to the office — it would go to Internal**

6 **Affairs or stay in the Office of Professional Standards,**

7 **that would be done, you know, by a supervisor as well.**

8 **And then for OPS, again, the next decision had to be made**

9 **who to assign it to, um, investigate.**

10    MS. DONNELL:  Okay.

11 BY MS. DONNELL:

12    Q.    And just to be clear, during this time frame,

13 OPS had jurisdiction over excessive force complaints

14 domestic violence, legal force, in-custody deaths, that

15 was OPS's jurisdiction; is that right?

16    MR. YAMIN:  Objection to form.

17    THE WITNESS:  And shootings, yes.

18    MS. DONNELL:  And shootings.

19    THE WITNESS:  By police officers.

20 BY MS. DONNELL:

21    Q.    Once the CR was initiated, and the allegation

22 coded, and jurisdiction was determined, that was reviewed

23 by an OPS supervisor; is that correct?

24    MR. YAMIN:  Objection, form.

---

47

1    THE WITNESS:  Yes, I believe so.

2 BY MS. DONNELL:

3    Q.    And if it was determined that OPS was going to

4 maintain jurisdiction of the investigation, I believe the

5 next step you said it would be assigned to an OPS

6 investigator; is that right?

7    **A.    Yes.**

8    MS. DONNELL:  Okay.

9 BY MS. DONNELL:

10    Q.    During this time frame how many investigators

11 did OPS have?

12    **A.    I don't know.**

13    Q.    During this time frame what volume or caseload

14 of CR allegations that were being investigated by

15 OPS -- sorry, strike that.

16        Do you have knowledge of the number of CRs'

17 files that were being investigated by OPS during this time

18 frame?

19    **A.    I don't --**

20    MR. YAMIN:  Excuse me, in the totality of the time

21 frame?

22    MS. DONNELL:  Or by year, whatever.

23    MR. YAMIN:  Would you reask that question, please?

24    MS. DONNELL:  Sure.

---

48

1 BY MS. DONNELL:

2    Q.    Do you know the approximate amount of CR

3 allegations that OPS was investigating each year during

4 the '89 to '96 time frame?

5    MR. YAMIN:  Objection to the form of the question,

6 and it's outside of the scope of the Notice.

7    THE WITNESS:  No, I'd have to review the annual

8 reports for those years.

9    MS. DONNELL:  Okay.

10 BY MS. DONNELL:

11    Q.    How did OPS assign cases to investigators during

12 this time frame?

13    **A.    I don't know exactly what criteria, but I am**

14 **sure a caseload was on the areas that I looked at.**

15    Q.    And how do you know caseload of a particular

16 investigator was one of the criteria?

17    **A.    Um, because that --**

18 **        I thought that Bruce Dean had mentioned**

19 **that, I thought.  But, I think, in his dep I thought that**

20 **he mentioned a caseload.**

21    Q.    Any other criteria that was used to determine

22 how to assign a particular CR investigation to an OPS

23 investigator?

24    **A.    I don't know.**

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

13 (49 to 52)

49

1    Q.  Once an allegation of officer misconduct was
2  assigned to an OPS investigator, what were the next step
3  in that investigation?
4    A.  Well, the investigator, um, would, um, take a
5  look at all of the documents that came with the case, and
6  try to attempt to contact complainants and, um, witnesses
7  as soon as possible.
8    Q.  After taking a look at any documents that were
9  part of the CR initiation, and trying to attempt to
10  contact the complainant and witnesses, what other steps
11  did the OPS investigator take?
12    A.  On some cases a canvass for witnesses would be
13  necessary in order to identify possible witnesses that
14  weren't indicated in the documents themselves.
15    MS. DONNELL:  Okay.
16  BY MS. DONNELL:
17    Q.  What additional steps were part of the OPS
18  investigation other than the ones you have testified to
19  already?
20    A.  Again, it's driven by the type of investigation.
21  But, um, it may involve also gathering of physical
22  evidence and other documentation from outside sources,
23  such as medical records.
24    Q.  Any other steps in the OPS investigation other

50

1  than those you've testified to already?
2    A.  Well, so, um —
3       If they manage to contact complainants and
4  witnesses, they would then either -- depending on the type
5  of investigation, they would interview those individuals
6  and/or take statements, you know, statements from those
7  individuals.
8    Q.  Any other investigatory steps that the OPS
9  investigator would take to investigate allegations of
10  officer misconduct other than the ones you have testified
11  to already?
12    A.  Well —
13    MS. ROSEN:  Objection to form.
14    MS. DONNELL:  You can answer.
15    THE WITNESS:  So after conducting of interviews or
16  getting statements from the complainants and witnesses,
17  and reviewing any of the physical evidence, and other
18  records, um, normally, then they would serve the accused
19  member with, um, the allegations of misconduct, and the
20  waiver of Counsel form.
21    MS. DONNELL:  Okay.
22    THE WITNESS:  And then, um, the accused then would be
23  interviewed.
24    MR. YAMIN:  There is not a pending question,

51

1  Ms. Skahill.
2    MS. DONNELL:  There was.  I think she was just
3  continuing in the process, but that's fine, I can --
4  BY MS. DONNELL:
5    Q.  So then after the investigator has served the
6  accused member of the allegation of misconduct and the
7  waiver of Counsel form, the next step would be the accused
8  officer would be interviewed; is that correct?
9    A.  Uh-huh or a statement would be taken from them.
10    Q.  And can you describe the difference between
11  being interviewed and a statement taken from the accused
12  officer?
13    A.  An interview according to the SOPs are exams,
14  verbal exchange of information, and the statement is
15  written question and answer.
16    Q.  Is a statement different than a to/from
17  memorandum that the accused officer might submit?
18    A.  Yes.
19    Q.  During this time frame could the accused officer
20  in lieu of an interview or a statement, which was a
21  question/answer format, could they also just submit a
22  to/from memorandum?
23    A.  They could.
24    Q.  And was there any type of allegation of

52

1  misconduct that required a verbal in-person interview
2  during this time frame?
3    A.  The more serious allegations required a
4  statement to be taken directly from the accused, and
5  complainants, and witnesses.
6    MS. DONNELL:  I am sorry I didn't hear the last part.
7    THE WITNESS:  Accusants', complainants', and
8  witnesses' statements in which, um, instead of a
9  discussion between -- an interview between the
10  investigator and the person they are interviewing, and
11  then writing a memo summarizing the conversation, it was a
12  detailed question and answer format.
13  BY MS. DONNELL:
14    Q.  And what kind of misconduct or allegations of
15  misconduct required a detailed statement from the
16  complainant, witnesses, and accused?
17    A.  One of the more serious ones such as --
18  involved -- allegations involving a lethal force, just
19  like the shootings, death in-custody cases, things of that
20  nature.
21    Q.  During the '89 to '96 time frame, if there was
22  an allegation of a coerced or fabricated witness
23  statement, would that require the complainant to give a
24  formal statement?

Transcript of Tina M. Skahill, Corporate Designee

Conducted on July 2, 2019

14 (53 to 56)

---

53

1    MR. YAMIN: Objection --

2    MS. ROSEN: Objection to form.

3    MR. YAMIN: -- same objection.

4    THE WITNESS: Not necessarily.

5 BY MS. DONNELL:

6    Q. And for a --

7        The same allegation, a fabricated or

8 coerced witness' statement, would the accused officer be

9 required to give one of the formal question and answer

10 statements?

11    MS. ROSEN: Objection to form.

12    MR. YAMIN: Same objection.

13    THE WITNESS: Not necessarily.

14    MS. DONNELL: I need to just take a quick break.

15    MR. YAMIN: Sure.

16    MS. DONNELL: Can we go off the record?

17        (WHEREUPON, at 10:23 a.m., a

18        brief recess was taken.)

19    MR. YAMIN: Heather, Ms. Skahill would like to add to

20 her testimony on something that you asked previously.

21 BY MS. DONNELL:

22    Q. So you have consulted with your Counsel and you

23 would like to add something to your testimony?

24    MS. ROSEN: Object to the from of that question.

---

54

1    MR. YAMIN: I object to that question.

2    MS. DONNELL: Well --

3    MR. YAMIN: Not just the form of the question, but

4 substance.

5 BY MS. DONNELL:

6    Q. I understand from your Counsel, Ms. Skahill,

7 that you would like to add to some of your testimony; is

8 that true?

9    **A. That is correct.**

10    Q. And what category would you like to supplement?

11    **A. You had asked about the criteria of assigning a**

12 **case to an investigator, and I mentioned caseload, um,**

13 **some other criteria might be the experience of the**

14 **investigator as well, and the type of investigation.**

15    Q. And what is the factual basis for your testimony

16 that the criteria to assign OPS investigators during this

17 time frame, in addition to caseload, might include the

18 experience of the investigator or the seriousness of the

19 allegation?

20    **A. Well, I'd like to add that I thought I had read**

21 **that in Bruce Dean's deposition.**

22    Q. Was there anything that you relied upon to

23 refresh your recollection at the break?

24    MS. ROSEN: Objection to form.

---

55

1    MR. YAMIN: Same objection.

2    THE WITNESS: No, just -- no.

3 BY MS. DONNELL:

4    Q. Other than the testimony you read in Bruce

5 Dean's deposition, is there anything else you are basing

6 your testimony on about the criteria that's assigned

7 (phonetic) to the OPS investigator?

8    **A. For this time frame, no.**

9    MS. DONNELL: Okay.

10 BY MS. DONNELL:

11    Q. Before our break we were -- I was having

12 questions and answers related to when an interview, a

13 statement where a to/from memorandum was required to be

14 submitted in the context of an OPS investigation; do you

15 remember that testimony?

16    **A. Maybe you can read it back.**

17    MS. DONNELL: I can read it back.

18    MR. YAMIN: I think she is just asking you in

19 general.

20    MS. DONNELL: I'm just saying in general kind of

21 thing, generally speaking.

22    THE WITNESS: Oh, okay.

23    MS. DONNELL: I want to get back to that other, to

24 kind of refresh your memory, if that's where we left off.

---

56

1    THE WITNESS: Yes, generally speaking.

2    MS. DONNELL: There is no question pending. I just

3 wanted to reorient where we were.

4 BY MS. DONNELL:

5    Q. During this time frame, were there any type of

6 OPS, CR investigations that did not require an interview,

7 a statement or a to/from memorandum by the accused

8 officer?

9    **A. There could be if you were unable to contact a**

10 **complainant, the witnesses, and the accused was unknown.**

11    MS. DONNELL: Okay.

12 BY MS. DONNELL:

13    Q. During the '89 to '96 time frame, was there an

14 affidavit requirement by the complainant to pursue the CR

15 investigation?

16    **A. No, not that I know of.**

17    Q. When did that --

18        Do you understand what I'm saying with an

19 "affidavit requirement"?

20    **A. Yes, I understood.**

21    Q. And when did that come to be a part of the

22 requirement for the CR investigation?

23    **A. A decade or so after this time frame.**

24    Q. If there was --

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

15 (57 to 60)

57

1      During this time frame '89 to '96, if there
2 was an anonymous complaint of officer misconduct, where
3 the complainant's identity was unknown, but the officer's
4 identity was known, would OPS or IAD investigate the
5 allegation and misconduct?
6    **A. Yes.**
7    Q. And if it was not possible because it was an
8 anonymous complaint for the OPS investigator to get any
9 kind of statement or interview from the complainant, would
10 the investigation proceed?
11    **A. It could if you can gather information from**
12 **other sources.**
13    MS. DONNELL: Okay.
14 BY MS. DONNELL:
15    Q. Other than the investigatory steps that you have
16 already testified to, and if you want me to refresh your
17 recollection, I can; are there other steps in the
18 investigation before we get to the conclusion or summary?
19    **A. Could you refresh where we left off.**
20    MS. DONNELL: Sure.
21 BY MS. DONNELL:
22    Q. You identified that the investigator once they
23 were assigned would take a look at any of the documents
24 provided in the initiation of the CR; that the

58

1 investigator would then attempt to contact the complainant
2 and witnesses as soon as possible. The investigator,
3 depending on the type of allegation, might canvass for
4 witnesses to identify additional possible witnesses.
5      The investigator, depending on the
6 investigation, might gather physical evidence or any
7 documentary evidence from other sources.
8      And then after taking a statement or
9 interview from the complaints and witnesses, the
10 investigator would serve the accused member that the
11 allegation was conduct (phonetic) in a waiver of Counsel
12 form, and an attempt to obtain their interviewing
13 statement or to/from memorandum from the accused officer.
14    **A. So after that then we conduct the interview,**
15 **retain the statement from the accused member.**
16    Q. What would be the next step in the
17 investigation?
18    **A. Then we would look at all of the information**
19 **that's been gathered for this investigation, all of the**
20 **statements, all of the physical evidence, and make a**
21 **decision as a recommended finding, um, based upon the**
22 **preponderance of the evidence.**
23    Q. And from the '89 to '96 time frame, what were
24 the possible recommended findings an investigator could

59

1 select from?
2    **A. You had, um, unfounded.**
3    Q. What was the definition of an "unfounded
4 allegation misconduct"?
5    **A. The alleged misconduct did not occur.**
6    MS. DONNELL: Okay.
7 BY MS. DONNELL:
8    Q. What were the other, the other possible findings
9 at the conclusion of the investigation of the officer
10 misconduct other than unfounded?
11    **A. Another one was exonerated.**
12    Q. And what was the finding of exonerated to
13 signify?
14    **A. The conduct occurred, but was lawful and proper.**
15    MS. DONNELL: Okay.
16 BY MS. DONNELL:
17    Q. And what was the third possible finding an OPS
18 investigator could select from after the conclusion of
19 their investigation?
20    **A. Not sustained.**
21    Q. And what does the finding of "not sustained"
22 signify?
23    **A. The investigator was unable to prove or disprove**
24 **the allegation.**

60

1    MS. DONNELL: Okay.
2 BY MS. DONNELL:
3    Q. And the final category, was that "sustained"?
4    **A. "Sustained."**
5    Q. And what did a "sustained" finding mean?
6    **A. The allegation of misconduct did occur.**
7    MS. DONNELL: Okay.
8 BY MS. DONNELL:
9    Q. Once the OPS investigator had reviewed all of
10 the evidence gathered, and reached one of the four
11 conclusions you've identified: Unfounded, exonerated, not
12 sustained or sustained, and selected one of those, what
13 was the next step in the OPS investigatory process?
14    **A. If it was sustained, then the investigator would**
15 **ask for the complementary history.**
16    Q. You call that "complementary history"?
17    **A. Yes.**
18    Q. And what are you referring to when you say an
19 investigator would request a complementary history?
20    **A. That's usually --**
21      **It would be awards, history of awards,**
22 **complimentary letters, and then they would also request**
23 **the disciplinary history.**
24    MS. DONNELL: Okay.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

61

1  BY MS. DONNELL:
2      Q.  In the '89 to '96 time period, how would an OPS
3  investigator obtain the disciplinary history of an accused
4  officer that they had sustained, found a sustained finding
5  for an allegation of misconduct?
6      **A.  They would obtain that from Internal Affairs.**
7          (WHEREUPON, Mr. Greenberg joins
8              the deposition.)
9  BY MS. DONNELL:
10     Q.  How did Internal Affairs obtain the disciplinary
11 history of an accused officer during this time frame?
12     MR. YAMIN:  Objection, foundation.
13     THE WITNESS:  Um, what was available to them from, I
14 guess, the mainframe or whatever was available at the
15 time.
16 BY MS. DONNELL:
17     Q.  Well, that's what I'm asking:  Were there
18 hardcopy and electronic records or just hardcopy records
19 of the disciplinary history in that '89 to '96 time frame?
20     MR. YAMIN:  Objection, form and foundation.
21     THE WITNESS:  There was a --
22          There was a mainframe but, um, a lot of
23 information was kept on paper.
24 BY MS. DONNELL:

62

1      Q.  Is it accurate to say that from the '89 to '96
2  time frame that IAD kept disciplinary histories of
3  officers in both hardcopy form and some electronic form in
4  the mainframe?
5      **A.  There --**
6          **Like I said, there were --**
7      MR. YAMIN:  Same objections. Go ahead, please.
8      THE WITNESS:  There were both, but I am not exactly
9  sure how -- which ones that Internal Affairs accessed at
10 the time, but mostly it was paper.
11     MS. DONNELL:  Okay.
12 BY MS. DONNELL:
13     Q.  So let's start with the paper form of
14 disciplinary histories of officers:  What files or
15 documents were kept in the Internal Affairs Division of
16 officers' disciplinary histories?
17     **A.  Disciplinary histories are -- would be**
18 **sustained -- sustained cases.**
19     Q.  So this is --
20         IAD only kept a record of sustained cases;
21 is that right?
22     **A.  For disciplinary histories.**
23     MS. DONNELL:  Okay.
24 BY MS. DONNELL:

63

1      Q.  And in what format did IAD keep a record of
2  sustained cases for their officers?
3      MR. YAMIN:  Would you repeat that?  I didn't catch
4  the last part.
5          (WHEREUPON, the question was read
6              back as requested.)
7      MR. YAMIN:  You want to just ask it again.
8      MS. DONNELL:  Sure.
9  BY MS. DONNELL:
10     Q.  From 1989 to 1996, what form did Internal
11 Affairs Division keep a record of the sustained cases of
12 its Department members?
13     MR. YAMIN:  Objection, form of the question.
14     THE WITNESS:  Like I said it was -- he had the
15 mainframe and paper, but it would be -- again, I'm not
16 sure how he would get a paper form that would list the
17 sustained cases on paper to put in a file.
18 BY MS. DONNELL:
19     Q.  So I am actually asking you to describe --
20         Let's take it back, a step back:  So during
21 this time frame did Internal Affairs have files by
22 officers that had sustained CRs against them, like a
23 physical hard copy file?
24     MR. YAMIN:  Objection, form, foundation.

64

1      THE WITNESS:  No, it was per the -- I mean, the
2  individual, not sustained officers' files, no.
3  BY MS. DONNELL:
4      Q.  Well, first off, why don't you describe for me
5  the files that Internal Affairs Division kept of officers'
6  disciplinary histories in the '89 to '96 time frame?
7      MR. YAMIN:  I am going to object to the use of the
8  word "files". I don't believe the deponent has used that
9  word.
10     MS. DONNELL:  Okay.
11 BY MS. DONNELL:
12     Q.  Well, do you have knowledge of how Internal
13 Affairs Division kept a record of the disciplinary
14 histories of the officers who had cases sustained against
15 them in hardcopy during this time frame?
16     MR. YAMIN:  Objection, asked and answered.
17     MS. ROSEN:  Same objections.
18     THE WITNESS:  I do know they had CR files of various
19 investigations, of all investigations.
20 BY MS. DONNELL:
21     Q.  So you're saying that during this time frame
22 Internal Affairs Division kept a record of all CR file
23 investigations?
24     **A.  They were the keeper of their own**

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

17 (65 to 68)

65

1  investigations, yes.
2      Q.  And would this include both sustained, and
3  unsustained, and not founding (sic) exonerated or only
4  sustained CR files?
5      A.  **They had files of all investigations regardless**
6  **of the finding.**
7      Q.  And they had kept --
8          Was it accurate to say that Internal
9  Affairs Division kept the OPS investigative CR files as
10 well as their own files?
11     A.  **Now let me see, I believe they did, that all**
12 **records were kept by Internal Affairs.**
13     MS. DONNELL:  Okay.
14 BY MS. DONNELL:
15     Q.  So it's your testimony that from '89 to '96 the
16 Internal Affairs Division kept all the completed CR
17 investigation files, whether IAD had conducted the
18 investigation or OPS, correct?
19     A.  **I believe so, but I'm not exactly sure.**
20     Q.  And where were they kept in IAD?
21     MR. YAMIN:  Objection, foundation, and outside of the
22 scope of the Notice.
23     THE WITNESS:  Yeah, I wouldn't know exactly where
24 they have -- it was possible they had control, some might

66

1  have been at a warehouse, I am not exactly sure.
2  BY MS. DONNELL:
3      Q.  Do you know?
4      A.  **Not exactly.**
5      MS. DONNELL:  So what we're trying to identify is the
6  next step in the process for a sustained case was --
7      THE WITNESS:  Yeah.
8      MS. DONNELL:  -- for the investigator to obtain the
9  complementary history of the officer the and disciplinary
10 history.
11 BY MS. DONNELL:
12     Q.  So maybe you could just describe for me how the
13 investigator obtained complementary history?
14     A.  **Um, they would ask, again, for the complementary**
15 **history and, um, disciplinary history from Internal**
16 **Affairs.**
17     MS. DONNELL:  Okay.
18 BY MS. DONNELL:
19     Q.  So OPS would make a request to Internal Affairs
20 to get the complementary history and the disciplinary
21 history for the accused officer?
22     A.  **Yes.**
23     MS. DONNELL:  Okay.
24 BY MS. DONNELL:

67

1      Q.  Do you have knowledge of where Internal Affairs
2  Division would obtain the complementary history for the
3  accused officer?
4      MR. YAMIN:  Objection, foundation.
5      MS. DONNELL:  Well, I'm trying to establish that.
6      THE WITNESS:  Not exactly during that time, no.
7  BY MS. DONNELL:
8      Q.  So you don't know how IAD would obtain the
9  complementary history for the accused officer, correct?
10     A.  **Not at that time.**
11     Q.  And, again for the relevant time period, do you
12 have knowledge how the Internal Affairs Division would
13 obtain the disciplinary history for the accused officer?
14     MR. YAMIN:  Objection, asked and answered.
15     THE WITNESS:  Just what I stated before.
16 BY MS. DONNELL:
17     Q.  Well, I don't -- it's not clear to me.
18         So could you describe for me how IAD would
19 obtain a disciplinary history for the accused officer from
20 the '89 to '96 time frame?
21     MR. YAMIN:  Objection, asked and answered.
22         You can answer to the best you can.
23     THE WITNESS:  Yeah.  Again, like I mentioned before
24 when the request was made it would come back typed out as

68

1  to what the sustained cases were, and the finding for the
2  disciplinary history.  But I'm not exactly sure if that
3  was derived from the mainframe or whether it came out on
4  paper.
5  BY MS. DONNELL:
6      Q.  And so is the basis of your testimony -- well,
7  strike that.
8          You just testified that an investigator, an
9  OPS investigator would make a request to IAD for the
10 officer's disciplinary history, you mean the sustained
11 CR -- am I going too fast?
12     THE COURT REPORTER:  Yes.
13 BY MS. DONNELL:
14     Q.  You just testified that an OPS investigator
15 would make a request to IAD for the accused officer's
16 disciplinary history, correct?
17     A.  **Yes.**
18     Q.  And that you just testified that what would be
19 returned to the OPS investigator would be a hardcopy
20 document that would list the accused officer's sustained
21 CR; is that right?
22     A.  **That's correct.**
23     Q.  But is it fair to say that you don't know how
24 Internal Affairs Division would generate that list of

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

18 (69 to 72)

69

1  sustained CR cases?
2      A.  That's correct.
3      MS. DONNELL:  Okay.
4  BY MS. DONNELL:
5      Q.  What is the factual basis for your testimony
6  that Internal Affairs Division would return a sheet
7  listing the disciplinary history of sustained CRs against
8  the accused officer?
9      A.  That's based upon my reading of, um, the dep,
10 and --
11     Q.  Mr Dean's deposition?
12     A.  Mr. Dean's and I believe also Commander Klymus'
13 (phonetic).
14     Q.  Do you recall reviewing those depositions that
15 there were 3 by 5 index cards kept at IAD with the
16 disciplinary histories?
17     A.  I remember reading about index cards and -- as
18 well at, um -- at OPS as well.
19     Q.  Did those index card files keep a record of
20 sustained CRs, to your knowledge?
21     A.  I don't recall.
22     Q.  How about --
23          Did you recall reading in those depositions
24 a record of CR face sheets being kept?

70

1      A.  Yes, I do recall face sheets.
2      Q.  Can you describe a face sheet?
3          For the record, what is a face sheet?
4      A.  A "face sheet" was something that's created at
5  intake initially that would list the date and the time
6  that the complaint was, um, initiated; the nature of the
7  allegations; the complainant's name, address, contact
8  information, and other info about the complainant.
9          In addition, if the accused member is
10 known, that information would be listed on there as well.
11 I recall that, um, reading in one of the depositions that,
12 um, upon assignment that there would be an indication of
13 investigators' information, they would assign it,
14 too -- it would be added.
15     Q.  Would the recommendation of the investigator's
16 outcome be unfounded, exonerated, sustained, would that
17 also be listed eventually on the face sheet?
18     MR. YAMIN:  Objection, form --
19     THE WITNESS:  No, I don't --
20     MR. YAMIN:  -- and foundation.
21     THE WITNESS:  I don't recall if that was listed, per
22 se, on the face sheet.  I do recall that it was during the
23 summary report.
24 BY MS. DONNELL:

71

1      Q.  And, to your knowledge, what format the face
2  sheet occurred in this time frame '89 to '96, was it a
3  Carbonite form?
4      A.  Yes, it was, um -- on reading Mr. Dean's dep, he
5  described it -- I think it was a five set -- form set
6  carbon copy.
7      Q.  Do you have knowledge of where each of the five
8  copies of the face sheet form set were distributed in this
9  time frame?
10     A.  I don't recall.
11     MR. YAMIN:  Objection, foundation and form.
12     MS. DONNELL:  I am asking if she has knowledge,
13 George, to establish foundation.  I don't know what's
14 objectionable about a foundation question; just to be
15 clear.
16 BY MS. DONNELL:
17     Q.  The question was:  Do you have knowledge of
18 where each of the five sheets of the form set were sent?
19     A.  I don't recall where each form set went.  I do
20 recall Mr. Dean said one of them would go to, um, the
21 investigator and -- but I don't recall where each one
22 went.
23     Q.  For a case in which the OPS investigator had
24 reached a recommendation of a sustained finding, you just

72

1  testified that they would then seek out the complementary
2  history of the accused officer and the disciplinary
3  accused officer, right?
4      A.  Yes.
5      Q.  Have you testified as to everything that you
6  have knowledge about with respect to obtaining both the
7  complementary history and the disciplinary history?
8      MR. YAMIN:  Objection to the form of the question.
9      THE WITNESS:  Yes.
10     MS. DONNELL:  Okay.
11 BY MS. DONNELL:
12     Q.  Once the OPS investigator had received
13 complementary history and the disciplinary history of the
14 accused officer from IAD, what was the next step in the
15 process?
16     A.  Then the investigator would make a recommended
17 finding -- I mean, um -- I'm sorry, penalty.
18     Q.  Okay, just to be clear:  Once the next step had
19 been taken in obtaining the complementary history and the
20 investigatory history, the next step in the investigator's
21 process would make a recommendation of a penalty?
22     A.  Penalty, yes.
23     MS. DONNELL:  Okay.
24 BY MS. DONNELL:

Transcript of Tina M. Skahill, Corporate Designee

Conducted on July 2, 2019

---

73

1  Q.  And what were the possible penalties that an OPS
2  investigator could recommend?
3  **A.  Anywhere from reprimand to separation.**
4  Q.  Once the investigator had determined a
5  recommended penalty, what was the next step in the
6  investigatory process for OPS?
7  **A.  Um, the investigation file, and that would be**
8  **reviewed by a supervisor.**
9  Q.  How many supervisors were assigned to OPS during
10 this time frame?
11 **A.  I don't --**
12 MR. YAMIN:  Objection, foundation.
13 THE WITNESS:  I don't know.
14 BY MS. DONNELL:
15 Q.  Do you have any knowledge of how many
16 individuals worked at OPS during this time frame?
17 MR. YAMIN:  Same objections.
18 THE WITNESS:  No, I don't.
19 MR. YAMIN:  Plus outside of the scope of the Notice.
20 BY MS. DONNELL:
21 Q.  You don't know?
22 **A.  No.**
23 Q.  Do you know who the head of OPS was during the
24 '89 to '96 time frame?

---

74

1  **A.  I believe Gail Shines (phonetic) was, um, chief**
2  **administrator at one point.**
3  Q.  Can you say that name again, Gail?
4  **A.  Gail Shines.**
5  MS. DONNELL:  Gail Shines.
6  BY MS. DONNELL:
7  Q.  So Ms. Shines was the chief administrator of OPS
8  during some portion of the '89 to '96 time frame?
9  **A.  I think so.**
10 Q.  Anyone else that you have knowledge of?
11 **A.  '89 to '96, let's see, that's the only name that**
12 **I can recall right now.**
13 MS. DONNELL:  Okay.
14 BY MS. DONNELL:
15 Q.  I think the step we were on in the OPS
16 investigatory process was that the investigators
17 recommended finding, and recommended penalty would be
18 reviewed by an OPS supervisor, correct?
19 MR. YAMIN:  That misstates --
20     Objection, it misstates the witness's
21 testimony.
22 MS. DONNELL:  Have I misstated your testimony?
23 THE WITNESS:  Could you repeat it again?
24 MS. DONNELL:  Sure.

---

75

1  BY MS. DONNELL:
2  Q.  You just testified that once the OPS
3  investigator had reached the step of a process of the
4  recommended finding, and a recommended penalty, that it
5  would be reviewed by an OPS supervisor; is that accurate
6  or have I mischaracterized your testimony?
7  MR. YAMIN:  What is the "OPS supervisor," that's
8  where I have my problem.
9  THE WITNESS:  The investigation, um, the file would
10 be reviewed, yes.
11 MS. DONNELL:  Okay.
12 BY MS. DONNELL:
13 Q.  So you're saying the entire investigatory file
14 would be reviewed along with the recommended finding, and
15 recommended penalty by an OPS supervisor; is that
16 accurate?
17 **A.  Yes, that is.**
18 Q.  And then what would happen with --
19     What possible next steps would happen after
20 an OPS supervisor had reviewed the CR file, the
21 recommended finding, and recommended penalty?
22 **A.  Um, the supervisor could think that additional**
23 **investigation needed to be done, and send it back to the**
24 **investigator for more investigatory work or they might**

---

76

1  forward it on to the coordinator to review as well.
2  Q.  And who is the coordinator?
3  **A.  That's an individual, again, of, um -- I don't**
4  **want to say higher rank, but more responsibility than the**
5  **supervisor.**
6  Q.  Do you have knowledge of how many --
7      Well, first of all, were the coordinators
8  part of OPS?
9  **A.  Yes.**
10 Q.  Do you have knowledge of how many OPS
11 coordinators were in the office during the '89 to '96 time
12 frame?
13 MR. YAMIN:  Objection, foundation, outside of the
14 scope of the Notice.
15 MS. DONNELL:  George, I am asking if she has
16 knowledge to establish whether there would be a
17 foundation.
18     So I appreciate you need to make a record,
19 but just to be clear, I am asking a foundational question.
20 BY MS. DONNELL:
21 Q.  Do you need me to reask it?
22 **A.  Could you please.**
23 MS. DONNELL:  Sure.
24 BY MS. DONNELL:

---

77

1    Q.   Do you have knowledge of how many OPS
2  coordinators were in the office in the '89 to '96 time
3  frame?
4        MR. YAMIN:  Same objection.
5        THE WITNESS:  I do not.
6        MS. DONNELL:  All right.
7  BY MS. DONNELL:
8    Q.   You were identifying the possible next steps
9  that was happening at OPS investigations at the
10 conclusions of the investigators investigation
11 recommendation and penalty.
12         So you said one option was the supervisor
13 could refer, you know, back to the investigator for
14 additional investigation or the supervisor could refer the
15 CR file to the OPS coordinator, correct?
16   **A.   Correct.**
17   Q.   Are there any other possible next steps in the
18 OPS investigation other than the two you have identified?
19   **A.   The coordinator could also send it back to the**
20 **investigator for additional investigation.**
21   Q.   During the '89 to '96 time frame, did OPS keep a
22 record of the number of CR files that the supervisor sent
23 back for additional investigation?
24       MR. YAMIN:  Objection, foundation.

78

1        THE WITNESS:  I don't know.
2  BY MS. DONNELL:
3    Q.   Do you have knowledge of whether the OPS -- I'm
4  sorry, strike that.
5         Do you have knowledge whether OPS kept a
6  record of how many CR files that a coordinator sent back
7  for additional investigation during the time frame?
8        MR. YAMIN:  Objection, foundation.
9        THE WITNESS:  I don't know.
10 BY MS. DONNELL:
11   Q.   Other than what you've already testified to in
12 terms of the next step of the OPS investigatory process,
13 were there any additional steps that would happen at this
14 stage other than the ones you have testified to?
15   **A.   After the coordinator it could go to the**
16 **administrator of OPS.**
17   Q.   And what cases would go to the administrator for
18 the administrator's review?
19   **A.   Um, again, it would be sustained cases.**
20   Q.   Did all sustained cases go to the administrator
21 for their review?
22       MR. YAMIN:  Objection, foundation.
23       THE WITNESS:  I'm not sure if all did.
24 BY MS. DONNELL:

79

1    Q.   Was there a certain criteria that determined
2  whether the OPS administrator needed to review a CR file
3  that was recommended for a sustained finding?
4    **A.  I believe according to Mr. Dean's dep, um, the**
5  **very serious cases like:  Shootings or death**
6  **investigations, um, would be reviewed by the**
7  **administrator.**
8    Q.   And when you're referring to very serious cases,
9  are you referring to those same substantive cases that
10 involved shootings, death in-custody a very serious
11 physical harm?
12   **A.  Yes.**
13   Q.   Any other cases that required the OPS
14 administrators review if there was a sustained finding,
15 other than those that you have categorized as very
16 serious?
17   **A.  I don't know.**
18   Q.   Do you know whether during the '89 to '96 time
19 frame if there was an allegation of a coerced witness
20 statement or coerced confession, whether there was a
21 sustained finding by the OPS investigator, whether the OPS
22 administrator had to review that file?
23       MR. YAMIN:  Objection, form of the question,
24 foundation.

80

1        THE WITNESS:  I'd have to look at the files
2  themselves to determine that.
3  BY MS. DONNELL:
4    Q.   But as you sit here today, do you know of any
5  OPS standard operating procedure that required certain
6  categories of alleged misconduct, whether it was a
7  sustained finding that required the OPS administrator's
8  review, other than the ones you identified as very
9  serious?
10       MR. YAMIN:  Objection, form of the question.
11       THE WITNESS:  Not that I can recall.
12 BY MS. DONNELL:
13   Q.   For those cases where the OPS investigator had
14 reached a recommendation of a sustained finding, and a
15 recommended penalty that didn't require the OPS
16 administrator's review, what was the next step for those
17 CR investigations?
18   **A.  That the investigations would go through command**
19 **channel review.**
20   Q.   And what are you referring to when you say:
21 "Command channel review"?
22   **A.  That's the review of the accused members exempt**
23 **rank superior officers.**
24   Q.   What was the purpose of a command channel

81

1  review?
2      A.  One of the purposes, again, was to allow the,
3  um, the supervisors to be aware of the investigations, and
4  the nature of them.
5          And the other was to review the
6  investigations and, um, to either concur or not concur
7  with finding and/or penalty, recommended penalty.
8      Q.  So during the command channel review process,
9  you said the nonexempt?
10     A.  Would be exempt.
11     MS. DONNELL:  The exempt, I'm sorry.
12  BY MS. DONNELL:
13     Q.  The exempt officers could review the
14  investigation and the finding, and they can either concur
15  or disagree?
16     A.  Or not concur.
17     MS. DONNELL:  Or not concur, okay.
18  BY MS. DONNELL:
19     Q.  And in those cases where -- upon the command
20  channel.
21          Well, first of all, did all OPS
22  investigation where the investigator recommended a
23  sustained finding require command channel review?
24     A.  No.

82

1      Q.  No?
2      A.  No.
3      Q.  For those that --
4          Which ones did not?
5      A.  I don't believe separation cases required that
6  review.
7      Q.  So everything short of a penalty that was
8  recommending separation of the member went through command
9  channel review?
10     A.  I believe so.
11     Q.  And for those where the OPS recommended penalty
12  was separation of the Department member, what was the next
13  step in the process?
14     A.  That would go to the superintendent.
15     MS. DONNELL:  Directly to the superintendent, okay.
16  BY MS. DONNELL:
17     Q.  Stepping back, though, for those OPS
18  investigations that require the OPS administrator's review
19  before completion, once the OPS administrator had
20  conducted their review, what was the next step for those
21  investigations?
22     A.  Um, if it wasn't a separation case, those two
23  then would go through the command channel review.
24     MS. DONNELL:  Okay, so let's put the separation cases

83

1  to the side for now.
2  BY MS. DONNELL:
3      Q.  For those cases that after the OPS had completed
4  its investigation, and it went to command channel review,
5  for those cases where after -- those in which there was a
6  nonconcur after the command channel review, what would
7  happen next?
8      A.  Um, the command staff member who did not concur
9  would have to write a report explaining the reasons for
10  their nonconcurrence.
11     Q.  Do you have any knowledge of the number of cases
12  or percentage of cases where the OPS had reached a finding
13  to sustain and impose a penalty, and the after command
14  channel review there was a not concur with the OPS
15  finding?
16     MR. YAMIN:  Objection, foundation, outside the scope
17  of the Notice.
18     THE WITNESS:  I don't know.
19  BY MS. DONNELL:
20     Q.  And I don't know if I asked this already:  Did
21  OPS keep any documentation of the cases in which they had
22  recommended a sustained finding, and a penalty, and the
23  command channel review rendered a not concur with their
24  finding, do you know if they kept documentation of that in

84

1  any kind of reports?
2      MR. YAMIN:  Objection about -- same objections.
3      THE WITNESS:  I don't know.
4  BY MS. DONNELL:
5      Q.  For those in which the command staff member
6  issued a not-concur finding and then prepared a -- I'm
7  sorry, you said a report?
8      A.  Yes.
9      Q.  As to why they did not concur, what would happen
10  next for those cases?
11     A.  Um, it depends on the reason for the
12  nonconcurrence.  They could also request additional
13  investigation.
14     MS. DONNELL:  Okay.
15  BY MS. DONNELL:
16     Q.  And what was the --
17          You said sometimes it depended on the
18  reasons for nonconcurrence, right?
19     A.  Yes.
20     Q.  What were the different reasons for
21  nonconcurrence that would determine the next step in the
22  process?
23     A.  Well --
24     MR. YAMIN:  Objection, form.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

85

1  BY MS. DONNELL:
2      Q.  Were you saying one might be they wanted
3  additional investigation?
4      **A.  That could be one.**
5      Q.  And what were the other reasons for
6  nonconcurrence that were possible?
7      **A.  It depends on the facts of each case.**
8      MS. DONNELL:  Okay.
9  BY MS. DONNELL:
10     Q.  What would happen after, let's say, there was
11 additional investigation or there was articulated reasons
12 for nonconcurrence, what would happen next in cases where
13 there was a not concurred by the command channel staff
14 review?
15     **A.  So it --**
16     MR. YAMIN:  Objection, it misstates Ms. Skahill's
17 testimony about the command channel review process, but
18 you can answer.
19     MS. DONNELL:  Okay, I don't want to -- if you need to
20 clarify it in any way.
21 BY MS. DONNELL:
22     Q.  For those cases, those OPS investigations where
23 the command channel review reached a nonconcur with the
24 OPS finding recommendation, you were identifying for me

86

1  what would happen next, and one was it might be a
2  recommendation for additional investigation, right?
3      **A.  Yes.**
4      Q.  And another might be just the command channel
5  review might state its reasons for not concurring with the
6  OPS conclusion or finding --
7      MR. YAMIN:  Same objection I made to the last
8  questions.
9      THE WITNESS:  Well, I was talking about the first
10 level of review, that first person who might not concur.
11     MS. DONNELL:  Okay.
12     THE WITNESS:  And then it would go to a second level.
13 BY MS. DONNELL:
14     Q.  And what would be the second level of review?
15     **A.  Now that second level would have us able to**
16 **review the comments of the command staff member below**
17 **them, and the investigators' recommendation in the file,**
18 **and the entire CR file as well.**
19     Q.  So the second level of command channel review
20 would be another nonexempt?
21     **A.  It would be a no exempt.**
22     Q.  I am sorry, in another exempt information --
23 another exempt member who would review now both the CR
24 file and the initial command channel review?

87

1      **A.  Yes.**
2      Q.  What would happen after the second level of
3  review in the command channel review?
4      **A.  Again, they have the same options as the**
5  **previous exempt member.**
6      Q.  And by that you mean they could request
7  additional investigation?
8      **A.  Yes.**
9      Q.  And what was their other option?
10     **A.  It depends on the facts of the investigation.**
11     Q.  What would it --
12         Describe for me what it would do?
13     **A.  Well --**
14     MR. YAMIN:  Objection, form.
15     THE WITNESS:  It would be hard to describe because it
16 depends upon the investigation itself on why you don't
17 agree to a finding, a recommendation.
18     MS. DONNELL:  Okay.
19 BY MS. DONNELL:
20     Q.  But assuming there was ultimately a nonconcur on
21 the second level of the command channel review, what would
22 happen next?
23     **A.  Because if there was a nonconcurrence then you**
24 **need a third level.**

88

1      Q.  And who would conduct the third level of review
2  in the command channel review?
3      **A.  Again, an individual of a higher rank would have**
4  **a nonconcurrence.**
5      Q.  So if you had a nonconcurrence after the second
6  level of the command channel review, then there would be a
7  third level of command channel review, correct?
8      **A.  Correct.**
9      Q.  And that would be by a higher up exempt member
10 of the Department, correct?
11     **A.  Yes.**
12     Q.  And what were the options at the third level of
13 the command channel review?
14     **A.  The same as the previous.**
15     Q.  And by that you mean?
16     **A.  As they could request additional investigation**
17 **or concur or not concur what the finding recommendations**
18 **of the investigation.**
19     Q.  And what would happen at the completion of the
20 third level of command channel review if there was still a
21 not concurrent?
22     **A.  Then at that point, um, it would go to the,**
23 **um, review-- well, then it was the ADS of Internal**
24 **Affairs, back to the Internal Affairs.**

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

89

1  Q.  And when you are saying "ADS," what are you
2  referring to?
3  **A.  Assistant Deputy superintendent.**
4  Q.  So if there was a case in which after the third
5  level of command channel review there was still a finding
6  of nonconcurrence with the original OPS recommendation,
7  then the file would be sent to the assistant deputy
8  superintendent of Internal Affairs for their review?
9  **A.  Well, for --**
10  **Again, to manage now for the superintendent**
11  **because this has to go to the superintendent.**
12  MS. DONNELL:  Okay.
13  BY MS. DONNELL:
14  Q.  Do you have any knowledge of how many cases
15  CR -- Strike that.
16  Do you have knowledge of how many OPS CR
17  investigations from the '89 to '96 time frame went through
18  the third level of command channel review?
19  MR. YAMIN:  Objection, foundation, and outside the
20  scope of the Notice.
21  THE WITNESS:  No, I don't.
22  BY MS. DONNELL:
23  Q.  Do you have knowledge of how many OPS CR
24  investigations had went to the assistant deputy

90

1  superintendent of Internal Affairs Division for their
2  review --
3  MR. YAMIN:  Same --
4  MS. DONNELL:  -- by management to present to the
5  superintendent?
6  MR. YAMIN:  Same objections.
7  THE WITNESS:  No, I don't know.
8  BY MS. DONNELL:
9  Q.  And just to complete this process, then once the
10  ADS received the CR file and the three levels of command
11  channel review, they would present the case to the
12  superintendent for determination?
13  THE WITNESS:  We are still talking about the
14  sustained cases?
15  MS. DONNELL:  Yes, that's right.  That's right, we
16  are still talking this topic.
17  THE WITNESS:  Yes, um -- for sustained, yes.
18  MS. DONNELL:  Okay.
19  BY MS. DONNELL:
20  Q.  And how about for cases in which there was a
21  sustained finding, and at the first level of command
22  channel review there was a concurrence with the OPS
23  finding, what would happen for those cases?
24  **A.  If at first level there was concurrence, it**

91

1  **still required at least two levels of command channel**
2  **review.**
3  Q.  So even if the first level of command channel
4  review concurred with the OPS finding and recommendation,
5  it still had to go through a second level of command
6  channel review?
7  **A.  Yes.**
8  Q.  And if the second level of command channel
9  review concurred with the OPS finding and the first level
10  at command channel review, what would happen next?
11  **A.  Then that's sufficient, it doesn't need to go to**
12  **a third level.**
13  Q.  And at that point would discipline be imposed?
14  **A.  No, the superintendent --**
15  Q.  So you get the superintendent?
16  **A.  -- must approve all sustained discipline during**
17  **this time frame.**
18  Q.  So regardless of the --
19  **A.  Of the --**
20  Q.  -- even if it was a reprimand it still had to go
21  to the superintendent?
22  **A.  Yes.**
23  Q.  So during the '89 to '96 time frame any
24  sustained case for any amount of recommended discipline

92

1  had to go to the superintendent for final approval?
2  **A.  Yes.**
3  MS. DONNELL:  Okay.
4  BY MS. DONNELL:
5  Q.  Have we tracked through the investigatory
6  process for any cases in which the OPS investigator found
7  a sustained finding?
8  MR. YAMIN:  Objection, form.
9  THE WITNESS:  Yes, that's what we are talking about.
10  MS. DONNELL:  And I think, um --
11  I think we will stop there for -- and go
12  back to the other kinds of cases before we go for review
13  after the superintendent imposes any discipline.
14  BY MS. DONNELL:
15  Q.  But for a case in which the OPS investigator
16  reached a not sustained finding, what would happen for
17  those cases, would there be any level of review?
18  **A.  Um, the not sustained cases would go through the**
19  **same process, except they would need to go to the**
20  **superintendent, the command channel review, but --**
21  Q.  Would not sustain cases require two levels of
22  command channel review?
23  **A.  Yes.**
24  Q.  How about a finding where the OPS investigator

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

24 (93 to 96)

93

1 reached exonerated finding, would those cases require any
2 additional review?
3   **A. The same.**
4   Q. Meaning two levels of command channel review?
5   **A. Yeah.**
6   Q. And is the same true for unfounded?
7   **A. I believe so, yes.**
8   MS. DONNELL: I wanted to go back and ask questions
9 regarding the OPS investigatory process before we get to
10 the finding, okay.
11 BY MS. DONNELL:
12   Q. For cases -- for, um -- well, during
13 the -- well, strike that.
14     During that OPS investigation, prior to
15 reaching a finding of being sustained, could OPS
16 investigators obtain a disciplinary history of the accused
17 officer?
18   **A. No.**
19   Q. So it's accurate to say that the OPS
20 investigator was only permitted to obtain the accused
21 officer's disciplinary history once the OPS investigator
22 had reached a sustained finding, true?
23   **A. That's correct.**
24   Q. In cases where the OPS investigator reached a

94

1 sustained finding, and they sought the alleged accused
2 officer's disciplinary history, was it possible for the
3 OPS investigator to obtain any CR allegations that were
4 not sustained?
5   MR. YAMIN: Objection, form.
6   MS. DONNELL: Do you understand my question?
7     I can restate it.
8   THE WITNESS: Please.
9 BY MS. DONNELL:
10   Q. So in a case where the OPS investigator reached
11 a sustained finding, they would seek out the disciplinary
12 history of an accused officer, right?
13   **A. Yes.**
14   Q. And that disciplinary history would only include
15 sustained CRs, correct?
16   **A. That's correct.**
17   Q. Was it ever possible during the '89 to '96 time
18 frame for the OPS investigator to obtain a list of the CRs
19 the accused officer had that did not result in a sustained
20 finding or could they only get sustained CRs?
21   **A. The disciplinary history of --**
22   MR. YAMIN: I'm just going to object, it misstates
23 the previous testimony; you can answer.
24   THE WITNESS: Yeah, the disciplinary history only

95

1 contains sustained.
2 BY MS. DONNELL:
3   Q. So is it fair to say that there was no way in
4 which an OPS investigator could obtain a list of CR files
5 against the accused officer, just the list of the CR, the
6 accused -- the allegations of misconduct?
7   MR. YAMIN: At any point?
8   MS. DONNELL: Yeah -- no, I'm saying --
9     Well, I'll go back.
10 BY MS. DONNELL:
11   Q. During the context of the OPS investigation, the
12 OPS investigator was not permitted to get the accused
13 officer's disciplinary history until they reached a
14 sustained finding, true?
15   **A. That's correct.**
16   Q. And once they reached a sustained finding they
17 would get the disciplinary history, but it would only
18 include sustained CRs, true?
19   **A. That's correct.**
20   Q. So my question is: At any point in the process,
21 could the OPS investigator get a list of CRs that the
22 accused officer had that would include those that were
23 currently being investigated or those that reached an
24 unfounded, exonerated or not sustained finding?

96

1   **A. If it was for a disciplinary investigation, um,**
2 **the contract provision of FOP limited what they could**
3 **review for them. Now if there was some other purpose, I**
4 **don't know. It may be -- if there -- I really can't say.**
5     **But if it's for the purposes of conducting**
6 **disciplinary investigation and the contract provisions,**
7 **FOP 8.4 had prevented from using that.**
8   Q. So per the FOP Section 8.4, OPS investigators
9 were only permitted to obtain the disciplinary history
10 once they had reached a sustained finding, and that would
11 only include sustained CRs?
12   **A. The disciplinary history only can -- by**
13 **definition only contained sustained CRs.**
14   MS. DONNELL: Okay.
15 BY MS. DONNELL:
16   Q. So it's your testimony that during this time
17 frame, pursuant to the FOP contract, OPS investigators
18 couldn't get a list of say current ongoing CR
19 investigations or CR investigations that had resulted in
20 an unfounded, not sustained or exonerated finding?
21   MR. YAMIN: Objection, asked and answered.
22   THE WITNESS: It's my understanding not only for the
23 contract, but if you remember correctly, too, the contract
24 required destruction of CR files. I think it stopped like

Transcript of Tina M. Skahill, Corporate Designee

Conducted on July 2, 2019

25 (97 to 100)

97

1  in 1991, so that even limited, even, what was available.
2      MS. DONNELL: Okay. I think maybe this would be a
3  good time to pause for your call. So we will go off the
4  record, it's 11:25.
5              (WHEREUPON, at 11:25 a.m., a
6              lunch recess was taken.)
7      A F T E R N O O N  S E S S I O N
8              (WHEREUPON, at 12:21 p.m., the
9              afternoon session began.)
10 BY MS. DONNELL:
11     Q. Ms. Skahill, we were sort of walking through the
12 investigatory process for an OPS investigation all the way
13 through the command channel review, up to the
14 superintendent for the relevant time period, right?
15     A. Yes.
16     Q. And I think you had just testified to the same
17 process for not sustained, exonerated, and unfounded as
18 well, correct?
19     A. With the exception that it didn't go through the
20 superintendent.
21     MS. DONNELL: The superintendent, right.
22 BY MS. DONNELL:
23     Q. So have we testified to the OPS investigatory
24 process up to that stage of the superintendent review

98

1  before we get to any police board review or any further
2  review?
3      A. I think so.
4      MS. DONNELL: Okay.
5              So I want to now switch gears to talk about
6  the Internal Affairs Division process, okay.
7      THE WITNESS: Yes.
8      MS. DONNELL: So for an Internal Affairs Division
9  investigation I want to walk through the same steps for
10 the investigation that you did for the OPS investigation,
11 okay.
12     THE WITNESS: Yes.
13 BY MS. DONNELL:
14     Q. So for the IAD investigations OPS
15 initiates -- gives the CR number -- assigns the CR number,
16 and assigns the code, and then assigns it to IAD, correct?
17     A. That's correct.
18     Q. So once the complaint register comes into the
19 Internal Affairs Division for investigation, what are the
20 first steps in the process for the Internal Affairs
21 Division investigation?
22     A. So then the investigation is examined to see
23 whether or not it will be investigated by an Internal
24 Affairs investigator or will it go to a unit outside of

99

1  Internal Affairs for investigation.
2      MS. DONNELL: Okay.
3  BY MS. DONNELL:
4      Q. And can you describe for me what investigations
5  remained inside the Internal Affairs Division for
6  investigation, and which types of alleged misconduct were
7  referred to a unit outside of the Internal Affairs
8  Division.
9      A. Usually less serious investigation went outside
10 of Internal Affairs, and the more serious and complex
11 investigations remained inside.
12     Q. And for Internal Affairs Division
13 investigations, which kinds of alleged misconduct were
14 considered more serious and remained -- more serious or
15 complex and remained inside of Internal Affairs?
16     A. It could be the accused. So if the accused was,
17 um, like a lieutenant or above, um --
18     Q. So the rank of the accused might --
19     A. -- or sergeant, the accused might be --
20     MS. DONNELL: Okay, so sorry to interrupt you.
21 BY MS. DONNELL:
22     Q. So it's fair to say that the rank of the accused
23 officer could make the investigation more complex and more
24 serious --

100

1      A. Yes.
2      Q. -- just the rank of the accused officer?
3      A. Yes.
4      Q. Other than the rank, what else would be
5  considered a more complex or serious allegation?
6      A. Um, the type of allegation.
7      Q. And for Internal Affairs Division alleged
8  misconduct, what would be considered a serious allegation?
9      A. So you could have like an EEO allegation.
10     Q. What do you mean by an "EEO allegation"?
11     A. Equal Employment Opportunity type of -- such as
12 sexual harassment or discrimination.
13     MS. DONNELL: Okay.
14 BY MS. DONNELL:
15     Q. Other than an EEO type allegation, which would
16 be like race or sex discrimination, what other types of
17 allegations were considered serious or complex, and would
18 remain with Internal Affairs for investigation?
19     A. Um, criminal investigations. So, um -- where
20 the member has been accused of a crime.
21     Q. Anything else other than the EEO type of
22 allegations or criminal investigations?
23     A. Um, the number of accused could play a factor.
24 So we would have multiple accused on an allegation.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

26 (101 to 104)

101

1  Q.  So, for example, hypothetically speaking if you
2  had many officers accused of overtime violations, would
3  that stay in Internal Affairs?
4  **A.  It could possibly --**
5  **It probably would given the nature of the**
6  **allegation, and the amount of people involved.**
7  Q.  Any other criteria during this time frame that
8  would be considered serious or complex, and remain inside
9  Internal Affairs for investigation, other than the
10  categories you just identified?
11  **A.  Confidential investigations.**
12  Q.  And what kinds of investigations were considered
13  confidential investigations for the '89 to '96?
14  **A.  Those would be investigating officers for**
15  **possible corruption.**
16  Q.  Any other category of alleged misconduct that
17  would be considered confidential?
18  **A.  Um --**
19  **Again, investigations conducted with the**
20  **FBI or um, the State's Attorney's office or Public**
21  **Integrity Unit.**
22  Q.  Do you have knowledge of any investigations that
23  were conducted with Internal Affairs Division and the FBI
24  during the '89 to '96 time period?

102

1  **A.  Not off the top of my head, no.**
2  Q.  How about any investigations that the Internal
3  Affairs Division conducted along with the Cook County
4  State's Attorney's office from '89 to '96?
5  **A.  Not off the top of my head, no.**
6  MS. DONNELL:  Okay.
7  BY MS. DONNELL:
8  Q.  So you were identifying various categories of
9  alleged misconducts that were considered serious or
10  complex in the '89 to '96 time frame.
11  Other than those you have testified to
12  already, are there any additional categories that you
13  considered serious or complex?
14  **A.  Um, you could also look at the -- besides the**
15  **accused, who the complainant is.  If you had a high**
16  **profile complainant, that would be more likely to stay**
17  **inside of Internal Affairs for investigation.**
18  Q.  And who --
19  What kind of individual would be considered
20  high profile, like if these person or a political person?
21  **A.  Either one of those folks will suffice.**
22  Q.  Anybody else?
23  **A.  Well, no.  Like you said "media worthy".**
24  MS. DONNELL:  Okay.

103

1  BY MS. DONNELL:
2  Q.  Any other categories that were considered
3  complex or serious such as they remained inside Internal
4  Affairs Division for investigation other than the ones you
5  have testified to?
6  **A.  Impersonation cases.**
7  Q.  And what's an impersonation case?
8  **A.  Where it -- an individual appears to be**
9  **impersonating a police officer.**
10  Q.  So this would be a non-officer being
11  investigated as impersonating an officer?
12  **A.  It comes in --**
13  **A lot of times it's an unknown officer, but**
14  **it appears as an impersonation case.**
15  MS. DONNELL:  Okay.
16  BY MS. DONNELL:
17  Q.  Any other categories of alleged misconducts that
18  were considered serious or complex in the relevant time
19  frame that would be investigated by the Internal Affairs
20  Division?
21  **A.  Things involving firearms or large quantities of**
22  **narcotics, things of that nature.**
23  Q.  Anything else?
24  **A.  Um, again --**

104

1  **It's basically, the way the system is set**
2  **up, um, after OPS makes the decision to give it to**
3  **Internal Affairs.  Another factor could be, again, the,**
4  **um, the facts of the investigation.  And if it is going to**
5  **involve any -- any lengthy investigation.  So length of**
6  **time it may take, and the skills would be assessed as**
7  **well.  So, generally investigators in Internal Affairs**
8  **would have more skills.**
9  MS. DONNELL:  Okay.
10  BY MS. DONNELL:
11  Q.  Who at Internal Affairs Division would conduct
12  review to determine whether the investigation would stay
13  with Internal Affairs or be referred to an outside unit?
14  **A.  There was an intake section of Internal Affairs**
15  **as well.**
16  Q.  Do you have knowledge of how many individuals
17  worked as an intake section of IAD during '89 and '96?
18  **A.  No, I don't.**
19  Q.  Do you have any knowledge of the number -- oh,
20  I'm sorry.
21  What was the proper term for the
22  investigator in the Internal Affairs Division at this time
23  frame, the investigator?
24  **A.  Well, "investigator" is fine, but we also had**

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

27 (105 to 108)

105

1 "police agents".

2     Q. What's the difference between the Internal
3 Affairs investigator and the Internal Affairs police
4 agents during this time frame?

5     **A. Um --**

6         **Basically, um, a police agent was a police**
7 **officer who was assigned to Internal Affairs to conduct**
8 **investigations. So the title code was different than a**
9 **police officer, and they received extra salary, extra**
10 **compensation for their skill set.**

11     Q. And the IAD investigators, were those non-sworn
12 office individuals that were civilians?

13     **A. No, those were police officers.**

14     MS. DONNELL: Okay.

15 BY MS. DONNELL:

16     Q. What's the difference between an investigator
17 and a police agent during this time frame?

18     **A. It's interchangeable.**

19     Q. Interchangeable, okay.

20     **A. And then sergeants were also investigators.**
21 **And, um, I think you also had police officers who started**
22 **out as -- and they weren't police agents, they were police**
23 **officers assigned, who conducted similar**
24 **investigations.**

106

1     Q. So there were police officers, police agents,
2 who were also police officers, assigned to IAD?

3     **A. Yes.**

4     Q. Then there were sergeants who were -- did (sic)
5 investigators assigned to IAD?

6     **A. All of those could be investigators.**

7     MS. DONNELL: Okay.

8 BY MS. DONNELL:

9     Q. And was there a hierarchy in terms of certain
10 investigations that were more complex, and more serious,
11 and more lengthy (phonetic) than to the sergeants versus
12 the police agents?

13     **A. The sergeants also would review the**
14 **investigations of the police officers or the police agents**
15 **as well.**

16     MS. DONNELL: Okay.

17 BY MS. DONNELL:

18     Q. Could confidential investigations be handled by
19 a police agent or a sergeant or were those assigned to
20 only sergeants?

21     **A. No, they could -- you could have police officers**
22 **assigned to confidential as investigators.**

23     MS. DONNELL: Okay.

24 BY MS. DONNELL:

107

1     Q. Do you have knowledge of the caseload that
2 sergeants or police agents or police officers carried of
3 allegations and misconduct during this time frame either
4 by year or um -- over the course of that time frame?

5         Do you understand my question?

6     MR. YAMIN: I object to the form, and outside of the
7 scope of the Notice.

8     THE WITNESS: No, I don't know.

9     MS. DONNELL: Okay.

10 BY MS. DONNELL:

11     Q. What were the outside units that the intake
12 individual from Internal Affairs Division could refer a
13 less serious or less complex allegation of officer
14 misconduct that had been referred from OPS?

15     **A. Usually those were the districts or outside**
16 **units of the accused member.**

17     Q. So a district other than the accused member's
18 district could be assigned an investigation?

19     **A. No.**

20     MS. DONNELL: I am sorry, I misunderstood you.

21     THE WITNESS: Those are usually the districts or the
22 unit to which the accused member was assigned or detailed.

23 BY MS. DONNELL:

24     Q. And those districts or units that the accused

108

1 member was assigned to could be referred an investigation?

2     **A. Yes.**

3     Q. What kinds of allege misconduct would IAD refer
4 to the district or unit of the accused member?

5     **A. The ones that I had previously spoke about, when**
6 **I had said about what would go outside in --**

7     Q. I'm sorry to interrupt, you have to explain, the
8 less serious allegations?

9     **A. Yes.**

10     Q. Like what?

11     **A. All of the ones that I previously mentioned.**

12     MS. DONNELL: I thought you had just listed the
13 serious ones, the EEO --

14     THE WITNESS: I said anything other than those.

15 BY MS. DONNELL:

16     Q. Anything other than those?

17     **A. Uh-huh.**

18     MS. DONNELL: I see.

19 BY MS. DONNELL:

20     Q. So anything other than EEO criminal
21 investigations?

22     **A. Right.**

23     Q. Confidential investigations, high rankings --

24     **A. Because the possibilities were very broad.**

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

109

1    MS. DONNELL: Okay, and just --
2        So let me finish my question before you
3    answer. I know you know where I'm going.
4    BY MS. DONNELL:
5    Q. Is it your testimony that anything other than
6    the categories of investigations you listed that were
7    considered serious or complex, those would be referred to
8    the districts or units of the accused officer?
9    A. Yes.
10   MS. DONNELL: Okay.
11   BY MS. DONNELL:
12   Q. Once the intake individual from Internal Affairs
13   Division decided that Internal Affairs would be conducting
14   the investigation, what was the next step in this process
15   for Internal Affairs?
16   A. To determine who the investigator would be.
17   Q. And who decided who the investigator would be in
18   Internal Affairs for a particular investigation?
19   A. And that would be a supervisor in the intake
20   section.
21   Q. I should ask: Before it was assigned where the
22   supervisor reviewed the intake individual's assessment of
23   whether it should remain at Internal Affairs or to be
24   referred to an outside unit or district?

110

1    A. Yes.
2    Q. So there would be some level of review first?
3    A. Yes.
4    Q. And once there was a review, then there would be
5    an assignment to an investigator, true?
6    A. Yes.
7    Q. And the super -- the Internal Affairs Division
8    supervisor would do the assignments?
9    A. Yes.
10   Q. What was the --
11       Who were the supervising individuals at
12   Internal Affairs Division during this time frame; what
13   were their titles?
14   A. Um, I already mention you have sergeants. I'd
15   have to look at, for that time frame, to see who was
16   actually assigned there or not, people move in and out.
17       But you could have a lieutenant. I don't
18   know if there were any captains assigned during this time
19   frame. But you definitely would have had an assistant
20   deputy superintendent who would have been over Internal
21   Affairs.
22   Q. Is the assistant deputy superintendent of
23   Internal Affairs the highest ranking officer of the
24   Internal Affairs Division at that time?

111

1    A. Yes.
2    Q. And the assistant deputy superintendent of
3    Internal Affairs Division reported directly to the
4    superintendent?
5    A. Yes.
6    Q. Do you have knowledge of who the assistant
7    deputy superintendents of Internal Affairs Divisions were
8    in '89 to '96?
9    A. No, not off the top of my head I don't.
10   Q. Do you have knowledge of who the superintendents
11   were at the Chicago Police Department from '89 to '96?
12   A. Um, well, those individuals, I think, I might
13   remember. Um, I came on in '82, and it was Brzeczek. And
14   then I think it was Fred Rice, I think. And I think it
15   was, um-- I think it was Leroy Martin. And I think after
16   Leroy Martin, um, Matt Rodriguez. After Matt Rodriguez I
17   think it was Terry Hillard.
18   MR. YAMIN: So just the relevant time period?
19   MS. DONNELL: Just for the relevant time period.
20   BY MS. DONNELL:
21   Q. So from '89 to '96 was that Superintendent Rice
22   and Rodriguez?
23   A. I believe so.
24   Q. And Hillard?

112

1    A. I can't remember.
2    MR. YAMIN: Mischaracterizes the testimony.
3    THE WITNESS: I can't remember what year it was.
4    BY MS. DONNELL:
5    Q. Once the supervisor assigned an Internal Affairs
6    Division CR investigation to a police agent or sergeant or
7    police officer to investigate, what was the next step in
8    the process for an Internal Affairs investigation?
9    A. So then the investigator would look at all of
10   the file, and the face sheet, and any other documents
11   associated with the investigation, and then attempt to
12   contact the complainant, and the witnesses as soon as
13   possible.
14   Q. What was the next step in the IAD investigatory
15   process during this time frame?
16   A. They might also do a canvass for additional
17   witnesses that they could not glean from the files given
18   to them; they had also -- you know, depending on the, um,
19   the facts of the investigation, um, attempt to obtain
20   documents outside of the investigation, such as medical
21   records, it depends on the allegations, photographs,
22   things in the possession of complainants and witnesses;
23   um, physical evidence, you know, inventories possible,
24   it's all driven by the facts of the case.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

29 (113 to 116)

---

113

1     Q. And what would be the next step after attempting
2 to interview the complainant, witnesses, possibly
3 conducting a canvass, attempting to obtain any documents
4 or photographs or any physical evidence, what would be the
5 next step in the Internal Affairs Division investigation?
6     **A. So then they would review all of that, and if**
7 **they were able to contact the complainant, and the**
8 **witnesses, and they agreed to be interviewed or give a**
9 **statement, then that would take place.**
10     Q. And what if the Complainant refused to give a
11 statement other than what had already been provided, what
12 would happen?
13     **A. They would continue, you know, the investigation**
14 **unless the complainant said they wanted to terminate the**
15 **investigation.**
16     Q. During the relevant time period, could Internal
17 Affairs Division conduct investigation when a complainant
18 remained anonymous?
19     **A. Yes.**
20     MS. DONNELL: Okay.
21 BY MS. DONNELL:
22     Q. And after the investigator would seek out and
23 possibly interview the complainant and witnesses, what
24 would be the next step in the process?

---

114

1     **A. Um, as I mentioned taking their statements in**
2 **that. And then, um, after that looking at, um, their**
3 **statements, and the evidence, and then serving the accused**
4 **member with allegations and a Waiver of Counsel form.**
5     Q. Did all Internal Affairs CR investigations
6 require serving the accused member with a Notice of the
7 allegations and the Waiver of Counsel form?
8     **A. Well, if the person is accused, yes, and then**
9 **the state of rights on the Waiver of Counsel.**
10     Q. Is it ever possible that the Internal Affairs
11 Division investigation would stop short and not serve the
12 accused member with notice of the allegation, for example,
13 if they were unable to interview a complainant or
14 witnesses?
15     MR. YAMIN: Objection to the form of the question, it
16 calls for speculation, incomplete hypothetical.
17     THE WITNESS: Um, if they --
18       If it's possible that they wouldn't be able
19 to interview the accused, if the accused was no longer
20 available. So if the accused had left the Department, the
21 accused had died or any number of possibilities.
22 BY MS. DONNELL:
23     Q. But in a scenario where the complainant was
24 unable to be interviewed or provide a statement, would the

---

115

1 investigation necessarily proceed to serving the accused
2 member with the allegation of misconduct?
3     MR. YAMIN: Objection, asked and answered.
4     THE WITNESS: It depends on the investigation. You
5 could have enough based upon, um, witnesses' statements,
6 interviews, documents, and that still to serve the
7 accused, it depends.
8 BY MS. DONNELL:
9     Q. Would it be up to the Internal Affairs Division
10 investigator's discretion whether to proceed to that phase
11 of the investigation of providing the accused member with
12 notice of the allegation, and scenarios where they were
13 unable to interview the complainant and/or witnesses?
14     **A. Well --**
15     MR. YAMIN: Objection to form.
16     THE WITNESS: It's driven by the facts of the
17 investigation. Again, it's possible to -- you may need to
18 interview the accused.
19 BY MS. DONNELL:
20     Q. But, I guess, my question is: Is it also
21 possible that they would not interview the accused or get
22 a statement from the accused?
23     **A. It's possible either way.**
24     Q. It would depend on the facts of that

---

116

1 investigation, and the allegations, and the seriousness of
2 the allegations?
3     **A. That's correct.**
4     MS. DONNELL: Okay.
5 BY MS. DONNELL:
6     Q. But assuming that an investigation proceeded to
7 the step of serving the accused member with notice of the
8 allegations, and a Waiver of Counsel form, what would
9 happen next or the possibilities of what would happen
10 next?
11     **A. Well, after interviewing the accused, and taking**
12 **their statement, um, then the investigator would review**
13 **that statement, and all of the physical evidence, and**
14 **other documentation, and other statements, and make a**
15 **recommended finding, and a recommended -- yeah, a**
16 **recommended finding.**
17     Q. Before I get to the categories of recommended
18 finding and penalties for the accused officer statement
19 phase, what could an accused officer do, could they submit
20 a "to/from" as an alternative to being interviewed or
21 providing a statement to the Internal Affairs Division
22 during that time frame?
23     **A. It's possible.**
24     Q. So they could be either interviewed in person;

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

117

1  is that right?
2  **A.  That's correct.**
3  Q.  Or they could do a question and answer
4  statement, written statement?
5  **A.  That's correct.**
6  Q.  Or the accused officer could just write a
7  to/from memo?
8  **A.  Depending on the individual case, that's**
9  **possible.**
10  Q.  Was it also possible that the accused officer
11  did not have to respond?
12  **A.  Well, it's possible, but failure to respond**
13  **could subject the member to disciplinary actions.**
14  Q.  And once the Internal Affairs investigation had
15  reached the step of obtaining a statement or to/from
16  memorandum or interview with the accused officer, you then
17  said that the investigator would look at all of the
18  evidence collected and reach a recommended finding; is
19  that right?
20  **A.  Oh, that's correct.**
21  Q.  And did Internal Affairs Division have the same
22  four categories of findings of unfounded, exonerated,
23  sustained, and not sustained?
24  **A.  Yes.**

118

1  Q.  Any other categories for Internal Affairs other
2  than those four?
3  **A.  No.**
4  Q.  And would the Internal Affairs investigator
5  after reaching a recommended finding also reach a
6  recommended penalty?
7  **A.  Not yet.**
8  Q.  Not yet, what would happen next?
9  **A.  So, if the recommended finding was sustained,**
10  **then the investigator would request a copy of a**
11  **complementary history and a disciplinary history.**
12  Q.  And this would be a request made to some portion
13  of the same division of Internal Affairs, right?
14  **A.  Yes.**
15  Q.  Do you remember who pulled the complementary
16  histories or the disciplinary histories and requests were
17  made by OPS and Internal Affairs during this time frame?
18  MR. YAMIN:  Objection, form, foundation.
19  THE WITNESS:  Personnel and the records division.
20  BY MS. DONNELL:
21  Q.  So personnel and the records division --
22  **A.  Records of Internal Affairs.**
23  MS. DONNELL:  Of Internal Affairs, that's what I was
24  going to ask you.

119

1  BY MS. DONNELL:
2  Q.  So Internal Affairs during this time frame had
3  its own records division; is that correct?
4  **A.  Records section would be fine.**
5  Q.  And the personnel who worked in the records
6  section would be responsible for responding to requests
7  from IAD or OPS investigators to get the accused members'
8  complementary and disciplinary history?
9  **A.  Disciplinary history, I am not sure --**
10  **complementary they might have gotten from another unit**
11  **within the Department.**
12  Q.  Like a human resources?
13  **A.  Human resources, yes.**
14  Q.  Do you, as you sit here today, have personal
15  knowledge of whether the complementary history that was
16  requested for a sustained finding came from the Personnel
17  Records Division or IAD?
18  **A.  I think complementary -- I'm pretty confident**
19  **complementary came from -- then it was the personnel**
20  **division.**
21  Q.  And then the disciplinary history would come to
22  the records division of Internal Affairs?
23  **A.  Yes.**
24  Q.  And did we speak earlier about that today that

120

1  you do not have specific knowledge of how the personnel on
2  the Records Division at IAD would obtain the list of
3  sustained CRs for the accused member, correct?
4  **A.  That's correct.**
5  Q.  But is it fair to state that you do know that
6  the disciplinary history that was obtained for an accused
7  officer would only include sustained CRs?
8  MR. YAMIN:  Sorry, would you just repeat it?
9  BY MS. DONNELL:
10  Q.  The disciplinary history that was requested and
11  obtained from the records division of the Internal Affairs
12  Division of the accused officer would only include
13  sustained CRs, correct?
14  MR. YAMIN:  Thank you.
15  THE WITNESS:  That's correct.
16  BY MS. DONNELL:
17  Q.  And is it also fair to say from the Internal
18  Affairs Division investigation, that the investigating
19  police officer, sergeant could not obtain an accused
20  officer's CR history until they reached a recommendation
21  of a sustained finding?
22  **A.  For the purposes of using it in their CR**
23  **investigation, that would be a true statement.**
24  Q.  So in the context of their investigation of an

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

31 (121 to 124)

121

1  allegation of misconduct, the investigating officer of the
2  Internal Affairs Division could not obtain the accused
3  officer's CR disciplinary history until they had reached a
4  recommendation of a sustained finding.
5      **A.  They were not to do that, yeah.**
6      Q.  They were prohibited?
7      **A.  Prohibited.**
8      Q.  And it's also fair to say that they -- at no
9  stage in the investigatory processes of the Internal
10 Affairs Division could the investigating agent or sergeant
11 obtain a list of all of the accused officers' CRs, that
12 would include those that were unfounded, unsustained, and
13 exonerated, true?
14     **A.  Well, for the purposes of reaching a finding on**
15 **a particular investigation, that's true.**
16     Q.  Could an Internal Affairs police agent, sergeant
17 or investigator obtain an accused officer's disciplinary
18 history for some other purpose in the context of their
19 investigation before they have reached a recommended
20 finding?
21     **A.  Not to be used in a CR investigation or adverse**
22 **employment and/or disciplinary procedures.**
23     Q.  So in what capacity are you thinking of that an
24 investigator IAD could obtain an accused officer's

122

1  disciplinary exchange?
2      **A.  It would depend.  I can think of possibly, um,**
3  **non-disciplinary matters.**
4      Q.  Such as?
5      **A.  Such as, um, personnel -- participation in the**
6  **Personnel Concerns Program or the Behavioral Alert System.**
7      MS. DONNELL: Okay, and I want to get to those, but I
8  do want to talk about those later.  But right now just in
9  the context of an investigation by Internal Affairs
10 related to allegations of officer misconduct.
11 BY MS. DONNELL:
12     Q.  For those purposes the investigating officer
13 could not obtain a disciplinary history based off of
14 those?
15     **A.  It was prohibited to be used for disciplinary**
16 **matters.**
17     MS. DONNELL: Okay.
18 BY MS. DONNELL:
19     Q.  So once the investigating officer or agent or
20 sergeant of Internal Affairs had obtained the accused
21 officer's complementary history and disciplinary history,
22 what happened next?
23     **A.  Then the investigator would, um, make a**
24 **recommendation of a penalty.**

123

1      Q.  And what recommendations of penalties were
2  available to Internal Affairs Division investigators
3  during the relevant time frame?
4      **A.  Reprimand to a separation.  At some point**
5  **violation noted became a possibility, but I'm not sure**
6  **about the time frame.**
7      Q.  And what do you mean by "violation noted"?
8      **A.  Um, would --**
9          **There was a possibility where it was just**
10 **noted that it was sustained violation noted, but**
11 **not -- but not a reprimand, something a little less than a**
12 **reprimand.**
13     Q.  So it's your testimony that some time in the
14 time period of '89 to '96 a new option came available that
15 was something less than a reprimand?
16     **A.  I'm not sure exactly.**
17     MR. YAMIN:  Objection, it mischaracterizes the
18 testimony.
19     MS. DONNELL:  Go ahead and finish your answer.
20     THE WITNESS:  Yeah, I am not sure if it's exactly in
21 that time frame or not or just after it.
22     MS. DONNELL:  Okay.
23 BY MS. DONNELL:
24     Q.  And once the IAD investigator had reached a

124

1  recommended penalty, what would happen next in the steps
2  of the IAD investigatory process?
3      **A.  The supervisor would review the investigation.**
4      Q.  And what would happen in the next step after the
5  supervisor of the Internal Affairs Division reviewed the
6  investigation?
7      **A.  They did not send it back for additional**
8  **investigation or disagreed with the finding, recommended**
9  **finding or penalty.**
10         **Um, then just like the OPS investigations,**
11 **it would go through command channel review, unless it was**
12 **a separation case.**
13     MS. DONNELL:  Okay.
14 BY MS. DONNELL:
15     Q.  And for separation cases where the Internal
16 Affairs Division investigator had recommended separation
17 and that was reviewed and approved by the IAD supervisor,
18 did those cases go directly to the superintendent --
19 department passing through the assistant?
20     **A.  Those would be reviewed by the assistant deputy**
21 **superintendent, and then get there directly.**
22     Q.  So for other cases other than where separation
23 was recommended, those would go through the command
24 channel review?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

125

1    A.  Yes.
2    Q.  And that would include all four of the
3  recommended findings for sustained, not sustained,
4  exonerated, and unfounded?
5    A.  Yes.
6    Q.  And would the same requirement of two levels of
7  command channel review be required for all recommended
8  findings?
9    **A.  Unless there was a nonconcurrence in there, and**
10 **then you need the next level.**
11   MS. DONNELL: Okay.
12 BY MS. DONNELL:
13   Q.  And once --
14       Were there any recommended penalties if
15 there was a concurrence on the command channel review, but
16 then had to go to their superintendent for final sign off
17 or do they all, including a reprimand?
18   **A.  The sustains, yeah, would go to the**
19 **superintendent.**
20   Q.  Even if the penalty was just a reprimand?
21   **A.  Even a reprimand.**
22   MS. DONNELL: Okay.
23 BY MS. DONNELL:
24   Q.  So once the IAD investigation had gone through

126

1  the command channel review, and if there was a sustained
2  finding with any level of penalty recommended, including
3  reprimand, all would go to the superintendent for the
4  superintendent's review?
5    **A.  Yes.**
6    Q.  Have we discussed or have you testified to all
7  of the steps up to that phase of the Internal Affairs
8  Division investigation?
9    **A.  For their investigation I think the**
10 **only -- well, yes, at that point.  I don't think we have**
11 **discussed the complaint review panel.**
12   MS. DONNELL: We have not done the complaint review
13 panel. I held back on that.
14 BY MS. DONNELL:
15   Q.  But before we get to that step in the process,
16 have we --
17   **A.  That pretty much covers it, in general.**
18   Q.  And how about for the cases which were less
19 serious and less complex, that were referred out to the
20 accused member's unit or district, would those come back
21 to Internal Affairs Division?
22   **A.  Yes.**
23   Q.  Describe for me the process for the cases that
24 got referred -- that IAD referred out to a district or a

127

1  unit?
2    **A.  So, um, those cases would go to the unit**
3  **commanding officer to -- for them to assign it to**
4  **sergeant.**
5    Q.  Okay, and then what would happen?
6    **A.  Um, then, um, that individual would be the**
7  **investigator, and they would basically perform the same**
8  **steps that BIA investigators performed.**
9        **So that means --**
10   Q.  And when you are saying "BIA," you're saying
11 Bureau of Internal Affairs, but you mean "IAD"?
12   **A.  I mean -- I'm sorry, IAD meaning Internal**
13 **Affairs.**
14   MS. DONNELL: Sure.
15   THE WITNESS: So, um, basically the first step is
16 getting the file as we mentioned before, getting the file,
17 looking at the documentation contained in that file, and
18 attempting to contact the complainant and witnesses as
19 soon as possible.
20 BY MS. DONNELL:
21   Q.  And then with the unit or district sergeant
22 assigned to that investigation also collecting, gather
23 additional evidence or physical evidence?
24   **A.  Um, generally because there is --**

128

1        **There is less complex, there might not be,**
2  **you know, those types of items.**
3    MS. DONNELL: Okay.
4  BY MS. DONNELL:
5    Q.  Would the sergeant in charge of the
6  investigation that was referred to an outside district or
7  unit, if they reached ultimately -- if they talked to the
8  complainant and witnesses, that they had then issued a
9  notice of the allegations and Waiver of Counsel to the
10 accused officer or would that come back to Internal
11 Affairs before that happened?
12   **A.  No, they would do that.**
13   Q.  Themselves?
14   **A.  Yes.**
15   Q.  And would the sergeant in charge of the
16 investigation of the outside unit or district also
17 interview the accused officer?
18   **A.  Yes.**
19   Q.  And could they also accept a to/from memo in the
20 alternative of being interviewed or giving a statement?
21   **A.  They did not take question and answer type**
22 **statements.  Those were taken by Internal Affairs**
23 **investigation; those were utilized in more serious cases.**
24   Q.  So for these types of cases, could an accused

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

129

1 officer submit a to/from memorandum instead of being
2 interviewed by the sergeant?
3     **A. They could, it would answer the sergeant's**
4 **questions, yeah.**
5     Q. Could an accused officer refuse to speak with
6 the sergeant in charge of the investigation?
7     **A. Well, it's a possibility, but then they would**
8 **face disciplinary action.**
9     MS. DONNELL: Okay.
10 BY MS. DONNELL:
11     Q. Once the sergeant in charge of the investigation
12 had completed that step in the investigatory process of
13 getting a statement from interviewing or receiving a
14 to/from memo from the accused officer, would the sergeant
15 in charge of the investigation then reach a recommended
16 finding?
17     **A. Well, not just after the interview of the**
18 **accused. They would then review their whole investigation**
19 **that included the interview of the accused and then, um,**
20 **make a recommended finding.**
21     MS. DONNELL: Okay.
22 BY MS. DONNELL:
23     Q. And if the sergeant in charge of the
24 investigation reached a recommended finding that would be

130

1 sustained, would the sergeant then submit a request for
2 the accused officer's complementary and disciplinary
3 history or would that come back to Internal Affairs before
4 that happened?
5     **A. No, that would make a request for those items.**
6     Q. And does the investigations that were referred
7 to an outside unit or district, was a sergeant in charge
8 of the investigation prohibited from obtaining the CR
9 history for the accused officer until they reached a phase
10 where they were recommending a sustained (phonetic)
11 finding (phonetic)?
12     **A. For the investigation of the disciplinary**
13 **investigations they would be prohibited from obtaining any**
14 **of the disciplinary history.**
15     Q. Once that phase had to happen with the sergeant
16 in charge of the investigation make a recommendation of a
17 penalty to impose for sustained cases (phonetic)?
18     **A. After receiving the complementary history and**
19 **the disciplinary history, um, yes. And then looking at**
20 **the investigations entirety, then they would make a**
21 **recommended penalty for sustained cases.**
22     Q. And who would review the sergeant's
23 recommendation of a sustained finding and a penalty to
24 impose?

131

1     **A. Well, generally the cases would go back to**
2 **Internal Affairs.**
3     Q. And who would review the case once it came back
4 from the outside unit, came back to Internal Affairs?
5     **A. That's going back to Internal Affairs. It also**
6 **went through, um, their superiors. So it's possible a**
7 **lieutenant or a captain may -- you look at it just to make**
8 **sure all of the forms were properly completed, everything**
9 **was, you know, in the investigation before it gets sent to**
10 **Internal Affairs.**
11     Q. Okay, so there would be some level of -- some
12 view at the district or unit prior to coming back to
13 Internal Affairs?
14     **A. Yes.**
15     Q. And once that level of review happened at the
16 district or unit and the file came back to Internal
17 Affairs, what would be the next step in the investigatory
18 process?
19     **A. For a sustained case, and that, too, would go**
20 **through a command channel review.**
21     MS. DONNELL: Okay.
22 BY MS. DONNELL:
23     Q. And that's -- the command channel review is the
24 same process for these cases that were referred to being

132

1 investigated by an outside district or unit, the command
2 channel review is that the same process by which you have
3 already testified to?
4     **A. Yes.**
5     MS. DONNELL: Okay.
6 BY MS. DONNELL:
7     Q. Are there any differences for these types of
8 cases that were investigated by an outside unit or
9 district?
10     **A. No, in essence pretty much the same except I**
11 **mentioned before, the districts don't do separation cases,**
12 **so —**
13     Q. They are the less serious cases?
14     **A. Less serious.**
15     MS. DONNELL: Okay.
16         So I want to talk about the next step in
17 the process for OPS, IAD, and then the ones that had been
18 referred out.
19 BY MS. DONNELL:
20     Q. Is the next step in the process going to be the
21 same for all three types of investigations or will they
22 differ for the police board review?
23     MR. YAMIN: Objection, form.
24     THE WITNESS: I think for all intents and purposes

133

1  it's pretty much the same.
2  BY MS. DONNELL:
3      Q.  So let's talk about the next step in the
4  process, once there has been a sustained finding that's
5  gone through the command channel review, and there has
6  been some sort of penalty recommended, and the
7  superintendent has concurred --
8      **A.  Yes.**
9      Q.  -- what is the next step in the process for a
10  sustained case?
11      **A.  So, um --**
12      Q.  And did I miss any steps before we go on?
13      **A.  I don't think so.  I think it's pretty much a**
14  **good overview --**
15      Q.  Okay.
16      **A.  -- process.**
17          **The complaint review panel was a**
18  **possibility.  Once the accused member is served with**
19  **notice of, um -- of the penalty, then they have options**
20  **available to them to either accept the penalty or ask for**
21  **like a complaint review panel to weigh in.**
22      Q.  And during this time frame, who was comprised of
23  the -- made up the Complaint Review Panel of McHugh
24  (phonetic) member soft (phonetic) review?

134

1      **A.  If I remember correctly in looking at the**
2  **directives from that time frame, the complaint review**
3  **panel consisted of, um, lieutenants, a sergeant, and, um,**
4  **say an individual who would have been the -- like the same**
5  **rank as the accused.**
6      Q.  Does the accused member have some ability to
7  select those complaint review panel members?
8      **A.  I don't recall that.  But I do recall that they**
9  **never could bring a representative with them, you know,**
10  **that could be, you know, a person of the same rank with**
11  **them.**
12      Q.  And the Complaint Review Panel process was that
13  provided for pursuant to the FOP contract?
14      **A.  I believe it was in the contract as well.**
15      Q.  And what were the possibilities once an accused
16  officer sought review by the Complaint Review Panel?
17      **A.  Um, I don't think they cannot increase the**
18  **penalty, but they could -- they could reduce the penalty.**
19      Q.  If the complaint review panel reduced the
20  penalty, was there any review?
21      **A.  Yeah.  It was my understanding, um, still that,**
22  **um -- yeah, I think that, um --**
23          **I mean, it's not a -- I guess we can say**
24  **not a review of the panel itself, because they made a**

135

1  **recommendation based upon what they thought.  But it was**
2  **only available for -- for certain -- for**
3  **certain -- everything was not available to go before the**
4  **Complaint Review Panel, it had to be within a certain**
5  **parameter of penalties.**
6      Q.  Could separation cases go to the Complaint
7  Review Panel?
8      **A.  No.**
9      Q.  So it had to be something less --
10      **A.  It had to be less.  Yeah, it had to be less than**
11  **that, I'm sure.**
12      Q.  It still had to be more than six days?
13      **A.  I thought it was between 6 and 30.**
14      Q.  And so a reprimand couldn't be taken before the
15  Complaint Review Panel, for example?
16      **A.  I thought it was between 6 and 30.**
17      Q.  And if the complaint review panel decided to
18  reduce the penalty, would that recommended reduction be
19  reviewed by the superintendent or any other body before
20  being imposed?
21      **A.  The superintendent would be privy to that.  But,**
22  **um -- as well as he is privy to the recommendations of,**
23  **um, command channel review.**
24      Q.  Are you uncertain about what happens after the

136

1  Complaint Review Panel makes a recommendation?
2      **A.  Yeah, I'm not sure, though, if he is bound by**
3  **either one of those; I don't think he is.  I think --**
4      Q.  Are they both just recommendations?
5      **A.  Recommendations, and not, yes --**
6      MS. DONNELL:  Okay.
7  BY MS. DONNELL:
8      Q.  And so ultimately the determination was still
9  within the superintendent's discretion?
10      **A.  Yes.**
11      Q.  Taking the command channel review's
12  recommendations, the complaint review channel's
13  recommendations, but those were just advisory --
14      **A.  Advisory --**
15      Q.  -- is that right?
16      **A.  -- that's my understanding of it.**
17      MS. DONNELL:  Okay.
18  BY MS. DONNELL:
19      Q.  And once the complaint review panel had reviewed
20  a sustained case, and a recommended penalty, and reached
21  either a concurrence or reduction in penalty, then what
22  would happen next?
23      **A.  Um, then the superintendent would have to, um,**
24  **approve or you know, sign off on the suspension notice.**

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

137

1    Q.  Were there any other forms of appeal or review
2  that could be taken after that process?
3    A.  No.
4        It's my understanding they could also
5  appeal directly to the superintendent.  You could write a
6  to/from subject report directly to the superintendent
7  appealing your case as well as asking him to reconsider --
8    Q.  Okay.
9    A.  -- after you received notice.
10    MS. DONNELL:  Okay.
11  BY MS. DONNELL:
12    Q.  Any other possible review mechanisms before a
13  sustained case and penalty would be imposed?
14    A.  So (inaudible) certain cases, again, the police
15  board, again, and I believe those are cases over 30 days.
16    Q.  So for cases that are over 30 days recommended
17  suspension or termination could go to review by the police
18  board?
19    A.  That's my understanding.
20    Q.  And during this time frame who was comprised of
21  the police board?
22    A.  I don't know who, um, was on the board at the
23  time.
24    Q.  How many members?

138

1    A.  There is nine today.  I don't know if there were
2  nine before.
3    MS. DONNELL:  Okay.
4  BY MS. DONNELL:
5    Q.  And what was the process of an accused officer
6  appeal to a suspended finding and penalty to the police
7  board for review?
8    A.  I believe, again, you -- if you are going to
9  appeal, I guess, you are going to need to alert the
10  Department of your request to appeal so that, um, charges
11  could be, um, set forth -- sent to, um, I guess, the legal
12  affairs in the, um, the law department to get the case
13  before the police board.
14    MS. DONNELL:  Okay.
15  BY MS. DONNELL:
16    Q.  Any other steps?
17    A.  Um, you know in many of their cases, too, they
18  are going through their union representative.
19    Q.  And when the police board reviewed accused
20  officers of review of their sustained finding and penalty,
21  what were the options the police board could do?  Could
22  they reduce a penalty; recommend a reduced penalty?
23    A.  They could reduce, yes, they could.
24    Q.  And were the police board's recommendation to

139

1  reduce a penalty considered advisory or somehow binding on
2  the superintendent?
3    A.  That was binding on the superintendent, um,
4  yeah.
5    Q.  So if the police board determined --
6        Could the police board determine that the
7  finding should be changed from something other than
8  sustained?
9    A.  Yes.
10    Q.  And would that be binding on the superintendent
11  as well?
12    A.  Yes.
13    Q.  And --
14        You said the police board could also reduce
15  the penalty (phonetic), correct?
16    A.  Yes.
17    Q.  And that would also be binding on the
18  superintendent?
19    A.  Yes.
20    Q.  Anything else that the police board could do for
21  the police officer that sought their review of their
22  sustained case?
23    A.  Not that I can recall.
24    MS. DONNELL:  Okay.

140

1  BY MS. DONNELL:
2    Q.  And once the police board has conducted its
3  review and made its recommendations, what would be the
4  next step in the process?
5    A.  Well, implementations.
6    Q.  And who would implement the police board's
7  recommendation?
8    A.  Well, if it involved, um, suspension time, um,
9  that would have to -- you know, issue the Police
10  Department an order, the superintendent would sign that
11  order as well, and they would go to like finance, um,
12  depending on what the order is to take -- for suspension
13  you would have to go to finance.
14    Q.  And if the superintendent disagreed with the
15  police board's recommendations, does the superintendent
16  have any ability to review the police board's
17  determination or have it reviewed?
18    A.  Um, what do you mean?
19        So outside of the circuit court, but
20  internally, no.
21    MS. DONNELL:  Okay.
22  BY MS. DONNELL:
23    Q.  Do you have any knowledge of any cases from the
24  '89 to '96 time frame in which the police board reduced a

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

36 (141 to 144)

141

1 penalty from what the superintendent had approved?

2    **A. No, I wouldn't know that, no.**

3    Q. Do you know if there were any records of that?

4    **A. The police board has --**

5    MR. YAMIN: Objection, foundation.

6 BY MS. DONNELL:

7    Q. You said the police board has records?

8    **A. Yes.**

9    Q. Similar question: Do you have any knowledge of

10 any cases from the '89 to '96 time frame in which the

11 police board changed a recommended finding of sustained

12 and allegation of officer misconduct to not sustain

13 unfounded or exonerated?

14    MR. YAMIN: Objection, foundation.

15    MS. DONNELL: You can answer.

16 BY MS. DONNELL:

17    Q. Do you have any knowledge?

18    **A. I don't have any knowledge.**

19    MS. DONNELL: Okay.

20        I want to talk about the reporting

21 requirement for Office of Professional Standards during

22 this time period, okay.

23    THE WITNESS: Uh-huh.

24 BY MS. DONNELL:

142

1    Q. Were there any reporting requirements that

2 investigators had at OPS from the '89 to '96 time frame

3 regarding their investigations, length of investigations,

4 anything like that?

5    MR. YAMIN: Objection, form, but primarily outside of

6 the scope of the notice for what Ms. Skahill is here for.

7    THE WITNESS: Yeah, I'm not sure what you mean by

8 "reporting requirements".

9 BY MS. DONNELL:

10    Q. Did any OPS investigators have to provide any

11 monthly, quarterly or annual report about the number of

12 investigations they conducted, how long their

13 investigations were going on for, any reporting

14 requirement that OPS investigators had during this time

15 period that you had knowledge of?

16    MR. YAMIN: Objection, outside of the scope of the

17 notice.

18    THE WITNESS: There are in the annual reports

19 information concerning OPS investigations. I don't know

20 if the investigators themselves provided that information.

21    MS. DONNELL: Okay.

22 BY MS. DONNELL:

23    Q. So other than the OPS annual reports, you don't

24 have any personal knowledge of other internal reporting

143

1 requirements that OPS had from '89 to '96?

2    MR. YAMIN: Standing objection for all questions

3 about reporting requirements that I made --

4    THE WITNESS: I don't think OPS had its own annual

5 report because they were part of the Police Department, so

6 it was included in the Police Department's annual report.

7    MS. DONNELL: Okay, thank you for clarifying.

8 BY MS. DONNELL:

9    Q. Other than the information that OPS provided to

10 be included in the Police Department's annual reports, do

11 you have any personal knowledge of any of the internal

12 reporting requirements that OPS had for its investigators

13 during the '89 to '96 time frame?

14    MR. YAMIN: Objection, form.

15    THE WITNESS: No.

16 BY MS. DONNELL:

17    Q. How about her Internal Affairs, do you have any

18 knowledge of the reporting requirements that the Internal

19 Affairs Department had as a department during the '89 to

20 '96 time frame?

21    MR. YAMIN: Same objection.

22    THE WITNESS: Internal Affairs also provided their

23 information, um, for the annual report.

24 BY MS. DONNELL:

144

1    Q. And that was for the whole Police Department's

2 annual report?

3    **A. Yes.**

4    Q. What information did Internal Affairs have to

5 provide annually to be included in the Chicago Police

6 Department's annual reports during the '89 to '96 time

7 frame?

8    MR. YAMIN: Objection, foundation, outside of the

9 scope of the notice.

10    THE WITNESS: You know I'd have to review the annual

11 reports because it lists the categories.

12 BY MS. DONNELL:

13    Q. You mean categories of allegation?

14    **A. Just -- I don't --**

15        **Categories of various findings and so**

16 **forth, yeah.**

17    Q. So is it based on your --

18        Did you review some of the annual reports

19 for your preparation for today?

20    **A. I saw some of the annual reports for that time**

21 **frame.**

22    MS. DONNELL: Okay.

23 BY MS. DONNELL:

24    Q. And based on your review of the CPD annual

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

145

1 reports from the '89 to '96 time frame, is it your -- you
2 have knowledge that OPS and Internal Affairs reported on
3 the number of investigations that they conducted?
4 **A. Yes.**
5 MS. DONNELL: Okay.
6 BY MS. DONNELL:
7 Q. And did OPS and Internal Affairs also report on
8 the findings, the ultimate conclusions, how many were
9 sustained, not sustained, unfounded, and exonerated?
10 MR. YAMIN: Objection, outside the scope.
11 THE WITNESS: I did recall those.
12 MS. DONNELL: Okay.
13 BY MS. DONNELL:
14 Q. Do you recall or do you have knowledge of
15 whether Internal Affairs and OPS also reported on the
16 categories of alleged misconduct that they investigated?
17 MR. YAMIN: Same objection.
18 THE WITNESS: Without looking at the annual report, I
19 don't know, and I wouldn't want to guess.
20 MS. DONNELL: Okay.
21 BY MS. DONNELL:
22 Q. How about the length that an OPS investigation
23 was expected to take during this time frame, do you have
24 any knowledge of whether there was any requirements or

146

1 expectations on how long an OPS investigation would take?
2 MR. YAMIN: Objection to the form of the question.
3 THE WITNESS: I kind of remember it in our -- in the
4 directives, they said, um, 30 days, for the investigation,
5 and then thereafter he would request an extension, so
6 every 30 days.
7 BY MS. DONNELL:
8 Q. And the OPS investigator, who would they request
9 an extension for if they needed additional time beyond the
10 initial 30 days for the investigation?
11 **A. Um --**
12 **I mean, through their supervisors.**
13 Q. Did IAD have a similar length of investigation
14 requirement pursuant to the directives as well?
15 **A. Yes.**
16 Q. Was it the same time frame?
17 **A. I believe it's the same time frame.**
18 Q. So initial 30 days, and for each additional
19 extension the IAD investigator assigned to the case would
20 have to seek an extension?
21 **A. I believe so.**
22 Q. I think I asked you this, but do you have any
23 knowledge of the average length of investigation that an
24 OPS investigation took in the '89 to '96 time frame?

147

1 MR. YAMIN: Objection, form and foundation.
2 THE WITNESS: No, I don't know.
3 BY MS. DONNELL:
4 Q. How about for Internal Affairs, do you have any
5 knowledge of the average length of investigation that an
6 IAD investigation took during the time frame?
7 MR. YAMIN: Same objections.
8 THE WITNESS: No, I don't know.
9 MS. DONNELL: I'm going to mark this as Exhibit 3.
10 (WHEREUPON, Exhibit No. 3 was
11 marked for identification.)
12 MS. DONNELL: Okay.
13 BY MS. DONNELL:
14 Q. Ms. Skahill, I'm handing you what I have
15 designated as Exhibit 3, which is a somewhat lengthy
16 document that has been produced by the City in this case
17 as Bates stamped City 30633 consecutive through 30712, and
18 it's a compilation of various orders, general orders, and
19 addendums, and special orders, okay.
20 **A. Yes.**
21 Q. And I'm going to call your attention just to the
22 first order that is part of the packed, which is
23 identified as --
24 MR. YAMIN: Excuse me, Ms. Skahill, would you like to

148

1 at least browse through that packet to see what's -- the
2 contents are. I am not -- I don't -- I'm not asking you
3 if you want to read them, I don't think that's necessary,
4 at least yet, but at least to see what the packet is. I
5 mean, you don't know what's there.
6 MS. DONNELL: Sure, I have no problem with you doing
7 that. I will just tell you, George, for purposes of this
8 question I am just going to be focusing on just the first
9 general order for right now. But she is welcome --
10 You are welcome, Ms. Skahill, to look
11 through the entire packet. I won't be asking about this
12 part.
13 MR. YAMIN: So you will or will not be asking about
14 the packet?
15 MS. DONNELL: Not the whole entire packet portions of
16 it. So -- but right now my question is going to be
17 directed to just the first general order, the first three
18 pages.
19 MR. YAMIN: And I might ask you, Ms. Skahill, just to
20 browse through to see what the headings are, and titles of
21 the directives, so you get a sense of the scope of the
22 packet.
23 THE WITNESS: Okay.
24 MR. YAMIN: And then we can go question by question

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

149

1    or lines of inquiry by lines of inquiry.
2        THE WITNESS:  Okay.
3              (WHEREUPON, the witness is
4              perusing through the document.)
5        THE WITNESS:  Okay.
6        MR. YAMIN:  Thanks.
7        MS. DONNELL:  Are you ready, Ms. Skahill?
8        THE WITNESS:  Yes.
9    BY MS. DONNELL:
10       Q.  And I guess --
11             I want to direct your attention to the
12   first general order, which is the first three pages of
13   Exhibit 3 for my initial question --
14       **A.  -- uh-huh.**
15       Q.  -- and this is the general order that was issued
16   January 13, 1993, General Order 93-3, right?
17       **A.  Yes.**
18       MR. YAMIN:  Just for clarification, this is all
19   General Order 93.
20       MS. DONNELL:  The whole packet?
21       MR. YAMIN:  Yes.
22       MS. DONNELL:  Well, I am just going draw your
23   attention to the first three pages of Exhibit 3,
24   General Order 93-3, that was rescinding General Order 82

150

1    and 80-3, okay.
2        THE WITNESS:  Uh-huh.
3    BY MS. DONNELL:
4        Q.  And this relates to the Complaint and
5    Disciplinary procedures, right?
6        **A.  Yes.**
7        Q.  And you reviewed this general order in
8    preparation for your deposition today, right?
9        **A.  Yes.**
10       Q.  And there are some little lines in the left-hand
11   margin indicating the newer revised item in this 93-3,
12   right?
13       **A.  Yes.**
14       Q.  I want to call your attention to Page 2 of
15   the --
16       **A.  What's the Bates stamp?**
17       MS. DONNELL:  Sure, CITY 30634.
18       THE WITNESS:  Thank you.
19   BY MS. DONNELL:
20       Q.  And this is Addendum -- identified as Addendum 1
21   to General Order 93-3 the Department Member's Bill of
22   Rights; do you see that?
23       **A.  I do.**
24       MS. DONNELL:  Okay.

151

1    BY MS. DONNELL:
2        Q.  And that was --
3              Again, you reviewed this for preparing for
4    today?
5        **A.  Yeah.**
6        Q.  Is that yes?
7        **A.  Yes.**
8        MS. DONNELL:  Okay.
9    BY MS. DONNELL:
10       Q.  And under --
11             In the Department Member's Bill of Rights'
12   letter "D" states:  "No anonymous complaint made against a
13   Department member shall be made the subject of a Complaint
14   Register investigation unless the allegation is of a
15   criminal nature"; do you see that?
16       **A.  I do.**
17       Q.  Does that refresh your recollection or change
18   your testimony from earlier today that anonymous
19   complaints could proceed or --
20       **A.  No.**
21       Q.  -- alter it in any way?
22       **A.  No, it doesn't.**
23       Q.  So --
24             But is it fair to say that under the

152

1    Department Member's Bill of Rights that only anonymous
2    complaints that regained -- include an allegation of a
3    criminal nature could proceed during this time frame?
4        **A.  But that includes, um -- like I said it still**
5    **makes -- it's still the same statement that they -- could**
6    **be made.**
7        Q.  But it would have to be of an allegation that
8    was of a criminal nature?
9              In other words, anonymous complaints that
10   weren't of a criminal nature couldn't proceed pursuant to
11   the Department Member's Bill of Rights Addendum 1 to 93-3?
12       **A.  But that didn't prohibit the taking of the**
13   **complaint either.**
14       Q.  But it shouldn't be -- it wouldn't be
15   investigated?
16       **A.  Well, it says it "shall be made the subject of a**
17   **Complaint ... unless the allegation is of criminal**
18   **nature," so it depends on the allegation.**
19       Q.  And it would have to be of a criminal nature --
20       **A.  It depends.**
21       Q.  -- in order for it to be investigated, true?
22       **A.  According to this, yes.**
23       MS. DONNELL:  Okay.  I'm going to put Exhibit -- you
24   can put Exhibit 3 to the side for now, and we will come

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

153

1 back to it later.
2     THE WITNESS: Okay.
3     MS. DONNELL: Okay.
4 BY MS. DONNELL:
5     Q. Now are you also familiar with Summary
6 Punishment Action Request for SPARS?
7     **A. I am.**
8     Q. And where SPARS --
9         What are SPARS; what is a Summary
10 Punishment Action Request?
11    **A. That's included in the complaint disciplinary**
12 **procedures, one of the addenda.**
13    MR. YAMIN: Do you need to review it at all?
14    MS. DONNELL: I'm sorry, should -- and answer -- you
15 can --
16        George, please don't interpret an answer if
17 the witness is testifying. If you could complete your
18 answer and then --
19    THE WITNESS: I was saying it's included in this
20 packet, and I'd like to turn to that.
21    MS. DONNELL: Sure, that's fine.
22 BY MS. DONNELL:
23    Q. But my question, first, was just that if you are
24 familiar with SPARS?

154

1     **A. I am.**
2     Q. And was SPARS another form of disciplinary
3 action that was available under the general orders in the
4 Chicago Police Department during the relevant time frame
5 as well?
6     **A. Yes.**
7     MS. DONNELL: Okay.
8         And you're welcome to refer to Exhibit 3,
9 if you would like or I can hand you what is designated as
10 Exhibit 4.
11        (WHEREUPON, Exhibit No. 4 was
12        marked for identification.)
13    MR. GREENBERG: What number is this?
14    MS. DONNELL: Exhibit 4.
15 BY MS. DONNELL:
16    Q. Are you ready?
17    **A. Yes.**
18    Q. So anything you need to refresh your
19 recollection of the mechanics --
20    THE COURT REPORTER: I'm sorry, you are going too
21 fast, and you're also mumbling now.
22    MS. DONNELL: I'm sorry, I will try to slow down.
23 BY MS. DONNELL:
24    Q. Ms. Skahill, briefly what is SPARS?

155

1     **A. This (indicated) one has been rescinded by this**
2 one (indicated).
3     Q. Okay.
4     **A. So they are not the same.**
5         **Which one do you want me to --**
6     Q. Well, for 93-3 came into effect in '93, right?
7     **A. Yes.**
8     Q. And prior to '93 for the '89 to '93 time period
9 the SPARS General Order 80-3 would have been in effect,
10 correct?
11    **A. Yes.**
12    Q. For the relevant time period there would be two
13 general orders --
14    **A. Yes.**
15    Q. -- relevant for SPARS, right?
16    **A. Yes.**
17    Q. And the same true for the complaint and
18 disciplinary --
19    **A. Yes.**
20    Q. -- general orders as well, right?
21    **A. Yes.**
22    Q. And you reviewed those sets of those orders for
23 the applicable time period?
24    **A. Yes.**

156

1     MS. DONNELL: So I'm just providing both of them to
2 you to the extent you need either one.
3     THE WITNESS: Right.
4 BY MS. DONNELL:
5     Q. But, briefly, can you state, for the record,
6 what SPARS is?
7     **A. Since --**
8         **Summary Punishment Action Request.**
9     Q. And so is that a form of discipline related to
10 less serious types of allegations?
11    MR. YAMIN: Objection, form.
12    THE WITNESS: My guess is the directives both state,
13 um, 80-3 as Section II. B.: "Less serious
14 transgressions," yes.
15 BY MS. DONNELL:
16    Q. And 80-3 Section II. B. is this 26 different
17 less serious allegations?
18    **A. Yes, yes.**
19    Q. And that investigation for our -- officer
20 misconduct was conducted by what office for SPARS?
21    **A. Well, usually the --**
22        **Usually SPARS were done by the unit on**
23 **themselves, so update the member.**
24    Q. And for SPARS a complaint register number

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

157

1  wouldn't be generated as well, correct?
2      **A. That's correct.**
3      Q. And during this time frame where were the record
4  of any SPARS disciplinary action kept?
5          Were they kept at the unit of the district
6  or did it -- there was a disciplinary action taken under
7  the SPARS system, would that also be recorded in Internal
8  Affairs?
9      **A. It would be --**
10     MR. YAMIN: Objection, foundation.
11     THE WITNESS: I just want to take a look at the order
12 and see if there is any.
13     MS. DONNELL: Sure.
14     MR. YAMIN: You know because we have these two
15 versions of sorts, could you either direct the witness as
16 to where she should consult or do you want her to answer
17 specific to one of the two that were operative during the
18 time period or -- I'm trying to avoid confusion here.
19     MS. DONNELL: Sure.
20 BY MS. DONNELL:
21     Q. For the first portion of the time period of '89
22 to '93, if there was a SPARS -- a summary punishment that
23 was -- an accused member was disciplined for, would
24 Internal Affairs Division keep a record of those SPARS

158

1  infractions under 80-3?
2      MR. YAMIN: Objection, foundation.
3          Tina, I suggest you look at the -- Exhibit
4  4 as the basis of your answer, and then look at a portion
5  of Exhibit 3 that's relevant to see if it's --
6      MS. DONNELL: I'm going to object to your --
7      MR. YAMIN: -- to see -- I am not finished, and then
8  you can object -- to see if there is a qualification
9  that --
10     MS. DONNELL: Well, I am going to object to your
11 speaking objection, and to instruct you limit -- I have
12 provided both documents to Ms. Skahill, you are welcome
13 to read --
14     MR. YAMIN: All right, but you did not --
15     MS. DONNELL: I'm objecting to your coaching the
16 witness, George.
17     MR. YAMIN: Well, it wouldn't have been necessary if
18 you had given me a suitable answer to the question that I
19 posed. Because we are trying to avoid -- this is a way to
20 avoid confusion for the record and for the witness. You
21 are giving her multiple documents.
22     MS. DONNELL: George, for the record, she has
23 identified that she reviewed these general orders in
24 preparation for today, and I have provided them to her.

159

1  It's not a trick question. And she can review whatever
2  she wants to. I'm objecting to you instructing the
3  witness how to answer the question.
4      MR. YAMIN: And what you said is not relevant to my
5  objection or my instructions.
6      THE WITNESS: So look at 93-3 Bates stamp 30706, it
7  notes under "Records Control," Section "E", it looks like
8  a -- Roman Numeral VII. A., that Internal Affairs received
9  the final recommendation and "retain the SPAR and
10 attachment(s), if any."
11 BY MS. DONNELL:
12     Q. And over in the left-hand margin of Section E.
13 1., has the line indicating it's a new change, right?
14     **A. It's a new change, uh-huh.**
15     Q. So is it accurate to say that the general order
16 93-3 -- let's see, Addendum 7 added that
17 requirement -- record control requirement for SPARS to be
18 kept in Internal Affairs Division --
19     **A. Let's see, but when you looked at Bates stamp**
20 **30583 --**
21     Q. And that's in Exhibit 4, correct?
22     **A. Right, Exhibit 4, under "Procedures," Roman**
23 **Numeral IV, and then you look down at "D" as in "David,"**
24 **it talks about forwarding, you know, after the member**

160

1  **accepts it, signs it, and so forth, they forward it to**
2  **Internal Affairs Division, so --**
3          And then the last sentence says as well:
4  If there is a new Summary Punishment Action request
5  completed, it's obtained, and new form set original will
6  be forwarded to Internal Affairs Division, so --
7          I mean it appears even under 80-3 it went
8  to Internal Affairs.
9      MS. DONNELL: Okay.
10 BY MS. DONNELL:
11     Q. Do you know whether any --
12         When an OPS investigator, and an IAD
13 investigator sought disciplinary history of accused
14 members' sustained findings, would they also receive the
15 SPARS findings during this time frame?
16     **A. I don't believe so, um, just because,**
17 um -- again, the Dist (phonetic) manager sustain CRs.
18     Q. I want to ask a question: Back in the beginning
19 part of the process of how a complaint register number is
20 initiated or generated. Remember you gave me the various
21 ways that a complaint register could be generated or
22 initiated?
23     **A. Yes.**
24     MS. DONNELL: Okay.

161

1  BY MS. DONNELL:
2      Q.  During the '89 to '96 time frame, did a
3  complaint register number get generated, an investigation
4  started if there was a civil lawsuit filed against any
5  members of the Department?
6      A.  If it was a new allegation, yes.
7      MS. DONNELL:  Okay.
8  BY MS. DONNELL:
9      Q.  And how would that come about, would OPS be
10 tracking the civil lawsuits or how would -- or IAD, how
11 did that come to be generated that a CR number would be
12 generated in a file started for a civil lawsuit if it was
13 a new allegation?
14     MR. YAMIN:  Objection to the form of the question.
15     THE WITNESS:  Well, there is a category code for
16 lawsuits.  And, um -- but all lawsuits usually go to Legal
17 Affairs.
18 BY MS. DONNELL:
19     Q.  Would Legal Affairs generate this hearing
20 number?
21     A.  Then Legal Affairs, again, would first check to
22 see whether or not, you know, there was already a CR
23 number associated with it.  But if not, you know, then one
24 would be initiated either by Legal Affairs or Internal

162

1  Affairs or um, OPS.
2      MS. DONNELL:  Okay.
3  BY MS. DONNELL:
4      Q.  How about if there was any criminal
5  investigation being conducted by a law enforcement agency,
6  and assuming the Department member themselves didn't
7  self-report, how during this time frame -- well
8  during -- Strike that.
9          During this time frame '89 to '96 an
10 outside law enforcement agency was investigating a member
11 for possible criminal conduct, would that generate a CR
12 file?
13     A.  Out of --
14         If we were notified about it, yes.
15     MS. DONNELL:  Okay.
16 BY MS. DONNELL:
17     Q.  And did the OPS or Internal Affairs have any
18 mechanism by which they were informed of a criminal
19 investigation by the FBI of one of its members?
20     A.  Well, we -- we had, um --
21         Let me see, we had several task forces, you
22 know, with the federal agencies.  So it could come to our
23 attention, you know, through the task force or um -- but
24 like I mentioned before, Internal Affairs did confidential

163

1  investigations sometimes with the FBI or State's
2  Attorney's office.  So, again, they had those connections
3  in which it comes to our attention.
4      Q.  During the '89 to '96 time frame was there any
5  liaisons between OPS, and IAD, and the Cook County State's
6  Attorney's office regarding being informed of any
7  investigations the Cook County State's Attorney's office
8  was conducting with any members within the Department?
9      A.  I don't know for sure.  But if I could look
10 through maybe here just to make sure.
11     MS. DONNELL:  Yeah, I'll give you --
12     THE WITNESS:  Yeah, just to make sure.
13             (WHEREUPON, the witness is
14             reviewing the document.)
15     THE WITNESS:  So one of the things that I do recall
16 is, um, criminal investigations were being conducted, and
17 part of the protocol, again, was to present information to
18 the State's Attorney's office, and only proceed with the
19 administration if they declined with -- if a letter of
20 declination was received.
21 BY MS. DONNELL:
22     Q.  From the State's Attorney's office?
23     A.  From the State's Attorney's office, and that was
24 for criminal investigations.

164

1      MS. DONNELL:  Okay.
2          I'm going to -- let's do this -- why don't
3  we put those to the side for just a minute, and I want to
4  talk to you now about a complaint category table, okay.
5      THE WITNESS:  Uh-huh.
6      MR. YAMIN:  Is this a new line of inquiry?
7      MS. DONNELL:  I suppose, yeah.
8          Would you like a break?
9      MR. YAMIN:  Yeah, it's definitely a break time.
10     MS. DONNELL:  We can go off the record.
11             (WHEREUPON, at 1:48 p.m., a brief
12             recess was taken.)
13     MS. DONNELL:  So I was going to go on to the
14 complaint category table, but before I do that, I'm going
15 to mark two other exhibits, and do something first.
16         The first is what I've designated as
17 Exhibit 5 to your deposition, Ms. Skahill.
18             (WHEREUPON, Exhibit No. 5 was
19             marked for identification.)
20     THE WITNESS:  Thank you.
21     MS. DONNELL:  And I want you to look at Exhibit 5,
22 and that's a collection of -- it's General Order 82-14,
23 and the addendums to it.  And it's been produced by the
24 City in this case, it's CITY 30595 consecutive through

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

42 (165 to 168)

165

1  30628.
2      THE WITNESS:  Okay.
3  BY MS. DONNELL:
4      Q.  And do you recognize Exhibit 5?
5      **A.  I do.**
6      Q.  And Exhibit 5 is the General Order that was the
7  precursor to 93-3, right?
8      **A.  Yes.**
9      Q.  And the General Order 82-14 would have been
10 operative until, I think it's January 13, 1993, correct?
11     MR. YAMIN:  15th.
12 BY MS. DONNELL:
13     Q.  I'm sorry, January 15, 1993; is that right?
14     **A.  Yes.**
15     Q.  And this is the General Order that would have
16 covered CR investigations prior to the enactment of 93-3,
17 right?
18     **A.  82-14 and 80-3.**
19     MS. DONNELL:  And 80-3, yes.  Thank you for
20 clarifying that.
21 BY MS. DONNELL:
22     Q.  And so I have that for you in case you need to
23 refer to that as well, okay?
24     **A.  Yes.**

166

1                  (WHEREUPON, Exhibit No. 6 was
2                  marked for identification.)
3      MS. DONNELL:  And then I also designated Exhibit 6 to
4  your deposition General Order 83-3, okay.
5      THE WITNESS:  Sure.
6      MS. DONNELL:  George, I believe this is Exhibit 6.
7  BY MS. DONNELL:
8      Q.  Ms. Skahill, do you recognize Exhibit 6 to your
9  deposition as Personnel Concerns, and General Order 83-3
10 that was effective March 9, 1985?
11     **A.  March 9, 1983.**
12     MS. DONNELL:  I'm sorry, thank you for clarifying
13 that.
14     THE WITNESS:  Yes, I do.
15     MS. DONNELL:  And I will also have that for
16 you -- for your reference, for your deposition as well.
17 BY MS. DONNELL:
18     Q.  So were there any --
19     **A.  If I could I have since this --**
20         **May I have 80-3?  You said you had that as**
21 **well.**
22     MS. DONNELL:  Did I already give it to you?
23         I think 80-3 was Exhibit 4 to your
24 deposition.

167

1      THE WITNESS:  Oh, here it is.
2  BY MS. DONNELL:
3      Q.  Do you have that as well?
4      **A.  Got it.**
5      MS. DONNELL:  Okay, so those are there for you in
6  case you need those.
7      THE WITNESS:  Okay.
8  BY MS. DONNELL:
9      Q.  And so I do want to talk about now:  During the
10 relevant time period '89 to '96 did the Chicago Police
11 Department have any early intervention programs?
12     MR. YAMIN:  Objection to form.
13     THE WITNESS:  If you could define what you mean by
14 "early intervention".
15 BY MS. DONNELL:
16     Q.  Do you have any understanding in the police
17 practices area of an early intervention system?
18     MS. ROSEN:  Objection to the form of the question,
19 she asked you to explain what you meant.
20     MR. YAMIN:  Yes, join.
21     THE WITNESS:  And in order for me to be able to
22 answer your question, I need to understand what you mean
23 by it.
24 BY MS. DONNELL:

168

1      Q.  Was there any mechanism, policy or procedure in
2  the Chicago Police Department during the relevant time
3  frame that would identify officers who were repeat
4  offenders?
5      MR. YAMIN:  Objection to the form --
6      MS. ROSEN:  Objection to the form of the question.
7      MR. YAMIN:  Joined if not obvious.
8      THE WITNESS:  I don't understand, um, "offenders".
9      MS. DONNELL:  Okay.
10 BY MS. DONNELL:
11     Q.  Were there any mechanisms in the Chicago Police
12 Department that would identify officers who were
13 repeatedly accused of misconduct?
14     MR. YAMIN:  Objection to form.
15     THE WITNESS:  Um, just -- I believe, um -- I believe,
16 um, 83-3 addresses that.
17 BY MS. DONNELL:
18     Q.  And you're referring to Exhibit 6?
19     **A.  Yes, I am.**
20     Q.  What does General Order 83-3 Exhibit 6 refer to?
21     **A.  It's entitled "Personnel Concerns."**
22     MS. DONNELL:  Okay.
23 BY MS. DONNELL:
24     Q.  And did you have an understanding --

169

1    Did you have an understanding of the
2  Behavioral Alert System and the Personnel Concerns Program
3  that were in effect during the relevant time period?
4       MR. YAMIN: Objection to form.
5       THE WITNESS: I have an understanding based upon the
6  Directive 83-3.
7  BY MS. DONNELL:
8       Q.   And did you review 83-3 in preparation to
9  testify here today on behalf of the City?
10      A.   I did.
11      MS. DONNELL: Okay.
12 BY MS. DONNELL:
13      Q.   And I believe earlier today you also, in
14 addition to reviewing 83-3, you had a conversation with
15 Director Robert Landowski as well to inform your testimony
16 today about the personnel -- the behavioral -- the
17 behavioral -- personnel concerns and behavioral
18 interventions, right?
19      A.   Um, Behavioral Alert System and personnel
20 concerns.
21      MS. DONNELL: Okay.
22 BY MS. DONNELL:
23      Q.   So in addition to reviewing General Order 83-3,
24 in your conversation with the director, Robert Landowski,

170

1  did you do anything else to prepare to testify today about
2  the Chicago Police Department's Behavioral Alert System or
3  Personnel Concerns Program?
4       A.   Everything that I mentioned at the beginning was
5  what I did.
6       MS. DONNELL: Okay.
7  BY MS. DONNELL:
8       Q.   Do you consider the Chicago Police Department's
9  Behavioral Alert System or Personnel Concerns Program a
10 form of an early intervention system that the Chicago
11 Police Department had in place?
12      MS. ROSEN: Objection to the form of the question.
13      MR. YAMIN: Join, objection.
14      MS. ROSEN: She has already asked you about
15 definitions.
16      THE WITNESS: Based on the definition that you gave,
17 if I could have that read back.
18      MS. DONNELL: Sure.
19 BY MS. DONNELL:
20      Q.   Well, I guess we could --
21           The definition of the Behavioral Alert
22 System in 83-3 was a systematic review of Department
23 members' behavior pattern to alert supervisors the need
24 for intervention, right?

171

1       A.   Yes.
2       Q.   Okay, are you comfortable with that definition
3  for the Behavioral Alert System?
4       A.   I am.
5       Q.   And the Personnel Concerns Program as defined in
6  Section II. B. as a program of intensive supervision of
7  Department members who have been designated as personnel
8  concerns, right?
9       A.   Yes.
10      Q.   And then 83-3 in Section II. C., further defines
11 a personnel concern, right?
12      A.   Yes.
13      Q.   And that would be a Department member who has a
14 history of unacceptable performance, and who has not been
15 responsive to repeated, corrective efforts of supervisory
16 members, this is a form of designation of a Department
17 member, which is applied by the director of personnel,
18 right?
19      A.   Yes.
20      MS. DONNELL: Okay.
21 BY MS. DONNELL:
22      Q.   What --
23           Do you have an understanding of what the
24 purpose of a Behavioral Alert System in the Personnel

172

1  Concerns Program was for this time period?
2       A.   Yes, according to 83-3, Section I, that says
3  "PURPOSE This order:  A.  Establishes the Personnel
4  Concerns Program for Department members.  B.  Defines
5  specific terms that pertain to the Personnel Concerns
6  Program.  C.  States Department policy relating to
7  Personnel concerns.  D.  Identifies general and specific
8  responsibilities associated with the program.  E.
9  Establishes the positions of Personnel Concerns Supervisor
10 and Personnel Concerns Program Manager."
11      MS. DONNELL: Okay.
12           Let's start with the Behavioral Alert
13 System, okay.
14 BY MS. DONNELL:
15      Q.   Well, first off before -- were there any other
16 programs other than the personnel concerns -- the
17 personnel concerns and the behavioral intervention program
18 that the Chicago Police Department had during this time
19 for some sort of early warning or intervention system or
20 were these the only two in place?
21      THE WITNESS: Are we using the definition of the
22 Behavioral Alert System?
23      MS. DONNELL: Yes.
24      THE WITNESS: So there were informal ways to detect

173

1   behavior patterns to alert supervisors to a need for
2   intervention.
3   BY MS. DONNELL:
4       Q.   So in addition to the Behavioral Alert System,
5   which was a formal system, there was also informal
6   mandates (phonetic) in which that could be alerted?
7       A.   Yes.
8       Q.   So let's start with the informal ways:  What are
9   you referring to, the informal ways that an officer who
10  has a behavior pattern that needs to be alerted to, what
11  were those informal mechanisms?
12      A.   So one way would be a supervisor interacting on
13  a daily basis with an officer, and detects issues, and
14  admonishes the officer for some infraction, verbally
15  admonishes, and then notes that admonishment on their
16  management supervisor's log.
17      Q.   Any other informal mechanisms that would alert
18  to a pattern of a member's behavior that was unacceptable?
19      A.   Um, another way would be a counseling form.
20  Again, um, a way to acknowledge, um – the member needs to
21  be put on notice about certain unacceptable behavior.
22      Q.   And would the counseling form go into the
23  member's personnel file?
24      A.   It would go into the unit file.

174

1       Q.   Goes into the unit file for that Department
2   member?
3       A.   Yes.
4       Q.   So it doesn't get sent to the personnel
5   department?
6       A.   And it has a –
7            It depends, and it has a time – an
8   unlimited time of potential.
9       MS. DONNELL:  Okay.
10  BY MS. DONNELL:
11      Q.   Any other informal mechanisms other than the two
12  you have testified to?
13      A.   Um, well we mentioned early about – earlier
14  about command channel review, so that's another way that
15  one of the reasons of sending an investigation through
16  one's superior officers as for them – as they are
17  reviewing, to notice certain patterns of behavior.
18      Q.   Okay, any other informal mechanisms?
19      A.   Um, we mentioned before about summary
20  punishment, the SPAR.  Again, another way of possibly
21  noticing certain patterns of behavior as you review – you
22  know, as you review the SPAR, and the note, you know, his
23  commander or the command member or supervisor that notice
24  certain behaviors.  Um –

175

1       Q.   Okay, anything else?
2       A.   We mentioned before about the whole process of
3   intake by both OPS and Internal Affairs personnel.  So in
4   making decisions about whether you are going to send an
5   investigation to BIA – I'm sorry, strike that, Internal
6   Affairs or if you are Internal Affairs you are trying to
7   make the decision on whether to send that to a district to
8   be investigated.
9            If you're looking at has this – is this
10  investigation already – is this already been a complaint,
11  um, so these are all informal ways that you are trying to
12  notice certain behaviors based upon the information that
13  comes in.
14      Q.   I want to make sure I understand that last
15  portion that you just testified to, that the intake
16  portion or OPS or IAD:
17           At the intake stage do any personnel intake
18  or investigators get an accused officer's disciplinary
19  history to determine whether there has been a prior
20  allegation of some misconduct?
21      A.   No, but formally you might recognize the name or
22  you might, again, say, um – and you're looking at not
23  just the name of the accused, but the name of the
24  complainant, is this something that's already being

176

1   investigated, that's important to know.  You know, if you
2   are going to merge it with another investigation or not.
3            I think before, too, we had talked about
4   like whether you are going to bifurcate cases, all of this
5   requires some form of gathering information and reviewing
6   it informally.
7       Q.   Okay, but just to be clear there is no formal
8   mechanism by which at the intake or assignment phase of a
9   CR file that an accused officer's disciplinary history was
10  pulled or looked at?
11      A.   No, you don't do that.
12      MS. DONNELL:  Okay, okay.  I just want to make sure I
13  understood it.
14      THE WITNESS:  No, you don't do that.
15  BY MS. DONNELL:
16      Q.   You're just saying informally if the intake
17  personnel investigator noticed the complainant with a
18  repeat name or the accused officer was a repeat or was
19  part of another complaint?
20      A.   Or the allegation itself –
21      Q.   Okay.
22      A.   – um –
23      MS. DONNELL:  Okay.
24      BY MS. DONNELL:

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

45 (177 to 180)

177

1     Q.   Any other informal mechanisms, other than those
2   that you have testified to?
3        A.   I think reviewing officers' paperwork.  So -- is
4   another way.  So, one of the things that supervisors --
5   immediate supervisors do is, um, review an officer's, um,
6   case reports, that they -- that they write.  So that's
7   another way.
8            In other words, if you're reviewing their
9   work product, that's part of your job as a supervisor.
10  You could, again, notice certain -- as the Directive 83-3
11  mentions, certain behavior patterns that would -- may
12  alert a supervisor to a need of an intervention.
13       MS. DONNELL:  Okay.
14  BY MS. DONNELL:
15       Q.   So let's focus on --
16            Did you address all of the informal
17  mechanisms that --
18       A.   Not all, I think --
19            Because they are informal, I think it's
20  rather vast because it's based upon the interaction of
21  supervisors who have subordinates on a regular basis.  So
22  that depends on the amount of interactions and the types.
23       Q.   But to the best of your ability, if you
24  identified all of the informal mechanisms you are aware of

178

1   relating to officers, the Department -- informal
2   mechanisms the Department used during this time frame,
3   that would alert to officers who had repeat allegations of
4   improper conduct?
5        A.   Well, you could mention roll call, that's
6   another opportunity, again, for supervisors to observe the
7   interaction of a subordinate with other officers.
8            Another way informally, as a supervisor
9   part of their job is to show up on the assignments of
10  subordinates and observe their behavior, you know, at
11  those assignments, that's another informal way.
12           Another way for -- to look at patterns of
13  behavior, um, we talked about -- and that could be good or
14  bad behavior.  We talked about awards, complementary
15  history.  So supervisors submit awards for their
16  subordinates, that's another way to look at patterns and
17  behaviors, so you can know what's normal for this person
18  and what's not.
19       MS. DONNELL:  Okay.
20  BY MS. DONNELL:
21       Q.   Anything else?
22       A.   Um --
23       MR. YAMIN:  That question has been asked and
24  answered.

179

1        THE WITNESS:  Pretty much.
2            Like you said that's pretty much just the
3   regular interactions of what a supervisor does.
4        MS. DONNELL:  Okay, and I would like to focus your
5   attention on the Behavioral Alert System, okay.
6        THE WITNESS:  Yes.
7   BY MS. DONNELL:
8        Q.   And are you --
9            Did you have any involvement in the
10  Behavioral Alert System when you were at Internal Affairs?
11       MS. ROSEN:  Objection to the form of the question.
12       THE WITNESS:  I was in Internal Affairs after the
13  time frame.
14           Are we looking at 19 --
15       MS. DONNELL:  '89 to '96.
16       THE WITNESS:  '89 to '96.  I was in Internal Affairs
17  from 2008 to 2009, so that was many, many years after the
18  time frame.
19       MS. DONNELL:  Understood.
20  BY MS. DONNELL:
21       Q.   But I'm just asking was that system still in
22  place the Behavioral Alert System when you were there?
23           In other words, did you have any
24  involvement with that system when you were at Internal

180

1   Affairs?
2        A.   There was a system.
3        MR. YAMIN:  Objection to the form.
4   BY MS. DONNELL:
5        Q.   There was a system?
6        A.   Yes.
7        Q.   But it was different from this system that
8   was in place in the '89 to '96 time frame?
9        MR. YAMIN:  Objection, form.
10       THE WITNESS:  Again, depending on how long this
11  directive.  I don't have directives after 93-3.
12       MS. DONNELL:  Okay.
13  BY MS. DONNELL:
14       Q.   But you're familiar with the Behavioral Alert
15  System as it was in place in the '89 to '96 time frame so
16  you can testify today?
17       A.   I am.
18       Q.   And the purpose of the system was to identify
19  Department members whose behavior indicates the future
20  disciplinary or performance problems may result in those
21  corrected actions taken as defined by Section V. A. 1.,
22  right --
23       A.   Yes.
24           -- of Exhibit 6, which is General Order 83-3,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

181

1  right?
2  **A. That's one of the purposes, yes.**
3  Q. And the other was to assist, command any
4  supervisory personnel to develop and implement strategies
5  for corrective action, right?
6  **A. Yes.**
7  Q. And the third purpose was to standardize the
8  system for documenting and maintaining records of
9  corrective action taken, right?
10  **A. According to the directive, yes.**
11  MS. DONNELL: Okay.
12  BY MS. DONNELL:
13  Q. And then there was in Section V. B. of 83-3
14  there were certain performance data that were considered
15  behavioral alert indicators, right?
16  **A. Yes.**
17  Q. And that would include all excessive force
18  complaints, right?
19  **A. Yes.**
20  Q. And that says "complaint and disciplinary
21  history," right?
22  **A. Yes.**
23  Q. What was included in the complaint and
24  disciplinary history that was relative to the behavioral

182

1  alert indicators?
2  **A. Well, complaint history would be all complaints,**
3  **regardless of the finding and disciplinary history would**
4  **have been sustained.**
5  Q. And then there is some additional indicators
6  that include incidents on the medical rule and --
7  **A. Well, repeated incidents.**
8  Q. Repeated -- and repeated incidents.
9  Those are minor transgressions, right?
10  **A. Yes.**
11  MR. YAMIN: Within a 12-month period.
12  MS. DONNELL: I am trying to summarize here.
13  MR. YAMIN: Well, summarizing by excluding words on
14  that Order is misleading.
15  BY MS. DONNELL:
16  Q. To the extent the document speaks for itself,
17  and we are trying to move things along, I was summarizing
18  that there is basically seven categories that are
19  identified in the performance data for the Behavioral
20  Alert System indicators, right?
21  **A. Well, the Order mentions -- lists seven. But,**
22  **um, the way it's written doesn't exclude the possibility**
23  **of others.**
24  MS. DONNELL: Okay.

183

1  BY MS. DONNELL:
2  Q. Well, how did the system operate, was there an
3  electronic way in which it was generated, how -- explain
4  to me back in '89 to '96 how the Behavioral Alert System
5  worked to identify members who were -- had one or more of
6  these indicators?
7  MR. YAMIN: Objection to form.
8  THE WITNESS: Well, when you look at the Order itself
9  it was not, um -- it was not a computer system. So, when
10  you look at the order itself, and you can start with, um,
11  the policy in the Order, Section III, that, um, requires,
12  um -- it's like you said early identification of members
13  who engage in conduct, which is contrary to the close
14  (sic) of the Department, and it talks about routine review
15  of, um, records. So part of that -- like we mentioned
16  before, not just command channel review, but looking at
17  other records may, um, help to identify, um, members for
18  these programs.
19  Once the members are identified as
20  exhibiting unaccepted behavior, then the Department looks
21  at what kind of resources they have, that they can
22  address -- to address the problem. It doesn't acknowledge
23  that individuals need to have programs specially tailored
24  for their specific problems. The solutions are not cookie

184

1  cutter.
2  And then in capital letters, which seems to
3  indicate it's very, very important is that neither, um,
4  program Behavioral Alert System or Personnel Concerns
5  Program is intended to be used as a substitute for
6  disciplinary reaction.
7  MS. DONNELL: I want to focus on the part that you
8  have discussed under Section III of 83-3 regarding routine
9  review of various Department records.
10  THE WITNESS: Yes.
11  BY MS. DONNELL:
12  Q. Who was required to conduct routine review of
13  Department records to identified members who had the
14  indicators for the Behavioral Alert System?
15  **A. Well, when you go down to the next section,**
16  **under Section IV "General Responsibilities," the Order**
17  **lays out who is responsible.**
18  **So at different levels -- so Section IV. B.**
19  **identifies the administrators of OPS are called upon to**
20  **review investigations in their office looking for patterns**
21  **of behavior.**
22  Q. How did the administrator of OPS conduct the
23  review of their files to identify any repeat offenders in
24  this time period '89 to '96?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

47 (185 to 188)

185

1    A.  Well, I don't think they called anybody repeat
2  offender in this directive.
3    Q.  Well, I'll use a different term: Somebody who
4  has indicators for the Behavioral Alert System such as,
5  um, excessive force complaints or the complaint of
6  disciplinary history; so how did the administrator of OPS
7  conduct that review?
8    **A.  Um, we talked earlier about the fact that**
9  **they -- part of their reviewing of the investigations that**
10 **come through them for approval before going out to -- just**
11 **to command channel review or it could be one way.**
12   Q.  Were there any standard operating procedures for
13 OPS that identified or directed how the administrator of
14 OPS was suppose to conduct review for the Behavioral Alert
15 System?
16   MR. YAMIN:  Objection, form.
17   THE WITNESS:  Well, I don't know within the SOP, but
18 they still had to follow the director, and the director
19 required them to notify Personnel Concerns Program manager
20 if their review identified anybody who had an unacceptable
21 pattern of behavior.
22   MS. DONNELL:  And I'm just getting -- trying to get
23 down into the nitty gritty how did they do that other than
24 what you just testified to, which is just their general

186

1  review of all CRs that came through the OPS administrator.
2  BY MS. DONNELL:
3    Q.  I'm asking if there was any specific ways that
4  the Behavioral Alert System review was supposed to be
5  implemented for OPS during this time frame?
6    **A.  Well --**
7        **I mean, given the fact that it was all**
8  **paper, you know, at the time, um, they could have done it**
9  **a number of ways if they choose to.  It was limited by the**
10 **fact of they were paper and the technology that we have**
11 **today wasn't available then.**
12       **In addition they would have been limited by**
13 **the contract that we spoke about, specifically 8.4 as to**
14 **what they could review and when and for what purpose.**
15   Q.  When the OPS administrator was doing -- was
16 conducting -- well, let me strike that.
17       So it's fair to say that whatever kind of
18 review the OPS administrator did for the implementation of
19 General Order 83-3, for the Behavioral Alert System, that
20 whatever it was, it was limited by review of paper files;
21 is that fair?
22   **A.  Yes, I think that's fair.**
23   MS. DONNELL:  Okay.
24 BY MS. DONNELL:

187

1    Q.  And you're also saying, I think, that the OPS
2  administrator's implementation of the Behavioral Alert
3  System was also limited by the FOP contract, Section 8.4;
4  is that correct?
5    MR. YAMIN:  Objection to the form.
6    THE WITNESS:  I think so.  In addition to also with
7  the previous destruction of the files mentioned before so.
8  Again, it could limit what's even available in paper form
9  for someone to be able to look at.
10 BY MS. DONNELL:
11   Q.  So what you are saying is if I get -- what
12 you're testifying to is that for this time frame the --
13 pursuant to the FOP contract, the only -- CRs could only
14 be maintained for five years; is that right?
15   **A.  Yes.  Well, it was --**
16       **They stopped destruction, I believe, in**
17 **'91.  But if things were destroyed previous to '91, that**
18 **reduces the available records that you are able to review,**
19 **even if they are paper form.**
20   MS. DONNELL:  Okay.
21 BY MS. DONNELL:
22   Q.  And is it your testimony that during this entire
23 time period from '89 to '96, there were not any electronic
24 records available to the OPS administrator to identify CR

188

1  files that have been -- for an accused member?
2    MR. YAMIN:  Objection --
3    MS. DONNELL:  Let me strike that, that wasn't good.
4  BY MS. DONNELL:
5    Q.  Is it your testimony that during the entire time
6  period of '89 to '96 there weren't any electronic records
7  of CR files?
8    **A.  I don't remember --**
9    MR. YAMIN:  Objection to the form of the question;
10 you can answer.
11   THE WITNESS:  I don't think so.
12       And looking at, again, I'm trying to
13 recall, um, Bruce Dean's dep he mentioned about the
14 fact -- you know, the card catalogs, paper files, and all
15 of that.  But there was no mention of being able to use
16 computers or other technology to -- you know, to retrieve
17 data.
18   MS. DONNELL:  Maybe this is a good time to just take
19 a pause for the ways in which the CPD maintains its record
20 of CR files that exist.
21 BY MS. DONNELL:
22   Q.  You're familiar with the mainframe?
23   **A.  The mainframe.**
24   Q.  Do you have an understanding of what the

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

189

1  mainframe is?
2  **A. I understood it was a computer program**
3  **before -- like I said at some point information was put**
4  **into a computer, and it covered -- and when it was -- the**
5  **mainframe was shutdown, and a new program went into place,**
6  **but it was from -- covered records from 1967 to 2000.**
7  MS. DONNELL: Okay.
8  BY MS. DONNELL:
9  Q. And was the mainframe available to OPS or IAD
10  investigators or administrator at any portion during the
11  '89 to '96 time frame; do you have any awareness of that?
12  **A. I don't. I don't.**
13  MR. YAMIN: Objection, calls for speculation.
14  BY MS. DONNELL:
15  Q. So you have no knowledge of whether any of the
16  mainframe electronic records of CR files from '67 through
17  '96 were available during the relevant time period; is
18  that accurate?
19  **A. Well, I don't know when that -- when those files**
20  **were put into the mainframe. That doesn't mean they were**
21  **put into the mainframe in '67.**
22  MS. DONNELL: Correct. I know -- no, no, I
23  understood.
24  BY MS. DONNELL:

190

1  Q. I am just saying: Do you know whether a
2  mainframe was available at any point during the '89 to '96
3  time frame, and my understanding is you are saying: "No,
4  you don't"?
5  **A. I don't know.**
6  Q. And then are you familiar with the Complaint
7  Registered Management System, also known as CRMS?
8  **A. Yes.**
9  Q. And what is CRMS?
10  **A. But that's outside of the time frame. I don't**
11  **think it came into being until around 2000.**
12  Q. And then do you know what "Auto CR" is?
13  MR. YAMIN: Objection, the same one, these are
14  questions both outside of the scope of the notice, and
15  outside of the time frame of the notice.
16  THE WITNESS: Yes, "Auto CR" is, again, based on the
17  program Clear, but it is outside of the time frame.
18  BY MS. DONNELL:
19  Q. But that would be a system that keeps a record
20  of CR files, correct?
21  MR. YAMIN: Objection to the form "record".
22  THE WITNESS: It has information, but it's,
23  um -- like I said it was decades past the time frame.
24  BY MS. DONNELL:

191

1  Q. Are you also aware of any other -- an index of
2  CR files, historic CR files that exist?
3  MR. YAMIN: Objection to form.
4  BY MS. DONNELL:
5  Q. Any other ways in which CPD keeps a record of
6  historic CR files other than the mainframe?
7  **A. From 1989 to -- I'm sorry, from --**
8  **Well, 1989 through 1996 I'm not aware.**
9  Q. So the only system you're aware of would be the
10  hardcopy files of the actual CR files that IAD kept and
11  then the mainframe whenever it came into existence; is
12  that the only two?
13  MS. ROSEN: Objection to the form.
14  THE WITNESS: Well, the CR file themselves whatever
15  they were, you know, both for OPS and Internal Affairs,
16  and I mentioned about the card catalogs that were kept at
17  the time.
18  BY MS. DONNELL:
19  Q. Okay, and then what are you referring to when
20  you say the "card catalog"?
21  **A. That Bruce Dean mentioned in his deposition.**
22  Q. And what's your understanding of the information
23  that was contained in the card catalog?
24  **A. Just the basic information about the officer,**

192

1  **the CR, maybe the finding in that or maybe the information**
2  **about the complainants and so forth.**
3  Q. Have you ever seen the card catalog that
4  Bruce Dean was testifying to?
5  **A. I don't recall ever seeing it before.**
6  Q. Do you have any knowledge of whether the
7  information contained in the card catalog was that stored
8  at Internal Affairs Division records division?
9  MR. YAMIN: Objection --
10  BY MS. DONNELL:
11  Q. Would you know where it was stored?
12  MR. YAMIN: -- foundation.
13  MS. ROSEN: Objection to the form.
14  THE WITNESS: No, I don't.
15  BY MS. DONNELL:
16  Q. And do you know whether the information on what
17  Bruce Dean's called a card catalog or index cards
18  contained only sustained CRs or was it all CRs?
19  MR. YAMIN: Objection, foundation.
20  MS. DONNELL: If you know.
21  MR. YAMIN: And form.
22  THE WITNESS: Yeah, I don't recall.
23  BY MS. DONNELL:
24  Q. Other than the testimony you reviewed by

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

193

1  Bruce Dean's deposition in the Rivera case, do you have
2  any other basis of what you are testifying to with respect
3  to what he called a card catalog with the index cards or
4  is it just his deposition?
5      **A.  Just pretty much -- his deposition pretty much.**
6      Q.  Do you have knowledge of any early intervention
7  system such as a precursor to the behavioral intervention
8  system or Personnel Concerns Program?
9      **A.  Well, no, it's --**
10     MR. YAMIN:  Objection, form.
11     THE WITNESS:  Behavioral Alert System.
12     MS. DONNELL:  I'm sorry, Behavioral Alert System.
13 BY MS. DONNELL:
14     Q.  Do you know what the --
15         Was there a precursor that was -- the
16 Chicago Police Department had to these two programs?
17     MR. YAMIN:  Objection.
18     THE WITNESS:  This was 83-3, so it was the previous
19 one, so it would be out of the time frame of the '89 to
20 '96; so, no, I don't know.
21 BY MS. DONNELL:
22     Q.  Was there a systematic way under the
23 Behavioral Alert System that an officer that had received
24 a certain number of CR allegations, let's say 10 or more,

194

1  is there any systematic way that somebody at OPS or IAD
2  would be alerted to that fact?
3      MR. YAMIN:  Objection, form.
4      THE WITNESS:  Well, the, um, 83-3 says that the way
5  they would be alerted is the administrator of OPS would be
6  alerted because they are directed to review investigations
7  specifically for patterns of behavior that would warrant
8  concern.  And the same goes for Internal Affairs, on Bates
9  stamped 30630 on the bottom.
10         Internal Affairs Division will review
11 disciplinary records to identify those numbers and display
12 a pattern of behavior that requires further evaluation by
13 the Personnel Concerns Program manager.
14         So both Internal Affairs and OPS is
15 required to review investigations or disciplinary records
16 to identify certain behaviors.
17 BY MS. DONNELL:
18     Q.  Let's start with OPS, how did OPS implement the
19 Behavioral Alert System, how did it conduct its review
20 during this time frame?
21     MR. YAMIN:  Objection, form, compound question.
22     THE WITNESS:  Um, like I said before I don't
23 know explicitly how they did, um --
24 BY MS. DONNELL:

195

1      Q.  Do you have any knowledge of any --
2      MR. YAMIN:  No, I don't --
3      MS. DONNELL:  Oh, I'm sorry, I thought you completed
4  your answer.
5      MR. YAMIN:  Did you complete your answer?
6      THE WITNESS:  Yes.
7      MR. YAMIN:  Okay, misunderstood your pause.
8  BY MS. DONNELL:
9      Q.  So just focusing on OPS now, I understand what
10 the directive says 83-3, and I'm just wondering now if you
11 have any knowledge as to how the OPS administrator
12 actually implemented the Behavioral Alert System in the
13 '89 to '96 period other than what's stated on 83-3?
14     **A.  No, outside of 83-3 I don't have none in**
15 **particular.**
16     Q.  How about with respect to the Internal Affairs
17 Division and what 83-3 required of Internal Affairs
18 Division, do you have any knowledge how the Internal
19 Affairs Division implemented the Behavioral Alert System
20 outlined in 83-3 during the '89 to '96 time frame?
21     **A.  Well, again, Internal Affairs would review or**
22 **have information on -- about certain behavior and required**
23 **further evaluation, then they would alert the Personnel**
24 **Concerns Program manager.**

196

1      MS. DONNELL:  Wait, so I understand that once they
2  identified the behavior they had to alert the Personnel
3  Concerns Program, and we will get to that, but --
4      THE WITNESS:  The manager, according to the Personnel
5  Concerns Program manager.
6      MS. DONNELL:  Okay, thanks for correcting me.
7  BY MS. DONNELL:
8      Q.  So putting that aside, and before we get to the
9  reporting to Personnel Concerns manager, I just want to
10 make clear if you have any knowledge as to how Internal
11 Affairs Division actually implemented its review to
12 identify officers that had indicators to be part of the
13 Behavioral Alert System; do you know how they did that?
14     **A.  In 1989 and 1996 I don't even know.  Later,**
15 **again, they would have reviewed or submitted reports to**
16 **personnel.  But during that time frame, I don't know.**
17     MS. DONNELL:  Okay.
18 BY MS. DONNELL:
19     Q.  So it's fair to say during the relevant time
20 period for this case, you don't know how Internal Affairs
21 Division actually conducted its review for implementing
22 the Behavioral Alert System outlined in 83-3, correct?
23     **A.  Well, I mean outside of -- like I said when you**
24 **are reviewing the -- reviewing the investigations**

Transcript of Tina M. Skahill, Corporate Designee

Conducted on July 2, 2019

50 (197 to 200)

197

1 themselves, that is a review as well.
2      If you notice any patterns of behavior and
3 you are concerned of that, then they would alert the
4 Personnel Concerns Program manager. Both the agencies
5 are --
6      Both agencies OPS and BIA are reviewing the
7 Complaint Registered investigations. And during that
8 review, that's one way, like I said, that they would come
9 across information that could fall into one of the
10 performance data, and then be required to notify the
11 person (inaudible).
12    Q. So, other than the regular review process that
13 OPS and IAD had for just a complete review investigation,
14 do you have knowledge of anything in addition to that
15 normal review process that was part of every complaint
16 register that either IAD or OPS led to implement their
17 Behavioral Alert System for them?
18    MR. YAMIN: Objection to the form of the question.
19    THE WITNESS: No. I mean, I didn't.
20 BY MS. DONNELL:
21    Q. And do you have any knowledge of how many
22 officers OPS identified as being part of the Behavioral
23 Alert System during the '89 to '96 time frame?
24    MR. YAMIN: Objection, foundation, calls for

198

1 speculation.
2    MS. DONNELL: I'm asking her if she has knowledge;
3 it's a foundational question, George.
4 BY MS. DONNELL:
5    Q. Do you have any knowledge, Ms. Skahill, of the
6 number of officers that OPS identified as having
7 performance data to report that officers are having
8 behavior alert indicators?
9    A. I don't have any knowledge of the ones that OPS
10 identified, no.
11    Q. How about for Internal Affairs during this time
12 frame, do you know how many officers Internal Affairs
13 Division identified?
14    A. No, I don't have knowledge about how many
15 Internal Affairs specifically identified.
16    Q. Do you have knowledge of how many officers were
17 part of the Behavioral Alert System at any point in time
18 to the '89 to '96 time frame?
19    MR. YAMIN: Objection, foundation.
20    THE WITNESS: Um, I did contact Director Robert
21 Landowski, and he did, um, give me some numbers as to how
22 many officers were in either the Behavioral Alert System
23 or Personnel Concerns Program over a span of years.
24    MS. DONNELL: Okay.

199

1 BY MS. DONNELL:
2    Q. At what number did he give you and over what
3 span of years?
4    A. I -- yeah, I don't recall the exact number,
5 but --
6    Q. And do you know what document or the form he was
7 referring to or computer he was referring to?
8    MR. YAMIN: Objection.
9    THE WITNESS: No, I don't know how he got the
10 information.
11 BY MS. DONNELL:
12    Q. And so he just reported it to you verbally?
13    A. No, it was in a report.
14    Q. And was the report from -- generated during the
15 '89 to '96 time frame or was it an older report?
16    A. No, he --
17    Someone on his staff created a to/from
18 subject report that purged the numbers.
19    Q. Did you provide that to Counsel?
20    A. Yes.
21    Q. And you just don't recall, as you sit here
22 today, the number?
23    A. That many numbers, no.
24    MS. DONNELL: And, George, did you produce that to

200

1 us?
2    MR. YAMIN: No.
3    MS. DONNELL: Can we get a copy of that?
4    MR. YAMIN: You can make a written request, and I
5 will consider it.
6    MS. DONNELL: Well, I'm making a verbal request now
7 to produce it. I will follow up too with an email.
8    MR. YAMIN: Because I want to see what the request
9 is.
10 BY MS. DONNELL:
11    Q. Were there any other information that you
12 obtained from -- is it Director Landowski.
13    A. Yes, Director Landowski.
14    MS. DONNELL: Thank you.
15 BY MS. DONNELL:
16    Q. -- Director Landowski related to the Behavioral
17 Alert System?
18    A. No, that's all.
19    Q. And the to/from number, is it from Director
20 Landowski to you?
21    A. I can't remember if it's to me or if it
22 was -- or if it was like whoever wrote it to him and he
23 just gave me a copy of it, I'm not sure.
24    MS. DONNELL: Okay.

201

1 BY MS. DONNELL:
2    Q.  But the subject matter was the number of
3 officers that were identified to be part of the Behavioral
4 Alert System during some span of years?
5    **A.  Yes.**
6    Q.  Was it specifically the '89 to '96 span of
7 years?
8    **A.  It might have been or it might have been a**
9 **little bit before.**
10   Q.  Did Director Landowski provide the same sort of
11 information to you with respect to the Personnel Concerns
12 Program?
13   **A.  It was all in one report.**
14   Q.  So this to/from memorandum contained the number
15 of officers that had also been identified for some span of
16 years within or at least inclusive of '89 to '96 that were
17 identified for the Personnel Concerns Program, too, as
18 well?
19   **A.  Yes.**
20   Q.  How about the Personnel Concerns Program, did
21 OPS and Internal Affairs Division have some role and
22 responsibility with -- in the Personnel Concerns Program?
23   **A.  Well, yes.**
24   Q.  How did OPS --

202

1       Did OPS conduct a review or any -- what
2 role did OPS have in the Personnel Concerns Program?
3    **A.  Well, as you mentioned at --**
4       **So individuals who were in, um, Behavioral**
5 **Alert System, and when that did not resolved the matter,**
6 **um, then they monitor that, and then the information then**
7 **will be forwarded to the program -- the Personnel Concerns**
8 **Program manager will make the decision about placement in**
9 **the Personnel Concerns Program.**
10   MS. DONNELL:  Okay.
11 BY MS. DONNELL:
12   Q.  And how about for Internal Affairs?
13   **A.  Well, the same thing, so the two programs there.**
14   Q.  But they both had correlated requirements?
15   **A.  Yes, it's those that --**
16   MR. YAMIN:  Really you should let her answer the
17 question and not provide the answer to -- for her, please.
18   MS. DONNELL:  Go ahead, Ms. Skahill, you can finish
19 your answer.
20   THE WITNESS:  The Order mentions on Section VI. A.
21 that says:  "Personnel Concerns Program is an alternative
22 for dealing fairly and impartial with members who have not
23 responded to routine corrective action or to increased
24 supervisory attention that results from Behavioral Alert

203

1 System indicators," so --
2 BY MS. DONNELL:
3    Q.  Do you have any knowledge of how OPS
4 did -- conducted its review to identified officers for the
5 Personnel Concerns program in '89 to '96?
6    **A.  Um, let's see, um, while --**
7       **Now the only thing that, and there is a**
8 **possibility is that you also have Department members in**
9 **the Office of Professional Standards in, um, Internal**
10 **Affairs.  So you could have individuals in those units as**
11 **well that could have been a part of behavioral alert or**
12 **personnel concerns.  And so one of the things is that it**
13 **requires for personnel concerns in that a supervisor be**
14 **designated as a personnel concerns supervisor.**
15      **So there is a possibility that a supervisor**
16 **and either Internal Affairs or OPS could be a personnel**
17 **concerns supervisor, in which case then they would have**
18 **specific responsibilities.**
19   MS. DONNELL:  Sure, understood.  I want to take a
20 step back, so I understand.
21 BY MS. DONNELL:
22   Q.  For OPS to conduct its review to identify
23 officers who wanted to be part of the Personnel Concerns
24 Program, do you know how in '89 to '96 they conducted

204

1 their review to identify such members of the Department?
2    **A.  Other than the way I mentioned before, reviewing**
3 **complaint register investigations as part of their normal**
4 **duties, I am unaware of any additional ways.**
5    Q.  And the same question with respect to the
6 Internal Affairs Department or Division in '89 to '96,
7 other than what you have testified to already that it was
8 a review process for each CR investigation, are you aware
9 of any other ways in which the Internal Affairs Department
10 conducted its review to identify members that were
11 identified for the Personnel Concerns Program?
12   **A.  I'm unaware at that time, again, like I**
13 **mentioned in the paper form --**
14   Q.  And the --
15   **A.  -- so it's only one way.**
16   MS. DONNELL:  Sorry, I didn't want to interrupt you.
17 BY MS. DONNELL:
18   Q.  And then the same is true, it's your testimony
19 today that whatever review that OPS and IAD did
20 took -- comply with General Order 83-3 in the Behavioral
21 Alert System, and the Personnel Concerns Program would be
22 limited to review of paper files, right?
23   **A.  During that time frame, that's my understanding.**
24   Q.  And it would be limited by the FOP contract

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

52 (205 to 208)

---

205

1 Section 8.4?
2    **A. Yes.**
3    Q. And it would be limited by any file that had
4 been destroyed prior to '91?
5    **A. Yes.**
6    Q. Do you know whether during this time frame OPS
7 kept any list of repeat offenders, meaning officers who
8 were repeatedly accused of excessive forces misconduct; do
9 you know if there was a list?
10    MS. ROSEN: Objection to the form of the question.
11    MR. YAMIN: Objection to the form, and also outside
12 of the scope of the Notice.
13    MS. DONNELL: I think I qualified '89 to '96.
14    MR. YAMIN: It's outside of the scope of the Notice.
15 BY MS. DONNELL:
16    Q. Do you know of any, Ms. Skahill?
17    **A. No, I don't.**
18    Q. How about for the Internal Affairs Division, did
19 the Internal Affairs Division keep a list of any officers
20 who had been repeatedly accused of misconduct?
21    MR. YAMIN: Same --
22    MS. ROSEN: Objection to the form.
23    MR. YAMIN: -- and I object it's outside of the scope
24 of the Notice.

---

206

1    THE WITNESS: I don't know.
2 BY MS. DONNELL:
3    Q. As far as you know there weren't any?
4    MS. ROSEN: Objection to the form.
5    MR. YAMIN: It also misstates her answer.
6    THE WITNESS: I don't know.
7 BY MS. DONNELL:
8    Q. Do you know whether --
9        And I ask this question just refer -- OPS
10 just with respect to excessive force complaints: Do you
11 know if there was any list of officers that had repeat
12 allegations and misconducts beyond just excessive force at
13 OPS during this time period?
14    **A. I don't know.**
15    Q. Do you know whether in '89 to '96, during that
16 time frame, OPS or IAD conducted any kind of pattern
17 analysis?
18    **A. Could you define what you mean by "pattern**
19 **analysis"?**
20    Q. Pattern --
21    MR. YAMIN: Objection to the form.
22    MS. DONNELL: Patterns of alleged misconduct by an
23 officer, a group of officers.
24    MS. ROSEN: By an officer?

---

207

1    MS. DONNELL: Accused as an officer --
2        I will rephrase.
3 BY MS. DONNELL:
4    Q. Do you know if the City during the '89 to '96
5 time frame conducted any sort of pattern analysis of
6 allegations of misconduct by certain officers?
7    MR. YAMIN: Objection to the form --
8    MS. ROSEN: Objection to the form.
9    MR YAMIN: -- of the question.
10    THE WITNESS: Well --
11        I mean, given that Director Landowski
12 verified that individuals were placed in Behavioral Alert
13 System and Personnel Concerns Program during the time
14 frame '89 to '96, um, and using the definitions of the
15 Directive 83-3 that talks about: Behavioral alert being a
16 systematic review of members' behavioral pattern to alert
17 supervisors with an intervention; and that the policy
18 required early identification of members that involved
19 routine review of various Department directives that have
20 required OPS administrators to review investigations
21 looking for patterns of behavior; it requires Internal
22 Affairs to review disciplinary records; it required
23 traffic safety and training section to review -- um,
24 looking for -- identifying patterns of, um, involvement

---

208

1 that would bring to the attention personnel concerns; it
2 required exempt unit commanding officers to monitor
3 behavior; it required watch commanding officers and
4 supervisors to monitor behavior; and in the training
5 division, um, the fact that those indicators also involve,
6 um, under Section V. B., excessive force complaints, and
7 complaints of disciplinary history, I would say, yes, I do
8 know.
9 BY MS. DONNELL:
10    Q. So your answer is "yes," based on what you have
11 just testified to that the Chicago Police Department was
12 conducting pattern analysis based on 83-3, and your
13 understanding of it?
14    **A. Yes.**
15    Q. Anything outside of what you just testified to?
16    **A. The earlier things that I mentioned, the**
17 **informal ways, um, that, um -- patterns, um -- again,**
18 **behavior using the definition that -- a pattern analysis,**
19 **but using the definition in 83-3 of the Behavioral Alert**
20 **System.**
21    MS. DONNELL: Okay.
22 BY MS. DONNELL:
23    Q. Do you know if any other forms of early
24 intervention systems other than the Behavioral Alert

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

209

1  System or Personnel Concerns Program were ever discussed
2  or contemplated by the Chicago Police Department?
3      MR. YAMIN: Objection --
4      THE WITNESS: Can you repeat that question, it was
5  hard to follow?
6      MS. DONNELL: Sure.
7  BY MS. DONNELL:
8      Q.  During this time period '89 to '96, do you know
9  if there is any considerations or discussion of other
10 types of behavioral -- of other early intervention systems
11 that were discussed by the Chicago Police Department?
12     MR. YAMIN: Objection to the form.
13     MS. ROSEN: Objection.
14     MR. YAMIN: Also calls for speculation.
15     THE WITNESS: Um, I don't --
16     MR. YAMIN: And foundation.
17     THE WITNESS: I'm not sure if they have -- I may have
18 mentioned I read some newspaper articles to prepare, and
19 there was a mention about a BrainMaker program.
20     MS. DONNELL: Yes.
21 BY MS. DONNELL:
22     Q.  Do you know what BrainMaker was, other than your
23 reference to it in the Chicago Tribune article?
24     **A.  And talking with my attorneys and reading the**

210

1  **Tribune article --**
2      MR. YAMIN: Excuse me a second, anything you spoke to
3  about -- sorry, what you spoke to with your attorneys is
4  privileged.
5      MS. DONNELL: My question is not trying to get you to
6  discuss your conversations with your Counsel.
7      THE WITNESS: Right.
8  BY MS. DONNELL:
9      Q.  Other than your conversations with your Counsel,
10 what is your understanding of the BrainMaker early
11 intervention system?
12     **A.  Um, from what I can glean from the article, um,**
13 **it was an off-the-shelf program. Um, it came from -- I**
14 **think it mentioned like Bowling Green University in Ohio,**
15 **um -- and, um, it attempted to identify, um, behavior**
16 **patterns to alert the Department to the need for**
17 **intervention. But I think it -- again, it had some -- it**
18 **had some limitations.**
19     Q.  What limitations did that BrainMaker program
20 have that you are aware of?
21     **A.  From what I -- I don't think, um --**
22         **I think there was concern -- I know there**
23 **was concern from FOP, um, in relation to 8.4, and that --**
24     Q.  With a specific provision of 8.4 that the FOP

211

1  was concerned about?
2      **A.  I believe so.**
3      Q.  Do you know which one it was?
4      **A.  No.**
5      MS. DONNELL: Okay.
6      THE WITNESS: I don't think anybody understood how it
7  worked. In a short, um --
8  BY MS. DONNELL:
9      Q.  Was the CPD using the BrainMaker software system
10 at any point during the '89 to '96 time frame?
11     MR. YAMIN: Objection, calls for speculation,
12 foundation.
13     THE WITNESS: Um, it just mentioned that if they -- I
14 don't know if it was like being tested or you know, trying
15 to see if it would be something that we could use,
16 um -- but, um, eventually, um, you know, it was, um -- it
17 was not utilized.
18 BY MS. DONNELL:
19     Q.  Do you know whether it was utilized some time in
20 the '89 to '96 time frame?
21     **A.  I thought it was -- I thought it was maybe the**
22 **end, but I am not sure.**
23     Q.  Like the '93 to '96 time frame?
24     **A.  Maybe, yeah, but I am not sure.**

212

1      Q.  Do you know if BrainMaker --
2          Do you have any knowledge if BrainMaker was
3  used by OPS or IAD during the '93 to '96 time frame?
4      **A.  The article just mentioned I think they**
5  **interviewed an Internal Affairs supervisor.**
6      Q.  And was the Internal Affairs supervisor that was
7  interviewed discussing IAD's use of BrainMaker during the
8  '93 to '96 time frame?
9      **A.  It was more --**
10         **The article was really more just the**
11 **Internal Affairs supervisor explaining to report how it**
12 **could be used.**
13     Q.  And what's your understanding of how the
14 BrainMaker system was used?
15     **A.  I --**
16         **Just from the short article I couldn't**
17 **glean if it was actually utilized as part of the**
18 **Behavioral Alert System. It didn't seem like it, but I'm**
19 **not sure.**
20     Q.  Did you have any discussions other than those
21 with your Counsel about the Chicago Police Department's
22 use of BrainMaker?
23     **A.  No.**
24     MR. GREENBERG: Is it called BrainMaker or Rainmaker?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

54 (213 to 216)

213

1    MS. ROSEN: BrainMaker.
2    MS. DONNELL: BrainMaker.
3    MR. GREENBERG: BrainMaker.
4    BY MS. DONNELL:
5    Q. Do you have an understanding of BrainMaker as
6    conducting pattern analysis of officers who were accused
7    of misconduct?
8    MR. YAMIN: Objection, foundation.
9    THE WITNESS: I think, um --
10       My understanding was that it was attempting
11   to do something, but it doesn't appear to have been
12   successful.
13   BY MS. DONNELL:
14   Q. And did you ever, in preparing for your
15   deposition, review any documents produced by the
16   BrainMaker system?
17   A. No.
18   MS. DONNELL: Okay.
19       I am going to switch gears now and talk
20   about the Complaint category tables, but I am
21   knowledgeable that we have been going for a while, and you
22   wanted coffee, does anybody need a break?
23   THE WITNESS: Sure.
24   MS. DONNELL: Okay, let's take a short break.

214

1    MR. YAMIN: Yes, before we do, though, I believe we
2    have been -- this deposition --
3    MS. DONNELL: Are we going off the record or you want
4    to be on the record?
5    MR. YAMIN: No, I want this on the record.
6       We are past four hours. I don't know how
7    much -- by how much. Just to remind you, Heather, we are
8    complying with the rule of -- this is a seven hour
9    deposition, and in seven hours we are done, so use your
10   time as you see fit.
11   MS. DONNELL: Wait, are you done?
12   MR. YAMIN: For now.
13   MS. DONNELL: Okay.
14   MR. GREENBERG: Can I put my name on the record?
15   MS. DONNELL: Yeah.
16   MS. ROSEN: Before you leave?
17   MR. GREENBERG: Before I leave.
18       Steve Greenberg, and I'm going to leave
19   now --
20   MS. DONNELL: Okay, we are going off the --
21   MR. GREENBERG: On behalf of Wayne Washington
22   (phonetic).
23   MS. DONNELL: We can go off the record now.
24       (WHEREUPON, a brief recess was

215

1       taken at 3:10 p.m.)
2    MS. DONNELL: Ms. Skahill, now we are going to talk
3    about Complaint category tables, and I have designated two
4    exhibits to your deposition, Exhibit 7 --
5    THE WITNESS: Okay.
6    MS. DONNELL: -- and Exhibit 8.
7       (WHEREUPON, Exhibit Nos. 7 and 8
8       were marked for identification.)
9    MS. DONNELL: Let's see --
10       Let me get a copy for you guys.
11   BY MS. DONNELL:
12   Q. So Exhibit 7 is the one that is not Bates
13   stamped, right?
14   A. Okay.
15   Q. This is Exhibit 7, and it has CPD 44.248 revised
16   1288; do you see that, on Exhibit 7?
17   A. I do.
18   Q. And then Exhibit 8 has the Bates
19   stamp -- Exhibit 8, CITY 31341 consecutive through 31342;
20   is that right?
21   A. Right.
22   Q. I would like for you to look at the second page,
23   Bates stamp 31342 there is approved for printing with a
24   signature and a date, 25 April '96; do you see that?

216

1    A. Yes.
2    Q. So these are the two Complaint category tables
3    that have -- from the Internal Affairs Division that were
4    produced by the City in this litigation.
5    A. Okay.
6    MS. DONNELL: Okay.
7    BY MS. DONNELL:
8    Q. Do you --
9       Have you reviewed both of these in
10   preparation for your deposition today?
11   A. Yes.
12   MS. DONNELL: Okay.
13   BY MS. DONNELL:
14   Q. And is it accurate to say that the Exhibit 7 was
15   the operative complaint category table for '89 to '96 or
16   through April '96 and then --
17   A. Yeah.
18   Q. -- Exhibit 8 was for that very tailend, in April
19   through December '96; is that right?
20   A. Yes.
21   Q. So I want to --
22       So Exhibit 7 was primarily the operative
23   complaint category table, and then just the tailend of the
24   time period was Exhibit 8, correct?

217

1  A.  Yes.
2  Q.  So let's talk about the complaint category
3  table, these --
4       Well, do you know what the purpose of the
5  complaint category table was?
6  **A.  Well, yes.  So that you can assign the**
7  **category -- categorize the investigations.**
8  Q.  And like you said earlier today, each complaint
9  register file would get a complaint category assigned to
10 it, correct?
11 **A.  Yes.**
12 Q.  But it would only get one during this time
13 frame?
14 **A.  Yes.**
15 MS. DONNELL:  Okay.
16 BY MS. DONNELL:
17 Q.  So regardless of the number --
18      Regardless of whether the complaint
19 included multiple types of allegations and misconduct, the
20 CR would only get one complaint category?
21 **A.  I believe so, would only get the most serious.**
22 MS. DONNELL:  Okay.
23 BY MS. DONNELL:
24 Q.  And do you know how --

218

1       I am sorry, an OPS intake would determine
2  the complaint category?
3  **A.  Yes.**
4  Q.  For both IAD and OPS investigations?
5  **A.  Yes.**
6  Q.  And do you know how OPS determined what was the
7  most serious allegation in a CR, in order to assign the
8  complaint category number?
9  MR. YAMIN:  Objection, asked and answered.  This was
10 addressed earlier in the deposition.
11      You can answer, Ms. Skahill.
12 BY MS. DONNELL:
13 Q.  So, for example, if there is an allegation of
14 excessive force and bribery, do you know which one OPS
15 would select, the category of the complaint?
16 **A.  Excessive force.**
17 MS. DONNELL:  Okay.
18 BY MS. DONNELL:
19 Q.  And how about commission of a crime in excessive
20 force, do you know which one OPS would be directed to
21 select?
22 MR. YAMIN:  Objection, this is calling for
23 speculation, and asking for answers absence of any
24 context.

219

1  MS. DONNELL:  You can answer.
2  MR. YAMIN:  In other words, calling for a
3  hypothetical.
4  THE WITNESS:  Yeah, I think it would -- I would need
5  probably more facts.
6  BY MS. DONNELL:
7  Q.  Was there anything in the OPS Standard Operating
8  Procedure that identified how the OPS intake person was to
9  identify a complaint category?
10 **A.  I don't recall.  I'd have to look at it again.**
11      (WHEREUPON, Exhibit No. 9 was
12      marked for identification.)
13 MS. DONNELL:  I am going to identify this as
14 Exhibit 9.  I'm handing you, Ms. Skahill, what I've
15 designated as Exhibit 9 to your deposition.
16      Exhibit 9 is the Operations Procedure
17 manual for the Office of Professional Standards, which the
18 City produced in this litigation, it's CITY Bates 31130
19 consecutive to 31274.
20 BY MS. DONNELL:
21 Q.  Are you familiar with Exhibit 9?
22 THE WITNESS:  If I could just have a few minutes.
23 MS. DONNELL:  Sure.
24      (WHEREUPON, the witness is

220

1       reviewing the document.)
2  THE WITNESS:  Okay.
3  BY MS. DONNELL:
4  Q.  Have you had an opportunity to review the
5  Operations Procedure manual for the Office of Professional
6  Standards, right?
7  **A.  Yes.**
8  MS. DONNELL:  Exhibit 9.
9  BY MS. DONNELL:
10 Q.  And is there anything in your review of
11 Exhibit 9 that you would like to refer to the answer, and
12 whether there was anything in the Standard Operating
13 Procedure manual to instruct how the complaint category
14 was assigned to a complaint?
15 **A.  I didn't see it.**
16 MS. DONNELL:  Okay.
17 BY MS. DONNELL:
18 Q.  Do you have any knowledge of --
19      Other than what you have testified to that
20 the most serious allegation would be given a complaint
21 category code, to what instructions were given how the
22 intake individual at OPS was to determine what was the
23 most serious allegation?
24 **A.  No, just, um, just -- I think based on**

221

1  Bruce Dean's I thought he might have addressed it, but I'm
2  not sure and, you know, my own experience of category
3  codes.
4      Q.  And by that you think something with excessive
5  force, shooting the body that's the most serious?
6      A.  Yeah, that's more probable than not.
7      MS. DONNELL:  Okay.
8  BY MS. DONNELL:
9      Q.  During that '89 to '96 time frame, if there was
10 an allegation that a witness had been coerced into
11 providing a false statement, how would that kind of
12 allegation be coded under the complaint category tables?
13     A.  Well, it would depend if it's the only
14 allegation.
15     MS. DONNELL:  Sure.
16 BY MS. DONNELL:
17     Q.  So assuming that was the only allegation, was
18 there a -- what complaint code would be used to code an
19 allegation of a coerced or a fabricated witness statement?
20     MS. ROSEN:  Objection to the form.
21     MR. YAMIN:  And I object, it's an incomplete
22 hypothetical.
23     THE WITNESS:  Um, just based on the limited facts
24 that you gave me, um, it could possibly fit under Group 3,

222

1  um, 3 G "miscellaneous".  Depending on the context it
2  could possibly -- if it was tied to an arrest, it could
3  possibly have been under Group 4 for "miscellaneous".
4          If it involved a civil suit, it might have
5  had -- Group 14, it's possible.  Depending on the context,
6  it could be a Group 10 for operation and personnel
7  violation under miscellaneous.
8          But like I said, it's just based on the
9  limited information that you gave me.
10     MS. DONNELL:  Okay.
11 BY MS. DONNELL:
12     Q.  And if there was --
13          So if there was an allegation that a
14 Department member had coerced a witness statement, is it
15 fair to say there isn't a particular complaint category
16 that directly addresses that kind of allegation, correct?
17     MS. ROSEN:  Objection to the form.
18     THE WITNESS:  Every, um, complaint gets a code.  So a
19 category code -- it wouldn't have a CR number without a
20 selection of a code.
21     MS. DONNELL:  I'm sorry, my question may not have
22 been clear.
23 BY MS. DONNELL:
24     Q.  You would agree with me that there isn't a

223

1  complaint category number that specifically identifies an
2  allegation of a coerced witness statement, correct?
3      MS. ROSEN:  Are you asking whether or not there is a
4  complaint category that is set, has a number, and that is
5  a coerced witness statement?
6      MS. DONNELL:  Yes, right.
7      THE WITNESS:  If I read each group, and I look for
8  coerced statements, um, I don't believe I see that.
9      MS. DONNELL:  Okay.
10 BY MS. DONNELL:
11     Q.  And the statement is true for a fabricated
12 witness statement, a false or fabricated witness
13 statement, true?
14     A.  I don't see fabricated or false witness
15 statement listed on this sheet --
16     Q.  And there is --
17     A.  -- on Exhibit 7.
18     MS. DONNELL:  Sorry.
19 BY MS. DONNELL:
20     Q.  And there isn't a complaint category for a
21 coerced confession, true?
22     A.  I don't see the term "coerced confession"
23 exclusively on Exhibit 7.
24     Q.  And there isn't a complaint category code for

224

1  evidence that was withheld in violation of Brady v.
2  Maryland, right?
3      A.  I don't --
4      MR. YAMIN:  Those specifics words?
5      MS. DONNELL:  Or evidence, withheld evidence.
6  BY MS. DONNELL:
7      Q.  Is there a code that would -- could be assigned
8  as an allegation that an officer had withheld or failed to
9  disclose evidence?
10     A.  Every --
11     MR. YAMIN:  Objection, form.
12     THE WITNESS:  Every complaint gets a code, so a code
13 would be assigned.
14     MS. DONNELL:  I'm not asking whether a code would be
15 assigned.  You've already testified that every CR is going
16 to get a code.
17 BY MS. DONNELL:
18     Q.  My question is:  There isn't a specific code
19 number that identifies an allegation of evidence being
20 withheld with the specific number?
21     A.  Well --
22          I mean, the number would identify it, but
23 you'd have to read the complaint itself to ascertain if it
24 was using the terms that you used.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

57 (225 to 228)

225

1    Q.  Is there a particular code complaint category
2 number that was used in the '89 to '96 time frame for
3 allegations of evidence being withheld from a prosecutor
4 or a criminal defendant?
5    MR. YAMIN:  Objection, form.
6    THE WITNESS:  Well, again, using the specific term
7 you used, there is no -- they don't appear in Exhibit 7.
8    MS. DONNELL:  Okay or 8, right?
9    THE WITNESS:  Or 8.
10 BY MS. DONNELL:
11   Q.  And is there a complaint category code that
12 specifically identifies improper photographic
13 identification procedures?
14   MS. ROSEN:  Using those terms?
15   MS. DONNELL:  Or something analogous.
16   MR. YAMIN:  Objection, form.
17   THE WITNESS:  Well, something analogous, again, if
18 it's -- those terms do not appear in Exhibit 8 or 7.
19 BY MS. DONNELL:
20   Q.  And there is not a complaint category for a
21 suggestive identification procedure, correct?
22   MR. YAMIN:  Objection, form.
23   THE WITNESS:  There is a, like I said, category code
24 for every complaint.  But, um, the specific terms you used

226

1 do not appear in Exhibit 7 or 8.
2    MS. DONNELL:  Okay.
3 BY MS. DONNELL:
4    Q.  And how about for fabricated physical evidence,
5 is there any complaint category code, number code for that
6 allegation?
7    MR. YAMIN:  Objection, form.
8    THE WITNESS:  There is a code that would be used, but
9 it doesn't use the exact terms that you have used in 7 or
10 8.
11 BY MS. DONNELL:
12   Q.  What code would be used for an allegation of
13 evidence that was withheld from the prosecutor or criminal
14 defendant?
15   **A.  Well --**
16   **Again, it depends upon the circumstances of**
17 **the investigation of whether or not it was in tandem with**
18 **another allegation.**
19   Q.  And is it fair to say that if there is an
20 allegation of both excessive force and a coerced
21 confession, that the CR code would get the code
22 for -- under Group 5, correct?
23   **A.  I think that would be a fair characterization.**
24   MS. DONNELL:  Okay.

227

1 BY MS. DONNELL:
2    Q.  So during the '89 to '96 time frame, was there a
3 means by which the OPS or IAD could track allegations of
4 coerced witness' statements other than reading the
5 narrative or summary of the CR file?
6    MR. YAMIN:  Objection, form.
7    MS. ROSEN:  Objection to form.
8    THE WITNESS:  Um, other than reading the file itself,
9 um, I don't recall if there was any other -- during that
10 time frame, another way of assessing it.
11 BY MS. DONNELL:
12   Q.  And for an allegation of a coerced confession,
13 is the same true -- other than reviewing the narrative or
14 summary of the actual CR file, was there a way during this
15 time period for IAD or OPS to track allegations of coerced
16 confessions?
17   **A.  Um, other than a review -- a paper review, I**
18 **don't recall any other way to do that.**
19   MS. DONNELL:  Okay.
20 BY MS. DONNELL:
21   Q.  And would the same be true for a fabricated
22 witness state?
23   **A.  Other than a paper review, I don't know of any**
24 **other way they can do that.**

228

1    Q.  Would your answer be the same for allegations of
2 evidence that was withheld from the prosecutor or a
3 criminal defendant?
4       You would have to conduct a paper review of
5 the actual CR file to look at the narrative or summary to
6 see whether the allegations included failure to disclose
7 exculpatory information to the prosecutor or criminal
8 defendant?
9    **A.  I mean, other than like you said the -- I mean,**
10 **the paper file and -- I mean -- and that could very well**
11 **include the card catalog, but that's still paper.  So it**
12 **wasn't just the card catalogs or CR files or paper back**
13 **then.**
14   Q.  And is the same true for improper photographic
15 identification procedure, that other than reviewing the
16 paper file there would be a way to track those kinds of
17 allegations and misconduct during the relevant time
18 period?
19   **A.  I believe that's so.**
20   MS. DONNELL:  Okay.
21 BY MS. DONNELL:
22   Q.  Do you know if during this time frame OPS did
23 track the number of Group 5 allegations it got for
24 excessive force?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

58 (229 to 232)

229

1    MR. YAMIN: Objection, form.
2    THE WITNESS: I don't know.
3    MS. DONNELL: Okay.
4  BY MS. DONNELL:
5    Q. During this time frame, '89 to '96, was there
6  any policies or practices in place with regard to the Cook
7  County State's Attorney's Office notifying the Department
8  if there was a statement that had been suppressed by a
9  Court?
10    **A. I am not familiar with the State's Attorney's**
11  **policy.**
12    Q. Is there any policy you are aware of with
13  respect to the Department, which the Department would
14  receive notification if a statement had been found to be
15  suppressed by being involuntary, would the IAD or OPS be
16  notified of that?
17    **A. If someone gave that information rather than**
18  **notify the Police Department, it would be looked at to see**
19  **if there is an allegation of misconduct contained in**
20  **there, and if it was, the rules and regulations directors**
21  **would require that a CR be initiated unless there already**
22  **was one.**
23    Q. And you are saying if the CPD was notified, was
24  there any formal mechanism or informal mechanism by which

230

1  the Cook County State's Attorney's Office was informing
2  CPD of when statements were being found to be suppressed?
3    **A. I'm not aware that the State's Attorney's Office**
4  **had a policy of notifying the Police Department.**
5    MS. DONNELL: Okay.
6  BY MS. DONNELL:
7    Q. How about if a Court determined that there was a
8  suggestive -- unduly suggestive identification procedure,
9  are you aware of any formal or informal mechanism that was
10  in place between '89 and '96 that would inform OPS or IAD
11  of an identification procedure being found unduly
12  suggestive?
13    MR. YAMIN: Objection, form.
14    THE WITNESS: Could you repeat it again?
15    MS. DONNELL: Yeah, sure.
16  BY MS. DONNELL:
17    Q. Do you know if there was any mechanism in place,
18  communication, policy or procedure that the Department had
19  that required or sought the Cook County State's Attorney's
20  Office to inform the Department if any of its
21  identifications were found unduly suggestive and therefore
22  suppressed by a Court?
23    MR. YAMIN: Objection, form.
24    THE WITNESS: Well, there was --

231

1    And, again, it depends on the facts of the
2  case. But there was a mention in the manual about
3  confirming with the State's Attorney's office. Again --
4  BY MS. DONNELL:
5    Q. You're looking at Exhibit 9?
6    **A. Yes, it's in Exhibit 9. I think I saw --**
7    Q. What section of Exhibit 9?
8    **A. Let me take a look here. I did see something**
9  **regarding the State's Attorney's office.**
10    **Okay, criminal allegation, Bates stamp**
11  **31140.**
12    MS. DONNELL: Okay, let me just get there with you.
13  BY MS. DONNELL:
14    Q. So at 31140 you are referring to Exhibit 9 of
15  the OPS Operational Procedure Manual, and this is under
16  Section 4, Criminal Allegations.
17    **A. Yes.**
18    Q. Okay, so --
19    **A. It makes mention of Section 4b, um, that "the**
20  **investigator will take statements from complainants,**
21  **victims, and witnesses. And during a preliminary**
22  **investigation if an Assistant State's Attorney is present,**
23  **the investigator will not take a stand of the**
24  **complainants, victims or witnesses until he or she has**

232

1  **consulted with the ASA."**
2    **"If the allegations are such that the**
3  **matters possibly will be referred to the State's**
4  **Attorney's office, the investigator will identify and**
5  **obtain information relative to the identification, home**
6  **and business address, and telephone numbers of all**
7  **complainants, victims, and witnesses, but will delay**
8  **taking statements until advised by the ASA."**
9    Q. So is it your understanding that this part of
10  the manual is referring to when statements have been found
11  to be suppressed in a Court of law?
12    **A. No, I'm saying it's a possibility if there were**
13  **criminal allegations attached to what you were talking**
14  **about, it might trigger, again, this consultation with the**
15  **State's Attorneys.**
16    MS. DONNELL: I see.
17  BY MS. DONNELL:
18    Q. So you are saying if the accused officers'
19  misconduct had criminal allegations --
20    **A. Yes.**
21    Q. -- along with what ultimately ended up being a
22  suppressed identification --
23    **A. Yes.**
24    Q. -- that it might --

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

59 (233 to 236)

233

1    A.  It might.
2    Q.  -- have interaction with the State' Attorney's
3  Office, right?
4    A.  Yes.
5    Q.  But, in general -- Strike that.  Is it your
6  testimony --
7        You are not aware of any policies or
8  practices that weren't in place in '89 to '96, by which
9  the CPD was being informed of when a statement
10 was -- when a statement or identification was being
11 suppressed in the criminal courts, right?
12   MS. ROSEN:  Objection, form.
13   MR. YAMIN:  Form, and asked and answered.
14   THE WITNESS:  No, I'm not aware of the State's
15 Attorney's policies.
16 BY MS. DONNELL:
17   Q.  And you're not aware of any Chicago Police
18 Department OPS or IAD policies that set up those lines of
19 communication whereby CPD was being informed when a
20 statement was being suppressed or an identification was
21 being suppressed?
22   MS. ROSEN:  Objection to form.
23   THE WITNESS:  CPD always had connections, um,
24 relationship with the State's Attorney's Office on various

234

1  matters.  This is one of them, but also --
2  BY MS. DONNELL:
3    Q.  When you're saying "this," you are referring
4  Exhibit 9 about the criminal allegations?
5    A.  Right, in addition felony review we are charging
6  the, um, again --
7        So there is always a communication, but our
8  directives would require that if the State's Attorney's
9  Office gave us information, um, that results of the
10 suppression hearing that suggested, again -- or gave --
11 alleged that the officer, um, was guilty of misconduct,
12 then our directives -- our directives and our rules and
13 regulations would require CR investigation.
14   Q.  And my question is:  You know how in the example
15 of when there is a civil lawsuit --
16   A.  Yes.
17   Q.  -- that the legal department would get notice of
18 the civil lawsuit, and they would first check and see if
19 there was already a CR file for that kind of misconduct,
20 and if not the civil lawsuit would itself generate a CR,
21 right?
22   A.  Yes.
23   Q.  There was no such similar analogous requirement
24 when there was a suppression hearing that suppressed a

235

1  statement or suppressed an identification?
2    MS. ROSEN:  Objection to the form.
3    MR. YAMIN:  Objection to form.
4    THE WITNESS:  I would say, again, if that information
5  came to any member of the Police Department, and it
6  alleged misconduct, that same process would be filed.  In
7  other words, to check and see, again, is this already
8  under investigation or does a new investigation need to be
9  initiated.
10 BY MS. DONNELL:
11   Q.  But just to be clear, there is no formal policy
12 that that requirement says that it came to the attention
13 of a Department member.  It wasn't --
14       There wasn't a requirement set up that any
15 time there was a suppression hearing that resulted in a
16 statement being suppressed or an identification being
17 suppressed, that that in and of itself would generate a
18 CR, if there wasn't one already?
19   MS. ROSEN:  Objection to --
20   MR. YAMIN:  Objection to the form.
21   MS. ROSEN:  -- the form.
22       How could CPD force a policy on the Cook
23 County's State's Attorney's Office?
24   MS. DONNELL:  Well --

236

1    THE WITNESS:  Well, that's what I had said before.
2  Well, at least that's the --
3    MS. DONNELL:  Yes, I understand.  I didn't want
4  Ms. Rosen testifying for you, but --
5    THE WITNESS:  But I mentioned that before, that's the
6  State's Attorney's policy, I --
7    MS. ROSEN:  You're fine.  I am not testifying.
8    MS. DONNELL:  Yes, I asked them the CPD --
9        I've been asking about the CPD policies.
10   THE WITNESS:  Yep.
11       CPD's policy is to investigate all
12 allegations of misconduct.  So, whether it was the State's
13 Attorney's Office or any other person that brought to the
14 Police Department's attention information of a suppression
15 hearing that involved an allegation of misconduct, our
16 formal directives and formal rules and regulations require
17 that a CR investigation commence unless already was
18 one related to the matter.
19   MS. DONNELL:  Okay.
20 BY MS. DONNELL:
21   Q.  Were there any reporting --
22       Maybe I already asked this:  Were there any
23 reporting mechanism set up between OPS or IAD in the U.S.
24 Attorney's Office during this time period if an officer is

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

60 (237 to 240)

237

1 being investigated by the U.S. Attorney's Office?
2     MR. YAMIN: Objection to form.
3     THE WITNESS: There is, again, a formal directive,
4 um -- it's, again, in the complaint and disciplinary
5 procedures that requires officers to notify the Department
6 if they are under investigation by any other law
7 enforcement agency.
8     In addition, the Internal Affairs Division
9 conducted -- its confidential section conducted
10 investigations with the FBI and the U.S. -- and, you know,
11 the U.S. Attorney's office. So, they already had those
12 connections.
13     But, again, I don't have -- the policy of
14 the U.S. Attorney's office, um, it's not a policy of the
15 Chicago Police Department.
16     MS. DONNELL: Okay.
17     I'm going to talk about sustained rates for
18 complaint register investigations during the relevant time
19 period, okay.
20 BY MS. DONNELL:
21     Q. Do you have any knowledge of the rate at which
22 CR files resulted in a sustained finding by OPS during '89
23 to '96?
24     MR. YAMIN: Objection, foundation, and outside of the

238

1 scope of the Notice.
2     MS. DONNELL: Again, I ask --
3     The question is a foundational question,
4 I'm asking if she has any knowledge. So I'm not sure what
5 the foundation objection is.
6     MR. YAMIN: I know you have this --
7     I think we just have some very basic
8 differences of opinion as to what --
9     MS. DONNELL: Foundation objections are.
10     MR. YAMIN: Yes.
11 BY MS. DONNELL:
12     Q. Do you --
13     Ms. Skahill, do you have any knowledge of
14 the sustained rates that the Office of Professional
15 Standards had during the '89 to '96 --
16     A. Could you define "sustained rates"?
17     Q. CR investigations where a finding of sustain was
18 recommended by OPS.
19     A. So if that's just the raw number, I mentioned
20 earlier those numbers are included in the annual reports.
21     Q. So other than what's in the annual report, you
22 don't have any knowledge?
23     A. Other than that, no knowledge.
24     Q. And how about for IAD?

239

1     A. Um, the same.
2     MS. DONNELL: Okay, just give me a second. Yes, I'm
3 going to switch gears now, so please give me a second.
4     (WHEREUPON, Exhibit No. 10 was
5     marked for identification.)
6 BY MS. DONNELL:
7     Q. Ms. Skahill, I'm handing you what I've
8 identified as Exhibit 10 to your deposition --
9     A. Okay.
10     Q. -- do you recognize Exhibit 10 --
11     Do you recognize Exhibit 10, and I will
12 show you -- for the record, I am identifying as -- this
13 was produced in this litigation by the City as 310 --
14     MR. YAMIN: I can look with the witness.
15     MS. ROSEN: What is it?
16     MS. DONNELL: It's the Internal Affairs Division
17 Standard Operating Procedure. The Bates stamp is 31070
18 consecutive through 31127.
19     I can have you take a break off the record
20 if you need it.
21     THE WITNESS: If I can take a look --
22     MS. DONNELL: Sure.
23     THE WITNESS: -- a quick look at it.
24     MS. DONNELL: Sure you can.

240

1     (WHEREUPON, the witness is
2     reviewing the document.)
3     THE WITNESS: Okay.
4 BY MS. DONNELL:
5     Q. Have you had an opportunity now to look at
6 Exhibit 10, the Standard Operating Procedures for the
7 Internal Affairs Division?
8     A. Yes.
9     Q. And is this the document you reviewed in
10 preparation for your deposition today?
11     A. Yes.
12     Q. And this said it was issued the 23rd of May
13 1997, right?
14     A. Yes.
15     Q. Did you review the Standard Operating Procedures
16 for the one before this?
17     A. I think -- I mean, I don't think -- no, just
18 '97.
19     Q. Is that the only one you are aware of?
20     A. Yeah.
21     Q. Is that a, "yes"?
22     A. Yes, I am sorry.
23     Q. And so -- I want to call your attention
24 to -- well --

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

241

1  And in your preparation for your
2  deposition, did you become aware of any other Standard
3  Operating Procedures prior to the one in Exhibit 10?
4      A.  No.
5      MS. DONNELL:  Okay.
6  BY MS. DONNELL:
7      Q.  Do you know if this is the first one that came
8  into existence?
9      A.  I don't know.
10     MR. YAMIN:  Objection, calls for speculation.
11 BY MS. DONNELL:
12     Q.  So if you would turn to Page 17 of Exhibit 10,
13 which is Bates stamped 31093, that section is called:
14 "State's Attorney Special Prosecutions Bureau --
15     A.  Yes.
16     Q.  -- Felony Review"?
17     A.  Yes.
18     Q.  And so you're familiar that the Internal Affairs
19 Division could refer certain allegations for an
20 investigative file to the State's Attorneys for their
21 review as well?
22     A.  Yes.
23     Q.  And that was from the section commanding
24 officers part of the Internal Affairs Division?

242

1      A.  The section commanding officer, yes.
2      Q.  And do you know what, during this period, '89 to
3  '96, what types of allegations were referred to in the
4  State's Attorney's Office for the special prosecution
5  bureau?
6      A.  Well, it would have to be criminal allegations.
7  But other than that, I -- without more information, I
8  couldn't say.
9      Q.  Do you have any knowledge as to how many CR
10 allegations were referred to the State's Attorney's office
11 during the '89 and '96 time frame?
12     A.  No, I don't.
13     Q.  Do you know or have any knowledge of whether the
14 Internal Affairs Division kept record of the CR files that
15 they referred to the Cook County State's Attorney's office
16 during the '89 to '96 time period?
17     A.  No, I don't know if they did.  If this was
18 included in the file, it would be a paper record that you
19 would have to review to find that information.
20     Q.  And by that you mean each CR file would have to
21 be reviewed to determine if there was ever a referral to
22 the Cook County State's Attorney special prosecutions
23 bureau, there wouldn't be a separate list?
24     A.  Not to my knowledge, but I don't know.

243

1      Q.  Earlier in your deposition you mentioned the
2  advocate section of the Internal Affairs Division; do you
3  remember that?
4      A.  Yes.
5      Q.  And that's referred to on Page 1 of the SOP
6  manual for the Internal Affairs Division, right?
7      A.  Yes.
8      Q.  And during the '89 to '96 time frame, what was
9  the role of the advocate section of the Internal Affairs
10 Division?
11     A.  Well, according to the SOP, Exhibit 10, it says:
12 "The function of the Department of Advocate section is to
13 ensure that the quality of internal investigations are at
14 the highest level.  The Department of Advocate section
15 ensures consistency, and the application of rule
16 violations and recommended disciplinary penalties on a
17 Department-wide basis, and is responsible for the review
18 and preparation of appropriate cases for presentation to
19 the police board as well as cases for complaint review
20 panel hearings."
21         "The Department of Advocate section is
22 responsible for representing the Department as an expert
23 witness, and arbitration hearings, grievance hearings,
24 Equal Employment Opportunity Commission hearings, and

244

1  other outside hearings as directed by the assistant deputy
2  superintendent Internal Affairs Division."
3         "The Department of Advocate is responsible
4  for establishing, monitoring, and enforcing the rules and
5  regulations with regard to the disciplinary process, and
6  sharing that information with other Department units."
7         "The Department of Advocate also acts as
8  liaison with the Department of Law, the Office of
9  Legal Affairs, and the Management of Labor Affairs
10 section."
11     Q.  So, Ms. Skahill, you just read the Advocate
12 section of the Standard Operating Procedures of the
13 Internal Affairs Division manual, right?
14     A.  Yes.
15     Q.  So apart from reading that manual, can you tell
16 me during the '89 to '96 time period how the Department
17 Advocate section ensured the quality of internal
18 investigations were at the highest level?
19     A.  Yes, when investigations were completed either
20 in Internal Affairs or from the districts among completion
21 by the investigators with the recommended finding, would
22 go to the advocate section for review before being sent
23 out to command channel review.
24     Q.  And for what process or criteria does the

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

62 (245 to 248)

245

1 advocate section use to review the IAD investigations or
2 district unit investigations to ensure they were of the
3 highest quality?
4     A.  The standards of the SOP, um, in addition to our
5 directives.  But they could also, um, have knowledge of
6 arbitration, you know, um, decisions, um, that could
7 impact the investigations as well.
8     Q.  Do you know of any --
9         Do you know how many individuals were part
10 of the advocate section during the '89 to '96 time period?
11    A.  I do not.
12    Q.  Do you know how many reviews were found to not
13 be of the highest quality -- how many -- I'm sorry, strike
14 that.  Do you know --
15        During the '89 to '96 time period -- do you
16 have any knowledge of IAD or Department district unit
17 investigations that were found to not comply with the
18 highest quality of investigation by the advocate section
19 of IAD?
20    A.  Well, if they found issues with the
21 investigation it would go back to the investigators.
22    Q.  Do you have any knowledge of any investigations
23 of the avocation (phonetic) section sent back to the
24 investigators during the '89 to '96 time period?

246

1     A.  I do not.
2     Q.  Do you know if IAD advocate section kept any
3 documents or reports of their review and the
4 investigations that they sent back for additional work?
5     A.  That would be included in the CR file.
6     Q.  Other than a review of the CR file, were there
7 any separate reports of the advocate section account
8 (phonetic)?
9     A.  I don't know.
10    Q.  But if the advocate section upon their review
11 determined that more needed to be done, that would be
12 documented in the particular CR file?
13    A.  It should be documented, yes.
14    Q.  Was there any of your forms, particular forms
15 that the advocate section would fill out and include in
16 the CR file when it sent an investigation back for
17 additional review?
18    A.  Well, let me look through Exhibit 10 just to
19 make sure.
20            (WHEREUPON, the witness is
21            reviewing the document.)
22 BY MS. DONNELL:
23    Q.  Have you had an opportunity to review
24 Exhibit 10?

247

1     A.  Yes, I don't see it -- if there is anything.
2         The only other place I could look would
3 be -- just to make sure would be 93-3.
4     MS. DONNELL:  Okay.  If you want to look at 93-3,
5 you're welcome to do so.
6     THE WITNESS:  Okay.
7     MS. DONNELL:  For your reference 93-3 is Exhibit 3.
8     THE WITNESS:  Exhibit 3?
9     MS. DONNELL:  Yeah.
10    THE WITNESS:  No, I don't see it in 93-3 either.
11        So to the best of my knowledge, I don't
12 think so.
13 BY MS. DONNELL:
14    Q.  So just to be clear:  To the best of your
15 knowledge you don't think there is a particular form that
16 the advocate section at the Internal Affairs Division
17 would fill out to put in the CR file when they wanted
18 additional information or an additional investigation
19 conducted?
20    A.  It doesn't mean that there isn't one.  It's just
21 that looking at the exhibits here for that time frame I
22 don't see it.
23    MS. DONNELL:  Okay.
24 BY MS. DONNELL:

248

1     Q.  Do you have knowledge of any audits that were
2 conducted of the Office of Professional Standards during
3 the '89 to '96 time frame?
4     MR. YAMIN:  Objection, outside of the scope of the
5 Notice, and form.
6 BY MS. DONNELL:
7     Q.  Do you have any knowledge of any audits of the
8 Office of Professional Standards that were conducted
9 between '89 and '96?
10    A.  By whom?
11    Q.  By anybody, by either an internal or an external
12 audit.
13    A.  I don't have any knowledge of that, no.
14    Q.  How about for the Internal Affairs Division, do
15 you have any knowledge of any external or internal audit
16 that was conducted at the Internal Affairs Division during
17 '89 to '96?
18    MR. YAMIN:  Same objections.
19    THE WITNESS:  I don't have any information on that.
20 BY MS. DONNELL:
21    Q.  And in preparing for your deposition, you did
22 not review any documentation of any audit of OPS or IAD?
23    A.  No.
24    Q.  Is it accurate to say that under the General

249

1  Order 93-3, if at any point an investigator had a CR
2  determined that their claim was unfounded or the member
3  was exonerated, that the investigation should terminate?
4      MS. ROSEN: Objection to the form.
5      MS. DONNELL: I will refer you to Addendum 3 to 93-3,
6  Section 2 --
7      THE WITNESS: Do you have a Bates stamp?
8      MS. DONNELL: Yes, 30651, Item 10.
9      THE WITNESS: Um, yes, according to Bates stamp 30651
10 in Exhibit 3, and Conduct of the Investigation, Section 2.
11 C. 10. says: "To terminate the investigation when it is
12 determined at any time that the Complaint is unfounded or
13 the member clearly exonerated."
14      "Reports and statements containing
15 information justify the unfounding or exoneration of the
16 accused will be forwarded in accordance with the
17 provisions of Addendum 4 of this order."
18      MS. DONNELL: Okay.
19 BY MS. DONNELL:
20     Q.   And for the command channel review, was it
21 all -- discipline could be subject to the command channel
22 review or just certain types of discipline, those that
23 exceeded five days of suspension over all forms of
24 discipline subject to command channel review?

250

1      A.   I can look at --
2      MR. YAMIN: Objection to the form.
3      MS. DONNELL: I'm referring to Addendum No. 4 to
4  93-3, that's CITY 30657, called: "Reporting and review
5  procedures", Unit 2A.
6      THE WITNESS: You're asking about command channel
7  review, though, right?
8      MS. DONNELL: Yes.
9      THE WITNESS: Because that's a different.
10     MS. DONNELL: This is command review.
11     THE WITNESS: It says under "2A", um, so "this
12 Addendum 4 is" --
13     THE COURT REPORTER: I'm sorry, can you slow down?
14     THE WITNESS: Oh, I'm sorry.  "This addendum sets
15 forth reporting procedures and provides for command review
16 of recommended disciplinary action." So it's a few Xs
17 (phonetic), um, "in cases wherein the recommendation
18 exceeds five days' suspension, a final report of a
19 complaint register investigation utilizing the summary
20 report as the first page, the following instructions shown
21 on both sides of the form to be submitted regardless of
22 the status of court action related to the accused member
23 ".
24      This is discussing the type of -- the type

251

1  of summary report.
2  BY MS. DONNELL:
3      Q.   Oh, okay, it's not for command review?
4      A.   Well, it's telling them which kind of, um,
5  report to use.
6      Q.   So it's all forms of penalties could be reviewed
7  by the command channel review?
8      A.   Yes.
9      MS. DONNELL: Okay.
10 BY MS. DONNELL:
11     Q.   And then for the --
12      So even reprimands would go through that
13 process?
14     A.   Unless there was a --
15      Unless it was a summary punishment
16 reprimand.
17     Q.   And then we were talking earlier about the
18 Complaint Review Panel, right?
19     A.   Yes.
20     Q.   And I was going to call your attention to CITY
21 30660, which is a portion of Addendum 4 as well,
22 Section I.
23     A.   Yes.
24     Q.   And that indicates under Section I 1A that:

252

1  "When an accused member requests a hearing relative to a
2  suspension of 30 days or any lessor degree" --
3      A.   Yes.
4      Q.   -- does that refresh your recollection of the
5  scope of a jurisdiction for review of the Complaint Review
6  Panel?
7      A.   For 93-3, and I'm assuming, um, just --
8      Q.   There is no --
9      A.   -- no line, that is the same for the previous
10 one.
11     MS. DONNELL: Yeah.
12 BY MS. DONNELL:
13     Q.   Does that refresh your recollection as to the
14 scope of review -- sorry, the Complaint Review Panel?
15     A.   Yes.
16     Q.   That it was suspensions of 30 days or less --
17     A.   30 days or less, yeah.
18     MS. DONNELL: Okay.
19     THE WITNESS: The only thing -- sometimes I just want
20 to make sure -- sometimes the contract provision --
21      I would need to really review also a
22 contract provision on it, just to really make sure because
23 sometimes that provision or it could be a letter or a
24 memorandum that would change --

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

64 (253 to 256)

253

1     MS. DONNELL:  And you're referring --
2     THE WITNESS:  -- things.
3     MS. DONNELL:  I'm sorry.
4  BY MS. DONNELL:
5     Q.  You're referring to the Fraternal Order of
6  Police contract?
7     A.  Yes.
8     MS. DONNELL:  Okay.
9  BY MS. DONNELL:
10    Q.  Earlier you testified that in 1991 is when the
11 Department stopped destroying CR files; is that right?
12    A.  I believe so, yes.
13    Q.  And I was just going to call your attention to
14 Addendum 6, 93-3 to Bates CITY 30699.
15    A.  Okay.
16    Q.  And in section R1.
17    A.  Okay.
18    Q.  And this was issued --
19         And if you see section R1 it states that:
20 "That disciplinary investigation files other than police
21 board cases will be destroyed by the Internal Affairs
22 Division five years after the date of the incident or the
23 date upon which the violation is discovered, whichever
24 ever is longer"; do you see that?

254

1     A.  I do.
2     Q.  And that was this -- the effective date of
3  Addendums 15 or (inaudible) 1993?
4     A.  Yeah.
5     Q.  Do you have a reason to explain that difference
6  in the date and why?
7     A.  I think this is taking the language, you know,
8  right out of the contract.  But I think in practice, they
9  still weren't --
10    Q.  Destroying.
11    A.  -- destroying, yes, I believe so.
12    MS. DONNELL:  All right.  Great.  Okay.
13         (WHEREUPON, Exhibit No. 11 was
14         marked for identification.)
15    MS. DONNELL:  I have one more exhibit, this is
16 Exhibit -- well, for now, one more exhibit.
17         I am going to hand you Exhibit 11, which
18 has been Bates stamped by the City in this litigation,
19 CITY 31275 consecutive through 31282.
20 BY MS. DONNELL:
21    Q.  Are you familiar with the City of Chicago Police
22 Board -- police complaint guide to Chicago Police
23 Department disciplinary process in the world of the
24 Chicago Police Board (phonetic)?

255

1     A.  If I could just review for one second.
2     MS. DONNELL:  Sure.
3         Well, we may go off the record if you are
4  going to review it; do you need time to review it?
5     THE WITNESS:  Just to skim it.
6     MS. DONNELL:  Okay.
7         (WHEREUPON, the witness is
8         reviewing the document.)
9     THE WITNESS:  Okay.
10 BY MS. DONNELL:
11    Q.  Did you review Exhibit 11 to prepare for your
12 deposition today?
13    A.  Um, I just now reviewed it.
14    Q.  But did you review it any time before your
15 deposition -- to prepare for your deposition; do you
16 remember reviewing this document?
17    A.  I don't recall reviewing it.
18    MS. DONNELL:  Okay.
19 BY MS. DONNELL:
20    Q.  So you're not familiar with it then?
21    MR. YAMIN:  Objection, form.
22    THE WITNESS:  I'm familiar with it.
23 BY MS. DONNELL:
24    Q.  Just from right now?

256

1     A.  Just from here.
2     Q.  And what --
3         Do you have an understanding of what
4  Exhibit 11 is?
5     A.  Um, that this was, um, given by the police board
6  to explain the disciplinary process.
7     Q.  To Department members?
8     A.  No, to the public.
9     MS. DONNELL:  To the public.
10 BY MS. DONNELL:
11    Q.  And then this explains the -- what kind of cases
12 would be heard by the police board, right?
13    A.  Yes.
14    Q.  And that was for those that involved five days
15 or more suspension, right?
16    A.  So it does mention, um -- on Bates, um --
17    MS. DONNELL:  Use the bottom number.
18    THE WITNESS:  The bottom one, 31279, and it talks
19 about, um, suspensions of five days or less, that the
20 police board is not involved in any way, and that
21 suspensions are 6 through 30 days with, um -- what the
22 options are.
23 BY MS. DONNELL:
24    Q.  And then if suspensions are 6 to 30 days, the

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

65 (257 to 260)

257

1 officer can file a grievance to be heard, right, the
2 police board?
3     A.  And then it goes on, Bates 31280, and discusses
4 discharges, and suspensions of more than 30 days.
5     Q.  What does it state with regard to those
6 discharges or suspensions more than 30 days?
7     A.  It mentions, um, that the superintendent, um,
8 goes through the Corporation Counsel's Office to prepare
9 formal charges before the Board; charges are filed; then
10 once charges are filed, the accused is then suspended
11 without pay; it continues -- that suspension continues
12 until there is a hearing by, um -- and the Board issues
13 its decision.
14         It goes into more detail about the hearing
15 process, um --
16     Q.  And that requires that any discharges or
17 suspensions more than 30 days have to go through the
18 police board review, right?
19     A.  Yes.
20     MS. DONNELL:  Okay, I'm going to shift gears now, and
21 go back to the other section of your 30(b)(6) Notice, and
22 this was with regard to actual alleged wrongful acts or
23 misconduct by certain named officers:  Kenneth Boudreau,
24 John Halloran, James O'Brien --

258

1     MR. YAMIN:  So, where are we --
2         Where are you reading at?
3     MS. DONNELL:  I am doing Topic 3a, okay.
4     THE WITNESS:  Yes.
5     MS. DONNELL:  Okay, so we are going to shift gears to
6 that topic.
7 BY MS. DONNELL:
8     Q.  And so I believe you already testified that in
9 preparation for Topic 3a you looked at listings of CRs for
10 these five officers from the mainframe, right?
11     A.  It stated on the document that it says
12 "mainframe," and that it had a disclaimer at the bottom.
13     Q.  And then you also looked at disciplinary history
14 from another -- not just the mainframe; is that right?
15     A.  No, the Summary Digest.
16     MS. DONNELL:  The Summary Digest, okay.
17         So let's -- I want to mark this as
18 Exhibit 12.
19             (WHEREUPON, Exhibit No. 12 was
20             marked for identification.)
21 BY MS. DONNELL:
22     Q.  What are you referring to when you say
23 "Summary Digest"?
24     A.  Well, it's --

259

1         Again, it's included in the directive that
2 talks about, um, basically, it's, um, a report of, um, the
3 steps taken in the investigation, and the allegation, the
4 recommended findings, and recommended penalty.
5     MS. DONNELL:  Okay.
6 BY MS. DONNELL:
7     Q.  So you looked at a number of CRs -- the summary
8 judge (phonetic) asked for a number of CRs for each of
9 these officers, right?
10     A.  Yes.
11     MS. DONNELL:  Let's start with Exhibit 12.
12         So I've designated this as Exhibit 12.  I'm
13 just going to move these for now.  Actually, can I have
14 that clip?
15     THE WITNESS:  Sure.
16     MS. DONNELL:  Here (indicating) is Exhibit 12, and
17 contained in Exhibit 12 is, I believe, some of the
18 mainframe listings that you have for the five officers,
19 okay.  If you flip the page of Exhibit 12, here on the
20 back.
21     THE WITNESS:  Okay.
22     MS. DONNELL:  Right?
23     THE WITNESS:  Yes.
24     MS. DONNELL:  So let's start with Kenneth Boudreau,

260

1 okay.  So in Exhibit 12, and at page -- Bates 21796.
2     MR. YAMIN:  One second, let me catch up.
3         What page?
4     MS. DONNELL:  21796.
5 BY MS. DONNELL:
6     Q.  Does that list the mainframe complaint register
7 history that you reviewed for Defendant Boudreau?
8     A.  Well, without comparing it to the one I
9 reviewed, I can't say for sure.  But it definitely looks
10 like it.
11     MS. DONNELL:  Okay.
12 BY MS. DONNELL:
13     Q.  And then if you turn to the next page, there is
14 a printout for Kenneth Boudreau that's from CRMS, that's
15 on Bates stamp 21797; do you see that?
16     A.  I do.
17     Q.  Did you review this printout from CRMS as well
18 to prepare for your deposition or no?
19     A.  Well, that's outside the time frame.
20     Q.  So you only looked at --
21         In terms of the mainframe complaint
22 history, you only looked at Page 21796 or something
23 equivalent to that?
24     A.  Yes.

261

1    MR. YAMIN: For Boudreau?
2    MS. DONNELL: For Boudreau, yes. We are just
3 focusing on Officer Boudreau now, okay.
4    THE WITNESS: Okay.
5 BY MS. DONNELL:
6    Q. And then you also reviewed the Summary Digest
7 for the CRs -- for certain CRs; is that right?
8    **A. Yes, right.**
9    MS. DONNELL: Okay.
10 BY MS. DONNELL:
11    Q. But you did not do any -- reviews of full CR
12 files; is that accurate?
13    **A. That's accurate.**
14    Q. And according to the mainframe complaint
15 register history, Detective Boudreau had nine CR files
16 that were found in the mainframe prior to the end of 1996
17 in terms of an incident date, right?
18    MR. YAMIN: Would you rephrase it or restate it?
19    MS. DONNELL: Sure.
20 BY MS. DONNELL:
21    Q. Looking at the printout from the
22 mainframe -- from the complaint register history of
23 Detective Boudreau from -- which is a printout from
24 January 1, 1967 to December 31, 1999, there were nine

262

1 complaint registers listed that were initiated prior to
2 the end of 1996, correct?
3    **A. So there are nine CRs listed, um, under the**
4 **column "Complaint" with dates from 1989 to 1994.**
5    MS. DONNELL: Okay.
6 BY MS. DONNELL:
7    Q. And then there is an additional five CRs listed
8 here through the end of 1999, correct?
9    **A. In that same column complaint, on Bates 021796,**
10 **there are five listed from 1998 to 1999.**
11    MS. DONNELL: Okay.
12 BY MS. DONNELL:
13    Q. Did you look at the Summary Digest for all of
14 the CRs that are listed here on Detective Boudreau's
15 mainframe complaint register history or just the ones
16 prior to the end of 1996?
17    **A. Um, I looked at Summary Digest within the time**
18 **frame of the Notice.**
19    Q. Right, so is that all of the ones that were
20 filed prior to -- or initiated prior to the end of 1996,
21 the first nine?
22    **A. I'd have to compare this document to the Summary**
23 **Digest to make sure those were the same.**
24    MS. DONNELL: Okay.

263

1 BY MS. DONNELL:
2    Q. Based on the document that I have in front of
3 you, CITY 21796, for all of the CRs that are listed here,
4 Detective Boudreau had one that was sustained, that was
5 closed on March 25, 1996, correct?
6    THE WITNESS: Could you repeat your question?
7    MS. DONNELL: Sure.
8 BY MS. DONNELL:
9    Q. So there was one CR that was sustained,
10 according to the documents -- the printout from the
11 mainframe complaint register history prior to the end of
12 1996, correct?
13    **A. That's correct.**
14    Q. And that's with the CR that has the finding
15 "SU," correct?
16    **A. That's correct.**
17    Q. And that was CR 193591, right?
18    **A. Wait a minute, 193591, yes.**
19    Q. And that has the initial code -- it was coded as
20 Code 5B, correct?
21    **A. That's correct.**
22    Q. And if you look at 5B, that's excessive force
23 allegation from arrestee after arrest prior to lockup,
24 correct?

264

1    **A. I'm looking at Exhibit 7, 5B, this is under:**
2 **"Group, excessive force, arrestee after arrest prior to**
3 **lockup."**
4    MS. DONNELL: Okay.
5 BY MS. DONNELL:
6    Q. And you would agree with me that any CR file
7 that existed that were destroyed prior to being entered in
8 the mainframe, would not be included on this list,
9 correct?
10    MR. YAMIN: Objection, foundation, calls for
11 speculation.
12    THE WITNESS: I don't know only because --
13    Again, I see the note on the bottom that
14 talks about limitations, um -- because of -- note:
15 "Because of the limitations of the code on classifications
16 used in the mainframe, the complaint classifications
17 stated do not necessarily represent the correct category
18 of the charges against the listed member. If any or that
19 of the listed member was even charged for conduct
20 constituting the stated classification on the mainframe,
21 and the classification may actually be referencing the
22 activities of individuals other than the listed member."
23 BY MS. DONNELL:
24    Q. Well, that doesn't --

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

67 (265 to 268)

265

1      A.  I couldn't say for certain if something would
2  not have been there.
3      MS. DONNELL:  Okay.
4  BY MS. DONNELL:
5      Q.  But you would agree with me that during this
6  time frame, the relevant time frame, CRs were being
7  destroyed after five years, right?
8      A.  There were --
9      MR. YAMIN:  Objection, that misstates the testimony
10 of --
11     MS. DONNELL:  I can restate it.
12 BY MS. DONNELL:
13     Q.  Prior to 1991, the Department was destroying CR
14 files after five years, right?
15     A.  That's correct.
16     Q.  And so not all CR files were entered into the
17 mainframe from '67 to '91 prior to their destruction,
18 correct?
19     MR. YAMIN:  Objection, calls for speculation,
20 foundation.
21     THE WITNESS:  Yeah, I don't -- I'm not --
22         I don't know about the procedure for
23 putting documents in the mainframe.
24     MS. DONNELL:  Okay.

266

1  BY MS. DONNELL:
2      Q.  So you have no knowledge whether there were
3  additional CR files for Officer Boudreau that were never
4  entered into the mainframe; there could have been, you
5  just don't know?
6      A.  I don't know.
7      MS. ROSEN:  Objection to form.
8      MS. DONNELL:  Okay.  I'm going to have you turn now
9  to Detective Halloran's mainframe printout.
10 BY MS. DONNELL:
11     Q.  So you also reviewed the mainframe printout for
12 Detective Halloran, right?
13     A.  Yes.
14     Q.  And I'm going to refer you to the second page,
15 Bates 21791, right?
16     A.  Right.
17     Q.  And you reviewed the mainframe printout for
18 disciplinary complaint register history for
19 Detective Halloran as well, right?
20     A.  Well, I --
21         As I stated before I don't know if it's a
22 printout from the mainframe.  I just know it was a
23 document that mentioned this information, and it
24 said -- the heading said "mainframe".

267

1      Q.  Did the document you looked at look similar to
2  what I'm showing you right now or did it look different
3  with more additional information?
4      A.  It looked similar, but I -- without comparing it
5  to, I couldn't say.
6      Q.  Can you say whether the one you looked at had
7  additional information other than CR number, the initial
8  code, the complaint category, the incident date, the
9  complaint date, the date it was closed, and the final
10 finding?
11     A.  I am pretty confident these were the same
12 fields.
13     Q.  And so for Detective Halloran, he had, at least
14 compared -- it was not found on the mainframe, he had
15 eight CR files prior to the end of 1996, right?
16     A.  So I'm looking at Exhibit 12, Bates 021791, and
17 there are eight CRs listed under the heading "Complaint"
18 from 1991 to 1994.
19     MS. DONNELL:  Okay.
20 BY MS. DONNELL:
21     Q.  And of those eight, the final findings were
22 either not sustained or unfounded, correct?
23     A.  That is correct.
24     Q.  In other words, there were no sustained findings

268

1  from Detective Halloran prior to 1996; is that right?
2      MR. YAMIN:  As listed on this?
3  BY MS. DONNELL:
4      Q.  As listed on the document, the mainframe, right?
5      A.  As listed on this document with the heading
6  "mainframe".
7      MS. DONNELL:  Okay.
8  BY MS. DONNELL:
9      Q.  And at least four of the eight CR allegations
10 that were listed on the mainframe complaint register
11 history were excessive force allegations, correct?
12     MR. YAMIN:  That misstates some of what that heading
13 says in the initial complaint category.
14 BY MS. DONNELL:
15     Q.  Pursuant to what's listed as the initial
16 complaint category as to the codes that were given to the
17 CRs, where they had an excessive for a Category 5, initial
18 complaint category, right?
19     A.  It's using Exhibit 7 and comparing that to
20 Exhibit 12, Bates 021791, and it lists four category codes
21 that begin with 05, which indicates Group 05, excessive
22 force, according to Exhibit 7.
23     Q.  And do you have any --
24         Do you have any knowledge of whether

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

68 (269 to 272)

269

1 Detective Halloran was triggered for the -- on the
2 Behavioral Alert Program, the Personnel Concerns Program
3 based on the number of CRs with excessive force
4 allegations that were filed against him in the relevant
5 time period?
6    MS. ROSEN: Objection, form.
7    MR. YAMIN: Objection to form.
8         Also it's misleading in light of the
9 disclaimer that Ms. Skahill has repeatedly brought to your
10 attention.
11 BY MS. DONNELL:
12    Q. Well, it's fair to say that any one of the aids
13 (phonetic) could also include excessive force allegations
14 that was just coded with a different code, right?
15         You can only get one code for a CR file
16 based on your testimony earlier today, right? Each CR got
17 one code.
18    MS. ROSEN: Objection to the form of that question,
19 because you had like four things going on in that
20 question.
21    MS. DONNELL: Sorry.
22 BY MS. DONNELL:
23    Q. Is it fair to say, Ms. Skahill, that the CR was
24 only given one code during this relevant time period,

270

1 right?
2    **A. I think that's fair to say.**
3    MS. DONNELL: Okay.
4 BY MS. DONNELL:
5    Q. And so there --
6         There could have been a number of
7 allegations in any CR file, but per the Department's
8 policies and procedures, only one code could be given as
9 an initial code, right?
10    **A. It's possible, but it's also possible this was**
11 **the only allegation as well.**
12    MS. DONNELL: Sure.
13 BY MS. DONNELL:
14    Q. And your earlier testimony is that according to
15 you, it was the OPS's policy and procedure to try and
16 select the most serious allegation for a coding, right?
17    **A. That's correct.**
18    Q. So as best as we can --
19         Based on your testimony, the best we can do
20 is assume that the most serious allegation was given the
21 initial code, right?
22    MS. ROSEN: Objection to the form, it calls for
23 speculation.
24    MR. YAMIN: Join.

271

1    MS. ROSEN: And it's not the (inaudible), it's a
2 faulty premise in the question.
3    THE WITNESS: I don't --
4         Without having a file to look at, I really
5 couldn't judge, you know, why they selected that code.
6    MS. DONNELL: Okay.
7 BY MS. DONNELL:
8    Q. But there could have been more serious
9 allegations once you looked at the file, but just didn't
10 get the initial code, right? I can strike that, that was
11 confusing.
12         We can assume that any number of CRs could
13 have one allegation of misconduct or multiple allegations
14 of misconduct, right?
15    **A. One or many -- must have at least one.**
16    Q. And could have multiple?
17    **A. Yes.**
18    MS. DONNELL: Okay.
19 BY MS. DONNELL:
20    Q. And based on the limitations of what you have in
21 front of you here, is it fair to assume that with respect
22 to Detective Halloran that at least four of his eight CRs
23 that were documented in the mainframe complaint register
24 history had received codes that were under Category 5, in

272

1 at least one of the allegations contained in the CR files?
2    **A. At least one of the allegations of the four was**
3 **excessive force.**
4    MS. DONNELL: Okay.
5 BY MS. DONNELL:
6    Q. Do you have any knowledge of whether
7 Detective Halloran was identified for the Behavioral Alert
8 System some time prior to the end of 1996?
9    MS. ROSEN: Objection to form, calls for speculation.
10    MR. YAMIN: Join to both of those.
11    MS. DONNELL: You can answer.
12    THE WITNESS: I don't know.
13 BY MS. DONNELL:
14    Q. And did you take any steps to investigate
15 whether he was, in preparation for this deposition?
16    MS. ROSEN: Objection to the form of the question.
17    MR. YAMIN: Join.
18    THE WITNESS: No, because in the Notice, again, it
19 didn't ask me about the behavioral intervention system
20 pertaining to the officers.
21    MS. DONNELL: Okay.
22 BY MS. DONNELL:
23    Q. Do you have any information whether
24 Kenneth Boudreau was identified for the Behavioral Alert

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

69 (273 to 276)

273

1  System as part of the Chicago Police Department's
2  disciplinary procedures prior to the end of 1996?
3      MR. YAMIN: Objection, outside of the scope of the
4  Notice, it calls for speculation.
5      THE WITNESS: I don't have any knowledge, it wasn't
6  included in the Notice.
7  BY MS. DONNELL:
8      Q. Will that same answer be the same for
9  Detective O'Brien, and Bernard Ryan, and Robert Lenihan,
10  you have no knowledge of whether any of those officers
11  were identified by the Behavioral Alert System prior to
12  the end of 1996?
13      MR. YAMIN: Same objections.
14      THE WITNESS: I do not.
15  BY MS. DONNELL:
16      Q. How about for the Personnel Concerns Program, do
17  you have any knowledge whether any of these five officers
18  were identified for being part of the Personnel Concerns
19  Program?
20      A. I do not.
21      MR. YAMIN: Same objections.
22      MS. DONNELL: Okay.
23          I'm going to have you turn to
24  Detective James O'Brien's mainframe complaint register

274

1  history printout, and understanding it's subject to the
2  qualifications in the bottom note, and this is Page 21795.
3      THE WITNESS: Is this it?
4      MS. DONNELL: Yes, this might just take a minute.
5  BY MS. DONNELL:
6      Q. Would you agree with me that there were -- for
7  Detective O'Brien there were 17 CR files that were related
8  to incidents prior to the end of 1996?
9      MR. YAMIN: You may want to recount those or you can
10  just have her not agree.
11  BY MS. DONNELL:
12      Q. Well, there is 17 for incidents prior to the end
13  of 1996, and there were 16 that were reported prior to the
14  end of 1996, right?
15      A. I counted 16 on Bates 021795 between 1989 and
16  1995.
17      MS. DONNELL: Okay.
18  BY MS. DONNELL:
19      Q. And of those how many were sustained?
20      A. Using Bates 021795, I see two.
21      MS. DONNELL: Okay.
22  BY MS. DONNELL:
23      Q. And one of those was coded --
24          At least one of the codes, initial code in

275

1  which she received was 5B for an arrestee -- for excessive
2  force of arrestee after arrest and prior to lockup,
3  correct?
4      A. At least one has a code of 5B, which is using
5  Exhibit 7 under the group "excessive force," and then we
6  use arrestee after arrest prior to a lockup.
7      Q. And 8 of the 16 had initial codes that were
8  under Category 5 for excessive force as well, correct?
9      A. 8 begins with the Code 05, which is under the
10  Group 05 excessive force using Exhibit No. 7.
11      Q. So prior to the end of the 1996 there were at
12  least eight CRs initiated against Detective O'Brien that
13  included at least some allegation of excessive force,
14  correct?
15      MR. YAMIN: Objection to the form of the question,
16  "at least".
17      THE WITNESS: I can only say in using Exhibit 12,
18  Bates 021795, that the initial complaint category, um,
19  listed 05 as under, um, excessive force using Exhibit 7
20  for the category code.
21  BY MS. DONNELL:
22      Q. There was eight, right?
23      A. Yes.
24      Q. And then for the period of time after

276

1  December 31, 1996, but through the end of December 1999
2  there -- in addition to the 16, would identify there was
3  another one, an additional nine CR files reported on 21795
4  for Detective O'Brien, correct?
5      MR. YAMIN: Objection, it's outside the scope of
6  Notice and the time frame.
7      THE WITNESS: This is outside of the time frame, 1989
8  to 1996.
9      MS. DONNELL: It's okay, you can still answer.
10  BY MS. DONNELL:
11      Q. Were there an additional eight CR files listed
12  on the mainframe complaint register history that you
13  reviewed? But --
14      MR. YAMIN: Subject to the objections, you can
15  answer.
16      MS. DONNELL: I haven't finished my question, but
17  you'll have an opportunity to object.
18  BY MS. DONNELL:
19      Q. Is that accurate that there is an additional
20  eight listed on this mainframe complaint register history
21  printout for Detective O'Brien for the period of time
22  after -- that were initiated after December 31, 1996, and
23  prior to December 31, 1999?
24      MR. YAMIN: Subject to my other objections, you can

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

277

1 answer, Ms. Skahill.
2    THE WITNESS: You are going to have to break that
3 question up.
4    MS. DONNELL: Sure, that's fine.
5 BY MS. DONNELL:
6    Q. What I'm trying to say is, there is an
7 additional eight CR files that are listed on 21795 for
8 Detective O'Brien that occurred for that -- I'm sorry,
9 that the complaint was initiated after December 31, 1996,
10 and at the end of December 31, 1999.
11    **A. I can see -- I'm using Bates 021795 in the**
12 **complaint category, um, that, um -- I'm sorry, in the**
13 **complaint column that, um -- that there are --**
14    MS. DONNELL: I miscounted, there is nine.
15    THE WITNESS: There are nine complaints between 1997
16 to 2000, it's outside of the time frame of the Notice.
17 BY MS. DONNELL:
18    Q. Well, some of them are related to incidents that
19 occurred during the 1996 time frame, but just were not
20 reported or the complaint was not initiated until after
21 the time frame, right, because some of the incidents were
22 in October 1996 and May 1996.
23    **A. Well, we wouldn't have been able to address them**
24 **if we didn't know about them.**

278

1    MS. DONNELL: Right.
2 BY MS. DONNELL:
3    Q. And so no other fellow officers reported those
4 allegations prior to -- during the 1996 time frame, right?
5    MR. YAMIN: Objection --
6    MS. ROSEN: Objection to the form, calls for
7 speculation.
8    MR. YAMIN: I vote for both of those.
9    THE WITNESS: I wouldn't know.
10 BY MS. DONNELL:
11    Q. You already testified that you have no knowledge
12 whether Detective O'Brien was identified by the Behavioral
13 Alert System prior to the end of 1996, right?
14    MR. YAMIN: Objection, asked and answered.
15    MS. ROSEN: Objection to form.
16    THE WITNESS: I don't know.
17 BY MS. DONNELL:
18    Q. Do you have any knowledge whether eight CR files
19 alleging excessive force should have triggered the
20 Behavioral Alert System under the General Orders that we
21 were reviewing earlier in your deposition?
22    MR. YAMIN: Objection --
23    MS. ROSEN: Can you read back the question?
24    (WHEREUPON, the question was read

279

1    back as requested.)
2    MR. YAMIN: Objection, form, calls for speculation.
3    THE WITNESS: I couldn't --
4    MR. YAMIN: Foundation.
5    THE WITNESS: -- I couldn't say whether it should or
6 should not, I can only explain the directive.
7 BY MS. DONNELL:
8    Q. Okay, so --
9    And if you want to look at Exhibit 6, which
10 is Directive 83-3, under the Behavioral Alert System,
11 which is Section 5, Section B1 list all excessive force
12 complaints, right, as the performance data that are
13 indicators for the Behavioral Alert System, right?
14    **A. Yes.**
15    Q. And that didn't require the excessive force
16 complaints to be sustained complaints, did it, it was all
17 complaints for excessive force, right?
18    **A. There is no requirement in 83-3 that there be**
19 **sustained complaints. However, one of the limitations**
20 **that I mentioned in relationship to another directive, you**
21 **still have the arguing (phonetic) agreement that could**
22 **impact, again, what was available to individuals.**
23    Q. And what are you referring to, Ms. Skahill, you
24 are saying the FOP contract?

280

1    **A. Yes, 8.4.**
2    Q. And are you referring to the fact that they
3 required the destruction of the CR files or that those
4 files couldn't be looked at for disciplinary purposes if
5 they were not sustained?
6    **A. Well --**
7    Q. Or what are you referring to?
8    **A. -- I'm in the 8.4, both --**
9    **One, we talked about the destruction. So**
10 **there could be, um -- again, what's available to look at**
11 **now is limited. But also if it's those -- the complaints**
12 **are not sustained, um, there was a regression of time**
13 **through the contract, that provision, um, that you weren't**
14 **able to look at not sustained complaints, except under**
15 **limited circumstances, relationships, and civil suits, I**
16 **think -- I think, criminal matters.**
17    **And later, um, towards '99, I think it was**
18 **in '99, able to look at non-sustained complaints. But**
19 **there were only excessive force and criminal conduct but**
20 **just, again, for credibility and notice purposes as well,**
21 **so --**
22    Q. So would I be correct in understanding your
23 testimony that pursuant to the FOP contract, Section 8.4,
24 that IAD or OPS couldn't look at unsustained CR

Transcript of Tina M. Skahill, Corporate Designee

71 (281 to 284)

Conducted on July 2, 2019

281

1 allegations in its review for identifying officers that
2 were to be identified under the Behavioral Alert System?
3     MR. YAMIN: Objection, form, calls for speculation.
4     THE WITNESS: What I am saying is that the contract
5 would have impacted it, but it depends on the purpose,
6 again, on what -- what their reviewing the files for.
7 BY MS. DONNELL:
8     Q. Would the review of a file for the Behavioral
9 Alert System and indicators of the performance data be
10 considered a disciplinary action, so that it would be
11 prohibited?
12     **A. The directive clearly says that these programs**
13 **are not to be a substitute for disciplinary action.**
14     Q. Right, but I am saying: Was the indicator would
15 be -- I'm sorry, strike that.
16         Are you saying -- I'm trying to understand
17 your testimony: When you are saying that the review of
18 complaints -- unsustained complaints might have been
19 limited by the FOP contract, Section 8.4, are you -- if
20 they weren't sustained, I'm saying -- are you saying that
21 the ability for OPS or IAD to look at the CR history, an
22 unsustained CR history, would have been limited by
23 Section 8.4?
24     **A. I'm saying it could have been. It depends,**

282

1 **again, on the purpose, and then going for what happens to**
2 **the officers as a result of that.**
3     Q. Okay, and is it your understanding that
4 being -- coming part of the Behavioral Alert System would
5 be considered a prohibited use such that you couldn't use
6 those CR forms?
7     MS. ROSEN: Objection to form.
8     THE WITNESS: Yeah.
9         Again, it depends on when -- the timing of
10 when the information is utilized, how it is utilized, and
11 is this directive noted. It doesn't mean that an
12 individual couldn't be in the Behavioral Alert System and
13 still be disciplined as well, they are not mutually
14 exclusive.
15     MS. DONNELL: Sure.
16 BY MS. DONNELL:
17     Q. But could --
18         I might be talking past you, and I might be
19 misunderstanding. But I understand the Behavioral Alert
20 System is no substitute for disciplinary action; I
21 understand that.
22         So putting that on the side, are you also
23 saying that the CR files that were not sustained, could
24 not be reviewed for purposes of the Behavioral Alert

283

1 System because of Section 8.4 of the FOP contract; am I
2 misunderstanding you?
3     **A. No, I'm just saying that it's a possibility; I'm**
4 **not sure. But those provisions were in place at the time.**
5 **So there, again, might have been interpretations that**
6 **limited, you know.**
7     Q. Is it fair to say what you are trying to
8 communicate or if I am understanding you correctly, is
9 that the Behavioral Alert System might have been
10 considered a disciplinary action, such that it prohibited
11 review of certain CR files?
12     MR. YAMIN: Objection, misstates her prior testimony.
13     THE WITNESS: What I'm saying is the contract still
14 would have had an impact. Even all of the directives, not
15 just 83-3, but all of the directives, nevertheless, have
16 to operate within the confines of the contract.
17     MS. DONNELL: Okay.
18     THE WITNESS: But the various provisions are open to
19 an interpretation. But they -- the contract does have an
20 impact. What that impact is can vary, and vary on the
21 individual; what the information is going to be used for;
22 what happens to the individual while in the system or
23 while in the program.
24     MS. DONNELL: Okay.

284

1     THE WITNESS: It depends.
2 BY MS. DONNELL:
3     Q. And do you know was there any standard
4 interpretation of Section 8.4 of the FOP contract that OPS
5 operated under during this time frame?
6     **A. No, I wouldn't know.**
7     MR. YAMIN: Objection, calls for speculation.
8 BY MS. DONNELL:
9     Q. And how about in terms of the Internal Affairs
10 Division, do you have a particular interpretation of the
11 restrictions like Section 8.4 of the FOP contract had on
12 them?
13     MR. YAMIN: Same objection.
14     THE WITNESS: If they did, I don't know the specific
15 interpretation.
16     MS. DONNELL: I need just to take a quick break.
17         (WHEREUPON, at 5:10 p.m., a
18         brief recess was taken.)
19     MS. DONNELL: Back on the record.
20 BY MS. DONNELL:
21     Q. Ms. Skahill, was there any number of total CRs
22 filed against a Department member that would trigger or
23 cause any sort of referral to the Behavioral Alert Program
24 in that relevant time period?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

72 (285 to 288)

285

1    MR. YAMIN:  Which Department member?
2        Are you talking about of the --
3    MS. DONNELL:  I'm saying any Department member.
4 BY MS. DONNELL:
5    Q.  Was there any particular --
6        Was there a threshold number of CRs filed,
7 let's say if, you know, 20 CR allegations have been filed
8 against an officer, would that be a sufficient number to
9 trigger recommendation into the Behavioral Alert Program
10 or the Personnel Concerns Program?
11    MR. YAMIN:  Objection, form, calls for speculation.
12    THE WITNESS:  The Directive of 83-3, Section 5B,
13 doesn't have any, um, qualifiers as the type that you
14 suggest.
15 BY MS. DONNELL:
16    Q.  So there is no threshold number of the CR
17 allegations filed against an officer that would indicate
18 that the member should be referred to the Behavioral Alert
19 Program or the Personnel Concern Program, right?
20    A.  **According to Directive 83-3, I don't see that.**
21    Q.  Do you know of any other policies, procedures or
22 practices that had a certain number of total CRs against a
23 Department member that would trigger them for the
24 Behavioral Alert Program referral between '89 and '96?

286

1    A.  **During that time frame, I don't know of any.**
2    MS. DONNELL:  Okay.
3 BY MS. DONNELL:
4    Q.  And how about excessive force allegations, were
5 there a particular number -- threshold number of excessive
6 force CR files that have been filed against a member that
7 would be -- trigger the Behavioral Alert or Personnel
8 Concerns Program referral for the member?
9    A.  **I don't see that indicated in the Directive.**
10    Q.  And it's your testimony that -- well, was it --
11        Other than the FOP contract, Section 8.4,
12 was there any other reason that Chicago Police Department,
13 OPS or IAD could not use unsustained CR files or even
14 sustained CR files in conducting its complaint register
15 investigations to look at past patterns of behavior of
16 Defendant -- I am sorry, let me strike that.
17        Was there any reason other than -- you've
18 identified Section 8.4 of the FOP contract, that
19 prohibited the Chicago Police Department from looking at
20 CR files against accused members to look at past patterns
21 of behavior of similar misconduct in a CR investigation?
22        Do you understand the question?  I am sorry
23 it's a little convoluted.
24    THE WITNESS:  I understand.

287

1    MR. YAMIN:  Well, I am going to object as to form.
2    THE WITNESS:  I didn't say it would necessarily
3 prevent it, I said it's having an impact.  So I think
4 three things had an impact.  One you mentioned already,
5 the destruction of some records would have an impact on
6 the amount of data available, files to review.
7        The second thing is the FOP contract, that
8 would impact on the ability to -- depending on the time
9 frame, for the ability to review certain CR files.
10        And lastly I would say the technology would
11 have -- a lack thereof would have an impact on the ability
12 to do what you asked because, again, it was a paper
13 system.  It's not that it couldn't be done, um, could be,
14 but it would be rather laborious.  I have mentioned
15 informal ways that that information could be gleaned.
16 BY MS. DONNELL:
17    Q.  And, of course, to the extent you have limited
18 knowledge of the BrainMaker software system, that was a
19 system that was looking at patterns of misconduct, right?
20    A.  **Just from the newspaper article.  I don't know**
21 **if it was looking at patterns or simply counting, I don't**
22 **really know.**
23    Q.  So you've identified the destruction of prior CR
24 files, the FOP contract Section 8.4 that had an impact to

288

1 look at a certain CR file or in the capacity that a CR
2 sometimes could be looked at, and then certain
3 technological limitations, and that's three limitations on
4 the ability to look at past allegations of alleged
5 misconduct, right?
6    A.  **Yes.**
7    Q.  Was there any other thing that prevented or any
8 other thing other than those three things you have
9 identified that prevented the Chicago Police Department
10 from analyzing prior allegations of similar misconduct in
11 their investigation of allegations of officer misconduct?
12    A.  **I don't known the universal things out there.  I**
13 **don't know if there are any arbitration decisions.  I**
14 **don't know if there are any labor board decisions during**
15 **that time frame.  I don't -- so I really couldn't say of**
16 **the universal things out there.  But it would**
17 impact (phonetic) that the three that I mentioned I
18 thought -- now those were rather apparent.
19    Q.  And as you reviewed the CR complaint history
20 file as documented in the mainframe printout for
21 Detective Boudreau and Halloran or O'Brien, the three that
22 we looked at thus far, did you have any information of
23 whether any of those three officers had been identified as
24 repeat offenders in any capacity prior to the end of 1996?

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

73 (289 to 292)

289

1    MR. YAMIN: Objection to the form of the question,
2 calls for speculation.
3    THE WITNESS: Well, I don't -- again, when you are
4 repeat offenders.
5 BY MS. DONNELL:
6    Q. Somebody who is an officer who was having repeat
7 allegations of misconduct?
8    **A. So I --**
9    MR. YAMIN: I still object to the form of the
10 question.
11    THE WITNESS: I have no knowledge.
12 BY MS. DONNELL:
13    Q. Do you have any knowledge whether -- let's
14 say -- take, for example, Defendant O'Brien who had 16 CR
15 files filed against him prior to the end of 1996, eight of
16 which were expected -- at least included one allegation of
17 excessive force, whether that was a sufficient number of
18 total allegations or excessive force allegations, such
19 that he should have been identified by somebody within IAD
20 or OPS, and someone who was repeatedly potentially
21 violating CPD's rules and regulations?
22    MR. YAMIN: Objection, form of the question, outside
23 the scope of the Notice, outside the scope of the time
24 frame.

290

1    THE WITNESS: I don't --
2    MR. YAMIN: Foundation.
3    THE WITNESS: -- I don't really have enough
4 information to make that judgment.
5    MS. DONNELL: Okay.
6 BY MS. DONNELL:
7    Q. And is it also fair to say that your review of
8 the Summary Digest of the CRs that you did review for
9 Defendant O'Brien didn't form your decision one
10 way -- it formed (inaudible) on that opinion one way or
11 the other; is that true?
12    **A. I don't think that's --**
13    MR. YAMIN: Objection, form.
14    THE WITNESS: I don't think the Summary Digest alone
15 would be sufficient to make that judgment.
16 BY MS. DONNELL:
17    Q. And for what purpose did you review the Summary
18 Digest of the CR files for these five officers, what was
19 your purpose in reviewing those?
20    **A. To fulfill my obligation per the Notice.**
21    Q. To see whether they had been investigated and
22 disciplined?
23    **A. You mentioned Section 3a actual alleged wrongful
24 acts and misconduct by Kenneth Boudreau, John Halloran,**

291

1    **James O'Brien, Bernard Ryan, Robert Lenihan that was
2 reported from 1991 through 1996. So my review of the
3 Summary Digest was done, you know, to comport with the
4 Notice.**
5    MS. DONNELL: Okay.
6 BY MS. DONNELL:
7    Q. And I am going to call your attention to
8 Exhibit 12 to Page 21800, this is the mainframe complaint
9 register history provided by the City in this litigation
10 for Robert Lenihan; do you see that page?
11    THE WITNESS: Could you repeat the Bates number,
12 again?
13    MS. DONNELL: Sure, it's 21800.
14    THE WITNESS: Yes.
15    MS. DONNELL: Okay.
16 BY MS. DONNELL:
17    Q. And you would agree with me that for
18 Robert Lenihan he had nine CR files filed against him
19 prior to the end of 1996 listed on the complaint register
20 history, right?
21    MR. YAMIN: Mainframe.
22    MS. DONNELL: From the "mainframe"; thank you,
23 George.
24    THE WITNESS: I see on Bates 021800 under the column

292

1 "complaint" on the list of nine from 1991 to 1996.
2    MS. DONNELL: Okay.
3 BY MS. DONNELL:
4    Q. And of those how many included at least some
5 allegation of excessive force?
6    **A. I'm looking under the column "Initial Complaint
7 Category," and I see four that begin with "05," and using
8 Exhibit 7 indicates group excessive force.**
9    Q. Do you have any explanation why Bates 21800 the
10 total number of CRs are listed as 13 for Robert Lenihan,
11 but there is not 13 listed on the mainframe?
12    **A. No. The only thing I can say is the disclaimer on
13 the bottom that I mentioned on the previous pages that
14 seems to indicate, um, that -- you know, the possible,
15 um -- possible limitations.**
16    Q. Meaning that there could have been others that
17 just aren't listed?
18    MS. ROSEN: Objection, calls for speculation.
19    MR. YAMIN: Join.
20 BY MS. DONNELL:
21    Q. I mean, you don't have any idea why the total
22 number is listed as 13 -- total number of CRs listed as
23 13, but then there is only 10 identified by CR number?
24    MS. ROSEN: Objection, asked and answered.

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                    74 (293 to 296)

293

1      THE WITNESS: No.
2  BY MS. DONNELL:
3      Q.  Now calling your attention to Bates 21805, the
4  mainframe complaint register history printout for
5  Bernard Ryan; do you see that sheet?
6      **A.  Okay.**
7      Q.  And for Detective Ryan -- but Ryan it appears
8  there were eight CR files listed that were initiated prior
9  to the end of 1996, right?
10     **A.  Bates 021805 there are eight listed under the**
11  **column "Complaint" from 1992 to 1996.**
12     Q.  And of those, were any of them sustained against
13  Detective Ryan?
14     **A.  I see one sustained for -- it appears in the**
15  **"Initial Complaint Category," 10W, um, vehicle licensing,**
16  **City.**
17     MS. DONNELL:  And actually I forgot to ask that.
18         Did I ask that?  I'm sorry if I forgot.
19  BY MS. DONNELL:
20     Q.  With respect to Detective O'Brien, did he have
21  any sustained allegations against him prior to the end of
22  1996?
23     THE WITNESS:  What's the Bates number again, please?
24     MS. DONNELL:  21795.

294

1      THE WITNESS:  21795.
2         Could you repeat your question?
3      MS. DONNELL:  Yeah.
4  BY MS. DONNELL:
5      Q.  Did Detective O'Brien have any sustained
6  allegations against him prior to the end of 1996 based on
7  the information that was contained in the mainframe
8  complaint register history for him, Bates 21795?
9      **A.  I see two indicated under column "Final**
10  **Finding," on Bates 21795.**
11     Q.  And one was for Complaint Register 193591, which
12  had an initial complaint category of 5B?
13     **A.  That is correct.**
14     Q.  And that's for excessive force for an arrestee
15  after an arrest, prior to lockup, right?
16     **A.  5B indicates group, um, excessive force.**
17     Q.  And then he also had a sustained finding for
18  Complaint 220046, which had an initial complaint category
19  of 10Z as in "zebra," which is miscellaneous, and
20  according to the complaint category table Group 10 is
21  operation of personnel violations, right?
22     **A.  That's correct.**
23     Q.  And how about for Detective Halloran, did he
24  have any sustained allegations against him prior to the

295

1  end of 1996 in his complaint -- mainframe complaint
2  register history was 21800, subject to the limitations
3  that that printout has; did he have any sustained
4  allegations?
5      **A.  Under column "Final Finding," it's Bates 021800,**
6  **I see no indication of sustained.**
7      Q.  And how about for Detective Ryan, did he have
8  any sustained allegations against him prior to the end of
9  1996 based on the information and subject to the
10  limitations of the mainframe complaint register history
11  printout for him?
12     **A.  Bates 021805, under "Final Finding" column, I**
13  **see one sustained.**
14     Q.  And what was that for?
15     **A.  Um, CR 199776 vehicle license in city.**
16     MS. DONNELL:  Okay.
17         (WHEREUPON, Exhibit No. 13 was
18         marked for identification.)
19     MS. DONNELL:  So let's see, I'm going to hand you a
20  couple up of these, and I will start with Exhibit 13.
21         I am going hand you Exhibit 13, which is
22  the Summary Digest for CR No. 203754.
23  BY MS. DONNELL:
24     Q.  And is Exhibit 13 one of the Summary Digests

296

1  that you reviewed in preparation for your deposition
2  today?
3      **A.  It looks like it, but without comparing the two,**
4  **I couldn't say for sure.**
5      MS. DONNELL:  Okay.
6  BY MS. DONNELL:
7      Q.  And this is an allegation CR that was filed on
8  behalf of -- Ms. Brenda Hill was the complainant, and the
9  victim was Frederick Ewing, right?
10     **A.  It lists component (sic) -- yes, Brenda Hill.**
11  **And on the Summary Report Digest it lists Frederick Ewing**
12  **as victim.**
13     Q.  And the finding, the allegation was that --
14     MR. YAMIN:  Hang on, what are you purporting this
15  document to be?
16     MS. DONNELL:  This is the Summary Report Digest --
17     MR. YAMIN:  Okay.
18     MS. DONNELL:  -- for Complaint Register 203754, and
19  this is by the City.
20     MR. YAMIN:  Okay, it is missing --
21     MS. DONNELL:  So, it's the first two pages.
22     MR. YAMIN:  Okay, well, then let me just --
23     MS. DONNELL:  It's the first two pages of the
24  Summary Digest.

297

1    MR. YAMIN:  Okay, just one second, please.
2    MS. DONNELL:  We can take a break and I can print the
3  rest.
4    MR. YAMIN:  No, we don't need -- well, not to
5  make -- it's incomplete, the Summary Digest is six pages
6  long.
7    MS. DONNELL:  Thanks for clarifying.
8      Just to be clear, it's just the first two
9  pages of the Summary Digest.
10    MR. YAMIN:  What's missing is the summary of the
11  investigation.
12    MS. DONNELL:  Sure, so --
13      Why don't we go off the record.
14        (WHEREUPON, a brief recess was
15        taken.)
16    MS. DONNELL:  Let's go back on the record.
17      Ms. Skahill, in the break I have corrected
18  Exhibit 13.  Exhibit 13 is the Summary Digest for
19  Complaint Register 203754.  However, it was Bates stamped
20  20837 consecutive through 20843, okay.
21    THE WITNESS:  Yes.
22  BY MS. DONNELL:
23    Q.  Now, is this the Summary Digest that you
24  reviewed for the Complaint Register 203754, with the

298

1  accused officers being Kenneth Boudreau and John Halloran?
2    **A.  Again, like I said before, it looks like it, but**
3  **I would have to compare it to the actual one I reviewed to**
4  **be sure.**
5    Q.  And you have no reason to doubt that it's any
6  different?
7    **A.  Well, I didn't, right.**
8    MR. YAMIN:  I will attest that it's the same document
9  that we provided to Ms. Skahill.
10    MS. DONNELL:  Okay, thank you.
11  BY MS. DONNELL:
12    Q.  And this includes allegations that -- at Area 1,
13  and that while being transported to Area 1, Mr. Ewing was
14  struck several times, and that excessive force was used on
15  Mr. Ewing by the officers, right, in a way, to transport
16  him to Area 1.
17    MR. YAMIN:  Alleged.
18    MS. DONNELL:  Right.
19    THE WITNESS:  Those are the allegations.
20  BY MS. DONNELL:
21    Q.  And the Detective struck Mr. Ewing in his chest
22  and his stomach with a police baton, right?
23    **A.  Did it say "baton"?  I don't see it.**
24      **Are we looking at the same thing,**

299

1  **because --**
2    Q.  On Page 2.
3    **A.  20838, I see Blackjacks, I don't see "batons".**
4    Q.  In the summary of the allegation.
5    **A.  Yeah.**
6      I see on 020838, it says:  "Complainant,
7  Ms. Brenda Hill, Mr. Frederick Ewing's mother did not
8  witness allege excessive force, at least by the accused
9  detectives while questioning Mr. Frederick Ewing."
10      "Ms. Hill was informed by a Mr. Frederick
11  Ewing that the two detectives that picked him up, and had
12  questioned him, had beaten him up with Blackjacks and
13  forced him to sign a confession form."
14    Q.  And then going on to the summary, it says that:
15  "Mr. Frederick Ewing relayed in a formal statement he
16  moved to Cook County Jail, that he was beaten by a police
17  baton," right, if you look here (indicating).
18    **A.  Oh, further down.**
19    MS. DONNELL:  Yeah, summarizing Mr. Ewing's
20  statement.
21    THE WITNESS:  Uh-huh.
22  BY MS. DONNELL:
23    Q.  And this is a --
24    MR. YAMIN:  Excuse me, what page are we on?

300

1    MS. DONNELL:  I am on Page 20838.
2    MR. YAMIN:  Okay.
3    THE WITNESS:  Okay.
4  BY MS. DONNELL:
5    Q.  And midway through the paragraph it states:
6  "One of the two detectives then begin to strike Mr. Ewing
7  around his chest and stomach area with a black stick or a
8  police baton," right?
9    **A.  I see that in the summary as well.**
10    Q.  And this is in the context of a murder
11  investigation related -- related to a murder
12  investigation, right?
13    **A.  That's the allegation.**
14    Q.  And then these findings were not sustained,
15  there was -- there is a total of four allegations, right?
16    **A.  Yes, it seems to indicate that there were four**
17  **and -- four against Detective Boudreau, four against**
18  **Detective Halloran, and one against an unknown detective,**
19  **et al. versus -- not sustained, um, recommended by -- as**
20  **recommended by the investigator.**
21    MS. DONNELL:  Okay.
22  BY MS. DONNELL:
23    Q.  And according to the complaint register
24  histories that you looked at, we know that this allegation

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

76 (301 to 304)

---

301

1  was not sustained; that was not sustained, right?
2  **A.  Well, I'd have to go back and look at them again**
3  **to check the number of them, but --**
4  **So for Halloran 203754 at -- on Bates**
5  **21791, it says, um, "not sustained".  And, um, for**
6  **Boudreau, um, Bates 021796, um, it also says "not**
7  **sustained".**
8  Q.  And this allegation also says that an allegation
9  of Mr. Ewing was forced to sign a confession for murder,
10 right?
11 **A.  The allegation in the summary page on Bates**
12 **20838 says that that was the allegation, yes.**
13 Q.  And Detective Boudreau was interviewed as part
14 of this investigation, correct?
15 Well, a summary of his -- the -- without
16 having the summary report digest, you know that Detective
17 Boudreau provided some sort of statement or a to/from?
18 **A.  Well, I see on Bates 020842 it makes reference**
19 **to Detective Kenneth Boudreau reported he was working**
20 **as -- so that would seem to suggest there was some**
21 **interview or statement.**
22 Q.  And Detective Boudreau denied all of the
23 allegations of being verbally threatening, physically
24 abusive or forcing -- threatening Mr. Ewing to sign a

---

302

1  confession, right?
2  **A.  Even with the redactions, um, on Bates 020842 it**
3  **does say that Detective Boudreau denied all allegations.**
4  Q.  And Detective Halloran was also contacted in
5  some form either -- provided by a statement, interview or
6  to/from, right?
7  **A.  Yes, also on Bates 020842.**
8  Q.  And Detective Halloran denied any physical abuse
9  or verbal abuse or that Mr. Ewing was forced to sign a
10 confession, right?
11 **A.  Yes, yes.**
12 Q.  And then the witnesses, Detective O'Brien,
13 Detective Karra (phonetic), and Detective Graft (phonetic)
14 were also interviewed relating to the arrest and
15 (inaudible) questioning of Mr. Ewing, right?
16 **A.  Yes, that's on Bates 020843.**
17 Q.  They also denied that there was any -- Detective
18 Boudreau or Halloran forced Mr. Ewing to sign a confession
19 while using physical or verbal threats, correct?
20 **A.  That's correct.**
21 Q.  And according to the OPS investigator there were
22 no other witnesses to interview with respect to this
23 complaint register; is that right?
24 **A.  Um, the statement on Bates 020843 states:**

---

303

1  **"However, there are no witnesses to support the account of**
2  **events as described by Mr. Frederick Ewing, and another**
3  **subject"; it didn't say that there were none.**
4  MS. DONNELL:  Okay.
5  BY MS. DONNELL:
6  Q.  And back during this time frame, do you know if
7  there was an allegation of misconduct and the defendant
8  officers and other police officer witnesses denied the
9  allegation, and there weren't additional witnesses whether
10 those allegations would be found to be unsustained?
11 MR. YAMIN:  I'm sorry, would you repeat it or were
12 you reading?
13 BY MS. DONNELL:
14 Q.  Well, in this time period '89 to '96, if there
15 was a complainant statement and then the accused officers
16 denied those allegations, and any department members who
17 were witnesses to those allegations also denied any
18 misconduct or witnessing any misconduct, would there be an
19 unsustained finding if there was no other witnesses to
20 interview; do you know?
21 **A.  Not necessarily.**
22 MS. ROSEN:  Objection to the form, and incomplete
23 hypothetical; you can go ahead and answer.
24 THE WITNESS:  Not necessarily.

---

304

1  BY MS. DONNELL:
2  Q.  And what is the basis for your testimony "not
3  necessarily"?
4  **A.  You could have other evidence that would support**
5  **a sustained finding.**
6  Q.  Such as?
7  **A.  You could have physical evidence, um, such as,**
8  **um, photographs of injuries to the victim; you could have,**
9  **um, medical reports.  So not necessarily.**
10 MS. DONNELL:  Okay, I might have the same issue,
11 let's -- can we go off the record for just a second?
12 (WHEREUPON, at 6:00 p.m., a brief
13 recess was taken.)
14 (WHEREUPON, Exhibit Nos. 14 and
15 15 were marked for
16 identification.)
17 MS. DONNELL:  Back on the record.
18 Ms. Skahill, I've handed you what I've
19 designated as Exhibit 14 and 15 to your deposition.
20 Exhibit 14 is Bates stamped CITY 21119, it's the complaint
21 against Department member form.
22 THE WITNESS:  Yes.
23 MS. DONNELL:  And then Exhibit 15 is the Summary
24 Digest for CR 211020, that's Bates stamped CITY 21115

---

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

305

1    consecutive to 21118, okay.
2       THE WITNESS: Yes.
3    BY MS. DONNELL:
4       Q. And this is the Complaint filed by
5    Maxine Franklin on behalf of the victim, Jerry Gillespie,
6    right?
7       **A. Yes.**
8       Q. And against Officer Boudreau as well as some
9    other officers from Area 1 violent crimes, right?
10      **A. Yes.**
11      Q. And then the allegations are physical abuse,
12   including beating her son with an unknown object that
13   (inaudible) to burn him physically with chair (phonetic)
14   or he was handcuffed, and then coercing him to sign a
15   statement of confession regarding a murder, right?
16      **A. Right.**
17      Q. And then in the Summary Digest, Exhibit 15,
18   there were allegations, two allegations against Detective
19   Boudreau as well as some other officers, right?
20      **A. Yes.**
21      Q. And these allegations were all determined to be
22   unfounded, right?
23      **A. Um, according to Exhibit 15, the recommended**
24   **findings of allegations were unfounded.**

306

1       MS. DONNELL: Okay.
2    BY MS. DONNELL:
3       Q. And in this case Detective Boudreau as well as
4    the other officers submitted reports denying the
5    allegation that there was any physical abuse of
6    Mr. Gillespie, right?
7       **A. Um, on Bates 021118 states: "Detectives Kenneth**
8    Boudreau, McDonald (phonetic) July at" -- I think that's a
9    misprint, should be "Foley and Berankovich (phonetic) also
10   made reports denying the allegations. Had denied seeing
11   any officer physically abuse Jerry Gillespie."
12      MS. DONNELL: Okay.
13   BY MS. DONNELL:
14      Q. Now Mr. Gillespie was interviewed as part of the
15   investigation, right?
16      **A. It appears in Bates 021116, um, you can see**
17   **what -- it says it several times: "Gillespie said" -- um,**
18   **he told the officers "Gillespie said he was knocked down";**
19   **"Gillespie said"; so, yes, he was interviewed.**
20      Q. Did you finish your answer?
21      **A. Yes.**
22      MS. DONNELL: Okay.
23   BY MS. DONNELL:
24      Q. And in this case the conclusion of the OPS

307

1    investigator concluded at this time there was no witnesses
2    or no physical evidence to corroborate Mr. Gillespie's
3    version of events, and because it occurred a year and a
4    half prior, that the recommendation was to reach a finding
5    of unfounded, right?
6       **A. Yes, on Bates 021118 it does say that: "They**
7    **have no witnesses. No physical or medical evidence to**
8    **corroborate Gillespie's version of what happened."**
9       **Um, he recommended -- the investigator**
10   **recommended the case be closed with a finding of**
11   **"unfounded".**
12      MS. DONNELL: Okay, I think probably I am over my
13   time; is that accurate, George?
14      MR. YAMIN: Yes.
15      MS. DONNELL: So, Ms. Skahill, I'm going conclude for
16   today, thank you so much for your time.
17      THE WITNESS: Okay.
18      MS. DONNELL: And you can leave all of those here.
19      THE WITNESS: Will do.
20      THE COURT REPORTER: Would you like to order?
21      MS. DONNELL: Um, you know, I will order, yeah. But
22   it doesn't need to be rushed. I'll take an e-trans.
23      MR. YAMIN: I need to confirm with my supervisor and
24   get back to you.

308

1       THE COURT REPORTER: Are you two together?
2       MS. ROSEN: Yeah -- no, we are just one -- it will be
3    just one of us that will order. Usually he will figure it
4    out and let you know.
5                (WHEREUPON, at 6:10 p.m., the
6                signature of the witness having
7                been waived, the witness
8                being present and consenting
9                thereto, the taking of the
10               instant deposition ceased.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

309

1  STATE OF ILLINOIS  )
               )SS.
2  COUNTY OF C O O K  )
3
4
5      I, PAMELA J. BREWER, a certified shorthand
6  reporter in and for the County of Cook and State of
7  Illinois, do hereby certify that heretofore, to-wit, on
8  the 2nd day of July 2019, at Loevy & Loevy, 311 North
9  Aberdeen Street, Third Floor, Chicago, Illinois 60607,
10 County of Cook and State of Illinois, TINA M. SKAHILL, a
11 witness was produced upon notice to the parties in a
12 certain cause now pending and undetermined in the United
13 States District Court, Northern District of Illinois,
14 Eastern Division.
15
16     I further certify that the said TINA M.
17 SKAHILL, was by me first duly sworn to testify the truth,
18 the whole truth and nothing but the truth in the cause
19 aforesaid; that the testimony then given by said witness
20 was reported stenographically by me in the presence of the
21 said witness and afterwards reduced to typewriting and the
22 foregoing is a true and correct transcript of the
23 testimony so given by said witness as aforesaid.
24

310

1      I further certify that the signature of the
2  witness to the foregoing deposition was waived.
3
4      I further certify that my certificate
5  annexed hereto applies only to the transcript signed and
6  notarized by me and produced by me personally or under my
7  direction and control. The undersigned assumes no
8  responsibility for the accuracy of any reproduced copies
9  not made under my control or direction.
10
11     I further certify that I am not counsel for
12 nor in any way related to any of the parties to this suit,
13 or am I in any way interested in the outcome thereof.
14
15     In testimony whereof, I have hereunto set
16 my hand this 25th day of July 2019.
17
18
19 By:  _Pamela J. Brewer_____
20      PAMELA J. BREWER
       CSR NO. 084-004362
21
22
23
24

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

79

| A |
|---|

**aberdeen**
1:24, 2:6,
309:10
**ability**
11:11, 134:6,
140:16, 177:23,
281:21, 287:8,
287:9, 287:11,
288:4
**able**
31:3, 86:15,
113:7, 114:18,
167:21, 187:9,
187:18, 188:15,
277:23, 280:14,
280:18
**above**
99:17
**absence**
218:23
**abuse**
302:8, 302:9,
305:11, 306:5,
306:11
**abusive**
301:24
**accept**
128:19, 133:20
**accepts**
160:1
**accessed**
62:9
**accordance**
249:16
**according**
51:13, 79:4,
152:22, 172:2,
181:10, 196:4,
243:11, 249:9,
261:14, 263:10,
268:22, 270:14,
285:20, 294:20,
300:23, 302:21,
305:23
**account**
246:7, 303:1

**accountability**
21:21, 26:5
**accuracy**
310:8
**accurate**
17:6, 19:20,
20:7, 20:11,
24:23, 30:23,
40:19, 41:3,
62:1, 65:8,
75:5, 75:16,
93:19, 159:15,
189:18, 216:14,
248:24, 261:12,
261:13, 276:19,
307:13
**accusants**
52:7
**acknowledge**
173:20, 183:22
**across**
197:9
**action**
129:8, 153:6,
153:10, 154:3,
156:8, 157:4,
157:6, 160:4,
181:5, 181:9,
202:23, 250:16,
250:22, 281:10,
281:13, 282:20,
283:10
**actions**
8:21, 117:13,
180:21
**activities**
264:22
**acts**
10:3, 18:21,
244:7, 257:22,
290:24
**actual**
10:2, 18:21,
19:21, 191:10,
227:14, 228:5,
257:22, 290:23,
298:3
**actually**
6:12, 16:21,

**63:19, 110:16,**
195:12, 196:11,
196:21, 212:17,
259:13, 264:21,
293:17
**add**
53:19, 53:23,
54:7, 54:20
**added**
11:10, 20:22,
70:14, 159:16
**addenda**
153:12
**addendum**
150:20, 152:11,
159:16, 249:5,
249:17, 250:3,
250:12, 250:14,
251:21, 253:14
**addendums**
147:19, 164:23,
254:3
**addition**
36:14, 54:17,
70:9, 169:14,
169:23, 173:4,
186:12, 187:6,
197:14, 234:5,
237:8, 245:4,
276:2
**additional**
20:21, 49:17,
58:4, 75:22,
77:14, 77:20,
77:23, 78:7,
78:13, 84:12,
85:3, 85:11,
86:2, 87:7,
88:16, 93:2,
102:12, 112:16,
124:7, 127:23,
146:9, 146:18,
182:5, 204:4,
246:4, 246:17,
247:18, 262:7,
266:3, 267:3,
267:7, 276:3,
276:11, 276:19,

**277:7, 303:9**
**address**
38:1, 70:7,
177:16, 183:22,
232:6, 277:23
**addressed**
218:10, 221:1
**addresses**
168:16, 222:16
**addressing**
15:23
**adequate**
10:14
**administration**
163:19
**administrator**
74:2, 74:7,
78:16, 78:17,
78:20, 79:2,
79:7, 79:22,
82:19, 184:22,
185:6, 185:13,
186:1, 186:15,
186:18, 187:24,
189:10, 194:5,
195:11
**administrator's**
78:18, 80:7,
80:16, 82:18,
187:2
**administrators**
79:14, 184:19,
207:20
**admonishes**
173:14, 173:15
**admonishment**
173:15
**ads**
88:23, 89:1,
90:10
**adverse**
121:21
**advised**
232:8
**advisory**
136:13, 136:14,
139:1
**advocate**
15:14, 15:20,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                                80

15:21, 15:24,
243:2, 243:9,
243:12, 243:14,
243:21, 244:3,
244:7, 244:11,
244:17, 244:22,
245:1, 245:10,
245:18, 246:2,
246:7, 246:10,
246:15, 247:16
**affidavit**
56:14, 56:19
**aforesaid**
309:20, 309:24
**after**
45:10, 49:8,
50:15, 51:5,
56:23, 58:8,
58:14, 59:18,
75:19, 78:15,
83:3, 83:5,
83:6, 83:13,
85:10, 87:2,
88:5, 89:4,
92:13, 104:2,
111:15, 111:16,
113:1, 113:22,
114:2, 116:11,
118:5, 123:21,
124:4, 129:17,
130:18, 135:24,
137:2, 137:9,
159:24, 179:12,
179:17, 180:11,
253:22, 263:23,
264:2, 265:7,
265:14, 275:2,
275:6, 275:24,
276:22, 277:9,
277:20, 294:15
**afternoon**
4:7, 97:9
**afterwards**
309:22
**again**
31:21, 44:10,
46:8, 49:20,
63:7, 63:15,

66:14, 67:11,
67:23, 74:3,
74:23, 76:3,
78:19, 81:2,
87:4, 88:3,
89:10, 101:19,
103:24, 104:3,
115:17, 137:14,
137:15, 138:8,
151:3, 160:17,
161:21, 163:2,
163:17, 173:20,
174:20, 175:22,
177:10, 178:6,
180:10, 187:8,
188:12, 190:16,
195:21, 196:15,
204:12, 208:17,
210:17, 219:10,
225:6, 225:17,
226:16, 230:14,
231:1, 231:3,
232:14, 234:6,
234:10, 235:4,
235:7, 237:3,
237:4, 237:13,
238:2, 259:1,
264:13, 272:18,
279:22, 280:10,
280:20, 281:6,
282:1, 282:9,
283:5, 287:12,
289:3, 291:12,
293:23, 298:2,
301:2
**against**
63:22, 64:14,
69:7, 95:5,
151:12, 161:4,
264:18, 269:4,
275:12, 284:22,
285:8, 285:17,
285:22, 286:6,
286:20, 289:15,
291:18, 293:12,
293:21, 294:6,
294:24, 295:8,
300:17, 300:18,

304:21, 305:8,
305:18
**agencies**
31:8, 31:13,
31:15, 31:18,
162:22, 197:4,
197:6
**agency**
39:8, 39:13,
162:5, 162:10,
237:7
**agent**
9:23, 105:6,
105:17, 106:19,
112:6, 121:10,
121:16, 122:19
**agents**
15:16, 15:17,
21:18, 22:2,
105:1, 105:4,
105:22, 106:1,
106:12, 106:14,
107:2
**ago**
7:20
**agree**
87:17, 222:24,
264:6, 265:5,
274:6, 274:10,
291:17
**agreed**
113:8
**agreement**
1:19, 279:21
**ahead**
6:1, 62:7,
123:19, 202:18,
303:23
**aids**
269:12
**al**
1:12, 300:19
**alert**
15:7, 122:6,
138:9, 169:2,
169:19, 170:2,
170:9, 170:21,
170:23, 171:3,

171:24, 172:12,
172:22, 173:1,
173:4, 173:17,
177:12, 178:3,
179:5, 179:10,
179:22, 180:14,
181:15, 182:1,
182:20, 183:4,
184:4, 184:14,
185:4, 185:14,
186:4, 186:19,
187:2, 193:11,
193:12, 193:23,
194:19, 195:12,
195:19, 195:23,
196:2, 196:13,
196:22, 197:3,
197:17, 197:23,
198:8, 198:17,
198:22, 200:17,
201:4, 202:5,
202:24, 203:11,
204:21, 207:12,
207:15, 207:16,
208:19, 208:24,
210:16, 212:18,
269:2, 272:7,
272:24, 273:11,
278:13, 278:20,
279:10, 279:13,
281:2, 281:9,
282:4, 282:12,
282:19, 282:24,
283:9, 284:23,
285:9, 285:18,
285:24, 286:7
**alerted**
173:6, 173:10,
194:2, 194:5,
194:6
**alexander**
26:22
**aligned**
44:9
**all**
7:18, 11:12,
11:16, 23:15,
24:17, 31:21,

32:10, 42:20,
43:24, 49:5,
58:18, 58:19,
58:20, 60:9,
64:19, 64:22,
65:5, 65:11,
65:16, 76:7,
77:6, 78:20,
78:23, 81:21,
91:16, 97:12,
106:6, 108:11,
112:9, 112:24,
113:6, 114:5,
116:13, 117:17,
121:11, 125:2,
125:7, 125:17,
126:3, 126:6,
131:8, 132:21,
132:24, 143:2,
149:18, 153:13,
158:14, 161:16,
175:11, 176:4,
177:16, 177:18,
177:24, 181:17,
182:2, 186:1,
186:7, 188:14,
192:18, 200:18,
201:13, 232:6,
236:11, 249:21,
249:23, 251:6,
254:12, 262:13,
262:19, 263:3,
265:16, 279:11,
279:16, 283:14,
283:15, 301:22,
302:3, 305:21,
307:18

**allegation**
32:7, 32:21,
36:24, 41:4,
41:22, 42:5,
43:17, 43:23,
44:5, 46:4,
46:21, 49:1,
51:6, 51:24,
52:22, 53:7,
54:19, 57:5,
58:3, 58:11,

59:4, 59:24,
60:6, 61:5,
79:19, 100:5,
100:6, 100:8,
100:9, 100:10,
100:15, 100:24,
101:6, 107:13,
114:12, 115:2,
115:12, 121:1,
141:12, 144:13,
151:14, 152:2,
152:7, 152:17,
152:18, 161:6,
161:13, 175:20,
176:20, 218:7,
218:13, 220:20,
220:23, 221:10,
221:12, 221:14,
221:17, 221:19,
222:13, 222:16,
223:2, 224:8,
224:19, 226:6,
226:12, 226:18,
226:20, 227:12,
229:19, 231:10,
236:15, 259:3,
263:23, 270:11,
270:16, 270:20,
271:13, 275:13,
289:16, 292:5,
296:7, 296:13,
299:4, 300:13,
300:24, 301:8,
301:11, 301:12,
303:7, 303:9,
306:5

**allege**
108:3, 299:8

**alleged**
7:16, 10:3,
11:8, 18:21,
45:8, 59:5,
80:6, 94:1,
99:6, 99:13,
100:7, 101:16,
102:9, 103:17,
145:16, 206:22,
234:11, 235:6,

257:22, 288:4,
290:23, 298:17

**alleging**
278:19

**allow**
81:2

**alone**
290:14

**along**
42:5, 42:16,
75:14, 102:3,
182:17, 232:21

**already**
13:15, 14:4,
14:20, 15:12,
22:9, 45:17,
49:19, 50:1,
50:11, 57:16,
78:11, 83:20,
102:12, 110:14,
113:11, 132:3,
161:22, 166:22,
170:14, 175:10,
175:24, 204:7,
224:15, 229:21,
234:19, 235:7,
235:18, 236:17,
236:22, 237:11,
258:8, 278:11,
287:4

**also**
3:12, 6:10,
7:11, 12:6,
15:13, 16:3,
21:8, 21:20,
22:17, 31:3,
31:7, 36:9,
36:21, 37:14,
38:4, 38:18,
39:5, 39:15,
42:4, 42:15,
49:21, 51:21,
60:22, 69:12,
70:17, 77:19,
84:12, 102:14,
104:24, 105:20,
105:21, 105:23,
106:2, 106:13,

112:16, 112:18,
115:20, 117:10,
118:5, 120:17,
121:8, 127:22,
128:16, 128:19,
131:5, 137:4,
139:14, 139:17,
143:22, 145:7,
145:15, 153:5,
154:21, 157:7,
160:14, 166:3,
166:15, 169:13,
173:5, 187:1,
187:3, 187:6,
190:7, 191:1,
201:15, 203:8,
205:11, 206:5,
208:5, 209:14,
234:1, 244:7,
245:5, 252:21,
258:13, 261:6,
266:11, 269:8,
269:13, 270:10,
280:11, 282:22,
290:7, 294:17,
301:6, 301:8,
302:4, 302:7,
302:14, 302:17,
303:17, 306:9

**alter**
151:21

**alternative**
29:11, 116:20,
128:20, 202:21

**although**
7:4

**always**
233:23, 234:7

**amended**
4:10, 6:6,
6:11, 6:22,
6:24, 7:10, 8:18

**among**
244:20

**amount**
48:2, 91:24,
101:6, 177:22,
287:6

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019
82

**analogous**
225:15, 225:17,
234:23
**analysis**
206:17, 206:19,
207:5, 208:12,
208:18, 213:6
**analyzing**
288:10
**annexed**
310:5
**annual**
34:12, 34:14,
34:15, 48:7,
142:11, 142:18,
142:23, 143:4,
143:6, 143:10,
143:23, 144:2,
144:6, 144:10,
144:18, 144:20,
144:24, 145:18,
238:20, 238:21
**annually**
144:5
**anonymous**
39:18, 57:2,
57:8, 113:18,
151:12, 151:18,
152:1, 152:9
**another**
39:8, 39:13,
40:8, 40:21,
59:11, 86:4,
86:20, 86:22,
86:23, 104:3,
119:10, 154:2,
173:19, 174:14,
174:20, 176:2,
176:19, 177:4,
177:7, 178:6,
178:8, 178:11,
178:12, 178:16,
226:18, 227:10,
258:14, 276:3,
279:20, 303:2
**answer**
20:2, 35:7,
40:12, 41:12,

42:18, 50:14,
51:15, 51:21,
52:12, 53:9,
67:22, 85:18,
94:23, 109:3,
117:3, 123:19,
128:21, 129:3,
141:15, 153:14,
153:16, 153:18,
157:16, 158:4,
158:18, 159:3,
167:22, 188:10,
195:4, 195:5,
202:16, 202:17,
202:19, 206:5,
208:10, 218:11,
219:1, 220:11,
228:1, 272:11,
273:8, 276:9,
276:15, 277:1,
303:23, 306:20
**answered**
22:12, 36:3,
64:16, 67:14,
67:21, 96:21,
115:3, 178:24,
218:9, 233:13,
278:14, 292:24
**answers**
55:12, 218:23
**anybody**
102:22, 185:1,
185:20, 211:6,
213:22, 248:11
**anyone**
36:17, 38:15,
74:10
**anything**
9:4, 14:3,
14:21, 22:4,
22:8, 54:22,
55:5, 100:21,
103:23, 108:14,
108:16, 108:20,
109:5, 139:20,
142:4, 154:18,
170:1, 175:1,
178:21, 197:14,

208:15, 210:2,
219:7, 220:10,
220:12, 247:1
**anywhere**
73:3
**apart**
244:15
**apparent**
288:18
**appeal**
137:1, 137:5,
138:6, 138:9,
138:10
**appealing**
137:7
**appear**
7:18, 7:20,
7:22, 213:11,
225:7, 225:18,
226:1
**appearances**
2:1, 3:1
**appears**
7:8, 7:9,
103:8, 103:14,
160:7, 293:7,
293:14, 306:16
**applicable**
155:23
**application**
243:15
**applied**
171:17
**applies**
310:5
**appointed**
27:1, 28:12
**appreciate**
76:18
**appropriate**
243:18
**approval**
92:1, 185:10
**approve**
91:16, 136:24
**approved**
124:17, 141:1,
215:23

**approximate**
48:2
**approximately**
24:15
**april**
215:24, 216:16,
216:18
**arbitration**
243:23, 245:6,
288:13
**area**
30:1, 167:17,
298:12, 298:13,
298:16, 300:7,
305:9
**areas**
48:14
**aren't**
292:17
**arguing**
279:21
**around**
190:11, 300:7
**arrest**
222:2, 263:23,
264:2, 275:2,
275:6, 294:15,
302:14
**arrestee**
263:23, 264:2,
275:1, 275:2,
275:6, 294:14
**article**
209:23, 210:1,
210:12, 212:4,
212:10, 212:16,
287:20
**articles**
12:7, 12:8,
12:9, 12:10,
12:12, 12:18,
12:20, 12:24,
13:8, 209:18
**articulated**
85:11
**asa**
232:1, 232:8
**ascertain**
224:23

aside
196:8
ask
9:6, 10:21,
11:18, 31:5,
60:15, 63:7,
66:14, 93:8,
109:21, 118:24,
133:20, 148:19,
160:18, 206:9,
238:2, 272:19,
293:17, 293:18
asked
8:2, 21:16,
21:22, 22:12,
36:3, 53:20,
54:11, 64:16,
67:14, 67:21,
83:20, 96:21,
115:3, 146:22,
167:19, 170:14,
178:23, 218:9,
233:13, 236:8,
236:22, 259:8,
278:14, 287:12,
292:24
asking
19:10, 55:18,
61:17, 63:19,
71:12, 76:15,
76:19, 137:7,
148:2, 148:11,
148:13, 179:21,
186:3, 198:2,
218:23, 223:3,
224:14, 236:9,
238:4, 250:6
assessed
104:6
assessing
227:10
assessment
109:22
assign
42:12, 42:17,
42:19, 43:8,
43:11, 44:6,
46:9, 48:11,

48:22, 54:16,
70:13, 127:3,
217:6, 218:7
assigned
43:17, 44:2,
45:19, 45:20,
47:5, 49:2,
55:6, 57:23,
73:9, 105:7,
105:23, 106:2,
106:5, 106:19,
106:22, 107:18,
107:22, 108:1,
109:21, 110:16,
110:18, 112:5,
127:22, 146:19,
217:9, 220:14,
224:7, 224:13,
224:15
assigning
44:11, 54:11
assignment
44:18, 70:12,
110:5, 176:8
assignments
110:8, 178:9,
178:11
assigns
43:4, 98:15,
98:16
assist
181:3
assistance
33:13
assistant
89:3, 89:7,
89:24, 110:19,
110:22, 111:2,
111:6, 124:19,
124:20, 231:22,
244:1
associated
112:11, 161:23,
172:8
assume
270:20, 271:12,
271:21
assumes
310:7

assuming
34:9, 87:20,
116:6, 162:6,
221:17, 252:7
attached
232:13
attachment(s
159:10
attempt
49:6, 49:9,
58:1, 58:12,
112:11, 112:19
attempted
210:15
attempting
113:1, 113:3,
127:18, 213:10
attention
36:8, 147:21,
149:11, 149:23,
150:14, 162:23,
163:3, 179:5,
202:24, 208:1,
235:12, 236:14,
240:23, 251:20,
253:13, 269:10,
291:7, 293:3
attest
298:8
attorney
22:17, 231:22,
241:14, 242:22
attorney's
101:20, 102:4,
163:2, 163:6,
163:7, 163:18,
163:22, 163:23,
229:7, 229:10,
230:1, 230:3,
230:19, 231:3,
231:9, 232:4,
233:2, 233:15,
233:24, 234:8,
235:23, 236:6,
236:13, 236:24,
237:1, 237:11,
237:14, 242:4,
242:10, 242:15

attorneys
22:18, 22:19,
209:24, 210:3,
232:15, 241:20
audit
248:12, 248:15,
248:22
audits
248:1, 248:7
august
27:2, 29:5
authority
9:22
auto
190:12, 190:16
available
44:1, 61:13,
61:14, 97:1,
114:20, 123:2,
123:14, 133:20,
135:2, 135:3,
154:3, 186:11,
187:8, 187:18,
187:24, 189:9,
189:17, 190:2,
279:22, 280:10,
287:6
average
146:23, 147:5
avocation
245:23
avoid
157:18, 158:19,
158:20
awards
60:21, 178:14,
178:15
aware
81:3, 177:24,
191:1, 191:8,
191:9, 204:8,
210:20, 229:12,
230:3, 230:9,
233:7, 233:14,
233:17, 240:19,
241:2
awareness
189:11

## B

**b**
10:12
**b) (6**
4:11, 5:20,
6:6, 6:19, 6:22,
8:2, 8:19,
10:17, 257:21
**b1**
279:11
**back**
7:5, 7:19,
15:8, 30:17,
35:16, 44:23,
55:16, 55:17,
55:23, 63:6,
63:20, 67:24,
75:23, 77:13,
77:19, 77:23,
78:6, 82:17,
88:24, 92:12,
93:8, 95:9,
124:7, 126:13,
126:20, 128:10,
130:3, 131:1,
131:3, 131:4,
131:5, 131:12,
131:16, 153:1,
160:18, 170:17,
183:4, 203:20,
228:12, 245:21,
245:23, 246:4,
246:16, 257:21,
259:20, 278:23,
279:1, 284:19,
297:16, 301:2,
303:6, 304:17,
307:24
**bad**
178:14
**based**
44:1, 58:21,
69:9, 115:5,
122:13, 135:1,
144:17, 144:24,
169:5, 170:16,
175:12, 177:20,

190:16, 208:10,
208:12, 220:24,
221:23, 222:8,
263:2, 269:3,
269:16, 270:19,
271:20, 294:6,
295:9
**basic**
191:24, 238:7
**basically**
104:1, 105:6,
127:7, 127:15,
182:18, 259:2
**basing**
34:11, 55:5
**basis**
54:15, 68:6,
69:5, 158:4,
173:13, 177:21,
193:2, 243:17,
304:2
**bates**
4:23, 147:17,
150:16, 159:6,
159:19, 194:8,
215:12, 215:18,
215:23, 219:18,
231:10, 239:17,
241:13, 249:7,
249:9, 253:14,
254:18, 256:16,
257:3, 260:1,
260:15, 262:9,
266:15, 267:16,
268:20, 274:15,
274:20, 275:18,
277:11, 291:11,
291:24, 292:9,
293:3, 293:10,
293:23, 294:8,
294:10, 295:5,
295:12, 297:19,
301:4, 301:6,
301:11, 301:18,
302:2, 302:7,
302:16, 302:24,
304:20, 304:24,
306:7, 306:16,

307:6
**baton**
298:22, 298:23,
299:17, 300:8
**batons**
299:3
**beaten**
299:12, 299:16
**beating**
305:12
**became**
28:2, 123:5
**because**
6:14, 19:10,
48:17, 57:7,
87:15, 87:23,
89:11, 108:24,
127:24, 134:24,
143:5, 144:11,
157:14, 158:19,
160:16, 177:19,
177:20, 194:6,
200:8, 250:9,
252:22, 264:12,
264:14, 264:15,
269:19, 272:18,
277:21, 283:1,
287:12, 299:1,
307:3
**become**
30:7, 241:2
**been**
5:5, 5:18,
5:20, 7:24,
19:10, 23:13,
23:23, 25:3,
31:3, 31:12,
37:22, 43:7,
58:19, 66:1,
72:19, 100:20,
107:14, 110:20,
113:11, 132:17,
133:4, 133:6,
134:4, 147:16,
155:1, 155:9,
158:17, 164:23,
165:9, 171:7,
171:14, 175:10,

175:19, 178:23,
182:4, 186:12,
188:1, 201:8,
201:15, 203:11,
205:4, 205:20,
213:11, 213:21,
214:2, 221:10,
222:3, 222:22,
229:8, 229:14,
232:10, 236:9,
254:18, 265:2,
266:4, 270:6,
271:8, 277:23,
281:18, 281:22,
281:24, 283:5,
283:9, 285:7,
286:6, 288:23,
289:19, 290:21,
292:16, 308:7
**before**
1:22, 5:23,
6:15, 7:23,
11:17, 19:9,
20:24, 23:7,
24:16, 33:14,
55:11, 57:18,
67:15, 67:23,
82:19, 92:12,
93:9, 98:1,
109:2, 109:21,
116:17, 121:19,
126:15, 127:16,
128:11, 130:3,
131:9, 132:11,
133:12, 135:3,
135:14, 135:19,
137:12, 138:2,
138:13, 162:24,
164:14, 172:15,
174:19, 175:2,
176:3, 183:16,
185:10, 187:7,
189:3, 192:5,
194:22, 196:8,
201:9, 204:2,
214:1, 214:16,
214:17, 236:1,
236:5, 240:16,

244:22, 255:14,
257:9, 266:21,
298:2
**began**
23:19, 27:11,
97:9
**begin**
23:5, 30:16,
268:21, 292:7,
300:6
**beginning**
21:9, 160:18,
170:4
**begins**
275:9
**behalf**
2:11, 2:21,
3:10, 10:6,
169:9, 214:21,
296:8, 305:5
**behavior**
170:23, 173:1,
173:10, 173:18,
173:21, 174:17,
174:21, 177:11,
178:10, 178:13,
178:14, 180:19,
183:20, 184:21,
185:21, 194:7,
194:12, 195:22,
196:2, 197:2,
198:8, 207:21,
208:3, 208:4,
208:18, 210:15,
286:15, 286:21
**behavioral**
15:6, 122:6,
169:2, 169:16,
169:17, 169:19,
170:2, 170:9,
170:21, 171:3,
171:24, 172:12,
172:17, 172:22,
173:4, 179:5,
179:10, 179:22,
180:14, 181:15,
181:24, 182:19,
183:4, 184:4,

184:14, 185:4,
185:14, 186:4,
186:19, 187:2,
193:7, 193:11,
193:12, 193:23,
194:19, 195:12,
195:19, 196:13,
196:22, 197:17,
197:22, 198:17,
198:22, 200:16,
201:3, 202:4,
202:24, 203:11,
204:20, 207:12,
207:15, 207:16,
208:19, 208:24,
209:10, 212:18,
269:2, 272:7,
272:19, 272:24,
273:11, 278:12,
278:20, 279:10,
279:13, 281:2,
281:8, 282:4,
282:12, 282:19,
282:24, 283:9,
284:23, 285:9,
285:18, 285:24,
286:7
**behaviors**
174:24, 175:12,
178:17, 194:16
**being**
13:3, 29:17,
40:8, 47:14,
47:17, 51:11,
69:24, 93:15,
95:23, 103:10,
116:20, 128:20,
129:1, 131:24,
135:20, 162:5,
163:6, 163:16,
175:24, 188:15,
190:11, 197:22,
207:15, 211:14,
224:19, 225:3,
229:15, 230:2,
230:11, 232:21,
233:9, 233:10,
233:19, 233:20,

233:21, 235:16,
237:1, 244:22,
264:7, 265:6,
273:18, 282:4,
298:1, 298:13,
301:23, 308:8
**believe**
18:3, 23:14,
23:21, 29:5,
32:3, 32:4,
38:3, 43:18,
44:12, 44:19,
47:1, 47:4,
64:8, 65:11,
65:19, 69:12,
74:1, 79:4,
82:5, 82:10,
93:7, 111:23,
134:14, 137:15,
138:8, 146:17,
146:21, 160:16,
166:6, 168:15,
169:13, 187:16,
211:2, 214:1,
217:21, 223:8,
228:19, 253:12,
254:11, 258:8,
259:17
**below**
86:16
**berankovich**
306:9
**bernard**
10:4, 16:11,
273:9, 291:1,
293:5
**besides**
102:14
**best**
11:11, 20:18,
67:22, 177:23,
247:11, 247:14,
270:18, 270:19
**between**
23:4, 24:7,
25:3, 27:20,
28:1, 51:10,
52:9, 105:2,

105:16, 135:13,
135:16, 163:5,
230:10, 236:23,
248:9, 274:15,
277:15, 285:24
**beyond**
45:16, 146:9,
206:12
**bia**
127:8, 127:10,
175:5, 197:6
**bifurcate**
176:4
**bifurcated**
34:6
**bifurcation**
32:11, 33:15
**bill**
150:21, 151:11,
152:1, 152:11
**binding**
139:1, 139:3,
139:10, 139:17
**bit**
201:9
**black**
300:7
**blackjacks**
299:3, 299:12
**board**
98:1, 132:22,
137:15, 137:18,
137:21, 137:22,
138:7, 138:13,
138:19, 138:21,
139:5, 139:6,
139:14, 139:20,
140:2, 140:24,
141:4, 141:7,
141:11, 243:19,
253:21, 254:22,
254:24, 256:5,
256:12, 256:20,
257:2, 257:9,
257:12, 257:18,
288:14
**board's**
138:24, 140:6,

140:15, 140:16
**body**
135:19, 221:5
**bones**
45:5
**both**
7:10, 23:13,
32:24, 33:9,
33:18, 33:19,
34:5, 34:6,
34:10, 37:11,
62:3, 62:8,
65:2, 72:6,
86:23, 136:4,
156:1, 156:12,
158:12, 175:3,
190:14, 191:15,
194:14, 197:4,
197:6, 202:14,
216:9, 218:4,
226:20, 250:21,
272:10, 278:8,
280:8
**bottom**
18:7, 18:10,
194:9, 256:17,
256:18, 258:12,
264:13, 274:2,
292:13
**boudreau**
8:20, 10:4,
16:6, 18:21,
257:23, 259:24,
260:7, 260:14,
261:1, 261:2,
261:3, 261:15,
261:23, 263:4,
266:3, 272:24,
288:21, 290:24,
298:1, 300:17,
301:6, 301:13,
301:17, 301:19,
301:22, 302:3,
302:18, 305:8,
305:19, 306:3,
306:8
**boudreau's**
262:14

**boulevard**
2:16
**bound**
136:2
**bowling**
210:14
**brady**
224:1
**brainmaker**
209:19, 209:22,
210:10, 210:19,
211:9, 212:1,
212:2, 212:7,
212:14, 212:22,
212:24, 213:1,
213:2, 213:3,
213:5, 213:16,
287:18
**break**
53:14, 54:23,
55:11, 164:8,
164:9, 213:22,
213:24, 239:19,
277:2, 284:16,
297:2, 297:17
**brenda**
296:8, 296:10,
299:7
**brewer**
1:22, 3:17,
309:6, 310:20
**bribery**
218:14
**brief**
53:18, 164:11,
214:24, 284:18,
297:14, 304:12
**briefly**
154:24, 156:5
**bring**
36:7, 36:23,
134:9, 208:1
**broad**
108:24
**broken**
45:5
**brought**
236:13, 269:9

**browse**
148:1, 148:20
**bruce**
13:12, 44:20,
48:18, 54:21,
55:4, 188:13,
191:21, 192:4,
192:17, 193:1,
221:1
**brzeczek**
111:13
**bureau**
5:15, 15:14,
25:9, 25:13,
26:20, 27:7,
27:12, 28:2,
28:12, 127:11,
241:14, 242:5,
242:23
**burn**
305:13
**business**
232:6

---
**C**
---

**call**
7:9, 38:9,
60:16, 97:3,
147:21, 150:14,
178:5, 240:23,
251:20, 253:13,
291:7
**called**
1:18, 5:5,
25:9, 184:19,
185:1, 192:17,
193:3, 212:24,
241:13, 250:4
**calling**
218:22, 219:2,
293:3
**calls**
35:20, 114:16,
189:13, 197:24,
209:14, 211:11,
241:10, 264:10,
265:19, 270:22,
272:9, 273:4,

278:6, 279:2,
281:3, 284:7,
285:11, 289:2,
292:18
**came**
40:17, 41:19,
41:22, 49:5,
68:3, 111:13,
119:16, 119:19,
123:14, 131:3,
131:4, 131:16,
155:6, 186:1,
190:11, 191:11,
210:13, 235:5,
235:12, 241:7
**can**
5:10, 7:1,
13:5, 13:22,
15:19, 19:18,
21:5, 22:13,
25:12, 35:7,
40:12, 41:12,
42:18, 43:18,
50:14, 51:3,
51:10, 53:16,
55:16, 55:17,
57:11, 57:17,
67:22, 70:2,
74:3, 74:12,
80:11, 81:14,
85:18, 94:7,
94:23, 96:12,
99:4, 122:2,
134:23, 139:23,
141:15, 148:24,
152:24, 153:15,
154:9, 156:5,
158:8, 159:1,
164:10, 178:17,
180:16, 183:10,
183:21, 188:10,
200:3, 200:4,
202:18, 209:4,
210:12, 214:14,
214:23, 217:6,
218:11, 219:1,
227:24, 239:14,
239:19, 239:21,

239:24, 244:15,
250:1, 250:13,
257:1, 259:13,
265:11, 267:6,
269:15, 270:18,
270:19, 271:10,
271:12, 272:11,
274:9, 275:17,
276:9, 276:14,
276:24, 277:11,
278:23, 279:6,
283:20, 292:12,
297:2, 303:23,
304:11, 306:16,
307:18

**can't**
96:4, 112:1,
112:3, 200:21,
260:9

**cannot**
134:17

**canvass**
49:12, 58:3,
112:16, 113:3

**capacities**
38:22

**capacity**
27:21, 27:24,
28:6, 30:2,
121:23, 288:1,
288:24

**capital**
184:2

**caps**
29:13, 29:15,
29:18

**captain**
131:7

**captains**
110:18

**caption**
6:14

**carbon**
71:6

**carbonite**
71:3

**card**
69:19, 188:14,

191:16, 191:20,
191:23, 192:3,
192:7, 192:17,
193:3, 228:11,
228:12

**cards**
69:15, 69:17,
192:17, 193:3

**carried**
107:2

**case**
1:10, 44:1,
49:5, 54:12,
66:6, 71:23,
82:22, 85:7,
89:4, 90:11,
91:24, 92:15,
94:10, 103:7,
103:14, 112:24,
117:8, 124:12,
131:3, 131:19,
133:10, 136:20,
137:7, 137:13,
138:12, 139:22,
146:19, 147:16,
164:24, 165:22,
167:6, 177:6,
193:1, 196:20,
203:17, 231:2,
306:3, 306:24,
307:10

**caseload**
47:13, 48:14,
48:15, 48:20,
54:12, 54:17,
107:1

**cases**
13:13, 33:8,
33:9, 34:10,
48:11, 49:12,
52:19, 62:18,
62:20, 63:2,
63:11, 63:17,
64:14, 68:1,
69:1, 78:17,
78:19, 78:20,
79:5, 79:8,
79:9, 79:13,

80:13, 81:19,
82:5, 82:24,
83:3, 83:5,
83:11, 83:12,
83:21, 84:10,
85:12, 85:22,
89:14, 90:14,
90:20, 90:23,
92:6, 92:12,
92:17, 92:18,
92:21, 93:1,
93:12, 93:24,
103:6, 124:15,
124:18, 124:22,
126:18, 126:23,
127:2, 128:23,
128:24, 130:17,
130:21, 131:1,
131:24, 132:8,
132:11, 132:13,
135:6, 137:14,
137:15, 137:16,
138:17, 140:23,
141:10, 176:4,
243:18, 243:19,
250:17, 253:21,
256:11

**catalog**
191:20, 191:23,
192:3, 192:7,
192:17, 193:3,
228:11

**catalogs**
188:14, 191:16,
228:12

**catch**
63:3, 260:2

**catching**
42:11

**categories**
80:6, 101:10,
102:8, 102:12,
103:2, 103:17,
109:6, 116:17,
117:22, 118:1,
144:11, 144:13,
144:15, 145:16,
182:18

**categorize**
217:7

**categorized**
79:15

**category**
4:16, 4:17,
13:18, 13:19,
13:20, 17:22,
17:24, 44:2,
54:10, 60:3,
101:16, 161:15,
164:4, 164:14,
213:20, 215:3,
216:2, 216:15,
216:23, 217:2,
217:5, 217:7,
217:9, 217:20,
218:2, 218:8,
218:15, 219:9,
220:13, 220:21,
221:2, 221:12,
222:15, 222:19,
223:1, 223:4,
223:20, 223:24,
225:1, 225:11,
225:20, 225:23,
226:5, 264:17,
267:8, 268:13,
268:16, 268:17,
268:18, 268:20,
271:24, 275:8,
275:18, 275:20,
277:12, 292:7,
293:15, 294:12,
294:18, 294:20

**cause**
284:23, 309:13,
309:19

**ceased**
308:10

**certain**
79:1, 80:5,
106:9, 135:2,
135:3, 135:4,
137:14, 173:21,
174:17, 174:21,
174:24, 175:12,
177:10, 177:11,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    88

181:14, 193:24,
194:16, 195:22,
207:6, 241:19,
249:22, 257:23,
261:7, 265:1,
283:11, 285:22,
287:9, 288:1,
288:2, 309:13
**certificate**
6:7, 6:9, 310:4
**certified**
1:22, 5:6,
309:6
**certify**
309:8, 309:17,
310:1, 310:4,
310:11
**chair**
305:13
**change**
6:4, 151:17,
159:13, 159:14,
252:24
**changed**
139:7, 141:11
**channel**
80:19, 80:21,
80:24, 81:8,
81:20, 81:23,
82:9, 82:23,
83:4, 83:6,
83:14, 83:23,
85:13, 85:17,
85:23, 86:4,
86:19, 86:24,
87:3, 87:21,
88:2, 88:6,
88:7, 88:13,
88:20, 89:5,
89:18, 90:11,
90:22, 91:1,
91:3, 91:6,
91:8, 91:10,
92:20, 92:22,
93:4, 97:13,
124:11, 124:24,
125:7, 125:15,
126:1, 131:20,

131:23, 132:2,
133:5, 135:23,
136:11, 174:14,
183:16, 185:11,
244:23, 249:20,
249:21, 249:24,
250:6, 251:7
**channel's**
136:12
**characterization**
226:23
**charge**
128:5, 128:15,
129:6, 129:11,
129:15, 129:23,
130:7, 130:16
**charged**
264:19
**charges**
138:10, 257:9,
257:10, 264:18
**charging**
234:5
**check**
161:21, 234:18,
235:7, 301:3
**chest**
298:21, 300:7
**chicago**
1:12, 1:25,
2:8, 2:18, 2:21,
3:7, 5:14, 8:20,
9:18, 9:24,
12:13, 12:14,
12:17, 27:24,
29:11, 31:11,
37:12, 111:11,
144:5, 154:4,
167:10, 168:2,
168:11, 170:2,
170:8, 170:10,
172:18, 193:16,
208:11, 209:2,
209:11, 209:23,
212:21, 233:17,
237:15, 254:21,
254:22, 254:24,
273:1, 286:12,

286:19, 288:9,
309:10
**chief**
28:17, 28:21,
28:24, 29:2,
29:3, 29:9,
29:10, 29:11,
29:15, 29:17,
29:19, 29:20,
29:23, 30:1,
74:1, 74:7
**chieftain**
26:22
**choose**
186:9
**circuit**
140:19
**circumstances**
226:16, 280:15
**citizen**
39:18, 40:9,
40:21
**city**
1:12, 2:21,
6:12, 6:16,
7:24, 8:20,
9:18, 9:23,
9:24, 10:6,
147:16, 147:17,
150:17, 164:24,
169:9, 207:4,
215:19, 216:4,
219:18, 239:13,
250:4, 251:20,
253:14, 254:18,
254:19, 254:21,
263:3, 291:9,
293:16, 295:15,
296:19, 304:20,
304:24
**city's**
5:19, 7:13,
11:6
**civil**
1:20, 8:21,
161:4, 161:10,
161:12, 222:4,
234:15, 234:18,

234:20, 280:15
**civilian**
21:21, 26:4
**civilians**
105:12
**claim**
249:2
**clarification**
149:18
**clarify**
8:14, 85:20
**clarifying**
143:7, 165:20,
166:12, 297:7
**clark**
3:5
**classification**
264:20, 264:21
**classifications**
264:15, 264:16
**clear**
24:17, 27:20,
41:7, 42:10,
46:12, 67:17,
71:15, 72:18,
76:19, 176:7,
190:17, 196:10,
222:22, 235:11,
247:14, 297:8
**clearly**
249:13, 281:12
**clip**
259:14
**close**
7:19, 183:13
**closed**
18:3, 263:5,
267:9, 307:10
**coaching**
158:15
**code**
42:8, 42:19,
43:12, 43:14,
43:17, 43:19,
43:22, 44:2,
44:6, 44:8,
44:11, 44:17,
45:20, 98:16,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    89

105:8, 161:15,
220:21, 221:18,
222:18, 222:19,
222:20, 223:24,
224:7, 224:12,
224:14, 224:16,
224:18, 225:1,
225:11, 225:23,
226:5, 226:8,
226:12, 226:21,
263:19, 263:20,
264:15, 267:8,
269:14, 269:15,
269:17, 269:24,
270:8, 270:9,
270:21, 271:5,
271:10, 274:24,
275:4, 275:9,
275:20
**coded**
42:5, 45:21,
46:22, 221:12,
263:19, 269:14,
274:23
**codes**
13:18, 13:19,
13:20, 17:24,
42:5, 42:16,
43:14, 44:11,
221:3, 268:16,
268:20, 271:24,
274:24, 275:7
**codes"**
13:23
**coding**
270:16
**coerced**
52:22, 53:8,
79:19, 79:20,
221:10, 221:19,
222:14, 223:2,
223:5, 223:8,
223:21, 223:22,
226:20, 227:4,
227:12, 227:15
**coercing**
305:14
**coffee**
213:22

**collected**
117:18
**collecting**
127:22
**collection**
44:6, 164:22
**column**
18:1, 262:4,
262:9, 277:13,
291:24, 292:6,
293:11, 294:9,
295:5, 295:12
**com**
3:9
**combined**
34:19
**come**
15:8, 35:16,
56:21, 67:24,
119:21, 126:20,
128:10, 130:3,
152:24, 161:9,
161:11, 162:22,
185:10, 197:8
**comes**
98:18, 103:12,
163:3, 175:13
**comfortable**
171:2
**coming**
131:12, 282:4
**command**
80:18, 80:21,
80:24, 81:8,
81:19, 81:23,
82:8, 82:23,
83:4, 83:6,
83:8, 83:13,
83:23, 84:5,
85:13, 85:17,
85:23, 86:4,
86:16, 86:19,
86:24, 87:3,
87:21, 88:2,
88:6, 88:7,
88:13, 88:20,
89:5, 89:18,
90:10, 90:21,

91:1, 91:3,
91:5, 91:8,
91:10, 92:20,
92:22, 93:4,
97:13, 124:11,
124:23, 125:7,
125:15, 126:1,
131:20, 131:23,
132:1, 133:5,
135:23, 136:11,
174:14, 174:23,
181:3, 183:16,
185:11, 244:23,
249:20, 249:21,
249:24, 250:6,
250:10, 250:15,
251:3, 251:7
**commander**
13:12, 69:12,
174:23
**commanding**
127:3, 208:2,
208:3, 241:23,
242:1
**commence**
236:17
**comment**
6:3
**comments**
86:16
**commission**
218:19, 243:24
**committed**
39:6
**commonly**
26:8
**communicate**
283:8
**communication**
230:18, 233:19,
234:7
**communications**
11:21, 12:1,
22:10, 22:17
**community**
39:24
**compare**
262:22, 298:3

**compared**
267:14
**comparing**
260:8, 267:4,
268:19, 296:3
**compensation**
105:10
**compilation**
147:18
**compl**
4:12, 4:14,
4:21
**complain**
36:15
**complainant**
36:7, 36:23,
37:4, 37:14,
38:15, 49:10,
52:16, 52:23,
56:10, 56:14,
57:9, 58:1,
70:8, 102:15,
102:16, 112:12,
113:2, 113:7,
113:10, 113:14,
113:17, 113:23,
114:13, 114:23,
115:13, 127:18,
128:8, 175:24,
176:17, 296:8,
299:6, 303:15
**complainant's**
57:3, 70:7
**complainants**
49:6, 50:3,
50:16, 52:5,
52:7, 58:9,
112:22, 192:2,
231:20, 231:24,
232:7
**complaints**
4:20, 33:17,
35:2, 37:20,
46:13, 151:19,
152:2, 152:9,
181:18, 182:2,
185:5, 206:10,
208:6, 208:7,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

90

277:15, 279:12,
279:16, 279:17,
279:19, 280:11,
280:14, 280:18,
281:18
**complementary**
60:15, 60:16,
60:19, 66:9,
66:13, 66:14,
66:20, 67:2,
67:9, 72:1,
72:7, 72:13,
72:19, 118:11,
118:15, 119:8,
119:10, 119:15,
119:18, 119:19,
122:21, 130:2,
130:18, 178:14
**complete**
90:9, 153:17,
195:5, 197:13
**completed**
8:7, 65:16,
83:3, 129:12,
131:8, 160:5,
195:3, 244:19
**completion**
82:19, 88:19,
244:20
**complex**
33:13, 99:10,
99:15, 99:23,
100:5, 100:17,
101:8, 102:10,
102:13, 103:3,
103:18, 106:10,
107:13, 109:7,
126:19, 128:1
**compliance**
29:2, 29:4,
29:10
**complimentary**
60:22
**comply**
204:20, 245:17
**complying**
214:8
**component**
296:10

**comport**
291:3
**compound**
194:21
**comprised**
133:22, 137:20
**computer**
183:9, 189:2,
189:4, 199:7
**computers**
188:16
**concern**
171:11, 194:8,
210:22, 210:23,
285:19
**concerned**
197:3, 211:1
**concerning**
21:17, 142:19
**concerns**
15:7, 122:6,
166:9, 168:21,
169:2, 169:17,
169:20, 170:3,
170:9, 171:5,
171:8, 172:1,
172:4, 172:5,
172:7, 172:9,
172:10, 172:16,
172:17, 184:4,
185:19, 193:8,
194:13, 195:24,
196:3, 196:5,
196:9, 197:4,
198:23, 201:11,
201:17, 201:20,
201:22, 202:2,
202:7, 202:9,
202:21, 203:5,
203:12, 203:13,
203:14, 203:17,
203:23, 204:11,
204:21, 207:13,
208:1, 209:1,
269:2, 273:16,
273:18, 285:10,
286:8
**conclude**
307:15

**concluded**
307:1
**conclusion**
57:18, 59:9,
59:18, 86:6,
306:24
**conclusions**
60:11, 77:10,
145:8
**concur**
81:6, 81:14,
81:16, 81:17,
83:8, 83:14,
83:23, 84:9,
86:10, 88:17
**concurred**
85:13, 91:4,
91:9, 133:7
**concurrence**
90:22, 90:24,
125:15, 136:21
**concurrent**
88:21
**concurring**
86:5
**conduct**
33:6, 58:11,
58:14, 59:14,
88:1, 104:11,
105:7, 113:17,
162:11, 178:4,
183:13, 184:12,
184:22, 185:7,
185:14, 194:19,
202:1, 203:22,
228:4, 249:10,
264:19, 280:19
**conducted**
25:2, 25:3,
31:8, 34:16,
34:17, 65:17,
82:20, 101:19,
101:23, 102:3,
105:23, 140:2,
142:12, 145:3,
156:20, 162:5,
163:16, 196:21,
203:4, 203:24,

204:10, 206:16,
207:5, 237:9,
247:19, 248:2,
248:8, 248:16
**conducting**
50:15, 96:5,
109:13, 113:3,
163:8, 186:16,
208:12, 213:6,
286:14
**confession**
79:20, 223:21,
223:22, 226:21,
227:12, 299:13,
301:9, 302:1,
302:10, 302:18,
305:15
**confessions**
227:16
**confident**
119:18, 267:11
**confidential**
101:11, 101:13,
101:17, 106:18,
106:22, 108:23,
162:24, 237:9
**confines**
283:16
**confirm**
307:23
**confirming**
231:3
**confusing**
6:14, 271:11
**confusion**
157:18, 158:20
**connections**
163:2, 233:23,
237:12
**connelly**
3:3
**consecutive**
147:17, 164:24,
215:19, 219:19,
239:18, 254:19,
297:20, 305:1
**consenting**
308:8

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    91

consider
44:24, 170:8,
200:5
considerations
209:9
considered
44:16, 44:21,
45:10, 99:14,
100:5, 100:8,
100:17, 101:8,
101:12, 101:17,
102:9, 102:13,
102:19, 103:2,
103:18, 109:7,
139:1, 181:14,
281:10, 282:5,
283:10
consisted
134:3
consistency
243:15
constituting
264:20
consult
157:16
consultant
27:21, 27:23
consultation
232:14
consulted
53:22, 232:1
contact
21:20, 23:7,
41:24, 49:6,
49:10, 50:3,
56:9, 58:1,
70:7, 112:12,
113:7, 127:18,
198:20
contacted
21:13, 302:4
contain
32:7
contained
17:19, 18:17,
40:13, 40:16,
96:13, 127:17,
191:23, 192:7,

192:18, 201:14,
229:19, 259:17,
272:1, 294:7
containing
249:14
contains
8:4, 95:1
contemplated
209:2
contents
22:16, 148:2
context
55:14, 95:11,
120:24, 121:18,
122:9, 218:24,
222:1, 222:5,
300:10
continue
113:13
continued
3:1
continues
257:11
continuing
51:3
contract
96:2, 96:6,
96:17, 96:23,
134:13, 134:14,
186:13, 187:3,
187:13, 204:24,
252:20, 252:22,
253:6, 254:8,
279:24, 280:13,
280:23, 281:4,
281:19, 283:1,
283:13, 283:16,
283:19, 284:4,
284:11, 286:11,
286:18, 287:7,
287:24
contracts
14:5, 14:8,
14:12, 14:15
contrary
183:13
control
65:24, 159:7,

159:17, 310:7,
310:9
conversation
52:11, 169:14,
169:24
conversations
210:6, 210:9
convoluted
286:23
cook
102:3, 163:5,
163:7, 229:6,
230:1, 230:19,
235:22, 242:15,
242:22, 299:16,
309:7, 309:11
cookie
183:24
coordinator
21:22, 76:1,
76:2, 77:15,
77:19, 78:6,
78:15
coordinators
76:7, 76:11,
77:2
copa
26:1, 26:8,
26:10
copies
71:8, 310:8
copy
63:23, 71:6,
118:10, 200:3,
200:23, 215:10
corporation
257:8
correct
16:12, 25:9,
25:11, 26:21,
26:24, 31:2,
31:19, 38:2,
38:5, 40:23,
42:2, 42:14,
43:9, 43:10,
43:19, 46:23,
51:8, 54:9,
65:18, 67:9,

68:16, 68:22,
69:2, 74:18,
77:15, 77:16,
88:7, 88:8,
88:10, 93:23,
94:15, 94:16,
95:15, 95:19,
97:18, 98:16,
98:17, 116:3,
117:2, 117:5,
117:20, 119:3,
120:3, 120:4,
120:13, 120:15,
139:15, 155:10,
157:1, 157:2,
159:21, 165:10,
187:4, 189:22,
190:20, 196:22,
216:24, 217:10,
222:16, 223:2,
225:21, 226:22,
262:2, 262:8,
263:5, 263:12,
263:13, 263:15,
263:16, 263:20,
263:21, 263:24,
264:9, 264:17,
265:15, 265:18,
267:22, 267:23,
268:11, 270:17,
275:3, 275:8,
275:14, 276:4,
280:22, 294:13,
294:22, 301:14,
302:19, 302:20,
309:23
corrected
180:21, 297:17
correcting
196:6
corrective
171:15, 181:5,
181:9, 202:23
correctly
96:23, 134:1,
283:8
correlated
202:14

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

92

**corroborate**
307:2, 307:8
**corruption**
101:15
**couldn't**
96:18, 135:14,
152:10, 212:16,
242:8, 265:1,
267:5, 271:5,
279:3, 279:5,
280:4, 280:24,
282:5, 282:12,
287:13, 288:15,
296:4
**counsel**
5:23, 11:21,
12:2, 22:5,
28:9, 28:11,
50:20, 51:7,
53:22, 54:6,
58:11, 114:4,
114:7, 114:9,
116:8, 128:9,
199:19, 210:6,
210:9, 212:21,
310:11
**counsel's**
8:11, 11:4,
257:8
**counseling**
173:19, 173:22
**counted**
274:15
**counting**
287:21
**county**
102:3, 163:5,
163:7, 229:7,
230:1, 230:19,
242:15, 242:22,
299:16, 309:3,
309:7, 309:11
**county's**
235:23
**couple**
9:1, 295:20
**course**
107:4, 287:17

**court**
1:1, 68:12,
140:19, 154:20,
229:9, 230:7,
230:22, 232:11,
250:13, 250:22,
307:20, 308:1,
309:14
**courts**
1:21, 233:11
**covered**
165:16, 189:4,
189:6
**covers**
126:17
**cpd**
22:10, 27:13,
27:22, 28:16,
30:6, 37:6,
39:23, 40:21,
144:24, 188:19,
191:5, 211:9,
215:15, 229:23,
230:2, 233:9,
233:19, 233:23,
235:22, 236:8,
236:9
**cpd's**
236:11, 289:21
**created**
15:21, 41:6,
41:9, 42:5,
42:7, 70:4,
199:17
**creates**
41:17
**credibility**
280:20
**crime**
100:20, 218:19
**crimes**
305:9
**criminal**
100:19, 100:22,
108:20, 151:15,
152:3, 152:8,
152:10, 152:17,
152:19, 162:4,

162:11, 162:18,
163:16, 163:24,
225:4, 226:13,
228:3, 228:7,
231:10, 231:16,
232:13, 232:19,
233:11, 234:4,
242:6, 280:16,
280:19
**criteria**
48:13, 48:16,
48:21, 54:11,
54:13, 54:16,
55:6, 79:1,
101:7, 244:24
**crms**
190:7, 190:9,
260:14, 260:17
**crs**
17:21, 47:16,
63:22, 69:7,
69:20, 94:15,
94:18, 94:20,
95:18, 95:21,
96:11, 96:13,
120:3, 120:7,
120:13, 121:11,
160:17, 186:1,
187:13, 192:18,
258:9, 259:7,
259:8, 261:7,
262:3, 262:7,
262:14, 263:3,
265:6, 267:17,
268:17, 269:3,
271:12, 271:22,
275:12, 284:21,
285:6, 285:22,
290:8, 292:10,
292:22
**csr**
1:22, 3:17,
310:21
**current**
5:13, 30:11,
96:18
**currently**
26:19, 26:23,

95:23
**customs**
7:14, 11:7,
11:13
**cutter**
184:1
**cv**
1:10

**D**

**d**
151:12, 159:23
**daily**
173:13
**data**
181:14, 182:19,
188:17, 197:10,
198:7, 279:12,
281:9, 287:6
**date**
6:7, 8:5,
12:23, 17:8,
18:2, 18:3,
70:5, 215:24,
253:22, 253:23,
254:2, 254:6,
261:17, 267:8,
267:9
**dated**
6:15, 6:20,
6:24, 7:3, 7:7,
7:22
**dates**
262:4
**david**
159:23
**day**
1:25, 309:9,
310:16
**daylight**
37:22
**days**
7:23, 135:12,
137:15, 137:16,
146:4, 146:6,
146:10, 146:18,
249:23, 250:18,
252:2, 252:16,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                     93

252:17, 256:14,
256:19, 256:21,
256:24, 257:4,
257:6, 257:17
**dealing**
202:22
**dean**
13:12, 35:12,
44:20, 48:18,
71:20, 191:21,
192:4
**dean's**
54:21, 55:5,
69:11, 69:12,
71:4, 79:4,
188:13, 192:17,
193:1, 221:1
**death**
32:9, 45:5,
52:19, 79:5,
79:10
**deaths**
32:5, 46:14
**decade**
56:23
**decades**
190:23
**december**
28:4, 28:7,
216:19, 261:24,
276:1, 276:22,
276:23, 277:9,
277:10
**decided**
109:13, 109:17,
135:17
**decision**
46:8, 58:21,
104:2, 175:7,
202:8, 257:13,
290:9
**decisions**
175:4, 245:6,
288:13, 288:14
**declination**
163:20
**declined**
163:19

**deep**
45:4
**defendant**
225:4, 226:14,
228:3, 228:8,
260:7, 286:16,
289:14, 290:9,
303:7
**defendants**
1:14
**define**
15:19, 40:3,
167:13, 206:18,
238:16
**defined**
171:5, 180:21
**defines**
171:10, 172:4
**definitely**
110:19, 164:9,
260:9
**definition**
59:3, 96:13,
170:16, 170:21,
171:2, 172:21,
208:18, 208:19
**definitions**
170:15, 207:14
**degree**
252:2
**delay**
232:7
**denied**
301:22, 302:3,
302:8, 302:17,
303:8, 303:16,
303:17, 306:10
**denying**
306:4, 306:10
**dep**
44:20, 48:19,
69:9, 71:4,
79:4, 188:13
**department's**
31:15, 31:18,
143:6, 143:10,
144:1, 144:6,
170:2, 170:8,

212:21, 236:14,
270:7, 273:1
**department-wide**
243:17
**depend**
32:14, 115:24,
122:2, 221:13
**depended**
84:17
**depending**
50:4, 58:3,
58:5, 112:18,
117:8, 140:12,
180:10, 222:1,
222:5, 287:8
**depends**
84:11, 85:7,
87:10, 87:16,
112:21, 115:4,
115:7, 152:18,
152:20, 174:7,
177:22, 226:16,
231:1, 281:5,
281:24, 282:9,
284:1
**deponent**
64:8
**deposition**
1:17, 4:11,
5:21, 6:5, 6:6,
6:11, 6:19,
6:23, 7:23,
7:24, 8:19,
8:24, 11:19,
12:2, 12:21,
13:10, 13:17,
14:16, 14:22,
15:3, 21:2,
22:11, 22:20,
23:6, 24:16,
26:15, 35:11,
54:21, 55:5,
61:8, 69:11,
150:8, 164:17,
166:4, 166:9,
166:16, 166:24,
191:21, 193:1,
193:4, 193:5,

213:15, 214:2,
214:9, 215:4,
216:10, 218:10,
219:15, 239:8,
240:10, 241:2,
243:1, 248:21,
255:12, 255:15,
260:18, 272:15,
278:21, 296:1,
304:19, 308:10,
310:2
**depositions**
1:21, 13:11,
69:14, 69:23,
70:11
**deputy**
5:15, 26:19,
27:6, 27:12,
28:2, 28:8,
28:10, 28:12,
30:1, 89:3,
89:7, 89:24,
110:20, 110:22,
111:2, 111:7,
124:20, 244:1
**derived**
68:3
**describe**
17:16, 51:10,
63:19, 64:4,
66:12, 67:18,
70:2, 87:12,
87:15, 99:4,
126:23
**described**
71:5, 303:2
**describing**
17:6, 17:17
**description**
17:21, 17:23,
44:20
**designated**
5:19, 45:12,
147:15, 154:9,
164:16, 166:3,
171:7, 203:14,
215:3, 219:15,
259:12, 304:19

designation
171:16
destroyed
187:17, 205:4,
253:21, 264:7,
265:7
destroying
253:11, 254:10,
254:11, 265:13
destruction
96:24, 187:7,
187:16, 265:17,
280:3, 280:9,
287:5, 287:23
detail
257:14
detailed
52:12, 52:15,
107:22
detect
172:24
detective
261:15, 261:23,
262:14, 263:4,
266:9, 266:12,
266:19, 267:13,
268:1, 269:1,
271:22, 272:7,
273:9, 273:24,
274:7, 275:12,
276:4, 276:21,
277:8, 278:12,
288:21, 293:7,
293:13, 293:20,
294:5, 294:23,
295:7, 298:21,
300:17, 300:18,
301:13, 301:16,
301:19, 301:22,
302:3, 302:4,
302:8, 302:12,
302:13, 302:17,
305:18, 306:3
detectives
299:9, 299:11,
300:6, 306:7
detects
173:13

determination
90:12, 136:8,
140:17
determine
42:22, 46:4,
48:21, 80:2,
84:21, 104:12,
109:16, 139:6,
175:19, 218:1,
220:22, 242:21
determined
32:20, 46:22,
47:3, 73:4,
79:1, 139:5,
218:6, 230:7,
246:11, 249:2,
249:12, 305:21
determining
43:22, 44:17
develop
181:4
didn't
7:20, 19:20,
21:11, 21:16,
23:17, 52:6,
63:3, 80:15,
97:19, 152:12,
162:6, 197:19,
204:16, 212:18,
220:15, 236:3,
271:9, 272:19,
277:24, 279:15,
287:2, 290:9,
298:7, 303:3
died
114:21
differ
132:22
difference
51:10, 105:2,
105:16, 254:5
differences
132:7, 238:8
different
17:17, 24:19,
51:16, 84:20,
105:8, 156:16,
180:7, 184:18,

185:3, 250:9,
267:2, 269:14,
298:6
digest
4:22, 4:24,
16:3, 16:13,
18:23, 19:13,
20:3, 258:15,
258:16, 258:23,
261:6, 262:13,
262:17, 262:23,
290:8, 290:14,
290:18, 291:3,
295:22, 296:11,
296:16, 296:24,
297:5, 297:9,
297:18, 297:23,
301:16, 304:24,
305:17
digests
295:24
direct
149:11, 157:15
directed
148:17, 185:13,
194:6, 218:20,
244:1
direction
32:15, 310:7,
310:9
directive
13:6, 169:6,
177:10, 180:11,
181:10, 185:2,
195:10, 207:15,
237:3, 259:1,
279:6, 279:10,
279:20, 281:12,
282:11, 285:12,
285:20, 286:9
directives
12:4, 37:13,
39:11, 39:15,
134:2, 146:4,
146:14, 148:21,
156:12, 180:11,
207:19, 234:8,
234:12, 236:16,

245:5, 283:14,
283:15
directly
22:4, 30:13,
36:9, 37:1,
37:15, 52:4,
82:15, 111:3,
124:18, 124:21,
137:5, 137:6,
222:16
director
5:15, 14:23,
14:24, 15:5,
15:9, 26:20,
27:6, 27:12,
28:2, 28:8,
28:11, 28:12,
169:15, 169:24,
171:17, 185:18,
198:20, 200:12,
200:13, 200:16,
200:19, 201:10,
207:11
directors
229:20
disagree
81:15
disagreed
124:8, 140:14
discharges
257:4, 257:6,
257:16
disciplinary
15:23, 16:15,
16:17, 16:20,
16:23, 17:4,
39:15, 60:23,
61:3, 61:10,
61:19, 62:2,
62:14, 62:16,
62:17, 62:22,
64:6, 64:13,
66:9, 66:15,
66:20, 67:13,
67:19, 68:2,
68:10, 68:16,
69:7, 69:16,
72:2, 72:7,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                              95

72:13, 93:16,
93:21, 94:2,
94:11, 94:14,
94:21, 94:24,
95:13, 95:17,
96:1, 96:6,
96:9, 96:12,
117:13, 118:11,
118:16, 119:8,
119:9, 119:21,
120:6, 120:10,
121:3, 121:17,
121:22, 122:1,
122:13, 122:15,
122:21, 129:8,
130:2, 130:12,
130:14, 130:19,
150:5, 153:11,
154:2, 155:18,
157:4, 157:6,
160:13, 175:18,
176:9, 180:20,
181:20, 181:24,
182:3, 184:6,
185:6, 194:11,
194:15, 207:22,
208:7, 237:4,
243:16, 244:5,
250:16, 253:20,
254:23, 256:6,
258:13, 266:18,
273:2, 280:4,
281:10, 281:13,
282:20, 283:10
**discipline**
7:16, 9:24,
11:8, 17:9,
91:13, 91:16,
91:24, 92:13,
156:9, 249:21,
249:22, 249:24
**disciplined**
157:23, 282:13,
290:22
**disciplines**
17:10
**disclaimer**
18:7, 18:9,

18:16, 258:12,
269:9, 292:12
**disclose**
11:20, 224:9,
228:6
**disclosing**
22:16
**discovered**
253:23
**discovery**
1:17
**discretion**
115:10, 136:9
**discrimination**
100:12, 100:16
**discuss**
210:6
**discussed**
13:5, 126:6,
126:11, 184:8,
209:1, 209:11
**discusses**
257:3
**discussing**
212:7, 250:24
**discussion**
52:9, 209:9
**discussions**
212:20
**display**
194:11
**disprove**
59:23
**dist**
160:17
**distributed**
15:22, 71:8
**district**
1:1, 1:2, 1:20,
8:21, 107:17,
107:18, 108:4,
109:24, 126:20,
126:24, 127:21,
128:6, 128:16,
130:7, 131:12,
131:16, 132:1,
132:9, 157:5,
175:7, 245:2,

245:16, 309:14
**districts**
107:15, 107:21,
107:24, 109:8,
132:11, 244:20
**divisions**
111:7
**document**
9:10, 10:24,
16:21, 16:24,
17:2, 17:3,
17:7, 17:16,
18:5, 18:10,
18:24, 68:20,
147:16, 149:4,
163:14, 182:16,
199:6, 220:1,
240:2, 240:9,
246:21, 255:8,
255:16, 258:11,
262:22, 263:2,
266:23, 267:1,
268:4, 268:5,
296:15, 298:8
**documentary**
58:7
**documentation**
40:7, 49:22,
83:21, 83:24,
116:14, 127:17,
248:22
**documentations**
10:15
**documented**
246:12, 246:13,
271:23, 288:20
**documenting**
181:8
**documents**
13:9, 13:15,
13:16, 14:20,
15:11, 15:14,
16:15, 19:1,
19:11, 19:14,
19:15, 21:1,
22:1, 22:9,
49:5, 49:8,
49:14, 57:23,

62:15, 112:10,
112:20, 113:3,
115:6, 158:12,
158:21, 213:15,
246:3, 263:10,
265:23
**does**
7:22, 14:18,
59:21, 130:6,
134:6, 140:15,
151:17, 168:20,
179:3, 213:22,
235:8, 244:24,
252:4, 252:13,
256:16, 257:5,
260:6, 283:19,
302:3, 307:6
**doesn't**
7:17, 91:11,
151:22, 174:4,
182:22, 183:22,
189:20, 213:11,
226:9, 247:20,
264:24, 282:11,
285:13, 307:22
**doing**
148:6, 186:15,
258:3
**domestic**
32:4, 32:8,
46:14
**done**
46:7, 75:23,
126:12, 156:22,
186:8, 214:9,
214:11, 246:11,
287:13, 291:3
**doubt**
298:5
**down**
154:22, 159:23,
184:15, 185:23,
250:13, 299:18
**down"**
306:18
**draw**
149:22
**driven**
49:20, 112:24,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                96

115:16
**duly**
5:5, 309:18
**duties**
204:4

**E**

**e**
159:7
**e-trans**
307:22
**each**
8:14, 17:5,
17:9, 17:17,
18:8, 18:10,
18:23, 18:24,
19:14, 23:12,
24:3, 24:7,
24:13, 32:14,
34:16, 44:1,
48:3, 71:7,
71:18, 71:19,
71:21, 85:7,
146:18, 204:8,
217:8, 223:7,
242:20, 259:8,
269:16
**earlier**
20:14, 30:21,
119:24, 151:18,
169:13, 174:13,
185:8, 208:16,
217:8, 218:10,
238:20, 243:1,
251:11, 253:10,
269:16, 270:14,
278:21
**early**
167:11, 167:14,
167:17, 170:10,
172:19, 174:13,
183:12, 193:6,
207:18, 208:23,
209:10, 210:10
**eastern**
1:3, 309:15
**education**
19:4

**eeo**
100:9, 100:10,
100:15, 100:21,
108:13, 108:20
**effect**
7:15, 11:7,
155:6, 155:9,
169:3
**effective**
166:10, 254:2
**efforts**
9:18, 171:15
**eight**
267:15, 267:17,
267:21, 268:9,
271:22, 275:12,
275:22, 276:11,
276:20, 277:7,
278:18, 289:15,
293:8, 293:10
**eileen**
3:4
**either**
24:24, 25:4,
26:16, 31:1,
33:6, 36:16,
50:4, 81:6,
81:14, 102:21,
107:3, 115:23,
116:24, 133:20,
136:3, 136:21,
152:13, 156:2,
157:15, 161:24,
197:16, 198:22,
203:16, 244:19,
247:10, 248:11,
267:22, 302:5
**electronic**
61:18, 62:3,
183:3, 187:23,
188:6, 189:16
**else**
14:3, 14:21,
55:5, 74:10,
100:4, 100:21,
102:22, 103:23,
139:20, 170:1,
175:1, 178:21

**email**
6:17, 21:17,
200:7
**employee**
4:21
**employment**
100:11, 121:22,
243:24
**enactment**
165:16
**end**
6:15, 30:3,
211:22, 261:16,
262:2, 262:8,
262:16, 262:20,
263:11, 267:15,
272:8, 273:2,
273:12, 274:8,
274:12, 274:14,
275:11, 276:1,
277:10, 278:13,
288:24, 289:15,
291:19, 293:9,
293:21, 294:6,
295:1, 295:8
**ended**
232:21
**enforcement**
39:8, 39:13,
162:5, 162:10,
237:7
**enforcing**
244:4
**engage**
183:13
**enough**
115:5, 290:3
**ensure**
243:13, 245:2
**ensured**
244:17
**ensures**
243:15
**entered**
264:7, 265:16,
266:4
**entire**
75:13, 86:18,

148:11, 148:15,
187:22, 188:5
**entirety**
130:20
**entities**
30:24, 34:6
**entitled**
168:21
**entity**
32:19, 41:6,
41:8, 41:17
**equal**
100:11, 243:24
**equivalent**
260:23
**erosen@rfclaw**
3:9
**esq**
2:5, 2:15, 3:4,
3:13
**essence**
132:10
**establish**
67:5, 71:13,
76:16
**establishes**
172:3, 172:9
**establishing**
244:4
**et**
1:12, 300:19
**evaluation**
194:12, 195:23
**even**
11:10, 41:9,
41:22, 91:3,
91:20, 97:1,
125:20, 125:21,
160:7, 187:8,
187:19, 196:14,
251:12, 264:19,
283:14, 286:13,
302:2
**events**
303:2, 307:3
**eventually**
70:17, 211:16
**ever**
94:17, 114:10,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

97

192:3, 192:5,
209:1, 213:14,
242:21, 253:24
**every**
146:6, 197:15,
222:18, 224:10,
224:12, 224:15,
225:24
**everything**
45:22, 45:24,
72:5, 82:7,
131:8, 135:3,
170:4
**evidence**
49:22, 50:17,
58:6, 58:7,
58:20, 58:22,
60:10, 112:23,
113:4, 114:3,
116:13, 117:18,
127:23, 224:1,
224:5, 224:9,
224:19, 225:3,
226:4, 226:13,
228:2, 304:4,
304:7, 307:2,
307:7
**ewing**
296:9, 296:11,
298:13, 298:15,
298:21, 299:9,
299:11, 299:15,
300:6, 301:9,
301:24, 302:9,
302:15, 302:18,
303:2
**ewing's**
299:7, 299:19
**exact**
37:21, 38:1,
38:12, 199:4,
226:9
**exactly**
18:15, 48:13,
62:8, 65:19,
65:23, 66:1,
66:4, 67:6,
68:2, 123:16,

123:20
**examination**
1:18
**examined**
5:6, 98:22
**example**
101:1, 114:12,
135:15, 218:13,
234:14, 289:14
**examples**
45:3
**exams**
51:13
**exceeded**
249:23
**exceeds**
250:18
**except**
92:19, 132:10,
280:14
**exception**
97:19
**excessive**
32:3, 32:8,
45:4, 45:10,
45:11, 46:13,
181:17, 185:5,
205:8, 206:10,
206:12, 208:6,
218:14, 218:16,
218:19, 221:4,
226:20, 228:24,
263:22, 264:2,
268:11, 268:17,
268:21, 269:3,
269:13, 272:3,
275:1, 275:5,
275:8, 275:10,
275:13, 275:19,
278:19, 279:11,
279:15, 279:17,
280:19, 286:4,
286:5, 289:17,
289:18, 292:5,
292:8, 294:14,
294:16, 298:14,
299:8
**exchange**
51:14, 122:1

**exclude**
182:22
**excluding**
182:13
**exclusive**
282:14
**exclusively**
223:23
**exculpatory**
228:7
**excuse**
35:5, 47:20,
147:24, 210:2,
299:24
**exempt**
80:22, 81:10,
81:11, 81:13,
86:21, 86:22,
86:23, 87:5,
88:9, 208:2
**exhibiting**
183:20
**exhibits**
164:15, 215:4,
247:21
**exist**
188:20, 191:2
**existed**
264:7
**existence**
191:11, 241:8
**exonerated**
59:11, 59:12,
60:11, 65:3,
70:16, 93:1,
95:24, 96:20,
97:17, 117:22,
121:13, 125:4,
141:13, 145:9,
249:3, 249:13
**exoneration**
249:15
**expectations**
146:1
**expected**
145:23, 289:16
**experience**
54:13, 54:18,

221:2
**expert**
243:22
**explain**
108:7, 167:19,
183:3, 254:5,
256:6, 279:6
**explaining**
83:9, 212:11
**explains**
256:11
**explanation**
292:9
**explicitly**
194:23
**extended**
45:7
**extension**
146:5, 146:9,
146:19, 146:20
**extent**
156:2, 182:16,
287:17
**external**
39:24, 248:11,
248:15
**extra**
105:9

---
**F**
---
**fabricated**
52:22, 53:7,
221:19, 223:11,
223:12, 223:14,
226:4, 227:21
**face**
40:16, 69:24,
70:1, 70:2,
70:3, 70:4,
70:17, 70:22,
71:1, 71:8,
112:10, 129:8
**facsimile**
2:10, 2:20
**fact**
185:8, 186:7,
186:10, 188:14,
194:2, 208:5,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

98

**280:2**
**factor**
100:23, 104:3
**facts**
18:5, 32:14,
33:14, 44:1,
85:7, 87:10,
104:4, 112:19,
112:24, 115:16,
115:24, 219:5,
221:23, 231:1
**factual**
54:15, 69:5
**failed**
224:8
**failure**
117:12, 228:6
**fair**
41:8, 68:23,
95:3, 99:22,
120:5, 120:17,
121:8, 151:24,
186:17, 186:21,
186:22, 196:19,
222:15, 226:19,
226:23, 269:12,
269:23, 270:2,
271:21, 283:7,
290:7
**fairly**
202:22
**fall**
197:9
**false**
221:11, 223:12,
223:14
**familiar**
153:5, 153:24,
180:14, 188:22,
190:6, 219:21,
229:10, 241:18,
254:21, 255:20,
255:22
**far**
206:3, 288:22
**fast**
68:11, 154:21
**faulty**
271:2

**fax**
36:20, 36:21,
36:22, 38:21,
38:23
**fbi**
101:20, 101:23,
162:19, 163:1,
237:10
**february**
6:21
**federal**
162:22
**fellow**
38:19, 278:3
**felony**
234:5, 241:16
**few**
23:23, 24:3,
219:22, 250:16
**fields**
267:12
**figure**
308:3
**file**
30:17, 37:6,
37:15, 38:10,
39:23, 40:14,
40:20, 41:6,
41:9, 42:6,
63:17, 63:23,
64:22, 73:7,
75:9, 75:13,
75:20, 77:15,
79:2, 79:22,
86:17, 86:18,
86:24, 89:7,
90:10, 112:10,
127:16, 127:17,
131:16, 161:12,
162:12, 173:23,
173:24, 174:1,
176:9, 191:14,
205:3, 217:9,
227:5, 227:8,
227:14, 228:5,
228:10, 228:16,
234:19, 241:20,
242:18, 242:20,

246:5, 246:6,
246:12, 246:16,
247:17, 257:1,
264:6, 269:15,
270:7, 271:4,
271:9, 281:8,
288:1, 288:20
**filed**
161:4, 235:6,
257:9, 257:10,
262:20, 269:4,
284:22, 285:6,
285:7, 285:17,
286:6, 289:15,
291:18, 296:7,
305:4
**files**
14:19, 16:15,
17:9, 17:11,
19:21, 20:8,
47:17, 62:14,
63:21, 64:2,
64:5, 64:8,
64:18, 65:4,
65:5, 65:9,
65:10, 65:17,
69:19, 77:22,
78:6, 80:1,
95:4, 96:24,
112:17, 184:23,
186:20, 187:7,
188:1, 188:7,
188:14, 188:20,
189:16, 189:19,
190:20, 191:2,
191:6, 191:10,
204:22, 228:12,
237:22, 242:14,
253:11, 253:20,
261:12, 261:15,
265:14, 265:16,
266:3, 267:15,
272:1, 274:7,
276:3, 276:11,
277:7, 278:18,
280:3, 280:4,
281:6, 282:23,
283:11, 286:6,

286:13, 286:14,
286:20, 287:6,
287:9, 287:24,
289:15, 290:18,
291:18, 293:8
**fill**
246:15, 247:17
**final**
60:3, 92:1,
125:16, 159:9,
250:18, 267:9,
267:21, 294:9,
295:5, 295:12
**finance**
140:11, 140:13
**find**
242:19
**finding**
18:1, 58:21,
59:12, 59:17,
59:21, 60:5,
61:4, 65:6,
68:1, 71:24,
72:17, 74:17,
75:4, 75:14,
75:21, 79:3,
79:14, 79:21,
80:7, 80:14,
81:7, 81:14,
81:23, 83:12,
83:15, 83:22,
83:24, 84:6,
85:24, 86:6,
87:17, 88:17,
89:5, 90:21,
90:23, 91:4,
91:9, 92:7,
92:16, 92:24,
93:1, 93:10,
93:15, 93:22,
94:1, 94:11,
94:20, 95:14,
95:16, 95:24,
96:10, 96:20,
116:15, 116:16,
116:18, 117:18,
118:5, 118:9,
119:16, 120:21,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                                    99

121:4, 121:14,
121:20, 124:8,
124:9, 126:2,
129:16, 129:20,
129:24, 130:11,
130:23, 133:4,
138:6, 138:20,
139:7, 141:11,
182:3, 192:1,
237:22, 238:17,
244:21, 263:14,
267:10, 294:10,
294:17, 295:5,
295:12, 296:13,
303:19, 304:5,
307:4, 307:10
**findings**
58:24, 59:8,
117:22, 125:3,
125:8, 144:15,
145:8, 160:14,
160:15, 259:4,
267:21, 267:24,
300:14, 305:24
**fine**
13:24, 26:10,
26:16, 51:3,
104:24, 119:4,
153:21, 236:7,
277:4
**finish**
109:2, 123:19,
202:18, 306:20
**finished**
158:7, 276:16
**firearms**
103:21
**firm**
2:14, 9:23,
22:18, 22:19
**first**
6:20, 7:5,
7:23, 23:5,
23:22, 31:15,
64:4, 76:7,
81:21, 86:9,
86:10, 90:21,
90:24, 91:3,

91:9, 98:20,
110:2, 127:15,
147:22, 148:8,
148:17, 149:12,
149:23, 153:23,
157:21, 161:21,
164:15, 164:16,
172:15, 234:18,
241:7, 250:20,
262:21, 296:21,
296:23, 297:8,
309:18
**fit**
214:10, 221:24
**five**
16:14, 16:16,
17:5, 19:14,
20:9, 71:5,
71:7, 71:18,
187:14, 249:23,
250:18, 253:22,
256:14, 256:19,
258:10, 259:18,
262:7, 262:10,
265:7, 265:14,
273:17, 290:18
**flip**
259:19
**floor**
1:24, 2:7,
309:10
**focus**
31:14, 177:15,
179:4, 184:7
**focusing**
148:8, 195:9,
261:3
**foley**
306:9
**folks**
102:21
**follow**
185:18, 200:7,
209:5
**following**
9:19, 250:20
**follows**
5:7

**fop**
14:14, 96:2,
96:7, 96:8,
96:17, 134:13,
187:3, 187:13,
204:24, 210:23,
210:24, 279:24,
280:23, 281:19,
283:1, 284:4,
284:11, 286:11,
286:18, 287:7,
287:24
**force**
32:3, 32:4,
32:5, 32:8,
45:4, 45:10,
45:11, 46:13,
46:14, 52:18,
162:23, 181:17,
185:5, 206:10,
206:12, 208:6,
218:14, 218:16,
218:20, 221:5,
226:20, 228:24,
235:22, 263:22,
264:2, 268:11,
268:22, 269:3,
269:13, 272:3,
275:2, 275:5,
275:8, 275:10,
275:13, 275:19,
278:19, 279:11,
279:15, 279:17,
280:19, 286:4,
286:6, 289:17,
289:18, 292:5,
292:8, 294:14,
294:16, 298:14,
299:8
**forced**
299:13, 301:9,
302:9, 302:18
**forces**
162:21, 205:8
**forcing**
301:24
**foregoing**
309:23, 310:2

**forgot**
293:17, 293:18
**formal**
52:24, 53:9,
173:5, 176:7,
229:24, 230:9,
235:11, 236:16,
237:3, 257:9,
299:15
**formally**
175:21
**format**
51:21, 52:12,
63:1, 71:1
**formed**
290:10
**forms**
131:8, 137:1,
208:23, 246:14,
249:23, 251:6,
282:6
**forth**
138:11, 144:16,
160:1, 192:2,
250:15
**forward**
76:1, 160:1
**forwarded**
160:6, 202:7,
249:16
**forwarding**
159:24
**found**
61:4, 92:6,
229:14, 230:2,
230:11, 230:21,
232:10, 245:12,
245:17, 245:20,
261:16, 267:14,
303:10
**foundation**
31:10, 61:12,
61:20, 63:24,
65:21, 67:4,
70:20, 71:11,
71:13, 71:14,
73:12, 76:13,
76:17, 77:24,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

100

78:8, 78:22,
79:24, 83:16,
89:19, 118:18,
141:5, 141:14,
144:8, 147:1,
157:10, 158:2,
192:12, 192:19,
197:24, 198:19,
209:16, 211:12,
213:8, 237:24,
238:5, 238:9,
264:10, 265:20,
279:4, 290:2
**foundational**
76:19, 198:3,
238:3
**founding**
65:3
**four**
6:18, 60:10,
117:22, 118:2,
125:2, 214:6,
268:9, 268:20,
269:19, 271:22,
272:2, 292:7,
300:15, 300:16,
300:17
**fourth**
4:10, 6:5,
6:24, 7:2, 8:18
**franklin**
305:5
**fraternal**
14:7, 14:8,
14:11, 14:15,
253:5
**fred**
111:14
**frederick**
296:9, 296:11,
299:7, 299:9,
299:10, 299:15,
303:2
**front**
263:2, 271:21
**fulfill**
290:20
**full**
33:6, 261:11

**function**
29:1, 243:12
**functions**
28:17, 28:22
**further**
98:1, 171:10,
194:12, 195:23,
299:18, 309:17,
310:1, 310:4,
310:11
**fusco**
3:3, 22:19
**future**
180:19

G

**gail**
74:1, 74:3,
74:4, 74:5
**gather**
57:11, 58:6,
127:22
**gathered**
58:19, 60:10
**gathering**
49:21, 176:5
**gave**
22:4, 41:17,
44:20, 45:3,
160:20, 170:16,
200:23, 221:24,
222:9, 229:17,
234:9, 234:10
**gears**
98:5, 213:19,
239:3, 257:20,
258:5
**gen**
4:12, 4:13,
4:14, 4:15
**general**
13:5, 28:8,
28:11, 31:3,
37:9, 55:19,
55:20, 126:17,
147:18, 148:9,
148:17, 149:12,
149:15, 149:16,

149:19, 149:24,
150:7, 150:21,
154:3, 155:9,
155:13, 155:20,
158:23, 159:15,
164:22, 165:6,
165:9, 165:15,
166:4, 166:9,
168:20, 169:23,
172:7, 180:24,
184:16, 185:24,
186:19, 204:20,
233:5, 248:24,
278:20
**generally**
55:21, 56:1,
104:7, 127:24,
131:1
**generate**
68:24, 161:19,
162:11, 234:20,
235:17
**generated**
157:1, 160:20,
160:21, 161:3,
161:11, 161:12,
183:3, 199:14
**george**
2:15, 8:7,
71:13, 76:15,
148:7, 153:16,
158:16, 158:22,
166:6, 198:3,
199:24, 291:23,
307:13
**get**
9:1, 25:13,
41:24, 55:23,
57:8, 57:18,
63:16, 66:20,
91:15, 93:9,
94:20, 95:12,
95:17, 95:21,
96:18, 98:1,
115:21, 116:17,
119:7, 122:7,
124:21, 126:15,
138:12, 148:21,

161:3, 174:4,
175:18, 185:22,
187:11, 196:3,
196:8, 200:3,
210:5, 215:10,
217:9, 217:12,
217:20, 217:21,
224:16, 226:21,
231:12, 234:17,
269:15, 271:10,
307:24
**gets**
131:9, 222:18,
224:12
**getting**
26:2, 50:16,
127:16, 129:13,
185:22
**gillespie**
305:5, 306:6,
306:11, 306:14,
306:17, 306:18,
306:19
**gillespie's**
307:2, 307:8
**give**
6:20, 52:23,
53:9, 104:2,
113:8, 113:10,
163:11, 166:22,
198:21, 199:2,
239:2, 239:3
**given**
45:2, 101:5,
112:17, 158:18,
186:7, 207:11,
220:20, 220:21,
256:5, 268:16,
269:24, 270:8,
270:20, 309:20,
309:24
**givens**
22:22, 22:23,
22:24, 23:3,
23:6, 23:13
**gives**
98:15
**giving**
128:20, 158:21

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

101

**glean**
112:17, 210:12,
212:17
**gleaned**
287:15
**go**
6:1, 8:13,
11:17, 30:6,
36:9, 37:15,
42:16, 46:5,
53:16, 62:7,
71:20, 78:15,
78:17, 78:20,
80:18, 82:14,
82:23, 86:12,
88:22, 89:11,
91:5, 91:11,
91:20, 92:1,
92:11, 92:12,
92:18, 92:19,
93:8, 95:9,
97:3, 97:19,
98:24, 108:6,
123:19, 124:11,
124:18, 124:23,
125:16, 125:18,
126:3, 127:2,
131:1, 131:19,
133:12, 135:3,
135:6, 137:17,
140:11, 140:13,
148:24, 161:16,
164:10, 164:13,
173:22, 173:24,
184:15, 202:18,
214:23, 244:22,
245:21, 251:12,
255:3, 257:17,
257:21, 297:13,
297:16, 301:2,
303:23, 304:11
**goes**
174:1, 194:8,
257:3, 257:8,
257:14
**going**
7:19, 8:9,
8:10, 20:20,

31:5, 42:23,
42:24, 47:3,
64:7, 68:11,
94:22, 104:4,
109:3, 118:24,
131:5, 132:20,
138:8, 138:9,
138:18, 142:13,
147:9, 147:21,
148:8, 148:16,
149:22, 152:23,
154:20, 158:6,
158:10, 164:2,
164:13, 164:14,
175:4, 176:2,
176:4, 185:10,
213:19, 213:21,
214:3, 214:18,
214:20, 215:2,
219:13, 224:15,
237:17, 239:3,
251:20, 253:13,
254:17, 255:4,
257:20, 258:5,
259:13, 266:8,
266:14, 269:19,
273:23, 277:2,
282:1, 283:21,
287:1, 291:7,
295:19, 295:21,
299:14, 307:15
**gone**
125:24, 133:5
**good**
5:10, 97:3,
133:14, 178:13,
188:3, 188:18
**got**
7:4, 20:22,
126:24, 167:4,
199:9, 228:23,
269:16
**gotten**
119:10
**graft**
302:13
**great**
254:12

**green**
210:14
**greenberg**
3:13, 61:7,
154:13, 212:24,
213:3, 214:14,
214:17, 214:18,
214:21
**grievance**
243:23, 257:1
**gritty**
185:23
**group**
6:8, 6:18, 7:2,
7:11, 206:23,
221:24, 222:3,
222:5, 222:6,
223:7, 226:22,
228:23, 264:2,
268:21, 275:5,
275:10, 292:8,
294:16, 294:20
**guess**
35:22, 61:14,
115:20, 134:23,
138:9, 138:11,
145:19, 149:10,
156:12, 170:20
**guide**
4:20, 254:22
**guilty**
234:11
**guys**
215:10

| H |
| --- |

**half**
307:4
**halloran**
10:4, 16:7,
16:10, 18:22,
257:24, 266:12,
266:19, 267:13,
268:1, 269:1,
271:22, 272:7,
288:21, 290:24,
294:23, 298:1,
300:18, 301:4,

**green**
302:4, 302:8,
302:18
**halloran's**
266:9
**hand**
154:19, 254:17,
295:19, 295:21,
310:16
**handcuffed**
305:14
**handed**
304:18
**handing**
147:14, 219:14,
239:7
**handle**
32:10
**handled**
106:18
**hang**
296:14
**happen**
75:18, 75:19,
78:13, 83:7,
84:9, 85:10,
85:12, 86:1,
87:2, 87:22,
88:19, 90:23,
91:10, 92:16,
113:12, 116:9,
118:8, 124:1,
124:4, 127:5,
130:15, 136:22
**happened**
122:22, 128:11,
130:4, 131:15,
307:8
**happening**
77:9
**happens**
135:24, 282:1,
283:22
**happy**
20:16
**harassment**
100:12
**hard**
63:23, 87:15,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                    102

209:5
**hardcopy**
61:18, 62:3,
64:15, 68:19,
191:10
**harm**
79:11
**has**
5:20, 6:6,
6:22, 6:23,
7:24, 10:11,
51:5, 64:8,
71:12, 76:15,
89:11, 100:20,
133:4, 133:5,
133:7, 140:2,
141:4, 141:7,
147:16, 155:1,
158:22, 159:13,
170:14, 171:13,
171:14, 173:10,
174:6, 174:7,
175:9, 175:19,
178:23, 185:4,
190:22, 198:2,
215:15, 215:18,
223:4, 231:24,
238:4, 254:18,
263:14, 263:19,
269:9, 275:4,
295:3
**haven't**
276:16
**having**
5:5, 55:11,
198:6, 198:7,
271:4, 287:3,
289:6, 301:16,
308:6
**head**
73:23, 102:1,
102:5, 111:9
**heading**
266:24, 267:17,
268:5, 268:12
**headings**
148:20
**hear**
52:6

**heard**
256:12, 257:1
**hearing**
161:19, 234:10,
234:24, 235:15,
236:15, 252:1,
257:12, 257:14
**hearings**
243:20, 243:23,
243:24, 244:1
**heather**
2:5, 53:19,
214:7
**held**
126:13
**help**
183:17
**her**
21:22, 53:20,
143:17, 157:16,
158:21, 158:24,
198:2, 202:16,
202:17, 206:5,
274:10, 283:12,
305:12
**here**
6:20, 35:17,
35:24, 80:4,
119:14, 142:6,
157:18, 163:10,
167:1, 169:9,
182:12, 199:21,
231:8, 247:21,
256:1, 259:16,
259:19, 262:8,
262:14, 263:3,
271:21, 299:17,
307:18
**hereby**
309:8
**herein**
8:24
**hereto**
310:5
**heretofore**
309:8
**hereunto**
310:15

**hierarchy**
106:9
**high**
102:15, 102:20,
108:23
**higher**
76:4, 88:3,
88:9
**highest**
110:23, 243:14,
244:18, 245:3,
245:13, 245:18
**hill**
296:8, 296:10,
299:7, 299:10
**hillard**
111:17, 111:24
**him**
6:1, 23:7,
137:7, 200:22,
269:4, 289:15,
291:18, 293:21,
294:6, 294:8,
294:24, 295:8,
295:11, 298:16,
299:11, 299:12,
299:13, 305:13,
305:14
**his**
44:20, 48:19,
174:22, 191:21,
193:4, 193:5,
199:17, 271:22,
295:1, 298:21,
298:22, 300:7,
301:15
**hist**
4:21
**historic**
191:2, 191:6
**histories**
16:17, 16:20,
16:23, 17:5,
62:2, 62:14,
62:16, 62:17,
62:22, 64:6,
64:14, 69:16,
118:16, 300:24

**history**
30:6, 60:15,
60:16, 60:19,
60:21, 60:23,
61:3, 61:11,
61:19, 66:9,
66:10, 66:13,
66:15, 66:20,
66:21, 67:2,
67:9, 67:13,
67:19, 68:2,
68:10, 68:16,
69:7, 72:2,
72:7, 72:13,
72:19, 72:20,
93:16, 93:21,
94:2, 94:12,
94:14, 94:21,
94:24, 95:13,
95:17, 96:9,
96:12, 118:11,
119:8, 119:9,
119:15, 119:21,
120:6, 120:10,
120:20, 121:3,
121:18, 122:13,
122:21, 130:3,
130:9, 130:14,
130:18, 130:19,
160:13, 171:14,
175:19, 176:9,
178:15, 181:21,
181:24, 182:2,
182:3, 185:6,
208:7, 258:13,
260:7, 260:22,
261:15, 261:22,
262:15, 263:11,
266:18, 268:11,
271:24, 274:1,
276:12, 276:20,
281:21, 281:22,
288:19, 291:9,
291:20, 293:4,
294:8, 295:2,
295:10
**hold**
28:10, 29:9,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    103

29:17
**home**
232:5
**hood**
1:6, 8:20
**horizon**
30:13
**hour**
214:8
**hours**
23:23, 24:3,
24:7, 24:10,
24:14, 37:18,
37:21, 37:22,
38:7, 38:9,
38:12, 214:6,
214:9
**housed**
15:24
**however**
279:19, 297:19,
303:1
**human**
14:24, 119:12,
119:13
**hypothetical**
114:16, 219:3,
221:22, 303:23
**hypothetically**
101:1

**I**

**i'll**
15:8, 20:19,
95:9, 163:11,
185:3, 307:22
**i've**
45:16, 164:16,
219:14, 236:9,
239:7, 259:12,
304:18
**iad**
4:19, 19:21,
26:14, 31:1,
31:19, 32:12,
32:20, 32:24,
33:2, 33:6,
33:9, 33:19,

34:5, 34:10,
34:23, 35:3,
35:19, 42:24,
57:4, 62:2,
62:20, 63:1,
65:17, 65:20,
67:8, 67:18,
68:9, 68:15,
69:15, 72:14,
98:14, 98:16,
104:17, 105:11,
106:2, 106:5,
108:3, 112:14,
119:7, 119:17,
120:2, 121:24,
123:24, 124:2,
124:17, 125:24,
126:24, 127:11,
127:12, 132:17,
146:13, 146:19,
147:6, 160:12,
161:10, 163:5,
175:16, 189:9,
191:10, 194:1,
197:13, 197:16,
204:19, 206:16,
212:3, 218:4,
227:3, 227:15,
229:15, 230:10,
233:18, 236:23,
238:24, 245:1,
245:16, 245:19,
246:2, 248:22,
280:24, 281:21,
286:13, 289:19
**iad's**
212:7
**idea**
35:17, 292:21
**identification**
4:9, 5:2,
10:13, 147:11,
154:12, 164:19,
166:2, 183:12,
207:18, 215:8,
219:12, 225:13,
225:21, 228:15,
230:8, 230:11,

232:5, 232:22,
233:10, 233:20,
235:1, 235:16,
239:5, 254:14,
258:20, 295:18,
304:16
**identifications**
10:14, 230:21
**identified**
13:9, 13:16,
15:12, 36:23,
57:22, 60:11,
77:18, 80:8,
101:10, 147:23,
150:20, 158:23,
177:24, 182:19,
183:19, 184:13,
185:13, 185:20,
196:2, 197:22,
198:6, 198:10,
198:13, 198:15,
201:3, 201:15,
201:17, 203:4,
204:11, 219:8,
239:8, 272:7,
272:24, 273:11,
273:18, 278:12,
281:2, 286:18,
287:23, 288:9,
288:23, 289:19,
292:23
**identifies**
172:7, 184:19,
223:1, 224:19,
225:12
**identify**
9:18, 49:13,
58:4, 66:5,
168:3, 168:12,
180:18, 183:5,
183:17, 184:23,
187:24, 194:11,
194:16, 196:12,
203:22, 204:1,
204:10, 210:15,
219:9, 219:13,
224:22, 232:4,
276:2

**identifying**
77:8, 85:24,
102:8, 207:24,
239:12, 281:1
**identity**
57:3, 57:4
**ii**
156:13, 156:16,
171:6, 171:10
**iii**
183:11, 184:8
**illinois**
1:2, 1:23,
1:25, 2:8, 2:18,
3:7, 8:21,
309:1, 309:8,
309:10, 309:11,
309:14
**immediate**
177:5
**impact**
245:7, 279:22,
283:14, 283:20,
287:3, 287:4,
287:5, 287:8,
287:11, 287:24,
288:17
**impacted**
281:5
**impartial**
202:22
**impersonating**
103:9, 103:11
**impersonation**
103:6, 103:7,
103:14
**implement**
140:6, 181:4,
194:18, 197:16
**implementation**
186:18, 187:2
**implementations**
140:5
**implemented**
186:5, 195:12,
195:19, 196:11
**implementing**
196:21

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    104

important
176:1, 184:3
impose
83:13, 130:17,
130:24
imposed
9:24, 91:13,
135:20, 137:13
imposes
92:13
improper
178:4, 225:12,
228:14
in-custody
32:5, 32:9,
45:5, 46:14,
52:19, 79:10
in-person
37:19, 52:1
incident
18:2, 33:1,
253:22, 261:17,
267:8
incidents
182:6, 182:7,
182:8, 274:8,
274:12, 277:18,
277:21
include
54:17, 65:2,
94:14, 95:18,
95:22, 96:11,
120:7, 120:12,
121:12, 125:2,
152:2, 181:17,
182:6, 228:11,
246:15, 269:13
included
18:9, 40:18,
44:5, 129:19,
143:6, 143:10,
144:5, 153:11,
153:19, 181:23,
217:19, 228:6,
238:20, 242:18,
246:5, 259:1,
264:8, 273:6,
275:13, 289:16,

292:4
includes
152:4, 298:12
including
9:20, 10:13,
125:17, 126:2,
305:12
inclusive
201:16
incomplete
114:16, 221:21,
297:5, 303:22
increase
134:17
increased
202:23
independent
9:22
index
69:15, 69:17,
69:19, 191:1,
192:17, 193:3
indicate
40:20, 184:3,
285:17, 292:14,
300:16
indicated
49:14, 155:1,
155:2, 286:9,
294:9
indicates
6:9, 180:19,
251:24, 268:21,
292:8, 294:16
indicating
150:11, 159:13,
259:16, 299:17
indication
70:12, 295:6
indicator
45:8, 281:14
indicators
181:15, 182:1,
182:5, 182:20,
183:6, 184:14,
185:4, 196:12,
198:8, 203:1,
208:5, 279:13,

281:9
individual
38:4, 38:9,
38:14, 43:11,
64:2, 76:3,
88:3, 102:19,
103:8, 107:12,
109:12, 117:8,
127:6, 134:4,
220:22, 282:12,
283:21, 283:22
individual's
109:22
individuals
43:4, 50:5,
50:7, 73:16,
104:16, 105:12,
110:11, 111:12,
183:23, 202:4,
203:10, 207:12,
245:9, 264:22,
279:22
info
70:8
inform
39:6, 169:15,
230:10, 230:20
informal
172:24, 173:5,
173:8, 173:9,
173:11, 173:17,
174:11, 174:18,
175:11, 177:1,
177:16, 177:19,
177:24, 178:1,
178:11, 208:17,
229:24, 230:9,
287:15
informally
176:6, 176:16,
178:8
information
15:6, 15:15,
17:19, 18:13,
18:17, 21:17,
21:22, 22:1,
26:2, 36:21,
40:13, 44:1,

51:14, 57:11,
58:18, 61:23,
70:8, 70:10,
70:13, 86:22,
142:19, 142:20,
143:9, 143:23,
144:4, 163:17,
175:12, 176:5,
189:3, 190:22,
191:22, 191:24,
192:1, 192:7,
192:16, 195:22,
197:9, 199:10,
200:11, 201:11,
202:6, 222:9,
228:7, 229:17,
232:5, 234:9,
235:4, 236:14,
242:7, 242:19,
244:6, 247:18,
248:19, 249:15,
266:23, 267:3,
267:7, 272:23,
282:10, 283:21,
287:15, 288:22,
290:4, 294:7,
295:9
informed
162:18, 163:6,
233:9, 233:19,
299:10
informing
230:1
infraction
173:14
infractions
158:1
initial
41:6, 86:24,
146:10, 146:18,
149:13, 263:19,
267:7, 268:13,
268:15, 268:17,
270:9, 270:21,
271:10, 274:24,
275:7, 275:18,
292:6, 293:15,
294:12, 294:18

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                          105

**initially**
70:5
**initiate**
36:19, 39:18
**initiated**
30:18, 36:6,
39:2, 39:3,
39:23, 40:8,
40:21, 41:9,
46:3, 46:21,
70:6, 160:20,
160:22, 161:24,
229:21, 235:9,
262:1, 262:20,
275:12, 276:22,
277:9, 277:20,
293:8
**initiates**
98:15
**initiation**
49:9, 57:24
**injuries**
45:7, 45:9,
304:8
**inner**
34:22
**inquiry**
149:1, 164:6
**insertion**
8:11
**inside**
99:5, 99:11,
99:15, 101:8,
102:17, 103:3
**insofar**
8:4
**inspector**
31:3
**instant**
308:10
**instead**
52:8, 129:1
**instruct**
158:11, 220:13
**instructing**
159:2
**instruction**
11:20

**instructions**
159:5, 220:21,
250:20
**intake**
43:7, 43:8,
43:24, 44:10,
45:19, 70:5,
104:14, 104:17,
107:11, 109:12,
109:19, 109:22,
175:3, 175:15,
175:17, 176:8,
176:16, 218:1,
219:8, 220:22
**integrity**
101:21
**intended**
184:5
**intensive**
171:6
**intents**
132:24
**interacting**
173:12
**interaction**
177:20, 178:7,
233:2
**interactions**
177:22, 179:3
**interchangeable**
105:18, 105:19
**interested**
310:13
**internally**
140:20
**interpret**
153:16
**interpretation**
283:19, 284:4,
284:10, 284:15
**interpretations**
283:5
**interrupt**
20:19, 99:20,
108:7, 204:16
**intervention**
167:11, 167:14,
167:17, 170:10,

170:24, 172:17,
172:19, 173:2,
177:12, 193:6,
193:7, 207:17,
208:24, 209:10,
210:11, 210:17,
272:19
**interventions**
169:18
**interview**
50:5, 51:13,
51:20, 52:1,
52:9, 55:12,
56:6, 57:9,
58:9, 58:14,
113:2, 113:23,
114:13, 114:19,
115:13, 115:18,
115:21, 117:16,
128:17, 129:17,
129:19, 301:21,
302:5, 302:22,
303:20
**interviewed**
50:23, 51:8,
51:11, 113:8,
114:24, 116:20,
116:24, 128:20,
129:2, 212:5,
212:7, 301:13,
302:14, 306:14,
306:19
**interviewing**
52:10, 58:12,
116:11, 129:13
**interviews**
50:15, 115:6
**into**
8:12, 11:17,
98:18, 155:6,
173:22, 173:24,
174:1, 185:23,
189:4, 189:5,
189:20, 189:21,
190:11, 191:11,
197:9, 221:10,
241:8, 257:14,
265:16, 266:4,

285:9
**inventories**
112:23
**investi**
5:15
**investigate**
9:19, 30:24,
32:1, 32:20,
46:9, 50:9,
57:4, 112:7,
236:11, 272:14
**investigated**
13:3, 24:24,
30:18, 31:12,
32:12, 33:1,
33:2, 33:18,
34:5, 35:2,
35:19, 45:3,
47:14, 47:17,
95:23, 98:23,
103:11, 103:19,
132:1, 132:8,
145:16, 152:15,
152:21, 175:8,
176:1, 237:1,
290:21
**investigating**
32:24, 48:3,
101:14, 120:18,
121:1, 121:10,
122:12, 122:19,
162:10
**investigations**
9:20, 10:1,
12:18, 25:2,
31:7, 34:4,
34:16, 34:23,
35:18, 56:6,
64:19, 64:23,
65:1, 65:5,
77:9, 79:6,
80:17, 80:18,
81:3, 81:6,
82:18, 82:21,
85:22, 89:17,
89:24, 96:19,
98:14, 99:4,
99:11, 99:13,

100:19, 100:22,
101:11, 101:12,
101:13, 101:19,
101:22, 102:2,
105:8, 105:24,
106:10, 106:14,
106:18, 108:21,
108:23, 109:6,
114:5, 124:10,
130:6, 130:13,
130:20, 132:21,
142:3, 142:12,
142:13, 142:19,
145:3, 163:1,
163:7, 163:16,
163:24, 165:16,
184:20, 185:9,
194:6, 194:15,
196:24, 197:7,
204:3, 207:20,
217:7, 218:4,
237:10, 237:18,
238:17, 243:13,
244:18, 244:19,
245:1, 245:2,
245:7, 245:17,
245:22, 246:4,
286:15
**investigative**
19:21, 65:9,
241:20
**investigator**
43:6, 47:6,
48:16, 48:23,
49:2, 49:4,
49:11, 50:9,
51:5, 52:10,
54:12, 54:14,
54:18, 55:7,
57:8, 57:22,
58:1, 58:2,
58:5, 58:10,
58:24, 59:18,
59:23, 60:9,
60:14, 60:19,
61:3, 66:8,
66:13, 68:8,
68:9, 68:14,

68:19, 71:21,
71:23, 72:12,
72:16, 73:2,
73:4, 75:3,
75:24, 77:13,
77:20, 79:21,
80:13, 81:22,
92:6, 92:15,
92:24, 93:20,
93:21, 93:24,
94:3, 94:10,
94:18, 95:4,
95:12, 95:21,
98:24, 104:22,
104:23, 104:24,
105:3, 105:16,
109:16, 109:17,
110:5, 112:9,
113:22, 116:12,
117:17, 118:4,
118:10, 121:17,
121:24, 122:23,
123:24, 124:16,
127:7, 146:8,
146:19, 160:12,
160:13, 176:17,
231:20, 231:23,
232:4, 249:1,
300:20, 302:21,
307:1, 307:9
**investigator's**
70:15, 72:20,
115:10
**investigators**
21:18, 21:24,
22:2, 26:3,
47:10, 48:11,
54:16, 70:13,
74:16, 77:10,
86:17, 93:16,
96:8, 96:17,
104:7, 105:11,
105:20, 106:5,
106:6, 106:22,
119:7, 123:2,
127:8, 142:2,
142:10, 142:14,
142:20, 143:12,

175:18, 189:10,
244:21, 245:21,
245:24
**investigatory**
20:8, 50:8,
57:15, 60:13,
72:20, 73:6,
74:16, 75:13,
75:24, 78:12,
92:5, 93:9,
97:12, 97:23,
112:14, 121:9,
124:2, 129:12,
131:17
**involuntary**
229:15
**involve**
49:21, 104:5,
208:5
**involved**
33:10, 52:18,
79:10, 101:6,
140:8, 207:18,
222:4, 236:15,
256:14, 256:20
**involvement**
179:9, 179:24,
207:24
**involving**
52:18, 103:21
**ipra**
25:19, 26:1
**isn't**
222:15, 222:24,
223:20, 223:24,
224:18, 247:20
**issue**
140:9, 304:10
**issued**
84:6, 128:8,
149:15, 240:12,
253:18
**issues**
173:13, 245:20,
257:12
**item**
150:11, 249:8
**items**
128:2, 130:5

**its**
41:10, 63:12,
83:4, 86:5,
119:3, 140:2,
140:3, 143:4,
143:12, 162:19,
188:19, 194:19,
196:11, 196:21,
203:4, 203:22,
204:10, 230:20,
237:9, 257:13,
281:1, 286:14
**itself**
41:14, 87:16,
134:24, 176:20,
182:16, 183:8,
183:10, 224:23,
227:8, 234:20,
235:17
**iv**
159:23, 184:16,
184:18

### J

**jackson**
2:16
**jail**
299:16
**james**
10:4, 16:10,
257:24, 273:24,
291:1
**january**
29:5, 149:16,
165:10, 165:13,
261:24
**jeff**
22:23
**jerry**
305:5, 306:11
**job**
177:9, 178:9
**john**
10:4, 16:10,
257:24, 290:24,
298:1
**join**
17:14, 167:20,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    107

170:13, 270:24,
272:10, 272:17,
292:19
**joined**
168:7
**joins**
61:7
**jr**
2:15
**judge**
259:8, 271:5
**judgment**
290:4, 290:15
**july**
1:25, 306:8,
309:9, 310:16
**june**
6:7, 6:10,
6:13, 6:15, 7:3,
7:7, 7:22, 23:8,
23:20
**jurisdiction**
30:22, 30:24,
31:24, 41:10,
42:23, 46:13,
46:15, 46:22,
47:4, 252:5
**justify**
249:15

**K**

**karra**
302:13
**keep**
40:7, 63:1,
63:11, 69:19,
77:21, 83:21,
157:24, 205:19
**keeper**
64:24
**keeps**
190:19, 191:5
**kenneth**
8:20, 10:3,
16:6, 257:23,
259:24, 260:14,
272:24, 290:24,
298:1, 301:19,

306:7
**kept**
61:23, 62:2,
62:15, 62:20,
64:5, 64:13,
64:22, 65:7,
65:9, 65:12,
65:16, 65:20,
69:15, 69:24,
78:5, 83:24,
157:4, 157:5,
159:18, 191:10,
191:16, 205:7,
242:14, 246:2
**kind**
12:8, 52:14,
55:20, 55:24,
57:9, 84:1,
102:19, 146:3,
183:21, 186:17,
206:16, 221:11,
222:16, 234:19,
251:4, 256:11
**kinds**
92:12, 99:13,
101:12, 108:3,
228:16
**klymus**
13:12, 69:12
**knocked**
306:18
**knowledge**
33:17, 34:4,
47:16, 64:12,
67:1, 67:12,
69:20, 71:1,
71:7, 71:12,
71:17, 72:6,
73:15, 74:10,
76:6, 76:10,
76:16, 77:1,
78:3, 78:5,
83:11, 89:14,
89:16, 89:23,
101:22, 104:16,
104:19, 107:1,
111:6, 111:10,
119:15, 120:1,

140:23, 141:9,
141:17, 141:18,
142:15, 142:24,
143:11, 143:18,
145:2, 145:14,
145:24, 146:23,
147:5, 189:15,
192:6, 193:6,
195:1, 195:11,
195:18, 196:10,
197:14, 197:21,
198:2, 198:5,
198:9, 198:14,
198:16, 203:3,
212:2, 220:18,
237:21, 238:4,
238:13, 238:22,
238:23, 242:9,
242:13, 242:24,
245:5, 245:16,
245:22, 247:11,
247:15, 248:1,
248:7, 248:13,
248:15, 266:2,
268:24, 272:6,
273:5, 273:10,
273:17, 278:11,
278:18, 287:18,
289:11, 289:13
**knowledgeable**
213:21
**known**
57:4, 70:10,
190:7, 288:12

**L**

**labor**
244:9, 288:14
**laborious**
287:14
**lacerations**
45:4
**lack**
10:14, 287:11
**landowski**
14:23, 15:3,
15:5, 15:9,
169:15, 169:24,

198:21, 200:12,
200:13, 200:16,
200:20, 201:10,
207:11
**language**
6:4, 254:7
**large**
103:21
**last**
6:13, 52:6,
63:4, 86:7,
160:3, 175:14
**lastly**
287:10
**late**
8:5, 19:3
**later**
11:10, 122:8,
153:1, 196:14,
280:17
**law**
2:14, 22:18,
22:19, 39:8,
39:13, 138:12,
162:5, 162:10,
232:11, 237:6,
244:8
**lawful**
59:14
**lawsuit**
161:4, 161:12,
234:15, 234:18,
234:20
**lawsuits**
161:10, 161:16
**lays**
184:17
**least**
91:1, 148:1,
148:4, 201:16,
236:2, 267:13,
268:9, 271:15,
271:22, 272:1,
272:2, 274:24,
275:4, 275:12,
275:13, 275:16,
289:16, 292:4,
299:8

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

108

**leave**
214:16, 214:17,
214:18, 307:18
**led**
197:16
**left**
55:24, 57:19,
114:20
**left-hand**
150:10, 159:12
**legal**
46:14, 138:11,
161:16, 161:19,
161:21, 161:24,
234:17, 244:9
**length**
23:22, 104:5,
142:3, 145:22,
146:13, 146:23,
147:5
**lengthy**
104:5, 106:11,
147:15
**lenihan**
10:5, 16:8,
16:11, 18:22,
273:9, 291:1,
291:10, 291:18,
292:10
**leroy**
111:15, 111:16
**less**
99:9, 107:13,
108:8, 123:11,
123:15, 126:18,
126:19, 128:1,
132:13, 132:14,
135:9, 135:10,
156:10, 156:13,
156:17, 252:16,
252:17, 256:19
**lessor**
252:2
**let**
6:1, 20:16,
27:20, 35:15,
38:8, 65:11,
109:2, 162:21,

186:16, 188:3,
202:16, 215:10,
231:8, 231:12,
246:18, 260:2,
286:16, 296:22,
308:4
**let's**
19:18, 31:14,
41:17, 62:13,
63:20, 74:11,
82:24, 85:10,
133:3, 159:16,
159:19, 164:2,
172:12, 173:8,
177:15, 193:24,
194:18, 203:6,
213:24, 215:9,
217:2, 258:17,
259:11, 259:24,
285:7, 289:13,
295:19, 297:16,
304:11
**lethal**
32:4, 32:5,
32:8, 52:18
**letter**
36:16, 38:15,
151:12, 163:19,
252:23
**letters**
60:22, 184:2
**level**
86:10, 86:12,
86:14, 86:15,
86:19, 87:2,
87:21, 87:24,
88:1, 88:6,
88:7, 88:12,
88:20, 89:5,
89:18, 90:21,
90:24, 91:3,
91:5, 91:8,
91:9, 91:12,
92:17, 110:2,
125:10, 126:2,
131:11, 131:15,
243:14, 244:18
**levels**
90:10, 91:1,

92:21, 93:4,
125:6, 184:18
**lewis**
2:5
**liaison**
244:8
**liaisons**
163:5
**license**
295:15
**licensing**
293:15
**lieu**
51:20
**lieutenant**
99:17, 110:17,
131:7
**lieutenants**
134:3
**light**
269:8
**like**
5:24, 10:20,
26:15, 37:9,
52:19, 53:19,
53:23, 54:7,
54:10, 54:20,
62:6, 63:14,
63:22, 67:23,
79:5, 96:24,
99:17, 100:9,
100:16, 102:20,
102:23, 108:10,
119:12, 124:10,
133:21, 134:4,
140:11, 142:4,
147:24, 152:4,
153:20, 154:9,
159:7, 162:24,
164:8, 176:4,
179:2, 179:4,
183:12, 183:15,
189:3, 190:23,
194:22, 196:23,
197:8, 200:22,
204:12, 210:14,
211:14, 211:23,
212:18, 215:22,

217:8, 220:11,
222:8, 225:23,
228:9, 260:10,
269:19, 284:11,
296:3, 298:2,
307:20
**likely**
33:4, 102:16
**limit**
158:11, 187:8
**limitations**
210:18, 210:19,
264:14, 264:15,
271:20, 279:19,
288:3, 292:15,
295:2, 295:10
**limited**
9:20, 18:13,
96:2, 97:1,
186:9, 186:12,
186:20, 187:3,
204:22, 204:24,
205:3, 221:23,
222:9, 280:11,
280:15, 281:19,
281:22, 283:6,
287:17
**line**
6:15, 159:13,
164:6, 252:9
**lines**
149:1, 150:10,
233:18
**list**
17:9, 17:11,
17:21, 34:15,
34:19, 63:16,
68:20, 68:24,
70:5, 94:18,
95:4, 95:5,
95:21, 96:18,
120:2, 121:11,
205:7, 205:9,
205:19, 206:11,
242:23, 260:6,
264:8, 279:11,
292:1
**listed**
8:24, 17:7,

34:23, 35:8,
70:10, 70:17,
70:21, 108:12,
109:6, 223:15,
262:1, 262:3,
262:7, 262:10,
262:14, 263:3,
264:18, 264:19,
264:22, 267:17,
268:2, 268:4,
268:5, 268:10,
268:15, 275:19,
276:11, 276:20,
277:7, 291:19,
292:10, 292:11,
292:17, 292:22,
293:8, 293:10
**listing**
69:7
**listings**
258:9, 259:18
**lists**
144:11, 182:21,
268:20, 296:10,
296:11
**litigation**
216:4, 219:18,
239:13, 254:18,
291:9
**little**
123:11, 150:10,
201:9, 286:23
**llc**
3:3
**located**
37:24
**lockup**
263:23, 264:3,
275:2, 275:6,
294:15
**loevy**
1:24, 2:4,
309:9
**log**
173:16
**long**
28:21, 29:3,
29:15, 29:20,

30:2, 142:12,
146:1, 180:10,
297:6
**longer**
26:9, 114:19
**longer"**
253:24
**look**
9:5, 16:20,
19:20, 49:5,
49:8, 57:23,
58:18, 80:1,
102:14, 110:15,
112:9, 117:17,
131:7, 148:10,
157:11, 158:3,
158:4, 159:6,
159:23, 163:9,
164:21, 178:12,
178:16, 183:8,
183:10, 187:9,
215:22, 219:10,
223:7, 228:5,
231:8, 239:14,
239:21, 239:23,
240:5, 246:18,
247:2, 247:4,
250:1, 262:13,
263:22, 267:1,
267:2, 271:4,
279:9, 280:10,
280:14, 280:18,
280:24, 281:21,
286:15, 286:20,
288:1, 288:4,
299:17, 301:2
**looked**
12:4, 12:6,
12:17, 13:11,
13:18, 14:5,
14:11, 15:11,
17:3, 17:18,
19:11, 19:24,
20:3, 48:14,
159:19, 176:10,
229:18, 258:9,
258:13, 259:7,
260:20, 260:22,

262:17, 267:1,
267:4, 267:6,
271:9, 280:4,
288:2, 288:22,
300:24
**looking**
16:13, 114:2,
127:17, 130:19,
134:1, 145:18,
175:9, 175:22,
179:14, 183:16,
184:20, 188:12,
207:21, 207:24,
231:5, 247:21,
261:21, 264:1,
267:16, 286:19,
287:19, 287:21,
292:6, 298:24
**looks**
159:7, 183:20,
260:9, 296:3,
298:2
**lot**
61:22, 103:13
**lunch**
97:6

---

### M

**machine**
36:22
**machines**
36:20
**made**
37:4, 41:5,
46:4, 46:8,
67:24, 86:7,
118:12, 118:17,
133:23, 134:24,
140:3, 143:3,
151:12, 151:13,
152:6, 152:16,
306:10, 310:9
**mainframe**
16:18, 16:21,
16:22, 17:1,
17:4, 17:5,
17:8, 17:17,
18:10, 18:24,

19:14, 61:14,
61:22, 62:4,
63:15, 68:3,
188:22, 188:23,
189:1, 189:5,
189:9, 189:16,
189:20, 189:21,
190:2, 191:6,
191:11, 258:10,
258:12, 258:14,
259:18, 260:6,
260:21, 261:14,
261:16, 261:22,
262:15, 263:11,
264:8, 264:16,
264:20, 265:17,
265:23, 266:4,
266:9, 266:11,
266:17, 266:22,
266:24, 267:14,
268:4, 268:6,
268:10, 271:23,
273:24, 276:12,
276:20, 288:20,
291:8, 291:21,
292:11, 293:4,
294:7, 295:1,
295:10
**mainframe"**
291:22
**maintain**
47:4
**maintained**
187:14
**maintaining**
181:8
**maintains**
188:19
**make**
5:24, 24:17,
27:20, 58:20,
66:19, 68:9,
68:15, 72:16,
72:21, 76:18,
99:23, 116:14,
122:23, 129:20,
130:5, 130:16,
130:20, 131:7,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

110

163:10, 163:12,
175:7, 175:14,
176:12, 196:10,
200:4, 202:8,
246:19, 247:3,
252:20, 252:22,
262:23, 290:4,
290:15, 297:5
**makes**
104:2, 136:1,
152:5, 231:19,
301:18
**making**
175:4, 200:6
**man**
4:18
**manage**
50:3, 89:10
**management**
90:4, 173:16,
190:7, 244:9
**manager**
160:17, 172:10,
185:19, 194:13,
195:24, 196:4,
196:5, 196:9,
197:4, 202:8
**mandates**
173:6
**manner**
39:1
**manual**
219:17, 220:5,
220:13, 231:2,
231:15, 232:10,
243:6, 244:13,
244:15
**many**
12:20, 23:2,
25:15, 33:17,
47:10, 73:9,
73:15, 76:6,
76:10, 77:1,
78:6, 89:14,
89:16, 89:23,
101:2, 104:16,
137:24, 138:17,
145:8, 179:17,

197:21, 198:12,
198:14, 198:16,
198:22, 199:23,
242:9, 245:9,
245:12, 245:13,
271:15, 274:19,
292:4
**march**
166:10, 166:11,
263:5
**margin**
150:11, 159:12
**mark**
147:9, 164:15,
258:17
**marked**
4:9, 5:2, 5:20,
147:11, 154:12,
164:19, 166:2,
215:8, 219:12,
239:5, 254:14,
258:20, 295:18,
304:15
**martin**
111:15, 111:16
**maryland**
224:2
**matt**
111:16
**matter**
35:12, 201:2,
202:5, 236:18
**matters**
15:23, 122:3,
122:16, 232:3,
234:1, 280:16
**maxine**
305:5
**may**
6:24, 7:21,
9:4, 20:2, 23:8,
23:20, 49:21,
96:4, 104:6,
115:17, 131:7,
166:20, 177:11,
180:20, 183:17,
209:17, 222:21,
240:12, 255:3,

264:21, 274:9,
277:22
**maybe**
55:16, 66:12,
97:2, 163:10,
188:18, 192:1,
211:21, 211:24,
236:22
**mcdonald**
306:8
**mchugh**
133:23
**mean**
23:17, 36:11,
40:3, 60:5,
64:1, 68:10,
72:17, 87:6,
88:15, 100:10,
123:7, 127:11,
127:12, 134:23,
140:18, 142:7,
144:13, 146:12,
148:5, 160:7,
167:13, 167:22,
186:7, 189:20,
196:23, 197:19,
206:18, 207:11,
224:22, 228:9,
228:10, 240:17,
242:20, 247:20,
282:11, 292:21
**meaning**
93:4, 127:12,
205:7, 292:16
**means**
127:9, 227:3
**meant**
167:19
**mechanics**
154:19
**mechanism**
162:18, 168:1,
176:8, 229:24,
230:9, 230:17,
236:23
**mechanisms**
137:12, 168:11,
173:11, 173:17,

174:11, 174:18,
177:1, 177:17,
177:24, 178:2
**media**
102:23
**medical**
49:23, 112:20,
182:6, 304:9,
307:7
**meet**
22:17
**meeting**
15:2, 15:8,
20:21, 21:10,
21:11, 23:5,
23:22, 24:2
**meetings**
15:11, 23:2,
23:12, 23:19,
24:6, 24:13
**member**
37:1, 37:5,
37:6, 39:24,
40:8, 40:21,
50:19, 51:6,
58:10, 58:15,
70:9, 82:8,
82:12, 83:8,
84:5, 86:16,
86:23, 87:5,
88:9, 100:20,
107:16, 107:22,
108:1, 108:4,
114:4, 114:6,
114:12, 115:2,
115:11, 116:7,
117:13, 120:3,
133:18, 133:24,
134:6, 151:13,
156:23, 157:23,
159:24, 162:6,
162:10, 171:13,
171:17, 173:20,
174:2, 174:23,
188:1, 222:14,
235:5, 235:13,
249:2, 249:13,
250:22, 252:1,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    111

264:18, 264:19,
264:22, 284:22,
285:1, 285:3,
285:18, 285:23,
286:6, 286:8,
304:21
**member's**
107:17, 126:20,
150:21, 151:11,
152:1, 152:11,
173:18, 173:23
**members**
31:11, 36:18,
38:18, 38:19,
39:5, 39:11,
63:12, 80:22,
119:7, 134:7,
137:24, 160:14,
161:5, 162:19,
163:8, 170:23,
171:7, 171:16,
172:4, 180:19,
183:5, 183:12,
183:17, 183:19,
184:13, 202:22,
203:8, 204:1,
204:10, 207:16,
207:18, 256:7,
286:20, 303:16
**memo**
52:11, 117:7,
128:19, 129:14
**memorandum**
51:17, 51:22,
55:13, 56:7,
58:13, 117:16,
129:1, 201:14,
252:24
**memory**
55:24
**mention**
110:14, 178:5,
188:15, 209:19,
231:2, 231:19,
256:16
**mentioned**
33:14, 45:2,
45:17, 48:18,

48:20, 54:12,
67:23, 108:11,
114:1, 127:16,
132:11, 162:24,
170:4, 174:13,
174:19, 175:2,
183:15, 187:7,
188:13, 191:16,
191:21, 202:3,
204:2, 204:13,
208:16, 209:18,
210:14, 211:13,
212:4, 236:5,
238:19, 243:1,
266:23, 279:20,
287:4, 287:14,
288:17, 290:23,
292:13
**mentions**
177:11, 182:21,
202:20, 257:7
**merge**
176:2
**met**
22:22
**midway**
300:5
**might**
18:14, 33:12,
34:10, 45:4,
51:17, 54:13,
54:17, 58:3,
58:6, 65:24,
75:24, 85:2,
86:1, 86:4,
86:5, 86:10,
99:18, 99:19,
111:12, 112:16,
119:10, 128:1,
148:19, 175:21,
175:22, 201:8,
221:1, 222:4,
232:14, 232:24,
233:1, 274:4,
281:18, 282:18,
283:5, 283:9,
304:10
**minor**
182:9

**minute**
164:3, 263:18,
274:4
**minutes**
219:22
**miscellaneous**
222:1, 222:3,
222:7, 294:19
**mischaracterized**
75:6
**mischaracterizes**
19:22, 24:9,
112:2, 123:17
**misconduct**
7:16, 9:20,
10:3, 10:13,
11:9, 13:3,
24:23, 31:1,
32:1, 32:10,
36:18, 36:19,
36:24, 38:19,
39:6, 39:12,
41:4, 41:5,
41:22, 43:17,
43:23, 44:5,
44:7, 44:16,
44:17, 45:1,
45:13, 49:1,
50:10, 50:19,
51:6, 52:1,
52:14, 52:15,
57:2, 57:5,
59:4, 59:5,
59:10, 60:6,
61:5, 80:6,
95:6, 99:6,
99:13, 100:8,
101:16, 107:3,
107:14, 108:3,
115:2, 121:1,
122:10, 141:12,
145:16, 156:20,
168:13, 175:20,
205:8, 205:20,
206:22, 207:6,
213:7, 217:19,
228:17, 229:19,
232:19, 234:11,

234:19, 235:6,
236:12, 236:15,
257:23, 271:13,
271:14, 286:21,
287:19, 288:5,
288:10, 288:11,
289:7, 290:24,
303:7, 303:18
**misconducts**
102:9, 103:17,
206:12
**miscounted**
277:14
**misleading**
182:14, 269:8
**misprint**
306:9
**miss**
133:12
**missing**
296:20, 297:10
**misstated**
74:22
**misstates**
74:19, 74:20,
85:16, 94:22,
206:5, 265:9,
268:12, 283:12
**misunderstanding**
282:19, 283:2
**misunderstood**
21:12, 107:20,
195:7
**monitor**
202:6, 208:2,
208:4
**monitoring**
244:4
**month**
182:11
**monthly**
142:11
**more**
43:16, 44:4,
44:8, 44:9,
44:16, 44:21,
44:24, 45:5,
45:12, 52:3,

52:17, 75:24,
76:4, 99:10,
99:14, 99:23,
100:5, 102:16,
104:8, 106:10,
106:11, 128:23,
135:12, 183:5,
193:24, 212:9,
212:10, 219:5,
221:6, 242:7,
246:11, 254:15,
254:16, 256:15,
257:4, 257:6,
257:14, 257:17,
267:3, 271:8
**morning**
5:10
**most**
33:8, 44:9,
217:21, 218:7,
220:20, 220:23,
221:5, 270:16,
270:20
**mostly**
62:10
**mother**
299:7
**move**
19:9, 110:16,
182:17, 259:13
**moved**
299:16
**much**
126:17, 132:10,
133:1, 133:13,
179:1, 179:2,
193:5, 214:7,
307:16
**multiple**
100:24, 158:21,
217:19, 271:13,
271:16
**mumbling**
154:21
**murder**
300:10, 300:11,
301:9, 305:15
**must**
91:16, 271:15

**mutually**
282:13

**N**

**name**
5:11, 70:7,
74:3, 74:11,
175:21, 175:23,
176:18, 214:14
**named**
16:5, 16:14,
16:16, 18:11,
257:23
**narcotics**
103:22
**narrative**
18:4, 227:5,
227:13, 228:5
**nature**
45:6, 52:20,
70:6, 81:4,
101:5, 103:22,
152:3, 152:8,
152:10, 152:18,
152:19
**nature"**
151:15
**necessarily**
53:4, 53:13,
115:1, 264:17,
287:2, 303:21,
303:24, 304:3,
304:9
**necessary**
49:13, 148:3,
158:17
**need**
9:2, 33:12,
53:14, 76:18,
76:21, 85:19,
87:24, 91:11,
92:19, 115:17,
125:10, 138:9,
153:13, 154:18,
156:2, 165:22,
167:6, 167:22,
170:23, 173:1,
177:12, 183:23,

210:16, 213:22,
219:4, 235:8,
239:20, 252:21,
255:4, 284:16,
297:4, 307:22,
307:23
**needed**
75:23, 79:2,
146:9, 246:11
**needs**
173:10, 173:20
**neither**
184:3
**never**
134:9, 266:3
**nevertheless**
283:15
**new**
123:14, 159:13,
159:14, 160:4,
160:5, 161:6,
161:13, 164:6,
189:5, 235:8
**newer**
150:11
**newsletter**
15:20, 15:21
**newsletters**
15:15
**newspaper**
12:7, 12:8,
12:12, 12:17,
12:20, 12:24,
209:14, 287:20
**next**
46:8, 47:5,
49:2, 51:7,
58:16, 60:13,
66:6, 72:14,
72:18, 72:20,
73:5, 75:19,
77:8, 77:17,
78:12, 80:16,
82:12, 82:20,
83:7, 84:10,
84:21, 85:12,
86:1, 87:22,
91:10, 109:14,

112:7, 112:14,
113:1, 113:5,
113:24, 116:9,
116:10, 118:8,
122:22, 124:1,
124:4, 125:10,
131:17, 132:16,
132:20, 133:3,
133:9, 136:22,
140:4, 184:15,
260:13
**nine**
138:1, 138:2,
261:15, 261:24,
262:3, 262:21,
276:3, 277:14,
277:15, 291:18,
292:1
**nitty**
185:23
**non-disciplinary**
122:3
**non-officer**
103:10
**non-sustained**
280:18
**non-sworn**
105:11
**nonconcur**
83:6, 85:23,
87:20
**nonconcurrence**
83:10, 84:12,
84:18, 84:21,
85:6, 85:12,
87:23, 88:4,
88:5, 89:6,
125:9
**none**
195:14, 303:3
**nonexempt**
81:9, 86:20
**nor**
310:12
**normal**
178:17, 197:15,
204:3
**normally**
50:18

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    113

**north**
1:24, 2:6, 3:5,
309:9
**northern**
1:2, 8:21,
309:14
**nos**
5:1, 215:7,
304:14
**not-concur**
84:6
**notarized**
310:6
**note**
174:22, 264:13,
264:14, 274:2
**noted**
123:5, 123:7,
123:10, 282:11
**notes**
159:7, 173:15
**nothing**
30:13, 309:19
**notice**
1:19, 4:10,
4:11, 5:20, 6:4,
6:6, 6:10, 6:11,
6:19, 6:22, 7:1,
7:4, 7:5, 7:8,
7:10, 7:11,
7:18, 7:20,
7:22, 8:1, 8:3,
8:18, 9:15,
10:17, 16:5,
19:3, 35:7,
40:2, 40:11,
48:6, 65:22,
73:19, 76:14,
83:17, 89:20,
107:7, 114:6,
114:12, 115:12,
116:7, 128:9,
133:19, 136:24,
137:9, 142:6,
142:17, 144:9,
173:21, 174:17,
174:23, 175:12,
177:10, 190:14,

190:15, 197:2,
205:12, 205:14,
205:24, 234:17,
238:1, 248:5,
257:21, 262:18,
272:18, 273:4,
273:6, 276:6,
277:16, 280:20,
289:23, 290:20,
291:4, 309:12
**noticed**
176:17
**noticing**
174:21
**notification**
229:14
**notified**
162:14, 229:16,
229:23
**notify**
185:19, 197:10,
229:18, 237:5
**notifying**
229:7, 230:4
**november**
30:8
**now**
26:5, 31:14,
65:11, 74:12,
83:1, 86:15,
86:23, 89:10,
96:3, 98:5,
122:8, 148:9,
148:16, 152:24,
153:5, 154:21,
164:4, 167:9,
195:9, 195:10,
200:6, 203:7,
213:19, 214:12,
214:19, 214:23,
215:2, 239:3,
240:5, 254:16,
255:13, 255:24,
257:20, 259:13,
261:3, 266:8,
267:2, 280:11,
288:18, 293:3,
297:23, 306:14,

309:13
**number**
31:12, 34:4,
41:13, 41:18,
41:19, 41:24,
42:13, 43:9,
45:20, 46:3,
47:16, 77:22,
83:11, 98:15,
100:23, 104:19,
114:21, 142:11,
145:3, 154:13,
156:24, 160:19,
161:3, 161:11,
161:20, 161:23,
186:9, 193:24,
198:6, 199:2,
199:4, 199:22,
200:19, 201:2,
201:14, 217:17,
218:8, 222:19,
223:1, 223:4,
224:19, 224:20,
224:22, 225:2,
226:5, 228:23,
238:19, 256:17,
259:7, 259:8,
267:7, 269:3,
270:6, 271:12,
284:21, 285:6,
285:8, 285:16,
285:22, 286:5,
289:17, 291:11,
292:10, 292:22,
292:23, 293:23,
301:3
**numbered**
7:9
**numbers**
43:5, 194:11,
198:21, 199:18,
199:23, 232:6,
238:20
**numeral**
159:8, 159:23

**O**

**o'brien**
10:4, 16:7,

16:10, 18:22,
257:24, 273:9,
274:7, 275:12,
276:4, 276:21,
277:8, 278:12,
288:21, 289:14,
290:9, 291:1,
293:20, 294:5,
302:12
**o'brien's**
273:24
**object**
53:24, 54:1,
64:7, 94:22,
107:6, 158:6,
158:8, 158:10,
205:23, 221:21,
276:17, 287:1,
289:9, 305:12
**objecting**
8:3, 158:15,
159:2
**objectionable**
71:14
**objections**
20:10, 62:7,
64:17, 73:17,
84:2, 90:6,
147:7, 238:9,
248:18, 273:13,
273:21, 276:14,
276:24
**obligation**
290:20
**obligations**
37:6
**observe**
36:19, 178:6,
178:10
**obtain**
58:12, 61:3,
61:6, 61:10,
66:8, 67:2,
67:8, 67:13,
67:19, 93:16,
93:20, 94:3,
94:18, 95:4,
96:9, 112:19,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    114

113:3, 120:2,
120:19, 121:2,
121:11, 121:17,
121:24, 122:13,
232:5
**obtained**
66:13, 120:6,
120:11, 122:20,
160:5, 200:12
**obtaining**
72:6, 72:19,
117:15, 130:8,
130:13
**obvious**
168:7
**obviously**
45:5
**occur**
59:5, 60:6
**occurred**
18:2, 59:14,
71:2, 277:8,
277:19, 307:3
**october**
277:22
**off**
23:16, 53:16,
55:24, 57:19,
64:4, 97:3,
102:1, 102:5,
111:9, 122:13,
125:16, 136:24,
164:10, 172:15,
214:3, 214:20,
214:23, 239:19,
255:3, 297:13,
304:11
**off-the-shelf**
210:13
**offender**
185:2
**offenders**
168:4, 168:8,
184:23, 205:7,
288:24, 289:4
**office**
9:21, 12:6,
21:21, 24:24,

25:4, 25:18,
26:4, 26:12,
28:8, 28:11,
29:2, 29:4,
29:10, 31:3,
34:17, 36:10,
36:14, 36:16,
37:15, 37:18,
37:23, 38:2,
38:7, 38:10,
46:5, 46:6,
76:11, 77:2,
101:20, 102:4,
105:12, 141:21,
156:20, 163:2,
163:6, 163:7,
163:18, 163:22,
163:23, 184:20,
203:9, 219:17,
220:5, 229:7,
230:1, 230:3,
230:20, 231:3,
231:9, 232:4,
233:3, 233:24,
234:9, 235:23,
236:13, 236:24,
237:1, 237:11,
237:14, 238:14,
242:4, 242:10,
242:15, 244:8,
248:2, 248:8,
257:8
**officer**
7:16, 11:8,
16:6, 16:7,
16:8, 16:10,
17:9, 18:21,
24:23, 30:7,
30:24, 32:1,
44:24, 45:13,
49:1, 50:10,
51:8, 51:12,
51:17, 51:19,
53:8, 56:8,
57:2, 58:13,
59:9, 61:4,
61:11, 66:9,
66:21, 67:3,

67:9, 67:13,
67:19, 69:8,
72:2, 72:3,
72:14, 93:17,
94:12, 94:19,
95:5, 95:22,
99:23, 100:2,
103:9, 103:11,
103:13, 105:7,
105:9, 107:13,
109:8, 110:23,
112:7, 116:18,
116:19, 117:6,
117:10, 117:16,
120:7, 120:12,
120:19, 121:1,
122:10, 122:12,
122:19, 127:3,
128:10, 128:17,
129:1, 129:5,
129:14, 130:9,
134:16, 138:5,
139:21, 141:12,
156:19, 173:9,
173:13, 173:14,
176:18, 191:24,
193:23, 206:23,
206:24, 207:1,
224:8, 234:11,
236:24, 242:1,
257:1, 261:3,
266:3, 285:8,
285:17, 288:11,
289:6, 303:8,
305:8, 306:11
**officer's**
57:3, 68:10,
68:15, 68:20,
93:21, 94:2,
95:13, 120:20,
121:3, 121:17,
121:24, 122:21,
130:2, 175:18,
176:9, 177:5
**officers**
3:10, 13:2,
16:5, 16:14,
16:16, 16:18,

17:6, 17:18,
18:11, 18:23,
18:24, 19:15,
20:9, 46:19,
62:3, 62:14,
62:16, 63:2,
63:22, 64:2,
64:5, 64:14,
80:23, 81:13,
101:2, 101:14,
105:13, 105:21,
105:23, 106:1,
106:2, 106:14,
106:21, 107:2,
121:11, 138:20,
168:3, 168:12,
174:16, 177:3,
178:1, 178:3,
178:7, 196:12,
197:22, 198:6,
198:7, 198:12,
198:16, 198:22,
201:3, 201:15,
203:4, 203:23,
205:7, 205:19,
206:11, 206:23,
207:6, 208:2,
208:3, 213:6,
232:18, 237:5,
241:24, 257:23,
258:10, 259:9,
259:18, 272:20,
273:10, 273:17,
278:3, 281:1,
282:2, 288:23,
290:18, 298:1,
298:15, 303:8,
303:15, 305:9,
305:19, 306:4,
306:18
**oh**
21:12, 55:22,
104:19, 117:20,
167:1, 195:3,
250:14, 251:3,
299:18
**ohio**
210:14

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

115

**older**
199:15
**once**
9:7, 46:3,
46:21, 49:1,
57:22, 60:9,
72:12, 72:18,
73:4, 75:2,
82:19, 90:9,
93:21, 95:16,
96:10, 98:18,
109:12, 110:4,
112:5, 117:14,
122:19, 123:24,
125:13, 125:24,
129:11, 130:15,
131:3, 131:15,
133:4, 133:18,
134:15, 136:19,
140:2, 183:19,
196:1, 257:10,
271:9
**one's**
174:16
**ones**
49:18, 50:10,
52:17, 62:9,
78:14, 80:8,
82:4, 103:4,
108:5, 108:11,
108:13, 132:17,
198:9, 262:15,
262:19
**ongoing**
96:18
**only**
43:18, 62:20,
65:3, 74:11,
93:20, 94:14,
94:20, 94:24,
95:17, 96:9,
96:11, 96:12,
96:13, 96:22,
106:20, 120:7,
120:12, 126:10,
135:2, 152:1,
163:18, 172:20,
187:13, 191:9,

191:12, 192:18,
203:7, 204:15,
217:12, 217:20,
217:21, 221:13,
221:17, 240:19,
247:2, 252:19,
260:20, 260:22,
264:12, 269:15,
269:24, 270:8,
270:11, 275:17,
279:6, 280:19,
292:12, 292:23,
310:5
**op**
4:19
**open**
38:13, 283:18
**operate**
183:2, 283:16
**operated**
284:5
**operating**
12:5, 13:7,
80:5, 185:12,
219:7, 220:12,
239:17, 240:6,
240:15, 241:3,
244:12
**operation**
37:18, 37:19,
222:6, 294:21
**operational**
4:18, 231:15
**operations**
219:16, 220:5
**operative**
14:12, 30:21,
157:17, 165:10,
216:15, 216:22
**opinion**
238:8, 290:10
**opportunity**
8:23, 9:5, 9:7,
9:14, 10:20,
11:2, 100:11,
178:6, 220:4,
240:5, 243:24,
246:23, 276:17

**ops's**
46:15, 270:15
**option**
77:12, 87:9,
123:14
**options**
87:4, 88:12,
133:19, 138:21,
256:22
**order**
4:12, 4:13,
4:14, 4:15,
14:7, 14:8,
14:11, 14:15,
37:10, 49:13,
140:10, 140:11,
140:12, 147:22,
148:9, 148:17,
149:12, 149:15,
149:16, 149:19,
149:24, 150:7,
150:21, 152:21,
155:9, 157:11,
159:15, 164:22,
165:6, 165:9,
165:15, 166:4,
166:9, 167:21,
168:20, 169:23,
172:3, 180:24,
182:14, 182:21,
183:8, 183:10,
183:11, 184:16,
186:19, 202:20,
204:20, 218:7,
249:1, 249:17,
253:5, 307:20,
307:21, 308:3
**orders**
147:18, 147:19,
154:3, 155:13,
155:20, 155:22,
158:23, 278:20
**organization**
9:23, 26:1
**organizations**
30:22
**original**
89:6, 160:5

**others**
182:23, 292:16
**otherwise**
27:22
**our**
9:15, 14:24,
39:15, 55:11,
146:3, 156:19,
162:22, 163:3,
234:7, 234:12,
236:15, 245:4
**out**
15:2, 19:4,
25:24, 26:4,
31:8, 67:24,
68:3, 72:1,
94:11, 105:22,
110:16, 113:22,
126:19, 126:24,
132:18, 162:13,
184:17, 185:10,
193:19, 244:23,
246:15, 247:17,
254:8, 288:12,
288:16, 308:4
**outcome**
70:16, 310:13
**outlined**
195:20, 196:22
**outside**
25:20, 31:8,
35:5, 35:6,
40:2, 40:10,
48:6, 49:22,
65:21, 73:19,
76:13, 83:16,
89:19, 98:24,
99:7, 99:9,
104:13, 107:6,
107:11, 107:15,
108:6, 109:24,
112:20, 128:6,
128:16, 130:7,
131:4, 132:1,
132:8, 140:19,
142:5, 142:16,
144:8, 145:10,
162:10, 190:10,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

116

190:14, 190:15,
190:17, 195:14,
196:23, 205:11,
205:14, 205:23,
208:15, 237:24,
244:1, 248:4,
260:19, 273:3,
276:5, 276:7,
277:16, 289:22,
289:23
**over**
8:10, 8:13,
20:18, 30:6,
30:22, 36:21,
46:13, 107:4,
110:20, 137:15,
137:16, 159:12,
198:23, 199:2,
249:23, 307:12
**overtime**
101:2
**overview**
133:14
**own**
39:12, 64:24,
65:10, 119:3,
143:4, 221:2

**P**

**packed**
147:22
**packet**
148:1, 148:4,
148:11, 148:14,
148:15, 148:22,
149:20, 153:20
**page**
4:7, 4:10,
4:11, 4:12,
4:13, 4:14,
4:15, 4:16,
4:17, 4:18,
4:19, 4:20,
4:21, 4:22,
4:23, 4:24,
6:13, 7:10,
8:17, 18:8,
18:10, 150:14,

215:22, 241:12,
243:5, 250:20,
259:19, 260:1,
260:3, 260:13,
260:22, 266:14,
274:2, 291:8,
291:10, 299:2,
299:24, 300:1,
301:11
**page(s**
4:4, 4:5, 4:6
**pages**
148:18, 149:12,
149:23, 292:13,
296:21, 296:23,
297:5, 297:9
**pamela**
1:22, 3:17,
309:6, 310:20
**panel**
126:11, 126:13,
133:17, 133:21,
133:23, 134:3,
134:7, 134:12,
134:16, 134:19,
134:24, 135:4,
135:7, 135:15,
135:17, 136:1,
136:19, 243:20,
251:18, 252:6,
252:14
**paper**
17:2, 61:23,
62:10, 62:13,
63:15, 63:16,
63:17, 68:4,
186:8, 186:10,
186:20, 187:8,
187:19, 188:14,
204:13, 204:22,
227:17, 227:23,
228:4, 228:10,
228:11, 228:12,
228:16, 242:18,
287:12
**paperwork**
177:3
**paragraph**
300:5

**parameter**
135:5
**part**
7:10, 34:6,
49:9, 49:17,
52:6, 56:21,
63:4, 76:8,
143:5, 147:22,
148:12, 160:19,
163:17, 176:19,
177:9, 178:9,
183:15, 184:7,
185:9, 196:12,
197:15, 197:22,
198:17, 201:3,
203:11, 203:23,
204:3, 212:17,
232:9, 241:24,
245:9, 273:1,
273:18, 282:4,
301:13, 306:14
**participation**
122:5
**particular**
13:2, 14:14,
24:22, 32:24,
42:6, 43:12,
43:23, 44:6,
48:15, 48:22,
109:18, 121:15,
195:15, 222:15,
225:1, 246:12,
246:14, 247:15,
284:10, 285:5,
286:5
**parties**
309:12, 310:12
**parts**
34:22
**passing**
124:19
**past**
15:6, 15:15,
25:15, 190:23,
214:6, 282:18,
286:15, 286:20,
288:4
**patrol**
30:1

**pattern**
170:23, 173:10,
173:18, 185:21,
194:12, 206:16,
206:18, 206:20,
207:5, 207:16,
208:12, 208:18,
213:6
**patterns**
173:1, 174:17,
174:21, 177:11,
178:12, 178:16,
184:20, 194:7,
197:2, 206:22,
207:21, 207:24,
208:17, 210:16,
286:15, 286:20,
287:19, 287:21
**pause**
97:3, 188:19,
195:7
**pay**
257:11
**penalties**
73:1, 116:18,
123:1, 125:14,
135:5, 243:16,
251:6
**penalty**
72:17, 72:21,
72:22, 73:5,
74:17, 75:4,
75:15, 75:21,
77:11, 80:15,
81:7, 82:7,
82:11, 83:13,
83:22, 118:6,
122:24, 124:1,
124:9, 125:20,
126:2, 130:17,
130:21, 130:23,
133:6, 133:19,
133:20, 134:18,
134:20, 135:18,
136:20, 136:21,
137:13, 138:6,
138:20, 138:22,
139:1, 139:15,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                117

141:1, 259:4
**pending**
50:24, 56:2,
309:13
**people**
36:21, 101:6,
110:16
**per**
64:1, 70:21,
96:8, 270:7,
290:20
**percent**
35:15
**percentage**
35:2, 35:18,
36:1, 83:12
**perform**
127:7
**performance**
171:14, 180:20,
181:14, 182:19,
197:10, 198:7,
279:12, 281:9
**performed**
127:8
**period**
9:17, 21:23,
22:3, 27:13,
31:1, 31:22,
32:19, 33:5,
35:1, 35:15,
38:22, 43:5,
44:15, 45:12,
61:2, 67:11,
97:14, 101:24,
111:18, 111:19,
113:16, 123:14,
141:22, 142:15,
155:8, 155:12,
155:23, 157:18,
157:21, 167:10,
169:3, 172:1,
182:11, 184:24,
187:23, 188:6,
189:17, 195:13,
196:20, 206:13,
209:8, 216:24,
227:15, 228:18,

236:24, 237:19,
242:2, 242:16,
244:16, 245:10,
245:15, 245:24,
269:5, 269:24,
275:24, 276:21,
284:24, 303:14
**permitted**
37:19, 93:20,
95:12, 96:9
**pers**
4:15
**person**
36:11, 36:12,
37:15, 52:10,
86:10, 102:20,
114:8, 116:24,
134:10, 178:17,
197:11, 219:8,
236:13
**personal**
119:14, 142:24,
143:11
**personally**
310:6
**personnel**
15:7, 15:13,
21:13, 21:15,
21:20, 22:11,
43:7, 43:8,
44:10, 45:19,
118:19, 118:21,
119:5, 119:16,
119:19, 120:1,
122:5, 122:6,
166:9, 168:21,
169:2, 169:16,
169:17, 169:19,
170:3, 170:9,
171:5, 171:7,
171:11, 171:17,
171:24, 172:3,
172:5, 172:7,
172:9, 172:10,
172:16, 172:17,
173:23, 174:4,
175:3, 175:17,
176:17, 181:4,

184:4, 185:19,
193:8, 194:13,
195:23, 196:2,
196:4, 196:9,
196:16, 197:4,
198:23, 201:11,
201:17, 201:20,
201:22, 202:2,
202:7, 202:9,
202:21, 203:5,
203:12, 203:13,
203:14, 203:16,
203:23, 204:11,
204:21, 207:13,
208:1, 209:1,
222:6, 269:2,
273:16, 273:18,
285:10, 285:19,
286:7, 294:21
**pertain**
172:5
**pertaining**
1:21, 272:20
**perusing**
149:4
**phase**
115:10, 116:19,
126:7, 130:9,
130:15, 176:8
**phonetic**
13:12, 17:10,
22:23, 35:9,
55:7, 58:11,
69:13, 74:1,
106:11, 130:10,
130:11, 130:17,
133:24, 139:15,
160:17, 173:6,
214:22, 245:23,
246:8, 250:17,
254:24, 259:8,
269:13, 279:21,
288:17, 302:13,
305:13, 306:8,
306:9
**photographic**
10:12, 10:14,
225:12, 228:14

**photographs**
112:21, 113:4,
304:8
**physical**
45:7, 45:8,
49:21, 50:17,
58:6, 58:20,
63:23, 79:11,
112:23, 113:4,
116:13, 127:23,
226:4, 302:8,
302:19, 304:7,
305:11, 306:5,
307:2, 307:7
**physically**
301:23, 305:13,
306:11
**picked**
299:11
**piece**
20:22
**place**
26:5, 36:20,
113:9, 170:11,
172:20, 179:22,
180:8, 180:15,
189:5, 229:6,
230:10, 230:17,
233:8, 247:2,
283:4
**placed**
207:12
**placement**
202:8
**plaintiff**
1:8, 1:18, 2:11
**plaintiff's**
5:19, 10:17
**plans**
30:11
**play**
100:23
**please**
5:11, 47:23,
62:7, 76:22,
94:8, 153:16,
202:17, 239:3,
293:23, 297:1

plural
43:13
plus
35:20, 73:19
point
30:12, 74:2,
88:22, 91:13,
95:7, 95:20,
123:4, 126:10,
189:3, 190:2,
198:17, 211:10,
249:1
policies
7:14, 11:6,
11:13, 39:10,
229:6, 233:7,
233:15, 233:18,
236:9, 270:8,
285:21
policing
29:11
policy
43:21, 44:16,
168:1, 172:6,
183:11, 207:17,
229:11, 229:12,
230:4, 230:18,
235:11, 235:22,
236:6, 236:11,
237:13, 237:14,
270:15
political
102:20
portion
18:4, 74:8,
118:12, 157:21,
158:4, 175:15,
175:16, 189:10,
251:21
portions
148:15
posed
158:19
position
5:13, 27:1,
27:6, 28:10,
28:15, 28:24,
29:9, 29:17,

29:23
positions
172:9
possession
112:22
possibilities
108:24, 114:21,
116:9, 134:15
possibility
123:5, 123:9,
129:7, 133:18,
182:22, 203:8,
203:15, 232:12,
283:3
possible
31:7, 32:23,
33:3, 33:4,
33:12, 49:7,
49:13, 57:7,
58:2, 58:4,
58:24, 59:8,
59:17, 65:24,
73:1, 75:19,
77:8, 77:17,
85:6, 94:2,
94:17, 101:15,
112:13, 112:23,
114:10, 114:18,
115:17, 115:21,
115:23, 116:23,
117:9, 117:10,
117:12, 127:19,
131:6, 137:12,
162:11, 222:5,
270:10, 292:14,
292:15
possibly
101:4, 113:2,
113:23, 122:2,
174:20, 221:24,
222:2, 222:3,
232:3
potential
174:8
potentially
289:20
practice
33:5, 254:8

practices
7:14, 11:6,
11:13, 12:11,
167:17, 229:6,
233:8, 285:22
precursor
165:7, 193:7,
193:15
preface
10:12
prefer
26:9
preliminary
231:21
premise
271:2
preparation
18:20, 20:11,
144:19, 150:8,
158:24, 169:8,
216:10, 240:10,
241:1, 243:18,
258:9, 272:15,
296:1
prepare
11:19, 12:2,
12:21, 13:10,
13:17, 14:16,
14:21, 15:3,
16:16, 19:1,
19:11, 19:16,
20:22, 21:1,
21:10, 22:11,
22:20, 23:5,
170:1, 209:18,
255:11, 255:15,
257:8, 260:18
prepared
8:14, 10:1,
10:6, 10:8,
10:16, 10:18,
10:21, 11:5,
11:11, 35:22,
84:6
preparing
151:6, 213:14,
248:21
preponderance
58:22

presence
309:21
present
3:12, 23:13,
90:4, 90:11,
163:17, 231:22,
308:8
presentation
243:18
pretty
119:18, 126:17,
132:10, 133:1,
133:13, 179:1,
179:2, 193:5,
267:11
prevent
9:19, 287:3
prevented
96:7, 288:7,
288:9
previous
7:18, 87:5,
88:14, 94:23,
187:7, 187:17,
193:18, 252:9,
292:13
previously
53:20, 108:5,
108:11
primarily
142:5, 216:22
print
297:2
printed
16:21, 16:24
printing
215:23
printout
17:4, 260:14,
260:17, 261:21,
261:23, 263:10,
266:9, 266:11,
266:17, 266:22,
274:1, 276:21,
288:20, 293:4,
295:3, 295:11
prior
8:24, 27:11,

27:18, 28:15,
28:16, 28:20,
28:24, 29:9,
29:17, 29:23,
93:14, 131:12,
155:8, 165:16,
175:19, 205:4,
241:3, 261:16,
262:1, 262:16,
262:20, 263:11,
263:23, 264:2,
264:7, 265:13,
265:17, 267:15,
268:1, 272:8,
273:2, 273:11,
274:8, 274:12,
274:13, 275:2,
275:6, 275:11,
276:23, 278:4,
278:13, 283:12,
287:23, 288:10,
288:24, 289:15,
291:19, 293:8,
293:21, 294:6,
294:15, 294:24,
295:8, 307:4
**private**
40:9, 40:21
**privileged**
210:4
**privy**
135:21, 135:22
**probable**
221:6
**probably**
101:5, 219:5,
307:12
**problem**
75:8, 148:6,
183:22
**problems**
180:20, 183:24
**proc**
4:18, 4:19
**procedure**
1:20, 43:21,
80:5, 168:1,
219:8, 219:16,

220:5, 220:13,
225:21, 228:15,
230:8, 230:11,
230:18, 231:15,
239:17, 265:22,
270:15
**procedures**
10:13, 12:5,
13:7, 39:10,
39:16, 121:22,
150:5, 153:12,
159:22, 185:12,
225:13, 237:5,
240:6, 240:15,
241:3, 244:12,
250:5, 250:15,
270:8, 273:2,
285:21
**proceed**
5:23, 8:9,
24:16, 57:10,
115:1, 115:10,
151:19, 152:3,
152:10, 163:18
**proceeded**
116:6
**process**
30:16, 45:21,
51:3, 60:13,
66:6, 72:15,
72:21, 73:6,
74:16, 75:3,
78:12, 81:8,
82:13, 84:22,
85:17, 90:9,
92:6, 92:19,
93:9, 95:20,
97:12, 97:17,
97:24, 98:6,
98:20, 109:14,
112:8, 112:15,
113:24, 124:2,
126:15, 126:23,
129:12, 131:18,
131:24, 132:2,
132:17, 132:20,
133:4, 133:9,
133:16, 134:12,

137:2, 138:5,
140:4, 160:19,
175:2, 197:12,
197:15, 204:8,
235:6, 244:5,
244:24, 251:13,
254:23, 256:6,
257:15
**processes**
121:9
**produce**
199:24, 200:7
**produced**
147:16, 164:23,
213:15, 216:4,
219:18, 239:13,
309:12, 310:6
**product**
177:9
**professional**
9:21, 12:6,
24:24, 25:4,
25:18, 26:12,
34:17, 36:10,
36:15, 36:16,
37:24, 38:10,
46:6, 141:21,
203:9, 219:17,
220:5, 238:14,
248:2, 248:8
**profile**
102:16, 102:20
**program**
122:6, 169:2,
170:3, 170:9,
171:5, 171:6,
172:1, 172:4,
172:6, 172:8,
172:10, 172:17,
184:4, 184:5,
185:19, 189:2,
189:5, 190:17,
193:8, 194:13,
195:24, 196:3,
196:5, 197:4,
198:23, 201:12,
201:17, 201:20,
201:22, 202:2,

202:7, 202:8,
202:9, 202:21,
203:5, 203:24,
204:11, 204:21,
207:13, 209:1,
209:19, 210:13,
210:19, 269:2,
273:16, 273:19,
283:23, 284:23,
285:9, 285:10,
285:19, 285:24,
286:8
**programs**
15:6, 167:11,
172:16, 183:18,
183:23, 193:16,
202:13, 281:12
**prohibit**
152:12
**prohibited**
121:6, 121:7,
122:15, 130:8,
130:13, 281:11,
282:5, 283:10,
286:19
**proper**
10:12, 59:14,
104:21
**properly**
131:8
**prosecution**
242:4
**prosecutions**
241:14, 242:22
**prosecutor**
225:3, 226:13,
228:2, 228:7
**protocol**
163:17
**prove**
59:23
**provide**
114:24, 142:10,
144:5, 199:19,
201:10, 202:17
**provided**
57:24, 113:11,
134:13, 142:20,

143:9, 143:22,
158:12, 158:24,
291:9, 298:9,
301:17, 302:5
**provides**
250:15
**providing**
115:11, 116:21,
156:1, 221:11
**provision**
96:2, 210:24,
252:20, 252:22,
252:23, 280:13
**provisions**
1:19, 14:5,
14:11, 14:14,
96:6, 249:17,
283:4, 283:18
**public**
101:20, 256:8,
256:9
**published**
12:12, 12:24
**pulled**
118:15, 176:10
**pun**
4:13
**punishment**
153:6, 153:10,
156:8, 157:22,
160:4, 174:20,
251:15
**purged**
199:18
**purporting**
296:14
**purpose**
80:24, 96:3,
121:18, 171:24,
172:3, 180:18,
181:7, 186:14,
217:4, 281:5,
282:1, 290:17,
290:19
**purposes**
26:15, 81:2,
96:5, 120:22,
121:14, 122:12,

132:24, 148:7,
181:2, 280:4,
280:20, 282:24
**pursuant**
1:19, 5:19,
37:9, 37:11,
96:17, 134:13,
146:14, 152:10,
187:13, 268:15,
280:23
**pursue**
56:14
**put**
7:24, 63:17,
82:24, 152:23,
152:24, 164:3,
173:21, 189:3,
189:20, 189:21,
214:14, 247:17
**putting**
196:8, 265:23,
282:22

**Q**

**qualification**
158:8
**qualifications**
274:2
**qualified**
205:13
**qualifiers**
285:13
**qualify**
18:16
**quality**
243:13, 244:17,
245:3, 245:13,
245:18
**quantities**
103:21
**quarterly**
142:11
**question**
20:1, 24:8,
32:13, 33:22,
40:1, 47:23,
48:5, 50:24,
51:15, 51:21,

52:12, 53:9,
53:24, 54:1,
54:3, 56:2,
63:5, 63:13,
71:14, 71:17,
72:8, 76:19,
79:23, 80:10,
94:6, 95:20,
107:5, 109:2,
114:15, 115:20,
117:3, 128:21,
141:9, 146:2,
148:8, 148:16,
148:24, 149:13,
153:23, 158:18,
159:1, 159:3,
160:18, 161:14,
167:18, 167:22,
168:6, 170:12,
178:23, 179:11,
188:9, 194:21,
197:18, 198:3,
202:17, 204:5,
205:10, 206:9,
207:9, 209:4,
210:5, 222:21,
224:18, 234:14,
238:3, 263:6,
269:18, 269:20,
271:2, 272:16,
275:15, 276:16,
277:3, 278:23,
278:24, 286:22,
289:1, 289:10,
289:22, 294:2
**questioned**
299:12
**questioning**
299:9, 302:15
**questions**
8:2, 9:7,
11:18, 20:15,
24:17, 31:21,
55:12, 86:8,
93:8, 129:4,
143:2, 190:14
**quick**
53:14, 239:23,

284:16

**R**

**r1**
253:16, 253:19
**race**
100:16
**rainmaker**
212:24
**rank**
76:4, 80:23,
88:3, 99:18,
99:22, 100:2,
100:4, 134:5,
134:10
**ranking**
110:23
**rankings**
108:23
**rate**
237:21
**rates**
237:17, 238:14,
238:16
**rather**
177:20, 229:17,
287:14, 288:18
**raw**
238:19
**rd**
240:12
**re-retire**
30:11
**reach**
117:18, 118:5,
129:15, 307:4
**reached**
19:4, 25:24,
26:4, 60:10,
71:24, 75:3,
80:14, 83:12,
85:23, 92:16,
93:1, 93:22,
93:24, 94:10,
95:13, 95:16,
95:23, 96:10,
117:15, 120:20,
121:3, 121:19,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    121

123:24, 128:7,
129:24, 130:9,
136:20
**reaching**
93:15, 118:5,
121:14
**reaction**
184:6
**read**
6:14, 18:15,
54:20, 55:4,
55:16, 55:17,
63:5, 148:3,
158:13, 170:17,
209:18, 223:7,
224:23, 244:11,
278:23, 278:24
**reading**
69:9, 69:17,
69:23, 70:11,
71:4, 209:24,
227:4, 227:8,
244:15, 258:2,
303:12
**ready**
149:7, 154:16
**really**
96:4, 202:16,
212:10, 252:21,
252:22, 271:4,
287:22, 288:15,
290:3
**reask**
47:23, 76:21
**reason**
84:11, 254:5,
286:12, 286:17,
298:5
**reasons**
83:9, 84:18,
84:20, 85:5,
85:11, 86:5,
174:15
**recall**
13:5, 19:18,
21:5, 22:13,
34:21, 35:11,
35:13, 37:21,

38:1, 69:14,
69:21, 69:23,
70:1, 70:11,
70:21, 70:22,
71:10, 71:19,
71:20, 71:21,
74:12, 80:11,
134:8, 139:23,
145:11, 145:14,
163:15, 188:13,
192:5, 192:22,
199:4, 199:21,
219:10, 227:9,
227:18, 255:17
**receive**
22:1, 38:22,
160:14, 229:14
**received**
6:16, 7:21,
19:3, 22:4,
72:12, 90:10,
105:9, 137:9,
159:8, 163:20,
193:23, 271:24,
275:1
**receiving**
129:13, 130:18
**recently**
7:20
**recess**
53:18, 97:6,
164:12, 214:24,
284:18, 297:14,
304:13
**recognize**
165:4, 166:8,
175:21, 239:10,
239:11
**recollection**
54:23, 57:17,
151:17, 154:19,
252:4, 252:13
**recommend**
73:2, 138:22
**recommendation**
70:15, 71:24,
72:21, 77:11,
80:14, 85:24,

86:2, 86:17,
87:17, 89:6,
91:4, 120:20,
121:4, 122:24,
130:16, 130:23,
135:1, 136:1,
138:24, 140:7,
159:9, 250:17,
285:9, 307:4
**recommendations**
88:17, 123:1,
135:22, 136:4,
136:5, 136:12,
136:13, 140:3,
140:15
**recommended**
58:21, 58:24,
72:16, 73:5,
74:17, 75:4,
75:14, 75:15,
75:21, 79:3,
80:15, 81:7,
81:22, 82:11,
83:22, 91:24,
116:15, 116:16,
116:17, 117:18,
118:5, 118:6,
118:9, 121:19,
124:1, 124:8,
124:16, 124:23,
125:3, 125:7,
125:14, 126:2,
129:15, 129:20,
129:24, 130:21,
133:6, 135:18,
136:20, 137:16,
141:11, 238:18,
243:16, 244:21,
250:16, 259:4,
300:19, 300:20,
305:23, 307:9,
307:10
**recommending**
82:8, 130:10
**reconsider**
137:7
**record**
5:11, 5:24,

6:4, 13:22,
15:19, 53:16,
62:20, 63:1,
63:11, 64:13,
64:22, 69:19,
69:24, 70:3,
76:18, 77:22,
78:6, 97:4,
156:5, 157:3,
157:24, 158:20,
158:22, 159:17,
164:10, 188:19,
190:19, 190:21,
191:5, 214:3,
214:4, 214:5,
214:14, 214:23,
239:12, 239:19,
242:14, 242:18,
255:3, 284:19,
297:13, 297:16,
304:11, 304:17
**recorded**
157:7
**records**
49:23, 50:18,
61:18, 65:12,
112:21, 118:19,
118:21, 118:22,
119:3, 119:4,
119:5, 119:17,
119:22, 120:2,
120:11, 141:3,
141:7, 159:7,
181:8, 183:15,
183:17, 184:9,
184:13, 187:18,
187:24, 188:6,
189:6, 189:16,
192:8, 194:11,
194:15, 207:22,
287:5
**recount**
274:9
**redactions**
302:2
**reduce**
134:18, 135:18,
138:22, 138:23,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

122

139:1, 139:14
**reduced**
134:19, 138:22,
140:24, 309:22
**reduces**
187:18
**reduction**
135:18, 136:21
**refer**
13:22, 77:13,
77:14, 107:12,
108:3, 154:8,
165:23, 168:20,
206:9, 220:11,
241:19, 249:5,
266:14
**reference**
8:4, 166:16,
209:23, 247:7,
301:18
**referencing**
264:21
**referral**
242:21, 284:23,
286:8
**referred**
26:8, 31:8,
99:7, 104:13,
107:14, 108:1,
109:7, 109:24,
126:19, 126:24,
128:6, 130:6,
131:24, 132:18,
232:3, 242:3,
242:10, 242:15,
243:5, 285:18
**referring**
6:8, 12:15,
34:14, 34:22,
46:1, 60:18,
79:8, 79:9,
80:20, 89:2,
168:18, 173:9,
191:19, 199:7,
231:14, 232:10,
234:3, 250:3,
253:1, 253:5,
258:22, 279:23,

280:2, 280:7
**refers**
26:12
**reflected**
6:5
**refresh**
54:23, 55:24,
57:16, 57:19,
151:17, 154:18,
252:4, 252:13
**refuse**
129:5
**refused**
113:10
**regained**
152:2
**regard**
7:24, 229:6,
244:5, 257:5,
257:22
**regarding**
10:15, 11:5,
93:9, 142:3,
163:6, 184:8,
231:9, 305:15
**regardless**
41:5, 65:5,
91:18, 182:3,
217:17, 217:18,
250:21
**register**
98:18, 151:14,
156:24, 160:19,
160:21, 161:3,
197:16, 204:3,
217:9, 237:18,
250:19, 260:6,
261:15, 261:22,
262:15, 263:11,
266:18, 268:10,
271:23, 273:24,
276:12, 276:20,
286:14, 291:9,
291:19, 293:4,
294:8, 294:11,
295:2, 295:10,
296:18, 297:19,
297:24, 300:23,

302:23
**registered**
13:20, 190:7,
197:7
**registers**
262:1
**regression**
280:12
**regular**
177:21, 179:3,
197:12
**regulations**
37:12, 39:14,
229:20, 234:13,
236:16, 244:5,
289:21
**relate**
13:2, 14:18
**related**
10:13, 12:10,
12:18, 55:12,
122:10, 156:9,
200:16, 236:18,
250:22, 274:7,
277:18, 300:11,
310:12
**relates**
150:4
**relating**
7:15, 11:7,
172:6, 178:1,
302:14
**relation**
210:23
**relationship**
233:24, 279:20
**relationships**
280:15
**relative**
181:24, 232:5,
252:1
**relayed**
299:15
**relevant**
24:18, 31:22,
35:1, 67:11,
97:14, 103:18,
111:18, 111:19,

113:16, 123:3,
154:4, 155:12,
155:15, 158:5,
159:4, 167:10,
168:2, 169:3,
189:17, 196:19,
228:17, 237:18,
265:6, 269:4,
269:24, 284:24
**relied**
54:22
**remain**
100:18, 101:8,
109:23
**remained**
39:18, 99:5,
99:11, 99:14,
99:15, 103:3,
113:18
**remember**
12:23, 21:14,
23:22, 55:15,
69:17, 96:23,
111:13, 112:1,
112:3, 118:15,
134:1, 146:3,
160:20, 188:8,
200:21, 243:3,
255:16
**remind**
214:7
**renamed**
25:14
**rendered**
83:23
**reorient**
56:3
**repeat**
63:3, 74:23,
120:8, 168:3,
176:18, 178:3,
184:23, 185:1,
205:7, 206:11,
209:4, 230:14,
263:6, 288:24,
289:4, 289:6,
291:11, 294:2,
303:11

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

123

**repeated**
171:15, 182:7,
182:8
**repeatedly**
168:13, 205:8,
205:20, 269:9,
289:20
**rephrase**
20:16, 34:2,
207:2, 261:18
**replaced**
25:14, 25:19,
26:1, 26:2
**report**
4:22, 4:24,
36:18, 38:19,
70:23, 83:9,
84:7, 137:6,
142:11, 143:5,
143:6, 143:23,
144:2, 145:7,
145:18, 198:7,
199:13, 199:14,
199:15, 199:18,
201:13, 212:11,
238:21, 250:18,
250:20, 251:1,
251:5, 259:2,
296:11, 296:16,
301:16
**reported**
3:17, 10:5,
111:3, 145:2,
145:15, 199:12,
274:13, 276:3,
277:20, 278:3,
291:2, 301:19,
309:21
**reporter**
1:23, 5:6,
68:12, 154:20,
250:13, 307:20,
308:1, 309:7
**reporting**
141:20, 142:1,
142:8, 142:13,
142:24, 143:3,
143:12, 143:18,

196:9, 236:21,
236:23, 250:4,
250:15
**reports**
16:3, 16:13,
18:23, 19:14,
20:4, 34:12,
34:14, 34:15,
34:19, 48:8,
84:1, 142:18,
142:23, 143:10,
144:6, 144:11,
144:18, 144:20,
145:1, 177:6,
196:15, 238:20,
246:3, 246:7,
249:14, 304:9,
306:4, 306:10
**represent**
264:17
**representative**
134:9, 138:18
**representing**
243:22
**reprimand**
73:3, 91:20,
123:4, 123:11,
123:12, 123:15,
125:17, 125:20,
125:21, 126:3,
135:14, 251:16
**reprimands**
251:12
**reproduced**
310:8
**request**
60:19, 60:22,
66:19, 67:24,
68:9, 68:15,
84:12, 87:6,
88:16, 118:10,
118:12, 130:1,
130:5, 138:10,
146:5, 146:8,
153:6, 153:10,
156:8, 160:4,
200:4, 200:6,
200:8

**requested**
63:6, 119:16,
120:10, 279:1
**requests**
118:16, 119:6,
252:1
**require**
33:15, 52:23,
56:6, 80:15,
81:23, 82:18,
92:21, 93:1,
114:6, 229:21,
234:8, 234:13,
236:16, 279:15
**required**
34:10, 39:5,
39:9, 39:11,
52:1, 52:3,
52:15, 53:9,
55:13, 79:13,
80:5, 80:7,
82:5, 91:1,
96:24, 125:7,
184:12, 185:19,
194:15, 195:17,
195:22, 197:10,
207:18, 207:20,
207:22, 208:2,
208:3, 230:19,
280:3
**requirement**
56:14, 56:19,
56:22, 125:6,
141:21, 142:14,
146:14, 159:17,
234:23, 235:12,
235:14, 279:18
**requirements**
142:1, 142:8,
143:1, 143:3,
143:12, 143:18,
145:24, 202:14
**requires**
176:5, 183:11,
194:12, 203:13,
207:21, 237:5,
257:16
**rescinded**
155:1

**rescinding**
149:24
**resolved**
202:5
**resources**
14:24, 119:12,
119:13, 183:21
**respect**
10:11, 16:22,
18:20, 72:6,
193:2, 195:16,
201:11, 204:5,
206:10, 229:13,
271:21, 293:20,
302:22
**respectively**
6:21
**respond**
117:11, 117:12
**responded**
202:23
**responding**
119:6
**responsibilities**
172:8, 184:16,
203:18
**responsibility**
76:4, 201:22,
310:8
**responsible**
119:6, 184:17,
243:17, 243:22,
244:3
**responsive**
171:15
**rest**
297:3
**restate**
94:7, 261:18,
265:11
**restrictions**
284:11
**result**
9:24, 94:19,
180:20, 282:2
**resulted**
96:19, 235:15,
237:22

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

124

**results**
202:24, 234:9
**retain**
58:15, 159:9
**retained**
9:23
**retire**
27:16
**retired**
27:13
**retirement**
27:18, 28:1,
28:15, 28:16,
28:23
**retrieve**
188:16
**return**
28:6, 69:6
**returned**
28:4, 68:19
**review's**
136:11
**reviewed**
12:4, 13:9,
13:17, 14:21,
16:3, 19:1,
19:15, 21:1,
22:10, 45:23,
45:24, 46:22,
60:9, 73:8,
74:18, 75:5,
75:10, 75:14,
75:20, 79:6,
109:22, 124:5,
124:17, 124:20,
135:19, 136:19,
138:19, 140:17,
150:7, 151:3,
155:22, 158:23,
192:24, 196:15,
216:9, 240:9,
242:21, 251:6,
255:13, 260:7,
260:9, 261:6,
266:11, 266:17,
276:13, 282:24,
288:19, 296:1,
297:24, 298:3

**reviewing**
9:10, 10:24,
18:22, 35:11,
50:17, 69:14,
163:14, 169:14,
169:23, 174:17,
176:5, 177:3,
177:8, 185:9,
196:24, 197:6,
204:2, 220:1,
227:13, 228:15,
240:2, 246:21,
255:8, 255:16,
255:17, 278:21,
281:6, 290:19
**reviews**
245:12, 261:11
**revised**
150:11, 215:15
**rice**
111:14, 111:21
**rights**
114:9, 150:22,
151:11, 152:1,
152:11
**rivera**
13:13, 35:12,
193:1
**robert**
10:5, 14:23,
15:3, 16:11,
169:15, 169:24,
198:20, 273:9,
291:1, 291:10,
291:18, 292:10
**rock**
3:3, 22:19
**rodriguez**
111:16, 111:22
**role**
43:11, 201:21,
202:2, 243:9
**roll**
178:5
**roman**
159:8, 159:22
**rosen**
3:4, 4:6,

11:21, 15:4,
17:13, 22:19,
22:21, 36:3,
45:15, 50:13,
53:2, 53:11,
53:24, 54:24,
64:17, 167:18,
168:6, 170:12,
170:14, 179:11,
191:13, 192:13,
205:10, 205:22,
206:4, 206:24,
207:8, 209:13,
213:1, 214:16,
221:20, 222:17,
223:3, 225:14,
227:7, 233:12,
233:22, 235:2,
235:19, 235:21,
236:4, 236:7,
239:15, 249:4,
266:7, 269:6,
269:18, 270:22,
271:1, 272:9,
272:16, 278:6,
278:15, 278:23,
282:7, 292:18,
292:24, 303:22,
308:2
**routine**
183:14, 184:8,
184:12, 202:23,
207:19
**rule**
4:10, 4:11,
5:20, 6:6, 6:22,
8:18, 10:17,
43:5, 182:6,
214:8, 243:15
**rules**
1:20, 37:11,
229:20, 234:12,
236:16, 244:4,
289:21
**rushed**
307:22
**ryan**
10:4, 16:7,

16:11, 18:22,
273:9, 291:1,
293:5, 293:7,
293:13, 295:7

**S**

**s**
13:1
**safety**
207:23
**said**
7:2, 7:17,
15:17, 23:19,
25:21, 38:4,
38:14, 47:5,
62:6, 63:14,
71:20, 77:12,
81:9, 84:7,
84:17, 102:23,
108:6, 108:14,
113:14, 117:17,
139:14, 141:7,
146:4, 152:4,
159:4, 166:20,
179:2, 183:12,
189:3, 190:23,
194:22, 196:23,
197:8, 217:8,
222:8, 225:23,
228:9, 236:1,
240:12, 266:24,
287:3, 298:2,
306:17, 306:18,
309:17, 309:20,
309:22, 309:24
**said"**
306:19
**salary**
105:9
**same**
6:23, 10:11,
10:15, 20:10,
20:19, 35:20,
53:3, 53:7,
53:12, 55:1,
62:7, 64:17,
73:17, 77:4,
79:9, 84:2,

86:7, 87:4,
88:14, 90:3,
90:6, 92:19,
93:3, 93:6,
97:16, 98:9,
117:21, 118:13,
125:6, 127:7,
131:24, 132:2,
132:10, 132:21,
133:1, 134:4,
134:10, 143:21,
145:17, 146:16,
146:17, 147:7,
152:5, 155:4,
155:17, 190:13,
194:8, 201:10,
202:13, 204:5,
204:18, 205:21,
227:13, 227:21,
228:1, 228:14,
235:6, 239:1,
248:18, 252:9,
262:9, 262:23,
267:11, 273:8,
273:13, 273:21,
284:13, 298:8,
298:24, 304:10

**saved**
17:5

**saw**
9:1, 144:20,
231:6

**say**
19:20, 20:7,
21:11, 24:23,
30:23, 40:19,
41:3, 41:8,
41:17, 45:24,
60:18, 62:1,
65:8, 68:23,
74:3, 76:4,
80:20, 85:10,
93:19, 95:3,
96:4, 96:18,
99:22, 120:17,
121:8, 134:4,
134:23, 151:24,
159:15, 175:22,

186:17, 191:20,
193:24, 196:19,
208:7, 216:14,
222:15, 226:19,
235:4, 242:8,
248:24, 258:22,
260:9, 265:1,
267:5, 267:6,
269:12, 269:23,
270:2, 275:17,
277:6, 279:5,
283:7, 285:7,
287:2, 287:10,
288:15, 289:14,
290:7, 292:12,
296:4, 298:23,
302:3, 303:3,
307:6

**saying**
17:23, 34:9,
55:20, 56:18,
64:21, 75:13,
85:2, 89:1,
95:8, 127:10,
153:19, 176:16,
187:1, 187:11,
190:1, 190:3,
229:23, 232:12,
232:18, 234:3,
279:24, 281:4,
281:14, 281:16,
281:17, 281:20,
281:24, 282:23,
283:3, 283:13,
285:3

**says**
6:10, 6:15,
152:16, 160:3,
172:2, 181:20,
194:4, 195:10,
202:21, 235:12,
243:11, 249:11,
250:11, 258:11,
268:13, 281:12,
299:6, 299:14,
301:5, 301:6,
301:8, 301:12,
306:17

**scenario**
114:23

**scenarios**
115:12

**scope**
35:5, 35:6,
40:2, 40:10,
48:6, 65:22,
73:19, 76:14,
83:16, 89:20,
107:7, 142:6,
142:16, 144:9,
145:10, 148:21,
190:14, 205:12,
205:14, 205:23,
238:1, 248:4,
252:5, 252:14,
273:3, 276:5,
289:23

**se**
70:22

**second**
24:2, 86:12,
86:14, 86:15,
86:19, 87:2,
87:21, 88:5,
91:5, 91:8,
210:2, 215:22,
239:2, 239:3,
255:1, 260:2,
266:14, 287:7,
297:1, 304:11

**section**
14:17, 14:18,
15:22, 15:24,
16:2, 96:8,
104:14, 104:17,
109:20, 119:4,
119:6, 156:13,
156:16, 159:7,
159:12, 171:6,
171:10, 172:2,
180:21, 181:13,
183:11, 184:8,
184:15, 184:16,
184:18, 187:3,
202:20, 205:1,
207:23, 208:6,

231:7, 231:16,
231:19, 237:9,
241:13, 241:23,
242:1, 243:2,
243:9, 243:12,
243:14, 243:21,
244:10, 244:12,
244:17, 244:22,
245:1, 245:10,
245:18, 245:23,
246:2, 246:7,
246:10, 246:15,
247:16, 249:6,
249:10, 251:22,
251:24, 253:16,
253:19, 257:21,
279:11, 280:23,
281:19, 281:23,
283:1, 284:4,
284:11, 285:12,
286:11, 286:18,
287:24, 290:23

**see**
9:1, 16:17,
18:15, 19:18,
65:11, 74:11,
98:22, 108:18,
110:15, 148:1,
148:4, 148:20,
150:22, 151:15,
157:12, 158:5,
158:7, 158:8,
159:16, 159:19,
161:22, 162:21,
200:8, 203:6,
211:15, 214:10,
215:9, 215:16,
215:24, 220:15,
223:8, 223:14,
223:22, 228:6,
229:18, 231:8,
232:16, 234:18,
235:7, 247:1,
247:10, 247:22,
253:19, 253:24,
260:15, 264:13,
274:20, 277:11,
285:20, 286:9,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

126

290:21, 291:10,
291:24, 292:7,
293:5, 293:14,
294:9, 295:6,
295:13, 295:19,
298:23, 299:3,
299:6, 300:9,
301:18, 306:16
**seeing**
192:5, 306:10
**seek**
15:2, 72:1,
94:11, 113:22,
146:20
**seem**
212:18, 301:20
**seemed**
18:16
**seems**
184:2, 292:14,
300:16
**seen**
192:3
**select**
42:16, 43:18,
44:5, 44:8,
59:1, 59:18,
134:7, 218:15,
218:21, 270:16
**selected**
42:8, 43:19,
43:22, 60:12,
271:5
**selection**
222:20
**self-report**
39:11, 162:7
**self-reporting**
39:8
**send**
36:16, 38:15,
75:23, 77:19,
124:7, 175:4,
175:7
**sending**
174:15
**sense**
148:21

**sent**
71:18, 77:22,
78:6, 89:7,
131:9, 138:11,
174:4, 244:22,
245:23, 246:4,
246:16
**sentence**
160:3
**separate**
34:23, 242:23,
246:7
**separation**
73:3, 82:5,
82:8, 82:12,
82:22, 82:24,
123:4, 124:12,
124:15, 124:16,
124:22, 132:11,
135:6
**september**
6:21, 7:5, 7:19
**sergeant**
99:19, 106:19,
112:6, 120:19,
121:10, 121:16,
122:20, 127:4,
127:21, 128:5,
128:15, 129:2,
129:6, 129:11,
129:14, 129:23,
130:1, 130:7,
130:15, 134:3
**sergeant's**
129:3, 130:22
**sergeants**
21:19, 22:3,
105:20, 106:4,
106:11, 106:13,
106:20, 107:2,
110:14
**serious**
44:8, 44:9,
44:17, 44:21,
44:24, 45:6,
45:13, 52:3,
52:17, 79:5,
79:8, 79:10,

79:16, 80:9,
99:9, 99:10,
99:14, 99:24,
100:5, 100:8,
100:17, 101:8,
102:9, 102:13,
103:3, 103:18,
106:10, 107:13,
108:8, 108:13,
109:7, 126:19,
128:23, 132:13,
132:14, 156:10,
156:13, 156:17,
217:21, 218:7,
220:20, 220:23,
221:5, 270:16,
270:20, 271:8
**seriousness**
45:8, 54:18,
116:1
**serve**
26:22, 27:21,
27:24, 28:21,
29:3, 29:15,
29:20, 30:2,
50:18, 58:10,
114:11, 115:6
**served**
6:10, 6:12,
7:4, 51:5,
133:18
**service**
6:7, 6:9
**serving**
114:3, 114:6,
115:1, 116:7
**session**
4:7, 97:9
**set**
17:7, 71:5,
71:8, 71:18,
71:19, 104:1,
105:10, 138:11,
160:5, 223:4,
233:18, 235:14,
236:23, 310:15
**sets**
155:22, 250:14

**seven**
182:18, 182:21,
214:8, 214:9
**several**
162:21, 298:14,
306:17
**sex**
100:16
**sexual**
100:12
**shall**
151:13, 152:16
**sharing**
244:6
**she**
21:22, 51:2,
55:18, 71:12,
76:15, 148:9,
157:16, 158:22,
158:23, 159:1,
159:2, 167:19,
170:14, 198:2,
231:24, 238:4,
275:1
**sheet**
17:20, 40:16,
69:6, 70:2,
70:3, 70:4,
70:17, 70:22,
71:2, 71:8,
112:10, 223:15,
293:5
**sheets**
69:24, 70:1,
71:18
**shift**
257:20, 258:5
**shines**
74:1, 74:4,
74:5, 74:7
**shooting**
221:5
**shootings**
46:17, 46:18,
52:19, 79:5,
79:10
**short**
82:7, 114:11,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                              127

211:7, 212:16,
213:24
**shorthand**
1:23, 5:6,
309:6
**should**
20:14, 43:22,
44:17, 109:21,
109:23, 139:7,
153:14, 157:16,
202:16, 246:13,
249:3, 278:19,
279:5, 279:6,
285:18, 289:19,
306:9
**shouldn't**
152:14
**show**
178:9, 239:12
**showing**
267:2
**shown**
250:20
**shutdown**
189:5
**sic**
65:3, 106:4,
183:14, 296:10
**side**
83:1, 152:24,
164:3, 282:22
**sides**
250:21
**sign**
125:16, 136:24,
140:10, 299:13,
301:9, 301:24,
302:9, 302:18,
305:14
**signature**
6:15, 215:24,
308:6, 310:1
**signature-ekcnb**
310:18
**signed**
310:5
**signify**
59:13, 59:22

**signs**
160:1
**similar**
105:23, 141:9,
146:13, 234:23,
267:1, 267:4,
286:21, 288:10
**simply**
17:1, 287:21
**since**
7:6, 45:19,
156:7, 166:19
**single**
43:19, 43:22,
45:20
**sit**
35:17, 35:24,
80:4, 119:14,
199:21
**six**
135:12, 297:5
**skahill**
1:18, 4:3, 4:9,
5:4, 5:10, 5:12,
5:13, 6:19, 8:9,
10:16, 22:8,
26:19, 41:12,
51:1, 53:19,
54:6, 97:11,
142:6, 147:14,
147:24, 148:10,
148:19, 149:7,
154:24, 158:12,
164:17, 166:8,
198:5, 202:18,
205:16, 215:2,
218:11, 219:14,
238:13, 239:7,
244:11, 269:9,
269:23, 277:1,
279:23, 284:21,
297:17, 298:9,
304:18, 307:15,
309:11, 309:18
**skahill's**
85:16
**skill**
105:10

**skills**
104:6, 104:8
**skim**
255:5
**sleep**
42:11
**slow**
154:22, 250:13
**soft**
133:24
**software**
211:9, 287:18
**solutions**
183:24
**some**
9:7, 11:18,
20:21, 23:20,
27:13, 30:12,
32:11, 33:1,
34:6, 34:10,
44:20, 49:12,
54:7, 54:13,
62:3, 65:24,
74:8, 96:3,
110:2, 118:12,
121:18, 123:4,
123:13, 131:11,
133:6, 134:6,
144:18, 144:20,
150:10, 172:19,
173:14, 175:20,
176:5, 182:5,
189:3, 198:21,
201:4, 201:15,
201:21, 209:18,
210:17, 210:18,
211:19, 238:7,
259:17, 268:12,
272:8, 275:13,
277:18, 277:21,
287:5, 292:4,
301:17, 301:20,
302:5, 305:8,
305:19
**somebody**
42:22, 185:3,
194:1, 289:6,
289:19

**somehow**
139:1
**someone**
21:16, 41:23,
42:15, 187:9,
199:17, 229:17,
289:20
**something**
53:20, 53:23,
70:4, 123:11,
123:15, 135:9,
139:7, 164:15,
175:24, 211:15,
213:11, 221:4,
225:15, 225:17,
231:8, 260:22,
265:1
**sometime**
13:1
**sometimes**
84:17, 163:1,
252:19, 252:20,
252:23, 288:2
**somewhat**
147:15
**somewhere**
24:6
**son**
305:12
**soon**
49:7, 58:2,
112:12, 127:19
**sop**
185:17, 243:5,
243:11, 245:4
**sops**
13:7, 44:19,
51:13
**sorry**
6:8, 14:9,
16:10, 21:12,
23:17, 38:8,
41:6, 42:10,
47:15, 52:6,
72:17, 78:4,
81:11, 84:7,
86:22, 99:20,
104:20, 107:20,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                          128

108:7, 120:8,
127:12, 153:14,
154:20, 154:22,
165:13, 166:12,
175:5, 191:7,
193:12, 195:3,
204:16, 210:3,
218:1, 222:21,
223:18, 240:22,
245:13, 250:13,
250:14, 252:14,
253:3, 269:21,
277:8, 277:12,
281:15, 286:16,
286:22, 293:18,
303:11
**sort**
97:11, 133:6,
172:19, 201:10,
207:5, 284:23,
301:17
**sorts**
157:15
**sotos**
2:14, 22:18
**sought**
94:1, 134:16,
139:21, 160:13,
230:19
**sources**
49:22, 57:12,
58:7
**span**
198:23, 199:3,
201:4, 201:6,
201:15
**spar**
159:9, 174:20,
174:22
**spars**
153:6, 153:8,
153:9, 153:24,
154:2, 154:24,
155:9, 155:15,
156:6, 156:20,
156:22, 156:24,
157:4, 157:7,
157:22, 157:24,

159:17, 160:15
**speak**
21:16, 119:24,
129:5
**speaking**
55:21, 56:1,
101:1, 158:11
**speaks**
182:16
**special**
28:17, 28:21,
29:1, 147:19,
241:14, 242:4,
242:22
**specially**
183:23
**specific**
120:1, 157:17,
172:5, 172:7,
183:24, 186:3,
203:18, 210:24,
224:18, 224:20,
225:6, 225:24,
284:14
**specifically**
186:13, 194:7,
198:15, 201:6,
223:1, 225:12
**specifics**
224:4
**specify**
24:19
**speculation**
35:21, 114:16,
189:13, 198:1,
209:14, 211:11,
218:23, 241:10,
264:11, 265:19,
270:23, 272:9,
273:4, 278:7,
279:2, 281:3,
284:7, 285:11,
289:2, 292:18
**spoke**
14:23, 15:5,
15:13, 21:14,
108:5, 186:13,
210:2, 210:3

**ss**
309:2
**staff**
83:8, 84:5,
85:13, 86:16,
199:17
**stage**
78:14, 97:24,
121:9, 175:17
**stamp**
150:16, 159:6,
159:19, 215:19,
215:23, 231:10,
239:17, 249:7,
249:9, 260:15
**stamped**
147:17, 194:9,
215:13, 241:13,
254:18, 297:19,
304:20, 304:24
**stan**
4:19
**stand**
231:23
**standard**
12:5, 13:7,
80:5, 185:12,
219:7, 220:12,
239:17, 240:6,
240:15, 241:2,
244:12, 284:3
**standardize**
181:7
**standards**
9:21, 12:6,
25:1, 25:4,
25:18, 26:12,
34:18, 36:10,
36:15, 36:17,
37:24, 38:10,
46:6, 141:21,
203:9, 219:17,
220:6, 238:15,
245:4, 248:2,
248:8
**standing**
143:2
**start**
9:5, 27:6,

62:13, 172:12,
173:8, 183:10,
194:18, 259:11,
259:24, 295:20
**started**
23:8, 30:18,
105:21, 161:4,
161:12
**state**
1:23, 5:10,
86:5, 114:9,
120:5, 156:5,
156:12, 227:22,
233:2, 257:5,
309:1, 309:7,
309:11
**state's**
101:20, 102:4,
163:1, 163:5,
163:7, 163:18,
163:22, 163:23,
229:7, 229:10,
230:1, 230:3,
230:19, 231:3,
231:9, 231:22,
232:3, 232:15,
233:14, 233:24,
234:8, 235:23,
236:6, 236:12,
241:14, 241:20,
242:4, 242:10,
242:15, 242:22
**stated**
20:14, 30:21,
67:15, 195:13,
258:11, 264:17,
264:20, 266:21
**statement**
51:9, 51:11,
51:14, 51:16,
51:20, 52:4,
52:15, 52:23,
52:24, 53:8,
55:13, 56:7,
57:9, 58:8,
58:13, 58:15,
79:20, 113:9,
113:11, 114:24,

115:22, 116:12,
116:13, 116:18,
116:21, 117:4,
117:15, 120:23,
128:20, 129:13,
152:5, 221:11,
221:19, 222:14,
223:2, 223:5,
223:11, 223:12,
223:13, 223:15,
229:8, 229:14,
233:9, 233:10,
233:20, 235:1,
235:16, 299:15,
299:20, 301:17,
301:21, 302:5,
302:24, 303:15,
305:15
**statements**
50:6, 50:16,
52:8, 53:10,
58:20, 114:1,
114:3, 115:5,
116:14, 128:22,
223:8, 227:4,
230:2, 231:20,
232:8, 232:10,
249:14
**states**
1:1, 1:20,
7:13, 151:12,
172:6, 253:19,
300:5, 302:24,
306:7, 309:14
**statistical**
35:9
**status**
250:22
**stay**
46:6, 101:3,
102:16, 104:12
**stenographically**
309:21
**step**
47:5, 49:2,
51:7, 58:16,
60:13, 63:20,
66:6, 72:14,

72:18, 72:20,
73:5, 74:15,
75:3, 78:12,
80:16, 82:13,
82:20, 84:21,
109:14, 112:7,
112:14, 113:1,
113:5, 113:24,
116:7, 117:15,
124:4, 126:15,
127:15, 129:12,
131:17, 132:16,
132:20, 133:3,
133:9, 140:4,
203:20
**stepping**
82:17
**steps**
49:10, 49:17,
49:24, 50:8,
57:15, 57:17,
75:19, 77:8,
77:17, 78:13,
98:9, 98:20,
124:1, 126:7,
127:8, 133:12,
138:16, 259:3,
272:14
**steve**
214:18
**steven**
3:13
**stick**
300:7
**still**
42:11, 88:20,
89:5, 90:13,
90:16, 91:1,
91:5, 91:20,
115:6, 134:21,
135:12, 136:8,
152:4, 152:5,
179:21, 185:18,
228:11, 254:9,
276:9, 279:21,
282:13, 283:13,
289:9
**stomach**
298:22, 300:7

**stop**
92:11, 114:11
**stopped**
96:24, 187:16,
253:11
**stored**
192:7, 192:11
**strategies**
181:4
**strategy**
29:12
**street**
1:24, 2:6,
309:10
**strike**
7:1, 35:15,
38:8, 47:15,
68:7, 78:4,
89:15, 93:13,
162:8, 175:5,
186:16, 188:3,
233:5, 245:13,
271:10, 281:15,
286:16, 300:6
**struck**
298:14, 298:21
**su**
263:15
**sub**
10:12
**subject**
7:9, 7:13,
8:11, 11:4,
117:13, 137:6,
151:13, 152:16,
199:18, 201:2,
249:21, 249:24,
274:1, 276:14,
276:24, 295:2,
295:9
**subject"**
303:3
**submit**
51:17, 51:21,
116:19, 129:1,
130:1, 178:15
**submitted**
55:14, 196:15,

250:21, 306:4
**subordinate**
178:7
**subordinates**
15:13, 177:21,
178:10, 178:16
**subsection**
16:1
**subsequent**
7:6
**substance**
11:17, 54:4
**substantive**
79:9
**substitute**
184:5, 281:13,
282:20
**subtopic**
10:2
**successful**
213:12
**such**
10:1, 15:6,
15:14, 49:23,
52:17, 100:11,
103:3, 112:20,
122:4, 122:5,
185:4, 193:7,
204:1, 232:2,
234:23, 282:5,
283:10, 289:18,
304:6, 304:7
**suffice**
102:21
**sufficient**
91:11, 285:8,
289:17, 290:15
**suggest**
158:3, 285:14,
301:20
**suggested**
234:10
**suggestive**
225:21, 230:8,
230:12, 230:21
**suit**
222:4, 310:12
**suitable**
158:18

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

130

suite
2:17, 3:6
suits
280:15
sum
4:13
summarize
182:12
summarizing
52:11, 182:13,
182:17, 299:19
summary
4:22, 4:24,
16:3, 16:13,
18:23, 19:13,
20:3, 57:18,
70:23, 153:5,
153:9, 156:8,
157:22, 160:4,
174:19, 227:5,
227:14, 228:5,
250:19, 251:1,
251:15, 258:15,
258:16, 258:23,
259:7, 261:6,
262:13, 262:17,
262:22, 290:8,
290:14, 290:17,
291:3, 295:22,
295:24, 296:11,
296:16, 296:24,
297:5, 297:9,
297:10, 297:18,
297:23, 299:4,
299:14, 300:9,
301:11, 301:15,
301:16, 304:23,
305:17
super
110:7
superintendent
82:14, 82:15,
89:3, 89:8,
89:10, 89:11,
90:1, 90:5,
90:12, 91:14,
91:15, 91:21,
92:1, 92:13,

92:20, 97:14,
97:20, 97:21,
97:24, 110:20,
110:22, 111:2,
111:4, 111:21,
124:18, 124:21,
125:16, 125:19,
126:3, 133:7,
135:19, 135:21,
136:23, 137:5,
137:6, 139:2,
139:3, 139:10,
139:18, 140:10,
140:14, 140:15,
141:1, 244:2,
257:7
superintendent's
126:4, 136:9
superintendents
111:7, 111:10
superior
80:23, 174:16
superiors
131:6
supervising
110:11
supervision
171:6
supervisor
36:8, 36:24,
37:5, 45:23,
46:1, 46:7,
46:23, 73:8,
74:18, 75:5,
75:7, 75:15,
75:20, 75:22,
76:5, 77:12,
77:14, 77:22,
109:19, 109:22,
110:8, 112:5,
124:3, 124:5,
124:17, 172:9,
173:12, 174:23,
177:9, 177:12,
178:8, 179:3,
203:13, 203:14,
203:15, 203:17,
212:5, 212:6,

212:11, 307:23
supervisor's
173:16
supervisors
36:19, 73:9,
81:3, 146:12,
170:23, 173:1,
177:4, 177:5,
177:21, 178:6,
178:15, 207:17,
208:4
supervisory
171:15, 181:4,
202:24
supplement
54:10
support
303:1, 304:4
suppose
164:7, 185:14
supposed
186:4
suppressed
229:8, 229:15,
230:2, 230:22,
232:11, 232:22,
233:11, 233:20,
233:21, 234:24,
235:1, 235:16,
235:17
suppression
234:10, 234:24,
235:15, 236:14
sure
9:3, 31:2,
36:20, 38:3,
38:21, 38:24,
40:5, 41:15,
47:24, 48:14,
53:15, 57:20,
62:9, 63:8,
63:16, 65:19,
66:1, 68:2,
74:24, 76:23,
78:23, 119:9,
123:5, 123:16,
123:20, 127:14,
131:8, 135:11,

136:2, 142:7,
148:6, 150:17,
153:21, 157:13,
157:19, 163:9,
163:10, 163:12,
166:5, 170:18,
175:14, 176:12,
200:23, 203:19,
209:6, 209:17,
211:22, 211:24,
212:19, 213:23,
219:23, 221:2,
221:15, 230:15,
238:4, 239:22,
239:24, 246:19,
247:3, 252:20,
252:22, 255:2,
259:15, 260:9,
261:19, 262:23,
263:7, 270:12,
277:4, 282:15,
283:4, 291:13,
296:4, 297:12,
298:4
suspended
138:6, 257:10
suspension
136:24, 137:17,
140:8, 140:12,
249:23, 250:18,
252:2, 256:15,
257:11
suspensions
252:16, 256:19,
256:21, 256:24,
257:4, 257:6,
257:17
sustain
83:13, 92:21,
141:12, 160:17,
238:17
sustains
125:18
switch
98:5, 213:19,
239:3
sworn
5:3, 5:5, 30:7,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

131

309:18
**system**
15:7, 104:1,
122:6, 157:7,
167:17, 169:2,
169:19, 170:2,
170:9, 170:10,
170:22, 171:3,
171:24, 172:13,
172:19, 172:22,
173:4, 173:5,
179:5, 179:10,
179:21, 179:22,
179:24, 180:2,
180:5, 180:7,
180:15, 180:18,
181:8, 182:20,
183:2, 183:4,
183:9, 184:4,
184:14, 185:4,
185:15, 186:4,
186:19, 187:3,
190:7, 190:19,
191:9, 193:7,
193:8, 193:11,
193:12, 193:23,
194:19, 195:12,
195:19, 196:13,
196:22, 197:17,
197:23, 198:17,
198:22, 200:17,
201:4, 202:5,
203:1, 204:21,
207:13, 208:20,
209:1, 210:11,
211:9, 212:14,
212:18, 213:16,
272:8, 272:19,
273:1, 273:11,
278:13, 278:20,
279:10, 279:13,
281:2, 281:9,
282:4, 282:12,
282:20, 283:1,
283:9, 283:22,
287:13, 287:18,
287:19
**systematic**
170:22, 193:22,

194:1, 207:16
**systems**
208:24, 209:10

**T**

**table**
164:4, 164:14,
216:15, 216:23,
217:3, 217:5,
294:20
**tables**
4:16, 4:17,
213:20, 215:3,
216:2, 221:12
**tailend**
216:18, 216:23
**tailored**
183:23
**take**
9:4, 32:16,
49:4, 49:11,
50:6, 50:9,
53:14, 57:23,
63:20, 104:6,
113:9, 128:21,
140:12, 145:23,
146:1, 157:11,
188:18, 203:19,
213:24, 231:8,
231:20, 231:23,
239:19, 239:21,
272:14, 274:4,
284:16, 289:14,
297:2, 307:22
**taken**
1:18, 1:21,
51:9, 51:11,
52:4, 53:18,
72:19, 97:6,
128:22, 135:14,
137:2, 157:6,
164:12, 180:21,
181:9, 215:1,
259:3, 284:18,
297:15, 304:13
**taking**
1:21, 49:8,
58:8, 114:1,

116:11, 136:11,
152:12, 232:8,
254:7, 308:9
**talk**
20:18, 20:24,
98:5, 122:8,
132:16, 133:3,
141:20, 164:4,
167:9, 213:19,
215:2, 217:2,
237:17
**talked**
128:7, 176:3,
178:13, 178:14,
185:8, 280:9
**talking**
33:21, 41:13,
86:9, 90:13,
90:16, 92:9,
209:24, 232:13,
251:17, 282:18,
285:2
**talks**
159:24, 183:14,
207:15, 256:18,
259:2, 264:14
**tandem**
226:17
**task**
162:21, 162:23
**technological**
288:3
**technology**
186:10, 188:16,
287:10
**telephone**
36:14, 38:5,
38:8, 232:6
**tell**
20:20, 148:7,
244:15
**telling**
251:4
**term**
17:3, 25:24,
26:11, 104:21,
185:3, 223:22,
225:6

**terminate**
113:14, 249:3,
249:11
**termination**
137:17
**terms**
22:9, 78:12,
106:9, 172:5,
224:24, 225:14,
225:18, 225:24,
226:9, 260:21,
261:17, 284:9
**terry**
111:17
**tested**
211:14
**testified**
5:6, 13:16,
14:3, 14:21,
19:23, 22:9,
35:14, 37:14,
49:18, 50:1,
50:10, 57:16,
68:8, 68:14,
68:18, 72:1,
72:5, 75:2,
78:11, 78:14,
97:16, 97:23,
102:11, 103:5,
126:6, 132:3,
174:12, 175:15,
177:2, 185:24,
204:7, 208:11,
208:15, 220:19,
224:15, 253:10,
258:8, 278:11
**testify**
8:14, 10:6,
10:16, 10:22,
11:5, 21:9,
169:9, 170:1,
180:16, 309:18
**testifying**
19:10, 153:17,
187:12, 192:4,
193:2, 236:4,
236:7
**testimony**
6:20, 11:18,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

132

19:2, 24:9,
53:20, 53:23,
54:7, 54:15,
55:4, 55:6,
55:15, 65:15,
68:6, 69:5,
74:21, 74:22,
75:6, 85:17,
94:23, 96:16,
109:5, 112:2,
123:13, 123:18,
151:18, 169:15,
187:22, 188:5,
192:24, 204:18,
233:6, 265:9,
269:16, 270:14,
270:19, 280:23,
281:17, 283:12,
286:10, 304:2,
309:20, 309:24,
310:15
**th**
165:11, 310:16
**than**
12:1, 13:6,
13:15, 14:3,
14:20, 15:12,
16:13, 18:22,
19:13, 22:8,
39:1, 43:16,
44:4, 49:18,
50:1, 50:10,
51:16, 55:4,
57:15, 59:10,
76:4, 77:18,
78:11, 78:14,
79:15, 80:8,
100:4, 100:15,
100:21, 101:9,
102:11, 103:4,
105:8, 106:11,
107:17, 108:14,
108:16, 108:20,
109:5, 113:11,
118:2, 123:11,
123:15, 124:22,
135:10, 135:12,
139:7, 142:23,

143:9, 172:16,
174:11, 177:1,
185:23, 191:6,
192:24, 195:13,
197:12, 204:2,
204:7, 208:24,
209:22, 210:9,
212:20, 220:19,
221:6, 227:4,
227:8, 227:13,
227:17, 227:23,
228:9, 228:15,
229:17, 238:21,
238:23, 242:7,
246:6, 253:20,
257:4, 257:6,
257:17, 264:22,
267:7, 286:11,
286:17, 288:8
**thank**
20:13, 120:14,
143:7, 150:18,
164:20, 165:19,
166:12, 200:14,
291:22, 298:10,
307:16
**thanks**
6:2, 149:6,
196:6, 297:7
**their**
21:21, 38:18,
39:12, 44:19,
45:2, 58:12,
59:19, 63:2,
64:24, 65:10,
78:21, 82:20,
83:10, 83:23,
87:9, 89:8,
90:1, 105:10,
110:13, 114:1,
114:2, 116:12,
120:22, 120:24,
121:18, 125:16,
126:9, 129:18,
131:6, 138:17,
138:18, 138:20,
139:21, 142:3,
142:12, 143:22,

146:12, 173:15,
177:8, 178:9,
178:10, 178:15,
183:24, 184:20,
184:23, 185:9,
185:20, 185:24,
197:16, 204:1,
204:3, 241:20,
246:3, 246:10,
249:2, 265:17,
281:6, 288:11
**them**
9:2, 21:16,
42:19, 51:9,
61:13, 63:22,
64:15, 71:20,
81:4, 86:17,
96:3, 112:18,
127:3, 133:20,
134:9, 134:11,
148:3, 156:1,
158:24, 174:16,
185:10, 185:19,
197:17, 234:1,
236:8, 251:4,
277:18, 277:23,
277:24, 284:12,
285:23, 293:12,
301:2, 301:3
**themselves**
39:7, 49:14,
80:2, 128:13,
142:20, 156:23,
162:6, 191:14,
197:1
**thereafter**
146:5
**therefore**
230:21
**thereof**
287:11, 310:13
**thereto**
308:9
**these**
8:15, 23:19,
31:21, 102:20,
128:24, 131:24,
132:7, 157:14,

158:23, 172:20,
175:11, 183:6,
183:18, 190:13,
193:16, 216:2,
216:9, 217:3,
258:10, 259:9,
259:13, 267:11,
273:17, 281:12,
290:18, 295:20,
300:14, 305:21
**thing**
55:21, 202:13,
203:7, 252:19,
287:7, 288:7,
288:8, 292:12,
298:24
**things**
45:6, 52:19,
103:21, 103:22,
112:22, 163:15,
177:4, 182:17,
187:17, 203:12,
208:16, 253:2,
269:19, 287:4,
288:8, 288:12,
288:16
**think**
12:22, 20:20,
32:5, 48:19,
51:2, 55:18,
71:5, 74:9,
74:15, 75:22,
92:10, 92:11,
96:24, 97:2,
97:16, 98:3,
105:21, 111:12,
111:14, 111:15,
111:17, 119:18,
122:2, 126:9,
126:10, 132:24,
133:13, 134:17,
134:22, 136:3,
143:4, 146:22,
148:3, 165:10,
166:23, 176:3,
177:3, 177:18,
177:19, 185:1,
186:22, 187:1,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

133

187:6, 188:11,
190:11, 205:13,
210:14, 210:17,
210:21, 210:22,
211:6, 212:4,
213:9, 219:4,
220:24, 221:4,
226:23, 231:6,
238:7, 240:17,
247:12, 247:15,
254:7, 254:8,
270:2, 280:16,
280:17, 287:3,
290:12, 290:14,
306:8, 307:12
**thinking**
121:23
**third**
1:24, 2:7,
6:11, 6:23,
7:10, 59:17,
87:24, 88:1,
88:7, 88:12,
88:20, 89:4,
89:18, 91:12,
181:7, 309:10
**though**
11:10, 38:2,
82:17, 136:2,
214:1, 250:7
**thought**
48:18, 48:19,
54:20, 108:12,
135:1, 135:13,
135:16, 195:3,
211:21, 221:1,
288:18
**threatening**
301:23, 301:24
**threats**
302:19
**three**
6:20, 90:10,
132:21, 148:17,
149:12, 149:23,
287:4, 288:3,
288:8, 288:17,
288:21, 288:23

**threshold**
285:6, 285:16,
286:5
**through**
10:5, 11:7,
36:22, 80:18,
82:8, 82:23,
89:17, 91:5,
92:5, 92:18,
97:11, 97:13,
97:19, 98:9,
124:11, 124:19,
124:23, 125:24,
131:6, 131:20,
133:5, 138:18,
146:12, 147:17,
148:1, 148:11,
148:20, 149:4,
162:23, 163:10,
164:24, 174:15,
185:10, 186:1,
189:16, 191:8,
215:19, 216:16,
216:19, 239:18,
246:18, 251:12,
254:19, 256:21,
257:8, 257:17,
262:8, 276:1,
280:13, 291:2,
297:20, 300:5
**throughout**
15:22
**thus**
288:22
**tied**
222:2
**times**
103:13, 298:14,
306:17
**timing**
282:9
**tina**
1:17, 4:3, 5:4,
5:12, 158:3,
309:11, 309:17
**title**
6:22, 6:23,
105:8

**titled**
6:5, 16:18,
17:1
**titles**
110:13, 148:20
**to-wit**
309:8
**today**
11:5, 11:19,
12:3, 12:21,
13:10, 13:17,
14:22, 15:3,
16:16, 21:2,
22:11, 22:20,
35:17, 35:24,
80:4, 119:14,
119:24, 138:1,
144:19, 150:8,
151:4, 151:18,
158:24, 169:9,
169:13, 169:16,
170:1, 180:16,
186:11, 199:22,
204:19, 216:10,
217:8, 240:10,
255:12, 269:16,
296:2, 307:16
**together**
308:1
**told**
306:18
**too**
20:1, 31:5,
68:11, 70:14,
96:23, 131:19,
138:17, 154:20,
176:3, 200:7,
201:17
**took**
146:24, 147:6,
204:20
**top**
102:1, 102:5,
111:9
**topic**
8:1, 8:12, 9:6,
9:13, 9:15,
9:17, 10:7,

10:11, 10:17,
10:20, 10:22,
11:2, 16:14,
16:16, 18:11,
18:20, 19:2,
19:6, 19:9,
19:13, 19:16,
20:22, 90:16,
258:3, 258:6,
258:9
**topics**
8:13, 8:24,
21:4
**total**
33:21, 284:21,
285:22, 289:18,
292:10, 292:21,
292:22, 300:15
**totality**
47:20
**towards**
280:17
**track**
39:23, 40:4,
227:3, 227:15,
228:16, 228:23
**tracked**
92:5
**tracking**
161:10
**traffic**
207:23
**training**
7:8, 7:14,
7:17, 8:1, 8:4,
8:12, 11:5,
11:10, 11:14,
19:4, 20:22,
21:10, 21:13,
21:15, 21:18,
21:21, 21:23,
22:2, 26:3,
207:23, 208:4
**transcript**
309:23, 310:5
**transgressions**
156:14, 182:9
**transport**
298:15

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

134

**transported**
298:13
**tribune**
12:9, 12:10,
12:14, 12:17,
13:8, 209:23,
210:1
**trick**
159:1
**trigger**
232:14, 284:22,
285:9, 285:23,
286:7
**triggered**
269:1, 278:19
**true**
40:22, 42:1,
42:24, 43:2,
54:8, 93:6,
93:22, 95:14,
95:18, 110:5,
120:23, 121:13,
121:15, 152:21,
155:17, 204:18,
223:11, 223:13,
223:21, 227:13,
227:21, 228:14,
290:11, 309:23
**truth**
309:18, 309:19
**try**
49:6, 154:22,
270:15
**trying**
49:9, 66:5,
67:5, 157:18,
158:19, 175:6,
175:11, 182:12,
182:17, 185:22,
188:12, 210:5,
211:14, 277:6,
281:16, 283:7
**turn**
8:17, 153:20,
241:12, 260:13,
266:8, 273:23
**two**
12:22, 13:8,

77:18, 82:22,
91:1, 92:21,
93:4, 125:6,
155:12, 157:14,
157:17, 164:15,
172:20, 174:11,
191:12, 193:16,
202:13, 215:3,
216:2, 274:20,
294:9, 296:3,
296:21, 296:23,
297:8, 299:11,
300:6, 305:18,
308:1
**type**
41:5, 44:4,
45:2, 49:20,
50:4, 51:24,
54:14, 56:5,
58:3, 100:6,
100:11, 100:15,
100:21, 128:21,
250:24, 285:13
**typed**
67:24
**types**
9:19, 45:11,
99:6, 100:16,
128:2, 128:24,
132:7, 132:21,
156:10, 177:22,
209:10, 217:19,
242:3, 249:22
**typewriting**
309:22
**tyrone**
1:6, 8:20

**U**

**uh-huh**
51:9, 108:17,
141:23, 149:14,
150:2, 159:14,
164:5, 299:21
**ultimate**
145:8
**ultimately**
87:20, 128:7,

136:8, 232:21
**unable**
56:9, 59:23,
114:13, 114:24,
115:13
**unacceptable**
171:14, 173:18,
173:21, 185:20
**unaccepted**
183:20
**unaware**
204:4, 204:12
**uncertain**
135:24
**under**
26:22, 34:1,
39:7, 39:12,
42:19, 151:10,
151:24, 154:3,
157:6, 158:1,
159:7, 159:22,
160:7, 184:8,
184:16, 193:22,
208:6, 221:12,
221:24, 222:3,
222:7, 226:22,
231:15, 235:8,
237:6, 248:24,
250:11, 251:24,
262:3, 264:1,
267:17, 271:24,
275:5, 275:8,
275:9, 275:19,
278:20, 279:10,
280:14, 281:2,
284:5, 291:24,
292:6, 293:10,
294:9, 295:5,
295:12, 310:6,
310:9
**underlying**
18:5
**undersigned**
310:7
**understand**
20:15, 26:11,
54:6, 56:18,
94:6, 107:5,

167:22, 168:8,
175:14, 195:9,
196:1, 203:20,
236:3, 281:16,
282:19, 282:21,
286:22, 286:24
**understanding**
5:18, 8:10,
45:22, 96:22,
134:21, 136:16,
137:4, 137:19,
167:16, 168:24,
169:1, 169:5,
171:23, 188:24,
190:3, 191:22,
204:23, 208:13,
210:10, 212:13,
213:5, 213:10,
232:9, 256:3,
274:1, 280:22,
282:3, 283:8
**understood**
56:20, 176:13,
179:19, 189:2,
189:23, 203:19,
211:6
**undetermined**
309:13
**unduly**
230:8, 230:11,
230:21
**unfounded**
59:2, 59:3,
59:10, 60:11,
70:16, 93:6,
95:24, 96:20,
97:17, 117:22,
121:12, 125:4,
141:13, 145:9,
249:2, 249:12,
267:22, 305:22,
305:24, 307:5,
307:11
**unfounding**
249:15
**union**
138:18
**unit**
98:24, 99:7,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                    135

101:21, 104:13,
107:22, 108:4,
109:24, 119:10,
126:20, 127:1,
127:2, 127:21,
128:7, 128:16,
130:7, 131:4,
131:12, 131:16,
132:1, 132:8,
156:22, 157:5,
173:24, 174:1,
208:2, 245:2,
245:16, 250:5
**united**
1:1, 1:20,
309:13
**units**
107:11, 107:16,
107:24, 109:8,
203:10, 244:6
**universal**
288:12, 288:16
**university**
210:14
**unknown**
56:10, 57:3,
103:13, 300:18,
305:12
**unless**
24:18, 113:14,
124:11, 125:9,
151:14, 152:17,
229:21, 236:17,
251:14, 251:15
**unlimited**
174:8
**unsustained**
65:3, 121:12,
280:24, 281:18,
281:22, 286:13,
303:10, 303:19
**until**
6:13, 7:6,
17:8, 28:11,
29:5, 95:13,
120:20, 121:3,
130:9, 165:10,
190:11, 231:24,

232:8, 257:12,
277:20
**untimeliness**
8:3
**unwritten**
7:14, 11:6
**update**
156:23
**upon**
32:14, 54:22,
58:21, 69:9,
70:12, 81:19,
87:16, 115:5,
135:1, 169:5,
175:12, 177:20,
184:19, 226:16,
246:10, 253:23,
309:12
**use**
14:19, 25:24,
26:11, 26:14,
26:15, 32:4,
43:13, 64:7,
185:3, 188:15,
211:15, 212:7,
212:22, 214:9,
226:9, 245:1,
251:5, 256:17,
275:6, 282:5,
286:13
**used**
48:21, 64:8,
121:21, 122:15,
178:2, 184:5,
212:3, 212:12,
212:14, 221:18,
224:24, 225:2,
225:7, 225:24,
226:8, 226:9,
226:12, 264:16,
283:21, 298:14
**using**
96:7, 120:22,
172:21, 207:14,
208:18, 208:19,
211:9, 224:24,
225:6, 225:14,
268:19, 274:20,

275:4, 275:10,
275:17, 275:19,
277:11, 292:7,
302:19
**usually**
37:21, 60:20,
99:9, 107:15,
107:21, 156:21,
156:22, 161:16,
308:3
**utilized**
128:23, 211:17,
211:19, 212:17,
282:10
**utilizing**
250:19

---
### V
**variety**
36:7
**various**
12:11, 64:18,
102:8, 144:15,
147:18, 160:20,
184:9, 207:19,
233:24, 283:18
**vary**
283:20
**vast**
177:20
**vehicle**
293:15, 295:15
**verbal**
37:4, 38:10,
51:14, 52:1,
200:6, 302:9,
302:19
**verbally**
23:7, 173:14,
199:12, 301:23
**verified**
207:12
**version**
6:23, 7:2, 7:5,
7:7, 307:3,
307:8
**versions**
6:18, 7:6,

7:18, 9:1,
157:15
**versus**
8:19, 8:20,
35:3, 35:19,
39:24, 40:9,
106:11, 300:19
**very**
79:5, 79:8,
79:10, 79:15,
80:8, 108:24,
184:3, 216:18,
228:10, 238:7
**vi**
202:20
**victim**
296:9, 296:12,
304:8, 305:5
**victims**
231:21, 231:24,
232:7
**view**
131:12
**viewing**
35:13
**vii**
159:8
**violating**
289:21
**violation**
123:5, 123:7,
123:10, 222:7,
224:1, 253:23
**violations**
101:2, 243:16,
294:21
**violence**
32:4, 32:8,
46:14
**violent**
305:9
**volume**
47:13
**vote**
278:8
**vs**
1:10

---
### W
**wait**
196:1, 214:11,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

136

**263:18**
**waived**
308:7, 310:2
**waiver**
50:20, 51:7,
58:11, 114:4,
114:7, 114:9,
116:8, 128:9
**walk**
98:9
**walking**
97:11
**want**
6:3, 8:13,
11:18, 24:17,
30:16, 55:23,
57:16, 63:7,
76:4, 85:19,
98:5, 98:9,
122:7, 122:8,
132:16, 141:20,
145:19, 148:3,
149:11, 150:14,
155:5, 157:11,
157:16, 160:18,
164:3, 164:21,
167:9, 175:14,
176:12, 184:7,
196:9, 200:8,
203:19, 204:16,
214:3, 214:5,
216:21, 236:3,
240:23, 247:4,
252:19, 258:17,
274:9, 279:9
**wanted**
56:3, 85:2,
93:8, 113:14,
203:23, 213:22,
247:17
**wants**
159:2
**warehouse**
66:1
**warning**
172:19
**warrant**
194:7

**washington**
8:19, 214:21
**wasn't**
35:8, 41:10,
82:22, 186:11,
188:3, 228:12,
235:13, 235:14,
235:18, 273:5
**watch**
208:3
**way**
6:16, 7:8,
40:7, 85:20,
95:3, 97:12,
104:1, 115:23,
151:21, 158:19,
173:12, 173:19,
173:20, 174:14,
174:20, 177:4,
177:7, 178:8,
178:11, 178:12,
178:16, 182:22,
183:3, 185:11,
193:22, 194:1,
194:4, 197:8,
204:2, 204:15,
227:10, 227:14,
227:18, 227:24,
228:16, 256:20,
290:10, 298:15,
310:12, 310:13
**wayne**
8:19, 214:21
**ways**
36:5, 36:7,
39:2, 160:21,
172:24, 173:8,
173:9, 175:11,
186:3, 186:9,
188:19, 191:5,
204:4, 204:9,
208:17, 287:15
**we're**
66:5
**weigh**
133:21
**welcome**
148:9, 148:10,

154:8, 158:12,
247:5
**went**
42:5, 71:19,
71:22, 82:8,
83:4, 89:17,
89:24, 99:9,
131:6, 160:7,
189:5
**weren't**
49:14, 105:22,
152:10, 188:6,
206:3, 233:8,
254:9, 280:13,
281:20, 303:9
**west**
2:16
**what's**
6:5, 71:13,
103:7, 105:2,
105:16, 148:1,
148:5, 150:16,
178:17, 178:18,
187:8, 191:22,
195:13, 212:13,
238:21, 268:15,
280:10, 293:23,
297:10
**whatever**
33:7, 47:22,
61:14, 159:1,
186:17, 186:20,
191:14, 204:19
**when**
6:16, 7:20,
12:12, 12:23,
17:6, 17:23,
19:3, 20:22,
23:5, 25:13,
25:24, 26:2,
27:6, 27:11,
28:1, 30:6,
34:9, 41:4,
45:24, 55:12,
56:17, 56:21,
60:18, 67:24,
79:8, 80:20,
89:1, 108:5,

113:17, 127:10,
138:19, 159:19,
160:12, 179:10,
179:22, 179:24,
183:8, 183:9,
184:15, 186:14,
186:15, 189:4,
189:19, 191:19,
196:23, 202:5,
230:2, 232:10,
233:9, 233:10,
233:19, 234:3,
234:15, 234:24,
244:19, 246:16,
247:17, 249:11,
252:1, 253:10,
258:22, 281:17,
282:9, 282:10,
289:3
**whenever**
38:12, 191:11
**where**
7:8, 37:23,
45:4, 55:13,
55:24, 56:3,
57:2, 57:19,
65:20, 65:23,
67:1, 71:7,
71:18, 71:19,
71:21, 75:8,
80:13, 81:19,
81:22, 82:11,
83:5, 83:12,
85:12, 85:22,
92:24, 93:24,
94:10, 100:19,
103:8, 109:3,
109:21, 114:23,
115:12, 123:9,
124:15, 124:22,
130:10, 153:8,
157:3, 157:16,
192:11, 238:17,
258:1, 258:2,
268:17
**whereby**
233:19
**wherein**
250:17

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

137

**whereof**
310:15
**whereupon**
5:1, 9:9,
10:23, 53:17,
61:7, 63:5,
97:5, 97:8,
147:10, 149:3,
154:11, 163:13,
164:11, 164:18,
166:1, 214:24,
215:7, 219:11,
219:24, 239:4,
240:1, 246:20,
254:13, 255:7,
258:19, 278:24,
284:17, 295:17,
297:14, 304:12,
304:14, 308:5
**whether**
32:15, 32:20,
38:21, 39:12,
39:23, 40:20,
42:22, 46:4,
65:17, 68:3,
76:16, 78:3,
78:5, 79:2,
79:18, 79:20,
79:21, 80:6,
98:23, 104:12,
109:23, 115:10,
119:15, 145:15,
145:24, 160:11,
161:22, 175:4,
175:7, 175:19,
176:4, 189:15,
190:1, 192:6,
192:16, 205:6,
206:8, 206:15,
211:19, 217:18,
220:12, 223:3,
224:14, 226:17,
228:6, 236:12,
242:13, 266:2,
267:6, 268:24,
272:6, 272:15,
272:23, 273:10,
273:17, 278:12,

278:18, 279:5,
288:23, 289:13,
289:17, 290:21,
303:9
**which**
5:20, 6:19,
7:19, 8:1,
10:11, 17:3,
17:4, 26:1,
30:17, 32:19,
33:9, 34:14,
39:1, 39:2,
51:20, 52:8,
62:9, 71:23,
82:4, 83:5,
83:21, 84:5,
89:4, 90:20,
92:6, 92:15,
95:4, 99:6,
99:13, 100:15,
107:22, 126:18,
132:2, 140:24,
141:10, 147:15,
147:22, 149:12,
155:5, 162:18,
163:3, 171:17,
173:5, 173:6,
176:8, 180:24,
183:3, 183:13,
184:2, 185:24,
188:19, 191:5,
203:17, 204:9,
211:3, 218:14,
218:20, 219:17,
227:3, 229:13,
229:24, 233:8,
237:21, 241:13,
251:4, 251:21,
253:23, 254:17,
261:23, 268:21,
275:1, 275:4,
275:9, 279:9,
279:11, 285:1,
289:16, 294:11,
294:18, 294:19,
295:21
**whichever**
253:23

**while**
203:6, 213:21,
283:22, 283:23,
298:13, 299:9,
302:19
**who**
21:14, 41:17,
43:4, 46:9,
64:14, 73:23,
76:2, 83:8,
86:10, 86:23,
88:1, 102:15,
102:18, 104:11,
105:7, 105:21,
105:23, 106:2,
106:4, 109:16,
109:17, 110:11,
110:15, 110:20,
111:6, 111:10,
118:15, 119:5,
130:22, 131:3,
133:22, 134:4,
137:20, 137:22,
140:6, 146:8,
168:3, 168:12,
171:7, 171:13,
171:14, 173:9,
177:21, 178:3,
183:5, 183:13,
184:12, 184:13,
184:17, 185:3,
185:20, 202:4,
202:22, 203:23,
205:7, 205:20,
213:6, 289:6,
289:14, 289:20,
303:16
**whoever**
200:22
**whole**
129:18, 144:1,
148:15, 149:20,
175:2, 309:19
**whom**
248:10
**whose**
180:19
**why**
9:5, 15:2,

17:16, 64:4,
84:9, 87:16,
164:2, 254:6,
271:5, 292:9,
292:21, 297:13
**will**
5:24, 7:9, 8:2,
9:6, 10:21,
20:15, 20:18,
26:13, 31:21,
34:2, 35:16,
92:11, 97:3,
98:23, 98:24,
102:21, 132:21,
148:7, 148:13,
152:24, 154:22,
160:5, 166:15,
194:10, 196:3,
200:5, 200:7,
202:7, 202:8,
207:2, 231:20,
231:23, 232:3,
232:4, 232:7,
239:11, 249:5,
249:16, 253:21,
273:8, 295:20,
298:8, 307:19,
307:21, 308:2,
308:3
**withheld**
224:1, 224:5,
224:8, 224:20,
225:3, 226:13,
228:2
**within**
1:23, 36:8,
36:17, 38:15,
41:10, 119:11,
135:4, 136:9,
163:8, 182:11,
185:17, 201:16,
262:17, 283:16,
289:19
**without**
22:16, 145:18,
222:19, 242:7,
257:11, 260:8,
267:4, 271:4,

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019 138

296:3, 301:15
**witness's**
74:20
**witnesses**
49:6, 49:10,
49:12, 49:13,
50:4, 50:16,
52:5, 52:8,
52:16, 56:10,
58:2, 58:4,
58:9, 112:12,
112:17, 112:22,
113:2, 113:8,
113:23, 114:14,
115:5, 115:13,
127:18, 128:8,
231:21, 231:24,
232:7, 302:12,
302:22, 303:1,
303:8, 303:9,
303:17, 303:19,
307:1, 307:7
**witnessing**
303:18
**won't**
30:6, 148:11
**wondering**
195:10
**word**
7:7, 7:17,
8:12, 43:13,
64:8, 64:9
**words**
25:8, 34:5,
152:9, 177:8,
179:23, 182:13,
219:2, 224:4,
235:7, 267:24
**work**
75:24, 177:9,
246:4
**worked**
73:16, 104:17,
119:5, 183:5,
211:7
**working**
301:19
**world**
254:23

**worthy**
102:23
**wouldn't**
45:16, 65:23,
114:18, 141:2,
145:19, 152:14,
157:1, 158:17,
222:19, 242:23,
277:23, 278:9,
284:6
**write**
83:9, 117:6,
137:5, 177:6
**writing**
52:11
**written**
7:13, 11:6,
44:15, 51:15,
117:4, 182:22,
200:4
**wrongful**
10:3, 18:21,
257:22, 290:23
**wrote**
200:22

**X**

**xs**
250:16

**Y**

**yeah**
6:3, 24:10,
24:15, 33:23,
65:23, 66:7,
67:23, 93:5,
94:24, 95:8,
116:15, 121:5,
123:20, 125:18,
129:4, 134:21,
134:22, 135:10,
136:2, 139:4,
142:7, 144:16,
151:5, 163:11,
163:12, 164:7,
164:9, 192:22,
199:4, 211:24,
214:15, 216:17,

219:4, 221:6,
230:15, 240:20,
247:9, 252:11,
252:17, 254:4,
265:21, 282:8,
294:3, 299:5,
299:19, 307:21,
308:2
**year**
7:19, 23:9,
23:20, 34:16,
47:22, 48:3,
107:4, 112:3,
307:3
**years**
15:15, 25:15,
34:13, 48:8,
179:17, 187:14,
198:23, 199:3,
201:4, 201:7,
201:16, 253:22,
265:7, 265:14
**yep**
236:10
**yesterday**
19:5
**yet**
10:20, 118:7,
118:8, 148:4
**you'd**
224:23
**you'll**
276:17
**you're**
23:15, 38:21,
64:21, 75:13,
79:8, 127:10,
154:8, 154:21,
168:18, 175:9,
175:22, 176:16,
177:8, 180:14,
187:1, 187:12,
188:22, 191:9,
231:5, 233:17,
234:3, 236:7,
241:18, 247:5,
250:6, 253:1,
253:5, 255:20

**you've**
9:14, 14:20,
50:1, 60:11,
78:11, 224:15,
286:17, 287:23

**Z**

**zebra**
294:19

**0**

**00**
1:26, 37:22,
304:12
**004362**
1:22, 3:17,
310:21
**020837**
4:22
**020838**
299:6
**020842**
301:18, 302:2,
302:7
**020843**
4:22, 302:16,
302:24
**0211**
4:24
**021115**
4:24
**021116**
306:16
**021118**
4:24, 306:7,
307:6
**021119**
4:23
**021790**
4:21
**021791**
267:16, 268:20
**021795**
274:15, 274:20,
275:18, 277:11
**021796**
262:9, 301:6
**021800**
291:24, 295:5

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                        139

**021805**
293:10, 295:12
**021816**
4:21
**05**
268:21, 275:9,
275:10, 275:19,
292:7
**084**
1:22, 3:17,
310:21
**0980**
2:20

---
**1**
---
**1**
164:11
**10**
4:19, 53:17,
193:24, 215:1,
222:6, 239:4,
239:8, 239:10,
239:11, 240:6,
241:3, 241:12,
243:11, 246:18,
246:24, 249:8,
249:11, 284:17,
292:23, 293:15,
294:19, 294:20,
308:5
**1000**
3:8
**11**
4:20, 97:4,
97:5, 254:13,
254:17, 255:11,
256:4
**12**
4:21, 7:23,
97:8, 182:11,
258:18, 258:19,
259:11, 259:12,
259:16, 259:17,
259:19, 260:1,
267:16, 268:20,
275:17, 291:8
**1240**
2:17

**1288**
215:16
**13**
4:22, 149:16,
165:10, 292:10,
292:11, 292:22,
292:23, 295:17,
295:20, 295:21,
295:24, 297:18
**14**
4:23, 164:22,
165:9, 165:18,
222:5, 304:14,
304:19, 304:20
**141**
2:16
**147**
4:12
**15**
4:24, 165:11,
165:13, 254:3,
304:15, 304:19,
304:23, 305:17,
305:23
**154**
4:13
**16**
1:10, 274:13,
274:15, 275:7,
276:2, 289:14
**164**
4:14
**166**
4:15
**17**
241:12, 274:7,
274:12
**19**
6:13, 6:16,
7:3, 7:7, 16:18,
179:14
**193591**
263:17, 263:18,
294:11
**1967**
16:18, 17:8,
189:6, 261:24
**1970**
1:10

**1982**
30:8
**1983**
166:11
**1985**
166:10
**1989**
7:15, 9:17,
10:5, 11:7,
14:12, 21:23,
24:18, 24:22,
25:3, 34:3,
63:10, 191:7,
191:8, 196:14,
262:4, 274:15,
276:7
**1991**
97:1, 253:10,
265:13, 267:18,
291:2, 292:1
**1992**
293:11
**1993**
149:16, 165:10,
165:13, 254:3
**1994**
262:4, 267:18
**1995**
274:16
**1996**
7:15, 9:17,
10:5, 11:7,
14:12, 21:23,
24:18, 24:22,
25:3, 34:3,
63:10, 191:8,
196:14, 261:16,
262:2, 262:16,
262:20, 263:5,
263:12, 267:15,
268:1, 272:8,
273:2, 273:12,
274:8, 274:13,
274:14, 275:11,
276:1, 276:8,
276:22, 277:9,
277:19, 277:22,
278:4, 278:13,

**288:24, 289:15,**
291:2, 291:19,
292:1, 293:9,
293:11, 293:22,
294:6, 295:1,
295:9
**1997**
240:13, 277:15
**199776**
295:15
**1998**
262:10
**1999**
261:24, 262:8,
262:10, 276:1,
276:23, 277:10
**1a**
251:24

---
**2**
---
**20**
6:13, 6:16,
7:3, 7:7, 7:23,
285:7
**2000**
16:19, 17:9,
189:6, 190:11,
277:16
**2006**
30:3
**2007**
25:19
**2008**
29:22, 30:3,
179:17
**2009**
29:16, 29:22,
179:17
**2011**
28:23, 29:5,
29:6, 29:16
**2013**
27:19, 27:20,
28:1, 28:16,
28:23
**2015**
27:16
**2016**
28:5, 28:7

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019

140

**2017**
27:2
**2018**
6:21, 7:5,
7:19, 27:8,
27:9, 27:11,
27:21
**2019**
1:25, 6:10,
6:13, 6:16,
6:21, 6:24, 7:3,
7:7, 309:9,
310:16
**203754**
295:22, 296:18,
297:19, 297:24,
301:4
**20837**
297:20
**20838**
299:3, 300:1,
301:12
**20843**
297:20
**21**
97:8
**211020**
4:23, 304:24
**21115**
304:24
**21118**
305:1
**21119**
304:20
**215**
4:16, 4:17
**21791**
266:15, 301:5
**21795**
274:2, 276:3,
277:7, 293:24,
294:1, 294:8,
294:10
**21796**
260:1, 260:4,
260:22, 263:3
**21797**
260:15

**21800**
291:8, 291:13,
292:9, 295:2
**21805**
293:3
**219**
4:18
**2200**
3:6
**220046**
294:18
**23**
53:17, 240:12
**239**
4:19
**243**
2:9, 2:10
**25**
6:21, 97:4,
97:5, 215:24,
263:5, 310:16
**254**
4:20
**258**
4:21
**26**
6:21, 156:16
**295**
4:22
**2a**
250:5, 250:11
**2nd**
1:25, 309:9

—— **3** ——

**3**
149:16, 149:24,
150:1, 150:11,
150:21, 152:11,
155:6, 155:9,
156:13, 156:16,
158:1, 159:6,
159:16, 160:7,
165:7, 165:16,
165:18, 165:19,
166:4, 166:9,
166:20, 166:23,
168:16, 168:20,

169:6, 169:8,
169:14, 169:23,
170:22, 171:10,
172:2, 177:10,
180:11, 180:24,
181:13, 184:8,
186:19, 193:18,
194:4, 195:10,
195:13, 195:14,
195:17, 195:20,
196:22, 204:20,
207:15, 208:12,
208:19, 215:1,
247:3, 247:4,
247:7, 247:10,
249:1, 249:5,
250:4, 252:7,
253:14, 279:10,
279:18, 283:15,
285:12, 285:20
**30**
4:11, 5:20,
6:6, 6:19, 6:22,
8:2, 8:19,
10:17, 135:13,
135:16, 137:15,
137:16, 146:4,
146:6, 146:10,
146:18, 252:2,
252:16, 252:17,
256:21, 256:24,
257:4, 257:6,
257:17, 257:21
**304**
4:23, 4:24
**30582**
4:13
**30583**
159:20
**30594**
4:13
**30595**
4:14, 164:24
**30628**
4:14, 165:1
**30629**
4:15
**30630**
194:9

**30632**
4:15
**30633**
4:12, 147:17
**30634**
150:17
**30651**
249:8, 249:9
**30657**
250:4
**30660**
251:21
**30699**
253:14
**30706**
159:6
**30712**
4:12, 147:17
**31**
261:24, 276:1,
276:22, 276:23,
277:9, 277:10
**310**
239:13
**31070**
4:19, 239:17
**31093**
241:13
**311**
1:24, 2:6,
309:9
**31127**
4:19, 239:18
**31130**
4:18, 219:18
**31140**
231:11, 231:14
**312**
2:9, 2:10, 3:8
**31274**
4:18, 219:19
**31275**
4:20, 254:19
**31279**
256:18
**31280**
257:3
**31282**
4:20, 254:19

Transcript of Tina M. Skahill, Corporate Designee
Conducted on July 2, 2019                                     141

**31341**
4:17, 215:19
**31342**
215:19, 215:23
**321**
3:5
**3377**
2:19
**370**
4:19
**3a**
10:7, 16:14,
16:16, 18:11,
18:20, 19:2,
19:13, 19:16,
258:3, 258:9,
290:23
**3b**
10:11, 10:17

---
**4**
---
**4**
37:22
**44.248**
215:15
**45**
35:15
**48**
164:11
**494**
3:8
**4b**
231:19

---
**5**
---
**5**
284:17
**55**
35:15
**5900**
2:9
**5902**
2:10
**5b**
263:20, 263:22,
264:1, 275:1,
275:4, 285:12,
294:12, 294:16

---
**6**
---
**6**
304:12, 308:5
**60604**
2:18
**60607**
1:25, 2:8,
309:10
**60654**
3:7
**630**
2:19, 2:20
**67**
16:18, 189:16,
189:21, 265:17

---
**7**
---
**735**
2:19
**773**
2:20

---
**8**
---
**8**
37:22
**8.4**
14:17, 14:18,
96:7, 96:8,
186:13, 187:3,
205:1, 210:23,
210:24, 280:1,
280:8, 280:23,
281:19, 281:23,
283:1, 284:4,
284:11, 286:11,
286:18, 287:24
**80**
150:1, 155:9,
156:13, 156:16,
158:1, 160:7,
165:18, 165:19,
166:20, 166:23
**82**
111:13, 164:22,
165:9, 165:18
**8214**
149:24

**83**
35:14, 166:4,
166:9, 168:16,
168:20, 169:6,
169:8, 169:14,
169:23, 170:22,
171:10, 172:2,
177:10, 180:24,
181:13, 184:8,
186:19, 193:18,
194:4, 195:10,
195:13, 195:14,
195:17, 195:20,
196:22, 204:20,
207:15, 208:12,
208:19, 279:10,
279:18, 283:15,
285:12, 285:20

---
**9**
---
**9**
1:26
**90**
13:1
**91**
187:17, 205:4,
265:17
**93**
35:14, 149:16,
149:19, 149:24,
150:11, 150:21,
152:11, 155:6,
155:8, 157:22,
159:6, 159:16,
165:7, 165:16,
180:11, 211:23,
212:3, 212:8,
247:3, 247:4,
247:7, 247:10,
249:1, 249:5,
250:4, 252:7,
253:14
**97**
4:7, 240:18
**99**
280:17, 280:18