# EXHIBIT LLLLL

1       IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
             CASE NO. 1:18-CV-1028
3            CASE NO. 1:18-CV-2312
      HON. STEVEN SEEGER, DISTRICT JUDGE
4    HON. SUNIL K. HARJANI, MAGISTRATE JUDGE

5


6            ARTURO DeLEON-REYES,
                  Plaintiff
7
                     V.
8
             REYNALDO GUEVARA, ET AL.,
9                  Defendants


10
              GABRIEL SOLACHE,
11                 Plaintiff

12                   V.

13           CITY OF CHICAGO, ET AL.,
                  Defendants
14

15

16

17

18

19

20

21

22

23

24   DEPONENT:  PHILIP CLINE
     DATE:      MAY 13, 2021
25   REPORTER:  BROOKE ANDREW

ORIGINAL

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1

2

3  ON BEHALF OF THE PLAINTIFF, ARTURO DeLEON-REYES:

4  Anand Swaminathan

5  Sean Starr

6  Loevy & Loevy

7  311 North Aberdeen

8  Third Floor

9  Chicago, Illinois 60607

10  Telephone No.: (312) 243-5900

11  E-mail: anand@loevy.com

12      sean@loevy.com

13  (Appeared via videoconference)

14

15  ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:

16  Jan Susler

17  People's Law Office

18  1180 North Milwaukee Avenue

19  Chicago, Illinois 60642

20  Telephone No.: (773) 235-0070

21  E-mail: jsusler@peopleslawoffice.com

22  (Appeared via videoconference)

23

24

25

Page 4

APPEARANCES (CONTINUED)

1

2

3  ON BEHALF OF THE DEFENDANT, DAVID NAVARRO:

4  Daniel Burns

5  Reiter Burns

6  311 South Wacker Drive

7  Suite 5200

8  Chicago, Illinois 60606

9  Telephone No.: (312) 982-0090

10  E-mail: dburns@reiterburns.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANTS, COOK COUNTY, ANDREW VARGA,

14  HEATHER BRUALDI, KARIN WEHRLE DOOLEY, THOMAS O'MALLEY:

15  Edward Brener

16  Cook County State's Attorney's Office

17  Richard J. Daley Center

18  Chicago, Illinois 60602

19  Telephone No.: (312) 603-3151

20  E-mail: edward.brener@cookcountyil.gov

21  (Appeared via videoconference)

22

23

24

25

Page 3

APPEARANCES (CONTINUED)

1

2

3  ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

4  Megan McGrath

5  Leinenweber Baroni & Daffada, LLC

6  120 North LaSalle Street

7  Suite 2000

8  Chicago, Illinois 60602

9  Telephone No.: (866) 786-3705

10  E-mail: mkm@ilesq.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO AND

14  DEPONENT, PHILIP CLINE:

15  Eileen Rosen

16  Jessica Zehner

17  Rock Fusco Connelly

18  321 North Clark Street

19  Chicago, Illinois 60654

20  Telephone No.: (312) 494-1000

21  E-mail: erosen@rfclaw.com

22  jzehner@rfclaw.com

23  (Appeared via videoconference)

24

25

Page 5

APPEARANCES (CONTINUED)

1

2

3  ON BEHALF OF THE DEFENDANTS, ERNEST HALVORSEN, EDWIN

4  DICKINSON, ROBERTH RUTHERFORD, DENNIS STANKUS, JOHN

5  NAUJOKAS, JOHN KARALOW, MARK HARVEY, DANIEL TREVINO,

6  EDWARD MINGEY, ROBERT BIEBEL, FRANK J. CAPPITELLI:

7  Caroline Golden

8  Sotos Law Firm

9  141 West Jackson Boulevard

10  Suite 1240A

11  Chicago, Illinois 60604

12  Telephone No.: (630) 735-3300

13  E-mail: cgolden@jsotoslaw.com

14  (Appeared via videoconference)

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

INDEX

1                    INDEX

2                                        Page

3  PROCEEDINGS                            8

4  DIRECT EXAMINATION BY MR. SWAMINATHAN  10

5                   EXHIBITS

6  Exhibit                                Page

7  A - Area 5 Supplemental Report - RFC SOLACHE

8      REYES 449-451                      217

9  B - Area 5 Supplemental Report - RFC SOLACHE

10     REYES 348-350                      218

11 C - Newspaper Article - SOLACHE 7474   230

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 STIPULATION

2

3  The VIDEO deposition of PHILIP CLINE was taken at

4  KENTUCKIANA REPORTERS, LLC, 730 WEST MAIN STREET SUITE

5  101, LOUISVILLE, KENTUCKY 40202, via videoconference in

6  which all participants attended remotely, on THURSDAY

7  the 14TH day of MAY, 2021 at approximately 10:08 a.m.;

8  said deposition was taken pursuant to the FEDERAL Rules

9  of Civil Procedure. The oath in this matter was sworn

10 remotely pursuant to FRCP 30.

11

12 It is agreed that BROOKE ANDREW, being a Notary Public

13 and Court Reporter, may swear the witness and that the

14 reading and signing of the completed transcript by the

15 witness is not waived.

16

17

18

19

20

21

22

23

24

25

1                 PROCEEDINGS

2

3      COURT REPORTER: My name is Brooke Andrew. I'm

4  the video technician and court reporter today.

5  Today is the 14th day of May, 2021.  The time is

6  10:08 a.m.  We are convened by videoconference to

7  take the deposition of Phil Cline, in the matters

8  of Arturo DeLeon-Reyes versus Reynaldo Guevara,

9  et al. and Gabriel Solache versus City of Chicago,

10 et al., pending in the United States District Court

11 for the Northern District of Illinois, Eastern

12 Division, Case number 1:18-CV-1028 and Case number

13 1:18-CV-2312.  Will everyone but the witness please

14 state your appearance, how you are attending, and

15 the location you are attending from, starting with

16 Plaintiff's counsel?

17     MR. SWAMINATHAN:  This is Anand Swaminathan

18 for Plaintiff Arturo DeLeon.

19     MR. STARR:  Sean Starr on behalf of Plaintiff

20 DeLeon as well.

21     MS. SUSLER:  Jan Susler on behalf of Plaintiff

22 Gabriel Solache.

23     MS. ROSEN:  Eileen Rosen on behalf of

24 Defendant City of Chicago and the witness.

25     MS. MCGRATH:  Megan McGrath on behalf of

1  Defendant Guevara.

2      MS. ZEHNER:  Jessica Zehner on behalf of City

3  of Chicago and the witness.

4      MR. BURNS:  Dan Burns on behalf of Defendant

5  Navarro.

6      MR. BRENER:  Edward Brener on behalf of

7  Defendants O'Malley, Brualdi, Worley, Varga, and

8  Cook County.

9      COURT REPORTER:  Thank you, Counsel.

10 Superintendent Cline, will you please state your

11 name for the record?

12     THE WITNESS:  Sure.  It's Philip Cline,

13 C-L-I-N-E.

14     COURT REPORTER:  Thank you.  Do all parties

15 agree that the witness is, in fact, Philip Cline?

16     MR. SWAMINATHAN:  We'll stipulate it.

17     MR. BURNS:  Yes.

18     MR. BRENER:  Yes.

19     MS. MCGRATH:  Yes.

20     MS. SUSLER:  Yes.

21     COURT REPORTER:  Thank you, Counsel.

22 Superintendent Cline, will you please raise your

23 right hand?  Do you solemnly swear or affirm that

24 the testimony you're about to give will be the

25 truth, the whole truth, and nothing but the truth?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1     THE WITNESS: I do.
2     COURT REPORTER: Thank you. You may begin.
3           DIRECT EXAMINATION
4  BY MR. SWAMINATHAN:
5     Q    Okay. Sir, please state and spell your name
6  for the record.
7     A    Sure. It's Philip Cline,
8  P-H-I-L-I-P C-L-I-N-
9           E.
10    Q    Okay. And just before we went on the record,
11 I had asked --
12         MS. SUSLER: (Inaudible).
13         MR. SWAMINATHAN: Jan, you have to put it on
14    mute.
15         MS. SUSLER: Sorry. Sorry.
16 BY MR. SWAMINATHAN:
17    Q    Sorry. Sir, just before we went on the
18 record, I had asked about a respectful way to address
19 you. You've obviously achieved substantial success in
20 your career and I wanted to be respectful of that. You
21 indicated Mr. Cline is okay with you; is that fair?
22    A    That's fine.
23    Q    Okay. All right. Are you currently employed?
24    A    Yes.
25    Q    And what is your current position -- current

Page 11

1  job?
2     A    I'm the executive director of the Chicago
3  Police Memorial Foundation.
4     Q    And how long have you been in that position?
5     A    14 years.
6     Q    You collect a salary for that work?
7     A    Yes.
8     Q    Do you have any other current employment?
9     A    No.
10    Q    Do you perform any work in your current
11 position in partnership with the FOP or Fraternal Order
12 of Police?
13    A    Not really, no.
14    Q    Do you have any role on the Fraternal Order of
15 Police?
16    A    No.
17         MS. ROSEN: Objection. Form.
18    Q    You may get to answer.
19    A    No.
20    Q    Are you currently collecting a pension from
21 the Chicago Police Department?
22    A    Yes.
23    Q    Are you currently collecting a pension from
24 any other organizations or entities other than Chicago
25 Police Department?

Page 12

1     A    No.
2     Q    Do you have any other sources of income
3  currently other than your pension and your current
4  position as executive director?
5         MS. ROSEN: Objection to the relevance of
6    these questions, but he can answer.
7     A    Social Security.
8     Q    Anything else?
9     A    No.
10    Q    Okay. In what year did you retire from
11 Chicago Police Department?
12    A    2007.
13    Q    All right. I know you -- strike that. Let me
14 just ask the question. Approximately how many times
15 have you been deposed in the past, sir?
16    A    Hundred.
17    Q    All right. I know you've been deposed many
18 times. I will repeat some of what I'm sure you've heard
19 at the beginning of many depositions. Obviously, this
20 is a question-and-answer session. I will be asking you
21 questions. You'll answer them and the court reporter is
22 going to take it down. So let's try our best to -- let
23 me finish my question before you answer. And then
24 similarly, I will let you finish your response before I
25 ask my next question, fair?

Page 13

1     A    Yes.
2     Q    Okay. There will be many times during the
3  deposition when you will know where my question is going
4  to end and what I'm asking. Just pause and let me
5  finish getting in my question, okay?
6     A    Yes.
7     Q    I think it's happened once already in this --
8  in the deposition. Counsel will be making objections
9  from time to time. Please make sure you give her a
10 moment to make her objection before you respond so the
11 court reporter can get it down, okay?
12    A    Yes.
13    Q    Okay. If I ask you a question and you don't
14 understand my questions, please let me know and I will
15 rephrase it; is that fair?
16    A    Yes.
17    Q    Likewise, if you answer my question, I'll
18 assume you understood my question; is that fair?
19    A    Yes.
20    Q    Okay. If you need to take a break at any
21 point, let us know and we will -- and we will take a
22 break. I just ask that you finish answering any pending
23 question before we take a break; is that fair?
24    A    Yes.
25    Q    Okay. This is not a question that asks you on



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

1  any specific medical conditions, it's a "yes" or "no"
2  question.  So listen to my question carefully.  Do you
3  have any medical conditions that would prevent you from
4  being able to understand my questions and answer them
5  truthfully today?
6      A   No.
7      Q   Are you taking any medications that would
8  prevent you from being able to understand my questions
9  and answer them truthfully today?
10     A   No.
11     Q   All right.  I have seen past testimony in
12 which you've talked about your work history at the
13 Chicago Police Department, but I'll just ask you to go
14 through it once for the record here so that I don't have
15 anything missing.  Could you just walk through -- that
16 sort of when you first joined the Chicago Police
17 Department and each of the positions you've held through
18 the time of your retirement in 2007?
19     A   In 1968, I became a cadet for Chicago Police
20 Department.  1970, I became a patrolman.  1972, I became
21 a detective.  1977, a sergeant.  1985, a lieutenant.
22     Q   Let me pause you there.  When you became a
23 lieutenant, what district were you working in?
24     A   The 21st District.
25     Q   Okay.  And in 1977 you made sergeant.  You

Page 15

1  were working narcotics; is that right?
2      A   I went to ten and then later narcotics.
3      Q   Okay.  I get that you had 21st District as a
4  lieutenant in 1985, and then keep going from there.
5      A   Yeah.  From the lieutenant's position in 21, I
6  was assigned Area 2 Violent Crimes.  From there --
7      Q   And that was in 1986?
8      A   Same year, '85.
9      Q   Okay.
10     A   And then in 1989, I went to the 11th District
11 and 2004 I was -- I went -- 2003 I went to Gang
12 Investigations.
13     Q   You said 2003.  Do you mean 1993?
14     A   1993.  Yes.  I'm sorry.
15     Q   Thank you.
16     A   So '93, I went to Gang Investigations.  '94 I
17 was promoted to commander.  And went to Area 5
18 detectives.  In '98, I was transferred to the narcotic
19 section.  And then in 2000, I was promoted to deputy
20 chief of Organized Crime.  2001, I was promoted to chief
21 of detectives.  2003, I was promoted to first deputy and
22 the same year, 2003, I was superintendent.
23     Q   Okay.  So from 1985 to 1989, you were
24 lieutenant in Area 2 Violent Crimes; is that right?
25     A   Yes.

Page 16

1      Q   Okay.  And then from '93 to 1994, you were a
2  lieutenant over -- in the Gang Crime section; is that
3  right?
4      A   Yes.
5      Q   Okay.  And then from 1994 to '98, you were
6  commander over Area 5 detectives; is that right?
7      A   Yes.  And I forgot one, I'd like to clear that
8  up.
9      Q   Please do.
10     A   From -- from '89 to '93, I was in the 11th
11 District.  In '93, I went to gangs.
12     Q   Okay.  In '80 -- from '89 to '93, when you
13 were a lieutenant in 11th District, what kind of
14 officers were you supervising in that position?
15     A   Initially, beat officers on the street and
16 then the tactical team.
17     Q   What kind of officers were on the tactical
18 team?
19     A   These were police officers from the 11th
20 district who were -- were selected to be in plainclothes
21 and -- and worked the street.
22     Q   And so their rank was patrol officer?
23     A   Yes.
24         COURT REPORTER:  I'm sorry to interrupt.  It
25 looks like Ms. Golden has joined the waiting room

Page 17

1  so I'm going to let her in.
2          MR. SWAMINATHAN:  Okay.  Carrie, are you
3  there?
4          MS. GOLDEN:  I am.  Thanks, An.
5          MR. SWAMINATHAN:  Sure.
6  BY MR. SWAMINATHAN:
7      Q   In 1993 when you became a lieutenant in the
8  Gang Investigation Section, what type of officers were
9  you supervising there?
10     A   Gang specialist.  That was a rank equal to
11 detective.  There was approximately 125 of them.
12     Q   All right.  I appreciate you going through the
13 -- your background.  Just so I remember, where are you
14 today for purposes of this deposition?
15     A   I'm sorry, I didn't understand the question.
16     Q   Where are you today for this deposition? Where
17 are you taking this deposition from?
18     A   At Rock Fusco's office.
19     Q   Okay.  Do you live in the City of Chicago,
20 sir?
21     A   Do I live in the City of Chicago?  No.
22     Q   All right.  Let me start with your time
23 working in -- as a lieutenant at Area 2 Violent Crimes.
24 You were the commanding officer when you took that
25 position; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1     A     Of the Violent Crime unit, yes.
2     Q     Okay. And you had detectives working under
3 you?
4     A     Yes.
5     Q     Okay. And you -- did all detectives at Area 2
6 work under you or just detectives in certain sections?
7     A     Just detectives in Violent Crimes.
8     Q     Did that include homicides?
9     A     Yes.
10    Q     Okay. Who did you replace in that position?
11    A     Jon Burge.
12    Q     And who was your supervisor?
13    A     Bob Biebers.
14    Q     And he would have been the commander?
15    A     Yes.
16    Q     Do you know if he went on to another position
17 or if he retired?
18    A     I -- when I left there, I went to the 11th
19 district, he was still there but I don't know where. I
20 think he retired shortly after that.
21    Q     Okay. And in that position, as the Lieutenant
22 in Violent Crimes -- you were supervising violent crime
23 detectives and homicide detectives, correct?
24    A     Yes.
25    Q     And that term "violent crime detective" or

Page 19

1 "homicide detectives," are those terms we can use
2 interchangeably -- means the same thing?
3     A     Well, back then, Violent Crimes included
4 homicide, sex, robbery. Later on it was changed to --
5 instead of homicide, it became -- a homicide unit was
6 established again. And then, robbery, burglary, theft
7 was a separate unit.
8     Q     Okay. So at that time they were violent
9 crimes detectives, not homicide detectives?
10    A     Right. They would handle homicides, but they
11 were -- they also would handle robberies and non-fatal
12 shootings and stuff.
13    Q     Okay. And so, at that time you were
14 supervising detectives. Had you previously been a
15 detective yourself?
16    A     Yes.
17    Q     And that was in the period from 1974 to -- oh,
18 1972-1977; is that right?
19    A     Yes.
20    Q     Okay. What types of cases did you investigate
21 when you were a detective?
22    A     Mostly narcotic and gang related. If a
23 homicide happened on the case we were investigating, we
24 would help out with the homicide. I was assigned --
25 during that time, I was assigned to DEA for several

Page 20

1 years, so we'd handle a lot of major narcotic cases.
2     Q     Okay. So primarily you were doing narcotics
3 cases, but sometimes you might have some involvement in
4 violent crimes and homicides; is that fair?
5     A     Yes.
6     Q     Okay. Going back to your period from 1985 on
7 when you were a lieutenant supervising Violent Crimes
8 detectives at Area 2, did you discipline any of the
9 detectives working under your command when you were in
10 that unit?
11          MS. ROSEN: Objection. Form. You can answer
12     if you understand the question.
13    A     I don't recall, as I sit here today, if I did
14 or not.
15    Q     Can you think of any instances when you had to
16 inflict any discipline upon any detectives working under
17 your command in that unit?
18          MS. ROSEN: Objection. Form.
19    A     Here again, as I sit here today, I can't
20 remember.
21    Q     When you came in as a lieutenant, you
22 indicated that you replaced Jon Burge, correct?
23    A     Yes.
24    Q     When you came into that position, did you come
25 to suspect that any detectives in that area had ever

Page 21

1 been involved in abusing suspects?
2     A     Not to my knowledge.
3     Q     Did you ever come to suspect that any of the
4 individuals working in that unit under you had been
5 engaging in misconduct during their interrogation of
6 suspects?
7          MS. GOLDEN: Object to foundation.
8          MS. ROSEN: You can answer.
9     A     No.
10    Q     Did you ever hear rumors that such conduct had
11 been occurring?
12          MS. ROSEN: Objection. Form. You can
13     answer.
14    A     Later I -- I know there was articles in the
15 media, but I don't know the time frame of that.
16    Q     During the time that you were lieutenant in
17 overseeing Area 2 Violent Crime detectives, did you ever
18 hear any rumors about such conduct?
19          MS. ROSEN: Objection. Form.
20    A     No.
21    Q     You learned at some point that a special
22 prosecutor -- we'll strike that. You learned that a
23 special prosecutor issued a report in 2006 about Jon
24 Burge at Area 2, correct?
25          MS. ROSEN: Objection. Form. Relevance.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    You can answer.
2      A    Yes.
3      Q    And you learned that the special prosecutor
4    had found that Burge and others at Area 2 had, in fact,
5    physically abused suspects, correct?
6           MS. ROSEN:  Objection.  Form.  Relevance.
7    You can answer.
8      A    I don't recall exactly what the report said,
9    but I know that was in there, that there was abuse.
10     Q    Okay.  When you read that report, what did you
11   think about those findings from special prosecutor?
12          MS. ROSEN:  Objection.  Form.  Relevance.
13     A    They were troubling.
14     Q    Did you have any opinions about whether the
15   special prosecutor's findings were true or not?
16          MS. ROSEN:  Objection.  Form.  Relevance.
17   Foundation.
18     A    No.
19     Q    Did you agree with the special prosecutor's
20   finding?
21          MS. ROSEN:  Objection to form.  Relevance.
22     Q    Did you disagree with the prosecutors --
23   strike that.  Did you disagree with the special
24   prosecutor's findings?
25          MS. ROSEN:  Objection.  Form.  Relevance.

Page 23

1      A    That wasn't for me to decide.  I mean, I -- I
2    read what he said.  But I wasn't privy to any of the
3    evidence or information that he had.
4      Q    Did you have an opinion about whether that
5    kind of conduct could have been occurring without
6    supervisors knowing about it?
7           MS. ROSEN:  Objection.  Form.  Foundation.
8      A    No.
9      Q    Do you have any explanation as to how that
10   could have been occurring in an area that -- under your
11   command without you having heard any rumors about it?
12          MS. ROSEN:  Objection.  Form.  Calls for
13   speculation.  Foundation.  And relevance.
14     A    No.
15     Q    In your view, could the sort of abuse
16   identified in the special prosecutor's report had been
17   going on without a commander knowing about it?
18          MS. ROSEN:  Objection.  Form.  Foundation.
19   Calls for speculation, and relevance.
20     A    No.
21     Q    In your view, could the sort of abuse
22   identified in the special prosecutor's report had been
23   going on without a lieutenant knowing about it?
24          MS. ROSEN:  Objection.  Form.  Foundation.
25   Calls for speculation.  Relevance.

Page 24

1      A    I have no opinion then.
2      Q    Sorry.  And maybe I misunderstood your answer
3    with regard to the -- with regard to the commander.  In
4    your view, could the sort of abuse identified in the
5    special prosecutor's report had been going on without
6    the commander knowing about it?
7           MS. ROSEN:  Same objection.
8      A    I would need more information whether someone
9    had told him anything or he had seen anything.  I can't
10   speculate.
11     Q    In other words, it's possible that such
12   conduct could have been occurring in an area without the
13   lieutenant or the commander finding out about it; is
14   that right?
15          MS. ROSEN:  Objection to form, foundation.
16   Calls for speculation.  Mischaracterizing his
17   answer.
18     A    I can't speculate on that.
19     Q    As when you were the Violent Crimes lieutenant
20   at Area 2, you were responsible for the interrogations
21   that were happening under your watch; is that right?
22          MS. ROSEN:  Objection.  Form.
23     A    Yes.
24     Q    Were you responsible for how detectives were
25   going about conducting their interrogations?

Page 25

1           MS. ROSEN:  Objection.  Form.
2      A    Yes.
3      Q    Can you vouch for what was happening in those
4    interrogation rooms?
5           MS. ROSEN:  Objection.  Form.
6      A    To my knowledge, there was no abuse.
7      Q    And when you say "to your knowledge," are you
8    able to say that because you're not aware of any abuse
9    that, in fact, no abuse occurred?
10          MS. ROSEN:  Objection.  I'm not sure I even
11   unders -- can you read back the question?  I don't
12   think I even understand.
13          MR. SWAMINATHAN:  I can ask it again, Eileen.
14          MS. ROSEN:  Okay.
15   BY MR. SWAMINATHAN:
16     Q    Can you say that because you're not aware of
17   any abuse occurring, that, in fact, no such abuse
18   occurred?
19          MS. ROSEN:  Objection to form.  Foundation.
20   Calls for speculation.
21     A    I couldn't speculate on that.
22     Q    And -- so the record's clear.  I'm not
23   accusing you in any way of any misconduct.  I'm asking
24   you -- let me be clear on the record.  Did you ever --
25   did you ever become aware of any claims of abuse by

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1 detectives working in your command -- under your command
2 at Area 2, while you were -- while you were the
3 lieutenant?
4          MS. ROSEN: Objection. Form. Foundation.
5     A    No.
6     Q    Okay.  And the fact that -- strike that.  That
7 doesn't mean that no such conduct occurred.  In other
8 words, you're not vouching for what actions every
9 detective took in every interrogation; do I have that
10 right?
11          MS. ROSEN: Objection. Form. Foundation.
12    A    Yes.
13    Q    Okay.  When you were the lieutenant in Area 2
14 Violent Crimes, where was your office?  Where did you
15 sit?
16    A    Right outside the squad room.  There's Violent
17 Crimes office.  My office was right next to it, and --
18 and the squad room and the area rooms were all right
19 outside there.
20    Q    Okay.  Was there a sort of open area where the
21 detectives sat?
22    A    Yes.
23    Q    Okay.  And then there were interrogation rooms
24 off of that open area, correct?
25    A    Yes.

Page 27

1     Q    And then there was a separate room where you
2 sat; is that right?
3     A    Yes.
4     Q    And who else sat in that office or that other
5 area, was it just lieutenants?
6     A    The lieutenant's office was just for the
7 lieutenant.  It was very small, probably five-by-seven
8 or something like that.
9     Q    And was it directly off the main floor?
10    A    There was a entrance to the Violent Crime
11 administrative office and then my office was right
12 there.
13    Q    And then where were the -- where did the
14 sergeant sit?
15    A    They would be out in the squad room.
16    Q    And what about the commander?
17    A    He had an office down the hall.
18    Q    And when you were at the area, where would you
19 typically spend your time when you were1 at Area 2, the
20 lieutenant Area 2 Violent Crime?  Were you typically in
21 your office?
22          MS. ROSEN: Objection. Form.
23    A    In my office or in the squad room talking to
24 the detectives, seeing what the cases were, whether they
25 needed any help with anything.

Page 28

1     Q    Would you go out in the street?
2     A    Yes.
3     Q    How often would you go out in the street as a
4 lieutenant in Area 2 Violent Crimes?
5     A    Every day.
6     Q    And what -- you -- what shift would you work?
7     A    I worked either days or the Property Crimes
8 lieutenant would work nights and then we'd flop every
9 month.
10    Q    And days means 4:00 to 12:00?
11    A    Days would be, like, 9:00 to 5:00 and
12 afternoons would be 5:00 until 1:00 in the morning.
13    Q    Okay.  So let me make sure I have the
14 terminology right.  Days, would that be the -- would
15 that be second shift?
16    A    Yes.
17    Q    Okay.  And that would be basically the morning
18 until the early afternoon?
19    A    Yes.
20    Q    Okay.  And then nights is third watch; is that
21 right?
22    A    Yes.
23    Q    Something like 4:00 p.m. to midnight?
24    A    That's correct.
25    Q    Okay.  So you -- when you were a lieutenant at

Page 29

1 Area 2 Violent Crimes you worked -- typically worked the
2 second shift days and then sometimes you would work
3 nights or third shift; is that right?
4     A    Every month we'd flip-flop.  Like I said, the
5 Property Crimes lieutenant and -- and myself had to be
6 on opposite shifts.
7     Q    Okay.  Was there any other lieutenant working
8 Area 2 Violent Crimes?
9     A    No.
10    Q    And was there any supervisor -- strike that.
11 Was there any lieutenant working the midnight shift or
12 first shift?
13    A    No.
14    Q    Who was -- was there a sergeant that worked
15 the midnight shift?
16    A    There was several sergeants -- like three --
17 because the days off, you had to always have somebody
18 available.
19    Q    So was the high -- on midnight shift, who was
20 the highest-ranking officer who was there at Area 2
21 Violent Crime?
22    A    The sergeant.
23    Q    I want to ask you a little bit about the
24 policies that were in place when you were the lieutenant
25 at Area 2 Violent Crimes, were those policies any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 different than the policies that applied when you had
2 been a detective back in 1972 to 1977?
3         MS. ROSEN: Objection to form. Foundation
4    vague. If you can answer the question, then go
5    ahead.
6    A    Not that I can think of.
7    Q    Had there been any changes in policies that
8 you can recall that from what had been applied to you as
9 a detective to what now apply to the detectives working
10 under your supervision?
11        MS. ROSEN: Objection. Form. Foundation.
12    A    The reports on GPR, is General Progress
13 Reports, came out about that time, but I don't remember.
14 They were already in place when I got to the area.
15    Q    Okay. So there had been some requirement of
16 GPRs that had come into place before you became the
17 lieutenant at Area 2 Violent Crimes, correct?
18    A    Yes. That weren't -- wasn't in '72 when I
19 made detective. There were no GPRs.
20    Q    Okay. And so, what is your understanding of
21 what that GPR policy required of your detectives working
22 under you when you were lieutenant?
23        MS. ROSEN: Objection. Form. Foundation.
24    A    If they were going to take notes, they needed
25 to take them on a GPR.

1    Q    And so when you were the lieutenant overseeing
2 the Violent Crimes detectives, you were familiar with
3 that policy change that had taken place; is that right?
4        MS. ROSEN: Objection. Form.
5    A    Yes.
6    Q    Did you ever get training on that policy
7 change?
8        MS. ROSEN: Objection. Form. Foundation.
9    A    I don't recall if there was formal training,
10 but, I mean, there was guidelines that were handed out
11 but I don't remember if I ever had any formal training.
12    Q    And do you know if there was any formal
13 training given to your detectives working under you?
14        MS. ROSEN: Objection. Form. Foundation.
15    A    Yeah, new detectives were all trained in the
16 use of GPRs.
17    Q    And how was that training conducted?
18        MS. ROSEN: Objection. Form. Foundation.
19    A    At the academy, they went through, like, a
20 month of pre-detective training and that was one of the
21 things that was included with GPRs.
22    Q    And then, for detectives who had already gone
23 through detective training, was there any training,
24 formal training for them about that policy change?
25        MS. ROSEN: Objection. Form. Foundation.

1    A    The sergeants would be responsible for
2 training them at roll call.
3    Q    Do you know if that training occurred?
4    A    Yes.
5    Q    And how do you know that that training
6 occurred?
7    A    I was told that it occurred by sergeants at
8 the area.
9    Q    Okay. Once the GPR requirement had come into
10 place, that was a substantial change from how detectives
11 had taken notes in the past; is that right?
12        MS. ROSEN: Objection to form.
13    A    Yes.
14    Q    And explain how it how it was done previously
15 before that change.
16    A    Detectives would take notes on any piece of
17 paper and then they were supposed to put it in the file
18 and this had -- the GPR had ID numbers on it and had to
19 be approved by a supervisor so that it tightened up the
20 rules regarding notetaking.
21    Q    And why would -- and why was that necessary?
22        MS. ROSEN: Objection to form. Foundation.
23    A    I believe there was a court case that came out
24 on it, but I don't know the information yet as I sit
25 here.

1    Q    Then would you agree there was some opposition
2 from detectives to that change that required them to
3 stop taking personal notes and put them onto these
4 official GPRs?
5        MS. ROSEN: Objection. Form. Foundation.
6    Mischaracterizes his testimony.
7    A    Not that I heard of.
8    Q    Would you say that detectives started using
9 GPRs, they sort of grudgingly agreed to use GPRs?
10        MS. ROSEN: Objection. Form. Foundation.
11    A    Not -- not begrudgingly. I mean, a lot of
12 them welcomed it because it was -- they were -- they
13 were all given notebooks with GPR forms on them and if
14 you see detectives on the street, you'd always see them
15 carrying a blue notebook with the police star on it.
16    Q    And before that, you had -- when you had been
17 a detective, what did you use to take notes?
18    A    Anything that was around, any kind of notepads
19 or, and you were responsible for turning it in.
20    Q    Did you use any kind of, like this, like a
21 legal pad or steno pad or anything like that?
22    A    Yes.
23    Q    Okay. That was your typical practice back
24 when you'd been a detective?
25        MS. ROSEN: Objection. Form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1    A    Yes.

2    Q    And you took notes as a detective; is that
3 right?

4    A    Yes.

5    Q    Had you been trained to take notes as a
6 detective?

7    A    Yes.

8    Q    Was that part of your training in detective
9 school?

10    A    Yes.

11    Q    Was that part of the training with the
12 detectives that work under -- worked under you when you
13 were a lieutenant at Area 2 Violent Crimes?

14        MS. ROSEN:  Objection.  Form.  Foundation.

15    A    Yes.

16    Q    Did you consider note-taking important to your
17 work as a -- when you were a detective?

18    A    Yes.

19    Q    And why -- what do you use notes for as a
20 detective?

21    A    To record what either information that you
22 gleaned or from trying to get statements down from what
23 people said.

24    Q    Did you take notes on the things that
25 witnesses would tell you when you spoke to them?

Page 35

1    A    Yes.

2    Q    And did you use those notes to help you write
3 reports?

4    A    Yes.

5    Q    Did you view your notes as -- did you view
6 notetaking as critical to your ability to write accurate
7 reports?

8        MS. ROSEN:  Objection.  Form.

9    A    I think each case and each person is
10 different.

11    Q    Did you have any detectives that you worked
12 with who simply didn't take any notes?

13    A    Some detectives took more notes than others.
14 Like I said, it was an individual thing.

15    Q    So some detectives took more notes, some
16 detectives took less notes, but were there some
17 detectives who took no notes?

18    A    Not that I'm aware of.  I never came across
19 anybody.

20    Q    When you were a lieutenant supervising
21 detectives, would you say your detectives -- well,
22 strike that -- your detectives had been trained to take
23 notes, right?

24        MS. ROSEN:  Objection.  Form.

25    Q    And they'd been trained to use notes to assist

Page 36

1 them in their report writing, correct?

2        MS. ROSEN:  Objection.  Form.

3    A    Yes.

4    Q    They'd been trained that taking notes was
5 important to writing thorough and accurate supplementary
6 reports, correct?

7        MS. ROSEN:  Objection.  Form.

8    A    There again, it depended on each detective's
9 ability, with some having better memory than other
10 detectives.  So it's different for each detective.

11    Q    I'm sorry, but --

12    A    They should take them on a GPR.

13    Q    When the detectives were trained in detective
14 school who were working under you as lieutenant, was it
15 your understanding that they were trained to write
16 thorough and accurate reports?

17        MS. ROSEN:  Objection.  Form.

18    A    Yes.

19    Q    And were they trained that notes were an
20 important piece of being able to write thorough and
21 accurate reports of the various investigative steps they
22 were taking?

23        MS. ROSEN:  Objection.  Form.

24    A    I don't know if they were trained that or not.

25    Q    Did you have any expectations -- well, strike

Page 37

1 that -- the detectives working under you as a
2 lieutenant, did they take notes?

3    A    Yes.

4    Q    Did you consider that to be good detective
5 work, to be taking notes?

6        MS. ROSEN:  Objection.  Form.

7    A    It's part of it.

8    Q    Did you consider taking notes to be one of the
9 important things that a detective -- a good detective
10 does?

11        MS. ROSEN:  Objection.  Form.  Foundation.

12    A    There again, it depends on each detective,
13 what their abilities are.

14    Q    Was it your expectation that detectives
15 working under you would be taking notes as they
16 conducted investigations?

17        MS. ROSEN:  Objection.  Form.

18    A    There again, it depends on each case.

19    Q    Did you have any detectives working under you
20 that simply took no notes?

21        MS. ROSEN:  Objection.  Form.  Asked and
22 answered.

23    A    Not that I'm aware of.

24    Q    If you had that -- you understood that some
25 detectives might take more detailed notes, some

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1 detectives might take less detailed notes, and there was
2 no rules around, you know, whether you needed to take
3 really detailed notes or not; is that fair?
4           MS. ROSEN: Objection. Form.
5     A   Yes.
6     Q   There was an expectation that detectives
7 document any pertinent information they learned during
8 the investigation, right?
9     A   Yes.
10    Q   If you had learned of a detective that simply
11 took no notes at all, would that cause you concern?
12          MS. ROSEN: Objection. Form. Foundation.
13    A   Not necessarily, because if his case report
14 had all the information on there, then I'd be satisfied
15 with that.
16    Q   Would you have any concerns about a detective
17 writing reports entirely from memory about witness
18 interviews?
19          MS. ROSEN: Objection. Form. Foundation.
20    A   No. Like I said before, each individual
21 detective's abilities dictate what -- what they're going
22 to -- how many notes they're going to take, if any.
23    Q   If you had a detective who was writing
24 reports, you know, several days after talking to
25 witnesses and doing so entirely from memory, would you

Page 39

1 have concerns about whether their reports were thorough
2 and accurate?
3           MS. ROSEN: Objection. Form. Foundation.
4     A   No.
5     Q   When you wrote your reports, could you write
6 them thoroughly and accurately without the aid of notes?
7           MS. ROSEN: Objection. Form.
8     A   I don't understand the question.
9     Q   When you took notes, just strike that -- when
10 you wrote reports as a detective, could you write them
11 thoroughly and accurately without relying on any notes?
12          MS. ROSEN: Objection. Form.
13    A   It would depend on the case.
14    Q   When you were interviewing witnesses, did you
15 typically take notes?
16          MS. ROSEN: Objection. Form.
17    A   Yes.
18    Q   And when your detectives working under you
19 interviewed witnesses, did they typically take notes?
20          MS. ROSEN: Objection. Form.
21    A   Each case is different.
22    Q   I want to ask you about street files. Are you
23 familiar with that term?
24          MS. ROSEN: Objection. Form.
25    A   Yes.

Page 40

1     Q   What is a street file?
2           MS. ROSEN: Objection. Form. Foundation.
3     A   Street file was a file that kept notes. Other
4 things that weren't on a case report, might be a
5 Polaroid photo of some piece of evidence. Anything that
6 wasn't inventoried or wasn't part of the case report
7 would become part of the street file.
8     Q   And then, when you were a lieutenant
9 overseeing Area 2 Violent Crime detectives, did the
10 detectives have street files?
11          MS. ROSEN: Objection. Form.
12    A   Yes.
13    Q   And then, when you later were in other
14 positions supervising detectives, correct? We'll talk
15 about that in a minute, but -- strike that. You were
16 later on in other positions supervising detectives,
17 correct?
18    A   Yes.
19    Q   And did your detectives at that time use --
20 continue to use street files?
21          MS. ROSEN: Objection. Form. Foundation.
22    A   When you say "street file," I'm talking about
23 the official file that's kept in the area with those
24 things that I discussed earlier.
25    Q   Yeah. So explain that to me again. So when

Page 41

1 you say "street file," is it something that detectives
2 take out on the street with them, is it something that
3 sits in the office; what is it?
4           MS. ROSEN: Objection. Form.
5     A   Mostly it's in the office. What it is, is you
6 collect items that aren't inventory, that -- might have
7 taken a Polaroid picture of something and put it in the
8 file so it helps the other detectives that are working
9 that case see it. But the original GPR is going to the
10 street file. I can't think right now of anything else
11 that might have gone in there, but those would be types
12 of things.
13    Q   Okay. And then in addition to the street
14 file, would that also sometimes be referred to as the
15 investigative file?
16    A   Yes.
17    Q   Okay. And where would -- when you were at
18 Area 2 Violent Crimes, where was that file kept in the
19 office?
20    A   We had one detective that was responsible for
21 the street files and he would keep them in the
22 administrative office of the lieutenant.
23    Q   And then any detectives could come in and
24 access that file if they needed it; is that right?
25    A   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    Q    And if you had detectives actively working the
2  case, they could hold on to that street file; is that
3  right?
4    A    No.  They were supposed to turn it in every --
5  at the end of their shift so that the next shift that's
6  working on it, they have the same information to be
7  privy to.
8    Q    And all of the notes from those detectives
9  should be in that street file; is that right?
10   A    On GPRs and in that street file.
11   Q    And as the lieutenant, was that your
12  expectation about what would be happening?
13   A    Yes.
14   Q    And that policy about using street file, using
15  -- strike that.  That investigative file and keeping
16  everything in that investigative file, including notes,
17  that was part of the policy change that took place based
18  on some litigation, correct?
19   A    Yes.
20   Q    Did you have an opinion about whether that
21  policy change was good or bad?
22       MS. ROSEN:  Objection.  Form.  Relevance.
23   A    I thought it was good.
24   Q    Did you conduct any audits when you were the
25  lieutenant at Area 2 Violent Crimes to determine whether

Page 43

1  the new policies related to street files were being
2  followed?
3    A    I remember doing audits and also having the
4  sergeant's audit, but I don't recall, as I sit here
5  today, exactly what took place.  But I remember we had
6  to audit the files.
7    Q    And what did that audit consist of?
8    A    A supervisor would go through the file and
9  make sure that the -- the proper reports were in there,
10  that the GPRs were approved, everything that -- to get
11  these files ready for court or continue the
12  investigation of unsolved crimes.
13   Q    And how many times were audits of the street
14  files conducted?
15   A    As I sit here today, I don't remember.
16   Q    And were these sort of regular check-ins to
17  make sure the files were as they were supposed to be, or
18  were they specific to assessing compliance with the
19  policy change?
20   A    Both.
21       MS. ROSEN:  Objection.  Form.
22   Q    So let me ask this.  Before the policy --
23  before the policy change, was there sort of routine
24  check-ins on the files to make sure things had been
25  signed and approved and those kinds of things that would

Page 44

1  take place?
2    A    As I sit here today, I don't know.
3    Q    Okay.  And then, were there any unique reviews
4  of the files that were done that were specific to see
5  whether the street files policy change was being
6  followed?
7        MS. ROSEN:  Objection.  Form.
8    A    That was part of the audit.
9    Q    Okay.  And that's what I'm trying to
10  understand.  Was that an audit that was already
11  occurring or was it an audit specifically to address
12  this policy change?
13   A    As far as I know, that was because of the
14  policy change, because there were --
15   Q    And how --
16   A    -- no GPRs before then.
17   Q    Okay.  And that audit, what was it -- what was
18  it -- what was it looking for in the files they were
19  reviewed?
20   A    Compliance with the policies and their rules
21  and regulations.
22   Q    And so, what were they -- what were they
23  looking for in the file that would indicate compliance
24  or non-compliance?
25   A    That the GPRs were in there and that any other

Page 45

1  type of evidentiary value was in there that wasn't
2  either inventoried or sent downtown with the initial
3  reports.
4    Q    And who conducted those audits?
5        MS. ROSEN:  Objection.  Asked and answered.
6    A    It was the supervisors, sergeants and the
7  lieutenant.
8    Q    And did you participate in those audits?
9    A    Yes.
10   Q    And what were the results of the audit?
11   A    I'd say mostly compliant.  If there was
12  something that wasn't compliant, the supervisor would
13  order the detective to correct it.
14   Q    Were there any were -- strike that.  How many
15  such audits occurred while you were the lieutenant at
16  Area 2 Violent Crimes.
17   A    As I sit here today, I don't remember.
18   Q    Was it one, was it five, was it ten?  Give me
19  a general ballpark.
20       MS. ROSEN:  Objection to form.  Foundation.
21  Asked and answered.
22   A    I think they were, like, quarterly or
23  something like that, if I remember.  Not sure as I sit
24  here today.
25   Q    And then, approximately how many files were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1 looked at as part of these reviews?
2        MS. ROSEN:  Objection to form.  Foundation.
3    A    It would be the unsolved murders, solved cases
4 that had been put together, and then they would be
5 shipped down to records downtown to keep.
6    Q    I'm sorry.  So how many files were being
7 looked at as part of these audits or reviews?
8    A    It would depend on the number of unsolved
9 homicides, and that could be hundreds.  I also had a
10 policy of every unsolved homicide had to be looked at
11 every six months by the different detectives to -- to
12 make sure that nothing was missed.
13   Q    And so, was that part of the same audit
14 process you're talking about, or that was something
15 different?
16   A    That was something different.
17   Q    So are you saying that each quarter, hundreds
18 of homicide files were looked at specifically to assess
19 compliance with the policy change around street files?
20       MS. ROSEN:  Objection.  Form.  Foundation.
21   A    As I remember it today, yes.
22   Q    Okay.  And that was -- and that hundreds --
23 those hundreds of files were looked at by the
24 supervising sergeants; is that right?
25   A    Yes.  And a lieutenant.

Page 47

1    Q    And for each of these quarters -- each of
2 these audits, how many files did you look at personally?
3        MS. ROSEN:  Objection.  Form.  Foundation.
4    A    I don't remember as I sit here today.
5    Q    And what did you do with the audit?  Were
6 there any documentation of the audit results that were
7 created?
8        MS. ROSEN:  Objection.  Form.
9    A    I don't recall.
10   Q    Did you generate any kind of report based on
11 those audits?
12       MS. ROSEN:  Objection.  Form.
13   A    I don't remember.
14   Q    Now, even after the policy changed, detectives
15 sometimes took notes on things other than GPRs; is that
16 true?
17   A    Possible.  Yes.
18   Q    And was that considered improper, or was that
19 something that would come up in the audit?
20   A    Well, they would have to explain why they
21 didn't use the GPR, and there might have been a reason
22 for it.  But the supervisor would make sure that that
23 piece of paper got into the investigative file or --
24   Q    Go ahead.
25   A    No.  That's my answer.

Page 48

1    Q    Did you have some detectives who still
2 preferred to take notes in their own pads?
3        MS. ROSEN:  Objection.  Form.  Foundation.
4    A    No.  Because they were corrected when they
5 didn't use a GPR -- and usually all you had to say it is
6 one time and they would go to using a GPR.
7    Q    If a detective took notes on something other
8 than a GPR, would it be okay for them to then transfer
9 that information over to a GPR and get rid of the other
10 sheet of paper?
11       MS. ROSEN:  Objection.  Form.  Foundation.
12   A    They're not supposed to.  They're supposed to
13 keep the original piece of paper that would go in the
14 investigative file and the GPR would also go in the
15 investigative file.
16   Q    Did you have any detectives who had the
17 practice of using their own notes and then transferring
18 it over to GPRs?
19       MS. ROSEN:  Objection.  Form.
20   A    Not that I'm aware of.
21   Q    If you did, would you have concerns about
22 that?
23       MS. ROSEN:  Objection.  Form.
24   A    Yes.
25   Q    And you were talking about open homicide file

Page 49

1 cases, and those were the kind of cases that were
2 audited; is that right?
3    A    Yes.
4    Q    And then -- and what would happen with the
5 closed homicide files?  Those wouldn't be part of the
6 audit?
7    A    They would be looked at once they were
8 cleared.  And the administrative detective that's
9 responsible for the homicide files would make sure that
10 everything was in there is supposed to be in there, and
11 then that file would be shipped down to records for
12 retention.
13   Q    When a case went from being an open case, you
14 know, then you'd get charges and it would become a
15 closed case, what steps would be taken with the street
16 file, at that point?
17       MS. ROSEN:  Objection.  Form.
18   A    That's the file I'm talking about, the
19 investigative file.
20   Q    Yeah.  So what would happen with that
21 investigative -- once it was an open case -- strike
22 that.  When a case is closed and it goes from being an
23 open investigative file to a closed file, what happens
24 at that state with the investigative file?
25   A    Like I said, the administrative detective

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 would -- would look at it to make sure everything is in
2 there.  It would then be shipped downtown and kept in
3 the permanent retention file.
4     Q    Would there -- would duplicates of documents
5 and things be removed from the file?
6         MS. ROSEN:  Objection.  Form.
7     A    I don't understand your question.
8     Q    If there was information in the file that was
9 duplicative, if there were, like, copies of the same
10 thing, would those things be removed from the file?
11         MS. ROSEN:  Objection.  Form.  Foundation.
12     A    They -- I'm not aware of anybody doing that,
13 but I mean, no, the file wouldn't be -- he'd be -- he'd
14 make sure that the reports that had been generated, the
15 case reports, were in there.  Any GPR should be in
16 there.  And then ship it down.
17     Q    Was there any process for inventorying or
18 indexing the documents that were in the investigative
19 file?
20         MS. ROSEN:  Objection.  Form.
21     A    No.  Because that was the purpose of the
22 investigative files, is to hold those documents that
23 weren't case reports, mostly being GPRs.
24     Q    Other than the investigative file kept in the
25 lieutenant's office, was there any other locations where

1 files related to homicide were kept at the area?
2     A    No.
3     Q    All right.  I want to -- after you had been at
4 Area 2 Violent Crimes, you went over to the 11th
5 district that we talked about in 1989, right?
6     A    Yes.
7     Q    Who was your supervisor there?
8     A    I think Gibson.
9     Q    He was the commander?
10     A    Yes.
11     Q    Okay.  And then in 1993, you went over to the
12 Gang Investigation Section, correct?
13     A    Yes.
14     Q    Okay.  And who were your supervisors when you
15 were the lieutenant at the gang unit?
16     A    Commander Bob Dart, and there was another
17 commander when Dart left, and I can't remember his name
18 as I sit here today.
19     Q    Okay.  And you worked out of Maxwell Street?
20     A    Yes.
21     Q    And at that point, all Gang Crimes officers
22 were working out of Maxwell Street; is that right?
23     A    Yes.
24     Q    Okay.  And were all Gang Crimes files kept at
25 Maxwell Street?

1         MS. ROSEN:  Objection.  Form.  Foundation.
2     A    As I sit here today, I believe so.  But I'm
3 not sure.
4     Q    Were there any files for the Gang Crimes
5 officers that were kept anywhere other than at the Gang
6 Crimes offices, that you're aware of?
7         MS. ROSEN:  Objection.  Form.  Foundation.
8     A    No.
9     Q    "Gang crimes specialist," you indicated, were
10 the -- was the title of the folks who worked under you,
11 correct?
12     A    Yes.
13     Q    And then, what type of work would the Gang
14 Crimes specialist do?
15     A    The -- when I was sent to Gang Investigations,
16 that was -- that was a new unit.  The Gang Crimes unit
17 before that had been out in the areas and Willie Lloyd
18 had just got out of the penitentiary.  And he was the
19 leader of the Vice Lords and he had a limo pick him up
20 and he had a long fur coat on, and they wanted us to
21 open up a case on Willie Lloyd because he was getting
22 too much attention over there; he was trying to get all
23 the Vice Lords together, it was going to be a big gang
24 problem.  So we opened up what we called back then,
25 "Street corner conspiracy cases" on Willie Lloyd and his

1 organization, and then also on other gang leaders.  And
2 so it turned more from street work to investigative work
3 for the gang specialist.  And they were very successful
4 in putting Willie Lloyd in jail, putting Jack Bobo in
5 jail, as well as the other top gang leaders.  So their
6 working changed when they went to Gang Investigations.
7     Q    And -- the part I just didn't understand is in
8 what way their work changed when they went to Gang
9 Investigations?
10         MS. ROSEN:  Objection.  Form.
11     A    Well, they were -- they were more street-
12 oriented before.  They would be out there on the street,
13 you know, looking for gang members.  And this way, we
14 were looking at the hierarchy and doing wiretaps and
15 more sophisticated investigations.
16     Q    So their work became more investigative in
17 nature?
18     A    Yes.
19     Q    And did Gang Crimes specialists assist
20 detectives in investigation?
21     A    Yes.
22     Q    Did they assist detectives at homicide
23 investigations?
24         MS. ROSEN:  Objection.  Form.
25     A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did they assist detectives in interviewing
2  suspects and witnesses?
3         MS. ROSEN:  Objection.  Form.
4    A    Yes.
5    Q    Would Gang Crimes officers conduct interviews
6  of suspects and witnesses in homicide investigations?
7         MS. ROSEN:  Objection.  Form.
8    A    They would be there, but the detectives would
9  handle the actual interviews.
10   Q    Would -- they would be -- would Gang Crimes
11 specialists ever conduct interviews of suspects or
12 witnesses on their own in homicide cases?
13        MS. ROSEN:  Objection.  Form.  Foundation.
14   A    Witnesses, I believe, yes.  Suspects, I think
15 that detectives were always involved.
16   Q    Okay.  And the distinction there is that when
17 you had folks at the station who were going to be
18 subjected to a -- who were suspect and going to be
19 questioned in a custodial interrogation, you'd have the
20 detective there, right?
21        MS. ROSEN:  Objection.  Form.  Foundation.
22   A    That was the hope they have, yes.
23   Q    And that would happen at area -- that would
24 happen at the detective area?
25   A    Correct.

1    Q    But interviews of the people out in the
2  streets, that could happen by Gang Crimes specialists,
3  right?
4    A    Yes.
5    Q    That was one of the ways that Gang Specialists
6  assisted in homicide investigations, correct?
7    A    Yes.  And they trained to develop informants
8  that were part of that gang and to get information on
9  the gang's activities.
10   Q    Did -- were there Gang Crimes offices --
11 strike that.  Were there interrogation rooms to the Gang
12 Crimes offices at Maxwell Street?
13   A    I can't remember.  I don't -- I don't think we
14 had any interview room there.  Because this was the old
15 building, so I don't remember any.  You know, we had --
16 we might have used a sergeant's office or a lieutenant's
17 office to do the interviews, but I don't remember any
18 specific interview rooms.
19   Q    Okay.  So gang specialists would conduct
20 interviews, at times, at Nashville Street.  They just
21 didn't have interview rooms; is that right?
22   A    That's correct.
23   Q    Did gang specialists keep gang books?
24        MS. ROSEN:  Objection.  Form.  Foundation.
25   A    Yes.

1    Q    And what were the gang books used for?
2         MS. ROSEN:  Objection.  Form.
3    A    Information on the gangs, photos of gang
4  members.
5    Q    And those were organized or categorized by
6  gang membership, right?
7    A    Yes.
8    Q    There are different gang books for different
9  gangs?
10   A    Yes.
11   Q    And those could be shown -- could those be
12 shown -- could those be taken out of the Maxwell Street
13 offices?
14   A    Yes.
15   Q    Did you have detectives who had come over to
16 Maxwell Street to work with Gang Crimes specialists?
17   A    Yes.
18   Q    Was that typical?
19   A    Yes.
20   Q    And did you -- was it common for Gang Crimes
21 specialists to go over to the areas to meet with
22 detectives?
23   A    Yes.
24   Q    And in what ways would Gang Crimes specialists
25 working on homicide investigations document the work

1  they did to assist in homicide investigations?
2         MS. ROSEN:  Objection.  Form.  Foundation.
3    A    There was a -- a similar form as to a GPR that
4  was made for gangs and their graphics.
5    Q    And what was that form called?
6    A    I think it was the N6, or something, it was
7  called.  But it was the same as a GPR -- the whole idea
8  about it was if you were going to take notes, take it on
9  this and make sure it gets turned in with the final
10 report.
11   Q    And was there, similarly, a file at the Gang
12 Crimes offices, where all of those forms were supposed
13 to be kept -- those notes were to be kept?
14        MS. ROSEN:  Objection.  Form.  Foundation.
15   A    Yes.
16   Q    Okay.  And were those forms kept as part of
17 the file related to a specific case or investigation?
18   A    Yes.
19        MS. ROSEN:  Objection.  Form.  Foundation.
20   Q    And then at the end of the process, or, you
21 know, if a case closed or an arrest was made, where
22 would those notes on those forms go?  Would they stay at
23 the Gang Crimes office or would they go somewhere else?
24        MS. ROSEN:  Objection.  Form.  Foundation.
25   A    As I sit here, I don't remember where they'd

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  go.
2      Q    You don't think --
3          MS. ROSEN:  I'm just going to interject,
4      sorry, and I just want to interject here.  You've
5      been going on for at least ten minutes now on Gang
6      Crimes in 1995 and getting crime specialists and
7      the ins and outs of Maxwell Street.  There is no
8      connection in this law to Reyes' case, to Gang
9      Crimes, Gang Crime specialists. I've let you go
10     just by way of background, but I think you're sort
11     of crossing the limits here of what's relevant for
12     purposes of this case and this deposition.
13         MR. SWAMINATHAN:  Okay.  That -- and I only
14     have a few more questions on this topic, so I don't
15     think there's much for me to debate it with you and
16     I think that that's fair.
17 BY MR. SWAMINATHAN:
18     Q    At some point, those the offices at gang --
19 the Maxwell Street Office of Gang Crimes was closed,
20 correct?
21     A    Yes.
22     Q    And in fact, all the Gang Crimes officers then
23 became detectives, correct?
24     A    Yes.
25     Q    When that happened, did they go through

Page 59

1  detective training?
2      A    Yes.
3      Q    Okay.  So they had to go through a new round
4  of training to be -- once they got that title of
5  detective?
6      A    Yes.
7      Q    Okay.  And all the files that had been kept at
8  Gang Crimes offices, where did those go?
9          MS. ROSEN:  Objection.  Form.  Foundation.
10     A    I don't know.
11     Q    Later in your career, you had multiple
12 positions including, you know, commander positions and
13 deputy chief and so on.  Did you ever see where any of
14 those Gang Crimes files went?
15         MS. ROSEN:  Objection.  Form --
16     A    No.
17         MS. ROSEN:  -- foundation.
18     Q    When Gang Crimes officers assisted detectives
19 in their investigations, would they provide any
20 documentation to you, as a supervisor, about cases that
21 they were assisting on?
22         MS. ROSEN:  Objection.  Form, foundation, and
23     relevance at this.
24     A    I believe their supervisor had to do a monthly
25 report talking about what activities they had and how

Page 60

1  many investigations, how many arrests something.
2      Q    And there was something called a daily -- a
3  may -- like, a daily worksheet.  Does that sound right?
4  Or a daily --
5          MS. ROSEN:  Objection.  Form.
6      Q    -- activity routine?
7      A    Yes.
8          MS. ROSEN:  Objection.  Form.
9      Q    Was that -- what was filled into that document
10 by gang specialist?
11         MS. ROSEN:  Objection.  Form.  Foundation.
12     A    Just summary of what he or -- or she did that
13 day.
14     Q    Okay.  And so, to the extent they assisted a
15 detective on an investigation, would that be included in
16 those sheets?
17     A    It may be, they may just have put the name of
18 the investigation and the assisted detectives.  I'm --
19         MS. ROSEN:  The witness needs a break.
20         MR. SWAMINATHAN:  Okay.
21         COURT REPORTER:  Okay.  We are off the record
22     at 11:09 a.m.
23             (OFF THE RECORD)
24         COURT REPORTER:  We are back on the record at
25     11:18 a.m.

Page 61

1  BY MR. SWAMINATHAN:
2      Q    Okay.  Sir, what did you do to prepare for
3  today's deposition?
4      A    Met with Eileen Rosen a couple of times and
5  looked at some reports that she showed me.
6      Q    How many -- on how many instances did you meet
7  with counsel?
8      A    I think three altogether.
9      Q    And when was that most -- what was the most
10 recent of those meetings?
11     A    Yesterday.
12     Q    How long did you meet for?
13     A    I'm sorry, I didn't understand.
14     Q    How long did you meet for yesterday?
15     A    An hour.
16     Q    Did you review any documents in that meeting?
17     A    Yes.
18     Q    You indicated report.  Did you review reports
19 in that meeting?
20     A    It was the clearing stuff I looked at.
21     Q    The cleared and closed report?
22     A    Yes.
23     Q    Did you re -- did you review any other
24 documents in that meeting?
25     A    I might have looked at another case report, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  don't remember.

2      Q     Okay.  Any other documents?

3      A     No.

4      Q     Did you meet with Ms. Rosen in preparation

5  this morning before the deposition?

6      A     Not really.  Got here and sat down and showed

7  me where to be.

8      Q     Okay.  Prior to your meeting yesterday, when

9  was your -- when was the meeting you had before that

10  one?

11     A     Late November.

12     Q     How long was that meeting?

13     A     About an hour and-a-half.

14     Q     Okay.  Did you review any documents in that

15  meeting?

16     A     Yes.

17     Q     Which documents?

18     A     Some of the supplementary reports to that

19  couple homicide.

20     Q     Anything else?

21     A     Not that I recall.  No.

22     Q     Did you review any notes?

23           MS. ROSEN:  Did you say note?

24     Q     Notes.

25     A     No.

Page 63

1      Q     In the meeting yesterday, did you review any

2  notes?

3      A     No.

4      Q     And the meeting prior to your November

5  meeting, when was that meeting, or your first meeting

6  basically in preparation for the deposition?

7      A     I think it was last summer sometime.  I don't

8  remember the -- the exact time, though.

9      Q     Okay.  And how long was that meeting?

10     A     Same thing, about an hour-and-a-half.

11     Q     Okay.  Did you review documents in that

12  meeting?

13     A     Oh, yes.

14     Q     Which documents?

15     A     Supplementary reports.

16     Q     Anything else?

17     A     No.

18     Q     Did you review any transcripts in preparation

19  for today's deposition?

20     A     No.

21     Q     Did you review any past trial testimony or

22  other testimony?

23     A     No.

24     Q     Did you review any photographs?

25     A     I think I saw the -- the two kids' photos and

Page 64

1  then the -- the three defendants.  I saw their photos in

2  the file.

3      Q     Anything else?

4      A     No.

5      Q     Did you review any notes in any of those

6  meetings?

7      A     No.

8      Q     When I say "notes," I'm referring to, like,

9  handwritten notes by police officers.  Did you review

10  any notes from any detectives or other officers?

11     A     There might have been some GPRs within the

12  supplementary reports, but I don't recall.

13     Q     Before reviewing those reports, did you have

14  any memory of this case?

15     A     Yeah.  I remember, you know, not specific, but

16  I remember the general case.  It was a heater at the

17  time, so that's why I remember it.

18     Q     You said a general memory that it would have

19  been a heater case; is that right?

20     A     I'm sorry, I didn't understand that.

21     Q     You just had a general memory that there --

22  that this had been a heater case; is that right?

23     A     Yes.

24     Q     Did you have any specific memories more than

25  that about the investigation and what all was done?

Page 65

1           MS. ROSEN:  Objection.  Form.

2      A     Some things about the -- the resources that we

3  got that help us, but that's about it.

4      Q     What was it that you -- what did -- what was

5  it that you specifically remembered even before

6  reviewing the reports?

7      A     That we got the pictures of the kids out right

8  away, we thought that would help us solve it, and which

9  it did at the end.  And calling the FBI when the kids

10  were missing because there were some leads to be

11  followed up in Mexico and California.

12     Q     Anything else that you remembered other than

13  that?

14     A     Not specifically, no.

15     Q     And then, after you reviewed the documents in

16  preparation for today's deposition, did you have any new

17  memories that came to you after reviewing them?

18           MS. ROSEN:  Objection.  Form.

19     A     Not specifically.  I mean, I remembered some

20  of the detectives' reports talking about the assignments

21  they had, and one was that I assigned some guys to go

22  canvass and that's about it, though.  It's -- we're

23  talking 20-some years ago.

24     Q     All right.  So when you saw the reports, it

25  made references to you assigning certain people to do

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 things.  Did you have any specific memory of actually
2 making those assignments?
3    A    No.
4    Q    Did it cause you to remember anything else
5 about the investigation other than the fact of you
6 making an assignment?
7    A    No.
8    Q    All right.  I want to go back to the issue
9 where it appear -- you were a lieutenant at Area 2
10 Violent Crime, but I forgot to ask you one question
11 about discipline that I wanted to just follow up about.
12 So in your supervisory role as a lieutenant of Violent
13 Crimes detectives in Area 2, what was your role in the
14 disciplinary process?
15    A    I would review any discipline that was
16 recommended for any of the detectives.
17    Q    Anything else?
18    A    No.  I mean, if I saw something myself, I
19 would either counsel a detective, or if it required
20 discipline, discipline the detective.
21    Q    And when you -- so when you -- anything else -
22 - I'm sorry -- strike that.  Anything else in terms of
23 your role in the disciplinary process as the lieutenant?
24         MS. ROSEN:  Objection.  Form.
25    A    Just what I just answered that.  Yeah.

1    Q    Okay.  When you reviewed recommendations of
2 discipline for your officers or detectives working under
3 your command, what was the purposes of your review of
4 those recommendations?
5    A    It's called command channel review, and it has
6 to do with the process from when there's a -- a
7 sustained case is being reviewed by the lieutenant
8 commander and then chief of detectives and decide
9 whether they agree with the investigation or
10 recommendation before it goes to the superintendent.
11    Q    And so, as a lieutenant, you'd have some say
12 in whether to accept the recommendation; is that true?
13    A    Yes.
14    Q    And in -- un -- if there had not been some
15 recommendation of discipline, would you have had --
16 would you have any knowledge or role in the process?
17         MS. ROSEN:  Objection.  Form.
18    A    Only on the sustained cases, not on anything
19 else.
20    Q    On -- not -- on cases that were under
21 investigation before there was a finding of sustained or
22 not sustained or unfounded, would you have any
23 involvement in those cases?
24         MS. ROSEN:  Objection.  Form.
25    A    If it was being investigated by his supervisor

1 at the area, yes.  If it was being investigated by, at
2 that time, OPS or -- or IAD, no.
3    Q    At that time, sometimes investigations of
4 detectives in your area could be investigated by the
5 supervisors in that area, correct?
6    A    If it was something minor, yes.  No -- missed
7 court or something along those lines, yes.
8    Q    Okay.  So when -- inve -- some investigations
9 would be conducted by supervisors in the area, correct?
10    A    Yes.
11    Q    And your characterization is that that would
12 only be in instances where it was minor; is that right?
13    A    Yes.
14    Q    Okay.  And otherwise, any investigations that
15 were more significant or serious would be conducted by
16 internal affairs or OPS or other disciplinary bodies; is
17 that right?
18    A    Yes.
19    Q    Okay.  When investigations were conducted by
20 supervisors in the area, who would conduct those
21 investigations?
22    A    Any one of the supervisors.
23    Q    Including you?
24    A    I -- I -- I would assign it to one of the
25 supervisors.  Look into this, Detective Smith didn't buy

1 a license plate sticker this year or whatever it would
2 be, like I said, minor things that they would handle.
3    Q    So you would learn about all of those.  In any
4 instance when it was referred to the area for
5 investigation, you'd learn of it as a lieutenant; is
6 that right?
7    A    Yes.
8    Q    And then you would assign it out to a
9 sergeant?
10    A    Yes.
11    Q    Did you ever conduct those investigations
12 yourself?
13    A    If the -- if the sergeant was the -- if there
14 was a sergeant that was accused and it was my area, yes,
15 I would handle it.  I don't remember specifically as we
16 sit here today.
17    Q    Okay.  And then, whatever conclusions the
18 sergeants reached in those cases that they investigated,
19 would you learn the result?
20    A    Yeah.  I would have to sign off on it.
21    Q    Even if it was not sustained or unfounded?
22    A    Yeah.  Because it's in our unit.  That's the
23 chain of command for that.
24    Q    Did you have any concerns about investigating
25 individuals who were working under your own command?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    A    No.
2         MS. GOLDEN: Object to form.
3    Q    Did you have any concerns that it was -- that
4    it would create a conflict?
5         MS. ROSEN: Objection. Form.
6    A    No.
7    Q    Why were more minor investigations referred to
8    the area, to the extent you know?
9         MS. ROSEN: Objection. Form. Foundation.
10   A    I believe it's just because of the volume of
11   cases that come through there.  IAD or OPS couldn't
12   handle every case.
13   Q    And then, you talked about the other role you
14   had in the disciplinary process, which is when you saw
15   something that you thought warranted some discipline,
16   you could -- you'd do that yourself; is that right?
17   A    Yes.
18   Q    And in that -- those instances, what type
19   of discipline was available to you?
20   A    Reprimand, suspension.
21   Q    And that would be taking place outside of the
22   complaint review process; is that right?
23   A    Yeah.
24        MS. ROSEN: Objection. Form.
25   Q    And was there any name for that process or was

Page 71

1    that informal?
2         MS. ROSEN: Objection. Form.
3    A    Part of it was called summary punishment.
4    Q    And is that part of that SPAR process?
5    A    Yes.
6    Q    Okay.  Now if you -- and so could you
7    essentially invoke that SPAR process if you were just --
8    in your day-to-day command, you saw detectives doing
9    things that you thought constituted misconduct, you
10   could invoke that SPAR process, right?
11        MS. ROSEN: Objection. Form.
12   A    Yes.
13   Q    And you could impose punishments including
14   suspension, correct?
15        MS. ROSEN: Objection. Form.
16   A    Yes.
17   Q    Could you impose -- what was the, sort of,
18   most severe punishment you could impose?
19   A    I -- there was a number of days suspension.  I
20   don't remember what the number was, but that would be
21   suspension.
22   Q    And it would be unpaid?
23   A    Yes.
24   Q    And where you invoked that process, to the
25   extent you were going to -- strike that.  Where you

Page 72

1    decide to invoke that process and impose some
2    punishment, did it then have to go through additional
3    process?
4         MS. ROSEN: Objection. Form. You can answer
5    if you understand.
6    A    There was some kind of a review -- not review,
7    but a -- the de -- detective could be -- could be asked
8    for -- to go to a hearing, and there would be a hearing.
9    Q    And the ability to impose a punishment through
10   the SPAR process, that was something you could do as a
11   lieutenant, correct?
12   A    Yes.
13   Q    Could sergeants do that as well?
14   A    Yes.
15   Q    And the commander as well?
16   A    Yes.
17   Q    Okay.  While you were the Area 2 Violent
18   Crimes -- strike that.  While you were the lieutenant
19   supervising detectives of the Area 2 Violent Crimes, did
20   you ever invoke the SPAR process and issue summary
21   punishment to one of the detectives working under your
22   command?
23        MS. ROSEN: Objection. Form. Foundation.
24   A    I don't remember.
25   Q    Can you think of any instances where you

Page 73

1    invoked that process to summarily punish any of the
2    detectives working under your command?
3         MS. ROSEN: Objection. Form. Foundation.
4    A    I don't remember.
5    Q    Can you think of any instances where your
6    commander used the summary punishment process to impose
7    any punishment on a detective?
8         MS. ROSEN: Objection. Form. Foundation.
9    A    I don't remember.
10   Q    So fair to say as you sit here today, you
11   can't remember any instance when that occurred?
12        MS. ROSEN: Objection. Form. Foundation.
13   A    I don't remember if it -- if I did or did not,
14   as I sit here 40 years later, you know.
15   Q    Do you believe that it would have been in --
16   that it was invoked by some commanders or by you at some
17   point while you were a lieutenant over Area 2 Violent
18   Crime?
19   A    I don't remember.
20   Q    You just can't say either way whether that
21   would have happened?
22        MS. ROSEN: Objection. Form. Foundation.
23   A    That's correct.
24   Q    Okay.  And did any of the sergeants overseeing
25   Area 2 Violent Crime detectives, ever impose summary

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 punishment?

2          MS. ROSEN: Objection. Form. Foundation.

3     A   I don't remember.

4     Q   And as you sit here today, can you think of

5 any instance when they did?

6          MS. ROSEN: Objection. Form. Foundation.

7     A   No.

8     Q   Where that SPAR process resulted in some

9 imposition of punishment, where would -- what

10 documentation would be created?

11    A   For the SPAR, there was an actual form,

12 Summary Punishment Action Request. That's where the

13 SPAR came from. That would go -- be part of the

14 personnel file of the detective or whoever was -- it was

15 kept for a certain amount of time before it was

16 destroyed.

17    Q   So it would be removed from the personnel file

18 of an officer after a certain amount of time?

19         MS. ROSEN: Objection. Form.

20    A   Five years or something like that. I don't

21 remember exactly when it was.

22    Q   I missed the beginning. How long?

23    A   I think it was, like, five years or something

24 like that. I don't recall. It -- part of that's

25 collective bargaining.

1     Q   And then, after that period of time, would

2 there be any more records left anywhere of the SPAR that

3 had been issued?

4          MS. ROSEN: Objection. Form. Foundation.

5     A   I don't know.

6     Q   Are you aware of any place where there'd be

7 any record of the SPARs that had been removed from the

8 personnel files?

9          MS. ROSEN: Objection. Form. Foundation.

10    A   No.

11    Q   When you were in your more senior positions in

12 the Chicago Police Department later on in your career,

13 did you ever have the ability to access SPARs against

14 officers that had been removed from their personnel

15 files?

16         MS. ROSEN: Objection. Form. Foundation.

17    A   No.

18    Q   Fair to say that if you wanted to review any

19 previous punishment against an officer pursuant to the

20 SPAR process, the only ones you'd be able to see were

21 any that had been in -- that were in the file of that

22 officer for the last five years --

23         MS. ROSEN: Objection.

24    Q   -- or whatever that exact period of time was

25 before they were removed?

1          MS. ROSEN: Objection. Form. Foundation.

2 Calls for speculation.

3     A   Yes.

4     Q   You mentioned the term "reprimand" several

5 times when I was asking you questions. Can you tell us

6 what reprimand means?

7     A   Basically, you're just counseling somebody and

8 telling them that you're noting this infraction, and

9 there again, it's for a minor infraction.

10    Q   And would that -- that would be some document

11 that would go into the file?

12    A   Yes.

13    Q   And would that also be the -- would that then

14 stay in the file, or is that also something that would

15 be removed after some period of time?

16    A   That would be -- it -- then it also got

17 removed after a certain period of time.

18    Q   And you refer to the personnel file. Was

19 there a personnel file kept for each detective working

20 under your command at Area 2, that was kept at the -- in

21 the -- you know, in the supervisor's office?

22         MS. ROSEN: Objection. Form. Foundation.

23    A   I don't -- I thought it was kept downtown, but

24 I don't remember, though.

25    Q   Okay. Did you have any sort of personnel file

1 for each of the detectives working under your command at

2 Area 2?

3          MS. ROSEN: Objection. Form. Foundation.

4 And relevance.

5     A   I don't recall.

6     Q   Was there any kind of unit file that was kept

7 at Area 2 related to the -- for each officer or any

8 reprimands that they got?

9          MS. ROSEN: Objection. Form. Foundation.

10 Relevance. Once again, you're getting into

11 detailed questions about process -- detailed

12 process to do with that Area 2 that has nothing to

13 do with what was going on in Area 5, 13 years

14 later, so I have a standing objection.

15    A   As I sit here today, I don't remember.

16 BY MR. SWAMINATHAN:

17    Q   Okay. All right. Let me ask you about

18 when -- over -- when you were at the Gang Investigation

19 section, what was your role in that department in terms

20 of the involvement in discipline of police officers

21 under your command?

22         MS. ROSEN: One again, I'm objecting to these

23 types of questions for units that have nothing to

24 do with this case. I understand that you are

25 entitled to ask some background about discipline.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    I understand that.  You can do some general
2    questioning, but we've now spent, you know, an hour
3    plus and we haven't even gotten to Area 5, so I
4    object.
5        A    It was the same.
6    BY MR. SWAMINATHAN:
7        Q    Okay.  Are you aware of any discipline of any
8    Gang Crimes specialists working under your command while
9    you were a lieutenant in that section?
10            MS. ROSEN:  Objection.  Form.  Foundation.
11   Relevance.
12       A    Yeah.  But I don't remember specifics.
13       Q    How many specialists are you -- were
14   disciplined while you were the commander overseeing Gang
15   Crime specialists?
16       A    I was a lieutenant.
17       Q    I'm sorry.  Let me ask the question again.
18   That's -- my apologies.  How many Gang Crimes
19   specialists were disciplined while you were the
20   lieutenant overseeing seeing that at Gang Crimes?
21           MS. ROSEN:  Objection.  Form.  Foundation.
22       A    There was some.  I just don't recall specifics
23   as I sit here today.
24       Q    Can you -- approximately how many times was
25   discipline imposed against Gang Crimes specialists while

Page 79

1    you were there, while you were their supervisor?
2        A    I don't recall.
3        Q    Did you approve discipline against Gang Crime
4    specialists while you were their supervisor?
5            MS. ROSEN:  Objection.  Form.  Foundation.
6        A    Yes.  But I don't recall the specifics of
7    which case.
8        Q    Do you recall the names of any of the Gang
9    Crimes specialists who were disciplined while you were
10   their supervisor?
11       A    No.
12       Q    The discipline that was imposed against Gang
13   Crime specialists, was it pursuant to the SPAR process
14   or the internal affairs or OPS processes?
15           MS. ROSEN:  I believe both.
16       Q    The -- tell me what you remember about what
17   the topics were, the things that had resulted in
18   discipline work for the Gang Crime specialists under
19   your supervision?
20           MS. ROSEN:  Objection.  Form.  Foundation.
21       A    As I sit here today, I don't recall the
22   specifics.
23       Q    Did it have to do with investigation behavior,
24   did it have to do with, you know, treatment of fellow
25   officers or something else?

Page 80

1            MS. ROSEN:  Objection.  Form.  Foundation.
2        A    I don't recall.
3        Q    While you were a lieutenant overseeing Gang
4    Crimes specialists, did you ever suspect that there
5    might be a criminal enterprise being run by Gang Crimes
6    specialists under your command?
7            MS. ROSEN:  Objection.  Form.  Foundation.
8        A    Well, I was aware of an investigation on one
9    of the gang specialists.  I don't recall when I found
10   out about it, though, wheth -- if it was either then or
11   after I had left.
12       Q    Okay.  So at some point, you learned of an
13   investigation against one gang specialist, correct?
14       A    Actually, two.
15       Q    Who were the two gang specialists?
16       A    Miedzianowski and his partner --
17       Q    Galligan?
18       A    -- Galligan.
19       Q    And you're not sure whether you learned of
20   that during -- while you were the lieutenant over gang
21   specialists or whether it was in your subsequent
22   position as the commander over Area 5, Violent Crimes;
23   is that right?
24       A    I was the commander of narcotics at the time,
25   that's when I heard that.

Page 81

1        Q    Oh, so you learned about the internal
2    investigation of Miedzianowski and Galligan when you
3    were a commander over narcotics; is that right?
4        A    Yes.
5        Q    Okay.  And so, what year was that when you
6    became a commander over narcotics?
7        A    '99.
8        Q    Okay.  Okay.  So prior to -- strike that.  So
9    while you were a lieutenant supervising Gang Crimes
10   specialists, you didn't know anything about an
11   investigation of a criminal conduct by Gang Crimes
12   specialists; is that right?
13       A    That's correct.
14       Q    Okay.  And you later learned that in fact,
15   Miedzianowski and others had been involved in a criminal
16   enterprise while they had been Gang Crimes specialists,
17   correct?
18           MS. ROSEN:  Objection.  Form.  Foundation.
19       A    Yes.
20       Q    You don't dispute that, in fact, Miedzianowski
21   and others had been involved in a criminal enterprise
22   while they were Gang Crimes specialists under your
23   command, correct?
24           MS. ROSEN:  Objection.  Form.
25       A    Well, he wasn't under my command at that time.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1    Q    Well, do you understand that, while you were
2  Gang Investigation lieutenant that, some of the
3  allegations of misconduct by Miedzianowski were
4  occurring while he was under your command?
5        MS. ROSEN:  Objection.  Form and foundation.
6    A    All right.  He was in Gang Investigations, but
7  he wasn't under my command.
8    Q    And why wasn't he under your command?
9    A    Because he worked for the other lieutenant
10  that was there.
11    Q    And how was that split up between you and the
12  other lieutenant?
13        MS. ROSEN:  Object to form.
14    A    I had the major investigations and -- and
15  Barton had the other investigations.
16    Q    What is the difference between major
17  investigations and other investigations?
18    A    Okay.  So to the major ones, we would do
19  wiretaps, we would be more sophisticated investigations,
20  and Lieutenant Barton had the immediate response to
21  shootings and those type of things.
22    Q    Did -- and so, Miedzianowski was not somebody
23  who you supervised?
24    A    No.  He was under Barton's supervision.
25    Q    Did you have any -- was he in your direct line

Page 83

1  of authority, Miedzianowski?
2        MS. ROSEN:  Objection.  Form.
3    A    I -- I don't know what do you mean by "direct
4  line"?
5    Q    In other words, did he ultimately -- did he
6  report to you in the chain of command?
7    A    No.
8    Q    Okay.  If -- did Barton ever indicate to you
9  any suspicions or concerns about Miedzianowski?
10        MS. ROSEN:  Objection.  Form.
11    A    Not that I remember.
12    Q    You and Barton shared an office, right?
13    A    Yes.
14    Q    You and then Barton, I assume were close?
15        MS. ROSEN:  Objection.  Form.  Foundation.
16    A    Co-worker.
17    Q    You got along well?
18        MS. ROSEN:  Objection.  Form.
19    A    I'm sorry, what's the last question?
20    Q    You got along well?
21    A    Yes.
22    Q    Talked regularly?
23        MS. ROSEN:  Objection.  Form.
24    A    Yes.
25    Q    Did he ever indicate to you that he had any

Page 84

1  suspicion that a criminal enterprise was being run by
2  Miedzianowski and others under his command?
3        MS. ROSEN:  Objection.  Form.  Foundation.
4    A    No.
5    Q    Were you surprised to learn that, there had
6  been a criminal enterprise going on involving Gang Crime
7  specialists that were in your unit?
8    A    Yes.
9    Q    Did it come -- did it come as a complete shock
10  to you?
11        MS. ROSEN:  Objection to form.
12    A    The scope of it, yes.
13    Q    Is it surprising to you that a criminal
14  enterprise like the one Miedzianowski was convicted of
15  being part of could have occurred without you or the
16  other lieutenant knowing about it?
17        MS. ROSEN:  Objection.  Form.  Foundation.
18    A    I think that later on, at Area 5, I banned
19  Miedzianowski from coming in to Area 5, and that was
20  because of a GPR turning up in a defense attorney's
21  briefcase.  And he was under investigation at that time,
22  and it was not too long after that that he was arrested.
23    Q    And we're going to turn to that in a minute.
24  That's while you were an Area 5 Violent Crimes
25  commander, correct?

Page 85

1    A    Yes.
2    Q    Okay.  Now, what I'm asking is:  Ultimately,
3  he was involved in a criminal enterprise while he was
4  operating as a gang crimes specialist, correct?
5        MS. ROSEN:  Objection.  Form.
6    Q    And throughout that time, he had sergeants and
7  lieutenants and commanders that he worked under,
8  correct?
9    A    Yes.
10    Q    And do you believe any of them knew about his
11  misconduct?
12        MS. ROSEN:  Objection.  Form.  Foundation.
13    A    I'm not familiar of how this -- his case got
14  started.  I know it was a combination of DEA, FBI, and
15  Chicago police, so I don't know what input any of those
16  supervisors might have had into giving information.
17    Q    Do you believe that any of those individuals
18  knew about his involvement in a criminal enterprise, any
19  of his sergeants or lieutenants?
20        MS. ROSEN:  Objection.  Form.  Asked and
21  answered.
22    A    Yeah.  I don't know what they found out and
23  what they -- how much they contributed to the
24  investigation.
25    Q    Did you come to learn that the investigation



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  began with allegations by ATF agents?
2        MS. ROSEN:  Objection.  Form.  Foundation.
3  And I'm pretty sure misstates the record.
4     A   I'm not sure.  I'm not -- as I sit here and I
5  don't know.
6     Q   Would you agree with me that, ultimately,
7  Miedzianowski and other Gang Crime specialists were able
8  to operate a criminal enterprise while they were, in
9  fact, gang crimes specialists?
10       MS. ROSEN:  Objection.  Form.  Foundation.
11  And once again, we're pretty far afield from the
12  Solache, Reyes case.
13  BY MR. SWAMINATHAN:
14    Q   I just have a couple of last questions on this
15  topic.  You can go ahead.
16    A   Yes.
17    Q   And this happened for some period of time
18  without any supervisors knowing about it, correct?
19       MS. ROSEN:  Objection.  Form.  Foundation.
20  He's already said he doesn't know what the
21  supervisors knew.  And you are asking questions
22  still that are not at all related to Solache,
23  Reyes.
24       MR. SWAMINATHAN:  I'm asking at some period
25  of time he was doing this without his supervisors

Page 87

1  knowing about it.  Do you agree with that?
2        MS. ROSEN:  How do you know that?  He just
3  said he didn't --
4        MR. SWAMINATHAN:  That's what I'm asking.
5  That's what I'm --
6     A   I don't know when the supervisors were made
7  aware of the investigation.  I know I -- as a commander
8  of narcotics, I was aware of it.  I know the commander
9  of Gangs at the time, Grow, was aware of it.  But I -- I
10  don't know about the other supervisors.
11  BY MR. SWAMINATHAN:
12    Q   Okay.  So that's what I didn't understand.
13  When did you became aware of it when you were a
14  commander -- you became aware of the Internal Affairs
15  investigation while you were commander at Area 5; is
16  that right?
17    A   No.  Commander of narcotics.
18    Q   Okay.  So while you -- is it your
19  understanding that the Internal Affairs investigation
20  into Miedzianowski -- when did -- what is your
21  understanding of when that investigation began?
22       MS. ROSEN:  Objection.  Form.  Foundation.
23    A   Well, I know that when I got a -- got what's
24  called a complaint register number on the fact that a
25  GPR ended up in a defense attorney's briefcase, that was

Page 88

1  against Miedzianowski.  I mean, it was -- he was the
2  arresting office on the case.  So I don't know when
3  other people might have put complaints in against
4  Miedzianowski.
5     Q   You put in a complaint against Miedzianowski
6  pretty early in 1994 after you became a commander at
7  Area 5; is that right?
8        MS. ROSEN:  Objection.  Form.
9     A   I don't recall but if you tell me that that's
10  when it was, I would say yes.
11       MS. ROSEN:  So I have an objection to the
12  scope of this deposition.  You're talking about all
13  these things.  You haven't produced any -- that is
14  just my objection.
15       MR. SWAMINATHAN:  I'm asking him about
16  discipline.  We have Monell claims about
17  discipline, I'm not -- and I appreciate the
18  questions that we know, limited probing about Gang
19  Crimes and so on.  But we're talking about
20  discipline here, and we're talking about conduct
21  here about -- that has to do with allegations that
22  this witness made while he was overseeing homicide
23  detectives.  So I'm not sure I understand the
24  relevance Objection.  But in any event, why don't
25  we keep moving. Could the court reporter please

Page 89

1  read back the last question?  I think we had one
2  standing.
3        COURT REPORTER:  Absolutely.  One moment.
4        MS. ROSEN:  You know what?  Anand, you did
5  not disclose them as a Monell witness on this -- on
6  that topic so --
7        MR. SWAMINATHAN:  There's no issue of
8  disclosing him as a Monell witness.  We're talking
9  about -- I don't make disclosures about a Monell
10  witness, I'm making it -- I've disclosed this
11  witness as somebody we want to depose.  We're
12  deposing him on the topic related to Reyes,
13  individual case and Monell.
14       MS. ROSEN:  I don't think he was disclosed on
15  this topic, but it's my objection, let's just keep
16  going.
17       MR. SWAMINATHAN:  Understood.  Go ahead.
18       COURT REPORTER:  Okay.  I'm going to play
19  back just a little bit further to make sure we get
20  everything.
21       MR. SWAMINATHAN:  Yeah.
22       (REPORTER PLAYS BACK REQUESTED
23       TESTIMONY)
24       MR. SWAMINATHAN:  Okay.  So let me ask a new
25  question.  Once you became a commander over Area 5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1  detectives, it was very shortly after that that you
2  made a complaint about Miedzianowski; is that
3  right?
4      A   I'm not sure.  I mean, I did make a complaint
5  about Miedzianowski.  I'm not sure what the time frame
6  is, though.
7  BY MR. SWAMINATHAN:
8      Q   Do you know whether it was while you were a
9  commander at Area 5 or while you were a lieutenant over
10 gang specialists?
11     A   That would have been when I was a commander of
12 Area 5.
13     Q   Okay.  When you made that complaint about
14 Miedzianowski, did you know that there was an open
15 Internal Affairs investigation against him?
16         MS. ROSEN:  Objection.  Form.
17     A   I'm not sure if I knew or not at that point.
18     Q   Okay.  That investigation -- how did you --
19 how did you come to learn the information that caused
20 him to make that complaint?
21         MS. ROSEN:  You broke up a little bit.  Can
22 you just say it again?
23     Q   Yes.  How did you come to learn the
24 information that caused you to make that complaint?
25     A   One of my supervisors came to me, I don't

Page 91

1  remember who it was, and said about the GPR turning up
2  in the briefcase of the lawyer, and I got a CRN on Brian
3  Miedzianowski because he was the arresting officer.
4      Q   You said that one of your supervisors, you --
5  so this is your commander above you?
6         MS. ROSEN:  Objection.
7      A   I was the commander, so it would have been one
8  of the sergeants or lieutenants came up to me about it.
9      Q   I see.  In other words, one of the supervisors
10 over the detectives came to you?
11     A   Right.
12     Q   Okay.  And do you recall whether it was a
13 detective or a sergeant or lieutenant who came to you?
14     A   No.  I don't.
15     Q   Do you recall who it was that came to you?
16     A   No.  Not as I sit here today.
17     Q   And what information did that individual share
18 with you?
19     A   That the GPR from a homicide case showed up in
20 a lawyer's briefcase.
21     Q   Okay.  And then when you got that information,
22 what was the next step that you took?
23     A   I called and got what's called the complaint
24 register number on and asked for an investigation in to
25 those fix.

Page 92

1      Q   And how -- what steps were taken to figure out
2  that it was -- that Miedzianowski was involved?
3      A   I think just -- I don't have all the
4  information today as I did then, but I mean, it was just
5  the fact that he was the arresting officer on the guy
6  that the lawyer was representing and he would've had
7  access to the GPRs that night before.
8      Q   And why would Miedzianowski have that access
9  to the GPR's?
10     A   Because he was working with the detectives on
11 that homicide.
12     Q   And so with the Gang Crime specialists, when
13 they assisted a homicide investigation, they'd have
14 access to the files from the homicide case, is that
15 fair?
16     A   Yes.
17     Q   Okay.  And Miedzianowski would sometimes come
18 over to the Area 5 detective division, fair?
19     A   He was assigned to work with the detectives of
20 Area 5 on violent crimes.
21     Q   So his specific assignment as a gang
22 specialist was to assist Area 5 Violent Crime
23 detectives?
24     A   Yes.
25     Q   Did he work out at Area 5 sometimes?

Page 93

1      A   Sometimes, yes.
2      Q   Did he keep a desk there?
3      A   I'm sorry, what?
4      Q   Did he keep a desk there?
5      A   No.
6         MS. ROSEN:  Objection to form.  Foundation.
7  Once again, irrelevant.
8      Q   Which detectives would -- yeah, which --
9  strike that.  Which detectives did he typically work
10 with when he was assisting homicide investigations?
11     A   It would've been whoever had that homicide or
12 shooting.
13     Q   Were there any particular detectives that he
14 seemed to work with more than others?
15     A   Not that I recall.
16     Q   You had some detectives that came out of the
17 Gang Crimes unit and had become detectives, correct?
18     A   I believe so.
19     Q   Some of the detectives under your command in
20 1994 had previously been gang specialists, right?
21     A   As I sit here now, I don't know.  But I mean,
22 that would make sense, yes.
23     Q   Do you remember a sergeant named Sergeant
24 Mingey?  Ed Mingey?
25     A   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1    Q    He had come out of Gang Crimes, correct?
2    A    He was at Area 5 when I got there, so I'm not
3  sure where he came from.
4    Q    Okay.  You had Rey Guevara.  He had previously
5  -- do you remember Reynaldo Guevara?
6    A    Yes.
7    Q    And he had previously worked in Gang Crimes.
8  Do you recall that?
9    A    There again, he was at Area 5 when I got
10  there, so I don't know where he was before.
11    Q    Okay.  Would you say that the -- that
12  Miedzianowski's assistance on homicide investigations
13  was typical in cases that involved Gang Crimes?
14         MS. ROSEN:  Objection.  Form.
15    A    That would be the idea of it, yes.
16    Q    And did -- would you say that Miedzianowski's
17  assistance to detectives was often with detectives who
18  had -- strike that.  Did Miedzianowski work more closely
19  with detectives that had previously worked in Gang
20  Crimes?
21         MS. ROSEN:  Objection to form.  Foundation.
22    A    I don't know.
23    Q    Did the detectives who had previously worked
24  in Gang Crimes work on more of the gang cases?
25         MS. ROSEN:  Objection form.

Page 95

1    A    Not necessarily.
2    Q    Well, as commander, did you have any plan or
3  initiatives around how you spread out cases?  Did you
4  try to have the guys who'd previously been in Gang
5  Crimes work on gang cases or anything like that?
6         MS. ROSEN:  Objection.  Form.  Foundation.
7    A    We would look at geographic components of it.
8  And then also, if there was a gang and somebody was up
9  on that gang, we would want them to be assigned to it,
10  but I don't recall any specifics.
11    Q    All right.  Now, when you got that complaint
12  register on, that was specifically a complaint about
13  Miedzianowski, correct?
14    A    It was about how the GPR ended up with the
15  defense attorney.  That was the allegation.
16    Q    That was the allegation, and was there a
17  GPR -- a complaint like that has an accused officer
18  identified, correct?
19    A    Not necessarily, because I didn't know for a
20  fact that Miedzianowski had put it in there.  I
21  suspected.  And that's when I had him banned from Area
22  5.
23    Q    So at that time when you made -- when you
24  first made that complaint about Miedzianowski having a
25  document given over to a criminal defense attorney that

Page 96

1  was -- at that time you banned him from Area 5?
2    A    Yes.
3    Q    So you strongly suspected that he had been
4  involved in that; is that right?
5    A    Yes.
6    Q    And in your view, your concern, was that he
7  had tampered with a homicide investigation, correct?
8    A    Yes.
9    Q    And when you made that complaint, you
10  identified Miedzianowski as the person you believed had
11  tampered with a homicide investigation, correct?
12    A    I don't remember as I sit here today, but yes,
13  that would have made sense.
14    Q    Okay.  Do you think that it's possible you
15  complained -- you made the complaint about this conduct
16  and didn't identify Miedzianowski as accused officer,
17  but on the other hand, banned him specifically from Area
18  5?
19         MS. ROSEN:  Objection.  Form.
20    A    I thought the integrity of our homicide
21  investigations meant more than Miedzianowski being
22  assigned Area 5.
23    Q    Okay.  And did you ban anybody else other than
24  Miedzianowski?
25    A    No.

Page 97

1    Q    Did you ban his partner, Galligan?
2    A    No.
3    Q    What caused you to believe that Miedzianowski
4  was involved and not Galligan?
5    A    I didn't not believe that Galligan was
6  involved, but I just -- Miedzianowski was the person
7  that was involved in this day.  I don't even know
8  if Galligan was working or not.
9    Q    Did the super -- did the individuals working
10  under you, lieutenant, sergeant to detectives agree with
11  the view that it was Miedzianowski who'd been involved?
12         MS. ROSEN:  Objection.  Form.  Foundation.
13    A    I don't remember.
14    Q    The individuals who came to you about this,
15  were they upset?
16    A    Yes.
17         MS. ROSEN:  Objection.  Form.
18    Q    Were -- did they feel that a homicide
19  investigation had been tampered with?
20         MS. ROSEN:  Objection.  Form.
21    A    Yes.
22    Q    And then, once you had gotten that complaint
23  number, you contacted -- who did you contact once you
24  had that complaint number?
25    A    After I got the number, I contacted the -- the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  superintendent and told him that I didn't want
2  Miedzianowski -- no, it was the commander of Gangs I
3  think I talked to, I'm not sure.  But they moved him
4  away from working those types of cases and out of Area
5  5.
6      Q    He was no longer assigned to Area 5?
7      A    Right.
8      Q    But he continued to work as a Gang Crime
9  specialist?
10          MS. ROSEN:  Objection.  Form.
11     Q    The only thing that had happened at that
12 point, if I understand correctly, is that he was banned
13 from Area 5?
14     A    And there was an investigation started into
15 his conduct.
16     Q    Okay.  And that -- you had -- and you had --
17 had you written the documents to initiate that
18 investigation?
19     A    Myself or one of the supervisors did that
20 handled it, I don't recall.
21     Q    Did it become -- did it become a CR?
22     A    I'm sure -- I assume it did.
23     Q    Okay.  And then who investigated that?
24          MS. ROSEN:  Objection.  Form.  Foundation.
25     A    It would have been Internal Affairs.

1      Q    Was a Sergeant Patton involved in
2  investigating that?
3          MS. ROSEN:  Objection.  Form.  Foundation.
4      A    I don't remember.
5      Q    Didn't that investigation come back to the
6  area?
7      A    I don't recall that.
8      Q    Do you recall one way or the other, whether
9  that investigation was conducted by Internal Affairs or
10 by somebody in the area?
11          MS. ROSEN:  Objection.  Form.  Foundation.
12     A    I don't know.  As I sit here today, I don't
13 remember.
14     Q    Okay.  Do you recall somebody named Sergeant
15 Patton?
16     A    I recall a Sergeant Patton, yes.
17     Q    Where did he work?
18     A    He was at Area 5.
19     Q    And did he have any involvement in any
20 investigation of the complaint you made about
21 Miedzianowski?
22          MS. ROSEN:  Objection.  Form.  Foundation.
23     And to the extent you have this CR, could you
24     identify the Bates range for it?
25          MR. SWAMINATHAN:  I don't -- I'm relying on

1  testimony that I've seen.
2          MS. ROSEN:  Do you have the -- did you
3  produce the transcript in this case?
4          MR. SWAMINATHAN:  I have some past -- I have
5  some past transcripts that I was able to find
6  recently.  It's based on my review.
7          MS. ROSEN:  Have you -- and have you produced
8  it in this case?
9          MR. SWAMINATHAN:  No.  No.
10         MS. ROSEN:  Okay.  Do you plan to?
11         MR. SWAMINATHAN:  It depends on whether we
12 think it's ultimately going to be relevant.  But
13 yeah, if we think we're -- going to be relevant,
14 we're going to --
15         MS. ROSEN:  So you're using a transcript.
16 Can you tell me the name of the case that you're
17 using the transcript from?
18         MR. SWAMINATHAN:  It's from -- let's see.  I
19 think it's from the Clipfell trial, actually.
20 Yeah, it's from the Clipfell trial.  It probably is
21 --
22         MS. ROSEN:  From the -- it's the trial
23 testimony?
24         MR. SWAMINATHAN:  Yeah.
25         MS. ROSEN:  And whose testimony are you

1  reading from?
2          MR. SWAMINATHAN:  Mr. Cline's.
3          MS. ROSEN:  Okay.  And do you have the Bates
4  range of the document?
5          MR. SWAMINATHAN:  No.  No.  I don't.  But I'm
6  not asking him about the specific document.  I'm
7  asking him about his memory of what happened, and
8  I'm asking about people who I think may have been
9  involved in the investigation.  He can answer the -
10 - if he remembers, he remembers.  If he doesn't, he
11 doesn't.
12         MS. ROSEN:  Okay.  But I think it's unfair
13 for you to be questioning a witness about a
14 transcript of his prior testimony and not having
15 produced it.  So and you know the answers to the
16 questions.
17         MR. SWAMINATHAN:  I don't -- I don't.
18         MS. ROSEN:  Yeah, you're reading them.  So
19 you're reading his testimony on this specific
20 topic.  I think it is unfair for you to be
21 questioning him without having provided the
22 transcripts.  Particularly on the topic of Joe
23 Miedzianowski, who has nothing to do with the
24 Solache, Reyes case.  So I have a standing
25 objection to this and if you continue, then we



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  might have to suspend the questioning on this
2  topic, move on to relevant topic, and we can fight
3  about it in front of Magistrate Judge Harjani.  I
4  don't think this is fair.
5       MR. SWAMINATHAN:  Yeah.  I mean, I'm just
6  asking him about what he remembers about this
7  incident that has to do with tampering with
8  homicide investigations.  I don't know how this is
9  possibly not relevant, but we'll keep going.
10      MS. ROSEN:  The problem is that you have
11  information that you are reading from, that now
12  you've told us is the testimony of this witness
13  from, I don't know, 15 years ago, Clipfell -- are
14  you talking about Clipfell the civil trial?  Are
15  you talking about something related to
16  Miedzianowski's criminal case?  It's not clear to
17  me, but regardless, I've asked you for the Bates
18  range.  Your clearly -- the documents clearly have
19  not been produced in this case.  I don't think it's
20  fair, and you know the answers to the questions
21  because you have his testimony in front of you.
22      MR. SWAMINATHAN:  I -- don't --
23      MS. ROSEN:  So the only reason -- so the only
24  reason for you to be asking him about his memory,
25  about something that he testified two years ago, is

1  to see if he will testify inconsistently.  That's
2  unfair.
3       MR. SWAMINATHAN:  No.  So let me just -- let
4  me put my position on the record.  To the extent
5  Counsel is suggesting that any background research
6  I do with regard to a witness who I depose, I'm
7  required to disclose and produce all of the -- all
8  of the research that I do to get ready for a
9  deposition, I disagree with that.  To the extent --
10  and -- so that's point one.  Point two is, I have
11  not asked this witness a bunch of questions that I
12  already know the answers to.  I have done some
13  research so I have an understanding of what some of
14  the possible information is that's out there, and
15  I'm asking him for information beyond what's in the
16  transcript.  This witness provided an indication
17  for the first time that was inconsistent with what
18  was in the document, which was he believed that it
19  was -- that it was investigated by Internal
20  Affairs.  That was inconsistent with something that
21  I had read.  So I was clarifying that to give them
22  a chance to remember a Sergeant Patton and whether,
23  in fact, Sergeant Patton investigated this.  I'm
24  not accusing this witness of not -- of giving
25  contradictory testimony or lying.  Not in any way,

1  but I was trying to refresh his memory to see if
2  what I had previously read may in fact be the case.
3  And he may simply not remember either way, right,
4  which is perfectly appropriate.  But I have follow-
5  up questions beyond what's in the transcripts and
6  I'm just trying to lay some foundation to be able
7  to ask my questions relevant to the issue of
8  homicide investigation tampering and discipline of
9  Chicago police officers.  That's my record.
10      MS. ROSEN:  Okay.  And I think what you have
11  just explained proves my point.  So I have an
12  objection to you utilizing the transcript that way.
13  He answered something differently than what he
14  testified to before and that's exactly the basis
15  for your probing him and the way you're probing
16  him, it is unfair.  So you're trying to impeach
17  him, basically, with prior testimony that you've
18  not produced in this case, that's my objection.  So
19  I have a standing objection to any and all
20  questions that you are using this strategy for.
21      MS. GOLDEN:  It's artificially creating
22  impeachment.
23  BY MR. SWAMINATHAN:
24      Q   All right.  Sir, as you sit -- as you sit --
25  strike that.  Having mentioned the name Sergeant Patton

1  as somebody who worked at Area 5, does that refresh your
2  memory about whether or not he would -- he was the
3  individual who investigated the complaint you'd made
4  against Miedzianowski?
5      A   No.
6      Q   Did you have any conversation with
7  Miedzianowski directly at the time that you banned him
8  from Area 5?
9      MS. ROSEN:  Objection.  Form.  Foundation.
10     A   As I sit here now, I don't recall.
11     Q   Did you -- did -- strike that -- you said you
12  contacted, you believe, his commander at Gang
13  Investigations, correct?
14     A   Yes.
15     Q   And in full -- and indicated to that
16  individual that Miedzianowski had been banned, correct?
17     A   I asked that he be removed from working at
18  Area 5 and they agreed.
19     Q   Did you make any further requests than that?
20     A   No.
21     Q   Did you indicate that you had opened a
22  complaint against Miedzianowski?
23     A   And probably did, I don't recall exactly as I
24  sit here today.
25     Q   Okay.  Did you have any communications with

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  anyone from internal affairs about that complaint?
2      A    I don't recall.
3      Q    Okay.  Did anybody interview you with regard
4  to that complaint?
5      A    I don't recall.
6      Q    Can you say one way or the other?
7          MS. ROSEN:  Objection.  Form.
8      A    No.
9      Q    Were any of the detectives or supervisors who
10  worked under you who brought that information to your
11  attention, were they interviewed?
12      A    I don't know.
13      Q    Was any SPAR issued against Miedzianowski
14  based on what had occurred?
15      A    I don't know.
16      Q    That complaint against Miedzianowski that you
17  filed, that was not sustained; is that correct?
18          MS. ROSEN:  Objection.  Form.  Foundation.
19      A    I don't know.
20      Q    There was a subsequent complaint register that
21  you filed against Detective Guevara -- Detective
22  Miedzianowski, correct?
23          MS. ROSEN:  Objection.  Form.  He was never a
24  detective.
25      A    I don't recall.

1          MR. SWAMINATHAN:  My apologies.  Let me re-
2      ask the question.
3      Q    There was a second time that you filed a
4  complaint against Gang Specialist Miedzianowski,
5  correct?
6          MS. ROSEN:  Objection.  Form.  Foundation.
7      A    I don't remember it.
8      Q    Are you aware of any instance in which
9  a complaint made against Miedzianowski about potential
10  tampering with homicide investigations resulted in
11  sustained findings?
12          MS. ROSEN:  Objection.  Form.  Foundation.
13      A    I don't know.
14      Q    Was there an incident in 1996 when you
15  suspected that Miedzianowski had stole [sic] a witness
16  statement from a homicide file?
17          MS. ROSEN:  Objection.  Form.  Foundation.
18      A    I don't recall the specifics of what you're
19  talking about.
20      Q    Okay.  Do you generally recall that there was
21  an instance when, similar to a criminal defense attorney
22  having a document from a homicide file, that there was
23  another instance when it turned out some gang bangers
24  had a copy of some documents from a homicide file?
25          MS. ROSEN:  Objection.  Form.  Foundation.

1      A    As I sit here right today, I don't recall it.
2      Q    Do you have any memory of some instance when
3  something like what had happened, the first complaint
4  that you'd made, happened again?
5          MS. ROSEN:  Objection.  Form.  Foundation.
6      A    As I sit here today, I don't recall.
7      Q    Can you say one way or the other whether you
8  ever made a second report to Internal Affairs about a
9  Miedzianowski misconduct?
10          MS. ROSEN:  Objection.  Form.  Foundation.
11      A    I can't remember as I sit here today.
12      Q    After that first incident involving
13  Miedzianowski that you made a complaint about, did you
14  conduct any type of review to determine if there were
15  other cases in which Miedzianowski had tampered with a
16  homicide investigation?
17          MS. ROSEN:  Objection.  Form.
18      A    I don't recall.
19      Q    As you sit here -- strike that.  Did you talk
20  to homicide detectives to see if any of them had any
21  other concerns about Miedzianowski?
22          MS. ROSEN:  Objection.  Form.  Foundation.
23      A    I would have asked my supervisors to do it,
24  but I don't recall specifics.
25      Q    Did you -- as you sit here today, are you

1  saying you recall specifically asking supervisors to do
2  it?
3      A    No.  I'm just saying if -- if I did, I would
4  have asked a supervisor to do it.
5      Q    But as you sit here today, you don't remember
6  asking supervisors to do that; is that correct?
7          MS. ROSEN:  Objection.  Form.
8      Q    Okay.  The complaint -- strike that.  The
9  complaints that were made about Miedzianowski
10  interfering in homicide investigations, did it result in
11  any review of homicide cases to see what cases might
12  have been impacted by Miedzianowski's misconduct?
13          MS. ROSEN:  Objection.  Form.  Foundation.
14      A    I don't know.
15      Q    Was there any effort to see if there were any
16  detectives who might have been involved in assisting
17  Miedzianowski in tampering with a homicide
18  investigation?
19          MS. ROSEN:  Objection.  Form.  Foundation.
20      A    That would have been part of the
21  investigation.
22      Q    Did you -- when you say it would've been part
23  of the investigation, did you have any involvement in
24  the investigation?
25      A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. ROSEN:  Objection.  Asked and answered.
2     Q    Do you know if it was -- so you don't know
3  whether that was in fact part of the investigation; is
4  that fair?
5          MS. ROSEN:  Objection.  Form.  Foundation.
6     A    Yes.
7     Q    Okay.  You're assuming that that is what --
8  that is part of what should have been done; is that
9  correct?
10    A    Yes.
11    Q    Okay.  In your view, the complaint that you
12 had made against Miedzianowski should have resulted in
13 some review to see if there were other people who were
14 also involved in what he had done; is that fair?
15         MS. ROSEN:  Objection.  Form.  Foundation.
16    A    I mean, I would not have all the information,
17 so it wouldn't be fair for me to say what they should've
18 done or didn't do or, you know, they had the
19 investigation, not me.
20    Q    Okay.  Looking back at it today, do you
21 have -- do you feel that the investigation into
22 Miedzianowski at that time was not handled correctly?
23         MS. ROSEN:  Objection.  Form.  Foundation.
24    A    I don't know.
25    Q    Do you have any concerns about how the

1  investigation had been conducted based on the complaint
2  that you had made on Miedzianowski?
3          MS. ROSEN:  Objection.  Form.
4     A    No.  I don't, no.
5     Q    Did you guide -- did you conduct any
6  investigation to identify what gangs might have been
7  involved that were -- that Miedzianowski was assisting?
8          MS. ROSEN:  Objection.  Form.
9     A    As I sit here today, I don't remember
10 specifically, but probably.
11    Q    Your expectation that there would have been
12 some review to identify what gangs had specifically been
13 assisted by the sharing of information?
14    A    Yes.  But I don't recall specifics.
15    Q    Okay.  Would that have been done by somebody
16 in your unit or would that have been done as part of the
17 internal affairs investigation?
18    A    I would say both.
19    Q    Okay.  And as you sit here today, are you able
20 to identify -- are you able to say one way or the other
21 what investigation was done by your unit into what gangs
22 were involved?
23    A    No.
24    Q    If that investigation had been done by your
25 unit, what documentation would've been created?

1     A    Depends on what they would have uncovered
2  and -- I don't recall any specifics from back then.
3     Q    Did you ever speak to an individual named
4  Risley at Internal Affairs about Miedzianowski?
5          MS. ROSEN:  Objection.  Form.  Foundation.
6     A    He was the head of internal affairs, but I
7  don't recall any specific conversation with him.
8     Q    Have you had -- have you ever had any
9  conversations with him about Miedzianowski?
10         MS. ROSEN:  Objection.  Form.  Foundation.
11    A    About Risley -- with Risley?
12    Q    With Risley.
13    A    I don't recall.
14    Q    Have you ever had any conversations with
15 Risley about any of the detectives that were working
16 under your command at Area 5?
17         MS. ROSEN:  Objection.  Form.  Foundation.
18 Once again, you're far afield from even discipline.
19    A    I don't recall.
20         MR. SWAMINATHAN:  Okay.  We've been going on
21 for a little chunk of time here.  Do you want me to
22 take another quick break, maybe five minutes?
23         MS. ROSEN:  Can I ask you, before we do that,
24 what you're -- how long do you think you're going

1  to go today and whether we going to -- were going
2  to need a lunch break?
3          MR. SWAMINATHAN:  Yeah.  I -- we're not going
4  to go all day.  I expect to be done -- it's going
5  to be more than an hour, but I can't say how much
6  more it could be.  It could be, I would say maximum
7  three hours, but I think that that's probably on
8  the high end, but I'm going to say that to you, so
9  that, you know, I'm not breaking my promise.
10         MS. ROSEN:  Maximum three hours more, you
11 mean?
12         MR. SWAMINATHAN:  Maximum three hours more.
13         MS. ROSEN:  And --
14         MR. SWAMINATHAN:  And I think probably less,
15 but I can't make that promise to you.
16         MS. ROSEN:  Okay.  And then, Jan, are -- do
17 you anticipate having questions as well?
18         MS. SUSLER:  Well, it's a little hard to say,
19 since I don't know how the rest of the dep is going
20 to go, but it is unlikely that I will have
21 extensive questioning.
22         MS. ROSEN:  Okay.  So I think that we should
23 at some point take a lunch break.  We don't have to
24 do it now.  We can go a little bit longer.  But if
25 you think you guys have three hours more, that's



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  going to take up the -- I mean, obviously, we're
2  going to need breaks. That's going to take us to
3  close to 4:00, and so we'll have to take a lunch.
4  So why don't we come back --
5      MR. SWAMINATHAN: Yeah. Well, Eileen, it's
6  12:15. We might as well do it now, I think, if
7  that makes sense to you.
8      MS. ROSEN: Well, I just have to get lunch
9  here. So it could be a shorter break.
10     MR. SWAMINATHAN: Okay.
11     MS. ROSEN: In a, you know, in an hour or so
12  is my plan.
13     MR. SWAMINATHAN: So --
14     MS. ROSEN: I mean, I'm happy to do the
15  longer break, but that seems silly.
16     MR. SWAMINATHAN: Yeah. Okay. Why don't we
17  take a short break now, and then whenever you --
18     MS. ROSEN: Okay.
19     MR. SWAMINATHAN: -- guys have lunch figured
20  out.
21     COURT REPORTER: Okay.
22     MR. SWAMINATHAN: That's that.
23     MS. ROSEN: Okay. Great. Thanks.
24     COURT REPORTER: We are off the record at
25  12:17 p.m.

1              (OFF THE RECORD)
2         COURT REPORTER: We are back on the record at
3     12:29 p.m.
4  BY MR. SWAMINATHAN:
5     Q   Actually, when you were a commander over --
6  became commander over Area 5 detectives in 1994, who did
7  you replace?
8     A   Charlie Roberts.
9     Q   And who did you report to as a commander?
10    A   A deputy chief for detectives at headquarters.
11    Q   Who was that?
12    A   I don't recall.
13    Q   Who was the chief of detectives at that time?
14    A   John Stibich.
15    Q   Was there more than one deputy chief of
16  detectives?
17    A   Yes. There was, like, three. One for the
18  north side, one for the south side, and one for the
19  special units, like bomb and arson, and --
20    Q   What were the other special units?
21    A   They had a fugitive squad, I believe, that
22  worked with the marshals.
23    Q   Any other special units you remember?
24    A   Not offhand.
25    Q   Okay. When you -- and so you reported to the

1  deputy chief assigned to the north side?
2     A   Yeah. John Frangello was the deputy chief's
3  name.
4     Q   Okay. And who were the lieutenants who were
5  working under you when you were commander at Area 5?
6     A   Ralph Barganski was the Violent lieutenant --
7  no, he was the Property lieutenant and John Farrell was
8  the Violent lieutenant.
9     Q   The policies that were in place when you were
10  now commander at Area 5, were they the same as the
11  policies in place when you were at Area 2 as Violent
12  Crimes lieutenant?
13        MS. ROSEN: Objection. Form. Foundation.
14    A   I'm not sure because, you know, things change
15  over the years, and they -- they put out general orders
16  and supplementary orders that -- that explain the
17  change, and -- so I'm not sure exactly. Nothing major
18  that I can think of.
19    Q   Any changes to the policies in place that you
20  can recall in the five years since you had last worked
21  in a detective division?
22        MS. ROSEN: Objection. Form. Foundation.
23    A   No.
24    Q   As far as you're concerned, was the day-to-day
25  job being done by the homicide detectives still the

1  same?
2         MS. ROSEN: Objection. Form.
3     A   Yes.
4     Q   Any changes you can think of in terms of how
5  the detectives went about conducting their jobs at Area
6  5 versus Area 2?
7         MS. ROSEN: Objection. Form.
8     A   No.
9     Q   Anything unique with the policies or practices
10  that were followed at Area 5?
11        MS. ROSEN: Did you say "anything unique"?
12        MR. SWAMINATHAN: Anything unique, yeah.
13        MS. ROSEN: Objection. Form.
14    A   No.
15  BY MR. SWAMINATHAN:
16    Q   Anything that you would say, you know, hey,
17  the guys at Area 2, they conducted, you know, witness
18  interviews a certain way, but the guys at Area 5, they
19  had a different way of doing things. Anything like
20  that, you would say?
21    A   No.
22        MS. ROSEN: Objection. Form.
23    Q   The policies that applied to detectives at
24  Area 5 were the same policies that applied to detectives
25  in Area 2?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 118

1        MS. ROSEN:  Objection.  Form.  Do you mean in
2    the same time frame?
3        Q     And I can ask the more generally, let me try
4    again.  Basically, what I'm trying to understand is the
5    policies that were in place -- strike that.  There were
6    certain policies that were in place for detectives at
7    Area 5, correct?
8        A     Yes.
9        Q     Were those policies unique to Area 5 or were
10   they citywide for detectives?
11       MS. ROSEN:  Objection.  Form.
12       A     Most were -- were citywide, there might be
13   some specifics because of a hospital or something like
14   that, that -- that would affect the individual area.
15   Like in Area 2, we had to go to Hammond a lot because
16   there was a hospital that took shootings on the
17   southside.  So we had to have issues of insurance for
18   the car and stuff like that before we'd leave Illinois
19   and go to Indiana.  So other than that, the -- the major
20   criminal investigations are the same.
21       Q     Okay.  So the policies with regard to how you
22   conduct criminal investigations were the same across the
23   areas for all detectives; is that right?
24       A     Yes.
25       MS. ROSEN:  Objection.  Form.

Page 119

1        Q     And as the commander at Area 5, are you aware
2    of any policies or rules that were in place that were
3    unique or different from what was being done at the
4    other areas for detectives?
5        MS. ROSEN:  Objection.  Form.
6        A     Other than what I just stated about the cars,
7    or it could have been other hospital issues, no.
8        Q     Okay.  Anything unique about the practices
9    that you had people following at Area 5 with regard to
10   criminal investigations that was different than the
11   other areas?
12       MS. ROSEN:  Objection.  Form.
13       A     Not that I recall.
14       Q     Okay.  While you were the commander at Area 5
15   for approximately five years, were there any changes in
16   the policies and practices under your command?
17       MS. ROSEN:  Objection.  Form.
18       A     Not that I recall.
19       Q     When you came in in 1994, did you change
20   anything about how things were done in the detective
21   division?
22       MS. ROSEN:  Objection.  Form.
23       A     I had geographic responsibilities added to the
24   detectives, so that there was better investigations,
25   knowing MOs and stuff like that of -- of the criminals

Page 120

1    out there.  Before I changed that they would have a --
2    detective might get a case in the 15th District, and a
3    case the 17th District, which would take about an hour
4    to drive to and from there.  So I made it so that there
5    was geographic accountability in order to give the
6    officers that worked -- the detectives that worked in 15
7    all the 15th District cases and similar for others.  But
8    that didn't apply to homicides.
9        Q     Okay.  With -- so let -- and then let me focus
10   on homicides then, since that's what we're -- that's
11   what we're here to talk about.  When you came in, did
12   you change anything about how things were done with
13   regard to homicide investigations?
14       A     Other than some minor stuff I -- that I can't
15   really think about now, no.  It was the same as Area 2.
16       Q     Okay.  What minor changes can you think of
17   that you made?
18       A     I can't even think of any right now.
19       Q     When you came in, did you have any kind of --
20   strike that.  When you came in, did you make any changes
21   that would have changed the day-to-day practices of the
22   homicide detectives working under your command from what
23   they were doing, you know -- strike that.  My apologies.
24   When you -- strike that.  While you were the commander
25   at Area 5 violent crimes, did you make any changes that

Page 121

1    would have impacted the day-to-day work of the homicide
2    detectives working under you?
3        MS. ROSEN:  Objection.  Form.
4        A     Not that I can think of.
5        Q     When you came in, did you have any kind of
6    meeting with all of the detectives under your command?
7        A     Yes.
8        Q     And so tell -- what was that?  It -- was it
9    like one meeting, like a get-to-know everybody meeting?
10   Help me understand what that was.
11       MS. ROSEN:  Objection.  Form.
12       A     Basically just introduced myself to them, let
13   them know what my background was, and tell them if they
14   needed anything, come and see me.
15       Q     Did you talk to them about any priorities or
16   initiatives that you wanted to have in place at Area 5?
17       A     No.  I just explained, like, for when we had a
18   bank robbery pattern going, I would take detectives and
19   put them inside the banks, and incidents like that that
20   might have been different than where they were used to.
21       Q     Did you put in place any initiative to try to
22   improve the performance of homicide detectives?
23       MS. ROSEN:  Objection.  Form.
24       A     Not that I can think of.
25       Q     As the commander at Area 5 detectives, did you



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1  have any major achievements during that four years that
2  you're proud of?
3      A    Well, our clear-up rate went up.  I -- I
4  thought a heater case like this, the detective's done an
5  outstanding job in solving it.  And the most important
6  thing was getting those two kids back.  So I mean, the
7  fact that we were able to get those kids back safely was
8  a great feat by the men and women of Area 5.
9      Q    Well, I'm not asking specifically about this
10 case -- I mean, I guess maybe what you're saying is the
11 -- solving this case was one of the achievements that
12 you're proud of; is that right?
13     A    Yes.
14     Q    Okay.  Are there other specific cases that
15 stand out as instances that -- where you guys solved a
16 case that you're proud of?
17     A    Well, we had a police officer shot and killed
18 in the line of duty, Dan Doffyn, and we were able to get
19 the offender on that case.  So I mean, anytime we had a
20 -- a high-profile case like that -- that we solved, I
21 was pleased with the work of the men and women.
22     Q    You said the clearance rate went up under your
23 command?
24     A    Yes.
25     Q    How were you able to get the clearance rate to

Page 123

1  go up?
2      A    I think just working with other units, working
3  with gangs, working with the district tac teams,
4  suburban departments that -- that showed any kind of
5  connection to that.  I had a once-a-month meeting with
6  all the suburbs that surrounded Area 5 and exchanged
7  information on cases.  So all those things helped.
8      Q    So there was -- so you instituted more
9  coordination between the homicide detectives and others?
10     A    Yes.
11     Q    Okay.  And sorry, I should ask, that clearance
12 rate going up, was that with regard to homicide cases,
13 or other cases, or both?
14     A    Both.
15     Q    Okay.  And so, the increased collaboration
16 with others applied to both homicide cases and other
17 cases; is that right?
18     A    Yes.
19     Q    And in the case of homicide cases, who were
20 the -- who were the folks that you had them
21 collaborating with more than they previously had been
22 doing?
23     A    DEA, you know, FBI.
24     Q    Gang crimes?
25     A    Gang crimes, yeah -- yeah.  That was on a

Page 124

1  daily basis.
2      Q    What do you mean by it was on a daily basis?
3      A    Well, because, I mean, we had a lot of
4  homicides in Area 5, so Gangs would be sending people
5  over to help us on those homicides.
6      Q    And you increased the involvement of Gang
7  Crimes officers in assisting on homicides, it sounds
8  like?
9           MS. ROSEN:  Objection.  Form.
10     A    Yes.
11     Q    And so, how did you go about doing that?
12     A    Again, making sure that the detectives were
13 sharing information, or the Gang Crimes specialists were
14 also letting us know anything they had, any informants
15 that we could use.
16     Q    And did you have a mechanism for information
17 sharing from the Gang Crimes specialists to the
18 detectives?
19           MS. ROSEN:  Objection.  Form.
20     I don't recall the specifics, but yeah.  I
21 mean, that was the idea of them being there.
22     A    So -- so was it under you that the Gang Crimes
23 specialists then would start to work out of the
24 detective division more often?
25           MS. ROSEN:  Objection.  Form.

Page 125

1      A    No.  They were doing it before I was there.
2      Q    Okay.  Was -- were there certain reports or
3  other documentation that you had either detectives or
4  Gang Crimes specialists create to sort of increase the
5  communication between the two teams?
6           MS. ROSEN:  Objection.  Form.
7      A    Not that I recall.
8      Q    Did you create any meetings that took place
9  between gang specialists or homicide detective on a
10 regular basis?
11     A    I'm sorry, what was the first part of your
12 question?
13     Q    Did you create any meetings, like regular, you
14 know, routine meetings that would occur in order to
15 increase the collaboration between those groups?
16     A    That was left up to the supervisors to make
17 sure that the people who were working these cases sat
18 down and exchanged information.
19     Q    Did you train detectives as part of your role
20 as the commander?
21     A    Yes.
22     Q    And what kind of training would you conduct?
23     A    Search warrants, anything specific to what was
24 going on, DNA, that was becoming real big back then.  And
25 so I just made sure that they had all the information

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1 they needed.
2    Q    And you would do those trainings yourself?
3    A    Some of it, yes.
4    Q    Which trainings did you personally conduct? On
5 what topics?
6    A    I don't recall exactly. It would have been
7 search warrants. I did search warrants for the whole
8 department. So it would have been search warrants, but
9 I don't recall anything else. Maybe DNA, I might have
10 done. Or I would try and get experts to come in. Get
11 attorneys from the State's Attorney's Office to come in
12 and talk about what they're looking for when charging
13 somebody.
14    Q    Did you do any training on interrogations?
15    A    No.
16    Q    Did any of your sergeants or lieutenants do
17 training on interrogations?
18    A    I don't recall as I sit here today, or if we
19 brought somebody in from the outdoors, you know,
20 outside.
21    Q    When you previously worked as a violent crimes
22 lieutenant, did you do any training of your detectives
23 on interrogations?
24    A    Not that I remember.
25    Q    As a commander, what was your expectation

Page 127

1 about how interrogations were being conducted by your
2 detectives?
3         MS. ROSEN: Objection. Form.
4    A    I wanted to make sure that they were following
5 all the guidelines that had been set down and
6 documenting information from the person that was going
7 to be interviewed.
8    Q    So it was your expectation that they were
9 documenting the things they learned from the person
10 interviewed?
11    A    Right.
12    Q    And that -- and when you talk about the
13 guidelines, what guidelines are you referring to for
14 interrogations?
15    A    With -- with the GPRs, and making sure that
16 they're reporting it on a GPR, and exchanging
17 information with -- watch to watch, that was an
18 important thing.
19    Q    Okay. Expectation was that they were taking
20 down information about interviews of -- strike that.
21 Your expectation was that they were taking down
22 information about their interrogations in GPRs, ensuring
23 that information across shifts; is that right?
24         MS. ROSEN: Objection to form. Foundation.
25    A    Yes.

Page 128

1    Q    Okay. And did you communicate that
2 expectation to your -- the supervisor working under you
3 and to detectives?
4    A    Yes.
5    Q    Okay. And was it your expectation that
6 detectives should have been following that guide -- that
7 instruction to take GPRs on their interrogations?
8         MS. ROSEN: Objection. Form. Foundation.
9    A    Yes.
10    Q    Okay. And as far as you know, was that
11 followed?
12         MS. ROSEN: Objection. Form. Foundation.
13    A    Yes.
14    Q    If that wasn't being followed, would you have
15 expected there to be some reprimand or consultation with
16 the officer?
17         MS. ROSEN: Objection. Form. Foundation.
18    A    Yes.
19    Q    When you were supervising interrogations at
20 Area 5, what was the practice with regard to suspect's
21 requests for counsel? Was there any process about
22 trying to encourage -- make sure that they were given
23 instructions about counsel, were there efforts to
24 discourage suspects from, you know, requesting counsel
25 and refusing to answer questions?

Page 129

1         MS. ROSEN: Objection. Form.
2    A    I remember we put signs up in every one of the
3 interview rooms that talked about the Miranda rights and
4 also it expounded on if they wanted an attorney. I
5 don't remember exactly what they said, but I know those
6 were put into the interview rooms, and we encouraged
7 detectives to use the FOP book or a card to read the
8 rights so that there was no doubt what the -- was said
9 to the offender.
10    Q    Was there a practice among detectives to try
11 to discourage suspects from remaining silent to the
12 course of an investigation?
13         MS. ROSEN: Objection. Form.
14    A    Not that I know of.
15    Q    Were there techniques that detectives were
16 taught to try to discourage individuals from remaining
17 silent during an interrogation?
18         MS. ROSEN: Objection. Form.
19    A    I don't think that they were trying for that
20 purpose, but I mean, they were taught interrogation
21 techniques, but not the specifically to get them not to
22 ask for an attorney or to -- to speak.
23    Q    If -- were they taught any -- detectives were
24 taught techniques to get people talking, right?
25    A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1    Q    Okay.  And what were some of the techniques
2  they were taught to get people talking?
3         MS. ROSEN:  Objection.  Form.  Foundation.
4    A    Well, I can just remember to start talking
5  about things in general rather than getting specific
6  right away.  That was something that we had the older
7  detectives talk to the new detectives about.  Take your
8  time with your interrogation and interviews.
9    Q    What do you mean by "take your time"?
10   A    Well, don't rush in there.  "Did you do it?"
11 and have them say, "no" and then you walk out the door.
12 I mean, you should walk in and say, "what neighborhood
13 you from, who did you go to school with," what -- get
14 them talking, get them trusting you.
15   Q    Did you -- did they learn any techniques to
16 try to avoid having somebody invoke their right to
17 remain silent?
18        MS. ROSEN:  Objection.  Form.
19   A    No.
20   Q    Did you -- were there any techniques to get
21 someone talking that involved sharing information with
22 them?
23        MS. ROSEN:  Objection.  Form.  Vague.
24   A    You might, you know, tell them that a co-
25 defendant is already talking to you and that would

Page 131

1  encourage them to talk.
2    Q    And that could be a lie, right?  You could lie
3  to suspects, correct?
4    A    That's what the Supreme Court said.
5    Q    And that was one of the techniques that
6  detectives use, right?  Ruse?
7         MS. ROSEN:  Objection.  Form.
8    A    I mean, I don't know if you're talking about a
9  specific case, but I mean, in general, detectives would
10 try and get statements from the interview -- people
11 being interviewed.
12   Q    And would detective share facts that they knew
13 about the crime with individual they are interrogating?
14   A    If that helped get the person to talk about
15 it, yes.
16   Q    And were detectives trained that that could
17 also be problematic because if you share information
18 with the individual, it's harder to assess whether their
19 confession is true?
20        MS. ROSEN:  Objection.  Form.
21   A    You always hold back something that only the
22 offender would know.
23   Q    Did the detectives working under your command
24 get any training about false confessions?
25   A    Yes.

Page 132

1    Q    What training did they get about that?
2    A    At the academy there was training on cases in
3  general, and I know we used the Florida case as an
4  example of a false confession.  You try and show them
5  what can cause something like that to happen and to
6  avoid it.
7    Q    And so, what steps were they taught to take to
8  avoid those false confessions?
9    A    Well, making sure that you hold something back
10 that the -- only the offender would know for sure.  Not
11 trying to force somebody into talking about something
12 that would -- would cause them to make a false
13 confession.
14   Q    Anything else that they were taught as
15 detectives?
16   A    Like, I'd have to know the case to know
17 specifics about it.
18   Q    I'm not asking about specific cases, I'm just
19 asking about the techniques they were trained on.  Was
20 there anything else they were trained to do other than
21 hold some piece of information back to avoid false
22 confessions?
23        MS. ROSEN:  Objection.  Form, foundation, and
24        mischaracterizes the testimony.
25   A    As I sit here today, I don't remember.

Page 133

1    Q    And was there any form that you would use to
2  have individuals sign their waiver of right to an
3  attorney and a right to remain silent?
4    A    Yes.
5    Q    And was -- that form was available to
6  detectives in your unit at Area 5?
7    A    Yes.
8    Q    And what was that form?
9    A    Just a rights form that talked about the right
10 to an attorney, right to keep silent, attorney would be
11 provided, and we encourage them to sign it.
12   Q    You said there was a document that you could
13 have the suspect sign expressly indicating that they
14 have -- that they've waived their rights?
15   A    Yes.
16   Q    That was something that detectives could use
17 in their interrogations; is that right?
18        MS. ROSEN:  Objection.  Form.
19   A    Yes.
20   Q    And was your expectation that they would use
21 those forms?
22        MS. ROSEN:  Objection.  Form.  Foundation.
23   A    Yes.  But in some cases, the defendant didn't
24 want to sign anything, so you would just proceed as long
25 as he had orally agreed to waive his rights.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1    Q    Okay.  But was the expectation that they would
2  at first -- they would first, in after giving the
3  Miranda warning, you'd first at least try to see if
4  they're willing to sign the document?
5        MS. ROSEN:  Objection.  Form.  Foundation.
6    A    Yes.
7    Q    Okay.  So whenever -- when detectives
8  conducted interrogations, they would take that form to
9  get a signature, if possible?
10   A    Yes.
11   Q    Okay.  And then if the individual would sign
12 the form, they could continue the interrogation; is that
13 right?
14   A    As long as he waived his rights, yes.
15   Q    All right.  And then -- and it was your
16 expectation that in each interrogation that detectives
17 in fact gave the individual an opportunity to sign that
18 form?
19   A    Yes.
20   Q    Okay.  And what is that form called or what
21 did you guys call it in the area at that time?
22   A    A rights form.  I don't know if it had a
23 number on it or something.  I don't recall.
24   Q    And that form was available to detectives in
25 the area, correct?

Page 135

1    A    Yes.
2    Q    And then if that form was signed, where would
3  it be put?
4    A    The original should have been inventoried and
5  then a copy put in the investigative file.
6    Q    When you say the original's inventoried, what
7  do you mean?
8    A    That it would be put into our inventory system
9  and it would be sent to evidence recovered property to
10 hold.
11   Q    And this was a CPD form that you're talking
12 about; is that right?
13   A    Yes.
14   Q    And was it a form available to all detectives
15 across areas or was it something unique to Area 5?
16   A    No.  Was all the areas.
17   Q    And later on, if an individual eventually gave
18 a handwritten statement to a prosecutor, that was a
19 separate document on which there was some written
20 waiver; is that correct?
21   A    Yes.
22   Q    Okay.  So there were two different forms.  One
23 that the prosecutor used and one that the detectives
24 used to obtain written waivers; is that right?
25   A    Yes.

Page 136

1    Q    Okay.  In your experience, did detectives
2  typically obtain those written waivers when they
3  conducted interrogations with suspects?
4    A    Where the individual waived his rights, yes.
5    Q    Okay.  And where individuals -- did you have
6  instances where individuals were willing to talk, but
7  just wouldn't sign the form?
8    A    Yes.
9    Q    Was that rare?
10       MS. ROSEN:  Objection.  Form.  Foundation.
11   A    No.
12   Q    It typically was just the case that if an
13 individual is willing to talk, they were also willing to
14 sign the form saying they were willing to talk?
15       MS. ROSEN:  Objection.  Form.  Foundation.
16   A    No.
17   Q    How often -- approximately how often was it in
18 general; ten percent, 50 percent, 100 percent, that
19 people would agree to talk but not agree to sign the
20 form saying they would talk?
21       MS. ROSEN:  Objection.  Form.  Foundation.
22   A    I don't know.  I mean, I don't know what
23 period of time you're talking -- how long.  I mean,
24 it -- it happened.
25   Q    When you were the commander, did you

Page 137

1  participate in any interrogations?
2    A    Maybe -- maybe a couple I walked in on, not
3  in --
4    Q    In the four or five years -- I'm sorry.  I'm
5  sorry.  Go ahead.  I didn't mean to cut you off, go
6  ahead.
7    A    I tried not to, you know, go in and let the
8  detectives know they were doing a good job, but -- but I
9  mean, not really.  I didn't -- maybe a couple.
10   Q    A couple times over about five years as the
11 commander?
12   A    Yes.
13   Q    Okay.  So for the most part, you did not
14 participate in interrogations of suspects, fair?
15   A    That's fair.
16   Q    Okay.  And where did you -- where did you sit
17 when you were at Area 5 as the commander?
18   A    In the office right outside the squad room.
19   Q    And who all was -- so was that off of the main
20 area?
21   A    The -- my office had an outer office that had
22 three desks there.  And then when you went out the door
23 from there, you were in the squad room.
24   Q    Okay.  So your of -- so you went from your
25 office into another office and then from that office out

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  into the open area; is that right?

2      A    Yes.

3      Q    If you were out in the open area, could you

4  see into your office as the commander?

5      A    I don't remember.

6      Q    As the commander, if you were sitting in your

7  office as the commander, could you see out into the open

8  area where the detectives were?

9      A    No.  I believe I had to walk into the next

10  office to do that.

11      Q    And who sat in that office?

12      A    Two detectives.

13      Q    And what detectives sat in that office right

14  outside of the commander's office?

15      A    Chris Alberts and Karen Salvey.

16      Q    And what was their role, were they detectives

17  that were out investigating cases or were they desk

18  detectives?

19      A    They were desk detectives, administrative

20  duties.

21      Q    And so, what kind of job were they doing?

22      A    Reviewing reports, creating reports that I

23  needed to get down, any -- any kind of flow paperwork

24  from headquarters out to the areas and back.  They would

25  be responsible for that.

Page 139

1      Q    Anything else that they would do?

2      A    I don't remember all their duties as I sit

3  here today.

4      Q    As commander, would you ever go out in the

5  field?

6      A    Yes.

7      Q    How often would you do that?

8      A    Couple times a week.

9      Q    And then if you went out, how long would you

10  go out?

11      A    Couple hours.

12      Q    When you went out, what would you do?  Would

13  you assist in investigations?

14      MS. ROSEN:  Objection.  Form.

15      A    Sometimes I might jump in the back seat of the

16  detective's car and ride with them and see what's going

17  on with the case they're working, or if it was a heater

18  case, I'd be out there helping with resources and making

19  sure that we're covering all the bases.

20      Q    And when you say, "helping with resources,"

21  what do you mean?

22      A    Well, like in -- in this case here, you had

23  two kids that were kidnapped and there was leads in

24  California and in Mexico.  So I made sure that we had

25  the FBI working on those leads.  We needed extra

Page 140

1  interpreters because of the amount of Hispanic people

2  that didn't speak English, so I got officers from other

3  units to come and help with the interrogations and the

4  interviews.

5      Q    So basically, you helped the detectives get

6  the resources and help that they needed from others; is

7  that right?

8      A    Yes.

9      Q    Okay.  Did you actually conduct the

10  investigation steps yourself?

11      A    No.

12      Q    Okay.  When you went out with the detectives,

13  you wouldn't interview witnesses and do that kind of

14  thing.  You would help them get the resources they need

15  to be able to do that.  Do I have that right?

16      A    Yes.

17      Q    Okay.  And when you were back at your -- at

18  Area 5, were you typically in your office?

19      A    Or in the squad room.

20      Q    And what types of things would you be doing

21  out in the squad room?

22      A    I'm talking to the detectives about their

23  cases, just general walking around, making sure that

24  everything we need is there.

25      Q    Did you review homicide files as a commander?

Page 141

1      A    Yes.

2      Q    And what were the purposes of your review of

3  homicide files?

4      A    Just to make sure that I was up to date on

5  what's going on and what the status of these

6  investigations are.

7      Q    Did you hold, like, a regular roll call

8  meeting or anything like that?

9      A    Once in a while.  Not -- not often.

10      Q    Were those types of meetings conducted by your

11  subordinate supervisors?

12      A    Or if I had something to say, I would get up

13  there and talk, and then we'd have staff meetings once a

14  month for the supervisors.

15      Q    What kind of issues were discussed at the

16  staff meetings among the supervisor?

17      A    I'm sorry, what?

18      Q    What types of issues were discussed among the

19  supervisors at the staff meeting?

20      A    Anything at all that needed to -- affected the

21  area and if there was some new law out or a court

22  decision or anything like that, we'd talk about that.

23  We'd have guest speakers once in a while.

24      Q    Would you discuss specific investigations?

25      A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Would you discuss officer discipline?

2    A    I don't recall exactly if we did or not.

3    Q    If there was some issues of discipline
4 involving a detective, would that be discussed in those
5 types of staff meetings?

6        MS. ROSEN:  Objection.  Form.

7    A    I -- I don't recall.

8    Q    While you were the Area 5 commander, would you
9 conduct audits of homicide files?

10   A    Yes.

11   Q    And what did those audits consist of?

12   A    Reviewing the file, making sure that all leads
13 had been followed up, make sure the proper paperwork's
14 in there.

15   Q    And were you also looking at it, as we
16 discussed before, to ensure that these special orders
17 were being followed about documentation and note-taking?

18   A    Yes.

19   Q    And how often was that done?

20   A    On an ongoing basis.

21   Q    And you were aware of the audits, of the
22 results of those audits; is that right?

23   A    Yes.

24   Q    And you were aware of the status of homicide
25 investigations as they proceeded, it sounds like?

1    A    Tried to be on top of all of them, yes.

2    Q    So you had some -- you basically had some
3 understanding of all the homicide investigations that
4 were going on in your unit; is that right?

5    Q    The homicide invest -- I'm assuming -- did you
6 have a knowledge of all the investigations that were
7 going on, homicide or non-homicide?

8

9    A    No.  It would have been impossible.

10   Q    Okay.  But homicides were more serious and so,
11 those specifically you were paying attention to?

12   A    Right.  And after that --

13        MS. ROSEN:  Object to the form.  Just paying
14 attention to but go ahead.

15   A    If there was any kind of patterns, I would
16 look at those cases.

17   Q    You -- and -- I think Eileen has a fair
18 objection.  So let me ask a -- let me ask a better
19 question.  You paid special attention to homicide cases;
20 is that true?

21   A    Yes.

22        MR. SWAMINATHAN:  Did he say yes?  I just
23 missed it.

24        THE WITNESS:  Yes.

25        MS. ROSEN:  He did.

1 BY MR. SWAMINATHAN:

2    Q    Okay.  Sorry.  And anytime a homicide case was
3 closed, would you know about it?

4    A    Yes.

5    Q    Could you review the homicide files in cases
6 that were closed?

7    A    Yeah.  I would have reviewed them at some
8 point.  Once they were closed, I didn't review them
9 after that.

10   Q    Okay.  So you would review homicide files as
11 they were proceeding?

12   A    Yes.

13   Q    Okay.  And so would you say that in general,
14 you put your eyes on pretty much all the homicide files
15 at some point in the process?

16   A    Yes.

17   Q    Would you report on what you were -- on the
18 homicide cases up the chain to people above you as the
19 commander?

20   A    If they had specific questions about it, yes.
21 I mean, there was no regular routine with that.

22   Q    Did -- were there any -- were there any type
23 of reporting that you made to supervisors above you
24 about homicide cases?

25   A    I don't recall if there was a specific form or

1 -- I mean, they might ask you what's happening with that
2 case or what's happening with this if they got some news
3 attention or somebody else was asking about it.  But I
4 don't recall any specific form that went up to them
5 every month with homicide reviews.

6    Q    Did you provide any -- would you share
7 information with the first deputy or the chief of
8 detectives about all the homicide cases as they were
9 coming in?

10   A    Not all of them, no.

11   Q    Okay.  What information about homicide cases,
12 or which homicide cases would you communicate to the --
13 your higher-ups about?

14   A    Anything that we call a heater, like this case
15 here, would have been something that I would have been
16 talking to when I was talking to the chief of detectives
17 about on a regular basis.

18   Q    You were talking to chief of detectives about
19 this case; is that right?

20   A    Yes.

21   Q    Okay.  And that you would -- you'd do that
22 with any heater case; is that right?

23   A    Yes.

24   Q    Okay.  What other types of information were
25 you communicating regularly to the first deputy or the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

1 chief of detectives, about homicide cases?
2 A    I don't recall anything else.
3 Q    Did you communicate information to them about
4 clearance rates of homicide cases?
5        MS. ROSEN:  Objection.  Form.
6 A    There was -- the headquarters put out a sheet
7 every month that showed all the areas, how many murders
8 they have, how many are cleared, what your clearance
9 rate is.  So it really came from them to us.
10 Q    Right.  And how did they keep track?  How did
11 they get the information they needed to provide that
12 information?
13       MS. ROSEN:  Objection.  Form.  Foundation.
14 A    Every day there was a log that went down to
15 headquarters that had homicides, robberies, serious
16 sexual assaults, anything like that, and they would get
17 their information off of that for their statistics.
18 Q    Okay.  If there were lawsuits filed against
19 the officers in your -- under your command, would you
20 learn about it?
21 A    Yes.
22 Q    And would you share that information up the
23 chain as you learned it?
24       MS. ROSEN:  Objection to form.
25 Q    Go ahead.

Page 147

1 A    Yes.
2 Q    When you learned information about potential
3 misconduct by officers in your unit, who would you share
4 that information with?
5        MS. ROSEN:  Did you say, who would you share
6    that information with?
7        MR. SWAMINATHAN:  Yeah.
8 A    How -- it depends on how I got the
9 information.  If they had come from the -- the OPS or
10 IAD, then they would have already been informed of it.
11 If there was something else that came in, I would inform
12 them myself.
13 BY MR. SWAMINATHAN:
14 Q    Was there -- I guess -- maybe let me ask a
15 better question.  With regard to the issue of discipline
16 or -- let me start with misconduct.  With regard to the
17 issue of misconduct, was there ever information you
18 communicated up the chain to the first deputy or to the
19 chief of detectives?
20       MS. ROSEN:  Objection to form.  Do you
21    understand what he's asked?
22       THE WITNESS:  No.
23 BY MR. SWAMINATHAN:
24 Q    Okay.  With regard to allegations of
25 misconduct, what information, if any, would you

Page 148

1 communicate up the chain to the first deputy or the
2 chief of detectives?
3        MS. ROSEN:  Objection to form.
4 A    If they already didn't have that information,
5 then I would tell them what the allegations were.
6 Q    Was it your understanding that they typically
7 already had information about allegations of misconduct
8 against the detectives?
9 A    If it was the CR number that was obtained
10 against the detective, that would come through the chain
11 of command, then they would be notified as part of it.
12 Q    Okay.  So when there were CRs that were issued
13 against the detective in your unit, you -- they would
14 learn about it even before you would learn about it; is
15 that right?
16 A    Or simultaneously, yes.  You know.
17 Q    Okay.  So when there were CRs issued against
18 somebody in your unit, that information was going to the
19 chief of detectives and to you?
20 A    Yes.
21 Q    Did the chief of detectives or first deputy
22 ever weigh in on any of the cases in which there was
23 allegations of misconduct against a detective?
24       MS. ROSEN:  Objection.  Form.
25 A    I don't know if they would or not.  I mean,

Page 149

1 they may -- I would think they would call up IAD.  I
2 know when I was the chief of detectives, I would call
3 IAD, let's do this thing, you know, because you want to
4 know whether that officer should be kept on the street
5 or taken off the street depending on the allegation.
6 Q    Okay.  And would you have similar
7 conversations with the IAD about officers to know
8 whether they -- you should have them on the street or
9 not?  When you were the commander?
10 A    When I was a commander, did I what now?
11 Q    Would you have -- would you make calls over to
12 IAD to know whether, you know, this is an officer I want
13 to keep on the streets or not?
14 A    No.
15 Q    That was only something that you did when you
16 were higher up?
17 A    Right.
18 Q    Why is that?
19 A    Well, the superintendent is the person that
20 has to strip them.  So I mean, no matter what I wanted
21 to do, it wouldn't matter anyway.  I just wanted to make
22 sure the information went -- went to the detective
23 division, but it would be the superintendent's call.
24 Q    Okay.  So as commander, one of the things --
25 it sounds like, given that you didn't have the authority

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to make those kind of disciplinary decisions, one of the
2  things you did as commander was just to make sure the
3  information was getting up the chain to the chief of
4  detectives; is that right?
5      A   Yes.
6      Q   And it was your understanding that the chief
7  of detectives, then, was sharing that information with
8  the superintendent so that decisions could be made?
9      A   Yes.
10     Q   Okay.  And that would be with regard to any
11 allegations of misconduct against detectives in your
12 unit?
13     A   Yes.
14     Q   While you were the commander, are you aware of
15 any discipline of detectives under your command?
16         MS. ROSEN:  Objection to form, foundation.
17     A   Sitting here today, I don't recall.
18     Q   Can you think of any instance when a detective
19 under your command was disciplined while you were the
20 commander at Area 5?
21         MS. ROSEN:  Objection.  Form.  Foundation.
22     A   There was a -- there was one case that stood
23 out because the -- the officer was later charged and
24 convicted, but I don't remember his name.  And he was
25 stripped and put down working at a desk because of the

1  allegation against him.  But I can't remember his name.
2      Q   Can you recall any other instance other than
3  that case?
4      A   Not as I sit here today, no.
5      Q   That officer's name, was it Woodall?
6      A   Yes.  Jon Woodall, right?
7      Q   And was he -- was there -- was it your
8  understanding that he had some involvement at all
9  with the enterprise involving Miedzianowski?
10         MS. ROSEN:  Objection.  Form.  Foundation.
11     A   I don't know.
12     Q   Did you have an understanding about whether or
13 not what he was accused of had anything to do with the
14 allegations against Mr. Miedzianowski?
15         MS. ROSEN:  Objection.  Form.  Foundation.
16     A   I don't know.
17     Q   Until while you were the commander at Area 5,
18 you learned of the allegations against Detective
19 Woodall; is that right?
20     A   Yes.
21     Q   And when you learned of it, was it at the
22 point that he'd been arrested or was it some earlier
23 point?
24     A   It was earlier.
25     Q   And when you learned about it, how did you

1  learn about it?
2      A   I think IAD called me, and told me about it.
3  And then it was -- he was later stripped and then, I
4  think he was convicted.
5      Q   When he was stripped, who made that decision?
6      A   The then-superintendent.
7      Q   And do you know what information they received
8  that led to the Internal affairs?  Was there an Internal
9  Affairs investigation into Mr. Woodall?
10     A   Yes.
11     Q   Okay.  And were you privy to what happened --
12 to what the process was of that Internal Affairs
13 investigation?
14     A   Something to do with drugs, and a car at the
15 pond.  I don't remember other specifics in that.
16     Q   Did Internal Affairs keep you abreast of what
17 was happening with that investigation?
18     A   Yes.
19     Q   And did they communicate to you a final result
20 of that investigation at any point?
21     A   Not that I recall.
22     Q   Okay.  Did that investigation ever actually
23 conclude or was it -- or was it -- ultimately, did it
24 end because there was the criminal conviction?
25     A   Well, it would've been, once the criminal case

1  was over, then they would conclude the -- the department
2  case.
3      Q   Okay.
4      A   I don't know.
5      Q   Do you know what the final conclusion was in
6  the department case?
7      A   I mentioned he -- if he -- if he hadn't
8  retired already, he would have been fired.
9      Q   Okay.  But he could have retired without being
10 fired; is that right?
11     A   Yes.
12     Q   Okay.  Now, with regard to the Miedzianowski
13 conduct, do you know whether Internal Affairs was
14 keeping anyone abreast of what was happening with that
15 investigation?
16     A   I remember knowing about it when I was a
17 commander in narcotics.  So that had to come from IAD or
18 from my boss, and --
19     Q   When you were --
20     A   -- I don't remember the specifics as I sit
21 here today.
22     Q   When you were the commander at Area 5, were
23 you kept abreast by Internal Affairs of that
24 investigation?
25     A   I don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    Q    Would you agree with me you don't believe you
2  were kept -- would you agree that you -- it's not your
3  recollection that you were kept abreast of that
4  investigation as it was proceeding?
5        MS. ROSEN:  Objection.  Form.
6    A    No.  I don't recall whether I was or wasn't.
7    Q    Okay.  The -- who was the individual you said
8  was the commander over Gang Investigations at that time
9  that you still were handling Miedzianowski?
10   A    Hiram Grow.
11   Q    Grow?  Okay.  So Grow was the first one you
12  spoke to about banning Miedzianowski, correct?
13   A    He might have talked to me about it or it was
14  IAD.  I don't remember as I'm sitting here today.
15   Q    But you -- at some point you communicated
16  something to somebody, a commander of Gang Crimes, that
17  you were banning Miedzianowski, that was stuff you said
18  before, right?
19   A    Yes.  It wasn't --
20   Q    Who was that?
21   A    I don't remember who that was.  Before Grow, I
22  think.
23   Q    Okay.  It was the commander before Grow?
24   A    Yeah.
25   Q    Okay.  When you communicated to that commander

Page 155

1  that you were banning Miedzianowski, did that individual
2  indicate anything to you about knowing of an Internal
3  Affairs investigation at that time?
4    A    I don't remember.
5        MS. ROSEN:  Kind of a belated relevance.
6    Objection.  Because once again, I think that's far
7    afield, even when you're talking about discipline.
8  BY MR. SWAMINATHAN:
9    Q    As the commander at Area 5, what was your role
10  in the discipline process?
11   A    I was part of the channel -- command channel
12  review.
13   Q    And so you would be -- where there was a
14  sustained allegation, you would learn about it and have
15  some say in what discipline was supposed to be; is that right?
16   A    Yes.
17   Q    Okay.  And if the allegations were not
18  sustained, you would not know about it; is that correct?
19   A    I don't remember the not sustained cases,
20  right?  I think it was just the sustained cases.
21   Q    Okay.  And is -- as there were CRs -- you
22  know, if an individual -- if a civilian came in and
23  filed a CR against a detective, would you know about
24  that?
25        MS. ROSEN:  Objection to form.  Foundation.

Page 156

1    A    If someone came in and got a complaint against
2  a detective?
3    Q    Yep.
4    A    Yes.
5    Q    Okay.  And who else would know about any CRs
6  that were -- that had been essentially filed and were
7  opened against the detective?
8        MS. ROSEN:  Object to the form, foundation.
9    A    I don't remember who was in the chain of
10  command.  I mean, I know I would get a copy of the
11  complaint, as the commander of that detective.
12   Q    Okay.
13   A    I don't know who else.
14   Q    Would your lieutenants know?
15   A    Yeah, I would let them know.
16   Q    Would the sergeants know?
17   A    Yes.
18   Q    Okay.  So everybody in the supervisory above
19  the detective would know that there had been some
20  allegations made by a civilian against the detective; is
21  that right?
22   A    Yes.
23   Q    Okay.  And did you have access to the CR
24  histories of the detectives under your command when you
25  were commander?

Page 157

1    A    They would be on there if it was -- if it was
2  the sustained case.
3    Q    Their CR history would be -- when you say "a
4  sustained case," you'd also then see their CR history?
5    A    A complimentary history, and their
6  disciplinary history.
7    Q    Okay.  Putting aside a specific incident when
8  sustained case came to you in the command channel
9  review, I'm asking:  In your day-to-day job, if you were
10  the commander and you wanted to know about the complaint
11  history of one of the detectives working under you, did
12  you have access to that information?
13   A    Yeah.  I mean, you -- you usually go on the
14  computer and get it.
15   Q    So you could access it directly on your own,
16  the complaint histories against your officer?
17   A    That -- that's how I remember it.
18   Q    And you'd be able to see all the cases that
19  were sustained.  Oh, I'm sorry.  Go ahead.
20       MS. ROSEN:  Yeah.  So he would like -- wants
21   to take a break.  So maybe this is a good time --
22       MR. SWAMINATHAN:  Yeah.  Yeah.
23       MS. ROSEN:  -- to do lunch, but if you want
24   to ask a question -- were you in the middle of a
25   question, or no?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1    MR. SWAMINATHAN:  No.  We can stop and take a
2 break now.
3    MS. ROSEN:  Okay.  Great.
4    COURT REPORTER:  Okay.  We are off the record
5 at 1:18 p.m.
6    (OFF THE RECORD)
7    COURT REPORTER:  We are back on the record at
8 1:51 p.m.
9 BY MR. SWAMINATHAN:
10    Q    All right.  Mr. Cline, you had talked -- we
11 talked a little bit earlier about clearance rates, and
12 you had indicated that you would get a regular report
13 about the clearance rate within Area 5 while you were
14 the commander; is that right?
15    A    The way I remember.  Yes.
16    Q    How often would you get that report?
17    A    Once a month.
18    Q    And then -- and that was coming -- and was
19 that also going to the chief of detectives and the first
20 deputy?
21    A    It was coming from the chief of detective's
22 office.
23    Q    I see.  Was that information also being shared
24 with the superintendent?
25    MS. ROSEN:  Objection.  Form.  Foundation.

Page 159

1    A    I believe so.  Yes.
2    Q    When you were the chief of detectives, was
3 that information being shared with the superintendent?
4    A    Yes.
5    Q    When you were the superintendent, was that
6 information being shared with you by the chief of
7 detectives?
8    A    Yes.
9    Q    When you were the Area 5 commander, would you
10 have discussions with your higher-ups about the
11 clearance rate?
12    MS. ROSEN:  Objection.  Form.
13    A    Yes.
14    Q    And in what settings would that occur?
15    A    Usually it was a phone call from them.
16    Q    If they had concerns about it, they'd call you
17 up?
18    MS. ROSEN:  Objection.  Form.  Foundation.
19    A    Not if they had concerns, but I mean, just as
20 a course of regular business they'd say, hey, I looked
21 at your numbers this week.  They're good, they're bad,
22 or you know, what's happening on them.
23    Q    And then what kind of information would you
24 provide back to them?
25    A    Just what we're doing, what -- what cases are

Page 160

1 -- are close to clearing, you know, and what we're
2 having problems with.
3    Q    And what actions would you take after you got
4 those calls?
5    A    I'd talk to the supervisors and tell them, you
6 know, if we got anything close to closed, then let's get
7 it closed, and look at cases that should be cleared.
8    Q    Okay.  And then your -- the supervisors
9 working under you would then, you know, share that
10 information down the chain to the detectives.  Was that
11 your expectation?
12    A    I would assume so.
13    Q    Okay.  Was the -- when you got calls about
14 this as you -- who were you getting them from, was it
15 from the superintendent, you know, chief of detectives,
16 first deputy, who was it?
17    MS. ROSEN:  Objection.  Form.
18    A    Usually, the deputy chief of detectives would
19 call.  I said that was John Frangello.
20    Q    Uh-huh.
21    A    -- and he would just -- whatever the concern
22 was, he would bring it up.
23    Q    And the concern -- would that usually be the
24 concern -- if Frangello was calling you up as the first
25 deputy, was he usually calling on behalf of the chief of

Page 161

1 detectives?
2    MS. ROSEN:  Objection.  Form.
3    A    Yes.
4    Q    Did chief of detectives ever call you directly
5 about those issues?
6    A    About these issues?
7    Q    Yeah.  Let me ask a better question.  That was
8 a poor question.  Sorry.  Would the chief of detectives
9 ever call you directly about the clearance rates?
10    A    I don't remember it happening.
11    Q    When you were the chief of detectives, would
12 you call over to the commanders about clearance rates?
13    A    As I sit here today, I don't remember if I did
14 or not.
15    Q    When you were the chief of detectives, were
16 you getting information about the clearing rates?
17    A    Yes.
18    Q    And were you -- was that something you were
19 always paying attention to, how good a job your
20 detectives were doing at clearing cases?
21    MS. ROSEN:  Object to the form.
22    A    I wouldn't say I was always looking it, but
23 that would be something that would be part of my duties.
24    Q    When you joined Area 5 as the commander, what
25 was the clearance rate?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1        MS. ROSEN: Objection. Form.
2    A    I don't remember.
3    Q    Can you say even approximately?
4        MS. ROSEN: Objection. Form.
5    A    I mean, we -- we're talking 25 years ago now
6 or something. I don't -- I don't think so.
7    Q    When you joined Area 5 as the commander, could
8 you say what the clearance rate was approximately for
9 homicide cases?
10        MS. ROSEN: Objection. Form. Foundation.
11    A    Same thing. As I sit here today, no, I don't
12 remember.
13    Q    Was it over or under 50 percent?
14        MS. ROSEN: Objection. Form. Foundation.
15    A    I don't remember.
16    Q    You said it had -- your clearance rate went up
17 during the time that you were the commander, correct?
18    A    I believe so. Yes.
19    Q    How much did it go up? And I'm talking
20 exclusively about homicide cases. How much did it go up
21 on homicide cases?
22        MS. ROSEN: Objection. Form. Foundation.
23    A    I don't know. I don't remember.
24    Q    Was it a couple percentage points, you know,
25 ten, 20, 30 percent -- can you give me any sense?

Page 163

1        MS. ROSEN: Objection. Form. Foundation.
2    A    I don't remember.
3    Q    You mentioned earlier that one of the things
4 you were proud of was closing this case during your time
5 as the commander, correct?
6    A    Yes.
7    Q    Have you had occasion to review the report of
8 Scott Lazzarro's team and Sidley Austin as hired by the
9 City of Chicago?
10    A    No.
11    Q    Are you aware that the City of Chicago hired
12 attorneys at Sidley Austin to conduct a review of
13 Reynaldo Guevara's work?
14    A    No.
15    Q    Are you aware that Scott Lazzaro's team
16 reached a conclusion with regard to the Reyes case about
17 what had occurred?
18        MS. ROSEN: Objection. Form. Foundation.
19    A    No. I'm not.
20    Q    Are you aware that Lazzarro's team issued a
21 report indicating that they found -- they concluded that
22 there had been physical abuse of suspects in this case?
23        MS. ROSEN: Objection. Form. Foundation.
24    A    No. I'm not.
25    Q    I'll represent to you that Lazzarro's team

Page 164

1 reached a conclusion that there had been physical abuse
2 of suspects in this case. What's your reaction --
3 what's your opinion about that?
4        MS. ROSEN: Objection. Form. What's his
5    opinion about what?
6        MR. SWAMINATHAN: That Lazzarro's team
7    reached this conclusion?
8 BY MR. SWAMINATHAN:
9    Q    What's your reaction?
10        MS. ROSEN: Objection. Form.
11    A    I would like to see what they base that on and
12 I haven't even read the reports. So it would be
13 speculation on my part.
14    Q    What shifts did you work as the -- when you
15 were the commander?
16    A    Normally, I'd get in about 9:30 in the morning
17 and stay until 8:00 at night.
18    Q    How many days a week?
19    A    Five.
20    Q    Weekends off?
21    A    Unless something happened and then you would
22 go in.
23    Q    Okay. And then did you have, like, a set time
24 that you would -- that you would leave? Was it 8:00
25 p.m. that you would leave?

Page 165

1    A    Around then, yes.
2    Q    Okay. And did you have lieutenants -- we'll
3 strike that. At the time of the Reyes investigation, do
4 you know what hours you were working?
5    A    As I sit here today, I don't recall.
6    Q    Do you assume it was the same, 9:30 -- around
7 9:30 to around 8:00 p.m.?
8    A    Yeah.
9    Q    Okay.
10    A    I mean, that was my normal. I don't know what
11 this date -- what day of the week was this?
12    Q    Let's see. It looks like April 3, 1998 was a
13 Friday. You would have worked that Friday, April 3rd,
14 from 9:30 to 8:00 p.m. Does that sound right?
15    A    Like I said, as I sit here today, I don't
16 remember. But that was my normal hours.
17    Q    Okay. So if you -- do you have any reason to
18 believe you deviated from your typical practices on that
19 date?
20        MS. ROSEN: Objection. Form. Foundation.
21    A    Not as I sit here today, no.
22    Q    Okay. And so, if -- I doubt that you -- do
23 you remember exactly what hours you worked during the
24 course of the homicide investigation in this case?
25    A    No. But I -- I put in a -- a lot of hours on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  this thing until it was cleared.
2      Q    Do you have -- do you have any ability to say
3  what hours you were there at the station during the
4  course of this investigation?
5      A    As I sit here, no.  I don't remember.
6      Q    Would it be -- would it be fair to assume that
7  you worked your 9:30 to 8:00 p.m. shift on Friday, April
8  3rd?
9          MS. ROSEN:  Objection.  Form.  Foundation.
10     A    As I sit here, I don't remember.
11     Q    Okay.  If you were asked in front of the jury,
12 what hours did you work on Friday, April 3rd, what would
13 you say?
14         MS. ROSEN:  Objection.  Form.  What kind of
15 question is that, if you're asked in front of the
16 jury?
17         MR. SWAMINATHAN:  What would you say?
18         MS. ROSEN:  Asked and answered.  Objection.
19 Form.  Foundation.  Asked and answered and
20 harassing.
21 BY MR. SWAMINATHAN:
22     Q    Go ahead.
23     A    I don't remember.
24     Q    If you were asked what hours that you were at
25 the station on April 4, 1998, what would you say?

1          MS. ROSEN:  Objection.  Form.  Foundation.
2      A    I don't remember.
3      Q    If you were asked what hours you were at Area
4  5 on April 5, 1998, what would you say?
5          MS. ROSEN:  Objection.  Form.  Foundation.
6  You're asking him what he's going to answer about a
7  question in the future.  Is that really what you're
8  asking him?
9          MR. SWAMINATHAN:  Ma'am, I'm asking if he
10 were in front of a jury, what would you -- if they
11 -- if you're asked, what hours were you there on
12 April 4, 1998, what will you say?
13         MS. ROSEN:  Right.  So you are asking him to
14 foresee into the future how he would answer a
15 question, not knowing what information was provided
16 to him to help refresh his recollection or anything
17 else.  Objection.  Form.
18 BY MR. SWAMINATHAN:
19     Q    Go ahead.
20     A    I don't remember.
21     Q    As you sit here today, do you have any memory
22 of what hours you worked on April 4th or April 5th of
23 1998?
24     A    No.
25     Q    As you sit here today, do you have any

1  information from which you can -- you would indicate
2  that you worked something other than your normal hours?
3          MS. ROSEN:  Objection.  Form.  Foundation.
4      A    No.  I mean, I can just tell you what my
5  normal hours were and what -- I don't remember
6  specifically on these days.
7      Q    Okay.  And you have -- and you can't say that
8  you deviated from your normal practices during the
9  period of this investigation; is that fair?
10         MS. ROSEN:  Objection.  Form, foundation, and
11 mischaracterizes his testimony.  He said he put in
12 a lot of hours in this case.
13         MR. SWAMINATHAN:  That's -- for the --
14 please.
15         MS. ROSEN:  Well, don't mischaracterize his
16 testimony.
17     A    I don't recall what hours I worked on this.  If
18 there was something that could refresh my memory, it
19 might help if it says I was at a certain place at a
20 certain time.
21 BY MR. SWAMINATHAN:
22     Q    Okay.
23     A    But, all I remember is we put all -- all put
24 it in a lot of overtime.
25     Q    What would you need to see to be able to

1  identify what hours you were there on April 3rd, 4th,
2  and 5, 1998?
3          MS. ROSEN:  Objection.  Form, foundation,
4  calls for speculation.
5      A    I'd look through the case reports and see if
6  there's any times in there that they have and they have
7  me at on the scene or -- or talking to them.
8      Q    Okay.  And if those documents might indicate
9  to you certain times that you may have been in certain
10 places, within the police reports themselves; is that
11 right?
12     A    Yes.
13     Q    Okay.  And other than looking at the police
14 reports to the extent they mention you being in a
15 certain place at a certain time, is there anything else
16 that would refresh your memory about what hours you were
17 working?
18     A    Well, there was a lot of media out there, so
19 we could find out what time they shot a certain segment
20 and if I'm in that segment, then we could figure out the
21 times from there.
22     Q    Okay.  So essentially, you would have to see
23 some document telling you that you were a certain place
24 at a certain time to be able to refresh your memory
25 about what hours you might have worked other than your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1  normal hours; is that fair?

2  A   Yes.

3  Q   Okay.  And you reviewed a number of documents

4  in preparation for today's deposition.  Did you see any

5  documents that indicated to you that you worked anything

6  other than your normal hours?

7      MS. ROSEN:  Objection.  Form, foundation,

8  calls for speculation.

9  A   No.

10  Q   When you reviewed the documents and reports in

11  preparation for today's deposition, did you see anything

12  that indicated to you that you had been working at a

13  time outside of your 9:30 to 8:00 p.m. shift Monday

14  through Friday?

15      MS. ROSEN:  Objection.  Form.  Foundation.

16  A   No.

17  Q   Did you see any document that indicated to you

18  that you had been in a certain place at a time outside

19  of your normal 9:30 to 8:00 p.m. schedule, Monday

20  through Friday?

21      MS. ROSEN:  Objection.  Form.  Foundation.

22  A   No.

23  Q   You talked earlier about the idea that, as a

24  commander, you had access to the CR histories of your

25  officers if you wanted to review them; is that right?

Page 171

1  A   Yes.

2  Q   Okay.  If you had a detective that had been

3  found previously by CPD internal investigators to have

4  lied on a police report, is that something you'd be able

5  to see if you reviewed CR histories?

6      MS. ROSEN:  Objection.  Form.

7  A   You could see just that there was a CR number

8  that was sustained, but I don't think it had that much

9  information on there.

10  Q   And then, would you then be able to open up

11  that CR and see what it was that had been sustained

12  against that officer?

13      MS. ROSEN:  Open it up.  What do you mean?

14  Q   Well, yeah, fair question -- fair objection.

15  Let me -- let me ask again.  Would you be able to then

16  dig in further -- other than knowing that just that

17  there was a sustained allegation -- would you be able to

18  dig in further and find out what caused the sustained

19  allegation?

20  A   I believe you'd have to go to IAD and get that

21  information.

22  Q   Okay.  So what you had access to was just

23  whether or not there was a sustained allegation, not

24  what the misconduct was that had been sustained; is that

25  right?

Page 172

1  A   As I remember it, yes.

2  Q   Okay.  If you had a detective working under

3  your command at Area 5 who had been found by CPD

4  internal investigators to have lied on police reports in

5  the past, would you want to know that?

6  A   Yes.

7  Q   If you had a detective that had been found by

8  CPD and internal investigators to have lied to them

9  during the course of a CR investigation, would you have

10  wanted to know that?

11  A   Yes.

12  Q   Okay.  And why is that the type of information

13  you would have wanted to know as the commander?

14  A   Because I put them in a non-sensitive

15  position, so that that didn't come back to hurt the

16  case.

17  Q   And what do you mean by "put them in a non-

18  sensitive position"?

19  A   I certainly wouldn't have them working on a

20  case like this if I didn't have to.  I mean, I would try

21  and keep them working on less sensitive cases.

22  Q   Okay.  So if you had an officer for whom there

23  had been a finding that they had lied to internal

24  investigators, you wouldn't want them working on high-

25  profile cases or sensitive cases; is that right?

Page 173

1  A   Yeah.  I'd have to look at all the facts of

2  the case you're talking about, but yeah, that would be

3  my inclination.

4  Q   Okay.  And if you had an officer who would

5  have been found had lied about what had happened during

6  the course of an event resulting in a sustained finding,

7  would you have that individual work homicide cases?

8      MS. ROSEN:  Objection.  Form, foundation,

9  calls for speculation.

10  A   There again, I'd have to see that case and

11  read the -- what happened, why they came to sustaining

12  it.

13  Q   Would you have at least -- oh, I'm sorry.  Go

14  ahead.

15  A   My inclination wouldn't be not to have them in

16  a sensitive position.

17  Q   You have concerns about having that individual

18  involved in homicide investigation; is that fair?

19  A   Yes.

20  Q   Okay.  And is one of the reasons you'd have

21  concerns because credibility is critical for detectives?

22      MS. ROSEN:  Objection.  Form.

23  A   There again, you're asking me to speculate.  I

24  -- I need to know all the facts of this case before I

25  can make my decision.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    Fair -- I mean, let's put aside any specific
2  case. I'll come back -- I'll come back to that. But
3  you agree with me the general point, and that's this:
4  Credibility is critical for detectives?
5          MS. ROSEN: Objection. Form.
6  A    Yes.
7  Q    And why is credibility critical for
8  detectives?
9  A    Because the -- the judge is going to determine
10 the credibility of the case in court.
11 Q    They have to testify in court cases, right?
12 A    Yes.
13 Q    And homicide detectives have to testify in
14 really high stakes cases, murder cases, right?
15         MS. ROSEN: Objection. Form.
16 A    Yes.
17 Q    And it's critical that they be somebody then
18 who is trustworthy when they're on the stand, testifying
19 in murder cases, fair?
20 A    Yes.
21 Q    And it's critical that you don't have somebody
22 on the stand testifying in a murder case where the other
23 side might be able to confront them with something that
24 showed that they've lied in the past; is that fair?
25         MS. ROSEN: Objection. Form. Foundation.

1  A    Yes.
2  Q    And even as a commander and a supervisor, your
3  -- you don't want somebody working on your
4  investigations who has had some issues with being honest
5  in the past; is that fair?
6          MS. ROSEN: Objection. Form. Foundation.
7  A    Yes.
8  Q    If you have a detective who's accused of --
9  well, I'll use an example. If you have a detective
10 who's accused of abusing somebody, a witness, okay? And
11 there's a CR investigation into that. And during the
12 course of the investigation, the officer denies having
13 abused the witness, and the internal investigators find
14 that in fact, the evidence shows that they did abuse the
15 witness. And so this finding is sustained that they had
16 in fact abused the witness. That's an example of a case
17 that would present credibility concerns, do you agree
18 with me?
19         MS. ROSEN: Objection. Form. Foundation.
20 A    Sir, you're asking me to speculate on
21 something I don't have all the facts.
22 Q    That's fair. In that case, let me just ask a
23 general question. If you have a detective -- if you had
24 a detective working under you, who denied abusing a
25 witness, and an internal investigation resulted in a

1  sustained finding that they had abused the witness,
2  would that present credibility concerns to you?
3          MS. ROSEN: Objection. Form, foundation,
4  calls for speculation.
5  A    There again, you're asking me to speculate on
6  something I don't have all the facts.
7  Q    Can't say either way?
8  A    No.
9  Q    You became the deputy chief over Organized
10 Crime in 2000, correct?
11 A    Yes.
12 Q    And what groups of folks were you supervising
13 in that role?
14 A    Narcotics, Gangs, and Vice.
15 Q    And those were all -- none of those were Gang
16 Crimes officers, correct? Sorry. Strike that. Let me
17 ask a question. Were Gang Crimes officers under your
18 supervision when you were a deputy chief of organized
19 crime?
20 A    Yes.
21 Q    Okay. And detectives were not, correct?
22 A    No.
23 Q    Okay. And then in 2001, you became the chief
24 of detectives, right?
25 A    Yes.

1  Q    Who did you replace?
2  A    I can't think of the name as I sit here now.
3  Q    And did you have first deputies who worked
4  under you? I'm sorry, did you -- sorry. Yeah. Go
5  ahead. Who worked under you?
6  A    The deputy chiefs.
7  Q    How many deputy chiefs did you have?
8  A    Three.
9          MS. ROSEN: Objection. Relevance.
10 Q    Who was your deputy chief on the north side?
11         MS. ROSEN: Objection. Relevance.
12 A    I don't remember his name.
13 Q    Did you report directly to the superintendent?
14         MS. ROSEN: Objection. Relevance.
15 A    Yes.
16 Q    And did you work --
17 A    There's a deputy superintendent for
18 investigative services that I also reported to.
19 Q    Say that last part again.
20 A    Deputy superintendent for investigative
21 services, I reported to him also.
22 Q    Okay. And you worked out of police
23 headquarters?
24 A    I'm sorry, what?
25 Q    You worked out of police headquarters?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

1     A    Yes.

2     Q    Okay.  So let me just ask you, what was -- as
3  the chief of detectives, what was your job?

4          MS. ROSEN:  Objection.  Relevance.  This is
5     past the Solache, Reyes investigation.  How in the
6     world is this relevant?

7          MR. SWAMINATHAN:  It's relevant to notice
8     because I want to know what the chief of
9     detective's role is in the department.  Go ahead.

10         MS. ROSEN:  And how is that relevant to the
11    Solache, Reyes investigation in 1980 -- 1998?

12         MR. SWAMINATHAN:  Because I -- it is
13    perfectly fair to ask him what were the -- what
14    were the responsibilities of the chief of
15    detectives three years after this case.  It's
16    certainly relevant to what the job was of the chief
17    of detectives three years earlier.

18         MS. ROSEN:  Relevant to what?  To what claim?

19         MR. SWAMINATHAN:  It's relevant to every
20    aspect of our Monell claim.

21         MS. ROSEN:  Oh, my God.  Fine.  Spend your
22    time how you wish.

23    A    Well, the chief of detective's responsible for
24 the investigation of all crimes that occur in the City
25 of Chicago.  To -- you're in command of all the

Page 179

1  commanders, deputy chiefs, lieutenants, sergeants, and
2  detectives that are covering and investigating those
3  crimes.

4  BY MR. SWAMINATHAN:

5     Q    And as the chief of detectives, do you have
6  any role in the actual investigation of homicide --
7  individual homicide cases?

8     A    No.

9     Q    In what ways -- obviously, as a commander,
10 your jurisdiction is much smaller.  As the commander of
11 Area 5, your jurisdiction was just detectives within
12 Area 5, and as the chief of detectives, your scope
13 includes all detectives within all areas, right?

14    A    Yes.

15         MS. ROSEN:  I object to the form of that
16    question.

17    Q    But in -- as the commander, what was your
18 overall role or responsibility at Area 5?

19    A    The commander of Area 5 is responsible for
20 those supervisors and the detectives who are assigned
21 Area 5, and the chief of detectives has the whole city.

22    Q    And as the commander of Area 5, what was the -
23 - what was your job -- what were your responsibilities
24 in terms of advancing investigations, if any?

25    A    Make sure that the resources are there that

Page 180

1  the detectives need to do their job.

2     Q    Was your job largely administrative as the
3  commander?

4          MS. ROSEN:  Objection.  Form.

5     A    I'd say it's more administrative than it is
6  street.

7     Q    And as chief of detective, is your role
8  largely administrative?

9     A    Yes.

10         MS. ROSEN:  Objection.  Form.

11    Q    As the chief of detectives, would you
12 establish policies to be applied throughout the areas?

13         MS. ROSEN:  Objection.  Form.

14    A    Yes.

15    Q    And what was your role with regard to
16 policymaking?

17         MS. ROSEN:  Objection.  Form.

18    A    You would review the current policy and see if
19 anything needed changing, and then you would have that
20 done and then have it sent out to the areas and make
21 sure that there's training for it and do it.

22    Q    When you were the commander, what was your
23 role with regard to policymaking?

24         MS. ROSEN:  Objection.  Form.

25    A    You would only make policy that would affect

Page 181

1  your area, not the whole city.

2     Q    And so what kind of policy would you make at
3  the commander level?

4     A    That's -- it is the commander level.  It's
5  just affecting that area.

6     Q    Okay.  And then -- and as the commander, were
7  there -- how would policy -- how would policies be
8  promulgated by the commander?

9     A    He would just -- like I talked to you earlier
10 about traveling out to Hammond to the hospital where a
11 man was shooting victims, the commander was the one who
12 would set the policy for what that has to be done on
13 that.  The chief of detectives would cover the whole
14 city and the commander would cover only his area.

15    Q    Okay.  So the chief of detectives could set
16 policy across all detective units across all areas,
17 correct?

18    A    Yes.

19    Q    And the commander could set policy across all
20 units within the area -- within its given area, correct?

21    A    Yes.

22    Q    Okay.  Do the lieutenants working under a
23 commander have any policy-making authority?

24         MS. ROSEN:  Objection.  Form.

25    A    No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    Would they help set policy within the areas?

2         MS. ROSEN:  Objection.  Form.

3    A    They would work with the commander on

4    something that they felt they needed to put policy in.

5    Q    As the chief of detectives, did you conduct

6    any audits to assess whether policies were being

7    followed across areas?

8         MS. ROSEN:  Objection.  Form.

9    A    There would be your commanders that would be

10   doing that, and they would be reporting back to you what

11   they found.

12   Q    As the chief of detectives, what type of

13   reports did you receive?

14        MS. ROSEN:  Objection.  Form.  About

15   anything?

16   Q    Yeah.  In terms of -- under your command, you

17   had -- you would have all of the investigations that are

18   happening or happening under your command as chief of

19   detectives.  So what kind of reports were you getting

20   about investigations being conducted by detectives as

21   the chief of detectives sitting way up high?

22        MS. ROSEN:  Objection.  Form.

23   A    I don't remember the actual reports that were

24   pushed up, but I mean, there would be a paper flow of

25   letting you know what's happening in that area --

1    Q    And would that include -- I'm sorry, go ahead.

2    A    -- crime patterns, homicides, clear-ups from

3    homicides that had information.

4    Q    As chief of detectives, any time new homicides

5    were occurring, would you get information about that?

6         MS. ROSEN:  Objection.  Form.

7    A    Yeah.  You would get basic information about

8    all crimes that were of an important nature, homicide

9    being one of them.

10   Q    As the chief of detectives, would you get

11   reports of -- as homicide cases were being closed across

12   areas?

13        MS. ROSEN:  Objection.  Form.

14        MR. SWAMINATHAN:  Not as they happen, but I

15        mean, as part of a monthly report, you'd get

16        information.

17   BY MR. SWAMINATHAN:

18   Q    And would you get -- would that include

19   information about what cases had been closed and who

20   would close them, those kinds of things?

21        MS. ROSEN:  Objection.  Form.  Did you say

22        who would close them?

23        MR. SWAMINATHAN:  Yeah.

24        MS. ROSEN:  Meaning like what specific

25        detective?

1         MR. SWAMINATHAN:  Yes.  Exactly.

2         MS. ROSEN:  Objection.  Form.

3    A    Not that I recall anything like that.

4    BY MR. SWAMINATHAN:

5    Q    When you were the commander, would you get

6    information about what cases were being closed and who

7    was closing them?

8         MS. ROSEN:  Objection.  Form.

9    A    Yes.

10   Q    And how would you get that information?

11   A    Probably mostly oral.

12   Q    Did you have any reports that you were getting

13   that would tell you, hey, here are the cases, here are

14   the detective assigned, here are the cases they're

15   closing?

16   A    Not that I recall.

17   Q    Did you have any information about clearance

18   rates by each detective?

19   A    There was some kind of a rating of the

20   detectives, but I don't remember specifically what the

21   form was.

22   Q    That rating form, was it -- how often was that

23   created?

24   A    I believe it was quarterly.

25   Q    And what type of information was included on

1    that rating form?

2    A    How many crimes they were assigned, how many

3    cases they cleared.  Basic information like that.  I

4    don't recall exactly what it was.

5    Q    Okay.  And when you say "rating," I imagine,

6    like, an actual rating.  Like you get an A, you get a B,

7    you get a C, was it like that?  Would you get a rating

8    like that?

9    A    It's just strictly statistics.

10   Q    Okay.  All right.  Other than the number of

11   cases they were assigned and the number of cases they

12   had closed, any other statistic you can remember being

13   on that rating form?

14   A    Arrests.

15   Q    Anything else?

16   A    Not offhand.

17   Q    Arrests would be basically all the cases on

18   which they're listed on that arrest report when --

19   A    Yes.

20   Q    -- when it's cleared?  If you had off -- if

21   you had detectives who had low clearance rates when you

22   were getting those reports, would you talk to them about

23   it?

24        MS. ROSEN:  Objection.  Form.

25   A    I wouldn't, but their supervisor would.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q   So you had communications with their
2 supervisors to say, hey, you know, talk to this guy?
3  A   Yeah.  Seeing what the problem is.  Does he
4 have a problem at home that's affecting his work, what
5 can we do to help him?  And what -- what -- what's
6 happening here.
7  Q   As the -- when you were the commander at Area
8 5, obviously, you're always trying to get the clearance
9 rates up on homicides, right?
10 A   Yes.
11 Q   What tools did you have available to you to
12 incentivize detectives to close cases and to clear
13 cases?
14     MS. ROSEN:  Objection.  Form.
15 A   I mean, you're -- you're trained to appeal to
16 their -- why they became detectives, is to help clear
17 those cases and they can't do it, then maybe you need to
18 move somebody out of that position and put them in a
19 different position.
20 Q   Where could you move detectives who were, you
21 know, who just didn't seem to be up to the job?
22 A   Within the RME, homicide is -- is considered,
23 or at least when I was there was, considered a prime
24 spot for work.  And you had robbery, burglary, general
25 assignments that handled lesser cases.  So taken

1 detectives working homicide, and if he's not working out
2 there you move him to handling interrogatories and
3 fixing incentive for him to stay there and -- and do a
4 better job instead of homicide.
5  Q   And to what incentives was just the kind of
6 cases they got assigned?
7  A   I'm sorry, what?
8  Q   One thing you could use as an incentive was
9 changing what cases they got assigned?
10 A   Yes.
11 Q   Okay.  And was that something you would
12 sometimes do, is try to incentivize them by giving them
13 different cases?
14 A   I'm sure I did.  I just don't remember any
15 specifics.
16 Q   Okay.  And why was homicide detective
17 considered, you know, a better job?
18     MS. ROSEN:  Objection.  Form.  Foundation.
19 A   Just any -- considered an elite unit and --
20 for people could be part of it.
21 Q   And for detectives who were working on other
22 cases, property crimes and other crimes that they did a
23 good job clearing cases, could an incentive be to then
24 get to be a homicide detective?
25     MS. ROSEN:  Objection.  Form.

1  A   Yes.
2  Q   When -- was it the case that you'd sometimes
3 have property crimes detectives and others assist on
4 homicide investigations?
5  A   Yes.
6  Q   And they did a good job on those
7 investigations, could they get assigned more homicides?
8  A   They'd have to maybe be moved over to the
9 homicide unit.
10 Q   So you could incentivize the property crimes
11 guys by giving them a chance to become violent crimes
12 detectives if they did good job; is that fair?
13     MS. ROSEN:  Objection.  Form.
14 A   Yes.
15 Q   Okay.  Was overtime an incentive that was
16 available to you to help reward the good detectives?
17     MS. ROSEN:  Objection.  Form.  Foundation.
18 A   I mean, I couldn't give them overtime just to
19 incentive by them, but I mean, there was the opportunity
20 to work a lot of overtime in homicide.
21 Q   Why is that?
22 A   Just because of the -- the types of
23 investigation, types of cases you had to do.
24 Q   And how could a detective, homicide detective
25 get more overtime?

1     MS. ROSEN:  Objection.  Form.
2  A   By working those cases.
3  Q   If a homicide detective closed more cases,
4 would they typically get more overtime?
5     MS. ROSEN:  Objection.  Form.
6  A   No.
7  Q   If a homicide detective worked second shift,
8 or the homicide detective worked first shift or third
9 shift, then they would get overtime when they went to
10 court, right?
11 A   Yes.
12     MS. ROSEN:  Objection to form.
13 Q   And so, for detectives on first shift and
14 third shift, closing cases would give them an
15 opportunity to earn more overtime going to court; is
16 that true?
17     MS. ROZEN:  Objection to form.
18 A   Yes.
19 Q   And was that incentive that was -- that you
20 had available to you at all to help them try to get more
21 overtime?
22     MS. ROSEN:  Objection.  Form.
23 A   They got paid overtime for working overtime,
24 not as an incentive.
25 Q   Did you have some detectives who wanted to



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 work first shift or second shift -- sorry. Did you had
2 some detectives who wanted to work first shift or third
3 shift so they could get more overtime?
4     MS. ROSEN: Objection. Form. Foundation.
5     Calls for speculation.
6 A   I don't know their motive.
7 Q   Was there a shift that typically was able to
8 get more overtime than other shifts?
9     MS. ROSEN: Objection. Form. Foundation.
10 A   First and third watch because court was held
11 during the second watch.
12 Q   And what -- which shift was one of the most
13 coveted among detectives?
14     MS. ROSEN: Objection. Form. Foundation.
15     Calls for speculation.
16 A   It depends on the individual detectives, just
17 there's, you know, school issues with their kids and
18 they need to be home for childcare during certain hours.
19 So it all depended on each individual detective. We
20 tried to satisfy what they needed as much as we could.
21 Q   All right. I want to ask you -- let's --
22 strike that. In terms of -- what was the role of
23 sergeants on homicide cases under your command?
24 A   To make sure that first of all, if there was
25 enough resources there to work the case. You need four

1 detectives, six detectives, you know how -- how
2 complicated is this investigation that you might need
3 more people. Making sure that they're doing the right
4 things and that their reports are right.
5 Q   Would they play an active role in homicide
6 investigations?
7 A   Yes.
8 Q   Was it your expectation that the sergeants
9 working under you played an accurate role in the on-site
10 investigations?
11 A   Yes.
12 Q   And that they were up to speed on all the
13 investigations that were being conducted by their
14 detectives?
15 A   Yes.
16 Q   Okay. And then what about --
17     MS. GOLDEN: And a belated objection to form
18     for that question.
19 Q   And then, what about lieutenants? Did you
20 have the same expectation as to them, or were they
21 somewhat removed from the active investigation process?
22     MS. ROSEN: Objection. Form.
23 A   They were making sure that sergeants were
24 doing their job. I mean, the division was a big part of
25 it, making sure that the Ts are crossed and the Is are

1 dotted, and the resources they need are there.
2 Q   Were the lieutenants less involved in the day-
3 to-day investigation than sergeants?
4 A   Yes.
5 Q   And was it thought more rare for lieutenants
6 to be involved in, you know, actively going out in the
7 street investigating cases?
8 A   Oh, not many. They would go out and see
9 what's going on. And -- but they had all these cases to
10 worry about, and I just
11 Q   Okay. We've talked about policies to some
12 extent. And let me ask you about the special orders and
13 general orders. Were those -- the special orders and
14 general orders are types of policies, correct?
15 A   Yes.
16 Q   Okay. And were those mandatory or are those
17 guidelines?
18 A   Guidelines.
19 Q   So the special -- so -- and for detectives,
20 there were special orders that provided some guidelines
21 about how they were to perform their jobs, right?
22 A   Yes.
23 Q   Okay. And those were basic considered sort of
24 high-level guidance on how to do your job but not
25 required; is that fair?

1 A   Yes. They're guidelines.
2 Q   Okay. And then, in terms of what detective
3 was expected to do and not do on a day-to-day basis,
4 that was not set by policy, but by within the
5 department; is that right? Or within the unit?
6     MS. ROSEN: Objection. Form. I don't
7     understand the question.
8 A   I don't understand the question.
9 Q   Let me ask a better question. And let's just
10 focus on homicide detectives. You supervised them as a
11 lieutenant than the commander in chief of detectives,
12 right?
13 A   Yes.
14 Q   In terms of -- based on your experience, in
15 terms of what homicide detectives were expected to do
16 and not do when they were conducting their
17 investigations, who was responsible for setting those
18 expectations?
19     MS. ROZEN: Objection. Form.
20 A   The sergeant is the one that is making sure
21 that they're doing the right things.
22 Q   Okay. So in terms of day-to-day, what the
23 expectations are about what detectives are doing or not
24 doing, that is -- that's being set by sergeants; is that
25 right?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

1        MS. ROSEN: Objection. Form.
2    A    Yes.
3    Q    Okay. And so, when you say -- strike that.
4  And so, would you say it was generally the sergeants who
5  were responsible for putting forth the do's and don'ts,
6  how detectives under their command did their job?
7        MS. ROSEN: Objection. Form.
8    A    Yes.
9    Q    I think you said this a few times, but there
10  are a number of case-by-case determinations that happen
11  in homicide cases, right?
12        MS. ROSEN: Objection. Form. Asked and
13    answered.
14    A    I don't understand the question.
15    Q    Yeah. I think you've said a couple of times
16  it depends on the circumstances or, you know, the case-
17  by-case thing. I mean, in other words, what I'm saying
18  is, there's a lot of case-by-case determinations that
19  have to be made in homicide cases, correct?
20    A    Yes.
21    Q    Okay. And if I understand correctly,
22  determinations about what you do with those given
23  instances is not really -- it's not told to you by
24  policies issued by the chief of detectives, right?
25    A    No.

Page 195

1    Q    Those decisions are made by the detectives and
2  the sergeants about how to handle those situations; is
3  that right?
4        MS. ROSEN: Objection. Form.
5    A    Yes.
6    Q    In other words, decisions about how to handle
7  the conduct of homicide investigations, that was
8  delegated to the sergeants to work with the detectives
9  on; is that right?
10        MS. ROSEN: Objection. Form.
11    A    Yes. Under the supervision of the lieutenant.
12    Q    Okay. And so, the lieutenant was also
13  somebody who might have some stay in determining what
14  are -- how homicide investigations are going to be
15  conducted; is that right?
16    A    Yes.
17        MS. ROZEN: Objection. Form.
18    Q    As the -- as -- both in your capacity as chief
19  of detectives and as the commander, would you say that,
20  in terms of how to go about conducting homicide
21  investigations and the expectations of how that was
22  being done, you delegated that responsibility to
23  lieutenants and sergeants?
24        MS. ROSEN: Objection. Form.
25    A    Yes.

Page 196

1    Q    Okay. As the chief of detectives, would you
2  say that you put any specific restrictions in place on
3  what homicide detectives were doing?
4        MS. ROSEN: Objection. Form.
5    A    No.
6    Q    As the commander, did you put any rules or
7  restriction in place because of what homicide detectives
8  were doing?
9        MS. ROSEN: Objection. Form.
10    A    No.
11    Q    As -- was it your understanding that your
12  lieutenants would have had some role in putting in place
13  the rules and restrictions that the homicide detectives
14  were following?
15        MS. ROSEN: Objection. Form.
16    A    There again, each case is different, so it
17  would depend on, you know, the case and what was
18  required.
19    Q    And so, to the extent there was determinations
20  about what was going to be done and we'll -- strike
21  that. To the extent they were rules or restrictions
22  being put in place on a given homicide case, that was
23  going to be coming from either the sergeant or the
24  lieutenant; is that right?
25        MS. ROSEN: Objection. Form. What are you

Page 197

1    talking about, rules and restriction?
2        MR. SWAMINATHAN: Go ahead?
3    A    That's -- I have a -- yeah, I don't understand
4  how rules, restrictions apply to a homicide case.
5  BY MR. SWAMINATHAN:
6    Q    Yeah. I did -- I mean, were there any
7  prohibitions? Hey, here's things you just cannot do as
8  a homicide detective, I'm not going to allow it.
9    A    But that would be general, not just specific
10  for that case.
11    Q    And so, to the extent there were do's and
12  don'ts about, you know, what you can do as homicide
13  detectives, where was that coming from?
14        MS. ROSEN: Objection. Foundation.
15    What are do's and don'ts?
16    A    The policy would come from the chief of
17  detectives, but it would be carried out by the sergeants
18  and lieutenant.
19    Q    But the policy I think you indicated was just
20  a guideline, right?
21    A    Yes.
22    Q    And so, really, in terms of what you actually
23  can and cannot do, in sort of putting actual rules in
24  place for detectives that's coming from the sergeants
25  and lieutenants; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1        MS. ROSEN:  Objection.  Form.  Foundation.
2    What rules?
3    A    Yeah, I'm not sure I understand the question.
4    Q    In other words, the policy doesn't tell a
5    detective what they have to do in any instance because
6    it's merely guideline; can we agree?
7    A    Yes.
8    Q    But on any given case, there could be some
9    restrictions on what a detective can and cannot do.  And
10   that is going to be set by a sergeant and a lieutenant;
11   is that right?
12       MS. ROSEN:  Objection.  Form.  Foundation.
13   Incomplete hypothetical and not fact-based.  What
14   are you talking about?
15   A    I can't think of an instance or what you're
16   talking about would occur.  But you can do it on this
17   case, but you can't in that case.  I don't understand
18   what you mean.
19   BY MR. SWAMINATHAN:
20   Q    You know, you have situations where a family
21   member comes to the station and says, Hey, you've got
22   my, you know, my son or daughter in an interrogation
23   room.  I want to talk to him.  You with me so far?
24   A    Okay.
25   Q    Yeah.  In that situation, is there a policy

Page 199

1    that says, "This is what you have to do when that
2    happens"?
3    A    Not that I'm aware of.
4    Q    Okay.  But in terms of making decisions about
5    what to do in that type of situation, the decisions are
6    going to be made by sergeants and lieutenants; is that
7    right?
8        MS. ROSEN:  Objection.  Form.  Foundation.
9    Calls for speculation.
10   A    Yes.
11   Q    Okay.  So in other words, in terms of making
12   determinations about how to handle what you do when a
13   given situation comes up in a homicide case, resolving
14   those questions is done by sergeants and lieutenants,
15   right?
16       MS. ROZEN:  Objection.  Form.  Foundation.
17   A    It could be a detective.
18   Q    Or the detective themselves?  In other words,
19   the decision-making is taking place either at the level
20   of the detective, sergeant or lieutenant, correct?
21   A    Yes.
22   Q    Okay.  And so -- I'm being clear about that,
23   when it comes to decision-making when it comes to how to
24   handle circumstances that come up in a homicide
25   investigation, those determinations are being made by

Page 200

1    detectives and their sergeants and lieutenants, correct?
2        MS. ROSEN:  Objection.  Form.  Foundation.
3    Calls for speculation and incomplete hypothetical.
4    A    There again, it would depend on -- give me an
5    indication of what you're talking about.  I mean, is it
6    the state police coming in to talk to us because they
7    want to talk about jurisdiction on -- on homicide, then
8    that would probably be the commander would handle that.
9    If it's somebody wants to see somebody and the detective
10   thinks that that's not going to hurt the case, the
11   detective can make a decision on that.
12   Q    I guess what I'm -- what I'm saying is, if you
13   -- the decisions have got to be made during the course
14   of homicide investigations about how to handle all kinds
15   of things that come up, right?
16   A    I'm mean -- I'm -- you're losing me.
17   Q    Yeah.  Let me -- what I'm just trying to
18   understand is -- what I'm trying to understand is the
19   relationship to these guidelines or policies, right?  And
20   so, my understanding is when a homicide detective is
21   making a determination about, you know, how to handle a
22   situation that comes up in a homicide case, including,
23   for example, the parent showing up at the station,
24   right?  The policies don't tell them what they have to
25   do or have to not do, right?

Page 201

1        MS. ROSEN:  Objection.  Form.  Incomplete
2    hypothetical.  Foundation.
3    A    Yes.
4    Q    What does tell them -- now they might make a
5    decision on their own about what they have to do, right?
6        MS. ROSEN:  Objection.  Form.
7    A    Yes.
8    Q    And to the extent anybody else participates in
9    that decision about what to do, it's going to be the
10   sergeants and the lieutenants, right?
11       MS. ROSEN:  Objection.  Form.
12   A    Or as I just mentioned, depending on if it's
13   the state police coming in to talk about jurisdiction,
14   then their commander will probably meet with them and
15   talk about it.  It all depends on what the detective --
16   the detective is the first one they're going to
17   encounter.  He or she is going to make a decision
18   whether they can handle it at their level or should it
19   go up higher.
20   Q    Has it worked in the -- in Area 5 when you
21   were the commander?  The chief of detectives was never
22   telling homicide detectives what to do on homicide
23   cases.  Do you agree with that?
24       MS. ROSEN:  Objection.  Form.  Foundation.
25   Incomplete.  Hypothetical.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 202

1    A    Normally, but there may be a thing where the -
2  - the chief of detective says he might -- his guys look
3  at this shift or I might just look at, but I mean, he
4  would not direct the investigation.
5    Q    And as a commander at Area 5, you were not
6  telling detectives what they had to do on their
7  investigations, correct?
8         MS. ROSEN:  Objection.  Form.  Foundation.
9    A    No.  But the same instance, if there was
10 something that I saw it hadn't been done, I would tell
11 the detectives to go do it.
12   Q    Were the lieutenants telling detectives what
13 they had to do on their homicide investigations?
14        MS. ROSEN:  Objection.  Form.
15   A    Same thing as -- as -- as the chief and the
16 commander.  If he sees something that needs to be done,
17 then he's going to tell them to do it.
18   Q    Now, the sergeants, they would tell detectives
19 what they wanted them to do on homicide investigations,
20 correct?
21        MS. ROSEN:  Objection.  Form.
22   A    They're immediate supervisor.
23   Q    Go ahead.
24   A    They're the immediate supervisor.  So they
25 would be responsible for making sure how you have a

Page 203

1  license plate mentioned in there, who's the register,
2  can you get that in your report, those type of things.
3    Q    And would you say that in terms of the
4  practices that were followed by homicide detectives day-
5  to-day at Area 5, those practices were really being set
6  on a day-to-day basis by the sergeants; is that fair?
7         MS. ROSEN:  Objection.  Form.  Foundation.
8  Incomplete, hypothetical, vague as to the term
9  "practices."
10   A    Other than what I talked about earlier about
11 depending on whether that person that's handling wants
12 to kick it up the -- the chain of command.  Yes.  The
13 sergeants make most of the decisions.
14   Q    All right.  We talked earlier about the Reyes
15 -- well, I guess, it's the Soto murder investigation.
16 You know what I'm referring to, right?
17   A    I'm sorry.  What?
18   Q    Sorry.  Let me ask you a better question.  The
19 deposition you're here for today is involves the murder
20 of the Soto family, right?  The husband and wife?
21   A    Yes.
22   Q    Okay.  I'm ref -- and I'll refer to that as
23 the Soto investigation or the Soto murder investigation.
24 Does that make sense to you?
25   A    Sure.

Page 204

1    Q    You understand that I'm talking about the case
2  that resulted in charges against Arturo Reyes and
3  Gabriel Solache and Adriana Mejia.
4    A    Yes.
5    Q    When you found out you were being deposed in
6  this case, did you remember the name Arturo Reyes?
7    A    No.
8    Q    Did you remember the name Gabriel Solache?
9    A    No.
10   Q    Did you remember the name Adriana Mejia?
11   A    No.
12   Q    Did you remember any facts about the
13 underlying crime?
14   A    Yes.  I remember what -- what the motive was
15 for.
16   Q    And what did you rem -- and what did you
17 remember?  What -- just when you knew you were being
18 deposed in this case.  Without having looked at any
19 documents, what did you remember?
20   A    That Mejia wanted a baby and falsified her
21 pregnancy.  Her friend and the Soto woman entered a bus
22 and followed her home and came back, and it was either
23 that night or the same night and stabbed the -- the Soto
24 husband and wife and took two little kids.  And then I
25 remembered that the friend of theirs was watching the

Page 205

1  three-year-old and saw him on his Patron TV because that
2  was one of the things we did is, we really went to the
3  media and asked them to get these pictures of the kids
4  out because that's how we felt we would solve this
5  crime.  And that he came into the 8th District with the
6  three-year-old.  And from there, we were able to arrest
7  all three of them and recover the baby, and like I said,
8  that was great police work by the officers assigned to
9  that.
10   Q    So you have some -- you have memory basically
11 of the overall facts of the underlying crime and how the
12 invest -- you know, how the investigation proceeded at
13 the early stages; is that right?
14   A    Yeah.  I mean, I -- I was heavily involved in
15 this one because of the type of crime, and the fact that
16 we wanted to get these two babies back home safely.  And
17 as far as I remember the, you know, the things that were
18 doing it was -- it a lot of people.  I used people from
19 Area 5, property crimes from other units were available,
20 Spanish speakers, FBI.  We had a lot of people involved
21 to help this case.
22   Q    And what specific things -- before looking at
23 any documents.  Just when you found out you were being
24 deposed in this case.  Obviously you remembered it was
25 this double murder, double kidnapping case, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1    A    Yes.
2    Q    And what specific things did you remember that
3  you did on the investigation?  Just based on your
4  memory?
5    A    Getting all the information out to the media,
6  requesting the FBI, and making sure that we had enough
7  detectives working the case.  This was an all hands-on
8  deck case and asked property crimes detectives they help
9  with the canvassing.  We used every resource that was
10 available to us.
11   Q    Anything else you remember -- you specifically
12 remember doing when you first learned that you were
13 being deposed in this case, other than getting info to
14 the media, requesting the FBI's involvement, making sure
15 you had enough detectives and having property crimes
16 help with the canvassing?
17        MS. ROSEN:  Objection.  Form.
18   A    It's basically what I remember.
19   Q    Do you remember any specific conversations
20 that you had with anyone about this investigation?
21   A    No.
22   Q    Do you recall any conversations that you had
23 with Reynaldo Guevara during the course of this
24 investigation?
25   A    No.

Page 207

1    Q    You had -- you know whether you ever spoke to
2  Reynaldo Guevara during the course of this
3  investigation?
4    A    As I sit here now, I don't remember.
5    Q    Did you -- do you recall having any
6  conversations with Ernest Halvorsen?
7    A    No.
8    Q    You would know whether you spoke to Ernest
9  Halvorsen during the course of this investigation?
10   A    No.  I don't.
11   Q    Do you recall having any conversations with
12 Detective Rutherford?
13   A    No.
14   Q    And if -- do you know whether you had any
15 conversation with Detective Rutherford?
16   A    No.
17   Q    Did you have any conversations with Detective
18 Dickinson?
19   A    Not that I remember.
20   Q    Did you have any conversations with Detective
21 Santo Padre?
22   A    Not that I remember.
23   Q    Did you have any conversations with Youth
24 Officer Trevino?
25   A    Not that I remember as I sit here today.

Page 208

1    Q    Did you have any conversations with Ed Mingey?
2    A    I don't recall.
3    Q    As you sit here today, can you say one way or
4  the other whether you had any conversations with
5  Detective Mingey?
6    A    No.
7        MS. ROSEN:  Sergeant Mingey?
8    Q    I'm sorry.  With Sergeant Mingey?
9    A    No.
10   Q    Did you have any conversations with Berscott
11 Ruiz?
12   A    Not that I remember.
13   Q    Did you have any conversations with Alan
14 Pergande?
15   A    Not that I remember.
16   Q    Do you recall if there were any Spanish
17 speakers at Area 5 during the course of this
18 investigation?
19        MS. ROSEN:  Did you mean police personnel or
20 -
21 -
22        MR. SWAMINATHAN:  Thank you.  Yeah.
23 BY MR. SWAMINATHAN:
24   Q    Were there any -- do you recall what Spanish-
25 speaking police officers there were that participated in

Page 209

1  this investigation?
2    A    I remember looking at the re -- the reports in
3  preparing for this, I remember seeing Guevara, Trevino.
4  There was another youth detective name I saw I don't
5  remember who it was.
6    Q    Is your knowledge about who among the police
7  officers was a Spanish speaker, is that based entirely
8  on documents?
9        MS. ROSEN:  Objection to form.
10   Q    Go ahead.
11   A    Yes.  I don't remember independently.
12   Q    Do you have -- did you have any conversations
13 with Robert -- Sergeant Bibo about this investigation?
14   A    Not that I recall.
15   Q    Did you have any conversations with Sergeant
16 Cappitelli about this investigation?
17   A    Not that I remember.
18   Q    Did you participate in the interrogation of
19 any suspect in this investigation?
20   A    No.
21   Q    Did you participate in the interviewing of any
22 witnesses during the course of this investigation?
23   A    No.
24   Q    Right.  We talked with you that this was a
25 heater case.  Just tell us what you mean by that term



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  "heater case."

2      A    A case that draws a lot of media attention. A
3  lot of attention might be political. The mayor and the
4  superintendent might be asking about it. In this
5  particular case, it was the two kids missing that made
6  it such a heater case. Everybody was worried. We
7  wanted to find those kids before any harm ended up.

8      Q    And so obviously, there was media coverage of
9  this case, correct?

10     A    Yes.

11     Q    Okay. And were higher-ups at CPD also paying
12  attention?

13     A    Yes.

14     Q    And who was that?

15     A    Chief of detectives. That's the only one I
16  spoke to, but I'm sure the superintendent was involved
17  too.

18     Q    And were they contacting you? The chief --
19  was the chief of detectives contacting you about this
20  case?

21     A    Yes.

22     Q    Did you have some conversations with the chief
23  of detectives about it?

24     A    Yes.

25     Q    What did the chief of detective say to you?

1      A    Are we getting this out to the media? And I
2  said yes. And he said, okay. That's good. And do you
3  need anything? And I said no, we're all set right now.

4      Q    Anything else?

5      A    Not that I recall sitting here, no.

6      Q    Was chief of detectives checking in with you
7  regularly about this investigation?

8      A    I don't remember.

9      Q    Were you making calls up to the chief of
10  detectives about this investigation?

11     A    I would have probably called my deputy chief
12  and he would have relayed it.

13     Q    And so you were keeping the deck -- the deputy
14  chief up to date on what was happening?

15     A    Yes.

16     Q    Were they telling you that they wanted to see
17  this case get closed?

18          MS. ROSEN:  Objection. Form.

19     A    No.

20     Q    Were they telling you they wanted to see this
21  case get solved?

22          MS. ROSEN:  Objection. Form.

23     A    No.

24     Q    In terms of -- well, strike that. When you
25  were being -- you were actually getting calls from your

1  higher-ups about this case. Did you communicate that
2  down the chain to the people working under you, that
3  there was the higher-ups who were paying attention to
4  this case?

5          MS. ROSEN:  Objection. Form.

6      A    No. I mean, I -- I remember getting everybody
7  together and telling them we wanted to find these kids
8  and get them home alive, and that's as much to the -- to
9  the troops that I did. The chief of detectives just
10  told me and -- what I told you earlier about, make sure
11  that we get this out to the media and everybody wanted
12  to see these kids get home alive.

13     Q    Did you communicate to your lieutenants
14  working under you that, you know, the chief of
15  detectives was paying attention on this one?

16          MS. ROSEN:  Objection. Form.

17     A    I didn't -- I don't remember saying that, but
18  I -- I didn't have to talk to them. Everybody knew that
19  we wanted to do -- once there's kids involved, all those
20  cops have kids the same age at home. They wanted to
21  make sure that those kids get home safely.

22     Q    So the detectives and sergeants in this case
23  knew this was a heater case, right?

24          MS. ROSEN:  Objection. Form.

25     A    I'm sorry, What's the question again?

1      Q    The detectives and sergeants in this case knew
2  it was a heater case, right?

3          MS. ROSEN:  Objection. Form.

4      A    Yes.

5      Q    All right. And then on a heater case,
6  obviously, you want to try to get it solved and be able
7  to tell the media that, you know, you got -- you caught
8  the guys, right? That's the goal.

9          MS. ROSEN:  Objection. Form. Foundation.

10     A    The goal was more of a, get those kids home
11  safely, than it was to catch the bad guys. That became
12  secondary.

13     Q    And on a heater case, there's a lot of
14  attention being paid to the case. You want to make sure
15  the case gets done right; is that true?

16     A    Yes.

17     Q    And so, what steps do you take to ensure that
18  the investigation is being done right?

19     A    Just make sure that everybody's doing their
20  job correctly and the -- the -- the supervisors are
21  standing on top of what information is coming in, what
22  evidence is being collected.

23     Q    On a heater case, not only do you want to --
24  you want to solve it, but you also want to make sure the
25  case holds up, right, that there aren't some problems



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  with the investigation that cause problems down the
2  road.  You agree with that?
3       MS. ROSEN:  Objection.  Form.  Foundation.
4    Q   Yes.
5    Q   I think you used the -- you used the phrase,
6  you -- want to dot your Is and cross your Ts on a heater
7  investigation; is that right?
8    A   Yes.
9    Q   Did you expect reports on a heater case like
10 this to be accurate and complete?
11   A   Yes.
12   Q   Did you expect the detective working on this
13 case to be taking good notes, to help them in writing
14 accurate and thorough reports?
15       MS. ROSEN:  Objection.  Form.
16   A   That wasn't one of the things I was worried
17 about.  I may want to make sure that they're doing
18 everything that we can get these kids.
19   Q   You didn't specifically say anything to the
20 detectives about notetaking, I assume, right?
21   A   No.
22   Q   And you didn't say anything specific to them
23 about report writing; is that right?
24   A   No.
25   Q   But did you tell them -- but did you

1  communicate down the chain that hey, we want this
2  investigation done right?
3       MS. ROSEN:  Objection.  Form.
4    A   I didn't have to have that conversation.
5    Q   Let me ask you about -- did you ever go to the
6  crime scene in this case?
7    A   I remember that I did.  I just don't remember
8  what time I was -- if I went there that night or the
9  next day.
10   Q   And do you remember what the crime scene
11 looked like as you sit here today?
12   A   No.
13   Q   Do you remember speaking with any media about
14 this case?
15   A   Yes.
16   Q   And what do you remember speaking to the media
17 about?
18   A   Kind of the facts of the case, that there was
19 a home invasion, mother and father were stabbed to
20 death.  Two children were taken and we -- our main goal
21 right now was the safe return of those two kids.
22   Q   And then once the -- once you had the kids,
23 you went back to the media and spoke to them again,
24 right?
25   A   Yes.

1    Q   And you told them right away that you found
2  the kids, right?
3       MS. ROSEN:  Objection.  Form.
4    A   I don't remember specifics, but then that
5  would've been my intentions.
6    Q   When you were communicating information to the
7  media, where were you getting the information in order
8  to be able to communicate about the facts of the case to
9  the media?
10   A   From my supervisors.
11   Q   In other words, from the sergeants and
12 lieutenants?
13   A   Yes.
14   Q   Okay.  They were communicating information up
15 to you, and then you were communicating it out to the
16 media?
17   A   Right.
18   Q   Okay.  Did you have any information that
19 you've had directly from detectives of this case?
20   A   Not that I recall.
21   Q   Other than the informa -- you told us about --
22 well -- strike that.  In terms of your involvement in
23 the investigation, you saw some reports that indicated
24 that you made some assignments in this case on April 2nd
25 and April 3rd, correct?

1    A   I made some what?
2    Q   Assignments -- you assigned some detectives to
3  perform some tasks on April 2nd, right?
4    A   I don't recall the exact date, but I saw
5  something in one of the reports they're talking about.
6    Q   Yeah, let's pull up the -- why don't we pull
7  up the report and look at it, make it easier.  All
8  right.  Pulling up on my screen here a document marked
9  as  Exhibit A to your deposition.  It's RFC 449 through
10 451.  It is a supplementary report dated April 15, 1998.
11 Do you see this, sir?
12       (EXHIBIT A MARKED FOR IDENTIFICATION)
13   A   Yes.  I do.
14   Q   Did you review this document in preparation
15 for today's deposition?
16   A   Yeah, I looked at it.  And I haven't read the
17 whole thing, but I -- I scanned it over.
18   Q   And there's a reference to your name in this
19 document, correct?
20   A   Yes.
21   Q   And it indicates that you made -- you assigned
22 the reporting detectives in this instance to do some
23 follow-up; is that correct?
24   A   Yes.
25   Q   All right.  And you -- right here, one second.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 Actually here, let's pull up the other report for it. I
2 think this is the second report that references it, so
3 one sec. Pull up the other one. All right. Let's take
4 a look at this document that I put on the screen now.
5 We'll mark it as Exhibit B. It's RFC Solache Reyes, 348
6 through 350. This is a supplementary report dated April
7 3, 1998. Do you see that?
8         ( EXHIBIT B MARKED FOR IDENTIFICATION)
9     A    Yep.
10    Q    And you reviewed this document in preparation
11 for the deposition, correct?
12    A    Yes. I did.
13    Q    And this document says in the first page it
14 has a reference to you, correct?
15    A    Yes.
16    Q    Okay. And it indicates that you assigned the
17 reporting detectives, Boyle and Gutierrez, to do some
18 follow-up investigation, fair?
19    A    Yes.
20    Q    Do you have any specific memory of the
21 conversations that you had about assigning Boyle and
22 Gutierrez?
23    A    No.
24    Q    But it indicates that the reporting detectives
25 met with you. Do you have any memory of specifically

1 meeting with them to talk about this case?
2     A    No.
3     Q    And at this point in the investigation -- so
4 these reporting detectives went out to the location
5 where the Sotos had previously lived. You agree with
6 that?
7     A    Yes.
8     Q    And they did some additional follow-up, it
9 looks like, at the Greyhound bus station and O'Hare
10 airport; you see that?
11    A    Yes.
12    Q    Did you assign them to do that -- to do those
13 tasks as well?
14    A    I don't remember, sitting here now. That
15 would have been something that I would have turned over.
16 That information came in and --
17    Q    In terms of the information, the contents of
18 this report about what happened when they went out and
19 conducted these investigative steps, do you have any
20 knowledge about any of those things happening?
21    A    Not as I sit here today.
22    Q    Do you have any memory about whether you've
23 got a copy of this report and reviewed it to see if they
24 had done what you asked them to do?
25    A    No.

1     Q    Anything you can say about what you did with
2 regard to this assignment and why you did it? Could you
3 say anything about it that's not based on what's written
4 in the document?
5     A    No. Like I said, it was all hands-on deck. So
6 I mean, if this information came in and now the next
7 shift was coming in, I would've told them, you know, go
8 do this, if there was no other supervisor up there.
9     Q    But in terms of everything that's documented
10 in this report, you don't have any personal memory of
11 any of it, correct?
12    A    No.
13    Q    Is that correct? You don't have any personal
14 memory?
15    A    Not at this time, no.
16    Q    Okay. When you say "not at this time," you've
17 had a chance to review the report, correct?
18    A    Yes.
19    Q    It doesn't refresh your memory and cause you
20 to suddenly remember something about the contents of
21 this report; is that fair?
22    A    No. It did not.
23    Q    When you made this assignment on April 2nd to
24 go up to the Soto prior residence and several other
25 locations, at that point, did you have any leads in this

1 investigation?
2         MS. ROSEN: Objection. Form.
3     A    I -- I have to look at the timeline on this
4 thing. I -- I don't know if I had them at that point or
5 not.
6     Q    So you say, "I have to look at the timeline."
7 You'd have to look at documents to be able to answer
8 that question; is that fair?
9     A    Right.
10    Q    Every -- in terms of everything that was done
11 subsequent to that in the timeline after April 2nd,
12 would you have to look at documents to be able to
13 testify about what happened?
14    A    Yes.
15    Q    Okay. In other words, you don't have any
16 specific memory about anything that you did on this
17 investigation after this April 2nd '98 assignment; do
18 you agree?
19        MS. ROSEN: Objection. Form.
20 Mischaracterizes his prior testimony.
21    A    Yes.
22    Q    Okay. Would you agree with me this case was
23 cracked when three men came in with the boy? Is that
24 true?
25        MS. ROSEN: Objection. Form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I mean that was a -- a -- a big part of it.
2  And we wouldn't use the word cracked, but I mean, that
3  was information that led to the solving of this case,
4  yes.
5    Q    Until those three men came in with the boy,
6  you didn't have anything that was leading you towards
7  any of those three individuals; is that correct?
8    A    No.  What we had was the -- the pictures of
9  the kids out there, and we were getting calls.  And this
10 guy walking into the 8th District with Santiago Soto who
11 is -- is what got us the information that led to the
12 recovery of the baby and Mejia, and the arrest of the
13 other two.
14   Q    Did you have any information pointing you to
15 the baby being with Adriana Mejia until those men came
16 in?
17   A    No.
18   Q    Do you know how many men came in?
19   A    I think it was a couple.  I'm not sure.
20   Q    And is that knowledge based on your review of
21 documents or based on your memory?
22   A    He reviewed the documents.  I don't remember
23 offhand.
24   Q    Do you remember the relationship of those men
25 to the woman who was found with the baby?

1    A    No.  I think one was her husband.
2    Q    One was her husband.  And you remember the
3  relationship with the other men who came in?
4    A    No.
5    Q    Those other men that came in, do you know what
6  happened to them?
7    A    I have to go through the reports.  I'm sure
8  they were brought in, interviewed, and released.
9    Q    And any information you have about what
10 happened to those other -- the men who came in with the
11 baby, you don't have any specific memory of that.  It's
12 just based on what you would read in the document; is
13 that right?
14   A    Yes.
15   Q    All right.  Let's look back at the other
16 report that I pulled up as Exhibit A.  All right.  Now,
17 looking at it, Exhibit A, RFC Solache Reyes, 348 through
18 350.  This is the April 3, 1998 supplementary -- oh, I'm
19 looking at the wrong one again, sorry.  Okay.  Looking
20 at Exhibit A, RFC Solache Reyes, 449 through 451.  This
21 is the supplementary report dated April 15, 1998.  I
22 think we just indicated before I got -- before I got
23 mixed up, you mentioned in this report as assigning
24 detectives McDonald, Collins, and Dickinson to do some
25 follow-up investigation once the boy, Santiago Soto, had

1  been located, correct?
2    A    Yes.
3    Q    Can you recall anything about what you said to
4  the reporting detectives?
5    A    No.
6    Q    And do you know if you actually spoke to those
7  reporting detectives?  It indicate -- well -- strike
8  that.  It indicates here, reporting detectives were
9  assigned to the continuation of this investigation by
10 Commander Cline.  Do you know if you assi -- personally
11 assigned them to do this work, or who it was done
12 through, one of your supervisors working under you?
13   A    No.  I'm assuming if they've got that in
14 there, that -- that I was the supervisor that was
15 available at the time and gave them this to do.
16   Q    Do you have any specific memory of what caused
17 you to assign them or what happened as a result of their
18 assignment?
19   A    No.
20   Q    Everything you could say about those -- about
21 why you assigned them and what they did when they were
22 assigned is all based on your view of documents; is that
23 fair?
24   A    Yes.
25   Q    Now, other than those two tasks of assigning

1  two detectives to go out to the former Soto home, and
2  then what's documented in Exhibit A -- strike that.
3  Other than what's documented in Exhibit B, of assigning
4  some detectives on April 2nd to go to the Soto home and
5  what's documented in Exhibit A, assigning some
6  detectives to do some follow-up when Santiago Soto was
7  found, do you recall having any other responsibility in
8  terms of assigning individuals to do anything in this
9  investigation?
10   A    Not as I sit here today.
11   Q    You recall anything else specifically that you
12 did on this investigation?
13   A    Not as I sit here today.
14   Q    You had a chance to review the cleared and
15 closed report, correct?
16   A    Yes.
17   Q    And after reviewing the cleared and closed
18 report, did that cause you to recall anything else you
19 did as part of this investigation?
20   A    No.
21   Q    The call you -- after having had the chance to
22 review the cleared and closed report and these other
23 reports you've reviewed, does that cause you to have any
24 memory about anyone you spoke to during the course of
25 this investigation?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No.

2    Q    Has it caused you to have any memory about
3  where you were and when during the course of this
4  investigation?

5    A    No.

6         MS. ROSEN:  Take a short break wherever it's
7  convenient for you.

8         MR. SWAMINATHAN:  Yeah.  We can take a pause
9  right here.  I'm, I'm getting close to the end.
10 Why don't we take a pause here.

11        MS. ROSEN:  Okay.

12        COURT REPORTER:  Okay.  We are off the record
13 at 3:11 p.m.

14        (OFF THE RECORD)

15        COURT REPORTER:  We are back on the record at
16 3:25 p.m.

17        MS. ROSEN:  Are you getting close to
18 finishing?

19        MR. SWAMINATHAN:  Yes.  I am.  I am very
20 close to being done?

21        MS. ROSEN:  Great.

22 BY MR. SWAMINATHAN:

23   Q    All right, Sir.  I don't remember exactly
24 where I left off, I'm going to concede, so but, but let
25 me -- if possible, I'll ask you one question that I

1  asked you previously.  All right.  You indicated -- you
2  did not participate in any of the interrogations in this
3  investigation, correct?

4    A    Correct.

5    Q    You do not recall any conversations that you
6  had with any detectives related to this interrogation --
7  investigation, correct?

8    A    Not as I sit here today, no.

9    Q    You don't recall any conversations you had
10 with any sergeants; is that correct?

11   A    No.

12   Q    You agree with me that none of the reports and
13 other documents that you reviewed indicate that you were
14 at Area 5 during the interrogations, correct?

15        MS. ROSEN:  Objection.  Form.  Foundation.

16   A    There is -- I'd have to go through them more
17 completely, but I mean, that is what I told you earlier,
18 maybe I could -- if you have the media reports and you
19 could match them up to what the -- when I was there, but
20 I was in and out, worked the weekend and stayed with
21 this thing.  But I don't remember the exact hours I was
22 there each day.

23   Q    Okay.  So based on the review of the documents
24 you've seen so far, you haven't seen any documents that
25 indicate to you that you were at Area 5 during the

1  course of the interrogations; is that true?

2    A    No.  I have not seen anything in the reports
3  today that I've reviewed so far.

4    Q    Okay.  And you don't know exactly where you
5  were when during the course of the interrogations in
6  this case, right?

7    A    No.  I don't recall, as I sit here today, know
8  where I was.

9    Q    And you can't say whether you were at Area 5
10 at the time the interrogations were going on, correct?

11   A    I cannot, no.

12   Q    Do you have any personal memory of who
13 conducted the interrogations without looking at
14 documents?

15   A    No.

16   Q    Okay.  And so you can't testify, as you sit
17 here today, about what Detective Guevara did during the
18 course of any interrogations, can you?

19   A    No.

20   Q    You're not in a position to vouch for what
21 Detective Guevara did or did not do while he was in the
22 interrogation room; is that fair?

23   A    I'm not -- not as I sit here today, no.  I
24 don't recall where I was when he was in the
25 interrogation room.

1    Q    And you're not in a position to vouch for what
2  any other detective did while they were interviewing --
3  strike that.  You're not in a position to vouch for what
4  any other detective did, other than Guevara, during the
5  course of their interrogations in the interview room; is
6  that correct?

7         MS. ROSEN:  Objection.  Form.  As to the word
8  "vouch."

9    A    As I sit here today, I -- I -- I don't have
10 the independent knowledge of where I was when other
11 detectives were doing interviews.

12   Q    Okay.  And so you don't have any personal
13 memory from which you could say what any detective was
14 doing in the interrogation rooms during the course of
15 their interrogations, fair?

16        MS. ROSEN:  Objection.  Form.

17   A    No.

18   Q    Okay.

19        MS. GOLDEN:  Anand, I'm sorry.  That might
20 not come out right.  You asked if it was fair and
21 he said no.

22 BY MR. SWAMINATHAN:

23   Q    I'm sorry.  I'll ask, okay.  Is that fair to
24 say that you are not in a position -- strike that.  You
25 don't have any personal memory from which you can say

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 anything about what was happening and what the
2 detectives were doing in those interrogation rooms
3 during the course of their interrogation; is that fair?
4     A   Yes.
5     Q   Okay. Thank you. All right. Let me show you
6 a couple of last documents here. All right. I'm
7 showing you -- are you able to see my screen?
8     A   No -- oh, there we go.
9     Q   You see news article on the page?
10     A   Yes.
11     Q   Yeah. Okay. I'm showing you a document we'll
12 mark as Exhibit C, and it's Bates stamped Solache 7474
13 and it's a newspaper article with the headline "Children
14 of Dead Bucktown Couple Still Missing." Do you see
15 that, sir?
16         ( EXHIBIT C MARKED FOR IDENTIFICATION)
17     A   Yes.
18     Q   Other than --
19         MS. ROSEN: Anand, just for the record there
20      - - I printed this out. So I've got the printed
21      copy there in front of him --
22         MR. SWAMINATHAN: Okay. Okay.
23         MS. ROSEN: -- because that's easier.
24 BY MR. SWAMINATHAN:
25     Q   You can look at whatever is easier for you,

1 sir. And there's some indications in here about -- some
2 comments that you made to the media during the course of
3 the investigation, correct?
4     A   Yes.
5     Q   And it looks like from this article, this is
6 before you had learned -- before the son had been
7 brought into the station, fair?
8     A   Yes.
9     Q   Okay. And there is a quote from you that
10 states, "Our most important concern is trying to locate
11 the children who are missing." Cline said, "If we find
12 the kids, we'll be a lot closer to solving this." Do
13 you see that?
14     A   Yes.
15     Q   Okay. And that's a statement that you gave to
16 the media according to this report, correct?
17     A   Yes.
18     Q   Okay. Do you remember being interviewed by
19 these reporters?
20     A   No.
21     Q   Okay. Because if you look at the bottom of
22 the first column onto the second column where it begins,
23 "Cline said detectives were investigating." Do you see
24 that?
25     A   Yes.

1     Q   It says that, "Cline said detectives were
2 investigating the crime as a double murder." And then
3 it says, "He left open the possibility that the domestic
4 trouble may have been at the root of the crime since the
5 knife that police found at the couple's home was under
6 the husband's body." Do you see that?
7     A   Yes.
8     Q   Okay. And so, it sounds like one of the leads
9 that your -- the detectives were pursuing in this case
10 was the possibility that it was a domestic incident; is
11 that right?
12         MS. ROSEN: Objection. Form. As to you used
13      the word "lead."
14     A   Yes. That would have been one of the things
15 we would have looked at.
16     Q   Okay. And do you have a specific memory of
17 that lead being considered or being looked into?
18         MS. ROSEN: Objection. Form.
19     A   No.
20     Q   And what was the reason that that was
21 considered a potential lead to look into in this case?
22         MS. ROSEN: Objection. Form.
23     A   Based on whatever you hear, it would've been
24 the fact that the knife was discovered under his body.
25     Q   Okay. And there was also no evidence of any

1 break-in; is that correct?
2         MS. ROSEN: Objection. Form. Foundation.
3     A   Not that I remember.
4     Q   Okay. And was the fact that there was no
5 evidence of a break-in also another one of the reasons
6 you suspected possible domestic incident?
7         MS. ROSEN: Objection. Form. Foundation.
8     A   I think the -- the knife was the most
9 important thing there.
10     Q   There was also some investigation into the --
11 a possible lead that family members of the Sotos might
12 have been involved; is that true?
13         MS. ROSEN: Objection. Form. Foundation.
14     A   One of the things we looked at was -- and
15 that's why we called the FBI in was that there somebody
16 may have taken the kids for because they didn't want the
17 State to -- to have them and they were now with
18 relatives, so that was the whole reason for that.
19     Q   And so was there -- was the FBI called in part
20 based on the possibility that some family member may
21 have been involved?
22         MS. ROSEN: Objection. Form. As to the word
23      "involved."
24     A   Not involved in the -- in the murder, but
25 involved in taking the kids.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

1    Q    I see. Okay. So there was, with regard to
2  the kidnapping, there was a potential lead was whether
3  any family members had taken the children?
4    A    Yes.
5    Q    Okay. And with the fact that there had been
6  no evidence of a break-in, was that something that was
7  considered in assessing who the possible perpetrators
8  were?
9         MS. ROSEN: Objection. Form.
10   A    The fact that they were home makes it more
11 possible that it's a home invasion and they forced their
12 way in versus a burglary if no one was home when they
13 broke in.
14   Q    And in terms of your assessment of the break-
15 in, you know, no evidence of a break-in, is that based
16 on any memory or that are based -- sort of just based
17 on, you know, your assumptions as we're talking about it
18 now?
19        MS. ROSEN: Objection. Form.
20   A    Pretty much the assumption of what we're
21 talking about now.
22   Q    Okay. Who else -- who were individuals who
23 were suspected or looked into as possible perpetrators
24 in this case before you had the son brought into the
25 station?

Page 235

1         MS. ROSEN: Objection. Form. Foundation.
2    A    I don't remember who it was. I have to go
3  through all the reports and see who was brought in.
4    Q    Anyone who was treated as a suspect in this
5  case, you would expect to see some documentation of
6  that, correct?
7    A    Yes.
8         MS. ROSEN: Objection. Form.
9    Q    Anybody who was interrogated regarding the
10 crime, you'd -- there should be documentation of that in
11 the file, correct?
12   A    Yes.
13        MS. ROSEN: Objection. Form. Foundation.
14   Q    Anyone who was interrogated as a suspect in
15 the case you would expect to see some -- you'd be able
16 to -- you expect you'd be able to find some documents in
17 the file about that, correct?
18        MS. ROSEN: Objection. Form. Foundation.
19   A    Yes.
20   Q    Do you recall anybody else being suspected of
21 the crime based on your review of the file?
22        MS. ROSEN: Objection. Form. Foundation as
23 to whether or not he reviewed the entire file.
24   A    I know there was other relatives brought in. I
25 know they were all interviewed, so that's all I remember

Page 236

1  here after reading the reports.
2    Q    Do you -- the individuals who were brought in
3  you would have -- strike that. Do you have a memory --
4  do you have any personal memory about family members of
5  the Sotos being brought into the police station and
6  interviewed?
7    A    No.
8    Q    Okay. Are you -- any memory you have about
9  who was brought in and who was interviewed, is it all
10 based on reports and documents?
11   A    Yes.
12   Q    Okay. And anybody who was brought to the
13 station and interviewed and questioned, there should be
14 documentation with that, correct?
15   A    Yes.
16   Q    Any family members of the Sotos who've been
17 brought in and interviewed that can be documented,
18 correct?
19   A    Should be. Yes.
20   Q    Okay. Anything else you recall about this
21 investigation that you haven't -- that you haven't told
22 us about today?
23   A    No. Like I said, it was something that we
24 wanted to get those two kids back alive. We did. So it
25 was a very successful investigation.

Page 237

1    Q    And you're aware that two of the individuals
2  were convicted of this crime later had their convictions
3  tossed, correct?
4         MS. ROSEN: Objection. Form.
5    A    Yes.
6    Q    Does that change your view in any way about
7  whether this was a successful investigation?
8    A    Well, like I said the -- the main goal was to
9  get the kids back. We did that. We convicted all three
10 in court, and then two of them had their conviction
11 overturned. I don't know what the judge looked at to
12 overturn it, but it surprised me that -- that he did
13 overturn it, because one had gotten the death penalty.
14   Q    Do you have any opinions -- oh, one of the
15 indiv -- strike that. Do you have any opinions one way
16 or the other about the judge's decision about to vacate
17 the convictions?
18   A    I have to see what the judge was presented
19 with that made him render that decision that way.
20   Q    Okay. And so, as you sit here today, you
21 don't have any opinions?
22   A    I'm sorry, I didn't hear you.
23        MS. ROSEN: Yeah. You made noise. I mean, I
24 didn't hear you.
25   Q    I'm sorry. As you sit here today, you don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 238

1  have any opinions about the determination by the judge
2  to vacate the conviction?
3      A    No.  It's disappointing, but no, I don't.
4      Q    Okay.  I'm almost done, just the last couple
5  of questions.  You had -- you were previously involved
6  in a case involving a man named Madison Hobley that
7  ha -- involved a fire that killed many people when you
8  were lieutenant at Area 2, correct?
9      A    Yes.
10     Q    Was that a heater case?
11     A    Yes.
12     Q    In that case, there were allegations of abuse,
13  correct?
14     A    Yes.
15     Q    Mr. Hobley had made allegations that he had
16  been abused by detectives who interrogated him, correct?
17     A    I don't recall his specific allegation, but I
18  know that there was questions about it.
19         MS. ROSEN:  And belatedly, and since there
20      seems to be more than just a couple of questions, I
21      have a standing objection to all Hobley questions
22      based on foundation and relevance and a host of
23      other things, but go ahead.
24  BY MR. SWAMINATHAN:
25     Q    Do you have -- are there any other cases that

Page 239

1  you've been involved with in any way in which there have
2  been allegations of abuse by the detectives conducting
3  the interrogations?
4         MS. MCGRATH:  Objection.  Form.  Foundation.
5      A    I believe so.
6      Q    That -- and how many other cases are there?
7         MS. ROSEN:  Objection.  Form.  Foundation and
8      relevance.
9      A    There's one that I know of right now.
10     Q    And what case is that?
11     A    Smith.
12     Q    The individual who alleged abuse, his name is
13  Smith.
14     A    And he killed his mother-in-law and
15  grandmother-in-law.
16     Q    And what was your position in the CPD at the
17  time that he alleged the abuse?
18     A    I was the Area 2 Violent Crime lieutenant.
19     Q    Okay.  Is that a -- is there any pending
20  litigation in that case?
21         MS. ROSEN:  There is pending litigation.  And
22      I'm -- you got about, like, one more question on
23      it, so before I tell him that he can't answer any
24      more questions.
25  BY MR. SWAMINATHAN:

Page 240

1      Q    I'm not going to ask you this stuff.  There is
2  currently pending litigation about it?  Is that what you
3  said?
4      A    Yes.
5      Q    Are you a named defendant in that case?
6      A    Yes.
7      Q    Have you ever asserted the Fifth Amendment in
8  response to questions under oath?
9         MS. ROSEN:  Objection.  Irrelevant.  Go
10     ahead.
11     A    Yes.
12     Q    On how many occasions?
13     A    Once.
14     Q    And when was it that you asserted the Fifth?
15         MS. ROSEN:  Like, what year?
16         MR. SWAMINATHAN:  Yeah.  At what year?
17     A    I think it was 50 years ago.
18     Q    Was it at a deposition or in court?
19     A    In court.
20     Q    And did it have to do with Charles Wilson
21  case?
22     A    Yes.
23     Q    Were you ever banned from the United States
24  Attorney's Office at any point?
25     A    Not that I was told.

Page 241

1      Q    Did you later hear that?  Did that come as a
2  surprise to you?
3         MS. ROSEN:  Objection --
4         MR. SWAMINATHAN:  That's a poor question.
5         MS. ROSEN:  -- did you later hear that?
6  BY MR. SWAMINATHAN:
7      Q    That's a poor question.  Let me -- did you
8  ever hear that you had been banned from the US
9  Attorney's Office?
10     A    No.
11         MS. ROSEN:  Well, I guess they told you only,
12     Anand.
13         MR. SWAMINATHAN:  Okay.  Apparently they only
14     told me.  I have nothing else.
15         MS. ROSEN:  Jan?
16         MS. SUSLER:  I don't have any questions, but
17     thank you.
18         MS. ROSEN:  Anybody else?
19         MR. BRENER:  And from me, Eileen?
20         MS. BURNS:  No questions.
21         MS. MCGRATH:  No questions.
22         MS. GOLDEN:  No questions.
23         MS. ROSEN:  No questions.  And we reserve
24     signature.
25         MR. SWAMINATHAN:  Superintendent, thank you



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1  for your time.

2        THE WITNESS:  You're welcome.

3        COURT REPORTER:  Okay.  This concludes our --

4        MR. SWAMINATHAN:  Have a good weekend

5  everybody.

6        COURT REPORTER:  -- this concludes our

7  deposition at 3:42 p.m.

8             (DEPOSITION CONCLUDED AT 3:42 P.M)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 243

1             CERTIFICATE OF REPORTER

2

3  I do hereby certify that the witness in the foregoing

4  transcript was taken on the date, and at the time and

5  place set out on the Stipulation page hereof by me after

6  first being duly sworn to testify the truth, the whole

7  truth, and nothing but the truth; and that the said

8  matter was recorded by me and then reduced to

9  typewritten form under my direction, and constitutes a

10  true record of the transcript as taken, all to the best

11  of my skills and ability. I certify that I am not a

12  relative or employee of either counsel, and that I am in

13  no way interested financially, directly or indirectly,

14  in this action.

15

16

17

18

19  

20

21

22  BROOKE ANDREW,

23  COURT REPORTER / NOTARY

24  COMMISSION EXPIRES ON: 11/27/2021

25  SUBMITTED ON:  05/26/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit A_ CLINE** 217:9, 12 223:16,17, 20 225:2,5

**Exhibit B_ CLINE** 218:5,8 225:3

**Exhibit C_ CLINE** 230:12, 16

___

**1**

**100** 136:18

**10:08** 8:6

**11:09** 60:22

**11:18** 60:25

**11th** 15:10 16:10,13,19 18:18 51:4

**125** 17:11

**12:00** 28:10

**12:15** 114:6

**12:17** 114:25

**12:29** 115:3

**13** 77:13

**14** 11:5

**14th** 8:5

**15** 102:13 120:6 217:10 223:21

**15th** 120:2,7

**17th** 120:3

**1968** 14:19

**1970** 14:20

**1972** 14:20 30:2

**1972-1977** 19:18

**1974** 19:17

**1977** 14:21,25 30:2

**1980** 178:11

**1985** 14:21 15:4,23 20:6

**1986** 15:7

**1989** 15:10,23 51:5

**1993** 15:13,14 17:7 51:11

**1994** 16:1,5 88:6 93:20 115:6 119:19

**1995** 58:6

**1996** 107:14

**1998** 165:12 166:25 167:4, 12,23 169:2 178:11 217:10 218:7 223:18, 21

**1:00** 28:12

**1:18** 158:5

**1:18-CV-1028** 8:12

**1:18-CV-2312** 8:13

**1:51** 158:8

___

**2**

**2** 15:6,24 17:23 18:5 20:8 21:17,24 22:4 24:20 26:2,13 27:19,20 28:4 29:1,8,20,25 30:17 34:13 40:9 41:18 42:25 45:16 51:4 66:9,13 72:17,19 73:17, 25 76:20 77:2, 7,12 116:11 117:6,17,25 118:15 120:15 238:8 239:18

**20** 162:25

**20-some** 65:23

**2000** 15:19 176:10

**2001** 15:20 176:23

**2003** 15:11,13, 21,22

**2004** 15:11

**2006** 21:23

**2007** 12:12 14:18

**2021** 8:5

**21** 15:5

**21st** 14:24 15:3

**25** 162:5

**2nd** 216:24 217:3 220:23 221:11,17 225:4

___

**3**

**3** 165:12 218:7 223:18

**30** 162:25

**348** 218:5 223:17

**350** 218:6 223:18

**3:11** 226:13

**3:25** 226:16

**3:42** 242:7,8

**3rd** 165:13 166:8,12 169:1 216:25

___

**4**

**4** 166:25 167:12

**40** 73:14

**449** 217:9 223:20

**451** 217:10 223:20

**4:00** 28:10,23 114:3

**4th** 167:22 169:1

___

**5**

**5** 15:17 16:6 77:13 78:3 80:22 84:18,19, 24 87:15 88:7 89:25 90:9,12 92:18,20,22,25 94:2,9 95:22 96:1,18,22 98:5,6,13 99:18 105:1,8,18 112:17 115:6 116:5,10 117:6, 10,18,24 118:7, 9 119:1,9,14 120:25 121:16, 25 122:8 123:6 124:4 128:20 133:6 135:15 137:17 140:18 142:8 150:20 151:17 153:22 155:9 158:13 159:9 161:24 162:7 167:4 169:2 172:3 179:11,12,18, 19,21,22 186:8 201:20 202:5 203:5 205:19 208:17 227:14, 25 228:9

**50** 136:18 162:13 240:17

**5:00** 28:11,12

**5th** 167:22

___

**7**

**72** 30:18

**7474** 230:12

___

**8**

**80** 16:12

**85** 15:8

**89** 16:10,12

**8:00** 164:17,24 165:7,14 166:7 170:13,19

**8th** 205:5 222:10

___

**9**

**93** 15:16 16:1, 10,11,12

**94** 15:16

**98** 15:18 16:5 221:17

**99** 81:7

**9:00** 28:11

**9:30** 164:16 165:6,7,14 166:7 170:13, 19

___

**A**

**a.m.** 8:6 60:22, 25

**abilities** 37:13 38:21

**ability** 35:6 36:9 72:9 75:13 166:2

**abreast** 152:16 153:14,23 154:3

**Absolutely** 89:3

**abuse** 22:9 23:15,21 24:4 25:6,8,9,17,25 163:22 164:1 175:14 238:12 239:2,12,17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

abused 22:5
175:13,16
176:1 238:16

abusing 21:1
175:10,24

academy
31:19 132:2

accept 67:12

access 41:24
75:13 92:7,8,14
156:23 157:12,
15 170:24
171:22

accountability
120:5

accurate 35:6
36:5,16,21 39:2
191:9 214:10,
14

accurately
39:6,11

accused 69:14
95:17 96:16
151:13 175:8,
10

accusing
25:23 103:24

achieved
10:19

achievements
122:1,11

Action 74:12

actions 26:8
160:3

active 191:5,21

actively 42:1
192:6

activities 55:9
59:25

activity 60:6

actual 54:9
74:11 179:6
182:23 185:6
197:23

added 119:23

addition 41:13

additional
72:2 219:8

address 10:18
44:11

administrative
27:11 41:22
49:8,25 138:19
180:2,5,8

Adriana 204:3,
10 222:15

advancing
179:24

affairs 68:16
79:14 87:14,19
90:15 98:25
99:9 103:20
106:1 108:8
111:17 112:5,7
152:8,9,12,16
153:13,23
155:3

affect 118:14
180:25

affected
141:20

affecting 181:5
186:4

affirm 9:23

afield 86:11
112:19 155:7

afternoon
28:18

afternoons
28:12

age 212:20

agents 86:1

agree 9:15
22:19 33:1 67:9
86:6 87:1 97:10
136:19 154:1,2
174:3 175:17
198:6 201:23
214:2 219:5
221:18,22
227:12

agreed 33:9
105:18 133:25

ahead 30:5
47:24 86:15
89:17 137:5,6
143:14 146:25
157:19 166:22
167:19 173:14
177:5 178:9
183:1 197:2
202:23 209:10
238:23 240:10

aid 39:6

airport 219:10

Alan 208:13

Alberts 138:15

alive 212:8,12
236:24

allegation
95:15,16 149:5
151:1 155:14
171:17,19,23
238:17

allegations
82:3 86:1 88:21
147:24 148:5,7,
23 150:11
151:14,18
155:17 156:20
238:12,15
239:2

alleged
239:12,17

altogether
61:8

Amendment
240:7

amount 74:15,
18 140:1

Anand 8:17
89:4 229:19
230:19 241:12

and-a-half
62:13

Andrew 8:3

answering
13:22

answers
101:15 102:20
103:12

anticipate
113:17

anytime
122:19 144:2

apologies
78:18 107:1
120:23

Apparently
241:13

appeal 186:15

appearance
8:14

applied 30:1,8
117:23,24
123:16 180:12

apply 30:9
120:8 197:4

approve 79:3

approved
32:19 43:10,25

approximately
12:14 17:11
45:25 78:24
119:15 136:17
162:3,8

April 165:12,13
166:7,12,25
167:4,12,22
169:1 216:24,
25 217:3,10
218:6 220:23
221:11,17
223:18,21
225:4

area 15:6,17,24
16:6 17:23 18:5
20:8,25 21:17,
24 22:4 23:10
24:12,20 26:2,
13,18,20,24
27:5,18,19,20
28:4 29:1,8,20,
25 30:14,17
32:8 34:13
40:9,23 41:18
42:25 45:16

51:1,4 54:23,24
66:9,13 68:1,4,
5,9,20 69:4,14
70:8 72:17,19
73:17,25 76:20
77:2,7,12,13
78:3 80:22
84:18,19,24
87:15 88:7
89:25 90:9,12
92:18,20,22,25
94:2,9 95:21
96:1,17,22
98:4,6,13 99:6,
10,18 105:1,8,
18 112:17
115:6 116:5,10,
11 117:5,6,10,
17,18,24,25
118:7,9,14,15
119:1,9,14
120:15,25
121:16,25
122:8 123:6
124:4 128:20
133:6 134:21,
25 135:15
137:17,20
138:1,3,8
140:18 141:21
142:8 150:20
151:17 153:22
155:9 158:13
159:9 161:24
162:7 167:3
172:3 179:11,
12,18,19,21,22
181:1,5,14,20
182:25 186:7
201:20 202:5
203:5 205:19
208:17 227:14,
25 228:9 238:8
239:18

areas 52:17
56:21 118:23
119:4,11
135:15,16
138:24 146:7
179:13 180:12,
20 181:16
182:1,7 183:12

arrest 57:21
185:18 205:6
222:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

arrested 84:22
151:22

arresting 88:2
91:3 92:5

arrests 60:1
185:14,17

arson 115:19

article 230:9,
13 231:5

articles 21:14

artificially
104:21

Arturo 8:8,18
204:2,6

asks 13:25

aspect 178:20

assaults
146:16

asserted
240:7,14

assess 46:18
131:18 182:6

assessing
43:18 234:7

assessment
234:14

assi 224:10

assign 68:24
69:8 219:12
224:17

assigned 15:6
19:24,25 65:21
92:19 95:9
96:22 98:6
116:1 179:20
184:14 185:2,
11 187:6,9
188:7 205:8
217:2,21
218:16 224:9,
11,21,22

assigning
65:25 218:21
223:23 224:25
225:3,5,8

assignment
66:6 92:21
220:2,23
221:17 224:18

assignments
65:20 66:2
186:25 216:24
217:2

assist 35:25
53:19,22 54:1
57:1 92:22
139:13 188:3

assistance
94:12,17

assisted 55:6
59:18 60:14,18
92:13 111:13

assisting
59:21 93:10
109:16 111:7
124:7

assume 13:18
83:14 98:22
160:12 165:6
166:6 214:20

assuming
110:7 143:6
224:13

assumption
234:20

assumptions
234:17

ATF 86:1

attending
8:14,15

attention
52:22 106:11
143:11,14,19
145:3 161:19
210:2,3,12
212:3,15
213:14

attorney
95:15,25
107:21 129:4,
22 133:3,10

attorney's
84:20 87:25

126:11 240:24
241:9

attorneys
126:11 163:12

audit 43:4,6,7
44:8,10,11,17
45:10 46:13
47:5,6,19 49:6

audited 49:2

audits 42:24
43:3,13 45:4,8,
15 46:7 47:2,11
142:9,11,21,22
182:6

Austin 163:8,
12

authority 83:1
149:25 181:23

avoid 130:16
132:6,8,21

aware 25:8,16,
25 35:18 37:23
48:20 50:12
52:6 75:6 78:7
80:8 87:7,8,9,
13,14 107:8
119:1 142:21,
24 150:14
163:11,15,20
199:3 237:1

___ B ___

babies 205:16

baby 204:20
205:7 222:12,
15,25 223:11

back 19:3 20:6
25:11 30:2
33:23 52:24
60:24 66:8
89:1,19,22 99:5
110:20 112:3
114:4 115:2
122:6,7 125:24
131:21 132:9,
21 138:24
139:15 140:17
158:7 159:24
172:15 174:2

182:10 204:22
205:16 215:23
223:15 226:15
236:24 237:9

background
17:13 58:10
77:25 103:5
121:13

bad 42:21
159:21 213:11

ballpark 45:19

ban 96:23 97:1

bangers
107:23

bank 121:18

banks 121:19

banned 84:18
95:21 96:1,17
98:12 105:7,16
240:23 241:8

banning
154:12,17
155:1

bargaining
74:25

Barganski
116:6

Barton 82:15,
20 83:8,12,14

Barton's 82:24

base 164:11

based 42:17
47:10 100:6
106:14 111:1
193:14 206:3
209:7 220:3
222:20,21
223:12 224:22
227:23 232:23
233:20 234:15,
16 235:21
236:10 238:22

bases 139:19

basic 183:7
185:3 192:23

basically

28:17 63:6 76:7
104:17 118:4
121:12 140:5
143:2 185:17
205:10 206:18

basis 104:14
124:1,2 125:10
142:20 145:17
193:3 203:6

Bates 99:24
101:3 102:17
230:12

beat 16:15

began 86:1
87:21

begin 10:2

beginning
12:19 74:22

begins 231:22

begrudgingly
33:11

behalf 8:19,21,
23,25 9:2,4,6
160:25

behavior
79:23

belated 155:5
191:17

belatedly
238:19

believed 96:10
103:18

Berscott
208:10

Bibo 209:13

Biebers 18:13

big 52:23
125:24 191:24
222:1

bit 29:23 89:19
90:21 113:24
158:11

blue 33:15

Bob 18:13
51:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Bobo 53:4

bodies 68:16

body 232:6,24

bomb 115:19

book 129:7

books 55:23
56:1,8

boss 153:18

bottom 231:21

boy 221:23
222:5 223:25

Boyle 218:17,
21

break 13:20,
22,23 60:19
112:23 113:2,
23 114:9,15,17
157:21 158:2
226:6

break- 234:14

break-in 233:1,
5 234:6,15

breaking
113:9

breaks 114:2

Brener 9:6,18
241:19

Brian 91:2

briefcase
84:21 87:25
91:2,20

bring 160:22

broke 90:21
234:13

Brooke 8:3

brought
106:10 126:19
223:8 231:7
234:24 235:3,
24 236:2,5,9,
12,17

Brualdi 9:7

Bucktown
230:14

building 55:15

bunch 103:11

Burge 18:11
20:22 21:24
22:4

burglary 19:6
186:24 234:12

Burns 9:4,17
241:20

bus 204:21
219:9

business
159:20

buy 68:25

by-case
194:17

———

C

C-L-I-N- 10:8

C-L-I-N-E 9:13

cadet 14:19

California
65:11 139:24

call 32:2
134:21 141:7
145:14 149:1,2,
23 159:15,16
160:19 161:4,9,
12 225:21

called 52:24
57:5,7 60:2
67:5 71:3 87:24
91:23 134:20
152:2 211:11
233:15,19

calling 65:9
160:24,25

calls 23:12,19,
25 24:16 25:20
76:2 149:11
160:4,13 169:4
170:8 173:9
176:4 190:5,15
199:9 200:3
211:9,25 222:9

canvass 65:22

canvassing
206:9,16

capacity
195:18

Cappitelli
209:16

car 118:18
139:16 152:14

card 129:7

career 10:20
59:11 75:12

carefully 14:2

Carrie 17:2

carried 197:17

carrying 33:15

cars 119:6

case 8:12
19:23 32:23
35:9 37:18
38:13 39:13,21
40:4,6 41:9
42:2 49:13,15,
21,22 50:15,23
52:21 57:17,21
58:8,12 61:25
64:14,16,19,22
67:7 70:12
77:24 79:7
85:13 86:12
88:2 89:13
91:19 92:14
100:3,8,16
101:24 102:16,
19 104:2,18
120:2,3 122:4,
10,11,16,19,20
123:19 131:9
132:3,16
136:12 139:17,
18,22 144:2
145:2,14,19,22
150:22 151:3
152:25 153:2,6
157:2,4,8
163:4,16,22
164:2 165:24
168:12 169:5
172:16,20

173:2,10,24
174:2,10,22
175:16,22
178:15 188:2
190:25 196:16,
17,22 197:4,10
198:8,17
199:13 200:10,
22 204:1,6,18
205:21,24,25
206:7,8,13
209:25 210:1,2,
5,6,9,20
211:17,21
212:1,4,22,23
213:1,2,5,13,
14,15,23,25
214:9,13 215:6,
14,18 216:8,19,
24 219:1
221:22 222:3
228:6 232:9,21
234:24 235:5,
15 238:6,10,12
239:10,20
240:5,21

case- 194:16

case-by-case
194:10,18

cases 19:20
20:1,3 27:24
46:3 49:1 52:25
54:12 59:20
67:18,20,23
69:18 70:11
94:13,24 95:3,5
98:4 108:15
109:11 120:7
122:14 123:7,
12,13,16,17,19
125:17 132:2,
18 133:23
138:17 140:23
143:16,19
144:5,18,24
145:8,11,12
146:1,4 148:22
155:19,20
157:18 159:25
160:7 161:20
162:9,20,21
172:21,25
173:7 174:11,
14,19 179:7

183:11,19
184:6,13,14
185:3,11,17
186:12,13,17,
25 187:6,9,13,
22,23 188:23
189:2,3,14
190:23 192:7,9
194:11,19
201:23 238:25
239:6

catch 213:11

categorized
56:5

caught 213:7

caused 90:19,
24 97:3 171:18
224:16 226:2

chain 69:23
83:6 144:18
146:23 147:18
148:1,10 150:3
156:9 160:10
203:12 212:2
215:1

chance 103:22
188:11 220:17
225:14,21

change 31:3,7,
24 32:10,15
33:2 42:17,21
43:19,23 44:5,
12,14 46:19
116:14,17
119:19 120:12
237:6

changed 19:4
47:14 53:6,8
120:1,21

changing
180:19 187:9

channel 67:5
155:11 157:8

characterizati
on 68:11

charged
150:23

charges 49:14
204:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charging
126:12

Charles
240:20

Charlie 115:8

check-ins
43:16,24

checking
211:6

Chicago 8:9,
24 9:3 11:2,21,
24 12:11 14:13,
16,19 17:19,21
75:12 85:15
104:9 163:9,11
178:25

chief 15:20
59:13 67:8
115:10,13,15
116:1 145:7,16,
18 146:1
147:19 148:2,
19,21 149:2
150:3,6 158:19,
21 159:2,6
160:15,18,25
161:4,8,11,15
176:9,18,23
177:10 178:3,8,
14,16,23 179:5,
12,21 180:7,11
181:13,15
182:5,12,18,21
183:4,10
193:11 194:24
195:18 196:1
197:16 201:21
202:2,15
210:15,18,19,
22,25 211:6,9,
11,14 212:9,14

chief's 116:2

chiefs 177:6,7
179:1

childcare
190:18

children
215:20 230:13
231:11 234:3

Chris 138:15

chunk 112:22

circumstance
s 194:16 199:24

city 8:9,24 9:2
17:19,21 163:9,
11 178:24
179:21 181:1,
14

citywide
118:10,12

civil 102:14

civilian 155:22
156:20

claim 178:18,
20

claims 25:25
88:16

clarifying
103:21

clear 16:7
25:22,24
102:16 186:12,
16 199:22

clear-up 122:3

clear-ups
183:2

clearance
122:22,25
123:11 146:4,8
158:11,13
159:11 161:9,
12,25 162:8,16
184:17 185:21
186:8

cleared 49:8
61:21 146:8
160:7 166:1
185:3,20
225:14,17,22

clearing 61:20
160:1 161:16,
20 187:23

Cline 8:7 9:10,
12,15,22 10:7,
21 158:10
224:10 231:11,

23 232:1

Cline's 101:2

Clipfell 100:19,
20 102:13,14

close 83:14
114:3 160:1,6
183:20,22
186:12 226:9,
17,20

closed 49:5,
15,22,23 57:21
58:19 61:21
144:3,6,8
160:6,7 183:11,
19 184:6
185:12 189:3
211:17 225:15,
17,22

closely 94:18

closer 231:12

closing 163:4
184:7,15
189:14

co- 130:24

Co-worker
83:16

coat 52:20

collaborating
123:21

collaboration
123:15 125:15

collect 11:6
41:6

collected
213:22

collecting
11:20,23

collective
74:25

Collins 223:24

column 231:22

combination
85:14

command
20:9,17 23:11

23 232:1

26:1 67:3,5
69:23,25 71:8
72:22 73:2
76:20 77:1,21
78:8 80:6
81:23,25 82:4,
7,8 83:6 84:2
93:19 112:17
119:16 120:22
121:6 122:23
131:23 146:19
148:11 150:15,
19 155:11
156:10,24
157:8 172:3
178:25 182:16,
18 190:23
194:6 203:12

commander
15:17 16:6
18:14 23:17
24:3,6,13 27:16
51:9,16,17
59:12 67:8
72:15 73:6
78:14 80:22,24
81:3,6 84:25
87:7,8,14,15,17
88:6 89:25
90:9,11 91:5,7
95:2 98:2
105:12 115:5,6,
9 116:5,10
119:1,14
120:24 121:25
125:20 126:25
136:25 137:11,
17 138:4,6,7
139:4 140:25
142:8 144:19
149:9,10,24
150:2,14,20
151:17 153:17,
22 154:8,16,23,
25 155:9
156:11,25
157:10 158:14
159:9 161:24
162:7,17 163:5
164:15 170:24
172:13 175:2
179:9,10,17,19,
22 180:3,22
181:3,4,6,8,11,
14,19,23 182:3

184:5 186:7
193:11 195:19
196:6 200:8
201:14,21
202:5,16
224:10

commander's
138:14

commanders
73:16 85:7
161:12 179:1
182:9

commanding
17:24

comments
231:2

common 56:20

communicate
128:1 145:12
146:3 148:1
152:19 212:1,
13 215:1 216:8

communicate
d 147:18
154:15,25

communicatin
g 145:25 216:6,
14,15

communicatio
n 125:5

communicatio
ns 105:25
186:1

complained
96:15

complaint
70:22 87:24
88:5 90:2,4,13,
20,24 91:23
95:11,12,17,24
96:9,15 97:22,
24 99:20 105:3,
22 106:1,4,16,
20 107:4,9
108:3,13 109:8
110:11 111:1
156:1,11
157:10,16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

complaints
88:3 109:9

complete 84:9
214:10

completely
227:17

compliance
43:18 44:20,23
46:19

compliant
45:11,12

complicated
191:2

complimentar
y 157:5

components
95:7

computer
157:14

concede
226:24

concern 38:11
96:6 160:21,23,
24 231:10

concerned
116:24

concerns
38:16 39:1
48:21 69:24
70:3 83:9
108:21 110:25
159:16,19
173:17,21
175:17 176:2

conclude
152:23 153:1

concluded
163:21 242:8

concludes
242:3,6

conclusion
153:5 163:16
164:1,7

conclusions
69:17

conditions

14:1,3

conduct 21:10,
18 23:5 24:12
26:7 42:24
54:5,11 55:19
68:20 69:11
81:11 88:20
96:15 98:15
108:14 111:5
118:22 125:22
126:4 140:9
142:9 153:13
163:12 182:5
195:7

conducted
31:17 37:16
43:14 45:4
68:9,15,19 99:9
111:1 117:17
127:1 134:8
136:3 141:10
182:20 191:13
195:15 219:19
228:13

conducting
24:25 117:5
193:16 195:20
239:2

confession
131:19 132:4,
13

confessions
131:24 132:8,
22

conflict 70:4

confront
174:23

connection
58:8 123:5

considered
47:18 186:22,
23 187:17,19
192:23 232:17,
21 234:7

consist 43:7
142:11

conspiracy
52:25

constituted

71:9

consultation
128:15

contact 97:23

contacted
97:23,25
105:12

contacting
210:18,19

contents
219:17 220:20

continuation
224:9

continue 40:20
43:11 101:25
134:12

continued
98:8

contradictory
103:25

contributed
85:23

convened 8:6

convenient
226:7

conversation
105:6 112:8
207:15 215:4

conversations
112:10,15
149:7 206:19,
22 207:6,11,17,
20,23 208:1,4,
10,13 209:12,
15 210:22
218:21 227:5,9

convicted
84:14 150:24
152:4 237:2,9

conviction
152:24 237:10
238:2

convictions
237:2,17

Cook 9:8

coordination
123:9

copies 50:9

cops 212:20

copy 107:24
135:5 156:10
219:23 230:21

corner 52:25

correct 18:23
20:22 21:24
22:5 26:24
28:24 30:17
36:1,6 40:14,17
42:18 45:13
51:12 52:11
54:25 55:6,22
58:20,23 68:5,9
71:14 72:11
73:23 80:13
81:13,17,23
84:25 85:4,8
86:18 93:17
94:1 95:13,18
96:7,11 105:13,
16 106:17,22
107:5 109:6
110:9 118:7
131:3 134:25
135:20 154:12
155:18 162:17
163:5 176:10,
16,21 181:17,
20 192:14
194:19 199:20
200:1 202:7,20
210:9 216:25
217:19,23
218:11,14
220:11,13,17
222:7 224:1
225:15 227:3,4,
7,10,14 228:10
229:6 231:3,16
233:1 235:6,11,
17 236:14,18
237:3 238:8,13,
16

corrected 48:4

correctly
98:12 110:22
194:21 213:20

counsel 8:16
9:9,21 13:8
61:7 66:19
103:5 128:21,
23,24

counseling
76:7

County 9:8

couple 61:4
62:19 86:14
137:2,9,10
139:8,11
162:24 194:15
222:19 230:6,
14 238:4,20

couple's 232:5

court 8:3,4,10
9:9,14,21 10:2
12:21 13:11
16:24 32:23
43:11 60:21,24
68:7 88:25
89:3,18 114:21,
24 115:2 131:4
141:21 158:4,7
174:10,11
189:10,15
190:10 226:12,
15 237:10
240:18,19
242:3,6

cover 181:13,
14

coverage
210:8

covering
139:19 179:2

coveted
190:13

CPD 135:11
171:3 172:3,8
210:11 239:16

CR 98:21 99:23
148:9 155:23
156:23 157:3,4
170:24 171:5,7,
11 172:9
175:11

cracked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

221:23 222:2

**create** 70:4
125:4,8,13

**created** 47:7
74:10 111:25
184:23

**creating**
104:21 138:22

**credibility**
173:21 174:4,7,
10 175:17
176:2

**crime** 15:20
16:2 18:1,22,25
21:17 27:10,20
29:21 40:9
58:6,9 66:10
73:18,25 78:15
79:3,13,18 86:7
92:12,22 98:8
131:13 176:10,
19 183:2
204:13 205:5,
11,15 215:6,10
232:2,4 235:10,
21 237:2
239:18

**crimes** 15:6,24
17:23 18:7,22
19:3,9 20:4,7
24:19 26:14,17
28:4,7 29:1,5,8,
25 30:17 31:2
34:13 41:18
42:25 43:12
45:16 51:4,21,
24 52:4,6,9,14,
16 53:19 54:5,
10 55:2,10,12
56:16,20,24
57:12,23 58:6,
9,19,22 59:8,
14,18 66:13
72:18,19 78:8,
18,20,25 79:9
80:4,5,22 81:9,
11,16,22 84:24
85:4 86:9 88:19
92:20 93:17
94:1,7,13,20,24
95:5 116:12
120:25 123:24,
25 124:7,13,17,

22 125:4
126:21 154:16
176:16,17
178:24 179:3
183:8 185:2
187:22 188:3,
10,11 205:19
206:8,15

**criminal** 80:5
81:11,15,21
84:1,6,13 85:3,
18 86:8 95:25
102:16 107:21
118:20,22
119:10 152:24,
25

**criminals**
119:25

**critical** 35:6
173:21 174:4,7,
17,21

**CRN** 91:2

**cross** 214:6

**crossed**
191:25

**crossing**
58:11

**CRS** 148:12,17
155:21 156:5

**current** 10:25
11:8,10 12:3
180:18

**custodial**
54:19

**cut** 137:5

---

**D**

**daily** 60:2,3,4
124:1,2

**Dan** 9:4 122:18

**Dart** 51:16,17

**date** 141:4
165:11,19
211:14 217:4

**dated** 217:10
218:6 223:21

**daughter**
198:22

**day** 8:5 28:5
60:13 97:7
113:4 146:14
165:11 215:9
227:22

**day-** 192:2
203:4

**day-to-day**
71:8 116:24
120:21 121:1
157:9 193:3,22
203:6

**days** 28:7,10,
11,14 29:2,17
38:24 71:19
164:18 168:6

**de** 72:7

**DEA** 19:25
85:14 123:23

**Dead** 230:14

**death** 215:20
237:13

**debate** 58:15

**decide** 23:1
67:8 72:1

**decision**
141:22 152:5
173:25 200:11
201:5,9,17
237:16,19

**decision-
making**
199:19,23

**decisions**
150:1,8 195:1,6
199:4,5 200:13
203:13

**deck** 206:8
211:13 220:5

**defendant**
8:24 9:1,4
130:25 133:23
240:5

**defendants**
9:7 64:1

**defense** 84:20
87:25 95:15,25
107:21

**delegated**
195:8,22

**Deleon** 8:18,20

**Deleon-reyes**
8:8

**denied** 175:24

**denies** 175:12

**dep** 113:19

**department**
11:21,25 12:11
14:13,17,20
75:12 77:19
126:8 153:1,6
178:9 193:5

**departments**
123:4

**depend** 39:13
46:8 196:17
200:4

**depended**
36:8 190:19

**depending**
149:5 201:12
203:11

**depends**
37:12,18
100:11 112:2
147:8 190:16
194:16 201:15

**depose** 89:11
103:6

**deposed**
12:15,17 204:5,
18 205:24
206:13

**deposing**
89:12

**deposition** 8:7
13:3,8 17:14,
16,17 58:12
61:3 62:5 63:6,
19 65:16 88:12
103:9 170:4,11
203:19 217:9,

15 218:11
240:18 242:7,8

**depositions**
12:19

**deputies** 177:3

**deputy** 15:19,
21 59:13
115:10,15
116:1,2 145:7,
25 147:18
148:1,21
158:20 160:16,
18,25 176:9,18
177:6,7,10,17,
20 179:1
211:11,13

**desk** 93:2,4
138:17,19
150:25

**desks** 137:22

**destroyed**
74:16

**detailed** 37:25
38:1,3 77:11

**detective**
14:21 17:11
18:25 19:15,21
26:9 30:2,9,19
31:23 33:17,24
34:2,6,8,17,20
36:10,13 37:4,
9,12 38:10,16,
23 39:10 41:20
45:13 48:7
49:8,25 54:20,
24 59:1,5 60:15
66:19,20 68:25
72:7 73:7 74:14
76:19 91:13
92:18 106:21,
24 116:21
119:20 120:2
124:24 125:9
131:12 142:4
148:10,13,23
149:22 150:18
151:18 155:23
156:2,7,11,19,
20 171:2 172:2,
7 175:8,9,23,24
180:7 181:16
183:25 184:14,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18 187:16,24
188:24 189:3,7,
8 190:19 193:2
197:8 198:5,9
199:17,18,20
200:9,11,20
201:15,16
202:2 207:12,
15,17,20 208:5
209:4 210:25
214:12 228:17,
21 229:2,4,13

**detective's**
36:8 38:21
122:4 139:16
158:21 178:9,
23

**detectives**
15:18,21 16:6
18:2,5,6,7,23
19:1,9,14 20:8,
9,16,25 21:17
24:24 26:1,21
27:24 30:9,21
31:2,13,15,22
32:10,16 33:2,
8,14 34:12
35:11,13,15,16,
17,21,22 36:10,
13 37:1,14,19,
25 38:1,6 39:18
40:9,10,14,16,
19 41:1,8,23
42:1,8 46:11
47:14 48:1,16
53:20,22 54:1,
8,15 56:15,22
58:23 59:18
60:18 64:10
66:13,16 67:2,8
68:4 71:8
72:19,21 73:2,
25 77:1 88:23
90:1 91:10
92:10,19,23
93:8,9,13,16,
17,19 94:17,19,
23 97:10 106:9
108:20 109:16
112:16 115:6,
10,13,16
116:25 117:5,
23,24 118:6,10,
23 119:4,24
120:6,22 121:2,

6,18,22,25
123:9 124:12,
18 125:3,19
126:22 127:2
128:3,6 129:7,
10,15,23 130:7
131:6,9,16,23
132:15 133:6,
16 134:7,16,24
135:14,23
136:1 137:8
138:8,12,13,16,
18,19 140:5,12,
22 145:8,16,18
146:1 147:19
148:2,8,19,21
149:2 150:4,7,
11,15 156:24
157:11 158:19
159:2,7 160:10,
15,18 161:1,4,
8,11,15,20
173:21 174:4,8,
13 176:21,24
178:3,15,17
179:2,5,11,12,
13,20,21 180:1,
11 181:13,15
182:5,12,19,20,
21 183:4,10
184:20 185:21
186:12,16,20
187:1,21 188:3,
12,16 189:13,
25 190:2,13,16
191:1,14
192:19 193:10,
11,15,23 194:6,
24 195:1,8,19
196:1,3,7,13
197:13,17,24
200:1 201:21,
22 202:6,11,12,
18 203:4 206:7,
8,15 210:15,19,
23 211:6,10
212:9,15,22
213:1 214:20
216:19 217:2,
22 218:17,24
219:4 223:24
224:4,7,8
225:1,4,6 227:6
229:11 230:2
231:23 232:1,9
238:16 239:2

**detectives'**
65:20

**determination**
200:21 238:1

**determinations**
194:10,18,22
196:19 199:12,
25

**determine**
42:25 108:14
174:9

**determining**
195:13

**develop** 55:7

**deviated**
165:18 168:8

**Dickinson**
207:18 223:24

**dictate** 38:21

**difference**
82:16

**differently**
104:13

**dig** 171:16,18

**direct** 10:3
82:25 83:3
202:4

**directly** 27:9
105:7 157:15
161:4,9 177:13
216:19

**director** 11:2
12:4

**disagree**
22:22,23 103:9

**disappointing**
238:3

**disciplinary**
66:14,23 68:16
70:14 150:1
157:6

**discipline**
20:8,16 66:11,
15,20 67:2,15
70:15,19 77:20,
25 78:7,25

79:3,12,18
88:16,17,20
104:8 112:19
142:1,3 147:15
150:15 155:7,
10,15

**disciplined**
78:14,19 79:9
150:19

**disclose** 89:5
103:7

**disclosed**
89:10,14

**disclosing**
89:8

**disclosures**
89:9

**discourage**
128:24 129:11,
16

**discovered**
232:24

**discuss**
141:24 142:1

**discussed**
40:24 141:15,
18 142:4,16

**discussions**
159:10

**dispute** 81:20

**distinction**
54:16

**district** 8:10,11
14:23,24 15:3,
10 16:11,13,20
18:19 51:5
120:2,3,7 123:3
205:5 222:10

**division** 8:12
92:18 116:21
119:21 124:24
149:23 191:24

**DNA** 125:24
126:9

**do's** 194:5
197:11,15

**document**
38:7 56:25 60:9
76:10 95:25
101:4,6 103:18
107:22 133:12
134:4 135:19
169:23 170:17
217:8,14,19
218:4,10,13
220:4 223:12
230:11

**documentation**
47:6 59:20
74:10 111:25
125:3 142:17
235:5,10
236:14

**documented**
220:9 225:2,3,5
236:17

**documenting**
127:6,9

**documents**
50:4,18,22
61:16,24 62:2,
14,17 63:11,14
65:15 98:17
102:18 107:24
169:8 170:3,5,
10 204:19
205:23 209:8
221:7,12
222:21,22
224:22 227:13,
23,24 228:14
230:6 235:16
236:10

**Doffyn** 122:18

**domestic**
232:3,10 233:6

**don'ts** 194:5
197:12,15

**door** 130:11
137:22

**dot** 214:6

**dotted** 192:1

**double** 205:25
232:2

**doubt** 129:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

165:22

**downtown** 45:2 46:5 50:2 76:23

**draws** 210:2

**drive** 120:4

**drugs** 152:14

**duplicates** 50:4

**duplicative** 50:9

**duties** 138:20 139:2 161:23

**duty** 122:18

_____

**E**

**earlier** 40:24 151:22,24 158:11 163:3 170:23 178:17 181:9 203:10, 14 212:10 227:17

**early** 28:18 88:6 205:13

**earn** 189:15

**easier** 217:7 230:23,25

**Eastern** 8:11

**Ed** 93:24 208:1

**Edward** 9:6

**effort** 109:15

**efforts** 128:23

**Eileen** 8:23 25:13 61:4 114:5 143:17 241:19

**elite** 187:19

**employed** 10:23

**employment** 11:8

**encounter** 201:17

**encourage** 128:22 131:1 133:11

**encouraged** 129:6

**end** 13:4 42:5 57:20 65:9 113:8 152:24 226:9

**ended** 87:25 95:14 210:7

**engaging** 21:5

**English** 140:2

**ensure** 142:16 213:17

**ensuring** 127:22

**entered** 204:21

**enterprise** 80:5 81:16,21 84:1,6,14 85:3, 18 86:8 151:9

**entire** 235:23

**entities** 11:24

**entitled** 77:25

**entrance** 27:10

**equal** 17:10

**Ernest** 207:6,8

**essentially** 71:7 156:6 169:22

**establish** 180:12

**established** 19:6

**et al** 8:9,10

**event** 88:24 173:6

**eventually** 135:17

**everybody's** 213:19

**evidence** 23:3 40:5 135:9 175:14 213:22 232:25 233:5 234:6,15

**evidentiary** 45:1

**exact** 63:8 75:24 217:4 227:21

**EXAMINATIO N** 10:3

**exchanged** 123:6 125:18

**exchanging** 127:16

**exclusively** 162:20

**executive** 11:2 12:4

**exhibit** 217:9, 12 218:5,8 223:16,17,20 225:2,3,5 230:12,16

**expect** 113:4 214:9,12 235:5, 15,16

**expectation** 37:14 38:6 42:12 111:11 126:25 127:8, 19,21 128:2,5 133:20 134:1, 16 160:11 191:8,20

**expectations** 36:25 193:18, 23 195:21

**expected** 128:15 193:3, 15

**experience** 136:1 193:14

**experts** 126:10

**explain** 32:14 40:25 47:20 116:16

**explained** 104:11 121:17

**explanation** 23:9

**expounded** 129:4

**expressly** 133:13

**extensive** 113:21

**extent** 60:14 70:8 71:25 99:23 103:4,9 169:14 192:12 196:19,21 197:11 201:8

**extra** 139:25

**eyes** 144:14

_____

**F**

**fact** 9:15 22:4 25:9,17 26:6 58:22 66:5 81:14,20 86:9 87:24 92:5 95:20 103:23 104:2 110:3 122:7 134:17 175:14,16 205:15 232:24 233:4 234:5,10

**fact-based** 198:13

**facts** 131:12 173:1,24 175:21 176:6 204:12 205:11 215:18 216:8

**fair** 10:21 12:25 13:15,18,23 20:4 38:3 58:16 73:10 75:18 92:15,18 102:4, 20 110:4,14,17 137:14,15

143:17 166:6 168:9 170:1 171:14 173:18 174:1,19,24 175:5,22 178:13 188:12 192:25 203:6 218:18 220:21 221:8 224:23 228:22 229:15, 20,23 230:3 231:7

**false** 131:24 132:4,8,12,21

**falsified** 204:20

**familiar** 31:2 39:23 85:13

**family** 198:20 203:20 233:11, 20 234:3 236:4, 16

**Farrell** 116:7

**father** 215:19

**FBI** 65:9 85:14 123:23 139:25 205:20 206:6 233:15,19

**FBI's** 206:14

**feat** 122:8

**feel** 97:18 110:21

**fellow** 79:24

**felt** 182:4 205:4

**field** 139:5

**fight** 102:2

**figure** 92:1 169:20

**figured** 114:19

**file** 32:17 40:1, 3,7,22,23 41:1, 8,10,14,15,18, 24 42:2,9,10, 14,15,16 43:8 44:23 47:23 48:14,15,25 49:11,16,18,19,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

23,24 50:3,5,8,
10,13,19,24
57:11,17 64:2
74:14,17 75:21
76:11,14,18,19,
25 77:6 107:16,
22,24 135:5
142:12 235:11,
17,21,23

**filed** 106:17,21
107:3 146:18
155:23 156:6

**files** 39:22
40:10,20 41:21
43:1,6,11,14,
17,24 44:4,5,18
45:25 46:6,18,
19,23 47:2
49:5,9 50:22
51:1,24 52:4
59:7,14 75:8,15
92:14 140:25
141:3 142:9
144:5,10,14

**filled** 60:9

**final** 57:9
152:19 153:5

**find** 100:5
169:19 171:18
175:13 210:7
212:7 231:11
235:16

**finding** 22:20
24:13 67:21
172:23 173:6
175:15 176:1

**findings** 22:11,
15,24 107:11

**fine** 10:22
178:21

**finish** 12:23,24
13:5,22

**finishing**
226:18

**fire** 238:7

**fired** 153:8,10

**five-by-seven**
27:7

**fix** 91:25

**fixing** 187:3

**flip-flop** 29:4

**floor** 27:9

**flop** 28:8

**Florida** 132:3

**flow** 138:23
182:24

**focus** 120:9
193:10

**folks** 52:10
54:17 123:20
176:12

**follow** 66:11

**follow-** 104:4

**follow-up**
217:23 218:18
219:8 223:25
225:6

**FOP** 11:11
129:7

**force** 132:11

**forced** 234:11

**foresee** 167:14

**forgot** 16:7
66:10

**form** 11:17
20:11,18 21:12,
19,25 22:6,12,
16,21,25 23:7,
12,18,24 24:15,
22 25:1,5,19
26:4,11 27:22
30:3,11,23
31:4,8,14,18,25
32:12,22 33:5,
10,25 34:14
35:8,24 36:2,7,
17,23 37:6,11,
17,21 38:4,12,
19 39:3,7,12,
16,20,24 40:2,
11,21 41:4
42:22 43:21
44:7 45:20
46:2,20 47:3,8,
12 48:3,11,19,

23 49:17 50:6,
11,20 52:1,7
53:10,24 54:3,
7,13,21 55:24
56:2 57:2,3,5,
14,19,24 59:9,
15,22 60:5,8,11
65:1,18 66:24
67:17,24 70:2,
5,9,24 71:2,11,
15 72:4,23
73:3,8,12,22
74:2,6,11,19
75:4,9,16 76:1,
22 77:3,9
78:10,21 79:5,
20 80:1,7
81:18,24 82:5,
13 83:2,10,15,
18,23 84:3,11,
17 85:5,12,20
86:2,10,19
87:22 88:8
90:16 93:6
94:14,21,25
95:6 96:19
97:12,17,20
98:10,24 99:3,
11,22 105:9
106:7,18,23
107:6,12,17,25
108:5,10,17,22
109:7,13,19
110:5,15,23
111:3,8 112:1,
6,11,18 116:13,
22 117:2,7,13,
22 118:1,11,25
119:5,12,17,22
121:3,11,23
124:9,19,25
125:6 127:3,24
128:8,12,17
129:1,13,18
130:3,18,23
131:7,20
132:23 133:1,5,
8,9,18,22
134:5,8,12,18,
20,22,24 135:2,
11,14 136:7,10,
14,15,20,21
139:14 142:6
143:13 144:25
145:4 146:5,13,
24 147:20

148:3,24
150:16,21
151:10,15
154:5 155:25
156:8 158:25
159:12,18
160:17 161:2,
21 162:1,4,10,
14,22 163:1,18,
23 164:4,10
165:20 166:9,
14,19 167:1,5,
17 168:3,10
169:3 170:7,15,
21 171:6 173:8,
22 174:5,15,25
175:6,19 176:3
179:15 180:4,
10,13,17,24
181:24 182:2,8,
14,22 183:6,13,
21 184:2,8,21,
22 185:1,13,24
186:14 187:18,
25 188:13,17
189:1,5,12,17,
22 190:4,9,14
191:17,22
193:6,19 194:1,
7,12 195:4,10,
17,24 196:4,9,
15,25 197:14
198:1,12 199:8,
16 200:2 201:1,
6,11,24 202:8,
14,21 203:7
206:17 209:9
211:18,22
212:5,16,24
213:3,9 214:3,
15 215:3 216:3
221:2,19,25
227:15 229:7,
16 232:12,18,
22 233:2,7,13,
22 234:9,19
235:1,8,13,18,
22 237:4 239:4,
7

**formal** 31:9,11,
12,24

**forms** 33:13
57:12,16,22
133:21 135:22

**found** 22:4
80:9 85:22
163:21 171:3
172:3,7 173:5
182:11 204:5
205:23 216:1
222:25 225:7
232:5

**foundation**
11:3 21:7 22:17
23:7,13,18,24
24:15 25:19
26:4,11 30:3,
11,23 31:8,14,
18,25 32:22
33:5,10 34:14
37:11 38:12,19
39:3 40:2,21
45:20 46:2,20
47:3 48:3,11
50:11 52:1,7
54:13,21 55:24
57:2,14,19,24
59:9,17,22
60:11 70:9
72:23 73:3,8,
12,22 74:2,6
75:4,9,16 76:1,
22 77:3,9
78:10,21 79:5,
20 80:1,7 81:18
82:5 83:15
84:3,17 85:12
86:2,10,19
87:22 93:6
94:21 95:6
97:12 98:24
99:3,11,22
104:6 105:9
106:18 107:6,
12,17,25 108:5,
10,22 109:13,
19 110:5,15,23
112:1,6,11,18
116:13,22
127:24 128:8,
12,17 130:3
132:23 133:22
134:5 136:10,
15,21 146:13
150:16,21
151:10,15
155:25 156:8
158:25 159:18
162:10,14,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

163:1,18,23
165:20 166:9,
19 167:1,5
168:3,10 169:3
170:7,15,21
173:8 174:25
175:6,19 176:3
187:18 188:17
190:4,9,14
197:14 198:1,
12 199:8,16
200:2 201:2,24
202:8 203:7
213:9 214:3
227:15 233:2,7,
13 235:1,13,18,
22 238:22
239:4,7

**frame** 21:15
90:5 118:2

**Frangello**
116:2 160:19,
24

**Fraternal**
11:11,14

**Friday** 165:13
166:7,12
170:14,20

**friend** 204:21,
25

**front** 102:3,21
166:11,15
167:10 230:21

**fugitive** 115:21

**full** 105:15

**fur** 52:20

**Fusco's** 17:18

**future** 167:7,14

G

**Gabriel** 8:9,22
204:3,8

**Galligan**
80:17,18 81:2
97:1,4,5,8

**gang** 15:11,16
16:2 17:8,10

19:22 51:12,15,
21,24 52:4,5,9,
13,15,16,23
53:1,3,5,6,8,13,
19 54:5,10
55:2,5,8,10,11,
19,23 56:1,3,6,
8,16,20,24
57:11,23 58:5,
8,9,18,19,22
59:8,14,18
60:10 77:18
78:8,14,18,20,
25 79:3,8,12,18
80:3,5,9,13,15,
20 81:9,11,16,
22 82:2,6 84:6
85:4 86:7,9
88:18 90:10
92:12,21 93:17,
20 94:1,7,13,
19,24 95:4,5,8,
9 98:8 105:12
107:4,23
123:24,25
124:6,13,17,22
125:4,9 154:8,
16 176:15,17

**gang's** 55:9

**gangs** 16:11
56:3,9 57:4
87:9 98:2
111:6,12,21
123:3 124:4
176:14

**gave** 134:17
135:17 224:15
231:15

**general** 30:12
45:19 64:16,18,
21 78:1 116:15
130:5 131:9
132:3 136:18
140:23 144:13
174:3 175:23
186:24 192:13,
14 197:9

**generally**
107:20 118:3
194:4

**generate**
47:10

**generated**
50:14

**geographic**
95:7 119:23
120:5

**get all** 52:22

**get-to-know**
121:9

**Gibson** 51:8

**give** 9:24 13:9
45:18 103:21
120:5 162:25
188:18 189:14
200:4

**giving** 85:16
103:24 134:2
187:12 188:11

**gleaned** 34:22

**goal** 213:8,10
215:20 237:8

**God** 178:21

**Golden** 16:25
17:4 21:7 70:2
104:21 191:17
229:19 241:22

**good** 37:4,9
42:21,23 137:8
157:21 159:21
161:19 187:23
188:6,12,16
211:2 214:13
242:4

**GPR** 30:12,21,
25 32:9,18
33:13 36:12
41:9 47:21
48:5,6,8,9,14
50:15 57:3,7
84:20 87:25
91:1,19 95:14,
17 127:16

**GPR's** 92:9

**GPRS** 30:16,19
31:16,21 33:4,9
42:10 43:10
44:16,25 47:15
48:18 50:23
64:11 92:7

127:15,22
128:7

**grandmother-
in-law** 239:15

**graphics** 57:4

**great** 114:23
122:8 158:3
205:8 226:21

**Greyhound**
219:9

**Grime** 84:6

**groups** 125:15
176:12

**Grow** 87:9
154:10,11,21,
23

**grudgingly**
33:9

**guess** 122:10
147:14 200:12
203:15 241:11

**guest** 141:23

**Guevara** 8:8
9:1 94:4,5
106:21 206:23
207:2 209:3
228:17,21
229:4

**Guevara's**
163:13

**guidance**
192:24

**guide** 111:5
128:6

**guideline**
197:20 198:6

**guidelines**
31:10 127:5,13
192:17,18,20
193:1 200:19

**Gutierrez**
218:17,22

**guy** 92:5 186:2
222:10

**guys** 65:21
95:4 113:25

114:19 117:17,
18 122:15
134:21 188:11
202:2 213:8,11

H

**ha** 238:7

**hall** 27:17

**Halvorsen**
207:6,9

**Hammond**
118:15 181:10

**hand** 9:23
96:17

**handed** 31:10

**handle** 19:10,
11 20:1 54:9
69:2,15 70:12
195:2,6 199:12,
24 200:8,14,21
201:18

**handled** 98:20
110:22 186:25

**handling** 154:9
187:2 203:11

**hands-on**
206:7 220:5

**handwritten**
64:9 135:18

**happen** 49:4,
20 54:23,24
55:2 132:5
183:14 194:10

**happened**
13:7 19:23
58:25 73:21
86:17 98:11
101:7 108:3,4
136:24 152:11
164:21 173:5,
11 219:18
221:13 223:6,
10 224:17

**happening**
24:21 25:3
42:12 145:1,2
152:17 153:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

159:22 161:10
182:18,25
186:6 211:14
219:20 230:1

**happy** 114:14

**harassing**
166:20

**hard** 113:18

**harder** 131:18

**Harjani** 102:3

**harm** 210:7

**head** 112:7

**headline**
230:13

**headquarters**
115:10 138:24
146:6,15
177:23,25

**hear** 21:10,18
232:23 237:22,
24 241:1,5,8

**heard** 12:18
23:11 33:7
80:25

**hearing** 72:8

**heater** 64:16,
19,22 122:4
139:17 145:14,
22 209:25
210:1,6 212:23
213:2,5,13,23
214:6,9 238:10

**heavily** 205:14

**held** 14:17
190:10

**helped** 123:7
131:14 140:5

**helping**
139:18,20

**helps** 41:8

**hey** 117:16
159:20 184:13
186:2 197:7
198:21 215:1

**hierarchy**

53:14

**high** 29:19
113:8 174:14
182:21

**high-** 172:24

**high-level**
192:24

**high-profile**
122:20

**higher** 149:16
201:19

**higher-ups**
145:13 159:10
210:11 212:1,3

**highest-
ranking** 29:20

**Hiram** 154:10

**hired** 163:8,11

**Hispanic**
140:1

**histories**
156:24 157:16
170:24 171:5

**history** 14:12
157:3,4,5,6,11

**Hobley** 238:6,
15,21

**hold** 42:2 50:22
131:21 132:9,
21 135:10
141:7

**holds** 213:25

**home** 186:4
190:18 204:22
205:16 212:8,
12,20,21
213:10 215:19
225:1,4 232:5
234:10,11,12

**homicide**
18:23 19:1,4,5,
9,23,24 46:10,
18 48:25 49:5,9
51:1 53:22
54:6,12 55:6
56:25 57:1
62:19 88:22

91:19 92:11,13,
14 93:10,11
94:12 96:7,11,
20 97:18 102:8
104:8 107:10,
16,22,24
108:16,20
109:10,11,17
116:25 120:13,
22 121:1,22
123:9,12,16,19
125:9 140:25
141:3 142:9,24
143:3,6,8,19
144:2,5,10,14,
18,24 145:5,8,
11,12 146:1,4
162:9,20,21
165:24 173:7,
18 174:13
179:6,7 183:8,
11 186:22
187:1,4,16,24
188:4,9,20,24
189:3,7,8
190:23 191:5
193:10,15
194:11,19
195:7,14,20
196:3,7,13,22
197:4,8,12
199:13,24
200:7,14,20,22
201:22 202:13,
19 203:4

**homicides**
18:8 19:10 20:4
46:9 120:8,10
124:4,5,7
143:10 146:15
183:2,3,4 186:9
188:7

**honest** 175:4

**hope** 54:22

**hospital**
118:13,16
119:7 181:10

**host** 238:22

**hour** 61:15
62:13 78:2
113:5 114:11
120:3

**hour-and-a-
half** 63:10

**hours** 113:7,
10,12,25
139:11 165:4,
16,23,25 166:3,
12,24 167:3,11,
22 168:2,5,12,
17 169:1,16,25
170:1,6 190:18
227:21

**Hundred** 12:16

**hundreds**
46:9,17,22,23

**hurt** 172:15
200:10

**husband**
203:20 204:24
223:1,2

**husband's**
232:6

**hypothetical**
198:13 200:3
201:2,25 203:8

—— I ——

**IAD** 68:2 70:11
147:10 149:1,3,
7,12 152:2
153:17 154:14
171:20

**ID** 32:18

**idea** 57:7 94:15
124:21 170:23

**IDENTIFICATI
ON** 217:12
218:8 230:16

**identified**
23:16,22 24:4
95:18 96:10

**identify** 96:16
99:24 111:6,12,
20 169:1

**Illinois** 8:11
118:18

**imagine** 185:5

**impacted**
109:12 121:1

**impeach**
104:16

**impeachment**
104:22

**important**
34:16 36:5,20
37:9 122:5
127:18 183:8
231:10 233:9

**impose** 71:13,
17,18 72:1,9
73:6,25

**imposed** 78:25
79:12

**imposition**
74:9

**impossible**
143:9

**improper**
47:18

**improve**
121:22

**Inaudible**
10:12

**incentive**
187:3,8,23
188:15,19
189:19,24

**incentives**
187:5

**incentivize**
186:12 187:12
188:10

**incident** 102:7
107:14 108:12
157:7 232:10
233:6

**incidents**
121:19

**inclination**
173:3,15

**include** 18:8
183:1,18

**included** 19:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

31:21 60:15
184:25

**includes**
179:13

**including**
42:16 59:12
68:23 71:13
200:22

**income** 12:2

**incomplete**
198:13 200:3
201:1,25 203:8

**inconsistent**
103:17,20

**inconsistently**
103:1

**increase**
125:4,15

**increased**
123:15 124:6

**independent**
229:10

**independently**
209:11

**indexing** 50:18

**Indiana** 118:19

**indicating**
133:13 163:21

**indication**
103:16 200:5

**indications**
231:1

**indiv** 237:15

**individual**
35:14 38:20
89:13 91:17
105:3,16 112:4
118:14 131:13,
18 134:11,17
135:17 136:4,
13 154:7 155:1,
22 173:7,17
179:7 190:16,
19 239:12

**individuals**
21:4 69:25

85:17 97:9,14
129:16 133:2
136:5,6 222:7
225:8 234:22
236:2 237:1

**inflict** 20:16

**info** 206:13

**inform** 147:11

**informa** 216:21

**informal** 71:1

**informants**
55:7 124:14

**information**
23:3 24:8 32:24
34:21 38:7,14
42:6 48:9 50:8
55:8 56:3 85:16
90:19,24 91:17,
21 92:4 102:11
103:14,15
106:10 110:16
111:13 123:7
124:13,16
125:18,25
127:6,17,20,22,
23 130:21
131:17 132:21
145:7,11,24
146:3,11,12,17,
22 147:2,4,6,9,
17,25 148:4,7,
18 149:22
150:3,7 152:7
157:12 158:23
159:3,6,23
160:10 161:16
167:15 168:1
171:9,21
172:12 183:3,5,
7,16,19 184:6,
10,17,25 185:3
206:5 213:21
216:6,7,14,18
219:16,17
220:6 222:3,11,
14 223:9

**informed**
147:10

**infraction**
76:8,9

**initial** 45:2

**Initially** 16:15

**initiate** 98:17

**initiative**
121:21

**initiatives** 95:3
121:16

**input** 85:15

**ins** 58:7

**inside** 121:19

**instance** 69:4
73:11 74:5
107:8,21,23
108:2 150:18
151:2 198:5,15
202:9 217:22

**instances**
20:15 61:6
68:12 70:18
72:25 73:5
122:15 136:6
194:23

**instituted**
123:8

**instruction**
128:7

**instructions**
128:23

**insurance**
118:17

**integrity** 96:20

**intentions**
216:5

**interchangeab
ly** 19:2

**interfering**
109:10

**interject** 58:3,4

**internal** 68:16
79:14 81:1
87:14,19 90:15
98:25 99:9
103:19 106:1
108:8 111:17
112:5,7 152:8,
12,16 153:13,

23 155:2 171:3
172:4,8,23
175:13,25

**interpreters**
140:1

**interrogated**
235:9,14
238:16

**interrogating**
131:13

**interrogation**
21:5 25:4 26:9,
23 54:19 55:11
129:17,20
130:8 134:12,
16 198:22
209:18 227:6
228:22,25
229:14 230:2,3

**interrogations**
24:20,25
126:14,17,23
127:1,14,22
128:7,19
133:17 134:8
136:3 137:1,14
140:3 227:2,14
228:1,5,10,13,
18 229:5,15
239:3

**interrogatorie
s** 187:2

**interrupt** 16:24

**interview**
55:14,18,21
106:3 129:3,6
131:10 140:13
229:5

**interviewed**
39:19 106:11
127:7,10
131:11 223:8
231:18 235:25
236:6,9,13,17

**interviewing**
39:14 54:1
209:21 229:2

**interviews**
38:18 54:5,9,11
55:1,17,20

117:18 127:20
130:8 140:4
229:11

**introduced**
121:12

**invasion**
215:19 234:11

**inve** 68:8

**inventoried**
40:6 45:2
135:4,6

**inventory** 41:6
135:8

**inventorying**
50:17

**invest** 143:6
205:12

**investigate**
19:20

**investigated**
67:25 68:1,4
69:18 98:23
103:19,23
105:3

**investigating**
19:23 69:24
99:2 138:17
179:2 192:7
231:23 232:2

**investigation**
17:8 38:8 43:12
51:12 53:20
57:17 60:15,18
64:25 66:5
67:9,21 69:5
77:18 79:23
80:8,13 81:2,11
82:2 84:21
85:24,25 87:7,
15,19,21 90:15,
18 91:24 92:13
96:7,11 97:19
98:14,18 99:5,
9,20 101:9
104:8 108:16
109:18,21,23,
24 110:3,19,21
111:1,6,17,21,
24 129:12
140:10 152:9,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

13,17,20,22
153:15,24
154:4 155:3
165:3,24 166:4
168:9 172:9
173:18 175:11,
12,25 178:5,11,
24 179:6
188:23 191:2,
21 192:3
199:25 202:4
203:15,23
205:12 206:3,
20,24 207:3,9
208:18 209:1,
13,16,19,22
211:7,10
213:18 214:1,7
215:2 216:23
218:18 219:3
221:1,17
223:25 224:9
225:9,12,19,25
226:4 227:3,7
231:3 233:10
236:21,25
237:7

**investigations**
15:12,16 37:16
52:15 53:6,9,
15,23 54:6 55:6
56:25 57:1
59:19 60:1
68:3,8,14,19,21
69:11 70:7
82:6,14,15,17,
19 93:10 94:12
96:21 102:8
105:13 107:10
109:10 118:20,
22 119:10,24
120:13 139:13
141:6,24
142:25 143:3,7
154:8 175:4
179:24 182:17,
20 188:4,7
191:6,10,13
193:17 195:7,
14,21 200:14
202:7,13,19

**investigative**
36:21 41:15
42:15,16 47:23
48:14,15 49:19,

21,23,24 50:18,
22,24 53:2,16
135:5 177:18,
20 219:19

**investigators**
171:3 172:4,8,
24 175:13

**invoke** 71:7,10
72:1,20 130:16

**invoked** 71:24
73:1,16

**involved** 21:1
54:15 81:15,21
85:3 92:2 94:13
96:4 97:4,6,7,
11 99:1 101:9
109:16 110:14
111:7,22
130:21 173:18
192:2,6 205:14,
20 210:16
212:19 233:12,
21,23,24,25
238:5,7 239:1

**involvement**
20:3 67:23
77:20 85:18
99:19 109:23
124:6 151:8
206:14 216:22

**involves**
203:19

**involving** 84:6
108:12 142:4
151:9 238:6

**irrelevant** 93:7
240:9

**issue** 66:8
72:20 89:7
104:7 147:15,
17

**issued** 21:23
75:3 106:13
148:12,17
163:20 194:24

**issues** 118:17
119:7 141:15,
18 142:3 161:5,
6 175:4 190:17

**items** 41:6

**J**

**Jack** 53:4

**jail** 53:4,5

**Jan** 8:21 10:13
113:16 241:15

**Jessica** 9:2

**job** 11:1 116:25
122:5 137:8
138:21 157:9
161:19 178:3,
16 179:23
180:1,2 186:21
187:4,17,23
188:6,12
191:24 192:24
194:6 213:20

**jobs** 117:5
192:21

**Joe** 101:22

**John** 115:14
116:2,7 160:19

**joined** 14:16
16:25 161:24
162:7

**Jon** 18:11
20:22 21:23
151:6

**judge** 102:3
174:9 237:11,
18 238:1

**judge's** 237:16

**jump** 139:15

**jurisdiction**
179:10,11
200:7 201:13

**jury** 166:11,16
167:10

**K**

**Karen** 138:15

**keeping** 42:15
153:14 211:13

**kick** 203:12

**kidnapped**
139:23

**kidnapping**
205:25 234:2

**kids** 65:7,9
122:6,7 139:23
190:17 204:24
205:3 210:5,7
212:7,12,19,20,
21 213:10
214:18 215:21,
22 216:2 222:9
231:12 233:16,
25 236:24
237:9

**kids'** 63:25

**killed** 122:17
238:7 239:14

**kind** 16:13,17
23:5 33:18,20
47:10 49:1 72:6
77:6 120:19
121:5 123:4
125:22 138:21,
23 140:13
141:15 143:15
150:1 155:5
159:23 166:14
181:2 182:19
184:19 187:5
215:18

**kinds** 43:25
183:20 200:14

**knew** 85:10,18
86:21 90:17
131:12 204:17
212:18,23
213:1

**knife** 232:5,24
233:8

**knowing** 23:6,
17,23 24:6
84:16 86:18
87:1 119:25
153:16 155:2
167:15 171:16

**knowledge**
21:2 25:6,7
67:16 143:7

209:6 219:20
222:20 229:10

**L**

**largely** 180:2,8

**Late** 62:11

**law** 58:8 141:21

**lawsuits**
146:18

**lawyer** 91:2
92:6

**lawyer's** 91:20

**lay** 104:6

**Lazzarro's**
163:8,15,20,25
164:6

**lead** 232:13,17,
21 233:11
234:2

**leader** 52:19

**leaders** 53:1,5

**leading** 222:6

**leads** 65:10
139:23,25
142:12 220:25
232:8

**learn** 69:3,5,19
84:5 85:25
90:19,23
130:15 146:20
148:14 152:1
155:14

**learned** 21:21,
22 22:3 38:7,10
80:12,19 81:1,
14 127:9
146:23 147:2
151:18,21,25
206:12 231:6

**leave** 118:18
164:24,25

**led** 152:8
222:3,11

**left** 18:18 51:17
75:2 80:11



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

125:16 226:24 232:3

**legal** 33:21

**lesser** 186:25

**letting** 124:14 182:25

**level** 181:3,4 199:19 201:18

**license** 69:1 203:1

**lie** 131:2

**lied** 171:4 172:4,8,23 173:5 174:24

**lieutenant** 14:21,23 15:4, 24 16:2,13 17:7,23 18:21 20:7,21 21:16 23:23 24:13,19 26:3,13 27:7,20 28:4,8,25 29:5, 7,11,24 30:17, 22 31:1 34:13 35:20 36:14 37:2 40:8 41:22 42:11,25 45:7, 15 46:25 51:15 66:9,12,23 67:7,11 69:5 72:11,18 73:17 78:9,16,20 80:3,20 81:9 82:2,9,12,20 84:16 90:9 91:13 97:10 116:6,7,8,12 126:22 193:11 195:11,12 196:24 197:18 198:10 199:20 238:8 239:18

**lieutenant's** 15:5 27:6 50:25 55:16

**lieutenants** 27:5 85:7,19 91:8 116:4 126:16 156:14 165:2 179:1

181:22 191:19 192:2,5 195:23 196:12 197:25 199:6,14 200:1 201:10 202:12 212:13 216:12

**Likewise** 13:17

**limited** 88:18

**limits** 58:11

**limo** 52:19

**lines** 68:7

**listed** 185:18

**listen** 14:2

**litigation** 42:18 239:20,21 240:2

**live** 17:19,21

**lived** 219:5

**Lloyd** 52:17, 21,25 53:4

**locate** 231:10

**located** 224:1

**location** 8:15 219:4

**locations** 50:25 220:25

**log** 146:14

**long** 11:4 52:20 61:12,14 62:12 63:9 74:22 84:22 112:25 133:24 134:14 136:23 139:9

**longer** 98:6 113:24 114:15

**looked** 46:1,7, 10,18,23 49:7 61:5,20,25 159:20 204:18 215:11 217:16 232:15,17 233:14 234:23 237:11

**Lords** 52:19,23

**losing** 200:16

**lot** 20:1 33:11 118:15 124:3 165:25 168:12, 24 169:18 188:20 194:18 205:18,20 210:2,3 213:13 231:12

**low** 185:21

**lunch** 113:2,23 114:3,8,19 157:23

**lying** 103:25

———————

**M**

———————

**made** 14:25 30:19 57:4,21 65:25 87:6 88:22 90:2,13 95:23,24 96:9, 13,15 99:20 105:3 107:9 108:4,8,13 109:9 110:12 111:2 120:4,17 125:25 139:24 144:23 150:8 152:5 156:20 194:19 195:1 199:6,25 200:13 210:5 216:24 217:1, 21 220:23 231:2 237:19, 23 238:15

**Madison** 238:6

**Magistrate** 102:3

**main** 27:9 137:19 215:20 237:8

**major** 20:1 82:14,16,18 116:17 118:19 122:1

**make** 13:9,10 28:13 43:9,17, 24 46:12 47:22

49:9 50:1,14 57:9 89:9,19 90:4,20,24 93:22 105:19 113:15 120:20, 25 125:16 127:4 128:22 132:12 141:4 142:13 149:11, 21 150:1,2 173:25 179:25 180:20,25 181:2 190:24 200:11 201:4, 17 203:13,24 212:10,21 213:14,19,24 214:17 217:7

**makes** 114:7 234:10

**making** 13:8 66:2,6 89:10 124:12 127:15 132:9 139:18 140:23 142:12 191:3,23,25 193:20 199:4, 11 200:21 202:25 206:6, 14 211:9

**man** 181:11 238:6

**mandatory** 192:16

**mark** 218:5 230:12

**marked** 217:8, 12 218:8 230:16

**marshals** 115:22

**match** 227:19

**matter** 149:20, 21

**matters** 8:7

**maximum** 113:6,10,12

**Maxwell** 51:19, 22,25 55:12

56:12,16 58:7, 19

**mayor** 210:3

**Mcdonald** 223:24

**Mcgrath** 8:25 9:19 239:4 241:21

**Meaning** 183:24

**means** 19:2 28:10 76:6

**meant** 96:21

**mechanism** 124:16

**media** 21:15 169:18 205:3 206:5,14 210:2, 8 211:1 212:11 213:7 215:13, 16,23 216:7,9, 16 227:18 231:2,16

**medical** 14:1,3

**medications** 14:7

**meet** 56:21 61:6,12,14 62:4 201:14

**meeting** 61:16, 19,24 62:8,9, 12,15 63:1,4,5, 9,12 121:6,9 123:5 141:8,19 219:1

**meetings** 61:10 64:6 125:8,13,14 141:10,13,16 142:5

**Megan** 8:25

**Mejia** 204:3,10, 20 222:12,15

**member** 198:21 233:20

**members** 53:13 56:4



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

233:11 234:3
236:4,16

**membership**
56:6

**Memorial** 11:3

**memories**
64:24 65:17

**memory** 36:9
38:17,25 64:14,
18,21 66:1
101:7 102:24
104:1 105:2
108:2 167:21
168:18 169:16,
24 205:10
206:4 218:20,
25 219:22
220:10,14,19
221:16 222:21
223:11 224:16
225:24 226:2
228:12 229:13,
25 232:16
234:16 236:3,4,
8

**men** 122:8,21
221:23 222:5,
15,18,24 223:3,
5,10

**mention**
169:14

**mentioned**
76:4 104:25
153:7 163:3
201:12 203:1
223:23

**met** 61:4
218:25

**Mexico** 65:11
139:24

**middle** 157:24

**midnight**
28:23 29:11,15,
19

**Miedzianowsk
i** 80:16 81:2,15,
20 82:3,22
83:1,9 84:2,14,
19 86:7 87:20

88:1,4,5 90:2,5,
14 91:3 92:2,8,
17 94:18 95:13,
20,24 96:10,16,
21,24 97:3,6,11
98:2 99:21
101:23 105:4,7,
16,22 106:13,
16,22 107:4,9,
15 108:9,13,15,
21 109:9,17
110:12,22
111:2,7 112:5,
10 151:9,14
153:12 154:9,
12,17 155:1

**Miedzianowsk
i's** 94:12,16
102:16 109:12

**Mingey** 93:24
208:1,5,7,8

**minor** 68:6,12
69:2 70:7 76:9
120:14,16

**minute** 40:15
84:23

**minutes** 58:5
112:23

**Miranda** 129:3
134:3

**mischaracteri
ze** 168:15

**mischaracteri
zes** 33:6 132:24
168:11 221:20

**Mischaracteriz
ing** 24:16

**misconduct**
21:5 25:23 71:9
82:3 85:11
108:9 109:12
147:3,16,17,25
148:7,23
150:11 171:24

**missed** 46:12
68:6 74:22
143:23

**missing** 14:15
65:10 210:5

230:14 231:11

**misstates** 86:3

**misunderstoo
d** 24:2

**mixed** 223:23

**moment** 13:10
89:3

**Monday**
170:13,19

**Monell** 88:16
89:5,8,9,13
178:20

**month** 28:9
29:4 31:20
141:14 145:5
146:7 158:17

**monthly** 59:24
183:15

**months** 46:11

**morning**
28:12,17 62:5
164:16

**MOS** 119:25

**mother** 215:19

**mother-in-law**
239:14

**motive** 190:6
204:14

**move** 102:2
186:18,20
187:2

**moved** 98:3
188:8

**moving** 88:25

**multiple** 59:11

**murder**
174:14,19,22
203:15,19,23
205:25 232:2
233:24

**murders** 46:3
146:7

**mute** 10:14

---

**N**

**N6** 57:6

**named** 93:23
99:14 112:4
238:6 240:5

**names** 79:8

**narcotic** 15:18
19:22 20:1

**narcotics**
15:1,2 20:2
80:24 81:3,6
87:8,17 153:17
176:14

**Nashville**
55:20

**nature** 53:17
183:8

**Navarro** 9:5

**necessarily**
38:13 95:1,19

**needed** 27:25
30:24 38:2
41:24 121:14
126:1 138:23
139:25 140:6
141:20 146:11
180:19 182:4
190:20

**neighborhood**
130:12

**news** 145:2
230:9

**newspaper**
230:13

**night** 92:7
164:17 204:23
215:8

**nights** 28:8,20
29:3

**noise** 237:23

**non-** 172:17

**non-
compliance**
44:24

**non-fatal**
19:11

**non-homicide**
143:8

**non-sensitive**
172:14

**normal** 165:10,
16 168:2,5,8
170:1,6,19

**north** 115:18
116:1 177:10

**Northern** 8:11

**note** 62:23

**note-taking**
34:16 142:17

**notebook**
33:15

**notebooks**
33:13

**notepads**
33:18

**notes** 30:24
32:11,16 33:3,
17 34:2,5,19,24
35:2,5,12,13,
15,16,17,23,25
36:4,19 37:2,5,
8,15,20,25
38:1,3,11,22
39:6,9,11,15,19
40:3 42:8,16
47:15 48:2,7,17
57:8,13,22
62:22,24 63:2
64:5,8,9,10
214:13

**notetaking**
32:20 35:6
214:20

**notice** 178:7

**notified** 148:11

**noting** 76:8

**November**
62:11 63:4

**number** 8:12
46:8 71:19,20
87:24 91:24



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

97:23,24,25
134:23 148:9
170:3 171:7
185:10,11
194:10

**numbers**
32:18 159:21

## O

**O'HARE** 219:9

**O'MALLEY** 9:7

**oath** 240:8

**object** 21:7
70:2 78:4 82:13
143:13 156:8
161:21 179:15

**objecting**
77:22

**objection**
11:17 12:5
13:10 20:11,18
21:12,19,25
22:6,12,16,21,
25 23:7,12,18,
24 24:7,15,22
25:1,5,10,19
26:4,11 27:22
30:3,11,23
31:4,8,14,18,25
32:12,22 33:5,
10,25 34:14
35:8,24 36:2,7,
17,23 37:6,11,
17,21 38:4,12,
19 39:3,7,12,
16,20,24 40:2,
11,21 41:4
42:22 43:21
44:7 45:5,20
46:2,20 47:3,8,
12 48:3,11,19,
23 49:17 50:6,
11,20 52:1,7
53:10,24 54:3,
7,13,21 55:24
56:2 57:2,14,
19,24 59:9,15,
22 60:5,8,11
65:1,18 66:24
67:17,24 70:5,
9,24 71:2,11,15

72:4,23 73:3,8,
12,22 74:2,6,19
75:4,9,16,23
76:1,22 77:3,9,
14 78:10,21
79:5,20 80:1,7
81:18,24 82:5
83:2,10,15,18,
23 84:3,11,17
85:5,12,20
86:2,10,19
87:22 88:8,11,
14,24 89:15
90:16 91:6 93:6
94:14,21,25
95:6 96:19
97:12,17,20
98:10,24 99:3,
11,22 101:25
104:12,18,19
105:9 106:7,18,
23 107:6,12,17,
25 108:5,10,17,
22 109:7,13,19
110:1,5,15,23
111:3,8 112:1,
6,11,18 116:13,
22 117:2,7,13,
22 118:1,11,25
119:5,12,17,22
121:3,11,23
124:9,19,25
125:6 127:3,24
128:8,12,17
129:1,13,18
130:3,18,23
131:7,20
132:23 133:18,
22 134:5
136:10,15,21
139:14 142:6
143:18 146:5,
13,24 147:20
148:3,24
150:16,21
151:10,15
154:5 155:6,25
158:25 159:12,
18 160:17
161:2 162:1,4,
10,14,22 163:1,
18,23 164:4,10
165:20 166:9,
14,18 167:1,5,
17 168:3,10
169:3 170:7,15,

21 171:6,14
173:8,22 174:5,
15,25 175:6,19
176:3 177:9,11,
14 178:4 180:4,
10,13,17,24
181:24 182:2,8,
14,22 183:6,13,
21 184:2,8
185:24 186:14
187:18,25
188:13,17
189:1,5,12,17,
22 190:4,9,14
191:17,22
193:6,19 194:1,
7,12 195:4,10,
17,24 196:4,9,
15,25 197:14
198:1,12 199:8,
16 200:2 201:1,
6,11,24 202:8,
14,21 203:7
206:17 209:9
211:18,22
212:5,16,24
213:3,9 214:3,
15 215:3 216:3
221:2,19,25
227:15 229:7,
16 232:12,18,
22 233:2,7,13,
22 234:9,19
235:1,8,13,18,
22 237:4
238:21 239:4,7
240:9 241:3

**objections**
13:8

**obtain** 135:24
136:2

**obtained** 148:9

**occasion**
163:7

**occasions**
240:12

**occur** 125:14
159:14 178:24
198:16

**occurred** 25:9,
18 26:7 32:3,6,
7 45:15 73:11

84:15 106:14
163:17

**occurring**
21:11 23:5,10
24:12 25:17
44:11 82:4
183:5

**offender**
122:19 129:9
131:22 132:10

**offhand** 115:24
185:16 222:23

**office** 17:18
26:14,17 27:4,
6,11,17,21,23
41:3,5,19,22
50:25 55:16,17
57:23 58:19
76:21 83:12
88:2 126:11
137:18,21,25
138:4,7,10,11,
13,14 140:18
158:22 240:24
241:9

**officer** 16:22
17:24 29:20
74:18 75:19,22
77:7 91:3 92:5
95:17 96:16
122:17 128:16
142:1 149:4,12
150:23 157:16
171:12 172:22
173:4 175:12
207:24

**officer's** 151:5

**officers** 16:14,
15,17,19 17:8
51:21 52:5 54:5
58:22 59:18
64:9,10 67:2
75:14 77:20
79:25 104:9
120:6 124:7
140:2 146:19
147:3 149:7
170:25 176:16,
17 205:8
208:25 209:7

**offices** 52:6
55:10,12 56:13

57:12 58:18
59:8

**official** 33:4
40:23

**older** 130:6

**on-site** 191:9

**once-a-month**
123:5

**ongoing**
142:20

**open** 26:20,24
48:25 49:13,21,
23 52:21 90:14
138:1,3,7
171:10,13
232:3

**opened** 52:24
105:21 156:7

**operate** 86:8

**operating** 85:4

**opinion** 23:4
24:1 42:20
164:3,5

**opinions** 22:14
237:14,15,21
238:1

**opportunity**
134:17 188:19
189:15

**opposite** 29:6

**opposition**
33:1

**OPS** 68:2,16
70:11 79:14
147:9

**oral** 184:11

**orally** 133:25

**order** 11:11,14
45:13 120:5
125:14 216:7

**orders** 116:15,
16 142:16
192:12,13,14,
20

**organization**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

53:1

**organizations**
11:24

**organized**
15:20 56:5
176:9,18

**oriented** 53:12

**original** 41:9
48:13 135:4

**original's**
135:6

**outdoors**
126:19

**outer** 137:21

**outs** 58:7

**outstanding**
122:5

**overseeing**
21:17 31:1 40:9
73:24 78:14,20
80:3 88:22

**overtime**
168:24 188:15,
18,20,25 189:4,
9,15,21,23
190:3,8

**overturn**
237:12,13

**overturned**
237:11

———————

**P**

———————

**P-H-I-L-I-P**
10:8

**P.m** 242:8

**p.m.** 28:23
114:25 115:3
158:5,8 164:25
165:7,14 166:7
170:13,19
226:13,16
242:7

**pad** 33:21

**Padre** 207:21

**pads** 48:2

**paid** 143:19
189:23 213:14

**paper** 32:17
47:23 48:10,13
182:24

**paperwork**
138:23

**paperwork's**
142:13

**parent** 200:23

**part** 34:8,11
37:7 40:6,7
42:17 44:8
46:1,7,13 49:5
53:7 55:8 57:16
71:3,4 74:13,24
84:15 109:20,
22 110:3,8
111:16 125:11,
19 137:13
148:11 155:11
161:23 164:13
177:19 183:15
187:20 191:24
222:1 225:19
233:19

**participate**
45:8 137:1,14
209:18,21
227:2

**participated**
208:25

**participates**
201:8

**parties** 9:14

**partner** 80:16
97:1

**partnership**
11:11

**past** 12:15
14:11 32:11
63:21 100:4,5
172:5 174:24
175:5 178:5

**patrol** 16:22

**patrolman**
14:20

**Patron** 205:1

**pattern** 121:18

**patterns**
143:15 183:2

**Patton** 99:1,15,
16 103:22,23
104:25

**pause** 13:4
14:22 226:8,10

**paying** 143:11,
13 161:19
210:11 212:3,
15

**penalty** 237:13

**pending** 8:10
13:22 239:19,
21 240:2

**penitentiary**
52:18

**pension** 11:20,
23 12:3

**people** 34:23
55:1 65:25 88:3
101:8 110:13
119:9 124:4
125:17 129:24
130:2 131:10
136:19 140:1
144:18 187:20
191:3 205:18,
20 212:2 238:7

**percent** 136:18
162:13,25

**percentage**
162:24

**perfectly**
104:4 178:13

**perform** 11:10
192:21 217:3

**performance**
121:22

**Pergande**
208:14

**period** 19:17
20:6 75:1,24
76:15,17 86:17,
24 136:23

168:9

**permanent**
50:3

**perpetrators**
234:7,23

**person** 35:9
96:10 97:6
127:6,9 131:14
149:19 203:11

**personal** 33:3
220:10,13
228:12 229:12,
25 236:4

**personally**
47:2 126:4
224:10

**personnel**
74:14,17 75:8,
14 76:18,19,25
208:19

**pertinent** 38:7

**Phil** 8:7

**Philip** 9:12,15
10:7

**phone** 159:15

**photo** 40:5

**photographs**
63:24

**photos** 56:3
63:25 64:1

**phrase** 214:5

**physical**
163:22 164:1

**physically**
22:5

**pick** 52:19

**picture** 41:7

**pictures** 65:7
205:3 222:8

**piece** 32:16
36:20 40:5
47:23 48:13
132:21

**place** 29:24
30:14,16 31:3

32:10 42:17
43:5 44:1 70:21
75:6 116:9,11,
19 118:5,6
119:2 121:16,
21 125:8
168:19 169:15,
23 170:18
196:2,7,12,22
197:24 199:19

**places** 169:10

**plainclothes**
16:20

**Plaintiff** 8:18,
19,21

**Plaintiff's** 8:16

**plan** 95:2
100:10 114:12

**plate** 69:1
203:1

**play** 89:18
191:5

**played** 191:9

**PLAYS** 89:22

**pleased**
122:21

**point** 13:21
21:21 49:16
51:21 58:18
73:17 80:12
90:17 98:12
103:10 104:11
113:23 144:8,
15 151:22,23
152:20 154:15
174:3 219:3
220:25 221:4
240:24

**pointing**
222:14

**points** 162:24

**Polaroid** 40:5
41:7

**police** 11:3,12,
15,21,25 12:11
14:13,16,19
16:19 33:15
64:9 75:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

77:20 85:15
104:9 122:17
169:10,13
171:4 172:4
177:22,25
200:6 201:13
205:8 208:19,
25 209:6 232:5
236:5

**policies** 29:24,
25 30:1,7 43:1
44:20 116:9,11,
19 117:9,23,24
118:5,6,9,21
119:2,16
180:12 181:7
182:6 192:11,
14 194:24
200:19,24

**policy** 30:21
31:3,6,24
42:14,17,21
43:19,22,23
44:5,12,14
46:10,19 47:14
180:18,25
181:2,7,12,16,
19 182:1,4
193:4 197:16,
19 198:4,25

**policy-making**
181:23

**policymaking**
180:16,23

**political** 210:3

**pond** 152:15

**poor** 161:8
241:4,7

**position** 10:25
11:4,11 12:4
15:5 16:14
17:25 18:10,16,
21 20:24 80:22
103:4 172:15,
18 173:16
186:18,19
228:20 229:1,3,
24 239:16

**positions**
14:17 40:14,16
59:12 75:11

**possibility**
232:3,10
233:20

**possibly** 102:9

**potential** 107:9
147:2 232:21
234:2

**practice** 33:23
48:17 128:20
129:10

**practices**
117:9 119:8,16
120:21 165:18
168:8 203:4,5,9

**pre-detective**
31:20

**preferred** 48:2

**pregnancy**
204:21

**preparation**
62:4 63:6,18
65:16 170:4,11
217:14 218:10

**prepare** 61:2

**preparing**
209:3

**present** 175:17
176:2

**presented**
237:18

**pretty** 86:3,11
88:6 144:14
234:20

**prevent** 14:3,8

**previous**
75:19

**previously**
19:14 32:14
93:20 94:4,7,
19,23 95:4
104:2 123:21
126:21 171:3
219:5 227:1
238:5

**primarily** 20:2

**prime** 186:23

**printed** 230:20

**prior** 62:8 63:4
81:8 101:14
104:17 220:24
221:20

**priorities**
121:15

**privy** 23:2 42:7
152:11

**probing** 88:18
104:15

**problem** 52:24
102:10 186:3,4

**problematic**
131:17

**problems**
160:2 213:25
214:1

**proceed**
133:24

**proceeded**
142:25 205:12

**proceeding**
144:11 154:4

**PROCEEDING
S** 8:1

**process** 46:14
50:17 57:20
66:14,23 67:6,
16 70:14,22,25
71:4,7,10,24
72:1,3,10,20
73:1,6 74:8
75:20 77:11,12
79:13 128:21
144:15 152:12
155:10 191:21

**processes**
79:14

**produce** 100:3
103:7

**produced**
88:13 100:7
101:15 102:19
104:18

**profile** 172:25

**Progress**
30:12

**prohibitions**
197:7

**promise** 113:9,
15

**promoted**
15:17,19,20,21

**promulgated**
181:8

**proper** 43:9
142:13

**property** 28:7
29:5 116:7
135:9 187:22
188:3,10
205:19 206:8,
15

**prosecutor**
21:22,23 22:3,
11 135:18,23

**prosecutor's**
22:15,19,24
23:16,22 24:5

**prosecutors**
22:22

**proud** 122:2,
12,16 163:4

**proves** 104:11

**provide** 59:19
145:6 146:11
159:24

**provided**
101:21 103:16
133:11 167:15
192:20

**pull** 217:6
218:1,3

**pulled** 223:16

**Pulling** 217:8

**punish** 73:1

**punishment**
71:3,18 72:2,9,
21 73:6,7 74:1,
9,12 75:19

**punishments**
71:13

**purpose** 50:21
129:20

**purposes**
17:14 58:12
67:3 141:2

**pursuant**
75:19 79:13

**pursuing**
232:9

**pushed** 182:24

**put** 10:13 32:17
33:3 41:7 46:4
60:17 88:3,5
95:20 103:4
116:15 121:19,
21 129:2,6
135:3,5,8
144:14 146:6
150:25 165:25
168:11,23
172:14,17
174:1 182:4
186:18 196:2,6,
22 218:4

**putting** 53:4
157:7 194:5
196:12 197:23

---

Q

---

**quarter** 46:17

**quarterly**
45:22 184:24

**quarters** 47:1

**question**
12:14,23,25
13:3,5,13,17,
18,23,25 14:2
17:15 20:12
25:11 30:4 39:8
50:7 66:10
78:17 83:19
89:1,25 107:2
125:12 143:19
147:15 157:24,
25 161:7,8
166:15 167:7,
15 171:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

175:23 176:17
179:16 191:18
193:7,8,9
194:14 198:3
203:18 212:25
221:8 226:25
239:22 241:4,7

**question-and-answer** 12:20

**questioned**
54:19 236:13

**questioning**
78:2 101:13,21
102:1 113:21

**questions**
12:6,21 13:14
14:4,8 58:14
76:5 77:11,23
86:14,21 88:18
101:16 102:20
103:11 104:5,7,
20 113:17
128:25 144:20
199:14 238:5,
18,20,21
239:24 240:8
241:16,20,21,
22,23

**quick** 112:23

**quote** 231:9

———————

**R**

———————

**raise** 9:22

**Ralph** 116:6

**range** 99:24
101:4 102:18

**rank** 16:22
17:10

**rare** 136:9
192:5

**rate** 122:3,22,
25 123:12
146:9 158:13
159:11 161:25
162:8,16

**rates** 146:4
158:11 161:9,
12,16 184:18

**rating** 184:19,
22 185:1,5,6,7,
13

**re-** 107:1

**reached** 69:18
163:16 164:1,7

**reaction** 164:2,
9

**read** 22:10 23:2
25:11 89:1
103:21 104:2
129:7 164:12
173:11 217:16
223:12

**reading** 101:1,
18,19 102:11
236:1

**ready** 43:11
103:8

**real** 125:24

**reason** 47:21
102:23,24
165:17 232:20
233:18

**reasons**
173:20 233:5

**recall** 20:13
22:8 30:8 31:9
43:4 47:9 62:21
64:12 74:24
77:5 78:22
79:2,6,8,21
80:2,9 88:9
91:12,15 93:15
94:8 95:10
98:20 99:7,8,
14,16 105:10,
23 106:2,5,25
107:18,20
108:1,6,18,24
109:1,14
111:14 112:3,8,
14,20 115:12
116:20 119:13,
18 124:20
125:7 126:6,9,
18 134:23
142:2,7 144:25
145:4 146:2

185:21 186:9

150:17 151:2
152:21 153:25
154:6 165:5
168:17 184:3,
16 185:4
206:22 207:5,
11 208:2,16,24
209:14 211:5
216:20 217:4
224:3 225:7,11,
18 227:5,9
228:7,24
235:20 236:20
238:17

**receive** 182:13

**received** 152:7

**recent** 61:10

**recently** 100:6

**recollection**
154:3 167:16

**recommendati
on** 67:10,12,15

**recommendati
ons** 67:1,4

**recommended**
66:16

**record** 9:11
10:6,10,18
14:14 25:24
34:21 60:21,23,
24 75:7 86:3
103:4 104:9
114:24 115:1,2
158:4,6,7
226:12,14,15
230:19

**record's** 25:22

**records** 46:5
49:11 75:2

**recover** 205:7

**recovered**
135:9

**recovery**
222:12

**ref** 203:22

**refer** 76:18
203:22

**reference**
217:18 218:14

**references**
65:25 218:2

**referred** 41:14
69:4 70:7

**referring** 64:8
127:13 203:16

**refresh** 104:1
105:1 167:16
168:18 169:16,
24 220:19

**refusing**
128:25

**regard** 24:3
103:6 106:3
118:21 119:9
120:13 123:12
128:20 147:15,
16,24 150:10
153:12 163:16
180:15,23
220:2 234:1

**register** 87:24
91:24 95:12
106:20 203:1

**regular** 43:16
125:10,13
141:7 144:21
145:17 158:12
159:20

**regularly**
83:22 145:25
211:7

**regulations**
44:21

**related** 19:22
43:1 51:1 57:17
77:7 86:22
89:12 102:15
227:6

**relationship**
200:19 222:24
223:3

**relatives**
233:18 235:24

**relayed** 211:12

**released** 223:8

**relevance** 12:5
21:25 22:6,12,
16,21,25 23:13,
19,25 42:22
59:23 77:4,10
78:11 88:24
155:5 177:9,11,
14 178:4
238:22 239:8

**relevant** 58:11
100:12,13
102:2,9 104:7
178:6,7,10,16,
18,19

**relying** 39:11
99:25

**rem** 204:16

**remain** 130:17
133:3

**remaining**
129:11,16

**remember**
17:13 20:20
30:13 31:11
43:3,5,15
45:17,23 46:21
47:4,13 51:17
55:13,15,17
57:25 62:1 63:8
64:15,16,17
66:4 69:15
71:20 72:24
73:4,9,11,13,19
74:3,21 76:24
77:15 78:12
79:16 83:11
91:1 93:23 94:5
96:12 97:13
99:4,13 103:22
104:3 107:7
108:11 109:5
111:9 115:23
126:24 129:2,5
130:4 132:25
138:5 139:2
150:24 151:1
152:15 153:16,
20 154:14,21
155:4,19 156:9
157:17 158:15
161:10,13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

162:2,12,15,23
163:2 165:16,
23 166:5,10,23
167:2,20 168:5,
23 172:1
177:12 182:23
184:20 185:12
187:14 204:6,8,
10,12,14,17,19
205:17 206:2,
11,12,18,19
207:4,19,22,25
208:12,15
209:2,3,5,11,17
211:8 212:6,17
215:7,10,13,16
216:4 219:14
220:20 222:22,
24 223:2
226:23 227:21
231:18 233:3
235:2,25

**remembered**
65:5,12,19
204:25 205:24

**remembers**
101:10 102:6

**removed** 50:5,
10 74:17 75:7,
14,25 76:15,17
105:17 191:21

**render** 237:19

**repeat** 12:18

**rephrase**
13:15

**replace** 18:10
115:7 177:1

**replaced** 20:22

**report** 21:23
22:8,10 23:16,
22 24:5 36:1
38:13 40:4,6
47:10 57:10
59:25 61:18,21,
25 83:6 108:8
115:9 144:17
158:12,16
163:7,21 171:4
177:13 183:15
185:18 203:2
214:23 217:7,

10 218:1,2,6
219:18,23
220:10,17,21
223:16,21,23
225:15,18,22
231:16

**reported**
115:25 177:18,
21

**reporter** 8:3,4
9:9,14,21 10:2
12:21 13:11
16:24 60:21,24
88:25 89:3,18,
22 114:21,24
115:2 158:4,7
226:12,15
242:3,6

**reporters**
231:19

**reporting**
127:16 144:23
182:10 217:22
218:17,24
219:4 224:4,7,8

**reports** 30:12,
13 35:3,7 36:6,
16,21 38:17,24
39:1,5,10 43:9
45:3 50:14,15,
23 61:5,18
62:18 63:15
64:12,13 65:6,
20,24 125:2
138:22 164:12
169:5,10,14
170:10 172:4
182:13,19,23
183:11 184:12
185:22 191:4
209:2 214:9,14
216:23 217:5
223:7 225:23
227:12,18
228:2 235:3
236:1,10

**represent**
163:25

**representing**
92:6

**reprimand**
70:20 76:4,6

128:15

**reprimands**
77:8

**Request** 74:12

**REQUESTED**
89:22

**requesting**
128:24 206:6,
14

**requests**
105:19 128:21

**required** 30:21
33:2 66:19
103:7 192:25
196:18

**requirement**
30:15 32:9

**research**
103:5,8,13

**reserve** 241:23

**residence**
220:24

**resolving**
199:13

**resource**
206:9

**resources**
65:2 139:18,20
140:6,14
179:25 190:25
192:1

**respectful**
10:18,20

**respond** 13:10

**response**
12:24 82:20
240:8

**responsibilitie
s** 119:23 178:14
179:23

**responsibility**
179:18 195:22
225:7

**responsible**
24:20,24 32:1
33:19 41:20

49:9 138:25
178:23 179:19
193:17 194:5
202:25

**rest** 113:19

**restriction**
196:7 197:1

**restrictions**
196:2,13,21
197:4 198:9

**result** 69:19
109:10 152:19
224:17

**resulted** 74:8
79:17 107:10
110:12 175:25
204:2

**resulting**
173:6

**results** 45:10
47:6 142:22

**retention**
49:12 50:3

**retire** 12:10

**retired** 18:17,
20 153:8,9

**retirement**
14:18

**return** 215:21

**review** 61:16,
18,23 62:14,22
63:1,11,18,21,
24 64:5,9 66:15
67:3,5 70:22
72:6 75:18
100:6 108:14
109:11 110:13
111:12 140:25
141:2 144:5,8,
10 155:12
157:9 163:7,12
170:25 180:18
217:14 220:17
222:20 225:14,
22 227:23
235:21

**reviewed**
44:19 65:15

67:1,7 144:7
170:3,10 171:5
218:10 219:23
222:22 225:23
227:13 228:3
235:23

**reviewing**
64:13 65:6,17
138:22 142:12
225:17

**reviews** 44:3
46:1,7 145:5

**reward** 188:16

**Rey** 94:4

**Reyes** 86:12,
23 89:12
101:24 163:16
165:3 178:5,11
203:14 204:2,6
218:5 223:17,
20

**Reyes'** 58:8

**Reynaldo** 8:8
94:5 163:13
206:23 207:2

**RFC** 217:9
218:5 223:17,
20

**rid** 48:9

**ride** 139:16

**rights** 129:3,8
133:9,14,25
134:14,22
136:4

**Risley** 112:5,
12,13,16

**RME** 186:22

**road** 214:2

**robberies**
19:11 146:15

**robbery** 19:4,6
121:18 186:24

**Robert** 209:13

**Roberts** 115:8

**Rock** 17:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

role 11:14
66:12,13,23
67:16 70:13
77:19 125:19
138:16 155:9
176:13 178:9
179:6,18 180:7,
15,23 190:22
191:5,9 196:12

roll 32:2 141:7

room 16:25
26:16,18 27:1,
15,23 55:14
137:18,23
140:19,21
198:23 228:22,
25 229:5

rooms 25:4
26:18,23 55:11,
18,21 129:3,6
229:14 230:2

root 232:4

Rosen 8:23
11:17 12:5
20:11,18 21:8,
12,19,25 22:6,
12,16,21,25
23:7,12,18,24
24:7,15,22
25:1,5,10,14,19
26:4,11 27:22
30:3,11,23
31:4,8,14,18,25
32:12,22 33:5,
10,25 34:14
35:8,24 36:2,7,
17,23 37:6,11,
17,21 38:4,12,
19 39:3,7,12,
16,20,24 40:2,
11,21 41:4
42:22 43:21
44:7 45:5,20
46:2,20 47:3,8,
12 48:3,11,19,
23 49:17 50:6,
11,20 52:1,7
53:10,24 54:3,
7,13,21 55:24
56:2 57:2,14,
19,24 58:3
59:9,15,17,22
60:5,8,11,19

61:4 62:4,23
65:1,18 66:24
67:17,24 70:5,
9,24 71:2,11,15
72:4,23 73:3,8,
12,22 74:2,6,19
75:4,9,16,23
76:1,22 77:3,9,
22 78:10,21
79:5,15,20
80:1,7 81:18,24
82:5,13 83:2,
10,15,18,23
84:3,11,17
85:5,12,20
86:2,10,19
87:2,22 88:8,11
89:4,14 90:16,
21 91:6 93:6
94:14,21,25
95:6 96:19
97:12,17,20
98:10,24 99:3,
11,22 100:2,7,
10,15,22,25
101:3,12,18
102:10,23
104:10 105:9
106:7,18,23
107:6,12,17,25
108:5,10,17,22
109:7,13,19
110:1,5,15,23
111:3,8 112:1,
6,11,18,24
113:10,13,16,
22 114:8,11,14,
18,23 116:13,
22 117:2,7,11,
13,22 118:1,11,
25 119:5,12,17,
22 121:3,11,23
124:9,19,25
125:6 127:3,24
128:8,12,17
129:1,13,18
130:3,18,23
131:7,20
132:23 133:18,
22 134:5
136:10,15,21
139:14 142:6
143:13,25
146:5,13,24
147:5,20 148:3,
24 150:16,21

151:10,15
154:5 155:5,25
156:8 157:20,
23 158:3,25
159:12,18
160:17 161:2,
21 162:1,4,10,
14,22 163:1,18,
23 164:4,10
165:20 166:9,
14,18 167:1,5,
13 168:3,10,15
169:3 170:7,15,
21 171:6,13
173:8,22 174:5,
15,25 175:6,19
176:3 177:9,11,
14 178:4,10,18,
21 179:15
180:4,10,13,17,
24 181:24
182:2,8,14,22
183:6,13,21,24
184:2,8 185:24
186:14 187:18,
25 188:13,17
189:1,5,12,22
190:4,9,14
191:22 193:6
194:1,7,12
195:4,10,24
196:4,9,15,25
197:14 198:1,
12 199:8 200:2
201:1,6,11,24
202:8,14,21
203:7 206:17
208:7,19 209:9
211:18,22
212:5,16,24
213:3,9 214:3,
15 215:3 216:3
221:2,19,25
226:6,11,17,21
227:15 229:7,
16 230:19,23
232:12,18,22
233:2,7,13,22
234:9,19 235:1,
8,13,18,22
237:4,23
238:19 239:7,
21 240:9,15
241:3,5,11,15,
18,23

round 59:3

routine 43:23
60:6 125:14
144:21

ROZEN 189:17
193:19 195:17
199:16

Ruiz 208:11

rules 32:20
38:2 44:20
119:2 196:6,13,
21 197:1,4,23
198:2

rumors 21:10,
18 23:11

run 80:5 84:1

Ruse 131:6

rush 130:10

Rutherford
207:12,15

_____

S

safe 215:21

safely 122:7
205:16 212:21
213:11

salary 11:6

Salvey 138:15

Santiago
222:10 223:25
225:6

Santo 207:21

sat 26:21 27:2,
4 62:6 125:17
138:11,13

satisfied 38:14

satisfy 190:20

scanned
217:17

scene 169:7
215:6,10

schedule
170:19

school 34:9
36:14 130:13
190:17

scope 84:12
88:12 179:12

Scott 163:8,15

screen 217:8
218:4 230:7

Sean 8:19

search 125:23
126:7,8

seat 139:15

sec 218:3

secondary
213:12

section 15:19
16:2 17:8 51:12
77:19 78:9

sections 18:6

Security 12:7

sees 202:16

segment
169:19,20

selected 16:20

sending 124:4

senior 75:11

sense 93:22
96:13 114:7
162:25 203:24

sensitive
172:18,21,25
173:16

separate 19:7
27:1 135:19

sergeant
14:21,25 27:14
29:14,22 69:9,
13,14 91:13
93:23 97:10
99:1,14,16
103:22,23
104:25 193:20
196:23 198:10
199:20 208:7,8
209:13,15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**sergeant's** 43:4 55:16

**sergeants** 29:16 32:1,7 45:6 46:24 69:18 72:13 73:24 85:6,19 91:8 126:16 156:16 179:1 190:23 191:8, 23 192:3 193:24 194:4 195:2,8,23 197:17,24 199:6,14 200:1 201:10 202:18 203:6,13 212:22 213:1 216:11 227:10

**services** 177:18,21

**session** 12:20

**set** 127:5 164:23 181:12, 15,19 182:1 193:4,24 198:10 203:5 211:3

**setting** 193:17

**settings** 159:14

**severe** 71:18

**sex** 19:4

**sexual** 146:16

**share** 91:17 131:12,17 145:6 146:22 147:3,5 160:9

**shared** 83:12 158:23 159:3,6

**sharing** 111:13 124:13,17 130:21 150:7

**sheet** 48:10 146:6

**sheets** 60:16

**shift** 28:6,15 29:2,3,11,12,

15,19 42:5 166:7 170:13 189:7,8,9,13,14 190:1,2,3,7,12 202:3 220:7

**shifts** 29:6 127:23 164:14 190:8

**ship** 50:16

**shipped** 46:5 49:11 50:2

**shock** 84:9

**shooting** 93:12 181:11

**shootings** 19:12 82:21 118:16

**short** 114:17 226:6

**shorter** 114:9

**shortly** 18:20 90:1

**shot** 122:17 169:19

**should've** 110:17

**show** 132:4 230:5

**showed** 61:5 62:6 91:19 123:4 146:7 174:24

**showing** 200:23 230:7, 11

**shown** 56:11, 12

**shows** 175:14

**sic** 107:15

**side** 115:18 116:1 174:23 177:10

**Sidley** 163:8, 12

**sign** 69:20

133:2,11,13,24 134:4,11,17 136:7,14,19

**signature** 134:9 241:24

**signed** 43:25 135:2

**significant** 68:15

**signs** 129:2

**silent** 129:11, 17 130:17 133:3,10

**silly** 114:15

**similar** 57:3 107:21 120:7 149:6

**similarly** 12:24 57:11

**simply** 35:12 37:20 38:10 104:3

**simultaneousl y** 148:16

**sir** 10:5,17 12:15 17:20 61:2 104:24 175:20 217:11 226:23 230:15 231:1

**sit** 20:13,19 26:15 27:14 32:24 43:4,15 44:2 45:17,23 47:4 51:18 52:2 57:25 69:16 73:10,14 74:4 77:15 78:23 79:21 86:4 91:16 93:21 96:12 99:12 104:24 105:10, 24 108:1,6,11, 19,25 109:5 111:9,19 126:18 132:25 137:16 139:2 151:4 153:20 161:13 162:11

165:5,15,21 166:5,10 167:21,25 177:2 207:4,25 208:3 215:11 219:21 225:10, 13 227:8 228:7, 16,23 229:9 237:20,25

**sits** 41:3

**sitting** 138:6 150:17 154:14 182:21 211:5 219:14

**situation** 198:25 199:5, 13 200:22

**situations** 195:2 198:20

**small** 27:7

**smaller** 179:10

**Smith** 68:25 239:11,13

**Social** 12:7

**Solache** 8:9,22 86:12,22 101:24 178:5, 11 204:3,8 218:5 223:17, 20 230:12

**solemnly** 9:23

**solve** 65:8 205:4 213:24

**solved** 46:3 122:15,20 211:21 213:6

**solving** 122:5, 11 222:3 231:12

**son** 198:22 231:6 234:24

**sophisticated** 53:15 82:19

**sort** 14:16 23:15,21 24:4 26:20 33:9 43:16,23 58:10

71:17 76:25 125:4 192:23 197:23 234:16

**Soto** 203:15, 20,23 204:21, 23 220:24 222:10 223:25 225:1,4,6

**Sotos** 219:5 233:11 236:5, 16

**sound** 60:3 165:14

**sounds** 124:7 142:25 149:25 232:8

**sources** 12:2

**south** 115:18

**southside** 118:17

**Spanish** 205:20 208:16 209:7

**Spanish-** 208:24

**SPAR** 71:4,7, 10 72:10,20 74:8,11,13 75:2,20 79:13 106:13

**SPARS** 75:7, 13

**speak** 112:4 129:22 140:2

**speaker** 209:7

**speakers** 141:23 205:20 208:17

**speaking** 208:25 215:13, 16

**special** 21:21, 23 22:3,11,15, 19,23 23:16,22 24:5 115:19,20, 23 142:16 143:19 192:12,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

13,19,20

**specialist**
17:10 52:9,14
53:3 60:10
80:13 85:4
92:22 98:9
107:4

**specialists**
53:19 54:11
55:2,5,19,23
56:16,21,24
58:6,9 78:8,13,
15,19,25 79:4,
9,13,18 80:4,6,
9,15,21 81:10,
12,16,22 84:7
86:7,9 90:10
92:12 93:20
124:13,17,23
125:4,9

**specific** 14:1
43:18 44:4
55:18 57:17
64:15,24 66:1
92:21 101:6,19
112:8 122:14
125:23 130:5
131:9 132:18
141:24 144:20,
25 145:4 157:7
174:1 183:24
196:2 197:9
205:22 206:2,
19 214:22
218:20 221:16
223:11 224:16
232:16 238:17

**specifically**
44:11 46:18
65:5,14,19
69:15 95:12
96:17 109:1
111:10,12
122:9 129:21
143:11 168:6
184:20 206:11
214:19 218:25
225:11

**specifics**
78:12,22 79:6,
22 95:10
107:18 108:24
111:14 112:3

118:13 124:20
132:17 152:15
153:20 187:15
216:4

**speculate**
24:10,18 25:21
173:23 175:20
176:5

**speculation**
23:13,19,25
24:16 25:20
76:2 164:13
169:4 170:8
173:9 176:4
190:5,15 199:9
200:3

**speed** 191:12

**spell** 10:5

**spend** 27:19
178:21

**spent** 78:2

**split** 82:11

**spoke** 34:25
154:12 207:1,8
210:16 215:23
224:6 225:24

**spot** 186:24

**spread** 95:3

**squad** 26:16,
18 27:15,23
115:21 137:18,
23 140:19,21

**stabbed**
204:23 215:19

**staff** 141:13,16,
19 142:5

**stages** 205:13

**stakes** 174:14

**stamped**
230:12

**stand** 122:15
174:18,22

**standing** 77:14
89:2 101:24
104:19 213:21
238:21

**star** 33:15

**Starr** 8:19

**start** 17:22
124:23 130:4
147:16

**started** 33:8
85:14 98:14

**starting** 8:15

**state** 8:14 9:10
10:5 49:24
200:6 201:13
233:17

**State's** 126:11

**stated** 119:6

**statement**
107:16 135:18
231:15

**statements**
34:22 131:10

**states** 8:10
231:10 240:23

**station** 54:17
166:3,25
198:21 200:23
219:9 231:7
234:25 236:5,
13

**statistic**
185:12

**statistics**
146:17 185:9

**status** 141:5
142:24

**stay** 57:22
76:14 164:17
187:3 195:13

**stayed** 227:20

**steno** 33:21

**step** 91:22

**steps** 36:21
49:15 92:1
132:7 140:10
213:17 219:19

**Stibich** 115:14

**sticker** 69:1

**stipulate** 9:16

**stole** 107:15

**stood** 150:22

**stop** 33:3 158:1

**strategy**
104:20

**street** 16:15,21
28:1,3 33:14
39:22 40:1,3,7,
10,20,22 41:1,
2,10,13,21
42:2,9,10,14
43:1,13 44:5
46:19 49:15
51:19,22,25
52:25 53:2,12
55:12,20 56:12,
16 58:7,19
149:4,5,8 180:6
192:7

**street-** 53:11

**streets** 55:2
149:13

**strictly** 185:9

**strike** 12:13
21:22 22:23
26:6 29:10
35:22 36:25
39:9 40:15
42:15 45:14
49:21 55:11
66:22 71:25
72:18 81:8 93:9
94:18 104:25
105:11 108:19
109:8 118:5
120:20,23,24
127:20 165:3
176:16 190:22
194:3 196:20
211:24 216:22
224:7 225:2
229:3,24 236:3
237:15

**strip** 149:20

**stripped**
150:25 152:3,5

**strongly** 96:3

**stuff** 19:12
61:20 118:18
119:25 120:14
154:17 240:1

**subjected**
54:18

**subordinate**
141:11

**subsequent**
80:21 106:20
221:11

**substantial**
10:19 32:10

**suburban**
123:4

**suburbs** 123:6

**success** 10:19

**successful**
53:3 236:25
237:7

**suddenly**
220:20

**suggesting**
103:5

**summarily**
73:1

**summary**
60:12 71:3
72:20 73:6,25
74:12

**summer** 63:7

**super** 97:9

**superintenden
t** 9:10,22 15:22
67:10 98:1
149:19 150:8
158:24 159:3,5
160:15 177:13,
17,20 210:4,16
241:25

**superintenden
t's** 149:23

**supervised**
82:23 193:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

supervising
16:14 17:9
18:22 19:14
20:7 35:20
40:14,16 46:24
72:19 81:9
128:19 176:12

supervision
30:10 79:19
82:24 176:18
195:11

supervisor
18:12 29:10
32:19 43:8
45:12 47:22
51:7 59:20,24
67:25 79:1,4,10
109:4 128:2
141:16 175:2
185:25 202:22,
24 220:8
224:14

supervisor's
76:21

supervisors
23:6 45:6 51:14
68:5,9,20,22,25
85:16 86:18,21,
25 87:6,10
90:25 91:4,9
98:19 106:9
108:23 109:1,6
125:16 141:11,
14,19 144:23
160:5,8 179:20
186:2 213:20
216:10 224:12

supervisory
66:12 156:18

supplementar
y 36:5 62:18
63:15 64:12
116:16 217:10
218:6 223:18,
21

supposed
32:17 42:4
43:17 48:12
49:10 57:12
155:15

Supreme

131:4

surprise 241:2

surprised 84:5
237:12

surprising
84:13

surrounded
123:6

Susler 8:21
9:20 10:12,15
113:18 241:16

suspect 20:25
21:3 54:18 80:4
133:13 209:19
235:4,14

suspect's
128:20

suspected
95:21 96:3
107:15 233:6
234:23 235:20

suspects 21:1,
6 22:5 54:2,6,
11,14 128:24
129:11 131:3
136:3 137:14
163:22 164:2

suspend 102:1

suspension
70:20 71:14,19,
21

suspicion 84:1

suspicions
83:9

sustained
67:7,18,21,22
69:21 106:17
107:11 155:14,
18,19,20 157:2,
4,8,19 171:8,
11,17,18,23,24
173:6 175:15
176:1

sustaining
173:11

Swaminathan
8:17 9:16 10:4,

13,16 17:2,5,6
25:13,15 58:13,
17 60:20 61:1
77:16 78:6
86:13,24 87:4,
11 88:15 89:7,
17,21,24 90:7
99:25 100:4,9,
11,18,24 101:2,
5,17 102:5,22
103:3 104:23
107:1 112:21
113:3,12,14
114:5,10,13,16,
19,22 115:4
117:12,15
143:22 144:1
147:7,13,23
155:8 157:22
158:1,9 164:6,8
166:17,21
167:9,18
168:13,21
178:7,12,19
179:4 183:14,
17,23 184:1,4
197:2,5 198:19
208:22,23
226:8,19,22
229:22 230:22,
24 238:24
239:25 240:16
241:4,6,13,25
242:4

swear 9:23

system 135:8

———————

T

tac 123:3

tactical 16:16,
17

taking 14:7
17:17 33:3
36:4,22 37:5,8,
15 70:21
127:19,21
199:19 214:13
233:25

talk 40:14
108:19 120:11
121:15 126:12

127:12 130:7
131:1,14 136:6,
13,14,19,20
141:13,22
160:5 185:22
186:2 198:23
200:6,7 201:13,
15 212:18
219:1

talked 14:12
51:5 70:13
83:22 98:3
129:3 133:9
154:13 158:10,
11 170:23
181:9 192:11
203:10,14
209:24

talking 27:23
38:24 40:22
46:14 48:25
49:18 59:25
65:20,23 88:12,
19,20 89:8
102:14,15
107:19 129:24
130:2,4,14,21,
25 131:8
132:11 135:11
136:23 140:22
145:16,18
155:7 162:5,19
169:7 173:2
197:1 198:14,
16 200:5 204:1
217:5 234:17,
21

tampered
96:7,11 97:19
108:15

tampering
102:7 104:8
107:10 109:17

tasks 217:3
219:13 224:25

taught 129:16,
20,23,24 130:2
132:7,14

team 16:16,18
163:8,15,20,25
164:6

teams 123:3
125:5

technician 8:4

techniques
129:15,21,24
130:1,15,20
131:5 132:19

telling 76:8
169:23 201:22
202:6,12
211:16,20
212:7

ten 15:2 45:18
58:5 136:18
162:25

term 18:25
39:23 76:4
203:8 209:25

terminology
28:14

terms 19:1
66:22 77:19
117:4 179:24
182:16 190:22
193:2,14,15,22
195:20 197:22
199:4,11 203:3
211:24 216:22
219:17 220:9
221:10 225:8
234:14

testified
102:25 104:14

testify 103:1
174:11,13
221:13 228:16

testifying
174:18,22

testimony
9:24 14:11 33:6
63:21,22 89:23
100:1,23,25
101:14,19
102:12,21
103:25 104:17
132:24 168:11,
16 221:20

theft 19:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

then-superintendent 152:6

there'd 75:6

thing 19:2 35:14 50:10 63:10 98:11 122:6 127:18 140:14 149:3 162:11 166:1 187:8 194:17 202:1,15 217:17 221:4 227:21 233:9

things 31:21 34:24 37:9 40:4,24 41:12 43:24,25 47:15 50:5,10 65:2 66:1 69:2 71:9 79:17 82:21 88:13 116:14 117:19 119:20 120:12 123:7 127:9 130:5 140:20 149:24 150:2 163:3 183:20 191:4 193:21 197:7 200:15 203:2 205:2,17,22 206:2 214:16 219:20 232:14 233:14 238:23

thinks 200:10

thought 42:23 65:8 70:15 71:9 76:23 96:20 122:4 192:5

three-year-old 205:1,6

tightened 32:19

time 8:5 13:9 14:18 17:22 19:8,13,25 21:15,16 27:19 30:13 40:19 48:6 63:8 64:17 68:2,3 74:15,18 75:1,24 76:15,

17 80:24 81:25 84:21 85:6 86:17,25 87:9 90:5 95:23 96:1 103:17 105:7 107:3 110:22 112:22 115:13 118:2 130:8,9 134:21 136:23 154:8 155:3 157:21 162:17 163:4 164:23 165:3 168:20 169:15,19,24 170:13,18 178:22 183:4 215:8 220:15, 16 224:15 228:10 239:17 242:1

timeline 221:3, 6,11

times 12:14,18 13:2 43:13 55:20 61:4 76:5 78:24 137:10 139:8 169:6,9, 21 194:9,15

title 52:10 59:4

to-day 192:3 203:5

today 8:4,5 14:5,9 17:14,16 20:13,19 43:5, 15 44:2 45:17, 24 46:21 47:4 51:18 52:2 69:16 73:10 74:4 77:15 78:23 79:21 91:16 92:4 96:12 99:12 105:24 108:1,6, 11,25 109:5 110:20 111:9, 19 113:1 126:18 132:25 139:3 150:17 151:4 153:21 154:14 161:13 162:11 165:5, 15,21 167:21, 25 203:19

207:25 208:3 215:11 219:21 225:10,13 227:8 228:3,7, 17,23 229:9 236:22 237:20, 25

today's 61:3 63:19 65:16 170:4,11 217:15

told 24:9 32:7 98:1 102:12 152:2 194:23 212:10 216:1, 21 220:7 227:17 236:21 240:25 241:11, 14

tools 186:11

top 53:5 143:1 213:21

topic 58:14 86:15 89:6,12, 15 101:20,22 102:2

topics 79:17 126:5

tossed 237:3

track 146:10

train 125:19

trained 31:15 34:5 35:22,25 36:4,13,15,19, 24 55:7 131:16 132:19,20 186:15

training 31:6,9, 11,13,17,20,23, 24 32:2,3,5 34:8,11 59:1,4 125:22 126:14, 17,22 131:24 132:1,2 180:21

trainings 126:2,4

transcript 100:3,15,17 101:14 103:16

104:12

transcripts 63:18 100:5 101:22 104:5

transfer 48:8

transferred 15:18

transferring 48:17

traveling 181:10

treated 235:4

treatment 79:24

Trevino 207:24 209:3

trial 63:21 100:19,20,22 102:14

troops 212:9

trouble 232:4

troubling 22:13

true 22:15 47:16 67:12 131:19 143:20 189:16 213:15 221:24 228:1 233:12

trusting 130:14

trustworthy 174:18

truth 9:25

truthfully 14:5, 9

Ts 191:25 214:6

turn 42:4 84:23

turned 53:2 57:9 107:23 219:15

turning 33:19 84:20 91:1

TV 205:1

type 17:8 45:1 52:13 70:18 82:21 108:14 144:22 172:12 182:12 184:25 199:5 203:2 205:15

types 19:20 41:11 77:23 98:4 140:20 141:10,18 142:5 145:24 188:22,23 192:14

typical 33:23 56:18 94:13 165:18

typically 27:19,20 29:1 39:15,19 93:9 136:2,12 140:18 148:6 189:4 190:7

---

U

Uh-huh 160:20

ultimately 83:5 85:2 86:6 100:12 152:23

un 67:14

uncovered 112:2

underlying 204:13 205:11

unders 25:11

understand 13:14 14:4,8 17:15 20:12 25:12 39:8 44:10 50:7 53:7 61:13 64:20 72:5 77:24 78:1 82:1 87:1 88:23 98:12 118:4 121:10 147:21 193:7,8 194:14,21 197:3 198:3,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

200:18 204:1

**understanding** 30:20 36:15 87:19,21 103:13 143:3 148:6 150:6 151:8,12 196:11 200:20

**understood** 13:18 37:24 89:17

**unfair** 101:12, 20 103:2 104:16

**unfounded** 67:22 69:21

**unique** 44:3 117:9,11,12 118:9 119:3,8 135:15

**unit** 18:1 19:5,7 20:10,17 21:4 51:15 52:16 69:22 77:6 84:7 93:17 111:16, 21,25 133:6 143:4 147:3 148:13,18 150:12 187:19 188:9 193:5

**United** 8:10 240:23

**units** 77:23 115:19,20,23 123:2 140:3 181:16,20 205:19

**unpaid** 71:22

**unsolved** 43:12 46:3,8,10

**upset** 97:15

**utilizing** 104:12

_____

**V**

_____

**vacate** 237:16 238:2

**vague** 30:4 130:23 203:8

**Varga** 9:7

**versus** 8:8,9 117:6 234:12

**Vice** 52:19,23 176:14

**victims** 181:11

**video** 8:4

**videoconferen ce** 8:6

**view** 23:15,21 24:4 35:5 96:6 97:11 110:11 224:22 237:6

**violent** 15:6,24 17:23 18:1,7, 22,25 19:3,8 20:4,7 21:17 24:19 26:14,16 27:10,20 28:4 29:1,8,21,25 30:17 31:2 34:13 40:9 41:18 42:25 45:16 51:4 66:10,12 72:17, 19 73:17,25 80:22 84:24 92:20,22 116:6, 8,11 120:25 126:21 188:11 239:18

**volume** 70:10

**vouch** 25:3 228:20 229:1,3, 8

**vouching** 26:8

_____

**W**

_____

**waiting** 16:25

**waive** 133:25

**waived** 133:14 134:14 136:4

**waiver** 133:2 135:20

**waivers** 135:24 136:2

**walk** 14:15 130:11,12 138:9

**walked** 137:2

**walking** 140:23 222:10

**wanted** 10:20 52:20 66:11 75:18 121:16 127:4 129:4 149:20,21 157:10 170:25 172:10,13 189:25 190:2 202:19 204:20 205:16 210:7 211:16,20 212:7,11,19,20 236:24

**warning** 134:3

**warranted** 70:15

**warrants** 125:23 126:7,8

**watch** 24:21 28:20 127:17 190:10,11

**watching** 204:25

**ways** 55:5 56:24 179:9

**week** 139:8 159:21 164:18 165:11

**weekend** 227:20 242:4

**Weekends** 164:20

**weigh** 148:22

**welcomed** 33:12

**were1** 27:19

**wheth** 80:10

**who'd** 95:4

97:11

**who've** 236:16

**wife** 203:20 204:24

**Willie** 52:17,21, 25 53:4

**Wilson** 240:20

**wiretaps** 53:14 82:19

**witnesses** 34:25 38:25 39:14,19 54:2, 6,12,14 140:13 209:22

**woman** 204:21 222:25

**women** 122:8, 21

**Woodall** 151:5, 6,19 152:9

**word** 222:2 229:7 232:13 233:22

**words** 24:11 26:8 83:5 91:9 194:17 195:6 198:4 199:11, 18 216:11 221:15

**work** 11:6,10 14:12 18:6 28:6,8 29:2 34:12,17 37:5 52:13 53:2,8,16 56:16,25 79:18 92:19,25 93:9, 14 94:18,24 95:5 98:8 99:17 121:1 122:21 124:23 163:13 164:14 166:12 173:7 177:16 182:3 186:4,24 188:20 190:1,2, 25 195:8 205:8 224:11

**worked** 16:21 28:7 29:1,14 34:12 35:11

51:19 52:10 82:9 85:7 94:7, 19,23 105:1 106:10 115:22 116:20 120:6 126:21 165:13, 23 166:7 167:22 168:2, 17 169:25 170:5 177:3,5, 22,25 189:7,8 201:20 227:20

**working** 14:23 15:1 17:23 18:2 20:9,16 21:4 26:1 29:7,11 30:9,21 31:13 36:14 37:1,15, 19 39:18 41:8 42:1,6 51:22 53:6 56:25 67:2 69:25 72:21 73:2 76:19 77:1 78:8 92:10 97:8,9 98:4 105:17 112:16 116:5 120:22 121:2 123:2,3 125:17 128:2 131:23 139:17, 25 150:25 157:11 160:9 165:4 169:17 170:12 172:2, 19,21,24 175:3, 24 181:22 187:1,21 189:2, 23 191:9 206:7 212:2,14 214:12 224:12

**worksheet** 60:3

**world** 178:6

**Worley** 9:7

**worried** 210:6 214:16

**worry** 192:10

**would've** 92:6 93:11 109:22 111:25 152:25 216:5 220:7 232:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**write** 35:2,6
36:15,20 39:5,
10

**writing** 36:1,5
38:17,23
214:13,23

**written** 98:17
135:19,24
136:2 220:3

**wrong** 223:19

**wrote** 39:5,10

---

**Y**

---

**year** 12:10
15:8,22 69:1
81:5 240:15,16

**years** 11:5 20:1
65:23 73:14
74:20,23 75:22
77:13 102:13,
25 116:15,20
119:15 122:1
137:4,10 162:5
178:15,17
240:17

**yesterday**
61:11,14 62:8
63:1

**youth** 207:23
209:4

---

**Z**

---

**Zehner** 9:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com