# EXHIBIT

# MMMMM



# Transcript of Sergeant Berscott Ruiz

**Date:** July 15, 2019
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4   ----------------------------x
5   ARTURO DeLEON-REYES,        :
6           Plaintiff,          :
7   v.                          :   Case No.:
8   REYNALDO GUEVARA, et al.    :   1:18-cv-01028
9           Defendants.         :
10  ----------------------------x
11  GABRIEL SOLACHE,            :
12          Plaintiff,          :
13  v.                          :   Case No.:
14  CITY OF CHICAGO, et al.     :   1:18-cv-2312
15          Defendants.         :
16  ----------------------------x
17       Deposition of SERGEANT BERSCOTT RUIZ
18              Chicago, Illinois
19            Monday, July 15, 2019
20                 10:03 a.m.
21
22  Job No.: 330952
23  Pages: 1 - 203
24  Transcribed by: Teresa R. Salazar
```

## Page 2

```
1        Deposition of SERGEANT BERSCOTT RUIZ, held at
2   the offices of:
3
4              LOEVY & LOEVY
5              331 North Aberdeen Street
6              3rd Floor
7              Chicago, Illinois 60607
8
9
10       Pursuant to agreement, before Juan Mares,
11  Notary Public in and for the State of Illinois.
```

## Page 3

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFF DeLEON-REYES:
4       SEAN STARR, ESQUIRE
5       LOEVY & LOEVY
6       311 North Aberdeen Street, 3rd Floor
7       Chicago, Illinois 60607
8       (312)243-5900
9
10  ON BEHALF OF PLAINTIFF SOLACHE:
11      JAN SUSLER and ANTOINETTE BOLZ, ESQUIRES
12      PEOPLE'S LAW OFFICE
13      1180 North Milwaukee Avenue, Third Floor
14      Chicago, Illinois 60642
15      (773)235-0070
16
17  ON BEHALF OF DEFENDANT GUEVARA:
18      KEVIN ZIBULSKI, ESQUIRE
19      LEINENWEBER, BARONI & DAFFADA, LLC
20      120 North LaSalle Street, Suite 2000
21      Chicago, Illinois 60602
22      (866)786-3705
23
24
```

## Page 4

```
1        A P P E A R A N C E S   C O N T I N U E D
2
3   ON BEHALF OF DEFENDANTS DICKINSON, RUTHERFORD,
4   STANKUS, NAUJOKAS, HARVEY, TREVINO, MINGEY,
5   BIEBEL:
6       JOSH M. ENGQUIST, ESQUIRE
7       THE SOTOS LAW FIRM, PC
8       141 West Jackson, Suite 1240A
9       Chicago, Illinois 60604
10      (630)735-3314
11
12  ON BEHALF OF DEFENDANTS WEHRLE, BRUALDI, VARGA,
13  O'MALLEY and COOK COUNTY:
14      EDWARD M. BRENER and KIMBERLY M. FOXX,
15      ESQUIRES
16      COOK COUNTY STATE'S ATTORNEY'S OFFICE
17      500 Richard J. Daley Center
18      Chicago, Illinois 60602
19      (312)603-5971
20
21
22
23
24
```

**Page 5**

1   A P P E A R A N C E S   C O N T I N U E D

2

3   ON BEHALF OF DEFENDANT NAVARRO:

4       KATHERINE C. MORRISON, ESQUIRE

5       REITER BURNS LLP

6       311 South Wacker Drive, Suite 5200

7       Chicago, Illinois 60606

8       (312)982-0090

9

10  ON BEHALF OF DEFENDANT CITY OF CHICAGO:

11      CATHERINE M. BARBER, ESQUIRE

12      ROCK FUSCO & CONNELLY, LLC

13      321 North Clark Street, Suite 2200

14      Chicago, Illinois 60654

15      (312)494-1000

16

17

18

19

20

21

22

23

24

**Page 6**

1   C O N T E N T S

2

3   EXAMINATION OF SERGEANT BERSCOTT RUIZ       PAGE

4       By Mr. Starr                            7

5       By Ms. Susler                           164

6       By Ms. Barber                           199

7       By Mr. Starr                            200

8

9

10              E X H I B I T S

11  RUIZ DEPOSITION EXHIBIT                      PAGE

12  Exhibit 1  Police Report                     109

13  Exhibit 2  Consent to Search                 135

14  Exhibit 3  Inventory Slip                    138

15  Exhibit 4  Testimony Transcript              160

16

17

18

19

20

21

22

23

24

**Page 7**

1   P R O C E E D I N G S

2   Whereupon,

3       SERGEANT BERSCOTT RUIZ

4   being first duly sworn or affirmed to testify to

5   the truth, the whole truth, and nothing but the

6   truth, was examined and testified as follows:

7       EXAMINATION BY COUNSEL FOR PLAINTIFF

8           DeLEON-REYES:

9   BY MR. STARR:

10      Q.  Good morning, sir.  My name is Sean

11  Starr.  I represent Plaintiff, Arturo Reyes, in

12  this case.  Could you please state and spell your

13  name for the record?

14      **A.  My name is Berscott Ruiz, spelled**

15  **B-E-R-S-C-O-T-T, last name Ruiz, R-U-I-Z.**

16          MR. STARR:  Okay.  Let the record

17  reflect this is the deposition of Berscott Ruiz

18  taken pursuant to notice and the Federal Rules of

19  Civil Procedure.  Today is July 15th.

20      Q.  Mr. Ruiz, are you -- have you had -- have

21  you been a party to any other civil lawsuits in

22  your life, either as a plaintiff or a defendant?

23      **A.  And you're talking city-wise.**

24      Q.  No, as any civil lawsuit, so, you know, a

**Page 8**

1   car accident or anything like that, have you been

2   either a plaintiff or a defendant?

3       **A.  Well, in these proceedings.**

4       Q.  Well, I don't believe you're a defendant

5   in this case.

6       **A.  Oh.**

7       Q.  Correct?

8       **A.  Yes.**

9       Q.  Okay.  So in any other cases, have you

10  been a plaintiff or a defendant?

11      **A.  Not that I can think of.**

12      Q.  Okay.  So never in your life were you a

13  -- like in a car accident and got sued and were a

14  defendant in that context, or anything else?

15      **A.  In any contexts, no.**

16      Q.  Okay.  And --

17          MR. ENGQUIST:  Just to be clear, don't

18  forget, the Gomez case, he's named, so --

19      **A.  Well, that's why I asked in these types**

20  **of proceedings.**

21      Q.  Yeah, yeah.  And I'm not trying to

22  confuse you so --

23      **A.  Yeah.**

24      Q.  -- my -- it was probably my fault for not

9

1  asking that question --
2  **A. Right.**
3  Q.  -- in a way that made sense, so -- and
4  besides the Gomez case, are you familiar with any
5  other cases where you were named as either a
6  plaintiff or a defendant?
7  **A. No.**
8  Q.  Okay.  And are you familiar with the
9  Gomez case that you were a defendant in that case?
10  **A. Yes.**
11  Q.  Okay.  Have you been deposed either as a
12  witness or as a party in any case in your life?
13  **A. Any case, yes.**
14  Q.  Yeah.  So how many depositions have you
15  sat for?
16  **A. I think it's two --**
17  Q.  Two?
18  **A. -- to date, yes.**
19  Q.  And did you -- do you recall the names of
20  those cases?
21  **A. The first one was -- let's see if I can**
22  **recall the names, but the Markham case.**
23  Q.  The Markham case?
24  **A. Yeah.  I believe it was Don Markham.**

10

1  Q.  Okay.  And were you a witness in that
2  case?
3  **A. A witness.**
4  Q.  Okay.  And do you remember approximately
5  what year that was?
6  **A. It was before I retired, so I've been**
7  **retired three years now.**
8  Q.  So sometime in the last ten years?
9  **A. Or maybe four or five years.**
10  Q.  Okay.  And then you said you believe two
11  cases that you were deposed in.  Do you recall what
12  the other one was?
13  **A. Yeah, I'm trying to think of the second**
14  **one.  Oh, it's Kubiak.**
15  Q.  Kubiak.
16  **A. Yeah.**
17  Q.  And were you a witness in that case?
18  **A. Witness.**
19  Q.  Okay.  And approximately when did that
20  deposition take place?
21  **A. It was in the last year.  Right now,**
22  **they're in the trial phase.  Today would have been**
23  **Day 1 and it may last two weeks from what I'm**
24  **hearing.**

11

1  Q.  You were deposed within the last two
2  weeks in that case?
3  **A. No, there is a trial going on as of**
4  **today.**
5  Q.  Okay.
6  **A. And that will go on for about two weeks**
7  **as it was told to me.**
8  Q.  Okay.  So do you -- but do you recall
9  when your deposition took place for that case?
10  **A. No.**
11  Q.  Was it within the last year?
12  **A. I believe so.**
13  Q.  Okay.
14  **A. Yes, it was within the last year.**
15  Q.  Okay.
16  MS. SUSLER:  Can I just ask you a favor?
17  Can you speak up a little bit?  It's a little hard
18  to hear you.
19  THE WITNESS:  Yes.  I'll pull this over.
20  Should I just pull this over?
21  MS. SUSLER:  Just in terms of my ears.
22  He'll have to tell you about the mike --
23  THE WITNESS:  Okay.
24  MS. SUSLER:  -- but I'm just having

12

1  trouble hearing you.
2  MR. ENGQUIST:  Just do your best to speak
3  up a little bit.
4  THE WITNESS:  Yeah.  I'll try.
5  MS. SUSLER:  Thank you.
6  THE WITNESS:  I'm a soft talker.
7  BY MR. STARR:
8  Q.  Mr. Ruiz, in terms of -- I believe you
9  referred to being retired.  Were you previously an
10  employee of the Chicago Police Department?
11  **A. Yes.**
12  Q.  Okay.  I'm going to get into your work
13  history in a minute, but before I do that, as a
14  member of the Chicago Police Department, were you
15  ever subject to any disciplinary complaints?
16  **A. CR numbers is what you're referring to.**
17  Q.  Yeah.  I mean, generally, there's -- I
18  believe there's other ways in which a Chicago
19  police employee may receive discipline, but one of
20  the ways is a CR number.  So why don't we start
21  there?  Were you ever subject to any CR numbers?
22  **A. Yes.**
23  Q.  Do you know how many?
24  **A. I don't know the exact number, but I**

13

1 would estimate on the high side ten.

2    Q. Okay.

3    A. Maybe on the low side eight. I think I'm

4 somewhere in there.

5    Q. Okay. And then in terms of any

6 alternative discipline complaints, non-CR-related,

7 do you recall any of those?

8    A. Only one other time where I was

9 reprimanded for missing court.

10    Q. Okay. And in terms of the CR complaints,

11 do you know what the resolution of those individual

12 CRs was?

13    A. Well, no, but I know I never took any

14 time of any of them.

15    Q. On none of the CR evaluations? Okay.

16    A. None of them.

17    Q. Was there any other discipline imposed as

18 a result of those CR complaints besides taking any

19 time?

20    A. I don't believe so.

21    Q. Okay. And when you refer to taking time,

22 you mean being suspended?

23    A. Suspension, yeah.

24    Q. Okay. Mr. Ruiz, have you been accused of

14

1 falsifying evidence as a Chicago police officer?

2    A. No.

3    Q. Okay. Have you ever been accused of

4 suppressing evidence?

5    A. No.

6    Q. Have you ever been accused of coercing

7 false confessions as a Chicago police officer?

8    A. No.

9    Q. Was there any other misconduct that you

10 can recall that you were accused of that we haven't

11 discussed?

12    MS. BARBER: Objection. Form.

13    MR. ENGQUIST: Join.

14    THE COURT REPORTER: I'm sorry. Who

15 objected?

16    MR. ENGQUIST: She objected. I joined.

17    Q. And just for my clarity, when you said

18 you were deposed in two other cases, those were

19 both cases where you were a Chicago police officer

20 who was deposed. Is that correct?

21    A. Yes.

22    Q. So given that you've been deposed on more

23 than one occasion, you may be familiar with some of

24 the ground rules of depositions but I just want to

15

1 go over a couple of things with you so we're both

2 clear. Okay?

3    A. Okay.

4    Q. You understand that you are currently

5 under oath and your testimony today will be given

6 under oath, correct?

7    A. Yes.

8    Q. You understand that telling a lie at a

9 deposition is essentially a crime, right?

10    A. Yes.

11    MR. ENGQUIST: Objection. Form.

12    Q. You understand that there's a court

13 reporter who's taking down everything you say and

14 it's being documented, correct?

15    A. Yes.

16    Q. It's important to give verbal answers,

17 so, you know, conversationally, we use a lot of

18 different ways to communicate, but in a deposition,

19 I need you to give me a yes or no as opposed to a

20 shoulder shrug, or a uh-huh, or anything along

21 those lines. Understand?

22    A. Yes.

23    Q. One really important thing is that we

24 speak at separate times, so I will do my best not

16

1 to talk over you and I ask that you do the same for

2 me. Okay?

3    A. Okay.

4    Q. If I ask a question that doesn't make

5 some sense, please let me know and I'll try to

6 rephrase the question for you.

7    A. Okay.

8    Q. Because there's not a judge in a

9 deposition, there's no one to rule on the

10 objections that your attorneys or other attorneys

11 may make. The attorneys have a right to make

12 objections for the record, but then once those

13 objections are lodged, generally speaking, you need

14 -- you have to answer the question nonetheless,

15 unless your attorney instructs you otherwise.

16 Understand?

17    A. Yes.

18    Q. If you need a break at some point time,

19 let me know. We have seven hours. I don't plan to

20 take seven hours you, but if you, you know,

21 need to use the restroom or if you want to take a

22 break, as long as there's not a pending question,

23 feel free to ask for a break. Okay?

24    A. Okay.

17

1    Q.   Do you have any conditions that might
2  affect your ability to provide truthful and
3  accurate testimony today?
4    A.   No.
5    Q.   Are you on any medications that may
6  affect your ability to give truthful and accurate
7  testimony?
8    A.   No.
9    Q.   Is there anything else that may affect
10 your ability to give a truthful testimony today?
11      MR. ENGQUIST: Objection to form. Vague.
12   A.   No.
13   Q.   Anything you can think of what I was
14 asking.
15   A.   No.
16   Q.   Okay. Are you represented for counsel --
17 by counsel today?
18   A.   Yes.
19   Q.   Who is your representative?
20   A.   Josh and Keith.
21      MR. ENGQUIST: No, it's just me.
22      THE WITNESS: Okay. Just Josh.
23      MR. STARR: So let the record reflect
24 that Mr. Engquist is Mr. Berscott Ruiz' attorney

18

1  today, correct?
2      MR. ENGQUIST: Yes.
3      MR. STARR: All right.
4    Q.   Tell me everything that you did to
5  prepare for your deposition.
6    A.   For this deposition, there was a court
7  case -- well, previously and I think it was in the
8  year 2000, and I attended court, and there was a --
9  oh, goodness -- testimony of mine from that court
10 case. I got a chance to see the inventory slips on
11 this court case and you'll have to excuse me. I
12 wrote the consent to search form.
13   Q.   Okay. And just for the record, feel free
14 to take your time and think through your answers.
15 We're not in a rush. I will do my best not -- I
16 tend to talk quickly, but I'll do my best to --
17   A.   Okay.
18   Q.   -- ask you concise questions and give
19 you your time to answer.
20      So just so that we're clear as to what you
21 just testified to, I believe you -- what you were
22 referring to is the criminal trial in this case,
23 you reviewed the -- your testimony from that?
24   A.   Yes.

19

1    Q.   Is that correct? Did you review anyone
2  else's testimony?
3    A.   No.
4    Q.   Okay. And then I think you said you also
5  reviewed an inventory slip or inventory slips. Is
6  that correct?
7    A.   Yes.
8    Q.   Did you review one or more than one?
9    A.   Two.
10   Q.   Two. Okay. And then your -- I think the
11 third thing you referred to is a consent to search
12 form. Did you review one consent to search form or
13 two?
14   A.   One.
15   Q.   Okay. Did you review any police reports?
16   A.   Yes.
17   Q.   Okay. Do you know which police --
18   A.   I did get to see the police report from
19 this case.
20   Q.   And do you know what police report that
21 specifically was?
22   A.   For double murder.
23   Q.   Right, but it's my understanding that
24 there's all sorts of different types of police

20

1  reports. Is that correct?
2    A.   Yes.
3    Q.   So which one did you review for this
4  case?
5    A.   The detective's side.
6    Q.   Okay. Did you review any -- strike that.
7  Are you familiar with what a GPR is?
8    A.   Yes.
9    Q.   Did you review any GPRs today?
10   A.   No.
11   Q.   Did you review any GPRs in preparation
12 for today?
13   A.   No.
14   Q.   Did you review any notes of any kind in
15 preparation for today?
16   A.   No.
17   Q.   Do you recall taking any notes back in
18 1998 during this investigation?
19   A.   No.
20   Q.   Okay. Did you review any correspondence
21 that you may have had with other people, whether
22 it's in an email or any other form?
23   A.   No.
24   Q.   Did you happen to look at any -- review

21

1  any media, or newspaper articles, or the like?
2      **A.  No.**
3      Q.   Okay.  So you testified at the criminal
4  trial, correct?
5      **A.  Yes.**
6      Q.   And your testimony was truthful?
7      **A.  Yes.**
8      Q.   And under oath?
9      **A.  Yes.**
10     Q.   All right.  And you reviewed that
11  testimony for today.
12     **A.  Yes.**
13     Q.   Was there anything about that testimony
14  that wasn't accurate that you noticed when you
15  reviewed it for today?
16     **A.  No, but I truly didn't have any**
17  **recollection of being in court and until that was**
18  **shown to me, I found out that I was in court.**
19     Q.   Okay.  As a Chicago police officer, did
20  you testify in court in other cases on a frequent
21  basis?
22     **A.  Yes.**
23     Q.   And so this case doesn't stand out, this
24  -- the Soto murder investigation and the subsequent

22

1  criminal trial doesn't stand out for you.  Is that
2  correct?
3      **A.  Correct.**
4      Q.   Any other materials that you reviewed in
5  preparation for today?
6      **A.  No.**
7      Q.   All right.  And then when was the last
8  time you reviewed -- or when did you review these
9  documents?
10     **A.  We had a meeting and I got a chance to**
11  **see them there.**
12     Q.   Okay.  I don't want to ask you what you
13  and your attorneys talked about, but when you say
14  we had a meeting, are you referring to you met with
15  your attorneys?
16     **A.  Yes.**
17     Q.   Okay.  And which attorneys did you meet
18  with?
19     **A.  Josh.**
20     Q.   And this was on one occasion?
21     **A.  I think we met twice.**
22     Q.   Do you know for each occasion,
23  approximately how long the meetings were?
24     **A.  The first meeting, possibly an hour.  The**

23

1  **second meeting, an hour and a half to two hours.**
2      Q.   And then the first meeting occurred
3  approximately when?
4      **A.  I'm going to say in the last two weeks.**
5      Q.   Okay.  And then the second meeting
6  occurred approximately when?
7      **A.  This past week.**
8      Q.   Okay.  And the past week being last week?
9      **A.  Yes.**
10     Q.   All right.  Did you meet with anybody
11  else in preparation for today's deposition?
12     **A.  The other attorneys here, you're asking?**
13     Q.   Anyone, police officers, you know --
14     **A.  No, just the meetings that I had with the**
15  **attorneys.**
16     Q.   Okay.  Are you referring to more than one
17  attorney?  When you say Josh, was there other
18  attorneys present?
19     **A.  Yes.  Carrie Golden.**
20     Q.   Anybody else?
21     **A.  And Katie was present.**
22     Q.   Okay.  For both meetings or just one of
23  them?
24     **A.  I believe both.**

24

1      Q.   Okay.  And did you talk to your lawyers
2  -- and I don't want to know what you talked about,
3  but did you talk to your lawyers on the phone in
4  preparation for today's deposition?
5      **A.  No.**
6      Q.   Mr. Ruiz, did you graduate high school?
7      **A.  Yes.**
8      Q.   Where'd you go to high school?
9      **A.  Prosser Vocational.**
10     Q.   Is that where you graduated from?
11     **A.  Yes.**
12     Q.   What year did you graduate?
13     **A.  '77.**
14     Q.   Did you go to college?
15     **A.  Yes.**
16     Q.   Where'd you go to college?
17     **A.  University of Illinois Circle Campus.**
18     Q.   Did you graduate from there?
19     **A.  Yes.**
20     Q.   What year did you graduate?
21     **A.  I'm not exactly sure.  I went for three**
22  **years when I left high school, so I started in '77,**
23  **quit after three years, and then went back to**
24  **finish.**

25

1    Q.  Okay.
2    A.  And I was on the police department when I
3  finished.
4    Q.  All right.
5       THE COURT REPORTER: I'm sorry. Which
6  was the campus?
7       THE WITNESS: The Circle Campus,
8  University of Illinois.
9    Q.  And what was your degree in?
10   A.  Criminal justice.
11   Q.  Was that a bachelor's degree?
12   A.  Yes.
13   Q.  Did you have any additional education
14  after college?
15   A.  Yes. I have a master's in criminal
16  social science from Lewis.
17   Q.  And when did you get the master's degree?
18   A.  I don't know the date of that also, but
19  it was while I was on the police department.
20   Q.  Okay.
21   A.  And I -- I'm sorry.
22   Q.  Go ahead.
23   A.  I have one other degree, an engineering
24  degree.

26

1    Q.  And what kind of degree do you have an
2  engineer in?
3    A.  That's another -- electrical engineering
4  degree from DeVry.
5    Q.  From DeVry. Is that a bachelor's degree?
6    A.  Yes.
7    Q.  Do you know when you received that
8  degree?
9    A.  While I was on the police department, but
10  I'm not sure about the dates.
11   Q.  Okay. And when --
12      THE COURT REPORTER: Sir, from where?
13      THE WITNESS: DeVry University.
14   Q.  When you went to Lewis, did you to the
15  Romeoville Campus or another campus?
16   A.  It wasn't the Romeoville Campus. Oh,
17  goodness. They had a junction -- I don't know
18  exactly how you'd call it, but it was off-campus.
19  It was office spaces and they had a number of
20  courses that were being offered there.
21   Q.  I don't know if they call it a satellite
22  campus or something along those lines?
23   A.  Yes, something along those lines.
24   Q.  What about DeVry, what campus did you

27

1  attend DeVry?
2    A.  The one over on Western and Belmont. I
3  think it's on Campbell Avenue.
4    Q.  Okay. Are you from -- you said you went
5  to high school in Chicago. Are you from Chicago?
6    A.  Yes, I am.
7    Q.  What neighborhood did you grow up in?
8    A.  Humboldt Park.
9    Q.  Have you heard about the alligator in
10  Humboldt Park lagoon?
11   A.  Yeah.
12   Q.  Were you born in the city?
13   A.  Yes, I was.
14   Q.  What year did you retire from the Chicago
15  Police Department?
16   A.  2016, June.
17   Q.  Are you currently employed?
18   A.  No.
19   Q.  Good for you. Okay. Could you give me a
20  summary of your employment with the Chicago Police
21  Department? And really, what I'm looking for here
22  is your assignments or details and the
23  corresponding year and your ranks. You know, I
24  understand -- and that is not a test, but I just

28

1  kind of want to get a sense of where you've been
2  and what kind of positions you've been in during
3  your career.
4    A.  Okay. Believe me, the dates, I couldn't
5  even get -- come close to them but I can estimate
6  how much time I was in each district and so forth.
7    Q.  Okay. If you could give me even a
8  ballpark date, you know, I think you said you
9  graduated high school in '77. You know, from that
10  point, you know, just general ballpark dates is
11  fine.
12   A.  Okay. Well, I started March of '87. I
13  was in the academy, and my first assignment out of
14  the academy was the 13th District. And I believe
15  at the end of that year or the beginning of '88 is
16  when I was transferred to the 10th District. I
17  stayed about two and a half years in the 10th
18  District and -- before I was -- before I requested
19  a transfer and went to the 14th District.
20   Q.  Would that make that in 1990?
21   A.  Right in that area.
22   Q.  Okay.
23   A.  I want to say that I was in the 14th
24  District anywhere from five to six years, maybe

29

1  seven years. I'm not exactly sure, but I was
2  promoted to detective from the 14th District while
3  I was there and I went to Area 5 to work. I was
4  in Area 5 about two and a half years before getting
5  promoted to sergeant. When I was promoted to
6  sergeant, my next assignment was the 13th District.
7     Q. Okay.
8     A. I was there for a year. From there, I
9  went back to -- I was transferred to the detective
10 division, Area 5, and I want to say I was there for
11 right around six years.
12    Q. And that was as a sergeant?
13    A. Yes. From there, I was promoted to
14 lieutenant. I went back to the 14th District where
15 I stayed for about two years. From there, I went
16 to the 10th District where I served as the tactical
17 lieutenant and I was a tactical lieutenant for one
18 year before I was promoted to commander of the same
19 district. I served as a commander for
20 approximately three years.
21       From there, I was transferred down to the 4th
22 District and I want to say I was there for two and
23 a half years. About two years into my -- being in
24 command of the 4th District, I was promoted to

30

1  deputy chief. As a deputy chief, I continued to
2  work in the 4th District for at least six months.
3  My assignment after leaving the 4th District was a
4  street deputy, and I filled that position until I
5  retired.
6     Q. Okay. Quite an accomplished career.
7  Working backwards, can you tell me what a street
8  deputy is? I'm not familiar with that.
9     A. Well, we had control of the whole city.
10 I mean, I was basically working nights, and we
11 oversaw the goings ons over the city.
12    Q. So when you say you had control of the
13 whole city, that meant you could be in a different
14 place any night?
15    A. Anytime, yes. If they needed somebody
16 that high in rank, it would be myself or whoever
17 was assigned that night.
18    Q. Okay. I don't want to go back over
19 everything you just told me, but I just want to
20 just ask you a couple of questions about what you
21 said.
22       So your first stint in Area 5 looks like it
23 was approximately in the early nineties. Is that
24 correct?

31

1     A. Let's say yes.
2     Q. Okay. And then you were there for
3  approximately -- I think you said five to seven
4  years?
5     A. Two and a half years as a detective.
6     Q. Two and a half years. Okay. Okay. So
7  just to correct my notes, it looks like you said
8  you were in 14 for five to seven years. Is that
9  correct?
10    A. Yes.
11    Q. Okay. And then you were promoted to a
12 detective in Area 5.
13    A. Yes.
14    Q. So that would have been likely to be the
15 mid to late nineties, correct?
16    A. I want to say it was probably closer to
17 '90, so maybe I was only in 14 about five years.
18    Q. Okay. Again, it's not a test. I'm just
19 trying to get some clarity here.
20    A. It should all add up to 29 years.
21    Q. I won't doubt you on that. So then you
22 were a detective in Area 5 for two and a half
23 years, and then you went to the 13th for one year
24 and came --

32

1     A. For one year.
2     Q. -- and then came back to Area 5.
3     A. Then came back to Area 5, yes.
4     Q. Okay. Okay. I think I got that down.
5  When you were a detective at Area 5, what were your
6  job responsibilities?
7     A. I was a property crimes sergeant and I
8  worked with the property crimes people that we
9  worked on burglaries and theft cases at the time.
10    Q. And does that encompass both your tenures
11 at Area 5? Let me rephrase that. Were you in
12 property crimes for both of the two different times
13 you were at Area 5?
14    A. Yes.
15    Q. Okay. As an Area 5 property crimes
16 detective, can you expound a little bit about what
17 your responsibilities and duties were?
18    A. Well, we basically worked on burglaries,
19 check cases, credit card cases, thefts, and pretty
20 much that.
21    Q. Did you work -- as an Area 5 property
22 crimes detective, did you ever work on homicides?
23    A. Not as a case that was mine. There were
24 two cases that we -- that I was called to assist

33

1  on.
2      Q.  What cases were those?
3      A.  This one that we're here on today and
4  another murder.
5      Q.  Is it the Gomez case?
6      A.  Yes.
7      Q.  Okay.  Just so we're clear, so in the
8  entire time that you were a detective in the
9  property crimes division, you only worked on -- or
10  you only assisted on two different homicide cases?
11      A.  Yes, that I can recall.
12      Q.  Okay.  Could you tell me a little bit
13  about the working environment at Area 5?  And what
14  I mean that -- what I mean by that is did -- as a
15  property crimes detective, did you work in the same
16  area with the homicide detectives or were they
17  separate areas that you worked in?
18      A.  We had one very long, open floor that
19  property crimes and violent crimes shared, but
20  there was -- I don't want to call it a dividing
21  line, but basically the south -- I think it's the
22  south end of the floor were the property crimes
23  desks and the northern portion of the floor is
24  where violent crimes had their desks.

34

1      Q.  Okay.  And what floor was that on?
2      A.  The second floor.
3      Q.  So you were in a big, open space.  There
4  was no actual physical division between the
5  property crimes and violent crimes, but they were
6  separated by desks.
7      A.  Correct.
8      Q.  Okay.  Were you familiar with Area 5
9  detectives who worked in violent crimes?
10      A.  I knew of them.  I knew some of them, I
11  should say.
12      Q.  Were you familiar with Rey Guevara?
13      A.  Yes.
14      Q.  Was Rey Guevara at Area 5 when you were
15  also at Area 5?
16      A.  Yes.
17      Q.  Was it during both your tenures that he
18  was there?
19      A.  Yes.
20      Q.  So did you have a professional
21  relationship with Rey Guevara?
22      A.  What do you mean, professionally,
23  actually working with him, is that what you're
24  saying?

35

1      Q.  Yeah.  I mean, professionally, did you
2  work with him versus did you have any kind of
3  personal or social relationship with him?
4      A.  No personal social relationship.  We did
5  talk occasionally.  As far as working, these are
6  really the only two cases that I've ever had to
7  assist on that he was part of.
8      Q.  If there was a case involving theft or a
9  murder that also involved any kind of violence,
10  would that be the type of situation where property
11  crimes and violent crimes would work together?
12      MR. ENGQUIST:  Objection.  Calls for
13  speculation.  It's an incomplete hypothetical.
14      THE WITNESS:  Can I still answer?
15      MR. ENGQUIST:  Yeah.
16      A.  I don't recall any that that was the
17  case, but if it's listed just theft, then we
18  handled it.  If let's say theft turned into a
19  robbery, then robbery would handle it, and I
20  believe as a detective when I first got there,
21  robbery was part of the violent crimes section.
22      Q.  Were there any other types of detectives,
23  meaning violent crimes, property crimes, that were
24  in that second floor of Area 5?

36

1      A.  We had sex crimes.
2      Q.  Okay.  Anybody else?
3      A.  On the same floor, but not in that open
4  space with us, we had the youth office.
5      Q.  And what did the youth office
6  particularly handle, what kind of cases?
7      A.  Things related to youths and they also
8  were detectives.
9      Q.  Any other groupings of types of
10  detectives?
11      A.  That's all I can think of right now.
12      Q.  So did you testify earlier that you only
13  worked on -- that you only worked on two cases with
14  Rey Guevara that you could recall.  Is that
15  correct?
16      A.  Yes.
17      Q.  And in -- can you tell me why on these
18  particular cases you were brought in to work on
19  those individual homicide cases?
20      A.  Well, I believe in this case, we were
21  asked as a group, the property crimes section --
22  this case in itself was a -- it's called a heater
23  case.  It's a high-profile case -- and that we may
24  be called to assist on it if need be.

37

1    Q.  So was it the status of the case as, you
2  know, being in the media and being high profile
3  that gave rise to additional detectives being
4  brought in, is that what you're telling me?
5    **A.  I don't know for sure, but I can imagine,**
6  **yes, that's what it is.**
7    Q.  Yeah.  And unless I specify, I'm just
8  really asking for your understanding of events --
9    **A.  Yes.  Okay.**
10    Q.  -- and that's what I was asking there.
11  Any other heater cases that you can recall working
12  on that weren't specifically property crimes, but
13  that also involved violent crimes?
14    **A.  The only other one is the Gomez case.**
15    Q.  All right.  Did you have any -- strike
16  that.
17    Tell me about your training as a Chicago
18  police officer.  What kind of training did you
19  have?
20    MS. BARBER:  Objection.  Form.
21    **A.  I believe at the time it was a four-month**
22  **training in the academy and we went over a number**
23  **of different things.  I don't remember everything,**
24  **but we went over law.  We went over self-defense.**

38

1  **We went over case report writing.  There was a**
2  **number of other things.  I just can't recall right**
3  **now.**
4    Q.  Did you have any continuing training or
5  continuing education during the course of your
6  career?
7    **A.  Yes.  I can't tell you exactly what it**
8  **was, but they were constantly sending police**
9  **officers back to the academy for training.**
10    Q.  So you'd return to the academy for like a
11  seminar?
12    **A.  I guess you can say it's a seminar, maybe**
13  **a one-day training, sometimes a four-hour training,**
14  **things of that sort.**
15    Q.  And how frequently would that happen?
16    **A.  I couldn't say.**
17    Q.  In the calendar year, would you have more
18  than one?
19    **A.  Realistically, we could probably go a**
20  **whole year without any, so it -- this is all**
21  **dependent on what the department has for us.**
22    Q.  So the training was infrequent?
23    MR. ENGQUIST:  Objection.  Form.
24    MS. BARBER:  Speculation.

39

1    **A.  I don't know how to term it, but when**
2  **they believed we needed training, we were called in**
3  **for training.**
4    Q.  Do you recall any of the like subject
5  matters that you were trained on in these four-hour
6  seminar-type training?
7    **A.  No, I don't.**
8    Q.  Were you trained at any point -- whether
9  in the academy or subsequent to the academy, were
10  you trained in interrogations?
11    **A.  I can't tell you for certain where or**
12  **when.  I would imagine in our initial trainings,**
13  **they made a distinction and I would imagine, again,**
14  **when we became detectives.**
15    Q.  Do you have any independent recollection
16  of either circumstance, whether it was in the
17  academy or when you became detectives, having
18  specific training on how to conduct interrogations?
19    **A.  Well, I can't recall them.  It's been**
20  **some time, but I would imagine and I shouldn't be**
21  **phrasing it this way, but in the detective division**
22  **or the detection -- detective training, I would**
23  **imagine that they had spoken about that.**
24    Q.  Okay.  I just want to ask you about a

40

1  couple of discrete areas and, you know, I'm asking
2  generally about them but also if you have any
3  independent recollection of actually having
4  training on it, please let me know.  So what about
5  evidence handling, did you have any training on
6  evidence handling either at the academy or
7  subsequent to the academy?
8    **A.  I can't tell you when, but I believe so.**
9    Q.  Okay.  And do you have an independent
10  recollection of that training?
11    **A.  No.**
12    Q.  Just for the record so we're both clear,
13  do you understand what I mean when I say
14  independent recollection?
15    **A.  How about you explain that to me?**
16    Q.  Sure, sure.  So do you actually have a
17  memory of specific details about whether it's an
18  example of training or some other circumstance
19  without having to, like, look at any documents or
20  consult, you know, your training schedule or
21  anything like that.  I'm specifically asking about,
22  like, do you have actual memories of in this case
23  going to a training on these particular subjects?
24    **A.  No.**

**41**

1  Q. Okay. What about training on documenting
2  an investigation, like keeping physical written
3  records of the investigative steps that you go
4  through?
5  **A. I don't remember the actual course.**
6  Q. Do you believe you had training?
7  **A. Yes.**
8  Q. Do you think it was at the academy, or
9  subsequent to the academy, or both?
10  **A. Well, our training was always at the**
11  **academy, so if -- when we went to training for the**
12  **detective division, it would be at the academy.**
13  Q. Fair enough. So just so that we're
14  clear, when I say at the academy, I mean that four-
15  month time you referred to earlier --
16  **A. Yes.**
17  Q. -- versus some seminar down the road, or
18  a four-hour training, or a one-day training. Okay?
19  **A. Okay.**
20  Q. Were you ever trained on -- actually,
21  strike that.
22  Are you familiar with the term tunnel vision?
23  Have you ever heard that term?
24  **A. Yes, I have.**

**42**

1  Q. You know what that term refers to?
2  **A. Well, I have my idea of what it is.**
3  Q. What is your idea?
4  **A. It's when you're just looking -- focusing**
5  **straight ahead. You're not aware of what's going**
6  **on left or right of you.**
7  Q. And did you -- do you have any
8  recollection -- independent recollection of being
9  trained on tunnel vision as a Chicago police
10  officer?
11  **A. No.**
12  Q. Mr. Ruiz, do you speak any other
13  languages?
14  **A. I speak Spanish.**
15  Q. And did you learn Spanish in a classroom
16  or did you grow up in Spanish-speaking house? How
17  do you know Spanish?
18  **A. Well, it might be a little long of a**
19  **story, but as a child, my parents did speak to us**
20  **in Spanish, but at some point growing up, maybe two**
21  **and a half, three years of age, they decided that**
22  **they would speak to us only in English, so -- and**
23  **my father had good reason for that. He came here**
24  **from Puerto Rico, didn't speak any English. He had**

**43**

1  **to learn the language as he went along. He had his**
2  **own issues with that and the way people talked to**
3  **him, and thought of him, and reacted to him. So he**
4  **didn't want us to have those same issues, so he and**
5  **my mom decided that they were going to speak only**
6  **English to us.**
7  Q. And then subsequent to that, did you take
8  any formal training on Spanish?
9  **A. I took some classes in college.**
10  Q. So could you tell me what your Spanish
11  proficiency level is? Are you fluent?
12  **A. No, I'm not fluent.**
13  Q. Could you characterize how well you know
14  Spanish?
15  **A. I speak Spanglish. Sometimes I can**
16  **start, and then I have to fill in a couple of**
17  **English words to go back to Spanish.**
18  Q. Okay. So are you able to understand
19  spoken Spanish?
20  **A. Yes.**
21  Q. Are you able to read written Spanish?
22  **A. I can read.**
23  Q. Did you ever speak Spanish as part of
24  your job as a Chicago police officer?

**44**

1  **A. On occasion.**
2  Q. How frequently would you speak Spanish?
3  **A. Well, as a patrolman, if I made a street**
4  **stop and the driver did not speak any English, I'd**
5  **speak to him in Spanish.**
6  Q. So is it fair to say if you were in a
7  circumstance where you had a witness or a civilian
8  actually is a better way to put it, who didn't
9  speak English and spoke Spanish, you would speak
10  Spanish to that person?
11  **A. Yes, I would.**
12  Q. So you -- I think you said your father is
13  from Puerto Rico.
14  **A. Yes.**
15  Q. Do you -- are you able to discern a
16  difference between Puerto Rican dialect of Spanish
17  and a -- like a Mexican dialect of Spanish?
18  **A. Yes. There's times that I can't, but**
19  **their accents and my wife is Mexican.**
20  Q. Okay.
21  **A. And when she does speak to me in Spanish,**
22  **there are some words that I don't understand.**
23  Q. So would you have an easier time
24  understanding Puerto Rican dialect of Spanish than

45

1 you do another dialect of Spanish?
2 **A. I'd say yes. I'm a little more familiar**
3 **with the language.**
4 Q. Do you know if Rey Guevara spoke Spanish
5 with a Puerto Rican dialect?
6 **A. Yes, I believe so.**
7 Q. All right. Mr. Ruiz, I want to ask you
8 some questions regarding your general understanding
9 of policies and practices of the Chicago police
10 department back in 1998. Okay? To the best of
11 your recollection.
12 **A. Yeah. Okay.**
13 Q. And feel free to -- if you're uncertain
14 of it, please, you know, let me know.
15 **A. Okay.**
16 Q. Do you know if there was any CPD policy
17 or practice regarding notetaking during an
18 investigation generally back in 1998?
19 **A. I don't understand. Are you saying are**
20 **we taking notes during investigations?**
21 Q. No. Do you know if there was a policy
22 that governed whether or not you had to keep your
23 notes if you took notes during an investigation?
24 **A. Yes, if you typed up a -- or wrote out a**

46

1 **GPR, it should be collected and turned in.**
2 Q. Could you explain for the record, like,
3 what a GPR is and what's the purpose of a GPR?
4 **A. Okay. I forget the acronym. It's a**
5 **general -- something -- report.**
6 Q. I believe it's a general progress report.
7 **A. Okay. General progress report and what**
8 **you would and use that form for was to jot your**
9 **notes down.**
10 Q. During the course of an investigation?
11 **A. Yes.**
12 Q. Okay. So if you didn't have any GPRs and
13 you had just the notepad and you jot a note down on
14 a notepad, were you required to then transfer those
15 notes to a GPR?
16 **A. I believe, if I remember correctly, we**
17 **would submit that as let's say your GPR.**
18 Q. So you could submit a note that you took
19 on some other piece of paper that wasn't a GPR form
20 per se as a GPR.
21 **A. Yes.**
22 Q. And do you believe there was some sort of
23 rule, or regulation, or a general order, for
24 instance, that governs?

47

1 **A. I don't recall if there was an actual**
2 **general order on this or not.**
3 Q. But you do believe you were required to
4 do so.
5 **A. If you were jotting down notes, yes.**
6 Q. Did you take notes as a detective?
7 **A. Yes and no. I worked in the property**
8 **crimes division, and a lot of times, I went**
9 **straight to the computer only because if I had**
10 **somebody that was an arrestee and I'm talking to**
11 **him, I had my computer open and I mark everything**
12 **down back and forth.**
13 **What we did in property crimes was -- or I**
14 **should say this. What my partner and myself did,**
15 **and our practice was this, if we have an arrestee,**
16 **we make sure we take care of the arrest report. We**
17 **make sure that the -- our supplementary case report**
18 **is done before the night is over, and any pertinent**
19 **information is put together, and if we finish a**
20 **felony file, we turn it in.**
21 **So we really did not use GPRs very often. I**
22 **know early on, when I was a new detective, I did**
23 **but as I went along and I was getting better at it**
24 **and more fluent with it or feeling more comfortable**

48

1 **with my position there, we just -- we talked to**
2 **somebody, came back, knocked it out, and that was**
3 **it but --**
4 Q. No. Are you finished?
5 **A. Yes, sir.**
6 Q. So just we're clear about that answer, if
7 you had an arrestee in your presence at the
8 station, you would defer to writing out your report
9 on the computer. Is that what you testified to?
10 **A. Yes.**
11 Q. So if you were in the field interviewing
12 witnesses or potential suspects, you wouldn't have
13 a computer with you, right?
14 **A. Right.**
15 Q. So would you take notes under those
16 circumstances?
17 **A. What we generally would do, depending on**
18 **what the information is they're giving to us, we**
19 **had -- we always had a copy of the case report, the**
20 **photostatic copy that we got from the field or I**
21 **should say patrol, and we'd jot notes there and**
22 **that would be part of our file, so we'd turn that**
23 **in.**
24 Q. You mentioned a term I'm not familiar

49

1  with.  Photostatic, is that the same as photocopy?
2      **A.  Yes, photocopy.**
3          MR. ENGQUIST:  Old-timer version.
4          MR. STARR:  Yeah.  MS. SUSLER:  You're
5  showing your age.
6          THE WITNESS:  I was showing my age.
7      Q.  So you would take notes on a photocopy of
8  a case report.  Is that what you testified to?
9      **A.  If I needed to.**
10     Q.  In what circumstances would you ever take
11  notes on a GPR?
12     **A.  Well, maybe a birthdate or an additional**
13  **address, something like that.**
14     Q.  And what was the purpose of using a GPR
15  for those circumstances?
16     **A.  Are you asking me why not?**
17     Q.  Yeah.  Why write on a GPR a birthdate or
18  an alternative address as opposed to just writing
19  it on a case report, like you previously described?
20     **A.  Yeah, I'm a little confused here, but I**
21  **thought you were -- are you asking why we would**
22  **write it on the original case report or why would I**
23  **write it on a GPR?**
24     Q.  No.  Well, I asked in what circumstances

50

1  would you use a GPR and I think you gave as an
2  example a birthdate or an alternative address.
3      **A.  No, no, no.  I'm sorry.  I meant to say**
4  **that I would jot that down on a general offense**
5  **case report and turn that in, not on a GPR.**
6      Q.  Fair enough.  So can you give me an
7  example of a circumstance where you would use the
8  GPR?
9      **A.  If I went out in the field and I'm**
10  **interviewing multiple witnesses, I would most**
11  **likely do that.**
12     Q.  And then you were obligated to keep that
13  GPR, correct?
14     **A.  Yes.**
15     Q.  And that became part of the file?
16     **A.  Yes.**
17     Q.  Can you explain why you were obligated to
18  keep your notes that you took on GPRs?
19         MS. BARBER:  Objection.  Foundation.
20         MR. ENGQUIST:  Join.
21     **A.  Why I would?**
22     Q.  Sure.  Start with you.
23     **A.  Okay.  Because I might have problems**
24  **remembering everything that I needed to know for my**

51

1  case.
2      Q.  And that obligation extended to all
3  detectives, correct, where you had to keep your
4  notes.  Is that what you testified to earlier,
5  right?
6      **A.  Yes.**
7      Q.  I believe you said that you would make
8  sure you and your partner's practice was to make
9  sure that your sup report was done before the end
10  of the night?
11     **A.  The closing sup, if in fact we had an**
12  **arrest.**
13     Q.  And why was it important to make sure
14  that it was done before the end of the night?
15     **A.  That's the way he trained me, and that**
16  **was his practice and we followed that.**
17     Q.  Well, what is your understanding of why
18  that was important?
19     **A.  You know, he -- if I can say, he was one**
20  **of the better property crime detectives on the**
21  **floor, and he did things correctly and there was a**
22  **point when we first started, he says I'm going to**
23  **show you how things are supposed to be done, and**
24  **what you do when you don't work with me is on you.**

52

1  **So I kept with his practices.**
2      Q.  And who is the he that you're referring
3  to?
4      **A.  Michael Stevens.**
5      Q.  So did you believe it was important to
6  get a sup report done before the end of the night
7  solely because he told you it was or did you have
8  any independent basis to think it was important to
9  do that?
10     **A.  I felt, first of all, he was a seasoned**
11  **detective, and if he believed it, I believed it.**
12  **I'll give you a quick example.  We were doing the**
13  **process from the district.  I don't know if there**
14  **were -- I don't remember if it was a burglary or if**
15  **it was a theft case, and we took some time on it.**
16  **I don't know, a few hours and stuff, and it was**
17  **getting real close to the ending time of our shift,**
18  **and I says, okay, Mike, listen, I'm -- I'll finish**
19  **the sup report tomorrow.  He looked at me and he**
20  **says, no, we're not.  You'll finish your sup**
21  **tonight and tomorrow we'll start fresh, and ever**
22  **since then, I never mentioned it or even questioned**
23  **it.**
24     Q.  Fair enough.  I just -- and I don't mean

53

1 to ask the same question over again. Did you have
2 any -- other than he told you this was an important
3 practice, which I understand -- I know as a senior
4 detective, he taught you and he trained you, I
5 think -- but did you have any reason to think that
6 it was also important to make sure you got your
7 report finished before the end of the night that
8 was independent, like did you have your own basis
9 for that?
10     **A.  Yes.**
11         MS. BARBER: I would object to the form
12 of that question.
13     **A.  Yes.  I believed at some point that if**
14 **you start shrugging your work off to the next day,**
15 **you can push it off again, and again, and again,**
16 **but it was important for us to make sure that we**
17 **took care of that because the next day, you don't**
18 **know what's coming and you don't know how many**
19 **cases you're going to have.  You don't know if you**
20 **have another process or an arrestee, and then you**
21 **never finished what you could have finished.**
22     Q.  Were you familiar with any Chicago Police
23 Department policy or practice regarding
24 interrogation of murder suspects?

54

1     **A.  No.**
2     Q.  And were you not familiar with that
3 because you were in property crimes?
4         MR. BRENER: Objection.  Foundation.
5     **A.  That and I don't recall that we had that**
6 **specific topic indicated.**
7     Q.  But are you familiar with any rule or
8 regulation that govern interrogation of murder
9 suspects?
10     **A.  No, I am not.**
11         MS. BARBER: And I object to the form of
12 the question.
13     Q.  Did you ever interrogate a murder suspect
14 in your time as a Chicago police officer?
15     **A.  Describe interrogation.**
16     Q.  Why don't you tell me what interrogation
17 means?  What is your understanding of the term?
18         MS. BARBER: I'm just going to object to
19 you using the terms and he's asking you for -- why
20 you're using it then you're providing the
21 definition.
22         MR. STARR: That is in the record for
23 sure.
24     Q.  What do you understand interrogation to

55

1 mean?
2     **A.  Well, it's a form of question, but I**
3 **believe it's a more direct questioning and a more**
4 **aggressive type of questioning.**
5     Q.  And back to my previous question, did you
6 ever during your time as a Chicago police officer
7 participate in an interrogation of a murder
8 suspect?
9     **A.  No.**
10     Q.  Did you ever participate in an interview
11 of a murder suspect?
12     **A.  Might have in Gomez.  I'm just not sure**
13 **if I sat in on an interview with one of the**
14 **suspects.**
15     Q.  Okay.  Any other circumstances where you
16 sat in a room where there was an interview or an
17 interrogation of a murder suspect taking place?
18     **A.  No.**
19     Q.  Did you sit in -- did you ever sit in any
20 of the interrogations or interviews of anyone
21 involved in the Soto murder investigation?
22     **A.  No.**
23     Q.  Do you know if there were any limitations
24 on the type of questioning one could use when

56

1 interviewing a murder suspect?
2         MR. ENGQUIST: Objection.  Form and
3 vague.
4     **A.  I'm not aware.**
5     Q.  Do you know if you were allowed to
6 threaten a murder suspect when interviewing one?
7     **A.  I know I never threatened any of my**
8 **arrestees.**
9     Q.  Do you know if there's any rule or
10 regulation governing whether you could or you
11 couldn't threaten a suspect?
12     **A.  I don't know.**
13         MS. BARBER: Objection.  Form as it's --
14 now we're switching it to suspects in general.
15     **A.  I don't know.**
16         MR. ENGQUIST: Okay.  Go ahead.
17     **A.  I don't know that there's a specific rule**
18 **per se.**
19     Q.  Do you know if there was any -- let me
20 strike that.
21     Did you ever intimidate, purposely intimidate,
22 a murder suspect in an interview?
23     **A.  No to the question and I don't ever**
24 **recall ever having to interview a murder suspect.**

57

1    Q.   Did you ever intimidate any suspects that
2  you were interviewing, not just murders?
3    **A.   No.**
4    Q.   Do you know if there's any rule or
5  regulation governing whether or not you could
6  intimidate a suspect?
7        MR. ENGQUIST:  Objection to form.  Vague.
8  Calls for speculation.
9    **A.   I can imagine there's a rule out there**
10 **and it is no, the answer is no.**
11   Q.   Were you generally familiar with the
12 rules of the regulations as a Chicago police
13 officer?
14   **A.   I read them whenever we had a test coming**
15 **up and designated rules and regulations, and**
16 **general orders, and special orders as pertained to**
17 **the exams.**
18   Q.   As a deputy chief, did you have a fairly
19 strong understanding of what the rules and
20 regulations were?
21       MS. BARBER:  Objection.  Form.
22   **A.   Even as a deputy chief and I hope I don't**
23 **sound like I didn't know what I was doing or what**
24 **was going on, but general orders, we had a stack of**

58

1  **I don't know how many different general orders, and**
2  **I would never remember them all or there's little**
3  **things from maybe some of the general orders that I**
4  **wouldn't remember.  If I needed to refresh my**
5  **memory, I'd have somebody pull it for me or I would**
6  **pull it myself, the general order that I believed**
7  **pertained to what I needed to know.**
8    Q.   Okay.  Did you have a general
9  understanding of the general orders as they applied
10 to interviewing or interrogating suspects of
11 crimes?
12   **A.   Yes.**
13   Q.   Did you ever -- during an interview or
14 interrogation of a suspect ever put your hands
15 physically on a suspect?
16   **A.   No.**
17   Q.   Did you ever witness any other police
18 officer put their hands on a suspect in an
19 interview or interrogation?
20   **A.   No.**
21   Q.   Do you know whether or not there's any
22 rules or regulations governing whether you can or
23 cannot touch a suspect in an interrogation or
24 interview?

59

1    **A.   You can't.**
2    Q.   You can't.  Are you positive about that?
3    **A.   Yes.**
4    Q.   When you would interview a suspect, would
5  you make -- would you document the interview?
6        MR. ENGQUIST:  Objection.  Calls for
7  speculation.  Incomplete hypothetical.
8        MR. STARR:  And I'm talking about a
9  suspect, not just a witness but a suspect.
10       MR. ENGQUIST:  Same objection.
11       MS. BARBER:  I'm also going to interpose
12 a form objection.
13   **A.   Like I said, when we were doing our cases**
14 **and, mind you, they're burglary cases, right, don't**
15 **have any -- I don't believe I handled anything on**
16 **the violent crimes side, but burglaries, I will**
17 **speak to the individual and come right back, put it**
18 **on, or sometimes it was a short explanation of his**
19 **actions, which I could have kept in my mind, and**
20 **then what I did is I transfer it to a computer.  So**
21 **very rare did I need a GPR.**
22   Q.   I wasn't talking about GPRs.  I was just
23 talking about documentation.  So you did document
24 interviews of suspects, correct?

60

1    **A.   Okay.  Yes.**
2    Q.   Did you feel like you were required to
3  document an interview of a suspect when you
4  conducted one?
5    **A.   That's part of our investigation, yes.**
6    Q.   Do you know if there was a rule or
7  regulation that said you had to document interviews
8  of suspects?
9    **A.   I don't know if I totally understand**
10 **that, but it's just part of an investigation, so**
11 **you document it.**
12   Q.   So there's a general understanding you're
13 supposed to do that.  Is that what you're saying?
14       MS. BARBER:  Objection.  Form.
15   **A.   Yes.**
16   Q.   Do you have a -- do you have any idea
17 whether or not there's an actual rule that says you
18 have to do that?
19   **A.   Nothing that I can tell you as, yeah, I**
20 **remember reading this or it's in this general**
21 **order, but it's part of an investigation, so --**
22   Q.   Again, not to ask the same question
23 again, but do you think there was a rule that said
24 you had to document interview suspects?

61

1    A.   I would imagine, yes.
2    Q.   Okay.  As a detective, did you have an
3 obligation to exhaust any leads you might have in
4 an investigation?
5         MR. ENGQUIST: Objection.  Form.  Vague.
6 Calls for speculation and it's an incomplete
7 hypothetical.
8    A.   Yes.
9         MS. BARBER: I'm sorry.  Can you have the
10 question read back, please?
11       (The previous question was played back.)
12    Q.   And was the obligation governed by any
13 rule that you knew of?
14       MS. BARBER: Objection.  Same objection.
15    A.   Okay.  This is how I look at it.  You're
16 not only there to protect the victim, but you may
17 have information if you follow those leads that
18 will prove that the suspect is not an offender.
19    Q.   And you have an obligation because of
20 that?
21    A.   Yes.
22    Q.   Could you explain what that obligation
23 is?
24    A.   Well, I can explain an example that I had

62

1 as a burglary detective and went along the same
2 lines.  A lady had a -- what she called like --
3 well, a cousin but to find out later on he wasn't a
4 cousin, and they called it a play cousin, but he
5 lived in a building where he was a tenant.  The
6 victim was a tenant, and they saw -- or the witness
7 apparently saw an individual that we later arrested
8 or we took into custody coming out of a window
9 trying to take a window air conditioner, and I
10 found out other things in the case.
11       Once I spoke to the suspect, he told me that
12 the mother did not like him, didn't appreciate him,
13 didn't want him with her daughter.  Apparently, he
14 was dating the daughter at one point, and he felt
15 that she's saying this because he was dating the
16 daughter.
17       Well, I got a chance to speak to the witness
18 and, just in speaking to him, he just didn't seem
19 very confident in what he was saying and what he
20 saw that day, so I continued to ask him more
21 questions.  I said, well, did you actually see this
22 individual that came out of the window?  You say
23 it's -- whatever the suspect's name was.
24       And I says, you do realize that for a

63

1 residential burglary, this young man could go to
2 jail for three years.  That's minimum, three years.
3 And even with that, I could sense that he was a
4 little reluctant at this point, so what I did at
5 this point is I told him, I said, it's not a crime
6 to say you didn't see him, and I'm not doubting
7 that you chased this guy down the street or through
8 the gangway down the street, but if you did not see
9 his face to say it was this person, you don't have
10 to worry about that you just didn't see him.  You
11 did more than anybody else would have done.  You
12 chased this guy half a block.
13       And he says, yeah, that's what happened.  I
14 never really saw is face.  I said, okay.  I just
15 want to be clear on that.  So I went back and I
16 says, okay.  Now I'm going to take all the
17 information that I have, what the victim said, what
18 the witness says, what the suspect says, and I went
19 to the state's attorney's office with it and let
20 them make the determination.
21       And of course, they rejected charges of
22 burglary, but in that sense, you're protecting this
23 young man when you sense that something wasn't
24 right there, and I'm protecting him.  It's not

64

1 always the victim, and in this instance or
2 incident, it just didn't seem right.
3    Q.   So in that example, the information that
4 you received about the witness not seeing the face,
5 would that be considered exculpatory evidence?
6    A.   Oh, I don't know what it is.
7       MS. BARBER: Objection.  Form.
8 Foundation.
9    A.   Yeah.  Can you just give me a definition
10 -- your definition of exculpatory?
11    Q.   Certainly.  So exculpatory means any
12 evidence that had -- would have a tendency to prove
13 the innocence of a suspect.
14    A.   Yes.
15    Q.   And that example you gave, the fact that
16 the witness didn't see the suspect's face, would be
17 exculpatory evidence.
18    A.   Yes.
19    Q.   And so did you obligation as a detective
20 to turn over any exculpatory evidence that you
21 encountered?
22    A.   Well, what I did was everything that was
23 part of that testimony went on the general offense
24 or not -- yeah, in my closing sup, so that's

65

1  where everything went.
2      Q.  Right.  But my question is, did you have
3  an obligation to turn over that exculpatory
4  evidence?
5      A.  I feel that I did.
6      Q.  Do you know if there's a rule that
7  governed you as a Chicago police officer, as a
8  detective?
9      A.  No, I can't tell you what I remember from
10 that.  I just know that that's -- morally, that's
11 what I'm supposed to do.
12     Q.  Do you think there was a rule that said,
13 if you encounter any exculpatory evidence, you have
14 to turn it over?
15     A.  If I had to guess, I'd say yes.
16     Q.  So as a practice, did you turn over all
17 exculpatory evidence that you encountered?
18     A.  Yes.
19     Q.  Would a alternative suspect be something
20 that would be exculpatory in nature?
21         MR. ENGQUIST: Objection. Calls for
22 speculation and is an incomplete hypothetical.
23         MR. BRENER: Join.
24     A.  I'm sorry.  What are we saying here?

66

1      Q.  So as a detective, you're investigating a
2  crime and you have a suspect and another
3  alternative suspect comes to light.  Is that
4  something that would be exculpatory in nature?
5          MR. ENGQUIST: Same objection.
6      A.  I would definitely have to look into it.
7  Yes, I can't overlook it.
8      Q.  Would you have an obligation to disclose
9  that there was an alternative suspect?
10         MR. ENGQUIST: Objection to form.
11     A.  I would put that in as part of my
12 narrative.
13     Q.  Do you feel like you would be obligated
14 to do so?
15     A.  Sure.
16     Q.  Do you think there's probably a rule that
17 governed whether or not you have to document
18 alternative suspects?
19     A.  I know I didn't -- I can't tell you I
20 remember reading it, but I would imagine so.
21     Q.  And how would you document it?  You said
22 you'd put it into your narrative.  Can you explain
23 what you mean by that?
24     A.  Yes.  Well, as somebody who had most

67

1  likely given me that information, right, so I would
2  put that as part of that individual's statement.
3      Q.  And you would document that in a police
4  report?
5      A.  Yes, my supplementary report.
6      Q.  And then you said -- I believe you
7  testified that, at the end, you would turn it over
8  to the state's attorney.  Is that correct?
9      A.  I would contact the state's attorney's
10 office, yes.
11     Q.  And did you have an obligation to do that
12 to provide all your evidence, including exculpatory
13 evidence to a state's attorney?
14     A.  Yes.
15     Q.  Did you ever conduct a lineup as a
16 Chicago police officer?
17     A.  Yes.
18     Q.  Do you know if there's a policy or a rule
19 or regulation regarding how to conduct lineups?
20     A.  There is a general order on lineups, yes.
21     Q.  Can you tell me generally what your
22 obligations were when conducting a lineup?
23         MR. ENGQUIST: Objection. Form.  I don't
24 know what timeframe we're looking at here.

68

1          MR. STARR: I did say before, but I'm
2  talking about his time at Area 5 as a detective.
3          MR. ENGQUIST: Okay.  So just that
4  period.  Okay.
5      A.  Generally, what we did is, if we had a
6  suspect and we were bringing in witnesses or the
7  victim for viewing and I don't remember all the
8  numbers, but that if you have one suspect, you had
9  to have at least four people in the lineup, and I
10 believe if you have two suspects, it was six.  And
11 I'm not exact on those numbers, but I know for one
12 you had to have at least four individuals.
13     Q.  And those other individuals, are those
14 called fillers?
15     A.  Yes, yes.
16     Q.  And was there any obligations that you
17 had regarding what fillers look like?
18     A.  Well, they had to be of similar size,
19 weight, and if the suspect was bearded, you would
20 need to have a bearded person in there or they all
21 should have.  If they were blond hair -- if the
22 suspect has blond hair, it stands to reason that
23 the fillers should be blond.
24     Q.  So generally speaking, they need to look

69

1  like the suspect, correct?
2      **A.  Yes.**
3      Q.  And if you had a male suspect, they --
4  all the fillers had to be males and vice versa for
5  a woman suspect?
6      **A.  Correct.**
7      Q.  Are you familiar with the term a double
8  blind?
9      **A.  No, I'm not.**
10      MS. BARBER:  I'm just going to object to
11  this entire line of questioning.  I'm not sure if
12  that's involved at all in this case, and to the
13  extent you're using this witness to fish for
14  others, I think that's [indiscernible].
15      MR. STARR:  Objection noted.
16      Q.  Do you -- did you have an obligation to
17  document the lineups you conducted?
18      **A.  I did.**
19      Q.  Do you know as a Chicago police officer,
20  did you have an obligation?
21      **A.  I believe so.**
22      Q.  Do you think there was probably a rule
23  that said you had to document the lineups?
24      **A.  I think so.**

70

1      Q.  And how would you document a lineup?
2      **A.  How would I?  I would most likely put it**
3  **in my narrative that it was a -- I don't remember**
4  **the term, in a good lineup, one where the**
5  **individual was not identified, and we do not have**
6  **him arrested, that's basically what it would be.**
7      **If, in fact, there was an arrest, we probably**
8  **would have to turn that in, so I'm not clear**
9  **exactly how we did it.  Normally, our lineups were**
10  **good.  I think there was one or two times that we**
11  **might not have had a positive or negative lineups.**
12      Q.  And what happened?
13      **A.  Well, we had to let our suspect go.**
14      Q.  In the event that you had a bad lineup,
15  you let the suspect go?
16      **A.  Oh, yes.  If they couldn't identify him,**
17  **we'd let him go.**
18      Q.  Would you document that lineup as well?
19      **A.  Yes.  It would be in the narrative of our**
20  **sup.**
21      Q.  Did you ever have an opportunity to
22  interview someone who confessed to a crime?
23      **A.  Yes.  Sorry about that.**
24      Q.  That's okay.  How would you document a

71

1  confession?
2      **A.  It'd be in my closing sup.**
3      Q.  Any other form that you'd document the
4  confession?
5      **A.  Well, not that I can think of.  That goes**
6  **into the final sup.**
7      Q.  Would you ever have any reason to leave
8  out a substantive part of a confession -- an
9  important part of a confession?
10      **A.  No.**
11      Q.  Are you aware if any substantive parts of
12  confessions were left out in this case?
13      **A.  In this case, not that I know of.**
14      Q.  Have you had a situation arise where one
15  officer creates a police report that conflicts with
16  a police report you've created?
17      MS. BARBER:  Objection.  Form.
18      **A.  Yeah.  I don't exactly understand that**
19  **because you're saying that we're both creating the**
20  **same case?**
21      Q.  No, any kind of police report.  Right,
22  there's all kinds of police reports, correct?
23      **A.  Sure.**
24      Q.  Have you ever been in a circumstance

72

1  where the police report you created was conflicted
2  with another police report that a different officer
3  created?
4      **A.  Not that I can think of.**
5      MS. BARBER:  Same objection.
6      Q.  Are you aware of any contradictory police
7  reports in the Soto murder investigation?
8      **A.  No.**
9      Q.  Have you ever had a circumstance arise
10  where you created a police report that went
11  missing?
12      **A.  Did I ever have one?  No, not that I can**
13  **think of.**
14      Q.  Have you ever heard of a circumstance
15  during your time as a Chicago police officer where
16  somebody's police reports go missing?
17      **A.  I can't say that I do.  I can't think of**
18  **any.**
19      Q.  Do you know if your police reports had
20  went missing, would you have an obligation to
21  document that fact?
22      MR. ENGQUIST:  Object.  Go ahead.
23      MS. BARBER:  Go ahead.
24      MR. ENGQUIST:  Objection.  Form.  Vague.

73

1 Calls for speculation. It's an incomplete
2 hypothetical.
3    **A.   I don't know who would document that, to**
4 **be honest with you.**
5    Q.   Well, if you created a police report and
6 you lost it, for instance, would you have to make
7 some sort of documentation of that fact?
8    **A.   Well, it's never happened but I**
9 **definitely would notify my sergeant to see if**
10 **there's somebody that can find it in the computer**
11 **because I'd have to agree that I don't know much**
12 **about computers.**
13    Q.   So you'd tell a supervisor.
14    **A.   Yes, absolutely.**
15    Q.   Okay.  Would you tell a state's attorney?
16    **A.   Only if it's part of the file and it was**
17 **a felony file put together, I think maybe.  I don't**
18 **know when I might need to tell a state's attorney.**
19    Q.   Are you aware if any police reports went
20 missing in this case?
21    **A.   No.**
22    Q.   And have you ever heard of police
23 reports, for instance, GPR reports going missing in
24 any case?

74

1    **A.   I don't know.**
2    Q.   Have you ever heard the term street file?
3    **A.   Street file.  I've heard the term.  I'm**
4 **not totally sure what a street file is, so I --**
5 **harder to answer that.**
6    Q.   Can you tell me what you think it is?
7    **A.   Well --**
8       MS. BARBER: Objection.  Speculation.
9    **A.   -- I kept files of my own cases that I**
10 **might have to go to court on, and they're not the**
11 **originals.  The originals gets turned in, but I**
12 **take a copy of my sup.  I would take a copy of the**
13 **general offense case report.  I put it in a little**
14 **manila folder, and if there was any inventory, I**
15 **would take -- I'd take that just in case I had to**
16 **go to court.**
17    Q.   Anything else you would keep in those
18 files?
19    **A.   Basically what was in the felony file,**
20 **anything that I believe I would have needed in**
21 **court to refresh my memory.**
22    Q.   Do you ever keep any notes in those
23 files?
24    **A.   The only thing I would keep is the same**

75

1 **things that I would put in the felony file.**
2    Q.   So no notes.
3    **A.   No.**
4    Q.   Are you familiar with a Chicago Police
5 Department policy regarding chain of custody in
6 terms of evidence?
7    **A.   Yes.**
8    Q.   What is your understanding of that
9 policy?
10    **A.   Chain of custody, if I'm taking custody**
11 **of, say, a baseball bat, I go, I take it, I**
12 **inventory it and make sure it gets to -- let's say**
13 **in the detective division, it goes to the front**
14 **desk and make sure that it goes to the person that**
15 **handles property after that.  I stay with that and**
16 **don't let it get out of my sight.**
17    Q.   So you have a responsibility to the
18 evidence when it's in your custody?
19    **A.   Yes.**
20    Q.   Is that governed by a general order?
21    **A.   I believe so.**
22    Q.   Did you ever choose to not inventory any
23 critical physical evidence in an investigation you
24 were part of?

76

1    **A.   Me?  No.**
2    Q.   Did you ever hear of any other police
3 officers --
4    **A.   No.**
5    Q.   -- doing the same?
6    **A.   No.**
7    Q.   Are you aware of any physical evidence in
8 this case that was not inventoried?
9    **A.   No.**
10    Q.   You have an obligation to document any
11 physical evidence, correct?
12    **A.   Yes.**
13    Q.   If in the course of an investigation you
14 are made aware of an alternative suspect, do you
15 have an obligation to interview that person?
16       MR. ENGQUIST: Objection.  Vague.  Calls
17 for speculation.  Incomplete hypothetical.
18    **A.   If it's my case, I make an effort.**
19    Q.   Do you know if there's a policy that says
20 all detectives have to interview alternative
21 suspects?
22    **A.   I don't know if it's in there or not.**
23 **Once again, I would imagine so.**
24    Q.   Mm-hmm.  And all these questions

77

1 regarding policies, were these the prevailing
2 policies as you understood them in 1998?
3     MS. BARBER: I just want to interpose a
4 form objection to that question and the one before.
5     **A. Can you just rephrase that?**
6     Q. Yeah. Is there -- do you remember any
7 moment in time where the policies drastically
8 changed or is what you testified today what the
9 policies you thought were in place in 1998?
10     **A. Well --**
11     MS. BARBER: Same objection.
12     **A. -- yeah. I'm not sure if it goes back to**
13 **1998 or the span that I was a sergeant also, but,**
14 **yes, it goes back to that time because they were**
15 **constantly changing, and I shouldn't say all of**
16 **them, but some changed.**
17     Q. Do you -- are you familiar with any major
18 changes that affected anything that you've
19 testified today?
20     **A. No.**
21     Q. If you were to take notes of an interview
22 of an alternative suspect, would there ever be a
23 situation where you could destroy or throw out
24 those notes?

78

1     **A. No.**
2     Q. As a property crimes detective, did you
3 ever receive information about license plate
4 numbers during the course of an investigation?
5     MS. BARBER: Objection. Form.
6     **A. As a property crimes detective, a lot of**
7 **times if there was, it would be on a general**
8 **offense case report and it would be given to me. I**
9 **can't say that I remember in calling some of the**
10 **victims, that they later on gave me -- that truly**
11 **is possible also because I do follow ups with each**
12 **of my -- let me explain how that's done, but we get**
13 **maybe three cases a day, sometimes more depending**
14 **on the week and everything else.**
15     **And what we do at that point is we try to**
16 **contact the victims. We want to know if, in fact,**
17 **they have any information on an offender, what his**
18 **description or somebody they know by name. We also**
19 **want to know if there is any additional property**
20 **that was taken and that way, we can add it to our**
21 **supplementary report. And if at that time, they**
22 **have a license plate, we can gather that also, but**
23 **a lot of times, we make those phone calls.**
24     **I would call at least twice, maybe today,**

79

1     **maybe tomorrow, and if I don't get anybody, I'll**
2 **send a letter indicating that they should contact**
3 **me within ten days. Sometimes I get no replies, so**
4 **after ten days, then I would suspend the case, but**
5 **if it was given to me, it would be put in a**
6 **supplementary report.**
7     Q. So if you were getting information from
8 -- on an offender from a witness or from a victim
9 and they said, yeah, there was a license plate --
10 or there was a car -- a suspicious car, here's the
11 license plate, what would you do as a detective?
12     **A. It's my case?**
13     Q. Yeah.
14     MR. ENGQUIST: Objection. Calls for
15 speculation. It's an incomplete hypothetical.
16 Form. Go ahead.
17     **A. And we're talking about burglary cases?**
18     Q. Any of the crimes you were investigating.
19     **A. Okay.**
20     MR. ENGQUIST: Same objection.
21     **A. Okay. Depending if it's my case, if it's**
22 **my case and I get that information, I record it in**
23 **the case report. If it's not my case and I'm**
24 **assisting or I'm out on the scene, I'll direct that**

80

1 **individual to the lead detective.**
2     Q. Is there any -- besides documenting, is
3 there any follow up you do?
4     MR. ENGQUIST: Objection. Vague. Calls
5 for speculation, is an incomplete hypothetical. Go
6 ahead.
7     **A. Yeah. I'm not sure.**
8     Q. So you'd just write the license plate in
9 the report and never do anything else?
10     **A. No.**
11     MR. ENGQUIST: Same objection.
12     MS. BARBER: Mischaracterizes his
13 testimony.
14     **A. Okay. Now I understand your question**
15 **better. Like I said, if it is somebody else's**
16 **case, I make sure he gets that and that individual**
17 **take that license plate number and then work it up.**
18 **If it were my case, I would either go to the**
19 **computer, depending if I know how to use the**
20 **computer, and get what information I can on that**
21 **vehicle.**
22     Q. So you would be able to search for the
23 license plate?
24     **A. Yes.**

81

1    Q.   And is there any kind of form that you
2  fill out when you do that?  Do you ever document
3  that?
4    **A.   No, I would put that in my case report.**
5    Q.   That you searched it?
6    **A.   Yeah.**
7    Q.   Would you -- once you got the information
8  about who owned the license plate, would you then
9  take any further investigative steps?
10      MR. ENGQUIST: Objection. Form. Calls
11  for speculation.  It's an incomplete hypothetical.
12   **A.   It all depends how it relates to the**
13  **case.**
14    Q.   Right.  And I'm sorry.  My question is if
15  you were given information from -- that an offender
16  may or may not have -- that there was a suspicious
17  car with a plate in the area at the same time of
18  the crime, and there was any reason to think that
19  was the offender, would you take any further
20  investigative steps?
21      MR. ENGQUIST:  Same objections.
22   **A.   Well --**
23      MS. BARBER: And objection to form if it
24  wasn't already put in previously.

82

1    **A.   -- I don't know that I've had too many**
2  **situations like that or if I had any situations**
3  **like that, but I would -- like I says, I would run**
4  **the plate, see how it relates to the case because**
5  **it could -- well, I can't even say that, but an**
6  **obligation I would have is to see if I can follow**
7  **up on it.**
8    Q.   And how would you follow up?
9      MR. ENGQUIST:  Same objection or
10  objections, actually.
11   **A.   I could go make a visit to the home of**
12  **whoever the owner is of that vehicle, if it**
13  **registers because sometimes it comes unregistered,**
14  **the plate, so that's one way.**
15    Q.   Would you document that visit?
16   **A.   Yes.**
17    Q.   Okay.  I'm going to change gears a little
18  bit and just talk to you about your independent
19  recollection of the Soto murder investigation.
20   **A.   Okay.**
21    Q.   So we've already defined independent
22  recollection as being an actual memory that you
23  have and without reference to documents or previous
24  testimony.  Is that fair?

83

1    **A.   Yes.**
2    Q.   And as we sit here today, what do you
3  independently recall about the Soto murder
4  investigation from March and April of 1998?
5    **A.   I remember that we secured -- and I'm not**
6  **sure if I'm terming this right, but a consent to**
7  **search and what I don't have a recollection of is**
8  **if in that consent to search, I was the one who**
9  **spoke to Mr. Mejia because I wouldn't have -- I'm**
10  **confident enough to explain that consent to search**
11  **to him or if I read it to him, which is a**
12  **possibility, or if he, himself, read it.**
13    Q.   Do you have an independent recollection
14  of Mr. Mejia?
15   **A.   No, I don't.**
16    Q.   So you're referencing the document, the
17  actual consent to search form --
18   **A.   Yes.**
19    Q.   -- that you reviewed in preparation for
20  today?
21   **A.   Yes.**
22    Q.   Okay.  So besides -- and I know it's like
23  sometimes hard to bifurcate in your mind, but
24  besides the documents you looked at, do you have

84

1  any additional independent recollection of anything
2  to do with the case?
3    **A.   I remember going to the Mozart address.**
4    Q.   What do you remember about that?
5    **A.   I went down there with my partner, which**
6  **was Michael Stevens.  I know he and I drove**
7  **together.  I don't recall if Mr. -- the other**
8  **detective, Santo Padre, came along with us or he**
9  **drove in another car, but I remember him being**
10  **there also.**
11      **I remember that, when I went to the location,**
12  **what stuck up -- stuck out in my mind was that I**
13  **was looking for money in one of the children's**
14  **rooms.  And then at one point, I heard my partner**
15  **call out and I believe he was calling out to Santo**
16  **Padre and I came out of the room.  He was in a**
17  **closet in the hallway or he had the door open and**
18  **he was looking into the closet, and he had in his**
19  **hands a pair of gym shoes, a black pair of gym**
20  **shoes.  I remember that.**
21    Q.   Do you have any other independent
22  recollection besides that?
23   **A.   I remember right after that, we decided**
24  **to go -- or I -- it was decided that we should go**

**85**

1 back to the area with the gym shoes. I believe my
2 partner described that there was blood on there,
3 and we came back to the area of the gym shoes.
4 Q. Just for clarity's sake, the partner that
5 called out to Santo Padre was who?
6 A. Mike Stevens.
7 Q. So Detective Stevens is the one who found
8 the shoes.
9 A. Yes.
10 Q. And you said you have an independent
11 recollection that you were looking money in one of
12 the children's rooms.
13 A. Yes.
14 Q. Do you remember why you were looking for
15 money?
16 A. No. I just remember that we -- that I
17 was looking for money.
18 Q. And do you have any independent
19 recollection of how you ended going to that
20 location? You know, this is a homicide
21 investigation, right?
22 A. Yes.
23 Q. You were in property crimes. Do you have
24 any independent recollection of how it came to be

**86**

1 that you and the other detectives went to that
2 location?
3 A. Well, earlier in that day, and I had
4 mentioned this earlier, that we were told about
5 this heater case, high profile case, and that as
6 property crimes detectives, we may be used or asked
7 to help out in this investigation.
8 Q. And who told you about the heater case?
9 A. I believe that was the commander at the
10 time, Phil Klein.
11 Q. Do you remember what he said to you?
12 A. Basically what I spelled out, that this
13 was a high-profile case, and we may be used to help
14 out.
15 Q. And do you remember actually hearing Phil
16 Klein say those things?
17 A. Yes.
18 Q. Do you remember who else was present for
19 that?
20 A. I think other property crimes detectives
21 for sure. I don't know if the violent crimes was
22 there also.
23 Q. Do you remember where that conversation
24 took place?

**87**

1 A. I believe, if I remember correctly, it
2 was in our conference room where we hold our roll
3 calls.
4 Q. And did you hold roll calls with violent
5 crimes as well, or was it just property crimes?
6 A. Yes. We held roll calls together.
7 Q. Do you remember if this conversation took
8 place during roll call?
9 A. I can't say for sure. I don't know if we
10 were called in later or it was at our regular roll
11 call.
12 Q. Do you recall what shift you were working
13 on that particular day?
14 A. My regular shift was a three o'clock
15 start.
16 Q. Is that nights, I guess?
17 A. Yes, afternoon, yes, evenings.
18 Q. So your regular shift, meaning that's the
19 shift that you generally had all the time?
20 A. Yes.
21 Q. Do you have any independent recollection
22 about the suspects in this case?
23 A. No.
24 Q. What do you remember about Mr. Mejia? Do

**88**

1 you remember what his name was?
2 A. No, I didn't until I saw the forms.
3 Q. Do you remember what he looked like?
4 A. No.
5 Q. Do you remember if he spoke English?
6 A. No.
7 Q. We talked earlier about you couldn't
8 remember if you read to him or if he read it
9 himself. Why do you have a memory of that?
10 A. Well, only because the form in itself is
11 in Spanish, and there's no back page to it, which
12 indicated English. I think one side was English
13 and one side was Spanish, and we -- I signed as a
14 witness on the Spanish section.
15 Q. So after looking at that document, you
16 remember that you couldn't recall if you had
17 translated it or not.
18 A. Exactly.
19 Q. Do you have any recollection of someone
20 named Arturo Reyes?
21 A. No.
22 Q. Do you know if you ever met Arturo Reyes?
23 A. I don't believe so.
24 Q. Do you know if you ever interviewed

89

1  Arturo Reyes?
2      A.  Oh, I definitely didn't.
3      Q.  Did you ever see Arturo Reyes?
4      A.  I don't believe so.
5      Q.  Did you ever participate in a police
6  investigation of Arturo Reyes?
7      A.  No.
8      Q.  Do you know why not?
9      A.  Well, we were just called to -- the parts
10 that I -- that we done was with the finding of the
11 shoes and the consent to search form, and that was
12 it.
13     Q.  Do you know whose shoes those were?
14     A.  I found out later it was Ms. Mejia, Ms.
15 Mejia's shoes.
16     Q.  Do you know what Ms. Mejia's first name
17 is?
18     A.  No.
19     Q.  Do you know when you found out those were
20 her shoes?
21     A.  I would imagine it was that same day or
22 -- I'm not sure.
23     Q.  Do you know -- do you have any
24 recollection of what Ms. Mejia looks like?

90

1      A.  No.
2      Q.  Do you know if you ever met Ms. Mejia?
3      A.  I don't believe I did.
4      Q.  Did you ever interview Ms. Mejia?
5      A.  No.
6      Q.  Did you participate, other than retrieval
7  of the shoes in your trip to the residence, did you
8  participate in the investigation of Ms. Mejia in
9  any further way?
10     A.  No.
11     Q.  What about Gabriel Solache, do you know
12 that name?
13     A.  No, just from reading it.
14     Q.  Do you recall ever interviewing Gabriel
15 Solache?
16     A.  Never interviewed him.
17     Q.  Do you recall ever meeting him?
18     A.  Don't recall ever meeting him.
19     Q.  Do you know if you ever even saw him?
20     A.  Don't know if I even saw him.
21     Q.  Did you participate in his investigation
22 whatsoever?
23     A.  No.
24     Q.  Are there any further documents that

91

1  could refresh your recollection as to Arturo Reyes?
2      A.  No.
3      Q.  Are there any further documents that
4  could refresh your recollection as to Gabriel
5  Solache?
6      A.  No.
7      Q.  Are there any further documents that
8  could refresh your recollection as to Adriana
9  Mejia?
10     A.  No.
11     Q.  Are there any further documents that
12 could refresh your recollection as to Rosauro
13 Mejia?
14     A.  No.
15     Q.  Did you ever speak to anybody about
16 Arturo Reyes?
17     A.  No.
18     Q.  Did you ever speak to anybody about
19 Gabriel Solache?
20     A.  No.
21     Q.  Did you ever speak to anybody about
22 Adriana Mejia, besides the conversation that you
23 had about the shoes?
24     A.  No.

92

1      MR. STARR:  Let me just take a quick
2  bathroom break, if that's okay with everybody.
3      (OFF THE RECORD)
4      (ON THE RECORD)
5      MR. STARR:  Could you read back the last
6  question I asked?
7      (The previous record was played back:)
8  "Q.  Did you ever speak to anybody about
9  Gabriel Solache?
10 "A.  No.
11 "Q.  Did you ever speak to anybody about
12 Adriana Mejia, besides the conversation that you
13 had about the shoes?
14 "A.  No."
15     MR. STARR:  Thanks.
16 BY MR. STARR:
17     Q.  Do you have an independent recollection
18 that there was blood on the shoes?
19     A.  I remember that day, when Michael Stevens
20 called out and he flashed the flashlight on the
21 shoes, I could not see it.  He said that there was
22 blood on there.
23     Q.  You couldn't see it at the time?
24     A.  No.

93

1    Q.   Do you know what the crime that formed
2  the basis of this case was?
3    A.   This was a double murder.
4    Q.   Do you know that, after you searched --
5  strike that.
6         Did you search the entire apartment?
7    A.   I can't be certain.  I know that I went
8  to one room specifically.
9    Q.   Do you know what your partner searched --
10 what rooms your partner searched?
11   A.   I don't know.
12   Q.   Would there be any reason why you
13 wouldn't search the entire apartment?
14   A.   Yes.
15   Q.   What reason was that?
16   A.   When the shoes were found, we decided,
17 listen, let's take this evidence back and bring it
18 back to the detective.
19   Q.   Was that standard procedure?
20   A.   Well, I don't know, but I think that's
21 what was decided at the time, and they thought that
22 was the best thing to do.
23   Q.   Do you know how long you were at the
24 residence before the shoes were discovered?

94

1    A.   No.
2    Q.   Do you have an approximation?
3    A.   No, I know I was still in that bedroom,
4  which I believe was the child's bedroom.
5    Q.   How do you know it was a child's bedroom?
6    A.   Well, I don't recollect.  I know that
7  that's where I was going and I don't know if I
8  asked Mr. Mejia if, in fact, I needed to go to a
9  bedroom or a child's room.
10   Q.   Do you know which child it was that --
11 whose bedroom you were searching?
12   A.   No.
13   Q.   Do you know if the Mejias had any
14 children?
15   A.   I didn't know.
16   Q.   Do you know that additional evidence was
17 found at that residence after you searched the
18 residence?
19   A.   Yes.
20   Q.   What was found?
21   A.   I believe there was clothing that was
22 found.
23   Q.   And how do you know that?
24   A.   I believe it was the next day or maybe

95

1  later that day that they went back.  I'm not sure,
2  but I know there was as second time that they had
3  gone to the apartment or house.
4    Q.   Do you recall that or did you read that
5  in a report?
6    A.   No, I just -- it wasn't that I read it a
7  report.  I recall that.
8    Q.   And how did you learn that?
9    A.   Well, I can't tell you for sure, but it's
10 an -- it was ongoing investigation, so now at this
11 point, we know that they're working on this case,
12 so it was either later that day or the next day,
13 something must've been said, but I know that
14 clothes was found there.
15   Q.   Did something refresh your recollection
16 of that recently?
17   A.   No, I wouldn't say that.
18   Q.   Okay.
19   A.   But I had no part in it, so --
20   Q.   So let me -- I just want to be clear.  I
21 don't want -- I'm not trying to trick you.  I just
22 want you to tell me whatever independent
23 recollection you have of the investigation
24 whatsoever and I don't think you included that

96

1  previously when I asked that question, so is there
2  anything else that you recall, whether it was part
3  of the investigation that you had direct contact
4  with or just something you recall from the
5  investigation?
6    A.   Well, that's the only thing I can think
7  of right now that I recall as part of it, but --
8  and I'm sorry I wasn't clear.  I thought it was --
9  well, I -- the recollection of what I had done or
10 what my part was, but I do remember that -- I
11 remember -- I don't remember who the detective was
12 -- coming back and that they had found clothes at
13 the apartment or house.
14   Q.   Do you recall anything else besides that
15 about the investigation?
16   A.   I can't think of anything right now.
17   Q.   Do you recall charges being brought
18 against any of the suspects?
19   A.   Oh, no.
20   Q.   What can you tell me about the layout of
21 the apartment?
22   A.   What I remember about the apartment is
23 that it was dark.  I know that the hallway was
24 dark.  I don't know if other lights were turned on

97

1  in the apartment.  The room that I went to, which I
2  believe was the -- a child's bedroom, was lit.
3      Q.   What time of day was it when you went to
4  the residence?
5      A.   I want to say -- I'd have to refer to
6  that report, and I think we had signed at 1630
7  hours, which would be 4:30, and I don't know
8  exactly what time we left the area.  I know it's
9  quite a distance away from the area, and I don't
10 remember how long it took us, but it would probably
11 be either during rush hour or at the tail end of
12 it, so I couldn't tell you.  I couldn't tell you.
13     Q.   So you just mentioned a hallway and one
14 bedroom that you searched.  When you -- do you
15 remember the entryway to the apartment?
16     A.   I don't even remember walking into the
17 home.  I don't remember if it was an apartment
18 building or a house.  I remember being there and
19 that the hallway was dark and that I went into a
20 lit bedroom.
21     Q.   So you recall a hallway that then
22 accessed the bedroom?
23     A.   No, the way I'm seeing it in my mind
24 right now, here's the bedroom and just before going

98

1  into to bedroom, here's a corridor or the hallway,
2  and there was a closet somewhere in that hallway on
3  the same side as the bedroom.  I believe that's the
4  way it was.
5      Q.   And just because we're not videotaping
6  this deposition -- correct me if I'm wrong -- your
7  description is there's a hallway and off of the
8  hallway is a bedroom and also off of that hallway
9  on the same side is a closet of some sort.
10     A.   Yes.
11     Q.   And you recall those two areas --
12     A.   Yes.
13     Q.   -- or three areas, correct?
14     A.   Yeah.
15     Q.   Do you recall any of the other areas of
16 the apartment?
17     A.   No.  The only thing I recall was going
18 into this bedroom and then once out into the
19 hallway when Michael Stevens found the shoes.
20     Q.   And do you recall what your partner,
21 Santo Padre, was doing at this time?
22     A.   No.  I don't know where he was in
23 relation to everything or what room he might have
24 been searching.

99

1      Q.   But he was in the apartment?
2      A.   Yes, he was out there with us.
3      Q.   Do you recall, was the expectation that
4  you were searching for money something that
5  everybody was doing or was it just your assignment?
6      A.   I couldn't tell you for sure, but I know
7  that's what I was looking for.
8      Q.   Okay.  Do you recall how much money you
9  were looking for?
10     A.   No.
11     Q.   Do you recall like if the money was
12 stored in something in particular?
13     A.   Now that you ask, I want to say there was
14 supposed to be a crib and the money was possibly
15 put somewhere in the crib.  I don't know where you
16 can hide money, but I believe that's where it was.
17     Q.   Who told you that the money was hidden in
18 a crib?
19     A.   I couldn't tell you.  I don't remember
20 who it was that sent us out.
21     Q.   Could it have been Rey Guevara?
22     A.   I don't know.  I can't say for sure.
23     Q.   Anything else you can recall about the
24 instructions to look for money that was hidden in a

100

1  crib?
2      A.   No, that was basic -- my basic
3  instruction.  That's what I recall.
4      Q.   Do you have any recollection as to why
5  there was potentially money hidden in a crib?
6      A.   Nothing that I can think of right now.
7      Q.   Okay.  If you do recall anything about
8  that, could you let me know?
9      A.   Sure, absolutely.
10     Q.   Okay.  Do you have any recollection of
11 any communication or conversation that you had with
12 Rey Guevara in -- during this investigation?
13     A.   No.
14     Q.   Do you know how many days you worked on
15 this investigation?
16     A.   Just that one day.  Yeah.  And the next
17 day --
18     Q.   And you're certain about that?
19     A.   -- yes.  The next day, we weren't called
20 to do anything else.
21     Q.   Do you have any recollection of any
22 state's attorneys being notified during this
23 investigation?
24     A.   No.

101

1    Q.   Were you ever interviewed by a state's
2  attorney regarding this investigation?
3    **A.   No.**
4        THE COURT REPORTER: I'm sorry. Could
5  you speak up, please?
6        THE WITNESS: I'm sorry?
7        THE COURT REPORTER: Could you speak up,
8  please?
9        THE WITNESS: No.
10       THE COURT REPORTER: Okay.
11       THE WITNESS: No, I will speak up, I
12 mean. The answer is no.
13   Q.   Do you recall any interactions or
14 communications that you had with a detective by the
15 name of Ernest Halvorsen during this investigation?
16   **A.   No.  As a matter of fact, I don't**
17 **remember seeing him on the floor that day or I**
18 **don't have any recollections of him being on the**
19 **floor.**
20   Q.   Are you familiar with the Detective
21 Halvorsen?
22   **A.   Yes.**
23   Q.   Have you worked on cases with Detective
24 Halvorsen?

102

1    **A.   No.**
2    Q.   What about a detective by the name of
3  Robert Rutherford, are you familiar with him?
4    **A.   Yes.  I can't picture his face, though.**
5  **I know he's a violent crimes detective.**
6    Q.   Do you know if he was on floor in Area 5
7  during investigation?
8    **A.   Oh, I don't know.**
9    Q.   Did you have any conversations with him
10 about this case?
11   **A.   I don't believe so.**
12   Q.   What about a police officer by the name
13 of Daniel Trevino, are you familiar with him?
14   **A.   Yes, I do know who he is.**
15   Q.   How do you know who he is?
16   **A.   He worked in the youth side in the youth**
17 **investigations.  That's where he worked.**
18   Q.   And do you remember if Daniel Trevino was
19 in the Area of Area 5 during the time you were
20 working on this investigation?
21   **A.   I don't remember him being there.  I**
22 **don't recall seeing him on the floor.**
23   Q.   Did you ever have any conversations with
24 Daniel Trevino about this case?

103

1    **A.   I don't believe so.**
2    Q.   Did you know that the youth division --
3  correct me if that's not the right term -- but that
4  the youth division was working on this case?
5    **A.   No, I didn't know that.**
6    Q.   Do you know that now?
7    **A.   Yes.**
8    Q.   How do you know that now?
9    **A.   Two children were kidnapped in this case.**
10 **They would have at some point probably be called**
11 **in.**
12   Q.   Is that an assumption you're making?
13   **A.   Yes.**
14   Q.   Do you have any other basis for knowing
15 that the youth division was working on this case?
16   **A.   No.**
17   Q.   Do you know a state's attorney by the
18 name of Tom O'Malley?
19   **A.   That name sounds familiar but I don't**
20 **know that I could put a face and a name.**
21   Q.   Do you remember seeing Tom O'Malley in
22 Area 5 during this investigation?
23   **A.   I don't believe so.**
24   Q.   What about a state's attorney by the name

104

1  of Dave Navarro, do you know him?
2    **A.   He sounds more familiar, but I cannot put**
3  **a face to the name.**
4    Q.   And do you have any recollection of him
5  being in Area 5 during this investigation?
6    **A.   No.**
7    Q.   Same questions for a state's attorney by
8  the name of Andrew Varga.
9    **A.   No.**
10   Q.   Same question for a state's attorney by
11 the name of Karen Wehrle.
12   **A.   No.**
13   Q.   Same questions for a state's attorney by
14 the name Brualdi, Heather Brualdi.
15   **A.   No.**
16   Q.   Do you know who she is?
17   **A.   No.  The name doesn't ring a bell.**
18   Q.   Did you have any involvement in the post-
19 conviction hearings in this case?
20   **A.   You mean other than my testimony in**
21 **court?**
22   Q.   So you testified in the criminal trial,
23 right?
24   **A.   Yes.**

105

1    Q.   Did you testify in any other hearing for
2  this case?
3    **A.   Not that I believe.**
4    Q.   Are you aware that Gabriel Solache and
5  Arturo Reyes have been exonerated in this case?
6    **A.   No, I didn't know that.**
7    Q.   So did you have any participation in the
8  post-conviction litigation?
9    **A.   Oh, no.**
10   Q.   Do you recall your testimony in the
11 criminal trial?
12   **A.   I'd have to refresh my memory.**
13   Q.   Do you recall if a state's attorney
14 helped prepare you for that testimony?
15   **A.   I don't remember that.**
16   Q.   Did you ever meet with Rey Guevara in
17 advance of your testimony in the criminal trial?
18   **A.   I don't believe so.**
19   Q.   Is there anything that would refresh your
20 recollection about having met with him?
21   **A.   I doubt it.**
22   Q.   Did you ever discuss this case with him
23 generally?
24   **A.   No.**

106

1    Q.   At no point did you ever discuss this
2  case with him?
3    **A.   Not that I can recall.**
4    Q.   Is there anything that I could show that
5  would help refresh your recollection?
6    **A.   No.**
7    Q.   Do you recall anything else that you did
8  as a Chicago police officer in -- as part of this
9  investigation?
10   **A.   No.  And I know that I had a small part
11 and I just want to add this.  I was a property
12 crimes detective, so I went back to my -- what I
13 did and we were asked to help and that was it.  If
14 they would have called me to do something else,
15 then I would -- we would have helped out and then I
16 went right back to burglaries.**
17   Q.   Do you know if this case and the Gomez
18 case, were those the two most high-profile cases
19 while you were in property crimes?
20   **A.   I don't know.**
21       MS. BARBER:  I'm just going to object to
22 form.
23       MR. ENGQUIST:  Join.
24   **A.   As odd as it might sound, I didn't keep**

107

1  track of what was going on, on that side.  We had a
2  lot of work on ours, so I really didn't keep tabs
3  on that.  The reason I do [indiscernible] is
4  because I was asked to do some.
5    Q.   Do you recall any other heater cases
6  during that time period?
7    **A.   I'd really have to sit and think about
8  it.  I'm sure there were, but I just can't think of
9  any.**
10   Q.   Did you ever have any other
11 communications with anybody else about this case
12 besides what you've testified to today?
13   **A.   No.**
14   Q.   Did you ever -- are you married?
15   **A.   Yes.**
16   Q.   Did you ever tell your spouse about this
17 case?
18   **A.   Very limited.  She used to complain that
19 I came home from work and I didn't tell her
20 anything about work cases.  I don't know what she
21 wanted.  And then I became a supervisor, and then
22 she really heard the woes and I think she wished I
23 didn't talk to her about those.**
24   Q.   Did you talk to any other police officers

108

1  about this case?
2    **A.   No.**
3    Q.   And when you met with your attorneys, I
4  don't want to know what you talked to Mr. Engquist
5  about, but what did you discuss with Ms. Barber?
6        MR. ENGQUIST:  Same objection and I'm
7  going to join defense on this whole thing, so he's
8  not going to say anything that he discussed with
9  Ms. Barber either.  I'll instruct him not to
10 answer.
11       MR. STARR:  Okay.  So you guys join
12 defense?
13       MR. ENGQUIST:  Yeah.
14       MR. STARR:  Okay.
15   Q.   Are you going to take your attorney's
16 advice and refuse to answer?
17   **A.   Yes.**
18   Q.   Could you tell me how it is that you came
19 to be represented by Mr. Engquist?
20   **A.   I believe I received a phone call.**
21       MR. ENGQUIST:  I can take that.  I
22 represent him on the Gomez case.  That's why I
23 represent him here at the dep.
24   Q.   Is that correct?

109

1    A.    Yes.
2    Q.    I'm asking you, not Mr. Engquist.
3    A.    Yes.
4    Q.    Was your attorney's answer the same
5 answer that you would want to provide for the
6 record?
7    A.    Yes.
8    Q.    Okay.  And I want to show you what I'm
9 going to mark as Exhibit 1.  Take a couple of
10 minutes and just take a look at that.  I don't
11 expect you to read the whole thing, but just
12 familiarize yourself with that document.
13         (Exhibit 1 was marked for
14 identification.)
15    A.    What aspect of it?
16    Q.    What it is generally.
17    A.    Okay.
18    Q.    I'll point you to a couple of pages in a
19 minute, but I just want you to make sure you that
20 you're familiar with it as a document generally.
21         Okay.  Did you have enough time to look at it?
22    A.    Yes.  I don't know exactly what you want
23 me to look for, so I glanced through it.
24    Q.    This is a police report, correct?

110

1    A.    Yes, it is.
2    Q.    What kind of police report is it?
3    A.    It's a closing sup.
4    Q.    And what is a closing sup?  What is your
5 understanding of what that document is?
6    A.    My understanding is when you're
7 finalized, you get charges, they're approved by
8 state's attorney, you put together a sup.  Well, I
9 shouldn't say that, not just that.  Some cases, the
10 state's attorney isn't the one that's approving
11 charges and -- but your final sup when you make a
12 determination is your closing sup.
13    Q.    Okay.  Any other important information
14 that needs to go into this document?
15         MR. ENGQUIST: Objection.  Form.  Vague.
16 Calls for speculation.  Assumes a --
17         MS. BARBER: Foundation.
18         MR. ENGQUIST: -- [indiscernible].  Go
19 ahead.
20    A.    Well, I'm not familiar with murder cases
21 or violent crimes cases.  I couldn't tell you
22 exactly what they need to put in these reports.
23    Q.    As a property crimes detective, do you
24 put together a clear and close report at the end of

111

1 an investigation?
2    A.    Yes.
3    Q.    So what kind of important information do
4 you generally put into a report like this?
5    A.    I put, of course, the place, time,
6 location, the victim's information, the suspect's
7 information, the suspect's information or the
8 offender at that point, any witnesses, any
9 pertinent information as far as inventories, if
10 there was something inventoried, things of that
11 nature, if a car is part of it, that would be
12 listed, anything that would basically -- that is
13 part of the investigation that you have.
14    Q.    Did you -- I'm sorry.  Did you say if a
15 car is part of it?
16    A.    Yeah.
17    Q.    Okay.  Do you know if your property
18 crimes clear and close report differs in any
19 significant way from a homicide detective's clear
20 and close report?
21    A.    Theirs is --
22         MS. BARBER: Objection.  Form.  Go ahead.
23    A.    Theirs are more involved.  I think that
24 normally, I can probably close mine in about two to

112

1 three pages and they normally have a lot more as
2 far as witnesses and things of that nature.
3    Q.    Do you know if the list you gave me is
4 the same list that they would necessarily have or
5 at least partial list that they would have in their
6 report?
7    A.    I believe that's a partial list at least.
8    Q.    Is it important that this information
9 that you put in a clear and close report is
10 accurate?
11    A.    Yes.
12    Q.    Why is it important?
13    A.    It tells the story.  Somebody's life is
14 at stake here.
15    Q.    Who writes a clear and close report?
16    A.    The lead detective.
17    Q.    Is it generally --
18    A.    I should say normally the lead detective.
19    Q.    Are there any circumstances where someone
20 else writes it?
21    A.    Well, there could be.  There were times
22 that all the property crimes section that I am the
23 lead detective on verbally and my partner does the
24 closing sup.  I do recall one time but I don't

113

1 remember the circumstances, but it was something
2 that was a little bit more delicate and I don't
3 know if it was a burglary or if it was check cases,
4 and definitely he knew more about that than me and
5 how to word things, so he took the lead and did the
6 closing sup on that and although I was the lead
7 detective.
8    Q.   Are there -- is it usually the case is
9 only one author?
10    A.   I don't know how they do it in the
11 violent crimes side, but normally for myself and
12 property, if it's my turn up, then I'm the author.
13    Q.   Is there different training for violent
14 crimes as there is for property division?
15       MS. BARBER:  Objection.  Form.
16 Foundation.
17       MR. ENGQUIST:  Join.
18       MR. BRENER:  Calls for speculation.
19    A.   I believe that when we went through the
20 training and I'm not sure if it was three or four
21 weeks long, but the class that I graduated from,
22 they had gang crime specialists, they had youth
23 officers, and they had detectives, so I think we
24 went to class as units for at least two weeks and

114

1 either the last week -- so it might have been three
2 -- but the last portion may be two and two, we were
3 separated.  Youth had their formal training, gang
4 specialists had theirs, and the detectives had
5 theirs.
6    Q.   So the detectives were all kind of
7 trained together other than the youth and the gang
8 crimes.
9    A.   Yes.
10       MS. BARBER:  Objection.  Form and
11 foundation.
12    Q.   And is that in the academy or was that
13 training after you were out of the academy?
14    A.   It was after the academy.
15    Q.   So that was specifically to be a
16 detective.
17    A.   Yes.
18    Q.   Once this is completed, this clear and
19 close report, is there some next step?  Does a
20 supervisor need to review it?
21    A.   Yes.  I don't know exactly how it fits in
22 there, but with us, we put ours all together and
23 anything that we needed to put in -- let's say we
24 did contact the state's attorneys and they approved

115

1 charges for burglary, anything that was pertinent
2 to my case would be put in the file, and then put
3 into the sergeant's office for review.
4    Q.   And then which sergeant would -- not
5 particularly, but is there a particular sergeant
6 that would be in charge of reviewing these or
7 whoever was on duty, how did that work?
8       MS. BARBER:  Objection.  Form.
9 Foundation.
10    A.   Yeah.  I believe our property crimes
11 sergeant would look ours over.
12    Q.   And on this form, do you see the bottom
13 of -- the Bates Stamp 426?
14    A.   Mm-hmm.
15    Q.   Is there a supervisor that signed this
16 form?
17    A.   Yes.
18    Q.   And is it in Box No. 92?  I'm sorry.  The
19 signature below Box 92?
20    A.   Yes, below it, it's Sergeant Capitelli.
21    Q.   And is that where the supervisor would
22 always sign on these forms?
23    A.   Well, if it was the same exact form, yes,
24 that's where they would sign.

116

1    Q.   Are you familiar with Sergeant Capitelli?
2    A.   I knew who he was.
3    Q.   Take a look at Bates Stamp 429.
4       MR. STARR:  And for the record, this is
5 ROC Solache Reyes Bates stamp between 426 and --
6 I'm sorry --
7       MS. SUSLER:  446?
8       MR. STARR:  -- 446.  Thank you.
9    Q.   At the top of the page there, you see
10 that inventory entry 1982726?
11    A.   Yes.
12    Q.   Does this refer to the inventory of the
13 evidence that you found at the Mejia residence?
14    A.   It should.
15    Q.   Black shoes with red stains.  Is that
16 correct?
17    A.   Yes.
18    Q.   But you don't remember seeing any blood
19 on there, right?
20    A.   No.  And the reason, just so I'm clear,
21 it was a dark hallway.  He was putting a flashlight
22 on it.  I didn't know exactly what to look for.
23    Q.   Did you guys put those shoes in an
24 inventory bag at the residence or did you -- what

117

1  did you -- how did you go about preserving that
2  evidence?
3  **A.   I don't recall that.  I know I did not**
4  **handle the shoes.**
5  Q.   Do you remember when you got back to Area
6  5 when you had the shoes there, were they just out
7  on their own or were they in an inventory bag?
8  **A.   I don't recall, but I know my partner was**
9  **in possession of those shoes.**
10  Q.   Stevens.
11  **A.   Yes.**
12  Q.   Can you turn to Bates Stamp 431?  Do you
13  see the section personnel assigned?
14  **A.   Yes.**
15  Q.   And your name is about a little more than
16  halfway down there.  Is that correct?
17  **A.   Yes.**
18  Q.   And that's your star number?
19  **A.   Yes.**
20  Q.   Okay.  Are there any other -- after Mr.
21  Stevens' name, it says Area 5 property crimes.  Are
22  there any other Area 5 property crimes detectives
23  on that list?
24  **A.   Well, he's youth.  These are technicians**

118

1  **and there's a patrolman.  No, no property crimes**
2  **detective after my name.**
3  Q.   And this Santo Padre, was he an Area 5
4  property crimes detective?
5  **A.   No, and I've seen him a couple of times**
6  **up there.  I didn't know what he did.  I didn't**
7  **know if he was a property crimes detective or a**
8  **violent crimes detective.  I never knew that.**
9  Q.   Where was his desk located?
10  **A.   And that's why it's so hard.  I didn't**
11  **see him up there very often.**
12  Q.   So you're not sure where his desk was
13  located?
14  **A.   No.  And sometimes they just use whatever**
15  **desk was available.  It just happened that Michael**
16  **Stevens and I had one desk that we used on a**
17  **regular basis.**
18  Q.   Generally during that time that you were
19  at Area 5, how many detectives were in property
20  crimes?
21  MS. BARBER:  Objection.  Foundation.
22  **A.   I don't have any idea.  I couldn't tell**
23  **you total numbers, but sometimes we'd have maybe**
24  **five on the floor for third watch shift, depending**

119

1  **on days off and who was taking off, we might have**
2  **more or sometimes less, but I think it's safe to**
3  **say we had on a regular basis four to five on the**
4  **floor.**
5  Q.   On any given shift.
6  **A.   Yes.  Oh, no, I should say afternoons.**
7  **On the afternoon shift.**
8  Q.   Just afternoons.
9  **A.   Yeah.**
10  Q.   What about do you have any knowledge
11  about how many detectives worked in violent crimes
12  on afternoons generally?
13  **A.   No, I don't.**
14  Q.   Was it more detectives or less than there
15  were in property crimes?
16  **A.   No, to me, it seemed like there was more**
17  **violent crime detectives than there were property**
18  **crimes detectives.**
19  Q.   Do you know if there was like double the
20  amount?
21  **A.   I never really took notice of it.**
22  Q.   You guys were there at the same time,
23  though.  Is that correct?
24  **A.   Yes.  Yes.**

120

1  Q.   If you could turn the page to 532, I'd
2  appreciate it.
3  MS. BARBER:  432?
4  MR. STARR:  I'm sorry.  Did I say 532?
5  MS. BARBER:  532.
6  MR. STARR:  432, yeah, sorry.
7  **A.   Yeah.**
8  Q.   The second to the last paragraph says on
9  October 3, 1998, at 1130 hours, Detective Guevara
10  conducted his first interview with Adriana Mejia
11  interview room at Area 5 detectives.  Do you see
12  that?
13  **A.   Yes.**
14  MR. ENGQUIST:  I'm sorry.  Where are we
15  at?  On April, is that what you said?
16  MR. STARR:  Mm-hmm.
17  MR. ENGQUIST:  You said October, so
18  that's what I was looking for.  Go ahead.
19  Q.   Do you see that?
20  **A.   Yes.**
21  Q.   Do you have any reason to doubt that time
22  as accurate?
23  **A.   I have no reason.**
24  Q.   Okay.  Do you have any independent

121

1 recollection of Detective Guevara interviewing
2 Adriana Mejia?
3     A.   No, I don't.  Well, and it's because of
4 this -- these reports, when we came back with the
5 shoes, he showed her the shoes and I believe she
6 was in an interview room, but that's my
7 recollection.
8     Q.   How do you know he showed her the shoes?
9     A.   It's in -- right here or in my statement.
10    Q.   So you recall it just because it's in a
11 document.
12    A.   Yes.
13    Q.   You didn't witness Detective Guevara show
14 her the shoes?
15    A.   Did I witness him doing that?
16    Q.   Yes.
17    A.   I have to defer to that report.
18    Q.   Sorry.  Turn the page to 433.  The second
19 to last paragraph, it says on April 3, 1998, at
20 1500 hours -- do you see that paragraph?
21    A.   Yes.
22    Q.   It says Detective Collins and McDonald
23 brought -- located Norma Salazar and brought her to
24 Area 5 detectives.  Do you see that sentence?

122

1     A.   Yes, I do.
2     Q.   Do you know who Norma Salazar is?
3     A.   No.
4     Q.   Did you ever hear that name before?
5     A.   I've heard the name, but -- Salazar, but
6 I don't know who that is.
7     Q.   Do you recall anyone being brought in to
8 Area 5 during this investigation, a woman?
9     A.   No, I don't.
10    Q.   It says Adriana Mejia viewed Norma
11 Salazar in a lineup but not -- but did not identify
12 her.  Do you see that?
13    A.   Yes.
14    Q.   Do you recall a lineup being conducted in
15 this investigation?
16    A.   No.
17    Q.   Do you have any reason to doubt the
18 accuracy of that -- the time and date on that
19 paragraph?
20    A.   No.
21    Q.   The paragraph above that paragraph says
22 that Detective McDonald searched the ICAM database.
23    A.   Okay.
24    Q.   What is the ICAM database?

123

1     A.   I don't remember exactly what ICAM stands
2 for, but I believe that's where we can get
3 information.  I don't know if that's neighborhood
4 information, crimes within the neighborhood,
5 because we've had so many different databases in
6 our time, so --
7     Q.   Did you ever use the ICAM database?
8     A.   I would have used it back then.
9     Q.   And what would you use it for?
10    A.   Again, I'm not exactly sure what this one
11 did, but if I'm just looking for burglaries and a
12 timeframe, I believe ICAM would also do that.  I
13 could put in a timeframe of, say, 1 April to 28
14 April, and then there's sections where you can ask
15 for what crimes you're looking for, shootings, it's
16 burglaries, shootings, thefts, and populate and I
17 believe there was a map and it would show you where
18 those things were happening.
19    Q.   And do you know what the acronym stands
20 for?
21    A.   I can't tell you right now.
22    Q.   Okay.
23    A.   We've had so many.
24    Q.   The --

124

1         THE COURT REPORTER:  I'm sorry.  Could
2 you repeat that, please, sir?
3         THE WITNESS:  I don't remember what the
4 acronym stands for.
5     Q.   The paragraph goes on to say a photo of
6 this Norma Salazar is shown to Adriana Mejia who
7 identified her as the woman who gave her the
8 children.  Do you know if you could get photographs
9 off the ICAM database?
10    A.   I believe -- well, like I says, I don't
11 remember exactly what the ICAM does, but there, I
12 believe we did have those capabilities then.  If we
13 had an IR number on somebody, you can go into
14 another program that we have and pop it up, and
15 it'll have their arrest photo in there.
16    Q.   And just for the record, an IR number
17 symbolizes what?
18    A.   This is a number that follows anybody
19 that's been arrested around.  That's basically for
20 lack of a better term, their social security
21 number.  I get arrested four different times, that
22 number will pop up and that will be my
23 identification number.
24    Q.   So if you, as a property crimes

125

1  detective, wanted to get a photograph of somebody
2  and you had their IR number, what would you do?
3  **A. I'd go into the computer --**
4  MR. ENGQUIST: Just we're talking back at
5  this time?
6  MR. STARR: Yes.
7  MR. ENGQUIST: Okay.
8  **A. I could go back into the computer, use**
9  **one of those databases, and there's sections for --**
10 **where you can type in a -- an IR number and it**
11 **would pull up the individual, if, in fact, there**
12 **was a photo on file.**
13 Q. And this is in 1998, right?
14 **A. I believe so.**
15 Q. Could you then print that photo if you
16 wanted to print the photo?
17 **A. Yes.**
18 Q. But you're not sure if the ICAM does that
19 or not.
20 **A. I'm not exactly sure what the ICAM did at**
21 **that point, and like I says, we had a bunch of**
22 **different programs and they were constantly**
23 **changing them.**
24 Q. Given what this paragraphs says, is there

126

1  any other information that -- strike that.
2  Given what this paragraph says, is it -- is
3  there reason to believe that the photograph that's
4  referenced came from ICAM?
5  **A. I don't believe there's any reason not to**
6  **believe it and just so that -- I remember we had a**
7  **different database. It was called Data Warehouse,**
8  **so there were different -- so I don't know exactly**
9  **or remember exactly what ICAM provided.**
10 Q. But you remember using ICAM at some point
11 while you were at Area 5.
12 **A. Yes.**
13 Q. Do you have any independent recollection
14 of an alternative suspect named Norma Salazar?
15 **A. No.**
16 Q. And you weren't present for the lineup
17 that was conducted with Norma Salazar.
18 **A. No.**
19 Q. Can you turn the page to 434? Could you
20 just read that first paragraph to yourself, just so
21 you're familiar with it?
22 **A. Okay.**
23 Q. The first sentence says that, on April 3,
24 1998, at 1700 hours, Detective Guevara asked if

127

1  Adriana Soto would submit to a polygraph
2  examination, which she agreed to do. Do you have
3  any recollection of that?
4  **A. No.**
5  Q. Do you know if Adriana Mejia ever
6  submitted to a polygraph or not?
7  **A. No, I don't.**
8  Q. Do you remember any conversation about
9  the possibility or the prospects of a polygraph
10 examination being administered?
11 **A. No.**
12 Q. And the next sentence said that Detective
13 Guevara and Detective Ruiz asked Rosauro Mejia if
14 he would sign a consent to search form for his
15 residence, so that detectives could search for any
16 evidence as to show his wife -- show how his wife
17 came to be in custody of the two Soto children.
18 **A. Yes.**
19 Q. Do you remember asking Rosauro Mejia to
20 sign the consent --
21 MR. ENGQUIST: Objection. Asked and
22 answered. Go ahead.
23 MR. STARR: Can I finish my question
24 before you object?

128

1  MR. ENGQUIST: Sure. Go ahead.
2  MR. STARR: Just can I get the whole
3  sentence out before you object?
4  MR. ENGQUIST: He was starting to answer.
5  That's why I objected. You can relax, finish your
6  question.
7  MR. STARR: I'm relaxed.
8  MR. ENGQUIST: Geeze. Ask.
9  MR. STARR: Geeze, I'm relaxed.
10 BY MR. STARR:
11 Q. Do you have any independent recollection
12 of asking Rosauro Mejia with Detective Guevara if
13 he would sign this consent to search form?
14 MR. ENGQUIST: Objection. Asked and
15 answered. Go ahead.
16 **A. No, I don't.**
17 Q. Does that entry say anything about
18 searching for money?
19 **A. No.**
20 Q. Do you remember searching for any
21 evidence to show how Adriana came into custody of
22 the children?
23 **A. Me, myself?**
24 Q. Yeah.

---

129

1  A.  No.
2      THE COURT REPORTER:  What was that last
3  sentence?
4      THE WITNESS:  The answer was no.
5  Q.  And then it says, on April 3rd at 1830
6  hours, Rosauro Mejia signed a consent to search
7  form at Area 5 detectives.  Do you have any reason
8  to doubt the time and the date of that?
9  A.  No, no reason to doubt it.
10 Q.  And 1830 hours is 6:30 p.m.?
11 A.  No, it's 4:30.
12 Q.  4:30?
13 A.  4:30.
14 Q.  Not the second paragraph but the third
15 paragraph, if you could take a look at that for me.
16 A.  Okay.  Okay.
17 Q.  The second -- I'm sorry.  Strike that.
18     The third full sentence says, shortly after,
19 Detective Guevara returned with Adriana Mejia,
20 Detective Stevens, Ruiz, and Santo Padre returned
21 to Area 5 detectives.  In their possession was a
22 pair of black shoes that had obvious red stains.
23 Guevara showed these shoes to Adriana Mejia, who
24 identified them as being hers.

---

130

1      Does that information in the reports generate
2  any additional independent recollection that you
3  have?
4  A.  No.
5  Q.  Do you remember seeing the shoes at Area
6  5?
7  A.  I don't have the recollection, but I --
8  undoubtedly, yes, because my partner was in
9  possession of them.  My recollection of these shoes
10 were at the scene.
11 Q.  Did you have any recollection of the red
12 stains being obvious?
13 A.  I can't say that I actually looked again
14 in the day -- or in a lit room and -- but I know I
15 didn't see it in the hallway.
16 Q.  Do you remember where you were when you
17 returned to Area 5?
18 A.  Where?
19 Q.  Yeah, physically where you were when you
20 were in Area 5 when you came back and you met with
21 Guevara.
22 A.  I want to say my vision of that is at the
23 -- in one of the interview rooms, standing in front
24 of one of the interview rooms with Michael Stevens

---

131

1  and, of course, Rey Guevara.
2  Q.  And do you remember anything that you
3  said to Rey Guevara?
4  A.  No.
5  Q.  Do you remember anything he said to you
6  or your partner?
7  A.  Well, I don't know if I even spoke to
8  him.  Mike had the shoes and predominantly he
9  presented the shoes to Michael -- to Rey.
10 Q.  Do you remember any conversation that Mr.
11 Stevens had with Mr. Guevara?
12 A.  No.
13 Q.  Did your partner, Stevens, speak Spanish?
14 A.  No.
15 Q.  Do you remember if Detective Santo Padre
16 spoke Spanish?
17 A.  I don't know.
18 Q.  Did you ever speak Spanish with him?
19 A.  No.
20 Q.  And do you recall if you spoke Spanish
21 with Rosauro Mejia?
22 A.  Me?
23 Q.  Yeah.
24 A.  I don't remember.  I actually don't

---

132

1  remember Mr. Mejia.
2  Q.  Okay.  Did you ever speak Spanish with
3  Rey Guevara?
4  A.  Not really, maybe a few words here and
5  there, you know.
6  Q.  Do you know how many Area 5 detectives
7  spoke Spanish?
8  A.  No.  No, I don't.  I know violent crimes
9  had several.  I can't think of who we might have
10 had in property crimes when I was a detective.
11 Q.  Can you name any of the detectives that
12 you recall could speak Spanish in Area 5?
13 A.  There's two that I recall.  One is Victor
14 and I don't remember Victor's last name, and there
15 was also a Hector Vergara, and I can't think of
16 anybody else offhand.
17 Q.  What about Rey Guevara?
18 A.  Rey Guevara, yes, I'm sorry.
19 Q.  Do you know if Daniel Trevino spoke
20 Spanish?
21 A.  Yes, he did, but he was a youth officer
22 and he was across the hall, so I -- that's why I
23 did not include him.
24 Q.  Do you remember -- in the transit that

133

1 you took to get to the Mejia residence, do you
2 remember who drove?
3    **A. No.**
4    Q. And I think you testified you weren't
5 sure if everyone went in the same car.
6    **A. Yeah, I don't believe or I'm not sure if**
7 **we all took one car or took two cars.**
8    Q. And you don't know if Rosauro Mejia went
9 with you, right?
10   **A. I don't recall him being there.**
11   Q. Do you recall if Rosauro Mejia was
12 handcuffed?
13   **A. I don't remember that he was there with**
14 **us. If, in fact, we would have handcuffed him, he**
15 **would have been an arrestee, but I'm not sure if at**
16 **that point we would have taken him with us.**
17   Q. Do you know if he was a suspect in this
18 case?
19   **A. No, I do not know.**
20   Q. Do you know if he was handcuffed when you
21 were at Area 5?
22   **A. I don't know.**
23   Q. Do you recall approximately where the
24 Mejia residence was?

134

1    **A. Only from the report, it was 6200 South**
2 **on Mozart.**
3    Q. Do you remember when you got there, was
4 there anyone who opened the door for you?
5    **A. No, I don't remember that. What I recall**
6 **from there is getting there and I don't remember if**
7 **it was a residence, a single-family home, or an**
8 **apartment building because the next recollection**
9 **was walking in and going to the bedroom.**
10   Q. Have you ever in your police career
11 gotten a consent to search form signed by someone
12 before?
13   **A. Yes, I have.**
14   Q. And have you ever searched a residence
15 after getting one of those forms?
16   **A. Yes.**
17   Q. How would you usually get into a
18 residence? Would you usually also have to ask for
19 the keys of the residence from the person signing
20 it how would that work?
21   **A. Normally, we would have gone with the**
22 **resident.**
23   Q. Was there ever an occasion that you can
24 recall where you had to break into a residence when

135

1 you had a consent signed search?
2    **A. No. I don't believe I've done too many**
3 **of them but definitely not.**
4    Q. And you don't remember if there was
5 anybody else at the residence when you searched it.
6    **A. I don't believe so. I don't have any**
7 **recollection of anybody else being there.**
8    Q. Were there any dogs present?
9    **A. I don't remember any dogs, no.**
10   Q. I'm going to show you what I'll mark as
11 Exhibit No. 2.
12   Take a minute to look that over. Is this the
13 consent to search form that you -- we've been
14 talking about?
15      (Exhibit 2 was marked for
16 identification.)
17   **A. Yes.**
18   Q. I don't speak or read Spanish. Could you
19 read this for me? I don't know what this says.
20   **A. I can read it. It won't sound pretty,**
21 but I can read it. (Speaking in Spanish.)
22   Q. I don't mean to interrupt you. I'm
23 sorry, but could you translate it?
24   **A. Oh, I'm sorry. I thought you wanted me**

136

1 **to read it.**
2    Q. I'm sorry. That's my fault for asking
3 the question.
4    **A. Okay. I might not be clear with certain**
5 **words.**
6    Q. To the best of your ability --
7    **A. Okay.**
8    Q. -- just so I have an idea of what it
9 says.
10   **A. It says I, Rosauro Mejia, being advised**
11 **of my rights, constitutional rights, not to have my**
12 premise or vehicle described below -- (speaking in
13 Spanish) I don't know exactly what that word is,
14 but I believe it's searched -- without first
15 consulting (speaking in Spanish) I believe and I'm
16 not certain, but I think without having a search
17 warrant. So I'm not certain. Also, I've been
18 advised of my right to negate or refuse the -- of a
19 search without having -- I believe that is a search
20 warrant.
21   Q. And then just maybe that second paragraph
22 that has your name in it. What does that paragraph
23 say?
24   **A. Okay. I've been advised (speaking in**

137

1 Spanish) of this right and understanding these
2 rights, I give authorization -- I give permission
3 to Detective Ruiz, Detective Santo Padre, Detective
4 Stevens that have identified themselves as
5 officials of the police department -- I don't know
6 what that -- oh, assigned to 650, which represents
7 Area 5, to do a search, a complete search (speaking
8 in Spanish) I believe that's an immediate area
9 (speaking in Spanish) I believe that's apartment
10 and vehicle under my control (speaking in Spanish)
11 and describe as residence first floor located at
12 6234 South Mozart.
13     Q.   Thank you.  Area or Unit 650, is that the
14 unit for the entire detective division of Area 5?
15     A.   Yes.  Area 5 is designed by 650, like
16 14th District, that's the designation for the
17 district in itself.
18     Q.   And then you signed this form further
19 down under witnesses.  Is that correct?
20     A.   Yes.
21     Q.   And does that look like your signature?
22     A.   Yes, it does.
23     Q.   And then also Detective Santo Padre and
24 Stevens signed as well?

138

1     A.   Yes.
2     Q.   Are you familiar with Detective Stevens'
3 signature?
4     A.   Yes, his, I am.
5     Q.   Does that look like his signature?
6     A.   Oh, yes.
7     Q.   Are you familiar with Santo Padre's?
8     A.   No.
9     Q.   Okay.  Does this allow you to -- I think
10 you said that there's also a vehicle listed here?
11     A.   Yeah, it says (speaking in Spanish).
12 It's denoting a premise/a vehicle.
13     Q.   Did you search any vehicles in this case?
14     A.   No, not I.
15     Q.   Do you know if a vehicle was searched in
16 this case?
17     A.   No, I don't know.
18     Q.   And then I want to show you one more
19 document here.  I'm going to mark that here.  I'm
20 going to mark that as Exhibit 3.
21         (Exhibit 3 was marked for
22 identification.)
23         MR. STARR:  And for the record, Exhibit
24 2, the previous exhibit, was Bates-stamped CCSAO

139

1 0052327, and Exhibit 3 is Bates-stamped Solache
2 004226.
3     A.   Okay.
4     Q.   Are you familiar with this document, sir?
5     A.   Yes.
6     Q.   Could you tell me what it is?
7     A.   It's an inventory slip.
8     Q.   Is this the inventory slip that
9 represents your inventory of the shoes in this
10 case?
11     A.   A copy.
12     Q.   A copy, yeah.  Not the original.
13     A.   Yeah.
14     Q.   But it's an accurate copy of the
15 original?
16     A.   I believe so, yes.
17     Q.   And the address here recovered from is
18 6234 South Mozart.  Is that correct?
19     A.   Yes.
20     Q.   And the owner's name is Adriana Mejia.
21     A.   Yes.
22     Q.   And Detective Stevens is listed here.
23     A.   Yes.
24     Q.   Detective Ruiz, correct?

140

1     A.   Yes.
2     Q.   And it says hold for investigator and
3 then Halvorsen is listed.  Is that correct?
4     A.   Yes.
5     Q.   And then it's -- the approving desk
6 sergeant, I think that's Joe Solame?
7     A.   Yes.
8     Q.   Okay.  Do you know why or am I missing
9 that Santo Padre's name is not on here?
10     A.   It was simply that there's only two
11 spaces for it.
12     Q.   Would that be common that more than one
13 officer or three officers have recovered evidence
14 and they would only list two of them?
15         MS. BARBER:  Objection.  Form.
16     A.   Possible, but that happens.  Normally, we
17 work in teams of two, so there's -- you really
18 don't encounter that very often.
19     Q.   And do you know what happened to these
20 shoes after you inventoried them?
21     A.   No, I don't.
22     Q.   Do you know if they made it to the crime
23 lab?
24     A.   No.

141

1    Q.   Do you know why it says hold for
2  Halvorsen as opposed to Guevara?
3    A.   No, I don't.
4    Q.   Did you fill out this form?
5    A.   No, I did not.
6    Q.   Do you know who filled it out?
7    A.   Yes.
8    Q.   Who?
9    A.   Michael Stevens.
10   Q.   Now forgive me.  Do you know if Mr.
11  Stevens is still alive?
12   A.   He's deceased.
13   Q.   Is he?
14   A.   Yeah.
15   Q.   I'm sorry to hear that.
16   A.   Thank you.
17   Q.   What is the purpose of the column or the
18  box, the hold for, do you know?
19   A.   Well, basically, it's for his
20  investigation.  You want to make sure that this is
21  -- stays in where it's taken to, evidence and
22  property section until the completion of the case,
23  and then they -- I'm sure at some point they
24  determine what to do with the shoes.

142

1    Q.   Who tells you to put the name on the hold
2  for box?
3    A.   I want to say we learned that in the
4  academy.
5    Q.   And you put the name of the lead
6  detective, is that what you do or how do you
7  determine that?
8        MS. BARBER:  Objection.  Form.
9    A.   To tell you the truth, I don't know,
10  maybe it was better that Mr. Stevens did this
11  because I'm sure he did know, and I'm not trying to
12  be funny or anything but --
13   Q.   And the fact that you gave it to -- that
14  the shoes were given to Detective Guevara and not
15  Detective Halvorsen, does that have any relevance?
16   A.   I don't believe so, and I think it might
17  be important that they might question it, but
18  they're partners, and as long as -- the way I see
19  is as long as one of them have control over it or
20  they're -- they don't dispose of this evidence
21  until speaking or a form is sent out to Mr.
22  Halvorsen and him back to ERPS that they don't
23  dispose of the evidence.
24   Q.   Do you know if this evidence ever made

143

1  its way to Detective Halvorsen?
2    A.   Oh, I don't know.  I don't remember him
3  being on the floor.
4    Q.   When you returned to Area 5 with the
5  shoes, do you remember how long it took before you
6  met up with Detective Guevara?
7    A.   No, I don't.
8    Q.   Was it -- do you recall if it was close
9  in time or did you -- do you recall having to wait?
10       MS. BARBER:  Objection.  Form.
11  Foundation.  Speculation.
12   A.   I don't know if he was already there or
13  we got there before him.  I don't remember.
14   Q.   Do you remember having any conversation
15  on the way back about the evidence with Detective
16  Stevens, or Detective Santo Padre, or Rosauro
17  Mejia?
18   A.   No, I -- my recollection wasn't that.  My
19  recollection is that we left and now we're in Area
20  5.  I don't remember how long that ride was.  I
21  don't know what type of conversation we had.  I
22  just have spotty recollections of that evening.
23   Q.   Do you have any additional independent
24  recollection now that we've reviewed these

144

1  documents?
2    A.   Of this?
3    Q.   Yeah.  We looked at three different
4  documents.  We looked at the clear and close, we
5  looked at the consent to search, and we looked at
6  the inventory sheet.  Do you have any additional
7  independent recollections been sparked by any of
8  those documents?
9    A.   No.
10   Q.   Do you know that Rosauro Mejia signed a
11  second consent to search form?
12   A.   I think I read that in this case report.
13  I believe so.
14   Q.   Is it necessary to sign a consent to
15  search form every time officers went to search a
16  residence?
17   A.   Well, I'm not sure.  I've never had to go
18  back a second time.
19   Q.   Do you know that there was additional
20  evidence that was found at the Mejia residence?
21       MR. ENGQUIST:  Objection.  Asked and
22  answered.
23       MR. STARR:  I might have asked that one.
24   A.   Yeah, there was clothing that was found.

145

1    Q.   Do you know whether the clothing was
2 bloody?
3    **A.   I believe so.**
4    Q.   Did you guys miss it or do you know why
5 you wouldn't have recovered that at the first
6 search?
7    **A.   No, I actually believe what it was, was**
8 **when he found the shoes and Mike called out and**
9 **when we got there, the consensus was to bring them**
10 **back, not to continue to further the search.**
11    Q.   Are you aware that there's numerous
12 allegations made about Rey Guevara's role in
13 framing innocent people for crimes they did not
14 commit?
15    MR. ENGQUIST:   Objection.   Form.
16 Argumentative.   Go ahead.
17    **A.   I believe after -- and I don't remember**
18 **these cases.   The first one that came about that**
19 **was overturned on this murder investigation, I**
20 **should say, is when I might have first heard of it.**
21    Q.   Do you remember when that was?
22    **A.   No.   I may have been the commander in 10**
23 **at the time.   I think it's -- I was gone from the**
24 **district already.**

146

1    Q.   Do you recall how you became aware of
2 that?
3    **A.   I don't know if it was the news.**
4    Q.   I'm sorry.
5    **A.   News, either Channel 7 or television.**
6    Q.   And do you know what individual -- what
7 case you're referring to?
8    **A.   No.**
9    Q.   So that's one instance.   Do you know of
10 any other instances?
11    **A.   No, but I want to say that -- and I'm**
12 **sure it's from the news also that, after that one**
13 **was cleared or it was overturned, I should say,**
14 **then others were popping up or they were re-**
15 **investigating other cases.**
16    Q.   And do you have -- do you know how many
17 people have been exonerated that were arrested and
18 convicted primarily because of Rey Guevara's work?
19    MR. ENGQUIST:   Objection.   Form.
20 Argumentative.
21    **A.   No, I don't.**
22    Q.   Do you have any opinion of Rey Guevara's
23 police work?
24    **A.   No.**

147

1    Q.   Do you have any opinion of Rey Guevara in
2 general?
3    **A.   Relating to police work or just --**
4    Q.   Just in general.
5    **A.   -- in general.   I thought he was an all**
6 **right guy.**
7    Q.   Do you know that he's -- numerous times
8 has invoked the Fifth Amendment when called to
9 testify in these cases?
10    **A.   Yes, I do.**
11    Q.   Do you have any knowledge regarding the
12 Chicago Police Department's discipline of Rey
13 Guevara?
14    **A.   No.**
15    Q.   Do you have any knowledge regarding
16 allegations that Rey Guevara coerced witnesses?
17    **A.   No.**
18    Q.   Do you have any knowledge regarding
19 allegations that Rey Guevara fabricated evidence?
20    **A.   No.**
21    Q.   Do you have any knowledge that Rey
22 Guevara -- any knowledge of allegations that Rey
23 Guevara suppressed evidence?
24    **A.   No.**

148

1    Q.   Did you ever witness Rey Guevara conduct
2 a lineup?
3    **A.   No.**
4    Q.   Did you ever witness Rey Guevara
5 interview a witness?
6    **A.   No.**
7    Q.   Did you ever witness Rey Guevara
8 interview a suspect?
9    **A.   That, in itself, I'm not sure if I was**
10 **present for one in the Gomez case.**
11    Q.   Let me ask you this.   Did you ever
12 witness Rey Guevara telling a suspect or a witness
13 what to say?
14    **A.   No.**
15    Q.   Did you ever witness Rey Guevara
16 threatening a witness or a suspect?
17    **A.   No.**
18    Q.   Did you ever witness Rey Guevara
19 intimidating a witness or a suspect?
20    **A.   No.**
21    Q.   Did you ever witness Rey Guevara
22 physically abuse or assault a witness or a suspect?
23    **A.   No.**
24    Q.   Do you have any opinion about the fact

149

1    that Rey Guevara has taken the Fifth?  Does that
2    say anything about him?
3        A.   Not to me.
4            MS. BARBER:  Objection.  Form.
5        Q.   Sorry?
6        A.   Not to me.
7            MR. STARR:  I'm going to take a short
8    five minutes.
9            (OFF THE RECORD)
10           (ON THE RECORD)
11   BY MR. STARR:
12       Q.   Can you tell me what the general layout
13   at the second floor of Area 5 was?  I understand
14   it's a big, open room.  You detailed that.
15       A.   The detective side --
16       Q.   Yeah.
17       A.   -- was very long, open floor.  The north
18   side of the floor -- there was a section for the
19   front desk and just alongside of that would be the
20   entrance to the detective division itself.  If I
21   remember correctly, behind the desk, off to the --
22   if they're facing the floor, there is a radio room,
23   and also, there's another office on the side there,
24   just outside the desk.  There's an office.  I think

150

1    that's violent crimes sergeant's office.  If not,
2    that's another office that the violent crimes use.
3    Then there's various numbers of desks, and there's
4    a lot of desks from the front portion all the way
5    to the back.
6        On the -- if you're facing the floor, the
7    right side, I believe, and I'm not sure if -- how
8    many any longer, but I think there were six
9    interview rooms.  I want to say they were pretty
10   much evenly spaced.  I think there was a -- also on
11   that same side, there was a violent crimes
12   sergeant's office and further down on the right
13   side was the property crimes sergeant's office.  I
14   know there was a bathroom there.  It might have
15   been right there on that same side.  I can't
16   remember exactly where that was.
17       At the end of that long corridor, there were
18   -- there was an office way in the back that was --
19   if I'm describing this right, it was basically
20   hidden and the officer that used that worked --
21   excuse the term, but Gypsy cases, and that was
22   basically the room he used, but also back there,
23   there's another door closer to where the --
24   basically on the same side of those interview

151

1    rooms, there's a room where we held our roll calls,
2    and also that was used for viewing of lineups, and
3    where that other officer's room is, there's a door
4    to the lineup room.
5        Q.   And that room that you used for lineups
6    and used for roll call, just for clarification, is
7    that on the opposite side of the interview rooms?
8        A.   No.  You know what?  Completely opposite
9    from the front desk.  It's at the other end of the
10   room.  And there's no windows there.  It's just a
11   room behind that wall but there's a door that gets
12   you in there.
13       Q.   And then if -- what about the wall that
14   was the exact opposite of the interview room wall,
15   what was along that wall?
16       A.   Oh, those were windows --
17       Q.   Okay.
18       A.   -- basically windows and you could see
19   downstairs to the first floor.
20       Q.   All right.
21       A.   Yeah.
22       Q.   Were the interview rooms -- you said that
23   you believe there were six of them.  Were they all
24   the same size?

152

1        A.   Yes.  I believe so.  They were all the
2    same size, and I believe there were six.
3        Q.   And was there a window on the door to the
4    interview rooms?
5        A.   Yes.
6        Q.   For all six of them?
7        A.   Yes.
8        Q.   Okay.  And then you described something
9    called an office for the officer that handled Gypsy
10   cases.  What is that?
11       A.   I forget the true technical case, but
12   they were cases involving -- let's see if I can
13   remember the term -- oh, God.  There's a term for
14   it.  You had individuals that came to your house,
15   pretended they were working with people's gas.
16   They target elderly people and they pull them
17   outside, talk to them, and then before you know it,
18   somebody would sneak in the house, and then they'd
19   tell them, listen, you've got a rebate coming,
20   something of that sort, but those were the cases he
21   handled.  And many of those cases were -- I forget
22   the term again, but Gypsies.
23       Q.   And you said he handled, was there only
24   one detective that handled these cases?

153

1    A.   Yes.

2    Q.   Do you have any idea or do you have any
3  knowledge as to why that was separate from -- or
4  was it separate from the other detectives?

5    A.   Oh, no.  It was basically property
6  crimes, but he had an office that he worked out of
7  and he just worked on that, so for some odd reason,
8  they gave him that office.

9    Q.   And what officer was that?

10    A.   Oh, God.  I couldn't remember his name.
11  I know he retired I think it was prior to me making
12  sergeant or maybe right after.  I don't remember.

13    Q.   Can you take a look at Exhibit 2 again,
14  the consent to search form?  And do you know whose
15  handwriting it is the narrative part?

16    A.   All this was mine and my signature.  I
17  filled this out.

18    Q.   Did you know if that date of April 3,
19  1998, is that accurate?

20    A.   I would say yes.  I'm the one who put it
21  there.

22    Q.   And do you -- and the time, 1830 hours,
23  do you believe that to be a correct, accurate time?

24    A.   I believe that's the accurate time, yes.

154

1    Q.   And would that denote the time that Mr.
2  Mejia signed it?

3    A.   Yes, or that I presented it to him, one
4  or the other.

5    Q.   So I briefly asked you about Rey
6  Guevara's reputation and cases involving
7  exonerations.  Do you have any knowledge of any
8  police officer reporting misconduct that Rey
9  Guevara committed?

10    A.   No.

11    Q.   Anytime while you were a police officer,
12  either when you were in Area 5 as a detective or
13  once you were promoted up the ranks, did anyone
14  ever come to you to express any concern about Rey
15  Guevara?

16    A.   I don't recall that.  No, I don't believe
17  so.

18    Q.   Are you aware that there's several civil
19  cases that involve Rey Guevara and that involve
20  individuals who have been exonerated who Rey
21  Guevara arrested and were eventually convicted?

22         MR. ENGQUIST:  Objection.  Form.

23    A.   You're talking about like this case here?

24    Q.   For example, one of them, yes.

155

1    A.   Yes.

2    Q.   And are you aware that some of those
3  civil cases have come to a conclusion -- have gone
4  to a trial and come to a conclusion?

5    A.   I do recall the very first one because, I
6  guess, after that one is when everything else
7  started to pop up, but I don't know how many have
8  come to conclusions.

9    Q.   Is that Juan Johnson?

10    A.   I don't even know the name.

11    Q.   Does the name Juan Johnson trigger any
12  recollection?

13    A.   No.

14    Q.   What about Jacques Rivera?  Do you know
15  who Jacques Rivera is?

16    A.   Jacques Rivera, no.

17    Q.   Are you aware of any misconduct that Rey
18  Guevara committed against Jacques Rivera?

19    A.   I don't know.

20    Q.   Okay.  What about the name, Jose
21  Montanez, are you aware of someone named Jose
22  Montanez that Rey Guevara arrested and was
23  eventually convicted?

24    A.   No.

156

1    Q.   And are you aware of any misconduct that
2  Rey Guevara committed during the investigation of
3  Jose Montanez?

4    A.   No.

5    Q.   How about Armando Serrano, does that name
6  ring any bells?

7    A.   No.

8    Q.   Are you aware of any misconduct that Rey
9  committed during the investigation of Armando
10  Serrano?

11    A.   No.

12    Q.   What about Jorge Pacheco, and forgive me
13  if I'm mispronouncing it.

14    A.   No, I don't.

15    Q.   Does that name ring any bells?

16    A.   No.

17    Q.   Are you aware of any misconduct that Rey
18  Guevara committed during the investigation of Mr.
19  Pacheco?

20    A.   No.

21    Q.   What about Roberto Almodovar, does that
22  name ring any bells?

23    A.   No.

24    Q.   Are you aware of any misconduct that Rey

157

1 Guevara committed during the investigation of Mr.
2 Almodovar?
3     A.   No.
4     Q.   I'm going to ask you a series of the same
5 questions about a number of names.
6     A.   Yeah.
7     Q.   You understand that?
8     A.   Yes.
9     Q.   Okay.  What about William Negron?
10    A.   No.
11    Q.   No knowledge of William Negron?
12    A.   I'm sorry.  I have no knowledge of him.
13    Q.   Jose Maysonet?
14    A.   Have no knowledge of him.
15    Q.   Angel Rodriguez.
16    A.   No knowledge.
17    Q.   Santos Flores?
18    A.   No knowledge.
19    Q.   Henry Johnson.
20    A.   No knowledge.
21    Q.   Arturo -- strike that.  Ariel Gomez.
22    A.   That's the other case that I was
23 assisting in.
24    Q.   So you're familiar with that case.

158

1     A.   With the case, yes.
2     Q.   What do you do know about that case?
3         MR. ENGQUIST:  Objection.  Form.  Do you
4 seriously want to ask him everything about the
5 case?
6     Q.   Do you know anything about any misconduct
7 that Rey Guevara committed during the investigation
8 of Ariel Gomez?
9     A.   No.
10    Q.   What about Xavier Arcos?
11    A.   Not familiar with that name.
12    Q.   Ricardo Rodriguez.
13    A.   I don't recall that name.
14    Q.   Thomas Sierra.
15    A.   Don't know that name.
16    Q.   Are you aware of any misconduct that's
17 been alleged about Rey Guevara outside of what
18 you've already testified to today, whatsoever?
19    A.   No.
20        MS. BARBER:  I'm just going to object to
21 the form of the question, even though it's after
22 the fact.
23    Q.   Did you ever conspire with any police
24 officer in this in this case to deprive Gabriel

159

1 Solache, or Arturo Reyes, or anyone else of their
2 constitutional rights?
3     A.   Did you say conspire?  No.
4     Q.   Did you ever withhold any exculpatory
5 evidence whatsoever from either Gabriel Solache or
6 Arturo Reyes in this case?
7     A.   No.
8     Q.   Did you withhold any exculpatory evidence
9 at all in this case?
10    A.   No.
11    Q.   Did Rey Guevara ever present you with any
12 exculpatory evidence that you know he then
13 withheld?
14    A.   No.
15        THE COURT REPORTER:  I'm sorry?
16        THE WITNESS:  No.
17    Q.   Did you ever hear of Bruce Halvorsen
18 withholding any exculpatory evidence in this case?
19    A.   No.
20    Q.   What about Robert Rutherford, did you
21 ever hear of him withholding any evidence in this
22 case?
23    A.   No.
24    Q.   Dan Trevino?

160

1     A.   No.
2     Q.   Tom O'Malley?
3     A.   No.
4     Q.   Andrew Varga?
5     A.   No.
6     Q.   Karen Wehrle?
7     A.   No.
8     Q.   Heather Brualdi?
9     A.   No.
10    Q.   Dave Navarro?
11    A.   No.
12    Q.   Do you recall testifying in this case?
13    A.   No.
14    Q.   I'm going to show you a copy of your
15 testimony.  I don't have very much more, just this
16 is going to be marked Exhibit 4.
17        And Exhibit 4 is Bates-stamped CCSAO 56772
18 through 56779.  I just want you to take a look at
19 Bates Stamp 56778, which I think is the second to
20 the last page -- through to the last page.
21        (Exhibit 4 was marked for
22 identification.)
23    A.   Did you want me look this over or were
24 you going to ask me a question?

161

1    Q.   No, I'm going to ask you a question about
2  it.
3    A.   Okay.
4    Q.   On cross examination, you were asked if
5  you were present when Detective Guevara took the
6  shoes into the room with Ms. Mejia.  And then you
7  were asked, did you go into the room with Detective
8  Guevara when he took in the shoes to Ms. Mejia's
9  room?  And you testified I don't remember if I did
10  or not.
11        MR. ENGQUIST:  Can you point to the line
12  that we're talking about?
13        MR. STARR:  The last [indiscernible]
14  cross examination Line 21 through 24.
15        MR. ENGQUIST:  Oh, going into the next
16  page.
17        MR. STARR:  Yeah.
18        MR. ENGQUIST:  Okay.
19    A.   Okay.
20    Q.   Do you still not have any recollection of
21  whether or not you went in that room?
22    A.   No, I don't.
23    Q.   You think there's anything that could
24  refresh your recollection as to whether or not you

162

1  went in that room?
2        MR. ENGQUIST:  Objection.  Asked and
3  answered.
4    Q.   I'm sorry.  I didn't hear your answer.
5    A.   No.
6    Q.   Line 12 of 56779, same page.  You were
7  asked, did you search the entire first floor, all
8  the rooms?  And your answer was, most, I believe
9  most of the rooms.
10    A.   Yes.
11    Q.   And then you were asked, do you recall
12  any rooms that you did not search?  And you said,
13  no, I did not.
14    A.   Mm-hmm.
15    Q.   Is that testimony accurate?
16    A.   I would say yes, that was -- I had a very
17  clear recollection at that time.
18    Q.   Did anything that we discussed today
19  refresh your recollection of the case in any way?
20    A.   I don't remember what it was, but there
21  was one thing that you had said that made me
22  remember something.
23    Q.   Anything in addition to that?
24    A.   No, nothing I can think of.

163

1    Q.   Do you know if there's any other
2  documents that exist that may help refresh your
3  recollection any further?
4    A.   No.
5    Q.   Okay.  One last thing, when you were at
6  Area 5, were there any rumors about Rey Guevara's
7  misconduct?
8        MR. ENGQUIST:  Objection.  Form.
9    A.   I can't say that there were.  I don't
10  recall anything of that sort, and I was going to
11  say we didn't have a personal relationship also.
12  It was -- saw him at work.  How you doing?  Just
13  like any other.
14    Q.   What about once you became a commander
15  and then a deputy chief?  Did you ever hear any
16  rumors about Rey Guevara and his misconduct?
17    A.   No, it wasn't till that first case that
18  we spoke of, the one that was overturned, and then
19  started to -- well, I should say this.  After that
20  and then the other ones started to pop up is when
21  we had more information but not so much that
22  somebody came to talk to me and told me something
23  about Rey or what happened on his cases or anything
24  like that.

164

1    Q.   When you had more information, what kind
2  of information did you have at that point?
3    A.   Whatever was on the news.
4    Q.   What about any internal discussions with
5  other police officers, did you talk about it at
6  all?
7    A.   No.  I had my hands full with the
8  district.
9    Q.   And no one ever approached you and asked
10  you about your time at Area 5 in regards to Rey
11  Guevara.
12    A.   No.  I don't believe so.
13        MR. STARR:  Okay.  I think I'm done.
14        THE WITNESS:  Thank you.
15        MS. SUSLER:  I'm sorry, sir.  You're not
16  done here because I have a few questions, and I'm
17  going to jump around a little bit and I'll try not
18  to ask questions --
19        THE WITNESS:  Do I need these?
20        MS. SUSLER:  We might.  So just hang onto
21  it.
22    EXAMINATION BY COUNSEL FOR PLAINTIFF SOLACHE:
23  BY MS. SUSLER:
24    Q.   I'm Jan Susler.  I am one of the

165

1 attorneys representing Mr. Solache in this matter.
2     When you approached Mr. Mejia to have him sign
3 the consent to search, what did you know about who
4 lived in the residence that you were going to be
5 searching?
6     A.  Well, first of all, I don't recall Mr.
7 Mejia, and I didn't know who lived in the residence
8 that we eventually searched.
9     Q.  Well, what did you do to find out who
10 lived in that residence before you searched it?
11     A.  I don't recall looking to find out who
12 lived there.
13     Q.  And what, if anything, did Rey Guevara or
14 any other detective working on the murder
15 investigation tell you about the residence that you
16 went to search and who resided there?
17     A.  I don't recall discussing it with Rey.
18     Q.  What did you do to determine whether you
19 had consent from everyone who was an occupant of
20 that home?
21     A.  I'm sorry.  What did I do to --
22     Q.  Yes, sir.  What did you do to determine
23 whether you had consent from everyone whose living
24 space you were going to be searching?

166

1     A.  I didn't do anything.
2     Q.  Did you know that Gabriel Solache and
3 Arturo Reyes lived in that apartment?
4     A.  No.
5     Q.  You knew at the time that you went to
6 search the apartment that they were being held in
7 Area 5 and questioned about their alleged
8 involvement in the crimes?
9     A.  No, I didn't know that.
10     Q.  What did you know about any suspects at
11 the time that you asked Mr. Mejia to sign the
12 consent to search?
13     A.  I didn't know anything about any of the
14 suspects.
15     Q.  In order for a -- in order for --
16     THE COURT REPORTER:  Try and speak up.
17     Q.  What did you know about the money that
18 you said you went to search for and its
19 relationship to the crimes that were being
20 investigated?
21     A.  I don't recall that, but I just knew that
22 I was supposed to go a child's room and look for
23 money.
24     Q.  What were you told about the quantity of

167

1 money?
2     A.  I don't remember.
3     Q.  You weren't looking for change that fell
4 in the -- between the sofa cushions, were you?
5     A.  No, like I says, I don't recall how much
6 money I was looking for or what amounts I was
7 looking for.
8     Q.  Or what role it had in the offenses that
9 were being investigated?
10     A.  Correct.
11     Q.  What did you know about what authority
12 Mr. Mejia had to consent to searches of rooms that
13 were rented to other people in his residence?
14     A.  I didn't have any knowledge of that.
15     Q.  And did you do anything to find out?
16     A.  No, I did not.
17     Q.  Is it fair to say that you assumed that
18 Mr. Mejia had authority to give you consent to
19 search anything you wanted to in the residence on
20 Mozart?
21     A.  Could you just repeat that one more time,
22 please?
23     Q.  Did you proceed with the assumption that
24 Mr. Mejia had the authority to give you the consent

168

1 to search anywhere at the address on Mozart that
2 appears in the consent to search?
3     A.  I would say yes.
4     Q.  What was Santo Padre supposed to be
5 looking for?
6     A.  I don't know.
7     Q.  What was Stevens supposed to be searching
8 for?
9     A.  I don't know.
10     Q.  Where did Santo Padre search?
11     A.  I don't know.
12     Q.  And where did Stevens search other than
13 the closet that you've already testified about?
14     A.  I don't know.
15     Q.  As far as you know, did any of the three
16 of you find anything other than the shoes that
17 Stevens found?
18     A.  It was just the shoes.
19     Q.  Did you ever make a report about your
20 participation in the execution of the consent to
21 search?
22     A.  No.
23     Q.  Why not?
24     A.  Because we had to send -- we had the

169

1 consent to search and that was turned over.

2    Q.   We had the consent search and that was

3 turned over.  I'm not sure what you mean.

4    A.   It was turned in as part of the file.

5    Q.   The actual form that is Exhibit 2.

6    A.   Yes.

7    Q.   But that doesn't say anything about what

8 happened when you went to the address.

9    A.   Nothing that I put on paper, no.

10    Q.   Exhibit 2 doesn't say anything about what

11 happened when you went to execute the search that

12 Mr. Mejia authorized you to do.  On Exhibit 2.

13    A.   Yeah, but your question is?

14    Q.   There's nothing on there that says what

15 happened when you went to the residence.  Is that

16 right?

17    A.   Well, yes.  I did not write a report.  I

18 did not, or a supplementary report to this case.

19    Q.   And if you had, your memory today could

20 be refreshed by that report.

21    A.   Yes, if I did.

22    Q.   Did you ever see a report written by

23 Santo Padre or Stevens that documented what

24 happened when you went to the address at Mozart

170

1 with Mr. Mejia?

2    A.   Not Santo Padre, but I think with Michael

3 Stevens, his inventory forms.  That's the only

4 report.

5    Q.   Okay.  So other than Mr. Stevens or

6 Officer Stevens, Detective Stevens' inventory, you

7 never saw any report by him or Santo Padre

8 documenting what the three of you did when you went

9 to the residence on Mozart with Mr. Mejia.

10    A.   Correct.

11    Q.   Do you know why they didn't make reports

12 about that participation in the investigation of

13 this heater case?

14    A.   It was because we weren't called to write

15 a report.

16    Q.   What do you mean, you weren't called to

17 write a report?

18    A.   We weren't asked to write a supplementary

19 report.

20    Q.   Why would someone have to ask you to

21 write a report about police activity that you

22 engaged in, in the investigation of a murder case?

23    A.   Realistically, the forms that we entered

24 was what we did.  We found shoes, so we inventoried

171

1 the shoes and we executed a search, and the consent

2 to search was turned in.

3    Q.   All right.  Exhibit 3 is the inventory

4 sheet you're referring to?

5    A.   I assume, yes.

6    Q.   Well, can you look at Exhibit 3, please?

7    A.   Yes.

8    Q.   Okay.  That's the inventory sheet that

9 you're referring to?

10    A.   Yes.

11    Q.   And is there anywhere on Exhibit 3 that

12 -- other than the fact that it says two black shoes

13 that were recovered at 6234 South Mozart that tells

14 us what any of the three of you did when you were

15 at 6234 South Mozart?

16    A.   No, it didn't spell it out.

17    Q.   You testified earlier today that you

18 reviewed two inventory forms?

19    A.   Yes.

20    Q.   What's the other inventory -- well,

21 assuming this is one of the inventory forms --

22    A.   Yes, it's one.

23    Q.   -- Exhibit 3.  What's the other inventory

24 form?

172

1    A.   It's titled statement, which would have

2 been the consent to search form that was

3 inventoried.

4    Q.   So you're holding up Exhibit 2?

5    A.   Yes, this is Exhibit 2 but there was

6 another inventory form that's related to No. 2.

7    Q.   And what does that consist of?

8    A.   Just a statement that's here, the consent

9 to search form.

10    Q.   Okay.  You're holding up Exhibit 2.

11    A.   Yes.

12    Q.   Okay.  So forgive me.  I'm maybe a little

13 slow, but I don't understand.  There's two -- there

14 were two documents that you and Stevens prepared as

15 a result of your participation in the murder

16 investigation, right?  There's Exhibit 2, which is

17 the consent to search form that you wrote and had

18 Mr. Mejia sign, and there's Exhibit 3 that is the

19 inventory sheet that Stevens filled out when you

20 turned the shoes in.

21    A.   Michael Stevens filled out both inventory

22 slips.

23    Q.   Right.  I guess what I'm trying to

24 understand is, other than Exhibit 3, what is the

173

1 other inventory slip?

2  **A.  There should be one other inventory slip**
3 **that documents this being entered -- inventoried.**

4       MR. ENGQUIST:  Exhibit 2.

5  Q.  I see.  So you're -- when you say this,
6 you mean Exhibit 2.

7  **A.  Exhibit 2.**

8  Q.  So there's an inventory sheet that
9 Stevens filled out to make Exhibit 2 a piece of
10 evidence that was turned in and inventoried.

11  **A.  Yes.**

12  Q.  I see.  Thank you.  Sorry that took so
13 long.

14  **A.  I apologize.  I don't always explain**
15 **myself well.**

16  Q.  All right.  Well, you're familiar with
17 the forms and I'm not, so -- all right.

18       Did you document in any way -- you, personally
19 -- that your search of the residence at 6234 South
20 Mozart was as you testified at the trial, a search
21 of the entire first floor?

22  **A.  Did I document any of that?**

23  Q.  Yes.

24  **A.  No.**

174

1  Q.  Did you personally document in any way
2 that the search that you participated in on April
3 3rd of the Mozart residence revealed no evidence
4 inculpating Gabriel Solache or Arturo Reyes?

5  **A.  I'm sorry.  What does inculpating mean?**

6       MS. SUSLER:  Can you read that back, and
7 then I'll tell you.  I don't mean to use legalese
8 if it's not understandable.

9       THE COURT REPORTER:  I'm sorry.  The
10 software glitched out.

11       MS. SUSLER:  Okay.  I'll try it again.

12  Q.  Did you personally document that, when
13 you searched the residence on Mozart on April 3rd,
14 that you found no evidence showing that Arturo
15 Reyes or Gabriel Solache were guilty?

16       MR. ENGQUIST:  Objection.  Form.
17 Foundation.

18  **A.  Are you asking, did I find any evidence?**

19  Q.  Well, I guess I should start with that.
20 Did you find any evidence in your search of the
21 Mozart residence on April 3rd that would show that
22 Gabriel Solache or Arturo Reyes were guilty of the
23 crimes that you were participating in the
24 investigation of?

175

1       MR. ENGQUIST:  Objection.  Foundation.
2 Form.

3  **A.  I'm going to say no because I did not**
4 **find any evidence.**

5  Q.  Okay.  So did you personally make a
6 report after your search of the residence on Mozart
7 on April 3 that you found no evidence showing that
8 Gabriel Solache and Arturo Reyes were guilty?

9  **A.  No.**

10       MR. ENGQUIST:  Same objections.

11  Q.  And as far as you know, did Santo Padre
12 or Stevens find any evidence during that search on
13 April 3rd of the Mozart residence showing that
14 Arturo Reyes and Gabriel Solache were guilty of the
15 crimes you were investigating?

16       MR. ENGQUIST:  Objection.  Form and
17 foundation.

18  **A.  I'm not sure.  They did find -- or**
19 **Michael Stevens did find the shoes, and I don't**
20 **know if that proved one way or the other that the**
21 **two individuals you mentioned, if it worked against**
22 **them.**

23  Q.  Other than those shoes, are you aware of
24 whether either Santo Padre or Stevens found any

176

1 evidence tending to show that Gabriel Solache and
2 Arturo Reyes were guilty?

3       MR. ENGQUIST:  Same objection.  Form and
4 foundation.

5  **A.  No.**

6  Q.  And are you aware of whether Santo Padre
7 or Stevens made a report or in any other way
8 documented the fact that, as a result of the search
9 they conducted on April 3rd of the Mozart
10 residence, they found nothing tending to show that
11 Gabriel Solache and Arturo Reyes were guilty of the
12 crimes being investigated?

13       MR. ENGQUIST:  Objection.  Form and
14 foundation.

15  **A.  I'm not aware that a report was**
16 **generated.**

17  Q.  And if a report had been generated, you
18 would be likely to know.

19  **A.  Could be, if my partner generated one.**

20  Q.  And if Santo Padre generated one?

21  **A.  I would say yes also.**

22  Q.  Now when you first encountered Mr. Mejia,
23 what did you know about him?

24       MS. BARBER:  Objection.  Asked and

177

1 answered.
2        MR. ENGQUIST:  Join.
3     **A.   I don't remember Mr. Mejia.**
4     Q.   Okay.  I guess what I'm trying to find
5 out is what you knew about him before you drove to
6 his residence and searched his home.
7        Did you know how long he had been held at the
8 police station?
9     **A.   No, I don't.**
10    Q.   Did you know whether he'd been given
11 anything to eat?
12    **A.   No.**
13    Q.   Did you know whether he'd been allowed to
14 go to the bathroom?
15    **A.   No.**
16    Q.   Did you know whether he was a suspect?
17    **A.   No.**
18    Q.   Did you know what his relationship was to
19 anyone else who was being questioned in the case?
20    **A.   No.**
21    Q.   Did you know whether he'd been physically
22 abused by Detective Guevara?
23    **A.   No.**
24    Q.   Did you know whether he could read in

178

1 Spanish?
2     **A.   I don't know.  I'm sorry.**
3     Q.   What, if anything, did you do to
4 determine whether Mr. Mejia understood the language
5 that's on Exhibit 2?
6     **A.   As I mentioned before, I don't remember**
7 **speaking to him or even seeing him.  I do have the**
8 **form in front of me, and if, in fact, I related**
9 **this form to him, I couldn't do it by my limited**
10 **Spanish.  I would have had to read it to him or he**
11 **would have had to read it himself, or the other**
12 **alternative is that Rey Guevara spoke to him.**
13    Q.   And to the best of your memory, which, if
14 any, of those things happened?
15    **A.   I don't remember any of it, but I know I**
16 **did sign it as a witness.  I filled out that form,**
17 **but I just do not remember.  And if, in fact, it**
18 **was me who did it, I would have read it to him or**
19 **any of those other two scenarios.**
20    Q.   So forgive me, but you just referred to
21 your limited Spanish.  Back in '98, could you read
22 this Spanish in Spanish?
23    **A.   Yes.**
24    Q.   And did you know what it meant?

179

1     **A.   There are words there that I would**
2 **probably have to pull a dictionary on.  I don't**
3 **understand.  For the most part, I can make it out**
4 **and understand what it meant, but I'm not fluent in**
5 **Spanish.**
6     Q.   Did I understand you to say that you --
7 your abilities in Spanish at the time were such
8 that, if you had had to read or explain this to Mr.
9 Mejia, you wouldn't have been able to do that?
10    **A.   I believe that's correct.**
11    Q.   So you would have had to do what then?
12    **A.   You mean, as far as this, if I knew he**
13 **could not understand it?**
14    Q.   Correct.
15    **A.   I would definitely have to find someone**
16 **else to explain it to him or read it to him.**
17    Q.   Okay.  And I think I heard you to say --
18 and please correct me if I'm wrong -- that you
19 weren't able to read this in Spanish to Mr. Mejia
20 or explain to him what it meant.
21        MR. ENGQUIST:  Objection.
22 Mischaracterizes his testimony.
23        MS. BARBER:  And object to the form of
24 that confusing question.

180

1     **A.   I said I could read it, but not**
2 **necessarily did I understand every word that I was**
3 **reading.**
4     Q.   So you wouldn't have been able to explain
5 it to him.
6     **A.   Absolutely, correct.**
7     Q.   Who was present when Mr. Mejia signed
8 Exhibit 2?
9     **A.   Oh, I have two other witnesses here, so**
10 **it would have been Santo Padre and Mike Stevens,**
11 **but I have no recollection of them being there**
12 **also.**
13    Q.   Okay.  So they might have signed it
14 later?
15    **A.   I doubt that.  They wouldn't do that.**
16    Q.   Or before?
17    **A.   I wouldn't do that.  No.  They would do**
18 **it then and there.**
19    Q.   But Stevens you said didn't speak
20 Spanish?
21    **A.   No, he did not.**
22    Q.   And Santo Padre, you didn't whether he --
23    **A.   I don't know if he spoke Spanish at all.**
24    Q.   Was Guevara present when Mr. Mejia signed

181

1  Exhibit 2?
2      A.  I don't recall.
3      Q.  Was anybody else present?
4      A.  Not that I can recall.
5      Q.  And where did -- where were you
6  physically when Mr. Mejia signed Exhibit 2?
7      A.  I don't know if we used the sergeant's
8  room.  I don't recall if we did it out in the open
9  space on one of the desks.  I don't recall that.
10     Q.  Where did you first encounter Mr. Mejia?
11     A.  I have no recollection of encountering
12 him or speaking to him.
13     Q.  Okay.  I just want to thank you for your
14 patience.  These are questions that I don't know if
15 you know the answers, but I'm obligated to ask.
16     Where was Mr. Mejia's wife when you had Mr.
17 Mejia sign the consent?
18        MS. BARBER:  Objection.  Foundation.
19     A.  I don't know.
20     Q.  Was Mr. Mejia told that you were looking
21 for evidence that could end up proving that his
22 wife participated in the murders?
23     A.  Again, I'd have to probably refer to that
24 case report and what's in that case report, but I

182

1  don't have any knowledge of that.
2      Q.  Was Mr. Mejia told that, by authorizing
3  the search of his residence, that he could be
4  allowing police to collect evidence that might show
5  that Gabriel Solache and Arturo Reyes participated
6  in the crimes being investigated?
7      A.  Not that I know of.
8      Q.  Do you know what happened to Mr. Mejia
9  when you returned from the -- searching the home?
10     A.  No, I don't.
11     Q.  If you -- in property crimes, back in
12 Area 5 -- well, first, let me ask you this.  You've
13 been referring to property crimes and violent
14 crimes as sharing that second floor, right?
15     A.  Yes.
16     Q.  Violent crimes is the unit which
17 investigates crimes like murder.
18     A.  Yes.
19     Q.  So is there a homicide division or it's
20 just called violent crimes?
21     A.  Well, they're called violent crimes, but
22 specific detectives are normally assigned murders.
23     Q.  Was Guevara one of those?
24     A.  Yes, he investigated murders.

183

1      Q.  In property crimes, you routinely
2  investigated as a detective back in '98 -- you
3  routinely investigated felony offenses.
4      A.  Yes.
5      Q.  And if -- and misdemeanors as well?
6      A.  I'm sorry.  Whatever cases would come
7  across our desk, not all of them happened to be
8  burglaries.  Burglaries is a felony offense if
9  charged, but we had theft cases that were at the
10 time, under 300 dollars, so we would get some of
11 those and a lot of times, that didn't even come out
12 to us, but primarily we handled the check cases and
13 the burglary cases.
14     Q.  Mostly felonies?
15     A.  Yes.
16     Q.  And if you had a need to conduct an
17 interview with a witness or a suspect who spoke
18 only Spanish, what would you do?
19     A.  Well, I would hope that somebody -- if I
20 had to go to the residence, somebody there spoke
21 Spanish or we could arrange that a family member be
22 there to speak Spanish to them.  If, in fact, they
23 came into the station to speak to me, I can listen
24 to -- we're talking about victims?

184

1      Q.  I said witnesses or suspects.
2      A.  Okay.  I can ask one of the other
3  detectives there that do speak fluent Spanish to
4  give me a hand.
5      Q.  And who was that back in '98?
6      A.  Oh, well, Victor --
7         MS. BARBER:  Asked and answered.
8  Objection.  Asked and answered.
9      A.  Victor and Hector Vergara.  I knew they
10 spoke Spanish.
11     Q.  And you're talking just people on your
12 same shift or watch?
13     A.  Yes.
14     Q.  Were there Spanish-speaking detectives in
15 property crimes that worked other shifts?
16     A.  You know what?  I don't recall.  I can't
17 think of any on third watch offhand.
18     Q.  That was your watch.
19     A.  Yes, the watch I worked.
20     Q.  And if you had wanted to find out if
21 there were Spanish-speaking detectives on other
22 shifts, it would have been pretty easy to find out?
23     A.  Yes.
24     Q.  And how about, did you ever have a

185

1 situation where you had a state's attorney come in
2 to take a statement from somebody in a property
3 crimes felony you were investigating?
4  **A.   So you're asking me if there -- a state's**
5 **attorney ever came in to process or seek charges on**
6 **one of our burglary suspects?**
7  Q.   Yes, sir.
8  **A.   Yes.  I've had one of those.**
9  Q.   One?
10  **A.   One that I can think of off the top of my**
11 **head where a state's attorney came in, yes.**
12  Q.   Was it a Spanish-speaker, the person
13 whose statement you were taking?
14  **A.   No.**
15  Q.   Did you ever have a situation where a
16 state's attorney came in to take a statement from a
17 Spanish-only-speaking suspect?
18  **A.   I remember -- I recall a time and I**
19 **couldn't tell you what case it was -- I know it**
20 **wasn't mine, but I don't know whose it was and**
21 **whether it was violent crimes or property crimes --**
22 **that they asked me to interpret for a state's**
23 **attorney, and I told the state's attorney I'm not**
24 **comfortable because my Spanish isn't fluent.  So I**

186

1 **don't know if they sought somebody else out or they**
2 **left and sent another attorney to come at a**
3 **different hour.  I don't know how that was handled.**
4  Q.   But you didn't do it.
5  **A.   But I did not do it.**
6  Q.   How about in violent crimes back in April
7 of '98, on the third watch or any other watch, who
8 were you aware of who was Spanish-speaking?
9  **A.   The only two that I can think of offhand**
10 **other than Rey Guevara was Victor and I don't**
11 **remember his last name, but the other one was**
12 **Hector Vergara.**
13  Q.   So were they in violent crimes or in
14 property crimes?
15  **A.   They were in violent crimes.**
16  Q.   And how about any other shift in violent
17 crimes in terms of Spanish-speakers?
18  **A.   I don't know.  I didn't know many of the**
19 **guys on days or midnights.**
20  Q.   Mm-hmm.  And how about other personnel in
21 Area 5 who were in administrative positions,
22 secretarial positions, clerk positions who were
23 Spanish-speakers back in April of '98?
24  **A.   The only other person that I believe he**

187

1 **spoke Spanish and I don't know to what degree was**
2 **the desk officer or detective, I should say,**
3 **Freddie Montilla, and I don't know what extent his**
4 **Spanish was.**
5  Q.   And the time that you were -- or let me
6 ask you this.  Area 5 is not the only police
7 function in that building that it's located at,
8 correct?
9  **A.   Correct.**
10  Q.   What other functions happen in that
11 physical locale?
12  **A.   Well, the 25th District is also located**
13 **there.  That's the beat patrol.  They're there.**
14 **We're upstairs.  We have youth, which is detectives**
15 **also on the second floor but across the hall from**
16 **us.  And I couldn't tell you what they were called**
17 **at the time, but it was an area, so the deputy**
18 **chief worked out of there and I don't remember what**
19 **it was at the time, they had their own group of**
20 **guys that's like a district tac team that worked**
21 **there out of the area also.**
22  Q.   So of all of those other folks in that
23 same physical building, the 25th District, the
24 youth office, the deputy chief, and the tac team,

188

1 who else could speak Spanish that you're aware of
2 on any shift?
3  **A.   I'm sure they had a number of police**
4 **officers in the 25th District that could speak**
5 **Spanish.**
6  Q.   And that's because of where it was
7 located, you mean, or --
8  **A.   Well, for the most part.  I mean, each**
9 **district, whether there's a large group of Hispanic**
10 **in the community, doesn't necessarily mean you're**
11 **going to get more, but you have other districts**
12 **that have smaller population of Hispanics that**
13 **still get -- that Hispanics work there.**
14  Q.   And in the department generally, not just
15 in the actual physical address where the 25th
16 District and Area 5 were located, back in April of
17 '98, there were a fair number of personnel who
18 spoke Spanish?
19     MS. BARBER:  Objection.  Foundation.
20     MR. ENGQUIST:  Join.
21  **A.   I don't have those numbers and I really**
22 **don't know.**
23  Q.   While you were at Area 5, how many other
24 Puerto Rican detectives were there?

189

1      MS. BARBER: Objection. Foundation.
2      A.  The only two that I can actually say is a
3  detective and -- that I know of was Rey Guevara and
4  Hector Vergara.  I believe Victor is Mexican and I
5  just don't recall who else might have been on the
6  floor or who worked afternoons.
7      Q.  Were you at any point during the time you
8  were at Area 5, a member of the Puerto Rican Police
9  Association?
10      A.  I believe I -- yes, but I don't know how
11  long because I don't want to say there was a time
12  where they weren't active or I don't want to say it
13  was disbanded, but they weren't doing much and --
14  but I tried to support the organizations.
15      Q.  What was the time that they were not
16  active?
17      A.  Oh, I don't know.  I never went to
18  meetings.  If they had a banquet, I would support
19  them in that fashion.  I don't even recall if I
20  paid dues or -- you know, I don't know if that was
21  a yearly thing or something like that, but if they
22  had a banquet, I would support them by going.
23      Q.  If you know, was Detective Guevara a
24  member of the Puerto Rican Police Association?

190

1      A.  I don't know.
2      Q.  Do you know whether the Puerto Rican
3  Police Association has ever taken a position with
4  respect to Detective Guevara?
5      A.  I don't know.
6      Q.  Do you know whether they've ever been
7  asked to take a position with respect to Detective
8  Guevara?
9      A.  It's the Puerto Rican Police Association?
10      Q.  Yes.
11      A.  No, I don't know.
12      Q.  You said you had given depositions in the
13  Markham and Kubiak cases.
14      A.  Yes.
15      Q.  What was your role in the Markham case?
16      A.  I was a deputy chief.  I was a street
17  deputy and I went to the scene of his suicide.
18      Q.  And your deposition then consisted of
19  questioning about your presence at the scene?
20      A.  My role and my being present, yes.
21      Q.  And how about -- and what happened with
22  that case, if you know?
23      A.  I don't know if it's -- I don't know the
24  end result with that.  I don't know if you heard

191

1  about the case but then later on, I don't know how
2  much time afterwards, his wife committed suicide,
3  so I really don't know if that's still ongoing or
4  what.
5      Q.  And who was your lawyer in that case?
6      A.  I was a witness.  I don't believe I had
7  an attorney.
8      Q.  As a deputy chief, you just testified
9  without a lawyer?
10      A.  I'll tell you what.  There was a -- I
11  don't believe there was any prep or anything.  They
12  just -- I came in and I spoke to them and that was
13  it.  And I want to say I might have been retired at
14  that point when they came to speak to me.
15      Q.  In the Kubiak deposition, what -- you
16  were deposed as a witness in that case?
17      A.  Yes.
18      Q.  And what was your relationship to that
19  case?
20      A.  She was supposed to transfer into the 4th
21  District and -- but she never made it, and she went
22  on medical prior to, and then real close to a year
23  after when she was supposed to be there, she
24  resigned.  And I had basically one conversation

192

1  with her and that was her exit interview.
2      Q.  And that's the case you say that is going
3  to trial now?
4      A.  Yes.  As a matter of fact, today's the
5  15th.  It started today and was supposed to last
6  maybe two weeks.
7      Q.  And have you been subpoenaed to testify
8  at the trial?
9      A.  I believe the attorney received that, but
10  they haven't set a date for when I should be there.
11      Q.  Who represented you at that deposition,
12  if you had a lawyer?
13      A.  Well, I don't know his last name, Jason
14  -- I have his card in my wallet.
15      Q.  Marsh?
16      A.  No.
17      Q.  No?
18      A.  I guess.
19      Q.  Is he with a private attorney or is he
20  with the city?
21      A.  He's with the city.  City attorney, yes.
22      Q.  Forgive me if you've already been asked,
23  but what conversations did you have with Raymond --
24  Reynaldo Guevara about the Solache and Reyes case?

193

1    A.    No conversation.
2    Q.    What conversations have you had with
3  Reynaldo Guevara since you participated in the
4  investigation of the Solache and Reyes case?
5    A.    None.
6        MS. BARBER: Any conversation at all?
7        MS. SUSLER: Yes.
8    A.    I'm sorry.
9    Q.    Any conversation at all.
10    A.    Any conversation? About the case, none.
11    Q.    Any conversation.
12    A.    None. I remember only one time that he
13  contacted me in the 10th District. I was then the
14  commander, and he was headed to -- 2016, California
15  for -- I guess he was testifying in a case of
16  sorts, and he said, hey, I'm coming down that way.
17  Maybe we can meet for lunch. That was it. We
18  never --
19    Q.    When was that?
20    A.    Oh, gosh. I was in the 10th District at
21  the time. I was the commander there, but I
22  couldn't tell you year, date, and months. That was
23  the only conversation I can recall after me leaving
24  the detective division.

194

1    Q.    Did you have lunch with him?
2    A.    No.
3    Q.    Why not?
4    A.    Very busy at the time.
5    Q.    After you testified at the criminal trial
6  in this case -- well, strike that.
7        After you came back to the station with shoes
8  that Detective Stevens found in the hallway closet,
9  what, if any, other participation did you have in
10  this investigation?
11        MS. BARBER: Objection to form.
12    A.    None. None.
13    Q.    So at the -- you were the commander in
14  2010, or 2011 to 2013 for the 10th District?
15    A.    I was the commander for three years. I
16  couldn't tell you exactly the years, but that
17  sounds right about -- 2009, maybe. 2010 is my
18  first start.
19    Q.    Okay. So by that time, had you already
20  heard about some of the exonerations that Detective
21  Guevara's cases resulted in?
22    A.    I can't place a time of when I heard, but
23  I remember when that first one was overturned.
24  And I don't know what year it was and don't know

195

1  the relation to where I worked.
2    Q.    By the time he called and said he was
3  going to stop by for lunch, did you already know
4  about some of those exonerations?
5    A.    I'm not sure.
6    Q.    If you had known, would you have been
7  interested in having lunch with him?
8    A.    Probably not.
9    Q.    Why not?
10    A.    Well, I -- not that I would want to shove
11  him off or anything, but I would rather not have.
12    Q.    Okay. I guess my question was why not?
13    A.    No particular reason, but I would rather
14  not.
15    Q.    You don't want to be associated with
16  that?
17        MS. BARBER: Objection. Form.
18    A.    No, I really haven't given it thought,
19  but I don't like to think that I didn't want to
20  associate myself with him, so I won't say that.
21    Q.    Would you have been concerned that, if
22  you had agreed to have lunch with him, he would
23  have taken that as your giving him your blessings?
24    A.    No, because that means I would have to --

196

1  like that's what he came to talk to me about.
2    Q.    Well, what did he come to talk to you
3  about?
4        MS. BARBER: Objection. Foundation.
5    A.    I have no idea. He said, hey, let's have
6  lunch.
7    Q.    And what did you say to him?
8    A.    I don't recall exactly what I said, but I
9  know we never met.
10    Q.    But I know -- sorry?
11    A.    We did not meet.
12    Q.    Did you have any other conversations with
13  Guevara before or after that?
14    A.    Not that I recall.
15    Q.    After you testified at the trial in this
16  case, what, if any, information did you have about
17  what happened to Mr. Solache and Mr. Reyes?
18    A.    I don't remember much about that case,
19  and I know I didn't follow it, so I can't say that
20  I had any other information afterwards.
21    Q.    Well, if I'm not mistaken, you said this
22  was -- this and Gomez were the only two heater type
23  violent crimes cases that you participated in.
24    A.    That I assisted in, yes.

197

1    Q.   And but you didn't find out the verdict
2  in the case in which you testified?
3    **A.   No.**
4         MS. BARBER:  Objection.  Argumentative.
5    Q.   Did you ever learn that Mr. Solache was
6  given the death penalty?
7    **A.   No.**
8    Q.   Did you -- what did you learn about the
9  reasons for their exoneration?
10   **A.   I didn't learn anything, and like I --**
11 **and as hard as this might seem to believe, I had no**
12 **interest in the case.  I was a property crimes**
13 **detective, and that's what I did, and I went to**
14 **assist, and that's all I did.**
15   Q.   So you -- did you see anything about it
16 on the news at any time?
17   **A.   I may have.**
18   Q.   Well, what do you remember?
19   **A.   Nothing.**
20        MS. BARBER:  Objection.  Foundation.
21   Q.   Did you follow the Gomez case on the
22 news?
23   **A.   No, I did not.**
24   Q.   In terms of the money that you had been

198

1  told to look for when you went to the search that
2  Mozart residence, what did you tell Detective
3  Guevara?
4    **A.   I didn't tell anybody anything about that**
5  **that I can recall.**
6    Q.   So he told you, you were supposed to look
7  for money and you came back with shoes and didn't
8  say anything about the money.
9    **A.   I don't remember who it was that told me**
10 **to look for money.**
11   Q.   Was it Halvorsen?
12   **A.   I don't recall even seeing Halvorsen that**
13 **day.**
14   Q.   Well, who else was it?
15   **A.   Could have been a supervisor.**
16   Q.   Which one?
17   **A.   Could have been -- I don't know.  I do**
18 **not recall who it was and it could have been**
19 **another detective that might have been related to**
20 **the case.**
21   Q.   Did you see anything in writing about the
22 case before you approached Mr. Mejia to sign that
23 search form -- the consent form?
24   **A.   In what sense do you mean?**

199

1    Q.   Did you see anything in writing about the
2  case before you approached Mr. Mejia to sign
3  Exhibit 2?
4    **A.   Are you talking about case reports or**
5  **news articles?**
6    Q.   Anything in writing.
7    **A.   I don't recall ever seeing anything in**
8  **writing.**
9    Q.   The other inventory report that
10 inventories Exhibit 2, who, to your best of your
11 recollection, filled that out?
12   **A.   Michael Stevens.**
13        MS. SUSLER:  Okay.  All right.  I don't
14 have any further questions.
15        MS. MORRISON:  I have no questions.
16        MR. BRENER:  No questions.
17        MR. ZIBULSKI:  No questions.
18        MS. BARBER:  I just have a little bit of
19 follow up.
20        EXAMINATION BY COUNSEL FOR DEFENDANT
21             CITY OF CHICAGO:
22 BY MS. BARBER:
23   Q.   Mr. Ruiz, were you aware during your time
24 as a detective with the Chicago Police Department

200

1  that you should keep an open mind when conducting
2  an investigation?
3    **A.   Yes.**
4         MS. BARBER:  Nothing further.
5         MR. ENGQUIST:  Okay.
6         MR. STARR:  Just a follow up to that.
7    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
8             DeLEON-REYES:
9  BY MR. STARR:
10   Q.   What does that mean, to keep an open mind
11 to you?
12   **A.   Oh, I'd say that example that I had given**
13 **you earlier, that the lady that claimed this guy**
14 **burglarized an apartment and you have to listen to**
15 **all of the evidence versus just say, hey, she's a**
16 **victim.  She's making a statement and we're going**
17 **with what she's saying.  You have to look at all**
18 **the evidence.  I believe that's what I take from**
19 **that for having an open a mind.  You listen to**
20 **everything before you make a decision.**
21   Q.   And as part of having an open mind and
22 looking at all the evidence, do you have to
23 document all the evidence you look at?
24   **A.   Yes.**

201

1          MS. BARBER:  Objection.  Form.
2          MR. STARR:  I don't have anything
3   further.
4          MR. ENGQUIST:  Okay.  We'll reserve.
5          MR. STARR:  Okay.  Thank you, sir.
6          THE WITNESS:  Thank you.
7          (Off the record at 2:19 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

202

1     CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2          I, Juan Mares, the officer before whom
3   the foregoing deposition was taken, do hereby
4   certify that said proceedings were electronically
5   recorded by me; and that I am neither counsel
6   for, related to, nor employed by any of the
7   parties to this case and have no interest,
8   financial or otherwise, in its outcome.
9          IN WITNESS WHEREOF, I have hereunto set
10  my hand and affixed my notarial seal this 29th
11  day of October 2020.
12
13
14  _____
15  Juan Mares, Notary Public
16  for the State of Illinois
17
18
19
20
21
22
23
24

203

1       CERTIFICATE OF TRANSCRIBER
2          I, Teresa R. Salazar, do hereby certify
3   that the foregoing transcript is a true and
4   correct record of the recorded proceedings; that
5   said proceedings were transcribed to the best of
6   my ability from the audio recording and
7   supporting information; and that I am neither
8   counsel for, related to, nor employed by any of
9   the parties to this case and have no interest,
10  financial or otherwise, in its outcome.
11
12
13  _____
14  Teresa R. Salazar
15  October 29, 2020
16
17
18
19
20
21
22
23
24

# A

**aberdeen**
2:5, 3:6
**abilities**
179:7
**ability**
17:2, 17:6,
17:10, 136:6,
203:6
**able**
43:18, 43:21,
44:15, 80:22,
179:9, 179:19,
180:4
**above**
122:21
**absolutely**
73:14, 100:9,
180:6
**abuse**
148:22
**abused**
177:22
**academy**
28:13, 28:14,
37:22, 38:9,
38:10, 39:9,
39:17, 40:6,
40:7, 41:8,
41:9, 41:11,
41:12, 41:14,
114:12, 114:13,
114:14, 142:4
**accents**
44:19
**accessed**
97:22
**accident**
8:1, 8:13
**accomplished**
30:6
**accuracy**
122:18
**accurate**
17:3, 17:6,
21:14, 112:10,
120:22, 139:14,

153:19, 153:23,
153:24, 162:15
**accused**
13:24, 14:3,
14:6, 14:10
**acronym**
46:4, 123:19,
124:4
**across**
132:22, 183:7,
187:15
**actions**
59:19
**active**
189:12, 189:16
**activity**
170:21
**actual**
34:4, 40:22,
41:5, 47:1,
60:17, 82:22,
83:17, 169:5,
188:15
**actually**
34:23, 40:3,
40:16, 41:20,
44:8, 62:21,
82:10, 86:15,
130:13, 131:24,
145:7, 189:2
**add**
31:20, 78:20,
106:11
**addition**
162:23
**additional**
25:13, 37:3,
49:12, 78:19,
84:1, 94:16,
130:2, 143:23,
144:6, 144:19
**address**
49:13, 49:18,
50:2, 84:3,
139:17, 168:1,
169:8, 169:24,
188:15
**administered**
127:10

**administrative**
186:21
**adriana**
91:8, 91:22,
92:12, 120:10,
121:2, 122:10,
124:6, 127:1,
127:5, 128:21,
129:19, 129:23,
139:20
**advance**
105:17
**advice**
108:16
**advised**
136:10, 136:18,
136:24
**affect**
17:2, 17:6,
17:9
**affected**
77:18
**affirmed**
7:4
**affixed**
202:10
**after**
24:23, 25:14,
30:3, 75:15,
79:4, 84:23,
88:15, 93:4,
94:17, 114:13,
114:14, 117:20,
118:2, 129:18,
134:15, 140:20,
145:17, 146:12,
153:12, 155:6,
158:21, 163:19,
175:6, 191:23,
193:23, 194:5,
194:7, 196:13,
196:15
**afternoon**
87:17, 119:7
**afternoons**
119:6, 119:8,
119:12, 189:6
**afterwards**
191:2, 196:20

**again**
31:18, 39:13,
53:1, 53:15,
60:22, 60:23,
76:23, 123:10,
130:13, 152:22,
153:13, 174:11,
181:23
**against**
96:18, 155:18,
175:21
**age**
42:21, 49:5,
49:6
**aggressive**
55:4
**agree**
73:11
**agreed**
127:2, 195:22
**agreement**
2:10
**ahead**
25:22, 42:5,
56:16, 72:22,
72:23, 79:16,
80:6, 110:19,
111:22, 120:18,
127:22, 128:1,
128:15, 145:16
**air**
62:9
**al**
1:8, 1:14
**alive**
141:11
**all**
18:3, 19:24,
21:10, 22:7,
23:10, 25:4,
31:20, 36:11,
37:15, 38:20,
45:7, 51:2,
52:10, 58:2,
63:16, 65:16,
67:12, 68:7,
68:20, 69:4,
69:12, 71:22,

76:20, 76:24,
77:15, 81:12,
87:19, 112:22,
114:6, 114:22,
133:7, 147:5,
150:4, 151:20,
151:23, 152:1,
152:6, 153:16,
159:9, 162:7,
164:6, 165:6,
171:3, 173:16,
173:17, 180:23,
183:7, 187:22,
193:6, 193:9,
197:14, 199:13,
200:15, 200:17,
200:22, 200:23
**allegations**
145:12, 147:16,
147:19, 147:22
**alleged**
158:17, 166:7
**alligator**
27:9
**allow**
138:9
**allowed**
56:5, 177:13
**allowing**
182:4
**almodovar**
156:21, 157:2
**along**
15:20, 26:22,
26:23, 43:1,
47:23, 62:1,
84:8, 151:15
**alongside**
149:19
**already**
81:24, 82:21,
143:12, 145:24,
158:18, 168:13,
192:22, 194:19,
195:3
**also**
19:4, 25:18,
34:15, 35:9,

36:7, 37:13,
40:2, 53:6,
59:11, 77:13,
78:11, 78:18,
78:22, 84:10,
86:22, 98:8,
123:12, 132:15,
134:18, 136:17,
137:23, 138:10,
146:12, 149:23,
150:10, 150:22,
151:2, 163:11,
176:21, 180:12,
187:12, 187:15,
187:21
**alternative**
13:6, 49:18,
50:2, 65:19,
66:3, 66:9,
66:18, 76:14,
76:20, 77:22,
126:14, 178:12
**although**
113:6
**always**
41:10, 48:19,
64:1, 115:22,
173:14
**amendment**
147:8
**amount**
119:20
**amounts**
167:6
**andrew**
104:8, 160:4
**angel**
157:15
**another**
26:3, 26:15,
33:4, 45:1,
53:20, 66:2,
72:2, 84:9,
124:14, 149:23,
150:2, 150:23,
172:6, 186:2,
198:19
**answer**
16:14, 18:19,

35:14, 48:6,
57:10, 74:5,
101:12, 108:10,
108:16, 109:4,
109:5, 128:4,
129:4, 162:4,
162:8
**answered**
127:22, 128:15,
144:22, 162:3,
177:1, 184:7,
184:8
**answers**
15:16, 18:14,
181:15
**antoinette**
3:11
**anybody**
23:10, 23:20,
36:2, 63:11,
79:1, 91:15,
91:18, 91:21,
92:8, 92:11,
107:11, 124:18,
132:16, 135:5,
135:7, 181:3,
198:4
**anyone**
19:1, 23:13,
55:20, 122:7,
134:4, 154:13,
159:1, 177:19
**anything**
8:1, 8:14,
15:20, 17:9,
17:13, 21:13,
40:21, 59:15,
74:17, 74:20,
77:18, 80:9,
84:1, 96:2,
96:14, 96:16,
99:23, 100:7,
100:20, 105:19,
106:4, 106:7,
107:20, 108:8,
111:12, 114:23,
115:1, 128:17,
131:2, 131:5,

142:12, 149:2,
158:6, 161:23,
162:18, 162:23,
163:10, 163:23,
165:13, 166:1,
166:13, 167:15,
167:19, 168:16,
169:7, 169:10,
177:11, 178:3,
191:11, 195:11,
197:10, 197:15,
198:4, 198:8,
198:21, 199:1,
199:6, 199:7,
201:2
**anytime**
30:15, 154:11
**anywhere**
28:24, 168:1,
171:11
**apartment**
93:6, 93:13,
95:3, 96:13,
96:21, 96:22,
97:1, 97:15,
97:17, 98:16,
99:1, 134:8,
137:9, 166:3,
166:6, 200:14
**apologize**
173:14
**apparently**
62:7, 62:13
**appears**
168:2
**applied**
58:9
**appreciate**
62:12, 120:2
**approached**
164:9, 165:2,
198:22, 199:2
**approved**
110:7, 114:24
**approving**
110:10, 140:5
**approximately**
10:4, 10:19,

22:23, 23:3,
23:6, 29:20,
30:23, 31:3,
133:23
**approximation**
94:2
**april**
83:4, 120:15,
121:19, 123:13,
123:14, 126:23,
129:5, 153:18,
174:2, 174:13,
174:21, 175:7,
175:13, 176:9,
186:6, 186:23,
188:16
**arcos**
158:10
**area**
28:21, 29:3,
29:4, 29:10,
30:22, 31:12,
31:22, 32:2,
32:3, 32:5,
32:11, 32:13,
32:15, 32:21,
33:13, 33:16,
34:8, 34:14,
34:15, 35:24,
68:2, 81:17,
85:1, 85:3,
97:8, 97:9,
102:6, 102:19,
103:22, 104:5,
117:5, 117:21,
117:22, 118:3,
118:19, 120:11,
121:24, 122:8,
126:11, 129:7,
129:21, 130:5,
130:17, 130:20,
132:6, 132:12,
133:21, 137:7,
137:8, 137:13,
137:14, 137:15,
143:4, 143:19,
149:13, 154:12,
163:6, 164:10,

166:7, 182:12,
186:21, 187:6,
187:17, 187:21,
188:16, 188:23,
189:8
**areas**
33:17, 40:1,
98:11, 98:13,
98:15
**argumentative**
145:16, 146:20,
197:4
**ariel**
157:21, 158:8
**arise**
71:14, 72:9
**armando**
156:5, 156:9
**around**
29:11, 124:19,
164:17
**arrange**
183:21
**arrest**
47:16, 51:12,
70:7, 124:15
**arrested**
62:7, 70:6,
124:19, 124:21,
146:17, 154:21,
155:22
**arrestee**
47:10, 47:15,
48:7, 53:20,
133:15
**arrestees**
56:8
**articles**
21:1, 199:5
**arturo**
1:5, 7:11,
88:20, 88:22,
89:1, 89:3,
89:6, 91:1,
91:16, 105:5,
157:21, 159:1,
159:6, 166:3,
174:4, 174:14,

174:22, 175:8,
175:14, 176:2,
176:11, 182:5
**asked**
8:19, 36:21,
49:24, 86:6,
92:6, 94:8,
96:1, 106:13,
107:4, 126:24,
127:13, 127:21,
128:14, 144:21,
144:23, 154:5,
161:4, 161:7,
162:2, 162:7,
162:11, 164:9,
166:11, 170:18,
176:24, 184:7,
184:8, 185:22,
190:7, 192:22
**asking**
9:1, 17:14,
23:12, 37:8,
37:10, 40:1,
40:21, 49:16,
49:21, 54:19,
109:2, 127:19,
128:12, 136:2,
174:18, 185:4
**aspect**
109:15
**assault**
148:22
**assigned**
30:17, 117:13,
137:6, 182:22
**assignment**
28:13, 29:6,
30:3, 99:5
**assignments**
27:22
**assist**
32:24, 35:7,
36:24, 197:14
**assisted**
33:10, 196:24
**assisting**
79:24, 157:23
**associate**
195:20

**associated**
195:15
**association**
189:9, 189:24,
190:3, 190:9
**assume**
171:5
**assumed**
167:17
**assumes**
110:16
**assuming**
171:21
**assumption**
103:12, 167:23
**attend**
27:1
**attended**
18:8
**attorney**
16:15, 17:24,
23:17, 67:8,
67:13, 73:15,
73:18, 101:2,
103:17, 103:24,
104:7, 104:10,
104:13, 105:13,
110:8, 110:10,
185:1, 185:5,
185:11, 185:16,
185:23, 186:2,
191:7, 192:9,
192:19, 192:21
**attorney's**
4:16, 63:19,
67:9, 108:15,
109:4
**attorneys**
16:10, 16:11,
22:13, 22:15,
22:17, 23:12,
23:15, 23:18,
100:22, 108:3,
114:24, 165:1
**audio**
203:6
**author**
113:9, 113:12

authority
167:11, 167:18,
167:24
authorization
137:2
authorized
169:12
authorizing
182:2
available
118:15
avenue
3:13, 27:3
aware
42:5, 56:4,
71:11, 72:6,
73:19, 76:7,
76:14, 105:4,
145:11, 146:1,
154:18, 155:2,
155:17, 155:21,
156:1, 156:8,
156:17, 156:24,
158:16, 175:23,
176:6, 176:15,
186:8, 188:1,
199:23
away
97:9

**B**

b-e-r-s-c-o-t-t
7:15
bachelor's
25:11, 26:5
back
20:17, 24:23,
29:9, 29:14,
30:18, 32:2,
32:3, 38:9,
43:17, 45:10,
45:18, 47:12,
48:2, 55:5,
59:17, 61:10,
61:11, 63:15,
77:12, 77:14,
85:1, 85:3,
88:11, 92:5,

93:17, 93:18,
95:1, 96:12,
106:12, 106:16,
117:5, 121:4,
123:8, 125:4,
125:8, 130:20,
142:22, 143:15,
144:18, 145:10,
150:5, 150:18,
150:22, 174:6,
178:21, 182:11,
183:2, 184:5,
186:6, 186:23,
188:16, 194:7,
198:7
back:
92:7
backwards
30:7
bad
70:14
bag
116:24, 117:7
ballpark
28:8, 28:10
banquet
189:18, 189:22
barber
5:11, 6:6,
14:12, 37:20,
38:24, 50:19,
53:11, 54:11,
54:18, 56:13,
57:21, 59:11,
60:14, 61:9,
61:14, 64:7,
69:10, 71:17,
72:5, 72:23,
74:8, 77:3,
77:11, 78:5,
80:12, 81:23,
106:21, 108:5,
108:9, 110:17,
111:22, 113:15,
114:10, 115:8,
118:21, 120:3,
120:5, 140:15,
142:8, 143:10,

149:4, 158:20,
176:24, 179:23,
181:18, 184:7,
188:19, 189:1,
193:6, 194:11,
195:17, 196:4,
197:4, 197:20,
199:18, 199:22,
200:4, 201:1
baroni
3:19
baseball
75:11
basic
100:2
basically
30:10, 32:18,
33:21, 70:6,
74:19, 86:12,
111:12, 124:19,
141:19, 150:19,
150:22, 150:24,
151:18, 153:5,
191:24
basis
21:21, 52:8,
53:8, 93:2,
103:14, 118:17,
119:3
bat
75:11
bates
115:13, 116:3,
116:5, 117:12,
160:19
bates-stamped
138:24, 139:1,
160:17
bathroom
92:2, 150:14,
177:14
bearded
68:19, 68:20
beat
187:13
became
39:14, 39:17,
50:15, 107:21,

146:1, 163:14
because
16:8, 47:9,
50:23, 52:7,
53:17, 54:3,
61:19, 62:15,
71:19, 73:11,
77:14, 78:11,
82:4, 82:13,
83:9, 88:10,
98:5, 107:4,
121:3, 121:10,
123:5, 130:8,
134:8, 142:11,
146:18, 155:5,
164:16, 168:24,
170:14, 175:3,
185:24, 188:6,
189:11, 195:24
bedroom
94:3, 94:4,
94:5, 94:9,
94:11, 97:2,
97:14, 97:20,
97:22, 97:24,
98:1, 98:3,
98:8, 98:18,
134:9
been
7:21, 8:1,
8:10, 9:11,
10:6, 10:22,
13:24, 14:3,
14:6, 14:22,
28:1, 28:2,
31:14, 39:19,
71:24, 95:13,
98:24, 99:21,
105:5, 114:1,
124:19, 133:15,
135:13, 136:17,
136:24, 144:7,
145:11, 145:22,
146:17, 150:15,
154:20, 158:17,
172:2, 176:17,
177:7, 177:10,
177:13, 177:21,

179:9, 180:4,
180:10, 182:13,
184:22, 189:5,
190:6, 191:13,
192:7, 192:22,
195:6, 195:21,
197:24, 198:15,
198:17, 198:18,
198:19
**before**
2:10, 10:6,
12:13, 28:18,
29:4, 29:18,
47:18, 51:9,
51:14, 52:6,
53:7, 68:1,
77:4, 93:24,
97:24, 122:4,
127:24, 128:3,
134:12, 143:5,
143:13, 152:17,
165:10, 177:5,
178:6, 180:16,
196:13, 198:22,
199:2, 200:20,
202:2
**beginning**
28:15
**behalf**
3:3, 3:10,
3:17, 4:3, 4:12,
5:3, 5:10
**behind**
149:21, 151:11
**being**
7:4, 12:9,
13:22, 14:20,
15:14, 21:17,
23:8, 26:20,
29:23, 37:2,
37:3, 42:8,
82:22, 84:9,
96:17, 97:18,
100:22, 101:18,
102:21, 104:5,
122:7, 122:14,
127:10, 129:24,
130:12, 133:10,

135:7, 136:10,
143:3, 166:6,
166:19, 167:9,
173:3, 176:12,
177:19, 180:11,
182:6, 190:20
**believe**
8:4, 9:24,
10:10, 11:12,
12:8, 12:18,
13:20, 18:21,
23:24, 28:4,
28:14, 35:20,
36:20, 37:21,
40:8, 41:6,
45:6, 46:6,
46:16, 46:22,
47:3, 51:7,
52:5, 55:3,
59:15, 67:6,
68:10, 69:21,
74:20, 75:21,
84:15, 85:1,
86:9, 87:1,
88:23, 89:4,
90:3, 94:4,
94:21, 94:24,
97:2, 98:3,
99:16, 102:11,
103:1, 103:23,
105:3, 105:18,
108:20, 112:7,
113:19, 115:10,
121:5, 123:2,
123:12, 123:17,
124:10, 124:12,
125:14, 126:3,
126:5, 126:6,
133:6, 135:2,
135:6, 136:14,
136:15, 136:19,
137:8, 137:9,
139:16, 142:16,
144:13, 145:3,
145:7, 145:17,
150:7, 151:23,
152:1, 152:2,
153:23, 153:24,

154:16, 162:8,
164:12, 179:10,
186:24, 189:4,
189:10, 191:6,
191:11, 192:9,
197:11, 200:18
**believed**
39:2, 52:11,
53:13, 58:6
**bell**
104:17
**bells**
156:6, 156:15,
156:22
**belmont**
27:2
**below**
115:19, 115:20,
136:12
**berscott**
1:17, 2:1, 6:3,
7:3, 7:14, 7:17,
17:24
**besides**
9:4, 13:18,
80:2, 83:22,
83:24, 84:22,
91:22, 92:12,
96:14, 107:12
**best**
12:2, 15:24,
18:15, 18:16,
45:10, 93:22,
136:6, 178:13,
199:10, 203:5
**better**
44:8, 47:23,
51:20, 80:15,
124:20, 142:10
**between**
34:4, 44:16,
116:5, 167:4
**biebel**
4:5
**bifurcate**
83:23
**big**
34:3, 149:14

**birthdate**
49:12, 49:17,
50:2
**bit**
11:17, 12:3,
32:16, 33:12,
82:18, 113:2,
164:17, 199:18
**black**
84:19, 116:15,
129:22, 171:12
**blessings**
195:23
**blind**
69:8
**block**
63:12
**blond**
68:21, 68:22,
68:23
**blood**
85:2, 92:18,
92:22, 116:18
**bloody**
145:2
**bolz**
3:11
**born**
27:12
**both**
14:19, 15:1,
23:22, 23:24,
32:10, 32:12,
34:17, 40:12,
41:9, 71:19,
172:21
**bottom**
115:12
**box**
115:18, 115:19,
141:18, 142:2
**break**
16:18, 16:22,
16:23, 92:2,
134:24
**brener**
4:14, 54:4,
65:23, 113:18,

199:16
**briefly**
154:5
**bring**
93:17, 145:9
**bringing**
68:6
**brought**
36:18, 37:4,
96:17, 121:23,
122:7
**brualdi**
4:12, 104:14,
160:8
**bruce**
159:17
**building**
62:5, 97:18,
134:8, 187:7,
187:23
**bunch**
125:21
**burglaries**
32:9, 32:18,
59:16, 106:16,
123:11, 123:16,
183:8
**burglarized**
200:14
**burglary**
52:14, 59:14,
62:1, 63:1,
63:22, 79:17,
113:3, 115:1,
183:13, 185:6
**burns**
5:5
**busy**
194:4

--- C ---

**calendar**
38:17
**california**
193:14
**call**
26:18, 26:21,
33:20, 78:24,

84:15, 87:8,
87:11, 108:20,
151:6
**called**
32:24, 36:22,
36:24, 39:2,
62:2, 62:4,
68:14, 85:5,
87:10, 89:9,
92:20, 100:19,
103:10, 106:14,
126:7, 145:8,
147:8, 152:9,
170:14, 170:16,
182:20, 182:21,
187:16, 195:2
**calling**
78:9, 84:15
**calls**
35:12, 57:8,
59:6, 61:6,
65:21, 73:1,
76:16, 78:23,
79:14, 80:4,
81:10, 87:3,
87:4, 87:6,
110:16, 113:18,
151:1
**came**
31:24, 32:2,
32:3, 42:23,
48:2, 62:22,
84:8, 84:16,
85:3, 85:24,
107:19, 108:18,
121:4, 126:4,
127:17, 128:21,
130:20, 145:18,
152:14, 163:22,
183:23, 185:5,
185:11, 185:16,
191:12, 191:14,
194:7, 196:1,
198:7
**campbell**
27:3
**campus**
24:17, 25:6,

25:7, 26:15,
26:16, 26:22,
26:24
**can't**
38:2, 38:7,
39:11, 40:8,
44:18, 59:1,
59:2, 65:9,
66:7, 66:19,
72:17, 78:9,
82:5, 87:9,
93:7, 95:9,
96:16, 99:22,
102:4, 107:8,
123:21, 130:13,
132:9, 132:15,
150:15, 163:9,
184:16, 194:22,
196:19
**cannot**
58:23, 104:2
**capabilities**
124:12
**capitelli**
115:20, 116:1
**car**
8:1, 8:13,
79:10, 81:17,
84:9, 111:11,
111:15, 133:5,
133:7
**card**
32:19, 192:14
**care**
47:16, 53:17
**career**
28:3, 30:6,
38:6, 134:10
**carrie**
23:19
**cars**
133:7
**cases**
8:9, 9:5, 9:20,
10:11, 14:18,
14:19, 21:20,
32:9, 32:19,
32:24, 33:2,

33:10, 35:6,
36:6, 36:13,
36:18, 36:19,
37:11, 53:19,
59:13, 59:14,
74:9, 78:13,
79:17, 101:23,
106:18, 107:5,
107:20, 110:9,
110:20, 110:21,
113:3, 145:18,
146:15, 147:9,
150:21, 152:10,
152:12, 152:20,
152:21, 152:24,
154:6, 154:19,
155:3, 163:23,
183:6, 183:9,
183:12, 183:13,
190:13, 194:21,
196:23
**catherine**
5:11
**ccsao**
138:24, 160:17
**center**
4:17
**certain**
39:11, 93:7,
100:18, 136:4,
136:16, 136:17
**certainly**
64:11
**certificate**
202:1, 203:1
**certify**
202:4, 203:2
**chain**
75:5, 75:10
**chance**
18:10, 22:10,
62:17
**change**
82:17, 167:3
**changed**
77:8, 77:16
**changes**
77:18

changing
77:15, 125:23
channel
146:5
characterize
43:13
charge
115:6
charged
183:9
charges
63:21, 96:17,
110:7, 110:11,
115:1, 185:5
chased
63:7, 63:12
check
32:19, 113:3,
183:12
chicago
1:14, 1:18,
2:7, 3:7, 3:14,
3:21, 4:9, 4:18,
5:7, 5:10, 5:14,
12:10, 12:14,
12:18, 14:1,
14:7, 14:19,
21:19, 27:5,
27:14, 27:20,
37:17, 42:9,
43:24, 45:9,
53:22, 54:14,
55:6, 57:12,
65:7, 67:16,
69:19, 72:15,
75:4, 106:8,
147:12, 199:21,
199:24
chief
30:1, 57:18,
57:22, 163:15,
187:18, 187:24,
190:16, 191:8
child
42:19, 94:10
child's
94:4, 94:5,
94:9, 97:2,

166:22
children
94:14, 103:9,
124:8, 127:17,
128:22
children's
84:13, 85:12
choose
75:22
circle
24:17, 25:7
circumstance
39:16, 40:18,
44:7, 50:7,
71:24, 72:9,
72:14
circumstances
48:16, 49:10,
49:15, 49:24,
55:15, 112:19,
113:1
city
1:14, 5:10,
27:12, 30:9,
30:11, 30:13,
192:20, 192:21,
199:21
city-wise
7:23
civil
7:19, 7:21,
7:24, 154:18,
155:3
civilian
44:7
claimed
200:13
clarification
151:6
clarity
14:17, 31:19
clarity's
85:4
clark
5:13
class
113:21, 113:24
classes
43:9

classroom
42:15
clear
8:17, 15:2,
18:20, 33:7,
40:12, 41:14,
48:6, 63:15,
70:8, 95:20,
96:8, 110:24,
111:18, 111:19,
112:9, 112:15,
114:18, 116:20,
136:4, 144:4,
162:17
cleared
146:13
clerk
186:22
close
28:5, 52:17,
110:24, 111:18,
111:20, 111:24,
112:9, 112:15,
114:19, 143:8,
144:4, 191:22
closer
31:16, 150:23
closet
84:17, 84:18,
98:2, 98:9,
168:13, 194:8
closing
51:11, 64:24,
71:2, 110:3,
110:4, 110:12,
112:24, 113:6
clothes
95:14, 96:12
clothing
94:21, 144:24,
145:1
coerced
147:16
coercing
14:6
collect
182:4
collected
46:1

college
24:14, 24:16,
25:14, 43:9
collins
121:22
column
141:17
come
28:5, 59:17,
154:14, 155:3,
155:4, 155:8,
183:6, 183:11,
185:1, 186:2,
196:2
comes
66:3, 82:13
comfortable
47:24, 185:24
coming
53:18, 57:14,
62:8, 96:12,
152:19, 193:16
command
29:24
commander
29:18, 29:19,
86:9, 145:22,
163:14, 193:14,
193:21, 194:13,
194:15
commit
145:14
committed
154:9, 155:18,
156:2, 156:9,
156:18, 157:1,
158:7, 191:2
common
140:12
communicate
15:18
communication
100:11
communications
101:14, 107:11
community
188:10
complain
107:18

**complaints**
12:15, 13:6, 13:10, 13:18
**complete**
137:7
**completed**
114:18
**completely**
151:8
**completion**
141:22
**computer**
47:9, 47:11, 48:9, 48:13, 59:20, 73:10, 80:19, 80:20, 125:3, 125:8
**computers**
73:12
**concern**
154:14
**concerned**
195:21
**concise**
18:18
**conclusion**
155:3, 155:4
**conclusions**
155:8
**conditioner**
62:9
**conditions**
17:1
**conduct**
39:18, 67:15, 67:19, 148:1, 183:16
**conducted**
60:4, 69:17, 120:10, 122:14, 126:17, 176:9
**conducting**
67:22, 200:1
**conference**
87:2
**confessed**
70:22
**confession**
71:1, 71:4,

**confessions**
14:7, 71:12
**confident**
62:19, 83:10
**conflicted**
72:1
**conflicts**
71:15
**confuse**
8:22
**confused**
49:20
**confusing**
179:24
**connelly**
5:12
**consensus**
145:9
**consent**
6:13, 18:12, 19:11, 19:12, 83:6, 83:8, 83:10, 83:17, 89:11, 127:14, 127:20, 128:13, 129:6, 134:11, 135:1, 135:13, 144:5, 144:11, 144:14, 153:14, 165:3, 165:19, 165:23, 166:12, 167:12, 167:18, 167:24, 168:2, 168:20, 169:1, 169:2, 171:1, 172:2, 172:8, 172:17, 181:17, 198:23
**considered**
64:5
**consist**
172:7
**consisted**
190:18
**conspire**
158:23, 159:3
**constantly**
38:8, 77:15,

71:8, 71:9
**constitutional**
136:11, 159:2
**consult**
40:20
**consulting**
136:15
**contact**
67:9, 78:16, 79:2, 96:3, 114:24
**contacted**
193:13
**context**
8:14
**contexts**
8:15
**continue**
145:10
**continued**
30:1, 62:20
**continuing**
38:4, 38:5
**contradictory**
72:6
**control**
30:9, 30:12, 137:10, 142:19
**conversation**
86:23, 87:7, 91:22, 92:12, 100:11, 127:8, 131:10, 143:14, 143:21, 191:24, 193:1, 193:6, 193:9, 193:10, 193:11, 193:23
**conversationally**
15:17
**conversations**
102:9, 102:23, 192:23, 193:2, 196:12
**convicted**
146:18, 154:21, 155:23
**conviction**
104:19

125:22
**cook**
4:13, 4:16
**copy**
48:19, 48:20, 74:12, 139:11, 139:12, 139:14, 160:14
**correct**
8:7, 14:20, 15:6, 15:14, 18:1, 19:1, 19:6, 20:1, 21:4, 22:2, 22:3, 30:24, 31:7, 31:9, 31:15, 34:7, 36:15, 50:13, 51:3, 59:24, 67:8, 69:1, 69:6, 71:22, 76:11, 98:6, 98:13, 103:3, 108:24, 109:24, 116:16, 117:16, 119:23, 137:19, 139:18, 139:24, 140:3, 153:23, 167:10, 170:10, 179:10, 179:14, 179:18, 180:6, 187:8, 187:9, 203:4
**correctly**
46:16, 51:11, 87:1, 149:21
**correspondence**
20:20
**corresponding**
27:23
**corridor**
98:1, 150:17
**could**
7:12, 27:19, 28:7, 30:13, 33:12, 36:14, 38:19, 43:10, 43:13, 46:2, 46:18, 53:21,

55:24, 56:10,
57:5, 59:19,
61:22, 63:1,
63:3, 77:23,
82:5, 82:11,
91:1, 91:4,
91:8, 91:12,
92:5, 92:21,
99:21, 100:8,
101:4, 101:7,
103:20, 106:4,
108:18, 112:21,
120:1, 123:13,
124:1, 124:8,
125:8, 125:15,
126:19, 127:15,
129:15, 132:12,
135:18, 135:23,
139:6, 151:18,
161:23, 167:21,
169:19, 176:19,
177:24, 178:21,
179:13, 180:1,
181:21, 182:3,
183:21, 188:1,
188:4, 198:15,
198:17, 198:18

**couldn't**
28:4, 38:16,
56:11, 70:16,
88:7, 88:16,
92:23, 97:12,
99:6, 99:19,
110:21, 118:22,
153:10, 178:9,
185:19, 187:16,
193:22, 194:16

**counsel**
7:7, 17:16,
17:17, 164:22,
199:20, 200:7,
202:5, 203:8

**county**
4:13, 4:16

**couple**
15:1, 30:20,
40:1, 43:16,
109:9, 109:18,

118:5

**course**
38:5, 41:5,
46:10, 63:21,
76:13, 78:4,
111:5, 131:1

**courses**
26:20

**court**
1:1, 13:9,
14:14, 15:12,
18:6, 18:8,
18:9, 18:11,
21:17, 21:18,
21:20, 25:5,
26:12, 74:10,
74:16, 74:21,
101:4, 101:7,
101:10, 104:21,
124:1, 129:2,
159:15, 166:16,
174:9, 202:1

**cousin**
62:3, 62:4

**cpd**
45:16

**cr**
12:16, 12:20,
12:21, 13:10,
13:15, 13:18

**created**
71:16, 72:1,
72:3, 72:10,
73:5

**creates**
71:15

**creating**
71:19

**credit**
32:19

**crib**
99:14, 99:15,
99:18, 100:1,
100:5

**crime**
15:9, 51:20,
63:5, 66:2,
70:22, 81:18,

93:1, 113:22,
119:17, 140:22

**crimes**
32:7, 32:8,
32:12, 32:15,
32:22, 33:9,
33:15, 33:19,
33:22, 33:24,
34:5, 34:9,
35:11, 35:21,
35:23, 36:1,
36:21, 37:12,
37:13, 47:8,
47:13, 54:3,
58:11, 59:16,
78:2, 78:6,
79:18, 85:23,
86:6, 86:20,
86:21, 87:5,
102:5, 106:12,
106:19, 110:21,
110:23, 111:18,
112:22, 113:11,
113:14, 114:8,
115:10, 117:21,
117:22, 118:1,
118:4, 118:7,
118:8, 118:20,
119:11, 119:15,
119:18, 123:4,
123:15, 124:24,
132:8, 132:10,
145:13, 150:1,
150:2, 150:11,
150:13, 153:6,
166:8, 166:19,
174:23, 175:15,
176:12, 182:6,
182:11, 182:13,
182:14, 182:16,
182:17, 182:20,
182:21, 183:1,
184:15, 185:3,
185:21, 186:6,
186:13, 186:14,
186:15, 186:17,
196:23, 197:12

**criminal**
18:22, 21:3,

22:1, 25:10,
25:15, 104:22,
105:11, 105:17,
194:5

**critical**
75:23

**cross**
161:4, 161:14

**crs**
13:12

**currently**
15:4, 27:17

**cushions**
167:4

**custody**
62:8, 75:5,
75:10, 75:18,
127:17, 128:21

---
**D**
---

**daffada**
3:19

**daley**
4:17

**dan**
159:24

**daniel**
102:13, 102:18,
102:24, 132:19

**dark**
96:23, 96:24,
97:19, 116:21

**data**
126:7

**database**
122:22, 122:24,
123:7, 124:9,
126:7

**databases**
123:5, 125:9

**date**
9:18, 25:18,
28:8, 122:18,
129:8, 153:18,
192:10, 193:22

**dates**
26:10, 28:4,
28:10

dating
62:14, 62:15
daughter
62:13, 62:14,
62:16
dave
104:1, 160:10
day
10:23, 53:14,
53:17, 62:20,
78:13, 86:3,
87:13, 89:21,
92:19, 94:24,
95:1, 95:12,
97:3, 100:16,
100:17, 100:19,
101:17, 130:14,
198:13, 202:11
days
79:3, 79:4,
100:14, 119:1,
186:19
death
197:6
deceased
141:12
decided
42:21, 43:5,
84:23, 84:24,
93:16, 93:21
decision
200:20
defendant
3:17, 5:3,
5:10, 7:22, 8:2,
8:4, 8:10, 8:14,
9:6, 9:9, 199:20
defendants
1:9, 1:15, 4:3,
4:12
defense
108:7, 108:12
defer
48:8, 121:17
defined
82:21
definitely
66:6, 73:9,

89:2, 113:4,
135:3, 179:15
definition
54:21, 64:9,
64:10
degree
25:9, 25:11,
25:17, 25:23,
25:24, 26:1,
26:4, 26:5,
26:8, 187:1
deleon-reyes
1:5, 3:3, 7:8,
200:8
delicate
113:2
denote
154:1
denoting
138:12
dep
108:23
department
12:10, 12:14,
25:2, 25:19,
26:9, 27:15,
27:21, 38:21,
45:10, 53:23,
75:5, 137:5,
188:14, 199:24
department's
147:12
dependent
38:21
depending
48:17, 78:13,
79:21, 80:19,
118:24
depends
81:12
deposed
9:11, 10:11,
11:1, 14:18,
14:20, 14:22,
191:16
deposition
1:17, 2:1,
6:11, 7:17,

10:20, 11:9,
15:9, 15:18,
16:9, 18:5,
18:6, 23:11,
24:4, 98:6,
190:18, 191:15,
192:11, 202:3
depositions
9:14, 14:24,
190:12
deprive
158:24
deputy
30:1, 30:4,
30:8, 57:18,
57:22, 163:15,
187:17, 187:24,
190:16, 190:17,
191:8
describe
54:15, 137:11
described
49:19, 85:2,
136:12, 152:8
describing
150:19
description
78:18, 98:7
designated
57:15
designation
137:16
designed
137:15
desk
75:14, 118:9,
118:12, 118:15,
118:16, 140:5,
149:19, 149:21,
149:24, 151:9,
183:7, 187:2
desks
33:23, 33:24,
34:6, 150:3,
150:4, 181:9
destroy
77:23
detailed
149:14

details
27:22, 40:17
detection
39:22
detective
29:2, 29:9,
31:5, 31:12,
31:22, 32:5,
32:16, 32:22,
33:8, 33:15,
35:20, 39:21,
39:22, 41:12,
47:6, 47:22,
52:11, 53:4,
61:2, 62:1,
64:19, 65:8,
66:1, 68:2,
75:13, 78:2,
78:6, 79:11,
80:1, 84:8,
85:7, 93:18,
96:11, 101:14,
101:20, 101:23,
102:2, 102:5,
106:12, 110:23,
112:16, 112:18,
112:23, 113:7,
114:16, 118:2,
118:4, 118:7,
118:8, 120:9,
121:1, 121:13,
121:22, 122:22,
125:1, 126:24,
127:12, 127:13,
128:12, 129:19,
129:20, 131:15,
132:10, 137:3,
137:14, 137:23,
138:2, 139:22,
139:24, 142:6,
142:14, 142:15,
143:1, 143:6,
143:15, 143:16,
149:15, 149:20,
152:24, 154:12,
161:5, 161:7,
165:14, 170:6,
177:22, 183:2,

187:2, 189:3,
189:23, 190:4,
190:7, 193:24,
194:8, 194:20,
197:13, 198:2,
198:19, 199:24
**detective's**
20:5, 111:19
**detectives**
33:16, 34:9,
35:22, 36:8,
36:10, 37:3,
39:14, 39:17,
51:3, 51:20,
76:20, 86:1,
86:6, 86:20,
113:23, 114:4,
114:6, 117:22,
118:19, 119:11,
119:14, 119:17,
119:18, 120:11,
121:24, 127:15,
129:7, 129:21,
132:6, 132:11,
153:4, 182:22,
184:3, 184:14,
184:21, 187:14,
188:24
**determination**
63:20, 110:12
**determine**
141:24, 142:7,
165:18, 165:22,
178:4
**devry**
26:4, 26:5,
26:13, 26:24,
27:1
**dialect**
44:16, 44:17,
44:24, 45:1,
45:5
**dickinson**
4:3
**dictionary**
179:2
**difference**
44:16

**different**
15:18, 19:24,
30:13, 32:12,
33:10, 37:23,
58:1, 72:2,
113:13, 123:5,
124:21, 125:22,
126:7, 126:8,
144:3, 186:3
**differs**
111:18
**direct**
55:3, 79:24,
96:3
**disbanded**
189:13
**discern**
44:15
**disciplinary**
12:15
**discipline**
12:19, 13:6,
13:17, 147:12
**disclose**
66:8
**discovered**
93:24
**discrete**
40:1
**discuss**
105:22, 106:1,
108:5
**discussed**
14:11, 108:8,
162:18
**discussing**
165:17
**discussions**
164:4
**dispose**
142:20, 142:23
**distance**
97:9
**distinction**
39:13
**district**
1:1, 1:2, 28:6,
28:14, 28:16,

28:18, 28:19,
28:24, 29:2,
29:6, 29:14,
29:16, 29:19,
29:22, 29:24,
30:2, 30:3,
52:13, 137:16,
137:17, 145:24,
164:8, 187:12,
187:20, 187:23,
188:4, 188:9,
188:16, 191:21,
193:13, 193:20,
194:14
**districts**
188:11
**dividing**
33:20
**division**
1:3, 29:10,
33:9, 34:4,
39:21, 41:12,
47:8, 75:13,
103:2, 103:4,
103:15, 113:14,
137:14, 149:20,
182:19, 193:24
**document**
59:5, 59:23,
60:3, 60:7,
60:11, 60:24,
66:17, 66:21,
67:3, 69:17,
69:23, 70:1,
70:18, 70:24,
71:3, 72:21,
73:3, 76:10,
81:2, 82:15,
83:16, 88:15,
109:12, 109:20,
110:5, 110:14,
121:11, 138:19,
139:4, 173:18,
173:22, 174:1,
174:12, 200:23
**documentation**
59:23, 73:7
**documented**
15:14, 169:23,

176:8
**documenting**
41:1, 80:2,
170:8
**documents**
22:9, 40:19,
82:23, 83:24,
90:24, 91:3,
91:7, 91:11,
144:1, 144:4,
144:8, 163:2,
172:14, 173:3
**dogs**
135:8, 135:9
**doing**
52:12, 57:23,
59:13, 76:5,
98:21, 99:5,
121:15, 163:12,
189:13
**dollars**
183:10
**don**
9:24
**done**
47:18, 51:9,
51:14, 51:23,
52:6, 63:11,
78:12, 89:10,
96:9, 135:2,
164:13, 164:16
**don't**
33:20, 97:16,
127:7, 163:9,
189:5, 199:13,
201:2
**door**
84:17, 134:4,
150:23, 151:3,
151:11, 152:3
**double**
19:22, 69:7,
93:3, 119:19
**doubt**
31:21, 105:21,
120:21, 122:17,
129:8, 129:9,
180:15

**doubting**
63:6
**down**
15:13, 29:21,
32:4, 41:17,
46:9, 46:13,
47:5, 47:12,
50:4, 63:7,
63:8, 84:5,
117:16, 137:19,
150:12, 193:16
**downstairs**
151:19
**drastically**
77:7
**drive**
5:6
**driver**
44:4
**drove**
84:6, 84:9,
133:2, 177:5
**dues**
189:20
**duly**
7:4
**during**
20:18, 28:2,
34:17, 38:5,
45:17, 45:20,
45:23, 46:10,
55:6, 58:13,
72:15, 78:4,
87:8, 97:11,
100:12, 100:22,
101:15, 102:7,
102:19, 103:22,
104:5, 107:6,
118:18, 122:8,
156:2, 156:9,
156:18, 157:1,
158:7, 175:12,
189:7, 199:23
**duties**
32:17
**duty**
115:7

**E**

**each**
22:22, 28:6,

78:11, 188:8
**earlier**
36:12, 41:15,
51:4, 86:3,
86:4, 88:7,
171:17, 200:13
**early**
30:23, 47:22
**ears**
11:21
**easier**
44:23
**eastern**
1:3
**easy**
184:22
**eat**
177:11
**education**
25:13, 38:5
**edward**
4:14
**effort**
76:18
**eight**
13:3
**either**
7:22, 8:2, 9:5,
9:11, 39:16,
40:6, 80:18,
95:12, 97:11,
108:9, 114:1,
146:5, 154:12,
159:5, 175:24
**elderly**
152:16
**electrical**
26:3
**electronically**
202:4
**else**
8:14, 17:9,
23:11, 23:20,
36:2, 63:11,
74:17, 78:14,
80:9, 86:18,
96:2, 96:14,
99:23, 100:20,

106:7, 106:14,
107:11, 112:20,
132:16, 135:5,
135:7, 155:6,
159:1, 177:19,
179:16, 181:3,
186:1, 188:1,
189:5, 198:14
**else's**
19:2, 80:15
**email**
20:22
**employed**
27:17, 202:6,
203:8
**employee**
12:10, 12:19
**employment**
27:20
**encompass**
32:10
**encounter**
65:13, 140:18,
181:10
**encountered**
64:21, 65:17,
176:22
**encountering**
181:11
**end**
28:15, 33:22,
51:9, 51:14,
52:6, 53:7,
67:7, 97:11,
110:24, 150:17,
151:9, 181:21,
190:24
**ended**
85:19
**ending**
52:17
**engaged**
170:22
**engineer**
26:2
**engineering**
25:23, 26:3
**english**
42:22, 42:24,

43:6, 43:17,
44:4, 44:9,
88:5, 88:12
**enquist**
4:6, 8:17,
12:2, 14:13,
14:16, 15:11,
17:11, 17:21,
17:24, 18:2,
35:12, 35:15,
50:20, 56:2,
56:16, 57:7,
59:6, 59:10,
61:5, 65:21,
66:5, 66:10,
67:23, 68:3,
72:22, 72:24,
76:16, 79:14,
79:20, 80:4,
80:11, 81:10,
81:21, 82:9,
106:23, 108:4,
108:6, 108:13,
108:19, 108:21,
109:2, 110:15,
110:18, 113:17,
120:14, 120:17,
125:4, 125:7,
127:21, 128:1,
128:4, 128:8,
128:14, 144:21,
145:15, 146:19,
154:22, 158:3,
161:11, 161:15,
161:18, 162:2,
163:8, 173:4,
174:16, 175:1,
175:10, 175:16,
176:3, 176:13,
177:2, 179:21,
188:20, 200:5,
201:4
**enough**
41:13, 50:6,
52:24, 83:10,
109:21
**entered**
170:23, 173:3

**entire**
33:8, 69:11, 93:6, 93:13, 137:14, 162:7, 173:21

**entrance**
149:20

**entry**
116:10, 128:17

**entryway**
97:15

**environment**
33:13

**ernest**
101:15

**erps**
142:22

**esquire**
3:4, 3:18, 4:6, 5:4, 5:11

**esquires**
3:11, 4:15

**essentially**
15:9

**estimate**
13:1, 28:5

**et**
1:8, 1:14

**evaluations**
13:15

**even**
28:5, 28:7, 52:22, 57:22, 63:3, 82:5, 90:19, 90:20, 97:16, 131:7, 155:10, 158:21, 178:7, 183:11, 189:19, 198:12

**evening**
143:22

**evenings**
87:17

**evenly**
150:10

**event**
70:14

**events**
37:8

**eventually**
154:21, 155:23, 165:8

**ever**
12:15, 12:21, 14:3, 14:6, 32:22, 35:6, 41:20, 41:23, 43:23, 49:10, 52:21, 54:13, 55:6, 55:10, 55:19, 56:21, 56:23, 56:24, 57:1, 58:13, 58:14, 58:17, 67:15, 70:21, 71:7, 71:24, 72:9, 72:12, 72:14, 73:22, 74:2, 74:22, 75:22, 76:2, 77:22, 78:3, 81:2, 88:22, 88:24, 89:3, 89:5, 90:2, 90:4, 90:14, 90:17, 90:18, 90:19, 91:15, 91:18, 91:21, 92:8, 92:11, 101:1, 102:23, 105:16, 105:22, 106:1, 107:10, 107:14, 107:16, 122:4, 123:7, 127:5, 131:18, 132:2, 134:10, 134:14, 134:23, 142:24, 148:1, 148:4, 148:7, 148:11, 148:15, 148:18, 148:21, 154:14, 158:23, 159:4, 159:11, 159:17, 159:21, 163:15, 164:9, 168:19, 169:22, 184:24, 185:5,

185:15, 190:3, 190:6, 197:5, 199:7

**every**
144:15, 180:2

**everybody**
92:2, 99:5

**everyone**
133:5, 165:19, 165:23

**everything**
15:13, 18:4, 30:19, 37:23, 47:11, 50:24, 64:22, 65:1, 78:14, 98:23, 155:6, 158:4, 200:20

**evidence**
14:1, 14:4, 40:5, 40:6, 64:5, 64:12, 64:17, 64:20, 65:4, 65:13, 65:17, 67:12, 67:13, 75:6, 75:18, 75:23, 76:7, 76:11, 93:17, 94:16, 116:13, 117:2, 127:16, 128:21, 140:13, 141:21, 142:20, 142:23, 142:24, 143:15, 144:20, 147:19, 147:23, 159:5, 159:8, 159:12, 159:18, 159:21, 173:10, 174:3, 174:14, 174:18, 174:20, 175:4, 175:7, 175:12, 176:1, 181:21, 182:4, 200:15, 200:18, 200:22, 200:23

**exact**
12:24, 68:11,

115:23, 151:14

**exactly**
24:21, 26:18, 29:1, 38:7, 70:9, 71:18, 88:18, 97:8, 109:22, 110:22, 114:21, 116:22, 123:1, 123:10, 124:11, 125:20, 126:8, 126:9, 136:13, 150:16, 194:16, 196:8

**examination**
6:3, 7:7, 127:2, 127:10, 161:4, 161:14, 164:22, 199:20, 200:7

**examined**
7:6

**example**
40:18, 50:2, 50:7, 52:12, 61:24, 64:3, 64:15, 154:24, 200:12

**exams**
57:17

**exculpatory**
64:5, 64:10, 64:11, 64:17, 64:20, 65:3, 65:13, 65:17, 65:20, 66:4, 67:12, 159:4, 159:8, 159:12, 159:18

**excuse**
18:11, 150:21

**execute**
169:11

**executed**
171:1

**execution**
168:20

**exhaust**
61:3

exhibit
6:11, 6:12,
6:13, 6:14,
6:15, 109:9,
109:13, 135:11,
135:15, 138:20,
138:21, 138:23,
138:24, 139:1,
153:13, 160:16,
160:17, 160:21,
169:5, 169:10,
169:12, 171:3,
171:6, 171:11,
171:23, 172:4,
172:5, 172:10,
172:16, 172:18,
172:24, 173:4,
173:6, 173:7,
173:9, 178:5,
180:8, 181:1,
181:6, 199:3,
199:10
exist
163:2
exit
192:1
exonerated
105:5, 146:17,
154:20
exoneration
197:9
exonerations
154:7, 194:20,
195:4
expect
109:11
expectation
99:3
explain
40:15, 46:2,
50:17, 61:22,
61:24, 66:22,
78:12, 83:10,
173:14, 179:8,
179:16, 179:20,
180:4
explanation
59:18

expound
32:16
express
154:14
extended
51:2
extent
69:13, 187:3

F

fabricated
147:19
face
63:9, 63:14,
64:4, 64:16,
102:4, 103:20,
104:3
facing
149:22, 150:6
fact
51:11, 64:15,
70:7, 72:21,
73:7, 78:16,
94:8, 101:16,
125:11, 133:14,
142:13, 148:24,
158:22, 171:12,
176:8, 178:8,
178:17, 183:22,
192:4
fair
41:13, 44:6,
50:6, 52:24,
82:24, 167:17,
188:17
fairly
57:18
false
14:7
falsifying
14:1
familiar
9:4, 9:8,
14:23, 20:7,
30:8, 34:8,
34:12, 41:22,
45:2, 48:24,
53:22, 54:2,

54:7, 57:11,
69:7, 75:4,
77:17, 101:20,
102:3, 102:13,
103:19, 104:2,
109:20, 110:20,
116:1, 126:21,
138:2, 138:7,
139:4, 157:24,
158:11, 173:16
familiarize
109:12
family
183:21
far
35:5, 111:9,
112:2, 168:15,
175:11, 179:12
fashion
189:19
father
42:23, 44:12
fault
8:24, 136:2
favor
11:16
federal
7:18
feel
16:23, 18:13,
45:13, 60:2,
65:5, 66:13
feeling
47:24
fell
167:3
felonies
183:14
felony
47:20, 73:17,
74:19, 75:1,
183:3, 183:8,
185:3
felt
52:10, 62:14
few
52:16, 132:4,
164:16

field
48:11, 48:20,
50:9
fifth
147:8, 149:1
file
47:20, 48:22,
50:15, 73:16,
73:17, 74:2,
74:3, 74:4,
74:19, 75:1,
115:2, 125:12,
169:4
files
74:9, 74:18,
74:23
fill
43:16, 81:2,
141:4
filled
30:4, 141:6,
153:17, 172:19,
172:21, 173:9,
178:16, 199:11
fillers
68:14, 68:17,
68:23, 69:4
final
71:6, 110:11
finalized
110:7
financial
202:8, 203:10
find
62:3, 73:10,
165:9, 165:11,
167:15, 168:16,
174:18, 174:20,
175:4, 175:12,
175:18, 175:19,
177:4, 179:15,
184:20, 184:22,
197:1
finding
89:10
fine
28:11
finish
24:24, 47:19,

52:18, 52:20,
127:23, 128:5
**finished**
25:3, 48:4,
53:7, 53:21
**firm**
4:7
**first**
7:4, 9:21,
22:24, 23:2,
28:13, 30:22,
35:20, 51:22,
52:10, 89:16,
120:10, 126:20,
126:23, 136:14,
137:11, 145:5,
145:18, 145:20,
151:19, 155:5,
162:7, 163:17,
165:6, 173:21,
176:22, 181:10,
182:12, 194:18,
194:23
**fish**
69:13
**fits**
114:21
**five**
10:9, 28:24,
31:3, 31:8,
31:17, 118:24,
119:3, 149:8
**flashed**
92:20
**flashlight**
92:20, 116:21
**floor**
2:6, 3:6, 3:13,
33:18, 33:22,
33:23, 34:1,
34:2, 35:24,
36:3, 51:21,
101:17, 101:19,
102:6, 102:22,
118:24, 119:4,
137:11, 143:3,
149:13, 149:17,
149:18, 149:22,

150:6, 151:19,
162:7, 173:21,
182:14, 187:15,
189:6
**flores**
157:17
**fluent**
43:11, 43:12,
47:24, 179:4,
184:3, 185:24
**focusing**
42:4
**folder**
74:14
**folks**
187:22
**follow**
61:17, 78:11,
80:3, 82:6,
82:8, 196:19,
197:21, 199:19,
200:6
**followed**
51:16
**follows**
7:6, 124:18
**foregoing**
202:3, 203:3
**forget**
8:18, 46:4,
152:11, 152:21
**forgive**
141:10, 156:12,
172:12, 178:20,
192:22
**form**
14:12, 15:11,
17:11, 18:12,
19:12, 20:22,
37:20, 38:23,
46:8, 46:19,
53:11, 54:11,
55:2, 56:2,
56:13, 57:7,
57:21, 59:12,
60:14, 61:5,
64:7, 66:10,
67:23, 71:3,

71:17, 72:24,
77:4, 78:5,
79:16, 81:1,
81:10, 81:23,
83:17, 88:10,
89:11, 106:22,
110:15, 111:22,
113:15, 114:10,
115:8, 115:12,
115:16, 115:23,
127:14, 128:13,
129:7, 134:11,
135:13, 137:18,
140:15, 141:4,
142:8, 142:21,
143:10, 144:11,
144:15, 145:15,
146:19, 149:4,
153:14, 154:22,
158:3, 158:21,
163:8, 169:5,
171:24, 172:2,
172:6, 172:9,
172:17, 174:16,
175:2, 175:16,
176:3, 176:13,
178:8, 178:9,
178:16, 179:23,
194:11, 195:17,
198:23, 201:1
**formal**
43:8, 114:3
**formed**
93:1
**forms**
88:2, 115:22,
134:15, 170:3,
170:23, 171:18,
171:21, 173:17
**forth**
28:6, 47:12
**found**
21:18, 62:10,
85:7, 89:14,
89:19, 93:16,
94:17, 94:20,
94:22, 95:14,
96:12, 98:19,

116:13, 144:20,
144:24, 145:8,
168:17, 170:24,
174:14, 175:7,
175:24, 176:10,
194:8
**foundation**
50:19, 54:4,
64:8, 110:17,
113:16, 114:11,
115:9, 118:21,
143:11, 174:17,
175:1, 175:17,
176:4, 176:14,
181:18, 188:19,
189:1, 196:4,
197:20
**four**
10:9, 41:14,
68:9, 68:12,
113:20, 119:3,
124:21
**four-hour**
38:13, 39:5,
41:18
**four-month**
37:21
**foxx**
4:14
**framing**
145:13
**freddie**
187:3
**free**
16:23, 18:13,
45:13
**frequent**
21:20
**frequently**
38:15, 44:2
**fresh**
52:21
**front**
75:13, 130:23,
149:19, 150:4,
151:9, 178:8
**full**
129:18, 164:7

**function**
187:7
**functions**
187:10
**funny**
142:12
**further**
81:9, 81:19,
90:9, 90:24,
91:3, 91:7,
91:11, 137:18,
145:10, 150:12,
163:3, 199:14,
200:4, 200:7,
201:3
**fusco**
5:12

---
G
---

**gabriel**
1:11, 90:11,
90:14, 91:4,
91:19, 92:9,
105:4, 158:24,
159:5, 166:2,
174:4, 174:15,
174:22, 175:8,
175:14, 176:1,
176:11, 182:5
**gang**
113:22, 114:3,
114:7
**gangway**
63:8
**gas**
152:15
**gather**
78:22
**gave**
37:3, 50:1,
64:15, 78:10,
112:3, 124:7,
142:13, 153:8
**gears**
82:17
**geeze**
128:8, 128:9
**general**
28:10, 45:8,

46:5, 46:6,
46:7, 46:23,
47:2, 50:4,
56:14, 57:16,
57:24, 58:1,
58:3, 58:6,
58:8, 58:9,
60:12, 60:20,
64:23, 67:20,
74:13, 75:20,
78:7, 147:2,
147:4, 147:5,
149:12
**generally**
12:17, 16:13,
40:2, 45:18,
48:17, 57:11,
67:21, 68:5,
68:24, 87:19,
105:23, 109:16,
109:20, 111:4,
112:17, 118:18,
119:12, 188:14
**generate**
130:1
**generated**
176:16, 176:17,
176:19, 176:20
**getting**
29:4, 47:23,
52:17, 79:7,
134:6, 134:15
**give**
15:16, 15:19,
17:6, 17:10,
18:18, 27:19,
28:7, 50:6,
52:12, 64:9,
137:2, 167:18,
167:24, 184:4
**given**
14:22, 15:5,
67:1, 78:8,
79:5, 81:15,
119:5, 125:24,
126:2, 142:14,
177:10, 190:12,
195:18, 197:6,

200:12
**giving**
48:18, 195:23
**glanced**
109:23
**glitched**
174:10
**go**
11:6, 15:1,
24:8, 24:14,
24:16, 25:22,
30:18, 38:19,
41:3, 43:17,
56:16, 63:1,
70:13, 70:15,
70:17, 72:16,
72:22, 72:23,
74:10, 74:16,
75:11, 79:16,
80:5, 80:18,
82:11, 84:24,
94:8, 110:14,
110:18, 111:22,
117:1, 120:18,
124:13, 125:3,
125:8, 127:22,
128:1, 128:15,
144:17, 145:16,
161:7, 166:22,
177:14, 183:20
**god**
152:13, 153:10
**goes**
71:5, 75:13,
75:14, 77:12,
77:14, 124:5
**going**
11:3, 12:12,
23:4, 40:23,
42:5, 43:5,
51:22, 53:19,
54:18, 57:24,
59:11, 63:16,
69:10, 73:23,
82:17, 84:3,
85:19, 94:7,
97:24, 98:17,
106:21, 107:1,

108:7, 108:8,
108:15, 109:9,
134:9, 135:10,
138:19, 138:20,
149:7, 157:4,
158:20, 160:14,
160:16, 160:24,
161:1, 161:15,
163:10, 164:17,
165:4, 165:24,
175:3, 188:11,
189:22, 192:2,
195:3, 200:16
**goings**
30:11
**golden**
23:19
**gomez**
8:18, 9:4, 9:9,
33:5, 37:14,
55:12, 106:17,
108:22, 148:10,
157:21, 158:8,
196:22, 197:21
**gone**
95:3, 134:21,
145:23, 155:3
**good**
7:10, 27:19,
42:23, 70:4,
70:10
**goodness**
18:9, 26:17
**gosh**
193:20
**gotten**
134:11
**govern**
54:8
**governed**
45:22, 61:12,
65:7, 66:17,
75:20
**governing**
56:10, 57:5,
58:22
**governs**
46:24

gpr
20:7, 46:1,
46:3, 46:15,
46:17, 46:19,
46:20, 49:11,
49:14, 49:17,
49:23, 50:1,
50:5, 50:8,
50:13, 59:21,
73:23
gprs
20:9, 20:11,
46:12, 47:21,
50:18, 59:22
graduate
24:6, 24:12,
24:18, 24:20
graduated
24:10, 28:9,
113:21
ground
14:24
group
36:21, 187:19,
188:9
groupings
36:9
grow
27:7, 42:16
growing
42:20
guess
38:12, 65:15,
87:16, 155:6,
172:23, 174:19,
177:4, 192:18,
193:15, 195:12
guevara
1:8, 3:17,
34:12, 34:14,
34:21, 36:14,
45:4, 99:21,
100:12, 105:16,
120:9, 121:1,
121:13, 126:24,
127:13, 128:12,
129:19, 129:23,
130:21, 131:1,

131:3, 131:11,
132:3, 132:17,
132:18, 141:2,
142:14, 143:6,
147:1, 147:13,
147:16, 147:19,
147:22, 147:23,
148:1, 148:4,
148:7, 148:12,
148:15, 148:18,
148:21, 149:1,
154:9, 154:15,
154:19, 154:21,
155:18, 155:22,
156:2, 156:18,
157:1, 158:7,
158:17, 159:11,
161:5, 161:8,
163:16, 164:11,
165:13, 177:22,
178:12, 180:24,
182:23, 186:10,
189:3, 189:23,
190:4, 190:8,
192:24, 193:3,
196:13, 198:3
guevara's
145:12, 146:18,
146:22, 154:6,
163:6, 194:21
guilty
174:15, 174:22,
175:8, 175:14,
176:2, 176:11
guy
63:7, 63:12,
147:6, 200:13
guys
108:11, 116:23,
119:22, 145:4,
186:19, 187:20
gym
84:19, 85:1,
85:3
gypsies
152:22
gypsy
150:21, 152:9

**H**

hair
68:21, 68:22
half
23:1, 28:17,
29:4, 29:23,
31:5, 31:6,
31:22, 42:21,
63:12
halfway
117:16
hall
132:22, 187:15
hallway
84:17, 96:23,
97:13, 97:19,
97:21, 98:1,
98:2, 98:7,
98:8, 98:19,
116:21, 130:15,
194:8
halvorsen
101:15, 101:21,
101:24, 140:3,
141:2, 142:15,
142:22, 143:1,
159:17, 198:11,
198:12
hand
184:4, 202:10
handcuffed
133:12, 133:14,
133:20
handle
35:19, 36:6,
117:4
handled
35:18, 59:15,
152:9, 152:21,
152:23, 152:24,
183:12, 186:3
handles
75:15
handling
40:5, 40:6
hands
58:14, 58:18,

84:19, 164:7
handwriting
153:15
hang
164:20
happen
20:24, 38:15,
187:10
happened
63:13, 70:12,
73:8, 118:15,
140:19, 163:23,
169:8, 169:11,
169:15, 169:24,
178:14, 182:8,
183:7, 190:21,
196:17
happening
123:18
happens
140:16
hard
11:17, 83:23,
118:10, 197:11
harder
74:5
harvey
4:4
he'll
11:22
head
185:11
headed
193:14
hear
11:18, 76:2,
122:4, 141:15,
159:17, 159:21,
162:4, 163:15
heard
27:9, 41:23,
72:14, 73:22,
74:2, 74:3,
84:14, 107:22,
122:5, 145:20,
179:17, 190:24,
194:20, 194:22
hearing
10:24, 12:1,

86:15, 105:1

**hearings**
104:19

**heater**
36:22, 37:11,
86:5, 86:8,
107:5, 170:13,
196:22

**heather**
104:14, 160:8

**hector**
132:15, 184:9,
186:12, 189:4

**held**
2:1, 87:6,
151:1, 166:6,
177:7

**help**
86:7, 86:13,
106:5, 106:13,
163:2

**helped**
105:14, 106:15

**henry**
157:19

**here**
23:12, 27:21,
31:19, 33:3,
42:23, 49:20,
65:24, 67:24,
83:2, 108:23,
112:14, 121:9,
132:4, 138:10,
138:19, 139:17,
139:22, 140:9,
154:23, 164:16,
172:8, 180:9

**here's**
79:10, 97:24,
98:1

**hereby**
202:3, 203:2

**hereunto**
202:9

**hey**
193:16, 196:5,
200:15

**hidden**
99:17, 99:24,

100:5, 150:20

**hide**
99:16

**high**
13:1, 24:6,
24:8, 24:22,
27:5, 28:9,
30:16, 37:2,
86:5

**high-profile**
36:23, 86:13,
106:18

**himself**
83:12, 88:9,
178:11

**hispanic**
188:9

**hispanics**
188:12, 188:13

**history**
12:13

**hold**
87:2, 87:4,
140:2, 141:1,
141:18, 142:1

**holding**
172:4, 172:10

**home**
82:11, 97:17,
107:19, 134:7,
165:20, 177:6,
182:9

**homicide**
33:10, 33:16,
36:19, 85:20,
111:19, 182:19

**homicides**
32:22

**honest**
73:4

**hope**
57:22, 183:19

**hour**
22:24, 23:1,
97:11, 186:3

**hours**
16:19, 16:20,
23:1, 52:16,

97:7, 120:9,
121:20, 126:24,
129:6, 129:10,
153:22

**house**
42:16, 95:3,
96:13, 97:18,
152:14, 152:18

**humboldt**
27:8, 27:10

**hypothetical**
35:13, 59:7,
61:7, 65:22,
73:2, 76:17,
79:15, 80:5,
81:11

---

**I**

**icam**
122:22, 122:24,
123:1, 123:7,
123:12, 124:9,
124:11, 125:18,
125:20, 126:4,
126:9, 126:10

**idea**
42:2, 42:3,
60:16, 118:22,
136:8, 153:2,
196:5

**identification**
109:14, 124:23,
135:16, 138:22,
160:22

**identified**
70:5, 124:7,
129:24, 137:4

**identify**
70:16, 122:11

**illinois**
1:2, 1:18, 2:7,
2:11, 3:7, 3:14,
3:21, 4:9, 4:18,
5:7, 5:14,
24:17, 25:8,
202:16

**imagine**
37:5, 39:12,

39:13, 39:20,
39:23, 57:9,
61:1, 66:20,
76:23, 89:21

**immediate**
137:8

**important**
15:16, 15:23,
51:13, 51:18,
52:5, 52:8,
53:2, 53:6,
53:16, 71:9,
110:13, 111:3,
112:8, 112:12,
142:17

**imposed**
13:17

**incident**
64:2

**include**
132:23

**included**
95:24

**including**
67:12

**incomplete**
35:13, 59:7,
61:6, 65:22,
73:1, 76:17,
79:15, 80:5,
81:11

**inculpating**
174:4, 174:5

**independent**
39:15, 40:3,
40:9, 40:14,
42:8, 52:8,
53:8, 82:18,
82:21, 83:13,
84:1, 84:21,
85:10, 85:18,
85:24, 87:21,
92:17, 95:22,
120:24, 126:13,
128:11, 130:2,
143:23, 144:7

**independently**
83:3

**indicated**
54:6, 88:12
**indicating**
79:2
**individual**
13:11, 36:19,
59:17, 62:7,
62:22, 70:5,
80:1, 80:16,
125:11, 146:6
**individual's**
67:2
**individuals**
68:12, 68:13,
152:14, 154:20,
175:21
**information**
47:19, 48:18,
61:17, 63:17,
64:3, 67:1,
78:3, 78:17,
79:7, 79:22,
80:20, 81:7,
81:15, 110:13,
111:3, 111:6,
111:7, 111:9,
112:8, 123:3,
123:4, 126:1,
130:1, 163:21,
164:1, 164:2,
196:16, 196:20,
203:7
**infrequent**
38:22
**initial**
39:12
**innocence**
64:13
**innocent**
145:13
**instance**
46:24, 64:1,
73:6, 73:23,
146:9
**instances**
146:10
**instruct**
108:9

**instruction**
100:3
**instructions**
99:24
**instructs**
16:15
**interactions**
101:13
**interest**
197:12, 202:7,
203:9
**interested**
195:7
**internal**
164:4
**interpose**
59:11, 77:3
**interpret**
185:22
**interrogate**
54:13
**interrogating**
58:10
**interrogation**
53:24, 54:8,
54:15, 54:16,
54:24, 55:7,
55:17, 58:14,
58:19, 58:23
**interrogations**
39:10, 39:18,
55:20
**interrupt**
135:22
**interview**
55:10, 55:13,
55:16, 56:22,
56:24, 58:13,
58:19, 58:24,
59:4, 59:5,
60:3, 60:24,
70:22, 76:15,
76:20, 77:21,
90:4, 120:10,
120:11, 121:6,
130:23, 130:24,
148:5, 148:8,
150:9, 150:24,

151:7, 151:14,
151:22, 152:4,
183:17, 192:1
**interviewed**
88:24, 90:16,
101:1
**interviewing**
48:11, 50:10,
56:1, 56:6,
57:2, 58:10,
90:14, 121:1
**interviews**
55:20, 59:24,
60:7
**intimidate**
56:21, 57:1,
57:6
**intimidating**
148:19
**inventoried**
76:8, 111:10,
140:20, 170:24,
172:3, 173:3,
173:10
**inventories**
111:9, 199:10
**inventory**
6:14, 18:10,
19:5, 74:14,
75:12, 75:22,
116:10, 116:12,
116:24, 117:7,
139:7, 139:8,
139:9, 144:6,
170:3, 170:6,
171:3, 171:8,
171:18, 171:20,
171:21, 171:23,
172:6, 172:19,
172:21, 173:1,
173:2, 173:8,
199:9
**investigated**
166:20, 167:9,
176:12, 182:6,
182:24, 183:2,
183:3
**investigates**
182:17

**investigating**
66:1, 79:18,
146:15, 175:15,
185:3
**investigation**
20:18, 21:24,
41:2, 45:18,
45:23, 46:10,
55:21, 60:5,
60:10, 60:21,
61:4, 72:7,
75:23, 76:13,
78:4, 82:19,
83:4, 85:21,
86:7, 89:6,
90:8, 90:21,
95:10, 95:23,
96:3, 96:5,
96:15, 100:12,
100:15, 100:23,
101:2, 101:15,
102:7, 102:20,
103:22, 104:5,
106:9, 111:1,
111:13, 122:8,
122:15, 141:20,
145:19, 156:2,
156:9, 156:18,
157:1, 158:7,
165:15, 170:12,
170:22, 172:16,
174:24, 193:4,
194:10, 200:2
**investigations**
45:20, 102:17
**investigative**
41:3, 81:9,
81:20
**investigator**
140:2
**invoked**
147:8
**involve**
154:19
**involved**
35:9, 37:13,
55:21, 69:12,
111:23

involvement
104:18, 166:8
involving
35:8, 152:12,
154:6
ir
124:13, 124:16,
125:2, 125:10
issues
43:2, 43:4
it'd
71:2
it'll
124:15
itself
36:22, 88:10,
137:17, 148:9,
149:20
i'm
27:21, 30:8,
48:24, 50:3,
63:6, 63:16,
63:24, 77:12,
79:23, 83:5,
101:6, 107:8,
110:20, 120:4,
124:1, 128:7,
129:17, 133:15,
135:22, 135:24,
141:15, 142:11,
149:7, 164:15,
164:16, 174:5

**J**

jackson
4:8
jacques
155:14, 155:15,
155:16, 155:18
jail
63:2
jan
3:11, 164:24
jason
192:13
job
1:22, 32:6,
43:24

joe
140:6
johnson
155:9, 155:11,
157:19
join
14:13, 50:20,
65:23, 106:23,
108:7, 108:11,
113:17, 177:2,
188:20
joined
14:16
jorge
156:12
jose
155:20, 155:21,
156:3, 157:13
josh
4:6, 17:20,
17:22, 22:19,
23:17
jot
46:8, 46:13,
48:21, 50:4
jotting
47:5
juan
2:10, 155:9,
155:11, 202:2,
202:15
judge
16:8
july
1:19, 7:19
jump
164:17
junction
26:17
june
27:16
justice
25:10

**K**

karen
104:11, 160:6
katherine
5:4

katie
23:21
keep
45:22, 50:12,
50:18, 51:3,
74:17, 74:22,
74:24, 106:24,
107:2, 200:1,
200:10
keeping
41:2
keith
17:20
kept
52:1, 59:19,
74:9
kevin
3:18
keys
134:19
kidnapped
103:9
kimberly
4:14
kind
20:14, 26:1,
28:1, 28:2,
35:2, 35:9,
36:6, 37:18,
71:21, 81:1,
110:2, 111:3,
114:6, 164:1
kinds
71:22
klein
86:10, 86:16
knew
34:10, 61:13,
113:4, 116:2,
118:8, 166:5,
166:21, 177:5,
179:12, 184:9
knocked
48:2
knowing
103:14
knowledge
119:10, 147:11,

147:15, 147:18,
147:21, 147:22,
153:3, 154:7,
157:11, 157:12,
157:14, 157:16,
157:18, 157:20,
167:14, 182:1
known
195:6
kubiak
10:14, 10:15,
190:13, 191:15

**L**

lab
140:23
lack
124:20
lady
62:2, 200:13
lagoon
27:10
language
43:1, 45:3,
178:4
languages
42:13
large
188:9
lasalle
3:20
last
7:15, 10:8,
10:21, 10:23,
11:1, 11:11,
11:14, 22:7,
23:4, 23:8,
92:5, 114:1,
114:2, 120:8,
121:19, 129:2,
132:14, 160:20,
161:13, 163:5,
186:11, 192:5,
192:13
late
31:15
later
62:3, 62:7,

78:10, 87:10,
89:14, 95:1,
95:12, 180:14,
191:1
**law**
3:12, 4:7,
37:24
**lawsuit**
7:24
**lawsuits**
7:21
**lawyer**
191:5, 191:9,
192:12
**lawyers**
24:1, 24:3
**layout**
96:20, 149:12
**lead**
80:1, 112:16,
112:18, 112:23,
113:5, 113:6,
142:5
**leads**
61:3, 61:17
**learn**
42:15, 43:1,
95:8, 197:5,
197:8, 197:10
**learned**
142:3
**least**
30:2, 68:9,
68:12, 78:24,
112:5, 112:7,
113:24
**leave**
71:7
**leaving**
30:3, 193:23
**left**
24:22, 42:6,
71:12, 97:8,
143:19, 186:2
**legalese**
174:7
**leinenweber**
3:19

**less**
119:2, 119:14
**let's**
9:21, 31:1,
35:18, 46:17,
75:12, 93:17,
114:23, 152:12,
196:5
**letter**
79:2
**level**
43:11
**lewis**
25:16, 26:14
**license**
78:3, 78:22,
79:9, 79:11,
80:8, 80:17,
80:23, 81:8
**lie**
15:8
**lieutenant**
29:14, 29:17
**life**
7:22, 8:12,
9:12, 112:13
**light**
66:3
**lights**
96:24
**likely**
31:14, 50:11,
67:1, 70:2,
176:18
**limitations**
55:23
**limited**
107:18, 178:9,
178:21
**line**
33:21, 69:11,
161:11, 161:14,
162:6
**lines**
15:21, 26:22,
26:23, 62:2
**lineup**
67:15, 67:22,

68:9, 70:1,
70:4, 70:14,
70:18, 122:11,
122:14, 126:16,
148:2, 151:4
**lineups**
67:19, 67:20,
69:17, 69:23,
70:9, 70:11,
151:2, 151:5
**list**
112:3, 112:4,
112:5, 112:7,
117:23, 140:14
**listed**
35:17, 111:12,
138:10, 139:22,
140:3
**listen**
52:18, 93:17,
152:19, 183:23,
200:14, 200:19
**lit**
97:2, 97:20,
130:14
**litigation**
105:8
**little**
11:17, 12:3,
32:16, 33:12,
42:18, 45:2,
49:20, 58:2,
63:4, 74:13,
82:17, 113:2,
117:15, 164:17,
172:12, 199:18
**lived**
62:5, 165:4,
165:7, 165:10,
165:12, 166:3
**living**
165:23
**llc**
3:19, 5:12
**llp**
5:5
**locale**
187:11

**located**
118:9, 118:13,
121:23, 137:11,
187:7, 187:12,
188:7, 188:16
**location**
84:11, 85:20,
86:2, 111:6
**lodged**
16:13
**loevy**
2:4, 3:5
**long**
16:22, 22:23,
33:18, 42:18,
93:23, 97:10,
113:21, 142:18,
142:19, 143:5,
143:20, 149:17,
150:17, 173:13,
177:7, 189:11
**longer**
150:8
**look**
20:24, 40:19,
61:15, 66:6,
68:17, 68:24,
99:24, 109:10,
109:21, 109:23,
115:11, 116:3,
116:22, 129:15,
135:12, 137:21,
138:5, 153:13,
160:18, 160:23,
166:22, 171:6,
198:1, 198:6,
198:10, 200:17,
200:23
**looked**
52:19, 83:24,
88:3, 130:13,
144:3, 144:4,
144:5
**looking**
27:21, 42:4,
67:24, 84:13,
84:18, 85:11,
85:14, 85:17,

88:15, 99:7,
99:9, 120:18,
123:11, 123:15,
165:11, 167:3,
167:6, 167:7,
168:5, 181:20,
200:22
**looks**
30:22, 31:7,
89:24
**lost**
73:6
**lot**
15:17, 47:8,
78:6, 78:23,
107:2, 112:1,
150:4, 183:11
**low**
13:3
**lunch**
193:17, 194:1,
195:3, 195:7,
195:22, 196:6

**M**

**made**
9:3, 39:13,
44:3, 76:14,
140:22, 142:24,
145:12, 162:21,
176:7, 191:21
**major**
77:17
**make**
16:4, 16:11,
28:20, 47:16,
47:17, 51:7,
51:8, 51:13,
53:6, 53:16,
59:5, 63:20,
73:6, 75:12,
75:14, 76:18,
78:23, 80:16,
82:11, 109:19,
110:11, 141:20,
168:19, 170:11,
173:9, 175:5,
179:3, 200:20

**making**
103:12, 153:11,
200:16
**male**
69:3
**males**
69:4
**man**
63:1, 63:23
**manila**
74:14
**many**
9:14, 12:23,
53:18, 58:1,
82:1, 100:14,
118:19, 119:11,
123:5, 123:23,
132:6, 135:2,
146:16, 150:8,
152:21, 155:7,
186:18, 188:23
**map**
123:17
**march**
28:12, 83:4
**mares**
2:10, 202:2,
202:15
**mark**
47:11, 109:9,
135:10, 138:19,
138:20
**marked**
109:13, 135:15,
138:21, 160:16,
160:21
**markham**
9:22, 9:23,
9:24, 190:13,
190:15
**married**
107:14
**marsh**
192:15
**master's**
25:15, 25:17
**materials**
22:4

**matter**
101:16, 165:1,
192:4
**matters**
39:5
**maybe**
10:9, 13:3,
28:24, 31:17,
38:12, 42:20,
49:12, 58:3,
73:17, 78:13,
78:24, 79:1,
94:24, 118:23,
132:4, 136:21,
142:10, 153:12,
172:12, 192:6,
193:17, 194:17
**maysonet**
157:13
**mcdonald**
121:22, 122:22
**mean**
12:17, 13:22,
30:10, 33:14,
34:22, 35:1,
40:13, 41:14,
52:24, 55:1,
66:23, 101:12,
104:20, 135:22,
169:3, 170:16,
173:6, 174:5,
174:7, 179:12,
188:7, 188:8,
188:10, 198:24,
200:10
**meaning**
35:23, 87:18
**means**
54:17, 64:11,
195:24
**meant**
30:13, 50:3,
178:24, 179:4,
179:20
**media**
21:1, 37:2
**medical**
191:22

**medications**
17:5
**meet**
22:17, 23:10,
105:16, 193:17,
196:11
**meeting**
22:10, 22:14,
22:24, 23:1,
23:2, 23:5,
90:17, 90:18
**meetings**
22:23, 23:14,
23:22, 189:18
**mejia**
83:9, 83:14,
87:24, 89:14,
89:24, 90:2,
90:4, 90:8,
91:9, 91:13,
91:22, 92:12,
94:8, 116:13,
120:10, 121:2,
122:10, 124:6,
127:5, 127:13,
127:19, 128:12,
129:6, 129:19,
129:23, 131:21,
132:1, 133:1,
133:8, 133:11,
133:24, 136:10,
139:20, 143:17,
144:10, 144:20,
154:2, 161:6,
165:2, 165:7,
166:11, 167:12,
167:18, 167:24,
169:12, 170:1,
170:9, 172:18,
176:22, 177:3,
178:4, 179:9,
179:19, 180:7,
180:24, 181:6,
181:10, 181:17,
181:20, 182:2,
182:8, 198:22,
199:2
**mejia's**
89:15, 89:16,

161:8, 181:16
**mejias**
94:13
**member**
12:14, 183:21,
189:8, 189:24
**memories**
40:22
**memory**
40:17, 58:5,
74:21, 82:22,
88:9, 105:12,
169:19, 178:13
**mentioned**
48:24, 52:22,
86:4, 97:13,
175:21, 178:6
**met**
22:14, 22:21,
88:22, 90:2,
105:20, 108:3,
130:20, 143:6,
196:9
**mexican**
44:17, 44:19,
189:4
**michael**
52:4, 84:6,
92:19, 98:19,
118:15, 130:24,
131:9, 141:9,
170:2, 172:21,
175:19, 199:12
**mid**
31:15
**midnights**
186:19
**might**
17:1, 42:18,
50:23, 55:12,
61:3, 70:11,
73:18, 74:10,
98:23, 106:24,
114:1, 119:1,
132:9, 136:4,
142:16, 142:17,
144:23, 145:20,
150:14, 164:20,

180:13, 182:4,
189:5, 191:13,
197:11, 198:19
**mike**
11:22, 52:18,
85:6, 131:8,
145:8, 180:10
**milwaukee**
3:13
**mind**
59:14, 59:19,
83:23, 84:12,
97:23, 200:1,
200:10, 200:19,
200:21
**mine**
18:9, 32:23,
111:24, 153:16,
185:20
**mingey**
4:4
**minimum**
63:2
**minute**
12:13, 109:19,
135:12
**minutes**
109:10, 149:8
**mischaracterizes**
80:12, 179:22
**misconduct**
14:9, 154:8,
155:17, 156:1,
156:8, 156:17,
156:24, 158:6,
158:16, 163:7,
163:16
**misdemeanors**
183:5
**mispronouncing**
156:13
**miss**
145:4
**missing**
13:9, 72:11,
72:16, 72:20,
73:20, 73:23,
140:8

**mistaken**
196:21
**mm-hmm**
76:24, 115:14,
120:16, 162:14,
186:20
**mom**
43:5
**moment**
77:7
**monday**
1:19
**money**
84:13, 85:11,
85:15, 85:17,
99:4, 99:8,
99:11, 99:14,
99:16, 99:17,
99:24, 100:5,
128:18, 166:17,
166:23, 167:1,
167:6, 197:24,
198:7, 198:8,
198:10
**montanez**
155:21, 155:22,
156:3
**month**
41:15
**months**
30:2, 193:22
**montilla**
187:3
**morally**
65:10
**more**
14:22, 19:8,
23:16, 38:17,
45:2, 47:24,
55:3, 62:20,
63:11, 78:13,
104:2, 111:23,
112:1, 113:2,
113:4, 117:15,
119:2, 119:14,
119:16, 138:18,
140:12, 160:15,
163:21, 164:1,

167:21, 188:11
**morning**
7:10
**morrison**
5:4, 199:15
**most**
50:10, 66:24,
70:2, 106:18,
162:8, 162:9,
179:3, 188:8
**mostly**
183:14
**mother**
62:12
**mozart**
84:3, 134:2,
137:12, 139:18,
167:20, 168:1,
169:24, 170:9,
171:13, 171:15,
173:20, 174:3,
174:13, 174:21,
175:6, 175:13,
176:9, 198:2
**much**
28:6, 32:20,
73:11, 99:8,
150:10, 160:15,
163:21, 167:5,
189:13, 191:2,
196:18
**multiple**
50:10
**murder**
19:22, 21:24,
33:4, 35:9,
53:24, 54:8,
54:13, 55:7,
55:11, 55:17,
55:21, 56:1,
56:6, 56:22,
56:24, 72:7,
82:19, 83:3,
93:3, 110:20,
145:19, 165:14,
170:22, 172:15,
182:17
**murders**
57:2, 181:22,

182:22, 182:24
**must've**
95:13
**myself**
30:16, 47:14,
58:6, 113:11,
128:23, 173:15,
195:20

**N**

**name**
7:10, 7:13,
7:14, 7:15,
62:23, 78:18,
88:1, 89:16,
90:12, 101:15,
102:2, 102:12,
103:18, 103:19,
103:20, 103:24,
104:3, 104:8,
104:11, 104:14,
104:17, 117:15,
117:21, 118:2,
122:4, 122:5,
132:11, 132:14,
136:22, 139:20,
140:9, 142:1,
142:5, 153:10,
155:10, 155:11,
155:20, 156:5,
156:15, 156:22,
158:11, 158:13,
158:15, 186:11,
192:13
**named**
8:18, 9:5,
88:20, 126:14,
155:21
**names**
9:19, 9:22,
157:5
**narrative**
66:12, 66:22,
70:3, 70:19,
153:15
**nature**
65:20, 66:4,
111:11, 112:2

**naujokas**
4:4
**navarro**
5:3, 104:1,
160:10
**necessarily**
112:4, 180:2,
188:10
**necessary**
144:14
**need**
15:19, 16:13,
16:18, 16:21,
36:24, 59:21,
68:20, 68:24,
73:18, 110:22,
114:20, 164:19,
183:16
**needed**
30:15, 39:2,
49:9, 50:24,
58:4, 58:7,
74:20, 94:8,
114:23
**needs**
110:14
**negate**
136:18
**negative**
70:11
**negron**
157:9, 157:11
**neighborhood**
27:7, 123:3,
123:4
**neither**
202:5, 203:7
**never**
8:12, 13:13,
52:22, 53:21,
56:7, 58:2,
63:14, 73:8,
80:9, 90:16,
118:8, 119:21,
144:17, 170:7,
189:17, 191:21,
193:18, 196:9
**new**
47:22

**news**
146:3, 146:5,
146:12, 164:3,
197:16, 197:22,
199:5
**newspaper**
21:1
**next**
29:6, 53:14,
53:17, 94:24,
95:12, 100:16,
100:19, 114:19,
127:12, 134:8,
161:15
**night**
30:14, 30:17,
47:18, 51:10,
51:14, 52:6,
53:7
**nights**
30:10, 87:16
**nineties**
30:23, 31:15
**non-cr-related**
13:6
**none**
13:15, 13:16,
193:5, 193:10,
193:12, 194:12
**nonetheless**
16:14
**norma**
121:23, 122:2,
122:10, 124:6,
126:14, 126:17
**normally**
70:9, 111:24,
112:1, 112:18,
113:11, 134:21,
140:16, 182:22
**north**
2:5, 3:6, 3:13,
3:20, 5:13,
149:17
**northern**
1:2, 33:23
**notarial**
202:10

**notary**
2:11, 202:1,
202:15
**note**
46:13, 46:18
**noted**
69:15
**notepad**
46:13, 46:14
**notes**
20:14, 20:17,
31:7, 45:20,
45:23, 46:9,
46:15, 47:5,
47:6, 48:15,
48:21, 49:7,
49:11, 50:18,
51:4, 74:22,
75:2, 77:21,
77:24
**notetaking**
45:17
**nothing**
7:5, 60:19,
100:6, 162:24,
169:9, 169:14,
176:10, 197:19,
200:4
**notice**
7:18, 119:21
**noticed**
21:14
**notified**
100:22
**notify**
73:9
**number**
12:20, 12:24,
26:19, 37:22,
38:2, 80:17,
117:18, 124:13,
124:16, 124:18,
124:21, 124:22,
124:23, 125:2,
125:10, 157:5,
188:3, 188:17
**numbers**
12:16, 12:21,

68:8, 68:11,
78:4, 118:23,
150:3, 188:21
**numerous**
145:11, 147:7

**O**

**o'clock**
87:14
**o'malley**
4:13, 103:18,
103:21, 160:2
**oath**
15:5, 15:6,
21:8
**object**
53:11, 54:11,
54:18, 69:10,
72:22, 106:21,
127:24, 128:3,
158:20, 179:23
**objected**
14:15, 14:16,
128:5
**objection**
14:12, 15:11,
17:11, 35:12,
37:20, 38:23,
50:19, 54:4,
56:2, 56:13,
57:7, 57:21,
59:6, 59:10,
59:12, 60:14,
61:5, 61:14,
64:7, 65:21,
66:5, 66:10,
67:23, 69:15,
71:17, 72:5,
72:24, 74:8,
76:16, 77:4,
77:11, 78:5,
79:14, 79:20,
80:4, 80:11,
81:10, 81:23,
82:9, 108:6,
110:15, 111:22,
113:15, 114:10,
115:8, 118:21,

127:21, 128:14,
140:15, 142:8,
143:10, 144:21,
145:15, 146:19,
149:4, 154:22,
158:3, 162:2,
163:8, 174:16,
175:1, 175:16,
176:3, 176:13,
176:24, 179:21,
181:18, 184:8,
188:19, 189:1,
194:11, 195:17,
196:4, 197:4,
197:20, 201:1
**objections**
16:10, 16:12,
16:13, 81:21,
82:10, 175:10
**obligated**
50:12, 50:17,
66:13, 181:15
**obligation**
51:2, 61:3,
61:12, 61:19,
61:22, 64:19,
65:3, 66:8,
67:11, 69:16,
69:20, 72:20,
76:10, 76:15,
82:6
**obligations**
67:22, 68:16
**obvious**
129:22, 130:12
**occasion**
14:23, 22:20,
22:22, 44:1,
134:23
**occasionally**
35:5
**occupant**
165:19
**occurred**
23:2, 23:6
**october**
120:9, 120:17,
202:11, 203:15

**odd**
106:24, 153:7
**off-campus**
26:18
**offender**
61:18, 78:17,
79:8, 81:15,
81:19, 111:8
**offense**
50:4, 64:23,
74:13, 78:8,
183:8
**offenses**
167:8, 183:3
**offered**
26:20
**offhand**
132:19, 184:17,
186:9
**office**
3:12, 4:16,
26:19, 36:4,
36:5, 63:19,
67:10, 115:3,
149:23, 149:24,
150:1, 150:2,
150:12, 150:13,
150:18, 152:9,
153:6, 153:8,
187:24
**officer**
14:1, 14:7,
14:19, 21:19,
37:18, 42:10,
43:24, 54:14,
55:6, 57:13,
58:18, 65:7,
67:16, 69:19,
71:15, 72:2,
72:15, 102:12,
106:8, 132:21,
140:13, 150:20,
152:9, 153:9,
154:8, 154:11,
158:24, 170:6,
187:2, 202:2
**officer's**
151:3

**officers**
23:13, 38:9,
76:3, 107:24,
113:23, 140:13,
144:15, 164:5,
188:4
**offices**
2:2
**officials**
137:5
**often**
47:21, 118:11,
140:18
**oh**
8:6, 10:14,
18:9, 26:16,
64:6, 70:16,
89:2, 96:19,
102:8, 105:9,
119:6, 135:24,
137:6, 138:6,
143:2, 151:16,
152:13, 153:5,
153:10, 161:15,
180:9, 184:6,
189:17, 193:20,
200:12
**old-timer**
49:3
**once**
16:12, 62:11,
76:23, 81:7,
98:18, 114:18,
154:13, 163:14
**one**
9:21, 10:12,
10:14, 12:19,
13:8, 14:23,
15:23, 16:9,
19:8, 19:12,
19:14, 20:3,
22:20, 23:16,
23:22, 25:23,
27:2, 29:17,
31:23, 32:1,
33:3, 33:18,
37:14, 38:18,
51:19, 55:13,

55:24, 56:6,
60:4, 62:14,
68:8, 68:11,
70:4, 70:10,
71:14, 72:12,
77:4, 82:14,
83:8, 84:13,
84:14, 85:7,
85:11, 88:12,
88:13, 93:8,
97:13, 100:16,
110:10, 112:24,
113:9, 118:16,
123:10, 125:9,
130:23, 130:24,
132:13, 133:7,
134:15, 138:18,
140:12, 142:19,
144:23, 145:18,
146:9, 146:12,
148:10, 152:24,
153:20, 154:3,
154:24, 155:5,
155:6, 162:21,
163:5, 163:18,
164:9, 164:24,
167:21, 171:21,
171:22, 173:2,
175:20, 176:19,
176:20, 181:9,
182:23, 184:2,
185:6, 185:8,
185:9, 185:10,
186:11, 191:24,
193:12, 194:23,
198:16

**one-day**
38:13, 41:18

**ones**
163:20

**ongoing**
95:10, 191:3

**only**
13:8, 31:17,
33:9, 33:10,
35:6, 36:12,
36:13, 37:14,
42:22, 43:5,

47:9, 61:16,
73:16, 74:24,
88:10, 96:6,
98:17, 113:9,
134:1, 140:10,
140:14, 152:23,
170:3, 183:18,
186:9, 186:24,
187:6, 189:2,
193:12, 193:23,
196:22

**ons**
30:11

**open**
33:18, 34:3,
36:3, 47:11,
84:17, 149:14,
149:17, 181:8,
200:1, 200:10,
200:19, 200:21

**opened**
134:4

**opinion**
146:22, 147:1,
148:24

**opportunity**
70:21

**opposed**
15:19, 49:18,
141:2

**opposite**
151:7, 151:8,
151:14

**order**
46:23, 47:2,
58:6, 60:21,
67:20, 75:20,
166:15

**orders**
57:16, 57:24,
58:1, 58:3, 58:9

**organizations**
189:14

**original**
49:22, 139:12,
139:15

**originals**
74:11

**other**
7:21, 8:9, 9:5,
10:12, 12:18,
13:8, 13:17,
14:9, 14:18,
16:10, 20:21,
20:22, 21:20,
22:4, 23:12,
23:17, 25:23,
35:22, 36:9,
37:11, 37:14,
38:2, 40:18,
42:12, 46:19,
53:2, 55:15,
58:17, 62:10,
68:13, 71:3,
76:2, 84:7,
84:21, 86:1,
86:20, 90:6,
96:24, 98:15,
103:14, 104:20,
105:1, 107:5,
107:10, 107:24,
110:13, 114:7,
117:20, 117:22,
126:1, 146:10,
146:15, 151:3,
151:9, 153:4,
154:4, 157:22,
163:1, 163:13,
163:20, 164:5,
165:14, 167:13,
168:12, 168:16,
170:5, 171:12,
171:20, 171:23,
172:24, 173:1,
173:2, 175:20,
175:23, 176:7,
178:11, 178:19,
180:9, 184:2,
184:15, 184:21,
186:7, 186:10,
186:11, 186:16,
186:20, 186:24,
187:10, 187:22,
188:11, 188:23,
194:9, 196:12,
196:20, 199:9

**others**
69:14, 146:14

**otherwise**
16:15, 202:8,
203:10

**out**
21:18, 21:23,
22:1, 28:13,
45:24, 48:2,
48:8, 50:9,
57:9, 62:3,
62:8, 62:10,
62:22, 71:8,
71:12, 75:16,
77:23, 79:24,
81:2, 84:12,
84:15, 84:16,
85:5, 86:7,
86:12, 86:14,
89:14, 89:19,
92:20, 98:18,
99:2, 99:20,
106:15, 114:13,
117:6, 128:3,
141:4, 141:6,
142:21, 145:8,
153:6, 153:17,
165:9, 165:11,
167:15, 171:16,
172:19, 172:21,
173:9, 174:10,
177:5, 178:16,
179:3, 181:8,
183:11, 184:20,
184:22, 186:1,
187:18, 187:21,
197:1, 199:11

**outcome**
202:8, 203:10

**outside**
149:24, 152:17,
158:17

**over**
11:19, 11:20,
15:1, 16:1,
27:2, 30:11,
30:18, 37:22,
37:24, 38:1,

47:18, 53:1,
64:20, 65:3,
65:14, 65:16,
67:7, 115:11,
135:12, 142:19,
160:23, 169:1,
169:3
**overlook**
66:7
**oversaw**
30:11
**overturned**
145:19, 146:13,
163:18, 194:23
**own**
43:2, 53:8,
74:9, 117:7,
187:19
**owned**
81:8
**owner**
82:12
**owner's**
139:20

**P**

**pacheco**
156:12, 156:19
**padre**
84:8, 84:16,
85:5, 98:21,
118:3, 129:20,
131:15, 137:3,
137:23, 143:16,
168:4, 168:10,
169:23, 170:2,
170:7, 175:11,
175:24, 176:6,
176:20, 180:10,
180:22
**padre's**
138:7, 140:9
**page**
6:3, 6:11,
88:11, 116:9,
120:1, 121:18,
126:19, 160:20,
161:16, 162:6

**pages**
1:23, 109:18,
112:1
**paid**
189:20
**pair**
84:19, 129:22
**paper**
46:19, 169:9
**paragraph**
120:8, 121:19,
121:20, 122:19,
122:21, 124:5,
126:2, 126:20,
129:14, 129:15,
136:21, 136:22
**paragraphs**
125:24
**parents**
42:19
**park**
27:8, 27:10
**part**
35:7, 35:21,
43:23, 48:22,
50:15, 60:5,
60:10, 60:21,
64:23, 66:11,
67:2, 71:8,
71:9, 73:16,
75:24, 95:19,
96:2, 96:7,
96:10, 106:8,
106:10, 111:11,
111:13, 111:15,
153:15, 169:4,
179:3, 188:8,
200:21
**partial**
112:5, 112:7
**participate**
55:7, 55:10,
89:5, 90:6,
90:8, 90:21
**participated**
174:2, 181:22,
182:5, 193:3,
196:23

**participating**
174:23
**participation**
105:7, 168:20,
170:12, 172:15,
194:9
**particular**
36:18, 40:23,
87:13, 99:12,
115:5, 195:13
**particularly**
36:6, 115:5
**parties**
202:7, 203:9
**partner**
47:14, 84:5,
84:14, 85:2,
85:4, 93:9,
93:10, 98:20,
112:23, 117:8,
130:8, 131:6,
131:13, 176:19
**partner's**
51:8
**partners**
142:18
**parts**
71:11, 89:9
**party**
7:21, 9:12
**past**
23:7, 23:8
**patience**
181:14
**patrol**
48:21, 187:13
**patrolman**
44:3, 118:1
**pc**
4:7
**penalty**
197:6
**pending**
16:22
**people**
20:21, 32:8,
43:2, 68:9,
145:13, 146:17,

152:16, 167:13,
184:11
**people's**
3:12, 152:15
**period**
68:4, 107:6
**permission**
137:2
**person**
44:10, 63:9,
68:20, 75:14,
76:15, 134:19,
185:12, 186:24
**personal**
35:3, 35:4,
163:11
**personally**
173:18, 174:1,
174:12, 175:5
**personnel**
117:13, 186:20,
188:17
**pertained**
57:16, 58:7
**pertinent**
47:18, 111:9,
115:1
**phase**
10:22
**phil**
86:10, 86:15
**phone**
24:3, 78:23,
108:20
**photo**
124:5, 124:15,
125:12, 125:15,
125:16
**photocopy**
49:1, 49:2,
49:7
**photograph**
125:1, 126:3
**photographs**
124:8
**photostatic**
48:20, 49:1
**phrasing**
39:21

physical
34:4, 41:2,
75:23, 76:7,
76:11, 187:11,
187:23, 188:15
physically
58:15, 130:19,
148:22, 177:21,
181:6
picture
102:4
piece
46:19, 173:9
place
10:20, 11:9,
30:14, 55:17,
77:9, 86:24,
87:8, 111:5,
194:22
plaintiff
1:6, 1:12, 3:3,
3:10, 7:7, 7:11,
7:22, 8:2, 8:10,
9:6, 164:22,
200:7
plan
16:19
plate
78:3, 78:22,
79:9, 79:11,
80:8, 80:17,
80:23, 81:8,
81:17, 82:4,
82:14
play
62:4
played
61:11, 92:7
please
7:12, 16:5,
40:4, 45:14,
61:10, 101:5,
101:8, 124:2,
167:22, 171:6,
179:18
point
16:18, 28:10,
39:8, 42:20,

51:22, 53:13,
62:14, 63:4,
63:5, 78:15,
84:14, 95:11,
103:10, 106:1,
109:18, 111:8,
125:21, 126:10,
133:16, 141:23,
161:11, 164:2,
189:7, 191:14
police
6:12, 12:10,
12:14, 12:19,
14:1, 14:7,
14:19, 19:15,
19:17, 19:18,
19:20, 19:24,
21:19, 23:13,
25:2, 25:19,
26:9, 27:15,
27:20, 37:18,
38:8, 42:9,
43:24, 45:9,
53:22, 54:14,
55:6, 57:12,
58:17, 65:7,
67:3, 67:16,
69:19, 71:15,
71:16, 71:21,
71:22, 72:1,
72:2, 72:6,
72:10, 72:15,
72:16, 72:19,
73:5, 73:19,
73:22, 75:4,
76:2, 89:5,
102:12, 106:8,
107:24, 109:24,
110:2, 134:10,
137:5, 146:23,
147:3, 147:12,
154:8, 154:11,
158:23, 164:5,
170:21, 177:8,
182:4, 187:6,
188:3, 189:8,
189:24, 190:3,
190:9, 199:24

policies
45:9, 77:1,
77:2, 77:7, 77:9
policy
45:16, 45:21,
53:23, 67:18,
75:5, 75:9,
76:19
polygraph
127:1, 127:6,
127:9
pop
124:14, 124:22,
155:7, 163:20
popping
146:14
populate
123:16
population
188:12
portion
33:23, 114:2,
150:4
position
30:4, 48:1,
190:3, 190:7
positions
28:2, 186:21,
186:22
positive
59:2, 70:11
possession
117:9, 129:21,
130:9
possibility
83:12, 127:9
possible
78:11, 140:16
possibly
22:24, 99:14
post
104:18
post-conviction
105:8
potential
48:12
potentially
100:5

practice
45:17, 47:15,
51:8, 51:16,
53:3, 53:23,
65:16
practices
45:9, 52:1
predominantly
131:8
premise
136:12, 138:12
prep
191:11
preparation
20:11, 20:15,
22:5, 23:11,
24:4, 83:19
prepare
18:5, 105:14
prepared
172:14
presence
48:7, 190:19
present
23:18, 23:21,
86:18, 126:16,
135:8, 148:10,
159:11, 161:5,
180:7, 180:24,
181:3, 190:20
presented
131:9, 154:3
preserving
117:1
pretended
152:15
pretty
32:19, 135:20,
150:9, 184:22
prevailing
77:1
previous
55:5, 61:11,
82:23, 92:7,
138:24
previously
12:9, 18:7,
49:19, 81:24,

96:1
**primarily**
146:18, 183:12
**print**
125:15, 125:16
**prior**
153:11, 191:22
**private**
192:19
**probably**
8:24, 31:16,
38:19, 66:16,
69:22, 70:7,
97:10, 103:10,
111:24, 179:2,
181:23, 195:8
**problems**
50:23
**procedure**
7:19, 93:19
**proceed**
167:23
**proceedings**
8:3, 8:20,
202:4, 203:4,
203:5
**process**
52:13, 53:20,
185:5
**professional**
34:20
**professionally**
34:22, 35:1
**proficiency**
43:11
**profile**
37:2, 86:5
**program**
124:14
**programs**
125:22
**progress**
46:6, 46:7
**promoted**
29:2, 29:5,
29:13, 29:18,
29:24, 31:11,
154:13

**property**
32:7, 32:8,
32:12, 32:15,
32:21, 33:9,
33:15, 33:19,
33:22, 34:5,
35:10, 35:23,
36:21, 37:12,
47:7, 47:13,
51:20, 54:3,
75:15, 78:2,
78:6, 78:19,
85:23, 86:6,
86:20, 87:5,
106:11, 106:19,
110:23, 111:17,
112:22, 113:12,
113:14, 115:10,
117:21, 117:22,
118:1, 118:4,
118:7, 118:19,
119:15, 119:17,
124:24, 132:10,
141:22, 150:13,
153:5, 182:11,
182:13, 183:1,
184:15, 185:2,
185:21, 186:14,
197:12
**prospects**
127:9
**prosser**
24:9
**protect**
61:16
**protecting**
63:22, 63:24
**prove**
61:18, 64:12
**proved**
175:20
**provide**
17:2, 67:12,
109:5
**provided**
126:9
**providing**
54:20

**proving**
181:21
**public**
2:11, 202:1,
202:15
**puerto**
42:24, 44:13,
44:16, 44:24,
45:5, 188:24,
189:8, 189:24,
190:2, 190:9
**pull**
11:19, 11:20,
58:5, 58:6,
125:11, 152:16,
179:2
**purpose**
46:3, 49:14,
141:17
**purposely**
56:21
**pursuant**
2:10, 7:18
**push**
53:15
**put**
44:8, 47:19,
58:14, 58:18,
59:17, 66:11,
66:22, 67:2,
70:2, 73:17,
74:13, 75:1,
79:5, 81:4,
81:24, 99:15,
103:20, 104:2,
110:8, 110:22,
110:24, 111:4,
111:5, 112:9,
114:22, 114:23,
115:2, 116:23,
123:13, 142:1,
142:5, 153:20,
169:9
**putting**
116:21

**Q**

**quantity**
166:24

**question**
9:1, 16:4,
16:6, 16:14,
16:22, 53:1,
53:12, 54:12,
55:2, 55:5,
56:23, 60:22,
61:10, 61:11,
65:2, 77:4,
80:14, 81:14,
92:6, 96:1,
104:10, 127:23,
128:6, 136:3,
142:17, 158:21,
160:24, 161:1,
169:13, 179:24,
195:12
**questioned**
52:22, 166:7,
177:19
**questioning**
55:3, 55:4,
55:24, 69:11,
190:19
**questions**
18:18, 30:20,
45:8, 62:21,
76:24, 104:7,
104:13, 157:5,
164:16, 164:18,
181:14, 199:14,
199:15, 199:16,
199:17
**quick**
52:12, 92:1
**quickly**
18:16
**quit**
24:23
**quite**
30:6, 97:9

**R**

**r-u-i-z**
7:15
**radio**
149:22
**rank**
30:16

ranks
27:23, 154:13
rare
59:21
rather
195:11, 195:13
raymond
192:23
reacted
43:3
read
43:21, 43:22,
57:14, 61:10,
83:11, 83:12,
88:8, 92:5,
95:4, 95:6,
109:11, 126:20,
135:18, 135:19,
135:20, 135:21,
136:1, 144:12,
174:6, 177:24,
178:10, 178:11,
178:18, 178:21,
179:8, 179:16,
179:19, 180:1
reading
60:20, 66:20,
90:13, 180:3
real
52:17, 191:22
realistically
38:19, 170:23
realize
62:24
really
15:23, 27:21,
35:6, 37:8,
47:21, 63:14,
107:2, 107:7,
107:22, 119:21,
132:4, 140:17,
188:21, 191:3,
195:18
reason
42:23, 53:5,
68:22, 71:7,
81:18, 93:12,
93:15, 107:3,

116:20, 120:21,
120:23, 122:17,
126:3, 126:5,
129:7, 129:9,
153:7, 195:13
reasons
197:9
rebate
152:19
recall
9:19, 9:22,
10:11, 11:8,
13:7, 14:10,
20:17, 33:11,
35:16, 36:14,
37:11, 38:2,
39:4, 39:19,
47:1, 54:5,
56:24, 83:3,
84:7, 87:12,
88:16, 90:14,
90:17, 90:18,
95:4, 95:7,
96:2, 96:4,
96:7, 96:14,
96:17, 97:21,
98:11, 98:15,
98:17, 98:20,
99:3, 99:8,
99:11, 99:23,
100:3, 100:7,
101:13, 102:22,
105:10, 105:13,
106:3, 106:7,
107:5, 112:24,
117:3, 117:8,
121:10, 122:7,
122:14, 131:20,
132:12, 132:13,
133:10, 133:11,
133:23, 134:5,
134:24, 143:8,
143:9, 146:1,
154:16, 155:5,
158:13, 160:12,
162:11, 163:10,
165:6, 165:11,
165:17, 166:21,

167:5, 181:2,
181:4, 181:8,
181:9, 184:16,
185:18, 189:5,
189:19, 193:23,
196:8, 196:14,
198:5, 198:12,
198:18, 199:7
receive
12:19, 78:3
received
26:7, 64:4,
108:20, 192:9
recently
95:16
recollect
94:6
recollection
21:17, 39:15,
40:3, 40:10,
40:14, 42:8,
45:11, 82:19,
82:22, 83:7,
83:13, 84:1,
84:22, 85:11,
85:19, 85:24,
87:21, 88:19,
89:24, 91:1,
91:4, 91:8,
91:12, 92:17,
95:15, 95:23,
96:9, 100:4,
100:10, 100:21,
104:4, 105:20,
106:5, 121:1,
121:7, 126:13,
127:3, 128:11,
130:2, 130:7,
130:9, 130:11,
134:8, 135:7,
143:18, 143:19,
143:24, 155:12,
161:20, 161:24,
162:17, 162:19,
163:3, 180:11,
181:11, 199:11
recollections
101:18, 143:22,

144:7
record
7:13, 7:16,
16:12, 17:23,
18:13, 40:12,
46:2, 54:22,
79:22, 92:3,
92:4, 92:7,
109:6, 116:4,
124:16, 138:23,
149:9, 149:10,
201:7, 203:4
recorded
202:5, 203:4
recording
203:6
records
41:3
recovered
139:17, 140:13,
145:5, 171:13
red
116:15, 129:22,
130:11
refer
13:21, 97:5,
116:12, 181:23
reference
82:23
referenced
126:4
referencing
83:16
referred
12:9, 19:11,
41:15, 178:20
referring
12:16, 18:22,
22:14, 23:16,
52:2, 146:7,
171:4, 171:9,
182:13
refers
42:1
reflect
7:17, 17:23
refresh
58:4, 74:21,

91:1, 91:4,
91:8, 91:12,
95:15, 105:12,
105:19, 106:5,
161:24, 162:19,
163:2
**refreshed**
169:20
**refuse**
108:16, 136:18
**regarding**
45:8, 45:17,
53:23, 67:19,
68:17, 75:5,
77:1, 101:2,
147:11, 147:15,
147:18
**regards**
164:10
**registers**
82:13
**regular**
87:10, 87:14,
87:18, 118:17,
119:3
**regulation**
46:23, 54:8,
56:10, 57:5,
60:7, 67:19
**regulations**
57:12, 57:15,
57:20, 58:22
**reiter**
5:5
**rejected**
63:21
**related**
36:7, 172:6,
178:8, 198:19,
202:6, 203:8
**relates**
81:12, 82:4
**relating**
147:3
**relation**
98:23, 195:1
**relationship**
34:21, 35:3,

35:4, 163:11,
166:19, 177:18,
191:18
**relax**
128:5
**relaxed**
128:7, 128:9
**relevance**
142:15
**reluctant**
63:4
**remembering**
50:24
**rented**
167:13
**repeat**
124:2, 167:21
**rephrase**
16:6, 32:11,
77:5
**replies**
79:3
**report**
6:12, 19:18,
19:20, 38:1,
46:5, 46:6,
46:7, 47:16,
47:17, 48:8,
48:19, 49:8,
49:19, 49:22,
50:5, 51:9,
52:6, 52:19,
53:7, 67:4,
67:5, 71:15,
71:16, 71:21,
72:1, 72:2,
72:10, 73:5,
74:13, 78:8,
78:21, 79:6,
79:23, 80:9,
81:4, 95:5,
95:7, 97:6,
109:24, 110:2,
110:24, 111:4,
111:18, 111:20,
112:6, 112:9,
112:15, 114:19,
121:17, 134:1,

144:12, 168:19,
169:17, 169:18,
169:20, 169:22,
170:4, 170:7,
170:15, 170:17,
170:19, 170:21,
175:6, 176:7,
176:15, 176:17,
181:24, 199:9
**reporter**
14:14, 15:13,
25:5, 26:12,
101:4, 101:7,
101:10, 124:1,
129:2, 159:15,
166:16, 174:9,
202:1
**reporting**
154:8
**reports**
19:15, 20:1,
71:22, 72:7,
72:16, 72:19,
73:19, 73:23,
110:22, 121:4,
130:1, 170:11,
199:4
**represent**
7:11, 108:22,
108:23
**representative**
17:19
**represented**
17:16, 108:19,
192:11
**representing**
165:1
**represents**
137:6, 139:9
**reprimanded**
13:9
**reputation**
154:6
**requested**
28:18
**required**
46:14, 47:3,
60:2

**reserve**
201:4
**resided**
165:16
**residence**
90:7, 93:24,
94:17, 94:18,
97:4, 116:13,
116:24, 127:15,
133:1, 133:24,
134:7, 134:14,
134:18, 134:19,
134:24, 135:5,
137:11, 144:16,
144:20, 165:4,
165:7, 165:10,
165:15, 167:13,
167:19, 169:15,
170:9, 173:19,
174:3, 174:13,
174:21, 175:6,
175:13, 176:10,
177:6, 182:3,
183:20, 198:2
**resident**
134:22
**residential**
63:1
**resigned**
191:24
**resolution**
13:11
**respect**
190:4, 190:7
**responsibilities**
32:6, 32:17
**responsibility**
75:17
**restroom**
16:21
**result**
13:18, 172:15,
176:8, 190:24
**resulted**
194:21
**retire**
27:14
**retired**
10:6, 10:7,

12:9, 30:5,
153:11, 191:13
**retrieval**
90:6
**return**
38:10
**returned**
129:19, 129:20,
130:17, 143:4,
182:9
**revealed**
174:3
**review**
19:1, 19:8,
19:12, 19:15,
20:3, 20:6,
20:9, 20:11,
20:14, 20:20,
20:24, 22:8,
114:20, 115:3
**reviewed**
18:23, 19:5,
21:10, 21:15,
22:4, 22:8,
83:19, 143:24,
171:18
**reviewing**
115:6
**rey**
34:12, 34:14,
34:21, 36:14,
45:4, 99:21,
100:12, 105:16,
131:1, 131:3,
131:9, 132:3,
132:17, 132:18,
145:12, 146:18,
146:22, 147:1,
147:12, 147:16,
147:19, 147:21,
147:22, 148:1,
148:4, 148:7,
148:12, 148:15,
148:18, 148:21,
149:1, 154:5,
154:8, 154:14,
154:19, 154:20,
155:17, 155:22,

156:2, 156:8,
156:17, 156:24,
158:7, 158:17,
159:11, 163:6,
163:16, 163:23,
164:10, 165:13,
165:17, 178:12,
186:10, 189:3
**reyes**
7:11, 88:20,
88:22, 89:1,
89:3, 89:6,
91:1, 91:16,
105:5, 116:5,
159:1, 159:6,
166:3, 174:4,
174:15, 174:22,
175:8, 175:14,
176:2, 176:11,
182:5, 192:24,
193:4, 196:17
**reynaldo**
1:8, 192:24,
193:3
**rican**
44:16, 44:24,
45:5, 188:24,
189:8, 189:24,
190:2, 190:9
**ricardo**
158:12
**richard**
4:17
**rico**
42:24, 44:13
**ride**
143:20
**right**
9:2, 10:21,
15:9, 16:11,
18:3, 19:23,
21:10, 22:7,
23:10, 25:4,
28:21, 29:11,
36:11, 37:15,
38:2, 42:6,
45:7, 48:13,
48:14, 51:5,

59:14, 59:17,
63:24, 64:2,
65:2, 67:1,
71:21, 81:14,
83:6, 84:23,
85:21, 96:7,
96:16, 97:24,
100:6, 103:3,
104:23, 106:16,
116:19, 121:9,
123:21, 125:13,
133:9, 136:18,
137:1, 147:6,
150:7, 150:12,
150:15, 150:19,
151:20, 153:12,
169:16, 171:3,
172:16, 172:23,
173:16, 173:17,
182:14, 194:17,
199:13
**rights**
136:11, 137:2,
159:2
**ring**
104:17, 156:6,
156:15, 156:22
**rise**
37:3
**rivera**
155:14, 155:15,
155:16, 155:18
**road**
41:17
**robbery**
35:19, 35:21
**robert**
102:3, 159:20
**roberto**
156:21
**roc**
116:5
**rock**
5:12
**rodriguez**
157:15, 158:12
**role**
145:12, 167:8,

190:15, 190:20
**roll**
87:2, 87:4,
87:6, 87:8,
87:10, 151:1,
151:6
**romeoville**
26:15, 26:16
**room**
55:16, 84:16,
87:2, 93:8,
94:9, 97:1,
98:23, 120:11,
121:6, 130:14,
149:14, 149:22,
150:22, 151:1,
151:3, 151:4,
151:5, 151:10,
151:11, 151:14,
161:6, 161:7,
161:9, 161:21,
162:1, 166:22,
181:8
**rooms**
84:14, 85:12,
93:10, 130:23,
130:24, 150:9,
151:1, 151:7,
151:22, 152:4,
162:8, 162:9,
162:12, 167:12
**rosauro**
91:12, 127:13,
127:19, 128:12,
129:6, 131:21,
133:8, 133:11,
136:10, 143:16,
144:10
**routinely**
183:1, 183:3
**ruiz**
1:17, 2:1, 6:3,
6:11, 7:3, 7:14,
7:15, 7:17,
7:20, 12:8,
13:24, 17:24,
24:6, 42:12,
45:7, 127:13,

129:20, 137:3,
139:24, 199:23
**rule**
16:9, 46:23,
54:7, 56:9,
56:17, 57:4,
57:9, 60:6,
60:17, 60:23,
61:13, 65:6,
65:12, 66:16,
67:18, 69:22
**rules**
7:18, 14:24,
57:12, 57:15,
57:19, 58:22
**rumors**
163:6, 163:16
**run**
82:3
**rush**
18:15, 97:11
**rutherford**
4:3, 102:3,
159:20

---
**S**
---

**safe**
119:2
**said**
10:10, 14:17,
19:4, 27:4,
28:8, 30:21,
31:3, 31:7,
44:12, 51:7,
59:13, 60:7,
60:23, 62:21,
63:5, 63:14,
63:17, 65:12,
66:21, 67:6,
69:23, 79:9,
80:15, 85:10,
86:11, 92:21,
95:13, 120:15,
120:17, 127:12,
131:3, 131:5,
138:10, 151:22,
152:23, 162:12,
162:21, 166:18,

180:1, 180:19,
184:1, 190:12,
193:16, 195:2,
196:5, 196:8,
196:21, 202:4,
203:5
**sake**
85:4
**salazar**
1:24, 121:23,
122:2, 122:5,
122:11, 124:6,
126:14, 126:17,
203:2, 203:14
**same**
16:1, 29:18,
33:15, 36:3,
43:4, 49:1,
53:1, 59:10,
60:22, 61:14,
62:1, 66:5,
71:20, 72:5,
74:24, 76:5,
77:11, 79:20,
80:11, 81:17,
81:21, 82:9,
89:21, 98:3,
98:9, 104:7,
104:10, 104:13,
108:6, 109:4,
112:4, 115:23,
119:22, 133:5,
150:11, 150:15,
150:24, 151:24,
152:2, 157:4,
162:6, 175:10,
176:3, 184:12,
187:23
**santo**
84:8, 84:15,
85:5, 98:21,
118:3, 129:20,
131:15, 137:3,
137:23, 138:7,
140:9, 143:16,
168:4, 168:10,
169:23, 170:2,
170:7, 175:11,

175:24, 176:6,
176:20, 180:10,
180:22
**santos**
157:17
**sat**
9:15, 55:13,
55:16
**satellite**
26:21
**saw**
62:6, 62:7,
62:20, 63:14,
88:2, 90:19,
90:20, 163:12,
170:7
**say**
15:13, 22:13,
23:4, 23:17,
28:23, 29:10,
29:22, 30:12,
31:1, 31:16,
34:11, 35:18,
38:12, 38:16,
40:13, 41:14,
44:6, 45:2,
46:17, 47:14,
48:21, 50:3,
51:19, 62:22,
63:6, 63:9,
65:15, 68:1,
72:17, 75:11,
75:12, 77:15,
78:9, 82:5,
86:16, 87:9,
95:17, 97:5,
99:13, 99:22,
108:8, 110:9,
111:14, 112:18,
114:23, 119:3,
119:6, 120:4,
123:13, 124:5,
128:17, 130:13,
130:22, 136:23,
142:3, 145:20,
146:11, 146:13,
148:13, 149:2,
150:9, 153:20,

159:3, 162:16,
163:9, 163:11,
163:19, 167:17,
168:3, 169:7,
169:10, 173:5,
175:3, 176:21,
179:6, 179:17,
187:2, 189:2,
189:11, 189:12,
191:13, 192:2,
195:20, 196:7,
196:19, 198:8,
200:12, 200:15
**saying**
34:24, 45:19,
60:13, 62:15,
62:19, 65:24,
71:19, 200:17
**says**
51:22, 52:18,
52:20, 60:17,
62:24, 63:13,
63:16, 63:18,
76:19, 82:3,
117:21, 120:8,
121:19, 121:22,
122:10, 122:21,
124:10, 125:21,
125:24, 126:2,
126:23, 129:5,
129:18, 135:19,
136:9, 136:10,
138:11, 140:2,
141:1, 167:5,
169:14, 171:12
**scenarios**
178:19
**scene**
79:24, 130:10,
190:17, 190:19
**schedule**
40:20
**school**
24:6, 24:8,
24:22, 27:5,
28:9
**science**
25:16

se
46:20, 56:18
seal
202:10
sean
3:4, 7:10
search
6:13, 18:12,
19:11, 19:12,
80:22, 83:7,
83:8, 83:10,
83:17, 89:11,
93:6, 93:13,
127:14, 127:15,
128:13, 129:6,
134:11, 135:1,
135:13, 136:16,
136:19, 137:7,
138:13, 144:5,
144:11, 144:15,
145:6, 145:10,
153:14, 162:7,
162:12, 165:3,
165:16, 166:6,
166:12, 166:18,
167:19, 168:1,
168:2, 168:10,
168:12, 168:21,
169:1, 169:2,
169:11, 171:1,
171:2, 172:2,
172:9, 172:17,
173:19, 173:20,
174:2, 174:20,
175:6, 175:12,
176:8, 182:3,
198:1, 198:23
searched
81:5, 93:4,
93:9, 93:10,
94:17, 97:14,
122:22, 134:14,
135:5, 136:14,
138:15, 165:8,
165:10, 174:13,
177:6
searches
167:12

searching
94:11, 98:24,
99:4, 128:18,
128:20, 165:5,
165:24, 168:7,
182:9
seasoned
52:10
second
10:13, 23:1,
23:5, 34:2,
35:24, 95:2,
120:8, 121:18,
129:14, 129:17,
136:21, 144:11,
144:18, 149:13,
160:19, 182:14,
187:15
secretarial
186:22
section
35:21, 36:21,
88:14, 112:22,
117:13, 141:22,
149:18
sections
123:14, 125:9
secured
83:5
security
124:20
see
9:21, 18:10,
19:18, 22:11,
62:21, 63:6,
63:8, 63:10,
64:16, 73:9,
82:4, 82:6,
89:3, 92:21,
92:23, 115:12,
116:9, 117:13,
118:11, 120:11,
120:19, 121:20,
121:24, 122:12,
130:15, 142:18,
151:18, 152:12,
169:22, 173:5,
173:12, 197:15,

198:21, 199:1
seeing
64:4, 97:23,
101:17, 102:22,
103:21, 116:18,
130:5, 178:7,
198:12, 199:7
seek
185:5
seem
62:18, 64:2,
197:11
seemed
119:16
seen
118:5
self-defense
37:24
seminar
38:11, 38:12,
41:17
seminar-type
39:6
send
79:2, 168:24
sending
38:8
senior
53:3
sense
9:3, 16:5,
28:1, 63:3,
63:22, 63:23,
198:24
sent
99:20, 142:21,
186:2
sentence
121:24, 126:23,
127:12, 128:3,
129:3, 129:18
separate
15:24, 33:17,
153:3, 153:4
separated
34:6, 114:3
sergeant
1:17, 2:1, 6:3,

7:3, 29:5, 29:6,
29:12, 32:7,
73:9, 77:13,
115:4, 115:5,
115:11, 115:20,
116:1, 140:6,
153:12
sergeant's
115:3, 150:1,
150:12, 150:13,
181:7
series
157:4
seriously
158:4
serrano
156:5, 156:10
served
29:16, 29:19
set
192:10, 202:9
seven
16:19, 16:20,
29:1, 31:3, 31:8
several
132:9, 154:18
sex
36:1
shared
33:19
sharing
182:14
sheet
144:6, 171:4,
171:8, 172:19,
173:8
shift
52:17, 87:12,
87:14, 87:18,
87:19, 118:24,
119:5, 119:7,
184:12, 186:16,
188:2
shifts
184:15, 184:22
shoes
84:19, 84:20,
85:1, 85:3,

85:8, 89:11,
89:13, 89:15,
89:20, 90:7,
91:23, 92:13,
92:18, 92:21,
93:16, 93:24,
98:19, 116:15,
116:23, 117:4,
117:6, 117:9,
121:5, 121:8,
121:14, 129:22,
129:23, 130:5,
130:9, 131:8,
131:9, 139:9,
140:20, 141:24,
142:14, 143:5,
145:8, 161:6,
161:8, 168:16,
168:18, 170:24,
171:1, 171:12,
172:20, 175:19,
175:23, 194:7,
198:7
**shootings**
123:16
**short**
59:18, 149:7
**shortly**
129:18
**should**
11:20, 31:20,
34:11, 46:1,
47:14, 48:21,
68:21, 68:23,
79:2, 84:24,
112:18, 116:14,
119:6, 145:20,
146:13, 163:19,
173:2, 174:19,
187:2, 192:10,
200:1
**shoulder**
15:20
**shouldn't**
39:20, 77:15,
110:9
**shove**
195:10

**show**
51:23, 106:4,
109:8, 121:13,
123:17, 127:16,
128:21, 135:10,
138:18, 160:14,
174:21, 176:1,
176:10, 182:4
**showed**
121:5, 121:8,
129:23
**showing**
49:5, 49:6,
174:14, 175:7,
175:13
**shown**
21:18, 124:6
**shrug**
15:20
**shrugging**
53:14
**side**
13:1, 13:3,
20:5, 59:16,
88:12, 88:13,
98:3, 98:9,
102:16, 107:1,
113:11, 149:15,
149:18, 149:23,
150:7, 150:11,
150:13, 150:15,
150:24, 151:7
**sierra**
158:14
**sight**
75:16
**sign**
115:22, 115:24,
127:14, 127:20,
128:13, 144:14,
165:2, 166:11,
172:18, 178:16,
181:17, 198:22,
199:2
**signature**
115:19, 137:21,
138:3, 138:5,
153:16

**signature-mig2k**
203:12
**signature-p1kal**
202:13
**signed**
88:13, 97:6,
115:15, 129:6,
134:11, 135:1,
137:18, 137:24,
144:10, 154:2,
180:7, 180:13,
180:24, 181:6
**significant**
111:19
**signing**
134:19
**similar**
68:18
**simply**
140:10
**since**
52:22, 193:3
**single-family**
134:7
**sir**
7:10, 26:12,
48:5, 124:2,
139:4, 164:15,
165:22, 185:7,
201:5
**sit**
55:19, 83:2,
107:7
**situation**
35:10, 71:14,
77:23, 185:1,
185:15
**situations**
82:2
**six**
28:24, 29:11,
30:2, 68:10,
150:8, 151:23,
152:2, 152:6
**size**
68:18, 151:24,
152:2
**slip**
6:14, 19:5,

139:7, 139:8,
173:1, 173:2
**slips**
18:10, 19:5,
172:22
**slow**
172:13
**small**
106:10
**smaller**
188:12
**sneak**
152:18
**social**
25:16, 35:3,
35:4, 124:20
**sofa**
167:4
**soft**
12:6
**software**
174:10
**solache**
1:11, 3:10,
90:11, 90:15,
91:5, 91:19,
92:9, 105:4,
116:5, 139:1,
159:1, 159:5,
164:22, 165:1,
166:2, 174:4,
174:15, 174:22,
175:8, 175:14,
176:1, 176:11,
182:5, 192:24,
193:4, 196:17,
197:5
**solame**
140:6
**solely**
52:7
**some**
14:23, 16:5,
16:18, 31:19,
34:10, 39:20,
40:18, 41:17,
42:20, 43:9,
44:22, 45:8,

46:19, 46:22,
52:15, 53:13,
58:3, 73:7,
77:16, 78:9,
98:9, 103:10,
107:4, 110:9,
114:19, 126:10,
141:23, 153:7,
155:2, 183:10,
194:20, 195:4

**somebody**
30:15, 47:10,
48:2, 58:5,
66:24, 73:10,
78:18, 80:15,
124:13, 125:1,
152:18, 163:22,
183:19, 183:20,
185:2, 186:1

**somebody's**
72:16, 112:13

**someone**
70:22, 88:19,
112:19, 134:11,
155:21, 170:20,
179:15

**something**
26:22, 26:23,
46:5, 49:13,
63:23, 65:19,
66:4, 95:13,
95:15, 96:4,
99:4, 99:12,
106:14, 111:10,
113:1, 152:8,
152:20, 162:22,
163:22, 189:21

**sometime**
10:8

**sometimes**
38:13, 43:15,
59:18, 78:13,
79:3, 82:13,
83:23, 118:14,
118:23, 119:2

**somewhere**
13:4, 98:2,
99:15

**sorry**
14:14, 25:5,
25:21, 50:3,
61:9, 65:24,
70:23, 81:14,
96:8, 101:4,
101:6, 111:14,
115:18, 116:6,
120:4, 120:6,
120:14, 121:18,
124:1, 129:17,
132:18, 135:23,
135:24, 136:2,
141:15, 146:4,
149:5, 157:12,
159:15, 162:4,
164:15, 165:21,
173:12, 174:5,
174:9, 178:2,
183:6, 193:8,
196:10

**sort**
38:14, 46:22,
73:7, 98:9,
152:20, 163:10

**sorts**
19:24, 193:16

**soto**
21:24, 55:21,
72:7, 82:19,
83:3, 127:1,
127:17

**sotos**
4:7

**sought**
186:1

**sound**
57:23, 106:24,
135:20

**sounds**
103:19, 104:2,
194:17

**south**
5:6, 33:21,
33:22, 134:1,
137:12, 139:18,
171:13, 171:15,
173:19

**space**
34:3, 36:4,
165:24, 181:9

**spaced**
150:10

**spaces**
26:19, 140:11

**span**
77:13

**spanglish**
43:15

**spanish**
42:14, 42:15,
42:17, 42:20,
43:8, 43:10,
43:14, 43:17,
43:19, 43:21,
43:23, 44:2,
44:5, 44:9,
44:10, 44:16,
44:17, 44:21,
44:24, 45:1,
45:4, 88:11,
88:13, 88:14,
131:13, 131:16,
131:18, 131:20,
132:2, 132:7,
132:12, 132:20,
135:18, 135:21,
136:13, 136:15,
137:1, 137:8,
137:9, 137:10,
138:11, 178:1,
178:10, 178:21,
178:22, 179:5,
179:7, 179:19,
180:20, 180:23,
183:18, 183:21,
183:22, 184:3,
184:10, 185:24,
187:1, 187:4,
188:1, 188:5,
188:18

**spanish-only-spe-
aking**
185:17

**spanish-speaker**
185:12

**spanish-speakers**
186:17, 186:23

**spanish-speaking**
42:16, 184:14,
184:21, 186:8

**sparked**
144:7

**speak**
11:17, 12:2,
15:24, 42:12,
42:14, 42:19,
42:22, 42:24,
43:5, 43:15,
43:23, 44:2,
44:4, 44:5,
44:9, 44:21,
59:17, 62:17,
91:15, 91:18,
91:21, 92:8,
92:11, 101:5,
101:7, 101:11,
131:13, 131:18,
132:2, 132:12,
135:18, 166:16,
180:19, 183:22,
183:23, 184:3,
188:1, 188:4,
191:14

**speaking**
16:13, 62:18,
68:24, 135:21,
136:12, 136:15,
136:24, 137:7,
137:9, 137:10,
138:11, 142:21,
178:7, 181:12

**special**
57:16

**specialists**
113:22, 114:4

**specific**
39:18, 40:17,
54:6, 56:17,
182:22

**specifically**
19:21, 37:12,
40:21, 93:8,
114:15

| | | | |
|---|---|---|---|
| **specify** | **stands** | 101:1, 103:17, | 175:12, 175:19, |
| 37:7 | 68:22, 123:1, | 103:24, 104:7, | 175:24, 176:7, |
| **speculation** | 123:19, 124:4 | 104:10, 104:13, | 180:10, 180:19, |
| 35:13, 38:24, | **stankus** | 105:13, 110:8, | 194:8, 199:12 |
| 57:8, 59:7, | 4:4 | 110:10, 114:24, | **still** |
| 61:6, 65:22, | **star** | 185:1, 185:4, | 35:14, 94:3, |
| 73:1, 74:8, | 117:18 | 185:11, 185:16, | 141:11, 161:20, |
| 76:17, 79:15, | **starr** | 185:22, 185:23 | 188:13, 191:3 |
| 80:5, 81:11, | 3:4, 6:4, 6:7, | **statement** | **stint** |
| 110:16, 113:18, | 7:9, 7:11, 7:16, | 67:2, 121:9, | 30:22 |
| 143:11 | 12:7, 17:23, | 172:1, 172:8, | **stop** |
| **spell** | 18:3, 49:4, | 185:2, 185:13, | 44:4, 195:3 |
| 7:12, 171:16 | 54:22, 59:8, | 185:16, 200:16 | **stored** |
| **spelled** | 68:1, 69:15, | **states** | 99:12 |
| 7:14, 86:12 | 92:1, 92:5, | 1:1 | **story** |
| **spoke** | 92:15, 92:16, | **station** | 42:19, 112:13 |
| 44:9, 45:4, | 108:11, 108:14, | 48:8, 177:8, | **straight** |
| 62:11, 83:9, | 116:4, 116:8, | 183:23, 194:7 | 42:5, 47:9 |
| 88:5, 131:7, | 120:4, 120:6, | **status** | **street** |
| 131:16, 131:20, | 120:16, 125:6, | 37:1 | 2:5, 3:6, 3:20, |
| 132:7, 132:19, | 127:23, 128:2, | **stay** | 5:13, 30:4, |
| 163:18, 178:12, | 128:7, 128:9, | 75:15 | 30:7, 44:3, |
| 180:23, 183:17, | 128:10, 138:23, | **stayed** | 63:7, 63:8, |
| 183:20, 184:10, | 144:23, 149:7, | 28:17, 29:15 | 74:2, 74:3, |
| 187:1, 188:18, | 149:11, 161:13, | **stays** | 74:4, 190:16 |
| 191:12 | 161:17, 164:13, | 141:21 | **strike** |
| **spoken** | 200:6, 200:9, | **step** | 20:6, 37:15, |
| 39:23, 43:19 | 201:2, 201:5 | 114:19 | 41:21, 56:20, |
| **spotty** | **start** | **steps** | 93:5, 126:1, |
| 143:22 | 12:20, 43:16, | 41:3, 81:9, | 129:17, 157:21, |
| **spouse** | 50:22, 52:21, | 81:20 | 194:6 |
| 107:16 | 53:14, 87:15, | **stevens** | **strong** |
| **stack** | 174:19, 194:18 | 52:4, 84:6, | 57:19 |
| 57:24 | **started** | 85:6, 85:7, | **stuck** |
| **stains** | 24:22, 28:12, | 92:19, 98:19, | 84:12 |
| 116:15, 129:22, | 51:22, 155:7, | 117:10, 117:21, | **stuff** |
| 130:12 | 163:19, 163:20, | 118:16, 129:20, | 52:16 |
| **stake** | 192:5 | 130:24, 131:11, | **subject** |
| 112:14 | **starting** | 131:13, 137:4, | 12:15, 12:21, |
| **stamp** | 128:4 | 137:24, 138:2, | 39:4 |
| 115:13, 116:3, | **state** | 139:22, 141:9, | **subjects** |
| 116:5, 117:12, | 2:11, 7:12, | 141:11, 142:10, | 40:23 |
| 160:19 | 202:16 | 143:16, 168:7, | **submit** |
| **stand** | **state's** | 168:12, 168:17, | 46:17, 46:18, |
| 21:23, 22:1 | 4:16, 63:19, | 169:23, 170:3, | 127:1 |
| **standard** | 67:8, 67:9, | 170:5, 170:6, | **submitted** |
| 93:19 | 67:13, 73:15, | 172:14, 172:19, | 127:6 |
| **standing** | 73:18, 100:22, | 172:21, 173:9, | **subpoenaed** |
| 130:23 | | | 192:7 |

**subsequent**
21:24, 39:9,
40:7, 41:9, 43:7
**substantive**
71:8, 71:11
**sued**
8:13
**suicide**
190:17, 191:2
**suite**
3:20, 4:8, 5:6,
5:13
**summary**
27:20
**sup**
51:9, 51:11,
52:6, 52:19,
52:20, 64:24,
70:20, 71:2,
71:6, 74:12,
110:3, 110:4,
110:8, 110:11,
110:12, 112:24,
113:6
**supervisor**
73:13, 107:21,
114:20, 115:15,
115:21, 198:15
**supplementary**
47:17, 67:5,
78:21, 79:6,
169:18, 170:18
**support**
189:14, 189:18,
189:22
**supporting**
203:7
**supposed**
51:23, 60:13,
65:11, 99:14,
166:22, 168:4,
168:7, 191:20,
191:23, 192:5,
198:6
**suppressed**
147:23
**suppressing**
14:4

**sure**
24:21, 26:10,
29:1, 37:5,
40:16, 47:16,
47:17, 50:22,
51:8, 51:9,
51:13, 53:6,
53:16, 54:23,
55:12, 66:15,
69:11, 71:23,
74:4, 75:12,
75:14, 77:12,
80:7, 80:16,
83:6, 86:21,
87:9, 89:22,
95:1, 95:9,
99:6, 99:22,
100:9, 107:8,
109:19, 113:20,
118:12, 123:10,
125:18, 125:20,
128:1, 133:5,
133:6, 133:15,
141:20, 141:23,
142:11, 144:17,
146:12, 148:9,
150:7, 169:3,
175:18, 188:3,
195:5
**susler**
3:11, 6:5,
11:16, 11:21,
11:24, 12:5,
49:4, 116:7,
164:15, 164:20,
164:23, 164:24,
174:6, 174:11,
193:7, 199:13
**suspect**
54:13, 55:8,
55:11, 55:17,
56:1, 56:6,
56:11, 56:22,
56:24, 57:6,
58:14, 58:15,
58:18, 58:23,
59:4, 59:9,
60:3, 61:18,

62:11, 63:18,
64:13, 65:19,
66:2, 66:3,
66:9, 68:6,
68:8, 68:19,
68:22, 69:1,
69:3, 69:5,
70:13, 70:15,
76:14, 77:22,
126:14, 133:17,
148:8, 148:12,
148:16, 148:19,
148:22, 177:16,
183:17, 185:17
**suspect's**
62:23, 64:16,
111:6, 111:7
**suspects**
48:12, 53:24,
54:9, 55:14,
56:14, 57:1,
58:10, 59:24,
60:8, 60:24,
66:18, 68:10,
76:21, 87:22,
96:18, 166:10,
166:14, 184:1,
185:6
**suspend**
79:4
**suspended**
13:22
**suspension**
13:23
**suspicious**
79:10, 81:16
**switching**
56:14
**sworn**
7:4
**symbolizes**
124:17

**T**

**tabs**
107:2
**tac**
187:20, 187:24

**tactical**
29:16, 29:17
**tail**
97:11
**take**
10:20, 16:20,
16:21, 18:14,
43:7, 47:6,
47:16, 48:15,
49:7, 49:10,
62:9, 63:16,
74:12, 74:15,
75:11, 77:21,
80:17, 81:9,
81:19, 92:1,
93:17, 108:15,
108:21, 109:9,
109:10, 116:3,
129:15, 135:12,
149:7, 153:13,
160:18, 185:2,
185:16, 190:7,
200:18
**taken**
7:18, 78:20,
133:16, 141:21,
149:1, 190:3,
195:23, 202:3
**taking**
13:18, 13:21,
15:13, 20:17,
45:20, 55:17,
75:10, 119:1,
185:13
**talk**
16:1, 18:16,
24:1, 24:3,
35:5, 82:18,
107:23, 107:24,
152:17, 163:22,
164:5, 196:1,
196:2
**talked**
22:13, 24:2,
43:2, 48:1,
88:7, 108:4
**talker**
12:6

**talking**
7:23, 47:10,
59:8, 59:22,
59:23, 68:2,
79:17, 125:4,
135:14, 154:23,
161:12, 183:24,
184:11, 199:4
**target**
152:16
**taught**
53:4
**team**
187:20, 187:24
**teams**
140:17
**technical**
152:11
**technicians**
117:24
**television**
146:5
**tell**
11:22, 18:4,
30:7, 33:12,
36:17, 37:17,
38:7, 39:11,
40:8, 43:10,
54:16, 60:19,
65:9, 66:19,
67:21, 73:13,
73:15, 73:18,
74:6, 95:9,
95:22, 96:20,
97:12, 99:6,
99:19, 107:16,
107:19, 108:18,
110:21, 118:22,
123:21, 139:6,
142:9, 149:12,
152:19, 165:15,
174:7, 185:19,
187:16, 191:10,
193:22, 194:16,
198:2, 198:4
**telling**
15:8, 37:4,
148:12

**tells**
112:13, 142:1,
171:13
**ten**
10:8, 13:1,
79:3, 79:4
**tenant**
62:5, 62:6
**tend**
18:16
**tendency**
64:12
**tending**
176:1, 176:10
**tenures**
32:10, 34:17
**teresa**
1:24, 203:2,
203:14
**term**
39:1, 41:22,
41:23, 42:1,
48:24, 54:17,
69:7, 70:4,
74:2, 74:3,
103:3, 124:20,
150:21, 152:13,
152:22
**terming**
83:6
**terms**
11:21, 12:8,
13:5, 13:10,
54:19, 75:6,
186:17, 197:24
**test**
27:24, 31:18,
57:14
**testified**
7:6, 18:21,
21:3, 48:9,
49:8, 51:4,
67:7, 77:8,
77:19, 104:22,
107:12, 133:4,
158:18, 161:9,
168:13, 171:17,
173:20, 191:8,

194:5, 196:15,
197:2
**testify**
7:4, 21:20,
36:12, 105:1,
147:9, 192:7
**testifying**
160:12, 193:15
**testimony**
6:15, 15:5,
17:3, 17:7,
17:10, 18:9,
18:23, 19:2,
21:6, 21:11,
21:13, 64:23,
80:13, 82:24,
104:20, 105:10,
105:14, 105:17,
160:15, 162:15,
179:22
**th**
7:19, 28:14,
28:16, 28:17,
28:19, 28:23,
29:2, 29:6,
29:14, 29:16,
31:23, 137:16,
187:12, 187:23,
188:4, 188:15,
192:5, 193:13,
193:20, 194:14,
202:10
**thank**
12:5, 116:8,
137:13, 141:16,
164:14, 173:12,
181:13, 201:5,
201:6
**thanks**
92:15
**theft**
32:9, 35:8,
35:17, 35:18,
52:15, 183:9
**thefts**
32:19, 123:16
**theirs**
111:21, 111:23,

114:4, 114:5
**themselves**
137:4
**they'd**
152:18
**thing**
15:23, 19:11,
74:24, 93:22,
96:6, 98:17,
108:7, 109:11,
162:21, 163:5,
189:21
**things**
15:1, 36:7,
37:23, 38:2,
38:14, 51:21,
51:23, 58:3,
62:10, 75:1,
86:16, 111:10,
112:2, 113:5,
123:18, 178:14
**think**
8:11, 9:16,
10:13, 13:3,
17:13, 18:7,
18:14, 19:4,
19:10, 22:21,
27:3, 28:8,
31:3, 32:4,
33:21, 36:11,
41:8, 44:12,
50:1, 52:8,
53:5, 60:23,
65:12, 66:16,
69:14, 69:22,
69:24, 70:10,
71:5, 72:4,
72:13, 72:17,
73:17, 74:6,
81:18, 86:20,
88:12, 93:20,
95:24, 96:6,
96:16, 97:6,
100:6, 107:7,
107:8, 107:22,
111:23, 113:23,
119:2, 132:9,
132:15, 133:4,

136:16, 138:9,
140:6, 142:16,
144:12, 145:23,
149:24, 150:8,
150:10, 153:11,
160:19, 161:23,
162:24, 164:13,
170:2, 179:17,
184:17, 185:10,
186:9, 195:19
**third**
3:13, 19:11,
118:24, 129:14,
129:18, 160:20,
184:17, 186:7
**thomas**
158:14
**thought**
43:3, 49:21,
77:9, 93:21,
96:8, 135:24,
147:5, 195:18
**threaten**
56:6, 56:11
**threatened**
56:7
**threatening**
148:16
**three**
10:7, 24:21,
24:23, 29:20,
42:21, 63:2,
78:13, 87:14,
98:13, 112:1,
113:20, 114:1,
140:13, 144:3,
168:15, 170:8,
171:14, 194:15
**through**
18:14, 41:4,
63:7, 109:23,
113:19, 160:18,
161:14
**throw**
77:23
**till**
163:17
**time**
13:8, 13:14,

13:19, 13:21,
16:18, 18:14,
18:19, 22:8,
28:6, 32:9,
33:8, 37:21,
39:20, 41:15,
44:23, 52:15,
52:17, 54:14,
55:6, 68:2,
72:15, 77:7,
77:14, 78:21,
81:17, 86:10,
87:19, 92:23,
93:21, 95:2,
97:3, 97:8,
98:21, 102:19,
107:6, 109:21,
111:5, 112:24,
118:18, 119:22,
120:21, 122:18,
123:6, 125:5,
129:8, 143:9,
144:15, 144:18,
145:23, 153:22,
153:23, 153:24,
154:1, 162:17,
164:10, 166:5,
166:11, 167:21,
179:7, 183:10,
185:18, 187:5,
187:17, 187:19,
189:7, 189:11,
189:15, 191:2,
193:12, 193:21,
194:4, 194:19,
194:22, 195:2,
197:16, 199:23
**timeframe**
67:24, 123:12,
123:13
**times**
15:24, 32:12,
44:18, 47:8,
70:10, 78:7,
78:23, 112:21,
118:5, 124:21,
147:7, 183:11
**titled**
172:1

**today**
7:19, 10:22,
11:4, 15:5,
17:3, 17:10,
17:17, 18:1,
20:9, 20:12,
20:15, 21:11,
21:15, 22:5,
33:3, 77:8,
77:19, 78:24,
83:2, 83:20,
107:12, 158:18,
162:18, 169:19,
171:17, 192:5
**today's**
23:11, 24:4,
192:4
**together**
35:11, 47:19,
73:17, 84:7,
87:6, 110:8,
110:24, 114:7,
114:22
**told**
11:7, 30:19,
52:7, 53:2,
62:11, 63:5,
86:4, 86:8,
99:17, 163:22,
166:24, 181:20,
182:2, 185:23,
198:1, 198:6,
198:9
**tom**
103:18, 103:21,
160:2
**tomorrow**
52:19, 52:21,
79:1
**tonight**
52:21
**took**
11:9, 13:13,
43:9, 45:23,
46:18, 50:18,
52:15, 53:17,
62:8, 86:24,
87:7, 97:10,

113:5, 119:21,
133:1, 133:7,
143:5, 161:5,
161:8, 173:12
**top**
116:9, 185:10
**topic**
54:6
**total**
118:23
**totally**
60:9, 74:4
**touch**
58:23
**track**
107:1
**trained**
39:5, 39:8,
39:10, 41:20,
42:9, 51:15,
53:4, 114:7
**training**
37:17, 37:18,
37:22, 38:4,
38:9, 38:13,
38:22, 39:2,
39:3, 39:6,
39:18, 39:22,
40:4, 40:5,
40:10, 40:18,
40:20, 40:23,
41:1, 41:6,
41:10, 41:11,
41:18, 43:8,
113:13, 113:20,
114:3, 114:13
**trainings**
39:12
**transcribed**
1:24, 203:5
**transcriber**
203:1
**transcript**
6:15, 203:3
**transfer**
28:19, 46:14,
59:20, 191:20
**transferred**
28:16, 29:9,

29:21
**transit**
132:24
**translate**
135:23
**translated**
88:17
**trevino**
4:4, 102:13,
102:18, 102:24,
132:19, 159:24
**trial**
10:22, 11:3,
18:22, 21:4,
22:1, 104:22,
105:11, 105:17,
155:4, 173:20,
192:3, 192:8,
194:5, 196:15
**trick**
95:21
**tried**
189:14
**trigger**
155:11
**trip**
90:7
**trouble**
12:1
**true**
152:11, 203:3
**truly**
21:16, 78:10
**truth**
7:5, 7:6, 142:9
**truthful**
17:2, 17:6,
17:10, 21:6
**try**
12:4, 16:5,
78:15, 164:17,
166:16, 174:11
**trying**
8:21, 10:13,
31:19, 62:9,
95:21, 142:11,
172:23, 177:4
**tunnel**
41:22, 42:9

**turn**
47:20, 48:22,
50:5, 64:20,
65:3, 65:14,
65:16, 67:7,
70:8, 113:12,
117:12, 120:1,
121:18, 126:19
**turned**
35:18, 46:1,
74:11, 96:24,
169:1, 169:3,
169:4, 171:2,
172:20, 173:10
**twice**
22:21, 78:24
**two**
9:16, 9:17,
10:10, 10:23,
11:1, 11:6,
14:18, 19:9,
19:10, 19:13,
23:1, 23:4,
28:17, 29:4,
29:15, 29:22,
29:23, 31:5,
31:6, 31:22,
32:12, 32:24,
33:10, 35:6,
36:13, 42:20,
68:10, 70:10,
98:11, 103:9,
106:18, 111:24,
113:24, 114:2,
127:17, 132:13,
133:7, 140:10,
140:14, 140:17,
171:12, 171:18,
172:13, 172:14,
175:21, 178:19,
180:9, 186:9,
189:2, 192:6,
196:22
**type**
35:10, 55:4,
55:24, 125:10,
143:21, 196:22
**typed**
45:24

**types**
8:19, 19:24,
35:22, 36:9

## U

**uh-huh**
15:20
**uncertain**
45:13
**under**
15:5, 15:6,
21:8, 48:15,
137:10, 137:19,
183:10
**understand**
15:4, 15:8,
15:12, 15:21,
16:16, 27:24,
40:13, 43:18,
44:22, 45:19,
53:3, 54:24,
60:9, 71:18,
80:14, 149:13,
157:7, 172:13,
172:24, 179:3,
179:4, 179:6,
179:13, 180:2
**understandable**
174:8
**understanding**
19:23, 37:8,
44:24, 45:8,
51:17, 54:17,
57:19, 58:9,
60:12, 75:8,
110:5, 110:6,
137:1
**understood**
77:2, 178:4
**undoubtedly**
130:8
**unit**
137:13, 137:14,
182:16
**united**
1:1
**units**
113:24

**university**
24:17, 25:8,
26:13
**unless**
16:15, 37:7
**unregistered**
82:13
**until**
21:17, 30:4,
88:2, 141:22,
142:21
**ups**
78:11
**upstairs**
187:14
**use**
15:17, 16:21,
46:8, 47:21,
50:1, 50:7,
55:24, 80:19,
118:14, 123:7,
123:9, 125:8,
150:2, 174:7
**using**
49:14, 54:19,
54:20, 69:13,
126:10
**usually**
113:8, 134:17,
134:18

## V

**vague**
17:11, 56:3,
57:7, 61:5,
72:24, 76:16,
80:4, 110:15
**varga**
4:12, 104:8,
160:4
**various**
150:3
**vehicle**
80:21, 82:12,
136:12, 137:10,
138:10, 138:12,
138:15
**vehicles**
138:13

verbal
15:16
verbally
112:23
verdict
197:1
vergara
132:15, 184:9,
186:12, 189:4
versa
69:4
version
49:3
versus
35:2, 41:17,
200:15
vice
69:4
victim
61:16, 62:6,
63:17, 64:1,
68:7, 79:8,
200:16
victim's
111:6
victims
78:10, 78:16,
183:24
victor
132:13, 184:6,
184:9, 186:10,
189:4
victor's
132:14
videotaping
98:5
viewed
122:10
viewing
68:7, 151:2
violence
35:9
violent
33:19, 33:24,
34:5, 34:9,
35:11, 35:21,
35:23, 37:13,
59:16, 86:21,

87:4, 102:5,
110:21, 113:11,
113:13, 118:8,
119:11, 119:17,
132:8, 150:1,
150:2, 150:11,
182:13, 182:16,
182:20, 182:21,
185:21, 186:6,
186:13, 186:15,
186:16, 196:23
vision
41:22, 42:9,
130:22
visit
82:11, 82:15
vocational
24:9

## W

wacker
5:6
wait
143:9
walking
97:16, 134:9
wall
151:11, 151:13,
151:14, 151:15
wallet
192:14
want
14:24, 16:21,
22:12, 24:2,
28:1, 28:23,
29:10, 29:22,
30:18, 30:19,
31:16, 33:20,
39:24, 43:4,
45:7, 62:13,
63:15, 77:3,
78:16, 78:19,
95:20, 95:21,
95:22, 97:5,
99:13, 106:11,
108:4, 109:5,
109:8, 109:19,
109:22, 130:22,

138:18, 141:20,
142:3, 146:11,
150:9, 158:4,
160:18, 160:23,
181:13, 189:11,
189:12, 191:13,
195:10, 195:15,
195:19
wanted
107:21, 125:1,
125:16, 135:24,
167:19, 184:20
warehouse
126:7
warrant
136:17, 136:20
watch
118:24, 184:12,
184:17, 184:18,
184:19, 186:7
way
9:3, 39:21,
43:2, 44:8,
51:15, 78:20,
82:14, 90:9,
97:23, 98:4,
111:19, 142:18,
143:1, 143:15,
150:4, 150:18,
162:19, 173:18,
174:1, 175:20,
176:7, 193:16
ways
12:18, 12:20,
15:18
we'll
52:21, 201:4
we're
15:1, 18:15,
18:20, 33:3,
33:7, 40:12,
41:13, 48:6,
52:20, 56:14,
67:24, 71:19,
79:17, 98:5,
125:4, 143:19,
161:12, 183:24,
187:14, 200:16

we've
82:21, 123:5,
123:23, 135:13,
143:24
week
23:7, 23:8,
78:14, 114:1
weeks
10:23, 11:2,
11:6, 23:4,
113:21, 113:24,
192:6
wehrle
4:12, 104:11,
160:6
weight
68:19
went
24:21, 24:23,
26:14, 27:4,
28:19, 29:3,
29:9, 29:14,
29:15, 31:23,
37:22, 37:24,
38:1, 41:11,
43:1, 47:8,
47:23, 50:9,
62:1, 63:15,
63:18, 64:23,
65:1, 72:10,
72:20, 73:19,
84:5, 84:11,
86:1, 93:7,
95:1, 97:1,
97:3, 97:19,
106:12, 106:16,
113:19, 113:24,
133:5, 133:8,
144:15, 161:21,
162:1, 165:16,
166:5, 166:18,
169:8, 169:11,
169:15, 169:24,
170:8, 189:17,
190:17, 191:21,
197:13, 198:1
weren't
37:12, 100:19,

126:16, 133:4,
167:3, 170:14,
170:16, 170:18,
179:19, 189:12,
189:13
**west**
4:8
**western**
27:2
**whatever**
62:23, 95:22,
118:14, 164:3,
183:6
**whatsoever**
90:22, 95:24,
158:18, 159:5
**whenever**
57:14
**where'd**
24:8, 24:16
**whereof**
202:9
**whereupon**
7:2
**whether**
20:21, 39:8,
39:16, 40:17,
45:22, 56:10,
57:5, 58:21,
58:22, 60:17,
66:17, 96:2,
123:15, 145:1,
161:21, 161:24,
165:18, 165:23,
175:24, 176:6,
177:10, 177:13,
177:16, 177:21,
177:24, 178:4,
180:22, 185:21,
188:9, 190:2,
190:6
**whoever**
30:16, 82:12,
115:7
**whole**
7:5, 30:9,
30:13, 38:20,
108:7, 109:11,

128:2
**wife**
44:19, 127:16,
181:16, 181:22,
191:2
**william**
157:9, 157:11
**window**
62:8, 62:9,
62:22, 152:3
**windows**
151:10, 151:16,
151:18
**wished**
107:22
**withheld**
159:13
**withhold**
159:4, 159:8
**withholding**
159:18, 159:21
**within**
11:1, 11:11,
11:14, 79:3,
123:4
**without**
38:20, 40:19,
82:23, 136:14,
136:16, 136:19,
191:9
**witness**
9:12, 10:1,
10:3, 10:17,
10:18, 11:19,
11:23, 12:4,
12:6, 17:22,
25:7, 26:13,
35:14, 44:7,
49:6, 58:17,
59:9, 62:6,
62:17, 63:18,
64:4, 64:16,
69:13, 79:8,
88:14, 101:6,
101:9, 101:11,
121:13, 121:15,
124:3, 129:4,
148:1, 148:4,

148:5, 148:7,
148:12, 148:15,
148:16, 148:18,
148:19, 148:21,
148:22, 159:16,
164:14, 164:19,
178:16, 183:17,
191:6, 191:16,
201:6, 202:9
**witnesses**
48:12, 50:10,
68:6, 111:8,
112:2, 137:19,
147:16, 180:9,
184:1
**woes**
107:22
**woman**
69:5, 122:8,
124:7
**word**
113:5, 136:13,
180:2
**words**
43:17, 44:22,
132:4, 136:5,
179:1
**work**
12:12, 29:3,
30:2, 32:21,
32:22, 33:15,
35:2, 35:11,
36:18, 51:24,
53:14, 80:17,
107:2, 107:19,
107:20, 115:7,
134:20, 140:17,
146:18, 146:23,
147:3, 163:12,
188:13
**worked**
32:8, 32:9,
32:18, 33:9,
33:17, 34:9,
36:13, 47:7,
100:14, 101:23,
102:16, 102:17,
119:11, 150:20,

153:6, 153:7,
175:21, 184:15,
184:19, 187:18,
187:20, 189:6,
195:1
**working**
30:7, 30:10,
33:13, 34:23,
35:5, 37:11,
87:12, 95:11,
102:20, 103:4,
103:15, 152:15,
165:14
**worry**
63:10
**wouldn't**
48:12, 58:4,
83:9, 93:13,
95:17, 145:5,
179:9, 180:4,
180:15, 180:17
**write**
49:17, 49:22,
49:23, 80:8,
169:17, 170:14,
170:17, 170:18,
170:21
**writes**
112:15, 112:20
**writing**
38:1, 48:8,
49:18, 198:21,
199:1, 199:6,
199:8
**written**
41:2, 43:21,
169:22
**wrong**
98:6, 179:18
**wrote**
18:12, 45:24,
172:17

| X |
| --- |

**xavier**
158:10

| Y |
| --- |

**yeah**
8:21, 8:23,

9:14, 9:24,
10:13, 10:16,
12:4, 12:17,
13:23, 27:11,
35:1, 35:15,
37:7, 45:12,
49:4, 49:17,
49:20, 60:19,
63:13, 64:9,
64:24, 71:18,
77:6, 77:12,
79:9, 79:13,
80:7, 81:6,
98:14, 100:16,
108:13, 111:16,
115:10, 119:9,
120:6, 120:7,
128:24, 130:19,
131:23, 133:6,
138:11, 139:12,
139:13, 141:14,
144:3, 144:24,
149:16, 151:21,
157:6, 161:17,
169:13

**year**
10:5, 10:21,
11:11, 11:14,
18:8, 24:12,
24:20, 27:14,
27:23, 28:15,
29:8, 29:18,
31:23, 32:1,
38:17, 38:20,
191:22, 193:22,
194:24

**yearly**
189:21

**years**
10:7, 10:8,
10:9, 24:22,
24:23, 28:17,
28:24, 29:1,
29:4, 29:11,
29:15, 29:20,
29:23, 31:4,
31:5, 31:6,
31:8, 31:17,

31:20, 31:23,
42:21, 63:2,
194:15, 194:16

**young**
63:1, 63:23

**yourself**
109:12, 126:20

**youth**
36:4, 36:5,
102:16, 103:2,
103:4, 103:15,
113:22, 114:3,
114:7, 117:24,
132:21, 187:14,
187:24

**youths**
36:7

---

**Z**

---

**zibulski**
3:18, 199:17

---

**0**

---

**004226**
139:2

**0052327**
139:1

**0070**
3:15

**0090**
5:8

**01028**
1:8

**03**
1:20

---

**1**

---

**10**
1:20, 28:16,
28:17, 29:16,
145:22, 193:13,
193:20, 194:14

**1000**
5:15

**109**
6:12

**1130**
120:9

**1180**
3:13

**12**
162:6

**120**
3:20

**1240**
4:8

**13**
28:14, 29:6,
31:23

**135**
6:13

**138**
6:14

**14**
28:19, 28:23,
29:2, 29:14,
31:8, 31:17,
137:16

**141**
4:8

**15**
1:19, 7:19,
192:5

**1500**
121:20

**160**
6:15

**1630**
97:6

**164**
6:5

**1700**
126:24

**18**
1:8, 1:14

**1830**
129:5, 129:10,
153:22

**19**
201:7

**1982726**
116:10

**199**
6:6

**1990**
28:20

**1998**
20:18, 45:10,
45:18, 77:2,
77:9, 77:13,
83:4, 120:9,
121:19, 125:13,
126:24, 153:19

**1:-cv**
1:8, 1:14

---

**2**

---

**2**
201:7

**200**
6:7

**2000**
3:20, 18:8

**2009**
194:17

**2010**
194:14, 194:17

**2011**
194:14

**2013**
194:14

**2016**
27:16, 193:14

**2019**
1:19

**2020**
202:11, 203:15

**203**
1:23

**21**
161:14

**2200**
5:13

**2312**
1:14

**235**
3:15

**24**
161:14

**243**
3:8

**25**
187:12, 187:23,
188:4, 188:15

**28**
123:13
**29**
31:20, 202:10,
203:15

**3**

**30**
97:7, 129:10,
129:11, 129:12,
129:13
**300**
183:10
**311**
3:6, 5:6
**312**
3:8, 4:19, 5:8,
5:15
**321**
5:13
**330952**
1:22
**331**
2:5
**3314**
4:10
**3705**
3:22
**3rd**
2:6, 3:6,
129:5, 174:3,
174:13, 174:21,
175:13, 176:9

**4**

**4**
97:7, 129:11,
129:12, 129:13
**426**
115:13, 116:5
**429**
116:3
**431**
117:12
**432**
120:3, 120:6
**433**
121:18

**434**
126:19
**446**
116:7, 116:8
**494**
5:15
**4th**
29:21, 29:24,
30:2, 30:3,
191:20

**5**

**500**
4:17
**5200**
5:6
**532**
120:1, 120:4,
120:5
**56772**
160:17
**56778**
160:19
**56779**
160:18, 162:6
**5900**
3:8
**5971**
4:19

**6**

**6**
129:10
**603**
4:19
**60602**
3:21, 4:18
**60604**
4:9
**60606**
5:7
**60607**
2:7, 3:7
**60642**
3:14
**60654**
5:14
**6200**
134:1

**6234**
137:12, 139:18,
171:13, 171:15,
173:19
**630**
4:10
**650**
137:6, 137:13,
137:15

**7**

**735**
4:10
**77**
24:13, 24:22,
28:9
**773**
3:15
**786**
3:22

**8**

**866**
3:22
**87**
28:12
**88**
28:15

**9**

**90**
31:17
**92**
115:18, 115:19
**98**
178:21, 183:2,
184:5, 186:7,
186:23, 188:17
**982**
5:8