# EXHIBIT NNNNN

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    ARTURO DELEON-REYES,            )
 4                                  )
                   Plaintiff,       )
 5                                  )
          -vs-                      ) No. 18 cv 1028
 6                                  )
    REYNALDO GUEVARA, et al.,       )
 7                                  )
                   Defendants.      )
 8  _____ )
    GABRIEL SOLACHE,                )
 9                                  )
                   Plaintiff,       )
10                                  )
          -vs-                      ) No. 18 cv 2312
11                                  )
    REYNALDO GUEVARA, et al.,       )
12                                  )
                   Defendants.      )

13

14

15              The deposition of SAUL BASURTO,

16  taken pursuant to notice and the Federal Rules

17  of Civil procedure for the United States District

18  Courts, reported by Sally Durkin, Certified

19  Shorthand Reporter and Notary Public within and

20  for the County of Cook, State of Illinois, via Zoom

21  videoconference from Chicago, Illinois, on Tuesday,

22  May 4, 2021 at the hour of 10:00 o'clock a.m.

23

24
```

Page 2

```
1   APPEARANCES:
2       LOEVY & LOEVY
        BY:  MR. SEAN STARR
3       311 North Aberdeen Street, 3rd Floor
        Chicago, Illinois  60607
4       sean@loevy.com
        (312) 243-5900
5
6               On behalf of the Plaintiff,
                Arturo DeLeon-Reyes;
7
8   PEOPLE'S LAW OFFICE
        BY:  MS. JAN SUSLER
9       1180 North Milwaukee Avenue
        Chicago, Illinois  60642
10      jsusler@gmail.com
        (773) 235-0070
11
12              On behalf of the Plaintiff,
                Gabriel Solache;
13
14  LEINENWEBER BARONI & DAFFADA, LLC
        BY:  MR. KEVIN ZIBOLSKI
15      120 North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
16      kevin@ilesq.com
        (312) 663-3003
17
18              On behalf of the Defendant,
                Reynaldo Guevara;
19
20  REITER BURNS, LLP
        BY:  MR. DANIEL BURNS
21      311 South Wacker Drive, Suite 5200
        Chicago, Illinois  60606
22      dburns@reiterburns.com
        (312) 982-0900
23
24              On behalf of the Defendant,
                Navarro;
```

Page 3

```
1
2   APPEARANCES CONTINUED:
3       ROCK FUSCO & CONNELLY, LLC
        BY:  MS. CATHERINE M. BARBER
4       321 North Clark Street, Suite 2200
        Chicago, Illinois  60654
5       cbarber@rfclaw.com
        (312) 494-1000
6
7               On behalf of the Defendant,
                City of Chicago and the deponent;
8
9   COOK COUNTY STATE'S ATTORNEY'S OFFICE
        BY:  MR. EDWARD BRENER
10      50 West Washington Street, Room 500
        Chicago, Illinois  60602
11      edward.brener@cookcountyil.gov
        (312) 603-3369
12              On behalf of the Cook County
                Defendants;
13
14  THE SOTOS LAW FIRM, PC
        BY:  MS. CAROLINE JAMESON GOLDEN
15      141 West Jackson Boulevard, Suite 1240A
        Chicago, Illinois  60604
16      cgolden@jsotoslaw.com
        (630) 735-3300
17
18              On behalf of the Individual
                Defendants.
19
20                  ****
21
22
23
24
```

Page 4

