# Exhibit 11

```
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION

 3  THOMAS SIERRA,              )
                               )
 4              Plaintiff,     )
                               )
 5         vs.                 )    No. 18 CV 3029
                               )
 6  REYNALDO GUEVARA, et al.,   )
                               )
 7              Defendants.    )

 8

 9         The videotaped deposition of

10  ANTHONY WAYNE FINNELL, taken pursuant to the

11  Federal Rules of Civil Procedure, before

12  Katie K. Elliott, Certified Shorthand Reporter

13  No. 084-004537, via Zoom Video Teleconference, on

14  Friday, January 13, 2023, commencing at

15  10:00 a.m. pursuant to notice.

16         APPEARANCES:

17             LOEVY & LOEVY, by
               MR. WALLY HILKE and
18             MS. RACHEL BRADY
               (311 North Aberdeen Street, Third Floor
19              Chicago, Illinois  60607
                312.243.5900
20              wally@loevy.com
                rachel@loevy.com)
21                appeared on behalf of the plaintiff;

22

23

24
```

Page 2

```
 1      APPEARANCES: (Cont'd)
 2         LEINENWEBER BARONI & DAFFADA, LLC, by
           MS. MEGAN K. McGRATH
 3         (120 North LaSalle Street, Suite 2000
           Chicago, Illinois 60603
 4         866.786.3705
           mkm@ilesq.com)
 5            appeared on behalf of the defendant
              Reynaldo Guevara;
 6
           THE SOTOS LAW FIRM, PC, by
 7         MS. CAROLINE P. GOLDEN
           (141 West Jackson Boulevard, Suite 1240A
 8         Chicago, Illinois 60604
           630.735.3300
 9         cgolden@jsotoslaw.com)
              appeared on behalf of the defendants
10            Halvorsen, Wojcik, McMurray,
              Figueroa, Mingey, Biebel, and
11            Cappitelli;
12         ROCK FUSCO & CONNELLY, LLC
           MS. THERESA B. CARNEY and
13         MS. EILEEN E. ROSEN
           (321 North Clark Street, Suite 2200
14         Chicago, Illinois 60654
           312.494.1000
15         tcarney@rfclaw.com
           erosen@rfclaw.com)
16            appeared on behalf of the defendant
              City of Chicago.
17
        ALSO PRESENT:
18
           Ms. Rachel Welling, Certified Legal
19         Videographer, Urlaub Bowen & Associates;
           Mr. Nick Trotta, Exhibit Technician,
20         Urlaub Bowen & Associates;
           Ms. Sabrina Scardamaglia, Law Clerk,
21         Rock Fusco.
22                 *  *  *  *  *  *  *
23
24
```

Page 3

```
 1              I N D E X
 2
    Witness:                             Page
 3
        ANTHONY WAYNE FINNELL
 4
           Examination by:
 5
           Ms. Carney...................   5
 6         Ms. Golden................... 197
           Mr. Hilke................... 306
 7
 8           E X H I B I T S
 9   No.  Description          Marked/Referenced
10    1  Curriculum Vitae of Deponent...........  20
      2  Group of Invoices - Finnell 2855-2862..  25
11    3  Attachment B - Report of Material
         Reviewed...............................  34
12    4  Expert Report of Finnell...............  39
      5  US DOJ - Bureau of Justice Statistics
13       Special Report - June 2006............. 122
      6  Article - Hickman and Poore -
14       RFC-Rodriguez 106156-106180........... 126
      7  Order - 12/3/2019..................... 138
15   12  CR 221462............................. 261
     13  Excel spreadsheet..................... 281
16   14  CR 217809............................. 285
     15  CR 182205............................. 286
17   16  CR 214426............................. 291
     17  CR 220046............................. 302
18
19            (Exhibits attached/scanned;
                 Exhibit 17 retained.)
20
21                  -  -  -
22
23
24
```

Page 4

```
 1      THE LEGAL VIDEOGRAPHER:  And we are now on the
 2   video record at 10:02 a.m.
 3            This is the videotaped video
 4   conference deposition of Anthony Finnell being taken
 5   on January 13th, 2023.
 6            This deposition is being taken on
 7   behalf of the defendant in the matter of Thomas
 8   Sierra versus Reynaldo Guevara, et al.  The case
 9   number is 18 CV 3029 filed in the United States
10   District Court for the Northern District of
11   Illinois, Eastern Division.
12            My name is Rachel Welling, certified
13   legal videographer, representing Urlaub Bowen &
14   Associates with offices at 20 North Clark Street,
15   Suite 600, Chicago Illinois.  The court reporter
16   today is Katie Elliott, also of Urlaub Bowen &
17   Associates.
18            Counsels, please identify yourselves
19   for the video record and the parties which you
20   represent.
21      MS. CARNEY:  Theresa Carney and Eileen Rosen
22   on behalf of the City of Chicago.  Also with us
23   today, we have our law clerk Sabrina "Scarbindalia"?
24   I just butchered that, sorry.
```

Page 5

```
 1      MR. HILKE:  Good morning.  Wallace Hilke for
 2   plaintiff Thomas Sierra.
 3      MS. GOLDEN:  Caroline Golden for defendants
 4   Halvorsen, Wojcik, McMurray, Figueroa, Mingey,
 5   Biebel, and Cappitelli.
 6      MS. McGRATH:  Megan McGrath for defendant
 7   Guevara.
 8      MS. CARNEY:  I think that's it.  I think
 9   Ms. Brady is on as well.
10      THE LEGAL VIDEOGRAPHER:  Okay.  Will the court
11   reporter please swear in the witness.
12            (Witness sworn.)
13         ANTHONY WAYNE FINNELL
14   called as a witness herein, having been first duly
15   sworn, was examined and testified as follows:
16            EXAMINATION
17   BY MS. CARNEY:
18      Q.  Good morning, Mr. Finnell.  Good to see
19   you again.
20      A.  Yes, good morning.
21      Q.  Good morning.
22            Just to get some formalities out of
23   the way, can I get you to state and spell your
24   first -- full name for the record?
```

Page 6

1    A.   Anthony Wayne Finnell.
2         Spell my last name, or all three?
3    **Q.   Just your last name is fine.**
4    A.   Okay.  F, as in frank, i-n-n-e-l-l.
5    **Q.   Okay.  And, Mr. Finnell, where are you**
6  **giving your deposition today?**
7    A.   Indianapolis, Indiana.
8    **Q.   And because we're on Zoom, I just want**
9  **to confirm, is there anybody else in the room with**
10 **you today?**
11   A.   No, there's not.
12   **Q.   And do you have any documents or**
13 **anything open on your desktop?  Do you have any**
14 **documents in front of you?**
15   A.   In front of me I have a copy of the
16 report that I submitted on this matter.
17   **Q.   Okay.  And do you have anything else**
18 **open on your computer?**
19   A.   No, I do not.
20   **Q.   Do you have any notes or anything else**
21 **pertaining to your report in front of you today?**
22   MR. HILKE:  I'm just going to instruct the
23 witness that as to any notes that may be on his
24 report that to the extent that question asks

Page 7

1  for work product information or information not
2  subject to disclosure under Rule 26 that he can
3  give -- he can answer yes or no as to whether there
4  are notes written on his report.
5         I don't know if that was your
6  question or not, Ms. Carney.
7    MS. CARNEY:  Well, I think my question is does
8  he have any notes in front of him, and if they're on
9  his report and he intends to read -- use those notes
10 as he gives his deposition, I think we're
11 entitled -- that's no longer work product, and we're
12 entitled to know that.
13 BY MS. CARNEY:
14   **Q.   So I guess the main question is:  Do**
15 **you have notes in front of you today?**
16   MR. HILKE:  Same instruction.
17        Go ahead, Mr. Finnell.
18   THE WITNESS:  Yes, I do.
19 BY MS. CARNEY:
20   **Q.   Okay.  And where are those notes?**
21   A.   Those notes are written throughout my
22 report.
23   **Q.   Okay.  And when did you create those**
24 **notes?**

Page 8

1    A.   Well --
2    MR. HILKE:  One second, Mr. Finnell.
3    THE WITNESS:  Oh, sorry.
4    MR. HILKE:  Yeah, go ahead.  You can answer.
5    THE WITNESS:  Excuse me.
6         The notes that are -- were created or
7  that are included in my report were created during
8  discussions with Mr. Sierra's legal counsel, legal
9  team while I was preparing for this deposition.
10 BY MS. CARNEY:
11   **Q.   And do you need -- do you need those**
12 **notes in order to -- are you intending to rely on**
13 **those notes in order to testify today?**
14   A.   Well, I have the notes in case I need
15 them.  I'm not sure to what extent I will need all
16 of the notes, but I've made notes, like I said, in
17 preparation for this deposition today.
18   **Q.   And who created the notes that you have**
19 **in front of you in preparation for this deposition**
20 **today?**
21   A.   I did.  They're -- they're -- I wrote
22 the notes.
23   **Q.   Are they handwritten notes, or are they**
24 **typed on your report?**

Page 9

1    A.   Handwritten, handwritten notes.
2    **Q.   I guess I would -- I would ask that**
3  **throughout this deposition if you are reading from**
4  **your notes instead of your report, I would ask that**
5  **you let me know that you are reading notes and not**
6  **directly from your report.**
7         **Is that fair?**
8    A.   Yeah, I guess.  I mean, I don't quite
9  understand that, but yeah, if I --
10   **Q.   Okay.  That's fair.  That was kind a**
11 **weirdly phrased request.**
12        **So throughout obviously this**
13 **deposition, we're going to be looking at portions**
14 **of your report.  And to the extent that you are**
15 **reading something that's handwritten and not**
16 **contained in your report, I would ask that you let**
17 **me know that that is -- that you are reading from**
18 **your notes.**
19   A.   Okay.
20   **Q.   Okay.  Fair.**
21   A.   Yes.
22   **Q.   Thank you.  So --**
23   MS. GOLDEN:  I'm just going to direct --
24 Wally, you're going to -- you're objecting to

1 production of the notes. Because if he's -- if he's
2 reviewing his notes and using them to testify today,
3 we're going to want them to be produced.
4     MR. HILKE: Yeah. I think our -- I believe we
5 discussed that this issue arose at his deposition in
6 Rodriguez, and our position would be the same. That
7 the notes that he wrote are work product and aren't
8 subject to disclosure under
9 Rule 26. That -- yeah, that's our position.
10    MS. GOLDEN: Okay, just letting you know.
11    MS. CARNEY: And obviously we -- we disagree
12 and we'll see how that plays out.
13 BY MS. CARNEY:
14    **Q.   Mr. Finnell, what did you do to prepare**
15 **for your deposition today?**
16    A.   I went back through my report that I
17 submitted, reviewed the various charts and tables
18 within the report. Also went back over the data
19 set and reviewed the contents of the data set. I
20 looked at some of the other materials that I
21 previously had reviewed just to refresh my memory
22 on the contents of those materials.
23    **Q.   Okay. And when you said you went back**
24 **over the data set and the contents of the data set,**

1 **which data set are you referring to?**
2    A.   The data set that was used in the
3 analysis, the Excel spreadsheet data set that was
4 used in the ana -- for the analysis and results
5 that were contained in this report. That was the
6 data set of the CRs that were received -- that were
7 compiled by the City of Chicago and presented to
8 plaintiff's legal team, and thus sent to me.
9    **Q.   Okay. And what is the -- what is**
10 **the -- what is that data set comprised of?**
11    A.   Yes --
12    MR. HILKE: Objection, form.
13        You can answer.
14    THE WITNESS: Okay, yes. It comprises of the
15 contents of the CRs that were requested through the
16 court order for the years 1991 through '95 for the
17 Area Five detectives for CPD. And so the data set
18 is the information that was contained in those CRs
19 as put into the spreadsheet for analysis.
20 BY MS. CARNEY:
21    **Q.   Okay. And is it your understanding**
22 **that the data set is limited to CRs for Area Five**
23 **detectives from 1991 through 1995?**
24    MR. HILKE: Objection, form.

1        Go ahead.
2    THE WITNESS: Well, my understanding is based
3 on the court order that was requesting that
4 information. That that's -- those were the
5 parameters of the data set. And so yes, that would
6 be what I expect to be contained in that data set.
7 BY MS. CARNEY:
8    **Q.   And did you do -- did you review any of**
9 **the physical CRs that are contained -- let me back**
10 **up.**
11        **Do you know how many CRs made up the**
12 **data set that -- do you know how many CRs made up**
13 **the data set?**
14    A.   Let me look at my report. I believe --
15 one second.
16        Yeah, on page 8 of my report, there
17 were 323 complaint register files, or CRs,
18 contained in the data set.
19    **Q.   Okay. And of those 323 CRs files**
20 **contained in the data set, it's your understanding**
21 **that those are CRs for Area Five detectives from**
22 **1991 through 1995?**
23    MR. HILKE: Objection, form.
24        Go ahead.

1    THE WITNESS: It's my understanding based on,
2 like I said, the -- the court order and then via --
3 I guess you'd call it the certification of -- the
4 completion of the court order that CPD had provided
5 all the -- all of the CRs for Area Five detectives
6 between '91 and '95.
7 BY MS. CARNEY:
8    **Q.   Okay. And did you review the 323 CRs**
9 **contained in the data set?**
10    A.   Yes. I looked at the actual CRs
11 themselves, so I did review each one.
12    **Q.   When you say you looked at the actual**
13 **CRs themselves, are you saying -- what do you mean**
14 **by that?**
15    A.   The CR file, each -- each complaint
16 register, I reviewed it.
17    **Q.   Okay. So you reviewed the entirety of**
18 **the physical -- well, I know they're -- I know --**
19 **let me ask you this.**
20        **Were they provided to you in hard**
21 **copy or online?**
22    A.   It was PDF format, so yeah.
23    **Q.   And so then when you say you reviewed**
24 **the entire CR file, you reviewed the entire PDF for**

Page 14

1 each of the 323 CRs that were produced.
2      MR. HILKE: Objection, form.
3          Go ahead.
4      THE WITNESS: No, I did not review the entire
5 PDF for each CR that was produced. I reviewed --
6 did an initial review of each one to see what the
7 allegations were, to review the findings, review the
8 summary report.
9          And on some CRs, I did in fact review
10 the entirety of that CR file; and on others, I
11 reviewed various segments of the CR file.
12 BY MS. CARNEY:
13      Q.   In your report -- or does your report
14 contain a list of the files that you reviewed the
15 entirety of the PDF?
16      A.   No, it does not.
17      Q.   Do you have a list of the CRs where you
18 reviewed the entirety of the PDF?
19      MR. HILKE: I --
20          (Simultaneous cross-talk.)
21      THE WITNESS: No, I -- I'm sorry.
22      MR. HILKE: That's okay.
23          You can answer. Go ahead.
24      THE WITNESS: No, I -- I do not have a list of

Page 15

1 the ones that I reviewed in their entirety versus
2 partial review of -- of the entire CR file.
3 BY MS. CARNEY:
4      Q.   Okay. Was there a specific criteria
5 that you used when deciding which CRs to review in
6 their entirety versus which CRs to just do an
7 initial review?
8      MR. HILKE: Objection, form, but you can
9 answer.
10      THE WITNESS: No, there really wasn't a
11 criteria. As I -- as I went through different
12 files, some I felt I needed to just look a little
13 further, or I wanted to look a little further to
14 determine the outcome. But there was no specific
15 criteria that estab -- that was established on which
16 ones would be reviewed entirely or not.
17 BY MS. CARNEY:
18      Q.   Okay. But at a minimum, you laid eyes
19 on and reviewed the initial -- sorry.
20          I think you said at a minimum you
21 reviewed the initial allegations, the findings, and
22 the summary report for each of the 323 CRs; is that
23 correct?
24      MR. HILKE: Ob --

Page 16

1          (Simultaneous cross-talk.)
2      THE WITNESS: That is correct.
3          I'm sorry.
4      MR. HILKE: No, that's okay. I think that's
5 fine, but just give me a chance to make an objection
6 before answering so we can have a clear record,
7 please.
8      MS. CARNEY: Katie, did you get his answer?
9      THE COURT REPORTER: Yes.
10          "That is correct."
11      MS. CARNEY: Okay, perfect.
12 BY MS. CARNEY:
13      Q.   Other than looking back through your
14 report, looking at the various charts and tables,
15 going over the data set, looking at some other --
16 well, let me ask you this.
17          You said you looked at some other
18 materials to refresh your recollection about what
19 you reviewed.
20          Do you remember what those materials
21 were?
22      A.   There -- I believe there was some
23 court-related materials specific to the request for
24 the CR files and the certification that that

Page 17

1 request had been -- that court order had been
2 completed. Looked at a couple of reports that had
3 been referenced within my report just to refresh my
4 memory.
5      Q.   Did you meet with anybody in
6 preparation for your deposition today?
7      MR. HILKE: And just an instruction not to
8 reveal the contents of your communications with
9 Mr. Sierra's attorneys.
10          You can answer.
11      THE WITNESS: Yes, I did. I met with
12 Mr. Sierra's legal team, and I also met with my
13 associates.
14 BY MS. CARNEY:
15      Q.   Okay. Who on Mr. Sierra's legal team
16 did you meet with? And I don't want to know the
17 contents of your conversations with them. Just who
18 you met with.
19      A.   I met with Mr. Hilke.
20      Q.   And how long did you and Mr. Hilke meet?
21          I'm sorry. When did the -- how many
22 times did you and Mr. Hilke meet in preparation for
23 your dep?
24      A.   Well, we had a couple scheduled. I'm

Page 18

1 just trying to -- I think it was at least two,
2 maybe three times.
3    **Q. When was your first meeting with**
4 **Mr. Hilke?**
5    MR. HILKE: Objection, form.
6    Go ahead.
7    And sorry, just -- you mean to
8 prepare for this deposition, Ms. Carney?
9 BY MS. CARNEY:
10   **Q. I guess in general when was your first**
11 **meeting with Mr. Hilke.**
12   A. Oh, wow. I -- I would have to go back
13 and look at my calendar for my first meeting. I
14 have no idea.
15   **Q. So is it fair to say that your meeting**
16 **for your deposition was not the first time you had**
17 **met with Mr. Hilke?**
18   A. Oh, yes, that's fair to say.
19   **Q. Okay. So when was your first meeting**
20 **with Mr. Hilke in preparation for your deposition?**
21   A. So I believe it was -- I believe it was
22 Tuesday of this week. I -- and I preface that by
23 saying that we had meetings scheduled, but I had
24 been ill and was not able to keep those meetings,

Page 19

1 so we had brief meetings.
2    But a substantial meeting would have
3 been Tuesday of this week.
4    **Q. Okay. I hope you're feeling better.**
5    A. I'm fine. Thank you.
6    **Q. How long did you guys meet on Tuesday**
7 **of this week?**
8    A. Couple hours.
9    **Q. And did you guys meet again after**
10 **Tuesday?**
11   A. Yes. Briefly Wednesday evening and
12 then yesterday.
13   **Q. And I think you said you also met with**
14 **your associates.**
15   **Who would that include?**
16   A. Dr. Timothy Knight and Mrs. Miroslava
17 Meza.
18   **Q. All right. I could pull up what I've**
19 **already marked as Exhibit 1 for your deposition.**
20   MS. CARNEY: Hold on. Nick's supposed to be
21 helping me.
22   Nick, are you there?
23   MR. TROTTA: Yes, I am sorry. I -- looks like
24 I have some technical issue real quick. I am sorry

Page 20

1 about that.
2    MS. CARNEY: That's okay. I can pull it up
3 while you -- not a problem.
4    MR. TROTTA: I apologize about that. It's now
5 asking me to restart my Zoom.
6    MS. CARNEY: Do we need to go -- I can do the
7 exhibits, but for -- do we need to go off the record
8 for a second?
9    Or, Rachel, are you still good?
10   THE LEGAL VIDEOGRAPHER: I'm good. If you
11 keep sharing, he'll just log in and out in the
12 background. And then at the next break, he can let
13 us know, if that's sound goods to you.
14   MS. CARNEY: Yeah, that's fine with me.
15   MR. TROTTA: Apologies about that.
16   MS. CARNEY: No worries.
17   MR. TROTTA: I'll be right back on.
18   MS. CARNEY: It happens.
19    (Deposition Exhibit No. 1,
20    Witness Finnell, was marked for
21    identification 01/13/2023.)
22 BY MS. CARNEY:
23   **Q. Okay. Let's see if I did that right.**
24   **Can you guys see my screen?**

Page 21

1    A. Yes, I can.
2    **Q. Okay. Look at me being tech savvy**
3 **today.**
4    **Mr. Finnell, this is what I have**
5 **previously marked or already marked for purposes of**
6 **your deposition as Exhibit 1, and this is the -- a**
7 **copy of your CV which we received in response to**
8 **our subpoena in this case.**
9    **I just want to scroll through this**
10 **and have you let me know if this is the most recent**
11 **and up-to-date copy of your CV. Is that okay?**
12   A. Okay.
13   **Q. So first page, is everything -- am I**
14 **good to scroll, or can you see it?**
15   A. Yes, it's -- you could scroll.
16    There has been some additions to
17 that page.
18   **Q. Okay. What has -- what has been added**
19 **to your CV?**
20   A. There's been some additional notation
21 added under Law Office of Thomas P. Needham.
22 There's at least -- I'd have to look at it, but
23 it's a couple more assignments that have been added
24 there.

Page 22

1    MS. CARNEY:  Okay.  And so, Wally, at some
2  point in the break, if you could get us an updated
3  version of his CV.  It's not a big deal right now,
4  but that would be --
5    MR. HILKE:  Yeah, I can do that.  I'm happy to
6  do that.
7    MS. CARNEY:  Thanks.
8  BY MS. CARNEY:
9    Q.   So, Mr. Finnell, if we could just talk
10  through.
11        You said there's a couple additional
12  assignments to the Law Office of Thomas Needham; is
13  that right?
14    A.   That is correct.
15    Q.   Okay.  Off the top of your head, can
16  you think of what those additional assignments are
17  or were?
18    A.   Go back to the first page --
19    Q.   Yep.
20    A.   -- real quick, please.
21        Okay.  All right.  There -- there
22  should be something referenced to some work I did
23  for the city and county of Athens, Georgia; Athens,
24  Clarke County, Georgia.  Most recent work I did for

Page 23

1  the City of Indianapolis.
2        And I think that's -- I think that's
3  it.  Again, I have to look at my CV to --
4    Q.   Okay.
5    A.   -- to be accurate, but I do know of
6  those two right off the top of my head.
7    Q.   Okay.  What kind of work did you
8  recently do for the city or county -- well, is it
9  Clarke County?  Athens, Georgia, in Clarke County?
10  Is that what it was?
11    A.   Yes.  It was a combination of Athens,
12  Georgia, but also Clarke County.
13    Q.   Okay.  And what kind of work did you do
14  for Athens, Georgia, in Clarke County?
15    A.   I did a training session for their
16  oversight entity that's coming on board, provided
17  some training sessions for them.
18    Q.   When did you provide those training
19  sessions?
20    A.   I believe it was in November of 2022.
21    Q.   Okay.  And then I think you said you
22  had some additional work for Indianapolis; is that
23  right?
24    A.   That's correct.

Page 24

1    Q.   Okay.  And what additional work did you
2  do for the City of Indianapolis?
3    A.   Also provided some training for their
4  oversight entity.
5    Q.   And when was that?
6    A.   This past Monday.
7    Q.   Oh, okay.  Keeping busy.
8        Okay.  So other than those two
9  additions -- well, I guess let me ask you this:
10  Was the additional work that you did for Athens,
11  Georgia, and Indianapolis done through your company
12  AW Finnell & Associates?
13    A.   It was done through the company, but it
14  was also done on behalf of NACOLE, National
15  Association of Civilian Oversight of Law
16  Enforcement.
17    Q.   Got it.
18        Okay.  So other than those
19  additions, if I go to the third page, there's
20  probably nothing else to add here?
21    A.   Yeah, that's accurate.
22    Q.   Okay.  And then this is the last page.
23    A.   That's accurate.
24    Q.   Okay, great.  I'll stop sharing.

Page 25

1        (Deposition Exhibit No. 2,
2         Witness Finnell, was marked for
3         identification 01/13/2023.)
4  BY MS. CARNEY:
5    Q.   So the next thing, I'm going to bring
6  up what I have already marked as Exhibit 2.
7        Can you see that?  It's small,
8  but -- oh, Mr. Finnell you went -- you muted
9  yourself.
10    A.   I don't know how that happened.  Okay,
11  yes.
12    Q.   Okay.  So I'm just going to scroll
13  through these quick, and then we'll go through them.
14        But these are invoices that were
15  produced to us in response to the subpoena in the
16  Sierra case.  And I should have saved these in a
17  different order, but I'm going to start with what
18  is Bates stamped as Finnell 2861.
19        Do you see that at the bottom?
20    A.   Yes.
21    Q.   Okay.  And this invoice is dated
22  August 4, 2022, and it's in regards to Sierra
23  versus City of Chicago.
24        Do you see that?

Page 26

1    A.   Yes, I do.

2    Q.   Okay.  Do you recall when you were

3  retained -- sorry, that was bad question.

4         Never mind.  I will -- okay.  So

5  this invoice -- in this package of invoices that we

6  received, we also have some invoices for Ms. Meza

7  and Mr. Knight.

8         So I'm going to scroll -- sorry if

9  I'm going fast.  Please tell me if I'm going too

10  fast.

11         So this invoice is Bates stamped

12  Finnell 2858.  Do you see that at the bottom?

13    A.   Yes.

14    Q.   Okay.  And this looks like Mr. Knight's

15  invoice for work on the Sierra case dated

16  July 31st, 2022, and it's for one hour.

17         Do you see that?

18    MR. HILKE:  Ms. Carney, I'm sorry, but could

19  you zoom in a little bit --

20    MS. CARNEY:  Yeah.

21    MR. HILKE:  -- on it.  I'm having trouble

22  reading the exhibit.

23    MS. CARNEY:  Better?

24    MR. HILKE:  It's better for me.

Page 27

1         Mr. Finnell, can you see that?

2    THE WITNESS:  Yes, I can.  Thank you.

3    MR. HILKE:  Thank you.

4  BY MS. CARNEY:

5    Q.   And I believe that you've testified

6  previously that when you received an invoice from

7  Mr. Knight, you would include those hours on the

8  invoice that you ultimately sent to Loevy & Loevy;

9  is that accurate?

10    A.   Yes, it is.

11    Q.   Okay.  So if this invoice was dated

12  July 31st of 2022, is it fair to assume it would

13  have been included on this invoice dated 8/4/2022?

14    MR. HILKE:  Objection, form.

15         You can answer.

16    THE WITNESS:  I mean, it's fair to say, yes.

17  I'm -- yeah, yeah.  I wouldn't have submitted a

18  separate one before that.

19  BY MS. CARNEY:

20    Q.   You think you would have submitted a

21  separate one for --

22    A.   No.

23    Q.   No, you don't.

24    A.   No, I don't.

Page 28

1    Q.   Okay.  So of this 38 hours on 8/4/2022,

2  one of those hours would have been for Mr. Knight.

3         Does that sound right?

4    A.   Yes.

5    MR. HILKE:  Objection, form.

6         You can answer.

7    THE WITNESS:  I'm sorry.  Yes.

8  BY MS. CARNEY:

9    Q.   And then -- sorry, I really should have

10  reordered these.  I apologize.

11         I'm going to zoom out for a second

12  just to show you that this is marked Finnell 2856

13  and is an invoice from Ms. Meza.

14         Oh, wrong one.  2855, an invoice

15  from Ms. Meza; date, 8/2/2022; Project, Sierra.

16         And it's for 14.25 hours.

17         Do you see that?

18    A.   Yes.

19    Q.   Okay.  And since this invoice is 8/2

20  and you submitted an invoice to Loevy & Loevy on

21  8/4, is it fair to say that these 14.25 hours would

22  have been included in this 8/4 invoice?

23    A.   Yes, it is --

24    Q.   Okay.

Page 29

1    A.   -- fair to say.

2    Q.   So if I do some math here, out of the

3  38 hours that you worked on this invoice, 14.25

4  were Ms. Meza and one hour was Mr. Knight.

5         So that leaves 22.75 hours that you

6  worked on this invoice; is that accurate?

7    MR. HILKE:  Objection, form.

8         You can answer.

9    THE WITNESS:  Yes, it is.

10  BY MS. CARNEY:

11    Q.   Okay.  And -- okay.  So that's the

12  first.

13         So the next invoice that we have for

14  you is from September 7th of 2022.  I have it in

15  front of you.  It's Bates stamped 2860.

16         Do you see that?

17    A.   Yes.

18    Q.   Okay.  And this is for 82 hours

19  regarding Sierra; attention, Wally Hilke, right?

20    A.   Yes.

21    Q.   Okay.  And then -- oh, look at that,

22  it's right next to it.

23         So here we have invoice Finnell

24  2859, Knight Life Solutions; invoice date

Page 30

1  8/31/2022, Sierra case, for 48.15 hours.
2          Do you see that?
3      A.  Yes.
4      Q.  Okay.  Would this invoice have been
5  included on the 9/7/2022 invoice that you submitted
6  to Loevy & Loevy?
7      A.  Yes, it would have.
8      Q.  Okay.  So of the 82 hours you invoiced
9  Loevy & Loevy, 48.15 of those were from Mr. Knight;
10  is that accurate?
11     MR. HILKE:  Objection, form.
12          You can answer.
13     THE WITNESS:  Yes, it is.
14  BY MS. CARNEY:
15     Q.  Okay.  And then Ms. Meza submitted an
16  invoice to you on 8/31/2022 for 31.5 hours for the
17  Sierra case, and this is invoice Finnell 2856.
18          And this invoice would have also
19  been included in the September 7th, 2022, invoice
20  to Loevy & Loevy; is that correct?
21     A.  That's correct.
22     Q.  Okay.  So 80 -- out of the 82 hours,
23  31.5 of those were Ms. Meza; is that right?
24     MR. HILKE:  Objection, form.

Page 31

1          You can answer.
2      THE WITNESS:  Yes, that's right.
3  BY MS. CARNEY:
4      Q.  Okay.  So if we do some math again,
5  82 hours minus 48.15 minus 31.5 leaves you with
6  2.35 hours on this invoice that was your work; is
7  that accurate?
8      A.  That's --
9      MR. HILKE:  Objection, form.
10          You can answer.  Go ahead, Anthony.
11     THE WITNESS:  Yeah, that's correct.
12  BY MS. CARNEY:
13     Q.  Okay.  And then we got one more invoice
14  from October 9th, 2022, and this is for nine hours.
15  This is Finnell 2862.  And then if I go to --
16  sorry, I'm really sorry about this -- Finnell 2857
17  is a September 30, 2022, invoice for Knight Life
18  Solutions in Sierra.
19          Do you see that?
20     A.  Yes.
21     Q.  Okay.  So this September 30, 2022,
22  invoice of two hours would have been included in
23  this October 9, 2022, invoice to Loevy & Loevy; is
24  that correct?

Page 32

1      A.  Yes, that's correct.
2      Q.  And even I don't need a calculator for
3  this one, though I might.
4          Of the nine hours worked on this
5  invoice, two of those would have belonged to
6  Mr. Knight; is that correct?
7      MR. HILKE:  Objection, form.
8          You can answer.
9      THE WITNESS:  Yes, that's correct.
10  BY MS. CARNEY:
11     Q.  Okay.  So leaving seven total hours
12  that you worked on this invoice.
13     MR. HILKE:  Same objection.
14          Go ahead.
15     THE WITNESS:  Yes.
16  BY MS. CARNEY:
17     Q.  Okay.  Do you know -- well, let me ask
18  you this.  I believe you've testified in the past
19  that -- well, sorry, strike that.
20          It looks like on each of these
21  invoices the rate that you charge Loevy & Loevy is
22  $350 an hour; is that correct?
23     A.  Correct.
24     Q.  Okay.  Mr. Knight's rate is $210 an

Page 33

1  hour.
2          Do you see that?
3      A.  Correct.
4      Q.  And Ms. Meza's rate is $300 an hour; is
5  that correct?
6      A.  Correct.
7      Q.  Okay.  All right.
8      THE LEGAL VIDEOGRAPHER:  Ms. Carney?
9      MS. CARNEY:  Yes.
10     THE LEGAL VIDEOGRAPHER:  Would you like to
11  take a quick break?  We can switch out the exhibit
12  tech and start showing exhibits.
13     MS. CARNEY:  Sure, that's fine.  We can take
14  a -- you just want to take 5 minutes?
15     THE LEGAL VIDEOGRAPHER:  Okay, yeah.
16     MS. CARNEY:  Want a little bit more, Wally?
17     MR. HILKE:  5's good with me.
18          Is that okay with you, Anthony?
19     THE WITNESS:  Yeah.
20     MS. CARNEY:  Great.
21     THE WITNESS:  I'm good.
22     THE LEGAL VIDEOGRAPHER:  We're off the video
23  record at 10:42 a.m.
24          (Recess taken.)

Page 34

1    THE LEGAL VIDEOGRAPHER: We are back on the
2 video record at 10:51 a.m.
3 BY MS. CARNEY:
4    Q.   All right. Mr. Finnell, just following
5 up on something at the very start of the morning,
6 the CRs that you ultimate -- my screen just
7 shifted, sorry.
8         The CRs that you ultimately decided
9 to review in full, sitting here today, could you --
10 like can you remember which ones those were?
11   A.   No, I can't.
12   MS. CARNEY: Kind of on that same topic, Nick,
13 if we can bring up what I've marked as Exhibit 3,
14 please?
15        (Deposition Exhibit No. 3,
16         Witness Finnell, was marked for
17         identification 01/13/2023.)
18 BY MS. CARNEY:
19   Q.   Mr. Finnell, this is what was included
20 in your report as Attachment B, which is the report
21 of your materials reviewed.
22        Do you see that there?
23   A.   I -- yes, I do.
24   Q.   Okay. And scrolling down to the

Page 35

1 bottom, like the fourth bullet point up, it says:
2 I reviewed numerous complaint register files with
3 an incident date of 1991 through 1995 and complaint
4 register files made against defendants, as well as
5 spreadsheets of information from plaintiffs'
6 attorneys related to these files.
7         Do you see that?
8   A.   Yes, I do.
9   Q.   Okay. What is an incident date?
10   A.   The incident date is -- that is the
11 date that the incident that is the source of the
12 allegations in the CR would have occurred.
13   Q.   And is -- okay. And we've talked about
14 complaint register files that you reviewed, and
15 then it says complaint register files made against
16 defendants.
17        Do you know how many complaint
18 register files you reviewed that were specific to
19 the defendant officers in this case?
20   A.   Let me see here.
21        As I sit here now, I don't have that
22 number --
23   Q.   Okay.
24   A.   -- that I can recall.

Page 36

1    Q.   And then it also says, spreadsheets of
2 information from plaintiffs' attorneys related to
3 these files.
4         How many spreadsheets of information
5 did you receive?
6   MR. HILKE: Objection, form.
7         You can answer.
8   THE WITNESS: I received the spreadsheet that
9 contained the CRs and the information from the CRs
10 that were -- had been provided by the City of
11 Chicago. I don't know why it says "spreadsheets,"
12 plural, but it was the spreadsheet that contained
13 the CR file -- the information from the CR files
14 that were submitted per the court order.
15 BY MS. CARNEY:
16   Q.   Okay. So it's just one spreadsheet of
17 1991 through 1995 complaint register files?
18   A.   Yes, it is.
19   Q.   And did you receive that spreadsheet in
20 PDF format or Excel?
21   A.   It would have been in Excel format.
22   Q.   The next bullet point says: All of the
23 materials reviewed in connection with my work on
24 the Velez v. City of Chicago case.

Page 37

1         Do you see that?
2   A.   Yes, I do.
3   Q.   What detective area was at issue in the
4 Velez case?
5   A.   I believe Velez was Area Four
6 detectives.
7   Q.   And did you have a data set -- well,
8 let me strike that.
9         How did you receive the information
10 regarding the data set in Velez?
11   MR. HILKE: Objection. Give me one second,
12 Anthony.
13        Yeah, you can answer.
14   THE WITNESS: You asked how did I receive it?
15        It would have been electronically,
16 the data set. I believe the data set was an Excel
17 spreadsheet as well.
18 BY MS. CARNEY:
19   Q.   So when you were doing your analysis in
20 Velez, which you've incorporated into your review
21 and analysis in Sierra, you reviewed an Excel
22 spreadsheet with information regarding Area Four
23 detectives; is that correct?
24   MR. HILKE: Objection, form, misstates

Page 38

1 testimony.
2          You can answer.
3     THE WITNESS:  I reviewed several pieces of
4 materials that were received in connection with
5 Velez.  So I mean, I'm sure I looked at the
6 spreadsheet as well, but it was several different
7 pieces of material and reports that were provided.
8 BY MS. CARNEY:
9     Q.   Okay.  So in the -- the data, the
10 spreadsheet that you received and reviewed in
11 Velez, was that PDF or Excel?
12     MR. HILKE:  Objection, form.
13          You can answer.
14     THE WITNESS:  When you say "data," what --
15 what data are you talking about?  The additional --
16 BY MS. CARNEY:
17     Q.   Well, you told me -- sorry, go ahead.
18     A.   Were you talking about the additional
19 materials, or the CRs?
20     Q.   The CRs.  Sorry about that.
21     MR. HILKE:  Same objection.
22          Go ahead.
23     THE WITNESS:  Yeah.  The CRs would have been
24 in Excel.

