# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | Magistrate Judge Geraldine Soat Brown |

**DEFENDANTS' MOTIONS *IN LIMINE* FOR PLAINTIFF'S *MONELL* CLAIM**

**MOTION NO. 1:  TO EXCLUDE FROM EVIDENCE PLAINTIFF'S DISCLOSURES OF DOCUMENTS ALLEGEDLY WITHHELD FROM CRIMINAL DEFENSE COUNSEL.**

Plaintiff's *Monell* claim in this case has significantly morphed since the Court granted him a new trial.  He originally asserted a *Brady*-based *Monell* claim alleging the City had a policy and practice of "systematically suppressing *Brady* material by intentionally secreting discoverable information in so-called street files."  (Third Am. Compl., Dkt. #105, at ¶65).  Unable to find any evidence of a systematic suppression of *Brady* material in the so-called basement files, plaintiff is now simply alleging a "systematic underproduction of records" by the CPD that caused a *Brady* violation in his case.  (4/11/16 Tr., at 8) (Ex. 1).  Plaintiff has acknowledged he will not be attempting to prove there was a *Brady* violation in any other case. (*Id*.)  Plaintiff accordingly has not identified any specific exculpatory or impeaching material information that was withheld in any other case from the "basement files."  Instead, plaintiff has submitted a supplemental disclosure in which he simply identified cases "in which, on information and belief, documents and information in the basement police files are not contained in the defense attorney files."  (Plaintiff's Supp. *Monell* Disclosures, Ex. 2, at 1).  *Monell* requires more than merely showing that some pages were not were not found in a defense file.

## A.     Plaintiff's *Monell* Disclosures are Based on a Faulty Legal Predicate

As a preliminary matter, Defendants continue to challenge the legal viability of plaintiff's theory under *Monell*. Where a municipal policy itself is unconstitutional, a plaintiff only needs to show a single application of the policy, and thus, only a single constitutional violation to prove a *Monell* claim. *See Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). However, where the policy is not itself unconstitutional, as is the case here, a plaintiff must show more than a single constitutional violation to establish municipal liability. *Okla. City v. Tuttle*, 471 U.S. 808 (1985). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Id*. at 823-24; *Connick v. Thompson*, 563 U.S. 51, 62-63 (2011); *Estate of Novack v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (Where the municipal policy would not itself be unconstitutional, a plaintiff must show "a series of constitutional violations from which deliberate indifference can be inferred"); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) (To establish "a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise for deliberate indifference").

Even assuming the City had a policy of not producing every piece of paper from a homicide investigation to prosecutors, nondisclosure of a document in and of itself is not a *Brady* violation. *See United States v. Agurs*, 427 U.S. 97, 111 (1976) ("since we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error"); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) ("The constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). The files identified by plaintiff from the Area Central basement do not provide evidence of a

2

policy which is itself unconstitutional, nor do they establish "a series of constitutional violations from which deliberate indifference can be inferred." *Estate of Novack*, 226 F.3d at 531.

Plaintiff essentially seeks to introduce evidence of a series of cases in which the Chicago Police Department ("CPD") did not violate the Constitution, and will ask the jury to infer from those cases the City has a widespread unconstitutional practice. Such a position is illogical and contrary to *Monell* case law. *Tuttle*, *supra*; *Estate of Novack*, *supra*. For example, a Southern District of Florida court dismissed a *Monell* claim based on an alleged policy and practice of using excessive force in shooting cases where the plaintiff alleged only one constitutional violation. *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313 (S.D. Fla. 2015). In *Whitaker*, the plaintiff pointed to four of 17 shootings in a nine-month span involving officers protecting themselves from vehicular assaults and alleged these instances represented typical conduct. *Id*. The court rejected the claim, noting "even assuming this is true, plaintiff does not allege that these other shootings were deemed unjustified, unconstitutional, or were anything other than legitimate self-defense shootings." *Id*. at 1321. The court further explained: "A plaintiff certainly cannot establish a widespread unconstitutional practice through prior constitutional actions. Plaintiffs have not offered any description of a prior incident involving a relevant constitutional violation." *Id*. Similarly here, plaintiff does not allege the CPD's production of documents in the cases for which there are files in the Area Central basement were anything other than prior constitutional actions. To the contrary, plaintiff has acknowledged he will not show any of the other files involve a relevant constitutional violation. Because plaintiff has failed to establish a "series of constitutional violations from which deliberate indifference can be inferred" (*Estate of Novack*, *supra*), plaintiff's *Monell* disclosures should be barred because they are based upon a faulty legal predicate.

3

**B.     Plaintiff's *Monell* Disclosures are Inadmissible Based on Foundational Deficiencies and Methodological Flaws**

Even if the Court were to assess plaintiff's *Monell* disclosures on their merits, irrespective of the unsound legal proposition on which they are based, serious foundational and methodological flaws become readily apparent.  Plaintiff presents no evidence to establish the completeness of the criminal defense files he reviewed and compared to the CPD files.  In addition, whatever methodology plaintiff used to identify the documents allegedly withheld was significantly flawed and ultimately unreliable.  These disclosures cannot form the basis for any admissible evidence.  Moreover, the flawed disclosures should not be presented to the jury in any form, as they have no probative value and will only serve to confuse or mislead the jury.

Plaintiff's modified *Monell* theory rests on the assumption that the criminal defense files "contain all the documents disclosed and made available to the [criminal defense] attorneys." (Brasfield Rpt., at 14, Ex. 3).  This assumption is untenable legally in assessing the CPD's compliance with *Brady*.  *See Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) ("While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation").  The criminal defense files therefore would not necessarily reflect what the CPD turned over to the prosecutors. Moreover, plaintiff has presented no witness, affidavit, or evidence to support his assumption that the criminal defense files at issue are complete or in the same state as when originally assembled.  Brasfield himself acknowledges a number of "sparse criminal defense attorney files" in those disclosed by plaintiff's counsel.  (Brasfield Rpt., at n. 40).  As the proponent of the evidence, plaintiff lacks the foundation to establish these criminal defense files are complete and in the same state as when originally assembled by criminal defense counsel.

