# EXHIBIT 14

2382

1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3

4    NATHSON E. FIELDS,                )   Docket No. 10 C 1168
                                       )
5                      Plaintiff,      )
                                       )
6            vs.                       )
                                       )
7    CITY OF CHICAGO, et al.,          )   Chicago, Illinois
                                       )   November 29, 2016
8                      Defendants.     )   9:30 o'clock a.m.

9
                     TRIAL TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE MATTHEW F. KENNELLY
                            VOLUME 9-A
11
     APPEARANCES:
12

13

14   For the Plaintiff:    LAW OFFICE OF H. CANDACE GORMAN
                           BY:  MS. H. CANDACE GORMAN
15                         220 South Halsted Street, Suite 200
                           Chicago, IL  60661
16                         (312) 441-0919

17                         LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
18                              MR. STEVEN EDWARDS ART
                                MR. ANAND SWAMINATHAN
19                              MR. TONY BALKISSOON
                           311 North Aberdeen Street, 3rd Floor
20                         Chicago, IL  60607
                           (312) 243-5900
21

22

23   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
24                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
25                         (312) 435-5639

1    with the corporation counsel's office, the plaintiff's

2    attorneys, the -- I think in this -- I can't remember.  I

3    think, specifically, he probably would have said that people

4    in the police department.

5           THE COURT:  Okay.  Have you covered what you needed

6    to cover?

7           MR. NOLAND:  Yes, your Honor.

8           THE COURT:  All right.  So, look, we've had a lot of

9    discussion about this.  I am going to tell you what you can do

10   and what you can't do.

11          So I'm going through this proffer as you've written

12   it here.

13          Paragraph 1 on page 2, I am not going to get into a

14   fight over may versus could in terms of whether Jones may or

15   may not have committed the murder, couldn't have committed the

16   murder.  That's just -- I am not going to micromanage it to

17   that level of detail.

18          The first three sentences I think are all appropriate

19   and admissible.  I don't think the fourth sentence that reads,

20   In spring 1982, Laverty learned Jones was on trial for murder.

21   He told his commander that an innocent person was being

22   prosecuted, and his commander did nothing.  I don't think

23   that's necessary, so I am excluding that under 403.

24          The last two sentences are fine because they are

25   admissible to show notice, as I have previously ruled.  That

1  topic is admissible.

2  So the two about -- two sentences about telling
3  Jones' criminal defense attorney and declaring a mistrial and
4  the charges being dropped, those are appropriate.

5  As far as paragraph 2 is concerned, I think it goes
6  into too much detail regarding what the lawsuit said.  I think
7  you can bring out that in 1983, Mr. Jones filed a civil
8  lawsuit challenging the practices that had been -- you know,
9  he claimed to have been exposed in that case, period.

10  Paragraph 3 about disciplinary proceedings against
11  Laverty, I don't see that as admissible.  I don't think it's
12  relevant.  Even if it is relevant, it's unfairly prejudicial
13  and it gets us off into a sidetrack.  So that's excluded.

14  Paragraph 4, now we have flipped over to Palmer, I
15  think that on the first -- that on that sentence or first
16  sentence in that, I think the way it needs to be elicited is
17  that there was a class action lawsuit alleging a policy and
18  practice rather than it was filed to challenge the policy and
19  practice -- it's a lawsuit alleging a policy and practice of
20  suppressing investigative materials.

21  The second sentence is fine.  It says, City
22  policymakers had notice of and participated in the lawsuit.

23  In terms of paragraph 5, when it says, Days after the
24  lawsuit was filed, give a date.  You know it.  It's a court
25  order.  You know what the date is.  So let's give a date

1    rather than days after the lawsuit was filed.

2            The first two sentences are fine.  On whatever date,

3    the judge ordered that the CPD preserve all street files, and

4    then, the superintendent issued a departmental notice

5    instructing that all notes be preserved.  I'll just point out

6    that that second sentence has already coming in, I think,

7    through Hickey.

8            I think that the amendment to the order is -- it's

9    really inconsequential for purposes of this, and, certainly,

10   the reasons for it I don't think are terribly significant and

11   so -- and it gets us off into a sidetrack, so I am excluding

12   the third sentence of paragraph 5.

13           Paragraph 6 and 7 I am basically going to collapse

14   into one thing because I don't really think it's either

15   necessary or appropriate to get into the details of the

16   judge's findings in the case.

17           I just want to look at one thing.  Hang on a second.

18           The details of the judge's findings in the case.  So

19   the stuff about how there was a finding that -- how people

20   were applying it in an improperly restrictive way and what two

21   commanders were doing and, you know, how official reports were

22   sometimes prepared and so on, I don't think any of that is

23   necessary.

24           However, I do think that -- and I think I -- if I

25   didn't say this, I at least hinted it pretty strongly in the

1   order that I entered previously on this topic, the written

2   order, that I think that you're entitled to bring in that

3   there was a -- that there was a determination by a judge that

4   special order 83-1 was insufficient to accord criminal

5   defendants the full rights to which they were entitled.

6       But I do not think that the specifics of that are

7   relevant.  I mean, I think that you can then -- you have a

8   basis to link that up with Hickey's testimony that in May

9   of '83, there was a further amendment based on, as he

10  testified, discussions with plaintiff's counsel.

11      So you can put in the first sentence of paragraph 7,

12  not the rest of it, not paragraph 6, and I continue to believe

13  and I am again ruling that what happened on the appeals is not

14  relevant because this is all being admitted for the purpose of

15  showing notice.  And there was no finding on appeal until 1986

16  besides.

17      So there you go.

18      All right.  Is everybody clear enough on all of that?

19      MR. LOEVY:  I think so, your Honor.

20      THE COURT:  All right.  So take 10 minutes, and then

21  we will resume.

22      MR. LOEVY:  Thank you.

23      MR. KULWIN:  Thanks, Judge.

24   (Short break.)

25   (The jury enters the courtroom.)

Brasfield - direct

2485

1      THE COURT:  All right.  Everybody can have a seat.

2   The next witness is on his way up.

3    (Witness sworn.)

4      THE COURT:  All right.  Mr. Loevy, you can go ahead.

5                       - - -

6       MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION

7   BY MR. LOEVY:

8   Q.  Sir, if you'd state your name for the record, please.

9   A.  Michael David Brasfield.

10   Q.  And what is your profession?

11   A.  I am retired from law enforcement after about 40 years,

12   and I occasionally do expert witness and consulting work.

13   Q.  Let's focus on your law enforcement career.  Tell the jury

14   a little bit about your history.

15   A.  As briefly as I can, I started in law enforcement with a

16   small agency in Washington state in 1968.  After a year there,

17   I transferred to the Seattle Police Department on January --

18   in January of 1969.  I stayed with the Seattle Police

19   Department until my retirement in January of 1995, about 26

20   years.

21       While I was with the Seattle Police Department, I

22   served as a patrol officer, took an exam, and eventually

23   became a detective, served in a number of investigative units

24   within the police department.

25       I then was promoted to sergeant.  I served in a

1    number of positions as a sergeant, including internal affairs
2    and vice and prostitution enforcement.

3              I was eventually promoted in 1978 to lieutenant, and
4    I was assigned at the time the City of Seattle had a contract
5    to provide all law enforcement training statewide in the
6    statewide police academy, and I became a commander of that.
7    We train law enforcement officers from approximately 130
8    different agencies, provided them with the basic tools to
9    become police officers.

10             I was promoted to captain in 1980.  I was in command
11   of both the downtown commercial and waterfront business
12   precinct.  I was then transferred to the command of the
13   internal investigation section, and I held that position for a
14   couple of years, investigated everything from officer-involved
15   shootings to police misconduct, including felony accusations
16   and allegations against officers.

17             After the two years there, I was requested and was
18   assigned to be the commander of the university district where
19   the University of Washington and a number of other
20   universities were, and I stayed there for the two years.

21             I was then -- in the City of Seattle, a captain is
22   the highest civil service rank .  I was tapped to become a
23   major and was put in charge of the inspectional service
24   division.  And in the inspectional services definition, among
25   many other things, we reviewed, wrote, modified policies and

1   procedures throughout the department, including homicides,

2   homicide investigations.  We also conducted audits and

3   inspections of units throughout the police department.

4   Q.  Let me slow you down there for a second.

5   A.  Yes, sir.

6   Q.  You were talking about your ranks.  Did you achieve ranks

7   all the way up to assistant chief of police and chief?

8   A.  Yes.

9   Q.  Tell the jury about that.

10  A.  After I served as commander of the inspector services

11  division, I was promoted to assistant chief, which is one step

12  below the chief of police, and my responsibilities were as

13  assistant chief with the administrative services, and that

14  included the records bureau, the maintenance of the subpoena

15  services, and a number of other units, including 911 dispatch

16  services.

17  Q.  All right.  Did you eventually become a police chief?

18  A.  I did.  After retiring in January of '95, I was contacted

19  by the City of Fort Lauderdale, Florida, and in June or July

20  of 1995, I was selected to be the police chief there, and I

21  served in that capacity until I decided it was time for a

22  second retirement, and I left as chief of police in Fort

23  Lauderdale in 2001.

24  Q.  After that?

25  A.  I returned to Washington state.  I kind of sat in the

1    retirement cabin for a little while and got bored, and there

2    was an upcoming election for sheriff of Jefferson County,

3    Washington, predominantly a rural area.  I had never been

4    involved officially in politics and decided to run for

5    sheriff.  I was elected.  I completed my first term, ran for

6    reelection, was successful, and started grooming a

7    replacement.  And about halfway through my second four-year

8    term, I decided to retire, and my successor was appointed to

9    fill that position.

10   Q.  Now, you have some associations and memberships.  Can you

11   just summarize that?

12   A.  I was granted life membership with the International

13   Association of Chiefs of Police, life membership with the

14   Police Executive Research Forum, life membership with the

15   National Sheriffs' Association, as well as a number of state

16   organizations.

17   Q.  And in that capacity, do you have the ability or the

18   opportunity to interact with other agencies and become

19   familiar with other police departments' policies and

20   practices?

21   A.  Yes, both in the process of writing policies and

22   procedures and implementing them and monitoring them in the

23   city of Seattle, as well as a chief and as a sheriff, I have

24   regular and significant interaction with other agencies.

25   Q.  And you mentioned audits, and I cut you off at audits.

1    Briefly, did that give you experience and opportunity to learn

2    about other police departments too?

3    A.  Yes.  I was -- while on active duty, I participated in a

4    federal grant to inspect and provide audit information on the

5    delivery of police services to a number of cities nationwide

6    on the delivery of police services in public housing, and that

7    process, my portion of the team was to look at their

8    records-keeping and their delivery of information to outside

9    requesters.

10   Q.  So that was actually the area of your expertise was

11   record-keeping, documentation, and transmitting that stuff to

12   outside --

13   A.  In that particular project, yes.

14   Q.  You also mentioned training.  Did that also -- in your

15   training capacity, did that give you experience with other

16   departments too?

17   A.  Yes.  One of the processes with training both at the entry

18   level police officer deputy training is to look at their

19   policies and procedures.  You have an academy class -- three

20   academy classes at one time with officers from multiple

21   agencies.  You have to become familiar with their policies and

22   procedures and tailor the training to reflect what they need

23   to do in theirs.  In that process, you're looking at their

24   policies and procedures.  And there's not too many agencies

25   that I am aware of when you're doing policies like when I was

1    at inspection services or the chief or the sheriff.  You are

2    not always hoping to reinvent the wheel.  You want to go and

3    see what some of the other agencies are doing nationwide.

4    Q.  All right.  And then you said you actually worked in

5    records division for a time, correct, where you --

6    A.  As an assistant chief, I absorbed that division, yes.

7    Q.  Supervising and --

8    A.  Yes.

9    Q.  And that would include homicide files as well, right?

10   A.  Yes.

11   Q.  All right.  And when you were the chief in Fort

12   Lauderdale, did that give you jurisdiction over the policies

13   and practices including what you've called high-risk policies

14   and practices?

15   A.  Yes.  When I describe high-risk policies, things such

16   as -- that have the opportunity or the potential for

17   significant impact either budgetarily or legal liability, and

18   in some instances with police pursuits and use of deadly

19   force, that either citizens' or officers' lives are in danger.

20   Q.  All right.  Were you a detective -- did you have

21   supervision over detectives over the course of your career?

22   A.  Yes.  I had that opportunity both as a sergeant and as a

23   captain and as a chief and as a sheriff.

24   Q.  Have you investigated as a detective homicides?

25   A.  I have investigated traffic homicides, traffic fatalities

1    for hit-and-runs.  You have situations where you have a fatal
2    crash, you may or may not have a suspect at the scene, you
3    have to assemble the files.
4    Q.  All right.  And as a sergeant in charge of internal
5    investigations and the assistant chief in Seattle, did you
6    regularly oversee and review detectives doing homicide
7    investigations?
8    A.  Yes.
9    Q.  Is that a subject about which you have great familiarity?
10   A.  I am.
11   Q.  All right.  Let's talk about this -- real briefly, the
12   Washington State Attorney General Homicide Investigation
13   Tracking System.
14   A.  The Washington State Attorney General instituted --
15   because of dissatisfaction statewide with clearances of
16   homicide investigations and inconsistent procedures for
17   homicide investigations, created a -- what the acronym was,
18   HITS, homicide investigation tracking system.  It consisted
19   of 10 or 12 practitioners, the number varied from time to
20   time, including what we call in Washington state prosecuting
21   attorneys, police investigators, and we would review
22   problematic homicide cases from around the state that were
23   either coming to a dead end or not seeming to have a
24   coordination in the investigation.
25   Q.  All right.  In summary then, is the subject of policies

 1  and practices about documenting and disclosing investigation

 2  materials, is that something you have expertise in, sir?

 3  A.  Yes, sir.

 4  Q.  All right.  Since you've retired, have you -- you

 5  mentioned you do some expert witness stuff --

 6  A.  Yes.

 7  Q.  -- some consulting.

 8        About how many cases have you been involved with?

 9  A.  I have actually been retained somewhere between 120

10  or 130.  However, the distinction is how many I have been

11  deposed or gone to trial on, and --

12  Q.  So let's break that down.  Sometimes you get retained, and

13  then you get a fee to review material?

14  A.  Correct.  That's correct.

15  Q.  And then what's your first step when you get retained?

16  A.  I ask for copies of certain documents relative to the

17  litigation, whether it is the criminal -- or the civil

18  complaint, any depositions that have already been taken, any

19  statements, any police reports, that type of thing, and review

20  them.

21  Q.  And then you do a review?

22  A.  Yes.

23  Q.  Does it matter who hires you as far as your opinion and

24  the money?  Can you explain?

25  A.  No.  I looked recently.  About 60 to 66 percent of the

1   cases I have handled have been for governmental entities, for

2   cities, counties, state agencies, police departments.  The

3   other 40 have been for plaintiffs' cases where someone is

4   suing the agencies.

5   Q.  If a lawyer calls you and says they want you to review the

6   facts of the case, does that mean you automatically are going

7   to take their side or testify for them?

8   A.  No.  Depending on whether I had experience with the

9   attorney or the law firm in the past, I may agree to take a

10  quick look at some material to see if it's something that I

11  thought I could honestly be engaged in.  Oftentimes, I'll look

12  at the material and indicate that, you know, I appreciate what

13  you're trying to do here, but I am not going to be a very good

14  witness for you because I don't feel that what was done was

15  correct.

16  Q.  All right.  So you'll only do the cases where you believe

17  it was correct?

18  A.  Yes.

19  Q.  And do you generally charge an hourly rate to review

20  materials in these cases?

21  A.  I do.

22  Q.  So you get paid that rate either way, regardless of

23  whether you have good news or bad news for the attorney?

24  A.  That's correct.

25  Q.  All right .  In this case, you did a lot of work, did you

Brasfield - direct

2494

1   not?

2   A.  I did.  This was one of the most time-consuming.

3   Q.  How many hours would you say you've spent in this case?

4   A.  Somewhere between 100 and 150, perhaps.

5   Q.  Hours?

6   A.  Yes.

7   Q.  And what is your hourly rate?

8   A.  $300 an hour.

9   Q.  Is that commensurate with the hourly rate of people in

10  your industry?

11  A.  Yes, it is.

12  Q.  Has your rate stayed the same or gone up over time?

13  A.  I initially started out probably eight or nine years ago

14  at $250 an hour, and four or five years ago I raised it to 3,

15  but it's been that way since.

16  Q.  In addition to this case with the 100 to 150 hours you've

17  spent, have you had other cases where you had opportunities to

18  study the policies and practices of the Chicago Police

19  Department?

20  A.  I have.

21          MR. NOLAND:  Objection.

22          THE COURT:  I need to ask you about this at sidebar.

23    (The following proceedings were had at sidebar outside the

24  hearing of the jury:)

25          THE COURT:  Where are you going with this?  Is it

1    just yes or no, or are you going to ask him details?

2            MR. LOEVY:  I was going to ask him, have you spent --

3    how many hours, and he, I believe, would say 4 to 500 hours

4    looking at the Chicago Police Department's policies and

5    practices.  Your Honor and I had a little discussion about

6    what this opens to and how far.  If they want to say, isn't it

7    true you did a bunch of cases against Chicago, we are going to

8    say, you know, well, those cases say this and that.  I just

9    had talked about, hey, I spent 4 to 500 hours looking at the

10   City's policies and practices --

11           THE COURT:  I understand.

12           Articulate the objection, Mr. Noland.

13           MR. NOLAND:  The objection is that that would, I

14   think, be a not disclosed opinion as to us, which is things he

15   relied on in the Fields case and what's in the Fields report.

16   I did talk about this.  I told Mr. Loevy it was unlikely I

17   would be asking him about other cases that Mr. Loevy's firm

18   has hired Mr. Brasfield on relative to the City of Chicago.

19           THE COURT:  Okay.  I am going to exclude it at this

20   point.  If you think that there's something that's covered on

21   cross that opens the door, then you'll tell me before the

22   redirect.

23           MR. LOEVY:  Got it.

24     (The following proceedings were had in open court in the

25   presence and hearing of the jury:)

1        THE COURT:  Okay.  You can proceed.

2   BY MR. LOEVY:

3   Q.  All right.  Let's turn to your role in this case.  What

4   did you review as part of forming opinions?

5   A.  I looked at the depositions of the City's representative,

6   Mr. Hickey.  I've looked at policies and procedures of the

7   Chicago Police Department.  I've looked at records that have

8   been found or located or retained in the Chicago Police

9   Department.  I've reviewed other depositions and other court

10  material.

11  Q.  All right.  Let's focus on the files that got found.  Can

12  you tell the jury what your understanding is what the files

13  were?

14  A.  Well, which files?

15  Q.  The files from the basement.

16  A.  Okay.  What are commonly referred to as the basement

17  files.  You want me to give the background?

18  Q.  Yes, please.

19  A.  There were literally hundreds of files that were located

20  in the basement of I believe Area 1 pertaining to homicide

21  investigations.  They ranged in time period from I believe as

22  early as the 1940s up through 2000s.  They were files that had

23  not previously been disclosed.

24        MR. NOLAND:  Objection, your Honor.  Move to strike.

25        THE COURT:  Well, the last sentence I am going to

Brasfield - direct

2497

1    strike not because it's right or wrong but because it's not

2    responsive to the question.

3            MR. LOEVY:  All right.

4            THE COURT:  Let's proceed on a question-by-question

5    basis.

6    BY MR. LOEVY:

7    Q.  Your undertaking, part of it was to examine some of those

8    files, correct?

9    A.  That's correct.

10   Q.  All right.  Of those files from the basement, how did you

11   determine your sample?  Tell the jury what your sample was.

12   A.  Well, the first -- the case in point here was one of the

13   driving with Mr. Fields' case, but also to pick out two groups

14   of files:  a group of files that would represent a time period

15   roughly three years before and after Mr. Fields' first trial,

16   and a second group of files that would as closely as possible

17   correspond to his second trial.  That time period -- the first

18   time period was from 1983 to 1986.  The second time period was

19   from 1999, I believe, to 2006, somewhere in there.

20   Q.  All right.  Well, it was on both sides of both criminal

21   trials, right?

22   A.  Yes.

23   Q.  Six-year time period?

24   A.  Yes, six and seven.

25   Q.  Just to lead you through it, it was your understanding

 1   that the Fields file was disclosed many years after the fact,
 2   the Fields investigative file, correct?
 3   A.  That's correct.
 4   Q.  And the Fields file was among some file cabinets that had
 5   other files, correct?
 6   A.  Yes.
 7   Q.  And then one of the questions was whether the materials in
 8   these investigative files had been disclosed to the criminal
 9   justice system; that was one of the things you looked at?
10   A.  That's correct.
11   Q.  Did you analyze those files, the sample you just told us
12   about?
13   A.  Yes, I did.
14   Q.  And that was part of your opinions in this case, correct?
15   A.  Yes.
16   Q.  All right.  Let's back up and tell the jury, turning to
17   your opinions, do police departments have systems, are they
18   supposed to have systems, for turning over exculpatory
19   evidence, and can you explain?
20   A.  Yes.  What's commonly referred to as Brady, Brady v.
21   Maryland, which -- back, I believe, in 1963, but the process
22   that officers learn and, more importantly, commanders and
23   administrative police agencies and sheriff's office, develop
24   systems so that they have a -- as much as possible a
25   consistent foolproof process of delivering information, all

Brasfield - direct

2499

1    information pertaining -- that could be potentially useful to

2    the prosecutor in determining whether -- or the state's

3    attorney in determining whether they want to file charges and

4    to the -- eventually, if charges are filed, to the criminal

5    defense attorney.

6    Q.   In your experience, do all modern police departments have

7    a responsibility to create such systems that work?

8    A.   Yes.

9    Q.   And you said documenting information.  Are detectives

10   supposed to document all potentially relevant information?

11   A.   Yes.

12   Q.   Can you explain?

13   A.   When a detective is developing leads, developing

14   information, whether it's in the field, on the phone,

15   face-to-face interviews, they gather, as you can well imagine,

16   all sorts of information.  Oftentimes, you don't know the

17   relevance of that information at the time.

18           So when someone tells you that they were either in a

19   place or not in a place at a certain time, that's the kind of

20   information you want to document.  If they give you

21   information about physical evidence, a description of a car, a

22   description of an individual, information about something they

23   observed, all of those kinds of things, as well as physical

24   evidence, obviously, should be documented.

25   Q.   Why is it important or necessary to document seemingly

1  benign details?

2  A.  Because if you -- it's much like if you picked up a who

3  done it novel, you don't know until you get towards the end

4  what the eventual solution is, if you will, or the outcome,

5  and, oftentimes -- in fact, the times I'm familiar with -- if

6  you picked up what's commonly referred to in police parlance

7  as a murder book, you see a number of different investigative

8  tracks or leads.  They go off in different directions.

9  Q.  All right.  So it is important to document everything?

10  A.  Yes.

11  Q.  Is that universal and throughout the country?

12  A.  In any that I have been familiar with, it is, with perhaps

13  one exception.

14  Q.  And who does that -- and what's that one exception?

15  A.  Chicago Police Department.

16  Q.  Does Chicago stand out as an aberration, in your review,

17  for how well or poorly they do that job?

18  A.  They --

19          MR. NOLAND:  Objection, your Honor, foundation.

20          THE COURT:  Overruled.

21          THE WITNESS:  In my opinion, based on the material

22  that I have had access to and reviewed, they have done a very,

23  very poor job of doing it through the years.

24  BY MR. LOEVY:

25  Q.  I'm saying compared to other departments?

Brasfield - direct

1   A.  Compared to others, in not only my personal experience but

2   in my reading and in my visits and my audits of other agencies

3   and all over the 40-year period of time, the best way of doing

4   that is a centralized file, centralized records system.  As

5   soon as you split that off, then you start getting more and

6   more information in different units, in different fields, in

7   different files, and it becomes harder.

8   Q.  Let me break in there.

9            So is it a standard in modern police departments to

10  have a single centralized place?

11  A.  That's correct.

12  Q.  And you started to explain why that's important.

13           By the way, single centralized place where stuff

14  relating to homicide investigations is kept, correct?

15  A.  Right.

16  Q.  Explain why that's important.

17  A.  Well, your technical term of "stuff" is as good as any.

18  You need to be able for a half a dozen reasons.  One is the

19  integrity of the investigation.  Everything has to be in one

20  location.  You're likely to have numerous detectives or

21  specialty lab individuals, gang squad, bomb and arson, they're

22  all under different chains of command, oftentimes in different

23  agencies.  All that information has to come to a central

24  point.

25           From a purely administrative standpoint, it's

1 | critical because you have to be able to have a supervisor and
2 | a chain of command all the way up to the superintendent or the
3 | chief knowing that the investigation is thorough and complete,
4 | and you can't do that by sending for records here or sending
5 | for records there.

6 |       Very important is for the discovery process to be
7 | able -- let me back up one -- is to present to a prosecutor or
8 | a state's attorney a complete and thorough investigation, not
9 | one that just says this person did it, this is the evidence we
10 | have, we'd like to see charges on it.  There has to be an
11 | opportunity for the prosecutor, the state's attorney to look
12 | at all of the other things.
13 | Q.  And is that -- is one way modern police departments do
14 | that is to keep everything in one place?
15 | A.  Yes.
16 | Q.  All right.  How about an index; is that a necessary part
17 | of a functioning process?
18 | A.  Absolutely.  It becomes even more critical if an agency
19 | should choose not to have centralized records.  Then it is
20 | very important, but there has to be a central index too.
21 | Q.  All right.  And then as far as training for subpoenaed
22 | processing and stuff like that, is that important and
23 | expected?
24 | A.  Yes.
25 | Q.  All right.  Let's talk about the early '80s in the city of

1    Chicago.  Is it your understanding that the City of Chicago

2    was put on notice for lack of a better word that there was a

3    problem in the early '80s?

4    A.  Yes, they were.

5    Q.  Can you summarize for the jury?

6    A.  There were a couple of lawsuits that had allegations

7    contained in them that the -- from the superintendent on down

8    were aware of that indicated that there were separate street

9    files and that the information was not being shared.

10   Q.  All right.  Let me focus you on April 1982 and a boy named

11   George Jones.  Can you briefly summarize what that was?

12   A.  Yes.  There was, I believe, a 12-year-old girl who was

13   murdered.  Her brother was also assaulted in the attack --

14   Q.  Well, without getting the facts of the murder, how did

15   that put the City on notice that there was a street file

16   problem?

17   A.  That information was -- there were representatives of the

18   police department, high-level command officials in the police

19   department, that participated in the litigation, and ignoring

20   for a moment just the news media, but the formal notification

21   of the process in the legal system.

22   Q.  And in that Jones case, how was it that it came to the

23   City's attention that there was a problem?  There was a

24   detective named Laverty, and what did he disclose?

25   A.  Detective Laverty discovered or unearthed in the course of

1    his investigation information that would have cleared or

2    seriously impeded any decision to prosecute young Mr. George

3    Jones, and he wrote it up in an informal process that ended up

4    in an investigative file.  That investigative file, the

5    contents of what Detective Laverty put in there that would

6    have cleared George Jones, was never disclosed to the defense

7    attorney.

