# EXHIBIT 17

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON REYES, | ) | |
| | ) | 1:18-cv-01028 |
| Plaintiff, | ) | |
| | ) | Hon. Steven C. Seeger |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Sunil R. Harjani |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| | | |
| GABRIEL SOLACHE, | ) | |
| | ) | 1:18-cv-02312 |
| Plaintiff, | ) | |
| | ) | Hon. Steven C. Seeger |
| v. | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | Hon. Sunil Harjani |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |

## DECLARATION OF THOMAS TIDERINGTON

I, Thomas Tiderington, hereby declare as follows:

1.  I have been retained by Plaintiff in this matter to give expert opinion testimony.

2.  Attached to this declaration as Exhibit A is a true and accurate copy of my report disclosed in this case, which contains opinions that I offer in this case, as well as attachments incorporated as part of that report. The report and its attachments are true and accurate to the best of my knowledge and belief.

3.  My qualifications for rendering expert opinions in this case are summarized in my report

1

and in my CV, which is attached to this declaration as Exhibit B. My CV is true and accurate as of the date of my report.

4.  If called to testify in this case, I would provide testimony consistent with my report and its attachments (Exhibit A) and my CV (Exhibit B).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:        April 5, 2024

Thomas Tiderington

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

DEMETRIUS JOHNSON,

     *Plaintiff.*

v.

REYNALDO GUEVARA, JOANN
HALVORSEN as PERSONAL
REPRESENTATIVE to the ESTATEs of
ERNEST HALVORSEN, WILLIAM
ERICKSON, and JOHN HEALY,
DARRYL DALEY, and the CITY OF
CHICAGO,

     *Defendants.*

**Case No. 1:20-CV-04156**

**EXPERT REPORT OF**

**THOMAS J. TIDERINGTON**
(Thomas J. Tiderington & Associates-LLC)

03-08-2023

1

**SUMMARY OF QUALIFICATIONS**

For the past forty-four years, twenty years as Chief of Police (retired June 2022), I have served as a full-time law enforcement officer with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. For over 30 years, I have been an instructor at numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last five years I have been engaged as a criminal justice consultant, trainer, case reviewer and expert witness in law enforcement related matters. As a recently retired Police Chief of twenty plus years, I have reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. I am currently an active life-member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life-member of the Michigan Association of Chiefs of Police (MACP).

Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshalls Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA). I have also worked cooperatively with numerous state and local police agencies including the Chicago Police Department. As a result of my many decades of working extensively with many federal, state and local agencies, I am familiar with the many similarities of investigative methods and strategies, as well as nationally acceptable best practices and protocols. I also have many years of extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations.

During my 44 plus year law enforcement career I have been responsible for the review and processing of hundreds of disciplinary actions up to and including suspensions and terminations. I also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments. The accreditation process furthers an agency's professional development and ensures that their methods, policies, procedures and daily operations follow the best practices or "professional standards" in the law enforcement arena.

As a Police Chief for over twenty-years I have reviewed and approved policy and procedures of every kind, including (but not limited to) criminal investigations, retention and maintenance of police records, complaints against police officers, training, supervision and discipline.

Further details of my training, experience, knowledge, and qualifications are contained in my Curriculum Vitae, which is attached as Attachment D of this report.

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. Any and all opinions expressed herein are held to a reasonable degree of professional certainty. The information that I relied on consists of the type of information that is reasonably relied upon in my field of expertise. All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration and discipline based upon my education, training and employment as a law enforcement officer, as well as my work as a law enforcement trainer, and my experience as a consultant in the field.

The method I used in reaching my conclusions included a review of materials provided by Plaintiffs' counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP),[1] and the Commission on Accreditation for Law Enforcement (CALEA). These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF).[2] Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder, but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a substantial body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to its operations. These generally accepted practices have developed over time

---

[1] IACP-The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2] CALEA-The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA®), was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF). The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards, which require: Comprehensive and uniform written directives that clearly define authority, performance, and responsibilities Reports and analyses to make fact-based and informed management decisions.

to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder.

Opinions that I present in this report may use terminology that resemble legal terms or standards. Use of specific/similar legal terminology is not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers-of the-fact. The use of certain terms such as "reasonable", "reckless", "negligent", "unreasonable", "foreseeable", and "deliberate indifference", "gross deviation" are commonly used in my field of expertise, and I used them often as a Police Chief, and when I train or communicate with law enforcement officers. These terms and others form the basis of my understanding of the subject matter and are commonly used by law enforcement officials in the field.

## INTRODUCTION

I have been retained by attorneys representing Plaintiff Demetrius Johnson. I was asked to assess two things:

(1) whether there were deviations from generally accepted police practices in the investigation into the murder of Edwin Fred that was conducted by various Chicago Police officers; and

(2) whether Chicago Police Department's policies and practices related to photo arrays/lineups, documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, were at the time adequate and consistent with acceptable police practices around the country.

I have reached conclusions on both of these issues.

First, as a result of my review of the materials provided to me related to the Fred murder investigation, I conclude to a reasonable degree of professional certainty that the homicide investigation conducted in this case grossly deviated from generally accepted police practices, as explained further below. It is also more likely than not that in order to secure a prosecution and conviction of Demetrius Johnson, the defendants also knowingly and intentionally suppressed evidence of Demetrius Johnson's innocence. Consistent with my opinions, I also note that Defendant Guevara, one of the key detectives in this investigation, has pleaded the Fifth when asked about whether he knowingly and intentionally manipulated the eyewitnesses into

4

providing false identifications, fabricated witness statements from others, and suppressed evidence of Johnson's innocence. In other words, Guevara does not deny committing egregious misconduct in this case.

**<u>To further summarize my opinions:</u>**

This is a case where Demetrius Johnson, who was fifteen years old when he was arrested for the murder of Edwin Fred, was convicted based on the following, all of which are problematic:

As I have observed in prior cases involving many of the same CPD investigators, including Detectives Guevara and Halverson, the Defendants here applied tunnel vision to obtain the evidence they needed to implicate Demetrius Johnson, their pre-chosen suspect. They unreasonably failed to consider alternative suspects, as well as facts and evidence that clearly undermined their line-up identifications; and conducted a substandard investigation in which they failed to properly document investigative steps, failed to conduct routine and basic follow-up, and failed to properly pursue all possible leads. The investigation reflected a primary goal of closing the case with charges, rather than finding the truth about who was responsible for the murder of Edwin Fred.

In addition, there is substantial evidence in the record that Detective Reynaldo Guevara and other defendants intentionally and willfully manufactured and falsified evidence, manipulated witnesses, and withheld relevant information from Johnson and his attorneys. Not only has Defendant Guevara pleaded the Fifth about whether he engaged in misconduct—a remarkable fact that is deeply troubling to me as a law enforcement professional—I have also reviewed ample evidence indicating that the defendants had a widespread practice or custom of acting in the same manner in similar cases for many years.

To further summarize my opinion:

a) CPD investigators hid and concealed the fact that Aby Gonzalez, an eyewitness to the murder, identified Bryan Jones as the shooter. Additionally, almost immediately following the shooting CPD dispatchers advised the responding officers that the assailant was Bryan Johns, aka Lil D, which was information that supported and corroborated Aby Gonzalez's eye-witness lineup identification of Bryan Johns.

b) CPD investigators failed to follow basic investigative steps and protocols to collect forensic and other incriminating evidence. For example, I have not seen any evidence that CPD investigators attempted to locate the actual murder weapon(s) or clothing worn by the perpetrator(s), the type of objective evidence police investigators routinely use to link a perpetrator to the crime, and to test the investigator's assumptions.

c) Detectives built a case around Demetrius Johnson despite not have any physical evidence, tangible proof, or corroborating evidence connecting Johnson to the shooting. The Defendants also totally disregarded alibi information provided by Johnson, Johnson's girlfriend Magdalia Reyes, and another mutual friend, who assert that they were with Johnson at his home watching the Chicago Bulls championship basketball game when the shootings occurred.

d) Detectives failed to properly document the chronological progress of the investigation, and the case file is devoid of any GPR's, handwritten notes, and inventory sheets from Guevara and Halvorsen, the lead Detectives involved in this case, which is contrary to police training and generally accepted police practices.

e) As discussed below, there was important information developed early on in the investigation indicating that there were two assailants responsible for the wounding of Raul Ortiz and the murder of Edwin Fred, but this important information was never investigated, explained, or documented in any notes or reports by the defendants.

f) The deviations from police practices in this case, and the evidence of investigative misconduct are consistent with records I have reviewed from other investigations involving Guevara and other defendants, which show a pattern and practice of manipulating witnesses and concealing or ignoring evidence that contradicts the detectives' predetermined theory. I have been provided with information showing that 39 people who were convicted based on investigations Guevara participated in have now had their convictions thrown out. I am not aware of a single police department in the country that has had so many violent crime convictions thrown out based on the investigative misconduct of a single officer.

Second, based on my review of Chicago Police Department's (CPD) policies and practices governing how information learned during homicide investigations was to be documented, stored and disclosed, as well as my review of numerous other documents and depositions and many dozens of homicide files and comparator criminal defense attorney files, it is my opinion to a reasonable degree of professional certainty that CPD's policies and practices related to homicide file documentation, storage/preservation and disclosure were woefully inadequate, deviated substantially from accepted practices in other departments, and resulted in the routine failure to disclose documents and information to criminal defendants. The policies themselves were inadequate, they were routinely not followed, the practices that instead were followed did not result in the thorough and accurate documentation of homicide investigations and the investigative information learned, and ultimately resulted in the routine failure to disclose potentially exculpatory or impeaching documents and information to criminal defendants.

In my opinion, there were numerous departures from generally accepted police practices in the Edwin Fred homicide investigation; and, the CPD, through its policies and practices created an environment where officers could routinely and systematically ignore city policies and the law with impunity and that such behavior was not only tolerated, but encouraged. Despite the CPD's formal written policies related to investigations and accountability, the evidence demonstrates that as a matter of unofficial policy or widespread investigative practices, detectives routinely violated common and accepted investigative practices.

Based on my many decades of law enforcement experience I understand the importance of consistent supervisory oversight at every step in the investigative process. Supervisors must probe the investigator about possible inconsistent evidence and encourage additional investigation, and must also conduct inspections and risk-assessment evaluations of cases to ensure that department policies are being followed. Without assessment tools or checklists and experienced supervisors' input, it can be almost impossible to recognize red flags when they arise in a case. In the same vein, necessary resources to flag and re-evaluate a possible wrongful arrest must be available to these supervisors. These resources will help supervisors lead substantive, insightful discussions among the investigative team, and allow for significant progress in reducing wrongful arrests and subsequent prosecutions and convictions.

My opinions and the facts upon which I base my opinions are discussed in greater detail below.

Attachments to this report include the following:

Attachment A - Litigation support experience-Listing of testimony and publications.
Attachment B - List of material reviewed.
Attachment C - My rate of compensation.
Attachment D - Complete and detailed curriculum vitae.
Attachment E - Spreadsheet of my data analysis in *Reyes/Solache* regarding 1995-1998 files.
Attachment F - Spreadsheet of my data analysis in *Sierra* regarding 1991-1995 files.
Attachment G - Michael Brasfield's expert report in *Fields v. City of Chicago*.
Attachment H - Michael Brasfield's expert report in *Rivera v. City of Chicago*.

In addition, my opinions are corroborated by, and consistent with, my review of materials and evidence in preparing my expert reports in *Reyes/Solache v. City of Chicago*, *Thomas Sierra v. City of Chicago*, *Geraldo Iglesias v. City of Chicago,* and *Jose Maysonet v. City of Chicago*, cases in which defendants Guevara and Halvorsen were among the principal investigators.

Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I therefore reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

**Summary of Facts Related to the Edwin Fred Investigation.**

The incident summary of this report is based upon various written documents, and other materials noted in Attachment B - List of materials reviewed section of this report. Without attempting a comprehensive recitation, but rather to give a brief summary of the matter sufficient to allow the reader to place the rest of this report in context, the following is provided:

On June 12, 1991, at approximately 7:45pm CPD officers responded to the area of Bell and North to a report of a "man shot." Responding Officer Hernandez (Beat 1414) advised via his police radio that one of the attackers was "Bryan Johnson / Lil D" and a member of the Maniac Latin Disciples street gang.[3] The initial CPD report prepared by Hernandez documented that multiple witnesses told the officer that there were two assailants, each of whom fired shots at the victims. Hernandez wrote in his police report:

> *"Offender #1 pointed a gun in his direction, when witness #1 (Aby Gonzalez) got out of the way offender #1 then pointed and shot at victim listed (sic) right side of chest area. Victim then struggled to his feet to try to get away when offender #2 appeared and fired several more at victim, wit #2 (Stanley Jewell) and wit #3 (Fina Martinez) both stated that the offenders just approached the victim and started shooting for no apparent reason...."* .... *"Wit #4 (Omar Ortiz) also stated that there were (2) offenders."* [4]

The offender section of Hernandez's report also documents the fact that a second offender was responsible for and participated in the Fred murder and shooting of Ortiz.



CPD Officer Darryl Daley responded to the call and immediately suspected Johns based on his familiarity with Mr. Johns, who he knew to be a member of the Maniac Latin Disciples, and based on the information that was broadcasted. Additionally, Daley had observed Johns just one hour prior to the murder in the approximate area of where the shootings took place.[5] Daley and other officers began searching the surrounding area for Johns. A short time later Daley and other officers found an occupied black van parked near 1651 N. Talman, not far from the scene of the shooting. According to Daly's police report:

---

[3] AKA Bryan Lamont Johns
[4] CPD Supplemental Report (RFC-Johnson 000036-37)
[5] CPD Supplemental Report (RFC-Johnson 000034) (shootings took place in area of Bell and North and Daley had seen Johns an hour before at 2632 W Wabansia).

*"....two M/4 subjects were observed to exit a black van parked at approximately 1651 N. Talman, followed by "Lil D".  R/O's immediately advanced on these subjects, but the two M/4 subjects were able to gain entry.  OFF#1 (Bryan Lamont Johns) stopped as r/o's approached and was shortly placed into r/o's squad car."*

All three suspects--Bryan Johns, Elliot Berverena and Jose Medina--were eventually taken into custody and transported to Area 5 Violent Crimes, along with the van that the suspects were seen riding in.  Upon searching the van CPD officers discovered a semi-automatic handgun. I also noted that Daley's report supports the fact that two suspects, and possibly two different handguns, were responsible for the Fred murder. Daley documented in his police report that he responded to the area of the shooting based on a *"simulcast by Bt. 1414 (Hernandez)"* indicating that one of the <u>attackers</u> was *"Lil D"* a member of the Maniac Latin Disciples street gang.[6]

Daley also stated in his police report that he discovered *"a 2-inch chrome AMT .25 cal. handgun secreted under a vinyl covering for the motor cover.  The crime lab was notified and the weapon was recovered by Bt. 9601."* This gun does not appear to have been inventoried; there is no evidence report, crime scene processing report or other report documenting that the .25 cal. handgun was inventoried, or that it was ever tested or analyzed.

A separate crime scene report prepared by Officer J. Hogan indicates that Officer Rivera #10619 recovered a second, different weapon, detailing that a "AMT 380-9mm Kurz semi-auto. Pistol with 4" barrel stainless S." was found on the front floor of the van.[7] The Crime Laboratory report dated 06-15-1991 indicates that five .38SPL caliber rounds were submitted for analysis and it was confirmed that they were suitable for comparison.[8] While the .380-9mm semi-automatic was tested against the bullet recovered from the victim's body and it was determined the bullet could not have come from the semiautomatic,[9] there was no similar testing done with the .25 cal. handgun.  The weapons described in the police reports remain as yet another unexplained investigative mystery based on my review of police reports relating to this case.

Note: Based on my extensive training and experience with firearms, I know that "38SPL" ammunition/rounds cannot possibly be fired from a .380-9mm, and this was confirmed by the firearms expert at Demetrius Johnson's criminal trial.[10]

---

[6] *Id.*
[7] Evidence Report (RFC-Johnson 000082).
[8] Crime Laboratory Report (RFC-Johnson 000084).
[9] Transcript of November 1992 Proceedings, Johnson 1259-1260.
[10] *Id.*

I also noted that the gun shown in the photograph below does not have a 4" barrel as described by Officer J. Hogan nor does the gun appear to be under the vinyl covering of the motor but in a different area of the van. The investigative files that have been provided for my review do not explain or document these apparent and obvious discrepancies.

