```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   ARTURO DELEON-REYES,          )
                                   )
 4               Plaintiff,        )
                                   )
 5        vs.                      )   No. 18 CV 01028
                                   )
 6   REYNALDO GUEVARA, et al.,     )
                                   )
 7               Defendants.       )
     ------------------------      )
 8   GABRIEL SOLACHE,              )
                                   )
 9               Plaintiff,        )
                                   )
10        vs.                      )   No. 18 CV 02312
                                   )
11   REYNALDO GUEVARA, et al.,     )
                                   )
12               Defendants.       )

13               VOLUME 1 - Pages 1-352

14         The deposition of THOMAS J. TIDERINGTON,

15   taken pursuant to the Federal Rules of Civil

16   Procedure, before Kathleen A. Hillgard, Certified

17   Shorthand Reporter No. 084-004093, via Zoom

18   Video Teleconference, on Wednesday, October 5,

19   2022, commencing at 10:10 a.m. pursuant to notice.

20

21

22

23

24
```

```
                                         Page 2
 1   APPEARANCES:
 2      LOEVY & LOEVY, by
        MR. ANAND SWAMINATHAN
 3      MR. SEAN C. STARR
        MS. ISABELLA AGUILAR
 4      (311 North Aberdeen Street, Third Floor
        Chicago, Illinois  60607
 5      312.243.5900
        anand@loevy.com
 6      sean@loevy.com
        isabella@loevy.com)
 7         appeared on behalf of the plaintiff
           Arturo DeLeon-Reyes;
 8
        PEOPLE'S LAW OFFICE, by
 9      MS. JAN SUSLER
        (1180 North Milwaukee Avenue, Third Floor
10      Chicago, Illinois  60642
        773.235.0070
11      jsusler@peopleslawoffice.com)
           appeared on behalf of the plaintiff
12         Gabriel Solache;
13      LEINENWEBER BARONI & DAFFADA, LLC, by
        MS. MEGAN K. MCGRATH
14      (120 North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
15      866.786.3705
        mkm@ilesq.com)
16         appeared on behalf of the defendant
           Reynaldo Guevara;
17
18
19
20
21
22
23
24
```

```
                                         Page 3
 1   APPEARANCES: (Cont'd)
 2      THE SOTOS LAW FIRM, PC, by
        MS. CAROLINE JAMIESON GOLDEN
 3      (141 West Jackson Boulevard, Suite 1240A
        Chicago, Illinois  60604
 4      630.735.3300
        cgolden@jsotoslaw.com)
 5         appeared on behalf of the individual
           police officer defendants;
 6
        ROCK FUSCO & CONNELLY, LLC
 7      MS. EILEEN E. ROSEN
        MS. THERESA B. CARNEY
 8      MS. JESSICA ZEHNER
        MS. ERICA FATIMA
 9      (333 West Wacker Drive, 19th Floor
        Chicago, Illinois  60606
10      312.494.1000
        erosen@rfclaw.com
11      tcarney@rfclaw.com
        jzehner@rfclaw.com
12      efatima@rfclaw.com)
           appeared on behalf of the defendant
13         City of Chicago.
14
     ALSO PRESENT:  Rachel Welling, Videographer
15                  Cindy Sobolewski, Exhibit Tech
                    Robyn Falasz, Exhibit Tech
16
                    * * * * * * *
17
18
19
20
21
22
23
24
```

```
                                         Page 4
 1                   I N D E X
 2
     Witness:                              Page
 3
        THOMAS J. TIDERINGTON
 4
           Examination by:
 5
           Ms. Golden...................    6
 6
 7
 8
 9
10
11
12
13
14             E X H I B I T S
15   No.   Description           Marked/Referenced
16    1  Attachment D - Curriculum Vitae........  12
         Attachment A - Litigation Support
17    2  Experience............................ 118
      3  Invoice 1/20/22....................... 122
18    4  Attachment B - Materials Reviewed...... 134
         Attachment E - Bibliography of
19    5  Background Source Materials ........... 154
      6  Expert Report......................... 156
20    7  RFC Solache-Reyes, 1 through 423....... 164
      8  Sidley & Austin Memorandum............. 227
21
22         (Exhibits attached/scanned.)
23
                    - - -
24
```

```
                                         Page 5
 1       THE VIDEOGRAPHER:  This is the beginning of
 2   Media Unit 1 and we are now on the video record at
 3   10:10 a.m.
 4          This is the videotaped video-
 5   conferenced deposition of Thomas Tiderington, being
 6   taken on October 5th, 2022.  This deposition is
 7   being taken on behalf of the defendant in the
 8   matter of Arturo DeLeon-Reyes v. Reynaldo Guevara,
 9   et al., the case number is 18 CV 2312, consolidated
10   with 18 CV 1028, filed in the United States
11   District Court for the Northern District of
12   Illinois, Eastern Division.
13          My name is Rachel Welling, certified
14   legal videographer, representing Urlaub Bowen &
15   Associates, with offices at 20 North Clark Street,
16   Suite 600, Chicago, Illinois.
17          The court reporter today is Kathy
18   Hillgard, also of Urlaub Bowen & Associates.
19          Counsel, please identify yourselves
20   for the video record and the parties which you
21   represent.
22       MS. GOLDEN:  Caroline Golden for the
23   individual officer defendants.
24          Good morning, Mr. Tiderington.
```

THOMAS TIDERINGTON, 10/05/2022                                    Page 6..9

Page 6

1    MR. TIDERINGTON: Good morning.
2    MS. ROSEN: Eileen Rosen on behalf of
3 Defendant City of Chicago with Theresa Carney, and
4 then we have two observers from my office, Jessica
5 Zehner and Erica Fatima.
6    MS. McGRATH: Megan McGrath on behalf of
7 Defendant Guevara.
8    MR. SWAMINATHAN: Anand Swaminathan for
9 Plaintiff Arturo Reyes.
10    MR. STARR: Sean Starr and Isabella Aguilar
11 for Plaintiff Arturo Reyes as well.
12    MS. SUSLER: Jan Susler on behalf of
13 Plaintiff Gabriel Solache.
14    THE VIDEOGRAPHER: Will the court reporter
15 please swear in the witness.
16        (Witness sworn.)
17        THOMAS J. TIDERINGTON
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20        EXAMINATION
21 BY MS. GOLDEN:
22    **Q.   Good Morning, sir. Could you please**
23 **state and spell your name?**
24    A.   Sure. My name is Thomas J.

Page 7

1 Tiderington -- (audio distortion) -- Thomas J.
2 Tiderington, T-i-d-e-r-i-n-g-t-o-n.
3    **Q.   Okay. And so you live in the Detroit**
4 **area?**
5    A.   I do.
6    **Q.   Okay. And you understand that you're**
7 **here today for a deposition in the Solache Reyes**
8 **cases?**
9    A.   Yes, ma'am.
10    **Q.   And what is your understanding of what**
11 **you were retained to do by the plaintiffs in this**
12 **case?**
13    MR. SWAMINATHAN: Objection to form.
14 Objection to the extent it calls for privileged
15 information in terms of our deliberations and
16 communications.
17        But you can answer as to your
18 understanding of what your -- what your role was in
19 this case.
20    THE WITNESS: I was asked to examine the
21 documents related to this case and determine if
22 there was any deviation from generally-accepted
23 police practices, essentially, and also to
24 determine whether the documentation and the

Page 8

1 disclosure of various documents were consistent
2 with generally-accepted police practices.
3 BY MS. GOLDEN:
4    **Q.   And did you do that?**
5    A.   I did.
6    **Q.   And how did you go about doing it?**
7    A.   Reviewed a lot of documents, case
8 files, investigative files, depositions, testimony
9 other expert reports. Kind of a comprehensive
10 review of the entire matter, I think is the best
11 way to describe it.
12    **Q.   And what did -- did you do anything**
13 **else other than review the documents that you just**
14 **mentioned?**
15    A.   What do you mean "other"?
16    **Q.   Did you do anything else other than**
17 **review documents?**
18    MR. SWAMINATHAN: Objection to form.
19        Go ahead.
20    THE WITNESS: No. My review was based on the
21 documents provided to me, yes.
22 BY MS. GOLDEN:
23    **Q.   And then did you prepare a report?**
24    A.   I did.

Page 9

1    **Q.   And is your report based on your review**
2 **of those documents?**
3    A.   Yes, it is.
4    **Q.   And the documents that you reviewed,**
5 **are they listed in Attachment -- in an attachment**
6 **to your report?**
7    A.   Yes, they are.
8    **Q.   Okay. Did you also attach to your**
9 **report a copy of your c.v.?**
10    A.   I did.
11    **Q.   And at the time that you attached it,**
12 **was it -- was it current?**
13    A.   Was it current? It was current then,
14 yes. I -- yeah, it was.
15    **Q.   Okay. Because the c.v. says that**
16 **you're the chief of police for Plymouth Township,**
17 **right?**
18    A.   I was. I retired about two months ago,
19 so yeah, I -- I think I retired at the end of May.
20    **Q.   Okay. And why did you retire?**
21    A.   After 20 years as the chief of police
22 and 44 years as a law enforcement officer, I felt
23 it was a good time to retire.
24    **Q.   Any other reason?**

Page 10

1    A.    No.
2    Q.    Are you still working?
3    A.    As a police officer or as an --
4    Q.    At all.
5    A.    I -- I do consulting on criminal
6 justice matters.
7    Q.    Okay.  And your consulting includes
8 work as an expert witness in litigation matters,
9 correct?
10   A.    It does.  Yes, it does.
11   Q.    Okay.  What percent of your consulting
12 work consists of being retained as an expert in
13 litigation matters?
14   A.    Well, obviously the -- my expert
15 witness portion of my business, I -- obviously
16 it's -- it's all criminal justice matters, if I
17 understand your question correctly.
18   Q.    Right, yeah.  So what percent of your
19 consulting work or does all of your consulting work
20 consist of being an expert witness in litigation
21 matters?
22        MR. SWAMINATHAN:  Objection to form.
23            Go ahead.
24        THE WITNESS:  Yeah, no.  I'm only hesitating,

Page 11

1 I -- I've consulted on some movie projects and some
2 media projects, so I -- I'm not sure if I should
3 include that in my answer to your question or if
4 you're referring to my work as an expert witness.
5 BY MS. GOLDEN:
6    Q.    I'm referring to your work as an expert
7 witness.
8    A.    Okay.
9    Q.    What percent of your consulting work is
10 work as an expert witness?
11   A.    Oh, probably 80 percent.
12   Q.    Okay.  And when you say "work as an
13 expert witness," what kind of work do you do?
14   A.    It's a variety of cases.  I've had
15 cases involving trade mark violations.  I have
16 several cases that I consider being premises
17 liability type cases; several law enforcement
18 cases; police misconduct on -- on both sides of the
19 equation, I guess.  So I would say a wide variety
20 of types of cases.
21   Q.    And so we're on the same page, we're
22 talking about cases in which you're retained by a
23 party to litigation to provide an expert opinion to
24 be disclosed to the other side about which you're

Page 12

1 expected to testify at trial; is that right?
2    A.    Yes, ma'am.
3    Q.    Okay.  All right.  Let's take a look at
4 Exhibit 1, which is Attachment D to your report and
5 it's your c.v.
6    A.    Okay.
7    Q.    Did you bring that with you?
8    A.    I did.
9    Q.    Do you have a hardcopy of the report?
10   A.    Yes.
11   Q.    Okay.  Great.  That will be helpful to
12 you, I think, so we won't have to look at the
13 screen -- or you won't have to look at the screen.
14        By the way, you're in -- where are
15 you?
16   A.    I'm in Ann Arbor, Michigan, in a -- in
17 an office.
18   Q.    Whose office?
19   A.    It's one of these day offices that you
20 lease.
21   Q.    Okay.  And who are you with?
22   A.    Anand.
23   Q.    And that's the lawyer for Mr. Reyes,
24 correct?

Page 13

1    A.    That is correct.
2    Q.    Is anyone else in the room?
3    A.    No.
4    Q.    Do you have any -- you're obviously on
5 a computer of some sort to participate in the
6 deposition, correct?
7    A.    That is correct.
8    Q.    All right.  Do you have anything in
9 front of you, anything else other than the
10 computer?
11   A.    I have a binder with attachments, my
12 report, and various attachments that I expect that
13 you're doing to ask me about.
14   Q.    Okay.  Can you show me the binder?
15   A.    (Complying.)
16   Q.    Can you pull it up a little bit?
17   A.    (Complying.)
18   Q.    Okay.  And what's in there other than
19 your report and attachments to your report?
20   A.    Nothing other than the attachments, I
21 don't believe.  My report and the attachments
22 associated with it.
23   Q.    Okay.  And where --
24   A.    And I also -- I'm sorry.  To more

THOMAS TIDERINGTON, 10/05/2022                    Page 14..17

Page 14

1 clearly answer your question, I also have some file
2 folders with some of the policies and the Sidley
3 report, the Scott Lassar report.
4       Q.   Okay.  Do you have anything in those
5 file folders other than policies and the Sidley &
6 Austin report?
7       A.   No.
8       Q.   Okay.  Do you have anything -- I'm
9 sorry?
10      A.   I'm sorry.  Of course, those -- those
11 were listed as attachments as well.  So I just
12 wanted to point out they weren't in the binder
13 necessarily.
14      Q.   Well, they weren't -- they weren't
15 attachments to your report, were they?
16      A.   Well, not -- I'm sorry.  Not
17 attachment, but either footnoted or mentioned it in
18 my report is -- is what I meant.
19      Q.   They were on the list of materials
20 reviewed, correct?
21      A.   That is correct.
22      Q.   They were not attachments to your
23 report, correct?
24      A.   That is correct.

Page 15

1       Q.   Okay.  Do you have anything else with
2 you other than the binder and the file folders with
3 the policy and the Sidley & Austin report?
4       A.   No.
5       Q.   Do you have your phone with you?
6       A.   Oh, I'm sorry, yes.  Yeah.  I have --
7       Q.   Okay.
8       A.   -- my -- I have my wallet, my keys,
9 and --
10      Q.   Okay.  Is your phone somewhere you can
11 see it as we're speaking?
12      A.   Yeah, but I'm not viewing it or I'm not
13 pulling anything up on it.
14      Q.   Okay.  Maybe you should put that away
15 so that --
16      MR. SWAMINATHAN:  He doesn't have it in front
17 of him and he's -- he's not using it.  And I'm an
18 officer of the court and he's under oath and
19 neither of us is communicating with each over via
20 his phone.
21 BY MS. GOLDEN:
22      Q.   Can you see your phone?
23      A.   I can't see the front of it.  I can see
24 the top of it, but it doesn't tell me anything.

Page 16

1       Q.   Okay.  Do you have -- is
2 Mr. Swaminathan to your right or to your left or
3 straight ahead?
4       A.   He's directly in front of me.
5       Q.   Okay.  As you're looking at the
6 computer screen, can you also see him?
7       A.   No.
8       Q.   Okay.  So you can't see him right now?
9       A.   I'm sorry.  I thought you asked if I
10 could see his computer screen.
11      Q.   No.  Can you see --
12      A.   Yes.  I can see --
13      Q.   -- him?
14      A.   Yeah.  I can see him, yeah.  Yes.
15      Q.   Okay.  Did you bring with you copies --
16 I'm sorry.  The -- the materials that you reviewed
17 to arrive at the opinions you formed in this case,
18 did you receive those in hardcopy form or
19 electronically?
20      A.   Electronically.
21      Q.   Okay.  And did you bring electronic
22 copies of all of the materials that you reviewed to
23 this deposition?
24      A.   I have them in a Dropbox that I believe

Page 17

1 I can access.
2       Q.   Okay.  From the computer that you're
3 working on?
4       A.   That is correct.
5       Q.   Okay.  Okay.  So in terms of the
6 materials that relate to this case, did you bring
7 anything with you or have anything in front of you
8 other than the binder with the -- your report and
9 attachments and the file folders with the policies
10 and the Sidley &Austin report?
11      A.   That is what I have.
12      Q.   Okay.  And what did you do to prepare
13 for the deposition?
14      A.   I reviewed some of the data that was
15 provided, some of the documents that were provided,
16 reviewed my report, reviewed other depositions,
17 kind of did a summary review of material that was
18 provided.  And of -- of course there was a lot of
19 documents, so I did not review everything.
20      Q.   Right.
21           Which depositions did you review?
22      A.   You know, I don't know exactly, but
23 I -- and again, when I say I reviewed depositions,
24 it may have been, you know, skimmed through Mike

THOMAS TIDERINGTON, 10/05/2022                    Page 18..21

Page 18

1 Brasfield's deposition or some of the other
2 witnesses.  I -- I don't recall specifically which
3 depositions I reviewed in preparation for the
4 depot.
5     **Q.  When did you do this?**
6     A.  I would say I started prepping for the
7 depo over the last week or two.
8     **Q.  How much time would you say you spent**
9 **preparing for today's deposition?**
10    A.  Probably 15 to 20 hours.
11    **Q.  And I take it based on what you**
12 **said before, that you don't specific -- you don't**
13 **recall -- you don't specifically recall which**
14 **deposition transcripts you reviewed; is that**
15 **correct?**
16    A.  I -- not as we sit here.  I could look
17 at the list of materials and point out which ones
18 I, you know may have looked at recently or
19 yesterday or last night.
20    **Q.  Did you look at deposition testimony**
21 **last night?**
22    A.  I went through some -- some
23 information.  I may have looked at a portion of a
24 deposition.  I'm -- I don't know, you know,

Page 19

1 specifically -- I can't recall specifically if I
2 read a deposition last night or not.  I don't think
3 so.
4     **Q.  Okay.  Do you recall anything that you**
5 **reviewed last night?**
6     A.  Well, sure.
7     **Q.  What did you review last night?**
8     A.  But again, as we speak, I do recall
9 looking at Mike Brasfield's deposition briefly last
10 night.  I looked at the, you know, Lassar report,
11 "La-zar" report.
12         Would you like me to look at the
13 list of materials and probably refresh my memory.
14    **Q.  No.  I'm just asking what you remember.**
15    A.  Yeah, no.  It's -- they're all kind of
16 running together at this point.
17    **Q.  Other than the Brasfield deposition and**
18 **the Lassar report, what other documents can you**
19 **recall reviewing in the last week or two?**
20    A.  Oh, I -- I don't know if I could recite
21 that.  I would have to, again, look at my list of
22 documents.  I looked at a lot of documents over the
23 last week or so.
24    **Q.  Can you recall any specific police**

Page 20

1 report that you looked at over the last week or so?
2     A.  I looked at the police reports related
3 to this matter, yes.
4     **Q.  All of them or just selected ones?**
5     A.  How do you define "all"?  I mean, I --
6 the documents that were provided to me, yes.  I
7 don't know if that was all of them.
8     **Q.  Okay.  So I'm just talking about in the**
9 **last week or two as you were preparing for the**
10 **deposition, did you re-review all of the police**
11 **reports that were provided to you?**
12    A.  I believe so, yes.
13    **Q.  Okay.  All right.  Can you recall**
14 **anything other than police reports, the Brasfield**
15 **deposition, the Lassar report, and some data that**
16 **you reviewed in the last week or two?**
17    A.  Well, again, I was provided with a lot
18 of documents and I kind of went through and
19 reviewed, you know, essentially everything that was
20 provided to me.  And I -- I can't describe in what
21 detail I looked at each document, but I -- I kind
22 of canvassed everything that was provided over the
23 last couple of weeks and kind of attempted to
24 refresh my memory on all of the documents that were

Page 21

1 provided.
2     **Q.  So is it your testimony that you've**
3 **done a general review of all the materials that**
4 **were provided to you over the last week or two to**
5 **prepare for this deposition?**
6     A.  I think that's a fair characterization
7 of what I attempted to do to prepare for this
8 deposition, yes.
9     **Q.  Okay.  And did you -- aside from**
10 **reviewing documents, did you do anything else to**
11 **prepare for the deposition?**
12    A.  I met with counsel.
13    **Q.  How many times?**
14    A.  Counting today, two.
15    **Q.  All right.  When was the first time you**
16 **met with counsel to prepare for the deposition**
17 **today?**
18    A.  Yesterday.
19    **Q.  And who do you meet with?**
20    A.  Mr. -- well, Anand.  I can't pronounce
21 his last name, so ...
22    **Q.  And that's counsel for Mr. Reyes?**
23    A.  Yes.
24    **Q.  Was anyone else present?**

THOMAS TIDERINGTON, 10/05/2022                    Page 22..25

Page 22

1    A.   No.
2    Q.   Was anyone else -- did anyone else
3  participate by video or phone or any other way?
4    A.   I think there was another attorney from
5  his office that we had a brief phone conversation
6  with.
7    Q.   And who was that?
8    A.   I don't recall his name, but -- I
9  don't -- I don't recall.  I don't know if I knew.
10 I -- first time I ever spoke with him, so I don't
11 know who it was.
12   Q.   And how long was the conversation with
13 that person?
14   A.   Maybe five minutes.
15   Q.   What is your understanding of that
16 person's role in this case?
17   A.   I understood him to be part of the
18 plaintiff's team.
19   Q.   For Mr. Reyes or Mr. Solache?
20   A.   I guess I don't know that.
21   Q.   Okay.  It was a male?
22   A.   Yes.
23   Q.   Could you see him or was it over the
24 phone?

Page 23

1    A.   It was over the phone.
2    Q.   Did you understand him to be a lawyer?
3    A.   Yes.
4    Q.   And how long was that phone
5  conversation?  Sorry if you told me already.
6    A.   Oh, maybe five minutes.  Pretty brief.
7    Q.   Okay.  So the first time you met with
8  counsel, that was yesterday with Anand and the
9  person on the phone.  And how long did that last?
10   A.   Most of the day.  When -- when I say
11 "most of the day," I think we started at around
12 10:00 o'clock and at some point we went to lunch
13 and then I think we ended at around 5:30 or so.  So
14 maybe four and a half hours, five hours total.
15   Q.   Did you review -- I'm sorry.  How many
16 hours total?
17   A.   Well, I don't know if you want to
18 count --
19   Q.   That's a long lunch?
20   A.   If you don't -- if you want to count
21 the lunch, though, I don't know.  Maybe from 10:00
22 to 6:00 with an hour, hour and a half lunch.
23   Q.   Okay.  And then when was the second
24 time you met with counsel to prepare for the

Page 24

1  deposition today?
2    A.   This morning probably an hour before
3  the deposition.
4    Q.   For about an hour's time?
5    A.   Probably less than an hour.  Anand was
6  a little bit late getting here.
7    Q.   That happens.
8         Did you review any documents when
9  you met with counsel this morning?
10   A.   I did.
11   Q.   And what documents did you review this
12 morning?
13   A.   Primarily I think just my report.
14   Q.   Anything else?
15   A.   I don't believe so.
16   Q.   What -- what parts of your report did
17 you review this morning?
18   A.   Well, I think I reviewed my entire
19 report this morning.
20   Q.   Okay.  Did you focus on any particular
21 parts of it?
22   A.   Not necessarily.
23   Q.   Was anyone else present when you met
24 with -- this morning you met with Anand, right?  I

Page 25

1  mean, I thought you said it.
2    A.   That's right.
3    Q.   Was anyone else present when you met
4  with him before the deposition today?
5    A.   No.
6    Q.   Okay.  Other -- and when you -- when
7  you spend time on a matter like this, how do you
8  keep track of your hours?
9    A.   I have an app on my telephone and you
10 click on the button and that is the way I track my
11 time.
12   Q.   Okay.  And then would you -- how do
13 you -- does that information somehow makes its way
14 to an invoice at some point hopefully?
15   A.   Hopefully.
16   Q.   Yeah.  And so the app tells you how
17 much time you spent on a matter, what you've done,
18 and the date?
19   A.   Well, no.  It doesn't tell you what
20 you've done.  It just essentially is a stopwatch.
21 It doesn't, you know -- and I put a title on it.
22 It doesn't really -- it's not comprehensive to the
23 point where it describes what work I'm doing.
24   Q.   Somebody should make -- somebody should

Page 26

1  make one for that.

2      A.   Would be a good idea.

3      Q.   That would be good.

4           Okay.  So you take the information

5  that you record on your phone and then you somehow

6  create an invoice?

7      A.   It goes into an Excel spreadsheet, yes.

8      Q.   Okay.  And it -- and so you keep your

9  time records contemporaneously with the spending

10 time on the -- on the matter?

11     A.   I try to, yes.

12     Q.   For the most part.  Okay.

13     A.   For the most part, yes.

14     Q.   Okay.  And did you keep track of the

15 time that you spent preparing for the deposition

16 today?

17     A.   Yes, I have.

18     Q.   Okay.  Have you done -- have you done

19 any work on this case after submitting the report

20 but before preparing for the deposition in the last

21 two weeks?

22     A.   When you say -- I guess define "work."

23 I guess preparing for the case was -- or the

24 deposition essentially was work.  I mean, if I

Page 27

1  understood your question.

2      Q.   Yeah, no.  It was probably poorly

3  worded.

4           So you -- you submitted your report

5  I think in January of this year.  Does that sound

6  right?

7      A.   That's correct.

8      Q.   Okay.  And you started preparing for

9  this deposition over the last week or two, correct?

10     A.   Yes.

11     Q.   Did you work on the case in between

12 those two times?

13     A.   I don't believe so.

14     Q.   Okay.  Have you received any documents

15 from the plaintiffs' lawyers or from anyone that

16 relate to this case since you submitted your

17 report?

18     A.   I have.

19     Q.   Okay.  And what have you received?

20     A.   I -- you know, I'll have to go in

21 and -- I can do it on a break or -- I'd have to go

22 into my Dropbox and see what I received recently,

23 unless you want me to attempt to do it at this

24 point.  It might take -- but there were -- I --

Page 28

1  I -- some -- can't recall exactly what it was, but

2  there was -- (audio distortion) --

3           MR. SWAMINATHAN:  You're all right.

4           THE WITNESS:  All right.

5           MR. SWAMINATHAN:  Go ahead.

6           THE WITNESS:  There's additional documents

7  that I've received since that time and that I -- I

8  can identify those and let you know after a break.

9           MS. GOLDEN:  All right.  Sure.  Thank you,

10 but who --

11          MR. SWAMINATHAN:  I also have -- I have them

12 in front me.  I -- sorry.  I was being on mute.

13          THE WITNESS:  I think she can hear you on

14 mute.

15          MR. SWAMINATHAN:  She can hear, sorry.

16          You -- you want me to identify them

17 for you?  I have the list here.

18          MS. GOLDEN:  That's fine.  I just want to ask

19 him a little bit about it first.

20          MR. SWAMINATHAN:  Okay.  Go ahead.

21          MS. GOLDEN:  Thanks.

22 BY MS. GOLDEN:

23     Q.   What can you tell me about these

24 documents?

Page 29

1           MR. SWAMINATHAN:  Object to the form.

2           Go ahead.

3           THE WITNESS:  I'd have to -- again, I'd like

4  to pull them up and I can tell you what they are,

5  what -- the context for which they were provided to

6  me in.

7  BY MS. GOLDEN:

8      Q.   Well, were they provided to you by

9  counsel for Mr. Reyes?

10     A.   Or Solache, yeah.  I -- yes.

11     Q.   Okay.  And obviously these documents

12 weren't necessary for you to form the opinions that

13 you disclosed in your report, correct?

14     A.   I'm sorry.  Can you answer that -- or

15 can you ask that again?  I'm sorry.

16     Q.   Is it -- is it fair to say that these

17 documents were not necessary for you to form the

18 opinions that you disclosed in your report?

19     A.   That -- that's correct.  It's -- I

20 think it perhaps supported the opinions, but it

21 certainly didn't change any opinions that I

22 provided.

23     Q.   Okay.  And did you ask for these

24 documents or were they provided to you without

Page 30

1 prompting by you?

2    A.   Well -- and again, without getting into
3 my discussion with -- with counsel.  I mean, we --
4 we had discussions, and I don't know exactly how
5 they came about or -- or how we determined what
6 was -- what should be sent to me.

7         But my practice is to attempt to
8 look at all of the information related -- relating
9 to this case, and I -- and that's what was provided.

10   Q.   Were you aware of the existence of
11 these documents before they were sent to you?

12   A.   I don't think so.

13   Q.   Okay.  And what, to the best of your
14 recollection, did the documents consist of?

15   A.   I think there were some old case files
16 relating to perhaps Brasfield's opinions or related
17 to the -- the charge in this case that -- some of
18 the documents relating to some of those cases that
19 are referenced in my police -- I'm sorry, in my
20 police report -- in my expert report.

21   Q.   And so did you receive investigative
22 files; is that what you're saying?

23   A.   Would have been --

24   Q.   When you say "case files," what do you

Page 31

1 mean?

2    A.   Again, I don't want to play cat and
3 mouse with you.  If I have an opportunity to look,
4 I can tell you exactly what they are and I -- I
5 don't want to misspeak, and I would rather refresh
6 my memory and tell you exactly what they are versus
7 having this memory test.

8    Q.   Well, approximately -- what do you mean
9 when you say "case files"?

10   A.   There were -- I don't know if they were
11 the permanent retention files or investigative
12 files from -- from some of the historical cases
13 relating to this manner.

14   Q.   Okay.  And do you remember from what
15 time period they were from?

16   A.   No, I -- I don't.

17   Q.   Do you remember when you received them?

18   A.   Within the last few days, I think.  I
19 think they were put in my Dropbox or sent to me.

20   Q.   Does your receipt of these case files
21 alter any of your opinions that you expressed in
22 your report?

23   A.   No.

24   Q.   Okay.  Did you receive -- again, I'm

Page 32

1 talking about that time period -- since you've
2 submitted your report, have you received any
3 additional -- any other materials from any source
4 that relate to this case other than the case files
5 you just mentioned?

6    A.   No.  I believe that's it.  And again,
7 I'll confirm on the break and let you know if there
8 is anything that I may have missed.

9    Q.   Okay.  So --

10   A.   I'm speaking of breaks, do you mind if
11 we take a break like every hour for like five
12 minutes or so or ten minutes?

13   Q.   Honestly, I -- I'd love that.
14 Generally, you know, we -- we have to be
15 appreciative of the court reporter and the
16 videographer, but we -- we let you be the guide.
17 Anytime you want a break, we can take one.  You've
18 just got to let us know and we -- I wouldn't want
19 to go more than an hour and a half without one so
20 that everybody can stretch their legs.

21   A.   Great.  Thank you.

22   Q.   Do you need a break right now?

23   A.   I can't look at my watch or my clock
24 because my phone's turned upside down, but no, I --

Page 33

1 I don't.  And like I say, every -- every hour would
2 be great or whatever --

3    Q.   Listen, don't worry about the time.
4 if you -- if you feel like you want a break, if
5 it's --

6    A.   No, I'm good.

7    Q.   -- take one.  Okay.  Fine.

8         All right.  So let's -- all right.
9 So Rachel, if you could put up Exhibit 1, please.

10        And, Mr. Tiderington, this is a copy
11 of your c.v.  this was Attachment D to your report.
12 Does it look familiar?

13   A.   Yes.

14   Q.   Do you have a copy in front of you?

15   A.   Yes, I do.

16   Q.   Okay.  All right.  So if we turn to
17 page 2, I think --

18   A.   Okay.

19   Q.   -- we can see that the -- the c.v. is
20 not current, right?  Because it says that you are
21 the current chief of police and we know that you
22 retired at the end of May, right?

23   A.   That's correct.

24   Q.   Do there need to be any other additions

THOMAS TIDERINGTON, 10/05/2022                              Page 34..37

Page 34

1 or revisions to this c.v. that you submitted in
2 order for it to be current?
3     A.   I think I retired with 44 years of law
4 enforcement experience.  It says 42, so ...
5     Q.   It's still over 42, right?
6     A.   Oh, with over 42.  Thank you for
7 pointing that out, yes.
8     Q.   Save yourself a minute.
9     A.   Thank you.
10    Q.   Okay.  So any other changes that need
11 to be made or additions?
12    A.   I would think that that would bring it
13 up to date.
14    Q.   Okay.  And in that first line
15 underneath Experience Overview, it refers to
16 42 year -- over 42 years of experience with four
17 different --
18    A.   Over.
19    Q.   Right.  With four different law
20 enforcement agencies.  You see that?
21    A.   That's correct.
22    Q.   And that's -- I can see from the
23 balance of the resume, refers to Detroit Police
24 Department, Fort Lauderdale Police Department, and

Page 35

1 the Plymouth Township Police Department; is that
2 right?
3     A.   That's correct.
4     Q.   What is the fourth law enforcement
5 agency?
6     A.   I spent close to five years -- or over
7 four years, I guess is a better way to describe it,
8 as a group supervisor assigned to the Drug
9 Enforcement -- the United States Drug Enforcement
10 Administration in charge of what is called the
11 South Florida Regional Task Force.
12    Q.   Okay.  And was that -- did that fully
13 occupy your -- so when you did that, were you also
14 sworn in as a DEA agent?
15    A.   I was, yes.
16    Q.   Okay.  And so did you work out of the
17 DEA office in Fort Lauderdale or out of the Fort
18 Lauderdale Police Department office?
19    A.   No.  I was full-time assigned to the
20 DEA and -- and work out of the Fort Lauderdale
21 district office.
22    Q.   So that was a full-time assignment that
23 took you outside the --
24    A.   Yeah.  It was close to five years I

Page 36

1 would say.
2     Q.   Okay.  And it was a full-time
3 assignment, you didn't have any other duties with
4 the Fort Lauderdale Police Department at the time?
5     A.   That's correct.
6     Q.   And is that what you refer to here in
7 the -- in the bottom paragraph of your c.v. on
8 page 2?
9     A.   Yes.
10    Q.   Okay.  And you say it was -- the "Task
11 Force" conducted one of the most sophisticated and
12 successful international money laundering
13 investigations (Operation Princess) to date.
14         Do you see is that?
15    A.   I do.
16    Q.   By what measure was that the most
17 sophisticated and successful international money
18 laundering investigation?
19    A.   It was an award that I was given by the
20 DEA administrator.  I think those -- that was the
21 terminology that was used.
22    Q.   Do you know the basis for that
23 terminology?  I mean, was it the most number of
24 arrests?  Was it the most -- the largest seizure of

Page 37

1 drugs?  Was it the largest seizure of cash?
2     A.   You know, it -- it's hard to say.  And
3 it's -- it's more of a -- it certainly was a very
4 significant investigation.  I don't want to say it
5 was the largest or the best and -- you know, every
6 day there's another new record cocaine seizure or a
7 new money seizure, so -- but at the time, it was
8 pretty significant.
9     Q.   What did you do on a day-to-bay basis
10 as a -- in connection with your work on the task
11 force?
12    A.   Well, I was a group supervisor, which
13 is essentially in a -- in a police department would
14 be at a sergeant or a lieutenant level within a
15 police department, as far as the equivalent for --
16 for the DEA type of chain of command.  And I was --
17 I had a group of task force officers, including DEA
18 agents, other officers from Broward County, a
19 variety of police departments throughout Broward
20 County.  We had other federal entities and we also
21 had the military assigned to us.
22    Q.   What was the mission of the task force?
23    A.   Well, the mission was to dismantle drug
24 cartels operating in South Florida, nationally and

THOMAS TIDERINGTON, 10/05/2022                    Page 38..41

Page 38

1 internationally.

2    Q.   And what can you tell me about
3 Operation Princess?

4    A.   Well, it was a complex investigation
5 resulting in numerous wiretap investigations.  It
6 also resulted in our informant being kidnapped down
7 in Columbia and being held for -- for several
8 months until we secured her release.

9    Q.   When she was kidnapped, did you know
10 who had kidnapped her?

11    A.   We had a pretty good idea, yes.  We
12 weren't sure, but we knew it was members of the
13 Cali cartel.

14    Q.   And how did you -- what do you base
15 that on?

16    A.   Confidential informant information,
17 undercover work, dark secrets, if I can describe it
18 as --as that way, CIA information that I can't
19 really discuss in detail, but it was a variety of
20 investigative methods that we used to determine who
21 she was being held by and -- and used that
22 information, working with and out of the embassy in
23 Columbia to secure her release from the -- from the
24 cartel.

Page 39

1    Q.   Did you, during your -- during the
2 course of your work these five years -- I'm sorry.
3 Strike that.

4         What years were you on the DEA task
5 force?

6    A.   I think I was there from 1990 to 1995,
7 I think is my recollection.

8    Q.   Okay.  And then in the first paragraph
9 of your resume -- let's see here, first paragraph
10 of your resume it says, Chief Thomas J. Tiderington
11 is an internationally recognized law enforcement
12 instructor who is one of the foremost experts in
13 the field of undercover operations and drug-related
14 police shootings.

15         Do you see that?

16    A.   I do.

17    Q.   So the field of undercover operations
18 and drug-related police shootings, are those your
19 fields of expertise?

20    A.   Well, yes.  I mean, but it doesn't --
21 isn't the sum -- sum total of my area of expertise,
22 but it -- what you just read from, I -- I was on
23 somewhat of a speaking tour with the YPO, Young
24 Presidents' Organization, and this is how they

Page 40

1 identified me in some of their advertisements to
2 their members as far as the speaking tour that I
3 was on or that I participated in.

4    Q.   So is this a resume that you prepared?

5    A.   Yes, it is.

6    Q.   Okay.  Are there any other words or
7 phrases on the resume other than the sentence I
8 just read and the sentence that described the task
9 force as conducting the most sophisticated and
10 successful international money laundering
11 investigation that are -- that are not yours, that
12 you took from some other source?  Do you
13 understand?

14    A.   No.

15    Q.   Long question.

16    A.   Yeah.

17    Q.   Okay.  So you told me that -- you know,
18 I asked you about this sentence, Under his
19 leadership, the task force conducted one of the
20 most sophisticated and successful --

21    A.   Right.

22    Q.   Right.  And you said that came from --
23 those were -- I think you said those weren't your
24 words, you borrowed those words from an award that

Page 41

1 you were given.

2    A.   That's correct.

3    Q.   And then I asked you about the first
4 sentence of the resume, which says that you're an
5 internationally recognized law enforcement
6 instructor who is one of the foremost experts in
7 the field of undercover operations and drug-related
8 police shootings, and you said those words, that's
9 the way someone else described you.

10    A.   That's correct.

11    Q.   And so I'm wondering if -- if -- well,
12 first of all, do you disagree with either of
13 those --

14    A.   No.

15    Q.   -- statements that --

16    A.   No.  That -- no.  I mean, it -- again,
17 it's just a summary of my -- perhaps a summary of
18 my -- topics that I -- my training topics or public
19 speaking topics that I have spoken on in the past
20 and --

21    Q.   Okay.

22    A.   -- essentially it was used as -- as I
23 explained, by -- by various groups to -- to
24 introduce me to their organizations.

Page 42

1    Q.   When you say you took these
2  descriptions of your experience from other sources,
3  are you intending to suggest that you don't also
4  believe them to be true?
5    A.   No, no.
6    Q.   Okay.
7    A.   No.  I believe it to be true, but I --
8    Q.   Okay.
9    A.   -- don't know if I would -- no.  I
10 believe it to be true.  I guess we'll leave it at
11 that.
12   Q.   Okay.  The -- then later in this
13 paragraph it talks about the eight years you spent
14 as an undercover agent.  And I think that was at
15 Fort Lauderdale PD; is that right?
16   A.   That's correct.
17   Q.   And what years were those?
18   A.   Probably started working undercover
19 probably 1982 until I got promoted, oh, I don't
20 know five or six years, seven years later.
21   Q.   Okay.  And what was the mission of
22 the -- you were undercover in the Fort Lauderdale
23 Police Department's Organized Crime Division,
24 right?

Page 43

1    A.   Well, I was -- again, I was a detective
2  assigned to the Organized Crime Division.  It
3  doesn't necessarily mean I only worked undercover
4  investigations, but I was assigned to the Organized
5  Crime Division and part of my responsibilities was
6  that of an undercover agent.
7    Q.   Okay.  I'm going to direct you to the
8  middle of the paragraph, the first paragraph on
9  page 2 of Exhibit 1.
10   A.   Okay.
11   Q.   It says, During his 40-year law
12 enforcement career, he served eight years as an
13 undercover agent assigned to the department's
14 Organized Crime Division where he was an undercover
15 operative in hundreds of cases.
16        Is any part of that not true?
17   A.   No.  That's true.
18   Q.   Okay.  So were you an undercover agent
19 for eight years?
20   A.   Well, yes.
21   Q.   Or am I -- okay.
22   A.   But I -- but again, in order to
23 clarify, it doesn't mean -- you know, everybody may
24 have a different idea of what an undercover agent

Page 44

1  is.  It doesn't mean, you know, that I had long
2  hair and a beard and I was living off on some yacht
3  with the drug traffickers for eight years.
4        My duties were -- included work as
5  an undercover agent, but was not solely -- the sum
6  totality of my experience or the work that I did as
7  a detective.
8    Q.   All right.  So during the eight years
9  that you were an undercover agent, how much of the
10 time over the -- how would you describe the amount
11 of time you spent undercover as opposed to the
12 amount of time you were not?
13   A.   And again, I know you're not here to
14 answer my questions, but --
15   Q.   I'll try.
16   A.   You have to really define -- you know,
17 again, a lot of people think an undercover agent --
18 you know, there may have been times where I went
19 undercover every day for a three-month period.  I
20 think if you see the paragraph Operation Blow, and
21 I recall that -- I think that was in 1985, and for
22 three or four months I -- my work was that of an
23 undercover agent.
24        Prior to that or just after that,

Page 45

1  there were, you know, many months that, you know, I
2  was on undercover that I assisted in other criminal
3  investigations or had other cases assigned to me
4  that weren't necessarily undercover work and not
5  necessarily narcotic investigations either.
6    Q.   So I think I understand you to say that
7  you weren't undercover for eight straight years,
8  right?
9    A.   Well --
10   Q.   I mean, you -- you were periodically
11 undercover.  Sometimes you were undercover;
12 sometimes you weren't --
13   A.   Well, I guess -- yeah.  I'm sorry.  Not
14 to interrupt you, but it depends on how you define
15 undercover work.  And I know you watch movies and
16 see television programs and people have this idea
17 that an undercover agent is -- you know, that's all
18 that he does.  He poses as a drug dealer and -- and
19 lives the lifestyle of a drug trafficker.
20        But in reality, that's really -- an
21 undercover detective -- being undercover is really
22 only a small portion of that person's job or
23 function, I guess, is how I best can describe it.
24   Q.   So what portion of your job during

THOMAS TIDERINGTON, 10/05/2022                              Page 46..49

Page 46

1 those eight years was spent undercover?
2      A.   I guess I didn't explain it to well.
3 Let -- let me try.  And again, I'm not -- I think I
4 understand your question.  I'm not trying to be
5 difficult, but I just want to make sure we're both
6 on the same page as to what I'm trying to explain.
7          If -- during that time period, I was
8 assigned as a detective to the Organized Crime
9 Division.  There's no assignment that says:  You're
10 an undercover detective.  It depends on what the --
11 what the mission or what the -- the case or the
12 investigation calls for.  There's times where a
13 drug investigation would not entail any undercover
14 work at all.  I could think of wiretap
15 investigations that I've been part of, various
16 smuggling operations, where being a detective
17 doesn't necessarily mean I'm undercover.
18          To answer your question, I think the
19 question, you know, how much of my time was I
20 actually purporting to be somebody other than a
21 police officer, that was only a very small portion
22 of my time as a detective.
23      Q.   About what portion in terms of percent?
24      A.   Again, to be very clear about it, if --

Page 47

1 and I'll give you an example.  If I'm undercover
2 and we're having an undercover meeting with a
3 suspect and I go and I meet with him at Denny's and
4 I have dinner with him at a restaurant or at a bar,
5 and that takes one hour, well, during what period
6 of time, I was undercover with that suspect for one
7 hour.  And if you look at it from an eight-hour
8 day, so it was one hour of the seven hours' worth
9 of work as a detective.
10          It's -- I don't know that I'm -- if
11 I'm -- I'm not going to be able to define for you
12 with any type of accuracy, you know, exactly what
13 percentage of time was, you know, spent, you know,
14 trying to convince a drug suspect or cartel member
15 that I was not a police officer or anything.  I --
16 it would be difficult for me to do that.
17      Q.   Okay.  I'm going to the next page of
18 your resume, page 3 of the exhibit, and it talks
19 about -- the paragraph that starts, Since 2001.  Do
20 you have that?
21      A.   I do, ma'am.
22      Q.   Okay.  The very last sentence of this
23 refers to the Joint Plymouth Communications Center,
24 PCC.  What is that?

Page 48

1      A.   When I was the chief police in Plymouth
2 Township, we -- we had a dispatch 911 center, and
3 we provided 911 coverage and dispatch services for
4 our neighboring police department.
5      Q.   Okay.  And then below that it lists
6 the Training Locations and Topics Taught by Chief
7 Tiderington.  Do you see that?
8      A.   I do.
9      Q.   Okay.  Is this list all of the training
10 events and lectures at which you've been instructor
11 on some aspects of police practices and criminal
12 investigations?
13      A.   No, I don't think it's totally
14 comprehensive, but it's -- you know, just basically
15 because I've been an instructor -- and instructor
16 and a teacher the last 30 years, I really -- I --
17 early on I don't think I kept detailed notes.  This
18 is kind of from memory of some of the training
19 classes that I've participated in, but probably not
20 a comprehensive list.
21      Q.   But everything you could recall, correct?
22      A.   For the most part, yes.
23      Q.   When was the list created by you?  Or I
24 guess I should say did you create this list

Page 49

1 yourself?
2      A.   I -- I did.
3      Q.   And when did you do that?
4      A.   I don't know how long ago.  Maybe five
5 years ago, ten years ago, or, you know, I think I
6 had a list maybe 15 years ago that I was not real
7 diligent in adding to, but -- so I think I've
8 always had a list of training classes that I've
9 thought.  But like I say, I don't know how diligent
10 I was in keeping track.
11          There was, you know, really no need
12 for me to keep a comprehensive list of all my
13 training.  And at some point I started thinking
14 back and -- and attempted to identify the training
15 classes that I participated in.
16      Q.   Are you okay?  You're looking at
17 something.
18      MR. SWAMINATHAN:  Somebody just walked by
19 outside.
20      THE WITNESS:  Yeah, looked in.
21      MS. GOLDEN:  All right.  Thanks.
22 BY MS. GOLDEN:
23      Q.   Okay.  A question about a few of the
24 items on this list.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/05/2022                          Page 50..53

Page 50

1        One is keynote speaker to the
2 Entrepreneurs' Organization.  Do you remember the
3 topic for that?
4        A.   Which one are you --
5        Q.   It's like one, two, three, four, five?
6        A.   Oh, in Barcelona?
7        Q.   No.  It's in Detroit, sorry.
8        A.   Oh.  Oh, I'm sorry.  Yes.  Yes, I do.
9        Q.   Okay.  What was the topic?
10       A.   International drug smuggling.
11       Q.   Okay.  What -- I'm not --
12       A.   Oh, I'm sorry.  I'm sorry.  Let -- let
13 me back up.
14            I believe that was a class at -- a
15 training class that we put on involving
16 kidnappings, international kidnappings.
17       Q.   Okay.  The line item above that, the
18 Schoolcraft College Criminal Justice/Adjunct
19 Instructor since 2005, are you still teaching
20 there?
21       A.   Not in the last two or three years.
22 Ever since COVID, I -- we're trying to rearrange
23 our training initiative.  So I have not taught
24 there probably in the last two years.

Page 51

1        Q.   When you did teach there, did you teach
2 every semester?
3        A.   No, no.
4        Q.   How often?
5        A.   As an -- well, and again, there's --
6 there's two different things, and of course the --
7 it doesn't reflect this here, but there's two
8 different things.
9            So I -- I would teach in-service
10 training classes at Schoolcraft College for police
11 officers to attend.  And then for a couple of years
12 I taught college level courses at the college.
13       Q.   This line here, Schoolcraft College
14 Criminal Justice/Adjunct Instructor, refers to
15 instructing college students, correct?
16       A.   I think it refers to both.
17       Q.   Okay.  What class did you teach when
18 you taught?
19       A.   When I was teaching criminal justice to
20 law enforcement officers, I -- it was essentially
21 criminal investigation-type of classes.  At the
22 college level, criminal justice 101, I guess is the
23 best way to describe it.
24       Q.   Do you still have the materials from

Page 52

1 the -- how often did you teach a criminal
2 investigation class at Schoolcraft College?
3        A.   Oh, I did that for many years, even
4 when I was with Fort Lauderdale.  So I think I
5 probably started teaching criminal investigations
6 at Schoolcraft College probably some time back in
7 the late '90s maybe, and -- and I would come up
8 here one or two times a year and put my training
9 classes on for the local police agencies.
10       Q.   When is the last time you did that?
11       A.   Probably 2017 maybe, '16, '17.
12       Q.   Do you have any plans to do it again?
13       A.   I'm not sure if I will again.  I
14 retired after 44 years of kind of being in a
15 high-stress, law enforcement position and trying to
16 wind things down, if that makes sense.  They --
17 they called me a quitter.  But after 44 years, I
18 think I can start scaling back some.
19       Q.   Was the instruction you provided at
20 Schoolcraft College to local law enforcement
21 specific to homicide investigations?
22       A.   No.
23       Q.   Or was -- okay.
24            What was the topic -- in the line

Page 53

1 below the keynote speaker for Entrepreneurs'
2 Organization, there's a line item for United States
3 Coast Guard - Criminal Investigators, do you recall
4 the --
5        A.   That's --
6        Q.   Do you see that?
7        A.   Yes.
8        Q.   Do you recall the topic?
9        A.   Well, all of my topics involve criminal
10 investigation of some type.
11       Q.   Do you recall what specific aspect of
12 criminal investigations you trained or taught to
13 the United States Coast Guard?
14       A.   I believe it was drug-related
15 investigations.
16       Q.   Okay.  On the bottom of the page,
17 there's a -- third from the bottom, there's a
18 National Intelligence Academy in Coral Springs,
19 Florida, which is a lovely place.
20            Do you recall what the topic was
21 that you trained or taught on that this refers to?
22       A.   I taught at the NIA, you know, several
23 classes at NIA, and it involved an array of topics,
24 primarily involving criminal investigations,

Page 54

1  narcotic investigations, and perhaps international
2  investigations.
3       Q.   Is any of the training listed in
4  this -- on pages 3 or 4, have you ever trained a
5  group on how to conduct a homicide investigation?
6       A.   I'm sorry.  Can you ask that again?
7       Q.   Have you ever trained any roup on how
8  to conduct a homicide investigation, specific to
9  homicides?
10      A.   Well, I don't know if there's anything
11 specific to homicide.  Criminal investigations,
12 whether you're investigating a rape, whether you're
13 investigating a robbery, whether it's a homicide,
14 the principles of criminal investigations are the
15 same.  I'm not suggesting that I have any expertise
16 in blood patterns or fingerprints or any of the
17 detailed homicide criminology-type cases or
18 forensic-type investigations, but criminal
19 investigations are the same whether it's -- again,
20 there's no difference on how you approach a
21 homicide investigation or a rape, a robbery,
22 kidnapping, drug investigations.  They're the same
23 principles.
24      Q.   So you're not an expert in forensic

Page 55

1  investigations, correct?
2       A.   I'm not a forensic investigator or have
3  no formalized training in forensics, no.
4       Q.   And you never have been a forensic
5  investigator, correct?
6       A.   No.
7       Q.   You've never collected evidence at a
8  crime scene -- I mean collected DNA evidence at a
9  crime scene?
10      A.   Not DNA evidence, no -- well, I'm
11 sorry.
12      Q.   You never dusted for fingerprints?
13      A.   Well, yeah, I have dusted for
14 fingerprints.
15      Q.   Okay.
16      A.   But I certainly --
17      Q.   How --
18      A.   I'm sorry?
19      Q.   How many times have you dusted for
20 fingerprints?
21      A.   Oh, earlier in my career, I would
22 say -- oh, it's hard to say, maybe 50 times.
23      Q.   Okay.
24      A.   And is it -- it's my understanding of

Page 56

1  your testimony that homicide investigations are
2  just like any other investigation, there's nothing
3  that is specific to homicide investigation
4  that's --
5       MR. SWAMINATHAN:  Objection to form.
6  BY MS. GOLDEN:
7       Q.   -- different than the other investi- --
8  well, let me ask you:  Have you ever personally
9  investigated a homicide?
10      A.   I have.
11      Q.   Okay.  And how many homicides have you
12 investigated?
13      A.   I would say I -- and I was thinking
14 about the number, but I -- I would say probably
15 50 or so homicide investigations.
16      Q.   And what police department were you
17 with at the time?
18      A.   That would have been with the Fort
19 Lauderdale Police Department and/or the Drug
20 Enforcement Administration.
21      Q.   Okay.  And did you have primary
22 responsibility for any of those homicide
23 investigations?
24      A.   No.  It would have been assisting

Page 57

1  homicide investigations on drug-related or
2  organized crime related homicides.
3       Q.   Was the investigation of any of those
4  homicides the primary responsibility of the unit
5  you were assigned to at the time?
6       MR. SWAMINATHAN:  Objection to form.
7       Go ahead.
8  THE WITNESS:  I --
9       MR. SWAMINATHAN:  And foundation.
10      THE WITNESS:  I'm sorry.  Could you please
11 ask that again?  I'm not sure I follow the question.
12 BY MS. GOLDEN:
13      Q.   All right.  So you said that some of
14 these were when you were assigned to the DEA,
15 right?
16      A.   That's correct.
17      Q.   And you also told me that the DEA's
18 mission was to -- was narcotic related, correct?
19      A.   That's correct.
20      Q.   And so the homicides that you were
21 involved in investigating, the DEA wasn't -- who
22 had primary responsibility for investigating those
23 homicides?
24      A.   No, I -- I understand the question now,

THOMAS TIDERINGTON, 10/05/2022                                    Page 58..61

Page 58

1 I think.

2       So as a task force supervisor, I had
3 a variety of officers from various departments.
4 And when there was a homicide anywhere in Broward
5 County, or many times in Dade County that had
6 connections perhaps into Broward County, we would
7 be tasked with the responsibility of assisting that
8 homicide unit or that homicide detective in -- in
9 investigating it if it was drug related. And as
10 you can imagine, many homicides in South Florida at
11 the time were drug related. So we were very
12 involved in conducting homicide investigations or
13 assisting the homicide detective in conducting
14 their investigations.

15      **Q.   And when you say "assisting," what do**
16 **you -- what kind of tasks did you do?**

17      A.   Well, I had -- and again, we're -- at
18 the DEA I was a supervisor, so I oversaw the --
19 the investigations of -- oh, I think we had 12
20 to 15 detectives. So it would be a -- kind of a
21 wide variety of cases and it would -- you know,
22 every day or every week there would be a new case
23 that would come to our attention that we would
24 participate in.

Page 59

1       I had several Spanish-speaking
2 officers and oftentimes they would be used to
3 assist in the homicide investigations where they
4 needed Spanish-speaking investigators.

5      **Q.   How would you use the Spanish-speaking**
6 **officers in these investigations?**

7      MR. SWAMINATHAN: Objection to form.

8      Go ahead.

9      THE WITNESS: Typically to translate for the
10 homicide investigators.

11 BY MS. GOLDEN:

12     **Q.   Do you speak Spanish?**

13     A.   No.

14     **Q.   Did you in the course of investigating**
15 **any case use a Spanish-speaking officer to**
16 **translate when you were taking a statement of a**
17 **witness?**

18     A.   Certainly, yes?

19     **Q.   Is that common? Was that a common**
20 **practice?**

21     A.   Yes.

22     **Q.   Did you also use Spanish-speaking**
23 **officers to translate when you were interviewing**
24 **suspects?**

Page 60

1      A.   Yes.

2      **Q.   And was that also a common practice?**

3      A.   It was.

4      **Q.   And you did this when you were with the**
5 **DEA, correct?**

6      A.   I did. I mean, throughout my career.
7 Again, whether I was a detective in Fort
8 Lauderdale, a detective sergeant, I was in charge
9 of the Special Investigations Division, there
10 was -- I was in charge of the entire Detective
11 Bureau at -- at one point.

12      So I guess the answer is yes to all
13 of the above, from a detective, from a supervisor,
14 then even at a command level.

15     **Q.   Okay. I want to get back to the -- the**
16 **training topics on your c.v. on pages 3 and 4 of**
17 **the exhibit and ask you again if any of these are**
18 **specific to homicide investigations.**

19     A.   I can't say they're specific to
20 homicide, but they certainly would be applicable to
21 homicide investigations.

22     **Q.   In the general sense?**

23     A.   In the general sense.

24     **Q.   Okay.**

Page 61

1      A.   And perhaps in the specific sense when
2 you're talking about witness interviews and
3 collecting evidence and talking with confidential
4 informants or witnesses. So --

5      **Q.   And you don't see any difference in**
6 **interviewing a witness in a homicide case as**
7 **opposed to interviewing a witness in a different**
8 **kind of case; is that fair?**

9      A.   I would say the principles are the
10 same, yes.

11     **Q.   Okay. And the same would be true**
12 **for suspects, there's no difference between**
13 **interviewing a suspect in a homicide case and**
14 **interviewing a suspect in some other kind of case?**

15     A.   Generally speaking, yes, that is --
16 that is accurate.

17     **Q.   Okay. Are you an expert in psychology?**

18     A.   No.

19     **Q.   Do you have any background in social**
20 **sciences?**

21     A.   No.

22     **Q.   Do you have any expertise in**
23 **psychological coercion?**

24     MR. SWAMINATHAN: Objection to form.

THOMAS TIDERINGTON, 10/05/2022                                    Page 62..65

Page 62

1          Go ahead.
2      THE WITNESS:  When you say "expertise," I --
3  I certainly have been -- in training classes
4  there's material that I reviewed on false
5  confessions and coerced confessions.  Certainly I
6  have been involved with -- I mean, obviously
7  anybody that does criminal investigations has to be
8  aware of the principles of coerced confessions.
9  BY MS. GOLDEN:
10     **Q.   Are you an expert in the principles of**
11 **coerced confession?**
12     A.   I don't know that I -- well, I -- I've
13 never been declared an expert in that area and I've
14 never really been asked to opine on what.
15     **Q.   Have you ever studied the principles**
16 **involved in false confessions?**
17     A.   I think in a general sense.  I don't
18 know that I can say that I studied it specifically,
19 but in -- in a general sense, yes.
20     **Q.   In what sense?  What did you study**
21 **about false confessions?**
22     A.   In terms of developing department
23 policies as to what's proper and what's not and --
24 and what's reasonable and what's not.

Page 63

1      **Q.   Have you -- and obviously physical**
2  **force is never permissible, right, to coerce a**
3  **confession, right?**
4      A.   I think that's a fair statement.
5      **Q.   Okay.  And everyone would agree with**
6  **that, correct?**
7      MR. SWAMINATHAN:  Objection to form and
8  foundation.
9      THE WITNESS:  Well, I'm not sure everyone.
10 Obviously, there's --
11     MS. GOLDEN:  Good point.
12     THE WITNESS:  -- probably detective that
13 didn't agree with that, but any reasonable officer
14 I think would agree with that, yes.
15 BY MS. GOLDEN:
16     **Q.   Do you agree that the average person**
17 **would agree with that as well?**
18     A.   I think it's common sense and it's --
19 yes.
20     **Q.   Okay.  Have you ever -- do you know**
21 **what a false evidence ploy is?**
22     A.   I'm sorry?
23     **Q.   Do you know what a false evidence ploy**
24 **is?**

Page 64

1      A.   I think you're asking false evidence
2  ploy, p-l-o-y.  I -- I don't know what that is, no,
3  or at least not using that terminology.
4      **Q.   Do you understand that throughout the**
5  **course of your law enforcement career, that it was**
6  **constitutionally permissible for police officers to**
7  **lie to witnesses and suspects?**
8      A.   Is it permissible?  I -- I guess you'd
9  have to have a larger discussion about that.  You
10 know, certainly as an undercover police officer, I
11 can I think of many times where I lied to suspects
12 and told them I was not a police officer.
13 Obviously, if I didn't do that, I would not have
14 been too effective.
15          So I guess it depends in the context
16 in which you're lying to a suspect or you're being
17 untruthful.  There's some times it's acceptable;
18 other times it's not.  If you tell the suspect, you
19 know, You're going to be put to death in the
20 electric chair if you don't admit to committing
21 this crime, I don't think that would be proper.
22 But I do think if an undercover officer lies to a
23 suspects -- if a suspect and tells him that he's
24 not a police officer, that that's -- that's proper

Page 65

1  as well.
2      **Q.   Is it --**
3      MR. SWAMINATHAN:  I'm sorry, Carrie.  So it's
4  been around an hour, little over an hour.
5      MS. GOLDEN:  Oh, yeah.
6      MR. SWAMINATHAN:  Could you -- we can keep
7  going if you want to get to a good stopping point,
8  but whenever you get to a good stopping point,
9  let's take a --
10     MS. GOLDEN:  Let me just -- yeah, I gotcha.
11 I'm going to try wrap.  I just want to finish up
12 the false evidence ploy.
13 BY MS. GOLDEN:
14     **Q.   Is it your -- okay.  So when you talked**
15 **about, you know, a threat of the electric chair,**
16 **that -- that's a threat.  That's not -- that's not**
17 **an assertion that you have evidence when you don't,**
18 **in fact, have it, right?**
19          **What I'm asking you is a little bit**
20 **different.  Is it permissible for a police officer**
21 **to lie to a suspect about what evidence they have**
22 **of the suspect's guilt?**
23     A.   Well, again, I would have to -- I know
24 it's a hypothetical, and I think I would have to

THOMAS TIDERINGTON, 10/05/2022                                    Page 66..69

Page 66

1 have more detail because, you know, at times it is
2 permissible and other times it would not be.
3      Q.   When is it not permissible and what is
4 your basis for that?
5      A.   I would say that it would not be
6 permissible if it's -- if it's unreasonable and if
7 it's coercive and if it would be a threat, you
8 know, versus an undercover ploy or something that
9 is used, you know, by perhaps undercover officers
10 or -- in other instances, I guess.
11      Q.   If the -- so it's your understanding
12 that if the false evidence is somehow coercive,
13 it's not permissible?
14      A.   Well, again, if -- if you can provide
15 some more detail as to --
16      Q.   Sure.
17           When -- when is it permissible for a
18 police officer in the course of interrogating a
19 suspect to tell the suspect that they have an
20 eyewitness that he committed the crime when, in
21 fact, they do not?
22      A.   Would that be permissible, is that what
23 you're asking?
24      Q.   Yes.

Page 67

1      A.   I think it would be, yes.
2      Q.   Okay.  Would it be permissible for a
3 police officer to --
4      A.   I'm sorry.  Not to interrupt you, but
5 it also would depend on the context.  If it's a
6 question that was a statement made by an officer
7 the first ten minutes that he interviewed somebody,
8 you know, is the person in custody, is it, you
9 know, 40 -- has that prisoner been locked up in an
10 interrogation room for 40 hours and have there been
11 other threats and -- you know.  So again, it's
12 difficult to answer that question without having
13 more of a context.
14      Q.   All right.  But do have any opinion
15 about whether or not there were any false
16 evidence ploys used in this particular case, in
17 the Solache -- in the Soto homicide investigation?
18      A.   I would have to review the report.  As
19 we sit here, I don't know that there was -- what
20 did you call it, false evidence ploy or --
21      Q.   Um-hmm, yeah.  You don't -- I mean, you
22 don't know what it was, right?  So I imagine you
23 have to --
24      A.   Oh, no.  I -- no.  I know what -- now I

Page 68

1 know -- I don't -- I guess I didn't understand the
2 terminology that you were using.  I understand the
3 concept that you were referring to and whether or
4 not it's permissible for an officer to lie to a
5 suspect.
6      Q.   Okay.  So now that you -- now what's
7 your understanding of a false evidence ploy?
8      A.   I think I -- I think I just answered
9 that, where it would by permissible at times for
10 officers to tell a suspect something that's not
11 true, but it depends on the context of which it
12 happens.
13      Q.   So my understanding is that it's your
14 belief that false evidence ploys are permissible so
15 long as they're not unduly coercive?
16      A.   I would think that that's a fair
17 statement, yes.
18      MS. GOLDEN:  Okay.  All right.  This is
19 probably a good time for a break.  Five minutes is
20 never long enough for me.  What do you guys say
21 about ten?
22      THE WITNESS:  Perfect.
23      MS. GOLDEN:  Okay.  Come back at 11:40.
24      MR. SWAMINATHAN:  We've got -- we started a

Page 69

1 little late here today, so let's try to keep it --
2      MS. ROSEN:  I'm having -- I'm having a
3 computer issue, so I might need the whole ten
4 minutes to get it fixed, but --
5      MR. SWAMINATHAN:  Yeah, okay.
6      MS. ROSEN:  Okay.
7      THE VIDEOGRAPHER:  Okay.  We're off the video
8 record at 11:28 a.m.
9           (Recess taken.)
10      THE VIDEOGRAPHER:  We are back on the video
11 record at 11:39 a.m.
12 BY MS. GOLDEN:
13      Q.   Okay.  You said earlier you were going
14 to go get something or you were going to look at
15 something.  What was that?
16      A.   Yeah, no.  You had asked what files
17 were sent to me since in the last couple weeks.
18      Q.   Oh, that's right.  And did you look at
19 those files?
20      A.   I did.
21      Q.   And how long -- when was that?
22      A.   Within the last week or two.
23      Q.   Okay.  Did you grab your list?
24      A.   Yes, I have that.

THOMAS TIDERINGTON, 10/05/2022                    Page 70..73

Page 70

1    **Q.   And can you tell us what's on the list?**
2    A.   Yeah.  So I was provided the expert --
3    **Q.   Wait a second.  Let me ask you before**
4    **you -- had you ever seen these materials before or**
5    **was this the first time you saw them?**
6    A.   This is the first time.
7    **Q.   Okay.  All right.  And what did you**
8    **look at?**
9    A.   They were the expert reports from the
10   expert on -- two other experts on this case, Final,
11   F-i-n-a-l, and the DNA expert Reich, Reek, R-i-c-h,
12   I believe.  And I was also sent three depositions
13   involving the Demetrius Johnson case and they were
14   from I believe the prosecutor Kevin Sheehan and
15   Ruth Miller and I believe Ms. Gooben, G-o-o-b-e-n,
16   I think.
17   **Q.   Can you say those names again?  Kevin --**
18   A.   Kevin Sheehan, Ruth Miller, and I
19   believe Ms. Gooben, G-o-o-b-e-n.
20   **Q.   Okay.  So two expert reports, three**
21   **depositions.  And I thought you said something**
22   **about case files?**
23   A.   Yeah, no.  I was mistaken.  It was
24   related to the Demetrius Johnson case, but these

Page 71

1    were the material that was sent to me relating to
2    that case file.
3    **Q.   Okay.  And I think you said something**
4    **about reviewing the deposition of a Brasfield**
5    **deposition?**
6    A.   I did review the deposition as well.
7    **Q.   Okay.  And do you have that handy?**
8    A.   His deposition?
9    **Q.   Yeah, the transcript that you reviewed.**
10   A.   I don't have it handy.  I could pull it
11   up.  It was electronic.
12   **Q.   Okay.  Can you tell me -- do you**
13   **remember what case?**
14   A.   It was -- I believe it was the Rivera
15   case.
16   **Q.   Okay.  So let's go back to Exhibit 1,**
17   **page 4 of the exhibit, which is your c.v.**
18   **So there's these two different box**
19   **graphs, right?  One is training location and topics**
20   **taught by you and the other is areas of instruction**
21   **provided by you.**
22   **Are these -- is this the same**
23   **material just organized differently or how do these**
24   **two box graphs relate to each other?**

Page 72

1    A.   Probably similar.  I think in the -- in
2    the first box, it kind of describes where I taught
3    various classes.  And then I -- I think the areas
4    of instruction are essentially the topics that I
5    discussed or that I taught in various training
6    classes.
7    **Q.   Do you remember -- in that second box,**
8    **Coercive Deception, do you remember who you**
9    **provided instruction to in the topic of coercive**
10   **deception?**
11   A.   That is part of a training class that
12   I've been putting on for 30 years and probably --
13   every training class that I've taught I probably
14   discuss that in some -- some way, shape, or form.
15   **Q.   And what did you say about coercive**
16   **deception?**
17   A.   Well --
18   **Q.   What is --**
19   A.   Well, it's not permissible.  And, I
20   mean, I guess I could give you an example of --
21   in the context in which I use it in most of my
22   training classes.
23   **Q.   Okay.**
24   A.   Well, I -- I guess in some of the

Page 73

1    criminal investigation classes I -- that I do, we
2    talk about consent searches and what can be told to
3    people in terms of trying to get consent to search
4    a vehicle or a house.  And if -- you know, we
5    describe a scenario which if you knock on
6    somebody's door and you tell them that you're the
7    pizza discovery man and you went to the wrong
8    house, and at the time, you know, you didn't have
9    cellphones, you could go in and use their telephone
10   and then look for drug activity in the house.  That
11   would not be necessarily be coercive deception.
12   If you used the same investigator
13   and he knocks on the door and he tells the people
14   that there's a gas leak been reported coming from
15   their house and if he doesn't go in and examine
16   their gas pipes, that the whole neighborhood could
17   blow up and everybody would be killed, well, that
18   would not be permissible.  That would be considered
19   to be coercive deception.
20   **Q.   Okay.  And do you -- you said something**
21   **about this being part of a class you teach**
22   **regularly and continue to teach?**
23   A.   Well, when I say -- I haven't -- you
24   know, since COVID, if we have - I haven't been

THOMAS TIDERINGTON, 10/05/2022

Page 74..77

Page 74

1  doing any training classes, but -- but that was one
2  of the standards topics that I taught for -- for
3  many years, I should -- should say.  I guess better
4  way to describe it.
5      Q.   And to whom did you give those talks?
6      A.   This would about have been in-service
7  police officers from around the country.
8      Q.   Do you still have the materials you
9  used to instruct on the topic of coercive
10 deception?
11     A.   Probably not.  At one point it was in a
12 PowerPoint presentation and I think I'm on my
13 second or third computer and some of it has not
14 translated into my new computer.  So I don't know
15 if I have any of that material in hardcopy any --
16 any longer.
17     Q.   When was the last time you instructed
18 officers on the topic of coercive deception?
19     A.   Oh, I would say, and again, this is
20 just a guess, probably three years ago.
21     Q.   And who was it or --
22     A.   I -- I don't remember specifically.
23 One of the things that I've done for many years is
24 I -- I taught for the -- for the DEA, the United

Page 75

1  States Drug Enforcement.  I taught their state and
2  local training classes, so, you know, certainly I
3  would have discussed it during those classes.  So
4  that would have been officers from throughout
5  Michigan and the neighboring states, including
6  Chicago.
7      Q.   Do you still have the materials you
8  used to provide instruction on the topic of
9  Concepts of Evidence and Rules of Evidence?
10     A.   I don't think I do.  I can look.  I
11 don't know exactly what I retained in hardcopy.
12 And as I said, most of my stuff was on PowerPoint
13 presentations and it's not made its way over to my
14 new computer at this point.
15     Q.   Can you -- or I'm sorry.  Do you still
16 have the materials you used to instruct on the
17 topic of Developing Probable Cause?
18     A.   I don't believe I do.
19     Q.   Okay.  So my -- let's talk generally
20 about education.
21          Did you go to high school in the
22 Detroit -- did you grow up in the Detroit area?
23     A.   I did.
24     Q.   Okay.  Go to high school there --

Page 76

1      A.   Yes.
2      Q.   -- in the area?
3          Okay.  And you went to college
4  where?
5      A.   I went to college -- my associate's
6  degree was here in Michigan at Mercy College of
7  Detroit.  Then I finished my college after I moved
8  to Florida, bachelor's degree at Florida Atlantic
9  University.
10     Q.   Okay.  When did you get your associates
11 degree from Mercy College of Detroit?
12     A.   That would have been probably 19- --
13 and again, I'm just giving you approximate dates.
14 Probably 1979, 1980.
15     Q.   And when did you get your bachelor's
16 degree in police administration from Florida
17 Atlantic University?
18     A.   Probably '83 or '84.
19     Q.   Okay.  So did you get your -- so you
20 got your associate's degree while you were a patrol
21 officer with Detroit Police Department; is that
22 right?
23     A.   That's correct.
24     Q.   And you got your bachelor's degree

Page 77

1  when you were with the Fort Lauderdale Police
2  Department; is that right?
3      A.   That's correct.
4      Q.   Okay.  What year did you graduate from
5  high school?
6      A.   1976.
7      Q.   What did you do for employment
8  between -- or what were you doing for employment
9  between 1976 and 1979 -- I'm sorry, 1976 and 1978
10 when you joined the police department at --
11     A.   Yeah.  There was like an 18-month
12 period I -- I parked cars at a local restaurant in
13 Detroit for -- you know, for several years from
14 when I was 16 until -- essentially until I got
15 hired by Detroit when I was 19 years old, I believe
16 it was.
17     Q.   Okay.  And were you -- what month were
18 you hired by Detroit?
19     A.   I couldn't tell you what month.
20     Q.   Do you know how many months you were
21 there?  Was it a full two years or was it closer to
22 one year?
23     A.   No.  It was -- it was almost two years,
24 just short of two years, I believe.

Page 78

1     Q.   And were you -- you went -- according
2 to your c.v. here on page 6 of Exhibit 1, they sent
3 you to the Detroit Police Academy; is that right?
4     A.   That's correct.
5     Q.   And what did that consist of? How long
6 was it; where was it? That kind of thing.
7     A.   It was in Detroit and it -- it was a
8 I think three-and-a-half, four-month training
9 academy.
10     Q.   And you were -- after you finished the
11 academy, you became a patrol officer in Detroit for
12 the police department?
13     A.   That's correct.
14     Q.   And did you -- that was your rank,
15 officer, correct?
16     A.   Police officer, yes.
17     Q.   And did you maintain that same rank the
18 entire time you were with Detroit?
19     A.   Yes.
20     Q.   Okay. And then what does this
21 Community Policing - Detroit Police Substation
22 Program refer to?
23     A.   One of my assignments while I was with
24 Detroit, they began an initiative where they opened

Page 79

1 up substations outside of main precinct in -- in
2 local high crime areas and -- (audio interference)
3 one of the substations early on.
4     Q.   Okay. And Motorcycle Training, what
5 does that mean?
6     A.   Exactly what it says. I was trained to
7 ride a motorcycle by the police department.
8     Q.   And Pistol Team, what does that mean?
9     A.   I was also on the precinct pistol team
10 and competed in competitions.
11     Q.   All right. Competitions. Got it.
12        Okay. So did you -- as a patrol
13 officer, did you have primary investi- -- primary
14 responsibility for investigating any homicides?
15     A.   Not primary. I -- I would say I had
16 experienced homicide investigations from a patrol
17 officer's perspective, that means arriving at the
18 crime scene of a homicide. I was involved in
19 probably, I don't know, maybe in the two-year
20 period several. I'm not sure exactly what
21 "several" means, but more than one.
22     Q.   And what do you recall about those
23 investigations?
24     A.   You know, what I recall about it mainly

Page 80

1 is the training that I received in Detroit was how
2 detailed you had to be as a -- from a patrol
3 officer's perspective, if -- if you're the first
4 one at the homicide scene, you have to protect the
5 scene; you have to take specific, detailed notes as
6 to who shows up, who steps over the yellow tape,
7 what time that person got there, what time phone
8 calls were made. So very detailed information as
9 to what's expected by the initial patrol officer
10 that gets -- that gets sent to a homicide
11 investigation.
12     Q.   Did any of the several homicides that
13 you believe you may have -- that involved --
14     A.   I --
15     Q.   Sorry?
16     A.   I -- and I'm -- I guess I was trying to
17 help you, but responding to initially I guess is
18 how I'd --
19     Q.   Okay.
20     A.   -- best describe it.
21     Q.   That's a better way to put it. Thank
22 you.
23        Did any of the homicide scenes that
24 you initially responded to as a patrol officer when

Page 81

1 you were at the Detroit Police Department involve
2 missing or abducted children?
3     A.   No, not that I can recall.
4     Q.   Okay. How many officers are there in
5 Detroit when you were there?
6     A.   At the time, there was somewhere I
7 think around 4,000, 4,500.
8     Q.   And it stays here that you were "laid
9 out due to budget reductions," is that right?
10     A.   I was one of 1,500 police officers laid
11 off, yes.
12     Q.   Okay. So was it 4,000 before or after
13 the 1,500 were laid off?
14     A.   That would have been before. That
15 would have been the manpower before they laid off
16 the 1,500 officers.
17     Q.   And what was the murder rate in Detroit
18 during the two years that you were there?
19     A.   It was high. I don't -- I don't
20 know -- I don't recall specifically what the murder
21 rate was.
22     Q.   Okay. Did you do any investigation
23 other than -- did you do any follow-up
24 investigation for any of the homicides that you

THOMAS TIDERINGTON, 10/05/2022                          Page 82..85

Page 82

1 were -- that you initially responded to as a patrol
2 officer while you were with Detroit?
3      A.   It -- and again, I don't know if I can
4 be specific, but it would have been what would be
5 expected of a patrol officer initially, meaning
6 getting names of possible witnesses that would have
7 been there, getting next-to-kin information, but
8 nothing substantive in terms of a follow-up
9 investigation.
10     Q.   Okay.  And were you assigned to a
11 particular district or division or how did they --
12     A.   I was assigned to a precinct.
13     Q.   What precinct was that?
14     A.   It was Number 16.
15     Q.   And did you have the same supervisor
16 the entire time you were with Detroit?
17     A.   I think I had several different
18 supervisors, but the only one I can recall is
19 Sergeant Lloyd Praedel.
20     Q.   Do you have my family members in law
21 enforcement?
22     A.   I do.
23     Q.   Where are they?  What --
24     A.   Well, my grandfa- -- again, we'll start

Page 83

1 with the family tree, but my grandfather was a
2 Detroit police officer and he was hired in 1927.
3 He's deceased.  My father was a Detroit police
4 officer.  My brother was a Detroit police officer.
5 I have cousins that are federal agents and my son
6 is a federal agent as well.
7      Q.   Who does your son work for?
8      A.   He works for the DEA.
9      Q.   So when you applied to the Detroit
10 Police Department, was you father grandfather
11 there?
12     A.   My father was.  My grandfather had
13 already retired.
14     Q.   When you were a patrol officer, did you
15 interview witnesses?
16     A.   I did.
17     Q.   And did you ever take any notes?
18     A.   I did.
19     Q.   And did you complete reports as a
20 patrol officer when you were at Detroit?
21     A.   Yes.
22     Q.   Okay.  And did you use your notes to
23 complete those reports?
24     A.   I would have, yes.

Page 84

1      Q.   And then what did you do with your
2 notes after the reports were completed?
3      A.   Well, again, it depends on what type of
4 case we were talking about.  I -- you know, if -- a
5 lot of times the notes were -- were kept.  I can
6 recall giving my notes to one of the homicide
7 detectives in some of the more critical cases; but
8 if it was a shoplifting case, those notes would not
9 have been retained.
10     Q.   And it's fair to say that you didn't
11 retain your notes in cases other than
12 shoplifting --
13     MR. SWAMINATHAN:  Objection to form.
14 BY MS. GOLDEN:
15     Q.   -- right?
16     MR. SWAMINATHAN:  Sorry, Carrie.
17 BY MS. GOLDEN:
18     Q.   I mean, shoplifting cases weren't the
19 only cases that you didn't retain notes as a
20 Detroit police officer, correct?
21     MR. SWAMINATHAN:  Objection to form and
22 foundation.
23     Go ahead.
24     THE WITNESS:  I'm sorry.  I'm not sure I

Page 85

1 understand the question.
2 BY MS. GOLDEN:
3      Q.   So like what kind of note -- so if
4 you -- are you saying that the only kind of cases
5 that you ever threw your notes away in were
6 shoplifting cases?
7      A.   No.  I didn't say that at all.
8      Q.   Okay.  All right.  So what brought you
9 to Fort Lauderdale Police Department in 1981?
10     A.   At the time, the Fort Lauderdale Police
11 Department came up to Detroit to recruit the laid
12 off police officers.  And I went through the
13 testing process and it was January and it was cold
14 and I was 20 years old and ...
15     Q.   Do you -- did you have any employment
16 in between the time you were laid off from the
17 Detroit Police Department and the time you started
18 with the Fort Lauderdale Police Department?
19     THE COURT REPORTER:  I think Anand was
20 talking, but he's on mute.
21     MS. GOLDEN:  Yeah.  And Mr. Tiderington is
22 frozen.
23     THE VIDEOGRAPHER:  Yeah.  Do you want to go
24 off the record?

THOMAS TIDERINGTON, 10/05/2022                    Page 86..89

Page 86

1    MS. GOLDEN:  Sure.
2    THE VIDEOGRAPHER:  We're off the video record
3 at 12:01 p.m.
4         (Recess taken.)
5    THE VIDEOGRAPHER:  We are back on the video
6 record at 12:03 p.m.
7    MR. SWAMINATHAN:  Go ahead, Carrie.
8    MS. GOLDEN:  Okay.  So could the court
9 reporter read back the last question and answer and
10 see if there's anything we need to fill in there.
11        (Record read.)
12    MR. SWAMINATHAN:  I think he was -- I think
13 there was more to his prior answer before your last
14 question when -- when you asked the question and
15 was it cut off of for you, it must have seemed like
16 it may be that there's something more.
17         Did you have anything more on that
18 one, Tom?
19    THE WITNESS:  No.
20    MR. SWAMINATHAN:  Okay.  All right.  So then
21 can you read the -- that last question you just
22 asked and then Tom can answer.  Sorry.
23    THE WITNESS:  All right.  I -- I have the --
24 I can answer that.  When I was laid off, I went

Page 87

1 back and parked cars for a short period of time
2 before I moved to South Florida.
3 BY MS. GOLDEN:
4    Q.   Okay.  And did you -- when you went to
5 Florida, you had -- had the -- you moved for the
6 job, right?  You weren't -- you already had it
7 secured?
8    A.   That's correct.
9    Q.   Okay.  Do you recall the size of the
10 police department you joined in Fort Lauderdale?
11    A.   Yeah.  Fort Lauderdale is somewhere --
12 and again, depending on vacancies, but it was
13 between a 5, 6 -- 500 and 600-man department, man
14 and woman, I should say.
15    Q.   And those are sworn officers or are
16 those total employees?
17    A.   That's sworn and probably another
18 100 or maybe 200 sworn employees -- or non-sworn
19 employees.
20    Q.   And what was the size of the population
21 that the Fort Lauderdale Police Department served?
22    A.   It -- of course it fluctuated depending
23 on what time of year it was, but I think the
24 consensus is or the census is -- of the population

Page 88

1 is it's somewhere around 200,000 or 175,000.
2    Q.   Okay.  And you were there approximately
3 20 years; is that right?
4    A.   21, I think.  Almost 22, I guess.
5    Q.   Did you have any training when you
6 first started there?
7    A.   I did.
8    Q.   I think your resume refers to
9 Comparative Compliance Program at Broward Police
10 Academy.  Is that the training that you're
11 referring to?
12    A.   That's correct.
13    Q.   All right.  And what is that
14 compared --
15    A.   If you're a certified law enforcement
16 officer, if you had gone through an accredited
17 police academy anywhere in the country, or I
18 believe it was anywhere in the country, that they
19 were not going to -- Fort Lauderdale Police
20 Department would waive the academy requirement and
21 instead you would be -- I was required to go
22 through what is called a Comparative Compliance
23 class, which essentially taught Florida law versus
24 Michigan law.

Page 89

1    Q.   Okay.  And you started there as a
2 patrol officer?
3    A.   I did.
4    Q.   And how long were you a patrol officer?
5    A.   Probably a year and a half, maybe two
6 years.
7    Q.   And what were duties and
8 responsibilities as a patrol officer?
9    A.   What you would normally think of as a
10 patrol officer.  Driving a uniform patrol vehicle,
11 responding to calls, those types of things.
12    Q.   And other than being an initial
13 responder to the scene of a homicide, did you have
14 any other involvement in homicide investigations as
15 a patrol officer when you were with Fort Lauderdale
16 Police Department?
17    A.   Not as a patrol officer, no.
18    Q.   Okay.  So that's two years.  That takes
19 us to 1983ish.  Does that sound about right?
20    A.   Yeah.  Probably end of '82, yes.
21    Q.   Okay.  And then at some point around
22 that time, did your duties and responsibilities at
23 the Fort Lauderdale Police Department change?
24    A.   Yes.  I was --

THOMAS TIDERINGTON, 10/05/2022                    Page 90..93

Page 90

1     Q.   How?
2     A.   I was assigned as a detective to the
3 Organized Crime Bureau.
4     Q.   Okay.  And the mission of the Organized
5 Crime Bureau was to do what?
6     A.   Well, just as it says.  Investigate
7 organized-type criminal investi- -- organized
8 criminal groups, whether it's the traditional
9 organized crime or the -- known as perhaps the
10 mafia.  Certainly our -- our focus at that time
11 period also dealt with what was known as the drug
12 cartels and the -- the marijuana industry and the
13 cocaine industry.
14     Q.   Was there some other department within
15 the Fort Lauder-- Ford Lauderdale Police
16 Department that had primary responsibility for
17 investigating homicides at the time?
18     A.   Well, it was part of the overall
19 Detective Bureau, which I was part of.
20     Q.   Okay.  So the Detective Bureau is --
21 the Organized Crime Bureau is a part -- was a part
22 of the Detective Bureau?
23     A.   That's correct.
24     Q.   Okay.  Who -- what was -- what bureau

Page 91

1 did the -- so what other -- so let's see.  There's
2 a Detective Bureau.  There's Organized Crime Bureau
3 that's part of the Detective Bureau.
4          What -- was there another part of
5 the Detective Bureau that had primary
6 responsibility for investigating homicides and
7 violent -- other violent crimes that were not
8 related to organized crime?
9     MR. SWAMINATHAN:  Object to the form.
10          Go ahead.
11     THE WITNESS:  Well, there was a homicide unit
12 within the Detective Bureau.
13 BY MS. GOLDEN:
14     Q.   And that was separate and apart from
15 the Organized Crime Bureau, correct?
16     A.   Well, it's a separate -- I guess it was
17 a separate division within the bureau or
18 separate --
19     Q.   Within the Detective Bureau?
20     A.   That's correct -- well, separate unit
21 within the Detective Bureau.
22          Let me try to kind of fast forward
23 this for you.  So we have a division of detectives.
24 And within that division of the detectives, you had

Page 92

1 a -- you know, perhaps a unit of property crime
2 detectives, violent crime detectives, homicide
3 detectives, and organized crime detectives.  But
4 we're all under the same command -- commander at
5 the time or deputy chief or chief of detectives at
6 the time who was in charge of all of the
7 investigative bureaus, units, groups, whatever you
8 like to call them.
9     Q.   Okay.  So within the detective division
10 there exists those -- existed those different
11 bureaus, you were assigned to organized crime and
12 there was -- and not the Homicide Bureau, correct?
13     A.   That is correct.
14     Q.   Okay.  And was that true -- how long
15 were you in the Organized Crime Bureau?
16     A.   Well, I was in there pretty much the
17 rest of my career as -- as either supervisor or
18 command officer.  There was the five-year stint
19 that I was assigned to the DEA, I was still within
20 the Detective Bureau.
21     Q.   No.  My question is not the Detective
22 Bureau because my question is specific to the
23 Organized Crime Bureau.
24          How long were you -- did you

Page 93

1 continue to be assigned to the Organized Crime
2 Bureau, or was that --
3     A.   Well --
4     Q.   Was that also for the rest of your
5 career?
6     A.   Well, it -- and again, it's somewhat
7 complicated.  Because the Organized Crime Bureau
8 eventually evolved into who was called Special
9 Investigations.  And so at some point in probably
10 '86 or '87, we were reorganized into the Special
11 Investigations Division.  It was still under the
12 Detective Bureau, but that was where I was
13 assigned.  And when I was assigned to the DEA, I --
14 my unit, if you will, was still the Special
15 Investigations Division.
16     Q.   When you were at the Fort Lauderdale
17 Police Department, were you ever assigned to the
18 Homicide Bureau in the detective division?
19     A.   I was not a homicide detective and I
20 was not assigned to the homicide unit.
21     Q.   Okay.  At any time, right?
22     A.   At any time.
23     Q.   Okay.
24     A.   But again, to clarify, I certainly

THOMAS TIDERINGTON, 10/05/2022                    Page 94..97

Page 94

1 worked hand in hand with the homicide detectives
2 and there were lots of crossovers in terms of our
3 investigations. So it's -- the lines aren't
4 defined as brightly as perhaps some may think.
5          So there's always -- you know, I can
6 think of times where the homicide detectives were
7 assigned to my division to work a drug case or to
8 assist in a kidnapping case.
9     Q.   But nonetheless, you were never
10 assigned to the homicide unit; is that correct?
11     MR. SWAMINATHAN:  Objection, asked and
12 answered.
13          Go ahead.
14     THE WITNESS:  No.  I -- I just wanted to be
15 clear on that, like I said.  When -- when you say
16 "assigned," you know, as -- did I assist in
17 homicide cases, would that have been an assignment?
18 Sure.  Was I ever formally in the homicide unit?
19 The answer is no.
20 BY MS. GOLDEN:
21     Q.   So what years were you a narcotics
22 detective in the -- this third bullet point
23 here in your resume, Organized Crime Bureau -
24 Narcotics Detective charged with investigating

Page 95

1 international --
2     A.   I think I was promoted in 1985 or 1986
3 to a -- to the sergeant rank.  And so as a
4 detective, I was assigned there probably from late
5 '81, '82 till '86, I think, as a detective.  And
6 then as I said, I went back as a sergeant, as a
7 supervisor, and actually retired as the commander
8 in charge of the Special Investigations Division in
9 2001.
10     Q.   So is there a difference in commander
11 in charge and captain?
12     A.   Our rank was captain or -- and -- and --
13 if you're in charge of the unit, you are the
14 commander.
15     Q.   So were you both the captain and the
16 commander in charge?
17     A.   That's correct.
18     Q.   Okay.  When you retired?
19     A.   Yeah.  The rank -- my rank was captain,
20 but my assignment was commander of the Special
21 Investigations Division.
22     Q.   Got it.  Which was formally known as
23 Organized Crime Bureau?
24     A.   Exactly.

Page 96

1     Q.   I'm getting it.
2     A.   You are.
3     Q.   Okay.  Hmm?
4     A.   I said you are getting it.  It's
5 complicated.
6     Q.   Hmm, I don't know.
7          Okay.  So we already talked about
8 this Group -- this fourth bullet point, Group
9 Supervisor in Charge of the Task Force, and I think
10 you told me what years those were.
11     A.   1990 to '95, roughly.
12     Q.   Okay.  So what were you doing from '86
13 to '90?
14     A.   I was a sergeant.  I got promoted to
15 sergeant.  And some of my time was spent -- short
16 period of time I went back to as a road patrol
17 sergeant and then I came back to the Detective
18 Bureau as a supervisor.
19     Q.   And when you -- when you came back to
20 the detective unit as a supervisor, who were you
21 supervising?
22     A.   It was supervising a unit of eight to
23 ten detectives.
24     Q.   Within the Special Investigations or

Page 97

1 Organized Crime Bureau?
2     A.   That's correct.
3     Q.   And as a supervisor of detectives in
4 the Organized Crime Bureau or Special
5 Investigations unit, what were your duties and
6 responsibilities?
7     A.   Pretty much the same responsibilities
8 as that of a detective that I described as a
9 detective assigned to the Special Investigations or
10 the Organized Crime Bureau, but now I was
11 supervising.  Rather than being a detective doing
12 the work, I was the actual supervisor in charge of
13 the operations.
14     Q.   Did you become personally involved in
15 investigations you were supervising, including
16 interviewing witnesses?
17     A.   Sure, yes.
18     Q.   Okay.  As a supervisor, were you also
19 involved in visiting crime scenes?
20     A.   Sure, yes.
21     Q.   Okay.  Here it says, so supervisor --
22 the next bullet point says, Supervisor and
23 Management Positions - Served in a variety of
24 progressively responsible leadership executive

THOMAS TIDERINGTON, 10/05/2022                          Page 98..101

Page 98

1  positions.
2      I -- that's some -- those are some
3  good words.
4      A.   They are.
5      Q.   What are you trying to say here?
6      A.   Well, I'm just trying to describe what
7  my assignments were and what I did within the
8  police department.  And --
9      Q.   Okay.
10     A.   -- if you look at the progress of my
11  career, that's exactly what it says, it's a variety
12  of progressively different and -- and took on more
13  responsibility the -- the further I got promoted up
14  the chain of command.
15     Q.   Okay.  So that's not a specific --
16  those are not specific positions you're referring
17  to.  You're just referring to your overall track
18  for the office.  Is that what you're saying?
19     A.   That would be a fair -- yes.  That
20  would be a fair statement.
21     Q.   Okay.  So because if we have -- so if
22  we have you're in patrol from '81 to 83 and then
23  narcotic detective from '81 to '85, and then a
24  sergeant from '85 --

Page 99

1      A.   Excuse me.  '86.  I think I got
2  promoted in '86.
3      Q.   And then a sergeant from '86
4  till when?
5      A.   I got promoted again to the rank of
6  captain in 1995, I believe, or '9- -- '95 or '96.
7      Q.   And then held the rank of captain and
8  commander of chief until you left the department?
9      A.   That's correct.
10     Q.   Okay.  And so in terms of assignments,
11  which are different than rank, right, you were in
12  the patrol --
13     A.   Yes.
14     Q.   -- for two -- two years, and then --
15     A.   As a captain.
16     Q.   No, no, no.  When you started.
17     A.   Oh, okay.  I'm sorry.  I following you.
18     Q.   I'm just going to try to go
19  chronological or -- well, maybe it's easier if you
20  do it, chronologically through your assignments.
21     A.   Yes.  I -- as -- as I started out as a
22  patrol officer there in the patrol division for a
23  year and a half or two years.  I was then assigned
24  as a detective to the Detective Bureau, and

Page 100

1  specifically to the Organized Crime Division
2  within -- within the bureau.  I was there working a
3  variety of cases as a detective until I got
4  promoted to sergeant, which would have been in 19,
5  I believe, 86.
6           After being promoted to sergeant, I
7  went to patrol for I think six months, or a short
8  period of time.  And then I was assigned back to
9  the Detective Bureau as a supervisor where I stayed
10  until 1990, where I was then assigned to the South
11  Florida Regional Task Force as the commander of the
12  task force, and I was there until '95 or '96 when I
13  got promoted to the captain.
14           I served as the captain and I was in
15  charge of the administrative division for a short
16  period of time, and then I went back as the captain
17  in charge of the -- one of the investigative
18  captains, there were two of us, and I was assigned
19  to the Special Investigations Division until I
20  retired, went -- moved back to Michigan.
21     Q.   Okay.  So captain until -- captain of
22  SID until 2001?
23     A.   That's -- that's correct.
24     Q.   Okay.  Who did you report to as part of

Page 101

1  the task force?  Who did you report to when you
2  were the supervisor for the task force?
3      A.   I reported to Joe Salvemini, who was an
4  ASAC, assistant special agent in charge, of the DEA
5  at the time in Fort Lauderdale.  So he was the
6  special agent in charge of the Fort Lauderdale DEA
7  unit -- or DEA office, I should say.
8      Q.   Okay.  And I should have asked you this
9  before.  When you were a member of the Detroit
10  Police Department, were you ever accused of
11  misconduct?
12     A.   No.
13     Q.   When you were a member of the Fort
14  Lauderdale Police Department, were you ever accused
15  of misconduct?
16     A.   I was not.
17     Q.   When you were chief of police at
18  Plymouth Township, were you ever accused of
19  misconduct?
20     A.   No.
21     Q.   When you were working on the DEA task
22  force, were you ever accused of misconduct?
23     A.   I was not.
24     Q.   When -- has anyone you've ever worked

THOMAS TIDERINGTON, 10/05/2022                    Page 102..105

Page 102
1  with -- oh, sorry.  Strike that.
2        When you were at the Detroit Police
3  Department, to the best of your knowledge, was
4  anyone you worked with accused of misconduct?
5     A.   No, not that I recall.
6     Q.   Have you ever been accused of
7  violating -- when you were at Detroit, did you --
8  were you ever accused of violating or -- a policy
9  or procedure of the police department?
10    A.   No.
11    Q.   When you were with Fort Lauderdale,
12  were you ever told that you had been accused of
13  violating a policy or procedure of the Fort
14  Lauderdale Police Department?
15    A.   I cannot think of one, no.
16    Q.   Are you aware of any occasion in which
17  somebody you were working with was accused of
18  violating a policy or procedure of the Fort
19  Lauderdale Police Department?
20    A.   Well, yeah, certainly.  I mean, I was a
21  supervisor.  I would have disciplined officers.  I
22  would have conducted investigations of misconduct.
23    Q.   When you were with the DEA, was anybody
24  on the task force accused of misconduct?

Page 103
1     A.   Not while I was there, no.  Oh, I --
2  I'm sorry.  Let me -- let me back up.
3        There was a DEA agent by the name of
4  Rene De La Cova that was accused of stealing a
5  million dollars, in which it was proven that he
6  did, in fact, do that, and he was charged
7  criminally and prosecuted.
8     Q.   And was he one the the of the task force
9  members that you supervised?
10    A.   He was a -- he was a DEA supervisor
11  that we utilized during our undercover operations
12  due to his Spanish-speaking abilities.  So he was
13  assigned to me as an investigator, but he was
14  really a supervisor.
15    Q.   All right.  I take it you had no idea
16  he was stealing money from the DEA; is that right?
17    A.   No, not till we found out that he was
18  and then we cooperated and did everything we could
19  to prosecute him.
20    Q.   Okay.  So what about as chief of police
21  at Plymouth Township, were you ever accused of
22  misconduct?
23    A.   I was not.
24    Q.   Were you ever sued in your capacity as

Page 104
1  chief of police for Plymouth Township?
2     A.   I was, yes.
3     Q.   Okay.  And what were you sued for?
4     A.   I think there was two or three
5  different times where -- and again, I don't think
6  there's a police chief in America that hasn't been
7  sued, but I think one of my officers -- it was a
8  bicycle accident.  I think he ran into somebody who
9  was crossing the street.  I think that lawsuit
10  still pending.  I -- I'm not sure if I was named in
11  it or not, to tell you the truth.  I know the
12  department was.  I think that's still pending.
13        And then there were some labor
14  issues where I took disciplinary action against
15  officers and they filed what I considered to be a
16  frivolous lawsuit.
17    Q.   And that -- is that -- were there two
18  cases like that?  I thought you said there were
19  three cases total.
20    A.   I think there was two separate cases in
21  which -- in which I took disciplinary against --
22  action against officers and they filed a lawsuit
23  against me.  When I say "me," the department.  I
24  don't know if I was named personally.

Page 105
1     Q.   Have you -- did you give a deposition
2  in any of those cases?
3     A.   I think I did, yes.
4     Q.   Which one, the labor one or the bicycle
5  one?
6     A.   The labor one I think I did.  I don't
7  recall given a deposition on the bicyclist.
8     Q.   Are the laborer cases still pending?
9     A.   No.  No, they're not.
10    Q.   How were they resolved?
11    A.   One was -- I don't know if he went to
12  trial or it was dismissed in summary or it -- it --
13  he lost that one.  And the other one, there was a
14  confidential settlement with -- with the officer.
15    Q.   Have you ever been sued personally?
16    A.   No.
17    Q.   Have you ever filed a lawsuit on your
18  own behalf?
19    A.   No.
20    Q.   Have you ever filed for bankruptcy?
21    A.   No.
22    Q.   Okay.  Have you ever testified at trial
23  in a civil case as an expert?
24    A.   I have.

THOMAS TIDERINGTON, 10/05/2022                    Page 106..109

Page 106

1    Q.    Okay.  And is that -- and when I say
2  "expert," I mean in a case like this where you're
3  retained as an expert witness, where you're paid
4  money to --
5    A.    Yes.
6    Q.    Okay.  And when was that?
7    A.    The most recent one was a few weeks ago
8  or a month ago.
9    Q.    Okay.  What -- what case?  What's the
10 name of the case?
11   A.    Blasingame, B-l-a-s-i-n-g-a-m-e, v. The
12 City of Atlanta, Atlanta Police Department -- and
13 the Atlanta Police Department.
14   Q.    And was it a federal case or a state
15 case?
16   A.    It was a federal case.
17   Q.    And who retained you?
18   A.    The plaintiff's attorney.
19   Q.    Who was that?
20   A.    Ven Johnson, V-e-n, Johnson.
21   Q.    Okay.  And did you -- how long -- what
22 was the nature of your opinion in that case?
23      MR. SWAMINATHAN:  Objection to form.
24      Go ahead.

Page 107

1      THE WITNESS:  My -- the nature of my opinion?
2  I'm not sure I understand.
3  BY MS. GOLDEN:
4    Q.    Well, you said you testified at trial,
5  right?  Did you give an expert opinion in the case?
6    A.    I did.
7    Q.    What was the nature of the testimony
8  that you provided in that case?
9    A.    It dealt with the police officers
10 actions in -- in the use of force and tasering an
11 individual.
12   Q.    Did you receive any instructions from --
13 from anyone that your testimony was to be limited
14 in any way when you took the stand?
15   A.    No.
16   Q.    Did you issue a report in that case?
17   A.    I did.
18   Q.    Do you still have it?
19   A.    I'm sure I do, yes.
20   Q.    Okay.  Do you have -- have you seen a
21 transcription of your -- the testimony you provided
22 in that case?
23   A.    I have not.
24   Q.    Have you testified as an expert

Page 108

1  witness, as a retained expert witness, in any case
2  other than Blasingame?
3    A.    In trial testimony or deposition?
4  Either/or I think is what you're asking, right?
5    Q.    No.  I was specific to trial.  I'm
6  going to ask -- don't worry, I'll get to
7  depositions.
8    A.    I testified in a criminal hearing as an
9  expert in a -- in a drug case, or an international
10 fugitive case, I guess I should describe it as,
11 several years ago.
12   Q.    And where is that case pending?
13   A.    It was in federal court in Miami.
14   Q.    And who retained you?
15   A.    The plaintiff attorney.
16   Q.    I thought you said it was --
17   A.    I'm sorry; I'm sorry.  Wait a minute.
18 I -- let me back up.
19        It was a criminal matter and it --
20 the defense attorney retained me on behalf of his
21 client.
22   Q.    Did you issue a report in that case?
23   A.    I did not.  It was a hearing.
24   Q.    And what was the nature -- did you

Page 109

1  provide an expert opinion at the hearing?
2    A.    I -- I did.  I testified as to what is
3  called a fugitive warrant, a federal international
4  fugitive warrant, and -- and how it is typically
5  executed by law enforcement officers on an
6  international basis.
7    Q.    And what was the name of that case?
8    A.    I don't recall offhand.
9    Q.    Okay.  Other than those two cases, have
10 you provided expert witness testimony at trial in
11 any other case, trial or hearing?
12   A.    Those are the only ones that I can
13 recall.
14   Q.    Okay.  And then as far as deposition
15 testimony, I think we have from your disclosure two
16 cases, right?
17   A.    I think there's -- since that time, I
18 think there may have been one more -- maybe a
19 couple more depositions.
20   Q.    One was the Jane Doe case, right?
21   A.    That's correct.
22   Q.    What was the nature of your testimony
23 in that case?
24   A.    That was a premises liability case

THOMAS TIDERINGTON, 10/05/2022                                    Page 110..113

Page 110

1  where a Jane Doe was suing a hotel for not
2  providing proper security and -- and she was
3  victimized as a human trafficking -- a victim of
4  human trafficking.  That was a deposition.  That
5  case was settled.  And then --
6      Q.   Okay.  Go ahead.
7      A.   I'm sorry?
8      Q.   Go ahead.
9      A.   And shockingly, I was also a
10 trademark -- I testified as a trademark -- as an
11 expert in a trademark infringement case.
12     Q.   Okay.  And those are the two that are
13 on the attachment to your report, right?
14     A.   That's correct.
15     Q.   Is there anything else that needs to be
16 added?
17     A.   There are.  I think I've had a couple
18 other depositions since I prepared this.  And
19 I'll -- again, on a break I think I can -- I'll
20 have to go back and look at my notes and clarify,
21 but -- but whatever I would add would have been
22 after I submitted this.
23     Q.   Okay.  Do you remember the nature of
24 the testimony you provided in either of those other

Page 111

1  couple of depositions you might have given since
2  you issued your report in this case?
3      A.   I -- yeah.  I -- again, let me check my
4  notes, but it --
5      Q.   Okay.
6      A.   I think there may have been one or two
7  other depositions.
8      Q.   And the Jane Doe case you just -- not
9  just, but you gave a deposition but did not testify
10 at trial; is that correct?
11     A.   That is correct.
12     Q.   And in the trademark, case that's the
13 BBK case right?
14     A.   That's correct.
15     Q.   And you testified -- you gave testimony
16 at a deposition, right?
17     A.   No.  I -- it was a deposition, yes.
18     Q.   Okay.  But not at trial, correct?
19     A.   It -- that's correct, not at trial.
20     Q.   Okay.  Do you know -- and I think you
21 said -- you said the Jane Doe case settled before
22 trial?
23     A.   It did.
24     Q.   Do you know whether or not the BBK case

Page 112

1  has been tried?
2      A.   I think the judge made a determination
3  before trial and I think the defendant prevailed on
4  it, is my understanding, but I don't have the
5  details.  All I --
6      Q.   So --
7      A.   -- attorney said, We won the case, so I
8  don't really know what that meant.
9      Q.   Okay.  But it's your understanding that
10 the judge issued a ruling before the trial that you
11 would not be permitted to testify; is that right?
12     A.   I'm sorry?
13     Q.   Were -- is it your understanding -- are
14 you saying somehow you were not permitted to
15 testify at the trial of the case?
16     A.   No.  I don't think there was a trial.
17     Q.   Oh.  The BBK case, no trial?
18     A.   Yeah, no.  There was no trial.
19     Q.   Okay.  Has --
20     A.   I don't think -- I don't know if it was
21 summary judgment or -- or what happened or how they
22 won or where they won it, but there was no trial,
23 is my understanding.
24     Q.   Has any -- has your testimony ever been

Page 113

1  subject to a Daubert hearing?
2      A.   I don't know.
3      Q.   Okay.
4      A.   And I -- I don't think so, but it -- I
5  don't know.
6      Q.   Have you ever been told that a court
7  has ruled that you're not permitted to testify at
8  trial?
9      A.   No.
10     MS. GOLDEN:  Okay.  I think we've been at it
11 for another hour.  Do you want a break or you want
12 to just --
13     THE WITNESS:  Yeah, yeah.  What would be your
14 plan for a lunch break today?
15     MS. GOLDEN:  Again, it's up to you.  I tend
16 to not get as hungry as everybody.  It's just --
17     THE WITNESS:  It's almost dinnertime here in
18 Michigan.
19     MS. GOLDEN:  Okay.  Let's go off the record.
20     THE VIDEOGRAPHER:  We're off the video record
21 at 12:38 p.m.
22          (Recess taken.)
23     THE VIDEOGRAPHER:  We are back on the video
24 record at 1:28 p.m.

THOMAS TIDERINGTON, 10/05/2022                    Page 114..117

Page 114

1 BY MS. GOLDEN:
2     Q.   Okay.  Mr. Tiderington, I want to touch
3 on your tenure as chief of police at Plymouth
4 Township Police Department.  Okay?
5     A.   Okay.
6     Q.   And you were there for -- from 2001
7 till 20 -- till May of 2021, right?
8     A.   '22.
9     Q.   Oh, I'm sorry.
10    A.   I just retired this year.
11    Q.   Yep.  So 2001 until May of 2022.  It's
12 a lot of 2s.
13         Okay.  So what caused you to leave
14 the Fort Lauderdale Police Department?
15    A.   Well, I was able to retire with --
16 because I had in excess of 20 years.  The family
17 wanted to move back to the midwest and it was great
18 a opportunity for us.
19    Q.   And so you retired to Michigan?
20    A.   I retired -- well, I got hired by
21 Plymouth Township before I retired, but -- but in
22 essence, yes.  I retired from Fort Lauderdale on a
23 Friday and started Plymouth Township police chief
24 on Monday, essentially.

Page 115

1     Q.   Has anyone told you you're retiring in
2 the wrong direction?
3     A.   I am.  I figured that out now.
4 unless -- unless you were in Fort Meyers, then you
5 realize why Michigan is a great place to live.
6     Q.   Point taken.
7         Okay.  So you were chief of police
8 the entire time you were at Plymouth Township,
9 correct?
10    A.   Correct.
11    Q.   And Plymouth Township, how would --
12 what's the population that the police department
13 serves?
14    A.   Roughly 28, 30,000 residents.
15    Q.   And is it mostly urban or a mix of
16 urban and rural?  How would you describe it?
17    A.   It's a mix of business -- I would say
18 high-end business and residential.
19    Q.   Is it considered a suburb of Detroit?
20    A.   It is.  It's between Detroit and Ann
21 Arbor.
22    Q.   And do you know what the average income
23 of a resident there is?
24    A.   I don't.  Probably higher than the

Page 116

1 norm, but I -- I don't know what it is exactly.
2     Q.   It's a pretty low crime area?
3     A.   Relatively, yes.
4     Q.   Okay.  And what was the homicide rate
5 when you were there?
6     A.   Oh, I think we only had -- I think
7 there were maybe three homicides in the 20 years I
8 was there.
9     Q.   And did -- for those three homicides,
10 did the township request assistance from any
11 outside law enforcement agency to assist in the
12 investigation of any of those three homicides?
13    A.   Not the three.  I think there was a
14 police-related homicide.  One of my officers shot
15 and killed somebody and I think we requested the
16 assistance of Michigan State Police on that, but I
17 don't think that's the type of case you're talking
18 about.
19    Q.   Well, how many employees are there in
20 the -- or were there in the Plymouth Township
21 Police Department when you were the chief of
22 police?
23    A.   Yeah.  We -- it was a small -- we had
24 32 sworn and another probably 20 civilian employees.

Page 117

1     Q.   And how many detectives?
2     A.   Three or four and a detective sergeant,
3 so maybe -- and when I say "three or four,"
4 depending on the time period, but three and a
5 sergeant or four and a sergeant.
6     Q.   Did you personally participate in
7 investigations as chief of police?
8     A.   When you say "personally," yeah.  I had
9 a small department.  Police chief wears many hats.
10 I would say that I -- there was a great deal of
11 oversight on my part.  I can't say that I was -- I
12 certainly wasn't acting as a detective but more of
13 a command officer.
14    Q.   Were you on the street interviewing
15 witnesses?
16    A.   No.  That would not have been my job or
17 my role.
18    Q.   Were you interrogating suspects?
19    A.   Not personally -- well, there
20 probably -- there was a few times, yes, but for the
21 most part that wasn't my primary responsibility.
22    Q.   A few times in the course of your
23 20 years there?
24    A.   As the police chief, yes.

THOMAS TIDERINGTON, 10/05/2022                    Page 118..121

Page 118

1    Q.   Okay.  And I take it you didn't perform
2 any forensic investigation or crime scene
3 investigation during your tenure as the Plymouth
4 Township chief of police?
5    A.   That's correct.
6    Q.   Okay.  And what was your salary as
7 chief of police?
8    A.   Maybe 140, 150,000.
9    Q.   Okay.  If we can, Rachel, go to
10 Exhibit 2, please.
11         And, Mr. Tiderington, this is
12 Attachment A to your report.
13    A.   Okay.
14    Q.   And I think you probably have a copy of
15 it in front of you, on the second page of the
16 document.
17    A.   Yeah.  Litigation Experience, is that
18 what you're looking at.
19    Q.   Yeah.  Do you have that in front of
20 you?
21    A.   I do.
22    Q.   Okay.  I'll give you a minute to grab it.
23         Do you have it in front of you now?
24    A.   I do.

Page 119

1    Q.   Okay.  Fine.
2         And so the -- the first case that's
3 listed here, this is the BBK case, tobacco case,
4 we were talking about, that's that trademark
5 infringement case you were speaking of before,
6 right?
7    A.   Yes.  Yes, ma'am.
8    Q.   And the nature of your testimony in
9 that case was what?
10    A.   Well, I gave a deposition.  I -- there
11 was no trial.  My understanding there a wasn't a
12 trial.
13    Q.   The nature of your testimony in the
14 deposition was what?
15    A.   Essentially I was asked to examine
16 products that were being sold by a company, BBK
17 Tobacco, and determine if the products that they
18 were selling were for use with drugs or marijuana
19 versus use with tobacco products.
20         Essentially what they were -- BBK,
21 and this is my general understanding, was suing
22 Central Coast Agriculture, which was a marijuana
23 company, for a trademark violation, and Central
24 Coast Agriculture I think cross-sued them and

Page 120

1 claimed that BBK's products are designed for drug
2 use and therefore you cannot legally trademark
3 something that's federally illegal.
4         So I was asked to look at various
5 products consisting of rolling papers, scales,
6 shredders, things associated with the drugs, and
7 determine whether or not they were designed for use
8 with tobacco or marijuana.
9    Q.   And do you have a copy of the
10 deposition you gave in this case?
11    A.   I don't.
12    Q.   And the Jane Doe case that's listed
13 here, we talked about this before, right?  I think
14 you said this was a failure to provide security
15 case.  Does that sound right?
16    A.   Well, it's a premises liability where
17 the hotel was being sued for -- yes, for not
18 providing proper security.
19    Q.   And what was the nature of your
20 testimony in that case -- in that deposition?
21    A.   I testified essentially to telltale
22 signs of human trafficking, what -- what are
23 telltale signs of those -- of females who are being
24 trafficked out of various hotels or -- in the

Page 121

1 community, entertainment industry type locations
2 where pimps may assault and coerce young woman into
3 prostitution.
4    Q.   Do you have a copy of the deposition
5 testimony you provided in that case?
6    A.   No, I do not.
7    Q.   Okay.  And I think you said there were
8 two others to add.
9    A.   Yes.
10    Q.   One was the Atlanta case, you -- did
11 you get a chance to look at this?
12    A.   Well, the Atlanta case there was no
13 deposition.  I -- I testified in trial at that, so
14 there's no deposition there.  I did prepare a
15 report, but there's no deposition.
16    Q.   And the nature of your testimony in
17 that case was whether or not there was an
18 appropriate use of force, right?
19    A.   That's correct.
20    Q.   Okay.  And then there was a criminal
21 case you told us about and the nature of your
22 testimony in that case was related to an intern-
23 national fugitive warrant?
24    A.   Correct.

THOMAS TIDERINGTON, 10/05/2022                    Page 122..125

Page 122

1    Q.   Did I get that right?  Okay.
2         And do you have a copy of the
3  testimony you gave in any of those cases?
4    A.   No, I don't.
5    Q.   Okay.  Is there another case to add to
6  the list of litigation experience you have?
7    A.   Yes.  And I -- like I said, we ran to
8  lunch, so I didn't have time -- the next time we
9  take a break, I'll confirm whether or not there was
10 another deposition or two on another case.
11   Q.   Okay.  I can come back to that.
12   A.   I'm going to make myself a note, if you
13 don't mind, just so --
14   Q.   Sure.  If you make a note, you know we
15 can look at it.
16   A.   Right.
17   Q.   Okay.  We can take that exhibit down
18 and go to Exhibit 3.
19        And this -- Mr. Tiderington, does
20 this look familiar to you?
21   A.   It does.
22   Q.   And what is this?
23   A.   This is the invoice that I submitted
24 for the time that I worked on the case.

Page 123

1    Q.   And that's -- does this represent the
2  time you worked on the case from the time you were
3  retained until -- up until and through the time you
4  issued the report?
5    A.   It does.
6    Q.   Okay.  And so that was a total of 78
7  and a quarter hours?
8    A.   Well, that's the billable hours.  I
9  probably worked twice as much on the case than what
10 I billed for.
11   Q.   Well, why would you do that?
12   A.   You know, I'm wondering that myself at
13 this point, but there -- there were times where, as
14 an example, when I was in Atlanta waiting to
15 testify, I think I was there for -- in the witness
16 room waiting for like two -- for two days to
17 testify and I -- I do recall that I read some of
18 the depositions, but I guess I didn't feel it was
19 right to -- I was already getting compensated on
20 one case.  I didn't feel it was right to get
21 compensated twice, is one example.
22        I guess I can give you some other
23 examples that -- some of the documents I was able
24 to convert to a Word file and -- and therefore like

Page 124

1  if I was driving for extended period of time, I --
2  at times I would just listen to the depo versus
3  reading it.  I don't think I billed for those
4  hours.
5         And so in most of my cases, you
6  know, I -- I don't bill for every hour that I work
7  on the case and probably I'll have to think about
8  it differently.
9    Q.   Okay.  Can you think of any other
10 circumstance in which you did not bill for your
11 time in this case?
12   A.   I think perhaps phone calls.  I don't
13 think I billed for any phone calls, or maybe one if
14 it was extended period of phone conversation or,
15 you know, if I -- no.  I think I covered the --
16 you know, examples of times where I would not have
17 billed on this case but spent more hours on it
18 than -- than what's reflected on the time sheet.
19   Q.   Can you think of any other circumstance
20 in which you would perform work on the case but not
21 bill for it other than listening to documents as
22 you drive, working while you're waiting in an
23 airport and on the clock on another case, or short
24 phone calls?

Page 125

1    A.   I think that's about it.
2    Q.   And can you approximate for me -- I
3  mean, did you -- did I hear you correctly before to
4  say that you think you spent another 78 and a
5  quarter hours that you didn't bill for?
6    A.   Well, no.  The fact that I didn't track
7  it, it's hard to say, but I -- I think I spent a
8  great deal of time that -- that I didn't bill for
9  on this particular case.
10   Q.   What's your best estimate as to the
11 number of hours that you spent on this -- working
12 on this case that you haven't billed for?
13   A.   You know, maybe another 20, 30,
14 40 hours I -- would be my best guess.
15   Q.   Okay.  Has the invoice been paid?
16   A.   It has.
17   Q.   Did you subcontract out any of the work
18 that was performed for you in order for you to
19 complete your report in this case?
20   A.   No.
21   Q.   And I see the charge here is $325 an
22 hour?
23   A.   That's correct.
24   Q.   Is that what you charge all of your

THOMAS TIDERINGTON, 10/05/2022                    Page 126..129

Page 126

1 clients in your consulting business?
2      A.   At that time yes, but now it's -- it's
3 a little bit higher. When I say "now," this year I
4 raised my rates somewhat.
5      Q.   What's your rate now?
6      A.   350 an hour to 375 an hour.
7      Q.   Depending on what?
8      A.   I think complexity of the case.
9      Q.   Do you charge more or less for more
10 complex cases?
11     A.   I would charge more.
12     Q.   You never know.
13     A.   Yeah, that's true. I'll think about
14 that.
15     Q.   You might like the complex ones more.
16 I don't know.
17          Okay. So that is that.
18          Have you done any -- have you done
19 any consulting -- I'm sorry. Have you done any
20 work as an expert witness for the People's Law
21 Office other than this case?
22     A.   The People's Law Office, is --
23     Q.   Yeah. Do you know who the People's Law
24 Office is or what it is?

Page 127

1      A.   I just want to make sure we're talking
2 about the same thing. Are you talking about
3 Anand's office or --
4      Q.   Right. So Anand -- I think I can say.
5 Anand's office is Loevy & Loevy?
6      A.   Right.
7      Q.   Okay. Is this the first case you ever
8 worked on for Loevy & Loevy?
9      A.   This is the -- is the first case, yes.
10     Q.   Okay. Do you have any other cases
11 right now that you're working on for Loevy & Loevy?
12     A.   I do.
13     Q.   Okay. And how many other cases?
14     A.   One other case.
15     Q.   Have you --
16     A.   I'm sorry. One other case that --
17 three total, I think. So one case I'm just
18 beginning to work on. Another case that I recently
19 competed a report on, which is, I know you didn't
20 ask yet, but the Sierra case. And then there's a
21 case that I just recently began looking at
22 information on.
23     Q.   Okay. I think I'm missing a case.
24          Your work as consultant -- in one

Page 128

1 case you're in the consulting case phase, right, so
2 you haven't issued a report, right?
3      A.   That's correct.
4      Q.   And then you've got the Sierra case,
5 right?
6      A.   That's correct.
7      Q.   And is there a third case or is this --
8      A.   And this case.
9      Q.   Okay.
10     A.   So three total.
11     Q.   Okay. Have you -- has -- are you aware
12 of any other case that you're working on that has
13 been referred to you through Anand's firm or
14 Loevy & Loevy?
15     A.   No, no. Not that's been referred to me
16 by them.
17     Q.   Okay. So the People's Law Office
18 is the name of the law firm that represents
19 Mr. Solache?
20          You -- is this the first case that
21 you've ever worked on for the People's Law Office?
22     A.   Yes.
23     Q.   Okay. Are you currently working on any
24 other cases for the People's Law Office?

Page 129

1      A.   No.
2      Q.   Okay. Do you have an estimate --
3 well -- okay. So we were provided with a figure
4 of -- let me strike that.
5          When did you start offering
6 consulting services?
7      A.   Well, I mean, as far as expert witness?
8      Q.   Yeah. Thank you.
9      A.   You know, I had a case maybe 25 years
10 ago up here in Michigan and I -- I don't remember
11 the name of it, but I -- I don't -- I didn't
12 testify. I think there may have been a deposition.
13 That would have been -- that would have been the
14 first time I was involved in a civil matter, I
15 think. And then over the last -- I think from 2017
16 there's been, you know, a case here or there that
17 I've been involved with.
18     Q.   So apart from that one case that was
19 quite some time ago, is it fair to say that you
20 started offering consulting expert -- expert
21 services on a regular basis over the last five
22 years?
23     A.   Yes.
24     Q.   Okay. So the attorneys for Mr. Reyes

THOMAS TIDERINGTON, 10/05/2022                     Page 130..133

Page 130

1  in this case provided us with a figure of $10,630
2  as your income from consulting in the year 2017; is
3  that --
4      A.   It sounds about right.  And again, I
5  would have to verify that, but it sounds about
6  right, yes.
7      Q.   And does -- it sounds like you've
8  provided a number similar to that to -- to counsel
9  for Mr. Reyes; is that right?
10     A.   That's correct.
11     Q.   Okay.  And what -- what does that
12 dollar amount represent?  Is that all of your
13 consulting income or just your consulting income
14 from expert services, expert witness services?
15     A.   That would have been all of my income
16 for expert witness services for each of those
17 years.
18     Q.   Okay.  And so then in 2018, there's a
19 dollar amount of zero.  Does that sound about
20 right?
21     A.   Yeah, it sounds -- yeah.
22     Q.   Why is it -- why is it zero, because
23 you had no cases?
24     A.   I probably didn't work any cases.

Page 131

1      Q.   And then in 2019, it goes to 49,732.
2  Does that sound right?
3      A.   It does.
4      Q.   And then for 2020, we have a figure of
5  $24,275.  Does that sound about right?
6      A.   Yes.
7      Q.   And then for 2021, we have a figure of
8  $190,000 and $524.  Does that sound right?
9      A.   That sounds right, yes.
10     Q.   Okay.  So of that $190,524, how much
11 would you say comes from, if any, the work you've
12 done for Loevy & Loevy on the Sierra case or the
13 other case that you're consulting with them on?
14     A.   In 2021?
15     Q.   Correct.
16     MR. SWAMINATHAN:  Objection to foundation.
17         Go ahead.
18     THE WITNESS:  Again, I would have -- I'd have
19 to look at my records, but I don't think -- I think
20 the Sierra -- any billable hours in the Sierra case
21 would have been in 2022.
22 BY MS. GOLDEN:
23     Q.   Okay.
24     A.   Any --

Page 132

1      Q.   And --
2      A.   And 2021, you have the invoices, so you
3  figure out -- I just don't have it in front of me.
4  I'm not trying to task you with work, but I know
5  you have the invoices from Anand's -- from this
6  case.  So whatever is left over, that's ...
7      Q.   So the consulting work -- the work
8  you're doing on the consulting case, that's 2022,
9  right?
10     A.   On the Sierra case, yes.
11     Q.   The Sierra case you think is 2022, that
12 is the case you recently started working on for
13 them, right?
14     A.   Yes.  Yes, ma'am.
15     Q.   Okay.  And so the only work you did for
16 Loevy & Loevy would be represented on the invoice
17 that we previously marked as Exhibit 3; is that
18 correct?  The only work from Loevy & Loevy in the
19 year 2021 would be on that invoice?
20     A.   That's correct.
21     Q.   Okay.  So do you know where the bulk of
22 this 190,000 came from?
23     A.   Other cases.
24     Q.   How many other cases?

Page 133

1      A.   Oh, I've probably been retained on
2  20 or 30 cases.
3      Q.   Okay.  Have you issued reports on any
4  of them?
5      A.   Yes.
6      Q.   How many of them have you issued
7  reports in?
8      A.   I would -- again, I go would have to
9  look at the list.  I do -- I'd have to look at the
10 list and see what -- what cases I issued reports.
11 But probably four to five cases in -- in '21, I
12 probably issued reports maybe -- maybe three or
13 four, five.
14     Q.   Have you issued any reports in any
15 cases in which you offer opinions relative to a
16 homicide investigation?
17     A.   Other than a police shooting case, as
18 I -- I'm trying to think back on the cases.  But of
19 the cases that I've issued opinions that dealt
20 with, you know, unintended death, if you will, it
21 would have been -- a police shooting case is all
22 that I can recall at this point.
23     Q.   Okay.  And if you -- you still retain
24 copies, I imagine, of all the reports you issued in

THOMAS TIDERINGTON, 10/05/2022                    Page 134..137

Page 134

1  2021?
2     A.  I do, yes.
3     Q.  Okay.  Do you have any estimate of the
4  amount of consulting income you've earned in 2022
5  to date?
6     A.  I believe it's just over $200,000.
7     Q.  And what percent of that do you think
8  is -- comes from Loevy & Loevy?
9     A.  Probably less than 10 percent, 10 to
10 15, 10 to 15 percent maybe.
11    Q.  Okay.  All right.  So let us turn to
12 Exhibit 4, please.  This is Attachment B,
13 Mr. Tiderington, to your deposition, which is
14 Materials Reviewed.
15    A.  Okay.
16    Q.  All right.  So we already talked about
17 a few things that need to be added, right?
18    A.  Yes.
19    Q.  The Brasfield deposition in the Rivera
20 case, three depositions in the Johnson case, and
21 then expert reports of Final and Reich; is that
22 correct?
23    A.  That is correct.
24    Q.  Is there anything else to add?

Page 135

1     A.  I don't think so.
2     Q.  Did you personally read all of the
3  materials that are listed on this exhibit as items
4  1 through 57?
5     A.  1 through 57?
6     Q.  Yeah.
7     A.  And you're stopping at -- you're
8  stopping at -- you're stopping at deposition of
9  Commander Eric Winstrom?
10    Q.  Yes.
11    A.  I've reviewed all of the documents
12 listed.  Did I read every word of every document?
13 I can't tell you that I did that, no.
14    Q.  Did you personally review every
15 document contained on the list of materials
16 reviewed?
17    A.  I believe I did, yes.
18    Q.  Okay.  Did you -- in terms of selecting
19 what materials to review, did you rely on the
20 attorneys for Mr. Solache and Mr. Reyes to provide
21 you with all the relevant materials?
22    A.  Well, yeah.  I -- I'm sorry.  The
23 answer is yes.  I relied on -- on them to provide
24 me all the material and -- and one of the requests

Page 136

1  that I had was that I wanted to -- to be able to
2  view everything related to the case; and my
3  understanding, that's what was provided to me.
4     Q.  Okay.  Do you -- as you were reviewing
5  these materials, did you see anything that -- did
6  you see anything that you thought was missing?
7     A.  Like what?
8     Q.  Like I don't know.  Did you review one
9  record and have it reference another and think, Oh,
10 I should have that but I don't?
11    A.  Well, certainly.  The -- there's a lot
12 of material.  It's complicated.  I can't say I --
13 I don't recall any specific instance that you're
14 asking about, but I'm -- I'm sure there was.
15    Q.  So then you reached out to the
16 plaintiffs' lawyers and were provided with whatever
17 it was that you were looking for?
18    A.  Or I already had it and I was told
19 where I could find a certain document or a certain
20 thing that I was looking for.  I don't believe I
21 was provided additional documents.
22    Q.  Okay.  When you were reviewing the
23 deposition transcripts that are listed here, did
24 you make any credibility assessments of any of the

Page 137

1  witnesses whose deposition testimony you reviewed?
2     A.  No, I -- I did not.
3     Q.  Did you make any credibility
4  assessments of any of the witnesses whose trial or
5  hearing testimony you reviewed?
6     A.  No, other than perhaps maybe the judge
7  that offered an opinion.
8     Q.  And what are you referring to?
9     A.  I think there was some opinions made by
10 some -- some of the judges in these cases that --
11 that offered their opinion on certain witnesses or
12 certain testimony.
13    Q.  And what are you thinking of?
14    A.  What am I thinking of?
15    Q.  Yeah.
16    A.  No.  You asked me did I make any
17 credibility assessments of any of the witnesses,
18 and I -- I noted that testimony from a judge or
19 orders from a judge, I -- I guess, caught my
20 attention that it would be perhaps pretty credible.
21    Q.  So did you give a judge's assessment of
22 credibility -- did that factor into your opinions
23 that you provided in this case?
24    MR. SWAMINATHAN:  Objection to form.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 138

1      Go ahead.
2      THE WITNESS:  Well, everything factored into
3  my opinion.  I considered all of the material
4  and -- from a perspective of all of the --
5  everything that was provided is what I authored my
6  opinion about.
7  BY MS. GOLDEN:
8      Q.   So you saw in the record, though, that
9  a judge made a statement assessing a witness's
10 credibility, right?
11     A.   I -- I did see that, yes.
12     Q.   And obviously the judge, unlike you or
13 I, was present when the witnesses were testifying,
14 right?
15     A.   Perhaps.
16     Q.   And so do you think that the judge is
17 in a better position to assess credibility than --
18 than anyone else?
19     MR. SWAMINATHAN:  Objection to form and
20 foundation to the extent unclear what judge you're
21 referring to in this case.
22     Go ahead.
23     THE WITNESS:  Yeah.  I don't know if he's in
24 a position to be any more credible than -- than

Page 139

1  anyone else and I don't know that I'd put any more
2  value in -- into his statements than any other
3  witness.
4  BY MS. GOLDEN:
5      Q.   What, if any, significance do you
6  attribute to a judicial statement assessing a
7  witness's credibility?
8      A.   I'm sorry?
9      Q.   What, if any, significance do you
10 attribute -- or did you attribute in your review of
11 the documents to a judicial statement about a
12 witness's credibility?
13     MR. SWAMINATHAN:  Objection to form.
14     Go ahead.
15     THE WITNESS:  I -- I think it's more so just
16 stuck in my mind more than anything else.  I don't
17 know that there was any additional value that I
18 attached to it, but certainly some of things that
19 were said by some of the judges stuck in my mind
20 and -- and I perhaps can recall them better than
21 some of the other testimony from other witnesses.
22 BY MS. GOLDEN:
23     Q.   Why do you -- what sticks in your mind
24 that a -- that the judge said?

Page 140

1      A.   Well, I guess one of the things that he
2  said was that Guevara -- it was a balded-face lie,
3  I guess is one of the things that kind of sticks in
4  my -- my mind.
5      Q.   And do you recall who said that?
6      A.   I don't.  One of the judges.
7      Q.   Do you recall what the judge said
8  Guevara was lying about?
9      A.   I would have to go back and -- and look
10 through that testimony or to -- but I don't as we
11 sit here today know.
12     Q.   Do you recall anything about the
13 context in which the judge made that statement?
14     A.   Not as we sit here today.
15     Q.   Do you recall -- and did you read that
16 transcript yourself?
17     MR. SWAMINATHAN:  Objection to the form and
18 asked and answered.
19     Go ahead.
20     THE WITNESS:  Which -- which transcript?
21 BY MS. GOLDEN:
22     Q.   The transcript in which the judge made
23 that statement about Detective Guevara, did you
24 read that transcript yourself?

Page 141

1      A.   I did.
2      Q.   And do you believe your report fairly
3  and accurately summarizes the context in which the
4  judge made that statement?
5      A.   I think I quoted it in -- in my report.
6  If you'd like, I could flip through there and make
7  sure that I refresh my memory to answer your
8  question.
9      Q.   No.  I just -- you said it sticks in
10 your mind, and so my question is a little
11 different.
12     Are you confident that you fairly
13 and accurately stated the context in which the
14 judge made that statement in your report?
15     MR. SWAMINATHAN:  Objection to form.
16     Go ahead.
17     THE WITNESS:  I believe so, yes.
18 BY MS. GOLDEN:
19     Q.   Do you recall any other judicial
20 assessment of credibility in any of the records you
21 reviewed?
22     A.   There were others, but I don't recall
23 without reviewing my report for guidance.
24     Q.   Okay.  Did you -- you might want to --

THOMAS TIDERINGTON, 10/05/2022                    Page 142..145

Page 142

1 can you -- how long would it take you to open that
2 hard drive or open the Dropbox or whatever it is?
3       A.   I can do it.
4            Okay.
5       Q.   You got it open?
6       A.   I do.
7       Q.   Give me a minute to think because now I
8 have -- I'm going to backtrack for a quick second.
9            What did the judge's assessment or
10 statement about Detective Guevara being a liar did
11 that factor into the opinions you have in this
12 case?
13      MR. SWAMINATHAN:  Objection to form and
14 foundation.
15           Go ahead.
16      THE WITNESS:  It -- it was just part of this
17 entire investigative file and it -- it was -- I
18 noted it.  It's -- it's part of a foundation of how
19 I create my opinions.  I -- I don't -- it wasn't
20 the basis for my opinion, of course, but it was one
21 of the things that I reviewed.
22 BY MS. GOLDEN:
23      Q.   Okay.  You're into the Dropbox.
24           Can you find the deposition

Page 143

1 transcript -- did you review the deposition
2 transcript of the plaintiff Reyes?
3       A.   I did.
4       Q.   Okay.  Can you pull that up?
5       A.   Okay.
6       Q.   Do you have it?
7       A.   I think so.
8       Q.   Let me know when you got it?
9       A.   Okay.  That's dated February 25, 2020?
10      Q.   Is that what you have?
11      A.   Yeah.  Videoconference deposition,
12 February 25th, 2020.
13      Q.   Do you have more than one transcript
14 from Mr. Reyes?
15      A.   I believe I do.
16      Q.   Okay.  So the transcript that you're
17 looking at with the date you just gave us, can you
18 tell us do you have exhibits to the deposition?
19      A.   I'll have to go back.
20           So you want to know if they're
21 attached to the deposition or you want to know if
22 they're separate attachments?
23      Q.   I want to know if you have the
24 exhibits, if you were provided the exhibits.

Page 144

1       A.   All right.  This ...
2       Q.   When you reviewed the deposition
3 transcripts, did you also review the exhibits that
4 were attached?
5       A.   I would have, yes.
6       Q.   Okay.  Do you review any videotaped
7 depositions?
8       A.   I don't think so.
9       Q.   Okay.  Item 15 on -- you can close --
10 you can close your - you can leave it open if you
11 want, but I'm not going to ask you about it right
12 now.
13           Item 15 on the list of materials
14 reviewed is Reyes Complaint.
15      A.   Correct.
16      Q.   And can you tell me how that factors
17 into your analysis in this case?
18      A.   Well, I think that was the first
19 document that I reviewed.
20      Q.   And why was that important to you?
21      MR. SWAMINATHAN:  Objection to form and
22 foundation.
23           Go ahead.
24      THE WITNESS:  Well, it was important to me

Page 145

1 just -- I wanted to understand what the allegations
2 were from the plaintiffs.
3 BY MS. GOLDEN:
4       Q.   And why is that important?
5       A.   I think it's important to understand
6 what they're claiming.
7       Q.   Why?
8       A.   So I can make an informed opinion on
9 the actions of the officers and -- and understand
10 from the perspective of the complainant on what
11 they claimed happened during this investigation.
12 I think it's important for any investigator to
13 understand what the allegations against a police
14 officer are.
15      Q.   And when you understood what the
16 allegations against the police officers were, did
17 you review the record to see if there was evidence
18 to support those allegations?
19      A.   Well, I think the -- all of the other
20 documents, I think you're speaking of the record, I
21 think that -- that's all of the other documents
22 that I -- that are listed here is the record.
23      Q.   Right.  And as you reviewed the other
24 documents listed there, you were looking for

THOMAS TIDERINGTON, 10/05/2022                    Page 146..149

Page 146

1  evidence that supported the allegations that were
2  contained in the complaint, right?
3      A.   Not necessarily --
4      MR. SWAMINATHAN:  I'm sorry.
5          Objection to form and foundation.
6          Go ahead.
7      THE WITNESS:  Not necessarily supported it,
8  or perhaps disproved it.  I ...
9  BY MS. GOLDEN:
10     Q.   You were looking for things to disprove
11  the plaintiffs' allegations?
12     A.   Well, this is how I do all of my cases.
13  I look at the case from the perspective -- because
14  this is what I've done for 20 years as a police
15  chief and 44 years as a law enforcement officer.  I
16  look at my -- at these cases from the perspective
17  of a command officer that is investigating
18  allegations of misconduct.  And when I investigate
19  allegations of misconduct against one of my
20  officers, I'm either looking to -- to prove that it
21  didn't happen or if it's obvious that it did, then
22  we'll have to deal with the disciplinary process
23  from that point forward.
24         So I'm always looking either to

Page 147

1  prove or disprove an allegation that's made against
2  a police officer.
3      Q.   Did you in this case look for evidence
4  in the record to support the notion that the
5  detectives in the case complied with standard
6  police practices and procedures?
7      A.   Will, I looked at what their practices
8  were.
9      Q.   And did you note when they did things
10  well or correctly or just when they did things that
11  were, in your opinion, not well done?
12     A.   I think both.
13     Q.   Okay.
14     A.   I think.
15     Q.   What did they do well?
16     A.   Well, again, we're talking about a lot
17  of documents and a lot of steps here, but one thing
18  I did note -- I mean, if we're starting from the
19  very beginning of the case, I thought the officers,
20  the responding officers, the initial responding
21  officers, did a -- did a good job and -- and
22  actually I believe they did what they were supposed
23  to do.  They took careful notes.  They identified
24  who was on the crime scene.  They listed different

Page 148

1  individuals.
2          So I do believe that the initial
3  steps in the investigation were -- were perhaps
4  well done.
5      Q.   And when you say "officers," who -- who
6  specifically are you referring to?  Are you talking
7  about the patrol officers that first came on scene?
8      A.   Yes, ma'am.
9      Q.   Okay.  Are you talking about anybody
10  else?
11     A.   Well, that's the beginning of -- I'm
12  trying to start chronologically about who did what
13  well and I -- I don't know that I can off the top
14  of my head go through every step of the process and
15  tell you whether or not it was well done or whether
16  or not it was not done according to acceptable
17  police standards.
18     Q.   As you sit here right now, can you
19  think of anything else that any officer involved in
20  the homicide investigation did in accordance with
21  police procedure?
22     A.   Well, certainly I -- I think there were
23  things done according to police procedures, but I
24  also determined there were things that appeared to

Page 149

1  be done that -- that were not.
2      Q.   Other than officers who initially
3  respond to the scene, who else did something well
4  in the course of this investigation?
5      A.   Can I review the police report?  And we
6  can go through --
7      Q.   No.  Just what you remember, what you
8  can --
9      A.   No, but I -- we both know this should
10  not be a memory test, but if -- if you want a more
11  comprehensive, complete answer, I think it would be
12  helpful if I would go chronologically.  I know
13  you're just trying to get a ten-thousand-foot view
14  of it at this point, but if -- if we're going to
15  drill down to those details, I think it would be
16  helpful if I reviewed my police report -- or their
17  police report.
18     Q.   I gotcha.  I totally understand.
19         But the question is just:  As you're
20  sitting here without the aid of notes or reports,
21  can you think of anything else that any particular
22  officer did while -- during the course of the Soto
23  homicide?
24     MR. SWAMINATHAN:  Objection to form,

THOMAS TIDERINGTON, 10/05/2022                    Page 150..153

Page 150

1 especially in light of the witness the admonition.
2      Go ahead.
3      THE WITNESS:  And again, I think there was a
4 lot of things they probably did well.  I can't
5 point to specifics at this point.  I mean,
6 everything that I reviewed I didn't think was
7 terrible that they did, but again, as we, you know,
8 go through the police report or the other documents
9 that I reviewed, if I can come back to that, I
10 can -- if you don't mind, I'll come back and say,
11 Hey, this is another area that I thought they did
12 well.
13      Q.   Okay.  If you think of it, you can
14 certainly provide me with the information?
15           Okay.  So I have a question about --
16 back to Exhibit 4, Rachel -- the category of -- on
17 page 4 of the exhibit.  Thank you.  The category of
18 References and Standards.
19      A.   Okay.
20      Q.   That might be page 5, Rachel.  Sorry.
21 There we go.
22           Okay.  And what -- how did you --
23 what process did you use to compile this list?
24      A.   You know, this is essentially I -- I

Page 151

1 kind of have like a library of law enforcement
2 topics that go back to my training and teaching
3 days.  So some of these doc- -- some of these books
4 and periodicals and articles I have.
5           Others -- I did look at Mike
6 Brasfield's report and I was curious as to the
7 references that he made, so I -- I did order some
8 of the books.  Some of them I already had, a couple
9 of them I actually ordered on Amazon, some of them
10 I was able to view online.  And that's how I kind
11 of compiled this list.
12      Q.   What does the list represent?  Like
13 what is it a list of?
14      A.   I think it's a list of material, not
15 necessarily that I looked at specifically for this
16 particular case, but the -- the information that I
17 have over 44 years of experience, some of these
18 references, you know, lead back to my days in the
19 police academy in 1978, others, you know, there may
20 have been something on another case that I either
21 ordered the book or downloaded the information.
22           So it's -- they're all related to
23 either my police training that I conducted or my
24 law enforcement experience as a whole, I guess is

Page 152

1 another way to describe it.
2      Q.   Have you read all the materials on this
3 list at one time or another during the course of
4 your 44 years of law enforcement?
5      A.   I would say -- I don't claim to have
6 read every word and every book or every document
7 here.  In fact, I think some of it's in French and
8 I don't speak or read French, but --
9      Q.   So why do you have a --
10      A.   I'm sorry?
11      Q.   I apologize.
12      A.   No.  For the most part, I've either --
13 either reviewed it or at some point in my career
14 utilized it for policy development or training.
15      Q.   Were any of these materials provided to
16 you by plaintiff's attorney?
17      A.   No.
18      Q.   Why do you have books in French on this
19 list?
20      A.   Well, I looked at -- when I first got
21 retained on the case, I was provided with Mike
22 Brasfield's expert report, and Mike, quite frankly,
23 was my police chief in Fort Lauderdale and -- and
24 he's a -- I was curious as to the importance of

Page 153

1 these books that he had in his references, so I --
2 I felt it was important for me to took at that as
3 well.
4      Q.   Why don't you list Mike Brasfield's
5 deposition in your list of materials reviewed?
6      A.   I don't think I got that until just
7 recently.
8      Q.   I thought you just said you got it at
9 the beginning of your case review; is that --
10      MR. SWAMINATHAN:  I just have an objection to
11 foundation.
12           Go ahead.
13      THE WITNESS:  I'm sorry.  I got his report.
14 BY MS. GOLDEN:
15      Q.   Oh, okay.
16      A.   Not his deposition.
17      Q.   Okay.
18      A.   And I think his --
19      Q.   And --
20      A.   His report is listed.
21      Q.   Okay.  What is the difference between
22 the materials -- that's fine with the exhibit,
23 Rachel.  Thank you.
24           What is the difference between the

THOMAS TIDERINGTON, 10/05/2022                          Page 154..157

Page 154

1  materials that are listed on Attachment B as
2  references and standards and the materials that are
3  listed in Attachment E 5 and as the Bibliography of
4  Background Source Material?
5     A.   I'm sorry, what -- what page are you --
6     Q.   Do you have exhibit -- Attachment E?
7     A.   E.
8     Q.   To your report.
9     A.   Right.
10    Q.   Sorry.  I'll actually give you a minute
11 to get it.
12    A.   I -- essentially, I mean, there's --
13 there's a lot of similarities and essentially
14 they're -- it -- I think a lot of them are
15 mentioned in both exhibits.
16    Q.   Did you write --
17    A.   There's no -- there's no real
18 significance or difference between one or the
19 other.
20    Q.   Did you write the first two paragraphs
21 of this Attachment E?
22    A.   I did.
23    Q.   And did you consider and review all of
24 the materials on Attachment E?

Page 155

1     MR. SWAMINATHAN:  Asked and answered.
2  BY MS. GOLDEN:
3     Q.   Did you review all these -- all the
4  materials listed on Attachment E in connection with
5  your work in this case?
6     MR. SWAMINATHAN:  Objection, asked and
7  answered.
8        Go ahead.
9     THE WITNESS:  Not necessarily in conjunction
10 with the work on this case, but over 44 years this
11 is material that I have seen or have been exposed
12 to or have used in various assignments.
13 BY MS. GOLDEN:
14    Q.   Okay.  Have you -- I think you said
15 that you've had some conversations with plaintiff's
16 counsel, and we saw the one that's denoted in your
17 bill for an hour and a half and then you said you
18 had some other smaller or shorter in length ones
19 that you may have not billed for, right?
20    A.   Right.
21    Q.   Did you -- during any of those phone
22 conversations, were you given the facts of the case
23 upon which you relied in forming your opinions?
24    MR. SWAMINATHAN:  Objection to the extent it

Page 156

1  calls for information that's protected under
2  Rule 26.
3        You can answer -- with the
4  understanding that you're being asked whether you
5  were told to assume any facts by plaintiff's
6  counsel for purposes of your opinion, you can
7  answer that question.
8     THE WITNESS:  I'm sorry.  Can you ask the
9  question one more time just so I'm clear?
10    MS. GOLDEN:  Sure.
11 BY MS. GOLDEN:
12    Q.   Did you -- in forming the opinions in
13 this case, did you rely on any facts that were --
14 or assumptions that were provided to you by
15 plaintiff's counsel?
16    MR. SWAMINATHAN:  Same admonition.  You
17 shouldn't talk about our communications, only
18 except to the extent that you were given facts or
19 assumptions from counsel.
20    THE WITNESS:  And I was not.
21 BY MS. GOLDEN:
22    Q.   Okay.  We can mark -- use Exhibit 6,
23 which is your report, Mr. Tiderington okay.
24        And your report, I assume, to the

Page 157

1  best of your ability is accurate and complete with
2  respect to all the opinions that you have in this
3  case?
4     A.   That is correct.
5     Q.   Okay.  And your report is what we have
6  on the screen as Exhibit 6, correct?
7     A.   It is.
8     Q.   And does your report represent your
9  personal assessment of the materials you reviewed
10 in this case?
11    A.   It does.
12    MR. SWAMINATHAN:  Form.
13    THE WITNESS:  I'm sorry.  It does, yes.
14 BY MS. GOLDEN:
15    Q.   And did you are review it before you
16 signed it?
17    A.   I did.
18    Q.   You signed the last page of it?
19    A.   Yes, electronically.
20    Q.   And to the best of your ability, you
21 made efforts to ensure that the report was error
22 free?
23    A.   Right.
24    Q.   What did you do to ensure the accuracy

Page 158

1 of your report?

2    A.   I proofread it.

3    Q.   Anything else?

4    A.   Well, I took great care in preparing

5 it, but I --

6    Q.   Did you check your citations to the

7 record?

8    A.   I don't know if I checked -- I don't

9 know if I double checked them.  I certainly checked

10 them.

11   Q.   Okay.  On page 2 of your report, in the

12 third paragraph it says that you have worked

13 cooperatively with numerous state and local police

14 agencies, including the Chicago Police Department.

15   A.   That's correct.

16   Q.   Can you tell me what you've done to

17 work cooperatively with the Chicago Police

18 Department?

19   A.   My time as a detective, as an

20 undercover detective or narcotics detective, we had

21 one or two cases in Chicago that would worked

22 jointly with.  There was cases as -- when I was a

23 DEA supervisor that we worked with the Chicago DEA

24 that had Chicago police officers attached to -- to

Page 159

1 the DEA office is what I'm referring to there.

2    Q.   Okay.  On page 3 of your report on the

3 bottom paragraph, you state here that you conclude

4 to a reasonable degree of professional certainty

5 that the homicide investigation conducted in this

6 case grossly deviates from generally-accepted

7 police practices.  Do you see that?

8    A.   I do.

9    Q.   And what -- how do you define a gross

10 deviation?

11   A.   I believe a gross deviation is beyond

12 what you would typically find in the -- you know,

13 perhaps the majority of police departments on how

14 they would conduct this type of investigation.

15   Q.   And in this case, are all the

16 deviations that you've identified in your report

17 gross deviations?

18   A.   How do you define gross deviations?

19   Q.   The way that you do.

20   A.   Okay.  That's fair.

21   Q.   The way you just did.

22   A.   I don't think they're all gross

23 deviations.  I think they were all gross

24 deviations.  I think there were -- there was -- you

Page 160

1 know, there's situations that -- there's

2 administrative oversights; there's sloppiness;

3 there's shoddy work; and there also appears to be

4 actions that are far more questionable and perhaps

5 far more serious of police misconduct.

6    Q.   What were the gross deviations in this

7 particular case in your opinion?

8    A.   Well, there -- there's many.  I guess

9 we'd start from the beginning where I -- I believe

10 the initial investigative steps that were being

11 started with Reyes and Solache essentially being

12 arrested at the police station.  Before any

13 investigative work whatsoever was done, they

14 appeared to be essentially under arrest by the --

15 almost from the minute they walked into the police

16 station to surrender the Soto boy.

17   Q.   What else was a gross deviation?

18   A.   Well, if the allegations are true where

19 the witnesses claim that they were handcuffed to a

20 wall, they were kept in interrogation rooms for

21 long periods of time, there's evidence that it's

22 more likely than not that you Guevara beat some of

23 the witnesses, those would all be -- especially if

24 the jury concluded that that's what happened, these

Page 161

1 would all be gross it deviations from police --

2 acceptable police conduct.

3    Q.   Other than arresting Solache and Reyes

4 before any investigative work had been done and the

5 moment they walked in the police station and

6 handcuffing them to a wall, keeping them for a long

7 time and physical abuse, what else are the gross

8 deviations in this case?

9    A.   Well, there's many more.  I mean,

10 we'll -- I guess I - let me go through the report

11 paragraph by paragraph and explain it to you, or

12 how do you want to do that?

13   Q.   Well, as you're sitting here right now

14 without going through each page of your report,

15 which is quite voluminous, can you think of any

16 other gross deviations?

17   MR. SWAMINATHAN:  Objection to form and

18 foundation.

19   Go ahead.

20   THE WITNESS:  I -- I think the police reports

21 that were prepared were in many ways deficient.

22 There were other suspects that -- there's no

23 explanation on how other suspects were cleared.

24 There's witnesses that, again, claim that they were

THOMAS TIDERINGTON, 10/05/2022                              Page 162..165

Page 162

1 mistreated.  There were -- I believe there were
2 reports that were withheld.  There's statements
3 made by Mejia that don't comport with the physical
4 evidence that were found at the scene.
5          There's just many things in this
6 case that I believe any reasonable police
7 supervisor, law enforcement manager commander,
8 would seriously question what these officers did in
9 this particular case.
10     Q.   And all the things you just mentioned,
11 in your opinion, those are gross deviations as
12 opposed to something less culpable?
13     MR. SWAMINATHAN:  Objection to form.
14          Go ahead.
15     THE WITNESS:  Well, I guess I'm getting hung
16 up on the word gross deviations.  These were all,
17 again, beyond what a reasonable officer, I be- --
18 would have done faced with the same set of facts
19 and circumstances.  I don't know what --
20 BY MS. GOLDEN:
21     Q.   In your mind -- I'm sorry.  In your
22 mind is there a difference between a deviation and
23 a gross deviation?
24     A.   You know, I don't think so.  I think --

Page 163

1 I think some that are perhaps more serious than
2 others, you know, not -- not submitting their
3 report timely might be a deviation from policy
4 versus physically abusing a prisoner.  I think
5 there's a big different between those two issues.
6     Q.   Okay.  On page 5 of your report -- I
7 have a different - why do I have a different page
8 5?  That's what I have for page 5.
9     A.   That's what I have.
10     Q.   What's on the screen you have as
11 page 5?
12     A.   Yes, ma'am.
13     Q.   Okay, good.  Me too.  For some reason,
14 Rachel, that shows up as page 6.  I don't know why.
15     MR. SWAMINATHAN:  Page 6 of the PDF, so it
16 means the cover page --
17     MS. GOLDEN:  Well, the cover -- cover page
18 has a - -is page 1.
19     MR. SWAMINATHAN:  I guess I don't have the
20 answer to that.
21     MS. GOLDEN:  Anyway.  Okay.  We can survive
22 that.
23 BY MS. GOLDEN:
24     Q.   Okay.  On page 5, the second paragraph,

Page 164

1 the Summary of Facts Related to the Soto Homicide
2 Investigation, second paragraph where it says, I
3 the earlier morning hours of March 28, 1998; you
4 see that?
5     A.   Yes.
6     Q.   Okay.  And you say that at that time,
7 the victims were stabbed to death in their home in
8 the Bucktown neighborhood, right?
9     A.   That's correct.
10     Q.   Okay.  Did you see anything in the
11 record that could more specifically pinpoint when
12 the murders most likely occurred?
13     A.   I think there was a time period.  I --
14 I don't recall it as we sit here tonight -- or, I'm
15 sorry, sit here today, but yes, it was a more
16 specific time period.
17     Q.   And it was closer to 6:00 or 7:00
18 o'clock in the morning, correct?
19     MR. SWAMINATHAN:  Objection to form.
20          Go ahead.
21     THE WITNESS:  I believe it was early morning
22 hours, but yes, I would agree with you.
23     MS. GOLDEN:  Okay.  Let's take a quick look
24 at Exhibit 7, page 340.  Let's try 418.

Page 165

1     MR. SWAMINATHAN:  Can you just identify the
2 document for us, Carrie, what Exhibit 7 is?
3     MS. GOLDEN:  Sure.  I'm just going to get it
4 to the right spot first.  There you go.
5          Exhibit 7 is Bates stamped RFC 1
6 through 423, I believe.
7          Rachel, can you check the last page?
8 1 through -- 1 through 423, which is -- which was
9 produced with the investigative file and provided
10 to everybody as Exhibit 7 this morning.
11     MR. SWAMINATHAN:  Exhibit 7 is RFC
12 Solache-Reyes, 1 through 423.
13     MS. GOLDEN:  No.  It's just -- oh, yeah,
14 you're right.  I always forget the Solache/Reyes,
15 but ...
16     MR. SWAMINATHAN:  Okay.
17 BY MS. GOLDEN:
18     Q.   And I'm looking at -- specifically
19 within Exhibit 7, we're looking at 418.  And if you
20 can pop to the top of this particular page, Rachel.
21          You'll see, Mr. Tiderington, this is
22 the General Offense Case Report, right?
23     A.   It is.
24     Q.   And is this -- this is the work of

Urlaub Bowen & Associates, Inc.    312-781-9586

THOMAS TIDERINGTON, 10/05/2022                    Page 166..169

Page 166

1 those officers you referred to before who you said
2 did a pretty fine job, correct?
3      A.   I believe it is, yes.
4      Q.   Okay.  And can you see here at the
5 bottom -- I'm sorry, at the top it lists the -- can
6 you make -- make it a little bit bigger, Rachel --
7 it lists the -- the time of occurrence as March 28th,
8 7:00 o'clock in the morning, correct?
9      A.   That's what the time says, yes.
10      Q.   And then you recall the bodies were
11 discovered several days after the -- they had been
12 stabbed, correct?
13      A.   That's correct.
14      Q.   And Mr. Solache and Mr. Reyes and
15 Mr. Mejia and?
16      MR. SWAMINATHAN: . Mejia didn't -- were
17 unknown to the police at the time this report was
18 filled out, right.
19      A.   Apparently, yes.
20      Q.   Why do you say "apparently"?  Is there
21 some doubt in your mind?
22      A.   Well, I -- I don't -- when you say they
23 were "unknown to the police," how would I -- I
24 don't really have any way of knowing what was

Page 167

1 known to them or what wasn't known to them, but
2 apparently they did not know.
3      Q.   Do you have any reason to believe that
4 Mr. Solache and Mr. Reyes, Ms. Mejia and Mr. Mejia
5 were known to the police when they discovered the
6 bodies of the Sotos on April 1st, 1998?
7      A.   No.  I have not seen any evidence that
8 suggest they were.
9      Q.   Okay.  And then if you can go a little
10 bit down to the bottom, little bit more, Rachel,
11 you'll see in the narrative for -- narrative
12 section of the report here, it says in part, At
13 above location, Witness 1 --
14      MR. SWAMINATHAN: Carrie, can you pull it up
15 a little bit higher?
16      MS. GOLDEN: Sure.
17      MR. SWAMINATHAN: And then make it a little
18 bigger.
19      MS. GOLDEN: That's Rachel.
20      MR. SWAMINATHAN: Sorry.  I don't know who --
21 who's running it there.
22      MS. GOLDEN: Yeah.  You know, if you can't
23 see something, please let me know.  Okay?
24      MR. SWAMINATHAN: Can you make it one size

Page 168

1 bigger too?
2      MS. GOLDEN: Mr. Tiderington, do you hear?
3      THE WITNESS: I do.  Thank you.
4      MS. GOLDEN: Okay.
5      MR. SWAMINATHAN: Sorry.
6      MS. GOLDEN: Can you see --
7      MR. SWAMINATHAN: Can you see it fine?
8      THE WITNESS: Yeah.  So I just moved it over
9 so our pictures aren't covering it, so yeah.  I can
10 see it for the most part.
11      MS. GOLDEN: Okay.  Can you slide it a little
12 bit more to the right so I can read the narrative
13 section?
14 BY MS. GOLDEN:
15      Q.   Okay.  So you see here that the
16 officers who initially respond to the scene report
17 that Witness Number 1 -- I'm sorry, the witness --
18 I'm sorry, that -- then the second line of the
19 narrative that they talked to a neighbor who lives
20 in front of 2071 North Leavitt states on March 28th
21 at 7:00 o'clock in the morning, he heard a male who
22 stated, and not verbatim, "I will not hurt you," in
23 Spanish out loud, and then a crash on the floor,
24 then no noise at all.

Page 169

1           Do you see that?
2      A.   I do.  I do see that and I do recall
3 that, yes.
4      Q.   Okay.  And so that's a pretty good
5 indication it's not -- that the time of the murders
6 can be placed sometime on that day at around that
7 time?
8      A.   Well, that was the initial report
9 without any type of further investigation, but
10 certainly would lend credence to the idea that
11 that's the time that it occurred, yes.
12      Q.   Did you see any evidence in the record
13 to suggest that the Sotos were attacked at a time
14 and date other than that?
15      A.   No.
16      Q.   And this -- going back now to
17 Exhibit 6, in the second -- third paragraph there,
18 starts with Adriana Mejia.  Can you just read that
19 paragraph?
20      A.   You want me to read it?
21      Q.   You can read it.  I mean, I can read it
22 to you or you can just read it for yourself.
23      A.   I'm sorry.  I didn't know if you wanted
24 me to -- yeah.  I can read it.

THOMAS TIDERINGTON, 10/05/2022                    Page 170..173

Page 170

1    Q.   Just read it to yourself.  Let me know
2  when you're finished.
3    A.   Okay.
4    Q.   Did you see any dispute in the record
5  about any of the statements that you make there?
6    A.   No, not that I can recall.
7    Q.   And then read the next paragraph and
8  tell me if the same is true for that paragraph, any
9  dispute in the record about what's stated here in
10  the fourth paragraph of the summary of facts.
11    A.   I believe it's accurate.
12    Q.   Okay.  Did you see any dispute in the
13  record about what's stated in the next paragraph?
14    MR. SWAMINATHAN:  Carrie, can you point to --
15  tell me what paragraph you're pointing at?
16    MS. GOLDEN:  It start with, Days later.
17    MR. SWAMINATHAN:  Okay.  On April 1, 1998?
18    MS. GOLDEN:  Yep.
19    MR. SWAMINATHAN:  Okay.
20  BY MS. GOLDEN:
21    Q.   Did you see any dispute in the record
22  about what's contained in that paragraph?
23    A.   I don't believe so.
24    Q.   Okay.  And so -- and then there's three

Page 171

1  sentences in the -- in the paragraph that starts,
2  Rosauro came home, halfway through that paragraph
3  there is a statement:  There is conflicting
4  testimony about whether the person who first
5  proposed taking the child to the police station was
6  DeLeon-Reyes, Solache, or Rosauro, but ultimately
7  it was the three of them who voluntarily took the
8  boy to the police station.
9        Do you see that?
10    A.   I do.
11    Q.   And do you remember what Mr. Reyes says
12  about that?
13    A.   In his deposition, in his -- in what
14  format or what context?
15    Q.   All right.  At any time, what -- what
16  does he say about whose idea it was to take the
17  child, the boy, to the police station?
18    MR. SWAMINATHAN:  Objection to form.
19        Go ahead.
20    THE WITNESS:  You know, I don't recall.  I
21  know there was some discussion in -- in deposition
22  testimony and -- and testimony about whose idea it
23  was.  I don't -- as I sit here today, I don't --
24  and I didn't footnote, I didn't reference it, but I

Page 172

1  know there was some discussion about whose idea it
2  was.
3  BY MS. GOLDEN:
4    Q.   Do you recall what Mr. Solache said on
5  the topic?
6    A.   I don't.
7    Q.   Okay.  In the last -- in the next
8  paragraph in the last -- in the paragraph that --
9  the last paragraph of this page on page 5 of the
10  report that starts, At 8th district police station,
11  in the -- the last paragraph on this page says,
12  Police brought a member of the Soto family who had
13  been in custody at CPD's Area 5 Police District to
14  the 8th District, and then that goes on to the next
15  page.
16    A.   Yes.
17    Q.   What is the basis for your statement
18  that the member of the Soto family had been in
19  custody at Area 5?
20    A.   If I remember correctly, I think there
21  was a couple areas.  I -- I think there was some
22  Polaroid pictures taken of the Soto family that
23  were consistent with photographs taken of Reyes and
24  Solache, which I guess would indicate to me that

Page 173

1  they were possible suspects.  And I believe there
2  was deposition testimony from members the Soto
3  family that they were -- they were being held and
4  actually were mistreated by the officers,
5  if -- if my recollection is correct.
6    Q.   Other than the -- you do think it's
7  natural, right, for the officers to want to speak
8  to the Soto family members in connection with
9  locating the missing children?
10    A.   Absolutely.
11    Q.   Okay.
12    A.   But -- but it wouldn't be all right if
13  they mistreated them.
14    Q.   I'm not suggesting --
15    A.   Okay.
16    Q.   -- that was --
17    A.   Sorry.
18    Q.   Do you also -- do you ever have -- have
19  you ever interviewed family members in connection
20  with suspected kidnapping?
21    A.   Yes.
22    Q.   And have you any of those family
23  members ever felt personally attacked?
24    A.   Personally attacked by the police?

THOMAS TIDERINGTON, 10/05/2022                                     Page 174..177

Page 174

1    **Q.   Right.**
2    A.   Not that I can recall, not the cases I
3    worked anyways.
4    **Q.   Okay.  Was there suspicion at the time**
5    **that family members could have taken the -- the**
6    **kidnapped victims in the cases -- the other cases**
7    **you're referring to?**
8    A.   No.
9    **Q.   Okay.  So in this particular case, one**
10   **of the things the police were looking at at the**
11   **time was whether or not anyone in the Soto family**
12   **had taken the children, correct?**
13   A.   Well, that's -- you've identified part
14   of the problem with this case.  I would -- if that
15   was -- if that was their intent, I would have
16   expected to see that documented in a police report
17   someplace that -- that these individuals were
18   eliminated as suspects, that they were
19   photographed, they were questioned, there would
20   have been perhaps notes of the interviews.  I
21   didn't see any of that and that's --
22   **Q.   Is it your --**
23   A.   That's --
24   MR. SWAMINATHAN:  Hold on one second.  Let

Page 175

1    him finish, please.
2    THE WITNESS:  Right.  And that's perhaps one
3    of my key points in -- in terms of the deficiency
4    in the investigation.
5    BY MS. GOLDEN:
6    **Q.   Do you remember the name of the Soto**
7    **family member who came that you're referring to**
8    **here in this last paragraph on page 5?**
9    A.   You know, I don't.  I -- I don't recall
10   the name as we sit here.
11   **Q.   Is it your understanding that there are**
12   **no notes of any interview with that person in the**
13   **record?**
14   A.   I don't recall --
15   MR. SWAMINATHAN:  Objection, form and
16   foundation.
17   Go ahead.
18   THE WITNESS:  I don't recall seeing any.
19   Certainly if -- if you could provide those to me,
20   it would maybe jar my memory and cause me to
21   remember it.  But I don't have any recollection
22   of -- of anything of substance about interviews
23   with the Soto family.
24

Page 176

1    BY MS. GOLDEN:
2    **Q.   And when you say "Soto family," who are**
3    **you referring to?**
4    A.   Well, any of the family members.  I
5    think there was a brother and a sister.
6    **Q.   Okay.  And it's your note -- it's your**
7    **understanding that there's no notes of any**
8    **interviews of them in the record as well; is that**
9    **what you're saying?**
10   MR. SWAMINATHAN:  Objection to form and
11   foundation.
12   Go ahead.
13   THE WITNESS:  I would have to look further.
14   I -- as we sit here, I don't recall.  And again, if
15   you could -- if there are notes that you could
16   provide me with, it would certainly refresh my
17   memory and make it easier to answer the question.
18   BY MS. GOLDEN:
19   **Q.   Okay.  And is there any other basis to**
20   **your opinion that the member of the Soto family who**
21   **came to the 8th District to identify the boy had**
22   **been in custody other than the fact that, as you**
23   **say, his picture had been taken and his deposition**
24   **testimony that he was not free to leave and was**

Page 177

1    **treated unfairly?**
2    A.   I think -- and again, I'll have to
3    research the police reports, but I think it was
4    noted in one of the reports that -- that he was
5    being held and was he brought to the station for
6    identification.  I think that was included in a
7    police report.
8    **Q.   That the person who identified --**
9    A.   The family --
10   **Q.   -- the boy --**
11   A.   -- that --
12   **Q.   -- was in custody?**
13   A.   I believe so.  I could be wrong on
14   that, though.
15   **Q.   Okay.  Is it your understanding that**
16   **Mr. Solache and -- that Mr. Solache was handcuffed**
17   **the entire time he was -- from the time he was**
18   **brought to Area 5 until the time he ultimately**
19   **signed the written confession?**
20   A.   No, I don't believe he was handcuffed
21   the entire time.
22   **Q.   Okay.  What's your understanding of**
23   **when he was handcuffed?**
24   A.   I don't know if there was any clear

Page 178

1  record of that other than what Solache claims.
2  it -- it's clear that -- or at least in my mind
3  it -- it appears that he was not handcuffed until
4  after the Spanish-speaking officer came to the
5  police station.  That was some two hours after they
6  first arrived there.  I think it was around 10:30
7  or 11:00 o'clock.
8         But it's also -- I think the
9  evidence is clear that they -- they certainly --
10 none of them were free to leave at that point.
11 Whether they were handcuffed or not, I -- I can't
12 really -- I don't really recall at this point.
13    Q.   All right.  What is your understanding
14 of when handcuffs were first put on Mr. Solache?
15    A.   I would have to again go back to the
16 police station report.  I -- and I don't know if
17 it's -- if it's documented, but I know there's some
18 testimony that he was handcuffed to the wall.  And
19 there's also some testimony about the duration of
20 time that he was in the interrogation room.  I -- I
21 think I remember the number to be somewhere around
22 40 hours.
23    Q.   Is it your understanding that he was
24 handcuffed at any point in time while he was at the

Page 179

1  8th District?
2     A.   I don't believe so.
3     Q.   But he --
4     A.   But I don't -- but I don't know.  I --
5  I don't have any -- I have no way of knowing that.
6     Q.   And there's conflict in the record, is
7  there not, about when or how long Mr. Solache was
8  handcuffed, correct?
9     A.   Which part of the record are you
10 referring to?
11    Q.   Just the record in general.  I mean,
12 there is -- there's -- Mr. Solache and -- I'll just
13 put it this way:  Did you appreciate any conflict
14 in the testimony about when, where, and for how
15 long Mr. Solache was handcuffed while he was in
16 custody?
17    A.   I don't recall any conflict in the
18 record on that.  There may have been, but I don't
19 recall it as we sit here today.
20    Q.   Do you recall any conflict in the
21 testimony about when, where, and for how long
22 Mr. Reyes was handcuffed while he was in police
23 custody?
24    A.   Same answer.  I do recall that they

Page 180

1  both claim that they were handcuffed for a long
2  period of time and that they -- they were
3  handcuffed to the wall in one of the interrogation
4  rooms.
5     Q.   And is it your understanding that the
6  interrogation rooms have rings on the walls for
7  people to be handcuffed to?
8     A.   That's my understanding.
9         MR. SWAMINATHAN:  Carrie, before you ask your
10 next question, just whenever you're at a good
11 stopping point.  I think we're about an hour and
12 half, so just whenever you're at a spot.
13        MS. GOLDEN:  Okay.  One more thing.
14 BY MS. GOLDEN:
15    Q.   It's common when there's multiple --
16 when you have multiple arrestees, it's common
17 practice to separate them, is it not?
18    A.   Yes.
19    Q.   If you're going to interview -- if
20 you're detaining people for questioning, you're not
21 going to put them all in the same room and let them
22 stay there until they're questioned, right?  You're
23 going to separate them in different rooms?
24    A.   That's correct.

Page 181

1     Q.   And there's a couple reasons for that,
2  right?
3     A.   There's reasons why you'd want to
4  separate witnesses, yes.
5     Q.   Tell us what -- what are those reasons?
6     A.   Well, you know, certainly you don't
7  want them to talk amongst themselves and come up
8  with a -- with a story about what to tell law
9  enforcement.  You want to make sure that you're
10 able to interview each witness or suspect
11 independently and see what that person tells you
12 versus what the other person may tell you, and to
13 see if there's any common -- any discrepancies or
14 any -- anything that's consistent with their
15 testimony -- I'm sorry, not their testimony, but
16 their statement, I should say.
17        MS. GOLDEN:  Sure.
18        Okay.  How about a break?
19        MR. SWAMINATHAN:  All right.
20        MS. GOLDEN:  Ten minutes?
21        MR. SWAMINATHAN:  Yeah.
22        THE WITNESS:  Great.
23        THE VIDEO TECHNICIAN:  We're off the video
24 record at 2:55 p.m.

THOMAS TIDERINGTON, 10/05/2022                    Page 182..185

Page 182

1        (Recess taken.)
2    THE VIDEO TECHNICIAN:  We are back on the
3 record at 3:07 p.m.
4    MS. GOLDEN:  Okay.  If you could, Robyn not
5 Rachel, put up Exhibit 6 again and page 6 of it
6 which starts with "the boy."  Thank you.
7 BY MS. GOLDEN:
8    Q.   So, Mr. Tiderington, page 6
9 of Exhibit 1 [sic], the second -- the first
10 full paragraph which starts, Police went to
11 Rosauro's home.
12    A.   Yes.
13    Q.   All right.  Do you know which officers
14 went to the home?
15    A.   I don't know as we sit here today.
16 It's -- I believe it's well documented, but I -- I
17 don't recall.
18    Q.   Okay.  And do you have an understanding
19 of whether or not they were able to interview
20 Adriana at the time?
21    A.   She was taken to the station.  I
22 don't -- I believe they spoke with her at the home
23 and then they ended up obviously taken taking her
24 to the police station.

Page 183

1    Q.   Do you know whether or not they relayed
2 the information that they obtained at the Mejia
3 home to the officers back in Area 5 before
4 Mr. Solache and Mr. Reyes were arrested?
5    A.   What -- what information?
6    Q.   The information, whatever it was, that
7 they learned then.
8    A.   I don't -- I don't know that.
9    Q.   Did you see any evidence of any
10 communication between the officers that interviewed
11 Adriana at her home and their back at Area 5
12 where Mr. Solache and Mr. Reyes were prior to
13 Mr. Solache and Mr. Reyes's arrest?
14    A.   Well, prior to the arrest, no.  It's my
15 understanding that they were essentially arrested
16 around 10:30 a.m.  That would have been before they
17 went to the Mejia residence.
18    Q.   And is that -- what's the significance
19 of that?
20    A.   Well, then they would have been
21 arrested even before there was any investigation,
22 which is, again, in my view, pretty significant.
23    Q.   Okay.
24    A.   So it would have been -- and again, I

Page 184

1 don't recall if there was any communication from
2 the Mejia residence to the detectives, but
3 essentially it's my understanding they were
4 arrested prior to any of that happening.
5    Q.   Okay.  In the third full paragraph of
6 your report -- I'm sorry, in the second and third
7 paragraphs on page 6, which start "two days later"
8 and then "police said."
9    A.   Yes.
10    Q.   It seems to me here that you're
11 recounting -- you know, you just -- it keeps saying
12 police said, police said, police said.
13        What is the source of the
14 information that you have written here?
15    A.   I'm sorry.  In -- what -- specifically
16 which paragraph?
17    Q.   So it says two days later -- the
18 paragraph that says two days later following
19 interrogations, police announced that Adriana,
20 Solache, and Reyes had each confessed to the
21 murders; police announced that Adriana had wanted a
22 child so badly she was willing to kill to get one.
23 And then after Adriana paid DeLeon-Reyes $600,
24 police said the three of them murdered Mariano and

Page 185

1 Jacinta Soto then abducted their two children.
2        And then the next -- the next
3 paragraph is more, you know, police said, police
4 said, police said.
5        What is the source of the
6 information that you are relating here?
7    A.   The police reports.
8    Q.   Okay.  This -- all this information
9 comes from the police reports?
10    A.   For the most part, yes.
11    Q.   Does it come from anything other than
12 police reports?
13    A.   It may have, but for -- I -- I believe
14 the majority is from the police reports themselves.
15    Q.   What else could it come from?
16    MR. SWAMINATHAN:  Objection to form and
17 foundation.
18    THE WITNESS:  I -- again, that's why I said I
19 think it came from the police reports.
20 BY MS. GOLDEN:
21    Q.   Can you think of any other source of
22 this information?
23    A.   I think there was a press release or --
24    Q.   Okay.

THOMAS TIDERINGTON, 10/05/2022                    Page 186..189

Page 186

1    A.   But I don't know if that played into
2 these two paragraphs or not.
3    Q.   So when you say "police said," "police
4 said," can you attribute any of these particular
5 statements to any particular police officer?
6    MR. SWAMINATHAN:  Objection to form.
7         Carrie, can you just point for the
8 record where -- which sentences are you referring
9 to?
10    MS. GOLDEN:  The -- those two paragraphs that
11 "start two days" later and "police said."
12    MR. SWAMINATHAN:  And are you asking about
13 both paragraphs or just the second paragraph that
14 has the "police said" in it?
15    MS. GOLDEN:  They all have "police said."
16    MR. SWAMINATHAN:  Where does it say "police
17 said" in the that first paragraph?
18    MS. GOLDEN:  Second line from the bottom.  It
19 says "police announced," "police announced,"
20 "police said."
21    MR. SWAMINATHAN:  "Police announced."  Okay.
22 I just -- that's why I'm asking for clarification.
23 I'm not sure how literal you're being.
24

Page 187

1 BY MS. GOLDEN:
2    Q.   I mean, I'm just in general trying to
3 find out who said these things.  If they're in a
4 police report, fine.  If they're not in a police
5 report, they're in a press release.
6         Do you remember who -- who issued
7 the press release or who made the press statement?
8    A.   I think -- and again, I don't recall
9 specifically.  It was a combination.  I -- I
10 believe the majority of these comments where I -- I
11 took from the police report.  But I do recall that
12 there was some kind of a press release, but I don't
13 remember the substance of it and -- and what
14 details.  So I feel confident saying the majority
15 of this came from the actual police reports.
16    Q.   Okay.  In the -- in the paragraph that
17 starts, Two days later, following interrogations
18 that lasted more than 40 hours, that part,
19 "interrogations that lasted more than 40 hours,"
20 did that come from a police report?
21    A.   Well, I think that were statements from
22 Reyes and Solache about that, but I think it was
23 confirmed in the police reports, or at least in --
24 yeah.  I think it was police reports.

Page 188

1 Because I do recall them --
2 something to the affect that, you know, it was late
3 and they were sleeping in the chairs, so we allowed
4 them to sleep and continue the interrogations the
5 following day.  So whether they said 40 hours or
6 not, it certainly was supported in the police --
7 police reports that I read.
8    Q.   And you don't mean 40 hours of
9 continuous interrogation do you?
10    A.   No.  I think the -- 40 hours of, you
11 know, being confined in the interrogation room, is
12 what I meant.
13    Q.   Okay.  And is that the 40 hours spent
14 in just one room?
15    A.   I -- I don't know.  I don't know.  I
16 know they in -- each were in different
17 interrogation rooms, but I -- I don't recall any
18 evidence that suggest that they were moved from one
19 or another or -- I don't know that.
20    Q.   Okay.  So do you have any idea how much
21 questioning time Mr. Reyes experienced in -- of the
22 40 hours?
23    A.   Well, no.  And that's -- again, part of
24 the problem with the deficiencies in the police

Page 189

1 report is there's no notes.  There were several --
2 apparently several different interviews conducted
3 of Reyes and Solache, but there were, I don't
4 believe, any notes concerning the time period in
5 which they were interviewed or -- maybe the time
6 period in which they were interviewed in the police
7 report, but no notes -- substantive notes about
8 what they said during these interviews.  So it's
9 hard to figure out how long they were in there, how
10 long the questioning last, because I would have
11 expected to see a more detailed document in the
12 police reports indicating that.
13    Q.   Is it your understanding that there are
14 no notes or reports of the times that Mr. Reyes was
15 questioned?
16    A.   Well, those -- I think those are two
17 questions -- two different questions.  I think
18 there's an indication in the police report of the
19 times that Reyes was interviewed, but there's no
20 corresponding notes to say what was asked, what he
21 said, none of that.
22    Q.   So are you -- do you rely on the fact
23 that Mr. -- that there are no notes of Mr. Reyes's
24 interview in forming your opinion?

THOMAS TIDERINGTON, 10/05/2022                          Page 190..193

Page 190

1    MR. SWAMINATHAN: Objection to form and
2  foundation.
3    THE WITNESS: Well, there's a handwritten
4  statement. I don't believe there's any notes.
5  and -- and again, there's a lot of material. If
6  you could -- if you have notes that you could use
7  to refresh my memory, you know, I -- I'm certain
8  you're not trying to trick me, so if you have
9  documents, it would be helpful for me to review,
10  but ...
11    Q. So, okay. Yeah, no. Well, I'm asking
12  what you remember. And I -- I heard you just say
13  that because there were no notes -- I asked you
14  about notes and reports. And then you said there's
15  a report but the problem is there's no notes of the
16  questioning of him. And so I was asking you if
17  that was significant to you that there was no notes
18  of questioning. I mean, if I got it wrong, let me
19  know.
20    MR. SWAMINATHAN: Objection --
21    THE WITNESS: Yeah.
22    MR. SWAMINATHAN: Objection, mischaracterizes
23  testimony and objection to form.
24    Go ahead.

Page 191

1    MS. GOLDEN: Well, let me ask you -- I can
2  ask it differently then.
3  BY MS. GOLDEN:
4    Q. Is it your understanding that there are
5  notes of interviews with Mr. Reyes?
6    A. Well, can we clarify it by allowing me
7  to look at the case file and I can definitively
8  tell you what I relied upon and we can figure out
9  exactly what notes there are and what they're not?
10    Q. I just can't because it takes up too
11  much time. I'm sorry.
12    A. Well, it's an important -- it's an
13  important matter and I think it's an important
14  question. I -- I don't really think --
15    Q. Well, if it's important --
16    A. I'm --
17    Q. Is it important --
18    A. I'm sorry. Go ahead.
19    Q. No, you go.
20    A. No. It's your deposition and you --
21  it's your decision on what's important. And if you
22  want the most accurate answer from me, it would be
23  helpful to allow me to look at the -- rather than
24  having this memory test of was there one or two or

Page 192

1  three, we can definitely determine that easily by
2  allowing me to -- to look at the case file. And
3  again, if you don't think it's that important,
4  that's fine. We can move on as well.
5    Q. Yeah, no. I don't want to know move
6  on. I want to ask you if there are notes, what are
7  the significance of the notes?
8    MR. SWAMINATHAN: Objection to form.
9    Go ahead.
10    THE WITNESS: If there are notes, what are --
11  first of all, we've got to determine if there are
12  notes.
13    MS. GOLDEN: You're right. Terrible
14  question.
15    THE WITNESS: Right. Not right that it's
16  terrible, but right that --
17    MS. GOLDEN: Yes. I agree with you.
18  BY MS. GOLDEN:
19    Q. So do you have understanding, without
20  looking at the documents or reviewing your report
21  in detail, whether or not there are notes of
22  interviews with Mr. Reyes?
23    A. My understanding is there were multiple
24  interviews with Mr. Reyes and that the report is

Page 193

1  absent of -- of notes for each of those interviews.
2  I don't know if there were four or five interviews
3  as we sit here or if there was one or -- I know
4  there were multiple interviews and there may or
5  may not have been notes.
6        Certainly there was a handwritten
7  statement that was prepared for Mr. Reyes during
8  one of those interviews, but I'm unclear as to
9  exactly what other notes may have been taken in the
10  interviews leading up to the handwritten statement,
11  if -- if that makes sense.
12    Q. And you agree with me that the
13  handwritten statement is different than notes from
14  an interview, right?
15    A. Sure, it's different. Yes.
16    Q. Okay. So when you say here that the
17  interrogations lasted more than 40 hours, you
18  certainly have had the ability to review
19  Mr. Reyes's testimony, correct?
20    A. I have, yes.
21    Q. So regardless of whether or not there
22  are police notes available to you to determine how
23  long he was questioned, over what period of time,
24  you certainly have Mr. Reyes's testimony, correct?

Page 194

1    A.   Correct.

2    Q.   And based on your review of Mr. Reyes's

3  testimony, how long -- or how much time of those

4  40 hours was he spent being questioned?

5    A.   Again, I -- I don't know the answer to

6  that question.

7    Q.   Can you describe it in any way, short

8  amount, most of the --

9    A.   Well --

10   Q.   -- time, half the time?

11   A.   I don't know what short amount means

12  and -- and I don't know if there was any -- I don't

13  see any evidence that there was a definitive answer

14  about how -- how long the interviews lasted while

15  he was in the interrogation rooms.

16   Q.   Is there any significance to you of the

17  amount of time of those 40 hours that he actually

18  spent being questioned?

19       MR. SWAMINATHAN:  Objection to form.

20         Go ahead.

21       THE WITNESS:  Well, I guess it's two

22  questions.  The -- spending 40 hours in an

23  interrogation room is highly unusual and

24  inconsistent with my understanding of acceptable

Page 195

1  police practices.  So I think that would be the

2  answer to the overall question.

3       Was it unreasonable for him to be

4  if, in fact, he was in an interrogation room for

5  40 hours?  Yes, it's -- it's highly unusual.

6       Of the time that he spent in that --

7  of those 40 hours, was there time that he spent asleep

8  in a chair?  I believe he was.  I don't know.  I

9  think some of the interviews stopped at 12:00,

10  1:00 o'clock in the morning, and then the dayshift

11  detectives were instructed to follow-up with the

12  interrogation when they got in at 7:00.

13       So it -- it's hard for me to

14  determine exactly how many -- or how many hours or

15  how long of a time was spent actually conducting

16  these interviews.

17  BY MS. GOLDEN:

18   Q.   Do you have any estimate as to the

19  amount of time that Mr. Solache was being

20  interviewed over the course of those 40 hours?

21   A.   I would have to answer the same for him.

22   Q.   Okay.

23   A.   As it applies to Mr. Solache, I should

24  say.

Page 196

1    Q.   Okay.  Page 6 towards the bottom, the

2  paragraph that starts, Adriana's husband, Rosauro.

3    A.   Yes.

4    Q.   And it says, Adriana's husband,

5  Rosauro, was released without being charged after

6  police investigators concluded he knew nothing

7  about the murders.

8    A.   That's my --

9    Q.   I'm sorry?

10   A.   That's my understanding, yes.

11   Q.   What, if anything, are you aware of

12  that the police did with respect to investigating

13  Rosauro?

14   A.   Again, you've identified another one

15  of the problems that -- that I've identified, is

16  there -- there's nothing in the record or no

17  evidence that suggests that they did anything to

18  check his alibi, determine his whereabouts.  I

19  don't know how they -- as we sit here today, I

20  don't know how they cleared -- cleared him at all.

21       I know one detective, and I don't

22  know who said this, but he said he appeared to be

23  very mild mannered and not capable of doing this,

24  but there was no significant evidence that suggests

Page 197

1  that he was cleared in any reasonable way.  I don't

2  think they took any blood evidence from him.  I

3  don't believe they took any of his clothing.  I

4  don't believe they did anything.

5       So it's --

6    Q.   Well, they -- well, they did interview

7  him, right?

8    A.   They did.

9    Q.   Yeah.  And he gave a statement, right?

10   A.   Apparently he did, yes.

11   Q.   And Adriana didn't say he was involved,

12  right?

13   A.   Well, wait a minute.  You said he gave

14  a statement.  I -- I'd have to look at the file

15  once again to see if there was notes of that

16  statement.  I -- I don't recall if there was or

17  not, but it -- it -- my recollection, according to

18  the police report, is that he was interviewed and

19  the detectives concluded that he was not involved.

20   Q.   Okay.  And if he gave a statement, that

21  would at least be something, right, that they had

22  done to investigate him, correct?

23   A.   Well, it would be an initial step in --

24  in what should have been a far more comprehensive

THOMAS TIDERINGTON, 10/05/2022                    Page 198..201

Page 198

1 investigation of him. Let's -- let's face it, he
2 was the husband of the wife that murdered two
3 people and stole their children and then brought
4 them to this guy's house and even -- I believe the
5 story as it is now, I mean, as far as faking the
6 pregnancy and so on, but she showed up with a --
7 with a baby and she -- he's asking the police to
8 believe that he didn't know his wife was pregnant
9 and it's a -- it's a story that had to be verified,
10 in my view.
11      **Q.  And neither Solache -- Solache signed a**
12 **statement that -- I'm sorry.**
13          **Once Reyes was presented with**
14 **evidence that Adriana was implicating him in the**
15 **crime, he confessed, right?**
16      MR. SWAMINATHAN: Objection to form and
17 foundation.
18          Go ahead.
19 BY MS. GOLDEN:
20      **Q.  But he admitted to Detective Guevara**
21 **that, yes, he had been involved, right.**
22      MR. SWAMINATHAN: Same objection, form and
23 foundation.
24

Page 199

1 BY MS. GOLDEN:
2      **Q.  Because --**
3      A.  Go ahead.
4      **Q.  Remember, I mean, initially when**
5 **Adriana admits to being involved, she doesn't say**
6 **Solache's involved, right?  She says Reyes was the**
7 **one who did it with her.**
8      MR. SWAMINATHAN: Objection to form and
9 foundation. Are you asking him what he thinks or
10 what the police records state? What are you asking
11 him?
12      MS. GOLDEN: I'm asking --
13      MS. ROSEN: No speaking objections, Anand.
14 The only objection is form. No speaking
15 objections.
16      MR. SWAMINATHAN: The question is so utterly
17 impossible, a million different interpretations. I
18 need to make sure we're clear on what's being asked
19 of the witness.
20      MS. ROSEN: That's -- no. There's no
21 speaking objections. Make your form objection.
22      MR. SWAMINATHAN: Well, no. I make my
23 objection if the question is -- is going to be a
24 problem in terms of how it can be interpreted, I'm

Page 200

1 going to make that objection.
2          You can reask the question if you
3 want or have him still answer the question, but I'm
4 not going to allow a question that's subject to ten
5 different interpretations.
6          So I -- I've been making non-
7 speaking objections throughout this deposition,
8 unlike Carrie did in the depositions with
9 Mr. Dickinson and Mr. Rutherford. However, on
10 occasion, I'm going to make an objection to address
11 a problem with a question.
12          Go ahead, Carrie.
13      MS. GOLDEN: Anand, thank you for that. And
14 I'm just going to point out that it's not for you
15 to allow or disallow my questions. You're
16 certainly entitled to make whatever objection you
17 see fit.
18 BY MS. GOLDEN:
19      **Q.  Anyway, do you remember the question,**
20 **Mr. Tiderington?**
21      A.  I have no idea the question at this
22 point.
23      **Q.  Okay.  Because it probably wasn't**
24 **clear, I'll just ask it a different ray.**

Page 201

1      A.  Thank you.
2      **Q.  When Adriana initially admitted to**
3 **Detective Guevara that she was involved personally**
4 **in the homicides and kidnappings and implicated**
5 **Arturo Reyes, she did not implicate Mr. Solache,**
6 **correct?**
7      MR. SWAMINATHAN: Objection to form and
8 foundation. Same objections.
9          Go ahead.
10      THE WITNESS: Well, it's a little unclear.
11 When -- when she was first interviewed, she denied
12 any involvement whatsoever. All right? So that
13 was perhaps the first time she was being untruthful
14 and lied to the detectives.
15          Any reasonable, experienced, trained
16 detective would understand if somebody's lying to
17 them in one instance, it doesn't necessarily mean
18 they're going to be absolutely truthful in the next
19 question or in the next interview.
20          So there were many different stories
21 that she told and many changing stories that she
22 told, so I don't think any reasonable detective
23 would have relied upon her statement as to who was
24 involved or who wasn't without independently

Page 202

1 corroborating the information that she provided to
2 them.
3 BY MS. GOLDEN:
4    Q.   Well, she's a demonstrable liar, right?
5    A.   Demonstrable liar, I'm not sure --
6    Q.   She lied to the police at least in some
7 respect?
8    A.   Absolutely.
9    Q.   Told so many stories they can't all be
10 true, right?
11   A.   I think that's a fair characterization,
12 yes.
13   Q.   And when she initially -- the first
14 person -- actually the first person she implicated
15 was Norma Salazar, right?
16   A.   That's correct.
17   Q.   And then the second person she -- the
18 second person she implicated was Mr. Reyes, right?
19       MR. SWAMINATHAN:  Objection to the form and
20 foundation.
21       Go ahead.
22       THE WITNESS:  I -- again, I'm trying to work
23 in order and I -- again, I'm not trying to be
24 difficult.  I'm just trying to remember back.

Page 203

1 Because there were so many stories, I'm trying to
2 think sequentially what her lies were, but yes, I
3 think that's a fair statement, that Reyes --
4 BY MS. GOLDEN:
5    Q.   And when she --
6    A.   -- was --
7    Q.   I'm sorry.
8    A.   That's -- that Reyes was involved but
9 Solache was not.
10   Q.   Right.
11       So when she first implicated
12 Mr. Reyes, she did not implicate Mr. Solache,
13 correct?
14   A.   That's correct.
15   Q.   And then Detective -- Detective Guevara
16 went to Mr. Reyes and said, Adriana has implicated
17 you.  And then only after he was presented with
18 that information did he say, Look, I'll tell you
19 what happened, and it wasn't just her and I, it was
20 Solache as well?
21       MR. SWAMINATHAN:  Objection to form and
22 foundation.
23       THE WITNESS:  Well, it's -- it's difficult to
24 understand what Guevara asked or what she told him.

Page 204

1 It's -- I don't recall seeing notes from that
2 specific interview.
3       There's certainly -- I guess there's
4 a discrepancy between what Reyes and Solache are
5 saying and what Guevara has once said.  Obviously
6 he refuses to answer any questions about this at
7 this point.
8       But you can't really answer that
9 question unless you address whether or not these
10 individuals were being beaten and whether Mejia was
11 being mistreated.  All of those have to be taken
12 into consideration before you can address that
13 question.  And --
14 BY MS. GOLDEN:
15   Q.   Well -- sorry.  At least according to
16 the police reports, that's how it happened, right?
17   A.   According --
18       MR. SWAMINATHAN:  Objection.
19       THE WITNESS:  According to the police
20 reports, yes, ma'am.
21 BY MS. GOLDEN:
22   Q.   Okay.  And so, you know, nobody there
23 is saying that Mr. -- that Rosauro Mejia was
24 involved in the crime, right?

Page 205

1       MR. SWAMINATHAN:  Objection to form.
2 BY MS. GOLDEN:
3    Q.   Have you seen anything in the record to
4 suggest that anyone in the Soto family, in the
5 Mejia family, Solache or Reyes or anyone at all at
6 any time while they were at that police station
7 suggested that Rosauro Mejia was involved in the
8 Soto murder and kidnapping?
9    A.   Well, of course, the Soto family never
10 had any knowledge about Reyes, Solache, or Mejia,
11 so obviously there -- there was never any testimony
12 from the Soto family.
13       As far as -- there was never -- and
14 I'm just thinking back to the record.  But there --
15 there's no evidence that there was any independent
16 investigation to clear Rosauro, because he clearly
17 had to be a suspect in this case.  Was he a suspect
18 at 10:30?  That -- there's a lot of questions
19 because the police report is incomplete and -- and
20 deficient in many ways.  Why was it -- you know,
21 was he arrested at the same time as Reyes and
22 Solache and then they cleared him or was he never
23 arrested?  He was in an interrogation room just
24 like the other ones as well.

THOMAS TIDERINGTON, 10/05/2022                    Page 206..209

Page 206

1    So I guess my point is when did they
2 clear him and what was the evidence -- what was the
3 evidence based on that they -- they cleared him and
4 allowed him to leave? And I think what you're
5 suggesting or asking me, it was based on the
6 statement from his wife.
7    **Q.   No.  My question is different.**
8        **My question is:  Did you see any**
9 **evidence in the record that any one person at any**
10 **time in the course of this investigation suggested**
11 **that Rosauro Mejia was involved in the kidnapping**
12 **of the Soto children and the murder of their**
13 **parents?**
14    A.   The specific answer to your question is
15 no, but I'd like to explain my answer.
16        Nobody said it specifically, but any
17 reasonable detective would have conducted a further
18 investigation to either further prove that Rosauro
19 was not involved or to perhaps -- you know,
20 understanding that confessions and --- you know,
21 are not always as they appear and there's always --
22 you know, there's certainly -- in my mind as a
23 detective, there would have been a reason for her
24 to lie and tell the investigators that her husband

Page 207

1 was not involved and to blame it on Solache and
2 Reyes.  So that would have certainly caused me to
3 be very suspicious and to conduct a further
4 investigation into the husband.
5        I guess you could not have expected
6 that the wife was -- was going to implicate her
7 husband and perhaps she was shifting the blame on
8 two innocent individuals that had nothing to do
9 with it so her husband would not get arrested, is
10 what I would be looking at as a -- from a
11 detective's perspective.
12    **Q.   And what's your basis for believing**
13 **that that -- that nobody did that, that nobody**
14 **conducted a further investigation or nobody, you**
15 **know, interviewed Rosauro or checked out his alibi**
16 **or any of those things?**
17    A.   Well, and that --
18    MR. SWAMINATHAN:  Objection to form.
19        Go ahead.
20    THE WITNESS:  I -- I'm sorry.  That again is
21 it another area that -- as you pointed out, is
22 deficient in the case file.  There is no evidence
23 that any -- anything was done to further eliminate
24 him or to corroborate his information.  I saw no

Page 208

1 evidence.
2        There's unexplained blood in this
3 case.  There's no evidence that they obtained blood
4 to compare his blood against the unknown blood
5 in -- in -- on the evidence that was found at the
6 Soto home.  There's no documentation that they
7 questioned him about his whereabouts on this night.
8 I don't think they questioned him about phone
9 calls.  His car was used for the murder.  There's
10 no evidence that -- there's -- the case file is
11 completely absent of anything that explains --
12 other than Mejia said he didn't do it, there's no
13 evidence in the case file that -- that there was
14 any type of investigative follow-up to Rosauro.
15 BY MS. GOLDEN:
16    **Q.   And you don't think that makes a little**
17 **bit of sense considering the fact that no one was**
18 **implicating him in the crime and the fact Solache**
19 **and Reyes admitted to their involvement in the**
20 **crime?**
21    MR. SWAMINATHAN:  Objection to form and
22 foundation.
23 BY MS. GOLDEN:
24    **Q.   I mean, in makes sense --**

Page 209

1    A.   You asked me a question.
2    **Q.   Sure.  I'll let you finish.**
3    A.   No.  Go ahead; go ahead.
4    **Q.   Assuming -- assuming that Solache and**
5 **Reyes are, in fact, guilty, right, and they confess**
6 **to the crime and Adriana we know is, in fact,**
7 **guilty and she confesses to the crime, and there's**
8 **three of them say that they were the only ones**
9 **involved, it makes sense under those circumstances**
10 **that they wouldn't further investigate Rosauro,**
11 **right?**
12    MR. SWAMINATHAN:  Can you read back the
13 question, Madame Court Reporter?
14        (Record read.)
15    MR. SWAMINATHAN:  Objection to form,
16 foundation.
17    MS. GOLDEN:  Rosauro.
18    MR. SWAMINATHAN:  Same objection.
19    THE WITNESS:  Okay.  I still have the
20 stenographer's logo up there, are not the
21 attorneys.
22        No, it doesn't make sense.  And
23 again, I can't fully answer that unless we kind of
24 create a timeline of when Rosauro was released from

THOMAS TIDERINGTON, 10/05/2022                           Page 210..213

Page 210

1 the police station.
2         And as we sit here today, I don't
3 know -- I don't believe it was after Solache and
4 Reyes confessed. He was released prior to their
5 confession, I -- is my understanding. And I could
6 be wrong on that, but I -- but it's my
7 understanding that he was released before they
8 confessed.
9 BY MS. GOLDEN:
10     **Q.   Okay. We got a little -- and is that**
11 **important to you that they released him before they**
12 **released --**
13         MR. SWAMINATHAN: Objection to form and
14 foundation.
15 BY MS. GOLDEN:
16     **Q.   Before they processed Solache and**
17 **Reyes.**
18         MR. SWAMINATHAN: Same objection.
19         THE WITNESS: Well, the premise of the
20 question that you -- you asked Me was that they had
21 evidence because Mejia confessed, Reyes confessed,
22 and Solache confessed, so therefore they should not
23 have conducted any further investigation of Mejia.
24         Again, regardless of who confessed,

Page 211

1 there should have been a follow-up to determine --
2 to corroborate to eliminate him as a suspect.
3         But more importantly, and -- and it
4 is important, if -- if he was released before the
5 confessions -- and again, I'd have to refresh my
6 memory, but if he was released before the
7 confessions, I guess that's more to my point that
8 there's no explanation as to why they -- they
9 released him, other than, I did read someplace in
10 one of the reports, one of the officers said he was
11 a mild mannered, nice guy.
12 BY MS. GOLDEN:
13     **Q.   What's your basis for your opinion that**
14 **after the police had three perpetrators who all**
15 **confessed and did not implicate any other person,**
16 **there needed to be -- and the three people had been**
17 **charged, that there needed to be further**
18 **investigation of other people's alibis?**
19         MR. SWAMINATHAN: Objection to form and
20 foundation.
21         Go ahead.
22         THE WITNESS: And that's to the heart of
23 whole problem with many of the cases that I've
24 reviewed involving the Chicago Police Department.

Page 212

1 The end doesn't justify the means.
2         And -- and as you identified, I
3 think by your question, is that it appears they
4 didn't care if they had the right person or not.
5 It appears that, based on my review of the -- of
6 the record, that instead of casting the wide net of
7 suspects and then methodically eliminating
8 suspects, they focused on two individuals and
9 ignored any other type of evidence that did not
10 support their theory. And I think this is clear
11 evidence by the fact that there was no
12 investigative follow-up done with Rosauro -- I'm
13 sorry, with the husband.
14 BY MS. GOLDEN:
15     **Q.   Do you give any weight -- well, did you**
16 **review -- do you know who Art Hill is?**
17     A.   Art Hill?
18     **Q.   Right.**
19     A.   You'd have to refresh my memory. I
20 don't recall.
21     **Q.   So he was the lead -- well, he was a**
22 **prosecutor in the case. He along with Mercedes**
23 **Luque-Rosales, I think, were cochairs for that**
24 **prosecution team.**

Page 213

1     A.   Okay.
2     **Q.   And I don't think you were provided**
3 **with a copy of his deposition testimony, were you?**
4     A.   I don't recall if I was or not. I may
5 have been, but I -- as we sit here, I don't recall.
6     **Q.   Do you recall any testimony from any of**
7 **the assistant state's attorneys involved in the**
8 **case about whose responsibilities it was to request**
9 **additional investigation once charges were brought**
10 **in Cook County?**
11         MR. SWAMINATHAN: Objection to form.
12         Go ahead.
13         THE WITNESS: I don't recall that, no.
14 BY MS. GOLDEN:
15     **Q.   Okay. And if there's testimony from**
16 **all of the assistant state's attorneys in this case**
17 **that it was the custom and practice for the state's**
18 **attorney's office to direct the police officers to**
19 **further investigate if necessary, would you credit**
20 **that testimony?**
21         MR. SWAMINATHAN: Objection to form.
22         Go ahead.
23         THE WITNESS: Credit in what respect?
24

Page 214

1 BY MS. GOLDEN:
2    **Q.   Would you believe them?**
3    A.   Well, I can tell you the State's
4 Attorney Office does not run a police department.
5 And regardless of what a state attorney says that
6 the police department should or not -- should or
7 should not do should be considered by the -- by the
8 chief or -- or managers of that police department.
9         But I -- I've worked with many state
10 attorneys office and I -- I certainly don't know
11 of any that would say, Don't do any further
12 investigation on a case because we don't want to
13 prove -- I mean, you want to continue to prove as
14 much as you can.
15        So if you're asking me because the
16 state attorney said -- well, I -- I don't -- I
17 guess I don't really know what you're asking there.
18 If there's testimony that the state
19 attorney would request additional information if
20 required, then, yeah, I would agree, but it doesn't
21 preclude the police department from continuing to
22 conduct their own investigation; and if they
23 develop exculpatory information or additional
24 information, it shouldn't -- they shouldn't have to

Page 215

1 wait for the state attorney to tell them it's okay
2 to do that.
3    **Q.   Right.  But if they close a case with**
4 **all known suspects who are charged, is it your**
5 **opinion that they have an obligation to continue to**
6 **investigate whether or not excluded -- you know,**
7 **people previously excluded have alibis?**
8    MR. SWAMINATHAN:  Objection to form and
9 foundation.
10       Go ahead.
11   THE WITNESS:  Well, again, I think you've
12 identified another problem within the Chicago
13 Police Department.  Closing a case, the -- the
14 state attorney can only go based on the information
15 that the police department provides him or her
16 with, and if the police -- if the information is
17 deficient, if it's false, if it's misleading, I
18 don't know if they can make an informed decision.
19       You know, certainly, and -- and I'm
20 giving you a hypothetical here, but if the -- if a
21 state attorney knew that Reyes, Solache, and Mejia
22 all claim that they were physically abused by the
23 detectives, I'm certain -- certain that that would
24 have changed their perspective on whether or not

Page 216

1 this case should have been closed.  I think if you
2 look at -- is it the Lassar report?  Did I
3 pronounce that correctly?  Lassar report.  They
4 concluded that the evidence without the confessions
5 is very, very weak, and -- and -- towards Reyes and
6 Solache.
7         So really without -- without the
8 coerceded confessions, there really is no evidence
9 whatsoever in this case to suggest that Reyes and
10 Solache ever did it.
11 BY MS. GOLDEN:
12   **Q.   Do you accept the Lassar report's**
13 **conclusion about whether or not Solache and Reyes**
14 **were subjected to physical abuse?**
15   MR. SWAMINATHAN:  Objection to form.
16       Go ahead.
17   THE WITNESS:  And again, I'd have to look at
18 the -- the report again, but I think they concluded
19 that it's more likely than not that -- that they
20 were physically abused and I coerced into providing
21 a statement, I think is -- is what the report that
22 was -- City of Chicago hired them to conduct an
23 investigation and their conclusion was that there
24 was coercion and physical abuse of Reyes and

Page 217

1 Solache and others.
2 BY MS. GOLDEN:
3    **Q.   And did you rely on that conclusion in**
4 **forming the opinions that are contained in your**
5 **report?**
6    A.   Well, I considered it and it certainly
7 is supportive of other information that I looked
8 at.
9    **Q.   Considering is a little different than**
10 **relying.**
11       **Did you rely on that concussion?**
12   A.   No.
13   MR. SWAMINATHAN:  Objection, asked and
14 answered.
15       Go ahead.
16   THE WITNESS:  I'm sorry I keep interrupting,
17 Anand.
18       No.  I considered it, just like I
19 consider all of the other documents and evidence in
20 this case.
21 BY MS. GOLDEN:
22   **Q.   And what kind of weight do you give it?**
23   MR. SWAMINATHAN:  Objection to form.
24       Go ahead.

THOMAS TIDERINGTON, 10/05/2022                                    Page 218..221

Page 218

1      THE WITNESS:  What kind of weight?  I -- I
2  don't know -- I don't think I've ever assigned a
3  percentage or I -- I -- you know, again, I think
4  it's -- it's a document that -- I mean, to kind of
5  put in perspective, the city appeared to be
6  concerned about the allegations.  They hired an
7  outside agency.  I'm sure they vetted the outside
8  agency who was going to conduct this investigation.
9  They provided documents.  They provided witnesses.
10  And I believe they did what the city asked them to
11  do, you know.
12      Assigning a weight to it, I -- I
13  think it's just one more piece of the puzzle for
14  me.  I don't know if there was any -- I think it's
15  supportive of other information that I -- I've
16  learned in this case, but I -- you know, I'm
17  certainly not totally relying on it.
18  BY MS. GOLDEN:
19      Q.   Did you consider their conclusion
20  that -- rejecting Mr. Reyes's claim that he was
21  innocent?
22      A.   I did note that.
23      Q.   Did you consider it?
24      A.   Well, certainly I considered it.

Page 219

1      Q.   Did you rely on it?
2      A.   Not any more than I relied on the fact
3  it was more likely or more -- that it was very
4  likely that the confessions were forced, coerced,
5  and beaten out the -- the suspects.
6      Q.   Did you also see -- did you also see in
7  the Lassar memorandum that they rejected
8  Mr. Solache's claim of innocence?
9      A.   I think they used the words that it was
10  very close, and I'm not sure what that means.  And
11  I think they used -- also used the words that there
12  was no other evidence other than the confessions.
13  And if you -- if you discard and discount the
14  confessions that there essentially is no evidence
15  against them, I -- I think is the takeaway I got
16  from that report.
17      Q.   Is it your opinion that if you take
18  away Mr. Solache's confession, there is no other
19  evidence against him?
20      A.   Well, you have Mejia's questionable
21  confession.  Which version do you believe?  And
22  this is, again, a dilemma that detectives are often
23  faced with.  There's usually not a clear path from
24  the -- from innocence to guilt.  It -- it's usually

Page 220

1  a roadway that goes in a lot of different
2  directions.
3      And to go back to your question
4  earlier, that's why it's important to corroborate
5  all of -- once you eliminate every possible
6  suspect, then it would be more likely that perhaps
7  Mejia and Reyes did it.  If you leave the husband,
8  if you leave all of the other individuals out with
9  no explanation as to why they should not be
10  considered suspects, then it's more difficult to
11  accept that Reyes and Mejia -- I'm sorry, Reyes and
12  Solache were, in fact, guilty of this crime.
13      Q.   But ultimately the Lassar report,
14  however they worded it, rejected Mr. Solache's
15  claim of innocence, right?
16      MR. SWAMINATHAN:  Objection to form.
17      Go ahead.
18      THE WITNESS:  The short answer is yes, but
19  your also, I think, asking me to discount the other
20  factors that they identified, such as the amount of
21  time they were held in -- in their interrogation
22  rooms; they also concluded that there was physical
23  abuse of the individuals.  There's a whole list of
24  other things that you -- you can't just make that

Page 221

1  decision in a vacuum.  I think you have to look at
2  all the other things they said in their report to
3  draw that conclusion.
4      And what sticks in mind, they said
5  it's very, very narrow, I think is the word, if --
6  if I'm using the quote correctly.  And if -- if
7  something's very, very narrow, then, you know, I
8  would rather -- well, most law enforcement officers
9  would not want to put somebody in prison for their
10  life on something that's a very, very narrow call.
11  BY MS. GOLDEN:
12      Q.   Do you put less weight into their
13  narrow rejection of their claims of innocence than
14  you do their conclusion that they were physically
15  abused?
16      MR. SWAMINATHAN:  Objection to form.
17      Go ahead.
18      THE WITNESS:  I -- I'm sorry.  I'm trying to
19  think of what you just asked me.  Do I put less
20  weight -- I'm sorry.  Could you ask that again,
21  please?  I'm sorry.
22      MS. GOLDEN:  Sure.
23  BY MS. GOLDEN:
24      Q.   I mean, ultimately the memo addressed

THOMAS TIDERINGTON, 10/05/2022                    Page 222..225

Page 222

1 two issues, right?  Whether or not they were likely
2 abused and whether or not they were likely
3 innocent.  And they said they were likely abused
4 and they were not likely -- they rejected their
5 claim that they were innocent.
6        So I'm wondering do you put more
7 weight on the conclusion that they were likely
8 abused than that they were not innocent or do you
9 give both findings equally?
10       MR. SWAMINATHAN:  Objection to form and
11 foundation.
12           Go ahead.
13       THE WITNESS:  Well, I think there's more
14 information that you'd have to consider.  I think
15 there's corroborating information that there was a
16 past pattern and practice of physical abuse on
17 behalf of the detective, which is consistent with
18 what the investigators found and -- and documented
19 in the report.
20           So I think that there's -- you have
21 to take it from that perspective and -- and look at
22 it not only -- not in a vacuum, you have to look at
23 it, Well, what else -- what other information did
24 they have?  And, you know, so from that

Page 223

1 perspective, I think there's corroborating
2 information that Guevara routinely, as a matter of
3 practice, physically abused prisoners, right?  I
4 think that's a -- is what they concluded in their
5 report and -- and in this case, they concluded that
6 that probably did, in fact, happen.
7           If they beat the confession out of
8 somebody, you know, as much as law enforcement
9 officers like to put people in jail, but we want to
10 put the right people in jail, and -- and if we're
11 relying solely on that confession and it -- it
12 appears that that's what they did, and I'm speaking
13 of the Mejia confession at this point, then I --
14 I think it's somewhat unreasonable.
15 BY MS. GOLDEN:
16    Q.   Do you recall the Sidley & Austin
17 memorandum stating that it was more like -- that
18 their conclusion was is it was more likely than not
19 that Solache and Reyes were physically abused by
20 Detective Guevara and were otherwise subjected to
21 unreasonable treatment during the course of their
22 interrogation?
23    A.   I do recall that, yes.
24    Q.   Okay.  And do you also recall their

Page 224

1 conclusion that despite the abusive conduct during
2 the course of their interrogation, they reject both
3 of their claims of actual innocence, noting in
4 particular that Adriana Mejia continues to identify
5 both of them as involved with her in the murder?
6 Do you remember them making that conclusion as
7 well?
8    A.   I do.
9    Q.   Okay.  Do you give equal weight to both
10 conclusions or do you think one is more likely than
11 the other?
12       MR. SWAMINATHAN: Objection to form.
13           Go ahead.
14       THE WITNESS:  Let's analyze that, and that's
15 one of the things that I thought about.
16           All right.  So I think they had to
17 conclude that if the confessions were coerced or
18 beaten from Reyes and Solache, that those
19 confessions should not be considered, should not be
20 considered by law enforcement, should not be
21 considered by the court.
22           So then what are we looking at in
23 terms of evidence against Reyes and Solache?
24 What -- what is left?  And if an investigator or

Page 225

1 homicide detective came to me today and said, There
2 was a double murder, we have one of the suspects
3 who claims that the -- these are the two guys that
4 did it, we don't have any blood evidence, we don't
5 have any fingerprints, we don't have any vehicle,
6 we don't have anything other than her questionable
7 testimony because she's already given four
8 different statements as to who was involved in
9 this, we would still be conducting an
10 investigation.  We would not be charging somebody
11 at that point.
12 BY MS. GOLDEN:
13    Q.   Okay.  I don't think you answered my
14 question.
15           My question is:  Do you give equal
16 weight to both of the conclusions that the -- that
17 are stated in the Lassar memorandum that you
18 reviewed?
19       MR. SWAMINATHAN: Objection to form.
20           Go ahead.
21       THE WITNESS:  And again, before I can answer
22 that, I -- I do have that report there, so I think
23 I should be given the opportunity to review that to
24 put it in context.  I think --

THOMAS TIDERINGTON, 10/05/2022                    Page 226..229

Page 226

1 BY MS. GOLDEN:
2    Q.   Go ahead.  Pull it up.  Go ahead.  Pull
3 it up?
4        MR. SWAMINATHAN:  Can you tell him which page
5 it was that you were referring to.
6        MS. GOLDEN:  Yeah.  It's the --
7            (Simultaneous crosstalk.)
8        MR. SWAMINATHAN:  -- a good idea.
9        MS. GOLDEN:  I'm sorry.  It's the cover page
10 and it's Bates stamped AR-Jenner -- I don't know
11 have it as an exhibit Robyn -- it's AR-Jenner 19812
12 through AR-Jenner 19831.
13       MR. SWAMINATHAN:  Okay.
14       THE WITNESS:  All right.  Let me just review
15 this for -- and I won't read every page.  Just let
16 me go through it real quick, if you don't mind.
17       MS. GOLDEN:  Right.  And I'll direct your
18 attention -- you can read whatever you'd like, but
19 I'll direct your attention to the bottom of page 1
20 which says, We have come to the following
21 conclusions.
22       THE WITNESS:  Okay.  I think I can answer
23 your question now.
24

Page 227

1 BY MS. GOLDEN:
2    Q.   Okay.  And my question is -- you see
3 here at the bottom of what we'll mark later as
4 Exhibit 8, the memorandum states:  We find it more
5 likely than not that Solache and Reyes were
6 physically abused by Detective Guevara and were
7 otherwise subjected to unreasonable treatment
8 during the course of their interrogations.
9        And they also state:  Second,
10 despite the abusive conduct during the course of
11 their interrogations, we nonetheless reject both
12 Solache and Reyes's claim of actual innocence,
13 noting in particular that Adriana Mejia continues
14 to identify both of them as involved with her in
15 the murders.
16       So my question is -- and those are
17 the only two conclusions stated here in this part
18 of the report.
19       Do you give both conclusions equal
20 weight or do you believe one to be more likely true
21 than the other?
22       MR. SWAMINATHAN:  Objection to form and asked
23 and answered.
24       Go ahead.

Page 228

1    THE WITNESS:  Again, it's difficult to answer
2 that and -- and I think there's two questions
3 there, right.
4        I -- I think I agree that it's more
5 likely than not that -- that the Reyes and Solache
6 were abused and -- and the -- their confessions
7 were coerced and forced from them.
8        The question that's difficult to
9 answer is the only evidence against them is the
10 confession -- or the testimony of -- not even the
11 testimony, the statement from Mejia.  And I don't
12 know if the Sidley report understood that Mejia
13 has -- although she continues to implicate them in
14 the murder, she also claims that she was coerced
15 by the detective as well.
16       So I considered both of those
17 situations.  From an experienced investigator, I
18 would not close an investigation based on only a
19 statement of somebody -- one of the suspects who
20 ultimately lied to the detectives multiple times
21 until she settled on a story that she felt that was
22 going to work for her.
23       And -- and again, I know I'm
24 interrupting your thought there, but which

Page 229

1 statement should we believe from her?  Should we
2 believe first one, the second one, the third one?
3 Which statement are you asking me to consider
4 as -- as truth?
5 BY MS. GOLDEN:
6    Q.   Do you believe that the Sidley & Austin
7 team had sufficient information to reject both
8 Solache and Reyes's claims of actual innocence?
9    A.   And I'm just -- I'm thumbing through
10 this report because I'm looking to see if they
11 considered the fact that Mejia had subsequently
12 testified that she was physically abused.  And if
13 they did not have that information, that certainly
14 may have changed their opinion.
15    Q.   Page 9.
16    A.   Oh, thank you.
17       All right.  So if I could read it
18 for the record:  Adriana also claims she was
19 mistreated during her interrogation, including
20 physically abused by Guevara.
21    Q.   Right.  Does that -- does that answer
22 your question about whether or not they had
23 information about her claims of physical abuse?
24    A.   They obviously did.

THOMAS TIDERINGTON, 10/05/2022                    Page 230..233

Page 230

1     Q.   Yep, and yet they still rejected
2  Mr. Solache and Mr. Reyes's claims of actual
3  innocence.
4          So my question that I'm trying to
5  get an answer with is:  Do you agree with the
6  second conclusion in the Lassar memorandum, which
7  is Exhibit 8?
8     MR. SWAMINATHAN:  Objection to form and
9  foundation.
10    THE WITNESS:  I -- I guess I can only answer
11 that by saying that the evidence in this record
12 indicates that all three individuals were beaten,
13 confessions were forced and coerceded.  And under
14 those circumstances, any reasonable law enforcement
15 officer would not use that information as the basis
16 for closing a case and bringing a case forward to a
17 prosecutor.  I --
18 BY MS. GOLDEN:
19    Q.   But you --
20    A.   I'm -- I'm going to answer your
21 question.
22          I -- and so in -- in that respect, I
23 would -- I do not necessarily agree that there's
24 still enough evidence to convict them.

Page 231

1     Q.   Where is different than being actually
2  innocent, right?
3     MR. SWAMINATHAN:  Objection to form.
4  BY MS. GOLDEN:
5     Q.   You could not have enough evidence to
6  prosecute somebody, but they can still be guilty,
7  right?
8     A.   O.J. Simpson, there's an example,
9  right?
10    Q.   Okay.  Would you, based on the record,
11 reject Mr. Solache's and Reyes's claims of actual
12 innocence?
13    MR. SWAMINATHAN:  Objection to form and
14 foundation.
15 BY MS. GOLDEN:
16    Q.   Based on the record you've reviewed?
17    MR. SWAMINATHAN:  Objection to form,
18 foundation, relevance.
19    Go ahead.
20    THE WITNESS:  Would I reject their claims of
21 innocence, is -- I'm sorry.  Is that what you
22 asked?
23    MS. GOLDEN:  Yes.
24    MR. SWAMINATHAN:  Same objection.

Page 232

1     Go ahead.
2     THE WITNESS:  I don't know if we can get
3  there.  I -- you know, law enforcement officer,
4  I -- I can only draw conclusion based on the
5  evidence that I have in front of me.  All right?
6          So if I'm an objective law
7  enforcement investigator, I have to look at the
8  evidence.  Even if I have a hunch, even if I know
9  the guy probably did it, if I don't have the
10 evidence to support my hunch or my theory, as --
11 as much as I'd like to put somebody in jail, I
12 certainly don't have -- I certainly could not bring
13 a case forward if the facts are not supportive of
14 the evidence.
15 BY MS. GOLDEN:
16    Q.   So in this opinion -- or so in this
17 case, is it your opinion that there's insufficient
18 evidence to conclude -- to reject their claims of
19 innocence?
20    MR. SWAMINATHAN:  Objection.  Insufficient
21 evidence to reject?  Form and foundation.
22    Go ahead.
23    THE WITNESS:  I'm confused.  Am I rejecting
24 their claims of innocence or am I agreeing with

Page 233

1  them that they're innocent?
2  BY MS. GOLDEN:
3     Q.   Either one.
4     MR. SWAMINATHAN:  Objection -- objection to
5  form, foundation, and relevance.
6     Go ahead.
7     THE WITNESS:  And again, I have to answer
8  that by saying based on my review of the case file,
9  I have not seen any evidence that supports a
10 conclusion from a reasonable police investigation
11 that Reyes and Solache were involved with this
12 murder -- murders.
13 BY MS. GOLDEN:
14    Q.   Okay.  You mentioned something about --
15 well, okay.  I'll come back to that.
16          You mentioned something about
17 forensic evidence and I think you referred to
18 unknown blood in the Soto home.  Do you remember
19 that?
20    A.   Yes.
21    Q.   Okay.  What were you referring to?
22    A.   Well, I think there was evidence that
23 blood was collected at the -- at the scene.
24 Certainly there -- I believe there was blood on

THOMAS TIDERINGTON, 10/05/2022                     Page 234..237

Page 234

1 Mejia's clothing. I think there's physical
2 evidence that unequivocally puts her at the scene
3 of the murder. But I have not seen any evidence,
4 any physical evidence, that would indicate that
5 Solache or Reyes were at that -- the scene.
6     Q.   And when you say "the scene," you mean
7 the -- the -- the Soto --
8     A.   Soto murders.
9     Q.   -- residence?
10         Okay. The residence, right, the
11 house?
12    A.   Yes, yes.
13    Q.   Okay. And is it your understanding
14 that there is an unknown DNA profile on an item of
15 evidence that as found in the Soto home?
16    A.   I don't know. I think -- I think there
17 may be. I -- I would have to check my -- I'd have
18 to check the police report to confirm that, but I
19 know that this -- the crime scene processing, they
20 did collect blood, so I'm not sure if there was
21 unidentified blood from the home.
22    Q.   Okay. And I think we talked a little
23 bit about Rosauro's car or we -- somebody referred
24 to it, right? We mentioned it?

Page 235

1     A.   I don't think we talked about it.
2     Q.   Oh, okay. I thought it had come up.
3          So -- but at least Exhibit 6 -- I'm
4 sorry. Yeah. Exhibit 6, page 6, at the bottom of
5 the page there where it starts Barbara Wilson, it
6 talks a little bit about the testimony of the DNA
7 analyst down there. Do you see that?
8     A.   Yes. Yes, I do.
9     Q.   And there's a reference there to -- I
10 thought I saw his car -- oh, yeah. Rosauro's
11 vehicle, the second line there.
12    A.   Right.
13    Q.   Okay. So this is the car, you
14 understand, that by all accounts Rosauro and
15 Guadalupe used to pick up Adriana, the baby, and
16 the boy at the hospital after the murders, right?
17    MR. SWAMINATHAN: Objection to the form.
18         Go ahead.
19    THE WITNESS: That's my understanding.
20 BY MS. GOLDEN:
21    Q.   And at the time Guadalupe and Rosauro
22 picked up Adriana, who was holding the baby and had
23 the boy, she had blood on her pants, right?
24    A.   I understand that to be true, yes.

Page 236

1     Q.   Okay. And we know from a later report
2 that that blood -- some of the -- that blood was --
3 some of that blood was tested and it came back to
4 one of the victims, right?
5     A.   That's my understanding, yes.
6     Q.   Okay. But -- so it wouldn't be
7 unusual, would it, for Adriana -- because it was --
8 it was the car that Rosauro and Adriana shared, it
9 wouldn't be unusual to find Adriana's blood in that
10 car?
11    MR. SWAMINATHAN: Objection to form and
12 foundation.
13         Go ahead.
14    THE WITNESS: I guess it depends on the
15 amount. I guess it would be unusual if you found
16 blood splattered on the seats, on the floorboard,
17 in the trunk. I guess -- I guess it would be
18 unusual.
19 BY MS. GOLDEN:
20    Q.   It wouldn't be unusual to find a spot
21 of DNA on a towel in the -- it wouldn't be unusual
22 to find a spot on a towel in the back of a car that
23 someone's -- I'm sorry.
24         It wouldn't be unusual, would it, to

Page 237

1 find the DNA of -- Adriana's DNA in Rosauro's car?
2     MR. SWAMINATHAN: Objection to form and
3 foundation.
4          Go ahead.
5     THE WITNESS: I guess I -- I don't have any
6 understanding of how often she was in the car, if
7 it was the only car that they owned, but I agree
8 with your hypothetical that if a car is owned by a
9 husband and wife, it's quite possible that DNA from
10 both of them may be found in the vehicle.
11 BY MS. GOLDEN:
12    Q.   All right. And it was a bloody crime
13 scene, right?
14    A.   It was.
15    Q.   Did you see the pictures?
16    A.   I did.
17    Q.   Do you -- you would imagine that anyone
18 who -- after assisted in stabbing Mariano 35 times
19 or 39 times and Jacinta 20 times, you would imagine
20 that they would have some of the victims' blood on
21 them, correct?
22    A.   That's correct.
23    Q.   And was any of the victims' blood found
24 in Rosauro's car?

Page 238

1    A.   I don't know that.
2    Q.   Okay.  If that is the case, what is the
3  significance of that?
4        MR. SWAMINATHAN:  You're asking him if the
5  victims' blood was found in the car?
6        MS. GOLDEN:  Right.
7  BY MS. GOLDEN:
8    Q.   If it's the case of the victims' blood
9  was not found in the car, what, if anything, is the
10  significance of that?
11    A.   Well, wait a minute.  I think -- to be
12  clear, I think -- and maybe we're talking about two
13  different things.  I believe Soto's -- Mariano
14  Soto's blood was found on Mejia's clothing, is my
15  recollection.  I'd have to look at my report
16  further to see or the police report to see if -- if
17  it was also established that there was blood in the
18  vehicle, but I -- I know it was found on her
19  clothing.
20    Q.   Right.  Assuming there was no -- no
21  victim blood found in the car, what is the
22  significant of that?
23    A.   Well, I would have expected that there
24  would -- would have been blood in -- the victims'

Page 239

1  blood in the vehicle.
2    Q.   Would you not expect that whatever car
3  was used by the people that brutally stabbed this
4  couple would have victim blood from in it if they
5  used it to drive away from the crime scene?
6    A.   I would.
7    Q.   When you were reviewing Mr. Solache's
8  testimony in hearings and his deposition, did you
9  notice any inconsistency in his descriptions of his
10  custodial interrogations?
11    A.   Can you point me to a specific area?  I
12  don't -- as we sit here today, I don't recall.
13  There have -- of course, there's a lot of
14  testimony, lot of depositions.  I don't recall.
15  There may have been.
16    Q.   Well, I don't want to -- I think that
17  will take up an awful lot of time.
18        So I'm just -- you know, one of the
19  things you look for when you interview witnesses on
20  multiple different -- multiple occasions is whether
21  or not their stories are consistent, right?
22    A.   That's correct.
23    Q.   And so when you were looking over
24  Mr. Solache's testimony, did you notice any

Page 240

1  difference in the way that he described his
2  custodial interrogations over time?
3        MR. SWAMINATHAN:  Objection to form,
4  foundation.
5        Go ahead.
6        THE WITNESS:  And again, I -- I think we have
7  to be more detailed.  I -- are you speaking of in a
8  deposition?  Are you speaking of testimony?  I
9  would -- I would really have to have you point out
10  specifically the specific areas of conflict, I
11  guess, for me to be able to answer that.
12  BY MS. GOLDEN:
13    Q.   Sure.
14        If there are discrepancies in the
15  nature of the physical abuse that Mr. Solache
16  claims to have suffered, what, if any, significance
17  is there to that?
18        MR. SWAMINATHAN:  Objection to form and
19  foundation.
20        Go ahead.
21        THE WITNESS:  You mean if he was slapped --
22  if he said in one time he was slapped four times,
23  another time he said he was slapped three times, or
24  something more significant than that deviation?

Page 241

1  BY MS. GOLDEN:
2    Q.   If there were significance deviations
3  in the way he describes his custodial
4  interrogations on different occasions, what is the
5  significance of that?
6        MS. SUSLER:  Objection, form.
7        THE WITNESS:  Sorry?
8        MS. GOLDEN:  That was -- that was Ms. Susler.
9  You can answer.
10        MR. SWAMINATHAN:  Yeah.  Can you read that
11  question?  I missed half of it.
12        MS. GOLDEN:  Sure.
13            (Record read.)
14        MR. SWAMINATHAN:  Objection to form and
15  foundation.
16        Go ahead.
17        THE WITNESS:  Yeah.  That -- it -- I'm sorry,
18  but that would be difficult for me to answer
19  because we -- we're not really defining what's
20  significant and we're not defining what the
21  deviation was and -- and that.  So you're asking me
22  to draw a conclusion based on two unknowns, so I --
23  I don't know that I can do that.
24        THE COURT REPORTER:  Caroline, it's the court

THOMAS TIDERINGTON, 10/05/2022                    Page 242..245

Page 242

1 reporter, when it's a good time to break, can we --
2      MS. GOLDEN:  Sure.  Let's do it.
3           Is that all right with everybody?
4      THE WITNESS:  Sure.  10 minutes?
5      MS. GOLDEN:  Yep.  How much -- yes.  Let's go
6 off the record.
7      THE VIDEO TECHNICIAN:  We're off the video
8 record at 4:19 p.m.
9           (Recess taken.)
10      THE VIDEO TECHNICIAN:  We are back on the
11 video record at 4:30 p.m.
12 BY MS. GOLDEN:
13      **Q.   Okay.  Mr. Tiderington, a few more**
14 **questions about cars.  Okay?**
15      A.   Okay.
16      **Q.   Did you see any evidence in the record**
17 **to suggest that a car other than Mr. Mejia's was**
18 **used in commission of the murders?**
19      A.   I did.  I think there was some question
20 about whether it was a brother's car or -- Mejia's
21 brother.  And then there was another car called
22 into question, I -- I think, if I recall correctly.
23      **Q.   And did you see in any of the**
24 **transcripts of proceedings that you reviewed that**

Page 243

1 **Mr. Solache also owned a car at or about the same**
2 **time of the murders that went missing?**
3      MS. SUSLER:  Objection; form, misstates the
4 evidence.
5 BY MS. GOLDEN:
6      **Q.   Do you recall that testimony?**
7      A.   I -- I'm sorry, I don't.
8      **Q.   If you had been provided with that**
9 **testimony, do you think you would remember it?**
10      A.   I think if you could provide it to me,
11 I could look at it and refresh my memory.
12      **Q.   That's for sure.**
13           **Is it your conclusion that**
14 **Mr. Solache suffered physical abuse at the hands of**
15 **Detective Guevara?**
16      A.   I think it's more likely than not that
17 that is what occurred.
18      **Q.   Okay.  And in order to reach that**
19 **conclusion, you have to reject the testimony in the**
20 **record that he did not physically abuse**
21 **Mr. Solache, right?  I mean, Detective Guevara**
22 **testified that he didn't lay hands on Mr. Solache,**
23 **right?**
24      MR. SWAMINATHAN:  Objection to form and

Page 244

1 foundation.
2      THE WITNESS:  You mean before -- before he
3 refused to testify in -- in any subsequent
4 hearings?  You're -- you're talking about just
5 during a pretrial testimony, is what you're
6 referring to?
7 BY MS. GOLDEN:
8      **Q.   During the pretrial, during the trial,**
9 **and then -- yeah.**
10      A.   Yeah, no.  I -- I considered that.
11 It's ...
12      **Q.   So in order to arrive at the conclusion**
13 **that he did put hands on Mr. Solache, you have to**
14 **reject that testimony, right?**
15      MR. SWAMINATHAN:  Objection to form and
16 foundation and mischaracterizes his testimony.  He
17 didn't say he concluded that he abused him -- or
18 put hands on him, is what he said.
19      THE WITNESS:  I think it's more likely than
20 not that he did and I think the evidence supports
21 the fact that he did abuse them.  And so I can --
22 again, I considered it, yes.
23 BY MS. GOLDEN:
24      **Q.   Okay.  And rejected it as most likely**

Page 245

1 **untrue?**
2      MR. SWAMINATHAN:  Objection to form and
3 foundation.
4      THE WITNESS:  I feel his answer was most
5 likely untrue, yes.
6 BY MS. GOLDEN:
7      **Q.   Okay.  And did you --**
8      A.   Guevara, yes.
9      **Q.   I'm sorry.**
10           **Did you give any weight to the fact**
11 **that he took the Fifth Amendment in subsequent**
12 **proceedings?**
13      A.   I considered it.  It's highly --
14      **Q.   And --**
15      A.   -- unusual -- it's very, very unusual
16 for a police officer to take the Fifth Amendment on
17 a case.
18      **Q.   But I -- I take it that you don't know**
19 **why he took the Fifth Amendment, correct?**
20      A.   I don't.
21      **Q.   You do know it was on the advice of**
22 **counsel, right?**
23      MR. SWAMINATHAN:  Objection to form and
24 foundation.

THOMAS TIDERINGTON, 10/05/2022                    Page 246..249

Page 246

1    THE WITNESS: I -- I wouldn't know that.
2  BY MS. GOLDEN:
3      Q.   Well --
4      A.   Well, I -- I'm sorry.
5      Q.   -- his testimony said it was, right?
6      A.   You're right.  I'm sorry.
7      Q.   About 500 times, right?
8      A.   Right.
9      MR. SWAMINATHAN:  Objection to form and
10 foundation.
11 BY MS. GOLDEN:
12     Q.   So -- and you're not a lawyer, right?
13     A.   That's correct, I'm not.
14     Q.   And you don't purport to be an expert
15 in reasons why someone might take the Fifth
16 Amendment in a criminal case; is that fair?
17     A.   That's fair.
18     Q.   Okay.  On page 8 of Exhibit 6, you
19 reference postconviction petitions alleging that
20 Detective Guevara coerced -- right there at the
21 top.  You say that both -- both men filed
22 post-conviction petitions alleging that -- that
23 Guevara had coerceded numerous false confessions in
24 other murder cases and had been accused in several

Page 247

1  other cases of police brutality.
2          And are you relying on allegations
3  that Detective Guevara committed misconduct in
4  other cases to support your opinion that he more
5  likely than not committed misconduct in this case?
6      MR. SWAMINATHAN:  Objection to form and
7  foundation.
8      THE WITNESS:  Again, I considered all of the
9  information I believe that was relevant and
10 certainly considered it.
11 BY MS. GOLDEN:
12     Q.   Do you think the allegations of
13 misconduct in other cases is sufficient to conclude
14 that the person has committed misconduct in some
15 other instance?
16     A.   No, not necessarily.
17     Q.   Do you think you have sufficient
18 information about the allegations in the
19 postconviction -- forget it.
20          And then what do you mean by the
21 term "exonerated?"
22     A.   Where -- what paragraph are you
23 referring to?
24     Q.   I'm -- it's on page 8 all the way

Page 248

1  towards the bottom, last paragraph, By the time.
2      A.   It's my understanding that at least six
3  individuals, maybe more at this point, have had
4  their convictions overturned.  And I -- I may not
5  have used the right terminology, but had their
6  convictions overturned based on misconduct on the
7  part of the officer.
8      Q.   Which does not necessarily equate to
9  innocence, correct?
10     A.   That's correct.
11     Q.   Okay.  I want to direct your attention
12 to page 28 of your report.
13          Do you -- okay.  And this is
14 additional -- in the section of the report at the
15 bottom there called Additional Significant
16 Deviations from Professional Homicide Investigation
17 Standards in Soto Homicide Investigation.
18     A.   Yes.
19     Q.   Okay.  And did you use the same process
20 we discussed earlier in arriving at this opinion,
21 basically reviewing the records and drawing on your
22 experience?
23     A.   Yes.
24     Q.   Okay.  And it says, This so-called

Page 249

1  investigation into the homicide of Mariano and
2  Jacinta Soto by the Chicago Police Department,
3  Reynaldo Guevara, and various police officers and
4  supervisors employed by the city was intentionally
5  and blatantly calculated to wrongfully focus on,
6  arrest, charge and convict Plaintiffs DeLeon-Reyes
7  and Solache.
8          Do you see that there?
9      A.   I do.
10     Q.   And the only officer identified by name
11 here is Reynaldo Guevara.  Do you see that?
12     A.   Yes.
13     Q.   Okay.  And when you refer to "various
14 police officers," who in particular are you
15 referring to?
16     A.   Perhaps some that are named and some
17 that aren't -- are not named.  You know, certainly
18 I identified Guevara because his -- it's more
19 likely not that his conduct was so outrageous
20 that in my opinion it could not have happened in a
21 vacuum, that -- that there had to have been --
22 supervisors, other officers must have been aware of
23 the misconduct for -- for Guevara to be able to
24 continue to mistreat individuals.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 250

1     Q.   As you sit here today, can you identify
2 by name any of the various police officers and
3 supervisors that you believe intentionally and
4 blatantly calculated to wrongfully focus on arrest,
5 charge, and convict Mr. Reyes and Mr. Solache?
6        MR. SWAMINATHAN:  Objection to form and
7 foundation.
8        Go ahead.
9        THE WITNESS:  Well, no, not -- I can't recall
10 them off the top of my head, but I -- I think I can
11 kind of pinpoint perhaps who they are.  But any --
12 any supervisor that had the responsibility for the
13 oversight of an area or a precinct, as -- sometime
14 as I refer it to, and they -- they had to have
15 knowledge that -- that individuals were in the
16 holding cells or the interrogation rooms for
17 extended periods of time and there's no indication
18 that there was corrective action taken.  There's
19 supervisors that must have signed off on some of
20 the police reports that had to have realized that
21 there was conflicting information and conflicting
22 evidence that would not necessarily support perhaps
23 even the arrest of Reyes and Solache.  You can't
24 conduct a shoddy investigation and only blame it on

Page 251

1 one particular detective.
2        It was, in my view, a systemic
3 problem and many people probably were responsible
4 for many of these problems.
5 BY MS. GOLDEN:
6     Q.   But you can't, as you sit here,
7 identify who exactly you're referring to in this
8 particular sentence by name?
9     A.   Not as we sit here, but I could go
10 through the police report and -- and indicate, you
11 know, This supervisor signed off on this particular
12 report and he did not -- obviously there was no
13 explanation as to -- I mean, we'll use Rosauro as
14 a -- the husband as an example.  The supervisor
15 should have said, What information do we have to
16 support that he was not involved?
17        There's many, many instances in
18 which I believe a supervisor, reasonable
19 supervisor, should have stepped in and asked many
20 questions about this investigation.
21     Q.   And that's based on your experience as
22 a law enforcement officer, right?
23     A.   That is, yes.
24     Q.   Does it violate any particular standard

Page 252

1 that you're aware of?
2        MR. SWAMINATHAN:  Objection to form.
3        Go ahead.
4        THE WITNESS:  Which -- I'm sorry.  What --
5 what specifically are you asking?
6 BY MS. GOLDEN:
7     Q.   I mean, you're basically assuming
8 that -- oh, forget it.
9        Do you know what Detective Kernan's
10 role was in the Soto homicide investigation?
11     A.   I'm sorry.  Which detective?
12     Q.   Kernan, K-e-r-n-a-n.
13     A.   It would have to refreshed.  I don't
14 know as we sit here exactly, no.
15     Q.   Do you know what Detective Mohan's role
16 was in the Soto homicide?
17     A.   I don't -- or I should say I don't
18 recall.
19     Q.   Okay.  Directing your attention to
20 page 29, and Number 1 says, Crime scene photographs
21 had to be retaken.  You see that?
22     A.   I do.
23     Q.   What is your basis for concluding that
24 crime scene photographs had to be taken -- retaken

Page 253

1 is a significant deviation from professional
2 homicide investigation standards?
3        MR. SWAMINATHAN:  Objection to form and
4 foundation.
5        Go ahead.
6        THE WITNESS:  Well, there's clearly no value
7 in -- in photographing a crime scene that has
8 already been released and other people have had
9 access to it for several days.
10        The intent and purpose of
11 photographing the scene is to document the -- the
12 condition of the crime scene as it was.  And that's
13 why -- you know, when you see the yellow tape
14 that's out there, that's why, you know, nobody
15 crosses that yellow tape and -- and it's supposed
16 to be pristine.  And to -- to photograph a crime
17 scene several days after it was released, you know,
18 who had access to it, what family?
19        I mean, there's no legitimate law
20 enforcement purpose of rephotographing a scene at
21 that point that I can think of.
22 BY MS. GOLDEN:
23     Q.   And you've not read the testimony of
24 Mr. Hill, have you?

THOMAS TIDERINGTON, 10/05/2022                    Page 254..257

Page 254

1    A.   I perhaps have.  I don't recall
2 specifically on that issue what he -- I think he
3 was at the scene and maybe directing the -- the
4 photographer being retaken.  I -- I know he had
5 some involvement in that.
6    Q.   Do you have any problem with forensic
7 investigators documenting a scene as it exists at
8 that time they're requested to photograph it?
9    A.   No, no.  You mean, photographing the
10 scene after the crime --
11   Q.   Right.
12   A.   -- versus two weeks after the scenes
13 been released to the family?
14   Q.   Right.
15   A.   Do I see a problem with that?  Yes.
16   Q.   Well, why -- what is your basis for
17 saying that there's no value whatsoever to those
18 photographs?  I mean, they were used at trial,
19 right?
20   A.   I don't know if they were.
21   Q.   Okay.  And the -- if they were used at
22 trial, that would be -- there would be some value
23 to them, right?
24        MR. SWAMINATHAN:  Are you talking about the

Page 255

1 first set of photos or the later photos?
2        MS. GOLDEN:  I'm talking about the -- the
3 retaken photos.
4        MR. SWAMINATHAN:  Objection to form and
5 foundation.
6 BY MS. GOLDEN:
7    Q.   Was it your understanding that none of
8 the photos that were taken the second time were
9 used at trial?
10   A.   I don't know if they were or not.  I
11 quite frankly don't see any -- and there may be a
12 legitimate purpose, but I as we sit here today, I
13 think it would be questionable to the value of a
14 photograph that was taken after the crime scene
15 has -- has been released.
16        I guess I would have, you know,
17 additional questions that I would be asking, why
18 investigators -- you know, did -- how did you get
19 back into the scene after you released it?  Did you
20 submit a search warrant?  Did you get a consent
21 search?  Who let you back in?  How did you get back
22 in?  These are all -- you know, the report is void
23 of any of these specific details that I would have
24 expected to have been able to answer these

Page 256

1 questions if I reviewed the case.
2    Q.   And you looked at the photos, right,
3 that were taken the second time?
4    A.   I believe I did.  I -- I don't know
5 that I can recall each one as we sit here.
6    Q.   Did you find them to be of any value or
7 assistance in understanding the Soto home and the
8 layout of the apartment?
9    A.   Well, I -- I think there perhaps would
10 be some value in that, but again, I think it's
11 highly unusual if -- if you're trying to
12 demonstrate to a jury that this is the condition of
13 the crime scene as -- you know, right after it
14 occurred versus two weeks after.
15   Q.   Did you see anyone representing to the
16 jury that those photographs represented anything
17 other than the condition of the Soto home on the
18 day the photographs were taken?
19   A.   No.
20   Q.   Okay.  And does it violate any police
21 practice or standard to take photographs at the
22 request of a state's attorney handling a case?
23        MR. SWAMINATHAN:  Objection to form and
24 foundation.

Page 257

1        THE WITNESS:  No.  There would -- there'd be
2 no violation, but --
3 BY MS. GOLDEN:
4    Q.   Did you ever have -- I'm sorry.
5    A.   But I would be -- you know, the caution
6 is we got to be careful that the -- an assistant
7 state attorney does not run the police department
8 and should not be -- as you said, they can make the
9 request, but other decisions have to be made and
10 other approval should be made.
11        And, you know, again, I pointed out
12 some concerns that I would have.  How did they
13 legally get back into that premise?
14   Q.   Why does that matter?
15   A.   Why does it matter?  You have to --
16 well, there had to be a way for the law enforcement
17 officers to legally go back into the -- to an
18 apartment that wasn't owned by the law enforcement
19 officer.  I think it matters.  I -- I think --
20   Q.   Well, let's just -- well, how did --
21 they obviously got in, right?  Are you suggesting
22 that the people who took the pictures when the
23 pictures were retaken should have somehow moved
24 everything back to try to recreate the scene the

THOMAS TIDERINGTON, 10/05/2022                    Page 258..261

Page 258

1 way it was right after the bodies were discovered?
2      A.   No, no.  I --
3           MR. SWAMINATHAN:  Argumentative.
4           Go ahead.
5           THE WITNESS:  No.  I'm sorry.  I -- I think
6 you're -- perhaps I didn't explain my point clear
7 enough.
8           When a crime scene -- when a crime
9 happens, officers can lawfully go from and
10 investigate.  Once they leave and shut the door and
11 lock the door, it's my understanding, in my
12 experience, if I'm going to go back to that scene a
13 week or two weeks later, I don't have the authority
14 just to barge in and open the door and start taking
15 pictures again.  I would either have to go and get
16 a search warrant to allow me to go back in or I
17 would have to go to the person that has control of
18 that apartment and -- and request a consent search.
19 I don't think I have the authority or I don't think
20 my officers would have the authority.
21           Again, it demonstrates to me that a
22 lot of shortcuts were taken and it's inconsistent
23 with what I would expect of a professional
24 investigation.

Page 259

1 BY MS. GOLDEN:
2      Q.   Okay.  Have you ever used a 35 millimeter
3 camera?
4      A.   I have.
5      Q.   Okay.  Have you ever -- you know,
6 sometimes those pictures dont turn out, right?
7           MR. SWAMINATHAN:  Objection to form.
8           THE WITNESS:  That -- that's a fair
9 statement, yes.
10 BY MS. GOLDEN:
11     Q.   And you can't tell when you're using a
12 35 millimeter camera whether the pictures are going
13 to turn out until they're developed, right?
14     A.   I agree.
15     Q.   Okay.  Do you have some reason to
16 believe that the camera was not faulty, that the --
17 the camera that was used to take the original
18 pictures the day of the bodies were discovered
19 was -- was not faulty?
20     A.   No.  I believe that probably was the
21 case.
22     Q.   And do you have any information -- I
23 mean, have you ever -- do you have any information
24 to believe that this is the only case the Chicago

Page 260

1 Police Department ever, you know, encountered where
2 pictures didn't turn out?
3      A.   No, but let me go back to that point.
4           What I would have expected to seen
5 and -- to see and I did not see, I would have seen
6 evidence that that roll of 35 millimeter film was
7 placed into an evidence bag and there would have
8 been a short -- or there would have been a report
9 from the crime scene investigator that on this date
10 the photographs were developed by crime scene
11 investigator such-and-such and the photographs did
12 not turn out and that would have been contained in
13 an evidence -- as an evidence exhibit.
14     Q.   And what is your understanding of the
15 state of the evidence as it relates to the original
16 set of photographs that were taken when the -- on
17 the day the bodies were discovered?
18           MR. SWAMINATHAN:  Objection to form.
19           THE WITNESS:  What's my understanding of
20 where they are or they did not turn out?
21 BY MS. GOLDEN:
22     Q.   All those things that you just listed,
23 do you think we don't have those things in this
24 case for that first set the photographs?

Page 261

1      A.   You may have, and -- and if we -- if
2 you do have them and I -- I missed it somewhere,
3 I -- we agree that that should have been done.  If
4 they did it, that would be -- on that list of
5 things they did well, that would be listed on that
6 list.
7      Q.   And is it your understanding -- you
8 have here in this paragraph, The crime scene photos
9 from a high-pro -- I'm sorry, That the crime scene
10 photos from a high-profile murder were damaged and
11 unusable is highly unusual.
12           Is it your understanding that the
13 original set of photos were unusable?
14     A.   I believe some of them were, yes.
15     Q.   Were any of them usable?
16     A.   I believe there were, yes.
17     Q.   Okay.  And when you say here, The file
18 did not contain any specific details as to what
19 aspects of the crime scene were rephotographed, are
20 you looking for information about what was
21 photographed?
22     A.   That would be something I would expect
23 to be contained in the police report.  If the --
24 using your example, if the state attorney said,

THOMAS TIDERINGTON, 10/05/2022                    Page 262..265

Page 262

1 Hey, I want to go out to the scene to rephotograph
2 it, I think there should have been. And perhaps
3 there is and I -- I don't recall seeing it at this
4 point, but there would have been a supplemental
5 report detailing that detective such-and-such was
6 contacted by ASA Art Hill and he's requesting
7 photographs of A, B, and C, and that's what I would
8 expect and perhaps that's what is in the file.
9    Q.   But if it is, you're not -- you can't
10 recall as you're sitting here today whether or not
11 that's in the file?
12    A.   I would have to go through it again. I
13 mean, as you know, there's, what, 5 or 600 pages --
14    Q.   Yeah.
15    A.   -- in the file.
16    Q.   If that's in the file, as is a crime
17 scene processing report that documents what
18 photographs were taken and why they were retaken,
19 would that satisfy your concerns about whether or
20 not the retaking of photographs violated some
21 professional homicide investigation standard?
22        MR. SWAMINATHAN: Objection to form and
23 foundation, asked and answered.
24        Go ahead.

Page 263

1        THE WITNESS: Well, I still think it would be
2 unusual. I -- I think -- and I can tell you from
3 experience. My -- my grandfather, if you will,
4 created the Detroit Police Department photo lab and
5 was the first crime scene investigator in the City
6 of Detroit. So I do have quite a bit of experience
7 with -- and we had a darkroom in our basement. My
8 father was a crime scene photographer as well.
9        What I'm saying is there are times
10 when photographs dont turn out but I -- but I'm
11 saying it's highly unusual that they don't.
12 BY MS. GOLDEN:
13    Q.   But that doesn't mean it violates some
14 professional standard, to retake photographs,
15 correct?
16        MR. SWAMINATHAN: Objection to form and
17 foundation.
18        Go ahead.
19        THE WITNESS: Well, again, it depends on how
20 you're going to use those photographs. If you're
21 retaking the photographs and suggesting this is
22 what the crime scene looked like at the time, yes,
23 it would be unprofessional and -- and inconsistent
24 with acceptable police standards.

Page 264

1        If you tell the jury, Photographs
2 didn't come out, this isn't the crime scene as it
3 looked, this was two weeks afterwards, you're being
4 shown these photos just to give you the layout of
5 the apartment, then I would agree that that would
6 be a good explanation and way to do that, yes, an --
7 BY MS. GOLDEN:
8    Q.   And that would --
9    A.   -- an appropriate way to do it, yes.
10    Q.   And that would not violate any -- that
11 would not be a deviation from professional homicide
12 investigation standards, right?
13    A.   If -- if it had happened as I described
14 it, no.
15    Q.   Okay. All right. What is your basis
16 for believing that obtaining a consent search
17 several over a court-approved search warrant is a
18 significant deviation from professional homicide
19 investigation standards?
20        MR. SWAMINATHAN: Objection to form,
21 foundation.
22        Go ahead.
23        THE WITNESS: Well, it's -- it's one of the
24 things that I teach in my training classes, that

Page 265

1 consent searches are good but nothing -- but a
2 search warrant always trumps a consent search.
3 And anytime, and -- and especially in a, quote,
4 high-profile homicide case, I would expect that
5 consent searches would not be used by my
6 investigators and that they would go the extra step
7 of getting a court-ordered search warrant in order
8 to search for specific property.
9        In my view, it's highly unusual in a
10 homicide case to rely on consent searches,
11 especially when those that are consenting don't
12 speak English or have limited -- their ability to
13 speak English is limited.
14        Anything more complex than that -- I
15 know I'm running long and -- and -- you also have a
16 house where multiple people live in a house. So
17 which area -- you know, did every single person
18 that lived in the house consented? Was that -- was
19 that considered as part of the consent?
20        That's why it, in my -- in my mind,
21 a consent search is deficient and should not have
22 been used in this case.
23 BY MS. GOLDEN:
24    Q.   Consent searches are perfectly legal,

THOMAS TIDERINGTON, 10/05/2022                          Page 266..269

Page 266

1 correct?

2      MR. SWAMINATHAN:  Objection to form.

3          Go ahead.

4      THE WITNESS:  They're a tactic, investigative

5 tactic, yes.  I understand them to be legal, yes.

6 BY MS. GOLDEN:

7      Q.   Have you ever used a consent search?

8      A.   Many, many times.

9      Q.   Okay.  And what can be --

10     A.   Never --

11          (Simultaneous crosstalk.)

12     Q.   -- through a consent search?

13     A.   Excuse me one second.  Never on a

14 homicide case.

15     Q.   Well, you've only -- you've never been

16 in charge of a homicide case either, right?

17     A.   That's -- that's incorrect.

18     Q.   Okay.  How many homicide cases have you

19 been in charge of?

20     A.   As a supervisor, I would say probably

21 25 to 30 homicide cases.  As a captain in charge of

22 investigative services, probably another 100.

23     Q.   As the lead investigator, how many

24 homicide investigations have you been in charge of?

Page 267

1      A.   At as a case agent?

2      Q.   Yes.

3      A.   I was not a case -- homicide case agent

4 on any case.

5      Q.   Okay.  So you've used consent searches

6 many times, right?

7      A.   I have.

8      Q.   And they're legal.

9           And is it your understanding that the

10 search that was executed -- that the searches

11 that were executed in the Mejia home were limited

12 in some way?

13     A.   I would say that the consent would

14 cause me a great deal of concern because who

15 consented to -- can one person -- can Mejia

16 consent -- if he had seven people living in seven

17 different bedrooms, can he consent to the search of

18 all those bedrooms?

19           It's my understanding -- and I'm not

20 a lawyer and I'm not going to debate the legality

21 of it or caselaw, but when I train officers that --

22 on search warrants, and I do quite a bit of

23 training on police search warrants and consent

24 searches, is that if -- if a person has a specific

Page 268

1 defined area within a house, that it may not be --

2 and you get a consent, a person can only consent to

3 the areas that he has full control over, not the

4 entire house.

5      Q.   I understand that can be an issue, but

6 my question is just slightly different.

7           Is it your understanding that the

8 consent -- I'm sorry, that the search that was --

9 the searches that were actually carried out in the

10 Mejia home were somehow limited by the fact they

11 used a consent search as opposed to a search

12 warrant?

13     A.   I believe they should have been

14 limited, but I don't think there's a lot of detail

15 and the file -- the case file's missing and -- and

16 deficient in terms of exactly what was searched,

17 what areas of the home were searched and what --

18 what evidence was obtained.

19           Again, that's -- you know, you've

20 identified another reason why a search warrant

21 signed by a judge ordering the officers to search a

22 specific area is best practice and has always been

23 best practice, in my view, for as long as I can

24 remember.

Page 269

1           I remember in the Detroit Police

2 Academy where we talked about always getting a

3 search warrant if you have the ability to get a

4 search warrant.

5      Q.   Where -- but there are some advantages

6 to consent searches, right?

7      A.   Like what?

8      Q.   Let me ask you:  Are there any

9 advantages to consent searches over a search

10 warrant?

11     A.   Yes.  I was -- well, I don't know if

12 there's any advantages over a search warrant, but

13 certainly consent searches are used.  And I -- like

14 I said, I've used it many times.

15           Typically a consent search is used

16 when the officer does not have probable cause to

17 get a search warrant.  So it's something that when

18 an officer realizes, Hey, if I take this to the

19 judge, he's not going to give me -- he's not

20 going to sign this warrant, he's not going to

21 sign this -- or he's not going to approve this

22 affidavit, so let me go try to get a consent

23 search, maybe the people won't understand, maybe

24 they'll give me a consent to search.

THOMAS TIDERINGTON, 10/05/2022                    Page 270..273

Page 270

1            And so that is, again, primarily
2 when and how consent searches are used.
3      **Q.   They're also faster to obtain, correct?**
4      A.   They can be.
5      **Q.   Okay.  In this particular case, it was**
6 **going to be faster to ask Rosauro to consent to**
7 **search than it was to be getting -- to go get a**
8 **search warrant, correct?**
9      A.   Well, it may have been faster, but it
10 was certainly not the appropriate and proper way to
11 do it.
12     **Q.   Well, my question is not whether it**
13 **would be --**
14     A.   Hold on.
15          I didn't see any evidence that time
16 was of the essence and that it was a -- any exigent
17 circumstances that precluded them from petitioning
18 the court for a search warrant.  If they felt
19 evidence could have been destroyed, they could have
20 gone and taken control of the house and then wrote
21 up the search warrant.
22          It's highly, highly unusual on
23 a homicide case involving the death of two
24 individuals and a kidnapping of a baby and another

Page 271

1 child to rely on a consent search based upon the
2 fact that it may be faster.
3          They should have gotten a search
4 warrant.  There's no question.  I mean, it's --
5 it's not even close.  I'm unequivocally telling you
6 that it's reasonable for them not to have gotten a
7 court-ordered search warrant in this case.
8      **Q.   And where is that standard?  Is it**
9 **written down somewhere?**
10     A.   Certainly.  And I'm sure I can provide
11 documentation through the IACP through PERF.
12 There's other subject matter experts on this.
13 There's -- I think in just about every criminal
14 justice police practices book that anybody has ever
15 read or would ever read would tell you the same
16 thing, that a consent search is -- is far less
17 reliable than a search warrant and that officers
18 should always get a search warrant whenever they
19 have the ability to do so.
20     **Q.   And is that limited to homicide**
21 **investigations or all investigations?**
22     A.   Well, nothing -- I mean, all
23 investigations.  But again, the more serious the
24 crime, the more likely I am to require my

Page 272

1 detectives to -- to get a search warrant and --
2 and that's the proper way to conduct these
3 investigations.
4      **Q.   Do you remember what Guadalupe said**
5 **about -- Guadalupe Mejia said about the scope of**
6 **the search of the home when she was there?**
7      A.   I don't.
8      **Q.   Was the scope of the search that was**
9 **executed by consent, did the officers search all of**
10 **Rosauro's living space?**
11     A.   Well, again, you've identified exactly
12 the problem with a consent search.  In a search
13 warrant affidavit, you're telling the judge exactly
14 what you're searching for, what areas you believe
15 the evidence is going to found in.  You're going to
16 lay out all of these details for him and the judge
17 is going to make a determination on whether or not
18 you have probable cause to search this place.
19          You're pointing out all of the
20 reasons why they should have done this.  I don't
21 know what they searched.  I don't know what they
22 seized.  I don't know what they had the -- what did
23 the consent --
24     **Q.   Well, I guess I'm just -- is it your**

Page 273

1 **understanding that they searched anything less than**
2 **the entirety of the home?**
3      MR. SWAMINATHAN:  Objection, asked and
4 answered.
5      THE WITNESS:  I don't think they -- I don't
6 think the consent gave them the authority to search
7 the entirety of the home.  And if they did, they
8 probably -- it was probably another violation.
9 BY MS. GOLDEN:
10     **Q.   My question is not what the scope of**
11 **the consent was.**
12          **My question was here you have -- in**
13 **paragraph 2 on page 29 you say, A proper search**
14 **warrant would have given them the ability to**
15 **conduct a more comprehensive search of the home.**
16          **So what exactly -- what part of the**
17 **home do you believe that they could not but should**
18 **have searched?**
19     A.   I -- I guess I -- and thank you for
20 pointing that out.  I think I made the assumption
21 that the consent -- that they only searched the
22 area that they lawfully had consent for.  And if it
23 was Rosauro -- if it was Mejia's own individual
24 room, they got the consent to search that.

THOMAS TIDERINGTON, 10/05/2022                    Page 274..277

Page 274

1        I don't think Mejia could give the
2  consent to search other people's bedrooms.  My -- I
3  don't think the officers would have the authority
4  to go in and search the entire home if other people
5  were paying rent or leasing space or had rooms
6  exclusive to their -- for their use, the consent
7  would not have authorized that.
8        Q.   Do you believe that if they'd had a
9  search warrant, that they would have discovered
10 additional evidence relative to the crime?
11       A.   Well, certainly there was other
12 evidence that should have been -- or that -- there
13 was evidence -- there's evidence of the crime that
14 has never been recovered.  I don't think there's
15 any question.  I think that's indisputable.  To
16 this day I think there's evidence out there that --
17 that that has never been accounted for.
18       Q.   And do you think that -- do you have
19 any reason to believe that any of that evidence was
20 in the Mejia home that the police officers were
21 unable to search because they had a consent search
22 as opposed to a search warrant?
23       A.   Well, again, I would have to review the
24 reports carefully, but I don't think there was

Page 275

1  enough specific detail as to the consent that was
2  provided by Mejia and what areas -- what areas that
3  they were authorized to search in.
4        I think it is -- the question in my
5  mind and as a supervisor, these would have been
6  questions I would have been asking my detective:
7  Okay, before we just go off start searching, what
8  specifically -- what authorization did Mejia give
9  us?  What areas can we search?  What are we
10 searching for?
11       I don't think I saw any detail as to
12 what they were searching nor.
13       The other strange deviation and
14 question I have is if they're going to rely on
15 Mejia's testimony, I don't think they ever asked,
16 you know, Where did you throw the knives out, where
17 were -- you know, the clothing that Solache and
18 Mejia -- or Solache and Reyes were wearing, where
19 did they dispose of that at?  And if Reyes and
20 Solache both confessed, I -- I still have seen no
21 evidence that they asked these specific questions.
22 Did they throw it in a dumpster?  Is it still in a
23 corner of the house?  You know, where is all this
24 stuff?

Page 276

1        So again, I keep using the word
2  shoddy, but this is an example of an unprofessional
3  investigation.
4        Q.   Okay.  On page 30, bottom of the page,
5  Number 4.
6        A.   Yes, ma'am.
7        Q.   It says, Based on 43 years of
8  investigative experience, I find the method used to
9  document the plaintiffs' alleged confessions to be
10 highly inappropriate and inconsistent with
11 acceptable police practices.
12       You see that?
13       A.   I do.
14       Q.   What police practices -- well, first of
15 all, what do you mean by "the method used to
16 document the plaintiffs' alleged confessions?"
17       A.   Well, I guess what I mean by that is
18 there were multiple interviews, undocumented, no
19 notes, nobody knows what was said from one
20 interview to another.  And then after these
21 multiple interviews with the suspects, the state
22 attorney is called and says, Okay, we're ready to
23 take a written statement.  And I find it highly
24 unusual in -- in most of the cases that I'm

Page 277

1  familiar with in which we give handwritten
2  statements, we have the suspect write out in his
3  own words what he did or what she did.
4        In this case, you had an English-
5  speaking prosector from the state attorney's office
6  and you had a Spanish-speaking officer writing a
7  statement out in English from a suspect that only
8  spoke Spanish.  And then you ask him to sign this
9  document to ensure that this is consistent with
10 what his testimony is.  It's illogical.  It makes
11 no sense whatsoever.
12       Q.   Did you read in the record where -- is
13 it your understanding that it was the police
14 officer who determined that this would be the
15 method of reporting -- or documenting the
16 confessions?
17       A.   Well, I think it was the practice of
18 the police department.  And as I mentioned before,
19 state's attorney's office does not run a police
20 department, all right, and they should not be
21 creating policies and procedures.  Certainly
22 there's a cooperative effort between the police
23 department and the state attorney's office, but at
24 the same time, if something doesn't make sense, I

Page 278

1 would expect that the Chicago Police Department
2 leadership -- I mean, this isn't rocket science.
3          I mean, just think about it
4 logically. How can you have a suspect sign a
5 statement that's written in English confirming that
6 that's what happened? I mean, it makes no sense to
7 me at all. And anybody -- any reasonable person
8 that would look at it -- and more importantly, they
9 had other options that they did not use.
10    **Q.   Did you read in the record the state's**
11 **attorneys explanations for why it was done that**
12 **way?**
13    A.   I may have, but I don't recall as we
14 sit here today at 5:30, or 6:30 my time. I don't
15 recall.
16    **Q.   Okay. So that -- so if you don't**
17 **recall what they were, you wouldn't know whether or**
18 **not they made sense, right?**
19    MR. SWAMINATHAN: Objection to the form and
20 foundation.
21    THE WITNESS: I guess if that's not what I
22 said, I -- if you can point to the document, I can
23 review it real quickly and determine whether or not
24 it makes sense in my view.

Page 279

1 BY MS. GOLDEN:
2    **Q.   Okay. And is that standard written**
3 **down anywhere, that confession statements of**
4 **Spanish-speaking individuals must be taken in**
5 **Spanish?**
6    A.   Well, I think the -- and again, you've
7 got to understand what a detective is doing after
8 a crime. A detective's job is to collect evidence.
9 And what we want to do as detectives is collect
10 what is considered to be the best evidence. All
11 right? So what is the best evidence? Perhaps the
12 best evidence is a suspect's own words.
13          The Chicago Police Department had
14 the ability to capture those words exactly as they
15 were said by any of these defendants. They
16 apparently chose not to. They had the ability to
17 bring a court reporter in and transcribe word for
18 word exactly what was said.
19          And I would argue that they should
20 have done that not only in the last interview, but
21 they should have done it in every -- every
22 interview if -- if they were going to rely on it
23 solely, solely, to charge individuals for -- for
24 double murder and kidnapping.

Page 280

1    **Q.   I think my question was: Is it written**
2 **down anywhere as a standard by any entity or**
3 **organization that statements of Spanish-speaking**
4 **people must be made in -- written down in Spanish?**
5    A.   I'm sure there are. I would have to
6 research some of my documents, but I -- I'm sure I
7 can point to a -- you know, before -- you know,
8 besides just my 44 years of experience and the
9 teaching that I do, I can certainly provide
10 additional support beyond that, whether it's
11 through the IACP or -- or PERF.
12    **Q.   And you think that it --**
13    A.   Or -- or by evidence. If it's such a
14 great practice, I don't think Chicago's still doing
15 it that way. I think they're doing it different
16 now. I don't think this is --
17    **Q.   Was it the standard -- I'm sorry. Was**
18 **it the standard back in 1998 -- was there a**
19 **standard back in 1998 that required confession**
20 **statements of Spanish-speaking people to be written**
21 **in Spanish?**
22    A.   I would -- I would think yes. I
23 certainly can't point it.
24          I can tell you from practical

Page 281

1 experience from an investigator working criminal
2 cases in 1998 that this was not a best practice,
3 this was not an acceptable practice. And as I
4 described the alternatives to you is -- is what
5 would have been at the time what I believe to be
6 reasonable and consistent with the vast majority of
7 how -- vast majority of departments operated at the
8 time.
9    **Q.   Okay. But so you think you can come up**
10 **with something in writing that says that was the**
11 **standard back in 1998?**
12    A.   I certainly think I can, yes.
13    **Q.   Okay. Did you see --**
14    A.   Can I just add one -- I think in -- I
15 do recall that the police spokesman, Winstrom, also
16 indicated that there were times that they would
17 bring a court reporter in to transcribe the
18 witnesses statement, all right, which tells me that
19 was a policy of the Chicago Police Department back
20 then.
21          If they argued that they didn't have
22 the ability to tape record, which they can't argue
23 because I worked with the Chicago Police Department
24 back in those days and I know they had the ability

THOMAS TIDERINGTON, 10/05/2022                    Page 282..285

Page 282

1 to secretly record conversations.

2          So if we're looking for the best

3 practices under the confines of what the Chicago

4 Police Department did, they should have, at the

5 very least, used a court reporter to transcribe the

6 testimony -- or the statement of the suspects. And

7 I agree with Winstrom that that should have been

8 done.

9     Q.    The court reporter would have to be a

10 Spanish speaker, would they not, in order for it to

11 be recorded without a translator?

12    A.    Perhaps.

13    Q.    So you'd have to have a Spanish-

14 speaking person asking questions and a Spanish-

15 speaking person who -- as a court reporter?

16    A.    Perhaps.

17    Q.    And do you think that they're -- I

18 mean, and there's four people's statements being

19 taken at or about the same time. You think there

20 were eight Spanish-speaking court reporters at

21 this -- the time these statements were taken?

22    MS. SUSLER:  Objection, misstates the

23 evidence.

24    MR. SWAMINATHAN:  Objection to form,

Page 283

1 argumentative.

2          Go ahead.

3    THE WITNESS:  Well, we're dealing with

4 capital crimes here. We're dealing with people's

5 lives, going to prison, going to the electrical

6 chair for -- going to prison for life. I don't

7 think that's too much to ask.

8          I don't think -- and perhaps you've

9 identified another problem within the Chicago

10 Police Department is: Let's get this case solved

11 as quickly as we can, we're not going to collect

12 the best evidence, we're just going to collect

13 enough evidence to get a conviction.

14          And -- and that's what I've seen

15 with this case and many of the other cases that

16 I've had an opportunity to review so far.

17 BY MS. GOLDEN:

18    Q.    What is your understanding of who, once

19 prosecutors are involved, decide whether to take a

20 statement from a person --

21    MR. SWAMINATHAN:  Objection to --

22 BY MS. GOLDEN:

23    Q.    -- (continuing) suspected of a crime?

24    MR. SWAMINATHAN:  Objection to foundation.

Page 284

1          Go ahead.

2    THE WITNESS:  I'm sorry. So if you don't

3 mind, if I can ask you to ask that again, please.

4    MS. GOLDEN:  Sure.

5 BY MS. GOLDEN:

6    Q.    Once the police have decided that

7 they're going to ask the prosecution to bring

8 charges against someone and the prosecution becomes

9 involved, what is your understanding of who decides

10 whether or not to take a statement from a person?

11    MR. SWAMINATHAN:  Objection to form and

12 foundation.

13          Go ahead.

14    THE WITNESS:  Well, a charging statement, a

15 confession, or -- they didn't bring the prosecutor

16 in till well after they had statements, multiple

17 statements, from the suspects. So --

18 BY MS. GOLDEN:

19    Q.    I mean -- I mean those -- those written

20 confession statements. Mr. Solache, let's just

21 take Mr. Solache's written confession statement.

22 What's your understanding of whose idea -- of

23 whose decision it was whether or not to take that

24 statement and, if so, in what form?

Page 285

1    MS. SUSLER:  Objection to your

2 characterization of it as Mr. Solache's written

3 statement.

4    MR. SWAMINATHAN:  Same objection.

5          Go ahead.

6    THE WITNESS:  I don't recall. Again, the

7 spokesman for the Chicago Police Department, I

8 don't -- I did read his testimony. I don't recall

9 what -- what Winstrom said exactly.

10          I can tell you from a practical

11 matter that it would be a cooperative effort

12 between the police department and the state

13 attorney's office as to what tactics law

14 enforcement would use to conduct their

15 investigations. Certainly, the prosecutor can make

16 suggestion, but they're not the police chief and

17 they don't run the police departments, or they

18 should not, anyways.

19 BY MS. GOLDEN:

20    Q.    Okay. And in Item 5 here on page 31 --

21    A.    Yes.

22    Q.    -- you state that, A number of

23 additional witnesses were deposed in this case who

24 testified that they had been brought to the station

THOMAS TIDERINGTON, 10/05/2022                          Page 286..289

Page 286

1 and interviewed by detectives, including some
2 treated as suspects, but there are no
3 contemporaneous notes of any of those interviews,
4 and in most cases no report documenting the
5 substance of those interviews. And then you list a
6 number of people.
7     A.   That's true.
8     Q.   Okay. And is it your understanding
9 that there are no contemporaneous notes of any
10 interviews with any of the people listed there?
11    A.   I think there are some notes, not to
12 the extent of the number of interviews or what I
13 would have expected to see in a -- a professional
14 case file involving a double homicide and a
15 kidnapping.
16         So there were limited notes by some
17 of the investigators. Guevara, off the top of my
18 head, I think he was the case agent, very limited
19 in terms of the notes that he took. Some of the
20 other officers were a little bit better. I think
21 Rutherford, there's some notes from Rutherford in
22 there. But not to the detail that I would have
23 expected to see in a case file of this magnitude.
24    Q.   When you were the chief of police in

Page 287

1 Plymouth Township, did you ever have more than one
2 pending homicide in your department at a time?
3     A.   Not -- not in Plymouth Township, no.
4     Q.   Do you have any idea how many pending
5 homicides the detectives involved in the Soto
6 homicide investigation or how many other cases they
7 were working on at the same time they were working
8 on this one?
9     A.   I -- I don't know that, but I don't
10 think that that's relevant or -- every -- every
11 case should be looked at individually. And I --
12 and again, I -- well, I guess I should let you
13 ask the rest of your question. I'm sorry. I'm
14 anticipating questions and I apologize for doing
15 so.
16    Q.   So do you know what the homicide rate
17 was in Chicago in 1998?
18    A.   I don't know specifically, but maybe
19 it -- maybe it was similar to the Detroit. I think
20 Detroit was the murder capital and Chicago was
21 second or, you know, they were back and forth
22 competing for that position.
23    Q.   And how many murders is that a year?
24    A.   It's a guess. I don't -- I don't -- a

Page 288

1 thousand. I -- I don't really know.
2     Q.   And in addition to a thousand murders,
3 the homicide detectives that worked on the Soto
4 homicide investigation were also responsible for
5 other -- for investigating other types of crimes
6 as well, right?
7     A.   That's my understanding.
8     Q.   Do you have any idea how many cases
9 they were working on at any particular time in
10 1998?
11    A.   I don't.
12    Q.   And does that matter to you?
13    A.   Certainly it would -- certainly it
14 would matter, but I -- I've not seen any evidence
15 that suggests that the deficiencies that were found
16 in this case were -- was the result of being
17 overworked.
18         I have not seen any evidence that
19 the chief of police came forward and said, We can't
20 handle the caseload, so we're asking the FBI, we're
21 asking the federal agency to come in, assist us in
22 these investigations because we don't have the
23 manpower to do it.
24         An agency as large as the Chicago

Page 289

1 Police Department -- and it's very similar to the
2 Detroit Police Department and, in some respects,
3 the DEA where I spent many years as a supervisor.
4 When you have a large agency, you can redirect
5 resources and prioritize cases.
6         And if you have a thousand homicides
7 and you're going to look at it and you're going to
8 say, Okay, we're not going to investigate the theft
9 of the four tires that came off the cars, we're
10 going to put our resources towards cases that are,
11 you know, homicide-type cases where we're not going
12 to take shortcuts, if we take shortcuts, we're
13 going to put the wrong person in jail.
14    Q.   Do you believe that it was possible
15 for Adriana Mejia to have committed the Soto
16 homicide -- murders and kidnapping on her own?
17    MR. SWAMINATHAN: Objection to form,
18 foundation, and relevance.
19         Go ahead.
20    THE WITNESS: Are you asking me my personal
21 opinion or -- or I guess you're asking both.
22 BY MS. GOLDEN:
23    Q.   Well, your professional opinion with
24 all your -- with your 44 years of law enforcement --

THOMAS TIDERINGTON, 10/05/2022                          Page 290..293

Page 290

1   A.   Right.
2   Q.   -- experience.
3   A.   No.  It -- it's more likely than not
4 that she did not commit this crime by herself.
5      Q.   And you understand what exculpatory
6 evidence is, right?
7   A.   I do.
8      Q.   Adriana's demonstration of how they
9 killed -- or how she stabbed Jacinta Soto, is that
10 exculpatory?
11      MR. SWAMINATHAN:  Objection to form and
12 foundation.
13      THE WITNESS:  Would it be exculpatory, would
14 it be something that should be turned over to --
15 BY MS. GOLDEN:
16      Q.   Well, what's your understanding of
17 exculpatory evidence?
18   A.   Evidence that would demonstrate a
19 person's guilt or innocence, innocence -- more so
20 innocence, obviously.
21      Q.   More so or entirely so?
22   A.   Oh, entirely I guess would be a fair
23 way to ...
24      Q.   So when Adriana's demonstrating how

Page 291

1 she murdered Jacinta Soto, that's not exculpatory,
2 right, that's inculpatory?
3      MR. SWAMINATHAN:  Objection to form.
4      Go ahead.
5      THE WITNESS:  Well, I think it's evidence
6 that she committed the crime and --
7 BY MS. GOLDEN:
8      Q.   And that's not evidence of innocence,
9 is it?
10   A.   No.  It's not evidence of innocence,
11 no.
12      Q.   So it's not exculpatory, correct?
13   A.   Well, it would be exculpatory if
14 somebody else was being accused of the crime.
15      Q.   Was anyone else accused of stabbing
16 Jacinta Soto that way?
17   A.   Reyes and Solache, weren't they?
18      Q.   Were they accused of bending over
19 Jacinta and stabbing her repeatedly in the back?
20      MR. SWAMINATHAN:  Objection to form and
21 foundation.
22      Go ahead.
23      THE WITNESS:  No.  I -- I think we're
24 splitting hairs as to where they were being stabbed

Page 292

1 and how they were being stabbed, but -- well, but
2 again, you do bring up another great point, and
3 I -- I thank you for doing that, is the -- even
4 that information was not handled properly.  It was
5 not reported I think for 18 or 19 months after it
6 allegedly occurred.
7 BY MS. GOLDEN:
8      Q.   But my question is -- is not that.
9 My question is whether that is exculpatory
10 information.
11   A.   Exculpatory towards who, towards --
12 towards her innocence or somebody else's innocence.
13      Q.   For Solache and Reyes?
14   A.   Yeah.  I --
15      Q.   How is that evidence indicative -- how
16 is that evidence indicative of their innocence?
17   A.   I -- I think it would be exculpatory if
18 the information did not comport with the -- other
19 evidence and the other facts in the case.  You
20 know, it's certainly evidence that, in my opinion,
21 should have been turned over.  It should have been
22 provided to the state attorney.  It should have
23 been documented.
24      I think it's important information.

Page 293

1 Whether it's exculpatory or not, and I -- I guess
2 we're splitting hairs on that, but it's certainly
3 evidence that should have been completed and
4 contained within the case file shortly after it
5 occurred.
6      MR. SWAMINATHAN:  Carrie, before you -- you
7 can finish your line of questioning.  I need to pee
8 real bad, so whenever you're at a good stopping
9 point.
10      MS. GOLDEN:  Let's do it -- let's do it now.
11      MR. SWAMINATHAN:  I don't mean to cut you
12 off.  I'm sorry.
13      MS. GOLDEN:  No, no.  It's good.  I switched
14 the page, so I'm good.
15      MR. SWAMINATHAN:  Okay.
16      THE VIDEO TECHNICIAN:  We're off the video
17 record at 5:31 p.m.
18      (Recess taken.)
19      THE VIDEO TECHNICIAN:  We're now back on the
20 video record at 5:44 p.m.
21 BY MS. GOLDEN:
22      Q.   Refresh my memory, what was your
23 assignment in Florida in 1998?
24   A.   1998, I would have been the captain in

Page 294

1 charge of the Special Investigations Division.
2    Q.   And was -- I imagine the course of your
3 work at -- in the department at that time, you came
4 into contact with a number of foreign nationals?
5    A.   I did.
6    Q.   In 1998, was the Fort Lauderdale Police
7 Department providing consular notifications to
8 foreign nationals who had been arrested or
9 detained?
10    A.   I don't believe that was our policy.
11    Q.   Are you aware of any police department
12 that was in 1998 providing consular notifications
13 to detained or arrested foreign nationals?
14    A.   I know the Chicago Police Department
15 had a policy that that's -- that's what they would
16 do, but I'm not familiar with any other department.
17 They may have, but I just don't know as we sit
18 here.
19    Q.   Okay.  Is your understanding that --
20 who is it that placed Mr. Solache under arrest?
21    A.   I'm not sure.  I --
22    MR. SWAMINATHAN:  Objection, foundation.
23       Go ahead.
24    THE WITNESS:  I would have to look at the

Page 295

1 police report.  I do recall seeing it in there, but
2 I don't know if it was the officer that transported
3 him to Area 5 or -- or whether it was the Area 5
4 detectives.  I -- I don't recall.
5 BY MS. GOLDEN:
6    Q.   Okay.  That's -- let's look at Exhibit 7,
7 page 270, I think.  Robyn will put it up for us.
8       Robyn, are you with us?
9       Okay.  Do you see here, sir, that is
10 this is the arrest report for Mr. Reyes?
11    A.   Yes.
12    Q.   And then if you scroll down a little
13 bit, you see that it's signed by Detective Mohan?
14    A.   Yes.
15    Q.   And Detective Kernan, correct?
16    A.   That's correct.
17    Q.   And then if you go to the -- so does
18 that lead you to believe they were the officers
19 that actually placed Mr. Reyes under arrest?
20    MR. SWAMINATHAN:  Objection to form.
21       Go ahead.
22    THE WITNESS:  Wait.  Can you scroll back up
23 to the top there, please?
24       So what I noted is that the arrest

Page 296

1 took place at 10:30 a.m. on -- on April 3rd.
2 BY MS. GOLDEN:
3    Q.   I'm not asking you about the time.  I'm
4 asking you if, based on this document, it's your
5 understanding that the officers that put Mr. Reyes
6 under arrest were Detectives Mohan and Kernan?
7    A.   Can you go down to that section of the
8 report?
9    Q.   Sure.
10       They're the ones who signed the
11 arrest report, right?
12    A.   They did, but in the paragraph above
13 that it says, Additional investigating, slash,
14 arresting officers, and -- and it lists the other
15 officers as well.  So --
16    Q.   Right.  And did you read the -- the
17 testimony in the record about what that denotes?
18    A.   I don't recall if I did or not.  I -- I
19 probably did, but I don't recall it as we sit here
20 today?
21    Q.   Do you know what the difference in
22 meaning is between the people who sign the arrest
23 warrant and the people who are noted there as
24 additional investigating, slash, arresting

Page 297

1 officers?
2    A.   Well, it indicates to me that the
3 officer that completed the report was Officer
4 Mohan, who authored the report and was probably
5 considered the arresting officer at that time.
6    Q.   Does that -- okay.  And if we go to the
7 next page, 271.  And this indicates that the same
8 two officers authored the report, the arrest
9 report, for Mr. Solache correct?
10    A.   It appears to be, yes.
11    Q.   So does that -- do either of those
12 arrest reports tell you who was present or who
13 decided when to arrest Mr. Solache and Mr. Reyes?
14    A.   When to arrest them?
15    Q.   I asked two different questions at the
16 same time.  My apologies.
17       Do you either of these reports tell
18 you who was present when Mr. Solache and Mr. Reyes
19 were arrested?
20    A.   Again, it's -- it's somewhat vague.  So
21 to answer your question, it does not tell me that.
22 I can make inferences, but I don't know for sure.
23    Q.   Okay.
24    A.   And again, the -- the other question

THOMAS TIDERINGTON, 10/05/2022                    Page 298..301

Page 298

1  was when they arrested them.  And I -- I think it
2  does indicate that on the top of the report.
3       MS. GOLDEN:  All right.  Let's go off the
4  record.  I need to find something here.
5       THE VIDEO TECHNICIAN:  We're off the video
6  record at 5:51 p.m.
7            (Recess taken.)
8       THE VIDEO TECHNICIAN:  We're back on the
9  video record at 5:52 p.m.
10 BY MS. GOLDEN:
11      Q.   Okay.  I think on page 14 of your
12 report on the top, which is Exhibit 6 -- thanks,
13 Robyn -- you discuss a motion to suppress hearing,
14 which you say occurred on March 3rd, 2000.
15      A.   That's correct.
16      Q.   And based on your prior testimony, this
17 is a -- you personally reviewed the transcript,
18 correct?
19      A.   I did.
20      Q.   And you have here a statement that
21 Judge Sacks made in italics, right?
22      A.   I believe so, yes.
23      Q.   And at the bottom of that quote it
24 says, As far as the Court is concerned, basically

Page 299

1  on everything I heard so far, as of 10:30 in the
2  morning on April 3rd, 1998, the police did not have
3  probably cause to arrest Arturo Reyes or Gabriel
4  Solache.  Do you see that?
5       A.   I do.
6       Q.   Okay.  And this is in part what you
7  used to base your opinion that Mr. Solache and
8  Mr. Reyes were arrested without probable cause;
9  right?
10      A.   I think it supports my opinion.  I
11 don't know if I used that as the basis for my
12 opinion, but it's -- you know.  It's obvious to me
13 that there was no evidence against them whatsoever
14 at 10:30 in the morning.  I -- it --
15      Q.   But I think you --
16      A.   Well --
17      Q.   You did say that --
18      A.   Hold on.
19      Q.   I'm sorry.
20      A.   And in their own reports, they conclude
21 that the only evidence against them were the
22 confessions and the confessions of Mejia, and none
23 of that occurred at 10:30 in the morning.  So there
24 was nothing that supported their arrest, and I

Page 300

1  think that the judge's ruling supports my
2  conclusion.
3       Q.   All right.  Do you know when the judge
4  says "basically on everything I heard so far," do
5  you know how many witnesses had testified so far at
6  that point?
7       A.   I don't.
8       Q.   Do you know how many witnesses
9  testified after that?
10      A.   I don't.
11      Q.   And you understand that the confessions
12 were eventually used against Mr. Solache and
13 Mr. Reyes at their trials, correct?
14      A.   I understand the confessions were used,
15 yes.
16      Q.   So it's fair to assume that the judge
17 denied -- ultimately denied their motions to
18 suppress, correct?
19      A.   You know, I -- I don't know.  If you're
20 telling me that's what happened, I would confirm
21 or I would agree with you, but I -- I don't
22 independently know that as we sit here.
23      Q.   Okay.  Do you recall whether or not the
24 motions to suppress raised other claims in addition

Page 301

1  to their claim that they were arrested without
2  probable cause?
3       A.   I don't know that.
4       Q.   Do you remember reviewing in any of the
5  materials that -- do you remember seeing in any of
6  the materials that you reviewed a claim by
7  Mr. Solache or Mr. Reyes that their confessions
8  should be suppressed because they were subject to
9  physical coercion?
10      A.   I do believe there was testimony to
11 that effect, yes.
12      Q.   And do you know what the outcome of
13 their motion to suppress their confessions based on
14 physical coercion was?
15      MR. SWAMINATHAN:  Objection to form.
16           Go ahead.
17      THE WITNESS:  I don't know, but I'm assuming
18 it was denied because they were ultimately
19 convicted.
20 BY MS. GOLDEN:
21      Q.   And Adriana raised the same claims,
22 right?  That she was arrested without probable
23 cause and that she was subject to physical
24 coercion.  Do you recall seeing --

THOMAS TIDERINGTON, 10/05/2022                    Page 302..305

Page 302

1    A.   I --
2    Q.   Do you recall seeing that in the
3 record?
4    A.   I believe that's correct.
5    Q.   And her motions were also denied?
6    A.   That's my understanding.
7    Q.   Do you recall seeing anywhere in the
8 record a finding by Judge Sacks that Mr. Solache's
9 claim that he was subjected to physical abuse was
10 not credible?
11    A.   It's possible I -- I vaguely recall,
12 but I could not without looking at that or having
13 you point to that, I -- I can't remember
14 specifically.
15    Q.   Did Judge Sacks' testimony about the
16 credibility of Mr. Solache's claim that he was
17 subject to physical abuse play any role in the
18 opinions that you formed in this case?
19    MS. SUSLER:  Objection, form.
20    MR. SWAMINATHAN:  Same.
21        Go ahead.
22    THE WITNESS:  I don't recall what the judge
23 said, so I -- I would have to say it was something
24 that I considered, but obviously wasn't something I

Page 303

1 relied or depended upon.
2 BY MS. GOLDEN:
3    Q.   And it's something that you didn't
4 recall until I brought it up, right?
5    MR. SWAMINATHAN:  Recall as of when?  I mean,
6 just -- go ahead.
7    THE WITNESS:  No.  What I said is if you want
8 to question me about his -- the judge's rulings,
9 I -- I had asked if we could -- if I could be
10 allowed to review that and I think I could give you
11 a better response on whether or not I recall
12 reading that.  But as we sit here, I don't
13 independently recall that at this point.
14 BY MS. GOLDEN:
15    Q.   Okay.  Is it your opinion that Adriana
16 Mejia was being truthful when she told Rosauro and
17 Arturo Reyes that she got the boy from Norma
18 Salazar?
19    MR. SWAMINATHAN:  Objection to form and
20 relevance.
21        Go ahead.
22    THE WITNESS:  Well, I mean, when did that
23 occur?
24

Page 304

1 BY MS. GOLDEN:
2    Q.   If you look on page 14 of your report
3 in Item B, you say --
4    A.   Oh, yeah.
5    Q.   Do you see it?
6    A.   Yes, I do.
7    Q.   Okay.
8    A.   So yeah.  That was her -- I -- again,
9 what I kind of refer to as her first untruthful
10 statement or story, is -- is that's what she
11 claimed, was that she got the child from this Norma
12 Salazar.
13    Q.   Okay.  So let me ask you this:  So
14 Adriana tells what you call her first untruthful
15 story and says that the boy came from Norma
16 Salazar.  And let's just assume for the sake of
17 argument Adriana doesn't have a working phone
18 number for her or an address from her or any way to
19 contact her.  What was the next appropriate
20 investigative step for the detectives to take to
21 pursue the Norma Salazar lead?
22    A.   Well, I think -- well, you're saying to
23 assume that there was no way to identify Norma?
24    Q.   Well, I'm saying to assume that Adriana

Page 305

1 did not provide any contact information -- any
2 truthful contact information for Norma Salazar.
3    MR. SWAMINATHAN:  Objection to form and
4 foundation.
5        Go ahead.
6 BY MS. GOLDEN:
7    Q.   Right.  Because there's -- if they
8 provided her phone number, I assume they would have
9 called the phone number, but if it was -- and if
10 they reached her, they would have called her in.
11        But assuming they have no truthful --
12 Adriana provides the police with no truthful
13 contact information for Norma Salazar from whom she
14 claims she received -- gave her the children, what
15 was the next appropriate investigative step for the
16 detectives to take in terms of pursuing the Norma
17 Salazar lead?
18    MR. SWAMINATHAN:  Objection to form and
19 foundation.
20    THE WITNESS:  Well, they -- they did identify
21 Norma Salazar and they brought her in.
22 BY MS. GOLDEN:
23    Q.   Well, okay.
24    A.   And -- and they presented a -- again,

THOMAS TIDERINGTON, 10/05/2022                    Page 306..309

Page 306

1  there's another -- thank you for bringing it up,
2  another example of deviation from normal police
3  practices.
4           There's testimony that she was shown
5  a single photograph and then either there was or
6  was not some sort of a lineup in which Mejia
7  originally identified the photograph and supposedly
8  did not identify the lineup.
9           So it's very confusing and it's
10 unusual and it's inconsistent with police practices
11 in terms of how they documented and -- how they
12 documented their involvement with Norma Salazar and
13 how they cleared her from being a suspect.
14    Q.   Okay.  Well, I -- I saw in the record,
15 and correct me if I've gotten it wrong, but she
16 said there was a Norma Salazar involved, right?
17 And she didn't -- and so then they found a Norma
18 Salazar, a picture of a Norma Salazar, and Adriana
19 says, Yeah, that's her, right?
20    A.   That's my understanding.
21    Q.   Okay.  Now, so but -- and I know you
22 take issue with showing her a single photograph of
23 Norma Salazar, but what were they supposed to do,
24 find like ten different Norma Salazars and put them

Page 307

1  all in front of her?
2     A.   No.  They were supposed to do a photo
3  lineup with people that -- or a live lineup with
4  people that somewhat resemble her, and they -- and
5  have her pick them out of a photo lineup of six
6  other individuals.
7     Q.   Well, how would they know what she
8  liked like?
9     A.   They brought her in.  They had her.
10 They identified her.
11    Q.   But they identified her because they
12 showed the single picture of her to Adriana, so
13 that's how they knew who to put in the lineup.  But
14 like if -- if they didn't know --
15    A.   Well --
16    Q.   -- which Norma Salazar Adriana thought
17 or was saying was the correct one, who would they
18 put in a lineup?
19    A.   And again, that's a -- that's a good
20 point.  So if the detectives identify somebody that
21 they believe is a suspect and they believe that
22 this could be and obviously if they have a picture
23 that they're going to show her, they should have
24 done it, again, the proper way and not the most

Page 308

1  convenient and the fastest and the shortcuts.  They
2  should have taken the time and they should have --
3  and pretty quick and pretty easily be able to find
4  five other photographs that somewhat resembled her
5  and they should have presented that to her and --
6  to see if she was able to identify this Norma
7  Salazar.
8           That would have been the appropriate
9  police investigative tactics that I would have
10 expected to see her, using your --
11    Q.   How -- how would they identify which
12 Norma Sala- -- I mean, presumably there's more than
13 one Norma Salazar in Chicago.  So how would they
14 identify which Norma Salazar they should put in the
15 lineup of five people and which Norma Salazar they
16 should find --
17    A.   And again --
18         (Simultaneous crosstalk.)
19    Q.   -- fillers for?
20    A.   And again --
21    MR. SWAMINATHAN:  Objection to form, asked
22 and answered.
23         Go ahead.
24    THE WITNESS:  Again, the record, as you point

Page 309

1  out, is -- is deficient and the report does not
2  reflect how they concluded that the photograph of
3  Norma Salazar, the one that showed to Mejia,
4  why they suspected that that was the person.  If
5  the detectives suspected that that was the Norma
6  Salazar that was involved in this case, I'm
7  suggesting that the standard protocol, and even
8  Chicago policy, would have required them to conduct
9  a photo lineup.
10         So of all these Norma Salazars, how
11 did they pick the right one that Mejia identified?
12 That should have been included in the report.  I
13 don't -- I can't answer that.  It was not in the
14 report.
15 BY MS. GOLDEN:
16    Q.   Okay.  So you're saying, you know, if
17 she was shown multiple pictures of different Norma
18 Salazars, that should be in the report?
19    A.   Well, certainly.  And it -- it also is
20 a tactic that the investigator could use to
21 determine whether she was lying or not.  They could
22 have put somebody in there whose name was -- you
23 know, who was not Norma Salazar and asked -- to see
24 if she was going to identify her.

THOMAS TIDERINGTON, 10/05/2022                    Page 310..313

Page 310

1    I mean, that's what investigators
2  do.  I mean, we -- we test to determine the
3  credibility of a witness.
4      Q.   Isn't that kind of what they did when
5  she came in and -- isn't that kind of what happened
6  when she refused to identify the Norma Salazar that
7  came in as the woman who gave her the boy, she
8  abandoned the lie?
9      A.   Well, she already identified her once.
10     Q.   Right, but then when the person was
11 live and in person, she -- she declined to say that
12 that was the person who gave her the boy, right?
13     A.   And that -- that's certainly -- and
14 again, it's very unusual to show somebody a
15 photograph -- highly unusually to show somebody a
16 photograph and then create a photo lineup -- or a
17 live lineup and say:  See if you can pick that
18 person out of the picture.  You know the picture I
19 just showed you?  See if you can point that person
20 out in this lineup.
21         I mean, it makes -- there's no
22 logical sense for what these officers did by
23 creating a live lineup after they showed an
24 individual -- or a picture of an individual that

Page 311

1  they told her was Norma Salazar.
2      Q.   So should they have just not had the
3  lineup?
4      A.   No.  They should have done the
5  lineup -- they should have either done one of two
6  things.
7          They should have either done a photo
8  lineup, which their policy spells out on how they
9  should have done that; or if they had Norma in the
10 police station and they -- they had an option of
11 doing a live lineup, they -- they couldn't -- they
12 should not have -- they should have done either one
13 of those.
14         But once you show somebody a
15 photograph and -- and I know you're not a police
16 officer, but if you just think about it logically,
17 you don't show a witness a picture and say, Okay,
18 is this the person that -- Norma Salazar and she
19 says, okay, let's go in here and see if you can
20 pick her out of a photo -- of a live lineup.  It's
21 not something that you do.
22     Q.   What does it tell you that Adriana
23 refused -- can you draw any conclusion -- do you
24 draw any conclusion from the fact that Adriana did

Page 312

1  not identify the same Norma Salazar that she
2  identified in the picture from the lineup?
3      A.   The conclusion I draw is she is a liar.
4  Everything -- there's nothing that I would have
5  believed out of Mejia's mouth at that point,
6  without additional corroborating information or
7  evidence.  There is nothing I would have believed
8  that her -- in terms of charging anybody else
9  without corroborating evidence.
10     Q.   Okay.  All right.  And I apologize if I
11 asked you this already -- you know, I think I did.
12     A.   And -- and I'm sorry.  And I -- I did
13 leave one thing out.  You -- you asked me about the
14 lineup.
15         The other deficiency I noted in
16 reviewing the file is that they violated their own
17 department policy by not completing a lineup
18 supplemental report detailing what they did and --
19 and how they did it.
20     Q.   And I'm glad you brought that up.
21 Because that supplementary report that -- that
22 you're referring to would have contained
23 information about the other people in the lineup,
24 right?

Page 313

1      A.   It should have, yes.
2      Q.   Okay.  And it should have said whether
3  or not Adriana was selected, correct?
4      A.   Adriana or --
5      Q.   I'm sorry.  Whether or not Norma
6  Salazar was selected?
7      A.   Correct, yes.
8      Q.   And we know from the report that
9  Adriana -- I'm sorry, that Norma Salazar was not
10 selected, correct?
11     A.   That is correct.
12     Q.   And we also know that the other people
13 in the lineup were fillers and were not appropriate
14 suspects in this criminal investigation, correct?
15     A.   That's my understanding, yes.
16     Q.   Okay.  Do you recall who, according to
17 the confession statements of Mr. Solache and
18 Mr. Reyes, drove to the Soto home?
19     A.   I don't.
20     Q.   Do you recall between Mr. Solache and
21 Mr. Reyes which of them Ms. -- Adriana Mejia had a
22 deeper friendship and relationship with?
23         MS. SUSLER:  Objection; form, misstates
24 the evidence.

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 314

1    MR. SWAMINATHAN: Objection to form.
2 Objection to foundation. You're asking for a
3 memory test.
4        Go ahead.
5    THE WITNESS: I don't recall seeing any
6 information on who she had a deeper relationship
7 with. I -- I do know she identified Reyes
8 initially. Solache said he wasn't involved. So I
9 guess you could draw a conclusion that she was
10 protecting Solache. But then I would also conclude
11 that maybe she's protecting her husband too, so I --
12 I don't know.
13 BY MS. GOLDEN:
14    Q.  Well, she knew Mr. Solache since she
15 was a young girl, right? Did you see that in the
16 record?
17    A.   I do recall seeing that, yes.
18    Q.   And Mr. Reyes just moved into the house
19 more recently, right?
20    A.   I -- yes. I -- I'll agree with you on
21 that. I don't know specifically, but yes.
22    Q.   And Mr. Mejia, Rosauro Mejia, he
23 testified, I think you -- you state in your report
24 he testified for the defense. Do you remember

Page 315

1 that?
2    A.   Yes, but are you referring to a
3 specific page that I could just refresh my memory
4 on?
5    Q.   I just saw it and I lost it knew.
6        But do you remember that he
7 testified for the defense?
8    A.   I don't recall if he testified at
9 trial or if he testified in subsequent hearings or
10 other -- I -- I do believe he provided testimony at
11 some point.
12    Q.   Okay. On page 16 of your report, in
13 Item D you refer to recent suspicious events,
14 including a firebombing of the Soto's car by gang
15 members causing them to move. Do you see that?
16    A.   I do.
17    Q.   Do you believe that was a credible lead
18 after the three -- after Ms. Mejia, Mr. Solache,
19 and Mr. Reyes signed the confession statements?
20    A.   Knowing what we know now, that they
21 were beaten and coerced, or knowing what the --
22 perhaps what they -- well, if the detective beat
23 them, then he knew at the time the confession was
24 coerced, so yeah. It should have been relevant

Page 316

1 whether they confessed or not. If the detective
2 knew that he coerced the statements from the
3 witnesses, yeah, it would be very relevant.
4    Q.   Knowing as we do now that Adriana was
5 involved in the Soto homicide and kidnapping, does
6 it still seem to you to be a credible lead?
7    A.   Certainly. It would be a lead that
8 the -- I would have expected that any reasonable
9 investigator would have followed up with and
10 certainly would have considered it and chased it
11 down and either included that it was not credible
12 or that it had no part in -- in this -- in the
13 murders.
14    Q.   And that's your --
15    A.   I'm sorry.
16    Q.   And it's --
17    A.   Certainly the Soto family thought it
18 was important and that's why they communicated that
19 to the police. And so yeah, it -- it was -- I
20 think it was very relevant.
21    Q.   And it was still relevant and credible
22 after knowing that Adriana is at least in part
23 responsible for the kidnapping of the children and
24 murder of their -- murders of their parents?

Page 317

1    MR. SWAMINATHAN: Objection to form,
2 argumentative.
3 BY MS. GOLDEN:
4    Q.   Is that true?
5    A.   Well, again, there was such limit
6 information, I -- I'm sorry, limited evidence that
7 every lead should have been investigated and
8 concluded.
9        Our -- our -- typically -- and this
10 is one of the problems or deficiencies that I see
11 in the Chicago Police Department, is that
12 oftentimes a case should not end with somebody
13 being arrested. It should continue on. And if
14 additional leads come in, they should not be
15 discounted. They should be investigated and -- and
16 the reason they should be investigated is because
17 you want to have the ability -- if the defense
18 attorney tries to say, You didn't follow-up on this
19 lead, did you, I want to be able to say, Yes, we
20 followed up on every credible lead that was
21 available to us.
22    Q.   And that -- in a perfect world, that's
23 ideal, right?
24    A.   Not in a perfect world, but in any

Page 318

1  police department that's charged with the
2  responsibility of investigating homicides should
3  have that mindset and that policy.
4      Q.   Okay.  Knowing what we know now, do you
5  think that pursuing the lead that the murder and
6  kidnapping was -- could have been caused by a
7  firebombing of the Soto's car at a prior residence,
8  you think that would have yielded fruit?
9      A.   Do I think it would have yielded what?
10     Q.   Fruit, information.
11     A.   Yeah.  It definitely would have yielded
12 information.
13     Q.   Even if it was just an exclusion of the
14 lead?
15     A.   Absolutely or --
16     Q.   You believe Adriana was --
17     A.   Wait a minute; wait a minute.  You did
18 ask that question.  I mean, you know, we don't have
19 all of the details.  We don't -- we don't know who
20 Mejia actually committed the murder with.  Maybe
21 she was dating the gang member that firebombed the
22 car.  I mean, you know, this is so highly unusual
23 where, you know, she follows somebody home from a
24 hospital and killed the parents to steal the

Page 319

1  babies.  All of -- it -- resources would have been
2  put on this case to chase down every possible lead
3  and -- and -- and that was not done.
4      Q.   Do you think she was telling the truth
5  when she was saying that gang members came to her
6  house and threatened her regarding the boy?
7      MR. SWAMINATHAN:  Objection to form,
8  foundation, and relevance.
9      THE WITNESS:  And you're speaking of Mejia?
10 BY MS. GOLDEN:
11     Q.   Correct.
12     A.   I -- I don't believe anything that
13 Mejia said at any point because, you know, what --
14 I mean, what would investigator do?  Okay.  I mean,
15 how do we know when she's telling the truth, what
16 she's lying about?
17          So without corroborating information
18 and without additional evidence, I would not
19 put much -- I mean, I would consider it, but I
20 certainly would not put much value into anything
21 that she says.
22     Q.   Okay.  Directing your attention to
23 page 16, the paragraph that starts "in addition."
24          And it says, In addition, detectives

Page 320

1  interviewed a relative of the victims, Rosa Aranda,
2  who had a potentially highly valuable lead into
3  what happened: the victim, Jacinta Soto, had
4  recently legal made a new friend at a clinic, that
5  woman sometimes went to Jacinta's house, and
6  shortly before the murder Jacinta complained that
7  her keys to the apartment had gone missing and that
8  the new friend had been over when it happened.  And
9  then you cite to Rosa Aranda's deposition
10 testimony.
11          Do you see that?
12     A.   I do.
13     Q.   And then you say, This was not only an
14 important lead into who might have committed the
15 murder and how it might have been committed, but
16 was also information that directly contradicted the
17 version of events and the handwritten statements
18 taken from DeLeon-Reyes and Solache (discussed
19 below).
20          Do you see that?
21     A.   I do.
22     Q.   And what is the significance of your
23 assessment that this information that Rosa Aranda
24 had was directly contra -- directly contradict the

Page 321

1  version of events in the handwritten statement?
2      A.   Well, there's a number of factors that
3  I would have to consider that I -- as an
4  investigator.  I think the information was when the
5  officers arrived at the scene, they -- the Soto
6  door -- the home of the door was locked, and I
7  believe the officer had to break a window panel in
8  order to -- to get in.  And they -- they talked
9  about a key inside the door.
10          So it led me to conclude that there
11 was possibly a deadbolt on this door, which
12 indicated that whoever murdered these people locked
13 the door when they left.  They had a key.
14          So it's consistent with the fact
15 that the keys had been stolen or the keys were
16 missing.  Certainly a viable lead that should have
17 been considered and looked at further.
18     Q.   Is it your understanding that the
19 deadbolt lock on the home of the Soto home could be
20 locked from outside of the apartment?
21     A.   You know, I -- I guess I never really
22 had a full understanding of what kind of lock.
23 Because I -- I think the report indicated that
24 there was a key inside the door.  And to me, if

THOMAS TIDERINGTON, 10/05/2022                    Page 322..325

Page 322

1 there's a key inside the door, it indicates to me
2 it's a deadbolt. Now, I'm not --
3      Q.   And that was --
4      A.   I'm not --
5      Q.   And that was important --
6      A.   I'm not defined as a lock expert, of
7 course, but that's my personal experience.
8      Q.   And that was significant to you?
9      A.   Well, it would have been. If the door
10 was locked from the outside, it's very significant.
11     Q.   Okay.
12     A.   Because that would indicate that
13 whoever murdered these people had a key to the
14 door.
15     Q.   Would it be important to you to have a
16 more fulsome understanding of how the locks on that
17 door worked?
18     MR. SWAMINATHAN: Objection to form.
19     THE WITNESS: That -- that would be helpful,
20 yes.
21 BY MS. GOLDEN:
22     Q.   Were you provided the deposition
23 testimony of the landlord, Raoul Delira, on that
24 issue?

Page 323

1      A.   I may have been. I don't recall,
2 though.
3      Q.   But it's not in your list, so is it
4 probably --
5      A.   If --
6      Q.   -- more true --
7      A.   If it wasn't on my list, I -- I
8 don't as we sit here today have an independent
9 recollection about that, no.
10     Q.   Okay. And is it your understanding
11 that the information Rosa Aranda had that Jacinta
12 had had made a new friend who sometimes went over
13 to her house is inconsistent with all of the
14 statements that Mr. Reyes provided to police?
15     A.   Inconsistent with the statements Reyes
16 provided? I --
17     Q.   Right.
18     A.   I think -- I don't think he ever spoke
19 about that.
20     Q.   And if he had -- well, strike that.
21          Ms. Aranda -- so you on -- this --
22 you go on to say, This information was presumably
23 known to detectives; Aranda testified that when she
24 was interrogated by detectives, she did not hide

Page 324

1 any information she knew and told them everything.
2      A.   That's the conclusion that I came up
3 with based on her testimony, yes.
4      Q.   And do you think that's a fair
5 conclusion based on her testimony?
6      A.   The conclusion that there was a new
7 friend, the conclusion that the keys were missing?
8      Q.   The conclusion that she provided the
9 information about the new friend to police back in
10 1998, do you think it's a fair conclusion based on
11 her deposition testimony from in the last few
12 years?
13     MR. SWAMINATHAN: Objection to form.
14          Go ahead.
15     THE WITNESS: I -- I don't have any reason to
16 doubt that. I mean, she could be lying, but I -- I
17 can only go based on what a witness says. I -- I
18 don't know.
19 BY MS. GOLDEN:
20     Q.   Well, she was never specifically asked
21 whether or not she told the police about the new
22 friend, right? I mean, she was only asked if she
23 hid any information from the police and whether or
24 not she told them everything.

Page 325

1          And so an unsophisticated person
2 might answer yes to those questions and not really
3 appreciate everything that -- the answers to those
4 questions entails, right?
5      MR. SWAMINATHAN: Objection to form,
6 foundation, misstates his testimony, and it -- it
7 calls for -- I don't know what -- go ahead. You
8 can answer.
9      THE WITNESS: No. I -- I believe he -- you
10 used the word "unsophisticated," very much like
11 Reyes and Solache were during interviews with the
12 detectives.
13          If you're suggesting that she may
14 have been manipulated by the detectives, I -- I
15 looked at it from the perspective of she really had
16 no motive to lie. She was a family member of the
17 Sotos. I always looked at it from the perspective
18 of, you know, what was she trying to gain. So I
19 had, again, no reason to doubt that she told the
20 detectives this.
21 BY MS. GOLDEN:
22     Q.   And you believe you've accurately
23 summarized her deposition testimony here?
24     A.   I think I have, but again, if you want

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/05/2022                    Page 326..329

Page 326

1 to point -- if you think that I made an error or
2 if I did not, I'd be happy to look at it again; and
3 if I'm wrong, I'll correct the record.
4     **Q.   Did she specifically, as you recall it,**
5 **testify that she told police about the new friend?**
6     MR. SWAMINATHAN: Objection to form,
7 foundation to the extent you're asking for a memory
8 test.
9         Go ahead.
10       THE WITNESS:  I think it's my understanding
11 or -- it's my understanding is that she recalled
12 that she told the police everything and in her mind
13 everything included these things.
14 BY MS. GOLDEN:
15    **Q.   And she said that second part?**
16    MR. SWAMINATHAN: Objection to form,
17 foundation, argumentative, asked and answered.
18 BY MS. GOLDEN:
19    **Q.   Did she say that second part?**
20    MR. SWAMINATHAN:  Based on his memory.
21        Go ahead.
22        Objection; asked and answered,
23 foundation, form.
24        Go ahead.

Page 327

1     MS. ROSEN:  Based on his memory is not an
2 objection.
3     THE WITNESS:  All right.  It's my
4 understanding that she said something to that
5 effect.  Certainly I could be more accurate if you
6 would allow me to review that transcript and then
7 we could definitively determine what she said or
8 what she testified to.
9 BY MS. GOLDEN:
10    **Q.   I could do that if you agree to stay**
11 **for an extra seven hours.**
12    A.   As she said, it's not --
13    MR. SWAMINATHAN:  14 hours and it's --
14 14 hours and --
15    MS. GOLDEN:  Let's make it 21.
16    MR. SWAMINATHAN:  14 hours, don't want to
17 show him any documents.  Just shocking.
18        Go ahead.
19    MS. GOLDEN:  There's still a lot to cover.
20 BY MS. GOLDEN:
21    **Q.   Okay.  Is it your understanding or is**
22 **it your --**
23    MR. SWAMINATHAN:  Sorry, Carrie.  Before you
24 ask that question, can you tell me that page of the

Page 328

1 report you're showing right now, which -- which
2 page of the report is that?
3     MS. GOLDEN:  You can see on the top.
4     MR. SWAMINATHAN:  Oh, 15, there we go.
5     MS. GOLDEN:  For some reason that's not --
6 oh, when she scrolled it doesn't -- okay.
7     MR. SWAMINATHAN:  Yeah.
8 BY MS. GOLDEN:
9     **Q.   Okay.  Is it your opinion that --**
10 **strike that.**
11        **What is the basis for your opinion**
12 **that a conflict between a confession and crime**
13 **scene evidence is evidence of tunnel vision?**
14    MR. SWAMINATHAN: Objection to form.  Are you
15 referring to a part of his report?
16    MS. GOLDEN: No, I'm not.
17    MR. SWAMINATHAN:  Okay.  Sorry.
18 BY MS. GOLDEN:
19    **Q.   Well, is it your opinion -- I'll just**
20 **start more general.**
21        **Is it your opinion that a conflict**
22 **between a confession statement and crime scene**
23 **evidence is evidence of tunnel vision?**
24    A.   Well, I -- I guess it depends on what

Page 329

1 the evidence is.  I think -- as an example, I think
2 there was a -- as part of the notes or statements
3 provided by Mejia, she talked about picking a lock,
4 hiding in the closet.  All of these facts that she
5 said in one of her statements did not comport with
6 the theory that the officer had and so none of that
7 was ever flushed out.  And I guess in my view, I
8 can attribute it to perhaps tunnel vision, trying
9 to make the facts fit their theory of the case.
10    **Q.   Is it your opinion that -- that every**
11 **item with blood on it should have been collected**
12 **from the Soto home?**
13    A.   Well, I guess I can answer it a
14 different way.  Every -- every item that was
15 collected that had blood on it should have been
16 tested.
17    **Q.   Okay.**
18    A.   Is that what you had said or is that
19 what you asked or you asked it a different way?
20    **Q.   I asked something a little bit**
21 **different, so -- but if that's your answer, that's**
22 **your answer.**
23    A.   I think -- just so I'm clear, I think
24 you asked every item in the home, if it had blood

THOMAS TIDERINGTON, 10/05/2022                    Page 330..333

Page 330

1  on it should every item have been tested.  Probably
2  not because it's not practical.  They would test --
3  swab certain areas, but every item that was
4  actually seized and entered into evidence should
5  have been tested, yes.
6      Q.  And what's your understanding of whose
7  decision it is to test evidence that's been
8  collected in a case once the charges have been
9  made?
10     MR. SWAMINATHAN:  Objection to form,
11 foundation.
12     THE WITNESS:  I -- well, it -- whose decision
13 should it be or whose decision was it?  I guess
14 it's two different questions.  And I -- I would
15 think that it would be the decision of the police
16 department to test the evidence; and if they felt
17 that there was some irregularities or did not agree
18 with the direction that the state attorney was
19 given, that there should have been a -- some
20 evidence of -- of discussion and some evidence
21 of some notes taken to indicate that they were --
22 that they were given improper direction by a state
23 attorney.
24

Page 331

1  BY MS. GOLDEN:
2      Q.  You understand do you not, that the
3  defense in a criminal case can ask that any item of
4  evidence be tested as well, right?
5      A.  I think that's a fair statement yes.
6      Q.  Did you see anything in the record to
7  indicate that Mr. Solache and Mr. Reyes every
8  requested that any particular item of evidence be
9  tested?
10     A.  No, I did not.
11     Q.  Okay.  On page 19 of your report, at
12 the very top it says, In addition, if Mariano Soto
13 had really been stabbed multiple times while lying
14 in bed, there would have been bloody blankets,
15 sheets, and stains on the mattress, but there
16 wasn't; there is no documentation of that in the
17 file and no sheets/mattresses were inventoried.
18         Do you see that?
19     A.  I do.
20     Q.  Based on your experience in homicide
21 investigations, can you think of any other reason
22 why or how Mariano Soto could have been stabbed
23 multiple times while lying in bed that there would
24 not be bloody blankets or sheets.

Page 332

1      A.  No.  I would have expected that there
2  would have been bloody sheets.
3      Q.  And you can't think of any reason why
4  there wouldn't be?
5      A.  If he was murdered someplace else and
6  placed on the bed, possibly.  I -- I mean, there --
7  there's possibly scenarios.  But as we sit here
8  today, I -- I could not explain, you know, why
9  there was no blood.
10     Q.  And then there's -- later in the lower
11 part of that page 19 of your report, you're talking
12 about the phone calls, right?
13     A.  Yes.
14     Q.  Do you know when the police department
15 received the call logs?
16     A.  You know, I -- I did look at that.  And
17 sometimes it takes 30 or 60 or 90 days to take
18 phone logs, but they got it relatively quick.  I
19 don't know exactly when they got it, but they got
20 it within three or four days of the -- of the
21 initiation of the investigation, maybe even sooner
22 than that.
23     Q.  Did they have the call logs at the
24 time that Mr. Solache and Mr. Reyes made their

Page 333

1  statements?
2      A.  They probably would not have had them,
3  no.
4      Q.  Okay.  Did you see any other -- did
5  you see any calls in the call log that could
6  potentially be calls from Adriana to the Mejia home
7  at or about the time she said she made the calls?
8      A.  Well, I guess there's also some
9  discrepancy exactly -- I think she indicated --
10 and again, this is from memory, but I think she
11 indicated based on the police report that there
12 were three phone calls made and I think they could
13 only account for one being made at that time period
14 and -- and they could not determine were it came
15 from.
16     Q.  Well, there's -- there's two calls that
17 night, right?  Ones to Martin Vaca and she says
18 she's had the baby and then there's a later one
19 where she speaks to her husband, right?
20     A.  I believe so, yes.
21     Q.  Okay.  And I'm just reading from your
22 report here, the last -- the middle of the page.
23         And you'd expect, would you not,
24 that the call to Martin Vaca would be shorter than

THOMAS TIDERINGTON, 10/05/2022                    Page 334..337

Page 334

1 the call she had with Rosauro?

2     MR. SWAMINATHAN: Objection to form,

3 foundation, relevance.

4         Go ahead.

5     THE WITNESS: I -- I don't know if I drew any

6 conclusion on that or how I would know that.

7 BY MS. GOLDEN:

8     Q.    You don't think that the call she has

9 to -- to a housemate would be -- about having a

10 baby would be shorter than a call that she had with

11 her husband about having a baby?

12    MR. SWAMINATHAN: Objection to form,

13 foundation, relevance, calls for speculation.

14        Go ahead.

15    THE WITNESS: Possibly. I mean, I -- you

16 asked me if I knew. I -- I don't know. I don't

17 know. Was she having an affair with him? Was

18 she -- I -- I mean, there's so many -- so many

19 questions, I don't think I can answer that, but --

20 BY MS. GOLDEN:

21    Q.    Okay. I --

22    A.    Supposed to --

23    Q.    All right.

24        (Simultaneous crosstalk)?

Page 335

1     A.    -- wonderful day, I perhaps would agree

2 that you would expect maybe the call to be longer

3 with her husband than the housemate.

4     Q.    Okay. And did you see any discrepancy

5 in the record about what exactly time these two

6 calls from Adriana came into the Mejia house?

7     MR. SWAMINATHAN: Objection to form.

8         Go ahead.

9     THE WITNESS: You know, I -- I don't recall

10 specifically without refreshing my memory from the

11 police report.

12 BY MS. GOLDEN:

13    Q.    Are you aware of any investigation by

14 defense counsel into when these calls -- I'm sorry,

15 into where these calls to the Mejia home came from?

16    A.    No.

17    Q.    Okay. Would you assume that if

18 Mr. Solache's attorneys were looking into whether

19 or not any of these phone calls came from the

20 hospital and discovered that they did not, would

21 you assume that that's evidence that they would

22 have used in their defense?

23    MR. SWAMINATHAN: Objection to --

24    MS. SUSLER: Objection form.

Page 336

1     MR. SWAMINATHAN: Calls for speculation.

2         Go ahead.

3     THE WITNESS: I -- you know, I can't really

4 opine on what a defense attorney would use or not

5 use. I mean, it seems logical, but I -- I don't

6 know that.

7 BY MS. GOLDEN:

8     Q.    And did you see any calls in the list

9 of calls to the Mejia home on March 27 that could

10 have been the two calls she claimed to have made to

11 the home that night?

12    MR. SWAMINATHAN: Objection to form,

13 foundation.

14        Go ahead.

15    THE WITNESS: No. What -- what struck me

16 about the phone calls, and I know this isn't your

17 specific question, but were the -- were the calls

18 from Carlos Martinez.

19        I believe, if my memory is correct,

20 that one call was made before the murders, you

21 know, sometime 12:00, 1:00 o'clock in the morning,

22 and then there was another call from the restaurant

23 the morning of the murders. I didn't really draw

24 any conclusions other than to say an investigator

Page 337

1 would have, you know, certainly looked at that

2 and -- and try to consider why Martinez was calling

3 the house before the murders and after the murders.

4 BY MS. GOLDEN:

5     Q.    That's not what I asked.

6         What I asked was: Did you see any

7 calls -- I mean, did you see any -- any testimony

8 in the record that the -- that the calls that

9 Adriana Mejia made to the home that night were made

10 at times other than at 5:15 and 7:00 p.m.?

11    A.    I don't think so.

12    Q.    Okay. And if you did, you didn't take

13 it into account, correct?

14    A.    Well, if I did, I -- again, I would

15 have to refresh my memory by looking at the police

16 report, so I -- as we sit here today, I don't know

17 if I took it into account or not or what the

18 relevance would have been.

19    Q.    Okay. Do you agree -- I know you state

20 in your report that the work records of Mr. Solache

21 and Mr. Reyes undermine their confessions.

22        Do you recall that in your report?

23    A.    I do.

24    Q.    Okay. I understand your conclusions

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 338

1 that they undermine the confessions, but do they
2 establish that it was impossible for them to have
3 been at -- in the Soto home in around 6:00 or
4 7:00 o'clock on the morning of the 28th?
5       A.   Well, again, another deficiency in the
6 police reports.  I don't recall any evidence that
7 the investigators went out and -- and spoke to the
8 employers -- employers or obtained any time
9 records.  All of these things you would have
10 expected a homicide investigator to have done.  So
11 it -- it was -- called to draw a conclusion on
12 whether or not they had the ability to commit these
13 murders.
14      Q.   Is it your ability [sic] that the
15 police had an obligation to establish an alibi for
16 Mr. Reyes and Mr. Solache?
17      MR. SWAMINATHAN:  Objection to form.
18      THE WITNESS:  Well, no.  It's what -- what a
19 reasonable investigator would would be to
20 anticipate perhaps an alibi, but more importantly,
21 knowing that there was no physical evidence
22 connecting Reyes and Solache and knowing that
23 Mejia gave multiple accounts of what actually
24 happened, these investigators, would have been

Page 339

1 reasonable for them to have determined whether or
2 not there was an alibi.  Yeah, that's something
3 that a detective should have done for obvious
4 reasons.
5 BY MS. GOLDEN:
6       Q.   Did you see any evidence in the record
7 that would make it physically impossible for
8 Mr. Reyes to be present in the Soto home at
9 7:00 o'clock in the morning on March 28th?
10      MR. SWAMINATHAN:  Objection to form.
11      Go ahead.
12      THE WITNESS:  I don't think I saw anything
13 that made it impossible, no.
14 BY MS. GOLDEN:
15      Q.   Did you see anything in the record
16 which made it physically impossible for Mr. Solache
17 to be in the Soto home at 7:00 o'clock in the
18 morning on March 28th?
19      A.   No.
20      Q.   Okay.  And do you know what is
21 generally referred to as the CSI effect?
22      A.   I'm -- I want to make sure we're on the
23 same page, but -- can you explain that to me my
24      Q.   Well, I'm -- I don't want to explain my

Page 340

1 understanding of it.  I'm asking you if you have an
2 understanding of what the CSI effect is?
3       A.   No.
4       MS. GOLDEN:  Okay.  How -- are we getting
5 close to seven hours?
6       THE WITNESS:  Hope so.
7       THE VIDEO TECHNICIAN:  Yes.  So right now
8 there are six minutes left.
9       MS. GOLDEN:  Okay.  I'm going to take just a
10 five-minute break to see if there's any specific
11 things that I want to cover before we end for the
12 day.
13           Is there -- or how much time do
14 you have left in you, Mr. Tiderington, everybody?
15 We can be done -- we should be done shortly
16 because --
17      THE WITNESS:  I have five minutes left in me.
18      MS. GOLDEN:  Okay.  So let me -- let me get
19 five minutes to organize myself and then I'll be
20 back.
21      THE WITNESS:  All right.  Thank you.
22      THE VIDEO TECHNICIAN:  Okay.  We're off the
23 video record at 6:43 p.m.
24           (Recess taken.)

Page 341

1       THE VIDEO TECHNICIAN:  We are back on the
2 video record at 6:49 p.m.
3 BY MS. GOLDEN:
4       Q.   Okay.  Can you put up Exhibit 4,
5 please, and can you go to the next page?
6            Do you see that?
7       A.   I can.
8       Q.   And do you see Items 37 -- and then can
9 you scroll down a little bit further -- Items 37
10 through 61 are deposition transcripts that you
11 reviewed, right?
12      A.   Yes.
13      Q.   Okay.  And I don't see the deposition
14 transcript for Ed Mingey in the list, do you?
15      A.   I don't see it, no.
16      Q.   Okay.  Do you have any recollection of
17 having reviewed his deposition testimony?
18      A.   Not as we sit here today I don't.
19      Q.   Do you have any -- what's your
20 understanding of what his role in the case was?
21      A.   I don't recall without looking at the
22 police report.  I want to say he was one of the
23 supervisors.
24      Q.   And do you know what, if any, portion

THOMAS TIDERINGTON, 10/05/2022                    Page 342..345

Page 342

1  of the investigation it was that he supervised?
2      A.   Not specifically.  I -- I would have to
3  refresh my memory on that portion of the case.  I
4  do recall that he -- I think he signed off on some
5  police reports and I believe --
6      Q.   More than one?
7      A.   I'm sorry?
8      Q.   More than one?
9      MR. SWAMINATHAN:  Objection to form,
10 foundation to the extent of -- go ahead.
11     THE WITNESS:  And again, I -- I don't know
12 how many he did.  I know he signed off on police
13 report, whether it was 1 or whether it was 10.  And
14 I believe I did read some -- I don't know if it was
15 deposition or testimony from him, but I can't
16 specifically say what the content was at this
17 point.
18 BY MS. GOLDEN:
19     Q.   Okay.  And what about Robert Biebel, I
20 don't see you having reviewed his deposition
21 transcript either.  Do you have any --
22     A.   What's the name?
23     Q.   Biebel, B-e -- B-i-e-b-e-l.  Does that
24 name ring a bell?

Page 343

1      A.   It's not.
2      Q.   Do you know what if any role he played
3  in the Soto investigation?
4      A.   As we sit here today, no.
5      Q.   Would the same also be true for
6  Cappitelli?
7      A.   I would have to refresh my memory on
8  his role, yes.
9      Q.   What about Dennis Stankus, do you know
10 what his role in the investigation was?
11     A.   Again, I'd have to refresh my memory.
12     Q.   And what about John Naujokas, do you
13 know what his role in the investigation was?
14     A.   Same answer.  I'd have to refresh by
15 looking at the record.
16     Q.   And what about Mark Harvey, do you know
17 what his role in the investigation was?
18     A.   Same response.
19     Q.   I think your opinions are -- well,
20 your first opinion is sort of divided into four
21 different sections.  The first section is
22 investigative tunnel vision, the second section is
23 DeLeon-Reyes and Solache were unreasonably
24 detained, and the next section is the

Page 344

1  interrogations of DeLeon-Reyes and Solache were
2  unreasonable and inconsistent with acceptable
3  police practices.  And then there is another
4  section that talks about additional significant
5  deviations from professional homicide investigation
6  standards.
7      The first --
8      MR. SWAMINATHAN:  You're referring to only
9  the first -- I guess first half or --
10     MS. GOLDEN:  The first --
11     MR. SWAMINATHAN:  -- Opinion 1 of his
12 opinions?
13     MS. GOLDEN:  Yep.
14 BY MS. GOLDEN:
15     Q.   Okay.  Opinion 1, the first section, is
16 Investigative Tunnel Vision by Reynaldo Guevara and
17 The Other Defendants.
18     And when you say "the other
19 defendants," who are you referring to?
20     A.   What -- what page are you on?
21     Q.   Page 13.  I'm sorry.
22     A.   And I -- I think I answered this, maybe
23 not specifically to that question, but Guevara
24 could not operate in a vacuum.  Whatever misconduct

Page 345

1  he was involved in had to have been known by
2  others.
3      I think there is clear evidence in
4  this case that the things that we've talked about
5  for the last seven hours could not -- many of
6  the things could not have occurred without the
7  knowledge of the supervisor.  And I -- I think I
8  used the example of keeping a prisoner in a -- in
9  an interrogation room for 40 hours is coercive and
10 unreasonable; arresting somebody before there's any
11 evidence of a crime is unreasonable.
12     All of these things occurred and
13 probably had to have been done with the knowledge
14 of other officers as well as other supervisors and
15 command officers.  And if they didn't know, I'm --
16 I'm sorry.  If they don't know, they should have
17 known.
18     MS. GOLDEN:  Okay.  Can you read that answer
19 back, please.
20     (Record read.)
21 BY MS. GOLDEN:
22     Q.   So I'm asking a different question and
23 I'd like you to answer the specific question, if
24 you can.

THOMAS TIDERINGTON, 10/05/2022                    Page 346..349

Page 346

1       What other defendants in this case
2 other than Detective Guevara do you believe
3 exhibited tunnel vision?
4       A.   Again, I would have to go through the
5 report to specifically identify each officer's
6 actions and perhaps their shortcomings or what, in
7 my opinion, should have been done or what they did
8 or didn't do.
9            I don't know if I can sit here and --
10 and give you bullet points without going through
11 the file again.
12      Q.   And would you be looking for -- would
13 you expect to see the names of the other defendants
14 in the report that you believed to have exhibited
15 tunnel vision?
16      A.   I -- I would be looking at -- and I did
17 with my examination of the file, I'd be looking at
18 the actions of all the -- all of the officers and
19 what they did or didn't do in the investigation.
20      Q.   So -- so Mark Harvey, by way of
21 example, is not mentioned by name in your report.
22           Do you believe that Mark Harvey
23 exhibited tunnel vision in the Soto homicide
24 investigation?

Page 347

1       MR. SWAMINATHAN:  Objection to form and
2 foundation and to the extent you're asking the
3 witness to talk about a person who said he'd need
4 to see the records to remember who that person is.
5            Go ahead.
6       THE WITNESS:  Yeah.  I -- at this point, I --
7 I would -- if we're going to talk about
8 individuals, I would have to have you point to
9 exactly or allow me to look through the 600 pages
10 and identify each person's role and any
11 deficiencies that I believe they had in preparing
12 their -- their reports or the conduct in this
13 investigation.
14 BY MS. GOLDEN:
15      Q.   Do you have an opinion to a reasonable
16 degree of professional certainty that Dennis
17 Stankus exhibited tunnel vision in connection with
18 the work he performed in the Soto homicide
19 investigation?
20      A.   I -- my answer would be the same.
21      Q.   So before you can tell me whether or
22 not Ed Mingey, Biebel, Cappitelli, Stankus,
23 Naujokas, or Harvey, whether you hold the opinion
24 that any one of them exhibited tunnel vision, you

Page 348

1 would have to go back and look at the records,
2 right?
3       A.   I would to be -- to be accurate and be
4 fair, yes.
5       Q.   Okay.  Because they're not identified
6 by name anywhere in your report?
7       A.   I understand that.
8       Q.   Okay.  Do you -- your -- on page 21
9 your headline is, DeLeon-Reyes and Solache Were
10 Unreasonably Detained.  And that's because you say
11 that they were arrested without probable cause.
12 And that was presumably done by the arresting
13 officers, correct?
14      A.   Well, I --
15      MR. SWAMINATHAN:  Object to form, foundation.
16           Go ahead.
17      THE WITNESS:  I typically don't offer an
18 opinion on what probable cause is.  I think that's
19 a decision that has to be made by a judge or a
20 jury.
21           I can say from a police practices'
22 expert standpoint, that I would not have arrested
23 him based on the information that the officers knew
24 at the time, which was virtually nothing.  There --

Page 349

1 there's certainly no evidence at 10:30 in the
2 morning of any criminal activity that any of these
3 individuals were responsible for.
4            You know, they learn of -- you know,
5 later in the day, later that night, 40 hours later,
6 but at that point they were, by all intents and
7 purposes, good Samaritans that were surrendering
8 two young children to the police department.
9 BY MS. GOLDEN:
10      Q.   And the individuals that, in your
11 opinion, are at fault there are the ones who
12 arrested Mr. Solache and Mr. Reyes, correct?
13      MR. SWAMINATHAN:  Objection to form and
14 foundation.
15      THE WITNESS:  No.  I would say there was a
16 lot more culpability and responsibility than just
17 the -- the two officers that arrested them.  I --
18 the two officers that arrested them, I don't recall
19 their names, but I -- I'm sure that they were
20 probably relatively new police officers; they were
21 probably uniformed officers.  I -- I don't know.
22 And -- and their decision was probably made for
23 them or they probably were given instructions as to
24 what to do.

THOMAS TIDERINGTON, 10/05/2022                          Page 350..352

Page 350

1 BY MS. GOLDEN:
2     Q.   Do you have any -- did you see any
3 basis in the record to conclude that Mingey,
4 Biebel, Cappitelli, Stankus, Naujokas, or Harvey
5 were involved in the decision to arrest or detain
6 Mr. Solache or Mr. Reyes?
7     MR. SWAMINATHAN:  Objection to form and
8 foundation to the extent -- in light of the
9 witness's prior testimony about reviewing records.
10     Go ahead.
11     THE WITNESS:  Again, I would have to review
12 the file to determine exactly what each individual
13 officer did or did not do.
14 BY MS. GOLDEN:
15     Q.   Okay.  And you didn't in your report
16 explain what each individual officer did or did not
17 do, correct?
18     A.   That's correct.
19     Q.   Okay.  The next section of Opinion 1
20 talks about Additional Significant Deviations From
21 Professional Homicide Investigation Standards in
22 Soto Homicide Investigation.
23     A.   Right.
24        Are we going to -- are we going to

Page 351

1 continue on much longer?  I thought we were done
2 in --
3     Q.   I think --
4     A.   -- five minutes.
5     Q.   I think five minutes.  Give me five
6 minutes to finish this up.
7     A.   Okay.
8     Q.   Unless you want -- unless you want to
9 start in the morning with this?
10     A.   Well, if we're going to go into a whole
11 different area, maybe it would helpful if we did
12 start tomorrow morning.
13     MR. SWAMINATHAN:  It's 8:05 p.m.  I think we
14 should -- we have to stop here.
15     THE WITNESS:  Yeah.  It's -- it's the middle
16 of the night in Michigan time.
17     THE VIDEO TECHNICIAN:  We're off the video
18 record at 7:05.
19        (The proceedings adjourned at
20         7:05 p.m.)
21
22
23
24

Page 352

1
2          REPORTER'S CERTIFICATE
3     I, Kathleen A. Hillgard, do hereby certify
that THOMAS J. TIDERINGTON was duly sworn by me to
4 testify the whole truth, that the foregoing
deposition was recorded stenographically by me and
5 was reduced to computerized transcript under my
direction, and that the said deposition constitutes
6 a true record of the testimony given by said
witness.
7
     I further certify that I am not a relative
8 or employee or attorney or counsel of any of the
parties, or a relative or employee of such attorney
9 or counsel, or financially interested directly or
indirectly in this action.
10
     IN WITNESS WHEREOF, I have hereunto set my
11 hand of office at Chicago, Illinois, this 19th day
of October 2022.
12
13

        K H (signature)

14
     Illinois CSR No. 084-004093
15
16
17
18
19
20
21
22
23
24

THOMAS TIDERINGTON, 10/05/2022

**Exhibits**

**1 Tiderington 100522-1** 12:4 33:9 43:9 71:16 78:2 182:9

**2 Tiderington 100522-2** 118:10

**3 Tiderington 100522-3** 122:18 132:17

**4 Tiderington 100522-4** 134:12 150:16 341:4

**5 Tiderington 100522-5**

**6 Tiderington 100522-6** 156:22 157:6 169:17 182:5 235:3,4 246:18 298:12

**7 Tiderington 100522-7** 164:24 165:2,5,10,11,19 295:6

**8 Tiderington 100522-8** 227:4 230:7

---

**$**

**$10,630** 130:1

**$190,000** 131:8

**$190,524** 131:10

**$200,000** 134:6

**$24,275** 131:5

**$325** 125:21

**$524** 131:8

**$600** 184:23

---

**-**

**--as** 38:18

**-is** 163:18

---

**1**

**1** 5:2 12:4 33:9 43:9 71:16 78:2 135:4,5 163:18 165:5,8,12 167:13 168:17 170:17 182:9 226:19 252:20 342:13 344:11,15 350:19

**1,500** 81:10,13,16

**10** 134:9,10 242:4 342:13

**100** 87:18 266:22

**101** 51:22

**1028** 5:10

**10:00** 23:12,21

**10:10** 5:3

**10:30** 178:6 183:16 205:18 296:1 299:1,14,23 349:1

**11:00** 178:7

**11:28** 69:8

**11:39** 69:11

**11:40** 68:23

**12** 58:19

**12:00** 195:9 336:21

**12:01** 86:3

**12:03** 86:6

**12:38** 113:21

**13** 344:21

**14** 298:11 304:2 327:13,14,16

**140** 118:8

**15** 18:10 49:6 58:20 134:10 144:9, 13 328:4

**150,000** 118:8

**16** 52:11 77:14 82:14 315:12 319:23

**17** 52:11

**175,000** 88:1

**18** 5:9,10 292:5

**18-month** 77:11

**19** 77:15 100:4 292:5 331:11 332:11

**19-** 76:12

**190,000** 132:22

**1927** 83:2

**1976** 77:6,9

**1978** 77:9 151:19

**1979** 76:14 77:9

**1980** 76:14

**1981** 85:9

**19812** 226:11

**1982** 42:19

**19831** 226:12

**1983ish** 89:19

**1985** 44:21 95:2

**1986** 95:2

**1990** 39:6 96:11 100:10

**1995** 39:6 99:6

**1998** 164:3 167:6 170:17 280:18, 19 281:2,11 287:17 288:10 293:23, 24 294:6,12 299:2 324:10

**1:00** 195:10 336:21

**1:28** 113:24

**1st** 167:6

---

**2**

**2** 33:17 36:8 43:9 118:10 158:11 273:13

**20** 5:15 9:21 18:10 85:14 88:3 114:7,16 116:7,24 117:23 125:13 133:2 146:14 237:19

**200** 87:18

**200,000** 88:1

**2000** 298:14

**2001** 47:19 95:9 100:22 114:6,11

**2005** 50:19

**2017** 52:11 129:15 130:2

**2018** 130:18

**2019** 131:1

**2020** 131:4 143:9,12

**2021** 114:7 131:7,14 132:2,19 134:1

**2022** 5:6 114:11 131:21 132:8,11 134:4

**2071** 168:20

**21** 88:4 133:11 327:15 348:8

**22** 88:4 114:8

**2312** 5:9

**25** 129:9 143:9 266:21

**25th** 143:12

**26** 156:2

**27** 336:9

**270** 295:7

THOMAS TIDERINGTON, 10/05/2022

**271** 297:7

**28** 115:14 164:3 248:12

**28th** 166:7 168:20 338:4 339:9,18

**29** 252:20 273:13

**2:55** 181:24

**2s** 114:12

---

### 3

**3** 47:18 54:4 60:16 122:18 132:17 159:2

**30** 48:16 72:12 125:13 133:2 266:21 276:4 332:17

**30,000** 115:14

**31** 285:20

**32** 116:24

**340** 164:24

**35** 237:18 259:2,12 260:6

**350** 126:6

**37** 341:8,9

**375** 126:6

**39** 237:19

**3:07** 182:3

**3rd** 296:1 298:14 299:2

---

### 4

**4** 54:4 60:16 71:17 134:12 150:16, 17 276:5 341:4

**4,000** 81:7,12

**4,500** 81:7

**40** 67:9,10 125:14 178:22 187:18, 19 188:5,8,10,13,22 193:17 194:4, 17,22 195:5,7,20 345:9 349:5

**40-year** 43:11

**418** 164:24 165:19

**42** 34:4,5,6,16

**423** 165:6,8,12

**43** 276:7

**44** 9:22 34:3 52:14,17 146:15 151:17 152:4 155:10 280:8 289:24

**49,732** 131:1

---

**4:19** 242:8

**4:30** 242:11

---

### 5

**5** 87:13 150:20 154:3 163:6,8,11,24 172:9,13,19 175:8 177:18 183:3,11 262:13 285:20 295:3

**50** 55:22 56:15

**500** 87:13 246:7

**57** 135:4,5

**5:15** 337:10

**5:30** 23:13 278:14

**5:31** 293:17

**5:44** 293:20

**5:51** 298:6

**5:52** 298:9

**5th** 5:6

---

### 6

**6** 78:2 87:13 156:22 157:6 163:14, 15 169:17 182:5,8 184:7 196:1 235:3,4 246:18 298:12

**60** 332:17

**600** 5:16 262:13 347:9

**600-man** 87:13

**61** 341:10

**6:00** 23:22 164:17 338:3

**6:30** 278:14

**6:43** 340:23

**6:49** 341:2

---

### 7

**7** 164:24 165:2,5,10,11,19 295:6

**78** 123:6 125:4

**7:00** 164:17 166:8 168:21 195:12 337:10 338:4 339:9,17

**7:05** 351:18,20

---

### 8

**8** 227:4 230:7 246:18 247:24

**80** 11:11

**81** 95:5 98:22,23

**82** 89:20 95:5

**83** 76:18 98:22

**84** 76:18

**85** 98:23,24

**86** 93:10 95:5 96:12 99:1,2,3 100:5

**87** 93:10

**8:05** 351:13

**8th** 172:10,14 176:21 179:1

---

### 9

**9** 229:15

**9-** 99:6

**90** 96:13 332:17

**90s** 52:7

**911** 48:2,3

**95** 96:11 99:6 100:12

**96** 99:6 100:12

---

### A

**a.m.** 5:3 69:8,11 183:16 296:1

**abandoned** 310:8

**abducted** 81:2 185:1

**abilities** 103:12

**ability** 157:1,20 193:18 265:12 269:3 271:19 273:14 279:14,16 281:22,24 317:17 338:12,14

**absent** 193:1 208:11

**absolutely** 173:10 201:18 202:8 318:15

**abuse** 161:7 216:14,24 220:23 222:16 229:23 240:15 243:14,20 244:21 302:9,17

**abused** 215:22 216:20 221:15 222:2,3,8 223:3,19 227:6 228:6 229:12,20 244:17

---

**abusing** 163:4

**abusive** 224:1 227:10

**academy** 53:18 78:3,9,11 88:10, 17,20 151:19 269:2

**accept** 216:12 220:11

**acceptable** 64:17 148:16 161:2 194:24 263:24 276:11 281:3 344:2

**access** 17:1 253:9,18

**accident** 104:8

**accordance** 148:20

**account** 333:13 337:13,17

**accounted** 274:17

**accounts** 235:14 338:23

**accredited** 88:16

**accuracy** 47:12 157:24

**accurate** 61:16 157:1 170:11 191:22 327:5 348:3

**accurately** 141:3,13 325:22

**accused** 101:10,14,18,22 102:4,6, 8,12,17,24 103:4,21 246:24 291:14,15,18

**acting** 117:12

**action** 104:14,22 250:18

**actions** 107:10 145:9 160:4 346:6, 18

**activity** 73:10 349:2

**actual** 97:12 187:15 224:3 227:12 229:8 230:2 231:11

**add** 110:21 121:8 122:5 134:24 281:14

**added** 110:16 134:17

**adding** 49:7

**addition** 288:2 300:24 319:23,24 331:12

**additional** 28:6 32:3 136:21 139:17 213:9 214:19,23 248:14,15 255:17 274:10 280:10 285:23 296:13,24 312:6 317:14 319:18 344:4 350:20

**additions** 33:24 34:11

**address** 200:10 204:9,12 304:18

**addressed** 221:24

**adjourned** 351:19

**administration** 35:10 56:20 76:16

**administrative** 100:15 160:2

**administrator** 36:20

**admit** 64:20

**admits** 199:5

**admitted** 198:20 201:2 208:19

**admonition** 150:1 156:16

**Adriana** 169:18 182:20 183:11 184:19,21,23 197:11 198:14 199:5 201:2 203:16 209:6 224:4 227:13 229:18 235:15,22 236:7,8 289:15 301:21 303:15 304:14,17,24 305:12 306:18 307:12,16 311:22, 24 313:3,4,9,21 316:4,22 318:16 333:6 335:6 337:9

**Adriana's** 196:2,4 236:9 237:1 290:8,24

**advantages** 269:5,9,12

**advertisements** 40:1

**advice** 245:21

**affair** 334:17

**affect** 188:2

**affidavit** 269:22 272:13

**agencies** 34:20 52:9 158:14

**agency** 35:5 116:11 218:7,8 288:21,24 289:4

**agent** 35:14 42:14 43:6,13,18,24 44:5,9,17,23 45:17 83:6 101:4,6 103:3 267:1,3 286:18

**agents** 37:18 83:5

**agree** 63:5,13,14,16,17 164:22 192:17 193:12 214:20 228:4 230:5, 23 237:7 259:14 261:3 264:5 282:7 300:21 314:20 327:10 330:17 335:1 337:19

**agreeing** 232:24

**Agriculture** 119:22,24

**Aguilar** 6:10

**ahead** 8:19 10:23 16:3 28:5,20 29:2 57:7 59:8 62:1 84:23 86:7 91:10 94:13 106:24 110:6,8 131:17 138:1,22 139:14 140:19 141:16 142:15 144:23 146:6 150:2 153:12 155:8 161:19 162:14 164:20

171:19 175:17 176:12 190:24 191:18 192:9 194:20 198:18 199:3 200:12 201:9 202:21 207:19 209:3 211:21 213:12,22 215:10 216:16 217:15,24 220:17 221:17 222:12 224:13 225:20 226:2 227:24 231:19 232:1,22 233:6 235:18 236:13 237:4 240:5,20 241:16 250:8 252:3 253:5 258:4 262:24 263:18 264:22 266:3 283:2 284:1, 13 285:5 289:19 291:4,22 294:23 295:21 301:16 302:21 303:6,21 305:5 308:23 314:4 324:14 325:7 326:9,21,24 327:18 334:4,14 335:8 336:2,14 339:11 342:10 347:5 348:16 350:10

**aid** 149:20

**airport** 124:23

**alibi** 196:18 207:15 338:15,20 339:2

**alibis** 211:18 215:7

**allegation** 147:1

**allegations** 145:1,13,16,18 146:1, 11,18,19 160:18 218:6 247:2,12,18

**alleged** 276:9,16

**allegedly** 292:6

**alleging** 246:19,22

**allowed** 188:3 206:4 303:10

**allowing** 191:6 192:2

**alter** 31:21

**alternatives** 281:4

**Amazon** 151:9

**Amendment** 245:11,16,19 246:16

**America** 104:6

**amount** 44:10,12 130:12,19 134:4 194:8,11,17 195:19 220:20 236:15

**analysis** 144:17

**analyst** 235:7

**analyze** 224:14

**Anand** 6:8 12:22 21:20 23:8 24:5, 24 85:19 127:4 199:13 200:13 217:17

**Anand's** 127:3,5 128:13 132:5

**and/or** 56:19

**Ann** 12:16 115:20

Index: announced–Austin

THOMAS TIDERINGTON, 10/05/2022

**announced** 184:19,21 186:19,21

**answers** 325:3

**anticipate** 338:20

**anticipating** 287:14

**anytime** 32:17 265:3

**apartment** 256:8 257:18 258:18 264:5 320:7 321:20

**apologies** 297:16

**apologize** 152:11 287:14 312:10

**app** 25:9,16

**apparently** 166:19,20 167:2 189:2 197:10 279:16

**appeared** 148:24 160:14 196:22 218:5

**appears** 160:3 178:3 212:3,5 223:12 297:10

**applicable** 60:20

**applied** 83:9

**applies** 195:23

**appreciative** 32:15

**approach** 54:20

**approval** 257:10

**approve** 269:21

**approximate** 76:13 125:2

**approximately** 31:8 88:2

**April** 167:6 170:17 296:1 299:2

**AR-JENNER** 226:10,11,12

**Aranda** 320:1,23 323:11,21,23

**Aranda's** 320:9

**Arbor** 12:16 115:21

**area** 7:4 39:21 62:13 75:22 76:2 116:2 150:11 172:13,19 177:18 183:3,11 207:21 239:11 250:13 265:17 268:1,22 273:22 295:3 351:11

**areas** 71:20 72:3 79:2 172:21 240:10 268:3,17 272:14 275:2,9 330:3

**argue** 279:19 281:22

**argued** 281:21

**argument** 304:17

**argumentative** 258:3 317:2 326:17

**argumentive** 283:1

**array** 53:23

**arrest** 160:14 183:13,14 249:6 250:4,23 294:20 295:10,19,24 296:6,11,22 297:8,12,13,14 299:3, 24 350:5

**arrested** 160:12 183:4,15,21 184:4 205:21,23 207:9 294:8,13 297:19 298:1 299:8 301:1,22 317:13 348:11,22 349:12,17,18

**arrestees** 180:16

**arresting** 161:3 296:14,24 297:5 345:10 348:12

**arrests** 36:24

**arrive** 16:17 244:12

**arrived** 178:6 321:5

**arriving** 79:17 248:20

**Art** 212:16,17 262:6

**articles** 151:4

**Arturo** 5:8 6:9,11 201:5 299:3 303:17

**ASA** 262:6

**ASAC** 101:4

**asleep** 195:7

**aspect** 53:11

**aspects** 48:11 261:19

**assault** 121:2

**assertion** 65:17

**assess** 138:17

**assessing** 138:9 139:6

**assessment** 137:21 141:20 142:9 157:9 320:23

**assessments** 136:24 137:4,17

**assigned** 35:8,19 37:21 43:2,4,13 45:3 46:8 57:5,14 82:10,12 90:2 92:11,19 93:1,13,17,20 94:7,10,16 95:4 97:9 99:23 100:8,10,18 103:13 218:2

**Assigning** 218:12

**assignment** 35:22 36:3 46:9 94:17 95:20 293:23

**assignments** 78:23 98:7 99:10,20 155:12

**assist** 59:3 94:8,16 116:11 288:21

**assistance** 116:10,16 256:7

**assistant** 101:4 213:7,16 257:6

**assisted** 45:2 237:18

**assisting** 56:24 58:7,13,15

**associate's** 76:5,20

**associates** 5:15,18 76:10

**assume** 156:5,24 300:16 304:16, 23,24 305:8 335:17,21

**assuming** 209:4 238:20 252:7 301:17 305:11

**assumption** 273:20

**assumptions** 156:14,19

**Atlanta** 106:12,13 121:10,12 123:14

**Atlantic** 76:8,17

**attach** 9:8

**attached** 9:11 139:18 143:21 144:4 158:24

**attachment** 9:5 12:4 14:17 33:11 110:13 118:12 134:12 154:1,3,6, 21,24 155:4

**attachments** 13:11,12,19,20,21 14:11,15,22 17:9 143:22

**attacked** 169:13 173:23,24

**attempt** 27:23 30:7

**attempted** 20:23 21:7 49:14

**attend** 51:11

**attention** 58:23 137:20 226:18,19 248:11 252:19 319:22

**attorney** 22:4 106:18 108:15,20 112:7 152:16 214:4,5,16,19 215:1, 14,21 256:22 257:7 261:24 276:22 292:22 317:18 330:18,23 336:4

**attorney's** 213:18 277:5,19,23 285:13

**attorneys** 129:24 135:20 209:21 213:7,16 214:10 278:11 335:18

**attribute** 139:6,10 186:4 329:8

**audio** 7:1 28:2 79:2

**Austin** 14:6 15:3 17:10 223:16

THOMAS TIDERINGTON, 10/05/2022

229:6

**authored** 138:5 297:4,8

**authority** 258:13,19,20 273:6 274:3

**authorization** 275:8

**authorized** 274:7 275:3

**average** 63:16 115:22

**award** 36:19 40:24

**aware** 30:10 62:8 102:16 128:11 196:11 249:22 252:1 294:11 335:13

**awful** 239:17

———————

**B**

———————

**B-E** 342:23

**B-I-E-B-E-L** 342:23

**B-L-A-S-I-N-G-A-M-E** 106:11

**babies** 319:1

**baby** 198:7 235:15,22 270:24 333:18 334:10,11

**bachelor's** 76:8,15,24

**back** 49:14 50:13 52:6,18 60:15 68:23 69:10 71:16 86:5,9 87:1 95:6 96:16,17,19 100:8,16,20 103:2 108:18 110:20 113:23 114:17 122:11 133:18 140:9 143:19 150:9, 10,16 151:2,18 169:16 178:15 182:2 183:3,11 202:24 205:14 209:12 220:3 233:15 236:3,22 242:10 255:19,21 257:13,17,24 258:12,16 260:3 280:18,19 281:11, 19,24 287:21 291:19 293:19 295:22 298:8 324:9 340:20 341:1 345:19 348:1

**background** 61:19 154:4

**backtrack** 142:8

**bad** 293:8

**badly** 184:22

**bag** 260:7

**balance** 34:23

**balded-face** 140:2

**bankruptcy** 105:20

**bar** 47:4

**Barbara** 235:5

**Barcelona** 50:6

**barge** 258:14

**base** 38:14 299:7

**based** 8:20 9:1 18:11 194:2 206:3, 5 212:5 215:14 228:18 231:10,16 232:4 233:8 241:22 248:6 251:21 271:1 276:7 296:4 298:16 301:13 324:3,5,10,17 326:20 327:1 331:20 333:11 348:23

**basement** 263:7

**basically** 48:14 248:21 252:7 298:24 300:4

**basis** 36:22 37:9 66:4 109:6 129:21 142:20 172:17 176:19 207:12 211:13 230:15 252:23 254:16 264:15 299:11 328:11 350:3

**Bates** 165:5 226:10

**BBK** 111:13,24 112:17 119:3,16,20

**BBK's** 120:1

**be-** 162:17

**beard** 44:2

**beat** 160:22 223:7 315:22

**beaten** 204:10 219:5 224:18 230:12 315:21

**bed** 331:14,23 332:6

**bedrooms** 267:17,18 274:2

**began** 78:24 127:21

**beginning** 5:1 127:18 147:19 148:11 153:9 160:9

**behalf** 5:7 6:2,6,12 105:18 108:20 222:17

**belief** 68:14

**believed** 312:5,7 346:14

**believing** 207:12 264:16

**bell** 342:24

**bending** 291:18

**Bibliography** 154:3

**bicycle** 104:8 105:4

**bicyclist** 105:7

**Biebel** 342:19,23 347:22 350:4

**big** 163:5

**bigger** 166:6 167:18 168:1

**bill** 124:6,10,21 125:5,8 155:17

**billable** 123:8 131:20

**billed** 123:10 124:3,13,17 125:12 155:19

**binder** 13:11,14 14:12 15:2 17:8

**bit** 13:16 24:6 28:19 65:19 126:3 166:6 167:10,15 168:12 208:17 234:23 235:6 263:6 267:22 286:20 295:13 329:20 341:9

**blame** 207:1,7 250:24

**blankets** 331:14,24

**Blasingame** 106:11 108:2

**blatantly** 249:5 250:4

**blood** 54:16 197:2 208:2,3,4 225:4 233:18,23,24 234:20,21 235:23 236:2,3,9,16 237:20,23 238:5,8,14, 17,21,24 239:1,4 329:11,15,24 332:9

**bloody** 237:12 331:14,24 332:2

**blow** 44:20 73:17

**bodies** 166:10 167:6 258:1 259:18 260:17

**book** 151:21 152:6 271:14

**books** 151:3,8 152:18 153:1

**borrowed** 40:24

**bottom** 36:7 53:16,17 159:3 166:5 167:10 186:18 196:1 226:19 227:3 235:4 248:1,15 276:4 298:23

**Bowen** 5:14,18

**box** 71:18,24 72:2,7

**boy** 160:16 171:8,17 176:21 177:10 182:6 235:16,23 303:17 304:15 310:7,12 319:6

**Brasfield** 19:17 20:14 71:4 134:19

**Brasfield's** 18:1 19:9 30:16 151:6 152:22 153:4

**break** 27:21 28:8 32:7,11,17,22 33:4 68:19 110:19 113:11,14 122:9 181:18 242:1 321:7 340:10

**breaks** 32:10

**briefly** 19:9

**brightly** 94:4

**bring** 12:7 16:15,21 17:6 34:12 232:12 279:17 281:17 284:7,15 292:2

**bringing** 230:16 306:1

**brother** 83:4 176:5 242:21

**brother's** 242:20

**brought** 85:8 172:12 177:5,18 198:3 213:9 285:24 303:4 305:21 307:9 312:20

**Broward** 37:18,19 58:4,6 88:9

**brutality** 247:1

**brutally** 239:3

**Bucktown** 164:8

**budget** 81:9

**bulk** 132:21

**bullet** 94:22 96:8 97:22 346:10

**bureau** 60:11 90:3,5,19,20,21,22, 24 91:2,3,5,12,15,17,19,21 92:12, 15,20,22,23 93:2,7,12,18 94:23 95:23 96:18 97:1,4,10 99:24 100:2, 9

**bureaus** 92:7,11

**business** 10:15 115:17,18 126:1

**button** 25:10

---

**C**

**c.v.** 9:9,15 12:5 33:11,19 34:1 36:7 60:16 71:17 78:2

**calculated** 249:5 250:4

**Cali** 38:13

**call** 67:20 92:8 221:10 304:14 332:15,23 333:5,24 334:1,8,10 335:2 336:20,22

**called** 6:18 35:10 52:17 88:22 93:8 109:3 242:21 248:15 276:22 305:9, 10 338:11

**calling** 337:2

**calls** 7:14 46:12 80:8 89:11 124:12,13,24 156:1 208:9 325:7 332:12 333:5,6,7,12,16 334:13 335:6,14,15,19 336:1,8,9,10,16,17 337:7,8

**camera** 259:3,12,16,17

**canvassed** 20:22

**capable** 196:23

**capacity** 103:24

**capital** 283:4 287:20

**Cappitelli** 343:6 347:22 350:4

**captain** 95:11,12,15,19 99:6,7,15 100:13,14,16,21 266:21 293:24

**captains** 100:18

**capture** 279:14

**car** 208:9 234:23 235:10,13 236:8, 10,22 237:1,6,7,8,24 238:5,9,21 239:2 242:17,20,21 243:1 315:14 318:7,22

**care** 158:4 212:4

**career** 43:12 55:21 60:6 64:5 92:17 93:5 98:11 152:13

**careful** 147:23 257:6

**carefully** 274:24

**Carlos** 336:18

**Carney** 6:3

**Caroline** 5:22 241:24

**Carrie** 65:3 84:16 86:7 165:2 167:14 170:14 180:9 186:7 200:8, 12 293:6 327:23

**carried** 268:9

**cars** 77:12 87:1 242:14 289:9

**cartel** 38:13,24 47:14

**cartels** 37:24 90:12

**case** 5:9 7:12,19,21 8:7 16:17 17:6 22:16 26:19,23 27:11,16 30:9,15, 17,24 31:9,20 32:4 46:11 58:22 59:15 61:6,8,13,14 67:16 70:10,13, 22,24 71:2,13,15 84:4,8 94:7,8 105:23 106:2,9,10,14,15,16,22 107:5,8,16,22 108:1,9,10,12,22 109:7,11,20,23,24 110:5,11 111:2, 8,12,13,21,24 112:7,15,17 116:17 119:2,3,5,9 120:10,12,15,20 121:5, 10,12,17,21,22 122:5,10,24 123:2, 9,20 124:7,11,17,20,23 125:9,12, 19 126:8,21 127:7,9,14,16,17,18, 20,21,23 128:1,4,7,8,12,20 129:9, 16,18 130:1 131:12,13,20 132:6,8, 10,11,12 133:17,21 134:20 136:2 137:23 138:21 142:12 144:17 146:13 147:3,5,19 151:16,20 152:21 153:9 155:5,10,22 156:13 157:3,10 159:6,15 160:7 161:8 162:6,9 165:22 174:9,14 191:7 192:2 205:17 207:22 208:3,10,13 212:22 213:8,16 214:12 215:3,13 216:1,9 217:20 218:16 223:5 230:16 232:13,17 233:8 238:2,8 245:17 246:16 247:5 256:1,22 259:21,24 260:24 265:4,10,22 266:14,16 267:1,3,4 268:15 270:5, 23 271:7 277:4 283:10,15 285:23 286:14,18,23 287:11 288:16 292:19 293:4 302:18 309:6 317:12 319:2 329:9 330:8 331:3 341:20 342:3 345:4 346:1

**caselaw** 267:21

**caseload** 288:20

**cases** 7:8 11:14,15,16,17,18,20,22 30:18 31:12 43:15 45:3 54:17 58:21 84:7,11,18,19 85:4,6 94:17 100:3 104:18,19,20 105:2,8 109:9, 16 122:3 124:5 126:10 127:10,13 128:24 130:23,24 132:23,24 133:2, 10,11,15,18,19 137:10 146:12,16 158:21,22 174:2,6 211:23 246:24 247:1,4,13 266:18,21 276:24 281:2 283:15 286:4 287:6 288:8 289:5, 10,11

**cash** 37:1

**casting** 212:6

**cat** 31:2

**category** 150:16,17

**caught** 137:19

**caused** 114:13 207:2 318:6

**causing** 315:15

**caution** 257:5

**cellphones** 73:9

**cells** 250:16

**census** 87:24

**center** 47:23 48:2

**Central** 119:22,23

**certainty** 159:4 347:16

**certified** 5:13 88:15

**chain** 37:16 98:14

**chair** 64:20 65:15 195:8 283:6

**chairs** 188:3

**chance** 121:11

**change** 29:21 89:23

**changed** 215:24 229:14

**changing** 201:21

**characterization** 21:6 202:11 285:2

**charge** 30:17 35:10 60:8,10 92:6 95:8,11,13,16 96:9 97:12 100:15, 17 101:4,6 125:21,24 126:9,11 249:6 250:5 266:16,19,21,24 279:23 294:1

**charged** 94:24 103:6 196:5 211:17 215:4 318:1

**charges** 213:9 284:8 330:8

**charging** 225:10 284:14 312:8

**chase** 319:2

**chased** 316:10

**check** 111:3 158:6 165:7 196:18 234:17,18

**checked** 158:8,9 207:15

**Chicago** 5:16 6:3 75:6 158:14,17, 21,23,24 211:24 215:12 216:22 249:2 259:24 278:1 279:13 281:19, 23 282:3 283:9 285:7 287:17,20 288:24 294:14 308:13 309:8 317:11

**Chicago's** 280:14

**chief** 9:16,21 33:21 39:10 48:1,6 92:5 99:8 101:17 103:20 104:1,6 114:3,23 115:7 116:21 117:7,9,24 118:4,7 146:15 152:23 214:8 285:16 286:24 288:19

**child** 171:5,17 184:22 271:1 304:11

**children** 81:2 173:9 174:12 185:1 198:3 206:12 305:14 316:23 349:8

**chose** 279:16

**chronological** 99:19

**chronologically** 99:20 148:12 149:12

**CIA** 38:18

**circumstance** 124:10,19

**circumstances** 162:19 209:9 230:14 270:17

**citations** 158:6

**cite** 320:9

**city** 6:3 106:12 216:22 218:5,10 249:4 263:5

**civil** 105:23 129:14

**civilian** 116:24

**claim** 152:5 160:19 161:24 180:1 215:22 218:20 219:8 220:15 222:5 227:12 301:1,6 302:9,16

**claimed** 120:1 145:11 304:11 336:10

**claiming** 145:6

**claims** 178:1 221:13 224:3 225:3 228:14 229:8,18,23 230:2 231:11, 20 232:18,24 240:16 300:24 301:21 305:14

**clarification** 186:22

**clarify** 43:23 93:24 110:20 191:6

**Clark** 5:15

**class** 50:14,15 51:17 52:2 72:11, 13 73:21 88:23

**classes** 48:19 49:8,15 51:10,21 52:9 53:23 62:3 72:3,6,22 73:1 74:1 75:2,3 264:24

**clear** 46:24 94:15 156:9 177:24 178:2,9 199:18 200:24 205:16 206:2 212:10 219:23 238:12 258:6 329:23 345:3

**cleared** 161:23 196:20 197:1 205:22 206:3 306:13

**click** 25:10

**client** 108:21

**clients** 126:1

**clinic** 320:4

**clock** 32:23 124:23

**close** 35:6,24 144:9,10 215:3 219:10 228:18 271:5 340:5

**closed** 216:1

**closer** 77:21 164:17

**closet** 329:4

**closing** 215:13 230:16

**clothing** 197:3 234:1 238:14,19 275:17

**Coast** 53:3,13 119:22,24

**cocaine** 37:6 90:13

**cochairs** 212:23

**coerce** 63:2 121:2

**coerced** 62:5,8,11 216:20 219:4 224:17 228:7 246:20 315:21,24 316:2

**coerceded** 216:8 228:14 230:13 246:23

**coercion** 61:23 216:24 301:9,14, 24

**coercive** 66:7,12 68:15 72:8,9,15 73:11,19 74:9,18 345:9

**cold** 85:13

**collect** 234:20 279:8,9 283:11,12

**collected** 55:7,8 233:23 329:11,15 330:8

**collecting** 61:3

**college** 50:18 51:10,12,13,15,22 52:2,6,20 76:3,5,6,7,11

**Columbia** 38:7,23

**combination** 187:9

**command** 37:16 60:14 92:4,18 98:14 117:13 146:17 345:15

**commander** 92:4 95:7,10,14,16, 20 99:8 100:11 135:9 162:7

**comments** 187:10

**commission** 242:18

**commit** 290:4 338:12

**committed** 66:20 247:3,5,14 289:15 291:6 318:20 320:14,15

**committing** 64:20

**common** 59:19 60:2 63:18 180:15, 16 181:13

**communicated** 316:18

**communicating** 15:19

**communication** 183:10 184:1

**communications** 7:16 47:23 156:17

**community** 78:21 121:1

**company** 119:16,23

**Comparative** 88:9,22

**compare** 208:4

**compared** 88:14

Index: compensated–continuing

THOMAS TIDERINGTON, 10/05/2022

**compensated** 123:19,21

**competed** 79:10 127:19

**competing** 287:22

**competitions** 79:10,11

**compile** 150:23

**compiled** 151:11

**complainant** 145:10

**complained** 320:6

**complaint** 144:14 146:2

**complete** 83:19,23 125:19 149:11 157:1

**completed** 84:2 293:3 297:3

**completely** 208:11

**completing** 312:17

**complex** 38:4 126:10,15 265:14

**complexity** 126:8

**Compliance** 88:9,22

**complicated** 93:7 96:5 136:12

**complied** 147:5

**Complying** 13:15,17

**comport** 162:3 292:18 329:5

**comprehensive** 8:9 25:22 48:14, 20 49:12 149:11 197:24 273:15

**computer** 13:5,10 16:6,10 17:2 69:3 74:13,14 75:14

**concept** 68:3

**Concepts** 75:9

**concern** 267:14

**concerned** 218:6 298:24

**concerns** 257:12 262:19

**conclude** 159:3 224:17 232:18 247:13 299:20 314:10 321:10 350:3

**concluded** 160:24 196:6 197:19 216:4,18 220:22 223:4,5 244:17 309:2 317:8

**concluding** 252:23

**conclusion** 216:13,23 217:3 218:19 221:3,14 222:7 223:18 224:1,6 230:6 232:4 233:10 241:22 243:13,19 244:12 300:2 311:23,24 312:3 314:9 324:2,5,6,7,8,10 334:6

338:11

**conclusions** 224:10 225:16 226:21 227:17,19 336:24 337:24

**concussion** 217:11

**condition** 253:12 256:12,17

**conduct** 54:5,8 159:14 161:2 207:3 214:22 216:22 218:8 224:1 227:10 249:19 250:24 272:2 273:15 285:14 309:8 347:12

**conducted** 36:11 40:19 102:22 151:23 159:5 189:2 206:17 207:14 210:23

**conducting** 40:9 58:12,13 195:15 225:9

**conferenced** 5:5

**confess** 209:5

**confessed** 184:20 198:15 210:4,8, 21,22,24 211:15 275:20 316:1

**confesses** 209:7

**confession** 62:11 63:3 177:19 210:5 219:18,21 223:7,11,13 228:10 279:3 280:19 284:15,20,21 313:17 315:19,23 328:12,22

**confessions** 62:5,8,16,21 206:20 211:5,7 216:4,8 219:4,12,14 224:17,19 228:6 230:13 246:23 276:9,16 277:16 299:22 300:11,14 301:7,13 337:21 338:1

**confident** 141:12 187:14

**confidential** 38:16 61:3 105:14

**confined** 188:11

**confines** 282:3

**confirm** 32:7 122:9 234:18 300:20

**confirmed** 187:23

**confirming** 278:5

**conflict** 179:6,13,17,20 240:10 328:12,21

**conflicting** 171:3 250:21

**confused** 232:23

**confusing** 306:9

**conjunction** 155:9

**connecting** 338:22

**connection** 37:10 155:4 173:8,19 347:17

**connections** 58:6

**consensus** 87:24

**consent** 73:2,3 255:20 258:18 264:16 265:1,2,5,10,19,21,24 266:7,12 267:5,13,16,17,23 268:2, 8,11 269:6,9,13,15,22,24 270:2,6 271:1,16 272:9,12,23 273:6,11,21, 22,24 274:2,6,21 275:1

**consented** 265:18 267:15

**consenting** 265:11

**consideration** 204:12

**considered** 73:18 104:15 115:19 138:3 214:7 217:6,18 218:24 220:10 224:19,20,21 228:16 229:11 244:10,22 245:13 247:8,10 265:19 279:10 297:5 302:24 316:10 321:17

**consist** 10:20 30:14 78:5

**consistent** 8:1 172:23 181:14 222:17 239:21 277:9 281:6 321:14

**consisting** 120:5

**consists** 10:12

**consolidated** 5:9

**constitutionally** 64:6

**consular** 294:7,12

**consultant** 127:24

**consulted** 11:1

**consulting** 10:5,7,11,19 11:9 126:1,19 128:1 129:6,20 130:2,13 131:13 132:7,8 134:4

**contact** 294:4 304:19 305:1,2,13

**contacted** 262:6

**contained** 135:15 146:2 170:22 217:4 260:12 261:23 293:4 312:22

**contemporaneous** 286:3,9

**contemporaneously** 26:9

**content** 342:16

**context** 29:5 64:15 67:5,13 68:11 72:21 140:13 141:3,13 171:14 225:24

**continue** 73:22 93:1 188:4 214:13 215:5 249:24 317:13 351:1

**continues** 224:4 227:13 228:13

**continuing** 214:21 283:23

**continuous** 188:9

**contra** 320:24

**contradict** 320:24

**contradicted** 320:16

**control** 258:17 268:3 270:20

**convenient** 308:1

**conversation** 22:5,12 23:5 124:14

**conversations** 155:15,22 282:1

**convert** 123:24

**convict** 230:24 249:6 250:5

**convicted** 301:19

**conviction** 283:13

**convictions** 248:4,6

**convince** 47:14

**Cook** 213:10

**cooperated** 103:18

**cooperative** 277:22 285:11

**cooperatively** 158:13,17

**copies** 16:15,22 133:24

**copy** 9:9 33:10,14 118:14 120:9
121:4 122:2 213:3

**Coral** 53:18

**corner** 275:23

**correct** 10:9 12:24 13:1,6,7 14:20,
21,23,24 17:4 18:15 27:7,9 29:13,
19 33:23 34:21 35:3 36:5 41:2,10
42:16 48:21 51:15 55:1,5 57:16,18,
19 60:5 63:6 76:23 77:3 78:4,13,15
84:20 87:8 88:12 90:23 91:15,20
92:12,13 94:10 95:17 97:2 99:9
100:23 109:21 110:14 111:10,11,
14,18,19 115:9,10 118:5 121:19,24
125:23 128:3,6 130:10 131:15
132:18,20 134:22,23 144:15 157:4,
6 158:15 164:9,18 166:2,8,12,13
173:5 174:12 179:8 180:24 193:19,
24 194:1 197:22 201:6 202:16
203:13,14 237:21,22 239:22
245:19 246:13 248:9,10 263:15
266:1 270:3,8 291:12 295:15,16
297:9 298:15,18 300:13,18 302:4
306:15 307:17 313:3,7,10,11,14
319:11 326:3 336:19 337:13
348:13 349:12 350:17,18

**corrective** 250:18

**correctly** 10:17 125:3 147:10
172:20 216:3 221:6 242:22

**corroborate** 207:24 211:2 220:4

**corroborating** 202:1 222:15
223:1 312:6,9 319:17

**counsel** 5:19 21:12,16,22 23:8,24
24:9 29:9 30:3 130:8 155:16 156:6,
15,19 245:22 335:14

**count** 23:18,20

**Counting** 21:14

**country** 74:7 88:17,18

**County** 37:18,20 58:5,6 213:10

**couple** 20:23 51:11 69:17 109:19
110:17 111:1 151:8 172:21 181:1
239:4

**courses** 51:12

**court** 5:11,17 6:14 15:18 32:15
85:19 86:8 108:13 113:6 209:13
224:21 241:24 270:18 279:17
281:17 282:5,9,15,20 298:24

**court-approved** 264:17

**court-ordered** 265:7 271:7

**cousins** 83:5

**Cova** 103:4

**cover** 163:16,17 226:9 327:19
340:11

**coverage** 48:3

**covered** 124:15

**covering** 168:9

**COVID** 50:22 73:24

**CPD's** 172:13

**crash** 168:23

**create** 26:6 48:24 142:19 209:24
310:16

**created** 48:23 263:4

**creating** 277:21 310:23

**credence** 169:10

**credibility** 136:24 137:3,17,22
138:10,17 139:7,12 141:20 302:16
310:3

**credible** 137:20 138:24 302:10
315:17 316:6,11,21 317:20

**credit** 213:19,23

**crime** 42:23 43:2,5,14 46:8 55:8,9
57:2 64:21 66:20 79:2,18 90:3,5,9,
21 91:2,8,15 92:1,2,3,11,15,23
93:1,7 94:23 95:23 97:1,4,10,19
100:1 116:2 118:2 147:24 198:15
204:24 208:18,20 209:6,7 220:12
234:19 237:12 239:5 252:20,24
253:7,12,16 254:10 255:14 256:13
258:8 260:9,10 261:8,9,19 262:16
263:5,8,22 264:2 271:24 274:10,13
279:8 283:23 290:4 291:6,14
328:12,22 345:11

**crimes** 91:7 283:4 288:5

**criminal** 10:5,16 45:2 48:11 50:18
51:14,19,21,22 52:1,5 53:3,9,12,24
54:11,14,18 62:7 73:1 90:7,8
108:8,19 121:20 246:16 271:13
281:1 313:14 331:3 349:2

**criminally** 103:7

**criminology-type** 54:17

**critical** 84:7

**cross-sued** 119:24

**crosses** 253:15

**crossing** 104:9

**crossovers** 94:2

**crosstalk** 226:7 266:11 308:18
334:24

**CSI** 339:21 340:2

**culpability** 349:16

**culpable** 162:12

**curious** 151:6 152:24

**current** 9:12,13 33:20,21 34:2

**custodial** 239:10 240:2 241:3

**custody** 67:8 172:13,19 176:22
177:12 179:16,23

**custom** 213:17

**cut** 86:15 293:11

**CV** 5:9,10

**D**

**Dade** 58:5

**damaged** 261:10

**dark** 38:17

**darkroom** 263:7

THOMAS TIDERINGTON, 10/05/2022

**data** 17:14 20:15

**date** 25:18 34:13 36:13 134:5 143:17 169:14 260:9

**dated** 143:9

**dates** 76:13

**dating** 318:21

**Daubert** 113:1

**day** 12:19 23:10,11 37:6 44:19 47:8 58:22 169:6 188:5 256:18 259:18 260:17 274:16 335:1 340:12 349:5

**day-to-bay** 37:9

**days** 31:18 123:16 151:3,18 166:11 170:16 184:7,17,18 186:11 187:17 253:9,17 281:24 332:17,20

**dayshift** 195:10

**De** 103:4

**DEA** 35:14,17,20 36:20 37:16,17 39:4 57:14,21 58:18 60:5 74:24 83:8 92:19 93:13 101:4,6,7,21 102:23 103:3,10,16 158:23 159:1 289:3

**DEA's** 57:17

**deadbolt** 321:11,19 322:2

**deal** 117:10 125:8 146:22 267:14

**dealer** 45:18

**dealing** 283:3,4

**dealt** 90:11 107:9 133:19

**death** 64:19 133:20 164:7 270:23

**debate** 267:20

**deceased** 83:3

**deception** 72:8,10,16 73:11,19 74:10,18

**decide** 283:19

**decided** 284:6 297:13

**decides** 284:9

**decision** 191:21 215:18 221:1 284:23 307:7,12,13,15 348:19 349:22 350:5

**decisions** 257:9

**declared** 62:13

**declined** 310:11

**deeper** 313:22 314:6

**defendant** 5:7 6:3,7 112:3

**defendants** 5:23 279:15 344:17, 19 346:1,13

**defense** 108:20 314:24 315:7 317:17 331:3 335:14,22 336:4

**deficiencies** 188:24 288:15 317:10 347:11

**deficiency** 175:3 312:15 338:5

**deficient** 161:21 205:20 207:22 215:17 265:21 268:16 309:1

**define** 20:5 26:22 44:16 45:14 47:11 159:9,18

**defined** 94:4 268:1 322:6

**defining** 241:19,20

**definitive** 194:13

**definitively** 191:7 327:7

**degree** 76:6,8,11,16,20,24 159:4 347:16

**Deleon-reyes** 5:8 171:6 184:23 249:6 320:18 343:23 344:1 348:9

**deliberations** 7:15

**Delira** 322:23

**Demetrius** 70:13,24

**demonstrable** 202:4,5

**demonstrate** 256:12 290:18

**demonstrates** 258:21

**demonstrating** 290:24

**demonstration** 290:8

**denied** 201:11 300:17 301:18 302:5

**Dennis** 343:9 347:16

**Denny's** 47:3

**denoted** 155:16

**denotes** 296:17

**department** 34:24 35:1,18 36:4 37:13,15 48:4 56:16,19 62:22 76:21 77:2,10 78:12 79:7 81:1 83:10 85:9,11,17,18 87:10,13,21 88:20 89:16,23 90:14,16 93:17 98:8 99:8 101:10,14 102:3,9,14,19 104:12,23 106:12,13 114:4,14 115:12 116:21 117:9 158:14,18 211:24 214:4,6,8,21 215:13,15

249:2 257:7 260:1 263:4 277:18, 20,23 278:1 279:13 281:19,23 282:4 283:10 285:7,12 287:2 289:1,2 294:3,7,11,14,16 312:17 317:11 318:1 330:16 332:14 349:8

**department's** 42:23 43:13

**departments** 37:19 58:3 159:13 281:7 285:17

**depend** 67:5

**depended** 303:1

**depending** 87:12,22 117:4 126:7

**depends** 45:14 46:10 64:15 68:11 84:3 236:14 263:19 328:24

**depo** 18:7 124:2

**deposed** 285:23

**deposition** 5:5,6 7:7 13:6 16:23 17:13 18:1,9,14,20,24 19:2,9,17 20:10,15 21:5,8,11,16 24:1,3 25:4 26:15,20,24 27:9 71:4,5,6,8 105:1, 7 108:3 109:14 110:4 111:9,16,17 119:10,14 120:10,20 121:4,13,14, 15 122:10 129:12 134:13,19 135:8 136:23 137:1 142:24 143:1,11,18, 21 144:2 153:5,16 171:13,21 173:2 176:23 191:20 200:7 213:3 239:8 240:8 320:9 322:22 324:11 325:23 341:10,13,17 342:15,20

**depositions** 8:8 17:16,21,23 18:3 70:12,21 108:7 109:19 110:18 111:1,7 123:18 134:20 144:7 200:8 239:14

**depot** 18:4

**deputy** 92:5

**describe** 8:11 20:20 35:7 38:17 44:10 45:23 51:23 73:5 74:4 80:20 98:6 108:10 115:16 152:1 194:7

**describes** 25:23 72:2 241:3

**descriptions** 42:2 239:9

**designed** 120:1,7

**destroyed** 270:19

**detail** 20:21 38:19 66:1,15 192:21 268:14 275:1,11 286:22

**detailed** 48:17 54:17 80:2,5,8 189:11 240:7

**detailing** 262:5 312:18

**details** 112:5 149:15 187:14 255:23 261:18 272:16 318:19

**detain** 350:5

**detained** 294:9,13 343:24 348:10

**detaining** 180:20

**detective** 43:1 44:7 45:21 46:8,10, 16,22 47:9 58:8,13 60:7,8,10,13 63:12 90:2,19,20,22 91:2,3,5,12, 19,21 92:9,20,21 93:12,18,19 94:22,24 95:4,5 96:17,20 97:8,9,11 98:23 99:24 100:3,9 117:2,12 140:23 142:10 158:19,20 196:21 198:20 201:3,16,22 203:15 206:17, 23 222:17 223:20 225:1 227:6 228:15 243:15,21 246:20 247:3 251:1 252:9,11,15 262:5 275:6 279:7 295:13,15 315:22 316:1 339:3 346:2

**detective's** 207:11 279:8

**detectives** 58:20 84:7 91:23,24 92:2,3,5 94:1,6 96:23 97:3 117:1 147:5 184:2 195:11 197:19 201:14 215:23 219:22 228:20 272:1 279:9 286:1 287:5 288:3 295:4 296:6 304:20 305:16 307:20 309:5 319:24 323:23,24 325:12,14,20

**determination** 112:2 272:17

**determine** 7:21,24 38:20 119:17 120:7 192:1,11 193:22 195:14 196:18 211:1 278:23 309:21 310:2 327:7 333:14 350:12

**determined** 30:5 148:24 277:14 339:1

**Detroit** 7:3 34:23 50:7 75:22 76:7, 11,21 77:13,15,18 78:3,7,11,18,21, 24 80:1 81:1,5,17 82:2,16 83:2,3,4, 9,20 84:20 85:11,17 101:9 102:2,7 115:19,20 263:4,6 269:1 287:19,20 289:2

**develop** 214:23

**developed** 259:13 260:10

**developing** 62:22 75:17

**development** 152:14

**deviates** 159:6

**deviation** 7:22 159:10,11 160:17 162:22,23 163:3 240:24 241:21 253:1 264:11,18 275:13 306:2

**deviations** 159:16,17,18,23,24 160:6 161:1,8,16 162:11,16 241:2 248:16 344:5 350:20

**Dickinson** 200:9

**difference** 54:20 61:5,12 95:10 153:21,24 154:18 162:22 240:1 296:21

**differently** 71:23 124:8 191:2

**difficult** 46:5 47:16 67:12 202:24 203:23 220:10 228:1,8 241:18

**dilemma** 219:22

**diligent** 49:7,9

**dinner** 47:4

**dinnertime** 113:17

**direct** 43:7 213:18 226:17,19 248:11

**directing** 252:19 254:3 319:22

**direction** 115:2 330:18,22

**directions** 220:2

**directly** 16:4 320:16,24

**disagree** 41:12

**disallow** 200:15

**discard** 219:13

**disciplinary** 104:14,21 146:22

**disciplined** 102:21

**disclosed** 11:24 29:13,18

**disclosure** 8:1 109:15

**discount** 219:13 220:19

**discounted** 317:15

**discovered** 166:11 167:5 258:1 259:18 260:17 274:9 335:20

**discovery** 73:7

**discrepancies** 181:13 240:14

**discrepancy** 204:4 333:9 335:4

**discuss** 38:19 72:14 298:13

**discussed** 72:5 75:3 248:20 320:18

**discussion** 30:3 64:9 171:21 172:1 330:20

**discussions** 30:4

**dismantle** 37:23

**dismissed** 105:12

**dispatch** 48:2,3

**dispose** 275:19

**disprove** 146:10 147:1

**disproved** 146:8

**dispute** 170:4,9,12,21

**distortion** 7:1 28:2

**district** 5:11 35:21 82:11 172:10, 13,14 176:21 179:1

**divided** 343:20

**division** 5:12 42:23 43:2,5,14 46:9 60:9 82:11 91:17,23,24 92:9 93:11, 15,18 94:7 95:8,21 99:22 100:1,15, 19 294:1

**DNA** 55:8,10 70:11 234:14 235:6 236:21 237:1,9

**doc-** 151:3

**document** 20:21 118:16 135:12, 15 136:19 144:19 152:6 165:2 189:11 218:4 253:11 276:9,16 277:9 278:22 296:4

**documentation** 7:24 208:6 271:11 331:16

**documented** 174:16 178:17 182:16 222:18 292:23 306:11,12

**documenting** 254:7 277:15 286:4

**documents** 7:21 8:1,7,13,17,21 9:2,4 17:15,19 19:18,22 20:6,18,24 21:10 24:8,11 27:14 28:6,24 29:11, 17,24 30:11,14,18 123:23 124:21 135:11 136:21 139:11 145:20,21, 24 147:17 150:8 190:9 192:20 217:19 218:9 262:17 280:6 327:17

**Doe** 109:20 110:1 111:8,21 120:12

**dollar** 130:12,19

**dollars** 103:5

**dont** 259:6 263:10

**door** 73:6,13 258:10,11,14 321:6,9, 11,13,24 322:1,9,14,17

**double** 158:9 225:2 279:24 286:14

**doubt** 166:21 324:16 325:19

**downloaded** 151:21

**draw** 221:3 232:4 241:22 311:23, 24 312:3 314:9 336:23 338:11

**drawing** 248:21

**drew** 334:5

THOMAS TIDERINGTON, 10/05/2022

**drill** 149:15

**drive** 124:22 142:2 239:5

**driving** 89:10 124:1

**Dropbox** 16:24 27:22 31:19 142:2, 23

**drove** 313:18

**drug** 35:8,9 37:23 44:3 45:18,19 46:13 47:14 50:10 54:22 56:19 58:9,11 73:10 75:1 90:11 94:7 108:9 120:1

**drug-related** 39:13,18 41:7 53:14 57:1

**drugs** 37:1 119:18 120:6

**due** 81:9 103:12

**duly** 6:18

**dumpster** 275:22

**duration** 178:19

**dusted** 55:12,13,19

**duties** 36:3 44:4 89:7,22 97:5

---

**E**

**earlier** 55:21 69:13 164:3 220:4 248:20

**early** 48:17 79:3 164:21

**earned** 134:4

**easier** 99:19 176:17

**easily** 192:1 308:3

**Eastern** 5:12

**Ed** 341:14 347:22

**education** 75:20

**effect** 301:11 327:5 339:21 340:2

**effective** 64:14

**effort** 277:22 285:11

**efforts** 157:21

**eight-hour** 47:7

**Eileen** 6:2

**Either/or** 108:4

**electric** 64:20 65:15

**electrical** 283:5

**electronic** 16:21 71:11

**electronically** 16:19,20 157:19

**eliminate** 207:23 211:2 220:5

**eliminated** 174:18

**eliminating** 212:7

**else's** 292:12

**embassy** 38:22

**employed** 249:4

**employees** 87:16,18,19 116:19,24

**employers** 338:8

**employment** 77:7,8 85:15

**encountered** 260:1

**end** 9:19 33:22 89:20 212:1 317:12 340:11

**ended** 23:13 182:23

**enforcement** 9:22 11:17 34:4,20 35:4,9 39:11 41:5 43:12 51:20 52:15,20 56:20 64:5 75:1 82:21 88:15 109:5 116:11 146:15 151:1, 24 152:4 162:7 181:9 221:8 223:8 224:20 230:14 232:3,7 251:22 253:20 257:16,18 285:14 289:24

**English** 265:12,13 277:7 278:5

**English-** 277:4

**ensure** 157:21,24 277:9

**entail** 46:13

**entails** 325:4

**entered** 330:4

**entertainment** 121:1

**entire** 8:10 24:18 60:10 78:18 82:16 115:8 142:17 177:17,21 268:4 274:4

**entirety** 273:2,7

**entities** 37:20

**entitled** 200:16

**entity** 280:2

**Entrepreneurs'** 50:2 53:1

**equal** 224:9 225:15 227:19

**equally** 222:9

**equate** 248:8

**equation** 11:19

**equivalent** 37:15

**Eric** 135:9

**Erica** 6:5

**error** 157:21 326:1

**essence** 114:22 270:16

**essentially** 7:23 20:19 25:20 26:24 37:13 41:22 51:20 72:4 77:14 88:23 114:24 119:15,20 120:21 150:24 154:12,13 160:11, 14 183:15 184:3 219:14

**establish** 338:2,15

**established** 238:17

**estimate** 125:10 129:2 134:3 195:18

**et al** 5:9

**events** 48:10 315:13 320:17 321:1

**eventually** 93:8 300:12

**evidence** 55:7,8,10 61:3 63:21,23 64:1 65:12,17,21 66:12 67:16,20 68:7,14 75:9 145:17 146:1 147:3 160:21 162:4 167:7 169:12 178:9 183:9 188:18 194:13 196:17,24 197:2 198:14 205:15 206:2,3,9 207:22 208:1,3,5,10,13 210:21 212:9,11 216:4,8 217:19 219:12, 14,19 224:23 225:4 228:9 230:11, 24 231:5 232:5,8,10,14,18,21 233:9,17,22 234:2,3,4,15 242:16 243:4 244:20 250:22 260:6,7,13,15 268:18 270:15,19 272:15 274:10, 12,13,16,19 275:21 279:8,10,11,12 280:13 282:23 283:12,13 288:14, 18 290:6,17,18 291:5,8,10 292:15, 16,19,20 293:3 299:13,21 312:7,9 313:24 317:6 319:18 328:13,23 329:1 330:4,7,16,20 331:4,8 335:21 338:6,21 339:6 345:3,11 349:1

**evolved** 93:8

**examination** 6:20 346:17

**examine** 7:20 73:15 119:15

**examined** 6:19

**examples** 123:23 124:16

**Excel** 26:7

**excess** 114:16

**excluded** 215:6,7

**exclusion** 318:13

THOMAS TIDERINGTON, 10/05/2022

**exclusive** 274:6

**exculpatory** 214:23 290:5,10,13, 17 291:1,12,13 292:9,11,17 293:1

**Excuse** 99:1 266:13

**executed** 109:5 267:10,11 272:9

**executive** 97:24

**exhibit** 12:4 33:9 43:9 47:18 60:17 71:16,17 78:2 118:10 122:17,18 132:17 134:12 135:3 150:16,17 153:22 154:6 156:22 157:6 164:24 165:2,5,10,11,19 169:17 182:5,9 226:11 227:4 230:7 235:3,4 246:18 260:13 295:6 298:12 341:4

**exhibited** 346:3,14,23 347:17,24

**exhibits** 143:18,24 144:3 154:15

**exigent** 270:16

**existed** 92:10

**existence** 30:10

**exists** 92:10 254:7

**exonerated** 247:21

**expect** 13:12 239:2 258:23 261:22 262:8 265:4 278:1 333:23 335:2 346:13

**expected** 12:1 80:9 82:5 174:16 189:11 207:5 238:23 255:24 260:4 286:13,23 308:10 316:8 332:1 338:10

**experience** 34:4,15,16 42:2 44:6 118:17 122:6 151:17,24 248:22 251:21 258:12 263:3,6 276:8 280:8 281:1 290:2 322:7 331:20

**experienced** 79:16 188:21 201:15 228:17

**expert** 8:9 10:8,12,14,20 11:4,6, 10,13,23 30:20 54:24 61:17 62:10, 13 70:2,9,10,11,20 105:23 106:2,3 107:5,24 108:1,9 109:1,10 110:11 126:20 129:7,20 130:14,16 134:21 152:22 246:14 322:6 348:22

**expertise** 39:19,21 54:15 61:22 62:2

**experts** 39:12 41:6 70:10 271:12

**explain** 46:2,6 161:11 206:15 258:6 332:8 339:23,24 350:16

**explained** 41:23

**explains** 208:11

**explanation** 161:23 211:8 220:9 251:13 264:6

**explanations** 278:11

**exposed** 155:11

**expressed** 31:21

**extended** 124:1,14 250:17

**extent** 7:14 138:20 155:24 156:18 286:12 326:7 342:10 347:2 350:8

**extra** 265:6 327:11

**eyewitness** 66:20

---

## F

**F-I-N-A-L** 70:11

**face** 198:1

**faced** 162:18 219:23

**fact** 65:18 66:21 103:6 125:6 152:7 176:22 189:22 195:4 208:17,18 209:5,6 212:11 219:2 220:12 223:6 229:11 244:21 245:10 268:10 271:2 311:24 321:14

**factor** 137:22 142:11

**factored** 138:2

**factors** 144:16 220:20 321:2

**facts** 155:22 156:5,13,18 162:18 164:1 170:10 232:13 292:19 329:4, 9

**failure** 120:14

**fair** 21:6 29:16 61:8 63:4 68:16 84:10 98:19,20 129:19 159:20 202:11 203:3 246:16,17 259:8 290:22 300:16 324:4,10 331:5 348:4

**fairly** 141:2,12

**faking** 198:5

**false** 62:4,16,21 63:21,23 64:1 65:12 66:12 67:15,20 68:7,14 215:17 246:23

**familiar** 33:12 122:20 277:1 294:16

**family** 82:20 83:1 114:16 172:12, 18,22 173:3,8,19,22 174:5,11 175:7,23 176:2,4,20 177:9 205:4,5, 9,12 253:18 254:13 316:17 325:16

**fast** 91:22

**faster** 270:3,6,9 271:2

**fastest** 308:1

**father** 83:3,10,12 263:8

**Fatima** 6:5

**fault** 349:11

**faulty** 259:16,19

**FBI** 288:20

**February** 143:9,12

**federal** 37:20 83:5,6 106:14,16 108:13 109:3 288:21

**federally** 120:3

**feel** 33:4 123:18,20 136:5 187:14 245:4

**felt** 9:22 153:2 173:23 228:21 270:18 330:16

**females** 120:23

**field** 39:13,17 41:7

**fields** 39:19

**figure** 129:3 130:1 131:4,7 132:3 189:9 191:8

**figured** 115:3

**file** 14:1,5 15:2 17:9 71:2 123:24 142:17 165:9 191:7 192:2 197:14 207:22 208:10,13 233:8 261:17 262:8,11,15,16 268:15 286:14,23 293:4 312:16 331:17 346:11,17 350:12

**file's** 268:15

**filed** 5:10 104:15,22 105:17,20 246:21

**files** 8:8 30:15,22,24 31:9,11,12,20 32:4 69:16,19 70:22

**fill** 86:10

**filled** 166:18

**fillers** 308:19 313:13

**film** 260:6

**Final** 70:10 134:21

**find** 136:19 142:24 159:12 187:3 227:4 236:9,20,22 237:1 256:6 276:8,23 298:4 306:24 308:3,16

**finding** 302:8

**findings** 222:9

**fine** 28:18 33:7 119:1 153:22 166:2 168:7 187:4 192:4

**fingerprints** 54:16 55:12,14,20 225:5

**finish** 65:11 175:1 209:2 293:7 351:6

**finished** 76:7 78:10 170:2

**firebombed** 318:21

**firebombing** 315:14 318:7

**firm** 128:13,18

**fit** 200:17 329:9

**five-minute** 340:10

**five-year** 92:18

**fixed** 69:4

**flip** 141:6

**floor** 168:23

**floorboard** 236:16

**Florida** 35:11 37:24 53:19 58:10 76:8,16 87:2,5 88:23 100:11 293:23

**fluctuated** 87:22

**flushed** 329:7

**focus** 24:20 90:10 249:5 250:4

**focused** 212:8

**folders** 14:2,5 15:2 17:9

**follow** 57:11

**follow-up** 81:23 82:8 195:11 208:14 211:1 212:12 317:18

**footnote** 171:24

**footnoted** 14:17

**force** 35:11 36:11 37:11,17,22 39:5 40:9,19 58:2 63:2 96:9 100:11,12 101:1,2,22 102:24 103:8 107:10 121:18

**forced** 219:4 228:7 230:13

**Ford** 90:15

**foreign** 294:4,8,13

**foremost** 39:12 41:6

**forensic** 54:24 55:2,4 118:2 233:17 254:6

**forensic-type** 54:18

**forensics** 55:3

**forget** 165:14 247:19 252:8

**form** 7:13 8:18 10:22 16:18 29:1, 12,17 56:5 57:6 59:7 61:24 63:7 72:14 84:13,21 91:9 106:23 137:24 138:19 139:13 140:17 141:15 142:13 144:21 146:5 149:24 157:12 161:17 162:13 164:19 171:18 175:15 176:10 185:16 186:6 190:1,23 192:8 194:19 198:16,22 199:8,14,21 201:7 202:19 203:21 205:1 207:18 208:21 209:15 210:13 211:19 213:11,21 215:8 216:15 217:23 220:16 221:16 222:10 224:12 225:19 227:22 230:8 231:3,13,17 232:21 233:5 235:17 236:11 237:2 240:3,18 241:6,14 243:3,24 244:15 245:2,23 246:9 247:6 250:6 252:2 253:3 255:4 256:23 259:7 260:18 262:22 263:16 264:20 266:2 278:19 282:24 284:11,24 289:17 290:1 291:3,20 295:20 301:15 302:19 303:19 305:3,18 308:21 313:23 314:1 317:1 319:7 322:18 324:13 325:5 326:6,16,23 328:14 330:10 334:2,12 335:7,24 336:12 338:17 339:10 342:9 347:1 348:15 349:13 350:7

**formalized** 55:3

**formally** 94:18 95:22

**format** 171:14

**formed** 16:17 302:18

**forming** 155:23 156:12 189:24 217:4

**Fort** 34:24 35:17,20 36:4 42:15,22 52:4 56:18 60:7 77:1 85:9,10,18 87:10,11,21 88:19 89:15,23 90:15 93:16 101:5,6,13 102:11,13,18 114:14,22 115:4 152:23 294:6

**forward** 91:22 146:23 230:16 232:13 288:19

**found** 103:17 162:4 208:5 222:18 234:15 236:15 237:10,23 238:5,9, 14,18,21 272:15 288:15 306:17

**foundation** 57:9 63:8 84:22 131:16 138:20 142:14,18 144:22 146:5 153:11 161:18 175:16 176:11 185:17 190:2 198:17,23 199:9 201:8 202:20 203:22 208:22 209:16 210:14 211:20 215:9 222:11 230:9 231:14,18 232:21

233:5 236:12 237:3 240:4,19 241:15 244:1,16 245:3,24 246:10 247:7 250:7 253:4 255:5 256:24 262:23 263:17 264:21 278:20 283:24 284:12 289:18 290:12 291:21 294:22 305:4,19 314:2 319:8 325:6 326:7,17,23 330:11 334:3,13 336:13 342:10 347:2 348:15 349:14 350:8

**four-month** 78:8

**fourth** 35:4 96:8 170:10

**frankly** 152:22 255:11

**free** 157:22 176:24 178:10

**French** 152:7,8,18

**Friday** 114:23

**friend** 320:4,8 323:12 324:7,9,22 326:5

**friendship** 313:22

**frivolous** 104:16

**front** 13:9 15:16,23 16:4 17:7 28:12 33:14 118:15,19,23 132:3 168:20 232:5 307:1

**frozen** 85:22

**fruit** 318:8,10

**fugitive** 108:10 109:3,4 121:23

**full** 77:21 182:10 184:5 268:3 321:22

**full-time** 35:19,22 36:2

**fully** 35:12 209:23

**fulsome** 322:16

**function** 45:23

### G

**G-O-O-B-E-N** 70:15,19

**Gabriel** 6:13 299:3

**gain** 325:18

**gang** 315:14 318:21 319:5

**gas** 73:14,16

**gave** 111:9,15 119:10 120:10 122:3 143:17 197:9,13,20 273:6 305:14 310:7,12 338:23

**general** 21:3 60:22,23 62:17,19 119:21 165:22 179:11 187:2 328:20

**generally** 32:14 61:15 75:19 339:21

**generally-accepted** 7:22 8:2 159:6

**girl** 314:15

**give** 47:1 72:20 74:5 105:1 107:5 118:22 123:22 137:21 142:7 154:10 212:15 217:22 222:9 224:9 225:15 227:19 245:10 264:4 269:19,24 274:1 275:8 277:1 303:10 346:10 351:5

**giving** 76:13 84:6 215:20

**glad** 312:20

**Golden** 5:22 6:21 8:3,22 11:5 15:21 28:9,18,21,22 29:7 49:21,22 56:6 57:12 59:11 62:9 63:11,15 65:5,10,13 68:18,23 69:12 84:14, 17 85:2,21 86:1,8 87:3 91:13 94:20 107:3 113:10,15,19 114:1 131:22 138:7 139:4,22 140:21 141:18 142:22 145:3 146:9 153:14 155:2, 13 156:10,11,21 157:14 162:20 163:17,21,23 164:23 165:3,13,17 167:16,19,22 168:2,4,6,11,14 170:16,18,20 172:3 175:5 176:1,18 180:13,14 181:17,20 182:4,7 185:20 186:10,15,18 187:1 191:1,3 192:13,17,18 195:17 198:19 199:1, 12 200:13,18 202:3 203:4 204:14, 21 205:2 208:15,23 209:17 210:9, 15 211:12 212:14 213:14 214:1 216:11 217:2,21 218:18 221:11,22, 23 223:15 225:12 226:1,6,9,17 227:1 229:5 230:18 231:4,15,23 232:15 233:2,13 235:20 236:19 237:11 238:6,7 240:12 241:1,8,12 242:2,5,12 243:5 244:7,23 245:6 246:2,11 247:11 251:5 252:6 253:22 255:2,6 257:3 259:1,10 260:21 263:12 264:7 265:23 266:6 273:9 279:1 283:17,22 284:4,5,18 285:19 289:22 290:15 291:7 292:7 293:10,13,21 295:5 296:2 298:3,10 301:20 303:2,14 304:1 305:6,22 309:15 314:13 317:3 319:10 322:21 324:19 325:21 326:14,18 327:9,15,19,20 328:3,5,8,16,18 331:1 334:7,20 335:12 336:7 337:4 339:5,14 340:4,9,18 341:3 342:18 344:10,13,14 345:18,21 347:14 349:9 350:1,14

**Gooben** 70:15,19

**good** 5:24 6:1,22 9:23 26:2,3 33:6 38:11 63:11 65:7,8 68:19 98:3
147:21 163:13 169:4 180:10 226:8 242:1 264:6 265:1 293:8,13,14 307:19 349:7

**gotcha** 65:10 149:18

**grab** 69:23 118:22

**graduate** 77:4

**grandfa-** 82:24

**grandfather** 83:1,10,12 263:3

**graphs** 71:19,24

**great** 12:11 32:21 33:2 114:17 115:3 117:10 125:8 158:4 181:22 267:14 280:14 292:2

**gross** 159:9,11,17,18,22,23 160:6, 17 161:1,7,16 162:11,16,23

**grossly** 159:6

**group** 35:8 37:12,17 54:5 96:8

**groups** 41:23 90:8 92:7

**grow** 75:22

**Guadalupe** 235:15,21 272:4,5

**Guard** 53:3,13

**guess** 11:19 22:20 26:22,23 35:7 42:10 45:13,23 46:2 48:24 51:22 60:12 64:8,15 66:10 68:1 72:20,24 74:3,20 80:16,17 88:4 91:16 108:10 123:18,22 125:14 137:19 140:1,3 151:24 160:8 161:10 162:15 163:19 172:24 194:21 204:3 206:1 207:5 211:7 214:17 230:10 236:14,15,17 237:5 240:11 255:16 272:24 273:19 276:17 278:21 287:12,24 289:21 290:22 293:1 314:9 321:21 328:24 329:7, 13 330:13 333:8 344:9

**Guevara** 5:8 6:7 140:2,8,23 142:10 160:22 198:20 201:3 203:15,24 204:5 223:2,20 227:6 229:20 243:15,21 245:8 246:20,23 247:3 249:3,11,18,23 286:17 344:16,23 346:2

**guidance** 141:23

**guide** 32:16

**guilt** 65:22 219:24 290:19

**guilty** 209:5,7 220:12 231:6

**guy** 211:11 232:9

**guy's** 198:4

**guys** 68:20 225:3

---

**H**

**hair** 44:2

**hairs** 291:24 293:2

**half** 23:14,22 32:19 89:5 99:23 155:17 180:12 194:10 241:11 344:9

**halfway** 171:2

**hand** 94:1

**handcuffed** 160:19 177:16,20,23 178:3,11,18,24 179:8,15,22 180:1, 3,7

**handcuffing** 161:6

**handcuffs** 178:14

**handle** 288:20

**handled** 292:4

**handling** 256:22

**hands** 243:14,22 244:13,18

**handwritten** 190:3 193:6,10,13 277:1 320:17 321:1

**handy** 71:7,10

**happen** 146:21 223:6

**happened** 112:21 145:11 160:24 203:19 204:16 249:20 264:13 278:6 300:20 310:5 320:3,8 338:24

**happening** 184:4

**happy** 326:2

**hard** 37:2 55:22 125:7 142:2 189:9 195:13

**hardcopy** 12:9 16:18 74:15 75:11

**Harvey** 343:16 346:20,22 347:23 350:4

**hats** 117:9

**head** 148:14 250:10 286:18

**headline** 348:9

**hear** 28:13,15 125:3 168:2

**heard** 168:21 190:12 299:1 300:4

**hearing** 108:8,23 109:1,11 113:1 137:5 298:13

**hearings** 239:8 244:4 315:9

**heart** 211:22

**held** 38:7,21 99:7 173:3 177:5 220:21

**helpful** 12:11 149:12,16 190:9 191:23 322:19 351:11

**hesitating** 10:24

**Hey** 150:11 262:1 269:18

**hid** 324:23

**hide** 323:24

**hiding** 329:4

**high** 75:21,24 77:5 79:2 81:19

**high-end** 115:18

**high-pro** 261:9

**high-profile** 261:10 265:4

**high-stress** 52:15

**higher** 115:24 126:3 167:15

**highly** 194:23 195:5 245:13 256:11 261:11 263:11 265:9 270:22 276:10,23 310:15 318:22 320:2

**Hill** 212:16,17 253:24 262:6

**Hillgard** 5:18

**hired** 77:15,18 83:2 114:20 216:22 218:6

**historical** 31:12

**hit** 140:14

**Hmm** 96:3,6

**hold** 174:24 270:14 299:18 347:23

**holding** 235:22 250:16

**home** 164:7 171:2 182:11,14,22 183:3,11 208:6 233:18 234:15,21 256:7,17 267:11 268:10,17 272:6 273:2,7,15,17 274:4,20 313:18 318:23 321:6,19 329:12,24 333:6 335:15 336:9,11 337:9 338:3 339:8,17

**homicide** 52:21 54:5,8,11,13,17, 21 56:1,3,9,15,22 57:1 58:4,8,12, 13 59:3,10 60:18,20,21 61:6,13 67:17 79:16,18 80:4,10,23 84:6 89:13,14 91:11 92:2,12 93:18,19, 20 94:1,6,10,17,18 116:4,14 133:16 148:20 149:23 159:5 164:1 225:1 248:16,17 249:1 252:10,16 253:2 262:21 264:11,18 265:4,10 266:14,16,18,21,24 267:3 270:23

271:20 286:14 287:2,6,16 288:3,4 289:16 316:5 331:20 338:10 344:5 346:23 347:18 350:21,22

**homicide-type** 289:11

**homicides** 54:9 56:11 57:2,4,20, 23 58:10 79:14 80:12 81:24 90:17 91:6 116:7,9,12 201:4 287:5 289:6 318:2

**Honestly** 32:13

**Hope** 340:6

**hospital** 235:16 318:24 335:20

**hotel** 110:1 120:17

**hotels** 120:24

**hour** 23:22 24:2,5 32:11,19 33:1 47:5,7,8 65:4 113:11 124:6 125:22 126:6 155:17 180:11

**hour's** 24:4

**hours** 18:10 23:14,16 25:8 67:10 123:7,8 124:4,17 125:5,11,14 131:20 164:3,22 178:5,22 187:18, 19 188:5,8,10,13,22 193:17 194:4, 17,22 195:5,7,14,20 327:11,13,14, 16 340:5 345:5,9 349:5

**hours'** 47:8

**house** 73:4,8,10,15 198:4 234:11 265:16,18 268:1,4 270:20 275:23 314:18 319:6 320:5 323:13 335:6 337:3

**housemate** 334:9 335:3

**human** 110:3,4 120:22

**hunch** 232:8,10

**hundreds** 43:15

**hung** 162:15

**hungry** 113:16

**hurt** 168:22

**husband** 196:2,4 198:2 206:24 207:4,7,9 212:13 220:7 237:9 251:14 314:11 333:19 334:11 335:3

**hypothetical** 65:24 215:20 237:8

— **I** —

**IACP** 271:11 280:11

**idea** 26:2 38:11 43:24 45:16 103:15 169:10 171:16,22 172:1

188:20 200:21 226:8 284:22 287:4 288:8

**ideal** 317:23

**identification** 177:6

**identified** 40:1 147:23 159:16 174:13 177:8 196:14,15 212:2 215:12 220:20 249:10,18 268:20 272:11 283:9 306:7 307:10,11 309:11 310:9 312:2 314:7 348:5

**identify** 5:19 28:8,16 49:14 165:1 176:21 224:4 227:14 250:1 251:7 304:23 305:20 306:8 307:20 308:6, 11,14 309:24 310:6 312:1 346:5 347:10

**illegal** 120:3

**Illinois** 5:12,16

**illogical** 277:10

**imagine** 58:10 67:22 133:24 237:17,19 294:2

**implicate** 201:5 203:12 207:6 211:15 228:13

**implicated** 201:4 202:14,18 203:11,16

**implicating** 198:14 208:18

**importance** 152:24

**important** 144:20,24 145:4,5,12 153:2 191:12,13,15,17,21 192:3 210:11 211:4 220:4 292:24 316:18 320:14 322:5,15

**importantly** 211:3 278:8 338:20

**impossible** 199:17 338:2 339:7, 13,16

**improper** 330:22

**in-service** 51:9 74:6

**inappropriate** 276:10

**include** 11:3

**included** 44:4 177:6 309:12 316:11 326:13

**includes** 10:7

**including** 37:17 75:5 97:15 158:14 229:19 286:1 315:14

**income** 115:22 130:2,13,15 134:4

**incomplete** 205:19

**inconsistency** 239:9

THOMAS TIDERINGTON, 10/05/2022

**inconsistent** 194:24 258:22 263:23 276:10 306:10 323:13,15 344:2

**incorrect** 266:17

**inculpatory** 291:2

**independent** 205:15 323:8

**independently** 181:11 201:24 300:22 303:13

**indicating** 189:12

**indication** 169:5 189:18 250:17

**indicative** 292:15,16

**indisputable** 274:15

**individual** 5:23 107:11 273:23 310:24 350:12,16

**individually** 287:11

**individuals** 148:1 174:17 204:10 207:8 212:8 220:8,23 230:12 248:3 249:24 250:15 270:24 279:4,23 307:6 347:8 349:3,10

**industry** 90:12,13 121:1

**inferences** 297:22

**informant** 38:6,16

**informants** 61:4

**information** 7:15 18:23 25:13 26:4 30:8 38:16,18,22 80:8 82:7 127:22 150:14 151:16,21 156:1 183:2,5,6 184:14 185:6,8,22 202:1 203:18 207:24 214:19,23,24 215:14,16 217:7 218:15 222:14,15, 23 223:2 229:7,13,23 230:15 247:9,18 250:21 251:15 259:22,23 261:20 292:4,10,18,24 305:1,2,13 312:6,23 314:6 317:6 318:10,12 319:17 320:16,23 321:4 323:11,22 324:1,9,23 348:23

**informed** 145:8 215:18

**infringement** 110:11 119:5

**initial** 80:9 89:12 147:20 148:2 160:10 169:8 197:23

**initially** 80:17,24 82:1,5 149:2 168:16 199:4 201:2 202:13 314:8

**initiation** 332:21

**initiative** 50:23 78:24

**innocence** 219:8,24 220:15 221:13 224:3 227:12 229:8 230:3 231:12,21 232:19,24 248:9 290:19,

20 291:8,10 292:12,16

**innocent** 207:8 218:21 222:3,5,8 231:2 233:1

**inside** 321:9,24 322:1

**instance** 136:13 201:17 247:15

**instances** 66:10 251:17

**instruct** 74:9 75:16

**instructed** 74:17 195:11

**instructing** 51:15

**instruction** 52:19 71:20 72:4,9 75:8

**instructions** 107:12 349:23

**instructor** 39:12 41:6 48:10,15 50:19 51:14

**insufficient** 232:17,20

**Intelligence** 53:18

**intending** 42:3

**intent** 174:15 253:10

**intentionally** 249:4 250:3

**intents** 349:6

**interference** 79:2

**intern-** 121:22

**international** 36:12,17 40:10 50:10,16 54:1 95:1 108:9 109:3,6

**internationally** 38:1 39:11 41:5

**interpretations** 199:17 200:5

**interpreted** 199:24

**interrogated** 323:24

**interrogating** 66:18 117:18

**interrogation** 67:10 160:20 178:20 180:3,6 188:9,11,17 194:15,23 195:4,12 205:23 220:21 223:22 224:2 229:19 250:16 345:9

**interrogations** 184:19 187:17,19 188:4 193:17 227:8,11 239:10 240:2 241:4 344:1

**interrupt** 45:14 67:4

**interrupting** 217:16 228:24

**interview** 83:15 175:12 180:19 181:10 182:19 189:24 193:14 197:6 201:19 204:2 239:19 276:20 279:20,22

**interviewed** 67:7 173:19 183:10 189:5,6,19 195:20 197:18 201:11 207:15 286:1 320:1

**interviewing** 59:23 61:6,7,13,14 97:16 117:14

**interviews** 61:2 174:20 175:22 176:8 189:2,8 191:5 192:22,24 193:1,2,4,8,10 194:14 195:9,16 276:18,21 286:3,5,10,12 325:11

**introduce** 41:24

**inventoried** 331:17

**investi-** 56:7 79:13 90:7

**investigate** 90:6 146:18 197:22 209:10 213:19 215:6 258:10 289:8

**investigated** 56:9,12 317:7,15,16

**investigating** 54:12,13 57:21,22 58:9 59:14 79:14 90:17 91:6 94:24 146:17 196:12 288:5 296:13,24 318:2

**investigation** 36:18 37:4 38:4 40:11 46:12,13 52:2 53:10 54:5,8, 21 56:2,3 57:3 67:17 73:1 80:11 81:22,24 82:9 116:12 118:2,3 133:16 145:11 148:3,20 149:4 159:5,14 164:2 169:9 175:4 183:21 198:1 205:16 206:10,18 207:4,14 210:23 211:18 213:9 214:12,22 216:23 218:8 225:10 228:18 233:10 248:16,17 249:1 250:24 251:20 252:10 253:2 258:24 262:21 264:12,19 276:3 287:6 288:4 313:14 332:21 335:13 342:1 343:3,10,13,17 344:5 346:19,24 347:13,19 350:21,22

**investigation-type** 51:21

**investigations** 36:13 38:5 43:4 45:3,5 46:15 48:12 52:5,21 53:12, 15,24 54:1,2,11,14,18,19,22 55:1 56:1,15,23 57:1 58:12,14,19 59:3,6 60:9,18,21 62:7 79:16,23 89:14 93:9,11,15 94:3 95:8,21 96:24 97:5,9,15 100:19 102:22 117:7 266:24 271:21,23 272:3 285:15 288:22 294:1 331:21

**investigative** 8:8 30:21 31:11 38:20 92:7 100:17 142:17 160:10, 13 161:4 165:9 208:14 212:12 266:4,22 276:8 304:20 305:15 308:9 343:22 344:16

**investigator** 55:2,5 73:12 103:13 145:12 224:24 228:17 232:7 260:9,

11 263:5 266:23 281:1 309:20 316:9 319:14 321:4 336:24 338:10, 19

**investigators** 53:3 59:4,10 196:6 206:24 222:18 254:7 255:18 265:6 286:17 310:1 338:7,24

**invoice** 25:14 26:6 122:23 125:15 132:16,19

**invoices** 132:2,5

**involve** 53:9 81:1

**involved** 53:23 57:21 58:12 62:6, 16 79:18 80:13 97:14,19 129:14,17 148:19 197:11,19 198:21 199:5,6 201:3,24 203:8 204:24 205:7 206:11,19 207:1 209:9 213:7 224:5 225:8 227:14 233:11 251:16 283:19 284:9 287:5 306:16 309:6 314:8 316:5 345:1 350:5

**involvement** 89:14 201:12 208:19 254:5 306:12

**involving** 11:15 50:15 53:24 70:13 211:24 270:23 286:14

**irregularities** 330:17

**Isabella** 6:10

**issue** 69:3 107:16 108:22 254:2 268:5 306:22 322:24

**issued** 111:2 112:10 123:4 128:2 133:3,6,10,12,14,19,24 187:6

**issues** 104:14 163:5 222:1

**italics** 298:21

**item** 50:17 53:2 144:9,13 234:14 285:20 304:3 315:13 329:11,14,24 330:1,3 331:3,8

**items** 49:24 135:3 341:8,9

---

**J**

**Jacinta** 185:1 237:19 249:2 290:9 291:1,16,19 320:3,6 323:11

**Jacinta's** 320:5

**jail** 223:9,10 232:11 289:13

**Jan** 6:12

**Jane** 109:20 110:1 111:8,21 120:12

**January** 27:5 85:13

**jar** 175:20

**Jessica** 6:4

**job** 45:22,24 87:6 117:16 147:21 166:2 279:8

**Joe** 101:3

**John** 343:12

**Johnson** 70:13,24 106:20 134:20

**joined** 77:10 87:10

**Joint** 47:23

**jointly** 158:22

**judge** 112:2,10 137:6,18,19 138:9, 12,16,20 139:24 140:7,13,22 141:4,14 268:21 269:19 272:13,16 298:21 300:3,16 302:8,15,22 348:19

**judge's** 137:21 142:9 300:1 303:8

**judges** 137:10 139:19 140:6

**judgment** 112:21

**judicial** 139:6,11 141:19

**jury** 160:24 256:12,16 264:1 348:20

**justice** 10:6,16 51:19,22 271:14

**Justice/adjunct** 50:18 51:14

**justify** 212:1

---

**K**

**K-E-R-N-A-N** 252:12

**Kathy** 5:17

**keeping** 49:10 161:6 345:8

**Kernan** 252:12 295:15 296:6

**Kernan's** 252:9

**Kevin** 70:14,17,18

**key** 175:3 321:9,13,24 322:1,13

**keynote** 50:1 53:1

**keys** 15:8 320:7 321:15 324:7

**kidnapped** 38:6,9,10 174:6

**kidnapping** 54:22 94:8 173:20 205:8 206:11 270:24 279:24 286:15 289:16 316:5,23 318:6

**kidnappings** 50:16 201:4

**kill** 184:22

**killed** 73:17 116:15 290:9 318:24

**kind** 8:9 11:13 17:17 19:15 20:18, 21,23 48:18 52:14 58:16,20 61:8, 14 72:2 78:6 85:3,4 91:22 140:3 151:1,10 187:12 209:23 217:22 218:1,4 250:11 304:9 310:4,5 321:22

**knew** 22:9 38:12 196:6 215:21 307:13 314:14 315:5,23 316:2 324:1 334:16 348:23

**knives** 275:16

**knock** 73:5

**knocks** 73:13

**knowing** 166:24 179:5 315:20,21 316:4,22 318:4 338:21,22

**knowledge** 102:3 205:10 250:15 345:7,13

---

**L**

**La** 103:4

**La-zar** 19:11

**lab** 263:4

**labor** 104:13 105:4,6

**laborer** 105:8

**laid** 81:8,10,13,15 85:11,16 86:24

**landlord** 322:23

**large** 288:24 289:4

**larger** 64:9

**largest** 36:24 37:1,5

**Lassar** 14:3 19:10,18 20:15 216:2, 3,12 219:7 220:13 225:17 230:6

**lasted** 187:18,19 193:17 194:14

**late** 24:6 52:7 69:1 95:4 188:2

**Lauder-** 90:15

**Lauderdale** 34:24 35:17,18,20 36:4 42:15,22 52:4 56:19 60:8 77:1 85:9,10,18 87:10,11,21 88:19 89:15,23 90:15 93:16 101:5,6,14 102:11,14,19 114:14,22 152:23 294:6

**laundering** 36:12,18 40:10

**law** 9:22 11:17 34:3,19 35:4 39:11 41:5 43:11 51:20 52:15,20 64:5 82:20 88:15,23,24 109:5 116:11

THOMAS TIDERINGTON, 10/05/2022

126:20,22,23 128:17,18,21,24 146:15 151:1,24 152:4 162:7 181:8 221:8 223:8 224:20 230:14 232:3,6 251:22 253:19 257:16,18 285:13 289:24

**lawfully** 258:9 273:22

**lawsuit** 104:9,16,22 105:17

**lawyer** 12:23 23:2 246:12 267:20

**lawyers** 27:15 136:16

**lay** 243:22 272:16

**layout** 256:8 264:4

**lead** 151:18 212:21 266:23 295:18 304:21 305:17 315:17 316:6,7 317:7,19,20 318:5,14 319:2 320:2,14 321:16

**leadership** 40:19 97:24 278:2

**leading** 193:10

**leads** 317:14

**leak** 73:14

**learn** 349:4

**learned** 183:7 218:16

**lease** 12:20

**leasing** 274:5

**leave** 42:10 114:13 144:10 176:24 178:10 206:4 220:7,8 258:10 312:13

**Leavitt** 168:20

**lectures** 48:10

**led** 321:10

**left** 16:2 99:8 132:6 224:24 321:13 340:8,14,17

**legal** 5:14 265:24 266:5 267:8 320:4

**legality** 267:20

**legally** 120:2 257:13,17

**legitimate** 253:19 255:12

**legs** 32:20

**lend** 169:10

**length** 155:18

**level** 37:14 51:12,22 60:14

**liability** 11:17 109:24 120:16

**liar** 142:10 202:4,5 312:3

**library** 151:1

**lie** 64:7 65:21 68:4 140:2 206:24 310:8 325:16

**lied** 64:11 201:14 202:6 228:20

**lies** 64:22 203:2

**lieutenant** 37:14

**life** 221:10 283:6

**lifestyle** 45:19

**light** 150:1 350:8

**limit** 317:5

**limited** 107:13 265:12,13 267:11 268:10,14 271:20 286:16,18 317:6

**lines** 94:3

**lineup** 306:6,8 307:3,5,13,18 308:15 309:9 310:16,17,20,23 311:3,5,8,11,20 312:2,14,17,23 313:13

**list** 14:19 18:17 19:13,21 28:17 48:9,20,23,24 49:6,8,12,24 69:23 70:1 122:6 133:9,10 135:15 144:13 150:23 151:11,12,13,14 152:3,19 153:4,5 220:23 261:4,6 286:5 323:3,7 336:8 341:14

**listed** 9:5 14:11 54:3 119:3 120:12 135:3,12 136:23 145:22,24 147:24 153:20 154:1,3 155:4 260:22 261:5 286:10

**listen** 33:3 124:2

**listening** 124:21

**lists** 48:5 166:5,7 296:14

**literal** 186:23

**litigation** 10:8,13,20 11:23 118:17 122:6

**live** 7:3 115:5 265:16 307:3 310:11, 17,23 311:11,20

**lived** 265:18

**lives** 45:19 168:19 283:5

**living** 44:2 267:16 272:10

**Lloyd** 82:19

**local** 52:9,20 75:2 77:12 79:2 158:13

**locating** 173:9

**location** 71:19 167:13

**locations** 48:6 121:1

**lock** 258:11 321:19,22 322:6 329:3

**locked** 67:9 321:6,12,20 322:10

**locks** 322:16

**Loevy** 127:5,8,11 128:14 131:12 132:16,18 134:8

**log** 333:5

**logical** 310:22 336:5

**logically** 278:4 311:16

**logo** 209:20

**logs** 332:15,18,23

**long** 22:12 23:4,9,19 40:15 44:1 49:4 68:15,20 69:21 78:5 89:4 92:14,24 106:21 142:1 160:21 161:6 179:7,15,21 180:1 189:9,10 193:23 194:3,14 195:15 265:15 268:23

**longer** 74:16 335:2 351:1

**looked** 18:18,23 19:10,22 20:1,2, 21 49:20 147:7 151:15 152:20 217:7 256:2 263:22 264:3 287:11 321:17 325:15,17 337:1

**lost** 105:13 315:5

**lot** 8:7 17:18 19:22 20:17 44:17 84:5 114:12 136:11 147:16,17 150:4 154:13,14 190:5 205:18 220:1 239:13,14,17 258:22 268:14 327:19 349:16

**lots** 94:2

**loud** 168:23

**love** 32:13

**lovely** 53:19

**low** 116:2

**lower** 332:10

**lunch** 23:12,19,21,22 113:14 122:8

**Luque-rosales** 212:23

**lying** 64:16 140:8 201:16 309:21 319:16 324:16 331:13,23

**M**

**Madame** 209:13

**made** 34:11 67:6 75:13 80:8 112:2 137:9 138:9 140:13,22 141:4,14 147:1 151:7 157:21 162:3 187:7

Index: mafia–missed

THOMAS TIDERINGTON, 10/05/2022

257:9,10 273:20 278:18 280:4
298:21 320:4 323:12 326:1 330:9
332:24 333:7,12,13 336:10,20
337:9 339:13,16 348:19 349:22

**mafia** 90:10

**magnitude** 286:23

**main** 79:1

**maintain** 78:17

**majority** 159:13 185:14 187:10,14
281:6,7

**make** 25:24 26:1 46:5 122:12,14
127:1 136:24 137:3,16 141:6 145:8
166:6 167:17,24 170:5 176:17
181:9 199:18,21,22 200:1,10,16
209:22 215:18 220:24 257:8
272:17 277:24 285:15 297:22
327:15 329:9 339:7,22

**makes** 25:13 52:16 193:11 208:16,
24 209:9 277:10 278:6,24 310:21

**making** 200:6 224:6

**male** 22:21 168:21

**man** 73:7 87:13

**Management** 97:23

**manager** 162:7

**managers** 214:8

**manipulated** 325:14

**manner** 31:13

**mannered** 196:23 211:11

**manpower** 81:15 288:23

**March** 164:3 166:7 168:20 298:14
336:9 339:9,18

**Mariano** 184:24 237:18 238:13
249:1 331:12,22

**marijuana** 90:12 119:18,22 120:8

**mark** 11:15 156:22 227:3 343:16
346:20,22

**marked** 132:17

**Martin** 333:17,24

**Martinez** 336:18 337:2

**material** 17:17 62:4 71:1,23 74:15
135:24 136:12 138:3 151:14 154:4
155:11 190:5

**materials** 14:19 16:16,22 17:6
18:17 19:13 21:3 32:3 51:24 70:4

74:8 75:7,16 134:14 135:3,15,19,
21 136:5 144:13 152:2,15 153:5,22
154:1,2,24 155:4 157:9 301:5,6

**matter** 5:8 8:10 20:3 25:7,17 26:10
108:19 129:14 191:13 223:2
257:14,15 271:12 285:11 288:12,
14

**matters** 10:6,8,13,16,21 257:19

**mattress** 331:15

**Mcgrath** 6:6

**meaning** 82:5 296:22

**means** 79:17,21 163:16 194:11
212:1 219:10

**meant** 14:18 112:8 188:12

**measure** 36:16

**media** 5:2 11:2

**meet** 21:19 47:3

**meeting** 47:2

**Megan** 6:6

**Mejia** 162:3 166:15,16 167:4
169:18 183:2,17 184:2 204:10,23
205:5,7,10 206:11 208:12 210:21,
23 215:21 220:7,11 223:13 224:4
227:13 228:11,12 229:11 267:11,
15 268:10 272:5 274:1,20 275:2,8,
18 289:15 299:22 303:16 306:6
309:3,11 313:21 314:22 315:18
318:20 319:9,13 329:3 333:6
335:6,15 336:9 337:9 338:23

**Mejia's** 219:20 234:1 238:14
242:17,20 273:23 275:15 312:5

**member** 47:14 101:9,13 172:12,18
175:7 176:20 318:21 325:16

**members** 38:12 40:2 82:20 103:9
173:2,8,19,23 174:5 176:4 315:15
319:5

**memo** 221:24

**memorandum** 219:7 223:17
225:17 227:4 230:6

**memory** 19:13 20:24 31:6,7 48:18
141:7 149:10 175:20 176:17 190:7
191:24 211:6 212:19 243:11
293:22 314:3 315:3 326:7,20 327:1
333:10 335:10 336:19 337:15
342:3 343:7,11

**men** 246:21

**mentioned** 8:14 14:17 32:5
154:15 162:10 233:14,16 234:24
277:18 346:21

**Mercedes** 212:22

**Mercy** 76:6,11

**met** 21:12,16 23:7,24 24:9,23,24
25:3

**method** 276:8,15 277:15

**methodically** 212:7

**methods** 38:20

**Meyers** 115:4

**Miami** 108:13

**Michigan** 12:16 75:5 76:6 88:24
100:20 113:18 114:19 115:5
116:16 129:10 351:16

**middle** 43:8 333:22 351:15

**midwest** 114:17

**Mike** 17:24 19:9 151:5 152:21,22
153:4

**mild** 196:23 211:11

**military** 37:21

**Miller** 70:15,18

**millimeter** 259:2,12 260:6

**million** 103:5 199:17

**mind** 32:10 122:13 139:16,19,23
140:4 141:10 150:10 162:21,22
166:21 178:2 206:22 221:4 226:16
265:20 275:5 284:3 326:12

**mindset** 318:3

**Mingey** 341:14 347:22 350:3

**minute** 34:8 108:17 118:22 142:7
154:10 160:15 197:13 238:11
318:17

**minutes** 22:14 23:6 32:12 67:7
68:19 69:4 181:20 242:4 340:8,17,
19 351:4,5,6

**mischaracterizes** 190:22 244:16

**misconduct** 11:18 101:11,15,19,
22 102:4,22,24 103:22 146:18,19
160:5 247:3,5,13,14 248:6 249:23
344:24

**misleading** 215:17

**missed** 32:8 241:11 261:2

**missing** 81:2 127:23 136:6 173:9 243:2 268:15 320:7 321:16 324:7

**mission** 37:22,23 42:21 46:11 57:18 90:4

**misspeak** 31:5

**misstates** 243:3 282:22 313:23 325:6

**mistaken** 70:23

**mistreat** 249:24

**mistreated** 162:1 173:4,13 204:11 229:19

**mix** 115:15,17

**Mohan** 295:13 296:6 297:4

**Mohan's** 252:15

**moment** 161:5

**Monday** 114:24

**money** 36:12,17 37:7 40:10 103:16 106:4

**month** 77:17,19 106:8

**months** 9:18 38:8 44:22 45:1 77:20 100:7 292:5

**morning** 5:24 6:1,22 24:2,9,12,17, 19,24 164:3,18,21 165:10 166:8 168:21 195:10 299:2,14,23 336:21, 23 338:4 339:9,18 349:2 351:9,12

**motion** 298:13 301:13

**motions** 300:17,24 302:5

**motive** 325:16

**motorcycle** 79:4,7

**mouse** 31:3

**mouth** 312:5

**move** 114:17 192:4,5 315:15

**moved** 76:7 87:2,5 100:20 168:8 188:18 257:23 314:18

**movie** 11:1

**movies** 45:15

**multiple** 180:15,16 192:23 193:4 228:20 239:20 265:16 276:18,21 284:16 309:17 331:13,23 338:23

**murder** 81:17,20 205:8 206:12 208:9 224:5 225:2 228:14 233:12 234:3 246:24 261:10 279:24 287:20 316:24 318:5,20 320:6,15

**murdered** 184:24 198:2 291:1 321:12 322:13 332:5

**murders** 164:12 169:5 184:21 196:7 227:15 233:12 234:8 235:16 242:18 243:2 287:23 288:2 289:16 316:13,24 336:20,23 337:3 338:13

**mute** 28:12,14 85:20

———————

**N**

**named** 104:10,24 249:16,17

**names** 70:17 82:6 346:13 349:19

**narcotic** 45:5 54:1 57:18 98:23

**narcotics** 94:21,24 158:20

**narrative** 167:11 168:12,19

**narrow** 221:5,7,10,13

**national** 53:18 121:23

**nationally** 37:24

**nationals** 294:4,8,13

**natural** 173:7

**nature** 106:22 107:1,7 108:24 109:22 110:23 119:8,13 120:19 121:16,21 240:15

**Naujokas** 343:12 347:23 350:4

**necessarily** 14:13 24:22 43:3 45:4,5 46:17 73:11 146:3,7 151:15 155:9 201:17 230:23 247:16 248:8 250:22

**needed** 59:4 211:16,17

**neighbor** 168:19

**neighborhood** 73:16 164:8

**neighboring** 48:4 75:5

**net** 212:6

**next-to-kin** 82:7

**NIA** 53:22,23

**nice** 211:11

**night** 18:19,21 19:2,5,7,10 208:7 333:17 336:11 337:9 349:5 351:16

**noise** 168:24

**non-** 200:6

**non-sworn** 87:18

**nonetheless** 94:9 227:11

**norm** 116:1

**Norma** 202:15 303:17 304:11,15, 21,23 305:2,13,16,21 306:12,16, 17,18,23,24 307:16 308:6,12,13, 14,15 309:3,5,10,17,23 310:6 311:1,9,18 312:1 313:5,9

**normal** 306:2

**North** 5:15 168:20

**Northern** 5:11

**note** 85:3 122:12,14 147:9,18 176:6 218:22

**noted** 137:18 142:18 177:4 295:24 296:23 312:15

**notes** 48:17 80:5 83:17,22 84:2,5, 6,8,11,19 85:5 110:20 111:4 147:23 149:20 174:20 175:12 176:7,15 189:1,4,7,14,20,23 190:4, 6,13,14,15,17 191:5,9 192:6,7,10, 12,21 193:1,5,9,13,22 197:15 204:1 276:19 286:3,9,11,16,19,21 329:2 330:21

**notice** 239:9,24

**notifications** 294:7,12

**noting** 224:3 227:13

**notion** 147:4

**number** 5:9 36:23 56:14 82:14 125:11 130:8 168:17 178:21 252:20 276:5 285:22 286:6,12 294:4 304:18 305:8,9 321:2

**numerous** 38:5 158:13 246:23

———————

**O**

**O.J.** 231:8

**oath** 15:18

**Object** 29:1 91:9 348:15

**objection** 7:13,14 8:18 10:22 56:5 57:6 59:7 61:24 63:7 84:13,21 94:11 106:23 131:16 137:24 138:19 139:13 140:17 141:15 142:13 144:21 146:5 149:24 153:10 155:6,24 161:17 162:13 164:19 171:18 175:15 176:10 185:16 186:6 190:1,20,22,23 192:8 194:19 198:16,22 199:8,14,21,23 200:1,10,16 201:7 202:19 203:21 204:18 205:1 207:18 208:21 209:15,18 210:13,18 211:19 213:11,21 215:8 216:15 217:13,23

Index: objections-pages

THOMAS TIDERINGTON, 10/05/2022

220:16 221:16 222:10 224:12 225:19 227:22 230:8 231:3,13,17,24 232:20 233:4 235:17 236:11 237:2 240:3,18 241:6,14 243:3,24 244:15 245:2,23 246:9 247:6 250:6 252:2 253:3 255:4 256:23 259:7 260:18 262:22 263:16 264:20 266:2 273:3 278:19 282:22,24 283:21,24 284:11 285:1,4 289:17 290:11 291:3,20 294:22 295:20 301:15 302:19 303:19 305:3,18 308:21 313:23 314:1,2 317:1 319:7 322:18 324:13 325:5 326:6,16,22 327:2 328:14 330:10 334:2,12 335:7,23,24 336:12 338:17 339:10 342:9 347:1 349:13 350:7

**objections** 199:13,15,21 200:7 201:8

**objective** 232:6

**obligation** 215:5 338:15

**observers** 6:4

**obtain** 270:3

**obtained** 183:2 208:3 268:18 338:8

**obtaining** 264:16

**obvious** 146:21 299:12 339:3

**occasion** 102:16 200:10

**occasions** 239:20 241:4

**occupy** 35:13

**occur** 303:23

**occurred** 164:12 169:11 243:17 256:14 292:6 293:5 298:14 299:23 345:6,12

**occurrence** 166:7

**October** 5:6

**Offense** 165:22

**offer** 133:15 348:17

**offered** 137:7,11

**offering** 129:5,20

**offhand** 109:8

**office** 6:4 12:17,18 22:5 35:17,18,21 98:18 101:7 126:21,22,24 127:3,5 128:17,21,24 159:1 213:18 214:4,10 277:5,19,23 285:13

**officer** 5:23 9:22 10:3 15:18 46:21 47:15 59:15 63:13 64:10,12,22,24

65:20 66:18 67:3,6 68:4 76:21 78:11,15,16 79:13 80:9,24 82:2,5 83:2,4,14,20 84:20 88:16 89:2,4,8, 10,15,17 92:18 99:22 105:14 117:13 145:14 146:15,17 147:2 148:19 149:22 162:17 178:4 186:5 230:15 232:3 245:16 248:7 249:10 251:22 257:19 269:16,18 277:6,14 295:2 297:3,5 311:16 321:7 329:6 350:13,16

**officer's** 79:17 80:3 346:5

**officers** 37:17,18 51:11,20 58:3 59:2,6,23 64:6 66:9 68:10 74:7,18 75:4 81:4,10,16 85:12 87:15 102:21 104:7,15,22 107:9 109:5 116:14 145:9,16 146:20 147:19,20, 21 148:5,7 149:2 158:24 162:8 166:1 168:16 173:4,7 182:13 183:3,10,11 211:10 213:18 221:8 223:9 249:3,14,22 250:2 257:17 258:9,20 267:21 268:21 271:17 272:9 274:3,20 286:20 295:18 296:5,14,15 297:1,8 310:22 321:5 345:14,15 346:18 348:13,23 349:17,18,20,21

**offices** 5:15 12:19

**oftentimes** 59:2 317:12

**online** 151:10

**open** 142:1,2,5 144:10 258:14

**opened** 78:24

**operate** 344:24

**operated** 281:7

**operating** 37:24

**operation** 36:13 38:3 44:20

**operations** 39:13,17 41:7 46:16 97:13 103:11

**operative** 43:15

**opine** 62:14 336:4

**opinion** 11:23 67:14 106:22 107:1, 5 109:1 137:7,11 138:3,6 142:20 145:8 147:11 156:6 160:7 162:11 176:20 189:24 211:13 215:5 219:17 229:14 232:16,17 247:4 248:20 249:20 289:21,23 292:20 299:7,10,12 303:15 328:9,11,19,21 329:10 343:20 344:11,15 346:7 347:15,23 348:18 349:11 350:19

**opinions** 16:17 29:12,18,20,21 30:16 31:21 133:15,19 137:9,22

142:11,19 155:23 156:12 157:2 217:4 302:18 343:19 344:12

**opportunity** 31:3 114:18 225:23 283:16

**opposed** 44:11 61:7 162:12 268:11 274:22

**option** 311:10

**options** 278:9

**order** 34:2 43:22 125:18 151:7 202:23 243:18 244:12 265:7 282:10 321:8

**ordered** 151:9,21

**ordering** 268:21

**orders** 137:19

**organization** 39:24 50:2 53:2 280:3

**organizations** 41:24

**organize** 340:19

**organized** 42:23 43:2,4,14 46:8 57:2 71:23 90:3,4,7,9,21 91:2,8,15 92:3,11,15,23 93:1,7 94:23 95:23 97:1,4,10 100:1

**organized-type** 90:7

**original** 259:17 260:15 261:13

**originally** 306:7

**outcome** 301:12

**outrageous** 249:19

**oversaw** 58:18

**oversight** 117:11 250:13

**oversights** 160:2

**overturned** 248:4,6

**Overview** 34:15

**overworked** 288:17

**owned** 237:7,8 243:1 257:18

---

**P**

**p-l-o-y** 64:2

**p.m.** 86:3,6 113:21,24 181:24 182:3 242:8,11 293:17,20 298:6,9 337:10 340:23 341:2 351:13,20

**pages** 54:4 60:16 262:13 347:9

THOMAS TIDERINGTON, 10/05/2022

**paid** 106:3 125:15 184:23

**panel** 321:7

**pants** 235:23

**papers** 120:5

**paragraph** 36:7 39:8,9 42:13 43:8 44:20 47:19 158:12 159:3 161:11 163:24 164:2 169:17,19 170:7,8, 10,13,15,22 171:1,2 172:8,9,11 175:8 182:10 184:5,16,18 185:3 186:13,17 187:16 196:2 247:22 248:1 261:8 273:13 296:12 319:23

**paragraphs** 154:20 184:7 186:2, 10,13

**parents** 206:13 316:24 318:24

**parked** 77:12 87:1

**part** 22:17 26:12,13 43:5,16 46:15 48:22 72:11 73:21 90:18,19,21 91:3,4 100:24 117:11,21 142:16,18 152:12 167:12 168:10 174:13 179:9 185:10 187:18 188:23 227:17 248:7 265:19 273:16 299:6 316:12,22 326:15,19 328:15 329:2 332:11

**participate** 13:5 22:3 58:24 117:6

**participated** 40:3 48:19 49:15

**parties** 5:20

**parts** 24:16,21

**party** 11:23

**past** 41:19 222:16

**path** 219:23

**patrol** 76:20 78:11 79:12,16 80:2, 9,24 82:1,5 83:14,20 89:2,4,8,10, 15,17 96:16 98:22 99:12,22 100:7 148:7

**pattern** 222:16

**patterns** 54:16

**paying** 274:5

**PCC** 47:24

**PD** 42:15

**PDF** 163:15

**pee** 293:7

**pending** 104:10,12 105:8 108:12 287:2,4

**people** 44:17 45:16 73:3,13 180:7, 20 198:3 211:16 215:7 223:9,10

239:3 251:3 253:8 257:22 265:16 267:16 269:23 274:4 280:4,20 286:6,10 296:22,23 307:3,4 308:15 312:23 313:12 321:12 322:13

**people's** 126:20,22,23 128:17,21, 24 211:18 274:2 282:18 283:4

**percent** 10:11,18 11:9,11 46:23 134:7,9,10

**percentage** 47:13 218:3

**PERF** 271:11 280:11

**perfect** 68:22 317:22,24

**perfectly** 265:24

**perform** 118:1 124:20

**performed** 125:18 347:18

**period** 31:15 32:1 44:19 46:7 47:5 77:12 79:20 87:1 90:11 96:16 100:8,16 117:4 124:1,14 164:13,16 180:2 189:4,6 193:23 333:13

**periodically** 45:10

**periodicals** 151:4

**periods** 160:21 250:17

**permanent** 31:11

**permissible** 63:2 64:6,8 65:20 66:2,3,6,13,17,22 67:2 68:4,9,14 72:19 73:18

**permitted** 112:11,14 113:7

**perpetrators** 211:14

**person** 22:13 23:9 63:16 67:8 80:7 171:4 175:12 177:8 181:11,12 202:14,17,18 206:9 211:15 212:4 247:14 258:17 265:17 267:15,24 268:2 278:7 282:14,15 283:20 284:10 289:13 309:4 310:10,11,12, 18,19 311:18 325:1 347:3,4

**person's** 22:16 45:22 290:19 347:10

**personal** 157:9 289:20 322:7

**personally** 56:8 97:14 104:24 105:15 117:6,8,19 135:2,14 173:23,24 201:3 298:17

**perspective** 79:17 80:3 138:4 145:10 146:13,16 207:11 215:24 218:5 222:21 223:1 325:15,17

**petitioning** 270:17

**petitions** 246:19,22

**phase** 128:1

**phone** 15:5,10,20,22 22:3,5,24 23:1,4,9 26:5 80:7 124:12,13,14,24 155:21 208:8 304:17 305:8,9 332:12,18 333:12 335:19 336:16

**phone's** 32:24

**photo** 263:4 307:2,5 309:9 310:16 311:7,20

**photograph** 253:16 254:8 255:14 306:5,7,22 309:2 310:15,16 311:15

**photographed** 174:19 261:21

**photographer** 254:4 263:8

**photographing** 253:7,11 254:9

**photographs** 172:23 252:20,24 254:18 256:16,18,21 260:10,11,16, 24 262:7,18,20 263:10,14,20,21 264:1 308:4

**photos** 255:1,3,8 256:2 261:8,10, 13 264:4

**phrases** 40:7

**physical** 63:1 161:7 162:3 216:14, 24 220:22 222:16 229:23 234:1,4 240:15 243:14 301:9,14,23 302:9, 17 338:21

**physically** 163:4 215:22 216:20 221:14 223:3,19 227:6 229:12,20 243:20 339:7,16

**pick** 235:15 307:5 309:11 310:17 311:20

**picked** 235:22

**picking** 329:3

**picture** 176:23 306:18 307:12,22 310:18,24 311:17 312:2

**pictures** 168:9 172:22 237:15 257:22,23 258:15 259:6,12,18 260:2 309:17

**piece** 218:13

**pimps** 121:2

**pinpoint** 164:11 250:11

**pipes** 73:16

**pistol** 79:8,9

**pizza** 73:7

**place** 53:19 115:5 272:18 296:1

**plaintiff** 6:9,11,13 108:15 143:2

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/05/2022

**plaintiff's** 22:18 106:18 152:16 155:15 156:5,15

**plaintiffs** 7:11 145:2 249:6

**plaintiffs'** 27:15 136:16 146:11 276:9,16

**plan** 113:14

**plans** 52:12

**play** 31:2 302:17

**played** 186:1 343:2

**ploy** 63:21,23 64:2 65:12 66:8 67:20 68:7

**ploys** 67:16 68:14

**Plymouth** 9:16 35:1 47:23 48:1 101:18 103:21 104:1 114:3,21,23 115:8,11 116:20 118:3 287:1,3

**point** 14:12 18:17 19:16 23:12 25:14,23 27:24 49:13 60:11 63:11 65:7,8 74:11 75:14 89:21 93:9 94:22 96:8 97:22 115:6 123:13 133:22 146:23 149:14 150:5 152:13 170:14 178:10,12,24 180:11 186:7 200:14,22 204:7 206:1 211:7 223:13 225:11 239:11 240:9 248:3 253:21 258:6 260:3 262:4 278:22 280:7,23 292:2 293:9 300:6 302:13 303:13 307:20 308:24 310:19 312:5 315:11 319:13 326:1 342:17 347:6,8 349:6

**pointed** 207:21 257:11

**pointing** 34:7 170:15 272:19 273:20

**points** 175:3 346:10

**Polaroid** 172:22

**police** 7:23 8:2 9:16,21 10:3 11:18 19:24 20:2,10,14 30:19,20 33:21 34:23,24 35:1,18 36:4 37:13,15,19 39:14,18 41:8 42:23 46:21 47:15 48:1,4,11 51:10 52:9 56:16,19 64:6,10,12,24 65:20 66:18 67:3 74:7 76:16,21 77:1,10 78:3,12,16, 21 79:7 81:1,10 83:2,3,4,10 84:20 85:9,10,12,17,18 87:10,21 88:9,17, 19 89:16,23 90:15 93:17 98:8 101:10,14,17 102:2,9,14,19 103:20 104:1,6 106:12,13 107:9 114:3,4, 14,23 115:7,12 116:16,21,22 117:7,9,24 118:4,7 133:17,21 145:13,16 146:14 147:2,6 148:17, 21,23 149:5,16,17 150:8 151:19,23 152:23 158:13,14,17,24 159:7,13

160:5,12,15 161:1,2,5,20 162:6 166:17,23 167:5 171:5,8,17 172:10,12,13 173:24 174:10,16 177:3,7 178:5,16 179:22 182:10,24 184:8,12,19,21,24 185:3,4,7,9,12, 14,19 186:3,5,11,14,15,16,19,20, 21 187:4,11,15,20,23,24 188:6,7, 24 189:6,12,18 193:22 195:1 196:6,12 197:18 198:7 199:10 202:6 204:16,19 205:6,19 210:1 211:14,24 213:18 214:4,6,8,21 215:13,15,16 233:10 234:18 238:16 245:16 247:1 249:2,3,14 250:2,20 251:10 256:20 257:7 260:1 261:23 263:4,24 267:23 269:1 271:14 274:20 276:11,14 277:13,18,19,22 278:1 279:13 281:15,19,23 282:4 283:10 284:6 285:7,12,16,17 286:24 288:19 289:1,2 294:6,11,14 295:1 299:2 305:12 306:2,10 308:9 311:10,15 316:19 317:11 318:1 323:14 324:9, 21,23 326:5,12 330:15 332:14 333:11 335:11 337:15 338:6,15 341:22 342:5,12 344:3 348:21 349:8,20

**police-related** 116:14

**policies** 14:2,5 17:9 62:23 277:21

**Policing** 78:21

**policy** 15:3 102:8,13,18 152:14 163:3 281:19 294:10,15 309:8 311:8 312:17 318:3

**poorly** 27:2

**pop** 165:20

**population** 87:20,24 115:12

**portion** 10:15 18:23 45:22,24 46:21,23 341:24 342:3

**poses** 45:18

**position** 52:15 138:17,24 287:22

**positions** 97:23 98:1,16

**possibly** 321:11 332:6,7 334:15

**post-conviction** 246:22

**postconviction** 246:19 247:19

**potentially** 320:2 333:6

**Powerpoint** 74:12 75:12

**practical** 280:24 285:10 330:2

**practice** 30:7 59:20 60:2 180:17 213:17 222:16 223:3 256:21

268:22,23 277:17 280:14 281:2,3

**practices** 7:23 8:2 48:11 147:6,7 159:7 195:1 271:14 276:11,14 282:3 306:3,10 344:3

**practices'** 348:21

**Praedel** 82:19

**precinct** 79:1,9 82:12,13 250:13

**preclude** 214:21

**precluded** 270:17

**pregnancy** 198:6

**pregnant** 198:8

**premise** 210:19 257:13

**premises** 11:16 109:24 120:16

**preparation** 18:3

**prepare** 8:23 17:12 21:5,7,11,16 23:24 121:14

**prepared** 40:4 110:18 161:21 193:7

**preparing** 18:9 20:9 26:15,20,23 27:8 158:4 347:11

**prepping** 18:6

**present** 21:24 24:23 25:3 138:13 297:12,18 339:8

**presentation** 74:12

**presentations** 75:13

**presented** 198:13 203:17 305:24 308:5

**Presidents'** 39:24

**press** 185:23 187:5,7,12

**pretrial** 244:5,8

**pretty** 23:6 37:8 38:11 92:16 97:7 116:2 137:20 166:2 169:4 183:22 308:3

**prevailed** 112:3

**previously** 132:17 215:7

**primarily** 24:13 53:24 270:1

**primary** 56:21 57:4,22 79:13,15 90:16 91:5 117:21

**Princess** 36:13 38:3

**principles** 54:14,23 61:9 62:8,10, 15

**prior** 44:24 86:13 183:12,14 184:4

THOMAS TIDERINGTON, 10/05/2022

210:4 298:16 318:7 350:9

**prioritize** 289:5

**prison** 221:9 283:5,6

**prisoner** 67:9 163:4 345:8

**prisoners** 223:3

**pristine** 253:16

**privileged** 7:14

**probable** 75:17 269:16 272:18 299:8 301:2,22 348:11,18

**problem** 174:14 188:24 190:15 199:24 200:11 211:23 215:12 251:3 254:6,15 272:12 283:9

**problems** 196:15 251:4 317:10

**procedure** 102:9,13,18 148:21

**procedures** 147:6 148:23 277:21

**proceedings** 242:24 245:12 351:19

**process** 85:13 146:22 148:14 150:23 248:19

**processed** 210:16

**processing** 234:19 262:17

**produced** 165:9

**products** 119:16,17,19 120:1,5

**professional** 159:4 248:16 253:1 258:23 262:21 263:14 264:11,18 286:13 289:23 344:5 347:16 350:21

**profile** 234:14

**Program** 78:22 88:9

**programs** 45:16

**progress** 98:10

**progressively** 97:24 98:12

**projects** 11:1,2

**promoted** 42:19 95:2 96:14 98:13 99:2,5 100:4,6,13

**prompting** 30:1

**pronounce** 21:20 216:3

**proofread** 158:2

**proper** 62:23 64:21,24 110:2 120:18 270:10 272:2 273:13 307:24

**properly** 292:4

**property** 92:1 265:8

**proposed** 171:5

**prosector** 277:5

**prosecute** 103:19 231:6

**prosecuted** 103:7

**prosecution** 212:24 284:7,8

**prosecutor** 70:14 212:22 230:17 284:15 285:15

**prosecutors** 283:19

**prostitution** 121:3

**protect** 80:4

**protected** 156:1

**protecting** 314:10,11

**protocol** 309:7

**prove** 146:20 147:1 206:18 214:13

**proven** 103:5

**provide** 11:23 66:14 75:8 109:1 120:14 135:20,23 150:14 175:19 176:16 243:10 271:10 280:9 305:1

**provided** 8:21 17:15,18 20:6,11, 17,20,22 21:1,4 29:5,8,22,24 30:9 48:3 52:19 70:2 71:21 72:9 107:8, 21 109:10 110:24 121:5 129:3 130:1,8 136:3,16,21 137:23 138:5 143:24 152:15,21 156:14 165:9 202:1 213:2 218:9 243:8 275:2 292:22 305:8 315:10 322:22 323:14,16 324:8 329:3

**providing** 110:2 120:18 216:20 294:7,12

**psychological** 61:23

**psychology** 61:17

**public** 41:18

**pull** 13:16 29:4 71:10 143:4 167:14 226:2

**pulling** 15:13

**purport** 246:14

**purporting** 46:20

**purpose** 253:10,20 255:12

**purposes** 156:6 349:7

**pursue** 304:21

**pursuing** 305:16 318:5

**put** 15:14 25:21 31:19 33:9 50:15 52:8 64:19 80:21 139:1 178:14 179:13 180:21 182:5 218:5 221:9, 12,19 222:6 223:9,10 225:24 232:11 244:13,18 289:10,13 295:7 296:5 306:24 307:13,18 308:14 309:22 319:2,19,20 341:4

**puts** 234:2

**putting** 72:12

**puzzle** 218:13

---

**Q**

---

**quarter** 123:7 125:5

**question** 10:17 11:3 14:1 27:1 40:15 46:4,18,19 49:23 57:11,24 67:6,12 85:1 86:9,14,21 92:21,22 141:8,10 149:19 150:15 156:7,9 162:8 176:17 180:10 191:14 192:14 194:6 195:2 199:16,23 200:2,3,4,11,19,21 201:19 204:9, 13 206:7,8,14 209:1,13 210:20 212:3 220:3 225:14,15 226:23 227:2,16 228:8 229:22 230:4,21 241:11 242:19,22 268:6 270:12 271:4 273:10,12 274:15 275:4,14 280:1 287:13 292:8,9 297:21,24 303:8 318:18 327:24 336:17 344:23 345:22,23

**questionable** 160:4 219:20 225:6 255:13

**questioned** 174:19 180:22 189:15 193:23 194:4,18 208:7,8

**questioning** 180:20 188:21 189:10 190:16,18 293:7

**questions** 44:14 189:17 194:22 200:15 204:6 205:18 228:2 242:14 251:20 255:17 256:1 275:6,21 282:14 287:14 297:15 325:2,4 330:14 334:19

**quick** 142:8 164:23 226:16 308:3 332:18

**quickly** 278:23 283:11

**quitter** 52:17

**quote** 221:6 265:3 298:23

**quoted** 141:5

---

**R**

---

**R-I-C-H** 70:11

THOMAS TIDERINGTON, 10/05/2022

**Rachel** 5:13 33:9 118:9 150:16,20 153:23 163:14 165:7,20 166:6 167:10,19 182:5

**raised** 126:4 300:24 301:21

**ran** 104:8 122:7

**rank** 78:14,17 95:3,12,19 99:5,7,11

**Raoul** 322:23

**rape** 54:12,21

**rate** 81:17,21 116:4 126:5 287:16

**rates** 126:4

**ray** 200:24

**re-review** 20:10

**reach** 243:18

**reached** 136:15 305:10

**read** 19:2 39:22 40:8 86:9,11,21 123:17 135:2,12 140:15,24 152:2, 6,8 168:12 169:18,20,21,22,24 170:1,7 188:7 209:12,14 211:9 226:15,18 229:17 241:10,13 253:23 271:15 277:12 278:10 285:8 296:16 342:14 345:18,20

**reading** 124:3 303:12 333:21

**ready** 276:22

**real** 49:6 154:17 226:16 278:23 293:8

**reality** 45:20

**realize** 115:5

**realized** 250:20

**realizes** 269:18

**rearrange** 50:22

**reask** 200:2

**reason** 9:24 163:13 167:3 206:23 259:15 268:20 274:19 317:16 324:15 325:19 328:5 331:21 332:3

**reasonable** 62:24 63:13 159:4 162:6,17 197:1 201:15,22 206:17 230:14 233:10 251:18 271:6 278:7 281:6 316:8 338:19 339:1 347:15

**reasons** 181:1,3,5 246:15 272:20 339:4

**recall** 18:2,13 19:1,4,8,19,24 20:13 22:8,9 28:1 44:21 48:21 53:3,8,11, 20 79:22,24 81:3,20 82:18 84:6 87:9 102:5 105:7 109:8,13 123:17 133:22 136:13 139:20 140:5,7,12,

15 141:19,22 164:14 166:10 169:2 170:6 171:20 172:4 174:2 175:9, 14,18 176:14 178:12 179:17,19,20, 24 182:17 184:1 187:8,11 188:1,17 197:16 204:1 212:20 213:4,5,6,13 223:16,23,24 239:12,14 242:22 243:6 250:9 252:18 254:1 256:5 262:3,10 278:13,15,17 281:15 285:6,8 295:1,4 296:18,19 300:23 301:24 302:2,7,11,22 303:4,5,11, 13 313:16,20 314:5,17 315:8 323:1 326:4 335:9 337:22 338:6 341:21 342:4 349:18

**recalled** 326:11

**receipt** 31:20

**receive** 16:18 30:21 31:24 107:12

**received** 27:14,19,22 28:7 31:17 32:2 80:1 305:14 332:15

**recent** 106:7 315:13

**recently** 18:18 27:22 127:18,21 132:12 153:7 314:19 320:4

**recess** 69:9 86:4 113:22 182:1 242:9 293:18 298:7 340:24

**recite** 19:20

**recognized** 39:11 41:5

**recollection** 30:14 39:7 173:5 175:21 197:17 238:15 323:9 341:16

**record** 5:2,20 26:5 37:6 69:8,11 85:24 86:2,6,11 113:19,20,24 136:9 138:8 145:17,20,22 147:4 158:7 164:11 169:12 170:4,9,13,21 175:13 176:8 178:1 179:6,9,11,18 181:24 182:3 186:8 196:16 205:3, 14 206:9 209:14 212:6 229:18 230:11 231:10,16 241:13 242:6,8, 11,16 243:20 277:12 278:10 281:22 282:1 293:17,20 296:17 298:4,6,9 302:3,8 306:14 308:24 314:16 326:3 331:6 335:5 337:8 339:6,15 340:23 341:2 343:15 345:20 350:3 351:18

**recorded** 282:11

**records** 26:9 131:19 141:20 199:10 248:21 337:20 338:9 347:4 348:1 350:9

**recounting** 184:11

**recovered** 274:14

**recreate** 257:24

**recruit** 85:11

**redirect** 289:4

**reductions** 81:9

**Reek** 70:11

**refer** 36:6 78:22 249:13 250:14 304:9 315:13

**reference** 136:9 171:24 235:9 246:19

**referenced** 30:19

**references** 150:18 151:7,18 153:1 154:2

**referred** 128:13,15 166:1 233:17 234:23 339:21

**referring** 11:4,6 68:3 88:11 98:16, 17 137:8 138:21 148:6 159:1 174:7 175:7 176:3 179:10 186:8 226:5 233:21 244:6 247:23 249:15 251:7 312:22 315:2 328:15 344:8,19

**refers** 34:15,23 47:23 51:14,16 53:21 88:8

**reflect** 51:7 309:2

**reflected** 124:18

**refresh** 19:13 20:24 31:5 141:7 176:16 190:7 211:5 212:19 243:11 293:22 315:3 337:15 342:3 343:7, 11,14

**refreshed** 252:13

**refreshing** 335:10

**refused** 244:3 310:6 311:23

**refuses** 204:6

**Regional** 35:11 100:11

**regular** 129:21

**regularly** 73:22

**Reich** 70:11 134:21

**reject** 224:2 227:11 229:7 231:11, 20 232:18,21 243:19 244:14

**rejected** 219:7 220:14 222:4 230:1 244:24

**rejecting** 218:20 232:23

**rejection** 221:13

**relate** 17:6 27:16 32:4 71:24

**related** 7:21 20:2 30:8,16 57:2,18 58:9,11 70:24 91:8 121:22 136:2 151:22 164:1

THOMAS TIDERINGTON, 10/05/2022

**relates** 260:15

**relating** 30:8,16,18 31:13 71:1 185:6

**relationship** 313:22 314:6

**relative** 133:15 274:10 320:1

**relayed** 183:1

**release** 38:8,23 185:23 187:5,7,12

**released** 196:5 209:24 210:4,7,11, 12 211:4,6,9 253:8,17 254:13 255:15,19

**relevance** 231:18 233:5 289:18 303:20 319:8 334:3,13 337:18

**relevant** 135:21 247:9 287:10 315:24 316:3,20,21

**reliable** 271:17

**relied** 135:23 155:23 191:8 201:23 219:2 303:1

**rely** 135:19 156:13 189:22 217:3, 11 219:1 265:10 271:1 275:14 279:22

**relying** 217:10 218:17 223:11 247:2

**remember** 19:14 31:14,17 50:2 71:13 72:7,8 74:22 110:23 129:10 149:7 171:11 172:20 175:6,21 178:21 187:6,13 190:12 199:4 200:19 202:24 224:6 233:18 243:9 268:24 269:1 272:4 301:4,5 302:13 314:24 315:6 347:4

**Rene** 103:4

**rent** 274:5

**reorganized** 93:10

**repeatedly** 291:19

**rephotograph** 262:1

**rephotographed** 261:19

**rephotographing** 253:20

**report** 8:23 9:1,6,9 12:4,9 13:12, 19,21 14:3,6,15,18,23 15:3 17:8, 10,16 19:10,11,18 20:1,15 24:13, 16,19 26:19 27:4,17 29:13,18 30:20 31:22 32:2 33:11 67:18 100:24 101:1 107:16 108:22 110:13 111:2 118:12 121:15 123:4 125:19 127:19 128:2 141:2,5,14,23 149:5,16,17 150:8 151:6 152:22 153:13,20 154:8 156:23,24 157:5, 8,21 158:1,11 159:2,16 161:10,14

163:3,6 165:22 166:17 167:12 168:16 169:8 172:10 174:16 177:7 178:16 184:6 187:4,5,11,20 189:1, 7,18 190:15 192:20,24 197:18 205:19 216:2,3,18,21 217:5 219:16 220:13 221:2 222:19 223:5 225:22 227:18 228:12 229:10 234:18 236:1 238:15,16 248:12,14 251:10, 12 255:22 260:8 261:23 262:5,17 286:4 295:1,10 296:8,11 297:3,4,8, 9 298:2,12 304:2 309:1,12,14,18 312:18,21 313:8 314:23 315:12 321:23 328:1,2,15 331:11 332:11 333:11,22 335:11 337:16,20,22 341:22 342:13 346:5,14,21 348:6 350:15

**report's** 216:12

**reported** 73:14 101:3 292:5

**reporter** 5:17 6:14 32:15 85:19 86:9 209:13 241:24 242:1 279:17 281:17 282:5,9,15

**reporters** 282:20

**reporting** 277:15

**reports** 8:9 20:2,11,14 70:9,20 83:19,23 84:2 133:3,7,10,12,14,24 134:21 149:20 161:20 162:2 177:3, 4 185:7,9,12,14,19 187:15,23,24 188:7 189:12,14 190:14 204:16,20 211:10 250:20 274:24 297:12,17 299:20 338:6 342:5 347:12

**represent** 5:21 123:1 130:12 151:12 157:8

**represented** 132:16 256:16

**representing** 5:14 256:15

**represents** 128:18

**request** 116:10 213:8 214:19 256:22 257:9 258:18

**requested** 116:15 254:8 331:8

**requesting** 262:6

**requests** 135:24

**require** 271:24

**required** 88:21 214:20 280:19 309:8

**requirement** 88:20

**research** 177:3 280:6

**resemble** 307:4

**resembled** 308:4

**residence** 183:17 184:2 234:9,10 318:7

**resident** 115:23

**residential** 115:18

**residents** 115:14

**resolved** 105:10

**resources** 289:5,10 319:1

**respect** 157:2 196:12 202:7 213:23 230:22

**respects** 289:2

**respond** 149:3 168:16

**responded** 80:24 82:1

**responder** 89:13

**responding** 80:17 89:11 147:20

**response** 303:11 343:18

**responsibilities** 43:5 89:8,22 97:6,7 213:8

**responsibility** 56:22 57:4,22 58:7 79:14 90:16 91:6 98:13 117:21 250:12 318:2 349:16

**responsible** 97:24 251:3 288:4 316:23 349:3

**rest** 92:17 93:4 287:13

**restaurant** 47:4 77:12 336:22

**result** 288:16

**resulted** 38:6

**resulting** 38:5

**resume** 34:23 39:9,10 40:4,7 41:4 47:18 88:8 94:23

**retain** 84:11,19 133:23

**retained** 7:11 10:12 11:22 75:11 84:9 106:3,17 108:1,14,20 123:3 133:1 152:21

**retake** 263:14

**retaken** 252:21,24 254:4 255:3 257:23 262:18

**retaking** 262:20 263:21

**retention** 31:11

**retire** 9:20,23 114:15

**retired** 9:18,19 33:22 34:3 52:14 83:13 95:7,18 100:20 114:10,19, 20,21,22

THOMAS TIDERINGTON, 10/05/2022

**retiring** 115:1

**review** 8:10,13,17,20 9:1 17:17,19, 21 19:7 21:3 23:15 24:8,11,17 67:18 71:6 135:14,19 136:8 139:10 143:1 144:3,6 145:17 149:5 153:9 154:23 155:3 157:15 190:9 193:18 194:2 212:5,16 225:23 226:14 233:8 274:23 278:23 283:16 303:10 327:6 350:11

**reviewed** 8:7 9:4 14:20 16:16,22 17:14,16,23 18:3,14 19:5 20:16,19 24:18 62:4 71:9 134:14 135:11,16 137:1,5 141:21 142:21 144:2,14,19 145:23 149:16 150:6,9 152:13 153:5 157:9 211:24 225:18 231:16 242:24 256:1 298:17 301:6 341:11, 17 342:20

**reviewing** 19:19 21:10 71:4 136:4, 22 141:23 192:20 239:7 248:21 301:4 312:16 350:9

**revisions** 34:1

**Reyes** 6:9,11 7:7 12:23 21:22 22:19 29:9 129:24 130:9 135:20 143:2,14 144:14 160:11 161:3 166:14 167:4 171:11 172:23 179:22 183:4,12 184:20 187:22 188:21 189:3,14,19 191:5 192:22, 24 193:7 198:13 199:6 201:5 202:18 203:3,8,12,16 204:4 205:5, 10,21 207:2 208:19 209:5 210:4, 17,21 215:21 216:5,9,13,24 220:7, 11 223:19 224:18,23 227:5 228:5 233:11 234:5 250:5,23 275:18,19 291:17 292:13 295:10,19 296:5 297:13,18 299:3,8 300:13 301:7 303:17 313:18,21 314:7,18 315:19 323:14,15 325:11 331:7 332:24 337:21 338:16,22 339:8 349:12 350:6

**Reyes's** 183:13 189:23 193:19,24 194:2 218:20 227:12 229:8 230:2 231:11

**Reynaldo** 5:8 249:3,11 344:16

**RFC** 165:5,11

**ride** 79:7

**ring** 342:24

**rings** 180:6

**Rivera** 71:14 134:19

**road** 96:16

**roadway** 220:1

**robbery** 54:13,21

**Robert** 342:19

**Robyn** 182:4 226:11 295:7,8 298:13

**rocket** 278:2

**role** 7:18 22:16 117:17 252:10,15 302:17 341:20 343:2,8,10,13,17 347:10

**roll** 260:6

**rolling** 120:5

**room** 13:2 67:10 123:16 178:20 180:21 188:11,14 194:23 195:4 205:23 273:24 345:9

**rooms** 160:20 180:4,6,23 188:17 194:15 220:22 250:16 274:5

**Rosa** 320:1,9,23 323:11

**Rosauro** 171:2,6 196:2,5,13 204:23 205:7,16 206:11,18 207:15 208:14 209:10,17,24 212:12 235:14,21 236:8 251:13 270:6 273:23 303:16 314:22 334:1

**Rosauro's** 234:23 235:10 237:1, 24 272:10

**Rosauro's** 182:11

**Rosen** 6:2 69:2,6 199:13,20 327:1

**roughly** 96:11 115:14

**roup** 54:7

**routinely** 223:2

**Rule** 156:2

**ruled** 113:7

**Rules** 75:9

**ruling** 112:10 300:1

**rulings** 303:8

**run** 214:4 257:7 277:19 285:17

**running** 19:16 167:21 265:15

**rural** 115:16

**Ruth** 70:15,18

**Rutherford** 200:9 286:21

---

**S**

**Sacks** 298:21 302:8

**Sacks'** 302:15

**sake** 304:16

**Sala-** 308:12

**salary** 118:6

**Salazar** 202:15 303:18 304:12,16, 21 305:2,13,17,21 306:12,16,18,23 307:16 308:7,13,14,15 309:3,6,23 310:6 311:1,18 312:1 313:6,9

**Salazars** 306:24 309:10,18

**Salvemini** 101:3

**Samaritans** 349:7

**satisfy** 262:19

**Save** 34:8

**scales** 120:5

**scaling** 52:18

**scenario** 73:5

**scenarios** 332:7

**scene** 55:8,9 79:18 80:4,5 89:13 118:2 147:24 148:7 149:3 162:4 168:16 233:23 234:2,5,6,19 237:13 239:5 252:20,24 253:7,11,12,17,20 254:3,7,10 255:14,19 256:13 257:24 258:8,12 260:9,10 261:8,9, 19 262:1,17 263:5,8,22 264:2 321:5 328:13,22

**scenes** 80:23 97:19 254:12

**school** 75:21,24 77:5

**Schoolcraft** 50:18 51:10,13 52:2, 6,20

**science** 278:2

**sciences** 61:20

**scope** 272:5,8 273:10

**Scott** 14:3

**screen** 12:13 16:6,10 157:6 163:10

**scroll** 295:12,22 341:9

**scrolled** 328:6

**Sean** 6:10

**search** 73:3 255:20,21 258:16,18 264:16,17 265:2,7,8,21 266:7,12 267:10,17,22,23 268:8,11,20,21 269:3,4,9,12,15,17,23,24 270:7,8, 18,21 271:1,3,7,16,17,18 272:1,6, 8,9,12,18 273:6,13,15,24 274:2,4,

9,21,22 275:3,9

**searched** 268:16,17 272:21 273:1, 18,21

**searches** 73:2 265:1,5,10,24 267:5,10,24 268:9 269:6,9,13 270:2

**searching** 272:14 275:7,10,12

**seats** 236:16

**secretly** 282:1

**secrets** 38:17

**section** 167:12 168:13 248:14 296:7 343:21,22,24 344:4,15 350:19

**sections** 343:21

**secure** 38:23

**secured** 38:8 87:7

**security** 110:2 120:14,18

**seized** 272:22 330:4

**seizure** 36:24 37:1,6,7

**selected** 20:4 313:3,6,10

**selecting** 135:18

**selling** 119:18

**semester** 51:2

**sense** 52:16 60:22,23 61:1 62:17, 19,20 63:18 193:11 208:17,24 209:9,22 277:11,24 278:6,18,24 310:22

**sentence** 40:7,8,18 41:4 47:22 251:8

**sentences** 171:1 186:8

**separate** 91:14,16,17,18,20 104:20 143:22 180:17,23 181:4

**sequentially** 203:2

**sergeant** 37:14 60:8 82:19 95:3,6 96:14,15,17 98:24 99:3 100:4,6 117:2,5

**served** 43:12 87:21 97:23 100:14

**serves** 115:13

**services** 48:3 129:6,21 130:14,16 266:22

**set** 162:18 255:1 260:16,24 261:13

**settled** 110:5 111:21 228:21

**settlement** 105:14

**shape** 72:14

**shared** 236:8

**Sheehan** 70:14,18

**sheet** 124:18

**sheets** 331:15,24 332:2

**sheets/mattresses** 331:17

**shifting** 207:7

**shocking** 327:17

**shockingly** 110:9

**shoddy** 160:3 250:24 276:2

**shooting** 133:17,21

**shootings** 39:14,18 41:8

**shoplifting** 84:8,12,18 85:6

**short** 77:24 87:1 96:15 100:7,15 124:23 194:7,11 220:18 260:8

**shortcomings** 346:6

**shortcuts** 258:22 289:12 308:1

**shorter** 155:18 333:24 334:10

**shortly** 293:4 320:6 340:15

**shot** 116:14

**show** 13:14 307:23 310:14,15 311:14,17 327:17

**showed** 198:6 307:12 309:3 310:19,23

**showing** 306:22 328:1

**shown** 264:4 306:4 309:17

**shows** 80:6 163:14

**shredders** 120:6

**shut** 258:10

**sic** 182:9 338:14

**SID** 100:22

**side** 11:24

**sides** 11:18

**Sidley** 14:2,5 15:3 17:10 223:16 228:12 229:6

**Sierra** 127:20 128:4 131:12,20 132:10,11

**sign** 269:20,21 277:8 278:4 296:22

**signed** 157:16,18 177:19 198:11

250:19 251:11 268:21 295:13 296:10 315:19 342:4,12

**significance** 139:5,9 154:18 183:18 192:7 194:16 238:3,10 240:16 241:2,5 320:22

**significant** 37:4,8 183:22 190:17 196:24 238:22 240:24 241:20 248:15 253:1 264:18 322:8,10 344:4 350:20

**signs** 120:22,23

**similar** 72:1 130:8 287:19 289:1

**similarities** 154:13

**Simpson** 231:8

**simultaneous** 226:7 266:11 308:18 334:24

**single** 265:17 306:5,22 307:12

**sir** 6:22 295:9

**sister** 176:5

**sit** 18:16 67:19 140:11 148:18 164:14,15 171:23 175:10 176:14 179:19 182:15 193:3 196:19 210:2 213:5 239:12 250:1 251:6,9 252:14 255:12 256:5 278:14 294:17 296:19 300:22 303:12 323:8 332:7 337:16 341:18 343:4 346:9

**sitting** 149:20 161:13 262:10

**situations** 160:1 228:17

**size** 87:9,20 167:24

**skimmed** 17:24

**slapped** 240:21,22,23

**slash** 296:13,24

**sleep** 188:4

**sleeping** 188:3

**slide** 168:11

**slightly** 268:6

**sloppiness** 160:2

**small** 45:22 46:21 116:23 117:9

**smaller** 155:18

**smuggling** 46:16 50:10

**so-called** 248:24

**social** 61:19

**Solache** 6:13 7:7 22:19 29:10 67:17 128:19 135:20 160:11 161:3

166:14 167:4 171:6 172:4,24
177:16 178:1,14 179:7,12,15
183:4,12,13 184:20 187:22 189:3
195:19,23 198:11 201:5 203:9,12,
20 204:4 205:5,10,22 207:1 208:18
209:4 210:3,16,22 215:21 216:6,
10,13 217:1 220:12 223:19 224:18,
23 227:5,12 228:5 229:8 230:2
233:11 234:5 240:15 243:1,14,21,
22 244:13 249:7 250:5,23 275:17,
18,20 284:20 291:17 292:13
294:20 297:9,13,18 299:4,7 300:12
301:7 313:17,20 314:8,10,14
315:18 320:18 325:11 331:7
332:24 337:20 338:16,22 339:16
343:23 344:1 348:9 349:12 350:6

**Solache's** 199:6 219:8,18 220:14
231:11 239:7,24 284:21 285:2
302:8,16 335:18

**Solache-reyes** 165:12

**Solache/reyes** 165:14

**sold** 119:16

**solely** 44:5 223:11 279:23

**solved** 283:10

**somebody's** 73:6 201:16

**someone's** 236:23

**someplace** 174:17 211:9 332:5

**something's** 221:7

**son** 83:5,7

**sooner** 332:21

**sophisticated** 36:11,17 40:9,20

**sort** 13:5 306:6 343:20

**Soto** 67:17 149:22 160:16 164:1
172:12,18,22 173:2,8 174:11
175:6,23 176:2,20 185:1 205:4,8,9,
12 206:12 208:6 233:18 234:7,8,15
248:17 249:2 252:10,16 256:7,17
287:5 288:3 289:15 290:9 291:1,16
313:18 316:5,17 320:3 321:5,19
329:12 331:12,22 338:3 339:8,17
343:3 346:23 347:18 350:22

**Soto's** 238:13,14 315:14 318:7

**Sotos** 167:6 169:13 325:17

**sound** 27:5 89:19 120:15 130:19
131:2,5,8

**sounds** 130:4,5,7,21 131:9

**source** 32:3 40:12 154:4 184:13

185:5,21

**sources** 42:2

**South** 35:11 37:24 58:10 87:2
100:10

**space** 272:10 274:5

**Spanish** 59:12 168:23 277:8 279:5
280:4,21 282:10

**Spanish-** 282:13,14

**Spanish-speaking** 59:1,4,5,15,
22 103:12 178:4 277:6 279:4
280:3,20 282:20

**speak** 19:8 59:12 152:8 173:7
265:12,13

**speaker** 50:1 53:1 282:10

**speaking** 15:11 32:10 39:23 40:2
41:19 61:15 119:5 145:20 199:13,
14,21 200:7 223:12 240:7,8 277:5
282:14,15 319:9

**speaks** 333:19

**special** 60:9 93:8,10,14 95:8,20
96:24 97:4,9 100:19 101:4,6 294:1

**specific** 18:12 19:24 52:21 53:11
54:8,11 56:3 60:18,19 61:1 80:5
82:4 92:22 98:15,16 108:5 136:13
164:16 204:2 206:14 239:11
240:10 255:23 261:18 265:8
267:24 268:22 275:1,21 315:3
336:17 340:10 345:23

**specifically** 18:2,13 19:1 62:18
74:22 81:20 100:1 148:6 151:15
164:11 165:18 184:15 187:9
206:16 240:10 252:5 254:2 275:8
287:18 302:14 314:21 324:20
326:4 335:10 342:2,16 344:23
346:5

**specifics** 150:5

**speculation** 334:13 336:1

**spell** 6:23

**spells** 311:8

**spend** 25:7

**spending** 26:9 194:22

**spent** 18:8 25:17 26:15 35:6 42:13
44:11 46:1 47:13 96:15 124:17
125:4,7,11 188:13 194:4,18 195:6,
7,15 289:3

**splattered** 236:16

**splitting** 291:24 293:2

**spoke** 22:10 182:22 277:8 323:18
338:7

**spoken** 41:19

**spokesman** 281:15 285:7

**spot** 165:4 180:12 236:20,22

**spreadsheet** 26:7

**Springs** 53:18

**stabbed** 164:7 166:12 239:3 290:9
291:24 292:1 331:13,22

**stabbing** 237:18 291:15,19

**stains** 331:15

**stamped** 165:5 226:10

**stand** 107:14

**standard** 147:5 251:24 256:21
262:21 263:14 271:8 279:2 280:2,
17,18,19 281:11 309:7

**standards** 74:2 148:17 150:18
154:2 248:17 253:2 263:24 264:12,
19 344:6 350:21

**standpoint** 348:22

**Stankus** 343:9 347:17,22 350:4

**Starr** 6:10

**start** 52:18 82:24 129:5 148:12
160:9 170:16 184:7 186:11 258:14
275:7 328:20 351:9,12

**started** 18:6 23:11 27:8 42:18
49:13 52:5 68:24 85:17 88:6 89:1
99:16,21 114:23 129:20 132:12
160:11

**starting** 147:18

**starts** 47:19 169:18 171:1 172:10
182:6,10 187:17 196:2 235:5
319:23

**state** 6:23 75:1 106:14 116:16
158:13 159:3 199:10 214:5,9,16,18
215:1,14,21 227:9 257:7 260:15
261:24 276:21 277:5,23 285:12,22
292:22 314:23 330:18,22 337:19

**state's** 213:7,16,17 214:3 256:22
277:19 278:10

**stated** 141:13 168:22 170:9,13
225:17 227:17

**statement** 59:16 63:4 67:6 68:17
98:20 138:9 139:6,11 140:13,23

THOMAS TIDERINGTON, 10/05/2022

141:4,14 142:10 171:3 172:17
181:16 187:7 190:4 193:7,10,13
197:9,14,16,20 198:12 201:23
203:3 206:6 216:21 228:11,19
229:1,3 259:9 276:23 277:7 278:5
281:18 282:6 283:20 284:10,14,21,
24 285:3 298:20 304:10 321:1
328:22 331:5

**statements** 41:15 139:2 162:2
170:5 186:5 187:21 225:8 277:2
279:3 280:3,20 282:18,21 284:16,
17,20 313:17 315:19 316:2 320:17
323:14,15 329:2,5 333:1

**states** 5:10 35:9 53:2,13 75:1,5
168:20 227:4

**stating** 223:17

**station** 160:12,16 161:5 171:5,8,
17 172:10 177:5 178:5,16 182:21,
24 205:6 210:1 285:24 311:10

**stay** 180:22 327:10

**stayed** 100:9

**stays** 81:8

**steal** 318:24

**stealing** 103:4,16

**stenographer's** 209:20

**step** 148:14 197:23 265:6 304:20
305:15

**stepped** 251:19

**steps** 80:6 147:17 148:3 160:10

**sticks** 139:23 140:3 141:9 221:4

**stint** 92:18

**stole** 198:3

**stolen** 321:15

**stop** 351:14

**stopped** 195:9

**stopping** 65:7,8 135:7,8 180:11
293:8

**stopwatch** 25:20

**stories** 201:20,21 202:9 203:1
239:21

**story** 181:8 198:5,9 228:21 304:10,
15

**straight** 16:3 45:7

**strange** 275:13

**street** 5:15 104:9 117:14

**stretch** 32:20

**strike** 39:3 102:1 129:4 323:20
328:10

**struck** 336:15

**stuck** 139:16,19

**students** 51:15

**studied** 62:15,18

**study** 62:20

**stuff** 75:12 275:24

**subcontract** 125:17

**subject** 113:1 200:4 271:12 301:8,
23 302:17

**subjected** 216:14 223:20 227:7
302:9

**submit** 255:20

**submitted** 27:4,16 32:2 34:1
110:22 122:23

**submitting** 26:19 163:2

**subsequent** 244:3 245:11 315:9

**subsequently** 229:11

**substance** 175:22 187:13 286:5

**substantive** 82:8 189:7

**Substation** 78:21

**substations** 79:1,3

**suburb** 115:19

**successful** 36:12,17 40:10,20

**such-and-such** 260:11 262:5

**sued** 103:24 104:3,7 105:15
120:17

**suffered** 240:16 243:14

**sufficient** 229:7 247:13,17

**suggest** 42:3 167:8 169:13 188:18
205:4 216:9 242:17

**suggested** 205:7 206:10

**suggesting** 54:15 173:14 206:5
257:21 263:21 309:7 325:13

**suggestion** 285:16

**suggests** 196:17,24 288:15

**suing** 110:1 119:21

**Suite** 5:16

**sum** 39:21 44:5

**summarized** 325:23

**summarizes** 141:3

**summary** 17:17 41:17 105:12
112:21 164:1 170:10

**supervised** 103:9 342:1

**supervising** 96:21,22 97:11,15

**supervisor** 35:8 37:12 58:2,18
60:13 82:15 92:17 95:7 96:9,18,20
97:3,12,18,21,22 100:9 101:2
102:21 103:10,14 158:23 162:7
250:12 251:11,14,18,19 266:20
275:5 289:3 345:7

**supervisors** 82:18 249:4,22
250:3,19 341:23 345:14

**supplemental** 262:4 312:18

**supplementary** 312:21

**support** 145:18 147:4 212:10
232:10 247:4 250:22 251:16
280:10

**supported** 29:20 146:1,7 188:6
299:24

**supportive** 217:7 218:15 232:13

**supports** 233:9 244:20 299:10
300:1

**supposed** 147:22 253:15 306:23
307:2 334:22

**supposedly** 306:7

**suppress** 298:13 300:18,24
301:13

**suppressed** 301:8

**surrender** 160:16

**surrendering** 349:7

**survive** 163:21

**Susler** 6:12 241:6,8 243:3 282:22
285:1 302:19 313:23 335:24

**suspect** 47:3,6,14 61:13,14 64:16,
18,23 65:21 66:19 68:5,10 181:10
205:17 211:2 220:6 277:2,7 278:4
306:13 307:21

**suspect's** 65:22 279:12

**suspected** 173:20 283:23 309:4,5

**suspects** 59:24 61:12 64:7,11,23

Index: suspicion–things

THOMAS TIDERINGTON, 10/05/2022

117:18 161:22,23 173:1 174:18
212:7,8 215:4 219:5 220:10 225:2
228:19 276:21 282:6 284:17 286:2
313:14

**suspicion** 174:4

**suspicious** 207:3 315:13

**swab** 330:3

**Swaminathan** 6:8 7:13 8:18 10:22
15:16 16:2 28:3,5,11,15,20 29:1
49:18 56:5 57:6,9 59:7 61:24 63:7
65:3,6 68:24 69:5 84:13,16,21
86:7,12,20 91:9 94:11 106:23
131:16 137:24 138:19 139:13
140:17 141:15 142:13 144:21
146:4 149:24 153:10 155:1,6,24
156:16 157:12 161:17 162:13
163:15,19 164:19 165:1,11,16
166:16 167:14,17,20,24 168:5,7
170:14,17,19 171:18 174:24
175:15 176:10 180:9 181:19,21
185:16 186:6,12,16,21 190:1,20,22
192:8 194:19 198:16,22 199:8,16,
22 201:7 202:19 203:21 204:18
205:1 207:18 208:21 209:12,15,18
210:13,18 211:19 213:11,21 215:8
216:15 217:13,23 220:16 221:16
222:10 224:12 225:19 226:4,8,13
227:22 230:8 231:3,13,17,24
232:20 233:4 235:17 236:11 237:2
238:4 240:3,18 241:10,14 243:24
244:15 245:2,23 246:9 247:6 250:6
252:2 253:3 254:24 255:4 256:23
258:3 259:7 260:18 262:22 263:16
264:20 266:2 273:3 278:19 282:24
283:21,24 284:11 285:4 289:17
290:11 291:3,20 293:6,11,15
294:22 295:20 301:15 302:20
303:5,19 305:3,18 308:21 314:1
317:1 319:7 322:18 324:13 325:5
326:6,16,20 327:13,16,23 328:4,7,
14,17 330:10 334:2,12 335:7,23
336:1,12 338:17 339:10 342:9
344:8,11 347:1 348:15 349:13
350:7 351:13

**swear** 6:15

**switched** 293:13

**sworn** 6:16,19 35:14 87:15,17,18
116:24

**systemic** 251:2

---

**T**

---

**T-I-D-E-R-I-N-G-T-O-N** 7:2

**tactic** 266:4,5 309:20

**tactics** 285:13 308:9

**takeaway** 219:15

**takes** 47:5 89:18 191:10 332:17

**taking** 59:16 171:5 182:23 258:14

**talk** 73:2 75:19 156:17 181:7
347:3,7

**talked** 65:14 96:7 120:13 134:16
168:19 234:22 235:1 269:2 321:8
329:3 345:4

**talking** 11:22 20:8 32:1 61:2,3 84:4
85:20 116:17 119:4 127:1,2 147:16
148:6,9 238:12 244:4 254:24 255:2
332:11

**talks** 42:13 47:18 74:5 235:6 344:4
350:20

**tape** 80:6 253:13,15 281:22

**tasering** 107:10

**task** 35:11 36:10 37:10,17,22 39:4
40:8,19 58:2 96:9 100:11,12 101:1,
2,21 102:24 103:8 132:4

**tasked** 58:7

**tasks** 58:16

**taught** 48:6 50:23 51:12,18 53:12,
21,22 71:20 72:2,5,13 74:2,24 75:1
88:23

**teach** 51:1,9,17 52:1 73:21,22
264:24

**teacher** 48:16

**teaching** 50:19 51:19 52:5 151:2
280:9

**team** 22:18 79:8,9 212:24 229:7

**TECHNICIAN** 181:23 182:2 242:7,
10 293:16,19 298:5,8 340:7,22
341:1 351:17

**telephone** 25:9 73:9

**television** 45:16

**telling** 271:5 272:13 300:20 319:4,
15

**tells** 25:16 64:23 73:13 181:11
281:18 304:14

**telltale** 120:21,23

**ten** 32:12 49:5 67:7 68:21 69:3
96:23 181:20 200:4 306:24

**ten-thousand-foot** 149:13

**tend** 113:15

**tenure** 114:3 118:3

**term** 247:21

**terminology** 36:21,23 64:3 68:2
248:5

**terms** 7:15 17:5 46:23 62:22 73:3
82:8 94:2 99:10 135:18 175:3
199:24 224:23 268:16 286:19
305:16 306:11 312:8

**terrible** 150:7 192:13,16

**test** 31:7 149:10 191:24 310:2
314:3 326:8 330:2,7,16

**tested** 236:3 329:16 330:1,5 331:4,
9

**testified** 6:19 105:22 107:4,24
108:8 109:2 110:10 111:15 120:21
121:13 229:12 243:22 285:24
300:5,9 314:23,24 315:7,8,9
323:23 327:8

**testify** 12:1 111:9 112:11,15 113:7
123:15,17 129:12 244:3 326:5

**testifying** 138:13

**testimony** 8:8 18:20 21:2 56:1
107:7,13,21 108:3 109:10,15,22
110:24 111:15 112:24 119:8,13
120:20 121:5,16,22 122:3 137:1,5,
12,18 139:21 140:10 171:4,22
173:2 176:24 178:18,19 179:14,21
181:15 190:23 193:19,24 194:3
205:11 213:3,6,15,20 214:18 225:7
228:10,11 235:6 239:8,14,24 240:8
243:6,9,19 244:5,14,16 246:5
253:23 275:15 277:10 282:6 285:8
296:17 298:16 301:10 302:15
306:4 315:10 320:10 322:23 324:3,
5,11 325:6,23 337:7 341:17 342:15
350:9

**testing** 85:13

**theft** 289:8

**theory** 212:10 232:10 329:6,9

**there'd** 257:1

**Theresa** 6:3

**thing** 78:6 127:2 136:20 147:17
180:13 271:16 312:13

**things** 51:6,8 52:16 74:23 89:11
120:6 134:17 139:18 140:1,3
142:21 146:10 147:9,10 148:23,24

150:4 162:5,10 174:10 187:3 207:16 220:24 221:2 224:15 238:13 239:19 260:22,23 261:5 264:24 311:6 326:13 338:9 340:11 345:4,6,12

**thinking** 49:13 56:13 137:13,14 205:14

**thinks** 199:9

**Thomas** 5:5 6:17,24 7:1 39:10

**thought** 16:9 25:1 49:9 70:21 104:18 108:16 136:6 147:19 150:11 153:8 224:15 228:24 235:2, 10 307:16 316:17 351:1

**thousand** 288:1,2 289:6

**threat** 65:15,16 66:7

**threatened** 319:6

**threats** 67:11

**three-and-a-half** 78:8

**three-month** 44:19

**threw** 85:5

**throw** 275:16,22

**thumbing** 229:9

**Tiderington** 5:5,24 6:1,17 7:1,2 33:10 39:10 48:7 85:21 114:2 118:11 122:19 134:13 156:23 165:21 168:2 182:8 200:20 242:13 340:14

**till** 95:5 99:4 103:17 114:7 284:16

**time** 9:11,23 18:8 21:15 22:10 23:7,24 24:4 25:7,11,17 26:9,10,15 28:7 31:15 32:1 33:3 36:4 37:7 44:10,11,12 46:7,19,22 47:6,13 52:6,10 56:17 57:5 58:11 68:19 70:5,6 73:8 74:17 78:18 80:7 81:6 82:16 85:10,16,17 87:1,23 89:22 90:10,17 92:5,6 93:21,22 96:15,16 100:8,16 101:5 109:17 115:8 117:4 122:8,24 123:2,3 124:1,11,18 125:8 126:2 129:14,19 152:3 156:9 158:19 160:21 161:7 164:6,13,16 166:7,9,17 169:5,7,11,13 171:15 174:4,11 177:17,18,21 178:20,24 180:2 182:20 188:21 189:4,5 191:11 193:23 194:3,10,17 195:6, 7,15,19 201:13 205:6,21 206:10 220:21 235:21 239:17 240:2,22,23 242:1 243:2 248:1 250:17 254:8 255:8 256:3 263:22 270:15 277:24 278:14 281:5,8 282:19,21 287:2,7

288:9 294:3 296:3 297:5,16 308:2 315:23 332:24 333:7,13 335:5 338:8 340:13 348:24 351:16

**timeline** 209:24

**timely** 163:3

**times** 21:13 27:12 44:18 46:12 52:8 55:19,22 58:5 64:11,17,18 66:1,2 68:9 84:5 94:6 104:5 117:20,22 123:13 124:2,16 189:14, 19 228:20 237:18,19 240:22,23 246:7 263:9 266:8 267:6 269:14 281:16 331:13,23 337:10

**tires** 289:9

**title** 25:21

**tobacco** 119:3,17,19 120:8

**today** 5:17 7:7 21:14,17 24:1 25:4 26:16 69:1 113:14 140:11,14 164:15 171:23 179:19 182:15 196:19 210:2 225:1 239:12 250:1 255:12 262:10 278:14 296:20 323:8 332:8 337:16 341:18 343:4

**today's** 18:9

**told** 23:5 40:17 57:17 64:12 73:2 96:10 102:12 113:6 115:1 121:21 136:18 156:5 201:21,22 202:9 203:24 303:16 311:1 324:1,21,24 325:19 326:5,12

**Tom** 86:18,22

**tomorrow** 351:12

**tonight** 164:14

**top** 15:24 148:13 165:20 166:5 246:21 250:10 286:17 295:23 298:2,12 328:3 331:12

**topic** 50:3,9 52:24 53:8,20 72:9 74:9,18 75:8,17 172:5

**topics** 41:18,19 48:6 53:9,23 60:16 71:19 72:4 74:2 151:2

**total** 23:14,16 39:21 87:16 104:19 123:6 127:17 128:10

**totality** 44:6

**totally** 48:13 149:18 218:17

**touch** 114:2

**tour** 39:23 40:2

**towel** 236:21,22

**township** 9:16 35:1 48:2 101:18 103:21 104:1 114:4,21,23 115:8,11

116:10,20 118:4 287:1,3

**track** 25:8,10 26:14 49:10 98:17 125:6

**trade** 11:15

**trademark** 110:10,11 111:12 119:4,23 120:2

**traditional** 90:8

**trafficked** 120:24

**trafficker** 45:19

**traffickers** 44:3

**trafficking** 110:3,4 120:22

**train** 267:21

**trained** 53:12,21 54:4,7 79:6 201:15

**training** 41:18 48:6,9,18 49:8,13, 14 50:15,23 51:10 52:8 54:3 55:3 60:16 62:3 71:19 72:5,11,13,22 74:1 75:2 78:8 79:4 80:1 88:5,10 151:2,23 152:14 264:24 267:23

**transcribe** 279:17 281:17 282:5

**transcript** 71:9 140:16,20,22,24 143:1,2,13,16 298:17 327:6 341:14 342:21

**transcription** 107:21

**transcripts** 18:14 136:23 144:3 242:24 341:10

**translate** 59:9,16,23

**translated** 74:14

**translator** 282:11

**transported** 295:2

**treated** 177:1 286:2

**treatment** 223:21 227:7

**tree** 83:1

**trial** 12:1 105:12,22 107:4 108:3,5 109:10,11 111:10,18,19,22 112:3, 10,15,16,17,18,22 113:8 119:11,12 121:13 137:4 244:8 254:18,22 255:9 315:9

**trials** 300:13

**trick** 190:8

**true** 42:4,7,10 43:16,17 61:11 68:11 92:14 126:13 160:18 170:8 202:10 227:20 235:24 286:7 317:4 323:6 343:5

THOMAS TIDERINGTON, 10/05/2022

**trumps** 265:2

**trunk** 236:17

**truth** 104:11 229:4 319:4,15

**truthful** 201:18 303:16 305:2,11, 12

**tunnel** 328:13,23 329:8 343:22 344:16 346:3,15,23 347:17,24

**turn** 33:16 134:11 259:6,13 260:2, 12,20 263:10

**turned** 32:24 290:14 292:21

**two-year** 79:19

**type** 11:17 37:16 47:12 53:10 84:3 116:17 121:1 159:14 169:9 208:14 212:9

**types** 11:20 89:11 288:5

**typically** 59:9 109:4 159:12 269:15 317:9 348:17

**U**

**ultimately** 171:6 177:18 220:13 221:24 228:20 300:17 301:18

**Um-hmm** 67:21

**unable** 274:21

**unclear** 138:20 193:8 201:10

**undercover** 38:17 39:13,17 41:7 42:14,18,22 43:3,6,13,14,18,24 44:5,9,11,17,19,23 45:2,4,7,11,15, 17,21 46:1,10,13,17 47:1,2,6 64:10,22 66:8,9 103:11 158:20

**undermine** 337:21 338:1

**underneath** 34:15

**understand** 7:6 10:17 23:2 40:13 45:6 46:4 57:24 64:4 68:1,2 85:1 107:2 145:1,5,9,13 149:18 201:16 203:24 235:14,24 266:5 268:5 269:23 279:7 290:5 300:11,14 331:2 337:24 348:7

**understanding** 7:10,18 22:15 55:24 66:11 68:7,13 112:4,9,13,23 119:11,21 136:3 156:4 175:11 176:7 177:15,22 178:13,23 180:5,8 182:18 183:15 184:3 189:13 191:4 192:19,23 194:24 196:10 206:20 210:5,7 234:13 235:19 236:5 237:6 248:2 255:7 256:7 258:11 260:14, 19 261:7,12 267:9,19 268:7 273:1 277:13 283:18 284:9,22 286:8

288:7 290:16 294:19 296:5 302:6 306:20 313:15 321:18,22 322:16 323:10 326:10,11 327:4,21 330:6 340:1,2 341:20

**understood** 22:17 27:1 145:15 228:12

**undocumented** 276:18

**unduly** 68:15

**unequivocally** 234:2 271:5

**unexplained** 208:2

**unfairly** 177:1

**unidentified** 234:21

**uniform** 89:10

**uniformed** 349:21

**unintended** 133:20

**unit** 5:2 57:4 58:8 91:11,20 92:1 93:14,20 94:10,18 95:13 96:20,22 97:5 101:7

**United** 5:10 35:9 53:2,13 74:24

**units** 92:7

**University** 76:9,17

**unknown** 166:17,23 208:4 233:18 234:14

**unknowns** 241:22

**unlike** 138:12 200:8

**unprofessional** 263:23 276:2

**unreasonable** 66:6 195:3 223:14, 21 227:7 344:2 345:10,11

**unreasonably** 343:23 348:10

**unsophisticated** 325:1,10

**untrue** 245:1,5

**untruthful** 64:17 201:13 304:9,14

**unusable** 261:11,13

**unusual** 194:23 195:5 236:7,9,15, 18,20,21,24 245:15 256:11 261:11 263:2,11 265:9 270:22 276:24 306:10 310:14 318:22

**unusually** 310:15

**upside** 32:24

**urban** 115:15,16

**Urlaub** 5:14,18

**usable** 261:15

**utilized** 103:11 152:14

**utterly** 199:16

**V**

**V-E-N** 106:20

**Vaca** 333:17,24

**vacancies** 87:12

**vacuum** 221:1 222:22 249:21 344:24

**vague** 297:20

**vaguely** 302:11

**valuable** 320:2

**variety** 11:14,19 37:19 38:19 58:3, 21 97:23 98:11 100:3

**vast** 281:6,7

**vehicle** 73:4 89:10 225:5 235:11 237:10 238:18 239:1

**Ven** 106:20

**verbatim** 168:22

**verified** 198:9

**verify** 130:5

**version** 219:21 320:17 321:1

**versus** 31:6 66:8 88:23 119:19 124:2 163:4 181:12 254:12 256:14

**vetted** 218:7

**viable** 321:16

**victim** 110:3 238:21 239:4 320:3

**victimized** 110:3

**victims** 164:7 174:6 236:4 320:1

**victims'** 237:20,23 238:5,8,24

**video** 5:2,20 22:3 69:7,10 86:2,5 113:20,23 181:23 182:2 242:7,10, 11 293:16,19,20 298:5,8,9 340:7, 22,23 341:1,2 351:17

**video-** 5:4

**Videoconference** 143:11

**view** 136:2 149:13 151:10 183:22 198:10 251:2 265:9 268:23 278:24 329:7

**viewing** 15:12

**violate** 251:24 256:20 264:10

THOMAS TIDERINGTON, 10/05/2022

**violated** 262:20 312:16

**violates** 263:13

**violating** 102:7,8,13,18

**violation** 119:23 257:2 273:8

**violations** 11:15

**violent** 91:7 92:2

**virtually** 348:24

**vision** 328:13,23 329:8 343:22
344:16 346:3,15,23 347:17,24

**visiting** 97:19

**void** 255:22

**voluminous** 161:15

**voluntarily** 171:7

---

### W

**wait** 70:3 108:17 197:13 215:1
238:11 295:22 318:17

**waiting** 123:14,16 124:22

**waive** 88:20

**walked** 49:18 160:15 161:5

**wall** 160:20 161:6 178:18 180:3

**wallet** 15:8

**walls** 180:6

**wanted** 14:12 94:14 114:17 136:1
145:1 169:23 184:21

**warrant** 109:3,4 121:23 255:20
258:16 264:17 265:2,7 268:12,20
269:3,4,10,12,17,20 270:8,18,21
271:4,7,17,18 272:1,13 273:14
274:9,22 296:23

**warrants** 267:22,23

**watch** 32:23 45:15

**ways** 161:21 205:20

**weak** 216:5

**wearing** 275:18

**wears** 117:9

**week** 18:7 19:19,23 20:1,9,16 21:4
27:9 58:22 69:22 258:13

**weeks** 20:23 26:21 69:17 106:7
254:12 256:14 258:13 264:3

**weight** 212:15 217:22 218:1,12

221:12,20 222:7 224:9 225:16
227:20 245:10

**Welling** 5:13

**whatsoever** 160:13 201:12 216:9
254:17 277:11 299:13

**whereabouts** 196:18 208:7

**wide** 11:19 58:21 212:6

**wife** 198:2,8 206:6 207:6 237:9

**Wilson** 235:5

**wind** 52:16

**window** 321:7

**Winstrom** 135:9 281:15 282:7
285:9

**wiretap** 38:5 46:14

**withheld** 162:2

**witness's** 138:9 139:7,12 350:9

**witnesses** 18:2 61:4 64:7 82:6
83:15 97:16 117:15 137:1,4,11,17
138:13 139:21 160:19,23 161:24
181:4 218:9 239:19 281:18 285:23
300:5,8 316:3

**woman** 87:14 121:2 310:7 320:5

**won** 112:7,22

**wonderful** 335:1

**wondering** 41:11 123:12 222:6

**word** 123:24 135:12 152:6 162:16
221:5 276:1 279:17,18 325:10

**worded** 27:3 220:14

**words** 40:6,24 41:8 98:3 219:9,11
277:3 279:12,14

**work** 10:8,12,19 11:4,6,9,10,12,13
25:23 26:19,22,24 27:11 35:16,20
37:10 38:17 39:2 44:4,6,22 45:4,15
46:14 47:9 83:7 94:7 97:12 124:6,
20 125:17 126:20 127:18,24
130:24 131:11 132:4,7,15,18
155:5,10 158:17 160:3,13 161:4
165:24 202:22 228:22 294:3
337:20 347:18

**worked** 43:3 94:1 101:24 102:4
122:24 123:2,9 127:8 128:21
158:12,21,23 174:3 214:9 281:23
288:3 322:17

**working** 10:2 17:3 38:22 42:18
100:2 101:21 102:17 124:22
125:11 127:11 128:12,23 132:12

281:1 287:7 288:9 304:17

**works** 83:8

**world** 317:22,24

**worry** 33:3 108:6

**worth** 47:8

**wrap** 65:11

**write** 154:16,20 277:2

**writing** 277:6 281:10

**written** 177:19 184:14 271:9
276:23 278:5 279:2 280:1,4,20
284:19,21 285:2

**wrong** 73:7 115:2 177:13 190:18
210:6 289:13 306:15 326:3

**wrongfully** 249:5 250:4

**wrote** 270:20

---

### Y

**yacht** 44:2

**year** 27:5 34:16 52:8 77:4,22 87:23
89:5 99:23 114:10 126:3 130:2
132:19 287:23

**years** 9:21,22 34:3,16 35:6,7,24
39:2,4 42:13,17,20 43:12,19 44:3,8
45:7 46:1 48:16 49:5,6 50:21,24
51:11 52:3,14,17 72:12 74:3,20,23
77:13,15,21,23,24 81:18 85:14
88:3 89:6,18 94:21 96:10 99:14,23
108:11 114:16 116:7 117:23 129:9,
22 130:17 146:14,15 151:17 152:4
155:10 276:7 280:8 289:3,24
324:12

**yellow** 80:6 253:13,15

**yesterday** 18:19 21:18 23:8

**yielded** 318:8,9,11

**young** 39:23 121:2 314:15 349:8

**YPO** 39:23

---

### Z

**Zehner** 6:5