**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | Case No. 18 C 1028 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 18 C 2312 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT CITY OF CHICAGO'S MOTION TO BAR
<u>PLAINTIFF'S EXPERT DR. RICHARD LEO</u>**

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Wallace Hilke
Annie Prossnitz
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
prossnitz@loevy.com

Jan Susler
Ben H. Elson
Nora P. Snyder
**PEOPLE'S LAW OFFICE**
1180 N. Milwaukee Avenue
3rd Floor
Chicago, IL 60642
(312) 235-0070
jsusler@peopleslawoffice.com

**INTRODUCTION**

The Court should deny the City's motion to bar the report of Dr. Richard Leo, Plaintiff's false confession expert. Dr. Leo is a highly qualified expert in police interrogation practices, conducting over 30 years of research on the subject and having qualified as an expert in nearly 400 cases. Indeed, the City does not challenge Dr. Leo's qualifications to offer expert testimony on this subject. To compose his expert report in this case, Dr. Leo analyzed thousands of pages of documents related to over 200 cases in which arrestees alleged that they were subjected to physically abusive and coercive interrogations by Chicago police detectives. Based on his knowledge and expertise as a social scientist, he has provided an extensive and deeply-researched report—the longest he has ever authored—opining in part that there were indeed policies in effect in 1998 which allowed detectives like Guevara to physically abuse suspects and coerce confessions. Rather than offering its own rebuttal expert or contradicting any evidence of the Chicago Police Department's coercive interrogation practices, the City resorted to unfounded critiques of Dr. Leo's methodology and the evidence he relied on, in a thin attempt to bar his opinion. Because Dr. Leo is well-qualified, his methodology is sound, and his opinions will help aid the jury at trial, his opinions should be admitted and the City's motion denied.

**BACKGROUND**

**I.      Dr. Leo's Qualifications**

Dr. Leo is a Professor of Law and Psychology at the University of San Francisco and was formerly an Associate Professor Psychology and Criminology and the University of California, Irvine. Ex. 1 (Leo Report) at 2. Over the past three decades, Dr. Leo has conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions and erroneous convictions.

1

*Id.* His research has included field work inside the Oakland Police Department, during which he observed 122 felony interrogations. *Id.* In the time since, he has analyzed thousands of cases involving interrogations and confessions, as well as researched, written, and published peer-reviewed articles and books on the subject. *Id.* Courts have recognized him as qualified to testify to testify as an expert at least 385 times, including courts in this district. *Id.*; *see Brown v. City of Chi.*, No. 18 C 7064, 2023 WL 2561728, at *10 (N.D. Ill. Mar. 17, 2023); *Harris v. City of Chi.*, No. 14 C 4391, 2017 WL 2436316, at *3 (N.D. Ill. June 5, 2017) (St. Eve, J.).

As a highly credentialed research social psychologist who has devoted his career to studying interrogations, confessions, and wrongful convictions, there is no question that Dr. Leo is qualified to proffer opinions on a pattern of coerced confessions within the Chicago Police Department. The City does not argue otherwise.

## II.     Dr. Leo's Opinions

Dr. Leo offers seventeen opinions in his expert report, fifteen of which relate to Plaintiff Reyes' and Plaintiff Solache's confessions and which the City does not develop any argument for barring. Ex. 1 at 12-15; Dkt. 747 at 12 (highlighting Dr. Leo's rigor in his analysis of Plaintiffs' confessions). The only two opinions at issue in this Motion are those that pertain to the City's practice of coerced and fabricated confessions:

- (16) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

- (17) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations

2

that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

Ex. 1 at 14-15.

## LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*. The Supreme Court in *Daubert* made clear that an expert by "knowledge, skill, experience, training, or education" may offer opinions if the expert's "scientific, technical, or other specialized knowledge" would "help the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-89 (1993). For its part, Rule 702 provides that a witness who is qualified as an expert, including by experience, can testify if that expert's specialized knowledge will help the trier of fact understand the evidence or a fact at issue, and his testimony is based on sufficient facts or data and is the product of a reliable methodology. Fed. R. Evid. 702. Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," *id*. (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one." *Daubert*, 509 U.S. at 594–95; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (Daubert applies to non-scientific expert testimony).

Although courts should serve as gatekeepers to ensure that experts' opinions are reliable and relevant, the threshold under Daubert is a permissive one: "the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Lapsley v. Xtec, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("A Daubert inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.").

