# Exhibit B

1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   JACQUES RIVERA,                      ) No. 12 CV 4428
                               )
4         Plaintiff,            )
   vs.                            ) Chicago, Illinois
5                             )
   Rey GUEVARA, STEVE GAWRYS, DANIEL NOON,)
6   JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,  )
   PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN
7   LEONARD, EDWARD MINGEY, RUSSELL WEINGART,  ) June 18, 2018
   ESTATE OF ROCCO RINALDI, City OF CHICAGO,  )
8                               )
         Defendants.           ) 9:25 o'clock a.m.
9

                    VOLUME 10 A
10              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                 and a jury

12   APPEARANCES:

13   For the Plaintiff:    LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
14                          MR. STEVEN E. ART
                          MR. ANAND SWAMINATHAN
15                   311 North Aberdeen Street
                   3rd Floor
16                   Chicago, Illinois  60607

17                   MACARTHUR JUSTICE CENTER
                   Northwestern University School of Law
18                   BY:  Locke E. Bowman, III
                   357 East Chicago Avenue
19                   Chicago, Illinois 60611
                   (312) 503-0844
20

21

   Court reporter:       Blanca I. Lara
22               Official Court Reporter
              219 South Dearborn Street
23                Room 2504
              Chicago, Illinois 60604
24               (312) 435-5895
             blanca_lara@ilnd.uscourts.gov
25

1  Appearances  (continued:)

2

3

   For the Individual          THE SOTOS LAW FIRM
4  Defendants:                 BY:   MR. JEFFREY N. GIVEN
                                     MR. JAMES G. SOTOS
5                                    MS. CAROLINE P. GOLDEN
                                     MR. JOSEPH M. POLICK
6                                    MR. DAVID A. BRUEGGEN
                               550 East Devon Avenue
7                              Suite 150
                               Itasca, Illinois  60143
8

9  For the Defendant           ROCK FUSCO & CONNELLY, LLC
   City of Chicago:            BY:   MS. EILEEN E. ROSEN
10                                   MS. CATHERINE M. BARBER
                                     MS. THERESA B. CARNEY
11                             321 North Clark Street
                               Suite 2200
12                             Chicago, Illinois  60654

13
   For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
14 Guevara:                    BY:   MR. THOMAS E. LEINENWEBER
                                     MR. JAMES V. DAFFADA
15                             120 North LaSalle Street
                               Suite 2000
16                             Chicago, Illinois  60602

17

18

19

20

21

22

23

24

25

1          (The following proceedings were had out of the

2          presence of the jury in open court:)

3              THE COURT:  On the record?

4              THE COURT REPORTER:  Yes.

09:25:45    5              THE COURT:  Starting over.

6              Let me just say quickly because we don't have a lot of

7    time, but I put on the record that juror Ciccarelli,

8    C-i-c-c-a-r-e-l-l-i, told the courtroom deputy that she saw a

9    headline about the case in the Tribune over the weekend.  Just

09:26:10   10    closed it up without reading it.

11              Mr. Sotos is just going on about how inflammatory it

12    was.  And Mr. Loevy added that it's exactly what happened in

13    court.  And let's not spend a lifetime on it, but is there

14    something you want to say?

09:26:27   15              MR. SOTOS:  I said it.

16              THE COURT:  Okay.

17              MR. SOTOS:  You know, in terms of it being exactly

18    what occurred in court, it was an inflammatory headline.

19              THE COURT:  All right.  And the other thing is, one of

09:26:35   20    our jurors got a sprained ankle over the weekend and is here,

21    but will be slow coming in and going out.  Okay?

22              Anything anyone needs to pick up with me in the next

23    five minutes?

24              MR. LOEVY:  Not for the first witness, Your Honor.

09:26:51   25              MR. SOTOS:  Not for the first witness either.

1      THE COURT:  Well, we got nothing over the weekend.  So

2  when you say "not for the first witness" what does that mean?

3      MR. LOEVY:  Well, Your Honor, we have a short motion

4  that we're going to file.  We haven't given to the other side.

09:27:06  5  We haven't given it to them, so ....

6      THE COURT:  So is this something I'm going to decide

7  in a hurry at some point today?

8      MR. LOEVY:  Well, before tomorrow.

9      THE COURT:  Oh.  Okay.

09:27:13  10      MR. SOTOS:  We have one of those, too.

11      THE COURT:  All right.  So I'm going to have it at

12  tonight?

13      MR. SOTOS:  Yes.  For sure.

14      THE COURT:  Okay.

09:27:24  15      MR. SOTOS:  It's just practically done.

16      THE COURT:  Okay.  As long as, you know, I don't have

17  to do it in five minutes over the break.

18      Okay.  So let me leave you alone.  I'll just wait.

19  I'm not going to go back there.

09:27:54  20      MR. SOTOS:  Oh, Judge, there is one other issue.

21  Maybe I can bring it up now since we have a few minutes.

22      I would just ask the Court to caution plaintiff.  When

23  he had damages witness on the stand, there was a bit of like an

24  embrace afterwards between him and his daughter.  And we would

09:28:09  25  just ask that that be reserved for outside the presence of the

1    jury, those kind of public displays of affection during trial.

2          THE COURT: Right. I think that would be a good idea.

3          MR. LOEVY: Okay, Your Honor.

4          MR. SOTOS: Thank you.

09:28:22  5       (Brief pause).

6          COURT SECURITY OFFICER: Everybody is here.

7          THE COURT: Everybody is here. Tell me when you want

8    to get started.

9          MR. LOEVY: We're ready.

09:28:34  10      Is Mr. Brasfield here?

11          MR. SWAMINATHAN: Yes. He's outside. I'll go get

12    him.

13          MR. LOEVY: Anand, why don't you finish what you're

14    doing and someone else can ....

09:29:13  15      (Brief pause).

16          THE WITNESS: Your Honor. Good morning.

17          THE COURT: Shall we start or do you want to break?

18          MR. LOEVY: Thirty seconds?

19          THE COURT: Sure. Sure.

09:29:50  20      (Brief pause).

21          COURT SECURITY OFFICER: Ready, Your Honor?

22          THE COURT: Not quite. Very soon.

23       (Brief pause).

24          THE COURT: Now is it time?

09:32:51  25          MR. LOEVY: We're ready.

1    THE COURT:  Okay.  Yes.

2    COURT SECURITY OFFICER:  All rise.

3    (The following proceedings were had in the

4    presence of the jury in open court:)

09:33:11  5    THE COURT:  Would you be more comfortable not climbing

6  into that jury box?

7    JUROR CICCARELLI:  Actually, I'm okay.

8    THE COURT:  Okay.

9    JUROR CICCARELLI:  I just realized how short I am.

09:33:29  10    (Brief pause).

11    THE COURT:  Good morning, ladies and gentlemen.

12  Please be seated.

13    Mr. Loevy, whenever you're ready.

14    MR. LOEVY:  Thank you, Your Honor.

09:33:41  15    MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

16    DIRECT EXAMINATION (resumed)

17  BY MR. LOEVY:

18  Q.  Mr. Brasfield, good morning.

19  A.  Good morning.

09:33:45  20  Q.  One of the subjects that you mentioned last week was

21  detectives taking notes when they talked to witnesses like

22  eyewitnesses.  And I think you gave us some perspective on

23  whether those notes are supposed to be in the file or not

24  supposed to be in the file.  Which is the answer?

09:33:58  25  A.  The notes are supposed to be transcribed into the GPRs.

1  Q.  Give the jury a little more context for what kind of notes

2  homicide detectives are supposed to take when they talk to

3  eyewitnesses and get their accounts.

4  A.  They should include the date, time, location, individuals

09:34:16  5  present, the identity of the individual being interviewed, and

6  the synopsis, if you ill, a Reader's Digest version of what was

7  discussed.

8          In the case of a witness that was of significant

9  importance to an investigation, such as an eyewitness, victim,

09:34:38  10  whatever.  For an, assault, obviously, not homicide, but you

11  would expect a written signed statement.

12  Q.  And what kinds of details would that include?

13  A.  That would include everything from the position of, in a

14  case of a witness, their location relative to what they

09:35:03  15  observed, any description of clothing, the time of day or

16  night, lighting conditions, whether they knew or had been

17  acquainted or had seen in the past the individual that they

18  were -- had said to be observed.

19  Q.  How about their level of certainty if it's an eyewitness

09:35:29  20  situation?

21  A.  That would also be an important factor to include.  You

22  would want to know, "Now you say that this is the person you

23  saw, you've given me the description, do you feel quite

24  confident that you'd be able to identify this person in the

09:35:47  25  future if you were to see them again?"  Or if not confident,

1    what their level of confidence was.

2          You would probably -- not "probably," you should also

3    take note of any indication that the detective observed that

4    might affect the reliability of the witness, that could include

09:36:20    5    whether they wore eyeglasses, their age, how well they're able

6    to articulate what they observed, that type of thing.

7    Q.  Now, each time an eyewitness is re-interviewed or speaks to

8    the police again, do you need to make notes again or is it

9    sufficient to rely on the first notes?

09:36:39    10   A.  No -- (coughing).  Pardon me.  I'm sorry.

11          No, it's important to continue taking notes.  There

12   may be -- and, again, I think I testified to it on Friday --

13   you never know during the course of an investigation what will

14   be important later.

09:36:52    15          So if you're re-interviewing a witness, you want to

16   make sure that if there is any change, or alteration, or

17   addition, or subtraction to what you had learned earlier from

18   that witness, you want to make notes of that.

19          And if they add something that they may have seen the

09:37:16    20   suspect subsequent to the last time they were interviewed,

21   whether they remembered something else about the individual or

22   whatever it was that was different than the first time.

23   Q.  And all that should be memorialized?

24   A.  Yes, it should.

09:37:33    25   Q.  How about if there is an identification procedure, either

09:37:52

1　photographs or otherwise, and the person makes an

2　identification, are those details supposed to be materialized?

3　A.　Yes, they are.　Whether it is a photographic lineup, a

4　montage, gang book, whatever, or a more formalized physical

5　lineup in person, the information should be memorialized as to

6　who was there, who conducted it, who was with the witness that

7　was observing the lineup, or picking photos out of a photo

8　array, whatever.

9　Q.　All right.　And leaving aside this case but talking

09:38:14

10　systemically on all the files that you looked at, did the City

11　of Chicago's investigators do a good job of complying with the

12　standard for the kinds of memorialization you've been talking

13　about?

14　A.　I would have to characterize, based on the files that I

09:38:29

15　have reviewed over a number of cases, including this one, that

16　they were very lackadaisical.

17　　　　　There would be sometimes some information about who

18　was present, but the nuts and bolts of what you would expect to

19　be in that were not there.

09:38:48

20　Q.　Did that deviate from the standard that you observed in

21　other departments and all the work you described yesterday on a

22　national level?

23　　　　　MS. ROSEN:　Objection, Judge.　This is beyond the

24　scope of the 26(a) disclosures.

09:39:00

25　　　　　THE COURT:　Is this subject -- I would like the report

1  if I need to.

2      MR. LOEVY:  I mean, it's really the whole gist of his

3  whole report of how Chicago didn't meet up to the national

4  standards.

09:39:11  5      THE COURT:  Well, this is the subject about taking

6  notes and keeping notes?

7      MR. LOEVY:  Yes.

8      THE COURT:  Does somebody have the disclosure that you

9  can hand to me or do I need to get it?

09:39:22  10      MR. LOEVY:  I can hand one to you, Your Honor.

11      (Document tendered to the Court.)

12      MR. LOEVY:  Your Honor, I guess it's like maybe 58

13  referred to --

14      THE COURT:  Well, let me see.  Where is the disclosed

09:39:35  15  according to the plaintiff?

16      MR. LOEVY:  I gave it to you.

17      THE COURT:  Oh, I'm sorry.

18      MR. LOEVY:  No, it's our fault, Your Honor.  It's all

19  the cases, which is basically the second half of it.

09:39:44  20      MS. ROSEN:  Well --

21      THE COURT:  Hold on.  Hold on.

22      Hand this back to counsel so he can direct me to the

23  page so we can move this along.

24      THE LAW CLERK:  Yes.

09:39:53  25      MR. SWAMINATHAN:  Let me do it this way.  We'll give

1  you this which lists all the cases they aren't turning over

2  notes.

3         MS. ROSEN:  Well, Judge, this is a different issue,

4  all the cases they're talking about right now about not turning

09:40:02   5  over notes.  What he's talking about just right now is the

6  quality of the notes --

7         THE COURT:  Let me see it and then we'll talk about

8  it.

9         (Document tendered to the Court.)

09:40:28   10        THE COURT:  Thank you.  That's perfect.  Give me a

11  second.

12        (Brief pause).

13        THE COURT:  Okay.  Let me see counsel at the side.

14        (Proceedings heard at sidebar on the record).

09:41:00   15        THE COURT:  This is all about the files?

16        MR. SWAMINATHAN:  Are you looking at page 58?

17        THE COURT:  Yeah.

18        THE COURT REPORTER:  Mr. Swaminathan, if you're going

19  to be on the record, I'm not hearing you.

09:41:12   20        MR. SWAMINATHAN:  Yes.  Sorry.

21        So starting on page 59.

22        THE COURT:  Oh, 59?

23        MR. SWAMINATHAN:  Yes.  It starts talking about --

24        THE COURT:  Okay.  I thought it was 58 and 59.  Hold

09:41:27   25  on.

1    MR. SWAMINATHAN:  Yes.

2    THE COURT:  Hold on.

3    (Brief pause).

4    THE COURT:  So what this is about is information that

09:42:00   5  was not put in the official files.

6    MR. LOEVY:  Uh-huh.

7    THE COURT:  He seems to be testifying that what he is

8    looking for was in note files.

9    MS. ROSEN:  Right.  The way I heard it, Judge, was

09:42:13  10  that even the notes that were taken were insufficient by

11   standards.  He's not saying -- he's not making the comparison

12   between what notes were in one file, or the ones in another

13   file, or the ones in the criminal defense attorney files, which

14   is the whole thrust of it.  What he is now saying is they

09:42:33  15  should've put this detail in the note, they put that detail in

16   the note, they should put that detail in the note, and that's

17   not -- he didn't make that comparison.

18   THE COURT:  I get it.  I get it.

19   MR. SWAMINATHAN:  There's a section in the report

09:42:43  20  where he specifically discloses opinions about a comparison of

21   these notes versus what's in --

22   THE COURT:  Show it to me.

23   MR. SWAMINATHAN:  That's the file, which is exactly

24   what he's talking about now.

09:42:53  25  MR. LOEVY:  That was the blue column on the chart.

1      THE COURT:  Just show me.

2          MR. SWAMINATHAN:  All of the pertinent information --

3          THE COURT:  Yes, it's got to be disclosed.  So telling

4  me does not do me any good.

09:43:15   5      MR. SWAMINATHAN:  Just to explain to you what this is,

6  he's saying information on the notes is not in the permanent

7  retention files.  It's not going into the reports, it's not

8  going into the permanent retention files --

9          THE COURT:  Well, it seems to me that if what he is

09:43:33  10  saying is that -- well, he just saw the permanent retention

11  files and it wasn't in there, is that what he's saying?

12         MR. LOEVY:  He saw both.  He saw the permanent

13  retention and the investigative files.

14         THE COURT:  So where is a critique of what's kept in

09:43:46  15  the investigative files?

16         MR. SWAMINATHAN:  That's what he's saying here, the

17  handwritten notes and so on, found in the investigative files

18  and they're not put into the retention files.

19         THE COURT:  That's not what he said.  That's not what

09:44:04  20  he said.  He said that the detectives were not recording all

21  kinds of things.

22         MR. LOEVY:  You know what it is?  It's that the murder

23  book chapters are missing -- remember yesterday he was talking

24  about the blue column?  He's saying that Chicago investigations

09:44:14  25  read like there's only one chapter, and the murder book is

1  supposed to have all chapters that goes in all difference

2  directions.  So it's limited -- he's what they memorialized is

3  not what he would expect to see.  It's less than they expect to

4  see.  One reason it's hard to show a specific thing is because

09:44:31   5  he's like saying he went through case by case, by case, and

6  he's like saying in this case they --

7         THE COURT:  Show me just one example where he's

8  critiquing the failure to record like witness interviews,

9  that's what he's talking about.

09:44:44  10         MR. SWAMINATHAN:  I'll find it.

11         (Brief pause)

12         MR. LOEVY:  I tell you what.  We've lost a lot of

13  time.  I'm ready to move on.  I appreciate that.

14         THE COURT:  Okay.

09:44:50  15         (Proceedings resumed within the hearing of the

16         jury.)

17         MR. LOEVY:  Ready, Your Honor?

18         THE COURT:  Yes.

19  BY MR. LOEVY:

09:45:16  20  Q.  Sir, you had a chance to review Mr. Wadas' file in this

21  case, correct?

