Exhibit F

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   ARTURO DeLEON-REYES,            )
                                     )
 4                   Plaintiff,      )
                                     )
 5   -vs-                            )   Case No. 18 C 1028
                                     )
 6   REYNALDO GUEVARA, et al.,       )   Chicago, Illinois
                                     )   March 7, 2022
 7                   Defendants.     )   10:18 a.m.
     _____)
 8                                   )
     GABRIEL SOLACHE,                )
 9                                   )
     -vs-                            )   Case No. 18 C 2312
10                                   )
     CITY OF CHICAGO, et al.,        )
11                                   )
                     Defendants.     )
12
         TRANSCRIPT OF PROCEEDINGS - Video Status/Motion Hearing
13             BEFORE THE HONORABLE SUNIL R. HARJANI

14   APPEARANCES:

15   For Plaintiff         LOEVY & LOEVY
     DeLeon-Reyes:         BY:  MR. ANAND SWAMINATHAN
16                         311 North Aberdeen Street
                           Third Floor
17                         Chicago, IL  60607

18
     For Plaintiff         PEOPLE'S LAW OFFICES
19   Solache:              BY:  MS. JANIS M. SUSLER
                           1180 North Milwaukee Avenue
20                         Chicago, IL  606042

21

22   Court Reporter:       AMY M. SPEE, CSR, RPR, CRR
                           Federal Official Court Reporter
23                         United States District Court
                           219 South Dearborn Street, Room 2318A
24                         Chicago, IL  60604
                           Telephone:  (312) 818-6531
25                         amy_spee@ilnd.uscourts.gov
</pre>

```
1   APPEARANCES (CONT'D):

2   For Defendant              ROCK FUSCO & CONNELLY, LLC
    City of Chicago:           BY:  MS. EILEEN E. ROSEN
3                              321 North Clark Street
                               Suite 2200
4                              Chicago, IL  60654

5   For the Individual         THE SOTOS LAW FIRM, P.C.
    Officer Defendants         BY:  MR. JOSH M. ENQUIST
6   Except Guevara:            141 West Jackson Boulevard
                               Suite 1240A
7                              Chicago, IL  60604

8   For Defendants             HINSHAW & CULBERTSON LLP
    Wehrle, Brauldi,           BY:  MR. MICHAEL C. STEPHENSON
9   Varga, and O'Malley:       151 North Franklin Street
                               Suite 2500
10                             Chicago, IL  60606

11  For Defendant              LEINENWEBER BARONI & DAFFADA LLC
    Guevara:                   BY:  MS. MEGAN K. McGRATH
12                             120 North LaSalle Street
                               Suite 2000
13                             Chicago, IL  60602

14  For Defendant              REITER BURNS LLP
    Navarro:                   BY:  MR. DANIEL J. BURNS
15                             311 South Wacker Drive
                               Suite 5200
16                             Chicago, IL  60606

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard via videoconference:)

2          THE CLERK:  18 C 1028 and 18 C 2312, DeLeon-Reyes v.

3  Guevara and Solache v. City of Chicago.

4          THE COURT:  Okay.  Good morning, everybody.

5          Any appearances, please, starting with plaintiffs?

6          MR. SWAMINATHAN:  Good morning, Your Honor.

7          Anand Swaminathan for Plaintiff Arturo DeLeon-Reyes.

8          MR. ART:  Good morning, Your Honor.

9          Steve Art for Plaintiff Reyes.

10         MS. SUSLER:  Good morning, Judge.

11         Jan Susler for Plaintiff Gabriel Solache.

12         MR. ENGQUIST:  Good morning, Your Honor.

13         Josh Engquist on behalf of Halvorson, Dickinson,

14 Rutherford, Stankus, Karalow, Harvey, Mingey, *et cetera*.

15         MS. ROSEN:  Good morning, Your Honor.

16         Eileen Rosen on behalf of Defendant City of Chicago.

17         MR. STEPHENSON:  Good morning, Judge.

18         Mike Stephenson on behalf of Defendants Brualdi,

19 O'Malley, Varga, and Wehrle.

20         MS. McGRATH:  Good morning, Your Honor.

21         Megan McGrath on behalf of Defendant Guevara.

22         MR. BURNS:  Good morning.

23         Dan Burns on behalf of Defendant David Navarro.

24         THE COURT:  Okay.  Good morning.

25         We're here on the motion filed by the defendants with

1  respect to the -- entitled Plaintiffs' Late Disclosure of New

2  Discovery and Expert Opinions who are relying upon that.

3  I appreciate the information you've given me. I've

4  reviewed the motion, the response, and the reply, but I want

5  to give a chance to you to argue the motion. I also had

6  questions for each of you.

7  So since it's the defendants' motion, I'll let you go

8  first, and then plaintiff can go after that.

9  Go ahead.

10  Ms. Rosen, if you're speaking, you're on mute.

11  MS. ROSEN: Thank you, Judge. Sorry about that.

12  As we set forth in our motion, Judge, this case has

13  been heavily litigated over the past few years, a significant

14  focus. The discovery in this case relates to the *Monell*

15  theories that both plaintiffs are pursuing. There's obviously

16  been a lot of motion practice regarding the scope of the

17  *Monell* discovery that started a couple of years ago. This

18  Court has extended a lot of time and energy in helping the

19  parties to manage the *Monell* discovery and to navigate it.

