Exhibit 20



Caroline Golden
The Sotos Firm
141 W. Jackson, Suite 1240A
Chicago, IL 60604

Re **Arturo Reyes and Gabriel Solache**

October 31, 2022

Dear Ms. Golden,

Pursuant to your request, I have conducted a forensic assessment of the disputed
confession and the issues presented as scientific knowledge in the report submitted by Dr.
Richard Leo for this litigation. Rosauro and Adriana Mejia, Arturo Reyes and Gabriel
Solache were arrested on April 5, 1998, in connection with with the March 28, 1998,
murders of Mariano and Jacinto Soto and the kidnappings of Santiago Soto, 3, and his two-
month-old sister Maria.

Mrs. Mejia implicated Mr. Reyes, who then confessed to the crimes and implicated Mrs.
Mejia and Mr. Solache. Ultimately, Mrs. Mejia, Mr. Reyes, and Mr. Solache confessed to all
participating in the killings and kidnappings, on April 4 and April 5, 1998. After a period of
police questioning and investigation, police released Rosauro Mejia.

Their statements were admitted into evidence after lengthy suppression hearings which
contemplated, among other challenges, allegations that the statements were coerced.

Among different examinations of evidence from the death scene, DNA tested and
matched to Mrs. Mejia. DNA did not match to Mr. Reyes or Mr. Solache on any of the
portions of items from the crime scene that were tested for DNA.

Mrs. Mejia pleaded guilty. Mr. Reyes and Mr. Solache went to trial and were convicted in
June 2000. Mr. Reyes was sentenced to a 30-year term. Mr. Solache was sentenced to death;
that sentence was commuted when Governor Ryan declared a moratorium on the death
penalty in Illinois in 2003.

In May 2003 and March 2004, trial Judge Sacks denied post-conviction petitions, terming
claims relating to coerced confessions "frivolous…and without merit." Judge Clapps
denied Mr. Reyes post-conviction petition in February 2005. But in 2006, the Illinois
Appellate Court reversed the dismissal, and in a lengthy argument explained why a

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **2** of **46**

characterization of "frivolous and without merit" was not proper. At the request of Mr. Solache, the Court reassigned the appeal to a new trial judge.

Rehearing on the issue was granted in 2013, and the court took testimony from witnesses about Det. Guevara's previous alleged misconduct. Judge Obbish then granted a motion for a new suppression hearing in June 2016, though he denied a motion to vacate the convictions. After the Judge granted the motion to suppress, prosecutors dismissed the prosecution despite noting their strong belief in the Plaintiffs' guilt. Judge Obbish vacated Mr. Reyes and Mr. Solache's convictions on December 21, 2017 and ordered them released from prison. Mrs. Mejia remains in prison.

On February 9, 2018, and March 30, 2018, Mr. Reyes and Mr. Solache filed respective civil claims against the Chicago Police Department, involved officers and prosecutors. The lawsuits charge that the officers and prosecutors "coerced confessions they knew to be false," and withheld exculpatory evidence from the defense.

In support of their claim, plaintiffs' attorneys produced a report by Richard Leo, Ph.D., a law professor, published critic and theorist of police interrogation, and advocate of concepts he originated to apply to disputes of confessions. Dr. Leo produced a report on January 15, 2022 in which he asserted that:

  1) Mr. Reyes and Mr. Solache have proven false confessions

  2) Mr. Reyes and Mr. Solache provided coerced-compliant false confessions

  3) Mr. Reyes and Mr. Solache's descriptions of their interrogations are consistent with "empirical social science research" on "types of interrogation techniques, practices, and effects" that lead to false confessions

  4) That police accounts of the interrogation techniques used in this case "are not consistent with the empirical findings of the social science research literature on what leads to false confessions"

  5) The interrogations contained examples of physically and psychologically coercive techniques, methods, strategies, and effects that have been shown to cause suspects to perceive that they have "no meaningful choice but to comply with the demands and requests of their interrogators"

  6) The interrogations featured risk factors researched to cause false confessions: a) lengthy interrogation b) sleep deprivation c) premature rush to judgment and guilt presumptive interrogation d) false evidence ploys e) explicit and "implicit" threats f) explicit and "implicit" promises and g) psychological and physical coercion.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **3** of **46**

7) The interrogations involved police interrogation contamination and "scripting" (pressure to accept a police narrative of how and why a crime occurred)

8) The interrogations displayed a "profoundly reckless disregard for finding the truth" and violated standards of police interrogation practice and training standards

9) From 1972 through 2000, the Chicago Police Department had a systematic practice of subjecting African American and Latino suspects…to physically abusive and coercive interrogations with the result of coercing or fabricating false and/or unreliable inculpatory evidence….without regard to actual guilt or innocence

10) Superiors in the Chicago Police Department received continuing notice of physical abuse and coercion of Black and Latino suspects from the testimony of criminal defendants at motion to suppress hearings and trials, court decisions, agency reports, and the admissions of city officials

The case is referred to my attention for review of pertinent materials and application of my pertinent case experience and of the available and relevant body of scientific knowledge and research in this area to address the following questions:

1) *Are the Solache and Reyes confessions proven false confessions? With respect to the "criteria" proposed by Dr. Leo, are these researched for validity or reliability? How does the application of a theory manifest in Dr. Leo's opinion and the Solache and Reyes confessions?*

2) *What is the relevant scientific body of knowledge for the Solache and Reyes disputed confessions?*

3) *With respect to the discrepant accounts of the interrogations, does "empirical social science research" resolve the truth or falsity of the confessions, or explain a false confession if that is the case?*

4) *With respect to Mr. Reyes and Mr. Solache's descriptions of their interrogations, do they reflect "empirical social science research" on "types of interrogation techniques, practices, and effects" that cause false confessions?*

5) *What research has been conducted to show, with validity and reliability, that the following are "risk factors" for false confession to murder and in particular, in a case in which mitigation would be difficult: 1) lengthy interrogation 2) sleep deprivation 3) premature rush to judgment and guilt presumptive interrogation 4) false evidence ploys 5) explicit and "implicit" threats and promises? What is the relevance of each of these terms to the Reyes and Solache confessions?*

6) *What is the empirical research affording validity and reliability to the term, "psychological coercion," as Dr. Leo uses it?*

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **4** of **46**

7) *Is there empirical study of contamination in false confessions to murder, beyond demonstration that it occurs? Is there evidence to demonstrate that this concept is pertinent in the confessions of Mr. Reyes and Mr. Solache?*

8) *Is there empirical study of "scripting" in false confessions to murder? Is there evidence to demonstrate that Mr. Reyes and Mr. Solache's confessions were scripted?*

9) *Does the scientific body of research inform the ability to discern a "profoundly reckless disregard for finding the truth," and investigative practices "without regard to actual guilt or innocence?"*

10) *How does previous history of professional conduct inform assessment of later professional conduct?*

## SOURCES OF INFORMATION

1. CCSAO File
2. First Amended Complaint, May 4, 2020
3. Second Amended Complaint, January 15, 2021
4. Postmortem Exams
5. Deposition of Eric Sussman, November 23, 2021
6. Deposition of Heather Brualdi, July 9, 2019
7. Deposition & Exhibits of Adriana Mejia, June 18, 2019 – February 5, 2021
8. Deposition & Exhibits of Rosauro Mejia, Rosauro, August 8 & September 16, 2019
9. Deposition & Exhibits of David Navarro, July 23, 2020
10. Deposition & Exhibits of Thomas O'Malley, August 14, 2019
11. Deposition & Exhibits of Arturo Reyes, February 25 – 28, 2020
12. Deposition & Exhibits of Gabriel Solache, December 6 – 9, 2021
13. Deposition & Exhibits of Jorge Soto, June 12, 2019
14. Deposition & Exhibits of Daniel Trevino, June 22, 2021
15. Deposition & Exhibits of Richard Leo, September 28 & 29, 2022
16. Illinois State Police reports, May 6, 1998 – December 24, 2020
17. Photographs
18. Motion to Quash Arrest of Reyes, February 1, 1999
19. Orders compelling blood samples, August 19, 1999
20. MTC Blood Samples of Mejia, Solache & Reyes
21. State SDTs to Cermak, August 31, 1999
22. Solache SDT to Cermak for hearing records, October 22, 1999
23. CCSAO Inv Report, January 27, 2000
24. Discovery Answers, Solache & Reyes
25. Trial Transcripts & Exhibits
26. Preliminary Hearing, April 6, 1998
27. Post-Conviction Circuit Court Order, June 29, 2016

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **5** of **46**

28. Order Vacating Conviction of Arturo Reyes, December 21, 2017
29. Mandate of the Appellate Court, December 11, 2006
30. Order Denying Post-Conviction Relief, Arturo Reyes, February 18, 2005
31. Order Denying Post-Conviction Petition, Arturo Eyes, March 2, 2004
32. Order Denying Post-Conviction Relief, Gabriel Solache, March 12, 2004
33. Order Denying Post-Conviction Petition, Gabriel Solache, May 16, 2003
34. Motion to Suppress Statements, Gabriel Solache, February 1, 1999
35. Motion to Suppress Statements, Arturo Reyes, April 14, 1999
36. People's Response to Defendant's Motion to Suppress Statements, June 15, 1999
37. Motion to Suppress Statements, Adriana Mejia, June 21, 1999
38. Motion to Suppress Hearing Transcripts of Mejia, Solache, & Reyes
39. Supplemental Motion to Suppress Statements, Arturo Reyes, July 26, 1999
40. Court's Decision on Motion to Suppress Statements, April 7, 2000
41. Petitions for Post-Conviction Relief, Gabriel Solache
42. Petitions for Post-Conviction Relief, Arturo Reyes
43. Transcripts of Post-Conviction Relief Hearings
44. Lassar Report, December 12, 2014
45. Report of Dr. Richard Leo, January 15, 2022
46. Medical Records
47. Statement of Gabriel Solache, April 5, 1998
48. Statement of Adriana Mejia, April 5, 1998
49. Statement of Arturo Reyes, April 5, 1998
50. Statement of Rosauro Mejia, April 5, 1998
51. Statement of Guadalupe Mejia, April 4, 1998
52. Statement of Rosauro Mejia, April 5, 1998

## THE STATEMENTS AND THE COERCION CLAIMS

Late on the night of April 2-3, 1998, Guadalupe Mejia saw a television news report that a boy resembling the boy now living in the Mejia home was missing after his parents were found murdered. After a heated argument between Rosauro and his wife Adriana over Guadalupe's information, Mr. Mejia proceeded to the 8th District precinct late at night, accompanied by Arturo Reyes and Gabriel Solache. They arrived at 315 AM.

The three men waited for a Spanish speaking officer, Juan Solis, who arrived with two fellow officers at 530 AM and spoke to them. Mr. Mejia conveyed his wife's account that the boy came to them via a woman named Norma Salazar, who had reportedly left the boy with her at the hospital. Officers telephoned Area 5, where the investigation was centered; the three men and Santiago were taken there to meet with detectives following that case.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **6** of **46**

It was at the 8th District that Jose Aranda, a family member of the Sotos, identified Santiago at 730 AM. The three men were taken into custody and interviewed separately at Area 5.

Detectives Dickinson and McDonald and Officer Flores went to the Mejia home to interview Adriana and view the baby she claimed to have birthed. When asked how she came to be in possession of the boy her husband had brought to the police station, Mrs. Mejia told police of the woman, Norma Salazar, who had approached Mrs. Mejia at the hospital, and told her that she was being admitted to deliver her own baby, and asked that Mrs. Mejia watch her little boy while she went in to delivery. The two women exchanged numbers and followed up, but the boy she called "Leonardo" remained with the Mejia family until the news report raised alarm.

Noting the baby appeared much bigger than a days old baby, the child's completely healed umbilicus, and a resemblance to the missing Maria Soto, police took her to Norwegian American Hospital for examination and blood typing. Meanwhile, police also took Adriana Mejia into custody and returned with her to Area 5. When police returned to Area 5 from the hospital with the baby, a relative (Rosa Aranda) positively identified her as Maria Soto.

At 1130 AM, Det. Guevara interviewed Adriana Mejia for the first time. She told police that while she was at the hospital on March 26, and feeling sad over having lost a pregnancy, Norma Salazar approached her. Upon learning of her dilemma, related Mrs. Mejia, Ms. Salazar offered that she could get her a baby girl for 600 dollars. She said that Ms. Salazar met her again on March 28 and at that time, had the boy with her. After exchanges between the two over the ensuing days, said Mrs. Mejia, Norma Salazar notified her that she no longer wanted the boy.[1]

The afternoon of April 3 at 5 PM, Det. Guevara asked Mrs. Mejia to take a polygraph test. She agreed. At 630 PM, Rosauro Mejia agreed to a police request for permission to search their residence, and Det. Stephens, Ruiz, and Santopadre proceeded there. Mrs. Mejia went to take the polygraph, whereupon she failed the exam.

