IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,                ) Case No. 18 CV 1028
                                    )
            Plaintiff,              )
                                    )
      v.                            )
                                    )
REYNALDO GUEVARA, *et al.*,         )
                                    )
            Defendants.             )
_____ )
GABRIEL SOLACHE,                    ) Case No. 18 CV 2312
                                    )
            Plaintiff,              )
                                    )
      v.                            )
                                    )
CITY OF CHICAGO, *et al.*,          ) Chicago, Illinois
                                    ) July 24, 2025
            Defendants.             ) 10:09 a.m.

TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For Plaintiff          LOEVY & LOEVY
DeLeon-Reyes:          BY:  MR. STEVEN E. ART
                            MR. SEAN STARR
                            MR. ANAND SWAMINATHAN
                       311 N. Aberdeen Street, 3rd Floor
                       Chicago, Illinois 60607


For Plaintiff          PEOPLE'S LAW OFFICES
Solache:               BY:  MS. JANIS M. SUSLER
                       1180 N. Milwaukee Avenue
                       Chicago, Illinois 60642


                    *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

For Defendant          BORKAN & SCAHILL.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                       Two First National Plaza
                       20 S. Clark Street, Suite 1700
                       Chicago, Illinois 60603


For Defendants         THE SOTOS LAW FIRM, P.C.
Halvorsen, Dickinson,  BY:  MR. JOSH M. ENGQUIST
Rutherford, and        141 W. Jackson Boulevard, Suite 1240A
Trevino:               Chicago, Illinois 60604


Court Reporter:        AMY M. KLEYNHANS, CSR, RPR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 2318A
                       Chicago, Illinois 60604
                       Telephone:  (312) 818-6531
                       amy_kleynhans@ilnd.uscourts.gov

(Proceedings heard in open court:)

THE CLERK: 18 CV 1028, DeLeon-Reyes versus Guevara, *et al.*

And then 18 CV 2312, Solache versus City of Chicago, *et al.*

THE COURT: Good morning, everybody. Nice to see everyone. Good morning.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the plaintiffs.

MR. ART: Good morning, Your Honor.

Steve Art for Plaintiff Reyes.

MR. SWAMINATHAN: Anand Swaminathan for plaintiff.

THE COURT: You've got to go into the microphone and speak nice and loud and nice and proud.

Go ahead.

MR. SWAMINATHAN: Anand Swaminathan for Plaintiff Reyes.

Good morning, Judge.

THE COURT: Good morning.

MR. STARR: Good morning, Judge.

Sean Starr for Plaintiff Reyes.

MS. SUSLER: Good morning, Judge.

Jan Susler for Plaintiff Gabriel Solache.

THE COURT: All right. Good morning to the plaintiff

team.

And defense counsel.

MR. ENGQUIST:  Josh Engquist, Your Honor, on behalf of Halvorsen, Dickinson, Rutherford, and Trevino.

MS. ROSEN:  Good morning, Your Honor.

Eileen Rosen on behalf of Defendant City of Chicago.

MR. SCAHILL:  And good morning, Your Honor.

Timothy Scahill on behalf of Defendant Guevara.

THE COURT:  All right.  Very good.

Good morning, folks.  Nice to see everyone.

Let me start by giving you both an apology and a "you're welcome" for what transpired on Tuesday.  I had called you in for a hearing, both on Tuesday and on Thursday.  And at about 9:00 in the morning, I issued an order saying, actually, I think we need to cancel today's hearing, which was set at 11:00 o'clock on Tuesday, and do it on Thursday.

Unbeknownst to me at the time, that was unexpectedly prescient because we had an emergency in the building.  We had a person with a knife in the lobby.  If you had come on over here or tried to come on over here, you either would have been trapped in the building with me, which is not good for anyone, or you would have been prevented from coming into the building.

So that was a lucky shot on my part.  But I do want to acknowledge if -- there may have been some inconvenience to you folks if you were planning to come in and found out a couple

hours before the hearing that we weren't actually going to have a hearing. So I want to apologize for that. I want to acknowledge that.

The reality is I needed a little more time, and I think it worked out in the wash anyway. Okay. So I just wanted to acknowledge that first.

As you folks are well aware, there are a number of pending motions. By my count, there are 14.

I am ready to rule. I am ready to rule.

Today I will be issuing a ruling on the motions for summary judgment filed by the individual defendants, so Mr. Guevara and the other officer defendants. There are two sets of defense motions for summary judgment, two in each case, for a total of four.

There are ten other motions that are pending, including a motion for summary judgment by the City, plus the plaintiffs' motion for partial summary judgment, plus a collection of expert-related motions. I have rulings ready for that as well.

But for purposes of today, I'm going to divide and concur. I'm going to give you my ruling on the motions for summary judgment filed by the individual defendants and only the individual defendants. I will save for later the ruling on the motion for summary judgment filed by the City, the motion for partial summary judgment filed by the plaintiffs, and the

expert motions. I'll save that for later. Okay?

Let me say this by way of a preview: I have in my hands the ruling on the cross-motions for summary judgment by the individual defendants. My ruling is 56 pages long, single-spaced. One option is to apply more spit polish, get it ready to go, make it beautiful, make it sing, make it handsome for Westlaw, and get it out there in writing. That's one option.

Another option is to read it to you. I'm going to go through door No. 2. I'm going to read it to you. I'm going to read it to you.

Let me say this by way of an observation: Everyone knows that judicial resources are finite. You hear people talking about judicial resources. Everyone knows that's a thing, but I don't think lawyers really believe it, truly. I didn't. As a lawyer, I didn't. People think it's like the Pacific Ocean: You can drink as much as you want.

Judicial resources are finite. They're limited. If I can save a couple of days and read it to you instead of making it beautiful, given the length, I'm going to do that.

I'm not suggesting that you folks in particular are insensitive to the limits on judicial resources. Don't take it that way. That's not what I'm saying.

I'm just saying that I once stood where you stand in this very courtroom, and I now sit where I sit. And my

perception of judicial resources today is different than my perception of judicial resources when I was standing instead of sitting. It's a very real thing.

So I am going to read this to you.

Let me offer this other preface: This is going to take some time. This is going to take some time. Because I am merciful, I will allow you to sit. So you folks can take a seat.

MR. ART: Thank you, Judge.

MS. ROSEN: Thank you, Judge.

THE COURT: Let me say another couple things before I dive in.

Everyone is welcome to stay for the whole thing if you'd like. If any of you want to have your colleagues have the short straw and stick through the whole thing, that is okay. Okay?

I will not require each and every one of you to stay put. It's not quite a hostage situation. Okay? But I do require at least one lawyer for each party to be here because you need to listen to it. Okay?

Let me also acknowledge that getting an oral ruling is less satisfactory than getting a written ruling. It just is. It's harder to digest. I personally would prefer to give it to you in writing. I personally would prefer to give it to you in writing. Our interests are aligned, but there's only so much I

can do.  Okay?

If you would like a written copy, you can get one; just order the transcript.  It will be maybe a little more challenging to read, perhaps.  It will maybe look a little less beautiful because it won't be on Westlaw.  But everything that I would say in writing is going to be in writing in a transcript of my oral ruling.  Okay?

If you want to order a transcript, just go to my Web page, get an estimate from the court reporter, pay the deposit, and put the order in.  Okay?

Does anyone have any questions before we get going? Anyone?

MR. SCAHILL:  No.

THE COURT:  I do expect that we will take a break. We'll have a brief intermission in this little play that I'm about to give you, or I may need to take a break if my throat gives out.

I expect -- if I had to guess -- we'll see how I'm doing -- I expect this to take two to three hours.  We'll see. Maybe you all can jot down before we start an estimate of how long this is going to go, and the winner will be acknowledged at the end of the hearing.

All right.  Everyone has five seconds to think of their answer, how long this is going to go.

Okay?  Everybody ready?

All right. It's 10:17. Here we go.

The parties filed cross-motions for summary judgment. I just summarized for you the pending motions. Today, in open court, I will issue an oral ruling on the four summary judgment motions filed by the individual defendants. They filed two motions for summary judgment in the two cases, for a total of four motions.

Specifically, I will rule on Defendant Guevara's motion for summary judgment, which is Docket No. 741 in *Reyes v. Guevara*, and Docket No. 570 in *Solache v. City of Chicago*.

I will also rule on the officer defendants' motion for summary judgment, which is Docket No. 742 in *Reyes v. Guevara*, and Docket No. 573 in *Solache v. City of Chicago*.

Before diving into the analysis, let me just give you the punch line of my ruling.

Here it goes.

The Court denies defendants' summary judgment motion on the following claims:

Number one, plaintiffs' coerced confession and fabricated confession claims.

Number two, the failure-to-intervene claim.

Number three, the state law malicious prosecution claim.

Number four, the Section 1983 deprivation-of-liberty claim.

Number five, the state law conspiracy claim.

And number six, the state law intentional infliction of emotional distress claim.

The Court grants the motions for summary judgment on the claim about the fabrication of Adriana Mejia's statement and on the Section 1983 conspiracy claim.

The Court grants the motions for summary judgment on nine of the 12 *Brady* theories, and denies the motions for summary judgment on the other three *Brady* theories.

That's the summary of the ruling.

Does anyone want me to repeat that?

MR. ART:  No, Judge.

THE COURT:  Okay.  I'll start with some background.

The parties are well aware of the facts, and the record is voluminous, to put it mildly.  I'll simply offer a high-level summary of the facts.

This case stems out of the wrongful conviction of Plaintiffs Gabriel Solache and Arturo DeLeon-Reyes for first-degree murder in June 2000.

Over 25 years ago, Adriana Mejia murdered Mariano and Jacinto Soto, a husband and wife, and kidnapped their two children, three-year-old Santiago and baby Maria.

Adriana Mejia pleaded guilty in February 2001 and remains in prison to this day.  Solache and Reyes lived in the same apartment as Adriana Mejia.  Investigators at the Chicago

Police Department quickly homed in on them as potential accomplices to Adriana Mejia's crime.

After an investigation, Solache and Reyes were each convicted of two counts of first-degree murder in June 2000. Their convictions were based largely on confessions that they made to investigators in CPD's Area 5 police district.

But Solache and Reyes maintained their innocence. They asserted that their supposed confessions were coerced and fabricated by members of the CPD.

Specifically, plaintiffs say that Detectives Reynaldo Guevara, Ernest Halvorsen, Edwin Dickinson, and Robert Rutherford, plus Youth Officer Daniel Trevino committed a host of constitutional violations that led to plaintiffs' confessions. They claim that the confessions led to their convictions.

After years of post-conviction proceedings, a judge ultimately suppressed the confessions. Without that key evidence, the Cook County State's Attorney decided to dismiss the indictment, and a state court vacated plaintiffs' convictions. In November 2002, Solache and Reyes each received certificates of innocence.

Plaintiffs now bring a series of constitutional and state law claims against the detectives who investigated their case and the City of Chicago.

They allege that defendants used coercive tactics to

procure their confessions in violation of the self-incrimination clause of the Fifth Amendment.

They allege that defendants fabricated their confessions in violation of the due process clause of the Fourteenth Amendment.

They allege the defendants fabricated a statement by Adriana Mejia, again, in violation of the due process clause.

They allege that defendants suppressed material exculpatory evidence in violation of *Brady v. Maryland* and *Giglio v. United States*.

They allege that defendants committed the state law tort of malicious prosecution and the related constitutional tort of deprivation of liberty.

They allege that the defendants committed state law intentional infliction of emotional distress.

They allege that defendants engaged in a state law conspiracy.

They allege that defendants also failed to intervene in other defendants' constitutional violations.

They allege that defendants conspired to commit constitutional violations.

Finally, defendants also bring a *Monell* claim against the City of Chicago.

The defendants include Reynaldo Guevara. The defendants also include a collection of other individual

defendants. And I'll simply call them the officer defendants. The defendants also include the City of Chicago.

At this stage, the Court has in front of it a series of motions for summary judgment by various defendants. Plaintiffs also filed a partial motion for summary judgment. The parties filed several motions about the experts, too.

Again, I'll put those motions to one side for now. Today, I will only address defendants' motions for summary judgment.

Those are the broad contours of the case. Obviously, specific facts will be critical in this summary judgment ruling.

But laying out a comprehensive factual background would take the Court all day, literally. The record is voluminous, to put it mildly. The record includes more than 14,000 pages of exhibits. The docket reveals multiple motions for summary judgment from various parties. The parties hotly debate the facts.

The Court will not attempt to give a full summary of the facts. The parties themselves know the background of the case. What the parties care about is whether there are factual disputes that preclude summary judgment on particular claims.

So the Court will address the facts and any factual disputes as they come up in the course of the Court's analysis.

I'll now turn to the legal standard.

The legal requirements for summary judgment are well established, and the Court will simply offer a brief overview of the legal standard here.

Basically, read Rule 56, read *Anderson*, and read *Celotex*.

Let me just read it to you.

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." That's from Rule 56.

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." That's from *Anderson v. Liberty Lobby*.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences.

Summary judgment is appropriate, if, on the evidence provided, no reasonable jury could return a verdict in favor of the nonmovant. And that's from *Celotex*.

That's the legal standard.

I'll now turn to the substance of the ruling.

My ruling has ten sections. By and large, each section is devoted to a different claim.

To make this oral ruling easier to understand, and to

make the transcript more digestible for you, I will tell you when I'm turning to a different section.

I'll start with Section I.

Before diving into the claims, the Court wants to make a brief note about the relationship between Defendant Guevara's motion for summary judgment and the officer defendants' motion for summary judgment.

Defendant Guevara filed for summary judgment separately from the officer defendants. But Guevara adopts large portions of the officer defendants' statement of facts and memorandum of law. That's from page 3 of Guevara's motion, Docket No. 741.

At the end of the day, Guevara asks the Court to grant summary judgment, quote, "to the extent this Court grants Co-Defendants' Motion for Summary Judgment," unquote. That's from page 3.

So, for the most part, the Court will analyze the claims together. The Court will address the arguments together, meaning the arguments from the defendants and from the plaintiffs.

But there are a few exceptions, such as when Guevara offers his own analysis on the claims of coerced and fabricated confessions.

Plaintiffs offer a number of other arguments against Guevara's motion, but the Court does not need to reach all of

the arguments.

I will now dive into the substance of the ruling. I will now turn to Section II.

I will turn to the first batch of claims. I'll start with the coerced and fabricated confession claims, which appear in Count I of Reyes's complaint and Counts I and II of Solache's complaint.

Reyes and Solache each allege that Guevara and the officer defendants used coerced and/or fabricated confessions in their prosecution of plaintiffs. The confession-based claims are the only claims on which Defendant Guevara offers his own analysis.

So the Court will separately analyze the claims against Guevara and the claims against the officer defendants.

But before diving in, I'll summarize the case law and confessions.

A coerced confession and a fabricated confession are not the same thing. But they're also not mutually exclusive. They can overlap, but they don't always overlap.

Quote, "The government violates the Self-Incrimination Clause by using coerced confessions at pre-trial hearings or trials in criminal cases," unquote. That's from *Jackson v. Curry*, 888 F.3d 259, at page 265, Seventh Circuit 2018.

It's well established that the government cannot beat a confession out of a defendant. *Brown v. Mississippi*, 297

U.S. 278, 1936.

The government also cannot overbear a defendant's will through certain forms of psychological pressure, like sleep deprivation or days of interrogation. *Spano v. New York*, 360 U.S. 315, 1989 -- excuse me -- 1959.

Oftentimes, the voluntariness of a confession is a question of fact.

Quote, "The voluntariness of a confession depends on the totality of the circumstances, including both the characteristics of the accused and the nature of the interrogation," unquote. *Hurt v. Wise*, 880 F.3d 831, 845, Seventh Circuit 2018.

Quote, "If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment," unquote. *Id.*

Not every coerced confession is false. Sometimes a coerced confession is true. It is possible to twist someone's arm until they tell the truth.

Coercion can lead to the truth. Even so, coercing a confession is a violation of the Fifth Amendment protection against self-incrimination.

But fabricated confessions are different. A fabricated confession, by its very nature, is false. A fabricated confession can come from anywhere except for the

incriminated person.

A different constitutional amendment governs fabricated confessions.

Using a fabricated confession against a defendant violates the due process clause of the Fourteenth Amendment. The Seventh Circuit has, quote, "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way," unquote. That's from *Avery v. City of Milwaukee*, 847 F.3d 433, at page 439, Seventh Circuit 2017.

Coercion and fabrication can overlap. A defendant can be coerced into admitting a made-up, false story. Violence or coercion can make someone admit something they know is untrue, simply to get the interrogation to stop. That is, coercion can sometimes produce unreliable statements. In that scenario, the confession was both coerced and fabricated.

But, again, coercion very well could produce a true statement.

So the upshot is that a coerced confession and a fabricated confession are different claims. A claim about a coerced confession falls under the Fifth Amendment, and a claim about a fabricated confession falls under the Fourteenth Amendment. But the same conduct can potentially support both claims.

With that background in mind, I will now turn to plaintiffs' claims. I'll start with the coerced confession claim, which is Part II.A of my ruling, and then I'll move to the fabricated confession claim, which is Part II.B of my ruling.

I'll start with Reyes's coerced confession claim against Defendant Guevara. This is Section II.A.1 of my ruling.

To start, it's not entirely clear which counts Defendant -- excuse me. Let me say that again.

To start, it's not entirely clear which counts Guevara is moving for summary judgment on. He incorporates by reference the officer defendants' arguments in their memorandum of law. That's from Guevara's motion, Docket No. 741 at page 3. But on some of the counts, the officer defendants don't explicitly offer argument that Guevara is entitled to summary judgment.

For example, maybe Guevara moved for summary judgment on the coerced confession claim, but the Court isn't really sure. He doesn't explicitly say so in his motion.

And as far as the Court can tell, the officer defendants don't offer an argument that Guevara is entitled to summary judgment on the coerced confession claim. That's from the officer defendants' motion, Docket No. 743, at page 10. And neither does Guevara in his own motion.

Nonetheless, it seems like Guevara is moving for summary judgment on all claims since he doesn't specify any particular claims. So the Court will assume that Guevara is moving for summary judgment on the coerced confession claim, too.

That said, the lack of any relevant argument that actually applies to Guevara means that the Court has nothing to work with. The Court, therefore, denies Defendant Guevara's motion for summary judgment on the coerced confession claims against Guevara.

The officer defendants don't argue for summary judgment on the coerced confession claim on Guevara's behalf. Again, look at page 10 of defendants' memo. The gist of the officer defendants' argument is that they weren't there when Guevara allegedly coerced confessions out of Reyes and Solache. That argument obviously doesn't apply to Guevara, so it can't be a basis for granting his motion.

Other than joining the officer defendants' memo, Guevara offers three pages of argument in support of the idea that a coerced confession is not the same as a fabricated confession.

As the Court just discussed a few minutes ago, that's true. A coerced confession is not the same as a fabricated confession. But it's beside the point. A coerced confession claim can stand on its own two feet.

