IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,                    )   Case No. 18 CV 1028
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )
REYNALDO GUEVARA, *et al.*,             )
                                        )
                Defendants.             )
_____ )
GABRIEL SOLACHE,                        )   Case No. 18 CV 2312
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )
CITY OF CHICAGO, *et al.*,              )   Chicago, Illinois
                                        )   August 7, 2025
                Defendants.             )   1:40 p.m.

TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For Plaintiff          LOEVY & LOEVY
DeLeon-Reyes:          BY:  MR. ANAND SWAMINATHAN
                            MR. SEAN STARR
                       311 N. Aberdeen Street, 3rd Floor
                       Chicago, Illinois 60607


For Plaintiff          PEOPLE'S LAW OFFICES
Solache:               BY:  MS. NORA P. SNYDER
                       1180 N. Milwaukee Avenue
                       Chicago, Illinois 60642



                       *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

For Defendant          BORKAN & SCAHILL
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                       Two First National Plaza
                       20 S. Clark Street, Suite 1700
                       Chicago, Illinois 60603


For Defendants         THE SOTOS LAW FIRM, P.C.
Halvorsen, Dickinson,  BY:  MS. CAROLINE P. GOLDEN
Rutherford, and        141 W. Jackson Boulevard, Suite 1240A
Trevino:               Chicago, Illinois 60604


For Defendant City     ROCK, FUSCO & CONNELLY
of Chicago:            BY:  MS. EILEEN E. ROSEN
                       333 W. Wacker Drive, 19th Floor
                       Chicago, Illinois 60606.


Court Reporter:        AMY M. KLEYNHANS, CSR, RPR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 2318A
                       Chicago, Illinois 60604
                       Telephone:  (312) 818-6531
                       amy_kleynhans@ilnd.uscourts.gov

(Proceedings heard in open court:)

THE CLERK: 18 CV 1028, DeLeon-Reyes versus Guevara, *et al.*, and 18 CV 2312, Solache versus City of Chicago.

THE COURT: All right. Good afternoon, everyone.

Why don't you come up in terms of introduction. It will be helpful to me to get to know everyone.

My overriding observation is you seemed to have switched sides. You think that I'm not paying attention, but I am paying attention.

Let's start with counsel for the plaintiffs.

MR. SWAMINATHAN: Good afternoon, Judge. Good afternoon.

Anand Swaminathan and Sean Starr from Loevy & Loevy.

MR. STARR: Good afternoon.

THE COURT: Sean Starr, you said?

MR. STARR: Yes, Your Honor.

THE COURT: Good afternoon.

MS. SNYDER: Good afternoon, Judge.

Nora Snyder for Plaintiff Solache.

THE COURT: All right. Good afternoon to the plaintiffs' team.

And defense team.

MS. ROSEN: Good afternoon, Your Honor.

Eileen Rosen on behalf of Defendant City of Chicago.

MS. GOLDEN: Caroline Golden, like the color, for the

4

individual officer defendants.

THE COURT: Okay.

MR. SCAHILL: Good afternoon, Your Honor.

Timothy Scahill on behalf of Defendant Guevara.

THE COURT: All right. Good afternoon, everyone.

Thank you, everybody, for being here. I appreciate you folks making the effort.

It's like the good ole days. There's actually a hearing in federal court. It doesn't happen as often as it used to.

I'll tell you this: I think it's a detriment to the bar that there aren't as many civil hearings. I mean, back in the good ole days, you'd come in for a motion and the place would be packed. And it was a great opportunity for young lawyers. And it's a great opportunity for the lawyers to get to know the judge. And I think the culture has changed here. I think we have not fully recovered from the pandemic on that score.

But it's good to have you folks in here.

So I will say this: There are obviously a slew of motions that were filed. I issued a long oral ruling a couple of weeks ago on the defendants' motion for summary judgment.

I don't know if you folks have ordered the transcript. You obviously can order the transcript if you haven't.

I don't remember exactly how long it took me to read

it.  I think it was about three and a half hours, I think, give or take.

On a personal note, when I went to bed that night, my throat still hurt.  I mean, there is a physicality to this job that I'll simply say.  And that's certainly true of my court reporter, too.

So we made some progress with an oral ruling.  I'm going to give you an oral ruling today on two of the other motions.  So not the rest of them, just two of them, partly because I want to look over a couple more things on what's left, but partly just from a digestibility standpoint and, frankly, a presentation standpoint, I just can't read everything that I've got.  So we're just going to keep chipping away.  Okay?

Was everyone here last time?  I don't think -- were all of you here?  I don't think -- a couple of you --

MS. SNYDER:  I was not, but I did get a recap, Judge.

THE COURT:  Okay.  Good.

All right.  So I'll just repeat what I said last time. I know that you would prefer to get a written ruling.  If I were in your shoes, I would want a written ruling.

I personally would rather give you a written ruling. I like writing.  I like putting things out there.  I think it's helpful for accountability.  It's helpful to make a record.  I just like it better.

But there are limits. Limited judicial resources is a thing.

I think sometimes the bar -- not you fine people -- but sometimes the bar talks about limited judicial resources, and they know it's a thing, but they don't really think it's a thing, really. I think there is more of a vibe that judicial resources are like the Pacific Ocean: You can drink as much as you want, and it's going to be there for you. You can take whatever because it's just there.

It takes a lot to get a 59-page, single-spaced document to be beautiful enough to go on Westlaw. It takes a lot. So that's why last time I read the 59-page, single-spaced ruling, because if I can save a couple of days, I'm going to do it. Because everyone on my docket is on the same team. Everybody wants a ruling, and I just have to make do sometimes.

So it's a long way of saying I'm going to give you an oral ruling today on two of the *Daubert* motions. Okay?

So why don't you folks have a seat.

Any questions before we get going?

Okay.

MS. ROSEN: Thanks, Judge.

THE COURT: As the saying goes, sit back, relax, and enjoy the ride.

Before I start reading, I'm going to just give you a quick overview. I'm going to rule on two of the City's *Daubert*

motions. The ruling is for Thomas Tiderington and Anthony Finnell. So those two motions.

I'm going to save the Leo ruling for later. Okay? And don't read anything into that.

Okay. Here it goes.

The City of Chicago filed three motions to exclude plaintiffs' experts.

The City moved to bar Dr. Richard Leo. That's Docket No. 747. The City also moved to bar Thomas Tiderington. That's Docket No. 759. Finally, the City moved to bar Anthony Finnell. That's Docket No. 6 -- excuse me -- 760.

I'm referring to the docket numbers in the case filed by DeLeon-Reyes, which is case No. 18 CV 1028.

I'm going to rule today on two of the three *Daubert* motions.

I'm going to rule on the motions about Thomas Tiderington -- am I saying that right, folks? Tiderington?

MR. STARR: Tiderington, yep.

THE COURT: Tiderington, okay. Tiderington.

-- and Anthony Finnell. I'm going to save the motion about Dr. Richard Leo for a later hearing.

For the following reasons, the City's motion to bar plaintiffs' experts are largely denied.

I'm going to address the two motions one at a time, starting with the motion about Tiderington.

I'll start with an overview of his qualifications briefly.

Tiderington has worked in law enforcement for over 40 years. Since 2001, Tiderington has served as chief of police in Plymouth Township, Michigan. He is also a long-time police training instructor, and he has given many lectures on police practices, criminal investigations, and more. That's all from his CV, which is on the docket at Docket No. 759-10.

