```
  1                 IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
  2                          EASTERN DIVISION

  3    ARTURO DELEON-REYES,            )  Case No. 18 CV 1028
                                       )
  4                    Plaintiff,      )
                                       )
  5         v.                         )
                                       )
  6    REYNALDO GUEVARA, et al.,       )
                                       )
  7    _____Defendants.     )
       GABRIEL SOLACHE,                )  Case No. 18 CV 2312
  8                    Plaintiff,      )
                                       )
  9                                    )
                                       )
 10         v.                         )
                                       )
 11    CITY OF CHICAGO, et al.,        )  Chicago, Illinois
                                       )  October 1, 2025
 11                    Defendant.      )  10:33 a.m.
 12
                    TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
 13               BEFORE THE HONORABLE STEVEN C. SEEGER

 14    APPEARANCES:

 15    For Plaintiff
       Deleon-Reyes:            LOEVY & LOEVY
 16                             BY:  MR. STEVEN E. ART
                                     MR. ANAND SWAMINATHAN
 17                             311 N. Aberdeen, 3rd Floor
                                Chicago, Illinois 60607
 18
       For Plaintiff
 19    Solache:                 PEOPLE'S LAW OFFICES
                                BY:  MS. JANIS M. SUSLER
 20                             1180 N. Milwaukee Avenue
                                Chicago, Illinois 60642
 21
       For Defendant
 22    City of Chicago:         ROCK FUSCO & CONNELLY
                                BY:  MS. EILEEN E. ROSEN
 23                             333 W. Wacker Drive, 19th Floor
                                Chicago, Illinois 60606
 24

 25
```

```
 1   APPEARANCES (Cont'd):

 2   For Defendant
     Guevara:                  BORKAN & SCAHILL, LTD.
 3                             BY:  MR. TIMOTHY P. SCAHILL
                               Two First National Plaza
 4                             20 South Clark Street, Suite 1700
                               Chicago, Illinois 60603
 5

 6   For Remaining
     Individual
 7   Officer Defendants:       THE SOTOS LAW FIRM, PC
                               BY:  MR. JOSH M. ENGQUIST
 8                             141 W. Jackson Boulevard, #1240A
                               Chicago, Illinois 60604
 9

10

11

12

13

14

15

16

17

18
     Court Reporter:           SANDRA M. TENNIS, CSR, RMR, FCRR
19                             Official Court Reporter
                               219 S. Dearborn Street, Room 2260
20                             Chicago, Illinois  60604
                               Telephone:  (312) 554-8244
21                             sandra_tennis@ilnd.uscourts.gov

22

23                       *   *   *   *   *

24
                   PROCEEDINGS REPORTED BY STENOTYPE
25       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1        (Proceedings heard in open court:)

2              THE CLERK:  18 CV 1028, DeLeon-Reyes versus Guevara,

3    *et al*., and 18 CV 2312, Solache v. City of Chicago.

4              THE COURT:  Good morning, everybody.  Let's get

5    everyone's appearances on the record, if you would, please.

6              Start with counsel for the plaintiffs.

7              MR. ART:  Good morning, your Honor.  Steve Art for

8    plaintiff Reyes.

9              THE COURT:  Good morning.

10             MR. SWAMINATHAN:  Good morning, Judge.  Anand

11   Swaminathan for plaintiff Reyes.

12             THE COURT:  Good morning.

13             MS. SUSLER:  Good morning, Judge.  Jan Susler for the

14   plaintiff Gabriel Solache.

15             THE COURT:  Good morning everyone on the plaintiffs'

16   team.  Good morning, folks.

17             And the defense team.

18             MS. ROSEN:  Good morning, your Honor.  Eileen Rosen on

19   behalf of defendant City of Chicago.

20             THE COURT:  Good morning.

21             MR. SCAHILL:  Good morning, your Honor.  Timothy

22   Scahill on behalf of defendant Guevara.

23             THE COURT:  Good morning.

24             MR. ENGQUIST:  And good morning, your Honor.  Josh

25   Engquist on behalf of the remaining defendants, individual

1    defendants.

2         THE COURT:  All right.  Good morning, everyone.  Thank

3    you for coming in.  I know you saw my minute entry from

4    yesterday just giving you the verdict, as it were, on the last

5    pair of remaining motions.  I've got to believe that the ruling

6    was not any particular surprise to you folks because it pretty

7    much flowed downhill from the expert rulings, but I wanted to

8    just make it official.

9         And I did want to call you in today anyway to give you

10   a little bit more of an explanation for it, although I think

11   it's largely self-explanatory, given the nature of the motions.

12   But I'm going to say a little bit.

13        When I'm done, I want to talk to you about the trial

14   date.  I put that in the minute order as well.  I know the

15   plaintiffs' team had moved for a trial date a while back, and I

16   thought that was premature.  But it's not premature now,

17   certainly.  So we should start talking about that.

18        So in a moment I'm going to give you my oral ruling.

19   I'll give you the normal disclaimer:  If you want a written

20   copy, you can order the transcript.  I am going to err on the

21   side of brevity today because I don't think you need a long

22   ruling, given the nature of the ruling.  I think it is fair to

23   say that in my four prior oral rulings I've probably erred on

24   the side of being a little longwinded.  I'm going to do the

25   opposite today.  I'm going to be a little brief and to the

1    point.

2           So I don't think this will take particularly long.

3    I'm just going to give you the thrust of the ruling, and then

4    we'll talk about the next steps.  All right, everybody?  Does

5    that make sense?  All right.  So let me just give you the

6    thrust of it.  Here it goes.

