**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES | ) | |
| | ) | Case No. 18 C 1028 |
| Plaintiff, | ) | |
| | ) | Hon. Steven Seeger, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| *Defendants*. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | | |
| GABRIEL SOLACHE | ) | |
| | ) | Case No. 18 C 2312 |
| Plaintiff, | ) | |
| | ) | Hon. Steven Seeger, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFFS' MOTION TO ADMIT
OTHER BAD ACTS OF DEFENDANT REYNALDO GUEVARA**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES .................................................................................................... iv

TABLE OF AUTHORITIES .................................................................................................... iv

TABLE OF AUTHORITIES ...................................................................................................... v

TABLE OF AUTHORITIES .................................................................................................... vi

INTRODUCTION ..................................................................................................................... 1

APPLICABLE LEGAL FRAMEWORK .................................................................................. 3

OTHER BAD ACTS OF REYNALDO GUEVARA .............................................................. 5

    A.    Relevant Rule 404(b) Evidence Relating to Chicago Police Officer William Dorsch ....... 7

    B.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Thomas Sierra (404(b) Witnesses Jose M. Melendez and Jose E. Melendez) ................................................... 8

    C.    Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of Alfredo Gonzalez and Jose Maysonet (404(b) Witness Alfredo Gonzalez) .......................................... 11

    D.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Daniel Rodriguez (404(b) Witness David Velasquez) ............................................................................ 15

    E.    Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of David Gecht and Richard Kwil (Cross-Examination Only) ..................................................................... 17

    F.    Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of John Martinez, Thomas Kelly, and Jose Tinajero (Cross-Examination Only) .................................................. 19

    G.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jacques Rivera (Cross-Examination Only) ............................................................................................ 22

    H.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Geraldo Iglesias (Cross-Examination Only) ............................................................................................ 26

    I.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Robert Bouto (Cross-Examination Only) ............................................................................................ 29

    J.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jose Montanez and Armando Serrano (Cross-Examination Only) ................................................................... 30

    K.    The City of Chicago's Own Investigation of Guevara Corroborates the Evidence Set Out Above ...................................................................................................................... 31

ADMISSIBILITY OF OTHER ACTS EVIDENCE ................................................................ 32

    A.    Other-Acts Evidence Is Admissible to Show Defendants' Intent ...................................... 33

    B.    Other-Acts Evidence Is Admissible to Show Absence of Mistake or Accident .............. 36

C.   Other-Acts Evidence Is Admissible to Show Knowledge ................................. 37

D.   Other-Acts Evidence Is Admissible to Show Opportunity ............................... 39

E.   Other-Acts Evidence Is Admissible to Show Identity ...................................... 40

F.   Other-Acts Evidence Is Admissible to Show Preparation and Plan ................. 42

G.   Other-Acts Evidence Is Admissible for Other Permissible Purposes As Well................ 43

H.   There Is No Good Reason to Exclude Other-Acts Evidence ............................ 46

I.   Federal Rule of Evidence 403 Does Not Call for Exclusion, Particularly Given Limiting
     Instructions .................................................................................................... 48

J.   All of the Other Bad Acts Discussed Above Were Amply Disclosed to Guevara ........... 49

CONCLUSION .................................................................................................................. 51

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Batchelor v. City of Chicago*, No. 18-cv-8513, 2020 WL 13647794 (N.D. Ill. Nov. 17, 2020) ................................................................................................................ 5

*Burton v. City of Zion*, 901 F.3d 772 (7th Cir. 2018) ......................................... 4, 5, 38

*Cazares v. Frugoli*, 2017 WL 4150719 (N.D. Ill. Sept. 19, 2017) ............................... 45

*Daniels v. Williams*, 474 U.S. 327 (1986) ................................................................. 33

*David v. Caterpillar*, 324 F.3d 851 (7th Cir. 2003) ................................................... 50

*Davies v. Benbenek*, 2014 WL 12660537 (N.D. Ill. May 28, 2014) ............................ 5

*Edwards v. Thomas*, 31 F. Supp. 2d 1069 (N.D. Ill. 1999) ............................ 34, 43, 47

*Harris v. City of Chicago*, No. 14-cv-4391, 2018 WL 2183992 (N.D. Ill. May 11, 2018)............ 4

*Hill v. City of Chicago*, 2011 WL 3840336 (N.D. Ill. Aug. 30, 2011) ......................... 42

*Holmes v. Godinez*, 2016 WL 4091625 (N.D. Ill. Aug. 2, 2016) ................................. 44

*Huddleston v. United States*, 485 U.S. 681 (1988) ..................................................... 46

*Jackson v. Esser*, 105 F.4th 948 (7th Cir. 2024) ......................................................... 4

*Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503 (7th Cir. 1997) .................... 45

*Lange v. City of Oconto*, 28 F.4th 825 (7th Cir. 2022) ...................................... 34,38,44

*Molnar v. Booth*, 229 F.3d 593 (7th Cir. 2000) ......................................................... 43

*People v. Allen*, 420 N.W.2d 499 (Mich. 1988) ......................................................... 49

*Petrovic v. City of Chicago*, 2008 WL 818309 (N.D. Ill. Mar. 21, 2008) .................... 47

*Rivera v. Guevara*, No. 12-cv-04428, 2018 WL 11468923 (N.D. Ill. June 1, 2018) ............ passim

# TABLE OF AUTHORITIES

*Se-Kure Controls, Inc., v. Vanguard*, 2007 WL 781253 (N.D. Ill. 2007) .................... 50

*Shields v. United States*, 2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) ........................ 41

*State Farm v. Campbell*, 538 U.S. 408 (2003)..................................................................... 45

*United States v. Anifowoshe*, 307 F.3d 643 (7th Cir.2002) ............................................... 47

*United States v. Anzaldi*, 800 F.3d 872 (7th Cir. 2015)..................................................... 34

*United States v. Arnold*, 773 F.2d 823 (7th Cir. 1985) ...................................................... 35

*United States v. Bell*, 624 F.3d 803 (7th Cir.2010)............................................................ 38

*United States v. Brown*, 31 F.3d 484 (7th Cir. 1994)......................................................... 43

*United States v. Brown*, 471 F.3d 802 (7th Cir. 2006)................................................. 37, 42

*United States v. Burrows*, 48 F.3d 1011 (7th Cir. 1995) ................................................... 34

*United States v. Chaverra-Cardona*, 879 F.2d 1551 (7th Cir. 1989) ............................... 34

*United States v. Clark*, 774 F.3d 1108 (7th Cir. 2014) ...................................................... 37

*United States v. Connelly*, 874 F.2d 412 (7th Cir. 1989)................................................... 37

*United States v. Curtis*, 781 F.3d 904 (7th Cir. 2015) ....................................................... 29

*United States v. DeFillipo*, 590 F.2d 1228 (2d Cir. 1979).................................................. 30

*United States v. Gomez,* 763 F.3d 845 (7th Cir. 2014) .............................................. passim

*United States v. Grabiec*, 563 F.2d 313 (7th Cir. 1977) .................................................... 40

*United States v. Harris*, 536 F.3d 798 (7th Cir. 2008)...................................................... 33

*United States v. Hernandez*, 84 F.3d 931 (7th Cir. 1996).................................................. 32

*United States v. Hillsberg*, 812 F.2d 328 (7th Cir. 1987).................................................. 32

*United States v. Hudson*, 884 F.2d 1016 (7th Cir. 1989)................................................... 36

*United States v. Johnson*, No. 24-2027, 2025 WL 1541048 (7th Cir. May 30, 2025) ................ 29

## TABLE OF AUTHORITIES

*United States v. King*, 627 F.3d 641 (7th Cir. 2010) ....................................................... 39

*United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) ..................................................... 37,47

*United States v. Macedo*, 371 F.3d 957 (7th Cir. 2004) ........................................................ 29

*United States v. Macedo*, 406 F.3d 778 (7th Cir. 2005) ..................................................... 35,47

*United States v. McGee*, 408 F.3d 966 (7th Cir. 2005).......................................................... 44

*United States v. Mireles*, 116 F.4th 713 (7th Cir. 2024).................................................. 34, 35, 39

*United States v. Nolan*, 910 F.2d 1553 (7th Cir. 1990) ........................................................ 34

*United States v. Shackleford*, 738 F.2d 776 (7th Cir. 1984) ................................................ 36

*United States v. Smith*, 80 F.3d 1188 (7th Cir. 1996) .......................................................... 39

*United States v. Taylor*, 728 F.2d 864 (7th Cir. 1984).......................................................... 38

*United States v. Thomas*, 986 F.3d 723 (7th Cir. 2021)................................................. 31, 36, 37

*United States v. Tylkowski*, 9 F.3d 1255 (7th Cir. 1993) ...................................................... 32

*United States v. Urena*, 844 F.3d 681 (7th Cir. 2016) ......................................................... 33

*United States v. Vance*, 764 F.3d 667 (7th Cir. 2014) .......................................................... 37

*United States v. Walter*, 870 F.3d 622 (7th Cir. 2017) ........................................................... 4

*United States v. White*, 68 Fed. App'x 707 (7th Cir. 2003)................................................... 33

*United States v. Wimberly*, 60 F.3d 281 (7th Cir. 1995)........................................................ 42

*United States v. Wormick*, 709 F.2d 454 (7th Cir. 1983 ....................................................... 28

*United States v. York*, 933 F.2d 1343 (7th Cir. 1991)........................................................... 42

*Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557 (7th Cir. 1990) ......................................... 39

*Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993) ............................................... passim

*Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (2004)....................40

## TABLE OF AUTHORITIES

*Wrice v. Burge*, 2016 WL 6962838 (N.D. Ill. Nov. 29, 2016) ..................................................... 44

*Young v. Rabideau*, 821 F.2d 373 (7th Cir. 1987) ........................................................ 33

**Rules**

Fed R. Civ. P. 26(a)(1) ................................................................................................. 50

Fed. R. Evid. 404(b) ............................................................................................... passim

Plaintiffs, ARTURO DeLEON REYES and GABRIEL SOLACHE, by their respective attorneys, respectfully request that the Court admit certain other acts evidence relating to Defendant Reynaldo Guevara, stating in support as follows:

## INTRODUCTION

Evidence of other acts of misconduct committed by Defendant Reynaldo Guevara is admissible in these cases. *United States v. Gomez* provides that other-act evidence is admissible under Rule 404(b) "when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*). In light of the defenses sure to be presented at trial by Defendant Guevara, there are ample propensity-free reasons for this Court to admit other-acts evidence.

Consider the starkly different accounts the jury will hear explaining Plaintiffs' wrongful conviction for the Soto murders and kidnappings. According to Plaintiffs, Guevara and the other Defendants decided to frame Plaintiffs, fabricated statements that they attributed Plaintiffs, coerced them to confess falsely, and suppressed exculpatory and impeachment evidence that could have been used to undermine key State's witnesses, and that could have been used to prove Plaintiffs' innocence. Defendants will dispute Plaintiffs on each of these points. They will tell the jury that they did not commit any police misconduct; that they did not fabricate suspect or witness statements, coerce Plaintiffs to confess; fabricated false statements, evidence, or reports; that they did not suppress evidence; and that Plaintiffs were properly arrested, prosecuted, and convicted of murder. And they will argue that they would not have—indeed, could not have—committed the grossly illegal misconduct of framing innocent men. As explained in this motion, it is these disputes—and the defense theories advanced by Defendants—that justify admitting other-acts evidence at trial.

1

Though there are permissible uses of other-acts evidence in this case, Plaintiffs recognize that this does not mean that they can conduct a three-ring circus about Guevara's reprehensible past misconduct. Indeed, Guevara's misconduct is so expansive and well documented that it would be impossible to scratch the surface in the time allotted for trial. Plaintiffs have no intention of holding a series of mini-trials on Guevara's other acts. Instead, cognizant of this Court's limited time to complete this trial, and consistent with Rule 403, Plaintiffs will limit their presentation of this evidence to calling no more than four live witnesses to testify about other acts, and to cross-examining Guevara about a limited and defined set of other acts. Though there are a number of fact patterns discussed in this response, to be clear Plaintiffs are not intending to explore all of them at trial. Plaintiffs expect the Court to limit this presentation.

Moreover, the presentation of these cases can be enormously streamlined for two significant and uncommon reasons: (1) Defendant Guevara does not deny any of the misconduct set out below. Instead, he is pleading his Fifth Amendment right not to incriminate himself in response to all questions about these cases, and so the proof of many of these other-acts fact patterns will take mere minutes. (2) The fact pattern below from the individual case in *Rivera* has been adjudicated already to judgment against Guevara, so he cannot dispute those facts due to issue preclusion.

Moreover, although there is an ample amount of compelling other-acts evidence described in this response, the undeniable reality that Guevara was a singularly bad police officer does not warrant the conclusion that the evidence against him would be unduly prejudicial because of its strength. On the contrary, the fact that there is such a developed body of past, proven misconduct makes the evidence more reliable and probative of the permissible purposes for which other-acts evidence is admissible under Rule 404(b). Indeed, former Chicago Police

2

Officer Dorsch and the City's own investigation of Guevara confirm the reliability and probative value of this other-acts evidence.

