# EXHIBIT 1



Testimony of William Dorsch in *People v. Solache,*
98 CR 12440-03

AR-L 101688      Confidential - Subject to Protective Order   Gomez CCSAO   4208

Please raise your right hand.

(Witness sworn.)

THE COURT: Please keep you are voice up a little louder so everyone can hear you the first time you respond.

You may proceed.

WILLIAM DORSCH, called as a witness on behalf of the Petitioner, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SIELING:

Q Please state your name.

A William Dorsch, D-o-r-s-c-h.

Q Mr. Dorsch, were you previously employed by the Chicago Police Department?

A Yes.

Q How long were you employed there?

A I began my career with them on June 15, 1970 and I retired on August 14, 1994.

Q And what units were you assigned to?

A Beginning my career in patrol for eight months at the 20th District, uniform patrol for about eight months, and then I was tactical unit civilian dressed in

71

Confidential - Subject to Protective Order  Gomez CCSAO  4209

the 20th District, 19th District, 13th District and then I worked gang crimes west, returned to the 20th District tactical unit and made detective in about 1985 or '86.

Q    And in what unit or area were you detective in?

A    Area 5.

Q    And for how long was that?

A    My entire time as a detective from my promotion until I retired in '94.

Q    And why did you leave the Chicago Police Department?

A    Oh, I had reached 50, the minimum retirement age.

Q    And during your tenure at the Chicago Police Department, approximately how many homicides did you work on?

A    Approximately 400 counting not only detective but gang crimes and tactical units and so forth and so on.

Q    After you left the Chicago Police Department, did you work?

A    Yes.

Q    What did you do?

A    Well, I retired to northern Wisconsin where I was contacted by the local sheriff's department asking me

72

AR-L 101690                Confidential - Subject to Protective Order  Gomez CCSAO  4210

if I wanted to work with them as a part-time officer. I said I would do that. They said I needed to be certified, so they sent me to the University of Wisconsin school where I had to take 40 hours only of a 400-hour course and I became certified, again, in jail procedures and patrol. When I got done with the class, they offered me a job teaching the very same classes.

Q     Other than your work with the law enforcement in Wisconsin, had you had any other experience, work experience?

A     Well, I've been a private investigator -- I did two years of teaching, as I said, after I got certified where I was training recruits teaching of the basic required courses, and then I went into private investigative work in the State of Wisconsin first and then I returned to Chicago in 2003, 2004.

Q     Are you a licensed private investigator?

A     Yes, I am.

Q     While you worked in Area 5, were you familiar with a police officer named Reynaldo Guebara?

A     Yes.

Q     Were you and Officer Guebara ever partners?

A     I don't think so. I knew him first from encounters on the street. He might have been -- he might

AR-L 101691          Confidential - Subject to Protective Order  Gomez CCSAO  4211

have been in the same gangs west unit when I was there, but I'm not sure. I knew he worked in 14, he worked in gangs west, and then I became more familiar with him when I was a detective and he would come into the Area.

Q    Did you ever work on cases or were you ever assigned to the same cases as Officer Guebara?

A    Yes.

Q    Did one of those cases involve Officer Guebara bringing in two new witnesses to a homicide --

MS. STACK:  I'm going to object to leading.

MS. SIELING:  Your Honor, we all know what he's going to be testifying to, it's just to bring it to his attention.

THE COURT:  In any event, don't lead the witness toward an answer.

MS. SIELING:  I'll rephrase.

BY MS. SIELING:

Q    I want to draw your attention to an incident you spoke with counsel for Solache and Reyes last month. Do you know the incident I'm referring to?

A    Yes.

Q    Now, did that incident involve a case?

A    Yes.

Q    Do you remember the exact year that this case

74

AR-L 101692                    Confidential - Subject to Protective Order  Gomez CCSAO  4212

occurred?

A    I tried to recall that with some difficulty, but I remembered that it occurred about three months before Guebara was meritoriously promoted to detective, so about three months before his promotion to detective.

Q    And how did you get involved in the case?

A    Well, I was assigned to Area 5 to homicide and police-related shootings. On this particular evening, I saw Guebara and another gangs officer come in and they had three people with them, and the three people remained in the waiting area while they went into the office and talked to the supervisors.

Q    And was there a reason that you needed to be involved in the case?

A    Well, not until the supervisor came out and told me that me and my partner were to assist Detective Guebara, that he found witnesses to an older homicide that was months old and these people had -- we were told that they had observed the homicide when it occurred.

MS. STACK:  Objection, double hearsay.

THE COURT:  Overruled.

THE WITNESS:  They had observed the homicide, written the license plate number down of the offender's car, but they never talked to any police officers that

75

AR-L 101693          Confidential - Subject to Protective Order  Gomez CCSAO  4213

night or any other time until now when they encountered Guebara and they talked to him about it and they brought them in.

BY MS. SIELING:

Q    For a clarification, was Officer Guebara a detective at that time?

A    No, he was working in gangs.

Q    And what information did you know about the homicide?

A    Well, because it was a homicide, solved or unsolved, I usually became familiar with everyone or as many of them as I could.  I recall the event in particular that occurred in the Humboldt Park area.  It involved two cars.  The victim was driving his car with a young girl, who was a relative, a cousin, who was seated beside him.  A car pulled up in the opposite direction and stopped and opened fire striking only the driver.

Q    Now, you mentioned that Officer Guebara brought in three people.  Can you describe those persons?

A    Well, three people came in with the gangs officers.  Two of them turned out to be young witnesses that we interviewed and talked to, the third person merely stayed out in the waiting area.  We never had occasion to talk to him or a reason to talk to him.

76

AR-L 101694          Confidential - Subject to Protective Order  Gomez CCSAO  4214

Q    What happened after those witnesses came in?

A    Well, we were advised by the sergeant to assist them, and what we learned was they had a license plate number that was given to Guebara and his partner by the two young boys who said they saw the homicide. So we ran the license plate, got the identity, the owner of the car.

The next step was to run an IR check on them. We found out that the person did have a gun arrest which would mean I would have a folder on file, so we kept the two witnesses with us at the station. Guebara left with the other person per our request to get not only the photo but a copy of the UUW arrest.

Q    And did Officer Guebara acquire a photograph?

A    Yes, he did. He brought it back to us.

Q    What happened after you acquired the photograph?

A    We waited for him to return, the purpose being we wanted to see if we could get an identification. So we put that photo with six to eight other photos of similar age and appearance, and we took the two boys back to a larger room in the back of the Area 5 on the second floor.

I separated the two boys. I put the pictures

77

AR-L 101695          Confidential - Subject to Protective Order  Gomez CCSAO  4215

down at one end of the table so only the one that I was calling up could see him, and I asked the one boy to come up. I told him what I usually tell people is that you're here to look at photos. I don't know if the person that you witnessed do these things is in the photos. I want you to be careful, take a good luck at them and only if you see the person that did the crime point him out. Do not point out anybody because that's what you think I want you to do, I want you to be sure it's the right person, not the wrong person.

So with Guebara standing there with the first kid, the second kid further back in the room unable to see the photo spread, I spread the pictures out on the table. The young man was looking at the photos and looking and looking, and I'm not uncomfortable with how long it takes because sometimes it takes --

MS. STACK: I'm going to object to the narrative here, Judge. He's talking about what his normal --

THE COURT: Overruled.

THE WITNESS: Sometimes witnesses are very quick to identify, but other people need more time and I've learned to give them more time. I might ask them if they're having difficulty, does somebody look like the person.

78

AR-L 101696          Confidential - Subject to Protective Order  Gomez CCSAO  4216

THE COURT: Do you recall if you -- if you did that in this particular case?

THE WITNESS: No, I didn't say that to him in this case.

THE COURT: Ask another question.

THE WITNESS: I merely told him to look at the photos after giving the instructions. He took a considerable amount of time, but I was not uncomfortable with that, and then suddenly Detective Guebara just reached out and put his finger right on the photo and said, "That's him," and the kid said, "Yeah, that's him. I was just about to say that was him. He looks a little different."

I said to Guebara -- it was unexpected, totally unexpected. I've never seen that before in my career. It was something I didn't want. I wanted the witness to identify the photo and not with the help of someone else.

I immediately ordered Guebara and this kid out of the room. Then I took the photos, I mixed them all up again and giving the same instructions to the second kid, he came up and he looked at the photos for as much time as he could and he did not identify anybody.

Q     What happened after the two witnesses viewed the photo array?

AR-L 101697                    Confidential - Subject to Protective Order  Gomez CCSAO  4217

A    Well, I've got a problem here. I want to get an identification that's positive from the witness.

MS. STACK: Your Honor, it's nonresponsive. He was asked what did he do next, and he begins this narrative about his whole thought process, in general.

THE COURT: Sustained. Ask another question.

BY MS. SIELING:

Q    What did you specifically do after finishing the photo lineup?

A    I went to the first person away from Guebara and asked him is this the person that is the offender because he had help in identifying him. He was adamant, he kept saying, yeah, it's him. I know it's him. He looks a little bit different, it was a while ago. So I had to take that for what it was knowing that the second kid couldn't identify him, but I knew I had to now call felony review.

Q    Did you call felony review?

A    Yes.

Q    What happened?

A    Well, whoever it was responded to Area 5 and they would have been allowed to interview both witnesses, and they would have been appraised of the fact that one person did identify and one person didn't identify.

80

AR-L 101698                Confidential - Subject to Protective Order  Gomez CCSAO  4218

Q    And what happened after felony review interviewed the witnesses?

A    Well, there was -- we were not done with the process.  Now that we have an identification of photos, I knew that we might be able to resolve --

MS. STACK:  Objection, Judge, same objection.  What happened next?

THE COURT:  Sustained.

BY MS. SIELING:

Q    After felony review spoke with the witnesses, what did you do?

A    We met with both witnesses, Guebara and his partner, and asked that they take the witnesses home as we were going to try to locate the person that was identified and try to have a lineup as soon as possible. We were hoping for the next day and that's what we did.

Q    So the next day did you go to the suspect's home?

A    Yes.

Q    And was the suspect there?

A    Yes, he was.

Q    What happened when you arrived?

A    We knocked on the door, identified ourselves, he invited us into the room.  We told him we wanted to

AR-L 101699          Confidential - Subject to Protective Order  Gomez CCSAO 4219

talk to him about an incident that occurred, we asked him some things about himself.

MS. STACK: Objection to "we." I'm not sure of the foundation. Who is he with when this happens?

THE COURT: All right. Go ahead, expand on foundation as to who else was present.

THE WITNESS: It would have been -- my partner, I believe, was Bill Johnston. We went there together. We identified ourselves like I said, and he told us that he was a college student that worked -- went to DePaul and worked at Walgreens, and we told him we needed to bring him in as he had been identified in an incident.

BY MS. SIELING:

Q       Did the suspect accompany you back to the station?

A       Yes, he did.

Q       And what happened when you arrived back at the station?

A       Then we would have -- then we contacted gangs and asked Guebara to pick up the two witnesses.

Q       And what happened when the two -- did the two witnesses come back to the station?

A       Yes.

Q       And what happened when they came back?

82

AR-L 101700                    Confidential - Subject to Protective Order  Gomez CCSAO 4220

A    Well, we needed to now do a physical lineup, even though one had not identified the photos, I still wanted him to look at the physical lineup not knowing if he could identify him from the physical lineup.

Q    And what happened with the physical lineup?

A    We did two lineups separate, none of them included Guebara. We brought the first person in who identified the photo and he did pick the person out of the lineup as the same as the photo; and the second person who didn't identify the photo could not pick anybody out of the lineup.

Q    After the physical lineup, what happened next?

A    I had to recontact felony review and ask that they come in and advise them that we had a lineup.

Q    And just to clarify, was anyone with the two witnesses when they came back to the station?

A    Yes.

Q    Who?

A    The same third person that was with them the first day.

Q    And once you called felony review, what happened?

A    Well, they responded to our request.

Q    And did felony review approve the charges?

AR-L 101701                Confidential - Subject to Protective Order  Gomez CCSAO  4221

A    Yes.

Q    The following day did you do anything further on the case?

A    The following day I had my partner, I told him we're going to go back out and pick up the witnesses, and we went and picked up both witnesses.  We talked to both of them about the fact that I was not comfortable with the way that first identification went down and wanted to know if they were comfortable with putting perhaps an innocent person in jail.  I just didn't feel -- something was wrong, and they both told us that they didn't want to put an innocent person in jail, but they had been paid by the third person to identify this kid and that they were paid money to do it.

Q    And that third person that paid them, was that the same person that accompanied them to the station?

A    Yes.

MS. STACK:  I didn't hear that.

THE WITNESS:  Yes.

MS. STACK.  The same person that what?

THE COURT:  Accompanied them to the station.

MS. STACK:  Thank you.

BY MS. STACK:

Q    After you picked up the witnesses, what did you

AR-L 101702          Confidential - Subject to Protective Order  Gomez CCSAO  4222

AR-L 101703

do with them?

A    Took them immediately to Branch 66 right here in this building.

Q    Can you explain what Branch 66 is?

A    It's on the 4th floor.  It's right across from the Grand Jury.  It's a place where you bring witnesses to serious offenses where they have a first-time interview before the case would be taken down to the main court for assignment.

Q    And what happened what you brought the witnesses to Branch 66?

A    They met with -- we informed the state's attorney that was handling the case in 66 that these two kids had picked out somebody the night before -- well, one of them had picked out the offender as the offender, and this kid was charged and now they were recanting because they were paid.

They met with the state's attorney, told him the same thing, that they had been paid money and this was not the offender, so we asked that this kid be released.

Q    As far as you know, were the charges dropped?

A    Yes.

Q    I'd like to discuss for a moment your

85

relationship with the Bloom Legal Clinic.

As a private investigator, have you done work for the Bloom Legal Clinic?

A    Since about 2011 I've been involved there, yes.

MS. STACK:  I'm sorry, done work with what?

THE COURT:  The Bloom Legal Clinic.

MS. STACK:  Judge, I asked for this information and was vehemently objected to.  I'll withdraw the objection right now, but ...

MS. DANIEL:  She's not going to go into it.  We don't need to go into it.

THE COURT:  The objection is withdrawn.

Proceed.

MS. STACK:  Premature.

BY MS. SIELING:

Q    Are you currently an investigator on the -- on this case, the Solache and Reyes case?

A    I've never been involved in this case.  I know nothing about it.

MS. SIELING:  No further questions.

MR. VAIL:  A very brief examination, your Honor.

THE COURT:  All right.

MR. VAIL:  First I'd like to, for the record, your Honor, adopt on behalf of Mr. Reyes and present on his

AR-L 101704                Confidential - Subject to Protective Order  Gomez CCSAO  4224

THE COURT: All right.

DIRECT-EXAMINATION

BY MR. VAIL:

Q    Detective Dorsch, my name is Andrew Vail.  I represent Petitioner Reyes.

Detective Dorsch, could you tell us why are you testifying in this proceeding?

MS. STACK:  Objection, relevance.

MR. SAUNDERS:  It goes to credibility, your Honor.

MS. STACK:  I'll withdraw the objection.

THE COURT:  Objection is withdrawn.

THE WITNESS:  It was an unusual event.  It's been on my mind so much so that it's even been -- I've even written about it on my Web page.

BY MR. VAIL:

Q    I have one other question for you, Detective Dorsch.  Was there any Chicago Police Department rule or policy that would have prevented Detective Guebara by recording either by audio or video his interrogation of my client, Mr. Reyes?

A    I'm not involved in that at all.

MS. STACK:  Objection.  This is beyond the scope.

MR. VAIL:  Thank you.

87

AR-L 101705                 Confidential - Subject to Protective Order  Gomez CCSAO  4225

behalf the testimony --

THE COURT. All right

AR-L 101706

Confidential - Subject to Protective Order  Gomez CCSAO  4226

THE COURT:  Cross?

MS. STACK:  Thank you, Judge.

CROSS-EXAMINATION

BY MS. STACK:

Q    You weren't here to hear yourself described, but how many years were you actually a detective with Chicago?

A    Eight or nine, I believe.

Q    Not 24 years, correct?

A    Right.

Q    And when you turned 50, you retired, is that what you testified to?

A    Yes.

Q    And you went to Wisconsin?

A    Yes.

Q    And your purpose was to retire?

A    Sometimes your dreams become your nightmare, so ...

Q    So you've been working for how many years since you've been retired from CPD?

A    I've been working as a private investigator since 1996.

Q    And that career started in Wisconsin?

A    Yes.

AR-L 101707          Confidential - Subject to Protective Order  Gomez CCSAO  4227

Q    And when did you move back to Illinois?

A    The end of 2003.

Q    What brought you back to our great state?

A    I guess I missed the type of work I always did. I had sons on the police department here and family here.

Q    So you came back for family or you came back for work or --

A    Both.

Q    A combination. Okay.

Now, your website talks quite a bit about your work for defense attorneys, correct?

A    Yes.

Q    And you've worked for the Innocence Project, your website says?

A    I first worked with the Innocence Project for the University of Wisconsin Law School.

Q    And when was that?

A    Oh, 2000. I brought them a case that I felt that the person was innocent.

Q    Yeah, your website makes quite a few comments that you're the one that brings these cases to the attention of Innocence Projects and groups like the Bloom Legal Clinic.

89

AR-L 101708            Confidential - Subject to Protective Order  Gomez CCSAO  4228

MS. DANIEL: Objection. Bloom Legal Clinic is not mentioned on Mr. Dorsch's website.

THE COURT: What's the question again?

MS. STACK: The question is -- I'll withdraw it and rephrase it.

THE COURT: Very well.

(WHEREUPON, a certain document was marked Respondent's Group Exhibit No. 1, for identification, as of 2/13/2013.)

BY MS. STACK:

Q    I'm going to show you what I'll mark as Respondent's No. 1. It is a copy of your resume that's attached to your website. There are four stapled pages and one loose page. I'll call it Respondent's Group No. 1, I guess.

MS. DANIEL: I haven't seen this exhibit. Maybe I have, but maybe if I could just see it --

MS. STACK: I'm marking it for you, Ms. Daniel. You'll have it in a second.

May I approach?

Counsel, I have copies for you, too.

Before we started, they asked if we were using anything other than the materials on his website and I said no.

AR-L 101709        Confidential - Subject to Protective Order  Gomez CCSAO  4229

MR. VAIL: Your Honor, I will object to the relevancy of this line of questioning.

THE COURT: What is your next question?

BY MS. STACK:

Q Have you had a chance to review that?

A Yes.

Q You have yourself listed as an expert witness, is that correct?

A I've been used as an expert witness and qualified as such in court, yes.

Q What have you been qualified as an expert in?

A In homicide.

Q In homicide?

A Homicide investigation.

Q Who offered you as an expert in homicide investigation?

THE COURT: Who offered him or who --

MS. STACK: Who offered him.

THE WITNESS: The case of Evan Zimmerman in northern Wisconsin --

BY MS. STACK:

Q Who offered you as the expert?

A I don't remember now.

Q Was it the Defense or the State?

91

AR-L 101710          Confidential - Subject to Protective Order  Gomez CCSAO  4230

A    The State -- no, it would have been the Defense.  We were appealing the case.

Q    Right.  You testified for the defense as an expert?

A    Yes.  Yes.

Q    And was your role there to criticize the job that the original officer had done in the case?

A    No, it was to get it right by procedure and other evidence.

Q    I'm sorry, to do what by -- to get it right?

A    To correct some errors.  As a matter of fact, the case was thrown out.

Q    So when you testified as an expert, you were called by the defense to criticize the job that was done by the original police, correct?

A    Yes, but I need -- in that case, your Honor, I didn't testify, they threw it out before they got to it.

MS. STACK:  Judge, I have another objection to the nonresponsive answers.

THE COURT:  All right.  Mr. Dorsch, please only respond to the question that has been put to you by the attorney.

THE WITNESS:  Yes.  I understand.

THE COURT:  Strike the last portion of his answer.

92

AR-L 101711        Confidential - Subject to Protective Order  Gomez CCSAO  4231

BY MS. STACK:

Q    How many years did you work in Area 5?

A    Eight or nine years.

Q    And that was between '84 and '96?

A    '94 I left.

Q    Before you left the State, correct?

A    Yes.

Q    Now, this incident that you just described in great detail for the judge, when did that occur, what year?

A    To the best of my memory, it's about three months or less before Detective Guebara was promoted, so it had to be -- I struggle with what year he got promoted.

Q    You don't know what year?

A    Now I think I'm better --

Q    Can you name a year?

THE COURT:  Let him try to -- one person at a time.

MS. STACK:  All right, Judge.

THE COURT:  For the benefit of everyone here, most importantly the benefit of the court reporter.

All right.  Ask a question.

BY MS. STACK:

Q    Can you name the year that it occurred?

93

AR-L 101712          Confidential - Subject to Protective Order  Gomez CCSAO  4232

A     I think it was '88 or '89.

Q     So you don't know whether it was 1988 or 1989?

A     I've tried through FOIA requests and other means to get this case better identified with no cooperation from the Chicago Police Department.

Q     Is that -- I'm asking what you remember.

A     Okay. I remember it was about '88 or '89.

Q     '88 or '89?

A     Yeah.

Q     And you were just -- throw that half question away.

When was the first time that you told the attorneys representing Solache and Reyes here that you had evidence against Ray Guebara?

A     They called me and asked for a meeting.

Q     They called and asked for you?

A     Yeah.

Q     Explain what happened to the Court there. How did you get involved in this case?

A     I was asked to meet with them.

Q     When was this?

A     At their offices.

Maybe a month ago.

Q     And that was the first time you had talked to

94

AR-L 101713          Confidential - Subject to Protective Order  Gomez CCSAO  4233

them about Ray Guebara suggesting --

A    Yes.

Q    Okay.  And that was about a month ago in January, right?

A    About that time.

Q    And they -- to your knowledge, did they memorialize that interview in a two-page memo?

A    I have no idea what they did.

Q    They didn't show you the memo that -- any documents they wrote?

MR. SAUNDERS:  Objection, your Honor.  This mischaracterizes the document that I believe Ms. Stack has in her hand.

MS. STACK:  I'll lay a foundation for that.

THE COURT:  The objection is overruled.

MS. STACK:  I thought he would know about it.

BY MS. STACK:

Q    I'm going to show you what I'll mark as Respondent's No. 2.  It is a two-page document entitled Interview of William Dorsch, dated January 11, 2013.

(WHEREUPON, a certain document was marked Respondent's Exhibit No. 2, for identification, as of 2/13/2013.)

MS. STACK:  Counsel, I'm sorry, I only have one copy

AR-L 101714          Confidential - Subject to Protective Order  Gomez CCSAO  4234

of this.

MS. DANIEL: I object to the showing of a witness a report that he didn't write and had no knowledge of.

MS. STACK: That's what I'm trying to ascertain.

THE COURT: What is the purpose of showing it to him?

MS. STACK: It's a memo that was drafted concerning an interview with him. Judge, I objected to his name appearing last month with no explanation.

THE COURT: My question is when you show an exhibit to a witness, it's usually done with a purpose. And so if you show him the exhibit, what is the purpose? Are you going to impeach him with something that was said?

MS. STACK: What I was trying to do was I asked him if he was aware that this existed.

THE COURT: And he said no.

MS. STACK: He gave a number of answers, and I was just going to show him and ask had he ever seen this before. It's really a lot of much ado about nothing, but there are impeaching facts in here, and if he --

THE COURT: You can use the statement as an impeaching document, if you choose to, based on what he may or what would be attributed to him as he gave the

96

AR-L 101715          Confidential - Subject to Protective Order  Gomez CCSAO  4235

statement to the attorneys.

MS. STACK: I'm not sure who I'll have to call to prove it up, Judge.

May I approach the witness and see if he's familiar with this?

THE COURT: Go ahead.

BY MS. STACK:

Q Have you ever seen this two-page document that is a memorandum of your meetings with the attorneys?

A No.

Q Can you look at the date? Is that the date --

A I wouldn't recall the date.

Q It's last month, January 11th?

A I have a pretty busy calendar. I don't recall the date.

Q Did you meet with attorneys for Petitioners more than once in the month of January 2013?

A No.

Q So you met with them only one occasion?

A One occasion only.

Q And if this is dated January 11th, that describes a meeting that would probably be the occasion?

MR. VAIL: Objection, your Honor.

THE COURT: Speculation. Sustained.

97

AR-L 101716        Confidential - Subject to Protective Order  Gomez CCSAO  4236

BY MS. STACK:

Q    What month did this occur where you observed --

THE COURT:  About a month ago.

MS. STACK:  Judge, I'm sorry.

BY MS. STACK:

Q    Drawing your attention back to the misconduct that you allegedly saw Ray Guebara observe, what month did that occur?

A    I'm not sure.

Q    Do you remember what the weather was like, what season it was?

A    I remember that I was at the shooting scene, it was not winter definitely, it was more like spring or summer.

Q    And do you remember the address of the shooting scene?

THE COURT:  Aren't you asking him about the month when the incident that he's testifying to about Guebara took place.

MS. STACK:  Right.

THE COURT:  I don't know if that's the same as the shooting or not.

THE WITNESS:  Yeah.

BY MS. STACK:

AR-L 101717                      Confidential - Subject to Protective Order  Gomez CCSAO  4237

Q    All right.  You don't know what month the shooting occurred, correct?

MR. VAIL:  Objection, your Honor.

THE COURT:  Sustained as to the -- overruled.

You may answer.

THE WITNESS:  The shooting was more like summer.

BY MS. STACK:

Q    What was the name of the murder victim?

A    I don't recall.

Q    What was the name of the person in the car with the murder victim?

A    All I recall is it was a 13-year-old relative, and she went back to Puerto Rico the very next day.

Q    What was her name?

A    I don't recall.  It would have been in the reports.

Q    How old was the murder victim?

A    I don't recall anymore.

Q    Was it a male or a female?

A    Male.

Q    Were you assigned the murder case?  Was that your murder case?

A    No.

Q    When were you first assigned it?

AR-L 101718          Confidential - Subject to Protective Order  Gomez CCSAO  4238

A    Technically assigned it?  It was the date that Guebara walked in with the witnesses.

Q    And you got involved with this because your supervisor asked you to follow-up on the people that Guebara had brought into the station, right?

A    Correct.

Q    What was the name of the first witness that was brought in?

A    I don't recall.

Q    How old -- was it a male or female?

A    Both were about 15.

Q    Male or female?

A    Male.

Q    What was the name of the second one?

A    I don't recall.

Q    What was the name of the man that brought them into the station?

A    Guebara.

Q    Didn't you say that the two boys were brought in --

A    They all came together.

THE INTERPRETER:  I'm having a difficult time listening to the witness and the interjecting -- not allowing the witness to answer.

100

AR-L 101719            Confidential - Subject to Protective Order  Gomez CCSAO  4239

THE COURT: Please give a pause before you begin your next question.

MS. STACK: I apologize.

BY MS. STACK:

Q    What date did these witnesses come into the station?

A    I don't recall.

Q    What year was it?

MS. DANIEL: Asked and answered, Judge.

MR. VAIL: Join.

MS. STACK: As the judge pointed out, there's two separate instances, the actual murder and date the witnesses came into the station.

THE COURT: This is cross-examination. The objection is overruled.

BY MS. STACK:

Q    Was it still summer?

A    Yeah, late summer, early fall.

Q    What kind of car was involved in the murder?

A    The only description that came was from the 13-year-old passenger and she described the large white car as the offender's vehicle.

Q    What was the name of the suspect in the photo array?

101

AR-L 101720                    Confidential - Subject to Protective Order  Gomez CCSAO  4240

A    I don't recall.

Q    How many photographs were in the photo array?

A    Because there was one person that was -- that we were looking at, there were six to eight.

Q    You don't remember the exact number?

A    It would have been standard for me to do six or eight to one.

Q    I appreciate your extensive experience, but what do you remember about this particular case, sir?  Do you remember how many photographs were used?

A    I know that those photographs are inventoried.

Q    Do you know how many photographs were used?

A    Six to eight.

Q    The answer is no?

MR. VAIL:  Objection, mischaracterizes.

THE COURT:  Sustained.

BY MS. STACK:

Q    Once these boys were brought into the station --

THE COURT:  Which occasion?

BY MS. STACK:

Q    On the second occasion when you say Ray Guebara brought the two witnesses in, right?

A    And the third person, too.

102

AR-L 101721          Confidential - Subject to Protective Order  Gomez CCSAO  4241

Q    What was the third person's name?

A    I never talked to him.

Q    How old was he?

A    He was about three or four years older than the boys.

Q    You never talk to him.  Did you record his name somewhere?

A    He never went past the waiting room.  I was never made known that he was part of the case.

Q    Did his name ever appear in the case reports?

A    No.

Q    Yet he was the man that you ultimately determined had brought false witnesses into your statement, correct -- into your station?

A    Yes.

Q    And just to be clear, at the end of this event that you described, it was this third unknown man that walked the two teenage boys into the station that told them to give false evidence, correct?

A    Correct.

Q    And not Ray Guebara?

A    I didn't ask --

Q    I'm asking you --

A    I never talked to the third person.

103

AR-L 101722                Confidential - Subject to Protective Order  Gomez CCSAO  4242

Q    And it's your testimony that when they brought these two witnesses in, they told you that you got the IR and eventually put together a photo array, correct?

A    Correct.

Q    What happened when you got the photos together to show to the boys?  Can you describe that again for me?

A    We took the photos back to the larger room in the rear of the station.

Q    Who is "we"?

MR. VAIL:  Objection, your Honor.  If she would allow the witness to finish his answer.

MS. STACK:  I apologize.

THE COURT:  He's answering "we."  I think that would be an appropriate thing to clarify.

THE WITNESS:  Detective Johnston and myself.

BY MS. STACK:

Q    Earlier when you mentioned Detective Johnston, you said he was probably your partner around that time. Do you have an actual memory of Detective Johnston being present for this event or are you supposing that it was probably him?

A    No, I believe it was Bill Johnston.

Q    Detective, when you use the terminology "I believe" --

AR-L 101723          Confidential - Subject to Protective Order  Gomez CCSAO  4243

A    Yes.

Q    It gives the impression that you're guessing.

A    It was Bill Johnston.

MR. VAIL:  Objection, your Honor.

THE COURT:  Overruled.

MS. STACK:  I just wanted to clarify.

BY MS. STACK:

Q    So you have a memory of him?

A    Yes.

Q    Who else was there?

A    In the back room?

Q    Yes.

A    The two gang crimes officers, one of which was Guebara.

Q    Who was the other?

A    I believe it would have been Steve Gawyrs.  I'm not sure, though.

Q    Can you spell that last name?

A    G-a-w-y-r-s.

Q    And about how old was that officer?

A    Well, he's retired now.  He's probably about 60.

Q    Do you know where he lives?

A    No, I don't.

AR-L 101724          Confidential - Subject to Protective Order  Gomez CCSAO  4244

Q    And you're saying that he was present for this, correct?

MR. VAIL:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. STACK:

Q    He was there for the photo array?

A    Yes.

Q    What happened next?

A    Where are we in the photo array?

Q    Well, my understanding is you, Johnston, Guebara and the third -- excuse me, the fourth officer whose name I didn't quite get --

THE COURT:  Spell that again.

THE WITNESS:  G-a-w-y-r-s.

BY MS. STACK:

Q    You go into a room and is that in the Area or the district?

A    The second floor area.

Q    The second floor of Area 5?

A    Right.

Q    And you take the two witnesses and there's four officers and you go and -- what happens next when you get into the room with the two witnesses and the

106

AR-L 101725                Confidential - Subject to Protective Order  Gomez CCSAO  4245

photo array?

A     Well, you never want both witnesses to look at the same time.  I separated them.

Q     Mr. Dorsch, please.

A     I separated them.

Q     You separated them?

A     Yes.

Q     Describe how you did that?

A     I tell one officer who is not going to see the photos the first show to stand towards the back of the room.

Q     So who did you tell --

MR. VAIL:  Objection, your Honor.

THE COURT:  Ms. Stack you're interrupting.

MS. STACK:  I'm sorry, Judge.  I'm sorry.

MR. VAIL:  Objection to those comments, your Honor.

BY MS. STACK:

Q     Who took the first witness with away?

A     He didn't take them away I merely asked them to move to the other end of the room.

Q     Who did that?

A     I did.

Q     Then what happened?

A     Gave instructions to the other person who was

107

up there with Guebara, me and my partner, to look at the photos but telling him again that the person may not be in those photos, to be careful, take his time and to point out only a personal he can identify, don't point someone out because you think you have to.

Q   So you're all still in the same room together?

A   Yes.

Q   So the witnesses were not separated?

A   They're separated by -- meaning that he can't see the photos.  I don't want him to see the photos.

Q   Okay.  You don't remember the names of the witnesses, right?

A   No, I don't.

Q   So let's call the one that you say was suggested to by Ray Guebara, witness number one.  Did witness number one see the photo array first?

A   The identifying person was the first person and he saw it first.

Q   Okay.  So you took him to the other side of the room?

A   After he was done?  You're talking about the first witness after he was involved in the photo ID?

Q   Whoever saw the photo array first, I would like you to describe that.

AR-L 101727                    Confidential - Subject to Protective Order  Gomez CCSAO  4247

A    I asked him to leave the room with Officer Guebara.

Q    I'm sorry, can you repeat that?

A    I told the first person to leave the room with Officer Guebara.

Q    And by "the first person," are you saying witness number one who was suggested to allegedly?

A    Yes.

MR. VAIL:  Objection.

BY MS. STACK:

Q    Okay.

THE COURT:  Let's take a five-minute break.  Take a breath, and I'm going to take one, too.  Let's try to move the hearing along with appropriate questions, appropriate responses and appropriate objections and a little less dripping sarcasm and hostility towards everybody.  A five-minute recess.

(WHEREUPON, a recess was had.)

THE COURT:  We'll resume with the cross-examination of the witness.  The record will reflect that all parties are present.

Ms. Stack, you may continue.

BY MS. STACK:

Q    Going back to the photo array which is the

109

AR-L 101728          Confidential - Subject to Protective Order  Gomez CCSAO  4248

basis for your testimony here today. Witness number one would be the number that Ray Guebara pointed to the photograph, okay?

A    Yes.

Q    And witness number two would the other 15-year-old that was with him, okay?

A    Yes.

Q    And witness number three would be the gentleman that brought them to the station, just to give him a name?

A    "Witness" is not how I refer to him.

Q    Give him any name you want so we can move it?

A    Companion.

Q    Companion. All right.

So companion is outside, witness one and two are with you and three other officers and describe what happened with the photo array briefly.

A    The first one.

Q    Start from the beginning, the first witness who saw the first photo array.

A    To make sure that they view them one at a time I separated them. Number one came up with Guebara to the table where I spread out the photos. I gave him instructions --

110

AR-L 101729          Confidential - Subject to Protective Order  Gomez CCSAO  4249

Q   Who, you?

A   Yes, instructions.

Q   You gave him the instructions?

A   Yes.

Q   Okay.

A   I asked that he look at the photos and point out someone if he recognize him as the person and gave him time to view the photos.

Q   Okay.

A   And then a very awkward moment when suddenly Detective Guebara reached out and put his finger right on the photo and said, "That's him" (indicating).

Q   And then what happened?

A   That's the -- number one almost immediately said, "Yes, that's him.  I was going to point him out. He just looks a little different."

Q   Now, where was witness number two when Guebara did this?

A   In the room but positioned in the corner with where he couldn't view the photos.

Q   Okay.  What happened next?

A   I immediately asked Guebara and number one to leave.  I asked number two to come up and I reshuffled the photos on the table so they weren't in the same

111

order. Same instructions, I asked him to review the photos and I gave him time to do so.

Q I'm sorry?

A I gave him time to view the photos.

Q What happened next?

A He could not identify anyone.

Q Backing up a little bit. When witness one and two first came into the station, did you speak to them to ascertain what they had witnessed of the crime?

A Yes.

Q And you got a narrative from them about what they saw at the crime scene, correct?

A Yes, it was that they had been on the street, witnessed the shooting, wrote down the license plate number and never talked to the police.

Q Did they describe the opportunity that they had to view the person who shot the gun at the murder victim?

A They said they were -- we wanted to know where they were. They said they were in such a position they could see the driver's side of the vehicle, which would have been the shooter's side.

Q All right. So after witness number two could not pick anybody out of the photo array, what did you do

112

Confidential - Subject to Protective Order  Gomez CCSAO  4251

next?

A    I went out and talked to number one.

Q    What happened after that?

A    Because he was insistent that he was about to identify the person without any help, I called felony review.

Q    So you're saying because witness number one was adamant about the identification, you called felony review?

A    Right.

Q    And you started the process with felony review to bring charges against the person who had been identified by witness number one, is that correct?

A    Start, yes.

Q    You started paperwork with the Chicago police in addition to the call?

A    No, not at that time.

Q    What else did you do to start formal charging of the person identified by witness number one?

A    Made preparations for the next date to try to find the person and bring him in for a lineup.

Q    Okay.  Did you bring him in for a lineup the next day?

A    Yes.

113

AR-L 101732          Confidential - Subject to Protective Order  Gomez CCSAO  4252

Q    And witness number one identified him again, correct?

A    Yes.

Q    And did you place the suspect under arrest at that time?

A    Yes.

Q    And after you placed the suspect under arrest, did you call felony review again?

A    Yes.

Q    And did you ask for charges?

A    Yes.

Q    And it was based on witness number one and his lineup identification, correct?

A    Yes.

Q    And someone came out from felony review?

A    Yes.

Q    And they talked to witness number one?

A    Yes.

Q    And do you remember that felony review ASA's name?

A    No.

Q    Do you remember whether it was a man or a woman?

A    No.

114

AR-L 101733           Confidential - Subject to Protective Order  Gomez CCSAO  4253

Q Do you remember if they were old or young?

A No.

Q White or Black?

A No.

Q Any detail about the ASA at all?

A No.

Q Did they physically come to Area 5?

A Yes.

Q Did they interview witness one?

A Yes.

Q Did they take a handwritten statement from witness one?

A I don't recall.

Q Did they approve charges of murder against the suspect?

A Yes.

Q And the suspect was processed and sent to Cook County Jail?

A We filled out the arrest report, the complaint, and delivered them to the district lockup.

Q And you signed the complaint against the suspect?

A I see that my name is on it, but it's not my signature.

115

AR-L 101734      Confidential - Subject to Protective Order  Gomez CCSAO  4254

Q    Whose signature was it?

A    I'm sorry, I'm thinking of another case.  I'm confused.

Q    That's all right.

A    I don't know whose name was on the complaint.

Q    You don't know whose name was on the complaint?

A    No.

Q    And all this talking about it you don't remember the name of the person that was arrested?

A    20-some years later, only unusual occurrences cause you to remember certain things.

Q    So he was processed, the case was approved. What happened after that?

A    Mow and my partner were sitting down at our desks when suddenly the father of the designated offender came in in tears asking to speak with us.

Q    So this would be the father of the man that you had just gotten murder charges put against?

A    Yes.

Q    And by the way, when you called felony review to get those murder charges approved against that suspect, it was you that called in the case and not Ray Guebara, correct?

A    It would have been either me or my partner.  I

116

AR-L 101735                    Confidential - Subject to Protective Order  Gomez CCSAO  4255

don't know which one of us called.

Q    So the suspect's father came into the station crying?

A    Oh, yes.

Q    And then what happened?

A    He asked if he could speak with us.  He sat down at the table with us.  He said his son was a hard-working kid, he never was in trouble.

Q    What was this man's name that spoke to you?

A    It was his father.  I don't know his name.

Q    And based on the conversation with the suspect's father, what happened after that?

A    I had told the father that your son had a UUW arrest, and he said well, he's not a gangbanger.  He did get arrested once with a gun.  I had the arrest report for the gun.  I reviewed the arrest report.  Probably then for the very first time it was as the young man had told me, that he got arrested with a gun one time.  He said, "I did a stupid thing.  I was driving down an alley, I saw a gun laying there.  I got out of my car, picked it up, saw that the frame was broken.  I threw it in the trunk of my car, I drove a few blocks and I was stopped and arrested."  When I reviewed the case report after the father had been with me, I did see that the gun

117

AR-L 101736          Confidential - Subject to Protective Order  Gomez CCSAO  4256

had a broken frame.

Q    But the suspect had told you that story before because --

A    I brought --

THE COURT:  Please.  Please.

THE WITNESS:  I'm sorry.

BY MS. STACK:

Q    So he had told it to you before?

A    Yes.

Q    But you didn't check it out when he told it to you the first time?

A    We were busy with the other stuff.

Q    And you remember the details of that UUW arrest, correct?

A    I remember that it was -- the police arrested him, found a gun in the trunk, and the gun was listed in the report as having a broken frame and it was inoperable.

Q    What was the first name of the man that this all happened to?  What was the name of the suspect?

A    Excuse me, the victim?

Q    The man that you falsely brought charges against?

A    I don't remember.

AR-L 101737          Confidential - Subject to Protective Order  Gomez CCSAO  4257

Q    Detective, it was you that continued with this case after you saw Ray Guebara suggest to this witness who to pick in the photo array, correct?

A    Correct.

Q    You did not contact your immediate supervisor and report Ray Guebara right then and there, did you?

A    I don't know.

Q    You don't know?

A    I don't know if I did.

Q    Did you contact Ray Guebara's supervisor and say he just ruined a murder case for us and told the witness who to pick out of a photo array?

A    I don't know how to respond to that. It's a topic well-known amongst other detectives.

Q    Is it amusing?

A    No, it's a topic that is well-known, an incident that is well-known by other detectives over years of conversation.

Q    Well, then, somebody must remember the name of this case, then, huh?

A    It's in the Chicago Police Department files, I know that.

Q    But you were unable to find it?

A    They're not as cooperative to me now as they

AR-L 101738                Confidential - Subject to Protective Order  Gomez CCSAO  4258

were when I was working.

Q Did the attorneys you work for have subpoena power?

A I haven't discussed that with them.

Q So right after it happened, you didn't report it to anybody?

A Report the --

Q Guebara's misconduct, the basis for you being here today.

A I couldn't get into his mind. I didn't know what was his motivation. Was it an overanxious irrational act? I say "irrational" because it's against all protocol to do that.

Q Well, you were suspect of the identification of witness number one, correct?

A But I as still hopeful that the next day the lineup might make the second person identify him.

Q Let's talk about the next day.

So you don't do anything day number one. Day number two you proceed with this case that is already tainted, and you take it to the text step. You bring this suspect in, you put him in a lineup, and you let this witness who you know his identification via photo array has been tainted, you let him sit in the lineup,

120

AR-L 101739          Confidential - Subject to Protective Order  Gomez CCSAO  4259

correct?

MR. VAIL: Objection, your Honor. It wasn't even a question.

THE COURT: Overruled.

BY MS. STACK:

Q    Did you put on a lineup with this witness?

A    I have to.

Q    And the witness picked out the suspect, correct?

A    He picked out the same person that he picked out from the photo the day before.

Q    And this is the point when you said, "All right, I've got to stop this. We're taking it to the supervisors. We can't let this case go any further," right?

A    No. The next step was to call felony review and see what they thought about the identification.

Q    And you called felony review about this bad identification?

A    I called him and told him I was not comfortable with the identification.

Q    Did you tell him what Ray Guebara did?

A    I was more interested in getting the case right and not looking at -- sometimes you don't want to ask

AR-L 101740        Confidential - Subject to Protective Order  Gomez CCSAO  4260

certain questions if you don't want the answer. I didn't want to know what was in his head.

Q    Did you tell felony review what Ray Guebara did?

A    I don't believe I did.

Q    Do you remember who you talked to in felony review?

A    No.

Q    Male, female?

A    It was two days, two different people. I don't recall who they were.

Q    You don't remember either person?

A    No. I've handled so many cases, I don't remember.

Q    So after the lineup, you officially arrested and booked this man, locked him up and had him charged with murder one, right?

A    Based on approval of charges by felony review, yes.

Q    Well, felony review based those charges on what you told felony review, correct?

A    Not only what I tell them, what the witnesses tell them.

Q    Was felony review present when Ray Guebara

122

AR-L 101741          Confidential - Subject to Protective Order  Gomez CCSAO  4261

suggested who to pick in that photo array?

A    No.

Q    So our main suspect is shipped off.  Is it the same night his poor father comes into the station?

A    The second night, yes.  He's in the lockup.

Q    So his son is still in the lockup?

A    Uh-huh.

Q    Were you able -- could you stop it then and get the son sent home that night and report this misconduct and stop this case?

A    It wouldn't have been proper.  It was going to Branch 66 in the morning.  The father was asking me what do I do, he's never been in trouble, do I get a lawyer. And I instructed him just to go to Branch 66 tomorrow and -- for bond court and see what happens.

Q    I'm sorry, can you please explain to me at the beginning of your answer you said it wasn't proper?

A    Pardon me?

Q    When I asked you if you reported the misconduct then when the father came in, you said it wasn't proper. Will you explain that, please?

A    I don't think I remember the question being put to me like that.

MR. VAIL:  Objection, your Honor, mischaracterizes

123

AR-L 101742                    Confidential - Subject to Protective Order  Gomez CCSAO  4262

the testimony.

THE COURT: Ask another question.

BY MS. STACK:

Q    Why didn't you report the conduct when the father came in?

A    I was -- to tell the father?

Q    Why didn't you tell your supervisor and stop this?

A    I told the supervisor that I was uncomfortable, that I was going to be picking up the two witnesses in the morning, which I did. They were aware that I was picking them up again in the morning to talk to them.

Q    You were going to pick him up in the morning --

A    I was working evenings. I picked them up in the morning.

Q    But you got charges approved?

A    Charges were approved that night, yes.

Q    So you took the witnesses to Branch 66 the next morning?

A    After they told us that they had been paid by the third person to finger this kid because this young man didn't even know that -- well, didn't even know, he did know I learned later, that he had been dating the third man's ex-girlfriend. That's what they told us,

124

AR-L 101743          Confidential - Subject to Protective Order  Gomez CCSAO  4263

that's what they told people in Branch 66.

Q    Was that the reason when they admitted they'd been paid off by the, quote, companion, was that the reason you decided to stop the prosecution of this man?

A    Immediately.

Q    But you didn't stop it when you knew Ray Guebara made the only identification tainted, did you?

A    I didn't know if it was impulsive on his part or if he was part of it, and I didn't want to know the answer after a while.  After the third person who was with him unknowing to me participated in all the rides, I knew nothing of the conversations that they had prior to being at the station, I didn't even want the answers to that.  I was focused on getting an innocent kid out of jail on charges that I felt he didn't deserve of.

Q    That's right.  You became focused on that, but not until the kid admitted he had been paid off by the companion?

MR. VAIL:  Objection, your Honor, argumentative.

THE COURT:  Sustained.

THE WITNESS:  I think --

THE COURT:  Sustained.

THE WITNESS:  Sorry.

THE COURT:  Ask another question.

125

AR-L 101744          Confidential - Subject to Protective Order  Gomez CCSAO  4264

BY MS. STACK:

Q    You knew that Ray Guebara had pointed out who to pick in that photo array and you proceeded through with charges contacting felony review a number of times --

THE COURT:  Rephrase.  Rephrase.  Form of the question.

BY MS. STACK:

Q    Mr. Dorsch, isn't it true that it wasn't Ray Guebara's actions that caused you to finally do the right thing on this case, is it?

A    It started me to question the entire identification.

Q    It started you?

A    Yes.

Q    Yet you took no action, arrested an innocent man, got charges against him, had him locked up and proceeded with his prosecution until the witness finally admitted he was bribed, correct?

MR. VAIL:  Objection, compound, argumentative.

THE COURT:  Sustained.

BY MS. STACK:

Q    Again, when was the first time that you remembered this piece of evidence?

126

Confidential - Subject to Protective Order  Gomez CCSAO 4265

A    Which piece?

Q    When was the first time that you told the attorneys in this courtroom about this evidence?

A    About this case?

Q    Yes, about the misconduct of Ray Guebara?

A    I hadn't met them until I was long retired.  I wasn't involved with any of these people.  I never worked with them.

Q    It was a month ago was the first time?

A    No, I had conversation in 2011.

Q    In 2011?

A    Right.

Q    When in 2011?

A    I had met -- I was invited to a play at the law school for the very first time, I had never been there before, a play by John Conroy.  And it was at that event that I met many people at Northwestern, and one of them that I met was Jane Raley.  We just had a conversation, and then about a month or so later, I wanted to ask her about a case that I had been working on for three years for nothing about a kid that is in jail here, in Cook County, I've been working on --

Q    Is that the Jacques Rivera case?

A    No, it's a different case.

127

AR-L 101746                    Confidential - Subject to Protective Order  Gomez CCSAO  4266

Q   Go on.

A   So I took that case to meet with Jane hoping that they might be interested in taking it.

Q   Did they take the case?

A   No.

Q   But they -- you have since developed a working relationship with them, correct?

A   Well, them and many other agencies.

Q   Mr. Dorsch, do you -- did you meet with the attorneys for the Petitioners and describe this incident that you just testified to the Court?

MR. VAIL:  Objection.  I would just like clarification given that there's two sets of counsel.

MS. STACK:  Judge, there's impeachment here. They're aware of it.  I'm trying to move through the process of setting the foundation.

THE COURT:  Ms. Stack, people object.  Relax.

MS. STACK:  All right.

THE COURT:  Let me rule.

MS. STACK:  I apologize.

THE COURT:  Just rephrase your question just to be a little more specific as to exactly what you're, you know, going to ask him.

MS. STACK:  Yes, your Honor.

AR-L 101747          Confidential - Subject to Protective Order  Gomez CCSAO  4267

BY MS. STACK:

Q    On January 11, 2013 between 10:00 and 11:00, were you at the Law Offices of Jenner & Block with William -- yourself, David Saunders, Andrew Vail, Jane Raley, Bil Staes and Lindsay Sieling?

A    I did have a meeting with those persons. The date and time, I don't recall. I'll defer to --

Q    Does that sound familiar?

A    Yes.

Q    And did you discuss the incident that you gave evidence about today on that date and time?

A    Yes.

Q    And on that date and time when you talked to those people, did you mention anything about the father coming in and telling you about the UUW?

A    I already knew about the UUW.

THE COURT: That wasn't the question, Mr. Dorsch. Please answer the question.

THE WITNESS: Please repeat the question.

BY MS. STACK:

Q    You're welcome to view this, but did you tell them that it was the father's emotional plea to you about the UUW that got you to take a look at the son's case -- I'll take that back.

129

AR-L 101748    Confidential - Subject to Protective Order  Gomez CCSAO 4268

Did you mention the father of the suspect to the attorneys?

A    I don't know.

Q    Is there anything that would -- did you -- when you talked to the attorneys, did you tell them that this murder investigation occurred in '89 or '90 instead of '88 or '89 as you testified today?

A    It's been difficult, but I may have, I don't know.

Q    So now it could have been '88, '89, '90?

A    I think it was '88 or '89.

Q    Could you have -- strike that.

Did you tell the attorneys that you thought it was '89 or '90?

A    I think I usually referred to it as being three months before Guebara was meritoriously promoted.  That would be a definitive way I could identify it by date.

Q    Did you tell them that it occurred in 1989 or 1990?

A    I don't recall.

Q    Just to be clear, you never reported this incident to anybody in your chain of command at the Chicago Police Department, correct?

A    Many people knew of it.

AR-L 101749          Confidential - Subject to Protective Order  Gomez CCSAO  4269

Q    Did you report it --

A    Many people knew of it, and they never made an official report of it.

THE COURT:  You need to answer the question, Mr. Dorsch.  Did you report that -- what you described to me today about Detective Guebara's actions that happened in front of you, did you report that to any of your supervisors in the Chicago Police Department at or about the same time that it happened.

THE WITNESS:  Yes.

BY MS. STACK:

Q    Who?

A    I don't recall.

Q    Can you describe what position this person occupied?  Was it your sergeant, for example?

A    I don't know what sergeants were present that day, but it was -- I don't want to elaborate.

Q    Tell us what you remember about reporting this incident?

A    It was the subject of conversation for a long time.

Q    Gossip, you mean?

A    Even today when you see people.

Q    Well, will you please give us the names of

131

AR-L 101750                    Confidential - Subject to Protective Order  Gomez CCSAO  4270

other people that know about this incident?

A    I don't -- guess you'd have to go to the roster would be the best way for me to say who knew about it.

Q    How do you remember then that everybody knew about it?

A    I didn't say everybody knew about it.

Q    Give me the names of the people that do know about it.

A    Detective Guebara.

Q    Okay.

A    Detective Garz, Bill Johnston, myself.

Q    Did Detective Johnston report this?

A    He was with me the whole time.  He went with me the next day.

Q    The next day?

A    To pick up the boys.

THE COURT:  You really didn't answer the question.

THE WITNESS:  Sorry.

Did he report it?

BY MS. STACK:

Q    Did Detective Johnston report this to anybody at CPD at or during around the time during this incident?

A    Report or talk is two different things.  We talked about it, but we never reported it.

132

AR-L 101751                Confidential - Subject to Protective Order  Gomez CCSAO  4271

Q    Did the other officer, the gang officer, Officer Garz, did he ever report it to anybody?

A    I don't know.

Q    In the years after you left the Chicago Police Department, did you ever tell anybody that you saw a police officer tell a witness who to pick out of a photo array? Did you ever report Ray Garza (sic) after you left CPD?

MR. VAIL:  Objection.

THE WITNESS:  Ray Garza?

THE COURT:  Rephrase your question.

BY MS. STACK:

Q    After you left CPD, did you ever report this incident to anybody?

A    Report or talk to anybody?

Q    Report it.

THE COURT:  Report it -- when you say report it --

MS. STACK:  All right, I'll clarify it.

BY MS. STACK:

Q    Did you ever report this to anybody at CPD after you left CPD?

A    No.

Q    Did you ever report it to anybody at OPS after you left CPD?

133

AR-L 101752                    Confidential - Subject to Protective Order  Gomez CCSAO  4272

A    No.

Q    When was the first time that you brought it up to Petitioner's attorneys?

MR. VAIL:  Objection.  We've asked this question a couple times, your Honor.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes.  I had a conversation with Jane Raley at Northwestern, the first official visit I had when I went there to see if she was interested in this.

BY MS. STACK:

Q    To see --

A    If she was interested in the case I had brought.

Q    Can you give us a month and date?

THE COURT:  That was not anything to do with --

THE WITNESS:  Nothing to do with this, your Honor.

BY MS. STACK:

Q    Can you give us an approximate time frame of that?

THE COURT:  Rephrase your question.  He's answering something that has nothing to do with any case involving Detective Guebara the way I understand his answers.

MS. STACK:  Okay.

134

AR-L 101753                Confidential - Subject to Protective Order  Gomez CCSAO  4273

THE COURT: I thought your question was when was the first time he brought the subject of his testimony earlier today to the attention of the attorneys. Earlier I believe he testified that it was last month.

MS. STACK: Correct, Judge. Thank you.

BY MS. STACK:

Q As to the subject of Ray Guebara's actions that you testified about today, when was the first time that you discussed it with any of the Petitioner's attorneys?

A The first time that I discussed it was in my very first meeting, official meeting with Jane Raley which was probably about 2010, late 2010, early 2011.

Q Since that time, did you try to find out any of the names of the people in this case?

A Oh, yes.

Q What efforts did you make?

A I went to the Chicago Police Department seeking the honorable mention that was given to me for solving this case. I went there because when it was given to me, I threw it in the garbage. I didn't want it, but I thought now that it might help me -- I thought it might help me recall the incident because that honorable mention would have name and RD number.

Q So you're telling the Court that you got an

135

Confidential - Subject to Protective Order  Gomez CCSAO  4274

award for solving this crime?

A    Yes, I did.

Q    Which crime was that?

A    The murder that we were investigating when Guebara brought the two kids in for the shooting. Right.

Q    The murder. So you eventually found more witnesses on this case?

A    No.

Q    When you say "solved," do you mean when you admitted to the State's Attorney's Office that you had brought a witness who he watched and suggested to --

MR. VAIL:  Objection, your Honor.

BY MS. STACK:

Q    You got an award for that?

A    I found it laughable, too.

Q    Let's talk about the other crime that happened here that you just described. The, quote, companion that brought the two 15-year-olds to the station and that is the person that, according to your testimony, told the 15-year-old to lie about this murder.

A    Yes.

Q    What did you do as far as bringing charges against him?

A    I returned to Area 5 from the Branch 66. I

136

informed them that the charges had been thrown out against the person that we rested the night before.

Q    Who is "them"?

A    The supervisors, whoever they were at the time on that day. And I was informed that we were never going to clear this crime, they were going to carry this clear close, and it is today on the books as a clear closed even though that case never went to trial and nobody ever appeared in bond court that day or never was charged past that day. So that case has been carried as clear closed based on the false identification of a person that night who got charged by felony review who 12 hours later I got released. And if it's found, it's going to show it was clear closed and it remains clear closed on the Chicago Police Department's files and records, and we were not allowed to work it.

Q    But despite your skills, we've never found an RD number, name of any relevant person in the case or been able to find any documentation that confirms this case.

MS. DANIEL:  Objection, your Honor, this is not a question.  This is argument.

THE COURT:  Sustained.

BY MS. STACK:

137

AR-L 101756                    Confidential - Subject to Protective Order  Gomez CCSAO  4276

Q    Have you found any RD numbers for this case?

MS. DANIEL:  Objection, your Honor.  She's asking what He found, not what the witness has found.

THE COURT:  I thought he said "he."

MS. STACK:  I'll clear that up.

BY THE COURT:

Q    Have you found the RD number for this case?

A    I cannot get access as I am no longer a member of the Chicago Police Department.

Q    So you have no investigative skills these days to find the case?

MR. VAIL:  Objection, your Honor.

THE COURT:  Sustained.

BY MS. STACK:

Q    You haven't tried to find this case at all?

A    No, I have, very much.

Q    Have you found any documents supporting what you testified to?

A    No police officers are going to give me any documents because they would be in trouble for giving me an outside member of the police department those documents.

Q    Have you found any documents that convert this case --

138

AR-L 101757                   Confidential - Subject to Protective Order  Gomez CCSAO  4277

A    I can't search documents.

Q    Is that a "No"?

A    No -- it is a "No."

Q    Thank you.

Back to the man who paid the 15-year-olds to lie. Did you pursue any action against him?

MS. DANIEL:  Asked and answered, Judge.

MS. STACK.  I don't think he answered it.

THE COURT:  Well, I would agree.  I don't believe he answered it either.  He went back to the homicide case, so that was clear closed.

THE WITNESS:  It is clear closed, no more work is necessary.

THE COURT:  But she's talking now about the case of the companion.

THE WITNESS:  I won't have access to anything so I can't charge him.  I'm a civilian.

THE COURT:  Back then, back in 1988 or 1989 or 1990, what happened back then?

THE WITNESS:  No, they refused.  It was a clear close case.  They wanted no more action.

THE COURT:  The companion's case was a clear close?

THE WITNESS:  Yes.

THE COURT:  Or the homicide, I'm sorry, it was a

139

clear close.

THE WITNESS: The homicide was clear closed and no one wanted us to follow-up on anything.

BY MS. STACK:

Q    And you're saying that you got an award for this case, I just want that to be clear.

MR. VAIL: Objection.

THE COURT: Sustained.

BY MS. STACK:

Q    Did you include that in your conversation with counsel on January 11, 2013?

A    I don't think so.

Q    Finally, Mr. Dorsch -- you already described your meeting with Ms. Raley in 2010 or 2011?

A    Yes.

Q    And at some point you became a consultant for the Bloom Legal Clinic?

A    I work for a variety of clinics. They are one of them. I've worked for Cook County Public Defender's Office on homicide cases, too.

Q    Okay. In reference to the attorneys who represent Mr. Solache, Jane Raley and Karen Daniel --

A    Yes.

Q    As you know, they are employees of the

140

Northwestern University Bloom Legal Clinic Center and unlawful conviction, correct?

A    Jane Raley?

Q    Yes.

A    And Karen Daniel, yes.

Q    And you have performed work for them, correct?

A    Yes.

Q    And would it be fair to say that between November 16th of 2011 and January 18th of 2013 you have been paid $43,278.43 by them?

A    I'm not sure of that amount.  I know for the last amount my 1099 was 30,000.

Q    If I was to tell you that they gave you that figure, would that sound about accurate to you?

A    Yes.

MS. STACK:  Thank you.

THE COURT:  Any other questions on behalf of Mr. Solache?

MS. SIELING:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. SIELING:

Q    Okay.  You told Ms. Stack that $43,000 was a reasonable amount that you were paid by the legal chain?

A    That sounds about right.

141

AR-L 101760    Confidential - Subject to Protective Order  Gomez CCSAO  4280

Q   Was that work done for just Ms. Raley and Ms. Daniel?

A   No.

Q   Was the majority of the work done for other attorneys?

A   Yes.

MS. SIELING:  Thank you for your time.

We have no further questions.

MR. VAIL:  Very briefly, your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. VAIL:

Q   Detective Dorsch, you were asked a litany of questions about at the time having not reported officially this incident with Detective Guebara, do you recall that examination, Mr. Dorsch.  Why didn't you immediately report it?

A   My task at hand was getting a proper and truthful identification of an offender on the homicide. I struggled to get it and get past what had happened.  I had hoped that maybe the second day the lineup might give me the second offender, giving me an ID which would solidify -- and then we'd maybe write-off that pointing as an error, a mistake, but it went the way it went.

142

AR-L 101761                    Confidential - Subject to Protective Order  Gomez CCSAO  4281

Q    And to be clear, is it your testimony today that others at the department were aware of this incident involving Detective Guebara?

A    Yes.

THE COURT:  I'll let the answer stand.  I heard him testify to that.

BY MR. VAIL:

Q    Finally, Detective Dorsch, why come forward to testify under oath to this judge about this incident?

A    When I was first gave this information to Jane Raley, it was in a conversation about a whole mess of other things.  I never knew that it was going to lead me here today, but I've always tried to do the right thing, so I'm here.

MR. VAIL:  Thank you.

THE COURT:  Any other questions?

RECROSS-EXAMINATION

BY MS. STACK:

Q    Concerning your expenses and fees that are --

MR. VAIL:  Objection, beyond the scope of any re-examination, your Honor.

MR. PAPA:  It's based on Northwestern.

THE COURT:  Overruled.

143

AR-L 101762     Confidential - Subject to Protective Order  Gomez CCSAO  4282

BY MS. STACK:

Q Are you paid on a commission? Do you get any cut of the civil cases that are brought by the Center on Wrongful Conviction?

A I get about half of what I get in the private practice. I make double the money with other attorneys and other cases. I work for -- I just got paid by the Illinois State Public --

THE COURT: Do you get paid by the hour?

THE WITNESS: I usually bill for hourly and expenses.

THE COURT: Do you get paid by commission?

THE WITNESS: No. Never.

MS. STACK: Thank you, Judge.

THE COURT: Any other questions?

All right.

MR. RALEY: Your Honor, I think there's some confusion. The Center of Wrongful Convictions does not bring civil suits against -- there's no -- I thought that the question that Ms. Stack asked was whether he gets a cut of the Center --

THE COURT: Please, that's a collateral issue. That isn't going to help me in any event. The answer that I'm using is that he gets paid for his services based on his

AR-L 101763                    Confidential - Subject to Protective Order  Gomez CCSAO  4283

hourly bill.

EXAMINATION

BY THE COURT:

Q    Mr. Dorsch, when you witnessed Detective Guebara, as you say, suddenly reach out in front of you and point out one of the photographs that you had put into the photo spread, at any time did the -- did you report that in any written police report you prepared for that homicide investigation?

A    No.

Q    Your testimony seems to me that people in the Area or in the police department locale, Area 5, all seem to know about this, but as far as you know, none of your fellow officers officially reported it to their supervisors?

A    Correct.

Q    And you did not officially report it to a supervisor?

A    I did not.

Q    All right.  And you did not tell the assistant state's attorney at felony review who came out after the photo array?

A    I don't think I told her that.

Q    It was a female?

145

AR-L 101764                    Confidential - Subject to Protective Order  Gomez CCSAO  4284

A    Well I said "her." I don't know who it was.

Q    So the only way -- would it be fair to say that people were talking about this because -- would have been because either you or your partner or one of those two gang crimes officers was telling everybody that Detective Guebara did this, is that correct?

A    Correct.

Q    That award that you received for solving a case, when did that take place?

A    Just a few days -- it was --

Q    Was it after the murder suspect had been released?

A    It was almost given as a joke, your Honor, and that's why I treated it the way I did.

Q    But it was after he had been released?

A    Oh, yes.

Q    Do you recall who gave you that award?

A    It was right out of the sergeant's office. I'm not sure who it was or who prepared it.

Q    Was it a joke award? I know that's how you're saying you took it, but was it done as a joke amongst fellow officers or was it really something that the department ordinarily would have done?

A    Normally the copy would go to the downtown

146

AR-L 101765               Confidential - Subject to Protective Order  Gomez CCSAO  4285

headquarters. I took it as a joke that it was meant to be a joke, but in seeking to try to identify the incident better, I did make an effort in the last year to see if they had it only to learn they threw everything away from officers gone after ten years or something like that.

Q But I get the sense, then, that it was really sort of a joke amongst the police officers?

A That's exactly the way I took it.

Q All right.

Did you ever place in any police report the statement of witness number one and witness number two that companion had paid them to make an identification?

A I didn't write a report, but the same statements were made to the attorney in 66, so he had his file folder. I don't know if he was writing, I don't know what he wrote.

Q This incident, this incident regarding what you allege Detective Guebara did here which caused you to be startled, was it something that always sort of bothered you?

A Yes, it's always bothered me. I take great pleasure in putting great cases together and I also took pleasure in the fact that I saved a kid from going to jail for a crime he didn't do.

147

AR-L 101766          Confidential - Subject to Protective Order  Gomez CCSAO  4286

Q   But you can't remember this person's name that you saved?

A   I'm on the outside now, your Honor.

Q   But you can't remember?

A   Oh, no, I can't remember.  I'm sorry I didn't keep something but I didn't.

Q   And you can't remember the name of the person that was murdered?

A   I can remember the location, I can remember the proximity of where we made the arrest.  I recall where he went to school at DePaul University and worked at Walgreens at six corners, but to identify him better than that, I was only looking to get him out for something he didn't do.

Q   Going back, then, to your first -- the first time that you met with -- I believe it was Ms. Raley, you said that you were bringing the Northwestern University whatever the various projects or organizations there that are relevant here, you were attempting to bring them a case of somebody you felt had been improperly imprisoned for a crime?

A   Yes.  I worked for a case in Wisconsin with the Innocence Project.  I knew nothing of Northwestern's work, but I thought they might be helpful.

148

AR-L 101767                    Confidential - Subject to Protective Order  Gomez CCSAO  4287

Q    So that was your purpose in meeting with the attorneys the first time?

A    Correct.

Q    And that case that you had hoped that they might take an interest in, did that case involve Detective Guebara?

A    No.

Q    Is it at that first meeting though you say you brought up Detective Guebara to the attorneys at Northwestern or was it back -- I'm trying to figure out when it is the first time that you told the attorneys who represent Mr. Solache, those are the attorneys at Northwestern, when is the first time that you told them about this incident that you testified to here today?

A    The people on the Solache case.

Q    The Solache team, which are the ladies that are seated there, when is the first time that you told Solache's attorneys or --

A    I never knew about the Solache case or still don't.

Q    When is the first time that you -- with respect -- I'm not talking about their case, but what I'm talking about the attorneys. When is the first time that you spoke to those attorneys that are now all here

AR-L 101768                    Confidential - Subject to Protective Order  Gomez CCSAO  4288

sitting around in front of you in court about the events of Detective Guebara surprising you by reaching out in the middle of one of your photo show-ups and identifying the suspect?

A   As far as the group there, in January, the other group would have been -- it wouldn't have been a group, it would have been with Jane.

Q   That was when?

A   That was about the end of 2010 or beginning of 2011.

Q   How did Detective Guebara and this incident come up in that case since Detective Guebara wasn't involved in the case that you were bringing to them?

A   I understand, your Honor.

I had gone to Northwestern for the first time in my life because I was invited by John Conroy who did the investigation of the Burge case. He did a big investigation and wrote an article or a book about it, I never read it, but I had -- but he invited me to Northwestern to see a review of the play he had put together.

It was there that I met not only Jane Raley but two dozen other people and had brief conversations and some became aware that I was a detective, so forth and so

AR-L 101769          Confidential - Subject to Protective Order  Gomez CCSAO  4289

on, exchanged business cards with some. One of them was Jane, and because I wanted to get this other case there I came there, and a conversation that day with her sitting down in her office, we talked about a lot of problems with the Burge case and other officers, and I brought up -- I asked even about myself, if I was involved in any cases because I handled a lot of cases. I don't know what's going on, I've been gone for years but I know these things can sometimes come back.

I asked about that, and that's how it started. That's how it started right there.

Q    You brought it up?

A    Yes.

THE COURT:  I don't have any questions.  I'll allow the attorneys for Solache to ask any questions at this time, if you wish.

MS. SIELING:  We have nothing.

THE COURT:  Anything on behalf of Mr. Reyes.

MR. VAIL:  No, your Honor.

THE COURT:  State?

MS. STACK:  No, Judge.

THE COURT:  All right.  You may step down.

All right.  This would be an appropriate time to take a break.  The officers will -- I'll continue the

151

AR-L 101770                    Confidential - Subject to Protective Order  Gomez CCSAO  4290

writs until tomorrow.

(WHEREUPON, discussion was had off the record.)

THE COURT: We can't get started at 10:00. I think we'll be able to get started very shortly thereafter. We'll continue this matter until tomorrow. Please be here by 10:00.

MR. VAIL: As you're aware, we intend to put on Mr. Reyes tomorrow. I believe there will be no other live witnesses.

THE COURT: When are you going to submit all of the other matters to me?

Off the record.

(WHEREUPON, discussion was had off the record.)

MS. STACK: To reserve my record and preserve my arguments that we feel very strongly about, we'd like to address the relevancy of those document.

THE COURT: What all is going to be submitted, all of those binders? Is it all that I'm looking at?

MS. DANIEL: Yes.

THE COURT: Can you leave it today, leave them today so you don't have to carry them and let me perhaps respond to you tomorrow, Ms. Stack.

152

AR-L 101771                    Confidential - Subject to Protective Order  Gomez CCSAO  4291

MS. STACK: I would suggest is just like, for instance, they say we have the case of John Doe, we believe it's relevant because he testified that Ray Guebara did XYZ. We respond, and we say John Doe is irrelevant because it's dissimilar in this way. And that's the way we've done it before. We just want to submit oral argument on those factors that are set out. I really would give my Scout's honor to do the best to keep it, you know, to the point and take a look, like I said, at the ones where they are coerced confession claims in that time frame to pare it down.

I'd say there's 10 to 12 that we're objecting to, so literally my argument can be that fast. I really do think it will protect the record on this, Judge, to -- they're advocating that you consider all the evidence and then make the relevancy finding. Well, of course --

THE COURT: Well, I brought that on myself, too, so I can't -- I can't blame them for that.

MS. STACK: This is a perfectly reasonable time to still do it, Judge, the arguments. We can get them done in an hour.

THE COURT: Like I said, I'll -- let me listen tomorrow.

MR. VAIL: Your Honor, if I may finish, given that

153

AR-L 101772                    Confidential - Subject to Protective Order  Gomez CCSAO  4292

we intend to put on the one live witness, we inquire whether the State is tending to put on any witnesses tomorrow so we can prepare.

THE COURT: Do you have any that you would be going ---

MS. STACK: It was our understanding we were going to finish their case in this period and move to ours afterwards.

MR. VAIL: That wasn't our understanding, your Honor.

THE COURT: Well, it's probably the only practical way that it can be done.

MS. STACK: Plus, we can't really know --

THE COURT: I understand. We'll deal with it tomorrow. Let's get the last live witness for the Petitioners on the stand tomorrow and give me an opportunity to try to digest the various requests that are being made.

(The above-entitled cause was continued until 2/14/2013.)

154

AR-L 101773          Confidential - Subject to Protective Order  Gomez CCSAO  4293

STATE OF ILLINOIS )

)  SS:

COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT - CRIMINAL DIVISION

I, Ellen Dusza, Official Court Reporter of the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had on the hearing in the aforementioned cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the Report of Proceedings had before the HONORABLE JAMES M. OBBISH, Judge of said court.

_____

Official Court Reporter

Ellen Dusza, CSR 84-3386

Circuit Court of Cook County

Date:_____2-14-73_____

155

AR-L 101774            Confidential - Subject to Protective Order  Gomez CCSAO  4294

AR-L 101775                    Confidential – Subject to Protective Order  Gomez CCSAO  4295

# EXHIBIT 2

STATE OF ILLINOIS        )
                         )  SS.
COUNTY OF C O O K        )

        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE STATE    )
OF ILLINOIS,               )
                           )
              Plaintiff,   )
                           )
     vs.                   )  No.  93 CR 1873(01)
                           )       93 CR 1873(03)
ARMANDO SERRANO and        )
JOSE MONTANEZ,             )
                           )
              Defendants.  )


              REPORT OF PROCEEDINGS had at the hearing

of the above-entitled cause before the HONORABLE

MAURA SLATTERY BOYLE, Judge of said court, on the

15th day of May, 2013.

     PRESENT:
     HONORABLE ANITA M. ALVAREZ,
        State's Attorney of Cook County, by:
     MR. JAMES PAPA, MS. CELESTE STACK and
     MR. KURT SMITKO
     Assistant State's Attorneys,
          appeared on behalf of the People;

     MS. JENNIFER BONJEAN
          appeared on behalf of the Defendant Armando
          Serrano.

     MR. RUSSELL AINSWORTH and 7-11 CAITLIN BROWN,
          appeared on behalf of the Defendant Montanez.

Denise A. Gross, CSR# 084-003437
Official Court Reporter
2650 S. California, Room 4C02
Chicago, Illinois 60608


                              1

EP Montanez Sub. Resp. 018637

jury trial, but it was a bench trial.

MS. STACK: I think I did refer to it as a jury trial.

THE COURT: And it was a bench trial before Judge Bolan. The record so reflects.

(Witness duly sworn.)

WILLIAM DORSCH,

called on behalf of the Petitioner, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q. Sir, would you please state and spell your name for the record?

A. William Dorsch, D-O-R-S-C-H.

Q. And I understand, sir, you are a former Chicago police officer; is that correct?

A. Yes.

Q. When did you serve as a Chicago police officer?

A. I began my career in June of 1970 and retired in August of 1994.

Q. Would you please trace your various assignments that you had within the Chicago Police

56

EP Montanez Sub. Resp. 018692

AR-L 566819

Department for us?

A.   Upon graduation from the academy, I worked in the 20th District for about five years assigned to the tactical unit, went to the 19th District tactical unit, 13th District tactical unit, then to gang crimes, then I went back to the 20th District tactical unit and then promoted to detective.

Q.   About when were you promoted to detective?

A.   Let's see, I think I was a detective for about nine years, and I retired in '94, so probably around '85.

Q.   And, sir, how long do you serve as either a tactical officer or a gang crimes officer?

A.   Well, as long as they want you, I guess.

Q.   Well, how long did you serve in that capacity?

A.   I was only in uniform officer for about eight months in my entire career.  I went into plain dressed tactical units and I stayed there in gangs.

Q.   So from about 1971 to 1985 you were serving in some capacity as a gang crimes officer or tactical officer?

A.   Correct.

57

AR-L 566820

Q. And then when you became a detective, were you assigned to an area?

A. Yes.

Q. What area were assigned to?

A. Area 5.

Q. Which Division of Area 5 were you assigned to?

A. Violent crimes.

Q. How long did you serve as a police detective in Area 5 violent crimes?

A. Until my retirement in August of '94, so about nine years.

Q. So the whole time you were in violent crimes?

A. Yes.

Q. Would you please tell the Court what kind of crimes you investigated as a violent crimes detective?

A. I was responsible for homicides and police involved shootings.

Q. And in your career as a Chicago police officer, about how many homicides did you investigate?

A. In my career, counting tactical units and

58

AR-L 566821

gang crimes, I would think over 400.

Q. Since your retirement, have you taught classes regarding law enforcement?

A. Yes, I have.

Q. What have you taught?

A. What classes have I taught?

Q. Yes.

A. Interviews and interrogations, report writing, criminalistics, forensics, a whole group of topics. I was an instructor for the State of Wisconsin for newly hired police officers. I trained for about two years.

Q. At their academy?

A. Well, it was a branch of their academy. It was at the University of Wisconsin in Rice Lake and also in Eau Claire, Wisconsin.

Q. Are you a member of any law enforcement associations?

A. No, I am not.

Q. Did you have any family members who are current police officers?

A. Yes.

Q. Just tell us how many and how you are related to?

59

AR-L 566822

A.   Well, I had two sons on the job at one time.  My youngest son I encouraged him to leave after about nine years.  He had some domestic problems, alcohol-related problems, and the job was not the right fit for him any more.  So he didn't retire.  He left the job, and he is doing well.

My other son who came on the job before him, I believe he came on in about 1996 -- I'm very proud of the work he's done.  He is in the 25th District and has got a good reputation.

Q.   He is still there?

A.   Yes.

Q.   Do you also work as a private detective?

A.   Yes.

Q.   Private investigator I should say?

A.   Yes.

Q.   Are you licensed as an investigator?

A.   Yes, I am.

Q.   During your time with the Chicago Police Department, did you know Detective Guevara -- well, do you know a Reynaldo Guevara?

A.   Yes.

Q.   How did you know him?

A.   First, just through general contact as I

60

AR-L 566823

worked either -- he might have been with me in gangs when I was in Gangs West. I am not certain of that. But I became more familiar with him when I became a detective working in Area 5. Previous to that I was in more or less usually in Area 6 or Area 4.

Q. Was there ever an occasion where you observed Detective Guevara suggest to a witness which photograph to pick out of a photo lineup?

A. Yes.

Q. When did that event occur?

A. Well, we tried to be specific, but it's difficult because it was about 25 years ago. The best way I can put it, I know it was only months before he became meritoriously promoted, so I think and I've tried to be specific, but I can't be that positive, it would have about '89, '88, '89, even into instigation '90, in that area, but I think it was more like '89.

Q. What was Reynaldo Guevara's title at the time of this incident?

A. He was working for gang crimes.

Q. And when you say he was meritoriously promoted, what was he promoted to, what position?

61

AR-L 566824

A.    He was promoted to detective and worked in Area 5.

Q.    So the incident you are talking about happened about three months before he was promoted?

A.    To the best of my memory, about three months before.

Q.    How did you come to be assigned to the case that involved in this photograph lineup?

A.    One day while at work in the office, Detective Guevara came in with three other people and he went into the office and talked to the supervisor.  The supervisor came out and said, that me and my partner should assist Detective Guevara on a homicide as he had two witness.

Q.    Had you ever seen those three persons who came in with Mr. Guevara at that time?

A.    No.

Q.    And so what did you do when the supervisor assigned you to assist in the investigation?

A.    Well, the first thing is to pull the reports as they exited in our office, review the reports to see if I had any memory of the case itself and then to sit down with Detective Guevara -- he wasn't a detective at that time -- with

62

AR-L 566825

Officer Guevara, and then to meet with the two witnesses.

Q. When you were first assigned to the case, were you given any indication of when the -- or what type of crime it was or when it happened?

A. Yes, I recognized the crime from my having been at the location I think a day after the shooting or maybe I remember the shooting was after midnight, early morning hour, and I was there probably because I was working days the next day and I went out to the scene during the next day, took a look at the scene. There wasn't much to gather. It was all -- the scene work had all been done.

Q. And was this a murder?

A. Yes. It was a car to car shooting.

Q. And how long since the murder had occurred did this incident happen?

A. It was months, months, and definitely months until Detective Guevara came in.

Q. You mentioned the shooting was a car to car shooting. What do you mean by that?

A. The victim was in a car going one direction coming up towards Bloomingdale, and he

63

had with him a relative, which I believe was a 13-year old niece sitting beside him, a car pulled up, going the opposite direction, and according to the niece who was not injured in the shooting, she described the shots as coming from the car that pulled up alongside them going the opposite way.

Q. Do you recall anything about the car, the description of the car that the shooter was in?

A. I never talked to the niece, because she was already interviewed, but from the reports she had described merely a large white auto.

Q. After you pulled the reports, what was the next thing you did in terms of your investigation?

A. Well, just talking with Officer Guevara about how he came in contact with this new information and the two individuals who are now witnesses.

Q. And what did he tell you?

A. That they had an encounter on the street where he met them, and they told him that they had seen this homicide that happened months before, and that they had written down the license plate number of the offender's vehicle, and although they had never talked to the police prior, they were able to

64

AR-L 566827

retrieve and give that license plate information to Detective Guevara or Officer Guevara.

Q. Do you know how many months after the incident this was?

A. It was, again, maybe three, four months.

THE COURT: He answered three to four months.

BY MR. AINSWORTH:

Q. Now --

THE COURT: I'm sorry. I don't mean to interrupt. That's what you indicated, correct?

THE WITNESS: Yes, three or four months.

MR. AINSWORTH: I thought the witness was still thinking. I apologize.

Q. Did you do anything with the information about the license plate?

A. Well, the most obvious thing for us to do was to run the plate to see if we could obtain vehicle owner identification for that license plate which we did.

Q. And tell us what you found out?

A. We got the name of the owner of that vehicle and ran a record check by telephone at that time and got back that the owner of that car had one arrest at the time. He had one arrest, and it

65

AR-L 566828

was for a UUW arrest, which means a gun.

Q. And so what did you do after you discovered that -- you found the owner of the vehicle and that owner had a prior UUW offense?

A. Well, we retained the two witnesses at the station, at Area 5, asked Detective Guevara to go and pick up the photo and a copy of the UUW report, because it was a UUW, they would have taken an arrest photo.

Q. And so when you are saying A photo, do you mean A photo of the person, the owner of the car?

A. The owner of the car, correct.

Q. And did Officer Guevara in fact go get that photo?

A. Yes, he did.

Q. And what happened after he got the photo?

A. It was -- yes. Yes, it's still the same day. There's two days involved here so I want to make sure I get it right. He came back to the station with the photo and the report of the UUW, gave it to me and my partner at the time and I then sought to put that photo with similar people fitting that basic description from the photo, put together 6 or 8 photos together and then proceeded

66

AR-L 566829

to take the two witnesses down to a larger room at the back of Area 5 so that I could have a photo array.

Q. Let me stop you there. Do you recall who your partner was at the time?

A. I believe it was Bill Johnston. That's what I recall.

Q. And you said you made a photo array. Can you describe that procedure?

A. Well, we have photos available in Area 5 from which we can go and pull similar like persons by, first specifically by race, by age, by height, weight, description, mustache, maybe glasses, whatever is best to fit the individual in question.

Q. And did you allow the witnesses to view that photo array?

A. Not together. Separately.

Q. So tell us how you did that.

A. Well, in the larger room there is a big table, and the room is large enough that you can separate the two witnesses. And I did that by having one of the two move to a corner, and he stood in the corner with Officer Guevara's partner, and I asked the other person, after I spread the

67

AR-L 566830

photos out on the table, I asked him to step forward and he did so with Officer Guevara. And I explain to him the procedure, I said, before he looked at the photos, I had explained to both of them that you are going to see photos. I don't know if the person that did this is in the photos. There's no need to pick out the wrong person. You are not going to do me any favor by feeling you need to pick out someone. I only want you to pick out someone if you truly believe that is the offender. And that was information given to both.

Q. And then did you have the witnesses view the photo array separately?

A. Yes.

Q. And what happened when the first witness viewed the photo array?

A. Well, he was standing right next to me and Officer Guevara was beside him and the photos were spread out on the table and he was looking at the photos and looking and looking. I wasn't upset with that because some people need more time, and from experience I learned to give them that time. So he was looking, and I wasn't upset with the fact that he wasn't quick to identify anybody, but then

68

AR-L 566831

suddenly Officer Guevara just reached out and put his finger on one photo and says, "That's him." And then the subject that was viewing the photo says, "Yes, yes, that's him. I was about to pick him out. He looks a little different."

Q. Prior to the point that Officer Guevara pointed, put his finger on one of the photos, had the witness made any ID of any of the photos?

A. No, no, movement to identify.

Q. Had he narrowed it down to any group of photos?

A. He said nothing and asked for nothing.

Q. What did you do after Officer Guevara told the witness which photo to pick out?

A. Well, it was very unusual no me. I was uncomfortable with it, and I immediately told Guevara and witness number one, that had just been at the table, to step outside.

Q. And why did you do that?

A. I had never experienced it before. I was upset. I wanted the identification to come solely from my witness with no input. I didn't know if I was dealing with someone who was just over zealous and did what everyone knows is wrong, but I was not

69

AR-L 566832

comfortable with it, but I still had a second person hopefully that could identify someone.

Q.   Could the second person see the photos that had been picked out by --

A.   No, he couldn't.  And even the second photo array would have been different than the first.  I would have mixed up the photos in a different order, okay, which I did do.

Q.   And so from the vantage point of the second person, you made sure that they couldn't see the photos?

A.   Yes, from the beginning, right.

Q.   And did you have that second witness look at the photo array?

A.   Yes, I did.

Q.   What happened when the second witness viewed the photo array?

A.   He was unable to pick out anyone.

Q.   And what happened when that -- and this was while Officer Guevara was out of the room; is that right?

A.   Yes, and the first witness also.

Q.   What happened after the second witness failed to make an identification?

70

AR-L 566833

A. Well, I had questions about the first identification, so I separated the first witness from Officer Guevara so I could speak to him independently about his identification.

Q. And did you speak to that first witness?

A. Yes, I did.

Q. And what conversation did you have with him?

A. I asked him he was identifying the photo because that is the person or was he in fact reacting to what the officer did. I said the identification has to be yours, and I am uncomfortable with the way it happened.

Q. And what did the first witness tell you?

A. He was adamant that he was, you know sorry for the confusion, but this is the right guy. The guy looks a little different. I was about to identify him. I really didn't need any help.

Q. You mentioned earlier that three people came in with Officer Guevara?

A. Yes.

Q. Was that third person asked to view the photo array?

A. That third person never got past the

71

AR-L 566834

waiting room. He sat in a chair across from the desk as you enter Area 5, and he never got past that. I never talked to him in the two days that he was there.

Q. Do you know why that third person was present at the police station that first day?

A. At the time, I did not.

Q. Did Officer Guevara tell you why that third person was there that on the first day?

A. No, and I didn't ask. I just assumed it was a friend, but not a police officer because a police officer could have come in.

Q. Could you tell the Court about the approximate age of the first two witnesses?

A. The first two witnesses were juveniles, okay, around 15, 16 years of age.

Q. Now, I just want to be clear. Have you seen any documents regarding this case to refresh your recollection?

A. Of the Guevara thing? No, I have not. I have sought -- I tried at best to recall or gather.

Q. So you're testifying from your memory about this?

A. All from memory from 20 some years ago.

72

AR-L 566835

Q. Did this incident stand out in your memory?

A. Yes, because of the unusual occurrence. I never had that happen before, and there was the follow up to that that happened.

Q. Is it something that you've ever done, that is tell a witness that's him in a photo array before they make an identification?

A. That would be totally improper. I mean, I didn't know if it was impulsive. I can't get into the head of Officer Guevara.

Q. Why is it totally improper?

A. Well, you are there to have the witness identify. You don't need input from somebody else. I mean, I certainly don't want to lead them. I mean, that would be like putting only one photo.

THE COURT: Ask a question.

BY MR. AINSWORTH:

Q. Sir, what did you do after you talked to the first witness and he said that, no, that was the shooter?

A. Well, it was a dilemma, but I still had to call felony review.

Q. And what happened when you called felony

73

AR-L 566836

review?

A. I apprised them of the fact that I had witness identification, and one who didn't identify him and had them sit down with felony review.

Q. Did felony review come out to area?

A. Yes.

Q. Did they talk to the witnesses?

A. Yes.

Q. And then what happened, what did you do to further investigate the investigation after the felony review Assistant State's Attorney spoke to the witnesses?

A. Well, we knew we needed -- the next step would be to find the person that's identified and to bring him in for a lineup, and we arranged to do that the next day.

Q. So tell us what you did to arrange for a lineup the next day?

A. Well, we didn't know that we would find him the next day, but we went out looking for him because we had his address and we found him at home.

Q. And did you speak to the suspect?

A. Yes, when we arrived at his apartment, he

74

AR-L 566837

answered the door, and we told him we were detectives from Area 5 and that he had been named in an incident and we were going to need to talk to him about that and could he accompany us into the Area 5 and he consented.

Q. Do you recall anything about the suspect, what he told you about either his family life or work life or anything like that?

A. Yes, he came to the door. He was dressed very nicely. He had a white shirt on, like a suit type of shirt. He invited us in. He had been sitting at his dining room table. He was a student at DePaul, I believe, University, and he had his books on the table and he had been sitting at the table writing out checks to pay his bills.

Q. Did he tell you where he worked?

A. He said he was a student and he worked at Walgreens at Irving and Milwaukee.

Q. Did you talk with him about his prior UUW?

A. Not at that time, no.

Q. Did you ask the suspect to come to the police station?

A. Yes.

Q. And did he in fact accompany you back to

75

AR-L 566838

the police station?

A.   Yes.

Q.   And was that Area 5?

A.   Correct.

Q.   What happened when the suspect accompanied you back to Area 5?

A.   We put him in an interview room and talked to him and told him about the seriousness of the offense that he was implicated in by witness identification, talked to him about his background and that's when I asked about the UUW arrest that he had.

Q.   What did he tell you about that?

MR. PAPA:   Objection.

THE COURT:   Sustained.

MR. AINSWORTH:   I am simply not offering it for the truth of it, but simply to corroborate.   It's a corroborating detail.

THE COURT:   Sustained.   Move on.

BY MR. AINSWORTH:

Q.   And after you talked with the suspect, what did you do next in your investigation?

A.   We contacted Officer Guevara and told him we had the suspect in custody and asked him to go

76

AR-L 566859

pick up the two witnesses.

Q. And did the witnesses come to Area 5?

A. Yes, with the same third person.

Q. At the time did you know why the same third person accompanied the two witnesses?

A. Again, it wasn't of concern. I didn't put anything to it and I basically ignored it.

Q. And did you know why he was there at the time?

A. No.

Q. Did you hold the lineup?

A. Yes.

Q. And I assume the suspect was in the lineup?

A. Yes, he was.

Q. What happened when you held the lineup?

A. Well, the individual that identified his photo -- there were two separate lineups again, as we did with the photos. The individual who identified the picture of the suspect, identified him in the lineup. All right. And the second lineup person who was unable to identify his photo was not able to identify anybody in the lineup.

Q. So when you are talking about two lineups,

77

AR-L 566840

you are talking about each witness viewed the lineup separately?

A. Separately, correct.

Q. What did you do after the first witness identified the suspect in the lineup and the second witness did not?

A. Well, the next step again would be to notify felony review that we held a lineup and the witnesses are here, we need you to come down and talk to them.

Q. And did felony review respond to Area 5?

A. Yes.

Q. And what did the felony review State's Attorney's do?

A. They approved charges after interviewing both persons.

Q. Did you talk with the witnesses again after charges were approved against the suspect?

A. The next day.

Q. And why did you speak to them?

A. Well, I had talked about this previously in another incident, but it was unclear to me if I was bringing them to the Grand Jury because I needed to bring them to the Grand Jury, which I

78

AR-L 566841

think that it might have been -- not to Grand Jury, but to Branch 66 because they were witnesses so. I believe we were intent on bring them to Branch 66 the next morning, and they were notified that they were going to pick them up, okay. But there was an event that occurred the night before that made me more aware of that I needed to talk to them and bring them to Branch 66.

Q. And what was that event?

A. Well, after we had gotten the charges approved and removed the suspect after telling him he had been identified and he was now charged in a homicide, we completed the arrest report and we moved him into the lockup, and then we returned to our office and sat down to start doing our closing reports.

Q. Did somebody come to speak to you?

A. Yes.

Q. Who came to speak to you?

A. A gentleman came up and identified himself as the father of the young man we had arrested.

Q. And what did he say to you?

MR. PAPA: Objection.

THE COURT: Overruled. I will allow it. You

79

AR-L 566842

BY THE WITNESS:

A. He came to us and broke out in tears right away. He said I want to talk to you. I don't what I should do. My son has not ever been in trouble. He's a good boy. He is a student. He works. He is not a problem. Do I need to get a lawyer? What do I have to do?

Q. What did you tell him?

A. I said, well, your son does have an arrest for a gun. I said I know that for a fact. I got the report, and he says, yes, I know he was arrested for a gun, but it was not a real gun, you know. I said, no, it was a gun and this kid had already told me that it was a gun but it was broken --

THE COURT: Sustained. Please ask a question. This is not a full hearing. Ask a question.

MR. AINSWORTH: I apologize, your Honor, but I offered that just to substantiate that the witness is giving information about a particular arrest that's verifiable.

THE COURT: Sustained. The Court indicated

80

AR-L 566843

that's sustained. Ask another question. Ask a question.

MR. AINSWORTH: Yes, Judge.

BY MR. AINSWORTH:

Q. And so what did you do after the father told you the information about his son being in his mind a good kid?

A. Well, from having talked to his son already and having been told that the prior arrest for the gun was for a weapon that he found in an alley but it was broken and inoperable, it confirmed what the father was telling me and the report also confirmed --

MR. PAPA: Objection.

THE COURT: Sustained.

BY MR. AINSWORTH:

Q. So, sir, what did you do the next day?

A. I went to pick up both witnesses to take them down to the Grand Jury -- I mean, to Branch 66, and with the intent of questioning them because I was uncomfortable with the identification.

Q. And what did you -- what happened when you talked to the witnesses?

81

AR-L 566844

A.    I stressed that we did not want to put innocent people in jail and this was a serious offense, and I said there were things that happened during the identification such that make me believe that something is not right.

Q.    Was Officer Guevara present when you spoke to those witnesses?

A.    No.

Q.    On that day?

A.    No.

Q.    And what did the witnesses say to you after you told them that you felt that there was something about the identifications that was not right?

A.    They had said that they had lied about the identification, that they had not witnessed the shooting, that they merely were giving information that was supplied to them by the third gentleman that had also accompanied them to the station both days and that that gentleman had paid them for that identification.

Q.    Did they tell you anything about the relationship between that third gentleman and the suspect?

82

AR-L 566845

A.   Yes.  It was that the gentleman, the young man that we had arrested, according to the two witnesses, was dating this man's ex-girlfriend.

Q.   What did you do after you learned that the witnesses or the witnesses had lied about his identification of the suspect?

A.   Well, certainly I wasn't going to extend the imprisonment of the young man who was obviously now to me innocent, so I took him down to Branch 66, advised the State's attorney in Branch 66 of what happened, had occurred that these two had been -- only one of them had identified him to begin with, but now both were telling me that they had been paid to identify him.

Q.   And did you tell that to Assistant State's Attorney?

A.   Yes.

Q.   What happened when you imparted the information to the Assistant State's Attorney?

A.   I said we need to get this young man released and he said we can do that.

Q.   What happened to the charges against that suspect?

A.   They were dropped that day in bond court.

AR-L 566846

Q. And what does the, what happened to the status of the investigation of that shooting?

A. When I returned -- this is a lengthy answer. I don't know if you want me to go into this like this.

THE COURT: Ask him a question.

BY MR. AINSWORTH:

Q. Were you able to do additional investigation on that shooting?

A. No, the case was --

Q. Why not?

A. The case was cleared closed after discussion between Area 5 and downtown homicide unit. It was decided that the case would be closed on the identification that was made with no mention of the release.

Q. And what does cleared closed mean?

A. No further investigative action is needed.

Q. And based on the case being cleared closed were you allowed to further investigate that shooting?

A. No.

Q. Do you recall the name of either the suspect or the victim in that case?

84

AR-L 566847

A.   No, I don't.

Q.   Did you receive a commendation for that case?

A.   Yes.

Q.   What did you do with that commendation?

A.   I threw it in the garbage.

Q.   Why?

A.   It was ludicrous.

Q.   Why do you say that?

A.   Because they were more concerned about the clear up than the investigation of a homicide victim.

Q.   What do you mean, they were more concerned about the clear up?

A.   They made it known to me when I came back that they were never going to solve that case, that there were no witnesses other than the 13-year-old who really couldn't help.

Q.   That's the 13-year-old niece?

A.   Yes.

Q.   Was she still in Chicago to your knowledge?

A.   No, I knew the next day or day after the shooting that she had already returned to

85

AR-L 566848

Puerto Rico.

Q. Sir, have you ever been hired by the Exoneration Project to investigate any cases?

A. By the University of Chicago?

Q. Yes.

A. No.

Q. Have you ever done any investigation for the University of Chicago Exoneration Project?

A. No.

Q. You've performed investigation for myself before; is that right?

A. Yes.

Q. Do you know how many years ago?

A. Oh, that was maybe 2003, 2004, or maybe 2005. I am not sure.

Q. When I called you on the phone to ask you to testify in this case, did you even know who I was?

A. I remembered your name. I did remember your name.

Q. Have you ever talked with me about the substance of your testimony here today?

A. No.

Q. And have you ever performed any

86

AR-L 566849

investigation for Ms. Jennifer Bonjean, the counsel sitting at the table?

A. No.

MR. AINSWORTH: I have no further questions.

THE COURT: Thank you, Mr. Ainsworth.

Ms. Bonjean?

EXAMINATION

BY MS. BONJEAN:

Q. Mr. Dorsch, have we ever met prior to today?

A. No.

Q. Have we ever spoken on the phone prior to today?

A. No.

Q. Was our first contact in the hallway this morning?

A. Yes, it was.

MS. BONJEAN: That's all I have.

THE COURT: Cross?

CROSS-EXAMINATION

BY MR. PAPA:

Q. Mr. Dorsch, you don't remember if this happened in 1988, 1989 or 1990, correct?

A. I said that it would be close to Guevara's

87

AR-L 566850

meritorious promotion. So whatever date he was promoted meritoriously, it would be about three months prior.

THE COURT: Mr. Dorsch, I am going to indicate to you, this is cross-examination. You're familiar? If you are asked a question, you answer the question only that's asked of you.

Mr. Papa, ask another question.

BY MR. PAPA:

Q. Mr. Dorsch, I believe you also said you knew what Officer Guevara did was totally improper with that witness, correct?

A. Yes.

Q. Totally wrong for a police officer to point somebody out to a witness, correct?

A. Yes.

Q. You then I assume, being a very conscientious detective, immediately reported Officer Guevara's actions to your supervisor?

A. No.

Q. You, I assume, again being a very conscientious Detective, immediately reported Officer Guevara's actions to his supervisor?

A. No.

88

AR-L 566851

Q. Did you report it to anybody?

A. It was a well-known --

Q. Answer my question.

A. No.

Q. Did you report it to anyone?

A. No.

Q. As a matter of fact, you continued on in this investigation, correct?

A. As proper.

Q. Did you say as proper?

A. It was proper to continue the investigation.

Q. You kicked Officer Guevara out and this witness who you have no idea whose name it is?

A. Today I don't, right.

Q. You then allowed the other person, the second guy, to look at the photo array, correct?

A. Yes.

Q. You kicked Officer Guevara out to be with the person that he just, according to you, told who to identify, pointed out who to identify, you told those two people to go out of the room together to be together, correct?

A. Yes.

AR-L 566852

Q. You, of course, being a conscientious detective, could have separated the two from each other, correct?

A. Yes.

Q. You could have put that first 15-year-old kid into another room so he would have no further contact with Officer Guevara, correct?

A. Correct.

Q. All you do is kick them out of the room so the two of them can continue to talk, correct?

A. They could.

Q. You believing that something so improper had just occurred could have ended the entire involvement of this 15-year-old-kid right then and there?

A. No.

Q. You could have done that?

A. It would be improper with another witness.

Q. I said the first witness. You could have ended it right there, and said, no, that identification was so tainted, this is wrong, I am not talking to him anymore; you could have done that?

A. I don't think that I would have ever done

90

AR-L 566853

that.

Q. You just said you knew that what Officer Guevara did was so improper, totally improper, you could have stopped it right then and there?

MR. AINSWORTH: Objection, argumentative, and asked and answered.

THE COURT: Overruled, you may answer Mr. Dorsch.

BY THE WITNESS:

A. I think to do that would be improper.

BY MR. PAPA:

Q. As opposed to not reporting it to a single supervisor?

MR. AINSWORTH: Object to the form of the question.

THE COURT: Overruled. You may answer, Mr. Dorsch.

BY THE WITNESS:

A. I am in the middle of a witness identification. I am not going to run out and seek supervisors when I don't know why it was done.

BY MR. PAPA:

Q. Well, you said you never told a supervisor though, correct?

91

AR-L 566854

A.    We talked about it for years, but no official report was ever made in protest.  Like I said --

Q.    Did you tell your immediate supervisor the night that this happened?

MS. BONJEAN:  Objection, asked and answered.

THE COURT:  Overruled.  Answer the question, did you tell your supervisor that night.

THE WITNESS:  Yes.

BY MR. PAPA:

Q.    Who?  I'm sorry I take that back.  You just testified that you did not report this to your supervisor?

A.    Not as a punitive matter, no.

Q.    I didn't ask you if it was punitive.  I asked you if you reported to your supervisor.

A.    Then I misunderstood your question, sir.  Would you please repeat your question.

MS. BONJEAN:  Objection, your Honor.  He is screaming at the witness.  It's argumentative and unnecessary.

THE COURT:  Overruled.  And again on word basis.  Overruled.

Mr. Dorsch, the question was posed to you,

92

did you report the conduct that night?

THE WITNESS: I'm trying to understand that question.

THE COURT: I'm sorry. Did you based on what you observed -- Mr. --

Mr. Papa, ask a question.

BY MR. PAPA:

Q. Who did you report it to?

MS. BONJEAN: Objection, assumes a fact not in evidence.

MR. PAPA: He just said it.

THE COURT: Okay, I am right here. Overruled. It does not assume a fact in evidence. He said they talked about it for years and so forth.

MS. BONJEAN: Objection. Your Honor, report is different than talking about it.

THE COURT: Overruled. Mr. Papa, ask a question.

BY MR. PAPA:

Q. Who did you report Officer Guevara's actions to?

A. Whomever was there in a supervisory capacity of that evening.

Q. When I started off these questions, I

93

AR-L 566856

asked you if you reported his actions to your immediate supervisor, and I believe your testimony was you did not.  Did I misinterpret what you said?

A.    I misinterpreted.

Q.    What did you misinterpret?

A.    I thought you meant punitively speaking.

THE COURT:  Punitively?

THE WITNESS:  Meaning to cause a statement of improper conduct to notify for what Guevara had done, like for a CR number or something like that.

THE COURT:  The conduct -- ask a question.

BY MR. PAPA:

Q.    Who did you report it to then?  Give me a name.

MR. AINSWORTH:  Objection, asked and answered.

THE COURT:  Overruled.

MS. BONJEAN:  Objection, asked and answered.

THE COURT:  Overruled.  Who did you report it to?

THE WITNESS:  Whomever the supervisors were on duty at that night.

BY MR. PAPA:

Q.    So don't know a name?

A.    It's 25 years ago.

94

AR-L 566857

MS. BONJEAN: Objection, asked and answered.

THE COURT: Overruled. Mr. Dorsch, do you know who it is?

MS. BONJEAN: Objection, asked and answered.

THE COURT: I am going to overrule my question too. Who did you report it to?

THE WITNESS: Whomever was the supervisor that night.

BY MR. PAPA:

Q. I asked for a name. Do you remember the name?

A. No, I don't.

MS. BONJEAN: Objection, asked and answered.

THE COURT: The answer may stand. No, he does not.

BY MR. PAPA:

Q. Did you report to Officer Guevara's immediate supervisor?

A. No.

Q. You could have?

A. At what -- I could have when?

MS. BONJEAN: No question pending, objection.

THE COURT: Overruled. Ask a question.

I'm sorry, is something funny?.

95

AR-L 566858

MS. BONJEAN: You overruled it and then told him to ask him a question.

THE COURT: Continue, Mr. Papa. I believe the question was --

MR. PAPA: I know. I'm sorry, I didn't mean to interrupt I am trying to figure out.

Q. You could have told Officer Guevara's supervisor about his conduct, correct?

A. Yes.

Q. You could have told him the night that this happened?

A. Yes.

Q. You could have told him the following day, correct?

A. Yes.

Q. You chose not to do any of that?

A. Yes.

Q. Instead, if I have this correct, Mr. Dorsch, you contacted a felony review assistant to come to Area 5?

A. Yes.

Q. You were under no obligation to contact a felony review assistant at that time, correct?

A. I had my witnesses there. That would have

96

AR-L 566859

been standard procedure. I wouldn't have allowed them to go home. I would have want them to talk to felony review.

Q. If you believed what Officer Guevara did was totally improper, you were under no obligation to have contacted a felony review assistant to come to the area, correct? I'm sorry, is there something funny?

A. It's such a gray area that you are throwing at me, that I don't know how to answer it.

Q. Why don't you try.

A. The investigation was ongoing, ongoing.

THE COURT: So the question then being, if it's ongoing, do you have to call or don't you have to call?

THE WITNESS: I would call.

THE COURT: Ask a question.

BY MR. PAPA:

Q. So felony review came out?

A. Yes.

Q. Man or woman?

A. I don't recall that.

Q. Person's name?

A. No, I don't know.

97

AR-L 566860

Q. You had the felony review assistant interview the first witness who had identified this individual, correct?

A. Yes.

Q. Now, prior to having the felony review assistant speak with this witness, you spoke to the review assistant?

A. Yes.

Q. You would have provided any documentation that would have been generated to the review assistant for them to look over, correct?

A. Yes.

Q. Now, when you're talking to felony review assistant, Mr. Dorsch, you told the review assistant, "By the way, Officer Guevara pointed this guy out," before the witness made that identification, right?

A. I don't think I did.

Q. You kept that piece of vital information to yourself?

A. No, it was still ongoing.

Q. What does that mean it was still ongoing?

A. It could have been rectified by the lineup the next day.

98

AR-L 566861

Q. You kept an important piece of information from the felony review assistant, yes or no?

A. I don't know that I told the felony review supervisor that. I was suspect about the identification in that only one identified and the other didn't, but I don't know if I did tell them about Guevara because I didn't know why he did it.

Q. So now if I have it correct, Mr. Dorsch, you possibly or may have told the review assistant this?

A. I may have, but I don't think that I did.

Q. Did the review assistant take a handwritten statement from witness number one?

A. Would have taken from both.

Q. I asked about number one.

A. I assume that whoever it was did.

Q. I'm not asking to assume. Did the review assistant take a handwritten statement from witness number one?

A. I know they were interviewed. I don't know if they she took -- she or he took a statement from him.

Q. Okay. So you are not sure?

A. I am not sure, no.

99

AR-L 566862

Q. Following day happens, you go and you find the person who had been identified, correct?

A. Yes.

Q. Now, I think you had also said that you had reviewed the reports regarding the shooting, correct?

A. Yes.

Q. And you had learned what the passenger in the car had cried as the vehicle used during the shooting, correct?

A. Yes.

Q. And it was some large white car or something like that, right?

A. Right.

Q. When you ran the license plate that had been provided to you, did you learn the type of car that was registered to this person?

A. Yes.

Q. What type of car was it?

A. Oh, now, I know longer recall.

Q. Was it the same type of car that had been described?

A. I do recall it was sitting in front of his house when we went to pick him up and it was a

100

AR-L 566863

white car.

Q. So this being an investigator detective, experienced detective, this is pretty good stuff at this point, right?

A. It sits well with me, correct.

MS. BONJEAN: Objection, pretty good stuff.

THE COURT: Overruled.

BY MR. PAPA:

Q. By the way, Mr. Dorsch, before I forget this, when you sent Guevara to go get the photo, those two 15-year-old kids were still at Area 5, correct?

A. Correct.

Q. They were with you?

A. They were in an interview room. I have other jobs I could be working on.

Q. Were you talking to them about --

A. No.

Q. -- the events that lead to them being there?

A. Oh, that had already been done.

Q. You had spoken to them before you sent Officer Guevara to go get the picture?

A. Sure, yes.

101

AR-L 566864

Q.   Did you speak to them together?

A.   At first, I believe so.

Q.   So two people who say they witnessed a crime, you are interviewing them together?

A.   Right.

Q.   Is it normal practice or better practice that you separate two witnesses?

MR. AINSWORTH:   Objection, relevance.

THE COURT:   Overruled.

BY THE WITNESS:

A.   If the crime had just occurred and these witnesses were at the scene of the actual event when it happened, I would not have interviewed them together.   But this was months later and they were coming to me with a piece of paper was their sole identification, so I didn't see any harm in talking to them both.

Q.   You think the time difference is a reason why you would not isolate two potential witnesses?

A.   Yes.

Q.   Putting two people in the same room so that each can hear the other's version of events, in your opinion, several months later, is a good idea?

AR-L 566865

A.   They have he had several months --

MS. BONJEAN:  Objection, misstates his testimony.

THE COURT:  Overruled.

BY THE WITNESS:

A.   They had several months of being together prior to their coming in to me.

BY MR. PAPA:

Q.   No, I am asking if you thought that was a good idea to put two potential witnesses in the same room together so each could hear the version that the other witness was saying?

A.   I saw no harm.

Q.   When you teach law enforcement officers, do you teach that technique?

MS. BONJEAN:  Objection, relevance.

THE COURT:  Overruled.  The parties brought up his qualifications and previous teaching experience.

BY THE WITNESS:

A.   Again, if it an incident that just happened, I would not recommend that they be interviewed together.

BY MR. PAPA:

103

AR-L 566866

Q. So you tell law enforcement officers as long as a certain time period has elapsed, bring everybody into the same room and have a conversation --

MS. BONJEAN: Objection, asked and answered, argumentative, misstating his prior testimony.

THE COURT: Overruled, go on, Mr. Dorsch, you may answer the question.

THE WITNESS: Please repeat the question.

BY MR. PAPA:

Q. You teach law enforcement officers, new law enforcement officers, as long A certain amount of time has passed from the incident, you can have as many potential witnesses together in a room so that each of them can hear how the other describes the event, is that what you are trying to tell us?

A. You are talking about two different things here. Officer Guevara had already told us --

Q. I'm not talking about Officer Guevara. I am talking about what you teach new law enforcement officers?

MS. BONJEAN: Objection, compound question, confusing question.

THE COURT: Overruled.

104

AR-L 566867

BY THE WITNESS:

A. It's a totally different incident over what I would be teaching. It's something -- not everything is written in stone, things change, things are different. Every experienced officer knows things change. I had already been given information by Detective Guevara how he meet these two.

THE COURT: Mr. Dorsch, I am going to instruct you again. You are not listening to the question being asked of you. You need to answer the question asked of you.

THE WITNESS: It's such a gray area.

THE COURT: The question is, do you teach law enforcement now the methodology in regards to interviewing witnesses after a certain amount of time, do you put them in the same room or do you separate them?

MS. BONJEAN: Objection.

THE COURT: Overruled. That's the question, Mr. Dorsch.

MS. BONJEAN: It's not understandable.

THE COURT: It's very understandable.

THE WITNESS: Not to me.

105

AR-L 566868

THE COURT: When you teach officers right now --

THE WITNESS: I am not teaching now.

THE COURT: When you did. Did you say at four months you could keep the witnesses together? Like at a time frame? Or did you say if it's before four months or at the time of the incident to separate them? I mean, what was your method? What did you teach?

MS. BONJEAN: Objection, still incomprehensible.

THE COURT: Mr. Dorsch?

THE WITNESS: Your Honor, there are times we bring A possible suspect back to the crime scene where everybody sees him at once.

THE COURT: Right.

THE WITNESS: So it's different. They are not kept separate, the people are not separate. They are brought back and that's proper.

THE COURT: So on this -- go ahead, Mr. Papa, ask a question.

BY MR. PAPA:

Q. Let's skip to the next day now. Second day of your involvement in this homicide. And by

106

AR-L 566869

the way, Officer, excuse me, Mr. Dorsch, you were not originally assigned to this homicide, correct?

A. Correct.

Q. Whenever it occurred?

A. Correct.

Q. And I think you said you went to the scene the next day?

A. Yes.

Q. Had you been assigned the follow-up investigation on the case?

A. No.

Q. So did you go to scenes, homicide scenes on cases that you are not assigned?

A. That's what my job was, to be at least aware of these homicides, even if it wasn't assigned to me, if they were open.

Q. Prior to your involvement with Officer Guevara when he brought these witnesses into the area, had you actually formally been assigned any part in the investigation?

A. No.

Q. So now the second day goes by, you go to, I think, you said to the suspect's house and you see a white car somewhere out in front of his house

107

AR-L 566870

and the suspect was taken into Area 5, correct?

A.    Yes.

Q.    If I understood you correctly, Mr. Dorsch, it's your testimony then that after placing this person or arresting him and taking him to Area 5, you then contact Officer Guevara and have Officer Guevara go get two witnesses?

A.    Yes.

Q.    The same two witnesses that had just been at the area the night before?

A.    Yes.

Q.    You on the second day involve Officer Guevara?

A.    Yes.

Q.    You think that what he has done is so improper that you call Officer Guevara to involve himself in the investigation again?

A.    Yes.

Q.    You could have called and requested any other officer that was at your disposal to go pick these witnesses up?

A.    In hindsight, yes.

Q.    Heck, you could have done it?

A.    I guess I could have, yes.

108

Q. You knew where they lived, correct?

A. At the time, I guess I did.

Q. At the time, the night before, you would have taken down all the pertinent information, correct?

A. Yes.

Q. A GPR would have been created?

A. Yes.

Q. You would have written down name, address, dates of birth, phone numbers, any information that you could so that you could have the opportunity to find this person for future events, correct?

A. But it was common for us to involve other district or gang crimes officers to do exactly what you are saying.

Q. Okay. The same one that you think did something so improper the night before, you asked?

A. But I don't know why he did it.

Q. Oh, you don't know why?

THE COURT: Mr. Papa.

MR. PAPA: I'm sorry, Judge.

BY MR. PAPA:

Q. So the why to you somehow was important?

A. Yes, because it could have been just

109

AR-L 566872

impulse. It would have been wrong.

Q. So you don't want to distance yourself from Officer Guevara in this case?

A. I don't want to make an accusations to make him look bad if he made a stupid mistake.

Q. Why involve him in the second day?

A. I wasn't sure what happened the first day. I never had that happen to me before.

Q. You make the request for Officer Guevara to bring these two guys in?

A. Yes.

Q. He does?

A. Yes.

Q. Third person, this companion if you want to call him that, is still with him?

A. Yes.

Q. Lineup is done, correct?

A. Yes.

Q. Witness number one, again, you don't know his name, he views the lineup, identifies the suspect, correct?

A. Yes.

Q. Witness number two cannot make an identification?

110

AR-L 566873

A.   Yes.

Q.   You contact felony review, correct?

A.   Yes.

Q.   Review comes back out?

A.   Yes.

Q.   Now, on the second night, is it the same or is it a different felony review assistant?

A.   I don't know.

Q.   Can't remember that piece?

A.   I can't remember that.

Q.   Okay.  Second night, when the review assistant comes out, you again would have provided the information to the review assistant as to the investigation, correct?

A.   Yes.

Q.   When you spoke to the review assistant, did you tell that review assistant about Officer Guevara pointing out the suspect before an identification had been made?

A.   I don't think that I did as I didn't know why.

Q.   What does that mean?

A.   I don't know if it was intentional for the wrong purpose or it was a stupid mistake.

111

AR-L 566874

Q.   And you think that somehow, somehow that reason, even if it was a mistake, you don't think the review assistant should have been told about it?

A.   I don't know that I did tell her, but I don't think that I did because I didn't know.

Q.   You called the out the review assistant because you as the detective on the case, were looking for charges of first degree murder to be placed on this particular individual?

A.   Yes.

Q.   Again, that's your call, your discretion, you didn't have to call felony review and even request first degree murder charges to be placed on this individual?

A.   I didn't have to, and I was uncomfortable with it.

Q.   Did you say you didn't have to?

A.   I didn't have to -- I was uncomfortable with charging, but I still had to call felony review, let them run it by with the witnesses and see what they think.  I can't charge him.  That's not my job.  My job is to notify.  My job is to notify felony review.  That's my job.  And if I

112

AR-L 566875

would have went to my supervisor --

THE COURT: Mr. Papa, ask a question. This is not a narrative or story telling by Mr. Dorsch.

BY MR. PAPA:

Q. You were calling felony review and asked that they approve first degree murder charges?

MS. BONJEAN: Objection, asked and answered two different times.

THE COURT: You may answer, Mr. Dorsch.

BY THE WITNESS:

A. You call felony review for the purpose of having them come down and interview the witness and listen to the evidence as gathered and they decide whether to charge.

BY MR. PAPA:

Q. Well, they decide whether to charge based on all the information that they can either gather or that is told to them by the detectives, correct?

A. Correct.

Q. Felony review -- the charges were approved against this suspect?

A. Yes.

Q. He's placed into the lockup?

A. Yes.

113

AR-L 566876

Q. Witness number one and witness number two go home; they leave?

A. Yes.

Q. Now, the following day, Mr. Dorsch, you now pick up the two witnesses?

A. Yes.

Q. And the purpose of picking up the witnesses is to take them down to Branch 66?

A. I think when I testified in another case earlier, I may not have --

Q. I am not asking about when you testified --

A. Well, no, I believe it was to take him to Branch 66. I think that was the intended purpose, and that was the intended purpose before I talked to the father.

Q. My question is the following day you picked up the two witnesses to take them to Branch 66?

A. Right.

Q. That wasn't an unusual event, correct?

A. Correct.

Q. That was some part of the duties as a detective, was after a case is charged, you have to

114

AR-L 566877

bring the witnesses down to Branch 66?

A. Correct.

Q. So that the Branch 66 Assistant State's Attorney can meet and interview them?

A. Correct.

Q. And then potentially to present them to the members of the Grand jury?

A. Yes.

Q. So the following day you pick up these two witnesses and then you said you had a conversation with them, correct?

A. Yes.

Q. You find out for the first time that according to you this companion had paid the two 15-year-old kids to make an identification?

A. Yes.

Q. Now, of course, Mr. Dorsch, at this point when you're talking to these 15-year-old kids, you find out the name of who the person, the companion was?

A. No.

Q. It didn't matter to you?

A. I was interested in correcting an error in and taking them to Branch 66.

115

Q. Ok. You take them to Branch 66 and let's say everything gets worked out, right? Through your testimony you say the charges were dropped, correct?

A. Yes.

Q. The offender was released from custody?

A. Yes.

Q. Now, then, all that's been done? The two witnesses are still with you?

A. Yes.

Q. The guy is released?

A. Well, that would have been later in the day.

Q. Whenever it was. The charges were dropped?

A. I was told they would be dropped later in the day, yes.

Q. The two witnesses area still with you at this point?

A. Yes.

Q. So now all of that is taken care of in terms of what your most important goal was, correct?

A. Yes.

116

Q. Now, when you have the time at this point, Mr. Dorsch, you then ask these two kids, hey, who is the companion, what's his name?

A. I don't -- I did find out the name, yes, I did.

Q. What's the name?

A. I don't remember.

Q. After getting the name, who did you get it from?

A. It came from -- it had to have come from the kids.

Q. Okay. They would have provided you an address too?

A. Oh, yes, definitely had an address, but was not allowed to go there.

Q. Well, hold on. Let's talk about that for a second. You are still in this building when you are having this discussion with the two 15-year-old kids?

A. Right.

Q. You don't need anybody's permission where to go, correct?

A. No.

Q. No you don't have permission or you don't

117

AR-L 566880

need to get permission?

A.   I don't need permission to go.   And felony review asked me if I wanted to charge the two kids for the false identification.

Q.   Okay.   With the information that you've just been provided that this companion paid the two 15-year-old kids, you said you got a name and address, correct?

A.   Yes.

Q.   You don't know the name or you don't know the address any longer?

A.   No, I don't.

Q.   I assume, Officer Dorsch, you drove immediately to that address to go pick up this companion, correct?

A.   No, I took the two kids home.

Q.   After you took the two kids home, you could have arrested the person who those two kids said paid to falsely identify this person, correct?

A.   We went to Area 5.

THE COURT:   Mr. Dorsch.

BY THE WITNESS:

A.   I didn't, no, I didn't arrest.

118

BY MR. PAPA:

Q.   I think my question was you could have.

A.   I could have.

Q.   You chose not to do that?

A.   I chose to go to Area 5.

Q.   A crime had been committed according to what you testified to, correct?

A.   In my eyes, yes.

Q.   Well, you are the only person up on the witness stand --

MS. BONJEAN:   Objection, argumentative.

THE COURT:   Sustained.

BY MR. PAPA:

Q.   Well, a crime had been committed according to you, correct?

A.   Yes.

Q.   Your job as a detective was to enforce the laws?

A.   Yes.

Q.   Your job as a detective is, if a crime occurs that you have knowledge of, you've got to go make an arrest?

A.   I agree with that.

Q.   Where did you go arrest the guy at?

119

AR-L 566882

A.   I wasn't allowed to.

Q.   No, no, no.  You are saying --

THE COURT:  Mr. Bonjean, I am not going to see any nodding or --

MS. BONJEAN:  Objection.  He answered the question.

MR. AINSWORTH:  I objection to the no, no, no.

THE COURT:  Overruled, Mr. Ainsworth.

MS. BONJEAN:  Mr. Papa is not a witness.  The question he was not --

THE COURT:  Ms. Bonjean, stop.

Mr. Papa, ask a question.

BY MR. PAPA:

Q.   When you found out a crime had been committed, you didn't have a discussion with any of your supervisors yet?  You were still in this building?

THE COURT:  Is that correct?

MS. BONJEAN:  Objection, foundation.

BY THE WITNESS:

A.   I hadn't talked to my supervisors yet, no.

THE COURT:  Overruled.

BY MR. PAPA:

Q.   Nobody was preventing you from making an

120

AR-L 566883

arrest of this companion?

MS. BONJEAN: Objection, foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. I chose to take the information about the subject going to be released back to my office knowing I could go and arrest the person later.

BY MR. PAPA:

Q. So, again, you made the decision on your own to ignore the crime that you had just learned about having occurred?

MS. BONJEAN: Objection, misstates the question.

THE COURT: Overruled, he can answer.

THE WITNESS: There was no need for haste to go there. It was more important for me, I felt, to notify my office that the identification that was made the night before was faulted, and that the subject that was arrested was not the guilty party. I took that information back to Area 5, appraised them of what they had said about being paid, and told them that I knew who the offender was that paid them. It was the third person that came in with Officer Guevara?

121

Q.    Are you done?

A.    Yes.

Q.    My question was, you chose to not go and arrest that individual?

MS. BONJEAN:  Objection, asked and answered, foundation.

THE COURT:  It hasn't been answered.  Answer that.

MS. BONJEAN:  When?  There's no foundation.

THE WITNESS:  Overruled.  Answer the question, Mr. Dorsch.

BY THE WITNESS:

A.    When?

BY MR. PAPA:

Q.    When you found out a crime had been committed?

A.    Did I leave this building and go there? No, I went to my office and asked that we go arrest him, and was told, no.

Q.    And, again, correct me if I am wrong, Mr. Dorsch, but you didn't need anybody's permission to enforce the laws?

MS. BONJEAN:  Objection.

THE COURT:  Overruled.

122

AR-L 566885

BY THE WITNESS:

A.   No.

BY MR. PAPA:

Q.   You didn't need to ask your supervisor hey, boss --

MS. BONJEAN:   Objection, argumentative.

THE COURT:   Sustained.

BY MR. PAPA:

Q.   Well, did you need your supervisor'S permission?

A.   No.

Q.   Your testimony, I believe, was that you were actually given some type of an award?

A.   Yes.

Q.   That was presented to you by whom?

A.   A sergeant.

Q.   What sergeant?

A.   I believe in hindsight thinking about it, that it was Rocco Ranaldi.

Q.   Did your partner get one?

A.   I would think he did, but it was a joke. It wasn't meant as an award.

THE COURT:   Mr. Dorsch, answer the question that's asked.

123

AR-L 566886

THE WITNESS: I don't know.

BY MR. PAPA:

Q. You don't know if your partner got one?

A. No.

Q. By the way, you could have filled out supplemental reports?

A. Not allowed to.

Q. So it's your testimony that your name appears -- if we ever uncovered reports of a homicide that took place in either 1988, 1989 or 1990 that happened in the Humboldt Park area with a drive-by type of shooting, your name wouldn't appear on any reports?

A. It would appear on the closing report for the identification and charging, but there were no reports about the release.

Q. Okay. On the reports that your name does appear though, sir, do you include the information, did you include the information that Officer Guevara pointed first in the photo array before the witness was able to identify somebody?

A. No.

Q. Of course you could have?

A. If I knew why, I would have.

124

AR-L 566887

Q. Again, of course you could have included that information in the report?

THE COURT: Mr. Dorsch, answer the question, yes or no.

BY THE WITNESS:

A. I guess, yes.

BY MR. PAPA:

Q. You didn't?

A. I didn't.

Q. So it's your testimony then, were you ordered not to write a supplemental report regarding the dropping of the charges?

A. Yes.

Q. By who?

A. The supervisors. There was a conversation I was aware of when I came back to the office already that downtown wanted this case cleared close.

Q. I'm asking you who?

A. I don't know who the office talked to.

Q. Who told you not to write a report?

A. The supervisory staff.

Q. Who?

A. I don't remember exactly who. I don't

125

AR-L 566888

remember if it was the commander of violent -- of the detective's unit or the sergeants. I just know there was a bunch of people there. A supervisor that said, you're doing nothing. We are going to be able to clear this case on arrest.

Q. Did you think that was wrong?

A. You bet I did.

Q. Who did you tell that to?

A. Everybody knew it.

Q. No, no, I am telling the reporting of the -- you being ordered not to further investigate the case?

A. If I further investigated the case, they couldn't clear close it.

Q. Well, you could have complained to --

A. I vociferously complained to --

Q. How about Office of Professional Standards?

A. No, I didn't.

Q. You could have?

A. I could have, yes.

Q. Would that have been the appropriate body to have made your complaint to?

A. And a career ender.

126

AR-L 566889

Q.    You say a career ender?

A.    Oh, I believe so.

Q.    There's laughter there, Mr. Dorsch?

A.    Yeah, it's not really funny to me.

Q.    It's not funny, correct?

A.    No.

THE COURT:  You know, for all parties in this courtroom, if I didn't make it clear, I will reiterate, there is nothing funny.  I expect no reaction except professionalism.  Do I make myself clear, Mr. Ainsworth?

MR. AINSWORTH:  Yes.

THE COURT:  Ms. Bonjean?

MS. BONJEAN:  Yes.

THE COURT:  Ms. Stack?

MS. STACK:  Yes, your Honor.

THE COURT:  Mr. Smitko, yes?

MR. SMITKO:  Yes, Judge.

THE COURT:  Mr. Papa?

MR. PAPA:  Yes, Judge.

THE COURT:  Mr. Dorsch?

THE WITNESS:  Yes, Judge.

THE COURT:  Ask a question.

BY MR. PAPA:

127

AR-L 566890

Q. So if this effected your career, then you are not going to do anything about it?

MS. BONJEAN: Objection.

THE COURT: Overruled. You may answer that, Mr. Dorsch.

BY THE WITNESS:

A. I didn't do anything.

BY MR. PAPA:

Q. You could have?

A. I could have.

Q. Now, let's fast forward to when you retire. 1994, correct?

A. Yes.

Q. No longer a police officer?

A. Correct.

Q. No longer any worries about career ending reports?

A. Yes.

Q. Who did you report this entire incident to in the Chicago Police Department?

A. Since I retired?

Q. Sure.

A. You mean in like an official report or just conversation?

128

AR-L 566891

Q. I know there's a distinction between what you think I am asking, but I am asking you, did you report the conduct of your supervisors to --

A. No.

Q. -- to the Office of Professional Standards?

A. No.

Q. How about the new thing that is created after that, IPRA?

A. I don't even know what that is.

THE COURT: Independent Police Review Authority.

MR. PAPA: Thank you.

Q. To them?

A. I don't think they were in existence then.

Q. They are in existence now. You could have done that though, correct?

MS. BONJEAN: Objection. This is absurd. It's argumentative.

THE COURT: Overruled. Mr. Dorsch, did you report it to OPS or IPRA at any time since 1994?

THE WITNESS: No.

BY MR. PAPA:

Q. And your belief, Mr. Dorsch, there is an

129

AR-L 566892

unsolved crime that the Chicago Police Department has labeled clear closed?

A. Yes.

Q. You have taken no steps to rectify that?

A. No.

Q. No you haven't taken?

A. No, I haven't taken any steps.

Q. Your partner at the time I think you believe was detective who?

A. I think it was Detective Bill Johnston.

Q. Is he still alive?

A. He's retired. I don't know where he is. I haven't seen him in many years.

Q. When is the last time you think you talked to him?

A. I have no idea. It's been a long time.

Q. When you knew you were going to testify in the Guevara related cases, did you make any attempt to contact your former partner, Detective Johnston?

A. No.

Q. Did you make an attempt to contact him so that he might he might give you a better idea of the year that this happened?

MR. AINSWORTH: Objection, asked and answered.

130

AR-L 566893

THE COURT: Overruled.

BY THE WITNESS:

    A.   No.

BY MR. PAPA:

    Q.   What efforts did you make to try and --

THE COURT: Mr. Papa, I don't mean to cut you off. I need to give her a break.

This is what we are going to do, Mr. Dorsch is going to remain in the jury room. He is going to have no contact or communication with any of the attorneys while this case is currently on the stand. Deputy Seropia, are you here, sir? And then Mr. Dorsch can remain in the jury room. And the I just -- I really need to give her a break. We will see everybody at 2:30.

MR. PAPA: Can I ask one questions. I believe Wilda Vargas has been under subpoena and is still in the hallway. Based on the ruling she should --

THE COURT: I don't know. I don't know who is here.

MS. BONJEAN: Your Honor, she is in the hallway and we do intend to make an offer of proof as to her testimony.

131

AR-L 566894

THE COURT: And my ruling previously stands. I am not going to be hearing an offer of proof.

MS. BONJEAN: It is reversible error to not allow us to make an offer of proof.

THE COURT: I will see everybody here at 2:30. We are going to move on.

(Lunch recess taken, after which the following proceedings were had.)

THE COURT: Back on People vs. Armando Serrano and Jose Montanez. We are in the middle of cross-examination of Mr. Dorsch. There are a couple issues. Yes, Mr. Ainsworth?

MR. AINSWORTH: Your Honor, we served Francisco Vincente with a subpoena to appear in court today. He has not appeared in court today, and we ask that a warrant issue for his arrest.

THE COURT: Sir, you do have a copy of that service?

MR. AINSWORTH: Yes, Judge. I tendered a copy to the State. If the Court would like --

THE COURT: If you could please give that to Madam clerk. I will issue an ACC. We will obtain that number. I will issue a warrant for his

132

AR-L 566895

arrest. No bail. Time is now 2:35. He is not in court. He was directed to be here at 10:00 a.m.. He has not been here all morning or all afternoon, so a warrant will be issued for his arrest.

Ms. Bonjean has indicated we do have some additional witnesses tomorrow. We also intend on calling Detective Guevara, and I believe, Ms. Bonjean, you have indicated that attorney for Mr. Guevara has not accepted service, so you need to accomplish that?

MS. BONJEAN: Yes, Mr. Soto, who represents Detective Guevara on several matters. I spoke to him twice. I did offer him the courtesy of arranging a good time and date by which Detective Guevara could come in, if he was willing to accept service. He indicated that he was not in a position. He called me this morning and said he was not a position to accept service. So we'll go about it like the other witnesses.

THE COURT: Also, there's also an issue of offer of proof with regard to Ms. Vargas -- I don't know what her first name is.

MS. BONJEAN: It's Elizabeth, but she goes by Wilda.

133

AR-L 566896

THE COURT: -- Wilda, the parties indicated a request for an offer of proof. I will grant them that. As what I would like to do, she is under subpoena, and I don't know if you still have her here or not, we can take the issue of the offer of proof tomorrow. If you want to let her go tonight and not to bring her back tomorrow, we can pick a date when Detective Guevara. If I change my opinion, then we will schedule it for that day. If that's what you want to do.

MR. AINSWORTH: We have no objection to proceeding that way, Judge.

THE COURT: So I don't know if she is still out there. If you want to, you don't have to keep her standing there, and you want to let her go. If she's still out there.

MR. AINSWORTH: She needed to go, so we let her go.

One issue, Judge, I was wondering if the Court could issue writs so that the petitioners could return for tomorrow's court date.

THE COURT: That is my next question. Where are they being housed?

MR. AINSWORTH: One is at Dixon and one is at

134

AR-L 566897

Danville.

THE COURT: My suggestion is what I am going to remand them to CCDOC, hold on call for tomorrow. Could I step out and call to see if that's a real that's my question is, it appears as though your clients are particularly --

MR. AINSWORTH: The issue is they loose their housing status when they don't go back and they loose their property.

THE COURT: I am trying to remember if we call that -- now, if I commence and continue their writ, will they bring them back tomorrow?

MR. AINSWORTH: They indicated they will.

THE COURT: That's fine. That's better then. You might want to tell him. I might want to tell him commenced and continue the writs for tomorrow. Hold on call until 5-16-2013. I have signed the paperwork. And so we will have that. So they don't have to be remanded to CCDOC.

MR. AINSWORTH: Thank you, Judge.

MR. PAPA: Does it say on the paperwork?

THE COURT: It says it on the transmittals. The paperwork that writs order of habeas corpus tomorrow. So that is what they say. I mean, if

135

AR-L 566898

they don't come back tomorrow, then that will be a whole other issue. We will commence and continue this it until they come back. We will put it on the paper so just so we can have the paperwork done on that. They are not going to be remanded to CCDOC. Writs are commenced and continued until tomorrow on 5-16.

All right. Any other administerial matters before we begin and continue?

Mr. Ainsworth?

MR. AINSWORTH: No, Judge.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No.

THE COURT: Ms. Stack?

MS. STACK: No.

THE COURT: Mr. Smitko?

MR. SMITKO: No.

THE COURT: Mr. Papa?

MR. PAPA: No.

THE COURT: All right. Bring out the witness. Again, Parties, we are going to 4:00 o'clock. I would like to think we might get done with this witness. I don't know.

We are in the middle of cross-examination.

136

AR-L 566899

Mr. Papa, continue, sir.

CROSS-EXAMINATION (CONT'D)

BY MR. PAPA:

Q. Mr. Dorsch, I am going to -- I know I kind of moved off it for a brief time, but I want to go back to the time when you were in Branch 66 and the offender was going to release that day. Okay?

A. Yes.

Q. Even before leaving this building, you being an experienced police detective, you knew where the office of felony review was located at, is that correct?

A. I can't say that I do.

Q. You don't know that it's on the 14th floor of the adjoining building here?

A. No.

Q. In all your time as a Chicago police officer --

A. I mean, I've been to the gang unit and stuff like that, but I don't recall exactly if there was one specific. I mean, I imagine there's one specific office for felony review, but I don't recall where it was.

137

AR-L 566900

Q. As a detective back in whatever year you say this occurred, you could have asked the Branch 66 assistants, hey, where is felony review at, right?

A. If I had a need to do so, yes.

Q. Well, when you said if you had a need to do so, again, you just found out that this companion had paid witnesses to falsely identify somebody in a homicide, correct?

A. Yes, yes.

Q. Again, you knew that was a crime?

A. Yes.

Q. You could have gone and located a supervisor within the felony review unit of the Cook County State's Attorney's Office and spoken to a supervisor, correct?

A. I didn't know that that was my task. I guess I could have, but I didn't know that that was my job to do.

Q. Well, you said that it was your job to call felony review when felony review or when somebody identified an individual in a homicide, you knew to do that?

A. Yes.

138

AR-L 566901

Q. You said that was something that you of course would do, correct?

A. Yes.

Q. You are saying that you didn't know you could go and talk with a felony review supervisor regarding the crime that this companion had committed?

A. I would go to my supervisor. I guess if I wanted to charge first. I mean, I had to bring them up to speed on what happened here.

Q. I guess I asked you a different question then? You could have?

A. I could have.

Q. You could have gone to the felony review unit and told them everything that occurred, correct?

A. Yes.

Q. You also said I think earlier that the Branch 66 Assistant asked you if you wanted to the two 15-year-olds charged?

A. Yes, he did.

Q. Now, you say it's a he?

A. In 66 it was a he.

Q. They are 15-years-old?

139

A.   15 or 16.  They were juveniles.  Juvenile in whatever year this occurred.

Q.   Was felony review a necessary party to charge a juvenile?

A.   I don't know.

Q.   You would have then?

A.   I wasn't looking to charge the juveniles. I was looking to get an innocent man out.  So I wasn't thinking about that.

Q.   When the Branch 66 assistant said, hey, you want those guys charged, did you respond back to them, what do I need you for?

A.   Huh?

THE COURT:  Counsels, again, nothing in this room is funny.  Nothing.  Continue, Mr. Papa.

BY MR. PAPA:

Q.   Did you ask the Branch 66 person what do I need your approval for on juveniles?

A.   I never said that.

Q.   You didn't need a felony review assistant to charge a juvenile with a crime, correct?

A.   I am not sure.

Q.   You are not sure now or you weren't sure then?

140

AR-L 566903

MS. BONJEAN: Judge, this has been asked and answered, objection.

THE COURT: Overruled.

BY THE WITNESS:

A. I am not sure.

BY MR. PAPA:

Q. I think we kind of got stopped earlier when we were talking about the honorable or commendation that you received. Is it your testimony, Mr. Dorsch, that this was an official award that was given to you by the Chicago Police Department?

A. An honorable mention is an in-house award, written by usually detective sergeant or patrol sergeant. It's not like a ceremonial award. It is something that you find in your mailbox.

Q. Okay, was this given to you by official channels in the Chicago Police Department?

A. Well, it was prepared by a sergeant in Area 5.

Q. What sergeant?

A. I believe it was Rocky Ranaldi.

MS. BONJEAN: Objection.

BY MR. PAPA:

141

Q.   Was this sergeant the same sergeant that had forbid you from including information, any information in your supplemental reports regarding the offender being released?

A.   Rocky Ranaldi -- I am not sure.  I worked homicide, so I usually could work different hours, different shifts.  So I don't know if he was -- at what point he came in.

THE COURT:  Mr. Dorsch, I am going to advise you once again.  There's a question asked of you, answer the question that is asked of you.

Mr. Papa, ask a question.

THE WITNESS:  Okay.

BY MR. PAPA:

Q.   Was this sergeant the same sergeant that had forbid you from writing the report that included the information about releasing this offender?

A.   No.

Q.   A different one?

A.   Yes.

Q.   You are shaking your hands and you are shrugging your shoulders?

A.   Because 25 years, I don't recall exactly

142

AR-L 566905

who first approached us and said don't do anything.

Q. Okay. You get this honorable mention, what do you do with it?

A. I throw it in the garbage.

Q. Did you go and talk to the sergeant, like, hey, was this some type of joke?

A. He was a known comedian.

Q. So it was a joke as far as you --

A. Oh, everybody -- not only I. Everybody knew it to be a joke.

Q. Had you told -- what was his name Rocky?

A. Ranaldi.

Q. Had you told Sergeant Ranaldi what this companion had done?

A. He would know it, yes.

Q. No, I didn't say --

A. Did I tell him directly or -- I don't know. I don't remember.

Q. Did you tell Sergeant Rocky Ranaldi, was he one of your supervisors?

A. One.

Q. Did you tell him what Detective or Officer Guevara had done?

A. He knew, yes.

143

AR-L 566906

Q.   No --

A.   Yes, he did know.

Q.   No, I asked you if you told?

A.   Yes.

Q.   You keeping saying he knew.  I am asking you, did you tell Sergeant Ranaldi?

A.   Yes.

Q.   When?

A.   At various times it was a topic.

Q.   When did you tell him?

A.   The first time would have been probably within the day that I returned to the office.

Q.   So sometime before this honorable mention --

A.   Oh, yes.

Q.   -- had been given to you?

A.   Yes.

Q.   When did you write your report anyhow?

MR. AINSWORTH:  Objection, foundation.

THE COURT:  Overruled.

MR. PAPA:  How many reports did you write?

BY THE WITNESS:

A.   Well, we would have only done the closing report for the arrest of the individual.

144

Q.   So one report?

A.   Yes, and lineup reports.

Q.   So more than one?

A.   Yes.  The standard procedure, the lineup reports and the closing report.

Q.   Well, in the closing report would that have also included your first encounter with the two 15-year-old kids?

A:   Sure.

Q.   So one report would have covered when you began your involvement until charges were approved?

A.   I believe so.

Q.   And then there were -- when did you write that report?

MS. BONJEAN:  Objection, foundation.

THE COURT:  Overruled.  He can answer that.

MS. BONJEAN:  Which report?

THE COURT:  I assume --

BY THE WITNESS:

A.   I don't recall.  I know we probably started it that night, but I don't know when we finished it.

BY MR. PAPA:

Q.   When you say that night, which night?

145

AR-L 566908

A. The night we placed him in lockup after charging him.

Q. Okay. And back in whatever year this occurred, were you using computers or was it still typewriters?

A. That's a good question. That's a good question. I don't recall. It was around -- the switch came about that time so I don't recall.

Q. Came about what time?

A. Around 1989, 1990.

Q. So the supplemental report that you say you generated concerning this case, would have been completed after this offender had been released from custody?

A. I don't know if it was completed before or after.

Q. So your testimony then, if I have that correct, would have been you could have completed it before you took anybody to Branch 66?

A. It could have been.

Q. So could have been completed the night that the lineup had been conducted?

A. It could have, yes.

Q. You're guessing at this point?

146

AR-L 566909

A.    I am.

Q.    Tell us the efforts that you've made to try and locate any reports concerning anything that you've testified to?

A.    The only thing as a retired member of the police department that I could do, without knowing the specific names and location or RD numbers was I went down to the police headquarters about a year ago looking for my personal file because your awards are supposed to be forwarded down to headquarters and be placed in your personal file. I hoped that I might find that award -- if it was sent. Sometimes they are not -- that it would be there. Only to learn that they no longer keep the retirees' personal files after about ten years.

Q.    They throw them away?

A.    Yes.

Q.    Now, you went down to the Chicago Police Department I am guessing at 35th and Michigan?

A.    Yes.

Q.    Because you wanted to look into your file?

A.    Yeah. I mean, I didn't ask to be here, but it was -- I wanted to get the answer because I couldn't remember 25 years ago.

147

AR-L 566910

Q. Okay, but you were looking to see if your honorable mention was in that file?

A. I thought there was a chance. I mean --

THE COURT: Mr. Dorsch.

THE WITNESS: Sorry.

THE COURT: Is that yes or no?

MS. BONJEAN: Objection. He is trying to answer the question. It doesn't require a yes or a no sometimes.

THE COURT: Ms. Bonjean, the Court is very well of its duties and obligations here. The Court will instruct the witnesses as such.

Ask the question. Answer the question that is asked of you.

BY MR. PAPA:

Q. You went down to the Chicago Police Department, to the headquarters hoping to find this honorable mention in your personal file?

A. Yes.

Q. This document that you have said was a joke?

A. Yes.

Q. This document that you said was issued by the sergeant as a joke?

148

A.   Yes.

Q.   You now 25 years later thought this sergeant, besides just putting into your mailbox, had forwarded to your official personal file to be kept in a permanent record?

A.   I hoped.

Q.   Now, was that the only thing that you did to try and locate a report?

A.   Because I am retired, yes.

Q.   You don't know anybody else in the Chicago Police Department that you can ask to have looked for that information?

MS. BONJEAN:   Objection.

THE COURT:   Overruled.

BY THE WITNESS:

A.   They are under danger of losing their job if they are searching for information without being ordered to do so.

BY MR. PAPA:

Q.   So that would be a no?

A.   No.

Q.   The reason that -- well, strike that.

When was the first time that you mentioned or talked about this Ray Guevara incident with

149

AR-L 566912

anybody after you retired?

A. With anybody?

Q. Yes.

A. I mean, it's come in up in conversation. I don't know.

Q. With who?

A. Well, I moved to Wisconsin for several years, so I was gone. Okay. So I wasn't communicating with anybody that I had worked with.

Q. When was the first time that you talked with anybody about Ray Guevara and this particular incident?

MS. BONJEAN: Objection. He answered. He doesn't know.

THE COURT: Overruled.

BY MR. PAPA:

Q. After you returned from Wisconsin?

A. I don't know.

Q. You had met with lawyers who worked for the Bloom Legal Clinic, correct?

A. Yes.

Q. And correct me if I am wrong, that's a center that works out of Northwestern University?

A. Correct.

150

AR-L 566913

Q. And which lawyers in particular had you met with?

A. Pertaining to this incident.

Q. Yes.

A. The first conversation I had was with Jane Raley.

Q. And what year was that?

A. It was to the best of my memory about the end of 2010, maybe early 2011.

Q. And how did that conversation take place?

A. I brought a particular case that I was interested in working on. It was a homicide, hoping to meet with somebody at Northwestern, hoping that they would take that case under consideration because I felt that the person was innocent.

Q. And the case that you brought to Northwestern had nothing to do with Ray Guevara?

A. Correct.

Q. So you bring a case to the Bloom Legal Clinic and you meet with Jane Raley?

A. Yes.

Q. And you are talking to her about this case that you had, correct?

151

AR-L 566914

A.   Yes.

Q.   That you brought with you?

A.   Yes, yes.

Q.   How does Ray Guevara come about?

A.   It was -- she mentioned to me that she saw my name in another case that I was involved with that was one of the Guevara's cases.

Q.   What case was that?

A.   I don't remember the name.  I don't remember that the name of that.  It was a case they were doing, Northwestern.

Q.   But you don't know the name of that case?

A.   No, but I remember -- may I answer?  You want me to go.

MS. BONJEAN:  Objection, no question pending.

BY THE WITNESS:

A.   She told me that there was --

THE COURT:  Overruled.

BY THE WITNESS:

A.   She told me that there was A particular case that my name had come up in and would I mind talking to her about it, and I said, no, ask me any question you want.

152

AR-L 566915

BY MR. PAPA:

Q. So she started the conversation with you about Ray Guevara?

A. Yes.

Q. And then it was, if I have this correct, sometime in late 2010 or early 2011 that you then tell her about your interaction with Officer Guevara back in either 1988 or '89 or 1990 whatever year this occurred?

A. Yes.

Q. And had she told you -- well, what did she tell about Ray Guevara?

MS. BONJEAN: Objection.

THE COURT: Overruled.

MS. BONJEAN: Objection, hearsay.

THE COURT: Overruled.

BY THE WITNESS:

Q. Her question was about what I did in the case, not what he did. What I did.

BY MR. PAPA:

Q. Then how do we get to it, how did the conversation with Jane Raley get to this incident.

A. Because it involved a situation similar where I was asked to take over and do a case that I

153

AR-L 566916

had not been involved in, again, where a supervisor came out and said, we need you to do a lineup. And it turned out it was a witness that I guess Guevara brought in, but he wasn't there when I did the lineup. And I did the lineup with this juvenile who picked out an offender. All right. And that's that person was subsequently charged.

Q. You don't remember that case that you just talked about?

A. I think it became a well-known case where the kid that recanted later and said he identified the wrong person and he went back and tried to tell them and they didn't believe him or they did nothing about it.

Q. Well, you are saying it's well-known?

A. I don't recall the name, but it was in the newspapers and such.

Q. So you remember all of that. It's in the newspapers. You just don't remember what it was?

MS. BONJEAN: Objection, asked and answered.

THE COURT: Overruled. I am right here. Do you recall the name?

THE WITNESS: No, I don't.

154

AR-L 566917

BY MR. PAPA:

Q. So based on that, you then tell Ms. Raley, hey, by the way in 1988 or 1989 or 1990 whatever that was, I had this encounter with Ray Guevara?

A. Not exactly.

Q. But something along those lines? You then volunteer this event of your involvement with Officer Guevara?

A. Right. I said sometimes you get tied to a case from separate efforts, without being really involved with the other people as I was with the lineup.

Q. On the other case?

A. Right.

Q. Because you ran your own lineup in this case?

A. Yes.

Q. You have done work for the Bloom Legal Clinic, correct?

MS. BONJEAN: Objection, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

BY MR. PAPA:

155

Q.   The case that you brought to Ms. Raley, did they accept that case?

A.   No, they didn't.

Q.   So the work that you've done for the legal clinic is other cases?

A.   Yes, nothing related to Guevara.

Q.   Nothing related to Guevara.   But you have been paid by the legal clinic in excess of $43,000 between November 2011 and January 2013?

A.   It's a small portion of what I do.

THE COURT:   Again, Mr. Dorsch answer Mr. Papa.

THE WITNESS:   Okay, yes.

THE COURT:   Mr. Dorsch, I am tired of saying this.   Answer the question asked of you.   Ask a question.

MS. BONJEAN:   Objection, relevance to this question.

THE COURT:   Overruled.   Ask it.

BY MR. PAPA:

Q.   You were paid by the legal clinic in excess of $43,000, correct?

A.   I am taking -- I have no idea.   I don't remember what I got paid.   Is that over a period of years?   I don't know.

156

Q. I think I said between November of 2011 and January of 2013, does that number sound right to you?

A. I don't know. Could be.

Q. Well, the work you do for the legal clinic, you don't do for free, correct?

A. Right. I expect to get paid for what I do.

Q. So the more cases that the clinic accepts that you bring to them, the more money you are going to make from them?

A. If I work it, I guess I would get paid.

Q. If they accept it?

A. Well, accepting doesn't mean I work on it.

Q. So you are going to take a case to them and then have no part of it?

A. Yes, I have done that before in other states.

Q. I am talking about the Bloom Legal Clinic.

MS. BONJEAN: Objection, asked and answered.

THE COURT: Overruled, yes.

THE WITNESS: Repeat, please.

BY MR. PAPA:

Q. The work you brought to the legal clinic

157

at Northwestern, when you bring them a case that they accept, you do work on that case?

A. It's never happened. They didn't accept the case.

Q. The moneys that you have been paid by the legal clinic, what's that in relation to then?

A. Cases they have been working on for many years.

Q. They've asked you to help on?

A. Yes.

Q. Well, you want to continue in your -- you want to continue doing work for them, would that be fair to say?

THE COURT: Sustained, Mr. Papa. Move on.

BY MR. PAPA:

Q. Mr. Dorsch, besides Detective Johnston, which I believe you said he was your partner, who else were your partners as a Chicago police detective in Area 5?

MS. BONJEAN: Objection, relevance.

MR. AINSWORTH: In '88 to '90?

MR. PAPA: In the time frame we are talking about, sure.

THE COURT: Sustained.

AR-L 566921

BY MR. PAPA:

Q.   In the time frame you believe this occurred with Ray Guevara, what partners had you been detectives with?

A.   You could get partnered-upped with someone new every day, Detective Shack, Detective Boyle, Detective Paul Kaminsky, Detective Garza, Detective Dickinson.  Many.

Q.   Who was your primary partner?

A.   My primary partners?

MS. BONJEAN:  Objection, foundation.

BY MR. PAPA:

Q.   During the time frame we are talking about.

MS. BONJEAN:  We are talking about three years.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I think Detective Johnston.

THE COURT:  For purposes of the record, I don't know if I indicated to the parties before, I had indicated to previous counsel, I am unrelated to and do not know Detective Boyle.

BY MR. PAPA:

Q.   Mr. Dorsch, in the years that followed

159

this incident until you retired, did you ever report this, and I am talking Officer Guevara's actions, to anyone in a supervisory role?

MS. BONJEAN: Objection, ambiguous objection.

THE COURT: Overruled. Mr. Dorsch, you may answer.

BY THE WITNESS:

A. Yes.

BY MR. PAPA:

Q. Who?

A. The supervisory detectives in Area 5.

Q. Okay. When?

MS. BONJEAN: Objection, asked and answered. We have been through this about five times.

THE COURT: Overruled. You may answer, Mr. Dorsch.

BY THE WITNESS:

A. From the moment I got back to Area 5 from Branch 66, report to the day I retired.

THE COURT: Mr. Dorsch, I am going to advise you too. There's nothing here humorous.

MS. BONJEAN: Let the record reflect, Mr. Dorsch is not laughing, your Honor.

THE COURT: He is exacerbated. And we will

160

note that.

MS. BONJEAN: Because the question has been asked of him five times.

THE COURT: Ms. Bonjean, I am going to advise you again of your behavior and sanctions will be imposed.

Mr. Papa, ask a question.

BY MR. PAPA:

Q. Mr. Dorsch, were you in the detective's department in Area 5 ever the subject of a CR?

A. Of course, yes.

MS. BONJEAN: Objection, relevance.

THE COURT: Overruled.

BY MR. PAPA:

Q. You said of course?

A. Well, I was 25 years on the police department.

Q. I thought I had limited it to Area 5 as a detective within Area 5?

A. I believe so.

MS. BONJEAN: Objection, your Honor, we have never had a relevancy ruling about this line of questioning. I thought we were all about relevancy rulings. So now I would like to have an offer of

161

AR-L 566924

proof where this line of questioning is going.

THE COURT: Overruled. You may answer, Mr. Dorsch.

BY MR. PAPA?

Q. What were the complaints against you?

MS. BONJEAN: Objection, foundation.

MR. AINSWORTH: And relevance.

MS. BONJEAN: Objection, assumes facts not in evidence.

THE COURT: The court reporter cannot take two people at one time.

MR. AINSWORTH: I join Ms. Bonjean's objection and add relevancy as an objection.

THE COURT: Overruled. You may answer, Mr. Dorsch.

BY THE WITNESS:

A. I don't recall specifics, but they are available to you.

BY MR. PAPA:

Q. You don't remember a single incident of what the complaints were against you as a detective in Area 5?

MS. BONJEAN: Objection, Ms. Bonjean. The court reporter cannot take attorneys talking over

162

AR-L 566925

each other.

THE COURT: Sustained. Mr. Papa, ask another question.

BY MR. PAPA:

Q. Were any of the complaints made against you as a Detective in Area 5 ever sustained?

MR. AINSWORTH: Objection, relevance.

BY THE WITNESS:

A. No.

THE COURT: Overruled, the answer may stand.

BY THE WITNESS:

A. Not to my knowledge, no.

BY MR. PAPA:

Q. Were you ever, and again I am just talking as a detective within Area 5, or sometime after you were you retired, sued civilly based on what you did as a Chicago police detective?

MS. BONJEAN: Objection, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. Was I ever sued civilly? One time, yes. While I was working, but not as a detective.

BY MR. PAPA:

Q. What year?

163

AR-L 566926

A.    Oh, it was probably around 1980.

MS. BONJEAN:   Objection, relevance.

THE COURT:   Overruled.

BY MR. PAPA:

Q.    For what?

A.    A woman shot at me from four feet away, fired three shots at my head, missed.   I slammed the door on her hand, broke her hand and she sued me.

MR. PAPA:   Judge, I have no further questions of the witness.

THE COURT:   Redirect, Mr. Ainsworth?

MR. AINSWORTH:   Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q.    And what was the end result of the lawsuit?

A.    It was dismissed.

Q.    Sir, as a police officer, is there a difference between reporting an incident to a supervisor and telling a supervisor about an incident in your mind?

A.    Yes.

Q.    What's that difference, sir?

164

AR-L 566927

A.   Telling is just relating an event. Reporting would be more official where you are trying to pursue something and make a record of it.

Q.   Tell us what happened when you returned from Branch 66 to Area 5 after the charges against the suspect were dismissed?

A.   The concern of the people in the office was that what are you doing?  Don't you know we are never going to solve this case?  We don't have any good witnesses.

Q.   So would you please set the scene for us. Was there more than one person that you are talking to?

A.   Oh, yes.

Q.   Could you tell us where the conversation took place when you returned from Branch 66?

A.   It would have been to the best of my recollection started on the floor and moved into the office.

Q.   When you say the office, what office are you referring to?

A.   Well, there is the general office where the secretary who handles the paperwork and then the violent crimes commander's office adjoining.

165

AR-L 566928

Q.    And was there more than one supervisor present?

A.    A lot of people were there.

Q.    And did you relate to the people who were present what Guevara had done?

A.    Yes.

Q.    And what was the response when you related what Guevara had done?

A.    The individual responses of the people or in general?

Q.    As best you can recall, sir.

A.    Well, it was that there -- the response came from the office that we're not going to -- we want to clear this crime, and you are ruining this by getting this guy released, and I said and am I supposed to put an innocent man in jail just to clear a crime, and I wasn't so polite in my choice of words.

Q.    What was the response?

A.    They didn't care.  They wanted this crime cleared, and they later told me that in conversation downtown, which I take to mean by police terminology, headquarters, that it's okay because you made the arrest.  You got a CR

166

number -- I mean, a CB number for criminal booking and he was charged, and we will be able to clear the crime just on that, but we will make no mention that he's been released.

Q. Was there any doubt in your mind that your supervisors knew about the allegation or about what Guevara had done?

MR. PAPA: Objection.

THE COURT: Overruled. You may answer.

BY THE WITNESS:

A. Yes, they knew.

BY MR. AINSWORTH:

Q. Why did you view complaining about the department's decision to clear close the indication as a career ender?

A. It's abhorrent to my job. My task is to clear crimes by arresting the correct person and to solve a crime, if I can.

THE COURT: You need to rephrase your question or repeat it. I don't think he heard it.

THE WITNESS: I understand.

BY MR. AINSWORTH:

Q. Why did you view complaining about what was going on as a career ender or problem for your

167

AR-L 566930

career?

A. Oh, oh, because the decision to clear close that case didn't just come from the area. It came from people downtown too. So you had people of very high status and high profile position that would be looking upon me unfavorably.

Q. When Guevara pointed out the photograph to the witness, did you know whether I was trying to be zealous or whether he was trying to frame somebody?

A. I still don't know.

Q. And do you take it lightly to accuse a fellow officer of committing misconduct by beefing them to OPS or internal affairs?

A. No.

Q. Did you open a complaint register against Guevara?

A. That would not have been my job. If the supervisors, if they had decided to, they could have.

Q. So you told your supervisor about what happened, right?

A. Yes.

Q. And then it's the supervisor who opened

168

AR-L 566951

the CR, right?

A. We have a chain of command, yes.

Q. Mr. Papa asked you some questions about why didn't you end the investigation when Guevara pointed the photograph out to the witness. So why didn't you end the investigation right then and there?

A. I was -- I had a dilemma to say the least. I did not want to jeopardize the case by making an improper decision, not knowing why. So I still had a possibility of getting what I thought was a way to resolve the case correctly by the other tasks at hand, which would be witness number two and lineups.

Q. At the time do you think there was a possibility that the witness might actually be identifying the real shooter in a murder case?

A. Sure.

Q. And you want to find out that?

A. That's my task.

Q. Did you want to find that out?

A. That's my task.

Q. Again, you investigate homicides?

A. Right, yes.

169

Q. So would you typically be arresting people for obstruction of justice or lying to police?

A. No.

Q. Tell us why you didn't or why you were not allowed to arrest the third person who had paid the other two witnesses to falsely accuse the suspect?

A. You would not be able to close that case based on the report that you would have to write.

Q. Do you mean any report that you write would contradict the clear close report that you were ordered to do?

A. Yes, yes.

Q. As a police officer, you dealt with witnesses in a number of cases, right?

A. Yes.

Q. Was there a value in having the same police officer deal with the same witnesses?

MR. PAPA: Objection.

THE COURT: Overruled. You may answer.

BY THE WITNESS:

A. Sometimes. It varies.

BY MR. AINSWORTH:

Q. Can police officers build up rapport with

170

AR-L 566933

witnesses?

A. Yes.

Q. Why did you have Officer Guevara pick up the witnesses the following day to do the lineup?

A. I didn't think that he could taint the lineup because the person that already said that the guy looked a little different when he saw the photo as his reasons for delaying the identification, and I had the possibility that the lineup would be challenging, but without Detective Guevara.

Q. Was Officer Guevara present for the lineup?

A. Not in the lineup room, no.

Q. Now, why is it that you would not -- well strike that.

On cross-examination you said that if you were talking to two witnesses to a shooting immediately after the shooting, you would separate them; is that correct?

A. When possible you try to do that, yes.

Q. Now, why would you not have the same concern about separating witnesses if an incident happened months later?

171

AR-L 566934

A.   Well, we are not talking about the identification yet.  I had already been told by Officer Guevara that these two witnesses still had the same license plate number on a piece of paper that they wrote.  Okay.  And that they had come in contact with each other and he brought them in to us.  I mean, talking to the two of them, I didn't see where that would hurt.

Q.   Was it your understanding that the witnesses over four months could easily talk amongst themselves over that time?

A.   They were friends.

Q.   Have you tried to provide as much detail as you can about this incident in an effort to aid people in being able to find paperwork on the case?

A.   Please repeat?

Q.   Have you tried to remember as much detail as you can about this incident so as to aid people in trying to track down the paperwork?

A.   Yes, oh, yes, yes.

Q.   Did you provide the witness' age or approximate age?

A.   Yes, they were teenagers.  I said about 15, 16 years old.

172

AR-L 566935

Q. Did you provide an approximate date of when it happened?

A. Again, in reference to the meritorious appointment.

Q. Did you provide the time span between when the person was arrested and when the charges were dismissed?

MS. STACK: Objection, the witness has testified at length about this. His testimony speaks for itself. This is self-serving.

THE COURT: Overruled. You may answer Mr. Dorsch.

BY THE WITNESS:

A. Yes, it was only a matter of hours from the time of arrest until me being in Branch 66.

BY MR. AINSWORTH:

Q. And, sir, in your retirement, do you talk about cases with other law enforcement people and attorneys and various people?

A. Yes.

Q. Which are you able to remember better, what happened or the names of the people involved?

A. What happened.

Q. How many people did you arrest over the

173

AR-L 566936

course of your career?

A.    Having been in tactical units and such, many thousands.

Q.    Is it difficult for you to remember the names of all the people you've arrested over the years?

A.    Yes.

Q.    Do you tell war stories?

A.    Yes.

MS. STACK:    Objection.

THE COURT:    Overruled, the answer may stand.

BY MR. AINSWORTH:

Q.    When you spoke with the Jane Raley, and she brought the name Guevara up, did you tell war stories to her?

A.    Yes.

Q.    Was it this one?

A.    Yes.

Q.    You talked to or you testified on cross-examination that you had talked about this incident involving Guevara with many people over a period of time; do you recall that?

A.    Uh-hum, yes.

Q.    How would it come up that you had talked

174

with other officers about what Guevara had done?

A.   How would it come up?

Q.   Yes.

A.   Some people remember it for the one thing that was mentioned was the kid wasn't the criminal type.  People have said that many times about the kid, but I don't see the police after I retired. It's kind of you go your separate ways.  You know, you don't go back.

Q.   Do you know either of the petitioners here in the courtroom?

A.   No.

Q.   Do you have any reason to come in here and lie on behalf of either Mr. Serrano or Mr. Montanez?

THE COURT:  Sustained.  I will take the credibility and assess the witnesses based on the questioning and cross-examination and the evidence to be considered by the Court.

BY MR. AINSWORTH:

Q.   Have I promised you or told you that I would give you investigative work if you came in here and testified?

A.   No.

175

AR-L 566938

Q. In the last five years have we ever discussed having you investigate any of the cases that I have worked on?

A. No.

Q. Or any of the cases that the Exoneration Project works on?

A. No.

MR. AINSWORTH: I have no further questions, your Honor.

THE COURT: Cross?

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q. Mr. Dorsch, this was 25 years ago, right?

A. Yes.

Q. How long have you been retired?

A. Eighteen years.

Q. So you have police reports to go off of at this time or moment, correct?

A. Correct.

Q. You are testifying from your memory to the best of your ability today, right?

A. Yes.

Q. Mr. Papa made a big deal about the fact that you didn't run out immediately from Branch 66

AR-L 566959

and go arrest this fella that had apparently paid two individuals to give false statements in this case, correct?

A. Correct.

Q. And by making a big deal of this, he is saying that --

THE COURT: Ms. Bonjean, stick to the testimony, don't make it personal and you will refrain from any personal attacks on counsel. Stick to the testimony of the witness. Ask another question.

BY MS. BONJEAN:

Q. Mr. Papa asked about four or five times why you didn't run out to go track down immediately after Branch 66 this fella that may have paid or tried to pay individuals to give false testimony; do you remember him asking you those questions?

A. Yes.

Q. And you testified I believe that wasn't your priority at that time, right?

A. Yes.

Q. And your priority was to get back to the police station, correct?

A. My priority had been to get this person

177

AR-L 566940

released who was not guilty and then report back to my office.

Q. And you did report back to your office and explain what had happened, right?

A. Yes.

Q. And did you get a message from your superiors at that time?

A. Yes.

Q. And what was the message?

A. What are you doing?

Q. Was the message to go out and try to arrest this fella?

A. No.

Q. And in fact, did you get the exact opposite message, which is don't go arrest this fella?

A. Yes.

Q. Either implicitly or expressly?

A. Yes.

Q. Now, you also were asked by Mr. Papa about why you didn't go to OPS or the Independent Police Review -- whatever the acronym is. They are all kind of the same -- why you didn't go to them, right? Do you remember that question?

178

AR-L 566941

A.   Yes.

Q.   Let me ask you it this way.  Back in, I guess this was now 25 years ago, would it have been a particularly, I'd say significant thing to go make an OPS report against a fellow police, report a police officer?

A.   Yes.

MS. STACK:  Objection.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Yes.

BY MS. BONJEAN:

Q.   Is there something called a code of silence?

THE COURT:  Sustained.  Stricken.  Move on.

BY MS. BONJEAN:

Q.   Well, are you familiar with the United States District Court Judge that issued a decision in 2012 --

THE COURT:  Sustained.  Stricken.  Move on.

BY MS. BONJEAN:

Q.   -- the code of silence?

THE COURT:  There is not be any reference to any federal decision in regard to this.  Continue

179

AR-L 566942

on.

MS. BONJEAN: Your Honor, are you saying that the code of silence is not relevant to inquiry?

THE COURT: I'm saying that is not going to be the topic of your next question. It is stricken. Ask another question.

MS. BONJEAN: I'd ask for a ruling and basis as to why a code of silence is not relevant to exact questions in this proceeding?

MS. STACK: It's beyond the redirect.

MS. BONJEAN: Mr. Papa opened the door as why did the he not go to OPS and he did not go to Independent Review Authority.

THE COURT: And he indicated it was career ending decision. There was no mention of any word of code of silence or any of the recent decisions. You will not ask any further questions about that. It is no longer relevant. The rulings have been made. Ask another question, Ms. Bonjean, based on the Court's current ruling.

MS. BONJEAN: I will make that career ending code of silence seem to be speaking the same language that we are talking about here, and I for the record, would object to not being permitted to

AR-L 566943

question this witness about the code of silence.

THE COURT: So noted. Overruled. It is as indicated. I made a ruling. You will not ask any further questions. Continue on with Officer Dorsch and his involvement with OPS or IPRA.

BY MS. BONJEAN:

Q. Mr. Dorsch, we talked in cross-examination and you did a little bit on direct about this career ending possibility, if you had gone and officially reported Guevara's misconduct, correct?

A. Yes.

Q. And let me ask you this, when Detective or Officer Guevara at that time pointed at that point picture, were you surprised that he did that?

A. Very.

Q. Did you understand why he did that at that moment?

A. No.

Q. Did you have -- have you ever seen another officer do that?

A. No.

Q. Did you ever see him do that?

A. No.

Q. Would his intent have factored into

181

AR-L 566944

whether you thought it was misconduct or something else?

A.   His intent, yes.

Q.   A youthful mistake, perhaps?

A.   Yes.

Q.   It could have been any number of those things?

A.   Yes.

Q.   And is that one of the reasons that it took you a while to sort of process it?

A.   Yes.

Q.   But he did eventually actually tell people about it, isn't that right?  You did eventually tell people?

A.   I thought you said him.  Oh, yes, I did I thought you said him.

Q.   Is it also possible Mr. Papa asked you about why you didn't end the investigation right there and then do you remember that line of questioning?

A.   Yes.

Q.   This was a homicide, right?

A.   Yes.

Q.   Homicides are kind of the most serious

AR-L 566945

crimes out there?

MR. PAPA: Objection. This is leading and it is a redirect, so it's her witness.

THE COURT: It is leading, Ms. Bonjean.

MS. BONJEAN: I don't to have lead. I will done tone that down.

Q. Let me ask you this, Mr. Dorsch. Are homicides very significant crimes from your point of view?

A. Yes.

Q. Would you want to just throw out a homicide investigation if an officer made a mistake?

A. No.

Q. Is your goal still to solve that same homicide?

A. Yes.

Q. And at the time that that witness put his -- I'm sorry -- when Officer Guevara put his finger on that picture and identified, did you know whether that was in fact the offender or not?

A. No.

Q. Could have been the offender from your point of view?

183

AR-L 566946

A.    Yes.

Q.    If you had ended the investigation completely right there and then, what would have happened?

A.    It would have been over for that day.

Q.    And is it possible that that person might have, that homicide might not have been actually solved?

A.    Yes.

Q.    Which it wasn't in fact solved, but was that going through your mind when you decided to not just stop the investigation?

A.    Yes.

Q.    Now, you testified this happened sometime in '88, '89 or 1990, right?

A.    Yes.

Q.    If we knew when Detective Guevara was promoted to detective or when Officer Guevara was promoted to detective, could we figure out within three months of when this occurred?

MR. PAPA:  Objection.

THE COURT:  Overruled.

BY THE WITNESS:

A.    Yes.

184

BY MS. BONJEAN:

Q.   So it's really just a matter of finding that information out, correct?

A.   Yes.

Q.   And did the State's attorneys find that out for you?

MR. PAPA:   Objection.

THE COURT:   Sustained.

BY MS. BONJEAN:

Q.   Did they tell you when Detective Guevara retired?

MR. PAPA:   Objection.

THE COURT:   Sustained.

BY MS. BONJEAN:

Q.   And by the way, you've never been paid by me for any investigative work, correct?

A.   No.

Q.   You are an investigator?

A.   Yes.

Q.   That's what you do for a living?

A.   Yes.

Q.   And Bloom Legal College, they require investigators?

A.   Yes.

185

AR-L 566948

Q. Are there other outfits in the City of Chicago that require investigative work for whom you've worked?

A. Yes, I have worked for many.

Q. Bloom isn't the only one you worked for?

A. No.

Q. Now, at the time that you had this conversation with Jane Raley and then you were trying to recollect about this event in greater detail and get names, you were retired, right?

A. Yes.

Q. Do you have subpoena power as a retired officer?

A. No.

Q. Do you have the ability to just go out and get police reports?

A. No.

Q. Because just us you were asked this before, the State has the ability to get police reports though, right?

A. Yes.

Q. Do you know whether they tried to get any police reports related to this event?

MR. PAPA: Objection.

186

AR-L 566949

THE COURT: Sustained.

BY MS. BONJEAN:

Q. Were you ever told this they made any efforts to get police reports related to the event you described here today?

MR. PAPA: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q. You testified that you didn't report this to OPS or you didn't follow-up knowing what you know about Detective Guevara, do you wish you had?

MR. PAPA: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q. Let me ask you this, Mr. Dorsch. Mr. Papa through his questioning has asked you many questions suggesting that what happened, what you testified to today here didn't happen at all?

MR. PAPA: Objection.

THE COURT: Overruled.

BY MS. BONJEAN:

Q. That was basically the tone and the questioning, would you agree?

A. Yes.

187

AR-L 566950

Q.   Okay.   You don't have any independent knowledge about this case other than what you have come in here today and told today, right?

A.   No, not that I recall.

Q.   If I told you that Detective Guevara was accused of doing the exact same thing --

MR. PAPA:  Objection.

BY MS. BONJEAN:

Q.   -- in the case of this case, would you be surprised?

THE COURT:  Objection sustained.

Mr. Papa, wait until she asks the question. Ms. Bonjean, wait until I make a ruling.  It is sustained.  You may not answer the question.

Ask other question.

BY MS. BONJEAN:

Q.   Would you be surprised in at least 15 other cases he actually told a witness to identify -- 15 cases that are admitted in this case -- to identify a witness, identify a defendant that he gave that information to a witness -- would you be surprised by that based on your actual knowledge?

MR. PAPA:  Objection.

THE COURT:  Sustained.

188

AR-L 566951

MS. BONJEAN: I have nothing further.

THE COURT: Mr. Papa?

RECROSS-EXAMINATION

BY MR. PAPA:

Q. Mr. Dorsch, I think you've said several times that you didn't know what was going on in Officer Guevara's head when he pointed to the picture out to be the person, correct?

A. Yes.

Q. Did you ever ask him?

A. I had a conversation with him outside.

Q. When?

A. After I was done with the photo array.

Q. So that night?

A. Right, I told him it was improper. He said I didn't know that. I said for the witness to identify.

Q. Did you ask him why he did it?

A. I don't know that I did. I just made it known to him that I was not happy that that was done. I didn't ask him why it was done. I just didn't like it.

Q. Well, I'm sorry if I interrupted you. But you have said many times counsel was just asking

189

you about. You know his intent was an important thing in your determination of going forward, or not going forward, right?

A. Well, it wasn't going to stop me from going forward.

Q. You said his intent was an important thing --

MS. BONJEAN: Objection, misstating the testimony.

THE COURT: Overruled.

BY MR. PAPA:

Q. -- to reporting him?

MR. AINSWORTH: I don't understand the question.

THE COURT: Overruled. You may answer the question.

BY MR. PAPA:

Q. Was Officer Guevara's intent an important thing to you?

A. It wasn't known to me and I guess I didn't ask it. I was moving on with what I was trying to do, but I made it known that if I wasn't happy with his action.

Q. Okay. Now how about answering my question

190

AR-L 566953

--

MS. BONJEAN: Objection.

THE COURT: Okay, Counsel. Ms. Bonjean, Mr. Papa, refrain from that type of question. Ask a question.

BY MR. PAPA:

Q. Was his intent important to you?

MS. BONJEAN: Objection.

THE COURT: Overruled.

MS. BONJEAN: Ambiguous foundation.

THE COURT: Overruled.

MS. BONJEAN: Asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. In my mind I still don't know his intent, and it was important. I mean, I would like to know.

Q. Did you ask him?

A. No, I just admonished him for the way he did it.

Q. You could have asked him?

A. I could have.

Q. You chose not to?

A. I chose not to.

191

MR. PAPA: Thank you. I have nothing further.

THE COURT: Redirect, Mr. Ainsworth?

FURTHER REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q. Simply, sir. Did you want Detective or officer Guevara to ever do that again on one of your cases?

A. No, never.

Q. Did you want Officer Guevara to do it in any case?

A. No, sir.

Q. Was the most important thing to you to make sure that he knew that this was totally unacceptable?

A. Yes.

Q. Did you really want to have to take the matter up to OPS and rat out a fellow officer? Is that something you want to have --

MR. PAPA: Objection.

THE COURT: Sustained. Beyond the scope of cross. Anything further, Mr. Ainsworth?

MR. AINSWORTH: No, Judge.

THE COURT: Ms. Bonjean?

MS. BONJEAN: I have nothing further accept to

192

AR-L 566955

levy an objection again to being barred from going into the area of code of silence, which is relevant to the area of questioning that Mr. Papa engaged in and he opened the door to it.

THE COURT: He did not open the door. The Court has made the ruling. The Court will not revisit. Mr. Papa, anything based on Mr. Ainsworth's?

MR. PAPA: No.

THE COURT: Mr. Dorsch, you could not talk to any witnesses about this. You may be called at a later time. You may step down.

Next witness, Mr. Ainsworth and Ms. Bonjean? We can do an offer of proof for Ms. Vargas.

THE COURT: Do you have any witnesses today or no?

MR. AINSWORTH: No other live witnesses. We will take care of one housekeeping matter before we begin with the offer of proof in regard to, Madam court reporter, this is an add on Sheet 7, Francisco, F-R-A-N-C-I-S-C-O, Vincente, V-I-N-C-E-N-T-E, 13 ACC 009401. Mr. Vincente did not appear in court as previously served by

193

personal service by Mr. Ainsworth and Ms. Bonjean. He is not here. The Court will issue a warrant for his arrest. Warrant to issue. No bail. The time is now 3:40 p.m.. we will go as long as we can.

We will commence and continue until tomorrow in regard to your further witnesses. Mr. Ainsworth, Ms. Bonjean, your offer of proof on Ms. Wilda Vargas, any witnesses in court? Motion to exclude is still in effect.

MR. AINSWORTH: I would ask to be allowed to proceed by way of making the offer to the Court.

THE COURT: Yes, sir.

MR. AINSWORTH: If called to testify, Ms. Wilda Vargas would testify that she was married to Rodrigo Vargas; that she was familiar with the investigation of his death; that she had many contacts with Detective Guevara over the course of the investigation; that Detective Guevara was a Spanish-speaking officer and that she speaks Spanish and thus the two of them, she knew who he was and had many conversations with him; that some months after the murder occurred, she was asked to drive around with Detective Guevara and his partner in a car in order to find -- in order to be able to

194

identify the car that had blocked in her husband's van at the gas station the night before the shooting. She would testify that as she was driven around the neighborhood, she was unable to identify any car as being the car that had blocked in her husband's van. She'll further testify that Detective Guevara then drove under a viaduct to a different street and brought her to a car and pointed the car out to her and told her this is the car, and then related to her that the bullet holes present in the vehicle that he showed to her, matched the ballistics evidence from the crime scene. And that he told her, she'll testify that she was confused by exactly what he meant, but that the bullets had gone through the van and had struck and then had ricocheted or something and had struck the car. And also that Detective Guevara told her that damage to the front fender of the vehicle matched the accounts of the crime.

THE COURT: Matched the what?

MR. AINSWORTH: The accounts of the crime. She'll testify that she did not, as Detective Halverston and Detective Guevara testified at trial in this matter, point out the car or bring the car

195

AR-L 566958

to the officers' attention, rather it was Detective Guevara who pointed the car out to her and told her this is the car and then she agreed that the car was similar, but that she could not tell if the car was the same.

And that is what she would testify to.

THE COURT: Thank you, Mr. Ainsworth.

Ms. Bonjean?

MS. BONJEAN: The only thing I would add to that as an offer of proof is that the car -- the issue did in it fact have what appeared to be bullet holes in the side of it, and I believe there is a picture that I could provide to the Court and did have front damage, and it was Detective Guevara who told Wilda Vargas that the ballistics from that bullet hole exactly what in fact was connected to the ballistics were that were found at the crime scene and that Guevara told they are that and that is in fact not borne out by any of the evidence that was presented at trial.

THE COURT: All right. Anything further?

MR. AINSWORTH: And just in relation to that point, the bullet holes in the van did not show any "exit" bullet holes that might show that a bullet

196

actually did exit the van, and certainly no witness testified to any bullets striking the van and there was no ballistics evidence or forensics evidence suggesting that the bullet holes in Mr. Montanez's car in any way matched the bullets or bullet holes in the van that the victim was found in.

THE COURT: Okay, thank you.

MS. BONJEAN: As part of this offer of proof, I would provide two photographs, Petitioners' 1 and 2.

THE COURT: All right. Ms. Stack?

MS. STACK: Yes, your Honor. Our objection, of course, remains the same. Wilda Vargas has obviously been a witness that has been available to the defense since the inception of this case, the murder of her husband and the robbery by the defendants. And Ms. Vargas testified at length at trial. She testified about finding the car, identified it was the same car that followed her from the gas station, and she was extensively crossed by two teams of defense attorneys at trial. Again, there seems to be a confusion or blurring between impeachment 20 years later, minor impeachment 20 years later, and what is newly

197

discovered evidence showing actual innocence.

The other thing, this new "information" was never conveyed to the State. We have made repeated discovery requests. Ms. Vargas has also unfortunately been targeted by a number of investigators over the past 7 or 8 years. The Northwestern investigators talked to her a number of times, and there was never any statement accusing Guevara of telling her which car to pick. There's obviously nothing like that in her trial testimony, and we have never been tendered any statements to that effect or affidavits. She filled out an affidavit for Northwestern and Jeff Urdangen did not include it in the post-conviction petition. It's not been included by these attorneys. They didn't include a new affidavit. And when we spoke to Ms. Vargas yesterday, we found out that she been interviewed twice in the last ten months. The first time about ten months ago. She told us that a number of people interviewed her at the same time and that people were taking notes. We never got notes of that interview. We never got any kind of notice of that interview and Mr. Ainsworth has admitted interviewing her twice.

AR-L 566961

The last time a couple days ago. And you can see on the witness list, it's part of the Court file, that when they did include her on their witness list, they made a reference to interactions with Detective Guevara, but they have never disclosed it. But in any event, now that they have disclosed it, it does nothing but make its crystal clear that your Honor's ruling is correct. This does not rise to the level of actual innocence which must be newly discovered and could not have been discovered with due diligence.

There's a number of cases, including the Supreme Court cases I cited earlier, Samuel Morgan and Davis Harris. There's also cases People vs. Wayne Barnslater, B-A-R-N-S-L-A-T-ER, that this kind OF piecemeal affidavit, the fact trying to it raise impeachment is simply not what's needed when they are alleging actual factual innocence. And they did not tender Ms. Vargas as your Honor pointed out as a 404B or propensity or bad acts witness. They decided to keep those allegations to themselves and not submit her for relevancy.

THE COURT: Ms. Stack, as I admonished the parties, I suspect there would be no personal

AR-L 566962

accusations of the parties. It will be what it is and the Court will recall it as such, as counsel I am directing all of to refrain from any personal attacks. What's important is the facts in this case.

MS. STACK: I didn't mean it as a personal attack. What I was pointing out to your Honor is that she's not been submitted in a witness list in this category. And with that, I am done.

THE COURT: All right. The parties will take this under advisement. We will see everyone here at 11:00 starting time. Anything further?

Court is adjourned.

(The above-entitled cause was continued to May 16, 2013, at 11:00 a.m.)

200

AR-L 566963

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CRIMINAL DIVISION

I, Denise A. Gross, Official Court Reporter of the Circuit Court of Cook County, County Department - Criminal Division, do hereby certify that I reported in shorthand the proceedings had on the hearing in the aforementioned cause; that I thereafter caused to be transcribed into typewriting the foregoing transcript, which I hereby certify is a true and accurate transcript of the Report of Proceedings had before the Honorable MAURA SLATTERY BOYLE, Judge of said Court.

Denise A. Gross, C.S.R.
Official Court Reporter
CSR License No. 084-003437

201

# EXHIBIT 3

2658

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                ) No. 12 CV 4428
                                               )
            Plaintiff,                         )
                                               )
vs.                                            ) Chicago, Illinois
                                               )
REYNALDO GUEVARA, STEVE GAWRYS,                )
DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,       )
JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN         )
MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,       )
RUSSELL WEINGART, ESTATE OF ROCCO              )
RINALDI, CITY OF CHICAGO,                      ) June 20, 2018
                                               )
            Defendants.                        ) 1:02 o'clock p.m.

VOLUME 12-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                        311 North Aberdeen Street
                        3rd Floor
                        Chicago, Illinois  60607

                        MacARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  LOCKE E. BOWMAN III
                        357 East Chicago Avenue
                        Chicago, Illinois  60611
                        (312) 503-0844

Court reporter:         Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                        Room 2504
                        Chicago, Illinois 60604
                        (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

AR-L 619851

2659

APPEARANCES:   (Continued)


For the Individual         THE SOTOS LAW FIRM
Defendants:                BY:   MR. JEFFREY N. GIVEN
                                 MR. JAMES G. SOTOS
                                 MS. CAROLINE P. GOLDEN
                                 MR. JOSEPH POLICK
                                 MR. DAVID A. BRUEGGEN
                           550 East Devon Avenue, Suite 150
                           Itasca, Illinois   60143


For the Defendant          ROCK FUSCO & CONNELLY, LLC
City of Chicago:           BY:   MS. EILEEN E. ROSEN
                                 MS. CATHERINE M. BARBER
                                 MS. THERESA B. CARNEY
                           321 North Clark Street, Suite 2200
                           Chicago, Illinois   60654


For the Defendant          LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                   BY:   MR. THOMAS E. LEINENWEBER
                                 MR. JAMES V. DAFFADA
                           120 North LaSalle Street, Suite 2000
                           Chicago, Illinois   60602

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 241 of 673 PageID #:100825
AR-L 619557
Dorsch - direct by Sotos

2665

THE COURT:  You may be seated.

WILLIAM DORSCH, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SOTOS:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  You work for the Chicago Police Department from 1964 through '94; is that right?

A.  No.

Q.  When did you work for the Chicago Police Department?

A.  I became a police officer in 1970; June 15th, 1970.

Q.  And then you retired in 1994?

A.  As soon as I reached 50 years of age, I retired, yes, in '94.

Q.  And you currently work as a private investigator?

A.  Yes.

Q.  Do you do work for criminal defense attorneys?

A.  Yes.

Q.  One of the things you do is to interview witnesses in criminal cases?

A.  Yes.

Q.  I want to take you back to 1988 and ask you about an incident that occurred in August of 1988.

Do you -- do you recall the incident that we're here for today?

A.  for today?

AR-L 619358
Dorsch - direct by Sotos

2666

A.   Only by reports.

Q.   So you've reviewed reports of the incident to refresh your recollection?

A.   Yes.

Q.   So just so we're clear that other than from your review of the reports, do you have any recollection of the incident at all?

A.   No.

Q.   And that's not unusual after 30 years, is it?

A.   No, especially with minimal participation.

Q.   Especially with minimal participation?

A.   In the incident, yeah.

Q.   Well, you did review the reports, right?

A.   I did.

Q.   And after having reviewed the reports, you characterized your involvement as minimal?

A.   Well, if I would have started work at 4:30 in the afternoon, it seems that it was concluded, my involvement in that case, about 7:30.

Q.   That evening?

A.   That evening, three hours.

Q.   All right.  But in terms of what happened, it was fairly significant, right?

A.   Oh, any -- any homicide is significant.

Q.   All right.  So when you say "minimal," you're just talking

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 243 of 673 PageID #:100827
AR-L 619859
Dorsch - direct by Sotos
2667

about the number of hours you devoted to the case --

A.  That's correct.

Q.  -- on that day?

All right.  So let's talk about that.  You became a detective in what year?

A.  1987.

Q.  So that was about a year before -- sometime in the year before the incidents that led to this lawsuit?

A.  Yes.

Q.  And prior to being a detective, in what capacity were you working as Chicago police officer?

A.  Beginning after I --

Q.  Just before you were a detective.

A.  Before I was a detective?  I was a tactical officer in the 20th District.

Q.  And at some point you worked as a Gang Crimes officer, correct?

A.  That's correct.

Q.  You never became a Gang Crimes specialist, but you were a Gang Crimes officer?

A.  No, I was still -- I was never a Gang Crimes officer.  I worked with Gang Crimes less, but I was not a Gang Crimes officer.

Q.  All right.  And I want to ask you, as a detective, can you describe how you worked with Gang Crimes specialists?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 244 of 673 PageID #:100828
Dorsch - direct by Sotos
2668
AR-L 619860

A.   Well, it's -- every case might be different, but like tactical officers or patrol officers, you go where you figure you can get assistance.

Q.   I'm talking about Gang Crimes specialists.

They were kind of your eyes and ears on the streets, so to speak, right?

A.   They and also, I would say, tactical officers.  And I say that because I was a tactical officer for most of my career.

Q.   Right.  But I'm not asking you about tactical officers. I'm asking you about Gang Crimes specialists, and specifically I'm asking, is it fair to say that as a detective, you worked with Gang Crimes specialists, and they functioned as your eyes and ears on the street?

A.   They assisted, yes.

Q.   Okay.  You don't disagree with me when I --

A.   No, I mean --

Q.   -- I'm using your words from your deposition, so --

A.   No, I'm not disagreeing at all.

Q.   All right.  So they functioned as your eyes and ears on the street?

MR. LOEVY:  Objection, asked and answered, Your Honor.

MR. SOTOS:  That's fine.

BY MR. SOTOS:

Q.   Mr. Dorsch, you recall giving a deposition in this case back in April of 2015, page 219?

AR-L 619861

Do you recall being -- line 16.

Do you recall being asked this question, giving this answer:

  "Question:  In the course of a murder investigation that you were working on as a detective, how, if at all, would Gang Crime specialists be used as part of that investigation?

  "Answer:  Not different than when I was a tactical officer.  They were the eyes and ears sort of of the streets.  So you got information."

MR. BOWMAN:  Objection.  That's not impeaching.  That's exactly what he said.

THE COURT:  That's what the witness just said.  Sustained.

MR. BOWMAN:  May it be stricken, Judge?

THE COURT:  Yeah, because it's not impeaching.

BY MR. SOTOS:

Q.  And so Gang Crime specialists essentially were able to provide you with information, correct?

A.  Yes.

Q.  All right.  About what was going on with the gangs?

A.  Yes.

Q.  Helped you -- helped you locate witnesses?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 246 of 673 PageID #:100830
Dorsch - direct by Sotos
2670

AR-L 619862

A. Yes.

Q. Okay. But they couldn't charge cases, right?

A. No. They would bring it to the Detective Division for assistance.

Q. All right. But they would have to bring it to the detectives, because you were the ones who were authorized by law to charge a case -- to bring -- to seek criminal charges?

A. Well, in a serious crime like a homicide, but they can make narcotic arrests and charge. And they can make gun arrests and charge. A variety of cases they can charge without detectives.

Q. But not in a homicide case?

A. They would also include the homicide units.

Q. Well, specifically it was the detectives --

A. Sure.

Q. -- that had the authority to seek charges in a homicide case, correct?

A. Yes.

Q. Not the Gang Crimes specialists?

MR. LOEVY: Objection, asked and answered, Your Honor.

MR. SOTOS: I'm just trying to make it clear, Judge. I'm not --

THE COURT: Overruled.

THE WITNESS: Repeat the question, please.

BY MR. SOTOS:

Q. In terms of who at the police department had the authority

AR-L 619863

to seek criminal charges in a homicide case, that was something detectives could do but not Gang Crimes specialists, correct?

A.  Well, they always worked through the detectives for that.

Q.  Again, because only the detectives could seek the criminal charges, correct?  They had --

MR. BOWMAN:  Objection, asked and answered.

MR. SOTOS:  I don't think -- I don't think he answered it.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yeah, I mean, we would call Felony Review and run the case by them, with the assistance of witnesses and the Gang Crimes officers or tactical officers and whatever -- whatever police officers were involved.

BY MR. SOTOS:

Q.  And if there was a lineup to be conducted, only the detectives could conduct it, correct?

A.  No.  I mean, in a homicide --

Q.  I'm sorry.

A.  -- yes.

Q.  You're right.

In a homicide -- you understand we're talking about a homicide case here?

A.  Yeah, if you want to stay there, because incorrect.  I've run lineups when I was a tactical officer.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 248 of 673 PageID #:100852
Dorsch - direct by Sotos
2672

AR-L 619564

Q. Right. But in a homicide case, only detectives could run those lineups?

A. Yes, that was part of our responsibility.

Q. And in this case, you did run a lineup, correct?

A. From reviewing the reports, it seems, yes.

Q. And you did seek criminal charges, correct?

A. There was an identification made, so criminal charges would have been asked for.

Q. Okay. And you -- you did that, right?

A. According to the report, criminal charges were granted, yes.

Q. Okay. But I'm not asking whether or not the State's Attorney granted the charge -- granted the charges.

I'm asking whether or not you were the person who actually sought the charges?

A. I can't answer that question, because I have no recall if I did that.

Q. Well, could it have been anybody other than you or your partner, John Boyle?

A. I would suspect it would either have been John or I.

Q. It would have had to have been one of the two of you, right?

A. After a lineup, yes.

Q. Let's -- let's look at the reports that you -- I think these are the reports that you were reviewing.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 249 of 673 PageID #:100853
Dorsch - direct by Sotos
2673

AR-L 619865

MR. SOTOS:  Can you put 23-H up?  It's RFC519.

MS. GOLDEN:  Which date?

MR. SOTOS:  September 15th Supp. Report.

BY MR. SOTOS:

Q.  Mr. Dorsch, I've placed in front of you Defendants' Exhibit 23-H.  And I'm going to ask you to look at that and tell me whether you recognize --

MR. SOTOS:  I don't think it should be in front of the jury.  I don't think it's been admitted yet.

MR. LOEVY:  No objection, Your Honor.

MR. SOTOS:  Well, I haven't moved it yet.  I just want to make sure --

THE COURT:  Wait.  It hasn't been moved.

MR. SOTOS:  Right.

BY MR. SOTOS:

Q.  Can you tell me whether you recognize that document?

A.  It is a Supplemental -- Supplemental Report, apparently authored by myself and Detective Boyle.

MR. SOTOS:  And, Your Honor, we would move for the admission of Defendants' 23-H.

THE COURT:  All right.  And there's no objection, right?

MR. BOWMAN:  None.

MR. LOEVY:  No.

THE COURT:  23-H is received.

AR-L 619866

(Defendants' Exhibit No. 23-H received in evidence.)

BY MR. SOTOS:

Q. So you've -- you've had a opportunity to review this report prior to your testimony here today, correct?

A. Yes.

Q. And so I'd like to take you through it.

At the top -- at the top it says, "Battery/Aggravated Handgun." But this was a homicide case, right?

A. Well, the initial investigation was from a battery. Subsequently, the -- the victim died, so it became a homicide, yes.

Q. But by the time you got it, it was a homicide?

A. Yes.

Q. Okay. So do you know where the "Battery/Aggravated Handgun" came from?

A. No, I don't.

Q. So you --

A. I mean, from the original report, I would assume.

Q. All right. Because you reviewed the other reports in the case prior to completing this report that's in front of you right now, right?

A. I don't recall the review, no.

Q. You don't recall that you reviewed the file on the day that you --

A. Thirty years later, I do not recall.

AR-L 619867

Q. Well, that's fair. Judging by -- let's ask by your practice.

I mean, when you were assigned to a case, was it your practice to review whatever reports were already in existence?

A. I was only assigned to a lineup -- a lineup.

Q. So -- but could you answer my question?

Was it your practice, when you were assigned to do part of an investigation on a case, would you review whatever reports were in the file?

A. If they were available. I also would have talked to the officers that were involved in making the arrest.

Q. But you would have reviewed the reports, too, right?

A. If they were there.

Q. Okay. And so that aggravated -- "Battery/Aggravated Handgun" reference, is that something you probably got from a prior report that you had reviewed and just put it in there?

A. I can tell you I know I didn't write that report because I never use parentheses, nor do I ever put the year like 1988. I would have wrote "August '88." I wouldn't have wrote 1988.

Q. Did I misunderstand you? You didn't say a little while ago that either you or your partner --

A. I said I or John Boyle wrote the report, yes.

Q. Okay. But didn't -- didn't you just say now that you know you didn't write it?

A. Well, I can tell you I don't believe that I wrote that

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 252 of 673 PageID #:100836
Dorsch - direct by Sotos
2676
AR-L 619868

report, because I can see from that it's different than how I would write a report.

Q. Well, I mean, you said a couple minutes ago that either you or John Boyle wrote it, correct?

A. Yeah.

MR. LOEVY: Objection, asked and answered.

MR. BOWMAN: Objection, asked and answered.

THE COURT: I think it's getting argumentive, and I'm going to sustain the objection.

BY MR. SOTOS:

Q. Well, let me ask you just a straight question.

Do you know whether you wrote it or not?

MR. LOEVY: Objection, Your Honor, asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't -- I don't believe that I wrote it. I believe John must have wrote it.

BY MR. SOTOS:

Q. All right. So you think Mr. Boyle wrote it?

A. Well, it's either him or I, and I don't believe that I wrote it because it's not my format.

Q. Because you don't use the parentheses?

A. Yeah, and I don't usually put the -- I don't put the full year out after, like, August you see in the upper right portion of the report.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 253 of 673 PageID #:100837
Dorsch - direct by Sotos
2677
AR-L 619869

Q. Up in the right where it says, August of 2000 --

A. Yes.

Q. -- "August 1988" --

A. Yeah.

Q. -- you don't do that?

A. I would have put '88.

Q. Okay. Is that your signature on the bottom left-hand corner of the report?

A. Yes, it is.

Q. Okay. And you read the report before you signed it, right?

A. I have no recall, but I would hope that I had.

Q. Again, going by your practice as a detective, aside from whether you recall it in this case or not, is that the kind of thing that you would have done before you signed the report? Would you have read it?

A. Well, you might not read all reports, but I -- I have no recall.

Q. Yeah, but I'm asking you about this -- I'm not asking you about all the reports, sir.

I'm just asking you about this report --

A. I don't recall. I don't recall --

Q. Let me finish, please.

A. Okay.

Q. I'm just asking you about this report that you signed -- I'm just asking you if you would have read this -- based on

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 254 of 673 PageID #:100838
Dorsch - direct by Sotos
2678
AR-L 619870

your practice, is this the kind of thing you would have read it before you put your signature on it?

A.  I have no recall, but I assume that I would have.

Q.  Okay.  And the fact that your name is in the lower left-hand box on this page, is that any indication to you that -- right down here -- does that -- does that indicate to you one way or the other whether you would have actually been the person to author it?

A.  No.

Q.  So there was no practice with whether the name went in the left-hand box or in the middle box in terms of who would have actually written it?

A.  Yes, unknown.

Q.  Do you know if that's John Boyle's signature next to yours or did you --

A.  I don't.

Q.  Do you know his handwriting?

A.  Not any longer, no.

MR. SOTOS:  Turn to the next page, please.

BY MR. SOTOS:

Q.  In the middle paragraph here where it has "Orlando Lopez," does that mean that was the eyewitness who was in the station that day?

A.  It says "Reinterviewed."  I -- yes.

Q.  So -- yeah, it says "Reinterviewed," right?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 255 of 673 PageID #:100839
AR-L 6198/1
Dorsch - direct by Sotos
2679

A. Yes.

Q. So does that signify to you that on the day the lineup was held that you would have reinterviewed Orlando Lopez?

A. I'm sure that he was talked to. He must have been talked to for a lineup.

Q. All right. And that's something that you would have done or Mr. Boyle or combination of the two of you, correct?

A. Yes.

Q. And right underneath that in the next paragraph, it states that you were assigned by Sergeant Rinaldi to continue into the investigation related to the case upon learning that the victim had died as a result of the multiple gunshot wounds.

You don't have any recollection of that occurring, correct?

A. Correct.

Q. All right. But you don't have any reason to doubt that that's what happened, correct?

A. No, no doubt.

Q. And in the next paragraph after that, it states that upon reviewing the case file, the R/S's -- and R/S's, is that a typo?

A. I've looked at that and thought that it possibly could be.

Q. Because the S is next to the D on the typewriter?

A. Exactly. I did -- I did look at that, and I kind of came to that same conclusion, because it didn't make sense

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 256 of 673 PageID #:100840
AR-L 619872
Dorsch - direct by Sotos

2680

otherwise.

Q. So that was probably meant to be R/D, correct?

A. I think so.

Q. And that's just a typo, right?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. All right. It states that you and Mr. Boyle contacted Gang Crimes North to notify them that the victim had died, correct?

Do you see the highlighted portion?

A. Yes, it says that.

Q. Okay. And, again, you don't have any recollection of doing that 30 years ago, correct?

A. Correct.

Q. And you don't have any reason to doubt that that's what you did at the time?

A. If all the events happened that day within three hours, there's an awful lot that was done within three hours that I don't know how all of it would have been done in that time span.

I mean, a phone call is a phone call. That could be done quickly. If a phone call was made, I don't know.

Q. All right.

A. But it says it was.

Q. Sir, I'm not asking you about everything else that was done

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 257 of 673 PageID #:100841
Dorsch - direct by Sotos
2681
AR-L 619873

or --

A. Yeah.

Q. -- how the notification was made.

I'm just asking if the report --

A. Yeah.

Q. -- as far as you know, is accurate in stating that after reviewing the case file that you and/or Mr. Boyle contacted Gang Crimes North to notify them that the victim had passed away?

A. Yes, it says that.

Q. Okay. And, again, you don't have any reason to doubt that that's what you did back 30 years ago?

A. No.

Q. Okay. And that you were requesting their assistance in locating the offenders of the incident, along with known witnesses.

Once, again, not remembering independently, you don't have any reason to doubt that what was written in the report by either you or Mr. Boyle was accurate?

A. I have no reason to doubt.

Q. Pardon me?

A. I have no reason to doubt it.

Q. Thank you. Moving on to the next paragraph, it states that Mr. Rivera was -- agreed to come to Area 5, that he was brought in to Area 5 by Mr. Guevara and Mr. Gawrys. Do you see that?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 258 of 673 PageID #:100842
Dorsch - direct by Sotos
2682
AR-L 619674

A. Yes.

Q. And that upon his arrival, he was informed that the victim had died -- that upon, excuse me, the -- Mr. Rivera's arrival, he was informed that the victim had died and that it was necessary to speak with him further and request that he participate in a lineup, correct?

A. Correct.

Q. Okay. And so, again, you're not disputing that you had a conversation with Mr. Rivera; you just don't remember the case at all?

A. Correct.

Q. Okay. You stated that he agreed to cooperate and was allowed to wait in an interview room until the arrival of a witness would arrive to view a lineup, correct?

A. Correct.

Q. Okay. And moving on to the next paragraph, it states that a lineup was conducted and that Mr. Rivera was positively identified as the person who while armed with a handgun and shot the victim numerous times. You don't recall that happening?

A. I don't recall it being told to me, but I see the report and have no reason to doubt.

Q. And that Mr. Rivera was then advised of his *Miranda* rights, to which he replied that he understood, was asked if he wanted to cooperate further, stated that he wanted to speak to a

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 259 of 673 PageID #:100843
AR-L 619875
Dorsch - direct by Sotos
2683

lawyer, at which time all questioning ceased, correct?

A. Correct.

MR. LOEVY: Your Honor, this report has already been read to the jury maybe more than once. So we object to cumulativeness.

THE COURT: Overruled.

MR. SOTOS: It was just admitted, Judge.

THE COURT: I overruled the objection.

BY MR. SOTOS:

Q. All right. So moving on to the next page, the report states that Assistant State's Attorney Julie Rosner was notified and responded to Area 5.

You don't have any reason to doubt that, in fact, either yourself or Mr. Boyle contacted Julie Rosner in order to -- in order to bring -- to come to the station in which you were seeking to have felony charges approved, correct?

A. That would be correct.

Q. And that was -- when I say "and/or Mr. Boyle," it's because you don't really remember which of you made notifications or phone calls, correct?

A. Correct.

Q. But whether it was you and/or Mr. Boyle, the two of you had agreed that this was something that you should do, correct?

A. It would have been procedure, yes.

Q. All right. So who actually made the notification isn't

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 260 of 673 PageID #:100844
AR-L 6198/6
Dorsch - direct by Sotos
2684

really significant; is that right?

A.   I don't find it is.

Q.   And then it goes to say that after reviewing the file and interviewing the witness and police officers, the charge of murder was approved against Jacques Rivera, correct?

A.   Yes.

Q.   Okay.  And that was a decision that Ms. Rosner made after, according to the report, reviewing the file and interviewing Orlando Lopez, correct?

        MR. LOEVY:  Objection, Your Honor, foundation and relevance.

BY MR. SOTOS:

Q.   According to your report?

A.   Felony Review -- if Julie Rosner was from Felony Review, it would have been her responsibility.

        MR. SOTOS:  Can you place 23-G up?

BY MR. SOTOS:

Q.   And, by the way, in 2010 you spoke with a representative of Northwestern about this case, correct?

A.   I'm not sure of the year.

Q.   Is that --

A.   And I'm not sure if you're talking about the first contact I ever had.

Q.   Well, would you take my word for it if I told you it was 2010 or 2011, or do you want me to find some documents?

AR-L 619577
Dorsch - direct by Sotos

2685

A. Well, if you tell me who I talked to, maybe it would help me.

Q. Do you recall talking to a Jane Raley in 2010?

A. Well, I remember talking to Jane Raley. It would have been the first time I talked to her.

Q. Okay. And you talked about your involvement in the case at that point, correct?

A. That's not why I was there, but eventually we talked about this case.

Q. Yeah. You were bringing her a different case, correct?

A. That's correct.

Q. All right. But you talked -- but then you asked her -- she told you that she was looking at cases involving Mr. Guevara, correct?

A. No. She said she had a case that I -- my name was also involved in that case.

Q. Okay. And then you talked to her about the case at the time, correct?

A. About that case, yes.

Q. The Rivera case, this case?

A. This case.

Q. Right. But she told you what she knew of your involvement in it, and it didn't refresh your recollection even back in 2010, correct?

A. First she asked me if I recalled the case, and she

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 262 of 673 PageID #:100846
AR-L 619878
Dorsch - direct by Sotos
2686

mentioned the name, and I had no recall.

And she said -- asked me if I had any objection to looking at the case and talking to her about that case.

Q. And you didn't remember it?

A. I didn't remember the case, but I did tell her I would talk to her. Show me the case and let me see if I can remember it.

Q. She showed you some of the same reports that we've looked at here today, correct?

A. There were reports that I did see, yes.

Q. Like the Supp. Report we just went through, that's one of the reports she showed you, right?

A. Again, I'm sure it probably was, but I don't recall -- have vivid memory of it.

Q. Okay. You said even at that time, it still didn't refresh your recollection about the case?

A. Not at all.

Q. Okay. Shortly after that, you started doing some work for Northwestern, correct?

A. Maybe a year later or so.

Q. Well, you've done quite a -- quite a bit of work for Northwestern, right, private investigative work?

A. Not true. I've done two major cases that ended in exonerations for them, yes.

Q. Okay. But did you --

A. But I had very minimal, very minimal, almost none since my

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 263 of 673 PageID #:100847
AR-L 619879
Dorsch - direct by Sotos

2687

involvement in the Guevara case.

Q.  Okay.  Would you quarrel with me if I said you were paid $65,000 as of your deposition four years ago in the case?

A.  I was paid how much?

Q.  A total of $65,000 from Northwestern and related entities?

A.  In one year?

Q.  No, all the --

A.  All the cases?

Q.  From 2011 up to 2014.

A.  That's -- from 2011 to '14, I don't -- I wouldn't have a -- I don't know.

I know I did work for the Illinois Appellate Defenders, even the State's Attorney's Office paid me probably a lot of money for working --

Q.  But I'm just asking you about --

A.  I don't recall.  I don't recall.

Q.  So would you quarrel with me if I told you that was the number?

A.  Over three or four years?  I don't know.  I'll take your word for it.  I have no idea.

Q.  All right.  We can move on.

By the way, when you were assigned to this case on September 15th, you indicated that you only had three hours or so of involvement in the case, right?

A.  From looking at the reports, that's what it does seem, from

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 264 of 673 PageID #:100848
AR-L 619580
Dorsch - direct by Sotos

2688

the time I started my shift to the end of the lineup.

Q. Do you -- do you know who the detectives were who were previously on the case?

A. Only from having reviewed the reports. I had no knowledge before that.

Q. And from reviewing the reports, what did that tell you about what detectives were on the case on the day that you were assigned?

A. Well, there were several, maybe four or five detectives that were involved in the case prior. But I think the primaries were Jack Leonard and Gillian McLaughlin.

Q. And do you know why they weren't on the case -- working on the case on September 15th, the day that you were assigned?

A. No idea.

Q. If they had been working that day or on duty, is it your assumption that they would have still been on the case that day?

A. I would think so.

Q. So you can't think of any reason why Gill McLaughlin or Detective Leonard would have been thrown off of the case?

A. Thrown off of the case?

Q. Right.

A. Specifically those words, I have no knowledge of.

Q. Because that would be a relatively significant thing, right, if a detective was thrown off of the case because they

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 265 of 673 PageID #:100849
AR-L 619581
Dorsch - direct by Sotos

2689

wanted to put somebody new on?

A. Well, thrown off, I never heard that before. I mean, I've had other people -- other detectives finish my own cases for a variety of reasons, furlough or I'm in court or I'm not working that day.

Q. Right. So it's not unusual for a detective who is working on a day to take over an investigation for somebody who isn't working that day?

A. It's not unusual, no.

Q. And so from your review of all the reports that you've looked at, do you have any reason to think that Gill McLaughlin or Jack Leonard were at the police station on September 15th, the day that the lineup was conducted of Mr. Rivera and he was charged with the murder?

A. I think --

    MR. BOWMAN: Asked and answered.

    THE COURT: Overruled.

BY THE WITNESS:

A. I think had they been there that they would have taken the case.

BY MR. SOTOS:

Q. So at the time the case came to you, it was still an investigation, correct?

A. The time the case came to me, it was now a homicide.

Q. Right.

AR-L 619582
Dorsch - direct by Sotos

2690

A.   And I was assigned to assist Gang Crimes in a lineup and only a lineup.

Q.   Well, it was -- the case was -- it had become a homicide, correct?

A.   Yes.

Q.   And from your review of the reports, Gill McLaughlin and Jack Leonard were two of the detectives who had been previously working the case before it became a homicide?

A.   I assume that I learned that.  How I learned it, whether it be from a report or from verbalizing from somebody else, I don't know.

Q.   Okay.  When you say "verbalizing," you mean during, like, your meetings with plaintiff's counsel to prepare for your testimony --

A.   No.

Q.   -- right?

A.   I mean at that time at that day in my office at Area 5, whatever information was rendered to me, either verbally or from a report that I may have seen.

Q.   Somehow you knew that Gill McLaughlin and Jack Leonard had been working on the case before it became a homicide?

A.   I assume that I did.

Q.   Okay.  And you said that all you were involved in was the lineup.  So let's talk a little bit about that.

         So this is the lineup report, which is in evidence as

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 267 of 673 PageID #:100854
AR-L 619683
Dorsch - direct by Sotos
2691

Defendants' Exhibit No. 23-G, Your Honor.

And on the top of this report, you see where it says, "Homicide/1st Degree"?

A.  Yes.

Q.  Okay.  That's different than the last report where it stated that it was "Battery/Aggravated Handgun," correct?

A.  Correct.

Q.  And if you go down to where it says, "Persons conducting lineup," it lists yourself and Detective Boyle, correct?

A.  Correct.

Q.  And you were the two individuals who were conducting that lineup, correct?

A.  It says that, yes.

Q.  Pardon me?

A.  Yes.

Q.  Thank you.  And there's some faint signatures on the bottom.  Can you see those, Detective John Boyle and Detective William Dorsch?

A.  Yes.

Q.  Okay.  Are -- is that signature yours, William Dorsch?

A.  It's different than my signature.

Q.  Okay.  It's different than the signature on the last document, correct?

A.  Right.  I mean, you can look at the "R" specifically and know that I don't ever sign my name like that.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 268 of 673 PageID #:100852
Dorsch - direct by Sotos
2692
AR-L 619884

Q. And is that a common police practice where one detective will allow another detective to sign their name to a document?

A. Yes.

Q. Okay. And going on to the next page, it lists yourself, Detective Boyle -- I was doing better with that on the last one -- Mr. Guevara and Mr. Gawrys as the people who were present during the lineup, correct?

A. Yes.

Q. And below that it lists the people who were there and then describes a positive identification of Mr. Rivera, correct?

A. Yes.

Q. Now, you don't have any recollection of what happened during this, correct?

A. No, I don't have a recollection of it.

Q. But you understand from reading the reports that you and Detective Boyle conducted the lineup with the eyewitness, Orlando Lopez, and with Mr. Rivera being one of the subjects in the -- in the lineup, correct?

A. That's correct.

Q. All right. And so if there had been -- well, before we get to that, what kind of instructions do you give the -- the witness before they actually view the lineup?

A. Well, I would hope that it would be something like: "Just because you're here, we've asked you to come in to look at a photo lineup or a physical lineup. It does not mean that the

person involved in the crime is actually here, so don't feel that you have to make an identification."

Q. So you have a conversation with the witness before they do the lineup?

A. Instructions to the witness that they don't have to make an identification.

Q. And if you had seen any kind of effort to influence -- well, strike that.

Before we get to that, can you tell from looking at the reports whether you were in with the witness or whether you were in the room with the -- with Mr. Rivera and the other fillers in the lineup?

A. No, I can't.

Q. But that's usually how it's conducted, right? You would be -- either you or Mr. Boyle would be with the witness, and then the other detective would be with the -- with Mr. Rivera and then the fillers in the lineup, correct?

A. Well, it could have been a combination of officers involving Gang Crimes, too. I don't know who would be on the other side of the glass, if both detectives are on one side of the glass or if we're split up or where the Gang Crimes officers are. I have no recall.

Q. All right. Understood. But typically, if you're doing a lineup, you would have at least one detective with the witness and one detective with the suspect and the fillers in the

AR-L 619886
Dorsch - direct by Sotos

2694

lineup, correct, as a general practice?

A.   I mean, I -- there's no general practice, I mean, as that goes.

Q.   And if you had seen anything that -- in terms of any kind of efforts to influence the witness in any way, is that something that would have been noted in your report?

A.   Well, you know from prior conversation with me that I have done that in the past.

Q.   Sir, I'm just asking you whether or not on that night --

A.   On that night, there's no indication and I have no reason to believe that there was anybody that led the victim -- led the witness.

Q.   Okay.  And I've never had a prior conversation with you at any point in our lives, have I?

A.   Oh, sorry.  I'm thinking of somebody else from your office.

Q.   I'm just -- I'm just asking you if I've ever had a conversation with you in our lives?

A.   Okay.  I'm mixing you up, I think.  You're with Sotos Law Firm, right?

Q.   This is the first time we've met, right?

A.   Okay.

Q.   So, again, if you had seen anything inappropriate with regard to the dealing with or handling of the witness, that's something you would have noted in your report, correct?

A.   Well, I wouldn't allow it, first off.  I wouldn't seek

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 271 of 673 PageID #:100855
AR-L 619687
Dorsch - direct by Sotos
2695

charging.

Q. Right. And you did seek a charge in this case?

A. Yes.

Q. So you had no reason to think at the time that anybody in any way improperly tried --

MR. LOEVY: Objection, asked and answered, Your Honor.

BY MR. SOTOS:

Q. -- tried to influence the witness?

THE COURT: Overruled.

BY THE WITNESS:

A. I had no reason to not believe the witness.

BY MR. SOTOS:

Q. And while you were at the police station, you didn't see any indications that the witness was expressing any reluctance in identifying Mr. Rivera on that day, correct?

A. I have no recall.

Q. But if you did, again, that's something that would have been noted?

A. Yes.

Q. If the witness in any way expressed that they were unsure, that's something you would have noted?

A. I would have liked to know, yes.

Q. If the witness had said anything along the lines of "That's the wrong guy," that's something you would have noted?

A. Yes.

AR-L 619888
Dorsch - direct by Sotos

2696

Q.  Now, having completed the lineup, you satisfied yourself that the case against Mr. Rivera was sufficient to warrant you seeking felony charges against him, correct?

A.  Yes, an identification had been made, and the procedure would be to call Felony Review.

Q.  Okay.  And -- but you understood the significance of asking the State's Attorney to bring a murder charge against a person who had been identified, correct?

A.  Yes.

Q.  So when we talked before about reading reports, given the fact that you had conducted the lineup and given the fact that you understood the significance of what was about to happen, is it fair to say that you would have reviewed the case file to satisfy yourself that you were comfortable in seeking felony murder charges against Mr. Rivera?

A.  As far as reviewing the case file, I would have been only satisfied with the identification and proceeded from there.

Q.  You would have satisfied yourself that the case was sufficient --

A.  With the identification.

Q.  -- was sufficient to seek felony murder charges against Mr. Rivera, correct?

A.  From the identification.

        MR. SOTOS:  Can we put up 23-I, please?

BY MR. SOTOS:

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 273 of 673 PageID #:100857
Dorsch - direct by Sotos
2697
AR-L 619689

Q. So in front of you, Mr. Dorsch, is a document that's been admitted into evidence as Defendants' Exhibit 23-I. This is already in evidence.

And I'm going to ask you, is that one of the documents that you reviewed to prepare for your testimony?

A. Yes.

Q. And can you tell the jury what that document is?

A. This is a complaint charging the defendant with first degree murder.

Q. And is that your signature on that document?

A. No.

Q. Do you know who wrote your signature on the document?

A. I would -- probably my partner. I mean, that would be the --

Q. Mr. Boyle?

A. I would expect, yes.

Q. So, I mean, I guess I understand why when there's reports with both of your names next to each other, why one person might write down for both. But do you know why Mr. Boyle would have written your signature on a complaint for criminal charges when your -- when his name isn't on there?

A. Well, not to be critical of John, but John didn't like to go to court. I did most of the court work.

Q. So was this to give you credit as the lead officer who was actually bringing the criminal charge?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 274 of 673 PageID #:100858
AR-L 619890
Dorsch - direct by Sotos
2698

A. You don't get credit.

Q. You don't get credit for that?

A. There's no -- there's no structure for awarding points or something -- if that's what you're getting to, no.

Q. I'm just asking --

A. No, there's nothing about credit.

Q. Okay. So it was -- your -- is that something that Mr. Boyle would do from time to time with you? He would -- because he didn't like to court that -- didn't like to go to court, he would sign your name on criminal complaints?

A. Well, he -- he had, and I'm sure I had done that in my career, too, with other officers.

Q. All right. So in any event, it was authorized -- you authorized him to sign your name to documents?

A. Yes.

Q. All right. So you understood that you were putting yourself out there as the person seeking the charges in this case?

A. Yes.

Q. And when you say that you're -- you know, a couple times you qualified your answer, I think, when I asked you whether you were comfortable in seeking the federal -- the felony charges. You said, well, on the basis of the lineup.

You were comfortable from reading the file and the lineup that the charges were warranted; is that fair to say?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 275 of 673 PageID #:100859
AR-L 619891
Dorsch - direct by Sotos

2699

MR. LOEVY: Objection, Your Honor. That -- we went over that, like, six times.

THE COURT: Sustained.

MR. SOTOS: One minute, Your Honor?

THE COURT: Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q. Just a couple other questions, sir.

There's been testimony throughout this case about GPRs. And you know what GPRs are, correct?

A. Yes.

Q. Those are handwritten notes that detectives make that -- throughout their investigations, correct?

A. Yes, General Progress Report.

Q. All right. And in the documents that we've looked at for you, we see that you, in fact, conducted a lineup, correct?

A. Yes.

Q. All right. And you didn't prepare a separate GPR memorializing that lineup beyond your Supp. Report, correct?

A. I don't recall.

Q. Is that something you typically would do?

A. I don't -- I don't know how to answer what is typical to something like that.

Q. Well, when you do a lineup, did you typically do a GPR as well as a Supp. Report?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 276 of 673 PageID #:100860
AR-L 619892
Dorsch - direct by Sotos

2700

A.  I may have written down the names of the people that were in the lineup before putting them to type.

Q.  How about the -- the reinterview of Orlando Lopez? According to your Supp. Report, Orlando Lopez was reinterviewed at the police station that day, correct?

Want me to show it to you again or --

A.  Please.

MR. SOTOS:  Okay.  Could you put -- put 23-H up, please?  Okay.

BY MR. SOTOS:

Q.  Do you see in front of you -- this is Defendants' Exhibit 23-H -- where it reflects that Orlando Lopez was reinterviewed?

A.  Yes.

Q.  Okay.  And you don't recall the specifics of that interview 30 years later, correct?

A.  Well, I think if I would have done the actual report, I would have put down "witness" and never had put in "reinterviewed."

Q.  Why is that?

A.  Because he was a witness to the lineup.  I have no knowledge, I don't think, of his prior interviews with the police officers.  If I did, I don't recall.

Q.  Well, didn't we just talk about this a little while ago?  I asked you whether or not he was reinterviewed that day, and you said yes?

AR-L 619893
Dorsch - direct by Sotos

2701

MR. LOEVY:  No.  Objection.  He said he didn't remember at all, Your Honor, and I --

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  I think I asked you whether or not the report reflected that Mr. Lopez had been reinterviewed, and you said yes?

A.  I think you pointed to that portion of it and showed me that it said "reinterviewed."

Q.  Right.

A.  I didn't comment on whether --

Q.  And did it indicate to you that he'd be reinterviewed?  Are you saying it doesn't indicate that to you?

A.  I'm saying I'll say it says that, but I'm saying that if I would have written it, I probably would have put "witness."  I wouldn't have wrote "reinterviewed."

Q.  Even if he was reinterviewed?

A.  I don't recall that I talked to him other than doing the lineup.

Q.  But you don't recall anything about that day, correct?

MR. BOWMAN:  Objection, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Thirty years later, I don't recall.  Usually people I find who recall events, if it's a recent event, it's easier to recall.  If it's an unusual event, it's easier to recall.  But

AR-L 619094
Dorsch - direct by Sotos

2702

if it's something that happens repeated -- repetitively in the habit of your work, you may not recall it years later.

BY MR. SOTOS:

Q. Couldn't agree more. That's why I'm asking you, how do you remember whether he was interviewed or not?

A. I don't.

MR. LOEVY: Objection, asked and answered.

THE COURT: Yeah, sustained. I think it's getting argumentative.

BY MR. SOTOS:

Q. Well, the document reflects that he was reinterviewed, correct?

MR. LOEVY: Objection, asked and answered, Your Honor.

THE COURT: You know, I'm going to overrule so we can get beyond this, because I think we're kind of stuck.

BY MR. SOTOS:

Q. The document reflects that he was reinterviewed, correct?

A. It says "reinterviewed."

Q. Do you have any reason, as you sit here today, to doubt that that's correct, that that's accurate?

MR. BOWMAN: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. I would hope that we talked to him about the crime in some form.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 279 of 673 PageID #:100866
AR-L 619895
Dorsch - direct by Sotos
2703

BY MR. SOTOS:

Q.  That's all I'm asking you.

So I'm just asking, assuming you did, there wasn't a GPR that was prepared to summarize that discussion?

MR. LOEVY:  Objection, foundation.  We don't even know if we have all the GPRs, Your Honor.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  Do you know whether you prepared a GPR summarizing a --

A.  No.

MR. SOTOS:  Just one more second, Your Honor.

THE COURT:  Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q.  And then just the last area, sir, is --

MR. SOTOS:  Defendants' Exhibit No. 12, please.

BY MR. SOTOS:

Q.  I'm placing --

MR. SOTOS:  No.  Oh, yeah, it's 1.2.  I said 12.  I apologize.

Maybe I can get a hard copy, Judge.  It doesn't seem to be --

THE COURT:  Yeah, a hard copy would be great.

MR. SOTOS:  Can we just go to the Elmo?  I can't pull this out.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 280 of 673 PageID #:100864
Dorsch - direct by Sotos
2704
AR-L 619896

BY MR. SOTOS:

Q.  Mr. Dorsch, I'm placing in front of you a document that's been admitted into evidence as Plaintiff's Exhibit 19-A, and I'll ask you whether or not you recognize that document?

A.  Well, it's an Investigative File Inventory of Reports that were written.

Q.  Okay.  And this is one of the reports that you prepared -- that you reviewed when you prepared for your deposition -- I mean, your testimony here today, correct?

A.  I don't know that I saw this.  Maybe I had.

Q.  All right.  Well, you do recognize it, though, correct?

A.  I know of this type of report, yes.

Q.  You do see your handwriting on it, correct?

A.  Yes, at the lower portion from 20 down, I believe that is my handwriting.

Q.  Which reflects the Lineup Supp., the arrest report, the 101, the murder complaint, the evidence report, and a closing stip, correct -- Closing Supp., correct?

A.  Correct.

Q.  And then moving on to the next page, it states "Supp. Report" from September 16th, 1988, correct?

A.  Correct.

Q.  Okay.  So you also logged that report into the --

A.  I believe that's my handwriting.

Q.  -- correct?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 281 of 673 PageID #:100865
AR-L 619897
Dorsch - direct by Sotos

2705

THE COURT REPORTER: I'm sorry. I didn't hear the end of your question.

BY MR. SOTOS:

Q. Into the file inventory, you inventoried that report, the September 16th report?

A. Apparently, yes.

Q. And in looking through the -- through the file, do you recall seeing any prior reports which indicated that Detective McLaughlin had tried to put a person named Mr. Rodriguez in a lineup with Mr. Rivera, but the -- they couldn't find the eyewitness, and then they tried to do a photo array?

Do you recall seeing that in the reports?

A. In the copies that were submitted to me recently, I saw that, yes.

Q. All right. So those were a couple of the documents that you spoke with plaintiff's attorney -- Mr. Rivera's attorneys about in preparing for your trial testimony, correct?

A. Yes.

Q. And you saw those reports back at the time you were assigned to the case as well, correct?

A. I don't recall that.

Q. All right.

MR. SOTOS: Can we get the September 1st Supp. Report up?

MR. LOEVY: Your Honor, we would have an objection --

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 282 of 673 PageID #:100866
AR-L 619898
Dorsch - direct by Sotos
2706

BY MR. SOTOS:

Q.  This is Defendants' --

        MR. LOEVY:  -- to this area of inquiry.  This is about events two weeks before he was involved, and it's not relevant. We've already done these Supp. Reports with other witnesses.

        MR. SOTOS:  Well, Judge, I think it is relevant.  He said that --

        THE COURT:  Well, you know, let me hear a question. As I've said many times, without a question, I don't know what anybody's doing.

BY MR. SOTOS:

Q.  So, Mr. Dorsch, in front of you is a document that's marked as Defendants' Exhibit 1.13 that's in evidence, and that's a Supp. Report dated September 1st, 1988.

        When you were assigned to the case on September 15th, is that the kind of document that you would have reviewed if it was present in your file?

A.  If it was presented to me at that -- on that date.  If it was presented to me on that date, yes.

Q.  Well, if it was in the file?

A.  I don't know that I had a file to review.

Q.  Well, do you know that you -- are you saying you didn't have a file to review or you just don't --

A.  I don't recall.

Q.  -- know?

AR-L 619899

A.   I don't recall.

Q.   So hypothetically, if you had -- hypothetically, if a file existed, you would have reviewed it before you sought felony murder charges against Mr. Rivera, correct?

        MR. BOWMAN:  Objection, asked and answered.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Yes.

BY MR. SOTOS:

Q.   All right.  So hypothetically speaking, then, if this report was in the file, you would have reviewed it?

A.   If I had the file and it was in there, I would have reviewed it.

Q.   Okay.  But that's what I'm asking you about when you say, like, "if I had the file."

        Before you sought felony murder charges against Mr. Rivera, you would have tried to get the file, right?

        MR. BOWMAN:  Objection, asked and answered.

        THE COURT:  Not that question.  Overruled.

        THE WITNESS:  Repeat the question, please.

BY MR. SOTOS:

Q.   Before you would have sought felony murder charges against Mr. Rivera, you would have tried to get the file, correct?

A.   Yes, I would liked to have gotten some reports about the incident prior, yes.

AR-L 619900
Dorsch - direct by Sotos

2708

Q. All right. And where would you get it from?

A. From the office, whoever -- probably the sergeant that said, "Here, run a lineup."

Q. And I understand that you don't have an independent recollection of it now, but if somebody told you back then, "Well, we don't have a file," that would have sounded pretty strange to you, right?

A. Oh, yeah, that definitely would have sounded strange.

Q. Especially when it's a case that was investigated a couple weeks earlier, so you would have assumed that something had been done, right?

A. I would have assumed that something would have been done by the prior detectives involved in the case, yes.

Q. Just from the reports that you wrote, you knew that the shooting had occurred back on August 27th, correct?

A. We had to copy that information from some report.

Q. Okay. So you would have been able to get -- you would have been able to ask for the file from the office, correct?

A. I'm sure we did.

Q. And if you didn't have it, you would have taken steps to make sure you got it before you brought felony murder charges against Mr. Rivera?

          MR. LOEVY: I think we've established that, Your Honor.

          MR. SOTOS: I don't know if we have, Judge.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 285 of 673 PageID #:100869
Dorsch - direct by Sotos
2709
AR-L 619901

THE COURT: I'm not sure.

MR. SOTOS: I'm not either.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Have we? Is that true that you would have taken steps to get the file that was in existence before you sought felony murder charges --

A. Well, I have to --

Q. -- against Mr. Rivera?

A. -- gather significant information that would have to be placed into my report, and that can only come, I believe, from a prior report.

Q. All right. So if -- so you don't have any reason, as you sit here today, to doubt that you had the prior Supp. Reports that had been created?

A. No.

Q. Okay. So understanding you don't recall specifically, in front of you is a Supp. Report from September 1st, 1988.

And do you see where it shows the two people are in custody, Jacques Rivera and Jose Rodriguez?

A. Yes.

Q. Okay. And you remember reviewing that while you were meeting with Mr. Rivera's attorneys to prepare for your testimony, correct?

A. From that inter -- from that, yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 286 of 673 PageID #:100870
Dorsch - direct by Sotos
2710
AR-L 619902

Q. Right. You've done -- you've done investigative work for Mr. Rivera's attorneys on other cases, correct?

A. No. I mean, I think I might have done one for Mr. Loevy. And Locke, I know he's at Northwestern, but I don't know that I did any cases for him there.

Q. Okay. But you have -- well, that's fine.

So in looking at this document, you would have seen that Mr. Rivera and Mr. Rodriguez were in custody back on August 31st, correct?

A. Yes.

MR. SOTOS: Okay. And can we go to the next page, please?

MR. LOEVY: Your Honor, just reading him a report that's already been read to the jury is not relevant. He doesn't remember it. There's nothing he -- what's the point?

MR. SOTOS: And I'm not reading, Judge.

THE COURT: You know what, let's just do it because I -- overruled.

BY MR. SOTOS:

Q. And do you see this page?

A. Yes.

Q. And, you know, we don't have to read from it because you've reviewed this in at least getting ready for your trial testimony, right?

A. I've looked at it, yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 287 of 673 PageID #:100874
Dorsch - direct by Sotos
2711
AR-L 619903

Q. Right. And you've talked about it with the attorneys. So you're familiar with it, as you sit here today, so we don't have to read it, right?

A. I'm familiar with the report.

Q. Okay. And you understand that the report states that Mr. Rodriguez and Mr. Rivera were both in custody on August 30th and 31st, correct?

A. Yes.

Q. And that Detective McLaughlin and Detective Leonard were trying to do a lineup with both of them in it, correct?

A. Yes.

Q. And that they couldn't find the eyewitness, right?

A. Correct.

Q. Okay. And that they then tried to do a photo array with the victim at the hospital to have him look at photographs of Mr. Rodriguez and Mr. Rivera, correct?

MR. BOWMAN: Objection. Is Mr. Sotos summarizing the report? I don't understand.

THE COURT: I think that -- I think there's a lack of clarity. You're going over the report, right?

MR. SOTOS: I'm asking him what he understands it to be as he sits there.

THE COURT: What the witness understands the report to say?

MR. SOTOS: Yes, not his independent memory. If I

AR-L 619904

sent that message, I didn't mean to.  Okay?

THE COURT:  Okay.  What the witness understands the report to say.

MR. SOTOS:  Yeah, so I don't have to read it.

BY MR. SOTOS:

Q.  So your understanding of the report, having reviewed it to prepare for your testimony, is that it recited that Detective McLaughlin and Detective Leonard were unable to complete the lineup because they couldn't find the eyewitness, correct?

And go ahead and read it.

A.  Yeah, it says "Reporting Detectives," and I assume this is their report, Leonard and McLaughlin.

Q.  Right.  If you want to check it --

A.  I'm sure on the last page it would say their names.

Q.  Okay.

MR. LOEVY:  Your Honor, if he wasn't part of it, he doesn't remember it, we've already talked about it, why are we doing it again?

THE COURT:  Well, because we are trying to get through some testimony about what the report says.

MR. LOEVY:  Okay.

THE COURT:  And let's just do it.

BY MR. SOTOS:

Q.  And you see that it -- the report recites that Detective McLaughlin and Detective Leonard tried to do a photo array with

the victim where they wanted to show him pictures of Mr. Rodriguez and Mr. Rivera, correct?

A. Yes.

Q. And that that wasn't completed because of the victim's medical condition, correct?

A. I believe it says that.

Q. Okay. So that's information that, if you had a copy of the file, you would have had available to you at the time that you sought charges against Mr. Rivera for murder, correct?

A. I would hope that I would have had it. It's credible police work. I would hoped to have had it.

Q. And as you -- as you sit here today, you don't have any explanation for why you didn't pursue the case against Mr. Rodriguez and try and get him into a lineup, do you?

A. No.

MR. SOTOS: Thank you. Nothing further, Judge.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MR. BOWMAN:

Q. Good afternoon, Mr. Dorsch.

A. Good afternoon.

Q. You've said repeatedly in response to questions that you have no recollection of this particular case?

A. That's correct.

Q. And why is it that you don't recall the case?

AR-L 619906
Dorsch - cross by Bowman

2714

A.   Thirty years ago, it's something that a task that I -- had been done on other cases, and usually it would take something of unusual occurrence for someone to have recall.

Q.   And from your review of the documents, you were able to determine how long was your total involvement in this particular case?

A.   Typically, working the afternoon shift, you started at 4:30.  You had a roll call which lasted 15 to 20 minutes.  And then you set about assigned tasks that were given to you by supervisors or you followed up on existing cases.

        And it states that the lineup was completed.  Begun, I believe, at 7:15 and completed at 7:30.  So you would have then sought Felony Review, and basically it's pretty much over at that 7:30 mark.  I mean, really there's nobody else to interview.  It's just waiting for Felony Review to come in and be appraised of the identification.

Q.   Does the fact that your total expenditure of time, at least according to the reports, was three hours have anything to do with the fact that you don't remember what happened in this particular matter, do you think?

A.   That's correct.  I mean, Felony Review would have had to respond, too.  But then I don't know that if I would have been sent out on another assignment.

Q.   Now, you were asked some questions about money that you have received from Northwestern University over the course of

AR-L 619907
Dorsch - cross by Bowman

2715

the period from 2011 to about, what was it, 2015, 2016?

A.  I believe that's what he mentioned.

Q.  And you indicated that you have worked on a couple of major cases for Northwestern lawyers, right?

A.  Yes.

Q.  A couple of cases that were exoneration cases, right?

A.  That's correct.

Q.  And you did a lot of work?

A.  Yes, on those cases.

Q.  Did you earn the money that you received from Northwestern based on the work that you did?

A.  I certainly did.

Q.  And actually, if you take 65,000 over that number of years, it works out to about $15,000 a year, right?

A.  Correct.

Q.  That's not your total income for any of those years by any means, right?

A.  No, it's not.

Q.  So would it be a fair summary that you and your partner ran a lineup on September 15, 1988, at which a witness by the name of Orlando Lopez picked out a suspect by the name of Jacques Rivera?

A.  According to the reports I've seen, yes.

Q.  And you were asked some questions by Mr. Sotos about whether you were assigned to this case.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 292 of 673 PageID #:100876
AR-L 619908
Dorsch - cross by Bowman
2716

Do you remember those questions?

A.  Yes.

Q.  And you weren't assigned to this case in the -- in the sense that you were given this case to investigate when it started, right?

A.  That's correct.

Q.  I mean, that's a special term of art in the police department; you're assigned to a case, it becomes your case, right?

A.  That's correct.

Q.  And your -- your responsibility in this case was to run a lineup, pure and simple, end of story, right?

A.  Yes.

Q.  You did not do any work on this case before the date of September 15, 1988, right?

A.  That's correct.

Q.  There's all kinds of stuff that had happened before you were involved, right?

A.  I would assume.

Q.  Detectives -- this was an assault -- a gun assault that occurred on August the 27th, right?

A.  Excuse me.  27 -- yes, 27th of August.

Q.  Presumably, I mean, you don't know, but detectives would have been called in; examination of the scene would have occurred, right?

AR-L 619909

A. Yes.

Q. Evidence would have been collected if there was any, right?

A. Correct.

Q. Witnesses -- canvass would have been done --

A. Yes.

Q. -- should have been done?

Witnesses would have been located, and so forth, right?

A. Correct.

Q. And you had no involvement in any of that, right?

A. That's correct.

Q. Now, you were asked some questions about the circumstance of your being asked to do this lineup.

And would it be a fair summary that you don't know what was in Sergeant Rinaldi's mind when he said, "Dorsch and Boyle, run a lineup for us"? Is that fair to say?

A. In his mind, no.

Q. I mean, whether Gillian McLaughlin and Jack Leonard were or were not on duty that day is not something you know, right?

A. No, I don't.

Q. You made an assumption that they weren't, but it's an assumption, right?

A. Yes.

Q. And you have no personal knowledge about that whatsoever, right?

A.  Correct.

Q.  And another possibility is that Gillian McLaughlin and Jack Leonard were asked not to do this lineup for some reason that you don't know about; you have no idea, right?

A.  No idea.

MR. SOTOS:  Objection, Your Honor.  No facts in evidence.

THE COURT:  Overruled.

BY MR. BOWMAN:

Q.  You have no idea whether Gillian and -- Gillian McLaughlin and Jack Leonard had been -- had decided that they were going to do something else that day and weren't in the building at the particular point in time when this lineup was run, right?

A.  Correct.

Q.  You don't know where they were in the hours before you were asked to do this; you don't know one way or another whether you saw them or didn't see them that day, right?

A.  Correct.

Q.  Now, if you were to answer a question about whether or not Gillian McLaughlin and Jack Leonard were or were not on duty on September 15, 1988, you'd be speculating one way or another, right?

A.  Yes.

Q.  Incidentally, do you have any personal knowledge as to why on September 15, 1988, of all days, that was the day that

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 295 of 673 PageID #:100879
AR-L 619911
Dorsch - cross by Bowman
2719

was -- that you were requested to run this lineup?

A. No.

Q. Now, you were asked some questions about your Supplementary Report, and I wanted to ask you some of my own about the -- about the report.

This is Plaintiff's Exhibit 19-H, which is in evidence, if the jury could see it.

So if you look at the bottom, you were directed to your signature. Yes?

A. Yes.

Q. And as you look at the signature on this particular document, you can be confident that this is, indeed, your signature, right?

A. That is my signature.

Q. Okay. Now, before we go any further, let me ask you a question.

You've had an opportunity to review this report. Do you have any reason to doubt the truthfulness of the report that you wrote?

A. Of that report? No.

Q. You mentioned a typo when Mr. Sotos was asking you questions. There was an "R/S" as opposed to "R/D."

Do you recall that testimony?

A. Yes.

Q. And that was -- that's a typo that people can make, right?

A. Yes.

Q. Are there any other typographical errors in your report, to your knowledge?

A. Not that I recall seeing.

Q. Well, we'll look and see if we can find any, but as far as you know, there are none, right?

A. Right.

Q. Now, I want you to look with me at a paragraph -- well, first of all, let's do this.

You were asked some questions about this reinterview of Orlando Lopez, right?

A. Correct.

Q. And you told us that when you conduct a lineup, one of the things that you do is you have to interact with the witness, right?

A. Yes.

Q. You need to have basic understanding -- the witness needs to have a basic understanding of what it is that's supposed to happen, right?

A. Yes.

Q. And among other things, you want the process to be fair, right?

A. Yes.

Q. So your practice, I believe you said, was that you would tell the witness, among other things, "Look it, the guy that --

that's suspected of this crime may be in this lineup; he may not be.  The guy you saw may not be there at all," right?

A.   That's correct.

Q.   And that's part of the process that you engage when you do that -- that discrete task of running a lineup, right?

A.   That's the way I did it.

Q.   And as you talk to the witness?

A.   Yes.

Q.   Now, you were asked some questions about the location, how the -- how the -- the folks that were key in this lineup came to the police station, right?

And you reported that upon reviewing the file you reached out to Gang Crimes North, right?

A.   It says that.

Q.   And the reason to reach out to Gang Crimes North is because they're the ones who know what's going on, right?

A.   Apparently.

Q.   I mean, you needed -- you're supposed to run a lineup.  You needed a witness, right?

A.   Yes.

Q.   And you need a suspect, right?

A.   Yes.

Q.   And what you did is you asked them to assist in locating offenders in the incident and known witnesses, right?

A.   Yes, but I -- I don't say that I did it.  I don't know if I

AR-L 619914

did it. It's possible. But it's also possible my partner did it, and I don't -- I don't recall.

Q. Fair enough. One or the other of you knew that you needed to find offenders, if any, and witnesses, if any, in order to do your job, right?

A. Yes.

Q. And the folks you turned to for that assistance was Gang Crimes North, right?

A. Yes.

Q. And then you conducted the lineup. At least by the report, it appears you conducted a lineup, right?

A. Yes, that's correct.

Q. Now, I want to be clear with you about -- about one thing.

It's not true, is it, that the detectives are the bosses of the Gang Crimes specialists? Is that right?

A. That's correct.

Q. I mean, the Gang Crimes specialists have their own chain of command; the detectives have their chain of command; and it's separate, right?

A. Right, there's --

Q. You don't boss Gang Crimes guys around and tell them what to do as a detective, right?

A. That's correct. We're structured sort of like the military.

Q. And so you may be in a position of asking for their

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 299 of 673 PageID #:100883
AR-L 619915
Dorsch - cross by Bowman
2723

assistance, right?

A.   Correct.

Q.   And they may be in a position of asking for your assistance as a detective, too, right?

A.   Yes.

Q.   For example, you're the guys -- the detectives are the guys who are supposed to run lineups in homicide cases, not the Gang Crimes guys, right?

A.   Correct.

Q.   So it would be fair to say that the detectives in those circumstances in a particular case might assist Gang Crimes in that regard --

A.   Definitely.

Q.   -- right?

A.   Definitely.

Q.   Now, when you ran the lineup, do you have a process that you would follow in order to select the fillers for the case?

A.   Well, you want the lineup to be fair.  So you need to pay attention to the person who is the subject of the lineup and try to find people of similar age, physical description.  And those are primary things that you're looking for.

         You certainly don't want to have someone too tall when the subject is smaller or too heavy when he's lighter.  You try to get as best you can a group of persons together that are somewhat similar in appearance.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 300 of 673 PageID #:100884
AR-L 619916
Dorsch - cross by Bowman

2724

Q.  Recognizing that you don't have any recollection of it, do you have any reason to doubt -- to doubt, based on your limited involvement, your three hours of involvement, that the lineup you ran was fair?

A.  No.

Q.  From your point of view?

A.  No.

Q.  And at the conclusion of your lineup, you were required to document the lineup that had been conducted, right?

A.  Yes.

Q.  And I've put on the screen Plaintiff's Trial Exhibit 19-G, which is in evidence.  And there's a section of that that I want to focus you on.

It says, "This is a lineup report," right?

A.  Yes.

Q.  And a lineup report is the report that the police department requires to be prepared in each and every circumstance when a lineup is run, right?

A.  Yes.

Q.  So if we're to go back to the police file, we'll see a record that you ran a lineup on September 15, right?

A.  Correct.

Q.  And among the things that you document in the lineup report is you have a list of the people who participated in the lineup, right?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 301 of 673 PageID #:100885
AR-L 619917
Dorsch - cross by Bowman

2725

A.  Yes.

Q.  And that includes the suspect?

A.  Yes.

Q.  And it includes fillers, right?

A.  Yes.

Q.  And the police department actually has rules about how many fillers there's supposed to be in a lineup for each suspect, right?

A.  Correct.

Q.  And then you make a note that when you asked this boy if he recognized anybody, he picked Jacques Rivera, right?

A.  By reviewing the report, that's what it says.

Q.  Now, at that point, you have a responsibility as a detective to engage with the State's Attorney's Office, right?

A.  Yes.

Q.  Somebody, whether it's you or Boyle, needs to make a call to Felony Review?  Yes?

A.  Yes.

Q.  And you have no recollection of that?

A.  That's correct.

Q.  And -- but your report clearly indicates that you -- that you made that call, right?

A.  Yes.

Q.  And there is paperwork to be done in addition, right?

A.  Yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 302 of 673 PageID #:100886
AR-L 619918
Dorsch - cross by Bowman
2726

Q. I'm going to put on the screen what's in evidence as Plaintiff's 19-I.

MR. BOWMAN: It's in evidence, right?

MR. LOEVY: Yes.

BY MR. BOWMAN:

Q. And tell us what that is.

A. This is a felony minute sheet. This is filled out after the subject's been positively -- or identified and charged in the case. It would be sent to the court.

Q. Now, there's some language up here. It says, "For State's Attorney Use Only." We've asked some questions about this.

Is this a document that the State's Attorneys fill out or the police?

A. The police.

Q. Okay. Did you fill out this document, to the best of your recollection?

A. I can't see the full report, but I see my name on it with Detective Boyle.

Q. And down at the -- so what does that suggest to you?

A. Well, it only suggests that my name is on the report.

Q. Okay. Further than that, you don't recall?

A. Correct.

Q. Now, there is a list of complaining witnesses in this -- in this document, right?

A. Yes.

Q.  Or prosecuting witnesses.

The first is Orlando Rivera, right?

A.  Yes.

Q.  And that's the kid who made the ID?

A.  Yes.

Q.  And then the next is "Gang Specialists GUEVARA," and that's all in caps.  Does that mean anything to you?

A.  No.

Q.  Below him is Gawrys, also a gang specialist, right?

A.  Yes.

Q.  And then yourself and Mr. Boyle, right?

A.  Yes.

Q.  Now, the purpose of this document is that it goes with the records over to the State's Attorney's Office, and it's available to the prosecutor who is going to be handling the case in court, right?

A.  Yes.

Q.  And so among other things, you list contact information for the police officers involved in the investigation, right?

A.  Yes.

Q.  And do you see here where there is a contact number written there?

A.  Yes, I do.

Q.  And do you happen to know from memory what that is a number for, 744-8260?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 304 of 673 PageID #:100888
AR-L 619920
Dorsch - cross by Bowman

2728

A.   I don't recall, but I know it's -- if I look by my name and Boyle for being assigned at Grand Avenue, that is not our office number.

Q.   Okay.  Well, let me show you a different -- a different report.

   (Counsel conferring.)

        MR. BOWMAN:  Your Honor, I'm going to refer next to Exhibit 154-H.  There was some discussion about it this morning.  I want to be sure I don't put it on the screen.

        I can put it on the screen so you can see it.

        MR. POLICK:  Your Honor, that was in for a limited purpose.

        THE COURT:  Okay.  Yeah, this was, I think, received for a limited purpose.  Is that -- is my memory right?

        MR. POLICK:  Correct.

        MR. BOWMAN:  I was just going to ask him -- I was going to ask him about the phone numbers on this document.

        THE COURT:  Okay.

        MR. LOEVY:  Do we need to move this one in before we ask him --

        MR. BOWMAN:  Right.  Yeah.  Okay.

BY MR. BOWMAN:

Q.   So let me back up for just a minute.

        I'm going to hand you what's been marked for identification as Plaintiff's Exhibit 154-H.  And can you tell

us what that is, sir?

A.  Again, it's a copy of the felony minute sheet that's prepared to be sent to the State's Attorney's Office.

Q.  And it lists your name on it, does it not?

A.  Yes.

Q.  It indicates a date of arrest of an individual on February 23, 1989, right?

A.  Yes.

Q.  And does it appear that this was prepared -- I'm assuming you have no recollection of this document, either?

A.  No, I have no recollection of it.

Q.  And does it appear that it was prepared either by yourself or by your partner?

A.  Yes.

MR. BOWMAN:  Your Honor, at this time we move 154-H for the limited purpose that's been discussed.

THE COURT:  Okay.  That's not the one that was already received for that limited purpose?

MR. LOEVY:  This is a different one.

THE COURT:  Okay.  154-H is received for the same limited purpose; that is, the phone number.

(Plaintiff's Exhibit No. 154-H received in evidence.)

MR. SOTOS:  Judge, we -- we don't want to spend time. They can use it.  It's fine.

MR. LOEVY:  It's in evidence.

MR. BOWMAN:  Okay.  It's in.  May the jury see the document, Judge?

THE COURT:  Yes.

BY MR. BOWMAN:

Q.  So we were talking about the date on this particular document, and this is Felony Minute Sheet Form 101, just like the one relating to the Valentin case that we were talking about a few minutes ago, right?

A.  Yes.

Q.  And this also -- the format is a little bit different, but it also lists the complaining or prosecuting individuals, prosecuting witnesses, right?

A.  Yes.

Q.  And there are a couple of civilians listed up at the top, right?

A.  Yes.

Q.  And then this is also a case that you and Boyle apparently worked with Guevara and Gawrys on, right?

A.  Yes.

Q.  Once again, Guevara is listed first; Gawrys is second, right?

A.  Yes.

Q.  And then your name and your partner's name appear below, right?

A.  Correct.

Q.  And here we have the same phone number for Guevara and Gawrys, right?

A.  Yes.

Q.  It is 744-8260, right?

A.  Yes.

Q.  And on this particular document, there is an address, 2452 West Belmont, right?

A.  Yes.

Q.  And do you recall that that was where Gang Crimes North was located at that time?

A.  Yes.

Q.  And then if we look on this one, there's actually a different number for yourself and Dorsch, right?

A.  For me and Boyle, yes.

Q.  I'm so sorry.  My apologies, Mr. Dorsch.

    There's a separate number for the two of you guys, right?

A.  Right, that would be our office number.

Q.  All right.  So when this document is prepared, it goes to the file in the State's Attorney's Office, right?

A.  Yes.

Q.  And the State's Attorney who is going to follow the case in court can make a phone call to the police officers who were involved in the investigation for follow-up purposes, right?

A.  Yes.

Q. For example, if there is a need for testimony from a police officer, the State's Attorney is going to dial the number on the form, right?

A. Yes.

Q. And on the form that's in evidence as Plaintiff's 19-I, there's only one phone number that can be dialed, right?

A. Yes.

Q. And that's the number for Mr. Guevara and Mr. Gawrys?

A. Yes.

Q. Now, did you testify, to the best of your recollection, at any point in the trial of Jacques Rivera for killing Felix Valentin?

A. No, I did not.

Q. Would it surprise you to learn that Rey Guevara did testify in that trial?

A. Surprise me? No.

Q. Now, did you frame Jacques Rivera, Mr. Dorsch?

A. No, I did not.

MR. SOTOS: Objection, Judge. Objection, Judge, beyond the scope, relevant. Nobody claimed that.

THE COURT: Sustained.

BY MR. BOWMAN:

Q. Well, let me ask you this.

Did you ever hear at any point when you were spending your three hours working on this case that Orlando Lopez had

AR-L 619925

said that Jacques Rivera was the wrong guy, wrong guy?  Did you ever hear that?

A.  I never heard that.

Q.  Did you -- let me ask you this.

If you had done your reinterview, whatever you want to call it, of Orlando Lopez and you had learned that Orlando Lopez was saying, "Jacques Rivera is the wrong guy, wrong guy," what would you have done, sir?

MR. SOTOS:  Objection, asked and answered.  I covered that.

THE COURT:  Overruled.

BY THE WITNESS:

A.  If he said that, that would mean that's a bad identification.  It's not the guy.

BY MR. BOWMAN:

Q.  Would you have gone ahead with a lineup under those circumstances?

A.  No.  You're trying to get the actual offender.

Q.  Now, if you had -- would you have hidden that fact and not reported it?

A.  No, never.

Q.  Did you tell Orlando Lopez who to pick out from the lineup that you ran?

MR. SOTOS:  Objection, Judge, relevance.  Nobody made any claim of that.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 310 of 673 PageID #:100894
AR-L 619926
Dorsch - cross by Bowman

2734

THE COURT: I'm sorry. What was the objection?

MR. SOTOS: Relevance, beyond the scope. Nobody made any claim of that.

THE COURT: Overruled.

BY MR. BOWMAN:

Q. Did you tell him?

A. That -- repeat, please.

Q. Did you tell Orlando Lopez who to pick out from the lineup that you ran?

A. No.

Q. If you had learned that Orlando Lopez had been suggested to and persuaded that he should pick out Jacques Rivera from a series -- over the course of a series of identification procedures, including a photograph that was shown to him on August 27, gang books shown to him on August 29 --

MR. SOTOS: Objection, Your Honor.

BY MR. BOWMAN:

Q. -- a lineup that he --

MR. SOTOS: Objection, beyond the scope.

MR. LOEVY: Your Honor, scope objections were waived at this trial.

THE COURT: Well --

MR. SOTOS: No, I don't think that --

THE COURT: -- I'm going to overrule the scope objection. This is so compound, I don't know how anybody can

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 311 of 673 PageID #:100895
AR-L 619927
Dorsch - cross by Bowman

2735

possibly answer it.

MR. BOWMAN: Okay. Let me try it again.

BY MR. BOWMAN:

Q. If you had been informed that somebody had, in effect, put a thumb on a picture of Jacques Rivera in Orlando Lopez's presence suggesting who Orlando Lopez should pick, what would you have done?

MR. SOTOS: Objection, Your Honor, assumes facts not in evidence. No evidence of that.

THE COURT: It's a hypothetical. Overruled.

BY THE WITNESS:

A. If somebody put a thumb on a photo, immediately throw that person out of the room, as it was suggestive of who they wanted someone to pick out. I don't want -- I only want the witness to pick out the offender.

BY MR. BOWMAN:

Q. Do you have any information about a circumstance in which Rey Guevara suggested to a witness in the course of a photo identification who he should -- who that witness should pick out?

MR. SOTOS: Objection, Your Honor, beyond the scope.

MR. BOWMAN: Mr. Loevy responded to that. We had a mutual understanding. I thought that scope objections --

THE COURT: I think you're going to have to come to the sidebar, because I don't know what we're doing.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 312 of 673 PageID #:100896
AR-L 619928
Dorsch - cross by Bowman
2736

(Proceedings heard at sidebar on the record:)

MR. SOTOS:  Judge, these scope objections --

THE COURT:  Well, it's way beyond the scope.  There's no question about that.

MR. SOTOS:  And it's also -- for him to say the scope is waived, this is on redirect.  This is on a -- I'm sorry.  This is, like, not in their case.  They closed their case without putting on any 404(b) evidence and --

THE COURT:  I don't know.  Were scope objections waived?

MR. LOEVY:  Yes, they were.  And we had a mutual understanding.

MR. DAFFADA:  No, they were not.

MR. LOEVY:  We didn't let them -- we didn't have a problem when they broke into our witnesses and it's their exam --

MR. SOTOS:  It's not --

MR. LOEVY:  -- and it's mutual.  We said for this trial --

THE COURT:  Yeah, I -- you only have to say it once.

MR. LOEVY:  I'm sure on the trial it's waived.

MR. SOTOS:  So it's not mutual, because what happened was they didn't call him in their case.  So if they called him in their case, the agreement is then we waive scope objections so we don't have to then do it all over again in our case.  It

AR-L 619929
Dorsch - cross by Bowman

2737

doesn't go back and forth like that where they can take evidence that they didn't introduce --

THE COURT: Well --

MR. LOEVY: We wouldn't have waived -- we wouldn't have not called him if we didn't have an agreement to waive scope at this trial.

THE COURT: Yeah.

MR. SOTOS: Just so you know, Judge, it's going to lead to a one-hour cross. I'm not exaggerating.

THE COURT: Well, it's already going on and on and on.

MR. SOTOS: Well, but I'm just saying this one is going to lead --

MR. LOEVY: Your Honor --

MR. SOTOS: -- to a one-hour cross.

THE COURT REPORTER: Gentlemen, please.

MR. LOEVY: Your Honor, what's not fair here is he walked him through a very long exam --

THE COURT: Well, I don't need to know about it. I was here.

MR. LOEVY: Well, he said it was a very legit ID; it was a legit lineup. It was a legit lineup, legit lineup.

Now Mr. Bowman wants to ask him --

THE COURT: So what are we doing now?

MR. LOEVY: He wants to do two things. One, well, you -- "Mr. Sotos just asked you about what you knew at that

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 314 of 673 PageID #:100898
AR-L 619930
Dorsch - cross by Bowman

2738

lineup.  What about what -- the things that you didn't know about?"  That's not beyond the scope.

THE COURT:  Wait a minute.  Wait a minute.  Wait a minute.

I think the question was about Guevara.

MR. LOEVY:  Right.  You don't know either way whether Guevara was suggestive with the witness before that --

THE COURT:  We did that.  We did that.

MR. LOEVY:  Well, he was on his second question, and he objected --

MS. ROSEN:  No, no, no.

THE COURT:  No, no, no, no.  We did it a whole -- we spent a half an hour on it like an hour ago, so --

MR. LOEVY:  And the second issue that's going to come up is he's going to testify that he had a reason to believe that Mr. Guevara did suggestive IDs because -- and the reason we didn't call him is because we had an agreement before the trial that's on the record --

THE COURT:  Wait.  You've told me that six times.

MR. LOEVY:  All right.  So that's what we -- that's the only other area left.

THE COURT:  What is the area?  Tell me the area.

MR. LOEVY:  Mr. Dorsch is going to say that he did observe Mr. Guevara doing suggestive things.

THE COURT:  In this case?

MS. ROSEN:  No, no.

MR. BOWMAN:  No, in another case.

MS. ROSEN:  404(b).

MR. DAFFADA:  It's one of the 404(b)s --

MR. BOWMAN:  This is one of the 404(b)s that you allowed, Judge.

MR. LOEVY:  So we deferred it --

MR. SOTOS:  Which -- which --

MR. LOEVY:  -- because we have a scope waiver.

MR. SOTOS:  Well, they didn't defer it, Judge.

MR. LOEVY:  Yes, we did.

MR. SOTOS:  They didn't ask about it during their case.

THE COURT:  I'm going to have to --

MR. SOTOS:  They said they closed --

THE COURT:  I'm going to have to tell the jury that both sides are calling the witness.  That's what I'm going to have to do.

MS. ROSEN:  Well, then, Judge, if that's -- if that's still an open question, then we need to know that.  We don't have to decide it right now, but we need to know that going forward.

THE COURT:  Well, you better tell me if it's going to be for any other witnesses, because I didn't know this was coming.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 316 of 673 PageID #:100908
AR-L 619932
Dorsch - cross by Bowman
2740

MS. ROSEN:  Neither did we.

MR. SOTOS:  We didn't either.  That's why we stayed away from it, Judge; otherwise, I would have brought it up.

MR. LOEVY:  We made our decisions based on a pretrial agreement --

THE COURT:  I'm telling you that if you want to do this again with some other witness, you need to tell me.

MR. LOEVY:  All right.  Got it.

THE COURT:  How much longer is this going to go on?

MR. SOTOS:  Judge, I really will have an hour.  It's very complicated.

THE COURT:  All right.  We'll take -- we're going to take our break then.

MR. SOTOS:  It goes over the course of 20 years.

(End of sidebar proceedings.)

THE COURT:  Ladies and gentlemen --

THE COURT REPORTER:  Judge, I'm sorry.

THE COURT:  -- I think this is as good a time as any for a 10-minute break.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  So --

MR. SOTOS:  Can we have the witness step out, Judge? Oh, I thought you were going to address the issue --

THE COURT:  Well, I want to say something, but I don't

AR-L 619933
Dorsch - cross by Bowman

2741

think it's going to affect the witness.

Do you want me to tell the jury that as far as this witness is concerned, both sides are calling him for their own purposes?

MR. LOEVY: We would be agreeable to that.

MR. BOWMAN: That's fine.

MS. ROSEN: Well, for the record, we have an objection to this procedure.

THE COURT: I know you do. I know you do.

MR. SOTOS: Well, actually --

THE COURT: But there's a -- there's a cat fight about what agreements you reached.

MR. SOTOS: But there's not. There's not.

THE COURT: Well, I know you say --

MR. SOTOS: He just talks really fast. There's no agreement --

THE COURT: Yeah, that's --

THE COURT REPORTER: I'm sorry.

THE COURT: That's what you say, Mr. Sotos.

MR. SOTOS: He's not saying there's an agreement, Judge.

MR. LOEVY: I'm saying what's on the record. We had -- at the pretrial conference, we said we're going to have -- not have scope objections, and both sides are going to be able to go into each other's witnesses.

AR-L 619934
Dorsch - cross by Bowman

2742

I'm saying it's on the record. I'm not saying me and Mr. Sotos has a secret understanding.

THE COURT: Well, I don't have the record with me.

MR. SOTOS: When you see -- when you see the pretrial, you'll see --

THE COURT: Okay. So I don't want to hear it again --

MR. SOTOS: Okay.

THE COURT: -- because I heard it over there for 15 minutes.

MR. SOTOS: Okay.

THE COURT: I asked you what you want me to tell the jury, if anything, and you're not responding to me, so forget about it. Ten minutes. I won't say anything.

MR. SOTOS: We would appreciate it if you would tell the jury, then, that both sides are calling witnesses --

MS. ROSEN: This witness.

MR. SOTOS: This witness.

MR. BOWMAN: This witness.

MR. SOTOS: Assuming that they won't be able to keep doing it, but for this witness, we'd appreciate if you would say that.

THE COURT: All right.

(Recess.)

AR-L 619935

THE COURT: Okay. Are we ready?

So it would be very helpful if I knew what witnesses were coming and which witnesses the plaintiff claims are subject to this kind of examination so I don't get surprised by it again.

MR. BOWMAN: Okay.

MS. GOLDEN: So, Your Honor, I think that we don't agree to waive scope in our case. If they have any other witnesses they want to call, they should call them before they close their case.

THE COURT: What does that mean?

MS. GOLDEN: That means that we have not agreed to waive scope in our defense case. If their case is still open, if they intend to call any witnesses in their case, they have a chance to do that.

THE COURT: Well, are you assuming that I didn't just rule that I am going to allow this with this witness?

MS. GOLDEN: Other than this witness.

THE COURT: Oh, okay. All right. Well, we'll have to deal with -- okay. We're ready.

(Jury in.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, both sides are calling Mr. Dorsch for their own reasons, as if they were calling Mr. Dorsch in their case. We're doing just what we did with the

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 320 of 673 PageID #:100904
AR-L 619936
Dorsch - cross by Bowman
2744

police officers throughout.

So with that, Mr. Bowman, why don't you go ahead.

MR. BOWMAN:  Thank you, Your Honor.

BY MR. BOWMAN:

Q.  Just one question more before we leave the subject.

To be clear, you don't know one way or another whether anybody did or didn't do anything suggestive to indicate to Orlando Lopez who he should pick out before you started dealing with him; is that fair?

A.  No, I don't.

Q.  Now, do you, sir, have information that Rey Guevara on a different occasion engaged in suggestive practice?

A.  Yes.

Q.  And can you, to the best of your ability, tell us when it was that this event that you recall happened?

A.  It would have been before he was meritoriously promoted to detective.  He was still in Gang Crimes.  It was an event that happened after this case.

Q.  And can you approximate how close in time it was to this case?  Just to the best of your ability.

A.  Oh.  This is in '88.  I believe this was in '89.  And to the best of my recollection, it would have been around Mother's Day of '89.

Q.  All right.  When this event that you recall occurred, who was present?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 321 of 673 PageID #:100905
AR-L 619937
Dorsch - cross by Bowman

2745

A.   This was a different case totally.  It was Detective -- I mean, Gang Crimes Specialist Guevara and Gawrys came into our offices with two witnesses and another man, and they went into our office.  And similar to this case, my partner and I were assigned to assist them with a lineup.

Q.   And who was your partner at the time?

A.   To the best of my recollection, that, again, would have been John Boyle.

Q.   Okay.  And was there an identification procedure that you were involved in --

A.   Yes.

Q.   -- at that time prior to the lineup?

A.   Yes.

Q.   And can you tell us -- just tell us what happened.

A.   Arrived at work that evening.  There had been a homicide that was probably -- it was unsolved, maybe two, three months old.  Not much to go on.  Person had been shot in a car with a young girl with him in the car, a relative.  That person died.  And there was no other information about the offenders.  The only clue was that the offenders had shot at him from a large white car.

And -- continue?

Q.   And so did it come about that on the particular occasion that you're recalling, Gang Crimes Specialist Guevara appeared in your office with a witness -- or with a couple of witnesses?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 322 of 673 PageID #:100906
Dorsch - cross by Bowman
2746
AR-L 619938

A.   Yes.   Both Gawrys and Guevara arrived at Area 5 with these two young teenage -- I remember they were still teenagers, younger, 15, and an older man who stayed in the lobby, and we were informed by our sergeant to assist with a lineup related to that unsolved homicide.

Q.   And prior to the lineup, was there a photo spread that was shown to the witnesses?

A.   Yes.

Q.   And can you tell us what happened during that procedure?

A.   We were able to obtain a photo of a person who owned a large white car.  That information came from the two juveniles who said they had witnessed the shooting, but for two or three months had never approached the police, yet they claimed to have written down the license plate number on a piece of paper. And when stopped by Detective Guevara that night, they told him that they had witnessed it and gave him the piece of paper, which they evidently still had on them, and brought them into the office where we did our lineup.

Q.   And then --

A.   A photo -- excuse me, a photo lineup was conducted.

Q.   And what happened during the photo lineup?

A.   Well, to do it fairly, brought the two young boys -- and Detectives Guevara and Gawrys came in with me and Boyle -- into a larger meeting room.  I placed the photo of the person who owned the white -- large white car amongst the group of maybe

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 323 of 673 PageID #:100907
AR-L 619939
Dorsch - cross by Bowman

2747

five or six other photos onto a table.

I called only one boy up to the table the first time, gave him the same instructions as I said in the other case, where, "Just because you're here and gonna look at a photo doesn't mean that the offender is in this group of photos. So don't feel you have to pick out somebody."

The photos were on the table. And the second young man stayed in the back so he couldn't see the photos. And Detective Guevara came up with the one young man. And the young man started looking at the photos, and he was looking and looking, and time passed. And I wasn't pushing him to pick out a photo. Like I said, I want him to be certain. I don't want him to guess. I don't want it -- him to make me happy. I only wanted to know if he could make a positive I.D.

And, like I said, he wasn't picking out anybody and then, suddenly, Mr. Guevara reached out, put his finger on a photo and said, "That's him," and the young man immediately said, "Yes, that's him." And I told Detective Guevara, not knowing why he had done that, to get out of the office, and I told the young boy to get out of the office also.

I then mixed up the photos, called the second young man up. He looked at the photos and he could not identify anybody.

So then I went out and talked to Detective Guevara and the young boy.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 324 of 673 PageID #:100908
AR-L 619940
Dorsch - cross by Bowman
2748

Q. And as a -- was there a lineup that occurred subsequent?

A. Yes.

Q. What happened in that lineup?

A. Well, it was the next day, because at -- the photo array had been later in the evening, and we had to go out and pick up this young man whose photo we had.

So after Sergeant Mingey, John Boyle and myself went out and found a white car with the license plate number and brought that young man into the station, and informing him that he would have to stand in a lineup, we set about having separate interviews -- I mean, separate lineups for the two boys.

Q. And what was the result of the lineup?

A. Well, the young man who had the assistance of Detective Guevara positively identified the subject in a lineup as the person that he had seen shooting and in that car the night the murder happened.

He left the room. The second lineup happened, and the young man who couldn't identify anybody could not identify anybody in the lineup.

Q. Now, following these events, do you know if charges were brought against the young man whose license plate and white car had resulted in his being brought in?

A. Well, we were -- I'll say not "we." I'll -- I was not happy with the way this happened. It was not an identification

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 325 of 673 PageID #:100909
AR-L 619941
Dorsch - cross by Bowman

2749

that I perceived as fair. I didn't know why Detective Guevara had put his finger on the photo. But I had to run it past Felony Review, and they said, basically, "You had a photo I.D., you had a lineup I.D. Charge him."

So we set about charging him. Sent the kids home. Guevara and Gawrys left, and me and my partner were sitting there thinking about what we have to do now, because we had put the kid in the lockup.

The father of the young man came in, and we had some conversation with him. And he wanted to know what he should do, and I told him merely to go to court the next day. Don't get an attorney. And I told my partner, we're gonna go pick up those two young men again, and we went out and picked them up.

Then the next morning, individually, basically, laid it on them, do you -- we have trouble with the identification. I don't know that it was really you or Detective Guevara for whatever reason picking him out, but I have trouble with the identification. What we don't want is to put an innocent person in jail. Okay?

And each boy independently said that they were approached by Detective Guevara and the older boy -- the older man that was in the lobby and told that they wanted their help in identifying this kid in this homicide. They never saw the murder.

Q. Now, after you obtained this information, what further

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 326 of 673 PageID #:100910
Dorsch - cross by Bowman
2750
AR-L 619942

step, if any, did you take?

A.   We took the kids immediately down to Branch 66, presented them to the state's attorney assigned the case.  I informed him about what had happened and that these kids had never seen that homicide, and it would be most important to get this kid released today, because once that kid got into the system, I don't know how long it would take, how long he would stay in jail before he could be released.

Q.   Do you have an understanding --

A.   So --

Q.   -- of what happened?

A.   Yes.  He was -- well, we left there with the word of the state's attorney that he was going to go to the Felony court and have him released.

We returned the two kids home, and me and my partner then drove back to our office; at which time, we were confronted by the office staff, our supervisors who already had been apprised of the fact that we had gone to court and gotten this kid released.

Q.   Now, without going into that conversation, let me ask you this.  Did you at any time approach Mr. Guevara's supervisors and inform Guevara's supervisors about what you had witnessed?

A.   No.

Q.   Why didn't you do that?

A.   Two reasons.  One, I didn't know why anyone would do what

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 327 of 673 PageID #:100914
Dorsch - redirect by Sotos
2751

AR-L 619943

he did. I'd never seen it before. But you didn't have to be a policeman to know that it was the wrong thing to do.

And number two, I would report it only to my supervisors because it's -- like I said, we're like the military. He was in a different unit, a different location. It would be more their job to approach his boss than it would be my job to approach his boss.

MR. BOWMAN: All right, sir. I have no further questions. Thank you.

THE COURT: Okay. Mr. Sotos.

MR. SOTOS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SOTOS:

Q. Mr. Dorsch, I'm going to ask you a few questions about this case and then I'm going to ask you some questions about the case you just talked about. Okay?

A. Yes.

Q. You were asked by Mr. Bowman a couple times on -- when he examined you about Rinaldi, Sergeant Rinaldi, your supervisor, telling you to do a lineup.

Do you recall that?

A. Are we talking about the other case first or --

Q. We're talking -- right now, we're talking about this case --

A. Okay.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 328 of 673 PageID #:100952
AR-L 619944
Dorsch - redirect by Sotos

2752

Q. -- the jury's here to decide. Then I'm going to ask you some questions about the other case that you just talked about.

A. On the --

Q. Okay.

A. On --

Q. So do you --

A. Yes. On the Rivera case. So we were -- apparently from the report, we were asked by Sergeant Rinaldi to do a lineup.

MR. SOTOS: Okay. So can you put 23-H on the screen, please? Page 2.

BY MR. SOTOS:

Q. Can you tell me where it says that Sergeant Rinaldi asked you to do a lineup?

A. Well, we're assigned the case.

Q. Right. It says that you were assigned to continue the investigation, correct?

A. Which took us three hours and it only entailed a lineup.

Q. Yeah, but that's different from saying that Sergeant Rinaldi told you -- well, strike that.

It only took three hours because you called the State's Attorney's Office to charge the case after the lineup, correct?

A. Well, it would have been after a positive identification that the State's Attorney's Office would have been called, yes.

Q. But if you weren't -- nobody told you you had to seek

AR-L 619945

felony murder charges, correct?

MR. LOEVY: Objection, Your Honor. You know, this was covered the first time. Nothing new on that.

THE COURT: Overruled.

BY THE WITNESS:

A. Nobody told me, but it's -- it's part of my job description. It's a format and policy and what we follow. And once you have the identification, we would then contact Felony Review.

BY MR. SOTOS:

Q. So no matter what the circumstances, once you get the identification, you're going to seek murder charges no matter what else you know?

MR. LOEVY: Objection, asked and answered, Your Honor.

MR. SOTOS: Just following up, Judge. Just following up on his answers, Judge.

THE COURT: I don't know where -- whatever else you know, I -- I don't -- I think that that question is really problematic given the answers the witness has already given.

BY MR. SOTOS:

Q. Okay. Well, you knew that there had been prior investigation into the case, correct?

MR. LOEVY: Objection, asked and answered, Your Honor. I mean, this was covered.

MR. SOTOS: This is all --

AR-L 619946

THE COURT:  Overruled.

MR. SOTOS:  -- follow-up to what Mr. Bowman --

THE COURT:  Overruled.

MR. SOTOS:  -- covered.

BY MR. SOTOS:

Q.  I mean, you knew that there was prior investigation?

A.  I would assume -- I would assume that I would have known there was prior investigation.

Q.  So you knew that Detective McLaughlin and Detective Leonard left you with an open investigation, correct?

A.  Well, I knew it was opened.  There -- you're bringing them into it.  They had no -- they didn't assign it to me.

Q.  You knew from the reports that they were trying to get Mr. Rivera and Mr. Rodriguez into a lineup, correct?

MR. LOEVY:  Objection, Your Honor.

THE COURT:  Sustained.  I think the witness testified that he doesn't remember what reports he saw.  So, so --

BY MR. SOTOS:

Q.  Hypothetically, if the reports were in the file, if you had the reports, you would have known that Detective McLaughlin and Detective Leonard were trying to get Mr. Rivera and Mr. Rodriguez into a lineup, correct?

MR. LOEVY:  Objection, Your Honor.  It's not even what the reports say, and it's not relevant.

MR. SOTOS:  Well, I can read through the reports

AR-L 619947
Dorsch - redirect by Sotos

2755

again.

THE COURT:  I think that would be useful so we know what we're talking about.

MR. SOTOS:  Can you put the September 1st report up, please.

MR. LOEVY:  Your Honor, the objection is that it's two weeks earlier.

MR. SOTOS:  Judge, he's giving testimony.

THE COURT:  Wait, wait, wait, wait.  The objection is that it was two weeks earlier.  That objection is overruled, unless I know what Mr. Sotos is going to be asking.

MR. LOEVY:  All right.

BY MR. SOTOS:

Q.  Can you look at page 2 of the report and tell me -- well, do you need to read it?  Do you know as you sit here today, as you prepared for your testimony, that the reports indicated that Detective McLaughlin and Detective Leonard were trying to get Mr. Rivera and Mr. Rodriguez into a lineup on August 31st?

THE COURT:  This we've been well over.  There's no question in my mind that we've been talking about this in your examination.

MR. SOTOS:  Well, I didn't hear.  Objection sustained, then, or --

THE COURT:  Well, Mr. --

MR. BOWMAN:  I'm sorry.  I didn't articulate an

AR-L 619948
Dorsch - redirect by Sotos

2756

objection.

THE COURT:  Mr. Bowman was on his feet.

MR. SOTOS:  All right.

MR. BOWMAN:  Objection.

BY MR. SOTOS:

Q.  Okay.  Well, you said that when -- well, all right.  Let me ask you this way.

Did you call Detective McLaughlin or Detective Leonard and say, "Should we charge this case?"

A.  No.

Q.  You could have if you had an issue, right?

A.  If there was a question or issue, I'm sure I would've.

Q.  You knew you didn't -- you only had the case on the one day for the three hours that you've described, right?

A.  Correct.

Q.  And so if you had any issues, you could have called Detective McLaughlin and said, "Is there any other issues that should hold us up in charging this case," correct?

A.  If I felt a need to, I'm pretty sure I would've.

Q.  And you didn't?

A.  I guess I didn't feel the need to.

Q.  And then you -- you know, you kept -- Mr. Bowman kept asking you about it was just three hours, and you said, "Well, I could have gone off on another investigation.  I don't know."

Well, you know that didn't happen, right?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 333 of 673 PageID #:100917
AR-L 619949
Dorsch - redirect by Sotos
2757

A.   No, I don't know.

Q.   Well, you've looked at the reports.  You submitted --
didn't you have to stick around and talk to the Felony Review
assistant after you did the lineup?

A.   I don't know.

Q.   Is that something that, based on your practice, you would
do?

A.   Partners, at times, split up.  I mean, I've done more than
one homicide investigation in an evening.  I've been taken off
of a case and sat out on a -- one that just occurred.

Q.   But you don't have any reason to think that that happened
on this day, do you?

A.   No, I don't have any recall.

Q.   So again, going by practice --

     MR. LOEVY:  Objection, Your Honor, asked and answered.

     THE COURT:  Sustained.

BY MR. SOTOS:

Q.   You submitted the report that you signed.  You submitted
that at 11:00 o'clock at night, right?

A.   I have no idea when it was submitted.

Q.   Okay.

     MR. SOTOS:  Can we put up Defendants' 23-G, please.
No, that's not the one.  23 -- this is Defendants' 1.1.

BY MR. SOTOS:

Q.   Okay.  Do you see the -- this is your supp. report,

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 334 of 673 PageID #:100918
AR-L 619950
Dorsch - redirect by Sotos
2758

correct?  The one we talked about before with your signature on it?

A.  Yes.

Q.  11:00 -- do you see the time?  It's 11:00 o'clock at night, right?

A.  Yes.

Q.  All right.  You reviewed those reports getting ready for your testimony, right?

A.  They were sent to me, yes.

Q.  So you know you didn't go off on any other assignment after 7:30, correct?

A.  I don't know that.

Q.  Even after reviewing the report, you don't know that?

A.  No.

Q.  Because you don't remember?

A.  Well, it's -- no, I don't know.

Q.  Does the report suggest to you, based on your practice, that if it was submitted at 11:00 o'clock at night, that you probably didn't go off on some other investigation or some other assignment after seeking felony murder charges against Mr. Rivera?

A.  I don't know.

Q.  Let's talk about this other case.

Did you testify on direct examination that the man in the station, you heard a conversation between him and Mr.

Guevara about wanting help?

A. That I said I heard it?

Q. Yes.

A. From them? You mean them talking about it?

Q. From anybody.

A. It was from the young men that were brought in as witnesses.

Q. So what is it that you heard them say?

A. They said, the next morning when we picked them up, that they had not witnessed that shooting at all; that they were stopped and they were asked to assist Detective Guevara and this man in identifying someone and putting a murder case on him, and that they were offered money to do so.

Q. So you've testified about this case several times, haven't you?

A. I have testified eight times in court and in depositions about this case.

Q. That many times? Eight times?

A. Yes.

Q. I wasn't aware of that.

And haven't you previously testified that the man who was in the police station, the witnesses said that he bribed them to make -- to identify the witness by giving them money or other things?

A. That's what the two young boys said, yes, and I've --

AR-L 619952

Q. Did you --

A. -- testified to that.

Q. You didn't say that during direct examination this morning.

MR. LOEVY: Objection, Your Honor. He's answering questions and --

THE COURT: Overruled.

BY THE WITNESS:

A. I don't know that it was asked.

BY MR. SOTOS:

Q. Okay. So --

MR. SOTOS: One second.

(Counsel conferring.)

MR. SOTOS: Do we have one for the judge?

MS. GOLDEN: I think so.

BY MR. SOTOS:

Q. Mr. Dorsch, this is a demonstrative, Defendants' Exhibit No. 1 -- Defendant's Demonstrative No. 1.

So this is the chronology about this incident that you've described, did you say, eight times?

A. I believe it's eight times.

Q. It's more than I was aware of, but --

MR. LOEVY: Objection. He said that. It wasn't a question either time.

BY MR. SOTOS:

Q. So you said that this happened in 1989, right? '88 or '89?

A. Eventually, I came to believe it was 1989 because it happened when Guevara was still in Gang Crimes and he was meritoriously promoted a few months after.

Q. So that's how you were able to place it in time by virtue of the fact that you know he was a Gang Crimes detective at the time and not a -- a Gang Crimes specialist and not a detective at the time the incident occurred?

A. Yes. And, as you said, that he would have needed a detective to run the lineup.

Q. And in the incident that happened in '89 or so -- I mean, are you sure it's '89 or around '89?

A. I believe it was '89.

Q. And you didn't report it to your superiors, correct?

A. I certainly did.

Q. You did?

A. Yes.

Q. Who did you tell?

A. Just about everybody who wanted to hear it.

Q. So you -- you've never testified that you didn't report it because it was a career ender?

A. I didn't --

MR. LOEVY: Objection. That's improper impeachment. You know, what testimony? What was the question?

THE COURT: Wait. Is this -- you're aware or you have evidence that this witness made the statement?

AR-L 619954

MR. SOTOS: Yes. I'm asking him if he ever said that.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Did you ever testify that you didn't report it because it was a career ender?

A. I felt -- I didn't know why he had done what he did. It troubled me. And I reported it to my supervisors and anybody else who wanted to hear about it. People knew I was angry.

But I did not go to his unit because I didn't feel like, in my own mind, I knew why he did it, was a stupid thing to do. Was it just a mistake? Was it a random action? I don't know. I didn't know at the time what the purpose was, so I did not think I wanted to destroy a man's police career by making an improper accusation.

Q. So then you didn't report it?

A. I reported it to my office.

Q. Because you did think it was a big deal?

A. Only because I know that their -- it would be their responsibility to pass it on. My responsibility was to keep an innocent man out of jail.

Q. Didn't you just say you didn't report it because you didn't want to interfere with a man's career?

MR. LOEVY: Objection --

BY THE WITNESS:

A. No.

AR-L 619955

MR. LOEVY:  -- Your Honor.

THE COURT:  I think there's some confusion, maybe.

MR. LOEVY:  It's also asked and answered.

THE COURT:  Well --

MR. SOTOS:  Okay.  Well, let me --

MR. LOEVY:  We covered it.

MR. SOTOS:  -- ask it --

THE COURT:  -- I think it's gotten --

MR. SOTOS:  -- straightforward.

THE COURT:  -- very confusing.

BY MR. SOTOS:

Q.  Did you testify that you didn't report it because you didn't want it to interfere with Mr. Guevara's career?

A.  Well, there's a big action that would've had to have taken place before my accusation, not knowing why he had done it, became an administrative complaint against him, I guess.

Q.  So you did report him or you didn't?

A.  I talked to the people in my office and told them what happened with that, and that's why I went and did what I did.

Q.  So who did you talk to?

MR. LOEVY:  Objection, Your Honor.  This really has been covered.

MR. SOTOS:  It hasn't at all, Judge.

THE COURT:  Overruled.

MR. SOTOS:  It hasn't been at all.

AR-L 619956

BY MR. SOTOS:

Q. Who'd you talk to?

A. Whomever was present the night of the -- after the young -- well, we wouldn't have talked to him that night because I wasn't sure what action we were gonna take until after the father came in and we decided to go to court with the young boys the next day. We had to take them anyway, but we were gonna pick them up.

But after we returned from court, my office supervisors, including the commander's office and probably the commander -- and this was, again, 1989. Whatever people were working days the next day were waiting --

Q. Who?

A. -- for me and my partner.

Q. Who? Who?

A. Well, it would've been Jim Fruin. Okay? He was a commander at that time in '89. But I don't have a vivid memory of him. But I can tell you what was said to me.

Q. But you're not sure if that's who you talked to?

A. I wasn't -- I didn't come back to talk to anybody about it. They approached me when I returned after dropping off the kids the next day.

Q. You're not sure who they are. You mentioned a person by name --

A. It was the office -- it was sergeants, lieutenants, but I

don't recall anymore.

And the reason I hesitate, it's 30 years ago. And if I make one mistake and name a wrong person, then my credibility will -- they will say is no good. So rather than do that, I will be honest and say I don't remember all that were there.

Q. Thank you. That's all I was asking you.

A. Yeah.

Q. So you don't remember all that were there. Do you remember anybody specifically that you reported this to?

A. Within the group, I can tell you the response in the question.

Q. I'm just asking if you remember any specific person that you reported it to. If you can give me a name, great. If you can't --

THE COURT REPORTER: Mr. Sotos, I'm having a hard time hearing you.

MR. SOTOS: Oh. Because I'm behind this -- I'm sorry.

MR. LOEVY: But, Your Honor, we do object, asked and answered. I mean, he's asked him multiple times.

THE COURT: I don't think there's been an answer to this question.

MR. LOEVY: All right.

BY THE WITNESS:

A. Okay. In all the times that I have talked about this incident, and the many times that I have testified about this

AR-L 619958

incident, for the same reason I just stated, rather than make one mistake and identify the wrong person, I have always said I don't recall, because I really don't recall exactly who was there, but I remember what was said to me.

BY MR. SOTOS:

Q. One of the reasons you don't recall is because it was so very long ago, correct?

A. Yes.

Q. All right. So let's talk about that.

You retired from the police department --

MR. SOTOS: I'm sorry. I keep stepping behind.

BY MR. SOTOS:

Q. You retired from the police department in 1994, correct?

A. That is correct.

Q. Okay. And you didn't bring this up to anybody until late 2010-2011, correct?

A. To anybody within the police department or are you talking about when I --

Q. Anybody.

A. Of course, everybody knew about it.

Q. Everybody who?

A. Well, everybody who cared, every -- I mean, we talked about it.

Q. Who?

A. People I worked with, my partner and others.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 343 of 673 PageID #:10092O7
AR-L 619959
Dorsch - redirect by Sotos
2767

Q.  Who was your partner?

A.  John Boyle.

Q.  John Boyle --

A.  Yes.

Q.  -- knew about this?

A.  Yes.  He was with me the whole time.

Q.  All right.  Now, you do agree that you previously testified that it was somebody else who was with you named Bill Johnston, correct?

A.  Yeah.

MR. LOEVY:  Your Honor, if we could get a page and a line for impeachment?  It's not fair to say --

MR. SOTOS:  Just I'm asking what his recollection is about his testimony.

THE COURT:  Well, if you're going to be -- I don't know what you have in your hand, but you have something in your hand, and it's normal to tell the other side what page -- what it is and what page and line.

MR. SOTOS:  But I'm not trying to impeach him, Your Honor.  I'm just asking him --

THE COURT:  All right, all right.

MR. LOEVY:  Well, we had just -- we'd just ask that he not ask about testimony unless he shows us the testimony, because, otherwise, we --

THE COURT:  There's no such rule.  As long as there's

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 344 of 673 PageID #:100928
AR-L 619960
Dorsch - redirect by Sotos

2768

not going to be any kind of impeachment.

BY MR. SOTOS:

Q.  Have you previously testified that the person who was with you that night was Bill Johnston, a different partner of yours?

A.  Like I said, I've talked about this eight times in court and depositions, and I had a hard time in the beginning trying to remember which partner I would have been working with at the time that had occurred, because I did have several partners over the years.

Q.  So you thought it was Bill Johnston at one point and then you later decided it was -- you concluded it was John Boyle?

A.  That's correct.

Q.  And anybody else know?

A.  Sergeant Mingey knows.  Him and I talked about it very many times in the last couple years when I would meet with him for coffee.

Q.  Okay.  And you talked to representatives of Northwestern about this, correct?

A.  Yes.

Q.  And so we talked during your direct examination about your meeting with Jane Raley from Northwestern in 2010-2011, in that time period, correct?

A.  I'll accept that.

Q.  Okay.  And in the 16 years before that meeting, after you retired, had you told anybody about this incident?

AR-L 619961

Dorsch - redirect by Sotos

2769

A. I was living -- I moved to northern Wisconsin.

Q. Yeah. But I'm just -- that's not my question --

A. And I wasn't --

Q. -- sir.

A. I wasn't --

Q. Sir, my question is, did you tell anybody in the intervening 16 years?

And if you have a reason for it, that's fine. We can go into that. But I'm just asking you now, did you tell anybody?

A. Anybody within family, police department, friends, things like that? A lot of those people know.

Q. Did you report this to anybody in those 16 years?

A. I was long gone from the police department.

Q. So the answer is no?

A. No, I didn't.

Q. Thank you.

In 2010 or 2011, you had a meeting with Jane Raley from Northwestern in which you were trying to bring her another case in which you've added that that person was exonerated, correct?

A. No, he has not been exonerated. I'm still working on it 12 years later.

Q. All right. That's good. But you had a meeting with Jane Raley at Northwestern --

AR-L 619962
Dorsch - redirect by Sotos

2770

A.  Yes.

Q.  -- because you were trying to bring her a case?

A.  Well, it had already been with Northwestern, but it was with Dave Protest that I first brought it to and then he stepped aside.  It went --

Q.  Were you --

A.  -- to another attorney after that, not from Northwestern. I was not happy with the way the case was being pursued, and I believed in the young man's innocence, so I decided to take it and I met with Jane Raley at Northwestern where I had never been before.

Q.  All right.  And so you weren't happy with the way David Protest was handling the case, and you wanted to see if Jane Raley and Northwestern would do it?

A.  Correct.

Q.  All right.  And so when you met with her, she told you she was working on cases involving Detective Guevara, correct?

A.  After we got done talking about the case I brought, she mentioned that -- she says, "Do you know Detective Guevara?" And I said, "Of course I do."

Q.  And you asked her, in fact, if she was working on any cases that you were involved in, correct?

A.  She told me they had a specific -- first, I believe she said, "We have a case that involves Detective Guevara, and your name is in that" -- "in the reports as being involved, too.

AR-L 619963

Would you like to talk about it?" And I -- she may have mentioned the name right off. I don't remember. But she said, "Would you" -- "Would you agree to talk about it?" And I said, "Certainly."

Q. So then --

A. And she showed me reports.

Q. She showed you some of the reports that we looked at --

A. She --

Q. -- during your testimony --

A. Yeah, she showed me --

Q. -- correct?

A. -- some reports.

Q. Okay. And during that same conversation, you decided to tell her about this other incident involving Mr. Guevara, correct?

A. Yes.

Q. Okay. And that was in late 2010, early 2011?

A. Correct.

Q. And then after that meeting, you started doing work for Northwestern, private investigative work, correct?

A. I was asked to do two cases, maybe three. The two major cases, like you said, ended in exonerations.

Q. And you're aware that Ms. Raley prepared notes from your meeting with her in your -- well, you know what? From a different meeting. Hold on. Hold on one second.

AR-L 619964

Dorsch - redirect by Sotos

2772

And then are you aware that Mr. Rivera filed suit in this case in June of 2012?

A.  Did -- Mr. -- in this case?

Q.  In this case.

A.  No, I wasn't aware.  I wasn't even aware there was a lawsuit when I talked to her the first time.

Q.  Well, when you talked to her the first time, there wasn't a lawsuit.

A.  Okay.  Yes.

Q.  The lawsuit --

A.  Yes.

Q.  -- was filed sometime over a year after that.

A.  Okay.

Q.  And you talked about conversations with Ed Mingey.  You actually talked to Ed Mingey about why it was that you weren't sued in this case, right?

A.  It had been one of our many conversations where we met for coffee that came up.  He asked me why I was not sued in this case.

Q.  All right.  And I think you've -- hold on one second, please.

        I think you've testified that he rightfully asked you whether -- why --

A.  Yes.

Q.  -- they were sued and you weren't.

AR-L 619965

A.  Yes.

Q.  Because you were expecting that you would be sued --

A.  I would --

Q.  -- correct?

A.  I would not have been surprised.

Q.  Okay.  But you had already had the meeting with Ms. Raley in which you disclosed the other incident involving Mr. Guevara, correct?

A.  Yes.

Q.  And then several months after that, the filing of this lawsuit, in January of 2013, you had a meeting with representatives of Northwestern about the allegations that you had brought forward about Mr. Guevara, correct?

A.  I don't recall.

Q.  You don't remember that?  Maybe I can show you something to refresh your recollection.

I'm showing you what's been marked as Defendants' Exhibit No. 76.  Ask you to take a look at that briefly and see if it refreshes your recollection.

MR. LOEVY:  What exhibit number is it?

MR. SOTOS:  76.

BY THE WITNESS:

A.  Oh, Jenner & Block, yes.

BY MR. SOTOS:

Q.  Pardon?

AR-L 619966

A.   Jenner & Block.  I recall that meeting.

Q.   You met at the law firm of Jenner & Block in down -- not too far from here, correct?

A.   I guess it was at their request, yes.

Q.   And the purpose of that meeting was to discuss the allegations that you had brought forward in your meeting with Jane Raley in 2010 and 20 -- or late 2010, early 2011, correct?

A.   What their purpose was, I don't know.  I just know that I was asked to come, and I came.  I don't know what their purpose was.

Q.   You didn't know what their purposes were during the meeting?

            MR. LOEVY:  Objection, asked and answered.

            THE COURT:  Overruled.

BY THE WITNESS:

A.   That's not -- that's not what I said.  I says I was requested to come to the meeting, but I didn't -- they didn't state to me specifically who was going to be there or what.

BY MR. SOTOS:

Q.   But you had an understanding.  You knew what the meeting was about, right?

A.   They probably told me it was about Guevara, but I didn't know -- I didn't know Jenner & Block was even involved.

Q.   But you knew that the people you were meeting with, in addition to the people from Northwestern, back at that time

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 351 of 673 PageID #:100935
AR-L 619967
Dorsch - redirect by Sotos

2775

were working on cases involving Detective -- excuse me, Mr. Guevara?

A. Probably by that time, I did.

Q. Okay. And so you provided them the information that you remembered about the case back in -- what you thought was 1989 during that meeting, correct?

A. I don't recall what was discussed.

Q. And after that meeting, you testified in -- the meeting was in January of 2013. Is that what the --

A. Yes.

Q. -- notes indicate?

A. That's correct.

Q. Do you recall testifying in February of 2013 in a post-conviction petition which involved another case involving Mr. Guevara?

MR. LOEVY: If we can get the exhibit and the page?

BY MR. SOTOS:

Q. The *Solache/Reyes* case?

A. Yeah. I testified in that case, yes.

MR. LOEVY: If we could just get the exhibit and the page?

MR. SOTOS: And -- which exhibit is this?

(Counsel conferring.)

MR. BRUEGGEN: Exhibit 69.

MR. SOTOS: This is Defendants' Exhibit 69.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 352 of 673 PageID #:100936
AR-L 619968
Dorsch - redirect by Sotos
2776

BY MR. SOTOS:

Q.  Sir, I'm going to show you what's been marked as Defendants' Exhibit No. 69.  Ask you to look at it --

A.  Thank you.

Q.  -- quickly and tell me if it refreshes your recollection as to what it is.

A.  It's related to the *Reyes* and *Solache* case, and I do recall that I testified in court.

Q.  Thank you.  And, again, that was on February 14th, 2013, correct?

A.  That's what it says.

Q.  Okay.  And then --

MR. SOTOS:  Your Honor, could I have one second?

THE COURT:  Sure.

(Counsel conferring.)

BY MR. SOTOS:

Q.  And, sir, I'm now going to show you what's been marked as Defendants' Exhibit No. 68 and tell me if you recognize that.

A.  Yes.

Q.  What do you recognize that to be?

A.  It is the *Serrano* and *Montanez* case that I testified in, also.

Q.  So you testified in February of 2013 and May of 2013, two different cases over in the Circuit Court of Cook County about this same incident that you've described here, correct?

AR-L 619969
Dorsch - redirect by Sotos

2777

A.  Yes.

Q.  And that's the only incident you really testified about in both of those cases, correct?

A.  I don't recall.

Q.  And was it your understanding through your meetings with Northwestern that people were trying to find out, like, which case it was that you were talking about?  They were trying to find the file, right?

A.  As was I.

Q.  Okay.  You couldn't find it either?

A.  My requests went unanswered.

Q.  Your request to the police department?

A.  Yes.

Q.  And then in April of 2015, Northwestern gave you a file which they told you was the file that you had been talking about?  At least that's what they told you?

A.  That's what they told me.

Q.  And so you reviewed the file, correct?

A.  I did.

Q.  And what did you conclude after reviewing the file?

A.  It was total fabrication, mixing some of what I had said that were similar to what I had said, but there were too many things in there that were not correct to be the file in the case that I specifically was talking about.

Q.  So you concluded that the file that Northwestern said --

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 354 of 673 PageID #:100938
AR-L 619970
Dorsch - redirect by Sotos
2778

sent you was a different file?

A.   It was not the case that I was talking about in the incident where Guevara put his finger on the photo.  It was not that case 'cause there were too many discrepancies.

Q.   Right.  And --

MR. SOTOS:  Your Honor, could I have a minute, please?

THE COURT:  Yeah.

MR. SOTOS:  Thank you.

(Counsel conferring.)

BY MR. SOTOS:

Q.   So, sir, you concluded after reviewing that file that it couldn't have been the file that you were talking about because there were too many differences, right?

A.   Most definitely.

Q.   So you reviewed that file pretty carefully, correct?

A.   Yes.

Q.   And there were a lot of similarities, too, right?

A.   Yes.

Q.   Okay.  Let's talk about some of the similarities.

Fair to say that in both cases, the Jimenez file and the one that you were describing -- now, wait.  Before we get to that, in reviewing the Jimenez file, did you see that the State's Attorney's Office -- Cook County State's Attorney's Office actually interviewed the witness who you had said Detective Guevara pointed it -- pointed out a suspect to --

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 355 of 673 PageID #:100939
AR-L 619971                     Dorsch - redirect by Sotos

2779

MR. LOEVY: Objection, foundation, Your Honor. He's just testifying to things that happened.

THE COURT: Hold on a second. The question -- Mr. Sotos, could you just repeat the question, please?

MR. SOTOS: Sure.

BY MR. SOTOS:

Q. In reviewing the file that Northwestern sent you, did you see that the Cook County State's Attorney's Office had interviewed the witness who you had claimed Detective Guevara had pointed a -- pointed out a photo to?

MR. LOEVY: And our objection is, Your Honor, foundation. If they want to prove that, they should prove it, but they can't just start talking about things that are allegedly in a file.

MR. SOTOS: Judge --

THE COURT: Overruled.

BY MR. SOTOS:

Q. You reviewed the file, correct?

A. Yes.

Q. I'm asking you if you recall reviewing the report that showed that the State's Attorney's Office -- you -- let me back up.

You understood that after that file was produced, the Cook County State's Attorney's Office started looking into it to determine whether or not what you were claiming had actually

AR-L 619972
Dorsch - redirect by Sotos

2780

happened?

A. Which they should do.

Q. Right. And you were aware of that when you reviewed the file?

A. No, I wasn't aware what action was taken, but I do know it took them four years to find it.

Q. Took who four years?

A. The police department, whoever found it first. I would assume it would be the police department. They certainly didn't find it per my requests.

Q. And it's your testimony that they found the wrong one?

A. I don't even believe in this one.

Q. You don't believe what?

A. I don't believe in it.

Q. You don't believe that they found --

A. There's too --

Q. -- the right --

A. There's too much coincidence to some of the things that they knew for four years.

In 1992, which this case is (indicating), sir, there were 33 homicides in the 14th District.

Q. This case being the Jimenez case?

A. The '92 case. That's the '92 case, is it not?

Q. It's a 19 -- December 1991.

A. Or '91. Okay. Then there were, I think, 34 homicides in

that year.

Q.  You remember that?

A.  I have it right in my file.

Q.  Okay.  So go ahead.

A.  Okay.  It took them four years before they could find it. I've had instances and requests that I have done of the Chicago Police Department where I filed FOIA requests over a period four times in ten years and told each time they could not find the file.  All the time, I had the file.

Q.  Okay.  Well, let's --

A.  All right?  And then, if I may bring this up --

Q.  Sure.

A.  -- Larry Potash himself helped me, from WGN, in the same incident.

MR. SOTOS:  Objection, Your Honor.  It's getting into a narrative.  He's not even responding to the question.

THE COURT:  Well --

THE WITNESS:  I understand, Your Honor.

THE COURT:  I think -- why don't we wait for a question.  I know that you asked to go into that, but let's start again.

BY MR. SOTOS:

Q.  I want to ask you about the consistencies between the file that Northwestern found, or the Jimenez file, and the case --

MR. LOEVY:  Objection, Your Honor.

AR-L 619974

BY MR. SOTOS:

Q. -- that Northwestern found --

MR. LOEVY: There's no foundation that Northwestern --

THE COURT: Yeah, I --

BY MR. SOTOS:

Q. That Northwestern gave you.

A. Right.

Q. Okay. I want to ask you about the similarities between that and the case that you're describing.

Before doing that, I'm trying to ask you whether or not you were aware, when you reviewed the materials that Northwestern gave you, that the Cook County State's Attorney's Office had talked to the witness who had told them that he was bribed to identify the wrong person, but that Detective Guevara didn't do anything wrong.

You were aware of that, correct?

A. I found that to be in that file, yes.

Q. All right. And so it was your testimony that, well, it had to have been a different case, correct?

A. Guevara was in Gang Crimes. He needed -- he did not need me in '91 because he was a detective.

Q. Understood. It couldn't have been the Jimenez file because of that?

A. That's correct. That's only one of the things.

Q. So in reviewing the file in the Jimenez case, you saw that

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 359 of 673 PageID #:100943
AR-L 619975
Dorsch - redirect by Sotos
2783

that case involved a situation where a victim was with a young girl passenger who was shot in Humboldt Park, correct?

A. Correct.

Q. And that was the same scenario that was in your case, correct --

A. Yes.

Q. -- that you remembered? And that in the Jimenez case, the suspect was allegedly driving a -- the person who was in a -- person who was in a car where the shooting occurred -- the shooter's car?

A. Yes.

Q. Was driving a big white car?

A. Correct.

Q. And that was similar to what was in the file that you described, correct?

A. I believe it was a different color, a little -- maybe --

Q. A yellow?

A. A yellow or green.

Q. But pretty similar, right?

A. I don't -- well, I'm pretty good on colors. I don't find them similar.

Q. White and yellow?

A. No.

Q. All right. And in both cases, correct me if I'm wrong, more than a month after the shooting, two witnesses were

AR-L 619976

brought to Area 5 by Mr. Guevara, correct?

A. According to that report.

Q. Correct. And that's in both the Jimenez file and in the case that you described, correct?

A. Yes.

Q. Okay. And in both of those cases, the witnesses had allegedly surfaced because they had kept a license plate -- they knew the license plate of the suspect shooter's car, correct?

A. Well, in my case, they had written it down and still had it in their possession months later.

Q. That wasn't the case in the Jimenez file?

A. I don't recall.

Q. You do recall, though, that the witness -- when the witnesses surfaced, it was because they -- when the witnesses surfaced, they had the license plate of the car, correct?

THE COURT: Mr. Sotos, for my benefit -- I don't know if anybody else is having trouble, but if you could identify these cases by name, because I'm getting pretty confused.

MR. SOTOS: We'll call it the Jimenez file and the Dorsch file. Okay?

BY MR. SOTOS:

Q. And I'm asking you about in both cases -- so I'm not talking about any differences now. I'm saying in both of those cases, the teenage -- involved teenage Hispanic witnesses,

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 361 of 673 PageID #:100945
AR-L 619977
Dorsch - redirect by Sotos
2785

correct?

A.  In the Jimenez case, the witnesses were 17.  They were not juvenile.  All right?

Specifically in my case, when I went to Branch 66 with the two juveniles, meaning younger than that -- and I recall they were like 14 or 15.  When I told the state's attorney there what had happened, the state's attorney asked me if I wanted to charge the two juveniles who were lying to me in that case, and I said no.  I only want to set an innocent free.  I don't want to go to juvenile court.

Q.  So a two-year difference -- maybe a two-year difference in age from the Jimenez case and the one you remember as the Dorsch case?

A.  A two-year difference, I think.

Q.  Okay.  And in both cases, the Jimenez case and the Dorsch case, the witnesses were brought into a room where you were present with your partner and with Mr. Guevara, and who else was there?

A.  Are you talking about the Dorsch case or --

Q.  Your case.

A.  It was Guevara, Gawrys, the two young men, and my partner, John Boyle, and myself.

Q.  Right.  And that's the same thing in the Jimenez case, correct?

A.  I don't recall.

AR-L 619978
Dorsch - redirect by Sotos

2786

Q.  You don't recall that that was the same allegations that were -- the same --

A.  No.

Q.  -- scenario --

A.  No.

Q.  -- in the Jimenez file?  In both cases, the one witness picked out the suspect, correct?

A.  I know in my case, that's what happened.

Q.  And the Jimenez case as well, right?

A.  I don't recall.

Q.  Well, you reviewed the Jimenez file pretty carefully, didn't you?

A.  Well, that was some time ago, sir.

Q.  When's the last time you reviewed it?

A.  Nobody sent that one to me, I mean, recently.

Q.  You didn't review it in preparing for --

A.  No.

Q.  -- your testimony?

A.  No.

Q.  So you don't recall, then, that in the Jimenez case, one witness picked the suspect and the other witness didn't?

A.  I don't recall that.

Q.  Okay.  Do you remember that in both cases, the witnesses said that a third party bribed them to identify the suspect?

A.  I recall that.

AR-L 619979
Dorsch - redirect by Sotos

2787

Q. Okay. But you don't recall that in the Jimenez case --

MR. LOEVY: Objection, Your Honor, asked and answered. You can see the pattern here. He's going to ask the same question again.

THE COURT: I have no idea. Sorry.

BY MR. SOTOS:

Q. So you do recall that in both cases, the witnesses said the -- they were bribed to give the false information?

MR. LOEVY: Objection, Your Honor.

THE COURT: That's sustained.

MR. LOEVY: It's the exact same question.

MR. SOTOS: Okay.

BY MR. SOTOS:

Q. It's your testimony that in your case, in addition to the bribe, Detective Guevara pointed somebody out, correct?

A. Definitely.

Q. Okay. And the difference in the Jimenez case is that the witness told the state's attorney that that never happened?

A. I don't recall.

Q. You don't recall that from reading the Jimenez file either?

A. No, I -- today, I don't recall.

Q. You don't dispute it, though?

A. No.

Q. You recall that you spoke to the father -- well, the witnesses -- the witness was -- excuse me.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 364 of 673 PageID #:100948
AR-L 619980
Dorsch - redirect by Sotos

2788

The suspect who was identified was charged, correct?

A. He was charged, yes.

Q. And you were a detective at the time, right?

A. Yes.

Q. So you went to Felony Review with the case, to have the guy charged, after you claim 20 years later that Mr. Guevara had pointed him out?

A. I took it to Felony Review again, apprised them of the fact that I was not happy with the lineup. I did not tell them, I don't believe, that Guevara put his finger on the picture because I was -- it only had just happened, and I was totally confused myself as to why he would do that.

Q. You did not tell Felony Review at the time this occurred?

A. I think for the same reasons I stated before. I was conflicted --

Q. Confused?

A. I was conflicted as to the purpose he did that.

Q. So how long had you been a detective at that point?

A. Two years.

Q. And how long had you been a police officer?

A. 1970.

Q. And so you testified here on -- about proper procedures, correct?

A. Right. And I never saw that before.

Q. So it's your testimony that you didn't know at the time

AR-L 619981
Dorsch - redirect by Sotos

2789

that it was wrong for a police officer to point at a photo and say, "That's the guy"?

A.   Oh, I knew it was wrong, but I didn't know why he did it.

Q.   What's the difference -- what's the difference why he did it if it was wrong?

A.   I -- he didn't -- he should've explained it to me why he did it.

Q.   I mean, it was another murder case like this one, correct?

A.   Now we're talking about the other case?

Q.   The other -- the case that you -- the Dorsch case.  It was a murder --

A.   Yes.

Q.   -- case, right?

A.   Yes.

Q.   Right.  And it's your testimony that you had the suspect charged with murder, correct?

A.   Felony Review charged him with murder, yes.

Q.   Even -- well, you went and sought Felony Review.

A.   Right.

Q.   You sought murder charges, right?

A.   Right.  Because we had to ask them.  Because we already had one state's attorney come in with the photo I.D., and I told them I wasn't feeling good about the identification.  And I don't think I told them about Guevara.  Like I said, I didn't know why, so I didn't want to push there.

AR-L 619982

Q. So --

A. And I knew also that we would need a live lineup, and that would be the next day. All right?

And, again, when I had the same person who reacted to Guevara's touching the photo identify him -- he had already seen the photo, I was not surprised -- and apprised the Felony Review that, again, that I was not happy -- a different person from Felony Review, I believe. That I was not happy with the way the identification went, they said charge him.

Q. I'm sorry. I don't remember what my question was at this point, but -- let me ask you one that I did ask, and I don't -- I didn't hear your answer.

What's the difference why? What does that have to do with anything? If this really happened, why didn't you report it to the State?

A. Well --

Q. Why would you seek murder charges?

A. Because you need the state's attorney to come in and apprise him of the facts. And I didn't tell him about that.

In hindsight, if I had been braver and been able to stand up and accuse another officer, not really knowing why he did something, maybe I should've, maybe I should've. But I find it my personal fault that I was not brave enough, sir, to stand up and say it like it was.

Q. Because you -- according to your testimony, you had two

witnesses, one who didn't identify the suspect and one who only did after he was pointed out, correct?

A.  Yes.

Q.  And you testified earlier that you told your supervisors, who you couldn't name -- you threw out a Jim Fruin, but you weren't sure --

MR. LOEVY:  Objection, asked and answered.

BY MR. SOTOS:

Q.  -- correct?

MR. LOEVY:  We went through that subject.  Let's not --

THE COURT:  Sustained.

MR. LOEVY:  -- go back.

THE COURT:  Sustained.

MR. SOTOS:  Judge, this impeaches about his conversations with Felony Review that he had.  He said he told other people.

THE COURT:  Well, why don't we not ask a question that's already been asked and answered.  If you're going to ask about Felony Review, I think that's different.

MR. SOTOS:  Okay.  But it's only because it relates to that issue, Judge.

THE COURT:  Well, I need to hear the question.

MR. SOTOS:  Okay.  That's fine.

BY MR. SOTOS:

AR-L 619984

Q. So you said that you sought felony murder charges against the suspect despite what you've testified now had occurred because you weren't brave enough to stand up then, correct?

A. Probably.

Q. And you wish you would have?

A. After all I've gone through, after all these testimonies and all these years, yes, I do.

Q. But while saying all of that, you've also testified that you did tell your superiors in the police department.

A. I told whoever was there, probably not that night. Maybe I did because there's a shift change. I don't know. And that's another conflict. I don't know who was still there at what point in time.

But I know when I came back from the office -- to the office, I know what was said to me, after they were told that I had been to Branch 66 and asked that that kid be relieved -- released. And do you want to know what they told me?

Q. Who?

A. Whoever it was. I can't remember exactly, but I know -- I'll never forget the words.

Q. Tell us the words, please.

A. "Dorsch, what the fuck are you doing? We're never gonna solve this case."

Q. So some unnamed person --

A. And I was told not to write any reports after that.

Q. But you were brave enough to go to your superiors and say that, correct?

A. Yeah. I was pissed off.

Q. But you -- you were mad and you -- your testimony is that you were perfectly willing to go tell your super -- your unnamed supervisors about it, correct?

A. Yes.

Q. But you didn't tell the state's attorney for whom you were seeking that a person be charged with murder about it?

MR. LOEVY: Your Honor --

BY MR. SOTOS:

Q. That's your testimony?

MR. LOEVY: -- that's argumentative, and he was asked six times.

THE COURT: Sustained.

BY MR. SOTOS:

Q. The other aspect of the two cases that were similar is that in both the Jimenez case and the Dorsch case, the witnesses who were saying that they were bribed both said that they were bribed because the person who bribed them was mad at the person he wanted picked out because that person was dating his ex-girlfriend, correct?

A. Yes.

Q. All right. And you're still testifying they're two separate cases?

AR-L 619986

A.   Let me explain something to you.  The two witnesses in the case I'm talking about could very well be the same two witnesses in the case two years later, who would now be 17 and no longer juveniles.  Okay?  So it could be that they are the same people but now attuned to another case.  All right?

Q.   In the Jimenez case and the Dorsch case, the suspect in both cases was a DePaul student who worked at Walgreens at Irving and Milwaukee streets, correct?

A.   That's correct.

Q.   Are you still saying it's two different -- two different cases?

A.   Yes.

Q.   And you testified in October of 2015 in still another post-conviction case involving Roberto Almadovar and William Nagran.  Do you recall that?

A.   Yes.

Q.   I'm going to show you Defendants' Exhibit --

          MR. SOTOS:  What?  228?

BY MR. SOTOS:

Q.   I'm showing you Defendants' Exhibit 228 and ask you to take a look at that and tell me whether you recognize it.

          MR. LOEVY:  228?  Oh, we don't have 228, Your Honor.

          MR. SOTOS:  Oh.  Is that an additional one?  Oh, I'm sorry.

          MR. LOEVY:  Well, if it's not in the pretrial order,

AR-L 619987
Dorsch - redirect by Sotos

2795

Your Honor, then we object.

MR. SOTOS:  It's his prior testimony, Judge.  I'm just going to ask him if he recognizes it.

BY THE WITNESS:

A.  Yes.  Apparently -- excuse me.

THE COURT:  Okay.  So it's not in the pretrial order, but it's being used for --

MR. SOTOS:  Just to refresh his recollection.

THE COURT:  All right.

MR. LOEVY:  If we could get a copy, then, Your Honor?

THE COURT:  Okay.  When can I -- can I?

MR. SOTOS:  We'll get copies at the end of the day, yes.

BY MR. SOTOS:

Q.  Does that refresh your recollection about when you testified in that case?

A.  Yes.  It's another exoneration that I did testify in.

Q.  Okay.  And do you recall testifying in that case that the Jimenez file and the case you're talking about are two different cases?

A.  Yes.

Q.  And to this day, you're still testifying to the same thing, correct?

A.  Yes, sir.

Q.  You've testified that the person who was your partner and

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 372 of 673 PageID #:100956
Dorsch - redirect by Sotos
2796

AR-L 619988

was actually in the room with you that day when this allegedly happened was your partner in this case, Mr. Boyle; is that right?  Your partner in the case that we're on trial for here?

A.  I believe it was John Boyle.

Q.  Okay.  And so you had previously indicated it was a Bob Johnston, correct?

A.  Early on when we first started talking about it so many years later, I wasn't sure what year it was that the incident happened, as I didn't know when Guevara became a detective.

Q.  Oh, so it was when you learned when Guevara became a detective that you figured out --

A.  It couldn't be Johnston.

Q.  Okay.  So it was just false when you were saying that it was Johnston?

MR. LOEVY:  Objection, Your Honor, argumentative.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  So how did finding out when Mr. Guevara became a detective help you place the time of this incident?  How did you know it was six months before that?

A.  I didn't say six months on anything.

Q.  Oh, I'm sorry.  Then I misspoke.

How did you -- how did that place the time for you?

A.  Because I knew he got meritoriously promoted about two months after -- maybe it was even a month later -- after that

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 373 of 673 PageID #:100957
AR-L 619989
Dorsch - redirect by Sotos
2797

incident, the Dorsch case, as you're talking about.

Q.  So you're able to place this incident in time with when he got promoted?

A.  Yes.

Q.  You think you might be having a false memory about that?

A.  No.  He was a Gang Crimes specialist.  He didn't need me for a lineup.  He did need me for a lineup.

MR. SOTOS:  All right.  Could I have a minute, Your Honor?

THE COURT:  Sure.

(Counsel conferring.)

MR. SOTOS:  That's all I have, Your Honor.  Thank you.

THE COURT:  Okay.

MR. LEINENWEBER:  Your Honor, I have about 20 minutes. I can start now, if you'd like.

THE COURT:  Okay.  Why don't we -- why don't you start.

MR. LEINENWEBER:  Thanks, Judge.

THE COURT:  I do want to stop at 4:00, though, so when you reach a --

MR. LEINENWEBER:  No problem, Your Honor.  I will stop.

If you would put that down, I'd appreciate it.  Take it down.  Thanks.

(Counsel removes exhibit from easel.)

AR-L 619990

THE COURT REPORTER:  Mr. Sotos, please take your lavaliere off.

MR. LEINENWEBER:  Judge, where should I place it? Because I'm going to draw pictures.

(Counsel holds up easel with paper.)

THE COURT:  Oh, a good question that I'm not sure I have the expertise to answer.  Make sure the jury can see it and then the lawyers can move, if they need to.

MR. LEINENWEBER:  Do you want me to -- can I do it right here?

THE COURT:  And I can move if I need to.

MR. LEINENWEBER:  Can I do it right here?  Do you mind, Jon, if I do it right here?

MR. LOEVY:  I don't mind if it's okay for the jury to see it.  I don't know if I'm blocking.

MR. LEINENWEBER:  Can everybody see that?

(Jurors nodding.)

THE COURT:  Are you going to be writing on it or --

MR. LEINENWEBER:  Yeah.

THE COURT:  Well, you may want to move it a little closer to the jury.  I don't know.

MR. LOEVY:  This is a good spot for it.

MR. LEINENWEBER:  Yeah.

MR. LOEVY:  Can I put this over here, Your Honor?

THE COURT:  Sure.

AR-L 619991

(Counsel moves easel.)

MR. LEINENWEBER:  Thanks, Jon.

Sorry.  Thank you.  I'll just put it right here.

REDIRECT EXAMINATION

BY MR. LEINENWEBER:

Q.  Good afternoon, Mr. Dorsch.

A.  Good afternoon.

Q.  I think you've said that -- today that the case that you're referring to -- I'm going to call it the umbrella case.  Is that a good way --

A.  Please.

Q.  Okay.

A.  It's been referred as that before.

Q.  Right.  So the umbrella case, the one -- and so we're clear, the umbrella case is the one where you say that -- the one where Mr. Guevara put his -- basically put his thumb on the picture, correct?

A.  Yes.

Q.  Okay.  So there's the umbrella case and then the other case we've been speaking about is the Jimenez case, correct?

A.  That you're speaking of, yes.

Q.  Okay.  And so the umbrella case, to the best of your recollection -- I think you said it occurred around Mother's Day of '89, is that right?

A.  It was -- that's -- was to the best of my recollection in

the many years later that we talked about it, yeah.

Q. Yeah. And I understand that as you look back on things, you try to determine when stuff happens. We all understand it was a long time ago.

So I'm going to write, like, a picture of an umbrella, and I'm going to say "May '89." It's a terrible picture.

So that's when that happened. And we know from the records that you reviewed about that -- well, let me say this.

The Jimenez case, you had some involvement in that investigation, correct?

A. Yes. Those names of the witnesses are familiar to me.

Q. Right. So then the Jimenez case -- so I'm going to put a big J over here -- that was December '91, correct?

A. As -- yes.

Q. Okay. So May of '89 and December '91 is approximately -- would you agree with me it's about 30 months?

A. Okay.

Q. Correct? The umbrella case, as you sit here today, you do not recall what the name of the person that was killed, correct?

A. That's correct. And I didn't recall the name of the person in '91 either.

Q. Understood. But at least the one in '91, the Jimenez case, you've seen reports with your name on it, correct?

A. Yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 377 of 673 PageID #:100961
AR-L 619993
Dorsch - redirect by Leinenweber
2801

Q.  Whereas, the umbrella case, you've never seen any reports with your name on it?

A.  Correct.

Q.  Okay.  So you don't know the name of the person that was killed at this -- I'll put D, for decedent, but we know it's Jimenez here.

And I take it you don't remember as you sit here today in the umbrella case the name of the person who was fingered, the person who was identified, correct?

A.  That's correct.

Q.  Okay.  So I'm going to put a question mark here.

But at least for the name of -- excuse me, for the '91 case, the Jimenez case, you know that a Mr. Ramon was arrested, correct?

A.  I know that a Mr. Ramon was arrested, but I don't remember the involvement.  I don't remember him from the case.

Q.  Right.  Understood.  I'm just asking if you understand the names.

So at least for the umbrella case, we have an approximate date of May of '89.  We do not know the --

MR. LOEVY:  Your Honor, we're going backwards again.

MR. LEINENWEBER:  I'm sorry, Judge.  I'll clear it up.

BY MR. LEINENWEBER:

Q.  We don't know the decedent, and we don't know -- so two question marks.  We don't know the decedent, and we don't know

AR-L 619994

the suspect, correct?

A. Correct.

Q. Okay. And then I think you said that there were two kids that were brought in by Mr. Guevara in the umbrella case.

A. Correct.

Q. And they are the ones -- one of them, witness No. 1, said, "Oh, yeah, I was gonna pick that guy," after Rey pointed him out, right?

A. Yes.

Q. Okay. And then the second witness, after you ushered that kid out, he couldn't tell you who it was, right?

A. Correct.

Q. Okay. And same thing happened there. They were both brought before a lineup.

No. 1, the kid who had been prodded, he knew who it was, but the second person didn't. Is that fair to say?

A. We're talking about -- as you --

Q. We're talking about the umbrella case.

A. Yes.

Q. And then I think you had found out you talked to, at least in the umbrella case, the defendant, whose name we don't know, that the father came in that night, correct?

A. Yes.

Q. You spoke to the father?

A. Yes.

AR-L 619995
Dorsch - redirect by Leinenweber

2803

Q. And the father said the kid had had like a prior felony of some kind, correct?

A. Yes, he did.

Q. It was a prior gun felony, right?

A. Yes, he did.

Q. And so I take it that when the dad comes in, you're probably a little suspicious of this guy, right?

A. Suspicious --

Q. Of the dad.

A. Of the dad?

Q. Yeah. Well, I mean, you've got a guy who a witness has fingered for a murder, and the dad comes in to plead his case. I'm sure that you were like, "Yeah, sure, whatever," correct?

A. No. He came in not knowing why his son was there.

Q. Okay. So you spoke to him, and he basically explained that this prior gun felony wasn't what it seemed to be, right?

A. I -- well, first, he said, "My son wouldn't have done something like this. He's not a bad kid." And I says, "Well, wait a minute. He does have a gun arrest."

Q. Right. And then the dad explained about the gun arrest. You looked up some paperwork about it, and it turned out the dad was correct, right?

A. Yes.

Q. Okay. So there was a gun arrest here of a suspect that turned out to be -- was it nolle'd or dismissed or it didn't

seem like --

A. I don't -- I don't recall.

Q. Okay. And then going to the Jimenez case, you know from your review of the reports that Ramon, the suspect, he had a gun case, too, correct?

A. Totally different.

Q. But it was a gun case, am I right?

A. A gun case, but totally different.

Q. But at least going to write "gun" here and I'm going to write "gun" here, because you'd agree with me that this was a gun case?

A. Yeah.

Q. The umbrella case?

A. Well, I know I --

Q. Correct?

A. Yes.

Q. Correct? And then Mr. Jimenez has a gun case, correct?

A. He did have a gun case.

Q. Thank you. Then it turns out you go and talk to the two teenage witnesses. So there's two teenage witnesses in both cases. So I'm going to run out of room here, but I'm putting two witnesses on both sides.

THE COURT: And we're about to run out of time, and you're getting into something complex, so --

MR. LEINENWEBER: It's not going to be complex when

I'm done, Judge.

THE COURT: All right. Well, I meant complex in terms of time.

MR. LEINENWEBER: Okay. I'm almost done. I'll just --

THE COURT: Okay.

MR. LEINENWEBER: Let me just wrap up this part.

THE COURT: Sure.

BY MR. LEINENWEBER:

Q. So there's two witnesses to the umbrella case, teenagers --

A. Uh-huh.

Q. -- right? And I think Hispanic teenagers, did you say?

A. I don't recall. Oh, wait. I believe they were both Hispanic in both.

Q. Okay. So then we jump to Jimenez, and there were two Hispanic teenage witnesses in that case, too, correct?

A. There were two named in the Jimenez case and two unnamed that I'm talking about.

Q. Okay. And then in both cases, I think Mr. Sotos asked you, both cases, the poor guy that was shot is at a light in a car with a woman or a girl next to him, right?

A. No. No. He's on a side street.

Q. Oh, a side street. But he's in a car, correct?

A. He's in a car.

Q. And a white car, at least in the umbrella case, a white car

AR-L 619998
Dorsch - redirect by Leinenweber

2806

comes up, shoots him, drives off, right?

A. Correct.

Q. And then in the Jimenez case, a car, yellow, white, drives up, shoots him, and drives off, correct?

A. I don't recall specifics.

MR. LEINENWEBER: Okay. Judge, we can break here, if it's good with you.

THE COURT: Okay. All right. 9:30, ladies and gentlemen.

(Jury out.)

THE COURT: Okay. Just to review what you need from me before we start tomorrow.

Now, we're not going to have Wasilewski tomorrow, right? Okay. Good.

Anything that you can anticipate needing me for overnight?

MR. LOEVY: Not from plaintiff.

MR. SOTOS: I don't think so, Judge. We have a little more room than we have now. Thank you, Your Honor.

MS. ROSEN: Yeah.

THE COURT: Okay. Well, just remember that I will be here from 8:00 o'clock. So --

MS. ROSEN: Okay.

THE COURT: -- if you need me, give me some warning so we don't keep the jury waiting. Okay?

AR-L 619999

2807

MR. SOTOS:  Thank you, Your Honor.

MR. ART:  Thank you, Judge.

MS. ROSEN:  Thank you.

MR. LOEVY:  Thank you, Judge.

(Adjournment at 4:02 p.m. until 9:30 a.m., 6/21/18.)

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 12-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 20, 2018.

/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/21/18

/s/ Colleen M. Conway, CSR, RMR, CRR          06/21/18

Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division

2978

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                                    ) No. 12 CV 4428
                                                   )
              Plaintiff,                            )
vs.                                                ) Chicago, Illinois
                                                   )
REY GUEVARA, STEVE GAWRYS, DANIEL NOON,            )
JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,         )
PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN           )
LEONARD, EDWARD MINGEY, RUSSELL WEINGART,          ) June 21, 2018
ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,          )
                                                   )
              Defendants.                           ) 9:25 o'clock a.m.

VOLUME 13 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOAN B. GOTTSCHALL
and a jury

APPEARANCES:

For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. STEVEN E. ART
                             MR. ANAND SWAMINATHAN
                        311 North Aberdeen Street
                        3rd Floor
                        Chicago, Illinois  60607

                        MACARTHUR JUSTICE CENTER
                        Northwestern University School of Law
                        BY:  Locke E. Bowman, III
                        357 East Chicago Avenue
                        Chicago, Illinois 60611
                        (312) 503-0844


Court reporter:              Blanca I. Lara
                        Official Court Reporter
                        219 South Dearborn Street
                           Room 2504
                        Chicago, Illinois 60604
                         (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

2979

Appearances  (continued:)


For the Individual        THE SOTOS LAW FIRM
Defendants:               BY:   MR. JEFFREY N. GIVEN
                                MR. JAMES G. SOTOS
                                MS. CAROLINE P. GOLDEN
                                MR. JOSEPH M. POLICK
                                MR. DAVID A. BRUEGGEN
                          550 East Devon Avenue
                          Suite 150
                          Itasca, Illinois  60143


For the Defendant         ROCK FUSCO & CONNELLY, LLC
City of Chicago:          BY:  MS. EILEEN E. ROSEN
                               MS. CATHERINE M. BARBER
                               MS. THERESA B. CARNEY
                          321 North Clark Street
                          Suite 2200
                          Chicago, Illinois  60654


For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
                               MR. JAMES V. DAFFADA
                          120 North LaSalle Street
                          Suite 2000
                          Chicago, Illinois  60602

AR-L 620012
Dorsch - redirect by Leinenweber

2989

those other things on Tuesday.

(The witness enters the courtroom)

THE COURT:  It's my hope that you will have the case on Wednesday.  That is not a complete promise.  And when on Wednesday, I'm not sure, but we're making progress and we're getting there.

Counsel, do we have a witness?

Ah, Mr. Dorsch.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning.

WILLIAM DORSCH, DEFENSE WITNESS, PREVIOUSLY SWORN

REDIRECT EXAMINATION (resumed)

BY MR. LEINENWEBER:

Q.  Good morning, Mr. Dorsch.

A.  Good morning.

Q.  To make things easier, you'll be happy to know that I'm abandoning the easel since I'm going to use the Elmo.

MR. LEINENWEBER:  So, Judge, I'll try not to reinvent the wheel, but I just like to establish a couple of things that we talked about yesterday.

BY MR. LEINENWEBER:

Q.  We talked about two cases.  We talked about the umbrella case.  And by that, you know, I'm referring to the case where you state that Mr. Guevara basically put the finger on the picture of the witness, correct?

AR-L 620013
Dorsch - redirect by Leinenweber

2990

A. Yes.

Q. When I say "umbrella," that's what I mean.

A. Understood. And Mingey referred to that case always as the umbrella case.

Q. Correct. So, but you know what I'm talking about when I saw umbrella, right?

A. Yes, I do.

Q. Okay. And then second case I believe you were talking about was the Jimenez case.

MR. LEINENWEBER: And if I could approach the witness?

THE COURT: Yes.

(Document tendered to the Court and the witness.)

BY MR. LEINENWEBER:

Q. Sir, I'm going to show you what's been marked as Defendants' Exhibit 70. If you could just take a look at that, please.

(Brief pause)

THE COURT: I do not have realtime. Should I --

THE COURT REPORTER: I'll fix it, Judge.

THE COURT: Hold on one second. A little technical glitch.

(Brief pause)

THE COURT: That's fine. Thank you.

Don't wait for me, I'm just plugging things in.

AR-L 620014

BY MR. LEINENWEBER:

Q. That exhibit, that appears to be the part of the criminal file of the Jimenez case, is that fair to say?

A. Yes.

Q. And if you look -- I put a little sticker on it to make it easier. If you look at that page where the sticker is on, you're listed there as the detective and the arresting officer, is that correct?

A. No, it's for a lineup report.

Q. But at least your name, your signature is on that document?

A. Well, my -- it's not my signature.

Q. But your name is on it?

A. My name is on it, yes.

Q. And also your partner at the time, Bill Johnson, is that correct?

A. Well, apparently we were working that day on that case.

Q. Okay. And I understand you've worked on a lot of cases, and it's been a long time since you've been on the police department. And no one here expects you to remember every detail, but seeing your name and your partner's name on that pretty much indicates to you that you were working on that case, correct?

A. Yes.

Q. Okay. And you were one of arresting officers, correct?

A. Apparently.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 390 of 673 PageID #:100974
AR-L 620015
Dorsch - redirect by Leinenweber

2992

Q. Okay. And we can tell by that date, that says the date of the murder. I think we established yesterday was December 19th of 1991, correct?

A. Right.

Q. Okay. And then going back to the umbrella case. You had said yesterday, on further thought, that you believe that that happened around Mother's Day of 1989, correct?

A. Yes.

Q. Now, again, because memory is memory, you said different dates on different occasions, is that fair to say?

A. Oh, sure.

Q. Yeah. At your deposition you said it may have been '88, may have been '89, may have '90, is that correct?

A. Correct.

Q. Okay. And at one point you actually had a blurb about this case on your website for your private business, correct?

A. On this case?

Q. No. No. On the umbrella case.

A. I don't know that -- I don't know.

Q. Okay. So I believe you had that on your website and you stated the date of that was 1992. Does that sound, correct?

MR. BOWMAN: Objection. Foundation.

THE COURT REPORTER: I'm sorry, who's objecting?

MR. LOEVY: Mr. Bowman.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't recall that case being on my website.

BY MR. LEINENWEBER:

Q. Okay. Do you remember you gave a deposition on this matter?

A. Yes. I've given, I think, with court testimony, about 8 times.

Q. Right. But at least in terms of this case, you gave a deposition a couple of years ago, is that right?

A. Well, I think the first people that came out to me were from the Sotos law firm. They came to my home.

Q. Understood. Understood. But you sat down, you were sworn in, you answered --

A. Right.

Q. -- questions, correct?

A. Sure.

Q. Okay. Same type of oath you took today, to tell the truth --

A. Yes.

Q. - - correct?

     And you told the truth to the best of your ability, is that correct?

A. Yes.

     MR. LEINENWEBER: Counsel, I'm referring to page 350, Lines 1 to 6.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 392 of 673 PageID #:100976
AR-L 620017
Dorsch - redirect by Leinenweber

2994

MR. BOWMAN:  Thank you.

BY MR. LEINENWEBER:

Q.  Were you asked this question and did you give this answer -- excuse me.  That's the wrong page.

MR. BOWMAN:  Page number?

MR. LEINENWEBER:  I'm sorry, it's 321, lines 16 to 24.

MR. LOEVY:  321?

MR. LEINENWEBER:  321, 16-24.

BY MR. LEINENWEBER:

Q.  And the next paragraph -- at Line 16, 321, this is question:

"Question:  The next paragraph starts in 1992 while working as a detective in Area 5."

And then you went on to describe the case in which you were uncomfortable with identification:

"...  the witnesses agreed that they've been paid by a third-party to finger the person who was arrested."

Am I right in believing that the case you were describing in your MLIS frequently asked questions is the same murder investigation you were talking about in the post-conviction proceedings?

"Answer:  Yes."

And now I'm on Line 5, on page 322:

"Question:  Okay.  So when you created your website page, you knew that or you wrote that the case occurred in 1992, correct?

"Answer:  From --"

 "I asked if --"

 "Answer:  I wrote that, yes.

"Question:  Okay.  Why did you believe when you wrote that that it was in 1992, but in the post-conviction proceedings you said it was the best recollection, '88 or '89.

"Answer:  Because I didn't know when Guevara became a detective.

"Question:  Okay.  So you were guessing?

"Answer:  I was guessing at that time and at that time also."

 Was that what --

A.  That's correct.

MR. LOEVY:  Objection.  Not impeaching, Your Honor.

THE COURT:  That is true, but -- -

MR. LEINENWEBER:  I'm sorry, judge.  I'll keep going.

BY MR. LEINENWEBER:

Q.  (Reading:)

"So when you wrote the web page, you were guessing?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 394 of 673 PageID #:100978
AR-L 620019
Dorsch - redirect by Leinenweber
2996

"Answer: Yeah.

"... it was 1992?

"Answer: Yeah."

Was that the question and those answers?

A. If you're repeating from that, but I don't -- I'm having difficulty with the web page because that was created so many years ago and I haven't seen it probably since this was created.

Q. Understood. But you have no reason to doubt that when you have that answer, that you had it on your web page and you wrote it in 1992, correct?

A. I don't recall it on the web page, but I don't disagree with the dates.

Q. Fair enough. I'll move on.

So at least if we go here (indicating). So I'm not using the paper anymore. It says date of incident for Jimenez, December 19th, 1991. The umbrella case 1988, 1989 and 1990, and I forgot to put 1992.

And we also know from the questions yesterday that the victim's name in the Jimenez case was, obviously, Jose Jimenez, is that correct?

A. In that case, yes.

Q. But in the umbrella case, we don't know who the name is, correct?

A. I do not recall.

Q.  Okay.  So I had put down "I don't remember," but "I don't recall" is kind of the same thing.

And the location of the incident for the Jimenez case was at, I think, Sawyer and Wabansia.  And so that location would be 3231 West Wabansia, correct, for the Jimenez case?

And you can check that report, if you'd like.  I think actually it says 1700 North Sawyer.

A.  Yes.

Q.  Sawyer and Wabansia.

A.  Well, wait.  I think it says 1200 here.

Q.  I'll take a look.

A.  The Jimenez case -- oh, 1700?  Where did I see 1200?

This says 1700.  Yes; consistent.

Q.  So I'm going to actually change this because I was wrong. I have Wabansia here.

But 1700 North Sawyer.

And for the umbrella case, it's fair to say, you don't remember where it happened, correct?

A.  No, it happened right near the viaduct on Bloomingdale, but I don't remember the exact north/south street, but it was in the area of Kedzie.

Q.  Okay.  So Kedzie and Bloomingdale.  I'll put that down.

A.  Right.

Q.  And the nature of the incident in both cases was, I believe we established yesterday, a drive-by shooting, correct?

AR-L 620021

A.   It was common.

Q.   Okay.  And then I believe you said in the umbrella case, you believed it was a white car in which the shooter was in, correct?

A.   I know it was a white car.

Q.   Okay.  But in the Jimenez case, it's a yellow car, correct?

A.   Correct.

Q.   Okay.  So that's a little difference of yellow and white, correct?

A.   (No response.)

Q.   And there was a passenger in the car in the Jimenez case, a girl named Maureen Clausen.  Does that name sound familiar?

A.   Yes.

Q.   And she was a 17-year-old girlfriend of Mr. Jimenez, correct?

A.   And her name is familiar to me from reviewing the reports, as are the two witnesses.

Q.   But in the umbrella case, you don't recall what the girl's name is, correct?

A.   Only that she was about 13 years old and she was a cousin of the person driving the car.  And that she was from Puerto Rico.  And after the shooting, the family immediately sent her back to Puerto Rico.  So we were not able to find her and interview her.

Q.   Okay.  But Maureen Clausen is the one in Jimenez, unknown

person in umbrella, right?

MR. LOEVY:  Objection "unknown," Your Honor.  He described the person.

BY MR. LEINENWEBER:

Q.  You don't know her name, right?

A.  I don't know her name.

Q.  So it's unknown, correct?

A.  It would've been in the report.

Q.  Correct.  But you don't know her name, right?

A.  Yes.

Q.  And I think you said that you believed that the girl in the umbrella case was 13, is that right?

A.  She was young.  She was 13, 14 years old.

Q.  But Maureen in the Jimenez case, she's 17, correct?

A.  That's correct.

Q.  Okay.  And I think you just said that after the incident, she moved away to Puerto Rico, the girl in the umbrella case?

A.  Well, she didn't move away to Puerto Rico.  She was sent back to Puerto Rico.

Q.  She was gone.  She went to Puerto Rico, right?

A.  Right.  I never talked to her.  I only remember that from the report.

Q.  But in the Jimenez case, Maureen -- Maureen moved to Philadelphia, correct?

A.  That's correct.

AR-L 620023
Dorsch - redirect by Leinenweber

3000

Q. Okay. And in both cases, there were two young teenage witnesses, correct?

A. Yes.

Q. And I think yesterday you agreed with me, you said in both of those cases the two young witnesses were of Hispanic origin, correct?

A. That's correct.

Q. And the witnesses' names, at least in the Jimenez case, were a Mr. Vargas and a Mr. Nelson, correct?

A. In the Jimenez case?

Q. Can you take a look.

(Brief pause)

BY THE WITNESS:

A. That's correct.

BY MR. LEINENWEBER:

Q. And in Jimenez, witness one, Mr. Vargas, picked the suspect out of a photo array and picked a suspect out of a lineup, correct?

A. That's what it says, yes.

Q. And Mr. Nelson, the second witness, he didn't make an ID either from a lineup or from the -- excuse me, from a photo array or a lineup, correct?

A. I would have to review it.

Q. Take a look.

(Brief pause)

BY THE WITNESS:

A. You have to forgive me. Maybe you can help me find it, because -- I apologize, but --

BY MR. LEINENWEBER:

Q. I know it's a lot. Take my word, it's in there.

A. Okay.

Q. And in the umbrella case, Witness No. 1 picked out a photo array, ID'd the defendant -- I mean, the suspect out of the lineup, but Witness No. 2 made neither, is that correct?

A. I'm going on your word, sir. I told you, I couldn't find it.

Q. That's what you testified to previously, correct? You said that -- I think actually Mr. Bowman asked you. You had said that Rey Guevara brings in two witnesses, hustles one over to you, you're doing a photo array, the kid's taking his time, and Rey is like, "Yeah, that's the guy, right there," right? And then that guy later, witness one, later made up an ID of the lineup, isn't that what you said yesterday?

A. In the umbrella case?

Q. Yes.

A. Yes.

Q. Okay. So similarly in Jimenez and umbrella, you have one Witness No. 1 does both, picks out of the ID and picks out of a lineup. Witnesses No. 2, "Nah, can't do it either," right? They're exactly the same?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 400 of 673 PageID #:100984
AR-L 620025
Dorsch - redirect by Leinenweber

3002

A.   The same.

Q.   And it came to be that you found out, at least in the umbrella case, that these kids had been bribed, right?

A.   Yes.

Q.   And you know in the Jimenez case that Vargas and Nelson had admitted to being bribed, too, correct?

A.   No, I never knew that, sir.

Q.   Okay.  Well, let me show you what I've marked as Defendants' Exhibit No. 71.

        MR. LEINENWEBER:  If I might approach, Judge.

BY MR. LEINENWEBER:

Q.   You were shown this document from your deposition, correct?

        (Document tendered to the witness)

BY THE WITNESS:

A.   Okay.

BY MR. LEINENWEBER:

Q.   You answered questions about that in your deposition?

A.   I don't recall.  I would have to read it to --

Q.   Go ahead.  Read it.

        But while you're reading it, I'll tell you what it says.  It says:

     "Witness Nelson and Vargas --"

        MR. LOEVY:  Your Honor, I object to foundation.

        MR. LEINENWEBER:  Judge, if you want, we can sit here and wait --

AR-L 620026
Dorsch - redirect by Leinenweber

3003

THE COURT: Wait a minute. Wait. What's the objection?

MR. LOEVY: It's a foundation objection. This is a document created by somebody else for a witness interview with somebody else.

THE COURT: And what are you using it for?

MR. LEINENWEBER: Impeachment.

MR. LOEVY: Well, it's for the truth of what's in it, Your Honor.

MR. LEINENWEBER: No, it's an impeachment, Judge.

THE COURT: Well, is it possible for me to see it so I know what you're talking about?

MR. LEINENWEBER: Sure.

This is a terrible copy. If I can approach, Judge.

THE COURT: I don't care, as long as I can read it.

MR. LEINENWEBER: You can sort of read it.

(Document tendered to the Court.)

THE COURT: Yeah, that does look pretty bad.

MR. LEINENWEBER: Yeah.

THE COURT: All right. Hold on a second.

(Brief pause)

THE COURT: So is there any basis for -- I guess I'm kind of figuring out, if the witness didn't write this report, what can be the basis for impeaching him on this report?

MR. LEINENWEBER: That he's answered questions about

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 402 of 673 PageID #:100986
AR-L 620027
Dorsch - redirect by Leinenweber

3004

this report. He's read this report before. And I believe he knows, having read that report, what these witnesses did.

MR. LOEVY: Your Honor, but they can't impeach him with somebody else's report.

THE COURT: You know, if he testified at his deposition about this report and is saying anything different about the report, I don't see what's wrong with that.

But what is the pending question?

MR. LEINENWEBER: The pending question is, did the witnesses, Nelson and Vargas, admit to being bribed.

MR. LOEVY: See, that's the truth. I mean, if --

THE COURT: Hold on. Hold on.

MR. LOEVY: Sorry.

THE COURT: So in a deposition, was the witness just testifying to what was in the report?

MR. LEINENWEBER: He was shown the report to refresh his recollection.

THE COURT: So you are asking him whether it refreshes his recollection now?

MR. LEINENWEBER: Correct.

THE COURT: All right. So you're using it to refresh recollection.

So does it refresh your recollection?

THE WITNESS: I've never seen this report. It's not mine.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 403 of 673 PageID #:100987
AR-L 620028
Dorsch - redirect by Leinenweber
3005

BY MR. LEINENWEBER:

Q.  You were shown that report at your deposition, correct?

A.  Which deposition?

Q.  At the deposition in this case, sir.

A.  Which time?

Q.  There was only one, sir.

A.  I've only had one deposition?

Q.  You only had one deposition --

THE COUR REPORTER:  I'm sorry.

BY THE WITNESS:

A.  I've given depositions numerous times.

THE COURT:  You know, you can't both talk at once.  I mean --

THE WITNESS:  I've been in numerous depositions, Your Honor.

MR. LEINENWEBER:

Q.  You were deposed in this case, correct?  I just asked you some --

A.  Yes.

Q.  -- questions --

A.  Yes, in the Rivera case.

Q.  And at that deposition you understood that these witnesses had been bribed, correct?

MR. LOEVY:  Objection, Your Honor.  He just --

THE WITNESS:  In the Rivera case?  No.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 404 of 673 PageID #:100988
AR-L 620029
Dorsch - redirect by Leinenweber
3006

THE COURT: Sustained.

MR. LEINENWEBER:

Q. No, in the umbrella case, sir.

In the umbrella case, you said that they were bribed, correct?

A. Yes.

Q. Okay. And in the Jimenez case, they were bribed, too, correct?

MR. LOEVY: Objection, Your Honor.

THE COURT: Sustained.

THE WITNESS: That is what that report says.

THE COURT: Sustained.

THE WITNESS: Sorry.

MR. LEINENWEBER: If I could have just one moment, Judge.

THE COURT: Sure.

(Brief pause)

BY MR. LEINENWEBER:

Q. And you understood in the umbrella case, that -- you understood in the umbrella case that the witnesses admitted to you that they had been bribed because the ex-boyfriend wanted to set up the kid, correct?

A. Yes.

Q. Okay. And, similarly, that's what happened here, too, correct, in the Jimenez case?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 405 of 673 PageID #:100989
Dorsch - redirect by Leinenweber
3007
AR-L 620030

A.   That's what it says.

Q.   All right.  And we know from the paperwork on the Jimenez case --

     MR. LOEVY:  Objection, Your Honor.  Same objection.  He's still working off the Jimenez paperwork.

     MR. LEINENWEBER:  That's the one that he was the arresting --

     THE COURT:  Let me hear the witness.

BY MR. LEINENWEBER:

Q.   We know from Exhibit 70 in which you said you were the arresting officer in the Jimenez case, right?  That the suspect who was arrested in that case was a man named Robert Ramos, correct?

A.   Yes.  From reviewing the reports I see that, yes.  And I recall the names.

Q.   Right.  However, in the umbrella case, you do not recall the name of the defendant or suspect, correct?

A.   Well, I only recall these names because they were handed to me.  If I would gladly have the other report, it probably would enhance my memory.

Q.   Of course.  And if that other report existed, sir, I would give it to you.  You'd be sure of that.  And if I didn't, you'd be sure Mr. Bowman would, correct?

A.   At that time --

Q.   That's correct?

AR-L 620031

A. Repeat, please.

Q. Sure. Of course.

If that report existed, you would have a copy of it either from us or Mr. Bowman, correct?

MR. LOEVY: Objection.

MR. BOWMAN: Objection.

THE COURT: What is the question?

MR. LOEVY: He should be able to answer.

MR. LEINENWEBER: It's a "yes" or "No" question.

THE COURT: Well, you're not giving him an opportunity, then.

MR. LEINENWEBER: Of course.

BY THE WITNESS:

A. Repeat, please.

BY MR. LEINENWEBER:

Q. Of course.

If that report existed, you would have been given it, correct?

A. It doesn't always happen that way, sir.

Q. Okay. But you've never seen this report, right?

A. Reports have disappeared numerous times within the Chicago Police Department.

Q. So -- Okay. But you haven't seen it, correct?

A. I -- '70?

Q. '70 you've seen. That's the one you were the arresting

AR-L 620032

officer on. The umbrella case, you've never seen a report on that, right?

A. Although I've asking for it.

Q. You've never seen that report, right?

A. No. Reports were typewritten --

Q. My question, sir, is, you've never seen the report, right?

A. I would've loved to, yes.

Q. My question --

A. I have not seen it.

Q. Correct. Thank you.

So we know Robert Ramos is a suspect. In Jimenez, umbrella man, we don't know who that suspect is, correct?

A. Correct.

Q. And I think you said you spoke -- yesterday we talked a little bit about it. You spoke to Mr. Ramos' father, "Good kid. Wouldn't do this." He had a previous gun charge, right?

A. I never said I talked to Mr. Ramos' father.

Q. Sorry. You're correct.

A. We were talking about the umbrella case, sir.

Q. You talked to unknown umbrella guy person, right?

A. That's correct.

Q. We don't know his name either, right?

A. It would've been senior.

Q. All right. So senior.

A. Father.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 408 of 673 PageID #:100952
AR-L 620033
Dorsch - redirect by Leinenweber
3010

Q. Father. He comes in, says, "This is a good kid. He would've done something." Basically convinces you, correct?

A. Convinced me to take a look at it. I already had doubts, so I was willing to go that route.

Q. Understood. Understood.

And you found out that umbrella suspect had a gun charge, but the dad explained it, right?

A. And the report explained it, too.

Q. Correct. And in the Jimenez case, as you answered my question yesterday, you knew that Mr. Ramos had a gun charge that had been dismissed, too, correct?

A. No.

Q. Let's take a look.

Excuse me. Yesterday you said you had, do you remember that question?

A. Oh, if we're talking about Ramos, you brought out the fact that he had a defaced firearm.

Q. Correct. And it was a gun charge, right?

A. But I wasn't shown any paper.

Q. I didn't show you any paper, correct.

A. Right.

Q. But there was a gun charge, right? And you admitted it?

A. As you said.

Q. Correct. So in both umbrella man and Ramos, there's a prior gun charge, right?

A.   According to what you described for Mr. Ramos, they both would've had gun charges.

Q.   And when you investigated umbrella man, you found out he worked at Walgreens, correct?

A.   Yes.

Q.   And if you look at your report there in Jimenez, Mr. Ramos worked at Walgreens, too, correct?

A.   In this report, but I wouldn't have known that at the time.

Q.   Right.  But in your report, it says he worked at Walgreens, correct?

A.   Yes.

Q.   And it also says, umbrella man and Mr. Ramos were both DePaul students, correct?

A.   I want to change something.  I would not say "in my report," sir.  I'm going to say, "in this report it says that."

Q.   Fair enough.  We obviously know that lots of officers, Gang Crime Specialists, police officers, detectives, they all work on these reports; fair enough?

A.   Correct.

Q.   Okay.  But those reports indicated that both umbrella man and Mr. Ramos worked at Walgreens and went to DePaul, correct?

A.   I believe so.

Q.   And in the umbrella case, as you indicated, it was Rey Guevara that brought the witnesses in, correct?

A.   Mr. Guevara and Mr. Gawrys.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 410 of 673 PageID #:100994
Dorsch - redirect by Leinenweber
3012
AR-L 620035

Q.  But in the Ramos case, the Jimenez case, those witnesses came in on their own, correct?

A.  I don't know.

Q.  Let's see Exhibit 70 just to make sure you got the right page there.  Just take a look at that, please.

(Said item tendered.)

BY MR. LEINENWEBER:

Q.  I'm going to ask you to look at page 46 -- excuse me.

MR. LEINENWEBER:  This is Exhibit 70, Judge, the page is listed as RFCO24682.

If I can approach the witness?

THE COURT:  Sure.

(Document tendered to the witness)

BY MR. LEINENWEBER:

Q.  Just take a look at that and see if that refreshes your recollection.

(Brief pause)

MR. LOEVY:  Your Honor, we object to foundation.

BY MR. LEINENWEBER:

Q.  This is your report, is it not, sir?

This is in evidence.

A.  This is a report that bares my name, yes.

Q.  Correct.

MR. LOEVY:  All right.  Then we withdraw the objection, Your Honor.

AR-L 620036

BY MR. LEINENWEBER:

Q. And in that report where I put in yellow it says:

"Vargas heard in the neighborhood that police
needed the witness to the offense, and he
presented himself along with Nelson to the
police station to help."

Does that refresh your recollection?

A. No.

Q. It doesn't?

A. No.

Q. Is that what the report says?

A. That's what the report says.

Q. You have no reason to doubt that report?

A. Oh, I have many reasons to doubt the report, sir.

Q. Okay. Well, at least that's what the report says, though, correct?

A. That's what the report says.

Q. Okay. So at least according to this report, which you signed, it says:

"Witnesses Vargas and Nelson presented
themselves to help."

Correct? Isn't that what it says?

A. That's what this report says.

Q. Thank you.

So the difference here between umbrella man and

Jimenez Ramos is, in umbrella man, Rey and Steve Gawrys bring the witnesses in.  In Jimenez, the witnesses volunteer and come in, right?  That's the difference between them two, as you sit there today, correct?

A.   That is one of the differences, yes.

Q.   At least that's the difference of how the witnesses came to your attention, right?

A.   According to the report, yes, that would be the difference.

Q.   And I believe you said yesterday, in the umbrella case you eventually went to Branch 66, and you told the state's attorney there to get rid of the case, correct?

A.   Yes.

Q.   Okay.  And that report indicates that you went to Branch 66 for Mr. Ramos, correct?

A.   No.

Q.   Take a look.

A.   Well, we would've gone to Branch 66 for Mr. Ramos several years later on a similar shooting, yes.

Q.   But I'm just talking about this shooting.

A.   Okay.  This shooting?

Q.   Right.

A.   Yeah.

Q.   You went to Branch 66 on both cases?

A.   That's what we would do, yes.

Q.   And the assistant state's attorney that's listed in your

AR-L 620038

Robert is Donna Nelson, correct?

A.  If he's listed, it's in the report.

Q.  I think it's a she.

A.  Or she.

Q.  She's listed in the report as the state's attorney.

However, in the umbrella case, as you sit here, you don't know the name of the assistant, correct?

A.  There were two, because it was two nights, one for the photo ID's and the second one for a lineup.

Q.  But you don't know the names of those state's attorneys, correct?

A.  Unfortunately, I do not recall.

Q.  So we have Donna Nelson and I don't remember the state's attorney.

And then finally, you've seen the Jimenez case file, we've gone through this, but you haven't seen an umbrella man case file, correct?

A.  That's correct.

Q.  So it appears from my little cheat sheet here, that if we take your date of Mother's Day and we go -- Mother's Day 1989, and we go to a little before Christmas of 1991, that's a span, I think you agreed with me yesterday, that's 30 months, correct?

A.  Yes.

Q.  So in the span of 30 months while working as a Chicago

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 414 of 673 PageID #:100998
AR-L 620039
Dorsch - redirect by Leinenweber

3016

police detective, you had not one, but two cases involving a DePaul student, working at Walgreens --

MR. LOEVY:  Objection.  Argumentative, Your Honor.

THE COURT:  I think so.  I think it's been established.

MR. LEINENWEBER:  Yes.

BY MR. LEINENWEBER:

Q.  Two very, very, very similar cases, right?

A.  At the time that I was a detective --

Q.  No, I'm just asking if they're very similar cases.

A.  As they appear today, there are similarities and many discrepancies.

Q.  Right.  And the biggest discrepancy, I suppose, as you sit there would be, there's a Jimenez file, but there isn't an umbrella file, right?  That's the biggest difference.

A.  To me the biggest difference?

Q.  Well, let's say --

A.  Is that your question?

Q.  I'll take that back.

That's a big difference, right?

A.  That's a big difference.

Q.  Yes.

MR. LEINENWEBER:  And I'm running against my time, Judge.  I'm almost done, I promise.

(Brief pause)

BY MR. LEINENWEBER:

Q. And I think you stated yesterday -- or I know you stated yesterday, that at one point you thought Bill Johnston was your partner on the umbrella case, but on further reflection you said it was John Boyle, correct?

A. In the early conversations about my recall of the events, trying to pinpoint when Guevara was a Gang Crimes specialist, that was the unknown to me. That's why there was some conflict for me to determine who my partner was at the time.

Q. Sure. But now after you thought about it, and as you testified yesterday truthfully, it was John Boyle, correct?

A. In '89? Yes.

Q. In the umbrella case.

A. Yes.

Q. He was your partner?

A. Yes.

Q. And would it surprise you to learn that John Boyle denies this ever happened?

MR. LOEVY: Objection, Your Honor. Is Mr. Boyle going to come to court?

MR. LEINENWEBER: He is going to come to court.

MR. LOEVY: All right. We'll hear from Mr Boyle, then.

BY MR. LEINENWEBER:

Q. Would it surprise you, sir?

A.   No, it wouldn't surprise me.

Q.   Okay.  And I believe you stated that --

        MR. LEINENWEBER:  If I could have one moment, Judge, if I could?

        THE COURT:  Sure.

     (Brief pause)

        MR. LEINENWEBER:  Judge, a few more questions.  I promise.

BY MR. LEINENWEBER:

Q.   So, sir, I think you stated your role, at least in Mr. Rivera's case, you don't recall it.  But apparently from like 4:30 to 7:30 on the day of September 1988, you did a lineup, correct?

A.   Apparently, yes.

Q.   Okay.  And the way you do a lineup, we're not going to go through the whole song and dance, but most likely you're in a room with a witness and they're looking at a two-way mirror or two-way glass, right?

A.   Correct.

Q.   Okay.  So you're in there with the witness, Orlando Lopez, correct?

A.   I don't recall which side of the class I would've been on.

Q.   Okay.  But it's possible you spoke with Mr. Lopez that day?

A.   I'm sure I did.

Q.   Okay.  And at the time, I take it, was your hair color a

different color than it is now?

A.  I was 30 years younger, sir.

Q.  So was it dark?

A.  Yes.

Q.  Did you have a mustache at that time?

A.  Yes.

Q.  And were you wearing glasses at that time?

A.  Yes.

MR. LEINENWEBER:  Has this been marked (indicating)?

(Counsel conferring.)

MR. LEINENWEBER:  Judge, if I can approach?

THE COURT:  You may.

MR. LOEVY:  Is this on the pretrial order?

MR. LEINENWEBER:  It's not.

MR. LOEVY:  All right.  Then, Your Honor, we object.
They're showing an exhibit that is not on the pretrial order.

THE COURT:  Okay.  I haven't seen the exhibit.  I
don't know what it's being used for.

What are you using it for?

MR. LEINENWEBER:  It's a picture of this witness from
the Chicago police file.

THE COURT:  Overruled.

MR. LEINENWEBER:  If I can approach, Judge.

.  I've marked this as exhibit --

What number?

MR. SOTOS: 229.

MR. LEINENWEBER: 290?

MR. SOTOS: 2-2-9.

BY MR. LEINENWEBER:

Q. 229. If you can take a look at that, sir.

(Document tendered to the witness:)

BY MR. LEINENWEBER:

Q. That's your picture, isn't it?

A. Yes, it is.

Q. That picture was taken, do you recall when?

Sometime in the '80s?

A. Pardon?

Q. Sometime in the '80s?

A. I think it was in an award ceremony.

Q. But it was sometime in the '80s?

A. Yes.

MR. LEINENWEBER: Judge, I would move that as an exhibit into evidence.

MR. LOEVY: No objection, Your Honor.

THE COURT: It's received.

(Defense Exhibit 229 was received in evidence)

BY MR. LEINENWEBER:

Q. So is it fair to say--I know it's 30 years ago--that you looked approximately like that?

A. Yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 419 of 673 PageID #:101006
AR-L 620044
Dorsch - redirect by Leinenweber

3021

Q. We all get old, but that's what you probably looked like?

A. Yes.

Q. And I think yesterday you had said that you met with Jane Raley from Northwestern. You asked her about whether you were involved in cases. She told you about Rey. And then you offered -- she talked this case that you were involved in, correct?

A. That's not how it went, sir. And I didn't testify to that.

Q. You met with Jane Raley --

A. Yes.

Q. -- sometime, correct?

A. Yes.

Q. Okay. And you were meeting her about the -- and I'm going to mispronounce his name, and forgive me, Echeveria (phonetic).

A. Echeveria (phonetic.)

Q. That was a case that you believe the person was innocent from Wisconsin, I think?

A. From where?

Q. Wisconsin?

A. No, it's a Chicago case. And I'm still working on it, sir.

Q. And that was the reason for your meeting with Ms. Raley was to see if Northwestern would be interested in taking up this person's cause, fair to say?

A. That's right.

Q. And during the conversation, it came up that you asked are

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 420 of 673 PageID #:101004
AR-L 620045
Dorsch - redirect by Leinenweber

3022

there any cases that Northwestern was working on that you might be involved in, is that correct?

A.  No, I believe she said to me, "Do you know Rey Guevara?" And I said, "Yes, I do."

Q.  And you talked about the Guevara case, this case, correct?

A.  Yes.  She said she had a case that was his case, and my name was also on that case, and would I have any objection to talking to her at that moment about the case --

Q.  And you did --

A.  -- and I told her I have no problem.

Q.  Okay.  And you did.  Let me ask --

THE COURT:  One person at a time.

BY MR. LEINENWEBER:

Q.  Yeah, let me ask the question, sir.

And you did, you told her.  And you said, "Hey, by the way, I got some information on Rey Guevara," correct?  And you told her about the umbrella story, right?

A.  We did talk about the umbrella story and --

Q.  You talked about the umbrella story --

A.  -- we talked about other events.

Q.  Okay.  But the umbrella story was a big part of it, right?

A.  It was a part of the conversation, sir.

Q.  That was the trade, right?

A.  That was the what?

Q.  That was the trade.  You traded that story, you traded the

AR-L 620046

umbrella story so you weren't sitting over there (indicating), isn't that fair to say?

A.   There was no lawsuit, as I understood.

Q.   Fair enough.

MR. LEINENWEBER:   Judge, I have no further questions. Thank you, sir.

THE COURT:   Let's see.   That's all the defense questioning, right?

Who was examining for the plaintiff?

MR. LOEVY:   Mr. Bowman, Your Honor.

THE COURT:   Okay.   Mr. Bowman, do you have anything else?

MR. BOWMAN:   I do.   Thank you.

RECROSS EXAMINATION

BY MR. BOWMAN:

Q.   Good morning, Mr. Dorsch.

A.   Good morning.

Q.   You've been asked this morning and yesterday a number of questions about whether the case you recall is the Jimenez case or some other case.

MR. BOWMAN:   I'm just setting the stage, Judge.

BY MR. BOWMAN:

Q.   Just putting aside which case it was.   Just leave that issue aside.

Whatever case it was, did what you say Rey Guevara

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 422 of 673 PageID #:101006
AR-L 620047
Dorsch - recross by Bowman
3024

did, did it happen?

A.   Yes.

Q.   You talked yesterday about how the memory works.  And you said some things stick in a person's mind, some things don't.  Is your memory of Rey Guevara putting a finger on a photograph something that falls in the category of "sticks in the mind" or something that falls in the other category of what one tends to forget?

A.   It's vivid in my memory.

Q.   You were asked some questions about whether you had seen this old file.  Have you undertaken efforts to look for it?

A.   Years of trying to find it.  Asking for it.

Q.   Can you tell the jury the steps that you've taken to attempt to find the file that you remember.

A.   Well, because I'm not a police officer at the time of my interest in finding the file, I have to take the general steps that normal people take and file FOIA requests, Freedom of Information Act, requesting that not because I didn't know the name of the file, requesting all homicide files by name from the area.

Q.   And have those efforts bore fruit?  Were you able to obtain the file from the Chicago Police Department using those channels?

A.   No.

          (Counsel conferring.)

AR-L 620048
Dorsch - recross by Bowman

3025

BY MR. BOWMAN:

Q.  Did they give you any files in response to your request?

A.  No, but they did send me a chronological event of homicides.

Q.  And was that helpful to you in locating the file?

A.  It wasn't helpful to me in locating the file, but in 1989, and I have it in my file here, it shows that they had 130 named homicide victims.  And they were all named, location and dates, but yet the total for the Area 5 was 129.  So that meant there was one homicide reported but not credited by the police department as one of theirs.

Q.  Okay.

A.  So there's one missing in my review.

Q.  Mr. Dorsch, what is it like for you as a former police officer to step forward and accuse a fellow veteran of the Chicago Police Department of wrongdoing?

        MR. LEINENWEBER:  Objection, Judge.  Relevance, scope.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  It's huge.  I've given testimony on this case, and every case I do no longer as a police officer.  In this case, I've never had an attorney present at depositions that represent me, at a deposition or in a courtroom --

        MS. ROSEN:  Objection.  Violates a motion in limine. If we could have a sidebar?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 424 of 673 PageID #:101008
AR-L 620049
Dorsch - recross by Bowman

3026

THE COURT: All right.

(Proceedings heard at sidebar on the record)

MS. ROSEN: There was a motion in limine on code of silence. On code of silence, Your Honor.

THE COURT: You mean whether he had an attorney present is a code of silence question?

MR. LOEVY: It was a generalized ruling on code of silence. You said you were going to see how the evidence goes and see if it becomes relevant. This code of silence has become injected into the case. He is a whistleblower.

THE COURT: No, no, no, no. I think it was the terminology.

MR. LOEVY: Yes. Not the concept.

THE COURT: So he shouldn't use the terminology --

MR. BOWMAN: I haven't spoken with him about it. I don't know that -- I don't know what he's going to say, but I don't intend to use it in a question. My point is just to have him clarify --

THE COURT: Do you have the ruling? Because normally I don't keep witnesses from saying what they want to say.

MR. LOEVY: It becomes very relevant.

THE COURT: I want to proceed my way, and I've asked for the ruling.

MS. ROSEN: These are the motions and that's the order.

(Document tendered to the Court)

THE COURT: There was no ruling. It's granted until I reconsider it. You know, I'm not going to prevent him from saying what he wants to say. But you better not ask him about that.

MR. LOEVY: Don't use that word.

MR. BOWMAN: I'm not going to use that word.

THE COURT: All right.

(Proceedings resumed in open court)

BY MR. BOWMAN:

Q. Could you tell the jury, Mr. Dorsch, whether or not it's easy to provide evidence of wrongdoing against a fellow cop?

A. No, it's not.

Q. Can you say why, please?

A. When you're working, it's like a family. You go to breakfast, you go to lunch, you go to dinner. You spend endless also hours in courtrooms or waiting to testify at a court hearing. You work 24, 30 hours straight sometimes with partners. You trust each other greatly. You depend on each other greatly. And basically pretty much all your friends are policemen.

Q. When you came forward with the information that Rey Guevara had committed misconduct, did it affect your relationships within the Chicago Police Department?

A. Well, I wasn't really expecting when I met with Jane Raley

AR-L 620051

Dorsch - recross by Bowman

what the conversation was going to be about, but later when it became known that I had talked about the incident, it greatly affected me. I mean, I've had threats.

Q. Have you -- have there been affects for you on your personal relationships?

A. Oh, I no longer associate with very many people in the Chicago Police Department, even partners. I give them space. I don't want them to have to answer. But mostly when I would run into people, they would want to know what was going on.

Q. Have you been subjected to scorn, Mr. Dorsch, as a result of coming forward with your information against Rey Guevara?

A. Oh, yes --

MR. SOTOS: Objection. Relevance, Judge.

THE COURT: Overruled.

BY THE WITNESS:

A. I even had a ranking officer telling me, "Why aren't you dead yet."

BY MR. BOWMAN:

Q. Have you been subjected to ridicule, Mr. Dorsch, because you came forward with information against Rey Guevara?

A. Yeah. People are misunderstanding. A lot of people think that I work for Northwestern Law School. And I never have. I've never been an employee. Everything I've done has been independent.

And I still get cases from Cook County Public

AR-L 620052
Dorsch - recross by Bowman

3029

Defender's Office.  I get cases from the Illinois Appellate Public Defender's Office.  The federal government has retained me on investigations.  But because of that kind of work, now being seen as being on the other side, I'm the bad guy.

Q.   Is it easy for you, Mr. Dorsch, to come into this courtroom and be subjected to cross-examination by Mr. Sotos and Mr. Leinenweber the way it was yesterday afternoon and this morning?

MR. LEINENWEBER:  Objection, Your Honor.

MR. SOTOS:  Objection, your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I understand their position.  I know what their job is, and I understood from previous court appearances in my career that their job is to -- is on behalf of their client.  I'm the bad guy.

BY MR. BOWMAN:

Q.   Is that a position you'd prefer to be in, Mr. Dorsch?

A.   Well, there was a time when I was considered their guy, when I'm talking about when I was a policeman.  I was trusted to testify.  They considered you an expert witness every time you went up there and gave testimony.  Now they question your qualifications.

Q.   Mr. Dorsch, you brought up in one of your answers yesterday afternoon the subject of bravery.  Is there any bravery

AR-L 620053
Dorsch - recross by Bowman

3030

involved in making an accusation against Rey Guevara?

MR. SOTOS: Objection, Your Honor. Leading, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. When you're a detective, the sole purpose of your job is to get to the truth. Anything short of that is a failure.

BY MR. BOWMAN:

Q. Does it go against the grain, Mr. Dorsch, for one cop, such as yourself, to make an allegation of wrongdoing against another cop?

MR. LEINENWEBER: Objection. Leading, repetition.

MR. SOTOS: Objection. Leading.

THE COURT: Overruled.

BY THE WITNESS:

A. Against another cop? People sitting in this courtroom were my friends. I am responsible for what I know and what I say. I have no control of what they will say if they were sitting in this seat.

BY MR. BOWMAN:

Q. You were asked some questions about who you told about this and when you told folks. Did I hear you say you told Sergeant Mingey.

A. Well, certainly. Sergeant Mingey went to the house to pick up the umbrella boy, which is a name he gave to that case, the

one where we don't know the name, and we don't recall where it was, and he no longer recalls. He gave it that name.

Q. Did it -- would it surprise you, Mr. Dorsch, to learn that when Ed Mingey was asked in this courtroom about whether you had, in fact, informed him of this incident, that Ed Mingey Fifth Amendment and didn't answer the question?

A. Does it surprise me? No.

Q. And would it surprise you to learn that before Mr. Mingey started Fifth Amendment, when he was asked in his deposition that he acknowledged that, indeed, you had told him about Rey Guevara's wrongdoing?

A. Ah --

Q. Would that surprise you to learn that?

A. That he told the truth? No.

Q. Now, you were asked about John Boyle. And you testified that it wouldn't surprise you either to learn that Mr. Boyle is expected to deny that he was involved in this or that you told him, and that doesn't surprise you?

A. No.

Q. Can you tell the jury why that doesn't surprise you.

A. Well, we're individuals, we all stand-alone. And for whatever reason, you do what you do, it's your choice. I can't control his choice.

Q. There were a number of years between the incident and your conversation in 2010 with Jane Raley. And in those years, can

AR-L 620055

you tell us what you were doing.  Were you a Chicago police officer?

A.   With Jane Raley?

Q.   No.  When did you retire from the Chicago Police Department?

A.   I retired in August of 1994.  As soon as I turned 50 years of age I left.

Q.   And between 1994 and 2010, where were you?

A.   Well, I retired to northern Wisconsin where I built a new home.  And worked part-time for the Sawyer County Sheriff's Department.  Was given a job where I was training police officers for the State of Wisconsin for 2 years.

Obtained my private investigator license up there and was working cases in Wisconsin.  And then I eventually returned to Chicago, and got my private investigator license here and began picking up cases from many attorneys that had one time been state's attorneys who were now doing defense work.

Q.   Is it fair to say that in that period of time you were moving on, leaving the Chicago Police Department behind?

A.   Oh, yes.

Q.   Now, you were asked about a conversation that you had with Jane Raley.  Can you tell us what Jane Raley said to you about the interest in Guevara that prompted her to -- that prompted you to provide her this information?

MR. GIVEN:  Objection, Your Honor.  Hearsay.

AR-L 620056
Dorsch - recross by Bowman

3033

MR. BOWMAN: It's for the effect on the witness, Judge.

THE COURT: Just hold on one second.

(Brief pause)

THE COURT: Okay. So why is that not hearsay?

MR. BOWMAN: Because the issue, that has been the subject to a great deal of cross-examination, has been why this witness didn't tell other people earlier about the circumstance.

THE COURT: And what Jane Raley said to him is going to -- I think I'm going to sustain the objection.

BY MR. BOWMAN:

Q. Well, the work that Jane Raley was doing was looking at wrongful convictions, right?

A. Yes.

UNIDENTIFIED SPEAKER: Leading. No foundation.

THE COURT: Overruled.

MS. ROSEN: Who is objecting? I'm sorry.

MR. BOWMAN: Mr. Daffada.

BY MR. BOWMAN:

Q. And did Jane Raley's focus on wrongful convictions influence your decision to inform her about your information on Rey Guevara?

MR. SOTOS: Objection, Your Honor. Leading.

THE COURT: Overruled.

AR-L 620057

Dorsch - recross by Bowman

3034

BY THE WITNESS:

A. Well, that wasn't the purpose of why I went there. I had no idea she was going to bring up Rey Guevara to me.

BY MR. BOWMAN:

Q. But she brought it up to you?

A. Yes.

Q. Now, you were asked a number of the questions about testimony that you provided in the years since 2010 yesterday afternoon when Mr. Sotos was asking you questions. Do you remember that?

A. Yes.

Q. How many times did you say you've testified under oath about this?

A. At trials and in depositions, at least 8 times.

Q. Have you been asked to provide this testimony?

A. Well, I've been subpoenaed to courts and depositions, yes.

Q. And one of the cases that Mr. Sotos asked you about was your testimony in a case called People of the State of Illinois against Armando Serrano and Jose Montanez.

A. Yes.

Q. That was a post-conviction hearing?

A. Yes.

Q. And did you testify in that case on May 15, 2013?

A. Well, I don't recall the date, but I did testify in that case.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 433 of 673 PageID #:101017
AR-L 620058
Dorsch - recross by Bowman

3035

Q.   And do you recall that the subject of that case was whether Mr. Guevara had physically abused a witness?

MS. ROSEN:  Objection.  Foundation.

MR. LEINENWEBER:  Objection.

THE COURT:  Okay.  Tell what is the objection.  I think I heard two at the same time.

MS. ROSEN:  Foundation as to the content of the question.  How would he know.

MR. LEINENWEBER:  Objection also on relevance, Judge.

THE COURT:  On what?

MR. DAFFADA:  Relevance and scope.

THE COURT:  Hold on a second.

(Brief pause)

MR. DAFFADA:  Relevance, scope, compound.  Violates Rule 404(b).

THE COURT:  The question is, did the witness know, right?

MR. BOWMAN:  Right.

THE COURT:  So the foundation objection is overruled.

MR. DAFFADA:  404(b) objection, Your Honor.

THE COURT:  I'm sorry what?

MR. DAFFADA:  404(b) objection, Your Honor.

MR. BOWMAN:  Mr. Sotos brought it up, Judge.

THE COURT:  I think it was brought up yesterday.  I don't remember the exact context, but I think counsel can go

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 434 of 673 PageID #:101018
AR-L 620059
Dorsch - recross by Bowman

3036

into anything that was opened up.

BY MR. BOWMAN:

Q.  So to be clear, Mr. Dorsch, do you know that the Serrano and the Montanez case was a case in which the allegation against Mr. Guevara was that he had physically abused a witness?

THE COURT:  Well, this is going to be leading.  I don't think you can even ask the question this way.

MR. BOWMAN:  Okay.

BY MR. BOWMAN:

Q.  Do you know what the allegations were against Mr. Guevara in that case?

MR. DAFFADA:  Same objection, Judge, 404(b).

THE COURT:  Overruled.

BY THE WITNESS:

A.  I remember being asked in a case, if it was that one, if I ever witnessed or knew of Guevara using physical force against someone.

BY MR. BOWMAN:

Q.  And do you know what the outcome of that case was?

THE COURT:  Let me talk to you at the sidebar.

Do you have the question you asked about this yesterday?

MR. SOTOS:  I know exactly what it was, Judge.

(Proceedings heard at sidebar on the record).

MR. SOTOS: I asked him whether he's testified in prior proceedings about this story he's telling. And --

THE COURT: What story he's telling?

MR. SOTOS: The story about Rey Guevara.

THE COURT: About this incident?

MR. SOTOS: Yes.

THE COURT: Yeah. Okay.

MR. SOTOS: And I asked him whether he testified in three specific cases involving six specific individuals.

THE COURT: Right.

MR. SOTOS: Whether he did that. And that's all we talked about. Now he's asking about the allegations.

THE COURT: Okay. Correct. I don't think that opens 404(b) up.

MR. LOEVY: All right. Then what we would like to establish is, and we can leave out the 404(b) at this point --

THE COURT: That would be good.

MR. LOEVY: He brought up the Serrano case, he brought up the Montanez case --

And the third case?

MR. ART: Selache (Phonetic.)

MR. LOEVY: Selache (Phonetic). And he's implying that Mr. Dorsch did this for personal gain to try to get Northwestern to pay him money, you know, that kind of thing. He should just be able to establish what those cases were.

Those were exoneration cases.

THE COURT:  No, I think that's beyond the pale.

MR. LOEVY:  Your Honor, while we're at sidebar before we go back, since we're here, there's been a lot of hearsay about the Jimenez case.  You know, what other people are saying happened in Jimenez.

THE COURT:  Right.

MR. LOEVY:  So, you know, I think we're done with the Jimenez subject, but if not, I don't want argue in front of the jury, no more hearsay about Jimenez is our objection.  I don't know if they're intending to do it on redirect, but --

MR. SOTOS:  I'm going to ask him about what he knew about the Jimenez case on redirect after that.  I'm definitely going to do that.

MR. LOEVY:  You already did that all that, and then he did all that --

THE COURT:  Well, it's actually been done twice.

MR. LOEVY:  And he asked the questions --

MR. SOTOS:  No, Judge.  He just asked him all sorts of questions about what he remembers testifying to.  I want to ask him whether he -- about what my job is on cross-examination to paint him out to be a bad guy, and how what he said as to Jimenez about the umbrella case was the truth, and about how the City appears to be hiding a file, and I want to ask him whether he testified about those things before --

AR-L 620062

THE COURT: Well, the objection was to going into a lot of hearsay about Jimenez.

MR. SOTOS: I'm not going to go into the back and forth.

THE COURT: All right.

MR. SOTOS: I'm not going to ask any hearsay questions, Judge. I won't ask a single hearsay objection.

THE COURT: All right. So make an objection.

(Proceedings resumed in open court)

BY MR. BOWMAN:

Q. In any event, Mr. Dorsch, you have had -- you have been called upon under subpoena to testify on multiple occasions about what you know about Rey Guevara, right?

A. Yes.

Q. Has your testimony been truthful?

A. Yes.

Q. Has it been easy for you to be repeatedly placed under subpoena and called upon to provide testimony --

MR. DAFFADA: Objection. Asked and Answered, cumulative.

THE COURT: It's a little different question, but it's pretty cumulative.

BY MR. BOWMAN:

Q. Let me move on to one other subject. You were shown a photograph of yourself from the late '80s, which you appeared

AR-L 620063

to be a much younger man with some different looking glasses and some darker hair and darker mustache. Do you remember seeing that?

A. Yes, I remember the photo.

Q. So let me put it to you, Mr. Dorsch, are you the guy to whom Orlando Lopez said, "Wrong guy. Wrong guy. This isn't the guy"? Did Orlando Lopez say that to you?

A. Never.

Q. What would you have if he had, sir?

A. Certainly would not have charged anyone.

MR. BOWMAN: That's all I have.

THE COURT: Okay. Mr. Sotos.

MR. SOTOS: Thank you, Judge.

FURTHER REDIRECT EXAMINATION

BY MR. SOTOS:

Q. Good morning, sir.

You testified just now that it's our job to make you the bad guy, correct?

A. From experience in the courtroom, yes.

Q. Do you understand that it's our job to probe the truth of the testimony that you give to the jury?

A. Yes.

Q. You understand that it's for the jury to decide whether or not what you're saying is truthful or not. Regardless of whether you testified repeatedly that it's truthful, it's

AR-L 620064

ultimately for the jury to decide whether, in fact, it's true, correct?

A. Most definitely, it is theirs.

Q. So do you understand that the reasons we ask you about the Jimenez file, which was disclosed, is to probe whether or not that was, in fact, the file that you were talking about rather than the umbrella file?

A. I understand why you did the that, yes.

Q. Okay. And you're certainly aware of many incredible similarities between the two cases, is that true?

A. Oh, yes.

Q. So many similarities that would you agree with me that unless you were sitting in your shoes, it would be very difficult to believe that there was another case that was so similar but still different?

A. I stated that, the first time I read that report.

Q. You were shocked at the similarities?

A. I was astounded.

Q. Still knowing that there was some other case out there --

A. Oh, I knew there were other cases similar.

Q. Right. But you were shocked when you --

MR. LOEVY: Asked and answered, Your Honor.

THE COURT: Sustained.

MR. SOTOS:

Q. You just testified that something about a chronology of

AR-L 620065

130 cases that you tried to look at -- before we do that, you testified that you've been trying to find this other file for 4 years?

A. Well, over a period of time, yeah. Yeah. Various ways.

Q. And you're aware, from your discussions with attorneys, that a lot of people have been looking for this file, correct?

A. That was why it was astounding that it was found 4 years later.

Q. And when Northwestern gave you the file, the Jimenez file, they told you that they had --

MR. LOEVY: Objection. Hearsay, Your Honor. "They told you," hearsay.

THE COURT: Well, I have no idea if it's hearsay.

Why are you asking it for?

MR. SOTOS: I want to know about his knowledge at the time. Not about whether or not -- whether it was actually a file. It's about what he was told about it and what he thought.

MR. LOEVY: Your Honor, hearsay. Objection.

MR. SOTOS: Not for the truth, Judge.

THE COURT: Let me hear the question.

Don't answer the question.

BY MR. SOTOS:

Q. When you were -- you were provided the Jimenez file by Northwestern, correct?

AR-L 620066
Dorsch - further redirect by Sotos

3043

A.  Yes.

Q.  And they told you that they had found the file you've been talking about?

MR. LOEVY:  Same objection, Your Honor.

THE COURT:  I don't see why that would be relevant except for the truth.  I'm going to sustain the objection.

MR. SOTOS:

Q.  In any event, they provided you with the Jimenez file?

A.  Yes.

Q.  Okay.  And then you looked at it and you were astounded at the similarities?

MR. LOEVY:  Objection.  Asked and Answered, Your Honor.

THE COURT:  Sustained.

BY MR. SOTOS:

Q.  You knew at the time you looked at the Jimenez file that the State's Attorney's Office --

MR. LOEVY:  Objection to Hearsay.  He's going to start saying the State's Attorney's Office --

THE COURT:  I have to hear the question.

MR. SOTOS:  He testified --

THE COURT:  No, just ask the question.

BY MR. SOTOS:

Q.  You knew at the time that you reviewed the Northwestern file that the Cook County State's Attorney's Office had

interviewed the witness in the Jimenez case, correct?

MR. LOEVY: Objection, Your Honor.

THE COURT: So at the time -- the question is, when the witness was provided the Jimenez file, did he know of his own knowledge?

MR. SOTOS: Yes.

THE COURT: Okay. Overruled.

MR. SOTOS: That was it.

BY MR. SOTOS:

Q. So at the time you reviewed the Jimenez file when Northwestern provided it to you, you knew that the Cook County State's Attorney's Office had interviewed the witness who you were claiming Mr. Guevara -- no, that's not a fair question, because he says it's a different case.

You knew at the time you were provided the file that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case, correct?

A. No, I didn't know.

Q. Do you recall giving a deposition in this case?

A. I recall depositions in this case.

Q. Well, let me ask you this, do you remember when you were provided the Jimenez file?

A. (No response)

Q. Do you remember when you were provided the Jimenez file? If I told you it was April 25, 2015, does that make sense to

AR-L 620068

you?

A. I have no recollection at all when I got it.

MR. LOEVY: Objection. Foundation, Your Honor.

THE COURT: The question --

BY THE WITNESS:

A. I don't remember.

BY MR. SOTOS:

Q. You don't remember?

A. I don't remember, no.

BY MR. SOTOS:

Q. You remember giving a deposition in the Rivera lawsuit in 2015?

A. I'm sure I did.

Q. April 14, 2015?

A. I don't remember the dates.

Q. You take my word for it?

A. Yes.

Q. Do you recall -- page 398, Line 6 -- do you recall being asked in April 2015:

"Question: Have you seen, are you aware that --"

MR. LOEVY: Objection, Your Honor. This is the hearsay he just wants to read. There's no foundation for it.

MR. SOTOS: It's not hearsay. It's about what he was aware of.

THE COURT:  You know, again, you have this, I don't. I don't know what's coming.  You seem to know.  If you want to give me that so I can look at it, maybe I'll have a better idea.

MR. LOEVY:  All right.  There's no time frame on the question at all.

THE COURT:  There's what?

MR. LOEVY:  No timeframe on the question at all.

MR. SOTOS:  Your Honor, I said it was a different --

MR. LOEVY:  Your Honor --

MR. SOTOS:  Can we show the witness --

THE COURT:  You know, just stop arguing.

So the objection is that there needs to be a timeframe?

MR. LOEVY:  No, the objection is, he's just trying to do what he said he wouldn't do at sidebar.

THE COURT:  And what I just told you was, I don't know.  So let me see it.

MR. SOTOS:  I got it right here.

(Mr. Sotos brushing against microphone, loud noise)

(Document tendered to the Court.)

THE COURT:  Come on, people.  Let's just try to get some kind of professionalism in here.

(Brief pause)

THE COURT: Okay. So this is in a deposition, and the witness read something?

MR. SOTOS: He had received a Northwestern file.

THE COURT: It doesn't say that.

MR. SOTOS: Well, there's a lot of --

THE COURT: Hold on.

(Brief pause)

THE COURT: Look, I'm going to sustain the objection. You're talking about documents from Northwestern, documents from the State's Attorney's Office. I don't know what you're talking about, and I don't know why it isn't hearsay, but --

MR. SOTOS: Can I answer?

THE COURT: Sure. Sure.

MR. LOEVY: Could we go to sidebar?

THE COURT: All right. We'll go to sidebar.

(Proceedings heard at sidebar on the record.)

MR. SOTOS: May I?

THE COURT: Yeah.

MR. SOTOS: Because this goes specifically to why he is continuing to -- it goes specifically to why he is trying to claim that the umbrella file is not the Jimenez file because he knew the witness had been interviewed by the Cook County State's Attorney's Office and that he had told the State's Attorney's Office that he was bribed by another person and he was not -- and that Rey Guevara did not do anything --

THE COURT: This is the witness in the Jimenez case?

MR. SOTOS: Judge, this is -- yes.

MR. LOEVY: Yes.

MR. SOTOS: That the witness in the Jimenez case had been interviewed by the Cook County State's Attorney's Office and had told him that he was bribed by another person and that Rey Guevara did not do anything to him. And it was because --

THE COURT: And what is the basis for -- I'm getting confused. He was in the Jimenez case?

MR. SOTOS: Judge, let me explain it to you again. Northwestern gave him the Jimenez file. I tried to ask him, they told him they thought that was the case.

THE COURT: Right.

MR. SOTOS: He looked at it, and learned that this witness had been interviewed by the State's Attorney's Office in the Jimenez case.

THE COURT: Yeah, but I'm trying to figure out why we're building this whole structure on Jimenez.

MR. SOTOS: Because -- because it explains --

MR. LOEVY: Well, if I can --

THE COURT: Shh.

Go ahead.

MR. SOTOS: Because it explains why he is lying about his, his umbrella case not being the Jimenez case.

MS. ROSEN: He did work on it.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 447 of 673 PageID #:101031
AR-L 620072
Dorsch - further redirect by Sotos
3049

MR. SOTOS: If I could finish!

MR. LOEVY: But he did --

THE COURT: One person at a time.

MR. SOTOS: He now just blamed the Chicago Police Department for hiding one file in the chronology when there is no other file --

THE COURT: Let me.

MR. SOTOS: -- it's the Jimenez file.

THE COURT: Well, let me ask a question --

MR. DAFFADA: To answer your last question, Mr. Dorsch was involved in the Jimenez case.

THE COURT: Yeah, I got that. I was already told that.

Did he make an accusation in the Jimenez case about bribery by Guevara?

MR. SOTOS: No.

MR. LOEVY: That's the point --

MR. SOTOS: The witnesses in the Jimenez case said they were bribed by an individual --

THE COURT: Yeah, I know, but why is this on his doorstep?

MR. LOEVY: It's not, Your Honor.

THE COURT: Could I hear this? Because I'm doing fine on my own at this point.

MR. LOEVY: All right..

AR-L 620073

Dorsch - further redirect by Sotos

3050

MR. SOTOS:  What's the question?

THE COURT:  My question is, this whole thing is about the fact that there's similar allegations in the Jimenez case. Did he make an accusation in the Jimenez case against Guevara?

MR. SOTOS:  No, because he made an accusation about an unknown unidentified file which everybody knows is the Jimenez case.  And he's saying it isn't because of the fact that the witness was interviewed by the State's Attorney's Office and said it never happened, that's why he's lying.

THE COURT:  But he never said it happened.

MR. SOTOS:  He did.

MR. LOEVY:  Your Honor, when am I going to get a turn?

THE COURT:  When did he say it happened?

MR. SOTOS:  What did he say?

THE COURT:  When did he say that Guevara bribed somebody in the Jimenez case?

MR. SOTOS:  He said --

MR. LOEVY:  He didn't.

MR. SOTOS:  No, Judge, he said --

MR. LOEVY:  Your Honor, I think you're going to -- you know --

MR. SOTOS:  Judge, this is the most serious of error after what he just said about this case and about the Chicago Police Department hiding files.

THE COURT:  All right.  Let me hear you.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 449 of 673 PageID #:101033
AR-L 620074
Dorsch - further redirect by Sotos

3051

MR. LOEVY: What they're trying to do is, Jim wants to tell the jury, "isn't it true that witnesses said things, isn't it true the state's attorney said things." Bring the witnesses in. They said they were going to do their rebuttal case. They want to short-circuit the rebuttal case and just do hearsay. They just want to tell this witness, didn't the state's attorney say this, didn't the witnesses say that.

Now I'm yelling. I'm sorry.

THE COURT: Yeah, you are.

MS. ROSEN: And, Your Honor, if I can --

THE COURT REPORTER: Ms. Rosen, I'm sorry, you're rubbing up against my machine and I can't write.

MS. ROSEN: Sorry!

THE COURT REPORTER: That's Okay.

MS. ROSEN: The chronology is is that he comes forward with this event that he says happened and gives all the descriptives. So then the City and Northwestern start looking through files to look for the case that matches that.

THE COURT: Yeah. I got that.

MS. ROSEN: We identified the Jimenez file. Northwestern believes it's the file, the City believes it's the file.

THE COURT: Right.

MS. ROSEN: He is told while this is happening that the State's Attorney's Office has interviewed the witnesses who

AR-L 620075

were bribed.

THE COURT: Right.

MS. ROSEN: And those witnesses say, "Yes, we were, but Rey Guevara had nothing to do with that."

THE COURT: Okay.

MS. ROSEN: So then the point is that once he learns that, all of a sudden the Jimenez file is not the file that he's talking about. It's some other unknown file with no descriptives. That's the point that we are trying to make, is that once he's confronted with --

THE COURT: Okay. Let me ask you this, I don't believe I'm hearing this for the first time, I mean the fact that there was an allegation of bribery in the Jimenez case.

MR. SOTOS: There was, Judge.

THE COURT: That didn't involve him.

MR. SOTOS: It did not involve him.

MR. LEINENWEBER: And, Judge, if I may. On my cross-examination he admitted that he knew that. He knew it in both cases.

THE COURT: That's what I thought. That's what I thought. I think we've beat this horse to death.

MR. LOEVY: So let's move on.

THE COURT: What are you trying to do now?

MR. LOEVY: Except for hearsay.

MR. SOTOS: I'm trying to demonstrate that this idea

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 451 of 673 PageID #:101035
AR-L 620076
Dorsch - further redirect by Sotos
3053

that the -- he just testified for the first time that --

THE COURT:  You know, all you're allowed to do in examination of a witness is get what you need for closing argument.

MR. SOTOS:  Correct.

THE COURT:  What more do you want to get than you already have?

MR. SOTOS:  I'm trying to impeach his credibility on his testimony that the City of Chicago withheld or buried a file when everybody knows it's not true.

MR. LOEVY:  Then ask him about --

MR. SOTOS:  That was the file.  So he doesn't have any foundation for saying that.

THE COURT:  So if Mr. Leinenweber already established that there was an allegation of bribery in the Jimenez case that -- did you bring out what the state's attorney's position was?

MR. LOEVY:  No, Mr. Sotos did.  Mr. Sotos did yesterday.  He did yesterday.

MR. SOTOS:  He denied it today, Judge.

THE COURT:  Well, if you go over it like 20 times, who knows.  We've spent enough time on this.

MR. SOTOS:  Wait.  No, no, no.  No, no.  Judge, he denied it today.  The deposition impeaches what he just said, that he didn't know the state's attorney had interviewed the

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 452 of 673 PageID #:101036
AR-L 620077
Dorsch - further redirect by Sotos

3054

witness.

MR. LOEVY:  But there's no timeframe on when he knew it.

THE COURT:  Wait.  Wait.  Wait.  Wait.

Okay.  So if we know that by April of 2015 he had seen the Jimenez file and he knew that the witnesses said what they said.

MR. SOTOS:  Yes.  And that's the time we're talking about, the time of the dep.

THE COURT:  You know, you can make your point with the date, you can't argue it.  I've heard enough on this subject, make your point --

MR. SOTOS:  That's all I want to do.

MR. LOEVY:  He already asked him what the date of the deposition was.

THE COURT:  Well, I just said what you can do, but I want the question that has the date in it --

MR. SOTOS:  Well, can I just ask that question?

MR. LOEVY:  And then we move on?

THE COURT:  Yeah.  Yeah.  If you make the date clear.

MR. LOEVY:  But then, Your Honor, we're not going to hear hearsay about what the investigators --

THE COURT:  I don't know what we're going to hear.

MR. LOEVY:  Well, Your Honor, we object to opening this can of worms.  I was trying to --

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 453 of 673 PageID #:101037
AR-L 620078
Dorsch - further redirect by Sotos

3055

THE COURT: Well, it's been opened for the whole darn examination. So we're not opening anything.

(Proceedings resumed in open court)

BY MR. SOTOS:

Q. Sir, you testified this morning that you were not aware that the State's Attorney's Office had interviewed the witness in the Jimenez?

MR. LOEVY: Objection to timeframe, Your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. As you sit here today, are you aware that the Cook County State's Attorney's Office interviewed the witness in the Jimenez case?

A. Am I aware?

Q. Yes.

A. Now I am.

Q. Were you aware of that at the time you reviewed the documents you received from Northwestern?

A. No.

Q. When did you become aware of that?

A. If I did become aware of it, I probably learned it while being at trials or depositions.

Q. Okay. So were you aware --

MR. LOEVY: Objection, Your Honor. That's what you allowed us to do.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 454 of 673 PageID #:101038
AR-L 620079
Dorsch - further redirect by Sotos

3056

THE COURT:  Let me hear the question.

MR. LOEVY:  It's hearsay, Your Honor.

BY MR. SOTOS:

Q.  Were you aware on April 14th, 2015, that the Cook County State's Attorney's Office had interviewed the witness, Mr. Vargas, in the Jimenez case?

A.  If somebody told me, then I would be aware.  I don't know that somebody told me.  I don't know --

Q.  You --

A.  The State's Attorney's Office never came to me and told me they interviewed anybody.

Q.  Different question, sir.  I'm not asking if the State's Attorney's Office told you.  I'm asking you whether at the time you gave this deposition in this lawsuit in April 2015, whether you were aware that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case?

A.  I do not recall which deposition.

Q.  If I showed you something from the deposition, would it refresh your recollection?

A.  Yes.

MR. SOTOS:  What exhibit is this?

MS. GOLDEN:  67.

(Document tendered to the witness)

BY MR. SOTOS:

Q.  Sir, I'm showing you what has been marked Defendants'

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 455 of 673 PageID #:101039
AR-L 620080
Dorsch - further redirect by Sotos

3057

Exhibit 67, page 398. Can you to review the highlighted portion, please.

(Document tendered)

BY THE WITNESS:

A. Yes.

BY MR. SOTOS:

Q. Does that refresh your recollection as to whether you knew at the time of the deposition that the Cook County State's Attorney's Office had interviewed the witness in the Jimenez case?

A. Well, I think it's even unclear to me reading what is my answer. It says, "I think that was part of what I saw." "I think." So do I really know? "I think."

Q. So you believe, at least at the time you gave your deposition, that the -- that you knew that the Cook County State's Attorney's Office had interviewed the witness --

MR. LOEVY: Objection. Asked and Answered.

THE COURT: Sustained.

BY MR. SOTOS:

Q. Did you know that the witness had told --

MR. LOEVY: Objection, Your Honor. Now he is testifying.

MR. SOTOS: I'm going to ask him what he knew. If he knew about this, I'm going to ask him what he knew about it.

THE COURT: He says he thinks. Okay. "Knew," there's

no basis for that.  The witness just said that's what he thought.

BY MR. SOTOS:

Q.  Do you think he knew --

MR. LOEVY:  Objection, Your Honor.  He just wants to testify --

THE COURT:  Da-da-da.  This is the question that I thought you were going to ask, and I thought it's just been answered.  So I don't know what else you're going to do.

MR. SOTOS:  I want to probe what he actually knew at the time before he started saying that there was another file other that the Jimenez case.  I want to ask him what he knew when he knew.

MR. LOEVY:  That's what we talked at sidebar, Your Honor.

THE COURT:  So you're going to ask what he knew from other sources at the time of the deposition about this other case?

MR. SOTOS:  Right.  To probe why he is saying that the Jimenez file is not --

THE COURT:  You know, I think you're going to need to do this some other way.  I'm going to sustain the objection.  I said you could do what you said you wanted to do.  Now I don't know what you're doing.  I'm not going to do another sidebar.

MR. SOTOS:  I was just going to ask him about his

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 457 of 673 PageID #:101041
AR-L 620082
Dorsch - further redirect by Sotos

3059

knowledge, Judge.

THE COURT:  Yeah, I can't even imagine, but the question has been asked and answered.

BY MR. SOTOS:

Q.  Well, sir, you testified on direct examination that there was a chronology of -- that you were trying to find the other file that's like the Jimenez case, you were trying to get that from the Chicago Police Department?

A.  No, I wasn't trying to find a case that was similar.  I was trying to find the case that I was talking about, sir.

Q.  Right.  Right.  Which is different from the Jimenez case?

A.  I had no knowledge of the Jimenez case when I was requesting the file to the case I'm talking about.

Q.  But you were on Jimenez case, right?

A.  Yes.

Q.  Right.  So, I mean, you worked that case, too?

MR. LOEVY:  Objection.  Asked and Answered, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yes.

BY MR. SOTOS:

Q.  All right.  And so you were trying to find the other file, the umbrella file from the Chicago Police Department?

MR. LOEVY:  Objection.  Asked and Answered, Your

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 458 of 673 PageID #:101042
AR-L 620083
Dorsch - further redirect by Sotos
3060

Honor.  That subject has been covered.

THE COURT:  Yeah.  We covered this for a long time. Let's get on to something new.

MR. SOTOS:  No, this was actually just brought up by Mr. Bowman on direct.  And he suggested that the file is missing.  It was a chronology.  He hasn't been crossed on it at all, Judge.

THE COURT:  Well, I'm pretty sure I heard it before.

MR. SOTOS:  No, it just came up for the first time.

THE COURT:  Go ahead.

MR. SOTOS:  In fact, let me ask him that.

BY MR. SOTOS:

Q.  You testified in response to Mr. Bowman's question that there was 129 files listed in the chronology you received from the Chicago Police Department, correct?

A.  Yes.

Q.  And you said that there were 130 murders committed in that same period, did I get that right?

A.  I think we have it backwards, but I have it, if you want to see it.

Q.  You have the chronology?

A.  What I received.

Q.  Okay.  Yeah.  Can you show that?  Can you hand that to me, please?

A.  Yes.

AR-L 620084
Dorsch - further redirect by Sotos

3061

Q.  You have other documents that you brought with you today?

A.  No.  Personal documents.

Well, actually I have 2 years, '89 and '88, because those were the years I was looking at because Guevara was a Gang Crimes specialist at that time.

In '89 with the Chicago Police --

Q.  Wait a minute.  Before you start reading it, maybe you better hand it to me so we can figure out what it is.

A.  Sure.

(Said item tendered)

BY MR. SOTOS:

A.  Thank you, sir.

MR. SOTOS:  Judge, I'll mark this as Defendants' Exhibit 230.

THE COURT:  How much do you have, Mr. Sotos?

MR. SOTOS:  Well, I'm going to have to explore this area.

THE COURT:  I know that, but I'm trying to figure out when to take a break.

MR. SOTOS:  We should probably take a break.

THE COURT:  All right.  Let's take 10 minutes.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

(The following proceedings were had out of the presence of the jury in open court:)

MR. LOEVY:  Your Honor --

THE COURT:  Yes.

MR. LOEVY:  -- if we could have permission to complain.  Mr. Bowman's exam was maybe 10 minutes and we've already like tripled that on the re-redirect.

THE COURT:  Well, I don't know what to do.

MR. SOTOS:  Judge, I've got two things to bring up. First of all, I didn't anticipate all that new stuff coming in about the City.  We just asked that this document that he relied on --

THE COURT:  You know, I don't know what he meant to state.

MR. SOTOS:  And the other thing is, you know, when I knocked over the microphone, you made a comment about the lawyers being unprofessional.  And the people who were sitting back there thought it was directed at me.  I don't know that it was, but it was right on the heels --

THE COURT:  So you want me to say that I didn't mean that knocking over the microphone was unprofessional?

MR. SOTOS:  No, I'm just --

THE COURT:  I mean, the court reporter can't even figure out who's objecting.  And I can't keep it all straight. You're talking over each other.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 461 of 673 PageID #:101045
AR-L 620086
Dorsch - further redirect by Sotos

3063

MR. SOTOS: I just felt the need to bring it up because that was the context in which it occurred.

THE COURT: Well, you don't bring it up unless you want me to do something. Because I'll be happy to do something, but I don't know what it is you want me to do.

MR. LOEVY: Well, hopefully we can get going --

THE COURT: I'd be happy to do something, but I don't think anybody looking at this could possibly think it was anything other than lawyers yelling over each other. So the court reporter and I can't figure out what's going on.

MR. SOTOS: Maybe if you said something along the lines, you think the attorneys are all being professional and you weren't trying to imply otherwise because of the back and forth that was occurring.

THE COURT: I don't think the lawyers are being professional. I think everybody is -- it's chaos in here. But I need to get the court reporter -- I mean, get the CSO because I don't know where he is.

(Brief pause)

MR. LOEVY: Judge, here he is.

THE COURT: Oh, here you are.

MR. SOTOS: Judge, we're waiting for your --

MR. GIVEN: I asked your clerk to make some extra copies of he documents.

THE COURT: And he's doing it.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 462 of 673 PageID #:101046
AR-L 620087
Dorsch - further redirect by Sotos

3064

MR. SOTOS:  That's what we need.

THE COURT:  Well, I think it takes a little while for the jury to get in here.  We won't start until we have copies.

(Brief pause)

THE COURT:  And, you know, if everybody just calms down, you'll be making objections that the court reporter can hear, that I can understand, and people won't be tripping over things, because that's all part of the chaos that this has erupted into.

MR. SOTOS:  Just when I handed you the paper, Your Honor, and I caught --

THE COURT:  Well, everybody just needs to slow down.

(Brief pause)

THE COURT:  Here he comes.  Everybody is getting their copies.

No more speaking objections, but objections ought to have a basis.  I mean, you can't just say "object."  I'm going to ignore that; okay?

MR. LOEVY:  We understand.

THE COURT:  But I don't need speaking objections, and I don't want them.

MR. LOEVY:  While the jury is out, can we make a standing objection that they've already gone twice what Mr. Bowman has redirected and we think it's all been covered during the last exams.

THE COURT: Okay. It's not common in this courthouse to want anybody to be bloodied at the end of cross-examination, and I suppose other people have different experiences.

MR. SOTOS: Judge, you know, we have a view on that based on what we believe occurred as part of our motion with respect to Mr. Guevara and Mr. Mingey. This witness is giving very important testimony, and we think we ought to be able to probe and --

THE COURT: I'm not stopping you.

We're ready. We're ready. Where is the CSO?

(Brief pause)

THE COURT REPORTER: I'll get him, Your Honor.

(Brief pause)

COURT SECURITY OFFICER: All rise.

(The following proceedings were had in the presence of the jury in open court:)

THE COURT: Please be seated, everyone.

Mr. Sotos.

MR. SOTOS: Thank you, Your Honor.

BY MR. SOTOS:

Q. Mr. Dorsch, before we talk about the document that you just handed to me, I just wanted to make one thing clear. After you talked to Ms. Raley in 2010 or 2011, sometime after that Mr. Rivera filed a post-conviction petition. Are you aware of that?

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 464 of 673 PageID #:101048
AR-L 620089
Dorsch - further redirect by Sotos

3066

A. Nobody kept me informed about Mr. Rivera's case.

Q. So you never testified about this story in connection with any proceedings involving Mr. Rivera until yesterday when Mr. Bowman asked you some questions about it, correct?

A. Correct.

Q. All right. So now I want to ask you some questions about the document that you just gave me. And it's been marked as Defendants' Exhibit 230.

And before I ask you about the substance of it, I want to ask you, have you shared this with the attorneys for Mr. Rivera?

A. No.

Q. Because you've been trying to find this file for several years now, right?

A. Yes.

Q. And you knew that a lot of people have been trying to find this file, right?

A. No.

Q. You knew that at the time that you were provided the Northwestern file -- I'm sorry, the Jimenez file by Northwestern in 2015, that people had thought they had found the file, right?

A. I had hoped people were looking for the file. I wanted it found.

Q. But you knew when people gave it to you that people had

been looking for it?

MR. LOEVY: Objection. Asked and Answered, Your Honor.

THE COURT: I mean, I don't even -- you can ask the question, but let's make it clearer.

BY MR. SOTOS:

Q. When Northwestern gave you the file in 2015, the Jimenez file, you knew that they had been looking for it?

A. I hoped they had.

Q. Right. And you knew lawyers for the City had been looking for it?

A. I hoped they had.

Q. Because you had given the story about what happened with Mr. Rivera?

A. Well, I was looking for the file myself, yes. I wanted verification.

Q. And you said you testified about this story on several occasions, as many as 8.

MR. LOEVY: Objection, your Honor.

THE COURT: Sustained.

BY MR. SOTOS:

Q. Well, in all the occasions when you did testify about it, some of the attorneys from Mr. Loevy's firm were the lawyers in those case, right?

A. Yes.

Q.   And there were other lawyers from Northwestern who were lawyers, at times, in those cases too, is that correct?

A.   Yes.

Q.   So were you talking to them during that time about this other file and where it might be?

A.   No.

Q.   Were they telling you that they were trying to find the file, too?

A.   I had asked for help from anyone that could find it, Chicago Police Department or anybody who could help me find the file.

Q.   Including the attorneys --

A.   Through my own efforts.

Q.   Including the attorneys in those other cases that were discussed.

A.   No.  No.

Q.   You didn't talk to them about --

         MR. LOEVY:  Objection, Your Honor.  Asked and answered.

         THE COURT:  Sustained.

BY MR. SOTOS:

Q.   When you asked people for help, like who did you ask?

         MR. LOEVY:  Objection.  Asked and Answered, Your Honor.

         MR. SOTOS:  I didn't ask that.

THE COURT: Overruled.

BY MR. SOTOS:

Q. Who were you asking for help?

A. Well, I asked, personally, maybe Jane Raley, Karen Daniel. Anybody who can find a file and my own records with FOIA.

Q. And did any of them -- did anybody ever tell you, the people that you asked --

MR. LOEVY: Objection. Hearsay.

MR. SOTOS: Just in terms --

THE COURT: I didn't hear the question.

BY MR. SOTOS:

Q. Did the people that you were talking to tell you that they were continuing to look for a different file after they had given you the Northwestern file --

MR. LOEVY: Your Honor --

MR. SOTOS: -- the Jimenez file?

THE COURT: And the objection?

MR. LOEVY: Hearsay, Your Honor.

THE COURT: Your Honor, I don't think it's really for the truth. Overruled.

MR. LOEVY: And relevance, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. No, nobody told me.

BY MR. SOTOS:

AR-L 620093

3070

Q. That they were still looking for another file?

A. No.

Q. All right. But you continued to look?

A. No.

Q. You stopped looking, too?

A. I only had 2 years that I looked at, '88 and '89.

Q. Okay. So because that's the years you think that this other incident occurred?

A. Those are the years that I knew occurred -- should've occurred.

Q. And so this is what I want to get to, so you testified earlier that you got this chronology. So you handed me a document that's been marked as Defendants' Exhibit number 230. And that's a document that you, in fact, have written all over, correct?

A. Yes.

Q. Okay.

MR. SOTOS: Your Honor, we would move to admit Defendants' Exhibit 230 at this time.

MR. LOEVY: We would object to relevance, Your Honor.

THE COURT: Overruled. I will receive it.

(Defendants' Exhibit 230 was received in evidence)

MR. SOTOS: Okay. May I publish, Judge?

THE COURT: Yes.

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 469 of 673 PageID #:101053
AR-L 620094
Dorsch - further redirect by Sotos
3071

BY MR. SOTOS:

Q. So I'm going to show you the first page of the document. This is a document that you received from the Chicago Police Department, is that correct?

A. No, you can get that off the website by just going for the Chicago Police Annual Report which will give you a summary.

Q. Okay. And you got a "42" up the upper left-hand corner. What is that?

A. I believe for that year there were 42 homicides in the 14th District.

Q. Okay. So to try to move through this quickly. At the bottom you write, "Report 130 homicide listed 129," correct?

A. Right.

Q. All right. And that's what you testified to in response to Mr. Bowman, that there was one missing file, right?

A. That's always been a question in my mind, why would there be 130 names but the police department only said there were 129 total homicides in Area 5. And maybe it's not important, but I just never, in my own mind, could understand why there was a difference of one.

Q. So what is the report that says there were 130 homicides?

A. If you go further on, you'll find the names of homicide victims that were returned to me from one of my FOIA requests. One of the only things I got back from Chicago.

Q. Okay. And that actually was attached to the same exhibit,

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 470 of 673 PageID #:101054
AR-L 620095
Dorsch - further redirect by Sotos
3072

and that is this page (indicating). This is the first page, those, right? These are homicide victims from 1989?

A. Correct.

Q. Correct?

A. Yes. Reported by the police department.

Q. And then some other ones, correct?

A. Right.

Q. And then there's another one. So you counted up a total of 129, is that right?

A. No, from those pages there's 130 names.

Q. 130 on these pages. And so where does the 129 number come from?

A. If you go back to the police summary for districts, you'll find it's broken down in areas. In the 14th, 15th, 16th, 17th, and 25th districts total 129 homicides.

Q. Okay. That's this document that was part of the --

A. Right. You'll see 14th, 15th, 16th, and so on, lists the number of homicides, as the police report for that year coming out to only 129, where there's 130 names. Maybe it's not important, I don't know. Maybe I'm misreading it.

Q. By the way, you've never shared this document with anybody prior to you giving it to me this morning?

A. No.

Q. Okay. So correct me if I'm missing something, and I just read it, but you said there's 130 names, 130 names that are

listed in these three pages?

A.   That's the police listing them, it comes out to 130.

Q.   But this report says there's 129.

A.   Right.  And that's a summary for the same year.

Q.   So there's more names listed than --

A.   No, which is --

Q.   -- than the index?  It's the opposite?

A.   Yeah.  That's why I don't understand it.

Q.   But you -- so if had this list, you could go through all 130 cases and then find out whether one of these is the case that's just like the Jimenez case?

A.   I tried to do that.

Q.   You went through them all?

A.   Well, from looking at it.

Q.   Were any of them the case --

A.   Only by location.

     I don't know.  I would have to get the individual files.

Q.   You never --

A.   Unless I have success getting returns of anything from the Chicago Police Department from my FOIA's.

Q.   All right.  And then, just so we're clear, were you attempting to testify on direct examination that because there was a difference between 129 and 130 of the people listed and the index here, that somebody in the City of Chicago police

AR-L 620097

department or City itself was trying to hide the other file that the umbrella file that you said that you were involved in?

A. Was that what I was trying to say? I was trying to understand the difference. I didn't know what to say.

Q. But you don't think that what you just handed me in any way suggests that anybody who was trying to -- trying to withhold a file from you, right?

A. As I'm not the author of either of those totals, I don't know what it is.

MR. LOEVY: Your Honor, we object. This topic has been covered scanned.

MR. SOTOS: I'm just about done, Judge.

THE COURT: Overruled.

BY MR. SOTOS:

Q. But you would agree with me that you don't have any reason to think that the list of all the people is complete?

A. I don't know what to think.

Q. You don't have any reason to doubt it?

A. No. No. I don't know what it means, the difference. I don't.

Q. You're not trying to say it's incomplete?

A. No.

Q. All right. So if you wanted to --

A. I'm saying that's what was returned to me per my request for information, because you asked me what attempts did I make

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 473 of 673 PageID #:101057
AR-L 620098
Dorsch - further redirect by Sotos
3075

no find it, that's all.

Q. And you never discussed your list with any of the attorneys here or any other attorneys anywhere --

THE COURT: Definitely asked and answered.

MR. SOTOS: If I could have one minute, Judge.

(Brief pause)

MR. SOTOS: I'm done, Judge. Thank you.

THE COURT: Okay. Mr. Leinenweber.

MR. LEINENWEBER: One, I promise.

THE COURT: Go ahead.

                    CROSS EXAMINATION

BY MR. LEINENWEBER:

Q. Thanks for your patience, Mr. Dorsch.

Just to bring you back to the case we're here for. I think you said, and you've already said it, you don't really have any memory of the Juan Rivera, your work on the Juan Rivera case, correct?

A. Correct.

Q. And so you have no memory or knowledge of any mistakes or errors made by any of the Chicago police officers in the case, would that be fair to say?

A. Correct.

Q. And I think you were asked by Mr. Bowman, you know, if -- if a witness did say to you, "Hey, wrong guy. Wrong guy," you would remember that and you would have done something about it,

Case: 1:18-cv-01028 Document #: 826-1 Filed: 11/22/25 Page 474 of 673 PageID #:101058
Dorsch - further redirect by Sotos

3076

AR-L 620099

right?

A. You bet.

Q. Okay. And it wouldn't have been unusual at that time in your work as a police officer, as a detective, for a witness to express fear, correct?

MR. LOEVY: Objection to scope and relevance, Your Honor.

MR. LEINENWEBER: Judge, I think it goes directly to --

THE COURT: You know what? I can rule on it without help.

I'm going to overrule the objection. It is beyond the scope but we have an issue about that. Go ahead.

MR. LEINENWEBER: Thanks, Judge.

BY MR. LEINENWEBER:

Q. It would've been unusual in your position as a detective when you're dealing to a witness for a witness to express fear, correct?

A. Sure.

Q. And that would be something, I'm assuming, the Chicago police would say, "Don't worry about it, we're going to protect you," is that fair to say?

A. Protect would be -- I would be lying to them if I said we were going to protect them.

Q. You would comfort them, is that fair to say?

AR-L 620100

A.  Right.  Well, I would try to express the importance of their doing the right thing.

Q.  Okay.  And that wouldn't be something you would even note in a report.  I take it witnesses would express trepidation, fear, whatever word, constantly to you right, when you're dealing with them?

A.  Well, you would explain that the procedure for a lineup that they were protected by a one-way glass.

Q.  Right.  But my question was, if someone did express some anxiety or fear, that's a common occurrence, right?  It happens all right?

        MR. BOWMAN:  Objection.  Asked and Answered.

        THE COURT:  Overruled.

BY THE WITNESS:

A.  Well, it doesn't happen all the time, sir, but it happens on occasion.

BY MR. LEINENWEBER:

Q.  On occasion.  Okay.

        And it would happen enough, though, that it's not something you would ever note in a report, correct?

A.  I don't think I ever have.

Q.  Okay.  And the one last question.  Do you understand that with regard to the umbrella case and the Jimenez case, it's Mr. Mingey's contention that they're the same one; do you understand that?

A.  No, I don't.

Q.  Okay.  You very much, sir.  Appreciate your patience.

MR. LEINENWEBER:  Thank you, Your Honor.

MR. BOWMAN:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may step down.
Watch your step.

THE WITNESS:  Thank you, Your Honor.

(Witness excused)

MR. LOEVY:  At this time, Your Honor, we would call
Mr. Victorson.

THE COURT:  This is the witness who was not able to
come before the plaintiff closed.  So we're reopening the
plaintiff's case for this one witness.

MR. LOEVY:  Thank you, Your Honor.

THE WITNESS DORSCH:  Just want to get my umbrella.
Sorry, Your Honor.

THE COURT:  No, that's fine.

(Brief pause)

(Witness enters the courtroom.)

THE COURT:  Is this the witness?

MR. LOEVY:  I believe that is.

Okay.  Is this the witness?

THE COURT:  Is this the witness?

MR. ART:  Yes, Your Honor.

THE COURT:  Okay.  Sir, could you step down here,

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 13-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 21, 2018.


/s/ Nancy L. Bistany, CSR, RPR, FCRR          06/22/18


/s/ Colleen M. Conway, CSR, RMR, CRR          06/22/18

Official Court Reporters                Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION *IN LIMINE* NO. 14 TO BAR REFERENCE, QUESTIONING, OR INNUENDO TO OTHER LAWSUITS OR COMPLAINTS/DISCIPLINE AGAINST THE DEFENDANT OFFICERS OR OTHER CHICAGO POLICE PERSONNEL

Defendants Reynaldo Guevara, Steve Gawrys, Daniel Noon, Joseph Fallon, Joseph Sparks, Paul Zacharias, John Guzman, Gillian McLaughlin, the Estate of John Leonard, Edward Mingey, Russell Weingart and Rocco Rinaldi ("Defendant Officers"), by their respective attorneys, move this Honorable Court to bar any reference or innuendo to other lawsuits or complaints/discipline ("alleged misconduct") against the Defendant Officers or other Chicago Police personnel.

1.     Throughout this litigation, Plaintiff's attorneys have referenced and inquired about other lawsuits against Defendant Officers and inquired about past complaints and discipline.

2.     Defendants anticipate that Plaintiff will seek to introduce evidence, testimony or argument relating to prior instances of alleged misconduct by Defendant Officers or any other Chicago Police personnel.

3.     Defendants move to bar evidence of alleged misconduct because it is not relevant to any issue in this case and constitutes improper character (or propensity) evidence disallowed

by Federal Rule of Evidence 404. FED. R. EVID. 401, 402, 404. Moreover, the introduction of such evidence threatens to taint the jury into believing that accusations of alleged misconduct raised in the past make it more likely that the officer acted improperly in the instant matter. FED. R. EVID. 403.

4.      Evidence of prior lawsuits is generally not admissible. *Gastineau v. Fleet Mortg. Corp.,* 137 F.3d 490, 494 (7th Cir. 1998); *Cazares v. Frugoli*, 2017 WL 4150719, at \*10 (N.D. Ill. Sept. 19, 2017)(barring reference to other lawsuits "[b]ecause there is no reason to believe that evidence of unrelated lawsuits are germane to Plaintiffs' claims, and given that the evidence would likely be unduly prejudicial and could confuse the jury"); *Miller v. Polaris Labs., LLC*, 2016 WL 1639087, at \*2 (S.D. Ind. Apr. 26, 2016) (barring evidence of unrelated lawsuits against defendants as unfairly prejudicial, irrelevant, and because it would cause undue delay); *Shea v. Galaxie Lumber & Const. Co.*, 1996 WL 111890, at \*1 (N.D. Ill. Mar. 12, 1996) (barring evidence of unrelated lawsuits against defendant under Rules 404(b) and 403).

5.      Evidence of complaint registers against police officers runs afoul of Federal Rule of Evidence 404(b)(1), which prohibits the use of "a crime, wrong, or other act . . . to show that on a particular occasion the person acted in accordance with the character."

6.      The Court must consider the purpose for which the evidence is being introduced, because if the prior misconduct evidence is being introduced solely to establish a propensity, then Rule 404(b) bars its admission. FED. R. EVID. 404(b); *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014)(*en banc*). In this case the prior lawsuits and complaints/discipline lack any probative value regarding the case at hand and instead are simply an attempt to improperly influence the jury to believe that the defendants are "bad police." There is no other purpose for

2

presenting evidence of unrelated prior lawsuits or complaints other than to imply that since Defendant Officers had been sued or complained about before, Defendant Officers "are bad" and must have violated Plaintiff's rights in this case.

7. Additionally, the probative value of using these complaints of misconduct against the Defendants is greatly outweighed by the danger of unfair prejudice. *See* FED. R. EVID. 403. It has been recommended that the use of character evidence in civil trials not be expanded, as it "is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion." FED. R. EVID. 404(a) advisory committee's note (quoting California Law Revision Comm'n, Rep., Rec. & Studies 615 (1964)).

8. If the Plaintiffs are allowed to introduce evidence of other lawsuits, then Defendant Officers will have to defend against them. Thus the court and jury will have to hear evidence from other cases in addition to the one brought by the Plaintiff. This would needlessly prolong the case and likely confuse the jury on the facts at issue.

9. If a jury were bombarded with third-party allegations of misconduct against officers, the jury would be more likely to decide the case on an improper basis, rather than the actual evidence presented. *See United States v. DeLuca*, 2002 WL 370213, at *3 (N.D. Ill. Mar. 8, 2002) (citing *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995)). Indeed, introduction of this evidence poses a significant risk of confusing and misleading the jury. *See Aguilar v. Dixon*, 1995 WL 319621, at *7–8 (N.D. Ill. May 25, 1995) (excluding civilian complaints against officers as improper propensity evidence that would "shed little light on this matter and would

have a tendency towards prejudice"). The prejudicial effect of recounting unsubstantiated allegations of prior misconduct would be great.

10.     In light of these concerns, courts in the Seventh Circuit have consistently barred this type of evidence from introduction at trial. For example, in *Estate of Keys v. City of Harvey*, defendants moved to bar evidence of other acts, including disciplinary records and personnel files of a police sergeant sued for an alleged § 1983 violation. 1996 WL 34422, at *1 (N.D. Ill. Jan. 26, 1996). The court found that the evidence amounted to nothing more than prior bad acts being used to prove actions in conformity therewith. *Id*. In addition, the court found that even if the evidence had not been clearly impermissible propensity evidence, the court still would have excluded the evidence as unfairly prejudicial under Federal Rule of Evidence 403. *Id*. at *2.

11.     Likewise, in *Heflin v. City of Chicago*, defendant officers sought to bar evidence of prior complaints against them. 1996 WL 28238, at *1 (N.D. Ill. Jan. 22, 1996). The court found that the evidence was not probative of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id* at *2. Even if there was minimal probative value, the court said that such value was substantially outweighed "by the danger of unfair prejudice and confusion of the issues." *Id.* Finally, the court stated that the undue prejudice would result in great delay because there would be a necessity for "a trial within a trial." *Id.* (citing *Jones v. Hamelman*, 869 F. 2d 1023, 1027 (7th Cir. 1989) (stating that because evidence of prior bad acts was not probative of defendant officers' modus operandi, it was impermissible under Federal Rule of Evidence 404(b), and even if probative, it was unfairly prejudicial)).

12. In short, case law in the Seventh Circuit is clear that alleged prior bad acts, especially in § 1983 lawsuits, are inadmissible at trial. *See Watts v. Sawyer*, 557 Fed. Appx. 584, 585 (7th Cir. 2014) (affirming exclusion of past civilian complaints because the magistrate judge "reasonably concluded that the unsubstantiated allegations were factually distinct, could confuse the jury, delay the trial, and mislead the jury to regard him as liable based on past accusations"); *Okai v. Verfuth*, 275 F.3d 606, 611–13 (7th Cir. 2001) (affirming exclusion of evidence of officer suspensions); *Bruce v. City of Chicago*, 2011 WL 3471074, at *6–7 (N.D. Ill. July 29, 2011)(barring reference to other lawsuits and incidents and the defendants' disciplinary history); *Casares v. Bernal*, 790 F. Supp. 2d 769, 778 (N.D. Ill. 2011) (barring direct evidence about a sustained complaint register); *Akbar v. City of Chicago*, 2009 WL 3335364, at *1, 3 (N.D. Ill. Oct. 14, 2009) (excluding complaint registers containing excessive force allegations against officers in § 1983 excessive force case); *Walker v. Cnty. of Cook*, 2009 WL 65621, at *1 (N.D. Ill. Jan. 9, 2009) (barring plaintiff from offering any testimony, evidence or argument regarding the prior disciplinary records of any defendant officer or sheriff's office personnel); *Moore v. City of Chicago*, 2008 WL 4549137, at *5 (N.D. Ill. Apr. 15, 2008) (barring any evidence or testimony regarding unrelated complaint registers); *Falk v. Clarke*, 1990 WL 43581, at *3 (N.D. Ill. Apr. 3, 1990) (barring use of prior allegation against officer because it was propensity evidence and unduly prejudicial); *Lastre v. Leonard*, 1990 WL 37658, at *2 (N.D. Ill. Mar. 21, 1990) (barring other civilian complaints and disciplinary history pursuant to Federal Rule of Evidence 404(b)).

13. Defendants have been sued or had complaints against them for various alleged actions or omissions that range from to about 1969/1970 to 2009. Defendants have disclosed

over 100 CRs for the twelve Officer Defendants. Most of the CRs relate to allegations that have no counterpart to the allegations here; they include such claims as physical and verbal abuse, improper searches and damaged or missing property.

14.     Defendants have been named as defendants in about 20 lawsuits that range from the 1970's up through 2018. These lawsuits allege various constitutional violations from physical abuse, to improper searches, arrests, and interrogations. Several recent lawsuits bring claims for reversed convictions though under different facts than this case.

15.     Consistent with Seventh Circuit precedent, Plaintiff should be barred from referencing any prior lawsuits, pending lawsuits, and complaint registers.

16.     None of the prior misconduct is similar to the unique facts of this case, in which a juvenile witness is alleged to have been manipulated even though he denies it. Accordingly, the Court should bar reference to prior lawsuits and complaints because they have no probative value and are simply prohibit propensity evidence.

17.     Similarly, Plaintiff should be barred from making any reference to, or admitting any evidence of or from, an internal investigation into a number of cases handled by Defendant Guevara, conducted by the Sidley Austin law firm under retention of the City of Chicago ("Sidley Review"). *See,* City of Chicago's Motion in *Limine* No. 3 to Bar Evidence and testimony Related to the Sidley Austin Review. As explained by the City's motion, 131,000 pages of documents were produced in this case that were accumulated and created during the Sidley Review, comprised of pleadings from various criminal proceedings, including post-conviction proceedings, appellate records, and criminal proceeding transcripts; transcripts from various civil cases; police reports; Complaint Register Files; memorandums of interviews

6

conducted by Sidley personnel during the Sidley Review; memorandums of conclusions reached regarding the review: and, other materials accumulated related to the various criminal cases under review. For the same reasons as discussed in the City's motion, and for the reasons discussed above, those documents and any reference to them or the Sidley Review, should be barred under Rules 401, 403, 404(b), 801 and 802 as irrelevant, unfairly prejudicial, confusing, and time-wasting hearsay that improperly refers or relates to allegations of prior bad acts. Prior to filing this motion and in compliance with the Court's standing orders on Motions *in limine*, counsel for Defendant Officers conferred with counsel for Plaintiff on May 14, 2018. In that discussion counsel for Plaintiff did not agree to this motion *in limine*.

18.     Prior to filing this motion and in compliance with the Court's standing orders on Motions *in limine*, counsel for Defendant Officers conferred with counsel for Plaintiff on May 14, 2018. In that discussion counsel for Plaintiff did not agree to this motion *in limine*.

WHEREFORE, Defendant Officers request that the Court enter an Order *in limine* to bar reference, questioning or innuendo about other lawsuits or complaints/discipline of Defendant Officers and other Chicago Police Personnel.

Dated: May 14, 2018

Respectfully submitted,

/s/Thomas M. Leinenweber
THOMAS M. LEINENWEBER
*One of the Attorneys for Reynaldo Guevara*

/s/ Jeffrey N. Given
JEFFREY N. GIVEN
*One of the Attorneys for Individual Defendants*

Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
Tel:(312)663-3003
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

James G. Sotos
Jeffrey N. Given
Caroline P. Golden
Jeffrey R. Kivetz
Joseph M. Polick
David A. Brueggen
The Sotos Law Firm, P.C.
550 E. Devon Avenue, Suite 150
Itasca, IL 60143
Tel: (630)735-3300
jgiven@jsotoslaw.com

8

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on May 14, 2018, I electronically filed the foregoing City **Defendants' Motion in *Limine* No. 14 to Bar Reference, Questioning, or Innuendo to Other Lawsuits or Complaints/Discipline Against The Defendant Officers or Other Chicago Police Personnel** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants below.

**Attorneys for Plaintiff**
Arthur R. Loevy
Jonathan I. Loevy
Elizabeth N. Mazur
Russel Ainsworth
Michael I. Kanovitz
Steven E. Art
Anad Swaminathan
Rachel Brady
Sean C. Starr
311 N. Aberdeen
Chicago, IL 60607
(312)243-5900
(312)243-5902(Fax)
loevylaw@loevy.com
jon@loevy.com
Elizabethm@loevy.com
russell@loevy.com
mike@loevy.com
steve@loevy.com
annad@loevy.com
Brady@loevy.com
sean@loevy.com

J. Samuel Tenenbaum
Bluhm Legal Clinic
375 East Chicago Avenue
Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, IL 60611
(312)503-4808
s-tenenbaul@law.northwestern.edu

Locke E. Bowman, III
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312)503-0844
(312)503-1272 (fax)
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

**Attorneys for City of Chicago**
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312)494-1000
(312)494-1001(Fax)
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

**Attorneys for Reynaldo Guevara**
Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 200
(312)663-3003
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

/s/ Jeffrey N. Given
JEFFREY N. GIVEN, Attorney No. 6184989
*One of the Attorneys for Individual Defendan*ts

9

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION IN *LIMINE* NO. 18 TO BAR THE TESTIMONY
OF RULE 404(b) WITNESSES**

Defendants Reynaldo Guevara, Steve Gawrys, Daniel Noon, Joseph Fallon, Joseph

Sparks, Paul Zacharias, John Guzman, Gillian McLaughlin, the Estate of John Leonard, Edward

Mingey, Russell Weingart and Rocco Rinaldi ("Defendant Officers"), by their respective

attorneys, move this Honorable Court to bar the testimony of certain witnesses (Jose Melendez,

Salvator Ortiz, Samuel Perez, Wilfredo Rosario, and Robert Ruiz) offered pursuant to Fed. R.

Evid. 404(b), and to bar any Rule 404(b) testimony by William Dorsch.

## I.      INTRODUCTION

During discovery, Plaintiff initially disclosed 44 "404(b)" witnesses who "may have

knowledge as to Defendant Guevara's pattern of engaging in unconstitutional and unlawful

conduct during police investigations." Pltf's Rule 26(a)(1) Disclosures, pg. 8, Ex. A. The Court

subsequently ordered Plaintiff to identify no more than ten 404(b) witnesses he intended to call

at trial. Dkt. #76. Plaintiff sent Defendants a letter consistent with the Court's order identifying

ten 404(b) witnesses, one of whom has since died (Luis Figeroa) and one of whom was

withdrawn by Plaintiff on May 21, 2014 (David Valesquez). Plaintiff has removed Edwin Davila,

1

Joseph Miedzianowski, and Julio Sanchez from his trial witness list. Defendants believe that Plaintiff intends to parade the five remaining witnesses before the jury to tell of their alleged negative interactions with Guevara, in the unrelated incidents, to prove that in this case Guevara acted in accordance with his actions in the other unrelated incidents.[1] These five remaining witnesses have no knowledge of any of the facts underlying this case, and instead are simply witnesses who allege prior bad acts by Guevara, which in turn is meant to be "propensity" evidence against Guevara. In addition, Defendant Officers anticipate that witness Dorsch, who has substantial relevant knowledge of the Valentin investigation, (and, in fact conducted the September 15, 1988 line-up at which Plaintiff was identified) will also attempt to provide Rule 404(b) testimony, as he did in his deposition, despite not being listed as one of Plaintiff's 404(b) witnesses; he should be barred for the same reasons as the 404(b) witnesses. The five 404(b) witnesses, plus Dorsch's Rule 404(b) testimony, will only lengthen the trial and inappropriately attempt to focus the jurors on Guevara's alleged propensity for unrelated misconduct, distracting the jurors from the facts specific to this case and unduly prejudicing not only Guevara, but all of the other Defendants as well. In refusing to allow Rule 404(b) witnesses proffered against Defendant Guevara in another case, Judge Grady explained:

> Trials are about fairness, first of all, and Rule 404(b) is obviously a rule that is based upon the drafters' concept of fairness. A person usually has enough to do to defend against a specific charge he or she is faced with; and to admit into evidence testimony that on other occasions, whether before or after the event in question, this defendant has engaged in allegedly similar misbehavior would weight the evidence strongly in favor of the person on whose behalf it is admitted. Now, this is especially true when the details of the other events tend to be somewhat inflammatory, as is the case in a couple of instances here.

---

[1] This is clearly foreshadowed in plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts paragraph # 160 that spans over three pages of alleged other acts by Guevara. Dkt. 317, ¶ 160, and Plaintiff's draft pretrial order that includes exhibits related to all the Rule 404(b) witnesses and lists all as may call witnesses except Wilfredo Rosario.

<u>4/21/09 Ruling of Judge Grady in Johnson v. Guevara</u>, 09 C 1042, N.D. Ill., Ex B..

## II.  ARGUMENT

To ensure a fair trial, Federal Rule of Evidence 404(b) provides that "other acts" evidence is not admissible to show a party's conduct in conformity therewith.  FED. R. EVID 404(b). The Seventh Circuit has set forth a "straightforward rules-based approach" for Courts to use to determine admissibility of other act evidence.  *United States v. Gomez*, 763 F.3d 845, 852-53 (7th Cir. 2014)(*en banc*). Under this approach, the Court should not only determine if the proffered other act evidence is relevant to a non-propensity purpose, but also *how* the other act evidence is relevant without relying on a propensity inference. *Id.* at 856. The Court must also determine whether the danger of unfair prejudice outweighs the probative value of the non-propensity purpose. *Id.* at 856-57. Additionally, in assessing the relevance, the Court should consider whether the evidence supporting the other act evidence is sufficient for a jury to find that the other act happened and should assess the similarity and timing of the other act to the substantive facts. *Id.* at 853-54. The Court should only admit the other act evidence if the proponent (here, Plaintiff) demonstrates that the other act is: probative and material, serves a legitimate non-propensity purpose, is not unduly prejudicial, and is supported by sufficient proof. *Id.* at 857-860; *Harris v. City of Chicago*, 2017 WL 2462197, at *2 (N.D. Ill. June 7, 2017).

### A. 404(b) Testimony Should be Barred Because It Is Inadmissible Propensity Evidence.

The Court must consider the purpose for which the evidence is being introduced. If the other act evidence is being introduced solely to establish a propensity, then Rule 404(b) bars its admission. FED. R. EVID. 404(b); *Gomez*, 763 F.3d at 855. The proponent of the other act evidence bears the burden to show a non-propensity purpose for introducing the evidence, but

3

can no longer simply identify one of the exceptions listed in Rule 404(b) itself. *Gomez*, 763 F.3d at 855-56. The proponent must show a chain of reasoning, independent of propensity, that makes the other act evidence relevant to a non-propensity purpose. *Gomez*, 763 F.3d at 856; *Harris*, 2017 WL 2462197, at \*2. Here, Plaintiff cannot meet this burden.

Rule 404(b)(2) lists several purposes for which other acts evidence might be admissible: motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. However, for other acts evidence to be admissible, the purported non-propensity purpose must be legitimately at issue in the case. *United States v. Chapman*, 765 F.3d 720, 727 (7th Cir. 2014)(*citing Gomez*, 763 F.3d at 859-60). In contrast to cases for which 404(b) evidence is often allowed, Guevara's identity, and whether he had the opportunity to commit the acts of which he has been accused, are not at issue because there is no dispute that Guevara was involved in the investigation of the Valentin homicide, and Defendants are not defending this case based on misidentification. Additionally, the preparation, knowledge, absence of mistake and accident exceptions are likewise not applicable in the instant matter as Defendants are contending that the alleged misconduct did not occur; not that there is some innocuous explanation for its occurrence. Further, the testimony Plaintiff desires to introduce does not demonstrate an underlying intent, motive or plan by Guevara to obtain a false identification where Guevara's involvement was supplementary to that of the detectives and the key witness, Lopez, does not claim that he was coerced by police.

Even if Plaintiff could identify a non-propensity purpose, it would not be sufficient to support admission, because *Gomez* has clarified that "a permissible ultimate purpose" does not "cleanse an impermissible subsidiary purpose (propensity)." *Gomez*, 763 F.3d at 855. Plaintiff

4

cannot demonstrate the non-propensity purpose of the evidence without relying on an inference of propensity. For example, Plaintiff alleges that Guevara was the bespectacled Hispanic detective present when Lopez said "wrong guy," and Plaintiff seeks to use the 404(b) witnesses to show that Guevara has a propensity to coerce witnesses to identify the wrong offender to support their claim.[2] The crux of the 404(b) evidence is that Guevara allegedly coerced a witness and fabricated or withheld exculpatory evidence at other times and therefore likely did it here. This is precisely the kind of propensity evidence which Rule 404(b) prohibits.

### B. 404(b) Testimony Should also be Barred Because The Prejudice to Guevara and Defendants Officers Substantially Outweighs Any Questionable Probative Value

The Court's analysis under Federal Rule of Evidence 403's balancing test should consider "the extent to which a non-propensity fact for which the evidence is offered actually is at issue in the case." *Gomez*, 763 F.3d at 860; *Harris*, 2017 WL 2462197, at *2. Rule 403's analysis is important because other act evidence "almost always carries some risk that the jury will draw the forbidden propensity inference." *Gomez*, 763 F. 3d at 857. In this case, that risk is amplified by the multiple witnesses alleging multiple other acts. The proposed Rule 404(b) testimony has no probative value - none of the 404(b) witnesses have any personal knowledge of Plaintiff's claims against Guevara or the facts of his case, which should be the focus of this trial. Only Dorsch has knowledge of the underlying case, which should not be confused with the separate and distinct Rule 404(b) testimony which Plaintiff wants to introduce . Allowing the other act testimony will distract the jury from the facts of this case, and substantially and unfairly prejudice Guevara and the Defendant Officers. The repetition of these other acts will undoubtedly impact the jury, making it difficult for the jury to separate Guevara's alleged

---

[2] The question of whether Guevara was the police officer to whom Orlando Lopez allegedly said "wrong guy" is not answered by reference to 404(b) evidence; certainly, Plaintiff did not argue that in response to summary judgment, relying instead on a photograph and other evidence. *See,* Summary Judgment Opinion and Order at __.

propensities from his factual actions in the underlying case. The prejudice suffered by Guevara overwhelms any relevance of unrelated acts, which should result in barring the five 404(b) witnesses and barring Dorsch from providing Rule 404(b) testimony.

### C. The Anticipated 404(b) Testimony Should also be Barred Because There Is Not Sufficient Proof of the Other Bad Acts and Sufficient Similarities Between those Acts and Alleged Acts in This Case.

Even if the Court finds a chain of logic for admitting other bad acts for purposes other than propensity, and finds that the probative value is not outweighed by the prejudicial effect, the Court must still consider whether the other act evidence "is sufficient for the jury to find by a preponderance of the evidence that the other bad act was committed" and similar in timing and acts to make it relevant. *Gomez*, 763 F.3d at 854. Federal Rule of Evidence 104 conditions relevance of a fact on whether there is proof sufficient to support a finding that the fact exists. FED. R. EVID. 104

Plaintiff's 404(b) witnesses make multiple *allegations* about Guevara's conduct in other incidents, but it is well established that an accusation against an officer that did not result in a finding of misconduct is inadmissible. *See Huddleston,* 485 U.S. at 689, 108 S.Ct. at 1501 (1988); *Edwards v. Thomas*, 31 F.Supp.2d 1069, 1074 (N.D. Ill. 1999). Even absent an investigation into an accusation, the accusation's relevance depends on whether there is proof sufficient to support the accusation. *Gomez*, 763 F.3d at 853-54; *Kyung Hye Yano v. City Colleges of Chicago*, 2014 WL 7450559, at *2 (N.D. Ill. Dec. 31, 2014). In this case, the proffered 404(b) evidence is replete with doubt concerning whether Guevara actually committed any of the acts alleged in those incidents. This will further complicate the trial with mini-trials as to Guevara's alleged conduct in the other 404(b) investigations (each with their own facts, complexities, and disputes),

6

which promises to distract the parties' and the jury's attention from the facts of this case. *See Gonzalez v. Olson*, 2015 WL 3671641, at * 24 (N.D. Ill. June 12, 2015)(The risks of "misleading the jury, confusing the issues, and wasting time so that each side can present its version of the facts substantially outweigh whatever limited probative value this evidence might have.")

In addition, the other acts evidence lack sufficient temporal and factual similarities that might other make these other acts relevant. In this case, there is no probative value in what Guevara allegedly did to coerce a suspect to confess or what alleged leverage Guevara applied to a witness with a criminal history to get him to implicate a suspect, because Lopez was twelve years old, had no criminal history, and has emphatically stated without any contradictory that he was not coerced or otherwise made to identify Plaintiff. Nor does Plaintiff allege Guevara or any other defendant tried to coerce his confession. As demonstrated below, there is no similarity between the other acts and the facts of this case. *See e.g. Patterson v. City of Chicago*, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 1017)("The allegations have not been proven, two of the incidents happened nearly 10 years ago, one of the incidents happened in August 2013, and none of the incidents involves conduct significantly like the conduct alleged in the current case."); *Gonzalez*, 2015 WL 3671641, at * 24. Accordingly, the five 404(b) witnesses, and Dorsch, should be barred from testifying about these varying alleged acts.

### III. APPLICATION TO PLAINTIFF'S 404(b) WITNESSES AND DORSCH

#### A. Jose Melendez

Plaintiff intends to introduce the testimony of Jose Melendez regarding Guevara's investigation of a 1995 shooting of Mr. Melendez's friend, Noel Andujar. Melendez, Andujar and another friend Alberto Rodriguez were in a car that was shot multiple times resulting in the

death of Andujar. Melendez's anticipated testimony is that he did not see the shooter, but Guevara told him who to choose out of a photo lineup. Melendez Dep., at pg. 135-36, 211-13, Ex. C. However, Melendez does not recall if he identified the shooter because he was mad and wanted to help catch the shooter, or if he just wanted to get out of the police station. *Id*., at pg. 135-36, 144-45, 213. Regardless, Melendez was clear that he was not physically threatened, forced to pick anyone out, or promised anything to pick out the shooter. *Id.*, at pg. 146, 173-74. In that case, the police had other independent evidence connecting the shooter to the murder. Rodriguez identified the shooter and testified that he was not told who were suspects or who to choose. Rodriguez Dep., JR-JJ083856, JR-JJ083869-876, Ex. D.[3] Additionally, the driver of the car from which the shooter shot confessed to his and the shooter's involvement in the murder. Montanez Stmt., pg. 2-3, Ex. E.

Melendez's testimony is not relevant to this case. Plaintiff's questioning of Melendez during his deposition belies any logical chain of reasoning that makes Melendez's testimony relevant to any non-propensity issue. Melendez Dep., at pg. 135-36, 211-12, Ex. C (Plaintiff's attorney's questioning sought to have Melendez testify to Guevera's reputation). Melendez's testimony is extremely prejudicial to Guevara without any redeeming probative value. The proposed testimony would significantly prejudice the Officer Defendants - implying that the police harass witnesses until the witness says what the police want, but there is no evidence of that in this case. Additionally, the evidence about Guevara's alleged investigation tactics in Andujar's murder case are confusing and contradicted, which makes it insufficient to support a jury finding that Guevara acted as alleged. Finally, the allegations are not similar in actions or time. Andujar's murder investigation occurred seven years after Plaintiff's arrest. There was

---

[3] Defendant Officers disclosed Rodriguez to provide the independent evidence of identifying the shooter.

8

other independent evidence, apart from Melendez's identification, that linked the shooter to the murder. Melendez' trial will detract from the facts of the case forcing the parties to present evidence in a mini-trial about Andujar's murder.[4]  Accordingly, the Court should bar Melendez from testifying.

## B. Robert Ruiz

Plaintiff disclosed Robert Ruiz to testify regarding Guevara's alleged pressuring of Ruiz to adopt Jose Reyes' statement and identify two criminal defendants. Ruiz Dep., pg. 27-28, 110-111, Ex. F. In 1997, Ruiz and Reyes were witnesses to the murder of their friend Oscar Pagan. *Id*., pg. 63-66. Ruiz signed a statement and testified that he identified the criminal defendants to the grand jury. *Id.* at 190-92. However, during the criminal trial of one of the criminal defendants, he recanted his identification and testified that he did not see the shooter. *Id.* at 195. Ruiz denies that Guevara ever threatened him or told him he would be arrested if he did not implicate the criminal defendants, nor did Guevara promise him anything if he identified the criminal defendants. *Id.* at 166 and 168. Instead Ruiz alleges that he made the identification to stop the police from repeatedly picking him up and taking him to the station to talk. *Id.* at 161.

Ruiz's testimony, about an investigation nine years after the Valentin investigation, lacks any non-propensity purpose because it does not provide any probative information about any parties or witnesses in the present case. The only possible value to Ruiz's testimony is as propensity evidence that the police generally pressure witnesses, so they must have here, which is improper. Ruiz's testimony would lead to a mini-trial and risk confusing the jury.[5]  Ruiz's potential testimony is prejudicial with no redeeming relevance, so it must be barred.

---

[4]  Defendant Officers disclosed ASA William Farrel, and Det. John McMurray who will clarify and contradict Melendez's testimony.
[5]  Defendant Officers disclosed Jose Reyes, Sean Gallagher, and Chiao Lee to contradict Ruiz's story.

### C. Salvador Ortiz

Plaintiff disclosed Salvador Ortiz to testify about his interactions with Guevara relating to a 1989 lineup identification. Ortiz and several other gang members were present at a party during which multiple fights broke out that resulted in the death of a fellow gang member. Ortiz and other gang members identified several people involved in the fight based on the assurance of Samuel Perez (*see infra*) that the individuals in photos shown by Guevara were the perpetrators. Ortiz Dep., pg. 128, Ex. G. Ortiz never told Guevara that he did not see who the perpetrators were. *Id.* pg. 131. Ortiz admitted that he went along with the identification without objection because he was doing Perez a favor. *Id.* pg. 139. The police did not mistreat Ortiz during his identification. *Id.* pg. 163. In 1990 Ortiz informed the attorney of one of the perpetrators he identified that he did not see the fight that resulted in death, but did not mention Guevara's alleged involvement until a 2003 affidavit he executed while incarcerated. Ortiz Dep. II, pg. 15, 109-11, Ex. H.

Ortiz's testimony is not only irrelevant but also suspect. He implies that Guevara was responsible for his questionable identification, but also explains he never told Guevara he did not see anything and that he went forward with the identification because he was doing a favor for Perez. This unique story is not probative in this case and its only purpose is for propensity evidence. This testimony is extremely and unfairly prejudicial to Guevara, with no redeeming value. The alleged actions are not similar to the facts of this case. Lopez did not allegedly identify Plaintiff as a favor to a third party, and specifically testified that he was present and witnessed the murder of Valentin. Allowing Ortiz's testimony would result in a substantial detour of this case into a mini-trial that would risk confusing the jury while also wasting the

10

Court's time.[6] Ortiz's testimony lacks any relevance and must be barred.

### D. Samuel Perez

Plaintiff disclosed Samuel Perez to testify regarding Guevara's alleged unconstitutional investigatory practices. The Defendants previously sought to bar Mr. Perez's trial testimony as a contempt sanction for his failure to appear for his continued deposition despite being served with two subpoenas. *See* Def. Motion for Sanctions, Dkt. # 229. The Court denied this motion without prejudice, foreshadowing the current motion in holding that "the Court has not yet had an opportunity to decide if Perez's testimony is admissible," and that "[u]nless and until Rivera establishes that this testimony is admissible, there is no need to spend time and money on contempt proceedings." 6/15/16 Court Order, pg. 4, Dkt. # 256.

As recounted in the motion to bar Perez, he has told several versions of his interactions with Guevara and what he has heard Guevara has done. Perez alleges that in 1989 Guevara advised Perez that Perez's gang was responsible for a murder and Guevara did not care who from the gang was charged but preferred it was four members. Perez Dep., pg. 90-91, Ex. I. This is the same case for which another of Plaintiff's 404(b) witnesses, Sal Ortiz, was proffered, and led to a hotly contested federal lawsuit that was tried before Judge Grady in 2009 and led to a verdict for the plaintiff, Juan Johnson, that was later settled during the appeals process. (*Johnson v. Guevara*, 05 C 1042, N.D. Ill.)   Perez believed that if he did not go along with Guevara that Guevara would frame Perez for the murder, so Perez told members of another gang (*see* Sal Ortiz *supra*) to identify the four people. Ortiz Dep., pg. 106-113 and 145. Guevara never threatened, coerced or promised anything to Perez. *Id.*, pg. 121. Perez did not testify in any case against the four people Guevara asked him to be identified and did not tell anyone about this alleged interaction

---

[6] Defendant Officers disclosed Juan Michael Delgado, Guillermo Vasquez, Edwin Gomez, Det. William O'Donnell, James Bailey, and Eileen Rubin to counter Ortiz's tale.

11

with Guevara until 2004 (15 years later). *Id.*, pg. 122-123.

Perez's testimony is questionable, strenuously disputed, and irrelevant to the case at hand. Perez's testimony is that he believed Guevara would frame him for a murder if he did not cooperate. Perez's testimony is simply propensity evidence with no redeeming probative value. The testimony is extremely and unfairly prejudicial to the Officer Defendants - implying that the police threaten to frame witnesses unless the witness says what the police want, but once again, there is no evidence of such conduct in this case -- Lopez has not made any similar allegations about a threat of being framed for a crime if he did not identify a witness. Allowing Perez's testimony would require a mini-trial to accentuate all the contradictions in Perez's testimony from the four or more post-conviction hearings in which he has testified. Perez's testimony presents a substantial risk of confusing the jury while also wasting the Court's time.[7]  Perez's testimony has no relevance and should be barred. To the extent the Court denies the motion to bar Samuel Perez as inadmissible under Rule 404(b), the Defendant Officers renew their motion for Sanction (Dkt. 229) to bar Perez for his failure to comply with a subpoena to be deposed.

### E.  Wilfredo Rosario

Plaintiff disclosed Wilfredo Rosario to testify regarding Guevara's alleged coercion of him to identify two criminal defendants. Rosario Testimony., pg. J-36, Ex. J. In 1991, Rosario was arrested by Guevara for a weapons charge and domestic violence and asked if he had any information about several homicides. *Id.*, pg. J-37, J-56, J-82. Rosario had a lot of information about a homicide but alleges that Guevara fed him additional details about the homicide and coerced him to inculpate the two criminal defendants. *Id.*, pg. J-37. Rosario signed a statement

---

7  Sal Ortiz would be a rebuttal witness to Sam Perez and there may be more rebuttal witnesses but Mr. Perez has not completed his deposition testimony to allow the Defendants to assess whether additional relevant rebuttal witnesses exist.

and testified at a Grand Jury identifying the two criminal defendants as having shot the victim. *Id.*, pg. J-29-30, J-52-53; Rosario Statement, pg. 4, Ex. K. However, during the criminal trial of one of the criminal defendants, Rosario recanted his identification and testified that he did not see the shooting. Rosario Testimony., pg. J-27-28, J-34, Ex. J.

Rosario's testimony has no relevance in this case. Guevara's alleged coercion stems from Rosario's willingness to help in hopes of avoiding being charged for a separate crime. *Id.*, pg. J-75. This pure propensity evidence does not provide any probative information about any evidence in the present case. Rosario's proposed testimony would significantly prejudice the Defendant officers by implying that the police provide witnesses detail and coerce them to identify offender despite the fact that Lopez has consistently testified that he was not coerced by the police and picked out Rivera based on his have witnessed the murder . In addition, Lopez was not attempting to avoid trouble from an arrest by cooperating with the police. The only possible value to Rosario's testimony is as propensity evidence that the police coerce witnesses, which is not proper. Rosario's testimony would necessitate a mini-trial and risk confusing the jury.[8] Rosario's potential testimony should be barred because it is significantly prejudicial and provide no value other than propensity evidence.

### F. William Dorsch

Plaintiff disclosed William Dorsch as a witness who "Participated in the Valentin murder investigation and conducted the second line-up leading to Plaintiff s arrest," but did not indicate that Dorsch would provide Rule 404(b) testimony. Pltf's Rule 26(a)(1) Disclosures, pg. 5-6, Ex. A.   While Dorsch will testify to his involvement in this case, which was properly disclosed, he

---

[8] Defendant Officers disclosed Maria Rodriguez, Det. John McKenna, Ofc. Kenneth Moore to rebut Rosario's story.

13

should not be able to provide Rule 404(b) testimony for the same reasons as the five 404(b) Witnesses above.

At his deposition and several post-conviction proceedings, Dorsch has told a story about seeing Guevara point out a suspect to a witness prior to a lineup in some other unidentified case. Dorsch Dep., pg. 332-333, Ex. L. Dorsch believes the case occurred around 1990, but cannot recall the name of the suspect or witnesses in the case. *Id*., pg. 332, 347-353. Dorsch also claims the witness who Guevara helped in the identification process later confessed to Dorsch that he was bribed by someone -- not Guevara -- to falsely identify the suspect.

Dorsch's 404(b) testimony is not relevant in this case. Since Dorsch cannot provide any details to identify and corroborate the case he refers to, his allegations cannot be verified in any way. Thus, Dorsch's anecdotal Rule 404(b) testimony provides no probative information about any parties or witnesses in the present case, while only providing pure propensity evidence that would unfairly prejudice Guevara by implying he helps witnesses identify suspects and did so in the Valentin investigation, when in fact Lopez has consistently denied that the police pointed out Plaintiff to him, and when Dorsch himself has testified that he is not aware of any improper conduct in this case. Dorsch Dep., pg. 251-252, Ex. L. Dorsch's testimony would also confuse the jury because Dorsch was also involved in the Valentin investigation, thus conflating that case with the one in Dorsch's vague 404(b) story. This would also waste the Court's time by requiring the Defendants to present evidence to undermine Dorsch's story.[9] Dorsch should be barred from providing any Rule 404(b) testimony at the trial.

---

9  Defendants would be further prejudiced by Dorsch's 404(b) testimony because they are unable to disclose any rebuttal witnesses because Dorsch has failed to identify the alleged investigation in his story.

14

**CONCLUSION**

The five 404(b) witnesses the plaintiff intends to call at trial have no relevant testimony and likewise, Dorsch's Rule 404(b) testimony has no relevance. Any alleged relevance is wholly contingent on the propensity evidence the testimony indisputably contains in violation of the Seventh Circuit's decision in *U.S. v. Gomez*, 763 F.3d 845 (7th Circuit 2014). The alleged other acts lack similarity and fail to have sufficient evidence for a jury to determine that they in fact occurred. Lastly, the testimony severely prejudices the Defendant Officers' defense by making it likely that they (and more specifically Guevara) could be held responsible for committing misconduct in this case based upon the jury's perception that allegations have been made against police in other cases, so that "where there's smoke, there must be fire." Accordingly this Court should bar the plaintiff's five 404(b) witnesses from testifying and bar any Rule 404(b) testimony from Dorsch.

Prior to filing this motion and in compliance with the Court's standing orders on Motions *in limine*, counsel for Defendant Officers conferred with counsel for Plaintiff on May 14, 2018. In that discussion counsel for Plaintiff did not agree to this motion *in limine*.

WHEREFORE, Defendant Officers request that the Court enter an Order *in limine* to bar the testimony of these five witnesses and bar Dorsch's Rule 404(b) testimony.

15

Dated: May 14, 2018                                       Respectfully submitted,

/s/Thomas M. Leinenweber                                  /s/ Jeffrey N. Given
THOMAS M. LEINENWEBER                                     JEFFREY N. GIVEN
*One of the Attorneys for Reynaldo Guevara*               *One of the Attorneys for Individual*
                                                          *Defendants*

Thomas M. Leinenweber                                     James G. Sotos
James V. Daffada                                          Jeffrey N. Given
Kevin E. Zibolski                                         Caroline P. Golden
Leinenweber Baroni & Daffada, LLC                         Jeffrey R. Kivetz
120 N. LaSalle Street, Suite 2000                         Joseph M. Polick
Chicago, IL 60602                                         David A. Brueggen
Tel:(312)663-3003                                         The Sotos Law Firm, P.C.
thomas@ilesq.com                                          550 E. Devon Avenue, Suite 150
jim@ilesq.com                                             Itasca, IL 60143
kevin@ilesq.com                                           Tel: (630)735-3300
                                                          jgiven@jsotoslaw.com

16

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on May 14, 2018, I electronically filed the foregoing City **Defendants' Motion in *Limine* No. 18 to Bar The Testimony of Rule 404(b) Witnesses** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants below.

**Attorneys for Plaintiff**
Arthur R. Loevy
Jonathan I. Loevy
Elizabeth N. Mazur
Russel Ainsworth
Michael I. Kanovitz
Steven E. Art
Anad Swaminathan
Rachel Brady
Sean C. Starr
311 N. Aberdeen
Chicago, IL 60607
(312)243-5900
(312)243-5902(Fax)
loevylaw@loevy.com
jon@loevy.com
Elizabethm@loevy.com
russell@loevy.com
mike@loevy.com
steve@loevy.com
annad@loevy.com
Brady@loevy.com
sean@loevy.com

J. Samuel Tenenbaum
Bluhm Legal Clinic
375 East Chicago Avenue
Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, IL 60611
(312)503-4808
s-tenenbaul@law.northwestern.edu

Locke E. Bowman, III
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312)503-0844
(312)503-1272 (fax)
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

**Attorneys for City of Chicago**
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312)494-1000
(312)494-1001(Fax)
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

**Attorneys for Reynaldo Guevara**
Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 200
(312)663-3003
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

/s/ Jeffrey N. Given
JEFFREY N. GIVEN, Attorney No. 6184989
*One of the Attorneys for Individual Defendan*ts

17

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE OFFICER DEFENDANTS'
MOTION *IN LIMINE* NO. 14 TO BAR REFERENCE, QUESTIONING OR
INNUENDO TO OTHER LAWSUITS OR COMPLAINTS/DISCIPLINE
<u>AGAINST DEFENDANT OFFICERS OR OTHER CHICAGO POLICE PERSONNEL</u>**

Plaintiff, JACQUES RIVERA, respectfully submits the following response in opposition

to the Officer Defendants' Motion In Limine No. 14, Doc. No. 407, stating in support as follows:

**INTRODUCTION**

Defendants seek to bar reference to lawsuits and complaints brought against the

Defendant Officers and other Chicago police personnel. Defendants argue that this evidence is

improperly prejudicial under Rule 403 and constitutes improper character evidence disallowed

by Rule 404. This motion should be denied because it is vague and overbroad, and Defendants

do not satisfy their obligation to demonstrate that this evidence is inadmissible for all purposes.

Contrary to Defendants' suggestion, evidence of past complaints against police officers have

many permissible purposes under Rule 404(b), and evidence of sustained complaint registers

(CRs) filed against the Defendants speak to many issues in this matter apart from propensity.

Courts routinely admit sustained CRs at trial, and Plaintiff seeks to rely on sustained CRs here.

This Court should deny the Defendants motion.

## DISCUSSION

**A.**   **Defendants' Motion Should be Denied Because It Is Vague and Asks for Exclusion of A Huge Category of Evidence**

The Defendants' motion should be denied as vague and overly broad. With its motion, Defendants have asked this Court to bar all evidence of prior misconduct. Doc 407 at 1. The Defendants do not identify specific evidence that it seeks to have excluded, or specific complaints to which it objects. Rather, the Defendants are simply attempting to impose a general proposition over evidence it has summarily labeled as "irrelevant."

But the parties cannot before trial anticipate all of the different contexts in which evidence of prior misconduct, specifically, evidence of sustained complaint registers, may be relevant to these proceedings. For example, Plaintiff could seek to introduce past CRs to impeach the Defendants or refresh the recollections of witnesses. *Torres v. City of Chicago*, 2015 WL 12843889 (N.D.Ill. Oct. 28, 2015) (evidence of CRs may be used to impeach or refresh the recollection of witnesses). Or the evidence might be admissible for a variety of permissible purposes under Rule 404(b), as discussed in the next section.

In *Austin v. Cook County*, defendants asked the court to bar any argument or testimony regarding the prior conduct or reputation of the defendants or defendants' witnesses. No. 07-c-3184, 2009 WL 7999488, at *4 (N.D.Ill. March 25, 2009). As in this case, the defendants in *Austin* asserted that such evidence was irrelevant, and outweighed by the danger of unfair prejudice under Rule 404(b). *Id.* Reviewing the motion, the Court stated that "the defendants do not explain or describe what specific evidence they are referring to," and dismissed the motion as "vague and undefined." *Id.* The Defendants in this matter have been similarly vague and undefined. They have not objected to specific evidence, or claimed as irrelevant specific claims levied against the Defendant Officers. As in *Austin,* the Defendants' requests are "so vague the

court has no basis on which to rule." *Id.* The Defendants have asked the Court to summarily exclude categories of evidence.

Defendants have fallen far short of their burden to demonstrate that the evidence they seek to exclude is inadmissible for all purposes. *Noble v. Sheahan*, 116 F. Supp. 2d 966, 969 (N.D. Ill. 2000) ("[A] motion *in limine* should be granted only if the evidence sought to be excluded is clearly inadmissible for any purpose."). Their general request to exclude a huge category of evidence is not an appropriate request for a motion *in limine*. *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at \*26 (N.D. Ill. June 12, 2015) (in the absence of more specific information, the court will not bar an entire category of evidence at this juncture).

**B.      Evidence of Sustained Complaint Registers is Admissible for a Variety of Non-Propensity Reasons**

Plaintiff intends to introduce evidence of Defendants' sustained CRs at trial.[1] Evidence of sustained CRs against Defendants is admissible under Rule 404(b)(2). Rule 404(b) bars evidence of other prior acts offered "to prove a person's character in order to show that on a particular occasion the person in acted in accordance with the character." FED. R. EVID. 404(b)(1). As explained in great detail in Plaintiff's Response to Defendants' Motion *In Limine* No. 18, 404(b)(2) allows for the introduction of other-act evidence to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). Evidence of defendant officers' sustained CRs has been deemed admissible for the abovementioned non-propensity reasons and for additional reasons in numerous cases. *E.g.*, *Petrovic v. City of Chicago*, 2008 WL 818309, at \*2 (N.D. Ill. Mar. 21, 2008); *Edwards v. Thomas*, 31 F.Supp.2d 1069, 1074 (N.D.Ill.1999). Moreover, sustained CRs have been

---

[1] The sustained CRs have the following numbers: C223928 (Guevara), C251502 (Guevara), C150473 (Guevara), C220046 (Guevara), C152902 (Guevara), CR 256364 (Zacharias), CR 1020408 (Zacharias), CR 155614 (McLaughlin), CR 256152 (Sparks).

distinguished from unsubstantiated complaints as more likely to be found admissible. *Moore v. City of Chicago*, No. 02 C 5130, 2008 WL 4549137, at *5 (N.D. Ill. Apr. 15, 2008).

Defendants' prior acts are admissible for a variety of reasons including, but not limited to: intent, absence of mistake or accident, knowledge, opportunity, identity, and impeachment. Contained within the sustained complaint reports levied against the Defendants is a substantial history of misconduct. Within these reports is evidence similar in kind and type to the alleged acts currently brought against the Defendants. As this evidence addresses a variety of relevant, non-propensity related issues, it should not be barred from trial as a category. Instead, Plaintiff will identify particular sustained CRs that he intends to use at trial, outside of the presence of the jury, and explain why those CRs are admissible under Rule 404(b). At that point, the Court can assess whether there is any danger of *unfair* prejudice from the CRs identified. *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matters under Rule 403.")

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion *in Limine* No. 14 to bar other misconduct should be denied.

Respectfully Submitted,

**JACQUES RIVERA**

By:     /s/ Jon Loevy
        *One of Plaintiff's Attorneys*

4

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steven Art
Rachel Brady
Sean Starr
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576

5

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, hereby certify that on May 21, 2018, I filed the foregoing

Response to Defendants' Motion *In Limine* via the Court's CM/ECF system and thereby served a

copy on all counsel of record.


/s/ Jon Loevy
*One of Plaintiff's Attorneys*

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

**RESPONSE IN OPPOSITION TO THE OFFICER DEFENDANTS' MOTION *IN LIMINE* NO. 18 TO BAR OTHER ACTS EVIDENCE AND THE CITY'S MOTION *IN LIMINE* NO. 3 TO BAR EVIDENCE OF THE SIDLEY AUSTIN REVIEW**

## TABLE OF CONTENTS

**Table of Authorities** ....................................................................................................... iv

**Introduction** .................................................................................................................... 1

**Applicable Legal Framework** ....................................................................................... 4

**Past Bad Acts of Reynaldo Guevara and Other Defendants** ..................................... 5

    A.   Relevant Rule 404(b) Evidence Relating to Chicago Police Officer William Dorsch ........ 6

    B.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Juan Johnson (404(b) Witnesses Sal Ortiz and Sam Perez) ........................................ 7

    C.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Thomas Sierra (404(b) Witness Jose Melendez) ..................................................... 9

    D.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Xavier Arcos (404(b) Witness Wilfredo Rosario) ................................................. 10

    E.   Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of Freddy & Concepcion Santiago (404(b) Witness Robert Ruiz) ......................................... 12

    F.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Luis Serrano (404(b) Witness Evelyn Diaz) ............................................................... 14

    G.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of David Colon (Cross-Examination Only) ........................................................................ 15

    H.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Angel Diaz (Cross-Examination Only) ........................................................................ 16

    I.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Ricardo Rodriguez (Cross-Examination Only) .................................................. 17

    J.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jose Montanez and Armando Serrano (Cross-Examination Only) ............................... 18

    K.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Roberto Almodovar and William Negron (Cross-Examination Only) ........................... 19

    L.   Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Robert Bouto (Cross-Examination Only) ....................................................................... 20

M.  Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Demitrius Johnson (Cross-Examination Only) ............................................................... 21

N.  The City of Chicago's Own Investigation of Guevara Corroborates the Evidence Set Out Above ......................................................................................................... 22

**Admissibility of Other Acts Evidence** ........................................................................... 23

A.  Other-Acts Evidence Is Admissible to Show Defendants' Intent.................................... 23

B.  Other-Acts Evidence Is Admissible to Show Absence of Mistake or Accident................ 27

C.  Other-Acts Evidence Is Admissible to Show Knowledge ................................................. 28

D.  Other-Acts Evidence Is Admissible to Show Opportunity ............................................... 29

E.  Other-Acts Evidence Is Admissible to Show Identity ...................................................... 30

F.  Other-Acts Evidence Is Admissible to Show Preparation and Plan ................................. 33

G.  Other-Acts Evidence Is Admissible for Other Permissible Purposes As Well.................. 33

H.  Defendants' Arguments to Exclude This Evidence Lack Merit ....................................... 36

I.  Federal Rule of Evidence 403 Does Not Call for Exclusion, Particularly Given Limiting Instructions.................................................................................................................. 38

**The City's Motion to Exclude Evidence relating to the Lassar Investigation** ...................... 39

**Conclusion** ...................................................................................................................... 40

ii

**TABLE OF AUTHORITIES**

**Cases**                                                                                     **Page(s)**

*Cazares v. Frugoli*,
2017 WL 4150719 (N.D. Ill. Sept. 19, 2017) ................................................................ 35

*Daniels v. Williams*,
474 U.S. 327 (1986) ...................................................................................................... 24

*Davies v. Benbenek*,
2014 WL 12660537 (N.D. Ill. May 28, 2014) ................................................................ 5

*Edwards v. Thomas*,
31 F.Supp.2d 1069 (N.D. Ill. 1999) ................................................................. 24, 35, 38

*Hill v. City of Chicago*,
2011 WL 3840336 (N.D. Ill. Aug. 30, 2011) ............................................................... 33

*Holmes v. Godinez*,
2016 WL 4091625 (N.D. Ill. Aug. 2, 2016) ................................................................. 34

*Huddleston v. United States*,
485 U.S. ........................................................................................................................ 36

*Jannotta v. Subway Sandwich Shops, Inc.*,
125 F.3d 503 (7th Cir.1997) ......................................................................................... 35

*Johnson v. Guevara, et al.*,
No. 5 C 1042 (N.D. Ill.) .................................................................................................. 8

*Molnar v. Booth*,
229 F.3d 593 (7th Cir.2000) ......................................................................................... 34

*Montanez v. Guevara*,
No. 17 C 4560 (N.D. Ill. June 19, 2017) ...................................................................... 18

*Negron v. Guevara, et al.*,
18 C 2701 (N.D. Ill. April 18, 2018) ............................................................................ 19

*People v. Allen*,
420 N.W2d 499 (Mich. 1988) ...................................................................................... 39

*People v. Arcos*,
282 Ill. App. 3d 870 (1996) .......................................................................................... 10

*Petrovic v. City of Chicago*,
2008 WL 818309 (N.D. Ill. Mar. 21, 2008) ................................................................. 37

*Shields v. United States*,
2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) ............................................................... 31

*Sierra v. Guevara, et al.*,
No. 18 C 3029 (N.D. Ill. Apr. 30, 2018) ........................................................................ 9

*State Farm v. Campbell*,
538 U.S. 408 (2003) ...................................................................................................... 35

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                          **Page(s)**

*United States v. Anifowoshe,*
 307 F.3d 643 (7th Cir.2002) ........................................................................................ 38

*United States v. Anzaldi,*
 800 F.3d 872 (7th Cir. 2015) ....................................................................................... 24

*United States v. Arnold,*
 773 F.2d 823 (7th Cir. 1985........................................................................................ 25

*United States v. Bell,*
 624 F.3d 803 (7th Cir.2010) ........................................................................................ 33

*United States v. Brown,*
 31 F.3d 484 (7th Cir.1994) .......................................................................................... 38

*United States v. Brown,*
 471 F.3d 802 (7th Cir. 2006) ....................................................................................... 32

*United States v. Chaverra-Cardona,*
 879 F.2d 1551 (7th Cir. 1989) ..................................................................................... 30

*United States v. Clark,*
 774 F.3d 1108 (7th Cir. 2014) ..................................................................................... 32

*United States v. Connelly,*
 874 F.2d 412 (7th Cir. 1989) ....................................................................................... 32

*United States v. Curtis,*
 781 F.3d 904 (7th Cir. 2015) ....................................................................................... 25

*United States v. DeFillipo,*
 590 F.2d 1228 (2d Cir. 1979)....................................................................................... 25

*United States v. Gomez,*
 763 F.3d 845 (7th Cir. 2014) (*en banc*) ............................................................... *passim*

*United States v. Grabiec,*
 563 F.2d 313 (7th Cir. 1977) ....................................................................................... 34

*United States v. Harris,*
 536 F.3d 798 (7th Cir. 2008) ....................................................................................... 29

*United States v. Hernandez,*
 84 F.3d 931 (7th Cir. 1996) ......................................................................................... 27

*United States v. Hillsberg,*
 812 F.2d 328 (7th Cir. 1987) ....................................................................................... 28

*United States v. Hudson,*
 884 F.2d 1016 (7th Cir. 1989) ..................................................................................... 31

*United States v. King,*
 627 F.3d 641 (7th Cir. 2010) ....................................................................................... 34

iv

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                         **Page(s)**

*United States v. Kreiser*,
    15 F.3d 635 (7th Cir. 1994) ...................................................................................... 27, 37

*United States v. Macedo*,
    371 F.3d 957 (7th Cir. 2004) ........................................................................................ 25

*United States v. Macedo*,
    406 F.3d 778 (7th Cir. 2005) ........................................................................................ 37

*United States v. McGee*,
    408 F.3d 966 (7th Cir. 2005) ........................................................................................ 34

*United States v. Nolan*,
    910 F.2d 1553 (7th Cir. 1990) ...................................................................................... 25

*United States v. Robinson*,
    161 F.3d 463 (7th Cir.1998) ......................................................................................... 32

*United States v. Shackleford*,
    738 F.2d 776 (7th Cir. 1984) ........................................................................................ 31

*United States v. Smith*,
    80 F.3d 1188 (7th Cir. 1996) ........................................................................................ 34

*United States v. Swan*,
    486 F.3d 260 (7th Cir. 2007) ........................................................................................ 40

*United States v. Taylor*,
    728 F.2d 864 (7th Cir. 1984) ........................................................................................ 34

*United States v. Tylkowski*,
    9 F.3d 1255 (7th Cir. 1993) .......................................................................................... 28

*United States v. Urena*,
    844 F.3d 681 (7th Cir. 2016) ........................................................................................ 28

*United States v. Vance*,
    764 F.3d 667 (7th Cir. 2014) ........................................................................................ 32

*United States v. White*,
    68 Fed. App'x 707 (7th Cir. 2003) ............................................................................... 28

*United States v. Wimberly*,
    60 F.3d 281 (7th Cir. 1995) .......................................................................................... 37

*United States v. Wormick*,
    709 F.2d 454 (7th Cir. 1983) ........................................................................................ 24

*United States v. York*,
    933 F.2d 1343 (7th Cir. 1991) ...................................................................................... 37

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                          **Page(s)**

*Varhol v. Nat'l R.R. Passenger Corp.,*
    909 F.2d 1557 (7th Cir. 1990) ........................................................................... 34
*Wilson v. City of Chicago,*
    6 F.3d 1233 (7th Cir. 1993) ....................................................................... *passim*
*Woodward v. Correctional Medical Services of Illinois, Inc.,*
    368 F.3d 917 (2004).......................................................................................... 35
*Wrice v. Burge,*
    2016 WL 6962838 (N.D. Ill. Nov. 29, 2016) .................................................... 34
*Young v. Rabideau,*
    821 F.2d 373 (7th Cir. 1987) ............................................................................ 24

**Statutes**

FED. R. EVID. 404(b) ................................................................................................. 4
FED. R. EVID. 801(d) ............................................................................................... 40

Plaintiff, JACQUES RIVERA, by his attorneys, respectfully submits this consolidated response in opposition to the Officer Defendants' Motion *In Limine* No. 18, Doc. No. 411, and the City's Motion *In Limine* No. 3, Doc. No. 382, stating in support as follows:

**INTRODUCTION**

Evidence of other acts of misconduct committed by Reynaldo Guevara is admissible in this case. *United States v. Gomez* provides that other-act evidence is admissible under Rule 404(b) "when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*). In light of the defense theories at trial, there are ample propensity-free reasons for this Court to admit other-acts evidence.

Consider the starkly different accounts the jury will hear explaining how Plaintiff was wrongly convicted of killing Felix Valentin. According to Plaintiff, Guevara and the other Defendants decided to frame him for a shooting without any evidence suggesting that he was the perpetrator; they then manufactured false evidence to implicate him in the crime, using rigged photo and live lineup identification procedures; and throughout they suppressed exculpatory evidence that could have been used to impeach key witnesses like Orlando Lopez and Guevara at trial, and that could have been used to prove Plaintiff's innocence.

Defendants will dispute Plaintiff on all points. They will tell the jury that they did not commit such gross misconduct; that they thought Lopez's identification of Plaintiff was legitimate, and if it was not that they were duped by Lopez's lies; and that Plaintiff was properly arrested, prosecuted, and convicted of murder. To make the case that they are not liable, Defendants will argue—as they did at summary judgment—that if Lopez in fact told the police before the September 15 lineup that Plaintiff was not the perpetrator, then it was not *them* who Lopez told. Defendants will tell the jury that they always conduct legitimate photographic and

live lineup identification procedures, and specifically that they would not point someone out for the eyewitness to pick in a photo array or lineup. And they will argue that they would not have—indeed, could not have—committed the grossly illegal misconduct of framing an innocent man. As explained in this response, it is these material disputes—and the defense theories advanced by Defendants—that justify admitting other acts evidence at trial.

Though there are permissible uses of other-acts evidence in this case, Plaintiff recognizes that this does not mean that he can conduct a three-ring circus about Guevara's reprehensible past misconduct. Plaintiff has no intention of holding a series of mini-trials on Guevara's other acts. Instead, cognizant of this Court's limited time to complete this trial, and consistent with Rule 403, Plaintiff will limit his presentation of this evidence to calling no more than three or four live witnesses to testify about other acts, and to cross-examining Guevara and other Defendants about other acts. Though there are a number of fact patterns discussed in this response, to be clear Plaintiff is not intending to explore all of them at trial. Moreover, the presentation of these cases can be enormously streamlined for an uncommon reason: Defendant Guevara does not deny any of the misconduct set out below. Instead, he is pleading his Fifth Amendment right not to incriminate himself in response to all questions about these cases, and so the proof of many of these fact patterns will take mere minutes.

Moreover, although there is an ample amount of other-acts evidence described in this response, the reality that Guevara was a singularly bad police officer does not warrant a decision that the evidence against him would be unduly prejudicial. On the contrary, the fact that there is such a developed body of past misconduct makes the evidence more reliable and probative of the permissible purposes for which other-acts evidence is admissible under Rule 404(b). Indeed,

2

former Chicago Police Officer Dorsch and the City's own investigation of Guevara during this litigation confirm the reliability and probative value of this other-acts evidence.[1]

Finally, the jury can be instructed that the other-acts evidence is only relevant to the specific permissible uses identified in this response, which will avoid the danger of the jury drawing the impressible propensity inference. Defendants are correct that there is a danger of unfair prejudice in the introduction of this evidence, but the Seventh Circuit in *Gomez* made crystal clear that limiting instructions rather than exclusion are the way to deal with that danger of prejudice. 763 F.3d at 860-61. Moreover, even without a limiting instruction, there is no reasonable argument that a limited presentation of other-acts evidence, which is extremely probative of issues in the upcoming trial on which 404(b) dictates that other-acts evidence is admissible, is *substantially outweighed* by the danger of unfair prejudice. Presented in the limited way that Plaintiff proposes, other-acts evidence passing muster under Rules 404(b) and 403 can be introduced without prolonging the trial and avoiding the danger of prejudice.

On the other hand, if the Court excluded all of the other-act evidence relating to Guevara at trial, then Defendants would have free rein to tell the jury a version of the story of the Valentin investigation that would make it appear as if the whole thing was an honest mistake. Allowing Defendants to take that position in the face of volumes of evidence showing that there was nothing at all accidental about what happened to Plaintiff would be unfairly prejudicial to Plaintiff in the extreme. This Court should deny Defendants' motion to exclude other acts evidence, consistent with the following outline for presentation of that evidence.

---

[1] Plaintiff responds to arguments made by the City in its Motion *In Limine* No. 3 in this response. In short, Plaintiff only intends to use the City's findings described below at trial. That limitation renders many of the City's arguments for exclusion of evidence moot, and the City's additional arguments are discussed at the end of this brief.

3

**APPLICABLE LEGAL FRAMEWORK**

Rule 404(b) bars evidence of other acts offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). But it allows other-act evidence for "another purpose," including but not limited to "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2); *United States v. Walter*, 870 F.3d 622, 628 (7th Cir. 2017).

In *United States v. Gomez*, the Seventh Circuit overhauled its test for determining whether evidence is admissible under Rule 404(b), holding that Rule 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*); *see also id.* at 856 ("[T]he district court should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference."). After analyzing whether other acts evidence is admissible under Rule 404(b), the Court applies Rule 403 as well. *Id.* at 857.

Before discussing the other-acts of Guevara and the particular propensity-free permissible uses of other-acts evidence that apply in this case, it is important to point out that the Seventh Circuit has endorsed the use of other-acts evidence almost exactly like the evidence that Plaintiff seeks to introduce here, in circumstances nearly identical to this case. In *Wilson v. City of Chicago*, the Seventh Circuit reversed a district court's decision to exclude at trial evidence of Chicago Police Officer Jon Burge's other acts of witness coercion, which were similar to the acts of witness coercion at issue in the case going to trial, holding that those other acts were admissible to show intent, opportunity, preparation, and plan, as well as to impeach Burge's

4

denial that he had engaged in those acts. 6 F.3d 1233, 1238 (7th Cir. 1993); *see also Davies v. Benbenek*, 2014 WL 12660537, at *3 (N.D. Ill. May 28, 2014) (recognizing that the other acts in *Wilson* were probative of the defendant police officers "having the means, intent, and ability to use force against suspects during their interrogation at a police station"). *Wilson* dictates admission of other-acts evidence in this case.

## PAST BAD ACTS OF REYNALDO GUEVARA AND OTHER DEFENDANTS

Reynaldo Guevara has an extensive history of gross misconduct. It is no exaggeration to say he is likely responsible for more wrongful convictions than any other officer ever employed by the Chicago Police Department, including Jon Burge. At least 18 men have been exonerated after being wrongly convicted of murder as the result of Guevara's misconduct—together they served hundreds of years behind bars. Guevara's misconduct has led to investigative probes by the City of Chicago, the Cook County State's Attorney, and others. *See generally* Melissa Segura, Detective Guevara's Witnesses, https://www.buzzfeed.com/melissasegura/detective-guevaras-witnesses?utm_term=.xkLAw20mR.

Plaintiff is not attempting to present this whole history of misconduct at trial. Doing so would take months, and the parties have just three weeks to complete the trial. Instead, and contrary to Defendants' suggestion, Plaintiff has already strictly limited the Rule 404(b) evidence that he intends to rely upon at trial. He has cut his list to six Rule 404(b) witnesses, and one other witness, former Chicago Police Officer Dorsch, who is both a fact witness in this case and a 404(b) witness with knowledge of Guevara's past efforts to rig a lineup in a murder case. Plaintiff intends to call three or four of those witnesses at trial. All other presentation of other-acts of Guevara and others will be presented by way of cross-examination.

5

Moreover, Plaintiff has already limited the other-acts evidence to those instances in which Guevara obtained fraudulent identifications by manipulating witnesses and by using corrupted identification procedures, just like he did in this case. In so doing, Plaintiff has excluded from this response a large volume of cases that involve Guevara coercing involuntary confessions and false witness statements through the use of physical abuse during interrogations.[2] Plaintiff describes the other-act evidence he anticipates using in this section.[3]

**A.    Relevant Rule 404(b) Evidence Relating to Chicago Police Officer William Dorsch**

William Dorsch is a former Chicago police detective who worked at Area Five and has first-hand knowledge about Guevara's manipulation of an eyewitness identification procedure during a murder investigation that Dorsch was working. *See* Ex. 1 (Dorsch Testimony from Solache Post-Conviction Hearing) at 74:18-151:22; Ex. 2 (Dorsch Testimony from Montanez Post-Conviction Hearing) 56:7-192:15. Dorsch has testified about this misconduct in the past. *Ibid.* At trial, Dorsch will testify that, a number of months before Guevara made detective in 1990, Dorsch was assigned to investigate a murder that had occurred in the Humboldt Park neighborhood.[4] During the investigation, Guevara brought two juveniles into the police station, who had purportedly witnessed the shooting and had supposedly recorded the license plate number of the car in which the shooter was riding. Doc. No. 317 at¶154. Defendant Gawyrs was also present. Ex. 1 (Dorsch Testimony from Solache Post-Conviction Hearing) at 105.

---

[2] Graciela Flores, Melvin Warren, Rafael Garcia, Daniel Pena, Armando Serrano, Adolfo Friar, Voytek Dembski, Leshurn Hunt, Eliezer Cruzado, Santos Flores, Gloria Ortiz, Daniel Rodriguez, Gabriel Solache, Adriana Mejia, Timothy Rankins, Maria Rivera, and Arturo DeLeon Reyes all have credible claims that Guevara beat them or abused them psychologically during investigations and interrogations.

[3] While the admissibility of other-acts evidence might change depending on testimony and argument from Defendants at trial, Plaintiff anticipates that the following accurate represents the bulk of the Rule 404(b) evidence that he seeks to present at trial.

[4] Dorsch is not sure whether this investigation was in 1988, 1989, or 1990. Given that it was an investigation during the summer a few months before Detective Guevara's 1990 promotion to detective, *Id.* At 87-88, it is most likely that the investigation was in 1989.

In a conference room of Area Five, Dorsch created a photo array so that the two juveniles could attempt to identify the shooter. Doc. No. 317 at ¶154; *see also* Ex. 3 (Testimony of William Dorsch, *People v. Serrano,* case no. 93 CR 1873) at 66-67. He will testify that the first of the two juveniles viewed the photo array for a long period of time, and before he had identified any person, Guevara put his finger on the suspect's photo and said, "That's him." Ex. 3 (Testimony of William Dorsch, *People v. Serrano,* case no. 93 CR 1873) at 68-69. In response, the juvenile adopted Guevara's story and identified the suspect he had pointed out. *Id.* at 69. Dorsch then directed Guevara to leave the room, and Dorsch alone performed the photo identification procedure with the second of the two juveniles. *Id.* at 69-70. The second juvenile was unable to make an identification. *Id*.

After the photo identification procedures, Dorsch conducted a live lineup, in which the first juvenile selected the suspect who Guevara had pointed out in the photo array, and the second did not make an identification. *Id.* At 76-77. Based on the identification, the suspect was charged with murder. *Id*. At 78. Subsequently, Dorsch spoke to the two juveniles without Guevara present, and they admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. *Id.* at 81-82. Prosecutors spoke to the two juveniles, and the suspect was released. *Id.* at 83.

**B.** **Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Juan Johnson (404(b) Witnesses Sal Ortiz and Sam Perez)**

Juan Johnson was wrongly convicted of the September 1989 murder of Ricardo Fernandez. The crime occurred in Humboldt Park, in the street outside of a nightclub, where Fernandez was beaten to death. Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 11-14. Guevara and Defendant Gawrys and Mingey investigated the crime. Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 1450-1451; *see also* Ex. 5 (Supp. Report produced in *Johnson v. Guevara* signed by Gawrys, Guevara,

7

and Mingey). After spending 12 years in prison for a crime he did not commit, Johnson was exonerated in 2004, when he was granted post-conviction relief, re-tried, and acquitted. Doc. No. 314-1 at 64. Subsequently, Johnson sued Guevara in 2005, alleging that Guevara had violated his right to due process by manufacturing false identifications during the investigation. *See Johnson v. Guevara, et al.*, No. 5 C 1042 (N.D. Ill.). In 2009, a jury returned a verdict of $21 million for Johnson on those claims. Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 2133.

The day after Fernandez was killed, Guevara approached 404(b) witness Samuel Perez (aka "Spanky"), put him inside his car, showed him photographs of Johnson and three other men, and told Perez that he did not care who got charged for the murder but that he thought it should be Johnson and the three others depicted. Ex. 6 (Sam Perez Dep. in *Johnson v. Guevara* at 90-92, 95; see also Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 618-620.

After talking with Perez, Guevara approached 404(b) witness Sal Ortiz on the corner of Kostner and Armitage. Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 1016. There, Guevara put some photographs of Johnson and others on his car and told Ortiz that they were the people responsible for killing Fernandez. *Id.* at 1017-1020. At the police station, Guevara showed Ortiz three photographs, told him that they were going to do a live lineup, and instructed him to identify the person in the first photo as the one who had beaten Fernandez with a 2"x4", the second photo as the person who had held a bat during the crime, and the third as the person who had fought with bottles and bricks. *Id.* at 1046. The photograph of the first person was Johnson. Ortiz then identified those people in the live lineup. *Id.* at 1047. At Johnson's criminal re-trial, Ortiz testified that Guevara had shown him photographs of Johnson and had instructed him to pick Johnson from a lineup. Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 1053, 1090.

8

Both Perez and Ortiz provided depositions and trial testimony in *Johnson v. Guevara* describing Guevara's eyewitness manipulations. Ex. 6 (Sam Perez Dep. in *Johnson v. Guevara* at 90-92, 95, 104-106, 112; see also Ex. 7 (Sal Ortiz Dep. I in *Johnson v. Guevara*) at 137-147; *see also* Ex. 4 (*Johnson v. Guevara* Trial Transcript) at 618-626, 1016-1020, 1046-1052, 1111-1113.

**C.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Thomas Sierra (404(b) Witness Jose Melendez)**

Thomas Sierra was wrongly convicted of the 1995 shooting murder of Noel Andujar in Logan Square and spent 22 years in prison before he was exonerated in January of this year. *See generally Sierra v. Guevara, et al.*, No. 18 C 3029, Doc. No. 1 (N.D. Ill. Apr. 30, 2018). The crime was a shooting between two automobiles, and it occurred on May 23, 1995. *Id.* Immediately after the incident, while they were still at the scene, the two eyewitnesses—Jose Melendez and Alberto Rodriguez—who had been riding in the car with Andujar told police that they could not describe the shooter, except to say that he was a Latino male. Ex. 8 (General Offense Case Report) at CPD982. The car in which the shooter had been riding had tinted windows that were rolled up throughout the shooting. *Id.*

The day after the shooting, Guevara, Mingey, and other police officers were assigned to the case. Ex. 9 (Guevara Supp. Report) at CPD1002. Despite there being no eyewitness identification of any person, Guevara decided on a theory that Sierra had been involved in the shooting, and he worked to obtain an identification of Sierra. *Id.* at CPD1002-03.

On May 30, 1995, Guevara brought Melendez and Rodriguez to Area Five to view a live lineup. Before the lineup, they showed Melendez and Rodriguez each a photo array. After the photo arrays, Melendez and Rodriguez were shown a lineup simultaneously, in which they purportedly selected Sierra. Ex. 10 (Guevara Lineup Report) at CPD 993-994.

9

Melendez has since testified that, during this photo array, Guevara held a photo of Sierra in his hand and told him that the photo depicted the perpetrator, saying that "he had reason to believe that this [Sierra] was the guy." Ex. 11 (Melendez Testimony in *People v. Sierra*) at E208; *see also* Ex. 12 (Melendez Dep.) at 132:17-135:10. Rodriguez has since testified that Guevara told him before the photo identification that "they probably got the guy." Ex. 13 (Rodriguez Testimony in *People v. Sierra*) at E139. Guevara's report of these identification procedures does not make any mention of the true circumstances of these identifications. Ex. 9 (Guevara Supp. Report) at CPD1003.

In addition, Guevara had brought a car that he thought had been used by Sierra in the shooting to the parking lot of Area Five. Guevara showed the car to Melendez and Rodriguez, who told him that it was not the car used in the shooting. Ex. 13 (Rodriguez Testimony in *People v. Sierra*) at E113-114; *see also* Ex. 11 (Melendez Testimony in People v. Sierra) at E213-215; *see also* Ex. 12 (Melendez Dep.) at 147-155. Nonetheless, Guevara falsely reported that Melendez and Rodriguez "both identified the [car] as the car from which Thomas Sierra fired his gun." Ex. 9 (Guevara Supp. Report) at CPD1004. Based on these identifications, Sierra was convicted of the Andujar murder.

**D.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Xavier Arcos (404(b) Witness Wilfredo Rosario)**

Xavier Arcos was convicted of murdering Orlando Guirola. *People v. Arcos*, 282 Ill. App. 3d 870, 871–72, 871 (1996). His conviction was based almost entirely on a written statement and testimony of a single eyewitness named Wilfredo Rosario, and the conviction was later overturned because Rosario disavowed his identification. *Id*. at 871–72, 875. Rosario testified that he identified Arcos because Guevara threatened to charge him for the murder. Ex. 14 (Rosario Trial Testimony), at J-36:10-20; J-47:12-24; J-49:4-10.

10

On July 29, 1988, 404(b) witness Rosario was at a party near Division and Kedzie when he and one of his friends went outside to get some air and smoke weed. Ex. 14 (Rosario Trial Testimony), J-25:15–23. Rudy Martinez, an acquaintance of Rosario's, pulled up outside the party, with two other people in the car, and Rosario chatted with Martinez for a few minutes. *Id.* at J-26:3-24; J-27:1-12. Rosario did not get a good look at the person in the passenger seat of Martinez's car or the person in the back seat. *Id.* at J-30:5-9. The car drove away, and shortly thereafter Rosario heard gun shots. *Id.* at J-35. Rosario took off. *Id.* at J-34:14-20.

More than two years later, in 1991, Guevara and his partner, Defendant Gawrys, arrested Rosario at his house for a domestic disturbance. *Id.* at J-45. On the way to Area Five police station, Guevara and Gawrys started talking about the Guirola murder with Rosario. *Id.* at J-36:8-17; J-47:4-12. Guevara told him that if he did not cooperate with him and give him information about the Guirola murder, they would charge him with that murder and lock him up. *Id.* at J-36:10-20; J-47:12-24. Guevara told Rosario that he had enough information to put Rosario at the scene and charge him with conspiracy or murder. *Id.* at J-49:4-10.

Rosario agreed to cooperate, *id.* at J-36-4-37:18, and Guevara and Gawrys started giving him information to help him "piece the case together," *id.* at J-36:20-J-37:3. Guevara told him that Arcos had been involved in the murder, and that the victim was a neighborhood drug dealer. *Id.* at J-39-6-8; J-40:11-15; J-42:14-24; J-41-23-6. Rosario had never mentioned Arcos, but Guevara told Rosario to "put Chino on the scene." *Id.* at J-48:11-24; J-40:13-24. They fed him specifics about the murder, told him to "be creative" with his story, and said he should implicate Xavier Arcos. *Id.* at J-43:1-5; J-48:11-48. Ultimately, Rosario testified that, on the night of the murder, he had seen Arcos in the passenger seat of Martinez's car and had seen Guirola in the backseat.

11

**E.     Relevant Rule 404(b) Evidence Relating to the Wrongful Convictions of Freddy & Concepcion Santiago (404(b) Witness Robert Ruiz)**

Concepcion and Freddy Santiago were wrongly convicted of the shooting murder of Oscar Arman, which occurred in Humboldt Park on July 1, 1997. Ex. 15 (Police Reports related to the Battery/Homicide of Oscar Arman (Pagan)) at JR-JJ 052665-66. Arman was with two friends, Robert Ruiz and Jose Reyes, when individuals in a car drove down the street and started shooting, striking and killing Arman. When questioned about the shooting, Ruiz denied knowing who had done it. Ex. 16 (Ruiz Testimony in *People v. Santiago,* case no. 97-20973) at Bluhm 033247; 033251. He did not see the shooter. *Id.* at Bluhm 033241-44.

On the initial police report, on which Ruiz is listed as a witness, the only description of the perpetrators is that they were three Latino males, and that one wore a "black hood." Ex. 15 (Police Reports related to the Battery/Homicide of Oscar Arman (Pagan)) at JR-JJ 052665-66. Another report of the day of shooting states that Ruiz also told police that the car used in the shooting was a white Oldsmobile Cutlass. *Id.* at JR-JJ 052667. The next day, Ruiz provided a similarly bare bones description of the shooters. *Id.* at JR-JJ 052676-77. According to the reports, these were the only descriptions that Ruiz related.

On July 6, Guevara was assigned to the case. *Id.* at JR-JJ 052681-82. Despite there being no eyewitness identification of any person, Guevara decided that Concepcion and Freddy Santiago had been involved in the shooting, and he worked to obtain an identification of the brothers. *Id.* at JR-JJ 052681-97. According to Guevara's July 9 report, an unidentified confidential source told Guevara that two brothers nicknamed "Joker" and "Lefty" were responsible for the shooting. *Id.* at JR-JJ 052679; 052681. On the same day, Guevara went to Arman's wake, where he encountered Ruiz and Reyes. *Id.* at JR-JJ 052682. They both allegedly told Guevara that the shooter was "Lefty" and the driver was "Joker." *Id.* Guevara took them to

12

the police station and showed them a photo array, in which they identified "Lefty" as Concepcion Santiago and "Joker" as Freddy Santiago. *Id.*

According to Ruiz, however, Guevara showed him a handful of photographs and told him who to identify. Ex. 16 (Ruiz Testimony in *People v. Santiago*) at Bluhm 033257. At his deposition in the *Johnson v. Guevara*, No. 5 C 1042 (N.D. Ill.), Ruiz testified that Guevara only showed him two photographs in total—one of Concepcion and the other of Freddy. Ex. 17 (Ruiz Dep. in *Johnson v. Guevara*) at JR-JJ 052496.

On July 8, Concepcion Santiago was detained at the police station. Ruiz and Reyes could not be located until the next day, July 9. Ex. 15 (Police Reports related to the Battery/Homicide of Oscar Arman (Pagan)) at JR-JJ 052683-84. According to a report prepared by Guevara, Ruiz and Reyes were then brought in to do a live lineup and they identified Concepcion Santiago as the shooter. *Id.* at JR-JJ 052683-89. On July 18, Freddy Santiago was detained at the police station. *Id.* at JR-JJ 052690-91. Reyes was not available because he was in Puerto Rico. *Id.* at JR-JJ 052695. A report states that Guevara conducted a live lineup and Ruiz allegedly identified Freddy Santiago. *Id.* at JR-JJ 052696-97. At his *Johnson* deposition, Ruiz testified that he could not recall ever seeing a lineup.  Ex. 17 (Ruiz Dep. in *Johnson v. Guevara*) at JR-JJ 052497.

At the Santiago brothers' criminal trial, Ruiz testified that he told detectives that he did not know who the shooter was before being questioned by Guevara. Ex. 16 (Ruiz Testimony in *People v. Santiago,* case no. 97-20973) at Bluhm 033302. He testified that Guevara forced him to come to the police station on three or four separate occasions after meeting him at Arman's wake, and each time police kept him locked in a room for seven to eight hours at a time. *Id.* at Bluhm 033255, 033362, 033259. He testified that he never told Guevara he saw the shooter, that he never told Guevara that he was afraid to identify the shooter, and that Guevara brought up the

13

Santiago brothers and coached him on what to say. *Id.* at Bluhm 033251, 033254, 033257, 033320-22. Guevara's report of these identification procedures does not make any mention of the true circumstances of these identifications. Ex. 15 (Police Reports related to the Battery/Homicide of Oscar Arman (Pagan)) at JR-JJ 052681-97.

**F.     Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Luis Serrano (404(b) Witness Evelyn Diaz)**

Luis Serrano was wrongly convicted of the murder of Raul Rodriguez in Logan Square and was sentenced to 55 years in prison. Rodriguez was shot to death on his way to work in the early morning hours at the corner of Kedzie and Armitage on August 19, 1995. Ex. 18 (Police File re: Homicide of Raul Rodriguez) at JR-JJ 018765-71.

The day after the shooting, Guevara found Serrano standing at the same intersection where the shooting had occurred. *Id.* at JR-JJ 018775. Guevara took Serrano to the station, took his photograph, and released him. *Id.* The next day Guevara showed the photo of Serrano to the victim's brothers, who purportedly told Guevara that Serrano was wearing a chain belonging to their deceased brother in the photo. *Id.* at JR-JJ 018773-75. A day later, the brothers allegedly told Guevara that they had spoken to a woman named Evelyn Diaz who had witnessed the shooting. *Id. at* JR-JJ 018775-76.

According to his report, Guevara interviewed Diaz in Rodriguez's brother's apartment on August 22. The report states that Diaz gave descriptions of several men she saw outside her apartment on the morning of the shooting, that she had seen Rodriguez as he was leaving for work that morning, and that she had looked away from the window for three or four minutes, at which point she heard gunshots, looked out the window, and saw Rodriguez lying on the ground. *Id.* at JR-JJ 018776. The report states that Diaz positively identified Serrano as one of the men she had seen that morning in a photo array. *Id.* at JR-JJ 018777.

14

Diaz gave a deposition on July 2, 2008 in *Johnson v. Guevara*, No. 5 C 1042 (N.D. Ill. 2005). Diaz disputed what the police reports said about her witnessing the shooting and identifying Serrano. She testified that Guevara's report was largely fabricated. Ex. 19 (Diaz Dep.) at 56-57. Guevara came to her apartment, and told her she had to come to the police station with him or else he would take her child away. *Id.* at 46:16-49:12; Ex. 18 JR-JJ 018776-77. At the police station, Guevara showed her a book with photographs in it. Ex. 19 (Diaz Dep.) at 64-67. Guevara repeatedly showed Diaz one photograph and asked her if she knew the man in the photo. *Id.* Guevara told her that the man was the shooter. *Id.* Guevara showed her a photograph of the suspect and told her it "was the guy." *Id*. at 57, 69-70. Diaz told Guevara that she did not recall seeing the man on the night of the shooting. *Id*. at 70. Guevara told her that she better identify the shooter or that he was going to send her to jail and take her son away. *Id*. at 71. Guevara's report of this identification procedure does not make any mention of the true circumstances of these identifications. Ex. 18 (Police File re: Homicide of Raul Rodriguez) at JR-JJ 018765- JR-JJ 018789.

**G. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of David Colon (Cross-Examination Only)**

On July 19, 1991, Michael Velez and sixteen-year-old Julio Sanchez were outside riding their bicycles near Sanchez's home at the intersection of Hamlin and Palmer, when someone came up next to Velez and fatally shot him. Ex. 20 (Sanchez Dep. *Johnson v. Guevara*, Case No. 05 C 1042) at 7, 20-23. Police spoke to Julio Sanchez directly after the shooting, and then approached him again almost two months later on his seventeenth birthday, September 8, 1991, when he was high on marijuana and drinking alcohol. *Id.* at 116-17, 128-29.

Julio Sanchez was brought into what looked like an interrogation room at the police station and given four photo albums from which to identify Velez's killer. *Id.* at 133. An officer stayed

in the room with him because he was intoxicated. *Id.* at 148. He told the officer that he could not identify the shooter from the pictures into the album. *Id.* at 135-36, 144. The officer went into the hall and came back with six to ten loose photos, all of which seemed to be of the same person, and asked Julio Sanchez to identify the shooter. *Id.* at 136-38, 141. Sanchez told the officer that he could not identify the shooter. *Id.* at 136. The officer left the room again and came back with what Sanchez believed to be the same photos. *Id.* at 140, 149. Sanchez eventually identified the shooter in one of the photos because he was tired and wanted the process to end, but he did not think the photo depicted the shooter. *Id.* at 148. Right after Sanchez identified the person from the photos, he was asked to identify that person from a line-up. *Id.* at 150. From the line-up, he selected the man that most resembled the man in the photos. *Id.* at 158. That man was David Colon. *Id.* at 157. Sanchez only chose David Colon from the line-up because he believed that the police officers were suggesting that he choose Colon because he looked most like the man in the photos they presented to him. *Id.* at 160.

Chicago Police Department Reports show that Detective Reynaldo Guevera was one of the two police officers conducting the line-up for Julio Sanchez on September 8, 1991. Ex. 21 (Excerpts from David Colon Chicago Police Department Supplemental Report). Sanchez believed that one of the officers who presented the photos to him stood behind him during the line-up. Ex. 20 at 153. Sanchez did not believe that the person he identified—David Colon—to be the actual shooter, and as a result, he refused to testify at Colon's trial. *Id.* at 167-69.

**H.  Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Angel Diaz (Cross-Examination Only)**

Angel Diaz was convicted of murder in 1996. Diaz's conviction was based on the testimony of a witness named Luis Figueroa. In 1995, Guevara told Figueroa to falsely identify

16

Diaz as the perpetrator even though Figueroa had not seen anything. Ex. 22 (Figueroa Testimony in *People v. Diaz*) at B-56:1-17 (spelling his name "Ray Cavera").

Luis Figueroa was sitting in a car with Yolanda Leal and another woman in January 1995, when a car pulled up next to them and someone sitting the passenger seat began shooting. *Id.* at B-29:23-30:12, B-31:4-16. Yolanda was shot in the head and died a week later. Figueroa identified Angel Diaz in a photo array, and the next day picked Diaz out of a lineup. *Id.* at B-51:8-52:6; B-18:13-16; B-38:23-39:10. One day after that, Figueroa testified before a Grand Jury that Diaz had killed Yolanda. *Id.* at B-41:18-43:12. But at trial, Figueroa recanted his statement and identifications. He testified that he had been unable to see the person who shot Yolanda, and had made all the false identifications at Guevara's direction. *Id.* at B-32:10-19; B-56:1-17. He testified that Guevara told him that Diaz was the one who had killed Yolanda and so he wanted to take him down. *Id.* at B-56:8-17. Figueroa told Guevara that he had not seen the shooter, and Guevara told him that he knew who did it and "his name is Angel Diaz." *Id.* Figueroa testified that Guevara had written the statement for him, and that he did not know who shot Yolanda when he made those statements. *Id.* at B-58:2-59:8; B-66:23-67:6. He confirmed this in an affidavit he signed in 1999, explaining that he never saw Angel Diaz shoot anyone, but that detectives told him that Diaz was the shooter and showed him Diaz's picture. Ex. 23 (Figueroa Affidavit) at Bluhm 040940.

## I. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Ricardo Rodriguez (Cross-Examination Only)

Ricardo Rodriguez was found guilty of murdering Rodney Kemppainen at a bench trial in 1997. Ex. 24 (Appeal Order) at JR-JJ 006403. The crime occurred in 1995. *Id.* at JR-JJ 006404-006405. Two witnesses, Rodolfo Zaragoza and Aurelio Martinez, provided the only testimony against Rodriguez at trial. *Id.* at JR-JJ 006405. Martinez testified that he was with Kemppainen

17

when he was shot and that he had seen the man who shot him. Ex. 25 (Martinez Trial Testimony) at B-31:11-35:23; B-36:7-20. Martinez testified that detectives came to his home, showed him photographs, and that he tentatively identified Rodriguez. Ex. 24 (Appeal Order) at JR-JJ 006406. Martinez later picked Rodriguez out of a lineup. *Id.* Meanwhile, Zaragoza testified that he had been walking outside when he saw heard shots fired out of a car and saw the shooter. Ex. 26 (Zaragoza Trial Testimony) at B-81:1-82:12; B-83:12-21. Zaragoza testified that he also viewed a photo array and looked through a mugshot book, but he could not identify the shooter. Nonetheless, Zaragoza went to the police station three weeks later and picked Rodriguez out of a lineup. Ex. 24 (Appeal Order) at JR-JJ 006407.

In 2004, Zaragoza came forward and said that Guevara had prompted them to identify Rodriguez. Zaragoza stated that Guevara showed him the photo array and told him, "This guy right here is [Rodriguez] from the Cobras. He's locked up right now." Ex. 27 (Zaragoza Affidavit 1); Ex. 28 (Zaragoza Affidavit 2). In addition, he swears that Rodriguez was not the shooter, and that Guevara pushed him into identifying Rodriguez. Ex. 28 (Zaragoza Affidavit 2). Rodriguez spent 21 years in prison before the Cook County State's Attorney's post-conviction unit agreed with Rodriguez that his convictions should be vacated, and dismissed the charges against him. Ex. 29 (Rodriguez Exoneration Order).

## J. Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Jose Montanez and Armando Serrano (Cross-Examination Only)

Jose Montanez and Armando Serrano were wrongly convicted of the 1993 murder of Rodrigo Vargas and both served 23 years in prison before they were exonerated in 2016. *See generally Montanez v. Guevara*, No. 17 C 4560, Doc. 1 (N.D. Ill. June 19, 2017). Mr. Vargas was murdered on February 5, 1993. The case went unsolved for a number of months, until a heroin addict named Francisco Vicente was arrested for committing a number of armed

18

robberies. According to Vicente, Guevara physically beat him and provided him undisclosed incentives to falsely implicate Montanez and Serrano in the murder. Ex. 30 (Affidavit of Francisco Vicente). Bowing to the coercion, Vicente repeated the story fed to him by Guevara at the Montanez and Serrano trial, leading the court to convict both men of murder. Vicente later disclosed that Guevara had told him to implicate Montanez and Serrano, and both Montanez and Serrano were released and received certificates of innocence. Ex. 31 (Montanez and Serrano COIs).[5]

Exactly like this case, Guevara obtained rap sheets for Montanez and Serrano in relation to the Vargas homicide before there was any reason to suspect either Montanez or Serrano in that crime. Specifically, there was no mention of Montanez or Serrano as suspects in the Vargas homicide investigation until June 2, 1993. *See* Ex. 32 (Guevara June 2, 1993 Supp. Report). But in May 1993, Guevara sought and obtained criminal history reports for both Montanez and Serrano, a week before they were implicated by anyone in connection with the Vargas murder or any other crime. *Compare* Ex. 33 (Criminal History Requests for Montanez and Serrano), *with* Ex. 34 (Rap Sheet).

**K.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Roberto Almodovar and William Negron (Cross-Examination Only)**

Roberto Almodovar and William Negron were wrongly convicted of the 1994 murders of Jorge Rodriguez and Amy Merkes and both served 23 years in prison before they were exonerated in 2017. *See generally Negron v. Guevara, et al.*, 18 C 2701, Doc. 1 (N.D. Ill. April 18, 2018). The murders occurred on the night of August 31, 1994. According to Guevara, a

---

[5] Guevara and Mingey also coerced another man, Timothy Rankins, to falsely implicate Montanez and Serrano, *see* Ex. 35 (Rankins statement), but Rankins never testified at Montanez and Serrano's trial. Rankins's account, however, corroborates Vicente's, to the extent that he accuses Guevara and Mingey of feeding him facts about the Vargas murder and coercing him to falsely implicate Montanez and Serrano. *See id.*

19

witness described one of the offenders as having a rectangular head with long hair, which matched Almodovar's description. *See* Ex. 36 at 2 (Guevara September 13, 1994 Supp Report). When Guevara learned that Almodovar had a friend, Negron, he used photographs of the two men to obtain identifications from the two eyewitnesses, who then implicated Almodovar and Negron at trial.

In reality, no one had ever described any of the offenders as having a rectangular face and long hair. *See* Ex. 37 (September 1, 1994 Supp. Report) at 33114 (describing one of the suspects, who was not identified as Almodovar, as having a long face). While still in the hospital recovering from a wound sustained in the shooting, the first witness was visited in the hospital and reported that police officers showed her two photographs and told her that the people in the photos committed the shooting. *See* Ex. 38 at 2 (Melinda Power Affidavit). The second witness, Kennelly Saez, in recanting his trial testimony, testified that a Latino detective showed him photographs of Almodovar and Negron and told him that they were the culprits. See Exhibit 39 (Saez Testimony in *People v. Negron*) at CCSAO 035474-81. It is undisputed that Guevara was the detective who obtained identifications from both of these witnesses. Exhibit 40 (Guevara Testimony in *People v. Almodovar*). Eventually, the State dismissed all charges against Almodovar and Negron and they were each granted a certificate of innocence. *See* Ex. 41 (Certificates of Innocence for Negron and Almodovar).

## L.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Robert Bouto (Cross-Examination Only)

Robert Bouto was wrongly convicted of the 1993 murder of Salvadore Ruvalcaba. His conviction was eventually overturned, but not until he had been incarcerated 23 years. Ruvalcaba was murdered on May 14, 1993, and the initial reports described the shooter as having a ponytail. *See* Ex. 42 (General Offense Case Report). Two witnesses, Carl Richmond and Rey

20

Lozada, identified Bouto from a lineup conducted by Guevara. *See* Ex. 43 (Guevara May 16, 1993 Report). Although Bouto did not have a ponytail, and presented alibi testimony from two witnesses, he was nevertheless convicted and imprisoned. *See* Ex. 44 (Line-up photos taken the day of the shooting, depicting Mr. Bouto without a ponytail); Ex. 45 (Alibi Trial Testimony of Astefan and Kandah).

After trial, both Richmond and Lozada came forward to reveal that their identifications had been tainted by Guevara. Both were permitted to view Bouto in custody at the police station before viewing the lineup conducted by Guevara. *See* Ex. 46 ¶¶ 6-7 (Richmond Affidavit); Ex. 47 ¶6 (Lozada Affidavit). Richmond explained that Guevara told him that he had caught the shooter, and that all Richmond and Lozada had to do was identify Bouto. *See* Ex. 46 ¶ 9 (Richmond Affidavit).  Bouto's conviction was overturned on April 30, 2018. *See* Ex. 48 (Order dated April 30, 2018).

## M.    Relevant Rule 404(b) Evidence Relating to the Wrongful Conviction of Demitrius Johnson (Cross-Examination Only)

Demetrius Johnson was charged with the 1991 shooting death of Fred Erwin, and convicted in 1992. Guevara, Mingey, and other police officers were assigned to the case. Ex. 49 (Police File re: Homicide of Fred Erwin) at RFC15474. A June 13, 1991 police report generated the day after the shooting indicates that several people in the neighborhood had come forward to say that the shooter was an individual who went by the nickname "Little D." An individual named Bryan Johns, who went by that nickname, was taken into custody. *Id.* at RFC15475. Among the individuals interviewed at the time was an individual named Aby Gonzalez, who witnessed the shooting. *Id.* The report indicates that Gonzalez viewed a lineup, "which is the subject of a separate report." *Id.*

21

Reports indicate that Johns was placed in a lineup, but was released on June 13 when no one could make an identification of him. *Id.* at RFC15740. However, a lineup documented as occurring at 11:30 pm on June 12, 1991 is reflected on a report in the investigative file. The report indicates that the lineup was conducted by Guevara and another officer, and was viewed by Gonzalez, among others. Gonzalez positively identified Johns as the shooter. *Id.* at RFC 15471. This lineup report *is not* contained in the prosecutor's file.

A separate lineup report is contained in the permanent retention file, documenting a lineup occurring at 11:00pm on June 12, 1991. Ex. 50 (Permanent Retention File re: Homicide of Fred Erwin) at RFC 163448-49. The report indicates that the lineup was conducted by Guevara and another officer, and viewed by Gonzalez. This lineup report indicates that Gonzalez viewed a lineup containing the suspect Johns and was not able to make any identification. *Id.* Johns was released as a result. *Id.* This lineup report *is* contained in the prosecutor's file. There is no explanation in the file for the discrepant reports regarding the lineup viewed by Gonzalez.

More than a month later, Guevara conducted a follow up interview with a witness that caused Demetrius Johnson to become a suspect. After being positively identified in a photo array and a live lineup, Johnson was charged with the murder of Erwin. *Id.* at RFC 163464-70.

**N.  The City of Chicago's Own Investigation of Guevara Corroborates the Evidence Set Out Above**

In 2013, the City hired Scott Lassar of Sidley & Austin to investigate Guevara's misconduct on its behalf. After conducting an exhaustive investigation, Lassar discovered that six men investigated by Guevara had been wrongfully convicted, including Jose Montanez, Armando Serrano, Robert Bouto, Roberto Almodovar, Gabriel Solache, and Arturo Reyes. *See* Exhibits 51, 52, 53, and 54 (Lassar reports for each of these cases).

22

In these cases, Lassar determined that Guevara had engaged in misconduct in obtaining Mr. Bouto's, Mr. Solache's, and Mr. Reyes's conviction, including manipulating witnesses to falsely identify Bouto and physically abusing Solache and Reyes. *See* Exhibit 51 at 43 (Lassar report for Bouto); Exhibit 52 at 12-13 (Lassar report for Solache and Reyes). Lassar also found that Mr. Montanez, Mr. Serrano, Mr. Bouto, and Mr. Almodovar were likely innocent of the crimes Guevara had pressed against them. See Exhibit 53 at 58 (Lassar report for Montanez and Serrano); Exhibit 51 at 43-44 (Lassar report for Bouto); Exhibit 54 at 15 (Lassar report for Almodovar). It goes without saying that the City's findings that Guevara engaged in misconduct in these cases substantially bolsters the evidence set out above.

## ADMISSIBILITY OF OTHER ACTS EVIDENCE

Other-acts evidence relating to Guevara is admissible in this case to prove intent, knowledge, opportunity, preparation and plan, the absence of mistake and lack of accident, Defendants' identity, and on other material issues. These categories of permissible uses for other-acts evidence of overlap to some extent, but Plaintiff discusses each in turn below, identifying the admissible evidence from the cases above. In each category, there are propensity-free explanations for why the other-acts evidence is relevant to a central dispute at trial. Plaintiff described above how Guevara often committed identification manipulations in front of his partners (including Defendant Gawrys) and supervisors (including Defendant Mingey), but Plaintiff intends to introduce other-acts evidence only against Guevara at trial.

### A.    Other-Acts Evidence Is Admissible to Show Defendants' Intent

When intent is a material issue in a case because it is contested, other-acts evidence demonstrating that Guevara acted with the requisite intent is admissible under Rule 404(b). In order to hold Defendants liable under section 1983, Plaintiff must show that they engaged

23

intentionally in conduct that violated the Constitution. Negligent conduct that causes harm is not enough. *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

As they did at summary judgment, Defendants will take full advantage of this standard at trial, and they will advance a defense that they did not act intentionally at all. Instead, they will argue, they were duped by Orlando Lopez and at worst acted negligently. Doc. No. 303 at ¶¶8, 10-16, Doc. No. 304 at 17, Doc. No. 305 at ¶¶8, 26, 29-31, 40-41. Defendants will vigorously dispute whether Plaintiff can show they intended to violate his rights, and in doing so they make intent a central issue for the trial.

Other-acts evidence showing that the false eyewitness identifications of Plaintiff by Lopez were obtained intentionally, and not as the result of negligent oversight, is therefore admissible. *See Wilson*, 6 F.3d at 1238 (reversing district court and ordering new trial because other acts of Jon Burge should have been admitted to demonstrate that Burge acted intentionally when he tortured Wilson and violated his rights); *Young v. Rabideau*, 821 F.2d 373, 379-80 (7th Cir. 1987) (permitting evidence of past misconduct to rebut the "main defense that [the party] did not intend to [commit the misconduct in the present case]"); *United States v. Wormick*, 709 F.2d 454, 459-60 (7th Cir. 1983) (deciding that evidence that police officer had fabricated a false police report in the past was admissible under Rule 404(b) to show intent to create false reports in the present case); *Edwards v. Thomas*, 31 F.Supp.2d 1069, 1074-75 (N.D. Ill. 1999) (use of excessive force admissible to prove intent to use force).

Repeatedly the Seventh Circuit has held that other-acts evidence comes in where a defendant argues that they lacked the requisite intent and acted in good faith. *See United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (holding that it was not an abuse of discretion for the district judge to admit evidence of other bad acts where they showed intent and "also helped

24

negate [the defendant's] asserted defense that she had acted in good faith"); *United States v. Curtis*, 781 F.3d 904, 910 (7th Cir. 2015) (holding that where a defendant opens the door by suggesting that he acted in good faith, other-acts evidence are admissible to rebut the defense and show intent); *United States v. Nolan*, 910 F.2d 1553, 1561 (7th Cir. 1990) (holding that evidence of 17 other bank robberies were relevant to show intent and to rebut the defendant's claim that he had entered a bank with innocent intent); *United States v. Arnold*, 773 F.2d 823, 833 (7th Cir. 1985) (concluding that a failed prior attempt to bribe a witness was relevant to show intention to bribe a witness in the present case). The same is true when a defendant claims that they lacked intent and were instead duped by third parties. *United States v. Macedo*, 371 F.3d 957, 967 (7th Cir. 2004) (holding that district court did not abuse its discretion by admitting past crimes where the defendant's theory of the case was that he lacked the requisite intent and instead was a "dupe"); *see also United States v. DeFillipo*, 590 F.2d 1228, 1240 (2d Cir. 1979) (where defense claimed defendants were innocent dupes in working with stolen goods, intent in issue).

Defendants' position at trial that they acted in good faith and were duped by Lopez makes other-acts of Guevara admissible to show that he did not act in good faith and was not duped by Lopez. In particular, other acts set out above are relevant to the theory that Guevara intentionally selected Plaintiff as a suspect first and then developed identification of that suspect second. Guevara took the same approach in the case described by Dorsch (*supra* Section A), as well as in the cases of Johnson (Section B), Sierra (Section C), Arcos (Section D), the Santiago Brothers (Section E), Colon (Section G), Angel Diaz (Section H), Ricardo Rodriguez (Section I), Montanez and Serrano (Section J) (confirmed by the City's Lassar investigation), Almodovar and Negron (Section K) (Almodovar confirmed by the City's Lassar investigation), and Bouto (Section L) (confirmed by the City's Lassar investigation). These other acts rebut the claim by

25

Guevara that he acted like a reasonable investigator and followed the evidence in the Valentin investigation where it led him.

Defendants will also present a case that they did not intend to instruct or coerce Lopez to pick Plaintiff in the photo array that occurred on August 29, 1988, or the second lineup that occurred on September 15, 1988, and that instead they obtained legitimate identifications through procedures performed in good faith. In other words, Defendants will claim that they would never intentionally instruct that a witness should pick a particular person during an identification procedure. In all of the cases just referenced Guevara intentionally instructed witnesses to select individuals from photo arrays or lineups before they had made any selection. Former Chicago Police Officer Dorsch will testify that he witnessed this conduct first hand in a case that he was investigating shortly after the Valentin investigation (Section A). These other-acts are therefore admissible on the question of Guevara's intention to dictate the selection of Plaintiff from lineup procedures during the Valentin investigation.

The same propensity-free chain of reasoning regarding proof of intent applies when it comes to showing Guevara's intent to suppress exculpatory information about his interactions with Lopez, his intention to write false police reports that did not recount what had actually happened during the investigation, his intent to testify falsely at Plaintiff's criminal trial, and his intent to frame an innocent man. On all of these subjects, Defendants will present a case to the jury that, even if these events occurred, they had no intention of violating Plaintiff's federally protected rights. But as far as Guevara is concerned, he intentionally suppressed exculpatory information regarding eyewitness identifications in the cases of Juan Johnson (Section B), Sierra (Section C), Arcos (Section D), the Santiago brothers (Section E), Luis Serrano (Section F), Colon (Section G), Diaz (Section H), Rodriguez (Section I), Montanez and Serrano (Section J),

26

Almodovar and Negron (Section K), Bouto (Section L), and Demetrius Johnson (Section M), and intentionally wrote false reports in all of those cases; and he intentionally engaged in misconduct that caused the wrongful conviction of at least Juan Johnson (Section B), Arcos (Section D), Rodriguez (Section I), Montanez and Serrano (Section F), Almodovar and Negron (Section K), Bouto (Section L), and as the City itself has concluded, Montanez and Serrano (Section F), Almodovar (Section K), and Bouto (Section L).

**B.** **Other-Acts Evidence Is Admissible to Show Absence of Mistake or Accident**

These same other acts are also relevant and admissible to prove the closely related theory that Guevara did not make a mistake in causing the wrongful prosecution and conviction of Plaintiff. Defendants will claim at trial—as they did at summary judgment—that the following version of events should be believed: they did not tell Lopez to implicate Plaintiff; Lopez selected Plaintiff himself; though Lopez said prior to the second lineup that Plaintiff was not the shooter, they were entitled to view that statement as Lopez expressing fear to make an identification; and that they thought Lopez's identifications were legitimate evidence to use in Plaintiff's criminal case. Under this theory, it was at worst a mistake on Defendants' part to believe Lopez, and not a frame job that renders them liable.

In their reply, Defendants will not be able to disavow that mistake or accident will be a major pillar of their defenses, and so the same other-acts evidence discussed in the section directly above will be admissible to demonstrate lack of accident or mistake. *United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996) (evidence of prior drug crime was properly admitted to show absence of mistake); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (permitted evidence showing defendant "was not some hapless fool mistakenly caught up in an overzealous law enforcement action"); *United States v. Tylkowski*, 9 F.3d 1255, 1262 (7th Cir.

27

1993) (permitting "evidence of another crime which tends to undermine the defendant's innocent explanations for his act"); *Young*, 821 F.2d at 379 (concluding that a prison's prior misconduct negates the defense that he committed similar misconduct accidentally); *United States v. Hillsberg*, 812 F.2d 328, 334 (7th Cir. 1987) (holding that prior firings of a gun on different occasions were relevant to prove that the defendant had not accidentally discharged the weapon on the occasion in question). Guevara's other acts are relevant to prove that Guevara did not make a mistake during the identification procedures in which Lopez identified Plaintiff.

## C. Other-Acts Evidence Is Admissible to Show Knowledge

Similarly, other acts evidence is relevant and admissible to show that Guevara had knowledge of the misconduct in this case that Plaintiff says occurred. Defendants will claim that they did not know that Lopez's identifications were the result of improper identification procedures. Moreover, they will claim that they had no knowledge that the true circumstances on the identifications had been suppressed. Other-acts evidence is admissible at minimum to show that Guevara had knowledge of both of these things. His knowledge that Lopez's identifications were the result of improper identification procedures is demonstrated by his conduct in the case described by Dorsch (Section A), as well as in Johnson (Section B), Sierra (Section C), the Santiago Brothers (Section E), Colon (Section G), Angel Diaz (Section H), Ricardo Rodriguez (Section I), Almodovar and Negron (Section K), Bouto (Section L) (confirmed by the City's Lassar investigation), and Johnson (Section M). The suppression of the true circumstances of identification procedures in Johnson (Section B), Sierra (Section C), the Santiago Brothers (Section E), Colon (Section G), Angel Diaz (Section H), Ricardo Rodriguez (Section I), Almodovar and Negron (Section K), Bouto (Section L), and Johnson (Section M) also are probative of Guevara's knowledge that he suppressed the true circumstances of Lopez's

28

identifications. Other acts are admissible when a defendant denies knowledge of facts in order to show that the defendant in fact had knowledge. *See*, *e.g.*, *United States v. Urena*, 844 F.3d 681, 683 (7th Cir. 2016) (other acts relevant after *Gomez* to show knowledge of misconduct when knowledge was denied); *United States v. White*, 68 Fed. App'x 707, 711 (7th Cir. 2003) (unpublished) (evidence of an officer's previous discipline for using excessive force relevant to charge that the officer used force knowingly); *United States v. Harris*, 536 F.3d 798, 806 (7th Cir. 2008) (prior drug deals admissible to prove defendant knew about drugs).

At the same time, Defendants will attempt to convince the jury that they lacked another type of knowledge: they will argue they did not have the skill or the means necessary to commit the type of manipulation of eyewitnesses and identification procedures that Plaintiff claims occurred. Other-acts evidence is also admissible without reference to propensity to show that Guevara in fact did have the requisite knowledge and skill. Each of the cases above shows manipulation of witnesses to make an identification of a suspect selected by Guevara, and the techniques employed—for example, instructing the witness to select a particular photo in the case described by Dorsch (Section A), as well as in Johnson (Section B), Sierra (Section C), the Santiago Brothers (Section E), Colon (Section G), Angel Diaz (Section H), Ricardo Rodriguez (Section I), Almodovar and Negron (Section K), and Bouto (Section L)—demonstrate Guevara's knowledge. The cases supporting admission of other-acts evidence for this proper purpose are cited in the next section, on the closely related category of using other acts to show opportunity.

## D.    Other-Acts Evidence Is Admissible to Show Opportunity

Defendants will also no doubt defend themselves by suggesting that Plaintiff is an unhinged conspiracy theorist, in the sense that the conspiracy and misconduct he alleges is so extreme that it could not possibly happen within the Chicago Police Department, and in the midst

29

of such a large group of people. In short, Defendants will argue that, even if Plaintiff can show the requisite intent and the means to commit the alleged misconduct, Defendants would have had no opportunity to engage in such bad behavior.

Opportunity (or the chance or capacity to commit an act) is an additional permissible use of other-acts evidence in this case. *Wilson*, 6 F.3d at 1238 (Burge's past abuse of suspects admissible to show opportunity to abuse suspect in the present case); *United States v. Burrows*, 48 F.3d 1011, 1018 (7th Cir. 1995) (evidence of prior bad acts involving handguns was admissible to show that defendant had the opportunity to possess a handgun); *United States v. Chaverra-Cardona*, 879 F.2d 1551, 1553 (7th Cir. 1989) (evidence of other acts by the defendant were admissible to show that she had the opportunity to commit the drug crimes at issue).

The cases of Sierra (Section C), the Santiago Brothers (Section E), and Montanez and Serrano (Section J) show that Guevara had the capacity and opportunity to select a suspect before there was any evidence implicating that person in the crime being investigated. The cases discussed directly above show that Guevara had the capacity and opportunity to point out a suspect to an eyewitness before the eyewitness had made any identification. And they show that Guevara and the capacity and opportunity to suppress the true circumstances of an identification procedure. All of the cases discussed above show that Guevara had the capacity and opportunity to rig identification procedures. All of the cases discussed above show that Guevara had the capacity and opportunity to cause criminal prosecutions to be initiated without probable cause.

E.    **Other-Acts Evidence Is Admissible to Show Identity**

Independently, use of other-acts evidence is permissible to show the identity and *modus operandi* of Guevara. A key piece of suppressed evidence in this case is Orlando Lopez's statement to police at the September 15 lineup that Plaintiff was not the person he had seen shoot

30

Felix Valentin. That evidence would have been the greatest piece of impeachment evidence Plaintiff and his attorneys could have hoped for in defending his criminal case. Indeed, state prosecutors no doubt would have dropped (or would never have pursued) charges had they learned of that evidence.

Recognizing how thoroughly this evidence support's Plaintiff's due process claims for suppression of evidence, Defendants adopt the only defense available—they contend that it was not them who Lopez told. At summary judgment, Defendants argued vehemently that, even if one believes Orlando Lopez's testimony that he said this to police at Area Five, he did not say it to them. Doc. No. 304 at 9-10, Though Plaintiff has circumstantial evidence that it was Defendants Guevara and McLaughlin that Lopez told, Doc. No. 321 at 13 n.7, as this Court noted at summary judgment, Lopez's description of Guevara could be any of the three people in the photo of Guevara that Plaintiff submitted at summary judgment, Doc. No. 373 at 20 n.5.

In this situation, where Defendants intensely dispute whether it was they who committed the misconduct, the law permits the use of other-acts to show identity. The distinctive features of Guevara's other misconduct are relevant to show that it was him who was present at the September 15 lineup. Where Defendants have engaged in similar acts of misconduct, those other acts are admissible to prove it was them this time as well. *See Gomez*, 763 F.3d at 861 ("[O]ne accepted way to use other-act evidence to prove identity is to argue that the perpetrator had a distinctive modus operandi."); *Shields v. United States*, 2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) (holding that evidence of modus operandi is usually used to prove identity).

One of Defendants' arguments is that none of the other-acts evidence is sufficiently similar to be used in the upcoming trial. The context in which similarity really matters is when 404(b) evidence is used to prove identity or *modus operandi*. But identical acts are not necessary.

31

Plaintiff must show "only that the prior acts bear 'a singular strong resemblance to the pattern of the offense charged.'" *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989) (quoting *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir. 1984)).The past incidents must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Shackleford*, 738 F.2d at 783. "Evidence of modus operandi is evidence that shows a defendant's distinctive method of operation." *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir.1998).

Here, Guevara's other acts of suppressing eyewitness identification procedures are so distinctive that they can be admitted in order to show that Guevara's denial that it was he who Lopez spoke with prior to the September 15 lineup is false. In the cases of Sierra (Section C), Luis Serrano (Section F), Colon (Section G), Angel Diaz (Section H), Ricardo Rodriguez (Section I), and Demitrius Johnson (Section M), Guevara was told by the eyewitness who was making the identification either that the suspect was not the perpetrator or that the eyewitness could not identify the perpetrator. Yet in each of these cases Guevara recorded an identification as if obtained legitimately, and then wrote a report that suppressed the true circumstances of the identification, and specifically the eyewitness's exculpatory statement that could have been used to impeach the identification.

Guevara's other acts are much more similar to the fact pattern in this case than the usual case in which other acts are admitted to prove identity or *modus operandi*. See, e.g., United States v. Clark, 774 F.3d 1108, 1114 (7th Cir. 2014) (evidence of uncharged robberies with very similar victims and descriptions of the perpetrator were relevant to identify defendant as the charged robber); *United States v. Vance*, 764 F.3d 667, 669 (7th Cir. 2014) (evidence of uncharged robberies of trio of restaurants relevant to show identity of perpetrators in a series of bank robberies where robbers used the same ski-masks and gun, and had one robber approach the

32

counter while the other stood guard); *United States v. Brown*, 471 F.3d 802, 806 (7th Cir. 2006) (evidence that defendant had purchased drugs from the same drug dealer before was relevant when defense tried to argue that drug dealer had mistakenly identified defendant); *United States v. Connelly*, 874 F.2d 412, 417 (7th Cir. 1989) (to be admissible as *modus operandi* evidence, similarities must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof) (internal citation omitted). Accordingly, the other-acts evidence can be used to prove Guevara's identity as well.

## F. Other-Acts Evidence Is Admissible to Show Preparation and Plan

In addition, as in *Wilson v. City of Chicago*, evidence of a police officer's past misconduct involving manipulation of witnesses is admissible to show preparation and planning on the part of the same officer engaging in the same type of misconduct in the case before the court. 6 F.3d at 1238 (police officers' previous interrogation methods "admissible for other purposes, including . . . preparation, and plan"); *see also Hill v. City of Chicago*, 2011 WL 3840336 (N.D. Ill. Aug. 30, 2011) (granting in part and denying in part motion to exclude prior acts evidence on theory that they were sufficiently similar that they showed preparation and planning on the part of the defendant officers). As in *Wilson* and *Hill*, the identified other acts here are sufficiently similar to the Valentin investigation to show preparation and planning on the part of Guevara.

## G. Other-Acts Evidence Is Admissible for Other Permissible Purposes As Well

Finally, evidence of Guevara's other acts is admissible for other purposes as well. It is admissible to impeach Guevara on the stand. If he is pleading his Fifth Amendment right to remain silent, and the jury is not required to draw an inference against him, then his answers are tantamount to a denial. And so when he is asked whether he would ever have told Lopez who to

33

select from the photo array on August 29, 1988, for example, his answer can be impeached with evidence that he did precisely that in the cases described by Dorsch (Section A), and the cases of Johnson (Section B), Sierra (Section C), and many others already discussed. The use of other acts to impeach claims of innocence by specific contradiction is permissible. *See United States v. Bell*, 624 F.3d 803, 810-11 (7th Cir.2010) (allowing other acts to bolster witness's impeaching power); *Molnar v. Booth*, 229 F.3d 593, 603-04 (7th Cir.2000) (allowing evidence of prior instances of similar sexual harassment for "impeachment purposes"); *United States v. Taylor*, 728 F.2d 864, 872 (7th Cir. 1984) (allowing evidence of other drugs and guns seized in home search against criminal defendant for impeachment).

In addition, evidence of other acts is also admissible to impeach Guevara's credibility. *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir. 1996) (prior acts showing untrustworthiness are admissible to impeach witness's credibility); *Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990) (prior acts involving deceit are admissible to impeach witness's credibility); *Wrice v. Burge*, 2016 WL 6962838, at *6 (N.D. Ill. Nov. 29, 2016) (allowing evidence of other bad acts to attack witness's credibility). Or to show that Guevara is biased in his testimony. *United States v. McGee*, 408 F.3d 966, 982 (7th Cir. 2005) (extrinsic evidence admissible for impeachment purposes to show bias); *Holmes v. Godinez*, 2016 WL 4091625, at *5 (N.D. Ill. Aug. 2, 2016) ("Defendant will be barred from offering bad act propensity evidence, but will be permitted to inquire into specific incidents of conduct on cross-examination to establish bias or the witnesses' character for truthfulness.").

Moreover, other acts can be used to corroborate the testimony of Lopez that he told Guevara before the second lineup that Plaintiff was not the shooter. That testimony is corroborated by the fact that Guevara had heard and suppressed identical statements from other

eyewitnesses in other cases, including the cases of Sierra (Section C) and Luis Serrano (Section F). Evidence that corroborates testimony on material points is admissible under Rule 404(b). *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) ("If the 'bad acts' are really direct evidence of the crime charged, Rule 404(b) is inapplicable."); *United States v. Grabiec*, 563 F.2d 313, 318 (7th Cir. 1977) (explaining that "additional criminal activities may be admitted to show a pattern of conduct corroborating a similar pattern carried out during the conspiracy and a method of operation," and concluding evidence of previous gang activity was admissible to show drug conspiracy).

The evidence of other acts is also centrally relevant to Plaintiff's *Monell* theories that the Chicago Police Department routinely suppressed exculpatory information, routinely manipulated eyewitnesses to make improper identifications, and failed to train its police officers. *Cazares v. Frugoli*, 2017 WL 4150719, at *9 (N.D. Ill. Sept. 19, 2017) (evidence of one officer's prior acts and especially the police department's "investigations into those accidents, are highly relevant to Plaintiffs' *Monell* claim, independent of any propensity chain of inference").

Finally, other-acts are doubly relevant to proving punitive damages. First, the Seventh Circuit has recognized that other acts are relevant to punitive damages because they show that the defendant intended to cause harm. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 517 (7th Cir.1997) (affirming decision to admit evidence of prior similar acts for the purpose of showing intent as relevant to damages); *see also Edwards*, 31 F.Supp.2d at 1074 n. 8 (plaintiff's request "for punitive damages would appear to make the issue of Officers' intent to do harm relevant on that claim"). Second, the Seventh Circuit has also held that evidence of repeated misconduct is also relevant because punitive damages are designed to deter and punish precisely this sort of pattern of misconduct. *Woodward v. Correctional Medical Services of Illinois, Inc.*,

35

368 F.3d 917, 930-31 (2004) (holding that other bad acts are admissible on question of punitive damages, and distinguishing *State Farm v. Campbell*, 538 U.S. 408 (2003)).

## H.   Defendants' Arguments to Exclude This Evidence Lack Merit

Defendants make a number of half-hearted arguments for exclusion of other-acts evidence that they apply generally to all of Guevara's past bad acts. First, they contend that the facts of some of the other-acts cases discussed above are contested, and they argue that these factual disputes call for exclusion. But the Seventh Circuit has been clear that Rule 404(b) does not require the Plaintiff to prove the other acts to the Court by a preponderance of the evidence before those other acts are admitted. *Gomez*, 763 F.3d at 854 (citing *Huddleston v. United States*, 485 U.S. at 689-90).

Nonetheless, there is strong evidence supporting the other acts, as Plaintiff's extensive citations to sworn testimony above show. In addition, and critically, Guevara has pleaded his Fifth Amendment right to remain silent in response to all questions about his misconduct in the cases of Juan Johnson, Luis Serrano, Davila, Almodovar and Negron, Bouto, Thomas Sierra. *See* Ex. 55 (Guevara Deposition in *Rivera*) at 398:19-404:18; 559; 514; 434; 560; Ex. 56 (Guevara Deposition in *Montanez*) at 12-13; 195; 225-27, 323-24. If Guevara fears incriminating himself by responding to basic questions about whether he rigged the identification procedures and suppressed evidence about eyewitnesses in these cases, then an inference is warranted that the evidence and accounts set out above accurately describe his misconduct. Were that not enough, Illinois courts have found that many of the men wrongly convicted by Guevara's misconduct were innocent, and they have been awarded Certificates of Innocence. *See*, *e.g.*, Ex. 31 (Certificates of Innocence for Jose Montanez and Armando Serrano). Ex. 41 (Certificates of Innocence for William Negron and Roberto Almodovar). And the City of Chicago's own

36

investigation has confirmed that this misconduct occurred. *See supra* at 22-23. Defendants' argument that the facts of these cases are too disputed to warrant admission of this evidence should be rejected.

Defendants next argue that these other cases are too factually dissimilar to serve as admissible other-acts evidence. Plaintiff discussed the similarity of the other-acts above, in the context of identity, where similarity is important to showing *modus operandi*. But in general the Seventh Circuit has "repeatedly said that the 'similarity' requirement for admitting other-act evidence is not 'unduly rigid,' but instead is 'loosely interpreted and applied[.]'" *Gomez*, 763 F.3d at 854; *see also United States v. York*, 933 F.2d 1343 (7th Cir. 1991) (if prior act is sufficiently similar in type, it need not be a "duplicate[ ] of the one for which the defendant is now being tried"). Defendants apply a much too stringent test that diverges from these settled rules. As Plaintiff has discussed at length already, the other-acts cases bear striking similarities to the present case—with many identical features—and that similarity is enough to dispose of Defendants' general arguments to the contrary.

Defendants argue in passing that Guevara other acts should not be admitted because those incidents are not sufficiently close to the Valentin investigation in time. But "the temporal proximity of the prior acts to the current charge is not alone determinative of admissibility." *United States v. Macedo*, 406 F.3d 778, 793 (7th Cir. 2005). Moreover, in many cases the Seventh Circuit has endorsed admitting other acts that are nearly a decade or more removed in time. *See*, *e.g.*, *id.* at 793 (nine-year gap in time sufficiently close to make other act admissible); *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (13 years when evidence highly similar and relevant to credibility); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir.1994) (seven years); *Petrovic v. City of Chicago*, 2008 WL 818309, at *3 (N.D. Ill. Mar. 21, 2008)

(eight years). It makes no difference whether the other acts or prior to or after the incident on trial. *United States v. Brown*, 31 F.3d 484, 492 (7th Cir.1994) ("[T]rial courts may admit evidence of prior or subsequent bad acts"); *United States v. Anifowoshe*, 307 F.3d 643, 646–47 (7th Cir.2002) ("[B]y its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts"); *United States v. Brown*, 31 F.3d 484, 492 (7th Cir. 1994) (Under Rule 404(b), "trial courts may admit evidence of prior or subsequent bad acts"); *Edwards*, 31 F. Supp. 2d at 1075. The highly similar other acts of Guevara discussed above are all sufficiently close in time—all are within 10 years and most are within five years—to be admitted, particularly so given that they are highly probative of many disputed issues at trial.

## H.   Federal Rule of Evidence 403 Does Not Call for Exclusion, Particularly Given Limiting Instructions

Finally, Defendants argue that exclusion is appropriate under Rule 403 because of unfair prejudice. Of course, that balance depends on the extent to which the factual issues on which the other-acts evidence is admissible are disputed, for the more disputed they are the more probative the other act evidence. *Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) Similarly, the greater number of disputed issues on which other-acts evidence is properly admitted, the greater the probative value (without any corresponding increase in the danger of unfair prejudice). When one considers how diametrically opposed the parties theories of this case are on so many different issues, and how many of those issues permit the admission of other-acts evidence, it is clear that the other-acts evidence in this case has tremendous probative value.

Accordingly, for evidence of other acts to be excluded in this case, they would have to cause such extreme unfair prejudice to Guevara that this tremendous probative value would be substantially outweighed. Defendants have not shown at all that the danger of the prohibited propensity inference is so great that it commands exclusion of the other-acts evidence. Moreover,

given that Plaintiff is limiting the evidence to three of four witnesses and will present the rest through cross-examination, there is not a credible argument that outright exclusion is warranted. In fact, the evidence that Plaintiff intends to present is already narrowly limited, and Plaintiff submits that the Rule 403 balance is already properly struck by that balance. To the extent that Plaintiff is incorrect, the Court can of course apply Rule 403 as the evidence comes in—to repeat, Plaintiff will not explore all of the facts of the other acts above with Guevara on the stand.

Finally, to the extent that there is a concern about unfair prejudice from the prohibited propensity inference, the Seventh Circuit has instructed lower courts how to deal with that concern: by using limiting instructions. In *Gomez* the Seventh Circuit stressed that "[a]ppropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence." 763 F.3d at 860; *see also id.* at 861(stating that Seventh Circuit Criminal Pattern Jury Instruction 3.11 is a good starting point, which should be customized to the case). There the Court concluded, "[W]e see no reason to keep the jury in the dark about the rationale for the rule against propensity inferences. Lay people are capable of understanding the foundational principle in our system of justice that 'we try cases, rather than persons.'" *Id.* at 861 (quoting *People v. Allen*, 420 N.W2d 499, 504 (Mich. 1988)). A limiting instruction about the permissible use of other-acts evidence will adequately control for the danger of unfair prejudice in this case.

## THE CITY'S MOTION TO EXCLUDE EVIDENCE
### RELATING TO THE LASSAR INVESTIGATION

Finally, Plaintiff addresses the City's motion to exclude evidence relating to the Lassar investigation briefly. *See* City Motion In Limine No. 3, Doc. No. 382. As discussed above, the City hired Scott Lassar of Sidley Austin to investigate Guevara's misconduct in 2013. *Supra* at 22-23. Lassar concluded that six men investigated by Guevara had been wrongfully convicted—

39

Jose Montanez, Armando Serrano, Robert Bouto, Roberto Almodovar, Gabriel Solache, and Arturo Reyes. And he wrote reports for the City on each case. *See* Exhibits 51, 52, 53, and 54 (Lassar reports for each of these cases). Those reports, which corroborate the other Rule 404(b) evidence set out in this response, are the only evidence from the Lassar investigation that Plaintiff intends to use at trial.

Accordingly, the City's argument that the Lassar materials represent tens of thousands of pages is moot. *See* Doc. No. 382 at 1-2. So is the City's argument that the evidence is not relevant to show notice to the City, for Plaintiff is not offering it to show notice. *Id.* at 2. Instead, he is offering the City's conclusion to corroborate other-acts that are admissible for all of the reasons discussed above. In addition, to the extent that the City's discussion of *Upjohn* and *Sandra T.E.* is meant to suggest that these are privileged materials, *see id.* at 2, they obviously are not because they have been disclosed by the City in this litigation (and elsewhere).

Finally, the reports issued by Lassar setting forth the City's conclusions about Guevara's misconduct are not hearsay. Instead, they are statements of a party opponent under Rule 801(d)(2). *United States v. Swan*, 486 F.3d 260, 264-65 (7th Cir. 2007) (Under Rule 801(d)(2)(D), a statement is not hearsay if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship") (citing FED. R. EVID. 801(d)). If the reports themselves contain another layer of hearsay (or more), Plaintiff will obviously raise that issue outside of the presence of the jury before presenting them in Court.

**CONCLUSION**

For all of the reasons set for above, Plaintiff respectfully requests that the Court deny Defendants motion to exclude Rule 404(b) evidence, consistent with the plan set forth in this response for presenting that evidence for permissible purposes.

Respectfully Submitted,

**JACQUES RIVERA**

By:      /s/ Jon Loevy
*One of Plaintiff's Attorneys*

| | |
|---|---|
| Arthur Loevy | Locke E. Bowman |
| Jon Loevy | David Shapiro |
| Russell Ainsworth | Alexa Van Brunt |
| Anand Swaminathan | RODERICK MACARTHUR JUSTICE CENTER |
| Steven Art | Northwestern University School of Law |
| Rachel Brady | 375 E. Chicago Avenue |
| Sean Starr | Chicago, Illinois 60611 |
| LOEVY & LOEVY | (312) 503-0844 |
| 311 N. Aberdeen St., Third Floor | |
| Chicago, IL 60607 | |
| (312) 243-5900 | J. Samuel Tenenbaum |
| | BLUHM LEGAL CLINIC |
| | Northwestern University School of Law |
| | 375 E. Chicago Avenue |
| | Chicago, Illinois 60611 |
| | (312) 503-8576 |

41

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, hereby certify that on May 21, 2018, I filed the foregoing Response to Defendants' Motion *In Limine* via the Court's CM/ECF system and thereby served a copy on all counsel of record.

/s/ Jon Loevy
*One of Plaintiff's Attorneys*

42

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS REPLY BRIEF IN SUPPORT OF DEFENDANT OFFICERS' MOTION IN *LIMINE* NO. 18 TO BAR THE TESTIMONY OF RULE 404(b) WITNESSES AND EVIDENCE AND CITY'S MOTION IN LIMINE NO. 3 TO BAR THE SIDLEY AUSTIN REVIEW**

Defendants Reynaldo Guevara, Steve Gawrys, Daniel Noon, Joseph Fallon, Joseph Sparks, Paul Zacharias, John Guzman, Gillian McLaughlin, the Estate of John Leonard, Edward Mingey, Russell Weingart, Rocco Rinaldi ("Defendant Officers") and the City of Chicago, by their respective attorneys, and for their reply brief in support of their respective motions to bar 404(b) evidence, state:

**DEFENDANT OFFICERS' REPLY IN SUPPORT OF BARRING 404(b) WITNESSES**

Plaintiff's sprawling response to Defendant Officers' motion *in limine* to bar 404(b) witnesses is very telling about Plaintiff's trial strategy: despite saying otherwise, he plans to add up to 13 mini-trials to highjack this case in a thinly veiled attempt to turn it into a one-sided referendum on Defendant Guevara's other cases as a substitute for the glaring deficiencies in the evidence in regards to his own case. Further, Plaintiff's response smacks of gamesmanship as trial approaches by arguing that he needs seven 404(b) witnesses but then claims he will only call three to four of them, forcing Defendants to prepare for mini-trials to examine seven 404(b)

witnesses at trial and subpoena multiple 404(b) rebuttal witnesses.[1]

Undercutting his argument that he needs the other act evidence to rebut Defendant Officers' defense, Plaintiff concedes that he "intends to introduce other-acts evidence only against Guevara at trial." P. Resp. MIL 18 and 3, at 23. There is no dispute, however, that Guevara will assert his Fifth Amendment rights at trial, so Plaintiff's explanations that he needs to use 404(b) evidence to rebut Guevara's imagined testimony that he "always conduct[s] legitimate photographic and live lineup identification procedures, and specifically that [he] would not point someone out for the eyewitnesses to pick in a photo array or lineup" (Response at 1-2) ring hollow, and create the extremely unfair prejudicial likelihood of the jury deciding against Defendants because they do not like Guevara. This is not only unfairly prejudicial to Guevara, but to the other eleven Defendants, who, if the evidence is admitted, would face a substantial risk of being found liable by association with Guevara without regard to the strength of the evidence against them.

The law requires this Court to not only determine if the proffered other act evidence is relevant to a non-propensity purpose (motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident), but also *how* the other act evidence is relevant without relying on a propensity inference. *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014)(*en banc*). Plaintiff argues under 404(b)(2) that his 404(b) witnesses are relevant for non-propensity purposes, but fails to show how the other act evidence is relevant without relying on a propensity inference. In addition, Plaintiff fails to overcome the substantial unfair prejudice that overwhelms any probative value. *Gomez,* 763 F.3d at 856-57. Finally, Plaintiff fails to show

---

[1] In order to soften his motion to file a 41 page response, Plaintiff postured his response as a joint response to two motions in limine, but the entire response with the exception of just over one page addresses the individual Defendants' 404(b) motion    P. Resp MIL 18 & 3, at 39-40.

that the other act evidence is sufficient for a jury to find that the other act happened. Instead, Plaintiff plans to parade his 404(b) witnesses up on the witness stand to tell their stories that Guevara is a bad man. These are only stories, and there are substantial rebuttal evidence and witnesses to undercut the truth of these stories. This will force the jury to decide the facts of these other stories, creating confusion, wasting time, and causing unfair prejudice to Defendants.

Plaintiff thus has failed to meet his burden to show his intended other act evidence is: probative and material; serves a legitimate non-propensity purpose; is not unduly prejudicial; and is supported by sufficient proof. *Id.* at 857-860; *Harris v. City of Chicago*, 2017 WL 2462197, at *2 (N.D. Ill. June 7, 2017). Furthermore, while Plaintiff's "Applicable Legal Framework" correctly cites *Gomez* as providing the tests for determining whether evidence is admissible under Rule 404(b), Plaintiff disingenuously relies on pre-*Gomez* cases for the proposition that "the Seventh Circuit has endorsed the use of other-acts evidence." P. Resp to MIL 18 and 3, at 4. For all these reasons, other acts evidence should not be allowed in this case because it violates *Gomez*'s framework for admission.

Defendants' motion concisely set forth why the 404(b) witnesses in Plaintiff's Response to MIL 18 and 3, Sections A-E (Dorsch, Ortiz, Perez, Melendez, Rosario, and Ruiz) should be barred. Dkt. 411. Defendant Officers also have explained why Evelyn Diaz should be barred as a 404(b) witness in their Motion in Limine #4. Dkt. 398.[2] Unabashedly, Plaintiff's Response has now sprung new 404(b) evidence of *nine more* cases about which he intends to question Guevara at trial: Colon, Diaz, Rodriguez, Montanez, Serrano, Almodovar, Negron, Bouto and Johnson. P. Resp to MIL 18 and 3, at 15-22. This new evidence should be barred for the same reasons set forth above and in Defendant Officers Motion *in Limine* #18. Dkt. 411. Plaintiff's newly

_____

[2] Defendants are also contemporaneously filing a reply in support of that motion.

disclosed intent concerning these nine new 404(b) cases should also be barred because of the substantial prejudice it would cause, without corresponding probative value. Plaintiff does not apparently intend to introduce any witness or evidence to support these additional cases; instead, he plans to ask Guevara questions about them, receive a Fifth Amendment response, and be done in "mere minutes." P. Resp to MIL 18 and 3, at 1. But this kind of "evidence" is inappropriate to support the adverse inference Plaintiff seeks because there would be no admissible, probative evidence to support it beyond the assertion of the Fifth Amendment itself; the Court should not allow an adverse inference without other probative evidence supporting it. *See, Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) (adverse inference is permissible but not mandatory, and must be based on probative evidence); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) ("An adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer."). Additionally, this should be barred because the additional cases are simply allegations that lack any foundation. This new evidence would unfairly prejudice the Defendants because the late identification precludes the Defendants from finding rebuttal witnesses to defend against these unfounded cases. Finally, the questioning about these other cases will result in more mini-trials and further waste this Court's and the jury's time. Accordingly, Plaintiff's intended plan of questioning Guevara about these other nine cases should be barred; the same would be even more true if Plaintiff intended to call any of these witnesses to the stand.

Plaintiff's argument that other act evidence should be allowed under Rule 404(b)(2) attempts to mislead the Court. P. Resp. MIL 18 and 3, at 23-33. Plaintiff disingenuously claims that his proffered 404(b) witnesses and evidence meet *every single* non-propensity category listed in Rule 404(b)(2). Response at 23-36. This claim, of course, is grossly exaggerated, but more importantly,

4

Plaintiff fails to explain how each piece of other act evidence is relevant without relying on a propensity inference. *Gomez,* 763 F.3d at 856. Further, Plaintiff has unequivocally stated the 404(b) evidence is solely offered against Guevara, but in arguing Rule 404(b)(2)'s exceptions, Plaintiff refers to all "Defendants," demonstrating the undue and severe prejudice that will arise from that evidence not just against Guevara, but to all the Defendant Officers by extension. Thus, that evidence should also be barred under Rule 403.

At bottom, and despite his protestations otherwise, Plaintiff's response makes clear that his true intent in proffering his non-probative 404(b) evidence is for propensity purposes – Guevara allegedly did it before, so he must have done it here. This is impermissible.

## FURTHER SUPPORT OF THE CITY'S MOTION IN *LIMINE* NO. 3 TO BAR THE SIDLEY AUSTIN MATERIAL

Plaintiff's one page response (in his combined 40 page response to the City's and Defendant Officers' motion in *limine*) all but concedes the inadmissibility of all of the evidence identified in the City's Motion in *Limine* To Bar Evidence and Testimony Related to the Sidley Austin Review ("City's MIL No. 3"). At the outset, Plaintiff expressly concedes that he is not attempting to use the Sidley Review materials as "notice" to the City. (*See,* Plaintiff's Combined Response to MIL no. 18 and MIL No. 3; Dkt. 478 at 40). Further, Plaintiff expressly concedes that he only intends to rely upon Exhibits 51, 52, 53 and 54. Accordingly, the City's motion should be granted as it relates to Plaintiff's Ex. 139 and to any testimony pertaining to "notice" to the City.

The remainder of Plaintiff's response is a cursory undeveloped attempt to do an end around each of the various evidentiary issues that the City detailed in MIL No. 3. First, Plaintiff argues, without further explanation or support, that these materials are the "City's

5

conclusions" and therefore can be introduced to "corroborate other acts." Plaintiff does not identify what 404(b) evidence can be corroborated by precisely what materials in any of the exhibits he has identified. Accordingly, the City cannot respond to this argument with any specificity. To the extent that Plaintiff generally means that the Lassar materials in some way verify, validate or authenticate the allegations made by any of the 404(b) witnesses, Plaintiff fails to explain how. As the City explained in its motion, Lassar and his firm were hired by the City to conduct an investigation into allegations of misconduct made against Guevara. Lassar determined that based upon his investigation that a small number of criminal investigations merited further review by the Cook County State's Attorney's Office ("CCSAO") and, as such, the City waived the work-product privilege over a subset of materials that were part of the global investigation and authorized Lassar to provide the CCSAO with copies of the materials he and other Sidley attorneys prepared and compiled regarding those cases. (*See,* MIL No. 3 at 2). Based upon the work done by Lassar and the materials identified by Plaintiff as exhibits it is difficult to understand (since Plaintiff fails to explain it) how any of the materials "corroborate" anything. In fact, Plaintiff's has identified no witnesses on the FPTO that can testify to or even lay the foundation for any of these materials. Accordingly, it is unclear how Plaintiff believes such evidence "corroborate[s] other-acts" or how such evidence is actually admissible.

Next, Plaintiff fails to address the hearsay within hearsay concerns embedded in these documents, ignoring the fact that his exhibits include 1) pleadings and transcripts from other proceedings; and 2) that the memorandum are summaries of various interviews and documents. Rather Plaintiff attempts to cast these documents are "statements of a party opponent." Such an argument is baseless and not well grounded in fact.

6

Additionally, Plaintiff's argument that the Lassar memos are admissible pursuant to Rule 801(d0(2)(D) is simply unpersuasive as it fails to account for the circumstances surrounding Lassar's retention by the City. While it is true that in certain cases (typically in criminal cases) an attorney *may* be an agent of his client for purposes of Rule 801(d)(2)(D), the "unique nature of the attorney-client relationship demands that a trial court exercise caution" in admitting "statements" that are a product of this relationship. *United States v. Jung,* 473 F.3d 837, 841 (7th Cir. 2007)(admission of former attorney statements was in error since district court failed to apply the "more exacting standard [that] must be demanded for an admission of statements by attorneys under Rule 801(d)(2)(D)"). Furthermore, the rare cases that have admitted such evidence are factually distinct from the case at hand. *See generally U.S. v. Harris,* 914 F.2d 927 (7th Cir. 1990) (former criminal defense attorney took a calculated risk in approaching an individual who might testify against his client in order to develop a defense strategy, when that strategy backfired the witness was able to testify as to their communications); *U.S. v. Sanders* 979 F.2d 87 (7th Cir. 1992). Plaintiff has failed to provide any evidence to support infringing on the attorney-client relationship in this way.

Rather, the evidence is clear that the scope of Sidley Austin's retention for services was to "provide legal advice and assistance" to the City pertaining to allegations of misconduct made against one of its former employees. (*See,* Ex. A: June 2013 Retention Letter). Sidley Austin was not retained to do anything more. Accordingly, the Sidley Review materials encompass materials accumulated and generated in connection with the services they were retained to provide.

Moreover, if this Court were to allow evidence of a post-event investigation of the type

7

the City hired Lassar to conduct in order to support a claim for money damages it would discourage municipalities from conducting these types of reviews. This type of investigation is analogous to a "subsequent remedial measure. *See,* Fed. R. Evid. 407, *see also, Kaczmarek v. Allied Chemical Corp.,* 836 F. 2d 1055, 1060 (7th Cir. 1987). In fact, there is a strong policy supporting the exclusion of such subsequent remedial measures, including the social policy of encouraging people to take, or at least not to discourage them from taking, steps in furtherance of added safety." *Public Serv. Co. of Indiana v. Bath Iron Works Corp.,* 773 F.2d 783, 791 (7th Cir.1985); *see also, Robenhorst v. Dematic Corp.,* 2008 WL 1821519 (N.D. Ill. 2008). Though, typically in the context of product liability cases, the same social policy implications are at issue in Section 1983 cases. Municipalities should not be discouraged from attempting to investigate and remedy, if necessary, allegations of bad behavior because of concern that such remedies will be used to prove it was liable for previous injuries.

Finally, Plaintiff seemingly admits that the documents inherently contain hearsay within hearsay but argues that such issues can be raised outside the presence of the jury before being presented. Plaintiff has identified 131,000 pages of documents. Plaintiff's proposal is yet another example of the scope of this trial and again causes the City to have serious concerns about the likelihood that this trial can be completed within 15 trial days or less as required by this Court.

WHEREFORE, Defendants request that the Court enter an Order *in limine* to bar the testimony of Plaintiff's 404(b) witnesses, bar 404(b) evidence of other reversed convictions, and 404(b) evidence from the Sidley Austin Review.

8

Dated: May 23, 2018

/s/ Eileen E. Rosen
EILEN E. ROSEN

*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, IL 60654
Tel: (312) 494-1000
ersonsen@rfclaw.com

/s/ Thomas M. Leinenweber
THOMAS M. LEINENWEBER

*Counsel for Defendant Guevara*
Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
thomas@ilesq.com

Respectfully submitted,

/s/ Jeffrey N. Given
JEFFREY N. GIVEN

*Counsel for Defendants Gawrys,
Noon, Fallon, Sparks, Zacharias,
Guzman, McLaughlin, Mingey,
Weingart, Rinaldi; and the Estate of
John Leonard*

James G. Sotos
Jeffrey N. Given
Caroline P. Golden
The Sotos Law Firm, P.C.
550 E. Devon Avenue, Suite 150
Itasca, IL 60143
Tel: (630)735-3300
jgiven@jsotoslaw.com

9

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on May 23, 2018, I electronically filed the foregoing **Officer Defendants' Reply Brief in Support of Their Motion in *Limine* No. 18 to Bar The Testimony of Rule 404(b) Witnesses** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants below.

**Attorneys for Plaintiff**
Arthur R. Loevy
Jonathan I. Loevy
Elizabeth N. Mazur
Russel Ainsworth
Michael I. Kanovitz
Steven E. Art
Anad Swaminathan
Rachel Brady
Sean C. Starr
311 N. Aberdeen
Chicago, IL 60607
(312)243-5900
(312)243-5902(Fax)
loevylaw@loevy.com
jon@loevy.com
Elizabethm@loevy.com
russell@loevy.com
mike@loevy.com
steve@loevy.com
annad@loevy.com
Brady@loevy.com
sean@loevy.com

J. Samuel Tenenbaum
Bluhm Legal Clinic
375 East Chicago Avenue
Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, IL 60611
(312)503-4808
s-tenenbaul@law.northwestern.edu

Locke E. Bowman, III
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312)503-0844
(312)503-1272 (fax)
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

**Attorneys for City of Chicago**
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312)494-1000
(312)494-1001(Fax)
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

**Attorneys for Reynaldo Guevara**
Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 200
(312)663-3003
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

/s/Jeffrey N. Given
JEFFREY N. GIVEN, Attorney No. 6184989
*One of the Attorneys for Individual Defendants*

10

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JACQUES RIVERA,             )
                                  )
         Plaintiff,        )
                                  )     Case No. 12-CV-04428
        v.                )
                                  )     Judge Joan B. Gottschall
REYNALDO GUEVARA et al.,    )
                                  )
        Defendants.     )

## RULING ON OFFICER DEFENDANTS' MOTIONS IN LIMINE NO. 18 TO BAR THE TESTIMONY OF RULE 404(b) WITNESSES AND NO. 14 TO BAR REFERENCE, QUESTIONING, OR INNUENDO TO OTHER LAWSUITS OR COMPLAINTS/DISCIPLINE AGAINST THE DEFENDANT OFFICERS OR OTHER CHICAGO POLICE PERSONNEL

In their eighteenth motion in limine, the police officers named as defendants ("officer defendants") in this 42 U.S.C. § 1983 action seek to bar plaintiff Jacques Rivera ("Rivera" or "plaintiff") from calling witnesses to testify about other alleged bad acts attributed to defendant Reynaldo Guevara ("Guevara") under Federal Rule of Evidence 404(b) ("404(b) witnesses"). During discovery, the court ordered Rivera to disclose no more than ten 404(b) witnesses. ECF No. 76 at 1. Five of the 404(b) witnesses Rivera disclosed later became unavailable or were withdrawn. *See* Officers' Mot. in Limine No. 18 at 1–2, ECF No. 411. Based on deposition testimony, the officer defendants also believe that a nondefendant police officer, William Dorsch ("Dorsch"), will offer testimony regarding Guevara's other alleged misconduct.[1] *Id.* at 2. In his response, Rivera says that he will not turn this trial into a "three-ring circus" of mini-trials on other acts of alleged misconduct. ECF No. 479 at 2. Rather, Rivera pledges, "consistent with Rule 403, . . . [to] limit his presentation of this evidence to calling no more than three or four live

---

[1] With the exception of Alfredo Rosario, Plaintiff lists all of these witnesses as "will call" witnesses in his proposed pretrial order.

witnesses to testify about other acts, and to cross-examining Guevara and other Defendants about other acts." *Id.* For the following reasons, the court limits Rivera to two 404(b) witnesses.

Under Rule 404(b), evidence of other acts may not be used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But evidence of prior acts can be admitted for "another purpose." *Id.* R. 404(b)(2). Permissible purposes listed in Rule 404 include (nonexhaustively) "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

In *United States v. Gomez*, the en banc Seventh Circuit held that the proponent of 404(b) evidence must demonstrate that "its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (en banc) (citing *United States v. Lee*, 724 F.3d 968, 978 (7th Cir. 2013)); *see also id.* at 860. Even if it passes Rule 404(b) scrutiny, evidence of other acts must still satisfy Rule 403, which gives the district court discretion to exclude relevant evidence if its probative value is "substantially outweighed by a danger of unfair prejudice." *Id.* at 856–57 (quoting Fed. R. Evid. 403) (alteration omitted). *Gomez* directed district courts to consider the "degree to which the non-propensity issue actually is contested when evaluating the probative value of the proposed other-act evidence . . . [b]ecause other-act evidence almost always carries a risk of unfair prejudice . . . ." *Id.* at 860.

Rivera argues that the 404(b) evidence he intends to introduce through his witnesses and on cross examination of Guevara is admissible for a host of non-propensity purposes. He claims that the evidence will be relevant to prove intent; to prove knowledge; to prove opportunity;[2] to

---

[2] Plaintiff argues that his 404(b) evidence will prove that Guevara had the opportunity and the capacity to select a suspect and fabricate evidence implicating the suspect, even though he worked for a large, urban police department and the alleged conspiracy would have involved many people. *See* Resp. at 29–30, ECF No. 479. No such defense

2

prove preparation and plan; to prove the absence of mistake and lack of accident; to prove

Guevara's identity as the officer to whom Orlando Lopez ("Lopez") allegedly told he had

identified the "wrong guy" on September 15, 1988; to impeach Guevara, who is expected to

invoke his Fifth Amendment privilege on the stand; to show that eyewitnesses in other cases told

Guevara that they selected the wrong person at a lineup but the "wrong person" was prosecuted;

to plaintiff's *Monell* theories; and to punitive damages. ECF No. 479 at 23, 34, 35, 36.

### *Monell* Claims, Knowledge, Impeachment-Only Evidence, and Punitive Damages

Plaintiff's *Monell* claims cannot furnish a basis for admitting this evidence because the

court dismissed plaintiff's *Monell* claim that the City failed to discipline Guevara at summary

judgment. All of plaintiff's alleged prior acts concern Guevara. Even if this evidence would be

marginally relevant, the risk of undue prejudice and confusion outweighs that probative value.

*See Rivera v. Guevara*, No. 12-CV-4428, 2018 WL 2183998, at*44–45 (N.D. Ill. May 11, 2018).

For similar reasons, Rivera's theory that his 404(b) evidence can be used to prove

Guevara's knowledge that the identification procedures were improperly suggestive, and that the

officer defendants lacked the skill to manipulate plaintiff, cannot be accepted, Resp. 34–35, ECF

No. 479, because the court dismissed Rivera's due process claims based on the use of unduly

suggestive lineup procedures at summary judgment. *Rivera v. Guevara*, 2018 WL 2183998, at *

26–27.

The court also will not allow Rivera's impeachment-only[3] 404(b) evidence of alleged

other acts in the cases of David Colon, Angel Diaz, Ricardo Rodriguez, Jose Montanez,

Armando Serrano, Roberto Almodovar, William Negron, and Demitrius Johnson. Rule 404(b)

---

was raised at summary judgment, however, and the court has no reason to think that it will be here. Plaintiff should alert the court outside of the jury's hearing if he believes the door has been opened to this sort of testimony.

[3] Rivera articulates an impeachment theory in his response. He argues that if Guevara invokes his Fifth Amendment privilege, as he is expected to do at trial, that is tantamount to a denial of his guilt. ECF No. 479 33–34. He cites no authority for this proposition and the court deems the argument waived. *See id.*

evidence may be used in appropriate circumstances to impeach a witness. *See, e.g.*, *United States v. Bell*, 624 F.3d 803, 810–11 (7th Cir. 2010). Because Rivera revealed his intent to inquire about these incidents for the first time in his response to the instant motion in limine, defendants did not have the opportunity to find rebuttal witnesses during discovery, so the officer defendants would be unfairly prejudiced by testimony about them at trial. *See* Fed. R. Evid. 403; Reply 3–4, ECF No. 494 (so representing).

Finally, the court can dispose of plaintiff's contention that the Rule 404(b) evidence is admissible on punitive damages in short order. Plaintiff suggests that proving other incidents of misconduct will be relevant to his claims against the officer defendants for punitive damages. This may be true in the limited sense that, as explained later in this order, some of plaintiff's Rule 404(b) evidence is relevant to prove that the officer defendants acted intentionally, and their degree of intentionality in the Valentin investigation is relevant to punitive damages. *See Edwards v. Thomas*, 31 F. Supp. 2d 1069, 1074 n.8 (N.D. Ill. 1999). To admit other acts to increase the officer defendants' punishment irrespective of their culpability in the Valentin investigation would run afoul of Supreme Court case law holding that punitive damages must be based on the defendants' conduct in the particular case. *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3840336, at *3 (N.D. Ill. Aug. 30, 2011) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422–23 (2003) and *Philip Morris USA v. Williams*, 549 U.S. 346, 356–57 (2007)) (granting in part motion in limine for this reason). This holds particularly true where, as here, the other acts occurred after the Valentin investigation. The court will consider a limiting instruction prohibiting the use of Rule 404(b) evidence to impose punitive damages if one is proposed.

**Summary of Plaintiff's 404(b) Witnesses**

Plaintiff submits that his 404(b) witnesses share a common theme, defendant Guevara. His witnesses initially identified people charged with violent crimes, and later recanted. Many of the facts to which plaintiff's Rule 404(b) witnesses are expected to testify are the subject of vigorous disputes, sometimes in pending litigation.[4] The following summary describes the testimony as plaintiff summarizes it in a light favorable to him.

William Dorsch, a nondefendant police officer who was involved in the Valentin investigation, will testify about an incident that occurred in or around 1990 during a murder investigation, *see* Tr. at 68:12–69:5, ECF No. 479 Ex. 3, in which Guevara brought two juveniles to view a photo lineup. Guevara pointed to the photo of the suspect and said, "That's him." One of the two juveniles then identified the suspect in a live lineup, but both young people later told Dorsch that a third party had paid them for the identification. *Id.* at 82:11–21. Prosecutors dropped the charges after talking to the two alleged eyewitnesses.

Plaintiff also intends to call two witnesses who testified at depositions and hearings in *Johnson v. Guevara*, No. 05 C 1042 (N.D. Ill.), Samuel Perez ("Perez") and Saul Ortiz ("Ortiz"). *Johnson* arose from the September 1989 murder of Ricardo Fernandez ("Fernandez") outside a nightclub located in Humboldt Park. Defendants Guevara, Gawrys, and Mingey investigated the crime. Perez and Ortiz testified that Guevara approached them shortly after the murder, showed them photographs of Johnson (later convicted and eventually freed), and said that Johnson and others should be charged with the murder. *See* Perez Dep. at 89:12–91:19, ECF No. 479 Ex. 6; *id*. Ex. 4 at 1016:15–1019:9 (Ortiz's testimony at the *Johnson* trial). Ortiz also testified that

---

[4] Defendants suggest that the contested nature of some of the witnesses' testimony counsels against admission. The witnesses the court will allow appear not to justify this concern, and the officer defendants make clear in their motion and reply that they stand ready to rebut the testimony. The rule that the court need not make a preliminary finding that the prior acts be proven by a preponderance of the evidence answers this argument sufficiently. *See Gomez*, 763 F.3d at 854 (citing *Huddleston v. United States*, 485 U.S. 681, 689-90 (1988)).

Guevara showed him three photographs and told him whom to pick at a live lineup. *Johnson* Trial Tr. at 1046:6–18. Ortiz complied, according to his testimony. *Id*. at 1047:11–20.

The next two 404(b) witnesses, Jose Melendez ("Melendez") and Alberto Rodriguez ("Rodriguez"), purportedly identified the car involved in the May 23, 1995, shooting of Noel Andujar ("Andujar"). Thomas Sierra ("Sierra") spent 22 years in prison for the Andujar murder before his release in January 2018. *See* Compl. ¶ 1, *Sierra v. Guevara*, No. 18 C 3029, ECF No. 1 (N.D. Ill. Apr. 30, 2018). Melendez has testified that before a May 30, 1995, lineup, Guevara showed him a photo of Sierra and told him he believed Sierra was the shooter. *See* Resp. Ex. 11 at 208. Melendez and Rodriguez also testified that Guevara showed them a car he said was involved in the shooting, but they told Guevara that he had the wrong car. *See id*. Ex. 12 at 147:10–55:15. Guevara's report summarizing the shooting omits those exculpatory facts. *See id*. Ex. 9 at CPD 1004.

Plaintiff expects Wilfredo Rosario ("Rosario") to testify about his identification, later recanted, of Xavier Arcos as the person who murdered Orlando Guirila ("Guirila") in or around 1989. Rosario testified that two years after the murder, Guevara and defendant Gawrys arrested him for an unrelated charge and threatened to charge him with the Guirila murder if he did not fabricate an identification. *See* ECF No. 479 Ex. 14 at J-36:1–J-37:3, J-47:11–24.

Rivera's next witness, Robert Ruiz ("Ruiz"), implicated Concepcion and Freddie Santiago in the 1997 murder of Oscar Arman. Ruiz testified that, contrary to police reports, Guevara showed him a photo array and told him whom to identify. *See* ECF No. 479 Ex. 16 at 77:1–16; *id*. Ex. 17 at 137:13–38:15 (deposition testimony). Police reports state that Ruiz picked one of the Santiagos at a live lineup, but Ruiz later testified that he did not recall any lineup occurring. *Id*. Ex. 17 at 139:23–140:5. At the criminal trial, Ruiz testified that Guevara forced

6

him to come to the police station three or four times, keeping him locked in a room for seven or eight hours each time.  *See id.* Ex. 16 at 75:4–22, 79:5–18.

Evelyn Diaz ("Diaz"), the final 404(b) witness plaintiff has listed, testified as an eyewitness to the 1995 shooting of Luis Serrano ("Serrano").[5]  An interview report prepared by Guevara states that Diaz identified Serrano from a photo array on August 22, 1997.  ECF No. 479 Ex. 18 at JR-JJ 018776–77.  At a deposition taken in 2008, Diaz testified that Guevara told her that she had to come to the police station with him, or he would take her child from her.  *Id*. Ex. 19 at 46:7–49:12.  Guevara showed her a photo book and repeatedly indicated one photo, telling Diaz that the indicated person was the shooter.  *See id*. at 56:21–57:6, 69:7–71:24.  When Diaz protested that she did not recall seeing the shooter, Guevara again threatened to take her child from her and added that he would see that she was sent to jail.  *See id*. at 70:7–71:21.

### Guevara's Identity at the September 15, 1988, Lineup

Rivera asserts that his Rule 404(b) evidence should be admitted to prove Guevara's identity as the officer Lopez allegedly told Rivera was the "wrong guy" at the September 15, 1988, lineup.  After he recanted, Lopez testified that he told two people that Rivera was the "wrong guy" before the September 15, 1988, lineup, but a fact dispute exists over who those people were.  *See Rivera*, 2018 WL 2183998, at *11 (discussing Lopez's testimony about this event).

Evidence of other acts may be admitted under Rule 404(b) "to prove a defendant's identity through a 'distinctive manner of operation, or *modus operandi*.'"  *Gomez*, 763 F.3d at 854 (quoting *United States v. Simpson*, 479 F.3d 492, 497–98 (7th Cir. 2007)).  But the inference only becomes relevant where there is "'a singular strong resemblance to the pattern of the

---

[5] In its ruling on Officer Defendants' motion in limine no. 4, the court ruled that Diaz may not testify because she was not properly disclosed.

offense charged' with the similarities between the two [acts] sufficiently idiosyncratic to permit an inference of pattern." *Id.* 763 F.3d at 854 (quoting *Simpson*, 479 F.3d at 498).

The court can see nothing sufficiently idiosyncratic about the police officer's alleged response when Lopez said Rivera was the "wrong guy" to warrant a pattern inference. Lopez testified that after he told the two people Rivera was the "wrong guy," the officer went forward with the identification anyway. Plaintiff points to no similar clothing worn by Guevara or distinctive physical features common to the Valentin investigation and the 404(b) evidence; he elicits at most a generalized pattern of nonresponse to a "wrong guy" statement. *Contrast United States v. Clark*, 774 F.3d 1108, 1114 (7th Cir. 2014) (pattern of physical descriptions of person who committed the robberies); *United States v. Vance*, 764 F.3d 667, 669 (7th Cir. 2014) (group of robbers used same masks, gun and practice when robbing restaurants and bank). True, some of plaintiff's Rule 404(b) witnesses testified that their protestations to Guevara that a person or a car was not involved in the crime fell on deaf ears, but ignoring something does not seem idiosyncratic and does not make the identification "more likely," Fed. R. Evid. 402, that Guevara, as opposed to someone else in the photograph, ignored Lopez. To accept this inference would unduly risk a pure propensity inference that Guevara is the sort of police officer who ignores complaints, so he must have been the one to ignore Lopez's complaint. *See Treece v. Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2000) ("If defined broadly enough, modus operandi evidence becomes nothing more than the character evidence that Rule 404(b) prohibits." (alteration and citation omitted)). Accordingly, plaintiff's Rule 404(b) evidence will not be admissible to prove Guevara's identity or modus operandi at the September 15, 1988, lineup. *See Patterson v. City of Chicago*, No. 15-cv-4139, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 2017).

**Intent, Absence of Mistake, and Knowledge**

The court next considers Rivera's theories that his 404(b) evidence is relevant, through a non-propensity chain of reasoning, to intent, absence of mistake or accident, and knowledge. In so doing, the court heeds *Gomez*'s admonition to "not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." 763 F.3d at 856. Mixed propensity and non-propensity chains of inference must be present. "Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Id.*

As plaintiff acknowledges, his theories of intent, absence of mistake, and knowledge bear a close relationship to one another. *See* Pl.'s Resp. 27, ECF No. 479 (describing intent and absence of mistake as "closely related"). On intent, Rivera says that the evidence will rebut the officer defendants' contentions that they were duped by Lopez and did not violate his rights intentionally. *See id*. at 23–24. Rivera also tells the court that intent is at issue on the question of whether defendants told Lopez to pick Rivera or coerced him to do so. *Id*. at 24.

Attending to the chain of inferences plaintiff wants the jury to draw, *see Gomez*, 763 F.3d at 857, Rivera argues that "[i]n all of the [Rule 404(b)] cases . . . Guevara intentionally instructed witnesses to select individuals from photo arrays or lineups before they had made any selection." Resp. at 26, ECF No. 479. He makes a similar argument under the heading of mistake: defendant "did not make a mistake in causing the wrongful prosecution and conviction of Plaintiff." *Id*. at 27. The same holds for Rivera's theory of knowledge. *See id*. at 28–29 (arguing that the Rule 404(b) evidence will prove Guevara's "knowledge that he suppressed the true circumstances of Lopez's identification").

9

For support, Rivera relies most heavily on *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993). In *Wilson*, the Seventh Circuit held that evidence of other acts performed by police officer defendants was admissible in a § 1983 case stemming from a wrongful conviction. *Id*. at 1238. The 404(b) testimony was that the officers beat another suspect "shortly before" the plaintiff there was arrested, and another witness testified that some of the officer defendants subjected him to electrical shocks during an interrogation nine days before the plaintiff said he was tortured by police. *Id*. Not only did the Seventh Circuit hold that the first witness's testimony was "plainly" relevant; it also decided that the testimony fit the Rule 404(b) categories of intent, opportunity, preparation, and planning. *Id*.

Defendants suggest no material way to distinguish *Wilson*. In their reply, the officer defendants fault plaintiff for relying on pre-*Gomez* cases. ECF No. 494 at 3. *Gomez* made clear, however that, although the Seventh Circuit was abandoning its four-part test used to evaluate the admissibility of Rule 404(b) evidence in favor of a rules-based approach, the "change is less a substantive modification than a shift in paradigm that we hope will produce clarity and better practice in applying the relevant rules of evidence." 763 F.3d at 853. *Gomez* did not cite or discuss *Wilson*. And the officer defendants have not explained how *Gomez* abrogates *Wilson*. ECF No. 494 at 3.

This court reads *Gomez* as harmonious with *Wilson*. As *Gomez* emphasizes, Rule 404(b)'s permitted purposes stand in "inherent tension" with the rule forbidding evidence of a person's propensity from prior acts, *Gomez*, 763 F.3d at 856, and indeed, "[o]ther-act evidence raises special concerns about unfair prejudice because it almost always carries some risk that the jury will draw the forbidden propensity inference," *id*. at 857 (citing *Lee*, 724 F.3d at 978); *see also id*. at 858 ("Our circuit also requires special caution when other-act evidence is offered to

10

prove intent, which though a permissible non-propensity purpose is nonetheless 'most likely to blend with improper propensity uses.'" (quoting *United States v. Miller*, 673 F.3d 688, 698 (7th Cir. 2012))). What the court has just quoted comes from *Gomez*'s explication of how Rule 403 balancing should be conducted when Rule 404(b) evidence is introduced to prove intent. *See id*. at 857–58. *Wilson* addresses the Rule 404(b) issues here, compelling the conclusion that Rivera's other acts evidence is relevant and admissible through a non-propensity chain of inferences to prove intent, opportunity, knowledge and planning to frame Rivera. *See Wilson*, 6 F.3d at 1238. *Gomez* then provides further guidance on determining whether the 404(b) evidence is relevant and for conducting the Rule 403 balancing to decide whether this 404(b) evidence is more prejudicial or confusing than probative. *See Gomez*, 763 F.3d at 857–58; *see also Hill*, 2011 WL 3840336, at *4 (finding, pre-*Gomez*, that *Wilson* controlled admissibility question and turning to other questions of Rule 404(b) admissibility and Rule 403 balancing).

### Rule 403 Balancing

Mindful that "Rule 404(b) does not provide a rule of automatic admission whenever bad acts evidence can be plausibly linked to another purpose," *Gomez*, 763 F.3d at 859 (quoting *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012)), the court balances the undue prejudice here against its probative value under the Rule 403. The *Gomez* opinion stresses that 404(b) evidence's importance generally increases in proportion to the degree to which the relevant facts are disputed. *See id*. at 857 (describing this as an "important issue"). If a party offers to stipulate to a fact, for instance, the risk that the jury will draw an unacceptable propensity inference gains greater importance. *Id*. This example stands at one end of a "spectrum" of factual disagreements. *Id*. (citations omitted).

11

On that spectrum, it would be fair to say that the dispute over whether the officer defendants, and Guevara in particular, set out intentionally to frame Rivera forms the white-hot nucleus of the disputed fact issues in the case at hand.  Defendants do not disagree that they will dispute those issues vigorously at trial.  Plaintiff's case on this issue rests primarily on the criminal history report stamped issued on inquiry on August 27, 1988, and inferences drawn from the course of the Valentin investigation.  The officer defendants, for their part, point to Lopez's testimony that the police did not coerce him to misidentify Rivera.  So Rivera's 404(b) evidence going to intent, absence of mistake, opportunity, and plan falls on the highly probative end of the *Gomez* spectrum.  *See Gomez*, 763 F.3d at 858; *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008); *see also Wilson*, 6 F.3d at 1238.

But the probative value of some of plaintiff's Rule 404(b) witnesses are still too likely to confuse the issues, waste the jury's time on mini-trials on dissimilar acts, and result in undue prejudice to defendants.  First, the court finds Rosario's testimony about Guevara's alleged conduct to be too dissimilar, and therefore unfairly prejudicial, to be admitted.  The passage of time as well as the alleged threat to charge Rosario if he did not cooperate differs from the officer defendants' alleged conduct in the Valentin investigation, where there is expected to be no evidence that a threat was issued.

The court also finds the testimony of Ruiz would be unduly prejudicial and likely to confuse the jury.  First, all of the misconduct about which Ruiz testified at his deposition occurred nine or more years after the Valentin investigation.  Ruiz testified that Guevara showed him several photographs before a live lineup and told him whom to identify.  ECF No. 479 Ex. 16 at 77:1–16; *id.* Ex. 17 at 137:13–38:15.  But critically, Ruiz testified to the use of tactics not present here, such as making him come to a police station on at least three occasions and locking

12

him up for seven or eight hours. *See id.* Ex. 16 at 75:4–22, 79:5–18. The parties have not mentioned similar strong-arm tactics used during the Valentin investigation, and the risk that the jury will use this evidence for pure propensity purposes looms large.

Primarily because the factual fit also seems remote and the different facts are likely to be unduly prejudicial and inflammatory, the testimony of Diaz that Guevara repeatedly showed her a single photo when she told him she could not identify the shooter does not squarely fit the alleged facts here. Moreover, she testified that Guevara threatened to take her son away and have her jailed if she did not identify the shooter. *See* Ex. 19 at 46:7–49:12; *id.* at 70:7–71:21. Plaintiff has no evidence of similar threats made to Lopez and has never argued that such threats were made. Introducing these facts would needlessly confuse the jury, risk a wasteful mini-trial, and invite a propensity inference.

But Perez and Ortiz's testimony regarding Guevara's 1989 investigation of the Fernandez murder raises fewer Rule 403 concerns as it is closer in time and involves an allegation that Guevara showed eyewitnesses photo books and told them whom to pick. Melendez testified to a similar course of events in the 1995 investigation of the murder of Andujar, but Rodriguez testified at most that Guevara commented before the lineup that he thought he had the right suspect. The court has no reason to believe that this comment involved pointing to a particular suspect. Its probative value is therefore too ambiguous to justify its admission.[6] The testimony of Melendez and Rodriguez that Guevara showed them the car he said was involved in the shooting comes close to what the plaintiff alleges here. *See id.*

---

[6] Based on what plaintiff has submitted, Rodriguez did not testify that he was coached. He testified that "just before the detective showed [him] the photographs, [the detective] told [Rodriguez] that they probably got the guy." *Id.* Ex. 13 at 139. That statement certainly expresses confidence, and it can be read as suggesting that the suspect is among the photos. Without more context, it does not appear to rise to the level of the alleged steering here.

13

Lastly, the court will allow Dorsch to testify about the 1989 or 1990 investigation, which the jury could view as fitting plaintiff's version of the facts closely here.  The court initially excluded Dorsch's testimony that the juvenile witnesses were paid in its minute order advising the parties of this ruling.  ECF No. 534.  Upon further reflection, the prejudice to defendants of hearing about witness payment is overshadowed by the prejudice that is likely to result if the jury does not hear Dorsch explain why the witnesses suddenly became forthcoming about intentionally framing someone for murder.  Allowing Dorsch to tell the whole story of what happened is necessary to prevent the jury from becoming confused and speculating about the hole left in the narrative.

After performing a Rule 403 balancing, the court finds find that the 404(b) evidence's probative value outweighs any undue prejudice or confusion likely to result from the admission of the testimony discussed in the prior two paragraphs.  *Gomez* explains that limiting instructions to the jury are the preferred way of curing any prejudice from Rule 404(b) evidence, and the court finds that they will be adequate here (assuming that the defense proposes them).  *Gomez*, 763 F.3d at 860–61.  Plaintiff remains free to argue, when the jury is not present, that the door has been opened to any of his 404(b) evidence.

### Ruling on Officer Defendants' Motion in Limine No. 14 to Bar Evidence and Argument About Complaints and Lawsuits Against Officer Defendants and Their Discipline

The officer defendants' fourteenth motion in limine also raises a Rule 404(b) claim that the court should bar references to other lawsuits filed against the officer defendants and complaints of alleged misconduct filed by members of the public in complaint registers ("CRs").  *See* Officer Defs.' Mot. in Limine No. 14 at 1, ECF No. 407.  The officer defendants say that evidence in these categories will inevitably be used to prove the officers had a propensity to

14

engage in misconduct and would be unduly prejudicial, will waste the jury's time, and will confuse the issues. *See id.* at 2–3, 5–6; *see also* Fed. R. Evid. 403, 404(b).

Plaintiff responds that he intends to rely exclusively on sustained CRs, but he does not mention prior lawsuits. *See* Resp. to Officer Defs.' Mot. in Limine No. 14 at 1, ECF No. 478. He points to cases admitting sustained CRs for non-propensity purposes, including those listed in Rule 404(b)(2) and for impeachment. *See, e.g.*, *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 818309, at *2 (N.D. Ill. Mar. 21, 2008); *Edwards v. Thomas*, 31 F. Supp. 2d 1069, 1074 (N.D. Ill. 1999).

As plaintiff argues, the record made by the parties leaves the court unable to perform a Rule 404(b) analysis and Rule 403 balancing required by *Gomez*. Plaintiff lists the sustained CRs he wishes to introduce by number in a footnote and indicates the officer defendant against whom the CR was lodged. ECF No. 478 at 3 n.1. The officer defendants include a table in their reply summarizing the CRs, but the summaries are too terse for a full Rule 404(b)/403 analysis. *See* Reply 2–3, ECF No. 501 (for example, "[p]hysical altercation with female family member" and "[d]isobeyed a direct order"). On this record, the court cannot say unequivocally that the sustained CRs will be inadmissible for any purpose at trial and cannot meaningfully assess their prejudicial effect. *See Austin v. Cook Cty.*, No. 07 C 3184, 2009 WL 799488, at *4 (N.D. Ill. Mar. 25, 2009); *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *26 (N.D. Ill. June 12, 2015)

Accordingly, the court declines to bar evidence of other lawsuits and CR files involving the officer defendants categorically. Because of the potential prejudicial effect of this evidence, the court will nevertheless require plaintiff to seek a ruling from the court outside of the jury's hearing before making reference to any prior lawsuits against the officer defendants or any CR

15

files.

\*\*\*

For the reasons stated, the Officer Defendants' Motion in Limine No. 18, ECF No. 411, is granted in part and denied in part. Consistent with this ruling, plaintiff may not cross examine Guevara about the other acts associated with David Colon, Angel Diaz, Ricardo Rodriguez, Jose Montanez, Armando Serrano, Roberto Almodovar, William Negron, and Demitrius Johnson. Plaintiff is limited to William Dorsch and Jose Melendez. The Officer Defendants' Motion in Limine no. 14, ECF No. 407, is granted in part and denied part. Before referencing prior lawsuits against officer defendants or CR files against officer defendants, plaintiff must obtain a ruling from the court outside of the jury's hearing.

Lawyers note: based on reflection, and contrary to the minute order issued on May 31, ECF No. 534, the court will permit Dorsch to tell the whole story of the witnesses' change of heart (specifically, what the witnesses said about being paid). This order supersedes ECF No. 534.

Date: June 1, 2018

_____/s/_____

Joan B. Gottschall
United States District Judge

16

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO RECONSIDER THIS COURT'S CLARIFICATION ORDER OF JUNE 8, 2018 REGARDING 404(B) WITNESSES PEREZ AND ORTIZ

Defendants, by their respective attorneys, move this Court to reconsider its minute order of June 8, 2018, granting in part Plaintiff's motion to clarify (Dkt. 566) and state:

1.      On June 1, 2018, this Court ruled on Defendants' motion in *limine* number 18 to bar 404(b) witnesses, and did not allow Sam Perez and Sal Ortiz to testify. Dkt. 540

2.      On June 8, at 12:36 a.m., Plaintiff filed his motion to clarify that previous order, asking *inter alia* to reconsider Perez and Ortiz.

3.      Before Defendants could respond, on June 8 at 9:55 a.m., this Court issued an order allowing Perez and Ortiz to testify as 404(b) witnesses, stating this was the Court's original intent. Dkt. 566. This Court should reconsider that ruling.

4.      As explained in Defendants' 2016 motion to bar Perez from testifying, Perez has repeatedly failed to comply with subpoenas to complete his deposition in this case. Dkt. 229. Indeed, after that motion was filed, Perez even failed to comply with a subpoena to appear before this Court to be deposed in the courthouse after a status hearing. Dkt. 245.

5.      This Court simply should not and cannot countenance such brazen disregard for Court orders and the discovery process, nor should it tolerate Plaintiff's attempt to take advantage of Perez's manipulations. Perez should be barred for those reasons alone.

6.      In discussing the problems caused by Perez on June 8, this Court and Plaintiff each suggested that Perez's failure to complete his 2016 deposition could be remedied by allowing Defendants to depose him during trial, a couple of days before being called by Plaintiff. This would not fix the problem, it would only exacerbate it by allowing Defendants to learn what Perez would say, but not giving them any time or opportunity to investigate his story and develop and present rebuttal and impeachment evidence and witnesses. That is something that occurs during discovery, which is what Defendants were prohibited from conducting as a result of Perez's disregard of the Court's processes.

7.      Further, Perez's story about the *Juan Johnson* case is dissimilar to Plaintiff's, does not meet the tests of *United States v. Gomez,* 763 F.3d 845 (7th Cir. 2014), and is nothing more than pure propensity evidence despite Plaintiff's rhetoric to the contrary. What we know so far about Perez from his previous testimony for Plaintiff's counsel in other cases is that Perez believed Defendant Guevara would frame him for a murder if Perez did not cooperate in convincing four *other* gang members to identify as suspects persons Guevara wanted identified, and Perez himself did not testify against those persons. *See* Motion in *Limine* No. 18 (Dkt. 411) at 11-12. Thus, the facts of this case involving Orlando Lopez have nothing in common with Perez's story except Guevara, making it obvious that the latter has only prohibited propensity value.

8.      Ortiz should also be barred. He was one of the people Perez convinced to identify Juan Johnson as the person who beat Fernandez to death even though he had not seen the perpetrator. Dkt. 411 at 10. Thus, like Perez, the story he tells is too dissimilar to Plaintiff's. Further, Defendants have disclosed several witnesses to rebut Ortiz, which will create a mini-trial within a trial that has from its outset threatened to go on too long, and which is already living up to that promise.[1]

---

[1] This Court's order of June 8 also said a witness named Rodriguez could be called as a 404(b) witness, but he has never been listed by Plaintiff as a 404(b) witness; rather, Defendants have listed him as a rebuttal

2

9.      Recognizing Perez's and Ortiz's weaknesses as 404(b) witnesses, Plaintiff proposed exchanging them for the currently-barred opportunity to cross-examine Guevara about two other people, Serrano and Montanez. *See* Exhibit A, Transcript 6/8/18, Vol. 4B at 891-92. Serrano and Montanez were co-criminal defendants and are now co-plaintiffs in their own civil cases. *See, Serrano v. Guevara,* No. 17 C 2869 (N.D. Ill.), *Montanez v. Guevara,* No. 17 C 4560 (N.D. Ill.). This proposal is a non-starter: as reflected in their nearly-identical civil lawsuits, Serrano and Montanez's allegations have no similarities to Plaintiff's, except for Guevara, who Serrano and Montanez claim framed them by coercing (through threats and promises) a jailhouse snitch to testify against them. There are no allegations about informants or coercion of informants in this case. It would be immensely unfair to allow Plaintiff to ask Guevara about these cases, particularly when Plaintiff knows Guevara will assert his Fifth Amendment rights. Such testimony seems designed not only to improperly influence this case, but Serrano and Montanez's as well.

10.      For the same reasons, Serrano and Montanez should not be allowed to be called as 404(b) witnesses, as the Court seemed to have suggested during the discussion on June 8. They tellingly were not designated as 404(b) witnesses, and adding them now would be unfairly prejudicial. Additionally, Serrano and Montanez have been attending this trial and listening to evidence, so they cannot now be witnesses. And, in neither this case nor their own civil lawsuits have Defendants had any reasonable chance to develop information or witnesses to rebut Serrano and Montanez's allegations.

WHERFORE, for all these reasons, Defendants move this Court to reconsider its order of clarification, Dkt. 566, and bar Perez and Ortiz as 404(b) witnesses.

---

witness to counter Jose Melendez. *See* Supplement to section 2(b) (witnesses) of Proposed Final Pretrial Order, Dkt. 515.

3

Dated: June 10, 2018

/s/ Eileen E. Rosen
EILEN E. ROSEN

*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, IL 60654
Tel: (312) 494-1000
ersonsen@rfclaw.com

/s/ Thomas M. Leinenweber
THOMAS M. LEINENWEBER

*Counsel for Defendants Guevara*
*And Mingey*

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
thomas@ilesq.com

Respectfully submitted,

/s/ Jeffrey N. Given
JEFFREY N. GIVEN

*Counsel for Defendants Gawrys,*
*Noon, Guzman, and McLaughlin*

James G. Sotos
Jeffrey N. Given
Caroline P. Golden
The Sotos Law Firm, P.C.
550 E. Devon Avenue, Suite 150
Itasca, IL 60143
Tel: (630)735-3300
jgiven@jsotoslaw.com

4

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on June 10, 2018, I electronically filed the foregoing **Defendants' Motion To Reconsider This Court's Clarification Order Of June 8, 2018 Regarding 404(B) Witnesses Perez And Ortiz** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants below.

**Attorneys for Plaintiff**
Arthur R. Loevy
Jonathan I. Loevy
Elizabeth N. Mazur
Russel Ainsworth
Michael I. Kanovitz
Steven E. Art
Anad Swaminathan
Rachel Brady
311 N. Aberdeen
Chicago, IL 60607
(312)243-5900
(312) 243-5902 (Fax)
loevylaw@loevy.com
jon@loevy.com
Elizabethm@loevy.com
russell@loevy.com
mike@loevy.com
steve@loevy.com
annad@loevy.com
Brady@loevy.com

J. Samuel Tenenbaum
Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, IL 60611
(312)503-4808
s-tenenbaul@law.northwestern.edu

Locke E. Bowman, III
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Aveneu
Chicago, IL 60611
(312)503-0844
(312)503-1272 (fax)
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

**Attorneys for City of Chicago**
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312)494-1000
(312)494-1001(fax)
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

**Attorneys for Reynaldo Guevara**
Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. La Salle Street, Suite 2000
(312)663-3003
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

/s/ Jeffrey N. Given
JEFFREY N. GIVEN, Attorney No. 6184989
*One of the Attorneys for Individual Defendant*

5

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR THIS COURT TO RECONSIDER ITS CLARIFICATION ORDER
OF JUNE 8, 2018 REGARDING 404(B) WITNESSES PEREZ AND ORTIZ**

Plaintiff, JACQUES RIVERA, by his attorneys, respectfully submits this response in

opposition to Defendants' motion to reconsider this Court's clarification order of June 8, 2018

regarding 404(b) witnesses Perez and Ortiz. In support, Plaintiff states as follows:

1.      On June 10, 2018, Defendants filed a motion for this Court to reconsider its order

clarifying a ruling it issued on June 1, 2018, Doc. Nos. 566, 540, regarding introduction of

certain 404(b) evidence. In its original order and its clarification minute entry, the Court

explained that witnesses Sam Perez and Sal Ortiz could testify live. Doc. No. 566, 540, at 13.

This Court explained: "But Perez and Ortiz's testimony regarding Guevara's 1989 investigation

of the Fernandez murder raises fewer Rule 403 concerns as it is closer in time and involves an

allegation that Guevara showed eyewitnesses photo books and told them whom to pick." *Id.*

2.      Defendants have given this Court no cause to reconsider any of its prior rulings.

These issues have been fully aired in Defendants' initial motion *in limine*, Doc. Nos. 382, 411,

Plaintiff's response, Doc. No. 479, Defendants' reply, Doc. No. 494, this Court's Order on the

motion *in limine*, Doc. No. 540, Plaintiff's request for clarification, Doc. No. 565, and this Court's order clarifying its prior ruling, Doc. No. 566. The Court ruled correctly. Defendants merely raise the same arguments they have raised before.

3.      Defendants remain wrong on the merits. As the Court previously ruled, other-acts evidence is admissible here to show intent, absence of mistake, knowledge, and planning. Doc. No. 540, 9-11.[1] Here Perez's and Ortiz's experiences in the Johnson case are probative of Guevara's intent to secure convictions through false identifications, and of whether he was duped by Orlando's highly unreliable identification, as he asserts he was. The fabricated witness identifications in Rivera's case and Johnson's case are very close in time and happened in nearly identical ways. Guevara showed the witnesses a photo of his suspect and told them to identify the suspect as the killer. This is highly probative of to his state of mind: his intent and absence of mistake. Indeed, the Court reached exactly this conclusion. Doc. No. 540, at 13.

4.      Defendants argue in passing that Sal Ortiz's testimony is too dissimilar and would result in mini-trials when they call rebuttal witnesses. But this is exactly what they argued before. The Court's original 404(b) ruling found the argument was unavailing, and the Court reiterated that Ortiz could testify live in its clarifying order. Doc. No. 540, at 13. Defendants' cursory argument provides no justification for reversing course.

---

[1] The Court's ruling is consistent with a legion of cases on these issues. *See United States v. Macedo*, 371 F.3d 957, 967 (7th Cir. 2004) (holding that district court did not abuse its discretion by admitting past crimes where the defendant's theory of the case was that he lacked the requisite intent and instead was a "dupe"); *United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996) (evidence of prior drug crime was properly admitted to show absence of mistake); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (permitted evidence showing defendant "was not some hapless fool mistakenly caught up in an overzealous law enforcement action"); *United States v. Tylkowski*, 9 F.3d 1255, 1262 (7th Cir. 1993) (permitting "evidence of another crime which tends to undermine the defendant's innocent explanations for his act"); *Young*, 821 F.2d at 379 (concluding that a prison's prior misconduct negates the defense that he committed similar misconduct accidentally); *United States v. Hillsberg*, 812 F.2d 328, 334 (7th Cir. 1987) (holding that prior firings of a gun on different occasions were relevant to prove that the defendant had not accidentally discharged the weapon on the occasion in question); *see also United States v. DeFillipo*, 590 F.2d 1228, 1240 (2d Cir. 1979) (where defense claimed defendants were innocent dupes in working with stolen goods, intent in issue).

5. Defendants assert that they will be prejudiced because Sam Perez has not been fully deposed and they need time to both re-depose him and conduct additional discovery. Not so. Perez has been fully deposed on the only subject about which he will testify: that in the Juan Johnson case, Guevara showed him a photo of the suspect and suggested that the person in the photo was the shooter. Perez gave a 145-page deposition on this topic in the *Juan Johnson* civil case (where Defendants were again represented by the Sotos firm), Ex. 8, Deposition of Samuel Perez in *Johnson v. Guevara*; and he then gave another 100 pages of testimony about Juan Johnson in his deposition in this case, Ex. 1, Perez Dep, at 68:8-22. It was only when the deposition questioning in this case turned to other instances of Defendant Guevara's misconduct—ones that are not the subject of Perez's 404(b) testimony in this case—that Perez insisted on speaking with a criminal lawyer.

In any event, Perez has also testified extensively about his *Juan Johnson* testimony in other cases. Ex. 2, Perez Criminal Testimony in *People v. Johnson*; Ex. 3, Perez Civil Trial Testimony in *Johnson v. Guevara*; Ex. 4, Testimony of Samuel Perez in *People v. Solache & Reyes*; Ex. 5, Testimony of Samuel Perez in *People v. Almodovar* and *People v. Negron*. Put simply, Defendants know exactly what Perez has to say on the subject of his 404(b) testimony, and have been given ample opportunity to develop that evidence. And in any event, on Friday, June 8, Plaintiff offered to facilitate a continued deposition of Perez, and on Saturday, June 9, Defendants declined. *See* Ex. 6, Email Chain.

6. With regard to Defendants' argument raised today about deposing Perez in the hope that he might be able to impeach former Chicago Police officer Bill Dorsch regarding a separate instance of misconduct by Guevara, this is a red herring. It is hard to believe that Defendants would like to elicit testimony from Mr. Perez regarding a second 404(b) fact pattern,

3

even if it is purportedly to develop impeachment of Mr. Dorsch. But if in fact Defendants are agreeing to allow Mr. Perez to testify about this other instance of Guevara's misconduct, Plaintiff remains willing to facilitate Perez's deposition.

7.      If this Court is inclined to bar Sam Perez based on Defendants' arguments, Plaintiff submits that it makes sense in that circumstance—in terms of Rule 404(b) and Rule 403 balancing—to allow Plaintiff to briefly cross examine Guevara about the identical rap-sheet fact pattern in the wrongful conviction case of Jose Montanez and Armando Serrano. As explained previously, Montanez and Serrano were wrongly convicted of the 1993 murder of Rodrigo Vargas and both served 23 years in prison before they were exonerated in 2016. *Montanez v. Guevara*, No. 17 C 4560, Doc. 1 (N.D. Ill. June 19, 2017).[2] Exactly like in this case, Guevara printed rap sheets for Montanez and Serrano before anything implicated either of them as a suspect in the Vargas homicide. The rap sheets bear precisely the same date stamp, showing they were issued at the end of May 1993. But there is no mention of Montanez or Serrano as a suspect in the Vargas homicide investigation until they were purportedly identified on June 2, 1993. This other-acts evidence is now highly probative evidence that rebuts Defendants' contention that a dated rap sheet before a suspect has become a suspect defies common sense, and it demonstrates Guevara's lack of mistake, knowledge, opportunity, and planning in the Valentin investigation and the prosecution of Plaintiff.

To be clear, Plaintiff proposes to cross-examine Defendant Guevara only about pulling Montanez and Serrano's rap sheets days before any eyewitness had identified them. This limited questioning is particularly probative, and the least prejudicial alternative because it would be

---

[2]  This morning, the Court indicated that it may be inclined to allow Plaintiff to substitute Wilfredo Rosario or Robert Ruiz (the other two 404(b) witnesses) to replace Perez if it so rules.  Plaintiff is certainly amenable to this outcome, and does not intend to waive that right, by proposing this *Serrano/Montanez* alternative described here.

4

introduced on cross-examination of Guevara rather than by a live witness. It therefore presents the fewest Rule 403 concerns.

8. Admittedly, Montanez was not disclosed as a 404(b) witness, but Defendants have already had ample opportunity to gather evidence surrounding Montanez's case. In 2013, the City hired Scott Lassar of Sidley & Austin to investigate Guevara's misconduct on its behalf. After conducting an exhaustive investigation, Lassar discovered that Montanez and Serrano had been wrongfully convicted. *See* Ex. 7, Lassar Report for Montanez and Serrano, at 58. That investigation and its results have been available to the parties for years. Indeed, the City's conclusion that Montanez and Serrano were wrongly convicted supports the view that the evidence described above is reliable. There is no prejudice to Defendants in admitting this evidence. It should be admitted under Rules 404(b) and 403 in place of Mr. Perez, if he is barred.

9. Even the Montanez/Serrano evidence cannot come in as substantive evidence, it is admissible to impeach Guevara's credibility. Defendant Guevara's repeated invocation of the Fifth Amendment places his credibility at issue. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) (holding that a jury can draw inferences about witness's credibility when witness repeatedly invokes the Fifth Amendment); *Harris v. City of Chicago*, 266 F.3d 750, 755 (7th Cir.2001) (finding district court abused discretion barring evidence of a witness's prior invocation of Fifth Amendment); *see also Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (explaining that witness's repeated invocation of the Fifth Amendment diminished his credibility, but concluding that district court should not substitute its credibility determinations for those of the jury); *United States v. Sixty-one thousand nine hundred dollars & no cents ($61,900.00) seized from account number XXXXXX4429 held in the name of PRP Rest., Inc.*, 802 F. Supp. 2d 451, 456 (E.D.N.Y. 2011) (concluding that witness

5

repeatedly invoked Fifth Amendment to protect credibility). In this case, there is little evidence supporting Defendants' version of events other than Guevara's own statements about what his investigation yielded. His credibility is paramount to his case.

Federal Rule of Evidence 608(b) allows impeachment by prior acts if they are probative of the witness's character for truthfulness or untruthfulness. Rule 608(b) also "expressly affords the trial judge broad discretion to allow . . . questioning regarding prior instances of conduct if they are probative of the character for truthfulness or untruthfulness of the witness." *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 800 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 637, 196 L. Ed. 2d 520 (2017); *United States v. Dvorkin*, 799 F.3d 867, 883 (7th Cir. 2015); *United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007).

## CONCLUSION

For all of the foregoing reasons, this Court should deny Defendants' motion in its entirety.

Respectfully submitted,

**JACQUES RIVERA**

By:     /s/ Jon Loevy
        *One of Plaintiff's Attorneys*

6

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steven Art
Rachel Brady
Sean Starr
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844


J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576

7

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JACQUES RIVERA,                          )
                                         )
      Plaintiff,                       )
                                         )       Case No. 12-CV-04428
      v.                               )
                                         )       Judge Joan B. Gottschall
REYNALDO GUEVARA et al.,                 )
                                         )
      Defendants.                      )

**ORDER**

In its ruling on the officer defendants' 14th and 18th motions in limine ("Ruling," ECF No. 540) and the subsequent order clarifying the ruling, ECF No. 566, this court attempted to strike a delicate balance regarding plaintiff's Federal Rule of Evidence 404(b) witnesses and impeachment-only questioning of defendant Reynaldo Guevara ("Guevara"). *See* Ruling 11–14, *see also United States v. Gomez*, 763 F.3d 845, 856–60 (7th Cir. 2014) (en banc). The court analyzed the evidence using the *Gomez* framework. Defendants' pending motion to reconsider the court's Rule 404(b) rulings takes issue with the last *Gomez* step, determining whether the Rule 404(b) evidence's admission would be more prejudicial than probative under Rule 403. *See Gomez*, 763 F.3d at 856–57.

Guevara's cross-examination at trial on June 12, 2018, mooted the impeachment-only Rule 404(b) issues. Defendants argued in the pending motion that plaintiff should be barred from cross examining about two individuals identified as Serrano and Montanez. ECF No. 570 at 3. Despite the court's limine rulings, defendants did not object, except on grounds unrelated to the limine rulings, to plaintiff's counsel cross examining Guevara about a host of other alleged incidents of misconduct. Defendants have therefore forfeited their objections to the

impeachment-only testimony, and the motion to reconsider on the impeachment-only witnesses is therefore denied as moot. *See Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 635–36 (7th Cir. 2018); *Willis v. Lepine*, 687 F.3d 826, 838–39 (7th Cir. 2012) (citing *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 482 (7th Cir. 2000)).

Regarding the live Rule 404(b) witnesses, the briefing and arguments of the parties at trial have made a great deal clear that was not apparent, or at least very obscure, when the court ruled on the motions in limine. First, witness Samuel Perez ("Perez") did not complete his deposition, and while plaintiff argues that his deposition could be completed, even if it were completed, the risk that additional discovery will be needed and the risk of digressing into a confusing and prejudicial mini-trial does not justify allowing Perez to testify. *See* Fed. R. Evid. 403. This is especially true because another Rule 404(b) witness, Saul Ortiz, will be testifying to largely the same alleged conduct. *See* Ruling 5–6 (summarizing the expected testimony of Perez and Ortiz).

Due to developments at trial, balancing the likely prejudicial effect of all of the proposed Rule 404(b) testimony with its probative value leads the court to allow the testimony of Robert Ruiz ("Ruiz"). At the motion in limine stage, the court attempted to find the most directly analogous, least prejudicial fact patterns. *See* Ruling 11–14. But again, something quite unexpected occurred at trial. Despite the court's ruling at the limine stage, defendants did not object to cross examination of Guevara about the murder of Oscar Arman ("Arman"), the case about which Ruiz will testify. Consequently, the jury has been exposed to the allegations made about the Arman investigation.

The unexpected inclusion of the Arman investigation changes the Rule 403 calculus. The court's assumption at the motion in limine stage that barring Ruiz's testimony would prevent the

2

jury from learning about the Arman investigation no longer holds, so Ruiz's testimony will not be as prejudicial as it first appeared. This development sufficiently addresses the factual distinctions drawn in the court's motion in limine ruling, namely that police officers locked Ruiz in a room for seven or eight hours on three or four occasions. *See* Ruling 6–7, 12. After hearing the testimony at trial, the court believes that the importance of falsifying information in police reports to suppress exculpatory material was understated at the motion in limine stage. On that score, unlike 404(b) witnesses Evelyn Diaz and Wilfredo Rosario, in the Arman investigation, the jury will hear that a police report allegedly stated falsely that a lineup occurred at which Ruiz identified a suspect, *see id.* at 6–7. Ruiz will testify that the lineup did not happen. After balancing the unfair prejudice and cumulative impact in light of what has transpired so far at trial, Ruiz will be allowed to testify.

Accordingly, Defendant's motion to reconsider, ECF No. 570, is granted in part and denied in part. Summing up the court's Rule 404(b) rulings, the impeachment-only witnesses have become moot. The following Rule 404(b) witnesses are allowed: William Dorsch, Jose Melendez, Saul Ortiz, Alberto Rodriguez ("wrong car" allegations only), and Robert Ruiz. The following Rule 404(b) witnesses are disallowed: Samuel Perez, Evelyn Diaz, and Wilfredo Rosario.

Date: June 15, 2018

_____/s/_____
Joan B. Gottschall
United States District Judge

3

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| Plaintiff, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S COMBINED LOCAL RULE 56.1(b)(3)(B) STATEMENT OF ADDITIONAL
MATERIAL FACTS OPPOSING MOTIONS FOR SUMMARY JUDGMENTOF
INDIVIDUAL DEFENDANTS AND DEFENDANT CITY OF CHICAGO**

Plaintiff, by and through his attorneys, Loevy & Loevy, submits the following Local Rule

56.1(b)(3)(B) Statement of Additional Material Facts Opposing the Motions for Summary

Judgment of the Individual Defendants and Defendant City of Chicago:

**A.    JACQUES RIVERA**

1.    Jacques Rivera is a 52-year-old man who grew up in the Humboldt Park

neighborhood of Chicago. Starting in 1988, when he was just 23 years old, Rivera was wrongly

arrested, prosecuted, and convicted of the murder of Felix Valentin, a crime he did not commit.

At the time that his ordeal began, Rivera was steadily employed at the Humboldt Park Institute,

an organization next to the church his family attended that helped young people to get their

General Education Diplomas, and lived with his wife and three children. ((Ex. 1, Rivera Dep at

1

8:6-9, 50:3-53:9; Ex. 3, Criminal Trial Transcript,  Rivera Testimony at 66:9-24, 67:16-68:4;

Pastor Rivas Testimony, at 86:17-23.)[1]

### B.     THE SHOOTING OF FELIX VALENTIN

2.      On the 27th of August 1988, Israel Valentin and his 16-year old younger brother

Felix Valentin drove to an apartment building located at 3320 West Cortland Street in the City of

Chicago, Illinois. Israel exited their car and went inside the building to pick up his girlfriend,

Marilyn Lopez, to attend a wedding. Felix waited in the driver's seat of the car, which was

parked next to the apartment building at the mouth of an alley off of Cortland Street. (Ex. 4,

Rivera Street File at Wron 12, 22, 33, 69; Ex. 3, Criminal Trial Transcript, Lopez Testimony, at

18:17, 20:4-10, 33:20-34:9, 51:12; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony at 46:9-

21; Ex. 6A, Lopez Dep at 38:3-39:12, 41:6-43:5, 47:11-24.)

3.      While Israel was inside, a car with two men inside pulled up on the street,

stopping close to where Felix was sitting. The passenger in the car got out, approached Felix's

vehicle, and shot him eleven times in rapid succession, and then ran back to the passenger seat of

the getaway car and drove away. Police communications received the call at around 3:45 pm.

Israel returned to find his brother seriously wounded. He got in the car and drove Felix to

Norwegian Hospital; Felix was eventually transferred to Cook County Hospital. (Ex. 4, Rivera

Street File at Wron 12, 16, 22, 24, 33, 69; Ex. 6A, Lopez Dep at 48:2-6; Ex. 5, 2011 PC Hearing

Transcript, Lopez testimony at 46:24-48:15.)

---

[1] Any statements or admissions contained herein are solely for purposes of adjudicating the motions for summary judgment.

### C. FELIX VALENTIN'S HOSPITAL COURSE AND DEATH

4. After being treated initially at Norwegian Hospital, at 7 p.m. the evening of August 27, 1988, Valentin was transferred to Cook County Hospital for surgery. Hospital records and the testimony of Dr. Sharkey, the resident who treated Valentin, reflect that Valentin was able to communicate with treaters and react to stimuli, and accept family visits for approximately a week after the shooting. Police records reflect an interview with Valentin at Cook County on the early morning hours of August 31. (Ex. 4, Rivera Street File at Wron 31-33, 34-36; Ex. 7, Medical Records at CPD 249-816, JR-L 8497-9160; Ex. 8A, Sharkey Dep at 92:21-95:24)

5. Valentin developed pneumonia around September 4, and his condition began to worsen rapidly. A few days later, his health was dramatically worse. By the evening of September 9, Valentin was confined to a roto-bed, which moved him constantly; he could not breathe on his own and was fully intubated on a breathing machine; he was on a medication that paralyzed him so he would not kick the ventilator; he was completely unresponsive to deep pain stimuli and to verbal stimuli; and his pupils were not reacting to light. (Ex. 8A, Sharkey Dep at 28:9- 53:1; Medical Records at CPD 596, 611, 612, 732.)

6. On September 10, all of these symptoms of Valentin's comatose condition continued unabated, his neurological functioning had been substantially suppressed by medication, and he was suffering from an Acinetobacter infection that was impossible to treat. (*Id.*; *see also* Ex. 8A, Sharkey Dep at 32:3-36:18, 51:15-53:1, 55:9-57:2; Ex. 7, Medical Records at CPD 729-31, 617-32.)

7. On September 14, 1988, just before midnight, Valentin died. (Ex. 4, Rivera Street File at Wron 12.) There is no indication that Valentin regained consciousness or responsiveness between September 9, 1988, and his death. (Ex. 8A, Sharkey Dep at 34:18-23.)

3

**D.      POLICE INTERVIEWS WITH FELIX VALENTIN AND THE
IDENTIFICATION OF JOSE RODRIGUEZ AND FILIPE NIEVES**

8.      On August 27, 1988, responding police units who arrived at Norwegian Hospital were furnished with descriptions of the suspect and his "getaway" driver. According to the police report, Felix Valentin described both subjects as Hispanic males between the ages of 16 and 18, and reported that they were driving an older brown vehicle – possibly a Toyota hatchback. Felix also related that the suspect had been wearing a yellow baseball hat and was of light to medium complexion. (Ex. 4, Rivera Street File at Wron 44.)

9.      Defendants Gillian McLaughlin and John Leonard were the principal detectives working the case. Defendants Reynaldo Guevara and Stephen Gawrys were the lead gang crimes specialists working the case. (Ex. 9A, McLaughlin Dep at 201:6-8; Ex. 10, Noon Dep at 153:2-7.)

10.      Defendants McLaughlin and Leonard responded to the hospital at 5:15 p.m. on August 27 to interview Felix and Israel Valentin. They created a general progress report and police report reflecting their investigation at the hospital. The August 27 general progress report, signed by Defendants Leonard and McLaughlin, related Israel's description of the events surrounding the shooting, but does not contain a description of the suspect or getaway driver. It also contains information that Marilyn Lopez's 12-year old younger brother, Orlando "Macho" Lopez, may have observed some portion of the shooting, but had not yet been interviewed. (Ex. 4, Rivera Street File at Wron 69; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 40:15-41:7, 70:13-71:11.) (Ex. 4 Wron 32-33, 68-69; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony, at 110:17-11:18)

11.      The August 27 police report contains a description of the suspect: Hispanic male between the ages of 18-22 with brown eyes, dark hair, a black jean jacket, dark pants, and gym

4

shoes. It also contains a description of the getaway driver: Hispanic male between the ages of 18-22. The description is not attributed to any person and the report does not describe the origin of the description. This description does not appear in the general progress report and is different than the description reported by responding police units. ((Ex. 4, Rivera Street File at Wron 31-Wron 33; *Compare* ¶¶ 8, 10, 11, *supra*.).

**E. DEFENDANTS SUPPRESS THE INVESTIGATION OF JOSE RODRIGUEZ AND FILIPE NIEVES**

12. Tactical officers Letrich and Moriarty interviewed Felix Valentin at the hospital on August 30, 1988. Felix stated that the two suspects were members of the Imperial Gangsters street gang. The officers then presented an Imperial Gangster photo album ("mug book") to Felix, who identified the shooter as Jose Antonio "Chequin" Rodriguez, and the driver of the getaway car as Filipe Nieves. (Ex. 4, Rivera Street File at Wron 39; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 56:15-57:13.)

13. Based on the identification provided by Felix, Rodriguez was arrested three blocks from the scene of the shooting at 1 a.m. on August 31, 1988 by Officers Moriarity, Vergara and Wojcik as the suspect in the shooting. A hold dated August 31, 1988 was placed on Rodriguez. The hold stated that a line-up was to be viewed by the witness in the case, Orlando Lopez, and that officers expected to charge Rodriguez with aggravated assault on Felix Valentin by 1 a.m. on September 2, 1988. (Ex. 4, Rivera Street File at Wron 58 (arrested at 0100 hours, at 2040 N. Spaulding, three blocks from Cortland and Kimball), 59; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony at 121:10-17; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 57:18-58:16.)

14. A lineup photograph of Rodriguez was taken on August 31, 1988. The photograph is one of a group of six lineup photographs of six different individuals. The six individuals

depicted in the photographs are the six individuals listed on Defendant Leonard's August 31, 1988 general progress report. The photographs also correspond to the photograph evidence form dated August 31, 1988, at 11:45 p.m. Rodriguez was then released later on August 31, 1988. (Ex. 11, RFC 1415-1420; Ex. 4, Rivera Street File at Wron 62-64; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 58:6-59:3.)

15. There is no reference in the entire police file to any interview of Rodriguez or Nieves. There is also no record of efforts to determine whether Rodriguez or Nieves had an alibi for the date and time of the shooting of Felix Valentin. These are typical investigative steps, and the evidence related to those investigative steps was, and remains, suppressed. (Ex. 12, Brasfield Report at 21; Ex.16, Ex. Wadas File (not contained therein);Ex. 19A, Wadas Dep at 64:8-16, 75:8-17, 140:11-16; Ex. 9A, McLaughlin Dep at 195:8-200:21, 205:3-08:23.)

16. The only other reference to Rodriguez or Nieves in the entire police file is in a September 16, 1988 police report prepared by Defendants Guevara and Gawrys. That police report, which states that they showed photographs of Rodriguez and Nieves to Orlando Lopez, presumably around the time of the live lineup on September 15 (since that is the next time Lopez was with the police), is full of fabrications. (*See* ¶¶65-66, 25-28, 45-48, ,48-49, *infra*; Ex. 4, Rivera Street File at Wron 09-10.)

**F. THE EYEWITNESS ACCOUNT ORLANDO LOPEZ**

17. Other than Felix Valentin himself, there was a single known eyewitness to the shooting named Orlando Lopez. He was the younger brother of Marilyn Lopez, whom Israel Valentin had come to see. At the time, Lopez was 12 years old. (Ex. 4, Rivera Street File at Wron 53; Ex. 17, JR 964; Ex. 18, JR 978; Ex. 6A, Lopez Dep at 26:24-27; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 46:20-47:17.)

### 1. Lopez's Different Accounts Given to Police

18.     Lopez was interviewed for the first time on August 29, 1988 by Defendants

McLaughlin and Leonard. (Ex. 4, Rivera Street File at Wron 29-30; 32-33 (Aug 27 police report,

submitted at 11:55 p.m. on that date, does not contain any reference to questioning 12 year-old

Orlando Lopez); *see* ¶¶ 23-24, *infra*.) Their report states that Lopez communicated the following:

> LOPEZ was coming from the store at corner of Kimball and Cortland. LOPEZ
> observed a copper colored GM-type car coming out of the alley, traveling
> northbound at approximately 3319 W. Cortland. LOPEZ indicated that said
> vehicle contained 2 M/WH's one of whom exited from the passenger's side of the
> vehicle and began to walk toward 3320 W. Cortland where the victim was seated
> behind the wheel of his vehicle. Suddenly, the M/WH began to run toward vehicle
> and LOPEZ noticed a gun in M/WH's hand. LOPEZ believed he heard three (3)
> shots but indicated that they were not very loud. LOPEZ indicated that LOPEZ
> saw the victim lean forward and to the right in the vehicle which victim had been
> seated.
>
> LOPEZ informed R/D's that LOPEZ could identify the shooter because LOPEZ
> recognized the shooter as a M/WH who played baseball at Humboldt Park and
> LOPEZ had observed him there on a few occasions. LOPEZ did not know
> shooters name but was aware that shooter was affiliated with the Latin Kings.
> LOPEZ then viewed books and made an identification of one RIOS, Jose (16-D
> LATIN KING Page 40D) as the M/WH who exited the copper car and shot the
> victim. At this time there is no identification of the driver.

(Ex. 4, Rivera Street File at Wron 29-30.)

### 2. Changes in Lopez's Accounts in Later Testimony

#### a. 1990 Trial Testimony

19.     At trial, Lopez gave a very different account of what happened than was

documented in Defendants McLaughlin and Leonard's August 29, 1988 police report. (*Compare*

¶ 23, *infra* and Wron 29-30 *with* ¶¶19a-h, *infra*.) Lopez's trial testimony about how he came to

be able to see the shooter and make an identification defies common sense and reason:

a.   Lopez testified that when the shooting occurred, he was going outside to go the store
     on the corner, which was approximately half a block away, at the corner of Cortland
     and Kimball. (Ex. 3, Criminal Trial Transcript, Lopez testimony at 18:8-19:16.)

7

b. Lopez testified that just as he came out of the house, there were a series of approximately four shots being fired by the shooter at Felix's car, which was in the alley right next to Lopez's apartment building. The shooter's back was facing Lopez, and so he could not see who the shooter was. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 19:12- 21:12, 34:7-11; 35:19-24, 43:16-23.)

c. Lopez testified that when he heard the shots, he ran the approximately half a block to the corner store, went inside and told the owner of the store to call the police. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 19:14-16, 23:11-13, 36:1-10, 43:16-23.)

d. Lopez testified that the store owner did not want to call the police, so Lopez ran the half block back toward the shooting and hid in a "dent" next to his building. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 23:11-24:21, 36:1-18, 44:17-23.)

e. Lopez testified that the process of running to the store, talking to the store owner, and running back took approximately 25 seconds – ten seconds to get to the store, five seconds in the store, and another ten seconds to run back toward the shooting and hide. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 44:12-45:5.)

f. Lopez testified that after this approximately 25 seconds, the shooter was still there, and Lopez saw him shoot one final shot and then run back to the passenger door of the car and got in. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 24:22-25:4, 45:6-8.)

g. Lopez testified that it was at this point, right before shooter got back in the car, that the shooter stopped and looked around, and that Lopez saw the shooter's face for the first time. He only saw the shooter's face "for a very brief moment," from approximately 25-30 feet away. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 25:23-26:8, 38:8-21, 42:10-21, 49.)

h. Nevertheless, Lopez testified that he got a clear view of the shooter and recognized the shooter as someone he had seen two or three times before playing basketball at Humboldt Park. Lopez also testified that the shooter had a ponytail dyed gold. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 22:15-19, 26:15-27:2; RFC 971:15-972:2, 986:22-987:5.)

### b. 2010 Affidavit

20.     In 2010, Lopez was visited by lawyers from the Northwestern University Center for Wrongful Convictions. He spoke with the investigators and signed a sworn statement regarding his knowledge of the shooting. (Ex. 20, Lopez Affidavit at 44736-39.) He stated as follows:

8

a. For years and years, Lopez had avoided telling anyone that he had lied at Rivera's criminal trial when he identified Rivera as the shooter, not even Israel Valentine. When investigators came to see him in 2010, however, the burden of the lie had grown to be too much, and Lopez wanted to set the record straight. (*Id.* at ¶ 17, 18.)

b. Lopez admitted that Rivera was not the person he had seen shoot Felix Valentin, and that the shooter was not someone he knew or had seen before. (*Id.* at ¶¶ 9, 13.)

c. He also admitted that he had seen two separate in-person, live lineups, the first one just a few days after the shooting. (*Id.* at ¶¶ 12, 14.)

d. About a week after the shooting, after the first lineup, he saw the actual shooter near Funston Elementary School, wearing the same black jacket as the shooter, and that he observed this person give the Imperial Gangsters handshake to another man. (*Id.* at ¶ 13.)

### c. 2011 Post-Conviction Hearing Testimony

21. In 2011, Lopez testified at a post-conviction hearing regarding Mr. Rivera's innocence. At that hearing, Lopez affirmed the statements above from his 2010 affidavit and stated that had not been pressured or threatened by the investigators who came to see him in 2010. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony, at 66; *see* ¶¶20a-d, *infra*.) He stated as follows:

a. Up to that point, he had never told his sister or any of the Valentins, and he did not come forward at the time of the trial because he was worried about being liked and how it would be perceived. But by the time the investigators came in 2010, he was feeling regret and wanted to correct the wrong and be able to "look at himself in the mirror." (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 67:23-68:18, 90:5-91, 94.)

b. This time, Lopez testified that he had seen the shooter's face not just once but twice: once when the shooter looked around after firing the last shot, and then again after he ran to the car. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 48.)

c. Lopez testified that his testimony that Rivera was the person who shot Felix Valentin was a lie. He did not recognize the shooter at the time, and had never seen him before. His trial testimony that the shooter was someone who played ball at Humboldt Park was false. The story was fed to him by the police. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 43-44, 49, 93.)

d. He viewed two live lineups. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 54.)

9

e. After the first lineup, Lopez saw the actual shooter near Funston School. He has no doubt the person he saw was the actual shooter. The person had the same black jacket and hair style, and his face is imprinted in Lopez's head. He saw the actual shooter perform the Imperial Gangsters handshake. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 56-58.)

**G. DEFENDANTS FRAME RIVERA BY FABRICATING AND SUPPRESSING EVIDENCE**

**1. Defendants Make Rivera the Suspect Before Any Witness Implicates Him In the Crime**

22. The record demonstrates that Defendants considered Rivera a suspect on August 27, 1988, the day of the crime, before any eyewitness ever implicated him in the crime. On that day, the Defendants requested Rivera's arrest history report, or rap sheet, from the Chicago Police Department's central records division, which was produced to the Defendants with a stamp that reads, "Issued on Inquiry, Aug 27 1988." That stamp means that an officer requested that person's rap sheet on or before that date. (Ex. 4, Rivera Street File at Wron 55; Ex. 22, Machain Dep at 50; Ex. 10, Noon Dep at 144; Ex. 23A Mingey Dep at 166:20-167:1; Ex. 24A, Guevara Dep at 16:15-20, 17:4-9, 18:6-9136:6-139:4, 143:8-21; *see also, e.g.,* ¶¶ 73-86, *infra*.)

23. However, Lopez first identified Rivera in a mug book on August 29, 1988, two days later. Indeed, multiple police reports state that Lopez selected Rivera from a mug book on August 29, 1988. The police file lacks any investigative basis for Rivera to have been on the Defendants' radar prior to Lopez's August 29, 1988 mug book identification. (Ex. 4, Rivera Street File at Wron 09 (Sept. 16 supplemental report stating that Defendants "located a witness on 29 Aug 88 [who] was brought into Gang Crimes North to view mug book photos."), *id.* at Wron 29-30; Ex. 25A, Gawrys Dep at 236:3-4.)

24. Defendants McLaughlin and Leonard's police reports and investigative notes indicate that they had not interviewed Orlando Lopez on August 27 or August 28, 1988, let alone

10

shown him mug books on those dates. For example, Defendants McLaughlin and Leonard created a police report dated August 27, 1988, at 11:55pm, documenting their investigative efforts that day. That police report omits any reference to Orlando Lopez, Lopez's supposed identification of Rivera from a gang book, or any reference to Rivera whatsoever. Likewise, their August 27, 1988 general progress report explicitly states that Orlando Lopez had not yet been interviewed. (Ex. 4, Rivera Street File at Wron 31-33, 69.)

### 2. Defendants Told Lopez Who To Pick From the Mug Books And Fabricated the Claim That The Shooter Played Ball at Humboldt Park

25. Defendants Noon, Guzman, Sparks, Zacharias, Leonard and McLaughlin were involved in initial conversations with Lopez, and along with Defendants Noon, Guzman, Sparks, and Zacharias – all gang crimes officers – showed him mug books of Latin Kings, from which he made a purported identification of Rivera. Defendants Guevara and Gawrys were also there when Lopez went through the mug books. (Ex. 4, Rivera Street File at Wron 09-10 (Noon, Guzman, Sparks, Zacharias involved in mug book identification), *id* at 29-30 (Leonard and McLaughlin police report stating that Lopez looked at mug books, listing photo he identified and stating that Lopez told them the shooter played ball at Humboldt Park); Ex. 26, Leonard Dep at 73:21-74:20, 80 (acknowledging spoke to Lopez and directed mug book procedure); Ex. 9A, McLaughlin Dep at 185:4-188:23-90; Ex. 25A, Gawrys Dep at 236:3-37:11; Ex. 27, Sparks Dep at 79:6-14, 90:17-91:1795:14 (admitting he and Zacharias were there when Lopez went through books), 94:4-20 (Guevara and Gawrys present); Ex. 24A, Guevara Dep at 18:17-19:11, 21:8-13.)

26. Consistent with the fact that the Defendants had requested Rivera's arrest history report two days earlier, (*see* ¶¶ 22, *supra*), Defendants Noon, Guzman, Sparks, Zacharias, Guevara and Gawrys manipulated Lopez into identifying Rivera from the gang book by showing him Latin King mug books and telling Lopez who to pick from the mug book. (Ex. 5, Transcript

11

of 2011 PC Hearing in *People v. Rivera*, case no. 88CR15436, Lopez Testimony at 49:10-50:12, 93:13-18 ("Because, you know, what happened was the cops were like, *when they pointed him out*, they were asking me have you seen him playing baseball or have you see him anywhere else; and I said, yes, that was the reason why I said that I seen him playing baseball in the park." (emphasis added); Ex. 24A, Guevara Dep at 18:17-19:11, 21:8-13, 158:15-23, 181:6-15, 182:10-19, 184:15-24, 189:6-12, 203:14-204:1.)

27.     In addition, Defendants Noon, Guzman, Sparks, Zacharias, Guevara and Gawrys fed him the story that the shooter was someone who played baseball at Humboldt Park. Lopez had never seen the shooter before, and he did not recognize the shooter as someone he had seen playing ball at Humboldt Park. His testimony to that effect was a lie. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony, at 49:6-12, 93:3-18 ("Because, you know, what happened was the cops were like, when they pointed him out, *they were asking me have you seen him playing baseball or have you see him anywhere else; and I said, yes, that was the reason why I said that I seen him playing baseball in the park.*" (emphasis added); Ex. 6A, Lopez Dep at 18:3-13, 58:21-59:3; Ex. 24A, Guevara Dep at 170:1-23.)

28.     There is also a complete lack of reliable evidence supporting the purported mug book identification made by Orlando Lopez of Rivera. (Ex. 25A, Gawrys Dep at 33:22-35:24 (stating that when a mug book identification is made, the gang crimes officers conducting the photo lineup should prepare a supplementary report documenting the identification; no such documentation exists here); Ex. 4, Rivera Street File at Wron 53 (general progress report referencing Lopez and has the date August 27 on it, as well as the dates August 28 and August 29, but no reference to a mug book or mug book identification); *compare* Ex. 4, Rivera Street File at Wron 09 (mug book ID conducted by Defendants Noon, Guzman, Sparks, Zacharias, at

12

Gang Crimes North) *with* Wron 29-30 (conducted by Defendants Leonard and McLaughlin, without reference to location); Ex.4 Rivera Street File at Wron 1-69 (mug book photo purportedly selected not contained therein); Ex. 25A, Gawrys Dep at 42:10-20 (doesn't preserve mug book photos after identification).)

### 3. Defendants Hold A First Live Lineup in Which A Filler Is Selected (and Cover Up Its Results and Its Connection to the Valentin Investigation)

#### a. *First Lineup on August 31, 1988*

29.     An undisclosed first, live lineup in which Rivera was a suspect was viewed by Orlando Lopez on or about August 31, 1988. Although the police reports indicate that Lopez viewed a single lineup on September 15, 1988, Lopez actually viewed two lineups containing Rivera. (Ex. 6A, Lopez Dep at 18:3-19:5, Lopez Dep at 80:11-82:8 (describing a first lineup to a tee: taken to police station by a detective, put in a separate room from the lineup participants, and looked through a glass window and made an identification); Ex. 3, Criminal Trial Transcript, Lopez testimony at 42:22-43:2 (it was "few days" after shooting); Ex. 20, Lopez Affidavit at ¶¶ 12 (first lineup was "[w]ithin a few days of the shooting"), 14; Ex. 5, 2011 PC Hearing Transcript, Lopez testimony at 54:1-3; Ex. 1, Rivera Dep at 166:2-68:15, Ex. 24A, Guevara Dep at 26:2-8.)

30.     Consistent with the occurrence of the first, live lineup on or about August 31, 1988, the two suspects in the case at that time – Jacques Rivera and Jose Rodriguez – were both in police custody on August 31, 1988. They had been arrested on August 30 at 11pm and August 31 at 1am, respectively. (Ex. 4, Rivera Street File at Wron File 35, 52, 56, 58.)

31.      The Defendants wanted Lopez to view a lineup on the night of August 30, around 11pm, but Lopez's mother said he was already asleep and she wanted the lineup to wait until the daytime. Accordingly, Defendants planned to conduct the lineup the next day, August 31,

13

instead, and gathered fillers on that date. (Ex. 26, Leonard Dep at 90:1-92:17, 278:17-80:5; Ex. 9A, McLaughlin Dep at 213:10-14:9, 228:3-30:24.)

32. Police reports from August 30 all indicate that a live lineup would take place on August 31, 1988. Plaintiff was arrested on August 30 by Defendants McLaughlin, Leonard, Guevara, Zacharias, Sparks, and Fallon; the arrest report stated that Lopez was not available on August 30, and so hold papers had been submitted so Lopez could view "a physical lineup which will be held on 31 Aug. 88." The August 30 hold request for Rivera prepared by Defendant Leonard stated that Lopez "will not be available until tomorrow's date," and that Rivera, "is expected to be charged with Aggravated Battery upon completion of the investigation at 1900 hours on 31 Aug 88." The August 31 hold request for Jose Rodriguez stated that "a lineup must be viewed by the witness," and that "it is expected that the prisoner will be charged with Aggravated Battery when the investigation is completed at 0100 hours on 2 Sep88." (Ex. 4, Rivera Street File at Wron File 56, 57, 59.)

33. Rivera and Rodriguez were then abruptly released on August 31, 1988. Rivera was released after being in the first of two lineups. The release reports for Rivera and Rodriguez were signed by Defendant Leonard. For the reasons set forth herein, the release report for Rivera falsely stated that they "were unable to locate the witness for a lineup." (Ex. 1, Rivera Dep at 166-68; Ex. 4, Rivera Street File at Wron File 52, 63.)

34. Testimony from Villafane, Olivero, and Ruiz also indicates that there was a first, live lineup on August 31, 1988. Ruiz testified that he had been in a lineup *for the shooting of Felix Valentin*, who was a friend of Ruiz. Villafane testified that he was in a live lineup in the summer of 1988, and that it is the only time he participated in a lineup in his life. Olivero also testified that he participated in a live lineup for a gang shooting in the summer of 1988, the only

14

lineup he had ever been in. (Ex. 28A, Ruiz Dep, at 26:14-27:24; Ex. 29A, Villafane Dep at 13:19-15:22; Ex. 30A, Olivero Dep at 13:20-14:14, 20:13-23, 59:9-19.)

35. These fillers believed that they were participating in a live lineup viewed by a witness. (Ex. 30A, Olivero Dep at 42:12-24 (saying they lined up and faced the mirror), 52:3-23 (he could hear people on the other side of the mirror); Ex. 28A, Ruiz Dep at 30:1-31:11 (officers pulled up and asked if he wanted to be in a lineup), 57:11-58:3 (they were told to look forward, turn to the right, turn to the glass, then go back to their spot in line); Ex. 29A, Villafane Dep at 20:7-13 (they said to look at the mirror, someone would be on the other side watching).

36. The police file includes a fabricated September 1 police report prepared by Defendants McLaughlin and Leonard stating that the six lineup participants did not participate in a live lineup but instead were participants in a photo array, whereby the Defendants organized a lineup, rounded up fillers, took photographs of the six participants, and then took the photos to the victim at the hospital for identification. (Ex. 4, Rivera Street File at Wron File 34-36.)

37. In reality, no photos were taken to the victim for identification. There was no reason to bring a bunch of fillers into the station just to create a photograph array to show the victim. Area 5 detectives and gang crimes officers already had numerous photos to use for photo arrays – in a drawer in the detective division, and in boxes and mug books in the gang crimes offices – all of which could be used for a photo array. This was the process by which photo arrays were conducted, not the procedure Defendants claim they used in the Valentin investigation. (Ex. 9A, McLaughlin Dep at 226:3-27:16; Ex. 25A, Gawrys Dep at 48:9-49:21; Ex. 10, Deposition of Edward Noon at 84:10-88:24; Ex. 23A, Mingey Dep at 114:12-116:17.)

15

38. Finally, Defendant Leonard admitted that he only spoke to the victim once, on the night of the shooting, meaning he could not have shown a photo array to the victim on August 31. (Ex. 26, Leonard Dep at 53:4-15, 54:13-15, 55:2-21.)

### b. *Lopez Selects Filler in August 31, 1988 First Lineup*

39. In the first lineup on August 31, 1988, Lopez made an identification. However, Lopez is mistaken when he says that he selected Rivera in that lineup; he did not select Rivera or Rodriguez, and instead selected one of the "fillers," since after the lineup, Rivera and Rodriguez were both promptly released. (Ex. 5 2011 PC Hearing Transcript, Lopez Testimony at 56-58; Ex. 4, Rivera Street File at Wron File 52, 63; Ex. BBBB, Criminal Trial Transcript, Letrich Trial Testimony, at 58-59; Ex. 1, Rivera Dep at 166:1-68:15; Ex. 9A, McLaughlin Dep at 264:7-16; Ex. 12, Brasfield Report at 71-72.)

40. The existence of this first August 31 lineup and the selection of a filler were concealed from Rivera by Defendants McLaughlin, Leonard, Guevara, Fallon, Sparks, and Zacharias. They were all involved in the investigation during August 30 and 31 when the suppressed first lineup and fabricated photo array at the hospital occurred, including Plaintiff's arrest and the preparation of a live lineup. (Ex. 4, Rivera Street File at Wron File 34-36 (listing arresting officers), Wron 56 (same); Ex. 9A, McLaughlin Dep at 285:2-86:8; Ex. 31, Fallon Dep at 105:15-06:2; Ex. 24A, Guevara Dep at 33:8-23-34:17.)

41. In addition, Defendant Guevara in particular was heavily involved in handling Lopez through the rest of the investigation, including picking him up and taking him to the first lineup. (Ex. 6A, Lopez Dep at 75:19-77:24; Ex. DDDD, 2011 PC Hearing Transcript, McLaughlin Testimony at 123:9-24:2; Ex. 24A, Guevara Dep. At 130:14-19, 282:7-14.)

16

c. *Rivera and His Counsel Are Unaware That August 31, 1988 Lineup Related to Valentin Investigation and Filler Was Selected*

42. Rivera knew that he had been in two live lineups in late August and September 1988, but he and his counsel had no way of knowing or proving that the first lineup was related to the Valentin investigation, that the person viewing the lineup was the eyewitness Lopez, and that he was a suspect and not a filler. Before the first lineup, no one asked Rivera any questions about a crime or told him what crime he was standing in the lineup for, or who was viewing the lineup. In addition, before the first lineup, Guevara had asked Rivera to be a filler in a lineup. (Ex. 1, Rivera Dep at 136:11-37:14, 166:-68:18, 186:16-23, 248:7-11; Ex. 19A, Wadas Dep at 106:19-107:7, 109:8-10, 114:4-23, 244:14-247:21, 109:8-10, 114:10-23, 244:14- 247:21; Ex. 32, Matarazzo Dep at 61:1-16; Ex. 24A, Guevara Dep at 41:20-24:2, 209:23-210:4.)

43. The police file contains no reference to a first lineup, and the documents that would have allowed Rivera or his attorney to confirm that Rivera was in a first lineup related to the Valentin investigation were all suppressed from Rivera and his defense attorney: the Rivera and Rodriguez arrest reports, hold reports, and release reports; the photos of the six lineup participants; and the general progress report listing the six lineup participants. (Ex. 4, Rivera Street File at Wron File 01-69 (no reference to Aug 31 lineup); Ex. 16, Wadas File (no reference to Aug 31 lineup and none of these suppressed documents); Ex. 19A, Wadas Dep at 94:10-18, 114:4-23, 244:14-247:21; Ex. 12, Brasfield Report at 70-72 (listing withheld documents).)

44. In addition, neither Rivera nor his defense attorney was ever told that a filler was selected in the first lineup. (Ex. 1, Rivera Dep at 166-68; Wron 01-69 (no such statement); Ex. 20, Bluhm 044729-31 (Nov. 8, 2010 Verified Petition for Post-Conviction Relief Based on

17

Actual Innocence (stating that 20 years later evidence has first emerged that Lopez viewed an earlier lineup and did not select Rivera); Ex. 19A, Wadas Dep at 247:1-21.)

### 4. Defendants Fabricate An Eyewitness Identification of Rivera from Felix Valentin

45. A police report dated September 16, 1988 (after Valentin's death), prepared by Defendants Guevara and Gawyrs, stated that on September 10, 1988 they went to Cook County Hospital and showed Felix Valentin a mug book, from which Felix made an identification of Rivera. This is the first and only instance in which there is a reference in the police file to an identification of Rivera by the victim (Ex. 4, Rivera Street File at Wron File 09-10; Ex. 25A, Gawrys Dep at 242:2-26; Brasfield Report at 17.)

46. Felix's purported identification of Rivera never happened. As set forth above, between September 9 and his death on September 14, Valentin was in effect in a comatose condition – among other things, he could not breathe on his own and was fully intubated on a breathing machine; he was on a medication that paralyzed him, and he was completely unresponsive to deep pain stimuli and to verbal stimuli; and his pupils were not reacting to light. Consistent with the medical records, Dr. Sharkey testified without any contradiction that Valentin could not have spoken to another person, he could not have looked through a photo album, and he could not even have communicated with eyes on September 10, 1988. (*See* ¶¶ 4-7, *supra*; Ex. 8A, Sharkey Dep at 55:9-57:2; Ex. 24A, Guevara Dep at 307:6-12, 357:6-13; Ex. 76, Guevara Answer to Fourth Interrogatories, No. 3 (asserting Fifth Amendment right in response to question about claim in Sept 16 report regarding Valentin's purported Sept 10 identification).)

47. A witness identification is an important investigative breakthrough, and it would be documented the same day and shared with detectives; that the victim identified the suspect on September 10, but this is not documented anywhere for another six days, is highly suspect and

18

contrary to practice. (Ex. 25A, Gawrys Dep at 197:19-98:17 (a witness identification is "big stuff" and so you would want to notify detectives), 245 (should have submitted report the same day, no explanation for why he did not); s*ee also* ¶¶ 65-66, *infra*.).

**5. Defendants Fabricate That Lopez Viewed Photos of Alternate Suspects Rodriguez and Nieves and Ruled Them Out**

48. The September 16, 1988 police report prepared by Defendants Guevara and Gawyrs also stated that Lopez was shown photos of alternate suspects Jose Rodriguez and Felipe Nieves, and confirmed that they were not the perpetrators. The police report does not state when or where this occurred. (Ex. 4, Rivera Street File at Wron File 10.)

49. This portion of the September 16, 1988 police report is also fabricated. Lopez was not shown photographs at the time of the September 15 lineup or after it, and was never shown a photograph of Jose Rodriguez or any other members of the Imperial Gangsters. (Ex. 6A, Lopez Dep at 177:1-21; Ex. 3, Criminal Trial Transcript, Lopez Testimony, at 48:9-49:8 (stating that he was never shown photograph of Rodriguez, and has no recollection of being shown photographs at or after September 15 lineup); Ex. 6A, Lopez Dep at 177:1-21 (stating he was not shown any photographs other than the mug book he viewed early in the investigation); Ex. 20, Lopez Affidavit, at ¶¶ 16; Ex. 25A, Gawrys Dep at 118:21-24, 251:2-4 ("Q: When did you show photographs to Lopez, A: I don't remember doing it."); Ex. 24A, Guevara Dep at 356:5-11, 375:12-19.)

**6. Defendants Suppress Orlando Lopez's Statements That Rivera Was Not the Perpetrator**

50. As set forth above, about a week after the shooting, Lopez saw the actual shooter near Funston Elementary School. The person was wearing the same black jacket as the shooter,

19

and he observed this person give the Imperial Gangsters handshake to another man. It was not Jacques Rivera. (*See* ¶¶ 20d, 21e, *supra*; Ex. 20, Lopez Affidavit at ¶ 13; Ex. 6A, Lopez Dep at 17:14-16, 87:24-90:16.)

51.     On September 15, Lopez was taken to the police station to view a live lineup containing Rivera. That lineup was conducted by two detectives, along with Defendants Guevara and Gawrys. Defendant McLaughlin was present throughout the entire second lineup as well. (Ex. 4, Rivera Street File at Wron File 49-50; Ex. 33, Boyle Dep at 159:7-12; Ex. 34, Dorsch Dep at 250:21-251:6; Ex. 24A, Guevara Dep at 325:7-13.)

52.     Right before Lopez viewed the live lineup on September 15, 1988, he told at least two people at the police station that Rivera "was the wrong guy" and had not committed the crime. He also told them about what he had learned, that is, that the shooter was an Imperial Gangster and a "neighborhood guy." Lopez repeated himself twice. (Ex. 20, 2010 Affidavit of Orlando Lopez, Ex. 20, Lopez Affidavit at ¶ 14; Ex. 5, Transcript of 2011 PC Hearing in *People v. Rivera,* case no. 88CR15436, Lopez Testimony, at 60:5-9, 62:1-11; Ex. 24A, Guevara Dep at 22:7-11, 23:3-11.)

53.     Lopez told this information to at least two people at the station: an older woman with white or blonde hair, and a Latino man with mustache, glasses, and an afro. (Ex. 5, Transcript of  2011 PC Hearing in *People v. Rivera* , case no. 88CR15436, Lopez Testimony, at 59:23-60:9; 62:1-13; Ex. 5, Transcript of  2011 PC Hearing in *People v. Rivera* , case no. 88CR15436, Estes Testimony at 172: 2-21; Lopez Dep at 95:5-96:9.)

54.     The white haired lady was Defendant McLaughlin. She was the principal investigator on the case, and had light blonde hair matching the description. In addition, she was the only female police officer involved with the case. (Ex. 25A, Gawrys Dep at 174:9-15; Ex. 4,

20

Rivera Street File at Wron File 49-50; Ex. 9A, McLaughlin Dep at 201:6-8; Ex. 4, Rivera Street File at Wron File 01-69 (McLaughlin only female officer referenced in police file); Ex. 24A, Guevara Dep. at 23:3-11, 325:7-13.)

55.     The only other woman involved in the investigation or prosecution of the case was an Assistant State's Attorney, Julie Rosner, but she was not involved in the lineup, was 31 at the time, and had brown hair. (Ex. 25A, Gawrys Dep at 165:16-66:4; Ex. 35A,  Rosner Dep at 16:17-17:4-; Ex. 4, Rivera Street File at Wron File 01-69 (McLaughlin and Rosner only female law enforcement officials referenced in police file).)

56.     The Latino man with mustache, glasses and an afro was Defendant Guevara, who matched the description at the time. Guevara is also listed, along with his partner Defendant Gawrys as present for the September 15 lineup. (Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony at 123:13-24:2; Ex. 4, Rivera Street File at Wron 49-50; Ex. 24A, Guevara Dep. at 23:3-11, 104:12-105:17; Ex. 36A, Melendez Dep at 30:6-19; Ex. 37,  Photo of Reynaldo Guevara at JR-L 63213.)

57.     None of the Defendants that heard Lopez's statement, including Defendants McLaughlin and Guevara, took steps to call off the lineup. Instead, Defendants suppressed Lopez's exculpatory statements and withheld that information from Rivera and his defense attorney, who, if provided with this information could have impeached the sole eyewitness's identification and prevented the State from arguing (as it did) that Lopez was unwavering in his identification. (Ex. 4, Rivera Street File at Wron File 01-69 (no reference to Lopez exculpatory statement); Ex. 16, Wadas File (no reference to Lopez exculpatory statement); Ex. 38, Affidavit of Kenneth Wadas, at JR2379 ¶ 9;Ex. 19A, Wadas Dep at 246:11-249:24.)

**7. Defendants Secure An Identification of Rivera from Orlando Lopez That They Know to Be False**

58.     Despite what Lopez had told them, Defendants, including Guevara and McLaughlin, "did not "want[] to hear what [Lopez] had to say." They did not ask Lopez what happened, or why he thought he had the wrong guy, or what was motivating him. They told Lopez that he should not be afraid to identify Rivera and that they would "protect him" if he went ahead and identified Rivera. (Ex. 20, 2010 Affidavit of Orlando Lopez, Bluhm 44738 at ¶ 14; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 60:10-15.)

59.     Lopez's protestations that Rivera was innocent fell on "deaf ears." Rather than listen to Lopez and take his statements seriously, Defendants Guevara and McLaughlin manipulated and coerced Lopez into going forward with the identification and picking Rivera. (Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 60:6-62:6; Ex. 20, Lopez, Affidavit at ¶ 15; Ex. 6A, Lopez Dep at 100:1-01:12; Ex. 24A, Guevara Dep at 18:17-23, 21:20-24, 22:7-11, 23:3-11, 23:19-24:2, 204:3-8.)

60.     The lineup report of the September 15 lineup made no reference to Lopez's exculpatory statement regarding Rivera and his inculpatory statement regarding the perpetrator being an Imperial Gangster, consistent with Valentin's identification of Jose Rodriguez. (Ex. 4, Rivera Street File at Wron File 49-50.)

### 8. Before Trial, Defendants Fabricate A Description By Lopez That The Shooter Had a Ponytail Dyed Gold

61.     At trial, Lopez testified that the shooter had brown hair, with a ponytail dyed blonde or gold. That testimony was fabricated by Defendants, who fed this description to Lopez and told him to provide this description at trial. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 22:13-19, 41:22-25, Guevara Testimony at 82:11-16; Ex. 24A, Guevara Dep at 204:19-205:1, 381:22-382:5.).)

22

62.     Lopez had never previously made this claim. In the August 29, 1988 police report in which Defendants Leonard and McLaughlin documented their interview with Lopez, there is no such description of the shooter. And nowhere else in the police file is there a description of the shooter as someone with a distinctive dyed hairstyle. (Ex. 4, Rivera Street File at Wron File 29-30; see also Ex. 4, Rivera Street File at Wron File 01-69.)

63.     In fact, Rivera did not have this hairstyle or have any part of his hair dyed. (Ex. 1, Rivera Dep at 301:8-12; Ex. 3, Criminal Trial Transcript, Rivera Testimony at 68:10-13; *id.* at Pastor Rivas Testimony, at 87; *id.* at Osorio Trial Testimony at 91:2-12; Ex. 4, Ex. 4, Rivera Street File at Wron File 37.)

64.     In order to make Lopez's fabricated description into powerful evidence against Rivera at trial, Defendant Guevara then falsely testified at trial that when he arrested Rivera for the murder, he noticed that Rivera had "a little pigtail died in gold" in the back. (Ex. 3, Criminal Trial Transcript Guevara Testimony, at 82:11-16; Ex. 24A, Guevara Dep at 26:15-22, 28:1-11.)

**9.  Defendants Prepare False Police Reports, Include Them In Their Files, and Present Them to Prosecutors**

(a) *Guevara and Gawrys False Closing Report*.

65.     On September 16, 1988, after the victim had died, Defendants Guevara and Gawrys created a police report about investigative steps that occurred earlier in the investigation. They both reviewed it before it was signed. As set forth above, the report is knowingly false. It contains the following statements: (a) that Lopez independently identified Rivera from the Latin Kings mug book; (b) that Felix Valentin identified Rivera out of a mug book at the hospital on September 10, 1988; (c) that Lopez was shown photos of Jose Rodriguez and Felipe Nieves, the members of the Imperial Gangsters that were alternate suspects, and excluded them as being involved in the shooting; and (d) that there was a September 15, 1988 lineup in which Lopez

23

identified Rivera, which by omitting reference to the August 31 lineup implied that Lopez viewed Rivera in a lineup only once, on September 15. (Ex. 4, Rivera Street File at Wron File 09-10; Ex. 25A, Gawrys Dep at 230:18-32:1; Ex. 24A, Guevara Dep at 350:17-24, 352:16-20, 354:20-24; Ex. 76, Guevara Answer to Fourth Interrogatories, No. 3 (asserting Fifth Amendment right in response to question about claim in Sept 16 report regarding Valentin's purported Sept 10 identification) *see* ¶¶ 25-28, 45-60, *supra*.)

66.     The September 16 report was also problematic for facially obvious reasons. For example, it is the only report in the police file in which the date and time of the sergeant's approval is typed in by the reporting officers, Defendants Guevara and Gawrys. On other reports, the date of the sergeant's approval is entered by way of a stamp by the sergeant. Preemptively typing in the date and time of the Sergeant's approval is extremely unusual. (*Compare* Ex. 4, Rivera Street File at Wron File 09 *with, e.g.,* Wron 49, 15, 26, 29; Ex. 25A, Gawrys Dep at 248:1-8.)

       (b) *McLaughlin and Leonard False First Lineup Report*.

67.     On September 1, 1988, Defendants McLaughlin and Leonard created a police report stating that on August 30 at 11pm they, along with Defendants Guevara, Fallon, Sparks and Zacharias, had arrested Jacques Rivera. Other officers had arrested an alternate suspect, Jose Rodriguez. A hold was placed on both Rivera and Rodriguez so that they could participate in a lineup to be viewed by the witness, Orlando Lopez. The report then stated that extensive efforts were made to locate Lopez, but were unsuccessful, and so Lopez did not view a lineup at that time. The report indicates that they instead shifted their focus to conducting a photo lineup with the victim, but that their attempt to show the photos to the victim at the hospital were ultimately unsuccessful given the victim's condition. (Ex. 4, Rivera Street File at Wron File 34-36.)

24

68.     The report is false. Defendant McLaughlin had spoken to Lopez's mother around 11pm on August 30 but he was sleeping at the time, and so Defendants decided to conduct the lineup the next day, August 31. He was then brought to the police station on August 31, 1988, where he viewed a lineup containing Rivera and Rodriguez and selected a filler, after which Rivera and Rodriguez were released. (*See* ¶¶ 29-41, *supra*.) In addition, twelve-year old Orlando Lopez was not hard to find. The police knew that he attended Mozart Elementary School; the shooting occurred on August 27, so Aug 31 was Wednesday; and the police were well aware that a good place to find a juvenile witness is at school. And finally, the statement that the suspects and fillers identified in the report were photographed and then used for a photo lineup that was viewed by the victim at the hospital was also false. Each of the suspects and fillers identified in the report stood in a live lineup at Area 5 on August 31, 1988. (*See* ¶¶ 50-60, *supra*; Ex. 6A, Lopez Dep at 27:2-25 (shooting occurred on August 27, so Aug 31 was Wednesday, and he attended Mozart Elementary School); Ex. 4, Rivera Street File at Wron File 27, 53 (police notes listing "Mozart" under Lopez's name); Ex. 23A, Mingey Dep. at 124:2 (good place to find juvenile witness is at school); Ex. 24A, Guevara Dep at 132:3-10.)

*(c) McLaughlin and Leonard False Report of Lopez Interview*

69.     On August 29, 1988, Defendants Leonard and McLaughlin drafted a police report stating that Lopez had made an identification of Rivera from Latin Kings mug books, and was able to do so because he recognized the shooter as someone who played ball at Humboldt Park. (Ex. 4, Rivera Street File at Wron File 29-30.) This report is false; Defendants fed Lopez the story that the shooter played ball at Humboldt Park and told him who to pick from the lineup. (*See* ¶¶ 25-28, *supra*.)

25

**10. The Police Withhold Substantial Portions of the Police File From Rivera and the Prosecutors, Which is Not Produced In Its Entirety Until This Civil Case**

(a) *The Complete Homicide File Is Suppressed.*

70.     By way of background, there are at least two key sets of police files maintained by the Chicago Police Department relevant to the discussion in this section:

      a.  The file containing the complete set of police records related to the Valentin investigation, including official reports, notes and other documents, was maintained at Area 5, and is what Plaintiff refers to as the street file, and what the City refers to as an Investigative File. That file is Bates-stamped Wron 01-69. (Ex. 4, Rivera Street File at Wron File 01-69; Ex. 12, Brasfield Report at 41, 68-69; Ex. 39A, Hickey Dep at 168:2-22; Ex. 40, Defendant City's Response to Plaintiff's 5th Interrogatories at 1-2.)

      b.  The file containing the complete set of official reports was maintained at the Records Division, and is commonly referred to as the Records Division file or permanent retention file. That file is Bates-stamped Hickey 01-33. (Ex. 42, Hickey 01-33; Ex. 12, Brasfield Report at 68-69.) Ex. 39A, Hickey Dep at 283:22-284:7, Ex. 41, Detective Division Internal Memo In Re Street Files; Ex. 40, Defendant City's Response to Plaintiff's 5th Interrogatories at 1-2.)

71.     In November 1988, well before Rivera's criminal trial, attorney John DeLeon sent a subpoena to the Chicago Police Department for "any and all police reports relating to . . . RD# K371955  [Valentin homicide investigation]," which was stamped as received by the Chicago Police Department's Records Division on November 10, 1988. (Ex. 42, Hickey 31; Ex. 4, Rivera Street File at Wron 1-69 (Valentin-related documents all labeled with RD# K371955); Ex. 50, Subpoena for Documents, *People v. Rivera*.)

26

72.     Rivera's defense attorney for trial was Judge Kenneth Wadas (retired). Wadas believed Rivera was innocent, and as a result Wadas kept his entire file related to the case, and produced it in response to a subpoena from the Defendants in this case as documents Bates-stamped RFC 469-810. The file he kept contains all documents Wadas received in discovery from the prosecutors and the police. (Ex. 19A, Wadas Dep at 47:15-48:6; 49:11-51:16; Ex. 16, Wadas File at RFC 469 (Wadas stating producing entire trial file in response to subpoena); Ex. 16, Wadas File at RFC 469-810.).)

73.     Before Rivera's criminal trial, his attorney, Kenneth Wadas, received 29 pages of police reports of any kind, including notes, in response to his Request for Discovery. They are Bates-stamped RFC 507-535. Those are the only 29 pages of police reports he received in response to his formal discovery motion and his additional requests to the prosecutors. (Ex. , Wadas File, RFC 507-535; Wadas Dep at 242:9-244:22; Ex. 47, Motion for Discovery at RFC 282-286.)

74.     These 29 pages are the same 29 pages of police reports that the Chicago Police Department produced to prosecutors as well. Before trial, Wadas took steps to confirm that he had received a complete police file. He made inquiries to the trial prosecutors, Larry Victorson and Mike Kress, about whether everything had been turned over; they showed him their file and told him that he had received everything they had received. The prosecutors turned over whatever police records they received; they did not hold anything back. (Ex. 19A, Wadas Dep at 86:22-87:10, 94:1-13, , 113:12-114:23, 244:14-22-246:21; Victorson Dep at 30:6-9 ("[Wadas] had everything I had, that I know, I can tell you that."), 32:22-33:24, 34:10-21, 38:13-15("He got everything we had, period.").)

27

75.     What Wadas and the prosecutors actually received is a copy of the Records Division file, or permanent retention file. The permanent retention file – containing only official reports and not general progress reports or other documents in a police file – consists of nearly an identical number of pages as Wadas's file, contains the exact same set of police reports, and like Wadas's file contains no general progress reports. Importantly, every police report in Wadas's file has been stamped – usually near the bottom of the page – with a date; the exact same stamp, in the exact same place, is on the permanent retention file copy of the police reports, but is *not* on the version of the police reports contained in the so-called investigative file kept at area. (Ex. 39A, Hickey Dep at 174:2-6 ("Q: So it appears that somebody has copied and provided to Mr. Wadas documents from the permanent retention file, right? A. Yes, sir."; *compare, e.g.*, Ex. 42, Permanent Retention File at Hickey 15 (permanent retention file version of Page 2 of Sept 1 police report, with datestamp highlighted) *with* Ex. 16, RFC 511 (Wadas version) *with* Ex. 4, Rivera Street File at Wron 35 (street file version) (permanent retention file and Wadas file have upside down datestamp "-3 SEP 1988 11 26" at the bottom; street file version does not); *see also* Ex. 12, Brasfield Report at 69.)

76.     The following documents contained in the street file were not produced to Rivera or his counsel before his criminal trial: WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069.)

77.     This includes Rivera's rap sheet stamped "issued on inquiry," on August 27. It also includes the arrest reports, hold reports and release reports from August 30 and August 31 for Rivera and Jose Rodriguez, as well as the August 31 general progress report listing the participants in the first lineup and the evidence form documenting the placement into evidence of the photographs from that lineup. (Ex. 4, Rivera Street File at Wron File 55; *id.* at 52, 56-59, 62-

64; Ex. 12, Brasfield Report at 86-87; *compare* Ex. Ex. 16, Wadas File, RFC 507-535 *with* Ex. Ex. 4, Rivera Street File at Wron, Wron 01-69.)

78. After Rivera's trial, in December 1996 he sent Freedom of Information Act requests to the Chicago Police Department for police records – including arrest reports, police reports and photographs - related to the Valentin investigation, and in particular the first lineup. When that was rejected, in February 1997 he filed a subsequent writ of mandamus for the same records. (Ex. 43, Jacques Rivera FOIA Requests for Police Reports at JR-L 10492-10503.)

79. None of the requests above resulted in the production of the street file documents. The entire street file, Wron 1-69, was not produced until 2014, in response to civil discovery in this case. (Ex. 12, Brasfield Report at 41, 68-69; Ex. 39A, Hickey Dep at 165:22-169:7; Ex. 40, City's Response to Plaintiff's 5th Interrogatory at 1-2; Ex. Z006, Plaintiff's 3rd Response to City's Interrogatories at 4; Ex. 44, Wronkowski Dep at 66:15-67:8, 70:7-71:5;  Ex. 55, Defendant Guevara's Amended Answers to First Interrogatories, No. 5.)

## H. RIVERA'S WRONGFUL PROSECUTION AND IMPRISONMENT

### 1. Defendants Cause Murder Charges to be Filed Against Rivera

80. On September 15, 1988, after the live lineup on that date, Rivera was placed under arrest and charged for the murder of Felix Valentin. The arrest report was signed by Defendant Guevara, with additional arresting officers including Defendant Gawrys. The arrest report stated the arrest was after a lineup in which the witnesses picked Rivera as the shooter. (Ex. 4, Rivera Street File at Wron File 51.)

81. The same day, charges were approved by Assistant State's Attorney ("ASA") Julie Rosner. The prosecuting witnesses were listed as Defendants Guevara and Gawrys. The felony minute sheet identified the following facts supporting the charges: Rivera "was identified

by photos by the witness Orlando Lopez," and was "positively identified" in a September 15 lineup. (Ex. 4, Rivera Street File at Wron File 48.)

82.     Before approving charges, ASA Rosner would have spoken with the investigators – detectives or gang crimes specialists – to learn what transpired over the course of the investigation, but she does not recall which ones spoke to her in this case. (Ex. 35A, Rosner Dep. at 24:9-20.)

83.     ASA Rosner was not told that Lopez had said before the September 15 lineup that Rivera was the wrong guy, or that there had been an earlier lineup in which Lopez had not selected Rivera. If she had been told either of these things, she would not have approved charges. (Ex. 35A, Rosner Dep. at 18:21-19:14, 19:15-20:2; 20:21-21:10.)

### 2.   Guevara Repeats His False Story to the Grand Jury

84.     On September 27, 1988, Defendant Guevara falsely testified before a grand jury that Rivera was identified by an "eyewitness" – he doesn't say if he is referring to Lopez or Valentin – as the person who shot Felix Valentin. (Ex. 45, JR 1389-93.)

### 3.   Police Investigation Before Criminal Trial

85.     In the period before trial, Defendants Guevara and McLaughlin coerced Lopez to testify falsely at trial against Rivera. Lopez felt that he was coached, and in particular that he was coached to identify the person on trial, Rivera. He said the people who were preparing him for his testimony were the "white haired lady and the cop." As above, (*see* ¶¶ 53-56, *supra*), this is likely a reference to Defendants McLaughlin and Guevara. (Ex. 46, Linzer Dep at 112:13-113:11; Ex. 24A, Guevara Dep at 45:22-26:7, 204:19-205:1.)

### 4.   Wadas's Attempts to Investigate

30

86.     Wadas did everything reasonably possible to defend Rivera. He visited the scene, filed a motion for discovery and answered discovery, viewed the prosecution's file, obtained answers to his discovery, made oral requests for discovery, developed a theory of the case, pursued a potential alibi defense, and spoke to the officer that obtained the identification of Imperial Gangster alternate suspects and subpoenaed him for trial.  He also considered whether to file a motion to suppress, but based on the limited information he had about the second lineup, he determined that there was no viable motion to be filed. He did not know that Lopez had given exculpatory statements before the lineup or that there had been an earlier lineup in which Lopez did not select Rivera. He also took steps to confirm that he had received a complete police file. (Ex. 19A, Wadas Dep at 69:15-70:23, 73:23-75:18, 77:1-19, 86:22-87:10, 93, 230:9-11, 260:5-261:20; Ex. 47, RFC 282-286 (Request for Discovery); Z011, RFC 287 (Answer to Discovery); Ex. 49, Victorson Dep at 77:6-77:12 ("fair and reasonable" for defense attorney to rely on State's answer to discovery); *see* ¶¶ 50-60, 67-68, 73-75,  *supra*.)

87.     The 29 pages of police records Wadas received contained no evidence of a first lineup. Wadas also made specific inquiries about whether there were documents related to a first lineup, and also made requests for any photos of a first lineup. He was told that had received everything, that there were no documents related to a first lineup because one did not exist. He accepted their answer because of the high regard he had for the prosecutors on the other side of the case. Without any photographs or any other documentation related to a first lineup, he had no way to investigate within the police department for a lineup he was told did not exist, and he would not have been able to get information about every lineup that was conducted at Area 5 in that time period. (Ex. 19A, Wadas Dep at 94:10-18, 114:4-23, 172:22-173:5, 245:8-246:21,265:22- 266:11; Ex. 49, Victorson Dep at 39:1-6, 43:4-12.)

31

88.     Although no general progress reports were included in the file, in Wadas' experience it was not unusual to receive no general progress reports in a case because it seemed that police officers stopped taking notes once that requirement came into place, and at that time they were still destroying their notes. He nevertheless asked the prosecutors to confirm that no such documents existed, and they confirmed that he had received everything. (Ex. 19A, Wadas Dep at 86:22--88:9, 245:8-246:2, 254:16-256:7, 265:22-266:11; Ex. 49, Victorson Dep at 30:6-9, 32:22-33:24.)

89.     Lopez was not available to be interviewed by Wadas because he knew, based on his experience, that Lopez would be controlled and that he was never going to be able to talk to Lopez, especially because he was a minor. (Ex. 19A, Wadas Dep at 71:2-16; Ex. Z064, Wasilewski Dep at 249-50.)

### 5.   Rivera's Criminal Trial

90.     Rivera's criminal trial began on April 5, 1990. Testifying witnesses at the trial were Israel Valentin, the brother of the victim, Orlando Lopez, Defendant Guevara, Detective Letrich, Rivera, and by stipulation Defendant Leonard and the medical examiner. In his surrebuttal case, Plaintiff presented two witnesses, Pastor Fernando Rivas and a friend named Guillermo Osorio. He was convicted on July 9, 1990, to 80 years incarceration in the Illinois Department of Corrections for the murder of Valentin, the maximum sentence. Throughout his sentencing, Rivera maintained his innocence.  (Ex. 3, Criminal Trial Transcript 009:1-010:6, 052:23-053:19, 064:14-065:24, 080:15-16, 085:8-13, 089:6-12., Sentencing Transcript at 107:11-14, 114:21-115:1).)

91.     During Lopez's trial testimony, his mug book photo identification of Rivera and his identification of Rivera in a September 15 live lineup were both introduced. A photograph

32

from the September 15 lineup was also introduced as People's Ex. 81, and Lopez placed an "X" over Rivera's head on the September 15 lineup photograph. He also made an in-court identification of Rivera. Lopez was also questioned about whether he actually viewed photos of Imperial Gangsters (to rule out Jose Rodriguez and Felipe Nieves, the Imperial Gangster alternate suspects). And he testified that the shooter had brown hair, with a ponytail dyed blonde or gold. (Ex. 3, Criminal Trial Transcript, Lopez Testimony, at 22:13-19. 29:14-32:19, 41:22-42:5, 42: 22-43:2, 48:9-49:2, 50:19-51:5; Ex. 52, Photos of Sept 15 Lineup.)

92.     Defendant Guevara testified at Rivera's trial about the September 15 lineup and lineup photo (without any reference to Lopez's exculpatory statements immediately prior), and testified that when he arrested Rivera for the murder, he noticed that Rivera had "a little pigtail dyed in gold" in the back. (Ex. 3, Criminal Trial Transcript, Guevara Testimony, at 82:11-16.)

93.     Defendant Leonard testified, by stipulation, about his August 29 police report detailing the interview of Lopez by him and Defendant McLaughlin. Leonard testified that Lopez recognized the shooter as someone who played ball at Humboldt Park, and was therefore able to make an identification from a Latin King mug book. (Ex. 3, Criminal Trial Transcript, Leonard Testimony, at 65:19-22.)

## I.     RIVERA'S POST-CONVICTION PROCEEDINGS, EXONERATION, AND CERTIFICATE OF INNOCENCE

94.     In 2010, the Center on Wrongful Convictions at Northwestern University School of Law had agreed to represent Rivera in his post-conviction proceedings, and set about investigating his case. Among other things, they spoke to Orlando Lopez and developed evidence that during the investigation, and before Felix Valentin even passed away, Lopez had determined that Rivera was the perpetrator, and that he had told this to the police. They also developed evidence that Lopez was fed the story about the shooter playing ball at Humboldt

33

Park, and that Lopez had actually viewed two lineups. (*See* ¶¶ 25-38, 50-60, *supra*; Ex. 5, 2011 PC Hearing Transcript, Raley Testimony at 140:17-141:23; *id.* at Lopez Testimony at 49:6-12, 53:14-54:3, 54:19-55:3, 56:19-57:18, 58:8, 58:17-19, 58:24-59:5, 60:6-15, 61:19-24; 62:7-11, 77:11-13, 83:18-85:21, 93:3-94:3.)

95.     On June 23, 2011 Rivera's evidentiary hearing began before Judge Neera Walsh in Cook County. The Court heard testimony from Orlando Lopez, Defendant McLaughlin, and Cythia Estes. In a written opinion on September 13, 2011, Judge Walsh granted Rivera relief, vacating his conviction and ordering a new trial. Judge Walsh relied primarily on the hearing testimony of Orlando Lopez, stating as follows: "Orlando Lopez testified in an evidentiary hearing on this matter on June 23, 2011. At the hearing, this court had an opportunity to assess his demeanor and tone in determining his credibility, and since then has read and re-read the transcript of his testimony. This court finds that Lopez was credible in his recantation." (Ex. 50, RFC 1063; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony, at RFC 1100, 1170, 1200; Ex. 18, Post-conviction Decision, JR977-984; *id.* at JR983.)

96.     Jacques Rivera has always been completely innocent, and had nothing to do with the tragic death of Felix Valentin. On October 4, 2011, state prosecutors dropped all charges against Rivera. He walked out of prison a free man. (Ex. 51, RFC 1378, 1381; Ex. 1, Rivera Dep at 9; Ex. 2, Rivera COI Opinion.)

97.     In November 2011, Rivera filed a petition for a certificate of innocence pursuant to 735 ILCS 5/2-702. Cook County Judge Michael McHale granted Rivera a certificate of innocence on September 5, 2012. With regard to Lopez's recantation, Judge McHale stated as follows: "After reviewing the trial and post -conviction hearing testimony of Orlando Lopez, the deposition testimony of Investigator Cynthia Estes and the ruling by Judge Walsh, this court

34

finds the recantation of Orlando Lopez to be credible." (Ex. 17, Certificate of Innocence Opinion at JR 972, 964-976.)

## THE CITY'S POLICIES AND PRACTICES

### A.    THE STREET FILES PRACTICE

#### *Chicago Police Department on Notice of Street Files Problem*

98.    In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional street files practice that caused his wrongful prosecution. (*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1073 (N.D. Ill. 1983) (Brzeczek testified at hearing); Ex. 39A, Hickey Dep at 207:15-209:8, *see also* 83:21-24:4 (Brzeczek testified at injunction hearing); Ex. 59, Hickey Testimony from 2016 Fields Trial , at 2012 ("It is true that the City got put on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."), 2019.)

99.    A detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones' criminal defense attorney about the information in the street file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. He then filed a civil lawsuit stemming from the withholding of

35

important investigative information in a street file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining "street files" that were withheld from the State's Attorney's Office and criminal defendants. *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988); Ex. 39A, Hickey Dep at 61:3-23, 63:6-9, 67:9-68:3; Ex. 59, Hickey Testimony from 2016 Fields Trial , at 2012-14; Ex.12, Brasfield Report at 33.)

100.    In April 1982, shortly after the Laverty revelations about street files, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of street files to suppress investigative materials, and days later federal judge Milton Shadur issued a temporary restraining order requiring the CPD to preserve all street files. *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069 (N.D. Ill. 1983); Ex. 39A, Hickey Dep at  69:22-72:2, 83:21-84:10; Ex. 12, Brasfield Report at 34.)

101.    The City became aware immediately that there was substantial resistance within Chicago Police Department to changing the street practice. Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting  "highly relevant and sometimes exculpatory" information that "the preparer does not deem 'pertinent.'"

36

*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069-1073 (N.D. Ill. 1983); Ex. 39A, Hickey Dep at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24; Ex. 12, Brasfield Report at 50-51.)

### *City Investigation Resulting From Jones and Palmer*

102. As a result of the developments in *Jones* and *Palmer*, James Hickey of the Chicago Police Department conducted an  internal review of Chicago Police Department practices related to street files, the results of which he shared with senior Department officials including Chief of Detectives Hardhardt. (Ex. 39A, Hickey Dep at 59: 1-24; 208:17-209:8, 220:11-222:22, 225:19-116:1, 227:3-6; Exs. 12-15 of Ex. 39A, Hickey Dep; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2012:19-2014:7, 2017:12)

103. Hickey's finding was that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. (Ex. 39A, Hickey Dep at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, , 215:10-16:15, 219:9-221:6 ; Ex. 56, April 10, 2014 Hickey Testimony, Fields v. City of Chicago at 2043:22-25; 2044, 2050, 2051:2-5;  Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2014:9-19, 2016:15-21.)

104.     City official were well aware at the time that the street files practice documented above resulted in wrongful prosecutions and convictions. (Ex. 39A, Hickey Dep at 102:2-23, 205:18-206:12; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2019:6-9; *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain street file documents "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").)

### *Special Orders 83-1, 83-2 and 86-3*

105.     Based on Hickey's investigation, in 1983 the Chicago Police Department promulgated Detective Division Special Order 83-1, which was quickly replaced by Special Order 83-2. (Ex. 60, Special Orders 83-1, 83-2; Ex. 39A, Hickey Dep at 225, 227:7-229:6; Ex. 59, Hickey Testimony from 2016 Fields Trial  2024:9-2025:13)

106.     The new Special Order 83-2 created a police document called a General Progress Report, or GPR, on which all notes and memoranda were to be documented. The Special Order required those GPRs to be placed in a so-called Investigative File kept at the Area, rather than in personal files kept on the street by investigators. Special Order 86-3 replace 83-2, but the only substantive change was the addition of an auditing provision. (Ex. 60, Special Order 83-2; Ex. 54, Special Order 86-3; Ex. 39A, Hickey Dep at 100: 9-101:12, 227, 246-47, 249, 174; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2028)

107.     Gang crimes specialists and others participated in homicide investigations, but the new Special Order applied only to detectives. (Ex. 60, SO 83-2 (*Detective Division* Special Order); Ex. 39A, Hickey Dep at 229-31.)

108.     Even though the Special Orders were a response to the failure to disclose documents created during the police investigation to prosecutors and criminal defendants, absent

38

from the new Special Order was any instruction that the general progress reports and other documents in the newly-created Investigative File were to be disclosed to prosecutors and criminal defendants, or any mechanism to ensure that occurred. Indeed, the Special Order expressly stated, "A copy of the [inventory form] will be forwarded to the Records Division" to ensure production to prosecutors and defense attorneys, but contained no instruction to produce or disclose the investigative file or the police records contained therein. (Ex. 60, Special Order 83-2; *see also* Ex. 12, Brasfield Report at 54.)

109.    The clerks in the Subpoena Service Unit were responsible for responding to subpoenas and producing documents to prosecutors and criminal defendants. But, the subpoena clerks received no formal training on how to respond to subpoenas for homicide files. There were also no rules, policies, directives or any other form of written guidance to the subpoena clerks that instructed them to produce the Investigative Files from the Area, or to otherwise ensure that all exculpatory information was produced. As a result, the process of disclosing police records to prosecutors and criminal defendants was *ad hoc*, and described by the City's designee, James Hickey (the same person who created the Special Order), as an "art form." (Ex. 39A, Hickey Dep at 161:10-163:24, *see also* 35-37, 39, 146-48, 159-60, 125, 197-198; Ex. 12, Brasfield Report at 13-14; Ex. 53, City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.)

### *Street Files Practice Continued Unabated*

110.    The Defendants in this case did not get training on the new Special Orders, or any obligation to preserve notes or disclose exculpatory information. (Ex. 26, Leonard Dep at 39-40, 71; Ex. 10, Noon Dep  at 68-69; Ex. 137, Guzman Dep  at 38, 70-71; Ex. 31, Fallon Dep at 66; *see also* Ex. 39A, Hickey Dep at 55:5-24.)

39

111.    No auditing or other steps were ever taken to ensure that the "major change" in practices required by the new Special Order were actually being implemented and followed. (Ex. 39A, Hickey Dep at 244, 247, 249; Ex. 56, April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*, at 2053:24-2054:1; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2036:13-23.)

112.    As a result, the street files practice continued unabated. Rather than checking out the investigative file, where all memos and notes were supposed to be stored and preserved (on general progress reports), detectives reverted back to keeping personal files with their own copies of investigative material. (Ex. 140, Hickey Kluppelberg Dep at 327-29.)

113.    The Defendants in this case admit that they continued the practice of keeping street files containing personal notes and memoranda exchanged between investigators that were not preserved in any official file or disclosed, and instead were destroyed. For example, Defendant Leonard took notes on a pad (not GPRs), and then destroyed his notes. Defendant Gawrys took notes as a gang crimes officer, keeping them in his own personal street file, and then shredding his street file at the end of each investigation. He also wrote notes to the next shift related to ongoing investigations, and at the end of an investigation would take those out of his files and destroy them. Defendant Guzman kept his own notes, would not transfer everything from his notes into his reports, and then would shred his notes. Defendant Fallon took notes in how own personal spiral notebook, and then threw away the notes. Defendant Zacharias would take notes on a piece of paper that was not an official police form of any kind, and then discard his notes. Defendant Mingey, a sergeant overseeing the gang crimes officers that investigated the Valentin homicide, testified that there was no centralized file for an investigation and the specialists instead kept files in their own lockers or elsewhere, and destroyed their notes.  (Ex. 26, Leonard Dep at 69-70; Ex. 25A, Gawrys Dep at 35-37, 188-89, 210-11, 213-14; Ex. 79,

40

Guzman Dep at 68-69; Ex. 31, Fallon Dep at 60-62, 65-66; Ex. 79, Zacharias Dep at 179-81; Ex. 23A, Mingey Dep at 134-37, 148, 149.)

114.    In addition, Defendant Rinaldi, a sergeant overseeing the Valentin investigation, and Defendant Zacharias, a gang crimes specialist, testified about the use of Serafini reports, which were memoranda homicide investigators prepared for the Sergeant containing information about an investigation, such as updates to be communicated to investigators working the next shift. These Serafini reports were posted on a board in the sergeant's office. They were not part of any official file, and were purged. (Ex. 77, Rinaldi Dep at 28:1-30:10, 34:4-36:25, 34:13-16, 102:12-103:2; Ex. 79, Zacharias Dep at 210-213.)

### *Continuation of Street Files Practice Results in Other Wrongful Convictions*

115.    The continuation of the street files practice has resulted in other wrongful prosecutions and convictions in which exculpatory information was withheld from criminal defendants, including for example Nathson Fields and James Kluppelberg. (Ex. 39A, Hickey Dep at 55:5-24; Ex. 62, Kluppelberg Street File; Ex. 63 Fields Street File; Ex. 64, Opinion on Kluppelberg Certificate of Innocence Opinion; Ex. 65 Fields Opinion on Post-Trial Motion; Ex. 12, Brasfield Report, Attachment I at 11, Attachment H at 40-45.)

116.    James Kluppelberg was convicted for a 1984 fire that killed six people, and later exonerated for that crime. In 2014, during Kluppelberg's subsequent civil case, anew file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area Three investigation, and included critical exculpatory information such as handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes (undermining the arson determination and supporting the evidence that the fire was accidental); numerous references to individuals

41

who had had arguments or fights with the victims; and a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby just hours before the fire for which Kluppelberg was convicted. Ramos also reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires. (Ex. 62, Kluppelberg Street File; Ex. 63, Opinion on Kluppelberg Certificate of Innocence Opinion; Ex. 12, Brasfield Report, Attachment I, at 11)

117. Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman. Fields' conviction was thrown out after a court granted his petition for post-conviction relief; he was re-tried in 2009 and acquitted. During discovery in his subsequent civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders was located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors. The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. It also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect in any of the street file documents. (Ex. 63, Fields Street File; *see also* Ex. 12, Brasfield Report at 67-68.); Ex. 65, Fields Opinion on Post-Trial Motion; Ex. 12, Brasfield Report, Attachment H at 40-45.)

118. In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded

Mr. Fields compensatory damages of $22 million. Discovery in *Fields* revealed dozens of other street files in the Area Central basement. (Ex. 67, Brasfield Summary of Voluminous Records -- Comparing Basement, Criminal Defense and Permanent Retention Files) At the trial in Mr. Fields' case, additional evidence in support of the conclusion that the City had a street file practice was presented, including the following:

a. Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for reporting missing investigative materials. (See *Fields v. City of Chicago,* Case No. 10 C 1168, Dock. No 1185-10 at 122:5-21, 127:11-128:3, 131:25-132:16; 1185-22 at 124:25-125:23; 1185-7 at 103:5-8, 112:3-9; 1185-16 at 31:2-9, 31:23-25, 32:14-24, 52:5-112; 1185-29 at 85:8-86:7, 95:22-96:5, 97:2-19; 1185- 27 at 137:5-22.)

b. Street files were kept and suppressed in violation of *Brady* in the cases of Jon Fulton, Timothy Malone, and James Crockett, *Fields v. City of Chicago,* Case No. 10 C 1168, Dock. No 1185- 15 at 12:3-14:15, 17:1-21:12, 18:10-17; 1185- 18 at 111:2-115:18; 1185-32 at 111:6-18; 1185-30 at 69:8-21; 1185- 20 at 58:1-61:1; 1185-32 at 29:13-31:8, 31:9-34:5]

### Report of Plaintiff's Retained Expert Michael Brasfield

119.    Plaintiff retained Michael Brasfield, a police practices expert, to review the Chicago Police Department's policies and practices related to the creation, maintenance, storage,

43

preservation, and disclosure of investigative materials in homicide cases. In addition to reviewing the relevant Special Orders, deposition testimony, and many other documents, In order to assess the Chicago Police Department's practices and adherence to its policies, Brasfield also reviewed and analyzed the 138 homicide files disclosed in this case, and compared them to available permanent retention files, criminal defense files and prosecutor files. (Ex. 12, Brasfield Report at 1-2, 40-42, Ex. B to Brasfield Report (materials reviewed).)

120.     Brasfield spent 41 years as a law enforcement officer. In 1969, he joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief of police. As a sergeant, he served in patrol, the tactical squad, and internal investigations.  As a lieutenant, he served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years.  As a captain, he had responsibility for over 250 officers and served as the commander of the Internal Investigations section of the Seattle Police Department.  He was the major in command of the inspectional services division responsible for developing, implementing, and monitoring departmental policies and procedures. And his last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau, where he was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel, intelligence; crime prevention; communications; records & evidence, which included the maintenance and control of homicide files; data processing; and fiscal, property & fleet management. He went on serve as the Chief of Police of the City of Fort Lauderdale, Florida for six years, retiring in 2001, and then spent another six years serving as the elected Sheriff of Jefferson County, Washington. (Ex. 12, Brasfield Report at 6-8; Ex. 68, Brasfield CV.)

44

121.    Brasfield reviewed the Special Orders promulgated in the wake of *Jones* and *Palmer*, discussed above. He concluded that the policies were deficient on their face to solve the street files problem of which the City was on notice. Among other things, he concluded that the policies (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to record in the official files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation. (Ex. 12, Brasfield Report at 56-58; *see also id.* at 36-40.)

122.    Brasfield also reviewed the Chicago Police Department's efforts to implement the new Special Orders and found that the City failed to provide proper training and oversight to ensure compliance with the Special Orders. He summarized his opinion as follows: "[I]t appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department- wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline when the new special orders were not followed. Based on my review of the record, almost none of this occurred." (Ex. 12, Brasfield Report at 58-59.)

123.    Brasfield also reviewed 190 homicide files from Area 5 for the period 1985-1991, the three-year period surrounding the Valentin homicide. Of those 190 files, 138 came from the

45

CPD records warehouse, where old homicide files are kept for storage. The other 52 homicide files came from file cabinets at Area North in which Area 5 homicide files from 1985-1991 were stored, including the Valentin homicide file produced as Wron 01-69.

124. In addition to the 190 homicide files, Plaintiff's counsel obtained by subpoena criminal defense files corresponding to 44 of the homicide files, and provided them to Brasfield for his review. 132 Chicago Police Department permanent retention files corresponding to the homicide files were also obtained in discovery in this case, and those were also provided to Brasfield for his review. He then analyzed these files independently and comparatively, and reached a number of conclusions. The file-by-file, document-by-document comparison of all of these file types is contained in Attachment G to Brasfield's Report. (Ex. 12, Brasfield Report at 40-42, 49, Attachment G to Brasfield Report.)

125. First, Brasfield analyzed the 190 homicide files themselves to see whether they demonstrated compliance to the new Special Orders. So, for example, the Special Orders require notes and memoranda to be maintained on general progress reports, not notebooks or other documents that police investigators might construe as being "personal property" outside the Department's retention and disclosure requirements; Brasfield analyzed whether this requirement was being followed. Brasfield found that 61% of homicide files contained notes not taken on general progress reports; and 20% of files contained to-from memos not on official police forms. (Ex. 12, Brasfield Report at 59-60.) When considering these and other requirements of the new Special Orders, Brasfield found that 100% of the homicide files he reviewed contained evidence that the special orders were not being followed – that is, they were either lacking inventories, had incomplete inventories, had handwritten notes not on GPRs, or had to-from memos not on GPRs; and most often, some combination of these things. (Ex. 12, Brasfield Report at 62-63.)

46

126.     Second, Brasfield reviewed the permanent retention files, which contain only official reports, standing alone. Based on his review of those permanent retention files, Brasfield opined as follows: the files are "different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged."(Ex. 12, Brasfield Report at 60.)

127.     Third, Brasfield compared the permanent retention files to the homicide files in the 43 cases where he had corresponding files. He found that the files were replete with examples in which information contained in handwritten notes (regardless of whether on general progress reports or scraps of paper) was not transferred into official reports, including information with potential exculpatory value. In addition, more than 50% of the permanent retention files did not contain a copy of the inventory that is supposed to serve as an index of every document placed in the homicide file, a violation of an express requirement in the Special Orders. (Ex. 12, Brasfield Report at 60-61.)

128.     Finally, Brasfield compared the contents of the homicide files to the contents of the criminal defense files to determine if the information contained in the homicide files was being produced to criminal defendants. His file-by-file, document-by-document comparison is contained in Attachment F to his report. Brasfield's finding was that over 90% of the criminal defense files were missing documents contained in the corresponding homicide files. Among other things, he also found that (a) the majority of files contained handwritten notes taken in "unofficial forms" – that is, not on general progress reports – and that 74% of the criminal

47

defense files were missing such handwritten notes; and (b) that approximately 17% of the criminal defense files were missing to-from memos – a classic type of street file document, *see* ¶ 6, *supra* – that were not present in the investigative files. (Ex. 12, Brasfield Report at 42-44, Attachment F to Brasfield Report.)

129.    Brasfield also identified specific examples of files where documents contained in the homicide files and missing from the criminal defense files was potentially exculpatory information of significant investigative value and should have been disclosed. The six examples for which he discussed at length the withheld investigative material that would have aided the defendant and therefore should have been disclosed under standard police procedures, are the following: (1) Records Division # J209456 (Defendants David Quinones, Bruce Andras, Marc Johnson); (2) RD # P526822 (Defendant Miguel Borrotto); (3) RD# J080925 (Defendant Samuel Slack); (4) N028256 (Defendant Jesse Swanigan); (5) RD# M258570 (Defendant Curtis Kirkland); and (6) N162782 (Defendant Tomas Nieves). For each of those six cases, Brasfield reviewed corresponding State's Attorney's Office files. In each of the six cases, the police documents were withheld from the criminal defendant, and were of potential exculpatory value, and were withheld from the prosecutors. (Ex. 12, Brasfield Report at 45-48, 49.)

130.    In further support of his conclusions, Brasfield also relied on and incorporated his review of hundreds of Chicago Police Department homicide files in the case of Nathson Fields. Attachment H to Brasfield's report is a copy of his opinions in the Fields case. In that case, Brasfield reviewed 429 homicide files produced by the Chicago Police Department, as well as 50 corresponding defense attorney files and an additional 27 corresponding permanent retention files. Among other things, his review found that more than 90% of defense attorney files were missing investigative material contained in the homicide file, including 80% of cases in which

48

handwritten notes (not on GPRs) were withheld, approximately 50% of cases in which GPRs were withheld, and approximately 20% of cases in which to-from memos were withheld. (Ex. 12, Attachment H to Brasfield Report; *id.* at 16-17.)

131.     In further support of his conclusions, Brasfield also relied on and incorporated his review of hundreds of Chicago Police Department homicide files in the case of James Kluppelberg. Attachment I to Brasfield's report is a copy of his opinions in the Kluppelberg case. In that case, Brasfield reviewed 164 homicide files produced by the Chicago Police Department. Among other things, his review found as follows: "The case files I reviewed (100%) are replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information. These handwritten notes contained critical investigative information, including: 1) Leads on different or additional avenues of investigation (Bates 120228; 120374); 2) Names or descriptions of possible alternative suspects (Bates 118848); 3) Names or descriptions of additional witnesses (Bates 120368; 120386); 4) Names or descriptions of possible alibi witnesses; 5) References to other CPD or outside law enforcement involvement in the investigation; and 6) Handwritten diagrams, scene and area maps, evidence locations. (Bates 128084; 120221)." (Ex. 12, Attachment I to Brasfield Report; *id.* at 45.)

## B.     FILLER LINEUPS

132.     When a witness identifies filler,that can be highly exculpatory information. It is a greater indicator that a witness is unreliable, and therefore more exculpatory, than when a witness fails to make any identification at all in a lineup; this is because when an eyewitness looks at a lineup and identifies a filler, the eyewitness is saying (in effect) that the filler looks more like the culprit than does the suspect (Ex. 39A, Hickey Dep at 262:12:24; Ex. 69, Wells Report at 15.)

49

133.     The City of Chicago's policy regarding lineup procedures, effective at the time of the Valentin investigation, was General Order ("GO") 83-5. That policy did not provide guidance on what had to be reported in the event of a lineup procedure in which a filler was selected. Likewise, neither that policy nor any other policies in effect in 1988 governed the conduct of photographic lineups. (Ex. 70, General Order 83-5 (no instructions for filler identifications, no instructions for photo lineups); Ex. 12, Brasfield Report at 19; Ex. 39A, Hickey Dep at 84:20-24, 254:23-256:2; 264:19-265:19; Ex. 25A, Gawrys Dep at 48:14-16 (learned by watching others); Ex. 71, Spratte Dep at 229:21-230:5.)

134.     The City designated James Hickey to provide binding testimony on behalf of the Chicago Police Department regarding policies, procedures, and practices concerning the conduct of lineups in the late 1980s, the period of the Valentin investigation. Hickey testified that the policy and practice at the time was that a photographic record would not be made of a lineup in which a filler was selected, and further, that if a filler was identified there would be no documentation of the fact that the witness had identified someone. Several of the Defendants in this case confirmed this was the practice. (Ex. 39A, Hickey Dep at  254:23-255:8, 261:10-262:6, 264:11-265:19; see also Ex. 72, Weingart Dep at 42:25-43:18 (filler documented as negative identification), 59:12-22 (negative identification means no identification); Ex. 25A, Gawrys Dep at 58:23-59:2; Ex. 33, Boyle Dep at 34:4-13, 36:7-11.)

135.     The parties reviewed 435 homicide investigative files stored in the records division of the Chicago Police Department warehouse. The 435 files represent all of the investigative files stored at the Records Division of the Chicago Police Department for homicides committed between January 1, 1985, and December 31, 1991, within Area 5 of the Chicago Police Department. The parties agreed that these 435 files were a representative sample

50

of the City's policies, practices, or customs for documenting live, in-person, and photographic lineups on a City-wide basis, including all of the Areas. Of the 435 homicide investigative files reviewed, 138 of them involved at least one live, in-person, or photographic lineup, and those 138 files were produced to all parties for analysis. (Ex. 73, Stipulation of Parties dated June 11, 2015.)

136.    The parties stipulated that these files were representative of the City's policies and practices citywide for the relevant time period. (Ex. 73, Stipulation of Parties dated June 11, 2015.)

137.    The City was asked to identify a single file—from anywhere at any time—in which a lineup report reflected the identification of a filler. (Ex. 74, Doc. No. 64, Plaintiff's Motion to Compel Regarding Filler Lineups (describing the history of this issue and Rivera's discovery requests].) The City responded that it would identify such a file if it found it, and it never updated that response. (Ex. 75, City Supplemental Response to Plaintiff's First Interrogatories, Request No. 14, July 2013.)

138.    Plaintiff retained Gary L. Wells, Ph.D., Distinguished Professor of Psychology at Iowa State University and the Stavish Chair in the Social Sciences at Iowa State University. He is an expert in social influence, human memory, and judgment in general, and eyewitness identification evidence in particular, and has published over 125 peer-reviewed publications reporting on his studies of eyewitness identification since 1978 and has received several national awards for this work. (Ex. 69, Wells Report at 1 *id* at Wells CV.)

139.    Plaintiff's counsel reviewed the 138 homicide investigative files and compiled the lineup results into a spreadsheet. Dr. Wells received all of the underlying files, and spot checked the spreadsheet for accuracy. Dr. Wells then reviewed the data collected from Chicago Police

51

Department files for the 138 homicide cases that involved eyewitness identification evidence to determine whether the rates of the eyewitnesses making positive identifications of suspects, tentative positive identifications of suspects, no identification of anyone in the lineup, or identifications of a filler (based on what was reported in the case files) were within expected and reasonable numerical ranges. (*Id.* at 2.)

140.    Dr. Wells found that the Chicago files showed a total absence of any filler identifications reported on an official or ancillary lineup report. In all of the thousands of pages of police files reviewed, there were only two pages that contained vague references to possible filler identifications, and these were mentioned in documents that were not police reports and that did not actually report the results of lineups. Notably, in both of those cases the official lineup reports did not report the filler identifications. (Ex. 69,  Wells Report Exhibit C,  RD# G159909 at RFC 2775-76, 2914, 2866-67, RD #K466033 at RFC 8484-85, 8529-30)

141.    In total, Dr. Wells reviewed 980 eyewitness identification attempts in the police reports of lineups that were included in the files produced by Chicago. Based on peer-reviewed published field studies across many jurisdictions, there should have been anywhere between 232 and 321 filler identifications found in these police reports. The absence of filler identifications in these police reports cannot be due to chance, and instead is the result of the result of a policy or practice of the detectives in these cases not reporting filler identifications.  (Id. at 3.)

142.    Controlled studies in psychological science indicate that people commonly make mistakes in attempting to identify a person they encountered previously. There is no single rate of mistaken identification, but instead mistaken identification rates vary as a function of a large number of variables relating to the three stages of memory, namely acquisition, retention, and retrieval. The reliability of an identification depends critically on factors such as view and

52

attention (acquisition variables), events that occur between witnessing and attempting to identify (retention variables), and the manner in which the identification test is administered (retrieval variables). All three factors (acquisition, retention, and retrieval) are necessary for successful retrieval of an accurate memory. In other words, a problem at the level of any one of these factors is sufficient to make a memory fail. At acquisition, for instance, stress and fear reduce the amount of information that is processed, thereby severely restraining what can be retained and what can be retrieved. As a result, encountering a person under stressful or fearful conditions increases the chances that the witness will later make a mistaken identification. (Id. at 3-4.)

143. There are now also eleven major studies that are published in peer-reviewed scientific journals that have tracked the outcomes of lineups conducted by police in actual cases across a broad number of jurisdictions, including Northern California, San Diego, Houston, TX, Tucson, AZ, Austin, TX, Charlotte, NC, and London, England. Collectively, these eleven field studies include over 6,000 eyewitness attempts to identify a perpetrator from a lineup. (Id. at 4-5.)

144. One of the core elements of each of the peer-reviewed studies of outcomes in actual police lineups is obtaining data on the rates at which eyewitnesses identify the suspect in a lineup (who might or might not be the guilty person), identify fillers (known-innocents who are placed in the lineup for the purpose of making it fair to the suspect), or make no identification. (Id. at 5.)

145. Taken in the aggregate, in the eleven peer-reviewed studies there were 6,734 attempts by eyewitnesses to identify perpetrators from lineups. Among the 6,734 attempts by eyewitnesses to identify the perpetrator from a lineup, 2,746 (40.8%) identified the suspect, 1,599 (23.7%) identified a known-innocent filler, and 2,389 (35.5%) identified no one. In other

words, on average a lineup filler is selected 24% of the time; and for every one suspect identification that occurs, we would expect about .58 filler identifications (i.e., 1,599 filler IDs divided by 2,746 suspect IDs). (Id. at 6-7.)

146.    The 138 Chicago Police Department files that were reviewed consist primarily of two categories of reports documenting identifications: (1) 211 official lineup reports, 209 of which were live lineups; and (2) 175 ancillary reports, 257 of which were photo lineups. (Id. at 7.)

147.    Beginning with the official lineup reports, some lineup reports document lineups viewed by more than one witness, or involving more than one suspect. As a result, the 211 official lineup reports contained 666 possible identifications of suspects (total number of witnesses x total number of suspects). The outcomes of the 666 possible identifications of suspects in Chicago, and as compared to outcomes from published field studies, are reported by Dr. Wells as follows:

| Comparison: | Field | | Chicago | |
|---|---|---|---|---|
| Suspect | 2746 | (40.8%) | 364 | (54.6%) |
| Filler | 1599 | (23.7%) | 0 | ( 0.0%) |
| No pick | 2389 | (35.5%) | 213 | (32.0%) |
| No outcome rep'd | 0 | | 89 | (13.4%) |
| Total | 6734 | | 666 | |

(*Id.* at 7.)

148.    Using these data, Chi-Square tests were used to compare the published field studies to the Chicago results on filler identification rates to test the statistical significance of the findings by determining a probability (called a p-value) that the two samples would yield the difference being observed based on mere chance. The results of the Chi-Square test on the data above results in a p-value of less than .0001, meaning that there is less than one chance in 10,000

54

that obtaining zero filler identifications in 666 lineups could have been due to mere chance. (Id. at 8.)

149.    Turning to the ancillary reports, there were 314 total witness attempts.  The outcomes of the 314 possible identifications of suspects in Chicago, and as compared to outcomes from published field studies, are reported by Dr. Wells as follows:

| Comparison: | Field | | Chicago | |
|---|---|---|---|---|
| Suspect | 2746 | (40.8%) | 190 | (60.5%) |
| Filler | 1599 | (23.7%) | 0 | (0%) |
| No pick | 2389 | (35.5%) | 100 | (31.8%) |
| No outcome rep'd | 0 | (0%) | 24 | (7.6%) |
| Total | 6734 | | 314 | |

(*Id.* at 9-10.)

150.    Using these data, the results of the Chi-Square test on the data above results in a p-value of less than .0001, meaning that there is less than one chance in 10,000 that obtaining zero filler identifications in 314 lineups could have been due to mere chance. (Id. at 10.)

151.    Based on field studies, of the 980 total eyewitness attempts in the Chicago case files studied in this case, one would have expected to see filler identifications totaling in the range of 232 (23.7% of 980) and 321 (554 identifications of suspects x .58). (Id. at 12.)

152.    Dr. Wells concluded that the Chicago Police Department's total or near total absence of documented filler identifications indicated that there was a policy or practice of not reporting filler identifications.  (*Id.* at 12-13.)

## C.    Failure to Discipline

153.    Juan Johnson: In 1989, Detective Guevara framed Juan Johnson for murder by coercing Samuel Perez into falsely implicating Johnson. To accomplish this feat, Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan

55

Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer. (See Ex. 80, Testimony of Samuel Perez, *People v. Johnson*, 89 CR 21806, at Bluhm 008131-48). Juan Johnson was later exonerated and Johnson sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. (See Ex. 81, Jury Verdict in *Johnson v. Guevara*, 05 C 1042). Guevara has taken the Fifth in regard to all allegations regarding Juan Johnson. (Ex. 24A, Guevara Dep, at 398-402).

154. Bill Dorsch: In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. (See Ex. 82, Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873 at JR-L 076819, JR-L 076824-48). Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. (*Id.*) Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was shooter. (*Id.*) Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. (*Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32). Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. (Ex. 24A, Guevara Dep, at 402-15).

155. Serrano & Montanez: In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano and

56

Jose Montanez. When Vicente initially refused to cooperate, Guevara hit him in the head and promised him money and a favorable disposition on unrelated pending charges. Guevara then provided Vicente with the details of the crime. (See Ex. 83, Affidavit of Francisco Vicente, at ¶¶4-14). In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez. As a result, Rankins testified falsely against the men in the Grand Jury. (See Ex. 84, Testimony of Timothy Rankins in *People v. Serrano*, 93 CR 18173, at JR-L 02899-912). The City of Chicago has since determined that Montanez and Serrano were wrongfully convicted. (*See* Ex. 85, Lassar Report Dated 3/3/15, at CCSAO 0046156). In 2016, both men were exonerated and received certificates of innocence. (See Ex. 86 and Ex. 87, Certificates of Innocence for Jose Montanez and Armando Serrano). Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. (Ex. 88, Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173, at JR-L 077138-43, JR-L 077148-62).

156. Robert Bouto: Also in 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. (*See* Ex. 89, Affidavit of Rey Lozada, at ¶¶ 3-5, 6-11; Ex. 90, Affidavit of Carl Richmond, at ¶¶ 5, 7-9). Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. (*See* Exhibit 91, Lassar Report regarding Robert Bouto Dated 3/3/15, at JR-L 055738-39). Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. (Ex. 24A, Guevara Dep, at 560).

157.     Almodovar & Negron: The City of Chicago has also determined that Roberto Almodovar was wrongfully convicted in another case investigated by Guevara in 1994. (*See* Ex. 92, Lassar Report regarding Roberto Almodovar, Dated 2/9/15, at JR-L 042869, JR-L 042882). In that case, Guevara was alleged to have framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a line-up without any influence by Guevara. (*See* Ex. 93,  Affidavit of Melinda Power; Ex. 94, Post-Trial Testimony of Kennelly Saez in People v. Negron, 94 CR 24318). Almodovar, and his co-defendant William Negron, have both since been exonerated. (*See* Ex. 95, Order Vacating Judgment and Sentence in *People v. Negron*, 94 CR 24318 ). Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron. (Ex. 24A, Guevara Dep, at 434-39).

158.     Solache & Reyes: In 1998, Detective Guevara repeatedly struck Gabriel Solache on the side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop.  Solache sustained permanent hearing loss to his left ear as a result of his abuse. (*See* Ex. 96, Suppression Hearing Testimony of Gabriel Solache, *People v. Solache & Reyes*, 98 CR 12440, at Bluhm 018579, 018586-97). In that same investigation, Detective Guevara repeatedly threatened and beat Arturo Reyes in an attempt to coerce Reyes into falsely implicating himself.  After two days of isolation and interrogation, Reyes finally gave in and falsely confessed.  (*See* Ex. 97, Suppression Hearing Testimony of Arturo Reyes, *People v. Solache & Reyes*, 98 CR 12440 ,at Bluhm 018478, 018482-502). The City of Chicago subsequently determined that Solache and Reyes were abused during their interrogations and that

58

their convictions should not stand. (*See* Ex. 98, Lassar Report Regarding Solache and Reyes, Dated 12/12/14, at CCSAO 0043666-67). Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes. (Ex. 99, Testimony of Reynaldo Guevara in People v. Arturo Reyes & Gabriel Solache, 98 CR 12440, at JR-L 049858-65).

159.    Guevara's Criminal Activity: The FBI authored a 302 report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Detective Guevara, in the 1980s and 1990s.  The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble."  Guevara also took bribes to alter the results of lineups.  Guevara, using an attorney as a conduit, would also receive cash in exchange for the dismissal of murder cases he investigated.  (See Ex. 100, FBI Report Dated June 23, 2001 at JR-L 02444-45). Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302. (Ex. 24A, Guevara Dep, at 418-26).

160.    Dozens of Other Instances of Guevara Misconduct:  In 1982, Guevara physically assaulted Annie Turner by hitting her across the face with a metal bracelet and called her a "nigger bitch;" although Ms. Turner complained to OPS, no discipline was imposed on Guevara; (*See* Ex. 101, Testimony, Medical Records, and OPS Complaint of Annie Turner); In 1982, Detective Guevara broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home; again, Ms. Lloyd complained to OPS, but no discipline was imposed; (See Ex. 102, OPS Complaint of Almarie Lloyd, Testimony of Almarie & Job Lloyd, *Hunt v. Jaglowski*, 85 C 1976); In 1983, Guevara and others beat Leshurn Hunt until he confessed to murder; that statement was suppressed and Mr. Hunt sued Guevara and complained to OPS about Guevara's misconduct;  (*See* Ex. 103, Affidavit of Leshurn Hunt; Ex. 104, Testimony of Leshurn Hunt in *Hunt v. Jaglowski*, 85 C 1976, at Bluhm 038527, 038539-89, 038609-12; Ex.

59

105, Letter from Leshurn Hunt to Eugene Hudson, Dated 2/28/86); In 1984, Guevara physically assaulted Graciela Flores; (*See* Ex. 106, Testimony of Graciela Flores & Anna Flores, *Hunt v. Jaglowski*, 85 C 1976); In 1985, Detective Guevara used threats and violence to attempt to coerce a false identification from Reynaldo Munoz; (*See* Ex. 107, Affidavit of Reynaldo Munoz); In 1986, Guevara beat Rafael Garcia, and the City's OPS found that Guevara had lied about the incident and recommended that Guevara be suspended; (*See* Ex. 108, OPS Complaint of Rafael Garcia); In 1986, Guevara coerced a confession from Daniel Pena by beating him; (*See* Ex. 109, Testimony of Daniel Pena, Armador Rivera, and Jamie Velez in *People v. Pena*, 86 CR 1458); In 1986, Guevara called Melvin Warren a "nigger dog" and beat him, and the City's OPS initially sustained Warren's allegations, recommending a five-day suspension, but OPS later downgraded the discipline to a reprimand for calling a citizen "nigger;" (*See* Ex. 110, OPS Complaint and Testimony of Melvin Warren, *Hunt v. Jaglowski*, 85 C 1976; Ex. 111, OPS Report and Findings regarding Warren Hunt); In 1989, Guevara coerced a false confession from Victor Vera; (See Ex. 112, Affidavit of Victor Vera); In 1989, Guevara coerced Virgilio Muniz to falsely implicate Manuel Rivera (See Ex. 113, Affidavit of Virgilio Muniz); in 1989, Guevara threatened Virgilio Calderon Muniz (unrelated to the Virgilio Muniz) into falsely identifying Victor Vera (See Ex. 114, Affidavit & Testimony of Virgilio Calderon Muniz); in 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos; (*See* Ex. 115, Testimony of Wilfredo Rosario & Appellate Court Opinion, *People v. Arcos*, 91 CR 743)2; In 1991, Guevara coerced David Rivera falsely confessing to murder; (*See* Ex. 116, Affidavit of David Rivera); In 1991, Detective Guevara coerced a false confession from Daniel Rodriguez; (*See* Ex. 117, Affidavit of Daniel Rodriguez); In 1991, Guevara physically coerced sixteen year-old David

---

[2] Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996).

Velazquez into falsely identifying Daniel Rodriguez; (*See* Ex. 118, Testimony of David Velazquez in People v. Velazquez, 91 CR 13938); In 1991, Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup; (*See* Ex. 119, Affidavits of Efrain & Julio Sanchez, Police Reports from *People v. Colon*, 93 CR 23750); In 1992, Guevara obtained an involuntary confession from 15 year-old Jacqueline Montanez; *see People v. Montanez*, 273 Ill. App. 3d 844, 855 (1st Dist. 1995); In 1993, Guevara tried to coerce 15 year-old Eleizar Cruzado into implicating himself in a murder; (*See* Ex. 120, Suppression Hearing Testimony of Eleizar Cruzado, *People v. Cruzado*, 93 CR 24896); In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz; (*See* Ex. 121, Affidavit of Adolfo Frias Munoz); In 1994, Guevara used violence to coerce a confession from Adrian Duta; (*See* Ex. 122, Affidavit of Adrian Duta); In 1995, Guevara and others coerced an involuntary confession from Santos Flores; *see People v. Flores*, 315 Ill. App. 3d 387, 393-94 (1st Dist. 2000); In 1995, Guevara coerced Evelyn Diaz into falsely identifying Luis Serrano; (*See* Ex. 123, Deposition of Evelyn Diaz, *Johnson v. Guevara*, 05 C 1042); In 1995, Guevara told Luis Figueroa to falsely identify Angel Diaz; (*See* Ex. 124, Testimony of Luis Figueroa, *People v. Diaz*, 95 CR 610901 & Supplemental Police Report); In 1995, Guevara coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores; (*See* Ex. 125, Deposition of Gloria Ortiz Bordoy, *Johnson v. Guevara*, 05 C 1042); In 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez; (*See* Ex. 126, Affidavit of Rodolfo Zaragoza); In 1995, Guevara told Jose Melendez to falsely identify Thomas Sierra; (*See* Ex. 127, Testimony of Jose Melendez, *People v. Sierra*, 95 CR 18601); In 1996, Guevara coerced Maria Rivera into falsely identifying Angel Gaya and all charges were later dropped in the case (*See* Ex. 128, Suppression Hearing Testimony of Maria Rivera, *People v. Solache and Reyes*, 98 CR 12440); In 1997, Guevara coerced Robert Ruiz into

61

falsely identifying Freddy and Concepcion Santiago as the murderers of Guevara's nephew; (*See* Ex. 129, Testimony of Robert Ruiz, *People v. Santiago & Santiago*, 97 CR 20973); In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not; (*See* Ex. 130, Post-Conviction Petition in *People v. Gomez*, 97 CR 18961); In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room; (*See* Ex. 131, Affidavit of Jed Stone); In 1998, Guevara used violence against Rosauro Mejia in an attempt to coerce a confession from him; (*See* Ex. 132, Suppression Hearing Testimony of Rosauro Mejia, *People v. Solache & Reyes*, 98 CR 12440); In 1998, Guevara used violence against Adriana Mejia during her interrogation; (See Ex. 133, Suppression Hearing Testimony of Adriana Mejia, *People v. Solache & Reyes*, 98 CR 12440); In November 2001, Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and conferred with Guevara; (*See* Exhibit 91, Lassar Report regarding Robert Bouto Dated 3/3/15).

161. Detective Guevara has refused to testify about his interactions with: Anna Flores (Ex. 88, Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173, at JR-L 077143, JR-L 077171-72; Ex. 99, Testimony of Reynaldo Guevara in P*eople v. Arturo Reyes & Gabriel Solache*, 98 CR 12440, at JR-L 049883-85), Graciela Flores (Ex. 88 at JR-L 077143, JR-L 077171-72; Ex. 99 at JR-L 049883-84), David Velazquez (Ex. 88 at JR-L 077143, JR-L 077168-71; Ex. 99 at JR-L 049873-75), Efrain Sanchez (Ex. 88 at JR-L 077144, JR-L 077172-73), Julio Sanchez (Ex. 88 at JR-L 077144, JR-L 077173-74), Adolfo Frias Munoz (Ex. 88 at JR-L 077144-45, JR-L 077174-75; Ex. 99 at JR-L 049869-70), Jose Melendez (Ex. 88 at JR-L 077145, JR-L 077177-79; Ex. 99 at JR-L 049886, JR-L 049888), Gabriel Solache (Ex. 88 at JR-L 077145-46; Ex. 99 at JR-L 049861-64), Arturo Reyes (Ex. 88 at JR-L 077146; Ex. 99 at JR-L

62

049858-61, JR-L 049893-94), Virgilio Muniz (Ex. 88 at JR-L 077147, JR-L 077180), Luis

Figueroa (Ex. 88 at JR-L 077176; Ex. 99 at JR-L 049890-92), Angel Diaz (Ex. 88 at JR-L

077176-77; Ex. 99 at JR-L 049891-92, JR-L 049894), Wilfredo Rosario (Ex. 88 at JR-L 077181-

82), Xavier Arcos (Ex. 88 at JR-L 077182; Ex. 99 at JR-L 049880-81), Gloria Ortiz Bordoy (Ex.

88 at JR-L 077182-83), Robert Ruiz (Ex. 88 at JR-L 077184; Ex. 99 at JR-L 049877-79),

Leshurn Hunt (Ex. 99 at JR-L 049867-68), Adrian Duta (Ex. 99 at JR-L 049868-69), Voytek

Dembski (Ex. 99 at JR-L 049871-72), Daniel Pena (Ex. 99 at JR-L 049875-77), Annie Turner

(Ex. 99 at JR-L 049881-82), and Thomas Sierra (Ex. 99 at JR-L 049887-88).


Respectfully Submitted,
PLAINTIFF JACQUES RIVERA

By   /s/ Steven Art
One of his attorneys


Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Elizabeth Mazur
Anand Swaminathan
Steven Art
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576


## CERTIFICATE OF SERVICE

I, Steven Art, an attorney, certify that on September 19, 2017, I served Plaintiff's

Combined Response Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts Opposing Motions for Summary Judgment of Individual Defendants and Defendant City of Chicago on all counsel of record.

/s/ Steven Art
*Counsel for Jacques Rivera*

*Attorneys for Defendants Guevara, Gawrys, Noon, Guzman, Fallon, Sparks, Zacharias, McLaughlin, Leonard, Mingey, Weingart, and the Estate of Rocco Rinaldi*

James G. Sotos
Elizabeth A. Ekl
Jeffrey N. Given
Caroline P. Golden
The Sotos Law Firm
550 E. Devon Ave., Suite 150
Itasca, Illinois 60143

*Attorneys for Defendant City of Chicago*

Eileen E. Rosen
John J. Rock
Silvia M. Masters
Stacy A. Benjamin
Erin N. Bybee
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000

64