```
1           I N D E X
2
3   WITNESS                    PAGE   LINE
4       SAUL BASURTO
5    Examination By Ms. Susler    6    15
     Examination By Mr. Starr   133    23
6
7
8           EXHIBITS
9   EXHIBITS                   PAGE   LINE
10
     Deposition Exhibit Number 1............78      7
11   Deposition Exhibit Number 2............83      3
     Deposition Exhibit Number 3............92      5
12   Deposition Exhibit Number 4...........104      1
     Deposition Exhibit Number 5...........134     12
13 (Exhibit 5 not attached.)
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1       THE REPORTER:  Before we proceed, I'll ask counsel
2   to agree on the record that under the current national
3   emergency, pursuant to Section 319 of the Public Health
4   Service Act, there is no objection to this deposition
5   officer administering a binding oath to the witness
6   remotely.
7           Please state your agreement on the
8   record.
9       MS. SUSLER:  Jan Susler, counsel for plaintiff
10  Gabriel Solache agrees.
11      MR. STARR:  Sean Starr, counsel for plaintiff
12  Reyes agrees.
13      MS. BARBER:  This is Katie Barber representing the
14  City and the witness, and I am agreed.
15      MS. GOLDEN:  Caroline Golden for the individual
16  police officer defendants agrees.
17      MR. BRENER:  Edward Brener on behalf of the
18  prosecuting defendants, O'Malley, Brualdi, Wehrle, and
19  Varga as well as Cook County in the Reyes case only,
20  Agreed.
21      MR. BURNS:  Dan Burns on behalf of the defendant
22  Navarro agrees.
23      MR. ZIBOLSKI:  Kevin Zibolski on behalf of
24  defendant Guevara agrees.
```

Page 6

1          (Witness sworn.)
2     MS. SUSLER:  Good morning.
3          Would you state your name and spell it,
4  please.
5     THE WITNESS:  First name is Saul.  S-A-U-L.  Last
6  name is Basurto.  B, as in boy, A-S-U-R-T-O.
7     MS. SUSLER:  Mr. Basurto, my name is Jan Susler.
8  I am an attorney for plaintiff Gabriel Solache, and I
9  am going to be asking you some questions today which
10  you are going to answer under oath.
11          SAUL BASURTO,
12       having been first duly sworn, was
13       examined and testified as follows:
14          EXAMINATION
15  BY MS. SUSLER:
16     Q.  I guess my first question is, do you have an
17  attorney today?
18     A.  Yes.
19     Q.  And who is your attorney?
20     A.  Katie Barber.
21     Q.  Okay.  Can I just ask a favor, can you just
22  quickly remove your face mask so I can see what you
23  look like and then put it back on.
24     A.  Sure.

Page 7

1     Q.  Thank you so very much.  I appreciate that.
2     A.  Okay.
3     Q.  So I don't know, have you ever had your
4  deposition taken before?
5     A.  I don't remember.  Probably sometime during
6  my career, yes.
7     Q.  How many times?
8     A.  A few.  Not many.
9     Q.  Okay.  Like less than five?
10     A.  I would say less than five.
11     Q.  Okay.  Were they situations in which you were
12  a party to the lawsuit?
13     A.  One that I recall.  Only one.
14     Q.  Can you tell me about that?  When was that?
15     A.  It was about 25 years ago, I would say.
16     Q.  Okay.  What do you remember about the
17  lawsuit?
18     A.  Just what I read on one of the reports
19  yesterday.  Other than that, I didn't.
20     Q.  Okay.  What did you read on the report?
21     A.  That I was a part of the lawsuit.  I believe
22  they were saying that I witnessed an officer beating a
23  prisoner and that I did not interfere.  I believe that
24  was the allegation against me.

Page 8

1     Q.  What happened with that lawsuit?
2     A.  I never heard anything else until I read it
3  in one of the reports that it was settled.
4     Q.  Okay.  What did it settle for?
5     A.  What did it settle for you said?
6     Q.  Yes.
7     A.  I don't know.
8     Q.  Okay.  And the other depositions, what can
9  you tell me about the lawsuits related to those?
10     A.  That was the only lawsuit that I'm aware of.
11  Just the one.
12     Q.  Okay.  So the other depositions in which you
13  testified, you were not a party to the lawsuit?
14     A.  Right.
15     Q.  You were a witness?
16     A.  Yes.
17     Q.  And was that in your capacity as a Chicago
18  police officer?
19     A.  Yes.
20     Q.  And were any of those related to your work as
21  a lockup keeper?
22     A.  No.
23     Q.  We can talk about that later, but I'm just
24  going to refresh your recollection about some

Page 9

1  guidelines that we'll be operating under today.
2          I'm going to be asking you a series of
3  questions, and if you don't understand a question,
4  you need to let me know.
5          Is that fair?
6     A.  Yes.
7     Q.  And if you answer the question, I'm going
8  to assume that you understood it and answered
9  accordingly.
10          Okay?
11     A.  Okay.
12     Q.  All right.  And, you know, because we're
13  under Zoom and some technological situation here,
14  if there is a delay or a gap or if we have any
15  technological problems on either end, we're going to
16  let each other know.
17          All right?
18     A.  Okay.
19     Q.  All right.  And if you need a break at any
20  point, just let me know.  You don't even have to say
21  what for.  Just tell me you need a break.
22     A.  Okay.
23     Q.  And we'll take a break.
24          But if there is a question pending, I am

1  going to ask that you answer the question before we
2  take the break.
3      All right?
4  A.  Okay.
5      Q.  All right.  Now, you just told me that you
6  looked at a report, did you say, yesterday?
7  A.  Yesterday is the first time I saw that, yes.
8      Q.  Okay.  Was that in a meeting with Ms. Barber?
9  A.  Yes.
10     Q.  Was that in person?
11 A.  Yes.
12     Q.  And was anybody else present?
13 A.  No.
14     Q.  Okay.  Was that the first time you met with
15 her?
16 A.  Second time.
17     Q.  Okay.  When was the first time?
18 A.  Must have been probably years ago.
19     Q.  How many?
20 A.  I don't recall.
21     Q.  And what was that in relation to?
22 A.  Same thing.  Same case.
23     Q.  Okay.  Was anybody else present at that
24 meeting?

1  A.  Not that I recall.
2      Q.  Did you have any other contact with
3  Ms. Barber to prepare for your deposition in this
4  case?
5  A.  No.
6      Q.  So yesterday when you met with Ms. Barber --
7  well, the first time you met with her, did she show
8  you some documents?
9  A.  Yes.
10     Q.  Do you recall what those documents were?
11 A.  The arrest reports.
12     Q.  And when you say the arrest reports, are you
13 referring to the arrest reports for Mr. Solache and
14 Mr. Reyes?
15 A.  Yes.
16     Q.  And when you met with her yesterday, she
17 showed you some additional documents?
18 A.  Yes.
19     Q.  Okay.  So there was a report, you said, about
20 a lawsuit where you were named for not revealing use
21 of force that you saw in a lockup?
22 A.  It wasn't in the lockup.  It was in one of
23 the interview rooms, and allegedly I had witnessed it,
24 but that's not so.  I never saw it.

1      Q.  Okay.  What was that report?
2  A.  I'm not sure.  It was a bunch of reports that
3  I was shown, and it was in one of them.
4      Q.  Was it a supp report?  Was it on an arrest
5  report?  Was it -- you know what I am saying, what
6  kind of police report?  Was it a police report?
7  A.  I believe it was a court report where one of
8  the lawyers brought it up.
9      Q.  Was it a transcript of a hearing --
10 A.  Yes.
11     Q.  -- in this matter?
12 A.  Yes.
13     Q.  What other documents did you look at with
14 Ms. Barber or outside of her presence to prepare for
15 this deposition?
16 A.  The ones that I've testified in the past.
17     Q.  Which are those?
18 A.  It's about three or four of them from
19 years ago.  Years and years ago.
20     Q.  Okay.  Are you talking about the transcript
21 of your testimony?
22 A.  Yes.
23     Q.  Okay.  So you looked at the transcript of
24 your testimony at a motion to suppress for both

1  Mr. Solache and Mr. Reyes?
2  A.  Yes.
3      Q.  And you looked at the transcript of your
4  trial testimony in the trials of Mr. Solache and
5  Mr. Reyes?
6  A.  Yes.
7      Q.  Okay.  And you looked at the post-conviction
8  transcript of your testimony in the post-conviction
9  for both?
10 A.  Yes.
11     Q.  What else did you look at?
12 A.  That's as far as I know.
13     Q.  Did you speak to anyone else in preparation
14 for your deposition today?
15 A.  I spoke with Kevin Casey, who was working
16 with me on that particular day.
17     Q.  When did you speak to Mr. Casey?
18 A.  This morning.
19     Q.  Okay.  What did you say to Mr. Casey?
20 A.  I asked him about PB on the arrest report
21 because I could not recall a PB.  On the receipts for
22 the property, we put PB on there, and I was wondering
23 what it was for because I couldn't remember.  So I
24 asked him what that hell was it?

Page 14

1    Q. What did he say?

2    A. It is property bag. It says property bag.

3  We didn't inventory any valuables. So we put just put

4  on there property bag, PB.

5    Q. What else did you -- I am sorry.

6    A. That was when I told him it was a case from

7  1998, and I told him I was surprised he was never

8  called in because he was working with me.

9    Q. And what did he say?

10   A. That's it. I told him I got to get ready to

11  leave, and that's it.

12   Q. Okay. What is Mr. Casey's phone number?

13   A. I would have to look it up on my phone.

14   Q. Okay. We can do that on a break, and then

15  you can let me know.

16   A. I don't know it by memory.

17  MS. BARBER: Why do you need his phone number?

18  BY MS. SUSLER:

19   Q. Well, before you spoke to Mr. Casey this

20  morning, when was the last time you had spoken to him?

21   A. When he retired, I called him to congratulate

22  him on his retirement.

23   Q. When was that?

24   A. A year ago.

Page 15

1    Q. Are you and Mr. Casey friends?

2    A. We're friends. I would say friends, yes.

3    Q. How long did you work together?

4    A. Altogether I knew him from work about 20

5  years.

6    Q. So Mr. Casey worked with you in the lockup

7  when you processed Mr. Solache and Mr. Reyes?

8    A. Yes.

9    Q. And you knew that from the reports that you

10  looked at?

11   A. Yes.

12   Q. Was he a police officer?

13   A. He is what we would call a detention aide.

14  He is not a sworn police officer.

15   Q. What is a detention aide?

16   A. They just work in the lockup assisting the

17  officer.

18   Q. Okay. Well, we'll get to that in a minute.

19   Did you speak to anybody else other than

20  Mr. Casey about your deposition?

21   A. No. Just Casey.

22   Q. So are you currently employed, sir?

23   A. No. I'm retired.

24   Q. Congratulations. What are you doing in your

Page 16

1  retirement?

2    A. Trying to just stay busy. I go to the health

3  club and try to stay active, try to keep moving.

4    Q. What was your last employment?

5    A. I retired from the Chicago Police Department

6  seven years ago. That was my last employment.

7    Q. So that would be 2014?

8    A. Yes.

9    Q. And how many years were you employed at the

10  Chicago Police Department?

11   A. 31 years and eight months total.

12   Q. So it's going to be hard for me to do the

13  math real quick.

14   When did you become a Chicago Police officer?

15   A. I started July 19th of 1982.

16   Q. I am sorry. I missed that. July 19th of

17  what year?

18   A. 8-2. '82.

19   Q. Can you tell me about your assignments from

20  the time you started working?

21   A. Started in 1982. I went to the 24th

22  District. I was there seven years. Then I

23  transferred to the 25th District, and I was there the

24  rest of my career.

Page 17

1    Q. What was your assignment at the 24th

2  District?

3    A. I was on patrol.

4    Q. The whole time?

5    A. Occasionally I would relieve the lockup

6  keeper on his days off. I would work the lockup there

7  also.

8    Q. And then when you moved to the 25th, what

9  was your first assignment?

10   A. I was also on patrol in the 25th, and then

11  there also I would occasionally relieve the lockup

12  keeper on his days off.

13   Q. Did you ever have an assignment to the

14  lockup?

15   A. Not at that time, but later on. My last

16  ten years, I worked the lockup eight of them.

17   Q. So from what year to what year did you work

18  the lockup as your assignment?

19   A. Well, that would be -- let's see. I retired

20  in 2014. 2012. From 2004 to 2012.

21   Q. So in 1998 if you were working in the lockup,

22  it was as a relief for the assigned lockup keeper?

23   A. Yes. I was still on patrol at that time.

24   Q. Can you quantify the number of months or

Page 18

1  years that you had worked in the lockup before 1998 as
2  a relief?
3       A.  When I was on third watch, which is the
4  afternoon watch, I worked it pretty regularly
5  relieving the lockup keeper on third watch.
6           And then when I switched to a second watch,
7  the day watch, I would also relieve the lockup keeper
8  on his days off.
9       Q.  When were you on third watch?
10      A.  I was on third watch from the time -- no.
11  When I first went to 25, we were rotating every 28
12  days.  Every period we would rotate watches, and then
13  I went on straight third watch probably -- I can't
14  remember now.
15      Q.  So would it be fair to say that by 1998 you
16  had significant experience working in the lockup as a
17  lockup keeper?
18      A.  Yes.
19      Q.  Did you have any other employment while you
20  worked for the Chicago Police Department?
21      A.  When I first started in 1982, let's see,
22  after I finished my probation I worked as a substitute
23  teacher.  On my days off I would work as a substitute
24  teacher.

Page 19

1       Q.  So that was early in your career?
2       A.  Yes.
3       Q.  How long did you do that?
4       A.  I did that about five years.
5       Q.  While you were with the Chicago Police
6  Department, were you a member of the Fraternal Order
7  of Police?
8       A.  Yes.
9       Q.  Do you continue to be a member of the
10  Fraternal Order of Police?
11      A.  Yes.
12      Q.  Have you ever held any office in the FOP?
13      A.  No.
14      Q.  Sir, what is your highest level of education?
15      A.  I got a bachelor's.
16      Q.  Where?  From where?
17      A.  U of I, Chicago Circle.
18      Q.  In what year?
19      A.  I graduated '75.
20      Q.  And what was your declared major?
21      A.  Spanish.  I was a Spanish teacher.
22      Q.  Are you on any kind of medication today that
23  would affect your ability to answer my questions
24  truthfully?

Page 20

1       A.  No.
2       Q.  All right.  So what year do you think you
3  started working lockup, whether it was an official
4  assignment or you were just relieving somebody?
5       A.  I started with the police department in 1982.
6  I probably relieved the lockup keeper in 24 --
7  probably three years later was my first time.  Maybe
8  two or three years later.
9       Q.  Two or three years after starting on the
10  force?
11      A.  Yes.
12      Q.  And that would have been, you said, '82.  So
13  that would have been '85?
14      A.  Approximately, yes.
15      Q.  More or less.  Yeah.  And about how often did
16  you work in the lockup, let's say, between around '85
17  and '98?
18      A.  At 24 I worked it probably a total of maybe
19  20 times.  In the 25th District I worked it probably a
20  hundred times.
21      Q.  All right.  Do you know, was there any
22  criteria for you to be eligible to serve as a lockup
23  keeper?
24      A.  Not that I know of.

Page 21

1       Q.  Okay.  Was it fair to say that that didn't require
2  any kind of medical training?
3       A.  It would be safe to say that.
4       Q.  All right.  And you didn't have any medical
5  training, did you?
6       A.  No.
7       Q.  And would it be fair to say that it didn't
8  require any kind of psychiatric or psychological
9  training?
10      A.  It would be safe to say that.
11      Q.  And you didn't have any psychiatric or
12  psychological training?
13      A.  I did not.
14      Q.  Basically, it was if you were available and
15  leave was needed, then you stepped in?
16      A.  Basically they knew that I had worked it
17  before, so yeah.
18      Q.  What, if any, training did you have to be a
19  lockup keeper?
20      A.  Just on-hand training from the regular lockup
21  keeper.
22      Q.  So kind of on the job?
23      A.  Yes.
24      Q.  And other than from the lockup keeper who you

Page 22

1 worked with when you filled in, was there any other
2 training that you got to be a lockup keeper?
3    A.  No.
4    Q.  So fair to say that you never had any
5 training regarding the Vienna Convention?
6    A.  Correct.
7    Q.  Do you know what the Vienna Convention is?
8    A.  I've heard.  At this point, I couldn't tell
9 you.
10    Q.  Did you, in your capacity as a lockup keeper
11 anytime between 1985 and 1998, ever apply the Vienna
12 Convention?
13    A.  No.  Not that I know of.
14    Q.  Can you tell me --
15    MS. BARBER:  Wait.  I'm sorry.  I couldn't get off
16 mute.  I have an objection to foundation and form.
17 BY MS. SUSLER:
18    Q.  Can you tell me, please, the job description
19 of lockup keeper as it existed in 1998?
20    A.  Processing the prisoners that were brought
21 into the lockup.
22    Q.  Did you ever have a written job description?
23    A.  No.
24    Q.  Okay.  So when you say processing prisoners

Page 23

1 that were brought into the lockup, can you tell me
2 what you mean?
3    A.  The first thing we did was search them, take
4 their property, take their shoelaces, belts so they
5 won't harm themselves.
6       Then a screening process to make sure that
7 they weren't injured or hurt, a set of questions for
8 them.  Then we fingerprint them and photograph them
9 and then put them in their cell.
10    Q.  And you knew that process or procedure from
11 the lockup keeper who you worked with and where you
12 learned on the job?
13    A.  Yes.
14    Q.  All right.  Was that true, your job
15 description, the whole time that you worked as a
16 lockup keeper, whether you were assigned or filling
17 in for someone?
18    A.  I don't understand the question.
19    Q.  The job description that you just described,
20 processing the prisoners and the steps that you went
21 through, was that applicable to your role as a lockup
22 keeper whenever and wherever you worked as a lockup
23 keeper?
24    A.  Yes.

Page 24

1    Q.  In the 25th District lockup, did that ever
2 change throughout the time that you were at the 25th
3 District and serving as a lockup keeper?
4    A.  Did what ever change?
5    Q.  The lockup itself.
6    A.  We eventually became computerized where
7 before it was all paper.  And then in the future, it
8 was on the computer.
9    Q.  When did it become computerized?
10    A.  I don't remember exactly.
11    Q.  Was it sometime after 1998?
12    A.  I would say it was '98 from looking at the
13 arrest reports which were on paper then.  So it was
14 after 1998.
15    Q.  Okay.  So what you are referring to is the
16 arrest reports that your lawyer showed you yesterday?
17    A.  Right.  They were paper.
18    Q.  Okay.  Other than becoming computerized, were
19 there any changes in the 25th District lockup?
20    MS. BARBER:  Objection.  Form.
21    THE WITNESS:  Not that I can recall.
22 BY MS. SUSLER:
23    Q.  Okay.  I just -- there was a guideline that I
24 forgot to mention to you.

Page 25

1       When there is an objection, sir, because
2 there is no judge here, the objection is for the
3 record, and you are going to go ahead and answer the
4 question unless your counsel instructs you not to.
5       Okay?
6    A.  Okay.
7    Q.  All right.  So where in the 25th District was
8 the lockup located?
9    A.  It was on the main floor.
10    Q.  All right.  Where on the main floor?
11    A.  Well, it depends on where you enter from.  If
12 you enter from the front entrance, it would be -- as
13 you enter from the front entrance, it would be to your
14 left.  If you entered from the back entrance, it would
15 be to your right.
16    Q.  Who had access to the lockup?
17    A.  The desk sergeant and the lockup keeper and
18 the detention aide and naturally the watch commander
19 also, the boss.
20    Q.  And the questions I'm asking you now and
21 these previous questions are about how the lockup
22 appeared in 1998, but it sounds to me like it hasn't
23 changed, is that right?
24    A.  As far as I know, it hasn't changed.  Yeah.

Page 26

1 It changed in that I believe like 2011 or 2012 they
2 started providing small mattresses for the cells,
3 where before that they didn't have none.
4    Q.  So then let's focus our inquiry on how it was
5 in 1998.  Okay.  Around April of 1998.
6       Did you have an office or a desk?
7    A.  I had a desk.
8    Q.  And did the detention aide have an office or
9 a desk?
10   A.  Desk.
11   Q.  When you worked as a lockup keeper, did you
12 always have a detention aide assigned to work with
13 you?
14   A.  No.  Sometimes it would be another sworn
15 officer if the detention aide was off.  Then there
16 might be another sworn officer instead of a detention
17 aide.
18   Q.  So it sounds like there were always at least
19 two people working the lockup?
20   A.  Yes.  That was the rule.  We had to have at
21 least two.
22   Q.  Do you know why that was the rule?
23   A.  I assume it was for safety reasons.
24   Q.  Were there ever, in '98, other people who

Page 27

1 worked in the lockup besides the two people you've
2 mentioned?
3    A.  Sometimes the janitors would come in to
4 clean.
5    Q.  Anyone else?
6    A.  The desk sergeant would come in to sign the
7 log, and the watch commander would also come in to
8 sign the log.
9    Q.  And tell me about this log you are talking
10 about.
11      What was it?
12   A.  Just it's the book that says if anything is
13 out of the ordinary, any abnormal occurrences.
14   Q.  It's an actual physical book?
15   A.  Yes.
16   Q.  And you handwrite in it?
17   A.  Yes.
18   Q.  And what was it logging other than if
19 anything unusual happened?
20   A.  That was it.  Just if everything was normal
21 and flowing smoothly, nothing.
22      But if something out of the ordinary
23 occurred, then it was noted on there.
24   Q.  Do you know where the logbook is stored?

Page 28

1    A.  It was right --
2    MS. BARBER:  Objection.  Form.
3       Go ahead.
4    THE WITNESS:  It was right on the -- as you came
5 in, it was right there on the counter.
6 BY MS. SUSLER:
7    Q.  Did people -- let's say detectives or other
8 officers who weren't working the lockup, did they have
9 to sign in when they came into the lockup?
10   A.  I'm not sure.  They never came into the
11 lockup.
12      Occasionally, if they signed out a prisoner
13 to take up to interview up to their office, they would
14 come in and take them upstairs.
15   Q.  Would they sign in and sign out to do that?
16   A.  Not with me.  With the watch commander.
17   Q.  All right.  The logbook from 19 -- from April
18 of 1998, do you know where that would be stored today?
19   MS. BARBER:  Objection.  Foundation, form.
20   THE WITNESS:  No, I don't.
21 BY MS. SUSLER:
22   Q.  When you worked as a lockup keeper, did you
23 ever have a situation where the logbook was filled up
24 and you needed another one to start over?

Page 29

1    A.  Oh, yeah.  Oh, yeah.
2    Q.  What did you do with the filled logbook?
3    MS. BARBER:  Objection.  Form, foundation.
4    THE WITNESS:  We put it in a cabinet where the new
5 books were.
6 BY MS. SUSLER:
7    Q.  Was that in the lockup?
8    A.  Yes.
9    Q.  And in April of 1998 there was a cabinet, did
10 you say?
11   A.  Yes.
12   Q.  Were there several logbooks in that cabinet?
13   A.  Yes.  Old ones and new ones.
14   Q.  All right.  So I'd like to understand the
15 layout of the lockup.
16      I guess, first of all, how many cells were in
17 the 25th District lockup?
18   A.  There were nine cellblocks, and we had small
19 ones that contained three cells, and then the bigger
20 ones contained six.
21   Q.  So how many cells total?
22   A.  Nine.  Individual cells?
23   Q.  Yes.
24   A.  I was going to say there was six in seven of

Page 30

1  them, and there was three in two of them.
2      Q. So that's 42 and 6 is 48 total.
3         Does that sound about right?
4      A. Sounds right.
5      Q. And how did you determine what cells to put
6  different arrestees in?
7      A. If we felt that they were charged with a very
8  serious offense, we put them in the cell where we
9  could keep an eye on them.
10        Misdemeanors we usually put in six, and that
11 was it.
12     Q. The very serious charges, where did you put
13 those folks?
14     A. In Cellblock 3.
15     Q. And was Cellblock 3 -- you had a visual
16 contact with that from the desk where you sat?
17     A. Yes.
18     Q. Why did you want to have visual contact with
19 somebody who was accused of a very serious crime?
20     A. We felt they were more likely to harm
21 themselves.
22     Q. And fair to say that murder would be
23 considered a very serious crime?
24     A. Yes.

Page 31

1      Q. All right. So the cells that were in
2  Cellblock 3, they were individual cells?
3      A. Yes. Three of them.
4      Q. And the other, I think you said, seven
5  cellblocks?
6      A. Yes.
7      Q. Were they also individual cells?
8      A. Yes.
9      MS. BARBER: I am sorry. One second.
10        Is anybody hearing that problem with the
11 audio?
12     MR. BRENER: Yeah. I hear it.
13     MS. BARBER: I don't know what that is. I don't
14 know if it's me or somebody else.
15     MR. BRENER: Jan, are you hearing it? It's like
16 a high-pitched ringing sound.
17     MS. SUSLER: There is -- I don't know if this is
18 what it is, but there is like a truck outside of my
19 house that has a kind of dinging.
20     MS. BARBER: That could be it.
21     MR. BRENER: That might be it.
22     MS. SUSLER: I am sorry. I can't mute myself.
23     MS. BARBER: That's fine. I just wanted to make
24 sure, you know, there wasn't something wrong. I'm

Page 32

1  sure the truck will go away at some point.
2      MS. SUSLER: Is it more distant now?
3      MS. BARBER: A little bit, yeah.
4      MS. SUSLER: Okay. Yeah. Sorry. I have my
5  windows open, and there is always some kind of
6  construction going on. So apologies for that.
7  BY MS. SUSLER:
8      Q. All right. You mentioned that you take the
9  prisoner's property as part of your processing?
10     A. Yes.
11     Q. Where did you do that?
12     A. Did you say where?
13     Q. Yes. Physically in the lockup where did that
14 take place?
15     A. There is also a cabinet for that.
16     Q. Where was that in relation to your desk?
17     A. Right behind me.
18     Q. So it was in the same room?
19     A. Oh, yeah. Everything is in the same room.
20     Q. So my next question was you said that part of
21 the process was searching.
22        Where did that take place?
23     A. Right at the counter when they came in.
24 There was a counter between my desk and where they

Page 33

1  came in.
2      Q. All right. You said there were questions and
3  screening where you asked about whether they were
4  injured or hurt --
5      A. Right. Those were the questions on the
6  arrest report.
7      Q. Okay. Let me just say another guideline for
8  any deposition, but particularly on Zoom. It's very
9  helpful for the court reporter and the record if you
10 let me finish my question before you answer it even
11 though you can guess what I'm asking.
12     A. Sorry. I thought you were finished.
13     Q. Okay. No problem. And I'll try to do the
14 same with you, but yeah.
15        So where were the questions asked physically
16 in the office?
17     A. Right there when they came in. As soon as
18 they came in, that was the first thing that was done.
19     Q. So that was the same place where the search
20 took place?
21     A. Yes.
22     Q. Okay. And then how about the fingerprinting,
23 where was that physically?
24     A. That was approximately 10 feet behind my

Page 34

1  desk.
2  **Q.  Also the same room?**
3  A.  Yes.
4  **Q.  And how about the photographing?**
5  A.  The camera was in front of the printing
6  machine.  Approximately 6 feet in the front of it.
7  **Q.  I am sorry.  6 feet in front of what?**
8  A.  The printing machine.
9  **Q.  And where was the printing machine located?**
10  A.  Behind my desk.  Approximately 10 feet
11  behind my desk.
12  **Q.  So approximately the same place where the**
13  **fingerprinting took place?**
14  A.  Yes.
15  **Q.  Okay.  Were there any walls in the lockup**
16  **room that you are describing for me?**
17  A.  Sure, there were walls.
18  **Q.  There were walls around the perimeter.**
19  **I guess what I am trying to find out is, were**
20  **there any walls dividing the space of the room that**
21  **you are talking about?**
22  A.  Oh, no.  No.  No walls dividing the room.
23  MS. BARBER:  Object to the form to the previous
24  question.

Page 35

1  BY MS. SUSLER:
2  **Q.  So if you and the detention aide are**
3  **processing arrestees, let's say you have got one**
4  **arrestee, and the detention aide has the other, can**
5  **you always see each other, what you're doing?**
6  A.  Yeah.
7  MS. BARBER:  Objection.  Form.
8  Just give a little bit of a beat before
9  you answer so I can object if I need to.
10  Objection.  Form.
11  Go ahead.
12  THE WITNESS:  Yes.  We're all -- we're not far
13  away from each other.
14  BY MS. SUSLER:
15  **Q.  And was there a telephone where the arrestees**
16  **could make phone calls?**
17  A.  Yes.
18  **Q.  Where was that located?**
19  A.  Right behind the cameras.  Approximately
20  6 feet behind the camera.
21  **Q.  Again, in the same room?**
22  A.  Yes.  It's all a big room.
23  **Q.  What were the dimensions of the room we're**
24  **talking about?**

Page 36

1  A.  I would say about 20 feet by 50 yards.
2  MS. BARBER:  Object to the foundation to the
3  previous question.
4  BY MS. SUSLER:
5  **Q.  You said 20 feet by 50 yards?**
6  A.  Maybe 40 yards, yeah.
7  **Q.  Was there anything else in the room that you**
8  **are describing for me that you haven't already told**
9  **me?**
10  MS. BARBER:  Objection.  Form.
11  THE WITNESS:  Let me think.  Cabinets, desk,
12  printing machine, camera, computer.  That was it.
13  BY MS. SUSLER:
14  **Q.  What paperwork typically was required of a**
15  **lockup keeper back in 1998?**
16  A.  The arrest report was the main thing.
17  **Q.  Was there other paperwork that you were**
18  **required to do?**
19  MS. BARBER:  Objection.  Form.
20  THE WITNESS:  The only other thing I can think of
21  was the log where we would indicate where something
22  unusual occurred during the tour of duty.
23  BY MS. SUSLER:
24  **Q.  Can you please give me an example of what**

Page 37

1  would be something unusual in a tour of duty?
2  A.  A hanging.  And we had them.
3  **Q.  Can you give me any other example of**
4  **something that would be unusual that you would need to**
5  **record in the logbook?**
6  A.  Sometimes the prisoners would throw feces at
7  us.  So things like that.
8  **Q.  Can you describe for me what a typical day in**
9  **the life of a lockup keeper was in 1998 when you were**
10  **serving as a lockup keeper?**
11  MS. BARBER:  Objection.  Form, foundation.
12  THE WITNESS:  Well, when I worked the third watch,
13  we were really busy.  Busy, busy, busy.
14  When I went to second watch, we weren't
15  as busy.  So we may take in maybe three, four
16  prisoners during the tour of duty.
17  Where on third watch we maybe take 10 in
18  on a tour of duty.
19  BY MS. SUSLER:
20  **Q.  In 1998, forgive me, I think you told me**
21  **this, but I don't remember, which watch were you on?**
22  A.  Well, if I was working the lockup on second
23  watch -- on that particular day, I was on second
24  watch, the day watch.

Page 38

1    Q.  Okay.  And so you were not busy?

2    MS. BARBER:  Objection.  Form, foundation.

3    THE WITNESS:  We weren't as busy as third watch.

4  BY MS. SUSLER:

5    Q.  But you were still busy?

6    MS. BARBER:  Same objection.

7    THE WITNESS:  It varied from day to day.  We had

8  no control over that.

9  BY MS. SUSLER:

10    Q.  All right.  So your day consisted of

11  processing the arrestees as they were brought to you?

12    A.  Right.

13    MS. BARBER:  Objection.  Form.

14    THE WITNESS:  Also, we would get them ready to be

15  transported for court in the morning.  A big van would

16  pick them up and take them to court.  The felonies and

17  the domestic batteries would have to go to court.  So

18  we would get them ready to be transported.

19  BY MS. SUSLER:

20    Q.  What does that mean, get them ready to be

21  transported?  What did you do?

22    A.  You have to bring them out of the cell and

23  line them up against the wall where the van workers

24  would handcuff them and line them up and take them out.

Page 39

1    Q.  And did you write on the prisoner's body at

2  all for that, getting them ready for court?

3    A.  No.

4    Q.  That was the transport people who did that?

5    A.  Yes.

6    Q.  And do you know what they would write on the

7  prisoner's body and where?

8    MS. BARBER:  Objection.  Foundation.

9    THE WITNESS:  No.  No.

10  BY MS. SUSLER:

11    Q.  They wrote on their arms?

12    MS. BARBER:  Objection.  Foundation.

13    THE WITNESS:  I don't know.

14  BY MS. SUSLER:

15    Q.  Did you ever see them write on their bodies?

16    A.  No.  I didn't pay attention.

17    Q.  But you know that they did it?

18    A.  I don't know that they did.

19    Q.  So was there anything other than processing

20  arrestees who were brought to you and preparing them

21  for court that you did in a typical day as a lockup

22  keeper back in '98?

23    A.  Yeah.  We had --

24    MS. BARBER:  Objection.  Form.

Page 40

1    THE WITNESS:  We had regular meal times where

2  either I or the detention aide would prepare the

3  baloney sandwiches, and then we go walk around and

4  ask, would you like a sandwich?  Some would.  Some

5  would not.

6  BY MS. SUSLER:

7    Q.  Baloney sandwich was the menu?

8    A.  That was the menu 365 days a year.  Same

9  menu.

10    Q.  Where did the baloney sandwiches come from?

11    MS. BARBER:  Objection.  Form.

12    THE WITNESS:  They were delivered, and we would

13  keep them in the refrigerator that we had there.

14  BY MS. SUSLER:

15    Q.  How, if you know, did an arrestee get to the

16  lockup?

17    A.  They were brought to the lockup gate by the

18  arresting officer.

19    Q.  And so what contact did you typically have in

20  1998 with the arresting officer?

21    A.  Not much.  Once they brought them to us, they

22  left.  The arresting officer would leave once the

23  arrestee came into the lockup.

24    Q.  Now, you said that you made some

Page 41

1  differentiation in terms of cell assignment for people

2  who were accused of serious felonies.

3    You would know what they were accused of

4  because the arresting officer would tell you?

5    A.  No.  Because I could see it on the arrest

6  report.

7    Q.  How did you get the arrest report?

8    A.  From the arresting officer.

9    Q.  Okay.  So the arresting officer would bring

10  you the arrestee and the corresponding arrest report

11  for the arrestee?

12    A.  From what I can remember, yes.

13    Q.  Okay.  Typically in 1998 would the arresting

14  officer bring you any other paperwork?

15    A.  I believe along with the arrest report there

16  was also the general case report and whatever

17  appropriate form, you know, came with the arrest

18  report.

19    Q.  What do you mean?

20    A.  Well, there was one for narcotics which would

21  be different than a general case report.  So that

22  would be a little different than the general case

23  report.

24    Q.  And what kind of a report would you expect

Page 42

1  in -- where someone is charged with murder or
2  kidnapping?  What other in addition to an arrest
3  report would you expect?
4     MS. BARBER:  Objection.  Form, foundation, calls
5  for speculation.
6     THE WITNESS:  I believe in that case there would
7  be a general case report.
8  BY MS. SUSLER:
9     Q.  Is there any other paperwork that the
10  arresting officer would bring to you when he brought
11  the prisoner?
12    A.  If they came -- if they had required medical
13  attention prior to entering the lockup, they would
14  have the medical report -- the medical release from
15  the hospital.
16    Q.  Any other paperwork that the arresting
17  officer would typically deliver to you when you
18  delivered a prisoner?
19    A.  That's all I can think of off the top of my
20  head right now.
21    Q.  Okay.  And what was -- typically, what was
22  your understanding of what you were to do with the
23  arrest report and the general case report?
24    A.  From what I remember, once we filled in our

Page 43

1  part of it, we would walk it to the front desk to the
2  desk sergeant and turn it over to them at the front
3  desk.
4     Q.  All right.  The general case report that
5  would typically be delivered to you with the arrest
6  report, you were to read that so that you understood
7  what the prisoner was being held for?
8     A.  No.  It just came along with it.  The only
9  one I was required to read was the arrest report,
10  filled in my part.  I didn't have to read anything
11  else.
12    Q.  Did you usually read the case reports as
13  well?
14    A.  No.  I didn't have time.  I was too busy
15  doing other things.
16    Q.  All right.  When the arresting officer
17  delivered the arrestee to the -- well, let me just
18  take a break for a second.
19       When I use the term arrestee or prisoner, I'm
20  talking about the same thing.  You understand that,
21  right?
22    A.  Yes.
23    Q.  Okay.  And we can call them a detainee, or we
24  can call them an inmate, but we understand we're

Page 44

1  talking about the person who is being brought to your
2  custody to be processed, right?
3     A.  Right.
4     Q.  Okay.  So I interrupted myself, and I lost my
5  train of thought.
6     A.  It happens.
7     Q.  Yeah.  The older we get, the more it happens.
8     A.  Tell me about it.
9     Q.  Yeah.  All right.  I was asking you about the
10  arrestee coming to the lockup.
11       Oh, was the arrestee typically handcuffed?
12    A.  Yes.  When they first got there.  Then the
13  arresting officer would take the handcuffs off them
14  once they enter the lockup.
15    Q.  So typically when you got the arrest report
16  the -- well, the arrest report was a two-sided
17  document, right?
18    A.  Right.
19    Q.  And the back side wasn't filled in yet,
20  right?
21    A.  Right.
22    Q.  The front side was filled in significantly?
23    A.  Yes.
24    Q.  And it had the charges the person was being

Page 45

1  held on?
2     A.  Yes.
3     Q.  And it had the -- some identifying
4  information about the arrestee?
5     A.  Yes.
6     Q.  And it had the names of the arresting
7  officers?
8     A.  Yes.
9     Q.  And it could also have the names of others
10  involved in the investigation or the arrest?
11    A.  Correct.
12    Q.  Okay.  So would you know who the arresting
13  officers were in each case?
14    MS. BARBER:  Object to form.
15    MS. GOLDEN:  Object to form.
16    THE WITNESS:  Yes.
17  BY MS. SUSLER:
18    Q.  Typically, other than getting the arrest
19  report and the general case report, what other
20  information were you typically provided about the
21  arrestee?
22    MS. BARBER:  Objection.  Form.
23    THE WITNESS:  Nothing that I can think of.
24  BY MS. SUSLER:

Page 46

1    Q.  Would you typically know how long the
2  arrestee had been held in police custody before being
3  brought to you?
4       MS. BARBER: Objection. Form.
5       THE WITNESS: No. I would not know that.
6  BY MS. SUSLER:
7    Q.  Would you typically know under what
8  circumstances the person had been held in police
9  custody before being brought to you?
10      MS. BARBER: Objection. Form.
11      THE WITNESS: I would not know that.
12  BY MS. SUSLER:
13    Q.  Now, if you wanted to know more about an
14  arrestee, what paperwork did you have access to?
15      MS. BARBER: Objection. Form.
16      THE WITNESS: Nothing.
17  BY MS. SUSLER:
18    Q.  Back -- instead of just repeating myself by
19  referencing 1998, and April of 1998, I want you to
20  understand that my questions are focused on the period
21  of April of 1998.
22      All right?
23  A.  Yes.
24    Q.  Was there a limit on the amount of time a

Page 47

1  person could be held at the lockup?
2       MS. BARBER: Objection. Form, foundation.
3       THE WITNESS: At that time they could be held for
4  72 hours while the investigation was taking place.
5       So they didn't necessarily have to be
6  in the lockup. They could be upstairs with the
7  detectives. Back at that time they could have been
8  held for 72 hours.
9  BY MS. SUSLER:
10    Q.  So that 72 hours you are talking about
11  includes the time they were with the detectives as
12  well as the time they were in the lockup altogether?
13  The limit was 72 hours?
14      MS. BARBER: Objection. Form, foundation.
15      THE WITNESS: Yes.
16  BY MS. SUSLER:
17    Q.  And was there an average amount of time that
18  a person was typically held at the lock up?
19      MS. BARBER: Objection. Form, foundation, calls
20  for speculation.
21      THE WITNESS: Most cases if they were
22  misdemeanors, they were only there three, four hours.
23  Maybe six at the most. And then they were I-bonded.
24  If they were felonies or domestic batteries, they

Page 48

1  would be held overnight and would be sent to court the
2  next morning.
3  BY MS. SUSLER:
4    Q.  And when you say maximum of 72 hours, are you
5  talking about 72 hours before they had to be released,
6  before they had to go to court, what?
7       Help me understand.
8  A.  One or the other. From what I understood,
9  one or the other, yeah.
10    Q.  Okay. So someone who was brought in, let's
11  say, at 8:30 in the morning would likely -- for a
12  felony -- still be there by the next day?
13  A.  He would go to --
14      MS. BARBER: Objection. Form.
15      MS. GOLDEN: Foundation.
16      THE WITNESS: If he was charged, he would go to
17  court the next morning.
18  BY MS. SUSLER:
19    Q.  Do you know why? Why was the person held
20  overnight, typically?
21  A.  I guess because the transport van that would
22  transport them to court only came every morning.
23    Q.  I see. So back in '98 there was one
24  transport van daily, and it was in the morning?

Page 49

1  A.  Right.
2       MS. BARBER: Objection. Form, foundation.
3  BY MS. SUSLER:
4    Q.  So there was only -- I think you said back in
5  '98 there weren't any mattresses in the cells?
6  A.  No. They didn't have mattresses back then.
7    Q.  Okay. Actually, I wanted to ask you, what
8  did the cells look like?
9       Like in Cellblock 3, how big were they?
10      MS. BARBER: Objection. Foundation.
11      THE WITNESS: I would say approximately 6 feet by
12  8 feet approximately.
13  BY MS. SUSLER:
14    Q.  Okay. Were they identical, the three cells
15  in Cellblock 3?
16  A.  Yes.
17    Q.  What was in the cell?
18  A.  A steel cot, bed. A steel toilet. And that
19  was it.
20    Q.  And what was the wall to the cell composed
21  of?
22      MS. BARBER: Objection. Form.
23      THE WITNESS: Typical wall cement.
24  BY MS. SUSLER:

Page 50

1    Q.  Okay.  It wasn't bars?
2    A.  No.  The only bars were in the front of it.
3    Q.  Okay.  There were bars in the front, and then
4  there were typical cement walls on the other three
5  sides?
6    A.  On the two sides -- three sides, yeah.  The
7  back also.
8    Q.  Okay.  So the person in Cellblock 3 had no
9  privacy in terms of --
10   MS. BARBER:  Objection to form.
11   THE WITNESS:  He had his own cell.  He was in
12  there by himself in the cell.
13  BY MS. SUSLER:
14   Q.  Okay.  So he had privacy from other people
15  who were detained?
16   A.  Yes.
17   Q.  But he didn't have privacy vis-a-vis you and
18  the detention aide?
19   A.  We weren't that close to him.
20   Q.  How far away were you?
21   A.  About 20 feet.
22   MS. BARBER:  Objection.  Foundation.
23   THE WITNESS:  I would say about 20 feet.
24  BY MS. SUSLER:

Page 51

1    Q.  20 feet.  Okay.  And I think you said that
2  the lack of privacy was done on purpose because you
3  wanted to be able to have visual contact?
4    MS. BARBER:  Objection.  Form, foundation,
5  misstates the witness's testimony.
6  BY MS. SUSLER:
7    Q.  With the detainees in Cellblock 3?
8    A.  From my perspective where I sat, we could not
9  actually see the arrestee in the cell.  We could see
10  the cell.  It was like a side view.  We could probably
11  hear them, but we could not see them.
12   Q.  All right.  Well, did you previously tell me
13  that you wanted to be able to keep an eye on people
14  accused of serious felonies because you thought they
15  might be --
16   A.  Easiest way for us to reach them and see
17  them.
18   MS. BARBER:  Just make sure she finishes her
19  question --
20   THE WITNESS:  Okay.  Sorry.
21   MS. BARBER:  -- before you start answering so she
22  gets the whole question out.
23   MS. SUSLER:  Thank you.
24  BY MS. SUSLER:

Page 52

1    Q.  That you wanted to be make sure that you
2  could keep an eye on people accused of the serious
3  felonies because you thought they were more likely to
4  harm themselves?
5    A.  Well, that was the closest cellblock to us,
6  right.
7    Q.  Okay.  If someone in Cellblock 3 wanted to
8  ask for something, you could hear them if they spoke?
9    A.  Yes.
10   Q.  You mentioned that part of the processing of
11  an arrestee was to search them.  I'd like you to
12  describe, please, the search process.
13       And, again, I'll remind you we're talking
14  about April of '98.
15   A.  Basically, we would -- they would be facing
16  the counter, and the searcher would get behind them,
17  pat them down, make sure they had no weapons.
18       First we would ask them to themselves take
19  all the property out of their pockets and put it up on
20  the counter.  Then we would do the pat-down ourselves
21  with our hands.
22   Q.  And if I understood you correctly, you said
23  you stood behind them to conduct the pat search?
24   A.  Yes.

Page 53

1    Q.  And the pat search that you conducted was
2  like from head to toe?
3    A.  Yes.
4    Q.  And it was on top of the arrestee's clothing?
5    A.  Yes.
6    Q.  In the lockup the arrestee is always fully
7  clothed?
8    A.  Yes.
9    MS. BARBER:  Objection.  Form.
10  BY MS. SUSLER:
11   Q.  And when they come into the lockup, they
12  come in with -- wearing the clothing that they were
13  wearing when they were arrested?
14   A.  Whatever they come into the lockup with,
15  yes.
16   Q.  Fair to say that they are not given a uniform
17  when they are in the lockup?
18   A.  No uniform.
19   Q.  And you don't ever do -- you never see the
20  arrestee's naked body, correct?
21   A.  Correct.
22   Q.  If you find something in a search that's
23  contraband, is that something that would go in your
24  log?

Page 54