Page 39

1 BY MS. CARNEY:
2     Q.   Okay.  Okay.  I think we're good with
3 that exhibit.  Sorry, too many papers.
4     MS. CARNEY:  Nick, if we could put up
5 Exhibit 4, which is his report.
6          (Deposition Exhibit No. 4,
7           Witness Finnell, was marked for
8           identification 01/13/2023.)
9 BY MS. CARNEY:
10     Q.   All right.  If we could go to page 6 of
11 the report, please.  Well, I guess -- hold on,
12 sorry, Nick.  Can you go to the first page?
13 BY MS. CARNEY:
14     Q.   Okay.  Mr. Finnell, I'm showing you
15 what we've previously -- or already marked as
16 Exhibit 4, which is your final report in the Sierra
17 case.
18          Is this the document that you have
19 in front of you right now?
20     A.   Yes, it is.
21     Q.   Okay.  If we could go to page 6,
22 please.
23     MS. CARNEY:  Oh, sorry, Nick.  Yep, perfect.
24 Right there.  It's the third paragraph up, the one

Page 40

1 that starts with, The opinions I have rendered.
2 BY MS. CARNEY:
3     Q.   Okay.  So, Mr. Finnell, in front of you
4 is your report, and it says here:  The opinions
5 here -- the opinions I have rendered here are based
6 on the materials reviewed regarding CPD's policies,
7 procedures, and practices with respect to officer
8 supervision, misconduct investigation and
9 discipline.
10          Do you see that?
11     A.   Yes, I do.
12     Q.   Okay.  What policies did you review in
13 connection with your report in the Sierra case?
14     A.   Specific policies, I'd have to refer
15 back to materials reviewed.  Give me a second and I
16 can --
17     Q.   We can do that.  We can flip to
18 Exhibit 3.
19     A.   The policies would have been the
20 General Orders:  80-3, 82-14, 83-3, 93-3.
21     Q.   Okay.  And sitting here today, do you
22 recall what those specific policies discuss?
23     A.   No, not independently as I sit here
24 today.

Page 41

1     Q.   All right.  So then going back to your
2 report, next sentence says:  And defendant
3 officers' careers in law enfor -- enforcement with
4 CPD, including CRs made against them.
5          Do you see that?
6     A.   Yes.
7     Q.   Okay.  Do you know if the defendant
8 officers' careers spanned outside the 1991 through
9 1995 time period?
10     A.   Yes, I do know that.  They did expand
11 outside of that time period.
12     Q.   And if a defendant officer had received
13 a CR outside the '91 through 1995 time period, was
14 that included in the data set?
15     MR. HILKE:  Objection, form.
16          You can answer.
17     THE WITNESS:  It should not have been included
18 within the data set if it was outside of '91 to '95.
19 However, I didn't compile the data set.  CPD
20 compiled the data set.
21          And so I -- I would not believe that
22 it contained '91 to '95 -- anything outside of '91
23 to '95.
24

Page 42

1 BY MS. CARNEY:
2    Q.   So you said CPD compiled the data set,
3 but you testified that you looked at all the
4 individual CRs, right?
5        MR. HILKE:  Objection, form.
6        You can answer.
7        THE WITNESS:  Well, yes, I looked at all of
8 them.
9 BY MS. CARNEY:
10   Q.   Okay.  So if you saw a CR that was
11 outside the 1991 through 1995 time period in your
12 review, did you have the ability to remove that CR
13 from the data set?
14       MR. HILKE:  Objection, form, incomplete
15 hypothetical.
16        You can answer.
17       THE WITNESS:  When you asked if I had the
18 ability to remove it, I mean, I had the ability --
19 physical ability to remove it.  However, I would not
20 have removed any CR from the data set as the data
21 set had been prepared by CPD per the court order,
22 and had also been I guess certified as being
23 accurate and complete and a fulfillment of that
24 court order, which had been agreed upon by all

Page 43

1 parties in this matter as far as legal teams and --
2 and legal counsel and the court.
3        So I did not -- I did not remove
4 anything if it appeared outside the '91 to '95
5 parameters, because I wasn't -- I didn't know, other
6 than just those parameters, how CPD determined which
7 ones fell within those -- within that time period.
8 BY MS. CARNEY:
9    Q.   Did you ever ask plaintiff's legal
10 counsel how CPD determined what was going to be
11 included in the time -- in the production of CRs?
12       MR. HILKE:  I'm going to instruct Mr. Finnell
13 not to answer because that question calls for
14 information not subject to disclosure under Rule 26
15 and work product information.
16 BY MS. CARNEY:
17   Q.   Mr. Finnell, are you going to take your
18 attorney's advice?
19   A.   Yes, I will take my attorney's advice
20 and not answer the question.
21   Q.   Okay.  Did you have concerns when
22 reviewing the CR -- 323 CRs that there were, in
23 fact, or if -- sorry, let me strike that.
24        In when -- when reviewing the

Page 44

1 323 CRs that were produced by CPD, if you had found
2 CRs that fell outside the 1991 through 1995 data
3 set, would that have concerned you?
4        MR. HILKE:  Objection, form, vague, incomplete
5 hypothetical.
6        You can answer.
7        THE WITNESS:  Again, no.  It -- it would not
8 have confirmed it.  I had confidence in the
9 information that was provided by CPD.  Again, my
10 confidence was in part because it was provided under
11 a court order, so the court had supervision over
12 that process.  And so CPD was to honor that court
13 order.
14        And then it was subsequently signed
15 off on, for lack of a better term, by legal counsel
16 that it was, in fact -- the court order had been
17 completed.  So I didn't have a concern that the data
18 that was provided was outside of what was issued in
19 the court order.
20 BY MS. CARNEY:
21   Q.   Were you aware that CPD was ordered to
22 produce the 1991 through 1995 CRs plus the
23 defendant officers' CRs for their entire career?
24       MR. HILKE:  Objection, form.

Page 45

1        You can answer.
2        THE WITNESS:  Well, if that was what's
3 contained in the court order.  I knew -- I knew the
4 '91 to '95.  I'd have to review the exact court
5 order for any other specifics that were requested or
6 required based on that court order.
7 BY MS. CARNEY:
8    Q.   Okay.  So then going to the next
9 sentence here, you say:  CRs from 1991 through 1995
10 made against Area Five detectives.
11        Do you see that?
12   A.   Yes, I do.
13   Q.   When it says, made against Area Five
14 detectives, what is your understanding of what that
15 means?
16   A.   That an officer who during that time
17 period, '91 to '95, was assigned to Area Five as a
18 detective, if there was a complaint register filed
19 against them, then that was to be included in the
20 delivery or production of the CRs.
21   Q.   Okay.  CR -- a CR file can be -- a CR
22 number can be taken out against multiple people; is
23 that correct?
24       MR. HILKE:  Objection, form.

1        Go ahead.
2        THE WITNESS:  If you mean that a CR can have
3  multiple subject officers, then yes, it can be.
4  BY MS. CARNEY:
5        Q.   Okay.  The next sentence says:
6  Hundreds of CR files from 1991 -- or sorry -- 1995
7  through 1998 made against area detectives in
8  connection with my expert work in Reyes v. City of
9  Chicago and Solache v. City of Chicago.
10        Do you see that?
11       A.   Yes, I do.
12       Q.   Okay.  And then it says:  And hundreds
13  of CR files from March 1996 through March 2001 made
14  against Area Four detectives and gang specialists
15  in connection with my expert work in Velez v. City
16  of Chicago.
17        See that?
18       A.   Yes, I do.
19       Q.   Okay.  And then it ends with, which
20  resulted in data and conclusions consistent with my
21  opinions here.
22        Is that -- did I read that
23  accurately?
24       MR. HILKE:  Objection, form.

1        You can answer.
2        THE WITNESS:  Yes.
3  BY MS. CARNEY:
4        Q.   Okay.  So is it fair to say that the
5  Excel spreadsheet that you reviewed in connection
6  with your work in Velez was relied upon for your
7  opinions in Sierra?
8        A.   The information contained in those
9  spreadsheets and the resulting analysis helped in
10  that -- it helped in that formation.  And it was
11  just simply to see if there was a pattern or -- or
12  see if it was consistent with what I later learned
13  in the work in this case.
14        Q.   And in Velez, you said you reviewed an
15  Excel spreadsheet that was -- had CRs from Area
16  Four detectives, right?
17       MR. HILKE:  Objection, form and asked and
18  answered.
19        Go ahead.
20        THE WITNESS:  Yes, I did.
21  BY MS. CARNEY:
22        Q.   Going up a little bit in this report to
23  the paragraph right above this, it says:  All of my
24  opinions are rendered to a reasonable degree of

1  professional certainty.
2        Do you see that?
3        A.   Yes.
4        Q.   Okay.  What does that mean?
5        A.   That as a professional in the field of
6  Civilian Oversight and Police Accountability, in
7  looking at and analyzing the data, the opinions
8  that I rendered would be consistent with the
9  opinions that another professional doing the same
10  type of work may be -- may be able to draw from the
11  same information.
12        MS. CARNEY:  Okay.  Nick, if we could go to
13  page 7.
14  BY MS. CARNEY:
15        Q.   First paragraph, looks like two
16  sentences down, three sentences down, you say:
17  These standards have also been established in model
18  policies promulgated by professional organizations
19  such as the National Association for Civilian
20  Oversight of Law Enforcement.
21        Do you -- and there's a footnote
22  there.  Do you see that?  Footnote 4?
23        A.   Yes, I do.
24        Q.   Okay.  What year were those principles

1  put into effect?
2        MR. HILKE:  Objection, form.
3        You can answer.
4  BY MS. CARNEY:
5        Q.   Sorry, I'll rephrase.
6        What year was that -- those -- the
7  National Association for Civilian Oversight in Law
8  Enforcement --
9        (Background interruption.)
10        Q.   What year was that document -- sorry,
11  now I just lost my train of thought.
12        What year were the principles of
13  effective oversight from the National Association
14  for Civilian Oversight of Law Enforcement published?
15        MR. HILKE:  Objection, form.
16        Go ahead.
17        THE WITNESS:  I'd have to go to the website to
18  pull up the principles to determine the -- to figure
19  out the exact year.  I'm not exactly sure when they
20  were published.
21  BY MS. CARNEY:
22        Q.   Okay.  If I represented to you that
23  they were published in 2016, does that sound right?
24        MR. HILKE:  Objection, form, foundation.

Page 50

1        You can answer.
2     THE WITNESS:  Again, I mean, I -- I don't
3  exactly know when, so I -- if I, you know, had -- if
4  I had it, I'd pull it up and look and confirm that.
5  BY MS. CARNEY:
6     Q.   Were -- did principles from -- that
7  were published in the National Association for
8  Civilian Oversight in Law Enforcement published in
9  1991?
10     MR. HILKE:  Objection, form, foundation.
11        You can answer.
12     THE WITNESS:  I was not part of the
13  organization then, so I really don't know what
14  documents and reports they had published in '91.
15  BY MS. CARNEY:
16     Q.   Was the National Association for
17  Civilian Oversight in Law Enforcement in -- in
18  existence in 1991?
19     A.   Let's see.  It's been in existence
20  28 years I think now.  So I don't -- I don't know.
21  I'd have to do the math, but it's been in existence
22  28 years I believe.
23     Q.   Okay.  What about the footnote 5?  You
24  have the Council of Inspectors General on Integrity

Page 51

1  and Efficiency.
2        Do you see that?
3     A.   Yes.
4     Q.   Okay.  And your footnote there actually
5  says 2017, if you go down to footnote 5.
6        Do you see that?
7     A.   Yes, I do.
8     MR. HILKE:  Objection, form.
9        You can answer.
10     THE WITNESS:  Sorry, yes.  I see in the link,
11  yes.
12  BY MS. CARNEY:
13     Q.   Okay.  And so what relevance would
14  investigative standards that were published in 2017
15  have on a data set with the time period of 1991
16  through 1995?
17     MR. HILKE:  Objection, form, foundation.
18        You can answer.
19     THE WITNESS:  The standards are just that.
20  And so in my -- in my opinion, I feel like it would
21  have a -- it would be able to set the baseline for
22  what should have occurred.  Even though it didn't
23  occur and it was published later, this is standards
24  that over years have been formulated.  And they were

Page 52

1  finally put together and published in a document so
2  that others could follow those.
3  BY MS. CARNEY:
4     Q.   Sorry.  Maybe I -- I'm -- so is it your
5  position that standards that were published in 2017
6  should be retroactively applied to the time period
7  of 1991 through 1995?
8     MR. HILKE:  Objection, form.
9        You can answer.
10     THE WITNESS:  It's my opinion that they should
11  be viewed, along with all the other evidence and
12  materials that were -- that were presented for
13  review.  I think they should be considered as you
14  try to determine what the standards were and what
15  they -- what they should be now and whether what was
16  going on in '91 to '95, if it's still occurring
17  today, and if those standards have yet to be met.
18        So I think it's relevant to know what
19  those standards are and to -- and to refer to those
20  standards as you look at all of the pieces of
21  information and look at all of the data related to
22  this case.
23  BY MS. CARNEY:
24     Q.   When were the standards from 2016 and

Page 53

1  2017 that you cite to in these two footnotes
2  developed?
3     MR. HILKE:  Objection, form, foundation,
4  compound.
5        You can answer.
6     THE WITNESS:  I -- I don't know when they were
7  developed or when that process began to create these
8  documents.  I was not a party to that.
9  BY MS. CARNEY:
10     Q.   Do you know what standards were in
11  place in 1991 through 1995?
12     A.   No, I do not know what those standards
13  were at that time.
14     Q.   Okay.  Do you cite in your report to
15  any standards that were in place between 1991 and
16  1995?
17     MR. HILKE:  Objection, form.
18        You can answer.
19     THE WITNESS:  When you say "standards,"
20  what -- standards of officer conduct or standards of
21  officer discipline?  What standards are you
22  referring to?
23  BY MS. CARNEY:
24     Q.   Well, I guess I'm -- so in your report,

Page 54

1 you state that your method that you use used for
2 reaching your conclusions, included a review of
3 materials provided by plaintiff's counsel and
4 vetted against what I have come to know through my
5 years of specialized education, training, and
6 experience as generally accepted practices in the
7 field of law enforcement. These standards have
8 been established in model policies promulgated by
9 professional organizations.
10        And then you list a bunch of
11 professional organizations that we've just talked
12 about.
13        So I guess my question is that: In
14 1991 through 1995, were these standards that you
15 are relying on promulgated by any professional
16 organizations?
17    MR. HILKE: Objection, form.
18        You can answer.
19    THE WITNESS: Yeah, I'm not aware of what
20 professional organizations had -- what their
21 standards were at that time.
22        You know, there were other measures
23 at that time. I mean, there were numerous reports
24 and studies that had been done that established what

Page 55

1 could be considered a standard of how officers
2 should conduct themselves, how oversight or officer
3 misconduct should be addressed.
4        But as far as these professional
5 organizations, no, I -- I'm not aware of what their
6 standards were at this time.
7 BY MS. CARNEY:
8    Q.    Okay. So down at the end of this page
9 here, the paragraph starts with, My analysis? Do
10 you see that?
11    A.    Yes.
12    Q.    Okay.
13        My analysis and report avoid
14 determining the credibility of the various parties
15 and witnesses, or choosing between disputed
16 accounts, as that is outside the purview of my work
17 and remains within the province of the fact finder.
18        Do you see that?
19    A.    Yes, I do.
20    Q.    Okay. So based on this paragraph, your
21 report does not make any determinations regarding
22 whether or not any CRs should have been sustained;
23 is that correct?
24    MR. HILKE: Objection, form.

Page 56

1        You can answer.
2    THE WITNESS: No. My -- we did not analyze
3 the -- or reinvestigate the individual complaints to
4 determine, you know, if they -- if they occurred or
5 not. We didn't do that.
6 BY MS. CARNEY:
7    Q.    Okay. What parties and -- so when you
8 said, My analysis and report avoid determining the
9 credibility of various parties and witnesses, what
10 parties and witnesses are you referring to?
11    MR. HILKE: Objection, form.
12        You can answer.
13    THE WITNESS: Well, the -- the -- like if
14 it's -- if there's -- with the CRs, if the
15 complainants or witnesses or people involved in the
16 CRs were credible or not.
17 BY MS. CARNEY:
18    Q.    Okay. So the next paragraph starts
19 with, The quantitative analysis? Do you see that?
20    A.    Yes.
21    Q.    Okay.
22        The quantitative analysis is based
23 in part on a compiled data set of 323 complaint
24 register files containing 896 individual

Page 57

1 investigations and 19 hundred -- sorry -- 1,973
2 allegation counts.
3        Do you see that?
4    A.    Yes.
5    Q.    Okay. What is a quantitative analysis?
6    A.    That is the taking the -- the data
7 that's within those register files or within
8 that -- that Excel spreadsheet and -- and looking
9 at it for various -- various components, such as
10 the types of allegations that were -- were made and
11 the origin of those allegations, the outcome or
12 findings of those allegations, and then what
13 happened when -- when the allegations were
14 sustained and the outcomes -- going through the
15 process that CPD had at the time to get the final
16 outcome.
17    Q.    And we already talked about the 323.
18 That's the number of complaint register files that
19 were produced.
20        What -- the number 896 individual
21 investigations, what does that mean?
22    A.    So within the 323 CR files, some of
23 those CRs had multiple officers, and each officer
24 would count as an individual investigation.

Page 58

1      Q.   And when you're using the phrase
2  "officers" --
3      A.   Or detectives.
4      Q.   -- are you referring to the detectives?
5      A.   Yes.
6      MR. HILKE:  Objection, form.
7           Go ahead.
8      THE WITNESS:  I'm sorry to -- I'm sorry to
9  both of you.
10          The subject officers, the subject
11  officers of the -- of the CR.
12  BY MS. CARNEY:
13     Q.   Okay.  But -- but when you say
14  "officers," you're just using that as a colloquial
15  term.  You're actually talking about the
16  detectives, because the data set was -- your
17  understanding of the data set was that it was
18  detectives from Area Five, right?
19     MR. HILKE:  Objection, form, misstates his
20  testimony.
21          Go ahead.
22     THE WITNESS:  Yeah, the data set were for Area
23  Five detectives.  And so when I say officer or
24  subject officer, I'm referring to the individual

Page 59

1  that is the subject of the complaint.
2  BY MS. CARNEY:
3      Q.   Okay.
4      A.   Some of the complaints have multiple
5  individuals, and some of those individuals might be
6  an officer.  But collectively, I just used the
7  phrase "subject officer."
8      Q.   When you say that some of the
9  individuals in a CR might be an officer, how would
10  that have been counted in your data set?
11     MR. HILKE:  Objection, form.  You can --
12  BY MS. CARNEY:
13     Q.   Sorry, I'll strike it.
14          When you say that some of the
15  individuals in a CR might have been an officer,
16  should those have been included in your data set?
17     MR. HILKE:  Same objection.
18          You can answer.
19     THE WITNESS:  Yes, they should have been,
20  because the CRs were generated based off the fact
21  that one or more of the subjects of the misconduct
22  or allegations against them were -- were an Area
23  Five detective.  So it was -- it was -- I referenced
24  the incident, and so all officers, whether they're a

Page 60

1  detective or a supervisor, related to that incident
2  should be included.
3  BY MS. CARNEY:
4      Q.   So it's your -- it's your understanding
5  that when -- okay.
6           Well, let me ask you this:  What are
7  allegation counts?  So then it says 900 -- 1,973
8  allegation counts.
9      A.   Okay.  The same with the having
10  multiple individuals -- the possibility of multiple
11  individuals within a CR, individuals could have
12  multiple allegations against them in that same CR.
13          So you could have one CR with two
14  individuals and each individual could have two
15  allegations.  So you would have four allegation
16  counts, two individual investigations, and one CR.
17     Q.   Okay.  Just really quick, kind of going
18  back to the paragraph above about not making any
19  credibility determinations, so is it fair to say
20  that your report does not make any determinations
21  that any misconduct actually occurred in the CRs
22  that you reviewed?
23     MR. HILKE:  Objection, form, vague.
24          You can answer.

Page 61

1      THE WITNESS:  The report doesn't determine
2  whether the allegations in the CRs are sustained or
3  not.  We simply look at the findings and look at the
4  patterns and -- and form an opinion based off that
5  information.
6  BY MS. CARNEY:
7      Q.   Okay.  And you didn't make a
8  determination about whether or not they should --
9  like, for example, if a CR was not sustained, you
10  do not have an opinion one way or another about
11  whether or not that was a correct finding.
12     MR. HILKE:  Objection, form.
13          You can answer.
14     THE WITNESS:  No, it was not my job to
15  determine the findings of the CRs.
16  BY MS. CARNEY:
17     Q.   Okay.  Going onto page 8, it says that
18  you also reviewed Chicago Police Department Annual
19  Reports, Chicago Police Board Annual Reports, and
20  Cook County data for exonerations between 1989
21  through 2021.
22          Do you see that?
23     A.   Yes.
24     Q.   Okay.  How would you define these

Page 62

1 sources of data?  The annual reports, the police
2 board annual reports, and the Cook County data for
3 exonerations.
4      MR. HILKE:  Objection, form and compound.
5          Go ahead.
6      THE WITNESS:  I would define them as public
7 facing documents that are record of -- of historical
8 activity.  With the -- with the CPD annual reports,
9 this is the historical activity as reported by CPD,
10 and same with the police board.
11          And with the data for exonerations,
12 you know, it's an independent organization providing
13 data to the public for analysis and review.
14 BY MS. CARNEY:
15      Q.  In your work in these -- in your
16 work -- sorry, strike that.
17          During your quantitative analysis
18 work in this case, did you -- sorry, that's a bad
19 question.
20          Have you ever heard of the term
21 "secondary data sources"?
22      A.  No, I can't say that I've heard that
23 term used.
24      Q.  So do you have an opinion or

Page 63

1 understanding about how secondary data sources
2 should be interpreted when doing a quantitative
3 analysis?
4      MR. HILKE:  Objection, form.
5          You can answer.
6      THE WITNESS:  With respect to performing a
7 quantitative analysis, I do not have an opinion how
8 that -- how secondary data sources should be used.
9 BY MS. CARNEY:
10      Q.  Okay.  The next paragraph says:  My
11 opinions and the tables in this report rely on the
12 analysis of the data set of 323 complaint register
13 files with a CR initiation date of 1991 through
14 1995.
15          Do you see that?
16      A.  Yes, I do.
17      Q.  Okay.  What is the CR initiation date?
18      A.  That is the date that the complaint or
19 the complaint register is actually filed.  So an
20 individual -- an incident may have happened six
21 months prior, but an individual comes in six months
22 later, and that is the date that the CR is
23 initiated or the investigation begins into that
24 complaint.

Page 64

1      Q.  Okay.  If you -- if we scroll back up a
2 little bit to the last paragraph of page 7, here it
3 says, complaint register files with an incident
4 date between 1991 and 1995, but the next paragraph
5 says, initiation date between 1991 and 1995.
6          And based on what you've just
7 described, there's a significant difference between
8 those.
9          Do you know what the data set
10 includes?
11      MR. HILKE:  Objection, form.
12          You can answer.
13      THE WITNESS:  The -- the data set includes
14 both an incident date and initiation date.  The data
15 set -- the incident initiation date is -- is the
16 parameter for which the data set was created.  But
17 the data set includes all of that information as
18 part of the information gathered from each CR.
19      MS. GOLDEN:  Could I have the answer read
20 back, please?
21      THE COURT REPORTER:  Sure.  Was that
22 Ms. Golden?
23      MS. GOLDEN:  Yes, it was.  Thank you.
24          (The record was read as follows:

Page 65

1          A. The data set includes both
             an incident date and initiation
2            date.  The data set -- the
             incident initiation date is the
3            parameter for which the data
             set was created.  But the data
4            set includes all of that
             information as part of the
5            information gathered from each
             CR.)
6
7 BY MS. CARNEY:
8      Q.  Okay.  So just to make sure I
9 understand your answer correctly, and I think part
10 of that was based on my bad question, so I
11 apologize for that.
12          When you say the data set includes
13 both initiation date and incident date, you're
14 telling -- you're saying that the Excel spreadsheet
15 that was provided to you includes data that tells
16 you both the initiation date and the incident date;
17 is that correct?
18      A.  Yes, that is correct.
19      Q.  Okay.  So both of those data points are
20 included on the spreadsheet.
21      A.  Yes, they are.
22      Q.  Okay.  But the parameters for which the
23 CRs were chosen -- sorry, wrong word, bad word.
24          The parameters for which the CRs

Page 66

1 were produced under were an initiation date of '91
2 through '95. Is that your understanding?
3    MR. HILKE: Objection, form.
4        You can answer.
5    THE WITNESS: Yes. Based on what the court
6 order directed, then the '91 to '95 initiation date
7 or CRs that initiated between that time period are
8 the -- it's my understanding how that -- that list
9 was compiled.
10 BY MS. CARNEY:
11    Q.   Okay. Do you -- in your report, do you
12 use initiation date and incident date
13 interchangeably?
14    MR. HILKE: Objection to form.
15        You can answer.
16    THE WITNESS: There may be times where that's
17 done. It should not have been. When -- when it --
18 when we discuss the CRs and the parameters -- when
19 we discuss '91 to '95 and CRs or use that time
20 period, we're referencing the date that the CR was
21 initiated. Not the -- necessarily the date of the
22 incident.
23 BY MS. CARNEY:
24    Q.   Okay. Back on page 8, that footnote.

Page 67

1 So right after it says, CR initiation date, that we
2 were just looking at, there's a little footnote 6
3 there.
4        If you read footnote 6, it says,
5 Some of the CRs omitted a CR initiation date, but
6 the file makes clear that the complaint was first
7 received by the Chicago Police Department between
8 '91 and '95.
9        Do you see that?
10    A.   Yes, I do.
11    Q.   Okay. How did those files make clear
12 that the initiation date was between '91 and '95?
13    MR. HILKE: Objection, form.
14        You can answer.
15    THE WITNESS: When you review the -- like the
16 intake or the summary report, it states when the
17 investigator received -- when the CR came in and the
18 investigator was assigned to the CR and the
19 initia -- and the incident -- not the incident --
20 the intake front cover that captures all the
21 information in the initial complaint would have the
22 date that it was received and initiated.
23 BY MS. CARNEY:
24    Q.   Okay. And based on your earlier

Page 68

1 testimony, at a minimum for all of these CRs,
2 that's something you would have reviewed, right?
3 The intake form?
4    A.   Oh, yes.
5    MR. HILKE: I'm sorry. Wait, sorry, sorry.
6 Just objection. I wasn't sure if Ms. Carney --
7        (Simultaneous cross-talk.)
8    MS. CARNEY: Sorry.
9    MR. HILKE: -- was done with her question.
10    MS. CARNEY: I'll pause.
11    MR. HILKE: Just objection to form. Go ahead,
12 Anthony.
13    THE WITNESS: Okay, yes. The --
14 BY MS. CARNEY:
15    Q.   Okay.
16    A.   The intake form or the -- yeah, the
17 first form that the complainant would have to
18 complete or they would fill out would definitely be
19 something that was reviewed on all of the CRs.
20    Q.   Okay. And so for this -- the files
21 that are -- for footnote 6, these files that
22 omitted a CR initiation date but made clear that
23 the complaint was received by CPD between 1991 and
24 1995, you would have reviewed those CRs to confirm

Page 69

1 that they actually were in fact received between
2 '91 and '95.
3    MR. HILKE: Objection, form.
4        You can answer.
5    THE WITNESS: Yes. I reviewed -- like I said,
6 I reviewed all of those, so they would have all been
7 within that window.
8 BY MS. CARNEY:
9    Q.   Okay. Back to that paragraph regarding
10 your opinions, that little paragraph. There you go.
11        It says: The analysis of these
12 files is set out in the tables in this report, as
13 well as in Appendix A.
14        And then it goes on to say you
15 relied on the statistical analysis and table
16 generated by Ms. Meza in support of your opinions.
17        Did you or Ms. Meza use any software
18 to conduct the analysis that's contained in this
19 report?
20    MR. HILKE: Objection, compound.
21        You can answer.
22    THE WITNESS: Okay. You said did we use any
23 software to do the analysis?
24

Page 70

1 BY MS. CARNEY:
2     Q.   Yeah.
3     A.   Ms. Meza prepared the analysis or did
4 the analysis, and I -- I know she used some
5 software, statistical software.  The specific
6 statistical software, I'm not sure what she used.
7     Q.   Do you know if the software that
8 Ms. Meza -- the statistical software that Ms. Meza
9 used to conduct her analysis generated any reports?
10     MR. HILKE:  Objection, form.
11         You can answer.
12     THE WITNESS:  I don't believe it generated
13 reports.  I believe it just generated the results of
14 the analysis.
15 BY MS. CARNEY:
16     Q.   Going down a little bit, there's the
17 bolded section that says, Data description: The CR
18 coding collected by plaintiff's team considered all
19 323 complaint register files.
20         Do you see that?
21     A.   Yes, I do.
22     Q.   Okay.  What is the CR coding that
23 you're referring to there?
24     A.   The -- the information contained in the

Page 71

1 Excel spreadsheet that was provided to us.
2     Q.   Okay.  What was the coding system that
3 was utilized in creating that spreadsheet?
4     A.   I'm not sure I fully understand your
5 question.
6         Are you asking how that spreadsheet
7 was created?
8     Q.   Yeah.  Was there -- so I'll ask a
9 couple -- I'll ask a couple questions.
10         Do you know how the CR -- how the
11 spreadsheet was created?
12     MR. HILKE:  Objection, form.
13         You can answer.
14     THE WITNESS:  I don't know specifically how it
15 was created.  That was created, you know, by
16 plaintiff's legal team or someone for plaintiff's
17 legal team, so I was not a part of that creation.
18 BY MS. CARNEY:
19     Q.   Do you know if there was any specific
20 parameters involved in the creation of the
21 spreadsheet?
22     MR. HILKE:  Objection, form and vague.
23         You can answer.
24     THE WITNESS:  Are you asking to determine what

Page 72

1 information would be captured?
2 BY MS. CARNEY:
3     Q.   Yes.
4     A.   Prior -- prior to the creation of the
5 spreadsheet, I did indicate that aside from the
6 general information contained in the CRs, such as,
7 you know, all -- all information on the intake
8 sheet or identifying information, information about
9 the findings and outcome, that the date when a case
10 was initiated, the date when a case was completed,
11 and the outcome as far as when discipline -- if
12 discipline were administered or -- or given, when
13 was that discipline carried out and the process
14 throughout the -- say the appeal process, that some
15 information from the CRs would be collected so that
16 we would be able to analyze that.  Not just the
17 general information from the intake sheet, and then
18 of course the findings or outcome of the
19 investigation.
20     Q.   Okay.  So is it fair to say that you
21 had some input in the types of information and data
22 points that were included in the spreadsheet?
23     A.   Yeah, that's fair to say.  They're --
24     Q.   Okay.

Page 73

1     A.   Like I said, my -- my thoughts were if
2 you have someone going through the CRs to capture
3 the information, capture as much as you can, and
4 then we'll figure out what we need to analyze.
5     Q.   Okay.  Do you know how many people from
6 plaintiff's legal team were involved in the coding
7 of the 323 complaint register files?
8     A.   No, I do not.
9     Q.   Do you know if the -- the people
10 involved in the coding of the 323 complaint
11 register files were trained in any specific way?
12     A.   No, I do not.
13     Q.   Do you have any idea how long it would
14 take an individual coder to review an individual CR
15 file?
16     MR. HILKE:  Objection, form.
17         You can answer.
18     THE WITNESS:  No.  The -- I mean, there's a
19 lot of factors that go into the length of time it
20 would take to adequately review a CR file and code
21 that information into a spreadsheet.
22         Obviously, familiarity with CR files
23 would be one.  And then the -- the size of the
24 CR file and all the information and steps that may

Page 74

1 have gone into that investigation would be a factor.
2      So no, I don't know.
3 BY MS. CARNEY:
4    **Q.   And then it says -- where are we at?**
5 **Okay.**
6         **Area -- 1991, 1995 against**
7 **detectives who worked at Area Five during the time**
8 **period.**
9         **Do you know how many detectives**
10 **worked at Area Five during this time period?**
11    A.   No, I do not know how many detectives
12 worked.  We were only looking at CRs, so I have no
13 idea the total number of detectives that were
14 assigned during that '91 to '95.
15    **Q.   Okay.  And do you know how many**
16 **detectives are in the data set that you reviewed?**
17    A.   Again, not as I sit here now.  That
18 information is -- is within the CRs, but I don't
19 think that information was disaggregated.
20    MS. CARNEY:  Okay.  Before I move on to the
21 next section, I think this is an okay time for a
22 quick comfort break, unless we want to take --
23 Mr. Finnell, do you need to eat?  Are you ahead an
24 hour?  How -- what's the time by you?

Page 75

1    THE WITNESS:  It's 12:50 here.
2    MS. CARNEY:  Do you want to eat some lunch
3 before we come back since it's already almost
4 1:00 o'clock there.
5    THE WITNESS:  Yeah, that'd be fine.
6    MS. CARNEY:  Just a half -- Wally, half an
7 hour?
8    MR. HILKE:  Half an hour sounds right.
9    MS. CARNEY:  Is that okay, Mr. Finnell?
10    THE WITNESS:  Oh, yes, that's fine.
11    MS. CARNEY:  All right.  So 20 after 12:00,
12 we'll come back?
13    THE WITNESS:  Okay.
14    THE LEGAL VIDEOGRAPHER:  We are off the video
15 record at 11:51 a.m.
16         (Recess taken.)
17    THE LEGAL VIDEOGRAPHER:  We're back on the
18 video record at 12:24 p.m.
19 BY MS. CARNEY:
20    **Q.   Okay, Mr. Finnell --**
21    MS. CARNEY:  Nick, if we could go back up
22 to -- or if we could put back up his report, which I
23 believe is Exhibit 4.
24         Okay.  And then page 7 if you

Page 76

1 wouldn't mind.
2         Great.  All the way -- if we could go
3 back all the way to the bottom, the paragraph that
4 starts, The quantitative analysis.  Okay.
5 BY MS. CARNEY:
6    **Q.   Earlier in the day, Mr. Finnell, we**
7 **were talking about this 9 -- 19 -- sorry -- 1,973**
8 **allegation count number?  Do you remember that?**
9    A.   Yes.
10    **Q.   Okay.  And be -- can you remind me what**
11 **the allegation count is.**
12    MR. HILKE:  Go ahead.
13    THE WITNESS:  Yes.  The allegation count is --
14 that 1,973 represents the total number of
15 allegations that were contained within the 323 CR
16 files.
17 BY MS. CARNEY:
18    **Q.   Okay.  And of those 1,973 allegation**
19 **counts, are those allegations made against Area**
20 **Five detectives only?**
21    MR. HILKE:  Objection to form.
22         You can answer.
23    THE WITNESS:  Those allegations are made
24 against all of the individuals that were a part of

Page 77

1 the 323 CR files.  There were 896 individual
2 investigations.  And I -- I don't know how many of
3 those 896 were not Area Five detectives but were
4 just officers that were a part of the CR connected
5 to an Area Five detective.
6 BY MS. CARNEY:
7    **Q.   Okay.  Do you note anywhere in your**
8 **report that this 19 -- 1,973 allegation count**
9 **includes persons other than detectives at Area Five?**
10    MR. HILKE:  Object to form.
11         You can answer.
12    THE WITNESS:  I -- I don't recall if there's
13 anything that specifically states -- states that
14 within the report.
15 BY MS. CARNEY:
16    **Q.   Is there anything in your report that**
17 **states that your analysis includes anybody other**
18 **than Area Five detectives?**
19    MR. HILKE:  Objection, form.
20    THE WITNESS:  Again, I don't recall if there's
21 anything that specifies that the analysis includes
22 officers in addition to Area Five detectives.  It's
23 just the data set is simply the information
24 contained in the 323 CRs.