Neither Brasfield nor plaintiff's counsel have disclosed any efforts to investigate or confirm the completeness of the criminal defense files, or whether documents not found in the current version of the file were actually produced or made available to criminal defense counsel at the time of trial. (Brasfield Rpt., at 16: "I did not make any inferences about what documents were turned over to criminal defendants – I based my conclusions on observations about actual differences between files"); (Brasfield dep, Ex. 4, at 20, 76). There is no attempt to account for the possibility that documents originally contained within the criminal defense files were removed at some point, purged, or misplaced, or that documents were made available to defense counsel but not copied for the file, or that the file itself was inadequately maintained and/or transferred among several different attorneys involved in different stages of the criminal process. Just because a document was not found in the present version of the criminal defense file does not mean that document was never in there, and it certainly does not mean the document was "withheld," "suppressed," or not otherwise made available by the prosecutors to defense counsel. Plaintiff's suggestion to the contrary requires an unwarranted and speculative inferential leap. There simply is no foundation for the completeness of the criminal defense files, rendering inappropriate any reliance on or use of them at trial.

There is another, independent basis to preclude plaintiff from relying on or using any "data" generated from his review of the criminal defense files: whatever methodology plaintiff used to identify the documents that were allegedly withheld was fundamentally and critically flawed. As set forth below, plaintiff's failure to conduct any critical assessment of the disclosures (apart from simply stating "on information and belief" a document was missing from the criminal defense file) has resulted in a highly misleading and unreliable "analysis" of what was and was not available to the criminal defense attorneys. A reasonably diligent investigation

would have revealed the invalidity of plaintiff's assumption that the criminal defense files contain all the documents disclosed and made available to the criminal defense attorneys.

*First*, plaintiff has disclosed missing documents in cases where he was unable to locate criminal defense files. Plaintiff does not explain how he was able to determine documents were missing from a file he could not even find. The error in utilizing such an approach is manifested in a number of cases.[1] In Case No. 42, plaintiff alleges numerous documents were withheld from criminal defense counsel, even though he was unable to produce the criminal defense file itself. According to his disclosure (Ex. 2, at 7), the criminal defense file contained no GPRs (ACB 35156-96), which seems an unlikely circumstance for any competent criminal defense attorney. Sure enough, review of the prosecutor's file confirms numerous GPRs were produced by the CPD and made available to defense counsel. In addition, the blue back from the State's Attorney's Office ("SAO") indicates the State tendered discovery several times, including on June 1, 2004, when the "State tenders [full set] police reports, street file, & GPRs." (SAO-NF-0097308) (Ex. 5). Similarly in Case No. 45, plaintiff identified a number of allegedly withheld documents despite lacking the criminal defense file. Defendants subsequently sent a subpoena to the criminal defense attorney, who responded that he no longer had a physical file, but he did have some computer files, which he produced. Some of those documents appeared to reflect a list of labels for individual files maintained in a larger trial file. Several of these labels matched documents plaintiff claims was not produced, such as the autopsy report, photographs, the defendant's criminal history, a gang arrest record, and a CPD Daily Bulletin Notice. These

---

[1] The cases referenced throughout this Motion are not meant to provide an exhaustive list; they are just some examples chosen to demonstrate the unreliability and inaccuracy of plaintiff's disclosures. Plaintiff continues to include all the disclosures discussed herein in his *Monell* trial exhibit list, even though Brasfield expressly declined to rely on some of them.

examples demonstrate the unreliability of plaintiff's process in identifying allegedly suppressed documents and the critical errors resulting from whatever flawed methodology was used.

*Second*, documents plaintiff claims were improperly withheld by CPD practices were clearly produced by the CPD and possessed by the prosecution. There is no *Brady* claim available against the police when the material in question is in the possession of the prosecutors. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). A check of the SAO files reveals hundreds of allegedly suppressed documents were not "withheld" by the CPD as claimed. For example, in Case No. 44, plaintiff claimed 60 pages were missing from the criminal defense file. However, a review of the SAO file revealed all of the allegedly missing investigative material was produced to prosecutors by CPD. SAO blue backs also refute plaintiff's disclosures in a number of cases. (*See* discussion of Case No. 42, *supra*). As an additional example, in Case No. 14, the SAO blue back repudiates plaintiff's contention that numerous pages were withheld from criminal defense counsel, as it establishes a 181-page "street file" was produced to the criminal defense attorney, including the reverse side of 18 pages. (SAO-NF-0003946) (Ex. 6). In Case No. 55, the blue back has an entry dated 2/28/91 reflecting that the defense attorney lost various police reports and documents, and prosecutors re-tendered a full set of reports. (SAO-NF-0005223) (Ex. 7).

Other documents on their face would have been in the possession of the State, so there would have been no CPD obligation to produce such documents to the prosecution. *Harris*, *supra*. The most obvious examples are written statements of witnesses and suspects taken by Felony Review assistants or other Assistant State's Attorneys ("ASAs"). Since the State itself generated these documents, they obviously would have been in the possession of the prosecutors, and therefore CPD would have had no disclosure obligations with respect to them. Yet, plaintiff blames the CPD for the absence of written statements in several criminal defense files. (*See,*

*e.g.*, Case No. 38, ACB 060720-23; Case No. 39, ACB 082197-230; ACB 082248-77) (Group Ex. 8). In another example, plaintiff accuses the CPD of failing to disclose an Illinois State Police ("ISP") laboratory report. (*See* Case No. 44, ACB 038172-75) (Ex. 9). However, the report on its face shows a "cc" to an ASA, indicating the prosecutors possessed the report. These disclosures reveal plaintiff did not exercise reasonable diligence and conducted absolutely no analysis of the allegedly "withheld" documents prior to disclosing them.

Perhaps most egregiously, examination of the criminal defense files themselves reveals a number of false disclosures. In Case No. 39, plaintiff claims pages Bates stamped ACB 082178-277 were withheld from criminal defense counsel. (*See* Ex. 2, at 7). However, every one of these 100 allegedly withheld pages can be found in the criminal defense file produced by plaintiff! In Case No. 45, discussed above, a list of file labels produced by the criminal defense attorney closely matched documents and information plaintiff claims were not produced to defense counsel. These examples provide perhaps the most compelling evidence of the unreliability of plaintiff's identification process, the worthlessness of the resulting disclosures, and the significant potential for misleading the jury if such "evidence" is introduced.