8    Q.  And then did Laverty do something in response?

9    A.  When he -- he had -- when he completed his information and

10   submitted it, he had been -- received some reassurances that

11   the prosecution -- the information would get to the state's

12   attorney --

13   Q.  Did he then inform the process, the justice system

14   participant?

15   A.  Yes, he did.

16   Q.  What did he inform them?

17   A.  He went to the -- he saw in the paper that the

18   prosecution, in fact, was proceeding, and he went to the

19   public -- or the criminal defense attorney and shared with him

20   or her the information about George Jones.

21   Q.  And about the street file practice?

22   A.  And the street file practice.

23   Q.  And then was there some litigation in '82 and '83 alleging

24   a policy and practice of suppressing investigative materials

25   in street files?

1  A.  There was a case referred to as the Palmer case where a
2  group of people alleged in court that there was a practice
3  within the Chicago police of doing just what had happened with
4  the George Jones case, and that became part of a legal suit.
5  Q.  All right.  And then on April 20th, 1982, shortly after
6  that lawsuit was filed, did a federal judge enter any orders?
7  A.  Yes.
8  Q.  Tell the jury about that.
9  A.  There was a direction -- order from the court that all
10  documents would be maintained and retained.
11  Q.  All right.  And was there a reason from the Jones case to
12  conclude that the policymakers had notice and participated in
13  the lawsuit, the City's policymakers?
14  A.  Yes.  They were called upon to testify and gave testimony
15  and were very officially and clearly put on notice.
16  Q.  And then just to draw your attention to a finding in
17  February 3rd, 1983, did the judge make a ruling that -- by the
18  way, did the City enter a special -- or create a special order
19  in response to this litigation?
20  A.  Yes.
21  Q.  What was that special order?
22  A.  82 -1, that they would preserve --
23          THE COURT:  82-1?
24          MR. LOEVY:  82-1, was the first one which they
25  preserved stuff.

 1  BY MR. LOEVY:

 2  Q.  And then?

 3  A.  And then the subsequent one.

 4  Q.  Which was --

 5  A.  Which was to retain and not dispose of and make available

 6  investigative files.

 7          THE COURT:  Just put numbers on these.

 8          MR. LOEVY:  The second one was 83-1, correct.

 9          THE WITNESS:  83-1, yes.

10  BY MR. LOEVY:

11  Q.  All right.  Did the judge make a finding that 83-1 was

12  insufficient to accord criminal defendants the full rights to

13  which they were entitled?

14  A.  Yes.

15          THE COURT:  As we discussed, you need to put the date

16  on that.  It was a couple of questions ago.

17          THE WITNESS:  I'm sorry.

18  BY MR. LOEVY:

19  Q.  Do you have the date there before you, sir?

20  A.  I don't have it right in front of me, no.

21  Q.  It looks like the lawsuit was filed on April --

22          THE COURT:  You can ask a leading question on the

23  date of the judge's order.

24  BY MR. LOEVY:

25  Q.  February 3rd, 1983.

1   A.  I believe that's correct.

2   Q.  4/20/82 was the --

3   A.  April 20th, 1982.

4            THE COURT:  Was what?

5            MR. LOEVY:  When was the judge's order?

6            MR. SWAMINATHAN:  The judge's order was the same

7   date.

8   BY MR. LOEVY:

9   Q.  4/20/82.  All right.

10  A.  Yes.

11           THE COURT:  It needs to be testimony, not just --

12           THE WITNESS:  It was --

13           THE COURT:  Excuse me.

14           Ask a question, please.

15  BY MR. LOEVY:

16  Q.  What was the date of the order?

17  A.  The date of the order was April 20th, 1982.

18  Q.  All right.  After the order of the court was entered to

19  improve the system and the City enacted these policies, did

20  you see evidence that the problem persisted?

21  A.  Yes, I did.

22  Q.  And let's focus, for example, on the investigative file in

23  this case.  Did you review the investigative file that was not

24  disclosed to Mr. Fields in this case?

25  A.  I did.

1   Q.  And was that evidence that the problem continued, and can

2   you explain, please?

3   A.  Yes.  Over the course of two criminal trials and appeals,

4   there were at least six or seven formal either subpoenas or

5   written requests for disclosure of investigative file in the

6   Fields case.  And each time, the City or the police

7   department's response was that there was no such material

8   available.  And, in fact, the City at one point initiated an

9   internal investigation to determine if there was an

10  investigative file, and they produced a document, a written

11  conclusion, that there was no investigative file.

12  Q.  What were the hallmarks of this investigative file, the

13  Fields investigative file -- well, actually, it was the

14  Smith/Hickman investigative file --

15  A.  Right.

16  Q.  -- that suggested it was outside the protocol set up by

17  the general orders?

18  A.  It contained -- when it was eventually discovered in 2010

19  or '11, that it contained specific types of documents that

20  were -- that were described in the litigation as not to have

21  been in that format.

22  Q.  What kind of documents were those?

23  A.  They were to and from memos between detectives and between

24  chain of command.  There were -- sorry.

25  Q.  Well, were notes --

1  A.  Yeah, handwritten notes were contained in it, notes were
2  not put onto official format, and those documents -- those --
3  even where they were were not submitted.
4  Q.  How about inventories or lack thereof and things not in
5  supp reports?
6  A.  The inventory were required by the general orders, and the
7  supplemental reports were not as required by the policies.
8  Q.  All right.  Did you see evidence when you reviewed that
9  sample of files from the basement that the Smith/Hickman file
10  was typical or atypical of other investigative files?
11  A.  In my review of the portions of the basement files, as I
12  previously described, I found them to be consistent with or
13  the Hickman/Smith discovery files were similar.
14  Q.  And the same kinds of things you just talked about were
15  evident in the other files as well?
16  A.  Yes.
17  Q.  All right.  You did analyze those files, correct?
18  A.  I did.
19  Q.  And tell the jury how exhaustive your analysis of those
20  files was.
21  A.  Do you want me to describe the total number of files?
22  Q.  However you want to describe what you did when you got
23  those files.
24  A.  I mentioned earlier and discussed the fact that I took a
25  sample from the six-year time period, '83 to '89, and the

1   second year time period, from 1999 to 2006, pulled out all of

2   the ones -- the homicide investigation files for that time

3   period, then looked at the investigative file itself to

4   determine what it contained, what it did not contain.  I

5   looked at the permanent retention files that the City used or

6   supposedly used to provide discovery --

7   Q.  So let me make sure I understand.  You had a basement file

8   that referred to an investigation, and then you had also the

9   corresponding official file, right?

10  A.  That's correct.

11  Q.  All right.  Then continue.

12  A.  And that I would refer to and the City does as a permanent

13  retention file that supposedly has everything about the

14  homicide case, but only if it's on an official supplementary

15  report, an arrest report, a lab report, that type of thing.

16  But permanent retention file after review, I can go into that,

17  if you want, later, but --

18  Q.  Well, we're going to talk about your review.

19          But you basically -- you described you did a

20  standalone of the investigative file?

21  A.  Yes.

22  Q.  And then you did a comparison with the permanent retention

23  files?

24  A.  I looked at the permanent retention files by themselves.

25  Q.  Okay.

1    A.  So I looked at the investigative files, I looked at the

2    permanent retention files, and then I looked and compared --

3    Q.  So that's a third thing?

4    A.  -- the permanent retention files as to what was -- what

5    they had in them that were reflected -- did they reflect what

6    was of substantive value in the investigative file.

7    Q.  So the third thing then was a comparison between the

8    investigative files and the permanent retention files?

9    A.  Yes.

10   Q.  Was there a fourth analysis you did?

11   A.  Yes.

12   Q.  Tell us about that.

13   A.  Also, through material provided to me, the criminal

14   defense files that corresponded with -- where there were

15   criminal defense files that corresponded with the

16   investigative files and the permanent retention files.  So I

17   looked at those as a standalone process to see what was in

18   there from -- as it pertained to what was actually in the

19   investigation and in the permanent retention files.

20         And then, finally, the fifth step was to compare what

21   was in the criminal defense files and the permanent retention

22   files.

23   Q.  All right.  Based on that review, did you make any

24   findings about whether the practice that was supposed to have

25   stopped with the Palmer/Jones litigation persisted through and

1    continuing through Mr. Fields' criminal trial?

2    A.  Yes.

3    Q.  What was that finding?

4    A.  Finding I, in my professional opinion, that the practices

5    that were the City of Chicago and the Chicago Police

6    Department and its command staff was aware of in as early

7    as 1982 but should have been much earlier than that was

8    continuing and no substantive changes, and, in fact, evidence

9    that there was no change at all.

10   Q.  In your last answer, you said that the command and the

11   policymakers should have been aware before the Jones

12   litigation in '82.  Can you explain?

13              MR. NOLAND:  Objection.

14              THE COURT:  Sustained.

15              MR. LOEVY:  All right.  At this time, your Honor,

16   plaintiff would move to introduce Plaintiff's Exhibit 307,

17   which is his summary chart of the basis of his opinion.

18              THE COURT:  It's a demonstrative?

19              MR. LOEVY:  Yes, your Honor.

20              THE COURT:  Okay.  Go show it to him.

21              MR. NOLAND:  I'm sorry?

22              THE COURT:  Yeah.  That's fine.

23              MR. NOLAND:  Subject to our prior -- the Court's

24   ruling.

25              THE COURT:  Okay.  So if I already ruled, I already

1    ruled.

2         Okay.  This is -- you've heard me use the word

3    "demonstrative."  It's a big legal word.  What it means is

4    this is used to illustrate testimony.  It's not part of the

5    evidence.  You're not going to actually have it back there.

6    It's used to illustrate testimony.  So if you want to take

7    notes on it, do that because you won't actually have --

8         MR. LOEVY:  Actually, your Honor, after he lays the

9    foundation, we intend to --

10        THE COURT:  Well, I might make a ruling later, but

11   for now, it's a demonstrative exhibit.

12        MR. LOEVY:  Okay.  Because we do intend to move it

13   into evidence after he lays the foundation for it.

14        THE COURT:  We will worry about that when we have to

15   worry about it.

16        MR. LOEVY:  Can we ask Mr. Brasfield to come down and

17   explain it?

18        THE COURT:  That's fine.  So the deal is he needs to

19   keep his voice up.

20        Which side are you going to have him stand on?  Right

21   here?

22        MR. LOEVY:  What do you prefer?

23        THE COURT:  You stand here so you are closer to the

24   mic.  And counsel can move over there if you need to in order

25   to see.

1          MR. NOLAND:  Thank you, your Honor.

2     BY MR. LOEVY:

3     Q.  Let's start with the middle column.  Can you explain to

4     the jury what we're looking at?

5          MR. LOEVY:  And, your Honor, maybe we put it on the

6     ELMO too?

7          THE COURT:  Either way.  I don't care.

8          MR. LOEVY:  The computer, your Honor.

9          THE COURT:  Computer.

10         THE WITNESS:  This rainbow effect here, this blue

11    section here that has a number of columns in it, are the

12    investigative file information.  And some of it is -- it's

13    just housekeeping, referring to what the lawyers call Bates

14    numbers that are stamped on the bottom of pages to identify

15    things.

16         But one of the first things they did, does the

17    basement file contain an inventory as required by policy --

18    BY MR. LOEVY:

19    Q.  So that's a yes/no, question?

20    A.  That's a simple yes/no.  And as I said, that's Bates

21    numbers.  If it did not, there's reference to that.

22         Is the inventory complete?  If there is an inventory

23    in the investigative file, I mean, that's good in and of

24    itself, but does the inventory actually reflect what is there,

25    what should be there?

1        Then we have the examples of items that were missing

2   from the inventory, so as I'm looking at that and making notes

3   to myself as to whether, okay, is this item in there?  If it's

4   not in there, what is it?  Put a list on that.

5        Are there handwritten notes in the file?  The

6   handwritten notes themselves may or may not be important as to

7   their actual content, but what is very important is are they

8   supposed to be in there as handwritten notes?  That's a

9   violation of policy as to how they're in there.

10        So it's two-fold.  One is the substantive value, if

11   you will, of the material, but also demonstrating adherence to

12   a policy.  And then I gave examples of specifics so that you

13   can look those up.

14        Are there to/from memos.  This is, again, the same

15   thing; the policies and procedures indicate that they are not

16   supposed to be in there.

17        Were there to and from memos in there? Yes, no.  If

18   yes, what were they?  And it gave, again, the Bates numbers of

19   reference so that with the sheer volume of this, being able to

20   go back, look through, and identify them.

21   BY MR. LOEVY:

22   Q.  If you could return to the stand then.

23   A.  Thank you.

24   Q.  All right.  Now, when you did the analysis in the blue

25   column there, you weren't actually comparing the investigative

1  files to any other files, correct?

2  A.  No.

3  Q.  Just looking at them themselves?

4  A.  As a standalone.

5  Q.  All right.  Did you draw any conclusions about the

6  investigative files?

7  A.  I did.

8  Q.  And tell the jury what your findings were?

9  A.  That the information that I was seeing in these basement

10  files, particularly investigative files, were a -- in my mind

11  from a professional standpoint, evidence that the things that

12  were supposed to have changed that should have been done and

13  accomplished after the City was put on notice were continuing.

14  Q.  Let's talk about the example you gave about handwritten

15  notes.  Now, they're supposed to take notes, but they're

16  supposed to be on GPRs, correct?

17  A.  General progress reports, yes.

18  Q.  The jury has already heard testimony about what a GPR is,

19  but that's basically where -- just real quickly?

20  A.  Just that your information that you made, heaven forbid,

21  written on the back of a business card or a McDonald's order

22  slip is put into a general progress report so that it's

23  formalized.

24  Q.  All right.  And was there evidence, based on your review

25  that the department's rule change that all notes had to be

 1   taken on general progress reports, was that being followed?

 2   A.  No, it was not, based on the material I looked at.

 3   Q.  What was the statistical analysis for the period '83

 4   to '89?  In what proportion of the cases was that policy not

 5   being followed?

 6   A.  I found that 82 percent of the cases that I looked at,

 7   they were not being followed.

 8   Q.  And then for the later time period?

 9   A.  From the 1999 to 2006, 61 percent.

10   Q.  How about the existence of to/from memos; those were memos

11   that were not on official supp reports, correct?

12   A.  That is correct.

13   Q.  And that policy too was supposed to change with the policy

14   change, right?

15   A.  That's correct.

16   Q.  Did you see evidence that it did change?  Did or didn't?

17   A.  I can -- it did not.

18   Q.  All right.  Tell the jury.

19   A.  The initial period from 1983 to 1989, 43 percent of the

20   files that I reviewed continued to show unofficial informal

21   memorandums, and that the 1999 to 2006 time period, that 17

22   percent of the files continued to show these supposedly not to

23   occur, to/from memos.

24   Q.  Does that suggest to you whether the system was or wasn't

25   working from a supervisory perspective?

1  A.  From a supervisory, either a first line supervisor or as
2  an auditor within the department or as the superintendent, it
3  would give me a clear indication that it just wasn't working.
4  Q.  All right.  Have you seen that level of failure at other
5  departments around the country?
6  A.  No, I have not.
7  Q.  All right.  What percentage of the basement files had
8  evidence of violations of the policies and the special orders
9  that were put into place?
10  A.  100 percent.
11  Q.  All right.
12          MR. LOEVY:  Your Honor, if I could have the witness
13  step down again to talk about the next column.
14          THE COURT:  That's fine.
15  BY MR. LOEVY:
16  Q.  Tell us about the purple and what this represents.
17  A.  The City of Chicago Police Department has a -- or had a
18  permanent retention file that was supposed to be the go-to.
19  This is where if you want to know what happened in a
20  particular homicide and you want it for discovery purposes,
21  this is where it's going to be.  It's in the permanent
22  retention file.
23          And so as I looked at that as a standalone process
24  with the -- looking for the same types of things, whether
25  there were inventory sheet as required, what types of

1   documents that were supposedly in there, were or were not, and

2   also, regardless of how the City of Chicago interpreted

3   permanent retention file, were there actually substantive

4   information in the investigative file that was not getting

5   into the permanent retention file.

6   Q.  Well, before we talk about the comparison, let's talk

7   about just the purple.

8   A.  Yes.

9   Q.  Okay?  So tell the jury what the fields were.

10  A.  We have, again, does the permanent retention file have an

11  inventory?  Are the investigative file inventory complete?

12  Does it have items missing?  We have -- and I'm sorry to block

13  your view; you can't probably see it anyway -- but, again, I

14  talked about the Bates numbers.  Are there general progress

15  reports from the basement files in the permanent retention

16  files?  And, again, I have to acknowledge that the City of

17  Chicago didn't feel that it was necessary, but they weren't in

18  there, and I made a note of it.

19          And are there handwritten notes in the permanent

20  retention file?  If so, and then describe what they were and

21  where they were.  Are there to/from memos in the basement

22  files that are in the permanent retention files?  And yes or

23  no and, where appropriate, identify those.  And then in

24  general, observations about some of those individual permanent

25  retention files.

Brasfield - direct

2520

1    Q.  All right.  Would you resume the stand, please.

2    A.  Yes.

3    Q.  All right.  Did you reach any conclusions analyzing this

4    whole series of permanent retention files?

5    A.  Yes.

6    Q.  How many permanent retention files did you look at?

7    A.  There were a total of -- there were a total of 429 files

8    overall, and as far as the permanent retention files, they

9    were on the light number.

10   Q.  All right.  And did you form any conclusions about the

11   City's policies and practices after you analyzed -- performed

12   the analysis you just described to the permanent retention

13   file?

14   A.  I did.

15   Q.  Can you describe to the jury what those were?

16   A.  First and foremost, if the City of Chicago Police

17   Department is going to use the permanent retention file as a

18   representation of the homicide investigation, it failed

19   miserably.  What I found in there is a single story line.

20   It's what I would refer to as a charging document, that after

21   a detective or detectives have completed a homicide

22   investigation, they have gone down their various paths and

23   looked at all the various possibilities and eliminated

24   suspects and so forth, they just have a clean copy.  It's not

25   the murder book that you would expect to find that would show

1    that an anonymous caller said Bob Smith did it, but we

2    interviewed witnesses and determined that he had an alibi and

3    so on and so forth.  All the permanent retention file is, this

4    is the arrest report, this is some lab reports, this is --

5    Q.  Why we think this guy did it?

6    A.  Yes.

7    Q.  And is that aberrational, different, unlike other cities

8    that you have reviewed and audited?

9    A.  Yes.

10   Q.  How does it work in places that are functioning

11   legitimately?

12            MR. NOLAND:  Objection, argumentative.

13            THE COURT:  Overruled.

14            THE WITNESS:  You go into any homicide investigative

15   file either cold, just by looking at the book, or physically

16   into various agencies.  You see a document that starts out

17   with the call from 911 or the discovery of whatever the

18   gathering of information.  Inevitably -- not inevitably -- but

19   quite often in homicide initial investigations, there might be

20   multiple suspects, and somebody thinks, well, this person had

21   a domestic problem or the person was -- had a bad debt or

22   problems with the neighbor, and so you have all of these

23   various avenues that you have to investigate.  And then you

24   either eliminate them and document why they were eliminated,

25   and there's other information that you're developing.

1           Oftentimes, again, as I said earlier, that initially

2    may not seem like it's important at all, but you have to

3    document it and put it in the file.  And this is obviously for

4    a number of reasons, as I said before.  You have detectives or

5    individuals from throughout the police department that may

6    have worked on a case, and they have to go to a central

7    location, to a central document to be able to see what's been

8    done and what hasn't been done and what needs to be done.

9    BY MR. LOEVY:

10   Q.  You mentioned in your analogy you used a little bit ago

11   about a novel.  Would a plot twist fit in your analogy on a

12   way an investigation is supposed to be documented in a

13   permanent retention file?

14           MR. NOLAND:  Judge, I object based on foundation and

15   not disclosed.

16           THE COURT:  Rephrase the question, please.

17   BY MR. LOEVY:

18   Q.  All right.  In the investigative files you're talking

19   about from other jurisdictions, is it always linear, start to

20   finish?

21           THE COURT:  Sorry.  Something happened here.

22           THE WITNESS:  No, it's not.

23   BY MR. LOEVY:

24   Q.  Can you explain?

25   A.  It can go off on tangents.  I have seen investigations

1   where literally weeks, if not months, can go into what in good

2   faith was thought to be a legitimate line of investigation,

3   only determined, for whatever reason, that the individual that

4   was thought to be the best suspect was, in fact, not.

5   Q.  And in other jurisdictions, is all that stuff in the

6   permanent file?

7   A.  Yes.

8   Q.  And is that true in Chicago?

9   A.  No.

10            MR. NOLAND:  Judge, objection.

11            THE COURT:  Let me see the lawyers at sidebar,

12   please.

13     (The following proceedings were had at sidebar outside the

14   hearing of the jury:)

15            THE COURT:  So while we are at it, I am holding

16   myself in contempt for my cell phone going off when I fine

17   myself some later to-be-determined amount of money.

18            What's the issue, Mr. Noland?

19            MR. NOLAND:  I was hoping to wait until lunch, but I

20   think he's gone well beyond on the permanent retention file

21   discussion from his report where he said 34 and 35 where he is

22   talking about perform rather than this whole issue we just

23   talked about for the last several paragraphs as far as the

24   investigation and a study of the permanent retention files.

25            THE COURT:  So you want -- let me just -- is it, A,

1    starting on page 34?

2          MR. SWAMINATHAN:  Judge, this is also part of it.

3          THE COURT:  Okay.  Let me just look at it.

4          I think this is fairly within the scope of the two

5    paragraphs that precede the letter that had an A on

6    paragraph 34.  I mean, essentially, what he's saying is -- the

7    way I'm getting it, at least, is what he's saying is that what

8    he saw is that the permanent retention file basically tended

9    to contain information that supported the conclusion of the

10   investigation, and it's supposed to include more than that,

11   and I think that's essentially what these two paragraphs say.

12          So I overrule the objection.

13     (The following proceedings were had in open court in the

14   presence and hearing of the jury:)

15          THE COURT:  Okay.  The objection is overruled.  You

16   can proceed.

17   BY MR. LOEVY:

18   Q.  Do you remember the question?

19   A.  No.

20   Q.  You were saying in other jurisdictions and the plot twist

21   thing.

22   A.  Yes.  As I described or paraphrased --

23          THE COURT:  Let me be more specific.  The two

24   preceding questions were, In other jurisdictions, is all that

25   stuff in the permanent file?  You said yes.  And then there

1    was a question, Is that true in Chicago?  Answer, no.  And

2    then I think he was then going to ask you to explain.

3    BY MR. LOEVY:

4    Q.  All right.  Can you explain now?

5    A.  The structure and the practice, based on the material that

6    I have reviewed here, is that there is an eventual

7    determination of who the police feel is the person that did

8    the crime.  And, oftentimes, there is a reverse engineering of

9    the plot.

10             MR. NOLAND:  Objection.

11             THE COURT:  Yeah, let's get more directly to the

12   point here.

13   BY MR. LOEVY:

14   Q.  All right.

15             THE COURT:  Ask a more leading question, if you

16   would.  You understand from the sidebar where we're going

17   here, Mr. Loevy?

18             MR. LOEVY:  I think it's been covered too.

19             THE COURT:  Okay.  Fair enough.

20   BY MR. LOEVY:

21   Q.  Who does that protect if you do it the proper way and

22   document everything?

23   A.  Well, it protects the integrity of the criminal justice

24   system as a whole.  It protects the -- it provides legal

25   protection for the individual who is eventually charged so

Brasfield - direct

2526

1   that the criminal defense attorney has a fair opportunity to

2   provide and mount a defense, and it provides, I think, in

3   fairness to the victims.

4   Q.  Is that something that other jurisdictions take seriously

5   and do effectively?

6   A.  Yes.

7   Q.  Does Chicago meet up to that standard?

8   A.  No, in my opinion.

9           THE COURT:  Are you changing topics?

10          MR. LOEVY:  Yes.

11          THE COURT:  We are going to stop for lunch here.

12          I have one very short case at 1:30.  We should be

13  able to start within a couple minutes of 1:30.  So just be

14  ready to go.

15          I will take the jury out.

16    (The jury leaves the courtroom.)

17          THE COURT:  Okay.  Anything we need to discuss?

18          MR. LOEVY:  Your Honor, we had some issues whenever

19  your Honor is ready to talk about them.  We still have the

20  intimidation issue that's hanging out there.  We have a couple

21  of new issues too.  I don't know if --

22          THE COURT:  Just tell me what they are, and -- we are

23  not going to talk about them now.  Just tell me what they are.

24          MR. LOEVY:  All right.  The first issue is you

25  ordered the discovery on Mr. Kees' deal, and you ordered them

1  to give us their emails and such.  We have written them an
2  email saying we think there are some gaps and deficiencies,
3  and to my knowledge, they haven't yet responded.
4          Is that correct?  They haven't yet responded?
5          MR. ART:  That's correct.
6          MR. LOEVY:  So at some point, we are going to want to
7  raise with the Court -- you know, there are some holes in the
8  production, and we want to talk about that with your Honor.
9          THE COURT:  Kees is testifying tomorrow, right?
10         MR. LOEVY:  Correct.
11         THE COURT:  We will talk about that at the end of the
12 day.  Just be prepared to talk about that at the end of the
13 day.
14         MR. LOEVY:  All right.  Another issue, your Honor, is
15 yesterday, a photograph was put on the screen by Mr. Kulwin
16 that was not in the pretrial order --
17         MR. ART:  By Mr. Burns.
18         MR. LOEVY:  Oh, I'm sorry.  Well, I cannot tell these
19 two apart.  But somebody on the defense side --
20         MR. KULWIN:  He can't tell me and Mr. Burns apart.
21         MR. LOEVY:  I mean, I keep saying "defense counsel."
22         THE COURT:  But you mistook me for John Wayne this
23 morning, so, you know.
24         MR. KULWIN:  But you do look like John Wayne.
25         THE COURT:  There, you did it again.

1    MR. LOEVY:  There was a photograph that is not in the
2  pretrial order that we didn't have and that there --
3            THE COURT:  What was the photo?
4            MR. LOEVY:  There was a photo with some initials on
5  it of where Mr. Hawkins was and where Mr. Langston was.
6            MR. SWAMINATHAN:  It's Defendants' Exhibit 384.
7            MR. LOEVY:  Well, the new exhibit number is 384.  It
8  was not an original exhibit.
9            And we also don't think we got it in discovery.  We
10  are still checking that.  But we would ask -- I don't know if
11  you want to talk about the issues now, but we want no more new
12  exhibits and no more new photographs because it's late, it's
13  not fair, and there's some prejudice there.
14            THE COURT:  So why don't you just sort of run down --
15  go ahead, Mr. Noland.  That's fine.
16            MR. NOLAND:  If you like now --
17            THE COURT:  On this point.  It looks like you have
18  something you want to --
19            MR. NOLAND:  We had told the plaintiffs that those
20  exhibits were actually just the copies of the Plaintiff's
21  Exhibit 219, so our 388 through 391 are Plaintiff's
22  Exhibits -- a part of Plaintiff's Exhibits 219.  They have
23  them.
24            THE COURT:  I think he said this was 384, though.
25            MR. NOLAND:  I don't think it was.