 

I also considered that the information contained in the initial police report indicating that four witnesses told police that they saw two assailants. And I considered Officer Daley's deposition testimony that he observed the two male Hispanics got out of the van and went into a vestibule out of his view before coming back outside.[11] This, of course, provided the suspects an opportunity to hand off a weapon to another person or drop a weapon in the vestibule. It is also logical to conclude that the handgun found in Johns' van may well have been the weapon used by the second assailant as described by the eyewitnesses listed in Officer Hernandez's report. I have not seen any evidence in the investigative files documenting the testing or results of any type of forensic or ballistic examinations being completed with this weapon or with the five rounds of "38SPL" ammunition that were placed into evidence and apparently submitted to the crime laboratory.[12]

That same night, June 12, 1991 approximately three hours following the shootings, CPD officers brought witnesses to Area 5 to view a live line-up in which Bryan Johns was the suspect.[13]

The investigative file contains a lineup report written by Det. Erickson. Erickson documented that six witnesses, Aby Gonzalez, Forrest Garnett, Fina Montanez, Rosa Burgos, Angel Cordova and Rosaline Morales, viewed the lineup. See actual excerpts from Erickson's report below.

---

[11] Deposition of Darryl Daley dated June 2, 2022, pgs. 185-187.
[12] Crime Laboratory Report (RFC-Johnson 000084).
[13] A procedure for conducting a line-up that allows witnesses to view suspects shown with "fillers" (persons of similar appearance to the suspect).

```
93. NARRATIVE
                  THIS IS A LINE UP REPORT

  DATE,TIME,LOCATION OF LINE UP:        12 June 91  2230 hrs.  Area 5 Det. Hdqrts.

  PERSON CONDUCTING LINE UP:            Det. Wm ERICKSON

                                        Det. Raymond GUEVARA

  PERSONS VIEWING LINE UP:              Forrest GARNETT    (2237 hrs.)

                                        Rosa BERGOS     (2240 hrs.)

                                        Aby GONZALEZ    (2243 hrs.)

                                           (cont'd)
90. EXTRA COPIES REQUIRED (NO. & RECIPIENT)    91. DATE THIS REPORT SUBMITTED =      TIME    92. SUPERVISOR APPROVING (PRINT NAME)   STAR NO.
                                               • DAY    MO.    YR.
                                                 13    June   91    1700
92. REPORTING OFFICER (PRINT NAME)    STAR NO.    94. REPORTING OFFICER (PRINT NAME)   STAR NO.   SIGNATURE
   Det. Wm ERICKSON        7121
SIGNATURE                              SIGNATURE                         95. DATE APPROVED (DAY-MO.-YR.)      TIME
```

```
  PERSONS VIEWING LINE UP:  (cont'd)      Rosaline MORALES  1532 Claremont   (2350 hrs.)
                                          Angel CORDOVA  2325 W. North Ave  (2355 hrs.)
                                          Fina MONTANEZ  2337 w. North Ave  (0115 hrs.)
```

Erickson documented that eyewitness Aby Gonzales positively identified Bryan Johns as the shooter and specifically detailed the time that the identification was made as 2243 hrs. I noted that Gonzalez told at least one person that back at the time of the Fred shooting, he knew Johns, which would've made Gonzalez's identification all the more powerful.[14]

```
HISTORY & INVESTIGATION:
     The above line up was viewed by 6 witnesses at seperate times.  Forrest GARNETT
viewed the line up first.  He viewed the participants as they were sitting side by
side in chairs.  The participants were not required to repeat any phrases.  After
viewing this line-up he was unable to make any identification.
     Rosa BERGOS viewed the line up next.  The participants were first viewed as they
were sitting side by side in chairs.  The participants were then requested to stand
and step forward to the center.  They each took turns standing and stepping forward
and then facing to the right and then the left.  They were not required to repeat any
phrases.  After viewing this line up, Rosa BERGOS was unable to make any identification.
     Aby GONZALEZ then viewed the line up.  He viewed the line up as the participants
were sitting side by side in chairs.  The participants were not required to make any
movements or repeat any phrases.  After viewing this line up, he identified the #2
participant, Bryan JOHNS, as the offender in said homicide.
```

```
90. EXTRA COPIES REQUIRED (NO. & RECIPIENT)    91. DATE THIS REPORT SUBMITTED =      TIME    92. SUPERVISOR APPROVING (PRINT NAME)   STAR NO.
                                               • DAY    MO.    YR.
                                                 13    June   91    1700
92. REPORTING OFFICER (PRINT NAME)    STAR NO.    94. REPORTING OFFICER (PRINT NAME)   STAR NO.   SIGNATURE
   Det. Wm ERICKSON        7121
SIGNATURE                              SIGNATURE                         95. DATE APPROVED (DAY-MO.-YR.)      TIME
```

15

---

[14] See Johnson 911-914 (notes of J. Tepfer).
[15] Excerpts from Erickson's Police Report dated June 13, 1991 (RFC-Johnson 000028).

A separate report of a lineup in which Johns was the suspect, authored by Defendant Guevara, is contained in the permanent retention file. In the Guevara report, Detective Erickson is listed as assisting in conducting the lineup. I noted that Defendant Guevara indicates that he wrote the report June 12, 1991 at 2300hrs, the same time that this lineup supposedly was taking place. In addition, the report was approved and signed by Sgt. J. Healy on June 24, 1991 at 0230hrs, twelve days after Guevara claims to have written the report.



According to Guevara's lineup report, four witnesses viewed the June 12, 1991 lineup with Johns: Aby Gonzalez, Rosa Burgos, Fina Montanez, and Forrest Garnett. Guevara's report does not mention that witnesses Rosaline Morales and Angel Cordova also viewed the lineup, which is contrary to Erickson's report. According to Guevara's report, none of the witnesses made an identification, also contrary to Erickson's report. Guevara's report states:



```
PERSONS IDENTIFIED IN LINE-UP:                    NEGATIVE LINE-UP

HISTORY & INVESTIGATION:                    On 12 Jun 91 at 2300hrs. The R/Dets.
                                            conducted a line-up at area five,
relative to a suspect in the FRED,Edwin Homicide. After four witnesses viewing this
line-up the results of it was negative. Because the results of the line-up was
negative the subject JOHNS,Bryan was released with out charging.



Det. Reynaldo Guevara #16345

Det. William Erickson # 7121
```

I also noted that the "fillers" listed on each lineup report are different. Bryan Johns is the only participant that is listed in both of the reports. In addition, I considered CPD records of the criminal histories of the fillers and affidavits from some of the fillers. CPD records show that the fillers in Erickson's report were arrested on the night of the Fred shooting and two attested that they stood in a lineup that night. By contrast, CPD has no records indicating that any of

---

[16] Excerpts from Guevara's Police Report dated June 12, 1991 (RFC-Johnson 000042).

the fillers in Guevara's report were under arrest or in custody on the night of the shooting, and one witness attested that he did not stand in a lineup and has never heard of Detective Guevara.

I am aware that Plaintiff alleges that Guevara buried Erickson's report in a secret "street file" that was never turned over to prosecutors or to Johnson's attorneys, and was only discovered decades later. Deborah Gubin and Magistrate Judge Ruth Miller were the attorneys that represented Demetrius Johnson during his criminal trial. When Attorney Gubin was asked if she was aware of the above police report at any point in the last 30 years, she stated that she was not, and only found out about it just prior to her November 04, 2021 deposition. [17] Ruth Miller testified that she is absolutely certain that the defense never had the lineup report. [18] I also considered the deposition testimony of the trial prosecutor, former judge Kevin Sheehan. Prosecutor Sheehan testified that he was certain that he "never" got the Erickson report.[19] His notes during the criminal prosecution that the Johns lineup resulted in "no ID" show support his testimony (CCSAO 000007).

Following the lineup views, and despite the eyewitness identification of Bryan Johns by Aby Gonzales, Guevara released Johns from custody. Remarkably, neither the investigative file or permanent retention file, or any other police document, documents if detectives even interrogated any of the three suspects that were arrested in possession of a weapon shortly after the shooting in the vicinity of the crime (Johns, Elliott Berverena and Jose Medina), or even asked by detectives if they had any knowledge of who the shooter may have been.

The CPD investigative files for this case are void of any photographs of the above lineup(s). Guevara later testified that he did not take photos of this lineup, claiming "no photos are taken in a negative lineup." Based on my knowledge, training, and decades of investigative experience, it is highly unusual and inconsistent with acceptable police practices to not have taken photographs of the lineup which was viewed by several witnesses to the Fred murder, regardless of results. And of course the positive identification documented in Erickson's report is all the more reason the lineup should have been photographed.

The investigative files are also void of any handwritten notes or GPR's of any such interviews, which leads me to logically conclude either a) the detectives failed to ask the suspects the most basic of questions concerning their involvement or knowledge of the Fred murder, or b) if the defendants did inquire, they failed to document the suspect's responses to such an obvious and basic interview question. Either scenario would be a serious deviation of generally acceptable police and investigative practices.

---

[17] Deposition of Deborah Gubin dated November 04, 2021 – pg. 34.
[18] Deposition of Ruth Miller dated Nov 2, 2021 – pgs. 27, 75.
[19] Deposition of Kevin Sheehan dated April 27, 2022 – pg. 43.

Erickson's report documenting this lineup and all references to the positive identification of Johns are omitted from the permanent retention file, and all of the evidence I have received indicates that this information was not provided to Johnson or his criminal defense attorneys or prosecutors. Instead, the permanent retention file contains the Guevara lineup report stating that Johns was not identified, and this document was clearly disclosed to the prosecution and defense, and referenced at trial.[20]

**THE INVESTIGATION TIMELINE SUMMARY:**

**June 12, 1991 – Shooting.** Johns is immediately suspected of the crime and arrested by Daley. Johns is identified by eyewitness Aby Gonzalez. Despite the positive identification, Guevara releases Johns.

**June 20, 1991** – Guevara interviewed Rosa Burgos and Victor Cordova. According to Guevara report Rosa Burgos told detectives that she would be able to identify the shooter, yet neither witness was asked to provide a description of the suspect(s) (RFC-Johnson 000021). The CPD file does not contain any contemporaneous notes, GPR's, or details of either of the two interviews referenced in the CPD police reports.

**June 21, 1991** – Guevara interviewed Ricardo Burgos (RFC-Johnson 000024-25). According to Ricardo, Guevara showed him a photo array and he identified Demetrius Johnson from that array.[21] There is no documentation in the file to indicate that Johnson was a suspect at this time, or explaining why his photo would have been included in an array as a suspect. The CPD file does not contain any contemporaneous notes or GPRs of this interview, nor did Guevara inventory the photos or document that Ricardo had made a positive identification. I have noted Ricardo Burgos' declaration and deposition in this case in which he testified that he did not see the shooting or shooter and could not have made an identification.[22]

**July 11, 1991** - Guevara interviewed Elba Burgos and Angel Cordova (mistakenly written as Angel Burgos) (RFC-Johnson 000018-19). During this interview Elba Burgos was shown a photo array containing five b/m's including Darrall Johnson. Elva reportedly told Guevara that "she could not make and identification but stated that the suspect resembled Darrall Johnson. Guevara claims that he was aware of Darrall Johnson having a younger brother, so he contacted Officer Daley and requested a photograph of 15-year-old Demetrius Johnson. Neither Elba Burgos nor Angel Cordova provided the detectives with a description of the shooter (RFC-

---

[20] Deposition of Kevin Sheehan dated April 27, 2022– pgs. 36-37; Prosecutor Sheehan's Notes CCSAO 000007 (6/12/91 lineup with "Little D" had "no ID"); Transcripts of November 1992 Proceedings, Johnson 1261-1278, Johnson 1278-1289.
[21] Transcript of November 1992 Proceedings, Testimony of Ricardo Burgos, Johnson 1082-1085.
[22] Deposition of Ricardo Burgos dated June 8, 2021 – pgs. 93-94; Declaration of Ricardo Burgos (Johnson 601-603).

Johnson 000019). The CPD file does not contain any contemporaneous notes, GPR's or details of either of the two interviews referenced in the CPD police reports.

**July 15, 1991** – Guevara is contacted by Officer Daley who provides a polaroid photograph of three individuals, including Demetrius Johnson. (RFC-Johnson 000019).

**July 15, 1991** - <u>Defendant Guevara returns to Elba Burgos and shows her the following 3-person polaroid photo</u> depicting Demetrius Johnson along with two other individuals:



Elba Burgos reportedly identified Johnson as the shooter based on the photograph. <u>(RFC-Johnson 000018-19)</u> I noted that in my opinion it appears that Johnson is the shortest and youngest person in the photo.

The Defendants claim that they also reinterviewed Angel Cordova and showed him the same 3-person photo that was shown to Elba Burgos and depicted above. Angel Cordova reportedly identified Demetrius Johnson as the shooter from the 3-person photo. <u>(RFC-Johnson 000018-19).</u> The CPD file does not contain any contemporaneous notes, GPR's or details of either of the two interviews referenced in the CPD police reports. Based on the identifications, the defendants submitted a stop order for Demetrius Johnson for the murder of Edwin Fred.

**July 22, 1991** – <u>Guevara and Halverson arrest Demetrius Johnson and transport him to Area 5.</u> Following the alleged identification of Johnson from the 3-person photo, Elba Burgos, Rosa Burgos, Angel Cordova, Victor Cordova and Ricardo Burgos were brought to Area 5 to view a live lineup The lineup consisted of Demetrius Johnson along with four other black males. Similar to the 3-person photo shown to Elba Burgos and Angel Cordova, Demetrius Johnson was placed in the middle of the lineup and is clearly the shortest and youngest person in the group. In addition, three of the individuals viewing the lineup had seen a photo of Demetrius Johnson before the lineup—Ricardo Burgos on June 21 and Elba Burgos and Angel Cordova on July 15, 1991.

15

Elba Burgos, Rosa Burgos, and Ricardo Burgos allegedly identified Johnson as the person who shot Edwin Fred. Two other witnesses, Angel and Victor Cordova were unable to identify Johnson as the shooter. (RFC-Johnson 000022-23).

I noted that none of the witnesses that identified Demetrius Johnson as the shooter had provided descriptions of the assailant on the day of the shooting.





I also found it to be highly inappropriate and inconsistent with acceptable police practices to have the persons participating in a lineup of this type to be shirtless, unless of course the suspect was shirtless when committing the crime, which no documentary evidence suggests occurred here. The investigative reports do not explain or offer an explanation as to the reason the Defendants felt it was necessary to have the subjects stand shirtless in the lineup proceedings.

**July 22, 1991** – A.S.A. Buckley, felony review, was contacted and responded to Area 5 as did Youth Officer Eileen Daly. Demetrius Johnson was interrogated and maintained that he had nothing to do with the shooting

After the identification of Johnson by Elba Burgos, Rosa Burgos, and Ricardo Burgos, A.S.A Buckley approved charging Demetrius Johnson with First Degree Murder. The closing case report stated: "*With the arrest and charging of the sole offender in this incident, it is requested that this case be filed, CLEARED BY ARREST/CLOSED*." RFC-Johnson 000080.

**Demetrius Johnson Was Convicted of Murder**

Demetrius Johnson went to trial before Judge Cawley in November 1992. Officer Daley testified of his arrest of Johns on the night of the shooting and knowledge that Johns was placed in a lineup. Daley also testified that Johns was not identified and was released. Guevara testified that a lineup occurred on the night of the shooting and that Johns was *not* identified. Guevara's testimony is flatly contradicted by Erickson's lineup report that Johns had been identified by Gonzalez.

Johnson argued that Johns was the true perpetrator of the Fred shooting. In rebuttal, the prosecution argued that no one had identified Johns in a lineup. Johnson was convicted and sentenced to 25 years in prison for the Fred murder.

**Post-Conviction Proceedings**

Johnson filed a direct appeal of his conviction, which was denied. He filed a post-conviction petition in March 1996. He filed an amended petition in 2019 based on the newly discovered evidence of the Erickson lineup report. I have reviewed those filings and their exhibits.

On November 12, 2019, Cook County Judge LeRoy K. Martin, Jr. vacated Johnson's conviction and ordered a new trial. On December 20, 2019, the State dropped all charges against Johnson.

On April 7, 2021, Cook County Judge Erica Reddick granted Johnson's petition for a certificate of innocence. Key to Judge Reddick's ruling was Guevara's failure to disclose the Erickson report. Judge Reddick wrote: "And key evidence that established that as a result of actions taken by this particular Detective [Guevara], that *there was strong evidence to believe that a key report, indicating a witness, an eyewitness, Aby Gonzalez, had actually identified a different person as the actual shooter of Edwin Fred, as well as Mr. Ortiz. That information was not revealed to the defense*, and as a result of other information -- important information about the actions of this particular Detective, and the numerous cases that his actions impacted negatively, wherein individuals were accused and convicted, based on information, it was determined was wrongfully withheld … as it pertains to this case, the particular evidence and information showed that there was key evidence that was hidden and not revealed, that would likely have made a difference in the Trial result."[23]

---

[23] Transcript of April 2021 Certificate of Innocence Proceedings, Johnson 998-1008 (emphasis added).