3

**ARGUMENT**

**I.          Dr. Leo's Opinions are Admissible**

In lieu of presenting its own expert witness to rebut Plaintiffs' claims regarding Chicago's sordid history of coerced confessions, the City argues that Dr. Leo's opinions are inadmissible. At the outset, the City does not provide *any* support for barring Dr. Leo's opinions on Plaintiffs' coerced confessions in this case, and therefore has waived the argument. *See* Dkt. 747; *see M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("undeveloped arguments are waived"). Moreover, it is clear that Dr. Leo's opinions are relevant to the issues in this case, that he is well qualified as a social psychologist and coerced confession expert, that he has more than sufficient facts and data to reach his conclusions, and that his methods are those of a social scientist and are reliable. The City's Motion should therefore be denied.

**A.  Dr. Leo's Methodology is Sound**

Dr. Leo employed his general methodology as a social scientist to formulate all of his opinions in this case—gathering relevant information and applying his training, experience, and knowledge to analyze the information he was provided. *See* Ex. 1 at 97 ("The opinions I express in this report are based on my knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me."). Dr. Leo's *Monell* opinions regarding a pattern of coerced confessions stem from his review of thousands of pages of documents, including court testimony, judicial opinions, official reports, and other sources of data, and his knowledge and experience as a social scientist in the field of coerced confessions. This is an acceptable social science methodology. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 235-36 (1989) (considering similar evidence by an expert social

4

psychologist); *Walden v. City of Chi.*, 755 F. Supp. 2d 942, 948-53 (N.D. Ill. 2010) (denying City of Chicago's motion to bar the plaintiff's expert, a historian who conducted a historical study regard the policies and practices of the Chicago Police Department and opined that "all the available evidence points to the existence of a historic pattern of coercive interrogations and illegal detentions that represented a de facto policy and practice of the Chicago Police Department in existence in 1952 at the time of [the plaintiff's] arrest and alleged mistreatment."); *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004) (social scientist expert "conducted a 'social framework analysis' by combining an extensive review of documents and deposition testimony regarding Wal-Mart's culture and practices with his knowledge of the professional research and literature in the field" which was "an acceptable social science methodology"); *Bowers v. Nat'l Collegial Athletic Assoc.,* 564 F. Supp. 2d 322, 361 (D.N.J. 2008) (ruling an expert's reliance on contextual materials, documents, testimony, literature in the field, and his own knowledge and expertise was a reliable methodology because it is a "conventional social science approach"); *Prado Alvarez v. R.I. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 41–42 (1st Cir. 2005) (finding that an expert may rely on newspaper articles for historical context).

At his deposition, Dr. Leo expounded on the methodology he followed in preparing the *Monell* portion of his report:

> The methodology is first and foremost to look at all the cases and all the evidence in all the cases and look for patterns to connect dots and figure out whether they're – they are isolated events or whether there is a widespread or pervasive not isolated practice. With respect to a particular piece of evidence, I would analyze it within that case in light of other evidence in that case and make my best analysis about the weight of the evidence in that case on both sides in light of what we know about the case and how I evaluate the strength of the evidence.

Ex. 2 (09.29.2022 Leo Dep.) at 432:9-22.[1]

"Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Stollings, Inc.*, 725 F.3d at 766. The Seventh Circuit has instructed that the "critical inquiry is whether there is a connection between the data employed and the opinion offered." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

The City takes issue with the data that Dr. Leo relied on, cherry picking one of the approximately 200 cases Dr. Leo reviewed in order to argue that Dr. Leo's case summaries are insufficient to establish a pattern of coerced confessions. Dkt. 747 at 9-10.[2] However, the evidence Dr. Leo reviewed in forming his pattern opinions was voluminous and included many