22  A.  The criminal defense attorney's file during the --

23         MR. LOEVY:  Your Honor, we did not yet moved

24  Exhibit 43 into evidence, Mr. Wadas' file.  We'd like to do so

09:45:30  25  now.

 1        THE COURT:  Any objection?

 2        MS. ROSEN:  No, Judge.

 3        THE COURT:  It is received.

 4        (Plaintiff's Exhibit No. 43 was received in

 5        evidence.)

 6   BY MR. LOEVY:

 7   Q.  And you also had the copy of what we've been calling the

 8   investigative file.  This is Plaintiff's Exhibit 19, which is

 9   also in evidence, correct?

10   A.  That's the one referred to as Wronkowski 1 to 69?

11   Q.  Exactly.

12   A.  Yes.

13   Q.  And what's your understanding of where the investigative

14   file turned up and how?

15   A.  That it was eventually discovered or provided after, long

16   after the criminal prosecution and conviction and during the

17   course of civil litigation, as I recall.

18   Q.  And is it your understanding that in both the Jacques

19   Rivera case and in others, that there were documents in the

20   investigative file that were not in the criminal defense file?

21   A.  That's my experience with the material I've reviewed over

22   the years.

23   Q.  In fact, you've reviewed a lot of cases and found similar

24   results, correct?

25   A.  That's correct.

1    Q.  All right.  I'd like to show you a copy of Plaintiff's

2    Exhibit 269.

3         And your exercise in this case was to do a comparison

4    between what was in the criminal defense file and what was

09:46:39    5    available at the police department either because they found it

6    in the basement, or on the pallet, or in the file cabinets,

7    right?

8    A.  That's correct.

9    Q.  So what is Plaintiff's Exhibit 269?

09:46:46    10    A.  This would be the investigative file as I recall -- or

11    excuse me, what I'm referring to as --

12    Q.  And I want to focus your attention on the subset of pages

13    that are missing from --

14         MS. ROSEN:  Can he identify that?  He didn't identify

09:47:08    15    what Plaintiff's Exhibit 269 is.

16         MR. LOEVY:  He might not know what Plaintiff's Exhibit

17    269 is.

18         MS. ROSEN:  Would you identify it?

19         MR. LOEVY:  Yeah.

09:47:12    20    BY MR. LOEVY:

21    Q.  Plaintiffs 269 were the pages that were in the

22    investigative file that were not in Mr. Wadas' file or the

23    permanent retention file?

24    A.  Yes, I understand.  This is the -- normally I've seen it as

09:47:26    25    a whole complete set.

1   Q.  Right.  So this is a subset that was created that you were

2   not part of creating?

3   A.  That's correct.

4   Q.  All right.  Now, you were not -- in this case and others,

09:47:36   5   is every page that didn't make it into Mr. Wadas' file

6   important or the kind of thing that would've been a

7   constitutional problem?

8   A.  Not necessarily --

9           MS. ROSEN:  Objection.

09:47:47   10          THE COURT:  What's the objection?

11          MS. ROSEN:  Judge, I think this is going to what you

12   barred --

13          THE COURT:  Overruled.

14          MS. ROSEN:  -- if I heard the question correctly.

09:47:58   15          THE COURT:  Overruled.  Overruled.

16   BY THE WITNESS:

17   A.  Not necessarily.  Although, it is still my position in

18   investigations that everything should be turned over.

19   BY MR. LOEVY:

09:48:09   20   Q.  All right.  But in this case and others, some of the

21   documents that didn't get turned over are relatively benign,

22   correct?

23   A.  That's correct.

24   Q.  I'm going to show you Plaintiff's Exhibit 268, which is a

09:48:20   25   subset of the subset.  All right.

1      These are documents that were not turned over to

2  Mr. Wadas, didn't make it into his file that may or may not

3  have had significance.  And this is page 2.

4          MR. LOEVY:  If we could have the Elmo, please.

09:48:33  5  BY THE WITNESS:

6  A.  I'm sorry?

7  BY MR. LOEVY:

8  Q.  I'm going to just put these in the Elmo and just ask you to

9  identify them.  I'm not going to ask you to comment on them or

09:48:43  10  give an opinion about whether or not they're exculpatory, but I

11  just want to identify them.

12  A.  Okay.  I hope they're a little dryer than this set.

13  Q.  Yes.  Sorry about that.  I spilled on them.

14          MS. ROSEN:  Do you have a copy for me?

09:48:56  15          MR. LOEVY:  Yes.

16          (Said item tendered.)

17  BY MR. LOEVY:

18  Q.  All right.  Can you identify page 2 of 268?

19  A.  Yes, this is a Chicago Police Department investigative file

09:49:09  20  inventory form.  It was the first of two pages, I believe.

21  Q.  All right.  And were inventory forms the kinds of documents

22  that you found missing in all the other files you reviewed,

23  too?

24  A.  In most of my files.

09:49:26  25  Q.  Do you remember the number?

1  A.  I don't have it right here in front of me, but I think I

2  testified to it Friday.  50% of the permanent retention files

3  didn't have inventories.

4  Q.  All right.  And then --

09:49:42    5       MS. ROSEN:  Mr. Loevy, I'm sorry to interrupt, but is

6  this 268 that you're showing him or 269?

7       MR. LOEVY:  268.

8       MS. ROSEN:  You gave me 269.

9       MR. LOEVY:  Sorry.

09:49:52   10       (Said item tendered.)

11  BY MR. LOEVY:

12  Q.  Why are inventories important to get turned over to

13  criminal defense attorneys?

14  A.  Well, in Chicago's system since there isn't this central

09:50:05   15  single investigative discovery file that contains everything,

16  since they chose to have a permanent retention folder, their

17  initial effort was to allude to, for lack of a better word, by

18  use of an inventory form what could be found in the parallel

19  investigative file.

09:50:30   20       And so it became critically -- or it becomes

21  critically important that everything that could be found in an

22  investigative file is inventoried and put into the permanent

23  retention file.  So that as the criminal defense attorney or

24  the assistant state's attorney gets the permanent retention

09:50:53   25  file also has this file inventory and can see, "oh, here's

1  something that's mentioned that's in an investigative file,

2  I'll ask for that, too."

3  Q.  And that was an important part of the policy changes that

4  the City enacted after Jones and Palmer, right?

09:51:10  5  A.  That was an attempt to do that, yes.

6  Q.  And what proportion of the criminal defense attorney files

7  did they actually get the inventories?

8  A.  Again, I don't have it right in front of me.

9  Q.  Do you have that cheat sheet that you made?

09:51:27  10  A.  Yes.

11  Q.  At the bottom.

12      Looks like 3 out of 38 cases, according to your

13  report, the criminal defense attorney didn't get the

14  inventory?

09:51:43  15  A.  6 out of 38 was to-from memos.

16  Q.  Not the to-from memos, the inventory.  The last two lines.

17  Only 8 percent of cases did criminal defense attorneys even

18  receive --

19  A.  Yes.  I'm sorry to have to work my way down so slowly, but

09:52:03  20  my last bullet point at only 8% did the criminal defense

21  attorney even received the inventory.

22  Q.  That's on page 43 --

23  A.  92% of the time they didn't, yeah.

24  Q.  All right.  You did not memorize all the statistics?

09:52:16  25  A.  No.  I'm sorry to fumble there, but ....

1  Q.  All right.  Showing you a copy of page 4, another document

2  that was not in Mr. Wadas' file but was in the investigative

3  file.

4          Can you identify for the jury what kind of document

09:52:29  5  that is?

6  A.  This is a general progress report.  It is an official

7  police form designed by the Chicago Police Department but is

8  not required to be included in the permanent retention file.

9  And in this case, it is a general progress report from the --

09:52:54  10  Q.  Without commenting on the significance for it in this case,

11  was this the kind of document that you saw missing from the

12  criminal defense attorney files in the review that you

13  performed?

14  A.  Yes.

09:53:04  15  Q.  Showing you page 5, a rap sheet of a Jose Rios, which also

16  has Jacques's name on it, issued on inquiry.

17          This is another document that was in the investigative

18  file but not in Mr. Wadas' file.  Was this typical of the kind

19  of document that criminal defense attorneys were not receiving?

09:53:25  20  A.  That's correct.

21  Q.  And showing you page 6 and page 8, two arrest reports with

22  Mr. Guevara's name on it of arrest of Jacques Rivera.

23          Those also were documents that Mr. Wadas did not

24  receive?

09:53:38  25  A.  That's correct.

1  Q.  And showing you page 11, 268.

2         This document we've been talking about here in the

3  last couple of weeks with Mr. Villafane, Mr. Olivero, Mr.

4  Rivera.  Was this the kind of document that also was not turned

5  over to criminal defense attorneys?

6  A.  That's correct.

7  Q.  Showing you page 12.

8         Macho Lopez has not been interviewed as of the 27.

9  This also is the kind of GPR we've been discussing, correct?

10 A.  That is correct.

11 Q.  Now, showing you this page 9, would it be fair to call this

12 an administrative document?

13 A.  This would be, in normal police parlance, would be

14 considered, intended to be an administrative-type document.

15 Q.  All right.  And was this typical of the kind of documents

16 that you found in the investigative files but not making it to

17 the criminal defense attorneys?

18 A.  That's correct.

19 Q.  And it says here:

20         "... It's expected the prisoner will be charged

21         with aggravated battery when the investigation

22         is completed on September 2nd ..."

23          talking about someone other than the suspect.

24         Even though this is an administrative document, not

25 talking generally but -- not talking specifically but

1  generally, can administrative documents be important to

2  criminal defense attorneys?

3  A.  Right.  Again, I mentioned that I think on Friday, that

4  since you never know what could be important, either for

09:54:56  5  prosecution or defense, it may -- this type of document, in

6  general circumstances, could be used to either discount or

7  disprove something that was a companion issue.

8  Q.  All right.  Let's talk about some of the cases.

9        You looked at a number of cases, right?

09:55:19  10  A.  Yes.

11  Q.  And not just in Jacques Rivera, but in prior cases as well,

12  right?

13  A.  That's correct.

14  Q.  And you were paid for your time to do that review,

09:55:26  15  correct?

16  A.  I was.

17  Q.  Do you know how many total hours you spent on this project

18  over the course of the 3, 4, 5 cases you've done?

19  A.  I honestly don't -- I've been deposed and I provided those

09:55:40  20  hours in each of the cases.  They run into the hundreds.

21  Q.  And how about in the Jacques Rivera case, how many hours

22  did you bill for?

23  A.  Up until the deposition by the City, I believe somewhere in

24  the neighborhood of close to 100 hours.

09:55:56  25  Q.  All right.  And do you know approximately how much you

1  billed in this case?

2  A.  No.  In excess of 100 hours.

3  Q.  All right.  So somewhere between 30- and 40,000 dollars?

4  A.  That sounds about right.

09:56:11  5  Q.  And did you do a lot of work for that?

6  A.  I did.

7  Q.  And do you have any other -- in your entire professional

8  career as a consultant, have you ever done a project that was

9  this time-consuming and this resource-intensive?

09:56:24  10  A.  As an aggregate of all the three cases?

11  Q.  Yes.

12  A.  No.  Never.

13  Q.  All right.  I'm going to show you not all of the files you

14  reviewed, but some of them.

09:56:32  15      I want to start with the Samuel Robinson case, and

16  show you an example of a document.  This is Bates stamped 13648

17  in the Robinson file?

18      MR. LOEVY:  Anand, do you know the exhibit number?

19      MR. SWAMINATHAN:  Plaintiff's Exhibit 154.

09:56:49  20  BY MR. LOEVY:

21  Q.  This is Plaintiff's Exhibit 154.

22      Can you tell the jury the kind of document we're

23  looking at here.

24  A.  This is a document not on --

09:56:59  25      MR. LOEVY:  Oh, the jury screen is not up, Your Honor.

1          And, Your Honor, we move this into evidence.

2          THE COURT:  Any objection?

3          MS. ROSEN:  Can you identify what that document is?

4     Bates number?

09:57:09    5          MR. LOEVY:  It is 13648.  It is a memo that was in the

6     investigative file but not the permanent retention or criminal

7     defense attorneys file.

8          MS. ROSEN:  Well, you know?  I'm going to object to

9     you testifying.

09:57:22   10          MR. LOEVY:  You asked me to identify it.

11          THE COURT:  You asked.  Can the witness identify the

12     document?

13          MR. LOEVY:  I believe so.

14          THE COURT:  All right.  Do it that way.

09:57:29   15     BY MR. LOEVY:

16     Q.  Mr. Brasfield?

17     A.  I cannot give you the specific case file that it came from,

18     but I've had occasion to look at this from the original

19     material that I reviewed and I have relied on it, in part, in

09:57:47   20     forming my opinions.

21          MR. LOEVY:  All right.  We would move this into

22     evidence, Your Honor.

23          THE COURT:  All right.  Is there an objection to

24     this?

09:57:52   25          MS. ROSEN:  There's an objection until I know what the

1  RD number is.

2  MR. LOEVY:  The RD number is 581836.  581836.

3  MS. ROSEN:  All right.

4  THE COURT:  It's received.

09:58:15  5  (Plaintiff's Exhibit No. 154 was received in

6  evidence.)

7  MR. LOEVY:  Your Honor, we would ask permission to

8  publish this memo.

9  THE COURT:  You may.

09:58:22  10  BY MR. LOEVY:

11  Q.  Can you tell us what we're looking at here?

12  A.  This is what I would refer to as a to-from memo.  Sometimes

13  the to-from memos are somewhat antiquated printed to-from

14  memos, but this one is obviously a typewritten note from one

09:58:44  15  detective or one police employee to another regarding what's

16  self-evident on the face of it, that a citizen called, an

17  anonymous citizen, and provided information about a possible

18  alternative suspect.

19  Q.  All right.  Is this the kind of information that should've

09:59:08  20  been turned over to the criminal defense attorney?

21  A.  Yes.

22  Q.  And it wasn't?

23  A.  No.

24  Q.  All right.  Is that -- that is an example of a systemic

09:59:19  25  problem?

1  A.  This is the type of thing, this would be an example that's

2  indicative of the types of things that I would find in

3  reviewing investigative files that would be generally missing

4  from the permanent retention file.

09:59:32  5  Q.  All right.  Let's talk about another case, the Fields case.

6  This is Plaintiff's Exhibit 146, page 950.

7       MR. LOEVY:  Your Honor, permission to show this to the

8  witness before we show it to the jury.

9       MS. ROSEN:  Judge, I have a standing objection to all

09:59:52  10  of the documents as to the Fields case for the reasons that

11  we've expressed.  And, quite frankly, I think the Court

12  sustained the objection to the documents from the Fields case

13  in the ruling.

14       MR. LOEVY:  Your Honor, these are the files he

10:00:02  15  reviewed to form his opinions.

16       THE COURT:  If you want to make it more specific to

17  me, it would be great, but I don't know that I made any

18  categorical ruling about --

19       MS. ROSEN:  Judge, the City objected to the entry of

10:00:15  20  the documents from Fields because Mr. Brasfield did not rely on

21  the documents from Fields in rendering the opinions in this

22  case.  He simply relied on the Fields report.

23       THE COURT:  Well, let me ask you this, were these

24  documents given to Mr. Brasfield?

10:00:30  25       MR. LOEVY:  Absolutely.

1       THE COURT:  And did they lead to a conclusion?

2       RIGHT SIDE:  Absolutely.

3       MS. ROSEN:  But, Judge, they were given to him in the

4   Fields case.  He expressly said he wasn't relying on the

5   underlying --

6       THE COURT:  You know what?  If you want to show me the

7   ruling, show it to me, because I'm not following.

8       Is it a motion in limine?

9       MS. ROSEN:  It is, Judge.

10      THE COURT:  And which motion in limine is it, because

11  maybe we can find it.

12      MR. SWAMINATHAN:  City's motion in limine number 6, I

13  believe.  Your ruling is docket 552, and the ruling is on

14  page 15.

15      THE COURT:  All right.  Let me just take a look at

16  this.

17      (Brief pause).

18      THE COURT:  We've got it.  So let me get it printed

19  out.

20      (Brief pause).

21      THE COURT:  I want to just remind the lawyers that I

22  said that I need to see the motions if you're going to rely on

23  some ruling.  And it wastes our time if you don't have them and

24  we got to find them and print them out.

25      (Brief pause).

                1    THE COURT:  Is it coming?

                2    COURT'S LAW CLERK:  Yes.

                3    MR. LOEVY:  Your Honor, can I back up and lay a better

                4  foundation?

10:02:05    5    THE COURT:  I have no idea, because I don't know what

                6  the ruling says.  I don't have them all committed to memory.

                7    (Brief pause).

                8    THE COURT:  How many pages do I need?

                9    MS. ROSEN:  Judge, page 14 of the ruling, docket 552.

10:02:44   10    THE COURT:  I've got 552, but I don't have 14.