20  As this Court will recall, the focus of most of the

21  *Monell* discovery disputes were around the investigative files

22  and the companion CCSAO and CPD files. As early as spring of

23  last year this Court held a status and specifically asked

24  plaintiffs, once we were about to complete fact discovery and

25  move into *Monell* discovery, their thoughts and plans regarding

1   that *Monell* discovery.  All of those discussions focused

2   nearly primarily on the files, 30(b)(6) witnesses, and then

3   eventually expert discovery.

4         At no time over the past three years, let's say, that

5   we've been litigating this case have plaintiffs put the

6   defendants on notice that they intended their *Monell* theories

7   and claims to rely on evidence going back to 1972 and relying

8   on incidents related to individuals such as -- and this is not

9   an all-inclusive list but an illustrative list -- but with

10  respect to former police officers like Jon Burge, Area 1

11  detectives like Michael Kill, Kenneth Boudreau, Jack Halloran,

12  Chris --

13        THE COURT:  Ms. Rosen, what is the legal obligations

14  of plaintiffs to notify you about what documents its expert is

15  going to rely upon prior to the 26(a)(2) disclosure?  What is

16  the rule or legal obligation that you are identifying?

17        MS. ROSEN:  Well, I think what we say in our

18  pleadings, Judge, is they have obligations both under

19  Rule 26(a) and under the MIDP that this case started under,

20  which was to give us notice of the mountain of evidence that

21  they were going to rely on, whether it's through their experts

22  or anywhere else.

23        THE COURT:  Well -- I'll stop you there.  Right.

24  26(a)(1) relates to an MIDP to a certain extent about

25  documents that they will use to support their claim or

1   defense.

2       MIDP and 26(a)(1) doesn't address documents that an

3   expert may use to support their opinion.

4       Do you have any ability to suggest that that is what

5   those rules contemplated?

6       MS. ROSEN:  Well, Judge, there would be no way for

7   defendants -- if 26(a) did not include the type of evidence

8   that these particular experts are relying on as it relates to

9   the *Monell* claim -- if 26(a) didn't contemplate that, then

10  defendants would never have an opportunity to proffer rebuttal

11  evidence to that because the schedules don't contemplate it.

12      Even in this case where the City asked for three

13  months to conduct expert discovery, when I look at the body of

14  materials that have now been produced and that the experts

15  purport to rely upon, there are hundreds of thousands, if not

16  millions, of pages of documents that could be used to rebut or

17  to challenge the methodology that these experts purport to

18  rely on.  And there simply is not enough time built into the

19  schedule for the City to mount that kind of a defense if we're

20  not put on notice that that's what's coming our way.

21      THE COURT:  Okay.  But isn't that a separate issue,

22  which is, you're here addressing a discovery violation, right?

23  That's a different issue than you needing more time.  If time

24  is the issue, you know where you have to go for that.

25      But I'm just trying to figure out, what is the

1   discovery violation?

2       MS. ROSEN:  Well, I know of no rule that exempts

3   expert dis- -- that exempts experts -- plaintiffs from relying

4   on an expert disclosure to circumvent their discovery

5   obligation.  I mean -- and if you look at --

6       (Unreportable cross-talk.)

7       THE COURT:  What is the discovery obligation?

8       26(a)(1) says to identify a copy or description,

9   category, and location of documents that the disclosing party

10  has in its possession, custody, and control and may use to

11  support its claims or defenses.

12      None of these documents are going to be admitted into

13  evidence affirmatively in a case-in-chief.  They are documents

14  used by an expert.

15      Isn't that your understanding, too?

16      MS. ROSEN:  Well, A, I don't know that that's my

17  understanding because I don't think that that's clear from the

18  expert disclosures.  That's number one.

19      And, number two, it's still being relied on by

20  plaintiffs to pursue their theory and to -- you can't simply

21  excerpt -- so, for example, in here there's -- there are

22  excerpts of deposition testimony from long ago cases, some of

23  which don't even have captions on them.  It's not even clear

24  sometimes who the speaker is, who is testifying.

25      You can sometimes glean from these -- from these

1    transcripts who the attorneys are that are asking the

2    questions simply because they are identified in the

3    transcript, but there's no way -- so these are documents that

4    are being relied upon to pursue the claims, and these are not

5    documents that simply these experts had -- it's not -- it is

6    not the type of expert disclosure where an expert is saying,

7    "I am relying on these particular articles in my field that

8    experts in my specialty typically rely upon," right?

9           So like, for example, with respect to Dr. Leo, the

10   disputed confession expert, he relies on multiple articles and

11   research papers that go back the last 20 years on the work

12   he's done.

13          That's not the complaint here.  The complaint here is

14   that this is litigation that has been pending against the City

15   of Chicago for the last 50 years.  And, quite frankly, if

16   plaintiffs didn't think that this was a discovery violation,

17   they wouldn't have gone ahead and produced them in all the

18   other Guevara cases, and they wouldn't have gone ahead and

19   produced them in Prince during discovery, which it's my

20   understanding that they've now produced all of these materials

21   in Prince.

22          So it is not -- they are not the same type of

23   documents that experts typically rely on.  These are documents

24   that were pulled and culled by plaintiffs' counsel based on

25   their knowledge of litigation that they've been personally

1  involved in over the course of the last 40 or 50 years or that

2  they've known of based on litigation that they've done in the

3  last 40 or 50 years, and then they've simply provided it to

4  the experts.  And that is simply doing the end run around

5  their discovery disclosure obligations.