At 1030 PM on April 3, Det. Guevara interviewed Mrs. Mejia. In that meeting, Det. Guevara confronted her about blood on her shoes and on the jacket of Santiago Soto. She responded by telling him she would tell a different story. It was then that Mrs. Mejia reported that she enlisted Mr. Reyes to help her get a baby, admitting to Mr. Reyes then that she was not pregnant. But she was afraid to admit to her husband that she had been lying by faking a pregnancy. According to Mrs. Mejia, Reyes spotted and identified the baby that would be taken for her, and her mother, and pointed them out to Mrs. Mejia

---

[1] The night before, when Ms. Mejia's sister-in-law advised them of the news report that flashed Santiago's picture as missing, an argument ensued between Mrs. Mejia and her husband, who insisted on taking the boy to the police. Mrs. Mejia reportedly wanted to cast the boy out of the house.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **7** of **46**

saying, "that's your baby." She stated that he told her to follow the mother and child home to find out their address and then later he left her at the University of Illinois Hospital while he went to the address and thereafter returned with the baby to the hospital, where Mrs. Mejia had remained, waiting for him.

Det. Guevara interviewed Arturo Reyes for the first time at 1130 PM on April 3. He denied awareness of how Mrs. Mejia came to have possession of the children. Detectives asked him to turn his pockets inside out; this produced two slips of paper. One piece of paper contained Norma Salazar's name, along with a phone number, and noting "hospital" and "Leonardo." Another piece of paper had Adriana's name and phone number. Other than Adriana's telephone number, the numbers were not in service.

Det. Guevara interviewed Gabriel Solache for the first time at 1215AM on April 4. He, too, denied involvement. His shoes were stained with red drops. Mr. Solache expressed that he did not know how the drops came to be there.

Sometime after 730AM and before 11AM on April 4, Detectives Dickinson and Rutherford, using Youth Officer Trevino as a translator, again interviewed Adriana Mejia. In this interview, she identified Mr. Reyes as the principal actor in the murder-kidnappings but admitted to being in the Soto home during the attack.

Mrs. Mejia was reinterviewed at 2 PM by a detective and a translator (Detective Trevino). It was then that Adriana Mejia admitted direct involvement, and acted out her stabbing of Jacinto Soto, in which she said she was straddling the victim's back on all fours. At that time, she denied that Mr. Solache, her cousin, had been involved.

Shortly afterward on April 4, Det. Guevara met for a second time with Mr. Reyes at 3 PM. The detective confronted him with Mrs. Mejia's singling him out as principally responsible for the murders and kidnappings. Mr. Reyes responded that he was going to tell police who was involved and what they did. He proceeded to say that he, Mrs. Mejia, and Mr. Solache all participated in the killing. According to Mr. Reyes, Mrs. Mejia offered him 600 dollars to obtain a baby; he asked her why she was willing to offer so much money; she responded that she needed him to conceal their activity from her husband.

In the days before the event, recalled Mr. Reyes, he observed Mrs. Mejia speaking to Mr. Solache and surmised that he was going to be involved. On the night of the event, related Mr. Reyes, Adriana assigned Mr. Solache the responsibility of taking care of the man in the house. According to Mr. Reyes, Adriana Mejia talked Mrs. Soto into allowing her in the home, whereupon the two men, who had been hiding out of view, rushed in with Mrs. Mejia. Mr. Reyes recounted that Mrs. Mejia told him to kill Mrs. Soto, and he stabbed her in the upper chest. Mrs. Soto then fell and Mrs. Mejia began to attack her and stab her repeatedly, while Mr. Reyes, by his account, went to another room and retrieved the baby, and the boy Santiago. Meanwhile, according to Mr. Reyes, Mr. Solache attacked Mr. Soto.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **8** of **46**

Mr. Reyes again met with Detectives Guevara, Dickinson, Rutherford, and Youth Officer Trevino at 6 PM on April 4, in a conference room. While recounting the story above, he informed police that he was wearing the same pants and shoes as on the day of the murders. Detectives took the pants and shoes from him for testing. Mr. Reyes signed a consent to search his room at the home for Det. Guevara, who executed the search. Nothing of evidentiary significance was found.

At 800 PM that day, Det. Guevara met again with Adriana Mejia. He advised her that Mr. Reyes told them that he, Mrs. Mejia, and Mr. Solache were all responsible. She admitted to lying earlier and also implicated Mr. Solache. In this account, she told of following Mrs. Soto home and noting her address and returning to the hospital by bus. She indicated that Mr. Reyes and Mr. Solache met her in the early morning hours at Cook County Hospital and she directed them to the Soto home. When they approached the entrance of the home, Mr. Reyes drew a knife he had been carrying. She told of their barging into the home, of Mr. Reyes quickly stabbing Mrs. Soto in the chest, and of Mr. Solache going to the bedroom and stabbing Mr. Soto while he slumbered. They then reportedly left with the two children, and dropped Mrs. Mejia and the children off at the hospital. According to Mrs. Mejia's statement, they named the boy Leonardo, derived from Arturo (De*Leon*-)Reyes. She stated that she realized when detectives came to the house on April 3 and noted that the baby looked much older than a newborn, that the plan had fallen apart.

Mr. Solache was interviewed at 9 PM and advised he had been implicated by the two others. He admitted involvement in the crime and provided additional background, including that he was close to his cousin Adriana in Mexico. In this account, he suggested that he was unaware of what was planned until he was summoned from his room the night of the event by Mr. Reyes, suggesting they go "to the hospital" to pick up Mrs. Mejia.

At this point, prosecutors were brought to Area 5. Three separate assistant state's attorneys met with detectives and then, with the suspects.

Now April 5, Mr. Reyes gave a written confession at 2AM to ASA O'Malley and Det. Trevino. Mrs. Mejia provided a signed statement to ASA Navarro (who was fluent in Spanish) and Det. Halvorsen at 215 AM. Mr. Solache gave a statement to ASA Brualdi and Det. Guevara at 335AM.

**FORENSIC ASSESSMENT**

1) *Are the Solache and Reyes confessions proven false confessions? With respect to the "criteria" proposed by Dr. Leo, are these researched for validity or reliability? How does the application of a theory manifest in Dr. Leo's opinion and the Solache and Reyes confessions?*

The Reyes and Solache confessions are not proven to be false confessions. They are disputed. The plaintiffs contend that Mr. Solache and Mr. Reyes are innocent. The

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **9** of **46**

defendants contend that the two men joined Adriana Mejia in a double murder-double kidnapping.

Mrs. Mejia's guilt is not disputed. In addition to confessing, her DNA was found as part of a death scene to which she would have no reason to otherwise be linked.

Alfredo Aranda, a neighbor whose apartment shared a wall with the Soto residence, heard a male voice at approximately 7AM saying, "I will not hurt you."

After the kidnappings, Mrs. Mejia, along with Santiago Soto and Maria Soto, met and was picked up by multiple family members at the hospital, including Rosauro Mejia. Given the need to travel from the Mejia home to the hospital after the killings, Mrs. Mejia would have had no transportation with which to bring the two children from the death scene to the hospital without a collaborator. For this reason, Mrs. Mejia could not have acted alone.

Mr. Reyes had a piece of paper with Norma Salazar's name in his pocket. The defense moved to conceal this information from the jury. Unless Ms. Salazar actually existed, why would a man who was not Mrs. Mejia's husband concern himself with the name of the "other woman" mentioned in connection with a murder-kidnapping?

Moreover, it's 24 years since the undisputedly guilty Mrs. Mejia implicated Mr. Solache and Mr. Reyes, and she still has not moved from that position. The criminal defense team comprised of numerous lawyers and appellate lawyers never produced evidence to implicate Rosauro, who was investigated and not charged, or Carlos Martinez, or any others.

Dr. Leo intones that the Reyes and Solache confessions meet "criteria" for a "proven false confession." What he identifies as "criteria" are four points he coined in 1998 to denote "proven":

1) When it can be objectively established that the suspect confessed to a crime that did not happen;
2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;
3) When the true perpetrator is identified, and his guilt is objectively established; and/or
4) When scientific evidence dispositively establishes the confessor's innocence.

These have not been researched to establish validity and reliability as proposed criterion. Validity means that what is deemed to be "proven" is in fact a false confession; reliability means that when one person applies such proposed criteria, the degree to which others who apply the criteria will obtain the same result. A closer examination of what Dr. Leo posits as criteria is informative.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **10** of **46**

#1) at first glance does not seem controversial. One might envision that one cannot offer a true confession to an arson when a fire started by accident, for example. But the word "objective" is weighty. For what exactly is establishing, "objectively," that a crime did not occur? Is it the same fire science that has dramatically evolved about determination of the origin of a fire? Is it a cause of death determination interpreted differently for "objective" if imprecise data about weather or humidity? For anyone in the forensic or hard sciences, and especially in social sciences, what can be "objectively established" is hardly equated with "proof." Rather, it is "evidence."

#2) If a murder happened in Toronto, according to a pathologist's objective determination of time of death, at 8 PM, and the alleged perpetrator was seen by an objective eyewitness at around 10 PM in a small Ontario town some distance away, one might say that the objective evidence is that it would have been physically impossible to have been the perpetrator because it would have required that one average 80 miles an hour for the trip.

What if the time of death determination is a wee bit off; what if the eyewitness is a wee bit off with a time estimate; what if the suspect drove like someone who wanted to get away as fast as possible? The evidence is still objective. But is it proof?

#3) runs into similar problems. Anthony Porter confessed to a murder. After Northwestern University researchers elicited a confession from Alstory Simon for the same crime, Anthony Porter was "objectively proven" to have confessed falsely. That is, until it was demonstrated that Mr. Simon was himself railroaded into a false confession by zealous investigators and Anthony Porter looked like a person guilty of murder who went from being a capital murder inmate to being free.

#4) Scientific evidence comes from all directions. And that scientific evidence may be the absence of DNA when expected, absence of sperm, a ping from a cell tower. That evidence may be key to a disposition of innocence or may prompt prosecutors to drop charges for lack of evidence. But that scientific evidence may reflect that DNA was not transferred, or measured from the wrong location, a perpetrator who could not produce sperm, or a ping to a phone that someone lent to a confederate driving in another direction. This evidence can impact disposition but does not prove the confession is false.

"Proven false confession" schemes take over the responsibility of a trier of fact; no longer does one need burden of proof or standard of proof, nor methodology to test out a formula, nor statute. Rather, Dr. Leo does it for you, in four easy steps.

The problems with the muddiness of Dr. Leo's coinage of "proof" are as easy to demonstrate as <u>D</u>r. Leo's application of his own system in this case. First of all, this sociologist declares that "the true perpetrator or perpetrators who committed this crime would have left their own DNA at the crime scene, and DNA from the crime scene would have been left on them." Based on what expertise of his? He continues, since their DNA

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **11** of **46**

was not found, "the DNA evidence and DNA testing excluded both Mr. (Reyes) and Mr. Solache."

Dr. Leo is not a pathologist, not an expert in DNA collection, not a crime scene analyst, and has no forensic science or criminalistics training, education, or experience. He is not a law enforcement officer, and he has not processed a scene. But here he pronounces what is "proven."

Then, according to Dr. Leo, it would have been physically impossible for Mr. Reyes to have committed the crime, because Mr. Solache was working until well after 1:30 AM, apparently at 3:00 AM. These times are "objectively" incompatible with Mr. Reyes' account of when he was picked up, but they are not incompatible with the ability of Mr. Solache and Mr. Reyes to have committed the crimes as charged. Mr. Solache could have finished his shift and had time to meet Mr. Reyes and to proceed to the crime scene. What Dr. Leo can shoehorn into his "criteria" as proven remains in dispute.

More indicative of proven false confessions are those that are undisputed. There are reasons why certain false confessions are undisputed; referencing what Dr. Leo proposed, the following are benchmarks by which confessions would be no longer disputed.

1) When evidence undisputedly establishes that there is no way the confessor could have committed the crime
2) When an alternative perpetrator's guilt is established beyond a reasonable doubt and there is no connection to the confessor as a collaborator taking on a different role
3) Scientific evidence (DNA of an identified, unrelated perpetrator, authenticated video recorded or other digitally validated evidence, or an alibi) undisputedly establishing the confessor's innocence

Dr. Leo also highlights contradictions that add to his unstated contention that the Reyes and Solache confessions were false and the plaintiffs are innocent. In actuality, there are numerous reasons why a person's recollection may be at odds with the factual evidence. For example:

- The graphic nature of the case may be traumatic and prompt repressing certain features
- Some aspects may be personally embarrassing, and the perpetrator downplays them
- Some aspects may impact culpability, and prompt an actor to position himself in a more passive role
- The perpetrator may redirect police away from incriminating evidence or evidence which elevates culpability
- The suffering of the victims may be such that the perpetrator chooses to portray the crime as a more abbreviated event

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **12** of **46**

- Attributing some blame to a co-conspirator may lower culpability
- Memory may be affected by a crime occurring in the middle of the night
- Memory may be affected by the actor having ingested an intoxicant at the time
- Contamination, which may occur to statements of guilty or innocent suspects

There is no social science formula for proving a false confession, any more than social science has a formula for establishing whether someone is innocent or guilty.