In sum, Guevara argues for summary judgment only on the fabricated confession claim without discussing a coerced confession. Even in his reply, Guevara says that, quote, "the independent grounds for summary judgment . . . relate to the latter [fabrication] claim not the former coerced confession claim," unquote. That's page 8, at Footnote 2, of Docket No. 777.

So since Guevara has failed to argue for summary judgment on Reyes's coerced confession claim, the coerced confession claim survives.

The same logic applies to Solache's claim for a coerced confession against Defendant Guevara. Nowhere does Guevara argue for summary judgment on Solache's coerced confession claim. And the officer defendants don't make that argument on behalf of Guevara, either. Solache's coerced confession claim against Guevara survives as well.

And, in any case, plaintiffs have pointed to lots of admissible evidence of coercive activity by Guevara. The existence of that evidence is an independent basis for denying the motion for summary judgment. I will discuss some of that evidence later in my ruling.

I'll now turn to Section II.A.2, which is the coerced confession claims brought by Reyes and Solache against the officer defendants.

The officer defendants first argue that Reyes

conflates his coerced confession claims and his fabricated confession claims. That's at page 10 of their memo, Docket No. 743. But that argument goes nowhere. As discussed a minute ago, it is totally fine for Reyes to bring two separate claims stemming from the same overarching conduct, because a confession can be both coerced and fabricated.

The officer defendants also argue that Reyes never testified that any officer defendant used force against him, so Reyes can't show that the officer defendants were involved in his coerced confession. Similarly, the officer defendants argue that Solache has no evidence that the officer defendants were involved in his coerced confession, because supposedly only Guevara was involved in Solache's interrogations.

Ultimately, that's too narrow of a lens through which to view a coerced confession claim.

The officer defendants correctly note that Reyes must offer evidence of their, quote, "personal involvement," unquote, in the coerced confession claim for them to be liable. They cite *Colbert v. City of Chicago*, 851 F.3d 649, at page 657, Seventh Circuit 2017.

Quote, "Mere presence," unquote, of an officer is not enough for Section 1983 liability. *Trout v. Frega*, 926 F.Supp. 117, 121, Northern District of Illinois 1996.

But as defendants themselves point out, a constitutional violation that occurs with a defendant's

23

"knowledge or consent" is sufficient for Section 1983 liability. See *Rasho v. Elyea*, 856 F.3d 469, 478, Seventh Circuit 2017.

Section 1983 liability may exist where a defendant, quote, "knew about the conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see," unquote. *Matthews v. City of East St. Louis*, 675 F.3d 703, 708, Seventh Circuit 2012.

Another case supports that point. It's *Rasho*, 856 F.3d, at page 478.

Against that standard, the officer defendants seem to say that they fall in the, quote, "mere presence," unquote, camp, or something like it. They themselves did not personally use violence against Reyes, only Guevara did. That's the argument on page 10 of Docket No. 473 [*sic*]. They argue that they were not present when Guevara got violent. Similarly, they weren't present for all of the interrogation of Solache.

Nonetheless, there is some evidence that the officer defendants had knowledge of, or approved of, or consented to, or turned a blind eye or a deaf ear to Guevara's actions. And Guevara's actions form the core of plaintiffs' coerced confession constitutional claims.

For example, Guevara and the officer defendants worked together on the investigation and kept each other up to date on the interrogations of plaintiffs. Defendants admit that in

their response to Solache's statement of additional facts, which is Docket No. 781, at paragraph 23.

Paragraph 23 of plaintiffs' statement of additional facts also contains the following fact: "Area 5 was on a single floor, with a large open space in the middle, where all the detectives worked, which was right next to the interview rooms. If defendants were being physically abused in the interrogation rooms, other detectives and sergeants would have heard it."

Defendants only dispute that fact on the grounds that it's immaterial and argumentative. It's not immaterial, and it's not argumentative. Defendants offer no evidence to dispute that fact. The fact in paragraph 23 is supported by admissible evidence. That's enough to survive summary judgment.

Under these circumstances, it would be difficult for any of the officer defendants to not know what Guevara was up to right under their noses. They would have heard Guevara's screaming or his use of physical violence against both defendants.

Let me reread the last sentence in paragraph 23 of plaintiffs' statement of facts, which is from Docket No. 781.

Again, this fact is undisputed. Or, at the very least, there is admissible evidence to support it. That's a better way to put it. There is admissible evidence to support

it.

"If individuals were being physically abused in the interrogation rooms, other detectives and sergeants would have heard it."

So plaintiffs offered admissible evidence that other people would have heard physical abuse in the interrogation rooms. That evidence is sufficient to get to a jury about whether the individual defendants approved of or consented to or turned a blind eye or turned a deaf ear to the coercive interrogations.

To be sure, that's not the only possible inference. Maybe it's not the best inference. Maybe it's not the strongest inference. Maybe a jury won't buy it. Maybe a jury won't buy it. But that's not my question for today.

It is a reasonable inference. And at summary judgment, the nonmovant gets the benefit of reasonable inferences.

Defendants object to those facts as improperly argumentative. But for purposes of summary judgment, the Court is required to construe all facts in the light most favorable to plaintiffs as the nonmovants and give them the benefit of all reasonable inferences.

In the Court's view, the idea that the officer defendants would have known about Guevara's actions based on their proximity is an inference that a reasonable jury could

draw.

After all, Guevara was up to a lot.

Reyes offered admissible evidence about what happened to him in the interrogation room.

I'll summarize the record briefly as stated in paragraphs 42, 45, 54, 55, and 56 of defendants' response to Reyes's statement of additional facts, which is Docket No. 785.

Here's the summary of the evidence that Reyes offered:

At various points, Guevara slapped Reyes across the face, screamed at him and took his clothing away. That's from defendants' response to Reyes's statement of additional facts, Docket No. 785, at paragraphs 42 to 45. Guevara slapped Reyes harder each time Reyes denied his accusations. That's from paragraph 45.

Guevara also beat Solache, slapping him while he was handcuffed to a wall. That's from paragraph 54. In fact, Guevara slapped Solache so hard that Solache completely lost hearing in his left ear. That's from paragraph 56. He punched Solache in the stomach multiple times. That's from paragraph 56.

Guevara told Solache that he would get, quote, "fucked up," unquote, if he didn't tell the truth. That's from paragraph 54. Guevara told Solache that something bad would happen if Solache didn't tell the truth. That's from paragraph 55.

A jury could find that these actions would not go unnoticed in the close quarters of the Area 5 station. And if defendant noticed these actions and condoned it, then a jury could find that they had, quote, "personal involvement," unquote, in the coerced confession as required by *Colbert*, 851 F.3d at 657.

That inference may or may not be the most natural inference. It may not be the strongest inference. But it is a reasonable inference that a reasonable jury could make. We'll see what the jury does.

The officer defendants disagree. In their reply, they cite cases reaffirming the, quote, "personal involvement requirement," unquote. That's Docket No. 783, at pages 3 and 4.

But the cases they cite don't establish that the officer defendants' presence in the "close quarters" of Area 5 cannot, as a matter of law, constitute personal involvement.

For example, one case they cite is *de Lima Silva v. Department of Corrections*, 917 F.3d 546, at page 564, Seventh Circuit 2019. In that case, "plaintiff did not develop any arguments about [the defendants'] personal involvement . . ."

In contrast, Solache and Reyes have offered arguments that go beyond mere, quote, "speculation or conjecture," unquote, that the officer defendants were personally involved in Guevara's alleged violent and abusive conduct by seeing,

hearing, or condoning it. See *King v. Hendricks County Commission*, 954 F.3d 981, at page 984, Seventh Circuit 2020. That's a key case for that speculation or conjecture point.

Under the summary judgment standard, they should be able to present these arguments to a jury.

Other evidence confirms that there is a disputed question of material fact.

For example, after Reyes had been told that the police station -- excuse me -- for example, after Reyes had been held at the police station for more than a day without food or water, Guevara brought him to a conference room with Trevino, Dickinson, and Rutherford. That's from Reyes's statement of additional facts, Docket No. 785, at paragraph 43.

In that conference room, Guevara told Reyes, albeit in Spanish, that he was going to get the electric chair if he didn't confess to the murder. That's from Docket No. 785, at paragraph 43. That's the quintessential coercive statement. And Trevino was translating parts of that conversation into English for Dickinson and Rutherford.

So a reasonable jury could find that Dickinson and Rutherford were personally involved in the coercion of a confession from Reyes in the sense that they condoned and approved of Guevara's coercive language and tactics.

All of this is a long way of saying the following: There is evidence in the record that Guevara abused Reyes and

Solache physically. There is evidence in the record of violence, and there is evidence in the record that the violence took place in the close quarters of the Area 5 police station. There is evidence in the record that the officer defendants were nearby in close proximity.

Based on that physical proximity and based on the nature of the conduct, a reasonable jury could find that the defendants knew about the conduct or facilitated it or approved it or condoned it or turned a blind eye or a deaf ear to the conduct. That is not the only possible inference. Maybe a jury won't buy it. That's certainly a possible outcome. That's not my job. My job is simply to figure out what a reasonable jury would do. And given the nature of the violent conduct, given the close proximity, a jury could find that the officer defendants knew what was going on next door. So that's the ruling.

The officer defendants' motion for summary judgment on the coerced confession claims is -- are denied.

I will now turn to Section II.B. I'll address the fabricated confession claims brought by Reyes and Solache against Guevara and the officer defendants.

"The essence of a due process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process."

*Patrick v. City of Chicago*, 974 F.3d 824, 835, Seventh Circuit 2020.

That will be a key case today.

A plaintiff must also prove that an officer manufactured a statement that he, quote, "knew, with certainty, was false," unquote. *Coleman v. City of Peoria*, 925 F.3d 336, 344, Seventh Circuit 2019. Evidence that an officer, quote, "has reason to doubt," unquote, a statement is not enough.

It is undisputed that plaintiffs' confessions were used against them at trial, at least in some capacity. Paragraphs 84 and 85 of plaintiffs' response to defendants' statement of facts, at Docket No. 766, makes that clear.

So, to survive summary judgment, plaintiffs simply need to introduce at least some evidence that defendants knowingly falsified the confessions. That is, plaintiffs must point to evidence that defendants manufactured evidence that they knew was false.

With that background in mind, I'll first address plaintiffs' claims against Guevara, and then I'll address the claims against the officer defendants.

We just finished page 10.

Plaintiffs fabricated confession claim against Guevara is Section II.B.1.

While the Seventh Circuit has described the standard for a fabrication of evidence claim as a, quote, "high bar,"

unquote, plaintiffs have cleared that bar for purposes of Guevara's motion for summary judgment. Specifically, there is a dispute of material fact about whether Guevara knew that the plaintiffs' confessions were false.

As an initial matter, the question whether Guevara knew that plaintiffs' confessions were false is a question of mental state and of credibility. Those kinds of questions are poorly suited for resolution at the summary judgment stage. "State of mind is an inquiry that ordinarily cannot be concluded on summary judgment." *Conley v. Birch*, 796 F.3d 742, at page 747, 2015.

Here, Reyes and Solache both say that no one ever read their respective confessions to them. Guevara or Trevino, the two Spanish speakers, didn't read their confessions to them. Neither did any other officer.

Start with Solache's confession. Guevara interrogated him in Spanish. That's from defendants' response to Reyes's statement of additional facts, Docket No. 785, at paragraph 59. Guevara then translated into English realtime.

From there, an assistant state's attorney wrote down what Guevara said, and that statement became Solache's confession. All of that is in paragraph 59.

But no one ever shared the details of Solache's confession with Solache himself. Specifically, the assistant state's attorney, quote, "was writing in English, and Guevara

never read [Solache] anything.  Solache just signed the pages and placed his initials where Guevara instructed," unquote. That's from paragraph 60.

Moreover, quote, "Guevara directed Solache to initial cross-outs in the confession statement that Solache could neither read nor understand and that were not read to him," unquote.  That's from paragraph 60.

Defendants don't dispute any of those facts except on materiality grounds.

The most striking aspect of those facts is that no one ever read Solache's confession to Solache in Spanish, the language he could understand.

Let me say that again.

No one ever read Solache's confession to Solache in Spanish, the language he could understand.

Instead, Guevara put the confession in front of Solache in English, and instructed him to read it -- excuse me -- instructed him to sign it.

Solache spoke Spanish, not English.  But he received a written version of his confession in English, not Spanish.

The officers had other options.  They could have taken down Solache's confession verbatim, in Spanish, word for word, and later translated it into English.

As another option, they could have translated the confession into English in real time, and then given Solache a

copy of the confession in Spanish so that he knew what he was confessing to.

That didn't happen.

The bottom line is that Solache did not receive a copy of his confession in Spanish, the only language that he knew, before he approved it.

A reasonable jury could draw different inferences from the omission. One possibility is that no one read Solache his own confession, or told him what he was signing, because they knew that the English statement was false. A jury might think: How else can officers explain the failure to read Solache his supposed confession? After all, it's a deviation from the usual practice to have criminal defendants blindly sign a confession without knowing what it contains.

Maybe that's not the most obvious or natural inference, but it is a reasonable inference that a reasonable jury could draw. It's a reasonable inference. It's certainly plausible that an officer might purposefully fail to read a confession to a criminal defendant in his or her native language because he knows that something in the confession is false.

Again, that is not the only possibility, but it is a reasonable inference. It is within the realm of possibility. It is a reasonable inference that a jury could draw.

The fact that Guevara directed Solache to initial

certain crossed-out statements might bolster that inference. A jury could view those cross-outs as intended to make the confession seem more authentic.

Again, at summary judgment, the Court must draw all reasonable inferences in the nonmovant's favor. Here, after drawing those reasonable inferences, in favor of the nonmovants, there is a dispute of material fact that a jury needs to resolve. So the Court cannot grant summary judgment.

I will now turn to the claim by Reyes. Reyes tells a very similar story.

The primary difference is that Trevino, rather than Guevara, pushed the confession across the table. See Docket No. 785, at paragraph 52.

Specifically, quote, "Reyes didn't know what the statement actually said. The statement was never read to Reyes in Spanish, nor could Reyes read it in English," unquote. Also, quote, "Trevino directed Reyes to put his initials next to cross-outs in the confession statement. Trevino instructed Reyes to sign the statement, and he did," unquote. All of that is from paragraph 52.

In fact, defendants concede that this sequence of events raises a question of material fact about whether Trevino fabricated Reyes's confession. That's at page 9 of defendants' memo, which is Docket No. 743.

Given the marked similarities between Reyes's

fabricated confession claim against Trevino and Solache's fabricated confession claim against Guevara, it's hard to see why Solache's claim would fare any differently.

True, Guevara isn't the one who got Reyes to sign the confession. Even so, Reyes's claim against Guevara can still go forward for the same reasons that the Court will explain momentarily in its analysis of the officer defendants' liability. The upshot is that Guevara cannot escape liability merely because he was not in the room when Trevino pushed the allegedly fabricated confession across the table to Reyes.

I will next turn to Solache's fabricated confession claim brought against the officer defendants, which is Section II.B.2.

The officer defendants raise a single, one-paragraph argument here. They say that Solache testified that only Guevara was involved in his questioning. See defendants' memo at Docket No. 743.

A few minutes ago, I rejected that argument as insufficient when it came to the coerced confession claim.

An officer could be involved in fabricating a confession, even if he never interviewed a criminal defendant. The officer defendants are not in the clear simply because they did not enter the interview room with Solache.

Similarly, the fact that all of the officer defendants were working in the same close quarters of Area 5, coordinating

with each other, and working on the investigation together is enough for a reasonable jury to find that the officer defendants were involved in Solache's fabricated confession.

That's not the only possible inference. It may not be the strongest inference, or the most persuasive inference, but it's a reasonable inference that a reasonable jury could draw. They were working together on the same case, in the same area, at the same time. A reasonable jury could draw inferences from that reality.

For the same reasons, Reyes's claim against Guevara can go forward, too, even though Trevino was the one who had Reyes sign the allegedly fabricated confession.

I'll now turn to Reyes's fabricated confession claim against the officer defendants. The officer defendants offer a slightly more fulsome argument against Reyes's fabricated confession claim.

As discussed a few minutes ago, the officer defendants admit that there is a material factual dispute about whether Trevino fabricated Reyes's confession. See defendants' memo at page 9 of Docket No. 743.

So that claim is going to a jury.

Next, Dickinson and Rutherford invoke the rule that a defendant must, quote, "knowingly," unquote, fabricate evidence to be liable for a fabricated confession claim. Again, that rule comes from the *Patrick* case, 974 F.3d 835.

Dickinson and Rutherford argue that it was impossible for them to, quote, "knowingly," unquote, fabricate Reyes's confession because Reyes spoke only Spanish, and they spoke only English. That's at page 10 of the memo where they cite their statement of facts at page -- excuse me -- at paragraphs 4 to 5.

As a result, they say that they couldn't have even known what Reyes said and, therefore, couldn't knowingly fabricate his statement.

That argument does not get them very far. True, a defendant's knowledge that the confession was false is an element of a fabrication claim. But Dickinson and Rutherford's "lost in translation" defense would lead to absurd results.

Imagine an officer drafted a statement that said, quote, "I'm the Loch Ness Monster," unquote, and then the officer put that statement in front of a non-English-speaking suspect and convinced the suspect to sign the statement. By Dickinson's and Rutherford's logic, that statement wouldn't be a knowing fabrication because the language barrier prevents the officers from knowing that the suspect didn't actually say, "I'm a Lock Ness Monster," just in a different language. That can't be the case.

In this Court's view, knowledge of falsity must be measured based on the facts that an officer has at the time. If Dickinson and Rutherford had no facts, as they seem to

suggest, and yet they participated in drafting the confession, then they knew that the confession was false. That is, the confession would have been made up out of thin air, even if later somehow it turned out to be true.

Zero facts should equal zero confession. Zero facts can morph into a confession only through fabrication. So Dickinson and Rutherford could still participate in a fabricated confession if they drafted up a confession with no actual knowledge of what Reyes said.

Let me say that again.

Dickinson and Rutherford could still participate in a fabricated confession if they drafted up a confession with no actual knowledge of what Reyes said.

In short, the Court doesn't buy the "lost in translation" defense.

And Dickinson and Rutherford offer no other arguments in favor of summary judgment on Reyes's fabricated confession claim. So the claim survives against them as well.

The defendants are welcome to try the "lost in translation" defense before a jury. Maybe a jury will agree. Maybe a jury will agree. It might be a good argument. The question is not whether it's a good argument. It might be a good argument. The question is whether it's dispositive. The question is whether it's so strong that it takes away the ability of the plaintiffs to get to a jury.

So the "lost in translation" defense might be a good defense. It might be persuasive to a jury. That's not my question. The question is, is it so strong that that's the only outcome that a reasonable jury could reach? And I conclude that it's not. It's not enough to grant summary judgment in favor of the defendants.

Again, Dickinson and Rutherford offer no other arguments in favor of summary judgment on Reyes's fabricated confession claim, so the claim survives against them as well.

Similarly, the officer defendants argue that Halvorsen is not liable because he, quote, "had to rely on information conveyed to him by other officers when drafting the reports summarizing Reyes's confessions," unquote. That's page 11 of the memo, Docket No. 743.