The City does not challenge Tiderington's qualifications. Instead, the City challenges his opinions.

Tiderington has two expert opinions that he would offer to the jury. The motion at hand challenges only his second opinion. That opinion is relevant to the *Monell* claim against the City.

Tiderington's second opinion is that the CPD's policies and practices for documentation and disclosure of evidence in homicide investigations were inadequate and resulted in routine failures to document and disclose information uncovered during investigations. That's from page 33 of his report, which is Docket No. 759-2.

The City argues that there are three reasons to exclude Tiderington's testimony.

First, the City argues that Tiderington's opinion has no foundation.

Second, the City argues that he did not rely on any

methodology when forming his opinion.

And third, the City argues that the opinion will not be helpful to the jury. That's from the City's motion, Docket No. 759.

So the arguments fall into three buckets. The first bucket is the lack of foundation. The second bucket is methodology. The third bucket is helpfulness to the jury.

I will analyze those arguments one at a time, but I will start with one overarching observation.

The City frames its arguments as challenges to foundation, methodology, and helpfulness, but that's not really what they are.

And in reality, the City is challenging the weight that a fact finder should give to the opinion. And that's a matter for the jury. It isn't a question about admissibility.

Again, as the Supreme Court said in *Daubert*, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible testimony" [*sic*]. That's from *Daubert*, 509 U.S. at 596.

Let me say this before I dive in. You all know the standard for *Daubert* and *Kumho Tire*. I'm not going to take the time to summarize it for you. The standard isn't in dispute. If anybody wants to come back and hear me talk about the standard, I can, but everybody knows the standard.

Take a look at 702, *Daubert* and *Kumho Tire*. Come back to me if you have any questions.

With that observation in mind, I'll turn to the specific arguments.

I'll start with the first bucket. I will start with the objection about foundation.

The gist of the City's argument is that Tiderington doesn't know enough about the facts he says he relied on, so Tiderington has no basis for his opinion.

So the City highlights several examples of supposed gaps in Tiderington's testimony. As the City sees things, those gaps indicate that Tiderington doesn't know what he's talking about.

The Court disagrees. When it comes down to it, the City is really challenging the persuasiveness of Tiderington's opinion, not its foundation.

Let me make this overarching observation before I dive in.

The City makes a lot of arguments. Some of the arguments might land with a jury. I'm not saying these are bad arguments. Candidly, I think the City has got some pretty useful lines of cross-examination.

I am not saying these are bad arguments. I'm saying these aren't arguments for admissibility. They aren't a reason to keep the expert out of the courtroom and keep him from

taking the witness stand. I think the City is going to have some punches, and some of them may land, but those aren't enough for a knockout before the person even enters the ring.

I just came up with that metaphor on the fly. It actually kind of worked.

So here it goes.

I'm going to first address the first bucket, which is the lack of foundation.

The City has five arguments about the lack of foundation. I'm going to address each of the five arguments separately.

Here it goes.

The first foundation argument is a challenge to Tiderington's analysis of the *Palmer* and *Jones* cases. *Palmer* and *Jones* were cases from the 1980s about the police's use of so-called street files, which are off-the-books investigative notes. The parties are well aware of these cases. You can find the *Palmer* case at 755 F.2d 560, Seventh Circuit 1985. And the *Jones* case is at 787 F.2d 200, Seventh Circuit 1986.

Tiderington's analysis of those cases goes from pages 36 to 39 of his report. He believes that the cases revealed a trend of failing to disclose relevant investigative materials. And he thinks that the CPD policies that the City put in place after *Palmer* and *Jones* didn't fix the problem.

The City argues that Tiderington doesn't know nearly

enough about the *Palmer* and *Jones* cases to opine on them. That's from page 5 of the City's motion, which is Docket No. 759.

The City thinks Tiderington's deposition shows an "utter lack of ability to answer the simplest of questions" on the cases. And that the only "only conclusion to be drawn" is that his opinions come from "summaries of the cases prepared by someone else." The City also says that Tiderington "didn't even have a basic understanding of the Court from which he purported to be citing from." I'm quoting there page 6 of the City's motion.

It's true that an expert cannot uncritically rely on summaries prepared by someone else. Judge St. Eve made that point in *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, at pages 1025 to 1026, Northern District of Illinois 2011.

But according to the list of materials that Tiderington reviewed, Tiderington looked at the *Palmer* and *Jones* cases. The list is on the docket at Docket No. 769-20.

So if the City thinks that Tiderington's thoughts on the cases are thin, that's best saved for cross-examination. But there is a foundation for Tiderington's review -- excuse me -- for Tiderington's views on those cases.

Basically, he said that he reviewed documents from those cases.

For example, at his deposition, Tiderington explained

that he read *Palmer*, but "not in specific detail." That's at Docket No. 759-3, at page 448, lines 3 to 5.

That testimony could be meat on the bone for cross-examination. The City could question Tiderington on his knowledge of the cases and call his credibility into question.

I will say this as an observation: Sometimes expert reports are bloated. Sometimes expert reports do too much. Sometimes that's a great benefit to the opposing party because it creates a target-rich environment, because most experts don't know their reports as well as they think they do, and it leads to vulnerability.

So when you have an expert report that's 50 pages or 60 pages or 70 pages or 80 pages, the expert better know it or the expert is going to get exposed.

But the exposure comes at the cross-examination time, not at the admissibility time. That's the key point.

The Court also disagrees with the City's implication that Tiderington has no foundation because he isn't familiar with the court system.

At Tiderington's deposition, defense counsel read the citation for the *Palmer* case to Tiderington. Take a look at Docket No. 759-3, at page 449.

The attorney asked Tiderington what F.2d means and what C-i-r means. Tiderington said he didn't know what "F.2d" means, and he said that "Cir.," C-i-r, probably meant

"circuit." And when the attorney asked Tiderington what the Seventh Circuit is, all Tiderington had to say was that it was part of the judicial system in Chicago. I'm looking at page 449 of his deposition.

In the Court's view, knowledge about how the Federal Reporter system works isn't particularly probative. Knowledge about how the judiciary works doesn't reveal a crippling vulnerability in his testimony.

In other words, he can testify about police practices even if he doesn't have a command about how judicial decisions are reported. Those are different things.

If defense counsel wants to expose him as a know-nothing who doesn't know anything about the judicial system, they could do that at cross-examination.

The second foundation argument is a challenge to Tiderington's opinions about the *Fields*, *Rivera*, and *Kluppelberg* cases. That argument is on pages 7 and 8 of the City's motion, Docket No. 759. For purposes of today's decisions, it's enough to say that those three cases are relevant in the same way as *Palmer* and *Jones*.

The City says that Tiderington testified that all of his knowledge about *Fields*, *Rivera*, and *Kluppelberg* came from reviewing the report of another expert, Michael Brasfield. So, in the City's view, Tiderington was merely parroting another expert.

In my view, the City is not fairly characterizing the deposition testimony.

Basically, defense counsel asked Tiderington what he knew about Brasfield's work on those cases.

Defense counsel asked Tiderington: "So the information that you know about the work that Mr. Brasfield did on the *Fields* case, the *Rivera* case, and the *Kluppelberg* case comes solely from the reports that he prepared in the cases, right" -- excuse me -- "in those cases, correct?"