7           The defendant, City of Chicago, filed a motion for

8    summary judgment in both the DeLeon-Reyes case and the Solache

9    case.  For the reasons that I will explain, the motion is

10    denied.  You all know the facts of the case.  I've summarized

11    it before.  I'm not going to do so again.  I will simply say

12    that the pending motions were brought by the City of Chicago.

13    The City of Chicago takes aim at the *Monell* claims.  You all

14    know *Monell* case law like the back of your hand.  You all know

15    this as well as anybody in the City, frankly, the six of you,

16    so I'm not going to belabor the point.  You all know the gist

17    of it.

18           I'll simply say this:  The three requirements for

19    *Monell* liability are well-established.  First, there must be a

20    deprivation of a constitutional right.  Second, there must be a

21    custom, policy, or practice of the municipality.  And, third,

22    there must be an action taken pursuant to the custom, policy,

23    or practice that was the cause of the deprivation.

24           So you've got to show deprivation of a right.  You've

25    got to show a custom, policy, or practice.  And you've got to

1    show causation.  That's the gist of it.

2         Take a look at *Dean vs. Wexford Health Services*, 18

3    F.4th 214 at page 235, Seventh Circuit 2021.  Needless to say,

4    a plaintiff can bring a number of different *Monell* theories.

5    That's what the plaintiffs did here.  Plaintiffs allege that

6    there were a number of customs, policies, or practices that

7    were problematic.

8         The City moved for summary judgment on three theories.

9    The first theory is that the City has a custom, policy, or

10   practice of withholding or suppressing evidence.  The second

11   *Monell* theory is that the City has a custom, policy, or

12   practice of failing to discipline its officers.  And the third

13   *Monell* theory is that the City has a custom, policy, or

14   practice of coercing confessions from suspects.

15        So, again, the first theory is about withholding

16   evidence.  The second theory is about discipline of officers.

17   And the third is about coercing confessions.

18        The parties disagree a little bit about whether the

19   plaintiffs have three theories or more than three theories.

20   The long and short of it is, it looked like people agreed that

21   the theories might have off-shoots, but they do fall within

22   those three basic umbrellas, so I'm going to proceed

23   accordingly.

24        I'm not going to take the time to summarize the

25   summary judgment standard.  Read Rule 56.  Read *Anderson vs.*

1    *Liberty Lobby*.  Needless to say, I have to grant summary

2    judgment if the movant shows that there is no genuine dispute

3    of material fact, then the movant is entitled to summary -- to

4    judgment as a matter of law.  I'm going to construe the facts

5    in the light favorable to the non-moving party.

6         I'm going to start with the first *Monell* theory.

7    That's the theory about withholding or suppressing evidence.

8    The City basically argues that the plaintiffs do not have

9    enough evidence to support the existence of a widespread

10   practice.  Plaintiffs' argument hinges on the motion to bar

11   plaintiffs' expert, Thomas Tiderington.  As the City sees

12   things, Tiderington's testimony is the linchpin in their

13   argument.  Tiderington's opinions, in the City's view, are not

14   admissible, and, therefore, the plaintiffs do not have

15   sufficient evidence to get to a jury.

16        I won't go through the whole backstory, but suffice it

17   to say that Tiderington concluded that, quote, "CPD maintained

18   a widespread practice in which investigative documents and

19   information learned during homicide investigations was

20   routinely withheld from criminal defense."  Unquote.  That's

21   from page 33 of his report.  It's Docket No. 759-2.

22        The City filed a vibrant motion under *Daubert* to

23   exclude Tiderington's testimony.  I gave it a close look, and I

24   denied that motion in my oral ruling on August 7, 2025.  It's

25   in Docket No. 801.  The City made a number of arguments for

1  exclusion.  They made five challenges to the foundation for his

2  testimony.  For example, they said that he didn't have

3  foundation to discuss the *Jones* case, the *Palmer* case, or the

4  *Fields* case, or the *Rivera* case, and so forth.  The City argued

5  that the expert didn't have an understanding of the opinions,

6  and they didn't have any -- and the expert didn't have a

7  foundation for statistical analysis.  And he didn't do enough

8  work on the case as revealed by his time sheets, et cetera.

9  That was the first group of arguments, the foundation

10  arguments.

11       The City also said that there was just no proper

12  methodology and the opinions wouldn't be helpful to the jury.

13       My oral ruling on August 7th walked through each of

14  those, and I denied the motion.

15       I'm going to repeat now what I have said before.  And

16  I want to make sure this is clear to everyone.  The fact that I

17  have allowed an expert to testify does not mean that anything

18  and everything in that report is coming in.  So it could be the

19  case that we get to trial and I do some trimming on what I

20  allow these experts to testify to.  That is not a forecast.

21  It's not a promise.  I say this not to get anyone's hopes up or

22  prepare anybody to be defeated down the road.  I will simply

23  say that when I go through a body of material that is this

24  extensive, sometimes questions will come up in my mind whether

25  particular things are admissible or inadmissible.  So I have

1  not green-lighted in its entirety the whole report from

2  Mr. Tiderington.

3  　　　　And the same goes for Mr. Finnell.  I have not given

4  the plaintiffs the green light to offer any and all testimony

5  from Mr. Finnell.  But I have said in broad strokes that I

6  don't think the *Daubert* challenge was correct.

7  　　　　So as I alluded to a moment ago, on August 7, 2025, I

8  denied the motion to exclude Tiderington.  I said that his

9  testimony, in large part, is admissible.