In addition, the jury can be instructed that the other-acts evidence is only relevant to the specific permissible uses identified in this response, which will avoid the danger of the jury drawing the impermissible propensity inference. While there is always some danger of unfair prejudice in the introduction of this type of evidence, the Seventh Circuit in *Gomez* made crystal clear that limiting instructions rather than exclusion are the way to deal with that danger of prejudice. 763 F.3d at 860-61. Moreover, even without a limiting instruction, there is no reasonable argument that a limited presentation of other-acts evidence, which is extremely probative of issues in the upcoming trial on which 404(b) dictates that other-acts evidence is admissible, is *substantially outweighed* by the danger of unfair prejudice. Presented in the limited way that Plaintiffs propose, other-acts evidence passing muster under Rules 404(b) and 403 can be introduced without prolonging the trial and avoiding the danger of prejudice.

On the other hand, if the Court excluded all of the other-acts evidence relating to Guevara at trial, then Defendants would have free rein to tell the jury a version of the story of the Soto investigation that would make it appear as if the whole thing was an honest mistake. Allowing Defendants to take that position in the face of volumes of evidence showing that there was nothing at all accidental about what happened to Plaintiffs would be unfairly prejudicial to Plaintiffs in the extreme. This Court should deny Defendants' motion to exclude other-acts evidence, consistent with the following outline for presentation of that evidence.

## APPLICABLE LEGAL FRAMEWORK

Rule 404(b) bars evidence of other acts offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R.

EVID. 404(b)(1). But it allows other-act evidence for "another purpose," including but not limited to "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2); *United States v. Walter*, 870 F.3d 622, 628 (7th Cir. 2017).

In *United States v. Gomez*, the Seventh Circuit overhauled its test for determining whether evidence is admissible under Rule 404(b), 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*), and has since "stressed that *Gomez* requires judges to look 'more generally to the Federal Rules of Evidence,'" *Jackson v. Esser*, 105 F.4th 948, 963 (7th Cir. 2024) (quoting *Burton v. City of Zion*, 901 F.3d 772, 779 (7th Cir. 2018)). *Gomez* holds that Rule 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*); see also *id.* at 856 ("[T]he district court should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference"). Nevertheless, "[o]ther-act evidence need not be excluded whenever a propensity inference can be drawn." *Id.* at 860. After analyzing whether other-acts evidence is admissible under Rule 404(b), including whether a jury could "find by a preponderance of the evidence that the other act was committed," *Harris v. City of Chicago*, No. 14-cv-4391, 2018 WL 2183992, at *16 (N.D. Ill. May 11, 2018) (quoting *Gomez*, 763 F.3d at 854), the Court applies Rule 403 as well. *Gomez*, 763 F.3d at 857.

Before discussing the other-acts of Guevara and the particular propensity-free permissible uses of other-acts evidence that apply in this case, it is important to point out that the Seventh Circuit has clarified that under *Gomez*, the similarity of other acts to those at issue in a case remains a proper consideration for 404(b) relevancy analysis, but it is not dispositive. See, *e.g.*,

*Jackson*, 105 F.4th at 963 (quoting *Burton*, 901 F.3d at 779) ("Sometimes similarity . . . will be relevant to the inquiry and sometimes [it] will not. If [it is] not, then a court may not reject the evidence based on a lack of similarity . . . .").

Furthermore, the Seventh Circuit has endorsed the use of other-acts evidence almost exactly like the evidence that Plaintiffs seek to introduce here, in circumstances nearly identical to this case. In *Wilson v. City of Chicago*, the Seventh Circuit reversed a district court's decision to exclude at trial evidence of Chicago Police Officer Jon Burge's other acts of witness coercion, which were similar to the acts of witness coercion at issue in the case going to trial, holding that those other acts were admissible to show intent, opportunity, preparation, and plan, as well as to impeach Burge's denial that he had engaged in those acts. 6 F.3d 1233, 1238 (7th Cir. 1993); *see also Davies v. Benbenek*, 2014 WL 12660537, at *3 (N.D. Ill. May 28, 2014) (recognizing that the other acts in *Wilson* were probative of the defendant police officers "having the means, intent, and ability to use force against suspects during their interrogation at a police station"); *Rivera v. Guevara*, No. 12-cv-04428, 2018 WL 11468923, at *5 (N.D. Ill. June 1, 2018) (finding *Wilson* controlled 404(b) analysis for probing intent, absence of mistake, and knowledge); *Batchelor v. City of Chicago*, No. 18-cv-8513, 2020 WL 13647794, at *7 (N.D. Ill. Nov. 17, 2020) (finding *Wilson* controlled 404(b) analysis for probing "motive, intent, plan, preparation, knowledge, absence of mistake, or modus operandi in utilizing manufactured and false polygraph examination results to coerce a confession, in addition to possible impeachment material" at discovery stage). *Wilson* dictates admission of other-acts evidence in this case.

## OTHER BAD ACTS OF REYNALDO GUEVARA

Reynaldo Guevara has an extensive history of gross misconduct. It is no exaggeration to say he is likely responsible for more wrongful murder convictions than any other officer ever

employed by the Chicago Police Department, including Jon Burge. More than 50 men and women have been exonerated after being wrongly prosecuted for murder as the result of Guevara's misconduct. Together they served centuries behind bars.[1] Guevara's misconduct has led to investigative probes by the City of Chicago itself, the Cook County State's Attorney, and others. His corruption has been widely recognized by state and federal judicial and executive authorities. More than 20 civil cases are currently pending in this District concerning Guevara's misconduct in murder investigations. In all of those cases Guevara used techniques to fix cases the same as those he used to frame Plaintiffs here.

That said, Plaintiffs are not attempting to present this whole history of misconduct at trial. Doing so would take months, and the parties have much less time to complete the trial. Instead, Plaintiffs have already strictly limited the Rule 404(b) evidence that they intend to rely upon at trial. Following litigation before the magistrate judge, Plaintiffs were ordered to and cut their witness list to ten Rule 404(b) witnesses who might be called live at trial. Plaintiffs intend to call at most four of those witnesses live at trial, including former Chicago Police Officer Dorsch, who is a witness with knowledge of Guevara's past efforts to manufacture false testimony in a murder case. Any other presentation of Rule 404(b) evidence relating to Guevara will be presented by way of cross-examination.

Moreover, Plaintiffs have already limited the other-acts evidence to those instances in which Guevara fabricated and coerced confessions, fabricated false police reports documenting

---

[1] As of the filing of this motion, 51 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Tyrece Williams, Antonio McDowell, and Demetrius Johnson.

investigative information that was manufactured, fabricated witness statements, and suppressed exculpatory and impeachment evidence, just as Guevara did in Plaintiffs' case.

Plaintiffs describe the other-acts evidence they anticipate using in this section.[2]

### A. Relevant Rule 404(b) Evidence Relating to Chicago Police Officer William Dorsch

William Dorsch is a former Chicago police detective who worked at Area Five and has first-hand knowledge about Guevara's fabrication of witness identifications and false reports during a murder investigation that Dorsch was working. See Ex. 1 (Dorsch Testimony from Solache Post-Conviction Hearing) at 74:18-151:22; Ex. 2 (Dorsch Testimony from Montanez Post-Conviction Hearing) 56:7-192:15; Ex. 3 (Dorsch Testimony from Jacques Rivera Trial). Dorsch has testified about this misconduct in the past. *Ibid.* In *Rivera v. Guevara*, in response to a motion to exclude Rule 404(b) evidence from Guevara, Judge Gotschall permitted Dorsch to testify. Ex. 4-12 (No. 12-cv-4428, Dkt. 407, 411, 478, 479, 494, 540, 570, 582, 600.).

At trial, Dorsch will testify that, a number of months before Guevara made detective in 1990, Dorsch was assigned to investigate a murder that had occurred in the Humboldt Park neighborhood. During the investigation, Guevara brought two juveniles into the police station, who had purportedly witnessed the shooting and had supposedly recorded the license plate number of the car in which the shooter was riding. Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2746:1; Ex. 13 (*Rivera*, No. 12-cv-4428 Doc. No. 317) at ¶154.

In a conference room of Area Five, Dorsch created a photo array so that the two juveniles could attempt to identify the shooter. Ex. 13 (*Rivera*, No. 12-cv-4428 Doc. No. 317) at ¶154; see also Ex. 2 (Dorsch Testimony from Montanez Post-Conviction Hearing) at 66-67;  Ex. 3 (Dorsch

---

[2] While the admissibility of other-acts evidence might change depending on testimony and argument from Defendants at trial, Plaintiffs anticipate that the following accurately represents the Rule 404(b) evidence that he seeks to present at trial.

Testimony from Jacques Rivera Trial) at 2746:10-18. The first of the two juveniles viewed the photo array for a long period of time, and before he had identified any person, Guevara put his finger on the suspect's photo and said, "That's him." Ex. 2 (Dorsch Testimony from Montanez Post-Conviction Hearing) at 68-69; Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2747:15-20. In response, the juvenile adopted Guevara's scripted story and identified the suspect he had pointed out. Ex. 2. at 69; Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2748:1-17. Dorsch then directed Guevara to leave the room, and Dorsch alone performed the photo identification procedure with the second of the two juveniles. Ex. 2. at 69-70. The second juvenile was unable to make an identification. *Id.*

After the photo identification procedures, Dorsch conducted a live lineup, in which the first juvenile selected the suspect who Guevara had pointed out in the photo array, and the second did not make an identification. *Id.* at 76-77. Based on the identification, the suspect was charged with murder. *Id.* at 78. Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2748:24 - 2749:4. Subsequently, Dorsch spoke to the two juveniles without Guevara present, and they admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. Ex. 2. at 81-82. Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2749:20-24. Prosecutors spoke to the two juveniles, and the suspect was released. *Id.* at 83. Ex. 3 (Dorsch Testimony from Jacques Rivera Trial) at 2750:12-14.

### B. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Thomas Sierra (404(b) Witnesses Jose M. Melendez and Jose E. Melendez)

Thomas Sierra was wrongly convicted of the 1995 shooting murder of Noel Andujar and spent 22 years in prison before he was exonerated in January 2018. *See generally* Ex. 18 (*Sierra v. Guevara, et al.*, No. 18-cv-3029, Dkt. 1 (N.D. Ill. Apr. 30, 2018)). The crime, which occurred in Logan Square on May 23, 1995, involved a shooting between two moving cars. Ex. 19 (Expert

Report of Tiderington in *Sierra*), Ex. 20 (Expert Report of Dysart in *Sierra*). Immediately after

the incident, while they were still at the scene, the two eyewitnesses—Jose Melendez and

Alberto Rodriguez—who had been riding in the car with Andujar told police that they could not

describe the shooter, except to say that he was a Latino male. Ex. 21 (General Offense Case

Report - *Sierra*) at AR-L 120247-120248. The car in which the shooter had been riding had

tinted windows that were rolled up throughout the shooting. *Id.*

The day after the shooting, Guevara, Mingey, and other police officers were assigned to the

case. Ex. 22 (Guevara Supp. Report) at AR-L 120253-120254. Despite there being no eyewitness

identification of any person, Guevara decided on a theory that Sierra had been involved in the

shooting, and he worked to obtain witness statements implicating Sierra. *Id.* at AR-L 120255-

120257. On May 30, 1995, Guevara brought Melendez and Rodriguez to Area Five to view a

live lineup. Before the lineup, they showed Melendez and Rodriguez each a photo array. After

the photo arrays, Melendez and Rodriguez were shown a lineup simultaneously, in which they

purportedly selected Sierra. Ex. 22 (Guevara Supp. Report) at AR-L 120263-120264.

However, Melendez has testified in Sierra's civil case that Guevara fabricated his

identification of Sierra out of whole cloth. Ex. 23 (Melendez Deposition in *Rivera*). Melendez

testified that he told Guevara that he did not know who the shooter was and could not identify

him; that during a photo array Guevara held a photo of Sierra in his hand and told him that the

photo depicted the perpetrator, saying that he had reason to believe that Sierra was the

perpetrator Ex. 23 (Melendez Deposition in *Rivera*) at 132:17-135:10; and that Guevara told him

to identify Sierra as the shooter. Guevara fabricated a false report about the identification

procedure that does not make any mention of the true circumstances of these identifications. Ex.

22 (Guevara Supp. Report) at AR-L 120255-120257.

In addition, Guevara pulled over and brought into Area Five a car that he thought had been used in the shooting. At the time it was pulled over, the car was being driven by a man named Jose E. Melendez (no relation). Guevara interrogated Jose E. Melendez at Area Five about the shooting, beating him throughout the questioning. Ex. 14 (Jose E. Melendez Deposition in *Sierra v. Guevara*) at 18-30. Jose E. Melendez would not confess. *Id.* None of the information about this interrogation was recorded in police report; instead, Guevara suppressed it.