1    A.  Yes.  There were cases where guns were found.

2    **Q.  If you find something in the search, is that**

3    **something that you would write on the arrest report in**

4    **the part that you are filling out?**

5    A.  No.  Not on the arrest report.  I would

6    notify the desk sergeant about it.

7    **Q.  And then typically what did the desk sergeant**

8    **do?**

9    MS. BARBER:  Objection.  Form, foundation.

10   THE WITNESS:  Like every case is different.  So it

11   varies depending on the case.

12   BY MS. SUSLER:

13   **Q.  Well, typically whatever the contraband was**

14   **would be seized?**

15   A.  If it was a gun or a knife, it could be an

16   additional charge added to them.

17   **Q.  And if it was drugs as well?**

18   A.  Yes.

19   **Q.  Then you said something about screening for**

20   **no injury, or I think you said if they were hurt.**

21   **Can you tell me what that screening consisted**

22   **of?**

23   A.  The first thing was a visual checkup on my

24   part.  Look them over when they come in, make sure

Page 55

1    they had no visible injuries, no limping, and then a

2    set of questionnaires asking them verbally if they are

3    hurt or injured or if they take medication.

4    **Q.  I am sorry.  Did you say no limping?**

5    A.  Yeah.  Make sure they are not hurt, limping,

6    or, you know, hurt.

7    **Q.  What was your understanding of the purpose of**

8    **the visual screening and the asking of the questions?**

9    A.  Well, from my understanding is that if they

10   require medical treatment, they would be taken for

11   medical treatment.

12   **Q.  The arrest report had a list of questions**

13   **that you were supposed to ask the arrestee?**

14   A.  Yes.

15   **Q.  And those were the questions you asked?**

16   A.  Yes.

17   **Q.  And typically you didn't ask questions that**

18   **weren't on the form, right?**

19   A.  No.

20   MS. BARBER:  Object to foundation, form.

21   THE WITNESS:  No, I did not.

22   BY MS. SUSLER:

23   **Q.  Was there a typical order in which you**

24   **conducted the processing of an arrestee?**

Page 56

1    A.  From what I can remember, first thing was the

2    search of their property, the pat-down, then the --

3    well, the original thing was, as they are coming into

4    the lockup, is a visual observation of them, and then

5    taking their property, patting them down, searching

6    them, and then the questionnaire from the arrest

7    report.

8    And then from there they were either

9    photographed or fingerprinted or vice versa.

10   **Q.  And all that was done before they were placed**

11   **in a cell?**

12   A.  Yeah.  All that -- the whole procedure would

13   take us approximately 5 to 10 minutes.

14   And then once they were fingerprinted,

15   photographed, they want to make a phone call.  They

16   could make their phone call.  Then they were placed in

17   a cell.

18   **Q.  If an arrestee responded to a question that**

19   **they were taking medication or that they were -- if**

20   **they responded positively to any of the questions that**

21   **you asked them, what were you supposed to do?**

22   MS. BARBER:  Objection.  Form.

23   THE WITNESS:  Well, it depends on the medication

24   that they were taking.  If they needed it right away,

Page 57

1    we'd have to send them to get it at the hospital.  If

2    they didn't need it right away, I would allow them to

3    call their family and bring it to the lockup.

4    BY MS. SUSLER:

5    **Q.  If they answered yes to any of the other**

6    **questions, what were you supposed to do?**

7    MS. BARBER:  Objection.  Form, foundation.

8    THE WITNESS:  Depends on which question it was.

9    BY MS. SUSLER:

10   **Q.  Well, can you give me an example.**

11   MS. BARBER:  Objection.  Form, foundation.

12   Example of what?

13   THE WITNESS:  Which question?

14   BY MS. SUSLER:

15   **Q.  If they answered positively to it was the**

16   **first time they had been arrested, what were you**

17   **supposed to do?**

18   A.  Just put on it there, yes, first time.

19   **Q.  And if they answered positively yes to have**

20   **you ever tried to kill yourself or done serious harm**

21   **to yourself, what were you supposed to do?**

22   A.  Indicate on the arrest report, notify the

23   desk sergeant, and place them in 3 -- in the Cellblock

24   3.

Page 58

1    Q.  And that was so you could maintain the visual
2  contact?
3    A.  Well, they were closer.  Yeah, closer to us.
4    Q.  If they responded yes to do you have any
5  serious medical or mental problems, what were you
6  supposed to do?
7    A.  Notify the desk sergeant is what I would do.
8    Q.  And if they said yes to are you receiving any
9  treatment, what were you supposed to do?
10    A.  Just say yes on the report, and that was it.
11    Q.  While you were the lockup keeper, did you
12  notify the desk sergeant about positive answers to any
13  of the questions by arrestees?
14    A.  Not that I recall at this time.
15    Q.  Did you ever document on a report an injury
16  to a prisoner?
17    A.  Not that I recall.
18    Q.  Did you ever reject an arrestee based on your
19  visual observation?
20    A.  Again, not that I recall.
21    Q.  Did you ever reject an arrestee based on any
22  answer that he gave to the questions you asked?
23    A.  At this time, not that I recall.
24    Q.  You said that the processing included

Page 59

1  fingerprinting.
2       Can you tell me what you did to fingerprint
3  an arrestee?
4    MS. BARBER:  Objection.  Form.
5    THE WITNESS:  Well, each finger is turned
6  individually.  From what I remember, the thumb, every
7  finger.
8       Originally, back in the '80s it was a
9  paper card and ink.  Then later on we were
10  computerized, and it was done on a machine.
11  BY MS. SUSLER:
12    Q.  And that computerization didn't come in until
13  after 1998?
14    A.  '98 we already had it.
15    Q.  You did have it?
16    A.  Yeah.  We didn't have the paper anymore, the
17  ink.  We had the machine.
18    Q.  Okay.  And so the person, what, put their
19  hand on some sort of computer that read their
20  fingerprints?
21    A.  Yeah.  We grab their hand, and we turned it
22  ourselves, yeah, each finger.
23    Q.  And how about the mugshot or the photograph,
24  what was that process?

Page 60

1    A.  Had them -- we had them stand in front of the
2  camera, face the camera, take the picture.  Face that
3  way, turn that way, take the side profile.  Ask them
4  if they had any tattoos.  If they did, we took
5  pictures of the tattoos.
6    Q.  And was that digital back in '98?
7    A.  Yes.
8    MS. BARBER:  Objection.  Form.
9    THE WITNESS:  Yes.
10  BY MS. SUSLER:
11    Q.  Can you -- oh, you mentioned the baloney
12  sandwiches.
13       You said something about a schedule for
14  serving meals?
15    A.  Right.
16    MS. BARBER:  Objection.  Form.
17    THE WITNESS:  You know, every watch had a certain
18  time that we would make the sandwiches and walk around
19  offering them to the ones that were there.
20  BY MS. SUSLER:
21    Q.  So once a watch you served baloney
22  sandwiches?
23    A.  Yes.
24    Q.  And on the second watch, that's also called

Page 61

1  the day, the day watch or the day shift?
2    A.  Yes.
3    Q.  And that was from what hour to what hour?
4    A.  From what I recall, it was between 9:00 and
5  10:00 in the morning.
6    Q.  The hours that you worked on second watch,
7  what were they?
8    A.  5:30 in the morning until 1:30 in the
9  afternoon.
10    Q.  So the sandwiches got passed out, I am sorry,
11  you said at 9:00 or 10:00?
12    A.  Yes.
13    Q.  And how about anything to drink?  Was that
14  provided to the arrestees?
15    A.  No.  They just had water in their cell.
16    Q.  And was it part of the -- I think you did
17  call it a steel toilet?
18    A.  Yes.  Everything was steel.
19    Q.  So there was water available to the detainees
20  inside the cell?
21    A.  Yes.
22    Q.  Fair to say that the detainees were not
23  provided with any kind of bedding?
24    A.  No.  They were not provided with bedding.

Page 62

1    Q.  No pillows, blankets, sheets, nothing?

2    A.  Not at that time.

3    Q.  And the telephone that you mentioned -- oh,

4  the toilet, can you describe where the water was for

5  the prisoners to have access to?

6    A.  From what I recall, there was a sink in there

7  also, and that had the water fountain.

8    Q.  The telephone that you mentioned where the

9  arrestees get a -- can have a phone call, that was

10  in -- you were able to see where the arrestee was from

11  your desk?  You could see straight to the telephone?

12    A.  Yes.

13    Q.  Was that also in hearing distance?

14    A.  I would say yes.

15    Q.  Now, once you had processed the arrestee and

16  put them in their cell, what, if any, responsibility

17  did you have to that arrestee other than as you

18  already testified getting them ready for court?

19    MS. GOLDEN:  Object to form.

20    THE WITNESS:  We also had a log where every 15

21  minutes we would circle around each cell that had

22  prisoners in it and check on them.

23  BY MS. SUSLER:

24    Q.  And that log was different from the log you

Page 63

1  told me about where you would note unusual incidents?

2    A.  It's the same log.

3    Q.  Every 15 minutes, what, you were supposed to

4  write in the log?

5    MS. BARBER:  Objection.  Form.

6    THE WITNESS:  We would make sure that everyone was

7  okay, and that's basically what we put on there.

8  Everything okay.

9         Unless, as I say, there was something

10  out of the ordinary.

11  BY MS. SUSLER:

12    Q.  And the entry that you would make in the log

13  would be every 15 minutes?

14    A.  Every 15 minutes either I or the one of the

15  detention aides would make our rounds.

16    Q.  And the entry that you would make in that log

17  would be just generally that everything was okay, or

18  did you have an entry for each cell?

19    A.  No.  Not for every cell.  Just generally for

20  everyone.

21    Q.  Just basically to show that you had made

22  rounds and found everything okay?

23    A.  Yes.

24    Q.  And what were you supposed to be looking for

Page 64

1  when you made those rounds every 15 minutes?

2    MS. BARBER:  Objection.  Form.

3    THE WITNESS:  Made sure that they were okay.

4  BY MS. SUSLER:

5    Q.  What do you mean?

6    A.  Well, as I said, we had attempted hangings.

7  So make sure that they weren't trying to harm

8  themselves, that they were laying down.

9         Usually most of them were just laying down

10  sleeping for the most part.

11    Q.  You mentioned that you or the detention

12  aide would make these rounds?

13    A.  Right.

14    Q.  Is it fair to say that you and the detention

15  aide both did all of the tasks in processing the

16  arrestees?

17    MS. BARBER:  Objection.  Form.  Foundation.

18    THE WITNESS:  Yes.  It's safe to say that.

19  BY MS. SUSLER:

20    Q.  And there was really no distinction whether

21  the person was a detention aide or you, a sworn

22  officer?

23         You could each do the same function with

24  respect to processing the arrestees?

Page 65

1    MS. BARBER:  Objection.  Form, foundation.

2    THE WITNESS:  Pretty much from what I can

3  remember, yes.

4  BY MS. SUSLER:

5    Q.  And how about in completing the arrest report

6  with the visual checks and the questionnaires, same?

7  Either you or the detention aide could fill that out?

8    A.  Yes.

9    Q.  All right.  Let me ask you a little bit about

10  the 25th District.

11         You mentioned that the lockup when you served

12  as lockup keeper was on the -- I think you said the

13  ground floor?

14    A.  Or the main floor.  There was also a basement

15  and a second floor.

16    Q.  What was in the basement?

17    A.  Locker rooms.  Locker rooms, small gym, the

18  range, the shooting range.

19    Q.  All right.  And that was where officers and

20  detention aides had access to --

21    A.  Yes.  The locker room, yes.

22    Q.  And then there was a second floor?  What was

23  on the second floor?

24    A.  Second floor was basically the detective

Page 66

1  quarters where the detectives were.
2  **Q.  Do you know what area of detectives were up**
3  **there?**
4  A.  Property crimes and violent crimes.
5  **Q.  And that was Area 5?**
6  A.  Area 5.
7  **Q.  And if Area 5 detectives arrested somebody,**
8  **the person would be held at the lockup on the main**
9  **floor?**
10  MS. BARBER:  Objection.  Form, foundation.
11  THE WITNESS:  Well, sometimes they kept them
12  upstairs, and then they would bring them down,
13  because at that time they would hold them 72 hours.
14  so they would first take them upstairs to interview
15  them, conduct an investigation.
16  BY MS. SUSLER:
17  **Q.  And when they were done with their**
18  **arrestee, they would bring them down to the lockup**
19  **on the main floor?**
20  A.  Yes.
21  MS. BARBER:  Objection.  Form, foundation.
22  THE WITNESS:  Yes.
23  BY MS. SUSLER:
24  **Q.  If 25th District officers arrested somebody,**

Page 67

1  they would also be brought to the lockup on the main
2  **floor?**
3  MS. BARBER:  Objection.  Form, foundation.
4  THE WITNESS:  Yes.
5  BY MS. SUSLER:
6  **Q.  So back in April of '98, fair to say that you**
7  **had regular contact with the Area 5 detectives?**
8  MS. BARBER:  Objection.  Form.
9  THE WITNESS:  Pretty much only when they brought
10  their prisoners down.
11  BY MS. SUSLER:
12  **Q.  You didn't see them in the locker room?**
13  A.  No.  They didn't have a locker room
14  downstairs with us.
15  **Q.  You didn't see them in the gym or the**
16  **shooting range?**
17  A.  No.  I didn't use the gym there, and I only
18  shot once a year.
19  **Q.  You didn't see them coming in and out of the**
20  **building?**
21  A.  No.  I would park my car in the garage, and I
22  would head to the lockup from the back.  So I didn't
23  even see the front desk or anything.
24  **Q.  So basically you dealt with them when they**

Page 68

1  brought arrestees to you?
2  A.  Basically that was the only time, yes.
3  **Q.  So you know we're here because Mr. Solache**
4  **and Mr. Reyes have brought a lawsuit against some**
5  **Chicago Police detectives and others?**
6  A.  Yes.
7  **Q.  And you know they were arrested for murdering**
8  **a couple and kidnapping their children?**
9  A.  That was the allegation against them.
10  **Q.  Okay.  What did you know before they were**
11  **brought to the lockup?  What did you know about the**
12  **crimes that had happened to the Sotos family?**
13  A.  I believe by then it had already been on the
14  news.  So I had heard about it on the news.
15  **Q.  What had you heard?**
16  A.  That they had killed a couple and taken the
17  baby and that the woman was claiming she had given
18  birth to the baby.
19  **Q.  Pretty unusual circumstances, right?**
20  A.  Right.
21  **Q.  And did you see it on the Spanish-speaking**
22  **news?**
23  A.  No.
24  **Q.  You saw it -- so you grew up speaking**

Page 69

1  Spanish, Mr. Basurto?
2  A.  Well, for the first nine years I lived in
3  Mexico.  That's where I was born.
4  **Q.  All right.  And then you -- obviously you**
5  **continued your Spanish.**
6  **You became a Spanish teacher?**
7  A.  Yes.
8  **Q.  Okay.  So did you see anything about the**
9  **crimes in the newspapers?**
10  A.  I don't recall.  I may have.
11  **Q.  It's the TV that stands out in your mind?**
12  A.  TV that stands out in my mind, yeah.  The
13  news.
14  **Q.  Did you see the interviews with any of the**
15  **members of the victims' family?**
16  A.  No.  I just heard about the crime itself from
17  what I remember.
18  **Q.  Did you see the police bulletin with the**
19  **photographs of the two children who had been**
20  **kidnapped?**
21  A.  I may have.  I don't recall at this time.
22  **Q.  In your memory, this was what was typically**
23  **known as a heater case?**
24  MS. BARBER:  Objection.  Form.

Page 70

1      THE WITNESS:  What kind of case?
2  BY MS. SUSLER:
3      Q.  A heater case, one with a lot of media
4  attention?
5      A.  Yes.
6      Q.  All right.  Now, before Mr. Solache and
7  Mr. Reyes were brought to the lockup on April 5th of
8  1998, what did you know about them?
9      A.  Nothing.  Just what the news said.
10     Q.  Now, on April 5th of '98 you were working the
11  day shift?
12     A.  Yes.
13     Q.  And at that point how long had you worked
14  with Kevin Casey?
15     A.  At that point I was still on patrol.  So I
16  wasn't the regular lockup keeper.  So at that point I
17  had only worked with him a number of times.
18     Q.  What do you mean, a number of times?
19     A.  Maybe 10, 15 at the most.
20     Q.  Back in '98 what did Mr. Casey look like?
21     A.  I would say the same as he looks now except
22  he didn't have the gray hair.
23     Q.  Okay.  How tall is he?
24     A.  He's approximately 5'9", 5'10".

Page 71

1      Q.  And back then what color was his hair?
2      A.  Back then it was blondish.
3      Q.  All right.  About how much did he weigh?
4      MS. BARBER:  Objection.  Foundation.
5      THE WITNESS:  I would say approximately 165,
6  170 pounds.
7  BY MS. SUSLER:
8      Q.  Can you describe his build?
9      A.  He was slender.
10     Q.  And how old was he back then in '98 more or
11  less?
12     MS. BARBER:  Objection.  Foundation.
13     THE WITNESS:  '98, he was probably about 40.  Oh,
14  maybe younger.  Hold on.  Let me see.
15  BY MS. SUSLER:
16     Q.  If you can tell me how old is he now, we can
17  figure it out later.
18     A.  He is younger than me.  He just retired.  I'm
19  70.  I believe he is about 65.
20     Q.  Okay.  Any distinguishing features on his
21  face?
22     A.  No.
23     Q.  Did he wear glasses?
24     A.  He wore glasses occasionally.

Page 72

1      Q.  Did he have any facial hair?
2      A.  No.
3      Q.  And what was his ethnicity?
4      A.  He's Irish, I believe.
5      Q.  So he is a white man?
6      A.  Yes.
7      Q.  Did Mr. Casey speak Spanish?
8      A.  No.
9      Q.  How did Mr. Casey dress for work?
10     A.  They had -- the detention aides also had a
11  uniform that they wore.
12     Q.  It was different from the uniform that you
13  wore?
14     A.  Yes.
15     Q.  How did you dress when you worked at the
16  lockup?
17     A.  I wore my police uniform.
18     Q.  Can you describe the uniform of the detention
19  aide, one that Casey would wear?
20     MS. BARBER:  Objection.  Form.
21     THE WITNESS:  It's a bluish shirt with a patch
22  that says detention aide on it.
23  BY MS. SUSLER:
24     Q.  From what you understood the duties and

Page 73

1  responsibilities of Mr. Casey as a detention aide
2  back in April of '98 were basically to process the
3  prisoners the same as you?
4      MS. BARBER:  Objection.  Form.  Asked and
5  answered.
6      THE WITNESS:  Yes.
7  BY MS. SUSLER:
8      Q.  And the title lockup keeper, that was
9  something that was the sworn officer's title, is
10  that fair to say?
11     A.  Yes.
12     Q.  And not the title of the detention aide?
13     A.  Correct.
14     Q.  So on the arrest report, regardless of who
15  actually did the processing, your name would appear
16  as lockup keeper if you were working with a detention
17  aide?
18     A.  Yes.
19     Q.  Do you know how long Mr. Casey had worked as
20  a detention aide at the 25th District by April 5th of
21  1998?
22     A.  I would say probably about 10, 15 years at
23  that time.
24     Q.  And do you know how long he had worked for

Page 74

1  the police department by that time?
2      MS. BARBER: Objection. Foundation.
3      THE WITNESS: I don't know for sure, but probably
4  all the time he was a detention aide.
5  BY MS. SUSLER:
6      Q. So just if I -- I think you said Mr. Casey
7  retired a year ago?
8      A. Approximately.
9      Q. And, if you know, was he consistently
10 employed by the Chicago Police Department at least
11 from April 5th of '98 until his retirement?
12     MS. BARBER: Objection. Form, foundation.
13     THE WITNESS: Yes.
14 BY MS. SUSLER:
15     Q. And he was even with the police department,
16 you said, 10 or 15 years before April 5th of 1998,
17 right?
18     A. Right.
19     MS. BARBER: Objection. Form, foundation.
20     MS. SUSLER: I think this is a good time to take
21 like a 3-minute break if that's okay with everybody.
22     MS. BARBER: That's fine with us.
23     THE WITNESS: It's okay with me.
24     MS. SUSLER: Okay. See you in a few.

Page 75

1          (A break was taken.)
2      MS. BARBER: We are back on. We're ready.
3      MS. SUSLER: Sean, are you ready?
4      MR. STARR: Yeah.
5      MS. SUSLER: Is everybody else back?
6      MR. BURNS: Yes.
7      MS. SUSLER: All right. We're ready to go back on
8  the record.
9  BY MS. SUSLER:
10     Q. Mr. Basurto, did you have the opportunity to
11 look at your phone for Mr. Casey's phone number?
12     MS. BARBER: So, Jan, I don't understand why you
13 would need his phone number. Ordinarily we don't give
14 out phone numbers of former employees of the Chicago
15 Police Department.
16         If you tell me that you wanted him
17 deposed, listed as a witness, statement disclosure,
18 something along those lines, we can reach out to him
19 and facilitate a deposition.
20     MS. SUSLER: So are you instructing him not to
21 answer the question?
22     MS. BARBER: Correct.
23 BY MS. SUSLER:
24     Q. Are you going to follow your attorney's

Page 76

1  advice Mr. Basurto?
2      A. I think I should follow her advice.
3      MS. GOLDEN: Well, there is no question pending.
4      MR. STARR: Yeah, there is.
5      MS. GOLDEN: The question was already asked if he
6  knew the phone number. He said he didn't.
7          Now you are actually asking him to do
8  something which is to pull out his phone and look
9  something up for you, and that's not a question.
10 BY MS. SUSLER:
11     Q. Mr. Basurto, you don't have any independent
12 memory of Gabriel Solache, do you, and your
13 interaction with him on April 5th of 1998?
14     MS. GOLDEN: Object to the form.
15     THE WITNESS: No.
16 BY MS. SUSLER:
17     Q. And is it also fair to say that you have no
18 independent memory of your interaction with Arturo
19 Reyes on April 5th of 1998?
20     MS. GOLDEN: Object to the form.
21     THE WITNESS: Right. I have no recollection of
22 either one of them.
23 BY MS. SUSLER:
24     Q. Do you know how Mr. Solache got to the

Page 77

1  lockup?
2      A. No. I don't remember.
3      Q. Did Detective Guevara bring him?
4      A. I am not sure if it was Detective Guevara.
5  I'm not sure who brought him down.
6      Q. All right. If I ask you what you did in
7  processing Mr. Solache, is it fair to say that you
8  know only what's on the arrest report?
9      MS. BARBER: Objection. Form.
10     THE WITNESS: Correct.
11 BY MS. SUSLER:
12     Q. And that would also be true for Mr. Reyes?
13     MS. BARBER: Objection. Form.
14     THE WITNESS: Correct.
15 BY MS. SUSLER:
16     Q. Did you do any paperwork other than the
17 arrest report on Mr. Solache?
18     A. No.
19     MS. BARBER: You can silence that if you want, and
20 if you need to take a break or a call or anything,
21 just let us know.
22     THE WITNESS: Nobody I know. I don't answer
23 unless I know the person.
24     MS. SUSLER: All right. I'm going to show you

Page 78

1  what we'll mark as Exhibit Number 1, which is
2  RFC Solache Reyes 669 and 670.
3          Sean, can you screen share?
4     MR. STARR:  Yeah.  Just give me a minute.
5     MS. SUSLER:  Oh, he has got the paper?
6     MS. BARBER:  Yeah.
7       (Whereupon, Exhibit Number 1
8       was identified.)
9  BY MS. SUSLER:
10    Q.  Okay.  This is one of the documents that
11  Ms. Barber showed you?
12    A.  Yes.
13    Q.  Okay.  And this appears to be the arrest
14  report for Gabriel Solache?
15    A.  Yes.
16    Q.  All right.  Now, do you see your handwriting
17  anywhere on that first page or the front of it?
18    A.  I don't recognize any of this as my
19  handwriting.
20    Q.  All right.  If you saw Kevin Casey's
21  handwriting, would you recognize it?
22    A.  No.
23    Q.  Can you say whose handwriting it is down in
24  Box 50 where it says, "arrestee searched by"?

Page 79

1     A.  I would say that's -- this is Casey's
2  handwriting.
3     Q.  Okay.
4     A.  He and I were the ones in the lockup working.
5  If it's not mine, it would have to be his.
6     Q.  Okay.  And --
7     A.  The telephone number called, that looks like
8  my handwriting.
9     Q.  Okay.  There is -- in that same box I just
10  asked you about, Box 50, there is -- in addition to
11  where arrestee searched by, it looks like he has
12  written Casey.
13        Do you see that?
14    A.  Yes.
15    Q.  And then it says star number -- star or
16  employee number, and he's written a number there?
17    A.  Yes.
18    Q.  Are you familiar with that number?
19    A.  Not really.
20    Q.  Okay.  In that same box at the top right, it
21  says unit.
22        Do you know what that means?
23    A.  Where are you talking about?
24    Q.  In that same Box 50, arrestee searched by, if

Page 80

1  you look, it asks for star number or employee number,
2  and then it says unit?
3     A.  Correct.
4     Q.  What does that mean, if you know?
5     A.  That would be the 25th District.
6     Q.  Okay.
7     A.  It would be the 25th.
8     Q.  So for Mr. Solache if you just go on to Box
9  51, date received lockup, it says April 5th of 1998?
10    A.  Yes.
11    Q.  And the time says 8:40.  Does that mean the
12  time he was received at the lockup?
13    A.  Yes.
14    Q.  And then Box 52 looks like property receipt
15  PB and property receipt number, I guess.
16        And PB you think means what?
17    A.  Property bag.
18    Q.  Okay.  What is that?
19    A.  It's the small plastic bag where we put
20  whatever property they had on them.
21    MS. SUSLER:  Sean, I think we're fine.  I don't
22  think we need screen sharing since Mr. Basurto has the
23  printout, but I appreciate your help.
24  BY MS. SUSLER:

Page 81

1     Q.  And then Box 53 says, telephone number
2  called.
3        What is that?
4     A.  That would be the number he provided that he
5  was going to call.  That would be Gabriel Solache.
6  And it looks like my handwriting.  So I probably asked
7  him in Spanish for the number.
8     Q.  And is that the time of the call, does that
9  say 0900?
10    A.  Yes.
11    Q.  Okay.  And it would appear that the next box
12  says booking officer?
13    A.  Right.
14    Q.  And that's -- it looks like that's supposed
15  to be your name, but it's misspelled, isn't it?
16    A.  Yes.
17    Q.  Okay.  But is that your star number?
18    A.  Yes.
19    Q.  Okay.  And then time fingerprinted, it looks
20  like 8:45?
21    A.  Yes.
22    Q.  And time photographed, 8:50?
23    A.  Yes.
24    Q.  And then time fed, there is nothing in there?

Page 82

1    A. Right.
2    Q. And would that mean that he wasn't fed?
3    A. It could mean that he declined a sandwich.
4    Q. And then the next box is placed in cell?
5    A. Yes.
6    Q. And 3-3 is written?
7    A. Yes.
8    Q. And tell me what that means?
9    A. That's the cell block that he went to.
10   Q. Okay. And so that's Cellblock 3?
11   A. Yes.
12   Q. And that's the cell block that you mentioned
13   where you put the people accused of very serious
14   felony?
15   A. Right.
16   Q. So that you could keep an eye on them?
17   A. Right. Where they would be closer to us.
18   Q. Okay. Now, do you have in front of you what
19   we'll mark as Exhibit 2 which is -- just give me a
20   minute -- RFC -- no. Sorry. It looks like Reyes 31.
21   MS. BARBER: One second.
22   MS. SUSLER: Which is a photograph.
23   MS. BARBER: You want me to give it to the
24   witness?

Page 83

1    MS. SUSLER: Yes, please.
2    MS. BARBER: (Indicating.)
3    (Whereupon, Exhibit Number 2
4    was identified.)
5    BY MS. SUSLER:
6    Q. Now it says on Exhibit 2 that this is a
7    photograph of Gabriel Solache.
8    Do you see that?
9    A. Yes.
10   Q. But you have no memory of Mr. Solache,
11   correct?
12   A. Only from looking at the pictures lately, but
13   from that time, no.
14   Q. So looking at the picture, it doesn't refresh
15   your memory as to what you knew back in April of 1998?
16   MS. GOLDEN: Object to form.
17   THE WITNESS: Yes.
18   BY MS. SUSLER:
19   Q. It does or it doesn't?
20   A. It does.
21   Q. Okay. So if Mr. Solache walked into the room
22   today, do you think you would recognize him?
23   A. Probably not. I'm sure he has changed in 23
24   years.

Page 84

1    Q. Is there any way to tell on Exhibit 2 when
2    this photograph was taken?
3    A. I see a date and time on here. So that's it.
4    MS. BARBER: I am just going to object to the
5    foundation.
6    BY MS. SUSLER:
7    Q. Where do you see that, sir?
8    A. Down at the bottom where it says 08 June,
9    1836 -- 37.
10   Q. Okay. It says 08 June 00?
11   A. Right.
12   Q. Okay. Other than that, is there any way to
13   tell when this photograph was taken?
14   MS. BARBER: Objection. Form, foundation.
15   Misstates the witness's testimony. Mischaracterizes
16   the witness's testimony.
17   THE WITNESS: Not that I know of.
18   BY MS. SUSLER:
19   Q. Is there any way to tell where this
20   photograph was taken?
21   A. Not that I am aware of.
22   Q. Is there any way to tell who took this
23   photograph?
24   A. Not from this printout.

Page 85

1    Q. Let me direct your attention back to Exhibit
2    1, the second page of that exhibit, the back of it.
3    A. Uh-huh.
4    Q. When the arresting officer delivers the
5    arrestee to the lockup, is this portion of the arrest
6    report typically blank?
7    A. Yes.
8    Q. Do you recognize any handwriting on Exhibit 1
9    on the back page?
10   A. That's all my handwriting.
11   Q. Now, if you look right about like maybe
12   a third of the way down where it says receiving
13   screening record for arrestee to be held in lockup,
14   do you see where I am?
15   MS. GOLDEN: Jan, if you are not going to screen
16   share, can you just give me a minute to get to the
17   exhibit?
18   MS. SUSLER: Sure.
19   MS. GOLDEN: Okay. Got it.
20   BY MS. SUSLER:
21   Q. Okay. If you go all the way to the right on
22   that same line, you'll see it says, date and time?
23   A. Yes.
24   Q. What is the time significance? What does it

Page 86
1  mean?
2      A.  8:40.  0840.
3      Q.  Yeah.  What does that indicate?  What
4  happened at 8:40?
5      A.  The time we got him.
6      Q.  You said that you typically did not have the
7  information about arrestees, how long they had been
8  held in police custody before they got to you.
9          Do you know how long Mr. Solache was held in
10  police custody before he got to you?
11      A.  I don't know.
12      Q.  And did you have any information on April 5th
13  of 1998 of the circumstances under which Mr. Solache
14  was held at the -- in police custody?
15      MS. GOLDEN:  Asked and answered.
16      THE WITNESS:  No.
17  BY MS. SUSLER:
18      Q.  And underneath that where it says arrestee
19  name, it says lockup keeper's visual check.
20          Do you see that?
21      A.  Yes.
22      Q.  Okay.  Is it fair to say that you have no
23  memory of conducting a visual check of Mr. Solache?
24      A.  Correct.

Page 87
1      Q.  Now, typically you said you never asked
2  arrestees -- you never saw arrestees nude, right?
3      A.  Right.
4      Q.  And is it fair to say that you also never
5  typically asked arrestees to remove or lift their
6  clothing during the processing?
7      A.  Right.  Correct.
8      Q.  And so likely you didn't ask Mr. Solache to
9  do that either, correct?
10      A.  Correct.
11      Q.  Now, on the right-hand side of the lockup
12  keeper visual check it says, lockup keeper's arrestee
13  questionnaire.
14          Do you see that?
15      A.  Yes.
16      Q.  You don't have any memory of asking
17  Mr. Solache the questions in that portion of the form,
18  do you?
19      MS. GOLDEN:  Object to form.
20      THE WITNESS:  Not at this time.
21  BY MS. SUSLER:
22      Q.  Now, you didn't have any training or ability
23  to observe injuries that weren't obvious, did you?
24      MS. BARBER:  Objection.  Form, foundation.

Page 88
1      THE WITNESS:  No.
2  BY MS. SUSLER:
3      Q.  And you would concede that some injuries are
4  not obvious?
5      A.  Correct.
6      Q.  On the visual check, Section Number 5 says,
7  does the arrestee appear to be despondent, but you had
8  no training in psychiatry or psychology, correct?
9      MS. BARBER:  Objection.  Asked and answered.
10      THE WITNESS:  Correct.
11      MS. BARBER:  Form.
12  BY MS. SUSLER:
13      Q.  And you weren't familiar with the outward
14  characteristics of despondency or depression, were
15  you?
16      A.  No.
17      Q.  With respect to your typical practice, I
18  think you told us earlier that you asked only the
19  questions on the form and no others, correct?
20      MS. BARBER:  Objection.  Asked and answered.
21      THE WITNESS:  Correct.
22  BY MS. SUSLER:
23      Q.  You never asked Mr. Solache any questions
24  other than those on the form, correct?

Page 89
1      A.  Correct.
2      Q.  You never asked him if he had been beaten or
3  abused in any way?
4      A.  No.  I did not ask him that.
5      Q.  You didn't ask him if he had been hit by
6  anybody while he had been in police custody?
7      A.  No.
8      Q.  And you didn't ask him if he had any injuries
9  to his ears?
10      A.  No.
11      Q.  You didn't ask him anything about how he had
12  been treated by police?
13      A.  No.
14      Q.  Not whether the police hit him?
15      A.  No.
16      Q.  Not where the police hit him?
17      A.  No.
18      Q.  Not how many times the police hit him?
19      A.  No.
20      MS. BARBER:  Objection.  Form.
21  BY MS. SUSLER:
22      Q.  Now, since Mr. Casey filled out the first
23  page of the arrest report, and you wrote the -- your
24  handwriting is in the back of the police report where

Page 90

1  it says, arrestee's name and date and time, and you
2  are the lockup keeper, you can't really say whether it
3  was you or Mr. Casey who checked the boxes in the
4  section for visual check, right?
5      MS. BARBER: Objection. Misstates the witness's
6  testimony. Mischaracterizes the witness's testimony.
7  Mischaracterizes the report and evidence.
8      THE WITNESS: Well, as I said, this is not my
9  handwriting on this page.
10  BY MS. SUSLER:
11      Q. You didn't know whether the police ever
12  abused Mr. Solache, is that correct?
13      A. Correct.
14      Q. How long was Mr. Solache at the 25?
15      MS. BARBER: Sorry. A late objection to the form
16  of the previous question.
17          Go ahead.
18  BY MS. SUSLER:
19      Q. How long was Mr. Solache at the 25th District
20  lockup?
21      A. From what I remember, he went to the court
22  the next morning from the time he was brought in. So
23  he would have left for court the next morning.
24      Q. And you remember that because that was the

Page 91

1  typical thing that happened with people who were
2  brought in on felonies?
3      A. Yes.
4      Q. Not because you remember specifically with
5  respect to Mr. Solache, right?
6      A. Right.
7      Q. Now, on the first page of Exhibit 1, is there
8  anywhere that tells you when Mr. Solache was taken
9  from the lockup?
10      A. No.
11      Q. Let me ask you to look at what is Box 30 that
12  says arrestee transported.
13          Do you see that box?
14      A. I see it.
15      Q. Does that mean when the arrestee was taken to
16  Area 5, if you know?
17      A. I don't know. I'm not sure.
18      Q. Okay. That's not a part of the arrest report
19  that was your responsibility to deal with, right?
20      A. Right.
21      Q. And there is nowhere on the sections that you
22  and Mr. Casey were responsible for filling out that
23  indicates how long Mr. Solache was held at District 25
24  lockup, is that right?

Page 92

1      A. That's right.
2      MS. SUSLER: Let's look at Exhibit 3, which is
3  RFC Solache Reyes 5159 and 5160. That should be the
4  arrest report for Mr. Reyes.
5      (Whereupon, Exhibit Number 3
6      was identified.)
7  BY MS. SUSLER:
8      Q. Can you pull that out, please? Let me know
9  when you have it.
10      A. I have it.
11      Q. Okay. Just to be clear, you have no
12  independent memory as you sit here today of having
13  processed Mr. Reyes, correct?
14      A. Correct.
15      Q. And other than Exhibit 3, do you have any
16  other paperwork that you did about Mr. Reyes?
17      A. No.
18      MS. BARBER: I am just going to object to form of
19  paperwork. I don't know if that includes the photo or
20  not.
21      MS. SUSLER: Actually, okay, Exhibit 1 -- let me
22  just recap what the exhibits are. I unfortunately
23  didn't write them down. What is Exhibit 1?
24      MS. BARBER: That, I believe, is the Solache

Page 93

1  arrest report.
2      MS. SUSLER: Okay. So then Solache photo was
3  Exhibit 2.
4      MS. BARBER: Correct.
5      MS. SUSLER: Okay. So this is Exhibit 3. Good.
6  BY MS. SUSLER:
7      Q. Do you see your handwriting on the first page
8  of Exhibit 3?
9      A. Are we on Arturo?
10      Q. Yes.
11      A. That's all my handwriting down at the bottom.
12      Q. Where it says "arrestee searched by"?
13      A. Yes. That's my handwriting.
14      Q. Okay. So in the section right in that box
15  where arrestee searched by, it has your name, your
16  star number, and then unit.
17          And what does that mean?
18      A. That's the 25th District.
19      Q. Oh, so when you wrote 025 vertically, that
20  was for both you and Mr. Casey.
21      A. Right.
22      Q. I see. And date received in the lockup,
23  April 5, '98, time 8:30.
24          Does that mean the time that Mr. Reyes was

Page 94

1  brought to the lockup?

2      A.  Yes.

3      Q.  And then same PB for the property bag for his

4  property?

5      A.  Yes.

6      Q.  And then the telephone number he called?

7      A.  The telephone number he gave me, yes.

8      Q.  And there is no time indicated.  So we don't

9  know what time he was given a phone call?

10     A.  We don't know if he called it or not.  That's

11 the number he gave.

12     Q.  When Mr. Solache made his phone call, do you

13 know whether he reached anybody?

14     A.  I do not recall.

15     Q.  Did you overhear the conversation?

16     A.  I do not recall.

17     Q.  And for Mr. Reyes, do you know whether he

18 reached anybody?

19     A.  I do not recall.

20     Q.  Did you overhear the phone conversation?

21     A.  I do not recall.

22     Q.  Now, it indicates in box number -- on

23 Exhibit 3 for Mr. Reyes and box Number 55 that he was

24 fingerprinted at 8:45?

Page 95

1      A.  Yes.

2      Q.  And he was photographed at 8:40?

3      A.  Yes.

4      Q.  And time fed, Box 57, is left blank?

5      A.  Yes.

6      Q.  And so does that indicate that Mr. Reyes was

7  not given a baloney sandwich?

8      A.  Again, like the other one, it could be that

9  he declined.

10     Q.  But we don't know?

11     A.  Right.  We don't know.

12     Q.  Was the day watch the only watch that

13 provided baloney sandwiches to the arrestees?

14     A.  Every watch provided the baloney sandwiches.

15     Q.  Where would that be documented?

16     A.  On the log.  On the daily log, it would also

17 indicate it on there.

18     Q.  And if the arrestee refused a meal, wouldn't

19 that be documented on the arrest report?

20     MS. BARBER:  Objection.  Form, foundation.

21     THE WITNESS:  No.  Because we wouldn't have it

22 with us anymore.  We wouldn't have it back there

23 anymore.

24     BY MS. SUSLER:

Page 96

1      Q.  What do you mean?

2      A.  It would be at the front desk once we got

3  through with it.  We don't keep the arrest report.  It

4  goes to the front desk.

5      Q.  When you say you got through with it, when is

6  that in the process?

7      A.  Once the arrestees are in their cell.

8      Q.  So once they are assigned to a cell, then the

9  arrest report goes to the desk sergeant, is that what

10 you said?

11     A.  Yes.

12     Q.  So the other watches, if the person is held

13 overnight, like if they provide food, the baloney

14 sandwich, that's not documented on the arrest report

15 for the person?

16     A.  Right.  Correct.

17     Q.  The only watch that completes the arrest

18 report is the watch that's on duty when the arrestee

19 is brought to the lockup?

20     A.  Yes.

21     Q.  And Box 58 on Exhibit 3 says, Mr. Reyes was

22 placed in Cell 3-2?

23     A.  Yes.

24     Q.  And that's the Cellblock 3 that you told us

Page 97

1  about where you put people who are being held on very

2  serious felonies?

3      A.  Yes.  He was placed right in the cellblock

4  right next to his friend, next to Gabriel Solache.

5      Q.  Why do you say it was his friend?

6      A.  Well, what did you want me to say?  His

7  co-defendant.

8      Q.  Well, do you have -- did you have any reason

9  to believe they were friends?

10     A.  No.  I just said that.

11     Q.  Okay.  So --

12     A.  Co-defendant.

13     Q.  Sorry.

14     A.  His co-defendant.

15     Q.  Okay.  So that was the same cellblock where

16 you placed people accused of serious felonies so that

17 you could keep an eye on them?

18     A.  Correct.

19     Q.  Is there anywhere else on the front page of

20 this Exhibit 3 that you see your handwriting?

21     A.  I see it where I put my name, Casey's name,

22 the time fingerprinted, time photographed, and time

23 taken in, and the phone number, property bag placed in

24 3-2, and then the CB number on both corners looks like

Page 98

1  my handwriting.
2  Q.  Other than that is your handwriting anywhere
3  on the front part of the arrest report?
4  A.  No.
5  Q.  At the bottom of that -- that very like
6  bottom line of that front page where it says "to
7  court," do you know the significance of that?
8  MS. BARBER:  Objection.  Form.
9  THE WITNESS:  That's the date -- from what I can
10  read, the date he was sent to court.
11  BY MS. SUSLER:
12  Q.  But that's something that wasn't your
13  responsibility as a lockup keeper to complete?
14  A.  Right.  It wasn't my responsibility.
15  Q.  Okay.  Let's look at the back of the arrest
16  report of Exhibit 3 for Mr. Reyes.
17      Do you see your handwriting anywhere on the
18  back of Exhibit 3, the second page?
19  A.  That is all my handwriting.
20  Q.  And again in the line where it says
21  receiving, screening record for arrestee to be held in
22  lockup?
23  A.  Uh-huh.
24  Q.  If you go all the way to the right where it

Page 99

1  says time, 8:30, is that the time Mr. Reyes was
2  brought to the lockup?
3  A.  Yes.
4  Q.  Now, from the first page of Exhibit 3, you
5  saw when Mr. Reyes was brought to the lockup.
6      And from the first page of Exhibit 1, you saw
7  when Mr. Solache was brought to the lockup.
8      The charges that they were arrested for were
9  murder, kidnapping, and home invasion, correct?
10  A.  Correct.
11  Q.  And you saw that the arresting officer was --
12  it looks like a Detective Mohan and Detective Kernan.
13      Do you see that?
14  A.  Yes.
15  Q.  And you saw that additional investigating and
16  arresting officers were Hanlon -- Sergeant Hanlon, PO
17  Golab, PO Solis of the 8th District.
18      Do you see that?
19  A.  Yes.
20  Q.  And then it also says Detective Jack
21  McDonald, Dickinson, Guevara, and Halvorsen of Area 5
22  violent crimes.
23      Do you see that?
24  A.  Yes.

Page 100

1  Q.  Okay.  So you knew which detectives and which
2  officers were involved in the arrest of Mr. Solache
3  and Mr. Reyes when they were brought to the district
4  lockup, correct?
5  MS. BARBER:  Objection.  Form, foundation.
6  Assumes facts not in evidence.
7  THE WITNESS:  Well, it's on the arrest report, but
8  I wouldn't even look at this stuff.  Basically, I just
9  did what I had to do.
10  BY MS. SUSLER:
11  Q.  And you are not talking about this particular
12  case?  You are talking about your typical practice?
13  A.  Right.
14  Q.  Because in this particular case, you have no
15  memory of what you did, correct?
16  A.  Right.
17  MS. BARBER:  Objection.  Form, misstates the
18  witness's testimony.
19  BY MS. SUSLER:
20  Q.  Now, on Exhibit 3 right in that same section
21  of the first page of the arrest report it says -- it
22  looks like it says, ID Kenny and then a number and
23  then something else.
24      Can you read that?  Do you know what that

Page 101

1  says?
2  A.  I see where you are talking about, but I
3  don't know what that is either.
4  Q.  Do you know who Kenny is?
5  MS. BARBER:  Objection.  Foundation.
6  THE WITNESS:  No, I don't.
7  BY MS. SUSLER:
8  Q.  Now, with Mr. Reyes' arrest report, the
9  section on lockup keeper visual check and the section
10  on lockup keeper arrestee questionnaire there are --
11  they are not exactly X's.  It looks almost like a loop
12  in the no boxes for every question and every visual
13  check.
14      Do you see that?
15  A.  Yes.
16  Q.  And you have no way of knowing whether you or
17  Mr. Casey made those marks, do you?
18  A.  Well, the rest of it is my handwriting.  So I
19  would say that's also me.
20  Q.  So you are basically guessing?
21  MS. BARBER:  Objection.  Form, mischaracterizes
22  the witness's testimony, mischaracterizes the report,
23  misstates the evidence in the record.
24  THE WITNESS:  I'm not guessing because we spoke --

1  I spoke to him in Spanish.  So I would have been the
2  one to answer these questions because Casey did not
3  speak Spanish.
4  BY MS. SUSLER:
5      Q.  Well, the visual check doesn't require
6  understanding any language, does it?
7      A.  No.
8      Q.  So you have no way of knowing who made those
9  marks in the no boxes for Mr. Reyes, correct?
10     A.  Not a hundred percent.
11     MS. BARBER:  Objection.
12     THE WITNESS:  Not a hundred percent.
13     MS. GOLDEN:  Asked and answered.
14 BY MS. SUSLER:
15     Q.  And in Exhibit 1 for Mr. Solache, you have no
16 way of knowing who made the X's in the section for the
17 lockup keeper's visual check same as Mr. Reyes,
18 correct?
19     MS. BARBER:  Objection.  Misstates the report,
20 mischaracterize the report, mischaracterizes the
21 witness's testimony, mischaracterizes the evidence in
22 the record.
23     THE WITNESS:  Correct.  But same as the other one,
24 that's still my handwriting up on top.

1  BY MS. SUSLER:
2      Q.  Now on page 1 of Mr. Solache's arrest report,
3  it's not your handwriting, is it?
4      A.  No, it's not.  Except for the phone number.
5      Q.  Okay.  So we don't know who made those X's in
6  the no boxes for Mr. Solache's in the section for the
7  visual check, correct?
8      MS. BARBER:  Objection.  Asked and answered,
9  argumentative, misstates the record, misstates the
10 report, mischaracterizes the witness's testimony, and
11 the evidence in the record.
12 BY MS. SUSLER:
13     Q.  Is that correct, sir?
14     A.  Correct.
15     Q.  Now, is it fair to say that you have no
16 independent recollection of what Arturo Reyes looked
17 like on April 5th?