Page 78

1  BY MS. CARNEY:
2      Q.  Okay.  Can I ask you what you're
3  reading off of?
4      A.  My report.
5      Q.  Okay.  What page of your report are you
6  looking at?
7      A.  I looked at page 7 and page 8 at that
8  time.
9      Q.  Okay.  And nowhere on page 7 or page 8
10 does it say that the analysis includes any other
11 type of sworn officer other than a detective; is
12 that correct?
13     MR. HILKE:  Ms. -- Ms. Carney, you'll give him
14 time to read both pages, yeah?
15     MS. CARNEY:  He's looking at it right now, so
16 he's the one that was reading it.
17     MR. HILKE:  Thank you.
18     THE WITNESS:  There's nothing that
19 specifically states that the analysis included
20 officers as opposed to detective.  It's just that it
21 included all the 323 complaint register files and
22 the 896 individual investigations during the period
23 of '91 to '95.
24         And the investigations selected all

Page 79

1  had a common point of including a detective.  So it
2  was an investigation, a CR that was selected because
3  it contained at least one allegation against an Area
4  Five detective.
5  BY MS. CARNEY:
6      Q.  Okay.  And so if you were -- what was
7  then the task that you were -- what was the task
8  that you were asked -- well, let me phrase it this
9  way.
10         What was the question that you were
11 asked to answer as it relates to -- sorry, let me
12 strike that.
13         You just testified that the
14 allegation count number, this 1,973 allegation
15 count is the total number of allegations contained
16 within the CR files; is that right?
17     A.  Contained within the data set of 323 CR
18 files, yes.
19     Q.  Okay.  So if the -- and those
20 allegations were coded by plaintiff's data team; is
21 that correct?
22     A.  Yes.
23     Q.  Okay.
24     A.  That is correct.

Page 80

1      Q.  If plaintiff's data team was taking the
2  time to break down the allegations and break down
3  the CRs into allegations, why were allegations
4  against officers not removed from the data set?
5      MR. HILKE:  Objection, form.
6         Go ahead.
7      THE WITNESS:  I'm not sure why the personnel
8  that were selected to gather the information from
9  the CRs and put them into the Excel data set did not
10 remove officers or -- or individuals.  I would not
11 expect them to remove any names from or any
12 information from the individual CRs.  I would not
13 expect them to add information.  I'd only expect
14 them to take the information from the CRs that were
15 provided and put that into a data set for later
16 analysis.
17         So I don't have an -- I don't even
18 know if that was something that was considered.  The
19 expectation would be to take the information that
20 was provided by CPD per the court order and input
21 that information into a process where we could
22 analyze it.
23 BY MS. CARNEY:
24     Q.  Okay.  But you were tasked with doing

Page 81

1  an analysis regarding Area Five detectives; isn't
2  that correct?
3      MR. HILKE:  Objection, form.
4         Go ahead.
5      THE WITNESS:  Well, actually, we were tasked
6  with reviewing the testimony, policies and reports,
7  the CRs, and other documentation that was provided
8  to render an opinion as to the City of Chicago's
9  policies, procedures, and practices as they related
10 to training supervision and discipline of officers
11 and their relationship to the disciplinary histories
12 and conduct of the defendant officers, and as -- as
13 that related to Mr. Sierra's case.
14         So the -- it was determined that the
15 data set we would analyze was from '91 to '95, and
16 it was centered on the Area Five detectives.  But if
17 other officers or supervisors were included in those
18 CRs, they would also be considered.  They were
19 part of -- they would have been part of whatever
20 incident prompted that CR.
21 BY MS. CARNEY:
22     Q.  Were you just reading from your report?
23     A.  The first part was from page 6.
24         The last part was -- no, I --

1 there's nothing -- I didn't read that.

2    Q.   Okay.  So is it your testimony now that
3 this report that you produced in Sierra is --
4 analyzed the disciplinary histories of all Chicago
5 police officers?

6    MR. HILKE:  Objection, form.

7       You can answer.

8    THE WITNESS:  No, I didn't say all Chicago
9 police officers.  It was the defendant officers.
10 We -- but we were looking at the system in which the
11 defendant officers were operating under within --
12 during 1991 to '95 and looking at the disciplinary
13 process during that time period.

14 BY MS. CARNEY:

15    Q.   Okay.  Do you know how many
16 non-detectives were included in the data -- the
17 allegation count of 9 -- 1,973?

18    MR. HILKE:  Objection, asked and answered.

19       Go ahead.

20    THE WITNESS:  No, I do not.  We didn't
21 disaggregate -- go through and disaggregate officers
22 versus supervisors versus detectives.

23 BY MS. CARNEY:

24    Q.   Okay.  In your career -- if I recall

1 correctly from your CV, at some point in your
2 career you worked at IPRA; is that right?

3    A.   Yes, I did.

4    Q.   Okay.  And when you were at IPRA, did
5 you have an opportunity to kind of learn how CPD
6 operated as it relates to the different units of
7 the department?

8    MR. HILKE:  Objection, form.

9       You can answer.

10    THE WITNESS:  I mean, I understood there to be
11 different units, but I'm not sure of what you're
12 asking when you say how they operated.  But yeah, I
13 knew there were different units in different areas.

14 BY MS. CARNEY:

15    Q.   Okay.  So for example, there were
16 detective units within CPD, right?

17    A.   Correct, yes.

18    Q.   Okay.  And there were patrol officers
19 within CPD, right?

20    A.   Yes, correct.

21    Q.   Okay.  And there were narcotics
22 officers within CPD?

23    A.   Correct.

24    Q.   Okay.  And there were TAC teams within

1 CPD.

2    A.   That is correct.

3    Q.   Okay.  And do you have an understanding
4 from your time at IPRA that those particular units
5 had different tasks and responsibilities?

6    MR. HILKE:  Objection, form, but go ahead.

7    THE WITNESS:  Well, yeah, I do have that
8 understanding, as well as personal experience having
9 been a police officer, that different units are
10 tasked with different responsibilities.

11       But oftentimes -- well, almost --
12 many of the times, if not most of the times, units
13 work with other units to carry out their task.
14 They'll have -- detectives will have members from
15 patrol assist on a warrant service, or they may have
16 a tactical unit or a SWAT team serve a warrant, or
17 patrol may be out and stop a subject that's wanted
18 by a detective.

19       And -- and so they -- they work
20 together.  They don't work in a vacuum.  None of
21 these units work in a vacuum.

22 BY MS. CARNEY:

23    Q.   Right, and I guess that's not my
24 question.

1       But my question is more that:  You
2 understand that the different units have, whether
3 or not they work together or not, different
4 responsibilities within the department; is that
5 correct?

6    MR. HILKE:  Objection, form.

7       Go ahead.

8    THE WITNESS:  Well, yes, they have different
9 responsibilities, but ultimately, they're all law
10 enforcement, all police officers.

11       So maybe in their day-to-day duties,
12 they will do specific tasks, but overall, at any
13 time, they may be tasked with working with someone
14 from a different unit or -- or end up working with
15 someone from a different unit just because of the
16 circumstances that arise.

17 BY MS. CARNEY:

18    Q.   Is it fair to say that some units are
19 more forward facing with the general public than
20 others?

21    A.   Yes, that's -- that's fair to say.

22    Q.   Okay.  And do you have -- when you were
23 working at IPRA, did you notice a difference
24 between the types of CRs that, say, a patrol

Page 86

1 officer would get versus a narcotics officer?
2      MR. HILKE: Objection, form, incomplete
3 hypothetical.
4           You can answer.
5      THE WITNESS: I mean, that's -- I can't recall
6 specifically of what trends or patterns. But just a
7 general experience having been in law enforcement
8 and been in supervision, I know that certain types
9 of CRs or certain types of complaints kind of go
10 hand in hand with certain units.
11 BY MS. CARNEY:
12     Q.   Okay. And is that the same for the
13 num -- like the amounts of complaints that certain
14 units get versus a different unit?
15     MR. HILKE: Objection, form, incomplete
16 hypothetical.
17           Go ahead.
18     THE WITNESS: I -- I don't necessarily think
19 that because you're in a certain unit, you're prone
20 to get more complaints than in another unit.
21           I really believe that is -- is
22 dependent upon, No. 1, the officer, individual
23 officer's behavior; and then their supervision.
24           Clearly, sometimes, depending on

Page 87

1 where you work, you may get more complaints. But
2 it's not a given that just because, say, you work in
3 narcotics in a high crime area, you're going to have
4 more complaints than if you work as a patrol in a
5 more affluent area.
6           It just -- a lot -- there's too many
7 factors to say that that is a -- a given that you're
8 going to get more complaints.
9 BY MS. CARNEY:
10     Q.   So is it your testimony that a patrol
11 officer on desk duty is comparable to a narcotics
12 officer who's on the street?
13     MR. HILKE: Objection, form, vague.
14           Go ahead.
15     THE WITNESS: When you say "comparable," what
16 do you mean?
17 BY MS. CARNEY:
18     Q.   Well, is it fair to compare the number
19 of CRs that a -- in order to determine trends in
20 an -- in order to determine trends, is it fair to
21 compare a narc -- a narcotics officer who's forward
22 facing and dealing with the public every day to a
23 patrol officer who is behind a desk?
24     MR. HILKE: Objection, form, incomplete

Page 88

1 hypothetical.
2           Go ahead.
3      THE WITNESS: I don't -- I don't think in this
4 instance we were making that comparison. I think we
5 were making the comparison of Area Five detectives.
6 And within those CRs, there may have been officers
7 who weren't a detective in Area Five but worked
8 another assignment that for whatever reason were
9 part of that -- part of that complaint at that time.
10           So you know, and if you're comparing
11 where an officer works versus their level of CRs
12 that they get are not -- I think you still need to
13 look at the individual officer and also the types of
14 CRs.
15           So there's many factors in making a
16 comparison to determine, you know, if there's a
17 problem or not.
18 BY MS. CARNEY:
19     Q.   That 100 percent did not answer my
20 question.
21           My question was: When you were
22 attempting to determine trends, like -- and analyze
23 the data, as you have done in this report, to draw
24 conclusions about the disciplinary system within

Page 89

1 the Chicago Police Department, would it be a fair
2 comparison to compare a narcotics officer who is
3 forward facing and with the public to a patrol
4 officer who is on desk duty?
5      MR. HILKE: Objection, form and incomplete
6 hypothetical.
7           Go ahead.
8      THE WITNESS: Well, again, I don't know what
9 you want to compare. If you're comparing the
10 outcome of -- if a desk duty officer gets a CR and a
11 narcotics officer gets a CR, then the comparison is
12 the outcome of the CR, not necessarily where they
13 work.
14           So I'm not sure what it is you are
15 trying to compare. Just because of where an officer
16 works doesn't preclude them from getting a CR.
17           And -- and what we were looking at
18 was the system, the process for accountability
19 and -- and how an officer that accumulated the CR,
20 whether it's 1 or 101, what was the outcome of those
21 CRs and how -- and then why was that officer -- how
22 was that officer addressed if those CRs were
23 sustained.
24

Page 90

1 BY MS. CARNEY:
2      Q.    Okay.  So is it your testimony then
3 that the type of allegation made against a police
4 officer doesn't matter?
5      MR. HILKE:  Objection, form.
6           Go ahead.
7      THE WITNESS:  I don't think I said that.  I
8 think I said where the officer works, whether they
9 get a CR, and how it's addressed.
10          I mean, obviously how a -- the type
11 of -- what the -- what the allegation or misconduct,
12 alleged misconduct is does matter.  If it's -- I
13 mean, that's another factor to consider.  It's not
14 just one or the other.  There's many factors to look
15 at when you're comparing and looking at and
16 analyzing CRs to see what a system and how a system
17 functions and if it's accountable or not.
18 BY MS. CARNEY:
19      Q.    Okay.  I really have -- don't
20 understand how that answered my question, but I
21 will move on.
22          You were -- let me back up.
23          In this report, you are purporting
24 to opine about the disciplinary procedures of the

Page 91

1 Chicago Police Department and how they impacted the
2 conduct of the defendant officers; is that correct?
3      MR. HILKE:  Objection, form.
4           You can answer.
5      THE WITNESS:  Yeah.  How -- basically how the
6 disciplinary process could permit an officer to --
7 to commit these alleged violations and continue to
8 commit them.
9           And not just this officer, but how
10 did the process address officers with similar
11 complaints, or how did it address, you know, other
12 complaints that would rise to the level of violating
13 an individual's constitutional rights.
14 BY MS. CARNEY:
15      Q.    Okay.  And based on your report, that
16 analysis includes the number of complaints against
17 a particular detective; in particular, the
18 defendant officers in this case, right?
19      A.    Yes, it does.
20      Q.    Okay.  So when analyzing the defendant
21 detectives in this case and the number of
22 complaints that they received, shouldn't you
23 have -- isn't it as a -- in order to get an
24 accurate data set, you should be comparing the

Page 92

1 num -- the CRs that these detectives received to
2 the numbers of CRs other detectives received in the
3 same area during the same time frame; isn't that
4 correct?
5      MR. HILKE:  Objection, form.
6           You can answer.
7      THE WITNESS:  That's what we compared.  The --
8 the detectives from Area Five from '91 to '95 and
9 the CRs that they compiled during that time period.
10 BY MS. CARNEY:
11      Q.    Okay.  But you just testified that the
12 numbers that you used throughout this report,
13 specifically the allegation count of 1,973,
14 includes an unknown amount of patrol officers or
15 officers that were not detectives; isn't that
16 correct?
17      MR. HILKE:  Object --
18           (Simultaneous cross-talk.)
19      THE WITNESS:  They were included in that
20 process.
21 BY MS. CARNEY:
22      Q.    Okay.  So if you're comparing the
23 number of allegations that these detectives
24 received to the number of allegations that

Page 93

1 unrelated patrol officers received from other
2 districts, aren't you comparing apples to oranges?
3      MR. HILKE:  Objection, form, misstates his
4 testimony.
5           Go ahead.
6      THE WITNESS:  No.  We're comparing the data
7 that was provided by CPD per the court order.  CPD
8 compiled the data with the understanding that they
9 needed to compile complaint registers for Area Five
10 detectives between '91 and '95.
11          So they provided the data, and we
12 analyzed the data they provided.
13 BY MS. CARNEY:
14      Q.    Right.
15          But plaintiff's legal team is the
16 one that analyzed the data, correct?
17      MR. HILKE:  Objection, form.
18 BY MS. CARNEY:
19      Q.    I'm sorry.  Plaintiff's legal team is
20 the one that distilled the data into the
21 spreadsheet that you analyzed; isn't that correct?
22      A.    Yes.  They put the data in the -- they
23 put the data from the CRs that were provided by
24 City of Chicago into the spreadsheet.

Page 94

1    Q.   Okay.  So plaintiff's data team and
2 legal team made a choice about what allegations to
3 include in the spreadsheet, which was then used for
4 you to create your analysis; isn't that correct?
5        MR. HILKE:  Objection, form, foundation,
6 misstates his testimony.
7        Go ahead.
8        THE WITNESS:  No, that's not correct.
9        Data -- the data that was put into
10 the spreadsheet came directly from the CRs.  There
11 was no choice or decision made as to what data from
12 the CRs were put into the -- the spreadsheet, other
13 than what categories needed to be covered, such as
14 findings, date of incident, date of initiation, date
15 complete, process that was -- whatever the results
16 and outcome of the appeals process and review
17 process.
18        But the information that was
19 contained in the CRs was just put in the Excel
20 spreadsheet.  There was no decision to put this or
21 that in there.  It was just taken directly from the
22 CRs.
23 BY MS. CARNEY:
24    Q.   And by taking the information from the

Page 95

1 323 CRs -- well, let me ask you this:  Whose
2 decision was it to distill the data from the
3 323 CRs into 896 individual investigations and
4 1,973 allegation counts?
5        MR. HILKE:  Objection, form and foundation.
6        Go ahead.
7        THE WITNESS:  Once the 323 complaint register
8 files were placed -- and their -- their
9 information contained in each were placed in the
10 Excel spreadsheet, when you look at the spreadsheet
11 after it's all been broken down, that's where you
12 get the 896 individual investigations and the
13 1,973 individual allegations or allegation counts.
14        There's no -- there was no decision.
15 That was the information that was contained within
16 each individual CR, so it was just put into a
17 spreadsheet for analysis.
18 BY MS. CARNEY:
19    Q.   Okay.  How does CPD calculate its data
20 as it relates to CRs?
21        MR. HILKE:  Objection, form and foundation.
22        Go ahead and answer.
23        THE WITNESS:  Yeah, I -- I don't know.  Are
24 you asking how they do it now, or how they did it in

Page 96

1 '95?
2 BY MS. CARNEY:
3    Q.   Well, your report purports to compare
4 numbers between -- compare data in 1991 through
5 1995.
6        So from 1991 through 1995, how did
7 CPD calculate the number of disciplinary complaints
8 made against police officers?
9        MR. HILKE:  Objection, form and foundation.
10        Go ahead.
11        THE WITNESS:  I'd have to look back at the
12 annual report to show what -- how they list it, but
13 I mean, they have -- they had a process of how they
14 reported out to the public, and that's all I could
15 go on as to how they would calculate complaints.
16        So you know, if they said they had
17 323 complaint registers and that was in their annual
18 report -- and I know it's more than that, but I'm
19 just saying if they used that number, then I guess I
20 could say that that's how they calculate it.
21        But we -- we calculate it by the
22 allegations and not just by the CRs.
23 BY MS. CARNEY:
24    Q.   Okay.  So I guess that's my question.

Page 97

1        Does CPD calculate by allegations or
2 by CRs?
3        MR. HILKE:  Objection, form and foundation.
4        Go ahead.
5        THE WITNESS:  As I sit here now, I'd have to
6 look at the annual reports to give you the
7 specifics.  I mean, it's listed in the annual
8 reports.
9        It's not by allegations.  I believe
10 it's by investigations, but I'd have to look to be
11 certain.
12 BY MS. CARNEY:
13    Q.   And when -- okay.
14        So moving on through your report to
15 page 8, this paragraph here, Based on CPD annual
16 reports?  That paragraph?
17    A.   Uh-hmm.
18    Q.   It says, 2.1 percent of all
19 investigations reported by CPD in their annual
20 reports.
21        Do you see that?
22    A.   Yes.
23    Q.   Okay.  In the Rodriguez report, you --
24 and I can show you this if you -- if you want me to.

Page 98

1        In the Rodriguez report, this
2 sentence read: 2.1 percent of all allegations
3 reported by CPD.
4        Do you know why you made that change
5 between the Rodriguez report and the Sierra report?
6     MR. HILKE: Objection, form ... yeah.
7     THE WITNESS: Well, we talked about that in
8 the Rodriguez report. Unfortunately, I don't
9 remember all.
10        But I do believe that after -- after
11 completing the Rodriguez report, we -- we may have
12 realized that we were talking about investigations
13 and using the terms interchangeably. But I can't be
14 for sure without seeing the annual reports.
15 BY MS. CARNEY:
16     Q.   Okay. When you say "we," does that
17 include conversations with plaintiff's counsel, or
18 is that conversations between you and your
19 associates regarding your report?
20     MR. HILKE: I'll just instruct the witness not
21 to reveal conversations between him and his counsel
22 for the same reasons we discussed before.
23     THE WITNESS: Yes. It -- in this instance,
24 it's myself and my associates.

Page 99

1 BY MS. CARNEY:
2     Q.   Okay.
3     A.   I'll try to be clear when I say it's an
4 interaction between plaintiff's counsel and myself.
5     Q.   Got it. I appreciate that.
6        What is the purpose of the
7 2.1 percent? What does that mean in -- as a
8 statistical -- in a statistical sense?
9     MR. HILKE: Objection, form.
10     THE WITNESS: In -- this paragraph, that
11 2.1 percent is the percentage of investigations that
12 would have been attributed to Area Five detectives
13 between 1991 and 1995 out of the total reported
14 investigations reported by CPD in their annual
15 reports for the same time period.
16 BY MS. CARNEY:
17     Q.   Okay. And is 2.1 percent, does it have
18 a statistical significance?
19     MR. HILKE: Objection, form.
20     THE WITNESS: Other than to show what the
21 percentage of just taking the Area Five detectives
22 for that time period over the -- all of the CPD
23 during the same time period, which would include
24 officers, civilians, detectives, and command staff,

Page 100

1 and so forth, supervisors.
2 BY MS. CARNEY:
3     Q.   Okay. And then if this 4 thou --
4 42,520 number is not investigations but rather the
5 number of CRs initiated in that time period, does that
6 bring the percentage to .759 percent, does that
7 impact the statistical significance of the number
8 of CRs that you reviewed?
9     MR. HILKE: Objection, form, compound,
10 incomplete hypothetical.
11     THE WITNESS: It -- I guess I'm trying to
12 understand. What are you referencing?
13 BY MS. CARNEY:
14     Q.   All right. Well, let me back up.
15        So is there a re -- is it important
16 in your analysis that you had 2.1 percent of all
17 investigations included in your data set? Is there
18 a statistical significance to having 2.1 percent?
19     MR. HILKE: Objection, form.
20     THE WITNESS: Statistical ... did you say a
21 statistical ...
22 BY MS. CARNEY:
23     Q.   Significance.
24     A.   Significance.

Page 101

1     Q.   Can you tell me what page of your
2 report you're reading on?
3     A.   Well, I'm looking at page 8, and I'm
4 going to refer back to appendix A that's at the
5 bottom of that paragraph, the last sentence of that
6 paragraph.
7     Q.   Okay. Do you have notes on the page
8 that you're reading from?
9     A.   Yes. The note was to refer to --
10     MR. HILKE: Well, hey, sorry. Just same thing
11 as last time. You can testify as to whether or not
12 there are notes, but we're going to instruct you
13 to -- that the contents of the notes are not
14 disclosable under Rule 26 and constitute work
15 product. I'm sorry.
16 BY MS. CARNEY:
17     Q.   Mr. Finnell, can you answer my question
18 without reading the notes that are on -- your
19 handwritten notes that are on the page -- on page 8
20 of your report?
21     A.   You asked of the statistical
22 significance. And as I said before, my
23 understanding is to show -- simply to show the
24 percentage of investigations that were filed

Page 102

1 against Area Five detectives during the same '91 to
2 '95 time period in relation to the overall number
3 of investigations that were filed.
4     **Q.  Okay.  That doesn't answer my question**
5 **though.**
6         **Is the 2.1 per -- is there a certain**
7 **threshold that you needed to meet in order to say**
8 **that you reviewed a statistically significant**
9 **sample of CR files in order to come up with your**
10 **conclusions?**
11     MR. HILKE:  Objection, form.
12     THE WITNESS:  Okay.  So you're asking me now
13 about a threshold.  Is that for the entire report
14 or -- because I thought we were just talking about
15 the information within the annual reports and -- and
16 what was in that paragraph.
17 BY MS. CARNEY:
18     **Q.  Well, in order to -- do you understand**
19 **what it means to have a statistically significant**
20 **sample?**
21     A.  Well, yes, I do.  I understand that --
22     **Q.  What does that mean?**
23     A.  That you need to have a sample large
24 enough of whatever population that you are trying

Page 103

1 to render a decision on or to analyze to make a
2 determination as to what has -- what is occurring
3 or has occurred within that population.
4         So you need to have a large enough
5 sample that's representative of the overall total,
6 without necessarily having to analyze the entire
7 body of whatever that -- whatever that situation
8 may be.
9     **Q.  Okay.  And is the sample that you**
10 **received from CPD signif -- statistically**
11 **significant?  Is it large enough to render an**
12 **opinion on the whole of the CRs that -- that were**
13 **received?**
14     MR. HILKE:  Objection, compound.  Which of
15 those questions are you asking?
16     MS. CARNEY:  It's the same question, but I'll
17 ask it again.
18 BY MS. CARNEY:
19     **Q.  Did you receive a statistically**
20 **significant sample in order to render your opinions?**
21     MR. HILKE:  Objection, form, foundation.
22     THE WITNESS:  Yes.  It's our belief that that
23 was -- what we received from CPD per the court order
24 was a stat -- a statistically large enough sample to

Page 104

1 analyze for this -- for this matter.
2 BY MS. CARNEY:
3     **Q.  And what was your opinion that you**
4 **received a statistically significant sample based**
5 **on?**
6     A.  The -- the -- it's based on what the
7 court order directed and what was provided by CPD.
8         Ms. Meza, as you know, is the one
9 that pro -- produces the statistical analysis and
10 determined that statistically the data that we
11 received was sufficient to render an opinion based
12 on CPD's actions.
13     **Q.  This court order that you keep**
14 **referring to, did it include a percentage of files**
15 **that needed to be -- or did it include a percentage**
16 **that would be statistically significant?**
17     A.  I'd have to review it.  I don't recall
18 one way or the other.  I'd have to review it to see
19 what specifically is said outside of the time
20 period and Area Five detectives.
21     **Q.  Okay.  So sitting here today, you don't**
22 **know whether or not you have a statistically**
23 **significant sample in order to render your opinions**
24 **as to the whole of the Chicago Police Department**

Page 105

1 **disciplinary system?**
2     MR. HILKE:  Objection, form.
3         Go ahead.
4     THE WITNESS:  Like I said, I believe that we
5 do have a statistically large enough sample to
6 render an opinion to determine whether or not the --
7 the disciplinary process and disciplinary system
8 from '91 to '95 for CPD functioned properly.  And in
9 this case, you know, if it did not, what were the --
10 the deficiencies.
11 BY MS. CARNEY:
12     **Q.  And what -- what did you do in order to**
13 **establish that statistical significance?**
14     MR. HILKE:  Objection, form and foundation.
15     THE WITNESS:  As a -- as a practitioner of
16 oversight, I often have to rely on other
17 professionals, other experts.  And in this case,
18 Ms. Meza, who is our statistician, conducted that
19 research and determined that she had a significant
20 enough number of data points or data to analyze.
21 BY MS. CARNEY:
22     **Q.  What did --**
23     A.  From --
24     **Q.  -- Ms. Meza -- oh, sorry.**

Page 106

1    MR. HILKE: Hold -- hold on. Go ahead.
2    MS. CARNEY: Relax. He paused. I thought --
3        (Simultaneous cross-talk.)
4    MR. HILKE: I -- I know.
5    MS. CARNEY: -- he was done.
6    MR. HILKE: I know. Sorry, I appreciate that
7 you caught that.
8        Go ahead, Anthony.
9    THE WITNESS: And from -- what I was going to
10 say and from that, I would say I felt comfortable
11 that we had enough data to -- that I had enough data
12 to render a decision or render an opinion based on
13 her analysis.
14 BY MS. CARNEY:
15   Q.   Okay. And what did Ms. Meza do to
16 establish that the data that you had received was
17 statistically significant?
18   A.   She -- I'm not a statistician, so I --
19 I can't say specifically. I believe -- if I refer
20 back to appendix A, I believe she's put some
21 information in there.
22   Q.   Okay. Well, let's look at -- let's
23 actually look at appendix A.
24   MS. CARNEY: Nick, if you could go to

Page 107

1 page 123.
2        Perfect.
3 BY MS. CARNEY:
4    Q.   We're going to look at table 30.
5        CPD complaints documented in their
6 annual report, '91 through '95, and it says,
7 Complaint received count.
8        Do you see that there?
9    A.   Yes.
10   Q.   Okay. And this table was compiled by
11 Ms. Meza, right?
12   MR. HILKE: Ob -- well, go ahead.
13 BY MS. CARNEY:
14   Q.   Sorry. Was this -- who compiled this
15 table?
16   A.   This table was compiled using the data
17 from the annual reports. I believe Ms. Meza
18 compiled this table.
19   Q.   Okay. And it says specifically,
20 complaint received count, right?
21   A.   Yes.
22   Q.   Okay. It doesn't say investigations.
23   A.   Okay.
24   Q.   Is that right?

Page 108

1    A.   That's correct.
2    Q.   Okay. And it doesn't say allegations,
3 right?
4    A.   Correct.
5    Q.   Okay. So if the 42,520 number is the
6 number of complaints received by CPD --
7    MR. HILKE: Objection, form, foundation.
8    MS. CARNEY: Hold on. I wasn't --
9    MR. HILKE: I'm sorry. Thank you. Go ahead.
10   MS. CARNEY: I know. There's a lot of
11 pausing, I get it, but ...
12 BY MS. CARNEY:
13   Q.   So going back then to page 8 of your
14 report.
15   A.   Okay.
16   Q.   All right. So we're in that
17 highlighted paragraph there, perfect, that says
18 42,520, right? That number is the number we just
19 looked at from table 30, right?
20   MR. HILKE: Objection, form.
21       Go ahead.
22   THE WITNESS: Yes.
23 BY MS. CARNEY:
24   Q.   Okay. So that's the complaint received

Page 109

1 count, right?
2    MR. HILKE: Objection, form, foundation.
3        Go ahead.
4    THE WITNESS: Repeat that? I'm sorry.
5 BY MS. CARNEY:
6    Q.   Yeah.
7        So we just looked at table 30 that
8 said that the 42,520 was the complaint received
9 count, correct?
10   A.   Correct.
11   Q.   And that's the same number we're
12 looking at on page 8: 42,520.
13   MR. HILKE: Objection, form.
14       Go ahead.
15   THE WITNESS: Correct.
16 BY MS. CARNEY:
17   Q.   Okay. So that's not the investigations
18 received, right?
19   MR. HILKE: Objection, form.
20       Go ahead.
21   THE WITNESS: Those are the -- the 42,520 are
22 the -- they constitute the investigations which are
23 each of the CRs.
24

Page 110

BY MS. CARNEY:

2    Q.   Which is each individual CR, right?

3    A.   Correct.

4    MR. HILKE:  Objection --

5 BY MS. CARNEY:

6    Q.   Okay.

7    MR. HILKE:  -- to form.

8 BY MS. CARNEY:

9    Q.   So in order to get the percentage of

10 files that you reviewed, you actually should have

11 divided the 42,520 by the 323 CRs that you got,

12 right?

13    MR. HILKE:  Objection, form, foundation.

14    THE WITNESS:  I -- when I look at the

15 paragraph above and look at the -- the footnote, it

16 says:  Individual investigations are each of the CRs

17 per officer opened from 1991 to '95.

18    So we're counting -- so still that

19 goes to the officers and the -- and the CRs, so

20 42,520.

21    What you're asking is -- or what

22 you're stating is that it should be 323; is that

23 correct?

24

Page 111

1 BY MS. CARNEY:

2    Q.   Yeah, because you just testified that

3 the 42,520 is each individual CR, not each

4 individual officer that had a CR against them.

5    MR. HILKE:  Objection, form, misstates his

6 testimony.

7    THE WITNESS:  No, it wouldn't have been the

8 officer.  Let me look here.

9    Again, I'd have to go back to the

10 actual annual report to see what -- how they headed

11 that to get those numbers --

12 BY MS. CARNEY:

13    Q.   Okay.

14    A.   -- that are on table 30.

15    And -- and whatever -- we base our

16 information off of what CPD provided, both in the

17 data set and in their annual reports that they had

18 provided, that they had produced.

19    Q.   Okay, that's fair.

20    So just -- if the 42,520 number is,

21 as you just testified, each individual CR and we --

22 and that you received 323 CRs, so we take the 323,

23 that gets divided by the 42,520, and mult -- I

24 think then you multiply that by a hundred in order

Page 112

1 to get the percentage, it would be .759 percent.

2    If that's true, if my math is

3 correct and that's the correct numbers, apples to

4 apples, is .759 percent a statistically significant

5 sample in order to draw the conclusions that you're

6 drawing in this report?

7    MR. HILKE:  Objection, misstates his

8 testimony, foundation.

9    THE WITNESS:  Yeah.  Before I could answer

10 that, I -- I'd like to see the -- the annual reports

11 again.

12 BY MS. CARNEY:

13    Q.   And that's fine.  We can -- if we have

14 time, we can go back to the reports.  We spent a

15 lot of time on the reports before.

16    So my question is:  Just reading

17 your report as it's written and using your

18 testimony just now, if we were to take the --

19 divide -- if I were to tell you that the sample

20 size that you are -- if I were to represent to

21 you -- okay, fine.  Let me strike that.

22    Hypothetically speaking, if the

23 sample size that you reviewed was actually only

24 .759 percent, is that statistically significant?

Page 113

1    MR. HILKE:  Objection, form, foundation.

2    THE WITNESS:  And again, I'd like to see

3 the -- the annual reports before I could answer that

4 question.

5 BY MS. CARNEY:

6    Q.   But the -- my question doesn't --

7    (Simultaneous cross-talk.)

8    A.   Because --

9    Q.   -- have to do with the annual reports.

10 My question is a hypothetical.

11    If you --

12    (Simultaneous cross-talk.)

13    A.   Well, I --

14    Q.   -- taking out --

15    (Simultaneous cross-talk.)

16    A.   -- it's hard to --

17    Q.   Hold on, hold on, hold on.

18    MR. HILKE:  Wait, wait, I'm -- I'm sorry.  He

19 should get to finish and then --

20    MS. CARNEY:  He was --

21    MR. HILKE:  -- you can answer your question.

22 He wasn't finished.

23    MS. CARNEY:  I was already asking my question

24 before he started talking again, so I just -- I'm

Page 114

1 going to -- I'm not asking him a specific question
2 about annual reports. I'm not asking him a specific
3 question about data. I am right now asking a
4 hypothetical.
5 BY MS. CARNEY:
6     **Q. Is .759 percent a statistically**
7 **significant sample size: Yes or no?**
8     MR. HILKE: Objection, form, foundation.
9     THE WITNESS: I'm not comfortable answering a
10 hypothetical without specifics, and so that --
11 that -- you know, I just can't answer that question.
12 BY MS. CARNEY:
13    **Q. So you cannot, sitting here today, tell**
14 **me whether or not .759 percent is a sta --**
15 **statistically significant sample in order to render**
16 **opinions on the Chicago Police Department?**
17    MR. HILKE: Objection, form, incomplete
18 hypothetical.
19    THE WITNESS: Like I said, I can't answer that
20 without additional information and -- and making
21 sure that what is being compared is -- is actually
22 what has been stated in the hypothetical.
23 BY MS. CARNEY:
24    **Q. Well, why not? What other information**

Page 115

1 **do you need?**
2     MR. HILKE: Same objection.
3     Go ahead.
4     THE WITNESS: Well, until I look at the annual
5 reports, I -- I wouldn't know if there's additional
6 information I need. I don't know what other
7 information I would need to -- to address that
8 question.
9 BY MS. CARNEY:
10    **Q. But my hypothetical doesn't include**
11 **the -- okay.**
12        **Because you don't know what the**
13 **significance of the 2.1 percent is, do you?**
14    MR. HILKE: Objection, form.
15    Go ahead.
16    THE WITNESS: As I stated earlier is part of
17 what I do is rely on other professionals. And in
18 this instance, on Ms. Meza, who is the statistician,
19 to determine what is a significant percentage to
20 render an opinion.
21 BY MS. CARNEY:
22    **Q. Okay. And you're not a statistician,**
23 **right?**
24    A. No, I am not.

Page 116

1     **Q. I'm going to move on to page 29 of your**
2 **report.**
3        **Okay. So here we are on page 29.**
4 **The subheading is, The City of Chicago had a**
5 **Pattern and Practice of Fabricating Evidence.**
6        **Do you see that?**
7     A. Yes, I do.
8     **Q. Okay. Going down to the third**
9 **paragraph, do you see there it says in bold**
10 **letters: Error! Reference source not found?**
11    A. Yes, I do.
12    **Q. Okay. What happened there? What's**
13 **that?**
14    A. Should have been reference to table 1,
15 but I'm not sure why that printed that way.
16    **Q. How do you know that it should have**
17 **been referenced to table 1? Are you reading**
18 **something off your report?**
19    A. I made a notation on my report when I
20 found this error and made a notation that it should
21 have stated, See table 1.
22    **Q. Okay. So you wouldn't have been able**
23 **to answer that question without the handwritten**
24 **notes in front of you, right?**

Page 117

1     MR. HILKE: Objection, form.
2     THE WITNESS: It was part of the review of the
3 report process, so I would have had to -- without
4 making a notation here, I would have had to go on
5 onto the next page to determine where -- where this
6 should go based on this paragraph.
7        But it was just -- it was just an
8 oversight of not catching it before the final print
9 was done.
10 BY MS. CARNEY:
11    **Q. Right.**
12        **And you had to use that note in**
13 **order to answer my question in this deposition,**
14 **right?**
15    MR. HILKE: Objection, form.
16    THE WITNESS: I don't understand "use the
17 note." I made the note. In that -- in that place,
18 there's lots of information that I've needed to
19 retain, and so I've just made a quick note so that
20 it would be there.
21 BY MS. CARNEY:
22    **Q. Moving down into the next paragraph, it**
23 **says: A federal survey found that 8 percent of the**
24 **use of force complaints received by large state and**

Page 118

1 local law enforcement agencies in 2002 were
2 sustained.
3         Do you see that?
4    A.  Yes, I do.
5    Q.  Okay.  Oh, actually, let me back up one
6 second.
7         Do you know who wrote, Error,
8 reference source not found?
9    MR. HILKE:  Objection, form, foundation, and
10 I'm going to instruct you not to answer questions
11 that -- this question is calling for information
12 protected by Rule 26 and as work product.
13 BY MS. CARNEY:
14    Q.  Are you going to take your attorney's
15 advice?
16    A.  Yes, I'll take my attorney's advice and
17 not answer the question.
18    Q.  Okay.  Do you know if your report has
19 any formulas included in it?
20    MR. HILKE:  Objection, form.
21         You can answer.
22    THE WITNESS:  Formulas as far as what?  For
23 calculations or --
24

Page 119

1 BY MS. CARNEY:
2    Q.  You're right.  That was a bad question.
3         Formulas -- well, let me back up.
4         Does your report use any of the Word
5 document's functions in order to -- for citations
6 and -- sorry, that was a bad question.
7         Does your report use any of
8 Word's -- Microsoft Word's tabulation functions or
9 citation functions?
10    MR. HILKE:  I'm going to instruct Mr. Finnell
11 not to answer that as calling for information not
12 subject to disclosure under Rule 26 and seeking work
13 product information.
14 BY MS. CARNEY:
15    Q.  Are you going to take your attorney's
16 advice?
17    A.  Yes, I am.
18    Q.  Okay.  So we'll go back down to the
19 paragraph regarding the federal survey.
20         A federal survey found that
21 8 percent of use of force complaints received by
22 large state and local law enforcement agencies were
23 sustained.
24         Do you see that?