*Third*, many of the documents plaintiff claims were withheld from the criminal defense attorneys were not available or did not even exist at the time of the criminal trial. In several cases, plaintiff identified court attendance reports. (*See, e.g.,* Case No. 30, ACB 020876, 020885, (Ex. 10); Case No. 7, ACB 005609-11, (Ex. 11)). These documents, which have no investigative value, would not have existed until after the case was in court and the identities of the police officers would have been known to the prosecutors (and likely criminal defense counsel). Other documents allegedly "withheld" from criminal defense attorneys were actually created many years after the fact and under circumstances having nothing to do with the

8

underlying prosecution.  In Case No. 35, plaintiff identified ACB 031294-95 (Ex. 12), which pertain to a 2014 request from the CPD's Office of Legal Affairs ("OLA") for a copy of the file in response to a subpoena.  The documents in question were generated twelve years after the incident underlying the prosecution of the criminal defendant.  In Case No. 37, plaintiff identified ACB 33498 (Ex. 13), which relates to a 2010 request to OLA for a copy of the file made in an unrelated federal civil lawsuit.  In Case No. 39, plaintiff disclosed ACB 081991-92 (Ex. 14), which relate to a 2014 FOIA request.  In Case No. 51, plaintiff disclosed ACB064944-49 (Ex. 15), which is a copy of the complaint from a 2009 civil lawsuit filed by one of the criminal co-defendants.  Inclusion of documents like these in a disclosure claiming materials were withheld from criminal defense attorneys at the time of the criminal trial is utterly without merit and underscores the unreliability of the entire disclosure.

*Fourth*, plaintiff discloses a number of documents that contain no information whatsoever, or provide information that was obviously known to defense counsel.  For an example of the former, some of the documents plaintiff discloses as "withheld" include blank pages or envelopes:  Case No. 45, ACB 041033 is a blank GPR sheet (Ex. 16); Case No. 9, ACB 007158 is a blank card (Ex. 17); Case No. 57, ACB 048180 is a blank CPD envelope (Ex. 18).  As examples of the latter, plaintiff has disclosed copies of business cards of criminal defense counsel: *See* Case No. 42, ACB 035235-36 (Ex. 19); Case No. 3, ACB 004441, 004504 (Ex. 20).

*Fifth*, plaintiff's disclosure reflects no analysis to ascertain if the allegedly withheld information was disclosed elsewhere.  For example, in Case No. 14, plaintiff contends a series of requests for latent fingerprint comparison were not tendered.  (ACB 011248).  A review of the investigative file, however, shows the exact same requests for latent fingerprint comparison were contained in the criminal defense file, with added information reflecting the negative results from

the fingerprint examiner. (*Cf.* ACB 011248 with 011243, which plaintiff admits was produced) (Ex. 21). Plaintiff nevertheless identifies the requests for latent fingerprint comparison page as "withheld," even though the criminal defense attorney had both the requests *and* the results.

The numerous examples set forth above demonstrate the unreliability of plaintiff's process in identifying allegedly suppressed documents, and the critical errors that resulted from whatever flawed methodology was used to make the disclosures. Plaintiff should not be allowed to present these misleading disclosures to the jury in any manner or form.

## MOTION NO. 2: TO BAR OPINIONS OF PLAINTIFF'S EXPERT, MICHAEL BRASFIELD.

### A. Opinions Based on a Comparison of the Files from the Area Central Basement With the Criminal Defense Files

Plaintiff's police practices expert Michael Brasfield's opinions based on his review of files contained at the Area Central basement (the "ACB files") and the corresponding defense attorney files should be barred for at least two independent reasons: (1) they will not help the trier of fact understand any evidence or determine a fact in issue; and (2) the opinions are based on insufficient facts and data and poor methodology. Brasfield's opinions should be barred as they are not helpful or reliable. Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods of the facts of the case.

The court serves as the gatekeeper of expert testimony. *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, the expert testimony must be helpful to the trier of fact and it must also be reliable. *Id*. "In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified and to examine the methodology the

Case: 1:10-cv-01168 Document #: 1003 Filed: 07/22/15 Page 12 of 32 PageID #:21769

expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In determining reliability, the court may examine whether there is "too great an analytical gap between the data and the opinion proffered." *Textron*, 807 F.3d at 835.

Plaintiff disclosed 59 files as evidence purportedly supporting his *Brady*-based *Monell* claim; but again, plaintiff does *not* allege the City failed to fulfill its *Brady* obligations in any of those cases. (4/11/16 Tr., Ex. 1, at 8). Plaintiff essentially seeks to introduce evidence of cases in which the CPD did not violate the Constitution, and will ask the jury to infer from those cases the City has a widespread unconstitutional practice. Allowing plaintiff to introduce Brasfield's testimony suggesting the City did something improper in cases in which it fulfilled its constitutional obligations would only serve to confuse the jury as to the issues and applicable legal obligations in this case. Such testimony could mislead the jury to believe the City has a constitutional duty to produce to prosecutors every document in every case, which is not what the law requires. It also suggests the jury could find against the City on the *Monell* claim even if plaintiff fails to prove a series of constitutional violations, in derogation of *Monell* case law.

Brasfield's opinions are also unreliable as they are not based on sufficient facts and were developed from flawed methodology. His analytical process for identifying documents he believes were withheld from criminal defendants consisted of simply comparing the contents of 51 of the investigative files from the Area Central basement with criminal defense files for those cases. (Brasfield Rpt., at 1). If a document from the ACB file was not found in the criminal defense file, Brasfield concludes with no further analysis the document was "withheld." The most obvious problem with this approach is that Brasfield was reviewing the wrong sources to determine what the CPD produced and/or made available. The CPD's obligation under *Brady* is satisfied by producing material exculpatory and/or impeachment evidence to the prosecutors.

*See Carvajal*, 542 F.3d at 566. Or, if responding to a subpoena, the CPD would be directed to provide documents to the Court. (*See, e.g.,* Case No. 13, ACB 010444) (Ex. 29). To determine what the CPD produced, Brasfield at a minimum should have looked at the prosecutor's files in addition to the criminal defense attorney's files. Brasfield himself acknowledged during his deposition that if the CPD turned documents over to the State, it would have fulfilled its obligations. (Brasfield dep at 134.). And as set forth in the previous Motion, a large majority of the documents Brasfield identified as missing from the criminal defense files were contained in the SAO's files. Yet, Brasfield never reviewed the SAO's files for these cases. (*Id*. at 126-27).

Indeed, Brasfield admits he does not know what the CPD did or did not disclose to the SAO, and he did not draw any inferences as to what was or was not disclosed. (Brasfield dep at 165; Rpt. at 16). This admission alone presents sufficient reason to bar his opinion that the CPD regularly failed to disclose evidence. His inability to identify a single document that was not disclosed demonstrates the speculative nature of his opinion.

Brasfield does not know what was turned over to the SAO, and he also does not know and makes no inferences regarding what documents the SAO turned over to criminal defendants. (Brasfield dep at 28). He admitted he has no idea what the criminal defense files contained at the time of trial and explained that he formed his opinions based only on what was in the criminal defense files when they were forwarded to him. (*Id.* at 54-55). He took no steps to verify the criminal defense files were complete. (*Id.* at 32-33). He has no knowledge of the criminal defense attorneys' retention policies, nor has plaintiff produced any evidence regarding those policies. (*Id.* at 238). Brasfield does not know how many other attorneys handled the files since the trial, including appellate attorneys or habeas attorneys. (*Id.* at 238).