1           THE COURT:  It wasn't 384, you don't think?

2           MR. NOLAND:  384 is a photo that was used at the

3    certificate of innocence proceeding with the plaintiff's

4    counsel, and so all the photos -- they were parties to that

5    proceeding.

6           MR. LOEVY:  Parties to the proceeding, but it wasn't

7    on the pretrial order, your Honor, so we were was surprised by

8    it.  I didn't --

9           THE COURT:  How are you harmed?  That's the question.

10          MR. LOEVY:  We want it to stop, though, or at least

11   if they're going to show something that's not in the pretrial

12   order, show me before they put it on the screen.  That's all

13   I'm asking.

14          THE COURT:  Okay.  That doesn't sound all that

15   unreasonable.

16          MR. NOLAND:  Absolutely, Judge.

17          MR. LOEVY:  All right.  The next thing is we've been

18   working together on stipulations, your Honor.  We haven't

19   quite got there.  There's a Buckles police report and the

20   Murphy GPR that are not in the Chicago Police Department's

21   files, and we're hopeful and remain hopeful we are going to

22   come to a stipulation, but if we don't, we have asked the City

23   to bring a record-keeper here tomorrow who can talk

24   knowledgeably about those topics, so we don't want there to be

25   any surprise that we do need a record-keeper who can say that

1    they've looked and these things are not in the files.

2              THE COURT:  Okay.

3              MR. LOEVY:  And then there's the intimidation issue.

4              THE COURT:  And that's it?

5              MR. LOEVY:  Yep.  That's it.  That's my issue.

6              MR. KULWIN:  I don't understand.

7              THE COURT:  It's the same issue that I've put off

8    several times, and I talked about it several times.  There may

9    not be much more to talk about.

10             Who is up after this witness?

11             MR. LOEVY:  Is Mr. Wharrie the next witness?

12             MR. ART:  No.

13             MR. LOEVY:  Is Ms. -- who is the next witness?

14             MR. ART:  Lyon or --

15             MR. LOEVY:  Oh, Lyon, Andrea Lyon.

16             THE COURT:  So we are going to close out the

17   intimidation issue to the extent that there's anything more to

18   talk about at the end of the day.  We will deal with this Kees

19   issue that you mentioned at the end of the day.  The photo

20   thing, I've dealt with.  The stipulations, you'll tell me when

21   you have something for me to talk about.

22             MR. LOEVY:  Very good.

23             MR. ART:  A juror left his notebook in the front row.

24             THE COURT:  I'll get it.  Thanks.

25             MR. MICHALIK:  Judge, we just had an issue with

1    respect to Andrea Lyon.  They let us know a couple days ago

2    that they were intending to call her, and to be honest, we're

3    sort of uncertain as to the basis for which they're doing so.

4             To our knowledge --

5             THE COURT:  I'm listening.

6             MR. MICHALIK:  Okay.  To our knowledge, she was

7    disclosed as someone who would testify about one of the

8    files --

9             THE COURT:  Go ahead.

10            MR. MICHALIK:  She was identified as a witness

11   regarding --

12            THE COURT:  Did she testify at the other trial?

13            MR. MICHALIK:  No.

14            THE COURT:  I don't remember.  Okay.

15            MR. MICHALIK:  She was identified as a witness who

16   was going to testify about the People v. Fuller (sic)

17   matter --

18            THE COURT:  People v.?

19            MR. MICHALIK:  People v. Fuller, which was one of

20   the -- Fulton, I'm sorry, F-u-l-t-o-n, and that was one of the

21   basement files that Mr. Brasfield has not relied upon.  So

22   that's the only basis that we can think of that she would

23   testify about.

24            THE COURT:  What's she going to testify about?

25            MR. SWAMINATHAN:  She's going to testify about the

1 Fulton case.  She was disclosed to testify about the Fulton

2 case.  She's essentially one of our Monell witnesses.  The

3 Fulton file is one of the files, Mr. Brasfield --

4 　　　　　　THE COURT:  In other words, she is going to say, I

5 was his lawyer -- I was this person's lawyer, I didn't get the

6 stuff, something like that?

7 　　　　　　MR. SWAMINATHAN:  We identified specific pages for

8 them that she says she did not receive.  She is going to

9 testify about her case, what those pages were she hadn't

10 received, that type of thing.

11 　　　　　　MR. KULWIN:  I guess the question is --

12 　　　　　　MR. MICHALIK:  Our understanding is that she was

13 post-conviction counsel on that case, so I don't know how she

14 could testify as to what was or was not in the criminal

15 defense file.

16 　　　　　　MR. SWAMINATHAN:  She will be able to lay a

17 foundation for all of that.  She --

18 　　　　　　THE COURT:  So if she can't lay the foundation, you

19 will make the proper objection at the proper time, and I will

20 rule on it.  I mean, I can conjure in my own mind what it is

21 that she's likely to say, and you will argue it to me at the

22 appropriate time.

23 　　　　　　MR. MICHALIK:  Thank you.

24 　　　　　　THE COURT:  All right.  See you at 1:30.

25 　　(The trial was adjourned at 12:35 p.m. until 1:30 p.m. of
this same day and date.)

2533

1               IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4  NATHSON E. FIELDS,             )  Docket No. 10 C 1168
                                )
5                 Plaintiff,  )
                                )
6           vs.               )
                                )
7  CITY OF CHICAGO, et al.,      )  Chicago, Illinois
                                )  November 29, 2016
8              Defendants.  )  9:30 o'clock p.m.

9
               TRIAL TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE MATTHEW F. KENNELLY
                     VOLUME 9-B
11
  APPEARANCES:
12

13

14  For the Plaintiff:    LAW OFFICE OF H. CANDACE GORMAN
                        BY:  MS. H. CANDACE GORMAN
15                   220 South Halsted Street, Suite 200
                     Chicago, IL  60661
16                   (312) 441-0919

17                   LOEVY & LOEVY
                     BY:  MR. JONATHAN I. LOEVY
18                      MR. STEVEN EDWARDS ART
                       MR. ANAND SWAMINATHAN
19                   311 North Aberdeen Street, 3rd Floor
                     Chicago, IL  60607
20                   (312) 243-5900

21

22
  Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                   Official Court Reporter
                     219 S. Dearborn Street, Suite 2102
24                   Chicago, Illinois  60604
                     (312) 435-5639
25

2534

1    APPEARANCES CONTINUED:

2    For Defendant
     City of Chicago:         DYKEMA GOSSETT PLLC
3                             BY:   MR. TERRENCE MICHAEL BURNS
                                    MR. DANIEL MATTHEW NOLAND
4                                   MR. PAUL A. MICHALIK
                              10 South Wacker Drive, Suite 2300
5                             Chicago, IL  60606
                              (312) 627-2100
6

7

8    For Defendant           KULWIN, MASCIOPINTO & KULWIN, LLP
     David O'Callaghan:       BY:   MR. SHELLY BYRON KULWIN
9                                   MS. RACHEL ANNE KATZ
                              161 North Clark Street, Suite 2500
10                            Chicago, IL  60601
                              (312) 641-0300
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court outside

2    the presence and hearing of the jury:)

3           THE CLERK:  Case No. 10 C 1168, Fields v. City of

4    Chicago.

5           THE COURT:  All right.  Is everybody good to go?

6           MR. LOEVY:  We are, your Honor.

7           THE COURT:  You can get the witness back on the

8    stand.  You can bring the jury in.

9           MR. LOEVY:  Could we get clarification if

10   Mr. O'Callaghan is going to cross-examine on the Monell?

11          THE COURT:  I don't think that Mr. O'Callaghan would

12   be doing anything.  It would be Mr. Kulwin.

13          MR. KULWIN:  Good catch, Judge.

14          THE COURT:  I am as sharp as a tack.

15          MR. KULWIN:  I may have a few questions, yes, Judge.

16          MR. LOEVY:  We object to the tag team.

17          THE COURT:  Well, but, I mean, you asked

18   Mr. O'Callaghan a whole bunch of questions about

19   record-keeping practices, so -- I mean, you know, the

20   testimony is -- I mean, it's primarily obviously directed

21   towards the Monell claim, but there's certainly things that he

22   says and issues about record-keeping that might be pertinent

23   to the claim against Mr. O'Callaghan too.

24          So, I mean, the whole non-duplication thing applies

25   as it always does, but I am not going to preclude somebody

1    from cross-examination.

2           MR. LOEVY:  Thank you, your Honor.

3           MR. KULWIN:  Judge, I have an emergency phone call

4    that I have to take.  Go ahead and start without me.

5           THE COURT:  Seriously?  Okay.

6           MR. KULWIN:  It will only take two minutes.  Go

7    ahead.  Literally two minutes.

8      (The jury enters the courtroom.)

9           THE COURT:  Do you understand you are still under

10   oath?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  All right.  Give it one second for

13   everybody to get situated.

14          All right.  Mr. Loevy, you can go ahead.

15                              - - -

16     MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION CONTINUED

17   BY MR. LOEVY:

18   Q.  All right.  Mr. Brasfield, to orient you, you told us

19   about the analysis you did of just looking at the

20   investigative files themselves to see if they complied with

21   the policy, right?

22   A.  Yes.

23   Q.  And you also told us about your analysis of the permanent

24   retention files themselves to make observations about whether

25   they were the way you thought they were supposed to look,

1  right?

2  A.  Yes.

3  Q.  I want to ask you now about a third area of analysis.  Did

4  you do any comparison between these files that were found in

5  the basement and their corresponding permanent retention

6  files?

7  A.  Yes, I did.

8  Q.  Okay.  Tell the jury about that.

9  A.  Again, looking at the material that was in the basement

10  file, there were a lot of unofficial reports that were not

11  getting on to official forms and, consequently, not getting

12  into the permanent retention files.  And roughly somewhere --

13  50 percent of those 89 files from the '80s did show the

14  relevant information, the unofficial notes not going into the

15  official reports.

16  Q.  And how many basement files did you say you had?

17  A.  The ones that I actually had to be able to compare to were

18  only found in the first time period, so there were 27 in

19  the --

20  Q.  Twenty-seven corresponding permanent retention files?

21  A.  Yes.

22  Q.  So there were 400-some basement files?

23  A.  429 in the -- if you want to call it a universe.

24  Q.  Yeah, that's what I'm getting at.

25  A.  Yes.

Brasfield - direct

2538

1   Q.  Then you found --

2   A.  Twenty-three in the first group, and 27 in the second

3   group.

4   Q.  All right.  Was that significant to you, that fully 50

5   percent of the permanent retention official files were missing

6   materials from the investigative files?

7   A.  Yes.  I would expect there to be near 100 percent

8   compliance.

9   Q.  And is that consistent with your experience in other

10  places?  Is that an unfair and unrealistic expectation?

11  A.  That is -- I don't feel it is -- in my experience at

12  looking at other homicide files and homicide investigations,

13  that I would expect that high of a deficiency.

14  Q.  Fifty percent struck you as an aberration?

15  A.  Yes.

16  Q.  Have you ever worked with or audited a department that

17  performed that poorly?

18  A.  Not in the case of homicide files, no.

19  Q.  All right.  Did you do the first line work to fill out the

20  boxes, whether it was an inventory, non-inventory, et cetera?

21  A.  No, I did not.

22  Q.  Tell the jury who you relied on to do that.

23  A.  Because of the sheer volume, and I don't want to do that

24  kind of stuff, the initial material review -- not review --

25  the material that was listed and documented and put in the

1    spreadsheet was done by people from your office.

2    Q.  Staff hired by us, correct?

3    A.  Yes.

4    Q.  And did you then review the work that they had done to

5    compile the checks -- you know, the box?

6    A.  Yes, the discussion initially was, is the best utilization

7    of my time, because I value it, is that that initial work

8    would be done, and then I would have the Bates numbers and the

9    file numbers to go back and check and verify that that's the

10   way they were.

11   Q.  And you also charged $300 an hour, right?

12   A.  That's correct.

13   Q.  So that is probably not the most efficient use of your

14   time?

15   A.  It's not the most efficient and it's not the most

16   enjoyable.

17   Q.  All right.  Did you spend a lot of hours making sure it

18   was accurate?

19   A.  I did.

20   Q.  Tell the jury approximately, you know, what you did to do

21   that and how long it took.

22   A.  Once the material was provided to me in electronic format,

23   I went through the files, looked at the corresponding Bates

24   numbers, and if anything, it errs on the side of the City

25   because I looked at -- to verify when it said that things were

1    either to/from memos or handwritten notes or material that

2    should have been in a permanent retention file, I verified

3    that, in fact, what people that you had hired found was

4    correct.  I did not go a further step and see if I could find

5    some more errors.

6    Q.  So you only caught errors going against you?

7    A.  Yes.

8    Q.  All right.  Is it acceptable in your field and in your

9    industry to rely on other people to do the -- you know, some

10   of the data entry in this kind of work?

11   A.  Yes.

12   Q.  All right.  I want to talk about your fourth analysis, and

13   that involves the criminal defense class, correct?

14   A.  Yes.

15   Q.  Tell the jury what your fourth layer of analysis was.

16   A.  Well, part of the underlying issue here was whether

17   material was getting discovered, if it was going to go to the

18   criminal defense attorney.  And the most obvious way to

19   determine that is to see how many criminal defense files were

20   available that correlated with information that was in

21   basement files and that were in permanent retention files.

22          And so, again, people that were hired by you sought

23   out the criminal defense attorneys and were able to eventually

24   receive criminal defense attorney files for 27 cases in the

25   first time period and -- or 23 in the first time period and 27

1   in the second.

2   Q.  All right.  So it was your understanding that as many

3   criminal defense files as possible were located to compare

4   with the basement files, correct?

5   A.  Yes.

6           MR. LOEVY:  And by the way, your Honor, at this time,

7   we do move Plaintiff's Exhibit 307 into evidence under --

8           THE COURT:  1006.

9           MR. LOEVY:  Yeah, 1006.

10          THE COURT:  We will talk about that at the end of the

11  direct.  Let's just -- we will do a sidebar at the end of the

12  direct to talk about it.

13  BY MR. LOEVY:

14  Q.  All right.  When you did this analysis of comparing the

15  available criminal defense files to the basement files, what

16  was your findings?

17  A.  Well, in 90 percent of the time, out of the 50 cases, 45

18  of them, there were investigating materials that were missing,

19  approximately 80 percent --

20  Q.  Well, before we leave that, I want to make sure I

21  understand.  So in the basement files, 90 percent of the time,

22  criminal defense attorneys' files did not have all the

23  materials in the basement files?

24  A.  That's correct.

25  Q.  All right.  Did you say -- what was the next number that

1    you --

2    A.  Approximately 80 percent, 40 of the 50, were missing --

3    the criminal defense files were missing handwritten notes that

4    were present in the basement files that detectives or others

5    had written down.

6    Q.  How about GPRs and to/from memos?

7    A.  Approximately 46 percent of the criminal defense files

8    were missing general progress reports that could be found in

9    the basement files.

10   Q.  And how many of the criminal defense attorneys' files

11   showed evidence of having received the inventory?

12   A.  There were 36 percent of the cases of the criminal defense

13   attorneys even received an inventory.

14          And I might also mention that only 20 -- or 20

15   percent were missing to/from memos that were in the basement

16   files too.

17   Q.  Now, you just said whether the criminal defense attorneys

18   received it, but you don't actually know what they got and

19   what they didn't get?

20   A.  No.  In my report, I made very clear, I had no firsthand

21   knowledge of what the criminal defense attorney received or

22   when it was received.

23   Q.  You had to use as a proxy their file, correct?

24   A.  That's correct.

25   Q.  And you don't claim -- do you claim that this would be a

1    perfect and, you know, unchallengeable procedure to guarantee
2    exactly every document they did and didn't have?
3    A.  No.
4    Q.  All right.  Overall, though, did you see evidence of a
5    problem?
6    A.  I did.  There was a consistent pattern, the material that
7    I reviewed, that would show the types of things that were in
8    the investigative file were not making it into criminal
9    defense files.
10   Q.  All right.  You're familiar with the defense hired an
11   expert named Mr. Murray, correct?
12   A.  Yes.
13   Q.  And he spent quite a few hours going over the same
14   material, correct?
15   A.  That's my understanding.
16   Q.  All right.  And there is a -- it was detected that there
17   was a problem with your analysis of the Octavia Anima file,
18   was there not?
19   A.  Yes.
20   Q.  Tell the jury what the problem was.
21   A.  In the spreadsheet that you see enlarged there, I made
22   reference to Bates numbers, and in one of the -- in a
23   particular case, there was a range of pages where a digit was
24   transcribed, and, for example -- in fact, as an example, I can
25   give you the exact number.  But in any event, it was a

Brasfield - direct

2544

1  typographical error, and it should have been -- what was a 1

2  should have been a 2 or a 2 should have been a 1 so that the

3  range, instead of having a hundred-and-some pages missing,

4  there were only seven or eight pages missing.

5  Q.  All right.  How many page document is your spreadsheet,

6  sir?  About 15?

7  A.  It covers 439 different cases, so I don't know exactly how

8  many pages there are.

9  Q.  All right.  You're not claiming it is completely free of

10  all typos, are you?

11  A.  No.  It was an effort to impartially examine what was

12  available.

13  Q.  All right.  Who is that on, the typo?  Was that on you or

14  somebody else?  Who takes responsibility on that?

15  A.  It's both on the initial typist, but it's also clearly on

16  me, so...

17  Q.  All right.  Does that change your opinions at all that you

18  were wrong about this Bates range?

19  A.  No.  In fact, even if -- two possible things.  Even if you

20  completely removed that Octavia Anima case, it doesn't change

21  the overall pattern of everything that I looked at.

22       Secondly, there were things missing regardless of

23  that one particular typographical --

24  Q.  So notwithstanding the typo, there still were --

25  A.  Yes.

1  Q.  All right.  How about the Christopher Peoples file?  This

2  is the one with the 150 pages from the criminal defense

3  lawyer.  Do you want to give some context there?

4  A.  That very clearly, out of the 50, was one that should not

5  have been included in the material for me to look at.  It

6  didn't represent any criminal defense file.  There were

7  documents there.  But I didn't feel it would be fair to either

8  side to say, oh, well, this one, I don't like this one, I'm

9  taking it out.  I mean, it was there, I looked at it, I did my

10  process.

11  Q.  Has the defense or anybody else brought to your attention

12  any other significant errors that you're aware of?

13  A.  No.

14  Q.  All right.  Does the fact that that mistake was made, does

15  that change any of your overall opinions?

16  A.  No, it does not.

17  Q.  Does it affect anything about your analysis of the blue

18  column, the purple column, the blue versus purple columns?

19  A.  No, it does not.

20  Q.  All right.  Now, the defense expert also said that some of

21  the documents that were missing from the criminal defense

22  files were things like court attendance sheets, notes like VIN

23  records, stuff that was administrative.  Did that -- what's

24  your opinion of that criticism?

25  A.  I don't think that is an accurate or fair explanation.  As

 1    I testified to before, you never know --

 2              MR. NOLAND:  Judge?

 3              THE WITNESS:  -- what is going to be --

 4              MR. LOEVY:  Mr. Brasfield, if you could hold on.  I

 5    think there is an objection.

 6              THE COURT:  I didn't hear it.

 7              MR. NOLAND:  Non-disclosed.

 8              THE COURT:  Let me see the lawyers at sidebar.  Bring

 9    the report.

10      (The following proceedings were had at sidebar outside the

11    hearing of the jury:)

12              THE COURT:  The question on the table has to do with

13    material missing from criminal defense files?

14              MR. KULWIN:  It was actually the reason I -- he was

15    talking about his review of Mr. Murray, our expert's, report.

16    They haven't disclosed any rebuttal from him with respect to

17    any review --

18              THE COURT:  Well, actually, it was in the question.

19    It was in the question.  So why don't you word the questions

20    in a different way.

21              MR. LOEVY:  I would be happy to stay away from it if

22    they don't want to get into it.  If it's a disclosure issue,

23    fine.  But if they're going to do it on cross, I'd like to

24    front it.

25              So I'd be happy to stay away from the subject.

Brasfield - direct

2547

1      MR. NOLAND:  We're certainly going to ask him if he

2  didn't review the prosecutor's files and show him some of

3  those things, but they didn't -- he's had that report for

4  months and hasn't done any type of rebuttal.

5      THE COURT:  Basically, what you're saying is that he

6  can't comment on the other side's criticism of his report?  I

7  don't think I agree with that.

8      MR. NOLAND:  He didn't submit a rebuttal is all I'm

9  saying, your Honor.  Yes.  I mean --

10      THE COURT:  Well, when was his dep taken?  In terms

11  of the sequence between plaintiff's report, defendants'

12  report, deposition, where did it fall in the --

13      MR. NOLAND:  We took his deposition before we

14  disclosed our report.

15      THE COURT:  Okay.

16      MR. LOEVY:  I will stay away from it if they are not

17  going to bring it up.  The criticism I thought they were going

18  to do on cross is some of this stuff is benign.  If they are

19  not going there, I'm done with it.

20      THE COURT:  Well, I think you can probably word the

21  questions in a way that doesn't say, well --

22      MR. LOEVY:  All right.

23      THE COURT:  -- the defendants' expert says this.  I

24  mean, because part of the -- I suppose in theory -- I am not

25  sure it's going to happen here, but I suppose in theory,

1    somebody could say, you did such a great job on cross of this

2    guy, we are not going to need to call this person.

3           MR. LOEVY:  Okay.

4      (The following proceedings were had in open court in the

5    presence and hearing of the jury:)

6           THE COURT:  Okay.  You can proceed.

7    BY MR. LOEVY:

8    Q.  Some of the materials in the investigative files that were

9    not evidenced in the criminal defense attorneys' files was

10   more significant than other materials, right?

11   A.  That is correct.

12   Q.  All right.  As far as any criticism that who cares if some

13   of this stuff was left out of the criminal defense attorneys'

14   files, can you speak to that?  What I'm talking about is

15   administrative documents, notes about a VIN number on a car,

16   that kind of stuff.

17   A.  As I had previously testified to, oftentimes, you don't

18   know what is important or what may have value either to

19   prosecution or defense.  Administrative things such as who

20   appeared in court, you may discover later that the key part of

21   a prosecution is that an officer was on the street and saw

22   something, but in reality, you have the administrative

23   document that said they were in court on that day.  I mean,

24   that's just an off-the-cuff example.

25           But the administrative-type material can be

1   important.  Oftentimes, it is not.  But until you have it or

2   don't have it, you're in a quandary.

3   Q.  All right.  When you did your analysis, some of the

4   materials that you listed as undisclosed were probably truly

5   benign, correct?

6   A.  That's correct.  Absolutely.

7   Q.  You didn't attempt to go through and sort like, oh, this

8   page is blank, or, you know, this page is not exculpatory,

9   page by page, right?

10  A.  I tried to be as objective and just put down what the

11  facts were.

12  Q.  All right.  Let's change topics then, sir.

13          Do you have any problem as a police practices expert

14  with police officers having a policy of destruction of notes,

15  and can you explain?

16  A.  I don't have a problem.  In fact, in my own career, I have

17  shredded, for lack of a better word, notes, but it's in the

18  context of having taken a two- or three-word or two- or

19  three-line note that I may have scratched in the field and

20  elaborated that on an official document when I am back in the

21  office.  If I happen to go out to a bodega and talk to Sam

22  Smith at the bodega, that just may be a penciled note.  But

23  when I come back in, it is on such-and-such a date at

24  such-and-such a time and such-and-such a location, I

25  interviewed Mr. or Mrs. or whoever and this is the context of

Brasfield - direct

2550

1   what I learned while it's fresh in my mind.  That is the
2   official document.  That reflects what was actually done.
3   That scrap of paper then the agency would feel is not
4   important.
5   Q.  So is there a national norm then that as long as you take
6   the information and put it in a report, you don't have to
7   preserve the notes?  Would you agree or disagree with that?
8   A.  It could be either way.  The key issue is, is the
9   information that was garnered put into a form that is
10  available for either review or discovery later?
11  Q.  Which means in the official file, correct?
12  A.  Yes, in the official file.
13  Q.  So would you have a problem with a policy that allowed you
14  to either discard or destroy or withhold notes if it didn't go
15  into an official report?
16  A.  Absolutely.
17  Q.  And would that be an aberration?
18  A.  It would.
19  Q.  All right.  You were asked some questions previously about
20  show me a specific policy that -- you know, from another city.
21  Do you remember being asked those questions?
22  A.  During a deposition, yes.
23  Q.  All right.  Do you have the Tallahassee policy from 1982?
24  A.  No, I do not.
25  Q.  Do you have the El Paso policy from 1984?

Brasfield - direct

2551

1  A.  I have no files that contain historic policies and

2  procedures from other jurisdictions.

3  Q.  All right.  But do you nonetheless have a familiarity with

4  other cities' policies during this time period, and can you

5  explain?

6  A.  Yes.  From the start of my college education in science

7  and the studying of policies of procedures and investigations

8  and then, more importantly, through my professional practice

9  of developing -- not to go over the same ground -- but I have

10  visited other police departments, I have audited other police

11  departments, I have reviewed their policies, I have looked in

12  the popular literature at the time and of those eras, and I

13  actually was a commander in those eras, and I am familiar with

14  what was the way things were written.

15  Q.  All right.  Back quickly to the comparison you did between

16  the criminal defense files and the basement files, why did you

17  choose -- well, first of all, you have an understanding that

18  the defense attorney did a different comparison, correct?

19  A.  Yes.

20  Q.  I'm sorry.  The defense attorney hired an expert.

21        And what did the defense expert, Mr. Murray, compare

22  the investigative files to?

23        MR. NOLAND:  Objection, your Honor.

24        THE COURT:  Same basis as the previous one?

25        MR. NOLAND:  Yes, Judge.

Brasfield - direct

2552

1           THE COURT:  All right.  Again, I need to see the

2     lawyers at sidebar, please.  Bring the report.

3        (The following proceedings were had at sidebar outside the

4     hearing of the jury:)

5           THE COURT:  You did what I told you not to do.  The

6     defense expert did this, the defense expert did that.  I told

7     you not to word questions that way.

8           MR. LOEVY:  I apologize.

9           THE COURT:  But here's the deal.  I mean, I don't

10    think that there's anything inappropriate or beyond -- or

11    outside the scope of Rule 26(a)(2) and the part of Rule 37

12    that goes along with it for him to be able to respond to

13    criticism by a defense expert.  So either he gets to do it

14    now, or he is going to get to bring him back on later.

15          So do you have a preference?

16          MR. LOEVY:  We do.

17          THE COURT:  I'm asking you.

18          MR. NOLAND:  Back later, you mean --

19          THE COURT:  Put him on in rebuttal to comment on what

20    your guy said about him.

21          MR. NOLAND:  If that would be the ruling --

22          THE COURT:  That's going to be the ruling.

23          MR. NOLAND:  -- then I would rather have him do it

24    now.

25          THE COURT:  Then let's do it now.

Brasfield - direct

2553

1    (The following proceedings were had in open court in the

2    presence and hearing of the jury:)

3        THE COURT:  Okay.  The objection is overruled.  You

4    can proceed.