## ANALYSIS

### OPINION 1: DEVIATIONS FROM POLICE TRAINING AND GENERALLY ACCEPTED POLICE PRACTICES IN DEFENDANTS' INVESTIGATION OF THE EDWIN FRED SHOOTING

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced, trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "murder books" in some jurisdictions. These investigative records provide a step-by-step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices.

Based on my review of the record in this case, including many thousands of pages of records and transcripts of testimony and other materials, it is my opinion that the investigation into the murder of Edwin Fred by the Chicago Police Department violated many commonly accepted police practices, and had many flaws and irregularities. The entire investigation was conducted in a manner that was inconsistent with any acceptable investigative standards.

Before detailing and describing the numerous specific failures in the Fred investigation, I must once again note that it is highly unusual that an investigator in a criminal matter would refuse to answer questions about the investigation under oath. On the advice of his attorneys, and apparently concerned about incriminating himself, Guevara refused in his deposition in this case to answer a single substantive question about the Fred investigation and prosecution, instead asserting his Fifth Amendment right against self-incrimination. This includes in response to questions about whether he framed Demetrius Johnson, manipulated and suppressed eyewitness identifications and fabricated evidence.[24] This refusal extended to all aspects of the case, including the fabrication and suppression of evidence, whether he manipulated witnesses, whether he engaged in misconduct during the live lineups and photo identification procedures used, the exclusion of alternative perpetrators, testimony at Johnson's criminal trial, and related misconduct in other cases.

It is a duty of a police officer to testify truthfully about investigations in which he/she is and was involved and a refusal to adhere faithfully to that duty is a departure from accepted police practices. Given Guevara's silence, it appears the defendants are unable to provide logical

---

[24] Deposition of Reynaldo Guevara dated April 20, 2022.

explanations for the serious deficiencies in the Fred homicide investigation, and the repeated deviations from accepted police practices discussed below.

Some specific and important examples and issues of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

### 1. <u>Investigative "tunnel vision" by Guevara, Halvorsen, and the other defendants.</u>

Police Detectives investigating crimes have an obligation under accepted practices to follow all leads to bring the true perpetrator(s) to justice. It is not an acceptable practice to focus on a suspect and develop evidence that implicates that suspect and exclude evidence that implicates other suspects (tunnel vision or confirmation bias). Tunnel vision[25] is apparent in the Johnson investigative materials. The following are examples of "tunnel vision" in the investigation of the Fred homicide and the prosecution of Johnson for that crime:

First and foremost, the Defendants failed to go where the evidence took them: to Bryan Johns. The Defendants ignored remarkably strong evidence that Johns had committed the crime, and simply released him,

- Based on the initial "flash message," Johns was immediately identified by name ("Bryan Johnson" and "Lil D") as the person responsible for the murder of Edwin Fred, along with at least one other accomplice. In addition, the fact that Johns was:
  a) seen in the area by Daley one hour prior to the murder,
  b) matched the information provided by dispatch including gang affiliation,
  c) apprehended shortly after the shooting as he exited a van with two Hispanic males,
  d) they were seen approaching a residence where a weapon or other incriminating evidence could be stashed,
  e) police discovered not just one, but apparently two, possible murder weapons in the van that Johns was riding in,
  f) Johns matched the eyewitnesses' physical descriptions of the shooter,

- All of this is in addition to the positive identification documented in the Erickson report. I note that it would be highly suspicious, and a gross deviation from accepted police practices, to conduct two lineups within a half hour of each other with the same witnesses. In my forty years of police experience, I have never heard of two lineups being conducted so close in time. There is no reasonable explanation for such a procedure. This, in addition to the evidence above corroborating Erickson's lineup report and contradicting Guevara's lineup report, leads me to question whether the lineup conducted by Guevara and documented in his report may not have happened at all.

---

[25] Tunnel vision is a process that leads investigators to focus on a particular conclusion and then filter all evidence in a case through the lens provided by that conclusion.

- In addition, even without the positive identification, investigators had every reason to conduct a thorough investigation into Johns. Yet inexplicably, they simply released him the same day. From a police practices perspective, the decision to simply let Johns go is baffling. A thorough investigation, based on the evidence and guided by an effort to get to the truth, would have included basic steps, including the following:

  o There is no documentation of a single interview of Johns, let alone a meaningful interrogation to determine what he knew, what alibi he could provide, etc.

  o Officer Daley wrote in his report: *"two M/4's subjects were observed to exit a black van parked at approximately 1651 N. Talman and rapidly cross the street and enter the building at 1652 N. Talman and rapidly cross the street and enter the building at 1652 N. Talman, followed by Lil D. R/o's immediately advanced on these subjects, but the two M/4 subjects were able to gain entry."* I have not seen any evidence that the defendant officers even attempted to go inside this building, or prepared or executed a search warrant at this location even though a trained investigator would know that the two suspects could have concealed the murder weapon inside the building.

  o I have not seen any documentation that the defendant CPD investigators ever attempted to determine the caliber of the weapon used to murder Fred. Likewise, I have not seen any documentation that the .25 cal. handgun recovered from under the vinyl covering for the motor in the van that Bryan Johns was riding in when he was arrested was ever tested to determine if it was the second weapon fired as described in Officer Hernandez's police report. The gun was not inventoried, analyzed, or documented whatsoever in the police file outside of Daley's report. This is shocking. It is perhaps one of the most basic and important inquiries in conducting a police investigation to locate all possible weapons, inventory them, and test them for fingerprints and against any bullets from the victim. Defendants' utter failure to follow-up on an additional murder weapon is a clear deviation from police training and generally accepted practices. And, if Defendants did test or otherwise analyze this potential murder weapon, their failure to document this would be a gross deviation from acceptable investigative practices and police standards.

Almost opposite of their approach to Johns, Defendants decided on Johnson without any witnesses, physical evidence or other leads pointing toward him as a perpetrator, and then developed the evidence they needed to secure his charges and conviction.

- After letting Johns go, Defendants created their own theory that their prechosen suspect Demetrius Johnson was the sole assailant and the person responsible for the shootings of both Edwin Fred and Raul Ortiz. This theory was based on nothing more than an incredulous story that a witness 25ft away from the shooting could and did identify that the shooter was Darrall Johnson's younger brother. Their theory of what occurred greatly conflicted with the

documented evidence and the investigative departure from the known facts and evidence are never mentioned or adequately explained in the investigative case file. Specifically, at least two eyewitnesses told the responding officers that there were two shooters and not one. Officer M. Hernandez wrote in his report that he spoke with four witnesses immediately following the shooting, and at least two of the witnesses described seeing two assailants firing shots at the victims. Yet, none of this appears to have been addressed, let alone considered, in the detectives' singular pursuit of Johnson.





I have not seen any notes, reports or other evidence that indicates CPD investigators made any attempts or efforts to identify the second shooter or assailant that was apparently with the shooter identified at the time as Bryan Johns. In fact, I have not seen any evidence that the defendants ever asked *any* of the witnesses about the second assailant. Failure to take this very basic investigative step was inconsistent with generally accepted police practices.

---

[26] CPD Police Report (RFC-Johnson 000036).

- I have not seen any evidence that CPD investigators attempted to locate the murder weapon(s) at all, nor did they search the home of Demetrius Johnson or any of the other identified suspects. This is a basic investigatory step that could provide powerful evidence of guilt, and if detectives believed Johnson truly was the perpetrator, this would have been one of the investigative steps that should have been taken to develop the requisite evidence of guilt (as opposed to identifications of witnesses who did not have a meaningful opportunity to view the perpetrator(s) and could not provide reliable identifications).

- Likewise, Guevara and others received about eyewitness Angel Cordova, who saw the shooting and indicated he could make an identification, that should have made the officers consider whether they had the wrong suspect. According to Erickson's lineup report, CPD investigators had him view the June 12, 1991 lineup that included Johns. Then, a month later, Guevara went back to Angel Cordova to show him a photo array with Demetrius Johnson, whom he identified from the array. But, when Cordova viewed the July 22, 1991 lineup that included Johnson, *he did not identify Johnson*. Cordova was an eyewitness to the shooting, and he did not ultimately identify Johnson as the shooter. This information should have at least given the officers pause and caused them to consider that another person had committed this crime rather than doggedly pursuing Johnson.

### 2. Additional leads were not considered or followed up.

- Perhaps most obviously, the Defendants never contacted Aby Gonzalez after Gonzalez's identification of Bryan Johns on the night of the shooting. There is no explanation in the investigative file for this profound failure of the Defendants in this case.

- Omar Ortiz was listed as witness #4 in the initial police report which states, *"Wit #4 stated that when the victim was shot the victim almost fell on top of him in which Wit #4 then frightened ran into his residence. Wit #4 also stated that there were (2) offenders."* (RFC-Johnson 36-37). I noted that Officer Hernandez listed Ortiz's address and phone number in his police report. Despite these details, I have not been provided with any supplemental reports, GPR's or investigative notes detailing any contact or investigative interviews occurring between the defendants and Omar Ortiz. To not interview such a key witness is a deviation of acceptable police standards and practices, or if he was interviewed and the defendants failed to document their interview with him would be a deviation from acceptable investigative practices and police standards.

- Rosaline Morales was listed in Erickson's report as having viewed the June 12, 1991 lineup that included Johns. (RFC-Johnson 26-27). The investigative file does not contain any additional information regarding this witness or any subsequent interviews by the defendants.

- Fina Montanez was interviewed by Guevara on June 23, 1991, and stated that she and her friend "Armando" were coming back from making a phone call at the corner of North and Western: *"As they were walking east on North toward Claremont approaching 2337 W. North Ave. She observed a male black or black Hispanic come around the corner from Claremont with a gun in his hands pointing it at her. He then turned and fire (sic) one shot at Raul Ortiz that was sitting in front of 2333 W North Ave. and striking him in the shoulder. He turned again and fired a few more shots at Edwin Fred striking him twice. She then feared for her life and ran upstairs."* (RFC-Johnson 000060). I have not seen any documents in the investigative file indicating that the defendants located or even attempted to identify or interview "Armando," potentially a key witness to the shooting and possibly in the same position as Fina Montanez in terms of witnessing the shooting and identifying the shooter.

- Ricardo Burgos was interviewed nine days after the shooting, on June 21, 1991, and claimed to have viewed the shooting from a moving car heading eastbound on North Avenue away from the shooting. According to Guevara's police reports, Ricardo said he saw the shooter, who he described as a "male Hispanic" walking down the street with a gun in his hand, and then saw the gunman fire and flee. Ricardo got out of his car and ran to assist Edwin Fred. (RFC-Johnson 000024-25). Burgos claimed that he was riding in a car away from the shooting driven by his friend "Ramon" when he witnessed the shooting. I have not seen any documents in the investigative file indicating that the defendants attempted to identify or interview Ramon, possibly a key witness to the shooting.

- On June 29, 1991, CPD Officer Crespo reports that he arrested an individual identified as Robert Weeks and determined that Weeks fit the description of the suspect wanted for the Fred homicide. Crespo also documented that received a phone call and spoke with a citizen identified Juan Lopez. According to Hernandez's police report, Lopez told the officer that he *"witnessed the homicide that occurred on 12JUN91, at 2311 W. North. He followed the offender to a building located at Lemoyne and Western, above a tire shop. Also noted by these informants was the fact that (WEEKS) is a member of the Spanish Cobra street gang, and that he has a distinctive tattoo of pitch fork and a large cobra snake on his rt. arm. R/o's on today's date contacted Area five Violent Crimes, DET. Halverson arrived at 014Dist. at which time the investigation was turned over to him."* (RFC-Johnson 000032).

```
       While processing (Weeks) the R/Os noticed that he fit the description of a Homicide
   fender recorded under RD#272087.
       R/Os spoke with a citizen via telephone who identified himself as Juan Lopez.
   MR.Lopez stated that he had witnessed the Homicide that occured on 12JUN91,at 2311 W. North.
   HE followed the offender to a building located at Lemoyne and Western,above a tire shop.
       He described the offender as a male black approx.20yrs.old,507,150LBS,
   R/Os also spoke to several informants who verified the fact that(WEEKS) frequented the
   the apartment located at Western and Lemoyne above tire shop. Also noted by these informants
   was the fact that(WEEKS) is a member of the Spanish Cobra street gang,and that he has a
   distinctive tatto of pitch fork and a large cobra snake on his rt. arm.
       R/Os on today's date contacted Area five Violent Crimes, DET.Halvorsen arrived at 014Dist.
   at 014Dist. at which time the investigation was turned over to him.
       Any further information will be the subject of a supplementary report.
```

Generally accepted police practices dictate that the defendants should have followed up on this seemingly important lead, including conducting an in-person interviews of Juan Lopez and Robert Weeks as well as a search of the apartment above the Tire Shop at 2311 W. North, that the eye witness claimed that he followed the shooter to.

Det. Halverson was provided with this important lead and the investigation of it was turned over to him. Yet, there is no indication in the homicide file that the Defendants conducted any type of follow up relating to this lead. Failure to take these basic investigative steps would be inconsistent with generally accepted police practices and is yet another example of the tunnel vision on display in this case. This lead was not consistent with the detectives' pre-conceived theory that Demetrius Johnson was the perpetrator, and so it appears it was simply dropped.

**3. The defendants grossly deviated from basic investigative protocols while conducting the photo and live lineups with Demetrius Johnson.**

Experienced and reasonably trained homicide detectives are familiar with the difficulties posed by relying entirely on an "eyewitness" as a basis for police presenting a charge of homicide and they were aware of these difficulties in 1991 and even prior to that. The presence of a weapon during an incident can draw visual attention away from other things, such as the perpetrator's face, and thus affect an eyewitness's ability to identify the holder of the weapon. This is further aggravated when the lineup does not contain the actual offender. In that situation young children and the elderly commit mistaken identifications at a rate higher than young adults.

Even by 1992 and 1993, the International Association of Chiefs of Police Law Enforcement Policy Center was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. As the IACP papers in 1992 and 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result.

24

Misidentifications by eyewitnesses are normally the result of a combination of factors."[27] Both papers explained the primary reasons that eyewitness identifications were "frequently unreliable": frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion.[28] The papers both quoted from the Supreme Court's 1967 decision in *United States v. Wade*, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." In fact, even in 1967, the IACP was putting out training material for law enforcement about the failures in witness perception, writing that "Eye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts[.]"[29] Long before the 1990's, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways.

Based on my review of the record, there were a number of concerning irregularities and deviations from accepted practices regarding the photo identification procedures. While different cases must be solved in different ways, here, the information available to detectives from the very start was that this was not a case that was going to be solved based solely on eyewitness identifications. However, there are other ways for detectives to solve cases, for example through forensic evidence. But as discussed above, the investigative work in those areas was woefully lacking. The defendants, including Guevara and Halvorsen, decided to conduct identification lineups rather than pursuing physical evidence and other potential leads, is another example of the tunnel vision that caused them to focus on closing the case against their chosen suspect, Demetrius Johnson, by whatever means necessary.

Defendants' gross deviation from accepted photo and live lineup procedures included the following:

- *Undocumented photo array with Ricardo Burgos*: On June 21, 1991, nine days after the shooting, Guevara showed Ricardo Burgos a photo array that included Demetrius Johnson.[30] Guevara did not document this identification in any police report or GPR nor did he inventory the photo array, a deviation from acceptable investigative practices and police standards.[31] Importantly, according to police reports, Demetrius Johnson did not become a suspect until July 11 when Defendant Guevara spoke to Elba Burgos, who reportedly said the

---

[27] IACP National Law Enforcement Policy Center, "Showups, Lineups and Photographic Identification," May 1993; IACP Training Key, "Showups, Lineups and Photographic Identification," 1992.

[28] *Id.*

[29] IACP Training Key #67, "Witness Perception," 1967.

[30] Transcript of November 1992 Proceedings, Testimony of Ricardo Burgos, Johnson 1082-1085.

[31] CPD General Order 88-18, eff. September 23, 1988.

shooter looked like a younger Darrall Johnson.[32] There is no explanation in the file for this significant contradiction.