---

[1] Citing *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008), the City asserts that "[p]arties are not permitted to cure deficient expert reports by supplementing them with later deposition testimony." Dkt. 747 at 7. To the extent that the City is implying that Plaintiffs are not permitted to cite Dr. Leo's deposition testimony regarding his methodology, this argument is not well-taken. An expert report need not cover every detail of what an expert might say in his or her forthcoming testimony. The purpose of an expert report "is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion. . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). *Ciomber* dealt with an extreme situation involving an "undeveloped" and "woefully deficient" expert report, submitted after the deadline, which set forth "eight terse statements" regarding liability. 527 F.3d at 641. The exclusion of the expert's subsequent deposition testimony was appropriate because "the expert clearly deviated from the established scope of his expected opinion." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (describing *Ciomber*). That is far from the case here. Dr. Leo referenced his methodology in his report, and his deposition testimony introduces no new opinions or issues that are not fairly within the scope of his report. Nor is the report so "undeveloped" that it would have failed to provide notice of the subject or content of his testimony. *See Metavante Corp*, 619 F.3d at 762; *Narsimhan v. Lowe's Home Ctrs., LLC*, No. 19 C 1255, 2021 WL 3930426, at *3 (N.D. Ill. Sept. 2, 2021); *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F. Supp. 3d 687, 703 n.8 (N.D. Ill. 2019); *Estate of Carlock v. Williamson*, No. 08 C 3075, 2012 WL 5386136, at *7 (C.D. Ill. Nov. 2, 2012); *GSI Grp., Inc. v. Sukup Mfg. Co.*, No. 05 C 3011, 2008 WL 4999126, at *2 (C.D. Ill. Nov. 20, 2008); *Estate of Gee v. Bloomington Hosp.*, No. 1:06 C 00094, 2012 WL 591459, at *4 (S.D. Ind. Feb. 20, 2012); *Damiani v. Allen*, No. 4:16 C 00053, 2018 WL 4095080, at *12 (S.D. Ind. Aug. 28, 2018).

[2] The City's repeated assertion that Dr. Leo reviewed "62 cases" is an undercount. That number does not include the more than 125 individuals who alleged torture at Area 2 and 3 under Burge, nor does it account for the fact that in certain of the Area 3, 4, and 5 "cases" multiple individuals alleged coercion.

different types of materials that varied in both amount and strength with regard to each individual case. Dr. Leo accounted for this variation in his analysis, explaining in his deposition that he reviewed a wide range of materials, with unproven allegations falling at the low end of the spectrum in terms of strength, while other cases were corroborated by other evidence:

> I'm an expert evaluating a body of evidence. The evidence ranges in strength, and the amount of evidence in each case also ranges. And there's some evidence like allegations of coercion or abuse or false confession that all I have is the complaint that was filed in the civil case. And there are other cases where I have testimony by the victim or the person who was interrogated. And then there are other cases where I have judicial findings, commission reports, admissions by city officials. So, the evidence that I relied on to make my opinions, to arrive at my opinions particularly in the pattern part of the report, varies. And that's one point I've been trying to make. And all I'm saying here is that photographic evidence of abuse that corroborates the accusations made by somebody who alleges they were physically assaulted like in this case, like in the Andrew Wilson case, and I believe like in some of the other cases, is stronger than in some other cases where the evidence might be at the low end of that spectrum, like an allegation in a complaint, and it's not as strong as evidence at the other end like judicial findings of fact or commission reports or admissions by City officials.

Ex. 2 at 444:20-445:24.

Furthermore, even if one were to throw out the one case with which the City takes issue, Dr. Leo explained in his deposition that the evidence of a pattern was so strong that disregarding any particular case would not change the analysis:

> Again, it's not for me to say whether somebody falsely confessed or make any other finding of fact. What I'm saying is I reviewed materials, evidence in this case, and that supports the opinion that there was the pattern and practice here, and that evidence is – is – varies in range. And in this case remember, I had mentioned that at the lower end there would be something like allegations made in a complaint. This is stronger than that because there is not only allegations but there is also sworn testimony. So, that's what I relied on as part of the evidence supporting my pattern opinion in this section of the report. And again, the evidence of the pattern here is so strong that even if we threw out the Arnold Day case, there's scores and scores of other cases that support that opinion.

Ex. 2 at 450:15-451:10.