               11    MS. ROSEN:  I'll hand it up to you --

               12    THE COURT:  Wait.  I have it now.

               13    MS. ROSEN:  Okay.

               14    (Said item tendered.)

10:03:07   15    THE COURT:  Can you stop the printing, if you can.

               16    COURT'S LAW CLERK:  Yes.

               17    (Brief pause).

               18    MS. ROSEN:  It's the middle paragraph.

               19    THE COURT:  Yeah, I'm reading it.

10:03:25   20    MS. ROSEN:  Okay.

               21    (Brief pause)

               22    THE COURT:  Well, let me ask you this, there was no

               23  categorical bar.  It was just a request of counsel to alert

               24  everyone to anything that he intended to use.  And I think we

10:03:43   25  now know it's being used, and it's being used the way other

1    documents were used.  I don't know if you gave notice or not.

2    It would've been helpful.

3            MR. LOEVY:  Well, it's page 67 and 68 of his report,

4    that he relied on this, you know, heavily.

10:03:57    5            MS. ROSEN:  Judge, and these documents were not

6    produced in discovery in the case.  The Fields documents were

7    not produced in discovery in this --

8            THE COURT:  Well, if he refers to it in this report, I

9    think that's adequate.

10:04:06   10            MS. ROSEN:  But if he expressly says that he's not

11    relying on the underlying source document and he's simply

12    relying on his whole opinion --

13            THE COURT:  This ruling does not give any kind of

14    prohibitive bar.  It simply says there needs to be notice

10:04:22   15    because there's been a lack of specificity in terms of how much

16    he's going to use from these cases.

17            MR. LOEVY:  And it's not much, Your Honor.

18            THE COURT:  I'm going to overrule the objection.

19            MR. LOEVY:  All right.  We would ask permission to

10:04:28   20    show Plaintiff's Exhibit 146, page 950.

21            THE COURT:  Okay.

22            MR. LOEVY:  And we can call this 146 A.

23            THE COURT:  And there's an objection to 146 A, I

24    assume, but I'm overruling it and it will be received.

10:04:47   25

1    (Plaintiff's Exhibit No. 146 A was received in

2   evidence.)

3    MR. LOEVY:  All right.  And if we could publish this

4 then to the witness, please.

10:04:50 5 BY MR. LOEVY:

6 Q.  Can you provide some context for the kind of document we're

7 talking about -- first of all, is this a document that was in

8 the criminal defense attorney file or not in the criminal

9 defense attorney file?

10:04:58 10 A.  This would've been not in the criminal defense attorney's

11 file.

12 Q.  All right.  Can you give us some context for why this is

13 the kind of document that's important?

14 A.  This is a general progress report produced on a City of

10:05:12 15 Chicago Police Department form.  And as I've mentioned, other

16 than the requirement that GPRs be inventoried, they're not

17 included in the permanent retention for discovery.

18    This is an example of one that was not produced.  And

19 it describes receiving a phone call who the caller indicated

10:05:36 20 that a Rodell Banks was the person who had shot the people on

21 39th Street.  This would be the type of information, however

22 eventually it turned out to be true or not true, would be the

23 type of thing that a criminal defense attorney would need, the

24 defendant would need to mount an effective defense.

10:05:57 25 Q.  And to be clear, the criminal defendant in this case was

1  not Rodell Banks, it was a man named Nate Fields, correct?

2  A.  That's correct.

3  Q.  All right.  Showing you Plaintiff's Exhibit 146 B, which is

4  page 921 of the same exhibit.

5  Can you identify the kind of document we're talking

6  about here?

7  A.  This is what's been referred to obviously as a handwritten

8  memo.  And it refers to --

9  MS. ROSEN:  Judge, I have an objection.

10  This is a different exhibit, correct?

11  MR. LOEVY:  Yes.  146 B.

12  MS. ROSEN:  Okay.  So it's on the screen.  I have an

13  objection to it.

14  THE COURT:  So this is for the same reason?

15  MS. ROSEN:  For the same reason.

16  THE COURT:  Okay.  That objection is overruled.  You

17  may publish it.

18  BY THE WITNESS:

19  A.  And it indicates that about 0900 hours in a stairwell, he

20  said that he was going to get a gun and that he would put on

21  masks.  And Lawrence also said he would -- wouldn't live

22  through the night, and Marshall said he would be jumping --

23  "won't be jumping on you anymore."  This, again, is referring

24  to someone other than Mr. Fields.

25  Q.  Is this the kind of information that Mr. Fields should've

1  had in the criminal defense trial?

2  A.  Yes, I would expect that to be.

3       MS. ROSEN:  Judge, just for purposes of the record,

4  this document I've never seen it before.  It's never been

10:07:17  5  produced.

6       MR. LOEVY:  It's a plaintiff's exhibit, Your Honor.

7       MS. ROSEN:  It's never been --

8       THE COURT:  Hold on.

9       It's never been produced?

10:07:22  10       MS. ROSEN:  Never produced in discovery in this case

11  at all.

12       MR. LOEVY:  Your Honor, it's a plaintiff's trial

13  exhibit.  They have all our trial exhibits.

14       MS. ROSEN:  But --

10:07:29  15       THE COURT:  Okay.  Let's not have a fight about it.

16  You're telling me that it was made available with other

17  exhibits?

18       MR. LOEVY:  We gave them all our trial exhibits, Your

19  Honor.

10:07:39  20       MS. ROSEN:  Before trial.  Just before trial.

21       THE COURT:  Overruled.

22  BY MR. LOEVY:

23  Q.  All right.  This one is not on a GPR, correct?

24  A.  That's correct.

10:07:46  25  Q.  Does that show evidence of compliance with the rules?

1  A.  No, it is clear, noncompliance with the rules.

2  Q.  All right.  Showing you 146 C.

3      MR. LOEVY:  And same type of document, Your Honor.

4  Last one from the Fields case.  We'd ask permission to move 146

5  C into evidence.

6      MS. ROSEN:  Same objection.

7      THE COURT:  And I will also overrule that objection.

8  It will be received.

9      (Plaintiff's Exhibit No. 146 C was received in

10      evidence.)

11  BY MR. LOEVY:

12  Q.  All right.  This is another document that did not make it

13  to the criminal defense attorney's file, correct?

14  A.  Yes.

15      THE COURT:  How are you marking this?

16      MR. LOEVY:  C.  It says "A" but it should be "C."

17      THE COURT:  Okay.  All right.

18  BY MR. LOEVY:

19  Q.  Can you explain what this document is?

20  A.  In police parlance, it's a rap sheet.  It's the

21  identification section listing of an arrest of an individual.

22  In my review of these hundreds of cases, that when it's

23  produced by the ID or record section to whoever it's asked for,

24  it's date stamped.  This one is April 27, '84.  What this

25  refers to is Earl Hawkins.

1  Q.  Now, without getting into too much detail about the Fields

2  case, could it be exculpatory if this guy, Hawkins, was a

3  suspect on April 27th, that might play into the chronology of

4  the case, correct?

10:09:09
5  A.  That's correct.

6  Q.  Now, can you know from looking at all these files whether

7  this date turned out to be important in the Fields case as

8  being before he was supposed to be a suspect?

9  A.  I can't --

10:09:20
10             MS. ROSEN:  Objection.

11             THE COURT:  Wait a minute.  Wait a minute.

12             What's the objection?

13             MS. ROSEN:  He's making an analysis of whether or not

14  it's important in the Fields case.

10:09:27
15             MR. LOEVY:  I'm asking if he can.

16             Could I ask a better question, Your Honor?

17             THE COURT:  Well, I thought we weren't going to do

18  that.

19             MR. LOEVY:  This is the Fields cases.  May I ask a

10:09:36
20  different question?

21             THE COURT:  Sure.

22  BY MR. LOEVY:

23  Q.  When you review these files, is it hard to know if a

24  particular document like this one had significance on the

10:09:44
25  Fields fact pattern?

1    A.  It's very difficult to, but it would require considerable

2    time to cross-check.

3    Q.  All right.  So this might be a benign document or it might

4    be a smoking-gun document, it's hard for you to know, correct?

10:09:58    5    A.  That's correct.

6    Q.  All right.  Let's talk about the Kluppelberg case.

7         This is another example of a file that turned up after

8    the criminal trial and included documents that didn't make it

9    to the criminal defense attorney, correct?

10:10:13   10    A.  That's correct.

11        MR. LOEVY:  All right.  I'd like to introduce at this

12    time Plaintiff's Exhibit 145 A, which is a handwritten note

13    from the investigative file that was found on the pallet.

14        MS. ROSEN:  Judge, I have the same objection to the

10:10:27   15    Kluppelberg documents.

16        THE COURT:  Was this also a trial exhibit?

17        MR. LOEVY:  Yes, Your Honor, Plaintiff's Exhibit 145.

18        THE COURT:  I will receive it.

19        (Plaintiff's Exhibit No. 145 A was received in

10:08:05   20        evidence.)

21    BY MR. LOEVY:

22    Q.  All right.  Can you give us some context for what we're

23    looking at here.

24    A.  Again, this would be a handwritten memo that would've been

10:10:40   25    in the investigative file that did not make it into the

1  permanent retention file for discovery.

2  Q.  And just to be clear for the context, Mr. Kluppelberg was

3  accused of an arson murder, correct?

4  A.  That's correct.

10:10:51  5  Q.  So why is this kind of information important?

6  A.  Well, Mr. Kluppelberg was accused and eventually convicted

7  of a fire that occurred in 1984 that killed six people.  It was

8  originally investigated and determined by both bomb and arson

9  and Violent Crimes as unknown origin or accidental and laid

10:11:18  10  dormant for a number of years.

11      And then -- but in the original investigation, there

12  were several things that were -- that came to light that were

13  included in the investigative file.

14  Q.  Such as this document?

10:11:33  15  A.  Such as this that alludes to the fact that a Minerva Herst

16  (phonetic) had indicated to the investigators that there were

17  extension cords all over the basement floor and that it was a

18  hazardous condition.

19  Q.  All right.  Showing you 145 B.

10:11:51  20      This is another handwritten note.  It looks like an

21  interview of some kind of with a name and a date?

22  A.  Yes.

23  Q.  Was this a document that was in the investigative file but

24  not in the official file?

10:12:02  25  A.  That's correct.

1  Q.  Is this problematic that this kind of information didn't
2  get turned over?
3  A.  Yes, because, on its face, that there was an individual who
4  had had an argument with the victim of the fire, and would lead
10:12:18  5  an individual to whether it was a criminal defense attorney or
6  investigator, that there may be -- if it was, in fact, a
7  malicious crime, that it might have a different suspect.
8  Q.  All right.  Do you remember -- this is a case you worked
9  on, the Kluppelberg case, correct?
10:12:35  10  A.  Yes.
11  Q.  Do you remember another suspect named Isabela Ramos and a
12  reason the police had to suspect she may have been involved?
13  A.  There was information came during the original 1984
14  investigation and contained in the investigative file that
10:12:49  15  there was a lady that had set fires in that immediate vicinity,
16  had a drug alcohol problem, as I recall, and could possibly
17  have set the fires and couldn't quite remember whether she
18  might have or not.
19  Q.  All right.  Was that the kind of information that should've
10:13:06  20  been turned over?
21  A.  Yes.
22  Q.  And when you reviewed the files, did you see other
23  information like that that should've been turned over and
24  wasn't?
10:13:13  25  A.  Yes, that's correct.

1  Q.  All right.  And showing you -- I'm not going to go through

2  all the files.  Obviously, some of the files contained

3  information that was more important than others that wasn't

4  turned over, correct?

10:13:26   5  A.  That's correct.

6  Q.  And some of them were sort of cryptic some of the

7  information that didn't get turned over, names, phone numbers,

8  license plates, that kind of thing?

9  A.  Yes.  There were several examples of just a one-line note

10:13:40   10  that could've been important, might not have been important,

11  but evidently the person that wrote it down, who did not

12  identify themselves in each occasion, thought it was important

13  enough to include in the investigative file.

14  Q.  All right.  I want to show you only one more file, the

10:14:00   15  Demetrius Johnson file, which is part of Plaintiff's

16  Exhibit 154.

17        And showing you a copy of a report from the permanent

18  retention file --

19        MR. LOEVY:  And, Your Honor, we'd move 154 J into

10:14:22   20  evidence.

21        THE COURT:  Any objection?

22        MS. ROSEN:  No objection.

23        THE COURT:  It is received.

24        (Plaintiff's Exhibit No. 154 J was received in

10:14:26   25        evidence.)

1  BY MR. LOEVY:

2  Q.  It looks like this is a lineup report that was in the

3  permanent retention files, Guevara report, dated 12th of June,

4  2300 hours, conducted by a Mr. Guevara.  And it looks like the

5  person viewing the lineup was Aby Gonzalez.  You've seen this

6  document, right?

7  A.  Yes, I have.

8  Q.  And the important thing here is that it was 11:00 o'clock

9  at night on June 12th, 1991, correct?

10  A.  That's correct.

11  Q.  Now, it looks like, based on this police report, that was

12  in the permanent retention file.  Does that mean this police

13  report was turned over?

14  A.  Yes.

15  Q.  It looks like the suspect here -- I just want to -- it

16  looks like it's a negative lineup.  And it says:

17       "... after four witnesses viewing this lineup,

18       the results were negative.  Because the results

19       of the lineup was negative, the subject was

20       released without charging."

21       It looks like Brian Jones is the guy they were

22  interested in, do you see that?

23  A.  Brian Jones, yes.

24  Q.  And showing you a copy of a report that was in the

25  investigative file that was not turned over.

1    MR. LOEVY:  This is Plaintiff's Exhibit 154 K, Your

2  Honor.

3  BY MR. LOEVY:

4  Q.  And this one was created looks like a day later on the

5  13th of June of 1991 at 1700 hours.  Do you see that?

6  A.  Yes.

7    MS. ROSEN:  Judge, I'm going to object to the term

8  "created."  There's no foundation for that.

9    THE COURT:  Sustained.

10  BY MR. LOEVY:

11  Q.  Well, it's dated 13th of June at 1700 hours, correct?

12  A.  Yes; referring to an event on June 12th.

13  Q.  All right.  Referring to an event that happened on

14  June 12th at what time?

15  A.  2230 hours.  10:30 p.m.

16  Q.  All right.  So that would be about a half hour before this

17  lineup that we just talked about, correct?

18  A.  That's correct.

19  Q.  And in this report, it looks like Aby Gonzalez, same person

20  doing the lineup, right?

21  A.  It's the same name, yes.

22  Q.  And, again, we have Brian Jones as one of the volunteers in

23  the lineup, right?

24  A.  Brian Jones, yes.

25  Q.  All right.  This report that was in the investigative file

1    contains different information than the one in the permanent

2    retention file, does it not?

3    A.  The highlighted section indicates that he did, in fact,

4    identify the participant as the offender.

10:16:49    5    Q.  All right.  As a professional in your field, why is it

6    important that the document that says he did identify this

7    alternate offender, why does that have to get turned over, too,

8    in addition to the one where he said he didn't?  Same person.

9    A.  Ah, I don't know how to explain why -- why you wouldn't.  I

10:17:11    10    mean, it is -- it is some conflicting information that it needs

11    to be.  It just calls out for further investigation and

12    explanation.

13    Q.  In other words, if the permanent retention file contained a

14    lineup report saying that 11:00 o'clock at night Aby Gonzalez

10:17:28    15    failed to identify the alternate suspect, and then there was

16    another report --

17        MS. ROSEN:  Objection to the phrase "alternate

18    suspect," Your Honor.

19        THE COURT:  Sustained to the form.

10:17:37    20    BY MR. LOEVY:

21    Q.  Brian Jones was not the person on trial in People of

22    Illinois versus Demetrius Johnson, correct?

23    A.  Correct.

24    Q.  All right.  So if there was another report half hour

10:17:47    25    earlier that said that the same witness, Aby Gonzalez, had

1  identified the alternate suspect, Brian Jones, as the offender,

2  that's the kind of thing that should've been turned over,

3  right?

4  A.  Absolutely.

10:18:05  5  Q.  Even if the first lineup was created by -- the first report

6  was created by Detective Guevara and the second report was

7  created by Detective Erickson, does that reduce the requirement

8  to turn this kind of information over?

9  A.  Absolutely not.

10:18:24  10  Q.  All right.  Were there other examples in the file you

11  reviewed, without going through file by file, by file, by file?

12  A.  Yes.  Of similar instances, yes.

13  Q.  All right.  And if Ms. Rosen was to show you file by file,

14  by file, by file, there would be a lot of examples of documents

10:18:45  15  that weren't necessarily important, would you agree with that,

16  too?

17  A.  I would.

18  Q.  So why did you list the documents also that weren't as

19  important along with documents that were as important when you

10:18:54  20  were describing what was missing?

21  A.  I'm sorry, would you --

22  Q.  Sure.

23  A.  -- state that again.

24  Q.  Did you make any editorial decision about only list the

10:19:02  25  important missing stuff or did you list all the missing stuff

1  when you compiled your statistics?