6      (Unreportable cross-talk.)

7      THE COURT:  The issue is then it is not the type of

8  materials that an expert has relied upon -- asked or should be

9  relying upon.  That's a substantive challenge to the experts'

10  opinion.

11      I'm trying to figure out again -- what law -- do you

12  have any case law that suggests that documents that an expert

13  relies upon to (indiscernible) its opinion must be disclosed

14  prior to the Rule 26(a)(2) disclosure date?

15      MS. ROSEN:  Well, if they're relying on documents

16  that are produced pursuant to the pursuit of particular

17  claims, then I don't see why they're exempt from 26(a) or the

18  MIDP.

19      If you're asking for a specific case that speaks to

20  experts, I do not have one.  We can look for one, but I do not

21  have one at the ready.

22      THE COURT:  Okay.  I looked (indiscernible) --

23      THE COURT REPORTER:  Judge, I'm having a little hard

24  time hearing you.  There is a lot of feedback when you speak.

25      THE COURT:  Are you talking to me?

1      THE COURT REPORTER:  Yes, but I am having trouble

2  hearing everyone.  There is a lot of background noise.

3      THE COURT:  Give me a second here.  Let me see if I

4  can use some headphones.

5      Lynette says it's not me.

6      Lynette, are you getting feedback from me?

7      THE CLERK:  I think it's -- Ms. Rosen, I'm going to

8  have to just mute you, and then you'll just have to unmute

9  yourself again.  I think the feedback comes from your end.

10      Let's try that.

11      THE COURT:  So I was saying, an expert can use

12  articles, they can use data points, they can use other

13  research, they can use public materials, for example, if

14  there's trial testimony in Fields or Rivera or all of these

15  other things, right?  They can use items that are in the

16  public purview to support their opinions.  None of those have

17  to be produced, as I understand it, prior to a Rule 26(a)(2)

18  deadline.

19      So these happen to be some documents in the public

20  purview but some documents that are in the possession of

21  plaintiffs' counsel.  I'm trying to understand how that second

22  category of documents is different than all the other

23  categories and triggers a discovery obligation.

24      MS. ROSEN:  Because there would be no way for the

25  experts to obtain those materials without first being provided

1  them by plaintiffs' counsel.  So, therefore, they are in

2  plaintiffs' counsel's possession, and it is their intent to

3  rely on it in pursuit of their claims.  So it fits within the

4  definition of 26(a).

5          It is not as if these experts hunted through the

6  public domain to find evidence to support these theories.  The

7  vast majority -- and I haven't done the breakdown because it's

8  hard to break down all of this because it's intermingled with

9  reproduction of documents that were already produced in this

10 case.  We're working our way through it.

11         But there is a significant portion of the materials

12 relied upon here that an expert could not obtain on their own.

13 They couldn't simply search the internet or simply search --

14 research databases or simply search academic materials to

15 obtain these materials, which means they were in plaintiffs'

16 possession which means they had an obligation that -- to

17 produce it pursuant to 26(a).

18         THE COURT:  Okay.  So essentially you're proposing

19 the rule to me, which is, anytime a counsel has documents in

20 its possession, that -- and I'm going to make the assumption

21 it's not going to be used in the case-in-chief independently.

22 And let's just say I agree with you.  Whether or not

23 plaintiffs can see that or not when I get to them -- let's

24 just say I agree with you -- that's not going to happen

25 because that -- either because the documents came late or what

1    have you.

2         But let's assume that they're not going to be used in

3    the case-in-chief.  They're going to be used to support an

4    expert opinion.  And let's put aside the issue of whether or

5    not those docs can even be talked about.  Right?  That's an

6    issue for the district judge to decide whether or not these

7    opinions come in, one, and, two, whether or not the underlying

8    factual data can be discussed to the jury.  Right?  Because

9    there is a lot of law out there that says that experts can't

10   discuss affirmatively hearsay evidence.  They can opine about

11   things, but they can't put in the underlying factual

12   information sometimes when it might be hearsay or other types

13   of evidence the jury should not be hearing.

14        Okay?  So let's put that aside for a moment.

15        What you're telling me is, anytime a counsel has

16   information in its possession that it's going to give to an

17   expert to use for solely expert testimony, that has to be

18   produced ahead of time because it's in the counsel's

19   possession; is that right?

20        Because there is a feedback.  We have to do this.  I

21   apologize.

22        MS. ROSEN:  No worries, Judge.

23        If it's not something that an expert can obtain on

24   their own because it's in the public domain, then how -- I

25   just can't fathom how it's not discoverable, because the only

1    way the expert is obtaining it is through plaintiff.

2          And, you know -- and then that leads to -- like --

3    because the practical problem, right, that we are faced with

4    right now -- if that's not the rule, the practical problem we

5    are faced with right now is that I am -- I am looking at

6    thousands of pages of material that in some instances I simply

7    cannot even identify their origination.

8          So there is -- there is -- if the rule is simply,

9    like, well, then your experts can just go find the rebuttal

10    material that they need, if I can't even identify where the

11    source material comes from because it's not originally

12    identified because of the way that this production comes

13    forward, then how is the City supposed to possibly rebut that?