Dr. Leo has consistently provided testimony for many years that cases are, essentially, false confessions. And yet, asked in recent testimony, how many proven false confessions he has seen in his career, Dr. Leo responded:

> *Q: Also, according to you, you have seen or been a part of or are directly involved with five to fifteen proven false confessions, correct?*
>
> *A That was my estimate of the 400 cases in which I've testified whether the confessions could be classified as proven false confessions.*[2]

This response should take into account that along with the 400 times that Dr. Leo has actually testified, there are those hundreds of other cases in which he has written reports such as this, and then a number of other times in which adversaries challenged the admissibility of his testimony and it was severely limited or excluded altogether. Thus, of the many hundreds of cases in which Dr. Leo has offered opinions substantively the same as in Solache and Reyes, he has seen only 5 to 15 in his entire career.

Apart from this reflecting a staggering error rate in his analysis, this figure underscores that his writings about "dramatic undercount" of false confessions and "tens or hundreds of thousands" of false confessions are disingenuous hype.

### 2) *What is the relevant scientific body of knowledge for the Solache and Reyes disputed confessions?*

Before there is a disputed confession, there is a confession. And there are studies of those who have confessed about their reasoning for doing so.

---

[2] *People v. Grondin,* Michigan 2022

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **13** of **46**

The most frequently demonstrated rationale for confessing was the suspect's perception of the strength of evidence against him.[3] This includes the belief that there was no point denying, that police would prove one's involvement anyway, and that there was strong evidence to demonstrate that perpetrator's guilt. Research also demonstrates that a suspect is more likely to deny responsibility if the suspect believes there is no evidence against him.[4]

Multiple studies have established that there are suspects who intend to confess at the outset of their interrogation. Many of those who expect to confess do; some change their minds and do not. On the other hand, among those who intend to deny, most maintain their denials, but some ultimately confess.[5] Therefore, confession may not necessarily be counterintuitive. However, the research shows that those who began with denial are three times more likely to maintain that denial than to confess.

Therefore, when someone changes from denial to confession, what caused that person to do so – in an interrogation for a murder – is important to understand. It is for this reason that actual empirical research, or research in which one can observe the actual events (such as moving from denial to confession) as they take place, is informative.

The interrogation of the murder suspect is distinctive in its inherent tension. Unlike less severe crimes, there is no overlooking the enormity of the consequences of murder. That was no different in this highly publicized developing story in which the news was disseminating the picture of a boy who was missing after his parents had been murdered. That news alert found its way into the Mejia home, and it provoked the argument that prompted Rosauro Mejia to take Santiago to the police in the middle of the night.

From there, scrutiny of the suspects began with their denial of the charges. Mr. Reyes and Mr. Solache were denying involvement in offenses that, according to research, they would have more likely admitted to in the face of strong evidence of their guilt. Likewise, Mrs. Mejia confessed only after her shoes tested positive for traces of blood.

Being identified by a guilty party who claims one as an accomplice (Mejia) is one such example of strong evidence. Being identified by two suspects (Mejia and Reyes) who themselves confess to being perpetrators was all the stronger evidence confronting Gabriel Solache, who thereupon confessed.

---

[3]Gudjonsson, G., & Sigurdsson, J. (1999**). The Gudjonsson Confession Questionnaire-Revised (GCQ-R) factor structure and its relationship with personality**. *Personality and Individual Differences*, 27(5), 953–968.

[4] Cleary, H., & Bull, R. (2021). **Contextual factors predict self-reported confession decision-making: A field study of suspects' actual police interrogation experiences**. *Law and Human Behavior*, 45(4), 310

[5] Deslauriers-Varin, N., Beauregard, E., & Wong, J. (2011). **Changing their mind about confessing to police: The role of contextual factors in crime confession**. *Police Quarterly*, 14(1), 5–24.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **14** of **46**

A false confession involves taking responsibility for a crime that one did not commit. A false confession to a murder is taking responsibility for a crime that carries with it significant penalties, that one did not commit. The severe consequences of the latter create a disincentive to confess, let alone to confess falsely. False confessions to murder are rarely established, despite tremendous efforts in recent decades to collect them for publication.

Less than 400 confirmed false confession cases form the essence of the body of knowledge from which we understand how false confessions happen in major crimes.[6] Critical data from these cases may not readily be available. However, that data is essential to track a suspect moving from denial to acceptance of responsibility. The reality is that only a few of those cases have been studied to any great depth.

Dr. Leo suggests in his report that police induce tens to hundreds of thousands of false confessions in America every year. He bases this upon a survey article he published in which police officers are asked about their practices and experience in interrogation. In his report, Dr. Leo misrepresents the article to suggest that police expressed the belief they elicit false confessions 5% of the time. However, the published article notes that those who responded said that 3.8% of innocent suspects provided a partial false admission and .97% a complete false confession.[7] These are very different distinctions from suggesting that 5% of suspects are knowingly taking responsibility for a crime they did not commit; suspects may make inadvertent statements that they do not realize to be incriminating, that ultimately are used against them at trial[8].

In the same study, respondents report having seen less than one false confession (.71%) in their entire careers. That .71 figure includes those who voluntarily falsely confess as a result of active psychotic symptoms, or who seek attention, both of which happen independent of interrogation, those who confess to other people and not police, and those who may confess to a crime to protect others. It may also include those who offer false confessions that embrace a minor role in a crime in which multiple defendants are involved but are otherwise guilty of a far greater crime. As the article is written, the surveys do not distinguish those who offer voluntary false confessions without police interrogation efforts and those who confess falsely during interrogation. The ambiguity of this study makes for a grossly inaccurate and alarmist claim about the incidence of false confessions.

Survey research is not empirical research, either. One is not observing a phenomenon as it happens. Rather, responses to the survey questions may be affected by the subject's personal agenda, biases, conflicts, memory distortion, guardedness, and other adulterants

[6] The National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx
[7] Kassin S, Leo R, Meissner C et al. **Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs** *Law Hum Behav* (2007) 31:381–400
[8] The previously footnoted Travis Hayes cases is one such example

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **15** of **46**

to good data. Recognizing this challenge, surveys such as this survey routinely exclude outlier answers.

In empirical research, by contrast, observing events as they happened or as they happen allow one to experience things exactly as they are. This is why it is known as empirical – referring to practical experience. And surveys, as Dr. Leo vividly displays, can be constructed and reported (unless transparency is enforced) in such a way to mislead the reader and end user.

Dr. Leo's assertion that the frequency of false confessions is dramatically undercounted is not based in fact. The data he was able to generate from years of study and collaboration with others amassing a database led to a law review article published in 2004 with 125 cases he touts as proven false confessions. Even that figure of 125 is an overcount; there are cases for which his only familiarity was media articles, others which were informed only by advocacy briefs, and others for which the guilt of the individual remains contested because the subject may truly be guilty. Among the remaining number, Dr. Leo counted false guilty pleas by those who had never confessed; and those who never confessed to police, but who reportedly had confessed to third parties who falsely implicated them. Far from "tens to hundreds of thousands," Dr. Leo falls well short of even the 125 cases he claims as "proven" speaks to the ginning of hype to gain admissibility.

Sensational and unsubstantiated rhetoric in the guise of "science" and the authority of an expert, particularly one who underscores his academic credentials, misleads juries and triers of fact with unexplored claims presented alongside what the triers of fact already know; that false confessions can occur, and have been known to occur in police interrogation.

In a study of actual false confession cases, Dr. Gisli Gudjonsson, a former police officer who became a forensic psychologist, identified compliance and suggestibility as personal qualities associated with false confessions. He developed the Gudjonsson Suggestibility Scales (GSS)[9] to isolate the degree of suggestibility, as well as a suspect's memory problems; he developed the Gudjonsson Compliance Scales (GCS)[10] to assess the degree of compliance of someone claiming a false confession. Both personal vulnerabilities were more closely studied among populations of those interrogated and who claimed to have confessed falsely.

In 1985, Dr. Saul Kassin, an experimental psychologist and critic of police interrogation techniques, published a typology of false confessions that distinguished:

---

[9] Gudjonsson, G. H. (1984). **A new scale of interrogative suggestibility.** *Personality and Individual Differences,* 5(3), 303–314. https://doi.org/10.1016/0191-8869(84)90069-2

[10] Gudjonsson, G. H. (1989). **Compliance in an interrogative situation: A new scale**. *Personality and Individual Differences,* 10(5), 535–540. https://doi.org/10.1016/0191-8869(89)90035-4

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **16** of **46**

a) **Voluntary False Confessions** – those false confessions initiated by the suspect independent of efforts by the police. Associated with grandiose delusions and psychosis,[11] or pathological attention seeking,[12] or erotomaniac overidentification with the victim.[13]

b) **Coerced Internalized Confessions** – those arising in interrogations in which a suggestible and often interrogation-naive suspect is in shock or bereavement over the loss of the victim, and distrusts one's memory because of intoxication, sleep, or other mental disengagement at the time of the crime. Responding to suggestions by the questioning officer, the suspect slowly adopts a narrative which positions him as responsible for the crime.

c) **Coerced Compliant Confessions** – those arising from interrogations that are so threatening, frightening or otherwise intolerable that the suspect confesses, to terminate the interrogation as quickly as possible. A suspect commonly retracts as soon as he or she leaves the interrogation and is free from the menace.[14]

Dr. Leo has opined that this case reflects coerced compliant false confessions.

Unlike the other two entries of this typology, coerced compliant confessions may be false or true.
A leading researcher of wrongful convictions has observed that those who give coerced confessions to murder are typically guilty.[15] Coercion may impact the admissibility of a confession, and may contribute to a confession being vacated, but it does not alone resolve the truth or falsity of a confession.

Dr. Gudjonsson conducted other self-report research on inmates who claimed to have confessed falsely. Comparatively little data was gathered from those who claimed to have confessed falsely to major crimes against persons.[16] Self-report data can derive from relevant study subjects, but its utility depends on the quality of an informant and cannot be objectively verified. Still, the research introduces topics for closer study in empirical research – when and if that is ever to be done in false confessions.

---

[11] Gudjonsson, G. (1999**). The making of a serial false confessor: The confessions of Henry Lee Lucas**. *Journal of Forensic Psychiatry*, 10(2), 416–426. https://doi.org/10.1080/09585189908403693

[12] Kassin S and Wrightsman L. **Confession Evidence in Psychology of Evidence and Trial Procedures** *Sage Beverly Hills* p. 67-94 (1985)

[13] Newman, M. (2006, August 17). Suspect in Ramsey Case Says Death Was an Accident. New York Times. Retrieved from http://www.nytimes.com.

[14] Gudjonsson G (2003**) The Psychology of Interrogations and Confessions: A Handbook**. Wiley.

[15] Gross, S.R. and O'Brien, B. (2008), **Frequency and Predictors of False Conviction: Why We Know So Little, and New Data on Capital Cases.** *Journal of Empirical Legal Studies*, 5: 927-962. https://doi.org/10.1111/j.1740-1461.2008.00146.x

[16] Gudjonsson GH, Gonzalez RA, Young S. **The Risk of Making False Confessions: The Role of Developmental Disorders, Conduct Disorder, Psychiatric Symptoms, and Compliance**. *J Atten Disord.* 2021 Mar;25(5):715-723. doi: 10.1177/1087054719833169. Epub 2019 Mar 21. PMID: 30895906.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel — Michael Welner, M.D.*
October 31, 2022

Page **17** of **46**

The most common form of research in disputed confessions has involved mock interrogation paradigms, using college students seeking credit or other volunteers. Interrogation reform advocates like Dr. Kassin and several other close colleagues have constructed mock exercises, from crashing a computer to providing answers to peers and being accused of cheating to highlight interrogation techniques that he critiques. However, these mock exercises cannot remotely replicate the competing pressures buffeting the suspect within a murder interrogation and lack what is known as ecological validity.

- A college student adopting a role-play does not face the unconscious pressures coursing through the mind of a suspect being interrogated for murder.
- A student adopting the role play of cheating does not experience the gravity of one confronting the consequences of accountability for murder.
- A person who participates in an experiment for class credit is not the same as a suspect detained and powerless in a situation of gravity for which they have no control.
- A person participating in a mock exercise of cheating or being accused of theft does not experience the same pressure of facing the death penalty for the investigated offense.
- A person participating in a mock project operates with the inherent trust that the role-play is managed by a person with a responsible interest in their experience.
- It is obvious in murder interrogations that the police officer is not aligned with the suspect. Whatever the acting skills of the mock interrogator, their bearing does not replicate someone who is genuinely questioning a murder suspect and attempting to do so forcefully.