That argument fails for similar reasons as Dickinson's and Rutherford's argument. Halvorsen may not have spoken directly to Reyes, but that doesn't mean he was incapable of fabricating a confession.

If the officer defendants told Halvorsen "X," and he told them to write "Y," or he himself wrote "Y," that's just as much of a knowing fabrication as if he heard "X" directly from Reyes.

Without any other arguments beside this insufficient one, the Court will look no further. The claim against Halvorsen survives summary judgment, too.

In sum, the Court denies summary judgment against all defendants on plaintiffs' fabricated confession claims.

At the end of the day, it's a jury question. We need a jury to sort it out.

I will now turn to Section III.

Guevara and the officer defendants moved for summary judgment on plaintiffs' claim that the alleged fabrication of witness statements violated defendant -- violated plaintiffs' due process rights. I will address Count II in Reyes's complaint and part of Count II in Solache's complaint.

The officer defendants discussed allegedly fabricated statements by various people in their original memo in support of summary judgment. That's page 16 of defendants' memo at Docket No. 743.

But plaintiffs clarified that they're only bringing due process claims about the alleged fabrication of their own confessions and about the alleged fabrication of Adriana Mejia's statement. That's page 7 of plaintiffs' response at Docket No. 772.

I've already discussed the claims about the alleged fabrication of plaintiffs' statements. I'll now turn to the statement given by Adriana Mejia.

As an aside, the claim in this case involve two people with the last name of Mejia. Again, the murders were committed by Adriana Mejia. But the case at hand involves Rosauro Mejia,

Adriana's husband, as well.

So to avoid confusion, I will refer to Adriana Mejia as simply "Adriana," just like you folks did.

In short, Adriana's statement inculpated Reyes and Solache in the murder of the Sotos. Adriana said that she, Solache, and Reyes, quote, "had all participated in the killing of Jacinto and Mariano Soto and abducting their children." That's paragraph 48, at Docket No. 766.

According to defendants, Adriana repeated the statement a second time and an assistant state's attorney took down her statement, which she signed and initialed. That's at paragraphs 49 and 50.

Plaintiffs dispute that any such statement ever occurred. They say that Adriana's confession and statement implicating Reyes and Solache was fabricated. They say the defendants, quote, "scripted Adriana's statement implicating plaintiffs in the crime, knowing the statement was false," unquote. That's from plaintiffs' response, Docket No. 772, at page 7.

And they say that the statement, therefore, violated their due process rights.

The parties vigorously disagree about whether the statement by Adriana was fabricated. Even if, for sake of argument, Adriana's statement was fabricated, it did not violate plaintiffs' due process rights because it was never

introduced at trial.

The only inculpatory evidence introduced against Reyes and Solache at their criminal trials were their own respective confessions.

Simply put, the State did not use Adriana's statement at the trial of Reyes and Solache. Preparing a fake statement by Adriana did not violate the due process of Reyes and Solache because the State never used it.

Basically, her statement wasn't part of the process, so there was no due process violation.

Let me briefly summarize the case law about evidence fabrication claims under the Fourth Amendment and the Fourteenth Amendment.

As I have previously written, quote, "evidence fabrication claims can sprout from the Fourth Amendment or the Fourteenth Amendment," unquote. That's my opinion in *Zambrano v. City of Joliet*, 2024 WL 532175, at page 9, Northern District of Illinois 2024, which was affirmed by the Seventh Circuit in 2025 WL 1733500.

Quote, "Different amendments apply to different stages of an interaction with law enforcement. If the police take you off the street based on phony evidence, that's a potential Fourth Amendment problem. If the State takes you to trial based on phony evidence, that's a potential Fourteenth Amendment problem," unquote. That was quoting my opinion in

*Zambrano*, 2024 WL 532175, at page 9.

The Seventh Circuit in *Patrick* elaborated on this point and described the, quote, "contours of constitutional claims based on allegations of evidence fabrication," unquote.

Let me read you a sentence or two.

Quote, "A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial." I'm quoting the *Patrick* case, 974 F.3d 834. The Seventh Circuit in *Patrick* was citing the *Lewis* case. It's *Lewis v. City of Chicago*, 914 F.3d 472, at pages 476 to 479, Seventh Circuit 2019.

In short, quote, "The Fourth Amendment, not the due process clause, governs a claim for wrongful pretrial detention," unquote. *Young v. City of Chicago*, 987 F.3d 641, at page 645, Seventh Circuit 2021.

In contrast, when, quote, "fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial," unquote. That's *Patrick*, 974 F.3d at 834 [*sic*].

Quote, "To bring a Fourteenth Amendment claim, a plaintiff has the burden to prove that 'the fabricated evidence was used against him, at his criminal trial,'" unquote.

*Zambrano*, 2024 WL 532175, at page 10.

Similarly, in *Avery v. City of Milwaukee*, the Seventh Circuit noted that, quote, "it was the admission of the false confession that made [the plaintiff's] trial unfair," unquote. *Avery*, 847 F.3d at 442.

Conversely, the Seventh Circuit in *Anderson v. The City of Rockford* held that the summary judgment on a due process claim was appropriate because the, quote, "plaintiffs cannot show that the prosecution used [the allegedly fabricated statement] to convict any of the plaintiffs," unquote. That's *Anderson*, 932 F.3d 494, 511, Seventh Circuit 2019.

In sum, fabricated evidence before trial can be a Fourth Amendment deprivation of liberty claim. But only fabricated evidence at trial can be a due process claim.

So plaintiffs need to show that Adriana's statement was admitted at trial or used against them at trial to secure a conviction. Impeachment counts.

Plaintiffs can't make that showing. Plaintiffs cannot point to a disputed question of material fact about it. After all, it's undisputed that Adriana's statement was never introduced at plaintiffs' criminal trial. That's from paragraph 86, at Docket No. 766, which is plaintiffs' response to defendants' statement of facts.

Plaintiffs raise a hearsay objection to the evidence that the officer defendants point to as supportive of that

fact. Again, take a look at paragraph 86. But the officer defendants cite the entire transcript from plaintiffs' criminal trial back in June of 2000.

The Court doesn't see how plaintiffs could raise a hearsay objection to the entire transcript of trial testimony. It is not hearsay. The question is simply what was said. The question is not whether something that was said was true. The trial testimony isn't offered for its truth. The trial testimony was offered to prove that something was not said.

The question is the presence or absence of the statement. The question is whether Adriana's statement was used at trial or was not used at trial. The question is not the truthfulness of Adriana's statement.

And, in any case, the Court is not concerned with what was actually said at trial, or the truth of what was said.

The Court here cares about what wasn't said. And the trial transcript confirms that Adriana's statement was not introduced at plaintiffs' criminal trial. So the hearsay rule doesn't bar the evidence for that purpose.

In any case, plaintiffs admit that it is, quote, "undisputed that the contours of Adriana's statements implicating Reyes and Solache were not presented to the jury at their trials," unquote. Again, take a look at paragraph 86 from Docket No. 766.

Next, plaintiffs try to argue that Adriana's statement

was used in other, more tangential ways. For example, its existence made defendant -- excuse me -- its existence made plaintiffs reluctant to cross-examine the testifying officers for fear of opening the door to its admission.

When I say "plaintiffs" there, I'm referring to Solache and Reyes.

Let me say it again with that in mind.

For example, they argue that the existence of Adriana's statement made Solache and Reyes reluctant to cross-examine the testifying officers for fear of opening the door to its admission. That's from page 12 of their response, Docket No. 772. And the officer defendants used it in the grand jury proceedings and suppression proceedings.

Maybe so. But plaintiffs cite no authority for their expansive interpretation of what it means to use something, quote, "at trial," unquote. The Seventh Circuit has been clear that it is, quote, "the admission," unquote, of the evidence, quote, "to obtain a conviction," unquote, that causes the injury. That's the *Avery* case, 847 F.3d at 442, and the *Patrick* case, 974 F.3d at 834. Both of those cases make that point.

What matters is the use of a fabricated statement at trial, not its potential use.

As an aside, we have now hit the one-hour mark.

Because Adriana's statement wasn't introduced at

trial, to convict Reyes and Solache, their due process claims fail, even if Adriana's statement was fabricated.

But plaintiffs soldier on and argue that any deprivation of liberty stemming from fabricated evidence is actionable as a due process violation. That's from page 9 of their response at Docket No. 772. That's incorrect, as the Court has just explained. The Seventh Circuit has not gone that far.

The cases the plaintiffs cite do not help them. All but one of the cases that they cite predates *Lewis v. City of Chicago*. In that case, the Seventh Circuit, quote, "clarified," unquote, its evidence fabrication jurisprudence, as I've just explained. I'm quoting there the *Patrick* case, 974 F.3d 834.

In other words, the Seventh Circuit in the *Patrick* case offered a gloss on what the Court did in the *Lewis* case, and the Seventh Circuit said that the *Lewis* case clarified its evidence fabrication jurisprudence. Did a little cleanup work.

They do cite one case that postdates *Lewis*. That's *Moran v. Calumet City*, 54 F.4th 483, Seventh Circuit 2022. That case dealt with evidence fabrication styled as a *Brady* claim. But a *Brady* claim is different than a due process claim about a fabricated statement. A *Brady* claim is a different animal. Plaintiffs don't couch their claim about Adriana's statement as a *Brady* claim, at page 7 of their response, so the

Court won't go there.

In short, the plaintiffs needed to show that the allegedly fabricated statement from Adriana was used against them at trial. They needed to show it was actually used at trial to get a due process violation. It wasn't used at trial. Adriana's statement wasn't used at the criminal trial of Reyes and Solache, so it could not have led to a due process violation. So the due process claims fail as a matter of law.

The Court grants Guevara's and officer defendants' motions for summary judgment on the due process claim about Adriana's statement.

One last point. At times, it appears that the parties might have confused due process fabrication of evidence claims with Fourth Amendment fabrication claims. They talked a lot about the pretrial deprivation of liberty. So I wanted to clarify one thing. The fabrication of evidence which leads to a pretrial deprivation of liberty can give rise to a constitutional violation, even if it isn't used at trial. But it's a Fourth Amendment claim, not a due process claim under the Fourteenth Amendment.

Specifically, the fabrication of Adriana's statement could be relevant evidence behind Reyes's Section 1983 deprivation of liberty claim, meaning Count III, as the Court will discuss a bit later.

But for now, the motion for summary judgment is hereby

granted as to the due process claims regarding the alleged fabrication of Adriana's statement.

I'll now turn to Section IV. This section is about the *Brady* claims.

I will consider plaintiffs' claim that defendants suppressed exculpatory evidence in violation of *Brady v. Maryland* and *Giglio v. United States*. This part will cover Count IV of Reyes's complaint and part three -- excuse me -- and part of Count II. Excuse me. Part two -- I'm sorry.

I'm going to say that whole sentence again because I misspoke.

This part will cover Count IV of Reyes's complaint and part of Count II of Solache's complaint. There will be a number of subparts here. Each *Brady* theory will get its own number, as I'll discuss in a moment.

I will start with a short overview of the law.

To establish a *Brady* claim, a plaintiff must show that, quote, "Number one, the evidence at issue is favorable to his defense; number two, the officer concealed the evidence intentionally or at least recklessly; and number three, the concealment prejudiced him," unquote. *Coleman v. Peoria*, 925 F.3d 336, at page 349, Seventh Circuit 2019.

A *Brady* claim can also be based on the suppression of impeachment evidence, rather than evidence that is directly exculpatory. *Giglio*, 405 U.S. 150, 154 to 155.

Plaintiffs have 12 theories under *Brady*. They have a dozen theories. That is, they have 12 theories about how defendants allegedly suppressed and withheld evidence. That's what plaintiffs say in their response to defendants' motion for summary judgment, which is Docket No. 772, on pages 14 through 17.

Plaintiffs say that as long as one of those claims is going forward, quote, "This Court need not parse due process theories at summary judgment, because it's clear a trial on plaintiffs' fair trial claims is necessary," unquote.

The argument seems to be "in for a penny, in for a pound." That is, plaintiffs basically argue that this Court doesn't need to get into the weeds about which *Brady* theories pass muster, as long as at least one *Brady* theory passes muster.

They say that on page 17. They cite *Goudy v. Cummings*, 922 F.3d 834, 843, Seventh Circuit 2019.

But the portion of *Goudy* that plaintiffs cite for that proposition doesn't support it. There, the Seventh Circuit explained that it must, quote, "look at the impact of withheld evidence in the aggregate, rather than seriatim. For this reason, we consider it appropriate that all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial *Goudy* ultimately received," unquote.

That's the *Goudy* case, 922 F.3d at 843.

This Court does not read that language to mean that, as long as one *Brady* theory is going to trial, all of them can. The Seventh Circuit didn't say that say. Instead, they stated that any defendant who participated in any *Brady* violation can be liable for all *Brady* violations, or something along those lines.

The Seventh Circuit didn't say that a district court has to let every *Brady* theory go to a jury, as long as one *Brady* theory goes to a jury. The Seventh Circuit did not take away a district court's inherent ability to screenout *Brady* theories that lack legal or factual support."

I'm the gatekeeper, and I'm at my post.

That's a materiality question, not a question about whether a court needs to consider a theory.

Basically, if something isn't a *Brady* violation, I can call it like I can see it, and I can say that nobody can be held liable for it, and I can throw it out of the case. I can call balls and strikes.

In conclusion, the Court can't just green-light one *Brady* theory and then say that every other theory under *Brady* can get to a trial. If that's what plaintiffs were saying, I reject it.

So I'm going to consider each one of the plaintiffs' 12 *Brady* theories.

But before diving into each and every one of those 12 *Brady* theories, let me just offer a few background observations to set the stage.

As defendants point out, the two sides are like two ships passing in the night when it comes to the *Brady* claims. That's the phrase they used at Docket No. 783, at page 9.

Let me summarize the back-and-forth in the briefing.

Defendants moved for summary judgment on the *Brady* claim.

Plaintiffs responded. They identified their 12 theories. They argued the defendants failed to respond to 11 of the 12 theories in their motion for summary judgment. Take a look at page 14 of their response, Docket No. 772.

Plaintiffs seem to think that defendants waive the opportunity to argue against those 11 *Brady* theories.

Defendants then came back in their reply with the litigation equivalent of, quote, "I know you are, but what am I," unquote. They say that plaintiffs are the ones who waived some of their claims, specifically, six *Brady* theories. They say that plaintiffs never disclosed those six *Brady* theories during discovery. That's Docket No. 783, at pages 9 to 11.

Defendants say that they did address those -- excuse me. Defendants say that they did address the other six theories. Defendants point out they addressed five of the theories in a different part of their briefs when discussing

the fabrication claims, not the *Brady* claims.

Here's the good news: At least the parties agree that both sides addressed one of the 12 theories. That's a small victory.

Let me make one other brief observation. The parties use the phrase "two ships passing in the night." I've never understood that idiom. It seems like a good thing if two ships pass in the night. A collision of two ships in the middle of the night seems like a bad idea. I have really, frankly, never understood that idiom. People talk about two ships passing in the night like it's a terrible thing. It seems like that's the ideal scenario, as far as I'm concerned, but I get what you meant.

The idea is that you want people to engage each other in litigation. I get it.

So here's what I'll do: I will start by looking at the six *Brady* theories that the defendants say are waived. The defendants say that the plaintiffs waive those theories because they never addressed them during discovery. And if they are waived, there is no need to discuss them on the merits.

Let me offer a bit of background about waiver and discovery.

A party has an ongoing obligation during discovery to update its response to discovery requests, quote, "in a timely manner if the party learns that in some material respect the

54

disclosure or response is incomplete or incorrect," unquote. That's Rule 26(e)(1)(A).

Here, defendants think that plaintiffs failed to disclose several of their *Brady* theories in their interrogatory responses.

The Federal Rules of Civil Procedure require parties to answer discovery requests in full, unless there is an objection. The default is full disclosure. Full disclosure is a basic part of fairness. Full disclosure allows a party to vet a theory during discovery. Full disclosure allows a party to ask questions. Full disclosure helps the party gather information and know what to ask about. Full disclosure enables a lawyer to get his or her head around the case and get the mental wheels turning. Full disclosure helps a lawyer think through an issue. Full disclosure prevents gamesmanship. Full disclosure protects a party from getting sandbagged at trial by the other party.

Let me say this so nobody misunderstands what I'm saying: Not every case involving nondisclosure is sandbagging. So don't anybody take anything that I say to be an accusation of sandbagging, because that's not where I'm going.

But sandbagging is a thing. And I don't like it.

Rule 37 contemplates that a party may lose the ability to present evidence or information at trial that a party didn't disclose in response to a discovery request. Rule 37 provides

that, quote, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless," unquote. That's Rule 37(c)(1).

The advisory committee has explained the purpose of the rule. The, quote, "automatic sanction provides a strong inducement for the disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56," unquote. That's in the notes to Rule 37.

Rule 37(c) is a full disclosure provision. Rule 37(c) is an antisandbagging provision. I like that rule.

Basically, if a party requests information during discovery, and if the responding party doesn't provide the information during discovery, then the responding party might lose the ability to present that information during trial.

Defendants think that, based on Rule 37, this Court should bar certain *Brady* theories that plaintiffs didn't disclose before summary judgment.

Again, plaintiffs offer 12 *Brady* theories. Defendants contend that six of the 12 *Brady* theories are waived.

I will address those six potentially waived theories first. I will use the numbering that plaintiffs use on pages 14 through 17 of their response, specifically, Docket

No. 772. Specifically, defendants argued that plaintiffs waived *Brady* theories No. 3, No. 4, No. 8, No. 9, and No. 10.

I will now address those six theories. I'm going to get into the weeds. I'm going to address each of the 12 theories one by one.

For now, I will set aside the other *Brady* theories, meaning theories No. 1, No. 2, No. 5, No. 6, No. 7, and No. 12. Again, I will start with the six theories that *Brady* say are waived. I will start with theories -- excuse me. I'm sorry.

I will start with theories No. 3, No. 4, No. 8, No. 9, No. 10, and No. 11, as numbered on pages 14 to 17.

Here it goes.

I will start with theory No. 3.

In plaintiffs' third *Brady* theory, they say that defendants suppressed that they never excluded Norma Salazar as a suspect and that no lineup procedure ever occurred.

Plaintiffs say this evidence would have implicated a different suspect, and would have called into question Adriana's allegedly fabricated statement. The nonoccurrence of a lineup could have been used to impeach Guevara, too.

The Court took a detailed look at plaintiffs' supplemental responses to defendants' interrogatory. Defendants asked plaintiffs to, quote, "state with particularity the exculpatory evidence the defendant withheld and/or suppressed," unquote. Take a look at Defendants'

Exhibits 98 and 99, at pages 194 and 208, of Docket No. 744-21. Those are the supplemental responses by plaintiffs to defendants' interrogatories.

Defendants asked a fair question. Defendants asked plaintiffs to state with particularity the exculpatory evidence that was withheld. That's a fair question. Defendants were entitled a straightforward answer. Basically, defendants asked a fair question, and they needed to get a fair answer. Plaintiffs had an obligation to give a straight answer to a straight question.