Tiderington responded: "That's correct. It certainly was not from him in any way, shape, or form."

That's from Docket No. 759-3, at page 384.

In other words, Tiderington was not saying that all of the information he had on those cases came from Brasfield's report. That's not what he said. Tiderington was saying that all the information that he had about the work that Brasfield did on those cases came from Brasfield's report. He was talking about his knowledge of Brasfield's work. He was not talking about his knowledge of the cases. Those are different things.

The testimony was about Tiderington's knowledge about Brasfield's work on those three cases. The testimony was not about Tiderington's knowledge about those three cases more generally.

Regardless, Tiderington's report indicates that he

reviewed *Fields*, *Rivera*, and *Kluppelberg*.

Tiderington's list of materials contains depositions from all three cases, motions and briefs filed in all three cases, investigative files and retention files from all three cases and more. Again, the list of materials is at Docket No. 769-20.

If the City doesn't like what Tiderington had to say about those cases, the City can take it up on cross-examination.

The third foundation argument is a challenge to Tiderington's knowledge more generally. The City says that Tiderington's deposition shows that he "lacked a basic understanding of the opinions contained in his own report." That's from the City's motion at page 8.

That argument goes to Tiderington's credibility, not to the admissibility of his testimony.

The City points to an example from Tiderington's deposition testimony, implying that Tiderington doesn't know what he's talking about.

Defense counsel asked Tiderington about the basis for his opinion that the CPD had a practice of failing to document information from investigations. Specifically, counsel asked him to identify examples in his report of cases where detectives failed to document. That's from the deposition transcript at page 426, lines 18 to 22, Docket No. 759-3.

In response, Tiderington pointed to cases on page 50 of his report. That testimony appears later on page 426 and 427 of the testimony.

The City argues that those cases were examples where the inventory sheets, which contained investigatory files, were missing or incomplete. That's from page 8 of the City's motion, Docket No. 759. The implication is that Tiderington's response shows that he doesn't know his own report.

Again, that's fodder for cross-examination.

If an expert does not know his own report, he can get badly exposed in front of a jury. But the right venue is the jury.

If some inventory sheets were missing, that could plausibly contribute to an opinion about potential failure to document information. So there is an apparent foundation for the opinion. I don't think that the problem here is foundation. The problem is credibility. Overall, the argument goes to his credibility, his believability, his command over the docket, his command over the materials, his command over the case files. Save it for cross-examination.

Defense counsel may be able to bat him around if he doesn't know his stuff, but the fun can happen in front of the jury.

The fourth foundation challenge is about the statistical analysis in Tiderington's report. That's from

page 9 of the City's motion.

The City argues that Tiderington is not a statistician. The City also argues that he did not verify the underlying data and that he did not know the coders for the spreadsheets that contained the data.

The City takes issue with, for example, Tiderington's opinion that "only 334 of the 344 investigative files contained handwritten notes. Of those, 154 of the 334 files, or approximately 46 percent, contained handwritten notes not on" the general progress reports. I'm quoting here from page 49 of the report, which is Docket No. 759-2.

In reality, Tiderington does not need to be a statistician to punch a few three-digit numbers into a calculator. It does not require special expertise as a statistician. It is not a statistical analysis to see which files contained handwritten notes and which files didn't contain handwritten notes. It is not something that requires statistical analysis to compare those numbers to the total number of files.

If the City disagrees with Tiderington's view of the evidence, the City can ask him in front of the jury.

The Court also disagrees with the notion that Tiderington did not verify the underlying data. I'm not saying it's wrong on the merits; I'm saying it's not a reason to keep him out.

Tiderington testified that he looked at all 344 investigative files, albeit "some in greater detail than others." I'm quoting page 400 of his transcript, Docket No. 759-3. That testimony alone is enough for the Court to conclude that Tiderington did not blindly go along with the data on the spreadsheet. Tiderington said that he spot-checked several of the files more deeply than others, but that he looked at all of them. We'll see if that is believable in front of the jury.

The fifth and final foundation argument is a challenge to the amount of time that Tiderington spent on the case. The City argues that he didn't bill enough time to complete the analysis in his report. That's page 11 from the City's motion.

The City points to the loads of documents and depositions that Tiderington allegedly reviewed and then notes that he billed only 78 hours.

Again, this isn't a challenge to the foundation of Tiderington's opinion. It's about the weight that a jury should give to the opinion. If a jury thinks that an expert didn't spend enough time formulating his opinion, then the opinion loses credibility.

That said, I do want to make one observation. It is hard for me to see how Tiderington could have done this analysis in only 78 hours.

When I read that number, I thought to myself: That's

less than the amount of time that a district court judge works in a week.  That was my reaction.

A standard workweek is 40 hours.  So 78 hours is not a lot of time, especially when Tiderington supposedly evaluated hundreds, many hundreds of case files.

Tiderington's report is 66 pages long.  It includes over a hundred footnotes.  It's chockfull of citations.

I don't know how long it took to write that report.  I know it took a lot of time.  It makes me wonder who did the writing.  It makes me wonder who did the analysis.  It's hard for me to see how this expert could have reviewed 344 case files.

If someone said that they built the Giza pyramids in 78 hours, I would have a few questions, even if you had helpers.  It's hard to see how this expert examined hundreds and hundreds of case files and came up with a 66-page report in only 78 magical hours.

True, experts are allowed to rely on assistants.  They can do that.  The federal rules contemplate that.  Oftentimes, colleagues and subordinates will review the documents and even write a first draft of the report to keep costs down.  That is acceptable.

Overall, the fact that Tiderington spent only 78 hours on the case is not a reason to exclude him at the admissibility stage.  It's not a *Daubert* argument.  But it is a

vulnerability, and it could expose him at trial.

He might get hung out to dry on cross-examination. Defense counsel might have some fun with him on the witness stand. But it's not a reason to keep him from taking the stand altogether.

I've said it before. I'll say it again. Take it up on cross.

That's the first bucket.

I'll now turn to the second bucket, meaning the second category of arguments against Tiderington's testimony. The second challenge has to do with his methodology.

Basically, the City challenges two of Tiderington's opinions, arguing that they aren't based on any methodology.

Or at least, that's how the City frames the challenges.

The City challenges Tiderington's methodology on two topics.

The first challenge to his methodology is about his opinion about the alleged failures of the government to produce all of its investigative files to the defense when the criminal cases were active.

The second challenge to his methodology is about whether the CPD followed its practices -- excuse me -- followed its policies.

I will start with the challenge about the

investigative files.

Tiderington opined that important investigative materials were regularly withheld from the defendants. That's from pages 52 to 55 of the report.

To get to that conclusion, Tiderington looked at the investigative files currently possessed by the government and compared them to the investigative files currently possessed by the defense. Tiderington found that some of the documents in the government's investigative files were regularly missing from the criminal defense's investigative files.

In other words, the government's current collection of its investigatory files from those old cases is bigger and more inclusive and contains more documents than the defense's current collection of the investigatory files from the old cases.

The government has more documents than the defense. The implication is that the defense never had the documents.

The implication is that the prosecutors and/or the police -- I assume it's the police here because the Cook County State's Attorney's Office didn't produce any files.

Is that right?

MS. ROSEN: They did produce files.

THE COURT: All -- how many of the files did they produce?