10  　　　　Given that ruling, I think the plaintiffs have

11  presented enough evidence that could support a verdict by a

12  reasonable jury that the City had a widespread practice of

13  withholding evidence.  I will repeat what I said a moment ago.

14  The City offered quite a few arguments to undermine his

15  testimony.  I don't know how he's going to do on

16  cross-examination.  They made a number of good points.  So

17  maybe it'll go great for the plaintiffs and maybe it'll be a

18  disaster, I don't know.  We'll just see.  But I did think that

19  these arguments had to do with the weight of the testimony and

20  the credibility of the witness and were not admissibility

21  problems.  So time will tell how persuasive it is.  But for the

22  purposes of now, I think it's -- there's enough in front of me

23  to conclude that Mr. Tiderington can testify.  If he can offer

24  those opinions, I think the City has done enough to support a

25  verdict by a reasonable jury that the City had a custom,

1    policy, or practice of withholding or suppressing evidence.

2          So that motion is denied.  Meaning, to the extent that

3    the City challenges plaintiffs' evidence on the first *Monell*

4    theory, meaning withholding or suppressing evidence, the motion

5    is denied.

6          So it's a long way of saying this:  I denied the

7    motion to exclude Tiderington under *Daubert*.  So he can testify

8    his opinions are sufficient to meet the plaintiffs' burden on

9    its *Monell* theory about withholding or suppressing evidence.

10         I'll now turn to the second theory of liability under

11   *Monell*.  That's the failure to discipline officers.  The thrust

12   is the same.  The City argues that plaintiffs have no evidence

13   to support the notion that the City had a widespread policy,

14   practice, or custom of failing to discipline officers.  It's in

15   their brief at Docket No. 758, pages 14 to 21.  The argument

16   hinges on the *Daubert* motion, meaning the motion to exclude

17   Anthony Finnell.  I issued an oral ruling on that on August 7,

18   2025.  Again, it's Docket No. 801.  Mr. Finnell's report is at

19   Docket No. 728.  I'm looking at the DeLeon-Reyes report.

20   Excuse me, DeLeon-Reyes docket.  Excuse me.

21         Mr. Finnell opines that the City failed to

22   investigate, supervise, and discipline officers for misconduct;

23   had a number of charts, and tables, and graphs, and so forth,

24   that supported that opinion with data.  I denied the motion to

25   exclude Mr. Finnell.  I concluded there was enough there to

1    survive a *Daubert* challenge.  I thought the arguments went to

2    the weight of his testimony, not its admissibility.

3         So the City made a motion for summary judgment that

4    was premised on the notion that Mr. Finnell shouldn't testify.

5    I denied the motion to exclude Mr. Finnell.

6         So putting that together, the motion for summary

7    judgment as to the second *Monell* theory is denied.  The City

8    has come forward with expert testimony supporting the notion

9    that the City had a policy, practice, or custom of failing to

10   discipline officers.  I have allowed that expert to testify.

11   I've allowed Mr. Finnell to testify.  I've denied the motion.

12   So, therefore, there's enough evidence, so it's denied.  Based

13   on Finnell's testimony, a reasonable jury could conclude that

14   the City had a widespread practice of failing to discipline

15   officers.

16        That brings us to the third *Monell* theory, which is

17   the theory of coercing confessions.  The City makes a very

18   similar argument here.  They say that the plaintiffs don't have

19   enough evidence to support that argument.  They rely on a

20   *Daubert* motion that took aim at Dr. Leo's opinions.  I issued a

21   separate oral ruling on Dr. Leo.  I issued my oral ruling on

22   that a couple of weeks ago on September 19th.  That's Docket

23   No. 808.

24        Parenthetically, it doesn't really seem like two weeks

25   ago, but here we are again.

1       I excluded Dr. Leo.  So to that extent, folks, the

2  motion for summary judgment is granted.  The City argued that

3  the plaintiffs do not have enough evidence to support the

4  notion that there is a policy, practice, or custom of coercing

5  confessions.  The plaintiffs responded by pointing to the

6  expert testimony of Dr. Leo.  Defendants moved to exclude

7  Dr. Leo under *Daubert*.  I granted that motion.  I think without

8  Dr. Leo's testimony, the record is too thin.  So it's a long

9  way of saying Dr. Leo is not going to testify.  Without

10  Dr. Leo's testimony, there's not sufficient evidence in the

11  record to support the notion that the City has a policy,

12  practice, or custom of coercing testimony.  So that *Monell*

13  theory is out, and I'm granting summary judgement to the City

14  based on that.

15       The City also made a causation argument.  I'll just

16  give you the punch line.  Having looked at the case law, I

17  think this goes to the jury.  You know, there have been a

18  number of cases in this district that talk about the fact that

19  causation under *Monell* is best left to the jury when the causal

20  link isn't too tenuous.

21       Let me give you some language from Judge Kness.  Judge

22  Kness wrote, quote, "As long as the causal link is not too

23  tenuous, the question of whether the municipal policy or custom

24  proximately caused the constitutional infringement should be

25  left to the jury."  Unquote.  That's *Washington vs. Budreau*,

1    2022 Westlaw 459 9708 at page 18.  It's the Northern District

2    of Illinois 2022.

3         I can give you a whole string cite of other cases.

4    Take a look, for example, at the case of *Estate of Loury by*

5    *Hudson vs. City of Chicago*.  2019 Westlaw 111 2260.  It's a

6    Northern District case from 2018.

7         Let me give you one more case.  It's *LaPorta vs. City*

8    *of Chicago*, 277 F.Supp.3d 969 991, Northern District of

9    Illinois 2017.

10        Let me give you a quote from Judge Shah.  He wrote,

11   quote, "When a defendant moves for summary judgment on a *Monell*

12   claim, the plaintiff is merely required to document sufficient

13   evidence to allow a jury to make a reasonable inference that

14   the municipality had a widespread custom or practice that

15   caused a comprehensible injury to the plaintiff."  Unquote.