At the same time, Guevara showed the car that Jose E. Melendez had been driving to Jose M. Melendez and Rodriguez, who told him that it was not the car used in the shooting. Ex. 25 (Rodriguez Testimony in *People v. Sierra*) at E113-114; see also Ex. 23 (Melendez Deposition in *Rivera*) at 147:10-155:15. Nonetheless, Guevara falsely reported that Melendez and Rodriguez "both identified the [car] as the car from which Thomas Sierra fired his gun." Ex. 22 (Guevara Supp. Report) at AR-L 120269. Based on these witness statements, Sierra was convicted of the Andujar murder.

After spending more than two decades in prison, Sierra was exonerated in 2018, when he was granted post-conviction relief and the Cook County State's Attorney dropped all charges against him. Ex. 26 (Order Vacating Conviction in *People v. Sierra*). In 2022, Sierra was granted a certificate of innocence. Ex. 27 (Order Granting COI in *People v. Sierra*).

Sierra sued Guevara in 2018, alleging that he had violated his right to due process by fabricating false police reports, fabricating false witness statements and identifications, and suppressing material exculpatory evidence. The case was litigated through summary judgment before Judge Robert Blakley. See Ex. 28 (18-cv-3029, Dkt. 520; Plaintiff's Response to

Summary Judgment); Ex. 29 (Plaintiff's Statement of Facts). While summary judgment was

pending, Sierra settled his claims against all Defendants for $17.5 million.

### C. Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of Alfredo Gonzalez and Jose Maysonet (404(b) Witness Alfredo Gonzalez)

Alfredo Gonzalez and Jose Montanez were wrongly convicted of the 1990 murders of

Torrence and Kevin Wiley. Gonzalez's conviction was eventually vacated, but not until he had

been incarcerated over 31 years.

The Wiley Brothers were murdered on May 25, 1990 on North Avenue around midnight

and the initial reports provided no leads other than witnesses overhearing an argument. See Ex.

Ex. 89 (RFC-Maysonet 55-56). There were no eyewitnesses to the murders, besides two sisters

Alma Prececo and Carmen Macias, who lived on the street where the men's bodies were found,

and who told detectives that they heard an argument around midnight that lasted about an hour

just before the shooting. According to one of the sisters, the men sounded highly intoxicated and

snippets of the conversation suggested that it was the Wiley brothers arguing with each other.

The witness described the voices as sounding to be African American voices. They spoke in

English and did not speak with a Puerto Rican accent. Ex. 89 (RFC-Maysonet 55-56). The sisters

also told police that they heard the victims use the name "Lulu." A police report authored by a

detective who responded to the scene shortly after the shooting was found in the prosecutors file

noted "Lulu," "1925 W. Drake," and a possible phone number of "238-1116."

Later, two suspects, Francisco Veras and Efrain Cruz, were initially brought in and

accused of the murders by Detective Guevara. See Ex. 90 (Veras Affidavit) at Gonzalez 167044-

167045, Ex. 91 (E.Cruz Affidavit) at Gonzalez 167027-167029. When Guevara's attempts to

frame them did not materialize, because Veras and Cruz had alibis, Guevara turned his focus on

another group of men. *Id*.

11

An August 23, 1990 police report documents an interview that Sgt. Mingey and Detective Montilla allegedly conducted with Jose Maysonet on July 15, 1990 based entirely on Mingey's hunch that because the gun that was used to kill the Wiley brothers was a 9 mm and Maysonet had been previously charged in an unrelated crime where he allegedly used a 9mm. According to this report, on July 15, 1990 Maysonet told Mingey and Montilla that he had supplied the gun and had knowledge of who may have killed the Wiley brothers. The report further states that later, on Aug 1, 1990, Mingey and Montilla re-interviewed Maysonet at Cook County Jail and Maysonet told them he was involved in the Wiley brothers murders. On Aug 22, 1990, Maysonet was arrested by Montilla and brought to Area Five. See Ex. 93 (RFC 136450-136457).

Guevara arrested Maysonet and physically and psychologically abused him until he implicated himself and Gonzalez (along with two others) in the Wiley Brothers murder. See Ex. 105 (Gonzalez Aff.) at Gonzalez 6558-6562; Ex. 106 (Maysonet Aff.) at Gonzalez 7401-7404), Ex. 107 (Maysonet Dep.) at 279-298). After his arrest on August 22, 1990, Maysonet was brought to Area Five and eventually placed in the lock-up until Guevara and Halvorsen arrived for their shift. Guevara then repeatedly interrogated him over the course of the evening and overnight.  The interrogation involved threats, physical violence, threats to lock-up Maysonet's girlfriend Rosa and ultimately a promise of release if he gave a statement manufactured by Guevara. The interrogation was conducted almost entirely by Guevara who spoke Spanish. Maysonet testified that he eventually agreed to give a statement that he believed was exculpatory. He was told he would be released after giving the statement and that he was essentially a witness to the murders. Maysonet further alleges that he was also tricked into believing that he was only a witness against Gonzalez and others and not a co-defendant. See Ex. 106 (Maysonet Aff.).

Eventually, Maysonet repeated a false statement implicating himself and co-defendants in the Wiley murders that was constructed by Guevara. Guevara physically abused and threated Maysonet until he agreed to give the statement. During his interrogation, Guevara handcuffed him to the wall and beat him with a flashlight and phone book and told Maysonet that his girlfriend would be put in prison and his children would be taken away if he did not cooperate. Maysonet agreed to provide the statement to a court reporter in the presence of a states' attorney who did not speak Spanish. Maysonet practiced with Montilla and tried to give the statement in English but was unable to do so. Montilla then wrote out the story in Spanish so Maysonet could repeat it. See Ex. 107 (Maysonet Dep.) at 314-317.

Shortly before Maysonet was arrested, he had a falling out with Guevara and infamous Chicago Police Officer Joseph Miedzianowski over an illegal narcotic sales ring that Maysonet, Guevara, and Miedzianowski were involved in. Maysonet encountered Guevara and Miedzianowski when they raided Maysonet's home looking for narcotics which they did not find. Maysonet met Guevara and Miedzianowski a few months later in the kitchen of a Cuban restaurant that served as a front for a larger drug-trafficker. It was at this restaurant that Guevara and Miedzianowski laid the groundwork for a financial arrangement with Maysonet in which they later provided protection for Maysonet in exchange for a share of the proceeds from his illegal drug sales. After this meeting, Maysonet entered into an agreement with Guevara to pay him for police protection for his drug selling activities. Guevara targeted Maysonet for arrest because Maysonet changed his mind and refused to continue to pay Guevara protection money. See Ex. 107 (Maysonet Dep.) at 156-159, 175.

Maysonet's girlfriend, Rosa Bello, was also coerced into signing a statement. Guevara told her that her children could be taken away from her if she did not cooperate with the

13

investigation. Bello did not read her statement closely and it contained mistakes. In her statement she claims to have seen Maysonet with a 9 mm gun in her house but later admitted that she does not know what a 9 mm gun looks like and would not be able to distinguish it from any other caliber firearm. Bello later testified that she saw Maysonet and Plaintiff with what she thought was a gun in July of 1990 – approximately three months after the Wiley Brothers shooting, instead of on the night of the shooting.  See Ex. 108 (Bello Aff) at Gonzalez 6020-6023 and Ex. 109 (Bello Dep.) at 64.

Guevara and Halvorsen also arrested and coerced a false confession from Justino Cruz implicating Gonzalez in the Wiley Brothers murder. Cruz was arrested and interrogated for 10-12 hours by Guevara. Guevara physically coerced and abused Cruz, who was handcuffed to the wall, during his interrogation on August 24, 1990 by grabbing him by the throat, choking him, repeatedly slapping and hitting him in the left ear with both hands (knowing that Mr. Cruz had an infection in his left ear at the time), and pushing him, striking him and knocking his head against the wall.  Guevara repeatedly threatened him and threatened to arrest members of his family if Cruz did not provide a confession statement implicating himself, Gonzalez and Maysonet in the Wiley brothers' double murder, while promising to let him go if he did.  See Ex. 118 (Cruz Dep.) at 37-45, Ex. 119 (J. Cruz Aff.) at Gonzalez 6029-6030, Ex. 120 (J. Cruz statement) at Gonzalez 136523-13625.

On August 23 1990, Guevara and others arrested Gonzalez, confronted him with Maysonet's statement, and physically and psychologically abused Gonzalez until he implicated himself as well. Guevara and Halvorsen repeatedly punched, hit and beat Gonzalez during his lengthy period of custody and interrogation on August 23-24, 1990. After he was arrested and put in handcuffs, but before he was placed in the police car, Guevara punched him with a closed

fist in the back. At the police station, Gonzalez was taken to an interrogation room while still handcuffed behind his back. Once in the interrogation room, Guevara immediately grabbed him by the neck and told him that he was going to pay for the double murder that he had committed. Gonzalez who was in handcuffs (with both arms handcuffed to the wall), for approximately 21 hours of was then pushed against a wall by Guevara and grabbed by the neck and pinned against the wall. Then Gonzalez was slapped in in the face back and forth several times causing his lip to bleed on the inside. Guevara then punched Gonzalez in the stomach, in kidney on the right side, punched Gonzalez underneath the arm on the left side. Gonzalez was also struck several times on left hand side underneath his armpit down to his waist, and repeatedly punched in the testicles multiple times. Halvorsen slapped Gonzalez several times and stomped on Gonzalez's big toe several times. Guevara also threatened to physically assault and abuse Gonzalez's family members if he did not admit to participating in the Wiley double murder. See Ex. 121 (Gonzalez Aff.) at Gonzalez 6558-6562, Ex. 122 (Gonzalez Dep. in *Maysonet*) at 100-103, 109. Eventually, Gonzalez succumbed to the physical and psychological abuse and signed a typed false confession statement. See Ex. 123 (Gonzalez statement) at RFC 136526-136532.

Gonzalez's conviction was overturned on August 9, 2022. See Ex. 124 (Order dated August 9, 2022).

### D. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Daniel Rodriguez (404(b) Witness David Velasquez)

Daniel Rodriguez was wrongly convicted of the 1991 fatal shooting of Jose Hernandez, Jr. See generally Ex. 124 (*Rodriguez v. Guevara, et al.*, No. 22-cv-6141, Dkt. 1 (N.D. Ill.). The crime occurred on the northwest side of Chicago on March 17, 1991, and it involved a shooting between two cars. Ex. 125 (Expert Report of Tiderington in *Rodriguez*); Ex. 126 (Expert Report

15

of Dyart in *Rodriguez*); Ex. 127 (Expert Report of Leo in *Rodriguez*). Initial leads pointed to suspects who were not Rodriguez. Daniel Rodriguez and George Laurano were not charged with the crime until two months later.

Rodriguez and Laureano were arrested after witnesses Jason Rivera and David Velasquez both signed statements implicating them. Guevara and Halvorsen knew and did not disclose that Rivera was a uncharged co-conspirator in another case they were investigating at the same time that he was used as a witness against Rodriguez. Nor did they disclose that Rivera's mother was having a romantic relationship with Guevara. Ex. 125 (Expert Report of Tiderington in *Rodriguez*).

Meanwhile, Guevara physically and psychologically abused David Velasquez, who was then a juvenile, until he signed the statement implicating Rodriguez that he told Guevara was a lie. Ex. 125 (Expert Report of Tiderington in *Rodriguez*).

The next day, Guevara arrested Rodriguez. Guevara and Halvorsen interrogated Rodriguez and held him incommunicado for more than five hours. Guevara and Halvorsen physically abused Rodriguez, hitting him at least 15 times on three separate occasions in the face, chest, and stomach. They rejected Rodriguez's protestations of innocence. They deprived him of sleep. They showed him the statements of Rivera and Velazquez they had fabricated, saying that he had been implicated in the crime. They threatened his fiancée and children. They falsely promised he could go home if he adopted their false statement. After Rodriguez's will was overborne, they scripted a false statement for him to provide, and he provided that statement. Ex. 127 (Expert Report of Leo in *Rodriguez*).

Based on Guevara's and Halvorsen's knowingly fabricated evidence and their suppression of exculpatory and impeachment evidence, Rodriguez was prosecuted and convicted

of murder. He spent decades in prison, until his conviction as vacated in 2022. After his release, he was awarded a certificate of innocence. Ex. 125 (Expert Report of Tiderington in *Rodriguez*).