18     A.  Right.  I don't remember.
19     Q.  Right.  Same as Mr. Solache, right?
20     A.  Right.
21     MS. SUSLER:  Now, I'm going to show you what we'll
22 mark as Exhibit 4, which is a photograph that purports
23 to be of Mr. Reyes that's marked Reyes 59.
24

1      (Whereupon, Exhibit Number 4
2      was identified.)
3  BY MS. SUSLER:
4      Q.  Can you let me know when you have that?
5      MS. BARBER:  I am sorry.  Did you say it's
6  purported to be Mr. Reyes?
7  BY MS. SUSLER:
8      Q.  Do you have the exhibit, sir?
9      A.  Yes.
10     Q.  Okay.  Now on Exhibit 4 it says, name, Arturo
11 DeLeon.
12     Do you see that?
13     A.  Yes.
14     Q.  You don't have any memory of whether this was
15 a photograph of Mr. DeLeon-Reyes, correct?
16     MS. BARBER:  Objection.  I am sorry.  Wait a
17 minute.  Can you ask that question again?
18 BY MS. SUSLER:
19     Q.  You don't have any independent memory of
20 whether this is a photograph of Mr. Arturo
21 DeLeon-Reyes, correct?
22     A.  Not at this time.
23     Q.  Okay.  Now --
24     MS. BARBER:  Can you just tell me who is the photo

1  of?  Is this somebody different?  Am I missing
2  something?
3  BY MS. SUSLER:
4      Q.  Is there any way, sir, to tell when this
5  photograph was taken from looking at Exhibit 4?
6      MS. BARBER:  You are asking him when the photo was
7  taken from the report only, correct?
8  BY MS. SUSLER:
9      Q.  The question is, is there any way from
10 looking at Exhibit 4 to tell when this photo was
11 taken?
12     MS. BARBER:  Okay.  So are you asking him is
13 there anywhere on the photo that indicates when the --
14 anything on this piece of paper that tells him when
15 the photo was taken?
16     Not if he knows when the photo was
17 taken, but if there is anything on this piece of paper
18 that says when the photo was taken, is that correct?
19     MR. STARR:  Is that an objection?
20     MS. BARBER:  I am asking for clarification on the
21 question.
22 BY MS. SUSLER:
23     Q.  The question is, sir, is there any way to
24 tell when this photograph was taken by looking at

Page 106

1  Exhibit 4?
2     A.  No.
3     Q.  Is there any way to tell by looking at
4  Exhibit 4 where this photograph was taken?
5     A.  No.
6     Q.  Is there any way to tell by looking at
7  Exhibit 4 who took this photograph?
8     A.  No.
9     Q.  If Arturo Reyes walked in the room today, you
10  wouldn't recognize him, would you?
11    MS. BARBER:  Objection.  Form, foundation.
12    THE WITNESS:  Same as for the other guy.  It's 23
13  years later.  I am sure he has also changed.
14       But I would not recognize him, no.
15  BY MS. SUSLER:
16    Q.  Now, when we were talking about the search of
17  Mr. Solache, you testified that you didn't ask him to
18  remove or lift his clothing.
19       That was true for Mr. Reyes as well, correct?
20    A.  Correct.
21    Q.  And with respect to Mr. Reyes, as you said
22  for Mr. Solache and your routine, you asked only the
23  questions that were on the form, correct?
24    A.  Correct.

Page 107

1     Q.  And you didn't ask him any questions that
2  were not on the form?
3     A.  Right.
4     Q.  So you never asked Mr. Reyes if he had been
5  threatened while he was in police custody, did you?
6     A.  No.
7     Q.  And you didn't ask him if he had ever been
8  hit or slammed while in police custody?
9     A.  No.
10    Q.  How long was Mr. Reyes at the 25th District
11  lockup?
12    A.  Probably went to court the next morning also.
13  I'm not sure at this point.
14    Q.  Yeah.  Your testimony is based on what
15  usually happened with felony arrestees?
16    A.  Yes.
17    Q.  And not based on what you remember from what
18  happened with Mr. Reyes, correct?
19    A.  Correct.
20    Q.  Now, if we look at Exhibits 1 and 3, I don't
21  know if you can pull them up at the same time in front
22  of you.
23    MS. BARBER:  You -- he doesn't have them numbered.
24  So she is talking about the arrest reports.  She wants

Page 108

1  you to look at them together.
2  BY MS. SUSLER:
3     Q.  Sure.  The arrest report for Mr. Solache and
4  the arrest report for Mr. Reyes, if you could look at
5  them side by side and look at the first page of each.
6     A.  I am looking at both front pages.
7     Q.  Okay.  For Mr. Reyes it looks like he came to
8  the lockup at 8:30, and Mr. Solache came at 8:40.
9       Is that what is reflected in the reports?
10    A.  That's what it says.
11    Q.  Okay.  And it looks like they were both
12  fingerprinted at the same time at 8:45?
13    A.  That's what it says.
14    Q.  And that Mr. Reyes was photographed at 8:40?
15    A.  Yes.
16    Q.  And Mr. Solache at 8:50?
17    A.  According to this report, yes.
18    Q.  So is it fair to say that one of you was
19  doing -- between you and Mr. Casey working -- well,
20  first of all, is it fair to say that you and Mr. Casey
21  worked together in processing these two arrestees?
22    A.  Yes.
23    Q.  And is it fair to say that at 8:40 when
24  Mr. Reyes was being photographed, one of you was doing

Page 109

1  the visual check and questionnaire with Mr. Solache?
2     A.  Yes.
3     Q.  But we don't really know which of you, you or
4  Mr. Casey, did what, do we?
5     MS. BARBER:  Objection.  Form, foundation.
6     Jan, you really do have to stop this.
7  You have to stop this.  You have already asked these
8  questions.  You have already gotten --
9     MS. SUSLER:  Make an objection without speaking.
10  You are not to make a speaking objection, and you know
11  it.  So stop it.
12    MS. BARBER:  I am objecting to you intentionally
13  trying to --
14    MS. SUSLER:  Form is the question -- form is the
15  objection.
16    MS. BARBER:  My objection is that you are
17  intentionally trying to confuse the witness.
18    MS. SUSLER:  Form is the objection.
19    MS. BARBER:  No, that's not.
20       My objection is that you are
21  intentionally trying to confuse the record.
22    MS. SUSLER:  All right.  That is not the case, and
23  that is a completely inappropriate objection, and you
24  need to stop.

Page 110

1   BY MS. SUSLER:
2      Q.  So is it fair to say, sir, that you can't say
3   which of you between you and Mr. Casey did the visual
4   check and questionnaire on Mr. Solache?
5      MS. BARBER:  And I'm also going to object that
6   that question lacks a good faith basis based on the
7   testimony you have heard today.
8      THE WITNESS:  Sorry.  Can I take this?
9      MS. SUSLER:  Yes, sir.  Take a break.  Let's go
10  off the record.
11     MR. STARR:  Before we take a break, I have a
12  question.
13     THE WITNESS:  Hold up.
14     MS. BARBER:  Well, no.  Here, you can't answer
15  that call on the record.
16         If you need to take that call, we can
17  take a break.  They would like you to answer the
18  question.  They would like you to answer the question
19  before you call that person back.
20     THE WITNESS:  Okay.  Can you repeat the question,
21  please?
22  BY MS. SUSLER:
23     Q.  Yeah.  Is it fair to say, sir, that you
24  cannot testify today what you did in terms of

Page 111

1   processing Mr. Solache and Reyes versus what Mr. Casey
2   did in terms of processing Mr. Solache and Mr. Reyes?
3      MS. BARBER:  Objection.  Form, foundation,
4   misstates the testimony, misstates the record,
5   mischaracterizes the witness's testimony,
6   mischaracterizes the evidence in the case.
7         And I believe that also lacks a good
8   faith basis based on the testimony today.
9   BY MS. SUSLER:
10     Q.  Can you answer the question, please?
11     A.  23 years later, I don't remember.
12     Q.  And is there any way from looking at Exhibit
13  1 and 3, the arrest reports, to know what you did
14  versus what Mr. Casey did in processing Mr. Reyes and
15  Mr. Solache?
16     MS. BARBER:  Same objections that that
17  mischaracterizes the evidence in the case,
18  mischaracterizes the witness's testimony, form, and
19  foundation.
20     THE WITNESS:  Well, the only thing I can say is
21  this.  As I said before, they did not speak English.
22  I would have been the one to talk to them because I
23  was talking in Spanish.
24  BY MS. SUSLER:

Page 112

1      Q.  So in terms of the section of lockup keeper
2   arrestee --
3      MS. BARBER:  Can we address the break so he can
4   take care of that phone call if he needs to before you
5   ask another question, please?
6      MS. SUSLER:  No.  I'd would like to finish this
7   section.  I'm almost done.
8   BY MS. SUSLER:
9      Q.  So in terms of the lockup keeper's arrestee
10  questionnaire, your testimony is that you would have
11  been the one to question Mr. Solache and Mr. Reyes, is
12  that what you are saying?
13     A.  If they didn't speak English, I would have
14  been the one to talk to them, yes.
15     Q.  And your testimony is based just on your
16  typical practice, not on your memory of anything
17  you did with respect to Mr. Solache and Mr. Reyes,
18  correct?
19     MS. BARBER:  Object to form.
20     MS. GOLDEN:  Object to form and foundation for
21  that question.
22     THE WITNESS:  Correct.
23  BY MS. SUSLER:
24     Q.  Typically, if an arrestee came in and spoke

Page 113

1   only Spanish, and it was you and Mr. Casey working,
2   you would be the person to ask the arrestee
3   questionnaire?
4      A.  Correct.
5      Q.  But you have no memory of asking Mr. Solache
6   or Mr. Reyes anything?
7      MS. GOLDEN:  Objection.  Asked and answered.
8      THE WITNESS:  Not at this time.  Just from seeing
9   the reports.
10     MS. SUSLER:  All right.  Sir, if you need to make
11  a telephone call, you can take a break now.
12         Let's go off the record.
13     THE WITNESS:  All right.  Thank you.
14         (A break was taken.)
15     MS. SUSLER:  Ready to go back on the record.
16  BY MS. SUSLER:
17     Q.  Mr. Basurto, the 25th District and Area 5
18  covers Spanish-speaking neighborhoods, right?
19     A.  Right.
20     Q.  And how many other arrestees were you
21  processing on the morning of April 5th of 1998?
22     MS. BARBER:  Objection.  Foundation.
23     THE WITNESS:  At that time it was just those two.
24  BY MS. SUSLER:

1    Q.  All right.  You had only two, you remember
2  that?
3    A.  That we were processing at that time, just
4  those two.
5    Q.  And how is it that you remember that?
6    A.  I just for some reason remember that.  At
7  that time, it was just those two.
8    Q.  When there are other arrestees, like if three
9  or four come in at the same time, and there are only
10  two of you working, how do you manage that usually,
11  typically?
12    A.  Usually, I would tell them, we're going to
13  take one at a time.  A lot of times they didn't like
14  it, but that's the way I worked.  I would take one at
15  a time.
16    Q.  Except with Solache and Reyes you took two at
17  a time, right?
18    A.  Yeah.  Because the detectives dropped them
19  off.  Usually if it was arresting officers, I would
20  have them wait.
21    Q.  Now, because you don't remember asking the
22  questions of Mr. Solache and Reyes, and because the
23  report does not indicate who asked those questions if
24  anyone, it's possible that Casey asked those

1  questions, and even if he didn't understand, placed
2  those checkmarks anyway, right?
3    A.  Well, that's all my handwriting on that part
4  of the arrest report.  So if I did all that
5  handwriting up on top, I don't see why Casey would do
6  the rest.  I would have done the same -- I would have
7  filled out the rest also.
8    Q.  But it's possible that he did that, right?
9    A.  Anything is possible except that which is
10  impossible.
11        And in this case it's impossible.  I would
12  have filled that out.
13    Q.  Well, would have is not the same thing as
14  did, is it, sir?
15    MS. BARBER:  Objection.  Argumentative.
16    THE WITNESS:  No, it's not.
17        But I said the rest -- all the rest up
18  on top is my handwriting.  So it doesn't make sense
19  that I would do that and that he would do the other.
20  BY MS. SUSLER:
21    Q.  Okay.  So what you're saying is you don't
22  remember, but you're drawing based on what you're
23  presuming, correct?
24    A.  Based on common sense.

1    Q.  All right.  It's fair to say you don't
2  remember?
3    MS. BARBER:  Asked and answered.
4    THE WITNESS:  Common sense would tell you that if
5  I filled out all the rest of it, I would also fill
6  that part.
7  BY MS. SUSLER:
8    Q.  But you didn't fill out the front part of
9  Mr. Solache's arrest report, did you?
10    MS. GOLDEN:  Again, argumentative and asked and
11  answered.
12    THE WITNESS:  That's not my handwriting.  The one
13  on Reyes is my handwriting on the front.
14  BY MS. SUSLER:
15    Q.  Is it fair to say you just don't remember?
16  Your answers are based on presuming?
17    A.  Right.
18    MS. BARBER:  Objection.  Form and asked and
19  answered.
20    MS. SUSLER:  Did you get the answer?
21    THE WITNESS:  Correct.
22  BY MS. SUSLER:
23    Q.  Okay.  Thank you.
24        Now, how many times have you testified in

1  court in relation to your role as a Chicago police
2  officer?
3    A.  Altogether in 31 years?
4    Q.  Yes.
5    A.  I don't recall how many times.
6    Q.  Hundreds?
7    A.  I don't think that many.  Under a hundred.
8    Q.  50?
9    MS. BARBER:  Objection.
10    THE WITNESS:  Approximately, I would say yes.
11    MS. BARBER:  Calls for speculation.  Sorry.  Go
12  ahead.
13    THE WITNESS:  I would say approximately that, yes.
14  BY MS. SUSLER:
15    Q.  And in relation to your role as a lockup
16  keeper, how many times have you testified in court?
17    A.  I don't recall.
18    Q.  Can you tell me what percentage of the
19  approximately 50 times were related to your function
20  as a lockup keeper?
21    MS. BARBER:  Objection.  Foundation.  Calls for
22  speculation.
23    THE WITNESS:  Just from what I can recall as of
24  right now, I believe this is the only case where I was

Page 118

1  in the lockup where I was involved in.
2  BY MS. SUSLER:
3      Q.  And in this case you testified several times,
4  didn't you?
5      A.  Yes.
6      Q.  The first time you testified was in the
7  motions to suppress.
8          Do you recall that?
9      A.  No, I don't recall exactly what it was for or
10  what it was, but I remember being on this case a few
11  times in court.
12     Q.  Did you understand that when you were asked
13  to testify, it was in order to say that you saw no
14  injuries on either Mr. Solache or Mr. Reyes when you
15  processed them?
16     A.  Yeah.  That was one of the questions that was
17  brought up.
18     Q.  And that they complained of no injuries when
19  you processed them?
20     A.  Correct.
21     Q.  And each time you testified, that was the
22  focus, correct?
23     A.  Yes.
24     MS. BARBER:  Objection.  Form.

Page 119

1  BY MS. SUSLER:
2      Q.  And you understood that Mr. Solache and
3  Mr. Reyes were alleging that Detective Guevara beat
4  them up and forced them to make a false confession,
5  right?
6      MS. BARBER:  Objection.  Form, foundation.
7      THE WITNESS:  It wasn't until later that I found
8  out that that's what it was all about.
9  BY MS. SUSLER:
10     Q.  When did you find that out?
11     A.  I think I started reading about the
12  detective and hearing his name on the news about his
13  different cases that he was involved in that were
14  being dismissed.
15         So that's when I made the connection between
16  the name and the face of the detective.
17     Q.  When you say the detective, you're referring
18  to Reynaldo Guevara?
19     A.  Yes.
20     Q.  When did you first start seeing -- was that
21  media reports?
22     A.  Yes.  I think this one was in the newspapers.
23     Q.  When did you first see reports about
24  Detective Guevara and the allegation that people were

Page 120

1  making about his using force?
2      A.  I'm not sure of the dates, but it was in the
3  newspaper.
4      Q.  When in relation to the last time you
5  testified in this case?
6      MS. BARBER:  Objection.  Form, foundation.  Calls
7  for speculation.
8      THE WITNESS:  I don't know.  I don't remember.
9  BY MS. SUSLER:
10     Q.  Was it before or after your testimony in the
11  post conviction in 2017?
12     MS. BARBER:  Objection.  Form, foundation, calls
13  for speculation.
14     THE WITNESS:  I'm not sure about that either.
15  BY MS. SUSLER:
16     Q.  Well, each time you testified you met with a
17  representative of the State's Attorney's Office to
18  prepare you for your testimony, did you not?
19     MS. BARBER:  Objection.  Form, foundation.
20     THE WITNESS:  Yes.
21  BY MS. SUSLER:
22     Q.  And each time the state's attorney explained
23  to you the purpose of your testimony, how it fit into
24  the criminal case?

Page 121

1      MS. BARBER:  Objection.  Form, foundation, assumes
2  facts not in evidence.
3      THE WITNESS:  They didn't really explain
4  everything to me.  They just wanted me to testify.
5  BY MS. SUSLER:
6      Q.  They wanted to be sure that you testified
7  that you didn't see any injuries when you processed
8  Mr. Solache and Mr. Reyes?
9      MS. BARBER:  Objection.  Form, foundation,
10  misstates the witness's testimony based on his
11  previous answer to a question about that exact same
12  topic, and assumes facts not in evidence.
13     THE WITNESS:  That's what I ended up testifying to
14  when I went to court.
15  BY MS. SUSLER:
16     Q.  Before any time you testified, did you ever
17  agree to be interviewed by any defense counsel that
18  represented Mr. Solache or Mr. Reyes?
19     MS. BARBER:  Objection.  Form, foundation, assumes
20  facts not in evidence.
21     THE WITNESS:  No.  Not that I know of.  So the
22  answer would be no.
23  BY MS. SUSLER:
24     Q.  Other than this case, did you ever testify in

Page 122
1  a motion to suppress a statement where a defendant
2  alleged that a Chicago police officer or detective
3  used force to coerce the confession?
4      A.  No.
5      Q.  This is the only one in your whole career?
6      A.  Yes.
7      Q.  Did you testify at any trials other than this
8  one where the accused person alleged that a Chicago
9  police officer or detective had used force to coerce a
10  confession?
11     A.  Nope.  Not that I recall at this time.
12     Q.  This is the only one?
13     A.  As far as I remember.
14     Q.  And in terms of a post-conviction proceeding,
15  did you ever testify in any other post-conviction
16  proceeding?
17     A.  Not that I recall.
18     Q.  So this is the only one?
19     A.  Yes.
20     Q.  Are you aware of whether Detention Aide Kevin
21  Casey was ever called to testify about anything
22  related to his role as a detention aide in the lockup
23  at the 25th District?
24     A.  From what I understand, he was never called.

Page 123
1      Q.  And you understand that from talking with
2  him?
3      A.  Yes.
4      Q.  All right.  And did you understand that if
5  anybody was going to testify about what happened at
6  the 25th District, it would be you, the sworn officer,
7  and not the detention aide?
8      MS. BARBER:  Objection.  Form, foundation.
9      THE WITNESS:  I don't know the reason why I was
10  called and he wasn't.  I don't know the reason for
11  that.
12  BY MS. SUSLER:
13     Q.  Now, when you had this conversation with
14  Casey about whether he had ever been called to
15  testify, what did he say about what he remembered
16  about this case?
17     A.  The only thing that I asked him when I talked
18  to him was that I did not recall what PB stood for,
19  and he says, Oh, that's property bag.  They didn't
20  have any valuables, so we just put the stuff in a
21  property bag.  That was the extent of our conversation
22  about this.
23     Q.  And that was this morning?
24     A.  That was this morning, yeah.

Page 124
1      Q.  And when was the conversation when he told
2  you that he had never been called to testify in this
3  case?
4      A.  Oh, also this morning.
5      Q.  And what else did you and he talk about?
6      A.  That was it.  I told him I got to get ready
7  to go because it was already about a quarter to 9:00,
8  and I had to get down here.
9      Q.  Other than this morning, when did you and
10  Casey talk about this case?
11     A.  Never.
12     Q.  As of April 5th of 1998, what did you know
13  about Detective Guevara?
14     A.  Nothing.
15     Q.  You knew he worked at Area 5?
16     A.  I knew he worked upstairs from seeing his
17  face, but I didn't even know his name.
18     Q.  Where did you see his face?
19     A.  From what I remember from him bringing
20  prisoners down.
21     Q.  How many times did he bring prisoners down?
22     A.  I don't remember exactly.  A few times.
23     Q.  Did you ever see injuries on any of the
24  prisoners that Mr. Guevara brought to you in the

Page 125
1  lockup?
2      A.  No, I did not.
3      Q.  Did you ever document any injuries on
4  arrestees that Mr. Guevara brought to the lockup?
5      A.  No, I did not.
6      MS. GOLDEN:  Object to form and foundation.
7  BY MS. SUSLER:
8      Q.  The first time you testified, sir, was in
9  1999.
10         What did you know about Mr. Guevara at that
11  time?
12     A.  Nothing.
13     Q.  The next time you testified was in 2000.
14  What did you know about Mr. Guevara at that time?
15     A.  Nothing.
16     Q.  Did anyone from the State's Attorney's
17  Office, when they prepared you for your testimony at
18  the motion to suppress or at trial, tell you about
19  the purpose of your testimony other than what you
20  have already told me?
21     A.  I remember a state's attorney came to my
22  house, and then they took me to a currency exchange,
23  and so that my statement could be notarized.
24         And that statement stated that I did not

Page 126

1  notice any injuries on these two defendants, but I
2  don't remember the exact dates date for that.
3      Q.  Okay.  Do you know whether that was before
4  you ever testified in court?
5      A.  I think I had already been to court on that
6  once, and then it was later on.  Years later when
7  they -- I may have already been retired when they came
8  and talked to me about that -- about doing that, you
9  know.
10     Q.  Sorry.
11     A.  That I didn't see any injuries on them.
12     Q.  That's when they took you to the currency
13  exchange?
14     A.  Right.  And the paperwork that's there
15  somewhere would tell the date, but I don't recall
16  right now.
17     Q.  Okay.  And the document that you signed to
18  get notarized at the currency exchange, was that a
19  document in someone's handwriting, or was it typed
20  out?
21     A.  It was typed out by the state's attorney.
22     Q.  Was it something that was already prepared,
23  and the state's attorney brought it to you all typed
24  out and ready for your signature?

Page 127

1      A.  I don't recall if he did it then or he had
2  already had it written.  I don't recall now.
3      Q.  Who was that state's attorney?
4      A.  I don't know his name.  I would have to look
5  at the paper.  I'm terrible with names.
6      Q.  Do you remember, do you have that paper?
7      A.  It's there somewhere.
8      Q.  What do you mean?
9      A.  I don't have it here in front of me, but it's
10  there in the report somewhere.
11     Q.  It's there in the report somewhere meaning
12  what?
13     A.  We have a stack of the reports across the
14  desk from me, and it's in one of those.
15     Q.  Could you please pull out that statement that
16  you signed.  I would like to see it.
17     A.  We'll find it.
18     MS. BARBER:  I'll look for it.
19     THE WITNESS:  We'll find it.
20     MS. SUSLER:  Thank you.
21     MS. BARBER:  It's Bates stamped MPSL0108 --
22     THE WITNESS:  What's the date on that?
23     THE REPORTER:  Counsel, can you do that again?
24  You backed off, and I didn't hear it.

Page 128

1      MS. BARBER:  Sorry.  It's MPSL0108630.
2      THE REPORTER:  Thank you.
3      MS. SUSLER:  And, Katie, I am not going to be able
4  to find that.  If you could tell me what the document
5  is?
6      MS. BARBER:  Affidavit (Indicating).
7      MS. SUSLER:  Okay.  It's a little hard to see.
8  Yeah.
9  BY MS. SUSLER:
10     Q.  Okay.  The state's attorney who brought that
11  to you, what did they look like?
12     A.  He was a male, white.  Probably middle --
13  probably in his 40s, I would say.
14     Q.  And what did you understand the purpose of
15  your sworn statement to be?
16     A.  Well, by that time, he explained to me what
17  it was, that they were alleging they had been beaten,
18  and that they wanted me to testify that I did not see
19  any injuries when I took them into the lockup.  So
20  that's basically what that paper is.
21     Q.  And did they say why they needed that
22  statement after you had already testified at least
23  through two stages of the criminal proceedings?
24     A.  I guess it was going to court again.

Page 129

1      Q.  And forgive me if I asked you this already,
2  but was -- did the state's attorney ask you to sign
3  that statement before or after the last time you
4  testified in 2017?
5      A.  Well, from what I saw on that date, that says
6  on the 15 -- 2015.  So that would have been before.  I
7  retired in 2014, and we did that in 2015.  I was
8  already retired.
9      Q.  Uh-huh.  Have you ever been called to testify
10  in any case other than this one to say that you saw no
11  evidence of a police officer having used force against
12  an arrestee?
13     A.  Well, from what I read in the reports also,
14  but I didn't recall, there was another case where
15  allegedly I was sued for not interfering where a
16  person was being beaten in one of the interview rooms
17  from another officer.
18         So there was an allegation against me, but I
19  was never able to defend myself, and I guess the City
20  settled because I did not witness that.
21         I would park my car in the garage, and I
22  would enter the lockup from the garage.  The interview
23  room was on the other side, and I never even went
24  there.  So I was not involved in that.  It's a false

Page 130

1  allegation that I was never able to defend myself on.

2    **Q.  That's this incident that you mentioned**

3  **earlier in your deposition?**

4    A.  Yeah.  That's some kind of lawsuit that

5  allegedly I was involved in where I did not interfere

6  once the guy was being beaten or something.

7    **Q.  Okay.  Other than that, have you ever been**

8  **called to testify to say that you saw no evidence of**

9  **the use of force by a Chicago police detective?**

10   A.  At this time I don't recall any other case.

11   **Q.  And have you ever had anything to do with any**

12 **case in which Guevara was involved other than the**

13 **arrestees that he brought to you at the lockup that**

14 **you testified to earlier?**

15   A.  This is the only one.

16   **Q.  What do you know about -- other than what you**

17 **told me that you saw in the media about Mr. Guevara,**

18 **what do you know about the exonerations of people he**

19 **arrested in other cases?**

20   A.  Just what I heard on the news, what I read

21 about in the paper.

22   **Q.  And what did you learn or hear in the news or**

23 **the paper?**

24   A.  Well, that allegedly he had beaten prisoners

Page 131

1  and coerced them into confessing.  That's what I heard

2  on the news.

3    **Q.  What did you think of that when you heard it**

4  **on the news?**

5    A.  Well, I have no way of knowing whether that's

6  true or not.  So that's where I'm at.  I don't know.

7  I don't know.

8         It could be.  It could be that it's true.  It

9  could be that it's not.

10   **Q.  What, if anything, do you know about what**

11 **happened with Mr. Solache and Mr. Reyes as a result of**

12 **the post-conviction proceeding in which you testified?**

13   A.  From what I understand, they were released,

14 and they were deported to Mexico, I believe.  That's

15 what I heard.

16   **Q.  Where did you hear that?**

17   A.  On the news.

18   **Q.  Do you have an opinion about whether**

19 **Mr. Solache and Mr. Reyes are innocent or guilty?**

20   A.  Well, at this point I'm not sure because I

21 don't have all the evidence that -- you know, I

22 haven't looked at all the evidence, and I'm not a

23 judge.  So I can't really say one way or the other.

24        I wish I had access to all the evidence so I

Page 132

1  could have a better understanding about what went on,

2  but I don't have all the evidence.  So I can't say one

3  way or the other.

4    **Q.  Do you have an opinion about whether**

5  **Detective Guevara beat them up and forced them to**

6  **falsely confess to the crimes they were convicted of?**

7    A.  Did you say if I have any evidence?

8    **Q.  No.  Do you have an opinion?**

9    A.  An opinion.  No, I don't have an opinion one

10 way or the other.

11   MS. SUSLER:  I don't have any other questions

12 right now.

13        Thank you so much, sir.  I believe that

14 other lawyers may have questions for you.  So we're

15 not quite done yet.

16   THE WITNESS:  Thank you.

17   MR. STARR:  Can we take a 5-minute break?

18   MS. BARBER:  Sure.

19        (A break was taken.)

20   MS. BARBER:  Jan and Sean, are you guys there?

21 We're back.

22   MR. STARR:  Yeah.

23   MS. BARBER:  Okay.  I just wanted to let you know

24 we're back when you are ready.

Page 133

1    MR. STARR:  Okay.

2    MS. SUSLER:  Katie, I'm not sure if you saw, I was

3  trying to get your attention while we were on break.

4        I'm not able to put my fingers on that

5  MPSL document.  Maybe you could email it.

6    MS. BARBER:  Well, maybe Sean can email it to you.

7  I can't get into my system from where I am in the

8  conference room right now.  I gave you the Bates

9  number.

10   MS. SUSLER:  Oh, okay.  I think Sean said he just

11 found it.  All right.  Then we're good.

12   MS. BARBER:  Are we ready?

13   MR. STARR:  I'm not sure if Ms. Susler is back or

14 not.

15   MS. SUSLER:  Yeah.  Let's go.

16   MR. STARR:  Okay.  I have a few questions.

17        Okay.  Good afternoon -- it is now,

18 Mr. Basurto.  My name is Sean Starr.  I represent

19 plaintiff, Arturo Reyes.  I just have a couple of

20 clarification questions I think here, and then we can

21 get you on your way hopefully.

22             EXAMINATION

23 BY MR. STARR:

24   **Q.  The affidavit that was just referenced when**

Page 134
1  Ms. Susler was asking you questions, the affidavit you
2  signed in 2015, is that correct?
3      A.  Yeah.  From what I saw, it's 2015.
4      MR. STARR:  Yeah.  So I want to use that
5  affidavit.
6          For the record, I want to enter that
7  affidavit as Exhibit Number -- I believe we're on 5
8  now, is that correct?
9      MS. BARBER:  That sounds right, yeah.
10     MR. STARR:  Okay.  So affidavit Bates stamp
11  MPSL0108630.
12         (Whereupon, Exhibit Number 5
13          was identified.)
14     MR. BRENER:  This is Eddie.
15         Do you have the ability to send that
16  around?
17     MR. STARR:  I was going screen share it, Eddie.
18  It's attached to some other documents that I don't
19  want to use as an exhibit.
20         If you want to take another break, I
21  can go in and, you know, extract it and do that.
22     MR. BRENER:  If you can share it after the
23  deposition then, I don't think we need to delay
24  things.  That would be fine.

Page 135
1      MR. STARR:  Sure.  Can do.
2  BY MR. STARR:
3      Q.  Okay.  So let's take a look at this briefly,
4  Mr. Basurto.
5          Can you see my screen that I'm sharing?
6      A.  Yes.
7      Q.  Okay.  And this is the affidavit you were
8  referring to, right?
9      A.  Right.
10     Q.  Okay.  I'm not going to make you read the
11  whole thing out loud.
12         But here at the end of this first full
13  paragraph it says -- can you see where I am
14  highlighting?
15     A.  Yes.
16     Q.  Okay.  So it says, part of my duties in
17  processing a prisoner is to conduct a visual check to
18  see if there are any obvious signs of injury.
19         And then the last sentence after that says,
20  further, I would ask each prisoner verbally if they
21  had any injuries or sickness that would require them
22  to go to the hospital.
23         Do you see that, sir?
24     A.  Yes.

Page 136
1      Q.  And that part of your affidavit, is that
2  referencing the questions that you testified to
3  earlier that are on the back of the police report?
4      A.  Yes.
5      Q.  Okay.  And so this part of your affidavit,
6  the part that I read into the record, that's only
7  referencing the things that you asked prisoners based
8  on what was on the arrest report, correct?
9      A.  Correct.
10     Q.  Okay.  And is your affidavit, this
11  information in your affidavit, was that based on your
12  independent recollection of doing this with Gabriel
13  Solache, or was that based on what your practice was?
14     A.  From the practice.
15     Q.  Okay.  And so when you signed this affidavit
16  in 2015, you didn't have any independent recollection
17  of whether or not you, in fact, did this with Gabriel
18  Solache?
19         You were instead signing an affidavit that
20  that would be your regular practice, correct?
21     MS. BARBER:  Objection.  Mischaracterizes the
22  report and the evidence in the case as well as the
23  other exhibits you used here today.
24  BY MR. STARR:

Page 137
1      Q.  You can answer, sir.
2      A.  Well, I saw the arrest report, and I saw
3  where I had filled that part out.  So I knew that I
4  had done that.
5      Q.  Okay.  So let me rephrase that question.
6  That's fair.
7          So your affidavit was not based on your
8  independent recollection of doing this with Gabriel
9  Solache, but instead was based on reviewing the
10  reports that you had regarding the arrest of Gabriel
11  Solache, correct?
12     A.  That's correct.
13     Q.  Okay.  Did you ever sign an affidavit
14  regarding your processing of my client, Arturo Reyes?
15     A.  No.  This was the only one.
16     Q.  That was the only one you signed.  Okay.
17         I just have a couple more questions then.
18         Well, before I get there, in addition to this
19  affidavit, is there any other documents that are in
20  front of you that you have been reviewing during the
21  course of this deposition besides the ones we have
22  used as exhibits?
23     A.  No.
24     Q.  Okay.  So on the -- I'm going to show you

Page 138

1 again -- or, no, I am not going to show you because
2 you have it.
3        The arrest report for Arturo Reyes, which is
4 RFC Solache 5159 through 5160.
5        Can you take a look at that?
6    A.  Yes.  Got it.
7    Q.  And in particular could you take a look at
8 the second page, 5160?
9    A.  Uh-huh.
10   Q.  Under the lockup keeper's visual check box,
11 do you see that whole box that Ms. Susler asked you
12 those questions about?
13   A.  Yes.
14   Q.  Number 1 says, does arrestee have any
15 obvious pain or injury, isn't that correct?
16   A.  Correct.
17   Q.  And the box that's checked is no, right?
18   A.  Right.
19   Q.  What was your understanding in 1998 of what
20 obvious pain or injury indicated?  That language in
21 Number 1 there, what did that mean?
22   A.  At that time it meant something that I could
23 visibly see.
24   Q.  Okay.  And can you give me any examples of

Page 139

1 obvious pain or injury that you saw on any other
2 arrestees that you would have checked the box yes for?
3    A.  Let's say they got a black eye.  They got a
4 bloody nose.  They got their lip banged.  Things like
5 that.
6        You know, if they come from the hospital,
7 they could even have a broken arm already.
8    Q.  Okay.
9    A.  But that would be obvious pain or injury.
10   Q.  And then if it was not something as severe as
11 a broken bone, but if it was something like you first
12 explained, like a bloody nose or a black eye, you
13 checked the box yes, is that correct?
14   A.  Yes.
15   Q.  And then would you write anywhere that they
16 had a black eye, or would you indicate why you checked
17 the box X under those circumstances?
18   A.  At the remarks down at the bottom, I would
19 indicate.
20   Q.  Okay.  And that would be your practice?
21   A.  Yes.
22   Q.  And you didn't do that here for Mr. Reyes or
23 for Mr. Solache, correct?
24   A.  Correct.

Page 140

1    Q.  And, Mr. Basurto, you do not know one way or
2 the other whether Arturo Reyes was, in fact, beaten by
3 police before he came to the lockup back in 1998,
4 correct?
5    A.  Correct.
6    Q.  And you testified earlier that you never
7 asked him whether the police physically abused him or
8 physically assaulted him, correct?
9    A.  Correct.
10   Q.  And you further testified that the only
11 question that you might have asked him are the ones
12 that are on the arrest report, right?
13   A.  Right.
14   Q.  And I believe you testified that you don't
15 independently recall whether or not Gabriel Solache
16 complained about the police abusing him, right?
17   A.  No.  They did not complain to me about -- oh,
18 they didn't complain that they had injuries, but as
19 far as them telling me they had been hit or abused,
20 they didn't tell me that.
21   Q.  Just for clarity sake, I think you were asked
22 the question by Ms. Susler about Gabriel Solache
23 independently, whether you independently recalled that
24 Gabriel Solache complained about the police abusing

Page 141

1 him.
2        Do you remember that question and answer?
3    A.  No.
4    Q.  Okay.  Well, I'll just ask it again.
5        Do you have any independent recollection
6 whether Gabriel Solache told you that the police had
7 abused him?
8    MS. BARBER:  Objection.  Misstates the witness's
9 previous testimony and the report.
10   THE WITNESS:  No.
11 BY MR. STARR:
12   Q.  Then I'll ask about my client.
13       Sir, do you have independent recollection
14 whether or not Arturo Reyes had told you that the
15 police had abused him?
16   MS. BARBER:  Same objections.
17   THE WITNESS:  I believe that if they had told me
18 that, I would have indicated it in the remarks.
19       So I don't think they told me that, but
20 I have no recollection, as you say.
21 BY MR. STARR:
22   Q.  Okay.  Just so the record is clear.  I
23 understand that you believe that you would have done
24 something if they had told you that.

Page 142

1    But as you sit here today, your testimony is
2  that you have no independent recollection that Arturo
3  Reyes told you that the police had abused him,
4  correct?
5    A.  Correct.
6    MS. GOLDEN:  Object to form.  Object to form.
7    MR. STARR:  Did you get -- Ms. Court Reporter, did
8  you get the answer?
9    THE REPORTER:  (Indicating.)
10 BY MR. STARR:
11   Q.  Okay.  Sir, do you have any independent
12 recollection whether Arturo Reyes looked like he had
13 been beaten by the police?
14   A.  From the report -- just from the report.  But
15 I have no recollection of it.  But from the reports, I
16 indicated that they had no physical injuries.
17   Q.  Right.  So I understand the reports
18 indicate -- don't indicate that they had any injuries,
19 but as you sit here today, you don't have any
20 independent recollection whether or not Arturo Reyes
21 looked like he had been beaten by the police, correct?
22   A.  Correct.
23   Q.  And you don't independently recall whether
24 you or Casey asked Reyes anything in particular,

Page 143

1  correct?
2    A.  I don't recall.  But as I stated before, if
3  they didn't speak English, I would have been the one
4  to talk to them.
5    Q.  Right.  I understand, but just for clarity
6  sake, you don't have any independent recollection of
7  asking Reyes anything at all, right?
8    A.  Not at this time, no.  Not 23 years later.
9    MR. STARR:  Okay.  I think that's all that I have,
10 but I am going to go off the record for 2 minutes just
11 because that new document came into existence, and
12 make sure that Ms. Susler and I are done with your
13 questions.  Okay?  2 minutes.  Thanks.
14   (A break was taken.)
15   MR. STARR:  Okay.  I just have a couple more, and
16 then we'll be done.  Everybody else back?
17   MR. BRENER:  I'm here.
18   MS. SUSLER:  Susler is back.
19   MS. GOLDEN:  I am back.
20   MR. STARR:  Back on the record then.
21 BY MR. STARR:
22   Q.  Mr. Basurto, you previously testified -- I
23 was asking you some questions about if an arrestee
24 presented to the lockup with obvious signs of injury,

Page 144

1  and some of the examples you gave were a black eye or
2  a bloody nose.
3    Do you remember that testimony?
4    A.  Yes.
5    Q.  And then I asked you if, in fact, an
6  arrestee had presented with a black eye or a bloody
7  nose, for example, what would you do?
8    And you testified that you would document
9  that in the remarks section on the arrest report.
10   Do you remember that testimony?
11   A.  Yes.
12   Q.  Do you have any recollection of ever
13 documenting an arrestee presenting to the lockup with
14 any obvious injuries that you, in fact, documented in
15 the remarks section?
16   A.  No.  The only recollection I have is that
17 persons that had been injured and needed medical
18 attention had already been to the hospital, and then
19 they were brought to us with medical care.
20   Q.  Okay.  So you have some recollection of like
21 some prisoners -- you know, not prisoners involved in
22 this case, but some prisoners who had went to the
23 hospital before they ever made it to lockup, and they
24 had come with medical clearance, and so you were able

Page 145

1  to accept them?
2    A.  Yeah.  Once they had medical clearance, we
3  could accept them.
4    Q.  Okay.  But you don't have any recollection
5  whatsoever of any arrestee ever presenting to the
6  lockup where you noticed that they, you know, had
7  either a bloody nose or a black eye or other signs of
8  obvious injury that were not life threatening where
9  you then checked the box, yes, and then documented it
10 in the remarks section, is that correct?
11   A.  Correct.
12   Q.  Okay.  And then you were asked by Ms. Susler
13 about the documents you reviewed in preparation for
14 today's testimony, and I believe you testified that
15 you reviewed some of the transcripts from the times
16 you testified, right?
17   A.  Right.
18   Q.  Do you have an independent memory of what you
19 said when you testified on the stand, or do you only
20 remember it based on reviewing those transcripts?
21   A.  I only remember from reading the reports.
22   Q.  Okay.  So when you say reports, are you
23 talking about the court transcripts?
24   A.  The court transcripts.

Page 146

1   Q.  Okay.  So whatever is in your testimony
2   in any of the court proceedings, whether it was in
3   motions to suppress for either Arturo Reyes or
4   Gabriel Solache, the criminal trial transcripts, or
5   the PC trial transcripts -- or the PC hearing
6   transcripts, your recollection of that is based
7   on reading those reports?
8       You don't have any independent recollection
9   of what you testified to, correct?
10  A.  Correct.
11      Q.  And so can you -- as you sit here today, can
12  you tell me whether, when you did testify, if your
13  testimony was based on reviewing the reports, or if
14  you had any independent recollection when you
15  testified?
16  MS. BARBER:  Objection.  Form, foundation.  I'm
17  not sure which testimony you're talking about.
18  MR. STARR:  Any of the times you testified.
19  THE WITNESS:  At this point I couldn't answer
20  that because I don't remember.
21  BY MR. STARR:
22      Q.  Okay.  So it's possible that when
23  you testified at the motion to suppress hearings
24  for Mr. Solache and Mr. Reyes, that your testimony

Page 147

1   was solely based on reviewing reports and talking
2   to the state's attorney, and not based upon your
3   independent recollection, correct?
4   MS. BARBER:  Objection.  Form, foundation,
5   misstates the witness's testimony.
6   THE WITNESS:  That's possible.
7   BY MR. STARR:
8       Q.  Okay.  And it's also possible that when
9   you testified at the criminal trial, that your
10  testimony was solely based on reviewing reports
11  and talking to the state's attorneys and not based
12  on any independent recollection, correct?
13  MS. BARBER:  Same objection.
14  THE WITNESS:  That's also correct, yes.
15  BY MR. STARR:
16      Q.  Okay.  And then it's also possible that
17  when you testified at the PC hearing, your
18  testimony was solely based on reviewing reports
19  and talking to the attorneys and not based on any
20  independent recollection you had whatsoever,
21  correct?
22  MS. BARBER:  Same objections.  And object to the
23  form and using "whatsoever" in that context.
24  THE WITNESS:  Correct.

Page 148

1   I am sorry.
2   MS. BARBER:  That's okay.  Go ahead.
3   BY MR. STARR:
4       Q.  And then I know that you testified that
5   during your long career that you were not only working
6   as a lockup keeper, you worked as patrol.
7       But I want to ask you a question just about
8   the time where you were working as lockup keeper.
9       Do you have an estimate of how many different
10  arrestees, you know, ballpark figure that you
11  processed during the time you were a lockup keeper
12  during your career?
13  MS. BARBER:  Objection.  Form, foundation.
14  THE WITNESS:  Well, from 2004 to 2012 I was the
15  regular lockup keeper.  Back in 1998 I wasn't the
16  regular lockup keeper.
17      So for those eight years, that's all I
18  worked was the lockup.  So in those eight years, I
19  processed hundreds of arrestees.
20  BY MR. STARR:
21      Q.  Hundreds each year?
22  A.  Yes.  I would say hundreds each year.
23      Q.  So is it fair so to say that you had
24  processed, as a lockup keeper, thousands of arrestees

Page 149

1   during the course of your career?
2   A.  Yes.
3   MR. STARR:  Okay.  I have no further questions.
4   Thanks.
5   MS. BARBER:  Any questions from any defense
6   counsel?
7   MR. BRENER:  I have no questions.
8   MR. ZIBOLSKI:  Kevin Zibolski, no questions.
9   MR. BURNS:  No questions from me.  This is Dan
10  Burns.
11  MS. GOLDEN:  No questions from Golden.
12  MS. BARBER:  Okay.  And I don't have any
13  questions.
14      We'll reserve signature.
15  MR. STARR:  Okay.  Thank you, Mr. Basurto.
16  THE WITNESS:  Thank you.
17  MR. STARR:  Have a nice day.
18  MS. SUSLER:  Thank you.
19  THE REPORTER:  Is anybody ordering now, or no?
20  MR. STARR:  Plaintiff is not.
21  MS. SUSLER:  No.
22
                        ***
23
24

Page 150

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3
4
              DELEON-REYES vs. GUEVARA
5                    18 CV 2312
6
7          I hereby certify that I have read the
8  foregoing transcript of my deposition given on
9  Tuesday, May 4, 2021 consisting of pages 1 through 151
10 inclusive, and I do again subscribe and make oath that
11 the same is a true, correct, and complete transcript
12 of my deposition so given as aforesaid as it now
13 appears.
14
15          Please check one:
16          _____ I have no corrections.
17          Number of errata sheets
            _____ enclosed.
18
19          _____
20                     SAUL BASURTO
21 SUBSCRIBED AND SWORN TO
   before me this_____
22 day of_____20__.
23
24 _____
   Notary Public
```