Page 120

1    A.  Yes, I do.
2    Q.  Okay.  And that cites to a Huffington
3 Post article I think is the footnote there, right?
4    A.  That is correct.
5    Q.  Okay.  Would you consider news -- news
6 articles an unbiased source of information?
7    MR. HILKE:  Objection, form.
8    THE WITNESS:  Not necessarily unbiased, but it
9 depends on what the article discusses.  It depends
10 on the -- the publication and what the article
11 discusses.
12 BY MS. CARNEY:
13    Q.  Okay.  The next line says:  In June --
14 in the June 10, 2020, Washington Post article,
15 Police unions and police misconduct:  What the
16 research says about the connection, about 7 percent
17 of complaints of officer misconduct for unionized
18 police agencies were sustained.
19         Do you see that?
20    A.  Yes.
21    Q.  Okay.  That 7 percent number, was that
22 all complaints of officer misconduct, or just use
23 of force complaints?
24    A.  I believe that 7 percent was all

Page 121

1 complaints.  I'd have to go back specifically to
2 the article, but I don't believe it was simply use
3 of force.
4    Q.  Okay.  The next paragraph said:  By
5 comparison, the 1991 through 1995 data set revealed
6 lower rates of sustained allegations for CPD
7 officers after investigation for all types of
8 complaints, the sustained -- and then it goes on to
9 say:  The sustained rate for complaints of
10 fabricated statements and evidence was just
11 7.7 percent after investigation.
12         Do you see that?
13    A.  Yes.
14    Q.  Okay.  The sustained rate for
15 complaints of false arrest was 4.1 percent after
16 investigation.
17         Do you see that?
18    A.  Yes.
19    Q.  And the sustained rate for the
20 excessive force complaints was 3 percent after
21 investigation.
22         Do you see that?
23    A.  Yes.
24    Q.  Okay.  And then it says:  The sustained

Page 122

1  rates for these categories were well below the
2  national average.
3         Do you see that?
4  A.  Yes, I do.
5     Q.   Okay.  And the national average that
6  you're citing to in that is the US Department of
7  Justice, Bureau of Statistics report from June of
8  2026 -- or 2006, right?
9  A.  Correct.
10    Q.   Okay.  So if we pull that up, which I
11 believe is Exhibit 5.
12         (Deposition Exhibit No. 5,
13          Witness Finnell, was marked for
14          identification 01/13/2023.)
15 BY MS. CARNEY:
16    Q.   First paragraph there, it says:  Large
17 State and local law enforcement agencies -- those
18 with 100 or more sworn officers -- received more
19 than 2 -- 26,000 citizen complaints about officer
20 use of force during 2002, right?
21 A.  Correct.
22    Q.   Okay.  And then two paragraphs down:
23 Among these complaints having a final disposition
24 at the time of the data collection, about 8 percent

Page 123

1  were sustained, right?
2  A.  Correct.
3     Q.   So this 8 percent national average that
4  you're citing to here from footnote 88 is in
5  regards to use of force complaints only, right?
6  A.   Use of force complaints that were --
7  that originated from the citizens or externally
8  from the organization.  Not just simply use of
9  force complaints for an agency.
10    Q.   Okay.  But this 8 percent is not
11 talking about false arrests, right?
12 A.   No.  It's just use of force.
13    Q.   Okay.  And it's not talking about
14 fabricated statements, right?
15 A.   No, it's not.
16    Q.   Okay.  And then if you go to page 3,
17 table 3 here says:  Complaint dispositions in large
18 law enforcements agencies, by number of full-time
19 sworn officers.
20         Do you see that?
21 A.  Yes.
22    Q.   Okay.  And then full-time sworn
23 officers, a thousand or more, had a sustained rate
24 of 6 percent.

Page 124

1         Do you see that?
2  A.   Correct.
3     Q.   Okay.  Do you know how many sworn
4  officers were in the Chicago Police Department
5  between '91 and '95?
6  A.   No, I do not.
7     Q.   Do you know if it was more than a
8  thousand?
9  A.   Yes, I'm pretty sure it was more than a
10 thousand.
11    Q.   Okay.  So using the average for
12 sworn -- complaint dispositions in large law
13 enforcement agencies -- for large law enforcement
14 agencies of a thousand or more, which CPD would be
15 a part of, the sustained rate for use of force
16 complaints was on average 6 percent, right?
17    MR. HILKE:  Objection, form.
18    THE WITNESS:  Yes.
19 BY MS. CARNEY:
20    Q.   Okay.  And then the next page has a
21 para -- a little box on the side, Limitations of
22 complaint data.
23         Citizen complaint data must be
24 interpreted with caution.  Difference in how

Page 125

1  agencies receive, process, and record complaints
2  can account for differences in the volume and rate
3  for complaints across agencies.  Likewise, the
4  citizen's decision whether to file a complaint may
5  be influenced by both citizen and agency
6  characteristics, and other factors.
7         Do you see that?
8  A.   Yes, I do.
9     Q.   Do you agree with the fact that
10 complaint data must be interpreted with caution?
11    MR. HILKE:  Objection, form.
12    THE WITNESS:  I believe that agencies all
13 collect data differently, have different collection
14 mechanisms, so it does make it difficult to
15 sometimes compare between one agency and another.
16         I think you have to look at -- at the
17 data and then take into consideration how the agency
18 defines, say, use of force data versus another
19 agency's use of force, and then just work with their
20 numbers.
21         So I guess that is using some
22 caution, but it's an understanding that there's no
23 standardized data collection at this time for this
24 type of data.

Page 126

1 BY MS. CARNEY:
2    Q.   Okay.  And then this article --
3    MS. CARNEY:  Nick, sorry, if we could go back
4 to the first page.
5 BY MS. CARNEY:
6    Q.   This is the Bureau of Justice
7 Statistics Special Report, and it was written by
8 Matthew J. Hickman, right?  He was a BJS
9 statistician.
10   A.   Yeah, I see it.
11   Q.   Okay.  Are you aware that Mr. Hickman
12 wrote a follow-up to this report on the same data
13 and subject matter that was published in 2016?
14   MR. HILKE:  Objection, form, foundation.
15   THE WITNESS:  Yes, I am aware that he wrote --
16 BY MS. CARNEY:
17   Q.   Okay.
18   A.   -- wrote something else.
19   Q.   Okay.
20   MS. CARNEY:  If we could pull that up, Nick?
21 It's Exhibit 6.
22        (Deposition Exhibit No. 6,
23         Witness Finnell, was marked for
24         identification 01/13/2023.)

Page 127

1 BY MS. CARNEY:
2    Q.   All right.  So this is called, National
3 Data on Citizen Complaints About Police Use of
4 Force:  Data Quality Concerns and the Potential
5 (Mis)Use of Statistical Evidence to Address Police
6 Agency Conduct.
7        Do you see that?
8    A.   Yes.
9    Q.   All right.  And it's written by
10 Matthew J. Hickman, who we just saw was the
11 statistician who wrote the Bureau of Justice
12 Statistics Report?
13   A.   Uh-hmm.
14   MR. HILKE:  Objection, form.
15        Go ahead.
16   THE WITNESS:  Yes, I see it.
17 BY MS. CARNEY:
18   Q.   Okay.  And this was published --
19        (Simultaneous cross-talk.)
20   Q.   Sorry, are you okay?
21   A.   Yes.
22   Q.   Okay.  This was published in 2016.
23        And just looking at the abstract,
24 starting with, it says, This study -- well, let's

Page 128

1 read the whole thing.
2        National data on citizen complaints
3 about police use of force were collected by the
4 Bureau of Justice Statistics in 20 -- 2003 and
5 2007.  These data are crit -- are a critical
6 component of the Department of Justice's overall
7 response to 42 USC 14142, which requires the
8 Attorney General to "acquire data about the use of
9 excessive force by law enforcement officers."  The
10 BJS data have the potential to help support
11 democratic policing, provide baseline data and --
12 on use of force for comparative statistical
13 reporting and research purposes, and enable strong
14 local checks on police abuses, provided their
15 validity and re -- reliability can be demonstrated.
16 This study sought to assess the -- the validity and
17 reliability of the BJ -- BJS data.  Findings
18 indicate that the BJS data suffer from serious
19 measurement flaws, do not provide a valid and
20 reliable basis for comparative statistical
21 reporting and research purposes, and should not be
22 relied on for purposes of litigation.
23        Do you see that?
24   A.   Yes, I see it.

Page 129

1    Q.   Okay.  Did you take this into account
2 when citing that initial BJS statistic for a
3 purported national average for use of excessive
4 force?
5    MR. HILKE:  Objection to form.
6    THE WITNESS:  Go ahead.
7    MR. HILKE:  No, you go ahead.
8    THE WITNESS:  There were portions of this, and
9 I explained earlier, concerning the standardized --
10 lack of standardization for the collection of data
11 across different agencies.
12        But to discard the -- the overall
13 concept of whether -- whether CPD sustained rate was
14 sufficient or on par with other agencies, no, I did
15 not.
16 BY MS. CARNEY:
17   Q.   If we go to page 460 at the top.
18        In -- in talking about the data
19 regarding citizen complaints, the office write:
20 One of the challenges in synthesizing this
21 literature is that police complaint processes are
22 somewhat idiosyncratic, owing to different intake
23 processes, unique codes of conduct, varying types
24 and layers of decision-making processes, different

Page 130

1 degrees of internal and external review, and
2 differing policies and procedures, some of which
3 are negotiated with collective bargaining units.
4        Do you see that?
5 A. Yes, I do.
6    Q. Okay. And that's kind of what you were
7 talking about before, right? There's different
8 ways of co -- there's different intake processes in
9 different departments, depending on the size, right?
10    MR. HILKE: Objection, form.
11        Go ahead.
12    THE WITNESS: Well, yeah, not just size. Just
13 they're different departments.
14 BY MS. CARNEY:
15    Q. Okay. Every department is a little bit
16 different, right?
17    MR. HILKE: Objection, form.
18    THE WITNESS: Yes. There's differences, yes.
19 BY MS. CARNEY:
20    Q. Okay. And then last quote, page 474.
21        The second line in says in
22 particular, The City of Chicago recently
23 experienced a wave of litigation in this style
24 using BJS complaints data, where it was argued that

Page 131

1 their complaint sustain rate was lower than
2 baseline in the BJS data, the City was not
3 adequately policing itself, and this contributed to
4 an environment in which officers acted with
5 impunity. The present study shows that BJS data do
6 not provide a valid and reliable basis for this
7 kind of comparative analysis.
8        Do you see that?
9    MR. HILKE: Objection. Just for the record,
10 "in particular" isn't part of the quote.
11        You can answer.
12    THE WITNESS: Yes, I see -- I see that.
13 BY MS. CARNEY:
14    Q. Okay. Did you take the -- it into
15 account at all that the author of the BJS study
16 that you cite for your national average came out
17 and said that it does not provide real -- valid and
18 reliable basis for the analysis that you did?
19    MR. HILKE: Objection, form, foundation.
20    THE WITNESS: No, because we did not just rely
21 solely on the BA -- BJS data. We relied on CPD's
22 own data and other -- the other materials that we
23 had reviewed.
24        This was just one component of -- of

Page 132

1 it, and we acknowledge that there was some -- there
2 are some concerns with standardization. But you
3 know, when -- when you're looking across the board
4 at all departments, not just large departments,
5 collectively there's an issue.
6        And so when you look at the data that
7 we were provided for CPD, we could see in just
8 looking at what CPD does that whether it's
9 8 percent or not, it's still -- there's still a
10 problem there.
11        So no, we didn't just discount this
12 based on this statement.
13 BY MS. CARNEY:
14    Q. So if the BJS data is -- if the authors
15 of the BJS study are saying that their data does
16 not provide a valid or reliable basis for
17 comparative analysis, what are you comparing the
18 CPD sustained rates to in order to determine -- in
19 order to come up with your opinion in this report?
20    MR. HILKE: Objection --
21        (Simultaneous cross-talk.)
22    MR. HILKE: Wait, wait, wait. Objection,
23 form, foundation.
24    THE WITNESS: We looked at other cities, such

Page 133

1 as Seattle, that -- and looked at their data. I
2 mean, looked at their -- their -- what they reported
3 as far as their sustained rates.
4        I -- you know, I've worked in
5 Oakland, and I -- I had an understanding of what
6 their sustained rates are. And I know those
7 departments are smaller, but when you're looking at
8 systems and you're looking at the process, that's
9 part of what we were tasked to determine, if CPD had
10 an effective process and effective systems.
11        So again, this was one -- one part
12 and the BJS -- in my opinion, the BJS studies is
13 saying that because of the lack of standardization
14 in collection process, you can't use this data
15 necessarily for research. But again, agencies
16 report their information. And based on what they
17 self-report is what you -- what we can analyze.
18        So I analyzed what -- what we had
19 and -- and that information to compare to what
20 CPD provided and what the analysis showed.
21 BY MS. CARNEY:
22    Q. What was the sustained rate for CRs or
23 complaints against police officers -- I'm sorry.
24        What was the sustained rate for

Page 134

1 detectives in the Seattle Police Department from
2 1991 through 1995?
3      MR. HILKE: Objection, form.
4      THE WITNESS: I don't have that information in
5 front of me.
6 BY MS. CARNEY:
7      Q.  Is that information contained in your
8 report?
9      A.  I don't believe for '91 to '95, no.
10      Q.  Okay. What was the sustained rate for
11 detectives in Oakland from 1991 through 1995?
12      MR. HILKE: Objection, form.
13      THE WITNESS: Yeah, I don't have that
14 information in front of me.
15 BY MS. CARNEY:
16      Q.  Okay. Is that contained in your report?
17      A.  No.
18      Q.  Okay. What's the sustained rate --
19 what size is the Seattle Police Department?
20      MR. HILKE: Objection, form, foundation.
21      THE WITNESS: It's over a thousand. I'm not
22 sure of the exact number.
23 BY MS. CARNEY:
24      Q.  Do you know how many detectives are in

Page 135

1 the Seattle Police Department?
2      MR. HILKE: Objection, form, foundation.
3      THE WITNESS: No, I do not.
4 BY MS. CARNEY:
5      Q.  Do you know how many -- how many sworn
6 officers were in the Seattle Police Department from
7 '91 through '95?
8      A.  No, I do not.
9      Q.  Do you know how many detectives were in
10 the Seattle Police Department from '91 through '95?
11      A.  No, I do not.
12      Q.  What about Oakland? How many police
13 officers does Oakland have?
14      MR. HILKE: Objection, form, foundation.
15      THE WITNESS: I'm not sure.
16 BY MS. CARNEY:
17      Q.  Is it over a thousand?
18      MR. HILKE: Objection, form, foundation.
19      THE WITNESS: I -- I don't know at this time
20 if it's over --
21 BY MS. CARNEY:
22      Q.  How many detectives does Oakland have?
23      MR. HILKE: Objection, form foundation.
24      THE WITNESS: I do not know.

Page 136

1 BY MS. CARNEY:
2      Q.  Okay. How many sworn police officers
3 did Oakland have from 1991 through 1995?
4      A.  I'm not sure.
5      Q.  And how many detectives did Oakland
6 have from 1991 through 1995?
7      A.  I'm not sure.
8      Q.  Okay. Going back to the report,
9 page 30.
10      MR. HILKE: Before you ask your next question,
11 when you get to a good point, could we take a
12 comfort break?
13      MS. CARNEY: Yeah. We can actually do that
14 now. That's fine.
15      MR. HILKE: Now would be nice.
16      MS. CARNEY: Not a problem. I'm going to say
17 10 minutes just because my -- it takes me a minute
18 to walk.
19      MR. HILKE: Thanks.
20      THE LEGAL VIDEOGRAPHER: Okay. We're off the
21 video record at 1:44 p.m.
22          (Recess taken.)
23      THE LEGAL VIDEOGRAPHER: We are back on the
24 video record at 2:02 p.m.

Page 137

1 BY MS. CARNEY:
2      Q.  Okay. Mr. Finnell, I'm going to show
3 you --
4      MS. CARNEY: Nick, I'll do this one because I
5 didn't send it out.
6          But, Wally, it's the order, the
7 Sierra order, document 154. I can send it right now
8 if you need it, but it's one --
9      MR. TROTTA: I think --
10      MS. CARNEY: -- that's in the list of
11 materials from you.
12      MR. TROTTA: -- they just sent it over. They
13 just sent us over a bunch.
14      MR. HILKE: If you give me one sec, I can find
15 it. Just give me one sec to get my own copy going.
16      MS. CARNEY: I'll put it up too.
17      MS. GOLDEN: I think it is in the group that
18 just went out.
19      MS. CARNEY: Oh, I don't have my email open,
20 so if another group went out, I --
21      MS. GOLDEN: Yeah. I think if you're looking
22 at -- if you're looking at docket 154?
23      MS. CARNEY: Yeah, but that's okay, because
24 I'm -- okay.

1    MR. HILKE: Okay, yeah, I've got it.

2    MS. CARNEY: Okay, great. What did I end on?

3 What have we marked so far?

4    MS. GOLDEN: I think you're on 7.

5    MS. CARNEY: Okay. So can we mark this as

6 Exhibit 8 -- sorry -- Exhibit 7?

7         (Deposition Exhibit No. 7,

8          Witness Finnell, was marked for

9          identification 01/13/2023.)

10 BY MS. CARNEY:

11   **Q.   Okay. Sorry about that, Mr. Finnell.**

12   **Mr. Finnell, throughout the**

13 **deposition, we've been talking a lot about a court**

14 **order that you've been relying on as it relates to**

15 **the data set that was produced by CPD.**

16        **And so I'm showing you what I've**

17 **marked as Exhibit 7, which is document 154, Thomas**

18 **Sierra versus Reynaldo Guevara. It's an order**

19 **entered by Judge Weisman on December 3, 2019. And**

20 **this is one of the documents that's listed on your**

21 **materials reviewed.**

22        **Do you recognize this document?**

23 A.   Yes, I do.

24   **Q.   Okay. And this is the order that you**

1 have been relying on for the proposition about what

2 the City was ordered to produce, right?

3 A.   Correct.

4   **Q.   Okay. So if we scroll down to the**

5 **bottom here and I've highlighted it here.**

6        **And it says: The Court believes the**

7 **production of all CRs opened between 1991 through**

8 **1995 against Area Five detectives strikes the right**

9 **balance between plaintiff's need for Monell**

10 **evidence and the burden -- the burden production of**

11 **that evidence imposes on the City.**

12        **Do you see that?**

13 A.   Yes, I do.

14   **Q.   Okay.**

15   MR. HILKE: I'm sorry, Ms. Carney. Could we

16 zoom in a little bit, please?

17   MS. CARNEY: Yeah.

18   MR. HILKE: Thank you.

19 BY MS. CARNEY:

20   **Q.   So the court order, specifically CRs**

21 **open, so that's the same as initiated, right?**

22   MR. HILKE: Objection, form.

23        Go ahead.

24   THE WITNESS: Yes, I would agree.

1 BY MS. CARNEY:

2   **Q.   Okay. Against Area Five detectives,**

3 **right?**

4 A.   Correct.

5   **Q.   From 1991 through 1995.**

6 A.   Correct.

7   **Q.   Okay. So based on this order, the**

8 **courts -- so then let's go back to --**

9   MS. CARNEY: Nick, if I could have you bring

10 the report back up, which is Exhibit 4, please.

11        And we're going to start at page 30.

12 BY MS. CARNEY:

13   **Q.   Okay. So table 1 here -- actually, let**

14 me just back up a second.

15        **Starting here on page 30 and**

16 **throughout the rest of this report, there's**

17 **different tables and graphs and things included,**

18 **right?**

19 A.   Yes.

20   **Q.   Okay. And based on your testimony,**

21 **it's my understanding that Ms. Meza is the one who**

22 **did the analysis and created these tables; is that**

23 **accurate?**

24   MR. HILKE: Objection, form, and to the extent

1 that the question asks about drafting processes as

2 opposed to summation of information, I'll instruct

3 Mr. Finnell not to answer under

4 Rule 26 and as goes to work product.

5 BY MS. CARNEY:

6   **Q.   I guess I -- Mr. Finnell, do you --**

7   MS. CARNEY: I guess I don't understand your

8 ob -- your objection, Wally. Are you objecting to

9 him telling me who created this table?

10   MR. HILKE: I'm -- I mean, it's the same

11 objection as was made at the Rodriguez deposition

12 where I think the line we drew there was as between

13 like the process in which -- whereas the drafting

14 piece is what I'm instructing him not to answer.

15 The rest of it is fine. That's my instruction to

16 him.

17        You can answer, Mr. Finnell.

18   THE WITNESS: Okay. So please repeat the

19 question. I'm confused.

20 BY MS. CARNEY:

21   **Q.   Yeah. So I guess I'm trying to**

22 **streamline this a little bit so we don't have to go**

23 **table by table, but I will if we have to.**

24        **The tables and graphs that are**

Page 142

1 included in your report starting at page 30, who
2 created those tables?
3      A.  Okay.  I provided instruction and
4 direction to Ms. Meza on what I wanted in each
5 table and -- and the type of information I wanted
6 collected, and Ms. Meza used the data set and
7 created -- you know, gathered the information and
8 created the tables for review.
9      Q.  Okay.  So for table 1, Ms. Meza is the
10 one that collected the data from the data set and
11 created this table, right?
12     A.  Yes, that is correct.
13     Q.  Okay.  And then generally speaking, if
14 there are errors, mathematical errors in the
15 tables, those would be attributed to Ms. Meza,
16 right?
17     MR. HILKE:  Objection, form, incomplete
18 hypothetical.
19         Go ahead.
20     THE WITNESS:  Ultimately if I didn't catch the
21 error, then yes, she would have done the
22 mathematics, and -- and I would try to do -- you
23 know, do a review to make sure that it was correct.
24 But I may have missed something.  But if there are

Page 143

1 any errors, then it would just depend on where the
2 error was.
3 BY MS. CARNEY:
4      Q.  Okay.  So then looking at table 1 here,
5 this grand total of allegation counts is 1,973,
6 right?
7      A.  Yes.
8      Q.  And based on your previous testimony,
9 that actually includes allegations against
10 non-detectives, right?
11     A.  If there are non-detectives included in
12 the 323 CRs, that includes all of the allegations
13 contained within the 323 CRs.
14     Q.  Okay.  But based on the court order
15 that we just read, the court ordered CRs against
16 Area Five detectives, right?
17     A.  That's what the order stated, yes.
18     Q.  Okay.  So by including allegations
19 against non-detectives, you've actually expanded
20 the data set from what the court had ordered,
21 right?
22     MR. HILKE:  Objection, form and foundation.
23     THE WITNESS:  No, we didn't expand the order.
24 The order was for the CRs of Area Five detectives.

Page 144

1      Now, we -- we analyzed those CRs and
2 the data that each contained.  And if it contained
3 an officer that was not a detective during '91 to
4 '95, then that still was an allegation that needed
5 to be addressed and analyzed because it was part of
6 an allegation that involved an Area Five detective.
7 It was part -- it was part of an incident in a CR
8 that involved an Area Five detective.
9      So I don't believe it expanded the
10 order.  I think the order was clear and -- and the
11 data and the information that was provided was part
12 of the order, so we analyzed all of the information
13 that came from that order.
14 BY MS. CARNEY:
15     Q.  So allegations against patrol officers
16 are relevant to an analysis about CRs made against
17 detectives.  Is that your testimony?
18     MR. HILKE:  Objection, form, incomplete
19 hypothetical.
20     THE WITNESS:  If -- if that patrol officer was
21 involved in an incident that also involved an Area
22 Five detective, then yes, it is relevant.  If
23 that -- if there was a supervisor involved in an
24 incident that involved an Area Five detective during

Page 145

1 that time period, then it is relevant.
2      Simply the fact that if -- if it had
3 been a patrol officer that did not have an Area Five
4 detective involved during '91 to '95, then no, it
5 would -- it should not have been included in the
6 data set.
7      But we didn't have -- we had -- we
8 believed the data was accurate.  That it -- and it
9 met the -- it honored the order and was compliant
10 with the order, and that each CR provided from '91
11 to '95 was a CR attributed to an Area Five
12 detective, as well as any other officers or
13 detectives that may have been included on that CR --
14 BY MS. CARNEY:
15     Q.  Okay.
16     A.  -- so the data contained therein was
17 subject to be analyzed.
18     Q.  Okay.  And do you say anywhere in your
19 report that you are also analyzing allegations
20 against non-detectives?
21     A.  No.
22     Q.  Okay.  Looking at this chart here, you
23 have a section that says, Unknown, with a little --
24 with a footnote 91.

Page 146

1          Well, hold on.  Let me back up.
2          So this is -- table 1 is,
3  Allegations in Chicago of coerced confession,
4  excessive force, fabricated statement or fabricated
5  evidence, false arrest, improper inventory
6  procedure, planted evidence, threats, verbal abuse,
7  racial and ethic slurs, '91 through '95, right?
8          And the chart -- this table seems to
9  break it down by the origin of complaint, which is
10  External, Internal, or Unknown.
11          Do you see that?
12  A.   That is correct, yes.
13      Q.   Okay.  So the footnote -- well, the
14  Count of All Allegations, 11 are unknown.  And then
15  it has a little footnote here that says 91, a
16  little footnote of 91.
17          And if you look at footnote 91, it
18  says:  The dataset includes a small number of
19  allegations that were left uncoded as to their
20  findings.
21          So what is the relevance of these
22  CRs that were uncoded as to their findings as it
23  relates to the origin of the complaint?
24          Does that make sense?  That was kind

Page 147

1  of a bad question.
2  A.   The --
3      MR. HILKE:  Go ahead.
4      THE WITNESS:  Pardon me?
5      MR. HILKE:  No, go ahead.
6      THE WITNESS:  Okay.  I was going to say
7  footnote 91 was misplaced.  It should actually be
8  with table 11 on page 41.
9  BY MS. CARNEY:
10      Q.   Okay.  And are you reading some notes
11  on your report that tell you that that was a
12  mistake and it should be on a different table?
13  A.   The note -- I've made a notation when I
14  identified the mistake and wrote should be with
15  table 11, page 41.
16      Q.   And had you not had that note, would
17  you have known why footnote 91 was included in
18  table 1?
19  A.   Once I identified that it was
20  misplaced, I had to go through and determine where
21  it should be placed.  And so again, I made the note
22  as a quick reference at this point.
23          But once I identified it, I would
24  have had to have gone through to find where it

Page 148

1  should be properly placed.
2      Q.   Okay.  And so then this count of
3  11 allegations that had unknown origin, do you know
4  how many individual CRs that included?
5      A.   Not as I sit here.  I could go back
6  through the spreadsheet, the data set spreadsheet
7  to make that determination, but I'm not sure
8  exactly the number of CRs it included.
9      Q.   Okay.  So it doesn't say in your report
10  what CRs are included in that 11 -- in those
11  11 allegations that had unknown origin.
12      MR. HILKE:  Objection to form.
13      THE WITNESS:  You know, I don't think we
14  listed the CRs.  I don't think I have a list --
15  provided a list of the CRs for the 11 allegations.
16  It's on the spreadsheet.
17  BY MS. CARNEY:
18      Q.   Okay.  And quick follow-up on the
19  Footnote 91, how did you identify that error, or
20  who -- who identified that error in your report?
21      A.   Who iden -- I identified it when I was
22  going back through as I prepared for the deposition
23  today and realized that that information belonged
24  somewhere else.

Page 149

1      Q.   Okay.  Page 31, these two tables,
2  table 2 and 3, both of these tables, did
3  Ms. Meza -- sorry -- did Ms. Meza conduct the
4  analysis that is the subject of both of these
5  tables?
6      A.   Yes.  I asked Ms. Meza to -- to tally
7  up the allegations for those allegations listed in
8  table 2 to give me a listing of the findings before
9  investigation -- I mean, the findings after
10  investigation before review, and then which ones
11  originated externally and internally, and then
12  provide me a percentage of the -- of the total.
13      Q.   Okay.  Page 32, same with table 4 and
14  table 5, were those tables created by Ms. Meza and
15  the analysis that was done to create them done by
16  Ms. Meza?
17      MR. HILKE:  Objection, compound question.
18          You can answer, but I'll again
19  instruct you not to disclose protected information
20  about the drafting process under Rule 26 or that
21  constitutes work product.
22          Go ahead.
23      THE WITNESS:  Okay.
24          Yes.  Ms. Meza, again at my

Page 150

1 direction, completed what I requested of her.
2 BY MS. CARNEY:
3      Q.   Okay.
4      A.   With respect to these two tables.
5      Q.   For tables 1, 2, 3, 4, and 5, do you
6 know if Ms. Meza used any software in order to
7 conduct the analysis that's found in those tables?
8      A.   I don't believe she used anything of
9 significance.  I mean, probably basic Excel
10 spreadsheet tabulations that are part of Excel.
11     Q.   At 33, tables 6, 7, and 8, did Ms. Meza
12 conduct the calculations that are the subject of
13 these tables?
14     A.   Again, yes.  By my direction for the
15 various categories for each table, Ms. Meza
16 conducted those calculations.
17     Q.   And then did Ms. Meza create the tables
18 that are included?
19     MR. HILKE:  Again, I'll instruct the witness
20 not to answer information about the drafting process
21 protected by Rule 26 or that constitutes work
22 product.
23 BY MS. CARNEY:
24     Q.   Page 34, table 9, did Ms. Meza conduct

Page 151

1 the analysis and calculations that are the subject
2 of this table?
3      A.   Yes.  At my direction, Ms. Meza
4 conducted the analysis associated with this table.
5      Q.   Okay.  And then at the bottom of
6 page 34 here, there's a bullet point with a
7 specific CR number, and these specific CRs go from
8 page 34, 35, and 36.
9          Do you see that in your report?
10     A.   Yes.
11     Q.   Okay.  How did you decide to use these
12 specific CRs in your report?
13     A.   In reviewing the CRs initially and
14 trying to identifying CRs that might show or did
15 show various violations that we needed to -- to
16 have an actual complaint to support, we just -- we
17 just selected these to use --
18          (Background noise.)
19     THE WITNESS:  Hello?
20     MS. CARNEY:  Yeah, there's somebody -- is
21 that --
22     MR. HILKE:  It was Carrie, but she's muted
23 now.
24     MS. CARNEY:  Okay.

Page 152

1      THE WITNESS:  Okay.  Yeah, so basically going
2 through the CRs, understanding -- like in this case,
3 looking for CRs that show you, you know, some kind of
4 egregious behavior that was aligned with what we
5 were showing or wanting to show, and then listing
6 those CRs or summarizing the CRs here in the report.
7 BY MS. CARNEY:
8      Q.   Okay.  And you said something before
9 about various violations.
10          What kind of violations are you
11 talking about?  Like what do you mean?
12     A.   The -- the complaint from Sierra and
13 related allegations that were either specific to
14 his complaint or would rise to a violation of
15 someone's constitutional rights or civil right.
16     Q.   Okay.  Was there any other selection
17 criteria involved when it came to the decision to
18 call out these specific one, two, three, four, five
19 CRs?
20     MR. HILKE:  Objection, form.
21     THE WITNESS:  No other specific criteria.
22 It's just wanting to show examples of within the
23 data set of the overall allegations that had been
24 raised.

Page 153

1 BY MS. CARNEY:
2      Q.   Going to page 36, I think the very
3 bottom, it says, CPD's accountability systems?
4 Okay, perfect.
5          And then there's a line in here that
6 says you have, identified several ways in which the
7 City's investigations of officer misconduct were
8 lacking and failed to comport with generally
9 accepted standards in the field of police practices.
10          Do you see that?
11     A.   Yes.
12     Q.   Okay.  What do you mean by "generally
13 accepted standards"?
14     A.   When you're conducting an investigation
15 our -- of officer misconduct, and it's generally
16 accepted that, you know, you conduct an interview
17 of -- of the complainant, interview of the
18 witnesses, gather any available evidence, and then
19 conduct an interview of the officer or officers
20 involved.
21          And in this case, many, many of the
22 investigations lacked in one or more of these
23 areas, specifically when it came to getting
24 statements and interviews from the officers.  They

Page 154

1  would get -- generally, they'd get a written
2  To/From statement, which didn't afford the
3  investigator an opportunity to do follow-up
4  questions, conduct an interview in realtime with an
5  officer.
6       So it was -- it was areas there
7  where just looking at all of the CRs, we just saw
8  these -- these -- these discrepancies and other
9  evidence that was passed off as simply because it
10 contradicted one another.  It didn't seem to be
11 much effort made to find out who was telling the
12 truth when it came down to one person's word
13 against another.  It was simply just written off as
14 not sustained because it was unable to prove or
15 disprove the allegation.
16       I saw that a lot.
17    Q.   Okay.  So let me ask you this:  Can
18 you -- do you have a list or can you tell me
19 specific CRs -- well, let me back up.
20       In 1991 through 1995, was it
21 generally accepted practices that written To/From
22 memos were unacceptable when it comes to
23 investigating police misconduct?
24    MR. HILKE:  Objection, form.

Page 155

1       THE WITNESS:  It was -- the practice was to
2  get statements, to get -- you know, interview
3  people.  Not just allow them to write out a
4  statement or send them questions and have them write
5  a report back on those questions.
6       So as far as investigative practices,
7  To/From memos were -- were -- that was a deficient
8  way of doing an investigation and getting the
9  statement.  And it -- it created an opportunity to
10 get an incomplete statement and not have an
11 investigator be able to do follow-up questions.
12 BY MS. CARNEY:
13    Q.   What are you referring to?  What
14 generally accepted practices from 1991 through 1995
15 required sit-down interviews during a police
16 misconduct investigation?
17    A.   During that time period, I took several
18 interviewing courses as part of my position as an
19 investigator within the police department.  And
20 interviewing and investigating techniques at that
21 time were such that called for effective interviews
22 to contain an actual interview, an actual person
23 face-to-face interview.  Not simply sending a
24 To/From or sending questions to someone.

Page 156

1       I -- so the practice of interviewing
2  and investigating and interrogating called for
3  natural face-to-face interview.
4       Now, they're -- it was still
5  evolving at that time for those interviews to be
6  recorded, but nonetheless, it was generally
7  accepted that an interviewer was to conduct an
8  interview so they'd have an opportunity to ask
9  follow-up questions, counter any -- clear up any
10 discrepancies in what they were told in previous
11 interviews.
12       But you can't do that in -- when you
13 simply have a To/From, and that's all you receive.
14    Q.   So is it your testimony that criminal
15 investigations and administrative investigations
16 were -- should have been handled the same in
17 1991 through 19 -- or sorry.
18       Is it your testimony that there's no
19 difference between an administrative investigation
20 and a criminal investigation?
21    MR. HILKE:  Objection, form.
22    THE WITNESS:  No, I didn't say there's no
23 difference.
24       I said when you're interviewing

Page 157

1  people, there are differences, particularly in
2  admonishments that you must give in criminal and
3  versus administrative.  And even within law
4  enforcement, there's certain statements that you
5  have to provide and say to the officer in question.
6       Because in many cases, officers are
7  required to give a statement, so they have to have
8  some protection so that those statements can't be
9  used against them in a criminal proceeding.  So
10 they're given a Garrity admonishment as opposed to a
11 Miranda warning in a criminal matter.
12       But the concept and the principle
13 behind investigating and interviewing is the same,
14 where you want to ask the questions at -- the best
15 scenario is to ask the questions, be in person, give
16 the -- have the opportunity to -- to ask follow-up
17 questions that may arise, and also have an
18 opportunity to clear up discrepancies that you
19 learned between one statement and another, or
20 between the evidence that you have versus what
21 someone says.
22       And you can't do that in a To/From
23 when you send it out, and then they send it back to
24 you via an interdepartmental mail or whatever.