Since the data underlying Brasfield's opinions was developed from insufficient source material, his resulting analysis and conclusions are unreliable. Of the 59 ACB identified, the SAO or United States Attorney's Office ("USAO") produced files for 43 of those cases.[2] A review of those cases reveals the vast majority of the pages in the ACB files were also contained in the corresponding prosecution file, with an even higher percentage for core investigatory documents such as supplementary reports, GPRs, or other detectives notes.[3] Brasfield's reliance on only the criminal defense files tethered his opinions to data that severely understated the number of documents produced by the CPD.

There are several reasonable explanations as to why there is a significant difference between the number of documents in the SAO file and the criminal defense files, none of which Brasfield took into consideration when he decided to review only the criminal defense attorneys' files. One possibility is that the State did not turn over to defense counsel all of the documents in its possession, such as a blank piece of paper from the Investigative File, a note with only a detectives' name, court attendance sheets, or similarly irrelevant non-investigatory pages. If so, the fact that the documents were not in the criminal defense file would have nothing to do with the CPD or its practices. Another reasonable explanation is the prosecutors had "open file" policies in which they allowed the criminal defense attorneys to review the SAO file and copy what they wanted. The criminal defense attorneys may have decided they did not need copies of everything, such as crime scene photographs or outdated criminal history reports. Brasfield

---

[2] The prosecutors could not locate files for 16 of the 59 cases.

[3] There is also evidence the SAO files themselves are incomplete, which suggests the possibility that even more documents were disclosed by the CPD. For example, the SAO file for one of the cases, Case No. 14, contains a note stating the ASA gave a "181 pp. street file which includes 18 pp. that have writing on back …" However, neither the SAO nor the PD files contained 181 pages of CPD documents from the investigative file.

acknowledged at his deposition that he was familiar with this type of open file policy and that this was a possibility. (Brasfield dep at 258-261).

A third reasonable explanation is that the criminal defense files are not complete. As explained above, Brasfield has no idea whether those files are complete, and the evidence indicates they are not. For example, one case Brasfield purportedly relies upon is Case No. 35. The criminal defense file for Case No. 35 contained a total of two documents generated by the CPD with the RD number for that homicide. Brasfield expressed doubt as to the completeness of the file at his deposition, admitting that based on his experience, he would have expected a criminal defense attorney to obtain a significant number of police documents not within the file. (Brasfield dep at 60). Yet he relied on the file anyway.[4]

Brasfield offers no discussion as to why any of these reasonable possibilities would not equally explain the absence of documents from the criminal defense files. And because he admits he cannot draw any inference as to what documents were produced and what documents were not produced, he can only speculate that the absence of documents was caused by CPD policies. Worse, he speculates the nondisclosure was a regular occurrence. Such speculation is improper. *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("the whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions. District courts must be careful to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves.") Brasfield claims to be able to draw this conclusion because he aggregated the data, but there is no reason why aggregating unreliable data would somehow produce reliable results. Since Brasfield cannot cite evidence in the record that even one page was withheld, how can he possibly

---

[4] Notably, the SAO file pertaining to Case No. 35 contained almost all of the pages alleged to be "withheld" in Brasfield's Report.

conclude that thousands of pages were withheld?  Brasfield's opinions based on his review of the ACB files and the corresponding defense attorney files should be barred.

**B.      Opinion Based on Cases For Which the SAO Cannot Locate Files**

Even if this Court does not bar the entirety of Brasfield's testimony regarding his comparison of the ACB Files to the criminal defense files, it should at least bar him from testifying about cases for which the SAO could not locate its file.  Plaintiff identified 59 files in his *Monell* disclosures.  The SAO (and USAO in three instances) located and produced files for 43 of those cases, but could not locate files for 16 of them.[5]

Brasfield's review of the criminal defense files without reviewing the corresponding SAO files resulted in his reaching conclusions based on incomplete data that significantly understated the number of documents the CPD produced.  For the 43 cases in which the prosecutor's files were found, plaintiff is claiming only about 74% of the pages in the ACB Files were in the criminal defense files.  However, the vast majority of the documents from the ACB Files were identified in the corresponding SAO files.  For the cases in which the SAO could not locate files, plaintiff is claiming only about 68% of the pages from the ACB Files were in the criminal defense files.  Had the SAO been able to locate its files for these cases, it is reasonable to infer, as in the other cases, defendants would have been able to show the vast majority of the documents not contained in the criminal defense files were in the SAO files.

If Brasfield is permitted to testify regarding the 16 cases for which the SAO could not locate its files, defendants through no fault of their own will be deprived of the ability to cross-examine him with the evidence that most directly undermines the basis for the conclusions he is

---

[5] The exhibits associated with these 16 files include plaintiff's Exhibit Nos. 347-50; 353-61; 364; 386;. 413; 418-19; 427; 431; 433; 437-38; 442; 445; 448; 456-57; 466; 648; 664; 839; 844-45; 853; 857; 859; 863-64; 868; 870; 873; 880-81; 890.

drawing.  Introducing evidence of these cases would result in only a partial, and very likely misleading, set of facts being presented to the jury.

## C.    Opinion Regarding Subpoena Practices

Brasfield opines that the CPD fails to produce documents in response to subpoenas, but again, his methodology and conclusions are flawed because he relied on inadequate data.  The CPD generally would not respond to subpoenas by sending the documents directly to the defense attorneys because the subpoenas were usually returnable to the Court.  (Ex. 29).  Brasfield, despite his unfamiliarity with this practice (Brasfield dep at 286-87), opined that the CPD's subpoena response practice "does little to ensure disclosure of all relevant materials."  (Brasfield Report at 18).  By reviewing only the criminal defense attorneys' files, his opinion on this topic suffers from all of the same reliability problems described above.

When asked to identify a subpoena the CPD did not fully comply with, Brasfield testified:  "I cannot determine what the Chicago Police Department produced."  (Brasfield dep at 76).  His opinions regarding the CPD's practice in responding to subpoenas lack a proper foundation, are unreliable, and would not help the trier of fact.  They should be barred.

## D.    Opinion Regarding the Significance of Documents From Area Files

Despite acknowledging he has made no inference regarding what documents were produced by the CPD (Brasfield Rpt., at 16), Brasfield nevertheless offers opinions about the potential relevance of various pieces of evidence that he claims were not disclosed and further, that those documents should have been disclosed.  (*Id*. at 19).  His report then opines on the potential significance of individual documents found in the ACB files.  (*Id*. at 19-23).  Brasfield should be barred from offering these opinions as he has no foundation to testify documents were not produced to the criminal defendants or to the prosecutors.  Brasfield does not know and has not drawn an inference regarding whether these documents were produced by the CPD.  There is

16

no appropriate basis for him opine on the potential use of documents by criminal defendants where he cannot even assert the documents were withheld from them.