5    BY MR. LOEVY:

6    Q.  All right.  Just as foundation, what is your understanding

7    of the analysis that the defense expert undertook?

8    A.  It is my understanding from reading his report and

9    deposition that he looked at --

10   Q.  Same basement files, right?

11   A.  Same basement files.

12   Q.  And what did he compare them to?

13   A.  He compared them to State's Attorney's Office files.

14   Q.  So in other words, you compared the same basement files to

15   the criminal defense, and then they compared them to the

16   state's attorney's files, right?

17   A.  That's correct.

18   Q.  And neither of one of you did what the other one did?

19   A.  That's correct.

20   Q.  Why did you choose to compare the basement files to the

21   criminal defense files to determine what the criminal defense

22   attorneys had?

23   A.  I tried to keep it as straightforward as possible.  The

24   issue that I was asked to look at was material relevant to the

25   investigation of homicides being given and made available to

1  the criminal defense attorney.  And the most straightforward
2  way to do that is to look at the criminal defense attorney's
3  files.
4  Q.  All right.  You've already testified that 90 percent of
5  the criminal defense attorneys' files were missing some
6  materials from the basement file.  Do you have any knowledge
7  as to what was in or wasn't in the state's attorney's files?
8  A.  No, I do not.
9  Q.  All right.  Let's talk about a few more areas.
10        You talked before lunch about why it's important to
11  have policies governing the subpoena unit and the subpoena
12  response unit.  Did the City of Chicago, after they enacted
13  the changes we talked about this morning, did they fix the
14  subpoena unit problems?
15  A.  No, they did not.
16  Q.  Can you explain?
17  A.  The policies that were promulgated did nothing to
18  establish guidelines or policies and procedures or training or
19  follow-up auditing or, in worst case scenario, discipline for
20  the successful operation of the subpoena services unit.
21        There was no checklist; if you did a subpoena from
22  the State's Attorney's Office, you do this, this, and this.
23  It becomes even more critically important to have that when
24  you have a police department with a culture of parallel files
25  of different sources of files.  You get a subpoena, and the

Brasfield - direct

2555

1   staff with no training is supposed to determine, well, how do

2   I respond to this?  Do I send something in writing over to the

3   gang squad because the gang squad may have had involvement in

4   this but their records aren't included in the investigative

5   file?  Do I send for things from the photo lab or from the

6   crime lab?

7          You can say that an experienced employee would know

8   that, but given the turnover and the fact that there is

9   absolutely no evidence that I have seen of any type of

10  guideline, of any training on any policy or procedure as to

11  how they will respond or what sources that they will examine

12  to get the material.

13  Q.  All right.  Did you review testimony by Mr. Hickey that

14  provided insight into this problem?

15  A.  A great deal of testimony from Mr. Hickey, yes.

16  Q.  And what did you conclude based on that?

17  A.  That he acknowledged as the City's expert in that field

18  that what I had just testified to was the case; that there was

19  no training, there were no guidelines.  And in fact, material

20  that I reviewed, that there were instances where there was

21  confusion or question among staff as to what should be turned

22  over or what shouldn't be turned over, and that none of that

23  questioning was ever resolved or sent up the chain of command

24  to decide what to do.

25  Q.  All right.  In addition to the lack of -- basically, did

1  any of the new policies that got passed, did they govern the
2  subpoena unit?

3  A.  No.

4  Q.  Was there a lack of policies there?

5  A.  There was a lack of policy.

6  Q.  All right.  Let's talk about the policies that were
7  passed.  Did those solve the problem for the decentralized
8  divisions you've just described?

9  A.  No, they did not address anything about a centralized
10 record system process.

11       And I might add, the larger the organization gets,
12 the more critically important it is to have a centralized
13 record system.

14 Q.  How out of the norm is Chicago's deficiency in that
15 regard?

16 A.  As I have said on several occasions, it is totally alien
17 to my experience that the City of Chicago Police Department
18 would have that type of system.

19 Q.  Did the policies leave too much or too little discretion
20 to detectives as far as what to make into official files?

21 A.  Well, they used the term "relevant."  And one of the
22 depositions that I reviewed, I believe it was from a gentleman
23 by the name of Stibich, indicated that what might be important
24 or relevant --

25       MR. NOLAND:  Objection, your Honor.  I believe that's

Brasfield - direct

2557

1    the subject of the discussion before the testimony.

2            THE COURT:  Okay.  Well, the last part of the answer

3    was not responsive, so I am going to strike the last part.

4            In fact, why don't you -- I am going to strike the

5    whole answer.  Why don't you put the question again.  The

6    answer really wasn't responsive.

7    BY MR. LOEVY:

8    Q.  All right.  Did you see any evidence either way whether

9    the system in Chicago left too much discretion to police

10   officers to decide what to put in the official file?

11           THE COURT:  That's just a yes or no.

12           THE WITNESS:  Yes.

13   BY MR. LOEVY:

14   Q.  Can you explain?

15           THE COURT:  So is this the issue where there's an

16   objection?

17           MR. NOLAND:  Yes, the reference to a particular name.

18           THE COURT:  Okay.  Bring the -- again, I need to talk

19   to the lawyers at sidebar.  Bring the relevant ruling.

20     (The following proceedings were had at sidebar outside the

21   hearing of the jury:)

22           THE COURT:  Is this my ruling?

23           Oh, you're talking about --

24           MR. NOLAND:  The proffer.

25           THE COURT:  You are talking about the proffer.  This

1    is not Jones/Palmer.

2            MR. SWAMINATHAN:  No one knows that his reference to

3    Stibich testifying is him testifying in Jones and Palmer.

4    He's just saying a guy name Stibich who is a commander said

5    certain things.

6            MR. LOEVY:  In other words, that would have been

7    outside the Jones proffer, but we are not offering it for the

8    Jones proffer.  This has nothing to do with the Jones proffer.

9    He's just said, I looked at Stibich's testimony --

10           THE COURT:  Who is Stibich?

11           MR. SWAMINATHAN:  He is a commander for the City who

12   testified about --

13           THE COURT:  Testified in the Palmer case?

14           MR. SWAMINATHAN:  It was in the Palmer case.

15           MR. NOLAND:  It's the pre-'83 policy, yes.

16           THE COURT:  Okay.  And what do you expect his

17   testimony to be on this?

18           MR. LOEVY:  Just what he said.

19           THE COURT:  Well, say it again.

20           MR. LOEVY:  That there was too much discretion left

21   to the detectives about deciding what's in and what's out.

22           THE COURT:  And the problem with that is?

23           MR. NOLAND:  It was the pre-'83 policy.  That was a

24   decision to change the policy.  So he's talking about a

25   different era before 83-1.

1    MR. LOEVY:  That sounds like --

2    MR. MICHALIK:  It's misleading to suggest that that

3   was his testimony after 83-1 comes out.

4    THE COURT:  Well, reword the question so it doesn't

5   do that.

6      (The following proceedings were had in open court in the

7   presence and hearing of the jury:)

8    THE COURT:  Okay.  The question is going to be

9   rephrased.

10   BY MR. LOEVY:

11   Q.  All right.  You looked at what happened in the City of

12   Chicago after they tried to solve the problem of the

13   Jones/Palmer era, correct?

14   A.  That's correct.

15   Q.  And I believe you told us you think they did an inadequate

16   job of solving that problem, right?

17   A.  Yes.

18   Q.  Did they solve the problem of having too much or too

19   little discretion to detectives to decide what to memorialize?

20   A.  No, they did not.

21   Q.  They did not solve that problem?

22   A.  No.

23   Q.  And if you could explain a little bit without reference to

24   Mr. Stibich?

25   A.  They used what I would consider vague terminology and left

1    it up to individual detectives to determine what was relevant

2    and what they did with the information that they thought was

3    relevant.

4    Q.  And that's not the norm in police practices?

5    A.  No.

6    Q.  You talked a little bit about training, and just a few

7    more questions, really.  But when they did these new policies

8    and these new practices, did they do the kind of training that

9    would be expected in your industry?

10   A.  Not for a significant policy such as discovery in

11   constitutional safeguards for individuals.  That, and as

12   evidenced by the information I had available to me, that was a

13   inbreded (sic) cultural problem that needed very significant

14   training, planning for the training in advance, training

15   presented by high-level commanders, perhaps even with an

16   introduction by the superintendent, that it encompass everyone

17   that would have their hands on an investigation, not just the

18   major crimes detectives, as I mentioned before.  They should

19   include bomb and arson, gang squad, anyone that has an

20   investigative responsibility, and to a lesser extreme, the

21   patrol officers.

22            And it should not be a one-time deal.  People

23   transfer in and out.  There are going to be questions that

24   arise in time.  You have a major significant change in the

25   culture as to, well, does this mean this or does that mean

1    that.  There needs to be, and often is, additional follow-up

2    training.

3    Q.  As a 40-year law enforcement person, do you regard this as

4    a significant change in the way of doing business?

5    A.  Yes.

6    Q.  Is a one three-hour training of the detectives sufficient?

7    A.  No.

8    Q.  And the last question then, you described the culture as

9    ingrained.  Can you explain from a police practices standpoint

10   how an organization can have culture resistance to change?

11          MR. NOLAND:  Objection, Judge, relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  For instance, when -- the requirement

14   to read suspects their rights, which goes back decades and

15   decades and decades, that was not what police were used to

16   doing and thought that it was going to let the bad guys get

17   away.  It's a cultural thing that had to be totally turned

18   around 180 degrees.

19          The same is true about, for instance, warning shots,

20   what I'll -- anyway, warning shots --

21          MR. KULWIN:  I'll object.

22          THE COURT:  Sustained.

23          MR. KULWIN:  I ask that it be stricken.

24          MR. LOEVY:  I have no further --

25          THE COURT:  That comment is stricken.

Brasfield - cross by Mr. Noland

2562

1          I'm sorry.  What did you say?

2          MR. LOEVY:  I'm finished.

3          THE COURT:  You're finished.  Okay.

4          MR. LOEVY:  Thank you, Mr. Brasfield.

5          THE COURT:  Mr. Noland.

6                              - - -

7          MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

8    BY MR. NOLAND:

9    Q.  All right.  Now, Mr. Brasfield, before lunch, you talked a

10   lot about notes and that in the files you reviewed, you saw

11   notes that were not on general progress report forms.  Do you

12   remember that testimony?

13   A.  Yes, I do.

14   Q.  And sometimes you might see it on the back of a piece of

15   paper or something not on the official general progress report

16   form, correct?

17   A.  That's not what I testified to this morning, but, yes, I

18   agree.

19   Q.  All right.  And, now, just recently, after lunch, you've

20   acknowledged that you would shred your own notes as a police

21   officer after completing a report; isn't that true?

22   A.  That's correct.

23   Q.  And to you, that's a perfectly acceptable practice, right?

24   A.  In the context of my explanation of transferring the

25   information in full onto official forms.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 85 of 191 PageID #:98291
Brasfield - cross by Mr. Noland
2563

1  Q.  So you would not give your notes to the criminal defense

2  attorney so he would have those notes in the courtroom in

3  order to cross-examine you with what you wrote

4  contemporaneously with your interview of somebody, correct?

5  Yes or no?

6  A.  Yes.

7  Q.  And you would not give those notes to the prosecutor so he

8  could see what you wrote -- he or she could see what you wrote

9  down contemporaneously with your investigation; isn't that

10  true?

11  A.  That's true.

12  Q.  And you have talked about a lot of criticism of Chicago's

13  policy.  We just heard that, correct?

14  A.  Yes.

15  Q.  Wouldn't you agree, sir, that, in fact, keeping notes,

16  retaining notes permanently so that they're available in the

17  criminal process is a better policy than your very own

18  personal policy of shredding your notes?  Isn't that true?

19  A.  No, it is not.

20  Q.  Now, Mr. Brasfield, you were never personally assigned as

21  a homicide detective; is that true?

22  A.  That's true.

23  Q.  But you're aware that in the Seattle Police Department, as

24  with your practice, the Seattle police officers would shred

25  their notes after completing a report, right?

1   A.  In that era --

2   Q.  Is that true?

3   A.  That's true.

4   Q.  And, Mr. Brasfield, isn't it true that in all your time in

5   Seattle, all those 20-plus years, you never did anything to

6   change that policy; isn't that true?

7   A.  No, that's not true.

8   Q.  Isn't it true, Mr. Brasfield, that you didn't do anything

9   to change the policy at Seattle of detectives who threw their

10  notes away?  Isn't that true?

11  A.  That's not true.

12  Q.  Well, Mr. Brasfield, you were the chief of police in Fort

13  Lauderdale; is that right?

14  A.  That's correct.

15  Q.  And you don't even know what the policy was in Fort

16  Lauderdale with respect to whether or not detectives could

17  destroy their notes after completing a report; isn't that

18  true?

19  A.  That's not entirely true, no.

20  Q.  Well, at your deposition, you told us you didn't know one

21  way or the other what the policy in Fort Lauderdale was; isn't

22  that right?

23          MR. LOEVY:  Objection.  Page and line?

24          THE COURT:  Sustained.  That's not the proper way to

25  do it.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 87 of 191 PageID #:98293
Brasfield - cross by Mr. Noland
2565

1  BY MR. NOLAND:

2  Q.  Page 327, line 10.  Isn't it true that you were asked

3  these questions with respect to the Fort Lauderdale policy and

4  gave the following answers:

5      "QUESTION:  So" --

6      MR. LOEVY:  Objection to the characterization with

7  respect to the policies.  Just the question and the answer.

8      THE COURT:  Ask the questions -- read the questions

9  and answers, leave out the commentary.

10  BY MR. NOLAND:

11  Q.    "QUESTION:  But what did they do with the actual notes?

12  Did they throw them away?

13      "ANSWER:  They were transcribed, and the notes -- I

14  don't have an independent recollection right now what they

15  were, what was done with them.  So it's possible they were

16  just thrown away.  The information would have been contained

17  in the file.  It's possible.  I said I have no independent

18  recollection.

19      "So the question is, so it's possible that the notes in

20  Fort Lauderdale that the detectives took after they either

21  electronically called them in and had them transcribed or

22  typed them or did whatever that they did with them and put

23  them in the file could have been thrown away?

24      "ANSWER:  That could have been."

25  A.  That's correct.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 88 of 191 PageID #:98294
Brasfield - cross by Mr. Noland
2566

1     MR. LOEVY:  Objection, not impeaching.

2     THE COURT:  I am going to overrule the objection.

3  But when you read the things, say "question" and "answer."

4  You are not going to do it again, but when you do it, say

5  "question" and "answer" so the jury understands what's being

6  read.

7     I am overruling the objection because it's a matter

8  of weight.

9     MR. NOLAND:  Thank you, Judge.

10  BY MR. NOLAND:

11  Q.  And isn't it true that as the chief of police, you didn't

12  have a policy one way or the other with respect to the

13  retention of notes at Fort Lauderdale?

14  A.  The policy was --

15  Q.  Isn't that true, sir?

16     MR. LOEVY:  Objection.

17     THE COURT:  So the question is did you have a policy?

18     THE WITNESS:  We had a policy.

19  BY MR. NOLAND:

20  Q.  Page 328, line 1.  Isn't it true you were asked this

21  question and gave this answer:

22     "QUESTION:  And as chief of police, you didn't have a

23  policy one way or the other?

24     "ANSWER:  I don't recall what the policy.  I don't have

25  it in front of me now."

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 89 of 191 PageID #:98295
Brasfield - cross by Mr. Noland
2567

1        Isn't it true that that question was asked --

2        MR. LOEVY:  Objection, your Honor.

3        THE COURT:  The objection is sustained.  Not

4   impeaching.  The jury is instructed to disregard it.

5   BY MR. NOLAND:

6   Q.  Now, Mr. Brasfield, you acknowledged after lunch here that

7   the key in all of this with respect to the review that you've

8   done and your testimony here today is that the information is

9   provided in the criminal justice process so that the

10  prosecutors get the information and the information will be

11  tendered to the criminal defense attorney; is that fair?

12  A.  The information that the police have are supposed to give

13  to the prosecutor or the State's Attorney's Office, yes.

14  Q.  And it's true, isn't it, that if the police -- when the

15  police provide the information to the prosecutor, the police

16  have fulfilled their duty to disclose under generally accepted

17  police practices; isn't that true?

18  A.  If they disclosed everything that they have, yes.

19  Q.  Yet, Mr. Brasfield, in this review you talked about with

20  plaintiff's counsel, you did not even look at the prosecutor's

21  files in comparison to the 50 investigative files from the

22  basement, did you?

23  A.  That's correct.

24  Q.  Now, Mr. Brasfield, you've talked about -- a lot about

25  permanent retention files.  Do you remember that testimony?

Brasfield - cross by Mr. Noland

2568

1   A.  Yes.

2   Q.  Now, Mr. Brasfield, you understand that at the Chicago

3   Police Department, there's a permanent retention file that has

4   the supplementary reports and the case reports.  That's

5   correct?

6   A.  That's correct.

7   Q.  And there's also the investigative file that is maintained

8   at the area while the investigation is ongoing; isn't that

9   true?

10  A.  That's one of the other files, yes.

11  Q.  And the investigative files are available to get requested

12  and subpoenaed in the criminal process by the prosecutors and

13  the criminal defense attorneys; isn't that true?

14  A.  There is no policy or practice that would indicate how

15  it's supposed to operate.

16  Q.  Well, it's supposed to operate in that the detectives --

17  the special order requires that detectives submit their

18  information that they generated or received in an

19  investigation into that investigative file for preservation;

20  isn't that what it says?  Isn't that what it says, yes or no?

21  A.  That's what it says.

22  Q.  Thank you.

23          And in this case, there is about 450 investigative

24  files that are listed on this table that the plaintiff's

25  attorneys gave you, right?

Brasfield - cross by Mr. Noland

2569

1   A.   429, yes.

2   Q.   And by the way, you didn't prepare this.  They prepared it

3   and provided it to you, correct?

4   A.   That's correct.

5   Q.   And but only on 50 of those 429 cases did they provide you

6   with any criminal defense file; is that true?

7   A.   That's true.

8   Q.   And on those criminal defense attorneys' files, there

9   were -- almost all of them, general progress reports and other

10  notes that were contained in those criminal defense attorneys

11  files, true?

12  A.   Those criminal defense --

13  Q.   Is that true or not, sir?

14  A.   No.

15  Q.   Okay.  But you are aware that information from the

16  investigative files was produced in the criminal process,

17  correct?

18  A.   You'll have to rephrase that.

19  Q.   Okay.  There are -- you came across dozens and dozens and

20  dozens of general progress reports that were in these criminal

21  defense attorneys' files that you reviewed; isn't that true?

22  A.   There were general progress reports in some of the files

23  that I looked at, yes.

24  Q.   So that was evidence that attorneys were getting material

25  from the investigative files, correct?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 92 of 191 PageID #:98298
Brasfield - cross by Mr. Noland
2570

 1   A.  In some instances, yes.

 2   Q.  And, in fact, it's your understanding that the practice at

 3   Chicago or the policy is that the general progress reports do

 4   not go into the permanent retention file, they go into the

 5   investigative file, correct?

 6   A.  That's correct.

 7   Q.  Now, with respect to these 50 or so criminal defense

 8   attorneys' files that were provided to you, you didn't

 9   personally do anything to independently verify that they were

10   complete or incomplete; is that right?

11   A.  I verified --

12   Q.  Sir, is that right?

13   A.  I received --

14   Q.  Sir, is that right?

15   A.  Please ask the question again.

16   Q.  Isn't it true, sir, that of the 50 criminal defense

17   attorneys' files that were provided to you by the plaintiff's

18   counsel, you did nothing to independently verify that they

19   were complete or incomplete?  Isn't that true?

20   A.  I took them at face value.

21   Q.  And you don't know how many times those files changed

22   hands from one attorney to another attorney to another

23   attorney over the years, true?

24   A.  That's true.

25   Q.  And most of these files were between 15 and some in excess

Brasfield - cross by Mr. Noland

2571

1  of 30 years old; isn't that right?

2  A.  That's possible.

3  Q.  And you don't know how many of these files were given to

4  appellate lawyers, right?

5  A.  That's correct.

6  Q.  You don't know how many were given to -- how many

7  post-conviction lawyers took those files, correct?

8  A.  All I know is they came from criminal defense attorneys.

9  Q.  And you didn't talk to any criminal defense attorneys and

10  say, hey, is this file complete, true?

11  A.  That's true.

12  Q.  Mr. Loevy brought up with you the Christopher Peoples

13  case, right?  That was a case --

14  A.  Yes.

15  Q.  -- we talked about at your deposition?

16  A.  Yes.

17  Q.  And that was a file that was provided to you by the

18  plaintiff's counsel, right?

19  A.  That's correct.

20  Q.  I'm going to show you what the plaintiffs have marked as

21  Plaintiff's Exhibit 383.  That is the criminal defense

22  attorney's file that the plaintiff's attorneys provided to

23  you; isn't that true?

24  A.  I believe so.

25          THE COURT:  Can you spell Peoples?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 94 of 191 PageID #:98300
Brasfield - cross by Mr. Noland
2572

 1          MR. NOLAND:  It is P-e-o-p-l-e-s.

 2          THE COURT:  Thanks.

 3   BY MR. NOLAND:

 4   Q.  And, sir --

 5          MR. NOLAND:  Judge, could we have the computer?

 6          Laura, if we could have Plaintiff's Exhibit 306-018.

 7          THE COURT:  Is this in evidence?

 8          MR. NOLAND:  This is Plaintiff's Exhibit --

 9          THE COURT:  I understand.  That's not my question.

10   Just focus on my question.  Is it in evidence?

11          Let me ask it a different way.  Is there an

12   objection?

13          MR. LOEVY:  We do not object.

14          THE COURT:  Okay, fine.  Then the jury will be able

15   to see it.

16          306-10- --

17          MR. NOLAND:  018, your Honor.

18   BY MR. NOLAND:

19   Q.  Sir, while Laura is pulling that up, the first page of

20   that document has got the name of the criminal defense

21   attorney for Christopher Peoples.  His name is Gary Stanton;

22   is that true?

23   A.  That's correct.

24          THE COURT:  I did it again.  There's two defense

25   tables.  I put it on the wrong one.  My mistake.  Sorry about

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 95 of 191 PageID #:98301
Brasfield - cross by Mr. Noland
2573

1    that.  There you go.

2    BY MR. NOLAND:

3    Q.  Mr. Brasfield, on the screen in front of you, that is

4    page 17 of your attachment F to your report; is that true?

5    A.  That's correct.

6    Q.  And you prepared this page 17, correct?

7    A.  I did.

8    Q.  And this was initially based upon your review of the --

9    this spreadsheet on the demonstrative exhibit that plaintiff's

10   counsel gave you, right?

11   A.  Yes.

12   Q.  And then you took that and did a file-by-file comparison

13   of the documents that were in the investigative files from the

14   police and the criminal defense attorneys' files given to you,

15   right?

16   A.  That's correct.

17          MR. NOLAND:  Laura, can you highlight the entire

18   paragraph missing from criminal defense files.

19   BY MR. NOLAND:

20   Q.  And there's actually 288 pages in that Chicago Police

21   Department file, correct, that you noted on attachment F?

22   A.  Yes.

23   Q.  And I have added them up beforehand.  I think we talked

24   about it at your deposition.  The documents you said were

25   missing from the criminal defense attorneys' files were about

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 96 of 191 PageID #:98302
Brasfield - cross by Mr. Noland
2574

1   250 pages or 257 pages; is that true?

2   A.  I don't recall.

3   Q.  Okay.  But it was somewhere in that ballpark?  Does that

4   sound about right?

5   A.  I would say that's fair.

6           MR. NOLAND:  Laura, if you could pull up Plaintiff's

7   Exhibit 383, pages --

8           THE COURT:  Is there any objection to this one?

9           MR. LOEVY:  What is it, your Honor?

10          THE COURT:  383.

11          MR. LOEVY:  Is it a file?

12          MR. NOLAND:  It's the file that's in front of him

13  that I --

14          MR. LOEVY:  No objection.

15          THE COURT:  Okay.  Fine.  So the 306 was -- 306 dot

16  whatever was the page from the report.  The 383 is the Peoples

17  file.

18          MR. NOLAND:  Thank you, Judge.

19          And this would be Bates stamp pages 8651-52.

20  BY MR. NOLAND:

21  Q.  So, sir, on the copy in front of you and on the screen, in

22  the middle of the document, there is a reference to the RD

23  number for this case.  That's the records division number; is

24  that right?

25  A.  Yes.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 97 of 191 PageID #:98303
Brasfield - cross by Mr. Noland
2575

1  Q.  And that would be HH358668.  That's the records division

2  number relative to the homicide at issue for this Christopher

3  Peoples case, right?

4  A.  That's correct.

5  Q.  And that's one page.

6          MR. NOLAND:  Can you go to the next page.  Can you go

7  back to the other one, Laura?  Under the subject line, Laura,

8  could you highlight that.

9  BY MR. NOLAND:

10 Q.  This is a request for prisoner to be held past next

11 scheduled court call, right?

12 A.  Yes.

13         MR. NOLAND:  Laura, could you go to the next page.

14 BY MR. NOLAND:

15 Q.  Again, the subject of this document is request for

16 prisoner to be held past court call, correct?

17 A.  Yes.

18         MR. NOLAND:  And, Laura, could you pull up that RD

19 number -- there you go.

20 BY MR. NOLAND:

21 Q.  And, again, it's the same RD number that we just read,

22 correct?

23 A.  Correct.

24 Q.  Now, isn't it true, Mr. Brasfield, that there isn't any

25 other police report in that file, the criminal defense file

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 98 of 191 PageID #:98304
Brasfield - cross by Mr. Noland
2576

1    that the plaintiff's attorneys gave you, that has the records

2    division number for the homicide at issue in that case?

3    A.  I don't independently recall, but if that's what you

4    indicated, yes.

5    Q.  I'll represent to you that that is the case.

6    A.  Fine.

7    Q.  So when you received this file and you did your

8    file-by-file comparison, you wrote down all those documents as

9    missing from the criminal defense files that were in the

10   basement file, true?

11   A.  That's correct.

12   Q.  So you accepted at that time when you issued your report

13   that this was a complete criminal defense file that the

14   plaintiff's attorneys were supplying to you, right?

15   A.  That's correct.

16   Q.  And you didn't notice at all, even though there's only two

17   pages of requests to hold over a prisoner in that file, that,

18   say, hey, wait a minute, this file is incomplete?  You didn't

19   notice that?

20   A.  No, I've acknowledge that that was in error.

21        MR. NOLAND:  Laura, could you pull up Defense 245,

22   page 270.

23        And, Judge, this is -- Jon, this is from the

24   prosecutor's file.

25        THE COURT:  Is there any objection to this?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 99 of 191 PageID #:98305
Brasfield - cross by Mr. Noland
2577

1      MR. LOEVY:  No, your Honor.

2      THE COURT:  Okay.

3      MR. NOLAND:  Can you highlight the discovery receipt

4  part, Laura?  Thank you.

5  BY MR. NOLAND:

6  Q.  So, Mr. Brasfield, you understand this document -- and

7  it's signed at the bottom by Gary Stanton; is that right?