- *Improper photo identification procedure with Elba Burgos and Angel Cordova*: After obtaining a photo from Daley of Demetrius Johnson along with two other individuals, Guevara showed the photo to Elba Burgos and Angel Cordova. This identification procedure, amounting to a show-up, was completely inappropriate. My understanding from reviewing the testimony in this case is that CPD detectives had access to many photos of known gang members and could have created a photo array that included photos of people with similar features to their suspect, Demetrius Johnson. All trained detectives knew in 1990s and before that photo lineups should be compiled in a way to ensure that the suspect does not stick out in any way. That means finding fillers that match that description of the shooter given by the eyewitness. There was no reason for Guevara to conduct the photo identification procedure in the manner that he did. In addition to only showing one photo, the photo shown to witnesses contain "fillers" that look far different from Johnson—he is the shortest and youngest. One of the individuals in the photo appears to be a different race that Johnson. Based on my experience and training, the singular photo with only two "fillers" who look nothing like the suspect was not reliable, or ones a supervisor should permit his detectives to show to a witness if the goal is to get to the truth.

- *Repeated identification procedures with Ricardo Burgos, Elba Burgos, and Angel Cordova:* The use of multiple, repeated identification procedures with witnesses, featuring a single, common suspect, further undermined the reliability of the identifications and further deviated from generally accepted police practices. The police reports indicate that Guevara and Halvorsen showed Elba Burgos and Angel Cordova each a 3-person polaroid photo first, and then had them view the lineup with Johnson. Guevara also conducted a photo array with Ricardo Burgos in which he identified Johnson, and then had him view the lineup with Johnson. The conduct of showing photo of the suspect impacts the reliability of the line-up held afterwards, because it gave the witnesses yet another opportunity to view Demetrius Johnson ahead of time and associate his face with the shooting. Reasonably trained police investigators know that using both a photograph of the suspect and a live line-up may increase the likelihood of false identifications, and at minimum reduce the value of the subsequent procedures. Witnesses may become familiar with the suspects face while viewing the photograph.

- *Improper live lineup procedures with Ricardo Burgos, Elba Burgos, and Rosa Burgos:* The unreliability of the identifications of Johnson by these witnesses should have been obvious to any reasonably trained investigators.
  - *Ricardo:* Almost two weeks after the shooting, Guevara interviewed Ricardo Burgos. He said he was in a moving car driving away from the shooting.

---

[32] CPD Supplementary Report (RFC-Johnson 000018-19).

(RFC-Johnson 000024-25). He testified that he never saw the shooting and he would not have been able to make an identification.[33]

o   *Elba:* Six weeks after the shooting, Guevara interviewed Elba Burgos. She said was sitting on her porch when she supposedly saw the shooter through a crowd of people. (RFC-Johnson 000018-19; Johnson 1003). She testified at her deposition that she never went to a police station in June or July of 1991 and has never spoken to Reynaldo Guevara or any other police officer.[34]

o   *Rosa:* The night of the shooting, Rosa told police that "everything happened so fast and that she wasn't sure" who the shooter was. (Johnson 1186-88). Eight days later, Guevara interviewed Rosa Burgos. She said she was inside a building walking down a flight of stairs behind Raul Ortiz when the shooting happened. She ran upstairs to avoid being shot. (RFC-Johnson 20-21).

In my forty-four years of law enforcement experience, I know that reasonably trained investigators understood by 1991 that eyewitness identifications are often problematic and unreliable, especially as time passes and memories fade. If these investigators were truly seeking the truth about who murdered Fred and shot Ortiz, they should have been questioning themselves about whether any of these witnesses could have made a reliable identification given their limited opportunity to see the shooter(s). These witnesses' recent testimony that they did not see the shooting corroborates Defendants' tunnel vision to prosecute Johnson for this crime. These problematic eyewitness identifications also raise questions about the propriety of the earlier procedures and the impact of the repeated procedures on these already shaky identifications.

I have also been provided with the expert report of Prof. Dysart in this matter, and have reviewed her opinions regarding the unreliability of the eyewitness identifications in this case, especially in light of the viewing circumstances. Her opinions are consistent with, and corroborate, my opinions regarding the use of identification procedures with Rosa, Elba, and Ricardo in this case.

- *Failure to conduct lineup procedures with eyewitnesses:* According to the Erickson report, at least six witnesses viewed the lineup the night of the shooting that included Johns, presumably because they got a good look at the shooter. Yet several of those witnesses—Aby Gonzalez, Fina Montanez, Forrest Garnett, and Rosaline Morales—were not brought back in to view the lineup that included Johnson. Instead, the Defendants' reliance on the dubious identifications of Rosa, Elba, and Ricardo Burgos shows these investigators were not conducting a thorough and comprehensive investigation. Any reasonably trained investigator

---

[33] Deposition of Ricardo Burgos dated June 8, 2021 – pg. 45.
[34] Deposition of Elba Burgos dated April 26, 2022 – pgs. 44-45.

would have had known eyewitnesses view a lineup with their suspect. There is no documentation, or reasonable explanation, for this investigative failure.

- Finally, based on the initial identification of the shooter as Bryan Johns, when asked point blank whether he manipulated the photo procedures, Guevara did not deny any of the misconduct discussed above with regard to the photo array and lineup procedures conducted with the witnesses in this case, instead he plead the Fifth. As I said earlier, this is highly troubling to me that a former law enforcement officer would not deny committing intentional misconduct and would instead testify that a truthful answer to the question would subject him to criminal prosecution.

### 4.  **Failure to document and transmit investigative information.**

The police investigation files in this matter demonstrate a serious failure by defendants to document investigative information. Oral communication of information during a homicide investigation is insufficient. A written record is necessary to communicate relevant information among investigating personnel in order to identify suspects and develop evidence leading to the apprehension of the true perpetrator(s) of the crime. A homicide file should allow the reader (including fellow detectives, supervisors, and eventually prosecutors and criminal defendants) to see the investigative steps that were taken, and all potentially relevant information must be recorded because the investigator will not know at the time information is received that it is or is not important to the ultimate case. Contemporaneous documentation is critical to ensure that information is accurately recorded and communicated. For this reason, police officers, and detectives and other investigators in particular, are trained that to take contemporaneous notes in order to assist them in preparing accurate and complete reports. Homicide investigations are often fast-moving and ever-changing, involve interviews of numerous witnesses, and can depend on minute details to develop critical leads. Relying on memory alone to prepare reports weeks, days, or even hours later creates the risk of losing critical information and failing to accurately document investigative information, as detectives are routinely trained.

Professional investigation and documentation are critically important for a number of reasons, some of which include but are not limited to:

- Case integrity
- Continuity of investigation
- Supervisory oversight
- Facilitation of case management
- Inclusion of investigative notes and investigators actions
- Insuring thoroughness of the investigation
- Allowing other investigators to assist or replace initial investigators
- Providing a "paper trail" of what steps were taken (or not taken)
- Focusing on important aspects of the case

- Identifying what remains to be done and what has already been done and by whom
- Eliminating suspicion from some possible initial suspects
- Providing sufficient information to identify and arrest a suspect
- Providing insight for prosecutors considering charges
- Providing an objective basis for charging and trying the suspect
- Providing an objective basis for the court to determine challenges
- To have a single document for discovery and disclosure (Brady rule)

In this case, detectives failed to document the investigation accurately and thoroughly, or to ensure that all relevant information was documented, including exculpatory information. These failures violated generally accepted police practices. I have detailed these failures throughout this report, and highlight the most critical ones here:

- There are no handwritten notes or GPRs in the entire investigative files in this case. Such notes are required by policy to be kept in the investigative file. In my decades of experience, I am not aware of a single homicide investigation in which detectives took no notes.

- If no notes were taken in this case by Guevara and the other defendants, despite numerous substantive interviews of witnesses, including interrogations of suspects, that would be contrary to police training and accepted police practices, and call into question the veracity of the information in the detectives' reports, purportedly all written from memory (in some cases, days after the events described therein).

- If notes were taken and later destroyed, this too would be a violation of CPD policy, which required the retention of all notes. As discussed below, this was uniquely critical in the Chicago Police Department, which had a history of withholding exculpatory information in officer notes and memos.

In this case, the evidence I reviewed includes numerous examples of documentation errors and failures. Examples of these documentation failures include the following:

- There is no contemporaneous documentation of the supposed conversations with the many witnesses that were interviewed during the course of this investigation. The investigative file is also void of any notes or details concerning efforts made by detectives explaining why certain individuals such as Johns, who had been identified the night of the shooting, or Weeks were eliminated as suspects.

- There is no contemporaneous documentation of the supposed June 21, 1991 interview with Ricardo Burgos and the subsequent photo array in which Ricardo made an identification; the supposed July 11 and July 15, 1991 interviews with Elba Burgos, nor are there any handwritten notes detailing interviews with any of the other witnesses identified in the defendants' police reports. The lack of documentation of Guevara's interview with Ricardo Burgos is particularly problematic, as Ricardo supposedly made an identification of

29

Demetrius Johnson weeks before he became a suspect in the case. There is also no explanation as to why police waited *weeks* to track down a suspected murderer. This is contrary to accepted police practice. Reasonably trained investigators would put out a request to other police officers and detectives to apprehend a murder suspect, and to seek arrest and/or search warrants to arrest the suspect and possibly develop additional evidence, not to wait weeks while a possible killer is on the loose.

- There are no contemporaneous notes of Guevara and Halvorsen's interviews with several key witnesses to the shooting, including Aby Gonzalez, Angel Cordova, Victor Cordova, Rosa Burgos, Fina Montanez, Rosaline Morales, and Forrest Garnett.

- At least fourteen witnesses were identified in the various police reports relating to this case. Yet, there is no contemporaneous notes or detailed documentation of any statements provided.

- A .25 caliber handgun was discovered from the initial suspect against whom the Defendants had strong evidence. Yet unbelievably, there is no evidence report, crime scene processing report, or other documentation of the weapon being inventoried. There is no documentation of efforts to match this gun to the bullet recovered from the victim. There is simply no documentation regarding this potential murder weapon in the rest of the file.

**OPINION 2: CPD's POLICIES AND PRACTICES CONCERNING DOCUMENTATION
AND DISCLOSURES IN HOMICIDE INVESTIGATIONS ARE WOEFULLY
INADEQUATE AND RESULT IN THE ROUTINE FAILURE TO DOCUMENT AND
DISCLOSE THE DOCUMENTS AND INFORMATION LEARNED DURING THE
HOMICIDE INVESTIGATION TO CRIMINAL DEFENDANTS**

**A.** **The CPD's policies and practices related to the documentation,
storage/preservation, and disclosure of documents and information learned during
homicide investigations was contrary to generally accepted police practices**

To meet their constitutional obligation to turn over investigative information to the criminal
justice system, police departments typically put in place policies and practices that require
officers to document the information they learn during the course of an investigation, keep all of
the investigative materials and information in a centralized file, and disclose all of the
investigative information in the central file to prosecutors and others in the criminal justice
system. In support of these steps, departments perform training and monitoring to ensure the
policies are followed and the necessary steps above are taken.

Based on my review, CPD did not maintain policies and practices to ensure that these basic steps
were being taken. First and foremost, under CPD policies there was not a centralized file, but
instead information related to each investigation was kept in multiple files in multiple places.
Then, CPD failed to provide any training or policies to ensure that formal or informal responses
to discovery requests from the criminal justice system actually resulted in the collection of all
investigative material from all locations. In other words, documents related to a single
investigation were in multiple places, but there was no policy, directive, checklist, or other guide
to tell the subpoena responders what all those places were or how to go about ensuring that they
had obtained it all. The result was predictable: a routine failure to disclose all relevant
investigative materials to criminal defendants.

My review indicates that these problems were known as early as 1981, as part of two federal
cases at that time, discussed below. But the policies and practices the City put in place in
response to these cases was plainly inadequate to solve the problem. The policies that were put in
place continued—rather than prohibited—the use of multiple, parallel files for each
investigation. The policies were also wholly missing any instruction or directive to ensure that
there was a process to ensure that whatever investigative material was out there, in the various
places it was housed, was all being produced in response to discovery requests from the criminal
justice system. There was also limited training on these new policies, and more importantly, no
supervision or auditing to ensure that the new policies were being followed.

In addition to the Fred homicide file, I have reviewed many more Chicago homicide files, and
corresponding criminal defense and prosecutor files. For this case, I reviewed all Area 5
homicide files (investigative files and permanent retention files) the City produced for the period
from 1991-1995, as produced by the City in *Sierra v. City of Chicago*. I also reviewed all Area 5

homicide files, and corresponding criminal defense files, for the period from 1995-1998 as produced by the City in *Reyes/Solache v. City of Chicago*, which I relied on to form opinions in that case and rely on here as well. In addition, I have also reviewed the expert reports of Michael Brasfield in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files for different time periods (Rivera) or different Areas (Fields), as well as the police homicide files in *Iglesias*, *Sierra*, *Reyes/Solache*, *Rivera*, *Fields* and *Kluppelberg*.

Each of those cases contain examples of investigative material suppressed in CPD homicide files, or that was otherwise not documented and disclosed, that should have been turned over to the criminal justice system based on police training, and that would have clearly been considered *Brady* material under generally accepted police practices. Based on my review of all of this material together, it is my opinion to a reasonable degree of professional certainty that CPD's documentation and file-keeping policies were deficient, and that CPD maintained a widespread practice in which investigative documents and information learned during homicide investigations was routinely withheld from criminal defendants. My findings here mirror my findings in *Iglesias* and *Sierra*, other cases that involved Area 5 defendants including Detective Guevara, which involved analysis of the same set of 1991-1995 and 1995-1998 files.

Remarkably, my findings appear to be true even to this day. The City of Chicago's own Office of Inspector General issued a report in June 2020 regarding CPD Record Management, stating that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations."[35] The OIG's findings included the following:

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, cannot ensure that they are identifying and locating all responsive records for production. The Department lacks the means to determine what records may exist for any case or incident, making it impossible to know whether it has identified and produced all relevant records."

- "When receiving a request for 'any and all' relevant records (i.e., requests with broad language) including but not limited to certain specific records, Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated, in order to satisfy the broader request."

- "When the Subpoena Unit receives subpoenas with broad language, members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records."[36]

The OIG issued a follow up report in September 2021 stating, "CPD's ability to meaningfully ensure that it is fulfilling all of its constitutional and legal obligations to produce all relevant

---

[35] June 2020 OIG Report, at 4-5.
[36] *Id.* at 4.

records for criminal and civil litigation remains seriously impaired."[37] The OIG was plain as day about CPD's unwillingness to do anything to fix the problem: "OIG concludes that CPD has undertaken almost no corrective actions." As discussed below, the OIG's findings—to this day—are consistent with my findings for the period from 1991-1995, and 1995-1998 (in *Reyes/Solache, Sierra and Iglesias*).

My opinions are discussed in more detail below.

**Standard police practice in the 1990s was to maintain a centralized repository, often referred to as a single "murder book" or "homicide file." to collect and store all investigative information learned during the course of a homicide investigation**

Necessary to every homicide investigation is not only the investigative steps taken to solve the case, but also the documentation and preservation of the information learned over the course of that investigation. By 1991, and well before, police departments as a matter of course trained their officers that they were required to thoroughly document their investigations and that they should disclose the entirety of their investigations to criminal defendants, as this was part of their constitutional Brady obligation to the prosecutors and criminal defendants.

Police departments around the country wrote policies and perpetuated practices designed to ensure these constitutional requirements related to documentation and disclosure were being net. The standard practice followed by police departments, in turn, was the obvious one: maintain a single homicide file in which all investigative material is placed and kept, and then disclose the entirety of that single, homicide file to the criminal justice system. This was typically done by having the lead detective(s) assigned to the investigation be responsible for ensuring that the investigative steps conducted (which they would have other done themselves, or been told about by assisting detectives) were documented, and for gathering and collecting all of the documents in a single homicide file. In this way, any work done by the lead detectives, assisting detectives, patrol officers or gang officers or other special units, and all the various traditional (reports, notes, etc.) and non-traditional investigative material (business cards, a photo received from a witness, etc.) was all in one place. Likewise, in this way, investigative steps documented in handwritten notes, or in typed reports, would also all be in one place. This approach not only aids the investigation—by ensuring that all investigative material is in one place and available to the lead investigators to review, and to supervisors to monitor the investigation's progress—but also provides a single, central repository from which the entire set of investigative materials can be collected and copied for production to the criminal justice system.

The standard practice I have described above is exactly the practice that was, and is, followed in each of the police departments in which I have worked. My knowledge of these standards is based on my extensive practical experience of supervising and managing criminal investigations; including my own experience as a detective and detective sergeant with multiple police agencies; and my familiarity with the policies used by departments nationwide. As a law enforcement

---

[37] Sept. 2021 OIG Follow-Up Report, at 2.

trainer I have for several decades provided investigative training to detectives from hundreds of agencies throughout the country. In the course of my work as an independent criminal justice consultant reviewing policies and practices of police departments around the country, I am familiar with industry standards established by organizations like the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF). These standards have also been documented in homicide guides and reference materials for decades, which are included in my materials reviewed.