The City's argument is, essentially, that some of the underlying data that Dr. Leo relied on in forming his opinions is unreliable. Even if that were true, however, it is well-established

7

that issues with the factual underpinnings of an expert's opinion are not a basis for exclusion; rather, those issues should be explored on cross-examination and decided by a jury. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586–87 (7th Cir. 2000) (finding district court abused its discretion by excluding expert testimony despite possible inaccuracies in patient-reported data underlying expert report because cross-examination, not exclusion, was proper remedy for issues with underlying data); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020–21 (7th Cir. 2000) (same); *Minemyer v. B-Roc Representatives, Inc.*, No. 07 C 1763, 2009 WL 3757378, at *2–3 (N.D. Ill. Oct. 29, 2009) (denying motion to bar expert's testimony that was based in part on uncorroborated testimony because possibility that underlying evidence "may prove unconvincing" was not a basis for exclusion); *United States v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005) (noting *Daubert* does not "regulate the underlying facts or data that an expert relies on when forming her opinion."); *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) ("factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

The City appears to fault Dr. Leo for not conducting independent interviews of every single one of the individuals who reported they were coerced to confess by the CPD. *See* Dkt. 747 at 9-11, 14-15. As the City knows, "an expert witness is not required to verify all the facts on

8

which he relies." *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015); *Daubert*, 509 U.S. at 591 ("an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"); *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) ("expert analysis is often based on reported information rather than firsthand knowledge, and that is no bar to its admissibility."). An expert can rely on hearsay "provided that such reliance is an accepted practice in his profession," as it is here. *Tilstra*, 791 F.3d at 753.

The City asserts that Dr. Leo has not applied his expertise because he has only provided case summaries of "allegations against a handful of detectives" and therefore cannot conclude that the City had a practice of coercing confessions based on an analysis of 62 cases. Dkt. 747 at 9, 13. The City's position is entirely without support. The Seventh Circuit has emphasized that there is no minimum number of occurrences necessary to establish the existence of a widespread practice. *See Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). The only "bright-line rule" defining a "widespread custom or practice" is that there must be more than one "or even three" instances so that the plaintiff can demonstrate "that there is a policy at issue rather than a random event." *Id.*

Furthermore, while the City could have presented an expert who would testify that the facts and data were insufficient to reach an opinion, it failed to do so.[3] Indeed, Plaintiffs provided the City with thousands of documents to support the coerced and false confession pattern and practice. In response, the City objected to the volume of material produced and was granted six additional months to conduct discovery on this exact issue, Dkt. 589. Despite this

---

[3] The City's rebuttal expert, Dr. Michael Welner, did not review the source material that Dr. Leo reviewed and therefore could not offer a contradictory opinion regarding whether those materials evidence a pattern of coerced confessions.

additional discovery period, the City did not provide *any* evidence contradicting Plaintiffs'

evidence of the City's practice of coerced confessions. Nor did the City use this time to attempt

to establish that the dozens of examples Plaintiffs had provided of brutal interrogations and false

confessions across the City for the past fifty years were an aberration or an unrepresentative

sample. And ultimately, the City did not retain a rebuttal expert to review this material and

challenge the evidence Dr. Leo relied upon in opining on the City's coerced confession pattern.

*See Zollicoffer v. Gold Standard Baking, Inc.*, 335 F.R.D. 126, 146 (N.D. Ill. 2020) (noting the

purpose of "rebuttal evidence is to contradict, impeach, or defuse the impact of the evidence

offered by an adverse party").

The City will be free at trial to cross-examine Dr. Leo and suggest that he lacked

sufficient information to render his opinions, but this is a matter for the jury to determine, not an

issue which requires exclusion of his opinions. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir.

2010) ("Determinations on admissibility should not supplant the adversarial process"); *Deputy v.*

*Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003) ("issues of credibility and persuasiveness .

. . are relevant only in valuing the testimony, not in determining its admissibility."); *Smith*, 215

F.3d at 719 ("it is not the trial court's role to decide whether an expert's opinion is correct. The

trial court is limited to determining whether expert testimony is pertinent to an issue in the case

and whether the methodology underlying that testimony is sound.").

### B. Dr. Leo's Opinions Will Assist the Trier of Fact

"An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury

in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d

405, 409 (7th Cir. 2014). In other words, "*Daubert* instructs that expert testimony must be

relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement."

*United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007). "Determining whether an expert's proposed opinions will assist the trier of fact in assessing a factual issue is essentially a relevance inquiry." *Greene v. Sears Prot. Co.*, 2018 WL 4716189, at *8 (N.D. Ill. Mar. 8, 2018).