2  A.  With the spread sheet that we demonstrated on Friday, that

3  was everything objectively, whether it was valuable or not

4  valuable, or potentially important or not potentially

5  important.

6  Q.  Why was it important in your analysis not to make a value

7  judgment about whether it was important or it wasn't

8  important?

9  A.  I was trying to illustrate the theme or the pattern of

10  noncompliance with the orders for discovery, and to emphasize

11  the fact that there was a systemic pattern of parallel files.

12  Q.  All right.  Were you -- like if you saw a note with a

13  license plate or a phone number or a name in a given

14  investigation, were you necessarily in a position to know how

15  much significance it always had?

16  A.  No, I was not.

17  Q.  All right.  You also included in your analysis

18  administrative documents.  Can you list the kinds of

19  administrative documents we're talking about?

20  A.  There were court attendance, there were -- there's a form

21  that is required that's kind of like a library check-out card

22  for when a file has been taken out of a particular location.

23  While you can call it an administrative file, the inventory was

24  certainly there as an administrative effort as opposed to an

25  investigative effort.

1  Q.  Could those kinds of, quote, administrative documents, also

2  turn out to be exculpatory?

3  A.  Yes.

4  Q.  For example, a court record or an attendance record, you

10:20:52  5  never know when it might become important in a case whether a

6  person was on duty or off duty, correct?

7  A.  That's correct.

8  Q.  And were those the kinds of documents that were or weren't

9  making into the file that got turned over?

10:21:05  10  A.  They were not making it into the files.

11  Q.  All right.  Approximately -- based on your numbers and your

12  report, and I think it's on page 43 of your report, bullet

13  point 4 of your cheat sheet, approximately what percent of the

14  time were the files you reviewed missing investigative

10:21:22  15  materials of the 38 cases?

16  A.  Well, of the -- I'm sorry, if you can speed the process up

17  here.  If you'll direct me to it.

18  Q.  It's --

19  A.  Page what?

10:21:33  20  Q.  Page 43 of your report or it's the first bullet point under

21  4 A in the bottom third of your summary.

22  A.  Well, on page -- I'm sorry to interrupt, but on page 43 of

23  my report the handwritten notes and general progress report,

24  74% were missing on official handwritten notes.  10% -- I'd go

10:21:56  25  down the stats here if you want but --

1    Q.  Well, the sort of summary stat, how many out of 38 we

2    missing at least some investigative materials?

3    A.  I believe that was 100%.

4    Q.  All right.  So in wrapping it up, you talked yesterday

10:22:15    5    about the policies of the police department and whether you

6    thought they were sufficient and insufficient.  And I believe

7    you said that you thought that it was an insufficient solution,

8    right?

9    A.  Yes.

10:22:26    10   Q.  But based on the fact on the file-by-file document review

11   that you did and gave some examples for, do you believe that

12   the police department had a problem in practice as far as

13   implementing these supposed rules that were supposed to fix

14   things?

10:22:40    15   A.  Yes, the material that I reviewed in hundreds and hundreds

16   of cases, that the actual practice was such that it was not --

17   that it indicated there were parallel files and that the

18   material was not -- significant material was not being turned

19   over to discovery.

10:22:57    20         MR. LOEVY:  I have no further questions, Your Honor,

21   thank you.

22         THE COURT:  Okay.  Cross-examination.

23         MS. ROSEN:  Your Honor, if I understood correctly,

24   Mr. Brasfield is using some kind of summary or bullet points

10:23:08    25   assistance in his testimony.  So if I heard that correctly, I

1  don't have --

2       MR. LOEVY:  I have a copy here.

3       THE COURT:  Okay.  Thank you.

4       (Said item tendered.)

10:23:33  5       MS. ROSEN:  Judge, are we going to take a break soon

6  or are you --

7       THE COURT:  Well, yeah, we haven't been going for an

8  hour.  I've been trying to push to an hour and a quarter.

9       MS. ROSEN:  Yeah.  So there's some stuff we need to

10:23:45 10  set up, but I can wait and then do that at the break.

11       THE COURT:  Let's try to push on for at least 10

12  minutes, 15 minutes.

13       MS. ROSEN:  Yes.  Thank you.

14                    CROSS EXAMINATION

10:23:58 15  BY MS. ROSEN:

16  Q.  Good morning, Mr. Brasfield.  How are you?

17  A.  Very good, Ms. Rosen.  Thank you.

18  Q.  I want to start with your global opinions.  And if I

19  understood your testimony on Friday and this morning, you hold

10:24:29 20  an opinion that the Chicago Police Department's policies and

21  practices, both written policies as well as how they played out

22  in practice, were deficient because they didn't provide the

23  criminal defense attorneys or criminal defendant with the

24  discovery that they're entitled to, do I have that generally

10:24:47 25  correct?

1    A.  Generally correct, yes.

2    Q.  Okay.  And in an effort to evaluate the City's policies and

3    procedures, if I understand your testimony correctly, you

4    looked four sets of files, correct?

10:25:05    5    A.  The investigative files, the permanent retention files, the

6    criminal defense attorney files, and, to a lesser extent, a few

7    of the assistant state's attorney files.

8    Q.  Okay.  And for purposes of your opinions in this case, you

9    looked at 138 investigative files, is that correct?

10:25:38    10    A.  Actually there were 52 Area North files, there were 138 in

11    the central area, or Area 5, that would total 190.  As I said,

12    I think in my testimony on Friday, there were some that had

13    multiple defendants and there were some that were redacted.  So

14    the base universe, as I referred to it, was around 190.

10:26:16    15    Q.  So the total number of investigative files that you had at

16    your disposal in this case was 190, right?

17    A.  That's correct.

18    Q.  And 52 of those files, it was your understanding, came from

19    the police facility called Area North, correct?

10:26:32    20    A.  That is my understanding, yes.

21    Q.  And those 52 Area North investigative files, you had no

22    companion permanent retention or records division files,

23    correct?

24    A.  There were eventually files that produced to correspond

10:26:52    25    with the 180 or so that I looked at.

1  Q.  Well --

2  A.  But some were not available.

3  Q.  Okay.  So let me just -- listen to my question.  Okay?

4         So with respect to the total 190, the 52 Area North

10:27:09  5  files did not have the companion permanent retention or records

6  division files, is that correct?

7  A.  That may be my recollection.  I'm not sure.

8  Q.  And we can take a look at your attachments --

9  A.  Okay.

10:27:24  10  Q.  -- in a minute, if that would help you.

11        But regardless, with respect to the total number of

12  investigative files, 52 were from Area North and 138 were from

13  records division storage facility, correct?

14  A.  Where they would normally be, yes.

10:27:44  15  Q.  Okay.  And then you also received what you're calling

16  permanent retention files.  And that's because in homicide

17  cases, when you're looking at those files years later, they

18  have that permanent retention stamp on it, correct?

19  A.  They eventually receive that stamp, yes.

10:28:02  20  Q.  Okay.  And that stamp, your understanding is based on your

21  review of the depositions in this case and everything else,

22  doesn't go on those documents immediately, correct?

23  A.  No, it does not.

24  Q.  And, in fact, I think it goes on.  I think the testimony

10:28:13  25  is, some 6 or 7 years after the case is closed, correct?

1  A.  I don't recall reading specifically the time.  It's when

2  the cases close, if you will.

3  Q.  Okay.  And so that's why you're calling those documents in

4  homicide cases permanent retention files, right?

10:28:35   5  A.  That's the terminology that I've seen the City's designated

6  experts refer to it as.

7  Q.  Sure.  And they're also referred to by those same people as

8  records division files, correct?  You've seen that?

9  A.  I've seen that, yes.

10:28:48  10  Q.  All right.  And in the process, you've talked about your

11  criticism of the Chicago Police Department as it relates to its

12  use of centralized files, and we'll get to that more

13  particularly in a minute.

14        But you understand that pursuant to the City of

10:29:03  15  Chicago's processes probably going back all the back to the

16  early 1960's, the records division is where original general

17  offense case reports and supplementary reports are funneled for

18  any investigation regardless of whether it's a homicide or not,

19  correct?

10:29:20  20  A.  That's my understanding.

21  Q.  Okay.  And the records division is the unit of the Chicago

22  Police Department that's required to maintain all of those

23  original documents, correct?

24  A.  All of the documents the Chicago Police Department deems to

10:29:37  25  go there.

1    Q.  Sure.

2    A.  But not all of the records.

3    Q.  Correct.  But my question was specific to general offense

4    case reports and supplementary reports; correct?

10:29:46    5    A.  That's correct.

6    Q.  And you have an understanding, don't you, based on your

7    review in this case and other cases where you've testified

8    against the City of Chicago, that the initial document that's

9    created at the inception of any crime is a document called the

10:29:59   10    general offense case report, correct?

11    A.  That's correct.

12    Q.  Okay.  And it's at that point that the investigation is

13    given a particularized identification number and that's the

14    thing we've all been calling the RD number, correct?

10:30:15   15    A.  The records division number, that's correct.

16    Q.  Correct.  And there's a letter and there's some numbers

17    after it, like N12345, correct?

18    A.  Correct.  Alphanumeric system, yes.

19    Q.  Okay.  And then you are also aware through the work that

10:30:31   20    you've done in connection with your opinions related to the

21    Chicago Police Department, that once a general offense case

22    report is prepared, if there's any follow-up investigation, any

23    document that's created should have that special records

24    division number, correct?

10:30:47   25    A.  That's correct.

1   Q.  And you also know that the typewritten reports that either

2   patrol division officers do, or tactical officers do, or Gang

3   Crimes Specialists do, or even detectives, those typewritten

4   reports go on something called a supplementary report, correct?

10:31:05   5   A.  They're supposed to, yes.

6   Q.  Okay.  But there's also, as you pointed out, post-events

7   that transpired as it relates to Mr. Jones and the Palmer

8   class-action litigation.  The Chicago Police Department created

9   new documents and new forms, correct?

10:31:22   10   A.  That's correct.

11   Q.  And one of the premiere forms, the identifying feature of

12   the new forms is a document called the general progress report,

13   correct?

14   A.  That is a form that was put into existence.  I don't know

10:31:41   15   the exact date.

16   Q.  Sure.  And that began, I think initially, with special

17   order 3-1, if I have that, correct, right?

18   A.  That's my recollection.

19   Q.  Okay.  And the general progress report was the Chicago

10:31:54   20   Police Department's attempt to, for purposes of the Detective

21   Division, standardize note-taking in the course of any criminal

22   investigation, correct?

23   A.  Limited to the Detective Division, yes.

24   Q.  Correct.  And you've seen through your review of all of

10:32:09   25   these files examples of general progress reports where notes

1    have been taken on them, is that correct?

2    A.  Yes, I have.

3    Q.  Okay.  And with respect to the review that you conducted in

4    this case, you looked at the -- we talked about the 52 Area

10:32:31    5    North files, the 138 files that came out of the records

6    division warehouse, and that's the set of investigative files

7    in this case, right?

8    A.  That's correct.

9    Q.  And contained within those investigative files are lots of

10:32:45    10    documents related to the investigation.  The sort of the

11    characteristic document that let's anybody know that it's an

12    investigative file, it's the general progress report, correct?

13    A.  I'm sorry, would you restate that?

14    Q.  Sure.  And you've reviewed lots and lots and lots of

10:33:02    15    investigative files not only in this case but in other cases,

16    correct?

17    A.  Yes.

18    Q.  And the sort of signature feature of the investigative file

19    is that it contains general progress reports, correct?

10:33:12    20    A.  Not necessarily.

21    Q.  They don't all contain --

22    A.  They do not all contain general progress reports.  I would

23    expect them to, but they do not.

24    Q.  Okay.  So the majority contained general progress reports?

10:33:25    25    A.  There are -- there are a number that contain general

1    progress reports, as to be expected.

2    Q.  Okay.  But in your review of all of the records division

3    files or permanent retention files, isn't it true that you

4    found zero general progress reports?

5    A.  In which?

6    Q.  The permanent retention file or the records division file,

7    isn't it true that there are zero general progress reports in

8    those files?

9    A.  In the permanent retention file, correct.

10   Q.  Correct.  Okay.  And that's by design, correct?

11   A.  They're supposed to be included on the inventory that goes

12   with the permanent retention file.

13   Q.  There's supposed -- there's supposed to be a reference to

14   them in the inventory log that would list out GPRs on that log

15   that we've seen and that you've already discussed, correct?

16   A.  There should be, yes.

17   Q.  Okay.  But, in fact, there are no actual hard copies of the

18   general progress reports in the permanent retention or RD file,

19   correct?

20   A.  That's the way it was designed, yes.

21   Q.  That's expressly by design and the City has never said

22   otherwise, correct?

23   A.  That would be correct.

24   Q.  Okay.  Also in your review you talked about the documents

25   to-from memos and then the handwritten notes that didn't appear

1  on the general progress report.  Do you recall that testimony?

2  A.  That they did end up on general progress reports?

3  Q.  No.  Let me slow that down a little bit and get to my

4  point.

10:34:55  5  A.  Please.

6  Q.  You've testified that in addition to finding general

7  progress reports in investigative files, you've also found what

8  we call to-from memoranda, correct?

9  A.  That's correct.

10:35:09  10  Q.  And the characteristic feature of a to-from memorandum is

11  that at the top of the document it says "to" and it's addressed

12  to somebody, and then it says "from" and it's from the person

13  who's typing up the memorandum and then it has information,

14  correct?

10:35:24  15  A.  If it's on a Chicago to-from memo, but, yeah, in general,

16  that's one of the examples that were shown a little earlier

17  this morning.  The essence of the to-from memo was "George,"

18  "Bob," "Jim" subject matter, and the end.

19  Q.  Well, actually in a to-from memorandum there is no Chicago

10:35:46  20  Police Department to-from memorandum form, right?

21  A.  In my review of the files over the last several years,

22  there have been where it says "to:" "from:" "subject:" That's

23  what I would refer to as a to-from memo.

24  Q.  Okay.  But it's not on a preprinted form.  It's somebody

10:36:09  25  saying "to" and the addressee "from" and the -- I mean, you've

1   seen no evidence to suggest that it's some official form from

2   the Chicago Police Department, right?

3   A.  Not that I recall.

4   Q.  Okay.  And so your criticism of the continued use of the

5   to-from memorandum after the changes that were made, after

6   Jones and Palmer, is that, in your opinion, because the Chicago

7   Police Department created the standardized general progress

8   report form, any information that was being prepared on a

9   to-from memo should've actually been prepared on a general

10  progress report, correct?

11  A.  That's correct, because it has to be available.  And if

12  it's not -- if it's a reference to a general progress report,

13  it's on the inventory sheet.  And you'd have a handwritten

14  memo, or a handwritten to-from, or typewritten, and it's not on

15  a general progress report, you may or may not have on the

16  inventory sheet a reference to this informal document.

17  Q.  Okay.  But you did those to-from memorandum in those

18  investigative files, right?

19  A.  I did, yes.

20  Q.  Okay.  And then the other criticism that you have with

21  respect to the contents of the investigative file is that there

22  are notes that are handwritten out that are not on the general

23  progress report form.

24      And it's your opinion that those notes should've been

25  transferred over to the general progress report form because

1  that's the standardized form for note-taking, correct?

2  A.  That's correct.

3  Q.  Okay.  And so what should the police officer do with the

4  original handwritten note?  If they do what you think they

5  should be doing, if they take the information that's on a blank

6  piece of paper that's not on the form, they transfer that

7  information over to the general progress report, what should

8  they do with that note that was taken on a non-GPR form?

9  A.  Well, as I testified to on Friday, since there is no clear

10  guidance from the Chicago Police Department as to what they

11  should do with it, the importance of a handwritten note is

12  going to be represented in the -- in the reference in the

13  general progress report.

14          And if -- if everything contained on the handwritten

15  note, and in a case of a license plate number --  many, many,

16  times I'd see a piece of paper that just had a license plate

17  number or a name.  And if that information, for instance a

18  license plate number, was on the general progress report

19  explaining what it represented, who acquired it, and when, then

20  if that piece of scratch paper was destroyed, shredded,

21  whatever, I would find no problem with that.

22  Q.  Okay.  Well, I'm talking about the circumstance of so

23  police officers, detectives, out on the field, for whatever

24  reason they don't have their general progress report forms,

25  they're interviewing a witness, they take a bunch of notes on a

10:37:54

10:38:14

10:38:40

10:39:06

10:39:26

1    piece of paper, it's your view in that scenario that that

2    information should be transferred from that slip of paper over

3    into a general progress report, right?

4    A.   That was also as I understand in reading the material in

10:39:44    5    Jones and Palmer, that was not only something that they were

6    supposed to do, it was required to do, and they didn't do.

7    Q.   Okay.  So in that scenario, it's your opinion that the

8    Chicago Police Department, post-Jones and Palmer, required

9    Chicago police officers to transfer the information that's on a

10:40:03   10    note on to a general progress report, correct?