14          Setting aside the -- the timing is --

15          THE COURT:  I can order them to identify the source

16    material for you.  That's a different issue.  Time is a

17    different issue.  If expert discovery is more complicated than

18    originally thought, that's a different issue.

19          But, again, coming back to the rule that has been

20    violated, and it sounds to me you're resting your hat on

21    26(a)(1) even though 26(a)(2) is a separate category under the

22    rule that discusses disclosure of expert testimony.  Anytime a

23    counsel has something in their possession that they might give

24    to an expert to use, they've got to give it to you during fact

25    discovery.

1        I just want to make sure I understand it.

2        MS. ROSEN:  That is our view.

3        And separate and apart from that, Judge, is the

4 notion that plaintiffs were specifically asked repeatedly over

5 the last year how they intended to pursue their *Monell*

6 theories, and at no point did they indicate any -- give any

7 indication whatsoever that they intended to rely on not only

8 the documents produced but other materials going back to 1972.

9        If -- if what we're talking about is a case where --

10 where the City has brought motion and there has been

11 litigation practice over the scope of *Monell*, both with

12 respect to what the City has to produce and other discovery,

13 right -- there were -- there was attempts, for example, to get

14 information from the Department of Justice related to

15 Roznowski.

16        The defendants attempted to get at phone calls of

17 Marilyn Mulero, who we thought had something to do with

18 Adriana Mejia.  So -- and now there's Mulero documents here.

19 So they stopped us from obtaining information that we wanted

20 with respect to Mulero, and now they've produced Mulero

21 documents for their experts to rely on.  That's just not fair.

22        THE COURT:  But, I mean -- I -- I understand your

23 point, but the opposing -- the PowerPoint is that, if they

24 want to use a discovery tool during discovery, we've got to

25 figure out whether it's relevant and proportional for purposes

1  of fact discovery, too, right?

2          The idea was, are they going to introduce fact

3  information about Miedzianowski during a fact case-in-chief,

4  right?  And by denying production of the documents based on

5  relevancy, now they cannot.

6          But now we're at expert discovery, and we're trying

7  to figure out what expert discovery -- what rule may have been

8  violated or not violated and what expert discovery is going to

9  take for you to respond to it, whether it's going to require

10  subpoenas or other things to respond to it.

11          But I'm trying to figure out why all of this

12  shouldn't be done -- let's just assume that I would have

13  preferred to have known about this, okay, because I ask a lot

14  of questions and I know what's coming.  So let's assume I

15  would have preferred to know about this.  But that's not

16  enough for me to strike it.  To strike it I have to find a

17  rule that was violated.

18          But coming back again to -- tell me if I'm right.

19  The rule they're relying on is MIDP and 26(a)(1); is that

20  right?

21          MS. ROSEN:  That's correct.

22          THE COURT:  Okay.  Okay.  Let me talk to defendants

23  for a while, and then I may come back to you for more

24  questions.  Thank you, Ms. Rosen.

25          Okay.  Let me talk to plaintiffs for a while, and

1  then I'll come back to you.

2          Plaintiffs, go ahead.

3          MR. SWAMINATHAN:  Thank you, Your Honor.

4          So let me first address the question that was sort of

5  looming out there.  Yes, Your Honor is correct that these

6  documents that are at issue are exclusively for use by our

7  expert.  The issue of these CPD documents are really only

8  being used by a single expert, Dr. Leo, for purposes of his

9  expert opinions exclusively.  They will not be presented as

10 substantive evidence in the underlying case-in-chief, as you

11 say.  So that hopefully addresses that question.

12         THE COURT:  Okay.  Let me stop you there.

13         So you said just Dr. Leo.  Because the defendants I

14 think are under the impression that it relates to a number of

15 experts.  Is that not right?

16         MR. SWAMINATHAN:  That is not the case.  The CPD

17 production is exclusively related to allegations of abuse

18 systemically in the Chicago Police Department, and so those

19 are documents that support the opinions of Dr. Leo

20 exclusively.

21         THE COURT:  Okay.  Okay.  Go on.

22         MR. SWAMINATHAN:  Okay.  So that -- so that clears

23 that issue up.

24         To the extent there's questions that the City has

25 about particular documents and the source materials or which

1    transcript or case it's from, those are questions we are happy

2    to confer about if there are issues.  And, you know, they'll

3    be able to raise that with us.  And to the extent there are

4    issues, we will of course work with counsel to address those

5    kinds of questions.  So I don't think that should be at issue.

6            Ultimately, you know, really the point here is,

7    Your Honor is correct.  The disclosure obligations for us with

8    regard to these materials given that they are exclusively for

9    our expert comes from Rule 26(a)(2)(B), and that rule

10   ultimately says facts and data relied on by our expert should

11   be provided in accordance with 26(a)(2) disclosures.  And so

12   we've provided this material in advance of and up to the time

13   of our 26(a)(2) disclosures.