Shallow those these mock exercises are, a coterie of social scientists promote this research as "laboratory studies." The term "laboratory studies" evokes the physical sciences and suggests applicable significance – as in a chemical reaction from daily life that you reproduce in a laboratory study. However, lacking the ecological validity of recreating interrogation, these studies fail to add to scientific understanding and are ultimately misleading when touted as relevant to actual interrogation to murder and other major crimes. The officious verbiage, as employed by Dr. Leo to claim research underpinning, illustrates the cosmetology of his exercise.

In an unguarded moment, Dr. Richard Ofshe, a sociologist who co-authored anti-police polemics on cases that he and Dr. Leo reviewed in the late 1990's, testified under oath[17] of this genre:

> *Prosecutor: Is that the computer crash test?*
>
> *Dr. Ofshe: What?*

---

[17] *State of Louisiana vs. Hayes*, 97-3780, October 13, 2006.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **18** of **46**

> Prosecutor: *The computer crash test. You're familiar with that, aren't you?*
>
> Dr. Ofshe: *Oh, I know about that, yes.*
>
> Prosecutor: *Could you explain that to the court, please?*
>
> Dr. Ofshe: *That's a silly piece of research that I think is laughable, incompetent, and the kind of thing that people like you keep bringing up because it is so stupid.*
>
> Prosecutor: *Well, why don't you explain it to the Court?*
>
> Dr. Ofshe: *Oh, I'll be happy to explain it to the Court. Somebody thought he could simulate interrogation by setting up an experiment in which someone crashed a computer and was told they had hit the wrong key on the key board and when that person was gotten to admit to that, somehow this was offered as an example of eliciting a false confession. It is a terribly naïve, incompetent piece of research which I have criticized in courtrooms all over this country and to the author of the work.*
>
> Prosecutor: *This Dr. Redlich apparently cites as part of her testimony.*
>
> Dr. Ofshe: *Then she doesn't know what she's doing.*
>
> Prosecutor: *OK. So you disagree with her on that?*
>
> Dr. Ofshe: *That's a laughable piece of research. If a graduate student gave me that piece of research, I'd give the graduate student a "D" and recommend that they be dropped from graduate school."*

Dr. Ofshe's candor is notable in that these "lab studies" are prominently featured in reviews of research on the topic, much as Dr. Leo in his report cites to review articles and even a White Paper. The notion Dr. Leo advances of a consensus of generally accepted methodologies is quite contradicted when the White Paper features "lab studies" research that is belittled by even Dr. Ofshe, one the chief patrons of the boutique area of false confessions. So much for "general acceptance," even among a group that tenaciously circles the wagons to avoid exposing the gaping weaknesses of the body of knowledge.

Emphasis on the "laboratory research" distracts one from appreciating that there is no empirical research to establish validity or reliability about a host of critical issues relating to false confessions to murder. This point is very significant and is starkly contradictory to Dr. Leo's insistent use of the word "empirical" throughout his report. Empirical research refers to what one learns from actually participating in the experience or watching the experience

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **19** of **46**

as it happens. It would be quite different from mock experiments to gather data from videotaped interrogations or actually monitoring the suspects.

And Dr. Leo understands this distinction well, having conducted empirical research on interrogation thirty years ago. When he published his findings in 1996, he wrote that he conducted his study
because: [18]

> "*American scholars have almost altogether ignored or avoided the empirical study of police interrogation practices and criminal confessions…*

…and added…

> "*I began this Article by pointing to the familiar contrast between how law is written in the books and how it is actually practiced by legal actors in the social world, arguing that the gap in our knowledge between legal ideals and empirical realities remains as wide as ever in the study of American police interrogation. In this Article I have tried to fill in this gap – a gap that has widened considerably in the last two decades due to the complete absence of any empirical research on police interrogation practices – by providing quantitative data from the almost 200 interrogations I observed in nine months of participant observation fieldwork at three police departments.*
>
> *Although this Article breaks new ground as the first empirical study of its type in more than two decades, our understanding of contemporary American police interrogation practices and outcomes remains highly incomplete. If we are to close the gap in our knowledge between the ideal and reality that the Miranda Court decried, we need more primary data and empirical studies of everyday police investigative practices, especially in other regions of the country.*"

Yet, in over twenty-five years since Dr. Leo set out that challenge, such empirical research on collections of false confessions has not been done.
The growing numbers of videotaped interrogations make such empirical research possible, and some research on interrogation in general is being published in recent years. However, false confession researchers have not yet utilized the available means to empirically study false confessions. It may be that this is because of the rarity of false confessions, but insofar as the videotaped evidence is available, the simple reality is that it can be studied and is not.

---

[18] Leo, R. **Inside the Interrogation Room** *Journal of Criminal Law and Criminology* (1996) 86:2 266-303

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **20** of **46**

Dr. Leo's "empirical research" basis of his arguments is, when scrutinizing his references and the scientific body of publication, no more than him saying "believe me, I say so," as he footnotes to review articles in which he has written, "believe me, I said so," footnoting to polemics in which he confidently espoused the same unsubstantiated theories or to research that is in fact mock exercises that are hardly empirical in nature. And Dr. Leo knows this, because he has been excluded in courts on this very issue.

In a disputed confession, it is vital to understand the decision-making underlying the shift from denial to acceptance of responsibility. Likewise, it is essential to understand the pressures that moved one from confession to retraction of that confession. In some instances, it may be family advice, or legal advice, or input from fellow inmates. That input may also be the mistreatment by other inmates that sometimes accompanies a high-profile murder of an otherwise law-abiding mother, or mistreatment of a child, the kinds of facts of a case such as the attack on the Soto family.

Within a case, before a matter gets to a suppression hearing and trial, there is an arc of moving from denial to confession, and then, from confession to denial. The focus on moving from denial to confession is part of the relevant data, and a valid analysis also probes what led to the retraction, or it is incomplete.

We as examiners must appreciate the pressures to confess potentially created by interrogative pressure, abuse, threats of the death penalty or perception of proof after being incriminated by one or even two alleged co-conspirators. However, we can only be objective if we similarly acknowledge equal if enduring pressures to retract once a defendant confronts the enormity of charges – and the centrality of a confession if incriminating evidence is otherwise limited.

The phenomenon of retraction of a confession is understood, like other aspects of false confessions, from anecdotal experience or case evidence. Guidance for understanding the retraction within a case resides at the earliest stages of an arrest. This includes notes and testimony from earliest contacts with a suspect after incarceration, including one's attorney. In certain previous cases of disputed confessions, I have found it instructive to review the notes of one's defense counsel, contemporaneous with their earliest meetings. Courts can learn a lot from these disclosures, just as we favor the most detailed record of how investigators and ASAs moved a suspect from denial to confession.

It's always very helpful to have videotapes of interrogations, though in 1998, interrogations were seldom videotaped, especially those that transpired in several parts such as those of Mr. Reyes and Mr. Solache. Those are facts and not reflective of some sinister force within the police department. The absence of a videotape forces the examiner to piece events together from accounts that may not resolve – the litigant disputing his confession is invested in deeming investigators' actions as improper, and the investigator is invested in showing that they were proper.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **21** of **46**

The accounts closest in time to the confession are the most valid way to understand what transpired in a confession. Mr. Solache and Mr. Reyes raised numerous objections in a motion to suppress. Claims of physical abuse by Detective Guevara elaborated only after their original suppression motion that Mr. Reyes and Mr. Solache had not been notified of his Vienna Convention rights to meet with a Mexican consular official. Does the lag in detailing physical abuse reflect embellishment of the plaintiffs' claims of abuse forcing a confession?

In my experience, data from processing a newly arrested defendant will yield indications of injury during interrogation when that experience is abusive. Injuries are reported then upon entry into custody to medical personnel, and chronicled. Or, they are reported to one's defense attorney when defendant and attorney recount the interrogation experience. This insulates the process from the criminal defense team, other advisors, or one's own legal need to undo a decision to confess contaminating the history with a false coercion narrative.

On April 6, 1998, the attorney for both Mr. Reyes and Mr. Solache asked the trial court at a bail hearing for Mr. Solache (not Mr. Reyes) to be photographed for evidence of injuries. The photographs were never thereafter produced, nor were they referenced in ineffective assistance of counsel proceedings claiming coercion.

Police are expected to document the interrogation and its features, from the atmospherics of how a suspect was treated in custody to the timing of events, to what was actually stated in a statement or a confession. So, too, does a criminal defense attorney document their experiences of their client and the specifics of their client's input, along with their own follow-up efforts to corroborate.

In this case, no notes of defense attorneys for Mr. Reyes or Mr. Solache were presented for my review. Quoting the characteristically melodramatic verbiage that Dr. Leo copies from one report to the next, one is "forever deprived" of knowing what transpired in the retraction and even during the confession because plaintiffs have not fully disclosed the defense attorneys' contemporaneous notes. These contemporaneous notes and memos of their investigators and photographs and other efforts, like the notes and reports of police officers, are a critical resource that has been instructive in past such civil litigation seeking to understand disputed confessions. It is no less relevant here.

That is empirical data. Review articles regurgitating claims about years of "social science research" that professors do with students seeking class credit is not. Indeed there is data that distinguishes the analysis of disputed confessions from mock exercises festooned with soapboxes. If you really want to know what happened, put all of the evidence on the table. Otherwise, to quote another expression Dr. Leo uses in this report, one has a "reckless disregard for truth."

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **22** of **46**

> 3) *With respect to the discrepant accounts of the interrogations, does
> "empirical social science research" resolve the truth or falsity of the
> confessions, or explain a false confession if that is the case?*

There is no empirical social science research that resolves whether the Reyes and Solache
confessions were true or false. One can find features of cases of guilty suspects just as one
can features of the innocent.

Dr. Leo organizes his conclusions around the presupposition that the confessions are false.
This ignores that the confessions may be false and coerced, but they may also yet be true
and coerced; that they may be true and not coerced. Or, that abuse, if it occurred, did not
coerce Mr. Solache and Reyes into confession. Still another possibility is that no coercion
took place at all.

Dr. Leo speaks of how police accounts do not account for empirical findings on what leads
to false confessions. This is not true; for there are a number of documented cases involving
multiple defendants in which suspects confronted with the statements by other suspects
implicating them as co-conspirators trigger a false confession. In some of these cases, false
confessions occurred without police abuse.[19]

And also, abuse may occur without eliciting a false confession.

Dr. Leo presupposes that when false confessions occur, it must reflect police misconduct.
In some cases that may occur, but a false confession does not de facto establish that abuse
occurred in a murder case simply because the pressures not to confess are so strong that
something had to be done to "overbear the suspect's will." In multiple suspect murder
cases, a suspect confronted with another suspect confessing and implicating them in turn
may perceive that identification to be strong proof of one's guilt. True confessions are
routinely triggered this way; in some false confession cases, false confessions were triggered
this way.[20]

Rosauro Mejia claimed to have been abused – and he did not confess. And, Mr. Reyes and
Mr. Solache reported being slapped in each one's first encounters with detectives – and not
confessing. They reported that they were also slapped at the time they confessed – but in
both instances, confessions occurred only after they were informed of having been
implicated by Mrs. Mejia. And, in the case of Mr. Solache, implicated by Mrs. Mejia and
Mr. Reyes.

The National Registry of Exonerations has documented approximately 50 separate cases in
which the false confession of multiple defendants in the same case were taken. In only a
small minority of the cases, all of the convicted perpetrators were innocent. Only a small

---

[19] For example, Central Park 5, Rosetti 4
[20] Ibid

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **23** of **46**

number of cases exist on the registry with multiple defendants whose confessions are accepted as false, but no one disputes the guilt of one of those arrested alongside them for the murder. The probability that Mr. Reyes and Mr. Solache are guilty, based on the registry case data of reported false confessions, therefore is quite substantial.

Consistent with this, the Lassar report of this case, which supported the likelihood that the suspects were mistreated, concluded that the defendants were nevertheless likely responsible.

4) *With respect to Mr. Reyes and Mr. Solache's descriptions of their interrogations, do they reflect "empirical social science research" on "types of interrogation techniques, practices, and effects" that cause false confessions?*

Mr. Reyes and Mr. Solache report that they were physically abused. That is not an interrogation technique. Officers are not taught to abuse suspects. Officers know that abuse is illegal, and that coercion will result in the exclusion of statements. Officers know that blows will be detectable at exam upon arrest. Officers also know that abused prisoners will convey their experiences to defense counsel, who will immediately move to suppress a confession if the history reflects one was coerced.

There is no "empirical social science research" on physical abuse. There are reported instances of physical abuse triggering coerced compliant true confessions and coerced compliant false confessions.