Plaintiffs can't expect to offer a *Brady* theory at trial that they did not disclose during discovery in response to that interrogatory.

Let me say that again.

Plaintiffs cannot expect to offer a *Brady* theory at trial that they did not disclose during discovery in response to that interrogatory. That's not fair. That's not how the federal rules work.

Parties must put their cards on the table during discovery or they will lose the ability to play the cards at trial. That's how our system of justice works.

Plaintiffs did respond to the interrogatory, but plaintiffs did not mention Norma Salazar. They did not mention a lineup or anything of the sort. Norma Salazar's name doesn't even appear in their responses to the interrogatories.

Plaintiffs do state that, quote, "Defendant withheld documents that reflect that Defendants had multiple theories of the case and alternative suspects," unquote. That's at pages 198 and 211 of Docket No. 744-21.

Read generously, perhaps too generously, that statement could potentially refer to the existence of Norma Salazar as an alternative suspect. But that's an overly generous reading.

The responding party has to give a straight answer, and the party that served the interrogatory should not have to guess what they're talking about. The response here is too generic. Plaintiffs' response is at such a high level of generality that it did not give defendants fair notice of the nature of the plaintiffs' theory. The interrogatory asked plaintiffs to disclose evidence with particularity. That's a quote, "with particularity." Referring to "documents" generally without any specificity, without any additional direction is not informative or responsive. It could have referred to anything. It just pointed to "documents."

I have no earthly idea what "document" means. The sentence could refer to just about any evidence that didn't corroborate defendants' case against the plaintiffs.

Frankly, the sentence basically just restated its obligation under *Brady*. It basically said that they didn't produce stuff, didn't produce documents. That's not a theory

of *Brady*. That's just a restatement of *Brady*. It says that they didn't produce things. It was not a response with particularity.

This Court doesn't see how defendants could have known what the theory was because plaintiffs didn't tell them what their theory was.

Here's the bottom line: Defendants served an interrogatory. Defendants asked a fair question. They asked plaintiffs to identify with particularity what evidence was not produced. That's a fair question. They need to get a fair answer. They received a response. Plaintiffs didn't point to anything involving Norma Salazar or any lineup procedure, so they didn't give notice that this was part of their *Brady* claim. So, therefore, it's out of the case.

Plaintiff waived the ability to bring *Brady* theory No. 3. Defendant's motion for summary judgment is granted as to theory No. 3 about Norma Salazar and the lineup.

I will now turn to the next *Brady* theory the plaintiffs alledgedly waived. That's theory No. 4.

Plaintiffs allege the defense suppressed the fact that they used physical force against Rosauro Mejia during an interrogation. Again, Rosauro Mejia was Adriana's husband.

Plaintiffs say that this evidence would corroborate plaintiffs' claims of abuse and coercion, and thus discredit their confessions. Plaintiffs also say it would have allowed

cross-examination of Guevara. That's in their response at Docket No. 772, at page 15.

Again, the Court examined the interrogatory responses. That's Exhibits 98 and 99.

I did not locate anything in plaintiffs' responses about defendants' use of physical force on Rosauro Mejia. It's not there.

Moreover, unlike Norma Salazar in theory No. 3, the interrogatory responses do mention Rosauro Mejia by name. But the responses only discuss fabricated statements by Rosauro Mejia, not coerced statements. That's pages 202 and 214 of Exhibits 98 and 99.

The affirmative mention of Rosauro, coupled with the absence of anything about the use of force against him, strengthens the conclusion that plaintiffs didn't disclose theory No. 4 to defendants, as required by Rules 26 and 37.

Basically, plaintiffs did mention Rosauro Mejia, but they didn't mention anything about using force against him. So it wasn't fully disclosed.

So for the same reasons as theory No. 3, plaintiffs waived theory No. 4, and the Court grants summary judgment to the defendants on that theory.

Plaintiff -- excuse me. Theory No. 4 fails for an additional reason.

It's undisputed that Rosauro Mejia testified at

plaintiffs' criminal trial that Guevara hit him. Take a look at Docket No. 766, at paragraph 83. So defendants didn't suppress that they allegedly used physical force against Mejia. It was out in the open. Rosauro Mejia testified that Guevara hit him. So it wasn't suppressed.

As the Seventh Circuit has noted, quote, "evidence cannot be used" -- excuse me. Let me say that again -- quote, "evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant." That's from *Avery*, 847 F.3d at 443.

Also, quote, "The Seventh Circuit has held that evidence is not considered suppressed if the defendant has an opportunity to confront and use it at trial," unquote. That's from Judge Dow. Always cite Judge Dow whenever you can. *United States v. Zheng*, 2020 WL 868534, at page 10.

So plaintiffs' *Brady* theory No. 4 would fail even if it wasn't waived. Summary judgment is hereby granted as to theory No. 4.

I will now turn to theory No. 8.

By way of signposting, we're on page 24. I intend to take a break at the bottom of page 27 when we complete our discussion of theory 10.

If anybody needs to step out in the meantime, it won't rub me the wrong way. But I'm going to go about three pages, and then we'll take about a ten-minute break. Okay?

Thank you, folks.

Let's move on to theory No. 8.

Plaintiffs' eighth *Brady* theory is that, quote, "Trevino suppressed he had never seen Adriana demonstrate how she had stabbed the victims, despite submitting a police report a year after the crime documenting that Adriana supposedly had done so during the interrogation." That's at page 16, Docket No. 772.

Defendants again argue that plaintiffs never disclosed this theory before summary judgment.

But plaintiffs' response to defendants' interrogatory states that Trevino, quote, "and other officers wrote false and fabricated handwritten and typed reports meant to supplement the false and coerced statements that Defendants extracted from Plaintiff Reyes and others," unquote. Take a look at pages 197 and 210, of Docket No. 744-21, in Exhibits 98 and 99.

That response was not very specific, but the language was sufficient to put defendants on notice that plaintiffs were bringing *Brady* claims based on allegedly fabricated reports meant to paper over gaps in the case against Reyes and Solache.

Defendants could have moved to file -- excuse me. Defendants could have filed a motion to compel. Defendants could have pressed plaintiffs for more details.

Their response wasn't perfect. Their response wasn't detailed. But their response wasn't silent, either.

It didn't put the ball in play very far, but it did bunt the ball. It put it in play just a little.

So the Court is not convinced that the automatic sanction of Rule 37 applies to that theory.

But this *Brady* theory fails for another reason. Case law forecloses a *Brady* claim of this nature.

Recall that the *sine qua non* of a *Brady* or *Giglio* claim is the suppression, withholding, or concealment of evidence. As this Court has previously said, quote, "concealment or suppression of evidence is central to a *Brady* claim." *Bolden v. Pesavento*, 2024 WL 1243004, at page 23, Northern District of Illinois 2024. Take a look at *Anderson*, 932 F.3d at 504, Seventh Circuit 2019.

Plaintiffs say that Trevino fabricated the supplementary report that he wrote on November 18th, 1999, because he allegedly never saw Adriana demonstrate how she stabbed the victims. Take a look at paragraphs 84 to 85 of Docket No. 785.

If plaintiffs had evidence showing that Trevino's report was falsified, that would have been evidence to impeach Adriana's trial testimony. And they could have used it to impeach the credibility of the officer defendants more generally.

So this Court has two questions. First, what evidence shows that the Trevino report was a fabrication? Second, did

Trevino and the other defendants suppress that evidence?

The problem with plaintiffs' theory is that they point to no specific evidence that the defendants allegedly suppressed. They didn't point to an e-mail or a document the defendants suppressed. There's no e-mail, for example, that shows that the report was fabricated.

Instead, plaintiffs simply say that, quote, "Trevino suppressed he had never seen Adriana demonstrate how she had stabbed the victims," unquote. That's from page 16 of their response, Docket No. 772.

In other words, plaintiffs are simply saying that Trevino suppressed his own personal knowledge that he allegedly fabricated a report.

That's not a *Brady* claim.

Officers are required to refrain from suppressing evidence, but they are not required to create evidence of their misconduct. That is, officers are not required to create evidence which would thereby discredit or impeach the results of that misconduct. But that's what Trevino would have had to do in order to give plaintiffs the evidence that they argue was suppressed. Trevino would have had to write down a declaration, or something along those lines, some statement or e-mail or document or something along those lines, in which he admitted fabricating a report.

The Seventh Circuit considered similar circumstances

in *Saunders-El v. Rohde*, 778 F.3d 556, Seventh Circuit 2015. In *Saunders-El*, the Seventh Circuit similarly barred a *Brady* claim.

There, the plaintiffs argue that, quote, "police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence," unquote.

Let me read that again.

The plaintiffs argued that, quote, "the police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence," unquote. That's from page 561. Again, 778 F.3d at 561.

The Seventh Circuit first surveyed its previous rejections of such a theory. For example, the Seventh Circuit noted that it had previously, quote, "rejected a plaintiff's argument that *Brady* requires police to disclose truthful versions of statements made during interrogations," unquote, because, quote, "it implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence," quote. The Seventh Circuit was quoting its opinion in *Gauger v. Hendle*, 349 F.3d at 354, Seventh Circuit 2003.

As the Seventh Circuit pointed out, the Constitution does not require that police testify truthfully -- let me read that again, but tell you where the quotation starts.

Let me start at the top.

As the Seventh Circuit pointed out, quote, "The

Constitution does not require that the police testify truthfully; rather 'the constitutional rule is that the defendant is entitled to a trial that will enable the jurors to determine where the truth lies,'" unquote. They were quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029, Seventh Circuit 2006.

And the Seventh Circuit previously, quote, "upheld the dismissal of a *Brady* claim premised on an argument that an officer is suppressing evidence of the truth by making a false statement to a prosecutor," unquote. I'm quoting page 561 of the *Saunders-El* decision once again. They were relying on that passage in *Harris v. Kuba*, 486 F.3d 1010, at page 1017, Seventh Circuit 2007.

Putting that all together, the Seventh Circuit rejected *Saunders-El's* claim because he sought, quote, "to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of evidence to the prosecution."

Let me read that quote again.

The Seventh Circuit rejected the claim because the plaintiff sought, quote, "to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of evidence to the prosecution," unquote.

And, quote, "case law makes clear that *Brady* doesn't

require the creation of exculpatory evidence," unquote, in that way.  Again, I'm quoting *Saunders-El* at page 561.

Similarly, in *Avery v. City of Milwaukee*, 847 F.3d at 443, the Seventh Circuit explained that it was no -- *Brady* claim -- let me say that again.

In *Avery*, the Seventh Circuit explained that there was no *Brady* claim where a, quote, "criminal defendant was just complaining that the officer didn't admit to falsifying his report," unquote.

In this Court's view, *Saunders-El* controls this case. Plaintiffs ask this Court to green-light a *Brady* claim against defendants for keeping quiet about the wrongdoing and for not creating truthful exculpatory evidence in the form of admitting to fabricating a report.  But that's not a *Brady* claim.

Simply put, plaintiffs cannot transform a fabrication claim into a *Brady* claim by saying the defendants suppressed exculpatory evidence by failing to affirmatively admit misconduct.  Again, *Brady* is about the suppression and withholding of evidence.  *Brady* is not about a failure to create evidence that would have helped the other side.

A failure to admit conduct -- excuse me.  Let me say that again.

A failure to admit misconduct in and of itself is not a *Brady* violation.

In sum, plaintiffs' theory No. 8 fails because it

seeks relief that a *Brady*-type claim does not offer. The claim is foreclosed by *Saunders-El*. The Court grants summary judgment to defendants on theory No. 8.

The next theory is theory No. 9.

Plaintiffs' ninth theory is that Guevara suppressed a conversation that he had with Lourdes Rodriguez, a neighbor of the Sotos. The gist of that conversation is that Rodriguez saw the Sotos on the morning of March 28th. According to plaintiffs, that information, quote, "fatally contradicted plaintiffs' fabricated confession statements about when the crime was committed (the witness saw the victims alive after the time the confessions stated the crime occurred)," unquote. I'm quoting paragraph 16 of plaintiffs' response.

Plaintiffs have a waiver problem. Plaintiffs didn't disclose that *Brady* theory in their interrogatory responses. Look at Exhibits 98 and 99, Docket No. 744-21. The name "Rodriguez" doesn't even show up. As such, plaintiffs have waived this *Brady* theory.

Even if plaintiffs hadn't waived the theory, it would still fail.

Plaintiffs argue that Guevara, quote, "made up a story that he had reinterviewed Rodriguez, and that she had changed the date she saw the victims to March 26, and he suppressed that this reinterview never actually occurred," unquote. I'm quoting page 16 of the response.

Based on that assertion, Guevara didn't suppress the evidence at all. Instead, he fabricated new evidence. It's similar to theory No. 8. The evidence, quote/unquote, suppression consisted of Guevara's alleged failure to tell the truth. And that's not a *Brady* claim.

Lying is bad. Lying is wrong. But a failure to tell the truth and come clean about misconduct, standing alone, isn't a *Brady* violation.

And so this theory runs into the same problems that the Seventh Circuit identified in *Saunders-El*. Again, *Brady* does not require officers to, quote, "create truthful exculpatory evidence," unquote. That's *Saunders-El*, 778 F.3d 561.

*Brady* is about a failure to disclose exculpatory evidence. *Brady* is not about a failure to create exculpatory evidence.

In any event, the theory is waived. So the Court grants summary judgment on theory No. 9.

I'll do one last theory, and then we'll take our break. And it's mercifully short. Theory No. 10 is next.

Plaintiffs' tenth theory is that Guevara and Halvorsen suppressed that they had discovered evidence that a week before the Soto murders, Jacinto Soto had befriended a woman and that her keys had gone missing, which explained how Adriana got into the apartment to murder the Sotos, and which contradicted

plaintiffs' confessions." Once again -- unquote. Once again, I'm looking at page 16 of Docket No. 772.

Unlike the prior two theories, this is a true suppression theory in that plaintiffs allege the defendants withheld existing evidence. The theory is not that defendants failed to admit to misconduct and failed to admit fabricating evidence.

But once again, the plaintiffs run into a waiver problem. Plaintiffs did not bring up this theory anywhere in their responses to defendants' interrogatories. Take a look at Exhibits 98 and 99. So this theory is waived as well.

The Court hereby grants summary judgment to the defendants on theory No. 10.

Folks, I'm now at page 28 of 56. It is the halfway point. It is now 11:58. So we've gone on, you know, for the better part of an hour and a half or an hour and 40, whatever the math is.

We are going to take a break.

One option is that we take a ten-minute break and then plow forward, but I expect that we probably wouldn't be done until after 2:00 o'clock -- I don't know -- depending on how it goes.

I would propose that we take a lunch break, depending on the needs of my staff, who are doing a terrific job taking this down right now. I think we should take a lunch break.

Let's go off the record for one second.

(Off the record.)

THE COURT: We're back on the record.

I will confess to you all that I basically never eat lunch, so I'm a little reluctant to take lunch breaks, because I don't eat lunch anyway. It's just how I roll.

So I know not everybody has the same needs.

I would propose that we come back in, like, 15 minutes. Let you guys take a break, call your clients if you want, grab a snack downstairs, and we can come back at 12:15 and just roll forward.

Another option is we could go for an hour, but I think we should just, you know, take 15 minutes and come back.

Does that work for everybody?

I don't know if anybody has diabetes or anything where they need to eat food. If you do, speak up, and I'll be sensitive to that.

Okay? Is that good, everybody?

So why don't we come back at 12:15. It's 12:00 o'clock now. You can call your clients. You can talk things over. But we'll take a 15-minute break, and we'll get rolling.

We'll see you soon, folks. Thank you.

We are adjourned.

THE CLERK: All rise.

(Recess at 12:01 p.m., until 12:25 p.m.)

THE COURT:  All right.  Welcome back, everyone.

I'll say again, thank you, everyone, for indulging me with the oral ruling.  I wish I could give you a written ruling.  Everything in the world is finite, including little ole me.

We ended with theory No. 10.  I'll pick up where we left off.

I will now consider theory No. 11, meaning *Brady* theory No. 11.

Here it goes.

Plaintiffs' 11th theory is that Guevara engaged in misconduct in previous -- let me say that again.

Plaintiffs' 11th theory is that Guevara engaged in misconduct in previous investigations and that, quote, "Defendants didn't disclose [Guevara's] pattern of extreme misconduct . . . which could have been used to impeach Guevara," unquote.  That's on pages 16 and 17 of the response.

Basically, plaintiffs think that defendants suppressed *Brady* material because defendants didn't tell plaintiffs all about Guevara's earlier misconduct.  But defendants were not required to have affirmatively produced new exculpatory evidence.  As explained in *Saunders-El*, they did not have to create new evidence for the plaintiffs.  Nondisclosure is not the same as suppression, when the evidence exists simply as

thoughts in the defendant's heads.

So for the reasons explained above when analyzing theory No. 8, meaning the theory about Trevino's backdated report, *Brady* did not require Guevara to tell plaintiffs all about his past misdeeds.

Summary judgment is hereby granted on theory No. 11.

I have now covered the six theories that plaintiffs allegedly waived.

I will now turn to the other six *Brady* theories. I will address the *Brady* theories that the defendants say they knew about before filing for summary judgment.

First up is theory No. 1.

Plaintiffs' first *Brady* theory is that defendants suppressed the tactics they used to procure confessions from Reyes and Solache. They say the defendants: "Hid from Reyes that they had scripted Solache's confession and the abuse and other interrogation tactics they had used to obtain Solache's confession; and, conversely, they hid from Solache that they had scripted Reyes's confession and the abuse and other tactics they used to obtain Reyes's confession. Defendants actively covered them up with false reports, and they provided statements and testimony that prevented plaintiffs from discovering what had happened during the interrogations they were not present for," unquote. I'm quoting page 15 of the plaintiffs' response, Docket No. 772.

That theory runs into two problems.

The first problem is that a *Brady* claim must rest on something more than an officer's internal knowledge that he had created a false report. To bring a *Brady* claim, a plaintiff must point to some other evidence that the officer suppressed above and beyond the officer's own internal knowledge. Knowledge in your head isn't evidence. Putting that knowledge down on paper or revealing that knowledge in a statement or testimony is evidence.

*Brady* covers the suppression of evidence. *Brady* doesn't require the creation of evidence.

Here, plaintiffs don't point to any then-existing evidence suggesting that reports were fabricated. That is, plaintiffs don't identify any evidence, such as a memo or an e-mail, suggesting that the reports were fabricated. They only point to the officer defendants' internal knowledge that they allegedly fabricated reports.

Again, the Seventh Circuit doesn't recognize a, quote, "*Brady* claim premised on an argument 'that an officer is suppressing evidence of the truth by making a false statement to a prosecutor,'" unquote. That's *Saunders-El*, 778 F.3d at 561. So the creation of a false report in and of itself doesn't constitute a *Brady* claim.

In contrast, a *Brady* claim can arise from coercive tactics. Plaintiffs could base their *Brady* claim on a theory

the defendants suppressed evidence of the coercive tactics they used to procure witness statements or confessions.

In *Avery v. City of Milwaukee*, 847 F.3d 433, Seventh Circuit 2017, the Seventh Circuit discussed a, quote, "violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it," unquote.