MS. ROSEN: The majority of the files that the Cook

County Public Defender's Office --

THE COURT: All right. Fair enough.

MS. ROSEN: -- produced.

THE COURT: So the implication is that the prosecutors and the police had important files that did not get into the criminal -- excuse me. Let me say that again.

The implication is that the government, meaning the prosecution team, had important files that did not get into the hands of the defense team for the defendants.

Basically, the assumption is that if the defense doesn't have the files now, then the defense must not have had the files decades ago, when the criminal cases were ongoing.

The City makes three arguments about Tiderington's methodology when it comes to the investigatory files.

First, the City makes the argument that Tiderington's methodology was unsound because it was based on faulty or incomplete data which led to erroneous results.

The City points out that there might be another explanation for why the current collections of documents are different. As the City points out, the fact that the government's files now are different than the defense's files now does not mean that the government's files decades ago were different than the defense team's files decades ago.

A difference now does not mean there was a difference earlier.

There are all sorts of reasons why the defense documents today could be different than the documents that the defense had decades ago. Documents could have been lost or misplaced or destroyed in the intervening years.

Not everyone keeps all documents forever. The Department of Justice doesn't keep all documents forever. Prosecutors don't keep all judges -- excuse me. Prosecutors don't keep all documents forever. The police doesn't keep all documents forever. Defense lawyers don't keep all documents forever. And I can tell you for sure the judiciary doesn't keep all documents forever, except on CM/ECF.

As the City points out, the record includes evidence that the defense did not maintain all of the documents in the intervening years. The City argues that the Public Defender's Office acknowledged that the defense files were not carefully maintained in the last 30 years.

So the idea is that the methodology is unreliable because the data set is flawed.

The City puts a lot of weight on the possibility that the defense simply lost or destroyed or otherwise misplaced the files in the last 30 years. The City argues that Tiderington knew about that problem. That argument appears on pages 14 and 15 of the City's motion, which is Docket No. 759.

The City has a point on the merits, maybe a strong point.

25

Tiderington's analysis assumes that the defense collection today is the same as the defense collection from decades ago. And he assumes that the absence of documents means that the government never turned them over way back when.

There could be all sorts of reasons why the defense collection today doesn't match the defense collection years ago.

Let me give you an analogy. It's the best I could do.

Let's imagine that a parent, a mom or a dad, packs school lunches for their two kids, and each kid is supposed to get five cookies in their sack of lunch. But when lunchtime comes, one kid has five cookies, and another kid has three cookies.

One possible explanation is that the second kid got shorted. Maybe mom or dad hadn't had their coffee yet and neglected to give the second kid the full allotment of five cookies. Maybe mom or dad messed up. So maybe the second kid walked out the door with only three cookies and not five cookies.

That's possible. That's a possible explanation, but it's not the only possible explanation.

Maybe both kids walked out the door with five cookies. Maybe the second kid got hungry before lunch and munched on two of the five cookies. Maybe the kid dropped a few cookies. Maybe his or her sibling swiped a couple. Who knows.

The point is simply that there could be all sorts of reasons why a collection at any one moment in time does not match a collection earlier in time. It could mean that the collections were different from the get-go. But it doesn't have to mean that. It could mean that something happened in the meantime.

That's basically what the City is arguing here. The City argues that the expert assumes that the government failed to turn over documents when the criminal cases were ongoing. The expert assumes that the explanation for the disparity is that the government never produced the documents on day one and the defense team never had them.

That is, the expert assumes that if the defense doesn't have the documents now, then the defense didn't have the documents decades ago when the criminal cases were ongoing.

That assumption might not be right. Maybe the defense had all of the documents on day one but lost them or misplaced them or destroyed them in 30 years.

Even so, that assumption is worth exploring at trial in front of the trier of fact. The assumption by the expert is not necessarily true, but the assumption is within the field of play. The assumption is not so outlandish that the expert can't be allowed to entertain it on the witness stand.

As the Seventh Circuit has said, "Assuming a rational connection between the data and the opinion" -- excuse me. Let

me say that again.

"Assuming a rational connection between the data and the opinion, an expert's reliance on faulty data is a matter to be explored on cross-examination; it does not go to admissibility."  That's from *Manpower v. Insurance Company of Pennsylvania*, 732 F.3d at 796, page 809, Seventh Circuit 2013.

Overall, this is a fertile line of cross-examination.  Maybe the defense has fewer documents now, but that does not mean that the defense had fewer documents decades ago.  Even so, that is not a reason to keep the opinion from entering the courtroom.  It does not challenge the methodology.

So I conclude that it's fair game.

Again, the defense team has some holes to poke.  The defense team might convince the jury that this analysis is deeply flawed, but it is not so flawed that it can't pass through the gate of *Daubert*.

I'll now turn to the second argument that the City makes about Tiderington's methodology when it comes to the investigative files.  The City complains that there were so many redactions in the criminal defendants' files that a comparison would be useless.

And, again, the City notes that Tiderington recognized that the reactions could affect his analysis.  That argument is on page 15 of the City's motion.

But, again, that's a problem with the underlying data,

not the methodology. If the reports were so heavily redacted that a comparison would be impossible, then the City can explore that topic on cross-examination.

The City can poke holes in the analysis when the witness is on the stand.

The City also makes a third argument about Tiderington's methodology for assessing the investigative files.

The City notes that Tiderington did not review any of the files kept by the State Attorney's Office. The City argues that the CPD discloses files to the State Attorney's Office, which, in turn, discloses files to the criminal defense attorneys.

So without a comparison with the files kept by the State's Attorney's Office, Tiderington -- Tiderington's conclusion falls apart. That's what the City is arguing on page 15 and 16 of the City's motion.

That was the reason for my question earlier. I had forgotten that part of it, but this is what I was getting at. So I was a little bit off, but I understand the point.

Again, that's not a problem with Tiderington's methodology.

As the Seventh Circuit has stated, whether an expert selected the best data to use is a question for the jury, not the judge. That's from *Manpower*, 732 F.3d at 809.

Again, this might be a really potent argument. If he didn't look at the files kept by the State's Attorney's Office, you might have some fun with him on cross-examination, but that goes to whether the data set was adequate. Rule 702 does require the person to rely on sufficiently reliable data, must have a foundation for it.

The defense team has an argument why the data set was incomplete, but my conclusion is it was not so incomplete that I have to close the door to it for *Daubert* purposes. You can save it for cross. And you might convince the jury.

I'll now turn to the second category, meaning the second challenge to Tiderington's methodology.

This is the second methodology-related argument about Tiderington.

The second category is a challenge to Tiderington's methodology when he opined that CPD's policies were not being followed. That's on page 49 of the report, Docket No. 759-2.

That conclusion was based on Tiderington's review of the 344 investigative files, which the Court discussed a few minutes ago. Basically, Tiderington reviewed the files alongside the CPD's policies for handling criminal investigations and evaluated whether the investigative files indicated compliance with the CPD's policies.

The City trivializes Tiderington's methodology as merely "using a spreadsheet." The City argues that he didn't

prepare the spreadsheet or do the calculations.  I'm quoting here page 17 of the City's motion.

It looks like a recharacterization of the City's prior argument about Tiderington's statistical analysis, and I reject it for the same reason.  Tiderington reviewed the investigative files, albeit with varying degrees of depth.