16   From *Wicks vs. Barron*, 2015 Westlaw 159 8102 at page 5,

17   Northern District case, from 2015.

18        I have to view the evidence in the light most

19   favorable to the plaintiffs who's the non-movants.  Judge Shah,

20   Judge Kness, and others, have noted that causation is not the

21   heaviest lift at the summary judgment stage.  There has to be

22   enough to support a finding by a reasonable jury that there was

23   causation.

24        I think the City may have an argument down the road,

25   but it's an argument for down the road.  I think the plaintiffs

1    have done enough to say that there was causation.  So it's a

2    long and short way of saying I think the causation question is

3    best left for the jury.  So to that extent, the motion is

4    denied.

5        The only other thing left is the City's argument on

6    derivative claims; meaning, respondeat superior

7    indemnification.  But given that the claims against the

8    individuals had survived, those issues are still alive, too.

9    So that's denied.

10        So it's a long way of saying the motion is granted in

11   part and denied in part.  I am granting the motion for summary

12   judgment in favor of the City when it came to the City's

13   policy, practice, or custom of coercing confessions.  In light

14   of the fact that Dr. Leo is not going to testify, I don't think

15   there's enough in the record to support that finding.

16        I reached a different conclusion for the other two

17   theories.  So to that extent, the motion is denied.  I'm going

18   to allow the jury to hear a *Monell* Theory No. 1 about

19   withholding or suppressing evidence.  And I'm going to allow

20   the jury to hear *Monell* Theory No. 2 about failing to

21   discipline officers.  So that's the ruling.

22        It's a long way of saying:  You listened to my *Daubert*

23   rulings.  In light of that, you knew what I was going to do on

24   summary judgment.  I could have just said that and been done.

25   There you go.

1          All right, folks.  That's the ruling.  I issued a

2    ruling I think on all pending motions.  Is anyone aware of

3    anything that's still pending that I have not ruled upon?

4          MR. ART:  Not from plaintiffs.

5          THE COURT:  I think I've got -- okay.  I think I've

6    got ruling on everything.

7          Okay.  So the next thing we have to do is get to

8    trial.  Have you folks had a chance to think about how long you

9    will need and when you can be ready?  Have you had a chance to

10   talk that over, by chance?

11         MR. ART:  Yes, we conferred this morning, your Honor,

12   and we have slightly -- we have slightly different views about

13   it.

14         THE COURT:  Okay.

15         MR. ART:  I think as expressed in the motion that we

16   filed some time ago to set a trial date, we think that the last

17   Guevara case tried in this courthouse in 2018 is a good

18   comparator.  It had the same evidence suppression *Monell* claim

19   in play.  It had, in our view, a similar number of witnesses.

20   It lasted, we were just talking, somewhere between 15 and 17

21   trial days.  The jury started deliberating I think on a Tuesday

22   morning.  And so we've -- from our perspective, that's the

23   right length.  The defendants have a different view.

24         And then in terms of timing, we've got another Guevara

25   trial scheduled in front of Judge Ellis for January the 5th or

1    6th.  We've got another one with all the same counsel scheduled

2    in front of Judge Daniel for September 8th next year.  And from

3    our perspective, somewhere in between those, if the Court has

4    room on the calendar, is a good time to try this case.

5              THE COURT:  Okay.  What does the defense team think?

6              MR. SCAHILL:  So with respect to the length of the

7    trial, I guess I'll start there because counsel started there.

8              THE COURT:  Do you mind going into the microphone so

9    my court reporter --

10             MR. SCAHILL:  Sorry, Judge.

11             THE COURT:  You're doing fine.  I say that in the

12   spirit of caring to hear what you have to say.

13             MR. SCAHILL:  Thank you.  I was not involved in

14   Rivera, but I'm not sure any case is a comparator to another

15   case.

16             But what we have here -- I mean, I was -- listed

17   likely witnesses, starting there.  You know, what do we need to

18   put on.  Well, first, the overarching issue is there's two

19   plaintiffs here.  There's five sets of attorneys.  There's I

20   think five living defendants and a number of other defendants

21   who are still at issue in the case.  We have, by my count,

22   nearly 40 likely fact witnesses.  Some might be pared off.  But

23   it's a very fact-intensive, complicated case with a lot of

24   issues that are at play.  So that's -- that's the first issue.

25             The second issue is that quite a few of these

1    witnesses require translators, which, as your Honor I'm sure

2    appreciates, extends the nature of examination,

3    cross-examination, and the like.  Both plaintiffs, my

4    understanding, have been removed from the country and are in

5    Mexico, not allowed to come back.  So this is likely going to

6    be remote.  Who knows what will happen between now and then.

7    But that's adding another layer to this.

8              THE COURT:  When you say "remote," what do you mean?

9              MR. SCAHILL:  They were deported.

10             THE COURT:  No.  Well --

11             MR. SCAHILL:  Oh, remote.  I mean either their

12   depositions are going to be read in or it's going to have to be

13   via video because, as of now, I don't believe they're allowed

14   to come into the United States.

15             THE COURT:  Yeah, okay.

16             MR. SCAHILL:  So there's that.  So we have essentially

17   two cases, several dozen witnesses, remote testimony, and the

18   like.  So there's that.