### E. Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of David Gecht and Richard Kwil (Cross-Examination Only)

David Gecht and Richard Kwil were wrongfully convicted of the 1999 murder of Roberto Cruz after Defendant Guevara coerced them into giving false statements. David Gecht, 18 years old and diagnosed with an emotional disorder at the time of his arrest, was arrested four weeks after the crime, which he knew about only from word in the neighborhood; he was taken to Area 5, where he was locked in an interrogation room and handcuffed to a ring on the wall. Ex. 128 (Gecht 018602, 018683, 018689-018693 Gecht trial testimony, *People v. David Gecht, Richard Kwil and Ruben Hernandez*). He was held for at least 12 hours, very scared, without sleeping or eating, while Defendant Guevara and other detectives entered the room several times, giving him information about the crime, showing him a semiautomatic pistol, and bringing Hernandez into the room with him. Ex. 128 (Gecht 018602, 018681-018692, Gecht trial testimony, *People v. David Gecht, Richard Kwil and Ruben Hernandez*). When he asked for an attorney or a phone call, Defendant Guevara denied both requests, slapping his face several times with an open fist on this occasion and later slapped him again several times, punching him in the stomach as well. Ex. 128 (Gecht 018602, 018690, 018704-018712, Gecht trial testimony, *People v. David Gecht, Richard Kwil and Ruben Hernandez*). Gecht gave a false statement to the prosecutor with facts provided by the detectives, as instructed by Defendant Guevara, who promised he could go home after repeating what Guevara wanted to hear. Ex. 128 (Gecht 018602, 018689, 018736-018737, Gecht trial testimony, *People v. David Gecht, Richard Kwil and Ruben Hernandez*).

Defendant Guevara also forced Gecht's girlfriend Colleen Miller, pregnant with his child, to adopt a fabricated statement saying Gecht confessed to her—Gecht actually told her that he had no knowledge of the murder—but Defendant Guevara threatened that if she didn't provide the statement, she would be charged as an accessory to the murder and would lose her child. Ex. 129 (Gecht 012032-012033, Gecht Aff.); Ex. 128 Gecht 018602, 018693, March 21, 2000 transcript, *People v. David Gecht, Richard Kwil and Ruben Hernandez*). Guevara also coerced her to testify at the grand jury by threatening to charge her with perjury if she refused. (*Id.*).

Richard Kwil, at age 19, was also arrested and convicted for the 1999 murder of Roberto Cruz, a crime for which he was innocent, and for which Defendant Guevara interrogated him over many hours. Ex. 130 (Gecht 011977-011978, Kwil Affidavit 2019). Kwil's insistence on his innocence only fueled Defendant Guevara's threats. (*Id.*). Guevara threatened that if he refused to confess, he would never again see his daughter. (*Id.*).

Defendant Guevara fabricated various false scenarios for Kwil, who was not present at the crime and knew nothing about who committed the murder. At one point, Guevara tried to get Kwil to confess to being the shooter; he then tried to get him to say the shooter was Ruben Hernandez; he later showed him a photo of David Gecht, falsely promising that if he made a statement identifying Gecht as the perpetrator, he (Kwil) could go home, and that if he refused to cooperate, he would be charged with the murder and spend a long time behind bars. (*Id.*). Guevara's coercion and threats overcame Kwil's will, and Kwil signed a false statement crafted by Guevara. (*Id.*).

Gecht was exonerated in 2022 and was granted a certificate of innocence the same year. Ex. 131(Gecht COI Order). Richard Kwil was exonerated, and in 2023, was granted a Certificate of Innocence. Ex. 132 (Kwil COI Order).

18

### F. Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of John Martinez, Thomas Kelly, and Jose Tinajero (Cross-Examination Only)

John Martinez, Thomas Kelly, and Jose Tinajero were wrongly convicted of the 1998 murder of Daniel Garcia. Each of their convictions were eventually overturned, but not until they had been incarcerated over 20 years. Garcia was murdered on October 11, 1998, and the initial reports provided no leads. See Ex. 15 (10.12.1998 General Offense Case Report) and Ex. 16 (10.12.1998 Initial Supp Report). The two men who were with Garcia just prior to the beating that led to his death, Jesus Fuentes and Esteban Rodriguez, were in a car out of sight of Garcia when the beating occurred. Garcia had left the two to go into an alley to purchase cocaine. After Garcia failed to return, Rodriguez, Fuentes, and Fuentes' six-year old son (who was also in the car) drove around to look for Garcia, finding him badly beaten in the alley. None of the witnesses provided any description of the offenders. See Ex. 15 and Ex. 16.

Detectives Guevara and Halvorsen were assigned to the investigation on December 11, 1998 after Garcia died from his injuries. See Ex. 17 (12.11.1998 Supp Report). On February 6, 1999, Guevara wrote a report stating that he spoke to a woman named Margarita Casiano – a daily drug user – on December 28, 1998 about an unrelated shooting and she told him she had information about Garcia's beating – that she overheard four Latin Kings, she knew as "Toy," "Johnny," "Rabbit," and "Snoopy," joking around about the beating. Casiano allegedly was buying drugs sometime back in October at Whipple and Armitage – near the Garcia beating scene when she heard this information. See Ex. 24 (2.6.1999 Supp Report). In that same report, Guevara wrote that he used "various resources" to determine that "toy" was Jose Tinajero.

According to another Guevara report, on February 6, 1999, he traced an anonymous 911 call to a woman named Melloney Parker. Allegedly Parker had called 911 and stated that at 1:55 am she had awoken and looked out her window and saw some Hispanic men in an alley near a

19

victim on the ground across the street from her third-floor window. She could not describe the man further. Parker didn't talk to police for several months after this call. See Ex. 24. Guevara wrote that that on January 24, he took a photo array to Melloney Parker's apartment and she identified Tinajero as being one of the men who beat the victim. Later in the report, it states that they determined that Johnny was Martinez and Rabbit was Serrano and mugshot photos were shown to Casiano. The report states that the detectives also had a photo of Thomas Kelly aka "Snoopy" and they showed that to Casiano. See Ex. 24. The detectives then showed these photos to Parker and Parker allegedly identified Martinez and Kelly as two people she believed took part in the beating. See Ex. 31 (2.14.1999 Supp Report). Approximately four months after the crime and two months after Casiano allegedly tipped off Guevara, the investigation became focused on John Martinez, Thomas Kelly, and Jose Tinajero, and Angel Serrano without any indication of a meaningful lead or other evidence pointing to the three men.

Guevara suppressed the fact that he never showed Parker a photo array at her house, and he suppressed that he told Parker there was a warrant for her arrest and that he could do something to take care of it if she made an identification in the case.

Guevara arrested Martinez, Kelly, and Tinajero and physically and psychologically abused them until they implicated themselves and one another in the Garcia murder. See Ex. 32, Ex. 33, Ex. 34, and Ex. 36. Guevara, Halverson, and Troche interrogated and coerced Tinajero over a 15 hour period on February 7, 1999, to provide a false confession. Guevara, Halvorsen, and Troche moved Kelly from denying to providing a statement confessing involvement in the murder of Garcia, a confession statement that Tinajero has also long maintained was the product of psychological coercion and is false. According to Tinajero, Guevara psychologically coerced him to stop denying his involvement in the murder and ultimately submit to the will of Guevara

20

and agree to a provide a confession statement, implicating himself and others (John Martinez, Thomas Kelly and Angel Serrano) in the Garcia murder, that Tinajero maintains is completely false and was fabricated by Detectives. See Ex. 32 and Ex. 37.

Martinez was interrogated over the course of more than 34 hours of custody February 7-9, 1999 by Detectives Guevara, Halvorsen, and Troche. Guevara, Halvorsen, and Troche coercively pressured and persuaded Marinez to agree with, and admit to, detectives Guevara's pre-existing conclusion that he actively participated in the murder of Garcia. Martinez did not know anything about the Garcia murder prior to his interrogation by Guevara and Troche. Guevara physically abused Martinez during the interrogation, prevented him from sleeping, and refused to provide him with any water to drink. Guevara and Troche repeatedly fed Martinez facts about the crime and scripted Martinez's confession statement by providing their false version of Martinez's alleged role in the Garcia murder and the narrative that was eventually incorporated into Martinez's confession statement. See Ex. 33 and Ex. 38.

Similarly, Guevara and Halverson interrogated and coerced Kelly over a 47-hour period on February 7-9, 1999, to provide a false confession. Kelly has testified that Guevara and Halvorsen intentionally kept him from sleeping during his extraordinary of custody and interrogation, the entirety of which Kelly has testified that his right hand was handcuffed to a ring in the wall in the interrogation room. Kelly testified that during this 47-hour period, he slept for at most 15-30 minutes. In addition, Kelly testified that the detectives did not allow him to go to the bathroom when he needed, thus causing him to urinate in the room when he could no longer hold it in; that they provided him a small amount of food during this 47 hour period; and that they never provided him with anything to drink during the entirety of his interrogation. See Ex. 34 and Ex. 44.

Martinez's, Kelly's, and Tinajero's convictions were overturned in 2023 and 2024.

### G. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jacques Rivera (Cross-Examination Only)

Jacques Rivera was wrongly convicted of the 1988 murder of 16-year-old Felix Valentin. See generally Ex. 39 at 1-6 (12-cv-4428, Dkt. 321; Plaintiff's response in opposition to summary judgment in *Rivera v. Guevara*). Valentin was shot 11 times while sitting in his car, and died in the hospital two weeks later. Ex. 40 (PX11 – General Offense Case Report with Fax Stamp) He initially told police the shooter was between 16 and 18 years old and later reported that he had been shot by a member of the Imperial Gangsters. Ex. 41 (PX19C - General Offense Report Missing Lopez Name and Other Information); Ex. 42 (PX12 – August 1988 General Progress Report); Ex. 43 (PX19B - 8/31/88 Supplementary Report Regarding Valentin Identification of Rodriguez); Ex. 61 (June 6, 2018 Transcript of Proceedings) at 136–37, 152–54. The lone potential eyewitness, Orlando Lopez, provided a barebones description of the shooter as an 18 year old wearing a black jacket, dark pants, and gym shoes. Ex. 42 (PX12 – August 1988 General Progress Report); Ex. 45 (June 7, 2018 Transcript of Proceedings) at 585-89.

Rivera, who was 23 years old at the time, did not match the description, and no evidence tied him to the crime. Nevertheless, Guevara targeted Rivera as the only suspect. After spending more than 20 years in prison for a crime he did not commit, Rivera was exonerated in 2011. He sued in 2012, and in 2018, a jury found Guevara, Gawrys, Mingey, and the City of Chicago liable and awarded Rivera over $17 million in damages. Ex. 46 (*Rivera* Verdict).

Guevara controlled every aspect of the investigation. On the day of the shooting, Guevara requested Rivera's rap sheet and had his mugshot printed. However, according to Guevara's version of events in his September 16 closing report, Rivera did not become a suspect until August 29, 1988—two days after Guevara inexplicably pulled Rivera's records and

photograph—when he was identified by Lopez in a gang photobook. There is no explanation for why Guevara was focused on Rivera as a suspect two days before he was a suspect. Ex. 47 (PX1A – 9/16/88 Report); Ex. 48 (PX4 – Rivera Rap Sheet Issued on Inquiry 8/27/88); Ex. 42 (PX12 – August 1988 General Progress Report); Ex. 49 (PX66 – Jacques Rivera Photograph); Ex. 45 (June 7, 2018 Transcript of Proceedings) at 576-77; Ex. 50 (June 8, 2018 Transcript of Proceedings) at 674-75; 681-99, 816-17, 931-35; Ex. 51 (June 12, 2018 Transcript of Proceedings) at 1278-79, 1296, 1324; Ex. 52 (June 13, 2018 Transcript of Proceedings) at 1648-1657; Ex. 53 (June 14, 2018 Transcript of Proceedings) at 1736-50, 1763-64; Ex. 54 (June 19, 2018 Transcript of Proceedings) at 2509; Ex. 55 (June 20, 2018 Transcript of Proceedings) at 2760.

On August 31, Guevara and other officers placed Rivera in a live lineup, which Lopez viewed. Ex. 56 (PX14 – 8/31/88 General Progress Report); Ex. 57 (PX62 – Photos of First Lineup); Ex. 45 (June 7, 2018 Transcript of Proceedings) at 529-35. Lopez picked a filler, not Rivera. Three fillers confirmed the lineup occurred, Ex. 58 (June 11, 2018 Transcript of Proceedings) at 1011-19, 1057-61; Ex. 59 (June 25, 2018 Transcript of Proceedings) at 3711-21, and Lopez himself confirmed that he participated in two lineups, with the first occurring shortly after the shooting. Ex. 52 (June 13, 2018 Transcript of Proceedings) at 1651; Ex. 60 (Designated Deposition Testimony of Orlando Lopez) at 178. There would have been a police report created had Lopez selected Rivera, but the report was suppressed. Ex. 45 (June 7, 2018 Transcript of Proceedings) at 548-554, 629-630. Because the lineup did not produce the result Guevara and his colleagues wanted, they wrote a false report claiming the lineup could not be completed because Lopez could not be located, and that they instead conducted a photo array with a different

23

witness. Ex. 13 (Plaintiff's Combined Local Rule 56.1(b)(3)(B) Statement, Dkt. 317) at ¶¶ 36–37, 67–68.