Page 151

```
1  STATE OF ILLINOIS      )
                          ) SS.
2  COUNTY OF COOK         )
3
4          I, Sally A. Durkin, Illinois CSR, and Notary
   Public, do hereby certify that on Tuesday, May 4, 2021
5  at the hour of 10:00 o'clock a.m. appeared before me
   via Zoom videoconference from Chicago, Illinois, SAUL
6  BASURTO, in a certain cause now pending and
   undetermined in the United States District Court,
7  Northern District of Illinois, Eastern Division.
           I further certify that the said witness was
8  first duly sworn to testify to the truth, the whole
   truth, and nothing but the truth in the cause
9  aforesaid; that the testimony then given by said
   witness was reported stenographically by me in the
10 presence of the said witness, and afterwards was
   transcribed via computer-aided transcription, and the
11 foregoing is a true and correct transcript of the
   testimony so given by said witness.
12         I further certify that I am not counsel for
   nor in any way related to any of the parties to this
13 suit nor am I in any way interested in the outcome
   thereof.
14         IN TESTIMONY WHEREOF, I have hereunto set my
   hand and affixed my notarial seal on January 28, 2022.
15
16
17         Sally A. Durkin, CSR
18         State of Illinois
           CSR License No. 003144
19
20
21
22
23
24
```