Page 158

1 BY MS. CARNEY:

2    **Q.   So this training that you're talking**
3 **about, that was in regards to criminal**
4 **investigations though, right, when you were at**
5 **the -- at the police department in Indianapolis?**

6    MR. HILKE:  Objection, form.

7    THE WITNESS:  It was primarily geared for
8 criminal, but it was geared for investigating and
9 interviewing both victims, witnesses, and suspects.

10 BY MS. CARNEY:

11    **Q.   Okay.**

12    A.   And it could be used in any format.  It
13 wasn't just because I was at -- did criminal
14 investigations at the time.  It wasn't that that --
15 those same principles were not applied to HR
16 interviews and administrative interviews within an
17 organization.

18    **Q.   Correct.  But that was training you**
19 **received as a patrol officer, right?**

20    A.   That's training I received as a
21 homicide detective.

22    **Q.   Okay.  And other than relying on your**
23 **experiences as a detective and training as a**
24 **detective, what is your basis to say that To/From**

Page 159

1 **memos were not acceptable from 1991 through 1995 as**
2 **it relates to investigating police misconduct?**

3    A.   The basis is as I just said.  It's not
4 just a single training incident.  It's multiple
5 training and it's multiple professionals that
6 taught interviewing and their principles behind
7 interviewing and conducting interviews and having
8 conversations with people.  That when you're trying
9 to get information, particularly in -- whether it's
10 an administrative situation or a criminal
11 situation, the best possible scenario is to have a
12 face-to-face interview where you're able to address
13 questions, do follow-up, and again, clear up
14 discrepancies that may arise from the initial
15 statement that you receive versus other evidence
16 that you have and know about.

17    **Q.   In 1991 through 1995, did the**
18 **Indianapolis Police Department require that**
19 **allegations of mis -- that officers be interviewed**
20 **in a formal sit-down interview when being**
21 **investigated for misconduct?**

22    MR. HILKE:  Objection --

23    THE WITNESS:  Yes.

24    MR. HILKE:  -- form.

Page 160

1    THE WITNESS:  Oh, sorry.

2    MR. HILKE:  Go ahead.

3    THE WITNESS:  Yes.  We had -- we -- internal
4 affairs would conduct an interview or your
5 supervisor would conduct an interview.

6         And -- and in those instances when a
7 supervisor may ask you to write out what's called an
8 interdepartmental about what occurred, you would
9 still be questioned about the contents of that
10 interdepartmental.  It would not just be accepted as
11 it'd just be accepted and no further follow-up would
12 occur, especially if there were discrepancies in
13 what you wrote and what the complainant or the
14 witnesses stated or what the evidence showed.

15 BY MS. CARNEY:

16    **Q.   Okay.  So I'm going to try to ask this**
17 **question again because I don't think I got an**
18 **answer.**

19         **Other than your training as a patrol**
20 **officer or your training as a detective, what else**
21 **are you basing -- what else are you basing your**
22 **opinion on that the use of To/From memos were not**
23 **acceptable in officer misconduct investigations**
24 **between 1991 through 1995?**

Page 161

1    A.   Again, I go back to the training I
2 received and the information that I was taught and
3 what I knew and what I -- what -- the experience
4 that I had in conducting investigations.

5         And again, it wasn't just one
6 training scenario.  These were multiple training
7 courses from different individuals about different
8 techniques.  And none of those techniques stated
9 simply getting the equivalent of a To/From as an
10 effective way to conduct an investigation.

11    **Q.   Okay.  So your opinion is solely based**
12 **on your training as a patrol officer and/or a**
13 **detective from the Indiana police department.**
14         **You have nothing else that you're**
15 **relying on.**

16    MR. HILKE:  Objection, form.

17    THE WITNESS:  You tried to minimize that, but
18 it's broader than that, okay?

19         The training wasn't just from
20 Indianapolis.  This training came from organizations
21 and individuals that were contracted by the City of
22 Indianapolis Police Department to conduct the
23 training.  It was not by the police department
24 solely.

Page 162

1      So over my -- over my career, I had
2 multiple trainings, particularly during that time
3 period, with -- about interviewing techniques and
4 interrogation techniques.
5 BY MS. CARNEY:
6    **Q.   Okay.  So while you -- but this was all**
7 **while you were a police officer, correct?**
8      MR. HILKE:  Objection, form.
9      THE WITNESS:  During that time period, yes.
10 BY MS. CARNEY:
11    **Q.   Okay.**
12     A.   I've had -- since retiring from the
13 police department, I've had additional trainings
14 very specific for oversight and accountability in
15 internal affairs, and that training is no different
16 than what I received -- no different in principle
17 than what I received as a -- as a criminal
18 investigator.
19    **Q.   But all of that training occurred after**
20 **1995.**
21     MR. HILKE:  Objection, form.
22     THE WITNESS:  After I retired, yes, it was
23 after '95.
24

Page 163

1 BY MS. CARNEY:
2    **Q.   Okay.**
3     A.   But again, like I said, it was no
4 different in principle than what we were doing back
5 then.
6    **Q.   Going to page 40, starting with**
7 **figure 1 -- oh, go back, there we go -- who**
8 **conducted the analysis and calculations in order to**
9 **create this figure in the table 10?**
10     A.   This was -- the information was created
11 by Ms. Meza at my direction.
12    **Q.   Okay.  And then looking at the**
13 **percentage, the source of the allegation,**
14 **everything is using this 1973 number, which as**
15 **we've discussed includes allegations against**
16 **non-detective officers, right?**
17     A.   It uses all the allegations that were
18 contained in the data set provided to us by CPD,
19 the 323 CRs from 1991 to '95.
20    **Q.   Right.**
21        And those allegations include
22 allegations against non-detectives, right?
23     A.   It's possible that some did, yes.
24    **Q.   Okay.  Table 11, who did the**

Page 164

1 **calculations in order to formulate this table?**
2     A.   I asked Ms. Meza to conduct a review
3 and analysis of the data set to provide the numbers
4 for this table looking at the findings and then
5 also the origin of allegation after a full review
6 of allegations that were initially sustained.
7    **Q.   Okay.  And then looking at the Unknown**
8 **number, you have 18 -- 18 with a finding of unknown**
9 **that were external, right?**
10     A.   Correct.
11    **Q.   And then you have 2 with an unknown**
12 **finding that were of unknown origin.**
13        **Do you see that?**
14     A.   Correct.
15    **Q.   Okay.  And you have that as totaling**
16 **28, but that's an error, right?  It's actually 20.**
17 **18 plus 2 is 20?**
18     A.   Yes, it should -- that should be 20.
19    **Q.   Okay.  Whose error was that?**
20     MR. HILKE:  Objection, form.
21     THE WITNESS:  It might have been Ms. Meza's,
22 but I failed to catch it.
23 BY MS. CARNEY:
24    **Q.   Okay.  And then based on your testimony**

Page 165

1 **earlier, Footnote 91 that we just looked at on**
2 **page 30 is where this table or this unknown should**
3 **be referred back to, right?  Findings After**
4 **Investigation?**
5     A.   Yes.
6    **Q.   All right.  So if we could go back to**
7 **page 30.**
8        **Okay.  So this says:  The dataset**
9 **includes a small number of allegations that were**
10 **left uncoded as to their findings, and it kind of**
11 **breaks it down here.**
12        **So if we have a CR with two**
13 **allegations, and it says one CR with five**
14 **allegations, one CR with one allegation.  We have a**
15 **CR with eight allegations and two allegations.**
16        **See that?**
17     A.   Yes.
18    **Q.   So that totals 18 allegations with an**
19 **unknown origin -- or sorry -- an unknown finding,**
20 **right?  Did I --**
21     A.   Right.
22    **Q.   -- do that math, right?**
23     A.   Yes.
24    **Q.   Okay.  So if we go back to page 41 at**

Page 166

1 table 11 that this is supposed to be referring
2 back -- linked to, you can see right there we have
3 18 external with unknown findings, right?
4    A.  Yes.
5    Q.  But then there's two unknown -- origin
6 with unknown findings.  You see that?
7    A.  Correct.
8    Q.  And we just talked about how that
9 totals 20, right?
10   A.  Right.
11   Q.  Okay.  So where are those other two
12 allegations coming from, since the Footnote 91 says
13 that there's only 18 allegations that have unknown
14 findings?
15   A.  Sitting here now, I can't tell you
16 where the unknown unknown -- it states it's an
17 unknown origin as well as unknown findings.
18       So I don't know if it was left off
19 the table 1 or -- or where that number at this
20 point was -- was supposed to go.
21   Q.  Okay.
22   A.  Because it does have -- it shows on
23 table 11 that it's an unknown origin as well as an
24 unknown finding.

Page 167

1    Q.  And sitting here today, you don't know
2 where those numbers are coming from?
3    MR. HILKE:  Objection, form.
4    THE WITNESS:  No.  I would have to go back
5 through the -- through the data set, through the
6 Excel spreadsheet to -- to locate those numbers.
7 BY MS. CARNEY:
8    Q.  And Ms. Meza is the one that compiled
9 the data, right?
10   A.  She compiled the data that I asked her
11 to, but in order to -- to identify where those two
12 are, I can go into the data set to see if I could
13 locate them as well.
14   Q.  Okay.  Page 42, figure 2, is it fair to
15 say that Ms. Meza is the one that compiled the data
16 in order to create this figure?
17   A.  Yes, it's fair to say.
18   Q.  And in fact, this is the same
19 information that's contained in table 10, right?
20   A.  Table 10?  Let me see table 10, same
21 information. (Reading to self.)
22       Yes.  It looks like it's the same
23 information for --
24   Q.  Okay.

Page 168

1    A.  -- for internal.  It's the same
2 findings after full internal review.
3    Q.  Okay.  So what's the point -- what's
4 the purpose of including figure 2 in addition to
5 table 10 if it's the same information?
6    A.  I believe this was just a visual
7 included and to show document of sustained findings
8 before and after full internal review.  So instead
9 of having a chart, it was a visual -- excuse me --
10 a visual to show the information.
11   Q.  Okay.  So it's no -- there's no new
12 information contained in figure 2.
13   A.  No, I don't believe so at this time.
14   Q.  Okay.  Page 43, tables 12 and 13, who
15 did the data analysis in order to calculate these
16 tables?
17   A.  Ms. Meza compiled the information in
18 the tables at my direction.
19   Q.  Okay.  In looking at table 12, there's
20 a category there called Other.
21       What does that include?  What does
22 that capture?
23   A.  That is a category that CPD used, so it
24 has information on what it captured of the -- it

Page 169

1 was just a category that CPD used.
2    Q.  Okay.  So same for table 13?  What is
3 the -- what does Other capture?
4    A.  Again, it's the category that was used
5 by CPD.  I don't know what it captures.
6    Q.  Okay.  Table 14, who -- I guess let's
7 try to group some of these.
8        14 and 15 on pages 44 and 45, who
9 tabulated the information included in these -- in
10 order to compile these tables?
11   A.  Ms. Meza tabulated this information at
12 my request.
13   Q.  Okay.  Page 46, table 16, and that goes
14 actually to page 47, who tabulated the information
15 in order to create these tables or this table?
16   A.  Again, Ms. -- Ms. Meza tabulated this
17 information at my request.
18   Q.  Table 17, page 48 to 49, who tabulated
19 the information in order to create this table?
20   A.  Ms. Meza tabulated this information at
21 my request.
22   Q.  Table 18 on page 50, who tab -- who
23 tabulated the information in order to create this
24 table?

Page 170

1    A.   Ms. Meza tabulated this information at
2 my request.
3    Q.   Okay.  Page 51, we get to another
4 section of your report that calls out three
5 particular CRs.
6         And you say:  Of the CRs I reviewed,
7 the following are a few examples of CRs where the
8 allegations were sustained, but the discipline
9 imposed was next to nothing.
10        What do you mean by "next to
11 nothing"?
12   A.   Based on the discipline that was
13 imposed, a final discipline that was imposed or the
14 severity of the misconduct.
15        So if -- I think in one, there
16 was -- in CR No. 219555, there was recommendation
17 for harsher discipline.  The superintendent
18 suspended one detective for a day, but the de --
19 detective was given the option to give up a day of
20 time off in lieu of the suspension.  And another
21 officer was given a -- recommended the sus --
22 suspension and was only given a written reprimand.
23        So there was -- the other one,
24 203110, the investigator had a -- was sustained

Page 171

1 against a Rule 2 -- Rule 2 violation for leaving a
2 threatening note towards a -- for a citizen.  And
3 his initial recommendation was no discipline, only
4 violation noted.  And you know, that was --
5 ultimately they received a reprimand, but initially
6 there was no discipline at all.  Just, okay, yeah,
7 this happened.  There was a long delay, even after
8 the officer admitted to leaving the note.  And
9 there was nothing to -- there was no conflict to
10 it.  It took him six months to -- to close it.
11        And 216576 was an internally driven
12 complaint where an officer had a Rule 8 violation
13 that was sustained, got a two-day suspension.
14 Others concurred with the sustained finding and
15 recommended discipline.  This officer rejected it.
16 And the complaint review panel heard it, and they
17 concurred with it, but they reduced the sentence.
18 They reduced the discipline as an alternate
19 penalty, and then the officer was allowed to take
20 time off instead of being suspended.
21        So when you say next to nothing,
22 there was examples where even when they had CPD as
23 witnesses, CPD supervisor as a witness, they
24 couldn't get an officer suspended or substantially

Page 172

1 disciplined for, you know, the conduct that he did
2 towards another off -- a fellow officer.
3    Q.   Okay.  Were you just re -- what were
4 you just reading from?
5    A.   Page 51, page 52.
6    Q.   So you were reading the summaries that
7 you included in your report?
8    A.   Yeah.
9    Q.   Okay.  For CR 219555, your criticism is
10 that they were given an option to take -- to give
11 up a day's pay in lieu of a suspension, right?
12   A.   Correct.
13   Q.   Okay.  What is --
14        THE WITNESS:  Have we lost Wally?
15        MS. CARNEY:  We did lose Wally.  Let's go off
16 the record quick.
17        THE LEGAL VIDEOGRAPHER:  We're off the video
18 record at 2:57 p.m.
19        (Recess taken.)
20        (Record read.)
21        THE LEGAL VIDEOGRAPHER:  We're back on the
22 video record at 3:08 p.m.
23 BY MS. CARNEY:
24   Q.   Okay.  So I had just asked,

Page 173

1 Mr. Finnell, your criticism of CR 219555 is that --
2 or one of the detectives, they were given the
3 option to give up a day's time off in lieu of a
4 suspension, right?
5    A.   Well, yes.  And also the level of
6 discipline based on the actions of the detective.
7    Q.   Okay.  But so my question is a little
8 different.
9         For a -- a suspension is ultimately
10 the officer losing a day's pay, right?
11        MR. HILKE:  Objection, form.
12        THE WITNESS:  Ultimately, yes.  But they
13 didn't -- they don't lose a day's pay if they give
14 up a vacation day.
15 BY MS. CARNEY:
16   Q.   Is it your testimony that CPD -- CPD
17 officers are not paid for vacation days?  That a
18 vacation day is not a paid day?
19   A.   A vacation day is a day that they
20 haven't taken yet, so they have not lost anything.
21 They can still earn vacation days.
22        So I'm not saying they don't get
23 paid, because obviously they have paid vacation.
24 But instead of giving up -- instead of basically

Page 174

1 being disciplined and losing a day's pay in that
2 pay cycle, they give up a vacation day that they
3 may never take and don't --
4          (Simultaneous cross-talk.)
5    **Q.   In CPD if you don't --**
6    A.   -- don't lose --
7    **Q.   Oh, sorry.  Go ahead.**
8    A.   I was going to say, and then they don't
9 lose anything until they decide to take a vacation
10 if they decide to take it.
11    **Q.    CPD -- in CPD, you get paid for your**
12 **vacation days if you don't use them, right?**
13    MR. HILKE:  Objection, form.
14    THE WITNESS:  When you mean paid, like when
15 you leave, or paid at the end of the year if you
16 don't use vacation?
17 BY MS. CARNEY:
18    **Q.   I'm asking you.**
19        **Does CPD get paid for unused**
20 **vacation days at the end of the year?**
21    MR. HILKE:  Objection, form.  Sorry,
22 objection, form, foundation.
23        Go ahead.
24    THE WITNESS:  Yeah, I don't know what their

Page 175

1 contract states.  I don't know if it states that at
2 the end of the year any unused vacation days are
3 paid to the officers, so I don't --
4 BY MS. CARNEY:
5    **Q.   What about when -- oh, sorry.**
6    MR. HILKE:  Were you finished, Mr. Finnell?
7    THE WITNESS:  Well, yeah.  I was just going to
8 say I'm not aware of what the terms of their CBA are
9 with respect to vacation days and how they get paid
10 for vacation days.
11 BY MS. CARNEY:
12    **Q.   Okay.  What about when they leave the**
13 **department?  Does CPD get paid for unused vacation**
14 **days?**
15    MR. HILKE:  Objection, form, foundation.
16    THE WITNESS:  I believe that they would
17 probably get paid for any unused vacation days.
18 Most police departments, larger police departments
19 pay you for your unused time or accumulated time up
20 to a certain point.  I think vacation days they
21 would probably get paid.
22 BY MS. CARNEY:
23    **Q.   Okay.  So if CPD pays officers for**
24 **unused vacation days, when they leave the**

Page 176

1 **department, if they have to give up one of those**
2 **vacation days, that's the same as losing a day's**
3 **pay, right?**
4    MR. HILKE:  Objection, form.
5    THE WITNESS:  It may be the same in losing
6 some pay.  It is not the same in the effects of
7 discipline.  Because at the time of the misconduct,
8 at the time that it's sustained, and at the time
9 that the decision is made for the findings, there's
10 no accountability.
11        It is like, Okay, you know, I'll just
12 lose a day's pay whenever I leave years from now,
13 but they still continue to do what they do.
14        So it's not the same.  You know,
15 if -- because it doesn't have the same impact of an
16 officer feeling, basically to use a lack of a better
17 phrase, feeling the pain at that moment.  You're not
18 being disciplined.
19        It'd be the same as -- I mean, you
20 have a toddler.  You mentioned a toddler earlier.
21 And you know, I think many of us on here have
22 children.  Discipline is -- is not necessarily
23 punishment, but discipline is correct -- is -- the
24 primary function is to correct unwanted behavior.

Page 177

1 So if we don't impose that discipline in a timely
2 manner, then we can't expect that unwanted behavior
3 to necessarily cease.
4        So that's -- that's my criticism of
5 using that option to still avoid a suspension by
6 giving up something that you may or may not use in
7 the future.
8 BY MS. CARNEY:
9    **Q.   But they're still giving up a day's**
10 **pay, right?  Regardless of when -- regardless if**
11 **it's in that exact moment or the next year or the**
12 **next year, they are giving up a day's pay, right?**
13    A.   Like I said, yes, they are --
14    **Q.   Okay.**
15    A.   -- but --
16    **Q.   And for some officers --**
17        (Simultaneous cross-talk.)
18    A.   But it's the impact --
19    **Q.   -- that's significant, right?**
20    A.   But it's the impact of the discipline
21 that's lacking.  So it's not -- it's not just that
22 they're giving up the pay.
23    **Q.   So but for -- for a police officer or**
24 **for anybody, giving up a day's pay is significant,**

Page 178

1 right, or can be significant, right?

2    A.    Exactly.  Except it's not giving up a
3 day's pay when it's -- it's not coming out of your
4 salary in realtime.  It's coming out in a lump sum
5 sometime later, or it's coming out in a day that
6 you don't take and you still work, so you still
7 going to get paid.

8          So we're not talking apples to
9 apples.  It's -- it's basically another way to
10 avoid an immediate penalty for an immediate action.
11 And you offset that penalty for -- to say, okay,
12 later on I'll give up a day's pay.  But later on,
13 you may not need that day's pay because you don't
14 have kids, you don't have -- you're not feeling the
15 pain of it as much when you retire, because you're
16 getting a lot more money when you retire.

17    Q.    That analysis that you just gave me
18 right there, that's pretty subjective, right?
19 That's your opinion.  That's not necessarily what
20 in particular office -- Detective Lodl felt when he
21 had to give up a day's pay in --

22    MR. HILKE:  I'm -- go ahead.

23 BY MS. CARNEY:

24    Q.    -- in this CR situation, right?

Page 179

1    MR. HILKE:  Objection, form and compound.

2    THE WITNESS:  Well, I have no idea what
3 Detective Lodl felt.

4          I do know -- I do have some
5 experience with disciplinary practices and effective
6 discipline.  And so I'm not -- Lo -- Detective Lodl
7 obviously felt something.  That's not the point that
8 I was making.

9          The point is he committed an act in
10 realtime or what -- close to realtime being that he
11 committed an act.  And in the proximity of that act
12 his -- his consequences were not in proximity to
13 that act.

14          It's -- giving up a vacation day
15 immediately is a day you're not even taking.  So if
16 you're going to say that you get paid for those days
17 later, well, that's just one less day.  And you
18 know, police officers are smart.  If I gave up a
19 vacation day and I still want to take a week's
20 vacation, I plan my vacation around a holiday.  I
21 plan my vacation around my days off so I don't feel
22 the pain.

23          You know, so there's ways to get
24 around actually addressing the consequences,

Page 180

1 significant consequences of his actions, and that
2 was my criticism of that.

3          He was recommended for a harsher
4 discipline.  They gave him a lighter discipline.
5 Then gave him the option not to even deal with that
6 discipline, just give up a day's pay.  Give up
7 something that he hasn't even used yet.

8 BY MS. CARNEY:

9    Q.    Okay.  But you don't know anything that
10 was going on in Detective Lodl's personal life or
11 work life at this point in time when he was given
12 the option to take a day off in lieu of a
13 suspension, right?

14    A.    No, I do not know.

15    Q.    Okay.  So you don't know whether or not
16 Detective Lodl felt the pain immediately because he
17 had to give that day off or not, right?

18    MR. HILKE:  Objection to form.

19    THE WITNESS:  No, I don't.

20 BY MS. CARNEY:

21    Q.    Okay.  Page 52 of your report, which is
22 Exhibit 4 -- actually, who created -- who did the
23 calculations in order to create the tables 19 and
24 20 here on page 52?

Page 181

1    A.    Ms. Meza prepared the calculations at
2 my -- at my direction.

3    Q.    Okay.  Going to page 59, you have
4 another section here on page 59 to 60 where you
5 call out one, two, three, four specific CRs.

6          Do you see that there?

7    A.    Yes, I do.

8    Q.    Okay.  And in three of these CRs, or
9 two of these CRs, they have a date of September 18,
10 1986, and August 27th, 1986.

11          Do you see that?

12    A.    Correct.

13    Q.    Okay.  Do you know if those CRs are
14 contained within the spreadsheet that you reviewed?

15    A.    They -- no, not the '86 -- the years
16 for '86, no.

17    Q.    Okay.  And how did you -- what was the
18 selection process that you used in order to call
19 out these particular CRs in your report?

20    A.    With these particular CRs, it was -- I
21 selected these based on CRs that involved the
22 defendant officer -- defendant Detective Guevara.
23 And also the allegations were very serious,
24 involved use of force, threatening with a handgun,

Page 182

1 threatening to shoot an animal with a handgun, and
2 also involved a Rule 14 violation, which is
3 violation that involves truthfulness where an
4 officer -- where a member of CPD is required to be
5 truthful in -- in statements and reports in -- in
6 the work that they do.
7          So yeah, so -- so there was some
8 sustained allegations for the Rule 14 violation.
9 So I included those -- those two in addition to two
10 others from the -- that were contained in the data
11 set that also involved -- one involved Detective
12 Guevara and the other involved falsifying a police
13 report and -- and other aspects of -- let's see.
14          Yeah, so -- so I involved -- I
15 included that one as well.
16      Q.   Okay.  Page 62, can we have table 21?
17          Who -- who did the calculations in
18 order to create this table?
19      THE LEGAL VIDEOGRAPHER:  Mr. Finnell?  Sorry,
20 if I could just break in just quick sec.  This is
21 the videographer.
22          When you look at your paper over
23 there, you're leaning just a bit, so --
24      THE WITNESS:  I'm sorry.

Page 183

1      THE LEGAL VIDEOGRAPHER:  -- we just want to
2 keep you in frame.
3          No worries.  Thank you so much.
4      THE WITNESS:  Okay.
5      MR. HILKE:  Do you need the question read
6 back, Mr. Finnell?
7      THE WITNESS:  Oh, oh, yes, please.  I'm sorry,
8 Ms. Carney.
9 BY MS. CARNEY:
10      Q.   That's okay.
11          I was just asking who created -- who
12 did the analysis in order to create the table in
13 21, to create table 21?
14      A.   Ms. Meza did the analysis at my
15 direction.
16      Q.   Okay.  And when you say 473 total, is
17 that 473 detectives?  Or what is that 473 number?
18      A.   It looks like it was 473 detectives or
19 officers contained within those CR data set.
20      Q.   So that's two different things.
21          Is it 473 detectives, or
22 473 officers?
23      MR. HILKE:  Objection, form.
24      THE WITNESS:  Well, detective is like a title

Page 184

1 or rank.  So it was 473 CPD sworn members that were
2 contained in the data set.
3          I didn't determine what their rank
4 was.  It could have been 473 with some of these
5 being supervisors.  I don't know what their rank or
6 title was.  It was just the 473 sworn members
7 contained in the Area Five data set from '91 to '95.
8 BY MS. CARNEY:
9      Q.   So table 21 is -- is an outlier
10 calculation, right?
11      A.   Correct.
12      Q.   Okay.  So is it your testimony that the
13 473 officers that you -- the 473 number that you're
14 using here is not specific to detectives?
15          Sorry, my cadence just screwed that
16 question up.
17          Is it your testimony that the 473
18 number here is not exclusive to detectives?
19      MR. HILKE:  Objection.  Oh, sorry.  Objection,
20 form.
21          Go ahead.
22      THE WITNESS:  Yeah.  I -- again, without going
23 through all of the CRs, I don't know what their
24 title or rank was at the time.  I do know that these

Page 185

1 473 members were included within the CRs that were
2 provided by CPD for Area Five -- excuse me --
3 detectives from 1991 to '95.
4          Yeah, so I -- I don't know if they
5 were supervisors.  I don't know if they were
6 officers.  I just know they were included in those
7 CRs.
8 BY MS. CARNEY:
9      Q.   Okay.  Moving on to pages 63, 64, 65,
10 there's several tables on here:  Table 22,
11 table 23, table 24, and table 25.
12          Who did the calculations in order to
13 create these tables?
14      A.   For each of these tables, I provided
15 Ms. Meza with direction on what I would -- what I
16 was looking to find out, and she conducted --
17 Ms. Meza -- I'm sorry -- conducted the calculations
18 according to my direction.
19      Q.   Okay.  Page 66, we have two additional
20 CRs that you call out in your report.
21          Did you -- how did you -- what was
22 the selection criteria you used to determine that
23 these CRs should be summarized in your report?
24      A.   These CRs were selected based on the

Page 186

1 defendant Officer Guevara, Detective Guevara, and
2 whether they were sustained, and the fact that that
3 review process Guevara used to ultimately mitigate
4 the discipline that he had been -- had been given
5 for his misconduct.
6     Q.   If I go to page 68, there's a table
7 there, table 26.
8          Who did the calculations in order to
9 create that table?
10    A.   Yes.  Ms. Meza performed the
11 calculations at my -- at my direction.
12    Q.   If we go to page 119, going down to
13 right underneath question 2, it says:  Your -- this
14 analysis relied on more than 117 records accessible
15 to the public (i.e., news articles and public
16 information).
17         Do you see that?
18    A.   Yes.
19    Q.   Okay.  What is -- is there a list
20 somewhere of what those 117 records are that you're
21 referring to?
22    MR. HILKE:  Objection -- sorry, just one
23 second.
24         You can answer.  Go ahead.

Page 187

1     THE WITNESS:  I have a -- the document that
2 showed what materials were reviewed.  I don't have a
3 document that lists all 117 articles because some
4 were categorized in -- as with other materials that
5 were reviewed in other -- other reports.
6 BY MS. CARNEY:
7     Q.   Um --
8     A.   And then some were -- I'm sorry.
9          And then some were cited within the
10 reports.
11    Q.   Okay.  So --
12    A.   Or my report.
13    Q.   Okay.  If --
14    MS. CARNEY:  Nick, if we could go back to
15 Exhibit 3?
16 BY MS. CARNEY:
17    Q.   Okay.  So I'm showing you the list --
18 or what we already marked as Exhibit 3, which is
19 your materials reviewed, and I counted 16 bullet
20 points on here.
21          Can you identify for me these
22 117 records accessible to the public that you're
23 including -- or that you reviewed here?
24    MR. HILKE:  Sorry, objection to form.

Page 188

1     THE WITNESS:  The 117 aren't all listed here.
2 There were -- there were articles that may have been
3 reviewed that I didn't cite or ultimately not used.
4 But there were lots of different articles but
5 particularly on accountability and officer
6 misconduct.
7 BY MS. CARNEY:
8     Q.   Are any of the 117 listed on this
9 exhibit?
10    A.   Well, the -- what's here is part of
11 that 117, but all -- every single document that I
12 looked at, I did not list.  Or every single
13 document that I looked at, I did not use either.  I
14 just may have looked at it and -- and moved on.
15    Q.   Can you identify for me any of the 117
16 records that this line con -- or this line includes
17 on Exhibit 3?
18    A.   There were -- on this exhibit, it
19 doesn't list specifically any of the documents that
20 would have been accessible to the public as well.
21 But within my report, there are newspaper articles
22 and other documentation that is also public --
23 publicly available.
24    Q.   And so I think before you talked about

Page 189

1 articles that you reviewed that weren't cited.
2          Do you have a list anywhere of
3 articles that you reviewed that you did not cite in
4 your report?
5     A.   I don't -- I don't have a list.  If --
6 if I did not use it in the report, I did not create
7 a list of it.
8     Q.   Okay.  So going back to the report,
9 page 119, under question 2, it -- the question 2
10 says:  Does a culture of law-offending prone -- a
11 culture of law-offending prone to civil rights
12 violations exist within the Chicago Police
13 Department?
14          And then you said:  This analysis
15 relied on more than 117 records accessible to the
16 public.
17          So those records are separate and
18 apart from what you have included on attachment B
19 of your report of material reviewed, right?
20    MR. HILKE:  Objection, form.
21    THE WITNESS:  Specifically, yes.  There are --
22 like the newspaper articles or other news articles
23 and public information I don't believe is -- is
24 listed specifically on -- on attachment B.

Page 190

BY MS. CARNEY:

2    Q.   Okay.  And nowhere in your report is
3  there a specific list of these 117 records
4  accessible to the public, right?
5    A.   Not a compiled list.  Only -- they
6  would be within footnotes if they were used.
7    Q.   And if they weren't used, we would have
8  no idea what they are, right?
9       MR. HILKE:  Objection --
10         (Simultaneous cross-talk.)
11      MS. CARNEY:  I'm sorry.
12      MR. HILKE:  -- to form.  Objection to form.
13  BY MS. CARNEY:
14    Q.   That's a bad question.
15         If you didn't cite them -- if you
16  reviewed them but didn't cite them, then we would
17  have no idea what those articles are, right?
18    A.   That's correct, because I would not
19  have used them.
20    Q.   But didn't you just tell me that you
21  did review some articles but you didn't cite them?
22      MR. HILKE:  Objection, form.
23         Go ahead.
24      THE WITNESS:  I reviewed articles.  They were

Page 191

1  not cited if I did not use them.  So if I said I
2  reviewed articles and didn't cite them, I misspoke.
3  I reviewed articles, but if I did not
4  use them in this report, they're not included in the
5  report as -- as a citation or a footnote or -- or
6  any indication that they were used.
7  BY MS. CARNEY:
8    Q.   Okay.  So the language that you used
9  when writing this report says that your analysis
10  relied on more than 117 records accessible to the
11  public.
12         So is it your testimony that every
13  single record accessible to the public is somewhere
14  cited in your report?
15      MR. HILKE:  Objection, misstates the report,
16  form.
17         Go ahead.
18      THE WITNESS:  No.  My testimony is the
19  materials that we used and I used to prepare the
20  report is cited or listed.  Out of -- out of the
21  accessible documents, like I said, it may have
22  been -- well, it was numerous news articles of -- of
23  various instances that had happened over the years.
24  So all of that would not necessarily have been cited

Page 192

1  but was read and -- and reviewed.
2  BY MS. CARNEY:
3    Q.   Okay.  So let me -- let me ask it this
4  way.
5         If I wanted to recreate and
6  review for -- if I wanted to review myself all of
7  these 117 records that you say you relied on for
8  your analysis, how do I figure out what those
9  records are?
10      MR. HILKE:  Objection, form.
11      THE WITNESS:  I didn't create -- I didn't
12  create a list of everything, so it was just a
13  general public search of documents and reports that
14  have been prepared over the years.
15  BY MS. CARNEY:
16    Q.   Okay.  So I could not reproduce this
17  list of documents in order for my own review to see
18  what you relied upon in your analysis, correct?
19      MR. HILKE:  Objection, form, vague.
20         Go ahead.
21      THE WITNESS:  If it's not cited in the report,
22  then I would not be able to reproduce it.
23  BY MS. CARNEY:
24    Q.   Okay.

Page 193

1    A.   With -- I should say I would not be
2  able to reproduce it with the exact certainty of
3  everything that I looked at.
4    Q.   Okay.  Moving down to the very last
5  paragraph on this page, it says:  We reached
6  saturation or the recurrence of dominant themes.
7         Do you see that?
8    A.   Yes.
9    Q.   Okay.  What does it mean to reach
10  saturation?
11    A.   Whereas after reviewing so many
12  documents and so many news articles, so many
13  reports, the -- the themes were dominant, and we
14  weren't getting any new -- any new or different
15  information.
16         So to continue -- just to continue
17  reviewing the multitude of information that was out
18  there and available, we wasn't -- we weren't going
19  to get anything that we didn't already have.
20    Q.   Okay.  And how many documents typically
21  reaches -- how many documents does it take to reach
22  saturation?
23      MR. HILKE:  Objection, foundation.
24      THE WITNESS:  It's -- you know, it's that -- I

Page 194

1 don't think there's a specific number. It depends
2 on the information that you are -- are examining.
3         For -- I believe for the purposes of
4 this, you know, Dr. Knight reviewed lots of the
5 historical information, and I'm not exactly sure
6 how -- what constituted saturation. But you know,
7 it was a sufficient number of information that he
8 was not able to get any additional themes or any new
9 information after a certain point.
10 BY MS. CARNEY:
11     Q.   Do you know if Dr. Knight reviewed
12 records in addition to the 117 that you reviewed
13 and relied upon in your analysis?
14     MR. HILKE: Objection, form.
15         Go ahead.
16     THE WITNESS: You said in addition to the --
17 he -- he reviewed the material that was provided by
18 counsel, plaintiff's counsel, and he reviewed
19 information as well that was publicly available.
20 But I'm not sure of the specific articles. I'm sure
21 we may have reviewed some of the same articles.
22 BY MS. CARNEY:
23     Q.   If you go to the next page, 120, the
24 very top, it says: The qualitative analysis of

Page 195

1 historical data and complaint reports using a
2 hybrid of inductive/deductive coding processes.
3         Do you see that?
4     A.   Yes.
5     Q.   Okay.  Is qualitative analysis a
6 subjective or an objective analysis?
7     MR. HILKE: Object to -- objection, form,
8 foundation.
9     THE WITNESS: That I'm not -- I'm not clear.
10 I'm not sure on if it's subjective or objective.
11 BY MS. CARNEY:
12     Q.   When you say using a hybrid of
13 inductive and deductive coding process, can you --
14 how does that coding process work?
15     A.   I'd ask Dr. Knight to conduct an
16 analysis of the literature and -- and the reports
17 that we found, and he conducted the analysis at my
18 direction. So I am not sure how that process works.
19     Q.   So who did -- who create -- who
20 did the hybrid of an inductive and deductive coding
21 process?
22     A.   Again, I asked Dr. Knight to conduct
23 that -- that analysis, and that was the process as
24 he described that he used.