Additionally, such testimony will only serve to confuse and potentially mislead the jury. Testimony about the significance of these documents would seemingly suggest to the jury the documents were not produced. After all, why else would he be testifying about them? Similarly, an opinion that certain documents should have been disclosed to criminal defendants clearly implies they were not. Any testimony by Brasfield regarding the potential relevance of evidence he can only speculate was not disclosed, or that certain documents should have been disclosed to criminal defendants when he concedes he has made no inference regarding what documents were produced by the CPD, should be barred.

**E.      Opinion Regarding Parallel Files**

Brasfield's report opines that there are several reasons why parallel files might be created in the CPD, but none of the reasons he gives are relevant to the file at issue. The first suggested reason for the existence of parallel files is that multiple detectives working on a case have no centralized place to keep their notes, resulting in notes being left in a variety of locations. (Brasfield Rpt., at 12). To support this proposition, Brasfield cites to the *Palmer* litigation. *Id.* However, *Palmer* involved City policies that preceded the enactment of DDSO 83-1, which is the initial written policy at issue in this case. And, 83-1 directs that notes (usually written on a GPR) be kept in a centralized location, the Investigative File.

Brasfield states different units like Bomb and Arson or Gang Crimes could have their own files. Again, this proposition has nothing to do with this case. There is no allegation or evidence plaintiff did not receive the subject file because it was kept at a specialized unit as opposed to Area One. Brasfield also discusses the existence of the Investigative File and the Permanent Retention File (more formally known as the Record Division file). The existence of a

17

separate Permanent Retention File containing the case report and Supplementary Reports on a homicide has no bearing in this case as plaintiff admits he received the Permanent Retention File for the Smith/Hickman murders during the criminal process.

**F.      Opinions Regarding Detective Division Special Order ("DDSO") 83-1**

Brasfield's opinion that DDSO 83-1 varies from acceptable police practices standards should be barred as he provides no basis for the opinion.  Brasfield opines that 83-1 did not meet commonly accepted police practices, but he is unable to point to a single policy from a single law enforcement agency (including those he worked for) that was superior (or even comparable) to 83-1 in the relevant time frame or that otherwise conforms to the standard he claims existed at the time.  (Brasfield dep at 83-84, 167, 326-27).  At his deposition he testified that his goals and objectives did not include comparing policies and procedures of different agencies in 1982 and that he "did not come to this deposition prepared to compare and contrast policies nationwide." (Brasfield dep at 168-69).  But that is exactly what he purports to be doing when he claims 83-1 does not meet standard police practices across the country.  He has no basis to claim 83-1 did not meet the standard followed by the rest of the country when he has no idea what the rest of the country was doing.

**G.      Opinions Regarding Police Department Disclosure Obligations to Defense Counsel**

Brasfield opines that the CPD can only fulfill its disclosure obligations under generally accepted police practices if it turns over to the defendant one hundred percent (100%) of all information it receives during a homicide investigation without regard to whether the information is relevant to the investigation (hereinafter, the "100% disclosure standard"). (Brasfield dep, at 159-61, 300).  He further opines that all major police departments across the country, with the exception of the CPD, abide by this standard.  (*Id*. at 337, 339-40).  Brasfield's opinions in this regard fail to meet the basic requirements of Rule 702 for the admissibility of

18

expert testimony because: a) he lacks the qualifications to so opine since he lacks the relevant experience and knowledge to render the specific opinions he is proffering; b) his opinions are legally unreliable for multiple reasons, including that his opinions are not supported by any relevant literature, generally accepted standards, and/or any federal or state statutes regarding the disclosure of information obtained during a homicide investigation; and c) his testimony will not assist the fact finders in understanding the specific issue for which it is proffered and/or is otherwise inadmissible under Federal Rule of Evidence 403.

**1.  Brasfield Is Not Qualified To Opine That All Major Police Departments Disclose 100% Of Information Obtained During The Course Of A Homicide Investigation**

According to Brasfield, his opinion that all major police departments comply with the 100% disclosure standard is based on his personal experience working with various police departments in different capacities.  (Brasfield dep at 212-213, 216). "Whether a witness is qualified as an expert can only be determined by comparing the *area* in which the witness has superior knowledge, skill, experience, or education with the *subject matter* of the witness's testimony."  *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (emphasis added).  The Court must ascertain not just whether Brasfield "is qualified in general, but whether his qualifications provide a foundation for [him] to answer specific questions."  *Id*. at 617.  While Brasfield may be qualified to opine about certain police practices, he is not qualified to opine that all major police departments across the country disclose 100% of all information obtained during a homicide investigation to the defendant without regard to the relevance of that information.

None of Brasfield's specific experiences, whether it be as a police officer, auditor, and/or consultant, give him the necessary foundation and/or knowledge to so opine.  By Brasfield's own admission, in the six cities in which he did conduct a police department audit, he was never tasked with investigating and/or auditing the police departments' disclosure of information in

19

criminal cases, nor was he tasked with determining whether the police departments were fulfilling their disclosure obligations in homicide cases. (Brasfield dep, at 322). For example, Brasfield admitted he could not say whether certain major police departments, including New York and Baltimore, were complying with the 100% disclosure standard. (*Id*. at 320). Brasfield is not uniquely qualified to opine that all major police departments nationwide comply with 100% disclosure standard.

2. **Brasfield's Opinions About Generally Accepted Police Disclosure Requirements And Police Departments' Compliance With Such Requirements Are Not Reliable**

Brasfield's specific opinions on the 100% disclosure standard, and that all major police departments comply with this standard, are not based on reliable principles and methods and/or sufficient facts or data. A court should bar an expert's opinions as unreliable where they are not generally accepted within the relevant scientific community (*Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)), and/or the expert is relying primarily upon his personal experience, but does not articulate why that particular experience compels his conclusion. *Crawford Supply Group, Inc. v. Bank of Am.*, 2011 U.S. Dist. LEXIS 117670, at *8 (N.D. Ill. 2011). Brasfield's opinions run afoul of both of these concerns.

First, Brasfield's opinion imposing a 100% disclosure standard is not a standard generally accepted within the law enforcement community. Nothing in the Illinois Supreme Court Rules, or any other Federal or State rule or statute, imposes a 100% disclosure requirement on a police department. State and federal laws require police departments to turn over material exculpatory and/or impeaching evidence to *prosecutors*. *Carvajal*, *supra*; 725 ILCS 5/114-13(b). Brasfield's opinions thus impose obligations on the police that go far beyond what the law requires.