8  A.  The attorney -- the public defender in this case, yes.

9  Q.  Mr. Stanton was the public defender for Christopher

10  Peoples, right?

11  A.  That's correct.

12  Q.  And you understand this document that he signed to be

13  acknowledging receipt of materials from the State's Attorney's

14  Office, true?

15  A.  That's true.

16  Q.  And the first line says, RD, two pages, right?

17  A.  Yes.

18  Q.  Now, that would be the case report for the case where the

19  initial beat officers respond to the scene and report on what

20  they saw, right?

21  A.  It may.

22  Q.  You don't know it?  You don't know what the RD is?

23  A.  I know what an RD is, yes, of course.

24  Q.  Is it or is it not the case report that the beat officers

25  did?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 100 of 191 PageID #:98306
Brasfield - cross by Mr. Noland
2578

1   A.  It may be, yes.

2   Q.  And then the next line has supp report that's a page.

3   Then if we go down, there's one, two, three, four, five -- six

4   supplemental reports, and they have the pages, there's three

5   pages and two pages and three pages and three and 14 and 14,

6   correct?

7   A.  That's correct.

8   Q.  Are any of those supplementary reports in that file in

9   front of you, sir?

10  A.  I would have to look through them.  I --

11  Q.  I will represent to you that they are not in there.

12  A.  If you represent that, I will accept that.

13          MR. NOLAND:  Laura, can you go to the next page.

14  BY MR. NOLAND:

15  Q.  And the next page of this document, page No. 271,

16  Defendants' 245, again, has eight more supplementary reports

17  with the pages listed on them, correct?

18  A.  That's correct.

19  Q.  And, again, it's signed by Gary Stanton as receiving them,

20  right?

21  A.  That's correct.

22          MR. NOLAND:  Can you go to the next page, Laura.

23  BY MR. NOLAND:

24  Q.  Even more supplementary reports produced to Mr. Stanton,

25  right, that aren't in that file?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 101 of 191 PageID #:98307
Brasfield - cross by Mr. Noland
2579

1  A.  That's correct.

2  Q.  Do you see the CSPR about four lines down?  Do you know

3  what that is?

4  A.  I don't recall right off the top of my head the CSPR.

5  Q.  Isn't it true it's the crime scene processing report, sir?

6  A.  Yeah.

7  Q.  Do you know what that is in the Chicago Police Department?

8  A.  Yeah, I am aware of what that is.  I was not aware that --

9       MR. NOLAND:  Laura, could you go to page 253, please.

10  Could you highlight the GPRs 73.

11  BY MR. NOLAND:

12  Q.  What does this signify, Mr. Brasfield?

13  A.  That the public defender, Mr. Stanton, received 73 pages

14  of GPRs.

15  Q.  And you didn't notice at all when you were preparing your

16  report and reviewing the spreadsheet that all of these

17  documents that had been provided to Mr. Stanton, the public

18  defender, were missing from his file; is that true?

19       MR. LOEVY:  Objection.  There's no foundation.  He

20  didn't have this document.  No foundation.

21       THE COURT:  Rephrase the question.

22  BY MR. NOLAND:

23  Q.  Wouldn't you have liked to have had this discovery receipt

24  before you made the representation in your report that the

25  Chicago Police Department withheld all of these documents from

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 102 of 191 PageID #:98308
Brasfield - cross by Mr. Noland
2580

1    Mr. Stanton?  Wouldn't you have liked to have had that?

2    A.  It certainly would have been helpful.

3    Q.  You wouldn't have made that mistake, would you, of missing

4    dozens and dozens of pages in your report, wouldn't you?

5    A.  I acknowledged that this particular --

6    Q.  Sir, would you have made that mistake?

7    A.  I would not have made that mistake.

8    Q.  Would that mistake have been made on this spreadsheet that

9    was provided to you by plaintiff's counsel if you had had this

10   discovery receipt?

11   A.  No.

12   Q.  Sir, it was incumbent upon you as an expert before you

13   came in here and gave testimony to look at those prosecutors'

14   files before making any type of claim of what the Chicago

15   Police Department did or did not produce in any of these

16   cases; isn't that true?

17   A.  No, it is not.

18         MR. NOLAND:  Laura, can you pull up Plaintiff's

19   Exhibit 306-011.

20   BY MR. NOLAND:

21   Q.  Now, Mr. Brasfield, referring your attention to another

22   case, you looked at a case called People v. James Crockett; is

23   that true?

24   A.  Yes, I did.

25   Q.  And this is a document you prepared as attachment F to

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 103 of 191 PageID #:98309
Brasfield - cross by Mr. Noland
2581

1    your report with respect to the allegedly missing from

2    criminal defense file pages, true?

3    A.  That's correct.

4    Q.  And this file had a hundred and -- this investigative file

5    had 159 pages, right?

6    A.  That's correct.

7    Q.  And by the way, Mr. Brasfield, you refer to these as the

8    basement files, correct?

9    A.  Street files, basement files.

10   Q.  Mr. Brasfield, isn't it true that these files were put

11   into the Chicago Police Department, a basement for storage

12   purposes, in the year 2012 when the CPD reorganized its areas

13   from Areas 1, 2, 3, 4, and 5 to Areas North, Central, and

14   South, right?

15   A.  I have no personal knowledge as to how they were moved or

16   who moved them or why they were moved.

17   Q.  And, Mr. Brasfield, I'll represent to you that in the

18   missing from criminal defense file section of your report

19   here, that there's approximately 107 pages that you contend

20   are missing, right?

21   A.  I haven't added them up, but that looks to be a fair

22   amount.

23   Q.  And included in this list of documents you say are missing

24   are supplementary reports, all of the general progress

25   reports, correct?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 104 of 191 PageID #:98310
Brasfield - cross by Mr. Noland
2582

1  A.  I'm sorry.  Would you ask the question again?

2  Q.  Sure.

3        Included in the documents you say are missing are a

4  number of supplementary reports and a number of general

5  progress reports, right?

6  A.  That's correct.

7  Q.  And, Mr. Brasfield, I'm going to show you Plaintiff's

8  Exhibit 359, which is the criminal defense file that

9  plaintiff's counsel provided to you for this case that brought

10  you here.

11        And, Mr. Brasfield, I put flags on that exhibit which

12  I provided to you which identified a couple of police reports

13  that are in this file.

14  A.  All right.

15  Q.  And if I could point you out the pages.  The first page is

16  Bates stamped 43388.  And then the next one, the next report,

17  would be 43392.  And then there's also an arrest report for

18  Mr. Crockett at 43416.

19        Now, in reference to those pages, Mr. Brasfield,

20  isn't it true that there aren't any other Chicago Police

21  Department supplementary reports or arrest reports in that

22  particular file in front of you?

23  A.  Without going through the several hundred pages, I had no

24  way of telling.

25  Q.  Okay.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 105 of 191 PageID #:98311
Brasfield - cross by Mr. Noland
2583

1      MR. NOLAND:  Laura, could you pull up

2   Plaintiff's 359, page 43647.

3   BY MR. NOLAND:

4   Q.  Now, Mr. Brasfield, this was the State -- the People of

5   the State of Illinois' answer to discovery in this Crockett

6   case that was provided to you, true?

7   A.  I'm having difficulty answering some of your questions

8   here.  I'm taking you at your word and what you are putting in

9   front of me, but I don't specifically recall this document as

10  we're speaking.  It seems to be argumentative, but...

11  Q.  Sir, if you don't understand one of my questions or if you

12  think I'm being too argumentative, please let me know, and

13  I'll rephrase it.

14  A.  No.  Just ask your question for me, please, again.

15      MR. NOLAND:  Laura, can you just show Mr. Brasfield

16  the whole document so he can see.

17  BY MR. NOLAND:

18  Q.  Do you know what this -- first of all, this page, this

19  document, was given to you, right?

20  A.  It may have been, yes.

21  Q.  Well, in the bottom right-hand corner here, you have the

22  Bates range of the criminal defense files, and this page

23  starts with 43647.  This was in a Bates range that you

24  represented in your report that you had received, true?

25  A.  Yes, yes.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 106 of 191 PageID #:98312
Brasfield - cross by Mr. Noland
2584

1   Q.  Okay.

2          MR. NOLAND:  All right, Laura.  Can you go back to

3   the whole document so Mr. Brasfield can see it.

4   BY MR. NOLAND:

5   Q.  Mr. Brasfield, do you know what this document is?

6   A.  It's labeled an answer to discovery from the -- it's the

7   People of the State of Illinois, begins, and then three

8   defendants here.

9   Q.  Do you know what the significance of this document is in

10  the criminal courts here in Cook County?

11  A.  It would be a -- probably an appeal situation.

12  Q.  Appeals?

13  A.  I don't know.

14  Q.  You don't know what this document is.

15         Sir, I'll represent to you that this document -- and

16  you let me know if you disagree -- that the People, the

17  prosecutors in the case, are required during the case to

18  identify their witnesses and other information on the answer

19  to discovery to provide that to the criminal defense attorney

20  in advance of the trial?

21  A.  Yes, I understand.

22  Q.  Is your recollection refreshed?

23  A.  Yes.

24  Q.  Thank you.

25         And, sir, your understanding is that the names of the

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 107 of 191 PageID #:98313
Brasfield - cross by Mr. Noland
2585

1  witnesses -- civilian witnesses and police officers that the

2  prosecutors get and put in these answers to discovery are

3  based upon the police reports that are supplied to them by the

4  police department?

5  A.  That would be one source, yes.

6  Q.  First of all, we have several witnesses:  Kevin McElroy,

7  Heywood Bobo, and Tyrone Carr on the first page.  Do you see

8  that?

9  A.  Yes.

10        MR. NOLAND:  Can you go to the next page, Laura.  And

11  can you highlight -- just pull out the whole page.

12  BY MR. NOLAND:

13  Q.  So, Mr. Brasfield, I'm going to represent to you that

14  those couple of police reports in the file, the criminal

15  defense file that's in front of you right now, that if you get

16  all the names of witnesses and police officers in those

17  reports, the only ones that could be found are the highlighted

18  names on this answer to discovery.  Okay?  I'm just going to

19  represent that to you.  I know you had -- you didn't do this

20  analysis, did you?

21  A.  I'm sorry.  You got two questions going on here.

22  Q.  Okay.  Sorry.

23        MR. LOEVY:  Your Honor, we accept the representation.

24        THE COURT:  Ask another question.

25  BY MR. NOLAND:

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 108 of 191 PageID #:98314
Brasfield - cross by Mr. Noland
2586

1    Q.  Did you conduct any analysis of the answer to discovery on

2    this Crockett case to see whether all the names in here could

3    have been derived from the police reports that are in the

4    criminal defense file provided to you?

5    A.  No.  As I testified, I have looked at what material was --

6    the pages that were in the criminal defense files.

7    Q.  Mr. Brasfield, assume hypothetically that these names that

8    I have highlighted are the only names that are found in that

9    criminal defense file that show up on this answer to discovery

10   that the People filled out and gave to the criminal defense

11   attorney --

12        MR. LOEVY:  Your Honor, we do object to the

13   assumption.  It hasn't been supplied -- we have no way to

14   check it.

15        THE COURT:  Finish the question.

16   BY MR. NOLAND:

17   Q.  Accepting that -- I'm asking you to accept that

18   hypothetical.  Okay?  And that the other names that are not

19   highlighted on this document are found nowhere in that

20   criminal defense file in front of you.  Okay?  Those are the

21   hypothetical facts I'd like you to assume.

22   A.  All right.

23   Q.  Isn't it true, sir, that this would be evidence that the

24   criminal defense file supplied to you by the plaintiff's

25   counsel is incomplete because the state's attorneys clearly

Brasfield - cross by Mr. Noland

2587

1    would have gotten these names from police reports supplied to

2    them by the police department?

3              MR. LOEVY:  Objection --

4              THE COURT:  Is this going to be connected up with

5    another witness?  That's my question to you.

6              MR. NOLAND:  It would be through our expert.

7              THE COURT:  Okay.  Then I'll overrule the objection.

8              I will just remind the jury that a question is not

9    evidence.

10             All right.  Go ahead and answer.

11             THE WITNESS:  That your hypothetical, I would assume

12   that because there are names here, they must have come from an

13   investigative file.  Is that your question?

14   BY MR. NOLAND:

15   Q.  That's the point.  Would you agree with that?

16   A.  In your hypothetical, yes.

17   Q.  Thank you.

18             Because the prosecutors aren't -- I mean, in your

19   experience, they're not just making up names out of whole

20   cloth as having relevant information to an investigation and

21   supplying it to the criminal defense attorney, correct?

22             MR. LOEVY:  Objection, your Honor.

23             THE COURT:  What's the basis for the objection?

24             MR. LOEVY:  Form of the question and foundation and

25   argumentative.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 110 of 191 PageID #:98316
Brasfield - cross by Mr. Noland
2588

1      THE COURT:  Sustained.

2    BY MR. NOLAND:

3    Q.  So presuming my hypothetical is true, Mr. Brasfield, which

4    you just acknowledged, that would mean that the information on

5    this chart that was supplied to you and on your attachment F

6    that you typed out would be inaccurate because the criminal

7    defense attorney actually had other police reports that are

8    not in that file in front of you, correct?

9    A.  You would have to have the state's attorney's file to

10   determine that.

11   Q.  Okay.

12       MR. NOLAND:  Judge, could I switch to the ELMO,

13   please?

14       THE COURT:  Sure.  There you go.

15   BY MR. NOLAND:

16   Q.  I'm showing the witness what's been marked as Defense

17   Exhibit 203, page 7.

18       What is this document, Mr. Brasfield?

19   A.  A subpoena duces tecum.

20       MR. LOEVY:  Your Honor, we do object to this state's

21   attorney's file that he hasn't seen.  No foundation for this

22   witness, if that's what this is.

23       THE COURT:  Well, I don't know what it is, and I'll

24   wait until I get a question.

25   BY MR. NOLAND:

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 111 of 191 PageID #:98317
Brasfield - cross by Mr. Noland
2589

1  Q.  Actually --

2          THE COURT:  Go ahead.  Just ask a question.

3  BY MR. NOLAND:

4  Q.  Sir, this is a document from the investigative files that

5  plaintiff's counsel supplied to you, correct?

6          MR. LOEVY:  Then I stand corrected, your Honor.

7          THE COURT:  Okay.  There you go.

8          MR. LOEVY:  Thank you.

9  BY MR. NOLAND:

10  Q.  And, Mr. Brasfield, isn't this a document that you said

11  was missing from the criminal defense attorneys' files that

12  were given to you?

13  A.  Given the volume of material here, I would have to take

14  the time to look and cross-check.

15          If -- again, to move things, if you're telling me

16  that that's what's in there, then I'll accept it as an honest

17  question.

18  Q.  I appreciate that for all of us, Mr. Brasfield.

19          Sir, this is a subpoena from the --

20          MR. NOLAND:  Laura -- I'll just point it right here.

21  BY MR. NOLAND:

22  Q.  -- from a man named John Dillon of the State's Attorney's

23  Office, correct?

24  A.  Yes.

25  Q.  And this is a document that on this spreadsheet here that

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 112 of 191 PageID #:98318
Brasfield - cross by Mr. Noland
2590

1    the plaintiff's counsel told you was missing or -- and you

2    accepted was missing investigative material, correct?

3    A.  That's -- yes, I assume that's correct.

4    Q.  Mr. Brasfield, a subpoena at the Cook County State's

5    Attorney's Office that they created can't be missing

6    investigative material that the police department withheld

7    from the State's Attorney's Office, correct?

8    A.  I'm sorry.  You'll have to ask that again.

9    Q.  A subpoena that the State's Attorney's Office prepared

10   themselves is not investigative material of the police

11   department; isn't that true?

12   A.  That would be -- normally, that would be the case.

13   Q.  Under what -- and the police department can't withhold

14   from the prosecutor a document that the prosecutor created,

15   correct?

16   A.  If a police agency receives copies of legal documents,

17   including subpoena duces tecum or arrest warrants or whatever,

18   those are generally included in the investigative file, in my

19   experience.

20   Q.  And the prosecutor has a copy -- in your experience, the

21   prosecutor has a copy of the subpoena that he wrote and sent

22   to the police department, right?

23   A.  You would hope so.

24   Q.  And I'll show you another one of these pages, or another

25   subpoena.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 113 of 191 PageID #:98319
Brasfield - cross by Mr. Noland
2591

1    A.  I recognize the name there.

2    Q.  I didn't even catch that.

3            THE COURT:  Different Nolan, right?

4            MR. NOLAND:  That's a different Nolan, yeah.

5            THE COURT:  Yours has a D.

6            THE WITNESS:  Sorry about that.

7    BY MR. NOLAND:

8    Q.  I'm showing you what's been marked as Defense Exhibit

9    287079.  This is another page, and I'll represent to you that

10   it's on this spreadsheet that plaintiff's attorneys and

11   yourself says is missing investigative material from the

12   police department.  Okay?

13   A.  Yes.

14   Q.  So this subpoena here from my namesake Daniel Nolan,

15   assistant public defender, on behalf of the defendant, Tyrone

16   Brown, is a subpoena from the public defender to the police

17   department, correct?

18   A.  Yes.

19   Q.  And, once again, a subpoena created by the public defender

20   is not investigative material of the police department, true?

21   A.  I found a number of these types of documents in the

22   basement files.

23   Q.  And you included them on this spreadsheet, or you and the

24   plaintiff's counsel, as missing investigative material of the

25   police department, isn't that true, what's on this

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 114 of 191 PageID #:98320
Brasfield - cross by Mr. Noland
2592

1  spreadsheet?

2  A.  That's correct.

3  Q.  And I've got several more subpoenas, and there are a bunch

4  of subpoenas that you included just like these ones on this

5  chart, correct?

6  A.  That's correct.

7        MR. LOEVY:  Object to relevance, your Honor.

8        THE COURT:  Overruled.

9  BY MR. NOLAND:

10 Q.  Mr. Brasfield, some more documents you include on your

11 chart are a series of Illinois State Crime Lab reports from

12 several of the files; is that true?

13 A.  Yes.

14 Q.  In this exhibit I'm showing you on the ELMO, it is marked

15 Defendants' 246, page 20.  And there is a cc in the bottom

16 left of this document, correct?

17 A.  Yes.

18 Q.  And who is the cc to?

19 A.  Assistant State's Attorney David Winter.

20 Q.  And there are -- I have several pages, approximately 10

21 or 15 of similar Illinois State Police reports in my hand.

22 You would agree that there's several Illinois State Police

23 reports with cc's to the prosecutors that you've included on

24 this table as missing investigative material of the Chicago

25 Police Department, true?

Brasfield - cross by Mr. Noland

2593

1    A.  That's correct.

2    Q.  Mr. Brasfield, what's a cc mean?

3    A.  In the old days, a carbon copy; but a copy.

4    Q.  That means that a copy of this report is being supplied to

5    the assistant state's attorneys --

6    A.  It was intended to be routed there, yes, that's correct.

7    Q.  And isn't it true, Mr. Brasfield, you don't have any

8    knowledge that the Illinois State Police -- and by the way, is

9    the Illinois State Police the same thing as the Chicago Police

10   Department?

11   A.  No.

12   Q.  The Illinois State Police has a crime lab is your

13   understanding, right?

14   A.  That's correct.

15   Q.  And in Chicago, at least as of 1995 and onward, Illinois

16   State Police handles the forensic -- most of the forensic

17   responsibilities for crimes occurring in Chicago, right?

18   A.  That's my understanding.

19   Q.  And do you have any evidence, Mr. Brasfield, that the

20   Illinois State Police scientists, when they say that they're

21   cc'ing a prosecutor, are lying?

22   A.  No.  It would be my belief and understanding that if it

23   said that it's been routed there, that's where it would be

24   routed.

25   Q.  But, again, these are materials that you were saying --

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 116 of 191 PageID #:98322
Brasfield - cross by Mr. Noland
2594

1    MR. LOEVY:  Objection, your Honor, asked and

2    answered.

3         THE COURT:  Sustained.

4    BY MR. NOLAND:

5    Q.  Showing you the next group of documents, Mr. Brasfield.

6    This would be Exhibit 266, page 130.  And it's a several-page

7    document.  I'm just showing the first page.

8         Mr. Brasfield, isn't it true that this document I am

9    showing you is a felony review blue back from the State's

10   Attorney's Office?

11   A.  I think that's the common terminology they use.

12   Q.  And, once again, Mr. Brasfield, I'll represent to you that

13   this document is on the spreadsheet that the plaintiff's

14   attorneys provided, gave to you, and that you guys identified

15   as missing investigative material.  Okay?

16   A.  Yes.

17   Q.  As with the subpoena, Mr. Brasfield, the Chicago Police

18   Department can't withhold documents from the State's

19   Attorney's Office that the State's Attorney's Office actually

20   created, right?

21   A.  They can withhold documents.

22   Q.  So you're saying this document --

23        THE COURT:  I think it was an issue with the phrasing

24   of your question.

25        MR. NOLAND:  Thanks, Judge.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 117 of 191 PageID #:98323
Brasfield - cross by Mr. Noland
2595

1   BY MR. NOLAND:

2   Q.  Isn't it true that the prosecutors would be in possession

3   of their own felony review blue back, right?

4   A.  I would agree with that, yes.

5   Q.  And so this isn't a document that the police department

6   could be withholding from the prosecutors because the

7   prosecutors have it, right?

8   A.  From the prosecutors.  But if it's subpoenaed from another

9   source, then that would be a different matter.

10  Q.  You have no evidence with respect to that particular

11  document that the prosecutors withheld it from the criminal

12  defense attorney, do you?

13  A.  No, I do not.

14  Q.  And you don't have any evidence that there was some

15  subpoena that the police department didn't comply with and not

16  provide that particular document to the criminal defense

17  attorney, do you?

18  A.  Not in this particular case, no.

19  Q.  Thank you.

20        Now, Mr. Brasfield, I'm going to show you another

21  document, a representative document.  This one has got the

22  Bates stamp, but Defendants' 244, page 120.  This is a

23  statement of Jerome Holmes, correct?

24  A.  Yes.

25  Q.  And, Mr. Brasfield, there are dozens and dozens of pages

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 118 of 191 PageID #:98324
Brasfield - cross by Mr. Noland
2596

1    in the criminal defense attorneys' files that have been

2    identified -- strike that.

3           There's dozens and dozens of pages from the

4    investigative files that you and the plaintiff's counsel have

5    identified as missing investigative material on this

6    spreadsheet, correct?

7    A.  Yes.

8    Q.  And these -- this page in front of you that's up on the

9    screen in front of jury and similar documents, this is a

10   document created by the assistant state's attorney from felony

11   review who goes to the police department and takes statements

12   from witnesses; isn't that true?

13          MR. LOEVY:  Objection, foundation.

14          THE WITNESS:  That's correct.

15          THE COURT:  Overruled.

16          THE WITNESS:  Correct.

17          THE COURT:  The answer can stand.

18   BY MR. NOLAND:

19   Q.  And isn't it true, Mr. Brasfield, that the prosecutor --

20   the assistant felony review prosecutor who goes out to the

21   police department and takes statements like these brings the

22   originals of those statements back to his or her office after

23   taking them, correct?

24   A.  I have no independent knowledge of how that works.

25   Q.  Okay.  But if -- assuming hypothetically that is the way

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 119 of 191 PageID #:98325
Brasfield - cross by Mr. Noland
2597

1   it works, then the prosecutors would be in possession of all

2   of these documents as well, any --

3           MR. LOEVY:  Objection to the relevance, your Honor.

4   Every document is handled that way?

5           THE COURT:  When you say "all of these," you need to

6   specify what "all of these" are.

7           MR. NOLAND:  Thank you, Judge.

8           THE COURT:  You mean similar types of documents like

9   this one?

10          MR. NOLAND:  Yes.  The Court phrased it a lot better

11  than I did.

12          THE WITNESS:  That if it is the practice of the

13  state's attorney or the prosecutor that generates these

14  documents and they take them back to their office, they would

15  be in possession of them, if that's your question.

16  BY MR. NOLAND:

17  Q.  That is my question.

18          So, once again, these wouldn't be documents that the

19  police department withheld from the prosecutors because the

20  prosecutors created them and have them, right?

21  A.  I can't agree with that.

22  Q.  It's the prosecutor's duty in the criminal justice system

23  to provide the materials the prosecutor receives from the

24  police on the case to the criminal defense attorney, right?

25  A.  That's correct.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 120 of 191 PageID #:98326
Brasfield - cross by Mr. Noland
2598

1  Q.  So if the prosecutors had these statements, it was
2  incumbent upon -- strike that.

3          If the prosecutors had these statements that the
4  prosecutor -- like these felony review statements that the
5  prosecutor prepared, it would be the prosecutor's duty to
6  provide that to the criminal defense attorney, right?
7  A.  I have to answer that question in the context of what I
8  examined in that if a centralized homicide investigation --
9          MR. NOLAND:  Judge.
10         THE WITNESS:  -- contains documents --
11         THE COURT:  You have to cut him off at the beginning.
12         Finish the answer.
13 BY MR. NOLAND:
14 Q.  Please, Mr. Brasfield.
15         THE COURT:  You can finish the answer.
16         THE WITNESS:  The police department should turn over
17 everything that they have to the State's Attorney's Office.
18 There will be duplicative items in there.  There may be
19 material that the state's attorney already has, but if you get
20 to a system where you have to pick and choose, well, I think
21 the prosecutor already has this so I don't need to send it,
22 the next step is, well, they probably have this, but I don't
23 need to send it.

24         The simple -- keep-it-simple process is send
25 everything that you have in your files to the prosecutor.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 121 of 191 PageID #:98327
Brasfield - cross by Mr. Noland
2599

1    BY MR. NOLAND:

2    Q.  Mr. Brasfield, the point is that it's the duty of the

3    prosecutor to provide it to the criminal defense attorney,

4    correct?

5    A.  Yes.

6            MR. LOEVY:  Objection, asked and answered, your

7    Honor.

8            THE COURT:  Overruled.  He can answer.

9    BY MR. NOLAND:

10   Q.  So this would be evidence that the criminal defense files

11   you were supplied are incomplete because you didn't find these

12   felony review state's attorney's documents in those criminal

13   defense files; isn't that fair?  Yes or no?

14   A.  I --

15   Q.  Yes or no, sir?

16   A.  Ask me the question once more, please.

17   Q.  Isn't it fair that if the -- these documents -- these

18   felony review witness statements that we're talking about,

19   you're saying that some of them are -- you didn't find them in

20   the criminal defense files, right?

21   A.  That's correct.

22   Q.  So isn't it, in fact, true, sir, that that would be some

23   evidence that the criminal defense files supplied to you are

24   incomplete because it's the prosecutor's responsibility to

25   provide those statements in the prosecutor's possession to the

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 122 of 191 PageID #:98328
Brasfield - cross by Mr. Noland
2600

1   criminal defense attorney?  Isn't that fair?

2   A.  As I testified --

3   Q.  Isn't that fair?

4   A.  Yes.

5   Q.  Thank you.

6          Showing the witness Exhibit Defense 210, page 58.

7   Mr. Brasfield, this is another document -- strike that.

8          What is this document?

9   A.  It's a post mortem examination report.

10  Q.  It's the autopsy?

11  A.  It's the autopsy report.

12  Q.  The autopsy of the murder victim in this particular case,

13  right?