In addition to the maintenance of a single, centralized file, there is also the question of what information should be documented and included in the centralized file. The answer is everything (within reason). The standard police practice is to document, in notes and/or reports, all of the information learned during the course of an investigation. Of course, homicide detectives were not expected to document if they stopped for coffee on their way to a crime scene, or a friendly greeting from a passerby on their way to see a witness. But putting aside the extreme, investigative steps taken to advance the investigation should be documented, even if they ultimately prove to be dead ends, or do not support the hunches or theories of the investigating officers. This is because an investigator does not know in advance which piece of information they learn will ultimately prove to be critical to solving the case, and something that seems like a bid lead today can fizzle; and something that seems like a small lead today can prove to provide the critical clue down the road. This is also one of the critical ways that detectives avoid tunnel vision, and becoming overly fixated on a single suspect or theory, a highly relevant issue in this case, as discussed above. Thorough documentation of an investigation—even those steps that might point to alternate suspects or undermine the case against the eventual suspect—is also necessary as a matter of meeting the police's constitutional obligations to criminal defendants and the criminal justice system. Put simply, in my experience detectives and other police officers are trained and expected to follow the policies and practices I've described above.

Finally, consistent with all of the above, under generally accepted police practices the complete homicide file, consisting of all of the documents and information gathered during the investigation, must be produced to the criminal justice system. This is true regardless of whether the request comes in the form of a formal subpoena, or an informal request from prosecutors, criminal defendants, or others. Investigators (or administrators, to the extent they are involved in disclosing files) must not sift through the file to decide which documents they want to produce. Pursuant to written policies and practices, direction is given that the entire file, including all investigative material, should be disclosed.

### "Street Files": the George Jones Case and the *Palmer* class action

In the early 1980s, the City's historic practice of permitting detectives to maintain "street files" containing their own "personal" investigative notes, undisclosed to the criminal justice system, came to light. It began with the criminal prosecution of a young man named George Jones, and resulted in two federal lawsuits through which a federal judge concluded that CPD's policies and

practices at the time were inadequate, and resulted in the routine withholding of investigative material from criminal defendants.

**George Jones:** In 1981, George Jones, a senior at a Chicago high school who edited the school newspaper and was nicknamed "Bookworm," was charged with the murder of Sheila Pointer. During the CPD investigation, Frank Laverty, one of the detectives investigating the case, interviewed the victim's brother, Purvy. Purvy told Laverty that there were two assailants and both were wearing stocking masks. Laverty documented this and other evidence that Jones was not the perpetrator and that Jones could have used to help defend himself. However, this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[38]

Detective Laverty later learned in the newspaper that George Jones was on trial for the Pointer murder. Laverty told his Commander that Jones was innocent and being wrongly prosecuted, but his Commander did nothing to stop the prosecution. Laverty then found Jones' criminal defense attorney and told him about the information in the street file. Laverty's earlier investigative efforts documenting information that was exculpatory for Jones had not been provided to the defense attorney. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[39]

Jones then filed a civil lawsuit. He won. The jury found that the City had a practice of using "street files" that were withheld from the criminal justice system. The Seventh Circuit explained that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[40]

**The Palmer Litigation:** In addition to Jones' personal lawsuit, a class action was filed in federal court to prevent the use of street files.[41] The plaintiffs sought an injunction, and one was granted requiring CPD to preserve all street files and documents formerly placed in street files.[42] The TRO was amended when it came to light that detectives were continuing to treat notes and other investigative materials as their own, for personal use as part of a personal street file but not available for inclusion in any CPD file.[43]

District Judge Milton Shadur conducted a preliminary injunction hearing, after which he reached the following conclusions:

- There were no guidelines about what information in "unofficial reports" (e.g., notes, witness interviews, worksheets, memoranda, etc.) had to go into "official reports" (e.g.,

---

[38] *Jones v. City of Chicago*, 856 F.2d 985, 988-991 (7th Circuit 1988)
[39] Ibid. (at 991)
[40] Ibid. (at 995).
[41] *Palmer v. City of Chicago*, No. 82 C 2349
[42] Ibid (at NF-L 005606-07)
[43] Ibid (NF-L 005607)

supplementary reports, closing reports, etc.). Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[44]

- The use of parallel files containing unofficial reports, referred to as "street files," "running files," "office files" or "working files," was well known within CPD.

- There was no policy or practice to ensure that all relevant information was placed in official reports or transmitted to the CPD's Records Division for permanent retention, resulting in potentially relevant information not being included in official reports.[45]

- In response to subpoena requests, CPD produces the official reports maintained at the Records Division, and photographs and lab reports, but not the unofficial reports maintained at the Area or kept by the detectives.[46] CPD Records Division employees do not respond to subpoenas or defense motions for discovery by contacting individual Areas for unofficial documents.[47]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[48] He also found that the use of street files created a "grave risk" of non-disclosure of exculpatory and impeaching information (in other words, *Brady* material). On appeal, the Seventh Circuit reversed Judge Shadur in part. It ordered CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies, but otherwise vacated the preliminary injunction because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. The Seventh Circuit did not revisit or revise Judge Shadur's factual findings.[49]

I also reviewed the Seventh Circuit's later decision regarding Plaintiff's request for attorneys' fees, denying that request. I am aware that the Court wrote that the plaintiff's attorneys had failed to identify exculpatory material in files other than Jones' case, stating, "They went on a fishing expedition, and the pond was empty. Maybe the city removed the fish, but at the moment that is just a slander."[50] I also reviewed the affidavit of Jeff Haas, one of the plaintiff's attorneys in Palmer, stating that they had not actually reviewed the files to identify exculpatory information, and did not have official CPD files (which I take to mean the permanent retention files) or prosecutor or criminal defendant files, to compare against to see if exculpatory information was withheld. I also note that Mr. Haas found evidence that some CPD files were "pre-purged" of notes

---

[44] Ibid (NF-L 005609-10)
[45] Ibid (NF-L 005612)
[46] Ibid (NF-L 005614)
[47] Ibid (NF-L 005614)
[48] Ibid (NF-L 005615)
[49] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.
[50] *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1986).

and memos and other information, a practice Haas indicated witnesses in the case had testified to. This is consistent with my findings, discussed below, that many files appear to be missing notes and other investigative information I would expect to see in a homicide investigation (*e.g.*, entire homicide files with no notes whatsoever, files where there are no notes of interrogations and other substantive interviews of suspects and key witnesses, files with no evidence of investigation into other leads or alternate suspects, etc.). Regardless, for my purposes the Seventh Circuit's attorneys' fees ruling does not alter Judge Shadur's findings, and the guidance it provided to CPD policymakers about the problems that needed to be addressed by its policies.

**George Jones Appeal**: In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of permitting detectives to keep street files undisclosed to criminal defendants.

The appellate decision included the following: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[51]

Notably, the decision included the following indictment of CPD leadership at the time:

> Laverty should have been commended for his adherence to the principles of honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[52]

Based on my review in this case, discussed further below, this commentary on the failure of CPD leadership proved to be foreshadowing. The Jones and Palmer rulings reveal a consistent theme: resistance to change from detectives who insisted on continuing to keep street files, and resistance to change from CPD leadership that was more concerned about punishing Laverty for blowing the whistle than abolishing unconstitutional practices that had almost resulted in the wrongful imprisonment of an innocent high school student. The lack of a strong institutional

---

[51] *Jones* at 988, 991-92, 993, 995-996.
[52] *Jones*, at 991-92.

response, and a strong message from CPD leadership that a dramatic change in practice was needed and was going to be enforced at the risk of discipline, is deeply problematic. It is no surprise, then, to see substantial evidence in this case, and the many other cases I reviewed, that the street files practice continued on for decades.

**CPD's policies after *Jones* and *Palmer* do not solve the problem, and are inadequate to ensure disclosure of all relevant investigative materials**

Despite the revelations from the Jones and Palmer lawsuits, including specific guidance from Judge Shadur regarding the failures in CPD's policies, the department's leadership made only the most tepid policy changes. The new policies were inadequate on their face, and wholly insufficient to make the sort of institutional changes necessary to ensure the consistent and complete disclosure of investigative material. The new policies were defective in nearly every way: they did not require documenting all investigative steps, they applied only to detectives but not other officers involved in investigations, they continued to permit a system of multiple files containing different information, they lacked any express directive to disclose all investigative material in the multiple police files, and they contained no processes or instructions to ensure subpoena responders gathered all investigative information from each of the multiple repositories that existed under CPD's parallel file system. In addition, there was very limited training on the new policies, and there was no auditing and monitoring to ensure that file disclosure problems had been resolved.[53] Put simply, the policies themselves were deficient, as were the efforts to ensure those deficient policies were even followed. Given this, the continuation of the street files problem—to this day, according to the City's OIG—is entirely predictable.

**The Teletype and Detective Division Notice 82-2:** In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.[54] CPD designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[55]

Notice 82-2 and the corresponding teletype were only about preserving documents. It did not require detectives to put notes or memos into a central repository (or any repository), and it did not even affirmatively require detectives to preserve notes or memos that had not already been turned into a police file.[56]

Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them in to a department file, or even preserve them at all.[57]

---

[53] Hickey *Fields* Dep. at 10, 43; Winstrom Deposition at 208-210.
[54] NF-L 008751; NF-L 008754; Hickey, *Kluppelberg* Deposition at 201
[55] Hickey *Kluppelberg* Deposition 221-22, 224; Brzeczek Test. NF-L 007517
[56] NF-L 008751-53; Hickey *Kluppelberg* Deposition at 212-13
[57] Stibich Test. (NF-L 007468-70)

Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[58]

**Special Order 83-1:** On January 3, 1983, Special Order 83-1 replaced Detective Division Notice 82-2. Special Order 83-1 applied only to detectives assigned to Violent Crimes.[59] Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved.[60] Special Order 83-1 also created General Progress Reports ("GPRs").[61] The GPR forms were to be used by detectives for taking handwritten notes or writing so-called "to-from memos" to their colleagues.

Special Order 83-1 created an obligation for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents.[62]

Judge Shadur found Special Order 83-1 to still be lacking, including the following:

- There was no obligation to create an Investigative Case File Folder unless the crime fit certain violent crime categories and felony charges were approved. According to Judge Shadur, this was problematic because there was nothing to prevent against selective retention while the case was still being investigated;[63]

- It lacked direction to ensure that any assisting detective who received information relating to an investigation would forward the information to the lead/assigned detective to be included in the Investigative File Case Folder;[64]

- It required detectives to include "relevant" information in the official reports but offered no guidance as to what should be considered "relevant," permitting detectives to again choose what to include and exclude from their reports.[65]

---

[58] NF-L 005615-16
[59] NF-L 007223-27
[60] Special Order 83-1, IV(D)
[61] Special Order IV(E); Hickey *Kluppelberg* Deposition 170
[62] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73
[63] NF-L 005620
[64] NF-L 005621
[65] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20.

- It lacks any guidance on how CPD should respond to a criminal subpoena or other request for disclosure of investigative material.[66]

**Special Order 83-2:** On May 2, 1983, Special Order 83-2 was issued. Under the updated policy, detectives were required to create records reflecting all relevant information, to pass along information they learn to detectives assigned to investigating that crime. In addition, under the updated policy the Investigative File Inventory Sheet was to be copied and disclosed to prosecutors and criminal defendants.[67] Special Order 83-2 also created the Investigative File Control Card, which was supposed to allow for the Investigative File to be checked out by investigating detectives and accounted for.[68]

The updated policy, although a small improvement, was still plainly deficient:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

- it still applied only to detectives.[69]

- it fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

- it still fails to provide any definition of what is "relevant."[70]

- it relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- there is no provision in Special Order 83-2 requiring an audit or oversight to ensure the special order is actually being followed.

**Special Order 86-3:** On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 changes very little.[71] Where it does make changes, most of those changes actually weaken the overall policy rather than strengthen it. For example, it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received,

---

[66] NF-L 005621
[67] NF-L 008746-50
[68] Hickey *Kluppelberg* Deposition 228-29
[69] Hickey *Rivera* Deposition 55, 87-88.
[70] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20
[71] Winstrom Deposition 44-46.

and it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it. Overall, it remained deficient, for at least the following reasons:

- it still perpetuated a multiple, parallel file system rather than a single, centralized file system.

- it still applied only to detectives.

- it still fails to state, expressly and plainly, that the investigative file MUST be disclosed in its entirety in response to requests from prosecutors or defendants.

- it still lacks any process, procedure, or guidance to ensure the investigative file and any other repositories of investigative material are disclosed to the criminal justice system.

- it still fails to provide any definition of what is "relevant."[72]

- it still relies on inventory sheets as the means of ensuring that documents from the police investigation are disclosed, but this is wholly inadequate since the inventory sheets are only as good as the information in them. Based on my review, inventory sheets are routinely incomplete, or contain entries that are too vague to be of any use in determining whether all investigative material has been disclosed.

- it removed the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)," thus permitting detectives to keep handwritten notes on their person, at home, or in their locker for extended periods of time, as they did when the street file practice came to light.

- it still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."

- it removed the requirement of sending the inventory sheet to defense attorneys, albeit inadequate, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

So, Judge Shadur's express statement that CPD's policies were deficient because they failed to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," there was still absolutely no policy directive or procedure to ensure production of investigative files. Notably, the Special Order contains a single instruction about disclosure: to forward a copy of the inventory sheet to the Records Division, to be forwarded to the defense attorney. But what it does

---

[72] Hickey *Kluppelberg* Deposition 238; Hickey *Kluppelberg* Deposition [2015] 20

not say is to forward a copy of the entire file to the criminal defense attorney. This is an inexcusable omission.

Moreover, despite Judge Shadur's admonition, there was still no policy, procedure, or directive to ensure that subpoena unit staff, or other support staff at the Areas, were retrieving investigative material from all possible locations, or any training to that effect.[73] This, too, was an egregious violation of generally accepted police practices. Especially given that CPD chose to perpetuate a multiple, parallel file system. Indeed, as Hickey acknowledged, the lack of a centralized file, combined with lack of instruction, created confusion among detectives and subpoena personnel about their disclosure obligations.[74]

Finally, the failure to define relevance in a way to ensure the documentation of all information learned during an investigation deviates from generally accepted police practice, and is particularly egregious given Judge Shadur's concerns on this very issue. Commander Stibich admitted that what is relevant to one detective may not be relevant to another.[75] And CPD designees on this topic, Hickey and Winstrom, have testified to exactly the problems with CPD's lack of guidance. Detectives could decide what was pertinent not contemporaneously, but whenever they chose to write their supplemental report.[76] If this occurred once a suspect had been arrested and charged, a detective could freely decide that all other evidence—perhaps investigation into an alternate suspect—could be arguably "not relevant" since it did not implicate the person charged. Indeed, Hickey and Winstrom have admitted that this is exactly what could and would occur. For example, they both testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[77] This is contrary to accepted police practices, a recipe for violating Brady obligations, and exactly the problem Judge Shadur warned of and that CPD's deficient policies created. Alternate suspect information is exactly the type of highly relevant information for which documentation and disclosure is critical.[78]

Finally, Special Order 86-3 included a section requiring "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." This is an improvement on appear; auditing is critical. However, it appears to have

---

e

[74] Hickey Rivera Deposition at 253-54. He testified to remembering conversations when he was in charge of records division in which there were questions from subpoena clerks and detectives about what they were required to produce in response to subpoenas, including whether the entire investigative files had to be turned over.

[75] Stibich Test. NF-L 007474

[76] Hickey *Kluppelberg* Deposition [2015] 24-25, 33

[77] Hickey *Rivera* Deposition 36, 185-87. Winstrom Deposition 106-107, 189, 192-94.

[78] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

been nothing more than words on paper; it was not done. Hickey and Winstrom, the City's designees on the topic, were not aware of a single instance in which such auditing occurred.[79]

**Standard Operating Procedures (SOP) 1988:** In 1988, standard operating procedures were created to govern the work of detectives. Chapter 18 deals with investigative files. The policy did not change. The relevant portion of the new SOPs, Chapter 18, contains "no substantive changes of any kind" from Special Order 86-3.[80]

In other words, the deficiencies described above with regard to Special Order 86-3 remained in the SOPs and was the governing set of policies (or lack thereof) through the Soto homicide investigation in 1998.