Dr. Leo's testimony about the existence of a citywide pattern of coerced confessions, and the failures of high-ranking police officials to appropriately respond after learning about what was going on, are not within the expected knowledge of a layperson and will help the jury understand the policy and practice evidence, put the facts in context, and determine the facts at issue. In addition, Dr. Leo's testimony will assist the jury by synthesizing and streamlining the presentation of the voluminous underlying data regarding the decades-long pattern and practice. *See In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *24 (N.D. Ill. Jan. 10, 2022) (denying motion to exclude expert whose testimony would "streamline presentation to the jury and help them understand" voluminous data); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (use of an expert was appropriate to "synthesize or summarize data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion") (cleaned up). Requiring Plaintiffs to put dozens of witnesses on the stand to establish a pattern rather than a single expert will needlessly prolong and complicate proceedings and will not facilitate efficient resolution of the issues.

## II. The City's Attempts to Discredit Dr. Leo's Opinions Lack Merit

The City's arguments concerning Dr. Leo's notes and invoices are red herrings. Due to the large volume of materials Dr. Leo relied on in forming his opinions, he created, along with Plaintiffs' counsel, notes that summarized the information contained in his report, for him to use as a memory aid during his deposition. The notes were created after he tendered his report, consisting of summaries of the materials he reviewed in preparing his report, and do not contain

11

any information that is not included in his report. Ex. 2 at 464:3-15. The City presents a straw man argument, faulting Dr. Leo for not disclosing "what methodology he used to create the notes" and then arguing, "the notes lack any expert analysis because Plaintiffs asserted a work product privilege to questions regarding the methodology about creating them." Dkt. 747 at 5, 11. Here, the City falsely conflates these memory aid notes with Dr. Leo's methodology in authoring this report. The notes were created *after* Dr. Leo tendered his report, and therefore the manner in which they were created has nothing to do with the methodology Dr. Leo used in forming his opinions. Again, the notes are simply summaries of portions of his report, which Dr. Leo used as a memory aid during his deposition. If the City believes that the notes somehow undermine Dr. Leo's opinions, it is free to use them in cross examination at trial, but they certainly do not support barring his opinions.

Likewise, the City's arguments about Dr. Leo's invoices go, at most, to weight, not admissibility. Dr. Leo spent a substantial amount of time—over 175 hours—reviewing thousands of pages of documents in order to arrive at his opinions. Ex. 2 at 512:8-12. It is "the longest report [he's] ever written." Ex. 2 at 469:8-10. If the City wants to nitpick how much time Dr. Leo spent on certain tasks, it can do so in front of the jury, but, again, this type of argument goes to weight, not admissibility.

The City's criticism of Dr. Leo for citing, in his report, a chart that was prepared by Plaintiff Solache's lawyers that summarized torture allegations at Areas 2 and 3 under Burge also rings hollow. Dkt. 747 at 11-12. As Dr. Leo explained in his deposition, while that document was the only citation for one particular sentence in his report, it was not the only document on which he relied for the proposition that scores of suspects were tortured at Area 2, and there were other materials—contained in the materials reviewed section of his report—that he reviewed and

12

relied on for that proposition, which the City itself has admitted multiple times over the years, including through its subsequent mayors who have publicly apologized for the torture scandal, and through its City Council, which passed legislation providing reparations for torture survivors. Ex. 2 at 369:13-371:20 ("This [chart] is merely one small part of the bigger picture and the substantial amount of documents that I reviewed and relied on."); Ex. 1 at 66-67. The City's arguments attempting to discredit Dr. Leo are frivolous and should be rejected as such.

## CONCLUSION

Dr. Leo has presented a comprehensive expert report on the City's practice of coerced and fabricated confessions, based on his review of thousands of documents, and provided opinions relevant to Plaintiffs' claims. For all the reasons discussed above, the City's motion to bar his testimony should be denied.

RESPECTFULLY SUBMITTED,

/s/ Annie Prossnitz                           /s/ Ben Elson
*Attorney for Plaintiff DeLeon-Reyes*    *Attorney for Plaintiff Solache*


Jon Loevy                                      Jan Susler
Anand Swaminathan                          Ben H. Elson
Steve Art                                        Nora P. Snyder
Rachel Brady                                   **PEOPLE'S LAW OFFICE**
Sean Starr                                       1180 N. Milwaukee Avenue
Wallace Hilke                                   3rd Floor
Annie Prossnitz                                 Chicago, IL 60642
Meg Gould                                       (312) 235-0070
**LOEVY & LOEVY**                        jsusler@peopleslawoffice.com
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
prossnitz@loevy.com

13