11    A.   That information should be placed in a general progress

12    report that can be put on an inventory sheet that will go into

13    the permanent retention file and lead to discovery.

14    Q.   Okay.  What should happen, in your opinion, should the

10:40:21   15    police officer do with that note after they've transferred that

16    information over to the general progress report?

17    A.   I would -- I would even be able to -- to feel the minimum

18    requirement was met if that information was -- was placed on a

19    general progress report and a copy of that entire general

10:40:48   20    progress report, with the note, was inventoried on the

21    inventory sheet and went to the file, but you have this

22    separate piece of paper floating around there.

23         But if, in fact, everything that was on that

24    handwritten note, depending on what it contained, was on a

10:41:05   25    general progress report, that would meet the criteria.

1  Q.  Okay.  But, in fact, what you found, actually, is that

2  those notes were retained in the investigative file, correct?

3  That's how you located --

4  A.  They were -- for lack of a better word, they were hidden in

10:41:20  5  there.  No one knew they were there based on the permanent

6  retention file.

7  Q.  When you say "they were hidden in there," that presupposes,

8  doesn't it, that criminal defense attorneys did not get

9  investigative files, right?  That's the premise for that

10:41:35  10  conclusion?

11  A.  Based on the number of cases I reviewed, that's my

12  conclusion, generally speaking.  I'm not saying that each and

13  every criminal defense attorney failed to get an investigative

14  file.

10:41:48  15  Q.  Okay.  In the course of your review in this case, you

16  compared investigative files to criminal defense attorney

17  files, correct?

18  A.  That's correct.

19  Q.  Okay.  And you compared 44 investigative files to 48

10:42:11  20  criminal defense attorney files, correct?

21  A.  That's what I was provided, yes.

22  Q.  And that's what the number -- I think you told us on Friday

23  that the criminal defense attorney files that we obtained in

24  this case were the only ones that were available that were

10:42:26  25  related to the number of -- the RD numbers that we had for

1  investigative files.  So the total universe that we had, the

2  parties could only locate 48 criminal defense attorney files,,

3  correct?

4  A.  That's correct.

10:42:39  5  Q.  Okay.  And it's 48 criminal defense files against 44

6  investigative files because some of those cases involved

7  multiple defendants, right?

8  A.  Right.

9  Q.  Okay.  So in your Attachment F to your report, isn't it

10:42:57  10  true that in every single criminal defense attorney file you

11  identified documents from the investigative file?

12  A.  That there were -- there were some documents from the

13  investigative file.

14  Q.  Well, let's talk about Mr. Sherman Addison.

10:43:15  15      Isn't it true that there were 69 pages of documents

16  from the investigative file in the criminal defense attorney's

17  file?

18  A.  Given the sheer volume of material that I've looked at, I

19  would have to have it here in front of me.

10:43:29  20  Q.  Okay.  So would you like to have your Attachment F?

21  A.  No, I have Attachment F.

22  Q.  Okay.  Well, take a look at page 4 of Attachment F.

23  A.  Okay.  I'm sorry.

24  Q.  And it says "Sherman Addison," right?

10:43:42  25  A.  Yes.

1    Q.  RD number G063126, right?

2    A.  Right.  With the corresponding Bates numbers.

3    Q.  Okay.  And in your comparison you list investigative files

4    69 pages, right?

10:43:53    5    A.  That's correct.

6    Q.  And the only thing that you note missing from the Sherman

7    Addison file is that ME body chart, right?

8    A.  Medical examiner's body chart, yes.

9    Q.  Okay.  And you know that the Medical Examiner body chart is

10:44:11    10    a document that's created not by the Chicago Police Department,

11    but by the Medical Examiner's Office, correct?

12    A.  And provided to the police department to be put in their

13    investigative file.

14    Q.  And provided to do the state's attorney, correct, in the

10:44:23    15    course of a criminal prosecution?

16    A.  The state's attorney would get that information from the

17    police department.

18    Q.  What's your basis for saying that?

19    A.  Well, in my experience and in the testimony and the

10:44:34    20    depositions I've reviewed, that the state's attorney would

21    request and get information from the police department

22    pertaining to their criminal homicide investigation.

23    Q.  And that's the sole place that the prosecutors went to for

24    their information?

10:44:48    25    A.  No.  I am sure, depending on the prosecutor, they might

1    seek it from other places.

2    Q.  Are you suggesting that there are criminal prosecutions

3    that happened in Cook County in 1985 to 1991 on homicide cases

4    where the medical examiner's report was not provided in the

10:45:04    5    criminal case to either the state's attorney or the criminal

6    defense attorney?

7    A.  That's not what I'm suggesting at all.

8    Q.  Okay.  Now, let's take a look at the next one on your list,

9    Joaquin Gonzalez.

10:45:18    10    You list there investigative file, 52 pages, right?

11    A.  Yes, that's correct.

12    Q.  And the only thing you note missing from the criminal

13    defense attorney file that was in the investigative file is the

14    MD body charts, correct?

10:45:28    15    A.  That's correct.

16    Q.  And you know, before we proceed, isn't it also true that in

17    your review of all of these documents, particularly the

18    criminal defense attorney files, that you do not know and

19    cannot represent that the criminal defense attorney files that

10:45:47    20    we got in connection with the discovery in this case are

21    actually complete files, right?

22    A.  It was put to me that the criminal defense Public

23    Defender's Office provided everything that they had in their

24    files.

10:46:01    25    Q.  But you have seen no evidence in any of the records that

1    the files, as they existed in 2015 or 2016 when we received

2    them in this case, were in the same condition that they were in

3    back in the 1980's or '90s when the criminal prosecutions were

4    going forward, correct?

10:46:23    5    A.  I have no independent knowledge of that, no.

6    Q.  Okay.  So as we sit here today when we're looking at files

7    that are 30 years old, none of us can say that they're in the

8    same condition that they were in when the criminal prosecution

9    was going forward, correct?

10:46:36    10    A.  I can only say that they should be, but I don't know

11    whether they were or not.

12    Q.  And you have no idea what -- and let me back up for a

13    second.  These criminal defense files all came from the Cook

14    County Public Defender's Office, right?

10:46:52    15    A.  That's my understanding, yes.

16    Q.  Okay.  And you have seen no testimony from anybody from the

17    Cook County Public Defender's Office that indicates that these

18    files were in the same condition that they were in back at the

19    time of the criminal prosecution, correct?

10:47:04    20    A.  I recall maybe one or two depositions or one or two source

21    documents where a criminal defense attorney at the time

22    represented that the file contained what they had, but I don't

23    recall independently.

24    Q.  Okay.  Well, I'm going to focus your attention actually on

10:47:21    25    these files that we're talking about.  They're listed in your

1    Attachment F.

2           And with respect to the criminal defense attorney

3    files that are listed in Attachment F, isn't it true that there

4    is zero testimony from any criminal defense attorney related to

10:47:35    5    these particular criminal defense files?

6    A.  These specific ones I don't recall, no.

7    Q.  Okay.  So now taking a look at the next name on the list at

8    page 4, Jesus Hernandez and Jipolito Torres.  It's

9    investigative file, 63 pages, correct?

10:48:00    10   A.  That's correct.

11   Q.  And then the documents that you list as being missing from

12   the criminal defense file is the investigative file inventory

13   that we've talked about, correct?

14   A.  Yes.

10:48:11    15   Q.  Okay.  The felony case computer printout, that's a document

16   that's created and prepared by the Cook County State's

17   Attorney's Office, right?

18   A.  That's my understanding, yes.

19   Q.  And subpoenas that were issued by the criminal defense

10:48:25    20   attorney to the police department, right?

21   A.  Correct.

22   Q.  So certainly the criminal defense attorney should've had

23   copies of his own subpoenas in his file, right?  If it were in

24   the same condition it had been in back in the 1980 and '90s?

10:48:42    25   A.  I was comparing them what was in the investigative file and

1  what wasn't in the criminal defense attorney files, so ...

2  Q.  I appreciate that.  But in the context of evaluating

3  whether or not these files are in the same condition that they

4  were in back in the 1980s, isn't it true that you would expect

10:48:55  5  a criminal defense attorney to keep a copy of a subpoena that

6  that criminal defense attorney issued in his file or her file?

7  A.  They may or may not.  But, again, I'm not evaluating what

8  should or should have been practice.  I was looking objectively

9  at what was in the file and what wasn't.

10:49:14  10  Q.  Right.  But if -- you would expect, wouldn't you, and if

11  you're looking at a criminal defense attorney's files, that

12  that criminal defense attorney would maintain copies of

13  subpoenas that that criminal defense attorney issued?

14          MR. LOEVY:  Objection, asked and answered, Your Honor.

10:49:30  15          THE COURT:  Overruled.

16  BY THE WITNESS:

17  A.  I have no way of knowing.

18  MS. ROSEN:

19  Q.  And so when you noticed that there were subpoenas missing

10:49:38  20  -- subpoenas that were prepared by criminal defense attorneys

21  and that there were no copies of those subpoenas in those

22  criminal defense attorney files, that did not inform your

23  opinions in any way regarding whether or not these files were

24  in the same condition they had been in during the time of the

10:49:57  25  criminal prosecution, right?

1  A.  That's correct.

2       THE COURT:  Ms. Rosen, it's 10 to.  Is this a good

3  time?

4       MS. ROSEN:  Sure.

10:50:06   5       THE COURT:  Let's take our mid-morning break, ladies

6  and gentlemen.

7       COURT SECURITY OFFICER:  All rise.

8       (The following proceedings were had out of the

9            presence of the jury in open court:)

10:50:34  10       THE COURT:  Okay.  10 minutes, everybody.

11       THE WITNESS:  Your Honor, may I just stay here?  Is

12  that all right?

13       THE COURT:  Sure.  Sure.

14       (Recess.)

11:00:05  15       THE COURT:  Ready, everybody?

16       (Brief pause).

17       THE COURT:  Got to say, at least the air-conditioning

18  is working here.  It's not working in chambers.

19       COURT SECURITY OFFICER:  All rise.

11:01:52  20       (The following proceedings were had in the

21            presence of the jury in open court:)

22       THE COURT:  Please be seated, everyone.

23       Ms. Rosen, as soon as you're ready.

24  MS. ROSEN:

11:02:31  25  Q.  Okay.  Mr. Brasfield, so we were talking about your

1  Attachment F to your report.  And we had talked about the first

2  three criminal defense files that you have listed here.

3          And you would agree with me, wouldn't you, that with

4  respect to every single case, every single criminal defense

11:02:57    5  file that you reviewed in connection with this comparison,

6  contained information that was exclusively found in the

7  investigative file, correct?

8  A.  I'm sorry, I have to ask you to repeat that.

9  Q.  Sure.  We were talking about your Attachment G -- I mean,

11:03:22   10  Attachment F, which is your comparison of 44 investigative

11  files to 48 criminal defense files.  And in every single one of

12  the 48 criminal defense files that you reviewed in this case

13  you found materials that are contained solely in the Chicago

14  Police Department's investigative files, correct?

11:03:45   15  A.  That there -- there are documents contained within the

16  investigative files, some, that are not in either the permanent

17  retention or the criminal -- I'm sorry, but --

18  Q.  Maybe I'm not being clear in my question.

19          So we're looking at your Attachment F, which is your

11:04:08   20  comparison between investigative files and criminal defense

21  files, in part, correct?

22  A.  Well, in the first page on page 1 of Attachment F, I

23  attempt to lay out exactly what that was.

24  Q.  Okay.  But I'm just asking you the question.  The jury

11:04:28   25  doesn't have it in front of them at this time, and the jury is

1  not reading it.  So it is true, is it not, that Attachment F is

2  your comparison of 44 investigative files to 48 criminal

3  defense files?

4  A.  And 43 corresponding permanent retention files.

11:04:47   5  Q.  Correct.  And I'm going to put that analysis to the side

6  for a moment.

7  A.  All right.

8  Q.  I just want to talk about your comparison between the 44

9  investigative files and the 48 criminal defense files.  Okay?

11:05:00  10  A.  As a portion of all of the comparisons I did, yes, that's

11  true.

12  Q.  Okay.  And when you compared the 44 investigative files to

13  the 48 criminal defense files, isn't it true that in every

14  single one of the 48 criminal defense files you found documents

11:05:17  15  that are solely contained in the investigative files?

16  A.  Yes.

17  Q.  Okay.  And so that is at least some indication that

18  documents from the investigative files are actually making

19  their way into the criminal defense attorney files?

11:05:37  20  A.  Some, yes.

21  Q.  Okay.  And your criticism is that there are pages from the

22  investigative file that don't appear in the criminal defense

23  files as they existed, correct?

24  A.  Yes; but taking it as a total group that there's a pattern

11:05:56  25  of certain types of documents not appearing in the criminal

1    defense file.

2    Q.  Okay.  So the pattern, if we're looking at your Attachment

3    F, if we're calling it a pattern, you identify the document

4    from the investigative file that's missing from the criminal

11:06:16    5    defense attorney file, right?

6    A.  Yes.  And each and every one will not be identical, but,

7    generally speaking, you will find handwritten notes, property

8    inventory sheets that are consistently, not entirely, but

9    consistently as a pattern missing.

11:06:39    10    Q.  And when you're talking about handwritten notes -- what was

11    the other thing?  Handwritten notes and what?

12    A.  Inventory sheets.

13    Q.  The inventory -- you mean the inventory, not property

14    inventory, right?

11:06:50    15    A.  No.

16    Q.  You're talking about evidence?

17    A.  I'm talking about the investigative file inventory sheets

18    as an example.

19    Q.  That log that we've been talking about?

11:06:57    20    A.  Yes.

21    Q.  So those -- so it's handwritten notes and the log that are

22    the things that you see that are -- have some pattern of being

23    missing from the criminal defense files?

24    A.  And the to-from memos, yes.

11:07:10    25    Q.  And the to-from memos.

|           | 1  | Okay. Take a look the Sherman Addison, the first one |

1    Okay.  Take a look the Sherman Addison, the first one

2    there.  Is the to-from memo, or handwritten notes, or the

3    inventory log missing from that one?

4    A.  No.  As I said, it's not consistent with each and every

11:07:24   5    one, but taken as a group, as often as not, they're missing.

6    Q.  Okay.  Well, take a look at number 2, Joaquin Gonzalez.

7    You don't identify that there's notes, or to-from memorandum,

8    or the inventory log missing there, right?

9    A.  That's correct.

11:07:44   10   Q.  Okay.  And number 3, Mr. Hernandez's file.  That one you do

11   note the inventory log, so that's one?

12   A.  And handwritten notes.

13   Q.  And handwritten notes --

14   A.  And a number of other things.

11:07:55   15   Q.  And handwritten notes that are missing from the permanent

16   retention file?

17   A.  From the permanent retention file.

18   Q.  Okay.  Well, I'm not focusing on the permanent retention

19   file.

11:08:01   20   Q.  All right.

21   Q.  I'm looking at the criminal defense attorney file.

22   A.  I apologize.  Yes.

23   Q.  So the criminal defense attorney file, right, because

24   that's where this stuff needs to go, right?

11:08:07   25   A.  I'm sorry?

1  Q.  This information, the information that's contained in the

2  permanent retention file and the information that's contained

3  in the investigative file needs to go to the criminal defense

4  attorney file, right?

11:08:13  5  A.  Yes.

6  Q.  Okay.  And the City has consistently said that, by design,

7  the documents that are in the investigative file and the

8  documents that are contained in the permanent retention file

9  are distinct, usually, correct?

11:08:32  10  A.  That's correct.

11  Q.  Okay.  So if both of those files get produced, then there

12  isn't a problem, right?

13  A.  If, if, -- that's a big if -- if both were produced, if

14  everything that was available that was produced during the

11:08:47  15  course of an investigation were discovered, produced to the

16  criminal defense, that would be fine.

17  Q.  Okay.  So now if we go down the list some more.  If we look

18  at the fourth one, the document that you identified missing

19  from the criminal defense attorney file is the Enmy report

11:09:04  20  (phonetic), right?

21  A.  That's correct.

22  Q.  Okay.  And then with respect to Mr. Marino on the next

23  page, that one you couldn't compare it to the criminal defense

24  file because it looked like the case was transferred to a

11:09:17  25  different attorney, so you couldn't make the comparison because

1    the file appeared, on its face, incomplete, correct?

2    A.  It was unavailable, yes.

3    Q.  Okay.  And then if you look at the next one, the document

4    that you say of the 34 pages of documents contained within the

5    investigative file, the document that you say is missing is the

6    arrest supplementary report, correct?

7    A.  That's correct.

8    Q.  Okay.  And if we go down the line, Mr. Devalle, no page is

9    missing from the criminal defense file, right?

10    A.  That's correct.

11    Q.  Okay.  The next one, Mr. Boyd, that one you couldn't review

12    the criminal defense file because the case was transferred.  So

13    in it's face, it was an incomplete file, correct?