14           You know -- and ultimately there are two sort of big

15   things happening in the background here.  This is not about

16   sandbagging anybody.  This is about finding a way to prove a

17   theory that we believe is a very important theory, a theory

18   that remarkably nobody has really been able to pursue

19   effectively against the Chicago Police Department despite what

20   we know about the history in this department, and that's

21   because it's a very difficult thing to gather this type of

22   material.  And we have made the effort to gather that

23   material.  And we have essentially done that in the context of

24   a case and a litigation strategy from the city across cases

25   that says we're not going to give you anything on any of these

1   issues, and we're going to have to have very serious --

2          THE COURT:  Let me jump in with some questions.

3          How do you respond to defendants' argument that

4   26(a)(1) requires you to disclose information that you have --

5   including documents, that you have in your possession,

6   custody, or control and may be used to support your claim or

7   defense?

8          I understand some of these are public information,

9   but not all of them.  Some of them are -- were in your

10  possession, custody, and control for many years and were not

11  disclosed.

12         How do you respond to that?

13         MR. SWAMINATHAN:  Yeah, I'd like to say, first, our

14  view is, we do not have a discovery obligation to turn over

15  material during the fact discovery period that are going to be

16  used exclusively by our experts.

17         The second point is, to the extent we've had material

18  that has been in our possession, we have never been operating

19  on the idea that everything we've got in our possession that

20  relates to every case of abuse or allegation of abuse in the

21  city is relevant.

22         And by the way, that's the City's own position.

23  Right?  The City's position is, you're producing stuff about

24  Burge and stuff from 1972 and other periods, none of which is

25  relevant.

1    And so what we have been doing is engaging in the

2  process of identifying materials -- yes, some of which has

3  been in the possession of our firm overall -- to identifying

4  material that we believe is relevant to these claims and

5  producing it.  And, yes, we've been producing a lot of it

6  during the fact discovery period itself.

7    And as we learned of additional material that we

8  believed and learned that our expert would rely on and want to

9  rely on, we have produced it, even in advance of the date for

10 the Rule 26(a)(2) disclosures.  And we've done that in part

11 because of the very idea that the City is going to want to

12 come back and say, well, you produced all this stuff, so I'm

13 going to want to do a bunch of stuff, and I'm going to need

14 additional time.

15    So we produced things in advance of the 26(a)(2)

16 disclosure date, not because we believed it was our obligation

17 but because our goal is not to sandbag anyone.  It's to get

18 these materials produced and provide our expert opinions.

19    THE COURT:  So I figured you were going to say that

20 in response to Ms. Rosen's comment that you produced this

21 earlier, therefore, you acknowledge you have a discovery

22 obligation.  I figured that you were going to tell me that you

23 were doing it out of consideration because you knew it was

24 going to take some time for them to consider this.

25    But -- and that -- tell me, how much of this material

1     -- out of the 71,000, ballpark, what percentage has been -- is

2     material you haven't produced previously?

3            MR. SWAMINATHAN:  So I don't have a definite answer

4     so I don't want to hold myself to a certain number, but I

5     believe it is well over 50 percent.  So our team that's been

6     working on this I think is confident it's well over 50

7     percent.  It might be as much as 75 percent.  But I can't give

8     you a hard number now, Your Honor.

9            THE COURT:  Okay.  All right.

10           Let me ask you another hypothetical -- a

11     hypothetical.  Right?  Let's just say you give your expert one

12     million documents to review, and -- let's just say you have a

13     million documents in your firm, and you give -- you give them

14     one million documents to review, and he considers them one

15     million documents.  And then you -- at the 26(a)(2) deadline,

16     you produce your report and you produce one million documents

17     in support of that.

18           Would there be no discovery violation in that

19     respect?

20            MR. SWAMINATHAN:  So let me address that practically

21     and as a legal matter.

22           As a legal matter, yes, there would not be a

23     discovery violation if it's being used exclusively as evidence

24     the expert is relying on.  What underlying set of facts and

25     data an expert needs, whether it consists of ten pages or a

1    million pages, it doesn't change whether or not there becomes

2    a discovery obligation.  Many times experts will rely on some

3    type of analysis that is hundreds and hundreds of pages or

4    thousands of pages of spreadsheets or whatever other kind of

5    data it takes.  Whether that charge is one page or a thousand

6    pages or a million pages doesn't change the discovery

7    obligations.  So that's the answer to the legal question.

8           As a practical question, I understand why Your Honor

9    raises this concern, and I even understand why the City says,

10   oh, my gosh, this is really difficult for me.  But I want to

11   point out that the framework in which we're having this

12   discussion is I think skewed, and I want to address that.

13          So the way the City seems to believe these cases

14   should be litigated is, they don't have to do anything with

15   regard to *Monell* claims that we have said since the day of the

16   complaint that we're going to be litigating and that they're

17   entitled to essentially sit on their hands, wait for

18   plaintiffs to decide how they're going to go about proving

19   their claims.  And then once plaintiffs have revealed their

20   entire strategy, then decide that they will then choose to

21   figure out how they want to defend the claims.

22          THE COURT:  Isn't that how defense works in every

23   case?

24          MR. SWAMINATHAN:  Not really.  And there's two pieces

25   to that.  One, we've identified in the complaint that we're

1    going to try to prove a widespread practice of abuse of

2    suspects across the city.  And, frankly, it shouldn't come as

3    a shock at all.  That's the allegation in this case.  That's

4    the allegation in this case.  We say we believe it's part of a

5    widespread practice.  It's well known that there's this

6    documented history from the City.