However, mistreatment and even physical mistreatment does not equate to coercion. Coercion speaks to the outcome. Bideman's work demonstrated that people can be mistreated to even an extreme degree and still not confess.[21]

Physical abuse may still not yield a confession. And sometimes that abuse will force a confession. There is no research to distinguish which abuse scenarios that result in coerced compliant confessions to end the interrogation elicit confessions from innocent vs. otherwise guilty suspects. To wit, Mr. Mejia claims to have been abused in his interrogation; he did not confess to murder and was not charged. If one is then to presuppose that abuse occurred to Mr. Solache and Mr. Reyes, what is it about either that was the difference in their confessing when Rosauro Mejia did not (if they are innocent)? Is it that they were confronted with being implicated by Mrs. Mejia and, in the case of Mr. Solache, both Mr. Reyes and Mrs. Mejia? Or was there a different threshold of what each found intolerable in what is being called a coerced compliant confession? No research is available to inform this analysis.

---

[21] Biderman, A. D. (1957). **Communist attempts to elicit false confessions from Air Force prisoners of war.** *Bulletin of the New York Academy of Medicine, 33*(9), 616-625.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **24** of **46**

Moreover, one cannot presuppose that such abuse occurred. Not only was no physical evidence of abuse produced, but as ASA O'Malley later testified, Mr. Reyes responded to a question of how he had been treated with, "Better than expected." Abuse is not established by speaking it into existence. Whether abuse occurred or its magnitude, in the absence of evidence, becomes a responsibility for a trier of fact.

> 5) *What research has been conducted to show, with validity and reliability, that the following are "risk factors" for false confession to murder and in particular, in a case in which mitigation would be difficult: 1) lengthy interrogation 2) sleep deprivation 3) premature rush to judgment and guilt presumptive interrogation 4) false evidence ploys 5) explicit and "implicit" threats and promises? What is the relevance of each of these terms to the Reyes and Solache confessions?*

No empirical research has been conducted on any of the aforementioned so-called "risk factors." Just as what he coins as "proof" and "criteria," Dr. Leo and a small group of circular citing social science colleagues pronounce "risk factors" with no research foundation beyond the play-acting of mock experiments and in certain instances, not even that.

The notion that these are "risk factors for false confession" gains momentum only from theoretical articles that pronounce them to be risk factors (with insufficient empirical or scientific basis), and which are then are cited to by collaborating authors in subsequent articles that are approved for publication by a peer reviewer who may be Dr. Leo himself, or others who in turn provide a turnstile for him to repeatedly posit unsubstantiated ideas long enough for him to claim them as "social science literature."

With that noted, closer scrutiny of each of the terms reveals the following:

Lengthy interrogation – The reference point of Dr. Leo's depiction of "lengthy interrogation" is his published article of a collection of "125 proven false confessions." Data for these cases is often derived from media sources, which the scientific community generally regards as unreliable, regardless of the pedigree of the news agency.

Otherwise, the data from the Leo sample commonly derives from legal sources is often limited to advocacy briefs prepared by defendants' appellate attorneys. Given the potential bias of one-sided advocacy briefs, or even websites that families and lay advocates set up for certain inmates, one has no confidence in the fidelity of facts.

That noted, Dr. Leo and his colleague on the "proven false confessions" article, criminal defense attorney and law professor Steven Drizin, provided data on the duration from only 44 cases of the 125. The great majority of those reported false confessions were listed to be 6 to 24 hours in duration.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **25** of **46**

However, the article made no distinction between time in interrogation and overall time in custody. By Leo and Drizin's interpretation, a person who would have been in custody for six hours before being interrogated for half an hour, then left for five hours, then interrogated for another half hour would be regarded to have been interrogated for twelve hours. The comingling of time in custody with that in interrogation has neither foundation in police training or practice, or in other interrogation research literature.

Cleary's 2021 study of 249 inmates who reported that they had been interrogated in their instant case, noted that 13 percent of inmates were detained for over 24 hours before being interrogated. [22] This study is only one example of how the research community separates interrogation time from custodial time. But by Leo and Drizin's account, every one of these study subjects would be at risk for false confessions. Notably, the same study found that actual interrogation time <u>alone</u> (independent of custodial time) ranged up to twelve hours.[23] Another study of 57 selected videotaped interrogations (without regard to confessions or false confessions) included interrogation times only approaching five hours in length – and some of those interrogation recordings may have been admittedly partial.[24]

It is true that false confessions have happened during some extended interrogations. So have true confessions. The Reid interrogation training, to which Dr. Leo cites, allows that some interrogations necessitate a longer time span.[25] Dr. Leo, in his own 1996 interrogation research of primarily minor crimes, found that longer interrogations were more associated with eliciting false confessions.[26]

In response to being confronted that his comingling of unremarkable custody and interrogation time is inappropriate, Dr. Leo argues that when suspects are alone while detectives are otherwise engaged with 1) talking to other suspects 2) talking to witnesses 3) processing paperwork 4) going to the scene 4) canvassing the area 5) working on other cases (for example), the suspect is "stewing," and becoming worked up. Therefore, according to Dr. Leo, custodial time alone is (according to him as a researcher) interchangeable with actual interrogation time.

If interrogation and its aims to elicit information or confessions were so simple as to merely confine suspects until they confessed, surely those many thousands of people who have extended waiting during their detainment would be offering false confessions at a frequency beyond the obvious rarity with which false confessions are established.

---

[22] Cleary, H., & Bull, R. (2021). **Contextual factors predict self-reported confession decision-making: A field study of suspects' actual police interrogation experiences**. *Law and Human Behavior, 45*(4), 310.
[23] Ibid.
[24] Cleary, H. M. D. (2014). **Police interviewing and interrogation of juvenile suspects: A descriptive examination of actual cases**. *Law and Human Behavior, 38*(3), 271–282. https://doi.org/10.1037/lhb0000070
[25] Inbau, F.E., Reid, J.E., Buckley, J.P. & Jayne, B.C. (2013). <u>Criminal Interrogation and Confessions</u>, 5th Edition. Jones & Bartlett Learning, 339-370
[26] Leo, R.(1996). <u>Inside the Interrogation Room</u>. *Jl Crim Law Criminal* 86 (2) p 280

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **26** of **46**

The aforementioned videotaped interrogation study also monitored the suspect during intervening breaks. The researchers reported, of their 57 subjects that during pauses in interrogations:

> *"Whereas a few youth paced the room or peered out of the holding room window, most youth simply sat in their chairs, rested their heads on the table, or slept when left alone. Two youth wept quietly and another exhibited extreme distress, sobbing loudly, striking his head against a wall and audibly chastising himself."*[27]

The dullness described during the breaks in interrogation starkly demonstrates that the stress, urgency, and pressures of interrogation are not replicated in solitude. If anything, the stresses are relieved.

Whether interrogation length is a risk factor could be studied. Interrogation videotapes are available from numerous jurisdictions and can and have been viewed. A sample of interrogation tapes of those arrested for murder who did not confess falsely can be compared to a sufficient sample size of videotaped interviews of those who did confess falsely to murder, with interrogation times compared. It's that straightforward.

However, there is no study of murder interrogations and the duration of interrogations that shows that length of interrogation is associated with or is a risk factor for false confessions. Or, that if it is, under what circumstances. It hasn't been done. Until this research has been conducted with a methodology that replicates the murder interrogation context and is not yet another mock playacting experience, the claim that interrogation length is a risk factor for false confessions is grossly misleading, especially if based off calculations which add custodial time to interrogation time to represent interrogation time.

The comingling of interrogation time with custodial time, used in the Leo-Drizin article, is simply a fake device that no one bothered to question within the circular citing academic community on false confessions because they have no professional experience interrogating beyond mock experiments with college students, and naively overlook the glaring reality that even a jury – let alone court decisions – do not equate the stress and intensity of interrogation with merely sitting in custody while detectives chase down leads or themselves get some rest. Again this illustrates how the boutique academic area of false confessions uses the quantity of publications that repeat the mantra that research has been done to wallpaper over the absence of research or the flimsiness of the research underlying what is claimed.

<u>Sleep deprivation</u> – Sleep deprivation involves the active prevention of a person from falling asleep. Sleep deprivation is not the same as waking a sleeping person and disturbing

---

[27] Cleary, H. M. D. (2014). **Police interviewing and interrogation of juvenile suspects: A descriptive examination of actual cases**. *Law and Human Behavior, 38*(3), 271–282.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **27** of **46**

that person's sleep, after which one resumes sleeping. Sleep deprivation is not fatigue; a fatigued person may nap, doze off, or remain awake. That person is only sleep deprived if there is an active effort to prevent that person from sleeping.

False confession case data does not include scenarios in which sleep deprivation as a technique led to false confession to murder. Mock exercises to create conditions of extreme fatigue are no less irrelevant to replicating police interrogation for murder. Apart from not replicating the pressures not to confess to murder, mock exercises do not account for the hyperarousal a suspect feels in the extreme stress of a murder interrogation even when fatigued. Soldiers, fighter pilots, and surgeons, demonstrate, for example, that extreme hyperarousal mitigates the effects of fatigue.

Regretted choices are ubiquitous to the human experience, and regretted choices among alternatives may be more common in fatigue.[i] But a regretted choice is not an elaborate and lengthy fabrication of a false confession to breaking into a stranger's home, attacking an adult with a knife and stabbing them to death, seizing a child or two and leaving the scene in an unremarkable manner to one's getaway car.

As for whether a false confession to murder emerges from fatigue, the level of disorientation from the effects of fatigue is such that the person would not be coherent enough to then sit with a law enforcement officer and write up a statement.

Moreover, extreme fatigue would not afford someone the mental stamina to be primed to give a contaminated confession to obediently follow an allegedly unscrupulous detective's script. How would such a fatigued person absorb all off that allegedly rehearsed material with concentration and attention impaired by fatigue?

Ultimately, a fatigued person dozes off, even in an interview. A sleep deprived person forced to stay awake during an interview does not, based on the legacy of documented cases, confess to murder in order to be allowed to go to sleep. Fatigue affects the judgment of certain choices and one's concentration. With the exception of extreme fatigue and disorientation in extremes of sleep deprivation, fatigue does not rob one of the desire for liberty and to avoid the extreme penalties attached to murder.

Mr. Reyes has stated that he could not sleep. Whether he dozed off as did those of the 57 videotaped interrogation subjects is not known without that evidence. We do know that Mr. Reyes and Mr. Solache were not prevented from sleep.

If Mr. Reyes and Mr. Solache did not sleep when either expected to, then they were hyper-aroused at that time with the stress of their respective situations. Were either to have been that aroused at quiet time, each would have been expected to be aroused during the stress of interrogation. Hyperarousal would mobilize attention and cognitive resources.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **28** of **46**

With that noted, police reports noted that Mrs. Mejia, Mr. Reyes, and Mr. Solache were all observed to be asleep at 3 AM on April 4. Police decided not to awaken them. This is the antithesis of sleep deprivation. Whatever happened during their time alone, sleeping when fatigued is a conclusion one can make with reasonable certainty.

<u>Premature rush to judgment and guilt presumptive questioning</u> – When a person appears at a police station with a missing child in an unsolved double homicide, and the explanation is that the three-year-old simply happened to be handed off to the wife at a hospital days earlier and with no plan to follow-up, such an account is dubious. There is clearly more to the story. And so police investigated further while Mr. Mejia, Mr. Reyes, and Mr. Solache remained at the station. That does not evidence a rush to judgment.

When the Norma Salazar narrative collapsed, and it became obvious that Adriana Mejia's baby was the child taken from a home in which an adult male and female were murdered, it would have been quite foolish for police not to have been suspicious of guilt at that point. A transparent falsehood and no explanation for how the children were acquired raises very reasonable suspicion.

Adriana Mejia was a target of suspicion. She confessed and implicated Mr. Reyes and later, Mr. Solache. Ms. Mejia turned out to be undisputedly guilty, and to this day, implicates both Mr. Reyes and Mr. Solache. Their guilt was not presumed – it was asserted by one of the admitted killers.

Police focus their resources and questioning on individuals who are deceitful and who engender suspicion based on the available evidence. The presence of Santiago and Maria Soto in the Mejia home, with no explanation as to how they arrived there from the home of their murdered parents, would engender suspicion. Judgment was not premature – whether it was ultimately mistaken or not.

As to whether a rush to judgment or presumption of guilt is a risk factor for false confessions, that is without empirical research foundation at all. First of all, interrogation training is not based on guilt presumption. The Reid training referenced by Dr. Leo is neither based on guilt presumption nor trains to guilt presumption. The proposition of Dr. Leo's report is a misstatement. The Reid training aims at focusing on interrogation as to guilt or relevant knowledge if evidence raises reasonable suspicions to begin with, or if there is evidence the person is lying to police.[28] If there is no basis for suspicion and no evidence for lying, interrogation does not proceed.

Moreover, and while the Reid training acknowledges the risk of false confessions, the principal concern of applying interrogation to those who do not raise reasonable suspicions, or who are not lying, is that it wastes hours of time and misdirects an

---

[28] Inbau, F.E., Reid, J.E., Buckley, J.P. & Jayne, B.C. (2013**). Criminal Interrogation and Confessions, 5th Edition.** Jones & Bartlett Learning, 339-370

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **29** of **46**

investigation when time management may be critical.[29] Otherwise, the innocent suspect and unaware witness questioned by law enforcement are expected to be cleared and released but the officers are left with a few less hours to address the many responsibilities a law enforcement officer has in working up a case where unaccounted evidence may be ephemeral.