The Seventh Circuit also explained why that duty to disclose coercive tactics is important. Quote, "Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officer used to extract it, and the jury has a fair opportunity to find the truth," unquote. That's from Judge Sykes in the *Avery* case, 847 F.3d 439.

The point is that coercive tactics can give rise to a *Brady* claim.

The Seventh Circuit was even more explicit two years later in *Anderson v. City of Rockford*, 932 F.3d 494, at page 507, Seventh Circuit 2019.

In *Anderson*, the plaintiffs claimed that two witness statements implicating the plaintiffs in murder were procured by police coercion.

The *Anderson* court cited *Avery* for the idea that "the right to a fair trial is implicated if the State fails to disclose 'facts about the coercive tactics used to obtain' a witness's statement," unquote.

As a result, quote, "due process entitled the

plaintiffs to learn before their trial what went on with [one of the witnesses]," unquote. Again, that's from *Anderson*, 932 F.3d at 507.

The Seventh Circuit got even clearer that a failure to disclose coercive tactics is a *Brady* violation.

The Seventh Circuit made that point later in the *Anderson* case.

Let me give you a long quote.

"Regardless of whether [the witness]'s statement (and the resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required the disclosure to the plaintiffs of the coercive tactics used to obtain [the witness]'s statement. Armed with that information, the plaintiffs could have contended, in their cross-examinations of [the witness] and closing arguments, that [the witness]'s testimony implicating plaintiffs in the [] murder was false -- the fruit of police coercion . . .

"Because it is undisputed that the defendants failed to disclose the coercive tactics used to obtain [the witness]'s statement, the district court erred by granting summary judgment on this alleged *Brady* violation," unquote. That's Anderson, 932 F.3d at 507 to 508.

Folks, I'll acknowledge that block quote was probably hard to digest when read to you in open court. Just go ahead and read it. It will make more sense.

At least you know what I'm reading and where you can find it.

The Seventh Circuit hasn't been completely clear about why officers need to bring forward evidence of coercive conduct that they committed in the process for procuring a witness's statement. That requirement feels like it is asking officers to create evidence, and *Brady* isn't about creating evidence.

So, perhaps, there's a bit of an aura of mystery around this. Perhaps the distinction is the coercive conduct is external to the officer, unlike an officer's internal thoughts or knowledge. Maybe the tactic is an act. Maybe the act of violence, for example, is an act as opposed to a thought, which is internal. Maybe that's the distinction.

Coercion involves an external manifestation of conduct, but knowledge only exists in an officer's head. There's no physicality to a thought.

Regardless, the Seventh Circuit has made clear that the suppression of evidence about coercive tactics can give rise to a *Brady* claim.

But that leads to a second problem with plaintiffs' theory. As the Court will explain, plaintiffs already possessed evidence about coercive tactics used by the defendants, or plaintiffs could have acquired that evidence with reasonable diligence. If the plaintiffs couldn't have gotten -- excuse me. If plaintiffs could have gotten the

information themselves, they don't have a *Brady* claim. That's what the Seventh Circuit said in *Goudy*, 922 F.3d at 832 [*sic*]. The Seventh Circuit said the same thing in *Carvajal v. Dominguez*, 542 F.3d 561, at page 567, Seventh Circuit 2008.

Plaintiffs each knew about the coercive tactics the defendants used on them. Reyes knew about the coercive tactics that the officers used on Reyes. Reyes didn't need the defendants to tell him what had happened to himself.

Solache knew about the coercive tactics that the officers used on Solache. Solache didn't need the defendants to tell him what had happened to himself.

Plaintiffs didn't need the defendants to tell them what had happened to the plaintiffs.

In fact, during their criminal proceedings, each plaintiff filed motions to suppress that detailed some of the coercive conduct that is the subject of this claim.

It was out in the open.

Plaintiffs also say that defendants hid evidence of coercive tactics used against Solache from Reyes. Plaintiffs say that defendants hid evidence of coercive tactics used by Reyes -- excuse me. Let me say that again.

I'll start at the top.

Plaintiffs say that defendants hid evidence of coercive tactics used against Solache from Reyes -- I'm going to say that one more time because I think if I move the phrase,

it's easier to understand.

Solache and Reyes say the defendants hid evidence of coercive tactics used against Solache and hid that from Reyes. Solache and Reyes also say the defendants hid evidence of coercive tactics that were used against Reyes and hid that evidence from Solache.

They say that such information is material because each plaintiff could have "used the evidence to corroborate their [respective] account of abuse." They say that on page 15 of their response.

Basically, Reyes and Solache say that defense suppressed evidence by failing to tell each plaintiff about what defendants did to the other plaintiff. So the notion is that the officers didn't tell Reyes what had happened to Solache, and they didn't tell Solache what happened to Reyes. That's the concept.

But with reasonable diligence, plaintiffs could have acquired that evidence. After all, Solache and Reyes undoubtedly knew each other. They lived together. They were prosecuted together. They could have talked to each other about the cases, and they both filed motions about what had happened to them. It was out in the open.

Solache could, with reasonable diligence, have acquired Reyes's account of coercion, and Reyes could, with reasonable diligence, have acquired knowledge about Solache's

account of coercion.  Solache and Reyes each knew each other. They knew that the other person was charged with murder.  They could have asked each other if defendants used coercive tactics on each other.

Moreover, they weren't testifying against each other. They weren't blaming each other.  They weren't pointing fingers at each other.  They weren't adverse codefendants.

Reyes knew that the officers had used coercive tactics to obtain a confession from him.  So Reyes could have asked Solache if the officers coerced a confession from him, too. Reyes could have said, "Look what happened to me.  Did that happen to you?  Is your confession phony, too?"

On the flip side, Solache could have done the same thing.  Solache knew that the officers had used coercive tactics against him to obtain a confession.  So Solache could have asked Reyes if the officers coerced a confession from him, too.  Solache could have asked Reyes if Reyes's confession was coerced.

As far as this Court can tell, Solache and Reyes didn't do that.  And that's a fatal flaw in their *Brady* argument.

After all, quote, "*Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence," unquote.  That's from *United States v. Stokes*, 64 F.App'x 585,

594, Seventh Circuit 2003.

The Sixth Circuit has said the same thing. Quote, "For evidence to be withheld under *Brady*, the evidence must be in the exclusive control of the state," unquote. That's *Clark v. Abdallah*, 131 F.4th 432, at page 455, Sixth Circuit 2025.

Also, "there could be no *Brady* violation when the defense had access to the same evidence through other means," unquote. That's from *Marshall v. Buckley*, 644 F.Supp.2d 1075, 1081, Northern District of Illinois 2009.

Basically, the evidence that each plaintiff says was suppressed wasn't in the exclusive hands of the government. It wasn't in the exclusive hands of the defendants. It was in the hands of the other plaintiff.

Solache could have obtained information from Reyes. Reyes could have obtained information from Solache. The evidence was not in the exclusive control of the State. Each plaintiff could have obtained the information through reasonable diligence. That's why *Brady* theory No. 1 fails.

The bottom line is, Reyes could have found out from Solache what had happened to Solache. Solache could have found out from Reyes what had happened to Reyes with reasonable diligence. So the first *Brady* theory fails.

As far as this Court can tell, there is no other information under theory No. 1 that allegedly was suppressed. The Court does not understand plaintiffs to be arguing, for

example, a report exists out there saying the defendants used coercive tactics and that the defense suppressed it. It's not like there is a memo or an e-mail out there that describes the course of tactics that wasn't produced. That would be a different story.

This Court takes the argument as it gets it. And as framed, the theory cannot proceed.

Plaintiffs already had or could have obtained through reasonable diligence all the information they needed about the defendants' coercive tactics. They don't point to any specific evidence the defendants alone possessed and which the defendants suppressed.

For those reasons, the motion for summary judgment on theory No. 1 is granted.

I will now turn to *Brady* theory No. 2.

Plaintiffs' second theory is the defendants, quote, "suppressed that they had scripted Adriana's statement implicating Plaintiffs, and then had abused Adriana to force her to adopt the statement," unquote. That's page 15 of the response.

For the same reasons the Court has explained previously, the fabrication or scripting aspect of the claim is barred by *Saunders-El*. And just as before, plaintiffs could have acquired evidence of the coercive tactics the defendants allegedly used on Adriana.

Specifically, through reasonable diligence, they could have gotten testimony from Adriana about coercive tactics, which they could have used to impeach her account of the murder that implicated Reyes and Solache.  So plaintiffs can't bring a *Brady* claim related to the coercive tactics.

Plaintiffs soldier on and say that theory No. 2, quote, "premised on the theory" -- I beg your pardon.  Let me say it again.

Plaintiffs soldier on and say that theory No. 2 is, quote, "precisely the theory approved in *Avery v. City of Milwaukee*, which held that a suppression due process theory should go to trial where investigating officers 'failed to disclose material impeachment evidence regarding their interrogations of the three jailhouse informants,'" unquote.  That's page 15.

But plaintiffs only get it half right.  *Avery* did approve something like theory No. 2.  Take a look at *Avery,* 847 F.3d at 443.  But the Seventh Circuit also distinguished three previous cases in which, quote, "the criminal defendants were already aware of the impeaching facts -- namely, that the testimony in question was coerced," unquote.

So theory No. 2 is not precisely the theory in *Avery*, as plaintiffs contend.  Instead, it's more like the other three cases, where the *Brady* claimants already knew, or could have known through reasonable diligence, about coercive tactics used

to procure inculpatory testimony. And in those case, the *Brady* claims could not proceed.

So too here. Theory No. 2 fails because Reyes and Solache could have acquired the impeachment evidence from Adriana through reasonable diligence.

So summary judgment is hereby granted as to theory No. 2.

Next up is theory No. 5.

Plaintiffs' fifth theory is that defendants suppressed evidence that they initially investigated the Soto family members as suspects. Take a look at page 15 of their brief.

Defendants argue that plaintiffs cannot point to any evidence to support this theory.

But plaintiffs do point to evidence. In fact, the first exhibit that plaintiffs cite for this theory is a deposition of Rosa Aranda, the niece of victims Jacinto and Mariano Soto, that took place in February of 2020.

During testimony, Aranda clearly stated that Guevara perceived her and other members of the Soto family as suspects and treated them as such.

I have a long set of Q&A that I could quote. In the interest of time, I'm not going to quote it. I'm just going to give you the cites.

Take a look at Exhibit FF, Docket No. 763-9, at pages 45 through 48. Specifically, look at the following

testimony:  Page 45:23, meaning page 45, line 23, through page 46, line 3.  Take a look at page 46, line 8 through page 46, line 25.  And take a look at page 47, line 15 through page 48, line 3.

If you read the testimony, you'll see that it supports the point.

The deposition testimony is more than enough to raise a question of fact about whether Guevara and the officer defendants considered the Sotos suspects in the investigation. So defendants' first argument fails.

To be fair, that testimony might be inadmissible hearsay if plaintiffs use it to prove the truth of the matter asserted, meaning that Rosa and Jose were suspects.  I'd have to think about that a little more.  Defendants don't raise a hearsay objection.  The parties don't brief the issue.  It might fall within the exception of hearsay.  I wondered about it.  That's all I'm saying, I wondered about whether it was a hearsay issue, but the parties don't address it, and maybe you don't address it because there is no hearsay problem.  So I'm just going to put that aside.  There may not be a hearsay problem.  I just wanted to flag it.  So don't anybody get too excited.  There may not be a hearsay problem.

Defendants' last argument is that the evidence wouldn't be material even if defendants were investigating alternative suspects.  They say that the evidence of other

suspects would not, quote, "tend to establish Plaintiffs' innocence or 'increase the probability that the trial judge would have reached a different verdict,'" unquote.  I'm quoting the reply at page 15, Docket No. 783.  There, they quoted *Serrano v. Guevara*, 2020 WL 3000284, at page 19, Docket No. -- excuse me -- Northern District of Illinois 2020.

Whether evidence of other suspects would tend to result in a different verdict is a factual question.  The Court can't say with much certainty whether that evidence would make a difference.  Maybe it would, maybe it wouldn't.  It's a question best left for the jury.

After all, materiality is generally a mixed question of fact and law.  In *Ruiz v. Cady*, the Seventh Circuit described materiality in a *Brady* claim as the kind of, quote, "mixed determination of law and fact that requires the application of legal principles to the historical facts," unquote.  That's *Ruiz v. Cady*, 635 F.2d 584, 589, Seventh Circuit 1980.

A majority of other circuits have ruled similarly, including the First, Second, Third, Fourth, Fifth, Sixth, Seventh -- excuse me -- Fifth, Sixth, Eighth, and Tenth Circuits.  I have a long string cite here.  I'm going to spare you from reading it.  Suffice it to say, a lot of circuits have come out the same way.

Mixed questions are for the jury.  Quote, "The

application of legal standard to fact sort of question . . . commonly called a mixed question of law and fact, has typically been resolved by juries," unquote. I'm quoting the Supreme Court in *Hana Financial v. Hana Bank*, 574 U.S. 418, 423 to 424, 2015.

So because *Brady* materiality is a jury question, a jury must answer it. A reasonable jury could find that the existence of alternative suspects and the investigative steps not taken regarding those suspects would have allowed plaintiffs to impeach testifying defendants enough to create a, quote, "reasonable probability that the result of the proceeding would have been different," unquote. I'm quoting *Beaman v. Freesmeyer*, 776 F.3d 500, at page 506, Seventh Circuit 2015.

Because there are material questions of fact about the existence of alternative suspects and whether that information would be material, defendants' motion for summary judgment on plaintiffs' fifth theory is hereby denied.

The next theory is No. 6. Plaintiffs' sixth theory is that defendants "suppressed that they asked Alfredo Aranda, a neighbor of the victims, if he had heard sounds coming from the Sotos' apartment that might corroborate the content of Plaintiffs' false confessions, that Aranda said he had not heard such sounds, and that Guevara and Halvorsen nevertheless wrote a report claiming Aranda heard those sounds," unquote.

I'm quoting page 16 of Docket No. 772.

Plaintiff Reyes's statement of additional facts describes the content of the report in which Guevara and Halvorsen allegedly reported what Alfredo Aranda told them.

Let me quote from defendants' response of statement of material -- statement of additional facts, Docket No. 785 at page -- excuse me -- at paragraph 89.

Here it goes.

"Alfredo Aranda heard through a bathroom wall the sound of someone falling out of bed and hitting the floor and wall. He next heard the muffled screams of a woman, as if someone had a hand over her mouth. He told Guevara and Halvorsen that he couldn't understand what the woman was saying, but recognized the voice as being Jacinto Soto. He heard what sounded like someone being dragged on the floor. He then heard a male voice say, 'Don't scream. I'm not going to hurt you.' He next heard a loud disturbance taking place in the victim's apartment. He heard metal banging and the sound of glass breaking. He heard the victims' 3-year-old son yelling, "Papi, Papi." He told defendants that the disturbance lasted ten to 15 minutes." Again, I'm quoting from paragraph 89, Docket No. 785.

A report like that would be strong evidence that a man participated in the murder along with Adriana. After all, it says that he heard a male voice. But the allegedly false

report itself cannot support a *Brady* theory for the same reasons this Court has articulated a few times.

To the extent that defendants simply fabricated a report or did not tell the truth, that is not a *Brady* claim. It's a fabrication claim. Creating a false report in and of itself is not a *Brady* violation. It's a fabrication claim. Take a look at Sanders v. El -- excuse me -- *Saunders-El*, 778 F.3d at 561.

Theory No. 6 isn't just about the report, however. It's also about the suppression of what Alfredo Aranda originally told defendants.

Alfredo Aranda testified that -- let me say that again.

Alfredo Aranda testified at plaintiffs' criminal trials. And his trial testimony largely matched the allegedly fabricated report. Exhibit 15 at pages 680 to 698, Docket No. 744-5.

So if Alfredo Aranda originally said something different, that evidence would be a strong basis for impeaching his trial testimony. And if defendants covered up what Alfredo Aranda actually said, that's a quintessential *Brady* claim.

In other words, the alleged coverup of what Alfredo Aranda actually said the first time is different than the creation of a false report about what he said.

Defendants could, and allegedly did, create a false

report to attempt to legitimize the coverup about what Alfredo Aranda say. The creation of a false report would not give rise to a *Brady* claim for the reasons stated in *Saunders-El*, as I've already discussed.

But the suppression of what Alfredo Aranda actually said is not the same thing as the creation of a false report. And that is a classic suppression claim.

A failure to disclose what Alfredo Aranda said is not the same thing as creating a false report about what Alfredo said.

The core of this *Brady* theory is not the allegedly false report. The core of this *Brady* theory is the withholding of evidence about what Alfredo Aranda initially said. That's a factual question: Did Alfredo Aranda originally tell defendants something different from his trial testimony, which defendants then suppressed? And more precisely for our purposes, do plaintiffs point to admissible evidence that creates a material factual dispute about those questions?

They do. In 2019, Alfredo Aranda sat for a deposition. He recalled what he told the police during their investigation. His recollection in 2019 about what he told the police officers in 1998 was different than what he recalled when he testified at plaintiffs' criminal trial in 2000.

For example, in his deposition in 2019, Alfredo Aranda explained what he told the police.

"Q. And what did you tell that detective you heard on March the 28th of 1998?

"A. The only thing that I heard was something fell, something was dragged and that the kid -- I don't know whether there was a cry or not; that a man told him to shut up, that nothing was going to happen to him. But I did not recognize that voice."

Take a look at Docket No. 763-15, at page 10, lines 11 to 18.

Even though those items were the, quote, "only thing," unquote, Alfredo Aranda had heard, he testified at trial in 2000 about other things he supposedly had heard.

For example, at the trial, Alfredo Aranda had this exchange with the prosecutor on direct examination:

"Q. What kind of noise did you hear?

"A. Some moaning, like a sick person."

I'm quoting from the transcript, Exhibit 15, Docket No. 744-15, at page 1313, lines 5 to 6.

In addition, Alfredo Aranda testified in his deposition in 2019 that the police wanted him to tell a particular story.

"Q. When you talked to the police at the police station, did you tell him that you heard Jacinto Soto's voice?

"A. I never heard her voice.

"Q.   And did the detective try to get you to get you to say that you did hear her voice?

"A.   He tried to say -- he tried to say that I said that, but I told him that I would never say something I had not heard.

"Q.   And you didn't hear that, correct?

"A.   No.   No."

Again, that's the same exhibit.  It's Exhibit XXXX, Docket No. 763-15, at page 12, lines 12 to 24.

A jury could find that there are discrepancies in his testimony.  Discrepancies between Alfredo Aranda's trial testimony and what he later testified to at deposition, coupled with testimony suggesting that the police wanted Alfredo Aranda to tell a certain story, are enough to create a question of material fact about whether the defendants suppressed what Alfredo Aranda originally told them.

A reasonable jury could look at this evidence and find the defendants suppressed evidence that could have been used to impeach Alfredo Aranda's inculpatory trial testimony by pointing to inconsistent statements.  And that's a *Brady* claim.