The City also argues that the coding in the spreadsheet is inconsistent and unverified.  They make that argument at pages 18 to 19 of the City's motion.

In support, the City notes an instance in the spreadsheet that has an obvious error.  The City argues that the error indicates that the spreadsheet is unreliable.

But, again, the Seventh Circuit has said that an expert's reliance on faulty data is an issue for cross-examination; it's not a matter of admissibility.

If you've spotted a problem in their spread- -- in the spreadsheet, great job.  You're going to have some fun.  You can bat him around, but it's not a reason for me to exclude his testimony.

If Tiderington relied on a faulty spreadsheet, then there's a problem with the underlying data, but it's not a problem with his methodology.

The methodological flaw is not so deep that he needs to not give the opinion at all.

So that's my ruling on the methodology challenges.

I will now turn to the third and final bucket. The issue is whether Tiderington's opinions would be helpful to the jury.

The City argues that the Court should exclude Tiderington's opinions because they won't help the jury decide the *Monell* claims.

Remember, *Monell* has three requirements. You folks know this better than everybody.

First, there was a deprivation of a constitutional right.

Second, the City had a widespread practice.

Third, an action taken pursuant to that practice caused the deprivation of a constitutional right.

I'm just paraphrasing the standard. That's the gist of it. It's from *Dean v. Wexford Health Services*, 18 F.4th 214, page 235, Seventh Circuit 2021.

Simply speaking, plaintiffs intend to argue that the City had a widespread practice of failing to disclose investigative information and that this practice caused plaintiffs' injuries.

The City argues that Tiderington's opinions don't help with the causation element. According to the City, Tiderington didn't identify any particular documents that were created and then withheld from the plaintiffs. That argument goes from pages 20 to 24 of the City's motion.

So basically, the City argues that Tiderington's opinions won't help the jury because Tiderington's opinions are only relevant to one of the three requirements, meaning the widespread practice element.

In my view, the City's argument is misplaced. The City is not making an argument about helpfulness to the jury; it's making an argument about the sufficiency of the evidence.

The existence of a widespread practice is one element that plaintiffs would need to prove to succeed on their *Monell* claim. Tiderington's testimony is helpful to the jury on that element.

Tiderington's testimony does not need to prove every element of a claim to be helpful to a jury.

His testimony is a piece of the evidentiary puzzle. It's a brick in the wall.

As the saying goes, a brick is not a wall, and a brick doesn't have to be a wall.

A brick is a building block. Plaintiffs can use Tiderington's testimony to built part of its case. It doesn't have to build its entire case with Tiderington's testimony.

Tiderington's testimony goes to one of the elements of a *Monell* claim. So it's admissible even if it doesn't advance the ball on the other elements of the *Monell* claim.

So that's my ruling on the *Daubert*-related arguments about Tiderington.

33

I want to say one thing about Rule 403. The City included a one-paragraph argument that Tiderington's opinions are inadmissible under Rule 403 because of the potential to confuse the jury. That argument comes in the very last page of the City's motion. We're going to save that argument for later.

I'm resolving today the *Daubert* motion to exclude. The City can raise its argument at the motion *in limine* stage if it wants. There wasn't enough there for me to rule on it. It was just a one-paragraph argument given the page limits. So I'm not going to reach the Rule 403 argument. You can save it for later. I'm just addressing the *Daubert* motions now. That's it. So any argument about Rule 403 is best reserved for a later time. So I'm not going to reach the Rule 403 issue today.

That's my analysis of the motion to bar Tiderington's testimony. The motion is hereby denied.

I will now turn to the motion to exclude testimony of a second expert, Anthony Finnell.

Plaintiffs want Finnell to testify about the law enforcement practices of the CPD.

Finnell has worn many hats in his long career. He's been a police officer, a police unit supervisor, a homicide investigator, and more. He has worked with police review boards, local agencies, and state governments.

Nowadays, Finnell is a consultant for issues involving civilian oversight of law enforcement. That's all from his CV, which is on the docket at Docket No. 768-1.

If allowed to testify, Finnell would opine that the CPD had a widespread practice of condoning improper law enforcement practices. He would further opine that the CPD's failure to discipline the officer defendants created a sense of impunity, which facilitated abuses. That's from Finnell's report, which is at Docket No. 768-3.

The City has four arguments for why the Court should bar Finnell's expert testimony. They are similar to the City's challenges to Tiderington with a little bit of extra flavor here and there.

The first argument is about Finnell's qualifications.

The second argument is about the foundation for Finnell's opinions.

The third argument is about Finnell's methodology.

The fourth argument is about whether Finnell's testimony would be helpful to the jury.

The Court is going to address the arguments one at a time.

I'll start with the argument about Finnell's qualifications.

The City's first challenge is that Finnell isn't qualified to render the opinions listed in his report. The

argument goes from pages 5 to 10 of the City's motion, Docket No. 760.

The City makes three arguments about his qualifications.

First, the City argues that Finnell is not qualified to be an expert because he lacks the necessary training and experience.

Second, the City argues that Finnell isn't an expert on statistics and, therefore, can't give opinions based on statistical analysis.

Third, the City argues that Finnell isn't an expert on qualitative analysis, so he can't give opinions based on a qualitative analysis.

I'll start with the first argument, which is about Finnell's experience generally. The City's first argument does not get very far.

Finnell holds a B.S. in organizational management from Oakland City University in Indianapolis. He earned an MBA, with an emphasis on security management, from the Keller Graduate School of Management. And he studied at the Indianapolis Police Department's Leadership Academy.

So from an educational background standpoint, he has at least some training in law enforcement.

More importantly, during his employment, Finnell has years of experience in law enforcement. Finnell held a number

of roles at the Indianapolis Police Department, where he worked for over 20 years. He was a field officer, a homicide and robbery investigator, a sergeant, a unit supervisor, and more.

Finnell also worked with two police review boards in Oakland, California, and worked with Seattle's Office of the Inspector General to investigate allegations of police misconduct.

He's a member of the National Organization of Black Law Enforcement Executives, and he's the vice president of the National Association for Civilian Oversight of Law Enforcement, to name just a few organizations.

For the last five years, Finnell has been the owner of his own consulting firm, specializing in matters of civilian oversight in law enforcement. That's from his CV, which is on the docket at Docket No. 768-1.

The City argues that Finnell was terminated after the Police Commission voted to remove him. The City says that Finnell was under investigation during his time at the Seattle OIG, Office of Inspector General, for failing to adequately review allegations of police misconduct, and that he resigned three days after the Seattle OIG received the results of the investigation.

As an aside, it sounds like the City is going to have some fun on cross-examination.

Plaintiffs take issue with the City's characterization

of Finnell's employment history.

But even apart from Finnell's supposed terminations and resignations, Finnell is still qualified as an expert within the requirements of the Federal Rules of Evidence.

Rule 702 requires that an expert be "qualified as an expert by knowledge, skill, experience or training." See Rule 702.

The rule "takes a liberal approach to expert witness qualifications." That's from Volume 29 of Wright & Miller, Federal Practice and Procedure, Section 6264.1.

There is some case law for when a wannabe expert is on the border between qualified and unqualified. Here, Finnell has enough experience to qualify as an expert on the issues at hand.

Again, Finnell spent over two decades in law enforcement. He worked on police enforcement review boards, and he is a member of multiple professional organizations dedicated to police oversight.