19             THE COURT:  Uh-huh.

20             MR. SCAHILL:  The second issue which we discussed with

21   counsel, which is a big issue in a lot of these cases,

22   particularly with my client, Mr. Guevara, who's reputation

23   unfortunately precedes him at times, is we run into this issue

24   of what are they going to try to introduce into evidence as far

25   as 404(b) evidence.  Now, my position is, in this case, as in a

1   lot of other cases, is, you know, none of this should be

2   allowed in the first place.  It's pure propensity, and all of

3   that.  We're going to argue that in front of your Honor.

4   That's not the issue for today, I understand that.

5          But one of the issues that I broached with counsel

6   this morning is can you let us know the sort of universe of the

7   incidents that you might seek to introduce in this case.  And I

8   don't want to commit counsel to a specific number, but what I

9   was told this morning is something in the neighborhood of 12

10  separate incidents in other cases, which, as your Honor can

11  appreciate, it's not just the issue of, you know, calling one

12  witness and that's the end of it.  There's actually evidence

13  put on with all these incidents.  So we're talking about, even

14  by their estimation now, the potential for 12 other mini-trials

15  within a trial, which you're going to have live witnesses and

16  documents, and things like that, which adds to this.  That's

17  not even counting perhaps, you know, 404(b) that they might try

18  to get in with -- with, you know, some of the other defendants.

19         But, again, I don't want to put words in their mouth,

20  but that's essentially the estimate that we were given.  And

21  it's a two-way street, right.  If they put the evidence on, we

22  put in rebuttal evidence, and, you know, it takes court time,

23  it takes time to present it.  And so it adds to the -- it adds

24  to the clock.

25         So that's essentially -- and then we have eight

1    experts, by my count, and then three -- is it three, 30(b)(6)s?

2    So there's, of course, that, with *Monell* and non-*Monell*

3    experts.  And it's -- it's going to take a lot of time.

4        And, you know, this is an important case.  It's an

5    important case for them, it's an important case for us.  This

6    is, you know -- it's a case with a lot of taxpayer dollars at

7    stake and one that we're all taking very serious.

8        And so, you know, putting this in a bucket of just a

9    couple of weeks, just looking at all those factors, seems very

10   ambitious.  And judicial time, of course, is very precious.

11   And when we start going over, then your Honor is going to be

12   put into potentially a precarious position if we don't estimate

13   correctly.

14       So that's a long-winded way of saying that -- and

15   we -- they put in the language in the footnote that we had

16   asked for in their motion to set the trial date, essentially

17   what our position was, which is that, it's sort of difficult to

18   say without looking at the evidence.  But there's all these

19   factors which really scream out that this is likely closer to a

20   five-week trial than a three-week trial.  And there are factors

21   which might even tinker with that.  So that's sort of what our

22   position is.  So that's length of trial.

23       As far as timing of the trial, as we discussed with

24   counsel, we have -- well, I have a trial starting in December.

25   I think that, we all agree, is ambitious, as of now anyway.

1    But we have a trial in front of Judge Ellis in January with

2    counsel.  We then turn around and have another trial in

3    February in front of Judge Daniel in another Guevara case not

4    involving the Loevy firm, which counsel in that case has

5    estimated that they believe that trial is going to go four

6    weeks.  In March, I believe, Ms. Rosen has another reverse

7    conviction trial that is going.

8          MS. ROSEN:  In front of Judge Ellis.

9          MR. SCAHILL:  Another one in front of Judge Ellis.

10   And then both me and Ms. Rosen have different trials starting

11   in July which are going to be multi-week trials, so.

12         And then we have the September trial with counsel

13   again in front of Judge Daniel, which is going to be -- which

14   is also a two-plaintiff case, which is also going to be a

15   multi-week trial.

16         So fitting a lot of these in is -- is a challenge,

17   particularly when they're all multi-week trials.  But sort of

18   stars are aligning all at once with a lot of this stuff.

19         So, I mean, we were looking at a post-September date

20   when we're at -- so we have a couple week trial with them in

21   September.  We were looking for a date realistically to turn

22   around perhaps in the fall of next year, given all those other

23   trials and other -- and that doesn't even speak to the personal

24   commitments that we might have turning around three trials in a

25   row in the summer of 2026.  So that's sort of where we're at.

1          THE COURT:  Well, thank you for all that.  Just for

2   sake of easy math, I'm just going to blur the estimates

3   together.  You know, the plaintiffs' team thinks maybe we can

4   do it in three weeks, or a little bit more.  The defense team

5   said maybe it's more like five weeks.  Let's just do four weeks

6   just for back-of-the-envelope here.

7          Based on what I've just heard, can you all do a

8   month-long trial in the next month?  Excuse me, sorry, a

9   month-long trial in the next year?  I mean, do you all -- is

10  that even doable from your availability standpoint, given your

11  trial dates?  I'm hearing more conflicts on the defense team

12  than the plaintiffs' team.

13         MR. ART:  I'm hearing April, May, and June being open

14  on both sides.

15         THE COURT:  Okay.  Is that right for you folks?

16         MR. SCAHILL:  Well, no, not --

17         MS. ROSEN:  Not April.

18         MR. SCAHILL:  No.  Ms. Rosen's trial goes into April.

19  And we're going to have turned around from three, you know,

20  multi-week trials in a row.  And then have to turn around to

21  prepare another one and all that takes for --

22         MS. ROSEN:  July.

23         MR. SCAHILL:  -- mid July.  I mean, it's -- is there

24  technically four weeks there where we're not physically in a

25  courtroom?  Yes.  Is it realistic that there's a month-long

1    trial between when Ms. Rosen ends in April and then we start

2    again, both of us, in July.  Extremely, extremely ambitious and

3    an extreme hardship I think on the personal lives of the

4    attorneys, in addition to the preparation that it takes to go

5    into these trials, which is a lot.  Both for the judges and for

6    the attorneys.