Guevara suppressed all documentation of the lineup—including hold papers, the GPR, and lineup photographs—by keeping them in an investigative file that was never disclosed to prosecutors or defense counsel. Ex. 61 (June 6, 2018 Transcript of Proceedings) at 205–06; Ex. 51 (June 12, 2018 Transcript of Proceedings) at 1387–89, 1399, 1422–23; Ex. 62 (June 21, 2018 Transcript of Proceedings) at 3100–03, 3131–32; Ex. 63 (PX19 – Valentin Investigative Street File) at 57, 59, 64; Ex. 57 (PX62 – Photos of First Lineup); Ex. 64 (PX269 - Documents That Are In Valentin Investigative Street File But Not In Judge Wadas's Criminal Defense File). One of the only documents in the file that was disclosed was the false report stating the lineup never happened. Ex. 65 (PX19F – 9/1/88 Report, First Lineup).

Guevara suppressed additional CPD investigative materials from the Valentin homicide. Both prosecutors and the defense requested all of the investigative files. Ex. 52 (June 12, 2018 Transcript of Proceedings) at 1375-84; Ex. 66 (PX39 – Wadas Motion for Discovery); Ex. 67 (PX40 – State's Answer to Discovery); Ex. 68 (PX43A - Police Records in Judge Kenneth Wadas's Criminal Defense File); Ex. 62 (June 21, 2018 Transcript of Proceedings) 3103-05, 3109-17. Neither prosecutors nor the defense received the complete investigative files. Ex. 64 (PX269 - Documents That Are In Valentin Investigative Street File But Not In Judge Wadas's Criminal Defense File); Ex. 69 (June 18, 2018 Transcript of Proceedings) at 2243-51; Ex. 53 (June 14, 2018 Transcript of Proceedings) at 1395-1412; Ex. 62 (June 21, 2018 Transcript of Proceedings) at 3099-3114. Many investigative notes or reports were not turned over. Ex. 64 (PX269 - Documents That Are In Valentin Investigative Street File But Not In Judge Wadas's Criminal Defense File).

Another report that was disclosed in the criminal case was a 9/16 report which contained one of Guevara's most unrealistic fabrications: a fabricated statement identifying Rivera as the perpetrator by the victim, Valentin, shortly before Valentin's death. Ex. 47 (PX1A – 9/16/88 Report); Ex. 53 (June 14, 2018 Transcript of Proceedings) at 1704-06. There was no contemporaneous documentation of this alleged identification, just the 9/16 report, weeks after the fact. Ex. 63 (PX19 – Valentin Investigative Street File); Ex. 53 (June 14, 2018 Transcript of Proceedings) at 1705-07. Years later, Guevara's colleague testified that Valentin had made an "unreliable" identification of Rivera, which directly contradicts the report, which says that Rivera was identified. Ex. 53 (June 14, 2018 Transcript of Proceedings) at 1707-16; Ex. 47 (PX1A – 9/16/88 Report).

In reality, by the date of the purported identification, Valentin was effectively in a coma. According to Dr. Sharkey, his treating physician in the hospital after the shooting, and his medical records, at the time that Guevara purportedly obtained Valentin's identification of Rivera, Valentin was not responsive, his neurological functioning was ceasing, he had no reaction to painful stimuli and his pupils did not react to light, and he was on heavy doses of drugs that induced paralysis so that he would not involuntarily kick the breathing machine that was keeping him alive. Ex. 70 (PX31A - Felix Valentin Medical Records Discussed by Dr. Sharkey); Ex. 71 (Designated Deposition Testimony of Dr. Arthur Sharkey) at 27-45; Ex. 52 (June 13, 2018 Transcript of Proceedings) at 1680; Ex. 53 at 1687, 1707-09. He could not have identified anyone, and did not identify a photo of Rivera at all on that day. Ex. 71 (Designated Deposition Testimony of Dr. Arthur Sharkey) at 55-56, 175-178. Guevara falsely reported Valentin's identification of Rivera, without reporting the true circumstances of that purported identification.

25

Dr. Sharkey already testified in the civil case, and his qualifications were ruled upon by the court—this Court does not need to re-adjudicate the validity of his testimony because it has already been established. Moreover, Guevara cannot contest any of the above facts because there is a judgment against him on all of these issues, and issue preclusion prevents him from litigating them here. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979) ("[Preclusion] has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party . . . and of promoting judicial economy by preventing needless litigation."); *Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987) (explaining that for issue preclusion to apply in a § 1983 suit, four requirements must be met: (1) the issue must be the same as that involved in the prior judicial proceeding; (2) the issue must actually have been litigated; (3) the issue must have been resolved; and (4) the issue must have been necessary to the judgment in the prior proceeding); see also Ex. 46 (Verdict in *Rivera*); Ex. 110 (Judgment in *Rivera*). Accordingly there will be no dispute at trial about these facts—they can simply be presented to a jury via cross examination.

## H. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Geraldo Iglesias (Cross-Examination Only)

Geraldo Iglesias was wrongly convicted of the 1993 shooting murder of Monica Roman in Logan Square and spent nearly two decades in prison before he was exonerated in 2019. See generally Ex. 72 (19-cv 6508, Dkt. 278; Pl. Resp. Defs. Mot. Summ. J.). The crime was a lone gunman firing into a fully passengered automobile, killing Monica Ramon who was sitting in the front passenger seat, and it occurred on June 7, 1993. *Id.* Immediately after the incident, responding detectives interviewed all of the witnesses who had been in the car with Roman and all of the witnesses at the scene. Ex. 73 (6/7/1993 Supplemental Report). None, including Rosendo Ochoa and Hugo Rodriguez, got a good look at the shooter nor could any make an

identification. *Id.* (absence of such information). Many circumstances of the shooting made it impossible for Ochoa and Rodriguez to see the shooter, let alone make an identification. Ex. 72.

Weeks after the shooting the case went cold, Guevara, Halvorsen, and other police officers got involved. *Id.* at 5–6. Guevara pulled Iglesias's rap sheet, decided on a theory that he had been involved in the shooting, and worked to obtain his identification. *Id.* On June 23 and June 24, 1993, Defendants fabricated all of the evidence implicating Iglesias in the murder. Defendants then created a report of their handiwork, which included: false claims that Ochoa and Rodriguez—two weeks after the murder—could now identify Iglesias, and a fabricated confidential informant's statement. Ex. 74 (Closing Report, 6/24/1993); Ex. 75 (6/23/1993 Ochoa Lineup Supplementary Report); Ex. 76 (6/23/1993 Rodriguez Lineup Supplementary Report) at CCSAO-Serr-Mont 00005802; Ex. 77 (Deposition of Stephen Gawrys) at 67:23-68:21 (their names at bottom of report means they were involved in preparing the report). Based solely on Defendants' report recounting fabricated witness statements, Iglesias was charged, detained, and prosecuted for Roman's murder. Ex.74 at RFC-Iglesias 123, 125; Ex. 78 (Deposition of Michael Latz) at 24:3–13, 46:6–25.

But the case against Iglesias was weak. About a month after Iglesias had been charged, Guevara and Halvorsen forced a jailhouse informant named Francisco Vicente to recount a story that Guevara and Halvorsen had fabricated: that while Vicente had been in Cook County Jail, he ran into Iglesias, who confessed to shooting Monica Roman. This interaction between Vicente and Iglesias never occurred, but Guevara and Halvorsen forced Vicente to adopt the statement they had fabricated by physically abusing him, threatening him, and making him promises—none of which were disclosed. *Id.*

27

And this wasn't the first time they had done so with Vicente: In other cases, using the same physical abuse, threats, and promises, Guevara and Halvorsen forced Vicente to falsely claim that four other innocent men—Jose Montanez, Armando Serrano, Angel Pacheco, and Robert Bouto—had each confessed to him about other crimes in which Guevara and Halvorsen were the investigating detectives. Ex. 79 (Expert Report of Nancy Franklin); Ex. 80 (Certificate of Innocence Hearing Transcript). All were wrongly convicted, and this information was suppressed in each of their trials. Ex. 81 (Deposition of Francisco Vicente in *Bouto* and *Iglesias*) at 69:15–71:3, 74:1–10, 75:4–77:14, 89:18–91:10, 91:18–92:2, 98:19–99:10, 143:19–145:6, 145:23–146:5, 146:16-147:21.

Guevara and Halvorsen fabricated reports recounting fabricated witness statements, and throughout trial suppressed the true circumstances of the force, threats, and promises Defendants used to obtain fabricated accounts. Ex. 111; Ex. 112; Ex. 81 at 69:15-71:3, 98:2-14, 280:22-282:5, 283:2-285:12; Ex. 113 & 114, (omitted from police files), Ex. 115 (no mention in prosecution file). At trial, Vicente testified about the fabricated confession that Iglesias purportedly made to him in Cook County Jail. Ex. 82 (Trial Testimony of Francisco Vicente) at V15-22. Based on Defendants' report recounting these fabricated identifications, confidential informant tip, and jail-house confession, Iglesias was convicted of the Roman murder. Ex. 116 at AA27; Ex. 117 at EP Subpoena Response 888-889.

Vicente has since testified to the truth of Defendants' report consistently, across multiple depositions and sworn statements in recent years that the statements he made against Iglesias and the other four men were all false; they were all manufactured by Guevara and Halvorsen; and that he was forced to give those statements because of physical abuse, threats, and promises from

Guevara and Halvorsen. Ex. 81 at 69:15-71:3, 74:1-10, 75:4-77:14, 89:18-91:10, 91:18-92:2, 98:19-99:10, 143:19-145:6, 145:23-146:5, 146:16-147:21, 283:2-285:12; Ex. 111; Ex. 112.

In Iglesias's subsequent litigation against Defendants for violating his constitutional rights, Defendants conceded that they were not entitled to summary judgment on the issue of Vicente's account. Ex. 72 (Pl. Resp. Defs. Mot. Summ. J. at 15, *Iglesias*, No. 19-cv-6508, Dkt. 278). After Guevara and Halvorsen pleaded the Fifth, the City of Chicago conducted an investigation into allegations of misconduct against Defendant Guevara, and concluded as part of that investigation that Vicente's statements implicating Iglesias and all four other men were false and fabricated. Ex. 81 at 244:11; 224:11-233:23; Ex. 24 at 19:17-22:1; 46:20-48:6; 296:13-297:2, 247:24-248:5; Ex. 101 at 34, 44; Ex. 103 at 48-50, 57-58.

### I. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Robert Bouto (Cross-Examination Only)

Robert Bouto was wrongly convicted of the 1993 murder of Salvadore Ruvalcaba. His conviction was eventually overturned, but not until he had been incarcerated 23 years. Ruvalcaba was murdered on May 14, 1993, and the initial reports described the shooter as having a ponytail. See Ex. 83 (General Offense Case Report - Bouto). Two witnesses, Carl Richmond and Rey Lozada, identified Bouto from a lineup conducted by Guevara. See Ex. 84 (Guevara May 16, 1993 Report). Although Bouto did not have a ponytail, and presented alibi testimony from two witnesses, he was nevertheless convicted and imprisoned. See Ex. 85 (Line-up photos taken the day of the shooting, depicting Mr. Bouto without a ponytail); Ex. 86 (Alibi Trial Testimony of Astefan and Kandah).

After trial, both Richmond and Lozada came forward to reveal that their witness statements and identifications had been fabricated by Guevara. Both were permitted to view Bouto in custody at the police station before viewing the lineup conducted by Guevara. See Ex.

29

87(Richmond Affidavit) at ¶¶ 6-7; Ex. 120(Lozada Affidavit) at ¶6. Richmond explained that

Guevara told him that he had caught the shooter, and that all Richmond and Lozada had to do

was identify Bouto. See Ex. 87(Richmond Affidavit) at ¶ 9. Bouto's conviction was overturned

on April 30, 2018. See Ex. 88 (Order dated April 30, 2018).

### J.Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jose Montanez and Armando Serrano (Cross-Examination Only)

Jose Montanez and Armando Serrano were wrongly convicted of the 1993 murder of

Rodrigo Vargas and both served 23 years in prison before they were exonerated in 2016. See

generally Ex. 92 (*Montanez v. Guevara*, No. 17-cv-4560, Dkt. 1 (N.D. Ill. June 19, 2017)). Mr.

Vargas was murdered on February 5, 1993. The case went unsolved for a number of months,

until a heroin addict named Francisco Vicente, discussed above, was arrested for committing a

number of armed robberies. According to Vicente, Guevara physically beat him and provided

him undisclosed incentives to falsely implicate Montanez and Serrano in the murder. Ex. 111

(Affidavit of Francisco Vicente). Bowing to the coercion, Vicente repeated the story fed to him

by Guevara at the Montanez and Serrano trial, leading the court to convict both men of murder.

Vicente later disclosed that Guevara had told him to implicate Montanez and Serrano, and both

Montanez and Serrano were released and received certificates of innocence. Ex. 94 (Montanez

and Serrano COIs).[3]

Guevara obtained rap sheets for Montanez and Serrano in relation to the Vargas homicide

before there was any reason to suspect either Montanez or Serrano in that crime. Specifically,

there was no mention of Montanez or Serrano as suspects in the Vargas homicide investigation

---

[3] Guevara and Mingey also coerced another man, Timothy Rankins, to falsely implicate Montanez and Serrano, but Rankins never testified at Montanez and Serrano's trial. Rankins's account, however, corroborates Vicente's, to the extent that he accuses Guevara and Mingey of feeding him facts about the Vargas murder and coercing him to falsely implicate Montanez and Serrano. See *id.*

until June 2, 1993. See Ex. 95 (Guevara June 2, 1993 Supp. Report). But in May 1993, Guevara sought and obtained criminal history reports for both Montanez and Serrano, a week before they were implicated by anyone in connection with the Vargas murder or any other crime. Compare Ex. 96 (Criminal History Requests for Montanez and Serrano), with Ex. 97 (Rap Sheets for Montanez and Serrano).