Page 152

```
1  Errata Sheet
2
3  NAME OF CASE: ARTURO DELEON-REYES vs REYNALDO GUEVARA
4  DATE OF DEPOSITION: 05/04/2021
5  NAME OF WITNESS: Saul Basurto
6  Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25                  _____
```

SAUL BASURTO, 05/04/2021

**Exhibits**

**1 Basurto 050421-1** 4:10 78:1,7 85:1,2,8 91:7 92:21,23 99:6 102:15 111:12,13

**2 Basurto 050421-2** 4:11 82:19 83:3,6 84:1 93:3

**3 Basurto 050421-3** 4:11 92:2,5, 15 93:5,8 94:23 96:21 97:20 98:16, 18 99:4 100:20

**4 Basurto 050421-4** 4:12 103:22 104:1,10 105:5,10 106:1,4,7

---

**0**

**00** 84:10

**025** 93:19

**08** 84:8,10

**0840** 86:2

**0900** 81:9

---

**1**

**1** 78:1,7 85:2,8 91:7 92:21,23 99:6 102:15 103:2 107:20 111:13 138:14,21

**10** 33:24 34:10 37:17 56:13 70:19 73:22 74:16

**10:00** 61:5,11

**15** 62:20 63:3,13,14 64:1 70:19 73:22 74:16 129:6

**165** 71:5

**170** 71:6

**1836** 84:9

**19** 28:17

**1982** 16:15,21 18:21 20:5

**1985** 22:11

**1998** 14:7 17:21 18:1,15 22:11,19 24:11,14 25:22 26:5 28:18 29:9 36:15 37:9,20 40:20 41:13 46:19, 21 59:13 70:8 73:21 74:16 76:13, 19 80:9 83:15 86:13 113:21 124:12 138:19 140:3 148:15

**1999** 125:9

**19th** 16:15,16

**1:30** 61:8

---

**2**

**2** 82:19 83:3,6 84:1 93:3 143:10,13

**20** 15:4 20:19 36:1,5 50:21,23 51:1

**2000** 125:13

**2004** 17:20 148:14

**2011** 26:1

**2012** 17:20 26:1 148:14

**2014** 16:7 17:20 129:7

**2015** 129:6,7 134:2,3 136:16

**2017** 120:11 129:4

**23** 83:23 106:12 111:11 143:8

**24** 20:6,18

**24th** 16:21 17:1

**25** 7:15 18:11 90:14 91:23

**25th** 16:23 17:8,10 20:19 24:1,2,19 25:7 29:17 65:10 66:24 73:20 80:5, 7 90:19 93:18 107:10 113:17 122:23 123:6

**28** 18:11

---

**3**

**3** 30:14,15 31:2 49:9,15 50:8 51:7 52:7 57:23,24 82:10 92:2,5,15 93:5,8 94:23 96:21,24 97:20 98:16, 18 99:4 100:20 107:20 111:13

**3-2** 96:22 97:24

**3-3** 82:6

**3-minute** 74:21

**30** 91:11

**31** 16:11 82:20 117:3

**319** 5:3

**365** 40:8

**37** 84:9

---

**4**

**4** 103:22 104:1,10 105:5,10 106:1, 4,7

**40** 36:6 71:13

---

**40s** 128:13

**42** 30:2

**48** 30:2

---

**5**

**5** 56:13 66:5,6,7 67:7 88:6 91:16 93:23 99:21 113:17 124:15 134:7, 12

**5'10"** 70:24

**5'9"** 70:24

**5-minute** 132:17

**50** 36:1,5 78:24 79:10,24 117:8,19

**51** 80:9

**5159** 92:3 138:4

**5160** 92:3 138:4,8

**52** 80:14

**53** 81:1

**55** 94:23

**57** 95:4

**58** 96:21

**59** 103:23

**5:30** 61:8

**5th** 70:7,10 73:20 74:11,16 76:13, 19 80:9 86:12 103:17 113:21 124:12

---

**6**

**6** 30:2 34:6,7 35:20 49:11

**65** 71:19

**669** 78:2

**670** 78:2

---

**7**

**70** 71:19

**72** 47:4,8,10,13 48:4,5 66:13

**75** 19:19

---

**8**

**8** 49:12

SAUL BASURTO, 05/04/2021

**8-2** 16:18

**80s** 59:8

**82** 16:18 20:12

**85** 20:13,16

**8:30** 48:11 93:23 99:1 108:8

**8:40** 80:11 86:2,4 95:2 108:8,14,23

**8:45** 81:20 94:24 108:12

**8:50** 81:22 108:16

**8th** 99:17

---

**9**

**98** 20:17 24:12 26:24 39:22 48:23 49:5 52:14 59:14 60:6 67:6 70:10, 20 71:10,13 73:2 74:11 93:23

**9:00** 61:4,11 124:7

---

**A**

**A-S-U-R-T-O** 6:6

**ability** 19:23 87:22 134:15

**abnormal** 27:13

**abused** 89:3 90:12 140:7,19 141:7,15 142:3

**abusing** 140:16,24

**accept** 145:1,3

**access** 25:16 46:14 62:5 65:20 131:24

**accused** 30:19 41:2,3 51:14 52:2 82:13 97:16 122:8

**Act** 5:4

**active** 16:3

**actual** 27:14

**added** 54:16

**addition** 42:2 79:10 137:18

**additional** 11:17 54:16 99:15

**address** 112:3

**administering** 5:5

**advice** 76:1,2

**affect** 19:23

**affidavit** 128:6 133:24 134:1,5,7, 10 135:7 136:1,5,10,11,15,19

137:7,13,19

**afternoon** 18:4 61:9 133:17

**agree** 5:2 121:17

**agreed** 5:14,20

**agreement** 5:7

**agrees** 5:10,12,16,22,24

**ahead** 25:3 28:3 35:11 90:17 117:12 148:2

**aide** 15:13,15 25:18 26:8,12,15,17 35:2,4 40:2 50:18 64:12,15,21 65:7 72:19,22 73:1,12,17,20 74:4 122:20,22 123:7

**aides** 63:15 65:20 72:10

**allegation** 7:24 68:9 119:24 129:18 130:1

**alleged** 122:2,8

**allegedly** 11:23 129:15 130:5,24

**alleging** 119:3 128:17

**altogether** 15:4 47:12 117:3

**amount** 46:24 47:17

**answering** 51:21

**answers** 58:12 116:16

**anymore** 59:16 95:22,23

**anytime** 22:11

**apologies** 32:6

**appeared** 25:22

**appears** 78:13

**applicable** 23:21

**apply** 22:11

**approximately** 20:14 33:24 34:6, 10,12 35:19 49:11,12 56:13 70:24 71:5 74:8 117:10,13,19

**April** 26:5 28:17 29:9 46:19,21 52:14 67:6 70:7,10 73:2,20 74:11, 16 76:13,19 80:9 83:15 86:12 93:23 103:17 113:21 124:12

**area** 66:2,5,6,7 67:7 91:16 99:21 113:17 124:15

**argumentative** 103:9 115:15 116:10

**arm** 139:7

**arms** 39:11

**arrest** 11:11,12,13 12:4 13:20 24:13,16 33:6 36:16 41:5,7,10,15, 17 42:2,23 43:5,9 44:15,16 45:10, 18 54:3,5 55:12 56:6 57:22 65:5 73:14 77:8,17 78:13 85:5 89:23 91:18 92:4 93:1 95:19 96:3,9,14,17 98:3,15 100:2,7,21 101:8 103:2 107:24 108:3,4 111:13 115:4 116:9 136:8 137:2,10 138:3 140:12 144:9

**arrested** 53:13 57:16 66:7,24 68:7 99:8 130:19

**arrestee** 35:4 40:15,23 41:10,11 43:17,19 44:10,11 45:4,21 46:2,14 51:9 52:11 53:6 55:13,24 56:18 58:18,21 59:3 62:10,15,17 66:18 78:24 79:11,24 85:5,13 86:18 87:12 88:7 91:12,15 93:12,15 95:18 96:18 98:21 101:10 112:2,9, 24 113:12 129:12 138:14 143:23 144:6,13 145:5

**arrestee's** 53:4,20 90:1

**arrestees** 30:6 35:3,15 38:11 39:20 58:13 61:14 62:9 64:16,24 68:1 86:7 87:2,5 95:13 96:7 107:15 108:21 113:20 114:8 125:4 130:13 139:2 148:10,19,24

**arresting** 40:18,20,22 41:4,8,9,13 42:10,16 43:16 44:13 45:6,12 85:4 99:11,16 114:19

**Arturo** 76:18 93:9 103:16 104:10, 20 106:9 133:19 137:14 138:3 140:2 141:14 142:2,12,20 146:3

**asks** 80:1

**assaulted** 140:8

**assigned** 17:22 23:16 26:12 96:8

**assignment** 17:1,9,13,18 20:4 41:1

**assignments** 16:19

**assisting** 15:16

**assume** 9:8 26:23

**assumes** 100:6 121:1,12,19

**attached** 134:18

**attempted** 64:6

**attention** 39:16 42:13 70:4 85:1 133:3 144:18

**attorney** 6:8,17,19 120:22 125:21 126:21,23 127:3 128:10 129:2 147:2

**attorney's** 75:24 120:17 125:16

**attorneys** 147:11,19

**audio** 31:11

**average** 47:17

**aware** 8:10 84:21 122:20

**B**

**baby** 68:17,18

**bachelor's** 19:15

**back** 6:23 25:14 36:15 39:22 44:19
46:18 47:7 48:23 49:4,6 50:7 59:8
60:6 67:6,22 70:20 71:1,2,10 73:2
75:2,5,7 83:15 85:1,2,9 89:24
95:22 98:15,18 110:19 113:15
132:21,24 133:13 136:3 140:3
143:16,18,19,20 148:15

**backed** 127:24

**bag** 14:2,4 80:17,19 94:3 97:23
123:19,21

**ballpark** 148:10

**baloney** 40:3,7,10 60:11,21 95:7,
13,14 96:13

**banged** 139:4

**Barber** 5:13 6:20 10:8 11:3,6
12:14 14:17 22:15 24:20 28:2,19
29:3 31:9,13,20,23 32:3 34:23 35:7
36:2,10,19 37:11 38:2,6,13 39:8,
12,24 40:11 42:4 45:14,22 46:4,10,
15 47:2,14,19 48:14 49:2,10,22
50:10,22 51:4,18,21 53:9 54:9
55:20 56:22 57:7,11 59:4 60:8,16
63:5 64:2,17 65:1 66:10,21 67:3,8
69:24 71:4,12 72:20 73:4 74:2,12,
19,22 75:2,12,22 77:9,13,19 78:6,
11 82:21,23 83:2 84:4,14 87:24
88:9,11,20 89:20 90:5,15 92:18,24
93:4 95:20 98:8 100:5,17 101:5,21
102:11,19 103:8 104:5,16,24
105:6,12,20 106:11 107:23 109:5,
12,16,19 110:5,14 111:3,16 112:3,
19 113:22 115:15 116:3,18 117:9,
11,21 118:24 119:6 120:6,12,19
121:1,9,19 123:8 127:6,21 128:1,
6 132:18,20,23 133:6,12 134:9
136:21 141:8,16 146:16 147:4,13,
22 148:2,13 149:5,12

**bars** 50:1,2,3

**based** 58:18,21 107:14,17 110:6
111:8 112:15 115:22,24 116:16

121:10 136:7,11,13 137:7,9 145:20
146:6,13 147:1,2,10,11,18,19

**basement** 65:14,16

**basically** 21:14,16 52:15 63:7,21
65:24 67:24 68:2 73:2 100:8
101:20 128:20

**basis** 110:6 111:8

**Basurto** 6:6,7,11 69:1 75:10 76:1,
11 80:22 113:17 133:18 135:4
140:1 143:22 149:15

**Bates** 127:21 133:8 134:10

**batteries** 38:17 47:24

**beat** 35:8 119:3 132:5

**beaten** 89:2 128:17 129:16 130:6,
24 140:2 142:13,21

**beating** 7:22

**bed** 49:18

**bedding** 61:23,24

**behalf** 5:17,21,23

**belts** 23:4

**big** 35:22 38:15 49:9

**bigger** 29:19

**binding** 5:5

**birth** 68:18

**bit** 32:3 35:8 65:9

**black** 139:3,12,16 144:1,6 145:7

**blank** 85:6 95:4

**blankets** 62:1

**block** 82:9,12

**blondish** 71:2

**bloody** 139:4,12 144:2,6 145:7

**bluish** 72:21

**bodies** 39:15

**body** 39:1,7 53:20

**bone** 139:11

**book** 27:12,14

**booking** 81:12

**books** 29:5

**born** 69:3

**boss** 25:19

**bottom** 84:8 93:11 98:5,6 139:18

**box** 78:24 79:9,10,20,24 80:8,14
81:1,11 82:4 91:11,13 93:14 94:22,
23 95:4 96:21 138:10,11,17 139:2,
13,17 145:9

**boxes** 90:3 101:12 102:9 103:6

**boy** 6:6

**break** 9:19,21,23 10:2 14:14 43:18
74:21 75:1 77:20 110:9,11,17
112:3 113:11,14 132:17,19 133:3
134:20 143:14

**Brener** 5:17 31:12,15,21 134:14,22
143:17 149:7

**briefly** 135:3

**bring** 38:22 41:9,14 42:10 57:3
66:12,18 77:3 124:21

**bringing** 124:19

**broken** 139:7,11

**brought** 12:8 22:20 23:1 38:11
39:20 40:17,21 42:10 44:1 46:3,9
48:10 67:1,9 68:1,4,11 70:7 77:5
90:22 91:2 94:1 96:19 99:2,5,7
100:3 118:17 124:24 125:4 126:23
128:10 130:13 144:19

**Brualdi** 5:18

**build** 71:8

**building** 67:20

**bulletin** 69:18

**bunch** 12:2

**Burns** 5:21 75:6 149:9,10

**busy** 16:2 37:13,15 38:1,3,5 43:14

**C**

**cabinet** 29:4,9,12 32:15

**Cabinets** 36:11

**call** 15:13 43:23,24 56:15,16 57:3
61:17 62:9 77:20 81:5,8 94:9,12
110:15,16,19 112:4 113:11

**called** 14:8,21 60:24 79:7 81:2
94:6,10 122:21,24 123:10,14 124:2
129:9 130:8

**calls** 35:16 42:4 47:19 117:11,21
120:6,12

**camera** 34:5 35:20 36:12 60:2

SAUL BASURTO, 05/04/2021

**cameras** 35:19

**capacity** 8:17 22:10

**car** 67:21 129:21

**card** 59:9

**care** 112:4 144:19

**career** 7:6 16:24 19:1 122:5 148:5, 12 149:1

**Caroline** 5:15

**case** 5:19 10:22 11:4 14:6 41:16, 21,22 42:6,7,23 43:4,12 45:13,19 54:10,11 69:23 70:1,3 100:12,14 109:22 111:6,17 115:11 117:24 118:3,10 120:5,24 121:24 123:16 124:3,10 129:10,14 130:10,12 136:22 144:22

**cases** 47:21 54:1 119:13 130:19

**Casey** 13:15,17,19 14:19 15:1,6, 20,21 70:14,20 72:7,9,19 73:1,19 74:6 79:12 89:22 90:3 91:22 93:20 101:17 102:2 108:19,20 109:4 110:3 111:1,14 113:1 114:24 115:5 122:21 123:14 124:10 142:24