Page 196

1     Q.   Okay.  Do you know if in statistics the
2 word "significant" has a specific definition or
3 meaning?
4     MR. HILKE: Objection, form.
5     THE WITNESS: No.  I don't know what meaning
6 in statistics that "significant" carries.
7 BY MS. CARNEY:
8     Q.   Okay.  And then moving on to
9 appendix A, appendix A starts at page 122 and goes
10 to page 131, the tables at least.
11         Who did the data analysis in order
12 to create the tables contained in appendix A?
13     A.   Ms. Meza would have completed the data
14 analysis for these tables at my direction.
15     Q.   And that would be true for all of the
16 tables contained in appendix A, right?
17     A.   Yes, that would be true for all the
18 tables.
19     MS. CARNEY: All right.  I might be done with
20 my portion of this, so if we could take a quick
21 10-minute break for me to review my notes and my
22 outline, I might -- I think I might be able to pass
23 it on to Ms. Golden.
24     THE WITNESS: Okay.

Page 197

1     THE LEGAL VIDEOGRAPHER: We're off the video
2 record at 3:46 p.m.
3         (Recess taken.)
4     THE LEGAL VIDEOGRAPHER: We're back on the
5 video record at 3:57 p.m.
6     MS. CARNEY: Mr. Finnell, I am done with my
7 part of the questioning. Thank you very much. I'm
8 going to pass it on to Carrie.
9         EXAMINATION
10 BY MS. GOLDEN:
11     Q.   Good afternoon, Mr. Finnell.  How are
12 you?
13     A.   Doing fine.  Good afternoon.
14     Q.   Are you feeling okay enough to -- or
15 well enough to proceed?
16     A.   Yes.
17     Q.   Okay.  Mr. Finnell, do you hold an
18 opinion to a reasonable degree of professional
19 certainty that the spreadsheet supplied by
20 Mr. Sierra's legal team and upon which you and your
21 team analyzed was reliable?
22     MR. HILKE: Objection to form.
23     THE WITNESS: Yes, I do.
24

Page 198

1 BY MS. GOLDEN:

2    Q.   And is it also your opinion to a
3 reasonable degree of professional certainty that
4 the spreadsheet supplied by Mr. Sierra's legal team
5 is accurate?

6    A.   Yes, I do.

7    Q.   And is it also your opinion to a
8 reasonable degree of professional certainty that
9 the spreadsheet supplied by Mr. Sierra's legal team
10 is complete?

11   A.   When you say "complete," what --
12 what -- are you referring to complete in the
13 representation of the CRs, or -- or --

14   Q.   Complete in the representation of all
15 the CRs that they were provided, the 323 CRs that
16 they were provided.

17   A.   Yes, I have confidence that it was
18 complete.

19   Q.   Do you also hold an opinion to a
20 reasonable degree of professional certainty, as you
21 define in your report, that the coding performed by
22 Mr. Sierra's legal team is free of bias?

23   A.   Yes, I -- I agree with that.

24   Q.   Do you also hold an opinion to a

Page 199

1 reasonable degree of professional certainty that
2 the spreadsheet supplied by Mr. Sierra's legal team
3 to you for analysis is free of guesswork and
4 speculation?

5    MR. HILKE:  Objection, form.

6    THE WITNESS:  Yes, yes, I do.

7 BY MS. GOLDEN:

8    Q.   And is it also your opinion or would
9 you -- strike that.

10        Would you expect that the coding
11 done by Mr. Sierra's legal team into the
12 spreadsheet was applied consistently across all CRs?

13   A.   Yes.

14   Q.   And did you rely on Mr. Sierra's
15 attorneys to provide you with a spreadsheet of data
16 that was reliable and accurate?

17   MR. HILKE:  Objection to form.

18        Go ahead.

19   THE WITNESS:  Yes, I did.

20 BY MS. GOLDEN:

21   Q.   Did you rely on Mr. Sierra's legal team
22 to provide you with a spreadsheet of data that was
23 complete?

24   MR. HILKE:  Same objection.

Page 200

1    THE WITNESS:  Yes, I did.

2 BY MS. GOLDEN:

3    Q.   And did you rely on Mr. Sierra's legal
4 team to provide you with a spreadsheet of data that
5 was free of bias?

6    MR. HILKE:  Same objection.

7    THE WITNESS:  Before I answer that, I want --
8 I wanted to kind of go back to the last question.
9 You asked if it was complete.  And I relied on -- on
10 the legal team, but myself and my associates also
11 checked and spot-checked the -- the spreadsheet
12 ourselves.

13        So we did not just accept it as
14 given.  We looked at random CRs and to make sure
15 that the information in the spreadsheet matched the
16 information within the CR.

17        And so I just wanted to say it wasn't
18 just a blind acceptance that this was complete or,
19 you know, it was what it was.  We did random checks
20 to make sure ourselves that we were confident that
21 what we were receiving was information we could use
22 to analyze.

23 BY MS. GOLDEN:

24   Q.   So you re -- is it fair to say that you

Page 201

1 relied on them to provide a spreadsheet that was
2 complete, and then you and Ms. Meza personally
3 checked to make sure that it was complete.

4    A.   Well, we --

5    MR. HILKE:  Objection to form.  Go ahead,
6 sorry.

7        (Simultaneous cross-talk.)

8    MR. HILKE:  That's okay.  Go ahead.

9    THE WITNESS:  No.  Myself and Ms. Meza,
10 Dr. Knight, looked at various CRs, looked at --
11 looked at the information contained in the
12 spreadsheet, and at various points throughout our
13 process, confirmed that the information in the
14 spreadsheet matched the information in the CRs.

15   Q.   And I think you've said before you
16 looked at all the CRs, right?

17   A.   I looked at all the CRs.  I did not
18 compare all the CRs to the data in the spreadsheet.
19 I compared some of the CRs to the data, as did
20 Ms. Meza and Dr. Knight.

21   Q.   In total, how many CRs were compared to
22 the data in the spreadsheet?

23   A.   That information I do not have.  I

Page 202

1 don't know the total number that were compared.

2    Q.    Do you have any approximation in terms

3 of what percent of the total of the 323 CRs that

4 were analyzed were reviewed for completeness?

5       MR. HILKE: Objection, form.

6       THE WITNESS: No, I do not have an

7 approximation for that percentage.

8 BY MS. GOLDEN:

9    Q.    But in any -- in any case, you would

10 have expected that Mr. Sierra's legal team that

11 prepared the spreadsheet for your review would have

12 coded the data into the spreadsheet without bias,

13 correct?

14    A.   Yes, that is correct.

15    Q.    And your -- it's your expectation

16 that -- that if they entered data into the

17 spreadsheet that there would be some basis for that

18 data that could be found in the CR, correct?

19       MR. HILKE: Objection, form.

20       THE WITNESS: Yes, it would be my expectation

21 that it was taken -- the data in the spreadsheet was

22 taken directly from the individual CR.

23 BY MS. GOLDEN:

24    Q.    The coders weren't free to disregard

Page 203

1 part -- any -- any allegations, right?

2       MR. HILKE: Objection, form, foundation.

3       THE WITNESS: No. They were to include the

4 allegations as -- as listed in the CR.

5 BY MS. GOLDEN:

6    Q.    Regardless of how many there were,

7 right?

8       MR. HILKE: Objection, form.

9          Go ahead.

10       THE WITNESS: Yeah, regardless of how many.

11 BY MS. GOLDEN:

12    Q.    And regardless of what kind of

13 allegation it was, correct?

14       MR. HILKE: Same objection.

15       THE WITNESS: That is correct. Regardless of

16 the type of allegation.

17 BY MS. GOLDEN:

18    Q.    So if there was a -- if there was an --

19 if there was a CR against an officer, you would

20 expect that data to be included in the spreadsheet?

21       MR. HILKE: Objection, form, vague, foundation.

22          Go ahead.

23       THE WITNESS: Yes. If there was an allegation

24 against an officer, we would expect that to be

Page 204

1 listed with the corresponding CR number in the

2 spreadsheet.

3 BY MS. GOLDEN:

4    Q.    And your expectation was that the

5 coders and Mr. Sierra's legal team consistently

6 coded all the CRs, correct?

7    A.   That was our expectation, yes.

8    Q.    And would you agree with me that your

9 analysis of the data set is only as good as the

10 reliability of the data set itself?

11       MR. HILKE: Objection, form.

12       THE WITNESS: Yes, that is -- I would agree

13 with that, and that is one of the reasons why

14 Ms. Meza went through the data set to make sure that

15 the data was in a consistent format so that we could

16 analyze the data.

17 BY MS. GOLDEN:

18    Q.    What do you mean "consistent format"?

19    A.   Make sure that as people were typing in

20 information there were no misspellings or, you

21 know, any kind of human error where they may

22 misspell something that we would not be able to

23 capture, say, when looking for sustained,

24 exonerated, or whatever, the findings. To make

Page 205

1 sure the information for all of that was

2 consistent, make sure the allegations were

3 consistently typed correctly, make sure that

4 there's an allegation to an individual, to a CR.

5          So just to make sure that the -- as

6 the legal team representatives were putting in the

7 information that it was in a format that we could

8 later go through or she actually -- Ms. Meza could

9 actually go through and analyze and be confident

10 that the data was set up in such a way that she

11 could analyze it accurately.

12    Q.    How much time does she spend

13 supervising the coders?

14       MR. HILKE: Objection, form, foundation.

15 BY MS. GOLDEN:

16    Q.    In the way that you just described.

17          How much time does she spend doing

18 that?

19       MR. HILKE: Same objection.

20       THE WITNESS: Ms. Meza did not supervise the

21 coders.

22 BY MS. GOLDEN:

23    Q.    Okay. When you said she --

24       MR. HILKE: Sorry, let him finish please.

Page 206

1    MS. GOLDEN: Sure, sorry.
2    THE WITNESS: Yeah, she -- she did not
3 supervise the coders. The coders worked for
4 plaintiff's legal team. Once they completed their
5 work, then the spreadsheet was sent to us to
6 analyze.
7          So as far as --
8 BY MS. GOLDEN:
9    Q.   So how --
10   A.   As far as a spot check, as far as the
11 review, I don't know how much time Ms. Meza spent
12 doing that aside from what she provided in her
13 invoices.
14   Q.   How much time did you spend
15 spot-checking the CRs to make sure that they
16 matched with the information that was contained in
17 the spreadsheet supplied by Mr. Sierra's legal team?
18   A.   I have no idea how much time. It was
19 not done in like a single setting. Over the course
20 of our work on the -- this -- this report, there
21 would be times when I would go in and look and
22 compare data.
23          But I don't have a -- I didn't
24 sit -- set aside a specific time to just do spot

Page 207

1 checks, so don't have a time.
2    Q.   Do you have any estimate as to the
3 amount of time in hours or days that you spent
4 ensuring -- personally ensuring that the
5 spreadsheet supplied by Mr. Sierra's legal team
6 matched the information in the CRs?
7    A.   No. Like I said, I don't have an
8 est -- excuse me -- an estimation of what that time
9 would have been.
10   Q.   Okay. And the -- you provided a report
11 in the Rodriguez case, correct?
12   A.   Yes, I did.
13   Q.   And the Rodriguez data set, the
14 spreadsheet is the same as the spreadsheet in this
15 case, correct?
16   A.   Yes, it is.
17   Q.   It's the same set of years, right?
18   A.   Yeah, I believe so. Yes, it is.
19   Q.   It's the same set of 323 CRs?
20   A.   Yes, it is.
21   Q.   It's the same number of investigations
22 as you define them?
23   A.   Yes.
24   Q.   And it's the same number of allegations

Page 208

1 as you define them.
2    A.   Yes.
3    Q.   And I think I understand from your
4 prior testimony that you can't tell us which --
5 strike that.
6          When you were spot-checking CRs, did
7 you check any of them for accuracy in the date the
8 CR was initiated?
9    A.   Specifically I can't say which CRs.
10 I'm sure that may have been a data point that I
11 checked just to confirm to make sure that it was
12 included; that it was typed in accurately.
13          I -- most of my spot-checking would
14 have included allegations listed, to make sure the
15 officer's name was spelled correctly, and the
16 disposition. And if it was sustained, make sure
17 that the additional information for the reviews --
18 internal reviews, external reviews -- were included
19 accurately.
20   Q.   As you sit here today, can you tell me
21 whether or not you reviewed any CR for accuracy in
22 terms of the date the CR was initiated?
23   A.   Again, like I said, I can't say
24 specifically as I sit here which CRs I may have

Page 209

1 looked at that -- at that data point as well.
2          I know -- I can say that
3 specifically to compare a CR to the date it was
4 initiated, I did not do that. I did look at the
5 spreadsheet to determine if the initiation dates
6 for the CRs fell within the time frame, '91 to '95.
7 But I did not look at -- I can't recall if I looked
8 at specific CRs and which ones I looked at the
9 initiation date as well.
10   Q.   Okay. So I'm not asking you if you can
11 recall which CR you reviewed for the accuracy of
12 the information about the CR initiation date.
13          I'm asking you whether you recall
14 looking at any CR to confirm the accuracy of the CR
15 initiation date.
16   MR. HILKE: Objection, form.
17   THE WITNESS: Okay. Well, again, I -- I'm
18 sure I looked at some. I just can't say yes, I
19 looked at this CR for this date.
20          But as I looked at information
21 contained in the CRs and compared them to the Excel
22 spreadsheet, I'm sure that that was one of the --
23 the points that I also glanced at and looked at to
24 confirm if -- if they matched.

Page 210

1 BY MS. GOLDEN:

2 **Q. I think you said one of the things you**
3 **did look at was to make sure that the allegations**
4 **were correctly coded; is that right?**

5 MR. HILKE: Objection, form.

6 THE WITNESS: Yes. That was one of the points
7 that I would look at. Again, not always, but that
8 was one of the points that I would look at.

9 BY MS. GOLDEN:

10 **Q. Approximately what percent of the CRs**
11 **did you review for coding accuracy in the area of**
12 **the nature of the allegation?**

13 A. I can't tell you. I don't know what
14 percentage. I can't even guess, because I wouldn't
15 just look at one point. I would maybe, you know,
16 open a CR and look at several different things
17 within that CR across that -- across the Excel
18 spreadsheet, so I don't know what percentage
19 included --

20 **Q. Can you --**

21 A. -- that.

22 **Q. Can you tell me how many different CRs**
23 **you opened and looked at in total for coding**
24 **accuracy?**

Page 211

1 A. No, I didn't write the list down or
2 keep a tally of the number of CRs I looked at.

3 **Q. Do you have any estimate as to the**
4 **number of CRs that you opened and reviewed for**
5 **coding accuracy in any respect?**

6 A. No. I mean, again, I didn't do it in
7 one sitting, so it -- it would be over a period of
8 time and I just -- I really don't know.

9 **Q. So is it fair to say that you have**
10 **absolutely zero idea about how much time you spent**
11 **reviewing the CRs to ensure that they were**
12 **correctly coded in the data sheet that was prepared**
13 **by plaintiff's legal team?**

14 MR. HILKE: Objection, form.

15 THE WITNESS: It's not that I have zero idea.
16 It's just it was done -- sometimes it was done
17 during the course of doing some other part of the
18 report. So I wouldn't necessarily have isolated
19 that time that I looked at it because I may have
20 been doing other work and decided, Well, let me go
21 verify this while I was doing that.

22 So it was done during the course of
23 the other tasks that I did in preparing this report.
24 I just don't -- I just can't quantify and isolate

Page 212

1 that time versus the time used on other aspects of
2 the report.

3 BY MS. GOLDEN:

4 **Q. So you can't isolate -- or you have no**
5 **estimate as to the amount of time you spent**
6 **reviewing the CRs for coding -- coding accuracy,**
7 **and you have no estimate for the number of CRs that**
8 **you reviewed for coding accuracy. Is that -- is**
9 **that fair?**

10 MR. HILKE: Objection, form.

11 THE WITNESS: Let's say, for instance, I look
12 at -- I'm looking at one of the charts, and so I
13 want to identify, say, a sustained -- a CR that had
14 a sustained finding.

15 Well, while I have that CR open, I'm
16 looking to make sure all the other information on
17 the spreadsheet is -- is accurate, but that wasn't
18 my primary focus of that. It was -- so I didn't --
19 you know, I wouldn't think of that time necessarily
20 because my time is spent on something else, but
21 I --

22 BY MS. GOLDEN:

23 **Q. But you did that process -- I think you**
24 **said before that you completed that process for all**

Page 213

1 **the CRs and the -- all the 323 CRs, correct?**

2 A. I --

3 (Simultaneous cross-talk.)

4 MR. HILKE: Objection -- objection to form and
5 misstates testimony.

6 Go ahead.

7 THE WITNESS: When I looked at all of the CRs,
8 I did not look at all of the CRs in conjunction with
9 the Excel spreadsheet. I looked at all of the CRs
10 just to read through them, get an idea of -- of what
11 the allegations were, and -- and really so that I
12 could have my eyes on all -- all the CRs.

13 Then as -- during the course of the
14 work on the report, I would go back and review
15 certain CRs, or when it came time to identify CRs to
16 include in the report, I would have a general idea
17 of, Oh, okay, I can go back to this one and look at
18 this, or go to the Excel spreadsheet, see what's on
19 the findings where then see if that CR was a
20 suitable CR for inclusion.

21 So it was multiple times of going
22 back and forth and looking at the CRs and at
23 different levels of review when I looked at a CR.

24

Page 214

1 BY MS. GOLDEN:
2     Q.   Can you provide any estimate as to the
3 amount of time you spent reviewing the CRs to
4 ensure that they were coded correctly?
5     MR. HILKE:  Objection, asked and answered.
6        You can answer.
7     THE WITNESS:  Like -- like I said before, I
8 can't -- I'm not comfortable trying to provide a
9 time because it was done in conjunction with other
10 tasks.  So it was not -- I don't have a time that I
11 could isolate and give you a reasonable estimation
12 of how much time I spent doing it.
13 BY MS. GOLDEN:
14    Q.   Okay.  So you cannot provide a
15 reasonable estimate as to the amount of time you
16 spent reviewing CRs for accurate coding, correct?
17    MR. HILKE:  Objection, asked and answered.
18       Go ahead.
19    THE WITNESS:  Yeah.  Like I said before, I
20 cannot do that.  That is correct.
21 BY MS. GOLDEN:
22    Q.   And is it also correct that you cannot
23 provide a reasonable estimate as to the number of
24 CRs that -- actually, I'll withdraw that question.

Page 215

1        Okay.  Is it your opinion to a
2 reasonable degree of professional certainty that
3 the coding of the CRs on the data sheet attached to
4 your report and upon which you relied in your
5 analysis was done correctly?
6     MR. HILKE:  Objection, form.
7     THE WITNESS:  Yes.
8 BY MS. GOLDEN:
9     Q.   Okay.  Now, can you tell me the notes
10 that you have in -- on the report that's in front
11 of you, about how many pages of that report contain
12 notes?
13    A.   Without going through every page and
14 counting, I would estimate between 25 maybe, 20 to
15 25.  I may be off.  I -- I haven't counted them.
16    Q.   Sure.
17       And have you used those notes as an
18 aid to your testimony today?
19    A.   At times, I have referred to the notes.
20    Q.   And you've relied on them, right?
21    MR. HILKE:  Objection --
22 BY MS. GOLDEN:
23    Q.   Not just re --
24    MR. HILKE:  I'm sorry.

Page 216

1 BY MS. GOLDEN:
2     Q.   Not just referred to them.
3        I mean, when you say you referred to
4 them, what do you mean?
5     A.   Referred to the --
6     MR. HILKE:  Sorry, sorry.  Objection, form.
7        Go ahead.
8     THE WITNESS:  Referred to the notes to -- to
9 recollect certain things or to refer to the notes as
10 a -- to identify specific places in the report when
11 responding to -- to your questions.  And in some of
12 the places in the report where there were errors
13 that would need to be addressed, referred to those
14 points so that I could provide you with the correct
15 information.
16 BY MS. GOLDEN:
17    Q.   Okay.  And were you alone when you made
18 the notes, or were you with counsel for Mr. Sierra
19 when you made some of those notes?
20    MR. HILKE:  Objection ... withdrawn.
21       Go ahead.
22    THE WITNESS:  At -- at times, I was alone.  At
23 times, I may have been speaking with counsel for Mr.
24 Sierra or working with my other colleagues if I had

Page 217

1 a question or needed a refresher on something.
2 BY MS. GOLDEN:
3     Q.   Okay.  Have -- I think you mentioned
4 something about errors in the report.
5        Have we discussed in the deposition
6 today all of the errors?  I mean, are there errors
7 in your report?
8     A.   Uh --
9     MR. HILKE:  Go ahead.  Go ahead.
10    THE WITNESS:  There were a couple of places
11 that we discussed; that item was in the wrong place
12 or item wasn't noted properly.  I don't believe that
13 there were any other errors, aside from maybe a typo
14 or something, but no error of fact or error -- or
15 error placement where information should have been
16 in one place and it was placed in another place.
17 BY MS. GOLDEN:
18    Q.   All right.  So why don't you go through
19 your report and tell me what the errors are that
20 you were referring to.
21    MR. HILKE:  Well, objection, foundation,
22 misstates the witness' testimony.
23    THE WITNESS:  There was a one on page 29.  It
24 says, See error, reference source not found.  I put

Page 218

1 in the information about table 1, and we discussed
2 that.
3 BY MS. GOLDEN:
4    Q.   And your note says what?
5    MR. HILKE:  Objection, I'm going to instruct
6 Mr. Finnell that the contents of his notes are
7 protected as work product and under Rule 26.
8    MS. GOLDEN:  Okay.  You understand, Wally,
9 that we disagree and we intend to pursue the matter.
10 And if he doesn't answer the question, we're going
11 to ask to bring him back to answer the questions and
12 produce the notes.
13    MR. HILKE:  I understand.
14    MS. GOLDEN:  Okay.
15 BY MS. GOLDEN:
16    Q.   All right.  Mr. Finnell, what other
17 errors are contained in your report?
18    A.   Page 30 where the footnote for 91 was
19 attached to table 1, and it should have been
20 attached to table 11.  And we discussed that as
21 well.
22    Q.   Are there any other errors in the
23 report?
24    MR. HILKE:  Just to confirm, Ms. --

Page 219

1 Ms. Golden, you had asked him to review his report.
2       Do you want him to keep reviewing his
3 report?
4    MS. GOLDEN:  Yes.
5    MR. HILKE:  Thanks.
6    THE WITNESS:  There was a -- the inclusion on
7 page 37 of footnote 94 that had been copied from
8 another version of the report and should not have
9 been included in this report.
10       The typo on page 44 in the paragraph
11 that begins, As set forth, and then down in the
12 middle of the paragraph, it should be a comma
13 between table 13 and table 16.
14 BY MS. GOLDEN:
15    Q.   Are there any other errors in your
16 report?
17    A.   I'm almost finished.  I don't believe
18 there are.  I'm toward the end now.
19       I mean, if -- if there are, I don't
20 believe I've caught them prior to today.  So if
21 there's any other typos, it's something I may -- I
22 have not caught prior to today.
23    Q.   Okay.  Did you catch those errors
24 yourself, or were they pointed out to you by

Page 220

1 someone else?
2    MR. HILKE:  And I'll just instruct you not to
3 reveal the contents of any conversations with
4 Mr. Sierra's attorneys.
5       You can answer.
6    THE WITNESS:  Those errors I caught myself,
7 identified myself.
8 BY MS. GOLDEN:
9    Q.   All five of them?
10    A.   Yes.
11    MR. HILKE:  Just objection -- I'm sorry.
12 You're good.  Withdrawn.
13    THE WITNESS:  I -- I didn't count them, but
14 the errors that I identified were the ones that I
15 caught myself.
16 BY MS. GOLDEN:
17    Q.   The error in the footnote about the
18 Flint Taylor interview, that's an error that you
19 caught yourself?
20    A.   Yes.
21    Q.   And that was a carryover from the
22 Rodriguez report, correct?
23    A.   Correct.  And --
24    MR. HILKE:  Objection, form.  Sorry, give me a

Page 221

1 sec.  Objection, form.
2       You can answer.
3    THE WITNESS:  Yes, it was a carryover, and I
4 meant to go back and -- and catch that and forgot to
5 do that.
6 BY MS. GOLDEN:
7    Q.   What changed in between the time you
8 submitted the Rodriguez report and the time you
9 submitted the Sierra report that caused you to want
10 to delete that footnote?
11    MR. HILKE:  Objection, form.
12       Go ahead.
13    THE WITNESS:  In the Rodriguez report, it was
14 identified as -- as being an error, and I knew that
15 it most likely would also be found in this report.
16 And I just failed to go back and -- and double check
17 specifically for that point.  It wasn't necessarily
18 a change.  It was the identification and catching it
19 at the Rodriguez report that prompted me to realize
20 that I probably had it here as well.
21 BY MS. GOLDEN:
22    Q.   And it wasn't exactly the Rodriguez
23 report that pointed out the error.  It was the
24 deposition you gave in the Rodriguez case, right?

Page 222

1      MR. HILKE:  Objection, form, foundation, facts
2  not in evidence.
3          You can answer.
4      THE WITNESS:  It was during the deposition
5  where I was made aware of the -- the error.
6  BY MS. GOLDEN:
7      Q.   Are there any other errors in the
8  Rodriguez report?
9      MR. HILKE:  Objection, form, foundation.
10          You can answer.
11      THE WITNESS:  While I sit here now without
12  looking at the report, I can't tell you if there's
13  any other errors.  Like I said, it may be some typos
14  or something.  I wouldn't know until I went back
15  through it specifically looking to see if there's
16  any errors.
17  BY MS. GOLDEN:
18      Q.   As you sit here today, are you aware of
19  any significant error that's contained in the
20  Rodriguez report that you previously issued?
21      MR. HILKE:  Same objections, form and
22  foundation.
23      THE WITNESS:  Nothing that I can recall right
24  now.

Page 223

1  BY MS. GOLDEN:
2      Q.   Is it still your opinion that the
3  outlier analysis that is contained in your
4  Rodriguez report was correctly performed?
5      MR. HILKE:  Objection, form, foundation.
6          You can answer.
7      THE WITNESS:  Without reviewing the report, I
8  can't recall.  I --
9  BY MS. GOLDEN:
10      Q.   Have you --
11      A.   And I don't have -- I don't have an
12  independent recollection right at the moment.
13      Q.   Sure.
14          You've -- your reports -- you issued
15  a report in Solache/Reyes as well, that case.  It's
16  a different one, right?
17      A.   Yes.
18      Q.   And your report contains an analysis of
19  outliers in Solache/Reyes, correct?
20      A.   Yes.
21      Q.   And you have an outlier analysis in the
22  Rodriguez report as well, correct?
23      A.   Yes, I do.
24      Q.   And you have I think we've talked about

Page 224

1  today an outlier analysis in the report you issued
2  in this case, correct?
3      A.   That is correct.
4      Q.   Did you perform the outlier analysis in
5  the same way in all three cases?
6      MR. HILKE:  Objection, form and foundation.
7      THE WITNESS:  I instructed Ms. Meza to perform
8  an outlier analysis and provide me with the results
9  of her analysis, so I did not perform the analysis
10  itself.
11  BY MS. GOLDEN:
12      Q.   And do you know how to perform an
13  outlier analysis?
14      MR. HILKE:  Objection, form.
15      THE WITNESS:  No.  I'm not a statistician, and
16  so I rely upon Ms. Meza as a statistician to perform
17  such work.
18  BY MS. GOLDEN:
19      Q.   Do you have an opinion to a reasonable
20  degree of professional certainty that Ms. Meza
21  accurately performed the outlier analysis in
22  Solache/Reyes?
23      MR. HILKE:  Objection, form, foundation, and I
24  think -- that's fine.  Go ahead.

Page 225

1      THE WITNESS:  Yes, I believe that Ms. Meza has
2  performed that analysis correctly.
3  BY MS. GOLDEN:
4      Q.   And the data that she relied upon was
5  reliable in Solache/Reyes?  Is that -- is it still
6  your opinion?
7      A.   Yes, it is still my opinion.
8      Q.   Is it also still your opinion that the
9  outlier analysis she -- I'm sorry -- the outlier
10  analysis that's contained in your report for
11  Rodriguez is correct?
12      MR. HILKE:  Objection, form, foundation.
13      THE WITNESS:  Yes.  I believe that Ms. Meza
14  has performed that analysis correctly.
15  BY MS. GOLDEN:
16      Q.   I mean, you're responsible for her
17  work, right?  You put your name on the report and
18  her analysis in the report.
19      MR. HILKE:  Same objection.
20  BY MS. GOLDEN:
21      Q.   Correct?
22      A.   That is correct, yes.
23      Q.   Do you have any reason to believe that
24  she didn't apply the same approach in her outlier

Page 226

1 analysis across all three cases?

2      MR. HILKE:  Objection, form, foundation.

3      THE WITNESS:  Like I said before, I have no

4 idea what approach she applied.  So I have no reason

5 not to believe that she's used sound, statistical

6 methods to identify and -- and analyze the data and

7 come to an answer with respect to the outlier.

8          But I'm not a statistician, so I -- I

9 rely on a professional, such as Ms. Meza, to perform

10 such work.

11 BY MS. GOLDEN:

12      Q.   Do you also rely on her to con -- to

13 use consistent methodology when she's calculating

14 an outlier analysis?

15      MR. HILKE:  Objection, form and foundation.

16      THE WITNESS:  I -- I rely on Ms. Meza as a

17 statistician to do -- to use consistent methodology

18 on all of her analyses, including outlier analysis.

19 BY MS. GOLDEN:

20      Q.   So you would expect the way that she

21 calculates the outlier analysis in Solache/Reyes to

22 be the same methodology she used in Rodriguez and

23 the same methodology she uses in Sierra, correct?

24      MR. HILKE:  Objection, form, foundation,

Page 227

1 misstates testimony.

2      THE WITNESS:  No.  What I would expect of

3 Ms. Meza is that she would use sound methodology.

4 Again, I'm not a statistician, so I rely on her to

5 use what she deems appropriate and best in analyzing

6 such data and providing that information to me.

7 BY MS. GOLDEN:

8      Q.   Would you expect her to calculate an

9 outlier the same way in all three cases?

10      MR. HILKE:  Objection, form and asked and

11 answered.

12          Go ahead.

13      THE WITNESS:  Again, my expectation from

14 Ms. Meza is that she would use the appropriate

15 methodology that is -- that is widely accepted by

16 professionals in her field as a statistician, as a

17 mathematician.

18          So again, I -- I am not one, so I --

19 I don't know what other methodologies that might be

20 used.  If one's better than another, I have no idea.

21          So I rely on Ms. Meza to perform

22 that -- those -- that work and provide that work and

23 information to me for inclusion in the report.

24

Page 228

1 BY MS. GOLDEN:

2      Q.   And you have no ability to correct her

3 work, right, because you're not a stat --

4 statistician.

5      MR. HILKE:  Objection, form and foundation.

6          Go ahead.

7      THE WITNESS:  My ability to, I guess, review

8 her work is based solely on, you know, meeting with

9 her to get a base understanding of how she

10 determines what would constitute an outlier or how

11 many CRs would an officer have to have within a time

12 period to be considered an outlier.

13          The specifics of that process, I'm --

14 I'm not -- I'm not clear on.  I'm not confident

15 in -- in performing myself.

16 BY MS. GOLDEN:

17      Q.   But you're comfortable with the

18 methodology she used in all three cases.

19      MR. HILKE:  Objection, form.

20      THE WITNESS:  I'm comfortable with Ms. Meza's

21 analysis and her explanation of what she has found

22 and how that -- how that interprets into which

23 officers or which -- you know, what becomes of the

24 outlier.

Page 229

1 BY MS. GOLDEN:

2      Q.   But you're -- because you're not a

3 statistician you're unable to critically review her

4 calculations in the outlier area, correct?

5      MR. HILKE:  Objection, form.

6      THE WITNESS:  Yes, I am unable to critically

7 review her calculations.

8 BY MS. GOLDEN:

9      Q.   How were you first introduced to

10 attorneys at Loevy & Loevy?

11      MR. HILKE:  Objection to the extent it -- that

12 you would have to reveal conversations with

13 attorneys for any of the clients on whose cases

14 you've worked, I'll instruct you not to answer.

15      MS. GOLDEN:  No.  That -- that is a question

16 that was asked on Wednesday by one of your peers, so

17 that's a question I want an answer to.

18      MR. HILKE:  I'm sorry.  It was asked by a

19 peer --

20      MS. GOLDEN:  Anand, Anand Swaminathan in this

21 partic -- exact case, that exact question.  So I

22 think could you please reconsider.

23      MR. HILKE:  I mean, I -- I was not at that

24 deposition.  Did -- was a privilege assert --

Page 230

1 objection made or I --
2     MS. GOLDEN: He asked the question.
3     MR. HILKE: There's --
4     MS. GOLDEN: Okay. So what's the basis for
5 your objection to that question?
6     MR. HILKE: Sure. My objection is that if to
7 answer that question Mr. Finnell would have to
8 reveal a conversation that happened in an
9 attorney/client context, like if he would have to
10 reveal conversations he had with attorneys related
11 to the work he did on the legal case, then Rule 26
12 protects attorney/expert communications about the
13 project the expert works on.
14         And so I -- I want to be really
15 clear. I did not say Mr. Finnell can't say how he
16 met the Loevy & Loevy attorneys. What I said was if
17 he'd have to reveal the contents of the
18 communication, you can't -- you know, that's a --
19 that's a privilege that the client has that you're
20 entitled to rely on.
21     MS. GOLDEN: Okay. So what I heard you say
22 was a direction to him not to answer the question,
23 so let me just try again.
24

Page 231

1 BY MS. GOLDEN:
2     Q.  Mr. Finnell, I'm not asking you to
3 disclose the contents of any conversation you've
4 had with anyone at Loevy & Loevy, but I want to
5 know how you first came to hear about the firm.
6     MR. HILKE: Same instruction, but answer, you
7 know, at -- as we've discussed, please.
8     THE WITNESS: Okay. I first learned of
9 Loevy & Loevy when I worked for IPRA. And a CR came
10 through, was -- was the basis of a civil lawsuit.
11 So that was the first time I learned of the firm and
12 became aware of the type of work -- pri -- primary
13 work that Loevy & Loevy was doing with respect to
14 CPD and officer misconduct.
15 BY MS. GOLDEN:
16     Q.  Do you have a personal relationship
17 with any of the lawyers or staff members of Loevy &
18 Loevy?
19     A.  No. The relationships are all
20 professional.
21     Q.  You're not -- you don't consider anyone
22 over -- you don't see anyone over there on a social
23 basis?
24     A.  Oh, no.

Page 232

1     Q.  Okay. Is it your understanding that
2 your data set of 323 CRs is the -- what is your
3 understanding of what the 323 CRs consist of?
4     A.  My -- my understanding of the 323 CRs
5 are that those are the CRs that the City of
6 Chicago, CPD, produced pursuant to the court order
7 requesting that they produce all of the complaint
8 register files for Area Five detectives between
9 1991 and -- and 1995.
10     Q.  I think you said you got the
11 spreadsheet in Excel format; is that correct?
12     A.  Yes, that is correct.
13     Q.  Did you use Excel to manipulate the
14 data in any way?
15     MR. HILKE: Objection, form, vague.
16         Go ahead.
17     THE WITNESS: If you mean by analyze the data
18 or tally the data and various categories, then yes.
19 We used Excel to -- to count, you know, and organize
20 the files by findings and -- and disposition and so
21 forth.
22 BY MS. GOLDEN:
23     Q.  Did you use any program other than
24 Excel to organize or review dan -- data?