Brasfield would improperly impose a "duty" on the CPD to disclose 100% of all information obtained during a homicide investigation without regard to relevance and when no

such duty existed during the 1980s and/or now.  Brasfield's opinion should be barred as it is not the product of reliable principles or methods and is not based on sufficient facts or data.  *See e.g., Lasorsa v. Showboat: The Mardi Gras Casino*, 2009 U.S. Dist. LEXIS 81948, at *13 (D.N.J. 2009) ("Without 'industry standards' to rely upon, [the expert] seems to base his conclusions on his own authority.  Because 'knowledge connotes more than subjective belief or unsupported speculation,' * * * there is no reliable foundation for [the expert's] expert testimony") (citations omitted).  Unsupported by his experience or any relevant literature, Brasfield nevertheless claims that he knows what a police department discloses to a criminal defense attorney, *i.e.*, 100% of all information obtained by a police department during the court of a homicide investigation, based on:  (1) his review of criminal defense attorney files; (2) conducting audits and reviews of criminal cases; and (3) attending annual Major City Chiefs Association conferences throughout the course of his career.  (Brasfield dep, at 175-76; 212-216, 329-30).  As explained below, these are insufficient bases to support his opinion on this issue.

First, Brasfield does not explain how his review of a selected number of criminal defense files supports his conclusion that all information obtained by police departments throughout the country during the course of an investigation are turned over directly to the defense.  (*See* Brasfield Rpt., at 14).  Brasfield acknowledged he had "limited occasion to actually see full criminal defense files."  (*Id*. at 214).  Brasfield admitted he never reviewed criminal defense files in Baltimore, Memphis, or San Francisco.  (*Id*. at 216).  Even assuming, *arguendo*, a review of criminal defense attorney files was sufficient to support a conclusion that all major police departments comply with this 100% disclosure standard, Brasfield's admittedly limited review of an unknown number of criminal defense files is far too insignificant to allow him to give an opinion involving nationwide compliance.

21

In the six major cities in which he claims to have done an audit of the police department, Brasfield admitted that he never did an audit regarding the police departments' disclosure of information in criminal cases. (*Id*. at 322). Brasfield further admitted that he has never done such an audit in any capacity as a police practitioner. (*Id*. at 216-17). Brasfield could not say whether the New York Police Department, the Baltimore Police Department, or the Seattle Police Department were in compliance with a 100% disclosure standard. (*Id*. at 322, 326). Brasfield's own testimony undermines his conclusion that all major police departments nationwide comply with a 100% disclosure standard.

Brasfield's bi-annual attendance at the Major City Chiefs' Association Conference, in which police chiefs from 50 major cities across the country attend and give closed door presentations relating to best police practices, do not support his opinions here. (Brasfield dep, at 329, 336). Although Brasfield claimed he learned at these conferences that all major police departments were complying with this 100% disclosure standard, when pressed for details, he was unable to recall any specific presentations or what anyone said during these conferences. (*Id.* at 330-31, 333). Such "street gossip" (Brasfield's conversations with unidentified police chiefs during closed door presentations) does not provide a reliable basis for an expert opinion. *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.,* 2007 U.S. Dist. LEXIS 46691, at *20 (N.D. Ind. 2007) (citing *Kay v. First Cont. Trading, Inc*., 976 F. Supp. 2d 772, 774 (N.D. Ill. 1997) (ruling that proposed expert would not be permitted "to report on random conversations that he had with colleagues")). Given that Brasfield cannot specifically recall or testify what these conversations and/or presentations entailed, his opinion that all major police departments reported compliance with a 100% disclosure policy is unverifiable "street gossip" and unreliable.

22

Perhaps most damning to Brasfield's methodology is the fact that when pressed for more detail regarding these conferences and the bases for his opinion that all major police departments comply with the 100% disclosure standard, he claimed reliance on vaguely described spreadsheets created by various federal agencies, which according to Brasfield, contained information relating to compliance. (*See* Brasfield dep, at 340) (admitting he conducted no independent research regarding which police departments were in compliance with a 100% disclosure requirement, and instead claiming reliance on spreadsheets that he agreed he would subsequently produce). Despite defense counsel's repeated formal and informal requests, Brasfield has not provided any document or spreadsheet containing the information he claims to have relied upon in reaching his opinion. (*See* June 2016 Correspondence) (Ex. 22). Brasfield has failed to explain how his experience or the literature supports his conclusion that all major police departments comply with a 100% disclosure standard. There "is too great an analytical gap between the data and the opinion proffered" to be admitted into evidence under the guise of an expert opinion and should therefore be barred. *See e.g., C.W. ex rel. Wood v. Textron, Inc*., 807 F.3d 827, 835 (7th Cir. 2015); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (district court may exclude expert testimony that is "connected to existing data only by the *ipse dixit* of the expert").

Finally, Brasfield's opinions regarding the 100% disclosure standard should be barred pursuant to Federal Rule of Evidence 403. For Brasfield's opinions to be admissible under Rule 702, his testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993). As detailed above, it does not. But even if Brasfield's proposed expert testimony passed muster under *Daubert*, FRE 403 requires that the trial judge ensure that the testimony's probative value is not substantially

23

outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury. *Id*. at 595. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules must exercise more control over experts than over lay witnesses." *Id*. To the extent Brasfield's report has any probative value (and defendants submit it has none), it is significantly outweighed by the risk of unfair prejudice to defendants, the confusion of the issues as discussed above, and the likelihood it would mislead the jury.

**MOTION NO. 3: TO BAR EVIDENCE AND TESTIMONY REGARDING THE *JONES* AND *PALMER* LITIGATION.**

Plaintiff's *Monell* Witness and Exhibit List (Ex. 23) includes 19 exhibits related to the *Jones* and *Palmer* litigation. Exhibits 308, 310-16, and 319-21 (Group Ex. 28) include memoranda regarding the City's investigation of and/or response to the issues associated with *Jones* and *Palmer*. Exhibits 335-338 include testimony and transcripts from those cases. Exhibits 339-341 include opinions regarding the litigation. None of these exhibits were produced or identified prior to the first trial, and they should be barred based on their belated disclosure well after the close of discovery in this case. This Court granted plaintiff a new trial to allow further discovery with respect to the basement files. (*See* Dkt. #812, at 10) (holding the Court "effectively prevented [plaintiff] from ascertaining whether evidence in files found in the so-called 'basement' file cabinets have been withheld from criminal defense attorneys on other cases"). Nothing prevented plaintiff from conducting discovery regarding the *Jones* and *Palmer* litigation prior to the first trial. Even after the new trial was granted, plaintiff still never announced his intention to conduct additional discovery on the *Jones* and *Palmer* litigation or the City's policies prior to the creation of 83-1, and never sought leave from this Court to do so. (The Court had barred this evidence in the prior trial.) Plaintiff's April 2015 *Monell* discovery

24

plan says nothing about discovery regarding these cases or any City policies from before 1984. (Dkt. #813). If plaintiff intended to rely on the *Jones* and *Palmer* litigation at the new trial, it was incumbent on him to disclose that intention much earlier.