14  A.  Yes.

15  Q.  And there's a number of post mortems that you identify on

16  this table and on -- as missing investigative material from

17  the Chicago Police Department, right?

18  A.  Yes.

19  Q.  And are there -- are Chicago police officers doing the

20  post mortem?

21  A.  They should be attending them.

22  Q.  Okay.  Are Chicago police officers writing these reports?

23  A.  No.

24  Q.  These reports are done by the coroner, right?

25  A.  That's correct.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 123 of 191 PageID #:98329
Brasfield - cross by Mr. Noland
2601

1  Q.  And, Mr. Brasfield, wouldn't you expect that in any murder

2  case, that a minimally competent criminal defense attorney

3  would make sure to have the post mortem report on the cause of

4  death before that criminal defense attorney defended their

5  client in the courtroom?  Wouldn't you expect that?

6  A.  I would expect that.

7  Q.  And if they didn't have that post mortem, wouldn't you

8  expect that they would try to get it?  True?

9  A.  I would expect that to be the case.

10        MR. LOEVY:  Objection to relevance, your Honor.

11        THE COURT:  Overruled.  It goes to weight.

12  BY MR. NOLAND:

13  Q.  I'm not going to put these on the screen because they are

14  crime scene photographs that you have contended are missing

15  from the criminal defense attorney files.  Just as a

16  representative sample, I'm showing you a stack that's about 3

17  or 4 inches thick, and I'll represent to you that these are

18  crime scene photographs on this table that you and the

19  plaintiff's attorneys have prepared and suggested is missing

20  investigative material.  Okay?

21  A.  Yes.

22  Q.  Do you accept that representation?

23  A.  Yes.

24  Q.  Same question on the crime scene photographs, sir.

25  Wouldn't you expect that a criminal defense attorney,

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 124 of 191 PageID #:98330
Brasfield - cross by Mr. Noland
2602

1  minimally competent, would obtain crime scene photographs of

2  the dead bodies and the crime scene before they're going to

3  march into a courtroom before a jury and try to defend that

4  case?  Wouldn't you expect that?

5  A.  I would --

6  Q.  Yes or no?  Yes or no, sir?

7  A.  Yes, with an explanation.

8  Q.  And wouldn't you expect that the prosecutor needs to

9  prove -- one of the things a prosecutor needs to prove is that

10  somebody -- in a homicide case, somebody was killed, right?

11          MR. LOEVY:  Objection to relevance, your Honor.

12          THE WITNESS:  Yes.

13          THE COURT:  Overruled.

14  BY MR. NOLAND:

15  Q.  And wouldn't the way to do that, you don't bring the body

16  in -- the dead body into the courtroom, do you, sir?

17  A.  Not under normal circumstances, no.

18  Q.  And so the way it's done is that photographs of the

19  victims are shown to the jury, just like this jury has seen in

20  this case, right?

21  A.  Depending on the judge's ruling, yes.

22  Q.  Well, the judge might exclude them in case they're too

23  gruesome, right?

24  A.  That's one possibility, yes.

25  Q.  But the point is is that the prosecutor has to get these

Brasfield - cross by Mr. Noland

2603

1   crime scene photographs before the trial on a murder case in

2   order to prove their case in court; isn't that fair?

3   A.  That would be part of a criminal defense attorney's

4   process, I would think.

5   Q.  And the prosecutor, right?

6   A.  I would hope.

7   Q.  May I have them?

8   A.  Please.

9   Q.  But, again, you're contending that all these pages are

10  missing investigative materials from the criminal defense

11  files, right?

12  A.  I'm contending that they were not in the criminal defense

13  files that I looked at.

14  Q.  And that's it, right?  That's all you're doing is that you

15  had a criminal defense attorney file on the one hand, you had

16  a police investigative file on the other, and all you're

17  saying is, well, this piece of paper is not in this piece of

18  paper, so I'll put it on this chart, right?

19  A.  That's correct.

20  Q.  And you're making some type of -- really not thinking at

21  all of whether or not that document in 99.9 percent likelihood

22  was in the possession of that prosecutor at the time of the

23  trial.  You didn't take that into account at all, did you?

24          MR. LOEVY:  Objection to the suggestion that 99

25  percent, your Honor.  We have been accepting the

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 126 of 191 PageID #:98332
Brasfield - cross by Mr. Noland
2604

1  representations, but we don't accept that one.

2          THE COURT:  Okay.  I understand the objection.

3          Sustained as to the form of the question.

4  BY MR. NOLAND:

5  Q.  Moving on, Mr. Brasfield, Mr. Loevy talked to you about --

6  and I think you characterized it as a mistake with respect to

7  the Anima case.  Do you remember that?

8  A.  Yes.

9          THE COURT:  Let's pause.  Let's take our

10 mid-afternoon break right here.  We are going to break for 10

11 minutes.  I will be right back out.

12   (The jury leaves the courtroom.)

13          THE COURT:  So since you are being questioned by the

14 other side's lawyer, you can't discuss your testimony, but you

15 can take a break.

16          THE WITNESS:  Thank you, sir.

17   (Short break.)

18   (The jury enters the courtroom.)

19          THE COURT:  Okay.  Everybody can have a seat.

20          Mr. Noland, you can go ahead.

21          MR. NOLAND:  Thank you, your Honor.

22 BY MR. NOLAND:

23 Q.  Mr. Brasfield, to pick up what we were talking about, you

24 did a side-by-side comparison of the police investigative file

25 on the one hand and then the criminal defense attorney's file,

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 127 of 191 PageID #:98333
Brasfield - cross by Mr. Noland
2605

1    and then the documents that were not from the investigative

2    file that were not in the criminal defense file were labeled

3    as missing investigatory --

4    A.  That's correct.

5    Q.  So the point I was making, you weren't doing any

6    qualitative analysis of the documents to think, you know what?

7    This document more than likely would have been in the criminal

8    defense attorney's files so that the criminal defense

9    attorneys' files were given to me have to be complete.  You

10   weren't making that analysis, correct?

11   A.  No.

12   Q.  Mr. Brasfield, I'd like to talk to you about the Anima

13   case that Mr. Loevy brought up with you.

14          MR. NOLAND:  Laura, can you bring up Plaintiff's

15   Exhibit 306, page 19.

16          Thank you, Judge.

17   BY MR. NOLAND:

18   Q.  Mr. Brasfield, I'm showing you the portion of the Anima

19   file that I showed you at your deposition when I brought this

20   issue to your attention.  Do you remember that?

21   A.  Yes, I do.

22   Q.  And what we had talked about at the deposition is that you

23   were contending in your report that there were 110 pages from

24   the police investigative file that were not in the criminal

25   defense attorney's file, right?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 128 of 191 PageID #:98334
Brasfield - cross by Mr. Noland
2606

1    A.  As reflected in the spreadsheet, yes.

2    Q.  And that we had actually found in there that about a

3    hundred of those pages actually were in the criminal defense

4    attorney's files and you guys had missed it, right?

5    A.  That there was a typographical error in the spreadsheet.

6    Q.  And so you testified that that was a typographical error.

7    I'm showing you Plaintiff's Exhibit 306, page 19, up on the

8    screen.  And this is the document that is attachment F to your

9    report, right?

10   A.  Yes.

11   Q.  And you typed up this report personally, right?

12   A.  I did.

13   Q.  And it was while you were doing the file-by-file

14   comparison, right?

15   A.  Yes.

16   Q.  And I've highlighted for you that I'll represent to you

17   the pages that you said were not in the criminal defense

18   attorney's file that, in fact, were and that the typographical

19   error -- mistake had been made.  Okay?

20   A.  That's correct.

21   Q.  You typed in Lee's report, page 82189-91, correct?

22   A.  Correct.

23   Q.  And that's under the phrase missing from criminal defense

24   attorney file.

25          MR. NOLAND:  Could you highlight that one too?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 129 of 191 PageID #:98335
Brasfield - cross by Mr. Noland
2607

1      THE WITNESS:  That's correct.

2  BY MR. NOLAND:

3  Q.  And then you typed in arrest report 82192, correct?

4  A.  Correct.

5  Q.  And then you typed in computer screenshot, correct?

6  A.  Yes.

7  Q.  And then you typed in criminal history report, and you

8  gave the number 82194, right?

9  A.  I typed all of those.

10 Q.  And that number, 82194, is the number of the basement file

11 that you couldn't find in the criminal defense attorney's

12 file, right?

13 A.  That was not on the spreadsheet, yes.

14 Q.  And so what you -- and you said that you were conducting a

15 case-by-case comparison yourself, right?

16 A.  Yes.

17 Q.  Now, Mr. Brasfield, what's up on the screen before the

18 jury, that's quite a long typo, isn't it?

19 A.  Well, the typo represents, as I've said, on the

20 spreadsheet itself, I had that it was missing Bates pages 173

21 to 2-something, and, in fact, it should have been 2-something

22 to 2-something.  But it's --

23 Q.  The typo was on the spreadsheet, right?

24 A.  It is an error.  I readily admit that.

25 Q.  The typo was on the spreadsheet, correct?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 130 of 191 PageID #:98336
Brasfield - cross by Mr. Noland
2608

1    A.  Yes.

2    Q.  And when you were doing your case-by-case analysis then

3    and you typed in LEADS report 82189 and so on and so on, you

4    were representing that you were looking at those two files

5    side by side and you were confirming that those pages were not

6    in the Anima file, right?

7    A.  That's what I should have been doing, yes.

8    Q.  But for this particular case, it's pretty evident,

9    Mr. Brasfield, you didn't do that case-by-case analysis at

10   all, did you?

11   A.  That's not correct.  I did.

12   Q.  Mr. Brasfield, if you did a case-by-case analysis yourself

13   of this Anima case, how could you possibly have included all

14   of the information that's highlighted on the jury that's in

15   front of them?  How could that have happened?

16   A.  I hate to admit it, but I made a mistake.

17   Q.  So you thought that you saw a LEADS report in the criminal

18   defense file, right?  And you typed that in?

19   A.  I typed it in.  This is my magic fingers on the computer.

20   I did it.

21   Q.  And then you thought that you saw that arrest report 82192

22   in that file, and you typed it in, right?

23   A.  That's correct.

24   Q.  And you thought that you saw that computer screenshot in

25   that criminal defense file, and you typed that one in?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 131 of 191 PageID #:98337
Brasfield - cross by Mr. Noland
2609

1    A.  To each and every one of those, yes.

2    Q.  So on each and every one of those, as you're sitting there

3    just comparing the files, one next to the other --

4            MR. LOEVY:  Judge, asked and answered, your Honor.

5            THE COURT:  Sustained.

6    BY MR. NOLAND:

7    Q.  Mr. Brasfield, isn't it, in fact, true that you didn't do

8    any case-by-case comparison of any of these cases.  You just

9    accepted this spreadsheet that the plaintiff's attorneys gave

10   to you and regurgitated it onto your paper?

11   A.  That is not correct.

12           MR. NOLAND:  Judge, if I may go back the ELMO,

13   please?

14           THE COURT:  Okay.

15   BY MR. NOLAND:

16   Q.  Mr. Loevy had talked to you about something called a court

17   attendance report, and you acknowledged with Mr. Loevy that

18   you included on this table and the plaintiff's attorneys did a

19   number of these court attendance sheets as missing

20   investigative material, right?

21   A.  That's correct.

22   Q.  And just at the top, that's a court attendance report for

23   a Detective Harrington, who was required to show up in court

24   for this particular case, right?

25   A.  That's correct.

Brasfield - cross by Mr. Noland

2610

1  Q.  And I think you acknowledged that this is a purely

2  administrative document that is not investigative in nature,

3  correct?

4  A.  No, I think what I said was is that it's intended as an

5  administrative document but could be used of some

6  investigative value to establish either a lead as to who might

7  have been possibly involved in the case that was not disclosed

8  or to either provide an alibi or discredit an alibi.

9  Q.  Mr. Brasfield, I just highlighted what it states on there.

10 It says, Trial in progress, correct?

11 A.  Yes.

12 Q.  So this is a detective actually showing up in court while

13 the trial is proceeding.  That's what it appears to be, right?

14 A.  Yes.

15 Q.  And so is it your testimony that you want the Chicago

16 Police Department detectives and officers when they show up in

17 court and do their paperwork proving that, that they're

18 supposed to fill out a court attendance report and turn it

19 into their supervisors, right, so they can get paid?

20 A.  That's correct.

21 Q.  And then you want them to also walk over to the criminal

22 defense attorneys and say, hey, by the way, I know you saw me

23 in court, but here's a document showing that, yeah, that was

24 me?  Is that what you're saying?

25 A.  No, that's not what I'm saying.  I'm saying --

Brasfield - cross by Mr. Noland

2611

1  Q.  All right.  Thank you.

2  A.  -- it should be included in the investigative --

3  centralized investigative file.

4  Q.  But the point is it's not created until the time of trial,

5  so it couldn't have been produced to the criminal defense

6  attorney because they're at trial, it's created at trial,

7  right?

8  A.  It's part of the record.

9  Q.  Mr. Brasfield, I'm showing you a packet of documents from

10  the -- relative to the murder of Melvin Rodriguez, which is

11  one of the cases.  This is a document in a series of documents

12  you stated are missing investigative material.  The Bates

13  number is D-221-003.  And I'm going to show you the date of

14  this document, May 2000.  And I'm going to represent to you

15  that -- and I'll show it to you, if you'd like -- that this

16  packet all deals with investigation of a particular homicide

17  in the year 2000.

18          Do you want to take a look at that?

19  A.  I have done a quick scan of it, yes.

20  Q.  Okay.  And on the first page, does that indicate when the

21  homicide occurred?

22  A.  I don't see it.  On the first page, right?

23  Q.  I thought I saw it on there.  If I could take a look at

24  it?

25  A.  It may be.  I just...

Brasfield - cross by Mr. Noland

2612

1  Q.  Just right here, the above-named prisoner is wanted for

2  the investigation of a homicide from 1 July 1985.  Do you see

3  that?

4  A.  Well, I see that.  I don't -- I'm not arguing with it.  It

5  just says, Investigation of a homicide from 1 July 1985.  If

6  that means that's when a homicide occurred.

7  Q.  Okay.  I'll represent to you, Mr. Brasfield, that this is

8  the Ruben Avalez -- I don't know if you remember that name --

9  the Ruben Avalez criminal defense attorney's file that the

10 plaintiff's counsel gave you and you put on your spreadsheet?

11 Do you remember that name?

12 A.  It's possible.  There were a lot of names.

13 Q.  Now, isn't it true, Mr. Brasfield, that the criminal

14 defense attorneys (sic) that the plaintiff's attorneys

15 supplied to you was relative to a trial of Mr. Ruben Avalez

16 that occurred in the mid-1980s?  Do you remember that?

17 A.  I would have to look at my documents; but, again, if what

18 you're telling me is correct, then I'll just say yes.

19 Q.  Okay.

20 A.  Otherwise, if this was a criminal trial, I would be

21 saying, I have to look at my records.

22 Q.  I think we all appreciate that.  Thank you.

23 A.  All right.

24 Q.  And the point I'm making is that the file given to you was

25 from a criminal prosecution in the mid-1980s and the packet of

1  documents in front of you which you state are missing from the
2  criminal defense attorney's file were created about 15 years
3  later.  Okay?
4  A.  All right.
5  Q.  Do you have that?
6         Mr. Brasfield, isn't it true that documents
7  created 15 years after the fact couldn't have been withheld
8  from a criminal defense attorney 15 years before in 1987?
9  A.  Sure.
10 Q.  So if you had thought about it at all before putting it on
11 this spreadsheet in your report, you would have said, wait a
12 minute, these documents were created after the fact, so
13 there's no way they could have been in the criminal defense
14 attorney's file, correct?
15 A.  No, that's not correct.  What I tried to do here with this
16 spreadsheet is to provide information that both sides can take
17 a look at, and you can weigh the value, you can evaluate what
18 you want with it.
19        I strictly looked at what was in the investigative
20 file and what was in the criminal defense file.  That's just
21 the objective process.
22 Q.  Thank you.
23        Without any thought one way or the other of whether
24 or not the stuff, in fact, was withheld by the police from the
25 criminal defense, right?  Am I correct?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 136 of 191 PageID #:98342
Brasfield - cross by Mr. Noland
2614

1        I'm sorry.  I didn't get the answer.

2    A.  I'm sorry.  Ask me the question once more.

3    Q.  And that is without any thought whatsoever before stating

4    that it's missing investigative material in your report that,

5    in fact, it was withheld from the police department from the

6    criminal defense attorney, correct, without thinking about

7    that at all?

8    A.  That's correct.

9    Q.  Thank you.

10        In fact, you don't have any personal knowledge on any

11   of these 50 cases at issue that any of the documents were

12   withheld from the Chicago Police Department from these

13   criminal defense counsel, correct?

14   A.  I can draw some generalized inferences, which I did.

15   Q.  I'm asking you, you said you don't have any specific

16   knowledge that any specific piece of paper in any of these 50

17   or 51 cases was actually withheld by the police department

18   from anybody in the criminal process, true?

19   A.  And I stated --

20   Q.  That's it.  Yes or no, sir?

21   A.  Yes.  I've stated that in my report.

22   Q.  I'm sorry.  Did you say yes?

23        THE COURT:  Okay.  Enough.  Next question.

24        MR. NOLAND:  Thanks, Judge.

25   BY MR. NOLAND:

Brasfield - cross by Mr. Noland

2615

1  Q.  Mr. Brasfield, you've talked about to/from memoranda?
2  A.  Yes.
3  Q.  And you identified some to/from memoranda in your report
4  as missing from the file -- files.
5       Showing you a series of these.  One is Exhibit
6  D230-129.  And you will see this is a September 23rd, 2014,
7  subpoena in this particular case; is that right?
8  A.  Yes.
9  Q.  And so similar to my last question, Mr. Brasfield, and
10  there is a packet of these, these documents that were created
11  well after the criminal defense attorney's files -- or well
12  after the criminal trials could not have been in the criminal
13  defense attorney's files at the time of the criminal
14  prosecutions, correct?
15  A.  But they also represent --
16  Q.  Is that true, sir?
17  A.  To your specific question, which is -- yes.
18  Q.  But another specific question, you put them on the table
19  and in your report as missing investigative material, correct?
20  A.  That's correct.
21  Q.  Now, Mr. Brasfield, you talked about the Jones and Palmer
22  case a little bit with Mr. Loevy, correct?
23  A.  Yes.
24  Q.  And you talked about the process by which special
25  order 83-1 went into place in about January 1983, correct?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 138 of 191 PageID #:98344
Brasfield - cross by Mr. Noland
2616

1    A.  Yes.

2    Q.  And you talked about how then with the Court and the

3    plaintiff's attorneys, the special order was revised pursuant

4    to some of the Court's comments, and that was done four months

5    later in May of 1983 by the police department, correct?

6    A.  That's correct.

7    Q.  Mr. Brasfield, you've also talked about -- I think you

8    referenced something called a murder book, right?

9    A.  Yes.

10   Q.  So you've seen or at least in Seattle or some other

11   jurisdictions that investigative detectives would have a

12   murder book on a particular homicide, right?

13   A.  Yes.

14   Q.  Now, a murder book is simply another way of saying the

15   file on that case in that particular jurisdiction, right?

16   A.  That's police parlance, generally speaking, for that.

17   Q.  And certainly in that murder book, there could be

18   documents such as a crime lab-type document, they might have a

19   DNA analysis in the recent times, not in the old times, or

20   some type of other document that might have some source

21   documents elsewhere, correct?

22   A.  That's correct.

23   Q.  But if it was in the murder book and referenced in the

24   murder book, that the prosecutors and the criminal defense

25   attorneys would know, oh, hey, the crime lab did a report on

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 139 of 191 PageID #:98345
Brasfield - cross by Mr. Noland
2617

1  this case, it's right here in the file.  You know, maybe they

2  have some additional source documents I might want to get.

3  Correct?

4  A.  No, that's not correct.  My response to your original

5  question was physical evidence.  Obviously, you're not going

6  to have shells from a gun or blood spatter, clothing, but

7  you'll actually have a report from the crime lab.

8  Q.  Sir, in fact, if you had an example of, say, if the marine

9  patrol unit was involved in a particular case and there was a

10 reference to it in the murder book, that the prosecutor would

11 know, hey, you know, there could be some other documents over

12 at the marine patrol unit that I might want to grab; isn't

13 that true?

14 A.  Not in the types of murder investigations that I'm

15 familiar with.

16 Q.  Mr. Brasfield, at your deposition at page 201, line 9,

17 isn't it true that you were asked this question and gave this

18 answer:

19      "QUESTION:  So that the prosecutor would be able to

20 read that in the murder book, and then they could also contact

21 the marine patrol unit to see if they had any additional

22 documentation; is that correct?

23      "ANSWER:  That would be how -- that would be how it

24 would normally work."

25      MR. LOEVY:  Objection.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 140 of 191 PageID #:98346
Brasfield - cross by Mr. Noland
2618

1   BY MR. NOLAND:

2   Q.  That question was asked and that answer was given?

3   A.  I --

4           MR. LOEVY:  We object, your Honor.  It's not

5   impeaching.

6           THE COURT:  It's a question.  The objection is

7   overruled.

8           THE WITNESS:  I would have to see it in the context

9   of --

10          MR. NOLAND:  Sir --

11          THE COURT:  I overruled the objection.  He said he

12  would have to see it in the context.

13  BY MR. NOLAND:

14  Q.  The question was that question was asked --

15          THE COURT:  I am going to make you show it to him

16  because there is a potential Rule 106 issue.

17          MR. NOLAND:  Okay.

18          THE WITNESS:  This section here?

19  BY MR. NOLAND:

20  Q.  Yeah.  I read from you beginning at line 9 to 13.  That's

21  what I just read to you.

22  A.  That would be an accurate recounting of what I said in

23  that part of the deposition in the context of the entire

24  deposition.

25  Q.  Thank you, sir.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 141 of 191 PageID #:98347
Brasfield - cross by Mr. Kulwin
2619

1          Just one question.  Did you rely -- I'm going to show

2    you Exhibit F of your report.  Is there a case in here called

3    Fulton?

4    A.  In the attachment F, which is the investigative base?

5    Q.  I'm showing you, yes, attachment F, where you list on

6    pages 2 and 3, that's where you list the table of contents of

7    the 50 or so files that you compared?

8    A.  And the name you were asking?

9    Q.  Fulton.

10   A.  I don't see it initially.

11   Q.  Thank you.

12          MR. NOLAND:  If I may have a moment, your Honor?

13          THE COURT:  Sure.

14     (Brief pause.)

15          MR. NOLAND:  Thank you, Mr. Brasfield.

16          Thank you, your Honor.

17          THE COURT:  Mr. Kulwin.

18                              - - -

19          MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

20   BY MR. KULWIN:

21   Q.  Mr. Brasfield, a detective conducting a homicide

22   investigation isn't required to take notes in your opinion?

23          MR. LOEVY:  Objection, your Honor.  That subject was

24   covered.

25          MR. KULWIN:  No, Judge.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 142 of 191 PageID #:98348
Brasfield - cross by Mr. Kulwin
2620

1    MR. LOEVY:  Notes was covered.

2    THE COURT:  The objection is overruled to this

3  particular question.  The rule of duplication applies.  I'll

4  see where it goes.

5  BY MR. KULWIN:

6  Q.  Let me start over.

7    Mr. Brasfield, a detective in a homicide

8  investigation isn't required to take notes as he gathers

9  information, correct?

10  A.  It depends upon the agency.

11  Q.  Okay.  But you agree that some detectives have super

12  memories and they can remember stuff.  It locks in their mind

13  and then they can keep it in their mind until they write a

14  written report, right?

15  A.  It's theoretically possible, yes.

16  Q.  And you actually believe that yourself; isn't that true?

17  A.  I don't think it's the best practice.

18  Q.  But you agree it can be done, right?

19  A.  It can be done.

20  Q.  Okay.  And, in fact, isn't it true that, at times, when a

21  detective is talking to somebody, if someone says during the

22  course of their statement that they happen to remember seeing

23  such-and-such standing on a corner, they would lock it into

24  their memory -- "they" being the detective -- and by the time

25  they left to do a follow-up report if they were going to do

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 143 of 191 PageID #:98349
Brasfield - cross by Mr. Kulwin
2621

1   one, they would have that, correct?

2   A.  If they did a follow-up report in a timely manner, within

3   a short period of time.

4   Q.  Right.

5           So the answer is, yes, you don't have a problem with

6   a detective talking to a witness --

7           MR. LOEVY:  Objection, asked and answered, your

8   Honor.

9           THE COURT:  Sustained.

10  BY MR. KULWIN:

11  Q.  Now, did I hear you correctly that you said you spent 150

12  hours preparing your report?

13  A.  Somewhere in that -- not preparing the report, but in

14  reviewing the material.

15  Q.  So you spent 150 hours in reviewing the material and then

16  writing the report?

17  A.  I billed, if I recall, somewhere in that area.

18  Q.  I just want to get the time right.

19          Are you saying that between the time you first got

20  the assignment from the plaintiff's lawyers until the time you

21  reviewed everything and wrote the report, it was 150 hours?

22  A.  I was contacted by the attorney's office sometime in

23  December, and I believe the date of my report is March 15th,

24  so I spent the time looking at material and writing my report.

25  Q.  All right.  And that was 150 hours; is that your

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 144 of 191 PageID #:98350
Brasfield - cross by Mr. Kulwin
2622

1    testimony?

2    A.  Billable hours.  I am pretty sure I spent a lot more time

3    on it than that, but...

4    Q.  Okay.  Well, do you remember giving a deposition in this

5    case in June of this year and being asked these questions and

6    giving these answers?

7           MR. LOEVY:  Page?

8           MR. KULWIN:  Page 265, line 13.

9    BY MR. KULWIN:

10   Q.    "QUESTION:  And so you had to squeeze it in, right?

11          "THE WITNESS:  I indicated that I spent approximately

12   60 hours on the case."

13          Go to the next page, page 266.

14          "QUESTION:  Now, the 60 hours that you spent, how many

15   of the hours did you spend actually reviewing the file before

16   you reached your conclusion?

17          "ANSWER:  I can't give you a breakdown of how much it

18   was because the work was simultaneously -- I was looking at

19   the files and working on my report, so I can't give you how

20   much of it was this and how much of it was that."

21          Were those questions asked and did you give those

22   answers?

23   A.  Yes.

24   Q.  All right.  Now, did I hear you correctly, sir, that part

25   of the basis for your opinions about what other police -- that

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 145 of 191 PageID #:98351
Brasfield - cross by Mr. Kulwin
2623

1    Chicago is so different from other police reports is that in

2    your career, you've audited police departments?

3    A.  That's correct.

4    Q.  But the fact of the matter is, sir, I don't believe --

5    you've never audited any police department on the issue of

6    whether they're -- how they're properly maintaining their

7    files and disclosing it in criminal cases; isn't that true?