**The policies described above are insufficient to remedy the "street files" problem**

**1. Continued use of parallel files:** The use of street files as part of a parallel file system had been in place since at least the 1970s.[81] Despite the revelations in *Jones* of the failure with this system, the City continued to perpetuate a multiple, parallel file system. For a given investigation, there would be *at least* three files: a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number; a unit RD file, that Hickey testified was a slim file kept in the homicide drawer at the Area that would contain all the known official police reports (supplementary reports, etc.);[82] and an investigative file maintained by the detective area, containing documents that individual detectives assigned to investigate the case chose to include.[83] By design, the files had different information in them.[84]

In addition to these files, investigative material could also be kept in the Evidence and Recovered Property Section, arrest reports could be kept at the Identification section, and individual detectives could each keep their own running/working files during an investigation.[85] And yet additional files could be created by other units of the Chicago Police Department, because the policies only applied to the Detective Division. So, in addition to the multiple files above, patrol officers, gang crimes officers, and other special unit investigators could each have additional sets of files related to a

---

[79] Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.

[80] Hickey *Rivera* Deposition pages 250-51; Winstrom Deposition 44-46.

[81] Hickey, the City's designated witness on this topic, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in Palmer v. City of Chicago, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[82] Hickey *Kluppelberg* Deposition 115-16, 299-300; S.O. 86-3.

[83] Hickey *Kluppelberg* Deposition 297-300

[84] Hickey *Kluppelberg* Deposition 100.

[85] Hickey *Kluppelberg* Deposition at 295-96; Hickey *Fields* April 2014 Trial Testimony at 2069.

homicide investigation. None of those files were subject to any documentation, storage and disclosure requirements.

Remarkably, Hickey himself raised some of these concerns. He informed CPD senior leaders that Special Order 83-1 was only addressed to the Detective Division,[86] and Hickey suggested that Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[87] CPD never acted on Hickey's concerns to look beyond the detective division, and allowed yet more parallel files to be created in other parts of the Department.

CPD's multiple, parallel files created unacceptable risk. Investigative information was kept in multiple places, in multiple units, without any mechanism to even track how many parallel files had been created for a particular case, or whether they had all been collected. This is why standard police practice around the country is to have a lead investigator responsible for keeping a single centralized file with everything in it. That the City kept in place a parallel file system after *Jones* and Judge Shadur's warnings, without any protections in place to make sure that all repositories were known and collected from, is an inexcusable police failure.

    **2. Discretion to determine what is relevant and needs to be documented and disclosed.** As discussed above, the policies left detectives to choose what information to document in official reports and when to turn in investigative materials. Given the street files problem and the history of resistance to change among detectives, CPD needed to provide strong, direct guidance; it did the opposite. The testimony of Hickey and Winstrom, discussed above, reveals the problem: they openly admit that it would be appropriate under CPD policy for detectives to determine that information about an alternate suspect was not relevant, if they so chose.[88]

    **3. No procedures or written instructions to subpoena responders to make sure investigative material from all locations is disclosed.** Inexplicably, despite having a system of multiple, parallel files for a single investigation, CPD did provide any sort of formal training and written procedures to subpoena responders on how to go about ensuring that they were gathering the documents from all repositories.

Based on the testimony of CPD's designees on the topic, Hickey and Winstrom, requests for investigative documents were handled by the Subpoena Service Unit in the Records Division.[89] But CPD had no written policy requiring, or explaining how, the staff in the Subpoena Service Unit were to go about searching for and gathering all responsive documents.[90] There were no

---

[86] Hickey *Kluppelberg* Deposition 207-208
[87] Hickey *Kluppelberg* Deposition 208
[88] Hickey *Kluppelberg* Deposition 339; Hickey *Kluppelberg* Deposition [2015] at 66-67.
[89] Hickey *Kluppelberg* Dep 358
[90] Hickey *Kluppelberg* Dep 36-37; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3

checklists, procedures, "safe checks" or any other guidelines or guidance to assist subpoena responders in making sure they were requesting material from all the right repositories, or to check on the back end whether they got everything they should, or even formal training to set the proper expectations and practices.[91]

As a result, whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck, as in whether the subpoena responder happened to request the right documents from the right places, and the unit that received the request copied everything in their repository.[92] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art," and that it was possible in a case with multiple units working on the same investigation for the subpoena to go to only one of those units.[93] Winstrom admitted that subpoena clerks would simply ready the subpoena and send a request for documents to whichever units they thought might have documents, and that they were not provided with any policies, directives, checklists, guidelines or training materials to guide their decision about where to obtain documents, nor were they given any forms or lists that identified all the repositories in which documents related to a homicide investigation might be found.[94]

The woefully inadequate policy and practice I have described above was in place since the 1980s, through 1995, and well into the 2000s.[95] In fact, the City's designee on the CPD's policies through 2009 testified that there is no system or procedure to follow up with the Area if it failed to respond to a request from the Records Division subpoena responder for documents.[96] The OIG Report discussed above demonstrates that all of the same, predictable problems continue to this day (June 2020 OIG Report, at 4):

- "CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, **cannot ensure that they are identifying and locating all responsive records for production**. The Department **lacks the means to determine what records may exist for any case or incident**, making it impossible to know whether it has identified and produced all relevant records."

- "When receiving a request for "any and all" relevant records (i.e., requests with broad language) including but not limited to certain specific records, **Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated**, in order to satisfy the broader request."

---

[91] Hickey *Kluppelberg* Dep 39, 147-48, 160; Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3; Winstrom Deposition 192-94.
[e] Hickey *Rivera* Deposition 43-46
[e] Hickey *Rivera* Deposition 162; Hickey *Kluppelberg* Deposition 362-63.
[94] Winstrom Deposition 189, 192-94.
[95] Hickey, *Rivera*, 151-53; Loughran Deposition 14 Winstrom Deposition 197-201.
[96] Loughran Deposition 15.

- "When the Subpoena Unit receives subpoenas with broad language, **members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records**."

The lack of concrete written policies, procedures, training and safeguards, in the face of a multiple file system that created a greater need for exactly such things, was an egregious departure from generally accepted police practices.

**4. There was inadequate training and monitoring/auditing to ensure compliance with the special orders.** The only training provided to detectives was one three-hour session about Special Order 83-1. But one three-hour training session on just the first iteration of the policy change, where CPD senior leaders already knew detectives were opposed to the change, was wholly insufficient to overcome a decades-long practice. Hickey himself admitted that he learned that unit detectives were reverting back to keeping their own files to take out on investigations after Special Order 83-1.[97]

CPD did nothing to monitor and assess whether the policy was being followed, or to reprimand those detectives and supervisors who refused to comply. Hickey and Winstrom admit they are not aware of, and could not identify, any sampling or auditing that occurred after the Special Orders were put in place.[98] In addition, I am not aware of the City having produced a single document demonstrating that any audit or inspection ever occurred. Hickey and Winstrom also admit that there was no discipline of detectives that did not comply with the Special Orders.[99]

Put simply, policymakers failed to train, monitor or supervise detectives to ensure compliance with the Special Orders. The result is obvious and predictable: a failure to comply. As discussed below, that is exactly what I found in my review of homicide files.

---

[97] Hickey *Kluppelberg* Deposition 321, 327.
[98] Hickey *Kluppelberg* Deposition 160-61, 166, 167, 375-76; Hickey *Rivera* Deposition 244, 249; Winstrom Deposition 208-210.
[99] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213; Winstrom Deposition 209-210.

### B. Review of CPD files, and related files, from the periods from 1991-1995, and from 1995-1998, demonstrate that CPD's policies and practices were not being followed.

I conducted a review of police files and criminal defense files for the period from 1991-1995 and 1995-1998, as follows:

Number of files reviewed:

|  | Area 5 investigative files | Corresponding permanent retention files | Corresponding PD/criminal defense files |
|---|---|---|---|
| 1991-1995 | 475 | 475[100] | N/A[101] |
| 1995-1998 | 344 | 341 | 72[102] |

**A review of investigative files shows that the Special Orders were not being followed**

As discussed above, I have opined that these policies were inadequate on their face to address the street files problem. But even if they were adequate on their face, they must also be implemented and followed. In my review, the files show that the special orders were not followed in a number of ways (which would have been obvious in any reasonable file audit).

I received two primary sets of records for my analysis of whether the Special Orders were being followed:

1. I reviewed investigative files for 344 different homicide investigations conducted by Area 5 detectives for the period from 1995-1998.[103] I reviewed the files to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs.

2. I reviewed investigative files for 475 different homicide investigations conducted by Area 5 detectives for the period from 1991-1995. I reviewed the files to evaluate

---

[100] There were actually 496 permanent retention files produced, but 21 of those had no corresponding investigative file. Hence, there were 475 files for comparison.

[101] It is my understanding that no PD files corresponding to the period from 1991-1995 were obtained in discovery.

[102] There were 105 total criminal defense files, but those files related to only 72 different investigative files (e.g., multiple defendants, PD file with no corresponding investigative file, etc.)

[103] For two homicide investigations, a permanent retention file was produced, but no investigative file: Z101225, Z160497. Those two files are still listed in Attachment E, and as a result the spreadsheet contains 346 rows, despite only 344 investigative files.

whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs.[104]

The analysis I conducted is the same one I conducted in *Iglesias*, *Sierra*, and *Reyes/Solache*, and that Michael Brasfield conducted in *Rivera* and *Fields*, and my findings are entirely consistent with his. In other words, my finding that the 1991-1995 Area 5 investigative files reveal that the policies were not being followed is the same conclusion that I reached with regard to the 1995-1998 Area 5 investigative files, and that Brasfield reached with regard to 1985-1991 Area 5 investigative files, and 1984-1989 Area 1 (primarily) investigative files.

I have also reviewed investigative files and permanent retention files from Area 5 homicide investigations for the period from 1987-1990, in *Maysonet v. City of Chicago*. My review of those files, and my analysis of those files, further confirms and corroborates my opinions here, including in particular homicide detectives' systemic failure to follow the Special Orders put in place to address the street files problem and withholding of exculpatory information identified in *Jones/Palmer*.

My findings are as follows:

**Handwritten notes, not on general progress reports, are still routinely used:** As discussed above, the special orders directed officers to use GPRs to take notes and were intended to eliminate the use of handwritten notes, which detectives had been treating as their own property and something they were not inclined to place in the CPD's file. I found that detectives consistently used handwritten notes not on GPRs, despite the direction in the special orders. For the period from 1991-1995: Only 424 of the 475 investigative files contained handwritten notes; of those, 213 of the 424 files, or approximately 50%, contained handwritten notes not on GPRs. For the period from 1995-1998: Only 334 of the 344 investigative files contained handwritten notes; of those, 154 of the 334 files, or approximately 46%, contained handwritten notes not on GPRs. This is consistent with Brasfield's findings in Rivera (61%) and Fields (82%).

**To-from memos are still being used:** As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports. However, I found that detectives continued using to-from memos (not on GPRs): For the period from 1991-1995: 47 of the files, or approximately 10%, contained to-from memos not on official police forms. For the period from 1995-1998: 95 of the files, or approximately 28%, contained to-from memos not on official police forms. This is consistent with Brasfield's findings in *Rivera* (20%) and *Fields* (43%).

---

[104] For twenty-one homicide investigations, a permanent retention file was produced, but no investigative file. Those files are still listed in Attachment F, and as a result the spreadsheet contains 496 rows, despite only 475 investigative files.

**Missing or Incomplete Inventory Sheets**: One of the new requirements under the policy, purportedly to ensure that prosecutors and criminal defendants could check to see if they had received all of the documents in the investigative file, was the creation of an inventory sheet to be included in the investigative file to track all the documents entered into the file. I have already opined that the inclusion of an inventory sheet in the investigative file does little to ensure all investigative information is being documented and included in the investigative file, or to ensure that the entire file is disclosed. But in any event, my review shows that inventory sheets were not consistently included in the investigative files. For the period from 1991-1995: I found that 115 files, or 24% of total investigative files, contained no inventory sheet. For the period from 1995-1998: I found that 57 files, almost 17% of total investigative files, contained no inventory sheet.

Even where there was an inventory sheet in the file, in many cases the inventory sheet was incomplete. For the period from 1991-1995: I found that 359 investigative files, approximately 88% of total investigative files, contained inventory sheets that were incomplete. For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete.

In total then, I found that in nearly all of the investigative files, inventory sheets were either missing or incomplete.

In addition, the inventory sheets do not appear to be contemporaneously updated as each new document is added to the file. Instead, documents were routinely added in bunches, with significant time delays from when the document was created. In addition, there are other ways in which they were simply not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.). Some examples include the following:

A242406

Z243035

A276340

A636514

A744094

P18275

P124971

Z533574

**Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports.** The special orders state that all relevant

information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation. The special orders also require that inventories be sent to the permanent retention file for distribution to prosecutors and criminal defendants (as discussed above, an indication that CPD contemplated that it would only initially produce permanent retention files). These requirements were routinely flouted.

I was provided with permanent retention files for 477 homicide investigations from the time period 1991-1995, and 341 homicide investigations from the time period 1995 – 1998. **See Attachments E and F**.

First, I examined the permanent retention files, standing alone, to assess whether they communicated a complete picture of the investigation. I found that while they communicate a story about how the detectives got from arrest to charges of their suspect, they communicated little else in terms of investigation into other leads or suspects. Rarely was there ever documentation of investigation into avenues that led to a dead end, something that happens in homicide investigations all the time (even those that eventually result in catching the correct perpetrator).

Michael Brasfield conducted the same exercise and wrote in his report as follows: "the permanent retention files in CPD are different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged. Put another way, in most departments, in addition to the various strands of the investigation, there is a charging memo in the official file that explains the basis for charges; CPD's entire official file is a charging document (or file)." This is well said, and I observed the same thing in my review of files.

Second, I compared and contrasted a number of the permanent retention files with their corresponding investigative files. **See Attachment E.**

Like Brasfield, I found many examples where information on handwritten notes was not transferred into official reports. In many cases, the information is potentially exculpatory. Examples include RFC-Reyes/Solache 34554, 76011-14, 76015-16, 77368, 77452, 94060, 110176, 110180, and 104166-70; and, RFC-Sierra 121416, 121420, 79168, 92370, 109932, 110061, 110043, 110062.

These examples in the paragraph above include handwritten notes containing cryptic notations on a page, without context: a name, a phone number, an address, etc. In my experience, notes like these are often important information (a new witness or suspect previously unknown, contact information for a possible alibi witness, the license plate of the getaway car, etc.). By not transcribing information into official reports, the relevance of the information, and its potential

inculpatory or exculpatory value, is lost. Obviously, a detective thought the information was important enough to take a note, and I acknowledge that often a note may only contain shorthand and abbreviations to keep up with a person as they are speaking. But then it is critical to write a report, using the note as a memory aid, to provide a more thorough explanation of the information learned and its relevance to the overall investigation. In my review, this final step is often not done. The result is a violation of the Special Orders, which require relevant information to be written down and transferred into official reports, as well as a failure to disclose important information to prosecutors and criminal defendants.

Finally, in my review I found that permanent retention files routinely did not have an inventory sheet, which according to policy should have been in the investigative file and copied into the permanent retention file (for the very purpose of ensuring prosecutors and criminal defendants could check to make sure they had received everything). Yet, for the period from 1991-1995: I found that only 64 of 477 permanent retention files had an inventory sheet, and that of the 360 investigative files with an inventory sheet, only 58 had a copy of the inventory sheet in the permanent retention file as well. And for the period from 1995-1998: I found that only 13 of 341 permanent retention files had an inventory sheet, and that of the 287 investigative files with an inventory sheet, only 12 had a copy of the inventory sheet in the permanent retention file as well.

My review of records in this case and others shows that the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. In addition, as discussed below, virtually all of the defense attorney files were missing information from the investigative file. So, even superficial audits of small samples of records would have revealed these problems.

**Criminal defense files show that important investigative materials are regularly withheld from criminal defendants**

Under generally accepted police practices, CPD's policy and practice must be to require and ensure that prosecutors and criminal defendants get **everything** from the police investigation, including all documents and information about the crime that was learned during the investigation. As discussed above, the standard is not to invite detectives or other officers to make their own assessments of what is exculpatory or not, what is relevant or not, or to pick and choose what documents and information from their investigation to disclose. The standard is to instruct officers to disclose everything, and let the prosecutor and criminal defendant determine what they think is important to their prosecution or defense at trial.

This is true regardless of whether the request for the police files comes from the prosecution or defense, or in response to a formal subpoena or motion for discovery, or in response to an informal request for investigative documents. In my experience, requests can come in from any of these avenues, but the response must be the same: to disclose everything, not pick and choose.

By the 1990s, and as much as a decade before, departments knew, and officers were trained, that they were required to follow such policies and practices as part of their constitutional obligations

under *Brady v. Maryland*. This means providing a defendant not just with evidence that might support his guilt, but also any evidence that might support his innocence, including evidence that might undermine or impeach the evidence against him.