14    A.  That's correct.

15    Q.  Okay.  And then when we get to Michael Green, which is on

16    page 6, that's 389 pages from the investigative file that are

17    found in Mr. -- in the criminal defense attorney's file from

18    Mr. Green's case.  You have a list of information there that

19    you say isn't found in the criminal defense attorney's file,

20    correct?

21    A.  That's correct.

22    Q.  Okay.  And in that one there's handwritten notes, there's a

23    supplementary report, there's request for photo

24    identifications, there's form 101's, there's a request to hold

25    prisoners, there's an arrest report and an arrest warrant.  All

1  those kinds of documents you have listed that are missing from

2  the 389 pages?

3  A.  That's correct.

4  Q.  Okay.  And then if we go to the next one, Mr. Slack.

11:10:53  5  Missing from the criminal defense file, you have identified

6  here a subpoena, a latent fingerprint examination report, an

7  arrest report, and one page of handwritten notes, right?

8  A.  And photographs, yes.

9  Q.  And photographs.

11:11:11  10  And the photographs you understand as it relates to

11  the Chicago Police Department back in the 1980's.  You're

12  aware, aren't you, that Mr. Wadas testified that typically they

13  weren't provided copies by the State of photographs?  They were

14  simply brought to court and the criminal defense attorney was

11:11:29  15  allowed to just review the photographs.  So they didn't

16  actually get copies back then because it was difficult and

17  costly to photograph the copies?

18  A.  I've seen the deposition information that there was some

19  material that was provided to the defense counsel in court.

11:11:46  20  Q.  Okay.  And photographs specifically, right?  I mean, that's

21  what Mr. Wadas testified to in connection with this case,

22  right?  You reviewed --

23  A.  Generally speaking, as I recall the testimony, it had to do

24  with crime scene or autopsy photographs, not necessarily

11:12:04  25  photographs pertaining to lineups or suspects or gang material.

1  There are a lot of other types of photographs.

2  Q.  Sure.  And you don't identify here what type of photograph,

3  right, in this list?

4  A.  No, I did not.

11:12:17  5  Q.  Okay.  And I'm not going to spend the time to go all the

6  way through each of these, but, generally speaking, your review

7  indicated to you that at least some documents that are

8  contained solely in an investigative file appeared in criminal

9  defense attorney files, right?

11:12:39  10  A.  That's correct.

11  Q.  Okay.  And you also had available for your review in

12  connection with this case Cook County state's attorney files,

13  right?

14  A.  I believe there were 6 of those, yes.

11:12:51  15  Q.  Well, you looked at 6, right?

16  A.  That's correct.

17  Q.  There were more available for your review, weren't here?

18  A.  That's my understanding, there may have been.  I reviewed

19  6.

11:13:02  20  Q.  But you also had more at your disposal, right?

21  A.  I did not have them, no.

22  Q.  They weren't -- they weren't provided to you?

23  A.  No.

24  Q.  But you knew they were available?

11:13:16  25  A.  Ah, they may have been.  I don't know.

1  Q.  You can't recall?

2  A.  I don't recall.  I do know that the state's attorney files,

3  the 6, when compared to the criminal defense files, were

4  missing the same information.

11:13:34  5  Q.  In the 6 that you reviewed, right?

6  A.  That's correct.

7  Q.  Okay.  But as I indicated, you knew there were more?  You

8  don't remember as you sit here today how many more state's

9  attorney files were available?

11:13:50  10  A.  I was not provided that information.

11  Q.  Were you told there were 26 state's attorney files

12  available that matched 26 of the criminal defense attorney

13  files, 26 of the permanent retention files, and 26 of the

14  investigative files?

11:14:15  15  A.  I don't recall that, no.

16  Q.  Okay.  How did you choose to look at only 6?

17  A.  Those wee the 6 that were provided to me.

18  Q.  By plaintiff's counsel?

19  A.  Yes.

11:14:26  20  Q.  All right.  You testified earlier about the work that you

21  did in connection with two other cases that relate to this

22  particular issue regarding the Chicago Police Department's

23  record-keeping policies in the 1980's, that was Kluppelberg

24  case and Fields case, correct?

11:14:54  25  A.  That's correct.

1   Q.  And in connection with the work that you did in Fields, you

2   looked at zero state's attorney files, right?

3   A.  That's correct.

4   Q.  And you looked at 28 criminal defense files that compared

11:15:15   5   to 89 total files that were found or located, stored in the

6   basement at Area 1 from 1983 to 1989, is that right?

7   A.  I don't have it in front of me, but that's what you have

8   there, yes.

9   Q.  You don't have your Fields report in front of you?

11:15:35   10   A.  It was contained in my -- in my submitted report.  I don't

11   have it in the folder in front of me.

12   Q.  Okay.  But you'll take my word for it that in connection

13   with the work that you did in Fields, for the time period 1983

14   to 1989, there were a total of 89 investigative files, right?

11:15:54   15   A.  I will take your word for it.

16   Q.  Okay.  And you did not have any state's attorney files for

17   those 89 files, right?

18   A.  That's correct.

19   Q.  And you had 28 criminal defense attorney files for those 89

11:16:08   20   files, right?

21   A.  I'll take your word for that.

22   Q.  Okay.  And you had 27 permanent retention or records

23   division files for those 89 files, right?

24   A.  I'll take your word for that, too.

11:16:19   25   Q.  Okay.  And then the other set of materials that you looked

1  at in Fields were for files that were from 1999 to 2006, right?

2  A.  I believe that was the date range.

3  Q.  Okay.  And that particular date range was of interest to

4  you because it had to do with the facts of the Fields case.

11:16:34  5  And it's 10 years later than any of the issues that we're

6  dealing with in this case, right?

7  A.  I believe I -- you're asking if I thought they were

8  relevant, is that the short version or --

9  Q.  No, I'm just asking you if I have the facts correct.

11:16:51  10  So 1999 to 2006 was another database that you looked

11  at in Fields, and that database was relevant to the facts in

12  the Fields case, right?

13  A.  Yes.

14  Q.  Okay.  And in this case you know that Mr. Rivera was

11:17:04  15  arrested in 1988 and he was prosecuted in 1990.  So the files

16  that are available from 1999 to 2006 is a whole another decade

17  later, right?

18  A.  That's correct.  In the specific case here with Rivera, I

19  looked at 3 years before and 3 years after.

11:17:25  20  Q.  Right.  So it was 1985 to 1991, that was the dataset?

21  A.  That's correct.

22  Q.  Okay.  And in Fields, that 1999 to 2006 timeframe, there

23  were 340 investigative files that were a part of that dataset,

24  right?

11:17:41  25  A.  As I recall that number.

1    Q.   And, again, zero SAO files, Cook County state's attorney

2    files available in that review, right?

3    A.   That's correct.

4    Q.   And only 23 criminal defense attorney files and no

5    permanent retention files, right?

6    A.   Again, I'll take your word for it.

7    Q.   Okay.  And then in the Kluppelberg case, you also reviewed

8    files from 1983 without an end date, right?

9    A.   The event occurred, I believe, in 1984.  So that would've

10   been the time period.

11   Q.   Okay.  And the documents that were available for your

12   review comprised, I think, 619 or so files, RD files, right?

13   Permanent retention files?

14   A.   Again, since I don't have the report right in front of me,

15   but that's --

16   Q.   Actually, I misspoke.  619 investigative files.

17   A.   Yes.

18   Q.   Okay.  And you only reviewed, in connection with the work

19   in Kluppelberg, 25 percent of those files?

20   A.   That sounds right.

21   Q.   Okay.  And, again, in Kluppelberg there were zero state's

22   attorney files, right?

23   A.   That's correct.

24   Q.   And zero criminal defense attorney files, right?

25   A.   That's my recollection.

1  Q.  And only 15 permanent retention files?

2  A.  Again, without the report.

3  Q.  So you looked at -- you'll take my word for it, that was

4  15?

11:19:18  5  A.  Yes.

6  Q.  And so you looked at, in Kluppelberg, 164 investigative

7  files, which represents the 25 percent of the total versus 15

8  permanent retention files, correct?

9  A.  Again, I would be much more comfortable if I had the

11:19:35  10  spreadsheet here in front of me.  But you're an officer of the

11  court, if that's what's in the report, I'll take your word for

12  it.

13  Q.  Well, I never had your spreadsheet from Kluppelberg, but I

14  had your report.

11:19:48  15  A.  All right.

16  Q.  So I gleaned it from your report.

17  A.  Okay.

18  Q.  Okay.  So you testified on Friday that you had physically

19  examined, I think the number you said was 2,000 homicide cases

11:19:59  20  in connection with your review of these 3 -- in connection with

21  the review you done in these 3 civil cases, is that right?

22  A.  I added them up and I think they were 2,216-or-something.

23  I think I testified on Friday that there were probably 2200.

24  Q.  Okay.  And does that represent investigative files, RD

11:20:23  25  files, criminal defense attorney files, and SAO files, or is

1  that just 220-something homicides?

2  A.  It's 2,200-some homicide investigations.  There may have

3  been more than one victim, but those are distinct homicide

4  investigations.

11:20:45  5  Q.  So you looked at 2,200, and whatever the number is,

6  investigative files?

7  A.  Homicide --  you asked if they were distinct homicides.

8  Q.  Okay.  So that number is distinct homicides, right?  That's

9  what you're saying?

11:21:05  10  A.  Yes.

11  Q.  So you had available for your review 2,200 homicide

12  investigations?

13  A.  Electronic format, yes.

14  Q.  How many did you have available for your review in this

11:21:17  15  case?

16  A.  As I mentioned, in the neighborhood of 190.

17  Q.  So the rest, the other 2,000 came from Kluppelberg and

18  Fields?

19  A.  That's correct.

11:21:27  20  Q.  Where you had zero state's attorney files available for

21  your review, right?

22  A.  That's correct.

23  Q.  And a total of 51 criminal defense files, right, that came

24  from the Fields case because you had zero in Kluppelberg?

11:21:49  25  A.  Right.

1    Q.   Right?

2    A.   There were a total of 48 criminal defense files in Rivera.

3    Q.   Yeah, I'm not asking about Rivera.  So of the 2,200 and

4    whatever, 190 came out of this case, right?

11:22:08    5    A.   Yes.

6    Q.   So that leaves 2,000 homicides that you reviewed in

7    connection with your work in Kluppelberg and Fields, right?

8    A.   That's correct.

9    Q.   Okay.  And in Kluppelberg and Fields you reviewed zero

11:22:22   10    state's attorney files?

11          MR. LOEVY:  Objection, asked and answered, Your Honor.

12          THE COURT:  Overruled.

13   BY THE WITNESS:

14   A.   That's right.

11:22:27   15   MS. ROSEN:

16   Q.   And in Kluppelberg and Fields combined, you reviewed of

17   those 2,000 homicide files, 51 criminal defense attorney

18   files?

19   A.   I believe that's correct.

11:22:40   20   Q.   And those 51 criminal defense attorney files were only

21   available to you in the Fields cases because you reviewed zero

22   criminal defense attorney files since Kluppelberg, right?

23   A.   That's my recollection.

24   Q.   Okay.  Now, let's talk a little bit about your background

11:23:02   25   and your expertise.

1    You've never been a homicide detective, correct?

2  A.  That's correct.

3  Q.  In fact, what you did do, what you did work in as a

4  detective, you worked something that you called, I think,

11:23:17    5  traffic homicides.  Is that what you called it?

6  A.  Traffic homicide, yes.  One of the assignments.

7  Q.  One of the what?  I'm sorry.

8  A.  One of the assignments.

9  Q.  As a detective?

11:23:26    10  A.  Yes.

11  Q.  Okay.  And traffic homicides is obviously some kind of car

12  accident that leads to a death, right?

13  A.  Right.  A car striking a pedestrian, hit-and-run, fleeing,

14  whatever.

11:23:40    15  Q.  Okay.  And that is the extent of the work you did related

16  to homicide investigations, right?

17  A.  As far as a hands-on detective in the deaths, yes.

18  Q.  Okay.  And in the course of your work as a traffic homicide

19  investigator, you had occasion to interview suspects, right?

11:24:01    20  A.  That's correct.

21  Q.  And when you interviewed suspects, you would jot down the

22  interview on notes, right?

23  A.  It would depend on where the interview was held.  If it was

24  held in the office, quite often I would type it as I went or

11:24:18    25  take a handwritten statement.

1  Q.  And that would be handwritten notes, right?

2  A.  It would be either a handwritten statement, or if I was in

3  the field it could be, depending on the individual, jotted

4  notes.

11:24:32  5  Q.  When you say "handwritten statement," that's not you taking

6  notes, if I'm understanding the distinction you are making.

7  That's a formal handwritten statement of the suspect, right?

8  A.  It's either a formal handwritten statement written by the

9  witness, or suspect, or victim, or it is a verbatim handwritten

11:24:57  10  statement by the investigative detective, in this case me.

11  Q.  Okay.  So you're aware, though, aren't you, that in Cook

12  County in the 1980's, those types of handwritten statements are

13  taken by assistant state's attorney, right?

14  A.  I've seen in the material that I've reviewed in the cases

11:25:21  15  that in a formal setting within the police facility, that was

16  the case.  In the field, no.

17  Q.  Okay.  But did you ever -- well, let me back up for a

18  second.

19       So it's your understanding that during the time period

11:25:39  20  and actually even to today, Cook County state's attorneys would

21  come out to the police facility and they were the ones that

22  memorialized either witness or suspect statements either in

23  handwritten form or court reported form, or sometimes just

24  orally, right?

11:25:59  25  A.  I've seen it done by the detectives, I've seen it by the

1    state's attorney, I've seen it transcribed by a court

2    stenographer, I've seen it handwritten by the suspect, I've

3    seen it handwritten by a detective, I've seen it -- I've seen

4    it in multiple ways.

11:26:15   5    Q.   In Cook County?

6    A.   In Cook County.

7    Q.   So you're claiming that you have, through your review of

8    the documents, seen handwritten statements written in the hand

9    of the suspect?

11:26:28   10   A.   Yes.

11   Q.   What cases were those?

12   A.   I can't identify them with that volume, but I have seen

13   because it was -- well, anyway, I can't point you to the

14   specific case, but I have seen it.

11:26:44   15   Q.   And what's the foundation for your belief that the

16   statement was written by the suspect as opposed to the state's

17   attorney?

18   A.   The handwritten statement would be signed by the suspect.

19   Q.   By all --

11:27:01   20   A.   Or the witnesses, or whatever.

21   Q.   Aren't they all -- isn't it true that in Cook County in

22   handwritten statements every single page of the handwritten

23   statement is signed at the bottom by the suspect?

24   A.   That may be the policy.  In the material that I've

11:27:21   25   reviewed, it is not consistently applied.

1  Q.  How do you know -- you're just reviewing the record,

2  right?

3  A.  I'm reviewing copies of the physical documents in the file.

4  Q.  Okay.  So how have you drawn your conclusion simply from

11:27:37    5  your review of the documents that a certain handwritten

6  statement was written in the hand of the suspect?

7  A.  In the vernacular, in many times that is used where it

8  says, "I went," "I saw," "I did this," "I did that," in some

9  instances, for lack of a better word, the dialect or the

11:28:10   10  language would indicate that it was being put down on paper by

11  the individual that was giving the statement.

12  Q.  Well, isn't it true that the practice of Cook County

13  state's attorneys doing Felony Review in Cook County were the

14  ones that actually talked to the suspects and handwrote their

11:28:29   15  statements?

16  A.  I think I answered that question, but in the police

17  facility I have seen many instances where the assistant Cook

18  County attorney or a stenographer was conducting the interview

19  and taking the statement.  I have seen other statements that

11:28:50   20  have been taken in the field by either the primary

21  investigator, or an investigator, or some other police employee

22  that was not taken by the State's Attorney's Office.

23  Q.  And you're distinguishing between notes of interviews and

24  formalized handwritten statements, right?

11:29:08   25  A.  I am.

1    Q.  Okay.  And --

2    A.  But the ones -- I'm sorry, maybe I misunderstood your last

3    question.  I have seen in the material that I have reviewed

4    handwritten statements acquired by Chicago police officers that

11:29:25    5    were taken in the field, not notes.

6    Q.  Okay.  And it's on that formalized form that the Cook

7    County State's Attorney's Office --

8    A.  Not necessarily.  They're generally all over the board.

9    They can be on blank pieces of paper, they can be on general

11:29:45    10    progress reports.  There's a lack of consistency.

11    Q.  And are you distinguishing whatever it is you claim to be

12    seeing in these files from simply notes of an interview?

13    A.  Yes.

14    Q.  And how are you making that distinction?

11:30:00    15    A.  If I understand your question correctly, is that I have

16    seen what are ascribed and understood by police officers to be

17    statements from a witness or a suspect that has been

18    handwritten, and sometimes an indication of where or some

19    reference in another document that said the statement was taken

11:30:30    20    by me at such and such a place, but, generally, just a

21    handwritten statement.