7          So they knew from day one that they could also be in

8    the process of developing the evidence they wanted to use to

9    defend that claim.  They've had time to be able to gather

10   materials that they wanted used to defend that claim.  They

11   could produce materials in fact discovery they think would be

12   relevant substantive evidence they want to rely on.  And they

13   can -- and their expert can rely on whatever materials they've

14   been working with their expert on gathering during the course

15   of the last several years.

16         But the City suggests that really the way this works

17   is they don't have to do anything, wait until they see our

18   expert report and then decide whether they want to come up

19   with any documents or any other evidence to defend the claim.

20   That's not how discovery works.

21         Now, that is to say that if they had issued an

22   interrogatory request immediately at the beginning of this

23   case that said, hey, what theory are you pursuing, and I

24   failed to identify this particular theory, then there might be

25   an issue, right?  But we have never failed to identify this

1    theory.

2            When we have had any obligation to identify our

3    theory, we have done so, even before -- even without the

4    obligation in the form of interrogatories or other requests.

5    We have said from the beginning we are going to be seeking to

6    pursue a theory based on the abuse of suspects on a widespread

7    practice basis.  And then Your Honor asked us, and at the

8    hearing we said we'd be pursuing -- our expert would be

9    relying on the history of misconduct.

10           So we have been open and honest about the fact that

11   we are pursuing this theory.  The City doesn't like the idea

12   that it should have to do anything until it sees our expert

13   reports.

14           And ultimately what we've said is, look, the City

15   says, in light of all of this, I need some additional time or

16   I need some ability to present my own counter documents.

17   Whatever it is, we could address that.  And we've said, fine.

18   If they feel that they need particular documents or they need

19   a process in place to try to address now these claims that

20   they've seen, we're willing to work with them to do that.

21           THE COURT:  Okay.  Do you have any case law that

22   suggests that your disclosure of obligation of 26(a)(1) does

23   not apply to documents that were in your possession that you

24   provided to your expert for their expert report?

25           MR. SWAMINATHAN:  I don't.  I think the argument has

1    been that that's sort of a clear and plain reading of

2    Rule 26(a)(1) and Rule 26(a)(2)(B) in particular.  We could

3    take a look if Your Honor would like us to.

4            But I think the other point is, the case law, to the

5    extent we cite it, talks about the idea that even documents

6    that are underlying substantive evidence that were ultimately

7    disclosed late (indiscernible) --

8            AUTOMATED VOICE:  You are muted.  You can press star

9    6 anytime to unmute yourself.

10        (The Court Reporter was placed on mute.)

11        MR. SWAMINATHAN:  -- before the expert disclosure

12   deadline.  Ultimately there was not prejudice, and the

13   defendant could address those arguments and disclose whatever

14   additional material it wanted, and so there wouldn't be

15   prejudice.

16           So our view is, to the extent there's case law that

17   would even suggest that there was some idea that we should

18   have disclosed these even earlier -- again, these cases that I

19   (indiscernible) are unlike ours.  In those cases, these

20   documents were produced after the fact discovery deadline.  In

21   our case, that isn't the case with the exception of 2,000

22   pages.

23           And in those cases, the documents were ultimately --

24   despite the fact that they were produced late, the Court still

25   ruled -- and despite the fact that there was substantive

1    evidence -- so actually produced late because they were

2    supposed to be used in the underlying case -- ultimately the

3    Court ruled, well, there's no prejudice.

4           So you're view is, even if there was to be some

5    notion of an obligation that we don't believe exists, we have

6    met those obligations.  And to the extent we haven't, there's

7    no prejudice.  We can resolve this issue by providing the City

8    the opportunity it needs to gather the materials it wants to

9    gather or believes it needs to gather.

10          THE COURT:  All right.  I would like to hear -- I've

11   got two questions for you.  One is, it's no secret that I have

12   wanted to know what's coming up every few months, so what

13   you're going to do next.  And besides the one disclosure you

14   told me, which is that the Fields and Rivera material were

15   likely going to be used by your expert, I did not hear you

16   tell me that there was going to be other cases that -- and

17   documents that you have in your custody that were going to be

18   used to support your expert.  And I would like to know why

19   that wasn't brought to my attention.

20          And I -- the fact that you've told me your theory, I

21   agree, you have certainly told me your theories multiple

22   times, whether it's in the complaint or whether it's in status

23   reports.  I know -- or whether it's in briefing.

24          But in terms of the actual documents -- or, more

25   likely, the cases that were being used as examples of a

1  practice I haven't heard before besides Fields and Rivera.

2  And so I'd like you to talk about that.

3  MR. SWAMINATHAN:  Sure.

4  So this has never been some idea of sandbagging

5  either defendants or the Court.  It has never been some

6  deliberate plan to, you know, not reveal this grand strategy.

7  It was our intention when we collected the homicide

8  files to use it not only for this (indiscernible) theory, but

9  also for the coerced -- for the coerced confession and

10  widespread practice theory.

11  Ultimately, as we worked through that material, we

12  did find that it was going to be extremely difficult to use it

13  for that particular purpose, and we used it for the other

14  purpose we did intend.  But based on the nature of the

15  documentation, it wasn't going to work for that purpose.