A read of Dr. Leo's presumptions about interrogation and detectives overlook time management and organization as important challenges in departments serving large populations. Dr. Leo is not an expert in police practice, so it is, therefore, not surprising that he conveys with the confidence of his own presumed expertise, a world view as if police are simpletons waiting around for a minority to show up with a missing baby from a double murder to coerce into a confession. The experience of most jurors would appreciate the range of demands on police time and the selectivity with which they must focus attention – including in the intervals between interrogation.

<u>False evidence ploys</u> – Adriana Mejia, a guilty party, named Arturo Reyes and then, also Gabriel Solache as co-conspirators. Police confronted Mr. Reyes with this evidence and then, Mr. Solache. This was not false evidence; it was evidence.

Perception of proof is how a person weighs the strength of evidence. If Mr. Reyes and Mr. Solache were innocent, being confronted with false evidence would be meaningless. One need look no farther than Rosauro Mejia, who was originally accused – but did not confess.

Even as he came to the police station with Santiago Soto, and was housing Maria Soto, was accused in interrogation, and may himself have been abused – Rosauro Mejia recognized that he was not involved and was not going to be impressed with the proof against him.

Significant others are never involved in homicides by females who fake pregnancy and then kill at term to avoid exposure of the lie.[30] The source of desperation for the female is that the spouse must not discover the lie, and the pregnancy term reaches a point where suspicions can no longer be answered. This is consistent with the account that Mrs. Mejia was particularly invested in her husband not learning that the baby was not hers. So from a criminology perspective, Rosauro Mejia would not likely have been responsible even if Mrs. Mejia had implicated him.

Adriana Mejia herself confessed after being advised that police had recovered her shoes, and that they appeared to have blood on them. That is perception of proof. But she also later conceded that even before then, when police said the baby did not look like a newborn, she realized that the plan had fallen apart. This is another example of perception

---

[29] Inbau, F.E., Reid, J.E., Buckley, J.P. & Jayne, B.C. (2013). **Criminal Interrogation and Confessions**, 5th Edition. Jones & Bartlett Learning, 339-370
[30] Burgess, O'Malley K A, Welner M. (2016). **Fetal abduction by maternal evisceration: A planned homicide.** *Forensic Sciences International.*

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **30** of **46**

of proof chronicled by Gudjonsson in his research – the belief that police are going to eventually prove the suspect's guilt.[31]

The notion of a "false evidence ploy" invokes consideration of why a suspect would perceive this to be stronger evidence of guilt. With that noted, there is no empirical research to date to demonstrate that false evidence ploys, apart from false claims that a person failed the polygraph (after passing it) are associated with false confessions to murder. No research has studied the significance of the polygraph and its being overvalued by suspects, and whether suspects who confess believe that if a measure shows that they are lying, that reflects even more poorly on them than culpability alone.

Moreover, there is no research or empirical basis for generalizing any risk from polygraph, whatever degree it may be, across all forms of evidence, of false evidence presentation.

Explicit and implicit threats and promises – Explicit threats and promises prompting a confession, by law, are sufficient grounds to render that confession inadmissible. That has nothing to do with science or research. Rather, it is a law deriving from a moral boundary to interrogation.

That explicit threats can prompt a coerced compliant confession is established. Specifically, that a person may confess because of the threat of harm, the resultant intensity of fear it inspires, and consequent desire to terminate the interrogation under any cost. That such a scenario can happen does not resolve whether the coerced compliant confession is that of an innocent or of a guilty person.

The nature of threat and its relationship to an urgency to terminate the interview by confessing has not been clarified by study or other data. Furthermore, what type of person would be more sensitive to explicit threats and to confess falsely to murder is not established. There is no accounting for how much a threat increases a risk of false confessions, and how much more a risk a threat is in certain types of cases or when paired with what types of techniques. It is possible that, were threats to be studied, we might find that certain physical threats create a risk of false confession, while other threats have no impact. We simply do not know.

Dr. Kassin, in the early 1990s, introduced the term "implicit promises" and "pragmatic implication." Again using the device of mock experiments, he introduced the idea that expression can convey a promise or a threat without being explicit. In theory this is understandable, but as it relates to interrogations, confessions and their disputes, whatever is "implied" can be claimed and may be completely at odds with what an interrogator intended or did. The expanse of such a loophole is endless – there is virtually no interrogation in which a suspect cannot say, "I took what the detective said as a threat." Or, "I thought he was promising me."

---

[31] Gudjonsson G. (2003). **The Psychology of Interrogations and Confessions: A Handbook**. Wiley

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **31** of **46**

No empirical research has been done to validate the idea that implied threats and implied promises cause false confessions. No research has been done to reliably assess what is meant by the nebulous term "implied."

Thus, "implied promises and threats" is hopelessly ambiguous to the end that there could not be a methodology for assessing it and measuring it. Like other devices, "implied" is used to expand the domain to claim risk in interrogation to include virtually every interrogation as grounds for exclusion.

Redirecting attention from the dearth of empirical study on this area, in 2018 Dr. Kassin gathered questionnaires from colleagues about police interrogation and suspect vulnerability. Using his own inclusion criteria of "expertise" that <u>excluded</u> law enforcement, legal professionals, and forensic psychiatrists – those who perform interrogations and who examine individuals -- to identify points of the assembled coterie's consensus.[32]

This is akin to a splinter sect living in rural Illinois polling its members about certain truths espoused by its elders. So long as those living in the empirical world are excluded, the illusion of consensus can be created. While this Kassin article was approved for publication by peer review and an editor (who presumably was not part of a study that claimed a cloistered expertise), the study's true meaning is akin to sampling only Cub fans about whom they agree upon as the best baseball team of all time, excluding the players themselves and those who align with all other teams, especially White Sox fans.

Publication of such papers provide a patina of academia and does fool all of the people some of the time. However, the notion that a self-gerrymandered group agrees on certain points does not replace the research needed to prove Dr. Leo's assertions.

6) *What is the empirical research affording validity and reliability to the term, "psychological coercion," as Dr. Leo uses it?*

There is no empirical research to establish validity or reliability of Dr. Leo's construct.

"Coercion" is, for decades, the distinction courts have used when rendering a confession inadmissible. So it is a term of great legal bearing, even though exclusion is traditionally associated with physical rather than psychological coercion.

Dr. Leo began using the term "psychological coercion" to refer to certain aspects of police interrogation in his advocacy articles on false confession that he published in the late

---

[32] Kassin, S. M., Redlich, A. D., Alceste, F., & Luke, T. J. (2018). **On the general acceptance of confessions research: Opinions of the scientific community.** *American Psychologist, 73*(1), 63-80, p. 75.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **32** of **46**

1990s. In his lone empirical study of interrogation of 1996, just before publishing his polemics and early publication about false confession, Dr. Leo monitored interrogations and scored the techniques he observed. Reviewing his data, he conceded his biases at that time about what he perceived to be "coercive" in day-to-day interrogation.[33]

> *"Although some may disagree with where or how I chose to draw the line between coercive and non-coercive interrogations, I believe that I erred on the side of ruling as "coercive" questioning methods that many contemporary trial and appellate courts would otherwise deem to be non-coercive and thus, my criteria for coercive tactics generally resolve any doubts in favor of the suspect, not the police."*

Even with that acknowledged bias, Dr. Leo only deemed 4 of the 182 cases to have used coercive techniques. And none of those 4 cases resulted in a confession, let alone false confessions. Two of the interrogations involved witnesses the police were actually treating as informants.

In actuality, "psychological coercion" was used to describe interrogations over 60 years ago by a military ethnographic researcher who worked with U.S. troops returning from the Korean War.[34] Albert Biderman interviewed fifteen formerly captured servicemen about their captivity and Chinese Communist efforts to force their confessions. What Biderman denoted as psychological coercion were techniques the Chinese employed over weeks, months, and even longer. This procedure consisted of eight methods used collectively and at times simultaneously:

- **Isolation** – the effect of which included making the captive intensely concerned with himself and dependent on the interrogator
- **Monopolization of perception** – maintaining the captive in a barren environment, all light or all dark, with restricted movement, eliminating stimuli not controlled by the captor and thwarting all actions not associated with compliance
- **Induced debility or exhaustion** – exploiting physical exposure; sleep deprivation; prolonged constraint; inducing illness and exploitation of wounds; semi-starvation; prolonged interrogation; forced writing; and over exertion in order to weaken one's mental and physical ability to resist
- **Threats** – of death, against family, of endless interrogation to cultivate anxiety and despair

---

[33] Leo, R.A. (1996). **Inside the interrogation room.** *Journal of Criminal Law and Criminology, 86,* 266-303

[34] Biderman, A. D. (1957**). Communist attempts to elicit false confessions from Air Force prisoners of war**. *Bulletin of the New York Academy of Medicine, 33*(9), 616-625.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **33** of **46**

- **Occasional indulgences** – occasional favors, promises, and fluctuations of interrogators' attitudes, in order to motivate compliance and to hinder adjustment to deprivation
- **Demonstration of omnipotence** – demonstrating complete control over a captive's fate, pretending cooperation is taken for granted, in order to suggest that resistance was futile
- **Degradation** – preventing personal hygiene, maintenance in filthy surroundings, demeaning punishments, denial of privacy, insults and taunts, reducing a prisoner to animal level concerns
- **Enforcing trivial demands** – enforcement of minute rules, including forced writing, to cultivate a habit of compliance

What Dr. Leo bases his assertion of "psychological coercion" upon is conspicuously more benign and has not been empirically studied in interrogation or confession populations. While it has a phraseology that approximates the legally consequential "coercion," just as he employs "proven false confession," based on "criteria" that are never researched and in some respects are fungible to arrive at the same end, and "implied" threats and promises that can make any number of communications grounds for inadmissibility.

"Psychological coercion" was researched in a methodologically sound study of human trafficking victims - but using the Biderman construct. Indeed, psychological coercion is demonstrated in those trafficked.[35] And it could be studied, because it is articulated through the Biderman construct in a manner that is reliable, unlike the catchall manner in which Dr. Leo uses it in his report, based on Dr. Leo's own personal value system.

In contrast, Dr. Biderman, as noted above, has specific criteria that draw directly out of the interviews of servicemen subjected to these experiences in the context of their captors aiming to extract confessions. The exercise was coercive by design because the Chinese knew they were not going to draw confessions otherwise. It produced the result from some and not from others.

Elsewhere, in disputed confession research that Dr. Leo endorsed in earlier testimony this year,[36] specifically a study about prospective juror awareness of false confessions, researchers employed a definition of "psychological coercion":

---

[35] Baldwin SB, Fehrenbacher AE, Eisenman DP. (2015). **Psychological Coercion in Human Trafficking: An Application of Biderman's Framework**. *Qual Health Res.* 25(9):1171-81. doi: 10.1177/1049732314557087. Epub 2014 Nov 4. PMID: 25371382.

[36] *People v. Grondin*, Michigan 2022

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **34** of **46**

> *"Something is coercive if it tends to remove an individual's perception of their freedom to make a meaningful choice. In other words, the less a suspect feels s/he has a choice as to whether or not to do what is being asked (i.e., confess) the more coercive an interrogation method is."[37]*

The above definition was not studied for validity or reliability, but demonstrates important truths:

- There is no generally accepted standard for what psychological coercion is, even 25 years after Dr. Leo began liberally using it in his writings on interrogations
- A construct for psychological coercion was developed in the late 1950's, related to interrogation and coerced confessions specifically, and Dr. Leo ignored it to promote a far more watered-down version as his own within his analyses and to endorse cases as reflective of psychological coercion
- The scientific community, when referencing psychological coercion, reached back to Dr. Biderman's application of the term to capture an authentic appreciation of the dramatic nature of the phenomenon
- Even the 2018 Mindthoff research that Dr. Leo has endorsed as an exhibit of representative "empirical research (of juror opinions)"[38] introduced its own definition of psychological coercion for research subjects. In so doing, the researchers recognized the potential for confusion as recently as 2018 with these otherwise unguided legally impactful terms. And despite citing Dr. Leo's writings, the researchers did not rely on his sprawling attribution of psychological coercion custodial qualities applicable to large number of interrogations.

Dr. Leo devotes a section of his report to the seriously titled, "The Scientific Study of Police Interrogation and False Confessions." He concludes the section thusly:

> *"[M]ost people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true."*

This statement functions as a closing argument for why his testimony should not be excluded under the *Daubert* standard. And in so doing, he illustrates exactly why his

---

[37] Mindthoff, A., Evans, et al. (2018). **A survey of potential jurors' perceptions of interrogations and confessions.** *Psychology, Public Policy, and Law, 24*(4), 430–448. https://doi.org/10.1037/law0000182,

[38] *People v. Grondin*, Michigan 2022

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **35** of **46**

testimony is not based on sound methodology, and would readily mislead the listener. . For Dr. Leo has his own definition of psychological coercion, which is whatever he says it is from one case to the next. Others define psychological coercion differently, and no research or other data he can point to renders his use of the term valid in a way that others' definitions and use are not.