The discrepancies aren't huge, but they're enough to create a question of fact.  A reasonable jury could look at the differences and find that plaintiffs' inability to impeach Alfredo Aranda's testimony with his original statements to the police made a difference to the outcome of the trial.

And, again, materiality is a mixed question of law and fact. It's a question for the jury.

So to the extent the defendants suppressed Alfred Aranda's original statement, meaning what he really said, not what's in the report, that may be a basis for liability on a *Brady*-type claim.

So the motion for summary judgment on theory No. 6 is hereby denied.

The next theory is theory No. 7. Defendants' seventh theory is that, quote, "Guevara suppressed that he got Guadalupe Mejia to give a false story about Reyes making incriminating statements over the phone, which he obtained only after detaining her for many hours and subjecting her to insults, mistreatment, and repeatedly accusing her of involvement in the crime." That's from page 16 of the plaintiffs' response.

To the extent this theory is about fabricated evidence, it fails for all the reasons the Court has explained on other theories. *Saunders-El* precludes *Brady* claims that are merely based on an officer's creation of a false report.

But similar to theories 1 and 2, this *Brady* theory also includes coercive tactics used to procure an inculpatory witness statement. That's plainly a *Brady* theory, as Judge Sykes laid out in *Avery v. City of Milwaukee*, as discussed above.

And, unlike theories No. 1 and 2, plaintiff put defendants on notice about a theory concerning a fabricated statement from Guadalupe Mejia in their responses to defendants' interrogatories. Take a look at Exhibits 98 and 99, Docket No. 744-21. So the theory isn't waived. Defendants don't argue that it's waived.

So far, so good on theory No. 7.

But then the Court reviewed the record that plaintiffs cite to support their factual assertions that Guadalupe was coerced into giving a false statement. Take a look at paragraph 76 through 79 of Docket No. 785.

The Court only saw two pieces of potential evidence that could even plausibly support the idea that any defendant coerced a statement out of Guadalupe.

First, Jorge Mejia, Guadalupe's husband, testified at a January 2020 deposition that someone threw food at Guadalupe while she was being interviewed.

Quote, "[Guadalupe] told me that when they were about to feed them, they threw the food on the ground -- on the floor, and she was screaming to get her out of there, that she had nothing to do with what was going on. But when I got there, she was sitting by an officer, and I didn't see anything," unquote. That's Plaintiffs' Exhibit NNNN, at page 38, lines 11 to 17, Docket No. 763-15.

That statement might be barred by the rule against

hearsay. It is likely that the present-sense-impression or excited-utterance exceptions don't apply. Although I'd have to think about that.

But even if it was admissible, the statement doesn't go far enough to raise a dispute of material fact that any defendant coerced Mejia into making a statement about the phone call.

The phrase "threw the food on the ground" is quite vague. Plaintiffs seem to take that to mean that Guevara threw food at Guadalupe, but that's not clear at all. That's a speculative reading of Jorge Mejia's statement. And speculation goes beyond a reasonable inference.

Moreover, the testimony in question used the phrase "they" -- or the word "they." It's unclear who "they" referred to. "They" could be a jailhouse worker completely unrelated to the investigation.

It's hard to believe that the defendant officers were the ones delivering trays of food in the Area 5 station while they were busy conducting a murder investigation. That, I suppose, is possible, but that's not in the record.

If "they" refers to someone else, it's hard to see how that could give rise to an inference that defendants coerced them.

I can't speculate on what the word "they" was referring to. That's not a reasonable inference. It's

speculative, and speculation can't defeat summary judgment.

I have to draw every reasonable inference in plaintiffs' favor as the nonmovants, but the idea that one cryptic sentence from Jorge Mejia establishes coercive tactics is simply a bridge too far. That conclusion would require speculation wrapped around speculation. It goes beyond reasonable inferences.

Next, plaintiffs argue that Guevara didn't deny that he used coercive tactics because he invoked the Fifth Amendment at deposition when asked if he used coercive tactics.

But the mere invocation of the Fifth Amendment is not enough to win at summary judgment.

Quote, "The nonmovant must point to some evidence in addition to the defendant's silence to avoid summary judgment." That's *Kluppelberg v. Burge*, 2017 WL 3142757, at page 4, Northern District of Illinois 2017.

Silence -- quote, "Silence, and adverse inferences drawn from it, cannot be the sole basis for finding liability," unquote. That's from *Ruiz-Cortez v. City of Chicago*, 2016 WL 6270768, at page 7, Northern District of Illinois 2016.

Quote, "A party's refusal to answer questions during discovery is not enough to create an issue of fact to avoid summary judgment." That's *Logan v. City of Chicago*, 891 F.Supp.2d 897, 901, Northern District of Illinois 2012.

So the invocation of the Fifth Amendment cannot get

plaintiffs across the finish line. And by the way, Guevara invoked the Fifth Amendment in response to every question in his deposition.

There isn't much other evidence in the record to support this point. Plaintiffs cite Exhibit O -- I'm sorry -- Exhibit OOOO for the idea that Guadalupe was coerced. See Reyes's statement of additional fact, Docket No. 763, at paragraph 76.

That exhibit doesn't appear in the list of filed exhibits. Take a look at Docket No. 763-15. The exhibit list says that Exhibit OOOO was produced electronically. I'm not aware of any electronically produced exhibits. I don't see that in the record. That's the record I'm relying on.

The long and short of it is that it wouldn't matter anyway, as far as I can tell. Plaintiffs had a burden to establish the absence of a genuine issue of material fact. I don't see it, so summary judgment is hereby granted on theory No. 7.

Let me pause here, folks.

If there is an exhibit in the record that is missing and you actually intended to file it and it just got missed someway, somehow, let me know, and I'll promise you that I'll revisit this. Okay? I'm just calling it as I see it. I don't see it, and I can't find it.

All right. So if there's something that I just

missed, I'd invite you to come back to me if you think it was submitted.

Fair enough, folks?

Okay. I'll now turn to the 12th and final *Brady* theory. That's *Brady* theory No. 12.

The Court reviewed plaintiffs' 12th theory. That's about the alleged suppression of Polaroid photos showing alternative suspects in defendants' investigation. The gist of theory No. 12 is that defendants were also investigating other suspects. That's on pages 17 and 18 of the response.

To that extent, the claim is duplicative of theory No. 3 -- excuse me. Theory -- I said "No. 3." Let me say that again.

To that extent, this claim is duplicative of theory No. 5. Theory No. 5 focused more broadly on defendants' suppression of investigation into other suspects. The Court sees no reason why theory No. 12 is anything more than a subset of theory No. 5.

The Polaroid photos themselves don't seem to have any exculpatory or impeachment value above and beyond what this Court already addressed in theory No. 5. It seems to fall within that.

So theory No. 5 survives summary judgment. Therefore, theory No. 12 survives summary judgment. It sounds like a subset of part 5 -- theory 5.

I have now completed my discussion of the 12 theories of *Brady* liability. I'm going to resist the temptation to summarize it for you off the cuff. Basically, read *Saunders-El*. Some of it survives; some of it doesn't. A lot of it was waived. That's the ruling.

I'm on page 40. We've got 16 pages to go.

I will now turn to Section V.

I will cover the failure-to-intervene claims. That claim is Count V in Reyes's complaint and Count III in Solache's complaint.

The basic idea of a failure-to-intervene claim is that, quote, "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right . . . but fails to do so may be held liable," unquote. *Harper v. Albert*, 400 F.3d 1052, 1064, Seventh Circuit 2005.

A failure-to-intervene claim naturally requires some predicate constitutional violation. "In order for there to be a failure to intervene, it logically follows that there must be an underlying constitutional violation," unquote. *Id.*

Defendants raise three arguments about the failure-to-intervene claim.

First, they argue that there has been no constitutional violation, so there necessarily cannot be a failure to intervene.

That argument obviously fails. The Court has denied summary judgment on multiple claims so far.

Second, defense argue that they never had an opportunity to intervene. Specifically, they say that Solache and Reyes cannot show that any officer had a chance to intervene in their allegedly coerced confessions. And they say that Reyes can't show that Halvorsen, Dickinson, or Rutherford had a chance to intervene in Reyes's allegedly fabricated confession. The idea is that they weren't present for the constitutional conduct. See their memo, Docket No. 473 -- excuse me -- Docket No. 743, at page 18.

But a reasonable jury could conclude that they were present.

The officer defendants may not have been in the same room for each plaintiff on each claim. But as discussed above, every officer was present in the cramped confines of the Area 5 station. A reasonable jury could conclude that the proximity gave them an opportunity to intervene.

Moreover, as discussed above, the Court has already denied summary judgment claims against all of the officer defendants on the coerced confession and fabricated confession claims. There is a question of material fact about whether the officer defendants are liable for his own conduct -- let me say that again.

There is a question of material fact about whether

each officer defendant is liable for his own personal involvement in the constitutional violation.

So, by the same token, there is a question of fact about whether each officer defendant failed to intervene. Failure to intervene is just one of the possible ways to be personally involved in a Section 1983 constitutional violation.

That said, plaintiffs will not be able to recover on both the underlying constitutional violations and on their failure-to-intervene claim. That's because, quote, "failure to intervene is not a claim for relief; rather, it's a theory of liability under Section 1983, specifically, a way to prove the liability of a state actor who is not a direct participant in the challenged wrongdoing." That's from *Johnson v. Guevara*, 2025 WL 903813, page 31, Footnote 12, Northern District of Illinois 2025, citing *Fields v. City of Chicago*, 2014 WL 477394, at page 10, Northern District of Illinois 2014.

For that reason, the Court's denial of summary judgment on the underlying constitutional violation as to each and every officer also precludes granting summary judgment on the failure-to-intervene claim.

Third and last, defendants argue that the, quote, "failure to intervene is not cognizable under Section 1983," unquote, because it, quote, "sounds like vicarious liability," unquote, and, quote, "Section 1983 supports only direct, and not vicarious liability," unquote. They quote from

Judge Easterbrook's concurrence in *Mwangangi v. Nielsen*, 48 F.4th 816, 834, Seventh Circuit 2022.

Other courts in this district have considered that argument and rejected it, including cases involving some of the same parties and same attorneys here.

Let me give you a couple cases.

*Johnson*, 2025 WL 903813, at page 31, Note 12. Also, *Fulton v. Bartik*, 2024 WL 1242637, at page 27, Footnote 32, Northern District of Illinois 2024.

Other courts have rejected the Judge Easterbrook concurrence for good reason. The Seventh Circuit has, quote, "long recognized," unquote, failure to intervene as a viable theory of a constitutional violation under Section 1983. That's from *Harper*, 400 F.3d 1064.

It has done so even after the *Nielsen* case where Judge Easterbrook offered his concurrence. For example, in *Stewardson v. Titus*, the Seventh Circuit considered a failure-to-intervene claim on the merits but ultimately affirmed summary judgment based on qualified immunity. That's from *Stewardson*, 126 F.4th 1264. Take a look at page 1279. Seventh Circuit 2025.

A concurrence by Judge Easterbrook is worth reading by definition. All of us should sit at attention and listen carefully.

That being said, a concurrence by Judge Easterbrook is

simply that. It's a concurrence. It's not a majority decision. It is not binding circuit precedent.

My job as a district court judge is to follow binding circuit precedent. I take my marching orders from the Seventh Circuit, not from any particular Seventh Circuit judge. Even if I personally think that that Seventh Circuit judge got it exactly right, I have to follow what the Seventh Circuit is saying.

The Seventh Circuit continues to recognize a failure-to-intervene claim. Simply put, quote, "Unless and until the Seventh Circuit alters course, failure to intervene remains a viable theory of liability under Section 1983," unquote. That's from *Fulton*, 2024 WL 1242637, at page 27, Footnote 32.

It's a long way of saying you've got a potential appellate issue here, but I'm not going to disagree with the Seventh Circuit, because that's not my job.

So, in sum, all of the defendants' arguments about the failure-to-intervene claim miss the mark. So the Court denies the motion for summary judgment as to the failure to intervene.

I'll now turn to Section 6. I'll now turn to the malicious prosecution claim. It appears as Count IX in Reyes's complaint and as Count V of Solache's complaint.

Malicious prosecution is a state law claim as framed here.

Under Illinois law, a malicious prosecution claim consists of five elements that a plaintiff must prove.

Quote, "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff."  That's from *Beaman v. Freesmeyer*, 131 N.E.3d 488, at 495, Illinois 2019.

Here, the defendants largely contest the second and third elements.  That is, they make arguments about whether there was a favorable termination, and they make arguments about probable cause.

I'll start by discussing the favorable termination requirement, which is Part V.A of my ruling.

At the very least, plaintiffs have raised a disputed question of material fact about whether the cases were favorably terminated.

In Illinois, a "criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused."  That's from my opinion in *Zhang v. Schuster*, 2022 WL 615015, at page 22, Northern District of Illinois 2022. I got affirmed by the Seventh Circuit, 2023 WL 5928162, Seventh

Circuit 2023.

In other words, a *nolle prosequi* is presumably a favorable termination.

The charges against Reyes and Solache were dismissed according to a *nolle prosequi* after their confessions were suppressed. Take a look at paragraph 94 of Docket No. 766. That's usually a favorable termination.

Defendants argue that plaintiffs fall within the exception where the dismissal of criminal charges is, quote, "for reasons not indicative of the innocence of the accused." I'm quoting my *Zhang* opinion, 22 -- excuse me -- 2022 WL 615015, at page 22.

I don't need to hash out defendants' legal arguments on that point because plaintiff presented admissible evidence that the dismissal of the criminal charges did occur because of their innocence. Reyes and Solache have certificates of innocence from the state of Illinois. Look at paragraph 1 of Docket No. 785. The existence of the certificates of innocence creates a question of material fact.

The Seventh Circuit has described a certificate of innocence as particularly important evidence in a malicious prosecution case. Here, plaintiffs' certificates of innocence are, quote, "directly relevant to an element on which [Plaintiffs bear] the burden of proof: that the prosecution against [them] was terminated in a manner indicative of

innocence," unquote. That's from *Patrick*, 974 F.3d at 832 to 833.

The certificates of innocence appear to be admissible. Defendants argue that a certificate of innocence is hearsay and does not fall within any hearsay exception because it's offered for the truth of the matter asserted; that is, plaintiffs' innocence. I doubt that is correct.

As an initial matter, I don't think the record includes the actual certificates of innocence. I'm prepared to be wrong on that, folks, because the record is so voluminous. I think that the record only includes the petitions for the certificates, not the actual certificates themselves, but I know what certificates of innocence are, so I'm not going to dwell on it.

In any event, the Seventh Circuit in *Patrick* approved of a district court's decision to admit a certificate of innocence for the same reason that it would serve here. That is, the Seventh Circuit in *Patrick* gave its blessing to the use of a certificate of innocence as evidence on whether the dismissal of charges occurred, quote, "in a manner indicative of innocence," unquote. That's *Patrick*, 974 F.3d 832 to 833.

In other words, the Seventh Circuit in *Patrick* gave its blessing to the admissibility of a certificate of innocence.

As far as I can tell, a certificate of innocence is

offered to show that the state believes that a person has no criminal liability. It's not offered to show that the person didn't do it in the real world.

In other words, it goes to the state's position about whether a person is guilty or innocent. It doesn't go to whether a person is in fact innocent, meaning whether the person did or did not do the criminal act.

I will say this, folks: On the hearsay question, I'm going to keep my powder dry. If someone wants to raise this argument at trial, you can. As I currently see things, I doubt that it's hearsay, so I'm going to assume it's admissible.

I'm not giving you a definitive ruling on that because I want to think this through a little bit more, but that's my inclination. My inclination is it's not hearsay because it doesn't go to the truth of the matter asserted because it's simply sufficient that it was said. It goes to what the state's position is as to whether this person has any criminal liability.

It basically cleans the slate and restores the person to the *status quo* ante. All of us are innocent until proven guilty. The certificate of innocence restored this person to innocence until proven guilty.

I don't know that you need to prove that you're innocent until proven guilty, because that's the presumption that all of us enjoy. So it's simply a certificate that

restores the person to a legal status, as far as I can tell. It's like giving you your legal status. It's not really talking about what happened in the real world.

That's how I'm tempted to see things, folks. And I want to be candid with you, I need to think this through some more. I have admitted certificates of innocence before. I did that in the *Bolden* case. But when I was writing this ruling up, I paused on this, and I wanted to think about it.

So for purposes of my ruling today, I'm going to assume that it is not an admissible hearsay. I'm assuming that it's admissible, but I'm not giving you a set-in-stone ruling on this. I believe that ruling is correct, but if someone wants to revisit this later, I will listen to you. Okay? That's my ruling for today.

Defendants do cite a few cases. Those cases address other issues, like the admissibility of an acquittal.

I'm not going to belabor the point. I'm simply going to say they're an out-of-circuit case or they're nonbinding circuit court cases. The *Patrick* case controls.

As far as I understand things, I believe that the certificate of innocence is likely admissible. So the certificates of innocence are admissible evidence. They create a disputed question of material fact on whether the charges were dropped on reasons indicative of innocence.

Let me say that again.

The certificates of innocence appear to be admissible. They appear to go to the favorable termination element. They are sufficient to give rise to a question of fact about whether the charges were terminated in favor of Solache and Reyes for reasons indicative of their innocence.

So if it's admissible, it creates a genuine issue of material fact.

We need a jury. That's the point. We need a jury on this.

I'll now turn to the other requirement for a malicious prosecution claim. That's probable cause.

The existence of probable cause is an absolute barred liability for malicious prosecution. Take a look at *Wade v. Collier*, 783 F.3d at 1081, at page 1085, Seventh Circuit 4 -- excuse me -- Seventh Circuit 2015.

Defendants argue that, based on the facts that they had available to them at the time, they had probable cause to prosecute Reyes and Solache. So, in their view, a malicious prosecution claim necessarily fails.

Based on my review of the record, I disagree.

Quote, "Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged," unquote. That's *Williams v. Chicago*, 733 F.3d 749, 759, Seventh Circuit 2013.

Quote, "A district court must assess probable cause 'objectively' after considering 'the conclusions that the arresting officer reasonably might have drawn from the information known to him,'" unquote. That's from *Allen v. Taylor*, 2025 WL 885838, at page 5, Northern District of Illinois, 2025. Take a look at *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679, Seventh Circuit 2007.

In addition, "probable cause 'necessarily' entails a 'fact-intensive inquiry.'" *Green ex rel. McCrory v. City of Chicago*, 2024 WL 1363543, at page 5, Northern District of Illinois 2024. Probable cause is based on the totality of circumstances. *United States v. Lewis*, 920 F.3d 483, 489, Seventh Circuit 2019.

The existence of probable cause is often a question that district courts cannot answer at the summary judgment stage.

Quote, "It is not always appropriate for the court to resolve the question of probable cause on summary judgment, as the probable cause determination 'typically falls within the province of the jury,'" unquote. *Saffold v. Village of Schaumburg*, 2009 WL 2601319, at page 7, Northern District of Illinois 2009.

Another court in this district has said that, quote, "the issue of probable cause is generally a question for the jury," unquote. *Payne v. Cook County*, 2017 WL 11886125, at

page 5, Northern District of Illinois 2017.