Based on that record, Finnell is qualified as an expert on issues of law enforcement practices.

If the City wants to bring up how Finnell's employment ended, that's an argument for cross-examination. It's not about his qualifications.

The City's second argument fares no better. The City thinks that Finnell can't use statistical analysis because he

is not a statistician.

Finnell relied on the statistical analysis of Miroslava Meza. That's from page 9 of Finnell's expert report, which is Docket No. 768-3.

Meza is a mathematician, data analyst, and industrial engineer. She taught college courses on statistics and has led the Seattle OIG's policy and statistics team. Meza currently works as a senior auditor for Seattle's Office of the City Auditor, where she leads citywide audits and provides technical advice to the city council and the mayor's office. That's from her CV, which is at Docket No. 768-13.

The City complains that Finnell relied heavily on Meza's statistics, but that he didn't crunch the numbers himself. The City argues that Finnell has no idea how Meza created the tables and graphs in the report and that he can't validate any of the table -- excuse me -- he can't validate any of the data in those tables and graphs.

That may be true, but those aren't reasons to exclude Finnell's testimony. For starters, the Seventh Circuit has said that it's permissible, even "common," under the Federal Rules of Evidence, "in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." That's from *Dura Automotive*, 285 F.3d 609, page 613, Seventh Circuit 2002.

As Judge Kness has said, "There is nothing objectionable about an expert relying on the work of a colleague."  That's from *Washington v. Boudreau*, 2022 WL 4599708, page 11, Northern District of Illinois 2022.

If the City has an issue with how Meza crunched the numbers, the Seventh Circuit has said what the City's options are:  "The opposing party can depose them in order to make sure the [assistants] performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in his field."  That's from *Dura Automotive*, 285 F.3d at 613.

Here, the City has done just that.  Meza was not some sort of secret, behind-the-curtain statistics expert.  Quite the opposite, the City deposed Meza three times across three cases.  She was deposed in this case and in the *Iglesias* case and in the *Sierra* case.  Those deposition transcripts are on the docket, Docket No. 768-7, 768-6, and 768-8.

The City also asked Finnell about Meza's statistical work during Finnell's deposition.

It's true that Finnell admitted that he is not a statistician and that Meza did the heavy lifting of putting the charts and tables together.  And he admits that a few times.  For example, take a look at page 768 -- excuse me -- at page 468, Docket No. 768, line 15.

Even so, Finnell was involved in the process. For example, he looked through every complaint that was on the complaint register spreadsheet, meaning that he looked at all 349 complaints. That's on page 131 of the Finnell deposition, which is at Docket 768-2.

He testified that he checked "several" of the complaints on the final product spreadsheet to make sure they were accurately recorded. That's on page 347 of Finnell's deposition, Docket No. 768-15.

I will also note that Finnell's deposition for this case happened over two days, so there are two docket entries. That's Docket No. 768-2 and 768-15.

Plus, Finnell testified that it is an accepted practice within this field to rely on statistical calculations provided by statisticians. That's from Finnell's deposition in the *Rodriguez* case, at page 263 through 264, Docket No. 768-14.

In short, it's permissible for an expert who is not a statistician to rely on the calculations of a statistician. That's especially true when the statistician herself was deposed.

So Finnell can rely on the statistical work performed by Meza, but he can't portray Meza's work as his own. He can't simply repeat what Meza said and then stop. He has to bring some additional value to the table.

So it can be a building block, but it can't be the

whole enchilada.

The City's third argument is that Finnell has no background in qualitative analysis and relied entirely on the qualitative analysis of Dr. Timothy Knight.  So in the City's view, any of Finnell's opinions that are based on qualitative analysis -- that's "quantitative analysis" -- should be barred.

According to Finnell's report, Dr. Knight has a Ph.D. in human services and specializes in social and community services.  He's done a wide range of work, including policy review and development for local governments, supervising investigations and more.  That's from pages 4 through 5 of Finnell's report, Docket No. 768-3.

On page 9 of the report, Finnell says that he "relied on Dr. Knight for the historical context and relevant documents" [*sic*] to support his opinion about the City's widespread practice of condoning improper law enforcement policies.  That opinion is on page 11.

Finnell testified that Dr. Knight helped Finnell review documents and gather historical data, but Finnell confirmed that he formulated his own opinions and that Dr. Knight "didn't provide any input into the opinions."  I'm quoting from page 145, Docket No. 768-2.  That's Finnell's deposition testimony.

As far as this Court can tell, Dr. Knight is nothing more than a permissible assistant for Finnell, the expert

witness. Dr. Knight helped lay the groundwork. Finnell is not testifying as a mouthpiece for Dr. Knight. That's how I read things.

As Finnell said, Finnell's opinions belong to Finnell alone.

So in the Court's view, Finnell is qualified to give expert opinions, and he can rely on the work by Meza and Knight.

I'll now turn to the second argument about Finnell.

The City's second argument is that Finnell has no foundation for his opinions.

So I'm turning now to the second of four bullets. Or maybe second of four buckets, either one, whichever works for you.

The City gives a few reasons in support of its argument about foundation, but the City's arguments are misplaced. Some of them are repackaged versions of the City's arguments about Meza and Dr. Knight. They go to the weight of the testimony and not admissibility.

The City first complains that Finnell did not conduct any statistical analysis in the report and that he renders his statistical analysis -- I'm sorry. Let me say that again.

The City first complains that Finnell "did not conduct any of the statistical analysis in the report." As the City sees things, "this renders his statistical analysis unreliable

and justifies excluding his opinions that rely on this information."  I'm quoting from the motion at pages 14 to 15, Docket No. 760.

That is a repeat of one of the City's arguments about Finnell's qualifications, which I've already addressed.

The City similarly complains that Finnell has no foundation to talk about the historical context of the CPD because he relied on Dr. Knight.

Again, that's the same sort of argument that I just addressed.  So for the same reasons, it's denied.

Next, the City argues that Finnell relied on inherently biased materials in formulating his opinion on the historical context of the CPD.  For example, the City complains that Finnell "relies heavily on a law review article written by G. Flint Taylor," the founding partner of the People's Law Office, which is counsel in this case for Plaintiff Solache.

That's not an admissibility problem; that's a weight of the evidence problem.  It goes to the person's bias.  It goes to the person's credibility.  If the City wants to make Finnell look like a biased expert in front of the jury by relying on something prepared by plaintiffs' counsel, the City is free to go to town.

Finally, the City argues that Finnell has no foundation for his "sustained rate" analysis.

The "sustained rate" analysis refers to how frequently

civilian complaints against CPD officers were sustained. Basically, Finnell compared Chicago's sustained rate with national rates and with the rates of other large cities.

The City argues that Finnell used the wrong time period for the comparison and that Finnell should have compared the City -- Chicago's sustained rate to large law enforcement agencies rather than to local ones.

But the City's argument, in reality, isn't about foundation; it's about the data itself and the conclusion that Finnell drew from it.

As I've noted earlier, the Seventh Circuit has talked about relying on unreliable data. They said, "Assuming a rational connection between the data and the opinion, an expert's reliance on faulty data is a matter to be explored on cross-examination; it does not go to admissibility." That's from *Manpower*, 732 F.3d at 809.