7         THE COURT:  It would help me if the defense team would

8    do this.  And if you did yesterday, or something, I didn't see

9    it.  Maybe you've done this, but, Ms. Ramos is out today.  I

10   need to sit down with her and talk about my schedule and what

11   works for you all.  Do you mind filing a one-paragraph

12   submission, just so I have it handy, I don't have to rely on my

13   chicken-scratch notes up here that says the defense team

14   believes that it is unavailable during these periods because of

15   other trials.  Just give me what you just said.  You know,

16   you've got this case in front of Judge Daniel, this case in

17   front of Judge Ellis, et cetera.  It does not have to be fancy,

18   just a one-pager that I can sit down with -- I mean, do you --

19   I mean, maybe May and June, I don't know what my calendar looks

20   like.  But what do you think of May and June next year?

21        MR. SCAHILL:  Well, like I said, I mean, it's -- is

22   it -- is there technically that amount -- that time where we're

23   not in a trial?  The answer to that, of course, is yes, right

24   now.  The issue of preparation and feasibility and where that

25   fits in makes it a little bit of a challenge because it's --

1    what if it goes -- what if our trial isn't four weeks, what if

2    it's closer to five?  And then we start getting into deadlines

3    with other courts.  But, again, this is -- we're speculating

4    because trials go how long trials go.  And, you know, there's

5    ways the Court, of course, can deal with that situation

6    sometimes.  But other times there's things that don't -- that

7    nobody can anticipate, and they just have to go, and they're

8    important, so.

9          I would say that is extremely ambitious, but, you

10   know, technically, as far as the calendar is concerned,

11   available.

12         THE COURT:  Uh-huh.

13         Mr. Art, your body language is suggesting to me that

14   you would like to have your turn at the microphone.

15         MR. ART:  If you don't mind, Judge.

16         THE COURT:  Go ahead.

17         MR. ART:  I think more macroscopically from our

18   perspective --

19         THE COURT:  Macroscopically.  A lot of syllables in

20   there.  Go ahead.

21         MR. ART:  Yeah.  From our perspective, there are

22   two-dozen Guevara cases pending, many of them -- you know, more

23   than 90 percent with the same counsel.  And I think that we

24   need to schedule within available openings, given that it is

25   unlikely that all of these cases will go to trial.  And if they

1    do, our perspective is it's incumbent on the law firms

2    representing the parties in these cases to make themselves

3    available for trial and not to kick these trials one year,

4    18 months, two years into the future.  Because by the time all

5    of these cases get scheduled, we'll be in 2030.

6           THE COURT:  Uh-huh.

7           MR. ART:  So from our perspective, if there's an

8    opening and it works for the Court's calendar, we should

9    schedule that.  And then it's on the lawyers who represent

10    these parties to make sure that they can try the cases.

11           THE COURT:  Well, thank you for that.  Maybe the

12    plaintiffs' team could do the same thing I asked defense team

13    to do.  I listened to what you said, but I didn't sort of take

14    notes.  If you could just put down -- and, frankly, if you want

15    to do a joint statement, that's fine, whatever is easier.  But

16    just give me something on the docket that I can look at with

17    Ms. Ramos when she's back in town later this week.

18           MR. ART:  Will do.

19           THE COURT:  I will tell you this:  This has been a

20    more challenging part of this job than I had reasonably

21    expected.  In my experience, when I was sitting where you folks

22    were sitting, nobody ever asked me when I wanted to go to

23    trial.  Just a thunderbolt will come down from Mount Olympus

24    and here's your trial date.  I try to make things a little more

25    humane, but that makes some complications.

1          I am concerned about the age of the case, both from a

2    conduct perspective and a docket perspective.  You know, the

3    cases were filed in 2018, and I would like to get this through

4    the pipeline.  I'm sensitive to that.  That's not a comment.

5    There was a lot of work that had to be done.  You all have done

6    such terrific work on the cases for such a long time.  But I do

7    want to get something scheduled promptly.

8          Let me make one more observation, if I can, about

9    length of trials, generally.  In criminal cases, I don't sit on

10   the parties to hurry up or go faster, et cetera, because

11   somebody's liberty is at stake, and I give people a wide

12   latitude.  I give people less latitude in civil cases for a

13   variety of reasons.  I can see things differently from this

14   perch than I could see when I was sitting at the table.  I'm

15   just telling you, you can just see things differently when

16   you're neutral, and you're not rooting for anybody, and you're

17   not being an advocate, you're just seeing how things play out.

18   And I have repeatedly seen the phenomenon where lawyers will

19   have a witness and they will go way, way, way, way, way too

20   long with a witness because they've got their outline, and this

21   is what they've already present -- planned to do, and the jury

22   is just not listening.  You have lost them.  All you're doing

23   is consuming time.  Needless to say, I'm not talking about any

24   of the lawyers in this room right now.  I'm just giving you

25   this observation that you can take or leave.