In the Vargas case, the victim's widow testified that Guevara manipulated her into adopting a false story that she had identified Mr. Montanez's car as the perpetrators' vehicle. Mrs. Vargas testified that Guevara told her that the killers' vehicle was an abandoned car, and that bullet holes in Mr. Montanez's car were forensically matched to the crime scene, and that the car sustained damage in the course of the Vargas homicide. Ex. 98 (Wilda Vargas dep) at 116-24, 230-234 This information was false. According to the scene supplementary report, there were no witnesses to the shooting and no suggestion that the perpetrators' vehicle had been shot or damaged in the attack on Vargas, who was killed as he entered his van to leave for work. Ex. 99 (Scene Supp Report, *Montanez*) Mr. Montanez's car happened to appear to be abandoned because it had no license plates on it. Ex. 100 (Photo of Montanez car)

In addition, Guevara claimed in his June 2, 1993 supplementary report that he learned about an encounter between the victim and the perpetrators the day before the shooting from Vicente. See Ex. 95 (Guevara June 2, 1993 Supp. Report). Mrs. Vargas testified that this was a lie. In fact, she told Guevara months before he interacted with Vicente about the encounter that Guevara claimed came from Vicente. Ex. 98 (Wilda Vargas dep) at 96-102

### K. The City of Chicago's Own Investigation of Guevara Corroborates the Evidence Set Out Above

In 2013, the City of Chicago hired Scott Lassar of Sidley & Austin to investigate Guevara's misconduct on its behalf. After conducting an exhaustive investigation, Lassar discovered that at least six men investigated by Guevara had been wrongfully convicted, including Robert Bouto, Gabriel Solache, Arturo Reyes, Jose Montanez, Armando Serrano, and Roberto Almodovar. See Ex. 101, 102, 103, and 104 (Lassar reports for each of these cases).

In these cases, Lassar determined that Guevara had engaged in misconduct in obtaining Mr. Bouto's, Mr. Solache's, and Mr. Reyes's convictions, including manipulating witnesses to falsely identify Bouto and physically abusing Solache and Reyes. See Ex. 101 at 43 (Lassar report for Bouto); Ex. 102 at 12-13 (Lassar report for Solache and Reyes). Lassar also found that Mr. Montanez, Mr. Serrano, Mr. Bouto, and Mr. Almodovar were likely innocent of the crimes Guevara had pressed against them. See Ex. 103 at 58 (Lassar report for Montanez and Serrano); Ex. 101 at 43-44 (Lassar report for Bouto); Ex. 104 at 15 (Lassar report for Almodovar). It goes without saying that the City's findings that Guevara engaged in misconduct in these cases substantially bolsters the evidence set out above.

## ADMISSIBILITY OF OTHER ACTS EVIDENCE

Other-acts evidence relating to Guevara is admissible in this case to prove intent, knowledge, opportunity, preparation and plan, the absence of mistake and lack of accident, Defendants' identity, and on other material issues. These categories of permissible uses for other-acts evidence of overlap to some extent, but Plaintiffs discuss each in turn below, identifying the admissible evidence from the cases above. In each category, there are propensity-free explanations for why the other-acts evidence is relevant to a central dispute at trial.

Plaintiffs described above how Guevara often fabricated suspect and witness statements, coerced confessions, wrote false reports, and suppressed evidence in front of his partners and

supervisors, but Plaintiffs intend to introduce other-acts evidence only against Guevara at the upcoming trial. The other acts of Guevara that Plaintiffs focus on from the above cases are in the categories: fabrication of false suspect and witness statements, coercion of false confessions, and suppressions of evidence.

### A. Other-Acts Evidence Is Admissible to Show Defendants' Intent

When intent is a material issue in a case because it is contested, other-acts evidence demonstrating that Guevara acted with the requisite intent is admissible under Rule 404(b). In order to hold Defendants liable under section 1983, Plaintiffs must show that they engaged intentionally in conduct that violated the Constitution. Negligent conduct that causes harm is not enough. *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

As they did at summary judgment, Defendants will take full advantage of this standard at trial, and they will advance a defense that they did not act intentionally at all. Instead, they will argue, they at worst were duped and acted negligently. Defendants will vigorously dispute whether Plaintiffs can show they intended to violate their rights, and in doing so they will make intent a central issue for the trial.

Other-acts evidence showing Guevara intentionally fabricated false statements attributed to Plaintiffs, intentionally used physical force against Plaintiffs to extract statements from them, and intentionally suppressed exculpatory and impeachment evidence during Plaintiffs' criminal prosecutions, instead of doing all those things negligently, is therefore admissible. See *Wilson*, 6 F.3d at 1238 (reversing district court and ordering new trial because other acts of Jon Burge should have been admitted to demonstrate that acted intentionally when he tortured Wilson and violated his rights); *Young v. Rabideau*, 821 F.2d 373, 379-80 (7th Cir. 1987) (permitting evidence of past misconduct to rebut the "main defense that [the party] did not intend to [commit the misconduct in the present case]"); *United States v. Wormick*, 709 F.2d 454, 459-60 (7th Cir.

33

1983) (deciding that evidence that police officer had fabricated a false police report in the past was admissible under Rule 404(b) to show intent to create false reports in the present case); *see also Rivera*, 2018 WL 11468923, at *6 (finding 404(b) evidence of Guevara's prior incidents of fabricated evidence, coercive identifications, and other constitutional violations highly probative of intent); *Edwards v. Thomas*, 31 F. Supp. 2d 1069, 1074-75 (N.D. Ill. 1999) (use of excessive force admissible to prove intent to use force).

Repeatedly the Seventh Circuit has held that other-acts evidence is admissible where a defendant argues that they lacked the requisite intent and acted in good faith. See *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (holding that it was not an abuse of discretion for the district judge to admit evidence of other bad acts where they showed intent and "also helped negate [the defendant's] asserted defense that she had acted in good faith"); *United States v. Curtis*, 781 F.3d 904, 910 (7th Cir. 2015) (holding that where a defendant opens the door by suggesting that he acted in good faith, other-acts evidence are admissible to rebut the defense and show intent); *United States v. Mireles*, 116 F.4th 713, 725 (7th Cir. 2024) ("By placing his knowing participation at issue, Mireles increased the probative value of otherwise tangential other-act evidence, and the government was entitled to introduce evidence to rebut the argument."); *Lange v. City of Oconto*, 28 F.4th 825, 843 (7th Cir. 2022) (affirming trial courts admission of other-acts evidence to explain "why and what the defendant[-officers] were thinking" when intentional discrimination was at issue); *United States v. Johnson*, No. 24-2027, 2025 WL 1541048 (7th Cir. May 30, 2025) (affirming trial courts admission of prior drug deals to probe defendant's intent to distribute methamphetamine and negate personal use defense); *United States v. Nolan*, 910 F.2d 1553, 1561 (7th Cir. 1990) (holding that evidence of 17 other bank robberies were relevant to show intent and to rebut the defendant's claim that he had

entered a bank with innocent intent); *United States v. Arnold*, 773 F.2d 823, 833 (7th Cir. 1985)

(concluding that a failed prior attempt to bribe a witness was relevant to show intention to bribe a

witness in the present case).

The same is true when a defendant claims that they lacked intent and were instead duped

by third parties, as might be the defense with respect to Adriana Mejia here. *United States v.

Macedo*, 371 F.3d 957, 967 (7th Cir. 2004) (holding that district court did not abuse its discretion

by admitting past crimes where the defendant's theory of the case was that he lacked the

requisite intent and instead was a "dupe"); *Mireles*, 116 F.4th at 725  (affirming district court's

admission of defendant's failure to file taxes as probative of his involvement in a drug

conspiracy, where his central defense was that "he was just a gullible friend who had been

duped); see also *United States v. DeFillipo*, 590 F.2d 1228, 1240 (2d Cir. 1979) (where defense

claimed defendants were innocent dupes in working with stolen goods, intent in issue).

Defendants' position at trial that they acted in good faith makes other acts of Guevara

admissible to show that he did not act in good faith. In particular, other acts set out above are

relevant to the theory that Guevara intentionally coerced Plaintiffs to adopt false confessions.

Guevara intentionally did the same thing in the cases of Gonzalez (supra Section C), Rodriguez

(Section D), Gecht/Kwil (Section E), and Martinez/Kelly (Section F). Similarly, Defendants will

also contend that they did not intentionally fabricate Plaintiffs' statements. In other words,

Defendants will contend that they would never script witness statements or testimony. But in all

of the cases just referenced, as well as the case described by former CPD officer Dorsch (supra

Section A), Sierra (Section B), Rivera (Section G), Iglesias (Section H), Bouto (Section I), and

Montanez/Serrano (Section J). Guevara intentionally instructed witnesses to provide false

evidence, by fabricating witness statements and identifications. These other acts are therefore

admissible on the question of Guevara's intention to fabricate false evidence during the Soto investigation, and to rebut any claim by Guevara that he acted like a reasonable investigator and followed the evidence in the Soto investigation where it led him.

The same propensity-free chain of reasoning regarding proof of intent applies when it comes to showing Guevara's intent to suppress exculpatory evidence, including Defendants' investigation of the Soto family as suspects, Aranda's statements, and alternative suspects documented in photographs in the investigative files. On these subjects, too, Defendants will present a case to the jury that, even if these events occurred, they had no intention of violating Plaintiffs' federally protected rights. But as far as Guevara is concerned, he intentionally suppressed exculpatory information in every one of the cases discussed above. The Court should admit the other-acts evidence for this reason.

**B. Other-Acts Evidence Is Admissible to Show Absence of Mistake or Accident**

These same other acts are also relevant and admissible to prove the closely related theory that Guevara did not make a mistake in causing the wrongful prosecution and conviction of Plaintiffs. Defendants will claim at trial that the following version of events should be believed: they did not manufacture Plaintiffs' confessions; witnesses implicated Plaintiffs by themselves; no evidence was hidden; and that they had no reason to suspect anyone but Plaintiffs (and Adriana Mejia) in their criminal investigation. Under this theory, it was at worst a mistake on Defendants' part to implicate Plaintiffs, and not a frame job that renders them liable.

In their response, Defendants will not be able to disavow that mistake or accident will be a major pillar of their defenses, and so the same other-acts evidence discussed in the section directly above will be admissible to demonstrate lack of accident or mistake, on the same theories. *United States v. Thomas*, 986 F.3d 723, 727, 732 (7th Cir. 2021) (holding district court

did not err admitting evidence of three fires to negate defendant's claim that the second and third fires were accidental, in a mail fraud case where intent was at issue); *United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996) (evidence of prior drug crime was properly admitted to show absence of mistake); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (permitted evidence showing defendant "was not some hapless fool mistakenly caught up in an overzealous law enforcement action"); *United States v. Tylkowski*, 9 F.3d 1255, 1262 (7th Cir. 1993) (permitting "evidence of another crime which tends to undermine the defendant's innocent explanations for his act"); *Young*, 821 F.2d at 379 (concluding that a prison's prior misconduct negates the defense that he committed similar misconduct accidentally); *United States v. Hillsberg*, 812 F.2d 328, 334 (7th Cir. 1987) (holding that prior firings of a gun on different occasions were relevant to prove that the defendant had not accidentally discharged the weapon on the occasion in question); *see also Rivera*, 2018 WL 11468923, at *6 (finding 404(b) evidence of Guevara's prior incidents of fabricated evidence, coercive identifications, and other constitutional violations highly probative of absence of mistake). Guevara's other acts are relevant to prove that Guevara did not make a mistake during the investigation of the Soto murders and kidnappings and the prosecution of Plaintiffs.

## C. Other-Acts Evidence Is Admissible to Show Knowledge

Similarly, other acts evidence is relevant and admissible to show that Guevara had knowledge of the misconduct in this case that Plaintiffs say occurred. Defendants will claim that they did not know that Plaintiffs' confessions were invented. They will say they did not know Plaintiffs had been abused and coerced to confession. They will say they had no knowledge that key evidence was suppressed. Other-acts evidence is admissible at minimum to show that Guevara had knowledge of all of these things. For instance, Guevara knowledge that Plaintiffs' confessions were police fabrications (as were the police reports documenting them) is

demonstrated by Guevara's conduct relating to the knowing fabrication of suspect and witness statements in the case described by Dorsch (Section A), as well as in the cases of Sierra (Section B), Gonzalez (Section C), Rodriguez (Section D), Gecht/Kwil (Section E), Martinez/Kelly (Section F), Rivera (Section G), Iglesias (Section H), Bouto (Section I), and Montanez/Serrano (Section J). That Guevara had knowledge of suppression of the identity of alternative suspects who were investigation and the suppression of witness accounts is shown by his knowledge of suppressions in Sierra (Section B), Rodriguez (Section D), Rivera (Section G), Iglesias (Section H), Bouto (Section I), and Montanez/Serrano (Section J).