**Casey's** 14:12 75:11 78:20 79:1 97:21

**CB** 97:24

**cell** 23:9 30:8 38:22 41:1 49:17,20 50:11,12 51:9,10 56:1,11,17 61:15, 20 62:16,21 63:18,19 82:4,9,12 96:7,8,22

**cellblock** 30:14,15 31:2 49:9,15 50:8 51:7 52:5,7 57:23 82:10 96:24 97:3,15

**cellblocks** 29:18 31:5

**cells** 26:2 29:16,19,21,22 30:5 31:1,2,7 49:5,8,14

**cement** 49:23 50:4

**change** 24:2,4

**changed** 25:23,24 26:1 83:23 106:13

**characteristics** 88:14

**charge** 54:16

**charged** 30:7 42:1 48:16

**charges** 30:12 44:24 99:8

**check** 62:22 86:19,23 87:12 88:6 90:4 101:9,13 102:5,17 103:7 109:1 110:4 135:17 138:10

**checked** 90:3 138:17 139:2,13,16 145:9

**checkmarks** 115:2

**checks** 65:6

**checkup** 54:23

**Chicago** 8:17 16:5,10,14 18:20 19:5,17 68:5 74:10 75:14 117:1 122:2,8 130:9

**children** 68:8 69:19

**circle** 19:17 62:21

**circumstances** 46:8 68:19 86:13 139:17

**City** 5:14 129:19

**claiming** 68:17

**clarification** 105:20 133:20

**clarity** 140:21 143:5

**clean** 27:4

**clear** 92:11 141:22

**clearance** 144:24 145:2

**client** 137:14 141:12

**close** 50:19

**closer** 58:3 82:17

**closest** 52:5

**clothed** 53:7

**clothing** 53:4,12 87:6 106:18

**club** 16:3

**co-defendant** 97:7,12,14

**coerce** 122:3,9

**coerced** 131:1

**color** 71:1

**commander** 25:18 27:7 28:16

**common** 115:24 116:4

**complain** 140:17,18

**complained** 118:18 140:16,24

**complete** 98:13

**completely** 109:23

**completes** 96:17

**completing** 65:5

**composed** 49:20

**computer** 24:8 36:12 59:19

**computerization** 59:12

**computerized** 24:6,9,18 59:10

**concede** 88:3

**conduct** 52:23 66:15 135:17

**conducted** 53:1 55:24

**conducting** 86:23

**conference** 133:8

**confess** 132:6

**confessing** 131:1

**confession** 119:4 122:3,10

**confuse** 109:17,21

**congratulate** 14:21

**Congratulations** 15:24

**connection** 119:15

**considered** 30:23

**consisted** 38:10 54:21

**consistently** 74:9

**construction** 32:6

**contact** 11:2 30:16,18 40:19 51:3 58:2 67:7

**contained** 29:19,20

**context** 147:23

**continue** 19:9

**continued** 69:5

**contraband** 53:23 54:13

**control** 38:8

**Convention** 22:5,7,12

**conversation** 94:15,20 123:13,21 124:1

**convicted** 132:6

**conviction** 120:11

**Cook** 5:19

**corners** 97:24

**correct** 22:6 45:11 53:20,21 73:13 75:22 77:10,14 80:3 83:11 86:24 87:7,9,10 88:5,8,10,19,21,24 89:1 90:12,13 92:13,14 93:4 96:16 97:18 99:9,10 100:4,15 102:9,18, 23 103:7,13,14 104:15,21 105:7,18 106:19,20,23,24 107:18,19 112:18,

22 113:4 115:23 116:21 118:20,22
134:2,8 136:8,9,20 137:11,12
138:15,16 139:13,23,24 140:4,5,8,
9 142:4,5,21,22 143:1 145:10,11
146:9,10 147:3,12,14,21,24

**correctly** 52:22

**cot** 49:18

**counsel** 5:1,9,11 25:4 121:17
127:23 149:6

**counter** 28:5 32:23,24 52:16,20

**County** 5:19

**couple** 68:8,16 133:19 137:17
143:15

**court** 12:7 33:9 38:15,16,17 39:2,
21 48:1,6,17,22 62:18 90:21,23
98:7,10 107:12 117:1,16 118:11
121:14 126:4,5 128:24 142:7
145:23,24 146:2

**covers** 113:18

**crime** 30:19,23 69:16

**crimes** 66:4 68:12 69:9 99:22
132:6

**criminal** 120:24 128:23 146:4
147:9

**criteria** 20:22

**currency** 125:22 126:12,18

**current** 5:2

**custody** 44:2 46:2,9 86:8,10,14
89:6 107:5,8

---

**D**

**daily** 48:24 95:16

**Dan** 5:21 149:9

**date** 80:9 84:3 85:22 90:1 93:22
98:9,10 126:2,15 127:22 129:5

**dates** 120:2 126:2

**day** 13:16 18:7 37:8,23,24 38:7,10
39:21 48:12 61:1 70:11 95:12
149:17

**days** 17:6,12 18:8,12,23 40:8

**deal** 91:19

**dealt** 67:24

**declared** 19:20

**declined** 82:3 95:9

**defend** 129:19 130:1

**defendant** 5:21,24 122:1

**defendants** 5:16,18 126:1

**defense** 121:17 149:5

**delay** 9:14 134:23

**Deleon** 104:11

**Deleon-reyes** 104:15,21

**deliver** 42:17

**delivered** 40:12 42:18 43:5,17

**delivers** 85:4

**department** 16:5,10 18:20 19:6
20:5 74:1,10,15 75:15

**depending** 54:11

**depends** 25:11 56:23 57:8

**deported** 131:14

**deposed** 75:17

**deposition** 5:4 7:4 11:3 12:15
13:14 15:20 33:8 75:19 130:3
134:23 137:21

**depositions** 8:8,12

**depression** 88:14

**describe** 37:8 52:12 62:4 71:8
72:18

**describing** 34:16 36:8

**description** 22:18,22 23:15,19

**desk** 25:17 26:6,7,9,10 27:6 30:16
32:16,24 34:1,10,11 36:11 43:1,2,3
54:6,7 57:23 58:7,12 62:11 67:23
96:2,4,9 127:14

**despondency** 88:14

**despondent** 88:7

**detained** 50:15

**detainee** 43:23

**detainees** 51:7 61:19,22

**detective** 65:24 77:3,4 99:12,20
119:3,12,16,17,24 122:2,9 124:13
130:9 132:5

**detectives** 28:7 47:7,11 66:1,2,7
67:7 68:5 100:1 114:18

**detention** 15:13,15 25:18 26:8,12,
15,16 35:2,4 40:2 50:18 63:15

64:11,14,21 65:7,20 72:10,18,22
73:1,12,16,20 74:4 122:20,22
123:7

**determine** 30:5

**Dickinson** 99:21

**differentiation** 41:1

**digital** 60:6

**dimensions** 35:23

**dinging** 31:19

**direct** 85:1

**disclosure** 75:17

**dismissed** 119:14

**distance** 62:13

**distant** 32:2

**distinction** 64:20

**distinguishing** 71:20

**district** 16:22,23 17:2 20:19 24:1,
3,19 25:7 29:17 65:10 66:24 73:20
80:5 90:19 91:23 93:18 99:17
100:3 107:10 113:17 122:23 123:6

**dividing** 34:20,22

**document** 44:17 58:15 125:3
126:17,19 128:4 133:5 143:11
144:8

**documented** 95:15,19 96:14
144:14 145:9

**documenting** 144:13

**documents** 11:8,10,17 12:13
78:10 134:18 137:19 145:13

**domestic** 38:17 47:24

**downstairs** 67:14

**drawing** 115:22

**dress** 72:9,15

**drink** 61:13

**dropped** 114:18

**drugs** 54:17

**duly** 6:12

**duties** 72:24 135:16

**duty** 36:22 37:1,16,18 96:18

## E

**earlier** 88:18 130:3,14 136:3 140:6

**early** 19:1

**ears** 89:9

**Easiest** 51:16

**Eddie** 134:14,17

**education** 19:14

**Edward** 5:17

**eligible** 20:22

**email** 133:5,6

**emergency** 5:3

**employed** 15:22 16:9 74:10

**employee** 79:16 80:1

**employees** 75:14

**employment** 16:4,6 18:19

**end** 9:15 135:12

**ended** 121:13

**English** 111:21 112:13 143:3

**enter** 25:11,12,13 44:14 129:22 134:6

**entered** 25:14

**entering** 42:13

**entrance** 25:12,13,14

**entry** 63:12,16,18

**estimate** 148:9

**ethnicity** 72:3

**eventually** 24:6

**evidence** 90:7 100:6 101:23 102:21 103:11 111:6,17 121:2,12, 20 129:11 130:8 131:21,22,24 132:2,7 136:22

**exact** 121:11 126:2

**EXAMINATION** 6:14 133:22

**examined** 6:13

**examples** 138:24 144:1

**exchange** 125:22 126:13,18

**exhibit** 78:1,7 82:19 83:3,6 84:1 85:1,2,8,17 91:7 92:2,5,15,21,23 93:3,5,8 94:23 96:21 97:20 98:16,

18 99:4,6 100:20 102:15 103:22 104:1,8,10 105:5,10 106:1,4,7 111:12 134:7,12,19

**exhibits** 92:22 107:20 136:23 137:22

**existed** 22:19

**existence** 143:11

**exonerations** 130:18

**expect** 41:24 42:3

**experience** 18:16

**explain** 121:3

**explained** 120:22 128:16 139:12

**extent** 123:21

**extract** 134:21

**eye** 30:9 51:13 52:2 82:16 97:17 139:3,12,16 144:1,6 145:7

## F

**face** 6:22 60:2 71:21 119:16 124:17,18

**facial** 72:1

**facilitate** 75:19

**facing** 52:15

**fact** 136:17 140:2 144:5,14

**facts** 100:6 121:2,12,20

**fair** 9:5 18:15 21:1,7 22:4 30:22 53:16 61:22 64:14 67:6 73:10 76:17 77:7 86:22 87:4 103:15 108:18,20,23 110:2,23 116:1,15 137:6 148:23

**faith** 110:6 111:8

**false** 119:4 129:24

**falsely** 132:6

**familiar** 79:18 88:13

**family** 57:3 68:12 69:15

**favor** 6:21

**features** 71:20

**feces** 37:6

**fed** 81:24 82:2 95:4

**feet** 33:24 34:6,7,10 35:20 36:1,5 49:11,12 50:21,23 51:1

**felonies** 38:16 41:2 47:24 51:14 52:3 91:2 97:2,16

**felony** 48:12 82:14 107:15

**felt** 30:7,20

**figure** 71:17 148:10

**fill** 65:7 116:5,8

**filled** 22:1 28:23 29:2 42:24 43:10 44:19,22 89:22 115:7,12 116:5 137:3

**filling** 23:16 54:4 91:22

**find** 34:19 53:22 54:2 119:10 127:17,19 128:4

**fine** 31:23 74:22 80:21 134:24

**finger** 59:5,7,22

**fingerprint** 23:8 59:2

**fingerprinted** 56:9,14 81:19 94:24 97:22 108:12

**fingerprinting** 33:22 34:13 59:1

**fingerprints** 59:20

**fingers** 133:4

**finish** 33:10 112:6

**finished** 18:22 33:12

**finishes** 51:18

**fit** 120:23

**floor** 25:9,10 65:13,14,15,22,23,24 66:9,19 67:2

**flowing** 27:21

**focus** 26:4 118:22

**focused** 46:20

**folks** 30:13

**follow** 75:24 76:2

**food** 96:13

**FOP** 19:12

**force** 11:21 20:10 120:1 122:3,9 129:11 130:9

**forced** 119:4 132:5

**forgive** 37:20 129:1

**forgot** 24:24

**form** 22:16 24:20 28:2,19 29:3 34:23 35:7,10 36:10,19 37:11 38:2, 13 39:24 40:11 41:17 42:4 45:14, 15,22 46:4,10,15 47:2,14,19 48:14

49:2,22 50:10 51:4 53:9 54:9 55:18,20 56:22 57:7,11 59:4 60:8, 16 62:19 63:5 64:2,17 65:1 66:10, 21 67:3,8 69:24 72:20 73:4 74:12, 19 76:14,20 77:9,13 83:16 84:14 87:17,19,24 88:11,19,24 89:20 90:15 92:18 95:20 98:8 100:5,17 101:21 106:11,23 107:2 109:5,14, 18 111:3,18 112:19,20 116:18 118:24 119:6 120:6,12,19 121:1,9, 19 123:8 125:6 142:6 146:16 147:4,23 148:13

**found** 54:1 63:22 119:7 133:11

**foundation** 22:16 28:19 29:3 36:2 37:11 38:2 39:8,12 42:4 47:2,14,19 48:15 49:2,10 50:22 51:4 54:9 55:20 57:7,11 64:17 65:1 66:10,21 67:3 71:4,12 74:2,12,19 84:5,14 87:24 95:20 100:5 101:5 106:11 109:5 111:3,19 112:20 113:22 117:21 119:6 120:6,12,19 121:1,9, 19 123:8 125:6 146:16 147:4 148:13

**fountain** 62:7

**Fraternal** 19:6,10

**friend** 97:4,5

**friends** 15:1,2 97:9

**front** 25:12,13 34:5,6,7 43:1,2 44:22 50:2,3 60:1 67:23 78:17 82:18 96:2,4 97:19 98:3,6 107:21 108:6 116:8,13 127:9 137:20

**full** 135:12

**fully** 53:6

**function** 64:23 117:19

**future** 24:7

### G

**Gabriel** 5:10 6:8 76:12 78:14 81:5 83:7 97:4 136:12,17 137:8,10 140:15,22,24 141:6 146:4

**gap** 9:14

**garage** 67:21 129:21,22

**gate** 40:17

**gave** 58:22 94:7,11 133:8 144:1

**general** 41:16,21,22 42:7,23 43:4 45:19

**generally** 63:17,19

**give** 35:8 36:24 37:3 57:10 75:13 78:4 82:19,23 85:16 138:24

**glasses** 71:23,24

**Golab** 99:17

**Golden** 5:15 45:15 48:15 62:19 76:3,5,14,20 83:16 85:15,19 86:15 87:19 102:13 112:20 113:7 116:10 125:6 142:6 143:19 149:11

**good** 6:2 74:20 93:5 110:6 111:7 133:11,17

**grab** 59:21

**graduated** 19:19

**gray** 70:22

**grew** 68:24

**ground** 65:13

**guess** 6:16 29:16 33:11 34:19 48:21 80:15 128:24 129:19

**guessing** 101:20,24

**Guevara** 5:24 77:3,4 99:21 119:3, 18,24 124:13,24 125:4,10,14 130:12,17 132:5

**guideline** 24:23 33:7

**guidelines** 9:1

**guilty** 131:19

**gun** 54:15

**guns** 54:1

**guy** 106:12 130:6

**guys** 132:20

**gym** 65:17 67:15,17

### H

**hair** 70:22 71:1 72:1

**Halvorsen** 99:21

**hand** 59:19,21

**handcuff** 38:24

**handcuffed** 44:11

**handcuffs** 44:13

**hands** 52:21

**handwrite** 27:16

**handwriting** 78:16,19,21,23 79:2, 8 81:6 85:8,10 89:24 90:9 93:7,11,

13 97:20 98:1,2,17,19 101:18 102:24 103:3 115:3,5,18 116:12,13 126:19

**hanging** 37:2

**hangings** 64:6

**Hanlon** 99:16

**happened** 8:1 27:19 68:12 86:4 91:1 107:15,18 123:5 131:11

**hard** 16:12 128:7

**harm** 23:5 30:20 52:4 57:20 64:7

**head** 42:20 53:2 67:22

**health** 5:3 16:2

**hear** 31:12 51:11 52:8 127:24 130:22 131:16

**heard** 8:2 22:8 68:14,15 69:16 110:7 130:20 131:1,3,15

**hearing** 12:9 31:10,15 62:13 119:12 146:5 147:17

**hearings** 146:23

**heater** 69:23 70:3

**held** 19:12 43:7 45:1 46:2,8 47:1,3, 8,18 48:1,19 66:8 85:13 86:8,9,14 91:23 96:12 97:1 98:21

**hell** 13:24

**helpful** 33:9

**high-pitched** 31:16

**highest** 19:14

**highlighting** 135:14

**hit** 89:5,14,16,18 107:8 140:19

**hold** 66:13 71:14 110:13

**home** 99:9

**hospital** 42:15 57:1 135:22 139:6 144:18,23

**hour** 61:3

**hours** 47:4,8,10,13,22 48:4,5 61:6 66:13

**house** 31:19 125:22

**hundred** 20:20 102:10,12 117:7

**hundreds** 117:6 148:19,21,22

**hurt** 23:7 33:4 54:20 55:3,5,6

SAUL BASURTO, 05/04/2021

## I

**I-BONDED** 47:23

**ID** 100:22

**identical** 49:14

**identified** 78:8 83:4 92:6 104:2 134:13

**identifying** 45:3

**impossible** 115:10,11

**inappropriate** 109:23

**incident** 130:2

**incidents** 63:1

**included** 58:24

**includes** 47:11 92:19

**independent** 76:11,18 92:12 103:16 104:19 136:12,16 137:8 141:5,13 142:2,11,20 143:6 145:18 146:8,14 147:3,12,20

**independently** 140:15,23 142:23

**Indicating** 83:2 128:6 142:9

**individual** 5:15 29:22 31:2,7

**individually** 59:6

**information** 45:4,20 86:7,12 136:11

**injured** 23:7 33:4 55:3 144:17

**injuries** 55:1 87:23 88:3 89:8 118:14,18 121:7 124:23 125:3 126:1,11 128:19 135:21 140:18 142:16,18 144:14

**injury** 54:20 58:15 135:18 138:15, 20 139:1,9 143:24 145:8

**ink** 59:9,17

**inmate** 43:24

**innocent** 131:19

**inquiry** 26:4

**inside** 61:20

**instructing** 75:20

**instructs** 25:4

**intentionally** 109:12,17,21

**interaction** 76:13,18

**interfere** 7:23 130:5

**interfering** 129:15

**interrupted** 44:4

**interview** 11:23 28:13 66:14 129:16,22

**interviewed** 121:17

**interviews** 69:14

**invasion** 99:9

**inventory** 14:3

**investigating** 99:15

**investigation** 45:10 47:4 66:15

**involved** 45:10 100:2 118:1 119:13 129:24 130:5,12 144:21

**Irish** 72:4

## J

**Jack** 99:20

**Jan** 5:9 6:7 31:15 75:12 85:15 109:6 132:20

**janitors** 27:3

**job** 21:22 22:18,22 23:12,14,19

**judge** 25:2 131:23

**July** 16:15,16

**June** 84:8,10

## K

**Katie** 5:13 6:20 128:3 133:2

**keeper** 8:21 17:6,12,22 18:5,7,17 20:6,23 21:19,21,24 22:2,10,19 23:11,16,22,23 24:3 25:17 26:11 28:22 36:15 37:9,10 39:22 58:11 65:12 70:16 73:8,16 87:12 90:2 98:13 101:9,10 112:1 117:16,20 148:6,8,11,15,16,24

**keeper's** 86:19 87:12 102:17 112:9 138:10

**Kenny** 100:22 101:4

**Kernan** 99:12

**Kevin** 5:23 13:15 70:14 78:20 122:20 149:8

**kidnapped** 69:20

**kidnapping** 42:2 68:8 99:9

**kill** 57:20

**killed** 68:16

**kind** 12:6 19:22 21:2,8,22 31:19 32:5 41:24 61:23 70:1 130:4

**knew** 15:4,9 21:16 23:10 76:6 83:15 100:1 124:15,16 137:3

**knife** 54:15

**knowing** 101:16 102:8,16 131:5

## L

**lack** 51:2

**lacks** 110:6 111:7

**language** 102:6 138:20

**late** 90:15

**lawsuit** 7:12,17,21 8:1,10,13 11:20 68:4 130:4

**lawsuits** 8:9

**lawyer** 24:16

**lawyers** 12:8 132:14

**laying** 64:8,9

**layout** 29:15

**learn** 130:22

**learned** 23:12

**leave** 14:11 21:15 40:22

**left** 25:14 40:22 90:23 95:4

**level** 19:14

**life** 37:9 145:8

**lift** 87:5 106:18

**limit** 46:24 47:13

**limping** 55:1,4,5

**lines** 75:18

**lip** 139:4

**list** 55:12

**listed** 75:17

**lived** 69:2

**located** 25:8 34:9 35:18

**lock** 47:18

**locker** 65:17,21 67:12,13

**lockup** 8:21 11:21,22 15:6,16

17:5,6,11,14,16,18,21,22 18:1,5,7,
16,17 20:3,6,16,22 21:19,20,24
22:2,10,19,21 23:1,11,16,21,22
24:1,3,5,19 25:8,16,17,21 26:11,19
27:1 28:8,9,11,22 29:7,15,17 32:13
34:15 36:15 37:9,10,22 39:21
40:16,17,23 42:13 44:10,14 47:1,6,
12 53:6,11,14,17 56:4 57:3 58:11
65:11,12 66:8,18 67:1,22 68:11
70:7,16 72:16 73:8,16 77:1 79:4
80:9,12 85:5,13 86:19 87:11,12
90:2,20 91:9,24 93:22 94:1 96:19
98:13,22 99:2,5,7 100:4 101:9,10
102:17 107:11 108:8 112:1,9
117:15,20 118:1 122:22 125:1,4
128:19 129:22 130:13 138:10
140:3 143:24 144:13,23 145:6
148:6,8,11,15,16,18,24

**log**  27:7,8,9 36:21 53:24 62:20,24
63:2,4,12,16 95:16

**logbook**  27:24 28:17,23 29:2 37:5

**logbooks**  29:12

**logging**  27:18

**long**  15:3 19:3 46:1 70:13 73:19,24
86:7,9 90:14,19 91:23 107:10
148:5

**looked**  10:6 12:23 13:3,7 15:10
103:16 131:22 142:12,21

**loop**  101:11

**lost**  44:4

**lot**  70:3 114:13

**loud**  135:11

M

**machine**  34:6,8,9 36:12 59:10,17

**made**  40:24 63:21 64:1,3 94:12
101:17 102:8,16 103:5 119:15
144:23

**main**  25:9,10 36:16 65:14 66:8,19
67:1

**maintain**  58:1

**major**  19:20

**make**  23:6 31:23 35:16 51:18 52:1,
17 54:24 55:5 56:15,16 60:18 63:6,
12,15,16 64:7,12 109:9,10 113:10
115:18 119:4 135:10 143:12

**making**  120:1

**male**  128:12

**man**  72:5

**manage**  114:10

**mark**  78:1 82:19 103:22

**marked**  103:23

**marks**  101:17 102:9

**mask**  6:22

**math**  16:13

**matter**  12:11

**mattresses**  26:2 49:5,6

**maximum**  48:4

**Mcdonald**  99:21

**meal**  40:1 95:18

**meals**  60:14

**meaning**  127:11

**means**  79:22 80:16 82:8

**meant**  138:22

**media**  70:3 119:21 130:17

**medical**  21:2,4 42:12,14 55:10,11
58:5 144:17,19,24 145:2

**medication**  19:22 55:3 56:19,23

**meeting**  10:8,24

**member**  19:6,9

**members**  69:15

**memory**  14:16 69:22 76:12,18
83:10,15 86:23 87:16 92:12 100:15
104:14,19 112:16 113:5 145:18

**mental**  58:5

**mention**  24:24

**mentioned**  27:2 32:8 52:10 60:11
62:3,8 64:11 65:11 82:12 130:2

**menu**  40:7,8,9

**met**  10:14 11:6,7,16 120:16

**Mexico**  69:3 131:14

**middle**  128:12

**mind**  69:11,12

**mine**  79:5

**minute**  15:18 78:4 82:20 85:16
104:17

**minutes**  56:13 62:21 63:3,13,14

64:1 143:10,13

**mischaracterize**  102:20

**mischaracterizes**  84:15 90:6,7
101:21,22 102:20,21 103:10 111:5,
6,17,18 136:21

**misdemeanors**  30:10 47:22

**missed**  16:16

**missing**  105:1

**misspelled**  81:15

**misstates**  51:5 84:15 90:5 100:17
101:23 102:19 103:9 111:4 121:10
141:8 147:5

**Mohan**  99:12

**months**  16:11 17:24

**morning**  6:2 13:18 14:20 38:15
48:2,11,17,22,24 61:5,8 90:22,23
107:12 113:21 123:23,24 124:4,9

**motion**  12:24 122:1 125:18 146:23

**motions**  118:7 146:3

**moved**  17:8

**moving**  16:3

**MPSL**  133:5

**MPSL0108**  127:21

**MPSL0108630**  128:1 134:11

**mugshot**  59:23

**murder**  30:22 42:1 99:9

**murdering**  68:7

**mute**  22:16 31:22

N

**naked**  53:20

**named**  11:20

**names**  45:6,9 127:5

**narcotics**  41:20

**national**  5:2

**naturally**  25:18

**Navarro**  5:22

**necessarily**  47:5

**needed**  21:15 28:24 56:24 128:21
144:17

neighborhoods 113:18

news 68:14,22 69:13 70:9 119:12 130:20,22 131:2,4,17

newspaper 120:3

newspapers 69:9 119:22

nice 149:17

normal 27:20

nose 139:4,12 144:2,7 145:7

notarized 125:23 126:18

note 63:1

noted 27:23

notice 126:1

noticed 145:6

notify 54:6 57:22 58:7,12

nude 87:2

number 14:12,17 17:24 70:17,18 75:11,13 76:6 78:1,7 79:7,15,16,18 80:1,15 81:1,4,7,17 83:3 88:6 92:5 93:16 94:6,7,11,22,23 97:23,24 100:22 103:4 104:1 133:9 134:7,12 138:14,21

numbered 107:23

numbers 75:14

---

**O**

O'MALLEY 5:18

oath 5:5 6:10

object 34:23 35:9 36:2 45:14,15 55:20 62:19 76:14,20 83:16 84:4 87:19 92:18 110:5 112:19,20 125:6 142:6 147:22

objecting 109:12

objection 5:4 22:16 24:20 25:1,2 28:2,19 29:3 35:7,10 36:10,19 37:11 38:2,6,13 39:8,12,24 40:11 42:4 45:22 46:4,10,15 47:2,14,19 48:14 49:2,10,22 50:10,22 51:4 53:9 54:9 56:22 57:7,11 59:4 60:8, 16 63:5 64:2,17 65:1 66:10,21 67:3,8 69:24 71:4,12 72:20 73:4 74:2,12,19 77:9,13 84:14 87:24 88:9,20 89:20 90:5,15 95:20 98:8 100:5,17 101:5,21 102:11,19 103:8 104:16 105:19 106:11 109:5,9,10, 15,16,18,20,23 111:3 113:7,22 115:15 116:18 117:9,21 118:24