Page 233

1     MR. HILKE: Go ahead.
2     THE WITNESS: I did not use any programs to
3 analyze specific data points. I have just a little
4 knowledge of Excel, enough to group it together and
5 sort different things.
6 BY MS. GOLDEN:
7     Q.  Okay. Have you had any windows open on
8 your computer screen other than the window for the
9 Zoom conference today?
10     A.  Not while we're talking, no.
11     Q.  Have you had -- have you reviewed
12 emails or texts while we've been in session here?
13     A.  Only on breaks.
14     Q.  Have you ever -- when did you first
15 become aware of the fact that a person might
16 falsely confess to a crime they didn't commit?
17     A.  Well, I've been -- I was a police
18 officer from '89 to 2013. So early on in my police
19 career, I -- particularly when I became a
20 detective, one of the trainings -- one of the key
21 points in all the trainings about investigations
22 and interrogation and interviewing was to conduct
23 an interview in such a way as to, you know, get the
24 truth, but also be able to -- if someone confessed,

Page 234

1 be able to ask questions to confirm that what
2 they're telling you is true.
3      Q.   And -- and --
4      MR. HILKE:  Sorry, were you done?
5      THE WITNESS:  No, I was done.
6 BY MS. GOLDEN:
7      Q.   Okay.  And is it -- is that something
8 that you generally -- and they -- you saw other
9 officers around you generally strive to avoid?
10 Soliciting a false confession --
11     MR. HILKE:  Objection --
12          (Simultaneous cross-talk.)
13 BY MS. GOLDEN:
14     Q.   -- or sorry --
15          (Simultaneous cross-talk.)
16     MR. HILKE:  -- to form.
17 BY MS. GOLDEN:
18     Q.   -- being against it?
19     MR. HILKE:  Sorry.  Same objection.
20     THE WITNESS:  I can only speak to my partner
21 and I worked together in homicide with other
22 officers, other detectives.  Obviously we had some
23 that were good and some that weren't as good.  So
24 I'm not sure to what degree others tried to confirm

Page 235

1 that a confession was -- was accurate.
2          I know myself and my partner, we
3 worked really hard to make sure that if someone
4 confessed to a crime we had the right person.
5 BY MS. GOLDEN:
6      Q.   And the idea that somebody could
7 falsely confess, was that something generally
8 known, or is that something generally known now?
9      MR. HILKE:  Objection, form, foundation.
10     THE WITNESS:  No, I think it's -- it's
11 still -- it should still be a concern if it's not.
12 But it is -- I believe it is still a concern with
13 investigators, law enforcement investigators to make
14 sure that if they get a confession, you know,
15 they're getting a confession con -- you know,
16 following constitutional police practices and
17 following the law and making sure that the -- the
18 confession and any subsequent review in a court
19 will -- will be upheld.
20 BY MS. GOLDEN:
21     Q.   But the idea that someone could
22 possibly confess to a crime that they didn't
23 commit, I mean, there's -- there's movies about
24 that, right?  There's podcasts about that.  There's

Page 236

1 television series about that.
2      Q.   Is that something -- you know, the
3 idea that somebody could falsely confess to a crime
4 they didn't commit, would you agree with me that
5 that's something that's generally known in the
6 community that we live in?
7      MR. HILKE:  Objection, form, foundation.
8      THE WITNESS:  I believe, particularly in law
9 enforcement, that investigators are aware that that
10 is a possibility.  And throughout all the trainings
11 I've ever had, we discussed that.
12          In recent times -- you mentioned
13 podcasts and movies and so forth.  In recent times,
14 that has become, you know, a -- a current topic.  I
15 think the group the Innocence Project has kind of
16 pushed that -- that to the forefront as well of --
17 of false confessions.
18          But I do believe that it is something
19 that any investigator needs to be aware of as
20 they're doing their job to make sure that they
21 aren't creating a situation where a false confession
22 can occur, or if a confession happens, if they're
23 confirming through other ways that the person is
24 tell -- telling the truth as they admit to a crime.

Page 237

1 BY MS. GOLDEN:
2      Q.   Have you ever testified in court as an
3 expert witness about the outlier analysis as it's
4 contained in the report you issued in this case?
5      A.   No, I haven't.
6      Q.   Would you agree with me -- oh, wait.
7          In your report, if you could put
8 up -- it's Sierra 4, page 7.  The paragraph that
9 begins, There is ...
10          Oh, wait.  And I think it's actually
11 highlighted already.  Let's go back up and -- oh,
12 no.  Sorry, my bad.
13          Okay.  In the second sentence of
14 that paragraph, can you see it all right?
15     A.   Yes.
16     Q.   Okay.  The second sentence of that
17 paragraph says:  These generally accepted practices
18 have developed over time -- have developed over
19 time.
20          What do you mean by that?
21     A.   The practices around police officer
22 misconduct, accountability, systemic issues within
23 an agency, and -- and a police agency's ability to
24 provide police services in a fair and equitable

Page 238

1 fashion to all segments of the community.
2          And so more and more police
3 departments are -- and more and more communities
4 are looking at police accountability and -- and
5 have developed policies and practices to ensure
6 that their -- or to try to get their police, if
7 they aren't, but to -- to really make sure that the
8 police services that are delivered are delivered in
9 a fair and equitable manner that are
10 constitutionally sound.
11     **Q.   All right.  Thank you for the exhibit.**
12 **You can take it down.**
13          **Would you agree with me,**
14 **Mr. Finnell, that the generally accepted police**
15 **practices that exist today are different than those**
16 **that existed in 1995 to some extent?**
17     A.   When you say "generally accepted police
18 practices," I mean, it's always been the desire I
19 believe of the community that they receive
20 equitable and fair police services.  Now --
21     **Q.   Do you agree -- oh, sorry.**
22     A.   I'm saying now looking at the response
23 to officer misconduct, now obviously more and more
24 police departments are being more transparent about

Page 239

1 their investigations and their policies and
2 practices than they were in '95 or, you know, ten
3 years ago maybe.  So I think things are evolving.
4     **Q.   Would you agree that the standards for**
5 **police accountability have changed in the -- have**
6 **evolved based on developments in science,**
7 **technology, and psychological sciences?**
8     MR. HILKE:  Objection, form, compound.
9          Go ahead.
10     THE WITNESS:  I believe the practice has.  I
11 don't -- departments have been -- have, you know,
12 always touted -- so I shouldn't say departments have
13 always.  But many departments have always expressed
14 that, you know, they -- they do fair internal
15 affairs investigations.
16          However, communities and community
17 members have challenged during the same amount of
18 time that one can't police itself.  You know, police
19 can't police themselves.  They can't investigate
20 themselves.  Therefore, they've pushed and pushed
21 for independent oversight or independent review.
22          I think now more departments are
23 probably doing a better job of internal affairs
24 investigations.  Those that still don't have

Page 240

1 independent review, those that do have independent
2 review I think are doing a better job.  But it
3 doesn't mean that they're doing a great job.  Some
4 are; some aren't.
5 BY MS. GOLDEN:
6     **Q.   Were there any allegations in any CR**
7 **that you reviewed that you considered to be so far**
8 **afield from the intended purpose of your analysis**
9 **that you decided not to include them in the data**
10 **set?**
11     MR. HILKE:  Objection, form.
12     THE WITNESS:  We didn't -- no, no, we didn't
13 exclude any CRs because of the type of allegation
14 that they had.  I mean, we had CRs that had
15 allegations that officers didn't, you know, pay a
16 parking ticket or buy a car sticker.  And then CRs
17 for allegations that officers used excessive force
18 or, you know, alleged to have -- have used force on
19 people.
20          So we included all of those in the
21 general analysis, and then were able to go through
22 and disaggregate the CRs for specific allegations
23 that we wanted to look at.
24

Page 241

1 BY MS. GOLDEN:
2     **Q.   So I think you might have started your**
3 **answer with misspeaking.  You meant to say that you**
4 **included them all, right?**
5     MR. HILKE:  Objection, form, misstates --
6 misstates testimony.
7          Go ahead.
8     THE WITNESS:  Well, no, I -- we included -- we
9 did not --
10 BY MS. GOLDEN:
11     **Q.   Did not exclude.**
12     A.   We did not exclude any CRs, regardless
13 of their allegation.  We did drill down into the
14 data set for specific allegations, but it -- but
15 when looking at all of the allegations for Area
16 Five detectives, if -- you know, if it -- like I
17 said, if it was one that comes up where they didn't
18 pay their -- their tickets or they haven't paid --
19 they haven't bought their stickers, we didn't
20 exclude those because it didn't really impact, you
21 know, a use of force or involve an outside citizen.
22          We included all those.
23     **Q.   So I think the officer count in this**
24 **case -- do you recall what it is?  Was it 473?**

Page 242

1    A.   For outliers?

2    Q.   No.  Just for the -- yeah, okay.

3         I think your report refers to a

4  total set of 473 employees.

5         And I would like you to not look at

6  your report if you can in order to answer my

7  question.  Do you -- if you want to look at it to

8  confirm the number, that's fine.  Just tell me

9  where you're looking.

10   A.   I -- yeah, I -- I believe that I saw

11 that number in the outlier.

12   Q.   Okay.  Check --

13        (Simultaneous cross-talk.)

14   A.   I don't know if --

15   Q.   Yeah.  If you want to check page 125,

16 the bottom of the page.

17   A.   Okay, yeah.  This -- this looks like

18 it's a count of all officers.

19   Q.   Okay.

20   A.   It says all officers here, so --

21   Q.   Okay.  So --

22   A.   I -- yeah, I think that's what that is.

23   Q.   And you're looking at your report,

24 right?

Page 243

1    A.   Yes, on page 125.

2    Q.   Are there any notes on that page?

3    A.   No, there are no notes on it.

4    Q.   Okay.  All right.  And can you tell --

5  is it your understanding that you have all of the

6  CRs for all of the officers, all of those 473

7  offers -- officers -- let me start over, okay.

8         Is it your understanding that you

9  have all of the C -- Mr. Finnell?  I would

10 really -- could you put the report behind you?

11   A.   Okay.

12   Q.   I would like you to not look at the

13 report when you answer the question.

14        If you need to look at the report,

15 just let me know, okay?  But the record needs to be

16 clear whether you're looking at the report or not,

17 all right?

18   A.   Okay.

19   Q.   Okay.

20   MR. HILKE:  And, Mr. Finnell, that's fine.  If

21 you want to -- if it helps to physically move the

22 report for a minute for these questions, that's

23 fine.  You can place it somewhere, as Ms. Golden

24 asks, if that's what -- would you like him to do

Page 244

1  that now, Ms. Golden?

2  BY MS. GOLDEN:

3    Q.   As long as you don't look at it, I

4  really don't care where it is.

5         But is it your understanding that

6  you have all of the CRs for all of the officers --

7  all of these 473 officers?  Okay, let me strike.

8  Try again, one more time.

9         Is it your understanding that you

10 have all of the CRs for the 473 officers that were

11 initiated in 1991 through 1995?

12   A.   That I have all of the CRs?

13   Q.   Right.  There's -- yeah.

14   MR. HILKE:  Go ahead and answer.

15 BY MS. GOLDEN:

16   Q.   Do you have all of the CRs from 1991 to

17 1995 for all of the officers, all those 473

18 officers?

19   A.   I'm -- I'm not -- yeah, I'm -- as far

20 as I sit here now, I'm not sure if I have all of

21 the CRs for all of those officers, the 407 -- the

22 473 officers.

23   Q.   Is it important to you that the coders

24 on Mr. Sierra's legal team were free of bias?

Page 245

1    A.   Yes.

2    Q.   Do you know how much the coders were

3  paid?

4    MR. HILKE:  Um ... that's okay.  Go ahead.

5    THE WITNESS:  No, I don't.

6  BY MS. GOLDEN:

7    Q.   Does that matter to you?

8    A.   Not really.

9    Q.   Does it matter to you whether or not

10 they knew what the purpose of their coding was?

11   A.   If you mean the specific case, no, I

12 really didn't think about -- about that.  I

13 believed them to be employees of the firm.  So

14 having been employees of the firm, I -- I didn't

15 consider whether they knew much about the case or

16 anything about the case.

17   Q.   So is it your understanding that as

18 employees of the firm the coders would know that

19 the coding was going to be used for a spreadsheet

20 in a lawsuit where their employer was going to ask

21 for millions of dollars for one of their clients?

22   MR. HILKE:  Objection, form, foundation.

23        Go ahead.

24   THE WITNESS:  Yeah, again, like I said, I -- I

Page 246

1 didn't really think much about the staff that was
2 doing the coding and, you know, what -- what they
3 thought about the work.
4 BY MS. GOLDEN:
5      Q.  Do you agree with me that the duties
6 and responsibilities of a patrol officer are vastly
7 different than those of a homicide detective?
8      A.  Well, yes, they are different.
9      Q.  Do you agree that in an outlier --
10 excuse me.
11           Do you agree that in performing an
12 outlier analysis of CRs received over a certain
13 period of time it would be a flawed analysis to
14 have only some of the CRs for some of the officers?
15      MR. HILKE:  Objection, form.
16 BY MS. GOLDEN:
17      Q.  That was terrible.
18      A.  I believe in looking at the time
19 period, I think that would be important to look at
20 the time period.  But I don't know if necessarily
21 you would need to have all of the CRs over -- you
22 know, for every officer to analyze this.
23           I think it's more so within that
24 time period that we were looking for to see the

Page 247

1 outliers within that given period.
2      Q.  Do you think four years is an
3 appropriate amount of -- appropriate period of time
4 over which to conduct an outlier analysis?
5      MR. HILKE:  Objection, form, foundation,
6 misstates the report.
7      THE WITNESS:  I think if -- if you're looking
8 to see during the four years who had -- who would be
9 considered an outlier during the four years, I don't
10 think the period of time necessarily is important.
11           I think it's what you determine -- it
12 could be six months.  How many -- how many CRs would
13 you expect an officer to get in six months.  And if
14 an officer has one, that might not be a big deal.
15 But if they have four, then that should -- that's an
16 outlier.  That shows it's a problem.  Maybe if they
17 have two, I don't know.
18           You know, but I don't think -- I
19 think as long as you're consistent in the time and
20 you're trying to see during that given time period
21 what would constitute an outlier of officers
22 receiving CRs, then you do your calculation and come
23 up with that number.
24

Page 248

1 BY MS. GOLDEN:
2      Q.  And it would be appropriate to do that
3 over any amount of time, whether it's six months, a
4 year, two years, three years, four years, correct?
5      MR. HILKE:  Objection, form.
6      THE WITNESS:  It -- and again, it depends on
7 what you're trying to determine.
8           In this instance, we wanted to
9 determine what would be an outlier during X number
10 of years, what would be considered.  And -- and
11 then, again, you could look at if it were four
12 years, what -- what would mean -- what number would
13 constitute an outlier.
14 BY MS. GOLDEN:
15      Q.  Right.
16           But you could perform the same
17 analysis over a different period of time, correct?
18 Or not you, but Ms. Meza could perform the same
19 analysis over a different period of time, right?
20      A.  Well, yes.  But you'd also need the
21 appropriate number of CRs for that time period.  So
22 you would have to look at your area, which is Area
23 Five, look at the detectives, and then look at the
24 time period and how many CRs were initiated during

Page 249

1 that time period, and then calculate what might be
2 an outlier for that given time period, what would
3 constitute an outlier.
4           And in this instance, we were
5 looking from '91 to '95.
6      Q.  So in this instance, you used a time
7 period of four years, correct?
8      MR. HILKE:  Objection, form.
9           Go ahead.
10      THE WITNESS:  I believe we looked at --
11 BY MS. GOLDEN:
12      Q.  I'm sorry, five years.  I don't know
13 why I can't add.  '91 to '95 is five years, right?
14      A.  Yeah.  I believe we used the time
15 period and then looking at -- I believe it was
16 defendant officers over their career.  We had
17 career -- I know we had career CRs, but I'm not
18 sure if we looked at career as outliers.
19           But you know, we definitely looked
20 at the database of 323 in the '91 to '95 period.
21      Q.  Okay.  So in this particular case,
22 you -- your report discusses an outlier analysis
23 that was performed over the course of five years,
24 correct?

Page 250

1    A.   Yes.
2    Q.   And who determined -- whose decision
3  was it, or what methodology was used to arrive at
4  the five years?
5    A.   As I sit here now, I can't recall
6  specifically the methodology used to determine that
7  time period.
8    Q.   Is there a standard in the oversight
9  profession about the appropriate period of time to
10  conduct an outlier analysis?
11    MR. HILKE:  Objection, form.
12    THE WITNESS:  Not a standard that I know of
13  for an appropriate --
14  BY MS. GOLDEN:
15    Q.   Do you know --
16    A.   -- amount of time.
17    Q.   Sorry.  Do you know of any police
18  department that was performing outlier analyses, as
19  you've discussed in your report, back in 1995?
20    A.   No, I do not know of any police
21  department that was doing that.
22    Q.   What is the first time you encountered
23  any police department using outlier analyses in the
24  way you've discussed in your report?

Page 251

1    A.   In principle, I know of police
2  office -- police agencies that use what they call
3  early warning systems for officers that get
4  complaints have other issues.  Maybe it doesn't
5  arise to a complaint, but there's other issues and
6  there's a series of issues that an officer may
7  experience where a supervisor or someone can flag
8  that officer and they can be brought in before --
9  you know, they -- maybe even before they get a
10  complaint, but before they have a major issue.  And
11  there's various factors.
12        Now, the principle is also based on
13  outliers, you know, but it's done -- it can be done
14  through some kind of program.  It can be done
15  through some kind of performance measurement tool
16  that determines which officers need to be flagged
17  and maybe brought in for counseling or some other
18  kind of intervention before they create a problem.
19  Or if they have actual complaints, then, again,
20  they're flagged in the system, and there's
21  additional counseling that's done to identify the
22  root cause of the problem.
23        The agency I used to work for
24  created an early warning system.  Other agencies

Page 252

1  across the country have created early warning
2  systems over the years.
3        So it's not specifically this, what
4  we've done in this report, but it is based off of
5  that principle of identifying an outlier --
6  basically identifying a number of incidents or
7  actions that rise -- cause that officer to rise to
8  the level where there needs to be intervention by
9  supervision before it becomes worse.
10    Q.   What's the name of the agency that you
11  were with that instituted an early warning system?
12    A.   Indianapolis Metropolitan Police
13  Department.
14    Q.   And in what year did they institute an
15  early warning system?
16    A.   I don't recall the year.  I remember
17  they instituted a performance measurement tool that
18  supervisors had to go in and -- and write in
19  information about their -- their unit members.  And
20  then depending on how it was flagged would
21  determine if, you know, that officer would need to
22  be called in or given, you know, special
23  counseling.
24        If it wasn't a disciplinary --

Page 253

1  sometimes it was disciplinary, but most of the time
2  it wasn't a disciplinary action.  It was more of an
3  intervention to prevent the officer from having
4  other issues.  And it could be off-the-job issues.
5  Not just related to work.
6    Q.   And when was the -- is this performance
7  tool like -- is it different than an early warning
8  system?
9    A.   Well, the early warning system was
10  primarily I believe for internal affairs at the
11  time.  I've been gone from the agency for almost
12  ten years, so I don't know what they use now.
13        But the performance tool was more of
14  a supervisory tool that wasn't necessarily a
15  disciplinary -- I mean, you could end in
16  disciplinary action, but you also could refer that
17  action to internal affairs or professional
18  standards -- so they have two different bureaus --
19  that would handle those things.
20    Q.   Did the performance tool include any
21  outlier calculation?
22    A.   I don't know -- I don't know the
23  algorithm that they used to develop it.  I have no
24  idea.

Page 254

1    Q.   Okay.
2    A.   I --
3    Q.   What about the early warning system?
4 Did that -- that was used at your agency.  I think
5 you said there was an early warning system.
6         Did that -- did any component of
7 that include the -- the assessment of outliers over
8 any particular time period?
9    A.   As part of the algorithm, it did.  I
10 just don't know what the number was.  I don't know
11 how it was formulated.  No one did what Ms. Meza
12 did at this level.  It was done through -- through
13 some type of computer system.
14    Q.   Can you point to any police department
15 that has ever performed an outlier analysis similar
16 to the analysis in your report for the purpose of --
17    MR. HILKE:  Objection --
18 BY MS. GOLDEN:
19    Q.   -- discipline and review?
20    MR. HILKE:  Objection, form.
21    THE WITNESS:  Like I said, I can't point to
22 any department that used -- that uses or has used
23 what Ms. Meza did for this -- this project.
24

Page 255

1 BY MS. GOLDEN:
2    Q.   Would two years also be an appropriate
3 amount of time in your opinion to conduct an
4 outlier analysis for the purposes of reviewing
5 disciplinary decisions?
6    MR. HILKE:  Objection, form.
7         Go ahead.
8    THE WITNESS:  I mean, I believe two years
9 would -- if -- if the agency decided that they
10 wanted to know what would constitute an -- an
11 outlier within a two-year period to determine how
12 many complaints would constitute an outlier or how
13 many actions would constitute the need for an
14 intervention within a two-year period.
15 BY MS. GOLDEN:
16    Q.   Does your report contain any opinion
17 about the number of CRs against an individual
18 officer over any particular amount of time that
19 would trigger additional review or should trigger
20 additional review?
21    MR. HILKE:  Objection, form and compound.
22         Go ahead.
23    THE WITNESS:  I mean, we talk about the
24 outliers and what constitutes an outlier.  And so in

Page 256

1 the report, you know, if -- if an officer -- I
2 believe it was four, if they had four, then that
3 would constitute an outlier.  Therefore, there
4 should have been some review.
5 BY MS. GOLDEN:
6    Q.   Does your report --
7    MR. HILKE:  I'm sorry.  I don't want to
8 interrupt this line, but we've going -- been going
9 almost an hour and a half.  And so if we could take
10 a comfort break when -- at an appropriate point.
11    MS. GOLDEN:  Just one more question or two.
12 BY MS. GOLDEN:
13    Q.   Does your report -- is that all right
14 with you, Mr. Finnell?
15    A.   Oh, yes, yeah.  Go ahead.
16    Q.   Does your report contain any
17 description about what steps should be taken in
18 that additional review that would be triggered by
19 defining any particular officer as an outlier?
20    A.   You said once an officer was identified
21 as an outlier?
22    Q.   Yeah.  Does your report contain any
23 opinions about what should happen once that
24 determination has been made?

Page 257

1    A.   Without looking at my report, I can't
2 readily recall exactly what opinion or
3 recommendation was made.
4    Q.   Does your report contain any opinion
5 about what would have happened had additional
6 review of CRs been done of officers who were
7 determined to be outliers?
8    A.   Again, without looking at it, I can't
9 really answer that question right now.
10    Q.   Do you -- as you sit here today, can
11 you tell me what would have happened if some
12 additional review had been made of those --
13    MS. GOLDEN:  I'm going to withdraw the
14 question.  Let's just take a break.
15         What do we -- 10 minutes?
16    THE LEGAL VIDEOGRAPHER:  We are off the video
17 record at 5:22 p.m.
18         (Recess taken.)
19    THE LEGAL VIDEOGRAPHER:  We are back on the
20 video record at 5:34 p.m.
21 BY MS. GOLDEN:
22    Q.   All right.  Mr. Finnell, I want to ask
23 you a few things, a few -- some, not just a few,
24 some more questions about your -- the outlier

Page 258

1 analysis contained in your report.
2       And the purpose of the outlier
3 analysis was to determine whether or not any
4 particular Area Five detective had more CRs than
5 other Area Five detectives, right?
6       MR. HILKE:  Objection, form, misstates
7 testimony.
8       THE WITNESS:  It wasn't necessarily to see if
9 they had more.  It was to see if any of the
10 detectives would be considered an outlier.
11 BY MS. GOLDEN:
12    Q.   Okay.  As compared to other Area Five
13 detectives, right?
14       MR. HILKE:  Objection, form.
15       THE WITNESS:  Yes, that is correct.
16 BY MS. GOLDEN:
17    Q.   Okay.  And is it your understanding --
18 and then the time period over which the outlier
19 analysis was conducted was January 1, 1991, through
20 December 31, 1995, right?
21       MR. HILKE:  Objection, form, foundation.
22       THE WITNESS:  Yes, that -- that was the time
23 period.
24

Page 259

1 BY MS. GOLDEN:
2    Q.   So in order to properly conduct an
3 outlier analysis of Area Five detectives in terms
4 of CRs initiated against them during that time
5 period, you needed to have all of the CRs that were
6 initiated against them during that time period,
7 correct?
8       MR. HILKE:  Objection, form, foundation.
9       THE WITNESS:  We needed to have the -- the CRs
10 from the data set that were used, yes.
11 BY MS. GOLDEN:
12    Q.   Okay.  And -- and the data point for
13 each detective was the total number of CRs they
14 received during that time period, right?
15    A.   Yeah, I believe that was the data point.
16    Q.   Okay.  And in order for the analysis to
17 be accurate, you needed to know the total number of
18 CRs initiated against each of those detectives
19 during that time period because that was the data
20 point, right?
21       MR. HILKE:  Objection, form, foundation.
22       THE WITNESS:  Yes, that was the data point.
23 BY MS. GOLDEN:
24    Q.   Okay.  And it would not be fair, right,

Page 260

1 to -- in an outlier analysis to compare the total
2 number of CRs -- the number of CRs that one officer
3 gets -- strike that.
4       In order for the -- the outlier
5 analysis to be reliable, you need to know the total
6 number of CRs of each person in that analysis,
7 correct?
8       MR. HILKE:  Objection, form, foundation.
9       THE WITNESS:  When you say "the total number,"
10 are you talking about from '91 to '95?
11 BY MS. GOLDEN:
12    Q.   Right.
13       MR. HILKE:  Same objection.
14       THE WITNESS:  You know, I believe if you're
15 using that data set, then yes, you would need to
16 know how many CRs they had during that time period,
17 if that's the time period you're measuring.
18 BY MS. GOLDEN:
19    Q.   Okay.  Do you know how the 400 -- how
20 the identity of the 473 officers that were included
21 in the outlier analysis were ascertained?
22    A.   No, I do not know specifically how
23 Ms. Meza identified those officers.
24    Q.   Is it your understanding that each of

Page 261

1 the 473 officers in the outlier analysis are all
2 Area Five detectives?
3    A.   Yes, it is my understanding that they
4 were Area Five detectives during '91 to '95.
5       (Deposition Exhibit No. 12,
6        Witness Finnell, was marked for
7        identification 01/13/2023.)
8 BY MS. GOLDEN:
9    Q.   Okay.  Let us pull up CR 221462.
10       Okay.  And this is -- you see on the
11 first page here?
12    A.   Yes, I do.
13    Q.   That the CR number is 221462?  You see
14 that?
15    A.   Correct.
16    Q.   Okay.  And you see up here in the upper
17 right-hand corner it says initiated March 2, 1996,
18 right?
19    A.   I can't make out the '96, but ...
20    Q.   Okay.
21    A.   Yeah.
22    Q.   And then on page 5, do you see that the
23 name of the first accused is Mark Reiter?
24    A.   Yes.

Page 262

1    Q.   Do you see his rank as detective?
2    A.   I see that, yes.
3    Q.   And do you see the unit assigned across
4 from there where it says 630?
5    A.   Yes.
6    Q.   Do you know that to be -- do you know
7 that to be Area Three?
8    A.   I do not know that to be Area Three.
9    Q.   Okay.  Do you have any idea what area
10 Mark Reiter -- Detective Mark Reiter was assigned
11 to then based on this page?
12    MR. HILKE:  Objection, form.
13        And I -- I don't think the full page
14 has been shown to him.
15 BY MS. GOLDEN:
16    Q.   Oh, you don't have the whole page.
17 Just scroll through it.
18    A.   Okay.  I don't know -- yeah, I don't
19 have an idea where Detective Reiter would have been
20 assigned to.
21    Q.   Okay.  If I represent to you that unit
22 assigned means -- 630 means Third District, can
23 you -- can you accept that?
24    MR. HILKE:  Objection to form.

Page 263

1    MS. GOLDEN:  Well --
2    MR. HILKE:  Go ahead.
3 BY MS. GOLDEN:
4    Q.   -- I'm going to -- okay.  I'm going to
5 represent to you that Unit 630 means Third
6 District.  Do you have a problem with that?
7    MR. HILKE:  Same objections.
8    THE WITNESS:  No, I don't have a problem with
9 that.
10 BY MS. GOLDEN:
11    Q.   You can see here that the second
12 accused is Stephen Lotts, right?  And he -- he's a
13 police officer, right?
14    A.   Correct.
15    Q.   That's --
16    MS. CARNEY:  Carrie, sorry to interrupt.  Did
17 you mean district or area?
18 BY MS. GOLDEN:
19    Q.   I'm sorry.  Third area, Area Three.
20 6 -- unit assigned 630 means Area Three.
21        Do you have any reason to dispute
22 that?
23    MR. HILKE:  Objection --
24        (Simultaneous cross-talk.)

Page 264

1    THE WITNESS:  Are you talking to me?
2 BY MS. GOLDEN:
3    Q.   Yeah.
4    MR. HILKE:  Objection, form.
5        Go ahead.
6    THE WITNESS:  No, I have no basis to dispute
7 that.
8 BY MS. GOLDEN:
9    Q.   Okay.  So and do you see the second
10 accused here Stephen Lotts is a police officer, not
11 a detective, right?
12    A.   Correct.
13    Q.   And he's assigned to unit 19, which is
14 the 19th district.  Do you see that?
15    MR. HILKE:  Objection, form.
16        Go ahead.
17    THE WITNESS:  Yes, I see that.
18 BY MS. GOLDEN:
19    Q.   And on page -- scrolling down
20 through -- to page 7, there's a list of additional
21 accused.
22    A.   Correct.
23    Q.   And do you see William Wright at the
24 top there?

Page 265

1    A.   Yes, I do.
2    Q.   Again, he -- he's listed as a
3 detective, not a police officer, right?
4    A.   Correct.
5    Q.   And he's assigned to unit 630, which
6 I'm representing is the -- is Area Three.
7        You see that?
8    A.   Correct.
9    Q.   And then if you -- so this is -- this
10 is one CR against Detective Wright, correct?
11    A.   That is correct.
12    Q.   And if we switch back to your report,
13 which is Exhibit 4, and look at page 129, towards
14 the bottom we see Mr. Wright's there -- Wright's
15 name there on the bottom.
16        Do you see that?
17    A.   Yes, I see that.
18    Q.   So comparing the CR with your list of
19 data points, we can see that the only CR we have
20 against Detective Wright is in his capacity as a
21 detective in Area Three.
22        Do you see that?
23    MR. HILKE:  Objection, form, foundation.
24    THE WITNESS:  Yes, I saw that.

Page 266

1 BY MS. GOLDEN:
2    Q.   So why is he included in the outlier
3 analysis?
4    A.   Can you go back to the CR?
5    Q.   Sure.  Which I think I'm going to make
6 Exhibit 12.
7    A.   And could you go back to the first page
8 or second.  Okay, second page, I'm sorry.
9         And you asked why would he be
10 included in Area Five?
11    Q.   Why is it appropriate to include
12 Detective Wright -- I'm sorry.
13         Yeah.  Why is it appropriate to
14 include Detective Wright in the -- as a data point
15 in the outlier analysis?
16    MR. HILKE:  Objection, form, foundation.
17 BY MS. GOLDEN:
18    Q.   You see here from the CR that the
19 incident happened in Area Three, right?
20    A.   Well, scroll down --
21    MR. HILKE:  Objection.
22    THE WITNESS:  Scroll down again.
23 BY MS. GOLDEN:
24    Q.   You see the address of the incident up

Page 267

1 above?
2    MR. HILKE:  Objection, I -- just to confirm if
3 the exhibit is showing him what you wanted to, Ms.
4 Golden, right now.
5    MS. GOLDEN:  It's not really.
6         Could you scroll just a little bit up.
7 BY MS. GOLDEN:
8    Q.   And do you see there, Mr. Finnell, the
9 address of the incident is Area Three interrogation
10 room?
11    A.   That's what it says.  Area three
12 interrogation room, yes.
13    Q.   Okay.  So do you have any explanation
14 for why Detective Wright's one CR is listed as a
15 data point in the outlier analysis?
16    A.   Okay.  Can you scroll down again?
17 Okay, up.  I'm not -- no, no.  Please keep it
18 there.
19         I'm not at this -- as I sit here
20 now, I cannot tell you exactly where Area Three
21 interrogation room is located, other than it's
22 identified as Area Three interrogation room.
23         In reading this allegation, it
24 states that the complaint was initiated by a civil

Page 268

1 suit.  And it also states that the incident that
2 prompted the complaint or the allegation happened
3 near Belmont and Western.
4         So I don't know if Area Three
5 interrogation room is at Belmont and western.  I
6 don't know if that's Area Five.
7    Q.   Do you --
8    A.   I don't know.
9    Q.   Sure.
10         Are you confident that this CR --
11 I'm sorry.
12         Are you confident that the number of
13 Detective Wright's CRs -- strike that.
14         Are you confident that Detective
15 Wright's CR count of one should have been included
16 in the outlier analysis?
17    A.   Well, when you look at that -- that
18 chart that you showed before, you see between David
19 Schweiger and William McKenna, there are several
20 dots.  So it's my belief that all of the ones that were
21 not outliers, starting with Schweiger on down, were
22 not included by name.
23         I would have to confirm that with
24 Ms. Meza, but the important thing with this -- with

Page 269

1 this graph, with this table was to show the
2 outliers and --
3    Q.   Outliers as compared to other Area Five
4 detectives, right?
5    MR. HILKE:  And I'm sorry, Mr. Finnell.  Were
6 you done with your answer?
7    THE WITNESS:  No, I was not.
8         So the outliers -- yes, as compared
9 to other Area Five detectives, but there's --
10 BY MS. GOLDEN:
11    Q.   So why do you compare --
12    MR. HILKE:  Hey, please, Carrie.
13 BY MS. GOLDEN:
14    Q.   Yeah, go ahead.
15    MR. HILKE:  Go ahead, Anthony.
16    THE WITNESS:  But when you look at the CR, the
17 incident occurred in October of -- what was it --
18 '93 or -- or November of '93.  The complaint was
19 filed in October of '95.
20         So where Detective Wright or
21 Detective Reiter or any of the other officers were
22 assigned on November of '93 when the incident
23 occurred would be the reason that this CR would be
24 included.  Where they were assigned on October of

Page 270

1 '95 is possibly Area Three. I don't know without
2 pulling their -- their personnel records to see
3 where they were assigned and when they may have been
4 reassigned.
5        So this CR was part of the CRs that
6 were submitted. And so the criteria that CPD used
7 to identify this CR, I felt confident -- we felt
8 confident to use it in our analysis.
9 BY MS. GOLDEN:
10    Q.   Do you believe that you have received
11 all of Detective Wright's CRs that were initiated
12 from January 1, 1991, through December 31, 1995?
13    MR. HILKE: Object -- no, that's okay.
14        Go ahead.
15    THE WITNESS: If he were assigned to Area Five
16 as a detective during that time period, then I'm
17 confident that we received all of them. I'm not --
18 BY MS. GOLDEN:
19    Q.   Well, let's just say he was never
20 assigned to Area Three -- or Area Five, and he just
21 worked -- let's go back to Exhibit 12, page 7.
22        Do you see the list of Additional
23 Accused?
24    A.   Yes, I see it.

Page 271

1    Q.   And do you see Detective Lynn Carroll
2 listed there and assigned to unit 650. You see
3 that?
4    A.   Yes, I do.
5    Q.   And so I'll represent to you that
6 Doc -- Detective Lynn Carroll was an Area Five
7 detective at the time of the CR, which is why the
8 CR was produced to you.
9        But that -- but that Detective
10 William Wright was assigned to Area Three;
11 Detective James Spencer was assigned to Area Three;
12 Detective Ralph Sikorski, unit 630, assigned to
13 Area Three; Detective Lawrence Aikin, assigned to
14 Area Three; Detective John Turney, assigned to Area
15 Three; and Detective Kenneth Webb, assigned to Area
16 Three.
17    A.   Okay. And --
18    Q.   So the only -- so the only detective
19 here assigned to Area Five is Detective Carroll,
20 which is why the CR was produced.
21        Do you understand that?
22    MR. HILKE: Objection, form.
23        Go ahead.
24    THE WITNESS: All right. Well, again, then

Page 272

1 that would go back to my earlier statements earlier
2 today in that the -- the analysis of the data
3 contained in the CRs that are produced pursuant to
4 the court order makes it valid to analyze the data.
5        The data contains officers from other
6 units and the data is -- the court order was
7 specific for CRs on officers or detectives from Area
8 Five detectives from '91 to '95, but it didn't
9 exclude all the other officers contained within each
10 CR.
11 BY MS. GOLDEN:
12    Q.   If you were --
13    A.   So --
14    Q.   -- going to conduct -- sorry, what --
15 were you going to say something else?
16    A.   I was going to say, so with
17 Mr. Wright's inclusion, he -- he should be included
18 because he was a data point in the -- in the Excel
19 spreadsheet because he was part of a CR that was
20 produced pursuant to the court order.
21    Q.   Okay. So realizing that you don't
22 have -- you don't have all the area -- you don't
23 have all the CRs for Area Three detectives during
24 the time period of 19 -- initiated during 1991 to

Page 273

1 1995, do you?
2    A.   No, I do not.
3    Q.   And you don't have all the CRs for
4 police officers assigned to the ninth -- 19th
5 District from the time period 1991 to 1995, do you?
6    A.   No, I do not.
7    Q.   In fact, the only -- you know, what you
8 have are the CRs for Area Five detectives from
9 the 19 -- initiated during the 1991 and 1995 time
10 period, right?
11    A.   Well, yes. That's because that's what
12 the court permitted.
13    Q.   Right.
14        And they didn't permit or require
15 Area Three -- any other CRs to be produced other
16 than the CRs of Area Five detectives from 1991 to
17 1995, right?
18    A.   Correct.
19    Q.   And as we've talked about before, those
20 CRs contain investigations and allegations about a
21 lot of people, officers at Chi -- at the Chicago
22 Police Department that were never assigned to Area
23 Three -- or Area Five, right?
24    MR. HILKE: Objection, form.