The exhibits also should be barred to prevent an irrelevant and unnecessary trial-within-a-trial re-litigating the *Jones* and *Palmer* cases, which do not deal with the same policies at issue in this case. *Jones* and *Palmer* dealt with the policies and practices prior to the enactment of 83-1. This case involves the City's policies and practices following the enactment of 83-1. Testimony regarding *Jones* and *Palmer* potentially could confuse the jury as to what policies and practices are actually at issue. For example, Brasfield's report contains long explanations of the factual background of both the *Jones* and *Palmer* cases. (Brasfield Rpt. 8-10). These summaries go far beyond explaining the City's policies, such as discussing the facts of the underlying crimes, what happened to the officers involved in the cases, and what happened in resulting civil suits. (*Id.*) None of this is relevant to plaintiff's case and will potentially cause juror confusion.

Worse, plaintiff seemingly intends to present an incomplete and misleading version of the *Jones* and *Palmer* litigation. Notably absent from plaintiff's exhibit list is the Seventh Circuit's opinion in *Palmer II*, which explained in language that could just as easily be applied to this case, that the plaintiffs' attorneys in *Palmer* inspected over 300 files "but found nothing on which they could base a claim that any member of the class had been convicted in violation of the Constitution." *Palmer v. City of Chicago*, 806 F.2d 1316, 1317 (7th Cir. 1986). Further, "Upon reviewing the files the plaintiffs' counsel were unable to find anything worthwhile. That is why they have allowed the case to peter out. They went on a fishing expedition, and the pond was empty." *Id.* at 1321. Finally, "The claim depends on there being exculpatory material in the street files—and there isn't any. The suit has been abandoned because it has been shown to

have, in fact, no legal merit." *Id.* at 1324. If plaintiff is permitted to introduce evidence of the *Jones* and *Palmer* litigation, defendants should be permitted to introduce this additional language from *Palmer II* to prevent the jury from being misled about those proceedings.

The written decisions from *Jones* and *Palmer* identified as exhibits 339-341 also are inadmissible hearsay not subject to any exception. Brasfield's reliance on these decisions does not allow for their introduction, either. As this Court has previously observed, the fact that an expert relied on inadmissible hearsay "does not authorize [the party] to drive a truck through the rules regarding the admissibility of evidence." (Dkt. #685, p. 9).

In addition to being hearsay, evidence of the *Jones* and *Palmer* litigation also should be barred pursuant to Rule 403 as any probative value it could possibly have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and wasting time.

## MOTION NO. 4: TO BAR RECENTLY PRODUCED EVIDENCE REGARDING THE *KLUPPELBERG*, *RIVERA*, AND *TAYLOR* LITIGATION.

As with the *Jones* and *Palmer* exhibits discussed above, plaintiff's *Monell* Witness and Exhibit List (Ex. 23) includes documents from three other cases that were not produced during discovery until 2016. (Exhibits 323-326 and 330-333 relate to *Kluppelberg v. City of Chicago*, 13 C 3693; Exhibits 327-329 relate to *Rivera v. City of Chicago*, 12 C 4428; Exhibit 334 relates to *Taylor v. City of Chicago*, 14 C 737). As explained above, this Court granted plaintiff a new trial so he could conduct discovery on the so-called basement files, not so that discovery could be reopened on all aspects of his *Monell* claim, giving plaintiff a second bite at the apple.

The belated inclusion of these cases in plaintiff's exhibit list is the result of his unilateral reopening of general discovery on his *Monell* claim. He never sought leave of Court to reopen *Monell* discovery generally or to conduct discovery on these cases specifically. He did not identify these cases in his April 2015 *Monell* discovery plan or otherwise advise this Court he

26

was planning to conduct *Monell* discovery outside the scope contemplated by this Court's orders. (Dkt. #813). If plaintiff intended to rely on *Kluppelberg*, *Rivera*, and *Taylor* at the new trial, it was incumbent to disclose that intention long before the recent identification of *Monell* exhibits.

The same trial-within-a-trial concerns discussed in Motion in Limine No.4 arise here as well. Allowing plaintiff to litigate *Taylor*, *Kluppelberg*, or *Rivera* in this case will require the City to call witnesses and identify documents to refute whatever point plaintiff is seeking to make. The exhibits related to the *Kluppelberg*, *Rivera*, and *Taylor* cases should be barred.

## MOTION NO. 5: TO BAR INVESTIGATIVE FILES AND PERMANENT RETENTION FILES FOR CASES IN WHICH NO CORRESPONDING CRIMINAL DEFENSE FILE WAS DISCLOSED.

In Plaintiff's *Monell* Witness and Exhibit List (Ex. 23), he discloses an additional 434 Investigative Files and Permanent Retention Files for which he did not locate any corresponding criminal defense file.[6] Brasfield relies on them to opine the CPD did not comply with 83-1 in various ways (for example, by including in the Investigative Files notes and To/From memos that were not on the official GPR form). (Brasfield Rpt., at 33-39). Brasfield then concludes that "[a]s a result of those deficient policies and widespread practice[s], criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases," and that the CPD "engaged in a pattern and practice of routinely failing to disclose material in criminal cases to defendants that should have been disclosed." (*Id*. at 45).

Brasfield's opinions in reliance on these exhibits should be barred because they are based on speculation. Without a corresponding file from the prosecutors (or even the criminal defense

---

[6] Exhibit 22, para. 397-400, 402-403, 405-412, 414-417,420-426,429, 432, 434-436, 439-441, 443-444, 446-447, 449-455, 459-465, 468-472, 475-478, 481-485, 488, 489-500, 502-510, 513-515, 517-523, 525-541, 543-560, 562-576, 578-584, 586-590, 592-615, 617-637, 639-663, 665-666, 668-682, 684-694, 696-697, 699-709, 712-713, 715-718, 720-724, 726-727, 729-800, 802-820, 823-826, 828-829, 831-838, 840-843, 846-852, 855, 858, 860-862, 865-867, 869, 871-872, 874-879, 883-889, 892-896, 899-903, 906.

attorneys), plaintiff cannot draw any reliable conclusions with respect to what was produced or not produced in these cases.[7] There is no evidence to substantiate the CPD withheld anything in these cases. Nevertheless, plaintiff through Brasfield is using these files to argue that the CPD does not comply with its policies, which leads to the withholding of material in criminal cases. Plaintiff should not be allowed to mislead the jury with such unfounded speculation.