8    A.  That's correct.

9    Q.  The only audits --

10   A.  I misunderstood your question.  I thought you asked did I

11   testify in a criminal case on that.  No, I have reviewed

12   procedures and processes and discoveries in various cities.

13   Q.  My question -- maybe we're ships passing in the wind here.

14        Let me be clear.  You've told the jury that part of

15   the basis of your opinion here is the auditing work you've

16   done, right?

17   A.  Yes.

18   Q.  But the fact of the matter is, sir, that you have never --

19   you've never conducted any independent audit of any police

20   department on the issue of their disclosure of information in

21   criminal cases; isn't that true?

22   A.  I'll refer back to my testimony.  I have visited and

23   audited, engaged to look at the delivery of police services

24   which included record-keeping and discovery processes.

25   Q.  All right.  Going back to your deposition of June of this

Brasfield - cross by Mr. Kulwin

2624

1　year, starting at page 319, line 24:

2　　　　"QUESTION:  Okay.  And I want to be clear.  Your

3　testimony is that those other major cities, though, the way

4　they do it is every piece of information they get during a

5　homicide investigation is documented, put in a file, and

6　turned over to either the defense attorneys directly or to the

7　prosecutor.  Do I understand that correctly?

8　　　　"ANSWER:  I'm saying that is the general practice.

9　　　　"QUESTION:  Was that what was going on in New York and

10　Baltimore and all the places you did audits of?

11　　　　"ANSWER:  My familiarity with the way it was done is

12　that" -- I'm sorry.  "My familiarity with the way it was done

13　is that was the desire.  Whether it occurred on each, I did

14　not do and have not done an independent audit of the New York

15　Police Department's homicide unit."

16　　　　Then it goes on.

17　　　　MR. LOEVY:  Your Honor, that's not impeaching.

18　　　　MR. KULWIN:  I'm not done.

19　　　　THE COURT:  I am going to wait until he is done.

20　BY MR. KULWIN:

21　Q.  "Well, okay.  So you say in your résumé I think you did

22　some auditing, right?  You did auditing of police

23　departments?"  "Yes."  "Was it Baltimore or Oxnard?"

24　　　　THE COURT:  Say the question, say answer.

25　　　　MR. KULWIN:  Oh, I'm sorry.  I apologize, Judge.

Brasfield - cross by Mr. Kulwin
2625

 1  BY MR. KULWIN:

 2  Q.     "ANSWER:  Yes.

 3         "QUESTION:  Wasn't it Baltimore or Oxnard?  Where else?

 4         "ANSWER:  I think there were six cities.

 5         "QUESTION:  Yeah, Baltimore, Oxnard.  Can you tell me,

 6  it would help me out, besides Baltimore and Oxnard."

 7             THE COURT:  Oxnard?

 8             MR. KULWIN:  Oxnard.  Right.  Sorry, Judge.

 9  BY MR. KULWIN:

10  Q.     "ANSWER:  Seattle, Memphis, I believe it was Memphis,

11  Oxnard, Baltimore, a city in Ohio.  I'll have to find it in

12  here.  It goes on.

13         "QUESTION:  We'll get back to it, but just let's stick

14  with Baltimore, Oxnard, Seattle, a city in Mississippi.  Where

15  is Oxnard?  Is that Mississippi?

16         "ANSWER:  It's Oxnard, California.

17         "QUESTION:  Oh, California.  I'm sorry.  I'm confused.

18         "ANSWER:  An area outside of Los Angeles.

19         "QUESTION:  How big is Oxnard?

20         "ANSWER:  As I recall at the time, it was maybe in the

21  couple hundred thousand.

22         "QUESTION:  All right.  All right.  Now, I want to be

23  clear.  You were asked to audit these cities' police

24  departments, like in --

25         "ANSWER:  It was part of a federal grant process to

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 148 of 191 PageID #:98354
Brasfield - cross by Mr. Kulwin
2626

1    examine the delivery of police services.  And so part of that,

2    as part of the team, we would meet with the chief of police,

3    we would meet with community leaders, we would look at the

4    functioning and organization and staffing levels and budgetary

5    appropriations for the organization.

6            "QUESTION:  In any of these cities, do you

7    investigate -- did you investigate or audit their disclosure

8    of information in criminal cases?

9            "ANSWER:  No."

10           MR. LOEVY:  Objection, your Honor.  Not impeaching.

11   That's a discrete number of cities.

12           THE COURT:  Sustained.

13   BY MR. NOLAND:

14   Q.  In any of these -- in any of these investigations, did

15   you --

16           THE COURT:  Sustained.  I want to say, given your

17   facial reaction, given the question you asked at 3:39 in the

18   afternoon, that is not impeaching.

19           The jury is directed to disregard the reading from

20   the deposition.

21           MR. KULWIN:  I'll ask a different question.

22   BY MR. KULWIN:

23   Q.  In any of these investigations that you did, any audits

24   that you did, in any audits that you've done in your career

25   that you're referencing, did you look at or audit or try to

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 149 of 191 PageID #:98355
Brasfield - cross by Mr. Kulwin
2627

1   analyze whether they were fulfilling -- these cities were

2   fulfilling their disclosure obligations in homicides or other

3   criminal cases?

4   A.  That was part of what my duties and responsibilities as a

5   specialist in records and discovery to look at that.  But it

6   was a minor -- the overall was the delivery of police services

7   in public housing, which included that process.

8   Q.  All right.  Now going back to your deposition, page 322,

9   line 5:

10       "QUESTION:  In any of these investigations, did you

11  look at or audit or try to analyze whether they were

12  fulfilling their disclosure obligations in homicide or other

13  criminal cases?

14       "ANSWER:  No, that was not part of the mandate."

15       MR. LOEVY:  Objection, your Honor.  The mandate is

16  talking about the federal mandate.

17       THE COURT:  Overruled.

18  BY MR. KULWIN:

19  Q.  Is that your testimony, sir?

20       THE COURT:  Did he read that particular question and

21  answer correctly?

22       THE WITNESS:  Yes.

23  BY MR. KULWIN:

24  Q.  Now, if I understand it correctly, one of the ways that --

25  there are two legs to the information that you've employed in

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 150 of 191 PageID #:98356
Brasfield - cross by Mr. Kulwin
2628

1    determining that Chicago is an anomaly in how they handle

2    their information and gather it and disclose it to criminal --

3    in criminal cases; do I have that right?  Two legs, right?

4    A.  Which two lines?

5    Q.  Well, one is you go to a bunch of conferences that you

6    attend with other police chiefs, right?  That was one of the

7    legs, right, that you told me about?

8          THE COURT:  He thinks you're saying "line."  You're

9    saying "legs," right?

10   BY MR. KULWIN:

11   Q.  Oh, sorry.  Legs.

12   A.  Oh, I'm sorry.

13   Q.  Let me do it again.  My fault.

14          As I understand it from earlier testimony you've

15   given, there are two legs that you rely on in determining that

16   Chicago was an anomaly vis-à-vis production of information to

17   criminal defendants than other cities?

18          MR. LOEVY:  Objection, your Honor.  Given the entire

19   testimony, it's improper.  He's got to show him --

20          THE COURT:  I think that question can be answered, so

21   the objection is overruled.

22   BY MR. KULWIN:

23   Q.  Mr. Brasfield, do I have it?

24   A.  I'm sorry.  You're losing me here.

25   Q.  Okay.  As I understand it -- let me see if I can help you

Brasfield - cross by Mr. Kulwin

2629

1   out.

2           You attend certain conferences of police chiefs,

3   right?

4   A.  I have over the years.

5   Q.  And that's one of the ways that you've concluded how other

6   police departments handle their -- that's one of the ways on

7   which -- that you've articulated in your report the standard

8   is of how they handle their disclosure of information,

9   correct?

10  A.  I don't believe that's in my report.

11  Q.  Well, I guess maybe I'm not asking the question

12  accurately.  Let me see if I can try it again.

13          You went to a bunch of conferences in which police

14  chiefs talked about best practices, including the chief of

15  police of Chicago, and you're basing your knowledge here in

16  part that all major police departments fulfill your

17  professional standard that you've articulated in your report

18  based on what you've learned in those conferences; isn't that

19  right?

20          MR. LOEVY:  Objection, compound, your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  I think that's entirely a

23  misrepresentation of my testimony --

24  BY MR. KULWIN:

25  Q.  Okay.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 152 of 191 PageID #:98358
Brasfield - cross by Mr. Kulwin
2630

1  A.  -- or in my deposition.  I described --

2          THE COURT:  I think you have answered the question.

3          Ask another one.

4  BY MR. KULWIN:

5  Q.  Let me go back to your deposition, and I'll ask you this

6  question.

7          MR. LOEVY:  Line and page number?

8          MR. KULWIN:  I'm getting there.  Line 4, page 336.

9  BY MR. KULWIN:

10 Q.      "QUESTION:  I understand that, and I'm going to leave

11 this topic and go on to another topic.  Same topic but another

12 area.  But all I'm trying to get at, sir, is, you know, you

13 went to a bunch of conferences in which police chiefs talked

14 about best practice, including the chief of police of the City

15 of Chicago, and you're basing your knowledge in part that all

16 major police departments fulfill your professional standard

17 that you've articulated in this report based in part on what

18 you've learned at those conferences about best practices?

19          "ANSWER:  That was a leg of it."

20 A.  That was a leg of it.

21 Q.  Right.  That's what I asked you.  It's a leg of it, right?

22 A.  The statement was yours, but the leg of it was mine.

23 Q.  Right.  Now, the fact is, though, sir, when you went to

24 these conferences that you're talking about that you're basing

25 your conclusions that this is how all these other cities do

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 153 of 191 PageID #:98359
Brasfield - cross by Mr. Kulwin
2631

1   it, you don't have any written material from any of those

2   conferences that substantiate your view; isn't that right?

3   A.  You're totally misrepresenting my testimony.

4   Q.  Sir, can you answer my question?  Do you have any written

5   material from any of those conferences that you attended that

6   substantiate that they told you that these are the best

7   practices at those conferences?  Do you have anything like

8   that?

9   A.  I indicated that I had gone to conferences in response to

10  a question of how I formed my opinion.  That was an

11  insignificant portion of it.

12          No, I don't have any documents from that.

13  Q.  Right.  And you can't name one police chief as you're

14  sitting there today from any major city who stood up and said,

15  yeah, we produce a hundred percent of everything that we get

16  in a criminal investigation.  We turn it over to the criminal

17  defendants?

18          MR. LOEVY:  Objection to the question, your Honor.

19  Relevance.

20          THE COURT:  Overruled.

21          MR. LOEVY:  Same with the hundred percent.

22          THE COURT:  Overruled.  Goes to weight.

23          THE WITNESS:  You're talking about a very minor

24  portion of what I based my opinion on.  I've said in my

25  deposition that among dozens of things, I also go to

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 154 of 191 PageID #:98360
Brasfield - cross by Mr. Kulwin
2632

1   conferences and talk to police chiefs informally, discuss

2   various issues that are on the front burner at the time,

3   whether they're use of force, police pursuits, whatever.

4   BY MR. KULWIN:

5   Q.  Sir, the question is at these conferences that you went

6   to, no police chief that you can name as you're sitting there

7   today said, yeah, we do a hundred percent disclosure?  You

8   can't name one, can you?

9   A.  When we -- I would not -- I would not name one.

10  Q.  Sir, the question was can you?

11  A.  I would not.

12  Q.  Can you is the question?

13  A.  I will not.

14  Q.  Not will you not.  You couldn't; isn't that true?  You

15  couldn't name one particular one; isn't that true?

16  A.  That's not true.

17  Q.  Okay.  Do you remember this question.  Page 332 at line 14

18  -- at line 24.

19          "No, no, no, first answer my question.  Did anyone

20  say" -- I'm sorry.  Line 14, page 332.

21          "QUESTION:  I'm going to get to the rest of the

22  information, but I'm focusing on these conferences.  In these

23  conferences --

24          "ANSWER:  Okay.

25          "QUESTION:  -- nobody that you can identify, not one

Brasfield - cross by Mr. Kulwin

2633

1   chief of police that you can identify, stood up and said, this

2   is how we're dealing with disclosure of investigative

3   information in criminal cases.  We do it X, Y, and Z, and we

4   have 100 percent compliance rate.  Nobody said that, correct?

5           "ANSWER:  What was the discussion?

6           "QUESTION:  No, no, no.  First answer my question.  Did

7   anyone say that?

8           "ANSWER:  I can't give you names of particular

9   individuals, but because it was such a hot topic of court

10  cases and disclosure, that was an item of discussion.  And we

11  would -- people would give their horror stories of what

12  happened when they failed to do it and why it was so important

13  that we all as a professional group changed our ways."

14          MR. LOEVY:  Objection --

15  BY MR. KULWIN:

16  Q.  That was the question and that was your answer; isn't that

17  true?

18          MR. LOEVY:  Objection, your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes.

21  BY MR. KULWIN:

22  Q.  And, in fact, what they were telling you, what you were

23  hearing at these conferences from these police chiefs, was,

24  look, we've got successes, we've got failures.  We're doing

25  our best.  That's what you heard.  You didn't hear a hundred

Brasfield - cross by Mr. Kulwin

2634

1  percent, right?

2  A.  That's not what I stated.

3       MR. LOEVY:  Objection --

4  BY MR. KULWIN:

5  Q.  I'm sorry?

6  A.  That's not what I stated.

7       THE COURT:  The answer can stand.

8  BY MR. KULWIN:

9  Q.  So you never heard a hundred percent, right?

10  A.  I answered the question the best I can.

11  Q.  Now, another one of the legs, another one of the legs that

12  you relied on for your basis for your conclusion that Chicago

13  is an anomaly on how major cities disclose information that

14  they gather in criminal cases is the federal government's

15  funding of various institutions; isn't that right?

16  Information you get from that; isn't that true?

17  A.  The information I get from literature either produced by

18  the federal government or funded by the federal government.  I

19  think that that was the context of my answer.

20  Q.  All right.  So another leg is the federal government has

21  expended a tremendous amount of money, the National Institute

22  of Justice, the Bureau of Justice Statistics, the Bureau of

23  Justice Administration (sic), the FBI, the whole alphabet soup

24  of agencies and universities, to examine the rise of violent

25  crime and strategies to address it.  You look at that

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 157 of 191 PageID #:98363
Brasfield - cross by Mr. Kulwin
2635

1   literature, right?

2   A.  Yes.

3   Q.  And that's one of the bases for your conclusion, that

4   literature, that Chicago is an anomaly in how they deal with

5   their disclosure of information, right?

6   A.  I'm sorry.  You are losing me.  My statement in my

7   deposition is what it was.

8   Q.  I know that.  But my question is -- my question is is that

9   one of the things that you say that you rely on in your report

10  to reach the conclusion that you've given the jury that

11  Chicago is an anomaly are these statistics and things of that

12  nature from all these different federal agencies, right?

13  A.  That it forms a basis of knowledge about how things are

14  done in the United States in police agencies.

15  Q.  All right.  But you're not saying that this work by the

16  Department of Justice substantiates your standard of a hundred

17  percent disclosure of all information gathered in a homicide

18  investigation.  Those agencies' research doesn't substantiate

19  that at all, does it?

20  A.  In the context of the question that I was asked during the

21  deposition as to what I form my opinion on was how other law

22  enforcement agencies respond to discovery requests and that it

23  was based on centralized records-keeping, accurate indexing,

24  and full disclosure, all of which was not the case that I had

25  seen in Chicago.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 158 of 191 PageID #:98364
Brasfield - cross by Mr. Kulwin
2636

 1  Q.  Right.  And my question to you, sir, is one of the bases
 2  for that opinion is all this information from these federal
 3  agencies, and you don't have any information from those
 4  agencies that substantiates that conclusion; isn't that right?
 5  A.  I disagree with how you're presenting that.
 6  Q.  All right.  Here's the question from your deposition.
 7          MR. LOEVY:  Page?
 8          MR. KULWIN:  Page 338.
 9  BY MR. NOLAND:
10  Q.    "QUESTION:  You just said, you just said that a key leg
11  of your conclusion was that the Department of Justice was
12  doing all these investigations about violent crimes and police
13  chiefs all over the country were aware of it.  Okay?  But
14  there were -- there's no -- but you're not saying that any of
15  these -- that this work by the Department of Justice
16  substantiates your standard that it's a hundred percent
17  disclosure of a hundred percent of all the information?
18          "ANSWER:  That's the goal, and that -- that's --
19          "QUESTION:  That's the goal?
20          "ANSWER:  And that --
21          "QUESTION:  That's the goal?
22          "ANSWER:  Close from a practical standpoint that your
23  cases and the way you operate will be conducted in that
24  manner."
25          It's a goal, right?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 159 of 191 PageID #:98365
Brasfield - cross by Mr. Kulwin
2637

 1          MR. LOEVY:  Objection, your Honor.  That's an

 2    unintelligible question.

 3          THE COURT:  Sustained.

 4    BY MR. KULWIN:

 5    Q.  As you sit there today, sir, okay, can you name any

 6    departments, any police departments, that you gleaned from

 7    looking at this Department of Justice information that reaps

 8    this hundred percent full disclosure rule?

 9          MR. LOEVY:  Objection, your Honor, the relevance to a

10    hundred percent.  This was the subject of a motion in limine.

11          THE COURT:  Sustained.  You can't word the question

12    that way.

13          MR. KULWIN:  Sure.

14    BY MR. KULWIN:

15    Q.  Sir, if I understand it -- if I understand it, sir, in

16    your professional opinion, the issue in this case is that

17    Chicago doesn't maintain their records appropriately, and as a

18    result of that, that leads to failure to disclose everything,

19    which leads to problems.  That's what we're talking about,

20    right?

21    A.  That's a major portion of it, yes.

22    Q.  Okay.  And as you said before, you think it's an anomaly

23    to other cities doing that same stuff, right?

24    A.  That's what I've stated.

25    Q.  Okay.  But you haven't done an analysis or a comparison of

1    any major city with a similar -- similar in size of population

2    and the number of homicides as Chicago that were occurring

3    between 1983 and 2006 to come to that conclusion, correct?

4    A.  That I haven't done a study?

5    Q.  Yeah.  You have not done any study of any major city of

6    similar size as Chicago with the same type of number of

7    homicides between 1983 and 2006, you have done no comparison

8    between Chicago and those cities on that issue, have you?

9    A.  Well, I testified to the fact that during the time period

10   that we're discussing here, for both time periods, I was aware

11   of and familiar with policies and procedures in other states,

12   other cities, in large cities included.

13   Q.  But you've done no such analysis; isn't that true?

14   A.  I was not hired to do an analysis, and I did not do an

15   analysis, but I can very comfortably and faithfully say that I

16   am familiar with the policies and procedures of those

17   jurisdictions and that they are not consistent with the way

18   the city of Chicago does it.

19   Q.  Let me break that down.  Now, I don't care about just what

20   you were retained for here.  Never in your entire --

21           MR. LOEVY:  Objection, your Honor.  Asked and

22   answered.

23           MR. KULWIN:  Sorry, Judge.

24           THE COURT:  Yeah, if you want to go beyond the

25   report --

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 161 of 191 PageID #:98367
Brasfield - cross by Mr. Kulwin
2639

1     MR. KULWIN:  No, I'm not --

2     THE COURT:  Well, no, because you just are about to.

3  That's the way your question is being worded.

4     MR. KULWIN:  Sorry, Judge.

5     THE COURT:  I will read back to you what you said.

6     MR. KULWIN:  No, I got it.

7     THE COURT:  Let me break that down.  I don't care

8  just about what you were retained for here.  Never in your

9  entire, dot, dot, dot.

10  BY MR. KULWIN:

11  Q.  Okay.  Sir, you've not done an analysis of any comparison

12  that's similar in size of population and similar in the number

13  of homicides that were occurring from 1983 to 2006 that you've

14  compared to Chicago to come to the conclusion that Chicago is

15  an anomaly on that issue?

16     MR. LOEVY:  Same objection, your Honor.

17     THE COURT:  Can I see the lawyers at sidebar, please?

18   (The following proceedings were had at sidebar outside the

19  hearing of the jury:)

20     THE COURT:  The way you worded the question, it's a

21  universe of one.  City of similar population with a similar

22  number of homicides during the period of 1983 to 2006 means

23  it's a universe of one.  What would the other city be?

24     MR. KULWIN:  I don't know.  New York?

25     THE COURT:  No.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 162 of 191 PageID #:98368
Brasfield - cross by Mr. Kulwin
2640

1    MR. KULWIN:  Los Angeles.

2    THE COURT:  Much bigger population, much smaller

3  number of homicides in the first one.  Much smaller number of

4  homicides in the second one.

5    So it's a universe of one.  So I am going to sustain

6  the objection.

7   (The following proceedings were had in open court in the

8  presence and hearing of the jury:)

9    THE COURT:  The objection is sustained.

10  BY MR. KULWIN:

11  Q.  Sir, in the city where you were chief of police, Seattle,

12  they had a about, what, 55 homicides a year?

13  A.  I was not the chief of police in Seattle.  I was the

14  assistant chief in Seattle.  I was the chief of police in Fort

15  Lauderdale, Florida.

16  Q.  Okay.  So when you were assistant chief of Seattle, they

17  had, what, about 55 homicides a year?

18  A.  I think the all-time record might have been pushing 100,

19  but on average, somewhere -- I haven't looked at it recently,

20  but that's probably a ballpark figure.

21  Q.  Ballpark?  Well, as of June of 2016, isn't that what you

22  thought it was, 50, 55?

23  A.  I believe that's what I testified to.

24  Q.  Okay.  And Fort Lauderdale -- and I think that Fort

25  Lauderdale you thought maybe had 10 or 20?

Brasfield - cross by Mr. Kulwin

2641

1  A.  They were -- I have gone back and checked, and probably
2  closer to the 20, 25 range.
3  Q.  Okay.  And when you were the sheriff, maybe one in a bad
4  year?
5  A.  Yeah, that's true.
6  Q.  And the Seattle detectives while you were out there, each
7  detective was handling maybe two or three homicides per year,
8  correct?
9  A.  No.  It was a much smaller homicide unit, so they were
10  carrying a larger caseload than that.
11  Q.  Remember this question, page 317:
12        "QUESTION:  Okay.  But in the city that has an average
13  50 to 55" -- line 17.  We were talking about Seattle.
14        "QUESTION:  Okay.  But in a city that has about an
15  average 50 to 55, so you're talking about assigned, you got
16  like maybe two or three homicides per detective, right?
17        "ANSWER:  On average perhaps, active cases, two or
18  three."
19  A.  Active cases, yes.
20        MR. LOEVY:  Your honor --
21        THE COURT:  The objection is overruled.
22  BY MR. KULWIN:
23  Q.  Active cases.
24        And you don't even recall the number of detectives --
25  homicide detectives you had in Fort Lauderdale, right?

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 164 of 191 PageID #:98370
Brasfield - cross by Mr. Kulwin
2642

1    A.  I don't recall what my answer was in the deposition.

2    Q.  Do you recall now what -- you don't recall.  Do you recall

3    now --

4    A.  No.  There are probably 10 or 12.

5    Q.  Okay.  So they were handling maybe one or two per year of

6    homicides, right?

7    A.  Not -- they were handling more than that.

8    Q.  Well, if you had 10 or 12 and you only had 20 to 25

9    homicides per year that are active cases per year, maybe one

10   or two?

11   A.  As a group.  I won't argue the point with you.

12   Q.  Finally, sir, you were asked some questions about, you

13   know, how an investigation goes, and I think you referred to

14   some novelist, Barrett (phonetic) or something.  It's like a

15   novel.  You never know how it's going to end, right?  Wasn't

16   that your analogy?

17   A.  That was an analogy, yes.

18   Q.  Okay.  So one question I have for you is when you were

19   reviewing all these files, you didn't take any notes, right?

20   A.  I took -- I think I testified in the deposition that as I

21   did any of my cases, I do my work on a computer, I maintain

22   what I am doing there, and it is a living, if you will,

23   document.

24   Q.  But the living document is actually the report that you're

25   writing.  That's the living document, the novel in this case,

1  right?

2  A.  Yes.

3  Q.  So you've got all these investigative reports, you've got

4  your, okay, report to plaintiff's counsel on Fields v. City of

5  Chicago, you've got it in your report format, you're starting

6  with that, right?

7  A.  Yes.

8  Q.  Okay.  Then you've got all the files that you're looking

9  at.  And what you're doing is you're not going through the

10  files and going, oh, this one or that one.  You're just typing

11  into the report, right?

12          MR. LOEVY:  Objection to the form of the question.

13          MR. KULWIN:  I will rephrase it if you want, Judge.

14          MR. LOEVY:  I will withdraw the objection.

15          THE COURT:  Okay.

16  BY MR. KULWIN:

17  Q.  You're not actually creating a document that just analyzes

18  what's in what, right?

19  A.  I'm looking at the electronic versions on the split screen

20  of the material that I've -- depending on the case that I'm

21  looking at, and then I'm typing in whatever is relevant at the

22  time.

23  Q.  Right into what's going to be the final report, correct?

24  A.  If I understand your question, yes.

25  Q.  And the last point on that, sir, on this novel idea, you

Brasfield - cross by Mr. Kulwin

2644

1   agree, sir, that criminal investigations take twists and

2   turns, right?

3   A.  Yes.

4   Q.  And it's easy to look back as a detective to another

5   detective's work and go, wow, he should have done this, and he

6   should have done that, and why didn't he see this, and why

7   didn't he see that.  Hindsight is 20/20, isn't it sir?

8   A.  That's not what I testified to.

9   Q.  I'm not asking what you testified to.  I'm asking, you're

10  an expert, isn't that true?

11  A.  That hindsight is 20/20?

12  Q.  Yeah.

13  A.  On anything.

14  Q.  Right.  Any detective or any expert or any lawyer can look

15  back at what a detective did 30 years ago and say, he made

16  this mistake, that mistake, and this mistake; isn't that

17  right?

18  A.  Individually, that's certainly true.  As an aggregate when

19  you look at dozens of cases or hundreds of cases, that's a

20  different matter with different detectives.

21          MR. KULWIN:  If I may have a second.

22     (Brief pause.)

23          MR. KULWIN:  Nothing else, your Honor.  Thank you.

24          THE COURT:  Redirect.

25          MR. LOEVY:  Thank you, your Honor.

```
 1                              - - -
 2          MICHAEL DAVID BRASFIELD, REDIRECT EXAMINATION
 3   BY MR. LOEVY:
 4   Q.  You were just asked if it's easy to look back and look at
 5   a detective's work and say, they should have done this, they
 6   should have done that.
 7          My question to you, sir, is are you able to look back
 8   at detectives and say, they should have done this and they
 9   should have done that if they don't document and memorialize
10   things?
11   A.  Well, it makes it extremely difficult, if not impossible.
12   Q.  You were asked if being -- having a high homicide load
13   creates problems.  Is that a valid excuse not to document
14   things?
15          MR. KULWIN:  Objection, Judge.  I didn't ask him
16   that.
17          THE COURT:  Overruled.
18          MR. LOEVY:  Let me pose the question.
19   BY MR. LOEVY:
20   Q.  Is it a valid excuse not to document things if you have a
21   caseload of homicides that --
22   A.  No.
23   Q.  Is that too much to expect from a municipality with a high
24   level of homicides, that they document things?
25   A.  They would -- I would -- as I've said before, it becomes
```

1  even more critically important that procedures and processes

2  are in place and centralized record-keeping.