Given the standards set forth above, any review of prosecutor and criminal defense files should reveal a simple finding: all of the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file.

Based on my review of the criminal defense files provided to me, as compared to the investigative files, that is not what I observed. Instead, I found that documents in the investigative file were routinely missing from criminal defense files. In a number of cases, this included investigative material withheld from criminal defendants that was relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. This is not surprising, given the lack of any such express requirement or instruction in the CPD policies (discussed above). My findings across these files is consistent with my findings from reviewing the police files from the Soto homicide investigation, where detectives did not disclose investigative information and documents that was exculpatory and impeaching and should have been disclosed. I discuss these conclusions below.

*Background on the Area Five investigative files and my file review*

I compared criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. It is my understanding that this is the set of files that were ordered to be produced in discovery in this matter, and so I was provided with all such documents (not a sample or selected portion). I note that I did not conduct this comparison of criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the years 1991, 1992, 1993, or 1994, because no criminal defense files were provided for comparison. Instead, the only criminal defense files made available were the files from 1995-1998, and so I compared those to the corresponding investigative files and permanent retention files for that period. I previously conducted this analysis in *Reyes/Solache*, and it is reproduced below.

The law firm of Loevy & Loevy provided me with a spreadsheet that served as an index of the investigative files, permanent retention files, and criminal defense files for the period from 1995-1998, attached as **Attachment E**. A similar spreadsheet, **Attachment F**, was provided for the period from 1991-1995, from *Sierra*, but without the green columns reflecting comparison to criminal defense files (since none were provided). I spot-checked, reviewed and double-checked the spreadsheets, and reviewed numerous files to make sure I was familiar with the information contained in the spreadsheets and how they were compiled. My analysis in this section—focused on comparing the homicide files to the criminal defense files—is limited to the 1995-1998 files previously produced in *Reyes/Solache*, referenced in **Attachment E**.

My intention and understanding is for the information contained in Attachment E to be objective – that is, it does not contain subjective determinations about how fields are to be coded, whether

something is relevant, whether something it administrative, etc. In this way, anything that was contained in the investigative file but not in the criminal defense file was identified in the spreadsheet. That spreadsheet is attached to this report as **Attachment E.**[105]

For file comparison purposes, for the 1995-1998 time period there were 105 criminal defense files provided corresponding to 72 investigative files (there were some cases with multiple defendants, so multiple criminal defense files for a single investigative file; or where the PD file produced did not have a corresponding investigative file;[106] or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted[107]). After excluding partial or incomplete PD files, there were a total of 64 criminal defense files included in my analysis.

Finally, I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the criminal defense file was incomplete, as mentioned above and in footnote 114. The files available came from the Public Defender's Office, so it is likely that in many of these instances the case was transferred to private counsel, and so the criminal defense file may not be complete. Those files contain a strikethrough in Attachment E (leaving 63 files for calculation and analysis). I also gave the City the benefit of the doubt in my comparison to criminal defense files by assuming that all material in the criminal defense file had been there at the time of the original criminal trial (even if it might have been added subsequently, for example, as part of appeals or post-conviction proceedings). And finally, I gave the City the benefit of the doubt by assuming that the only police documents related to an investigation were those in the investigative file and the permanent retention file the City produced in this case. But of course, as discussed above, the Special Orders regarding documentation and file-keeping applied only to detectives, and so patrol officers, gang crimes officers and others could keep their own notes and reports that were not required to be included in the investigative file.

---

[105] I intend to rely on the spreadsheet included as Attachment E at trial to help explain the differences between the particular files to the jury.

[106] Those cases are Y188817, C381983, C166557, K340833, X146756, A12723, B29657, B540081, C112684, X234861, and C166557.

[107] Where there was a PD file that contained no police documents in it (e.g., just court transcripts, pleadings or other documents), it was marked in Attachment E as being an investigation with no corresponding PD file. Those cases are as follows:  A496779, A594174, A732463, C650817, C713913, C739679.  Where there were *some* police records in the PD file but it appeared to partial or incomplete, in the interest of giving the City the benefit of the doubt and remaining objective in terms of what goes into Attachment E, the case was included in the spreadsheet and marked as being an investigation with a corresponding PD file ("Yes" in column S), but the row was stricken out and not counted for purposes of my calculations and analysis. Those files are: A103098, A325358, A440114, A482669, B662923, C037884, C250890, and C722335.

*Criminal defense files are missing pages from the police investigative files*

I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. As discussed above, my comparison exercise was objective rather than subjective. I then analyzed the types of documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could be of importance to prosecutors or defense attorneys and should have been disclosed.

Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and unlikely to have been important to prosecutors or defense attorneys (although administrative records can be important, such as the inventory sheets discussed above, an inventory control card identifying detectives who may have checked out the file and participated in the investigation, and even a homicide file checklist noting investigative steps that were taken); while other records were clearly investigative in nature and highly relevant. Regardless, any withheld pages that had been created before trial and conviction, regardless of importance, are evidence that there was not a policy of copying **all** documents in the police files. Instead, what the files reveal is that individual officers or others are making *ad hoc* decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production of all material in all police investigation files, are both egregious departures from generally accepted police practices.

My comparison of the investigative files to corresponding defense attorney files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

> **Handwritten Notes and General Progress Reports:** 37 of the criminal defense files (or approximately 59% of the 63 files analyzed) were missing handwritten notes that were present in the investigative files (see Row Z of Attachment E). Likewise, 26 of the criminal defense files, or 41%, were missing GPRs that were present in the investigative files (see Row X of Attachment E). The handwritten notes are often found on what appear to be plain sheets of paper, scraps of paper, and so on, none of which were the official GPRs on which such information was supposed to be documented.

> **Investigative File inventories:** 43 of the 63 criminal defense files did not have an inventory to serve as an index of documents in the police investigative files.

> As discussed above, CPD created the requirement of an inventory sheet in the wake of *Jones/Palmer*, with the idea that prosecutors and criminal defendants could review the inventory to make sure they got all the documents. As discussed above, this is not an

adequate safeguard, and the inventories were often missing, incomplete or too vague, and on top of that it appears that the inventory sheets were not getting to criminal defendants at all in most cases. In other words, the safeguard CPD purportedly built into its policy was useless.

**Issuing a subpoena**: In many of the cases I reviewed, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the investigative file. But not all the documents in the investigative file were disclosed in response to those subpoenas. So, even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," there was no guarantee that a defense attorney would receive the complete investigative file (even assuming that was all the documents in the file).

*Examples of relevant information in police files that was withheld from criminal defendants but should have been disclosed*

Below are some examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed.

## C687989 - Kim Mathis

This case involves the beating death of a child. The investigation revealed that Kim Mathis, the child's mother, admitted hitting the child on the back with a belt four to five times, and that he died two days later. The child died from blunt trauma to the abdomen. (RFC-Solache/Reyes 65178.) Detectives pursued Mathis, and, according to her testimony, beat, threatened, and intimidated her into signing a statement that she had not read. (AR-PD 30237-60.) The handwritten statement and corresponding supplementary report say that Mathis admitted hitting the child in the back with a belt and also stomping on his abdomen with her heel. (RFC-Solache/Reyes 65192, 110155-60.) Mathis denied to the CCPD that she kicked or stomped on her son. (AR-PD 29833)

The investigative file includes handwritten notes with a potential witness to the beating. The handwritten note states that Mathis's sister had been at the apartment when the beating occurred (RFC-Solache/Reyes 110176), but the cleared/closed report says that Mathis's sister was not at the apartment during the beating and did not see the child at that time (RFC-Solache/Reyes 65212). Given that Mathis disputed that she had stomped on her son's abdomen and testified that she was coerced into giving her statement, it would have been critical for the defense attorney to know of all witnesses who were at the house when the supposed beating occurred.

## Z475236 – Ardell Clemons

This case involves the stabbing death of a woman named Nyree Johnson. The investigation revealed that Ardell Clemons, the victim's friend, had been living with the victim at the time of

the murder. (RFC-Solache/Reyes 51121.) Detectives pursued Clemons, who had fled to Florida. Clemons was arrested just a few days after the crime.

The investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file. One handwritten note not in the PD file documents another potential suspect who had previously worked with the victim and was dating the victim. (RFC-Solache/Reyes 44288). While the police report lists this individual as a witness and states that he had briefly stayed with the victim, it also stated that they were "only friends. (RFC-Solache/Reyes 51121.). Another document in the investigative file but not in the PD file is an apartment lease noting that the victim left her former residence due to domestic violence, what would have been a lead into another potential alternate suspect (RFC-Solache/Reyes 044260). Another document in the investigative file but not in the PD file is a handwritten note that lists the name of another potential alternate suspect named Harold. (RFC-Solache/Reyes 44290).

### B442532 – Oscar Soto

This case involves a gang-involved shooting from one vehicle to another vehicle. The victim was a man named Miguel Salas who was shot on July 17, 1997, and died a few days later. Detectives investigating an unrelated aggravated battery decided to show a photo array from that case to the witnesses to the Salas shooting. Three witnesses allegedly identified two individuals as a passenger and the shooter on July 20, 1997. (RFC-Solache/Reyes 093896-97). Later, on July 23, 1997, after Detective Guevara was apparently assigned to the case (RFC-Solache/Reyes 093922), a different man, Oscar Soto, was identified as shooter. (RFC-Solache/Reyes 093917).

Two supplementary reports identifying the initial two suspects (RFC-Solache/Reyes 059529) and indicating that witnesses could not identify those suspects in a lineup (RFC-Solache/Reyes 059532) are in the permanent retention file. However, other documents related to these alternate suspects were not: officers believed that this shooting was linked to a separate aggravated battery in which the same two initial suspects were suspected and were identified in the other case by a witness who was familiar with them. The arrest reports for those suspects, providing this information—including that they were suspected in a related shooting and had been identified in a familiar-perpetrator identification—is contained in the investigative file but is not in the PD file (RFC 93896-97).

The investigative file also contains several handwritten GPRs (RFC-Solache/Reyes 93888-93; 95; 93924-25) which do not appear to be in the public defender's file, along with other missing documents. These GPRs contain conflicting information regarding whether the witnesses were able to identify the initial suspects and vehicle used in the crime, as well as police notes documenting interviews with the witnesses.

### B023979 – Leon Fields

A 1997 shooting of two victims, Howard Ervin (aka Charles Johnson) and Michael Welch in a game room. One of two offenders, Leon Fields, was identified in a line up by the surviving victim, Welch (RFC-Solache/Reyes 81373).

Critically, the PD file is missing a handwritten GPR that appears to be the 2nd pg. of an interview with eyewitness, Tierre Moton, (RFC-Solache/Reyes 81464) and includes details not in any supplemental report. For example, it includes the fact that shooter had a "scar and bumps" (RFC-Solache/Reyes 81465).  It is notable that defendant Fields does not appear to have "scars and bumps" in photos contained in the investigative file (RFC-Solache/Reyes 81365, 81417-18). The supplementary report of the interview of Moton omits the information about "scar and bumps" contained in the GPR (RFC-Solache/Reyes 81368).

Other items missing from the PD file include one typed GPR containing information not in any typed supplementary report, including details from an interview with the surviving victim Welch (RFC-Solache/Reyes 81445), in which Welch provides numerous details about the crime, is noted to "very reluctant to identify who shot him," discusses potential motives, and provides information about other individuals (including someone named "Noon" Curtis Henderson) with potential information about the crime. It also contains a handwritten note referencing the name "Calvin Morris. " This interview of Welch is not documented in any supplementary report, and the reference to Calvin Morris is unexplained and does not appear in any other report, including in the PD file.

### A403252 - Guy Rainey

Cedric Morris was shot to death on June 10, 1996. Witnesses reported seeing one or two assailants with dark hoodies pulled over their faces, and an eyewitness heard that one of the offenders went by a street name containing "Little." RFC-Solache/Reyes 53995, 54002-03. Detectives requested over a dozen IR photos of individuals with nickname containing "Little," sufficient to compile multiple photo arrays. See RFC Solache-Reyes 72767, 72788, 72802, 72831, 72838, 72768-87, 72789-90, 72792-801, 72803-30, 72832-7, 72839-55. This indicates that there were multiple potential suspects and potentially multiple photo identification procedures performed, but the defense file does not include the Request for Photos forms listing the individuals requested, or any of the mugshot photos that were received in response to the more than one dozen individuals whose photos were requested. Many of these names are contained on a GPR that was in the investigative file and in the PD file, but not all, meaning at least one alternate suspect was not disclosed. In addition, even if many of the names were disclosed in a note, the photos themselves in the investigative file should have been disclosed, as they are independently of value (e.g., defense counsel might find some of the alternate suspects looked like his client, or fit the witness descriptions, supporting defense of mistaken identity).

Further, according to a lineup and supplementary report, Donnie Morris identified Guy Rainey out of a line-up. Rainey was ultimately charged. Morris's identification appears to be the only

inculpatory evidence in the file. But there is a handwritten note in the investigative file, RFC-Solache/Reyes 72857, with Morris's name on it and the statement, "Kevin Haas pull file to see if he is still wanted." If Morris was possibly wanted at the time, that should have been disclosed, as it might be relevant to the sole eyewitness's motivation to cooperate with police, his credibility, etc.

**Rivera, Fields, Kluppelberg, Reyes and Sierra are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials**

My findings above, and the Roman investigation itself (as discussed below), are consistent with the facts and circumstances of other wrongful conviction cases involving CPD in which exculpatory information was withheld, including *Fields v. City of Chicago*, *Kluppelberg v. City of Chicago, Rivera v. City of Chicago, Reyes/Solache v. City of Chicago and Sierra v. City of Chicago*. These cases are, respectively, a 1984 homicide investigation in Area 1, a 1984 homicide investigation in Area 3, a 1988 homicide investigation in Area 5, and a 1998 homicide investigation in Area 5. I reviewed the underlying police files and related records from these cases. Collectively, they are further evidence that the street files practices at issue in *Jones* and *Palmer* continued unabated for decades, and that the practice was Citywide. A brief summary of each of those cases is provided below, and further information is contained in **Attachments G and H**.

**Fields v. City of Chicago:** Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman based on a homicide investigation conducted by Area 1 detectives. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders were located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors.

The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. Notably, it also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect in any of these documents.

In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of CPD and awarded Mr. Fields compensatory damages of $22 million.

58

**Kluppelberg v. City of Chicago:** James Kluppelberg was convicted for a 1984 fire that killed six people. In 1984 the fire was investigated by CPD's Bomb and Arson division and Area 3 detectives. Bomb and Arson investigators could not determine the origin of the fire and Area 3 detectives closed the case as accidental. But the case was re-opened in 1988. During the 1988 investigation, Area 3 detectives found new fire investigators to rule the case an arson, and James Kluppelberg was coerced into confessing to the crime. At his 1988 criminal trial, Kluppelberg only had the documents from the 1988 Area 3 investigation. The 1984 Area 3 and Bomb and Arson files were withheld.

Following his exoneration, Kluppelberg filed a civil case. In 2014, during the civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area 3 investigation, and included critical exculpatory information. Specifically, it included handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes -- undermining the arson determination and supporting the evidence that the fire was accidental. It contained numerous references to individuals who had had arguments or fights with the victims. And the file also contained a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby and just hours before the fire for which Kluppelberg was convicted. Moreover, Ramos reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires.

The file was found on a pallet among other Area 3 files at the records warehouse, and it appears it was packed up in 1991 when Area 3 was relocated. Neither of the Bomb and Arson files (from 1984 or the reinvestigation in 1988) has been located, much like the gang crimes documents in this case.

In both of these cases, the undisclosed documents should have been produced to Mr. Fields and Mr. Kluppelberg before their original criminal trials in 1986 and 1988 (and at numerous points after that). These documents should have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

**Rivera v. City of Chicago:** Jacques Rivera was convicted of a 1988 shooting that killed a young man named Felix Valentin. He was convicted based on the eyewitness identification of a single person, a 12-year old boy. The investigation was conducted by Area 5 violent crime detectives and officers from Gang Crimes North, including Reynaldo Guevara. Mr. Rivera was exonerated in 2011 after the sole eyewitness recanted his previous identification or Rivera.

During civil discovery, an investigative file was produced that contained a number of documents not previously produced to Mr. Rivera or his criminal defense attorney, Ken Wadas. Based on a comparison to Wadas' file, the documents in the investigative file that were WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. These documents included all

of the GPRs, the inventory sheet, arrest reports and hold reports, and a rap sheet for Mr. Rivera. These documents proved to be of critical importance.