22    Q.  And as you sit here today, you can't identify a single one

23    of those files for us to take a look at?

24    A.  I would not have any difficulty spending a few hours and

11:30:46    25    finding the samples, I'm confident of that.  But as I sit here

1    right this moment, I can't give you a page number or a Bates

2    number.

3    Q.  Okay.  So going back to your note-taking practices when you

4    were a traffic homicide investigator.  It is true, isn't it,

11:31:02    5    that you would sometimes jot down notes of an interview so that

6    when you later prepared your typewritten report it would jog

7    your memory, right?

8    A.  In the sense of just a short note or two, yes.

9    Q.  Okay.  And most investigators that you were familiar with

11:31:23    10    back at the time that you were a traffic homicide investigator

11    did the same thing, right?

12    A.  It was -- it was a practice that was common, yes.

13    Q.  Okay.  And the notes that you took when you were -- when

14    were you a traffic homicide investigator, by the way?

11:31:40    15    A.  I was promoted to the Detective Division in 1971, '72.

16    Q.  And how long did you remain a traffic homicide

17    investigator?

18    A.  I was there for, I think, a little over a year, then I went

19    to vice narcotics, and then I went to burglary theft.

11:31:57    20    Q.  Okay.  So in this time period, you took notes sometimes of

21    interviews.  And in that time period the Seattle Police

22    Department had no standardized form for taking notes, right?

23    A.  That's correct.  We had standardized formats, such as

24    Chicago's general progress reports, for transcribing any notes

11:32:25    25    on to.

1    Q.  Okay.  And so the notes that you didn't take on those forms

2    were on a note pad or a legal pad, right?

3    A.  That's correct.

4    Q.  And sometimes detectives that you worked with had really

11:32:39    5    good memories and took no notes at all, right?

6    A.  They were considered poor detectives, but ....

7    Q.  I'm sorry, what?

8    A.  Poor detectives.

9    Q.  With great memories?

11:32:52    10    A.  (Laughing.)

11    Q.  Well, those are your words, right?

12    A.  I have attested to the fact that detectives have claimed to

13    have excellent photographic memories.

14    Q.  Well --

11:33:06    15    A.  But have never claimed that they were supposed to wait more

16    at the end of shift to transcribe that memory on to an official

17    police report.

18    Q.  Okay.  We're not talking about when they're transcribing

19    from memory.  My point is that sometimes you're aware of

11:33:21    20    detectives with great memories who would conduct an interview

21    without taking any notes at all, and then eventually, whatever

22    the time period is, prepared their typewritten report, right?

23    A.  I'm aware of detectives that did that.  They were not

24    classified, in my professional opinion, as great detectives.

11:33:37    25    Q.  Okay.  But other detectives like yourself took notes,

1  right?

2  A.  That's correct.

3  Q.  And that legal pad or note pad that you took the notes on

4  was not an official Seattle Police Department record, right?

11:33:50  5  A.  That's correct.

6  Q.  And, in fact, you referred to that procedure as sloppy

7  procedure, right?

8  A.  I'm sorry?

9  Q.  I said you have described that procedure of taking photos

11:33:58  10  on a legal pad as a sloppy procedure, right?

11  A.  I may have.  I don't recall that.

12  Q.  Okay.  And then after you used the information from the

13  notes and typed it into your reports, you would destroy those

14  notes, right?

11:34:11  15  A.  Depending upon the format and the context of the

16  investigation.  If it was, as I've testified to in other

17  depositions or in trial, if it was just a memory jog that

18  someone had approached me on the street corner and I wrote down

19  "John Smith," then transcribed that into an official form that

11:34:41  20  said on such-and-such a date on such-and-such location I was

21  with my partner and we were approaching someplace, and then the

22  name that was on the piece of paper contacted me, I would not

23  keep the scratched paper that said "John Jones" or "Bill

24  Smith," or however.

11:35:00  25          If, however, it was an extensive note having to do

1    with things that I saw and observed, I would introduce that

2    into the case as a piece of evidence.

3    Q.  Okay.

4    A.  And it would get an evidence number.

11:35:10    5    Q.  But there was no universal prohibition against shredding

6    notes, right?

7    A.  Against what?

8    Q.  Shredding notes.

9    A.  Within the parameters and the context of what I testified

11:35:23    10   to, no.

11   Q.  Well, if you're shredding the notes, then we don't know,

12   right?  Exactly what you wrote on the note, right?

13   A.  Yes, I do, because contemporaneous with the taking of the

14   note I detail on an official police form the date, time, all

11:35:37    15   the relevant material that I've just previously testified to,

16   that would've been fully encompassing everything well beyond

17   what was on the note.

18   Q.  But we have to take your word for it, right?  Because you

19   destroyed the note?

11:35:53    20   A.  (Laughing).  You'd have to take the detective's word for

21   what was on the official police document.  And I think you're

22   holding the detective far more accountable having them detail

23   the date, time, place, location, who, what, when, why, where

24   and how, than on a piece of paper that just ends up in an

11:36:19    25   investigative file.

1  Q.  Well, I'm not sure if you answered my question, but we can

2  move on.

3        With respect to the note-taking generally, there is no

4  requirement, right, no national generally accepted police

11:36:39   5  practices requirement that investigators, detectives, take

6  notes, right?

7  A.  I believe that in my report is a supplemental that

8  indicates a long list of bibliography of police textbooks and

9  publications contemporaneous to the time period of the cases

11:37:05  10  that I reviewed that indicated that that was what would be the

11  advisable practice.

12        I cannot, as we sit here, point you to a specific page

13  on a particular document, but as early as when I started

14  college in 1962 or '63 and I was taking criminal justice

11:37:31  15  courses, from V. A. Leonard who published a text even before

16  that, it's just the things that you learn in the police

17  academy, and it's in the published literature about taking

18  notes, what you do with them, that type of thing.

19  Q.  And the materials that you are citing are your Attachment

11:37:54  20  E, right, to your report?

21  A.  Yes.

22  Q.  And you list a bunch of reference materials, right?

23  A.  That's correct.

24  Q.  And these reference materials, you don't identify within

11:38:07  25  the reference material any particular citation to support the

1    proposition that the taking of notes is required or in what

2    form or fashion the taking of notes should be recorded,

3    correct?

4    A.   No.  And in a two-paragraph preface to that, it describes

11:38:30    5    generally accepted policing practices during the relevant time

6    period, that it's not exhaustive and it's supplemental to my

7    experience with police practices, et cetera.  It's just -- it's

8    the way things were done, should be done.

9    Q.   Well, my question is more specific.  I'm not focusing on

11:38:50    10   your experience or what you believe should be done.  My

11   question is specific to the source materials that you listed in

12   your report for us to look at.

13          And isn't it true that there is not a single citation

14   in your source materials to a particular page or chapter of any

11:39:11    15   of these source materials to support the proposition that notes

16   have to be taken, and if they do have to be taken, in what

17   format, is that right?

18   A.   That's correct.  I did not give you page and line, or in my

19   report did I give you page and line, but I gave you an ample

11:39:33    20   bibliography to put in context my opinion.

21   Q.   And some of the books that you identified are homicide

22   investigations, right, by Mr. Franco?

23   A.   There are some that go back into the 19th Century.  My

24   attempt there was to show that this was not a new invention.

11:39:55    25   That for well over 100 years police detectives, police

1  investigators have been expected to document, take notes, and

2  provide a single source for information.  And some of them were

3  even tongue-in-cheek because they were from military manuals

4  and French publications, the point being that there's a great

5  body of literature.

6  Q.  So the Franco that I have in my hand is published,

7  copyrighted in 1931, right?

8  A.  I don't have it in front of me, but I'll take your word for

9  it.

10  Q.  Okay.  It's listed in your Attachment E on the third page.

11  So you don't need to take my word for it.

12       (Brief pause).

13  BY MS. ROSEN:

14  Q.  Do you see it there?

15  A.  I'm sorry, which one is it?

16  Q.  It's the Franco publication.

17  A.  Harold A. Franco?

18  Q.  Yes.

19  A.  1931?

20  Q.  Yes.

21  A.  Yes.

22  Q.  Correct.  And there's no citation.  It's a reference to

23  this homicide investigation, but there's no citation in this

24  book about the requirements regarding notes, right?

25  A.  That's correct.  On all of the documents.

11:40:18
11:40:29
11:40:46
11:40:55
11:41:04

1  Q.  There's not a single reference from any of these materials

2  that you list to a particular page or policy, model policy or

3  anything as it's relates to notes, right?

4  A.  No.  As I said, this is to provide a universe of what kind

11:41:31  5  of literature and information that a confidant homicide

6  investigator, or in this case a police department, should be

7  aware of, and to point out that it wasn't a narrow body of

8  information.  But I did not, in my additional information or

9  bibliography, give you a page and line number.

11:41:50  10  Q.  Okay.  And the body of literature you alluded to it

11  before -- I think you said it's sort of tongue-in-cheek --

12  included publications that are completely in French, right?

13  A.  I gave an example of a 1938 publication on scientific

14  police homicide investigations.  I gave one from the Judge

11:42:10  15  Advocate General's Office of the law on Belligerent Occupation

16  in 1945.  That is not to takeaway from the more relevant

17  documents that are cited here for the time period in question.

18  My attempt, again, was to point out that this was a historical

19  knowledge base.

11:42:32  20  Q.  And yet not a single specific citation to support the

21  proposition --

22        MR. LOEVY:  Your Honor, asked and answered.

23        THE COURT:  Sustained.

24  BY THE WITNESS:

11:42:41  25  A.  I've given you my answer on that.

1    THE COURT:  Sustained.

2    BY MS. ROSEN:

3    Q.  Okay.  And included in all these materials that we've been

4    talking about, there is also no specific citation to the

11:42:50    5    requirement that files need to be centralized or centrally

6    located, right?

7    A.  And I've acknowledged that there can be other systems

8    besides just a single centralized one.  But if you don't have a

9    centralized one, then you need to have safeguards and specific

11:43:10   10    guidelines to affect the same outcome.

11    Q.  Okay.  Now, let's talk about the guidelines and the

12    directives.  So if we could look at what's been marked as City

13    Exhibit No. 34, which I believe is already in evidence.

14    So we can go ahead and publish it to the jury.

11:43:36   15    BY MS. ROSEN:

16    Q.  You can look at it up on your screen.

17    That's special Order 86-3, right?  So that's the

18    version of the investigative file special order that was in

19    place at the time of Mr. Rivera's arrest and prosecution,

11:43:52   20    correct?

21    A.  Yes, this is a copy of Special Order 863, May 29th, 1986.

22    Q.  Okay.  And your understanding is -- I think you testified a

23    little bit about it on Friday -- is that after the Jones and

24    Palmer cases came to light, that the Chicago Police Department

11:44:17   25    created new procedures as they related to recordkeeping and

1  file maintenance, retention, and production, right?

2  A.  This was the latest in a series of attempts by the police

3  department, yes.

4  Q.  Okay.  And in your view, the written policy, in and of

5  itself, is insufficient, right?

6  A.  That's correct.

7  Q.  And can you identify for us an example of a written policy

8  that would be sufficient from a law enforcement agency from the

9  time period of the mid 1980's?

10  A.  I'm sorry, would you repeat that?

11  Q.  Sure.  Are you able to identify for us any written policy

12  that is sufficient, in your view, from any law enforcement

13  agency from the 1980's?

14  A.  I did not provide one within my report, no.  I was asked to

15  examine the Chicago Police Department's.

16  Q.  And in connection with your review of the Chicago Police

17  Department, you're critical of the -- separate and apart from

18  the criticisms that you have about how it played out in

19  practice, you are critical of the written policy, correct?

20  A.  In the context of the outcome of the George Jones case and

21  the Palmer case, and the criticisms that the respective courts

22  had with the deficiencies in these, coupled with the criticisms

23  of that particular order and the earlier orders that are

24  contained in my report on page 55, yes, I'm still critical of

25  it.

1   Q.  So you're only critical of it because of the context, is

2   that what I'm understanding you to say?

3   A.  I'm critical of it because it does not accomplish what the

4   courts put the Chicago Police Department on notice that they

11:46:31   5   needed to do as the result of specifically the Jones and Palmer

6   cases.

7        And I outlined in detail over several pages what some

8   of those criticisms were.  And they were concurrent or

9   consistent, I should say, with the self-assessment of

11:46:55   10   depositions that I found from employees of the Chicago Police

11   Department, as well as excerpts from the decisions in the Jones

12   and Palmer cases.

13   Q.  Okay.  So if I understood what you just said correctly, the

14   reason that you believe that Special Order 86-3 is insufficient

11:47:18   15   is because of what occurred in Jones and Palmer, is that

16   correct?

17   A.  No.  What I'm trying to convey is that the Chicago Police

18   Department was put on notice that their practices and their

19   policies were leading to events, up to and including wrongful

11:47:46   20   convictions, and that their policies and their practices needed

21   to change.  That their attempts to create that change in the

22   culture of the Chicago Police Department were, on their face,

23   just looking at the policy itself, failing to address the

24   underlying issues.

11:48:09   25   Q.  Okay.  So let's de-construct that a little bit.  So you

1   said because the City's policies before the cases of Jones and

2   Palmer came to light, it led to wrongful convictions, right?

3   Is that what you said?

4   A.   The material I reviewed indicated, historically, that was

11:48:28   5   the case, yes.

6   Q.   And isn't it true, actually, that factually what happened

7   was, Mr. Jones never was convicted because the information came

8   to light during the course of his criminal case, right?

9   A.   That's correct.  He was, through no effort of either the

11:48:43   10   Chicago Police Department or the state's attorney, he was

11   narrowly spared a wrongful conviction.

12   Q.   Okay.  And then, in fact, in Palmer, that was a class

13   action lawsuit, right?

14   A.   That's correct.

11:48:57   15   Q.   And zero plaintiffs in the class action lawsuit were

16   wrongfully convicted, right?

17   A.   In the context of my response, that's correct.

18   Q.   Okay.  So in terms of the City's policies before Jones and

19   Palmer, it's your understanding, isn't it, that the City's

11:49:19   20   record-keeping policies at that time were that there was the

21   records division file that we've been talking about in pretty

22   much the same condition and with the same materials contained

23   in it as we've been talking about, right?

24   A.   Yes.

11:49:35   25   Q.   And then --

1  A.  That's a long question.

2  Q.  And there was not pre-Jones and Palmer any direction to the

3  Detective Division about how to maintain, how to record, how to

4  produce investigative files, or materials like that, right?

11:49:55  5  A.  That's correct.

6  Q.  And that's the issue that created the problem in Jones and

7  the issue that created potential problems in Palmer, right?

8  A.  Within the confines of what I was asked to do, that's

9  correct.

11:50:11  10  Q.  Okay.  And after the Palmer class-action litigation was

11  filed and the Chicago Police Department was put on notice that

12  there were these records that were being maintained in the

13  Detective Division, they drastically changed their policy,

14  right?

11:50:29  15  A.  They wrote some policies.

16  Q.  Which was a drastic change, right?  It now detailed and

17  required these files to be maintained and produced in

18  discovery, right?

19  A.  Ah, on the face, if you pay attention to the policy

11:50:49  20  language, that was what was an attempt to accomplish.  As far

21  as an actual, viable policy with specific steps and the scope,

22  or limited scope, and other criticisms within my report, it did

23  not have the desired effect.

24  Q.  But going back to my question.  The changes that were made

11:51:18  25  from the pre-Jones-Palmer policies to the post-Jones/Palmer

1  policies were drastic.  They were now acknowledging and

2  requiring that these files be maintained in a certain fashion

3  so that they could be available for criminal cases, right?

4  A.  They -- I might quibble with the term "drastic."  I think

11:51:43  5  the policies were an attempt to bring the Chicago Police

6  Department into compliance with general accepted police

7  practices around the country at the time.

8  Q.  And you cannot identify for us a single policy from around

9  that time that matches or exceeds the policy that was written

11:52:05  10  by the Chicago Police Department in 1983, correct?

11  A.  I have not provided that, that's correct.

12  Q.  Okay.  Now, taking a look at Special Order 83-3.

13      If you take a look at the second page where it

14  discusses the general progress report:

11:52:22  15      "... the general progress report is a department

16      form that's 8 1/2 by 11 in size, which would be

17      utilized by all division members."

18      Do you see that there?

19  A.  Yes.

11:52:33  20  Q.  And it says:

21      "... this document is designed to standardize

22      the recording of handwritten notes and

23      memorandum."

24      Do you see that?

11:52:41  25  A.  Yes.

1  Q.  So that's the general progress report that we've seen in

2  court and that you've been discussing, right?

3  A.  Yes.

4  Q.  Okay.  And if you go down to the bottom of that page, 4C,

11:52:53  5  where it says?