16  Meanwhile, we were collecting and gathering this

17  other material.  And we never had an idea that this -- that we

18  knew exactly how we were going to be able to use this material

19  and exactly how we would be -- which particular aspects of

20  this material we'd ultimately be able to use.  There were a

21  lot of questions that we were resolving throughout this

22  process about what documents do we have, what's actually in

23  it, what do we need to prove citywide practices.

24  And so we essentially have been in a process of

25  trying to gather this material as we're also understanding

1   what the Court's rulings have been around *Monell* issues, both

2   in terms of CR files and homicide files and ultimately saying

3   to ourselves how do we go about proving this theory given the

4   challenges we face with burden and other obligations on the

5   City.

6           And so where we have developed the idea that this is

7   information we are going to rely on, we've been producing it.

8   And so it's never been sort of in advance we had this grand

9   strategy and we were just going to hide it from everybody.

10  That's never been the approach.

11          The approach has been, this is the theory we're

12  pursuing.  That's been clear since day one.  And how we're

13  going to go about proving it absolutely has been in flux

14  throughout the discovery period as we deal with the various

15  challenges.  And that's really all it is.

16          THE COURT:  Yeah, it also sounds like you've told me

17  that, in not so many words, the defendants were right, and you

18  can't look at a homicide file and determine whether or not

19  somebody was coerced or interrogated and have to confess.

20          MR. SWAMINATHAN:  I think that that's fair.  I think

21  what we believed we'd be able to do is prove aspects of the

22  widespread practice using those files, which would be then

23  relevant to the constitutional violations constituting coerced

24  confessions.  What we found is that even that piece was very

25  difficult to do.  That's fair.

1    THE COURT:  Okay.  And that's unfortunate because we

2  spent a lot of time dealing with the non-*Brady*-related

3  theories and how the homicide files would be used -- or could

4  be used to support that.

5    But you're telling me it didn't work out at all?

6    MR. SWAMINATHAN:  It didn't work for that purpose.

7    But I want to be clear about this, every single

8  homicide file was used by our expert.  The City says we only

9  relied on seven or eight out of all of those files.  That is

10  not the case.  Every single one of the files was coded and

11  relied on by our experts as part of a very detailed

12  statistical analysis.

13    So I want to be clear, we used every single one of

14  those files.  And, yes, for one of the theories that we hoped

15  to be able to use it for, we didn't, but we used it for the

16  other theory that we talked to the Court about.

17    THE COURT:  Okay.  How many cases out of 76,000 --

18  whatever it is -- 71,000 -- how many of those documents -- how

19  many cases constitute that?  So is it 30 wrongfully convicted

20  cases?  Is it 100?  Is it ten?  What is it?

21    MR. SWAMINATHAN:  It's -- I believe it's about 40.

22    THE COURT:  And have you identified what documents

23  relate to what case?

24    MR. SWAMINATHAN:  Yeah, so the Bates stamps

25  themselves identify what case it is.  So they're identified as

1   PTP dash, and then it's the name.  And so a lot of this is

2   also done so that there could be a sort of -- whatever it is,

3   something to make -- a better organization for documents and

4   files.

5          So that's clear.  To the extent there's some -- any

6   ambiguity or the City is uncertain about what those cases are,

7   we can easily identify them.

8          THE COURT:  Okay.  Ms. Rosen, go ahead.  I'll let you

9   give a short rebuttal since it's your motion.

10         MS. ROSEN:  Sure, Judge, just a couple things.

11         With respect to which experts rely on this, it -- the

12  face of the reports indicate that it's both Dr. Leo, who is

13  the disputed confession expert, and Mr. Fanell (phonetic), who

14  is the failure to discipline and supervise, I guess I'll call

15  him, expert.  So he is the one that met -- looked at

16  statistics and coding that was done based on somebody's -- not

17  his own but somebody else's review of the CR files in the case

18  that we produced, and that makes up part of his opinions.  But

19  he also goes through an extensive detailed what he calls

20  historical background and starts -- and, in fact, I think one

21  of the headers is "The Burge Era," and starts at 1972

22  through 1991, and then goes through and talks about the Area 1

23  detectives, which is the group that usually encompass

24  Boudreau, Halloran, O'Brien, and Kill, and then he also spent

25  some time with Kato and Joe Miedzianowski.

1   So it is not true that it's only Dr. Leo.  So there's

2   two experts in play with respect to all of these documents.

3   And then I guess the only other point I would make

4   is, with respect to plaintiffs' counsel reference to the

5   discovery, if the City had asked for discovery and they didn't

6   answer it, the City did propound contention interrogatories.

7   The City deliberately waited until we got to the end of *Monell*

8   discovery because historically we get objections and say it's

9   premature and we're still in the middle of discovery.  So to

10  avoid that Rule 37 problem, we issued them at the end of

11  November.

12  We received discovery responses from plaintiff

13  December 30th of 2021, specifically asking for all of the

14  *Monell* theories and all of the facts and evidence to -- that

15  would be relied upon in support of those theories.  We are

16  still engaging in Rule 37 discussions about those responses.

17  But to the point that was made earlier, there is

18  reference to Burge, Boudreau, Halloran, and Kato; there is no

19  reference to the cases.  It is simply the City has a

20  long-standing history dating back to the early '90s or early

21  '70s with respect to the different theories, see, e.g., you

22  know, Burge; see, e.g., Boudreau, Halloran; see, e.g., Kato.

23  And there is no detailed information about the cases or the

24  evidence that's going to be relied upon.