Moreover, what Dr. Leo regards as psychologically coercive is, by his own published admission, biased in favor of a suspect and against police relative to the positions of courts. But these are impressions and not based on any study. Moreover, Dr. Leo uses expressions like "extremely" psychologically coercive and "classic psychological coercion" in his report on Solache and Reyes; if there is no standard for the term itself, how can there be any reliable or valid characterization of the "extreme" or "classic" of that fungible entity?

"Most people," writes Dr. Leo, "do not know which interrogation techniques create a risk of eliciting false confessions." But he doesn't, either. And most people, he adds, don't know "how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess." And beyond his ability to speculate, Dr. Leo cannot either.

Dr. Leo writes, "This unfamiliarity causes most people to assume that virtually all confessions are true." Yet when one reviews prospective jury studies that Dr. Leo himself has held out as relevant and recommended research, this statement is knowingly false.

> 7) *Is there empirical study of contamination in false confessions to murder, beyond demonstration that it occurs? Is there evidence to demonstrate that this concept is pertinent in the confessions of Mr. Reyes and Mr. Solache?*

Contamination in false confessions was not appreciated until Professor Brandon Garrett reviewed a sample of reported false confessions and published his findings beginning in 2008. Prior to that, Dr. Leo and others with similar views were taught to reject confessions lacking unique and informative crime detail.[39] With the Garrett work, the legal community became sensitized to how difficult contaminated confessions may be to identify as false and may in turn contribute to wrongful convictions.

What we now appreciate, based on closer study of contaminated cases, is that contamination can occur intentionally, or based on sloppiness, or even innocuously, or

---

[39] Leo, R. A., & Ofshe, R. J. (1997). **Consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation**. *J. Crim. L. & Criminology*, 88, 494.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **36** of **46**

from suspects simply piecing together random data intuitively in constructing a false narrative.

There is no methodology for ascertaining how a confession became contaminated, any more than collecting valid, reliable data about how everything within a confession came to be articulated as it was. Appreciating that contamination can happen from any number of sources, true confessions can include contamination as well – because the vectors for how interrogation is conducted allow for various portals through which contamination can occur.

Likewise there is no methodology for ascertaining what aspect of a confession originated from contamination. Nor does the presence of contamination resolve whether a suspect is guilty or innocent.

In short, contamination is an important phenomenon that has forced law enforcement to introspect about how to better chasten the interrogation process to avoid creating contaminated confessions and to eliminate sloppy practices.

With respect to this case, whether contamination did or did not occur cannot be ascertained. If Mr. Solache and Mr. Reyes' confessions were false, it follows that detailed aspects of their confessions could have been contaminated from different sources. If they were involved in the murders, contamination could still have occurred. Contamination does not render a confession false; it does make a false confession appear true.

Since Dr. Leo concludes that Mr. Solache and Mr. Reyes are innocent, he presumes contamination to bolster that presumption. "Contamination" only has relevance if the opinion is that they must be innocent – and therefore could not have arrived at a salient account of the crime on their own, because they were not at the crime scene to begin with. Otherwise, the discussion of contamination is ineffable.

A more objective opinion, and certainly from the standpoint of the role of the forensic examiner, is that the plaintiffs may or may not have committed the crime. Sorting contamination out from there is another level of vague and haplessly devoid of scientific certainty.

### 8) *Is there empirical study of "scripting" in false confessions to murder? Is there evidence to demonstrate that Mr. Reyes and Mr. Solache's confessions were scripted?*

Scripting relates to narratives suggested by interrogating police that suspects might adopt, in the course of confessing in a manner that the suspect finds acceptable. The confession still inculpates, but for the guilty murder suspect, the crime is more benign in its quality – either because the crime is more impetuous, the victim contributes, events are short-lived,

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **37** of **46**

trauma of the victims is whitewashed, intoxication becomes a major theme, or other ways of sprinkling perfume on a foul episode of a perpetrator's history.

The murder perpetrator still recognizes that he is confessing to something for which he will lose liberty and suffer other major consequences – although the moral enormity of the case may feel diminished. However, the truth is worse than the script to which he agrees.

Only in cases of coerced internalized confession, in which a person's memory distrust gives way to adopting a narrative, is naivete so pivotal that a suspect does not appreciate scripting as part of the false confession. In a coerced false confession, the interrogation is so intolerable that the suspect confesses to end the interrogation – and may adopt a suggested script as a narrative.

In this case, the defendants confessed to stabbing to death two innocent people and making off with their two children. The key points of the crime are the murders themselves and the kidnappings. The narrative developed from the original confession of Mr. Reyes – only after Mrs. Mejia singled out Mr. Reyes. After his confession, the general account was fairly consistent; but the notable evolution of the narrative from the time of Mrs. Mejia's first confessions to the confessions after Mr. Reyes on April 4 does not reflect police scripting, but a story converging as police learn more and follow up on areas introduced in the earlier interrogations.

If police were invested in managing a narrative, it follows that if the confessions were coerced, they would not be contradictory and would be devoid of seeming implausibility, such as the reported observation of Mrs. Mejia on top of Mrs. Soto and stabbing away, as Mr. Reyes related, "like an animal."

The reinterview of Mrs. Mejia in 2014 by Scott Lassar illustrates how the narrative at arrest may have deviated from the ground truth in gentle but significant ways. According to Mrs. Mejia in April 1998, Mr. Reyes was the prime mover; Mrs. Mejia even excluded Mr. Solache from her earlier disclosure. In 2014, she explained that she did this because she was personally closer with Mr. Solache.

When Mr. Reyes confessed in his interrogation, he added Mr. Solache's participation, and then, so did Mrs. Mejia. But when Mr. Solache ultimately confessed, he maintained himself on the periphery, even as a confessed homicidal actor, in a statement that was consistent enough with Mr. Reyes. In Mrs. Mejia's later interview with police, however, she related that Mr. Solache was in actuality the more central figure in whom she confided well before the kidnapping.

Scripting can also be attributed to the criminal defendants' complaints about police abuse. The assertions of Mr. Solache and Mr. Reyes referenced slaps to the face. After months of working with their criminal defense attorneys, having confessed to a grievous crime, and with options for inadmissibility otherwise limited to the Vienna Convention, a double

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **38** of **46**

homicide defendant has nothing to lose to learn a script, and far less detail needed and far more time to do so than the time span of April 4-5, when Mr. Reyes first confessed, and April 5 at 1215 AM, when Mr. Solache first confessed.

Scripting reflects something coordinated by an outside force. To that end, Dr. Leo observes,

> *"The parallels between what Mr. DeLeon-Reyes and Mr. Solache describe occurring during their 40+ hours of custody and interrogation in the Area 5 police station are striking."*

It is indeed striking that two accounts, of people questioned separately (and therefore not witnesses at the time to the interrogation of the other) and with their own individual experiences could so conform. Conformity reflects the adopting of a script – in this instance, defendants who have the opportunity to communicate and strategize together scripting an account of abuse.

Scripting that arises in the context of criminal defense claims of abuse portrays a more intense and frightening interrogation as time passes if claims are unsuccessful in earlier proceedings. A suppression effort that fails and is followed by more dramatic claims at later proceedings, either at trial, post-conviction, or after media interviews, raises suspicions of legally or financially motivated embellishment.

The motions to suppress began with very little attention to abuse and coercion. The claims highlighted a lack of access to the Mexican consulate and adequate translation – even though there was no material consequence demonstrated from the Puerto Rican and Mexican-American Spanish with which the suspects had been engaged. Only downstream of the original and unrelated suppression arguments, and challenges about prolonged detention, did physical abuse come to the fore – even with arrangements specifically made to photograph Mr. Solache.

Without access to the defense attorneys' complete notes from the earliest sessions with their now-released clients, and their own investigative follow up, there is no way of knowing whether the abuse allegations arose as a stratagem rather than as a history.

For example, the suppression motion of Adriana Mejia alleges that in her interrogation, police "hit her two times on the back with his hand." In her deposition on the civil matter 21 years later, Mrs. Mejia testified that Detective Guevara "beat her," that he "kept slapping my back" and hit her in the face and made her face bleed, repeatedly insulted her, and did not allow her water or to go to the bathroom; and that he threatened her brother, her parents, and her husband. And, she also later claimed that Detective Guevara was directing her what to say.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **39** of **46**

Likewise Mr. Reyes' accounts of his treatment evolved. His initial suppression motion focused on the Vienna regulations; only weeks later did he raised being slapped and threatened with the electric chair.

Mr. Solache's assertions about police abuse also evolved meaningfully over time. In his motion to suppress, he claimed to have been slapped in the face and to have broken a tooth. Support for the dental injury was ambiguous. In the suppression hearing, he noted permanent hearing loss, and also reported that Detective Guevara punched him in the stomach and that it was this beating that preceded his willingness to confess. An officer who had examined him after arrest noted that he voiced no complaints and showed no signs of injury. Moreover, Cook County Jail paramedic John Musa indicated that Mr. Solache denied a history of recent head injury, though the officer noticed a scar on Mr. Solache's head from an old injury.

At trial, Mr. Solache now emphasized the beating to the stomach, testifying that he only gave a self-incriminating statement because the blows to his stomach were so painful that he could not take it anymore.

> ### 9) Does the scientific body of research inform the ability to discern a "profoundly reckless disregard for finding the truth," and investigative practices "without regard to actual guilt or innocence?"

Before police ever met the plaintiffs, the Soto children were reported missing. Police interviewed Raul Aranda, a family member who had alerted them, among others.

Police detained Rosauro Mejia and investigated his involvement in the kidnapping of the Soto children who were in his possession. They investigated the story he relayed as presented to him by Adriana Mejia.

They interviewed Mrs. Mejia and explored her story – only to learn that she had not been a patient at the University of Illinois Hospital. They took the baby to a hospital, where she was tested and matched to Maria Soto's A+ blood type. Police then brought the baby to where a relative identified her as Maria Soto.

Adriana Mejia was brought into police custody when her truth was proven to be false, and the baby was in fact Maria Soto. Police searched for Norma Salazar, the alleged source of Santiago Soto. Mrs. Mejia's story of Ms. Salazar did not prove to be true and to date, there is no record that the Norma Salazar described by Mrs. Mejia was who Mrs. Mejia claimed her to be.

Police interviewed neighbors for additional information and followed up on physical evidence from the crime scene and the hospital where Mrs. Mejia allegedly met Norma Salazar.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **40** of **46**

When police confronted Mrs. Mejia about the falsity of her Norma Salazar story, she implicated Mr. Reyes. When police interviewed Mr. Reyes, he denied involvement. However, a search of his pants pockets yielded a paper containing Norma Salazar's name and a phone number that did not exist. This made it more difficult for him to project that he was disengaged, and his criminal defense attorneys sensibly tried to have this evidence excluded from the jury's attention in pretrial proceedings.

Given that this was a double murder and double kidnapping, and Mrs. Mejia was admitting guilty knowledge as her story fell apart, it would have been tunnel vision for police to believe that this woman, with no means of transportation back to the hospital, would have perpetrated the killings and made off with the two children by herself.

Police confronted Mr. Reyes about Mrs. Mejia implicating him. He responded by admitting his involvement and implicating Mrs. Mejia and Mr. Solache as well. Police returned to Mrs. Mejia and in a subsequent interrogation, she admitted her own direct involvement in the murders and implicated Mr. Solache as well. Police then went to Mr. Solache, advised him that he had been implicated by Mrs. Mejia and Mr. Reyes and he admitted his involvement.

Police released Rosauro Mejia when they determined he was not involved in the crime. Were their approach to have reflected rigidity, detectives would not have been willing to acknowledge that initial suspicions of Mr. Mejia were unfounded.

Subsequent investigation solidified the evidence corroborating Mrs. Mejia's involvement, as well as the motive for her participation in the murder-kidnapping. Subsequent investigation did not add DNA evidence against Mr. Reyes and Mr. Solache, but did not implicate anyone else, either. Mrs. Mejia maintains to this day – at no benefit to herself -- that she, Mr. Reyes, and Mr. Solache committed the home invasion, murders and kidnappings.

No alternative suspects have been linked to Mrs. Mejia to date. The numerous criminal defense teams working with the accused co-conspirators did not produce a slate of evidence or suspects or alternatives. Rather, they succeeded in persuading a higher court that Detective Guevara's history of complaints from other cases warranted a new suppression hearing, nearly twenty years after the original one failed on the same evidence from this case.

There were no investigative truths overlooked if Mr. Reyes and Mr. Solache were guilty. If they were innocent, there are no investigative truths from this double-murder offered by the successive criminal defense teams that had been overlooked.