In sum, defendants, as the movants, face a high bar to show that there is not any dispute of material fact such that defendants have established the existence of probable cause as a matter of law.

In attempting to clear that bar, defendants point to at least ten pieces of evidence to support their determination of probable cause.

I will now go through the ten pieces of evidence.

Number one, defendants point out that Mariano and Jacinto Soto were savagely murdered and their children were taken from the scene between March 27th and April 1.

That evidence does not indicate anything about Reyes's and Solache's potential involvement. It simply states the offense.

Second, defendants point out that Reyes and Solache were living with Adriana and the two kidnapped children from March 28th until April 3rd.

Maybe so, but the mere fact that Reyes and Solache lived with Adriana does not give the officers probable cause to believe that they were involved in a murder. That factor also appears to be double-counted by the next factor, that Reyes and Solache had the opportunity to turn in Santiago only because they lived with Adriana.

Third, Reyes and Solache turned in the missing child,

Santiago, along with Rosauro.

Defendants seem to assume that Reyes and Solache brought Santiago to the police to deflect blame. Maybe that's a possible inference. But turning in a child is not enough to create probable cause that the person in question committed a murder. It's maybe a step. It's a fact. It's a data point. It's a stitch. But the stitch can't hold very much.

Fourth, defendants point out that Adriana was pretending that the two-month-old Maria was her own child. But, again, that has nothing to do with whether Reyes and Solache were involved in a murder.

Fifth, defendants point out that Adriana was approximately 5-foot tall and 164 pounds and that the two adult victims were bigger. Jacinto was 5-foot tall and 175 pounds, and Mariano was 5'3" and 161 pounds. And there was a sign of a struggle. The Sotos were collectively stabbed 50 times.

The idea appears to be that someone else must have been involved. Maybe so. Maybe a 5-foot woman that weighs 165 or 164 pounds wouldn't have enough muscle to murder two people with a knife. Maybe that's right. But that doesn't mean that Solache and Reyes were involved; it just means that maybe she didn't act alone. The question is whether there is probable cause to believe that Reyes and Solache were implicated in the murder.

Six, defendants point out that at least one man's

voice was heard by a neighbor at the time Jacinto and Mariano were murdered, saying something to the effect of "Don't scream. I'm going to hurt you." That tells you something, but it doesn't get you very far. A man's voice narrows the potential universe of suspects to approximately 50 percent of the adult population. That's not probable cause.

I had a male voice in 1999, in the year 2000. I don't think there was probable cause to think that I was involved.

It tells you something, but it doesn't get you very far.

Seventh, defendants point out the defendants collected shoes and pants from Adriana's apartment that tested positive for blood.

Again, it has nothing to do with Reyes's and Solache's involvement. The blood was Adriana's blood and the Sotos' blood. And nobody disputes that Adriana committed the offense.

So the existence of blood by Adriana and the Sotos doesn't tell you anything about whether Reyes and Solache were involved. It doesn't tell you much. It doesn't get you very far. It's certainly not dispositive. That's the key point. It's certainly not dispositive. The question is whether any of this is so compelling that there's no genuine issue of material fact.

Eighth, defendants point out that the police discovered a note in Reyes's pocket that mentioned Norma

Salazar. That's the same name that Adriana supplied to the police when falsely explaining her possession of Santiago.

But Reyes explained that Adriana had given him a note with the name Norma Salazar. Adriana told Reyes that she was babysitting 3-year-old Santiago for Salazar and pitched -- asked him to pitch in. Take a look at defendants' response to the Reyes's statement of facts, Docket No. 785, at paragraph 20.

There are other reasons that this note could have been in Reyes's pocket. They are potentially consistent with the Good Samaritan view of the evidence.

In sum, there is a disputed question of fact about how this piece of evidence contributes to probable cause, if at all.

Ninth, defendants point out that Guadalupe overheard a conversation between Adriana and Reyes in which he stated something to the effect of "You are the only one that knows. I hope you don't serve me up headfirst."

I'll say this: The veracity of the phone call is questionable given the coercive tactics that Guevara allegedly used against Guadalupe, even though the Court granted summary judgment on the *Brady* claim about that, meaning *Brady* theory No. 7. The Court granted summary judgment because there isn't a dispute of material fact about coercive tactics used on Guadalupe. There's still a question of fact about whether the

statement is true.

Tenth, and finally, defendants point out that Adriana admitted to detectives, at a minimum, that she, Solache, and Reyes were present inside the Sotos' home, witnessed the murders of Jacinto and Mariano. Solache stabbed Jacinto and Mariano, and she, Reyes, and Solache kidnapped Santiago and Maria.

Even though plaintiffs' fabrication claim over Adriana's statement fails because it wasn't introduced at trial, there might still be a factual question of whether the statement was made up. Fabricated evidence cannot support probable cause. Take a look at *Lawson v. Veruchi*, 637 F.3d 699, 704 to 705, Seventh Circuit 2011.

The answer might be different if there wasn't a question of fact about whether the statement is fabricated, but that's not the situation we have here.

The existence of Adriana's statement results in more factual questions. The questions are whether the officer defendants had probable cause to believe -- excuse me. The questions are whether the officer defendants had probable cause to bring charges against Reyes and Solache. Given those factual questions, Adriana's statement cannot support summary judgment for the defendants.

Let me try to summarize what I've just done in those ten points.

The question is whether there is a genuine issue of material fact about whether the officers had probable cause. There are a lot of disputed facts. I don't think these facts are either undisputed, or I think the undisputed facts are not compelling enough to say that no reasonable jury could doubt that there was probable cause.

Let me put that a different way.

The question for me is not whether there was probable cause. The question is, is there enough evidence in the record to support a finding by a reasonable jury that there was not probable cause.

I don't think the record dispositively demonstrates that the officers had probable cause. The evidence is either undisputed but uncompelling or the evidence is disputed.

The undisputed evidence doesn't get them very far. For example, pointing out that a murder took place and that Reyes and Solache turned in the missing child, pointing out that a voice was heard that was a male, pointing that Adriana was small. All of that may well be true, but none of that is enough, in my view, to show that there's probable cause, and certainly not enough to show that there's probable cause as a matter of law such that a reasonable jury couldn't reach the opposite conclusion.

As I look at this, there is a question of fact about whether there's probable cause. There's enough on both sides

of the ledger, so the jury has got to sort it out.

As I think about it, factors 1 through 4 -- excuse me -- factors 1 and factor -- let me say that one more time.

Factor 1 and Factors 4 through 7 don't relate to Reyes and Solache at all. For example, the first factor is the fact that the murder happened. Factor 4 is about Adriana pretending that the child is hers. Factor 5 is about the size of Adriana. Factor 6 is about a man's voice. Factor 7 is about blood. Those don't relate to Reyes and Solache.

Factor 2, about the fact that Reyes and Solache were living with Adriana, doesn't get the needle to move very far. It's not enough for probable cause. Certainly not dispositive. It's a data point. Maybe it's helpful. But it doesn't move the ball forward very much.

Factor 3 is about the fact that Solache and Reyes turned in the missing child. Maybe that shows a connection or maybe it shows that they were a Good Samaritan. It doesn't get them very far.

There are questions of fact about Factors 9 and 10, about Guadalupe and Adriana that have questions of fact.

That leaves Factor No. 8. That's the note with Norma Salazar's name. That fact alone wouldn't support probable cause about whether Reyes was involved in the murder. Adriana could have committed the murder by herself and asked Reyes to baby-sit. There's nothing about the note that would support

probable cause that Solache was involved.

In short, the existence of probable cause is highly disputed. The Court has to draw all reasonable inferences in favor of the plaintiffs as the nonmoving party. They get the benefit of the doubt.

I cannot say that the officer defendants had probable cause to charge the plaintiffs as a matter of law.

So defendants cannot avail themselves of the absolute bar of malicious prosecution provided by probable cause.

The long and short of it is simple. There is a question of fact about probable cause, and the record does not establish probable cause definitively. There is a question of fact, so it's going to go to a jury.

So summary judgment on the malicious prosecution claim is denied as to all defendants but Rutherford, who I am now going to address. So I'm going to address Rutherford separately.

Defendants threw out one additional argument. This is part VI.C of my analysis, Section VI.C.

Defendants argue that Rutherford cannot be liable for malicious prosecution because "Plaintiffs have no evidence that Rutherford played any role in their prosecutions." That's page 20 of the memo.

But defendants cite case law that cuts against them. They cite *Cusick v. Gualandri*. In that case, a court in this

district determined that "the significant role determination must include the persons who . . . knowingly provided misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct that was instrumental in the commencement or continuation of the criminal prosecution," unquote. That's from *Cusick*, 573 F.Supp.3d 1256, at page 1271, Northern District of Illinois 2021.

The Court previously denied Rutherford's motion for summary judgment as to the coerced and fabricated evidence claims, as well as some of the *Brady* claims. There are factual questions about whether he provided misinformation, suppressed exculpatory evidence, or committed other misconduct. So Rutherford falls squarely into the group of individuals who can be said to have played a significant role in a malicious prosecution as interpreted by the Illinois Supreme Court in *Beaman*.

In short, Rutherford is not entitled to summary judgment. Defendants' motion for summary judgment on the malicious prosecution claim is denied in full.

It's now 1:45 p.m. I'm on page 48. I've got eight or nine pages to go.

Does anyone need a break?

MR. SCAHILL: No, Judge.

THE COURT: Okay. If you need a break, just raise

your hand, and I'll take a break.

I'll now turn to Section VII.

Plaintiff Reyes, but not Plaintiff Solache, also brings a Section 1983 deprivation of liberty claim, which is basically a federal constitutional form of a malicious prosecution claim under the Fourth Amendment. The claim appears in Count III of Reyes's complaint.

Again, the claim is brought by Reyes only. Solache does not bring a deprivation of liberty claim.

As defendants note, a, quote, "Fourth Amendment claim for deprivation of liberty without probable cause mirrors the elements of malicious prosecution," unquote. I'm quoting defendants' memo, Docket No. 743, page 19. They were citing *Thompson v. Clark*, 596 U.S. 36, at page 42. The Supreme Court made that decision in 2022.

To be exact, a deprivation of liberty claim under Section 1983 has one additional element. As the name suggests, quote, "the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." That's *Thompson* at page 43, Note 2. You can also take a look at my opinion in *Allen v. Taylor*, 2025 WL 885838, at page 4.

The parties do not discuss or dispute that Reyes suffered pretrial deprivations of his liberty as part of his prosecution. That's the last element of his claim. So the Court's denial of summary judgment on Reyes's malicious

prosecution claim also means that he made out a *prima facie* case of Section 1983 deprivation of liberty.

Defendants do raise one defense.  They argue that they should receive qualified immunity on this constitutional claim. Specifically, they say that the notion of, quote, "arguable probable cause," unquote, requires a Court to grant qualified immunity.

As defendants point out, quote, "arguable probable cause exists when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law."  That's *Humphrey v. Staszak*, 148 F.3d 719, 725, Seventh Circuit 1998.

Essentially, arguable probable cause is how the second prong of qualified immunity, meaning a clearly established right, gets applied to a case where the alleged right violated is arrest or seizure on less than probable cause.  The Seventh Circuit explained this in *Abbott v. Sangamon County*, 705 F.3d 706, at page 715, Seventh Circuit 2013.

Here's the quote.

Quote, "Though at first blush similar, the arguable probable cause inquiry is separate from the probable cause inquiry; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable

probable cause is a violation of a 'clearly established' constitutional right."

Let me read that again.

Quote, "Though at first blush similar, the arguable probable cause inquiry is separate from the probable cause inquiry; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right," unquote.

What's confusing about, quote, "arguable probable cause," unquote, is that there is, quote, "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits," unquote. That's *Maxwell v. City of Indianapolis*, 998 F.2d 431, at page 435, Seventh Circuit 1993.

The probable cause determination already includes a level of reasonable mistake in it. An officer doesn't have to get the facts perfectly right to have probable cause. Take a look at *Heien v. North Carolina*, 574 U.S. 54, at page 66, 2014.

But arguable probable cause also includes a bit of reasonable mistake of law in it. An officer doesn't have to get the law perfectly right to have arguable probable cause, because the officer is only required to know clearly established law. If their conduct was ultimately determined to be a constitutional violation, but the well-established law didn't make clear at the time that it was a violation, the

officer is still entitled to qualified immunity.

Here, defendants think that there was no clearly established law from which they could know that, based on the facts in front of them, there was not probable cause to arrest Reyes and Solache.

Quote, "Ordinarily, to show that the law was 'clearly established,' plaintiffs must point to a 'closely analogous case' finding the alleged violation was unlawful. But in some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the Court with any analogous cases," unquote. That's from *Reed v. Palmer,* 906 F.3d 540, 547, Seventh Circuit 2018.

So if the constitutional violation is patently obvious, there is no qualified immunity.

Here, the Court thinks that the patently obvious form of clearly established law applies.

Let's look at the relevant facts supporting probable cause that are not subject to a disputed question of fact.

First, Reyes and Solache lived with Adriana, and they brought 3-year-old Santiago into the police station with Rosauro.

Living with someone doesn't produce probable cause. That's not enough. Long before the events of this case, it was well known that "mere association with a person suspected of criminal activity is not enough to establish probable cause to

arrest the non-suspected individual," unquote. That's *United States v. Mided*, 582 F.Supp. 1182, 1184, Northern District of Illinois 1984. It was affirmed, 782 F.2d 1045, Seventh Circuit 1985.

Second, Adriana was small, so she might have had help in committing the murder, but that help could have been anyone. The fact that Adriana needed help doesn't say that there was probable cause to think that Reyes and Solache provided the help.

Third, Reyes had a note in his pocket with Norma Salazar's name on it. That's about it. Everything else is subject to a genuine dispute of material fact. Alfredo overhearing a man's voice is disputed. Guadalupe eavesdropping on a telephone conversation is disputed. Adriana's confession is disputed. A lot of disputes.

The Court cannot incorporate those facts into arguable probable cause. If there's a dispute about whether the facts are true, or if there is a dispute about whether the information is fabricated, that is enough to create a genuine issue of material fact. Fabricated statements don't give probable cause, and that reality was clearly established a long time ago. See *Olson v. Tyler*, 771 F.2d 277, 281, Seventh Circuit 1985.

When it boils down to it, defendants asked the Court to say that they're entitled to qualified immunity based almost

entirely on the note in Reyes's pocket. That piece of evidence is close to saying that there's probable cause based on mere association. And that's forbidden.

There is nothing to suggest that the note was nefarious. Officers simply assumed that it could only serve a nefarious purpose. They rejected Reyes's explanation for it, meaning the explanation that Adriana asked him to baby-sit for her on behalf of Norma Salazar.

In any event, it seems to fall within the patently obvious bucket that a mere piece of paper with a name on it can't provide probable cause for murder.

Let me say that again.

It seems patently obvious that simply having a piece of paper in your pocket with a name on it isn't enough to create probable cause to believe that someone committed a murder.

That's clearly established law that a reasonable officer could know even if there's not a closely analogous case.

It seems obvious that having someone's name in your pocket isn't probable cause to think that you murdered somebody. So the defendants aren't entitled to probable -- to qualified immunity on the deprivation of liberty claim.

One more thing to note is that -- before I leave this section, as I discussed earlier, plaintiffs' claim about

Adriana's allegedly fabricated statement as part of this Fourth Amendment deprivation of liberty claim, it can't be a due process claim because the fabricated statement wasn't used at trial, but it can be a Fourth Amendment claim because it arguably led to a pretrial deprivation of liberty.

So that's my ruling on Section VII.

I will now turn to Section VIII.

I'm on page 51 out of 56.

I will consider the state law tort of intentional infliction of emotional distress.

Under state law, intentional infliction of emotional distress consists of three elements:

"(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe distress." *Swearnigen-El v. Cook County Sheriff's Department*, 602 F.3d 852, 864, Seventh Circuit 2010.

Defendants argue that their conduct was not extreme and outrageous because there were -- I'm sorry. Let me say that again.

Defendants argue that their conduct was not extreme and outrageous where, quote, "IIED claims are based on the same conduct that was allegedly unconstitutional," unquote. In their view, the constitutional claims fail, so, therefore, the

intentional infliction of emotional distress claims fail. That's really the only argument they have. But the constitutional claims pass muster, so I'm denying summary judgment on the claims about intentional infliction of emotional distress. So even if their reading of *Cooney* is right -- that's *Cooney*, 746 F.Supp.2d 973 -- it doesn't matter. The constitutional claims can proceed, so the intentional infliction of emotional distress claims can proceed as well.

So defendants' motion for summary judgment on the intentional infliction of emotional distress claims is denied.

I will now turn to Section IX.

Defendants move for summary judgment on the state law conspiracy claim. But the motion only invokes one short argument. Defendants argue that a, quote, "state law conspiracy claim is derivative of the state law malicious prosecution claims," unquote. That's at pages 22 to 20 -- excuse me -- 23 to 24 of their memo. Defendants believe that the malicious prosecution claim fails, so their conspiracy claim fails.

As discussed a few minutes ago, plaintiffs' malicious prosecution claim survives. The officer defendants don't make any other argument, so the motion for summary judgment is denied.

Similarly, Guevara, quote, "explicitly adopted the arguments that his codefendants made," unquote. I'm quoting

there page 2 of his reply, 777.

The long and short of it is the other claims survive, so the state law conspiracy claim survives, too. So the motion is denied.

I will now turn to Section X.

I'm pleased to report this is the last section.

I will turn to the Section 1983 conspiracy claim.

Only Reyes brings a Section 1983 conspiracy claim, and it appears as Count VI of his complaint.

Like the failure to intervene, conspiracy is another way of establishing liability under Section 1983. Quote, "Conspiracy is not an independent basis of liability in a Section 1983 action, but is instead a way of proving that a defendant is legally responsible for that violation," unquote. That's from *Wilson v. Estate of Burge*, 667 F.Supp.3d 785, 874 to 75, Northern District of Illinois 2023. The Court there was citing *Smith v. Gomez*, 550 F.3d 613 and 617, Seventh Circuit 2008.

To establish a Section 1983 conspiracy, a plaintiff must show, quote, "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights; and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement," unquote. That's from Judge Dow in *Wheeler v. Piazza*, 364 F.Supp.3d 870, 880, Northern District of Illinois 2019.

As I said before, quoting Judge Dow is never a bad idea.

Defendants present one principal argument against Section 1983 conspiracy. They argue that they should receive qualified immunity.

Specifically, they invoke the so-called intra-corporate conspiracy doctrine. Despite its brevity, defendants' single-paragraph argument is potent. As the Court will explain, qualified immunity applies and bars plaintiffs' Section 1983 conspiracy claim.

As the Supreme Court has explained, the intra-corporate conspiracy doctrine stands for the principal that, quote, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy," unquote.

The idea is that, quote, "when two agents of the same legal entity make an agreement in the course of their official duties, [] as a practical matter and legal matter, their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people," unquote. I'm quoting *Ziglar v. Abbasi*, 582 U.S. 120, at page 153, 2017.

Defendants were all members of the Chicago Police Department, part of the city of Chicago. Because they were all members of the same legal entity, defendants think they

couldn't have engaged in a Section 1983 conspiracy as a matter of law.