As the Seventh Circuit said in the same case, "whether [an expert] has selected the best data set to use" is "a question for the jury, not the judge."

My use of the word "quotes" and "brackets" may have interfered with the point. I'll simply say this: The Seventh Circuit in *Manpower* said that questions about the reliability of the data go to the believability of the witness, the reliability of the testimony. It doesn't go to admissibility.

I will say this: I have often thought that that quote

from the Seventh Circuit is a bit of an overstatement, candidly. Rule 702(b) says that the testimony must be based on sufficient facts or data. It's one of the four requirements.

"The testimony is based on sufficient facts or data."

So speaking on behalf of little ole me, and me alone, to say that you can't make a *Daubert* challenge based on faulty data seems like an overstatement. It's one of the requirements in the rule.

But I don't think the Seventh Circuit maybe meant that literally. I think what the Seventh Circuit was probably trying to say is just because you can poke holes in the data doesn't mean the opinion is inadmissible. It doesn't have to be perfect. It can be flawed and still be admissible. There has to be room for cross-examination. So just because you've got a really good argument why it's unreliable doesn't mean that it's not going to see the light of day at trial.

I do have to decide whether it's sufficiently reliable within the meaning of Rule 702. And that's my limited holding.

The data in front of Finnell was sufficiently reliable within the meaning of 702 to be allowed to be presented at trial. It doesn't mean it's perfect. It doesn't mean it's not flawed. It can be flawed or incomplete and still admissible. That's my ruling.

Here's the punch line: Any arguments about that are best left for cross-examination.

I will now turn to the third bucket of arguments about Finnell. I will challenge -- I will talk about the challenge to Finnell's methodology.

Again, the City has a few arguments in support of its challenge. But once again, they go to the weight of the testimony, not its admissibility.

One of the City's arguments is that there's no reliable evidence to support the sustained rate analysis. But once again, the City is simply repeating its other arguments. The City's arguments are really a challenge to Meza's role in Finnell's report. Once again, the City argues that Meza did all the statistics and, therefore, Finnell has no idea what's going on. The City's argument is that Finnell didn't understand Meza's methodology, so the opinions have to go.

Again, that argument is about the reliability of the evidence, not about his methodology. It has to do with whether Finnell really understands Meza's statistics. It doesn't go to methodology.

And the City also repeats its argument about Finnell's reliance on Dr. Knight. I'm going to reach the same ruling.

Apart from those arguments, the City argues that Finnell's report contains errors, and those errors indicate that Finnell doesn't understand the methodology or the concepts that he would opine on.

For example, the City asserts that Finnell conflates

complaint files with individual investigations and allegations. In the City's view, that means that Finnell didn't review 9.6 percent of the complaints, but he reviewed only 0.9 percent of the complaints.

That's on page 19 of the City's motion, Docket No. 760.

Plaintiffs disagree. They point out that in Finnell's rebuttal report, Finnell notes that the CPD's reports often don't distinguish among complaints, investigations, and allegations. That's Figure 1 on page 10 of the rebuttal report. It's in the docket at Docket No. 768-4.

So, in the City's view, the math is wrong, meaning the City's math is wrong.

Truth be told, this back-and-forth between the parties isn't about Finnell's methodology. If Finnell used incorrect or incomplete data, that's a problem for him, but it's not a problem with his methodology. So once again, I reject the City's argument.

The last challenge, meaning the fourth bucket, is the challenge to Finnell's testimony about helpfulness to the jury.

The City argues that Finnell's testimony would not be relevant or helpful to the jury. Take a look at pages 24 to 25 of the City's motion, Docket No. 760.

As the City sees things, Finnell's testimony isn't connected to the people involved in this case. It's because

Finnell doesn't plan to testify about how CPD's policies caused plaintiffs, in particular, to suffer constitutional injuries, and Finnell didn't testify that any particular complaint that he reviewed should have been sustained.

This is basically the same sort of challenge that the City made to Tiderington's testimony. And the Court rejects it for the same reasons.

Again, a brick is not a wall, and a brick doesn't have to be a wall.

For plaintiffs to win on their *Monell* claim against the City, plaintiffs need to prove the existence of a widespread practice that caused their injuries. Finnell's testimony is directly related to the existence of a widespread practice. Finnell's testimony does not need to prove each and every one of the elements of *Monell* to be admissible. It speaks to a relevant element. It's admissible. It otherwise satisfied the rules -- the requirements of Rule 702.

The City also makes an argument about Rule 403. I'm going to bracket that, and I'm going to put that aside for the moment.

Before I turn to that issue, I want to make one other topic -- I want to address one other topic.

Finnell didn't simply opine about the pattern and practices of the Chicago Police Department. He also opined about a culture of impunity.

He mentioned the word "impunity" more than a dozen times in his report.

Let me read Finnell's second opinion, which appears on page 69 of his report, as stated in Docket No. 768-3.

He wrote: "The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses."

Let me give you two more examples.

Actually, before I do that, let me read that opinion again.

Finnell's second opinion was as follows: "The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated or encouraged and allowed abuses."

Again, that's page 69 of his report, Docket No. 768-3.

Let me give you two more examples where he talked about the culture of impunity.

Here's a quote from page 16 of the report.

"It has been my experience that when an organization fails to establish and sustain effective systems of accountability and consciously turns a blind eye to misconduct, it sends a message throughout the organization that those who engage in misconduct may do so without immunity" [*sic*].

Here's another example from page 65.

"The aforementioned data and cumulative evidence are indicative of a broken and ineffective disciplinary process that invites officers to conceal misconduct and fosters a culture of silence and complacency that allows wrongdoers to act without fear of punishment and impunity."

I do not see how this expert could testify so directly about a culture of impunity or a code of silence. I don't see any expert analysis. I do not see any methodology. He does not appear to reach that opinion through any methodology that could be tested. He just says so.

I don't see how that opinion passes the rigors of *Daubert*, because I don't see any methodology that led to the opinion.

Rule 702(c) says that the opinion must be "the product of reliable principles and methods."

I don't see any principles and methods here.

There is no way to measure culture.

The Supreme Court has talked about the fact that an expert's analysis must be able to be tested. I don't see how this can be tested.

It, frankly, doesn't seem helpful to the jury, either. The jury can figure it out.

Frankly, it seemed like raw advocacy. He seems like a commentator on this point, not an expert. I don't see any expertise; I see gloss.

So here's my reaction: Save it for closing argument.

Maybe an expert could testify about the number of complaints filed against officers in a police department. An expert hypothetically could compare the volume of complaints in one city to the volume of complaints in another city.

Similarly, an expert could, hypothetically, evaluate how often complaints are sustained. You can crunch the numbers and reach a conclusion, that seems fine, if the conclusion is fair game, meaning the topic is fair game.

That type of analysis is one thing, but opining about a culture is another. It feels like a leap. It feels like a gloss. It feels like raw argument.

So here's the point on this: I'm going to keep my powder dry on this issue. I want to hear more from the parties about Finnell's second opinion before trial. I want to hear more from the parties about whether an expert can talk about whether there is or is not a culture of impunity, whether there is or is not a code of silence.

The presumption is going to be that Finnell can't testify about a culture of impunity, including a code of silence, unless and until he receives clearance from me. It's out unless and until I say it can come in.

So I want to make sure everybody understands what I'm saying.