1          I do want to sensitize you to the very real phenomenon

2    that juries just want lawyers to finish and want witnesses to

3    just be done.  Like, I cannot tell you how often I've sat up

4    here and listened to a testimony and looked over at the jury

5    and thought this is not resonating with them at all.  The only

6    thing that matters at trial is are you resonating with this

7    group of people.  Unless it's something that's going to be

8    essential to your case on appeal, or like an element to your

9    claim.  So if you've got to get some -- the document custodian

10   in here to lay the foundation for something, fine.  It's going

11   to be boring, but you got to do it.  Unless it's something like

12   that, I would really encourage you folks when you do your exam

13   at the end of the day to just focus on that group of people.

14   And just -- you got to ask yourself:  Is this landing?  Is this

15   helping my case?  And if it's not, you should think about

16   sitting down.  I'm telling you.

17          I am also aware of the phenomenon that juries will

18   start resenting lawyers that speak too much and go on too long.

19   Let me say that again.  Juries resent lawyers who speak too

20   much.  And I'd encourage you to just think about that.  If

21   we're talking about a trial that lasts more than a couple

22   weeks -- it sounds like we clearly are -- the jury is going to

23   be nervous about that on day one when I pick a jury.  They're

24   going to be thinking:  Holy smoke, I've got to sit here for

25   three weeks, four weeks, five weeks.  When is this going to be

1    done?  And every day they're going to think to themselves:

2    Where are we?  How are we doing?  When is this going to be

3    done?  And then if they sit here and they hear exams that go on

4    too long, they start getting agitated and they start getting

5    resentful.  You have got to be mindful of that at trial if you

6    want to be effective lawyers.  I'm telling you.  This is

7    something that all of us know in the abstract but not everybody

8    knows when they're at the podium.  Because all of us,

9    especially me, thinks the more they talk, the more persuasive

10   they are.  I plead guilty to that phenomenon.  Okay?

11           I want you all, all of you, both sides, to be

12   effective at trial.  I always say I want to treat my jurors to

13   major-league-baseball-level lawyering in my courtroom.  Both

14   sides.  I want to see great directs.  I want to see great

15   crosses.  We're going to treat them to top-notch lawyering.

16   And when you do that, I'd really encourage you to be -- to be

17   to the point and brief.

18           You all can take what I said and throw it out the

19   window, if you want.  But I do have the benefit of some

20   neutrality here.  And just -- I can tell you some things that I

21   couldn't see as a lawyer.  So, for what it's worth.

22           Can we talk about the 404(b) issue?  I think that we

23   need to talk about a way for us to plan about what the

24   plaintiffs intend to do on that and how long it's likely to

25   take.  What is the plaintiffs' thought on that?

1      MR. ART:  So typically what happens is at the

2  motion-in-limine stage, Guevera files a motion to exclude all

3  other-acts evidence, and we respond saying, here are the

4  incidents, the other-acts incidents, that we want to get into.

5  And we divide them in two categories.  One is, here are the

6  ones we want to call a live witness about.  And usually we're

7  saying to the Court we'd like to call, at most, five, six live

8  witnesses.  And then we say:  Here are the cases we'd like to

9  be able to cross Guevara about when he's on the stand.  And

10  then -- you know, we've done this all the way through trial

11  once in the Rivera case for these Guevara cases.  We have that

12  briefing fully briefed and pending in another case before Judge

13  Ellis, the one that's going to trial in January.  We could do

14  that briefing now in this case, and that would give us a little

15  bit more of a --

16      THE COURT:  That's what I was thinking.  I mean, maybe

17  what we ought to do is have the defense team file your motion,

18  and they can respond in a way -- we've got -- we've got the

19  benefit of some time here.  What do you think of that?

20      MR. SCAHILL:  Yeah, that's fine.  I mean, obviously

21  clarity on this -- that's the biggest X factor in length of

22  trial.  I mean, I still think the trial is longer than they

23  think it is, but that's a big X factor.  So that's not a bad

24  idea.

25      THE COURT:  Yeah.  Well, I think we should just kick

1   that off.  We're going to have to brief it anyway.

2           So I guess what I would propose is maybe the defense

3   team can file your motion on this.  It doesn't have to be

4   Shakespeare, just put the ball in play, and they can respond.

5   Why don't we get a briefing schedule on that.  What do you

6   think?

7           MR. SCAHILL:  Sure.

8           THE COURT:  How soon do you think you can file your

9   motion?  I'll give you whatever time you think.

10          MR. ENGQUIST:  Well, it's not going to be just -- it's

11  not going to be just Guevara, I'm assuming.  It's going to be

12  my clients as well.  So, and I -- I don't have a canned one.

13  Like, we don't have one already filed for them.  So it will be

14  a little bit longer.

15          MR. SCAHILL:  I mean, I think -- so before I answer

16  that, there's an issue of framing here that I'm just trying

17  to -- to conceptualize because, in this case, and in so many

18  other cases, there's literally hundreds of thousands of pages

19  that they've produced and witnesses that names have come up

20  about 404(b), and then they get winnowed down into a smaller

21  category of people.

22          I mean, I think what would be most productive, and

23  this is just a suggestion --

24          THE COURT:  Uh-huh.

25          MR. SCAHILL:  -- is if I can get some sort of

1    statement or commitment to them of, these are the incidents

2    that we intend to bring up.  And then I have -- I'm not

3    shadowboxing.  Because if I'm dealing with, you know, dozens of

4    people that they're going to say, well, we have no intention of

5    putting this in, it's a waste of my time, and it's a waste of

6    the Court's time.  So if we're dealing with a smaller subset,

7    then I can focus on, okay, these shouldn't come in for this

8    reason, and also, you know, here are the other, you know,

9    reasons why we think this doesn't come in.