Other acts are admissible when a defendant denies knowledge of facts in order to show that the defendant in fact had knowledge. See, *e.g.*, *United States v. Urena*, 844 F.3d 681, 683 (7th Cir. 2016) (other acts relevant after *Gomez* to show knowledge of misconduct when knowledge was denied); *Lange*, 28 F.4th at 843 (affirming trial courts admission of other-acts evidence to explain "why and what the defendant[-officers] were thinking"); *United States v. White*, 68 Fed. App'x 707, 711 (7th Cir. 2003) (unpublished) (evidence of an officer's previous discipline for using excessive force relevant to charge that the officer used force knowingly); *United States v. Harris*, 536 F.3d 798, 806 (7th Cir. 2008) (prior drug deals admissible to prove defendant knew about drugs).

At the same time, Defendants will attempt to convince the jury that they lacked another type of knowledge: they will argue they did not have the skill or the means necessary to commit the type of fabrications and suppressions that Plaintiffs claim occurred. Other-acts evidence is also admissible without reference to propensity to show that a defendant in fact did have the requisite knowledge and skill. See, *e.g.*, *Burton*, 901 F.3d at 780 (reversing trial court's excluding evidence of defendant-officer's prior excessive force to an arrestee for its relevance in

determining requisite knowledge for applying reasonable force to the same arrestee). An other

act's relevance and probative value for requisite knowledge are heightened when its inclusion

would ameliorate an information asymmetry. *Id.* at 781 ("[I]t would create an odd asymmetry to

say that a police officer may consider a suspect's prior bad acts when considering the amount of

force to use, but need not consider his own prior bad acts."). Each of the instances above shows

manipulation of evidence to generate evidence implicating a suspect selected by Guevara, and

the techniques employed—for example, using physical force to obtain confessions, as in the

cases of Gonzalez (Section C), Rodriguez (Section D), Gecht/Kwil (Section E), and

Martinez/Kelly (Section F)–demonstrate Guevara's knowledge. Additional cases supporting

admission of other-acts evidence for this proper purpose are cited in the next section, on the

closely related category of using other acts to show opportunity.

**D. Other-Acts Evidence Is Admissible to Show Opportunity**

Defendants will also no doubt defend themselves by suggesting that Plaintiffs are

conspiracy theorists, in the sense that the conspiracy and misconduct that Plaintiffs allege are so

extreme that it could not have possibly happened within the Chicago Police Department, and in

the midst of such a large group of people. In short, Defendants will argue that, even if Plaintiffs

can show the requisite intent and the means to commit the alleged misconduct, Defendants

would have had no opportunity to engage in such bad behavior.

Opportunity (or the chance or capacity to commit an act) is an additional permissible use

of other-acts evidence in this case. *Wilson*, 6 F.3d at 1238 (Burge's past abuse of suspects

admissible to show opportunity to abuse suspect in the present case); *United States v. Burrows*,

48 F.3d 1011, 1018 (7th Cir. 1995) (evidence of prior bad acts involving handguns was

admissible to show that defendant had the opportunity to possess a handgun); *United States v.*

*Chaverra-Cardona*, 879 F.2d 1551, 1553 (7th Cir. 1989) (evidence of other acts by the defendant

were admissible to show that she had the opportunity to commit the drug crimes at issue); see also *Rivera*, 2018 WL 11468923, at *6 (finding 404(b) evidence of Guevara's prior incidents of fabricated evidence, coercive identifications, and other constitutional violations highly probative of opportunity).

The cases discussed above show with ample and extremely reliable evidence–sometimes evidence that has resulted in a federal judgment–that Guevara had the capacity, and indeed the nearly unlimited opportunity, to decide to frame criminal suspects, to fabricate evidence, to create suspect and witness statements, and to withhold from the criminal justice system just about any investigative material he wanted to.

### E. Other-Acts Evidence Is Admissible to Show Identity

Independently, use of other-acts evidence is permissible to show the identity and *modus operandi* of Guevara. Key pieces of suppressed evidence in this case relate to alternative suspects investigated by Defendants but not disclosed to Plaintiffs in their underlying criminal cases. That evidence would have been powerful exculpatory and impeachment evidence. Recognizing that this evidence supports Plaintiffs' due process claims for suppression of evidence, Defendants will adopt the only defense available—they will contend contrary to the evidence that they did not and would not withhold this evidence. Defendants will argue that, even if one believes Plaintiffs' evidence, it was not them who caused Plaintiffs to go without this critical information.

In this situation, where Defendants intensely dispute whether it was them who committed the misconduct, the law permits the use of other-acts to show identity. The distinctive features of Guevara's other misconduct are relevant to show that it was him who suppressed key evidence. Where Defendants have engaged in similar acts of misconduct, those other acts are admissible to

40

prove it was them this time as well. See *Gomez*, 763 F.3d at 861 ("[O]ne accepted way to use other-act evidence to prove identity is to argue that the perpetrator had a distinctive modus operandi."); *Shields v. United States*, 2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) (holding that evidence of modus operandi is usually used to prove identity).

Defendants may argue that none of the other-acts evidence is sufficiently similar to be used in the upcoming trial. The context in which similarity really matters is when 404(b) evidence is used to prove identity or *modus operandi*. But identical acts are not necessary. Plaintiffs must show "only that the prior acts bear 'a singular strong resemblance to the pattern of the offense charged.'" *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989) (quoting *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir. 1984)). This is because "[d]istinctiveness is key to whether something is proper modus operandi evidence," and inherently, "[s]uch uniqueness lies on a spectrum." *Thomas*, 986 F.3d at 731. The past incidents must only be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Shackleford*, 738 F.2d at 783. That said, many of the other acts discussed in this brief are so similar to the misconduct at issue here that they are properly classified as *modus operandi* evidence.

Here, Guevara's other acts of suppression and fabrication are so distinctive that they can be admitted in order to show that it was Guevara who suppressed alternative suspect information and witness accounts and fabricated false confessions. Guevara did exactly the same fabricating of false statements to implicate suspects in Sierra (Section B), Gonzalez (Section C), Rodriguez (Section D), Gecht/Kwil (Section E), Martinez/Kelly (Section F), Rivera (Section G), and the same suppression of exculpatory evidence in Sierra (Section B), Rivera (Section G), Iglesias (Section H), Bouto (Section I), and Montanez/Serrano (Section J).

41

Guevara's other acts are much more similar to the fact pattern in this case than the usual case in which other acts are admitted to prove identity or *modus operandi*. See, *e.g.*, *United States v. Clark*, 774 F.3d 1108, 1114 (7th Cir. 2014) (evidence of uncharged robberies with very similar victims and descriptions of the perpetrator were relevant to identify defendant as the charged robber); *United States v. Vance*, 764 F.3d 667, 669 (7th Cir. 2014) (evidence of uncharged robberies of trio of restaurants relevant to show identity of perpetrators in a series of bank robberies where robbers used the same ski-masks and gun, and had one robber approach the counter while the other stood guard); *United States v. Brown*, 471 F.3d 802, 806 (7th Cir. 2006) (evidence that defendant had purchased drugs from the same drug dealer before was relevant when defense tried to argue that drug dealer had mistakenly identified defendant); *United States v. Connelly*, 874 F.2d 412, 417 (7th Cir. 1989) (to be admissible as *modus operandi* evidence, similarities must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof) (internal citation omitted). Accordingly, the other-acts evidence can be used to prove Guevara's identity as well.

### F. Other-Acts Evidence Is Admissible to Show Preparation and Plan

In addition, as in *Wilson v. City of Chicago*, evidence of a police officer's past misconduct involving manipulation of witnesses is admissible to show preparation and planning on the part of the same officer engaging in the same type of misconduct in the case before the court. 6 F.3d at 1238 (police officers' previous interrogation methods "admissible for other purposes, including . . . preparation, and plan"); see also *Thomas,* 986 F.3d at 727, 732 (holding district court did not err admitting other-act evidence under 404(b) which tended to prove a plan, "scheme or artifice to defraud"); *Rivera*, 2018 WL 11468923, at *6 (finding 404(b) evidence of Guevara's prior incidents of fabricated evidence, coercive identifications, and other constitutional violations highly probative of a plan); *Hill v. City of Chicago*, 2011 WL 3840336

(N.D. Ill. Aug. 30, 2011) (granting in part and denying in part motion to exclude prior acts evidence on theory that they were sufficiently similar that they showed preparation and planning on the part of the defendant officers). As in *Wilson* and *Hill*, the identified other acts here are sufficiently similar to the Soto investigation to show preparation and planning on the part of Guevara.

### G. Other-Acts Evidence Is Admissible for Other Permissible Purposes As Well

Finally, evidence of Guevara's other acts is admissible for other purposes as well. It is admissible to impeach Guevara on the stand. If he is pleading his Fifth Amendment right to remain silent, and the jury is not required to draw an inference against him, then his answers are tantamount to a denial. And so, when he is asked whether he would ever have fabricated a statement for Plaintiffs to give or beat them until they adopted those statements, for example, his answer can be impeached with evidence that he did precisely that in the cases described by Gonzalez (Section C), Rodriguez (Section D), Gecht/Kwil (Section E), and Martinez/Kelly (Section F).

The use of other acts to impeach claims of innocence by specific contradiction is permissible. See *United States v. Bell*, 624 F.3d 803, 810-11 (7th Cir.2010) (allowing other acts to bolster witness's impeaching power); *Molnar v. Booth*, 229 F.3d 593, 603-04 (7th Cir.2000) (allowing evidence of prior instances of similar sexual harassment for "impeachment purposes"); *United States v. Taylor*, 728 F.2d 864, 872 (7th Cir. 1984) (allowing evidence of other drugs and guns seized in home search against criminal defendant for impeachment). Guevara has received ample notice that other acts evidence could be used against them for impeachment purposes, and accordingly, the opportunity to produce rebuttal witnesses. See *Rivera*, No. 12-CV-04428, 2018 WL 11468923, at *2 (N.D. Ill. June 1, 2018) (deciding use of 404(b) for Guevara's impeachment on notice grounds).

43

In addition, evidence of other acts is also admissible to impeach Guevara's credibility. *Lange*, 28 F.4th at 843–44 (affirming district court's admission of other-acts evidence bearing on a party's "credibility as to the extent of her disability" in a reasonable accommodations claim); *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir. 1996) (prior acts showing untrustworthiness are admissible to impeach witness's credibility); *Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990) (prior acts involving deceit are admissible to impeach witness's credibility); *Wrice v. Burge*, 2016 WL 6962838, at *6 (N.D. Ill. Nov. 29, 2016) (allowing evidence of other bad acts to attack witness's credibility). Or to show that Guevara is biased in his testimony. *United States v. McGee*, 408 F.3d 966, 982 (7th Cir. 2005) (extrinsic evidence admissible for impeachment purposes to show bias); *Holmes v. Godinez*, 2016 WL 4091625, at *5 (N.D. Ill. Aug. 2, 2016) ("Defendant will be barred from offering bad act propensity evidence, but will be permitted to inquire into specific incidents of conduct on cross-examination to establish bias or the witnesses' character for truthfulness.").

Moreover, other acts can be used to corroborate the testimony of key witnesses who contend, for example, that Guevara fabricated a false witness accounts and recorded it in police reports. That testimony is corroborated by the fact that Guevara did exactly that with other suspect and witness statements in each of the other cases discussed above. Evidence that corroborates testimony on material points is admissible under Rule 404(b). *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) ("If the 'bad acts' are really direct evidence of the crime charged, Rule 404(b) is inapplicable."); *United States v. Grabiec*, 563 F.2d 313, 318 (7th Cir. 1977) (explaining that "additional criminal activities may be admitted to show a pattern of conduct corroborating a similar pattern carried out during the conspiracy and a method of

operation," and concluding evidence of previous gang activity was admissible to show drug conspiracy).

The evidence of other acts is also centrally relevant to Plaintiff's *Monell* theories that the Chicago Police Department routinely suppressed exculpatory information. *Cazares v. Frugoli*, 2017 WL 4150719, at *9 (N.D. Ill. Sept. 19, 2017) (evidence of one officer's prior acts and especially the police department's "investigations into those accidents, are highly relevant to Plaintiffs' *Monell* claim, independent of any propensity chain of inference"). There is no credible argument *against* admitting Guevara's other acts for this purpose.