119:6 120:6,12,19 121:1,9,19 123:8 136:21 141:8 146:16 147:4, 13 148:13

objections 111:16 141:16 147:22

observation 56:4 58:19

observe 87:23

obvious 87:23 88:4 135:18 138:15,20 139:1,9 143:24 144:14 145:8

occasionally 17:5,11 28:12 71:24

occurred 27:23 36:22

occurrences 27:13

offense 30:8

offering 60:19

office 19:12 26:6,8 28:13 33:16 120:17 125:17

officer 5:5,16 7:22 8:18 15:12,14, 17 16:14 26:15,16 40:18,20,22 41:4,8,9,14 42:10,17 43:16 44:13 64:22 81:12 85:4 99:11 117:2 122:2,9 123:6 129:11,17

officer's 73:9

officers 28:8 45:7,13 65:19 66:24 99:16 100:2 114:19

official 20:3

older 44:7

on-hand 21:20

open 32:5

operating 9:1

opinion 131:18 132:4,8,9

opportunity 75:10

order 19:6,10 55:23 118:13

ordering 149:19

Ordinarily 75:13

ordinary 27:13,22 63:10

original 56:3

Originally 59:8

outward 88:13

overhear 94:15,20

overnight 48:1,20 96:13

---

**P**

pages 108:6

pain 138:15,20 139:1,9

paper 24:7,13,17 59:9,16 78:5 105:14,17 127:5,6 128:20 130:21, 23

paperwork 36:14,17 41:14 42:9, 16 46:14 77:16 92:16,19 126:14

paragraph 135:13

park 67:21 129:21

part 7:21 32:9,20 43:1,10 52:10 54:4,24 61:16 64:10 91:18 98:3 115:3 116:6,8 135:16 136:1,5,6 137:3

party 7:12 8:13

passed 61:10

past 12:16

pat 52:17,23 53:1

pat-down 52:20 56:2

patch 72:21

patrol 17:3,10,23 70:15 148:6

patting 56:5

pay 39:16

PB 13:20,21,22 14:4 80:15,16 94:3 123:18

PC 146:5 147:17

pending 9:24 76:3

people 26:19,24 27:1 28:7 39:4 41:1 50:14 51:13 52:2 82:13 91:1 97:1,16 119:24 130:18

percent 102:10,12

percentage 117:18

perimeter 34:18

period 18:12 46:20

person 10:10 44:1,24 46:8 47:1,18 48:19 50:8 59:18 64:21 66:8 77:23 96:12,15 110:19 113:2 122:8 129:16

persons 144:17

perspective 51:8

phone 14:12,13,17 35:16 56:15,16

62:9 75:11,13,14 76:6,8 94:9,12,20
97:23 103:4 112:4

**photo** 92:19 93:2 104:24 105:6,10,
13,15,16,18

**photograph** 23:8 59:23 82:22
83:7 84:2,13,20,23 103:22 104:15,
20 105:5,24 106:4,7

**photographed** 56:9,15 81:22 95:2
97:22 108:14,24

**photographing** 34:4

**photographs** 69:19

**physical** 27:14 142:16

**physically** 32:13 33:15,23 140:7,8

**pick** 38:16

**picture** 60:2 83:14

**pictures** 60:5 83:12

**piece** 105:14,17

**pillows** 62:1

**place** 32:14,22 33:19,20 34:12,13
47:4 57:23

**plaintiff** 5:9,11 6:8 133:19 149:20

**plastic** 80:19

**PO** 99:16,17

**pockets** 52:19

**point** 9:20 22:8 32:1 70:13,15,16
107:13 131:20 146:19

**police** 5:16 8:18 12:6 15:12,14
16:5,10,14 18:20 19:5,7,10 20:5
46:2,8 68:5 69:18 72:17 74:1,10,15
75:15 86:8,10,14 89:6,12,14,16,18,
24 90:11 107:5,8 117:1 122:2,9
129:11 130:9 136:3 140:3,7,16,24
141:6,15 142:3,13,21

**portion** 85:5 87:17

**positive** 58:12

**positively** 56:20 57:15,19

**post** 120:11

**post-conviction** 13:7,8 122:14,15
131:12

**pounds** 71:6

**practice** 88:17 100:12 112:16
136:13,14,20 139:20

**preparation** 13:13 145:13

**prepare** 11:3 12:14 40:2 120:18

**prepared** 125:17 126:22

**preparing** 39:20

**presence** 12:14

**present** 10:12,23

**presented** 143:24 144:6

**presenting** 144:13 145:5

**presuming** 115:23 116:16

**pretty** 18:4 65:2 67:9 68:19

**previous** 25:21 34:23 36:3 90:16
121:11 141:9

**previously** 51:12 143:22

**printing** 34:5,8,9 36:12

**printout** 80:23 84:24

**prior** 42:13

**prisoner** 7:23 28:12 42:11,18
43:7,19 58:16 135:17,20

**prisoner's** 32:9 39:1,7

**prisoners** 22:20,24 23:20 37:6,16
62:5,22 67:10 73:3 124:20,21,24
130:24 136:7 144:21,22

**privacy** 50:9,14,17 51:2

**probation** 18:22

**problem** 31:10 33:13

**problems** 9:15 58:5

**procedure** 23:10 56:12

**proceed** 5:1

**proceeding** 122:14,16 131:12

**proceedings** 128:23 146:2

**process** 23:6,10 32:21 52:12
59:24 73:2 96:6

**processed** 15:7 44:2 62:15 92:13
118:15,19 121:7 148:11,19,24

**processing** 22:20,24 23:20 32:9
35:3 38:11 39:19 52:10 55:24
58:24 64:15,24 73:15 77:7 87:6
108:21 111:1,2,14 113:21 114:3
135:17 137:14

**profile** 60:3

**property** 13:22 14:2,4 23:4 32:9
52:19 56:2,5 66:4 80:14,15,17,20
94:3,4 97:23 123:19,21

**prosecuting** 5:18

**provide** 96:13

**provided** 45:20 61:14,23,24 81:4
95:13,14

**providing** 26:2

**psychiatric** 21:8,11

**psychiatry** 88:8

**psychological** 21:8,12

**psychology** 88:8

**Public** 5:3

**pull** 76:8 92:8 107:21 127:15

**purported** 104:6

**purports** 103:22

**purpose** 51:2 55:7 120:23 125:19
128:14

**pursuant** 5:3

**put** 6:23 13:22 14:3 23:9 29:4 30:5,
8,10,12 52:19 57:18 59:18 62:16
63:7 80:19 82:13 97:1,21 123:20
133:4

---

**Q**

**quantify** 17:24

**quarter** 124:7

**quarters** 66:1

**question** 6:16 9:3,7,24 10:1 23:18
25:4 32:20 33:10 34:24 36:3 51:19,
22 56:18 57:8,13 75:21 76:3,5,9
90:16 101:12 104:17 105:9,21,23
109:14 110:6,12,18,20 111:10
112:5,11,21 121:11 137:5 140:11,
22 141:2 148:7

**questionnaire** 56:6 87:13 101:10
109:1 110:4 112:10 113:3

**questionnaires** 55:2 65:6

**questions** 6:9 9:3 19:23 23:7
25:20,21 33:2,5,15 46:20 55:8,12,
15,17 56:20 57:6 58:13,22 87:17
88:19,23 102:2 106:23 107:1 109:8
114:22,23 115:1 118:16 132:11,14
133:16,20 134:1 136:2 137:17
138:12 143:13,23 149:3,5,7,8,9,11,
13

**quick** 16:13

**quickly** 6:22

---

**R**

**range** 65:18 67:16

**reach** 51:16 75:18

**reached** 94:13,18

**read** 7:18,20 8:2 43:6,9,10,12 59:19 98:10 100:24 129:13 130:20 135:10 136:6

**reading** 119:11 145:21 146:7

**ready** 14:10 38:14,18,20 39:2 62:18 75:2,3,7 113:15 124:6 126:24 132:24 133:12

**real** 16:13

**reason** 97:8 114:6 123:9,10

**reasons** 26:23

**recall** 7:13 10:20 11:1,10 13:21 24:21 58:14,17,20,23 61:4 62:6 69:10,21 94:14,16,19,21 117:5,17, 23 118:8,9 122:11,17 123:18 126:15 127:1,2 129:14 130:10 140:15 142:23 143:2

**recalled** 140:23

**recap** 92:22

**receipt** 80:14,15

**receipts** 13:21

**received** 80:9,12 93:22

**receiving** 58:8 85:12 98:21

**recognize** 78:18,21 83:22 85:8 106:10,14

**recollection** 8:24 76:21 103:16 136:12,16 137:8 141:5,13,20 142:2,12,15,20 143:6 144:12,16,20 145:4 146:6,8,14 147:3,12,20

**record** 5:2,8 25:3 33:9 37:5 75:8 85:13 98:21 101:23 102:22 103:9, 11 109:21 110:10,15 111:4 113:12, 15 134:6 136:6 141:22 143:10,20

**referenced** 133:24

**referencing** 46:19 136:2,7

**referring** 11:13 24:15 119:17 135:8

**reflected** 108:9

**refresh** 8:24 83:14

**refrigerator** 40:13

**refused** 95:18

**regular** 21:20 40:1 67:7 70:16 136:20 148:15,16

**regularly** 18:4

**reject** 58:18,21

**related** 8:9,20 117:19 122:22

**relation** 10:21 32:16 117:1,15 120:4

**release** 42:14

**released** 48:5 131:13

**relief** 17:22 18:2

**relieve** 17:5,11 18:7

**relieved** 20:6

**relieving** 18:5 20:4

**remarks** 139:18 141:18 144:9,15 145:10

**remember** 7:5,16 13:23 18:14 24:10 37:21 41:12 42:24 56:1 59:6 65:3 69:17 77:2 90:21,24 91:4 103:18 107:17 111:11 114:1,5,6,21 115:22 116:2,15 118:10 120:8 122:13 124:19,22 125:21 126:2 127:6 141:2 144:3,10 145:20,21 146:20

**remembered** 123:15

**remind** 52:13

**remotely** 5:6

**remove** 6:22 87:5 106:18

**repeat** 110:20

**repeating** 46:18

**rephrase** 137:5

**report** 7:20 10:6 11:19 12:1,4,5,6,7 13:20 33:6 36:16 41:6,7,10,15,16, 18,21,23,24 42:3,7,14,23 43:4,6,9 44:15,16 45:19 54:3,5 55:12 56:7 57:22 58:10,15 65:5 73:14 77:8,17 78:14 85:6 89:23,24 90:7 91:18 92:4 93:1 95:19 96:3,9,14,18 98:3, 16 100:7,21 101:8,22 102:19,20 103:2,10 105:7 108:3,4,17 114:23 115:4 116:9 127:10,11 136:3,8,22 137:2 138:3 140:12 141:9 142:14 144:9

**reporter** 5:1 33:9 127:23 128:2 142:7,9 149:19

**reports** 7:18 8:3 11:11,12,13 12:2 15:9 24:13,16 43:12 107:24 108:9 111:13 113:9 119:21,23 127:13 129:13 137:10 142:15,17 145:21, 22 146:7,13 147:1,10,18

**represent** 133:18

**representative** 120:17

**represented** 121:18

**representing** 5:13

**require** 21:1,8 55:10 102:5 135:21

**required** 36:14,18 42:12 43:9

**reserve** 149:14

**respect** 64:24 88:17 91:5 106:21 112:17

**responded** 56:18,20 58:4

**responsibilities** 73:1

**responsibility** 62:16 91:19 98:13, 14

**responsible** 91:22

**rest** 16:24 101:18 115:6,7,17 116:5

**result** 131:11

**retired** 14:21 15:23 16:5 17:19 71:18 74:7 126:7 129:7,8

**retirement** 14:22 16:1 74:11

**revealing** 11:20

**reviewed** 145:13,15

**reviewing** 137:9,20 145:20 146:13 147:1,10,18

**Reyes** 5:12,19 11:14 13:1,5 15:7 68:4 70:7 76:19 77:12 78:2 82:20 92:3,4,13,16 93:24 94:17,23 95:6 96:21 98:16 99:1,5 100:3 102:9,17 103:16,23 104:6 106:9,19,21 107:4,10,18 108:4,7,14,24 111:1,2, 14 112:11,17 113:6 114:16,22 116:13 118:14 119:3 121:8,18 131:11,19 133:19 137:14 138:3 139:22 140:2 141:14 142:3,12,20, 24 143:7 146:3,24

**Reyes'** 101:8

**Reynaldo** 119:18

**RFC** 78:2 82:20 92:3 138:4

**right-hand** 87:11

**ringing** 31:16

**role** 23:21 117:1,15 122:22

**room** 32:18,19 34:2,16,20,22
35:21,22,23 36:7 65:21 67:12,13
83:21 106:9 129:23 133:8

**rooms** 11:23 65:17 129:16

**rotate** 18:12

**rotating** 18:11

**rounds** 63:15,22 64:1,12

**routine** 106:22

**rule** 26:20,22

---

                        **S**

**S-A-U-L** 6:5

**safe** 21:3,10 64:18

**safety** 26:23

**sake** 140:21 143:6

**sandwich** 40:4,7 82:3 95:7 96:14

**sandwiches** 40:3,10 60:12,18,22
61:10 95:13,14

**sat** 30:16 51:8

**Saul** 6:5,11

**schedule** 60:13

**screen** 78:3 80:22 85:15 134:17
135:5

**screening** 23:6 33:3 54:19,21 55:8
85:13 98:21

**Sean** 5:11 75:3 78:3 80:21 132:20
133:6,10,18

**search** 23:3 33:19 52:11,12,23
53:1,22 54:2 56:2 106:16

**searched** 78:24 79:11,24 93:12,15

**searcher** 52:16

**searching** 32:21 56:5

**section** 5:3 88:6 90:4 93:14
100:20 101:9 102:16 103:6 112:1,7
144:9,15 145:10

**sections** 91:21

**seized** 54:14

**send** 57:1 134:15

**sense** 115:18,24 116:4

**sentence** 135:19

**sergeant** 25:17 27:6 43:2 54:6,7
57:23 58:7,12 96:9 99:16

**series** 9:2

**serve** 20:22

**served** 60:21 65:11

**Service** 5:4

**serving** 24:3 37:10 60:14

**set** 23:7 55:2

**settle** 8:4,5

**settled** 8:3 129:20

**severe** 139:10

**share** 78:3 85:16 134:17,22

**sharing** 80:22 135:5

**sheets** 62:1

**shift** 61:1 70:11

**shirt** 72:21

**shoelaces** 23:4

**shooting** 65:18 67:16

**shot** 67:18

**show** 11:7 63:21 77:24 103:21
137:24 138:1

**showed** 11:17 24:16 78:11

**shown** 12:3

**sickness** 135:21

**side** 44:19,22 51:10 60:3 87:11
108:5 129:23

**sides** 50:5,6

**sign** 27:6,8 28:9,15 129:2 137:13

**signature** 126:24 149:14

**signed** 28:12 126:17 127:16 134:2
136:15 137:16

**significance** 85:24 98:7

**significant** 18:16

**significantly** 44:22

**signing** 136:19

**signs** 135:18 143:24 145:7

**silence** 77:19

**sink** 62:6

**sir** 15:22 19:14 25:1 84:7 103:13
104:8 105:4,23 110:2,9,23 113:10

115:14 125:8 132:13 135:23 137:1
141:13 142:11

**sit** 92:12 142:1,19 146:11

**situation** 9:13 28:23

**situations** 7:11

**slammed** 107:8

**sleeping** 64:10

**slender** 71:9

**small** 26:2 29:18 65:17 80:19

**smoothly** 27:21

**Solache** 5:10 6:8 11:13 13:1,4
15:7 68:3 70:6 76:12,24 77:7,17
78:2,14 80:8 81:5 83:7,10,21 86:9,
13,23 87:8,17 88:23 90:12,14,19
91:5,8,23 92:3,24 93:2 94:12 97:4
99:7 100:2 102:15 103:19 106:17,
22 108:3,8,16 109:1 110:4 111:1,2,
15 112:11,17 113:5 114:16,22
118:14 119:2 121:8,18 131:11,19
136:13,18 137:9,11 138:4 139:23
140:15,22,24 141:6 146:4,24

**Solache's** 103:2,6 116:9

**solely** 147:1,10,18

**Solis** 99:17

**someone's** 126:19

**sort** 59:19

**Sotos** 68:12

**sound** 30:3 31:16

**sounds** 25:22 26:18 30:4 134:9

**space** 34:20

**Spanish** 19:21 69:1,5,6 72:7 81:7
102:1,3 111:23 113:1

**Spanish-speaking** 68:21 113:18

**speak** 13:13,17 15:19 72:7 102:3
111:21 112:13 143:3

**speaking** 68:24 109:9,10

**specifically** 91:4

**speculation** 42:5 47:20 117:11,22
120:7,13

**spell** 6:3

**spoke** 13:15 14:19 52:8 101:24
102:1 112:24

**spoken** 14:20

**stack** 127:13

**stages** 128:23

**stamp** 134:10

**stamped** 127:21

**stand** 60:1 145:19

**stands** 69:11,12

**star** 79:15 80:1 81:17 93:16

**Starr** 5:11 75:4 76:4 78:4 105:19
110:11 132:17,22 133:1,13,16,18,
23 134:4,10,17 135:1,2 136:24
141:11,21 142:7,10 143:9,15,20,21
146:18,21 147:7,15 148:3,20
149:3,15,17,20

**start** 28:24 51:21 119:20

**started** 16:15,20,21 18:21 20:3,5
26:2 119:11

**starting** 20:9

**state** 5:7 6:3

**state's** 120:17,22 125:16,21
126:21,23 127:3 128:10 129:2
147:2,11

**stated** 125:24 143:2

**statement** 75:17 122:1 125:23,24
127:15 128:15,22 129:3

**stay** 16:2,3

**steel** 49:18 61:17,18

**stepped** 21:15

**steps** 23:20

**stood** 52:23 123:18

**stop** 109:6,7,11,24

**stored** 27:24 28:18

**straight** 18:13 62:11

**stuff** 100:8 123:20

**substitute** 18:22,23

**sued** 129:15

**supp** 12:4

**supposed** 55:13 56:21 57:6,17,21
58:6,9 63:3,24 81:14

**suppress** 12:24 118:7 122:1
125:18 146:3,23

**surprised** 14:7

**Susler** 5:9 6:2,7,15 14:18 22:17

24:22 28:6,21 29:6 31:17,22 32:2,
4,7 35:1,14 36:4,13,23 37:19 38:4,
9,19 39:10,14 40:6,14 42:8 45:17,
24 46:6,12,17 47:9,16 48:3,18
49:3,13,24 50:13,24 51:6,23,24
53:10 54:12 55:22 57:4,9,14 59:11
60:10,20 62:23 63:11 64:4,19 65:4
66:16,23 67:5,11 70:2 71:7,15
72:23 73:7 74:5,14,20,24 75:3,5,7,
9,20,23 76:10,16,23 77:11,15,24
78:5,9 80:21,24 82:22 83:1,5,18
84:6,18 85:18,20 86:17 87:21 88:2,
12,22 89:21 90:10,18 92:2,7,21
93:2,5,6 95:24 98:11 100:10,19
101:7 102:4,14 103:1,12,21 104:3,
7,18 105:3,8,22 106:15 108:2
109:9,14,18,22 110:1,9,22 111:9,
24 112:6,8,23 113:10,15,16,24
115:20 116:7,14,20,22 117:14
118:2 119:1,9 120:9,15,21 121:5,
15,23 123:12 125:7 127:20 128:3,
7,9 132:11 133:2,10,13,15 134:1
138:11 140:22 143:12,18 145:12
149:18,21

**switched** 18:6

**sworn** 6:1,12 15:14 26:14,16 64:21
73:9 123:6 128:15

**system** 133:7

---

**T**

---

**taking** 47:4 56:5,19,24

**talk** 8:23 111:22 112:14 124:5,10
143:4

**talked** 123:17 126:8

**talking** 12:20 27:9 34:21 35:24
43:20 44:1 47:10 48:5 52:13 79:23
100:11,12 101:2 106:16 107:24
111:23 123:1 145:23 146:17 147:1,
11,19

**tall** 70:23

**tasks** 64:15

**tattoos** 60:4,5

**teacher** 18:23,24 19:21 69:6

**technological** 9:13,15

**telephone** 35:15 62:3,8,11 79:7
81:1 94:6,7 113:11

**telling** 140:19

**tells** 91:8 105:14

**ten** 17:16

**term** 43:19

**terms** 41:1 50:9 110:24 111:2
112:1,9 122:14

**terrible** 127:5

**testified** 6:13 8:13 12:16 62:18
106:17 116:24 117:16 118:3,6,21
120:5,16 121:6,16 125:8,13 126:4
128:22 129:4 130:14 131:12 136:2
140:6,10,14 143:22 144:8 145:14,
16,19 146:9,15,18,23 147:9,17
148:4

**testify** 110:24 118:13 121:4,24
122:7,15,21 123:5,15 124:2 128:18
129:9 130:8 146:12

**testifying** 121:13

**testimony** 12:21,24 13:4,8 51:5
84:15,16 90:6 100:18 101:22
102:21 103:10 107:14 110:7 111:4,
5,8,18 112:10,15 120:10,18,23
121:10 125:17,19 141:9 142:1
144:3,10 145:14 146:1,13,17,24
147:5,10,18

**thing** 10:22 23:3 33:18 36:16,20
43:20 54:23 56:1,3 91:1 111:20
115:13 123:17 135:11

**things** 37:7 43:15 134:24 136:7
139:4

**thought** 33:12 44:5 51:14 52:3

**thousands** 148:24

**threatened** 107:5

**threatening** 145:8

**throw** 37:6

**thumb** 59:6

**time** 10:7,14,16,17 11:7 14:20
16:20 17:4,15,23 18:10 20:7 23:15
24:2 43:14 46:24 47:3,7,11,12,17
57:16,18 58:14,23 60:18 62:2
66:13 68:2 69:21 73:23 74:1,4,20
80:11,12 81:8,19,22,24 83:13 84:3
85:22,24 86:5 87:20 90:1,22 93:23,
24 94:8,9 95:4 97:22 99:1 104:22
107:21 108:12 113:8,23 114:3,7,9,
13,15,17 118:6,21 120:4,16,22
121:16 122:11 125:8,11,13,14
128:16 129:3 130:10 138:22 143:8
148:8,11

**times** 7:7 20:19,20 40:1 70:17,18
89:18 114:13 116:24 117:5,16,19

118:3,11 124:21,22 145:15 146:18

**title** 73:8,9,12

**today** 6:9,17 9:1 13:14 19:22 28:18
83:22 92:12 106:9 110:7,24 111:8
136:23 142:1,19 146:11

**today's** 145:14

**toe** 53:2

**toilet** 49:18 61:17 62:4

**told** 10:5 14:6,7,10 36:8 37:20 63:1
88:18 96:24 124:1,6 125:20 130:17
141:6,14,17,19,24 142:3

**top** 42:19 53:4 79:20 102:24 115:5,
18

**topic** 121:12

**total** 16:11 20:18 29:21 30:2

**tour** 36:22 37:1,16,18

**train** 44:5

**training** 21:2,5,9,12,18,20 22:2,5
87:22 88:8

**transcript** 12:9,20,23 13:3,8

**transcripts** 145:15,20,23,24
146:4,5,6

**transferred** 16:23

**transport** 39:4 48:21,22,24

**transported** 38:15,18,21 91:12

**treated** 89:12

**treatment** 55:10,11 58:9

**trial** 13:4 125:18 146:4,5 147:9

**trials** 13:4 122:7

**truck** 31:18 32:1

**true** 23:14 77:12 106:19 131:6,8

**truthfully** 19:24

**turn** 43:2 60:3

**turned** 59:5,21

**TV** 69:11,12

**two-sided** 44:16

**typed** 126:19,21,23

**typical** 37:8 39:21 49:23 50:4
55:23 88:17 91:1 100:12 112:16

**typically** 36:14 40:19 41:13 42:17,
21 43:5 44:11,15 45:18,20 46:1,7
47:18 48:20 54:7,13 55:17 69:22

85:6 86:6 87:1,5 112:24 114:11

## U

**Uh-huh** 85:3 98:23 129:9 138:9

**underneath** 86:18

**understand** 9:3 23:18 29:14
43:20,24 46:20 48:7 75:12 115:1
118:12 122:24 123:1,4 128:14
131:13 141:23 142:17 143:5

**understanding** 42:22 55:7,9
102:6 132:1 138:19

**understood** 9:8 43:6 48:8 52:22
72:24 119:2

**uniform** 53:16,18 72:11,12,17,18

**unit** 79:21 80:2 93:16

**unusual** 27:19 36:22 37:1,4 63:1
68:19

**upstairs** 28:14 47:6 66:12,14
124:16

## V

**valuables** 14:3 123:20

**van** 38:15,23 48:21,24

**Varga** 5:19

**varied** 38:7

**varies** 54:11

**verbally** 55:2 135:20

**versa** 56:9

**versus** 111:1,14

**vertically** 93:19

**vice** 56:9

**victims'** 69:15

**Vienna** 22:5,7,11

**view** 51:10

**violent** 66:4 99:22

**vis-a-vis** 50:17

**visible** 55:1

**visibly** 138:23

**visual** 30:15,18 51:3 54:23 55:8
56:4 58:1,19 65:6 86:19,23 87:12
88:6 90:4 101:9,12 102:5,17 103:7

109:1 110:3 135:17 138:10

## W

**wait** 22:15 104:16 114:20

**walk** 40:3 43:1 60:18

**walked** 83:21 106:9

**wall** 38:23 49:20,23

**walls** 34:15,17,18,20,22 50:4

**wanted** 31:23 46:13 49:7 51:3,13
52:1,7 75:16 121:4,6 128:18
132:23

**watch** 18:3,4,5,6,7,9,10,13 25:18
27:7 28:16 37:12,14,17,21,23,24
38:3 60:17,21,24 61:1,6 95:12,14
96:17,18

**watches** 18:12 96:12

**water** 61:15,19 62:4,7

**weapons** 52:17

**wear** 71:23 72:19

**wearing** 53:12,13

**Wehrle** 5:18

**weigh** 71:3

**whatsoever** 145:5 147:20,23

**white** 72:5 128:12

**windows** 32:5

**witness's** 51:5 84:15,16 90:5,6
100:18 101:22 102:21 103:10
111:5,18 121:10 141:8 147:5

**witnessed** 7:22 11:23

**woman** 68:17

**wondering** 13:22

**wore** 71:24 72:11,13,17

**work** 8:20 15:3,4,16 17:6,17 18:23
20:16 26:12 72:9

**worked** 15:6 17:16 18:1,4,20,22
20:18,19 21:16 22:1 23:11,15,22
26:11 27:1 28:22 37:12 61:6 70:13,
17 72:15 73:19,24 108:21 114:14
124:15,16 148:6,18

**workers** 38:23

**working** 13:15 14:8 16:20 17:21
18:16 20:3 26:19 28:8 37:22 70:10
73:16 79:4 108:19 113:1 114:10

148:5,8

**write** 39:1,6,15 54:3 63:4 92:23
139:15

**written** 22:22 79:12,16 82:6 127:2

**wrong** 31:24

**wrote** 39:11 89:23 93:19

---

### X

---

**X's** 101:11 102:16 103:5

---

### Y

---

**yards** 36:1,5,6

**year** 14:24 16:17 17:17 19:18 20:2
40:8 67:18 74:7 148:21,22

**years** 7:15 10:18 12:19 15:5 16:6,
9,11,22 17:16 18:1 19:4 20:7,8,9
69:2 73:22 74:16 83:24 106:13
111:11 117:3 126:6 143:8 148:17,
18

**yesterday** 7:19 10:6,7 11:6,16
24:16

**younger** 71:14,18

---

### Z

---

**Zibolski** 5:23 149:8

**Zoom** 9:13 33:8