Page 274

1    Go ahead.
2    THE WITNESS:  Correct.
3 BY MS. GOLDEN:
4    Q.   Right?  Because you're not working in a
5 bubble.  You're working with other officers, and
6 you're not always working with officers who have
7 the exact same assignment as you, right?
8    A.   That is correct.
9    Q.   Okay.  So do you still have complete
10 confidence in the outlier analysis and the data
11 points that were used in it as detailed in your
12 report?
13    MR. HILKE:  Objection, form.
14    THE WITNESS:  Yes, I do.
15 BY MS. GOLDEN:
16    Q.   Okay.  And even though you know that
17 you don't have all of the CRs for Detective Wright
18 during the 1991 to 1995 time period, you're still
19 confident that it is appropriate in the outlier
20 analysis to include a data point of 1 for him?
21    A.   Yes, because he has one CR.
22    Q.   Okay.  But that may or may not be all
23 the CRs he has during that time period, right?
24    A.   It may or -- it may not be but based

Page 275

1 on --
2    (Simultaneous cross-talk.)
3    Q.   And it doesn't matter --
4    (Simultaneous cross-talk.)
5    A.   -- the area --
6    Q.   It doesn't matter to you --
7    A.   -- that we are --
8    Q.   I'm sorry.
9    A.   Based on the area that we were
10 analyzing and the time period we were analyzing
11 within, it's appropriate to include him as a -- as
12 not as an outlier.  If we expanded the area to Area
13 Three and expanded the time period, then maybe we
14 would have -- maybe he would become an outlier.
15    Q.   Okay.  But -- but the determination of
16 whether or not all the other officers that are
17 all -- depends on the data points assigned to each
18 individual officer, right?
19    MR. HILKE:  Objection, form, foundation.
20    THE WITNESS:  When you say all of the other
21 officers are -- which officers are you referring?
22 BY MS. GOLDEN:
23    Q.   Right.
24    The outlier calculation is a

Page 276

1 comparison of how the officers compared to each
2 other, right?  Whether they have more than usual or
3 whether they -- whether they are outside a standard
4 deviation of data point.  That's how they compare
5 to other officers.
6    So if you have, you know, 30, 40,
7 50 officers in this list of data points for
8 officers, that -- for whom you don't have all the
9 CRs during that time period, how is this a valid
10 analysis?
11    MR. HILKE:  Objection, form, foundation.
12    THE WITNESS:  This analysis I still say is
13 valid because of the window of time that we are
14 using and the area that we are using within.  If we
15 expanded or changed any of those -- any of those
16 parameters, then it may not be valid.  But only --
17 the only way I can answer that is by conducting
18 additional analysis to -- with the new parameters
19 placed in there.
20    So as it stands, I still stand on the
21 analysis that we performed with the parameters and
22 data that we had.
23 BY MS. GOLDEN:
24    Q.   Okay.  If I told you that -- and let's

Page 277

1 go back to -- let's pull the report up and go to
2 page 128.  And I'm just going to -- we're just
3 going to scroll through this list and ask you to
4 assume something.
5    If you don't have the total number
6 of CRs initiated from 1991 through 1995 for Timothy
7 Gilbert, Anthony Shapiro, Edward Feliciano, Michael
8 Stevens, Robert Dubiel, Victor Guerrieri, Anthony
9 DeLeonardis, David Friel, Michael Mancuso, Ronald
10 Meziere, William Jaski, and Carlos Velez, if you
11 don't have all of their CRs for the time period
12 from 1991 to 1995, are you still confident in the
13 data points used for them and in the resulting
14 analysis?
15    MR. HILKE:  Okay, sorry.  Objection to form.
16    THE WITNESS:  And again, I would say yes,
17 because we're analyzing '91 to '95, Area Five CRs.
18    And at some point, all the officers,
19 detectives you named had a CR within that time
20 period, or they were part of a CR within that time
21 period.
22 BY MS. GOLDEN:
23    Q.   So is it your testimony that you don't
24 need to know the total number of CRs for these

Page 278

1 officer -- for all of these officers during the
2 time period, and that the only thing that counts is
3 CRs that they got when they were working with
4 someone from Area Five?
5      MR. HILKE: Objection, form and compound.
6      THE WITNESS: Based on the information that we
7 were provided and the data that we provided, I have
8 to work with -- with and analyze that data, and
9 these are the results of that data.
10      If I had all of the areas and I had a
11 wider time frame, then the numbers may be different.
12 But based on that information that we were given and
13 the information that the Court ordered to be
14 provided, these are -- these are the results. So I
15 stand on that.
16 BY MS. GOLDEN:
17      Q.  Okay. You're still confident with this
18 outlier analysis?
19      A.  Yes.
20      Q.  Okay. And so how would your analysis
21 change if -- I'm going to -- I'm going to stop that
22 and ask you to -- just so I understand it, it
23 doesn't matter to you -- so on page 128, if you
24 could go up to the top where it says CR Count.

Page 279

1      And the CR Count here refers to CRs
2 initiated from 1991 to 1995, correct?
3      MR. HILKE: Objection, form.
4      Go ahead.
5      THE WITNESS: Yes, correct.
6 BY MS. GOLDEN:
7      Q.  And so the -- the number that's used
8 there, those are the data points that were used for
9 the -- the corresponding officers, correct?
10      MR. HILKE: Objection, form.
11      THE WITNESS: The 27 represents that this
12 officer within that five-year period had 27 CRs --
13 BY MS. GOLDEN:
14      Q.  Well, is it --
15      A.  -- lodged against --
16      MR. HILKE: Hold on. Were you done,
17 Mr. Finnell?
18      THE WITNESS: I was going to say he had 27 CRs
19 that were -- where his name appeared as -- as a
20 subject officer.
21 BY MS. GOLDEN:
22      Q.  Right.
23      And -- and is it important to you to
24 know whether or not those are all the CRs he had

Page 280

1 during that 1991 to 1995 time period?
2      MR. HILKE: Objection, form.
3      THE WITNESS: It -- what's important is that
4 are those all the CR -- did we have all of the CRs
5 from 1991 to 1995 at Area Five detectives.
6      So that's what we're measuring, and
7 that's what we're analyzing.
8      If it included -- if the sample size
9 were extended to the other areas as well, then we
10 would -- the analysis would have to be done to
11 determine what constituted an outlier.
12      But at that one area during those
13 five years, once the analysis was done, the
14 Detective Graf was determined to be an outlier.
15 BY MS. GOLDEN:
16      Q.  Should any detective who's never been
17 assigned to Area Five appear on this list of
18 473 officers?
19      A.  If they appeared in one of the CRs that
20 were presented for analysis and they appeared
21 27 times, then yes.
22      Q.  Have you ever testified that the only
23 types of officers that should appear in this list
24 are Area Five detectives?

Page 281

1      MR. HILKE: Objection, form, foundation.
2      THE WITNESS: The only officers, I don't
3 believe I've --
4 BY MS. GOLDEN:
5      Q.  No.
6      Have you ever testified the only
7 officers that should appear on this list are Area
8 Five detectives?
9      MR. HILKE: Same objection.
10      THE WITNESS: I don't believe I've testified
11 that the only officers or detectives that appear on
12 this list should be Area Five detectives. I -- I
13 spoke earlier about how officers from other areas
14 appear on -- could appear on the CRs that were
15 provided for analysis.
16      MS. GOLDEN: Okay. Let us pull up --
17 actually, let's pull up the spreadsheet that Theresa
18 circulated as an exhibit, and we'll call it Exhibit
19 13.
20      (Deposition Exhibit No. 13,
21      Witness Finnell, was marked for
22      identification 01/13/2023.)
23      MS. CARNEY: Hey, Carrie and Nick, would it be
24 better if I manipulated the spreadsheet instead of

Page 282

1 Nick?
2    MS. GOLDEN: That'd be great, Theresa. Thank
3 you.
4    MS. CARNEY: Okay. Nick, if you could stop
5 sharing, I will do the spreadsheet, please and thank
6 you.
7         Give me one second.
8    MR. HILKE: While you're pulling it up, could
9 I ask for a time check, please.
10    MS. GOLDEN: Can we do that in like 5 minutes?
11    MR. HILKE: That's fine. Thank you.
12    MS. GOLDEN: Okay. Can you go, Theresa, to
13 line 1396 of the spreadsheet?
14         Whoa, it's really small.
15 BY MS. GOLDEN:
16    Q.    Do you have the spreadsheet accessible
17 to you, Mr. Finnell, in Excel?
18    A.    Not readily accessible, no.
19    MS. GOLDEN: Okay. Let's do this then.
20    MS. CARNEY: 13 -- line 1396, Carrie?
21    MS. GOLDEN: Yeah.
22    MS. CARNEY: Can you guys see that?
23    MR. HILKE: Is it possible to zoom in a little
24 bit, please? Maybe one more. Thank you.

Page 283

1         Is that okay for you, Mr. Finnell?
2    THE WITNESS: Yes, uh-hmm.
3    MS. CARNEY: Is this the right one, Carrie?
4    MS. GOLDEN: Yeah, it's fine.
5 BY MS. GOLDEN:
6    Q.    I am going to put this over here, okay.
7 So line 1396, you see column A is
8 the -- is the line number, and the CR number is
9 216931. And if you scroll --
10    MS. CARNEY: I think -- there -- oh, I
11 highlighted the wrong one. Give me one second.
12 Sorry about that.
13    MS. GOLDEN: Let me know when you're there
14 because I'm looking at something different.
15    MS. CARNEY: I'm there. 13 --
16 BY MS. GOLDEN:
17    Q.    Okay. Line 1396, do you see it in
18 column A?
19    A.    Yes, I do.
20    Q.    Okay. And that's for CR 217809, right?
21    MS. CARNEY: Hold on, Carrie. Which one?
22 1395 or 1396?
23    MS. GOLDEN: So it's -- column A is 1396.
24    MS. CARNEY: Got it.

Page 284

1 BY MS. GOLDEN:
2    Q.    You see that's for CR 217809?
3    MR. HILKE: Give her one second to get the
4 highlighting right here, please.
5         Okay, go ahead.
6    THE WITNESS: 217 -- okay, yes, I see it.
7 BY MS. GOLDEN:
8    Q.    And do you see that in column L that
9 there's a blank, right?
10    A.    Yes.
11    Q.    And that's the date the CR was
12 initiated, right? Column L?
13    A.    I don't know. Column L, Date CR
14 Initiated, yes.
15    Q.    Okay. And do you see that there's also
16 a blank in column M, which is the date the CR is
17 completed in summary report?
18    A.    Yes.
19    Q.    And that was one of the calculations
20 you did for CRs, right? How long it took from the
21 date of initiation until the date that the CR was
22 completed in summary report, right?
23    A.    Yes, that was one of the -- one of the
24 calculations.

Page 285

1    Q.    And that was one of the things you
2 spot-checked, right?
3    A.    Yes, we --
4    Q.    And there's no --
5    A.    -- we spot-checked.
6    Q.    And there's no information for that CR
7 in the data sheet, correct?
8    A.    No, there's not.
9    MS. GOLDEN: Okay. If we could open up CR
10 217809, which we'll mark as Exhibit 14, and the
11 spreadsheet will be Exhibit 13.
12         (Deposition Exhibit No. 14,
13         Witness Finnell, was marked for
14         identification 01/13/2023.)
15 BY MS. GOLDEN:
16    Q.    Do you see here, Mr. Finnell, that
17 this -- wait, this is -- I'm looking for 217809.
18 Is that what I said? Here we go.
19         Do you see here, sir, that we have
20 CR 217809?
21    A.    Yes, I do.
22    Q.    Okay. And if you could just scroll
23 through the CR. Can you stop -- yeah.
24         You see it was initiated May 22,

Page 286

1 1995?

2     A.    Yes.

3     Q.    And do you see date investigation

4 completed May 22, 1995?

5     A.    Yes, I see that.

6     Q.    And do you see the number of

7 investigative days is one?

8     A.    Correct.

9     Q.    And so why wasn't that number of

10 investigative days coded into the spreadsheet?

11    MR. HILKE:  Objection, form, foundation.

12    THE WITNESS:  I'm not sure why it was not

13 coded into the spreadsheet.

14    MS. CARNEY:  Okay.  Can we take a look at

15 CR 182205?

16            (Deposition Exhibit No. 15,

17            Witness Finnell, was marked for

18            identification 01/13/2023.)

19 BY MS. GOLDEN:

20    Q.    And so here we have that same sort of

21 envelope, right?  If you could just scroll through

22 it, whoever's doing the -- you know what this is.

23 This is like a -- page 2 is a request for CRs,

24 right?  It's not -- doesn't relate to the

Page 287

1 allegations of the case itself.

2    MS. GOLDEN:  You might need to make it a

3 little bit bigger.

4    MR. HILKE:  Just for the record, it's -- now

5 it's all the way down on page 4.

6    MS. GOLDEN:  Okay.  Do you want him to go back

7 up to the top?

8    MR. HILKE:  Just that the page that's being

9 shown is the one that's being asked about, please.

10 BY MS. GOLDEN:

11    Q.    No.  Let's just -- let's start back up

12 at the top.

13          You see page -- up here, this first

14 page doesn't contain any information about the date

15 of the incident or the date the CR -- the result of

16 the CR or who the officers were, right?

17    A.    No, it doesn't contain any information

18 like that.

19    Q.    And does the -- does this -- go to page

20 2 or scroll down.

21          Does this contain any of that

22 information, page 2?

23    A.    No, it does not.  It's just a list of

24 CR numbers.

Page 288

1     Q.    That are being supplied to a particular

2 office in the Chicago Police Department, right?

3     A.    That is correct.

4     Q.    Okay.  And then the next page, page 3,

5 also doesn't -- is also a request for a

6 disciplinary history, right?

7     A.    Correct.

8     Q.    Okay.  Next page.

9           Also no information about the

10 allegations, right?

11    A.    Correct.

12    Q.    No allega -- no information about the

13 date the CR was initiated, right?

14    A.    Correct.

15    Q.    Okay.  Keep going.

16          And here is another request for CRs

17 for these different officers, right?

18    A.    Yes.  All CR files, yes.

19    Q.    And it's -- it's a request for any CRs,

20 all CR files for these officers, right?

21    A.    Correct.

22    Q.    Okay.  Is that a sufficient basis to

23 conclude that this CR related to -- all right.

24 Let's just keep going.  Hold on, next page.

Page 289

1           Still no information about the

2 allegations, made by whom, and what they were,

3 right?

4     A.    Correct.

5     Q.    Okay.  Next page.

6           Still a request for CR files, right?

7     A.    Yes.

8     Q.    And the last page is just the

9 continuation of that request, right?

10    A.    That's what it looks like, yes.

11    Q.    Okay.  How should this CR have been

12 coded with respect to -- let's go back to the --

13 with the initiation date for the CR?

14    MR. HILKE:  Objection, form.

15    THE WITNESS:  It looks like based on the -- on

16 the routing that it was February 8th of '91.  I

17 don't know when -- if I go to the next page, maybe

18 it has the date it was requested.

19 BY MS. GOLDEN:

20    Q.    No.  Most of them are all just requests

21 for CRs and correspondence about putting them back

22 and forth.

23          So going back to page 1, is it your

24 opinion that February 8th, 1991, was the date this

Page 290

1 CR was opened?

2      MR. HILKE: Objection, form.

3      THE WITNESS: I have no idea when it would

4 have been opened. That's the first date on the

5 routing document.

6 BY MS. GOLDEN:

7      Q.    That's certainly not clear evidence

8 that it was opened on that date, right?

9      MR. HILKE: Objection, form.

10     THE WITNESS: No, it doesn't -- there's no --

11 I didn't see an initial request for any doc -- for

12 any of the documentation, so I don't know when those

13 requests would have been entered or why this CR --

14 when this CR would have been initiated.

15 BY MS. GOLDEN:

16     Q.    Is it -- we can -- I'm done with that.

17            Is it appropriate to double count

18 CRs in your data set?

19     MR. HILKE: Objection to form.

20     THE WITNESS: No, it is not appropriate to

21 double count CRs.

22 BY MS. GOLDEN:

23     Q.    Okay. So let's open up CR 217809.

24            And -- oh, sorry. And you see

Page 291

1 here that -- that's -- that's it. Oh, we had this

2 one before.

3            Let's go down a little bit further.

4            Do you see how this CR was -- hold

5 on, keep going. Up. I mean up, yeah.

6            You see where it says it was

7 administratively unfounded and incorporated into

8 CR 214426, right?

9      A.    Correct.

10     MS. GOLDEN: And so if we go to CR -- but this

11 CR 217809 -- I'm sorry. Let's go to 214426.

12            So this -- this CR was -- you see

13 where it's 2 -- no, I think I need 214426. It's

14 probably not marked as an exhibit yet.

15            Is this it?

16     MR. TROTTA: 21 --

17     MS. GOLDEN: Oh, here we go.

18     MR. TROTTA: -- 4426.

19            (Deposition Exhibit No. 16,

20            Witness Finnell, was marked for

21            identification 01/13/2023.)

22 BY MS. GOLDEN:

23     Q.    Do you see this 214426?

24            Okay, can you go up a little bit?

Page 292

1      Q.    Do you see the date here on the --

2 on the far left on the top? The date is

3 December 21, 1994, right?

4      A.    Correct.

5      Q.    That's the first date on that folder.

6      A.    Correct.

7      Q.    So let's keep going down.

8            And this is the CR that the prior CR

9 we looked at, 217809, was subsumed into, right?

10     A.    Yes.

11     Q.    Okay. And so is it appropriate to

12 count both CRs in the data set?

13     MR. HILKE: Objection, form, foundation.

14     THE WITNESS: When you say appropriate to

15 count them, they were both provided. So we count

16 them and then list how they are -- with the findings

17 or how they are closed out.

18 BY MS. GOLDEN:

19     Q.    But isn't --

20     A.    So --

21     Q.    -- including -- isn't including both of

22 them double counting?

23     A.    No, it's not double counting. You --

24 you identify what happened to that CR, but then you

Page 293

1 also identify what happened to this one and how it

2 was closed.

3            Because we've got to account for the

4 CR and what happened with the CR. Whether --

5 whether it was administratively closed, unfounded,

6 sustained, you have -- you have to identify what

7 happened with it.

8      Q.    Okay. Let us look at the spreadsheet.

9      MS. CARNEY: Nick, I can do that again.

10     MR. TROTTA: Okay, sure.

11 BY MS. GOLDEN:

12     Q.    And the -- as you're getting that, I'm

13 going to ask.

14            I think we've talked this before,

15 but the basis for inclusion in the data -- data set

16 was a CR initiation date between January 1, 1991,

17 and December 31st, 1995, right?

18     MR. HILKE: Objection, form and to the extent

19 it misstates his testimony.

20            Go ahead.

21     THE WITNESS: That was -- that was a point

22 that was placed in the Excel spreadsheet, yes.

23 BY MS. GOLDEN:

24     Q.    And if it was just a day or two before

Page 294

1 January 1st, 1991, there -- it shouldn't have been
2 included, right?
3       MR. HILKE: Objection, form, foundation.
4       THE WITNESS: No, I would not necessarily say
5 it shouldn't be included. Again, CPD established
6 the parameters for -- I think someone's mic is
7 open ...
8 BY MS. GOLDEN:
9       Q.   Did CPD make you perform --
10      MR. HILKE: Wait, wait -- sorry.
11      THE WITNESS: Wait a minute.
12           CPD established the parameters for
13 which they were going to select which CRs they were
14 going to include in the -- for the court order.
15           So I don't -- I don't -- I know it
16 says '91 to '95, but I don't know how they
17 determined if there was one before or -- before '91
18 or if it was one after '95, how they determined that
19 issue be included in this data set.
20 BY MS. GOLDEN:
21      Q.   Do you see column L is the date the CR
22 is initiated?
23      A.   Yes, I see that.
24      Q.   Okay. Let's go to lines 468 and 469.

Page 295

1       MS. CARNEY: 4 ...
2       MS. GOLDEN: 468 and 469. It's in column A,
3 469 and 469.
4       MS. CARNEY: Yep, got it.
5 BY MS. GOLDEN:
6       Q.   Do you see in column L there for 468
7 and 469 the CR initiation date of January 8, 1996?
8       A.   Yes.
9       Q.   Okay. Should this CR and these
10 allegations and this investigation have been
11 included in the data set?
12      A.   I would need to see more about that
13 specific CR to understand why CPD included that in
14 the data set.
15      Q.   Why did you include it in your analysis?
16      A.   Because it was part of the data that
17 was provided by CPD and per the court order, so we
18 analyzed the data that was provided. We didn't --
19      Q.   Did you -- did you exercise any
20 discretion in determining whether or not the data
21 in the CRs you were provided were suitable for
22 analysis?
23      MR. HILKE: Objection, form.
24      THE WITNESS: The -- the only discretion would

Page 296

1 have been what I spoke of earlier when Ms. Meza went
2 through the data to make sure that the information
3 was -- there was no typos, no misspellings, the
4 information contained within the spreadsheet was
5 accurate and sufficient for her analysis.
6           We didn't go through and try to
7 determine why CPD included this CR versus another
8 CR.
9 BY MS. GOLDEN:
10      Q.   Well, aren't you an expert? I mean,
11 it's your report. Couldn't you do with the data
12 what you wanted --
13      MR. HILKE: Objection --
14 BY MS. GOLDEN:
15      Q.   -- and analyze it however way you saw
16 fit? Or did you feel constrained to analyze every
17 single piece of data that was in that CR?
18      MR. HILKE: Objection, form, compound, and
19 argumentative.
20           Go ahead.
21      THE WITNESS: We -- we did analyze the data as
22 we saw fit. We -- we chose to analyze all of the
23 data that was provided by the City, all of the data
24 that was approved as being complete and accurate by

Page 297

1 all of the counsel involved and by the Court.
2 BY MS. GOLDEN:
3       Q.   Did you -- I mean, there's -- there's
4 also another CR, CR 223786, that has a
5 CR initiation date of January 14, 1996, which is in
6 your data set.
7           Is it your opinion that it's
8 appropriate to include that CR --
9       A.   Like --
10      Q.   -- in your analysis?
11      A.   Like I said before, I would have to
12 look at the CR itself. But on its -- on -- just
13 looking at this spreadsheet and the work that we
14 did, I would say yes, it's contained therein. I
15 would not -- without looking at the CR and
16 understanding exactly what it all entailed --
17      Q.   So depending on what the CR entailed,
18 if it's initiated after 1990 -- after 1995, it
19 could be appropriate to include it.
20      MR. HILKE: Mr. Finnell, were you done with
21 your last answer?
22      THE WITNESS: No. I was going to say because
23 CPD made the determination based on the court order.
24 And it -- it -- really, it was not my determination

Page 298

1 to decide if they had provided the accurate
2 information per the court order. That was already
3 determined.
4         Once the Court reviewed the
5 information that they provided, once all of the
6 attorneys involved reviewed the information, and
7 everyone agreed that the court order had been
8 complied with sufficiently, then that data was
9 produced for us, so --
10 BY MS. GOLDEN:
11     Q.   If that -- I'm sorry.
12     A.   So my analysis of the data was to just
13 analyze or have analyzed the data that had been
14 produced pursuant to that court order.
15     Q.   If they provided a CR from 2005 in that
16 production, would you have included that in your
17 analysis?
18     MR. HILKE: Objection, form, incomplete
19 hypothetical.
20     THE WITNESS: That is so far outside the realm
21 that I would have to again look at the CR to
22 determine why it was included in the -- in the data
23 set. There may have been a very good reason why
24 that CR was included. But until I've reviewed that,

Page 299

1 I would not know that.
2         So again, I can't tell you sitting
3 here that CR 222914 should be excluded because I
4 don't know the specifics about why it was initiated
5 on this date. I don't -- I don't understand -- I
6 don't know the specifics of why that date is
7 included and why the CR was included.
8     MS. GOLDEN: All right. Let's take a quick
9 break. I probably don't have much time left.
10         So can we go off the record and then
11 get a time count.
12     THE LEGAL VIDEOGRAPHER: We're off the video
13 record at 6:31 p.m.
14         (Recess taken.)
15     THE LEGAL VIDEOGRAPHER: We're back on the
16 video record at 6:39 p.m.
17 BY MS. GOLDEN:
18     Q.   Mr. Finnell, you previously test --
19 testified about a court order compelling the
20 production of CRs against Area Five detectives
21 between 1991 and 1995.
22         Do you recall that testimony?
23     A.   Yes, I do.
24     Q.   And you know the order that I'm talking

Page 300

1 about?
2     A.   The order that was presented today, yes.
3     Q.   Okay, right.
4         And in that order, were you required
5 to rely on each of the CRs that were produced by
6 CPD?
7     MR. HILKE: Objection, form.
8     THE WITNESS: Was I re -- required to rely,
9 no. I don't believe the order instructed me to do
10 anything.
11     MS. GOLDEN: All right. Can we pull up
12 CR 220046?
13 BY MS. GOLDEN:
14     Q.   Oh, wait. Before we do that, can I --
15 can I ask a couple questions.
16         First of all, Mr. Finnell, that if
17 there's a CR against let's just say 50 different
18 officers, and they're all accused of doing the same
19 thing, that should be coded as one CR, 50 invest --
20 50 investigations, and 50 allegations, right?
21     MR. HILKE: Objection, form, incomplete
22 hypothetical.
23     THE WITNESS: Yes. If it was a single CR with
24 50 officers and each had one allegation, that's how

Page 301

1 it would be coded.
2 BY MS. GOLDEN:
3     Q.   Okay. That's -- and that standard
4 should be applied consistently without regard to
5 how it might affect the data in the spreadsheet,
6 correct?
7     MR. HILKE: Objection, form, foundation.
8     THE WITNESS: I believe it would have to be
9 applied consistently with each CR to include the
10 number of officers and the number of allegations per
11 officer.
12 BY MS. GOLDEN:
13     Q.   And if there was one CR with 50 subject
14 officers and there were two allegations against
15 each of them, it should be one CR,
16 50 investigations, and a hundred allegations, right?
17     MR. HILKE: Objection, form, incomplete
18 hypothetical.
19     THE WITNESS: Yes, it should be.
20 BY MS. GOLDEN:
21     Q.   And that would result in the second
22 example in a hundred different line items on the
23 data sheet, right, because there's a separate line
24 item for each allegation.

Page 302

1    A.   That is correct.

2    Q.   And by the way, the court order didn't

3 require you to break up CRs into investigations and

4 allegations the way that you've done it, right?

5    A.   You said it required me to?

6    Q.   It did not require you to do that, did

7 it?

8    A.   No.   The court order did not require me

9 or specify how I should analyze the data.

10    Q.   Okay.   Let's go to CR 220046.

11        Actually -- yeah, let's do that.

12        (Deposition Exhibit No. 17,

13        Witness Finnell, was marked for

14        identification 01/13/2023.)

15 BY MS. GOLDEN:

16    Q.   Let's start at the top page.

17        You see this is CR 220046, right?

18    A.   That is correct.

19    Q.   And then at the bottom of page 3 --

20 actually, not at the bottom of page 3 -- you see

21 that in the Accused section there's 150 accused

22 members, right?

23    A.   That is correct.

24    Q.   Okay.   Let's scroll through the

Page 303

1 document.   You see that the names of all these

2 officers are provided, right?

3    A.   Yes, I see the names.

4    Q.   So assuming -- let's get to the final

5 count.   Up a little bit.

6    MS. GOLDEN:   What page is that?

7    MS. CARNEY:   17 of 25.

8 BY MS. GOLDEN:

9    Q.   So you see there on page 17 that we

10 have one CR against 150 different officers, right?

11    A.   Yes, that is correct.

12    Q.   So in the data set, this should be

13 coded as one CR and 150 separate line items for

14 each of the allegations, right?

15    MR. HILKE:   Objection, form, foundation.

16    THE WITNESS:   Yes, it should be.

17    MS. GOLDEN:   Okay.   Let's go to the report,

18 page 124.

19    MS. CARNEY:   Oh, shoot.   I don't have the

20 report, Carrie.   I just have --

21    MS. GOLDEN:   It's Exhibit 4.

22    MR. TROTTA:   I can share that one quick if you

23 want?

24    MS. CARNEY:   Thanks.

Page 304

1    MR. HILKE:   For -- for the record I have one

2 minute left of seven hours.

3 BY MS. GOLDEN:

4    Q.   Okay.   Page 124.

5        All right.   Do you see that in

6 table 31 the number in bold there that says, 896?

7    A.   Yes, I do.

8    Q.   Okay.   In the -- in the Rodriguez

9 report, the number was reported as 869 based on an

10 analysis of the same data.

11        Do you know which is correct?

12    MR. HILKE:   Objection, form, foundation.

13    THE WITNESS:   I'd have to look at the

14 Rodriguez report.   I'm not sure -- as I sit here

15 now, I'm not sure how to respond to that without

16 first reviewing that report and -- and then

17 reviewing this one.

18    MR. HILKE:   I'm sorry.   If we could get a time

19 check?   I believe that's seven hours on the record.

20    THE LEGAL VIDEOGRAPHER:   That was seven more

21 minutes of time.

22    MS. GOLDEN:   Okay.   I'd like just a little bit

23 more time because we've had some technical

24 difficulties.

Page 305

1    MR. HILKE:   Ms. Golden, what -- how many more

2 minutes are we talking about?

3    MS. GOLDEN:   10 more minutes.

4    MR. HILKE:   I -- I think I'm -- I think I'm

5 going to insist that we stop your exam.   I think

6 that's been our position throughout the expert

7 depositions.

8    MS. GOLDEN:   Okay.   Signature?

9    MR. HILKE:   I'm sorry.   I'm going to ask -- I

10 don't think that deprives me of what I think will be

11 5 minutes of rebuttal.

12    MS. GOLDEN:   Okay.   So you won't let me have

13 10 more minutes but you have some time for your own

14 questioning.

15    MR. HILKE:   I -- I think we're entitled to

16 rebuttal, and I think the defendants are only

17 entitled to seven hours of questions.

18    MS. GOLDEN:   Okay.

19    MR. HILKE:   And I'm sorry.   Could I -- before

20 we do that, could I go off the record for just one

21 minute, please?

22    THE LEGAL VIDEOGRAPHER:   Okay.   We're off the

23 video record at 6:48 p.m.

24        (Recess taken.)

Page 306

1        THE LEGAL VIDEOGRAPHER: We are back on the
2 video record at 6:50 p.m.
3               EXAMINATION
4 BY MR. HILKE:
5        Q.   Mr. Finnell, do you recall your
6 testimony earlier about credibility determinations?
7        A.   Yes, I do.
8        Q.   Did you reinvestigate any CRs as part
9 of your analysis?
10        MS. CARNEY:  Objection, asked and answered.
11        THE WITNESS:  No, I did not.
12 BY MR. HILKE:
13        Q.   Did you make credibility determinations
14 as you conducted your analysis?
15        MS. CARNEY:  Objection, asked and answered.
16        THE WITNESS:  No, I did not.
17 BY MR. HILKE:
18        Q.   Did you identify any deficiencies in
19 the CRs you reviewed in your analysis?
20        A.   I saw areas that concern -- were of
21 concern to me, specifically areas around the use of
22 To/Froms as I reported.  But also the -- the way
23 that conflicting testimony or conflicting
24 statements may have been addressed if, say, if a

Page 307

1 complainant said something happened and a detective
2 or an officer said it didn't happen that way, it
3 was -- it didn't seem to me much effort was made to
4 identify what -- who was telling the truth.
5        Q.   And in your analysis, did you form an
6 opinion on whether the Chicago Police Department
7 adequately investigated CRs?
8        A.   Yes, I did.
9        Q.   And just as a yes or no, is that
10 opinion in your report?
11        A.   Yes, it is.
12        Q.   Did you form an opinion on whether the
13 Chicago Police Department adequately analyzed the
14 information available in CRs?
15        A.   Yes, I did.
16        Q.   Is that opinion in your report?
17        A.   Yes, it is.
18        Q.   Did you form an opinion on whether the
19 Chicago Police Department adequately administered
20 discipline as to the CRs that you reviewed?
21        A.   Yes, I did.
22        Q.   Is that opinion in your report?
23        A.   Yes, it is.
24        Q.   Did you form an opinion on whether the

Page 308

1 Chicago Police Department provided an adequate
2 justification for the discipline it administered?
3        A.   Yes, I did.
4        Q.   Is that opinion in your report?
5        A.   Yes, I did, it is.
6        Q.   Did you form an opinion on whether
7 Chicago Police Department's discipline sustain rate
8 was appropriate?
9        MS. CARNEY:  Objection, form.
10 BY MR. HILKE:
11        Q.   You can answer.
12        A.   Yes, I did.
13        Q.   Is that opinion in your report?
14        A.   Yes, it is.
15        Q.   Do you remember testifying about Bureau
16 of Justice statistics data from a 2006 report by
17 Hickman?
18        A.   Yes, I do.
19        Q.   Are those data used in your field?
20        A.   Yes, it is.
21        MS. CARNEY:  A belated objection to form and
22 foundation.  What field are you asking him about?
23 BY MR. HILKE:
24        Q.   Are those data used in the field of

Page 309

1 police discipline?
2        MS. CARNEY:  Objection, form, foundation.
3        THE WITNESS:  Yes.  Well, in looking at
4 officer discipline as an oversight practitioner and
5 as someone who looks at police accountability.
6 BY MR. HILKE:
7        Q.   And why are those data used in that
8 field?
9        MS. CARNEY:  Objection, form, foundation.
10        THE WITNESS:  It -- it's used as a baseline to
11 determine if an agency or oversight entity that they
12 conduct internal investigations or administrative
13 investigations on police officers, if they're doing
14 an adequate job.  It's -- it's one metric that is
15 used.
16        MR. HILKE:  Those are all my questions.
17 Thanks.
18        MS. CARNEY:  Waive or reserve?
19        MR. HILKE:  Reserve, please.
20        THE LEGAL VIDEOGRAPHER:  We're off the video
21 record at 6:55 p.m.
22               (The proceedings adjourned at
23                6:55 p.m.)
24

Page 310

```
1           IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3   THOMAS SIERRA,              )
                                )
4              Plaintiff,       )
                                )
5        vs.                    )   No. 18 CV 3029
                                )
6   REYNALDO GUEVARA, et al.,   )
                                )
7              Defendants.      )
8
9           This is to certify that I have read my
10  deposition taken on Friday, January 13, 2023,
11  in the foregoing cause and that the foregoing
12  transcript accurately states the questions asked
13  and the answers given by me, with the changes or
14  corrections, if any, made on the Errata Sheet
15  attached hereto.
16
            _____
17              ANTHONY WAYNE FINNELL
18
    No errata sheets submitted (Please initial)
19  Number of errata sheets submitted _____ pages
20  Subscribed and sworn to
    before me this _____ day
21  of _____ 2023.
22
    _____
23      Notary Public
24
```

Page 311

```
1           REPORTER'S CERTIFICATE
2       I, Katie K. Elliott, do hereby certify that
    ANTHONY WAYNE FINNELL was duly sworn by me to
3   testify the whole truth, that the foregoing
    deposition was recorded stenographically by me and
4   was reduced to computerized transcript under my
    direction, and that said deposition constitutes a
5   true record of the testimony given by said witness.
6       I further certify that the reading and signing
    of the deposition was not waived, and the deposition
7   was submitted to Mr. Wally Hilke, plaintiff's
    counsel, for signature.  Pursuant to Rule 30(e) of
8   the Federal Rules of Civil Procedure, if deponent
    does not appear or read and sign the deposition
9   within 30 days, the deposition may be used as fully
    as though signed, and this certificate will then
10  evidence such failure to appear as the reason for
    signature not being obtained.
11
        I further certify that I am not a relative
12  or employee or attorney or counsel of any of the
    parties, or a relative or employee of such attorney
13  or counsel, or financially interested directly or
    indirectly in this action.
14
        IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my seal of office at Chicago,
    Illinois, this 13th day of February 2023.
16
17
            Katie K. Elliott
18      Illinois CSR No. 084-004537
19
20
21
22
23
24
```

Page 312

```
1   Errata Sheet
2
3   NAME OF CASE: THOMAS SIERRA vs REYNALDO GUEVARA, et al.
4   DATE OF DEPOSITION: 01/13/2023
5   NAME OF WITNESS: Anthony Wayne Finnell
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25              _____
```