**MOTION NO. 6: TO BAR OPINIONS OF WILLIAM BRIDGES**

Plaintiff has identified William Bridges as an expert witness, purportedly to rebut the testimony of defendants' expert Judith Roberts. Bridges' testimony should be barred because (1) it would not rebut Roberts' findings, (2) his opinions are based on inadmissible and irrelevant evidence, and (3) his testimony would be cumulative of the testimony of plaintiff's other expert, Mr. Brasfield. "The proper role of rebuttal evidence is to contradict, impeach, or defuse the impact of evidence offered by an adverse party. (Citation omitted). Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach, or defuse the impact of the evidence offered by an adverse party, is improper on rebuttal." *Peals v. Terre Haute Police Dep't.*, 535 F.3d 621, 630 (7th Cir. 2008). Bridges' report does not contradict, impeach, or defuse the impact of the evidence offered in Roberts' report, but instead consists primarily of analysis on questions irrelevant to Roberts' evaluation. Where Bridges' report does address issues raised by Roberts, it essentially duplicates Brasfield's report.

Brasfield's opinions are based on his comparison of 50 Investigative Files with 51 criminal defense attorneys files. (Brasfield Rpt., at 16). Roberts' report challenges the sample size, representativeness, and assumptions underlying Brasfield's analysis. (Roberts' Rpt., Ex. 27). Bridges does not directly rebut Roberts' opinion that the 50/51 files is an inappropriate

---

[7] In fact, there is evidence that To/From memos and notes on non-GPR paper were produced during the criminal process. *See* Group Ex. 25.

sample size and that these 50/51 files are not representative of the broader universe of homicide files. Instead, Bridges' report focuses on the larger sample used by Brasfield and offers an opinion that files do not contain inventories or have notes that are not on GPR forms. This portion of Bridges' report is not rebuttal, as Roberts' report does not address this issue.

As explained in motion *in limine No. 5*, Brasfield opines that the CPD failed to comply with DDSO 83-1 based on his review of dozens of Investigative Files and Permanent Retention Files for which plaintiff did not produce a corresponding criminal defense file. Plaintiff improperly discloses Bridges as a "rebuttal" witness on this topic, even though Roberts does not address the sample size for this particular Brasfield opinion.

Bridges' report also provides his analysis of whether 89 CPD files contained (1) a complete inventory sheet, (2) handwritten notes, and (3) to/from reports. This analysis has nothing to do with Roberts' report, which addressed the portion of Brasfield's opinion contending that materials were not produced to criminal defendants. Again, Bridges does not provide rebuttal evidence at all, but discloses a new analysis conducted well after the deadline for disclosure of plaintiff's *Monell* experts. It is also irrelevant to any issue in this case, and its admission would likely lead to juror confusion. Plaintiff's *Monell* claim is based on the alleged withholding of information from criminal defendants, not the alleged use of the wrong form to take notes. There is no constitutional right to a complete inventory form, or a constitutional requirement that a detective take or notes only on a form that says "General Progress Report" at the top. The introduction of this irrelevant information can only serve to distract the jury from the fact that plaintiff cannot prove a series of constitutional violations and to mislead them as to what it is plaintiff has to prove to prevail on his claim.

Where Bridges does address the basis for Brasfield's opinion regarding whether the CPD produces documents from investigative files, he offers an analysis that is duplicative of Brasfield's and does not actually rebut Roberts' opinions. Bridges "analysis" consisted of looking at 28 of the exact same criminal defense files that Brasfield looked at and comparing the contents to the exact same CPD files Brasfield looked at. (*Compare* Ex. 26, at 12 (Bridges) to Attachment B to Brasfield Report, Ex. 24, at 4-5). It is a complete duplication of Brasfield's review. The only difference between Bridges' duplicative "analysis" and that of Brasfield is that Bridges' table lists the Area that investigated each of the 28 files.

An additional basis for barring Bridges' testimony is his reliance on inadmissible and irrelevant evidence. His report relies on information provided in the *Kluppelberg* case. Plaintiff failed to disclose any of this information during discovery in this case. (*See* Motion *In Limine* 4, above). Plaintiff should not be permitted to introduce that untimely and irrelevant evidence through the back door by having a "rebuttal" expert witness propose it. This is especially true because the *Kluppelberg* information he relies on relates only to whether files produced in that case had a complete inventory sheet, which as explained above, does not actually rebut anything in Roberts' report, and furthermore is not evidence that investigatory information from those files was withheld.

Bridges' report also relies on investigative files for which no corresponding criminal defense file was found. The analysis with respect to these files has nothing to do with whether information was disclosed to prosecutors or criminal defendants. It deals with whether the files contained inventories and whether notes were in the proper format. Again, this analysis in no way rebuts the conclusions drawn by Roberts.[8]

---

[8] Defendants reserve the right to supplement this motion after Bridges is deposed.

Dated: July 12, 2016

Respectfully submitted,

By:   s/ Daniel M. Noland

By:   s/ Rachel A. Katz

ATTORNEYS FOR DEFENDANTS,
City of Chicago, Joseph Murphy and Daniel
Brannigan

ATTORNEYS FOR DEFENDANT,
David O'Callaghan

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker, Suite 2300
Chicago, Illinois  60606

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, IL 60601

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **July 12, 2016**, I electronically filed the foregoing **Defendants'**

**Motions** *in Limine* **for Plaintiff's** *Monell* **Claim** with the Clerk of the Court using the ECF

system, which sent electronic notification of the filing on the same day to:

H. Candace Gorman
Adrian J. Bleifuss Prados
Andrew D. Finke
Law Office of H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
312.427.2313
hcgorman1@gmail.com
ableifuss@gmail.com
andrew.finke@gmail.com

Steve Art
Anand Swaminathan
Sarah Grusin
D. Samuel Heppell
Loevy & Loevy
311 North Aberdeen, Suite 3rd Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com
anand@loevy.com
grusin@loevy.com
sam@loevy.com

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, IL 60601
312.641.0300
312.855.0350 (fax)
skulwin@kmklawllp.com
rkatz@kmklawllp.com

s/ Daniel M. Noland