3  Q.  You were asked about your report being a living document.

4  Are police reports supposed to be living documents that can be

5  edited as the facts come in, or are they supposed to be set,

6  finalized, and submitted?

7  A.  They are not supposed to be manipulated, if I understand

8  your question correctly.

9  Q.  In other words, let's say you have an event that happens

10  on Monday, and you have another event that happens on Thursday

11  and another happens on next Tuesday.  Are you allowed to keep

12  your report unwritten as a living document until you see where

13  it's going, or are you supposed to submit at each event?

14         MR. KULWIN:  Leading and argumentative.

15         THE COURT:  Overruled.

16         THE WITNESS:  You're supposed to put the information

17  as close to the time that you gathered it or learned of it,

18  and then you put it in there.

19  BY MR. LOEVY:

20  Q.  You were asked about some detectives might have super

21  memories.  Is there an exemption to the need to document

22  things for detectives who believe that they, themselves, can

23  remember things?

24  A.  No, absolutely not.

25  Q.  Can you explain?

1  A.  You're not -- no one has an infallible memory.  And even

2  if one had Carnac the Magnificent and was able to absolutely

3  recall things, they have to document to put in the report so

4  that it's available for others to see it any time.  It's --

5  and I'm sorry about the poor analogy, but the detective can

6  get hit by a bus, and if he's got three weeks' worth of

7  information in his wonderful memory, it does no one any good.

8  Q.  And memories do fade, do they not?

9  A.  Yes.

10       MR. KULWIN:  Objection, Judge.  He's not an expert on

11  this.

12       THE COURT:  Overruled.  As it pertains to what he's

13  talking about.

14       MR. LOEVY:  All right.  If I can have the ELMO?

15  BY MR. LOEVY:

16  Q.  Showing you page --

17       THE COURT:  You've got it.

18  BY MR. LOEVY:

19  Q.  -- 8625.  This is a police report for Nathson Fields dated

20  June the 17th and then submitted July the 7 --

21       MR. KULWIN:  Objection, Judge, to the premise.

22  That's inaccurate.  It's a misstatement of the evidence.

23       THE COURT:  Just ask the question.

24       MR. LOEVY:  All right.

25  BY MR. LOEVY:

Brasfield - redirect

2648

1   Q.  If a police officer does an interview on June 13th of an

2   important witness, a suspect in a homicide case, is it

3   consistent or inconsistent with police practices to rely on

4   your memory and not create the police report until four days

5   later with no notes?

6   A.  I would expect the report to be done the same day, and

7   even if it entailed unpaid overtime, that before they went

8   home for the night, that would be written up.

9   Q.  How universal is that expectation?

10  A.  That's an expectation on the front line supervisors,

11  sergeants, lieutenants, captains, commanders.  It's --

12  Q.  I mean how universal in the country as a law enforcement

13  expert.  Is that --

14  A.  That's common practice.  That's my experience.

15  Q.  All right.  You were asked about -- you said you spent a

16  range of 100 to 150 hours on the case, correct?

17  A.  Yes.

18  Q.  And how many -- of that 100 and 150 hours on the case, you

19  did things other than review the file, right?

20  A.  Yes.

21  Q.  Tell the jury what else you did besides review the files

22  with that 100 to 150 hours.

23  A.  I reviewed at least, I believe, three or four portions

24  of -- because sometimes the depositions, for instance, with

25  Mr. Hickey, were done over several days, and so there were

Brasfield - redirect

2649

1   hours' and hours' worth of transcribed depositions that I

2   reviewed, the policies and procedures that I have reviewed,

3   case --

4   Q.  Drafting the report as well?

5   A.  Drafting the report, yes.

6   Q.  All right.  You estimated you spent about 60 hours on the

7   files.  Was that a sufficient amount of time to accomplish the

8   project that you accomplished?

9   A.  In the parameters that I had, yes.

10  Q.  All right.  Returning to Mr. Noland's questions, if there

11  were 57,745 criminal defense file pages and 88,290 basement

12  file pages, for a total of about 140,000 pages, I'll ask you

13  to assume that, did you do a page-by-page audit of all 140,000

14  pages?

15  A.  No.

16  Q.  How much would that have cost for you to look through

17  every page and see if it should be in or out and putting

18  thought into every page?

19  A.  I can't even begin to imagine how many weeks or months

20  that would have taken.

21  Q.  All right.  You have come to learn that the defendant

22  spent quite a bit of time and money doing that audit, correct?

23  A.  Yes.

24  Q.  And they have confronted you with some of the mistakes you

25  made, correct?

1    A.  Yes.

2    Q.  All right.  After having been confronted with those pages

3    that should have been on one side of the line and you put them

4    on the other side of the line, does that change anything about

5    your opinions?

6    A.  No, it does not.

7    Q.  In fact, several hundred pages out of a sample size that

8    bad, is that a terrible rate of error?

9            MR. KULWIN:  Objection, leading.

10            THE COURT:  Overruled.

11            THE WITNESS:  Well, I would prefer to have no errors,

12    obviously, but it's not significant in the pattern that I was

13    observing.

14    BY MR. LOEVY:

15    Q.  Talk about that for a minute, if you would, sir.  I mean,

16    we -- they showed you examples of specific pages that

17    shouldn't have been on.  Tell me about the broader patterns

18    you saw.

19    A.  In the individual cases that I looked at, there were very

20    specific listing of individuals who were identified as

21    possible suspects or alternative suspects in the

22    investigation, that there were witnesses that had information

23    that was not followed up on, or that there was contradictory

24    information, for instance, a witness seeing someone but was

25    too far away to identify them or they were wearing masks.

Brasfield - redirect

2651

1  Q. All right. That kind of pattern, was that evident

2  notwithstanding the fact that some of the court records should

3  have been listed as produced and not produced?

4       MR. NOLAND: Objection, argumentative.

5       THE COURT: Sustained.

6  BY MR. LOEVY:

7  Q. All right. Mr. Noland asked you if you were lying about

8  having performed the case-by-case analysis. Do you remember

9  that question?

10 A. Yes, I do.

11 Q. Were you lying, sir?

12 A. No.

13 Q. Tell the jury what you did to do that review, sir, where

14 you were; provide some context.

15 A. I have a home office set up with a couple of computers and

16 an iPad. And as I have the material electronically, I open up

17 the files, I look at them, I -- as thoroughly as I try to be,

18 I put that material there, I'll start a spreadsheet, I'll

19 start a list of material reviewed, I'll start a list of

20 bibliography. And as I am getting more information -- and

21 it's kind of like a homicide investigation. As you're getting

22 more information, you're adding to it, and you eventually

23 finish and develop your product. That's the way I do it.

24 Q. All right. You said this morning that you started at 90

25 percent of the investigative files were missing -- or the

Brasfield - redirect

2652

1  criminal defense files were missing investigative materials?
2  Did I get that right?
3  A.  Yes.
4  Q.  All right.  Even after the examples that they pointed out
5  at your deposition, what is the number of criminal defense
6  files that were missing investigative material, what
7  percentage?
8  A.  100 percent.
9  Q.  So the fact that they were able to provide you some
10 examples of files -- of documents that you thought were
11 missing but weren't missing, did that change the overall
12 number of files that were missing documents?
13 A.  No.  When you're looking at all of these files and you
14 take out either, you know, one and -- for instance, in Anima,
15 there were still pages that were missing.  But you can even
16 say, okay, I'm going to give the City the absolute benefit of
17 the doubt and just throw the whole case away.  It doesn't
18 change anything, my opinion.
19 Q.  All right.  You did the 60-hour job, which was obviously a
20 rough way of doing it, right?
21 A.  Yes.
22        MR. KULWIN:  Objection.  Objection, argumentative.
23        THE COURT:  Sustained.
24 BY MR. LOEVY:
25 Q.  If I understood your answers to Mr. Kulwin and Mr. Noland,

Brasfield - redirect

2653

1    you were saying you weren't actually considering each page and

2    say, was -- you know, let me look at the context of a page.

3    It was just, yes or no?  Is it in one file, is it in the other

4    file?  Is that a fair summary?

5    A.  That's fair.

6    Q.  All right.  Even though you did it in that very rough form

7    and didn't analyze the particular page, was it still a useful

8    exercise?

9    A.  Yes, it was.

10   Q.  All right.  You were asked about the 50 criminal defense

11   attorneys' files.  And those were the files that could be

12   located, correct?

13   A.  Yes.

14   Q.  If more could have been located, would you have analyzed

15   more?

16   A.  Yes, I would have.

17        MR. NOLAND:  Objection, Judge, foundation as to that

18   last statement.

19        THE COURT:  Overruled.

20   BY MR. LOEVY:

21   Q.  Is your understanding there was any cherry-picking at all

22   as far as criminal defense files weren't given to you?  If

23   they were located, you were supposed to get them, correct?

24        MR. NOLAND:  Objection, Judge.

25        THE COURT:  Overruled.

Brasfield - redirect

2654

1           THE WITNESS:  Yes.

2    BY MR. LOEVY:

3    Q.  All right.  You admitted you didn't interview defense

4    attorneys.  You did not interview these 50 defense attorneys,

5    right?

6    A.  That's right.

7    Q.  All right.  You were asked if a document that was

8    created 15 years later could have been withheld.  Do you

9    remember that question?

10   A.  I believe so.

11   Q.  All right.  Of course, in Mr. Fields' case, if he was

12   convicted in '86 and he had a retrial in 2009, a document that

13   was created 15 years later very well could have been withheld

14   and been material, correct?

15   A.  Yes.

16   Q.  You don't know going into an investigation what's going to

17   be material and what's not, right?

18   A.  That's correct.

19   Q.  And that's why you need processes that work?

20   A.  Yes.

21   Q.  All right.  You were asked about -- Mr. Noland put on the

22   screen, there was a bunch of names, and he asked you, isn't it

23   true some of these names were in the police reports.  Do you

24   remember that question?

25   A.  Yes.

1    Q.  You did not analyze all the police reports and all the

2    names in these 140,000 files (sic), correct?

3    A.  No, I did not.

4    Q.  And you never purported to, correct?

5    A.  No.

6    Q.  The fact that a name is in a police report, does that mean

7    that all the exculpatory information relating to the name

8    that's also in the investigative file has been given to the

9    criminal defendant?

10   A.  No, absolutely not.

11              THE COURT:  Hang on.

12              MR. NOLAND:  Objection, argumentative.  It

13   mischaracterizes the question.

14              THE COURT:  Everybody was talking at the same time.

15   I'll just look at what you said.

16              Overruled.  It wasn't attempting to characterize a

17   question.

18   BY MR. LOEVY:

19   Q.  Now, for example, page -- document No. 8609 has a

20   reference to a Delbert Edwards, correct?

21   A.  Yes.

22   Q.  And the jury has seen these documents.  But just because

23   Delbert Edwards is in the official file does not mean that

24   they've seen a copy -- the defense attorney is getting a copy

25   of plaintiff's 1-69 from the investigative file with

1  additional information, correct?

2  A.  That's absolutely correct.

3  Q.  So is it sufficient just to put a name in a police report?

4  A.  No.

5  Q.  Now, you were asked about court attendance sheets.  And

6  you were asked, isn't it true some of them might not be

7  helpful, right?

8  A.  Yes.

9  Q.  You were also asked, isn't it true that if it happened in

10  court, it couldn't possibly be exculpatory?  Do you remember

11  that?

12  A.  Yes.

13  Q.  Let me give you a hypothetical.  Let's say in Nate Fields'

14  case in 1986, there was a court attendance sheet that showed

15  O'Callaghan was present in court on a day he wasn't scheduled

16  to be there but Randy Langston was there?

17       MR. KULWIN:  I'm going to object to the question,

18  Judge.  There is no basis for that question --

19       THE COURT:  I am going to say it's beyond the scope

20  of the report.  So you'll argue it later.

21  BY MR. LOEVY:

22  Q.  May I ask then, there are ways in which even

23  administrative documents might turn out to be exculpatory,

24  right?

25  A.  Absolutely.

Brasfield - redirect

2657

1   Q.  And that's why everything should be turned over?

2   A.  Yes.

3   Q.  All right.  You were asked about the Crockett file.  Do

4   you remember those questions?

5   A.  Yes.

6   Q.  I am going to move to the end here.

7          You were asked about criminal defense attorney files

8   having subpoenas.  Do you remember those questions?

9   A.  Yes.

10  Q.  Does the fact that the Chicago Police Department has

11  documents that are in the state's attorney's file mean that

12  they're not withholding anything?

13  A.  Would you rephrase?  I'm sorry.  Say that again.

14  Q.  I'm going to show you Plaintiff's Exhibit 312105.  This is

15  from the Cecil Robinson file?

16  A.  Yes.

17  Q.  Do you remember there were examples where criminal

18  defendants sent subpoenas directly to the Chicago Police

19  Department?

20  A.  Yes.

21         MR. KULWIN:  Judge, I'm going to object here for a

22  second on this particular document and ask to take it off the

23  ELMO and ask to be heard.

24         MR. LOEVY:  Your Honor, I will withdraw it.  I don't

25  want to waste any more time.

1      THE COURT:  Fine.

2  BY MR. LOEVY:

3  Q.  All right.  Now, you were asked a lot of questions about

4  your comparison between blue and green, which is the

5  investigative files and the criminal defense files, right?

6  A.  That's correct.

7  Q.  Let's say you got everything wrong on the comparison

8  between the criminal defense files and the investigative

9  files.  Do you understand my hypothetical?

10  A.  Yes, I do.

11  Q.  Does that have anything to do with all the opinions you

12  gave that the blue column, all the problems about the

13  investigative files as a standalone problem, does that have

14  any effect on that at all?

15  A.  Absolutely none.

16  Q.  How about your analysis on the permanent retention files;

17  do any of the typos and missing documents that they pointed

18  out have any effect on any of the opinions you've given here

19  in court about the problems with the permanent retention

20  files?

21  A.  No, they do not.

22  Q.  Does it have anything to do with the problem that the

23  stuff in the investigative files wasn't getting into the

24  permanent retention files?

25  A.  It has absolutely no effect on it.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 181 of 191 PageID #:98387
Brasfield - recross by Mr. Noland
2659

1 | Q. And as far as the problems they showed you that some of
2 | the documents that you thought had been withheld from the
3 | criminal defense attorneys' files weren't, you understand that
4 | the state's attorney -- they have done a similar review of the
5 | state's attorney's documents, correct?
6 | A. I'm aware of that.
7 | Q. If 60 percent of the files from the State's Attorney's
8 | Office did not have material from the basement files, is that
9 | an acceptable percentage?
10 | A. No, it's not.
11 | Q. Okay.
12 |      MR. LOEVY: Let me confer for a moment?
13 |   (Brief pause.)
14 |      MR. LOEVY: Your Honor, we would want to admit 307,
15 | if there's any additional foundation from the witness while
16 | he's still here.
17 |      THE COURT: No.
18 |      MR. LOEVY: Okay.
19 |      THE COURT: It's not a foundational --
20 |      MR. LOEVY: All right.
21 |      Thank you. No further questions, Judge.
22 |      MR. COURT: Anything else, Mr. Noland?
23 |      MR. NOLAND: Just quickly, Judge.
24 |            - - -
25 |      MICHAEL DAVID BRASFIELD, RECROSS-EXAMINATION

Brasfield - recross by Mr. Noland

2660

1    BY MR. NOLAND:

2    Q.  Mr. Loevy was just asking you about a color, I think he

3    said blue, the blue color thing dealing with the permanent

4    retention files and your opinions --

5    A.  The blue was the investigative files.

6    Q.  Okay.  And the investigative files about whether or not

7    there are notes not on a GPR form in those type of files, is

8    that the blue section?

9    A.  I'm sorry.  Say that again.

10   Q.  What is the blue section?

11   A.  The blue section is the investigative files.

12   Q.  But those -- you're not saying --

13   A.  The basement files.  I mischaracterized.  Basement files.

14   Q.  That wasn't the section dealing with the comparison with

15   the criminal defense files, correct?

16   A.  I'm sorry.  Say that again?

17   Q.  I'm sorry.  I was confused with -- the question with

18   plaintiff's counsel, and probably my fault.

19          What I'm asking you is that the comparison with

20   the -- the only comparison you made with respect to whether or

21   not documents were missing from criminal defense files were on

22   those 50 cases that you and I spent some time with, right?

23   A.  Yes.

24   Q.  So all the other opinions you've given with respect to

25   permanent retention files and anything else and investigative

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 183 of 191 PageID #:98389
Brasfield - recross by Mr. Noland
2661

1  files, you're not offering any opinion that anything from

2  those files were withheld in those criminal cases; am I

3  correct?  You're just giving an opinion about the compliance

4  or non-compliance with the special order, right?

5  A.  I've testified -- what I testified to, the material, when

6  we were looking at the criminal -- when I was looking at the

7  criminal defense files, whether they contained or did not

8  contain documents.

9       I also testified that I looked at the investigative

10  files as a standalone process, what was in it, what wasn't in

11  it, I looked at the permanent retention files, what was in it,

12  what weren't in it, and then a comparison between the

13  investigative file and the basement file to the permanent

14  retention file.

15  Q.  And my question was that the only aspect of your review

16  related to what the CPD produced or didn't produce had to do

17  with the comparison with those 50 criminal defense files,

18  correct?

19  A.  Not entirely.

20  Q.  Isn't it true that you had no basis to say that in any of

21  those -- nothing to evaluate with with any of the files other

22  than those 50 files, you have the 400 that is or so --

23       MR. LOEVY:  Objection, scope, your Honor.

24       THE COURT:  Hang on a second.  Let me hear the whole

25  question.

Case: 1:18-cv-01028 Document #: 769-14 Filed: 01/28/25 Page 184 of 191 PageID #:98390
Brasfield - recross by Mr. Noland
2662

1    BY MR. NOLAND:

2    Q.  -- that anything was withheld from criminal defense

3    attorneys in those cases?

4            THE COURT:  Hang on a second.

5            I am going to sustain the objection under Rule 403.

6            MR. NOLAND:  Nothing else.  Thanks, Judge.

7            THE WITNESS:  Thank you.

8            MR. KULWIN:  Nothing else, Judge.

9            MR. LOEVY:  We could try to call the next witness,

10   your Honor.

11           THE COURT:  Well, do you have any more questions

12   based on the redirect?

13           MR. LOEVY:  No.

14           THE COURT:  Do any of the jurors have any questions?

15           Well, we are definitely going to start with the next

16   witness.

17           Let me see the lawyers at sidebar.

18     (The following proceedings were had at sidebar outside the

19   hearing of the jury:)

20           THE COURT:  Okay.  I am going to read these.  What

21   did you mean by this -- the early part of his testimony, What

22   did you mean by, This case here with Mr. Fields was the

23   driving file?  And the word is "driving."  I honestly don't

24   remember it.

25           MR. LOEVY:  I didn't understand the question.

Brasfield - recross by Mr. Noland

1    THE COURT:  You referred to the -- the juror thought

2  he said something along the lines of, This case here with

3  Mr. Fields was the driving file.  I really don't --

4    MR. BURNS:  Early on when you were identifying

5  Fields, you talked about Fields first --

6    MR. LOEVY:  Yeah, I was trying to say was it typical

7  of the others?  Do they mean like running file?

8    MR. KULWIN:  No, I think -- the way I take it, what I

9  heard was that it was like the driving thing that led to his

10  retention and why he was --

11    THE COURT:  Yeah.  Maybe I'll just ask him a leading

12  question about that.

13    The second question, Were the other files that he --

14  the basement files that he looked at, were they all homicide

15  files?

16    Anybody have a problem with that?

17    MR. NOLAND:  No.

18    THE COURT:  You stated that there was not enough

19  police training for constitutional safeguards for individuals.

20  Will you elaborate on constitutional safeguards for

21  individuals?  What individuals?

22    MR. KULWIN:  Can I have that one again, Judge?

23    THE COURT:  Just look at it.

24    MR. KULWIN:  There was not enough police training for

25  constitutional safeguards for individuals.  Will you elaborate

1    on constitutional safeguards -- what individuals?

2               Yeah, you can ask that, Judge.

3               THE COURT:  Okay.  Fine.

4               Who is the next witness?

5               MR. LOEVY:  Andrea Lyon, the Monell.

6               MR. NOLAND:  The only point I was trying to make at

7    the end, I don't want to go back, but the last objection you

8    sustained, I think it had to do with -- what I was trying to

9    get at was a motion in limine, I can't find it now, about he

10   couldn't say anything other than the criminal defense files

11   and those other 400 or so that he looked at that anything was

12   withheld from the criminal defense attorney.  We had a motion

13   in limine on that.

14              THE COURT:  It wasn't what it sounded like to me, so

15   I overruled it.

16     (The following proceedings were had in open court in the

17   presence and hearing of the jury:)

18              THE COURT:  I think it was somewhere early in your

19   direct examination, I think a question may have been asked

20   that referred to the Fields' case as kind of the driving file.

21   Is it fair to say that what prompted you to be retained in

22   this case was the Fields matter?

23              THE WITNESS:  Yes.

24              THE COURT:  Okay.  The other basement files that you

25   looked at, were they all homicide cases?

1       THE WITNESS:  Yes.

2       THE COURT:  Okay.  And then the last question is you

3  made -- you gave some testimony along the lines of there

4  wasn't enough training involving constitutional safeguards for

5  individuals.  And the question is who are the individuals you

6  are talking about?  Are you talking about defendants in

7  criminal cases?

8       THE WITNESS:  That would be part of the group, yes.

9       THE COURT:  Okay.  Follow-up based on that,

10  Mr. Loevy?

11       MR. LOEVY:  No, your Honor.

12       THE COURT:  Anybody else?

13       MR. NOLAND:  No, your Honor.

14       THE COURT:  You are excused.

15       THE WITNESS:  Thank you, your Honor.

16    (Witness excused.)

17       THE COURT:  Please call the next witness.

18       MR. SWAMINATHAN:  Plaintiff calls Andrea Lyon.

19       THE COURT:  Come on up.

20    (Witness sworn.)

21                         - - -

22            ANDREA LYON, DIRECT EXAMINATION

23  BY MR. SWAMINATHAN:

24  Q.  Good afternoon.  Could you please state your name.

25  A.  My name is Andrea Lyon, L-y-o-n.

Lyon - direct

2666

1  Q.  Please tell the jury what you do.

2  A.  I'm the dean of the Valparaiso University Law School.

3  Q.  What does that position entail?

4  A.  A lot of things.  I run the law school, I teach, set

5  policy, fundraise, deal with personnel issues.  There seems to

6  be at least one crises a day, seems to be part of it.

7  Q.  Do you also maintain a private practice?

8  A.  I have some cases that I work on.  I wouldn't call it a

9  business.  My students work with me.

10  Q.  What kind of cases do you work on?

11  A.  Right now, I have one that is in state post-conviction,

12  and I have one that is in state appeals court.

13  Q.  When you say "state post-conviction," are these criminal

14  cases?

15  A.  Yes, they're both criminal cases.

16  Q.  Criminal cases in an appeals stage?

17  A.  Correct.

18  Q.  Okay.  Do you have experience doing criminal trials?

19  A.  I do.

20  Q.  How many -- let me ask you, do you have experience doing

21  homicide trials?

22  A.  I do.

23  Q.  Approximately how many homicide trials do you think you've

24  done?

25  A.  It's -- actually, I know the number.  It's 138 murder

1  trials that I have defended.

2  Q.  And when did you first begin doing homicide trials?

3  A.  Now I have to tell my age.  1979.

4           MR. KULWIN:  Judge, I'm going to object to all of

5  this on relevancy grounds based on what we were advised for

6  the purpose of this witness.

7           THE COURT:  I think you're pretty close to getting to

8  the point at this point, Mr. Swaminathan.

9           MR. SWAMINATHAN:  All right.

10 BY MR. SWAMINATHAN:

11 Q.  When you started doing homicide cases, were you working at

12 the Cook County Public Defender's Office?

13 A.  I was.

14 Q.  Okay.  When you worked there, did you work in the homicide

15 section?

16 A.  I did, ultimately, yes, for a long time.

17 Q.  What position did you hold there?

18 A.  I was one of the members of the task force, and then I was

19 a supervisor, and then I was the chief.

20 Q.  When you worked there, did you become familiar with the

21 file-keeping practices related to homicide cases?

22 A.  Yes.

23 Q.  And what was the practice?

24 A.  The practice was you kept absolutely every piece of paper.

25           MR. KULWIN:  Judge, I'm going to object on this and

 1  ask to be heard.

 2          THE COURT:  Okay.

 3     (The following proceedings were had at sidebar outside the

 4  hearing of the jury:)

 5          MR. KULWIN:  We were told -- we were told -- we were

 6  told that the only purpose for this witness was to come in and

 7  say, I worked on this specific file, that I remember I got

 8  this stuff or didn't get this stuff.

 9          They have now tried to shoehorn her in as an expert

10  on criminal defense, and now they're trying to get her to give

11  an expert opinion on the practices of the Public Defender's

12  Office and what their retention policies is.  It wasn't

13  disclosed, it's never been disclosed, and my view of it is

14  that they are -- it's highly prejudicial and undisclosed.

15          MR. LOEVY:  Both sides disclosed a number of Monell

16  witnesses.  We deposed just about every state's attorney they

17  disclosed.  They didn't depose Ms. Lyon.  She is barely listed

18  on the pretrial order.  She is a witness in the case.

19          MR. BURNS:  She is disclosed.

20          THE COURT:  Let me just look at it.

21          MR. MICHALIK:  Page 7, Judge.

22          MR. BURNS:  She was disclosed here.

23          THE COURT:  What were you going to show me,

24  Mr. Michalik?

25          MR. MICHALIK:  Well, it was that page.  And I will

1    also represent the only document that was produced -- there

2    was no criminal defense file produced in the Fulton case for

3    which she has been disclosed.  The only document was an

4    unsigned, undated copy of the verified --

5            THE COURT:  Post-conviction?

6            MR. MICHALIK:  -- petition of the post-conviction

7    brief.

8            So any testimony as to policies, practices of the

9    public defender goes far beyond the scope of anything that's

10   been disclosed here.

11           MR. LOEVY:  The only thing I would add is they

12   disclosed -- how many states attorneys have they disclosed?

13           MR. SWAMINATHAN:  I think twenty or 25.

14           MR. LOEVY:  Twenty, 25.  We asked them to give us

15   specifics.  They declined.  They said, Depose them all.  We

16   deposed a lot of them.  They disclosed 25 Monell witnesses.

17   We disclosed roughly the same number.

18           THE COURT:  Yeah, but, I mean, people make judgments

19   about who to depose based on what the disclosure is, and the

20   way I'm reading that disclosure is that she was disclosed as

21   somebody who was going to testify about a particular case, and

22   now she's been asked a question about policies and practices.

23           So my view of this is it's not admissible on direct.

24   It may be admissible on redirect, depending upon what the

25   cross is about, you know, whatever, but you can't do it on