The rap sheet for Mr. Rivera included an "issued on inquiry" date stamp of 8/27/1988, the same day as the Valentin shooting. But Mr. Rivera did not become a suspect in the investigation until he was purportedly selected from a book of gang photos by the sole eyewitness on 8/27/1988, two days later. This was highly exculpatory information because it established that Guevara and the other officers had made Mr. Rivera a suspect *before* the sole eyewitness supposedly identified him. This document is contained only the investigative file – it was excluded from the permanent retention file, the CCSAO file, and Judge Wadas's file.

There were other important exculpatory documents withheld from Mr. Rivera. The withheld GPRs included a handwritten note documenting an interview with the sole eyewitness. That GPR indicated that the witness had been "by the store," placing him much further from the shooting (and far less likely to be able to make an identification) than was otherwise known. The investigative file also contained hold reports and other documents indicating that Mr. Rivera had been placed in a lineup several days before the lineup documented in the official typed reports.

Mr. Rivera won a jury verdict against Guevara, his partner, and his Sergeant, as well as against the City of Chicago for the same policy and practice failures disclosed in this report. Mr. Rivera was awarded $17.175 million.

**Reyes/Solache v. City of Chicago:** Arturo Reyes and Gabriel Solache were convicted of the 1998 double murder of Mariano and Jacinta Soto, and the kidnapping of their young children. They were convicted based on an investigation conducted by Area 5 detectives, including several of the Defendants in this case. Detective Guevara was the primary investigator involved in conducting the interrogations that resulted in the confessions of Reyes and Solache, which formed the primary evidence used to obtain their convictions. Reyes and Solache asserted at their trials that their convictions were the result of physical and psychological abuse by Guevara, and that they were innocent. Their convictions were thrown out more than two decades later, after a hearing in which Guevara's pattern of physical abuse and coercion of suspects was presented at a hearing and the criminal trial judge, Judge Obbish, ultimately concluded that Guevara was a "bald faced liar" and credited Reyes and Solache's accounts of abuse and coercion.

In the civil case, an investigative file was produced that contained photographs and other documents not previously disclosed to Reyes and Solache. Among them were a set of Polaroid photos that were missing from both the prosecutor and criminal defense files, which were taken of several witnesses: Guadalupe Mejia, Jorge Mejia, Rosa Aranda, and Felicia Soto.[108] Based on their deposition testimony in the civil case, which included describing accusatory and threatening interrogation techniques, these individuals appear to have each been treated as alternate suspects.

---

[108] RFC-Solache/Reyes 76-81.

The fact that Rosa Aranda, Jose Aranda, and Guadalupe Mejia were each questioned about the murder, subject to accusatory interrogations, and denied involvement is all information that should have been documented, along with the reasons they were detained and suspected. The fact that each of these individuals were treated as an alternate suspect is itself important exculpatory and impeachment evidence.

Next, the Polaroid photos were evidence that each of these individuals had been questioned by Detectives at Area 5, and that they had been treated as alternate suspects in the murder and kidnapping of the Soto family. In fact, the only other individuals that the detectives took Polaroid photos of were DeLeon-Reyes, Solache, Adriana Mejia, and Rosauro Mejia, all of whom had been treated as suspects and interrogated over days. The very fact that they were treated as alternate suspects is the type of quintessential *Brady* evidence that police are required to document and disclose to the criminal justice system. Had defense counsel had these Polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed. DeLeon-Reyes' or Solache's counsel may have wanted to call these witnesses to argue that they were alternate suspects, or to testify about their treatment by Guevara to corroborate their own claims of physically and psychologically abusive interrogation tactics.

In this case, such an inquiry would have yielded critical information. That Guadalupe Mejia was treated as a suspect is of particular importance for DeLeon-Reyes, because after being questioned by Guevara she signed a statement claiming that she heard DeLeon-Reyes make incriminating statements on a phone call with Adriana. DeLeon-Reyes claims that statement is false, and so evidence that Guadalupe Mejia had been treated as a suspect, accused of

the crime and subjected to harassing behavior, could have been critical to the defense in explaining why she signed a false statement incriminating Reyes.

Likewise, the Polaroid photo indicating that Rosa Aranda was interrogated at Area 5 is also of critical importance. At her deposition, Rosa Aranda revealed that the victim, Jacinta Soto, had made a new friend at a clinic in the weeks before the crime; that the new friend sometimes went to Jacinta's house; and that in the days before the murder, Jacinta had complained that her keys to the apartment had gone missing, and that the friend was over at the same time the keys went missing.[109] She also testified that when the detectives interrogated her, she told them everything.[110] These facts severely undermine the version of events contained in DeLeon-Reyes and Solache's confessions, powerful evidence in a case where they were alleging that their confessions were false and the product of coercion. According to the confessions, Jacinta Soto was a random target that DeLeon-Reyes found at the hospital on the day of the crime; and when they then went to the home later that night they knocked on the door, Jacinta opened the door, at which point DeLeon-Reyes barged in and immediately began stabbing the victim. Rosa Aranda's

---

[109]  Rosa Aranda deposition (pg. 84-85, 91-92).
[110]  Rosa Aranda deposition (pg. 60).

information about Jacinta's new friend and lost keys would have been powerful evidence that Plaintiffs' confessions were in fact false. This information may have also permitted the defense to argue that Adriana Mejia could have acted alone, if she was able to gain entry while the family was sleeping (rather than needing to physically overwhelm an adult male and female).

Ultimately, the question of exactly how the defense would have used this evidence is besides the point: it is investigative information contained in the Soto investigative file, and there is no excuse for failing to disclose it. In fact, that Polaroid photos of DeLeon-Reyes, Solache and Adriana were all disclosed, but not these, suggests that these photos may have been deliberately withheld, for the reasons set out above. Regardless, the fact that these Polaroids were not disclosed is consistent with my findings about CPD's documentation and disclosure policies and practices discussed above.

In addition, and much like this case, there was a lot of additional investigative information that CPD detectives learned during the Soto investigation that they simply failed to document (or was documented in files that was placed in parallel files other than the investigative file). All of it was investigative information of exactly the type detectives are expected to document and disclose, including interview notes, and lineup reports.

**Sierra v. City of Chicago**: Sierra was convicted of a 1995 murder in which the offenders from one moving car shot into another moving car at night, from a car with tinted windows. In many ways, the facts of that case mirror this one. In both cases, the primary incriminating evidence was two dubious eyewitness identifications despite extremely challenging viewing circumstances. And in both cases, Guevara and his colleagues obtained statements from witnesses claiming to have knowledge of incriminating evidence against the police suspect (Hector Montanez, Francisco Vicente). Both of those individuals later testified that they were pressured or coerced in various ways to give false statements incriminating Sierra and Iglesias.

The Sierra case is particularly notable for the lack of a single GPR or other handwritten note in the homicide file, strongly suggesting the file had been purged of such information. There are no notes of interviews with either of the two eyewitnesses who were later used to obtain identifications. One of those eyewitnesses, Jose Melendez, testified at Sierra's criminal trial, and consistently since, that Guevara pointed to a picture of Sierra and told him that is who he should pick. There is also no documentation of interviews of Hector Montanez, who eventually gave a statement incriminating Sierra (later recanted).

In addition, the underlying homicide was linked by Guevara to another homicide several days earlier of man named Ruben Gonzalez, based on evidence related to vehicles used in the two shootings. There was evidence in the investigative file in the Gonzalez shooting that Guevara created a fabricated report claiming that a beat officer at the scene of that shooting, Ron Malczyk, had provided information linking the two cases (and linking the crime to Hector Montanez's car). This was directly contradicted by an earlier detective's report from Ron Malczyk. In his deposition, Malczyk testified that Guevara's report was false and fabricated.

Neither of the reports from the Gonzalez shooting regarding Malczyk were ever disclosed in the Sierra murder investigation.

**Iglesias v. City of Chicago:** Iglesias involved a 1993 shooting of a young woman named Monica Roman, in which a shooter was standing on one side of the street, and fired into a moving car driving away. Similar to this case, Mr. Iglesias was convicted based on two highly dubious eyewitness identifications. The additional evidence used against Mr. Iglesias was a supposed confession by Iglesias to a jailhouse snitch named Francisco Vicente, who later admitted to making up the confession based on physical abuse, threats and promises by Defendants Guevara and Halvorsen. These two defendants had used Mr. Vicente to claim that men suspected in two other cases had also confessed to him, all within a matter of weeks. All of those men have since had their convictions thrown out.

A typed supplementary report contained in the homicide files from another case (JR-L 3687), involving the same Francisco Vicente, states that during the early stages of the Roman investigation there was a credible lead that the homicide had been committed by two or more Spanish Cobras, and that a Sergeant questioned a known Spanish Cobra about his knowledge of the crime. This report, and the information in the typed report regarding the Spanish Cobras lead, is not contained anywhere in the Roman investigative file or permanent retention file, or the CCSAO file (no criminal defense was found in that case) ,and is not discussed at all by the prosecution or defense at Iglesias's trial. This report was simply buried in the file of another investigation. Iglesias was not affiliated with the Spanish Cobras and so the Spanish Cobras lead, and whatever witness or evidence resulted in the lead, were  potential alternate suspect information that should have been disclosed.

In addition, a handwritten note in the Roman investigative file (not on a GPR) includes notes about several witnesses, including Bernice Bullocks, Hyatt S. Bullocks, Arnell (bus driver), and Sarah Torres. These appear to be notes of interviews of these witnesses, and should have been disclosed.

What stands out most is the handwriting along the left margin of the page, stating next to notes regarding Sarah Torres: "Son came from the boys club, knows shooter [or shorti]." This is important information that should have been disclosed. It is not contained in any of the typed reports discussing the police interviews of Sarah Torres and her son, Efrain Torres. It is not entirely clear if the note states that Torres knows "shooter" or "Shorti," but in either case it is potentially critical exculpatory information (either he knew the shooter but did not make an identification of Iglesias, or he knew Shorti who becomes an alternate suspect).These cryptic notes should have been explained and expanded on in a typed report, but were not. And the handwritten note was not contained in the prosecutor file (again, the criminal defense file was not found).

Overall, the Iglesias case is yet another example of a homicide investigation in which documents containing exculpatory information were not properly disclosed to the prosecution or defense.

**The failure to turn over crucial documents in the Fred homicide investigation was a direct result of the failed policies and practices discussed above.**

As discussed above, I have thoroughly reviewed thousands of pages of records and testimony from the Fred homicide investigation, including the complete police files from the case. I have also received the documents made available from the prosecutor, which are limited.

Based on my review, what is apparent is that (1) there was critical investigation information learned, including highly exculpatory information, that was not disclosed to the prosecution or defense, and (2) there are significant gaps and omissions from the police files in this case, reflecting important investigative steps taken and investigative information that CPD detectives learned, that detectives either failed to document and disclose, or otherwise documented and concealed. All of it was investigative information of exactly the type detectives are expected to document and disclose.

It is my understanding that in this case, a criminal defense file was not found, and that the prosecutor's file was also missing and thus the CCSAO file consists primarily of the trial prosecutor's notes. As a result, I cannot identify everything that was withheld from the prosecution and defense.

However, based on the information provided to me, it is clear that there was at least one critical document, and its subject matter, that was not disclosed to the prosecution or defense. As discussed above, the investigative file contains documentation of an in-person lineup by Detective Erickson, in which a witness positively identified an alternative suspect named Bryan Johns. RFC 15470-71. The report of this lineup and all references to this lineup occurring are omitted from the permanent retention file. Instead, a typed police report by defendant Guevara included in the permanent retention file states the exact opposite: that Bryan Johns was not selected in a lineup that night (see supplementary report at RFC 15480). I note that it is Guevara that wrote the lineup report claiming there was no identification, contrary to the lineup report of Erickson stating that there was a positive identification; and in addition, Guevara was involved in the lineups and other steps that resulted in Demetrius Johnson's prosecution and conviction.

Based on my review of the record, it is abundantly clear that the Erickson report documenting at identification of the alternate suspect Bryan Johns was not disclosed to the prosecution or defense: (1) it is contained in the investigative file, but inexplicably is not in the permanent retention file, where it should have been (along with all other typed reports); (2) there is no reference to the Erickson lineup report at the criminal trial, despite its obvious relevance to the defense's theory that Johns was the real perpetrator (and Johnson was mistakenly identified), (3) Guevara testified consistent with his lineup report, and contrary to Erickson's, stating that Johns was in a lineup but not identified by anyone, without challenge by defense counsel; (4) trial prosecutor Sheehan's notes indicate that he asked Guevara about the Johns lineup and was told that there was no ID, *see* CCSAO 00007, (5) Sheehan testified at his deposition that he was certain that he never received the Erickson lineup report or the information contained in it; and

(6) both of Johnson's criminal defense attorneys testified that they were certain they had never received the Erickson lineup report or the information contained in it.

The fact that Erickson documented a positive identification of Johns by an eyewitness to the murder, hours after the shooting, is a critical investigative finding, and has obvious exculpatory value. All of the officers and supervisors working on the Fred investigation would have known, and certainly should have known, this is information that had to be disclosed to the prosecution and defense, and the failure to do so is a blatant violation of accepted police practices.

**Additional investigative information not documented and/or not disclosed**: In addition to all of this, there is ample additional investigative information that CPD detectives learned during their investigation that they simply failed to document. All of it was investigative information of exactly the type detectives are expected to document and disclose. Much of this is discussed at length in my Opinion 1, and includes the following:

- Photo identification procedures:
  - There is no documentation in the file regarding some of the photo array procedures that witnesses testified were performed. For example, Ricardo Burgos testified that he was shown a photo array containing Johnson in June 1991 (see Opinion 1 above), but this is not documented anywhere in the homicide files, nor is whatever information caused defendants to include Johnson's photo in an array at that time.
- Supplementary reports of critical witness interviews:
  - There are no reports or notes, or any other document whatsoever, documenting any interviews of Bryan Johns and the two other men that were arrested with him by Officer Daley shortly after the Fred shooting. These men were suspects in a murder, and some were placed in lineups, yet inexplicably there is no indication in the file anywhere of what these men said when questioned about the murder. Either these men really were not questioned about the shooting at all, or they were but those interviews were not documented or were documented and concealed. Either way, that would be a shocking deviation from accepted police practices.
- Interview Notes:
  - There are no GPRs or other notes anywhere in the file. Although I have now seen this pattern in multiple cases involving Defendant Guevara and his colleagues, it is extremely unusual, and all but unheard of, as a matter of generally accepted police practices.
  - For example, Demetrius Johnson was interrogated regarding his involvement in the Fred homicide, but there are no notes of his interrogation. Johnson testified that he denied any involvement in the crime.
  - There are no notes of any of Defendants' interviews of numerous eyewitnesses to the shooting, including every one of the individuals from whom Guevara later obtained identifications of Johnson (Ricardo, Rosa and Elba Burgos). It is

completely contrary to my decades of law enforcement experience for detectives to interview numerous eyewitnesses, as they did in this case, without taking any notes to assist them in their report writing.

- The .25 caliber gun Daley discovered from Johns and the other two arrestees in the van shortly after the shooting:
  - As discussed in Opinion 1, Daley documented that he found a .25 caliber gun during his arrest of Johns and two others with him. There appears to be a photo of a .380 caliber semi-automatic handgun contained in the files I have reviewed. But there is no documentation I have seen regarding the gun found by Daley. It is as though it disappears from the file. There is no document indicating it was placed into inventory, or any evidence report, crime scene processing report, or other document I would typically expect to see documenting the recovery and chain of custody of a potential murder weapon.
  - There is also no documentation of any analysis or testing on this gun. It would be a serious deviation from police practices to fail to conduct any analysis of that weapon, especially given the evidence that the .380-9mm did not match to the bullet found in the victim and that multiple witnesses claim to have seen two shooters. If in fact analysis of the .25 caliber did occur, as it should have, that information has been unacceptably omitted from the homicide file and would also constitute a violation of accepted police practices.

Based on these failures to document and failures to disclose, the investigative file in the Fred homicide investigation suffers from the same systemic problems observed in the investigative files I reviewed as a whole, from this case, the hundreds of other investigative files I reviewed, and other cases such as *Rivera*, *Fields*, *Kluppelberg, Sierra, Iglesias,* and *Reyes/Solache*. These leads should have been disclosed under generally accepted police practices but were not as a result of CPD's deficient policies and practices related to documentation and disclosure of investigative information learned in homicide investigations.

## <u>CONCLUDING STATEMENT</u>

I have provided my opinions based upon my training, experience, and my review of thousands of pages of records in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices.

If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*

<u>/s/Thomas J. Tiderington</u>