6          "... detectives are required to ... "

7          take a look at paragraph 3.  Do you see that it says:

8          "... detectives are required to submit all

9          handwritten notes and investigative documents

11:53:09  10          generated or received by unit supervisor for

11          review and inclusion in the investigative file

12          case folder."

13          Do you see that there?

14  A.  Yes.

11:53:15  15  Q.  So that is not a prohibition from including notes in the

16  investigative file, right?

17  A.  No, I don't believe I testified that it was a prohibition.

18  Q.  Okay.  All right.  Now, let's take a look at some of the

19  files that you looked at in this case.

11:53:45  20          So first let's put up the demonstrative.  You saw on

21  Friday the chart that was here --

22  A.  I'm sorry.  Yes, I did.

23  Q.  That was your Attachment G?

24  A.  G.

11:54:01  25  Q.  Yeah.

1    MS. ROSEN:  This is our demonstrative.  You don't have
2  an objection to it?
3    MR. LOEVY:  No.
4  BY MS. ROSEN:
5  Q.  So we're going to look at City Demonstrative Number 1.
6    Do you see that there on your screen?
7  A.  I see it labeled Brasfield Attachment G.
8  Q.  Okay.
9  A.  It's illegible but --
10 Q.  Well, there's a lot of data there, right?
11 A.  Yes, there is.
12 Q.  And there's lots of colors, right?
13 A.  Yes.
14 Q.  Okay.  And this reflects each of the pages, right, that
15 compromise Attachment G, right?
16 A.  I would assume that's the case, yes.  Since it is
17 illegible --
18 Q.  Okay.  And if you look at two pages all the way to the far
19 right, do you see that there?  Where it's just in blue?
20 A.  Yes.
21 Q.  Those are the Area North files, right?
22 A.  I'm sorry, your question again?
23 Q.  The two pages that are all the way to the right on the
24 screen --
25 A.  And whoever is running the Elmo or device, I actually have,

1  even though they're a lot smaller, I actually have those pages

2  in front of me, if you can give me --

3  Q.  I think it's probably the last -- in your attachment, is

4  take what you mean?

11:55:34  5  A.  My exhibit G.  The far left-hand corner of those two pages

6  in the light gray column you'll see a series of sequential

7  numbers.  If you can tell me what those numbers are, I can turn

8  to the correct page.

9        MS. ROSEN:  Can you tell me the first number on that?

11:55:55  10        MS. CARNEY:  G340106.

11  BY THE WITNESS:

12  A.  No, I mean in the very far left-hand column under "in

13  identifying information," it runs 1 to 90.

14  BY MS. ROSEN:

11:56:03  15  Q.  Oh, that number you mean?

16  A.  Yeah.

17        MS. CARNEY:  145.

18  BY MS. ROSEN:

19  Q.  145.

11:56:25  20  A.  All right.  That's the upper left-hand column, first

21  number.

22  Q.  Right.  So the pages --

23  A.  Okay.

24  Q.  Those two sheets there, right?

11:56:34  25  A.  We're on the same page.

1  Q.  Okay.  Great.  So those are the Area North files, right?

2  A.  Yes.

3  Q.  And so the only information that you have is information

4  related to the investigative files that were found at Area

5  North?

6  A.  This is a compilation of all 190 files.

7  Q.  The entirety of your attachment, right?

8  A.  Yes.

9  Q.  But focusing on the last two pages, which begin at 145 and

10  go down, those two pages.

11  A.  That includes on the two pages a column, the blue column

12  for investigative files, the purple column for permanent

13  retention, and the next page, which is the green, is the

14  criminal defense attorney files.

15  Q.  Correct.  But when you're looking at that attachment and

16  you're looking at those last two pages, all that you have

17  written in the blue -- actually, let me back up for a second.

18       Did you prepare this attachment?

19  A.  I did not specifically make the Excel spreadsheet, but I'm

20  familiar with its contents and I've looked at it and compared.

21  Q.  Okay.  So you did not actually go through the files

22  yourself, extract the information, and put it on to the Excel

23  spreadsheet, correct?

24  A.  No, I believe I testified to on Friday that the sheer

25  volume here that either contract or permanent employees with

1    the retaining law firm did the initial screening and made notes

2    when things were either contained or not contained within a

3    category or contained or not contained cross-reference between

4    investigative versus permanent retention, and then using what

11:58:23    5    was developed I would go through and see if, in fact, that was

6    an accurate reflection.

7    Q.  Okay.  So going back to my question.  You weren't the one

8    that reviewed the files and then took the information from

9    whatever comparisons were being made and included it in the

11:58:41    10    attachment.  That was done for you and you utilized that then

11    for your purposes, right?

12         MR. LOEVY:  Objection, that's exactly what he's been

13    talking about.

14         THE COURT:  Sustained.

11:58:49    15    BY THE WITNESS:

16    A.  Yeah, that is correct.  However, I had an electronic

17    format, an exact copy of the investigative file, the permanent

18    retention file, and the criminal defense file available to me.

19    BY MS. ROSEN:

11:59:05    20    Q.  But not the state's attorney files, right?

21    A.  Other than the 6.

22    Q.  Okay.  So going back to my original question.  So the ones

23    that begin at 145, that if you look at the screen that we have

24    an arrow in, so there's two pages.  Those are files that relate

11:59:26    25    to the investigative files that were found at Area North for

1    which you made no comparison to any other file, right?

2    A.  That's -- if I understand your question correctly, yes.

3    Q.  Okay.  So for purposes of evaluating just the one simple

4    question of whether or not these documents are contained in a

11:59:49    5    criminal defense attorney file, they don't help us, right?

6    A.  Say that again.

7    Q.  Since you compared the investigative files from Area North

8    to no other files, and you simply looked at them on their face

9    for whatever information it was that would be helpful to you in

12:00:08    10    your global opinions --

11    A.  That's correct.  I was limited to looking in that group at

12    just what was contained and what wasn't contained within the

13    investigative file.

14    Q.  Okay.  So it gives us, those files give us zero information

12:00:25    15    about whether or not any of this information or all of this

16    information was in the companion criminal defense attorney

17    files it, right?

18    A.  As I understand your question, that's correct.

19    Q.  Okay.  So now if we take a look at City Demonstrative

12:00:49    20    Number -- I think I have mine out of order.

21          Actually, wait.  We're not done with this yet.

22          I think you told us on Friday that the blue columns

23    reflected information from the investigative files, right?

24    A.  That's correct.

12:01:05    25    Q.  And the purple reflected information that you -- that was

1    found and that you compared to the permanent retention file,

2    right?

3    A.    That's correct.

4    Q.    And so looking at that simply on its own, that does not

12:01:22    5    help us or inform whether or not these materials actually are

6    contained in any particular in criminal defense attorney file?

7    That's your evaluation about whether or not the policies were

8    being followed as they were written, right?

9    A.    Within the context of its limitation, yes.

12:01:46    10    Q.    Okay.  And then across the top of the attachment there is

11    color-coding that just lines up with green for criminal defense

12    attorney file, blue for investigative file, and purpose for

13    permanent retention file, right?

14    A.    Yes.

12:02:06    15    Q.    Okay.  So now if we move to City exhibit -- Demonstrative

16    Exhibit Number 2.

17         MS. ROSEN:    I assume no objection?

18         MR. LOEVY:    No objection, Your Honor.

19    BY MS. ROSEN:

12:02:19    20    Q.    So now the next page you'll see we sort of grayed out the

21    purple color, and we grayed out the blue color.  So we can

22    focus our attention now on the green, which represents

23    information that you found that's contained within the criminal

24    defense attorney file, right?

12:02:40    25    A.    Again, the corresponding number in the upper left hand --

1    Q.  Just generally.  So you can look at any one of your pages

2    that you have there, and you can compare it to the

3    demonstrative that's on your screen.  And you'll see that

4    what's been done is that the blue column and the gray -- the

12:03:02    5    blue column and the purple column has been grayed out.  And so

6    that way we can see the green, which is what represents --

7    which represents what's contained or not contained in the

8    criminal defense files, right?

9    A.  I think I understand what you're saying.  It's not what I

12:03:18    10    had.  It's something that you produced, but if what you're

11    saying is the green represents criminal defense files, then I

12    would agree with that.

13    Q.  Yeah.  I mean, it's your green.  We didn't change the

14    green.

12:03:32    15    A.  I realize that, but the darkened-out portions which have

16    some relevance, they're not there, so ....

17    Q.  Okay.  And the green represents the cases, the files where

18    you found and determined that there were pages missing from the

19    criminal defense file that appeared in the investigative files,

12:03:55    20    right?

21    A.  I'm not trying to be obtuse, but the spreadsheet I have is

22    the spreadsheet that I included with my report.  This is

23    something that you have done.  I can't read it, and I don't

24    understand what you're trying to ask me.

12:04:10    25    Q.  Okay.  So let me see if I can be a little more clear.  In

1    the demonstrative what we've done is we've eliminated the blue

2    color and we've eliminated the purple color and made it all

3    gray like the rest of your background.

4         And so then what's there, so that we can focus in on

12:04:28     5    the criminal defense files is the green cells as they appeared

6    in your attachment.

7         So all those green cells represent, if I understand

8    your attachment correctly, criminal defense files that purport

9    to have missing documents, right?  Isn't that what the green

12:04:53    10   cells represent?

11   A.   The green cells in the original report referred to the

12   criminal defense files.  And I'm not -- I'm not arguing that or

13   denying that.  It's just still unclear to me because what I

14   have on the screen in front of me could be anything.  I can't

12:05:12    15   tell what it is.

16   Q.   Okay.  So if you'll take my word for it, hypothetically

17   speaking --

18   A.   Certainly.  If that's the preface.

19   Q.   -- that the green cells match your green cells, and that I

12:05:23    20   haven't changed any green cells --

21   A.   Okay.

22   Q.   -- and all we've done is make all the other colors gray.

23   A.   Okay.

24   Q.   Are you with me?

12:05:30    25   A.   Yes, ma'am.

1   Q. Okay. So now we've got the green cells, and the green

2   cells represent documents that are missing from the criminal

3   defense attorney files, right?

4   A. Okay.

12:05:37   5   Q. Okay. So now each of those lines --

6       MS. ROSEN: And if we can give him an example.

7       (Brief pause).

8   MS. ROSEN:

9   Q. If we look at your Attachment G in your form, if you take a

12:06:04   10   look at Line 3.

11   A. And since Line 3 corresponds to three different sections,

12   the green, the purple, and the blue, and they're found on

13   different pages, just the green.

14   Q. Just the green.

12:06:26   15   A. All right.

16   Q. Okay. So now we're on the same page.

17   A. Yes.

18   Q. So Line 3, just the green. The first column or cell,

19   what's written at the top of that?

12:06:35   20   A. In the green part?

21   Q. The green, at the very top, what is that?

22   A. (Reading:)

23       "... has a criminal defense attorney file been

24       produced?"

12:06:42   25   Q. Okay. And that's a "yes" or a "no," right?

1   A.  That's "yes" or a "no."

2   Q.  Okay.  And in this particular case, Line 3, the answer is

3   "yes," right?

4   A.  And I'm sorry.  It's a little small.

5           (Brief pause.

6   BY THE WITNESS:

7   A.  "Yes."  It is a "yes."

8   BY MS. ROSEN:

9   Q.  And if we go next to the cell right next to it, same line,

10  at the top.

11  A.  It says:

12          "Is there any investigative material missing

13          from the defense attorney file."

14  Q.  And the answer is "yes" or "no," right?

15  A.  Yes, that's correct.  The answer in this specific column is

16  "yes."

17  Q.  And then if we move further to the right, what's the

18  question asked at the top of that cell?

19  A.  Referring to the just mentioned column is:

20          "If, in fact, there is material missing, what is

21          the Bates number for the missing material?"

22  Q.  Okay.

23  A.  And in this case there was a single Bates number.

24  Q.  So a single page was missing from that particular file?

25  A.  That's correct.

1    Q.  Okay.  And then if we move further to the right, what's

2    there?

3    A.  (Reading:)

4            "Does the defense attorney file contain an

5            inventory sheet?"

6            "Yes" or "no."

7            In this case "yes."

8    Q.  Okay.  And then if we move further to the right, what's

9    that column?

10   A.  (Reading:)

11           "If "yes," i.e., the inventory in the defense

12           attorney file, does it match the inventory in

13           the investigative file?"

14   Q.  And then in this case?

15   A.  It was not applicable because there was no inventory in the

16   investigative file.

17   Q.  Okay.  And then the next cell over, what is that one?

18   A.  (Reading:)

19           "Are GPRs from the investigative file --"

20           (Laughing.)  I'm really sorry, but it would help if I

21   had a bigger one.

22           MR. SWAMINATHAN:  I have a bigger one.  Can I give

23   that to him?

24           MS. ROSEN:  Sure.

25           THE WITNESS:  Thank you, sir.

1    MR. SWAMINATHAN:  Would it help you if you have a
2  bigger copy, Judge?
3         THE COURT:  Is this a bigger copy (indicating)?
4         MR. SWAMINATHAN:  We have a bigger one.  Do you want
12:08:55   5  that?
6         THE COURT:  Well, this wasn't big enough.
7         MR. SWAMINATHAN:  Judge, you have two options,
8  actually.
9         THE COURT:  Oh, that's nice and big.
12:09:17  10         (Document tendered to the Court.)
11  BY MR. LOEVY:
12  Q.  Okay.
13  A.  It is a little bit better:
14         "... are GPRs from the investigative file
12:09:26  15         missing from the attorney file?"
16         And that be "yes" or "no."  And in this particular
17  case of row three:
18         "Not applicable because no GPRs in the
19         investigative file."
12:09:35  20  Q.  And then moving further to the right?
21  A.  (Reading:)
22         "If, in fact, there are GPRs missing, what are
23         the Bates numbers?"
24         And since that's not the case here, it's marked "NA,"
12:09:47  25  not applicable.

1  Q.  Okay.  And then further to the right?

2  A.  (Reading:)

3       "Are handwritten notes from the investigative

4       file missing from the attorney file?"

12:09:57  5       And then in this, not applicable, no handwritten

6  notes in the investigative file.

7  Q.  Okay.  And then one more?

8  A.  (Reading:)

9       "Bates numbers from missing handwritten notes."

12:10:04  10       Not applicable since there were none.

11  Q.  And then finally one more.

12  A.  (Reading:)

13       "Are to-from memos from the investigative file

14       missing from the attorney file?"

12:10:15  15       This is "NA," "no, there are no to-from in

16       investigative file."

17  Q.  Okay.  So now if we're interested in simply isolating from

18  this giant chart here that's too small to read, just the

19  information that's missing from the criminal investigative

12:10:35  20  file, it would be appropriate to look at this third cell,

21  right, where it says "missing documents"?

22  A.  Right.

23  Q.  So if we could move then to City Demonstrative Number 3?

24       MR. LOEVY:  Judge, these aren't the same read from his

12:10:51  25  chart, right?

1    MS. ROSEN:  Same.

2    MR. LOEVY:  No objection.

3    BY MS. ROSEN:

4    Q.  So if we move to City Exhibit 3.  If you'll take a look

12:10:59    5    there.  Take a look just on the screen.

6    So the green that's there on your cell, I'm going to

7    represent to you represents each cell that identifies the list

8    of missing documents in the criminal defense attorney files

9    that were available for your review.  Okay?

12:11:20    10    A.  Just limited to the criminal defense files, yes.

11    Q.  Correct.  Okay.

12    MS. ROSEN:  Judge, if we're going to take a lunch

13    break, now might be a good time.

14    THE COURT:  Yes.  Very good.

12:11:32    15    Let's take an hour, ladies and gentlemen.  We'll start

16    at ten after 1:00.

17    COURT SECURITY OFFICER:  All rise.

18    (The following proceedings were had out of the

19    presence of the jury in open court:)

12:12:11    20    THE COURT:  Can anyone give me any sense of how we're

21    doing?

22    MS. ROSEN:  Yes.  I mean, I think I have about half an

23    hour, and then I think Mr. Loevy is estimating at this moment

24    about half an hour, and then I think we're moving through the

12:12:24    25    remaining witnesses today and tomorrow.

1    MR. LOEVY:  I think so, Your Honor.  We have some hope

2  that we're going to close our case tomorrow, subject to one

3  witness who is not available tomorrow.

4    THE COURT:  It's longer than anticipated.  But, okay.

5  And then what?

6    MS. ROSEN:  And then we're anticipating three or

7  4 days, depending.

8    THE COURT:  Okay.  All right.  Very good.  That's not

9  terrible news.

10    (Laughter in the courtroom).

11    MS. ROSEN:  We'll go with that.

12

13

14    (Luncheon recess taken from 12:13 o'clock p.m.

15    to 1:10 o'clock p.m.)

16

17         *    *    *    *    *    *    *    *

18

19

20  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

22

23  /s/Blanca I. Lara              June 18, 2018

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25