25  So, as I've said, we're engaging in Rule 37, but I

1    just wanted to address that point, because it was raised

2    earlier, about how the City perhaps could have issued

3    discovery earlier.

4         THE COURT:  Yeah, so, look, I don't have -- to the

5    extent that you're concerned that I have -- that you have

6    worried about your own discovery conduct, I have no concerns.

7         You in 2018 issued I believe a doc request asking for

8    expert opinions and materials supporting the expert opinions.

9    And of course you got what every opposing party does, which is

10   to say we're not there yet.  When we get to the Rule 26(a)(2)

11   disclosures, we'll give you the opinions and the materials.

12   Right?  And obviously there is no motion practice on that

13   because that's generally how it goes.

14        And then you issued a contention interrogatory near

15   the end of your discovery period.  And that's also typical

16   because you're not going to get an answer prior to that point

17   in time.

18        But I guess the point is, doesn't that just go to

19   show that we're doing things in the appropriate time frame,

20   that now is the time frame for expert discovery, now is the

21   time frame for you to respond with your report?

22        If you think they cherry-picked stuff, your expert

23   can say that.  If you think the analysis is terrible by the

24   plaintiffs' experts, your expert can say that.  Maybe you

25   think that there's things that should never come in, like

1    Miedzianowski and Burge.  You can move *in limine* and ask for a

2    *Daubert* hearing or exclude that.

3        Again, I come back and I'm focusing very clearly on

4    the discovery violation only and what that is.  And, again, if

5    the issue is, you don't have enough time to respond to this,

6    you can go to the DJ and ask for more time and you can say,

7    everybody got the discovery schedule wrong, this is going to

8    take more time than we anticipated, and tell him why.

9        But like I said, I keep coming back to the discovery

10   violation.  And what is -- what would be your response to

11   that?

12       MS. ROSEN:  Well, Judge, it's the same thing that I

13   said before.  This is not the typical type of discovery that

14   experts rely upon that get revealed for the very first time

15   during expert discovery.  This has a very -- even though

16   plaintiffs are saying that they're only going to get it in

17   through their expert, that doesn't, in the City's view, shield

18   them from an obligation to disclose the information in a

19   timely fashion so that -- so that it can be dealt with in a

20   timely way.

21       This is part of *Monell* -- this is their *Monell* claim.

22   We had six months of *Monell*, exclusively *Monell* discovery.

23   And I just don't understand why it couldn't have been produced

24   during that time frame.  And we rely on 26(a), and we rely on

25   the MIDP disclosure rules.

1      THE COURT:  Okay.  I am happy to give you a little

2   time if you want to present case law to me for your position

3   that 26(a)(1) covers documents that an expert is going to be

4   using for purposes of your expert opinion.  I'd like to get

5   this right.

6      I'm not going to give you too much time because I

7   don't need a lot of briefing on this.  I actually would like

8   to see the cases.  Frankly, I don't even need you to tell me

9   what the cases say.  I'll read them.  But it just saves

10  everyone time.

11     So -- because I want to get it right, and so I want

12  to make sure that when I make a decision, there is law that

13  supports your pick.

14     So I'll ask you if you can give me a supplemental

15  memo by Thursday, March 10th.  And like I said, it doesn't

16  have to be long.  And if you can do it earlier than that, that

17  would be even better.  But I'd like to see what the cases are

18  that you are proposing, and then I'll take it from there.

19     I'd imagine -- Defendants, why don't you -- excuse

20  me -- Plaintiffs, why don't you see what is filed first before

21  you make a decision about what you want to do with it.

22     In the meantime, I will say, while this clock is

23  ticking, I would suggest that the defendants start working

24  with their expert and make the assumption that this expert is

25  going to have to respond to these materials.  If the expert

1  wants, obviously it can ignore it, and you can just do a

2  *Daubert* motion and seek to exclude it.

3       But for purposes of time, I would suggest that you

4  have your experts start working on this.  And you'll get a

5  ruling no later than next week, early next week, hopefully, to

6  give you some grounds.  But I don't want this week to go by

7  without it being used efficiently.

8       Okay?  Any questions from anybody?

9       MS. ROSEN:  No, Judge.

10      THE COURT:  Okay.  Thank you.  That was very helpful.

11  I appreciate your time and advocacy.  I'll look for your memo

12  on Thursday.

13      And I think, Defendants, if you -- excuse me --

14  Plaintiffs, if you want to respond, I would say just let my

15  courtroom deputy know, but it really would have to be by

16  Monday.  And, again, you know, I'm hoping what I get is just a

17  few pages because I just want to read the cases rather than

18  argument about the cases.  Okay?

19      Okay.  Thank you very much.  I appreciate your time.

20  We're adjourned.

21      MULTIPLE SPEAKERS:  Thank you, Your Honor.

22  (Which were all the proceedings heard.)

23

24

25

```
                              *   *   *   *   *   *

                         C E R T I F I C A T E


        I certify that the foregoing is a correct transcript, to

    the extent possible, of the record of proceedings in the

    above-entitled matter, given the limitations of conducting

    proceedings via videoconference.


    /s/ Amy M. Spee                 3/23/2022
    _____  _____
    AMY M. SPEE, CSR, RPR, CRR          Date
    Official Court Reporter
```