Dr. Leo is not a law enforcement officer and has never conducted an interrogation and so, he passionately engages theories from a perch far removed from empirical experiences of homicide investigation and interrogation. Whether the above course of events reflects a profoundly reckless disregard for finding the truth and an investigation without regard to

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **41** of **46**

guilt or innocence is best left to the trier of fact or experts in police procedure. So is the question of whether standards for investigating a multiple perpetrator homicide case in 1998. I am not an expert in police procedure, any more or less than Dr. Leo, and so I will not offer an opinion here on police standards.

The inventory of the investigation – what was done and could have been done, reflects in the evidence of the case. The Lassar report, which in 2014 was altogether helpful to the criminal defendants, did also unearth leads and circumstantial information that was not yet explored, such as Santiago Soto's emotionally charged reaction to seeing Mr. Solache, and referring to him as "Diablo." Given that the most conspicuous evidence of innocence remains that Det. Guevara has a record of numerous complaints against him, the plaintiffs and Dr. Leo have still produced no evidence base focusing on perpetrators other than Mr. Solache and Mr. Reyes in 2022. And Mrs. Mejia remains guilty and remains resolute, miles and years from Det. Guevara, that Mr. Solache and Mr. Reyes carried out the crimes with her.

With respect to whether there was "reckless disregard" and whether detectives were "without regard for guilt or innocence," these are issues of contemporaneous decision-making and thinking that psychologists and psychiatrists in a forensic role interview to inform. Dr. Leo did not interview any officers or probe these issues to inform what was happening in the minds of the police actors.

### 10) How does previous history of professional conduct inform assessment of later professional conduct?

Dr. Leo devotes considerable attention to the prior allegations of prisoner abuse in Chicago. In so doing, he reinforces the current truth that no one can confirm that Mr. Reyes and Mr. Solache were coerced. And, if they were, they may have been guilty and coerced into confessions or innocent and coerced into confessions.

In support of his unstated but substantive opinion that Mr. Reyes and Mr. Solache were 1) Innocent 2) Confessed falsely and 3) Confessed falsely because they were coerced, Dr. Leo details some of the alleged misconduct of Chicago Police Department officers and supervisors, and the divisions in which these reported events took place. This documentation is in support of his assertion that prisoner abuse – and particularly black and latino suspect abuse -- in Chicago is systemic, thereby causing the detectives to coerce Mr. Reyes and Mr. Solache into falsely confessing. This opinion raises several important issues:

Dr. Leo advances allegations against Det. Guevara from earlier occasions to discount detectives' contention that they did not abuse the plaintiffs here. The past complaints about Detective Guevara emerge from institutional channels to easily field and handle complaints from the community about police officers. As such, these complaints detail

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **42** of **46**

incidents that would customarily be thoroughly and objectively probed by a forensic examiner opining on them.

Dr. Leo is not a clinician, or a forensic psychiatrist or psychologist. The practice standard in those disciplines for relevance of history, as applied to future risk determinations, fitness for duty determinations, allegations of workplace misconduct, criminal responsibility and other areas of the behavior and law interface is to investigate.

1) **The data behind the complaint to fully fact-find**; complaints may be lodged to undermine a prosecution, to retaliate against an officer for legal and personal consequences, or even the inconvenience of Det. Guevara's law enforcement, for more benign but still unpleasant experiences visited on a more unforgiving personality; to incapacitate him from being a successful detective when his effectiveness is interfering with criminal enterprise; and other reasons.

2) **If confirmed, the nature of the situation in which Det. Guevara committed misconduct.** Was it during a divorce, illness in the family, conflict with a supervisor; were there other issues within the detective division? Was he personally connected to the case being investigated, or otherwise overly sensitive to the subject matter? Did he have mental illness? A substance abuse problem? Did events happen after a particularly long interrogation? Was the suspect seemingly obviously guilty and unresponsive? Was the suspect disrespectful? Was the interrogation a particularly sensitive case? With a particular ethnicity or type of defendant? In the company of a particular colleague? This enables an examiner to pinpoint the conditions under which the detective might be likely to act in an unprofessional manner, and how.

3) **Which of the above factors were and were not operative at the time of the April 3-5, 1998 interrogation time frame?** Past behavior is more prognostic of future behavior when the context is replicated.

None of this was investigated by Dr. Leo. Quite the opposite, he added reference to events that involved other officers, in other precincts even. In his deposition, he acknowledged that he relied, in part, upon a chart prepared by an advocate about events that happened in Area 2 & 3, without inquiry to learn the ground truth, and conceded that he did not engage in fact finding. His "methodology" was the same for the Area 4 & 5 cases. He explained at his deposition that his methodology was to accumulate allegations of physical and psychological abuse and thus was able to conclude the allegations established a pattern and practice. There is no evidence that he performed any analysis other than to stack allegations of a few sentences that do not reflect assessment for their relevance or commonality or differences from the Solache and Reyes allegations. Such a lemming approach to data derived from an advocate source is methodologically incompatible with the role of a forensic examiner.

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **43** of **46**

Dr. Leo's shoehorning events attributed to other Areas likewise presumes a uniformity among all police officers across Chicago. This homogenization cannot even be validly made between officers – for every person practices his profession differently. When one takes the liberty to pile on events from removed precincts, there is hardly the shame to stop one from adding precincts from Milwaukee, or St. Louis, or Kansas City, or any other urban precinct. But that does not make the data valid for application to the study of an individual police officer.

The shiny object of headline cases distracts from Dr. Leo's responsibilities in this case. How indeed do any of those cases inform what happened in the interrogation of Mr. Reyes and that of Mr. Solache? How many of those cases involved a co-defendant that is undisputedly guilty who implicated the complainant? How many of those cases were not prosecuted or vacated because of previous complaints in earlier cases about the detective, as opposed to the likelihood of innocence? Where is the evidence for racial prejudice in this case? What injuries demonstrated in this case correlated to the injuries demonstrated in other cases of confirmed coercion? How many of those cases inform what caused Mr. Reyes and Mr. Solache to confess, and how do they do so?

So little is known about Mr. Reyes and Mr. Solache. Objective data about their lives in Mexico is lacking. Objective data about their lives after entering the United States is absent. For all of the niceties that folks can write about Mr. Reyes and Mr. Solache from their hometown, no doubt Det. Guevara has friends who can say good things, too. In my experience in other capital murder cases involving Mexican nationals living in the United States, I have read supportive letters from people in their hometown that would suggest that undisputed perpetrators of sometimes brutal and shocking crimes were beloved and respected and law abiding at the point of their Mexican origins. Even among cases involving gang members, I have never read otherwise.

Thus, the capacity to scrutinize Detective Guevara's background – which Dr. Leo did not do, just the same – stands in diametric contrast to the absence of data about Arturo Reyes and Gabriel Solache.

It is ironic but telling that Dr. Leo zealously draws a link to a detective's bad acts claim history as necessarily relevant if not conclusory to Detective Guevara's practices in this case and certainly to his credibility. For Dr. Leo, over the years, has been repeatedly excluded and limited in other cases. Sometimes the court decisions have been for the limits of the science, but at other times it has been because of proposed testimony that is itself reckless and borne of claims that are without foundation. Asked about his exclusions under oath, he has misled the courts about that as well. For example, the following exchange took place in a recent hearing,

> *Q: And there are some courts that will allow you to testify as well as there are courts that will exclude you from testifying, is that correct, Dr. Leo?*

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **44** of **46**

*A: Yeah, there are courts that have, but it's extremely rare that a court has excluded my testimony.*

*Q Well, when you say rare, how many times have you been excluded?*

*A: I've been excluded I believe about a dozen or so times, maybe 15, and oftentimes it's been because of relevance or problems with the defense attorney, nothing having to do with me or the science. No court has ever said I'm not qualified as an expert in this area. So if you put that number 15 over 400, what is that, you know, 96 percent of the time or more I'm allowed to testify. Now it is true, as I've testified here today, as we all know, that courts, when they allow me to testify sometimes don't limit the testimony very much and sometimes they limit it a lot. So each court makes a decision about what I can testify to, what areas, whether I can testify to particular case facts and conclusions. So like many experts, the testimony is often being limited. Virtually no court wants to allow me to testify that I think a confession is false or not false, and that's typically outside the scope of why I was retained. So the testimony is almost always limited in that sense but it's rarely excluded, and I think I've only been excluded once or twice in the last decade, so the cases in which I have been excluded typically are more than a decade old.[40]*

Contrary to Dr. Leo's testimony, he has been excluded at least eight times in the past decade;[41] this is only based on a preliminary review. Prior to that, he was limited many times, tallying far more than "15." In a 2014 case, a court took note of Dr. Leo downplaying the frequency of his being excluded in its opinion:

> *"Working off the cases listed in Dr. Leo's curriculum vitae, the judge researched court records and online docket systems and found that Dr. Leo's testimony had been excluded "in every forum where a pretrial admissibility hearing was held."*

> *The judge concluded from his research that Dr. Leo had been "less than candid" during his voir dire at Vent's criminal trial, and in his testimony at the post- conviction relief proceeding, when he said he only recalled one*

---

[40] *People v. Grondin*, Michigan 2022

[41] *Commonwealth v. Alicia, 92 A.3d 753 (Pa. 2014), Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012), *People v. Kowalski*, 492 Mich. 106, 821 N.W.2d 14 (Mich. 2012), *United States v. Yazzie*, Case No. 11-CR-1876 WJ (D.N.M. Sep. 17, 2012), *United States v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012), *United States v. Begay*, 310 F. Supp. 3d 1318 (D.N.M. 2018), *United States v. Phillipos*, 869 F.3d 15 (1st Cir. 2017)

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **45** of **46**

> *case in which his expert testimony had been excluded based on the subject matter of the testimony."*[42]

Eight years later in Grondin, Dr. Leo was demonstrably being less than candid all over again on the very same issue.

His percentages of 15 of 400 are disingenuous. Dr. Leo knows full well that most of the cases he has offered testimony on have neither the timing, nor resources, nor familiarity with how irrelevant or misleading his testimony is to request or successfully obtain a Daubert hearing. The more appropriate percentage is calculated by how many dozen times he has been excluded divided by the number of Daubert and Frye hearings held over the admissibility of his testimony.

His representation about witnesses being limited as a matter of routine is false. Witnesses who are limited based on experience avoid areas from which they have been limited in the past, as a matter of respect for the boundaries of the court.

Even when excluded, Dr. Leo returns in a subsequent case or jurisdiction to posit the same things, essentially as if no previous exclusion or limiting has taken place. His methodology, which is at odds with the ethics of forensic science, and as noted above, is to testify about whatever he won't get limited on, or whatever he can get away with. How does that jibe with his righteous indignation over the presumption of police officer tricks and pushing boundaries?

Dr. Leo's report, and his attempt to testify to points that have themselves been repeatedly excluded, demonstrate that he is unbowed, and simply goes on to a different jurisdiction, doing the same thing, as if no such opinion occurred. He has the hubris to greatly emphasize Detective Guevara's complaints while whitewashing his own testimonial record of being caught and cited for misleading courts under oath. History matters for thee, but not for me.

Apart from generalizing Det. Guevara's professional conduct, and generalizing other individual officers' conduct to Det. Guevara, or generalizing a different precinct's unprofessional and abusive history to Det. Guevara's own, Dr. Leo expands the allegations against Det. Guevara into a "systemic matter." Which is to say that this is how the system works. Dr. Leo adds that this abuse is a systemic problem for black and Latino suspects. There is no evidence that Dr. Leo personally researched complaints against police in the 1972 to 2000 time period he claims evidence systemic issues, Det. Guevara's own history beyond the complaints presented here, and how one is able to identify a particular alleged Guevara misconduct as ethnically motivated.

---
[42] *Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012)

Re: **Reyes and Solache vs. Chicago Police Dept. et al.**
*The Forensic Panel – Michael Welner, M.D.*
October 31, 2022

Page **46** of **46**

Injecting ethnic prejudice claims into this case (that "reckless" and "incompetent" Det. Guevara – and he's a racist, too!), absent a full examination of Det. Guevara, further distracts a jury from the missing science he proposes to represent.

As if that is not reflective enough of a gap in the science that Dr. Leo fills with "breathtaking" contrived sanctimony. Dr. Leo refers to Detective Guevara as "lazy" – in a report that Dr. Leo copies and pastes whole expanses of irrelevant sections from previous evaluations of other reports that are also regenerated. This includes large swaths of presumptions about police practice suffused through Dr. Leo's report, reflecting both his own tunnel vision and scripting using hot-button legal verbiage. A fitting summation to all of this is that Dr. Leo, he doth protest too much.

Please call me with any additional data you have for my review, or questions on this matter.

Very truly yours,



Michael Welner, M.D.
Chairman, The Forensic Panel
Clinical Professor of Psychiatry Mt. Sinai School of Medicine