At the very least, defendants think that plaintiffs cannot show that defendants' conduct constituted a Section 1983 conspiracy under clearly established law, as they must under *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, cited in 2011.

The Seventh Circuit has not addressed whether the intra-corporate conspiracy doctrine applies to Section 1983 conspiracy claims. As far as I can tell, there's no decision from the Seventh Circuit on that.

But plaintiffs think that the intra-corporate conspiracy doctrine should not apply for three reasons.

First, plaintiffs point out that the Supreme Court and the Seventh Circuit have previously permitted Section 1983 conspiracy claims to go forward. They point to three cases, including the *Adickes* case, 398 U.S. 144, as well as the *Jones* case, 856 F.2d 985, and the *Bell* case, 746 F.2d 1205. The most recent of those cases was cited in 1988.

None of those three cases discuss the application of the intra-corporate conspiracy doctrine, so they don't really control the issue.

Moreover, only *Jones* even touches on immunity. So it's not clear that qualified immunity was even a defense that needed to be overcome.

In any event, the *Jones* decision was decided so long

ago that it didn't even use the term "qualified immunity." The doctrine of qualified immunity has changed a lot since 1988. I am loathed to rely on a 35-year-old case to establish the current boundaries of qualified immunity given that the law has gone through some transformations.

So the fact that the Supreme Court and the Seventh Circuit have permitted a Section 1983 conspiracy claim with one legal entity and allowed that to go forward does little for the plaintiffs.

All of those cases were decided before I graduated from high school.

Second, plaintiffs assert that courts have never applied the intra-corporate conspiracy doctrine to 1983 claims, and cases applying a doctrine in other contexts do not -- let me say that again.

Plaintiffs assert that courts have never applied the intra-corporate conspiracy doctrine to Section 1983 claims. Plaintiffs also assert that cases applying a doctrine in other contexts do not unsettle constitutional law. I'm giving but botching a quote from the plaintiffs' response on page 24, Docket No. 772.

As far as this Court can tell, the first part of that sentence isn't entirely accurate. Some courts have decided that the doctrine of quali- -- I'm sorry. Some courts have decided that the doctrine requires qualified immunity because

132

the right in question was not clearly established.

At least three circuit courts have granted qualified immunity based on the intra-corporate conspiracy doctrine and it barred a Section 1983 claim. Look at the *Rehberg* case in the Eleventh Circuit, 611 F.3d 824. That was affirmed, 566 U.S. 356. Take a look at the Eighth Circuit's decision in *Faulk*, 30 F.4th 739, decided in 2022. And take a look at the *Jackson* case, 925 F.3d 793, decided by the Sixth Circuit in 2019.

In addition, quote, "Once a defendant raises the defense of qualified immunity, 'it becomes the plaintiffs' burden to defeat it.'" That's the *Smith* case, 140 F.4th 359, Seventh Circuit 2025.

In that sense, applying a doctrine to a new context can unsettle constitutional law for purposes of an individual case, because it's the plaintiffs' burden to show that the law is settled. That is, it's on the plaintiffs to bring forward case law showing that defendants violated a clearly established right. But here, they don't point to any such case law.

Third, plaintiffs argue that applying the intra-corporate conspiracy doctrine to Section 1983 cases is inconsistent with the rest of Section 1983 and supporting case law.

Specifically, plaintiffs argue that, quote, "*Monell* holds that actions of municipal employees can never be imputed

to a municipal employer."  That's from page 22, Footnote 22 of plaintiffs' response, Docket No. 772.

Plaintiffs have that generally correct.  Quote, "There is no *respondeat superior* liability for municipalities under 42 U.S.C. Section 1983," unquote.  That's the *Ruiz-Cortez* case, 931 F.3d 592.

But the whole genesis of the intra-corporate conspiracy doctrine in corporate and antitrust contexts is that employees of the same legal entity cannot conspire because their actions are those of one single entity that is ultimately responsible for those actions.

A judge down the hall, Judge Chang, wrote about this in a case called *Haliw v. City of South Elgin*.

Judge Chang wrote:  "There is reason to doubt, however, that this corporate-based and antitrust-based doctrine should apply to civil-rights conspiracy claims under Section 1983.  The intracorporate conspiracy defense makes sense in the corporate and antitrust settings because whatever a business's employees do (within the scope of employment) is deemed to be the act of the business via vicarious liability. In sharp contrast, there is no *respondeat superior* theory of liability against municipalities for Section 1983 claims."

Judge Chang wrote that in 2020.  And the cite is 2020 WL 1304697, page 4, Northern District of Illinois 2020.

Notice the phraseology used by Judge Chang.  He said

there was reason to doubt. He gave a reason to doubt whether the intra-corporate conspiracy doctrine is a good fit for Section 1983 cases involving conspiracies.

Doubt is not enough to defeat qualified immunity. The whole idea of qualified immunity is that officers should receive immunity when there is an uncertainty about a particular doctrine's application. Doubt goes in favor of the officers. For that same reason, Judge Chang granted summary judgment in *Haliw*. Specifically, Judge Chang actually granted qualified immunity in *Haliw*, despite recognizing that the intra-corporate conspiracy doctrine was a poor fit for 1983.

So Judge Chang raised some doubts, but he still gave qualified immunity. The tie goes to the runner, and the doubt goes to the officer.

Similarly, in *Ziglar v. Abbasi*, the Supreme Court noted that multiple circuits had extended the intra-corporate conspiracy doctrine to bar the distinct but related concept of a Section 1985(3) conspiracy. While the Court reserved the merits question, the dispute among the circuits was enough for the Supreme Court to grant qualified immunity.

The Court wrote: "Yet the fact that the courts are divided as to whether or not a Section 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on this point is not well settled. When courts are divided on an issue so central to the

cause of action alleged, a reasonable official lacks the notice required before imposing liability." That's *Abassi*, 582 U.S. at 154.

Judge Chang applied the same logic in the *Haliw* case when he barred a Section 1983 conspiracy claim on qualified immunity grounds. Again, the cite is 2020 WL 1304697, at page 4.

This Court will do the same thing. Applying the Supreme Court's approach in *Abassi* reaches -- leads me to reach the same conclusion.

Multiple circuits have granted qualified immunity on Section 1983 conspiracy claims based on the intra-corporate conspiracy doctrine.

This Court cannot say that the law is settled and clearly established such that police officers working for the same department should be on notice that they face liability for conspiracies under Section 1983.

Simply put, it is not clearly established that police officers have potential conspiracy liabilities under Section 1983. The law is in flux. And if the law is in flux, it's not clearly established. If it's not clearly established, there is qualified immunity. That's the long and short of it.

As Judge Chang said, quote, "in light of these extensions of the intracorporate conspiracy doctrine to Section 1983, and absent controlling authority to the contrary,

it cannot be said that the law is clearly established on this point," unquote.

Defendants are entitled to qualified immunity on Reyes's Count VI, so summary judgment is granted.

And at long last, I have reached the end of all ten sections.

I have one last thing to say.

The ruling resolves four of the pending motions for summary judgment. There are other pending motions, too.

I will rule separately on the other motions, including plaintiffs' motion for partial summary judgment, as well as the City of Chicago's motion for summary judgment on the *Monell* claim.

I will rule separately on the expert motions, too.

I will put out a minute order that summarizes what just happened.

Let me give you a brief conclusion.

In conclusion, the Court grants in part and denies in part the motions for summary judgment.

The Court grants summary judgment for the defendants on the claims about Adriana's fabricated witness statement.

The Court also grants summary judgment on Plaintiff Reyes's Section 1983 conspiracy claim.

The Court grants summary judgment on nine of the 12 *Brady* theories.

Specifically, the Court denies summary judgment on theories 5, 6, and 12. Those theories cover the investigation into alternative subjects, including Polaroid photos. The theories include Alfredo Aranda's statement about allegedly overhearing a murder. Summary judgment is granted as to the other *Brady* theories, meaning every theory except theories 5, 6, and 12.

Other than that, the motions for summary judgment are hereby denied.

All right, folks. Why don't you come on up.

All right. I've completed my oral ruling. I don't know at this point what is the most sore, whether it's my voice, my court reporter's fingers, or your ears. I'm going to go with my court reporter.

I want to thank Amy for her service today.

I will say this as like an overarching observation: There are so many people in this building, so many public servants that really, truly honestly go way, way, way above and beyond for litigants in ways that the litigants never see.

So I'm very appreciative for Amy. I'm very appreciative for Jessica. I'm appreciative of all the people in the clerk's office. There are people that work after hours all the time as need be just to get things done for people. And today was a lot to ask Amy to do, so I appreciate Amy doing that.

I want to, again, acknowledge what you all are thinking: You would rather have had a written ruling. I would rather have given you a written ruling instead of an oral ruling. I would've. But Congress has seen fit to create a lot of causes of action, and to have an amount-in-controversy requirement that is not particularly high, which means a lot of cases come to the building, which means we all have pretty big dockets, and there are only 20 of us, and you can only do what you can do. So if I can save a couple days, I'm going to save a couple days. Because I don't just look at you folks; I look to the docket as whole, the team as a whole, all litigants. I'm saving a couple days by giving you an oral ruling.

The reality is we're going to trial. You just want to know what the answer is. What are we going to trial on? Now you know. We're going to trial.

I don't know who won the estimate. We went from 10:17 until noon. That's about an hour and 40 minutes. We then went from 2:24 to 2- -- I'm sorry -- 12:24 to 2:13. That's an hour and 50 minutes. Doing a little math here, I think that's -- is that three and a half hours? Is that right?

Did anybody want to raise their hand and express pride at their guess? Anybody?

It went a little longer than I expected.

I appreciated your patience and your professionalism. I know it was a lot. I know it was a lot to sit through. I

get it.

Judge Shadur used to do this to me. I would come in, and he would just say, "Sit down. I'm going to read." So I remember doing this.

I also want to acknowledge this: I am a human being up here. I am a flawed individual. I make mistakes. It is certainly possible that I botched some of the sentences.

My court reporter alerted me that there were times where, for example, I may have said the opposite of what I intended to say, or I just forgot a word, and I said "defendants" instead of "plaintiffs" or something. That could have happened.

I would encourage you to read the transcript and try to figure out with context what I was trying to say instead of what I actually said.

I want to acknowledge that I could've gotten something wrong.

If there is any quote where you think it's just either so cryptic and uncertain or it just seems upside down and couldn't possibly be right, I want you to tell me if you think it's important, if it matters.

I am loathed to have it quoted back to me later if I just screwed it up. Okay? So if you think I messed something up, you can let me know, and I'll take it in the right spirit. Okay?

I had a criminal trial once where I was reading the jury instructions, and for whatever reason, I said that the burden of proof was on the defendant. That was a mistake, and I fixed it. But I was so horrified. I was so horrified. But I am a human being, and I'm flawed.

Okay. So if there's something that I said that you think just can't possibly be right or it's upside down, let me know, and I'll try to fix it. Okay?

I have other rulings to give you. I don't know what my schedule is. I'm going to need to work with my courtroom deputy to figure out what my availability is.

I expect I will probably do the same thing for the other rulings. I think the collective weight is about the same as what I have before -- before now, meaning today. So we're looking at another 50 pages or so, give or take.

Maybe I will decide to put one of out there in writing, but I think I will probably just do the same.

Here's what I would propose: Why don't I have my courtroom deputy throw out some dates and times when you can come back, and we'll see if it works. If it works, great. If it doesn't work, then maybe you can sort something out offline.

THE CLERK: How much time far out? In August?

THE COURT: We can do -- could we do next week?

THE CLERK: Oh.

THE COURT: How does next week look?

THE CLERK:  Does Monday, the 28th work?

MR. ART:  Yes for Reyes.

MS. SUSLER:  And yes for Solache.

MS. ROSEN:  I have a deposition that day, unfortunately.  Sorry.

THE CLERK:  That's fine.

Wednesday, the 30th?

MR. ART:  Yes again for the plaintiffs.

MR. SCAHILL:  One second.

Yeah, I have a dep, but our motion was ruled on.  I could probably get someone else from my office, if it works for everyone else here, if it's going to be best for the Court.

So I am taking a deposition on that day all day, though.  So . . .

THE COURT:  Okay.

MR. ENGQUIST:  Can you do it?  Because if not, I'll just get a body.

THE COURT:  Why don't we go off the record, folks, just for a second to give Amy a break.

    (Off the record.)

THE COURT:  I will say this:  If you fly at O'Hare and you see the board of incoming and outgoing flights, that's what my docket looks like, that's my calendar in terms of hearings and things.

THE CLERK:  Does August 5th, then -- either the 4th,

the 5th, or the 8th?

THE COURT:  Please speak up if it doesn't work.  I try to have good customer service.  So if it's problematic, we can figure something out.

MS. SUSLER:  I'm out that week, but I could have my cocounsel come in.

THE COURT:  Okay.  Is that acceptable to you?  Is that --

MS. SUSLER:  Yes.

THE COURT:  -- okay?

Does August 5th work, folks?

MR. SCAHILL:  It's okay for me.

MR. ENGQUIST:  I could get coverage, I'm sure.

MS. ROSEN:  It's fine.

THE COURT:  Okay.  Why don't we put that down.  If it becomes problematic, e-mail my courtroom deputy, and we'll try to work it out.  Okay?

I do try to be easy to deal with on scheduling.  When I was practicing, court hearings came down from Mt. Olympus with thunderbolts:  This is when it's going to be.  I try to have a little bit of a kinder, gentler approach and try to work with people because it's important to your clients.  Okay?  That's just how I roll.

All right.  So let's put it down for August 5th.  If you all realize after court that this is problematic, we'll

change it.  Okay?

Let's get the time again.

THE CLERK:  10:00 o'clock.

MR. ENGQUIST:  Okay.

THE COURT:  Does that work for everybody?

MS. ROSEN:  Yep.

THE COURT:  Here's what I would also propose:  I have denied defendants' motion for summary judgment.  So we need to talk about a trial.

I would like you to meet and confer beforehand, and start talking about it.

How long do you think you'll realistically need on the plaintiffs' side?

You know, you've got a burden here.  What do you think you're going to need to put your case on?

Do the best you can in terms of getting a real estimate.

You know, defendants don't have a burden to put a case on, but you certainly may want to, right?  So think about what you might want to do on their end once they close.  All right?

See if you can work together and kind of ballpark, back of the envelope, get me an estimate, and also let me know how soon you think you can be ready.

I will say this:  I think it would be a big challenge on my end to schedule something in 2025 unless something

miraculous happens. I assume that there is much rejoicing within your heads right now. I assume none of you were looking forward to a trial in 2025. Maybe the plaintiffs were. I don't know. But that's a heavy lift. I don't know.

I would say this: The longer the trial, the more difficult it is to schedule. So on the plaintiffs' side, if you're anxious to get to trial, bringing a bloated case to trial equals more delay than bringing a streamlined case to trial.

I will also say this: In criminal cases, I do not tend to sit on people for the length of their trials. Given that someone's liberty is at stake, I give people a lot of latitude. I give people less latitude in civil cases.

I have been known to get estimates from people and then say, "That's adorable. You get half that." So be as reasonable as you can.

It's hard for you folks because you don't want to get going in trial and things just take longer for reasons outside your control, and all of a sudden -- you've told the judge you need a week a half and -- you know, a week into trial, and most of your evidence isn't in yet, and then you feel stuck and the judge is grumpy. I get the whole dynamic, I do.

But I will say this: Having sat in this chair through lots and lots and lots of jury trials, juries get worn out. Juries get worn out, more than I think lawyers can reasonably

anticipate.

If I tell you to be short and brief and to cut it short, I'm doing you a huge favor. I really am.

All of us think that the more we speak, the more persuasive we are. I am probably more guilty of that than anyone. For crying out loud, I just read you a 56-page ruling.

Okay. Shorter works in a courtroom. I cannot tell you how many times I've seen an exam, like a cross-exam that has gone on for two hours, where I said, boy, a ten-minute cross would have been so much more effective. I'm just telling you. You made some great points in the first couple of minutes, and then you just made the jury fall asleep, and then it's lost. Get up there and make some -- land some punches and sit down.

But all of us, me included, think if we just keep going, we're going to be -- we're doing so great up here.

That's an observation that you can totally ignore if you want. It's up to you. I'm not really here to give you trial advice.

But I would say this: I think all of us, me included, overestimate the rhetorical value of length. All right? So just really think about it. Especially the plaintiffs here. You've got the burden, you know. Think about what's going to be effective for you.

And the same with the defense, what do you think is

going to be effective?

And this is the point in time where I often quote the Rolling Stones. It's not what you want; it's what you need. Okay. Quoting the Rolling Stones isn't bad, either.

Think about what you really need, all right?

And I have no idea, do you folks have an estimate? Have you thought about it?

You may not want to say it now. That's fine.

MR. ART: I mean, I would say, off the cuff, ten trial days total.

THE COURT: Okay.

MR. ENGQUIST: Wow. We don't even know if the *Monell* claim is going forward, Your Honor. I know that one --

THE COURT: Yeah --

MR. ENGQUIST: -- is substantial.

THE COURT: -- I've got you. Stay tuned.

MR. ENGQUIST: And also, considering all the witnesses that almost every one of them needs translators, and during discovery, plaintiffs -- those depositions were doubled in length to cover the amount of translation that went on --

THE COURT: Yeah.

MR. ENGQUIST: -- I don't think ten days would make sense, even if it was just the underlying claim.

THE COURT: Yeah. Well --

MR. ENGQUIST: But we can talk about it.

THE COURT: Yeah, yeah. And I know this is going to be a tricky case to get some estimate on. I get that.

I just want people to be aware of the phenomenon that the longer it goes, the harder it is to get a trial date, you know, because I give my criminal cases first priority for scheduling. Because if I've got somebody in lockup, they're going to get the courtroom before anybody else. All right?

So why don't we continue our discussion. And I understand that there are other motions pending, and until you know the full parameters of the case, it's hard to estimate the contours -- the length of the trial. You've got to know the size of the case before you can estimate its length. I get that. But just start thinking about it. That's all I'm saying, just start thinking about it. Okay?

Is there anything that anyone wants to raise while we're here?

MR. ART: Not from the plaintiffs.

THE COURT: Anything, anybody?

MR. SCAHILL: No.

MS. ROSEN: Not from defendants.

THE COURT: You all know how to order the transcript if you want it?

MS. ROSEN: Yep.

THE COURT: Thank you, everybody, for coming in today. I will look forward to seeing everyone on August 5th. I won't

require everyone to be here.  You need at least just one person for each party, and that will suffice from my end.  And I won't take it -- I won't take it as a slight if any of you decide to send someone over just to sit through.  That's fine with me. Whatever you want to do.

Okay?  Anything else, anyone?

MR. ART:  Thank you, Judge.

MR. SWAMINATHAN:  Thank you.

THE COURT:  I will see you in a couple weeks.  Thank you, folks.  Take care.

THE CLERK:  All rise.

(Concluded at 2:30 p.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* _____    *8/4/2025* \_
Amy M. Kleynhans, CSR, RPR, CRR        Date
Official Court Reporter