I have my doubts about this. I have my doubts about

this.  But I'm not issuing a ruling because I want to hear more.  And, frankly, folks, I want to think about it some more.  I want to think about it some more.

So for now, he can't take the leap and talk about the culture, the feelings, the beliefs, because I don't think that can be tested.  I don't think that's something that is able to be determined through any particular methods.

I am skeptical of experts who roll up in the witness stand and say, "I have a lot of experience, and here's what I think about the world."  That's not what experts are supposed to be doing.

So I have my doubts on Finnell on this point.  But let me say this again:  I'm keeping my powder dry.  Don't anybody get too excited.  Don't anybody get too disappointed.

Let me also say this as an overarching observation to all of the experts, including the two rulings that I've just done and the ruling for Leo that will come down the pike.  All pretrial rulings are preliminary by definition.  They're preliminary.  I am here calling balls and strikes.  I have tried my best to call balls and strikes to the arguments presented to me.

I have gone through the reports.  I have gone through the briefs.  The materials are quite voluminous.  Frankly, folks, it's a lot.  I'm a human being, and it's a lot.

When I went through the reports, especially Finnell's

report, I had some questions. I had some questions. There were times when I paused. There were times where I independently wondered whether this is admissible.

Our system relies on the adversary process, but the Supreme Court has also appointed me as a gatekeeper to protect the jury.

So my gears always independently turn whenever I read an expert report.

It might be too strong to say that I have some concerns about some of the proffered opinions. I will simply say I have some questions in my own head about some of the opinions.

Let me tell you what I've done today and what I have not done today.

I have given you a preliminary ruling on two of the experts. I have not said that anything and everything in the report is fair game. We might do some trimming. The trimming might come with a little hand trimmer. The trimming might come from a chain saw or some other gas-powered device.

I want to think about the experts some more. Expert testimony can sway a jury. I have often seen expert reports that are more advocacy than I want.

I'm not saying that's true in this particular case, so don't anybody feel that way. I'm just saying in general, I often see that in my cases.

So I feel duty-bound to be on the lookout for advocacy disguised as expert testimony. I'm always on the lookout for experts who get over their skis. I'm always on the lookout for expert testimony that really goes to something that the jury can figure out.

So I'll simply say this: I've called balls and strikes on the arguments presented to me. I think a lot of the arguments had to do with problems with the reports that really go to believability, credibility, those sorts of things. I think you can do it at cross.

I don't think by and large they go to admissibility. But that is not to say that I have no concerns about admissibility generally. I'm independently thinking about these things. And I may want to revisit the admissibility of expert testimony.

I don't plan to change my mind on anything I've just said, unless somebody gives me a good reason to, but I can tell you this: Before any of these experts take the witness stand, I am going to be personally comfortable that everything they intend to say is fair game, because I have a few questions. I have a few questions.

So the long and the short of it is this: The motion for exclusion of Tiderington is denied. The motion to exclude Finnell is denied. That's Dockets No. 759 and 760. But I am not green-lighting their testimony lock, stock, and barrel.

I don't know if those two metaphors play well together, but you know what I mean.

I'm not saying it's all coming in, because I have a few questions.

But by and large, the motions are denied, except as I have otherwise indicated.

One last housekeeping matter. There was a Rule 403 argument about Finnell. We're going to save that for later, too. I'm just going to reach *Daubert* now.

Okay. So that is my ruling, folks.

Thank you, everybody, for listening.

Does anyone have any questions? Anything, anyone?

Okay. So we've got two more motions down.

I will talk to my courtroom deputy about when I can have you back on the other motions. I've got a very vibrant criminal calendar right now, and criminal cases always take first dibs with me.

I'm hoping that we can come back at some point in the next two weeks, maybe next week, even, depending on my calendar, to do another ruling.

I've got rulings that I'm ready to give, but I've got to just fit you in. Okay?

Does that sound good, everyone?

MS. ROSEN: Yes.

THE COURT: So we'll make progress.

MR. STARR: (Nodding head up and down.)

MS. SNYDER: (Nodding head up and down.)

THE COURT: I know that we talked last time about thinking about a trial date, and I know that the defense team in particular said it's hard to figure out the need for the length of trial without knowing the scope of the trial. And that is fair, but it's fair up to a point. You know, it's -- this isn't going to be a short trial, whatever it is. So I think we should start talking about that. I think it would be nice to get a placeholder on the docket.

Have you all talked about that?

MS. ROSEN: No. Amongst us, not yet.

THE COURT: Okay. Does anybody think this trial can be done in less than two weeks?

MS. ROSEN: No.

THE COURT: Obviously not, I wouldn't think.

What do you think?

MR. STARR: I think our goal is to present the case in two weeks. I think our goal is to present the case in two weeks from plaintiffs' side. I think we acknowledge -- I think one of their counsel last -- last time we were here noted that there are some witnesses who would have to be presented through interpreter, which is a fair point. It does add some time.

Our view is that it's going to be for a limited number of witnesses. And so we think that might add two to three days

of trial time, but that's still what we think is -- is the goal.

THE COURT: Okay. I would like you to start thinking about this and talk about this. I think we should pin something down the next time we're here, see if we can get something on the calendar so you folks can start planning accordingly.

MR. STARR: We'll confer.

THE COURT: You know, I -- I know it's not going to be in 2025. And that reality disappoints no one, I'm sure. But we're probably looking at, what, next summer, something like that. So I think we should get something on the docket. Maybe late spring. We'll see where we are.

Nothing bad ever happens by setting a trial date. So I'd like to do that. And this case is a long time coming. This case was filed in 2018. It's one of the very -- these two cases are one of the very few cases that I still have on the docket from day one.

When I raised my hand on September 16th, 2019, I got blessed with 342 cases. I think I have fewer than five from that original allotment. And this is two of them. I don't have very many.

So you folks have been working really hard for a really long time on this case. I'm sure the plaintiffs are anxious to get to trial. I need to give you a trial date. I

understand that.

It's just been -- it's been a ton of work for you folks. You guys have done a ton of work and done such a terrific job with everything.

I appreciate everybody's work on these motions. You know, I can just tell how much work you put into this. I've been there and I've done that. I know how much work it is. So I appreciate everybody's thoughtfulness.

And I'll say this in particular: On the defense team, I thought you made a lot of good points, as I've talked about, on the vulnerabilities of these witnesses. I just think it's going to be saved for cross, but you've got some good arguments. You know, you've got some good arguments.

You've also kind of previewed for the plaintiffs what some of the arguments might be. Maybe you've got some more things up your sleeve or maybe they know anyway.

Whenever I had an expert who said too much and knew too little, I loved it. That's when the fun begins.

So, you know, we'll pop some popcorn when the day comes.

So why don't we do that, folks. We'll come back in the next week or two. We will see how much progress we make.

I've got to give you the ruling on Leo, and then I've got a couple other motions. I think we've got, like, seven or eight left.

But we are making progress. And we'll get you a trial date, and we'll go from there.

Anything else from anybody?

MR. STARR: Nothing from plaintiffs.

THE COURT: Anything from the defense team?

I appreciate you guys coming in.

We're adjourned. Thank you, folks.

THE CLERK: All rise.

(Concluded at 3:06 p.m.)

\* \* \* \* \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* _____     *8/21/2025* __
Amy M. Kleynhans, CSR, RPR, CRR          Date
Official Court Reporter