10         THE COURT:  Here's what I'd like you to do: I would

11   like you all to give this a little thought, and by the end of

12   the week, I'd like you to shoot an e-mail to Ms. Ramos with a

13   proposed briefing schedule on this.  So you can talk amongst

14   the defense team how long will you think you need to put this.

15   And talk to the plaintiffs' team.  And they can get whatever

16   weeks they need to respond to that.  Make sure you build enough

17   time into the schedule so you can meet-and-confer and try to

18   sort out some of these issues before you file your motion.

19         So, for example, maybe you're worried that they're

20   going to present evidence that he shoplifted at Target last

21   month, or something.  Who knows.  Maybe you can talk about the

22   shoplifting incident, you know, before you file your motion.

23         So what I would expect is your motion would be filed,

24   you know, in a couple of weeks.  Two, three, four weeks,

25   whenever it is.  The defense team will put the ball in play.

1    The plaintiffs can have whatever reasonable time they think.

2    Just propose a briefing schedule by the end of the week.  Is

3    that okay, everybody?

4          MR. SCAHILL:  Yeah.  Look, Judge, I just -- all I

5    wanted to know is what am I -- what I'm moving to exclude.  And

6    so if I can -- if we can confer on that, then I can get some

7    sort of idea on that, it's going to shorten the amount of time

8    and make it easier.

9          THE COURT:  So here's what I am thinking:  By Friday,

10   shoot an e-mail to Ms. Ramos, propose a briefing schedule.

11   This briefing schedule will be for a 404(b) motion in limine.

12   All right?  Let's just handle that issue sooner rather than

13   later.  I assume there will be other motions in limine that

14   we'll just put in a different track.  But I'd like to just kick

15   off the 404(b) issue because I think that is important in terms

16   of trial timing and also the magnitude of the issue.  Let's

17   just start -- start working on that.  Does that make sense,

18   everybody?

19         MR. ART:  Yes, Judge.

20         MR. SCAHILL:  Absolutely.

21         THE COURT:  Okay.  Great.  Does anybody else think

22   that there's another issue that would frame the architecture of

23   the trial such that we need to kick off the briefing sooner

24   rather than later?  Is there any other comparable issue that

25   you really want to brief now from either side?

1    MS. ROSEN:  The City will likely file a motion to

2 bifurcate the *Monell* claim from the trial --

3    THE COURT:  Okay.

4    MS. ROSEN:  -- against the underlying case based on

5 prejudice.

6    THE COURT:  Okay.

7    MS. ROSEN:  So that might be one that we

8 could brief --

9    THE COURT:  Okay.

10    MS. ROSEN:  -- earlier -- sooner rather than later.

11    THE COURT:  Okay.  Why don't you hash that out, too.

12 I'm fine to have an early schedule on that.  Whether it's the

13 same schedule or if you want to stagger it to make it a little

14 more humane for you folks, you don't have two briefs due one

15 day, that's fine with me.  Just hash that out amongst

16 yourselves, just submit something.

17    Anything from the plaintiffs' team that you want to

18 get a ruling on?

19    MR. ART:  No, your Honor.

20    THE COURT:  Okay.  So those two motions.  Just work

21 together cooperatively, come up with a schedule that works for

22 everybody, and we'll get the briefs in on that, at some point

23 this year we'll be done.  Okay?

24    I don't know off the top of my head what my trial

25 schedule looks like in the next year.  I know that things

1  progressively get easier, as you might expect.  So if you all

2  had come in here this morning and said we want a trial in the

3  first quarter of 2026, that might have been hard.  Although, I

4  think I have a criminal case going away in January.  I know

5  that doesn't work for you folks based on what I just heard, but

6  just letting you know.  Okay?

7       So I will look forward to getting your briefs.  And I

8  will look forward to getting your filings by, I said the end of

9  this week, on your trial availability.  I just need to sit down

10 with her, frankly, and just figure out on my end what I can do.

11      What else do you folks want to talk about today?

12      MR. ART:  Nothing from plaintiffs.

13      THE COURT:  Anything from the defense team?

14      MS. ROSEN:  No.

15      THE COURT:  Well, I will say this, folks:  You're

16 getting to know me.  I never think I have a monopoly on good

17 ideas, you know.  So if you folks can think of ways that the

18 trial can go more smoothly, something you need, any bright

19 ideas -- and I mean that in a non-snarky way -- any actual

20 bright ideas, I'll be amenable to that.  You know, we'll get

21 you a trial date, we'll get a schedule in place that works for

22 everybody, and then we'll get you your day in court, and we'll

23 be off to the races.  Okay?  So I look forward to getting your

24 submissions.

25      Anything else before we close, folks.

1          MR. ART:  No.  Thanks, Judge.

2          MS. ROSEN:  No.  Thanks.

3          THE COURT:  I want to thank you again everybody for

4  coming here, not once, not twice, not three times, but five

5  times for oral rulings.  I know that was not your first

6  preference.  But hopefully you've got the gist of the ruling in

7  a way that you can make sense of and digest, and we'll look

8  forward to having a trial down the road.  Okay.

9          MR. ART:  Thank you, Judge.

10         MR. SCAHILL:  Thank you, Judge.

11         THE CLERK:  Court is adjourned.  All rise.

12    (Proceedings concluded at 11:20 a.m.)

13              *   *   *   *   *

14     I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16  */s/Sandra M. Tennis*         *October 8, 2025* _____
     Sandra M. Tennis          Date

17  Official Court Reporter

18

19

20

21

22

23

24

25