Finally, other-acts are doubly relevant to proving punitive damages. First, the Seventh Circuit has recognized that other acts are relevant to punitive damages because they show that the defendant intended to cause harm. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 517 (7th Cir. 1997) (affirming decision to admit evidence of prior similar acts for the purpose of showing intent as relevant to damages); see also *Edwards*, 31 F. Supp. 2d at 1074 n.8 (plaintiff's request "for punitive damages would appear to make the issue of Officers' intent to do harm relevant on that claim"). Second, the Seventh Circuit has also held that evidence of repeated misconduct is also relevant because punitive damages are designed to deter and punish precisely this sort of pattern of misconduct. *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 930-31 (2004) (holding that other bad acts are admissible on question of punitive damages, and distinguishing *State Farm v. Campbell*, 538 U.S. 408 (2003)). Defendant Guevara's other acts directly harmed Plaintiffs and many other civilians. And the use of those other acts, nearly identical to Defendant's actions in this case, are permissible for the purpose of deterring future conduct, and are directly probative of Defendant's malicious intent or lack

thereof (e.g., whether Defendant intended to harm Plaintiffs individually or as part of a larger, unfeeling plan).

### H. There Is No Good Reason to Exclude Other-Acts Evidence

None of the typical arguments for excluding other-acts evidence holds water here. Guevara might contend that the facts of some of the other-acts cases discussed above are contested, and he might argue that these factual disputes call for exclusion. But the Seventh Circuit has been clear that Rule 404(b) does not require the Plaintiffs to prove the other acts to the Court by a preponderance of the evidence before those other acts are admitted. *Gomez*, 763 F.3d at 854 (citing *Huddleston v. United States*, 485 U.S. 681, 689-90 (1988)).

Moreover, there is strong evidence supporting the other acts, as Plaintiffs' extensive citations to sworn testimony above show. Again, and critically, Guevara has pleaded his Fifth Amendment right to remain silent in response to all questions about his misconduct in each and every one of the cases above. If Guevara fears incriminating himself by responding to basic questions about whether he rigged the identification procedures and suppressed evidence about eyewitnesses in these cases, then an inference is warranted that the evidence and accounts set out above accurately describe his misconduct. In *Rivera*, as discussed, there is a judgment against Guevara, and so he is actually issue precluded from litigating the facts at issue above. And were all of that not enough, Illinois courts have found that many of the people wrongly convicted by Guevara's misconduct were innocent, and they have been awarded Certificates of Innocence. Any argument that the facts of these cases are too disputed to warrant admission of this evidence should be rejected.

Guevara also might argue that these other cases are too factually dissimilar to serve as admissible other-acts evidence. Plaintiffs discussed the similarity of the other-acts above, in the

context of identity, where similarity is important to showing *modus operandi*. But in general the Seventh Circuit has "repeatedly said that the 'similarity' requirement for admitting other-act evidence is not 'unduly rigid,' but instead is 'loosely interpreted and applied[.]'" *Gomez*, 763 F.3d at 854; see also *United States v. York*, 933 F.2d 1343 (7th Cir. 1991) (if prior act is sufficiently similar in type, it need not be a "duplicate[ ] of the one for which the defendant is now being tried"). As Plaintiffs have discussed at length already, the other-acts cases bear striking similarities to the present case—with many identical features—and that similarity is enough to dispose of Defendants' general arguments to the contrary.

Finally, though Guevara may make arguments about the timing of these other acts. But the other acts are close in time to the case here. The Seventh Circuit holds that "the temporal proximity of the prior acts to the current charge is not alone determinative of admissibility." *United States v. Macedo*, 406 F.3d 778, 793 (7th Cir. 2005). Moreover, in many cases the court of appeals has endorsed admitting other acts that are nearly a decade or more removed in time. See, *e.g.*, *id.* at 793 (nine-year gap in time sufficiently close to make other act admissible); *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (13 years when evidence highly similar and relevant to credibility); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir.1994) (seven years); *Petrovic v. City of Chicago*, 2008 WL 818309, at *3 (N.D. Ill. Mar. 21, 2008) (eight years). It makes no difference whether the other acts or prior to or after the incident on trial. *United States v. Brown*, 31 F.3d 484, 492 (7th Cir.1994) ("[T]rial courts may admit evidence of prior or subsequent bad acts"); *United States v. Anifowoshe*, 307 F.3d 643, 646–47 (7th Cir.2002) ("[B]y its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts"); *United States v. Brown*, 31 F.3d 484, 492 (7th Cir. 1994) (Under Rule 404(b), "trial courts may admit evidence of prior or subsequent bad acts"); *Edwards*, 31 F. Supp.

2d at 1075. The highly similar other acts of Guevara discussed above are all sufficiently close in time—most a few years—to be admitted, particularly so given that they are highly probative of many disputed issues at trial.

## I. Federal Rule of Evidence 403 Does Not Call for Exclusion, Particularly Given Limiting Instructions

Rule 403 also does not require exclusion of this evidence. Of course, the Rule 403 balance depends on the extent to which the factual issues on which the other-acts evidence is admissible are disputed, for the more disputed they are the more probative the other act evidence. *Gomez*, 763 F.3d 845, 857. Similarly, the greater number of disputed issues on which other-acts evidence is properly admitted, the greater the probative value (without any corresponding increase in the danger of unfair prejudice). When one considers how diametrically opposed the parties' theories of this case are on so many different issues, and how many of those issues permit the admission of other-acts evidence, it is clear that the other-acts evidence in this case has tremendous probative value.

Accordingly, for evidence of other acts to be excluded in this case, it would have to cause such extreme unfair prejudice to Guevara that this tremendous probative value would be substantially outweighed. Defendants cannot show at all that the danger of the prohibited propensity inference is so great that it commands exclusion of the other-acts evidence. Moreover, given that Plaintiffs are limiting the evidence to just a couple of witnesses–many of whom have testified before, so the parties know precisely what they will say and can even read the testimony or play it for the jury–and will present the rest through cross-examination, there is not a credible argument that outright exclusion is warranted. In fact, the evidence that Plaintiffs intend to present is already narrowly limited, and Plaintiffs submit that the Rule 403 balance is already properly struck by that balance.

Finally, to the extent that there is a concern about unfair prejudice from the prohibited propensity inference, the Seventh Circuit has instructed lower courts how to deal with that concern: by using limiting instructions. In *Gomez* the Seventh Circuit stressed that "[a]ppropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence." 763 F.3d at 860; see also *id.* at 861 (stating that Seventh Circuit Criminal Pattern Jury Instruction 3.11 is a good starting point, which should be customized to the case). There the Court concluded, "[W]e see no reason to keep the jury in the dark about the rationale for the rule against propensity inferences. Lay people are capable of understanding the foundational principle in our system of justice that 'we try cases, rather than persons.'" *Id.* at 861 (quoting *People v. Allen*, 420 N.W.2d 499, 504 (Mich. 1988)). A limiting instruction about the permissible use of other-acts evidence will adequately control for the danger of unfair prejudice in this case. One of the innovations of the Seventh Circuit's *en banc* decision was that it expressed a preference for explanation of other acts evidence to the jury, and the Seventh Circuit has repeatedly reaffirmed since that limiting instructions are assumed to be effective. *E.g.*, *United States v. Mireles*, 116 F.4th 713, 726 n.4 (7th Cir. 2024).

### J. All of the Other Bad Acts Discussed Above Were Amply Disclosed to Guevara

Finally, Plaintiffs address briefly an argument that Guevara has pressed in other cases: that his other bad acts should not be admitted because they have not been properly disclosed to him. The Court should not entertain such an argument in this case. Defendant Guevara's misconduct has been properly disclosed in this case. Indeed, after Plaintiffs disclosed a wide arrange of witnesses who could testify to Guevara's misconduct, the parties litigated the appropriate scope of Rule 404(b) live witnesses, the magistrate judge ruled, and Plaintiffs disclosed witness information in response to that order. *Reyes*, Dkt. 313. Meanwhile all of the other acts mentioned above have been litigated dozens of times, the witnesses have all testified,

49

and the facts have been deeply explored, including in more than thirty other civil cases which name Guevara as a Defendant,[4] and in which he is represented by the same counsel as in this case.[5] In a number of those cases, they have already been litigated through summary judgment and even trial, so the contention that Guevara would not have been aware of them defies common sense.

Rule 26 exists to ensure that all parties are on notice of the witnesses and the subject matter of testimony that might testify on particular subjects. Fed R. Civ. P. 26(a)(1); *David v. Caterpillar, Inc.*, 324 F.3d 851 (7th Cir. 2003) (affirming district courts admitting witness testimony despite plaintiff's failure to amend 26(a)(1) when defendants were aware of the witness and subject of potential testimony eighteen months before trial); *Se-Kure Controls, Inc., v. Vanguard*, 2007 WL 781253, at *6–7 (N.D. Ill. 2007) (finding no grounds for exclusion because rules required only "that the information be made known in the context of the case itself" and that parties are under "no obligation to provide supplemental or corrective

---

[4] A non-exhaustive list of all the cases in which Guevara is a Defendant and in which evidence of his other bad acts have been disclosed and/or introduced as evidence at trial includes: *J. Johnson v. Guevara,* No. 05-cv-1042 (N.D. Ill.); *J. Rivera v. Guevara,* No. 12-cv-4428 (N.D. Ill.); *DeLeon-Reyes v. Guevara,* No. 18-cv-1028 (N.D. Ill.); *Solache v. Guevara,* No. 18-cv-2312 (N.D. Ill.); *Almodovar v. Guevara,* No. 18-cv-2341 (N.D.Ill.); *Negron v. Guevara,* No. 18-cv-2701 (N.D. Ill.); *Serrano v. Guevara,* No. 17-cv-2869 (N.D. Ill.); *Sierra v. Guevara,* No. 18-cv-3029 (N.D. Ill.); *Gomez v. Guevara,* No. 18-cv-3335 (N.D. Ill.); *Montanez v. Guevara,* No. 17-cv-4560 (N.D. Ill.); *Maysonet v. Guevara,* No. 18-cv-2342 (N.D. Ill.); *R. Rodriguez v. Guevara,* No. 18-cv-7951 (N.D. Ill.); *Bouto v. Guevara,* No. 19-cv-2441 (N.D. Ill.); *Iglesias v. Guevara,* No. 19-cv-6508 (N.D. Ill.); *D. Johnson v. Guevara,* No. 20-cv-4156 (N.D. Ill.); *D. Rodriguez v. Guevara,* No. 22-cv-6141 (N.D. Ill.); *Rios v. Guevara,* No. 22-cv-3973 (N.D. Ill.); *Gonzalez v. Guevara,* No. 22-cv-6496 (N.D. Ill.); *Flores v. Guevara,* No. 23-cv-1736 (N.D. Ill.); *Hernandez, et al. v. Guevara,* No. 23-cv-1737 (N.D. Ill.); *Lugo v. Guevara,* No. 23-cv-1738 (N.D. Ill.); *Davila v. Guevara,* No. 23-cv-1739; *Abrego v. Guevara,* No. 23-cv-1740; *Martinez v. Guevara,* No. 23-cv-1741 (N.D. Ill.); *Gecht v. Guevara,* No. 23-cv-1742 (N.D. Ill.); *G. Rivera v. Guevara,* No. 23-cv-1743 (N.D. Ill.); *Mendoza v. Guevara,* No. 23-cv-2441 (N.D. Ill.); *Munoz v. Guevara,* No. 23-cv-3210 (N.D. Ill.) *Cruz v. Guevara,* No. 23-cv-4268 (N.D. Ill.); *Kwil v. Guevara,* No. 23-cv-4279 (N.D. Ill.); *Cain v. Guevara,* No. 23-cv-14282 (N.D. Ill.); *R. Hernandez v. Guevara,* No. 23-cv-15375 (N.D. Ill.); *Tinajero v. Guevara,* No. 24-cv-1598 (N.D. Ill.); *Kelly v. Guevara,* No. 24-cv-5458 (N.D. Ill.); *Robinson v. Guevara,* No. 24-cv-5954 (N.D. Ill.); *Ortiz v. Guevara,* No. 24-cv-11057 (N.D. Ill.); and *O. Soto v. Guevara,* No. 24-cv-12554 (N.D. Ill.). In other words, there are at least 38 such cases.

[5] Of these 38 cases, Defendant Guevara is or was represented by the same counsel which represents him in this case in 32 cases.

50

information" to their disclosures when that information is "otherwise made known to the other parties during the discovery process *or* in writing") (emphasis added). It would be difficult to imagine a civil litigation scenario in which a party has more notice of potentially admissible evidence in a case than Guevara has of his own past misconduct at issue in dozens of past and pending civil cases.

## CONCLUSION

For all of the reasons set for above, Plaintiffs respectfully request that the Court admit Rule 404(b) evidence, consistent with the plan set forth in this motion for presenting that evidence for permissible purposes.

Respectfully Submitted,

/s/ Steve Art
*One of the Attorneys for Plaintiff Reyes*

Jon Loevy
Anand Swaminathan
Steven Art
Sean Starr
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St.
3rd Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

/s/ Jan Susler
*One of the Attorneys for Plaintiff Solache*

Jan Susler
Ben Elson
People's Law Office
1180 N. Milwaukee, 3rd Fl.
Chicago, IL 60642
(773) 235-0070
jsusler@gmail.com